# BCI EXHIBIT

# 56

Page 1

1

2                    UNITED STATES BANKRUPTCY COURT

3                    SOUTHERN DISTRICT OF NEW YORK

4

5        In re:                      )

                                     ) Chapter 11

6        LEHMAN BROTHERS             ) Case No. 08-13555(JMP)

                                     )

7        HOLDINGS, INC., et al.,     )

                                     )

8                    Debtors.        )

         -------------------------)

9

10

11

12

13

14            HIGHLY CONFIDENTIAL DEPOSITION OF

15                   ALASTAIR BLACKWELL

16                  New York, New York

17                Friday, August 7, 2009

18

19

20

21

22

23       Reported by:

24       KRISTIN KOCH, RPR, RMR, CRR, CLR

25       JOB NO. 24037

## Page 2

```
 1
 2
 3
 4                    August 7, 2009
 5                    9:21 a.m.
 6
 7
 8          Deposition of ALASTAIR BLACKWELL,
 9    held at the offices of JONES DAY, LLP, 222
10    East 41st Street, New York, New York,
11    before Kristin Koch, a Registered
12    Professional Reporter, Registered Merit
13    Reporter, Certified Realtime Reporter,
14    Certified Livenote Reporter and Notary
15    Public of the State of New York.
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2    A P P E A R A N C E S :
 3
 4
 5    JONES DAY, LLP
 6    Attorneys for Lehman Brothers, Inc.
 7       222 East 41st Street
 8       New York, New York 10017-6702
 9    BY:   WILLIAM J. HINE, ESQ.
10          GEORGE E. SPENCER, ESQ.
11
12
13    BOIES, SCHILLER & FLEXNER, LLP
14    Attorneys for Barclays and Alastair
15    Blackwell
16       5301 Wisconsin Avenue, N.W.
17       Washington, D.C. 20015
18    BY:   JONATHAN M. SHAW, ESQ.
19
20
21    QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
22    Attorneys for Creditors Committee
23       51 Madison Avenue
24       New York, New York 10010
25    BY:   ROBERT K. DAKIS, ESQ.
```

## Page 4

```
 1
 2    A P P E A R A N C E S :  (Continued)
 3
 4
 5    JENNER & BLOCK LLP
 6    Attorneys for Examiner
 7       330 North Wabash Avenue
 8       Chicago, Illinois 60611-7603
 9    BY:   ROBERT L. BYMAN, ESQ.
10
11
12    HUGHES HUBBARD & REED LLP
13    Attorneys for SIPA Trustee
14       One Battery Park Plaza
15       New York, New York 10004-1482
16    BY:   SETH D. ROTHMAN, ESQ.
17          NEIL J. OXFORD, ESQ.
18          AMINA HASSAN, ESQ.
19
20
21    ALSO PRESENT:
22
23       RAJESH ANKALKOTI, Alvarez & Marsal
24
25
```

## Page 5

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED
 3    by and between the attorneys for the
 4    respective parties herein, that filing and
 5    sealing be and the same are hereby waived.
 6          IT IS FURTHER STIPULATED AND AGREED
 7    that all objections, except as to the form
 8    of the question, shall be reserved to the
 9    time of the trial.
10          IT IS FURTHER STIPULATED AND AGREED
11    that the within deposition may be sworn to
12    and signed before any officer authorized
13    to administer an oath, with the same
14    force and effect as if signed and sworn
15    to before the Court.
16
17
18
19
20                  - oOo -
21
22
23
24
25
```

## Page 6

1
2  A L A S T A I R   B L A C K W E L L,
3      called as a witness, having been duly sworn
4      by a Notary Public, was examined and
5      testified as follows:
6  EXAMINATION BY
7  MR. HINE:
8      Q.   Good morning, Mr. Blackwell.
9      A.   Good morning.
10     Q.   How are you?
11     A.   Very good, thanks.
12     Q.   I am sure your counsel has told you
13  what's going on here today, but we are here
14  taking a deposition involving the Lehman
15  bankruptcy proceedings.
16          My name is Bill Hine and I am from
17  Jones Day, which is the firm that's special
18  counsel to LBHI. Several of the other counsel
19  along the table will introduce themselves
20  later, but they represent various entities that
21  are involved in this proceeding.
22          So the way this is going to work is
23  I am going to ask you a bunch of questions
24  first and they will all take turns with you
25  later as we progress.

## Page 7

1      Blackwell - Highly Confidential
2      A.   Understood.
3      Q.   As we go, I am going to be asking
4  you a series of questions. You are under oath,
5  so you will answer the questions. At some
6  points in time you will hear your counsel state
7  an objection. That doesn't mean you don't have
8  to answer the question. That just means he is
9  either preserving the record or he wants to ask
10 me to clarify the question. If he instructs
11 you not to answer, that's up to you as well,
12 but the mere fact that he makes an objection
13 doesn't mean you don't have to answer the
14 question.
15          In that vein, I'd like to ask you
16 just please ask me to clarify any question
17 where I might misuse an acronym or a word. I
18 feel like I am learning a new language here
19 reading all you folks' e-mail, so I know there
20 is technical financial words that you guys use
21 and you understand readily, but if you need me
22 to clarify one, I want to have a clear question
23 so you can answer it.
24          I think your counsel has probably
25 told you, but you have been designated as a

## Page 8

1      Blackwell - Highly Confidential
2  30(b)(6) witness for a select set of issues in
3  this case and those issues relate to Schedules
4  A and B of the Clarification Letter. We will
5  get to that later, but I just want to let you
6  know that, and that I will alert you to that
7  fact when we get to that portion of the
8  deposition, so in that portion you will be
9  speaking on behalf of Barclays.
10          So I am ready to proceed if you are.
11 Are we ready to do this?
12     A.   Absolutely, yes. Thank you.
13     Q.   Can we start off with a little
14 background information about you.
15          You are currently employed by
16 Barclays Capital; correct?
17     A.   I am, yes.
18     Q.   And what is your present position?
19     A.   I am responsible for the Americas
20 operations department for capital markets.
21     Q.   Okay. And do you have a title?
22     A.   I am a managing director.
23     Q.   When did you start your employment
24 at Barclays?
25     A.   I received a contract after

## Page 9

1      Blackwell - Highly Confidential
2  bankruptcy, I don't know exactly when I signed
3  that, but it would have been, I think, two
4  weeks after bankruptcy that I signed a contract
5  to join Barclays. I wasn't one of those people
6  that received an e-mail and clicked off on it,
7  for instance.
8      Q.   Okay. When did you — that's the
9  contract, we will get to that in a second, but
10 when did you consider yourself a Barclays
11 employee?
12     A.   Post bankruptcy.
13     Q.   Was it upon the closing of the sale
14 transaction?
15     A.   I would think so, yes.
16     Q.   And just as we go forward, if I
17 refer to the sale transaction, can we agree
18 that that will be the transaction that closed
19 on the 22nd of September 2008 whereby certain
20 assets were transferred to Barclays? Can we
21 agree on that?
22     A.   What time is that?
23     Q.   I don't know the time.
24     A.   Midnight from that day.
25     Q.   Okay. So is it fair to say after

Page 10

1    **Blackwell - Highly Confidential**
2    **that day you were a Barclays employee?**
3    A.   Yes.
4    **Q.   Can you just tell me, describe for**
5    **me generally your duties and responsibilities**
6    **in your present position.**
7    A.   There are approximately 900 staff in
8    the Americas and the majority of which are in
9    New York and New Jersey that provide support,
10   and when I say "support," I mean that there is
11   a function to help capture transactions, verify
12   transactions and record them on the books and
13   records of Barclays Capital, or the BCI entity
14   predominantly, and to ensure the securities in
15   cash, consideration is received on these
16   transactions. My responsibility is to manage
17   that across all of the asset classes that
18   Barclays transacts in the region. That does
19   not include the wealth business in the region.
20   The wealth business is a client of BCI. We do
21   provide a shared -- what we would describe as a
22   shared service to provide operational support
23   in the sense that I clear -- our organization
24   clears transactions on behalf of the wealth
25   business.
     TSG Reporting - Worldwide  (877) 702-9580

Page 11

1    Blackwell - Highly Confidential
2        MR. SHAW:  Before you go on, I
3    forgot to put this on the record at the
4    beginning.  Under the protective order I
5    believe the way we were proceeding is we
6    have been designating the entire deposition
7    as highly confidential and then within
8    seven days we re-designate more precisely
9    based on the content.
10       MR. HINE:  That's no problem.
11   **Q.   I think I understood what you just**
12   **told me, but is that different in any way from**
13   **the duties you had when you were with Lehman?**
14   A.   In breadth, yes. It's a narrower
15   remit.
16   **Q.   Excuse me?**
17   A.   It's a narrower remit.
18   **Q.   "Remit" meaning?**
19   A.   My responsibilities were broader at
20   Lehman.
21   **Q.   In what way?**
22   A.   I had global responsibility for
23   operations, for capital markets, and I was also
24   responsible for what was called the IMD
25   division, so that's the investment management
     TSG Reporting - Worldwide  (877) 702-9580

Page 12

1        Blackwell - Highly Confidential
2    division, globally at Lehman Brothers.
3    **Q.   So is the difference in**
4    **responsibility geographic?**
5    A.   Geographic and the fact that it also
6    encompassed the investment management division.
7    **Q.   Okay.**
8    A.   And there are functional
9    definitions -- every firm on Wall Street
10   defines operations slightly differently in
11   terms of content.  So an example would be the
12   treasury function sits in finance in the former
13   Lehman organization, but sits in operations at
14   Barclays Capital. So there are definitional
15   components which would be different, but
16   substantially very similar.
17   **Q.   Who do you report to at Barclays?**
18   A.   I report to Carol Machell.
19   **Q.   Can you spell that?**
20   A.   M-A-C-H-E-L-L.
21   **Q.   Anyone else?**
22   A.   That's my global report. She is
23   based in London. And I report to Gerard
24   LaRocco regionally, who is the regional CAO for
25   the Americas.
     TSG Reporting - Worldwide  (877) 702-9580

Page 13

1    Blackwell - Highly Confidential
2    **Q.   Any other reports that you have?**
3    A.   No.
4    **Q.   And who reports to you in your**
5    **present position?**
6    A.   Again, this is where the functional
7    construct of Barclays is different to Lehman.
8    In my regional role the people with primary
9    responsibility for the products are actually
10   the global heads of the product line, so there
11   was a global head of rates, credit, prime
12   brokerage, equities, et cetera, who have
13   primary responsibility. People who report to
14   me directly are Samantha Hoban, who is the COO
15   for the region, and I have responsibility for
16   tax, that's Lisa Ryer, and Alex Crepeau, who is
17   responsible for regulatory reporting. I also
18   have responsibility for the TSA effort within
19   operations, which it had historically, but we
20   no longer support the LBHI Alvarez Marsal
21   clean-up effort of LBHI. That organization has
22   transitioned in its entirety. That was managed
23   by a gentleman called Greg Eickbush. He is now
24   an employee of LBHI. I still have
25   responsibility for the LBI TSA operations team,
     TSG Reporting - Worldwide  (877) 702-9580

1        Blackwell - Highly Confidential
2    which is led by James Black and informally
3    managed by Alex Crepeau until about a week ago.
4        Q.   When you talk about operations
5    function, is there a component of that of your
6    work that covers valuing or marking assets?
7        A.   I want to be very precise about the
8    way I would describe that. There is a function
9    in operations that values positions, but that's
10   using data, pricing data, that is either
11   purchased from a third party or is consumed
12   from a front office trading source, so we are
13   not determining a valuation on a security. We
14   do not determine valuation.
15       Q.   But you mark the security with this
16   information that you receive from a third
17   source?
18       A.   It's a mechanical process.
19   Inventory, mark, it gives you a result. It's
20   not -- you are not applying any thought to it
21   other than is that actually the security that
22   our mark ties out to.
23       Q.   Could we go back now to your last
24   position you held at Lehman.
25            First of all, how long did you work

1        Blackwell - Highly Confidential
2    for Lehman?
3        A.   I worked for Lehman from November
4    27th, 2000 until the 22nd of September, 2008.
5        Q.   And what was the last position you
6    held at Lehman?
7        A.   I was global head of operations for
8    both capital markets and IMD. I was in the
9    process of taking responsibility for Aurora
10   loan services, but I hadn't been formally
11   announced, so that was matter of a few weeks'
12   worth of effort, but I didn't have any formal
13   management responsibility at that point, so you
14   will see information in my e-mails associated
15   with Aurora.
16       Q.   And who did you report directly to
17   in that position?
18       A.   I reported to Ian Lowitt.
19       Q.   Anyone else?
20       A.   No.
21       Q.   And who were your direct reports?
22       A.   In the United States, Neal Ullman,
23   who is global head of our clearance and custody
24   function. Monty Forrest, who is global head of
25   prime services operations. Kirk Butryn who was

1        Blackwell - Highly Confidential
2    co-head of equity operations. Alex Crepeau,
3    who was responsible for regulatory operations,
4    tax, operations control, client valuations and
5    margin. I believe that's all of them from
6    memory. In the U.K. there is a gentleman
7    called Garth Barker Goldie, who is responsible
8    for European operations, and in Asia,
9    Christopher Flanagan, who was responsible for
10   our Asian operations. And there was also --
11   actually, there is another gentleman called
12   Stewart Nineham who was my CAO in -- global
13   CAO.
14       Q.   Can you explain to me in your Lehman
15   role whether your group was responsible for
16   valuing or marking securities? Same question
17   only I am trying to see if the Lehman role was
18   the same.
19       A.   It was identical. In terms of
20   consumption of data, any model-driven pricing
21   would be front-end trading, trading
22   responsibility to provide a mark, and finance
23   function at Lehman Brothers, product control,
24   for want of a better term, was responsible for
25   price testing, so they would test the models to

1        Blackwell - Highly Confidential
2    ensure that those were accurate and produce the
3    result that they were intended to do.
4        Q.   And who were in charge of those
5    functions at Lehman; do you recall?
6        A.   The front office was various
7    different business heads, so, I mean,
8    ultimately it would have been Bart as president
9    and head of risk effectively, but Gelband was
10   responsible for the fixed income division and
11   Jerry Donini was responsible for equities, and
12   the IMD business theoretically didn't take any
13   risk.
14       Q.   I don't mean to be intrusive, but I
15   have to ask you some questions about your
16   compensation.
17            MR. SHAW:  This is all highly
18   confidential.
19            MR. HINE:  Yes.
20       Q.   When you transitioned from Lehman,
21   your position at Lehman to your position at
22   Barclays, did your compensation increase?
23       A.   No, actually, it declined.
24       Q.   Declined. In what way?
25       A.   I had a two-year guarantee from

Page 18

1    Blackwell - Highly Confidential
2  Lehman Brothers in 2007 and the first year of
3  that guarantee was -- for 2007 I think was
4  ████████. The second year was
5  ████████. My -- obviously the majority of
6  that comp gets paid in stock. At the point of
7  transition there was a process which you
8  probably see in my e-mail where I was offered a
9  certain role and I considered it over a period
10  of time and decided to do something slightly
11  different and at that point we agreed that I
12  would have a two-year contract because of
13  uncertainty about where the future would lead
14  and the compensation was tied to my 2007
15  number, so it was probably approximately
16  ████████ less. There were some additional
17  incentive payments for longevity at two points
18  in September of this year and September of
19  next, but I think the headline number was
20  probably less than overall what my Lehman
21  compensation would have been in 2008.
22    Q.   And what position were you
23  considered for that -- you alluded to a
24  suggestion of a position and you opted for
25  something else. Could you just explain to me
TSG Reporting - Worldwide  (877) 702-9580

Page 19

1    Blackwell - Highly Confidential
2  what you meant by that?
3    A.   I had been global head at Lehman
4  for, I think, three or four months, a
5  relatively a short period of time. The role
6  that I was offered was running Americas
7  operations and being co-head of the equity
8  operations organization. In my mind that was
9  taking me back four or five years in my career
10  and I didn't really see the -- it didn't feel
11  appropriate, so I was a little unhappy that
12  that was what I was being offered and I
13  certainly wasn't -- yeah, I was -- it wasn't --
14  it didn't feel like the right thing for me at
15  that point, but I was very keen to help
16  everyone with the integration process. I felt
17  I had a moral obligation to my team to make
18  sure that happened, and though I was being
19  offered jobs externally for some period of
20  time, I felt I wanted to stay and see this
21  through and put faith in the organization to
22  find me a role in the future, which I am still
23  hoping will happen.
24    Q.   You said you were head of global for
25  only three months. What was your position
TSG Reporting - Worldwide  (877) 702-9580

Page 20

1    Blackwell - Highly Confidential
2  prior to your position as head of global for
3  Lehman?
4    A.   I had global responsibility for
5  prime services operations. I also had global
6  responsibility for equity operations, and in
7  addition to that I was European head of
8  operations, so I commuted back and forth
9  between London and New York almost on a weekly
10  basis for about a year, little less than a
11  year.
12    Q.   Back to your compensation, can we
13  just break it into some components here just so
14  I understand it. I take it at Lehman you had a
15  base salary?
16    A.   Yes.
17    Q.   And what was that?
18    A.   I think it was ████████.
19    Q.   And then you had -- am I correct to
20  say you had a cash component bonus and an
21  equity component bonus?
22    A.   Yes, that's correct. Off the top of
23  my head I wouldn't be able to tell you. I
24  could go back and look at documents and confirm
25  it, but the number I recall would be
TSG Reporting - Worldwide  (877) 702-9580

Page 21

1    Blackwell - Highly Confidential
2  ████████ of bonus, of which somewhere
3  between 50 and -- I would imagine somewhere
4  around 50 percent would be cash, 50 percent
5  securities, deferred five-year equity.
6    Q.   And that was for 2007, you said?
7    A.   Correct.
8    Q.   Now, in 2008 your base salary was
9  still the same; correct?
10    A.   Correct.
11    Q.   Okay. And then you expected to make
12  ████ in bonus, whether it's cash or equity?
13    A.   No, my base was ████. I was
14  expecting ████, so I was expecting ████.
15    Q.   You are right. I am bad at math.
16    When you went to Barclays, out of
17  that ████ did you receive any of it?
18    A.   No.
19    Q.   Did you receive any payment from
20  Barclays that was supposed to have compensated
21  you for your 2008 bonus?
22    A.   I received a bonus in February in
23  the normal compensation cycle, so yes, I
24  received a bonus payment, but I think it was to
25  compensate me for -- that it was to retain me
TSG Reporting - Worldwide  (877) 702-9580

Page 22

1        Blackwell - Highly Confidential
2    as an employee of the organization and I was
3    performing an important role within the
4    organization.
5        Q.   Okay.  So you didn't view it as
6    reimbursing you or compensating you for the
7    first nine months of the year that you have
8    spent at Lehman; is that right?
9        A.   No.
10       Q.   No, it's not right or -- I asked a
11   strange question.
12       Did you view it as compensating you
13   for your first nine months of work that you had
14   spent at Lehman in 2008?
15       A.   No.
16       MR. HINE:  I want to show you a
17   document here which we are going to mark as
18   Exhibit 55 B.
19       (Exhibit 55 B, letter dated October
20   2, 2008, Bates stamped BCI-EX-00077291
21   through BCI-EX-00077293, marked for
22   identification.)
23       Q.   Mr. Blackwell, I have just handed
24   you a document marked as 55 B.  I just wanted
25   to ask you if you have ever seen that document

TSG Reporting - Worldwide  (877) 702-9580

Page 23

1        Blackwell - Highly Confidential
2    before.
3        A.   Yes.
4        Q.   What is that?
5        A.   That is the contract that Carol
6    Machell handed me, offered me to become an
7    employee of Barclays Capital.
8        Q.   And is that your signature on the
9    last page?
10       A.   Yes.
11       Q.   You said you wanted to say something
12   in addition to supplement your prior testimony.
13       A.   Yes.  I just wanted to mention that
14   in addition to my regular compensation in 2008,
15   Lehman Brothers awarded me a special stock
16   award, I think it was in July, of some deferred
17   stock issued at a discounted price, which would
18   vest in three years.  There was no partial
19   vesting.  It was full vesting in three years.
20   So I just wanted to put that on the record as
21   well.
22       Q.   And that is part of your Lehman
23   compensation for 2008?
24       A.   It was approximately --
25       MR. SHAW:  Objection.  Foundation.

TSG Reporting - Worldwide  (877) 702-9580

Page 24

1        Blackwell - Highly Confidential
2        A.   Sorry.  Could you ask the question
3    again?
4        Q.   Why did they give you this award?
5        MR. SHAW:  Objection.  Foundation.
6        MR. HINE:  You can answer.
7        A.   My understanding is that we were
8    obviously seeing a lot of employees leave the
9    firm at that point in time, there was a lot of
10   movement in the marketplace, people moving
11   around, and I think my understanding was it was
12   to show that I was a valued employee.
13       Q.   Okay.  And what was the value of
14   this -- did you say it was an option?
15       A.   Deferred stock.  I don't have the
16   document, I haven't looked at it for a very
17   long time, but it was approximately a ███████
18   ███████ of deferred discounted Lehman
19   securities.
20       Q.   And did you consider that part of
21   your compensation for your work in 2008?
22       A.   I considered it as part of my
23   compensation in 2008, yes.  I didn't consider
24   it in the headline number I gave you of
25   ███████.  That was in addition.

TSG Reporting - Worldwide  (877) 702-9580

Page 25

1        Blackwell - Highly Confidential
2        Q.   I understand.  We will just look at
3    your contract here for a second.  You have
4    testified about some of this.  I just want to
5    make sure I understand it.
6        Where it says "Compensation," the
7    heading Compensation, it mentions a base salary
8    of 200,000.  That's what you testified earlier;
9    correct?
10       A.   Correct.
11       Q.   So that's your base salary now at
12   Barclays?
13       A.   It is.
14       Q.   Then it talks about a 2008
15   guaranteed cash bonus.  Do you see that line?
16       A.   I do.
17       Q.   And now is that -- have you been
18   paid that?
19       A.   I have.
20       Q.   And is that -- what is that for?
21   Why were you paid that?
22       MR. SHAW:  Objection.  Foundation.
23       A.   Compensation for my employment by
24   Barclays.
25       Q.   Okay.  So that's compensation for

TSG Reporting - Worldwide  (877) 702-9580

Page 26

Blackwell - Highly Confidential

1
2  your employment by Barclays for the period that
3  you worked for them in 2008?
4        MR. SHAW: Objection. Foundation.
5        MR. HINE: You can answer.
6        A.   I would think of these in the normal
7  course of business when you transfer between
8  companies, if I moved to Citibank, for
9  instance, I would have expected to receive a
10  guarantee or award to move in a half year, so
11  when I think of this, this is for my period of
12  employment with Barclays, but I think it's
13  relatively standard practice that somebody at
14  my level leaving between organizations, which
15  is effectively what happened, would be
16  compensated and I would think of that as my OA
17  comp.
18        Q.   Later on I see 2008 EPP
19  Recommendation. Do you see that heading?
20        A.   I do.
21        Q.   Can you describe for me what this
22  is?
23        A.   I understand this to be deferred
24  compensation, a stock award, to the value --
25  and I'm not sure what it was awarded at, I

TSG Reporting - Worldwide  (877) 702-9580

Page 27

Blackwell - Highly Confidential

1
2  haven't paid any attention to it, but it's an
3  award that will vest over a three-year period,
4  so if I am an employee in three years from now
5  at Barclays, then I will receive that -- I will
6  receive that stock.
7        Q.   Okay. Did you, in fact, receive
8  this award on March 15th, 2009?
9        A.   I received the award, but not on
10  March 15th.
11        Q.   When did you receive it?
12        A.   I don't know the precise date, but
13  it was late. It was later in the year.
14        Q.   Okay. Do you have an approximate
15  date you can give me?
16        A.   No.
17        Q.   Then I see something called 2009
18  guaranteed cash bonus. Do you see that?
19        A.   I do.
20        Q.   Now, is that the bonus that you
21  previously described when you were talking
22  about the bonus that you expect to receive from
23  Barclays going forward?
24        A.   This is the bonus I expect to
25  receive for my work and performance in 2009.

TSG Reporting - Worldwide  (877) 702-9580

Page 28

Blackwell - Highly Confidential

1
2        Q.   And continuing down on the list we
3  see 2009 EPP recommendation, which appears to
4  be a stock award.
5             Is that what you expect to receive
6  as a stock bonus for your work in 2009?
7        A.   Yes.
8        Q.   Now, continuing further down you see
9  a special cash award which mentions the sum of
10  ███████. Do you see that?
11        A.   I do.
12        Q.   What is that for?
13        A.   I think this is --
14        MR. SHAW: Objection. Foundation.
15        A.   I think this is an award, it's
16  effectively a retention payment to encourage me
17  to stay at the firm over that period of time,
18  because, again, there have been alternatives
19  along the way and I want to stay at Barclays,
20  so I think that's what that payment is for.
21        Q.   And you haven't received that yet?
22        A.   No.
23        Q.   But you expect to receive it on the
24  anniversary of your employment?
25        A.   Yes. 22nd of September I would

TSG Reporting - Worldwide  (877) 702-9580

Page 29

Blackwell - Highly Confidential

1
2  expect to receive the first half of that
3  payment.
4        Q.   Can you tell me when you first began
5  discussions with Barclays about your employment
6  arrangement that you expected to have with
7  them?
8        A.   It was in the week immediately
9  after -- immediately after LBI's filing after
10  the 22nd. I don't think discussions began
11  until later in that week. I think around the
12  24th or 25th, but I can't recall precisely.
13        Q.   Okay. Can I just clarify some
14  dates. I will represent LBHI filed on the
15  15th.
16        A.   Absolutely.
17        Q.   Correct? Okay. LBI filed on the
18  19th; correct?
19        A.   Yes.
20        Q.   Okay. And during that week did you
21  have any discussions with Barclays about your
22  potential employment there?
23        A.   No.
24        Q.   Did you have any discussions with
25  anyone else?

TSG Reporting - Worldwide  (877) 702-9580

Page 30

Blackwell - Highly Confidential

1     Blackwell - Highly Confidential
2     A.  I was incredibly busy, incredibly
3 busy. Friends and family were concerned and
4 it's possible that I made reference to the fact
5 that I would become a Barclays employee at some
6 point, I assumed. I had an assumption. I had
7 no knowledge that I would be and I had no
8 discussions that were suggested I would be.
9     Q.  And so did I understand you
10 correctly to say that you didn't have such
11 discussions until after the closing of the sale
12 transaction?
13     A.  Yes. It wasn't until, I think, the
14 earliest the 24th. It was certainly into
15 the -- post LBI's bankruptcy after the APA was
16 signed.
17     Q.  And who did you have those
18 discussions with at Barclays?
19     A.  Carol Machell. At Barclays, Carol
20 Machell.
21     Q.  Did you discuss it with Michael
22 Evans at all?
23     A.  Absolutely not.
24     Q.  And Carol Machell is the person who
25 ultimately became your supervisor?

Page 31

1     Blackwell - Highly Confidential
2     A.  Absolutely.
3     Q.  What do you recall about those
4 discussions?
5     A.  The financial component was of
6 little interest to me, frankly. I was
7 expecting that we would discuss a role and the
8 discussion didn't go very well, because I
9 wasn't very happy in terms of the role. The
10 focus wasn't on the financial components. I
11 have no dependents. I don't -- the money isn't
12 the main motivator in why I go to work. I was
13 looking for an interesting role in an
14 organization which I thought would be an
15 interesting place to be and the role that I was
16 initially offered I thought was -- didn't meet
17 my expectations and, therefore, I actually
18 considered leaving. What we had discussed in
19 that first set of conversations was that I
20 would go away and think about it and, again, I
21 wanted to be responsible and work with Carol to
22 ensure there was a smooth integration, so that
23 wouldn't mean I would leave immediately, but
24 work for a period of time, certainly into the
25 new year to help with a smooth transition of my

Page 32

1     Blackwell - Highly Confidential
2 staff.
3     Q.  Was there any back-and-forth on the
4 numbers?
5     A.  Yes, because it was -- the original
6 contract I was offered was more money than
7 this.
8     Q.  So could you just summarize what the
9 back-and-forth was?
10     A.  It was more about the duration, the
11 value of the contract, the cash award or
12 whatever -- I don't recall the numbers exactly,
13 but it was more than this contract.
14     Q.  When you say "the duration," you
15 mean the length of your expected employment?
16     A.  This contract effectively has
17 several components, but I would look at it as a
18 two-year contract, and the contract that I was
19 offered was a one-year contract with two years
20 of incentive payments. From memory. I may not
21 be precise. But certainly the role was the
22 core part of my focus.
23     Q.  During the week of the 15th, in
24 other words, after LBHI's filing leading up to
25 eventually LBI's filing, did you have any

Page 33

1     Blackwell - Highly Confidential
2 understanding of the arrangements that had been
3 made as to compensation for former Lehman
4 employees?
5     A.  No.
6     Q.  Did you have any knowledge of the
7 provisions in the APA that related to
8 compensation?
9     A.  No.
10     Q.  Did you have any role in negotiating
11 those types of provisions?
12     A.  No. I was asked to make lists of
13 people who were critical to certain things, but
14 that was it.
15     Q.  Did you hear any rumors about how
16 former Lehman employees were going to be
17 compensated when they moved to Barclays?
18     A.  Can you be precise about the time
19 frame you are talking about?
20     Q.  I am talking about the week of --
21 let's talk about the week of September 15th.
22 In other words, LBHI has filed, LBI has not yet
23 filed, but that five-day period.
24     A.  All I had heard was speculation in
25 the press, and from my recollection I can't

Page 34

1     Blackwell - Highly Confidential
2   determine exactly -- again, that period of time
3   is a strange period, but I'm sure my e-mail
4   would highlight anything that I knew at the
5   time. My understanding, there was press
6   speculation which was rife amongst the staff,
7   so they were talking about it, and my concern
8   was to calm people, because a lot of people at
9   Lehman were just leaving the building, so,
10  again, just trying to hear what they were
11  seeing and reading so I could respond in a way.
12  If I didn't know anything, I would tell them I
13  didn't know anything, it wasn't necessarily
14  true. So it wasn't information I was receiving
15  from people negotiating the deal or from my
16  superiors.
17     Q.   Am I correct to say that you had no
18  specific knowledge of how these folks would be
19  compensated?
20     A.   None whatsoever.
21     Q.   And so you did not communicate to
22  your subordinates the compensation arrangements
23  that they could be expecting?
24     A.   Expecting, no.
25     Q.   No, you did not?
TSG Reporting - Worldwide  (877) 702-9580

Page 35

1     Blackwell - Highly Confidential
2     A.   I didn't.
3     Q.   All right. So let's -- I'd like to
4   turn to that -- that week is of great interest
5   to us lawyers here, so can we just talk
6   generally about your role during that week and
7   maybe the couple of days prior to that.
8     A.   So just to clarify, this is the 15th
9   through to the 22nd?
10    Q.   Correct. Let's just start prior to
11  the 15th.
12     You are aware that Barclays and
13  Lehman had some discussions prior to the filing
14  of bankruptcy about a possible transaction?
15    A.   Yes.
16    Q.   Were you involved in any of those
17  discussions at all?
18    A.   No. I was asked by Ian to come to a
19  meeting on the -- I don't know what day it was.
20  It was in the week pre -- sorry, it was pre
21  LBHI's bankruptcy, in the week prior to that,
22  and I was in a -- I joined a meeting for about
23  half an hour. It had been going on for a long
24  time. I don't really have any recollection as
25  to what was actually even being discussed,
TSG Reporting - Worldwide  (877) 702-9580

Page 36

1     Blackwell - Highly Confidential
2   frankly, and Ian actually asked me to come over
3   and talk about some business-related issue, so
4   it was not in terms of any negotiation,
5   understanding what content there was. There
6   were lots of Barclays people, lots of lawyers
7   and lots of bankers on the floor, but I had no
8   documentation, no exposure to anything that was
9   relevant to that.
10    Q.   And where was this meeting?
11    A.   I believe it was on the 32rd floor
12  of 745.
13    Q.   Do you know the date?
14    A.   No, I don't.
15    Q.   Do you have any recollection of what
16  was being discussed?
17    A.   In the room, absolutely none, and I
18  think -- Ian, I think, just wanted to make sure
19  I was okay. That was probably the --
20    Q.   Ian being?
21    A.   Ian Lowitt. Just wanted to make
22  sure I was okay. That's why he had asked me to
23  come over really and talk about some
24  business-related thing.
25    Q.   Did you have any role in the
TSG Reporting - Worldwide  (877) 702-9580

Page 37

1     Blackwell - Highly Confidential
2   preparation or the filing of bankruptcy by
3   LBHI?
4     A.   Absolutely not.
5     Q.   Did you know about it before it
6   happened?
7     A.   Yes. I think I knew about it before
8   it was going to happen because I was asked to
9   go and see Ian in the board room and,
10  coincidentally, I don't know how many times
11  this happened over the course of that day, but
12  whilst I was in the board room, and that was in
13  the evening of the -- I'm not sure what day it
14  was, but I think it was pre the filing, Dick
15  Fuld walked in and said that we would be
16  filing. At the time I had no understanding
17  what that meant, was that LBI, LBHI, it wasn't
18  clear, but it was clear that some bankruptcy
19  proceeding was going to be -- and there were
20  Weil lawyers in the room at the time, so what I
21  was asked -- Ian asked me to -- I was being
22  asked to carry out a certain set of functions
23  and that's why I was in attendance for a very
24  brief period of time, left and went to carry
25  out that instruction or instructions.
TSG Reporting - Worldwide  (877) 702-9580

Page 38

1      Blackwell - Highly Confidential
2      Q.   Was that instruction related to the
3   bankruptcy?
4      A.   No, it wasn't related to the
5   bankruptcy. It was related to LBI's
6   functioning, ongoing functioning.
7      Q.   Did you have any discussion -- when
8   you say "LBI's functioning," is that -- are you
9   talking about the fact that LBI did not file
10  for bankruptcy until several days later?
11     A.   Correct.
12     Q.   Okay. So what were you doing to
13  assure LBI's functioning?
14     A.   Ian asked me to do two things. Be
15  able to be -- be able to function -- have LBI
16  function as an entity by itself from an
17  operational standpoint, so -- and also work
18  with treasury to create a funding ladder for
19  the week, so based on the settlement activity
20  that would be taking place over the course of
21  that week, lay out a cash flow, and also put a
22  payment protocol in so that no payment, no cash
23  could leave LBI. So that was done. Myself and
24  Bridget O'Connor, who was the Lehman head of
25  technology, went away and worked with our
        TSG Reporting - Worldwide  (877) 702-9580

Page 39

1      Blackwell - Highly Confidential
2   respective teams and our teams then worked
3   together to execute that. We worked into, I
4   think, the early hours of the night to
5   determine what we thought the cash flows would
6   be. I provided that ladder, funding ladder, to
7   the treasury department, which is run by Paolo
8   Tonucci.
9      Q.   So you used a lot of words there. I
10  just want to see if I understand.
11          Is this the financing that was
12  provided by the Fed to LBI?
13     A.   No. This is -- the cash flows -- in
14  the securities business, exchange securities
15  for cash. In the exchange of securities for
16  cash, obviously some security is leaving, some
17  securities are coming into inventory. Some
18  client securities are coming in and leaving.
19  And the associated cash flows that went with
20  that was to understand what the net cash
21  position each day would be if the firm had
22  perfect settlement. And when I say "perfect
23  settlement," I mean all transactions, so all
24  securities and consideration settled on the
25  contractual settlement date.
        TSG Reporting - Worldwide  (877) 702-9580

Page 40

1      Blackwell - Highly Confidential
2      Q.   So back to your role during that
3   week, now on the 15th you learned that LBHI has
4   filed for bankruptcy; correct?
5      A.   Is that -- that day of the week --
6      Q.   That's Monday.
7      A.   That's the Monday. I think it was
8   Sunday night.
9      Q.   So you heard about it Sunday night?
10     A.   I think so. It was the 14th. Late
11  Sunday night.
12     Q.   What did you hear -- apparently on
13  the 15th Barclays and Lehman start speaking
14  again and they eventually arrive at an APA.
15          Can you describe for me any role you
16  played in that process?
17     A.   I didn't know that Barclays -- I
18  wasn't involved in any of those discussions, so
19  I played no role.
20     Q.   Okay. So did the APA come as a
21  surprise to you when you heard that?
22     A.   I didn't know -- does the
23  agreement --
24     Q.   That was a bad question.
25          How did you first hear that there
        TSG Reporting - Worldwide  (877) 702-9580

Page 41

1      Blackwell - Highly Confidential
2   was going to be a sale transaction between
3   Barclays and Lehman?
4      A.   I think on the Monday what I was
5   asked to do as another set of actions was work
6   towards a conversion and the way I would
7   interpret a conversion is that there is going
8   to be some -- either some asset sale or the
9   whole organization is going to be sold as a
10  going concern ,the LBI organization would be
11  sold as a going concern. So I'm sure you can
12  see it in my e-mail as well, there was a series
13  of meetings to create a project plan, to
14  work -- which involved technology, finance,
15  operations, to have -- create a fully
16  functioning broker/dealer for whenever that was
17  going to be. So that was an incredibly onerous
18  piece of work. These things normally take
19  months and years to create and we were given a
20  very compressed time frame to try and do that,
21  so I was trying to get a business up and
22  running again potentially. That's the way I
23  interpreted that. Those were my marching
24  orders at that point. So I had no idea what
25  the content -- what sale meant.
        TSG Reporting - Worldwide  (877) 702-9580

## Page 42

1    Blackwell - Highly Confidential
2        Q.  Did you have an understanding of the
3    terms of the Asset Purchase Agreement?
4        A.  I didn't know an Asset Purchase
5    Agreement existed at that point.
6        Q.  Have you ever seen an Asset Purchase
7    Agreement?
8        A.  I have, but not -- I have, yes, I
9    have, but much, much, much post bankruptcy.
10   Maybe weeks afterwards.
11       Q.  Okay.  That was a badly phrased
12   question.
13       Have you -- when I meant "Asset
14   Purchase Agreement," I meant the Asset Purchase
15   Agreement that's at issue in this case, which
16   is the one between Barclays and Lehman.
17       So am I correct to understand you to
18   say you didn't see that agreement until after
19   the closing of the sale transaction?
20       A.  I believe so.  It may have hit my
21   e-mail.  I don't ever remember reading it.  I
22   think it's highly unlikely that I saw it until
23   after bankruptcy, and it's certainly the case
24   that I was asking Jonathan Hughes post
25   bankruptcy --

TSG Reporting - Worldwide  (877) 702-9580

## Page 43

1    Blackwell - Highly Confidential
2        MR. SHAW:  Let's not get into any
3    discussions you had with Jonathan.
4        MR. HINE:  Is Jonathan a lawyer?
5        MR. SHAW:  He is the general
6    counsel.
7        MR. HINE:  So you are asserting a
8    privilege over that conversation?
9        MR. SHAW:  Yes.
10       Q.  I just want to be clear.  When we
11   talk here, when you said "bankruptcy," you were
12   talking LBI's bankruptcy?
13       A.  I am talking about LBI's bankruptcy,
14   yes.  I had no knowledge of an APA pre
15   bankruptcy and the content of it.
16       Q.  Did you have any understanding of
17   what the sale transaction was supposed to
18   accomplish?
19       A.  I had a set of actions to perform,
20   which was providing data to my supervisor, to
21   Ian Lowitt, and those components were
22   clearly -- at certain points it became clear
23   they were part of the transaction, but I didn't
24   know what part, and I had very limited
25   understanding.  It was perform this task, get

TSG Reporting - Worldwide  (877) 702-9580

## Page 44

1    Blackwell - Highly Confidential
2    the task done, and that's what I tried to
3    execute as effectively as I could.
4        Q.  And so did you ever -- again, I
5    understand that and we will go through those
6    tasks as we go, but did you ever have any
7    inkling about a $70 billion figure with respect
8    to the assets that were going to be transferred
9    to Barclays?
10       A.  70 billion?
11       Q.  Yes.
12       A.  That's not a number that sticks out
13   in my memory, no.
14       Q.  Did you ever hear anyone talk about
15   a discount that was being awarded to Barclays
16   with respect to Lehman assets?
17       A.  No.  And I think when I was asked
18   what the deal content was by one of my
19   colleagues, I pointed them in someone else's
20   direction to the deal lawyers.  I didn't have
21   details of that.
22       Q.  Did you have any -- I'm not asking
23   about whether you were involved in discussions,
24   but did you hear any rumors or, you know, water
25   cooler talk about a discount being awarded to

TSG Reporting - Worldwide  (877) 702-9580

## Page 45

1    Blackwell - Highly Confidential
2    Barclays as to Lehman assets?
3        A.  I don't think so, no.
4        Q.  Did you ever hear the phrase "block
5    discount" used in connection with the sale
6    transaction?
7        A.  Block discount, no.
8        Q.  Did you ever hear that phrase or a
9    similar phrase used when it came to valuing
10   assets that were supposed to be transferred to
11   Barclays?
12       A.  No.  I wasn't focused on anything
13   related to valuation, so that wasn't really --
14   making lists of securities was different than
15   determining what they should be worth in
16   aggregate.
17       Q.  We will get into that more.  I
18   understand.
19       Did you ever hear anyone refer to
20   the transaction as a wash transaction or words
21   to that effect?
22       A.  No.
23       Q.  Is it fair to say that you really
24   were fairly unfamiliar with the specific
25   contractual terms of that transaction during

TSG Reporting - Worldwide  (877) 702-9580

Page 46

1       **Blackwell - Highly Confidential**
2  **that week?**
3       A.   Very unfamiliar.
4       **Q.   I want to show you a document --**
5  **some of these documents I am going to show you**
6  **just to see if you know about them or what you**
7  **know about them.**
8       A.   I'd just like to make a point.  I
9  was sending or receiving about a thousand
10  e-mails a day at that time, I think,
11  approximately, so documents passed across my
12  e-mail.  It was physically impossible for me to
13  consume all that information.
14       MR. HINE:  I understand.
15       Let's mark this as the next exhibit.
16       (Exhibit 56 B, e-mail dated May 29,
17       2009, Bates stamped 10295594, with attached
18       fax, Bates stamped 10300652, marked for
19       identification.)
20       **Q.   Mr. Blackwell, I am handing you a**
21  **document that's marked as Exhibit 56 B, which**
22  **appears to be an e-mail in or about Monday,**
23  **September 15th, 2008, and attached to it is a**
24  **fax that's addressed to you and it's attaching**
25  **a document entitled Custodial Undertaking in**
       TSG Reporting - Worldwide  (877) 702-9580

Page 47

1       **Blackwell - Highly Confidential**
2  **Connection With Master Repurchase Agreement.**
3       A.   The repo agreement.
4       **Q.   Right. So my question to you is**
5  **have you ever seen this agreement or this**
6  **document?**
7       MR. SHAW:  Take a chance to look
8       through it.
9       (Document review.)
10       A.   I don't recall looking at this.  I
11  think it's a standard repo agreement.
12       **Q.   Can I just ask you a question or two**
13  **about -- this repo agreement relates to an**
14  **agreement between Lehman, Barclays and JPMC or**
15  **JPMorgan Chase.**
16       **In your role as head of operations,**
17  **did you deal with repurchase agreements of this**
18  **nature?**
19       A.   We processed repurchase agreements.
20  We didn't agree to commercial terms of a
21  repurchase agreement, but we processed it.
22       **Q.   What do you mean by process it?**
23       A.   So in terms of the technical way
24  that you would manage a tri-party repo
25  agreement is that you have a tri-party agent
       TSG Reporting - Worldwide  (877) 702-9580

Page 48

1       Blackwell - Highly Confidential
2  and two counterparties.  A firm's tri-party
3  agent selects the collateral based on the
4  agreement terms, what collateral becomes
5  eligible, and will pledge that.  You book
6  something called a shell on -- operations book
7  a shell to the value that the tri-party agent
8  has pledged based upon their market value, and
9  so those components are then fed into a system
10  to record the repo transaction.  So that is
11  sort of bread and butter activity for a
12  broker/dealer, how a broker/dealer would fund
13  itself.  So it's a daily event with multiple
14  counterparties.  Chase were Lehman's primary
15  tri-party agent.
16       **Q.   So there was a pre-existing Master**
17  **Repurchase Agreement involving these three**
18  **parties; is that right?**
19       A.   I believe so.  I don't know.
20       **Q.   My real question is do you know why**
21  **this was executed or this was either presented**
22  **to you or executed on the 15th, which is the**
23  **date of the LBHI bankruptcy?**
24       A.   From looking at this it looks like
25  they were trying to set up a new agreement.  I
       TSG Reporting - Worldwide  (877) 702-9580

Page 49

1       Blackwell - Highly Confidential
2  don't think it was used without.
3       **Q.   You don't think --**
4       A.   I don't think so, because I think --
5  because Bank of New York were Barclays' -- I
6  think the attempt here was due to a technical
7  constraint, Lehman Brothers did not have
8  tri-party structure in place because of the
9  volume of transactions.  The operational
10  technicalities of doing this were too complex.
11  So the goal was to set up -- I think, I may be
12  wrong, because I'm not the expert, the team
13  that run this are the experts, hence why they
14  are on here.  The finance team and the treasury
15  team and the operations team responsible for
16  processing the repo are the experts.  I believe
17  from memory that there was an attempt to set up
18  a Barclays arrangement with Chase at that
19  point.  I think this was scrapped as a
20  structure.  I think so, but I may be wrong.
21       **Q.   Who should I ask -- who would you**
22  **ask if you really wanted -- I understand you**
23  **don't have intimate knowledge, but who should I**
24  **ask that question?**
25       A.   Well, the business person that would
       TSG Reporting - Worldwide  (877) 702-9580

Page 50

Blackwell - Highly Confidential

1    Blackwell - Highly Confidential
2    have been responsible for this ultimately is
3    John Coghlan, he would be responsible for the
4    commercial terms, and the people that work for
5    him on here would be John Feraca, who is on the
6    e-mail. Others may -- the rest of them are
7    treasury and operations people.
8        MR. HINE: Okay. I am going to hand
9        you another document now.
10        (Exhibit 57 B, Amendment Agreement,
11        marked for identification.)
12    Q.    Mr. Blackwell, I am handing you a
13    document marked as Exhibit 57 B, which is
14    entitled Amendment Agreement as of -- it's
15    dated as of September 15, 2008 and it's between
16    Barclays and Lehman Brothers.
17    A.    September 2008. Okay.
18    Q.    Right. On the front it says "dated
19    as of September 15, 2008." Do you see that?
20    A.    Yes.
21    Q.    My question is have you ever seen
22    this document before?
23        MR. SHAW: Take a minute and look
24        through it.
25        (Document review.)

Page 51

1    Blackwell - Highly Confidential
2    A.    No, I have not seen this agreement.
3    I certainly haven't read it.
4    Q.    Do you have any understanding or
5    guess as to why this document would have been
6    signed during this time period?
7        MR. SHAW: Objection. Calls for
8        speculation.
9    A.    This seems to be determining some
10    set of commercial terms which I wouldn't have
11    been involved in negotiating, so I have no idea
12    what the purpose of this agreement would be.
13    Q.    So should I ask the same folks that
14    you mentioned earlier?
15    A.    I think you would -- I would ask
16    John Coghlan, yes.
17    Q.    Let's get back to our discussion of
18    the week of September 15th.
19        At some point in time -- well, some
20    point in time you learn on Monday, say, that
21    there is going to be a sale transaction of some
22    nature between Barclays and Lehman; correct?
23    A.    There was -- I understood that there
24    was negotiations. I didn't know what that
25    would mean.

Page 52

1    Blackwell - Highly Confidential
2    Q.    Okay. And so what were you asked to
3    do in support of those negotiations or
4    agreement? Let's try to take it day by day.
5    Let's talk about Monday.
6    A.    My recollection of what I was being
7    asked to do was, again, figure out the funding
8    settlement matter, monitor the settlement
9    activity. So there were teams of people.
10    Monitoring settlement activity would be with
11    the various clearing bodies, which as you will
12    see over the course of the week became
13    increasingly challenging. Fielding client
14    questions when they -- or the team were
15    fielding client questions as they were arising.
16    And then the bulk of the effort in the early
17    part of the week was trying to put together a
18    project plan and a set of actions to build
19    towards a conversion, which was yet -- which
20    wasn't fully specified.
21    Q.    When you use the term "conversion,"
22    are you saying -- does that mean moving the
23    broker/dealer business to Barclays?
24    A.    That was my assumption. I don't
25    think I was ever told that. Conversions

Page 53

1    Blackwell - Highly Confidential
2    normally mean that you are converting on to
3    someone else's systems or you are moving your
4    systems. And so we were working towards a set
5    of scenarios where, for instance, I was aware
6    that Barclays had a relatively small equities
7    business and we had a very substantial one at
8    Lehman Brothers. Lehman had a very substantial
9    equity business and so it would be physically
10    impossible to transact the equity business on
11    the Barclays technologies. It's just
12    impractical. A year's worth of volume in a
13    day. So it's just technically not possible.
14    So we were working towards various things of
15    that nature, which, again, is very operational
16    in nature, time-consuming, complex and very,
17    very detailed, so a lot of my team were focused
18    on that.
19    Q.    Was it your expectation that your
20    team and most of the employees of Lehman in the
21    broker/dealer business would move over to
22    Barclays?
23    A.    That was my hope.
24    Q.    No one ever told you that?
25    A.    No.

Page 54

1        Blackwell - Highly Confidential
2     Q.    Okay.  Can we go through some
3   terminology here just so I understand.
4        I see in a lot of e-mails the phrase
5   "BONY tri-party."  Can you just tell me what
6   that is meant to encompass?
7     A.    BONY is Bank of New York.  Tri-party
8   is a type -- is a repo.
9     Q.    Okay.  I didn't mean to interrupt
10  you, but we have been discussing a repurchase
11  transaction on September 18th involving
12  Barclays, Lehman and BONY.
13       Is that what you folks call the BONY
14  tri-party in the e-mail, generally?
15    A.    I think that's very broad.
16    Q.    What would you understand that BONY
17  tri-party to be?
18    A.    Depends on the context.
19    Q.    Okay.  Did there come a point in
20  time — well, let's step back to the Monday
21  again.
22       Did you learn at some point that the
23  fed was providing some kind of financing to LBI
24  during that week?
25    A.    Yes.  We had been pledging more and
TSG Reporting - Worldwide  (877) 702-9580

Page 55

1        Blackwell - Highly Confidential
2   more of our -- we had a large repo under
3   various different schemes with the Fed.
4     Q.    When you say various different
5   schemes, is that -- I see acronyms PDFC, OMO
6   and TSLF.  Is that what --
7     A.    Correct.
8     Q.    So those are three different Fed
9   programs?
10    A.    Yes.
11    Q.    Am I correct to say that on Monday
12  night, Tuesday night and Wednesday night of
13  that week the Fed was providing some sort of
14  financing under those programs to Lehman?
15    A.    It was a repo, again, pledging
16  assets through Chase and a tri-party agent to
17  the Fed and the Fed provided cash.
18    Q.    And now were you involved in
19  selecting the assets that were pledged?
20    A.    The mechanism by which assets are
21  selected are driven by the repurchase
22  agreements and the schedules attached to the
23  repurchase agreements that are in place.  So it
24  was eligible collateral.  So that's an
25  automated process in a normal course of
TSG Reporting - Worldwide  (877) 702-9580

Page 56

1        Blackwell - Highly Confidential
2   business in that your tri-party agent will look
3   at the eligible collateral and pledge that on
4   your behalf to the Fed and then you get a file
5   from in this instance Chase, which is uploaded
6   into your system, into your repo shell to
7   reflect the securities that are being pledged.
8     Q.    Okay.  Is that what took place in
9   this instance?
10    A.    As far as I understand, in the early
11  part of the week, that's absolutely what
12  occurred.
13    Q.    So, again, I'm not trying to put
14  words in your mouth.  I am just trying to
15  translate it into something that a non-finance
16  person can understand.
17       Is it correct to say that JPMC or
18  Chase selected the securities that were pledged
19  to the Fed?
20    A.    That would be my understanding of
21  the mechanism.  The individuals within the
22  business, treasury and operations that
23  transacted or carried out those functions could
24  give you a much more precise answer.
25    Q.    So you are talking about within
TSG Reporting - Worldwide  (877) 702-9580

Page 57

1        Blackwell - Highly Confidential
2   Lehman's treasury department?
3     A.    Yes, and operations, Jim Hraska.
4     Q.    Jim Hraska?
5     A.    Yes.
6     Q.    And at some point you learned, I
7   take it, that there was going to be some kind
8   of transaction where Barclays would be
9   providing that financing instead of the Fed;
10  correct?
11    A.    Correct.
12    Q.    Tell me what you understood about
13  that.
14    A.    I was initially contacted -- I think
15  conversations had already been taking place
16  between John Coghlan, treasury and Barclays
17  about how a repo process would take place.  A
18  gentleman called David Aranow and John Feraca
19  were -- both of them were asked by John Coghlan
20  to basically run the process of moving the
21  collateral that was currently pledged to the
22  Fed under the various programs, and I am going
23  to caveat that, I will come back to that in a
24  second, under the various programs, and the
25  collateral that was eligible over to Bank of
TSG Reporting - Worldwide  (877) 702-9580

Page 58

1       Blackwell - Highly Confidential
2    New York. Now, I think the first conversations
3    were had on the 17th -- sorry, I think --
4    that's when I first started to hear about this,
5    I think, around the 17th, and I think it was
6    determined it was technically -- not say
7    impossible, but incredibly difficult to move
8    that amount of collateral on that day, which
9    was, I think, what had been discussed, so it
10   was then determined that that would then happen
11   the following -- I think it was the following
12   day, so there was some setup work that was
13   required and you will see that communication
14   flying around between treasury, operations and
15   business as how to set this -- set the
16   mechanism up to facilitate that. And this is a
17   very large amount of collateral --
18       Q.   Sure.
19       A.   -- so there are a lot of operational
20   complexities to it. So at that point that's
21   when I was aware that we were in the process
22   of -- that Barclays were going to be funding
23   the LBI entity through the repo and taking the
24   Fed's exposure away or relieving Fed's
25   exposure.
          TSG Reporting - Worldwide  (877) 702-9580

Page 59

1       Blackwell - Highly Confidential
2       MR. SHAW:  When you reach a logical
3    stopping point, we have been going about an
4    hour.
5       MR. HINE:  Do you want to take a
6    break?
7       THE WITNESS:  Another five minutes
8    or so.
9       Q.   I think I understood what you just
10   said. Now, do you know if the same collateral
11   that was supporting the Fed financing on
12   Wednesday night was, in fact, transferred to
13   Barclays to support its tri-party?
14       A.   It wasn't. No, it wasn't. It
15   was -- again, there is -- it's an awful lot of
16   operational complexity, it's a huge number of
17   securities and no -- there were differences in
18   the schedule that the Fed held versus what
19   actually then ended up in Bank of New York's --
20   in Bank of New York's tri-party account.
21       Q.   Okay. So this is -- when I see the
22   phrase "Bank of New York tri-party," that's --
23   if it's dated at this time, it's probably
24   talking about the Barclays tri-party with Bank
25   of New York acting as the agent; correct?
          TSG Reporting - Worldwide  (877) 702-9580

Page 60

1       Blackwell - Highly Confidential
2       MR. SHAW:  Objection to form.
3       A.   Again, it's a broad term. I'd need
4    specific --
5       Q.   I will withdraw that question. I
6    understand.
7       So what is the difference, if you
8    know, between the collateral that was
9    supporting the Fed financing on Wednesday night
10   and the collateral that was transferred to
11   Barclays on sometime Thursday?
12       MR. SHAW:  Objection to form.
13       A.   There were a series of operational
14   issues that occurred at Chase, first of all,
15   and also the repurchase agreement, collateral
16   that's eligible to be transferred to BONY,
17   create a difference, so, you know, those
18   operational processes at Chase which were -- I
19   don't have any visibility over and, frankly,
20   have limited visibility at what's happened at
21   Chase post the event as well, resulted in some
22   of the collateral being delivered from the Fed
23   into the Lehman box and pended settlement took
24   place, so that the securities that were
25   released from the Fed were delivered into the
          TSG Reporting - Worldwide  (877) 702-9580

Page 61

1       Blackwell - Highly Confidential
2    Lehman box and trades that were pended for
3    settlement were settled that were unrelated to
4    the repo, but were trades that had been entered
5    into by Lehman Brothers on a previous date.
6       Q.   So am I correct -- so Chase settled
7    other trades with the money -- with the
8    securities that had been released from the Fed
9    funds?
10       A.   So Barclays had paid $5 billion to
11   Chase and paid that to the Fed, the Fed
12   released $5 billion worth of collateral, what
13   the Fed believed is $5 billion worth of
14   collateral to Chase, and that went into the
15   clearance box and settlement took place.
16       Q.   Okay. And then so then what
17   collateral was ultimately transferred to
18   support the Barclays repo?
19       A.   There are schedules that show that
20   collateral. So again, collateral that was
21   eligible under the repurchase agreement was
22   delivered. The remaining securities that came
23   back from the Fed, some portion of them, again,
24   subject to operational friction and
25   eligibility, were then delivered to Bank of New
          TSG Reporting - Worldwide  (877) 702-9580

Page 62

1      Blackwell - Highly Confidential
2 York.
3      Q.   And were you involved in that
4 process of the delivery to Bank of New York?
5      A.   My team were actively involved.  I
6 was doing very many different things at that
7 time, so Monty Forrest and Jim and the team of
8 people within the repo ops area in conjunction
9 with the treasury department and with the
10 trading desk, the financing trading desk, were
11 all working hard to get that.  I was being
12 asked also questions by my management and
13 whether these things were happening.  I was
14 also liaising with Barclays when -- certainly
15 when the first 5 billion -- we were trying to
16 do it in 5 billion pieces so there was no
17 daylight exposure to Lehman.  That mechanism
18 resulted in the outcome I described before,
19 which was some leakage, because of Chase's
20 method -- Chase's internal operational issues,
21 and so there was some discussion, but it went
22 very quiet for a period of time until the 40
23 billion of cash was paid by Barclays or the 45
24 billion of cash was paid by Barclays, and then
25 settlement took place with the Fed and DTC.

TSG Reporting - Worldwide  (877) 702-9580

Page 63

1      Blackwell - Highly Confidential
2 Settlement processes were kept open until the
3 early hours of the morning, which is
4 unprecedented, to allow this massive volume of
5 collateral to work its way through the system
6 and settle.
7      Q.   You mentioned someone named Jim.  Is
8 that Jim Hraska?
9      A.   Jim Hraska.
10      Q.   Is it fair to say he was more mired
11 in the details of this transfer of collateral
12 than you were?
13      A.   Absolutely.  He is an industry
14 expert in the space.  The Fed consult with Jim,
15 so he is expert in this process.
16      MR. HINE:  Okay.  Why don't we take
17 a break now.  I have some documents to show
18 you about this whole topic, so you need to
19 rest up.
20      (Recess was taken from 10:31 to
21 10:42.)
22 BY MR. HINE:
23      Q.   Mr. Blackwell, we were talking about
24 the transition from the Fed repo arrangement on
25 Wednesday to the replacement transaction with

TSG Reporting - Worldwide  (877) 702-9580

Page 64

1      Blackwell - Highly Confidential
2 Barclays and BONY on Thursday.
3      Before we get into how that took
4 place and any problems that had to do with
5 that, could I just run a couple documents by
6 you just so I can understand what's being said
7 in these e-mails to the extent you remember.  I
8 know you had several e-mails during that period
9 of time, but let's just start with this one.
10      MR. HINE:  Let's mark that.
11      (Exhibit 58 B, e-mail dated
12 September 17, 2008, Bates stamped 77752,
13 marked for identification.)
14      ( Exhibit 59 B, e-mail dated
15 9-17-2008, marked for identification.)
16      Q.   Mr. Blackwell, I handed you an
17 e-mail which we have marked as Exhibit 58 B
18 which is an exchange between you and some other
19 folks on Wednesday, September 17th, and some
20 earlier e-mails below.
21      I just wanted to understand
22 what's -- you appear to be congratulating some
23 folks here about doing a good job.  In one of
24 the e-mails Mr. Feraca talks about yielding the
25 max from both PDCF and Barclays financing.

TSG Reporting - Worldwide  (877) 702-9580

Page 65

1      Blackwell - Highly Confidential
2      Could I just give me a sense of --
3 was this a difficult effort to get this
4 financing in place on Tuesday?
5      A.   I think it was hard all week.  It
6 was a very challenging environment to be
7 operating in, to say the least.  I just think
8 John as the person responsible for financing
9 and I think it's just congratulating everyone
10 for -- under the construct of the agreement to
11 delivering an excellent result and just
12 thanking people.  I have no more information
13 about this than that.
14      Q.   My question is this was a Tuesday
15 night e-mail, the one in the middle.  Now, the
16 PDCF, that's referring to the Fed's financing;
17 correct?
18      A.   The Primary Dealer's Credit
19 Facility.
20      Q.   That's a Fed program?
21      A.   Fed facility, yes.
22      Q.   Now, it also refers to Barclays
23 financings in the same sentence.
24      What financings does Barclays have
25 in place on Tuesday?

TSG Reporting - Worldwide  (877) 702-9580

Page 66

1    **Blackwell - Highly Confidential**
2       A.   I don't recall. I'm assuming it's
3    referring to a repo, but I have no idea.
4          MR. SHAW: Bill, just so it's clear,
5    although the date that appears on the sent
6    line says Wednesday, September 17th, it's
7    Greenwich meantime, so it's also Tuesday.
8          MR. HINE: You are right.
9       Q.   I guess my main point for that
10   document is you don't really have any knowledge
11   of other of Barclays' financings on the Monday,
12   Tuesday, Wednesday of that week?
13      A.   Correct.
14      Q.   So your role during that week with
15   respect to Barclays' financing was the one that
16   was put in place on Thursday to replace the Fed
17   financings of Wednesday night; is that right?
18      A.   Yes.
19      Q.   Okay. If you could turn to the next
20   document, which is marked as Exhibit 59 B,
21   again, it's an e-mail stream involving yourself
22   and others. It talks in the bottom about not
23   doing the Barclays PDCF trade tonight. Do you
24   see that language?
25      A.   Yes.

TSG Reporting - Worldwide  (877) 702-9580

Page 67

1    Blackwell - Highly Confidential
2       Q.   Now, this is Wednesday night, and I
3    believe you previously testified, you had a
4    discussion of possibly doing that transition
5    transaction on Wednesday night?
6          MR. SHAW: Objection to form. It's
7    not clear to me what the "this is Wednesday
8    night" refers to.
9          MR. HINE: Let me just rephrase it.
10      Q.   You see the e-mail at the bottom of
11   this document which is sent says it's sent on
12   Wednesday, September 17th. Do you see that?
13      A.   Yes.
14      Q.   And the first line of that e-mail
15   says "we are not doing the Barclays' PDCF trade
16   tonight." Do you see that?
17      A.   I do.
18      Q.   And that's Mr. Ullman sending that
19   e-mail to you; correct?
20          MR. SHAW: Can I just note for the
21   record the witness is underlining the
22   phrases you have pointed out to him on the
23   exhibit.
24          MR. HINE: Okay.
25          MR. SHAW: I'm not allowed to do

TSG Reporting - Worldwide  (877) 702-9580

Page 68

1    Blackwell - Highly Confidential
2    that, I take it.
3          MR. HINE: Probably a good idea just
4    to --
5          THE WITNESS: It's a habit.
6          MR. HINE: Okay. Not a problem.
7       Q.   My question was what discussions
8    were there about possibly having the Barclays
9    take over this financing role from the Fed on
10   Wednesday night?
11         MR. SHAW: Objection. Foundation.
12      A.   I don't have any -- I wasn't
13   involved in those discussions, so -- you would
14   probably -- yeah, I wasn't involved in those
15   discussions.
16      Q.   Okay. Continuing on with that
17   e-mail, it says "we will be increasing the
18   tri-party trade we have been doing with
19   Barclays at BONY to 13 billion." Do you see
20   that?
21      A.   I do.
22      Q.   What is that referring to?
23      A.   It refers to the fact that Barclays
24   would be extending financing for that night of
25   13 million.

TSG Reporting - Worldwide  (877) 702-9580

Page 69

1    Blackwell - Highly Confidential
2       Q.   So this is a separate tri-party that
3    Barclays has with Lehman and BONY?
4       A.   The same tri -- they are a
5    tri-party. A tri-party agreement is one
6    tri-party agreement. So this is an arrangement
7    where Barclays are providing cash in return for
8    securities.
9       Q.   Okay. So the 13 billion refers to
10   the amount that's apparently needed to get
11   through that night or to get into the next day;
12   is that right?
13      A.   Or that was the available
14   collateral. I don't know why 13 billion was 13
15   billion, but that was the transaction that was
16   done.
17      Q.   Could you just -- what is your
18   understanding of why Barclays did not affect
19   this transaction on Wednesday as opposed to
20   Thursday?
21      A.   My understanding was that it wasn't
22   the case of Barclays -- it wasn't the case that
23   Barclays didn't want to. It was technically
24   un -- it wasn't feasible to actually put a
25   mechanism in place to allow that transaction to

TSG Reporting - Worldwide  (877) 702-9580

Page 70

1      Blackwell - Highly Confidential
2  happen.
3      Q.   Okay.
4      A.   Because of the scale and complexity.
5      Q.   So why was it possible to do that on
6  Thursday?
7      A.   Because a mechanism was put in
8  place.
9      Q.   So you folks had been working on
10 putting this mechanism in place previously?
11     A.   No, that day. So it was -- when --
12 on the Wednesday, then through Wednesday
13 through Thursday there was a mechanism put in
14 place.
15     Q.   As to the collateral that was
16 originally supporting the Fed, and you
17 described that some of it made it to Barclays
18 but there were issues as to that transfer, did
19 you have any role in placing a value on that
20 collateral?
21     A.   Operations are not placing a value
22 on the collateral. The systems that operations
23 use have a value associated with them, so not
24 figuring out that this equity or this bond is
25 worth -- we are not marking the security in

TSG Reporting - Worldwide  (877) 702-9580

Page 71

1      Blackwell - Highly Confidential
2  that regard. Chase, again, would have primary
3  role in terms of collateral selection based on
4  the schedules of the agreement.
5      Q.   And did you ever hear any
6  discussions about a discount or a haircut that
7  was applied to that collateral?
8      MR. SHAW:  Asked and answered.
9      A.   No. Not that I recall, no.
10     Q.   Okay. What do you understand the
11 term "haircut" to mean with respect to repos
12 generally?
13     MR. SHAW:  Objection. Foundation.
14     A.   I would -- I'm not an expert in
15 terms of that process, so, again, commercial
16 components would be agreed by the business.
17     Q.   Could you describe for me -- well,
18 let me just ask about two other documents
19 before we go further.
20     (Exhibit 60 B, e-mail dated
21 9-18-2008, marked for identification.)
22     Q.   Mr. Blackwell, I am handing you a
23 copy of the document marked as Exhibit 60 B,
24 which is an e-mail stream which appears to be
25 dated September 18th, 2008, and attached to it

TSG Reporting - Worldwide  (877) 702-9580

Page 72

1      Blackwell - Highly Confidential
2  is a spread sheet of some sort. I know that --
3  I don't see your name on this e-mail, but I
4  wanted to ask you about the spread sheet that's
5  attached.
6      Have you ever seen a spread sheet
7  like this?
8      MR. SHAW:  Objection. Form.
9      A.   It's possible I have seen one. I
10 don't recall seeing one, but it's a schedule of
11 collateral values. It's being provided by -- I
12 assume this is being provided by JPMorgan.
13     Q.   Why do you say that?
14     A.   Because of who it's being sent from.
15     Q.   The title of the spread sheet says
16 BONY Transaction Anticipated Pre Funding. Do
17 you have any idea what that could mean?
18     A.   No.
19     Q.   Do you have any idea what the column
20 to the far right means where it says
21 Anticipated Pre Funding Dollar Amount?
22     A.   Only just the literal interpretation
23 of the title. It's a valuation.
24     Q.   Do you have any understanding of the
25 value of the different types of collateral that

TSG Reporting - Worldwide  (877) 702-9580

Page 73

1      Blackwell - Highly Confidential
2  were posted to the different Fed programs
3  listed here?
4      A.   At the time?
5      Q.   Yes.
6      A.   Possibly. I mean, I didn't look at
7  the detail. And, again, the detail is
8  thousands of CUSIPs. It's meaningless looking
9  at lists. It does have to be applied based on
10 the rules.
11     Q.   Do you have any understanding of the
12 aggregate amounts of the collateral you were
13 trying to transfer?
14     A.   I knew we were trying to transfer
15 $45 billion. That was the headline number,
16 approximate number.
17     Q.   Is it fair to say there were some
18 problems in transferring the collateral to or
19 unexpected issues arose with respect to
20 transferring the collateral from the Fed
21 program to the Barclays repo?
22     MR. SHAW:  Objection to form.
23     A.   There were problems, yes, there
24 were.
25     Q.   Could you just generally describe

TSG Reporting - Worldwide  (877) 702-9580

Page 74

1    **Blackwell - Highly Confidential**
2    for me what the problems were and how they
3    resolved themselves or didn't resolve
4    themselves?
5        A.   The process was designed that Chase
6    would pay -- sorry, Barclays would pay
7    $5 billion, and I explained this earlier,
8    $5 billion to -- Barclays would pay that to
9    Chase, Chase would pay that to the Fed, the Fed
10   would deliver $5 billion in collateral.
11       MR. BYMAN:  Could I ask you to speak
12   a little louder.
13       THE WITNESS:  Okay.  Do you want me
14   to repeat that?
15       MR. BYMAN:  If you would, I'd
16   appreciate it.
17       A.   Barclays paid -- my understanding
18   was Barclays paid Chase -- paid Lehman, their
19   tri-party agent, Chase, $5 billion.  $5 billion
20   was paid to the Fed.  The Fed released
21   $5 billion worth of collateral.  Their
22   valuations, not Lehman's valuations, but their
23   valuations based on what had been pledged the
24   previous night.  That collateral came into
25   Chase's box and was not delivered to BONY, to
TSG Reporting - Worldwide  (877) 702-9580

Page 75

1    **Blackwell - Highly Confidential**
2    Bank of New York.
3        Q.   To satisfy other transactions that
4    you mentioned earlier?
5        A.   Yeah, and I don't have visibility
6    over what those transactions were.
7        Q.   So was this -- could you just kind
8    of relay what you tried to do to resolve this
9    issue?
10       A.   I didn't try and resolve the issue.
11   A team of people that were managing it for me,
12   Monty, the global head of that function, and
13   Jim worked hard with treasury and my
14   settlements team as well to try and resolve
15   that issue, but it was mainly a dialogue with
16   Chase, the Fed, and there was an open line in
17   place that was being managed out of Jim's
18   office.
19       Q.   Okay.  And were you -- when you say
20   "open line," what do you mean by that?
21       A.   Open conference -- a phone line that
22   every participant could dial into.
23       Q.   And did you participate in that
24   conference call?
25       A.   I may have been on it briefly, very,
TSG Reporting - Worldwide  (877) 702-9580

Page 76

1        Blackwell - Highly Confidential
2    very briefly.  I wasn't sitting in that room.
3    I was in and out.
4        Q.   Is it fair to say that Jim Hraska or
5    the other individual you mentioned are the ones
6    that have in-depth knowledge of how this
7    problem was addressed?
8        A.   Jim Hraska.
9        Q.   Okay.  Do you have an understanding
10   of whether the full compliment of collateral
11   that Barclays was expecting to be posted to
12   their repo ever made it to Barclays?
13       A.   I don't believe the full value made
14   it, no.
15       Q.   Do you know what amount did not?
16       A.   Exact numbers, no, but the full
17   amount did not make it.
18       Q.   Do you have approximate numbers?
19       A.   Off the top of my head, I don't.  It
20   would be in an e-mail, but it wasn't the
21   complete amount.
22       Q.   Is there a $7 billion number that --
23   does that sound like the approximate amount?
24       A.   There was a cash repo that I
25   understood that was put on for 7 billion that
TSG Reporting - Worldwide  (877) 702-9580

Page 77

1        Blackwell - Highly Confidential
2    night as well which was pledged to Barclays to
3    make up some of the shortfall.
4        Q.   Okay.  Did that money go to
5    Barclays?
6        A.   I understand that it did or should
7    have done, but it was held properly -- I don't
8    know.  Actually, I don't want to misspeak.
9    It's probably in my -- again, it would be in my
10   e-mail.
11       Q.   And when you said put in place, that
12   was Thursday night?
13       A.   Overnight Thursday, yes, into the
14   early hours of Friday.
15       (Exhibit 61 B, e-mail dated
16   9-17-2008, marked for identification.)
17       Q.   Mr. Blackwell, I am handing you a
18   document that's been marked as 61 B, which is
19   an e-mail stream dated September 17th, 2008,
20   and the subject line reads "key points from
21   today's call with Alastair pertinent to
22   equities."
23       My question to you is have you ever
24   seen this document?
25       A.   I would have seen it in my -- I was
TSG Reporting - Worldwide  (877) 702-9580

Page 78

1    Blackwell - Highly Confidential
2  probably on the distribution.
3    Q.  Well, this is one of my questions
4  where I am not sure I'm on the same topic we
5  were just talking about.
6        Can you tell me what this call you
7  had had to deal with?
8    A.  About conversion.  John Neave was
9  one of the project managers who worked with
10  Samantha Hoban.  He wasn't an employee --
11  direct employee of mine, a resource within the
12  project team looking at conversion.  So these
13  meetings were happening periodically.  More
14  than probably daily.  Talk about what we knew
15  and what we didn't know and where we were in
16  terms of the project, and I would imagine that
17  you will see there are project plans and
18  updated project plans that go with each one of
19  these meetings, so these meetings were intended
20  to facilitate the conversion as we understood
21  it.  So as information became available, the
22  project plan would change.
23    Q.  Okay.  And so this is, just to
24  clarify, so this is not related to the repo
25  issue we were just talking about, this was your

TSG Reporting - Worldwide  (877) 702-9580

Page 79

1    Blackwell - Highly Confidential
2  plan or this is your folks' effort to
3  transition the broker business to Barclays in
4  some form?
5    A.  Yes.
6    Q.  I just had a couple of questions
7  about some of these lines here.
8        In the second sentence it says "the
9  074 box will simply roll up to the existing
10  Barclays B/D, i.e., a second DTC network."
11        Can you just tell me what that's
12  referring to?
13    A.  Okay, so that's as it relates to a
14  broker/dealer, Barclays broker/dealer.  074 was
15  Lehman's DTC clearing box.  At that point there
16  had been a discussion or assumptions made that
17  the clearing boxes would move at that point.
18  That subsequently changed.
19    Q.  How did it change?
20    A.  Over the course of the weekend it
21  was clear that Barclays were not taking
22  responsibility for the clearing boxes or any of
23  their liabilities in the clearing boxes and
24  that became a point of negotiation, I
25  understand, with the regulators.  I wasn't

TSG Reporting - Worldwide  (877) 702-9580

Page 80

1    Blackwell - Highly Confidential
2  involved in those discussion, but it became
3  clear that that assumption was, in fact,
4  faulty.
5    Q.  Okay.  Could you just tell me, you
6  said you were not involved in those
7  discussions?
8    A.  No, I wasn't.
9    Q.  What did you understand about them?
10    A.  Nothing apart from really what I
11  have just shared with you.
12    Q.  Okay.  So how — were you involved
13  in any discussions or did you have any
14  understanding relating to a payment of
15  $250 million between Barclays and the DTC?
16    A.  I'm aware of that.  Again, I'm not
17  sure how that number was calculated or what
18  consideration it is related to, to be honest.
19    Q.  Are you aware whether that payment
20  was ever made or how it all ended up?
21    A.  No.
22    Q.  The next bullet here talks about an
23  inventory of unencumbered LBI assets will be
24  identified based on the stock record on
25  Thursday night and will be priced at Thursday's

TSG Reporting - Worldwide  (877) 702-9580

Page 81

1    Blackwell - Highly Confidential
2  close.  Then it goes on to refer to the assets
3  that underpin the purchase agreement.
4        Do you see that paragraph I am
5  reading?
6    A.  I do.
7    Q.  Could you tell me what's at issue in
8  that discussion?
9    A.  At that point I had an understanding
10  that there were a schedule of assets that were
11  going to be purchased and transferred.  Again,
12  I believe the model -- and this is a point in
13  time.  That was the understanding of what was
14  happening at that point.  Post that things may
15  have changed, but that was the understanding.
16  So in terms of thinking about this from an
17  operational perspective, I would be given that
18  list and then I would figure out a way to
19  mechanically transfer it.  So this is what the
20  action here is thinking -- is considering.  I
21  don't know that I ever saw a list.
22    Q.  Okay.  So just not to -- I just want
23  to understand what you said.  At this time on
24  Wednesday you are thinking that you are going
25  to be given a list of assets and that you need

TSG Reporting - Worldwide  (877) 702-9580

Page 82

1       **Blackwell - Highly Confidential**
2   to somehow figure out how to transfer them to
3   Barclays. Okay.
4           Were you told at some point that
5   that was not going to take place?
6       A.   After the Friday.
7       Q.   What were you told?
8       A.   That there wasn't a conversion, and
9   I think you will see that in my e-mail trails
10  as well, that I was asked to come to a meeting
11  on Friday night, I think it was Friday night,
12  Friday about 5:00, and was told that there
13  wasn't a conversion and I needed to be working
14  towards being ready for business as Barclays on
15  Barclays -- get Barclays Capital ready for
16  business on the Monday.
17      Q.   I guess I don't understand what you
18  mean by there is no conversion in that context.
19      A.   Again, all the work that we had done
20  over the course of that week, how we
21  collectively, this group of people, thought a
22  transaction -- assumed a transaction might take
23  place, there wasn't going to be a conversion of
24  LBI as a going concern or any of these entities
25  or any of the contents of the entities as a
        TSG Reporting - Worldwide  (877) 702-9580

Page 83

1       Blackwell - Highly Confidential
2   going concern.
3       Q.   And what was going to take its
4   place?
5       A.   I didn't know at that point. I
6   didn't know at that point. And an agreement
7   hadn't been signed, so that wasn't shared with
8   me. So my marching orders became quite clear
9   that I should go off again, similar to a
10  conversion, be ready to be able to transact as
11  Barclays on the Monday. To support -- let me
12  correct that. I don't transact. Support
13  transactions as Barclays Capital.
14      Q.   So by that you meant -- you
15  understood -- is it correct to say that you
16  understood that to mean you were going to be
17  moved over to Barclays and somehow some assets
18  were going to be transferred, or did you have
19  any understanding of what assets were going to
20  be transferred to Barclays?
21      A.   None. Wasn't making an assumption
22  that any assets were to transfer. At this
23  point what I was talking about was the
24  ability -- whether I was going to be a Barclays
25  employee or not was unclear and that wasn't a
        TSG Reporting - Worldwide  (877) 702-9580

Page 84

1       Blackwell - Highly Confidential
2   consideration. What I was being asked to do,
3   to try and facilitate Barclays Capital's
4   ability to transact on the Monday or the
5   Tuesday, whenever we were going to go live,
6   various different asset classes. So that
7   was the -- my primary driver, again, was get
8   everyone together to start to be able to
9   support business as much as possible as usual.
10      Q.   And this was as of Friday you were
11  told this?
12      A.   On Friday, I think late on Friday we
13  were told that that was going to happen. I
14  actually -- it may have actually been -- the
15  marching orders may have been given to me the
16  following morning, actually, because I think at
17  that point it was unclear exactly what was
18  going to happen, but I was told there was no
19  conversion at that point. That was very clear.
20  So the details that were in here, a lot of
21  these things were becoming obsolete or -- as
22  time passed, so this is a point in time in a
23  process that operations and finance would go
24  through.
25          MR. SHAW: And just so it's clear,
        TSG Reporting - Worldwide  (877) 702-9580

Page 85

1       Blackwell - Highly Confidential
2   when the witness said "on here," he was
3   pointing to Exhibit 61 B.
4       Q.   Were you told that the assets that
5   had been posted as collateral to the Barclays
6   BONY repo were going to be sold to Barclays?
7       A.   Sold, no. I didn't -- I wouldn't
8   assume that, no.
9       Q.   Were you told that they were going
10  to be somehow rolled into the Asset Purchase
11  Agreement as purchased assets?
12      A.   I didn't know there was an Asset
13  Purchase Agreement at that point.
14      Q.   Did you have any involvement in the
15  Clarification Letter that was prepared over
16  that weekend?
17      A.   I don't believe so. I contributed
18  data to my superiors who may -- my supervisors
19  and others that asked, but who may have then
20  used that as part of the clarification letter,
21  but I didn't contribute directly.
22      Q.   So when I use the term
23  "Clarification Letter," is that a new term to
24  you?
25      A.   At that time it was something I was
        TSG Reporting - Worldwide  (877) 702-9580

Page 86

1    Blackwell - Highly Confidential
2  unfamiliar with. Post of the event, yes, it's
3  something I became aware of.
4    Q.   Since you have been at Barclays you
5  have seen it?
6    A.   Yes, I don't know whether I have
7  seen it, but I am aware of its existence.
8    Q.   And what's your understanding of
9  what that Clarification Letter did with respect
10  to the transaction?
11    MR. SHAW: Foundation.
12    A.   I actually don't know. I really --
13  I don't know. I know a Clarification Letter
14  exists and I don't recall reading it. It's
15  been referred to. That's all.
16    Q.   Do you have any understanding of the
17  two schedules that are attached to the
18  Clarification Letter, which are called
19  Schedules A and B?
20    A.   I am aware of Schedules A and B,
21  yes.
22    Q.   What are you aware of about them?
23    A.   Schedule A is the original repo
24  transaction, the original Fed repo transaction,
25  the assets are transferred to BONY. Schedule B
    TSG Reporting - Worldwide  (877) 702-9580

Page 87

1    Blackwell - Highly Confidential
2  was unencumbered assets within the clearing
3  boxes.
4    Q.   Just so I understand that, we have
5  been talking about the Fed repo which was
6  replaced by a Barclays repo and those -- that
7  collateral was to comprise Schedule A; is that
8  right?
9    MR. SHAW: Objection to form.
10    A.   My understanding is Schedule A was
11  the collateral that made it to Barclays. Now,
12  in a normal repo process there is substitution
13  and change, so it doesn't always work, it's not
14  always going to be precise, and that's just
15  reality. Every single repo that would be
16  processed would be different.
17    Q.   So your understanding was that the
18  collateral that was posted to the Barclays repo
19  was to become -- was to be included in
20  Schedule A?
21    MR. SHAW: Objection to form.
22    MR. HINE: You can answer.
23    A.   I think that would be my
24  understanding.
25    Q.   And is this an understanding that
    TSG Reporting - Worldwide  (877) 702-9580

Page 88

1    Blackwell - Highly Confidential
2  you had during that weekend or is this
3  something you developed later?
4    A.   Afterwards. I didn't spend any time
5  in terms of reconciling -- as an operations
6  organization we are reconciling and there was a
7  transfer of information between the parties
8  that would share information and Chase stopped
9  providing us with information on the Friday
10  morning, so we had no visibility over what was
11  going on there, but we did compare what had
12  transferred between Barclays and Lehman to
13  ensure that we were reconciled, and seen there
14  a very small difference of -- what we had
15  recorded on our books was less than
16  $30 million. So it was an accurate reflection
17  of what transferred. Or our books are an
18  accurate reflection of what transferred.
19    Q.   How about Schedule B, did you have
20  any role with respect to Schedule B over that
21  weekend?
22    A.   Yes. I mean, over the course of the
23  weekend my team were working with treasury to
24  refine a list of unencumbered assets sitting
25  within the clearance boxes.
    TSG Reporting - Worldwide  (877) 702-9580

Page 89

1    Blackwell - Highly Confidential
2    Q.   And why were you doing that?
3    A.   Because I was asked to do it.
4    Q.   Did you have any understanding as
5  part of the transaction why that was being
6  done?
7    A.   That was part of -- all I had was
8  there was negotiations going on and I was asked
9  to find -- to identify a set of securities that
10  were unencumbered in the clearance box.
11    Q.   Did you have any understanding about
12  that being used to fill some shortfall in the
13  assets that were supposed to have been
14  transferred to Barclays?
15    A.   I didn't know why precisely, so no.
16  What I was trying to do was mechanically create
17  a list or assist in mechanically creating a
18  list of assets that were unencumbered.
19    Q.   And when you say "unencumbered,"
20  what does that mean in that context?
21    A.   Unencumbered means there was a
22  methodology applied which would be firm --
23  predominantly firm inventory or assets that
24  were available to be re-hypothecated.
25    Q.   And were you only looking in the
    TSG Reporting - Worldwide  (877) 702-9580

Page 90

1      **Blackwell - Highly Confidential**
2  clearance boxes at DTC?
3      A.   We were looking -- we looked at
4  Euroclear. We looked in several places.
5      Q.   Could you just tell me the places
6  you looked.
7      A.   From memory, I think it was Canada,
8  the Canadian depo, DTC, and Euroclear. Two --
9  I think two boxes at DTC and a physical box at
10  Chase, I think. Again, this is -- I may not be
11  a hundred percent precise, but those depos
12  would be the primary locations.
13      Q.   When you say "we looked," can you
14  describe for me is this -- when did you start
15  looking?
16      A.   I think there was an ongoing process
17  over the course of the weekend. I don't know
18  when precisely. Again, I think you will find I
19  was actually in the office all of the night on
20  Thursday, so Thursday, Friday became one day
21  and all that time I don't have an exact
22  recollection of when that happened.
23      Q.   Okay. But is it fair to say it was
24  sometime at end of the week, it wasn't an
25  effort started Monday or Tuesday?
         TSG Reporting - Worldwide  (877) 702-9580

Page 91

1      **Blackwell - Highly Confidential**
2      A.   Oh, absolutely not.
3      Q.   And did you look at the OCC as well?
4      A.   Possibly. I can't comment on that.
5      Q.   Just for my own, I see reference to
6  an 074 box and then a 636 box. Could you
7  explain to me the difference between the two?
8      A.   The 074 box is predominantly an
9  equity clearing box, DTC clearing box, and --
10  sorry, 626 box?
11      Q.   636.
12      A.   636 is predominantly corporates,
13  corporate bonds.
14      Q.   I see something else referred to as
15  a non-actionable box. Is that a term you are
16  familiar with?
17      A.   Yeah. The non-actionable box, I
18  believe, was the list of securities that we
19  thought were -- some securities are actionable,
20  some securities are not. Securities that are
21  customer assets, for instance, you wouldn't --
22  they are not unencumbered, they are
23  fully-paid-for customer assets, so that's the
24  difference between the two.
25      Q.   Now, when you did this effort over
         TSG Reporting - Worldwide  (877) 702-9580

Page 92

1      **Blackwell - Highly Confidential**
2  the weekend to assemble these assets that were
3  to go into Schedule B, did you know there was
4  going to be a Schedule B or were you shooting
5  towards that goal?
6         MR. SHAW: Objection to form.
7      Q.   Bad question, but you can still
8  answer it.
9      A.   I was creating a schedule. I didn't
10  know what it was going to be called, what it
11  was going to be used for. Again, I was working
12  with a very large group of people to produce
13  this, so...
14      Q.   I guess I was asking did you know
15  the term "Schedule B" or that it was going to
16  be a schedule to a Clarification Letter at that
17  time?
18      A.   I didn't know it was going to be a
19  schedule to a Clarification Letter. It may
20  have been labeled as Schedule B, but, again, I
21  didn't know its purpose.
22      Q.   Fair to say you were not involved in
23  any of the court proceedings in the bankruptcy?
24      A.   No.
25      Q.   Is it fair to say that you didn't
         TSG Reporting - Worldwide  (877) 702-9580

Page 93

1      **Blackwell - Highly Confidential**
2  help prepare documents that were filed in any
3  of the courts?
4      A.   Not directly, no.
5         MR. SHAW: I think we had a slight
6  ambiguity. I believe you asked is it fair
7  to say he was not involved and he said no,
8  but I think the intent was --
9         MR. HINE: Let me just ask it again.
10      Q.   Were you ever involved in preparing
11  documents that were to be filed in the
12  bankruptcy proceeding in this case?
13      A.   I prepared documents for my
14  management which would invariably -- some
15  content of that would have gone into the
16  bankruptcy proceedings.
17      Q.   Is it fair to say that you were not
18  involved in preparing the Clarification Letter
19  and its schedules that were ultimately filed
20  with the court?
21      A.   I certainly didn't prepare the
22  letter, but there may have been data that came
23  from -- that I contributed to that were part.
24      Q.   Let's get back to this effort to
25  locate unencumbered assets.
         TSG Reporting - Worldwide  (877) 702-9580

Page 94

1    **Blackwell - Highly Confidential**
2    **How many assets did you locate?**
3    **What's the value of the assets that you**
4    **located, if you recall?**
5    A.   I think it was -- initially it was
6    about -- it was over $2 billion, but there was
7    Lehman paper within there, so it's difficult to
8    put a value on that, so...
9    **Q.   And who places the value on those**
10   **assets?**
11   A.   Normally that would be model driven,
12   so the finance organization would place a value
13   on it or a third-party source.
14   **Q.   And is it fair to say that your**
15   **operations group did not place the value on**
16   **those assets?**
17   A.   That's fair.
18   **Q.   I apologize for jumping back to the**
19   **Schedule A and the repo, but as to the**
20   **valuation of the assets that are posted as**
21   **collateral for the Barclays repo, we see**
22   **reference in some of the documents to BONY**
23   **placing a value on them. Why is BONY placing a**
24   **value on those assets?**
25   A.   Because they are Barclays' tri-party
     TSG Reporting - Worldwide  (877) 702-9580

Page 95

1    Blackwell - Highly Confidential
2    agent. You would expect them to place a value
3    on the collateral that they received.
4    **Q.   And is that valuation that's**
5    **different or was different than the valuation**
6    **that Lehman had placed on those assets?**
7         MR. SHAW: Objection. Foundation.
8    A.   I believe it was different by -- I'm
9    not sure the exact amount.
10   **Q.   Do you recall any discussions about**
11   **the difference between those two values?**
12   A.   I didn't have any of those
13   discussions, so no, I don't recall those
14   discussions.
15   **Q.   That would not fall within the**
16   **operation group's purview generally?**
17   A.   Jim may have had conversations with
18   them, with Bank of New York, Chase and the Fed
19   at that time, but he would be the right person
20   to ask.
21   **Q.   So is it fair to say you would not**
22   **have intimate knowledge of BONY's valuation of**
23   **those assets?**
24   A.   No, I wouldn't.
25        MR. HINE: I want to show you
     TSG Reporting - Worldwide  (877) 702-9580

Page 96

1    Blackwell - Highly Confidential
2    another document.
3         (Exhibit 62 B, e-mail dated
4    September 17, 2008, Bates stamped 10293351,
5    marked for identification.)
6    **Q.   Mr. Blackwell, I am handing you a**
7    **copy of a document marked 62 B, which is an**
8    **e-mail between Mr. Ullman and yourself on**
9    **September 17th, 2008.**
10        **Have you ever seen this document**
11   **before?**
12   A.   I would have thought so, yes.
13   **Q.   Can you just take a minute and**
14   **review it and see -- my question to you is**
15   **going to be what is Mr. Ullman being cynical**
16   **about or concerned about?**
17        MR. SHAW: Objection. Foundation.
18   A.   I don't know exactly what's going
19   through his mind, but I think you can see from
20   the e-mail that he has uncertainty about we
21   don't know the terms of a deal and he is
22   speculating about -- he is speculating about
23   what is going on. That is all. I have no idea
24   why he thought this. You would have to ask
25   him.
     TSG Reporting - Worldwide  (877) 702-9580

Page 97

1    Blackwell - Highly Confidential
2    **Q.   Do you have any recollection of**
3    **discussing this issue with him or anyone else?**
4    A.   No. I didn't have time to discuss
5    conjecture and speculation at that point in
6    time. I was purely doing my function as much
7    as I possibly could.
8         MR. HINE: I want to show you
9    another document.
10        (Exhibit 63 B, e-mail dated
11   September 19, 2008, Bates stamped 10294630,
12   marked for identification.)
13   **Q.   Mr. Blackwell, I am handing you a**
14   **document marked as Exhibit 63 B, which is an**
15   **e-mail stream involving yourself from the**
16   **period September 19th, 2008 dating back to the**
17   **prior date, September 18th. I don't have many**
18   **questions about this document.**
19        **What I really want to ask you about**
20   **is I see a series of documents like this,**
21   **e-mails, discussing fails, so I just want to**
22   **understand what fails are and how they related**
23   **to what you were doing at this point in time.**
24   A.   I think there were a lot of
25   questions being asked about the clearance
     TSG Reporting - Worldwide  (877) 702-9580

Page 98

1      Blackwell - Highly Confidential
2   boxes, exposure in the clearance boxes, and I
3   think this relates to ultimately the conclusion
4   that the only assets being transferred were the
5   unencumbered assets of the clearance boxes, but
6   not the fails.
7      Q.   Could you just tell me what fails
8   are in this context?
9      A.   Fails are transactions that have
10  been entered into where you are receiving cash
11  or securities --
12      MR. BYMAN: I'm sorry,
13  Mr. Blackwell, I cannot hear you.
14      A.   Definition of a fail is where a
15  security is to be delivered and cash to be paid
16  with either counterparty, and so fails would be
17  a list of failed to receive securities and
18  failed to receive cash where securities were to
19  be delivered. So that is a fail. So that --
20  if you are taking responsibility for the fails,
21  you are taking responsibility for the overall
22  clearance box. If you are not taking
23  responsibility for the clearance box, you are
24  not taking responsibility for the fails. And
25  that is -- this is where the questions -- where
TSG Reporting - Worldwide  (877) 702-9580

Page 99

1      Blackwell - Highly Confidential
2   questions are arising. There were questions
3   over the weekend as to the amount of fails and,
4   again, the visibility that we had was very,
5   very -- was limited because of the data that we
6   had received.
7      Q.   When you say "visibility," you mean
8   DTC had this data and you guys couldn't tell
9   the percentage of fails?
10      A.   We couldn't see data properly, but
11  that -- we had given -- yes, absolutely. We
12  had limited -- Chase in particular, that was a
13  major challenge for us, because it hadn't
14  provided us with any activity data that had
15  taken place on the Friday or I think since the
16  Thursday night.
17      Q.   Aren't you entitled to that as their
18  client or customer?
19      A.   Yes.
20      Q.   And did you argue with them about
21  that?
22      A.   Yes.
23      Q.   And what was the result of that?
24      A.   We still didn't get the data and I
25  believe Hughes Hubbard has been fighting to try
TSG Reporting - Worldwide  (877) 702-9580

Page 100

1      Blackwell - Highly Confidential
2   and get it from Chase ever since bankruptcy.
3      Q.   Can you tell me the position that
4   Barclays took with respect to fails?
5      MR. SHAW: Objection to form.
6      A.   I was asked by my -- again, my
7   superiors to try and explain what the fails
8   situation was and I think on several occasions
9   over the course of the week we provided data --
10  I provided data to the Barclays, Barclays'
11  lawyers or to my management with a status and I
12  think there was some communication where I said
13  I wasn't going to focus on this, I am going to
14  focus on the conversion now again, so we
15  provided the fails data and moved on and then
16  that sort of died as far as in my thought -- in
17  my recollection the issue died until the -- I
18  think the Sunday, I think it's the 21st, when
19  that was then brought up again in -- I think
20  that was -- I was started -- I was asked
21  another set of questions around that.
22      Q.   And what do you remember about that
23  conversation?
24      A.   Just to explain what fails were.
25      Q.   And who was that with, Barclays
TSG Reporting - Worldwide  (877) 702-9580

Page 101

1      Blackwell - Highly Confidential
2   or --
3      A.   No, that was with my own management.
4   And then I think I had some conversations with
5   our trading desks about that as well.
6      Q.   Your management in this regard is
7   who, Mr. Lowitt?
8      A.   It was probably Ian. It may have
9   been Alex Crepeau as well.
10      Q.   Were you party to any discussions
11  they might have then had with Barclays about
12  this issue?
13      A.   No.
14      Q.   Do you know how this issue was
15  resolved between Barclays and Lehman?
16      A.   I left the Weil offices at that
17  point. I hadn't been in any of the rooms
18  negotiating anything. I had just been in an
19  ante-room providing information to my
20  management, as I said. I returned to the
21  office to continue working on the unencumbered
22  assets.
23      Q.   What date was this?
24      A.   I think that was a Sunday. Again,
25  the timing may be slightly off, it may be
TSG Reporting - Worldwide  (877) 702-9580

Page 102

1　　　Blackwell - Highly Confidential
2　Saturday or Sunday, but it was over the
3　weekend.
4　　　Q.　So in the end did Barclays end up
5　getting the fails?
6　　　A.　No.　Barclays did not take
7　responsibility for the clearance box, just the
8　unencumbered assets sitting in the clearance
9　box.
10　　　Q.　Okay.　I am not trying to put words
11　in your mouth.　So you were able or your team
12　was able to take certain unencumbered assets
13　out of the clearance box and somehow it was
14　transferred to Barclays, just those assets?
15　　　MR. SHAW:　Objection.
16　Mischaracterizes prior testimony.
17　　　A.　I made a schedule of unencumbered
18　assets and in the following week there was
19　discussion with the trustee of LBI to move some
20　assets and some assets did move based on that
21　schedule.
22　　　Q.　Okay.　And those were unencumbered
23　assets?
24　　　A.　Unencumbered assets.
25　　　Q.　So just so I understand, that would

Page 103

1　　　Blackwell - Highly Confidential
2　not have included the fails?
3　　　A.　Does not include the fails.　Now, I
4　want to clarify one point here as it relates to
5　PIM, because PIM was the private investment
6　management business.　That hadn't transferred
7　at that point.　Assets did transfer
8　subsequently and the PIM business doesn't have
9　any fails either, its contractually-settling
10　business, so it's a non-fail environment.　So
11　the full set of customer assets are in the
12　customer accounts.
13　　　MR. HINE:　Let's mark this.
14　　　(Exhibit 64 B, e-mail dated
15　9-18-2008, marked for identification.)
16　　　Q.　Mr. Blackwell, I am handing you a
17　document marked as Exhibit 64 B, which is an
18　e-mail between yourself and Mr. Eickbush dated
19　September 18th, 2008 and it references in the
20　subject line something called a fails call, and
21　I believe this is the topic we have just been
22　discussing?
23　　　A.　I'm sorry, what day is this?
24　　　Q.　Upper right-hand corner says
25　September 18th.

Page 104

1　　　Blackwell - Highly Confidential
2　　　A.　Okay, yes.
3　　　Q.　Do you have any recollection of that
4　fails call?
5　　　A.　I don't think Greg was on that call.
6　I have a recollection of a call with the
7　Barclays lawyers on that -- I think over that
8　night, so that's the Thursday night.　Again, we
9　were trying to ascertain the value and the
10　number of fails and, again, it's sort of
11　pertaining to taking control of the box or just
12　taking the inventory.
13　　　Q.　Okay.　And do you recall anything
14　else about that call?
15　　　A.　I provided data, which is, again, in
16　my e-mail, which was provided to the Weil
17　lawyers as well, and that was the end of the
18　discussion.　I think we spoke to Bart and just
19　told him what we had done and that was it and
20　that was the end of the issue until the
21　weekend.
22　　　Q.　I see the use of a phrase in this
23　e-mail "cherrypicking of assets."　Do you see
24　that?
25　　　A.　Yeah.　I don't -- he wasn't on the

Page 105

1　　　Blackwell - Highly Confidential
2　call, so this is conjecture and speculation on
3　his part.　I don't know.　You would have to ask
4　him why.
5　　　Q.　Does that phrase have any meaning to
6　you in this context?
7　　　A.　I think the latter part of that
8　sentence makes sense.　I think what he is
9　saying, my interpretation of this, and you
10　should ask Greg for his perspective, would be
11　that the unencumbered securities within the box
12　are part of any transaction potentially, and,
13　again, he wasn't party to any deal details or
14　nor was I, so this is his speculation, so he is
15　speculating that it's unencumbered assets.
16　　　(Exhibit 65 B, e-mail dated
17　September 19, 2008, Bates stamped 10298087,
18　marked for identification.)
19　　　Q.　Mr. Blackwell, I am handing you a
20　copy of an exhibit marked 65 B, which is Bates
21　stamped 102 -- not Bates stamped, but it's
22　marked with numbers at the bottom 10298087
23　through -- well, actually, they are all marked
24　087, but it appears to be an e-mail stream from
25　September 19th in which you are one of the

Page 106

1    **Blackwell - Highly Confidential**
2  recipients.
3        MR. SHAW: Take your time.
4    A.    It is just going to take a little
5  bit of time for me to read.
6    **Q.    Sure.  If it helps you, my question**
7  **is going to be on the first page.**
8    A.    Yeah, but I would still like to read
9  the --
10   **Q.    Sure.  Sure.**
11       (Document review.)
12   A.    Okay.
13   **Q.    Have you had a chance to review the**
14 **document?**
15   A.    I have.  Thank you.
16   **Q.    My question relates to the e-mail**
17 **from Mr. Dolan to several people including**
18 **yourself where he says "let's be very clear**
19 **here, there is no such thing as cherrypicking.**
20 **Per Berkenfeld and Lodato, all positions will**
21 **move."**
22       **Could you just tell me what is the**
23 **issue here?  I see the phrase "cherrypicking"**
24 **and I just want to know what's at issue in this**
25 **communication.**
       TSG Reporting - Worldwide  (877) 702-9580

Page 107

1    **Blackwell - Highly Confidential**
2        MR. SHAW: Objection.  Foundation.
3    A.    The whole e-mail trail is about a
4  conversion, a conversion position.
5    **Q.    Okay.**
6    A.    And I'm just trying to ascertain
7  exactly when this was, but, again, it looks
8  like this was on the Thursday and there was an
9  assumption, as you can see, by everyone
10 involved here that there is an assumption that
11 a conversion is taking place, therefore, the
12 boxes are moving -- the clearing boxes are
13 moving over.  What this, in fact, is then
14 talking about is just firm accounts.  I think
15 the title of the e-mail is talking about firm
16 account transitions and is very specific about
17 trading, trading positions, but this is
18 redundant.  This is redundant.  This is up to a
19 point in time and this is not what then came to
20 pass ultimately, I don't believe, so, again,
21 this is based on a team of people, technology
22 operations, finance and business working on a
23 set of assumptions which were faulty ultimately
24 or became redundant because another set of
25 decisions were made by senior management.
       TSG Reporting - Worldwide  (877) 702-9580

Page 108

1    Blackwell - Highly Confidential
2    **Q.    Okay.  Let me just see if I**
3  **understand that.**
4        **Are you saying that this use of the**
5  **term "cherrypicking" does not relate to the**
6  **fails that we just talked about previously;**
7  **correct?**
8    A.    No.  As far as I -- the way I am
9  interpreting this document, it's not.  I would
10 interpret this by looking at firm accounts and
11 saying we have this position from the firm
12 accounts and I think what he is saying is that
13 isn't happening and it's not relevant to the
14 fails.
15   **Q.    So when you are using the phrase**
16 **"conversion," am I correct to say that in the**
17 **conversion context all the accounts would go**
18 **over including every aspect of the clearance**
19 **boxes?**
20   A.    No.  Sorry, carry on.  I apologize
21 for interrupting.
22   **Q.    I am trying to understand.**
23       **Previously you had talked about**
24 **finding unencumbered assets in the clearing**
25 **boxes; correct?**
       TSG Reporting - Worldwide  (877) 702-9580

Page 109

1    **Blackwell - Highly Confidential**
2    A.    Yes.
3    **Q.    Is that not the case in a**
4  **conversion?  Does the entire clearing box go**
5  **over?**
6    A.    These are two different things.
7  This is two different exercises completely.
8  This is about a way a deal potentially may have
9  been -- having been conceived up to a point in
10 time and something completely different
11 afterwards, so it's comparing apples with
12 oranges.
13   **Q.    So is it correct to say the**
14 **conversion effort started earlier in the week**
15 **worked its way through different iterations up**
16 **to some point in time and then was abandoned?**
17   A.    And then abandoned on the Friday at
18 5 p.m. I think I called a meeting and told
19 everyone the conversion -- all these people
20 were working feverishly to try and create a --
21 to do certain things and to facilitate whatever
22 we believed the transaction was.  It was
23 irrelevant.
24   **Q.    And then you shifted gears and I**
25 **think you testified before that you then were**
       TSG Reporting - Worldwide  (877) 702-9580

## Page 110

Blackwell - Highly Confidential

1 tasked with getting yourself set up so you
2 could run your operations on behalf of Barclays
3 Capital as of Monday; is that right?
4    A.   Or some form of that still to be
5 determined with conversations with Barclays'
6 operations staff, which I wasn't really able to
7 have.
8    Q.   Okay.  That was going to be my next
9 question.  What did you, in fact, do with
10 respect to that task?
11    A.   A number of the people involved in
12 what was perceived to be the original
13 conversion then started to work on a plan to
14 create our ADP stream, which is the back office
15 clearance system, a new DTC clearance box
16 linking up to Barclays' back office
17 infrastructure, and we built a whole plethora
18 of pieces of technology or replicated
19 technologies.  On -- I think it was on
20 Sunday -- there was clarification over the
21 weekend and at one point I asked a question is
22 prime brokerage going to be live in the first
23 week and it was agreed that that wasn't going
24 to be the case.  That was passed to me from

TSG Reporting - Worldwide  (877) 702-9580

## Page 111

Blackwell - Highly Confidential

1 Ian.  And we continued to work through that
2 process.  On -- I think it was late on Sunday I
3 was told -- or may have been Monday morning I
4 was told that we wouldn't be trading for a week
5 and so it became moot.  So post bankruptcy we
6 did a -- we had a combined plan, not a plan
7 where Lehman employees try to figure out how
8 they would be working at Barclays, but one
9 where we were coming together as a group of
10 people to determine exactly what we were doing,
11 set goals and then deliver those goals, and
12 that wasn't really done until -- I can't
13 remember the meeting, but it was in the board
14 room at 745.
15    Q.   This was after the closing?
16    A.   I believe so, yes.  I can't -- we
17 could clarify when it was.
18    Q.   Do you have any recollection of any
19 issues arising during this weekend period about
20 assets that were, I guess, belonged to LBIE
21 versus LBI?
22    A.   I think there may have been some
23 discussion.  I don't recall it.
24    Q.   You don't recall any problems with

TSG Reporting - Worldwide  (877) 702-9580

## Page 112

Blackwell - Highly Confidential

1 assets that were previously supposed to go to
2 Barclays that ended up being from LBIE and they
3 couldn't go?
4    A.   I don't, but it's possible.
5    Q.   You weren't involved?
6    A.   I don't recall that.
7       MR. HINE:  Do you want to take a
8 break?
9       MR. SHAW:  Sure.
10       (Recess was taken from 11:43 to
11 11:53.)
12       (Exhibit 66 B, e-mail dated
13 September 19, 2008, Bates stamped 10298186,
14 marked for identification.)
15 BY MR. HINE:
16    Q.   Mr. Blackwell, I am handing you a
17 copy of a document marked as Exhibit 66 B,
18 which is an e-mail stream dated Friday, the
19 19th of September, and you are listed as a
20 recipient on the last of the e-mail stream.
21       I wanted to ask you if you have ever
22 seen this e-mail before, if you recall seeing
23 it.
24    A.   What time is this?  What time is the

TSG Reporting - Worldwide  (877) 702-9580

## Page 113

Blackwell - Highly Confidential

1 original flow here?  Is that the accurate time?
2    Q.   I don't know.
3    A.   Is that middle of the day, middle of
4 the night?  I can't tell.  Where Paolo says
5 "got it."
6    Q.   Well, here is my question:  The part
7 of the e-mail stream that you were referring to
8 is an e-mail from David Aranow to Paolo Tonucci
9 which says, and let me just read it:
10 "Barclays' operations team has recalculated the
11 value of the collateral that they received from
12 us last night and they are more than fully
13 collateralized including the haircuts applied.
14 Senior management at Barclays, I am told, are
15 very satisfied with the results of the effort."
16 And then it goes on.
17       Do you recall any discussions about
18 this issue on that Friday?
19    A.   No.
20       MR. SHAW:  Objection to form.
21    Q.   Am I understanding your prior
22 testimony correctly that not all the collateral
23 got transferred to Barclays that they expected
24 on Thursday night?

TSG Reporting - Worldwide  (877) 702-9580

Page 114

1      **Blackwell - Highly Confidential**
2      A.   I don't know what this is referring
3  to precisely.
4      Q.   Okay.
5      A.   So I can't comment on this e-mail.
6  I'm on the e-mail trail. There is -- the
7  commercial components are -- you have John
8  Wickham, John Feraca and John Coghlan on here
9  that are the people that would have an opinion,
10 and same with Paolo. I don't know what this is
11 referring to.
12     Q.   Do you recall any debate or
13 discussion on either Thursday night or Friday
14 of that week about whether the collateral had,
15 in fact, all been transferred to Barclays under
16 the repo?
17     A.   There was a mechanism put in place
18 to move collateral, so there was debate and
19 discussion about what was moving in terms of
20 the mechanism. Had a lot of conversation about
21 the mechanism. So that's where the focus,
22 again, from an operations standpoint had, and
23 what moved was reconciled. So I think that's
24 understood that physically moved. I don't know
25 what this is referring to. I don't know what

Page 115

1      Blackwell - Highly Confidential
2  the value is, so I don't have a -- don't really
3  have any opinion on this.
4      **Q.   Okay. I understand your testimony.**
5  **I just want to make sure I got it all.**
6      **Where it says "fully collateralized**
7  **including the haircuts," do you have any**
8  **understanding what haircuts they are talking**
9  **about there?**
10     A.   I don't know what Barclays would
11 have applied.
12     **Q.   And I take it also you don't**
13 **understand what the phrase "fully**
14 **collateralized" in this context is?**
15     A.   I don't know exactly. I think this
16 is -- yes.
17         MR. HINE: That's fine.
18         Let's mark this.
19         (Exhibit 67 B, e-mail dated
20 9-18-2008, marked for identification.)
21     **Q.   Mr. Blackwell I am handing you a**
22 **document marked as Exhibit 67 B, which is an**
23 **e-mail dated September 18th apparently late in**
24 **the evening between Mr. Hraska and yourself,**
25 **and there is other aspects of the e-mail, but**

Page 116

1      **Blackwell - Highly Confidential**
2  **my question to you relates to the middle e-mail**
3  **in this stream in which Mr. Hraska writes**
4  **"without margin we are 1.5 billion short. With**
5  **margin, we owe them 7 billion." Do you see**
6  **that?**
7      A.   Yes, I do.
8      **Q.   I think I understand your prior**
9  **testimony as to the last document, but do you**
10 **have an understanding what this is talking**
11 **about?**
12     A.   I think this is discussing a
13 shortfall. Most of my conversations with Jim
14 were face to face, because he was down the
15 hallway, but it looks like there was a
16 shortfall in terms of what was actually
17 delivered, as I understood it, and that he was
18 attempting to arrange a loan against the Chase
19 depo positions and pledge cash. Whether that
20 was successful or not, I --
21     **Q.   Just so I understand that, you mean**
22 **he was attempting to affect a loan from Chase**
23 **and then the cash would then be transferred to**
24 **Barclays to make up for the shortfall?**
25     A.   Would fill the repo. I think that's

Page 117

1      Blackwell - Highly Confidential
2  what he was saying here. He would be the
3  person who could describe this precisely, but
4  that would be my interpretation.
5      **Q.   And do you have an understanding**
6  **that there was a $7 billion shortfall in the**
7  **repo or do you --**
8      A.   That -- I have a recollection of
9  that kind of number, but, again, I wouldn't be
10 able to talk as eloquently as Mr. Hraska would.
11     **Q.   I just want to see what you recall.**
12     **Do you recall that that 7 billion --**
13     A.   It sounds familiar.
14     **Q.   -- shortfall was ever satisfied?**
15     A.   I don't.
16     **Q.   Can you explain to me your**
17 **understanding of why there is a $7 billion**
18 **shortfall when there is with margin and then it**
19 **says without margin a smaller shortfall? Do**
20 **you know what that means?**
21     A.   These would be the commercial terms
22 of a repo. So a margin -- you have to deliver
23 a higher value which is margin, so I think you
24 need -- you would have to ask Jim what
25 exactly this meant or, indeed, the front office

Page 118

1        Blackwell - Highly Confidential
2   as to the terms that were agreed.
3        Q.   Okay. So you don't have any
4   independent recollection --
5        A.   No.
6        Q.   -- of what that issue is?
7        A.   No, I don't.
8            (Exhibit 68 B, e-mail dated
9        9-20-2008, marked for identification.)
10       Q.   Mr. Blackwell, I am handing you a
11  copy of an exhibit marked 68 B, which is an
12  e-mail stream dated September 20th apparently
13  from a great part of your life and I just
14  wanted to have you take a look at it and see if
15  you recall this e-mail stream.
16           (Document review.)
17       A.   I recall this.
18       Q.   Could you tell me what was making
19  your life a living hell at that time?
20       A.   Just trying to do my job, frankly.
21  That was it. It was just the volume of
22  information and data I was being asked to
23  provide. The environment I was working in was
24  very, very difficult. It wasn't an environment
25  where we had perfect information. So there was

TSG Reporting - Worldwide  (877) 702-9580

Page 119

1        Blackwell - Highly Confidential
2   a lot of uncertainty in terms of the data that
3   we were trying to gather and we weren't
4   operating in normal course of business, so
5   being put under enormous pressure to generate
6   data from a substandard environment which
7   wasn't designed to create the data. The way we
8   were having to extract it at that point in time
9   was incredibly, incredibly challenging, and so
10  that was the living hell.
11       Q.   Okay. But when you say "data," what
12  data are you referring to?
13       A.   All of the work streams that are in
14  my e-mail that I was being asked to work on, so
15  all contribute.
16       Q.   Was it a particular -- was this just
17  venting about the general situation or was it a
18  particular task that you were being asked that
19  you were particularly mad about or stressed
20  about at that point?
21       A.   No, I don't really recall exactly.
22  John Dorogoff used to run the investment
23  management division for me and was off at
24  Neuberger, so he wasn't part of whatever deal
25  was going on, he was dealing with a separate

TSG Reporting - Worldwide  (877) 702-9580

Page 120

1        Blackwell - Highly Confidential
2   set of issues, so I have -- I was being
3   challenged. I think the reference to being
4   offended was I think Rich Ricci was unhappy
5   that -- I showed him something and it
6   wasn't the same as something else that somebody
7   else had shown him which was very similar, or I
8   had been in the room when something was shown
9   to him and that was in 745 and I don't know
10  what data it refers to, frankly, but I know
11  that he wasn't -- he had seen a similar piece
12  of information that was different, so, again,
13  it's around having to try and do a work to the
14  standard that I am used to doing in my daily
15  life under incredibly difficult circumstances,
16  which hopefully not many people have to live
17  through, and trying to perform to the standard
18  I want to as a professional. And that was the
19  challenge.
20       Q.   Well, can you -- at the bottom of
21  this first page you write something about "if I
22  can't figure out what assets are in and out of
23  the deal, the deal can't close."
24           Is that -- I am just trying to
25  understand what assets you are probably

TSG Reporting - Worldwide  (877) 702-9580

Page 121

1        Blackwell - Highly Confidential
2   referring to there.
3        A.   I don't know.
4        Q.   You don't know?
5        A.   I don't know. I mean, I could
6   speculate, but it's not meaningful.
7        Q.   Okay. Is this during the period
8   when you are trying to locate the unencumbered
9   assets that we talked about earlier?
10       A.   What date is this? This is the
11  20th. It's possible. It's possible. I was
12  doing lots of things at that time. I was also
13  trying to figure out -- yes, I was doing many,
14  many, many different things, you can see that,
15  so it could be a reference to anything. It's
16  more of a reference to my state of mind than it
17  is to individual task I am carrying out.
18       Q.   Above that you talk about a
19  conversation with Bob Diamond's number 2. Who
20  is that?
21       A.   Rich Ricci.
22       Q.   Okay. So that's what you were
23  talking about before when you said he would
24  have been offended?
25       A.   Yes.

TSG Reporting - Worldwide  (877) 702-9580

Page 122

1      Blackwell - Highly Confidential
2      Q.   Do you recall anything else about
3  that conversation?
4      A.   No, not really apart from -- I
5  really don't -- I don't even know what I was
6  talking about, to be honest. I don't know what
7  the subject of the conversation was about, but
8  it was some piece of data that I handed over
9  and -- or something of that nature. I really
10 can't recall.
11     Q.   At the very top you talk about what
12 they bought. Do you see that phrase?
13     A.   Yes. I didn't know.
14     Q.   You didn't know what they bought?
15     A.   No.
16     Q.   My question was is there push-back
17 from Barclays during this period of time about
18 the assets that they thought they bought but
19 they are not getting?
20         MR. SHAW: Objection to form.
21     A.   I wasn't having conversations with
22 Barclays about what assets. I was doing my
23 task. I didn't know what the deal was, so I
24 don't know. In terms of data that was being
25 shared, I was sharing information with my
        TSG Reporting - Worldwide  (877) 702-9580

Page 123

1      Blackwell - Highly Confidential
2  management and attending in meetings at 745
3  with people and that was happening constantly
4  24 hours a day pretty much, so I don't recall
5  what it's specifically referring to.
6      Q.   Okay. I understand you weren't in
7  conversations with Barclays, but do you recall
8  any just general scuttlebutt or your general
9  understanding about Barclays pushing back as to
10 the assets they thought they were buying?
11     A.   The only thing I recall was the
12 clearance boxes and there are obviously assets
13 that fall under the Fed repo, but that was
14 before this point, fall under the Fed repo that
15 would not be eligible as collateral to be
16 delivered to -- as part of a regular repo,
17 because the Fed takes lower-quality assets, but
18 that's standard commercial terms.
19     Q.   The Fed takes lower-quality assets
20 than a repo between private parties?
21     A.   Yes.
22     Q.   That's pretty standard?
23     A.   The PDCF was created to create
24 liquidity for that very purpose, to allow
25 poorer quality assets to be lent so that it
        TSG Reporting - Worldwide  (877) 702-9580

Page 124

1      Blackwell - Highly Confidential
2  would create liquidity in the market.
3      Q.   And does the Fed get a bigger
4  haircut or discount as to the collateral that's
5  posted for those?
6      A.   I'm not sure.
7      Q.   You are not sure?
8      A.   I'm not sure.
9          (Exhibit 69 B, e-mail dated
10 September 19, 2008, Bates stamped 93219,
11 marked for identification.)
12     Q.   Mr. Blackwell, I am handing you a
13 document which is marked as 69 B which is an
14 e-mail stream taking place on Friday the 19th.
15 You are involved in this stream.
16         My question has to do with the part
17 of it that's on the second page. Please take
18 your time to look at it.
19         (Document review.)
20     A.   Okay.
21     Q.   In that e-mail -- have you had a
22 chance to review the document?
23     A.   Yes.
24     Q.   In the e-mail that I am referring
25 to, which is between Mr. John Palchynsky and
        TSG Reporting - Worldwide  (877) 702-9580

Page 125

1      Blackwell - Highly Confidential
2  Mr. Hraska and others, CC'd to you on the 19th
3  at 3:57 p.m., he discusses seven -- "as per
4  Barclays' request, 7 billion cash was allocated
5  to their lock-up last night. If securities
6  were/can be used instead, that would free up
7  margin collateral by reducing the amount of
8  higher haircut securities allocated to the JP
9  Chase Bank loan."
10         Could you explain to me what that
11 means, if you understand it?
12         MR. SHAW: Objection. Foundation.
13     A.   The technical experts would be
14 better to explain this to you. I think that
15 would be -- I can make an attempt to explain it
16 to you, but I think --
17     Q.   Do you have an understanding of what
18 it means? I understand you are not the
19 technical expert.
20     A.   Just almost literally that 7 billion
21 of cash, collateral, the loan I think was
22 referred to earlier where securities were
23 pledged to Chase as a loan and 7 billion of
24 cash was pledged to Barclays. That 7 billion.
25 And I think John is referring -- John
        TSG Reporting - Worldwide  (877) 702-9580

Page 126

1     Blackwell - Highly Confidential
2  Palchynsky is referring to different commercial
3  terms dependent on the quality of collateral.
4  What he is referring to in that last sentence
5  in terms of the JPMorgan Chase situation, I
6  don't know what he is referring to precisely
7  there, so I'd rather not speculate, but, again,
8  the middle part of that paragraph he is just
9  referring to substitution or changes based on
10 collateral quality, as far as I understand,
11 which would give you different commercial --
12     Q.  Higher haircut securities are lower
13 quality?
14     A.  I believe so, but you have to ask
15 them for confirmation.
16     Q.  Do you have any recollection of the
17 discussion discussing this with your folks?
18     A.  No. No. This wasn't an environment
19 where we were having lots of discussion.
20     Q.  Are you copied simply because you
21 are in the chain of command?
22     A.  Yes.
23     Q.  You are not the guy on the ground
24 doing this type of deal?
25     A.  No. I had 2 and a half thousand
      TSG Reporting - Worldwide  (877) 702-9580

Page 127

1     Blackwell - Highly Confidential
2  people working for me. I didn't do this kind
3  of detail.
4         (Exhibit 70 B, e-mail dated May 29,
5  2009, Bates stamped 10296524, marked for
6  identification.)
7     Q.  Mr. Blackwell, I am handing you a
8  copy of a document marked as Exhibit 70. It's
9  an e-mail on Friday, September 19th, from Neal
10 Ullman to several people — two people
11 including yourself titled "did you hear that
12 this is on hold." Do you recall this e-mail?
13     A.  Yes. It's in relation to the Kathy
14 Bopp Flynn, who is the originator of this
15 e-mail, was referring -- was sending a note to
16 Neal around the conversion work. Again,
17 thinking, this is Friday, that we are all
18 working towards a conversion. That conversion
19 is now stopping. It's on hold. And Neal is
20 speculating again that the assets have gone as
21 part of a repo. I have no idea why he thought
22 that or otherwise. I don't know.
23     Q.  Do you recall any discussion at all
24 about being out-smarted because the assets are
25 now in their possession due to the repo?
      TSG Reporting - Worldwide  (877) 702-9580

Page 128

1     Blackwell - Highly Confidential
2     A.  I think there was speculation
3  amongst a lot of people as to what was
4  happening. We didn't know at that point. So
5  again, this may be Neal's theory at that time.
6     Q.  Okay. But your recollection of the
7  phrase "did you hear that this is on hold" is a
8  reference to the conversion effort?
9     A.  Absolutely. And that was Kathy's
10 role, as I think she was responsible for -- she
11 was head of audit at the time, so, again, a
12 process role.
13        (Exhibit 71 B, e-mail dated
14 September 19, 2008, Bates stamped 138587,
15 marked for identification.)
16     Q.  Mr. Blackwell, I am handing you an
17 exhibit marked 71 B, which is an e-mail from
18 yourself to Paolo Tonucci on Friday the 19th.
19     A.  Right.
20     Q.  First of all, do you recall this
21 e-mail?
22     A.  I don't recall the e-mail, but I
23 understand it.
24     Q.  Could you explain to me what you are
25 discussing here with Mr. Tonucci?
      TSG Reporting - Worldwide  (877) 702-9580

Page 129

1     Blackwell - Highly Confidential
2     A.  I am asking him -- again, I thought
3  I was doing a conversion, so I had -- I was
4  asking him the question that as a repo going
5  into default the conversion, have we converted,
6  that's it, because the conversion -- I then
7  actually went to Ian's office and met Paolo and
8  that's when I was told at I think 5 p.m. that
9  day there isn't a conversion. So I am
10 speculating is that what's happened. I didn't
11 know. Been working towards a conversion and we
12 had been working hard to process a repo trade
13 and that's the question I am asking. So I went
14 into Ian's office and was told that there
15 wasn't a conversion and all of the things that
16 I have told you previously.
17     Q.  Okay. And when you say "putting the
18 repo into default is my conversion," what does
19 that mean? What does putting the repo into
20 default mean?
21     A.  The financing trade, by Lehman going
22 bankrupt, my understanding would be that repo
23 is going to default.
24     Q.  You mean LBI going bankrupt?
25     A.  Yes.
      TSG Reporting - Worldwide  (877) 702-9580

Page 130

Blackwell - Highly Confidential
1
2    Q.    So you are --
3    A.    I'm sorry, go ahead.
4    Q.    I am just trying to understand what
5    you are talking about.
6         Is it your understanding at that
7    time that if LBI goes bankrupt, the repo goes
8    into default?
9    A.    That's standard terms.
10    Q.    Okay. And --
11    A.    If the counterparty puts you in
12    default, ultimately.
13    Q.    Do you recall any discussions about
14    the repo going into default?
15    A.    Absolutely not at this point.
16    Q.    Did you have any water cooler
17    conversation or any speculation about whether
18    the repo would go into default at the time?
19    A.    Not that I recall, no.  No.
20    Q.    Did anyone ever discuss with you the
21    possibility that if the repo went in default,
22    those assets would be left with Barclays?
23    A.    It's possible. Again, I don't
24    recall a specific conversation of that nature.
25    Q.    Do you recall any conversations with

TSG Reporting - Worldwide  (877) 702-9580

Page 131

Blackwell - Highly Confidential
1
2    anyone about a possible default under the repo?
3    A.    I don't remember specific
4    conversations, no, on that.
5    Q.    Do you have any general
6    recollections that it was a topic of
7    discussion?
8    A.    I think it was a topic of
9    speculation.
10    Q.    Did you raise that topic when you
11    met with Mr. Tonucci or Mr. Lowitt?
12    A.    I was asked -- I was told -- I went
13    to the room. There was a conversation already
14    under way. I can't remember who exactly was in
15    the room, but I was told that there wasn't a
16    conversion, and so I asked what's next, and so
17    that's when I got my -- I started to get the
18    marching orders for the following week, so that
19    was really the bulk of that conversation. Now,
20    I think I was in a cab potentially on my way
21    back into the office or just got back into the
22    office at this point from being up all night.
23    I had just gone home to shower and come back
24    again, so I was kind of in the process of being
25    in transit to an office.

TSG Reporting - Worldwide  (877) 702-9580

Page 132

Blackwell - Highly Confidential
1
2    Q.    But when you did go in and met with
3    Mr. Tonucci and Mr. Lowitt, was anyone else in
4    the office?
5    A.    Yes, there were. I can't remember
6    who it was. It was some combination of Gerry
7    Reilly, Martin Kelly, potentially, and there
8    may have been other people as well, but it
9    wasn't -- there weren't any more than that, I
10    don't think.
11    Q.    Did you hear the notion of a repo
12    default mentioned at all in that meeting?
13    A.    I don't recall that. I don't think
14    so.
15    Q.    Do you recall anything about a
16    default being discussed in that meeting?
17    A.    No, I don't recall anything being
18    discussed in that meeting in terms of a
19    default. The conversation had moved on by the
20    time I had got into the room to here, my
21    conversation.
22         (Exhibit 72 B, e-mail dated
23    9-20-2008, marked for identification.)
24    Q.    Mr. Blackwell, I am handing you a
25    copy of an exhibit marked 72 B, which is an

TSG Reporting - Worldwide  (877) 702-9580

Page 133

Blackwell - Highly Confidential
1
2    e-mail stream on September 20th between
3    Mr. Hraska, Mr. Tonucci and you are CC'd.
4         My question is do you recall that
5    e-mail discussion?
6         (Document review.)
7    A.    I have read the mail.
8    Q.    Do you see in the first paragraph on
9    the page it discusses Barclays closing the repo
10    under default. Do you see that phrase?
11    A.    I do, yes.
12    Q.    Does this ring a bell with you or do
13    you recall any discussions on repo default?
14    A.    In terms of timing, this starts to
15    ring a bell. It wasn't a Friday conversation I
16    was having. So I think Jim is saying that in
17    order to protect the pledge positions of the
18    securities that are being pledged, they would
19    need to carry out a certain process, put the
20    repo in default, Barclays would have to put the
21    repo in default.
22    Q.    Can you explain to me what you mean
23    by "in order to protect the pledge positions"?
24    A.    Well, if you have placed cash with a
25    counterparty and you have securities as

TSG Reporting - Worldwide  (877) 702-9580

Page 134

1    Blackwell - Highly Confidential
2    collateral, if you put a repo into default,
3    keep the securities and the cash stays with the
4    counterparty, and that's a standard term of a
5    repo agreement.
6        Q.   Is it standard to keep excess
7    collateral?
8        A.   I don't know.
9        Q.   And so what is -- do you recall
10   any -- this exchange between Mr. Hraska and
11   Mr. Tonucci?
12       A.   I received a lot of e-mails. I saw
13   it at the time, so I'm sure -- I don't have --
14   it doesn't stick out in my memory as something
15   particularly.
16       Q.   Do you recall -- I guess ultimately
17   the repo was not put into default; correct?
18       MR. SHAW: Objection.
19       A.   Actually, I'm not a hundred percent
20   sure of the fact pattern what happened around
21   the repo in terms of its legal standing.
22       Q.   Okay. Do you ever recall hearing
23   that it was put in default?
24       A.   In terms of how it was -- no, not in
25   terms of -- it may have been used as a
TSG Reporting - Worldwide  (877) 702-9580

Page 135

1    Blackwell - Highly Confidential
2    shorthand for recording it. Not in a legal
3    sense. More about how we were recording --
4    trying to capture things on the books and
5    records of Lehman Brothers post bankruptcy.
6        Q.   Can you explain what you mean by
7    that?
8        A.   Just cleaning up the books to try
9    and reflect real-world activity, which has been
10   something that continues to today.
11       Q.   So on the books now it's reflected
12   as a default?
13       MR. SHAW: Objection to form.
14       A.   I would need to look at it exactly
15   how it's been recorded, but it's been recorded
16   how Hughes Hubbard and their professionals
17   wanted it recorded.
18       Q.   You don't recall how it's recorded?
19       A.   No, not at this point, no.
20       Q.   Do you recall any discussion about
21   the possibility of defaulting the repo as it
22   relates to the Clarification Letter?
23       A.   No, not -- no.
24       Q.   We talked about the Clarification
25   Letter earlier.
TSG Reporting - Worldwide  (877) 702-9580

Page 136

1    Blackwell - Highly Confidential
2        Do you recall any discussion about
3    the modifications to the transaction that were
4    embodied in the Clarification Letter being used
5    instead of defaulting the repo?
6        A.   No. I wasn't party to the
7    Clarification Letter.
8        (Exhibit 73 B, e-mail dated
9        September 20, 2008, Bates stamped 10222586,
10       marked for identification.)
11       Q.   Mr. Blackwell, I am handing you a
12   copy of an exhibit marked 73 B, which is an
13   e-mail between yourself and Bart McDade on
14   Saturday the 20th.
15       My question to you is do you recall
16   your exchange with Mr. McDade on this day and
17   what the topic was?
18       A.   I recall conversations with Bart. I
19   don't know exactly what Bart is referring to
20   here. The conversations I was having with Bart
21   focused on the fails, those fails conversation
22   previously, so I can't -- I don't actually -- I
23   know there are other e-mails between myself and
24   Bart and that's what I recall. I don't know
25   exactly what we were talking about here. I
TSG Reporting - Worldwide  (877) 702-9580

Page 137

1    Blackwell - Highly Confidential
2    don't know.
3        Q.   You don't recall?
4        A.   No.
5        Q.   Did you ever set up an account to
6    capture Barclays' dough and send securities to
7    them?
8        A.   On Saturday?
9        Q.   At any time.
10       A.   No. No. I mean, we had a repo
11   agreement and so on and so forth, but not this.
12       Q.   This is not ringing any bells at
13   all?
14       A.   No, not -- the actions I took
15   immediately after this would probably be
16   helpful.
17       Q.   What I am trying to figure out, was
18   there any discussions of alternative types of
19   transactions instead of defaulting the repo or
20   any other alternative, were you a party to any
21   discussion where alternative transactions were
22   discussed?
23       MR. SHAW: Objection to form.
24       A.   No, I wasn't party to any
25   discussions in terms of -- I had my marching
TSG Reporting - Worldwide  (877) 702-9580

Page 138

1    Blackwell - Highly Confidential
2  orders for that weekend, which are 15C3 and the
3  unencumbered securities in the clearance boxes.
4    Q.  Can you tell me what you recall of
5  the 15C3 securities you just mentioned?
6      MR. SHAW:  Is this a logical time to
7  take our lunch break?
8      MR. HINE:  Yes.  Do you want to
9  break for lunch?  Okay.  Sounds good.
10     (Lunch recess was taken at 12:30.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 139

1    Blackwell - Highly Confidential
2      (Time noted:  1:14.)
3  A L A S T A I R   B L A C K W E L L,
4    resumed as a witness, was examined and
5    testified as follows:
6  CONTINUED EXAMINATION BY
7  MR. HINE:
8    Q.  Good afternoon, Mr. Blackwell.
9    A.  Good afternoon.
10   Q.  Hope you had a good lunch.  We have
11 some more talking to do here, unfortunately for
12 you.  I think we had left off with — we had
13 mentioned 15C3.
14     Could you just explain to me what
15 you were doing over that weekend as far as
16 trying to locate assets in 15C3 accounts?  And
17 I meant the weekend of the 20th, 21st.
18   A.  I wasn't trying to locate assets in
19 15C3.
20   Q.  Okay.  What were you trying to do
21 with respect to 15C3 accounts?
22   A.  It isn't an account.  It's not an
23 account.  It's a calculation that historically
24 was run once a week and is designed for
25 customer protection.  It's a regulatory

Page 140

1    Blackwell - Highly Confidential
2  requirement you run this calculation and what I
3  was doing was trying -- working in conjunction
4  with the people that were responsible for
5  producing that, which is the finance
6  organization, was to rerun a calculation.
7    Q.  And why did it need to be rerun?
8    A.  To come up with -- I was asked to
9  come up with what is the number, what is the
10 sum, basically, run the calculation and come up
11 with a number.  That is the 15C3 calculation.
12   Q.  Okay.  And then what was to be done
13 with that calculation once you did it?
14   A.  Provide it to the -- my supervisors
15 and for them to have an understanding of what
16 that number was.
17   Q.  Did you have any understanding of
18 how that calculation related to the transaction
19 that was going on between Barclays and Lehman?
20   A.  In terms of -- running the
21 calculation was to find out whether -- what the
22 calculation was, come up with a number.
23   Q.  And did you have any understanding
24 of what your superiors were going to do with
25 that number once you gave it to them?

Page 141

1    Blackwell - Highly Confidential
2    A.  Compare that to what was locked up
3  as cash to -- cash and securities to protect
4  customers.
5    Q.  And am I correct if that calculation
6  yielded a number that was lower than what was
7  previously locked up, that would release some
8  assets to Barclays; is that right?
9      MR. SHAW:  Objection.  Foundation.
10   A.  It would mean there is an excess.
11 It would mean there is an excess of cash locked
12 up or securities locked up as part of customer
13 protection.
14   Q.  And why were they trying to find out
15 whether there was an excess?
16     MR. SHAW:  Objection.  Foundation.
17   A.  I was asked to go recalculate the
18 numbers, so I worked with the finance people
19 who own the calculation as a whole, operations
20 are an input to some of the lines in the
21 calculation and we work towards creating that.
22   Q.  And who at finance are charged with
23 doing this calculation?
24   A.  At the time, Tony Stucchio, Anthony
25 Stucchio, who reported to Martin Kelly.

Page 142

1       Blackwell - Highly Confidential
2          (Exhibit 74 B, e-mail dated
3    9-20-2008, marked for identification.)
4       Q.  Mr. Blackwell, I am handing you a
5    copy of a document marked as Exhibit 74 B,
6    which is an e-mail stream dated September 20th,
7    2008 involving yourself and several others
8    including Ian Lowitt and some of your people in
9    your group. I think I am mixing two concepts
10   here, so I just want to get some clarification
11   on what we have just been talking about after
12   you have had a chance to look at the e-mail.
13          (Document review.)
14      A.  Okay.
15      Q.  Have you had a chance to look at it?
16      A.  I have.
17      Q.  Could you tell me what you recall
18   about this discussion that's embodied in this
19   e-mail?
20      A.  It's just a -- it's a list of things
21   that we were working on. It's two things that
22   we were working on. Looking for the
23   unencumbered -- trying to define a list of
24   unencumbered assets, and what it's saying here
25   is that 15C3, if there is excess, and that

TSG Reporting - Worldwide  (877) 702-9580

Page 143

1       Blackwell - Highly Confidential
2    potentially there is money that can be released
3    as an unencumbered asset of the firm.
4       Q.  I think I understand what you said.
5    I just want to make sure.
6          This is during a period of time when
7    your group is trying to locate unencumbered
8    assets which would then presumably be
9    transferred to Barclays for whatever purpose?
10      A.  Right.
11         MR. SHAW:  Objection. Foundation.
12      Q.  And I see here mentioned the goal is
13   1.9 billion. Do you see that?
14      A.  Yes.
15      Q.  Who set that goal or where did that
16   goal come from?
17      A.  Ian is saying guys, we need 1.95
18   billion.
19      Q.  Okay. Ian is after the below
20   e-mail; right? The e-mails are from the bottom
21   up in sequence?
22      A.  Yes. It would have come from Ian or
23   Paolo.
24      Q.  Do you recall any discussions about
25   why we need 1.9 billion in unencumbered assets?

TSG Reporting - Worldwide  (877) 702-9580

Page 144

1       Blackwell - Highly Confidential
2       A.  Again, people closer to the deal
3    were negotiating whatever they were
4    negotiating. I was being asked to carry out an
5    action. I have a goal. Find 1.9 billion of
6    unencumbered assets.
7       Q.  I just want to make sure, you were
8    not involved in the setting of that goal or --
9    am I correct to say you don't have any
10   knowledge of why that number was passed down to
11   you?
12      A.  I haven't -- no, I don't have
13   knowledge.
14      Q.  And now as I read this e-mail, the
15   bottom e-mail is Monty Forrest reporting on
16   some of the efforts to find unencumbered
17   assets; correct?
18      A.  Yes.
19      Q.  Okay. And as we get to the upper
20   e-mail, Ian says he really needs 1.95 billion;
21   is that right?
22      A.  Yes.
23      Q.  But I don't understand what he means
24   by a shortfall in the 15C3 lock-up release.
25   Can you explain that?

TSG Reporting - Worldwide  (877) 702-9580

Page 145

1       Blackwell - Highly Confidential
2       A.  I don't know exactly -- the way I
3    would interpret this would be if he is looking
4    for -- if the target is to find 1.95 billion of
5    unencumbered securities, then -- if there is no
6    excess in the 15C3 or there is an excess, we
7    don't know at this point, because we haven't
8    rerun the calculation, then potentially finding
9    more unencumbered assets because you wouldn't
10   take -- if it is not an excess, you can't take
11   it, so it's a sum.
12      Q.  Is it correct to say he is asking
13   for a little more in the assets in case there
14   was no excess in 15C3, but actually there was a
15   shortfall --
16         MR. SHAW:  Objection. Foundation.
17      Q.  -- in 15C3? Is that right?
18      A.  No, I wouldn't interpret it like
19   that. I think he is saying find -- review --
20   we are not looking for assets that aren't
21   there. We are going through a process in a
22   very methodical way based on a set of -- an
23   understood approach which are under the rules
24   that we would apply to our depos, to the boxes
25   of Lehman Brothers, to find unencumbered

TSG Reporting - Worldwide  (877) 702-9580

Page 146

1    Blackwell - Highly Confidential
2    securities based on those rules to come up with
3    a list. The data that we had, because Chase
4    had failed to send files for a period of time,
5    was incredibly difficult to work with.
6    Broker/dealer systems aren't run -- aren't used
7    to running over a weekend, they work on a
8    five-day week normally, so trying to create
9    this data was difficult. So we are combing
10   through the data to create a list of
11   unencumbered assets. We are recalculating the
12   15C3 to see what the segregation -- what the
13   lock-up requirement would be, on a hypothesis
14   that as customer assets had left Lehman
15   Brothers, then the requirement for a lock-up
16   would be reduced, so that would create an
17   unencumbered asset. So we weren't looking for
18   things that weren't there. We were looking for
19   things that were there based on the
20   challenge -- very challenged and uncertain data
21   that we had.
22       Q.   I think I understood what you just
23   said, but did you mean that over the previous
24   week presumably customers had left Lehman and
25   that would reduce the requirement for the 15C3

TSG Reporting - Worldwide  (877) 702-9580

Page 147

1    Blackwell - Highly Confidential
2    lock-up or reserve?
3        A.   That was a hypothesis.
4        Q.   And you were doing the calculation
5    to test that hypothesis?
6        A.   Yes.
7        Q.   Did it prove to be correct?
8        A.   I don't know what conclusion we
9    ultimately reached, because the data was so
10   challenging we didn't reach a conclusion that
11   weekend.
12       Q.   So do you know if there was an
13   excess in the end?
14       A.   I don't. I don't recall whether
15   there was an excess or not.
16       Q.   When you say the data was so -- what
17   data are you talking about?
18       A.   Stock record data. Books and
19   records of the firm are dependent on several
20   data feeds; trade data -- new trade data that
21   comes from the front office, external trade
22   data, so repo, for instance, coming from Chase,
23   these are all of the trades -- securities we
24   have pledged, I need that data, that needs to
25   be fed in, and then you carry out third

TSG Reporting - Worldwide  (877) 702-9580

Page 148

1    Blackwell - Highly Confidential
2    world -- a third-party check of your depos
3    versus the outside world, so your custody
4    information. We had partial information around
5    repo coming back in and we had no visibility
6    over our depo at Chase, because they had
7    removed access to their systems, so we couldn't
8    operate in the normal course of business.
9        Q.   Depo means deposit?
10       A.   Depo means like a clearing box. I
11   would use that term interchangeably.
12       Q.   And why had Chase cut off this data
13   stream?
14       A.   As a result of the funding activity
15   that is taking place. I believe -- and this
16   is -- I didn't have a conversation with Chase,
17   but they rescinded access. I passed that
18   information on to Paolo and asked him to speak
19   to Chase, because -- he in the end called Chase
20   and they still would not give us access to the
21   systems.
22       Q.   Did they ever restore access to the
23   system?
24       A.   Not that I'm aware of.
25       Q.   Were you party to any of those

TSG Reporting - Worldwide  (877) 702-9580

Page 149

1    Blackwell - Highly Confidential
2    conversations between Lehman and Chase about
3    this issue?
4        A.   No, I was not.
5        Q.   Do you have any understanding of why
6    they were restricting access to the system?
7        A.   I believe it's a dispute that they
8    had with Barclays around the financing trades
9    that were put on at that point.
10       Q.   Do you have any more detail in your
11   understanding than that?
12       A.   Just around -- just that.
13           (Exhibit 75 B, e-mail dated
14   9-20-2008, marked for identification.)
15       Q.   Mr. Blackwell, I am handing you a
16   document marked as Exhibit 75 B, which is a
17   similar e-mail stream to the one you previously
18   just looked at marked as sent on September
19   20th, 2008. It appears to me to be the same
20   e-mail stream, only the last entry is a little
21   different than previously. So my question has
22   to do with the first entry on page 1 after you
23   have had a chance to look at it.
24           (Document review.)
25       A.   Okay.

TSG Reporting - Worldwide  (877) 702-9580

Page 150

Blackwell - Highly Confidential
1
2    Q.    Have you had a chance to look at it?
3    A.    I have.
4    Q.    In the first paragraph of this
5    e-mail it's mentioning an 8:00 call and it
6    appears to relay certain groups of assets and
7    eventually there is a line that says the total
8    is 2.181 billion. Do you see that?
9    A.    I do.
10    Q.    Are these the assets that your group
11    identified as unencumbered assets?
12        MR. SHAW: Objection. Vague as to
13    time.
14    Q.    Do you have an understanding of what
15    this list of assets is?
16    A.    I understand what is trying to be
17    shown here, yes.
18    Q.    Could you tell me what it is?
19    A.    The team of people, so finance,
20    operations working through the process I
21    described to identify assets on the books and
22    records that were highlighted as inventory,
23    unencumbered inventory, this is the breakdown
24    by clearance boxes.
25    Q.    I think previously you testified
TSG Reporting - Worldwide  (877) 702-9580

Page 151

Blackwell - Highly Confidential
1
2    that there was about $2 billion in assets that
3    you ultimately identified.
4    A.    Which is consistent.
5    Q.    My question for you is do you
6    believe this is pretty close to the end result
7    of your effort to find unencumbered assets?
8    A.    This was a point in time. That work
9    continued. I can't emphasize enough how
10    challenging the system environments were.
11    Getting information was happening. We had
12    technology teams working through the night to
13    extract data from the systems in a non-standard
14    environment. This is not what we are designed
15    to do and when they were designed to do them,
16    and we weren't getting the third-party feeds we
17    needed to to give us the hundred percent
18    confidence on the data that we had. So there
19    is uncertainty here. So at that point in time
20    there was a call -- I'm not sure that I was
21    actually on that call. I think I was tied up
22    on another issue. But this was the result of
23    that night's work, the overnight work that was
24    done by the technology and operations and
25    finance to come up with that list.
TSG Reporting - Worldwide  (877) 702-9580

Page 152

Blackwell - Highly Confidential
1
2    Q.    Okay. Do you know when that process
3    came to a conclusion?
4        MR. SHAW: Objection. Assumes facts
5    not in evidence. Foundation.
6        MR. HINE: You can answer.
7    A.    It continued. It continued. My
8    team continued working on this to try and
9    identify the unencumbered assets into the early
10    part of the following week.
11    Q.    So even after the closing it
12    continued?
13    A.    We didn't have access to data and
14    then we had virtually no access then, so it
15    just stopped. The work stopped.
16    Q.    When did it stop?
17    A.    I don't know precisely.
18    Q.    If you look at this list, there is
19    four different classes of assets.
20        Do you recall any other classes of
21    assets that were identified as being
22    unencumbered other than the four listed here?
23    A.    No. These were the main buckets. I
24    described these earlier as well.
25    Q.    Now, when it says "mortgages," do
TSG Reporting - Worldwide  (877) 702-9580

Page 153

Blackwell - Highly Confidential
1
2    you see that on number 4? Do you recall any
3    discussions or -- any discussions over that
4    weekend about Barclays getting a greater
5    percentage of the mortgage-based assets than
6    was previously agreed to?
7    A.    No.
8    Q.    Is the term resi's used to describe
9    this type of asset, mortgage-based asset?
10    A.    Possibly. Without seeing the list
11    of securities, I would be speculating.
12    Q.    Am I correct to say that you were
13    not -- would have no knowledge of discussions
14    between Barclays and Lehman as to the
15    disposition of residential mortgage-based
16    assets?
17    A.    That's correct. I think there is
18    one point worth mentioning here. You can see
19    even here that Chase are taking assets, again,
20    so we don't know exactly what's in the real
21    world box. That's really showing you the
22    uncertainty of the data.
23    Q.    And you are pointing to something.
24    Can you just tell me which line you are
25    pointing to?
TSG Reporting - Worldwide  (877) 702-9580

Page 154

1    **Blackwell - Highly Confidential**
2    A.   It's the second to last paragraph or
3    sentence in the "we are also looking" --
4    Q.   **"To valuate how much JP Chase put a**
5    **lien on Friday by CUSIP"?**
6    A.   Yes. We couldn't.
7    Q.   **Just so I understand, you are trying**
8    **to figure out what assets Chase is holding in**
9    **the system and not releasing?**
10   A.   What Chase has seized.
11   Q.   **And did you ever figure the amount?**
12   A.   That won't, I believe, is still
13   ongoing in terms of what was being done.
14        (Exhibit 76 B, e-mail dated
15   September 21, 2008, Bates stamped 138124,
16   marked for identification.)
17   Q.   **Mr. Blackwell, I am handing you a**
18   **copy of an exhibit marked as 76 B, which is an**
19   **e-mail dated September 21st, Sunday, from**
20   **yourself to Ian Lowitt, a copy to some others.**
21   **Take a minute to look at it, if you would.**
22        **(Document review.)**
23   Q.   **Have you had a chance to look at it?**
24   A.   I have, yes.
25   Q.   **Do you recall what this e-mail is**

Page 155

1    **Blackwell - Highly Confidential**
2    **about or could you explain to me what it's**
3    **about?**
4    A.   I can. This is in relation to
5    fails. What I had been asked to do was
6    determine what the fails were, and as I
7    previously stated around the quality of data,
8    the Lehman systems at that time hadn't consumed
9    the data from the third parties. The
10   third-party sources, in regular course of
11   business that you would have expected, would
12   give you a completely 100 percent accurate
13   statement of your real world positions. What I
14   was suggesting we could make available to
15   Barclays is give Barclays access to DTC -- give
16   DTC, the Depository Trust Company, authority to
17   allow Barclays to look at the depos so that it
18   could see the fails for themselves, which would
19   be maybe a even more accurate reflection than
20   our books at that time, but that's on Sunday in
21   the night, I think, so I am just trying to help
22   solve the problem around the clearance box.
23   Q.   **And was your suggestion acted on?**
24   A.   I think it was after the event -- I
25   think -- at some point -- I don't think

Page 156

1    Blackwell - Highly Confidential
2    actually as it relates to DTC that happened,
3    actually. I don't think that ever happened.
4    Q.   I think previously you discussed
5    fails, you said you thought it had been put to
6    bed and then it came back for you on Sunday.
7    A.   This is it coming back.
8    Q.   And do you recall your
9    conversations -- or did you have a conversation
10   with Bart McDade about this issue at this time?
11   A.   Not then. It was third party.
12   Q.   So you don't know if, in fact,
13   Barclays was granted access to the DTC so they
14   could look at the fails themselves?
15   A.   I don't know. I don't know. That
16   was only a suggestion.
17   Q.   Would someone else in your
18   department know that?
19   A.   Unlikely.
20   Q.   Would someone else at Lehman know
21   that?
22   A.   If it was granted, it would be in my
23   e-mail, because I probably would have had to
24   grant it.
25        (Exhibit 77 B, e-mail dated

Page 157

1    Blackwell - Highly Confidential
2    September 21, 2008, Bates stamped 459680,
3    marked for identification.)
4    Q.   Mr. Blackwell, I am handing you a
5    copy of Exhibit 77 B, which is an e-mail dated
6    September 21st, 2008 on which you are one of
7    the recipients and the subject of the e-mail is
8    17.9 billion, 9:15 p.m. update.
9        (Document review.)
10   Q.   Have you had a chance to look at the
11   document?
12   A.   I have, yes.
13   Q.   My question really has to do with if
14   you see on the first line, it says: "Monty,
15   you and Alastair need to be at that 7 a.m.
16   meeting."
17        My question is do you recall having
18   a meeting 7 a.m. on Monday morning?
19   A.   Is it Monday or Sunday?
20   Q.   That's what I am trying to figure
21   out.
22   A.   No, I don't think it was a Monday
23   morning meeting.
24   Q.   It was a Sunday meeting?
25   A.   What time is that? I can't tell

Page 158

1      Blackwell - Highly Confidential
2    from here. Is it a 7 p.m. or 7 a.m. meeting?
3    It's a 7 a.m. meeting. I possibly was, but I
4    don't recall the meeting. Yeah, I don't recall
5    that meeting specifically. It would probably
6    be in my diary if I was there. I don't know.
7        Q.    I think I might have misled you as
8    to the day. If you read this correctly, this
9    is sent at Sunday, 2 a.m., Greenwich meantime,
10   so that would be Saturday night here, correct,
11   so that the suggestion, as I read this, would
12   mean that it's suggesting a Sunday morning
13   meeting; do you recall?
14       A.    That makes more sense, yes.
15       Q.    Does that ring a bell then about a
16   meeting?
17       A.    There was a meeting. I don't think
18   I was in that meeting. Monty took -- was in
19   that meeting, if there was one. I don't know
20   if it actually took place, but effectively this
21   is just a continuation of the process of
22   creating a list, which is -- looking at the
23   list by itself is pretty meaningless. It's a
24   list of CUSIPs with the price next to it.
25       Q.    So you don't recall being at that
TSG Reporting - Worldwide  (877) 702-9580

Page 159

1      Blackwell - Highly Confidential
2    meeting?
3        A.    I don't recall being at that
4    meeting. I certainly was discussing this topic
5    constantly.
6        (Exhibit 78 B, e-mail dated
7    September 21, 2008, Bates stamped 10252597,
8    marked for identification.)
9        Q.    Mr. Blackwell, I am handing you a
10   copy of Exhibit 78 B, which is an e-mail dated
11   Sunday, September 21st, and the title -- the
12   topic is update 15C3-3.
13       My question to you has to do with
14   the first line where you write: "This won't be
15   perfect. Perfect is Tony taking that
16   approach."
17       My question is what were you talking
18   about when you said "this won't be perfect"?
19       A.    The systems and the data were
20   imperfect, so that was my --
21       Q.    So are you referring to the
22   calculation of the 15C3 number that we
23   previously discussed?
24       A.    I'm referring to the inputs. The
25   calculation should be correct, because it's a
TSG Reporting - Worldwide  (877) 702-9580

Page 160

1      Blackwell - Highly Confidential
2    standard calculation. Some of the inputs into
3    that calculation are being produced in a
4    non-standard way to the best of everyone's
5    ability at that point in time. So that is my
6    point. It's not going to be a perfect
7    calculation. I think the last calculation was
8    done on the 17th.
9        Q.    So it's not going to be perfect
10   because the inputs are not perfect?
11       A.    Yes. Not because we were changing
12   the way you do the calculation. The
13   calculation was done the same way as it had
14   been done for twenty-odd years.
15       (Exhibit 79 B, e-mail dated
16   9-21-2008, marked for identification.)
17       Q.    Mr. Blackwell, I am handing you a
18   copy of Exhibit 79 B, which is an e-mail dated
19   September 21st, 2008 from yourself to Ian
20   Lowitt.
21       A.    Yes.
22       Q.    Have you had a chance to look at it?
23   Can you tell me what you are talking about in
24   this e-mail? Because it's entitled "they are
25   talking about tri-party fail," so I just want
TSG Reporting - Worldwide  (877) 702-9580

Page 161

1      Blackwell - Highly Confidential
2    to see if you recall what this e-mail is
3    discussing.
4        A.    Yes. I was in a room at Weil. Ian
5    and Paolo were outside of it and I think from a
6    Lehman perspective Bart, myself, those are the
7    people I remember. There were representatives
8    from the Fed, from Chase, from Barclays, from
9    most of the regulators in the room, and this is
10   where discussions, I think, started around the
11   clearance box. I think Chase made -- this is
12   my recollection, so it may be imperfect. Chase
13   made reference to the fact that there was a
14   repo for 15.8 billion, what was called the HIC
15   loan, so held in custody repo, which was a loan
16   that they wanted to assign to Barclays, which
17   Barclays wouldn't take at that time, because
18   they hadn't authorized the trade, which would
19   appear reasonable. I wasn't the expert on
20   this. And what I was actually doing was trying
21   to get -- and what you will see is an e-mail to
22   Bart from me at this same meeting saying we
23   need Paolo in here and Paolo came into the room
24   and I left, I think, at that point, and so
25   that's what it relates to.
TSG Reporting - Worldwide  (877) 702-9580

Page 162

Blackwell - Highly Confidential
1
2   Q.   So the 15.8 repo that's mentioned in
3   your e-mail is the HIC loan that you just
4   talked about?
5   A.   Yes.
6   Q.   And "Chase want to liquidate," the
7   phrase you use there, that's meant to --
8   A.   I think that meeting is probably
9   documented, because I think Hughes Hubbard were
10  present at the time as well and Weil, so I
11  can -- there is a lot of information around
12  that meeting.
13  Q.   Do you recall anything else about
14  that meeting?
15  A.   It was -- yeah, there was -- it was
16  a discussion around the repo transactions,
17  Barclays' and Chase's position at that point.
18  Q.   Okay. Do you recall anything other
19  than what you just told us?
20  A.   That was -- I believe that was the
21  main thrust. Rich Ricci at the time also
22  stated that we weren't taking responsibility
23  for the clearance boxes and that's when I think
24  the meeting broke up, pretty much broke up, or
25  was about to break up, but I think I left the

TSG Reporting - Worldwide  (877) 702-9580

Page 163

Blackwell - Highly Confidential
1
2   room.
3   Q.   Do you have any knowledge of how
4   this issue was resolved ultimately, if at all?
5   A.   No. Not the 15.8, no.
6   Q.   Did you have any other follow-on
7   interaction with this 15.8 issue?
8   A.   No. Just one of the repos that were
9   on.
10  (Exhibit 80 B, e-mail dated
11  September 22, 2008, Bates stamped 464767,
12  marked for identification.)
13  Q.   Mr. Blackwell, I am handing you a
14  copy of Exhibit 80 B, which is an e-mail stream
15  dated September 22nd, 2008 in which you are
16  involved, and after you have had a chance to
17  look at it, I have a quick question about it.
18  (Document review.)
19  A.   Okay.
20  Q.   Do you see on the second page where
21  it says -- an e-mail from Mr. Scagnelli where
22  he says "DTC has a free pledge chill on 636,"
23  do you see that?
24  A.   Yes.
25  Q.   Can you explain to me what that

TSG Reporting - Worldwide  (877) 702-9580

Page 164

1   Blackwell - Highly Confidential
2   means, if you know?
3   A.   I would interpret that as meaning
4   that DTC has locked everyone out of the system,
5   that they are controlling the clearance box at
6   this point. They are not taking direction.
7   Q.   Okay. And that --
8   A.   That means we couldn't do anything.
9   Q.   Okay. And later on I see your
10  e-mail which says "we need to get to DTC PDQ."
11  A.   Yes.
12  Q.   Do you recall what -- did you, in
13  fact, get to the DTC?
14  A.   Yes. They didn't release anything.
15  DTC -- I don't think I actually spoke to them.
16  I don't believe we were in a position to be
17  able to -- we weren't controlling the box. It
18  was in the hands of the trustee.
19  Q.   Okay. And so was there a meeting
20  about this or do you have any knowledge of what
21  happened after this?
22  A.   No. We didn't -- we ceased to have
23  any ability to impact the books and records of
24  LBI. That's my recollection. And this was
25  just, again, another part of the data issues

TSG Reporting - Worldwide  (877) 702-9580

Page 165

1   Blackwell - Highly Confidential
2   that we were experiencing and probably close to
3   the end.
4   Q.   Can you describe for me what your
5   role has been with respect to these assets,
6   these unencumbered assets after the closing,
7   since you have gone to Barclays?
8   A.   Most of my -- my focus is obviously
9   trying to get management and structure in
10  place, so some -- I have been in some meetings
11  along the way. Jim Hraska has worked probably
12  most closely with Martin Kelly, Robert Azerad
13  in the post -- at Barclays to assist. I'd
14  say -- so it's been limited to the series of
15  meetings as it relates to these two specific
16  issues.
17  Q.   Two issues meaning the unencumbered
18  assets and --
19  A.   The 15C3.
20  Q.   And do you have a recollection of
21  what's gone on since the closing as to these
22  issues or --
23  A.   Again, more on the periphery of what
24  I have done, I have reviewed methodology to
25  ensure that I feel comfortable that the

TSG Reporting - Worldwide  (877) 702-9580

Page 166

1    Blackwell - Highly Confidential
2  approach that someone like Monty or Jim has
3  taken makes sense to me, which it does, and I
4  feel very comfortable with the methodology
5  under the terms of the agreement, so where it's
6  been necessary to have my input, then I have
7  been involved. So I think we have created
8  additional schedules since bankruptcy at
9  Barclays which have been made available, so
10 that's been the extent of my involvement. And
11 the 15C3 calculation is rerun every week by the
12 trustee of LBI.
13    Q.  Previously I mentioned that you have
14 been designated as a 30(b)(6) witness for
15 select issues in this case by Barclays, I've
16 just wanted to take a few minutes to address
17 that issue in this deposition, so for this
18 portion of the deposition it will be a 30(b)(6)
19 deposition.
20    Have you ever -- did you review the
21 30(b)(6) deposition notice that we provided to
22 Barclays?
23    A.  I don't believe I have seen it.
24    MR. SHAW: If you show it to him, he
25 might know it.
      TSG Reporting - Worldwide  (877) 702-9580

Page 167

1    Blackwell - Highly Confidential
2    MR. HINE: Let's mark this as an
3  exhibit.
4    (Exhibit 81 B, Debtors' Second Rule
5  30(b)(6) Deposition Notice to Barclays on
6  Issues Relating to the Transfer of Assets,
7  marked for identification.)
8    Q.  Mr. Blackwell, I am handing you a
9  copy of Exhibit 81 B, which is a copy of the
10 Debtors' Second Rule 30(b)(6) Deposition Notice
11 to Barclays on Issues Relating to the Transfer
12 of Assets.
13    My first question is have you ever
14 seen this document before?
15    A.  In my discussions with Jonathan I
16 think I may have seen some portion --
17    MR. SHAW: We are not going to get
18 into the substance of those discussions.
19    Q.  I don't want to ask you about a
20 privileged communication you might have had,
21 but can you please turn to Schedule A of that
22 document.
23    As I understand from Barclays, you
24 have been designated as a witness as to the
25 first two topics listed on that schedule, so
      TSG Reporting - Worldwide  (877) 702-9580

Page 168

1    Blackwell - Highly Confidential
2  could you just take a minute and just take a
3  look at those topics.
4    (Document review.)
5    A.  Understood.
6    Q.  Okay. You will see those topics
7  relate to Schedules A and B that we have talked
8  about previously in the deposition, so I just
9  want to spend a little time talking about those
10 two schedules.
11    Let's look at topic number 1. Were
12 you involved in the selection of the securities
13 that made their way into Schedule A?
14    MR. SHAW: Objection to form.
15    Q.  Let me rephrase it.
16    Were you involved in the selection
17 of the securities that are listed in Schedule A
18 to the Clarification Letter?
19    A.  I was involved in the transfer of
20 the Fed assets over to Barclays, so in terms of
21 selecting the assets, the selection was done as
22 I -- was done as I described, which was under
23 the terms of the repo agreement that was in
24 place between Lehman and Barclays at that time,
25 so eligible collateral is a component of that
      TSG Reporting - Worldwide  (877) 702-9580

Page 169

1    Blackwell - Highly Confidential
2  agreement and had been in place for some time.
3  So selection is done -- was done -- the assets
4  were put into the Fed repo. We know that there
5  were operational issues that I described in
6  terms of the assets changing because of the
7  settlement that took place at Chase, and then
8  there is also a subset of securities that
9  weren't eligible under the legal terms -- under
10 the commercial terms of the repo agreement
11 Barclays had in place with Lehman, which was
12 standard practice, that's why the Fed had
13 stepped in and provided liquidity to the whole
14 market with the PDCF, so poorer quality
15 collateral was funded by the Fed.
16    So it was clear based on the
17 schedules which securities fell outside of that
18 in terms of their quality. So yes, my team
19 worked with finance with the treasury team to
20 refine that list based on that requirement, and
21 in addition to that there were obviously some
22 substitutions that had to take place to make up
23 value, so my team worked again with finance and
24 the clearance teams to drive that -- to
25  finalize that list, but the list is a
      TSG Reporting - Worldwide  (877) 702-9580

## Page 170

1    Blackwell - Highly Confidential
2  reflection of what moved.
3      MR. HINE: Okay. Let me go at it a
4  different way here. I have, unfortunately,
5  some hefty exhibits to pass to you.
6      (Exhibit 82 B, e-mail dated
7  September 20, 2008, Bates stamped BCI-CG
8  00035134, marked for identification.)
9    Q.  Mr. Blackwell, I am handing you a
10 lengthy exhibit marked as 82 B, which is a
11 list -- it's a document Bates stamped BCI-CG
12 00035134 through 35954. I am not going to ask
13 you about the contents of this entire document,
14 but I would like to direct your attention, if
15 you could take a minute and look at the page --
16 first page after the e-mail cover, the covering
17 e-mail, which is marked with the Bates number
18 35138. Do you see that page?
19    A.  Yes.
20    Q.  Can you tell me whether -- you will
21 see in the page a little summary of different
22 classes of collateral and their market value.
23 Do you see that?
24    A.  I do.
25    Q.  Could you tell me whether this is

## Page 171

1    Blackwell - Highly Confidential
2  the collateral that made its way into
3  Schedule A?
4    A.  I would assume that it is, based on
5  the fact I provided the data to Paolo, but it's
6  Paolo's team that would have put this together,
7  so would have interpreted the valuations and
8  the content based on that.
9    Q.  Do you know if the value of the
10 securities listed on Schedule A is what's
11 listed here under the column Market Value?
12    A.  I don't know. It would be dependent
13 on how -- again, how -- I don't know how Paolo
14 ultimately put this together.
15    Q.  And when you say "Paolo," you are
16 talking about Mr. Tonucci?
17    A.  Yes.
18    Q.  So it's his team that would do the
19 valuation of this schedule?
20    A.  It's his team that created the
21 summary. Jim Hraska and my team, Monty
22 Forrest, helped create the data and pushed it
23 up to the treasury team for them to package.
24    Q.  Now, did the list of securities that
25 ultimately were listed on Schedule A change

## Page 172

1    Blackwell - Highly Confidential
2  over time?
3    A.  Not that I understand, no.
4    Q.  Okay.
5    A.  What was at the Fed and what made it
6  to Barclays was different for a very sensible
7  set of reasons as I described, so -- and
8  perfectly legitimate reasons based on the legal
9  contracts that were in place at the time.
10    Q.  I understand that, but then at some
11 point the securities that made it to Barclays
12 were listed in Schedule A; correct?
13    A.  Right. So then it would be -- there
14 was a reconciliation carried out to the best of
15 our ability to what BONY had received, so that
16 would be part -- that would be what's in
17 Schedule A.
18    Q.  What are you reconciling when you
19 did that reconciliation?
20    A.  Lehman books and records to a BONY
21 statement. So effectively Barclays to Lehman,
22 what moved.
23    Q.  Barclays to Lehman?
24    A.  Yes.
25    Q.  Once the September 18th repurchase

## Page 173

1    Blackwell - Highly Confidential
2  agreement was put in place and the securities
3  or assets that were collateral for the Fed
4  moved, some of which I understand didn't make
5  it because of the issues you have talked about
6  with respect to BONY, but once that set of
7  securities made it into the Barclays — to
8  support the Barclays repo, were there any other
9  further changes to that set of collateral
10 between that time and the time that it was
11 listed on Schedule A?
12    A.  Not that I'm aware of. I can't --
13 Paolo would be better placed to describe that,
14 if there had been any change.
15    Q.  Mr. Tonucci would know specifically
16 about that?
17    A.  Yes.
18    (Exhibit 83 B, e-mail dated
19 September 21, 2008, Bates stamped BCI
20 006647 through BCI 006653, marked for
21 identification.)
22    Q.  Mr. Blackwell, I am handing you a
23 copy of Exhibit 83 B, which is a document Bates
24 stamped BCI 006647 through 6653. My first
25 question is if you have ever seen this document

Page 174

1    **Blackwell - Highly Confidential**
2    before.
3        A.    I think I saw it in conversations
4    with Jonathan.
5        Q.    In preparation for this deposition
6    you saw it?
7        A.    In preparation, yes.  That's the
8    first time I saw it.
9        Q.    Okay.  My question is if you look in
10    the center of the first page, it says "we
11    should book all positions from the Lehman
12    financing facility to BCI, approximately 45
13    billion securities, see attached file."  Do you
14    see that?
15        A.    I do.
16        Q.    And the attached file is a list of
17    securities; correct?
18        A.    It's not a list of securities.  It's
19    types, security types.
20        Q.    My question is do you know why this
21    approximately $45 billion worth of securities
22    listed in this file and why that's different
23    than the numbers listed on the previous
24    exhibit?
25        A.    I don't.

TSG Reporting - Worldwide  (877) 702-9580

Page 175

1    Blackwell - Highly Confidential
2        Q.    Who would have knowledge of that?
3        A.    Again, Paolo would probably be --
4    Paolo Tonucci would probably be the best person
5    to ask.
6        Q.    Again, I'm not trying to trip you up
7    here.  I just want to know, you are not the
8    person with knowledge as to the value of how I
9    would compare 45 billion cited here with the 49
10    billion on the previous exhibit; correct?
11        A.    No, I'm not.
12        Q.    And it's probably someone in
13    Mr. Tonucci's shop who would be that person?
14        A.    Also somebody within Barclays as
15    well, heritage Barclays.
16        (Exhibit 84 B, e-mail dated
17    September 22, 2008, Bates stamped BCI
18    008149 through BCI 008670, marked for
19    identification.)
20        Q.    Mr. Blackwell, I am handing you a
21    copy of Exhibit 84 B, which is a
22    document with a Bates ranges BCI 008149 -- I
23    can't use the Bates ranges, because they appear
24    to have disappeared, but the first page is
25    marked BCI 008149, and attached to it is a

TSG Reporting - Worldwide  (877) 702-9580

Page 176

1    **Blackwell - Highly Confidential**
2    lengthy spread sheet of some sort.
3        My question is if you have ever seen
4    this document before.
5        A.    Again, in preparation for this
6    deposition.
7        Q.    My question, similar to last time,
8    if you see on the front page it mentions a
9    total BONY market value of approximately 45
10    million.  Do you see that?
11        A.    Yeah, I think that's a typo.
12        Q.    Why do you think that's a typo?
13        A.    This looks like more than
14    $45 million of securities.
15        Q.    I think I might have misspoke.  I
16    believe it says 45 billion.  Is that right?
17        A.    Like I said, I saw this in
18    preparation.
19        Q.    Am I correct -- well, let me just
20    ask the question.
21        Could you explain to me the
22    difference in valuation between the securities
23    listed in this exhibit versus the first
24    Exhibit 82 that we just discussed?
25        A.    Is this Schedule A or Schedule B?

TSG Reporting - Worldwide  (877) 702-9580

Page 177

1    Blackwell - Highly Confidential
2        Q.    That's my question to you.
3        A.    I don't know.
4        Q.    Is it fair to say that someone in
5    Mr. Tonucci's shop is probably the person I
6    should ask as to the difference in values as to
7    the different schedules?
8        A.    Yes.
9        Q.    If I showed you some more schedules
10    like this, would you give me that same answer?
11        A.    You are probably going to get the
12    same answer, yes.
13        MR. HINE:  I did want to show you
14    one other massive exhibit, though.
15        (Exhibit 85 B, e-mail dated
16    September 30, 2008, Bates stamped
17    BCI-EX-(S)-00004396 through
18    BCI-EX-(S)-00004675, marked for
19    identification.)
20        Q.    Mr. Blackwell, I am handing you a
21    copy of Exhibit 85 B, which is Bates marked
22    BCI-EX-(S)-00004396 through 4675.  I am not
23    going to ask you to look through this entire
24    document, Mr. Blackwell, but I would direct
25    your attention to the first three or four

TSG Reporting - Worldwide  (877) 702-9580

Page 178

1    **Blackwell - Highly Confidential**
2    pages, in particular what's entitled APA Lead
3    Sheet, page marked number 1. Do you see that?
4        A.    Yes.
5        Q.    My first question is on the covering
6    page this is an e-mail from Mary Korycki to
7    yourself. Do you recall getting this e-mail?
8        A.    I don't recall getting the e-mail.
9        Q.    Do you recall receiving this
10   document?
11       A.    No, and I would not have printed it
12   off.
13       Q.    Have you ever seen this document
14   before?
15       A.    Not that I recall, no, I don't,
16   going to an APA schedules meeting.
17       Q.    Can you refer now to that third page
18   I pointed you to which says APA Lead Sheet.
19           Have you ever seen a schedule like
20   that before?
21       A.    Possibly, but I don't really --
22   quite possibly.
23       Q.    Could you tell me if the -- do you
24   see the first part talks about Schedule A?
25       A.    Yes.

TSG Reporting - Worldwide  (877) 702-9580

Page 179

1    Blackwell - Highly Confidential
2        Q.    And it comes to a total transferred
3    under repo agreement of $44 billion. Do you
4    see that?
5        A.    I do.
6        Q.    Can you tell me if that's actually
7    what is the value of the securities on
8    Schedule A?
9        A.    I can't.
10       Q.    Okay. Do you --
11       A.    It should be equal to what's on
12   Schedule A, but I can't tell you definitively.
13       Q.    Is this it something, again, I
14   should ask folks in Mr. Tonucci's department?
15       A.    Yes, and Jim Hraska.
16       Q.    If you go further down on that list
17   you see two entries entitled Positions Not With
18   No Memo Seg. Do you see that?
19       A.    I do.
20       Q.    Can you tell me, do you know what
21   that means?
22       A.    I do.
23       Q.    Can you tell me what it means?
24       A.    It's a term that refers to the way
25   that clearing boxes work, so that a clearance

TSG Reporting - Worldwide  (877) 702-9580

Page 180

1        Blackwell - Highly Confidential
2    box will put a memo segregation on a position
3    if there is a stock break, if there is a record
4    break, i.e., if your books and records have a
5    difference versus the outside -- the real
6    world, as it were. And in addition to that
7    memo seg is also put on securities where they
8    are customer assets, so they are not
9    unencumbered. So this is saying that there
10   are -- Schedule B-1 has $235 million worth of
11   security positions which are unencumbered and
12   in addition to that there isn't a memo seg in
13   the system.
14       Q.    And were you involved in preparing
15   that schedule?
16       A.    I was involved in the methodology
17   and talking through the methodology. My team
18   worked with finance to produce the schedule, so
19   yes.
20       Q.    And so that would be -- would that
21   be Mr. Hraska as well?
22       A.    Yes.
23       Q.    And am I correct to say that he
24   would supply the lists of securities to
25   Mr. Tonucci's team who then arrives at this

TSG Reporting - Worldwide  (877) 702-9580

Page 181

1        **Blackwell - Highly Confidential**
2    valuation?
3        A.    Correct, or the valuations in the
4    system.
5        Q.    Positions with memo seg means?
6        A.    So where there was an excess -- I
7    will try and walk you through a real -- take an
8    example. There may have been a memo seg in the
9    system for a hundred thousand shares of IBM.
10   The total position of IBM may have been a
11   million shares, so in this instance the
12   methodology would mean that we extract the
13   hundred thousand shares, you would be left with
14   900,000 shares of IBM as unencumbered
15   securities, which were available. So any
16   customer assets that were segged or any breaks,
17   so, again, it is a conservative approach to --
18   a methodology to identify unencumbered assets.
19       Q.    So can I just to go with your
20   hypothetical, you said if there was a million
21   shares of IBM, 900,000 were unencumbered, they
22   would go into the first entry on this -- they
23   would go into Schedule B-1?
24       A.    No, they would go into B-2.
25       Q.    Did I say that backwards?

TSG Reporting - Worldwide  (877) 702-9580

Page 182

1      **Blackwell - Highly Confidential**
2      A.   Do you want me to explain it again?
3      Q.   Yes.
4      A.   Positions not with -- positions, I
5  think, is a typo anyway.  Positions with no
6  memo seg.  So what no memo seg means, in a
7  scenario where there are a million shares
8  assigned to what would have been probably a 931
9  trading account, i.e., firm inventory, so
10 unencumbered assets, and there is no portion of
11 that position which is being segregated by memo
12 seg applied, then a hundred percent of that
13 position would be applied as available
14 unencumbered security.  So that's B-1.
15      B-2 is saying positions with a memo
16 seg, so in the scenario where there are a
17 million shares of IBM, some of which is
18 customer asset, potentially a hundred thousand
19 shares, there is a segregation, so in order to
20 protect the customers, only 900,000 of those
21 securities would be available as firm
22 inventory, again, comparing that versus the
23 firm inventory account only.  That's important.
24 It's only the firm inventory accounts that are
25 being looked at.  And any excess over and above
      TSG Reporting - Worldwide  (877) 702-9580

Page 183

1      Blackwell - Highly Confidential
2  the seg is being applied in B-2.
3      Q.   Okay.  I understand.
4      Now, if we continue down this chart,
5  you see 636 on the left-hand side, and can you
6  tell me what those securities are?
7      A.   That's going to be unencumbered
8  corporates, I think.
9      Q.   And does your department identify
10 them?
11     A.   They would have helped identify
12 those, yes.
13     Q.   Mr. Tonucci's crew would determine
14 the value?
15     A.   Probably, or it would be system
16 driven, and it's not -- Paolo Tonucci's team
17 would not necessarily be determining value.
18 It's going to be a third-party source of data
19 in most instances or model driven, so it's an
20 application of pricing data, not generation of
21 valuation.
22     Q.   Okay.  I understand that.  But
23 that's done in his department as opposed to
24 yours?
25     A.   It would have been in the systems.
      TSG Reporting - Worldwide  (877) 702-9580

Page 184

1      Blackwell - Highly Confidential
2      Q.   So let's continue down.  You see
3  Friday, 9-26, transfers.  What is that entry
4  meant to embody?
5      A.   I think that's additional securities
6  being transferred as part of a repo on Friday
7  morning, securities that hadn't necessarily
8  made it over the previous night.
9      Q.   That's not your effort to identify
10 unencumbered securities that we talked about
11 earlier?
12     A.   I don't know, actually.  I don't
13 want to comment on that.  I don't think so.
14     Q.   Okay.  So you are not the guy to ask
15 on what that entry is about?
16     A.   No.
17     Q.   How about the following entries
18 where it says "Monday transfer" and then there
19 is one that says "Monday transfers par value,"
20 do you see that?
21     A.   Yes, I do.  I think talking to Paolo
22 Tonucci or Jim would be more fruitful.
23     Q.   You don't have any knowledge of
24 what's that meant to embody?
25     A.   Not exactly, no.
      TSG Reporting - Worldwide  (877) 702-9580

Page 185

1      Blackwell - Highly Confidential
2      Q.   And where it says "footnote 1,
3  includes 14 billion in chilled securities not
4  delivered," do you understand what that means?
5      A.   I think that's a reference to the
6  point on the early e-mail where DTC had put a
7  chill on the account, effectively frozen the
8  account -- actually, that's not correct.
9  That's not correct.  Chilled securities are
10 securities that I think are going through some
11 corporate event of some sort that are
12 undeliverable at that point, potentially.
13 Again, I may be misspeaking.
14     Q.   You are not the person to ask about
15 it?
16     A.   No.
17     (Exhibit 86 B, chart, Bates stamped
18 BCI-EX-00099519 through BCI-EX-00099521,
19 marked for identification.)
20     Q.   Mr. Blackwell, I am handing you a
21 copy of an exhibit marked 86 B, which is Bates
22 stamped BCI-EX-00099519 through 521.
23     My question is have you ever seen
24 that document before?
25     A.   No, I don't think I have seen it at
      TSG Reporting - Worldwide  (877) 702-9580

Page 186

1    Blackwell - Highly Confidential
2  all.
3    Q.    Would you know if the entries in the
4  upper third of the chart relate to Schedule A
5  securities?
6    A.    I couldn't say that definitively.
7    Q.    Do you know if the values listed on
8  line 14 where it shows PCG value of
9  approximately 42.5 billion, do you see that?
10   A.    Yes.
11   Q.    Do you know if that's the value of
12 the Schedule A securities?
13   A.    No. I don't know.
14   Q.    Could you look at the top, the
15 entries, you see it says "PCG value." Do you
16 know what that means?
17   A.    I could speculate. I think maybe
18 that may stand for product control group.
19   Q.    That's a Lehman division?
20   A.    Yes, that's the finance function.
21 If that's the -- if that's what it stands for.
22   Q.    You see the entry to the left of
23 that BONY value, do you see that?
24   A.    Bank of New York.
25   Q.    Right. Can you tell me why the

Page 187

1    Blackwell - Highly Confidential
2  values are different between those two columns?
3    A.    I can't, no.
4    Q.    How about to the right of the PCG,
5  do you see an entry that says "MV 922 with bid
6  offer," do you see that?
7    A.    I do.
8    Q.    Do you know what that column is
9  meant to signify?
10   A.    I don't know how it was created, but
11 the heading seems to suggest it as being
12 updated market data on the Monday.
13   Q.    Were you involved in creating that
14 column?
15   A.    I don't think I was.
16   Q.    Could you explain to me the
17 difference between that column and the prior
18 two?
19   A.    The market value has declined,
20 that's what that is showing, as far as I can
21 tell.
22   Q.    Okay, but can you explain to me how
23 the valuations were arrived at to create
24 column E?
25   A.    No, I can't.

Page 188

1    Blackwell - Highly Confidential
2      (Exhibit 87 B, JPM Chase assets,
3    Bates stamped BCI-EX-00108700, marked for
4    identification.)
5    Q.    Mr. Blackwell, I am handing you a
6  copy of Exhibit 87 B, which is a spread sheet
7  with Bates stamps BCI-EX-00108700 through --
8  the second page is marked 109154.
9      THE COURT REPORTER: There is only
10   one page.
11   Q.    My question is only on the first
12 page, so let me ask you, page 108700, do you
13 see that page?
14   A.    I do.
15   Q.    Are you familiar with how this chart
16 was derived and prepared?
17   A.    No.
18   Q.    Do you know what JPM Chase assets
19 it's referring to?
20   A.    I don't.
21   Q.    Would that be something I should ask
22 someone in Mr. Tonucci's group?
23   A.    Yes.
24      (Exhibit 88 B, chart, Bates stamped
25    BCI-EX-00109154 through BCI-EX-00109161,

Page 189

1    Blackwell - Highly Confidential
2    marked for identification.)
3    Q.    Mr. Blackwell, I am handing you a
4  copy of Exhibit 88 B, which is Bates marked
5  BCI-EX-00109154 through 161. My questions have
6  to do with page 109156.
7    A.    This is a Barclays document. I have
8  never seen an acquisition balance sheet.
9    Q.    Okay. That was my question. Did
10 you ever see this before?
11   A.    No.
12   Q.    Do you know — could you tell me, if
13 you look down the left-hand column, whether --
14 which of those assets made it to Schedule A
15 versus Schedule B?
16   A.    Absolutely no idea.
17   Q.    Could you tell me what the valuation
18 adjustment entry on number 12 is, on line 12?
19   A.    No.
20      MR. SHAW: You are ranging a little
21   far afield from the two topics.
22      MR. HINE: I hear you.
23   Q.    These are topics that you have no
24 knowledge of; right?
25   A.    No, I don't.

## Page 190

1  Blackwell - Highly Confidential
2      MR. HINE: Mr. Blackwell, I have no
3  further questions for you. Thank you for
4  your cooperation. And I think some of my
5  colleagues would like to ask you a few
6  questions.
7      MR. SHAW: Can we take five minutes.
8      (Recess was taken from 2:26 to
9  2:32.)
10 EXAMINATION BY
11 MR. OXFORD:
12     Q.  Mr. Blackwell, we met earlier off
13 the record. As you know, my name is Neil
14 Oxford. I am with Hughes Hubbard & Reed and we
15 represent the SIPA trustee in this case.
16     I would like to follow up on some of
17 Mr. Hine's questions and your answers thereto.
18     You testified about a set of actions
19 that you took to provide Mr. Lowitt with data.
20 Do you remember testifying about that?
21     A.  Yes, I do.
22     Q.  And you said that at some point it
23 became clear to you that certain of these
24 components became part of the transaction with
25 Barclays. Do you remember saying that?

TSG Reporting - Worldwide  (877) 702-9580

## Page 191

1  Blackwell - Highly Confidential
2      MR. SHAW: Objection to form.
3      A.  What components were we talking
4  about at the time?
5      Q.  I think you answered the question in
6  very general terms, which is why I am following
7  up.
8      A.  Can we refresh?
9      Q.  Sure. Let's try it this way. At
10 some point you said Mr. Lowitt gave you your
11 marching orders over the weekend of the 21st
12 and 22nd. Do you remember saying that?
13     A.  Yes, I do.
14     Q.  Can you tell me everything you
15 recall about those marching orders.
16     A.  My instructions were to work with
17 the finance team to determine at one point --
18 well, to find out if there was any unencumbered
19 collateral in the boxes and to work with
20 finance to recalculate the 15C3.
21     Q.  Did you understand Mr. Lowitt to be
22 asking you and your team to go and find and
23 identify $1.9 billion of unencumbered
24 collateral in what you called the clearance
25 box?

TSG Reporting - Worldwide  (877) 702-9580

## Page 192

1  Blackwell - Highly Confidential
2      A.  I think initially the goal -- there
3  was a target set. Actually, let me correct
4  that. Initially we were working to just
5  determine if there was any unencumbered. Then
6  there was a target set and then it changed
7  again ultimately to be that any of the assets
8  in the clearance box, unencumbered assets in
9  the clearance boxes were -- were potentially
10 included in the deal.
11     Q.  Okay. I'd like to break that down.
12     Do you remember when you first had a
13 conversation with Mr. Lowitt about your role in
14 determining the existence or otherwise of
15 unencumbered assets over the weekend of
16 September 20th and 21st?
17     A.  I don't know when precisely that
18 took place, no, I don't.
19     Q.  Do you know if it was before or
20 after the sale hearing in the bankruptcy court
21 on September 19th?
22     A.  So that was on the Friday?
23     Q.  That was on Friday.
24     A.  No, it would have been -- that would
25 have taken place over the course of the

TSG Reporting - Worldwide  (877) 702-9580

## Page 193

1  Blackwell - Highly Confidential
2  weekend, so actually Saturday, Sunday. My
3  marching orders of 5:00 on that Friday were to
4  be ready for business on Monday. That was my
5  recollection.
6      MR. SHAW: Let me offer a belated
7  clarification, because, of course, the
8  hearing actually carried through into
9  Saturday morning, so you may want to
10 clarify that as well.
11     MR. OXFORD: That's a good
12 clarification.
13     Q.  To the best of your recollection, it
14 is sometime on Saturday morning that Mr. Lowitt
15 had that conversation with you rather than
16 Friday evening?
17     A.  I think it was over the course of
18 Saturday, yes, because I think in -- if you
19 look at my e-mail, which I'm sure you have,
20 there is -- the process starts and as that
21 process starts, we are working through as a
22 team, again, how we are going to review -- what
23 available data there is or how to go and get
24 the data, so it's about the process of
25 gathering data to determine what is

TSG Reporting - Worldwide  (877) 702-9580

Page 194

1      Blackwell - Highly Confidential
2  unencumbered.
3      Q.   Did you have a number of
4  conversations with Mr. Lowitt over the weekend
5  about the subject of the unencumbered assets?
6      A.   I would imagine so, yes.
7      Q.   But is it fair to say they kind of
8  blur a little bit into one?
9      A.   It was -- yes.  It was -- they did.
10 It's hard to know exactly when and where these
11 conversations took place, but clearly we were
12 using e-mail a lot as well to just ask people
13 to create it.
14     Q.   Were any of your conversations with
15 Mr. Lowitt face to face?
16     A.   Some of them would be, yes.  Ian was
17 not -- some of them might have been.  Fairly
18 infrequently.
19     Q.   Did Mr. Lowitt prefer to communicate
20 by e-mail?
21     A.   I just had a very narrow set of
22 actions I was focused on, right, so I think it
23 wasn't a question whether he preferred to
24 communicate or not.  I was doing the task that
25 had been sent me and he wanted updates.  He
TSG Reporting - Worldwide  (877) 702-9580

Page 195

1      Blackwell - Highly Confidential
2  would send "any update."  I think there are
3  lots of e-mails like that, and there were lots
4  of e-mails from me to the various teams that
5  were working on these things saying "any
6  updates."
7      Q.   Understood.  Do you remember when
8  your first conversation with Mr. Lowitt was
9  about this task that he had sent you?
10     A.   No, and it's possible it was Paolo
11 that initiated the work even.  Paolo Tonucci
12 may have even initiated the work.
13     Q.   So you may have gotten your marching
14 orders indirectly from Mr. Lowitt?
15     A.   That's quite possible.
16     Q.   You said that your task changed over
17 time and that your first task was to determine
18 whether there was, in fact, any unencumbered
19 assets; is that correct?
20     A.   Correct.
21     Q.   Did you have any understanding of
22 why it was you had been sent this task?
23        MR. SHAW:  Objection.  Asked and
24 answered.
25     A.   As I stated earlier, I had a goal
TSG Reporting - Worldwide  (877) 702-9580

Page 196

1      Blackwell - Highly Confidential
2  that was sent me.  It wasn't a period of time
3  when we were asking lots of questions about why
4  we were doing it.
5      Q.   Did you come to learn at any time
6  that the purpose of you and your team
7  identifying unencumbered assets was that they
8  be transferred to Barclays?
9        MR. SHAW:  Objection.  Asked and
10 answered.
11     A.   There was a -- my understanding was
12 at some point later on over the course of the
13 weekend, I actually think it may even have been
14 the Monday that we were talking about
15 transferring these assets, talking with I think
16 the trustee of LBI even at that point.
17     Q.   That was a conversation you had with
18 the trustee of LBI?
19     A.   I didn't, no, but people within my
20 organization or people within the former Lehman
21 organization were having those conversations.
22     Q.   Okay.  What do you remember about
23 that conversation?
24     A.   I don't -- I didn't have it, so I
25 don't recall it.
TSG Reporting - Worldwide  (877) 702-9580

Page 197

1      Blackwell - Highly Confidential
2      Q.   You just remember that there was a
3  conversation with the trustee?
4      A.   Yes.
5        MR. SHAW:  Objection.
6      Q.   About the subject of transferring
7  assets?
8      A.   I recall that there were -- there
9  was a dialogue with the trustee.
10     Q.   When you say "the trustee," do you
11 mean the trustee directly or the trustee's
12 office and his staff?
13     A.   I think it's probably something like
14 Anson Frelinghuysen.
15     Q.   We will put that under staff.
16        The second part of your marching
17 orders appears to be to ascertain the existence
18 or otherwise of any excess in Lehman's 15C3
19 account; is that correct?
20     A.   It was to recalculate the 15C3.  The
21 moneys and securities that were locked up in
22 association with that were managed by the
23 treasury function, I contributed data into the
24 calculation which finance ran and we ran that
25 calculation.
TSG Reporting - Worldwide  (877) 702-9580

Page 198

1    Blackwell - Highly Confidential
2    Q.   And as I understand it, it is
3  Mr. Tonucci's team I think you said owns that
4  calculation?
5    A.   No, it's not. It's Tony Stucchio
6  who reported to Martin Kelly.
7    Q.   And Mr. Kelly's position at the time
8  was?
9    A.   Financial controller.
10    Q.   And that's a separate reporting
11  stream from yourself and separate --
12    A.   Reported to Ian.
13    Q.   And separate from Mr. Tonucci?
14    A.   Paolo reported to Ian.
15    Q.   Did anybody tell you at any point,
16  Mr. Blackwell, that a certain amount of the
17  excess, if any, in the 15C3 fund was to be
18  transferred to Barclays?
19        MR. SHAW: Objection to form. Asked
20    and answered.
21    A.   There was a discussion about a
22  mechanism potentially, and I think I had that
23  conversation with Gerard LaRocco, to transfer
24  cash if the SEC, Mike Macchiaroli, signed off
25  that there was, indeed, an excess at a point in
TSG Reporting - Worldwide  (877) 702-9580

Page 199

1    Blackwell - Highly Confidential
2  time. Now, that changed. That was a mechanism
3  we looked at and discarded. So that's the only
4  conversation that I had around moving cash.
5    Q.   When did you have that conversation
6  with Mr. LaRocco?
7    A.   I don't recall, again, exactly the
8  exact time. It was probably on -- late on
9  Saturday, maybe Sunday, but certainly over that
10  weekend.
11    Q.   Mr. LaRocco was employed by Barclays
12  at that time; correct?
13    A.   Correct, but that was more about how
14  do you technically move money over a weekend.
15    Q.   What was the mechanism you discussed
16  with Mr. LaRocco?
17    A.   This is an operational process. You
18  can't move money on a weekend, so discussing
19  opening up a bank account at -- I think it was
20  at Wells Fargo. We didn't pursue that any
21  further.
22    Q.   It sounded like you also discussed
23  with Mr. LaRocco the need for the SEC to sign
24  off on any transfer of 15C3 funds; is that
25  accurate?
TSG Reporting - Worldwide  (877) 702-9580

Page 200

1    Blackwell - Highly Confidential
2    A.   Well, the SEC would have to give --
3  it is a bankrupt entity -- or the SEC would
4  need to approve any cash movement out of the C3
5  lock-up.
6    Q.   What's the basis of your knowledge
7  about that subject?
8    A.   Just -- what do you mean by the
9  "basis"?
10    Q.   How is it you are able to testify
11  about that fact?
12    A.   What fact?
13    Q.   That the SEC would have to approve
14  any transfer from a bankrupt entity.
15    A.   Because of the experience that I
16  have had.
17    Q.   That's all I was asking.
18        Did you have any conversations with
19  the SEC that weekend about the subject of the
20  15C3 in particular?
21    A.   Not over that weekend, no. I think
22  I had conversations with -- I had many
23  conversations with the SEC post, but not over
24  that weekend.
25    Q.   The conversations that you have had
TSG Reporting - Worldwide  (877) 702-9580

Page 201

1    Blackwell - Highly Confidential
2  with the SEC subsequent to that weekend, are
3  they related to the transfer of funds from
4  Lehman's 15C3 account to Barclays?
5        MR. SHAW: Objection. Form.
6    A.   I wouldn't characterize them that
7  way. The -- no, I wouldn't characterize them
8  that way.
9    Q.   How would you characterize them?
10    A.   The conversations I had with the SEC
11  have been around asset transfers, not
12  necessarily related to moneys due from the
13  15C3, although I think I have had one
14  conversation post the LBI bankruptcy with Mike
15  Macchiaroli and some other members of his
16  office where we discussed this and provided --
17  I think we may have -- we had a discussion
18  around the 15C3. That was probably the only
19  direct conversation we have had specifically
20  around the 15C3. Then in relation to other
21  asset transfers, the PIM asset transfer, we
22  have had a plethora of conversations of which
23  the 15C3 is a source of customer protection
24  and, therefore, moneys that you would expect
25  would be released as it relates to the PIM
TSG Reporting - Worldwide  (877) 702-9580

---

Page 202

Blackwell - Highly Confidential

1 transfer, so it's slightly tangential.
2 Q.   When did you have this conversation
3 with Mr. Macchiaroli?
4 A.   I don't know the exact date. It was
5 probably on the Tuesday -- sometime in the
6 first week.
7 Q.   And when you say "the first week,"
8 just so we have a clear record --
9 A.   My first week at Barclays.
10 Q.   Who else was present for that
11 conversation with Mr. Macchiaroli?
12 A.   Kendall McLaughlin and Alex Crepeau,
13 I think. I may not be correct.
14 Q.   Who is Kendall McLaughlin?
15 A.   He was responsible for regulatory
16 operations at Lehman Brothers.
17 Q.   Does he work for Barclays now?
18 A.   He does not at present. He did
19 transfer. He subsequently left.
20 Q.   Do you know where he is employed
21 now?
22 A.   Citibank.
23 Q.   And Mr. Crepeau you mentioned
24 earlier. Was he --

TSG Reporting - Worldwide (877) 702-9580

---

Page 203

Blackwell - Highly Confidential

1 A.   Kendall's boss.
2 Q.   Did he transfer to Barclays?
3 A.   He did.
4 Q.   And is he still employed by
5 Barclays?
6 A.   He is.
7 Q.   Do you know what his position is?
8 A.   He is responsible for regulatory
9 operations. He replaced Kendall. He had
10 previously post bankruptcy been responsible for
11 the LBI TSA, the services provided by Barclays
12 to LBI for operations only.
13 Q.   Do you recall why it is you met with
14 Mr. Macchiaroli?
15 A.   Yes. We discussed the potential
16 transfer of -- we wanted to transfer the
17 initial funding of the PIM accounts so -- this
18 is actually -- this meeting is later. This is
19 a week later, actually. Sorry. My
20 recollection is wrong. This is later on, this
21 meeting.
22 Q.   So if we are talking about the
23 closing of the deal on Monday, the 22nd, of
24 September, you think it's sometime the week

TSG Reporting - Worldwide (877) 702-9580

---

Page 204

Blackwell - Highly Confidential

1 of --
2 A.   I think it's later.
3 Q.   The week of Monday 29th?
4 A.   Or even possibly later.
5 Q.   Possibly afterwards?
6 A.   Yes. So we were talking about the
7 transfer of the loan, the cash in the 15C3 that
8 was related to the margin loans, and that was,
9 I think, the first element of the conversation,
10 and I think the second component of the
11 conversation was as it related to the
12 $769 million worth of securities, Ginnie Maes
13 held at Chase that potentially were going to be
14 delivered as part of the -- that was one way to
15 satisfy the component of the APA, it would
16 either be securities or some alternative value.
17 Q.   Can you explain to me a little more
18 about your conversation that related to the
19 first alternative, the first part. You said it
20 was cash in the 15C3 account or fund that
21 related to the margin. What do you mean by
22 that?
23 A.   That's related to PIM. PIM
24 customers take, borrow money against their

TSG Reporting - Worldwide (877) 702-9580

---

Page 205

Blackwell - Highly Confidential

1 positions. They can borrow up to 440 percent
2 of value.
3 Q.   And you said the second subject, I
4 think probably the subject that I am more
5 interested in, is the $769 million of Ginnie
6 Mae securities that you said were potentially
7 to be transferred pursuant to the agreement
8 with Barclays; correct?
9 A.   769 value, so that was either going
10 to be satisfied through Ginnie Maes or other
11 alternative value, if there is an excess in the
12 C3, the 769 value.
13 Q.   It sounds like you have an
14 understanding now of the deal between Barclays
15 and Lehman, is that correct, at least in this
16 respect?
17 A.   Yes.
18 Q.   Can you tell me without waiving any
19 privilege, of course, and any of my questions
20 are not designed to discover information that
21 you discussed with your attorneys, but can you
22 tell me how it is you came to have that
23 understanding of the APA. I ask because your
24 answers to Mr. Hine's questions suggested you

TSG Reporting - Worldwide (877) 702-9580

Page 206

1       Blackwell - Highly Confidential
2    weren't really involved and have no knowledge
3    of the deal and now you are telling me you have
4    some knowledge of the deal.
5       A.   This was after the event, after the
6    deal had closed, I believe, and that was where
7    these conversations began, in terms of
8    actioning the content of the deal.
9       Q.   Right.  Okay.
10      A.   It doesn't mean I had an
11   understanding of the whole deal.
12      Q.   I understand.  I don't think you
13   quite answered my question, though, which is
14   how is it that you came to have an
15   understanding that this was a term of the deal?
16      MR. SHAW:  If you can answer the
17      question without revealing discussions with
18      counsel.
19      A.   That is probably the most likely
20   source.
21      Q.   Okay.  Let's try it this way.  What
22   did you and Mr. Macchiaroli discuss in this
23   meeting that you testified about that took
24   place sometime in the week of September 29th or
25   perhaps later?

TSG Reporting - Worldwide  (877) 702-9580

Page 207

1       Blackwell - Highly Confidential
2       A.   Asking the SEC to review the
3    calculation and release and authorize --
4    provide their sign-off that the C3 had an
5    excess or otherwise, but have an opinion on the
6    C3 and authorize a sign-off to the trustee of
7    LBI to release the cash related to the margin
8    balances, as I mentioned before, another
9    element of the PIM transfer, and securities
10   from -- securities from JPMorgan Chase.
11      Q.   Was this a meeting that you had
12   requested, Mr. Blackwell?
13      A.   I don't recall whether I requested
14   it.  It's quite possible I did.  The SEC set up
15   an office at 745, so were available.
16      Q.   Where did the meeting take place, at
17   the SEC's office at 745?
18      A.   Correct.
19      Q.   And this was Mr. Macchiaroli's
20   office?
21      A.   Yes.
22      Q.   Do you have any notes of the
23   conversation you had there?
24      A.   I don't believe I do.  I could go
25   back to my -- I could go back and try and

TSG Reporting - Worldwide  (877) 702-9580

Page 208

1       Blackwell - Highly Confidential
2    review my papers.
3       Q.   Where would they be if you had them?
4       A.   Where would they be?  They are most
5    likely going to be in my e-mail and they are
6    also potentially in my boxes of files which I
7    have already reviewed and looked through, so I
8    can do that based on these questions.
9       Q.   Your counsel and I can talk off the
10   record about our document requests.
11      What was Mr. Macchiaroli's response
12   to your request that the SEC review and sign
13   off the 15C3 calculation?
14      A.   I don't think he was comfortable
15   doing it, doing that at that point.  He wanted
16   to get a better understanding of the books and
17   records at that point.  So I think we continued
18   to work with members of the SEC and to try and
19   provide them with a better understanding and
20   the finance team probably led that effort in
21   terms of the overall 15C3.
22      Q.   At the time you asked
23   Mr. Macchiaroli to sign off on this
24   calculation -- withdrawn.  I am going to set
25   that up a little better.

TSG Reporting - Worldwide  (877) 702-9580

Page 209

1       Blackwell - Highly Confidential
2       You testified in response to
3    Mr. Hine's questions that you were
4    uncomfortable about the accuracy of the C3
5    calculation over the weekend of September 20th
6    and 21st; correct?
7       A.   To be precise, what I said, I was
8    uncomfortable about some of the inputs into the
9    calculation, not the calculation itself.
10      Q.   I didn't mean to mischaracterize
11   your testimony.  I didn't mean to suggest that
12   somehow the formula wasn't properly applied,
13   but it seemed to me that as of Sunday night,
14   the 21st, you were not comfortable that the
15   calculation, because of the reasons you have
16   testified to, you are not comfortable that the
17   calculation or the result of the calculation
18   was a hundred percent accurate; is that
19   correct?
20      A.   That's correct.
21      Q.   And what happened between Sunday the
22   21st of September and this meeting with the SEC
23   a week or so hence that allowed you to become
24   comfortable that the calculation was correct?
25      A.   I wasn't talking about the accuracy

TSG Reporting - Worldwide  (877) 702-9580

---

Page 210

1    Blackwell - Highly Confidential
2  of the calculation. I was talking about the
3  components that we would request from the C3.
4  So the request was there are certain components
5  that are owed to Barclays as under the terms of
6  the APA and, therefore, would you be
7  comfortable signing off based on the value of
8  the moneys that are locked up. So the
9  conversation, as far as I recall it, wasn't
10  about how accurate the calculation was. So if
11  Mike had concerns about the accuracy, then,
12  again, we were working with him to try to
13  provide him with some level of comfort as to
14  how the calculation had been constructed and he
15  wanted to carry out that review.
16    Q.  I am going to try that question
17  again, because I'm not sure that you answered
18  it.
19    You were talking with
20  Mr. Macchiaroli about the components you would
21  request from the C3. That's what you just
22  said?
23    A.  Let me --
24    Q.  Can you explain that a little more.
25    A.  The request related to the

TSG Reporting - Worldwide  (877) 702-9580

---

Page 211

1    Blackwell - Highly Confidential
2  calculation itself. There is a component
3  that's associated with margin debits and margin
4  credits, so these margin loans related to PIM
5  customers. I was asking that Mike sign off --
6  the SEC sign off the release of that money from
7  within the 15C3, because it was in the
8  calculation, and I think that component we
9  could highlight very accurately as being
10  correct without any question. So we were
11  asking for that money to be released and that
12  was the main driver of my conversation, I
13  believe, that's what I recall anyway, with
14  Mike. In addition to that I think in the same
15  meeting that I had with Mike I asked if he was
16  able to authorize the release of the securities
17  as well.
18    Q.  When you say "the securities,"
19  again, just so we have a clear record, you mean
20  the 769 Ginnie Mae securities that were held at
21  JPMorgan Chase that are referenced in the
22  Clarification Letter?
23    A.  Yes.
24    Q.  Why did you ask him to do that, sir?
25    A.  Because that was part of the

TSG Reporting - Worldwide  (877) 702-9580

---

Page 212

1    Blackwell - Highly Confidential
2  agreement.
3    Q.  Had you become comfortable between
4  the night of Sunday the 21st of September and
5  the date of your request to the SEC some week
6  or so later that the C3 calculation you had
7  performed was a hundred percent accurate?
8    A.  I wasn't --
9    MR. SHAW:  Objection to form.
10    A.  I was not saying that the
11  calculation was a hundred percent accurate. I
12  wasn't making that assertion.
13    Q.  So why did you ask Mr. Macchiaroli
14  to authorize the release of this money?
15    A.  Because that was part of the
16  agreement.
17    Q.  What was part of the agreement?
18    A.  That if there was an excess in the
19  calculation, and I'm not the person that is
20  going to determine whether there is an excess
21  or not, I think Mike and the finance team would
22  be the people that would determine whether
23  there was, that if there was an excess,
24  $769 million worth of Ginnie Mae securities
25  held at Chase were part of the agreement and

TSG Reporting - Worldwide  (877) 702-9580

---

Page 213

1    Blackwell - Highly Confidential
2  that value should be paid to Barclays.
3    Q.  Were you comfortable at the time of
4  your request to Mr. Macchiaroli that there was
5  at least $769 million of excess in the C3
6  account in Lehman?
7    A.  Again, I'm not the expert on the C3
8  calculation, so I'm not making -- I'm making a
9  request based on the components that I'm
10  involved in. So not the whole calculation. I
11  don't have -- I would need to look at the
12  schedules that were shown to Mike at the time.
13  But if the schedules had shown an excess, then
14  that would give me a level of comfort.
15    Q.  I don't wish to belabor the point,
16  but it seems to me that you have two choices.
17  Either you got comfortable that the C3
18  calculation was accurate between Sunday night,
19  the 21st, and whenever you asked
20  Mr. Macchiaroli to release this, or you asked
21  him to release it not knowing whether or not
22  these calculations showing an excess of 769
23  million or more was accurate.
24    MR. SHAW:  Objection to form.
25    A.  That's not what I was representing.

TSG Reporting - Worldwide  (877) 702-9580

Page 214

1      Blackwell - Highly Confidential
2    I was discussing with Mike the fact that there
3    are multiple components for 15C3 calculation,
4    multiple components, of which I am not expert
5    at the multiple components. Over the course of
6    the weekend leading -- the 21st, 20th, 21st,
7    the work that was done was to determine the
8    operational components that go into a 15C3
9    calculation which is some of the components
10   that we would -- that operations would provide,
11   and there are many other components that make
12   that up. That calculation then determines how
13   much money is locked up. I don't know at that
14   point in time when that conversation happened
15   how much money was locked up. We know that the
16   trustee of LBI knew how much money was locked
17   up and what the value of that calculation was.
18   But I would need to look at papers from there
19   to determine whether there was an excess. The
20   request was on the basis that if Mike felt
21   there was an excess, when could we discuss
22   having the $769 million worth of securities.
23   If there isn't an excess, then I'm not
24   expecting him to release the securities. But
25   then alternative value would need to be found

TSG Reporting - Worldwide  (877) 702-9580

Page 215

1      Blackwell - Highly Confidential
2    away from the C3.
3        Q.   We will come back to the alternative
4    value in a little bit.
5            Have you had any subsequent
6    conversations with the SEC about the subject of
7    C3?
8        A.   Yes. Again, as it pertained to the
9    margin debits and the PIM asset transfer,
10   multiple. Too many to list.
11       Q.   Have you had any conversations with
12   the SEC about the $769 million?
13       A.   I don't think I have had any
14   subsequent conversations.
15       Q.   Do you know if anybody else at
16   Barclays has had conversations with the SEC
17   about the release of 769 from the 15C3 account?
18       A.   I don't know is the -- I don't know.
19       Q.   Were you ever asked over the
20   weekend, sir, the weekend of September 20th and
21   21st, to do any work as it relates to Lehman's
22   margin or deposits at the OCC or any other
23   exchange?
24       A.   I don't recall doing any work on
25   that.

TSG Reporting - Worldwide  (877) 702-9580

Page 216

1      Blackwell - Highly Confidential
2        Q.   Do you recall ever hearing that
3    Lehman's margin or deposits at the OCC or any
4    other exchange were ever part of the deal
5    between Lehman and Barclays?
6        A.   Over the deal weekend, no.
7        Q.   That answer suggests to me that
8    subsequently to the deal weekend you have heard
9    that.
10       A.   I understand that to be the deal.
11       Q.   And, again, without wishing to
12   invade any privilege that you may have, can you
13   tell me how it is you came to learn that piece
14   of information?
15       A.   I learned that as part of some
16   conversations that I think took place --
17   meetings that took place between the trustee of
18   LBI, a member of my staff, and Barclays'
19   counsel, so I...
20       Q.   That's fine. It's probably not
21   privileged, but I don't need to go into it.
22           You said in response to one of
23   Mr. Hine's questions that one of your
24   responsibilities over the weekend was to
25   monitor settlement activity between various

TSG Reporting - Worldwide  (877) 702-9580

Page 217

1      Blackwell - Highly Confidential
2    clearing organizations.
3        A.   Not over the weekend, because there
4    is no settlement can take place over the
5    weekend.
6        Q.   I'm sorry. I misspoke.
7            Was monitoring settlement activity
8    in various clearing organizations part of your
9    responsibility in the week preceding the LBI
10   bankruptcy on the 19th of September?
11       A.   Correct.
12       Q.   Can you tell me a little more about
13   your role in monitoring the settlement
14   activity, please.
15       A.   My settlement teams were obviously
16   working very closely with these exchanges to
17   try and clear the business and working with the
18   treasury team to fund -- to make sure the boxes
19   were funded as much as they possibly could, and
20   over the course of that week funding obviously
21   started to disappear, so settlement started to
22   wind down. The most notable event apart from
23   Chase not providing clearance on the Friday
24   before bankruptcy was DTC raising the debit cap
25   to zero, which basically prevented us from

TSG Reporting - Worldwide  (877) 702-9580

Page 218

1  Blackwell - Highly Confidential
2  being able to settle transactions.
3  Q.  What does that mean, raising the
4  debit cap to zero?
5  A.  It means that the account is
6  effectively not funded, so the process of
7  settlement can't take place.
8  Q.  I have heard that over the week
9  prior to LBI's bankruptcy that DTC was
10  threatening not to clear trades.
11  Is that the same thing that you have
12  just told me in slightly different language?
13  A.  Yes.
14  Q.  Do you have an understanding of why
15  DTC was threatening not to clear trades?
16  A.  Because the account -- because of
17  funding, funding the account, cash being made
18  available to fund the account. The treasury
19  organization would fund all the clearing
20  systems. If they had insufficient cash to fund
21  or insufficient cash to fund a clearing
22  mechanism, then the mechanism doesn't work.
23  Q.  Did you have any conversations with
24  anybody at DTC about the funding issues you
25  just described?
TSG Reporting - Worldwide  (877) 702-9580

Page 219

1  Blackwell - Highly Confidential
2  A.  I was informed by Neal Ullman, who
3  had a direct call with DTC, I had a
4  conversation, I think it was an e-mail
5  conversation and then ultimately a conversation
6  directly with Ian when we became aware of the
7  situation. I asked Paolo as well if he could
8  fund the account. So that was -- and asked him
9  to -- I think there is an e-mail asking for
10  $1.2 billion to be put into the clearance box.
11  Q.  What was Mr. Tonucci's response to
12  your request?
13  A.  I don't remember one.
14  Q.  You took that as a no?
15  A.  I, yeah, moved on.
16  Q.  At any point did you have an
17  understanding, Mr. Blackwell, of the terms of
18  the deal between Lehman and Barclays as to
19  Lehman's DTC box?
20  A.  I think I have discussed this in
21  some of my earlier answers. I was under the
22  working assumption that there would be a
23  conversion of, I think, the 074 box, the DTC
24  box. That was not accurate. There was
25  definitely dialogue between the regulators,
TSG Reporting - Worldwide  (877) 702-9580

Page 220

1  Blackwell - Highly Confidential
2  which I wasn't in, but I'm aware of, between
3  the regnlators, DTC and Barclays and Lehman as
4  to Barclays taking responsibility. I think
5  Barclays was very clear that we not take
6  responsibility for the liabilities of the
7  boxes.
8  Q.  You testified earlier that you had
9  made a suggestion that Barclays go and look at
10  Lehman's DTC books. Do you remember that?
11  A.  I do.
12  Q.  For what purpose were you making
13  that suggestion?
14  MR. SHAW: Asked and answered.
15  A.  So that it was possible to
16  understand any settlement risk.
17  Q.  Was that suggestion made at a time
18  when Barclays was considering stepping into
19  Lehman's shoes at DTC?
20  MR. SHAW: Objection. Foundation.
21  A.  I don't know what the -- I don't
22  know.
23  Q.  Well, let me ask it this way: The
24  conversion plan about which you have testified,
25  you said that as of, I believe, Friday
TSG Reporting - Worldwide  (877) 702-9580

Page 221

1  Blackwell - Highly Confidential
2  afternoon, maybe around 5:00, you said the
3  conversion plan was no longer going to be
4  affected; is that correct?
5  A.  Correct.
6  Q.  Did you understand at any point
7  after 5:00 on Friday Barclays was still
8  assessing the risk in Lehman's DTC box?
9  A.  Not at that point. That issue
10  didn't come up until Sunday.
11  Q.  Do you have any understanding as to
12  why the issue arose on Sunday?
13  A.  I believe it's because the
14  regnlators and other entities that were
15  involved in signing off on the deal were
16  insisting that the box should be -- Barclays
17  should take responsibility for the box, which
18  they did not want to do.
19  Q.  Where did you get that
20  understanding, that the regulators wanted
21  Barclays to take over the box?
22  A.  I would have heard it either from
23  Ian or from -- maybe even from Alex Crepeau.
24  Q.  Does that answer exhaust your
25  recollection of the regulators' interactions
TSG Reporting - Worldwide  (877) 702-9580

Page 222

1    **Blackwell - Highly Confidential**
2    with Barclays on this issue?
3    A.   I was not part of them, so yes, it
4    does.
5    Q.   Do you understand that Barclays --
6    withdrawn.
7         Did Barclays decide to take over the
8    box in whole or did they decide to just take
9    the assets rather than the liabilities?
10   MR. SHAW: Objection. Foundation.
11   A.   My understanding is that Barclays
12   agreed to take unencumbered assets. This is a
13   post-event recollection. Agreed to take
14   unencumbered assets and not take responsibility
15   for clearance boxes of Lehman Brothers.
16   Q.   Do you have any understanding as to
17   the reasons that decision was made?
18   A.   No.
19   Q.   You never talked to anybody about
20   it?
21   A.   It's possible, but, again, we were
22   moving on to a building mode at Barclays.
23   MR. OXFORD: I'd like to show you a
24   few documents, please.
25        (Exhibit 89 B, e-mail dated
     TSG Reporting - Worldwide  (877) 702-9580

Page 223

1    Blackwell - Highly Confidential
2    9-19-2008, marked for identification.)
3    Q.   Mr. Blackwell, you have in front of
4    you a document I have marked as Exhibit 89 B.
5    Can you read that and let me know when you have
6    had a chance to look over it.
7         (Document review.)
8    A.   Okay.
9    Q.   You will see in the e-mail that's
10   ultimately forwarded to you, the bottom e-mail
11   in the chain is an e-mail from Chris Concannnon
12   at NASDAQ to Gerald Donini. Do you see that?
13   A.   I do.
14   Q.   Who is Mr. Donini?
15   A.   Gerry Donini is -- or was head of
16   equities at Lehman Brothers.
17   Q.   Where is Mr. Donini now?
18   A.   He is at Barclays Capital. Holds
19   the same position.
20   Q.   You see the last line of the first
21   paragraph, the last sentence of the first
22   paragraph says: "DTC is contemplating a cease
23   act notice for LEHM tonight." Do you see that?
24   A.   I do.
25   Q.   That e-mail chain is ultimately
     TSG Reporting - Worldwide  (877) 702-9580

Page 224

1    **Blackwell - Highly Confidential**
2    forwarded to you and to Mr. Joseph Lodato by
3    Gerald Donini. Do you see that?
4    A.   I do.
5    Q.   Mr. Donini writes to you and
6    Mr. Lodato "need an answer and help."
7    A.   I think Gerry probably answered
8    that. Gerry was responsible for compliance for
9    the equity division. At that point I had no
10   understanding of what Barclays' intent was
11   around the boxes other than to assume they were
12   taking responsibility for them at that point.
13   Q.   Why was it you assumed they were
14   taking responsibility for it? Is that because
15   you were still in your conversion mindset, as
16   it were?
17   A.   Yes. So I don't think I confirmed
18   or denied -- I don't think I responded to this.
19   Q.   You don't recall speaking to
20   Mr. Donini or Mr. Lodato about this?
21   A.   It's possible I did, but, again, in
22   light of the number of things going on, it was
23   possible that I didn't follow through on that
24   particular item.
25   MR. OXFORD: Okay. That's all I
     TSG Reporting - Worldwide  (877) 702-9580

Page 225

1    Blackwell - Highly Confidential
2    have for that document.
3         (Exhibit 90 B, e-mail dated
4    9-19-2008, marked for identification.)
5    Q.   Mr. Blackwell, you have in front of
6    you Exhibit 90 B. I should say, just so we are
7    clear, there is a somewhat complicating factor
8    when these e-mails were processed in the
9    timing, so the first line of the "sent," which
10   is up here as 2:53 p.m., is actually in
11   Greenwich meantime, so that is an e-mail that
12   was sent at 10:53 a.m. on Friday.
13   A.   10:53 --
14   Q.   A.M. on Friday, but the e-mails
15   below the chain -- sorry, in the chain, are in
16   Eastern standard time.
17   A.   Okay. So this is the morning of
18   Friday.
19   Q.   Friday morning.
20   A.   We are still in conversion mode.
21   Q.   Still in conversion mode.
22   Mr. Nicholson writes to you and Mr. Lodato
23   again asking for guidelines as to what is going
24   presumably to Barclays. Correct? That's how
25   you read it?
     TSG Reporting - Worldwide  (877) 702-9580

Page 226

1       **Blackwell - Highly Confidential**
2       A.   I would read it that way, yes.
3       Q.   And you reply "currently being
4   **argued, they are taking all the DTC 074 box."**
5       A.   And, again, that was an assumption
6   at that point in time that the box was going.
7       (Exhibit 91 B, e-mail dated
8   9-21-2008, marked for identification.)
9       Q.   Mr. Blackwell, you have in front of
10  you what I have marked as Exhibit 91 B, which
11  at the top is an e-mail that's sent by you on
12  Sunday, the 21st of September, at 2:43 a.m.,
13  that's what it bears, but it would have been
14  sent at Saturday, 10:43 p.m. on the 20th.
15      A.   Okay.
16      Q.   I say this as much for your benefit
17  as to try to keep myself --
18      A.   I was definitely --
19      Q.   Below you write an e-mail at
20  10:38 p.m. to Mr. McDade and to Mr. Lowitt
21  saying "DTC suggestion."
22           Does this reflect a suggestion by
23  you that Barclays review the Lehman assets at
24  DTC?
25      A.   Yes, it does.  To give -- it's to

Page 227

1       Blackwell - Highly Confidential
2   give -- I think we discussed this earlier.
3   This is to give Barclays access to the DTC
4   clearance boxes either to review unencumbered
5   assets or fails.  I don't know what topic I am
6   referring to.  Probably on the Saturday it's
7   referring to unencumbered.
8       Q.   Sorry, can you explain that last
9   answer.
10          MR. SHAW:  You are going to need to
11  ask a more precise question.
12      Q.   You said "either to review
13  unencumbered assets or fails."  What do you
14  mean by reviewing unencumbered assets?
15      A.   What do I mean by reviewing
16  unencumbered assets?  That's probably not
17  accurate.  I am just thinking in terms of the
18  timeline of when this was sent and what I was
19  focused on.  So I think the primary purpose of
20  this effort was to allow Barclays to review the
21  failing transactions.  I do think that was the
22  primary purpose, but I can't be a hundred
23  percent sure.  I'm sure there are more e-mails
24  associated with this.
25      Q.   In the context of Barclays' review

Page 228

1       Blackwell - Highly Confidential
2   of Lehman's DTC box, what did TBAs mean to you?
3   They are not on this document.
4       A.   I wasn't in -- I don't -- I don't
5   know.  It's a type of security.
6       Q.   Was it a type of security that was
7   in Lehman's DTC box?
8       A.   It's quite possible.
9       Q.   Was it a type of security that you
10  had any understanding Barclays was concerned
11  about?
12      A.   I don't know.
13      Q.   Is it a type of security that comes
14  with any potential liabilities?
15      A.   I think any security comes with a
16  sort of liability.  They go up and down, so any
17  security has liability.
18      (Exhibit 92 B, e-mail dated
19  9-20-2008, marked for identification.)
20      Q.   I've marked as Exhibit 92 B what I
21  think is a double-sided document.  It's a
22  two-page document that is ultimately
23  forwarded -- sorry -- that is ultimately sent
24  by you on Saturday at 7:14 p.m. Eastern.
25  Subject, 1.4 billion update.  If I can direct

Page 229

1       **Blackwell - Highly Confidential**
2   your attention to the original e-mail in the
3   chain, which is on the reverse of your exhibit,
4   there is an e-mail that is not sent to you at
5   this stage, but it's forwarded up to you.  It's
6   from Mr. Lowitt to Mr. McDade and
7   Mr. Berkenfeld on Saturday, September 20 at
8   5:53 a.m.
9           Mr. Lowitt writes:  "Did the court
10  accept the 15C3 lock-up and unencumbered box
11  make it through to Barcap."
12          Do you remember, when you received
13  this e-mail, scrolling down and reading this
14  part of the chain?
15      A.   Probably not.  Just the sheer volume
16  of mail I'm getting, my goals are here, the
17  e-mail from Monty, which I think we have
18  actually looked at several times in other
19  exhibits.
20      Q.   If you go two up the chain, Beth
21  Rudofker sends an e-mail to Mr. Berkenfeld and
22  copies you amongst others.
23      A.   Yes.
24      Q.   Is that the point at which you would
25  become focused on this e-mail?

Page 230

**Blackwell - Highly Confidential**

1
2    A.   Quite possibly, but again, the focus
3    of this e-mail is the e-mail trail and the
4    focus of what I am doing as the operations
5    manager is trying to identify based on the set
6    of criteria unencumbered securities. I don't
7    know what was discussed in court. I have no
8    idea. And it was, frankly, of little interest
9    to me at that point.
10    Q.   Miss Rudofker writes: "Alastair" --
11    and she spells your name wrong -- "and Neal are
12    working on getting it ring-fenced/moved if
13    needed."
14        Was that your understanding of what
15    your marching orders were that weekend, to get
16    the 15C3 assets and the unencumbered box
17    ring-fenced and moved, if needed?
18    A.   I couldn't technically do that. I
19    could identify assets. I can't move anything
20    over the weekend. I couldn't move cash at the
21    weekend and I couldn't move securities related
22    to it, so practically that's not possible, so
23    my marching orders, as I said, was to identify
24    the assets and provide that information, what
25    are the assets that are currently unencumbered,

Page 231

**Blackwell - Highly Confidential**

1
2    and recalculate the C3.
3    Q.   Did anyone ever tell you that cash
4    had been removed from the deal between Lehman
5    and Barclays?
6    A.   That was my understanding of why 769
7    cash couldn't move, it had to be securities,
8    but I think that was a post -- that was a
9    post-weekend event. That's my recollection.
10    Q.   Your recollection -- and the event
11    you are talking about is you learning that the
12    reason the transfer is 769, not some number in
13    cash, is because, as you understood it, the
14    terms of the deal was that no cash could go to
15    Barclays?
16    A.   That was after the weekend, as I
17    thought 769 was a strange number.
18    Q.   Okay. I think you have answered my
19    question as to timing, but not actually my
20    question.
21        Is it correct that your
22    understanding was that the reason the deal
23    between Barclays and Lehman was the transfer of
24    $769 million in Ginnie Mae securities rather
25    than that number or some other number in cash

Page 232

**Blackwell - Highly Confidential**

1
2    was because cash had been excluded from the
3    deal with Barclays?
4    A.   I don't think -- I don't think I
5    would have known that. I think I may have
6    learned that subsequently. Around the time my
7    understanding would have been securities needed
8    to move or alternative value.
9    Q.   From whom did you gain that
10    understanding, sir?
11    A.   It's going to have been from a
12    similar set of people you see in my e-mails.
13    It's going to be Ian, Martin or Paolo who would
14    have informed me of that.
15    Q.   So one of the three, to the best of
16    your recollection, you can't remember which,
17    would have told you that the reason the deal
18    changed from I think it was a billion
19    dollars -- does that sound right to you?
20    MR. SHAW: Objection. Foundation.
21    Q.   I think there is probably a number
22    of proper objections to that question.
23        Did you ever have an understanding
24    that some other value different to $769 million
25    was to be transferred from Lehman's C3 account

Page 233

**Blackwell - Highly Confidential**

1
2    to Barclays?
3    A.   Over the course of the weekend I had
4    spent time, that conversation I had with Gerard
5    around the billion dollars of cash at Wells
6    Fargo, so I had a conversation about the
7    mechanism to potentially move that. That's
8    where my involvement was.
9    Q.   So based on your conversation with
10    Mr. LaRocco, you had understood that one
11    component of the deal between Barclays and
12    Lehman was to move a billion dollars of cash
13    which was held in that Wells Fargo account
14    which was that 15C3 account?
15    A.   Correct, dependent, though, on
16    determining there was an excess, and there
17    would be alternative value.
18    Q.   And when the deal is finally inked
19    in the Clarification Letter, that number has
20    changed, hasn't it? It's no longer $1 billion;
21    correct?
22    A.   That is my understanding, yes.
23    Q.   That number has changed from
24    $1 billion to $769 million; correct?
25    A.   Correct.

Page 234

1    Blackwell - Highly Confidential
2      Q.   And just so we have got a clear
3    record, I think we are there, but one more
4    question, your understanding of the reason that
5    the deal changed from $1 billion in cash from
6    Wells Fargo, assuming there is an excess in the
7    C3 account, the reason it changed from that
8    $1 billion to 769 of Ginnie Mae securities was
9    a belief that no cash was to go to Barclays
10   under this deal?
11         MR. SHAW: Objection to form.
12     A.   I don't have -- over the course of
13   the weekend when the Clarification Letter was
14   being produced, I have no understanding of that
15   at all.
16     Q.   I understand that, sir. That wasn't
17   my question.
18     A.   Post the event that is a
19   possibility. It is not something I spent a
20   huge amount of my time discussing.
21     Q.   But you believe the basis of your
22   knowledge, such as it is, comes from
23   conversations with Mr. Lowitt, Mr. Tonucci and
24   Mr. Kelly?
25     A.   Most likely.
        TSG Reporting - Worldwide  (877) 702-9580

Page 235

1    Blackwell - Highly Confidential
2         (Exhibit 93 B, Management of the
3    Unencumbered Asset Gap, marked for
4    identification.)
5         (Recess was taken from 3:33 to
6    3:38.)
7    BY MR. OXFORD:
8      Q.   Mr. Blackwell, you have in front of
9    you what I have marked as Exhibit 93 B, which
10   is a document -- a one-page document
11   entitled -- two-page document entitled
12   Management of the Unencumbered Asset Gap.
13         Do you recall seeing this document
14   before?
15     A.   When I was reviewing my e-mail, I
16   think I saw something like this, if not this
17   one.
18     Q.   And when you say reviewing your
19   e-mail, do you mean in preparation for this
20   deposition?
21     A.   Absolutely.
22     Q.   Did that review refresh your
23   recollection about the events that took place
24   at the time this document was created?
25     A.   I think this is the -- to the extent
        TSG Reporting - Worldwide  (877) 702-9580

Page 236

1    Blackwell - Highly Confidential
2    that it is consistent with the attempt to look
3    for 1.95 billion of collateral. At that point
4    that was a target. I don't know why that
5    target was set, but that was the target. That
6    target subsequently became irrelevant or
7    raised.
8      Q.   When did it become irrelevant or
9    raised?
10     A.   It was -- the target ceased to be --
11   over the course of the weekend it ceased to be
12   about finding a specific number. It was what
13   is available unencumbered collateral.
14     Q.   And was that change in emphasis
15   something that Mr. Lowitt communicated to you?
16     A.   I believe so, yes.
17     Q.   And again, just so we are clear, the
18   idea then was to find as much unencumbered
19   collateral as possible so that it could be
20   transferred to Barclays?
21     A.   No, that wasn't my understanding.
22   It was to identify unencumbered collateral and
23   determine what value -- determine what was a
24   list of unencumbered securities so that a value
25   could be applied to it. I don't know that the
        TSG Reporting - Worldwide  (877) 702-9580

Page 237

1    Blackwell - Highly Confidential
2    intent was to transfer all of it to Barclays.
3    I think the terms of the APA state that the
4    contents of the clearance boxes, i.e., the
5    unencumbered securities in the clearance boxes
6    would be transferred, so I think this is an
7    earlier iteration of that.
8      Q.   When you say the APA, Mr. Blackwell,
9    the APA to me means the Asset Purchase
10   Agreement that was signed on 16th of September.
11   Is that a document you are referring to?
12     A.   I'm not sure which date. Whatever
13   legal agreement was in place. I've seen it
14   subsequently, but my understanding is it was --
15   that was my understanding.
16     Q.   And is it your understanding that
17   whatever legal agreement this may be, the APA
18   or something else, transfers in terms of
19   unencumbered collateral, it transfers what to
20   Barclays?
21         MR. SHAW: Asked and answered.
22     A.   The contents of the -- the
23   unencumbered assets in the clearing box.
24     Q.   Clearance box was broader to your
25   mind than DTC; correct?
        TSG Reporting - Worldwide  (877) 702-9580

Page 238

1      Blackwell - Highly Confidential
2      A.   Yes, it would be.
3      Q.   Was it -- I think you testified that
4   it included Euroclear?
5      A.   Correct.
6      Q.   It also included Canadian exchanges?
7      A.   Not exchanges.
8      Q.   Sorry.  Then I apologize for my
9   layman's language.  It included certain
10  clearance corporations in Canada?
11     A.   Correct.
12     Q.   What else were you -- withdrawn.
13          Where else were you looking for
14  unencumbered collateral, if anywhere else?
15     A.   We were looking in the clearance
16  depos of LBI, and I don't know all the numbers
17  off the top of my head, but there are a list of
18  depos that would fall under LBI and we would --
19  the teams would have looked in those depos and
20  discounted some of them as not being depos, so
21  the focus is really on, I think, three or four
22  core pools of unencumbered securities.
23     Q.   The document that I have marked as
24  93 B says:  "The objective is to deliver to BCI
25  $195 billion as unencumbered collateral by COB

Page 239

1      Blackwell - Highly Confidential
2   Friday, September 19th."  Do you see that?
3      A.   I do.
4      Q.   I read COB to be short for close of
5   business.  Do you read that also?
6      A.   I do.
7      Q.   Do you know why this document has as
8   its objective the delivery of unencumbered
9   collateral by the close of business on Friday,
10  September 19th?
11     A.   I actually don't, and I think
12  somebody like Paolo would be better answering
13  this question.
14     Q.   Did you ever have an understanding
15  that there was any effort to transfer
16  unencumbered collateral to Barclays by close of
17  business on Friday, September 19th?
18     A.   Possibly.  I don't recall that as a
19  major part of the fact pattern that we were
20  working towards at that time, but that's
21  possible.
22     Q.   Do you recall anything else about an
23  effort to transfer collateral to Barclays on
24  Friday, the 19th?
25     A.   No.

Page 240

1       Blackwell - Highly Confidential
2      Q.   Can you explain for me what your
3   understanding is of a 15C3 account, just to
4   make sure we are not passing each other when we
5   are talking about it?
6          MR. SHAW:  Objection.  Asked and
7      answered, and I think also the problem you
8      are going to run into, again, is the use of
9      15C3 account.
10         MR. OXFORD:  You are right.  He did
11     correct that earlier.
12     Q.   Do you have an understanding of what
13  the requirements are of SEC rule 15C33?
14     A.   I'm at an expert on that rule.
15     Q.   Okay.  That's useful.  That was my
16  next question.
17         Do you have a general understanding
18  of what the rule requires?
19     A.   I have a general understanding what
20  it requires.
21     Q.   Can you tell me what that general
22  understanding is?
23     A.   The purpose of the calculation is to
24  protect customer assets by calculating a figure
25  and that figure is then -- it then requires you

Page 241

1       Blackwell - Highly Confidential
2   to deposit either cash or securities, whichever
3   the security types are eligible, into an
4   account for that customer's protection.
5      Q.   And do you have an understanding of
6   the various elements of the calculation --
7      A.   No, I don't.
8      Q.   -- that goes into the 15C3
9   calculation?  You don't know?
10     A.   I don't.
11     Q.   Do you have any understanding of how
12  secured loans are treated under 15C3?
13     A.   No.
14     Q.   Do you have any understanding of how
15  overdrafts are treated under 15C3?
16     A.   I don't.
17     Q.   Do you have any understanding of how
18  margin that is posted at the options clearing
19  corporation is treated under 15C3?
20     A.   I don't.
21         (Exhibit 94 B, e-mail dated
22  9-22-2008, marked for identification.)
23     Q.   Okay, Mr. Blackwell, I have put in
24  front of you a document marked Exhibit 94 B,
25  which is a one-page e-mail that at the bottom

Page 242

1          **Blackwell - Highly Confidential**
2    is sent to you at 5:22 a.m. on Monday, the 22nd
3    of September. Do you see that?
4          A.    I do.
5          Q.    The re line is 15C3, and do you see
6    that Mr. Tonucci writes to Chris O'Meara, Ian
7    Lowitt, it looks like a Russian version of
8    Martin Kelly, I'm not quite sure why, to Robert
9    Azerad and copying you? Do you see that?
10         A.    I do.
11         Q.    He says: "The final agreement was
12   limited to 769 million, MM, of treasuries, so
13   should be more comfortable to accomplish." Do
14   you recall receiving that?
15         A.    That probably when I learned it
16   was a different number.
17         Q.    Just so we are clear, a different
18   number, are you referring to your earlier
19   testimony about a change in the business terms
20   of the deal between Barclays and Lehman from
21   $1 billion of excess to 15C3 -- sorry -- from
22   the 15C3 reserve to 769 million of treasuries?
23         A.    When I became aware that it was 769
24   million of treasuries that was included in the
25   agreement. I didn't know that the -- I didn't
                TSG Reporting - Worldwide  (877) 702-9580

Page 243

1          Blackwell - Highly Confidential
2    know that cash had definitively been included
3    in any agreement.
4          Q.    Did you know that it had
5    definitively been excluded from any agreement?
6          A.    All I knew at this point was 769 had
7    been included.
8          Q.    Do you think you had a subsequent
9    conversation with Mr. Tonucci, Mr. Lowitt or
10   Mr. Kelly about this topic?
11         A.    Quite probably. It's probable that
12   I did. Possible that I did and probably I did.
13         (Exhibit 95, e-mail dated 9-21-2008,
14         marked for identification.)
15         Q.    Okay, Mr. Blackwell, I have marked
16   as Exhibit 95 B what is a five-page e-mail
17   with, I believe, two attachments entitled
18   Forward Net Long Options - 9/18, which is sent
19   from Francis Pearn to a distribution list, and
20   you are copied, on Sunday, September 21st at
21   4:03 Eastern standard time.
22         If you could just take a moment to
23   review that e-mail and tell me when you have
24   had a chance to read it.
25         A.    I've read it.
                TSG Reporting - Worldwide  (877) 702-9580

Page 244

1          Blackwell - Highly Confidential
2          Q.    Do you recall receiving this e-mail,
3    Mr. Blackwell?
4          A.    No. This isn't something I was
5    focusing on at all.
6          Q.    Can you tell me what you were doing
7    at 4:00 on Sunday afternoon of the 21st?
8          A.    21st is a Sunday?
9          Q.    21st is a Sunday. The deal closes
10   on Monday, the 22nd. Where physically were
11   you?
12         A.    I am possibly at Weil's offices at
13   that point. I am possibly at Weil's offices.
14   I can't remember the timing exactly, but I was
15   there for some of the day, so that's quite
16   possible I was there.
17         Q.    And your focus at that time was not
18   on OCC. What was it on?
19         A.    The major topics for me that day
20   were, again, the unencumbered collateral and
21   the 15C3 and the fails topic was raised again
22   in the course of that day, so I was in a room
23   away from where the deal was being discussed,
24   but it was somewhere in Weil's offices with
25   people, and questions were being put to me,
                TSG Reporting - Worldwide  (877) 702-9580

Page 245

1          Blackwell - Highly Confidential
2    information was coming back, so I was trying to
3    carry out the task that I had been set from
4    there and be available to Ian and anyone else
5    that needed me.
6          Q.    You testified earlier that someone
7    called Alex Crepeau works for you; is that
8    right?
9          A.    That's correct, yes.
10         Q.    Forgive me if I am mispronouncing
11   his name. You said that he was responsible for
12   client valuation and margin.
13         A.    Correct.
14         Q.    Does he have responsibility for
15   margin at the OCC or is that a different
16   functional area?
17         A.    Yes, it's a different functional
18   area.
19         Q.    Do you have responsibility --
20   withdrawn.
21         Did you in your position at Lehman
22   in September of 2008, did you have
23   responsibility for the OCC?
24         A.    Clearance of trades at the OCC, yes.
25   Treasury were responsible for the margin,
                TSG Reporting - Worldwide  (877) 702-9580

Page 246

1       Blackwell - Highly Confidential
2    pledging margin to -- all of the exchange
3    margin, so the names mentioned here, Craig
4    Jones, Dan Fleming. I believe you are speaking
5    to Dan at some point.
6       Q.   Mr. Fleming has operational
7    responsibility for or had, rather, operational
8    responsibility for the margin at OCC during the
9    month of September '08?
10      A.   Correct.
11      Q.   Did he report to Mr. Jones or did
12   Mr. Jones report to him?
13      A.   Mr. Jones reported to Dan Fleming.
14      Q.   Are both of those individuals still
15   at Barclays?
16      A.   They are.
17      Q.   Do you know why the other Lehman
18   individuals would be copied on an e-mail about
19   this subject? Did they also have
20   responsibility for this area?
21      A.   I don't. There seem to be
22   regulatory people, regulatory finance people on
23   here, so I don't know what -- reading through
24   the e-mail trail, I don't know what the
25   ultimate genesis of this trail of work is.
     TSG Reporting - Worldwide  (877) 702-9580

Page 247

1       Blackwell - Highly Confidential
2       Q.   Which are the regulatory finance
3    people?
4       A.   Peter Tennison and Tony Stuccio,
5    and then there are product controllers in Frank
6    Pearn and Gerry Reilly.
7       Q.   Thank you. That's all I have for
8    that document.
9            Can you have in front of you, it's
10   one of the big fat ones that Mr. Hine marked,
11   85 B. Can you open the page to the last
12   document in here which starts at Bates range
13   4607 and it's entitled at the top Exhibit B6
14   Source Schedule B Final, Schedule B. Do you
15   see that?
16      A.   I do.
17      Q.   Do you recognize this document or
18   know what it is?
19      A.   I believe I know what it is.
20      Q.   Can you tell me what it is, please.
21      A.   I believe this is the unencumbered
22   collateral list.
23      Q.   When you say "the unencumbered
24   collateral list," can you be a little more
25   specific, please?
     TSG Reporting - Worldwide  (877) 702-9580

Page 248

1       Blackwell - Highly Confidential
2       A.   List of securities that were
3    unencumbered in the clearance box of Lehman
4    Brothers.
5       Q.   As of which date?
6       A.   I don't know the date. I'm not
7    going to say what date it was, but the schedule
8    being created over that weekend is my
9    understanding.
10      Q.   This might be a slightly vague
11   question. It's not intended to be in any way
12   tricky. I am just trying to get a sense of
13   whether you think this is in some way the
14   product of the work that your team did over the
15   weekend to identify unencumbered assets. Is
16   that a fair reading of the situation?
17      A.   I'm aware of a Schedule B that we
18   contributed to, so I'm assuming based on the
19   title of the document, but without a number to
20   compare it, it's difficult for me to --
21      Q.   It is in alphabetical order, but I
22   take your point.
23      MR. SHAW: I will note that on
24   page 1, Schedule B6, which I think is what
25   you are looking at, has a title by it
     TSG Reporting - Worldwide  (877) 702-9580

Page 249

1       Blackwell - Highly Confidential
2    saying Monday Transfers Par Amount.
3       A.   Right. So it's only one component
4    of Schedule B.
5       MR. OXFORD: Which page?
6       MR. SHAW: Third page of the
7    document after the first blue page. You
8    see there is F/N and exhibit.
9       MR. OXFORD: Yeah, I don't think
10   that's got anything to do with that. Okay.
11      A.   So this document equals that 2.6
12   number?
13      Q.   Is that your understanding?
14      A.   Well, that's -- I don't know how
15   this is laid out, so I think that's a fair
16   point.
17      Q.   In compiling your list of
18   unencumbered assets, which may not be exactly
19   what is at Bates range 4607 and following, did
20   you or your team undertake any effort to take
21   out securities that were owned by Lehman's
22   customers?
23      MR. SHAW: Objection. Vague as to
24   time.
25      Q.   At any point over the weekend when
     TSG Reporting - Worldwide  (877) 702-9580

Page 250

1      **Blackwell - Highly Confidential**
2  **you were combining a list of unencumbered**
3  **assets that informs this Schedule B that we are**
4  **looking at, did you or your team undertake any**
5  **efforts to deduct from that list of CUSIPs any**
6  **CUSIPs that were owned by Lehman customers?**
7          MR. SHAW: Objection to form.
8      You can answer.
9      A.   Of course. Unencumbered assets by
10  definition are not customer assets, however, we
11  had data within the -- we had data challenges,
12  so some of the accuracy of the data was
13  challenging. We applied a rationale, as I
14  described before, around memo seg and memo to
15  just take firm inventory, we excluded customer
16  inventory and were -- we applied a methodology
17  absolutely with the intent of protecting
18  customer assets all the way through the
19  process.
20      Q.   **Have you ever done any analysis to**
21  **determine whether or not any customer assets**
22  **ended up on Schedule B?**
23      A.   I think there were some analysis,
24  that's possible. I can't -- there was
25  definitely analysis on Schedule B and
        TSG Reporting - Worldwide  (877) 702-9580

Page 251

1      Blackwell - Highly Confidential
2  refinement of it, and it's possible, but I
3  think if that happened, then there was a
4  correction that took place.
5      Q.   **And who did that analysis?**
6      A.   I would imagine it's going to be the
7  finance team and Jim Hraska in conjunction
8  maybe with the regulatory ops team.
9      Q.   **Were you involved in that analysis?**
10      A.   Not doing the analysis. I think I
11  have seen analysis over the months post
12  bankruptcy.
13      Q.   **Were you involved in reviewing the**
14  **analysis that was done by others?**
15      A.   It's possible. I can't confirm that
16  a hundred percent, but it's possible I reviewed
17  analysis. There was no intent to move customer
18  assets.
19      Q.   **When you say there was no intent to**
20  **move customer assets, do you include in your**
21  **definition of customers Lehman affiliates?**
22      A.   I include the way these schedules
23  were created or the way that the unencumbered
24  assets were created was using 931 inventory
25  accounts, which are firm positions, firm being
        TSG Reporting - Worldwide  (877) 702-9580

Page 252

1      Blackwell - Highly Confidential
2  LBI positions.
3      Q.   **Why do you use the date of 9/31?**
4      A.   I don't use the date. It's an
5  account identifier. 931 is an account range.
6      Q.   **I understand.**
7      A.   So it's a distinct account range
8  that we analyze, firm inventory accounts.
9      Q.   **Is it possible that Lehman's system**
10  **showed that multiple parties, including**
11  **customers of Lehman and Lehman itself, could**
12  **have entitlement to the same security in the**
13  **clearance box?**
14      A.   Yes, but there was a methodology
15  applied to identify that.
16      Q.   **What was that methodology?**
17      A.   Again, using 931 accounts, taking
18  the difference between the value of the
19  customer -- taking a total value of the
20  position in the box, taking only the component
21  which was a -- taking only the component that
22  was the trading book component, and if that
23  trading book component was bigger than the
24  total position, then there was an adjustment
25  there as well, so absolutely we are taking the
        TSG Reporting - Worldwide  (877) 702-9580

Page 253

1      Blackwell - Highly Confidential
2  most conservative component and if there was
3  any doubt in terms of total position and if the
4  position in the box was less than the -- was
5  less than the -- less than or equal to the
6  customer position, we left that position there.
7  So we didn't -- there was a methodology for
8  each of the schedules that absolutely was
9  designed to protect the customer assets.
10      Q.   **So I understand this, if, for**
11  **example, there were a million shares of IBM and**
12  **Lehman's books and records showed that there**
13  **was an entitlement to those million shares by a**
14  **customer and by Lehman, those under your**
15  **methodology would have been excluded from your**
16  **list of unencumbered assets?**
17      A.   Yes. That was the intent.
18      Q.   **Does the same apply to securities**
19  **that Lehman's books and records show an**
20  **entitlement to by not only Lehman, by which I**
21  **mean LBI, the broker/dealer, but also a Lehman**
22  **affiliate?**
23      A.   Jim would be a better person to
24  explain exactly how he applied the methodology,
25  but there was deliberate methodology applied to
        TSG Reporting - Worldwide  (877) 702-9580

Page 254

1    Blackwell - Highly Confidential
2  each one of the schedules.
3    Q.  Do you have any understanding that
4  on Schedule B that's attached to the APA a
5  number of the securities that were included in
6  the repo transaction and also on Schedule A to
7  the -- withdrawn.
8        Do you have any understanding that
9  Schedule B to the Clarification Letter includes
10  repo securities that are also on Schedule A to
11  the Clarification Letter?
12    A.  I didn't.
13    Q.  Do you have any reason to believe
14  that they should be on there?
15    A.  I don't have a view.
16    Q.  Did you follow up with
17  Mr. Macchiaroli after your meeting with him in
18  late September, early October 2008 about the
19  15C3 account?
20      MR. SHAW: Asked and answered.
21    A.  Yes, many times.
22    Q.  Did you follow up with him on the
23  question of your request that he authorize the
24  release of moneys from -- specifically
25  $769 million of securities from Lehman's 15C3?

TSG Reporting - Worldwide  (877) 702-9580

Page 255

1    Blackwell - Highly Confidential
2    A.  I don't think I did.
3      MR. SHAW: Asked and answered.
4      MR. OXFORD:  I don't think I have
5  anything further at this time.
6  EXAMINATION BY
7  MR. DAKIS:
8    Q.  I think we met earlier off the
9  record. My name is Robert Dakis. I am from
10  the law firm of Quinn Emanuel Urquhart Oliver &
11  Hedges and I represent the Unsecured Creditors
12  Committee of Lehman Brothers Holdings, Inc.
13      I want to go back to the discussion
14  of collateral posted for the Fed and the
15  tri-party repos. Just a couple of things I
16  want to make sure that I understood from your
17  prior testimony about them.
18      Now, I believe you explained the
19  process was the clearing bank, either JPMorgan
20  Chase or Bank of New York depending on where we
21  were, would value the collateral that's posted
22  under the repurchase agreements.
23    A.  Yes.
24    Q.  Okay. And the clearance bank then
25  selected the collateral that's pledged under

TSG Reporting - Worldwide  (877) 702-9580

Page 256

1    Blackwell - Highly Confidential
2  the repos?
3    A.  Under normal course of business,
4  that's correct, yes, they did. There are some
5  exceptions, but yes.
6    Q.  Were there any exceptions in the
7  week of September 15th, 2008?
8    A.  Not in the -- not that I'm aware of,
9  no.
10    Q.  Okay. Typically, in your
11  experience, when does the clearing bank inform
12  Lehman of the value it's assigning to the
13  collateral?
14    A.  I think that's part of the process
15  of closing the tri-party agreement in any one
16  day, so I don't know exactly what time, but
17  once the tri-party is closed down or tri-party
18  is set, we would understand what the value was.
19  I don't know when that is in the normal course
20  of business.
21    Q.  After the clearing bank assigns the
22  value and sets the securities that are going to
23  be transferred, does the buyer under a repo
24  have the discretion to refuse delivery of any
25  securities?

TSG Reporting - Worldwide  (877) 702-9580

Page 257

1    Blackwell - Highly Confidential
2      MR. SHAW: Objection. Foundation.
3    A.  I don't know. On what basis?  If it
4  falls outside of the agreed schedules.
5    Q.  Let me try to make it a little more
6  clear so that we can create some foundation for
7  this.
8      You understand that a repurchase
9  agreement typically has a buyer who buys
10  securities for some short-term subject to an
11  obligation to sell them back to the seller at
12  the maturity date of the repurchase agreement,
13  correct?
14    A.  I understand what a repo is.
15    Q.  Just trying to set it up for the
16  record.
17      The entity who buys under the
18  repurchase agreement typically sets a schedule
19  or at least under these repurchase agreements
20  it's your understanding that the buyer sets a
21  schedule of specific categories of securities
22  that it will accept.
23    A.  There are schedules attached to the
24  repo agreement that says these are the types of
25  collateral that are eligible for this

TSG Reporting - Worldwide  (877) 702-9580

Page 258

1     Blackwell - Highly Confidential
2  agreement, yes.
3     Q.   In your experience, does the buyer
4  under these repurchase agreements have
5  discretion to refuse delivery of a security
6  that falls within those schedules?
7     MR. SHAW:  Objection to form.
8     A.   I'm not aware.
9     MR. DAKIS:  I am going to show you
10  an exhibit.
11     (Exhibit 96 B, e-mail dated
12     September 18, 2008, Bates stamped 77882,
13     marked for identification.)
14     Q.   I believe you have been handed a
15  document that's been marked as Exhibit 96.
16  This is an e-mail chain.  The top e-mail in the
17  chain is an e-mail from you to Ian Lowitt dated
18  Thursday, September 18th at 8:56 p.m. GMT.  In
19  the lower right-hand corner is a Bates number
20  77882.
21     Did I accurately describe that?
22     A.   77882, yes.
23     Q.   I want to focus on in the fourth
24  e-mail in the chain, which is an e-mail from
25  Ian Lowitt to you on Thursday, September 18th,

TSG Reporting - Worldwide  (877) 702-9580

Page 259

1     Blackwell - Highly Confidential
2  Ian asks you "are we still papering the 18
3  billion repo with Barclays or is that all part
4  of the same transfer."
5     Did you understand at the time what
6  Mr. Lowitt meant by that?
7     A.   Sorry, where are you looking at?
8  Oh, here.  What I understood was that there was
9  a -- away from the Fed repo in the days
10  preceding I guess -- in the week between LBHI
11  and LBI's bankruptcy Barclays were extending
12  some -- were financing the organization through
13  some -- through a repo arrangement and that had
14  been rolled for the previous two nights, so
15  yes, my understanding was at that point it was
16  possible that that would get rolled again for
17  another night.
18     Q.   And just to be sure that I am clear,
19  this is a separate repo from the Fed repo?
20     A.   Absolutely, yes, it's a Barclays --
21  Barclays to Lehman repo directly.
22     Q.   Okay.  And is it your understanding
23  that that repo rolled again on the night of the
24  18th?
25     A.   It didn't.  At the end of the

TSG Reporting - Worldwide  (877) 702-9580

Page 260

1     Blackwell - Highly Confidential
2  process of settling the Fed repo out to BONY, a
3  discussion was had at I think it was probably
4  about 2 in the morning, I think it was e-mails,
5  where the Barclays repo was not being rolled.
6  We thought it would be.  And a HIC loan, I
7  think, was put on that -- held-in-custody loan
8  for $15 billion, and at that time I -- when Jim
9  informed me of that, I tried to contact a
10  number of people at Barclays, Harry Harrison,
11  Gerard LaRocco, I think I tried to get ahold of
12  Ian and Paolo and I don't think I had any luck
13  in getting contact with anyone to tell them
14  that it happened, so the following day we
15  started the day with a -- I think there was
16  this HIC loan for 15.8 billion.
17     Q.   You said that there was a discussion
18  at about 2 in the morning about the Barclays
19  repo not rolling.
20     A.   Yes.  At that point.
21     Q.   Who was on that discussion?
22     A.   When I say discussion, it was Jim
23  Hraska probably coming down to tell me or vice
24  versa.  I can't recall exactly how.  Or Monty.
25     Q.   And by "Monty" you mean?

TSG Reporting - Worldwide  (877) 702-9580

Page 261

1     Blackwell - Highly Confidential
2     A.   Forrest.
3     Q.   And do you know who at Barclays made
4  the decision not to roll the repo?
5     A.   No.
6     Q.   Now, could you explain the HIC loan
7  to me.  What was the purpose of the HIC loan?
8     A.   A HIC loan is a held-in-custody
9  loan, so it's a loan against the collateral in
10  the Lehman box.
11     Q.   Who provided the loan?
12     A.   Chase.  JPMorgan Chase.  I don't
13  believe the repo -- that the held in custody
14  was for the full value of what was in the box.
15     Q.   And I believe you testified earlier
16  that you were in a room with a bunch of Weil
17  lawyers at some point before the repo rolled
18  when you learned that the repo wasn't going to
19  roll.  You said that it was reasonable that it
20  didn't roll?
21     MR. SHAW:  Objection.
22  Mischaracterizes prior testimony.
23     A.   Yes, the timing is wrong there.
24     MR. DAKIS:  Could we take a
25  two-minute break while I find it on

TSG Reporting - Worldwide  (877) 702-9580

Page 262

1      Blackwell - Highly Confidential
2   Livenote so I can pull up the right
3   testimony.
4        MR. SHAW:  Sure.
5        (Recess was taken from 4:19 to
6   4:20.)
7   BY MR. DAKIS:
8      Q.   Okay.  Going back to my prior
9   question, you testified earlier in the day that
10  at some point you were in the room with Weil,
11  Ian and Paolo were outside --
12       MR. DAKIS:  Can you read it.
13       (Record read.)
14     Q.   Does that refresh your recollection
15  of your prior testimony?
16     A.   Yes.
17     Q.   Okay.  Why did you think at the time
18  that it was reasonable Barclays wouldn't take
19  the loan?
20     A.   Because repos roll generally and
21  this repo was rolled over a 24-hour period.
22  At 2 in the morning there is no economic
23  outcome either way for any of the organizations
24  involved.  A HIC loan unwinds instantly in the
25  morning.  So if Barclays had taken a trade,

TSG Reporting - Worldwide  (877) 702-9580

Page 263

1      Blackwell - Highly Confidential
2   they would have delivered cash and got cash
3   straight back, so net net, nobody gained or was
4   harmed, so in effect the HIC loan was there to
5   protect Chase and put a back value entry into
6   their books to give their credit department
7   comfort.  That would be my opinion.
8      Q.   Do you know how the Fed valued
9   collateral that was pledged to the Fed wire?
10     A.   I don't know how they did it.  I
11  don't know what mechanism they used.
12     Q.   Can you please put Exhibit 85 B in
13  front of the witness again.  It's one of those
14  large books.
15     A.   I have it.
16     Q.   Just a couple more questions.  We
17  are almost done.
18       I believe when we were talking -- if
19  you could turn to page 4398.  It's, I believe,
20  the third page.
21       We were talking about the values on
22  this first page earlier and I believe your
23  testimony was that the values were either
24  system driven or model driven and you didn't
25  know which.  Is that correct?

TSG Reporting - Worldwide  (877) 702-9580

Page 264

1      Blackwell - Highly Confidential
2      A.   I wouldn't know without looking at
3   the assets.  I wouldn't know even looking at
4   the assets, frankly.
5      Q.   Fair enough.  Could you just explain
6   what you mean by a value is system driven?
7      A.   What I was referring to was that the
8   systems would have had close of business Friday
9   prices in or whatever close of business price
10  had been fed in.  When I say system driven, I
11  mean that's been sourced from a pricing venue,
12  so Bloomberg or Reuters, some other price feed
13  that the firm purchased.
14     Q.   Was there anyone at Lehman that was
15  responsible for ensuring that the systems were
16  updated regularly?
17     A.   Absolutely.  It was a continuous
18  process every day and to manage stale pricing.
19     Q.   Who was the key person responsible
20  for this process?
21     A.   The systemic prices, to make sure
22  there was a price being fed in, that was done
23  by operations, by Alex Crepeau.
24     Q.   And you had said that it's a
25  possibility that these values were model

TSG Reporting - Worldwide  (877) 702-9580

Page 265

1      Blackwell - Highly Confidential
2   driven.  Could you explain what you meant by
3   "model driven"?
4      A.   I'm not sure if they are included in
5   this list, but model-driven prices would be
6   that a trader or a comp team would create a
7   model.  That model then -- or apply a model, an
8   existing model, to a product that prices it
9   based on a series of inputs.
10     Q.   And who at Lehman was responsible
11  for the models?
12     A.   In terms of testing the models, it
13  would be finance that would test the models, or
14  product controllers.
15     Q.   Who would be in charge of the
16  product controllers or finance?
17     A.   At the time I think it was Gerry
18  Reilly.
19     Q.   If you could please turn to the page
20  that starts 4402.  At the top it says
21  Exhibit A-1, Source Barclays Financing
22  Collateral List, Barcops 9-20-2008, Fed
23  Settled.
24     A.   Yes.
25     Q.   Can you tell what this is a schedule

TSG Reporting - Worldwide  (877) 702-9580

Page 266

1          Blackwell - Highly Confidential
2     of based on the document or based on the actual
3     title?
4          A.   Not really, no.
5          Q.   Could you now turn to page 4607. I
6     know one of my colleagues spent a fair amount
7     of time on this, so I am not going to belabor
8     the point. I just want to ask one or two more
9     follow-up questions.
10         A.   46- --
11         Q.   -07. It's in front of the last blue
12    sheet. Behind the last blue sheet. Sorry.
13         A.   Schedule B.
14         Q.   Now, this says it's Schedule B
15    Final. Would you be able to -- strike that.
16              Earlier in the day I think you
17    testified that Barclays didn't receive all of
18    the collateral it had bargained for under the
19    APA and the revised APA; correct?
20         A.   Correct.
21         Q.   Would you be able to point where on
22    Schedule B, which securities it didn't receive?
23         A.   Absolutely not.
24         Q.   Okay. Would you be able to tell us
25    which categories it didn't receive?

TSG Reporting - Worldwide  (877) 702-9580

Page 267

1          Blackwell - Highly Confidential
2          A.   I wouldn't without being able to run
3     reports in to produce it.
4          Q.   Let me ask you the same question.
5     If I were to put Schedule A in front of you,
6     would you be able to point out which securities
7     on Schedule A Barclays didn't receive?
8          A.   No, not without a certain comparison
9     document.
10              MR. DAKIS: I have nothing further.
11              (Time noted: 4:27 p.m.)
12
13
14              ----------------------
15              ALASTAIR BLACKWELL
16
17    Subscribed and sworn to before me
18    this          day of              2009.
19
20    ----------------------------------------
21
22
23
24
25

TSG Reporting - Worldwide  (877) 702-9580

Page 268

1
2          C E R T I F I C A T E
3
4     STATE OF NEW YORK  )
5                        ) ss.:
6     COUNTY OF NASSAU  )
7
8          I, KRISTIN KOCH, a Notary Public
9     within and for the State of New York, do
10    hereby certify:
11         That ALASTAIR BLACKWELL, the witness
12    whose deposition is hereinbefore set
13    forth, was duly sworn by me and that such
14    deposition is a true record of the
15    testimony given by such witness.
16         I further certify that I am not
17    related to any of the parties to this
18    action by blood or marriage; and that I am
19    in no way interested in the outcome of
20    this matter.
21         IN WITNESS WHEREOF, I have hereunto
22    set my hand this 7th day August, 2009.
23         ----------------------
24         KRISTIN KOCH, RPR, RMR, CRR, CLR
25

TSG Reporting - Worldwide  (877) 702-9580

Page 269

2     ---------------- I N D E X ----------------
3
      WITNESS          EXAMINATION BY      PAGE
4
5     ALASTAIR BLACKWELL   MR. HINE         6
6                         MR. OXFORD      190
7                         MR. DAKIS       255
8
      ---------------- EXHIBITS ----------------
9
10    NUMBER                    PAGE LINE
11
12    Exhibit 55 B
      Letter dated October 2, 2008, Bates
      stamped BCI-EX-00077291 through
13    BCI-EX-00077293................... 22  19
14    Exhibit 56 B
      E-mail dated May 29, 2009, Bates
15    stamped 10295594, with attached
      fax, Bates stamped 10300652......... 46  16
16
      Exhibit 57 B
17    Amendment Agreement................ 50  10
18    Exhibit 58 B
      E-mail dated September 17, 2008,
19    Bates stamped 77752................ 64  11
20    Exhibit 59 B
      E-mail dated 9-17-2008.............. 64  14
21
      Exhibit 60 B
22    E-mail dated 9-18-2008.............. 71  20
23    Exhibit 61 B
      E-mail dated 9-17-2008.............. 77  15
24
      Exhibit 62 B
25    E-mail dated September 17, 2008,

TSG Reporting - Worldwide  (877) 702-9580

## Page 270

```
 1
 2   -------EXHIBITS--------------
 3
     NUMBER              PAGE LINE
 4
 5   Exhibit 63 B
     E-mail dated September 19, 2008,
 6   Bates stamped 10294630............... 97  10
 7   Exhibit 64 B
     E-mail dated 9-18-2008............... 103  14
 8
     Exhibit 65 B
 9   E-mail dated September 19, 2008,
     Bates stamped 10298087............... 105  16
10
     Exhibit 66 B
11   E-mail dated September 19, 2008,
     Bates stamped 10298186............... 112  13
12
     Exhibit 67 B
13   E-mail dated 9-18-2008............... 115  19
14   Exhibit 68 B
     E-mail dated 9-20-2008............... 118  8
15
     Exhibit 69 B
16   E-mail dated September 19, 2008,
     Bates stamped 93219............... 124  9
17
     Exhibit 70 B
18   E-mail dated May 29, 2009, Bates
     stamped 10296524............... 127  4
19
     Exhibit 71 B
20   E-mail dated September 19, 2008,
     Bates stamped 138587............... 128  13
21
     Exhibit 72 B
22   E-mail dated 9-20-2008............... 132  22
23   Exhibit 73 B
     E-mail dated September 20, 2008,
24   Bates stamped 10222586............... 136  8
25   Exhibit 74 B
```

## Page 271

```
 1
 2   -------EXHIBITS--------------
 3
     NUMBER              PAGE LINE
 4
 5   Exhibit 75 B
     E-mail dated 9-20-2008............... 149  13
 6
     Exhibit 76 B
 7   E-mail dated September 21, 2008,
     Bates stamped 138124............... 154  14
 8
     Exhibit 77 B
 9   E-mail dated September 21, 2008,
     Bates stamped 459680............... 156  25
10
     Exhibit 78 B
11   E-mail dated September 21, 2008,
     Bates stamped 10252597............... 159  6
12
     Exhibit 79 B
13   E-mail dated 9-21-2008............... 160  15
14   Exhibit 80 B
     E-mail dated September 22, 2008,
15   Bates stamped 464767............... 163  10
16   Exhibit 81 B
     Debtors' Second Rule 30(b)(6)
17   Deposition Notice to Barclays on
     Issues Relating to the Transfer of
18   Assets............................ 167  4
19   Exhibit 82 B
     E-mail dated September 20, 2008,
20   Bates stamped BCI-CG 00035134....... 170  6
21   Exhibit 83 B
     E-mail dated September 21, 2008,
22   Bates stamped BCI 006647 through
     BCI 006653....................... 173  18
23
     Exhibit 84 B
24   E-mail dated September 22, 2008,
     Bates stamped BCI 008149 through
25   BCI 008670....................... 175  16
```

## Page 272

```
 1
 2   -------EXHIBITS--------------
 3
     NUMBER              PAGE LINE
 4
 5   Exhibit 85 B
     E-mail dated September 30, 2008,
 6   Bates stamped BCI-EX-(S)-00004396
     through BCI-EX-(S)-00004675......... 177  15
 7
     Exhibit 86 B
 8   Chart, Bates stamped
     BCI-EX-00099519 through
 9   BCI-EX-00099521................. 185  17
10   Exhibit 87 B
     JPM Chase assets, Bates stamped
11   BCI-EX-00108700................. 188  2
12   Exhibit 88 B
     Chart, Bates stamped
13   BCI-EX-00109154 through
     BCI-EX-00109161................. 188  24
14
     Exhibit 89 B
15   E-mail dated 9-19-2008............... 222  25
16   Exhibit 90 B
     E-mail dated 9-19-2008............... 225  3
17
     Exhibit 91 B
18   E-mail dated 9-21-2008............... 226  7
19   Exhibit 92 B
     E-mail dated 9-20-2008............... 228  18
20
     Exhibit 93 B
21   Management of the Unencumbered
     Asset Gap....................... 235  2
22
     Exhibit 94 B
23   E-mail dated 9-22-2008............... 241  21
24   Exhibit 95
     E-mail dated 9-21-2008............... 243  13
25
```

## Page 273

```
 1
 2   -------------------EXHIBITS-------------------
 3
 4   NUMBER                    PAGE LINE
 5   Exhibit 96 B
     E-mail dated September 18, 2008,
 6   Bates stamped 77882................... 258  11
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page  274

```
 1
 2       ERRATA SHEET FOR THE TRANSCRIPT OF:
 3   Case Name:      In re: Lehman Brothers
     Dep. Date:      August 7, 2009
 4   Deponent:       Alastair Blackwell
 5           CORRECTIONS:
 6   Pg. Ln.  Now Reads    Should Read    Reason
 7   ____ ___ _____  _____  _____
 8   ____ ___ _____  _____  _____
 9   ____ ___ _____  _____  _____
10   ____ ___ _____  _____  _____
11   ____ ___ _____  _____  _____
12   ____ ___ _____  _____  _____
13   ____ ___ _____  _____  _____
14   ____ ___ _____  _____  _____
15   ____ ___ _____  _____  _____
16   ____ ___ _____  _____  _____
17   ____ ___ _____  _____  _____
18
19               _____
20           Signature of Deponent
21   SUBSCRIBED AND SWORN BEFORE ME
22   THIS____DAY OF_____, 2009.
23
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____
```

TSG Reporting - Worldwide  (877) 702-9580

# BCI EXHIBIT

# 57

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------x
     In Re:                        Chapter 11
5    LEHMAN BROTHERS               Case No. 08-13555 (JMP)
     HOLDINGS, INC., et al.,       (Jointly Administered)
6    ------------------------------)

7

8         * * * HIGHLY CONFIDENTIAL * * *

9    VIDEOTAPED DEPOSITION OF ALVIN H. BROWN

10              New York, New York

11          Friday, January 8, 2010

12

13

14

15

16

17

18

19

20   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

21   JOB NO. 27031

22

23

24

25

Page 2

1
2
3
4
5          January 8, 2010
6          1:24 p.m.
7
8
9          HIGHLY CONFIDENTIAL videotaped
10    deposition of ALVIN H. BROWN, held at
11    the offices of Simpson Thacher &
12    Bartlett, 425 Lexington Avenue, New
13    York, New York, pursuant to Federal Rule
14    of Civil Procedure 30(b)(6), before
15    Francis X. Frederick, a Certified
16    Shorthand Reporter, Registered Merit
17    Reporter and Notary Public of the States
18    of New York and New Jersey.
19
20
21
22
23
24
25
      TSG Reporting - Worldwide    877-702-9580

Page 3

1
2     A P P E A R A N C E S :
3          JONES DAY, LLP
4          Attorneys for Lehman Brothers, Inc.
5             222 East 41st Street
6             New York, New York 10017-6702
7          BY:  WILLIAM J. HINE, ESQ.
8
9          BOISE SCHILLER & FLEXNER, LLP
10    Attorneys for Barclays Capital
11            401 East Las Olas Boulevard, Suite 1200
12            Fort Lauderdale, Florida 33301-2211
13        BY:  W. TODD THOMAS, ESQ.
14        - and -
15        BOISE SCHILLER & FLEXNER, LLP
16            575 Lexington Avenue - 7th Floor
17            New York, New York 10022
18        BY:  SHAUNA BLUGH, ESQ.
19
20        QUINN, EMANUEL, URQUHART, OLIVER &
21        HEDGES, LLP
22        Attorneys for the Creditors Committee
23            51 Madison Avenue
24            New York, New York 10010
25        BY:  ERIC M. KAY, ESQ.
      TSG Reporting - Worldwide    877-702-9580

Page 4

1
2     A P P E A R A N C E S :  (Cont'd.)
3
4     HUGHES, HUBBARD & REED, LLP
5     Attorneys for the SIPA Trustee
6          One Battery Park Plaza
7          New York, New York 10004-1482
8     BY:  SETH ROTHMAN, ESQ.
9
10    SIMPSON THACHER & BARTLETT
11    Attorneys for the Witness
12        425 Lexington Avenue
13        New York, New York
14    BY:  ANDREW S. AMER, ESQ.
15        LAURA MURPHY, ESQ.
16        SHINZONG LEE(admitting admission)
17
18
19
20
21
22
23
24    ALSO PRESENT:
25        JORDAN MUMMERT, Videographer
      TSG Reporting - Worldwide    877-702-9580

Page 5

1     PROCEEDINGS - HIGHLY CONFIDENTIAL
2          THE VIDEOGRAPHER:  This is the
3     start of the tape labeled number one of
4     the videotaped deposition of Alvin Brown
5     in re. Lehman Brothers.  This deposition
6     is being held at 425 Lexington Avenue,
7     New York, New York, on January 8th, 2010
8     at approximately 1:24 p.m.  My name is
9     Jordan Mummert from TSG.  I'm the legal
10    video specialist.  The court reporter is
11    Francis Frederick in connection with TSG
12    Reporting.
13         Will the counsel please introduce
14    yourself.
15         MR. THOMAS:  Todd Thomas from
16    Boies Schiller on behalf of Barclays.
17         MR. AMER:  Andrew Amer from
18    Simpson Thacher for the witness.
19         MR. MURPHY:  Laura Murphy, Simpson
20    Thacher, also for the witness.
21         MR. HINE:  William Hine from Jones
22    Day on behalf of the Estate of Lehman
23    Brothers Holdings.
24         MR. KAY:  Eric Kay from Quinn
25    Emmanuel on behalf of the Official
      TSG Reporting - Worldwide    877-702-9580

Page 6

1      A. BROWN - HIGHLY CONFIDENTIAL
2    Creditors Committee.
3          MS. LEE:  Shinzong Lee from
4    Simpson Thacher.
5          MR. ROTHMAN:  Seth Rothman from
6    Hughes Hubbard on behalf of the SIPA
7    Trustee.
8          MR. THOMAS:  And let me just note
9    that this is part two of a 30(b)(6)
10   deposition of Simpson Thacher as opposed
11   to an individual deposition of the
12   witnesses.
13                  * * *
14   A L V I N    B R O W N , called as a witness,
15   having been duly sworn by a Notary
16   Public, was examined and testified as
17   follows:
18   EXAMINATION BY
19   MR. THOMAS:
20   Q.    Mr. Brown, good afternoon.
21   A.    Good afternoon.
22   Q.    Would you please state your full
23   name?
24   A.    Alvin Howard Brown.
25   Q.    And have you been deposed before?
     TSG Reporting - Worldwide    877-702-9580

Page 7

1      A. BROWN - HIGHLY CONFIDENTIAL
2    A.    I have.
3    Q.    So you understand how this process
4    works. If at any point you're not sure what
5    question I'm asking, please ask me to
6    rephrase. I'll be happy to try.
7    A.    Yes.
8    Q.    Do you understand you've been
9    designated by Simpson to be the 30(b)(6)
10   witness on a couple of topics here today?
11   A.    Yes.
12   Q.    And those topics include generally
13   the compensation and cure liabilities assumed
14   by Barclays and the employment offered to
15   Lehman executives by Barclays.
16   A.    I just didn't understand -- after
17   "compensation" what was the next word that
18   you --
19   Q.    Cure payments, liabilities.
20   A.    Okay.
21   Q.    We'll work through it and see how
22   we do.
23   A.    Fine.
24   Q.    How long have you been with
25   Simpson?
     TSG Reporting - Worldwide    877-702-9580

Page 8

1      A. BROWN - HIGHLY CONFIDENTIAL
2    A.    Since May of 1983. So about 26
3    years.
4    Q.    And what is your area of practice?
5    A.    I'm the head of the Executive
6    Compensation and Employee Benefits Group at
7    the firm.
8    Q.    And when was the first time you
9    became involved in the Lehman/Barclays
10   transaction?
11   A.    September of 2008. It was after
12   Labor Day. I don't -- I don't remember the
13   exact date.
14   Q.    And had you worked previously for
15   or with Lehman Brothers?
16   A.    During the course of my time at
17   Simpson?
18   Q.    Yes.
19   A.    Yes.
20   Q.    Had they been a regular client of
21   the firm for many years?
22   A.    Yes.
23   Q.    And can you describe what work you
24   have done for Simpson over the years? You
25   personally?
     TSG Reporting - Worldwide    877-702-9580

Page 9

1      A. BROWN - HIGHLY CONFIDENTIAL
2    A.    For Simpson?
3    Q.    Or excuse me. For Lehman. What
4    work have you done for -- on behalf of Lehman
5    while at Simpson?
6          MR. AMER:  Do you mean in very
7    general terms?
8          MR. THOMAS:  Yes.
9    A.    Actually, my involvement was in my
10   early years at Simpson generally and I
11   addressed some questions related to ERISA or
12   compensation. But hadn't worked with them for
13   years until this.
14   Q.    And when this came up, the
15   transaction with Barclays, why were you
16   brought into the matter?
17   A.    Because my partner in the group
18   had a personal issue conflict that he couldn't
19   be available for the weekend that was going to
20   be relevant and I was asked to step in.
21   Q.    Do you recall the week that Lehman
22   Brothers Holding filed bankruptcy being
23   roughly September 15th? Is that consistent
24   with your recollection?
25   A.    Yeah. That's consistent.
     TSG Reporting - Worldwide    877-702-9580

1  A. BROWN - HIGHLY CONFIDENTIAL
2  Q.   And do you recall whether you were
3  over -- physically went over to Lehman
4  Brothers' building on that Monday after the
5  filing?
6  A.   Yes.
7  Q.   And you spent a good part of the
8  day there?
9  A.   Yes.
10 Q.   And what were you doing there?
11 A.   Negotiating the benefit provisions
12 of an acquisition agreement.
13 Q.   And can you elaborate a little
14 more on the benefit provisions, what precisely
15 you mean?
16 A.   There were provisions in the
17 agreement that related to the treatment or
18 handling of the employees of the Lehman
19 entities. And I was addressing those issues
20 along with two partners from Weil Gotshal.
21 Q.   And who were they?
22 A.   Andy Gaines and Amy Rubin.
23 Q.   And did you continue to work on
24 those issues through the week or just for a
25 couple of days, or do you recall?

TSG Reporting - Worldwide    877-702-9580

1  A. BROWN - HIGHLY CONFIDENTIAL
2  A.   My recollection, yes, but
3  intermittently.
4  Q.   So through the time of closing?
5  A.   Really, after the agreement was
6  signed my involvement was pretty attenuated.
7  Q.   And by agreement, are you
8  referring to the original executed APA?
9  A.   Correct.
10 Q.   Let me go ahead and show you this.
11 I might refer to it later. It was previously
12 marked as Exhibit 1. Take a moment and review
13 and just confirm whether that's the agreement
14 that you were involved in negotiating and
15 drafting.
16 A.   I mean the title of it is the same
17 title as the agreement. You know, without --
18 I'm assuming that if it is, it is the one that
19 I worked on.
20 Q.   If you would --
21 A.   It's certainly the same title.
22 A.   Sure. And if you'd flip to
23 Section 9.
24 A.   (Witness complies.)
25 Q.   Are those sections or issues some

TSG Reporting - Worldwide    877-702-9580

1  A. BROWN - HIGHLY CONFIDENTIAL
2  of the sections and issues that you worked on?
3  A.   Yes.
4  Q.   Let's put that aside for a second.
5  And let me show you a document -- we'll refer
6  back to that in a minute. But let me show you
7  a document marked Exhibit 489 which is the
8  LBHI board minutes.
9  (Document review.)
10 Q.   Let me start by asking if you
11 recognize the document itself.
12 A.   Only because it's identified. But
13 I'm not sure.
14 Q.   Have you had occasion to read this
15 document before?
16 A.   I have read it in connection with
17 preparing for this deposition.
18 Q.   Okay.
19 A.   I'm not sure I saw it before that.
20 But I...
21 Q.   Do you recall attending this board
22 meeting described here?
23 A.   Yes.
24 Q.   And you're listed as a present on
25 the first page.

TSG Reporting - Worldwide    877-702-9580

1  A. BROWN - HIGHLY CONFIDENTIAL
2  Do you see that?
3  A.   Yes.
4  Q.   If you would turn, please to page
5  number 3 of this document.
6  A.   (Witness complies.)
7  Q.   The second paragraph reads, "Mr.
8  Roberts -- " do you understand that to be a
9  Weil Gotshal lawyer?
10 A.   I don't remember who he was with.
11 Q.   Okay.
12 It reads, "Mr. Roberts resumed by
13 describing that it is a condition to the
14 transaction that eight specific firm employees
15 enter into employment agreements with
16 Barclays. He stated that Mr. McGee was one of
17 those employees, so interested firm employees
18 were involved in the transaction negotiations
19 on behalf of the team."
20 Do you see that?
21 A.   Yes.
22 Q.   And so Simpson was aware at the
23 time the deal was being negotiated that
24 members of Lehman negotiating the deal were at
25 the same time negotiating employment

TSG Reporting - Worldwide    877-702-9580

Page 14

A. BROWN - HIGHLY CONFIDENTIAL
1
2  agreements with Barclays, correct?
3        MR. HINE: Object to the form.
4     A.  Well, I'm not sure -- from your
5  question I'm just not -- you said Simpson was
6  aware?
7     Q.  Yes. Simpson Thacher.
8     A.  I was aware.
9     Q.  Good enough.
10    A.  Okay.
11    Q.  And you're the firm designee on
12 this issue.
13    A.  Okay.
14    Q.  Do you recall that being raised in
15 the -- in a board minute, a discussion of the
16 fact that certain employees, Lehman employees
17 who were negotiating a transaction were at the
18 same time negotiating for future employment
19 and bonus agreements with Barclays?
20       MR. HINE: Object to the form.
21    A.  No. No. Not --
22    Q.  You don't recall that?
23    A.  I don't recall that being a point
24 of discussion in the form you just asked me.
25    Q.  Okay. Do you recall that it was

TSG Reporting - Worldwide     877-702-9580

Page 15

A. BROWN - HIGHLY CONFIDENTIAL
1
2  described to the board that interested firm
3  employees were involved in transaction
4  negotiations on behalf of LBHI?
5     A.  Yes.
6     Q.  And at the last paragraph on this
7  page do you see where it says "Mr. Brown of
8  Simpson Thacher & Bartlett reported on the
9  employee benefits aspect of the proposed sale
10 agreement. He..." being yourself "...reported
11 that the firm proposed post-closing covenants
12 to protect employee benefits but that the only
13 commitment Barclays would make is to keep
14 severance levels in place for the balance of
15 the calendar year."
16       Do you see that?
17    A.  Yes.
18    Q.  The reference to employee benefits
19 and the keeping of severance levels in place
20 for the balance of the calendar year, is that
21 issue described in Section 9 of the original
22 APA, Exhibit 1?
23    A.  Yes.
24    Q.  It goes on. Further down in the
25 paragraph, it says, "Mr. Brown described the

TSG Reporting - Worldwide     877-702-9580

Page 16

A. BROWN - HIGHLY CONFIDENTIAL
1
2  draft employment letters for eight specific
3  former employees which are a condition to the
4  deal. He described that draft employment
5  letters provide for at-will employment for a
6  period of time with salary and guaranteed cash
7  bonus and a retention award."
8        Is that an accurate summation of
9  your description to the board?
10    A.  Based on my recollection, yes.
11    Q.  And did you actually review the
12 employment agreements of those individuals?
13    A.  No.
14    Q.  How did you know about the terms
15 of the agreements?
16    A.  I saw a draft of the form of
17 letter. But not the actual completed letters
18 for the individuals.
19    Q.  And the form of the letter made
20 clear that salary and guaranteed cash bonus
21 and retention award were being provided?
22    A.  You know, at this point I don't
23 recall. But...
24    Q.  You have no reason to believe this
25 description's inaccurate.

TSG Reporting - Worldwide     877-702-9580

Page 17

A. BROWN - HIGHLY CONFIDENTIAL
1
2     A.  I do not.
3     Q.  So in any event you and presumably
4  others at Simpson were aware of the fact that
5  people -- at least some of the people
6  negotiating the deal on behalf of LBHI were at
7  the same time being offered employment with
8  Barclays including salary, guaranteed cash
9  bonus and retention awards?
10       MR. HINE: Object to the form.
11       MR. AMER: Objection to the form
12 of the question. You can answer.
13    A.  Yes.
14    Q.  If you would turn to page 4,
15 please.
16    A.  (Witness complies.)
17    Q.  The last paragraph reads, "The
18 directors asked questions about the sale and
19 license-back of the Lehman Brothers name and
20 the ability to solicit firm employees if the
21 deal does not go forward, and the fact that
22 Barclays will have already signed up
23 approximately 200 of the firm's employees."
24       Do you recall that the -- Barclays
25 was concerned about being able to retain the

TSG Reporting - Worldwide     877-702-9580

Page 18

1    A. BROWN - HIGHLY CONFIDENTIAL
2    firm's employees which they were going to be
3    buying?
4        A.    Yes.
5        Q.    And did that make sense to you in
6    this environment that Barclays was concerned
7    that they were essentially buying the
8    business, that they be able to retain the
9    Lehman employees that made up the business?
10        MR. HINE:  Object to the form.
11        A.    Yes.
12        Q.    Let me show you a document that
13    we'll mark as Exhibit 531.
14            (Deposition Exhibit 531, document
15        bearing production number STB 09661,
16        marked for identification as of this
17        date.)
18    BY MR. THOMAS:
19        Q.    And let me know when you've had a
20    chance to review it.
21            (Document review.)
22        A.    Okay.
23        Q.    Do you recognize this as an e-mail
24    from yourself to a couple people at Lehman and
25    other Simpson attorneys dated September 17th,

TSG Reporting - Worldwide    877-702-9580

Page 19

1    A. BROWN - HIGHLY CONFIDENTIAL
2    2008?
3        A.    Yes.
4        Q.    And in here you write in part in
5    the second paragraph, "I wanted to be sure
6    that you knew that I would be happy to you or
7    to you or any of the Big 8 or other senior
8    executives as they worked through the
9    employment letters or other arrangements with
10    Barclays."
11            Do you see that?
12        A.    I do.
13        Q.    Do you recall if you ever ended up
14    doing further work in terms of the substance
15    of the employment letters?
16        A.    I -- yes.
17        Q.    And did you?
18        A.    No.
19        Q.    Turning back to the original APA
20    and that Section 9.  Section 9.1.  Is it fair
21    to say that Section 9.1 addresses two types of
22    employment -- employee benefits; one involving
23    severance payments and one involving bonus
24    payments?
25        A.    Could you repeat the question?

TSG Reporting - Worldwide    877-702-9580

Page 20

1    A. BROWN - HIGHLY CONFIDENTIAL
2        Q.    Sure.  Within Section 9.1 which is
3    Employment Benefits there's both an assumed
4    liability by the purchaser in terms of
5    severance and bonus payments, correct?
6        MR. HINE:  Object to the form.
7        MR. AMER:  You can answer.
8        A.    Yes.
9        Q.    Do you know if there was ever any
10    effort to calculate that liability?
11        A.    I don't recall.
12        Q.    Do you have any recollection of a
13    $2 billion number?
14        A.    Yes.
15        Q.    Is it your recollection that $2
16    billion number was someone's estimate of
17    potential liability under Section 9.1?
18        MR. HINE:  Object to the form.
19        A.    Yes.  But not with respect to the
20    section that you just were referencing.  The
21    $2 billion number really related to subsection
22    C.
23        Q.    Do you recall ever seeing it on
24    a -- where do you recall seeing the $2 billion
25    number?

TSG Reporting - Worldwide    877-702-9580

Page 21

1    A. BROWN - HIGHLY CONFIDENTIAL
2        A.    It was on a schedule.
3        Q.    And did the schedule have a
4    separate line item for severance?
5        A.    I don't recall.
6        Q.    And do you know who calculated the
7    $2 billion figure?
8        A.    I do not.
9        Q.    Were you involved in that process
10    in any way?
11        A.    In calculating the number?
12        Q.    Yes.
13        A.    No.
14        Q.    Do you have any understanding what
15    it entailed specifically?
16        A.    Yes.
17        Q.    And -- let me go ahead and show
18    you a document we'll mark as 532.
19            (Deposition Exhibit 532, document
20        bearing production number LBHI 013444
21        with attached spreadsheet, marked for
22        identification as of this date.)
23        A.    Okay.
24        Q.    Have you ever seen this document
25    before?

TSG Reporting - Worldwide    877-702-9580

Page 22

1     A. BROWN - HIGHLY CONFIDENTIAL
2     A.    No.
3     Q.    Let me ask you to take a moment to
4   review the attachment to the e-mail.
5     A.    The attachment to --
6     Q.    The cover is an e-mail --
7     A.    Oh, I see. Okay. Sorry.
8     Q.    The cover is an e-mail from Kelly
9   Martin to Richard Krasnow, an attorney at Weil
10  Gotshal, dated September 18th, 2008.
11    A.    Right.
12    Q.    The spreadsheet attachment, do you
13  recall whether as part of your work with
14  respect to the Barclays sales transaction, you
15  ever reviewed sheets like this?
16    A.    Yes.
17    Q.    And did you?
18    A.    Yes. But not this one.
19    Q.    How do you -- how are you certain
20  a year later that it's not this one?
21    A.    I've just never seen it before.
22    Q.    Did you see a lot of spreadsheets?
23    A.    No. Well, in this transaction?
24  No.
25    Q.    Have you seen more than one?
          TSG Reporting - Worldwide    877-702-9580

Page 23

1     A. BROWN - HIGHLY CONFIDENTIAL
2     A.    Not that I recall.
3     Q.    When you say spreadsheet, are you
4   referring to just a one-page schedule?
5     A.    Correct.
6     Q.    You never saw any of the backup as
7   to how that schedule was built up?
8     A.    (Witness shakes head.)
9        MR. AMER: You have to answer.
10       THE WITNESS: Oh.
11    A.    No.
12    Q.    If you would look at the last page
13  of this document under the Liabilities column,
14  do you see the fourth section there, Payables?
15    A.    Yes.
16    Q.    And do you see Compensation
17  Payable?
18    A.    Yes.
19    Q.    And do you see that there was a
20  transaction adjustment to that payable?
21    A.    Yes.
22    Q.    Were you aware at the time that
23  there was a transaction adjustment to the
24  estimate for compensation payables?
25    A.    Not that I recall.
          TSG Reporting - Worldwide    877-702-9580

Page 24

1     A. BROWN - HIGHLY CONFIDENTIAL
2     Q.    You don't recall having
3   discussions with Weil Gotshal lawyers about
4   that issue?
5     A.    No.
6     Q.    Do you have an understanding of
7   why there would be a transaction adjustment?
8        MR. GATTO: Object to the form of
9   the question.
10    Q.    To the compensation payable.
11       MR. AMER: Same objection. Since
12  he doesn't recall there being an
13  adjustment.
14    A.    No. I mean...
15    Q.    Do you have any knowledge as to
16  whether this line item, Compensation Payable,
17  includes severance?
18    A.    No.
19    Q.    Do you know whether Lehman pays a
20  larger or smaller percentage of its yearly
21  bonuses as cash than Barclays does?
22       MR. AMER: Object to the form of
23  the question.
24    A.    I don't recall.
25    Q.    Do you know whether the $2 billion
          TSG Reporting - Worldwide    877-702-9580

Page 25

1     A. BROWN - HIGHLY CONFIDENTIAL
2   figure you're referring to was adjusted in
3   order to allow for the fact that Barclays pays
4   a higher percentage of cash compensation?
5        MR. HINE: Object to the form.
6     A.    No.
7     Q.    Do you understand whether there
8   was any adjustment to the figure in order to
9   cover the entire Lehman fiscal year for the
10  compensation amounts due?
11       MR. HINE: Object to the form.
12    A.    No.
13    Q.    Do you have any understanding of
14  where that $2 billion figure came from or how
15  it was calculated?
16    A.    Yes.
17    Q.    Can you tell me.
18    A.    My understanding was that that was
19  the number for the accrued bonuses for the
20  Lehman employees for that year. It had been
21  agreed to and was put on the schedule.
22    Q.    And where did that understanding
23  come from?
24    A.    I don't -- it was from one of the
25  participants or part of the team that was
          TSG Reporting - Worldwide    877-702-9580

Page 26

A. BROWN - HIGHLY CONFIDENTIAL

1  involved in negotiating but I don't recall
2  specifically who it was.
3
4  Q.  Do you recall which party it was
5  from?
6  A.  No.
7  Q.  Is this something that you
8  actually recall from a year and a half ago or
9  is it something that you've learned in
10  preparation for this deposition?
11  MR. HINE:  Well, hold on.  Before
12  you answer that --
13  MR. THOMAS:  That's a timing
14  question.  That can't be privileged.
15  MR. HINE:  I'm cautioning him not
16  to reveal privileged information he
17  might have learned after September 30th.
18  We have a waiver here.  So if your
19  answer entails something that you
20  learned after September 30th you're not
21  allowed to waive the privilege.
22  A.  I'm not -- could you repeat the
23  question because I'm not sure --
24  Q.  Your understanding about this $2
25  billion figure, is this an actual recollection

TSG Reporting - Worldwide    877-702-9580

Page 27

A. BROWN - HIGHLY CONFIDENTIAL

1
2  of yours from a year and a half ago or is it
3  something you've come to understand more
4  recently in connection with this deposition?
5  MR. HINE:  Same warning.
6  A.  When you say my understanding of
7  this, I mean, what I told you was my
8  understanding and I really hadn't had
9  discussions that changed that since then.
10  Q.  So this is based on your
11  recollection from a year ago.
12  A.  My recollection.
13  Q.  Now, what did you do to prepare
14  for today's deposition?
15  A.  I met with my counsel.
16  Q.  Anything else?
17  A.  Actually, no.
18  Q.  If -- so turning back to the --
19  Section 9.1 of the original APA did you draft
20  this language in any part of the 9.1?
21  A.  Yes.
22  Q.  Which portions did you draft?
23  A.  That I can't recall.
24  Q.  Were you the original drafter?
25  A.  No.

TSG Reporting - Worldwide    877-702-9580

Page 28

A. BROWN - HIGHLY CONFIDENTIAL

1
2  Q.  Do you know who was?
3  A.  Somebody at Cleary.  I dealt with
4  Arthur Cohen who's a partner at Cleary but I
5  don't -- the draft came originally to me and
6  my understanding was it had been drafted by
7  Cleary and then I marked it up.
8  Q.  Do you recall any changes you made
9  to (b) or (c)?  Section (b) or (c) of 9.1.
10  A.  I don't recall the specifics.
11  Q.  Okay.  Is it your under -- let's
12  say that after Barclays -- the Barclay
13  transaction was consummated 90 percent of the
14  employees were severed.  Barclays would have
15  to pay severance for those employees, correct,
16  pursuant to 9.1(b)?
17  MR. AMER:  Objection to the form
18  of the question.
19  Q.  9(c).  Strike that.
20  If Barclays -- under 9.1 Barclays
21  would have to pay severance payments to
22  employees severed prior to the end of the
23  year; is that correct?
24  A.  Correct.
25  Q.  And if there were a lot of

TSG Reporting - Worldwide    877-702-9580

Page 29

A. BROWN - HIGHLY CONFIDENTIAL

1
2  severances -- strike that.
3  And you know if that would involve
4  paying those employees all of their accrued
5  2008 bonus money.
6  A.  Yes.
7  Q.  So there's potentially a lot of
8  assumed liability by taking on that severance
9  obligation; is that correct?
10  MR. HINE:  Objection.
11  A.  Correct.  Yes.
12  Q.  Is it your belief that if Barclays
13  had terminated 90 percent of the employees,
14  that the remaining 10 percent of the employees
15  would have to get paid $2 billion?
16  MR. ROTHMAN:  Objection to the
17  form.
18  MR. HINE:  Same objection.
19  MR. AMER:  You can answer.
20  A.  No.  That's not my understanding.
21  Or my belief.
22  Q.  In that event if that -- in that
23  scenario, would some of the $2 billion be sent
24  to pay bonuses to the retained employees and
25  severance to the severed employees?

TSG Reporting - Worldwide    877-702-9580

Page 30

1     A. BROWN - HIGHLY CONFIDENTIAL
2         MR. HINE: Object to the form.
3     A.   Well -- no. I mean, I --
4         MR. AMER:  If you don't understand
5     the question tell him.
6     A.   Yeah.  Can you repeat the
7     question?
8     Q.   Sure.  There's $2 billion we've
9     referred to.
10    A.   Right.
11    Q.   And I think you've said that if
12    90 percent of the employees are severed you
13    wouldn't have to pay the whole $2 billion to
14    the remaining 10 percent for bonuses.  My
15    question is wouldn't some of the $2 billion
16    under your -- under the section here be going
17    to pay the accrued bonuses of those severed?
18    A.   Yes.
19        MR. HINE: Object to the form.
20    A.   As well as severance.
21    Q.   Okay.  So the $2 billion includes
22    both bonus and severance?
23        MR. HINE: Object to form.
24        MR. KAY:  Objection.
25    A.   No.
      TSG Reporting - Worldwide    877-702-9580

Page 31

1     A. BROWN - HIGHLY CONFIDENTIAL
2     Q.   Can you explain?
3     A.   Yes.  The bonus -- in order to
4     prevent people from being terminated and
5     deprived of their bonus, the arrangement was
6     that if they were terminated they would
7     receive their accrued bonus and they would be
8     paid severance under the severance
9     arrangements so that the $2 billion -- if
10    90 percent of the people were terminated and
11    they represented 90 percent of the bonus pool,
12    they would be paid the 90 percent of the bonus
13    pool and to the extent they were covered under
14    severance arrangements they would also be paid
15    the severance arrangements that they were
16    entitled to.  If they were severed before
17    12/31/2008.
18    Q.   But those that were severed,
19    although they would be getting paid in effect
20    their accrued bonus for 2008, that payment
21    would actually be in the form of a severance
22    payment, correct?
23        MR. HINE: Object to the form.
24    A.   I mean, you know, to me it's a
25    bonus payment that's being paid because
      TSG Reporting - Worldwide    877-702-9580

Page 32

1     A. BROWN - HIGHLY CONFIDENTIAL
2     somebody's being severed.  To you that may be
3     a severance payment.  I distinguish the
4     severance payment that somebody gets purely on
5     account of being severed from things that get
6     accelerated by virtue of a termination.
7         So, for instance, if somebody was
8     entitled to a retirement payment under a
9     non-qualified retirement arrangement and the
10    got severed and that accelerated the payment,
11    I wouldn't call that a severance payment.  I
12    would call that an accelerated retirement
13    payment that's triggered by severance.
14        So I would say they would get
15    severance and they would get a bonus.  The $2
16    billion or their portion of the $2 billion
17    would be the bonus and the severance would be
18    whatever the severance was.
19    Q.   Well, however it's characterized,
20    if there was a 90 percent -- or 90 percent of
21    the compensation, of the $2 billion 90 percent
22    would go to the 90 percent terminated and the
23    10 percent would go to the 10 percent
24    retained, correct?
25    A.   Correct.
      TSG Reporting - Worldwide    877-702-9580

Page 33

1     A. BROWN - HIGHLY CONFIDENTIAL
2     Q.   Turning back to Exhibit 532 which
3     is the e-mail attaching the two-page
4     spreadsheet.
5     A.   Okay.
6     Q.   What do you understand the term
7     transaction adjustment to refer to?
8         MR. HINE: Object to the form.
9     A.   Generally?
10    Q.   Yes.
11    A.   It's some kind of either purchase
12    price or other calculation change.
13    Q.   And are you -- do you know how the
14    estimates for potential exposure on cure
15    liabilities was calculated?
16    A.   No.
17    Q.   Do you have any knowledge of what
18    those amounts were?
19    A.   No.
20        Yeah, go ahead.
21    Q.   I mean --
22    A.   I'm not sure I know what a cure
23    liability is so --
24    Q.   Okay.  Or -- well, let's take a
25    look at Section 2.5 of the APA.  Would you
      TSG Reporting - Worldwide    877-702-9580

Page 34

A. BROWN - HIGHLY CONFIDENTIAL
1  take a moment to review that, please.
2
3        (Document review.)
4    A.   Okay.
5    Q.   Did you work on or have anything
6  to do with this issue or this section of the
7  APA?
8    A.   No.
9    Q.   Did you gather any information
10  concerning cure amounts in preparation for
11  your deposition?
12    A.   No.
13        MR. THOMAS:  Why don't we go off
14  the record for a second.
15        THE VIDEOGRAPHER:  The time is
16  2:05.  We're off the record.
17        (Discussion held off the record.)
18        THE VIDEOGRAPHER:  The time is
19  2:09.  We're on the record.
20        MR. THOMAS:  Subject to, you know,
21  the potential issue concerning the cure
22  testimony and the 30(b)(6)
23  representative I have no further
24  questions.  Thank you for your time.
25        THE WITNESS:  Thank you.

TSG Reporting - Worldwide    877-702-9580

Page 35

A. BROWN - HIGHLY CONFIDENTIAL
1
2        MR. AMER:  I have no questions.
3        MR. HINE:  No questions here.
4        MR. KAY:  No questions.
5        MR. ROTHMAN:  No questions.
6        THE VIDEOGRAPHER:  The time is
7  2:10.  We're off the record.
8        (Time Noted:    2:09 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20        _____
        ALVIN H. BROWN
21
22  Subscribed and sworn to before me
23  this ____ day of _____, 2010.
24
25        _____

TSG Reporting - Worldwide    877-702-9580

Page 36

1
2        C E R T I F I C A T E
3  STATE OF NEW YORK    )
4                  : ss.
5  COUNTY OF NEW YORK   )
6        I, FRANCIS X. FREDERICK, a Notary
7  Public within and for the State of New
8  York, do hereby certify:
9        That ALVIN H. BROWN, the witness
10  whose deposition is hereinbefore set
11  forth, was duly sworn by me and that
12  such deposition is a true record of the
13  testimony given by the witness.
14        I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage, and that I
17  am in no way interested in the outcome
18  of this matter.
19        IN WITNESS WHEREOF, I have
20  hereunto set my hand this 8th day of
21  January, 2010.
22
23
24        _____
        FRANCIS X. FREDERICK
25

TSG Reporting - Worldwide    877-702-9580

Page 37

1
2  ---------------- I N D E X ----------------
3  WITNESS       EXAMINATION BY      PAGE
4  ALVIN H. BROWN     MR. THOMAS        6
5
6
7
8
9  ---------- INFORMATION REQUESTS -----------
10  DIRECTIONS:  NONE
11  RULINGS:  NONE
12  TO BE FURNISHED:  NONE
13  REQUESTS:  NONE
14  MOTIONS:  NONE
15
16
17  ----------------- EXHIBITS -----------------
18  EXHIBIT                 FOR ID.
19  Exhibit 531
20  document bearing production
21  number STB 09661...................... 18
22  Exhibit 532
23  document bearing production
24  number LBHI 013444
25  with attached spreadsheet.............. 21

TSG Reporting - Worldwide    877-702-9580

Page  38

```
 1
 2          NAME OF CASE:  IN RE:  LEHMAN BROTHERS
 3          DATE OF DEPOSITION:  JANUARY 8, 2010
 4          NAME OF WITNESS:  ALVIN H. BROWN
 5          Reason codes:
               1. To clarify the record.
 6             2. To conform to the facts.
               3. To correct transcription errors.
 7          Page _____ Line _____ Reason _____
            From _____ to _____
 8
            Page _____ Line _____ Reason _____
 9          From _____ to _____
10          Page _____ Line _____ Reason _____
            From _____ to _____
11
            Page _____ Line _____ Reason _____
12          From _____ to _____
13          Page _____ Line _____ Reason _____
            From _____ to _____
14
            Page _____ Line _____ Reason _____
15          From _____ to _____
16          Page _____ Line _____ Reason _____
            From _____ to _____
17
            Page _____ Line _____ Reason _____
18          From _____ to _____
19          Page _____ Line _____ Reason _____
            From _____ to _____
20
            Page _____ Line _____ Reason _____
21          From _____ to _____
22          Page _____ Line _____ Reason _____
            From _____ to _____
23
            _____
24
                  ALVIN H. BROWN
25
            TSG Reporting - Worldwide    877-702-9580
```

# BCI EXHIBIT

# 58

Page 1

1

2                    UNITED STATES BANKRUPTCY COURT

3                    SOUTHERN DISTRICT OF NEW YORK

4        ------------------------x

5        In Re:

6                                        Chapter 11

7        LEHMAN BROTHERS          Case No. 08-13555(JMP)

8        HOLDINGS, INC., et a1,    (Jointly Administered)

9                    Debtors.

10       ------------------------x

11

12              DEPOSITION OF SAUL BURIAN

13                  New York, New York

14                  December 17, 2009

15

16       Reported by:

17       MARY F. BOWMAN, RPR, CRR

18       JOB NO. 26532

19

20

21

22

23

24

25

Page 2

```
 1
 2
 3
 4                December 17, 2009
 5                9:35 a.m.
 6
 7
 8      Deposition of SAUL BURIAN, held at
 9   the offices of Boies, Schiller & Flexner,
10   LLP, 575 Lexington Avenue, New York, New
11   York, before Mary F. Bowman, a Registered
12   Professional Reporter, Certified Realtime
13   Reporter, and Notary Public of the State of
14   New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2               APPEARANCES:
 3
 4   JONES DAY, LLP
 5   Attorneys for Lehman Brothers, Inc.
 6      222 East 41st Street
 7      New York, New York  10017-6702
 8   BY: TRACY V. SCHAFFER, ESQ.
 9      SUSAN A. TURK, ESQ.
10
11   BOIES, SCHILLER & FLEXNER, LLP
12   Attorneys for Barclays and The Witness
13      575 Lexington Avenue
14      New York, New York  10022
15   BY: JACK G. STERN, ESQ.
16      CAMILLE OBERKAMPF, ESQ.
17
18   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
19   Attorneys for the Creditors Committee
20      865 Figueroa Street, 10th Floor
21      Los Angeles, CA  90017
22   BY: ERICA TAGGART, ESQ.
23      JAMES S. TECCE, ESQ.
24      TYLER WHITMER, ESQ.
25
```

Page 4

```
 1
 2               APPEARANCES:
 3
 4   HUGHES, HUBBARD & REED, LLP
 5   Attorneys for the SIPA Trustee
 6      One Battery Park Plaza
 7      New York, New York  10004-1482
 8   BY: NEIL OXFORD, ESQ.
 9
10   Also Present:
11      Nicholas Kemp, Paralegal,
12      Boies Schiller & Flexner
13      Steve Sanpietro, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2
 3
 4
 5      IT IS HEREBY STIPULATED AND AGREED, by
 6   and between the attorneys for the respective
 7   parties herein, that filing and sealing be
 8   and the same are hereby waived.
 9      IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15      IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25
```

Page 6

BURIAN

1
2    (Exhibit 457-B, Notice of Deposition
3    marked for identification, as of this date.)
4        THE VIDEOGRAPHER:  This is the start
5    of the tape labeled number 1 of the
6    videotape deposition of Saul Burian in the
7    matter of In re Lehman Brothers Holding,
8    Inc., et al.
9        This deposition is being held at
10    575 Lexington Avenue, New York, New York, on
11    Thursday, December 17, 2009, at
12    approximately 9:34 a.m.
13        My name is Steve Sanpietro from TSG
14    Reporting, Inc.  I am the legal video
15    specialist.  The court reporter today is
16    Mary Bowman in association with TSG
17    Reporting.
18        Will the court reporter please swear
19    in the witness.
20        (Witness affirmed)
21        THE VIDEOGRAPHER:  Will counsel please
22    state your appearance for the record.
23        MR. STERN:  Jack Stern, from Boies,
24    Schiller & Flexner for Barclays.
25        MS. OBERKAMPF:  Camille Oberkampf from

Page 7

BURIAN

1
2    Boies, Schiller & Flexner for Barclays.
3        MS. SCHAFFER:  Tracy Schaffer and
4    Susan Turk from Jones Day for LBHI.
5        MR. OXFORD:  Neil Oxford from Hughes,
6    Hubbard & Reed for the SIPA trustee.
7        MR. TECCE:  James Tecce, Quinn
8    Emanuel, Urquhart, Oliver & Hedges for the
9    official committee.
10        MR. WHITMER:  Tyler Whitmer, Quinn
11    Emanuel, for the committee.
12        MS. TAGGART:  Erica Taggart with Quinn
13    Emanuel for the committee and the witness.
14    SAUL BURIAN,
15        called as a witness by the parties,
16        having been duly affirmed, testified as
17        follows:
18    EXAMINATION BY
19    BY MR. STERN:
20        Q.    Good morning, Mr. Burian.  Could you
21    state for us your education, starting with
22    college?
23        A.    Sure.  Good morning.
24        I went to Yeshiva College here in New
25    York City.  I went to Columbia University School

Page 8

BURIAN

1
2    of Law, also here in the city.
3        Q.    Could you describe your professional
4    experience before you joined Houlihan Lokey?
5        A.    Starting after law school or --
6        Q.    Yes.
7        A.    So after I left Columbia, I joined the
8    firm Kramer Levin Naftalis & Frankel.  I was
9    there for 13, 14 years, and then joined Houlihan
10    Lokey, which is where I am now.
11        Q.    What was your position at Kramer Levin
12    when you left Kramer Levin?
13        A.    I was a partner of the firm.
14        Q.    In what practice area?
15        A.    Restructurings and business
16    reorganizations.
17        Q.    And was that your practice area for
18    your entire time at Kramer Levin?
19        A.    The first short period of time I split
20    my time between the corporate department and the
21    restructuring department.  I wanted to
22    specialize in distressed transactions.
23        Q.    So for how many years at Kramer Levin
24    did you practice bankruptcy law?
25        A.    Again, I'm not sure what you mean by

Page 9

BURIAN

1
2    bankruptcy law.  I spent most of my time in the
3    early years doing corporate transactions in and
4    around insolvencies.  I did public offerings and
5    other stuff as well, but for the most part
6    corporate transactions that related to
7    restructuring matters.
8        Later on, I started working more
9    broadly on restructuring matters.  So you decide
10    when that means I started doing bankruptcy law
11    and when I didn't.
12        Q.    Fine.
13        When was Houlihan Lokey first engaged
14    to serve as financial advisor to the creditors
15    committee in the Lehman case?
16        A.    I will consider engagement to be when
17    the committee said you're hired, not when the
18    court order was entered.  We interviewed with
19    the committee, I believe it was the Wednesday
20    night after the filing.  If you have a calendar,
21    I could be more specific about dates.  But it
22    was that Wednesday night.
23        Q.    For ease of reference, I'll give you a
24    calendar for September 2008.
25        A.    OK.  So I would say Wednesday, the

Page 10

BURIAN

1   17th of September.
2       Q.   And how did Houlihan go about
3   selecting its team for this representation?
4           MS. TAGGART:  Object to form.
5           THE WITNESS:  Does that mean I
6   continue or I stop?
7           MS. TAGGART:  Yes, go ahead.
8       A.   Well, in a financial restructuring
9   group, we have a number of managing directors
10  who have experience in complicated matters.  We
11  were invited to meet with the committee on that
12  Wednesday morning, the 17th, and it was a
13  combination of who had availability for a matter
14  this time consuming and this complex, as well as
15  who had the requisite combination of skills for
16  a deal of this size.
17          There is no specific formulas.  It is
18  probably similar to how you got involved in the
19  Barclays litigation.
20      Q.   Ultimately who were the key members of
21  the Houlihan team?
22          MS. TAGGART:  Object to form and to
23  time.  When -- when do you mean?
24      Q.   At the outset.

Page 11

BURIAN

1   matter.  Eric Siegert and I sort of quarterback
2       A.   You know, Lehman is a very, very large
3   the whole transaction, but -- the whole
4   representation of the committee, but with
5   respect to a variety of different areas, there
6   are different people that day-to-day are more
7   responsible than others.
8           This has required a pretty significant
9   effort.
10      Q.   During the first week of your
11  engagement, who were the most senior members of
12  your team?
13      A.   Eric and I. Mike Fazio.  Brad Geer.
14  Tanja Alto was very active.
15          We then had certain people that we
16  were trying to get up to speed on different
17  assets.  We had the financial institutions group
18  that was very active the first couple -- you
19  know, first couple of months, mainly on
20  Neuberger Berman and its related assets.
21          It is hard to answer with -- is that
22  the answer you are looking for?
23      Q.   That's fine.
24          Were you and Mr. Siegert the most

Page 12

BURIAN

1   senior members of the team?
2       A.   Again, senior in terms of age, senior
3   in terms of the firm?
4           Jeff Werbalowsky, who is the co-CEO of
5   our firm, attended the pitch and was available
6   when and if we needed him.
7           If you are asking who actually
8   performed services, billed time, recorded time
9   and organized work groups, Eric and I were the
10  two managing directors that did that.
11      Q.   You supervised the matter?
12          MS. TAGGART:  Object to form.
13          Go ahead.
14      A.   I worked on the matter and supervised
15  it as well.  And we split up responsibilities
16  for different things.
17      Q.   And what role did Mr. Fazio have?
18      A.   Then or now?
19      Q.   At the time in the first week after
20  the engagement.
21      A.   You know, we were drinking from a
22  firehose in all sorts of issues.  Mike was
23  supporting me in trying to understand the
24  Barclays transaction, give advice, and also

Page 13

BURIAN

1   trying to get our arms around all the
2   non-Barclays-related issues, you know, at
3   Lehman.
4       Q.   What was Mr. Geer's role?
5       A.   There, too, Brad was also helpful in
6   trying to figure out what needed to get done,
7   assign responsibilities, and he, too, focused on
8   aspects of the Barclays transaction.
9           At that point in time, I don't know if
10  it is possible to really adequately describe how
11  much was going on at once.  And therefore, just
12  to create lists of what had to get done was a
13  full-time job.
14          So Brad and Mike were extremely
15  helpful in that regard.
16      Q.   At the time, did you feel that you had
17  selected a team that was highly qualified to do
18  the assignment that you had?
19          MS. TAGGART:  Objection to form.
20      A.   Yeah, I'm not sure -- we were
21  comfortable that the representation of the
22  committee was adequate, and the committee
23  selected us because they had confidence in us, I
24  guess.

4

Page 14

BURIAN

1
2  Q.  You felt that you had a team that was
3  highly qualified to analyze the financial
4  aspects of the bankruptcy sale?
5  MS. TAGGART: Object to form.
6  A.  When we first got involved, we didn't
7  know what the sale was. So it is sort of a
8  chicken and egg problem.
9  We had a team that has as much or more
10  experience in advising committees in complex
11  transactions of all types. All types, not just
12  financials. And we didn't know exactly what
13  would be faced, but our job is try to dive in,
14  understand it the best we can and give advice.
15  Q.  And I understand that the situation
16  was very expedited. Did you feel that you had a
17  team that was as capable as any financial
18  advisory team of handling such an expedited
19  situation?
20  MS. TAGGART: Object to form. Calls
21  for speculation.
22  A.  Again, you keep on talking about as
23  qualified or as any other team. Theoretically I
24  can get an all-star dream team of people,
25  parachute them in, and I could cherry-pick from

Page 15

BURIAN

1
2  every firm around the world and find the right
3  person that could match up with every single
4  need. That's not the way the real world works.
5  That's not the way restructuring firms work.
6  So no, we were not as qualified as any
7  team I can imagine could have been at the time.
8  And if anything, as you know, Houlihan Lokey
9  does not have a capitals markets practice. We
10  don't do sales and trading. We don't do public
11  offerings.
12  As many, many of these things we don't
13  do, and therefore, in retrospect, it might have
14  been nice to have some of that expertise.
15  Q.  What other financial advisors worked
16  for the committee in that time period?
17  MS. TAGGART: Objection, foundation.
18  A.  There was another financial advisory
19  firm that was retained the same night, FTI
20  Consulting.
21  Q.  Did Houlihan work with FTI Consulting
22  in the period from September 17 through the end
23  of September?
24  A.  Sure.
25  Q.  Did FTI have the capital markets

Page 16

BURIAN

1
2  experience that you just said Houlihan lacked?
3  A.  No. I mean not to my knowledge. They
4  focused mainly on the TSA aspects of the
5  transaction and the integration and computer IT
6  issues, which was an area that we were not as
7  familiar with.
8  Q.  Did Houlihan ever advise the committee
9  that it felt that Houlihan lacked certain
10  necessary experience to handle the assignment?
11  MS. TAGGART: Hold on. Wait, I want
12  to read that.
13  Is this before or after the retention,
14  Jack? Are you asking before or after the
15  retention did Houlihan advise the committee?
16  MR. STERN: At any time.
17  MS. TAGGART: Then I will object to
18  privilege. You can answer before the
19  retention.
20  MR. STERN: You're instructing him not
21  to answer?
22  MS. TAGGART: Yes, I am instructing
23  not to answer after the retention about
24  Houlihan's advice to the committee about the
25  experience that Houlihan had.

Page 17

BURIAN

1
2  So you should -- can you read, reread
3  the question.
4  And you should answer up until the
5  point that you were retained.
6  (Record read)
7  A.  We did not believe we lacked necessary
8  experience, nor did we -- we advised the
9  committee accurately about what our relative
10  strengths and weaknesses were, and they chose us
11  as the best firm to represent them.
12  Q.  At any time did Houlihan provide legal
13  advice to the committee?
14  A.  No.
15  THE WITNESS: Sorry.
16  MS. TAGGART: That's all right.
17  Objection.
18  It's OK. I was just going to tell you
19  to answer yes or no to that, so go ahead.
20  A.  No.
21  Q.  We have premarked as Exhibit 457-B the
22  30(b)(6) notice for this deposition.
23  Mr. Burian, you understand that you're
24  testifying today both in your individual
25  capacity and as a 30(b)(6) representative of

Page 18

BURIAN

1
2  Houlihan Lokey?
3      A.  I do understand that.
4      Q.  And did you review this deposition --
5      A.  I am sorry, sir.  Am I supposed to
6  look at the camera or look -- I keep feeling I'm
7  looking this way, but you're over there.
8          (Discussion held off the record)
9      Q.  Mr. Burian, did you review before this
10  deposition the deposition notice that we have
11  marked as Exhibit 457-B?
12      A.  I did.
13      Q.  Did you have an opportunity before
14  this deposition to review the definitions that
15  appear on page 3?
16      A.  I did.  When I received it, I did.
17  It's been a while.
18      Q.  That's fine.  I want to take a moment
19  to go through some of those definitions, as we
20  may be using some of these terms later.  And if
21  we do, we may need to refer back to this
22  document.
23          Looking at definition number 16 on
24  page 5, do you see there is a definition there
25  of the term "Fed replacement transaction"?

Page 19

BURIAN

1
2      A.  I do.
3      Q.  If you could take a moment to review
4  that definition and let me know if that is
5  understandable to you.
6      A.  I'm sorry, if the words are
7  understandable to me?
8      Q.  If the definition is understandable.
9      A.  Yeah, I understand your definition of
10  "Fed replacement transaction."
11          MS. TAGGART:  Let me note for the
12      record, part of this is referring to "as
13      described in another declaration."  I think
14      if you are going to rely on that being the
15      full definition, maybe we have that part of
16      the declaration out.
17      Q.  I don't think we'll have much
18  difficulty understanding what we are talking
19  about when we talk about the Fed replacement
20  transaction, and when we get to that, we will
21  come back to the definition.
22      A.  I have no problem going in that
23  direction.  My only concern is, I don't want to
24  be -- I don't want you to assume that the facts
25  in these definitions are facts that I know of on

Page 20

BURIAN

1
2  my own account or that I necessarily agree with.
3      Q.  I understand.  That's not what I am
4  asking.
5      A.  OK.
6      Q.  I am just asking if the definition is
7  understandable.
8      A.  I understand that the Fed replacement
9  transaction that you want to use for this
10  definition is Barclays stepping into the shoes
11  of the Fed and Shari Leventhal says that you
12  funded 45 billion in that transaction.
13      Q.  Let me ask you about definition number
14  28 on page 6.  This defines the term "repo
15  collateral," and it says, "Repo collateral means
16  the collateral actually transferred to Barclays
17  as part of the Fed replacement transaction."
18      A.  Um-hm.
19      Q.  "Which shall be defined for purposes
20  of this notice to include the 7 billion dollar
21  cash amount."
22          And then the term "7 billion dollar
23  cash amount" is defined in definition number 2
24  on page 3.  Do you see that?
25          And it says, "The 7 billion dollar

Page 21

BURIAN

1
2  cash amount shall mean the 7 billion dollars in
3  cash that was understood by Barclays as of the
4  time of the September 22, 2008 closing to have
5  been posted to a Barclays account at JPMC
6  because certain collateral had not been
7  transferred to Barclays as anticipated in the
8  Fed replacement transaction."
9          And I'm not asking you to agree with
10  those definitions or any of the facts stated,
11  but do you understand those two definitions?
12      A.  I understand how you want to define
13  those terms.  If you want to proceed on that
14  basis, that's fine.  But when you use those
15  terms, you have to be careful, because there are
16  aspects of those definitions that are -- that
17  concern me.
18      Q.  I understand.
19          Now, what did you do to prepare for
20  this deposition?
21      A.  I mean a number of things.  Reviewed
22  the e-mails and notes that were sent over as
23  part of discovery.  I read some of the
24  definitions in the asset purchase agreement.  I
25  looked at a variety of those documents.

Page 22

BURIAN

1    Obviously met with counsel to better
2  understand what it is that I am supposed to be
3  doing in the room today, answering questions and
4  not being argumentative and all the good things.
5      Q.  Did you meet with anybody else at
6  Houlihan in order to prepare concerning the
7  30(b)(6) topics?
8      A.  Well, I talk to people at Houlihan all
9  the time obviously.  It is hard to know if it is
10  about this or things generally, but yes, I spoke
11  to -- what were those things called, the
12  questions I was asked, interrogatories, and I
13  had an associate pull a log of --
14      MS. TAGGART:  Let me object, on
15  privilege.  I want you to not answer your
16  communications with these people.
17      Why don't you just say the people that
18  you interacted with that might be at all in
19  preparation for this deposition.  Just the
20  names of people.
21      A.  I checked my calendar.  I am sorry.  I
22  checked my calendar, which may have included
23  talking to my assistant.  I spoke to Brad Geer.
24  I spoke to Mike Fazio.  I spoke to Eric Siegert,

Page 23

BURIAN

1    mainly to complain that I had to do this and he
2  wasn't.
3      I spoke to Ann McCovsky.  I spoke to
4  other associates or VPs at Houlihan.
5      Q.  Where is Mr. Siegert based?
6      A.  He lives in Minneapolis and works out
7  of our Minneapolis office.
8      Q.  Where is Mr. Geer based?
9      A.  Minneapolis.
10      Q.  Mr. Fazio?
11      A.  New York.
12      Q.  And you're based in New York?
13      A.  Correct.
14      Q.  Was Mr. Siegert in New York at all
15  during the events from September 17 through the
16  closing of the transaction on September 22?
17      A.  My recollection is he was in New York
18  on Thursday and then he left and did not come
19  back until after the closing.
20      Q.  Was Mr. Geer in New York for any of
21  that time period?
22      A.  I believe Mr. Geer also left on
23  Thursday and returned on Sunday, the 21st.
24      Q.  Now, you said in preparation for this

Page 24

BURIAN

1    deposition you reviewed your calendar.  Is that
2  a calendar of events during the period of
3  September 2008?
4      A.  Yeah.  We looked at -- I looked at a
5  calendar and tried to remember meetings and
6  tried to make sure I understood the time frame
7  of the different events.
8      Q.  I am trying to understand what
9  calendar you looked at.  Was it a personal
10  calendar that listed your appointments?
11      A.  No.  I mean I carry a Blackberry
12  obviously, but it doesn't go back that far.
13      Q.  So in other words, you didn't look at
14  a calendar that listed your particular meetings
15  and phone calls and other activities during that
16  period?
17      A.  Honestly I did look at my Blackberry
18  to look to see if the committee meeting was the
19  16th or the 17th, our retention, but it was all
20  blank.
21      Q.  In other words, your Blackberry didn't
22  retain that information?
23      A.  It doesn't go back more than a year.
24      Q.  So what type of calendar did you look

Page 25

BURIAN

1    at?  Just a blank calendar?
2      A.  So when I opened it up, it wasn't
3  there, and then someone reminded me the
4  Wednesday was the committee meeting.
5      Q.  OK.
6      A.  I think I looked at the retention
7  application.
8      Q.  Did you review the committee's Rule 60
9  motion?
10      A.  I have reviewed it, not in connection
11  with this deposition.  I saw it way back when.
12      Q.  I think you said you reviewed e-mails
13  and notes that were part of the discovery.  Were
14  those e-mails and notes that Houlihan produced?
15      A.  You know, I'm not sure.  I was given
16  a --
17      MS. TAGGART:  Don't go into which
18  documents you were given.  If you know if
19  what you reviewed had been produced, you can
20  answer that.  And if you know who produced
21  it.
22      A.  It was certainly Houlihan e-mails in
23  the things that I looked at.  The rest of your
24  question, I can't respond to.

Page 26

BURIAN

1
2    Q.   Did reviewing that material refresh
3    your recollection concerning the facts?
4    A.   Well, there are two aspects of this
5    deposition, right? I was told that I'm the
6    Houlihan representative even beyond things that
7    I have direct personal knowledge of, if I feel
8    comfortable I can say with authority that they
9    occurred or didn't occur.
10       So to the extent that they related to
11   events that I was not directly part of, they
12   might have.
13   Q.   They might have refreshed your
14   recollection?
15   A.   Again, there are two aspects of this.
16   There is things that I know because I was there,
17   I did, I saw, I participated.
18   Q.   Let me focus on that. Let me focus on
19   that.
20       Did anything that you reviewed in
21   preparation for this deposition refresh your
22   recollection concerning those matters, those
23   matters you were involved in?
24   A.   Yeah. I had some notes that we
25   produced that helped me remember the -- how the

Page 27

BURIAN

1
2    deal was described to us at different times.
3    Q.   Did you review any privileged
4    communications?
5        MS. TAGGART: Object to form and I
6    guess foundation.
7        But if you know if you reviewed
8    privileged communications, you can answer.
9    A.   You have to define that for me,
10   because it keeps changing. I know there was a
11   hearing about that yesterday, but I don't
12   think -- I don't think so. Things I got were
13   redacted. It was -- I think I only received
14   what you received. So if you received
15   privileged information, then yes, but I don't
16   think you did, so no.
17   Q.   Did you review any summaries of the
18   sale transaction that Houlihan had provided to
19   the committee?
20   A.   No. No.
21   Q.   Did you review any summaries of the
22   sale approval hearing that Houlihan had provided
23   to the committee?
24   A.   No.
25   Q.   During the period from September 17

Page 28

BURIAN

1
2    through September 22, when Houlihan provided
3    summaries to the committee concerning the
4    transaction, what was the purpose of those
5    summaries?
6        MS. TAGGART: Object to form. And
7    vague.
8    A.   We didn't provide written summaries to
9    the committee. I don't know that wasn't your
10   question, but I am trying to move this along.
11   We didn't provide written summaries.
12   Q.   It is your testimony today that
13   Houlihan never provided a written summary of the
14   status of negotiations or the status of the
15   agreement?
16   A.   I have no recollection of any written
17   Houlihan summary of the transaction.
18   Q.   I would like to mark as the next
19   exhibit a document labeled "limited Objection of
20   Official Committee of Unsecured Creditors."
21       (Exhibit 458-B, document labeled
22   "Limited Objection of Official Committee of
23   Unsecured Creditors" marked for
24   identification, as of this date.)
25   Q.   This will be labeled 458-B.

Page 29

BURIAN

1
2    A.   You are not marking the attachments?
3    You are just the objection?
4    Q.   Correct. We will get to the
5    attachments separately.
6        Mr. Burian, do you recognize the
7    document that we have marked as Exhibit 458-B?
8    A.   I do.
9    Q.   And what is it?
10   A.   It's my committee's limited objection
11   to the SIPC settlement with Barclays.
12   Q.   And at the time you submitted a
13   declaration that supported this objection; is
14   that right?
15   A.   I did. I see it is not attached.
16   Q.   We will mark that separately, but my
17   question is, when you submitted your declaration
18   in support of this objection, did you review the
19   objection itself?
20   A.   Yeah, I must have.
21   Q.   And do you recall whether you did or
22   not?
23   A.   I did. I mean I must have.
24   Q.   At the time, did you believe that
25   everything stated in the objection was accurate?

Page 30

BURIAN

1
2    A.    In this objection?
3    Q.    Yes.
4    A.    At the time did I think everything
5    stated in this objection -- the things that
6    concerned me, I checked, I read, and would have
7    corrected if I thought there was a mistake.
8        If there is things in here that don't
9    relate to me, then I may have left it to Quinn
10    Emanuel to get right.
11    Q.    Let's look at page 8, and specifically
12    footnote 12. Do you see that?
13    A.    Yes.
14    Q.    It states, "At the sale hearing, the
15    Lehman sellers indicated the value of the Fed
16    portfolio securities was 47.4 billion dollars."
17        As of the time this objection was
18    submitted, was that an accurate statement of
19    what the committee believed the 47.4 billion
20    dollars represented?
21        MS. TAGGART:  Objection to form, and
22    as worded I am going to object on privilege
23    and instruct not to answer.
24        So don't answer.
25        MR. STERN:  You're instructing him not

Page 31

BURIAN

1
2    to answer?
3        MS. TAGGART:  Yes.  He should not
4    answer what the committee believed was the
5    value of the Fed portfolio at that time.
6    And I know there is going to be a
7    deposition, a 30(b)(6) deposition of the
8    committee, so --
9        MR. STERN:  You have instructed him
10    not to answer?
11        MS. TAGGART:  Yes.  I think any
12    understanding that he has of what the
13    committee believed at that time would be
14    based on privileged communications, so I am
15    instructing not to answer.
16        And that's also not something that's
17    in the 30(b)(6) notice.  He is testifying
18    for Houlihan and he is the Houlihan 30(b)(6)
19    witness.
20        MR. STERN:  He is also testifying in
21    his individual capacity.
22    Q.    Let me ask a different question.
23    Mr. Burian, looking again at footnote 12 of this
24    objection, at the time that you reviewed this
25    objection, did you have any reason to believe

Page 32

BURIAN

1
2    that this statement was an inaccurate or false
3    statement?
4        MS. TAGGART:  Hold on.  The statement
5    being that the Lehman sellers had said that
6    the value of the Fed portfolio was 47.4
7    billion?
8        MR. STERN:  Please, please.  I think
9    you know that you are entitled to object to
10    form or to instruct not to answer.  But
11    speaking objections are not allowed.
12        Let me ask the question again.  Let's
13    see if we can adhere to the rules.
14    Q.    Mr. Burian, looking again at
15    footnote 12, it states, "At the sale hearing,
16    the Lehman sellers indicated the value of the
17    Fed portfolio securities was 47.4 billion."
18        My question to you, based on your
19    personal knowledge, at the time that was said to
20    the court in this submission, was that an
21    accurate statement of what you understood the
22    47.4 billion dollars to represent?
23        MS. TAGGART:  Object to form.
24    Q.    You can answer.
25        MS. TAGGART:  You can answer if you

Page 33

BURIAN

1
2    understand.
3    A.    What definition are we using for Fed
4    portfolio securities?  Are we using the
5    colloquial definition of the securities that
6    were part of the repo, or using your definition
7    that says in retrospect it included 7 billion in
8    cash, it didn't include 7 billion in cash?
9        You know, that's why I stated to you
10    earlier that you were going to have this
11    problem, because I don't know what Barclays
12    intended it to include and, as you know, the
13    7 billion in cash may or may not have been
14    moved.
15    Q.    Let's look back at --
16    A.    At the closing, not at the hearing.
17    So --
18    Q.    Let's look back at paragraph 7, which
19    begins on page 4.
20    A.    Paragraph 7 of the --
21    Q.    Of the committee's objection.  You can
22    put the 30(b)(6) notice to the side.  I'm not
23    referring to that.
24    A.    OK, but in -- I kept it out only
25    because I was concerned about definitions.

Page 34

BURIAN

1
2    Q.   Let's put that to the side. I'm not
3    focusing on the definitions in that, and I
4    apologize if I created confusion by referring to
5    that for that purpose. I don't believe that the
6    30(b)(6) notice defines this term, but I believe
7    the committee's objection does.
8    A.   OK.
9    Q.   So let's focus on the committee's
10   objection.
11        Paragraph 7 on page 4 states, "On or
12   about September 15, 2008, the Federal Reserve
13   Bank of New York, the New York Fed extended a
14   collateralized line of overnight financing to
15   LBI. On September 16, the New York Fed advised
16   Barclays Capital, Inc. that Barclays needed to
17   take out the New York Fed's exposure to LBI
18   prior to the closing of its transaction.
19   Barclays thus agreed to assume the New York
20   Fed's obligations to fund LBI, which entailed
21   the New York Fed transferring LBI securities to
22   Barclays in order to collateralize that
23   obligation (hereinafter the Fed portfolio and
24   the securities in such portfolio, the Fed
25   portfolio securities)."

Page 35

BURIAN

1
2        Do you see that definition of Fed
3    portfolio securities?
4    A.   Yes.
5    Q.   Based on that definition, can you tell
6    me whether the statement in footnote 12 on
7    page 8 was an accurate statement of your
8    understanding at the time?
9        MS. TAGGART: Object to form, and
10   which time?
11   Q.   At the time this objection was
12   submitted to Judge Peck.
13   A.   Do I call you Jack or Mr. Stem?
14   Q.   Either.
15   A.   Mr. Stem, this footnote just relates
16   back to the sale hearing and says -- it quotes
17   the transcript. It says the Lehman sellers
18   indicated a value of 47.4.
19        My recollection -- I can't tell you I
20   had a firm -- that I thought about this footnote
21   very much at the time this was filed. So if you
22   are asking me did I focus on this and determine
23   it to be true, I can't answer.
24        But I can tell you that generally
25   speaking, my understanding sitting in the

Page 36

BURIAN

1
2    courtroom was that there was 47.4 of securities
3    that were going to be transferred to Barclays --
4    going to be transferred to Barclays.
5    Q.   And those were the Fed portfolio
6    securities?
7    A.   Those were supposed to be a
8    termination -- the securities that no one else
9    had grabbed in the interim and that no one else
10   asserted a first priority senior security
11   interest, and I believe that the understanding
12   was that whatever free securities were available
13   were going to be -- were pledged to the Fed and
14   then pledged to Barclays.
15        I'm just trying not to be -- sorry.
16   Q.   So let me come back to what the
17   committee told the court in this objection. The
18   committee told the court that at the sale
19   hearing, the Lehman sellers indicated the value
20   of the Fed portfolio securities was 47.4
21   billion.
22        And my question is simply, was that
23   statement to the court an accurate reflection of
24   your understanding at the time this objection
25   was made?

Page 37

BURIAN

1
2        MS. TAGGART: Object to form.
3    A.   Honestly, I want this to go as quickly
4    as possible, but you're jumping between three
5    different times, saying is my recollection of
6    this footnote as it relates back to the hearing
7    date accurate when I sat at the hearing or when
8    I am sitting reading --
9    Q.   At the time --
10   A.   I honestly don't know what you want.
11   Q.   At the time this objection was
12   submitted to Judge Peck, did you have any reason
13   to believe that this statement in footnote 12
14   was not accurate?
15   A.   I believed when this was -- when I
16   read this -- I didn't correct it, so I thought
17   it was true, and I -- and that the judge was
18   apprised that securities worth 47.4 were going
19   to be transferred.
20   Q.   So at the time you reviewed this
21   objection, which was in December of 2008 --
22   A.   Oh. And that these were -- to fully
23   answer your question, and that those were, the
24   securities were part of the repo. I just want
25   to be complete.

Page 38

BURIAN

1  Q.   So you believed that the judge was
2  apprised that the securities worth 47.4 billion
3  dollars were going to be transferred and that
4  the securities were part of the repo?  Is that
5  correct?
6  A.   Yeah, now that I think about it, there
7  may have been vagueness about transferred or
8  kept because of the cancellation of the repo.  I
9  don't remember that detail.
10      But yeah, that basically 47.4 billion
11  of securities, Barclays was going to end the
12  transaction by taking, keeping, being
13  transferred to 47.4 billion of securities.
14  Q.   Those are the securities that were
15  being transferred as part of the repo, correct?
16  A.   I don't remember that -- I don't
17  remember -- we can look at the transcript
18  together if you like, how definitive Lori was
19  about -- Ms. Fife from Weil, how definitive she
20  was about exactly where the securities came
21  from.
22  Q.   That's why I am focusing on this.  In
23  December 2008, the committee told Judge Peck
24  that it understood that at a sale hearing, the
25

Page 39

BURIAN

1  Lehman sellers indicated the value of the Fed
2  portfolio securities was 47.4 billion dollars.
3  You have no reason to believe that that
4  statement to Judge Peck in December of 2008 was
5  an inaccurate or false statement, do you?
6  A.   Again, because maybe I am missing a
7  nuance here, I know now and I knew in December
8  that there was a lot of confusion about what was
9  part and not part of the Fed portfolio package.
10  There were allegations that JP Morgan took
11  assets, problems that DTC refused to clear
12  assets.
13      There were all sorts of disputes going
14  on that for the most part were not explained to
15  us.  We were told -- I understand that some cash
16  was substituted.
17      So if you are asking me did I know in
18  December whether some very narrow definition of
19  exact collateral for a specific repo in one
20  particular place was 47.4, I would have assumed
21  not.  It was an amalgam of a bunch of things.
22      Are you asking me sitting at the
23  hearing whether I thought that Lori was
24  describing the transaction that I had been
25

Page 40

BURIAN

1  described earlier that day, that was we have a
2  repo, we have collateral for the repo and they
3  are going to -- that that's 47.4, yes.
4      So what this footnote is saying, and
5  it wasn't meant to be parsed the way you are
6  parsing it, what this footnote is saying is,
7  golly gee whiz, the transaction was a simple
8  transaction in which the repo obligations and
9  the assets were being transferred.  And the Fed
10  portfolio securities were at that time, we
11  thought, what those securities -- the bucket of
12  securities that were involved.
13      Is that helpful?
14  Q.   Let me try to ask my question again,
15  because I need an answer to my question, which
16  is a simple question.
17      Footnote 12 of this objection, which
18  is dated as of December 19, 2008, states, "At
19  the sale hearing, the Lehman sellers indicated
20  the value of the Fed portfolio securities was 47
21  billion dollars."
22      My question is, as of the time this
23  objection was submitted, as of the time this
24  statement was made to Judge Peck, you did not
25

Page 41

BURIAN

1  have any reason to believe, did you, that this
2  was an inaccurate statement of what the Lehman
3  sellers had indicated?
4  MS. TAGGART:  Objection --
5  Q.   Yes or no?
6  MS. TAGGART:  Objection to form, asked
7  and answered.  He just gave that answer.  He
8  can answer one more time, but that's going
9  to be all.
10  A.   I didn't go back and read the whole
11  trial transcript when this was filed, and
12  therefore, I didn't have a view as to whether
13  this was a direct quote or not of Ms. Fife.
14  Q.   Did you have any reason to believe
15  this was an inaccurate statement of what she had
16  said?
17  MS. TAGGART:  Objection, asked and
18  answered.  Object to form.
19      OK, do you want to answer that again?
20  A.   I think it was an accurate description
21  of what we all thought she said.
22  Q.   Let's turn now to another part of the
23  objection, paragraph 9 on page 6.  It states,
24  "The hearing" -- are you with me on paragraph 9?
25

Page 42

BURIAN

1
2    A.    I am.
3    Q.    Paragraph 9 states, "The hearing to
4    consider approval of the transaction (the sale
5    hearing) commenced on Friday evening,
6    September 19, 2008. At the sale hearing, the
7    Lehman sellers advised the court of certain
8    changes to the sale transaction's terms since
9    executing the purchase agreement on
10   September 16th, purportedly resulting from
11   dramatic changes in the value of the Fed
12   portfolio securities being transferred to
13   Barclays, now 47.4 billion dollars, and
14   liabilities being assumed by Barclays, now
15   45.5 billion dollars."
16         Now, do you see that this refers to
17   liabilities being assumed by Barclays of 45.5
18   billion dollars? Do you see that?
19   A.    I see the words, yeah, sure.
20   Q.    And at the time that this objection
21   was submitted, did you understand that
22   45.5 billion dollars to refer to the amount of
23   Lehman's repurchase agreement obligation to the
24   Fed?
25         MS. TAGGART: Objection to form.

Page 43

BURIAN

1
2    If you understand the question, you
3    can answer.
4    A.    No.
5    Q.    You didn't understand the 45.5 billion
6    dollars to refer to the amount that Lehman owed
7    the Fed under its repurchase agreement?
8    A.    That's correct, I did not.
9    Q.    You did not.
10   A.    Jack, you are referring to --
11   Q.    Are we off the record?
12   A.    No, we are on the record.
13         When you asked that question,
14   referring to what date? You keep asking about
15   what Lehman owed the Fed. According to the
16   affidavit, there was no Fed loan. It was a
17   Barclays loan at that date.
18         And I just don't -- I'm happy to
19   say -- you say is it yes or no and play games,
20   but I want to get to the --
21   Q.    Did you understand the 45.5 billion to
22   be the amount that Barclays would pay in
23   replacing the Fed repo?
24   A.    I can't answer that either.  No.
25   Q.    Why not?

Page 44

BURIAN

1
2    A.    Because I have no idea what Barclays
3    paid the Fed, and they were different times, and
4    I don't know -- I don't know if Barclays
5    extended more funds over a period of time from
6    the takeout of the Fed.
7          What this sentence says is we thought
8    and we were told that the Barclays' repo
9    obligation as of the weekend, as of that Friday
10   hearing, was 45.5 billion. And the assets
11   supporting it had dropped to 47.4 billion.
12         I know I didn't answer yes or no, but
13   I am trying to correct the obvious misstatements
14   or try to make sure this goes faster.
15         MS. TAGGART: Make sure you say what
16   you need to explain your answer.
17   A.    Was that helpful or you want me to
18   answer yes or no?
19   Q.    Hold on.
20         So what you're telling me, Mr. Burian,
21   is that this sentence in paragraph 9 of the
22   objection is saying that the committee thought
23   that the Barclays repo obligation as of the sale
24   approval hearing was 45.5 billion and the assets
25   supporting it were 47.4 billion? Is that

Page 45

BURIAN

1
2    correct?
3    A.    Yes. That's correct. What the
4    committee thought. That's what I was told, what
5    I thought.
6    Q.    Now let me move on to another
7    document. Let's mark this as the next exhibit.
8         (Exhibit 459-B, transcript dated
9    December 22, 2008 marked for identification,
10   as of this date.)
11   Q.    Exhibit 459-B is an excerpt of a
12   transcript of a hearing before Judge Peck on
13   December 22, 2008, and I am going to point you
14   to a specific section of this and then ask you a
15   question about it.
16         Looking at page 45 of the transcript,
17   you see Mr. Kirpalani is speaking?
18   A.    I do.
19   Q.    Do you know who Mr. Kirpalani is?
20   A.    I do.
21   Q.    Who is he?
22   A.    A lawyer at Quinn Emanuel.
23   Q.    And he represents the creditors
24   committee?
25   A.    That is correct.

Page 46

BURIAN

1  Q.   And at the bottom of page 45, starting
2  at line 21, when Mr. Kirpalani says, "Your Honor
3  knows better than I, from the Friday night when
4  you approved the sale going forward, were
5  thereafter spun into a whole variety of
6  additional discussions and negotiations into
7  Saturday and Sunday.  And we did submit the
8  declaration of Mr. Saul Burian from Houlihan
9  Lokey, who was involved -- who was intimately
10 involved in those negotiations.
11     "The sale order itself made the
12 creditors committee a party, if you will, to the
13 transaction in the sense that it couldn't be
14 changed without the creditor committee's
15 consent, even an immaterial change."
16     And my question is, to your knowledge,
17 was that statement to Judge Peck by the
18 creditors committee counsel an accurate
19 statement?
20     MS. TAGGART:  Objection to form.
21 Compound.
22 Q.   Was it an accurate statement?
23 A.   As long as you understand what
24 intimately involved in those negotiations means,

Page 47

BURIAN

1  yes.
2  Q.   And help me understand intimately
3  involved in those negotiations.
4  A.   I was intimately involved in all
5  creditor committee aspects of the negotiations.
6  But I was not intimately involved in what
7  appeared to be all sorts of discussions and
8  negotiations among and by other parties during
9  that fateful weekend.
10 Q.   So subject to that qualification,
11 Mr. Kirpalani's statement is accurate, correct?
12 A.   The court order, I'm told, has the
13 terms of what changes the committee needs to
14 look at.  I think he is summarizing here the
15 idea that if there were changes, we were
16 supposed to -- if the company believed that
17 there were changes, they would need to get our
18 consent.
19     But the standard relates back to the
20 order.
21 Q.   And you were familiar with the sale
22 order at the time it was issued?  You read it?
23 A.   At the time it was issued?  Exactly
24 what time is that?

Page 48

BURIAN

1  Q.   Did you read the sale order before the
2  closing?
3  A.   No.
4  Q.   Coming back to Mr. Kirpalani's
5  statement, I just want to make sure I understand
6  your testimony.  I think you explained to me
7  your involvement in the negotiations.  Subject
8  to that explanation, is what Mr. Kirpalani told
9  Judge Peck correct?
10     MS. TAGGART:  Object to form.
11 A.   I refer back to the sale order for
12 what the consents were needed or not needed, but
13 otherwise, yeah.
14 Q.   Now, did you attend the sale hearing?
15 A.   I -- well, which one?
16 Q.   The sale hearing on September 19, the
17 final sale approval hearing?
18 A.   I attended most of it or a large
19 portion of it.
20 Q.   It ran into the Sabbath?
21 A.   Correct.
22 Q.   So I understand that you wouldn't be
23 there during the Sabbath, correct?
24 A.   I was not there during the Sabbath,

Page 49

BURIAN

1  correct.
2  Q.   You would make an attempt -- what --
3  do you recall at what time you left the sale
4  hearing?
5  A.   I mean we could back into it by
6  seeing -- you know, 18 minutes after sunset, I
7  would have left, but I don't remember the exact
8  time. I was --
9  Q.   I understand. I understand.
10     Do you recall whether you were present
11 for the opening of the sale hearing?
12 A.   Absolutely.
13 Q.   Were you present for a recess that was
14 taken shortly after the hearing began?  If you
15 remember?
16 A.   I'm not sure exactly which recess you
17 are referring to, if there was, but I was
18 there -- I went through all of the
19 case-in-chief, and I think I left when some
20 parts were beginning -- some of the smaller
21 creditors were beginning to make statements.
22     It was -- must have been, I'm
23 assuming, not the beginning of the hearing.
24 What time did the hearing start?  Do you

Page 50

BURIAN

1  remember?
2      Q.   We will come to that, we will come to
3  that later in more detail. But for now, I just
4  wanted to get a general recollection.
5          Did somebody report to you concerning
6  what had occurred to the -- parts of the hearing
7  that you were not present at?
8      A.   Yes.
9      Q.   And who did that?
10     A.   A variety of people told me about the
11  hearing. Most importantly, I heard it from the
12  Milbank lawyers, you know, that the sale was
13  approved. Mike Fazio gave me a rundown.
14     Q.   Was Mike Fazio the only Houlihan
15  representative who attended the entire sale
16  approval hearing?
17     A.   I don't remember.
18     Q.   Mr. Geer was not there?
19     A.   To the best of my knowledge, he was
20  not there.
21     Q.   And Mr. Siegert was not there?
22     A.   He was -- I am pretty sure he was not
23  there. Neither of them were in New York then.
24     Q.   And did you at some point over the

Page 51

BURIAN

1  weekend after the hearing review a transcript of
2  the hearing?
3      A.   No.
4      Q.   Do you recall what Mr. Fazio reported
5  to you concerning the parts of the hearing you
6  missed?
7      A.   Yeah. I can't swear on a Bible that
8  everything that I am telling you is what
9  Mr. Fazio told me as opposed to a collection of
10  what I heard from everybody, so --
11     Q.   Understood.
12     A.   It is hard sometimes to separate that
13  out. But frankly, what I was told is that the
14  hearing was anticlimactic, sort of a nonevent,
15  and a lot of people got up to make some noise.
16  The ad hoc committee represented by Akin Gump,
17  you know, made an objection that was not
18  supported, that a bunch of creditors had some
19  parochial issues.
20         I was at the hearing portion when DTC
21  made their comments and others dealing with
22  trading issues or JP Morgan, but I was told that
23  may have -- because remember, people were giving
24  me descriptions that could have been parts of

Page 52

BURIAN

1  the hearing I was at. So I don't know -- I
2  can't promise you if the DTC lawyer spoke twice
3  or once, just when I was there or not.
4          Generally speaking, it was what you
5  would expect for something that was as large as
6  this with so many parties, people getting up to
7  say their piece. More clarifications. Nothing
8  exciting other than Judge Peck's approval, which
9  seemed to -- people said he was emotional and
10  felt the weight of the moment that was a hushed
11  courtroom and a meaningful moment.
12         But substantively, I was told that I
13  missed nothing.
14     Q.   At some point, did you get involved
15  in -- withdrawn.
16         Going into the weekend, the weekend of
17  September 20, 21, did you have a transcript of
18  what had been said at the hearing?
19     A.   I don't think so.
20     Q.   Do you recall at any point before the
21  closing on September 22, reviewing a transcript
22  of the sale approval hearing?
23     A.   I do not.
24     Q.   But you felt going into that weekend

Page 53

BURIAN

1  and before the closing that you had adequate
2  information concerning what had occurred at the
3  hearing both based on your own attendance and
4  the reports that you got?
5      MS. TAGGART: Object to form.
6      A.   Yes.
7      Q.   And now, after you left the hearing to
8  observe the Sabbath, when did you get back to
9  work on this matter?
10     A.   Immediately after Sabbath ended,
11  called the people from Milbank that were at Weil
12  Gotshal. I think I either tried to reach Mike
13  Fazio or reached him, but either way, the result
14  of those conversations were that I went over to
15  Weil Gotshal.
16     Q.   Do you recall roughly when you went to
17  Weil?
18     A.   You know, maybe I should have prepared
19  more, but we could figure it out again by
20  looking at when sundown was on Saturday night.
21     Q.   Sometime after sundown?
22     A.   I think I had to drop off one of my
23  kids at a play date, because I had no coverage
24  that night, and I continued down in a cab. So

Page 54

BURIAN

1    BURIAN
2    it couldn't have been more than a half hour, an
3    hour after Sabbath ended. I just don't remember
4    exactly.
5        Q. Sometime that evening of Saturday,
6    September 20?
7        A. Right.
8        Q. And from that point through the
9    closing on September 22, were you present at
10   Weil for that entire time period?
11       A. No.
12       Q. Tell me, you know, during that period
13   from Saturday evening, the 20th, through the
14   closing, as best you can recall, when you were
15   present at Weil.
16       A. I believe I was at Weil -- I think --
17   I'm not sure, but I think I went home at one
18   point Saturday night and got a few hours of
19   sleep. I honestly don't remember, but I -- I'm
20   pretty sure at some point Sunday morning,
21   Saturday night, I did go home.
22       I mean I remember I did not carry a
23   gym bag, I didn't bring stuff with me for the
24   night to Weil, so I would have gone home and
25   changed my clothes and showered or whatever. So

Page 55

BURIAN

1    BURIAN
2    that I do remember.
3        Q. At some point you returned to Weil?
4        A. Yeah. So I definitely went home at
5    some point Saturday night. I can't swear on a
6    Bible if it was 12 o'clock or 4 o'clock in the
7    morning, but kind of late. Probably -- I did go
8    home for a few hours.
9        And Sunday, I left Weil -- got there
10   early and, you know, I left Weil somewhere
11   between 2:30 and 4:00 in the morning.
12       Q. So that would have been 2:30 or --
13   between 2:30 and 4:00 in the morning of the
14   22nd?
15       A. Of Monday, the 22nd.
16       Q. And you -- do you know when the
17   closing occurred?
18       A. I've been told that it closed before
19   the open of business on Monday, the 22nd.
20       Q. You were not present for the physical
21   closing?
22       A. In this day and age, physical, I'm not
23   sure what a physical closing means. Does that
24   mean sign everything, all in escrow, somebody
25   says are we closed, we're closed? You know,

Page 56

BURIAN

1    BURIAN
2    things move --
3        Q. Let me rephrase.
4        A. I was not there when -- I was not at
5    Weil Gotshal, you know, between the hours of
6    let's say 5:00 and 8:00 in the morning when, you
7    know, people became legally committed and it was
8    deemed done.
9        Q. Was anybody from Houlihan present for
10   that closing?
11       A. I don't believe anyone was at -- no --
12   I don't believe anyone from Houlihan was at Weil
13   from 5:00 to 8:00 in the morning.
14       Q. Was anybody from Milbank there?
15       MS. TAGGART: Object to foundation.
16       A. I do not believe anyone from Milbank
17   was there during those hours either.
18       Q. Was there any representative of the
19   committee present at the closing on the morning
20   of Monday, September 22?
21       MS. TAGGART: Object to foundation.
22       A. There was no committee representative
23   at Weil between those hours of 4:00 to 8:00,
24   4:00 to 9:00.
25       Q. At some point after the closing, you

Page 57

BURIAN

1    BURIAN
2    received a copy of the final purchase agreement;
3    is that right?
4        A. Yeah.
5        MS. TAGGART: Jack, I think we might
6    want to take a break soon, if this is going
7    to be --
8        MR. STERN: Sure, we can take a short
9    break. Sure.
10       THE VIDEOGRAPHER: The time is now
11   10:39 a.m. We are now off the record.
12       (Recess)
13       THE VIDEOGRAPHER: This is the start
14   of tape number 2. The time is 10:51 a.m.
15   We are now back on the record.
16   BY MR. STERN:
17       Q. To come back to my last question, at
18   some point after the closing, you did receive a
19   copy of the final purchase agreement; is that
20   right?
21       A. I received an execution copy of the
22   asset purchase agreement. The actual agreement,
23   if that's what you are referring to, not all
24   the -- this looks a lot thicker than anything I
25   ever got, so I'm concerned about that.

Page 58

BURIAN

1
2 Q. Let's look at it. Let me put before
3 you a document that we have previously marked,
4 that has been previously marked as Exhibit 26.
5 Mr. Burian, this is a copy of the
6 notice of filing of the purchase agreement and
7 it has three exhibits. Exhibit A, the asset
8 purchase agreement dated September 16, 2008;
9 Exhibit B, the first amendment to the asset
10 purchase agreement dated September 19, 2008, and
11 Exhibit C, executed clarification letter
12 agreement dated September 20, 2008.
13 After the closing, did you have all of
14 these agreements?
15 A. I -- yes, I've seen each of these
16 three agreements.
17 Q. And did you understand at the time
18 that these three agreements comprised the final
19 purchase agreement?
20 MS. TAGGART: Object to form. Calls
21 for a legal conclusion and vague as to time.
22 A. At which time?
23 Q. After the closing, did you understand
24 that these three documents, the documents that
25 were filed with the court on September 22,

Page 59

BURIAN

1
2 comprised the final purchase agreement?
3 MS. TAGGART: Same objections.
4 A. I've been told that these are the --
5 this is the asset purchase agreement and the
6 clarification letter and the amendment that
7 governed the transaction. There are exhibits
8 and other transfer and other documents and
9 schedules that go with them, but this, what you
10 are handing me purports to be the legally
11 binding agreement among the parties.
12 Q. And at the time that you received the
13 final purchase agreement, did you understand
14 that it was a fully integrated, written
15 agreement?
16 MS. TAGGART: Object to form. And
17 calls for a legal conclusion. Also, could
18 call for privileged information.
19 If you have an opinion that you
20 yourself have formed about that, go ahead.
21 If it is informed by something like if you
22 spoke to counsel about it, don't reveal
23 that.
24 Do you need to hear the question
25 again?

Page 60

BURIAN

1
2 A. I didn't think in those terms or
3 consider that issue.
4 Q. But my question is, if you would take
5 a look at the asset purchase agreement, which is
6 Exhibit A, and specifically at page 39. There
7 is a Section 13.5. Do you see that?
8 A. Yes, I do.
9 Q. And the second sentence of that
10 section says, "This agreement can be amended,
11 supplemented or changed and any provision hereof
12 can be waived only by written instrument making
13 specific reference to this agreement signed by
14 the party against whom enforcement of any such
15 amendment, supplement, modification or waiver is
16 sought."
17 Did you understand at the time that
18 the final purchase agreement was a fully
19 integrated, written agreement that could not be
20 changed unless it was changed in writing, signed
21 by the parties?
22 MS. TAGGART: Object to form. Calls
23 for a legal conclusion. Could call for
24 privileged information.
25 You should answer if you had on your

Page 61

BURIAN

1
2 own an opinion about that question.
3 A. Honestly, I don't think in terms of
4 fully integrated -- whatever the other term was.
5 Do I know that documents -- that legal
6 obligations need to be signed? Yeah.
7 Q. You were an experienced transactional
8 lawyer?
9 A. I'm saying -- the reason why a
10 clarification letter -- are you asking me
11 whether I thought that you could have -- ask me
12 the question again.
13 Q. Did you understand that all the terms
14 of the agreement, that all the terms of the sale
15 transaction had to be reflected in these written
16 agreements that are marked as Exhibit 26?
17 MS. TAGGART: Object to form. Calls
18 for a legal conclusion. Could call for
19 privileged advice.
20 But if you formed an understanding at
21 the time on your own, you can answer.
22 A. This and its associated schedules, and
23 there were real estate transfer documents and
24 other things, there were -- there was -- there
25 were other related documents, that the table had

Page 62

BURIAN

1  many, many other things.
2  So those, that combination of things
3  was the corporate transaction.
4  Q.    And did you understand that the
5  transaction couldn't, could not be changed
6  orally?
7  MS. TAGGART: Object to the form.
8  Calls for a legal conclusion.
9  If you formed your own independent
10  understanding at the time about that, you
11  can answer.
12  A.    You know, it depends what you mean by
13  orally. We often in bankruptcy state things on
14  the record that are binding, and we often
15  have -- you know, that transcript or
16  representation is binding.
17  So these were the agreements and then
18  there was the record of the hearings.
19  Q.    OK. Did you have any understanding at
20  the time you reviewed these final agreements
21  that they incorporated any provision of any
22  transcript of any hearing?
23  A.    You know --
24  MS. TAGGART: Object to time and --

Page 63

BURIAN

1  Q.    Yes or no?
2  MS. TAGGART: No. I am going to --
3  let me read it again. Hold on.
4  Q.    Let me ask another question.
5  A.    I am not going to answer if --
6  MS. TAGGART: I don't want you to
7  answer it.
8  Q.    OK. Is there any -- did you
9  understand that the sale transaction would be
10  governed by the final written agreements that
11  the parties executed?
12  MS. TAGGART: Object to form. Calls
13  for a legal conclusion.
14  Go ahead.
15  A.    I understand and I understood that
16  this and all associated schedules and other
17  documents related to it purported to be the
18  agreement that Barclays and LBHI and the debtors
19  agreed to, and that among them, this was the
20  deal.
21  I also understood that the capacity to
22  act in bankruptcy correlates to the court order
23  and the sale order, and the court order and the
24  sale hearing and representations made in court,

Page 64

BURIAN

1  so that no matter what this document said, it
2  could not go beyond what the court authorized.
3  And therefore, I'm really -- I want --
4  let me just finish. If you are asking me
5  whether I understand that Barclays' commitments
6  and LBHI's agreements were supposed to be
7  written down in these documents and that oral
8  chatter would not be an amendment to it, of
9  course, corporate transactions work that way.
10  You write down your understandings.
11  If you are asking me whether this
12  document, when I reviewed it post closing, I
13  said this is -- this governs a transaction,
14  nothing outside these four corners has any
15  impact on the transfers that occurred, the
16  answer would be no.
17  Q.    OK. Did you believe that the written
18  terms were binding on the parties?
19  MS. TAGGART: Objection. Form, calls
20  for a legal conclusion.
21  A.    Not on the debtor estates, if they
22  conflicted with their capacity to contract.
23  Q.    Did you identify anything at the time
24  that you felt conflicted with the debtor

Page 65

BURIAN

1  estate's ability, capacity to contract?
2  MS. TAGGART: Objection and vague as
3  to time. When are you asking?
4  Q.    Right after the closing?
5  A.    Right after like --
6  Q.    Well, from the time of the closing
7  through September 30, did you identify anything
8  in these written agreements marked as Exhibit 26
9  that conflicted with what the court had been
10  told?
11  MS. TAGGART: Object to form, called
12  for legal and also could call for privileged
13  information.
14  If you independently looked at
15  something and through September 30 can
16  answer that, go ahead.
17  A.    I did not have a specific view. I
18  only had what we were -- what was represented to
19  us. We didn't have the ability -- the answer
20  is, what I knew on that date, I thought it was
21  probably fine. I didn't know of anything in
22  particular.
23  But my direct knowledge of the
24  underlying facts, you know, in retrospect turned

Page 66

BURIAN

1
2  out to be quite wrong.
3      Q.   Based on reviewing the agreement --
4  withdrawn.
5      After the closing, am I correct that
6  you reviewed the final agreement?
7      A.   I did not read it cover to cover. It
8  was done, there was the next crises or crisises,
9  so I never sat down after the closing and read
10  every single one of these documents to look for
11  things that were consistent or inconsistent.
12      I --
13      Q.   You're saying that between --
14      MS. TAGGART:  Hold on, did you finish?
15      Q.   Are you saying --
16      MS. TAGGART:  Hold on.
17      A.   I was trying to answer your question.
18  The question was, did I search the document for
19  things that -- why don't you read back your
20  question.
21      Q.   Let me ask this.
22      MS. TAGGART:  He needs to finish his
23  answer. Can we read back the question.
24      (Record read)
25      A.   The answer was, I reviewed pieces of

Page 67

BURIAN

1
2  it from time to time. I don't remember ever
3  sitting down and studying and reading all the
4  documents in the final agreement.
5      Q.   OK. So from the time after the
6  closing on September 22, through the end of
7  September, you did not review these final
8  agreements carefully?
9      MS. TAGGART:  Objection.
10      Q.   Is that right?
11      MS. TAGGART:  Mischaracterizes the
12  statement and object to form.
13      MR. STERN:  Please, please. These
14  speaking objections are really taking a lot
15  of time. If you have an objection to the
16  form or you want to instruct him not to
17  answer, that's what the rules provide for.
18      Q.   So let me ask the question. From the
19  time after the closing on September 22, through
20  the end of September, did you review the final
21  agreements carefully?
22      MS. TAGGART:  Object to form. Asked
23  and answered.
24      A.   I reviewed them sufficiently for my
25  purposes.

Page 68

BURIAN

1
2      Q.   And in doing that review that was
3  sufficient for your purposes, did you identify
4  anything on the face of the agreements that was
5  inconsistent with what you understood the court
6  had been told at the sale approval hearing on
7  September 19, 2008?
8      A.   We identified lists of questions in
9  order to determine whether or not these -- the
10  transaction was consistent.
11      We --
12      MS. TAGGART:  That's it.
13      Q.   You had lists of questions. Did you
14  identify anything that you believed in this time
15  period between September 22 and the end of
16  September was on its face inconsistent with what
17  the court had been told?
18      MS. TAGGART:  I am going to object
19  now. Form, compound and also privileged.
20  And I am going to instruct not to answer for
21  things that are after the closing that
22  his -- his analysis of it, unless you
23  communicated to someone other than someone
24  at Houlihan and the committee, on work
25  product.

Page 69

BURIAN

1
2      MR. STERN:  You're instructing him not
3  to answer?
4      MS. TAGGART:  Yes.
5      Q.   Let's be clear about this then. In
6  this time period between September 17 -- I am
7  sorry.
8      In the time period between
9  September 22, 2008 and the end of September, did
10  you identify anything on the face of the
11  agreements marked as Exhibit 26 that was
12  inconsistent with what you understood the court
13  had been told at the approval hearing?
14      MS. TAGGART:  Same objections. Form,
15  asked and answered.
16      To the extent, though, that you're
17  asking for any of his analysis after the
18  closing that was not communicated to someone
19  outside Houlihan and the committee, I am
20  going to object on work product and instruct
21  not to answer.
22      MR. STERN:  So you're instructing him
23  not to answer a question concerning whether
24  the final purchase agreement was or was not
25  consistent with what he understood the court

Page 70

BURIAN

1
2  had been told at the sale approval hearing?
3     MS. TAGGART: If you want to ask him
4  today about things like whether it is
5  consistent, but if you are asking for his
6  analysis between September 22nd and the
7  30th, either in Houlihan or with the
8  committee, I think that that's work product
9  and I'm going to instruct not to answer.
10    Q.   Between September 22 and September 30,
11 did you or the committee consider making a
12 motion before Judge Peck for reconsideration of
13 his sale order?
14    MS. TAGGART: I am going to object on
15 form, but also on privilege and instruct not
16 to answer. It is both work product
17 privilege and attomey/client privilege.
18    Q.   Between September 22 -- withdrawn.
19    Did you understand after the sale
20 approval hearing that there was a certain amount
21 of time available to the committee to make a
22 motion for reconsideration of the sale order?
23    MS. TAGGART: Object to form. Calls
24 for a legal conclusion.
25    If you have an independent answer to

Page 71

BURIAN

1
2  that, that's not based on any advice from
3  counsel, go ahead and answer.
4     A.   Generally one can appeal an order, or
5  one can seek reconsideration of an order. At
6  the time, I did not know what time frames --
7  what the rules were for the time frames for
8  reconsideration of orders.
9     Q.   Did you ask anybody?
10    A.   I probably knew at some point, but I
11 didn't remember then.
12    Q.   Then did you ask anybody?
13    MS. TAGGART: Objection. You can say
14 if you asked somebody that wasn't like your
15 counsel, but don't -- I instruct you not to
16 answer whether you asked your counsel that
17 question or anyone of the committee.
18    A.   So did I ask someone what the time
19 frame for reconsideration was that was not a
20 committee member, counsel or financial advisor
21 to the committee?
22    MS. TAGGART: Yes.
23    A.   I don't think so. I can't be sure,
24 but I don't think so. I would say no.
25    Q.   So you don't recall at the time,

Page 72

BURIAN

1
2  between September 22 and the end of September,
3  being aware of the date by which the committee
4  would have to make a motion for reconsideration?
5     A.   I don't recall knowing that
6  information.
7     Q.   What litigation was the committee
8  contemplating in that period?
9     MS. TAGGART: Objection, instruct not
10 to answer on privilege.
11    Q.   Was the committee considering
12 litigation in that period?
13    MS. TAGGART: Objection, instruct not
14 to answer on privilege.
15    MR. STERN: You asserted work product
16 before, and I'm trying to explore whether
17 there is a basis for a work product claim.
18    Q.   In that period between September 22
19 and September 30, to your knowledge, was the
20 committee contemplating litigation in connection
21 with the sale transaction?
22    MS. TAGGART: Same objection, same
23 instruction, don't answer.
24    Q.   Now, based on your review of the final
25 purchase agreement, which is marked as

Page 73

BURIAN

1
2  Exhibit 26, did you identify any specific
3  provision that you felt you needed to discuss
4  with Weil Gotshal because it was inconsistent
5  with what Weil Gotshal had told Judge Peck about
6  the transaction?
7     MS. TAGGART: Objection, I'm going to
8  instruct not to answer, that you could
9  answer, and if you want to ask the
10 question --
11    MR. STERN: Are you instructing?
12    MS. TAGGART: Yes. I'm instructing on
13 that, but I am going to explain why.
14    MR. STERN: If there is an
15 instruction, just an instruction is needed.
16 I don't need a speech.
17    So you are instructing him not to
18 answer?
19    MS. TAGGART: Yes. I am allowed to
20 state the basis of my instruction.
21    MR. STERN: It is not necessary. If
22 you instruct, you can instruct. You don't
23 have to make a speech every time you do the
24 instruction.
25    MS. TAGGART: I am allowed to explain

Page 74

BURIAN
1
2  on the record why I am giving a privilege
3  instruction.
4      MR. STERN: Then we are going to be
5  here longer than three hours.
6      MS. TAGGART: I have reasons why I am
7  giving this privilege instruction. If you
8  would like not to hear them, that's OK.
9      MR. STERN: I just want the
10  instruction.
11      MS. TAGGART: I am instructing not to
12  answer.
13      MR. STERN: You are instructing him
14  not to answer.
15     Q.  Did you ever -- after the closing on
16  September 22, 2008, did you ever have a
17  discussion with anyone from Lehman or Weil or
18  Lazard concerning whether any aspect of the
19  final purchase agreement was inconsistent with
20  what Weil had represented to Judge Peck at the
21  sale approval hearing?
22      MS. TAGGART: You can answer yes or no
23  to that.
24     A.  Yes.
25     Q.  Did you have any such discussion with

Page 75

BURIAN
1
2  Weil or Lehman or Lazard at any time between
3  September 22 and the end of September, 2008?
4     A.  I don't specifically recall the exact
5  dates. Part of the problem here is, you keep on
6  using the phrase "inconsistent." If a contract
7  says securities are being transferred, that's
8  not -- that may not be inconsistent. But if I
9  am not sure whether the securities that were
10  actually transferred were or were not
11  consistent, asking me very narrow questions
12  about did I find an inconsistency in the
13  document doesn't help anything. I honestly
14  don't know if I should answer yes or no to that.
15     Q.  Well, you --
16     A.  I truly am trying to explain. If it
17  helps it go faster, great. If it doesn't, I'll
18  pay for the three seconds.
19         My point is, our questions were not
20  what the document said, but how -- what actually
21  happened pursuant to the documents. So I don't
22  know if it was exactly between the 22nd and
23  23rd, but on multiple occasions we asked people
24  from Lazard and Weil, not the privileged stuff,
25  for reconciliations of, this provision says

Page 76

BURIAN
1
2  this, what happened under that provision in
3  order to determine whether that provision or
4  whether the execution of that provision was
5  consistent or inconsistent.
6         Does that help?
7     Q.  Consistent or inconsistent with what?
8     A.  With what we thought the judge was
9  apprised.
10     Q.  What you thought the judge was told?
11     A.  With what the judge was told.
12         So --
13     Q.  Let me just break this down into two
14  sections. I am going to come to what you are
15  talking about, which is the analysis of the
16  transfers. But right now I'm just focusing on
17  the face of the agreement. And I would like to
18  try to get an answer to that before moving on to
19  the list of questions that you referred to.
20         Did you have any discussion with
21  anyone from Lehman or Weil or Lazard between
22  September 22 and September 30 concerning whether
23  anything on the face of the final agreements,
24  anything on the face of the final agreements was
25  not consistent with what Weil had represented to

Page 77

BURIAN
1
2  the court concerning the agreement?
3     A.  When you say "inconsistent," what you
4  mean is directly opposite?
5     Q.  What do you understand the word
6  "inconsistent" to mean?
7      MS. TAGGART: Object to form.
8  Argumentative.
9     A.  We had many conversations about, that
10  some of these aspects were not described in
11  detail to the court. That does not necessarily
12  mean that they were inconsistent with the
13  transaction that was described to the court.
14     Q.  So tell me about those --
15     A.  That's why I am having trouble with --
16  yes.
17     Q.  Tell me about those discussions in
18  which you discussed whether specifics of the
19  final agreement had been described to the court.
20      MS. TAGGART: This is the same time
21  period and the same people we were speaking
22  about before.
23     A.  Are we talking about during that
24  weekend?
25     Q.  We are talking about from September 22

Page 78

BURIAN

1  BURIAN
2  through the end of September.
3      A.   Oh, we did not have detailed
4  conversations about that, during that period of
5  time.  Again, if it happened between 22nd or the
6  30th.  It may have been early October when the
7  Weil Gotshal lawyers finally got some sleep.  I
8  don't remember exactly what it was, but we would
9  have had more general conversations regarding
10  what exactly happened as opposed to, you know,
11  the more detailed conversations of whether this
12  was described in detail or not described in
13  detail.
14      Q.   How soon after the closing on
15  September 22 did you review the final
16  clarification letter that is Exhibit C to
17  Deposition Exhibit 26?
18      A.   I was pretty tired also.  I don't -- I
19  know I got it Monday, Tuesday or Wednesday.  I
20  can't recall exactly when I read it completely.
21      Q.   Do you think you read it the week of
22  September 22?
23      A.   I certainly read portions of it during
24  that week.
25      Q.   When you did that review of the

Page 79

BURIAN

1  BURIAN
2  clarification letter, were there any provisions
3  of the clarification letter that you thought
4  should be brought to Judge Peck's attention?
5      MS. TAGGART:  I am going to -- this is
6  after the closing?  I am going to object to
7  that answer and instruct not to answer on
8  privilege.
9      If you communicated something about
10  that to somebody, then -- that's outside the
11  committee or your financial advisors, you
12  can answer.
13      A.   It is the same answer in that I read
14  it and had questions.  We were specifically told
15  that our consent was not necessary and
16  therefore, that this clarification letter was
17  not a change.
18      To go and say to the estate that they
19  were wrong or there was a mistake, you know, at
20  that point in time didn't make sense.  It was a
21  question of, great, the transaction closed, tell
22  us what happened and confirm what we were
23  represented.
24      It was more review for the purposes of
25  follow-up, not for -- no one at that point in

Page 80

BURIAN

1  BURIAN
2  time, at least I did not at that point in time
3  have, you know, an "I got you" mentality, is
4  this consistent or inconsistent.  It was, a lot
5  happened.  A lot of people knew about what
6  happened and I don't.  You know, explain it to
7  me, so that I could determine whether it was,
8  you know, consistent or inconsistent.
9      Q.   Who told you that the clarification
10  letter was not a change?
11      MS. TAGGART:  Objection.  You can
12  answer if there is anybody at -- that's not
13  the Houlihan, the committee or your counsel.
14      A.   That Saturday night and Sunday
15  morning, when we got the clarification letter,
16  you know, we asked about it.  We were told that
17  this was a means of execution in order to avoid
18  a double transfer of the securities.
19      The idea was to change the APA from a
20  purchase of assets to a closeout of a repo in a
21  manner consistent with what Ms. Fife had told
22  the court, and that there were, you know, other
23  provisions obviously in order to clarify the
24  APA, and we specifically asked whether you
25  wanted, needed committee consent to anything and

Page 81

BURIAN

1  BURIAN
2  were told no.
3      Q.   OK.  You said you were told.  Who was
4  telling you those things?
5      A.   Well, I said a lot of things in that
6  answer.  So the part about the committee
7  consent, the most important conversation was
8  probably with me and Harvey from Weil Gotshal,
9  where we made it very clear as it got later and
10  later Sunday that we were going to be unable to
11  get a quorum of the committee, and there was a
12  limit to how late we could have calls, and
13  therefore, we were reaching the time where if
14  committee consent were needed, it just would not
15  be available.
16      And then later on, before I left for
17  the evening, we confirmed again, saying is there
18  any need for us to be here, do you need us to
19  sign off on anything, and we were told that the
20  transaction was moving forward and the committee
21  was not necessary.
22      Q.   Who told you that and what did they
23  say?
24      A.   Most of the conversations were in the
25  hallways at Weil, so I'm not sitting down in

Page 82

BURIAN

1  BURIAN
2  organized conference rooms where we introduce
3  ourselves.
4        But the main conversation on both
5  those fronts, both before the committee went to
6  sleep and before I left, were me and, I believe
7  Harvey. You know, Tom Roberts was there. Lori
8  Fife was all around the place. There were
9  corporate lawyers from Weil, but the main
10 conversation -- really the conversation that I
11 have a firm recollection of before I left was me
12 and Harvey.
13    Q.   And in that conversation, did you
14 discuss whether the clarification letter would
15 create any changes that would have to be
16 described to Judge Peck after the closing?
17    A.   Described to Judge Peck after closing?
18    Q.   Yes.
19    A.   No, I didn't have a conversation with
20 Harvey about post-closing disclosure. No.
21    Q.   Did Mr. Miller ever indicate to you
22 that he thought that there was some aspects of
23 the clarification letter that would have to be
24 disclosed to Judge Peck?
25    A.   No.

Page 83

BURIAN

1  BURIAN
2    Q.   At the time, did you believe that any
3  such disclosure would be necessary?
4    A.   At which exact time? I mean there was
5  a --
6    Q.   At the time you had those discussions.
7    A.   I am going to focus on the last
8  conversation, so for your benefit, I actually
9  had a draft of the clarification letter at that
10 time.
11       We asked the question. So obviously
12 it was a thought in my mind as to whether or not
13 this was or was not, but we didn't have the
14 background or the details of what -- not what
15 the words meant, but what was actually happening
16 pursuant to those words, and therefore, I was
17 concerned and asked the question, and that --
18 and the answer I was given was, we are going to
19 sit down with you now and explain it to you.
20       And then we had that explanation, and
21 then we confirmed that in light of the
22 explanation, we are going to go home, do you
23 need us, and we were told no.
24    Q.   OK. Focusing on the words in the
25 agreement, was there anything in the words in

Page 84

BURIAN

1  BURIAN
2  the agreement that you had as of that time that
3  caused you to think that a further disclosure
4  should be made to Judge Peck, concerning the
5  words of the agreement?
6    A.   Concerning the words of the agreement.
7    MS. TAGGART: Object to form.
8    A.   It is too narrow of a question to
9  really answer, because assuming that these words
10 were describing businesses and assets, and as we
11 were explained, then we thought on balance, the
12 clarification letter was fine.
13       Clearly, whether -- clearly a true-up
14 or an explanation of what actually closed would
15 be useful. I didn't form a legal view as to
16 whether and how that would be communicated to
17 Judge Peck.
18    Q.   And the true-up, would that have
19 concerned the identity or value of assets being
20 transferred?
21    MS. TAGGART: Object to form.
22    A.   Look at paragraph 4 on page 3 of the
23 clarification letter.
24    Q.   No. Let's stick with my question.
25    A.   You asked me about the words of the

Page 85

BURIAN

1  BURIAN
2  letter, so I am trying to give you an example.
3        There is a number there on the bottom
4  of page 3 in paragraph 4 which is an aggregate
5  of 1.29 billion dollars. In my experience, it
6  would be highly unlikely if at some point the
7  judge were not informed of what exactly the
8  aggregate consideration was actually paid for
9  the assets.
10       So did I have a problem with the words
11 on the bottom of page 3? No, I didn't think
12 about it then, but you are asking me the
13 question now. Did I have an expectation that
14 they would be disclosed either in the form of
15 filing documents with the court or saying to
16 your Honor, good news, we closed and we got 1.29
17 billion dollars? Of course.
18    Q.   So you are talking about confirmation
19 that the consideration was actually paid?
20    A.   Not confirmation. Just what the
21 number was. Remember at the hearing, Ms. Fife
22 said that there is still open issues. We found
23 out that one of the issues related to, you know,
24 whether it was pre or post commission, and that
25 issue was ultimately settled.

Page 86

BURIAN

1  So I would have expected -- so again,
2  fixing that number was in my view consistent
3  with Ms. Fife's disclosure to the court that
4  there was going to be a relatively modest
5  negotiation on the exact amount. The words
6  here --
7  Q.   You are talking about the appraisal of
8  buildings?
9  A.   Not only the appraisal. It was also
10  whether or not you used the pre-fee or post-fee
11  number.
12  Q.   For the buildings?
13  A.   For the buildings.
14  Q.   So --
15  A.   But they --
16  Q.   Let's go back to your list of
17  questions.
18  MS. TAGGART: He needs to finish.
19  A.   I want to finish answering your
20  question.
21  So your focusing on the words in
22  paragraph 4 is a perfect example where I
23  understood the words, I was not troubled that it
24  was inconsistent with, to use your language, on

Page 87

BURIAN

1  the order itself, but I did have an expectation
2  that there would be disclosure at some point of
3  what actually happened.
4  Q.   Now, let's stick with this agreement
5  that you're looking at, the clarification
6  letter, which is Exhibit C. If you look at
7  page 1, under the first section, purchased
8  assets, you see that in Section I(a)(ii) -- are
9  you with me?
10  A.   I'm listening.
11  Q.   Exhibit C, if you could just look at
12  Exhibit C.
13  A.   Give me one second, please.
14  Yeah. Sorry.
15  Q.   On page 1 of Exhibit C, this is the
16  clarification letter, on the first page under
17  Section I(a)(ii), you see it says, "With respect
18  to Clauses A, D and E of the definition of
19  purchased assets in the original agreement,
20  instead of the items referred to in such
21  clauses, A, the securities owned by LBI and
22  transferred to purchaser or its affiliates under
23  the Barclays repurchase agreement" --
24  A.   Where are you?

Page 88

BURIAN

1  Q.   On the clarification letter --
2  A.   Page 1?
3  Q.   Exhibit C, page 1, the bottom part of
4  the page, Section I(a)(ii).
5  A.   Now I see it, OK.
6  Q.   "With respect to Clauses A, D and E of
7  the definition of purchased assets in the
8  original agreement, instead of the items
9  referred to in such clauses --
10  A.   Right.
11  Q.   -- "A, the securities owned by LBI and
12  transferred to purchaser or its affiliates under
13  the Barclays repurchase agreement as defined
14  below, as specified on Schedule A, previously
15  delivered by seller and accepted by purchaser."
16  That reference to the Barclays repurchase
17  agreement, based on that reference, did you
18  understand that the repurchase agreement
19  collateral would be included as a purchased
20  asset?
21  A.   Yes.
22  Q.   And --
23  A.   I am sorry. We are talking
24  colloquially, not whatever definition we talked

Page 89

BURIAN

1  about earlier.
2  Q.   For now going forward, let's ignore
3  the definitions in the 30(b)(6) notice and we
4  will define things as we go along.
5  A.   OK, OK. So yes, I did.
6  Q.   At the time, did you also, based on
7  your experience, understand that it is common in
8  financings like the Fed repurchase agreement for
9  there to be a cushion or a haircut in valuing
10  the assets in relation to the liabilities?
11  MS. TAGGART: Object to form.
12  MS. SCHAFFER: Objection to form.
13  A.   I was aware that repos, the amount,
14  the amount lent on a repo was usually slightly
15  less than the value of the securities that
16  backed the repo. I know "lent" is not the
17  technical term, it is a purchase and sale, but
18  the amount extended by the repo participants.
19  Q.   So you understood that the value of
20  the securities purchased under the repurchase
21  agreement would typically exceed the amount of
22  cash paid for those securities?
23  A.   Typically exceed.
24  Q.   Typically.

Page 90

BURIAN

1
2   A.   In a normal situation.
3   Q.   And were you aware that the Fed had
4   advance rates or haircuts that it made available
5   publicly?
6        MS. TAGGART: Object to form.
7   Foundation.
8   A.   I was not aware of any public
9   announcement by the Fed as to what their repo
10  advance rates were for these assets.
11  Q.   Were you aware that there were sources
12  by which you could find out the Fed's advance
13  rates?
14       MS. TAGGART: Object to form.
15  Foundation.
16  A.   No.
17  Q.   Did you have any reason to think that
18  those advance rates were a secret?
19       MS. TAGGART: Object to form.
20  Foundation.
21  A.   I didn't think about it. I didn't
22  know one way or the other.
23  Q.   At the time, did you understand that
24  the repo collateral that was being included as a
25  purchased asset included that haircut?

Page 91

BURIAN

1
2        MS. TAGGART: Object to the form.
3   A.   No.
4   Q.   What did you understand all the repo
5   collateral to mean?
6        MS. TAGGART: Object to vague as to
7   time.
8   A.   It is a good point. As of what time?
9   Q.   As of the time you read this
10  agreement.
11  A.   First time, post closing, preclosing?
12  Yesterday?
13  Q.   Post closing, when you read the final
14  clarification letter.
15  A.   Right.
16  Q.   And it states, "The securities owned
17  by LBI and transferred to purchaser or its
18  affiliates under the Barclays repurchase
19  agreement."
20       Did you understand that to mean all of
21  the securities that had been transferred to
22  Barclays in connection with the repurchase
23  agreement?
24       MS. TAGGART: I am still going to have
25  to object, vague as to time, and he can't

Page 92

BURIAN

1
2   answer everything after the closing. Could
3   you be a little more specific.
4   Q.   Is there -- there is an objection, but
5   you can answer.
6        MS. TAGGART: Well, as it is, I would
7   have to do on privilege. I wouldn't allow
8   him to answer the question of anytime that
9   his understanding post closing, of what he
10  thought that it meant.
11       So I guess I have to object and
12  instruct not to answer.
13  Q.   At the time after the closing that you
14  read this agreement, the clarification letter, I
15  think we established that you understood that
16  the repo collateral was being treated as a
17  purchased asset; is that correct?
18  A.   Yes.
19  Q.   Did you understand that the haircut
20  was a part of the repo collateral?
21  A.   I told you before, no. My answer is
22  in my affidavit. I'm not sure I understand --
23  I'm happy to try to get you to ask the question
24  more properly, if you like, but my answer is in
25  my affidavit.

Page 93

BURIAN

1
2        I thought that the repo collateral was
3   less than the value -- the value was less than
4   the amount outstanding on the Barclays repo.
5   Q.   That's not what I am asking. I am not
6   asking what you understood the value to be. I
7   am asking whether you understood that under the
8   clarification letter, all the repo collateral
9   would be treated as a purchased asset.
10  A.   You asked that several times, and I
11  said yes, but then you asked a follow-up
12  question about my understanding of the value.
13  Q.   OK. So the answer is yes?
14  A.   I --
15       MS. TAGGART: He needs to explain it.
16  A.   I understood that the transaction was
17  being modified from an asset purchase agreement
18  where you would have to transfer securities, to
19  a repo closeout in which the assets already held
20  by Barclays would just stay at Barclays and not
21  be sent back pursuant to the closeout of the
22  repo and then transferred again. That was my
23  understanding.
24  Q.   Now, with respect to that category of
25  securities which were to be listed on

Page 94

BURIAN

1
2  Schedule A --
3      A.   Right.
4      Q.   -- was there a condition requiring an
5  agreed valuation for those securities?
6          MS. TAGGART: Object to form. Calls
7  for a legal conclusion.
8      A.   Was there a condition?
9      Q.   Was there a condition in the
10  agreement --
11     A.   In the agreement.
12     Q.   -- calling for a valuation of that
13  class of securities?
14         MS. TAGGART: Also, the document
15  speaks for itself.
16     A.   Well, the clarification letter does
17  not say of a particular amount or a particular
18  value. But there were --
19     Q.   Yeah.
20     A.   But I don't know -- what was the
21  phrase you used before? Integrated document?
22  The -- there was an understanding that we think
23  was a binding understanding of what the
24  aggregate assets could have been.
25         So it is -- so if you are asking me

Page 95

BURIAN

1
2  whether this section says up to or equal to,
3  there is no number in Section 1(a)(ii).
4      Q.   Was -- did Weil Gotshal ever tell the
5  court, to your knowledge, that the final
6  agreement would contain a condition capping the
7  value of the assets Barclays would acquire?
8      A.   There was no discussion of a cap or no
9  cap. I believe the representation was a
10  balanced transaction, and therefore, if assets
11  went up or liabilities went up, things would be
12  imbalanced, so that it was what -- at the
13  Wednesday hearing, my understanding is that, you
14  know, Mr. Miller made very clear that we are
15  getting 1.7 billion, we are giving assets, and
16  there is an assumption of liabilities equal to
17  the assets being taken.
18         And then the Friday hearing, we were
19  told things dropped in value, shorts are being
20  closed out, and now there is going to be a
21  like-for-like exchange on the assets being
22  transferred, and we are still getting our net
23  cash amount.
24         So would -- was there a particular
25  word "cap" used? And did it matter if it was

Page 96

BURIAN

1
2  47.4 or 47.5 or 47.3? That was not my
3  understanding. My understanding was that there
4  was a relationship between liabilities and
5  assets -- liabilities and assets that was very,
6  very firm.
7      Q.   Now, you understand that Weil Gotshal
8  informed the court at the hearing on the 19th
9  that there had been changes in the transaction?
10     A.   Of course.
11     Q.   And you understood that Weil Gotshal
12  had informed the court on the 19th that there
13  was no final agreement yet? No final written
14  agreement?
15         MS. TAGGART: Object to form.
16         MS. SCHAFFER: Objection to form.
17     A.   Yes, I remember a reference to a
18  clarification letter is coming down, was going
19  to come down to court, and when I left, it
20  wasn't there, and I was subsequently told it
21  never appeared.
22     Q.   Do you believe that Weil Gotshal ever
23  used the phrase "balanced transaction" before
24  Judge Peck in describing the deal?
25         MS. TAGGART: Objection, the

Page 97

BURIAN

1
2  transcript will speak for itself.
3      A.   I can go back to the transcript. I
4  was at the Wednesday hearing and it was clear as
5  day to me --
6      Q.   I am talking about the Friday hearing.
7          MS. TAGGART: Wait, let him finish.
8      A.   I need to talk about Wednesday because
9  Friday doesn't happen in a vacuum.
10         Friday Ms. Fife stood up and said,
11  "Your Honor, things have changed. Let me tell
12  you what's changed."
13         And it was on -- it was a continuation
14  of a description on the Wednesday hearing. And
15  that's the way I understood it, and that's the
16  way I believe most people would have understood
17  it.
18     Q.   Did Weil Gotshal ever tell the court
19  at the final approval hearing that there were
20  firm valuations for the classes of assets that
21  were being transferred to Barclays?
22         MS. TAGGART: Object to form. The
23  transcript will speak for itself.
24         MS. SCHAFFER: Objection to form.
25     A.   Let's keep in mind, I haven't read the

Page 98

BURIAN

1  whole transcript, and I told you that I left
2  after what I thought was the most important
3  part, when it was subsequently described to me
4  as being the description of the deal by Weil.
5  So I can't say what occurred after I left and
6  the transcript does speak for itself.
7      I will tell you -- I am sorry, your
8  question was again? I was so focused on the
9  other parts.
10     Q.   Did Weil Gotshal ever tell the court
11  at the final approval hearing that there were
12  firm valuations for the classes of assets that
13  were being transferred to Barclays?
14     A.   The asset purchase agreement talks
15  about book value. We were told it was a book
16  value on the Lehman books, and Lori, Ms. Fife,
17  talked about that we now have assets of 47.4,
18  and to us, that was -- that meant that they
19  thought they had assets of 47.4. It sounded
20  pretty firm to us.
21     Q.   We have covered the 47.4 already.
22  What I am talking about is the entire array of
23  purchased assets. Did Weil Gotshal ever tell
24  the court that there were specific valuations or

Page 99

BURIAN

1  appraisals prepared for each class of purchased
2  assets?
3      MS. TAGGART: Object to form.
4      Q.   To the best of your knowledge.
5      A.   To the best of my knowledge, the
6  appraisals were not -- I don't believe that they
7  described in particular the appraisal on the
8  real estate yet, but Ms. Fife gave the range and
9  informed the court that there may need to be an
10  adjustment.
11     There was no appraisal of the
12  securities. They were described as being worth
13  a particular value, which in the context of the
14  asset purchase agreement meant book value on the
15  Lehman books.
16     And there was specifically no
17  representation about the value of the franchise,
18  which was being paid 250 million dollars, that
19  was a number that was the price, and there was
20  no -- to the best of my knowledge, no
21  representation or appraisal other than either
22  Miller or Ms. Fife saying if the transaction
23  doesn't occur, we think it may be worth
24  significantly less than 250 million, but no

Page 100

BURIAN

1  attempt to value what it was worth if -- you
2  know, in an ordinary course, stable environment.
3      So there were three -- at that time,
4  there were three buckets of assets. One had
5  appraisals, but not finalized. One had a
6  particular value, but not off of an appraisal,
7  and the other one, there was no attempt to make
8  an appraisal.
9      Q.   Let's take a look at the original
10  asset purchase agreement, which is Exhibit A
11  within Deposition Exhibit 26. And I want to
12  point you to page 6, which lists a series of
13  purchased assets.
14     I want to focus on a number of the
15  assets that are described here. If you see,
16  item B refers to all deposits. Do you see that
17  description?
18     A.   Yes.
19     Q.   In your view at the time of the
20  approval hearing, did you believe that that
21  asset category could have value to Barclays?
22     MS. TAGGART: Object to form.
23  Foundation.
24     A.   Sure.

Page 101

BURIAN

1      Q.   Did you have a valuation or any
2  representation concerning the value of that
3  asset category?
4      A.   No.
5      Q.   It was uncertain?
6      A.   Yes.
7      MS. TAGGART: Object to form.
8      Q.   Looking at category C, that refers to
9  "transferred property leases together with all
10  improvements, fixtures and other appurtenances
11  thereto and rights in respect thereof."
12     At the time of the sale approval
13  hearing, did you believe that that asset would
14  have value to Barclays?
15     A.   Yes.
16     Q.   Did you have a valuation for that
17  asset category?
18     A.   It was in the real estate appraisals.
19     Q.   Well, the real estate appraisals
20  related to the headquarters buildings and data
21  centers, correct?
22     A.   Yes.
23     Q.   Was there a valuation for the leases?
24     A.   We need to go back to the definition

Page 102

BURIAN

1  BURIAN
2  of leases.  Are these leases in those buildings?
3  I think that's what they were, right?
4      Q.    Well, there are leases in different
5  parts of the country, San Francisco and a
6  variety of different places.
7      A.    No.  They could have been an asset or
8  a liability frankly.
9      Q.    OK.
10     A.    Because --
11     Q.    Do you know if there was a valuation
12 of that asset category?
13     A.    I do not know.
14     Q.    It was uncertain?
15     A.    I don't know that either.
16     Q.    So you don't know one way or the
17 other?
18         MS. TAGGART:  Object to form.
19     A.    I don't know if it was an asset or a
20 liability.
21     Q.    OK.  Now, looking at category D, this
22 refers to certain securities and positions with
23 a book value as of the date hereof of
24 approximately 70 billion dollars.
25         Did you understand that that provision

Page 103

BURIAN

1  BURIAN
2  was deleted by the clarification letter?
3      A.    It was replaced by the clarification
4  letter, yes.
5      Q.    And so that provision ultimately
6  became irrelevant, correct?
7          MS. TAGGART:  Object to form.
8      A.    I wouldn't say irrelevant.  I would
9  say it wasn't part of the -- it was modified by
10 the clarification letter.
11     Q.    It was modified by the clarification
12 letter.  How did it remain relevant?
13         MS. TAGGART:  Object to form.
14     Q.    To the final agreement if it was
15 modified?
16     A.    Well, it is here, we are reading it,
17 we are talking about it.
18     Q.    How does it relate to the final
19 agreement if it was taken out of the final
20 agreement?
21         MS. TAGGART:  Object to form, asked
22 and answered, argumentative.
23     A.    Because when someone says here are the
24 following changes to the agreement, you need to
25 know what the agreement is to know what the

Page 104

BURIAN

1  BURIAN
2  changes are, right?
3      Q.    As of the final agreement, did this
4  provision D have any effect?
5          MS. TAGGART:  Object to form.
6      Q.    Any binding effect?
7          MS. TAGGART:  Objection to form, calls
8  for a legal conclusion.
9      A.    I told you earlier that when the
10 estate described the changes to the deal, to the
11 court, what the basis was from which those
12 changes are being described was relevant to me.
13 I needed this information to understand the
14 clarification letter, and therefore, the
15 clarification letter -- I am sorry, therefore,
16 this provision is relevant to our conversation.
17     Q.    OK.  So it was relevant insofar as it
18 had some bearing on how the final agreement
19 changed?
20         MS. TAGGART:  Object to form.
21 Mischaracterizes the testimony.
22     Q.    Is that what you are saying?
23     A.    It was relevant to my understanding of
24 the transaction as it existed then, as it
25 existed over that weekend and as it exists now.

Page 105

BURIAN

1  BURIAN
2      Q.    And you -- but you understood that
3  provision D was modified or replaced by the
4  clarification letter?
5      A.    You read to me the clarification
6  letter.  I understand the clarification letter
7  replaces A, D and E with subparagraph I(a)(ii)
8  of the clarification letter.
9      Q.    Turning now to page 7 of the APA, do
10 you see at the top there is a purchased asset G,
11 purchased intellectual property?
12     A.    Yes.
13     Q.    Do you see that?
14     A.    Yes.
15     Q.    At the time, did you believe that that
16 asset category would have value to Barclays?
17     A.    My assumption was there was net value
18 in G to Barclays.
19     Q.    Did you have a valuation for that
20 asset?
21     A.    I did not.
22     Q.    The value was uncertain?
23     A.    Again, I don't know if it was
24 uncertain.  I did not know it.
25     Q.    To you it was uncertain?

27

Page 106

BURIAN

1
2  A.  I did not know the valuation of those
3  assets.
4  Q.  So it was uncertain?
5  MS. TAGGART: Objection, asked and
6  answered.
7  Q.  To you?
8  MS. TAGGART: And object to form. He
9  has already answered this.
10  And I think you don't need to answer
11  it again.
12  MR. STERN: Yeah. That's not a valid
13  objection.
14  Q.  You did not have any certain valuation
15  of this asset category?
16  MS. TAGGART: Objection, asked and
17  answered.
18  Q.  Is that correct?
19  MS. TAGGART: Go ahead and answer it
20  again.
21  A.  I don't recollect any specific
22  valuation of intellectual property in G.
23  Q.  H, purchased contracts. Did you
24  assume that that would have value to Barclays?
25  A.  That's a good one. I did not --

Page 107

BURIAN

1
2  again, I did not know if it was an asset or a
3  liability because of the cure costs. I mean
4  obviously it is listed, Barclays wanted them,
5  you assume people want things. Then again in
6  bankruptcy, debtors tell you you want something
7  because they don't want it. So I couldn't have
8  been sure.
9  Q.  You didn't know one way or the other
10  whether it was a positive or negative value?
11  A.  I assumed it was positive, but I knew
12  there was net liabilities against it.
13  Q.  You didn't have any valuation of that
14  asset category?
15  A.  I did not.
16  Q.  Now, on page 8, page 8, item Q, refers
17  to "all past and present goodwill and other
18  intangible assets associated with or symbolized
19  by the business, including customer and supply
20  lists."
21  Did you at the time assume that that,
22  that asset category would have value to
23  Barclays?
24  A.  Yeah. You were being careful -- my
25  understanding, you were being careful to make

Page 108

BURIAN

1
2  sure that you got the Lehman name and the Lehman
3  fixed income and other relevant trading
4  business, and you wanted to make sure that you
5  got the data that went with the functioning of
6  that business.
7  Q.  And did you have a valuation for that
8  asset category?
9  A.  We were not given a valuation of that
10  category.
11  Q.  As of the sale approval hearing, did
12  you have a valuation for all of the purchased
13  assets listed in the APA?
14  A.  I -- we went through this before. We
15  were not given a valuation prior to this, other
16  than the -- I don't think we got a draft of the
17  real estate appraisals or not. I don't think
18  so. I think the appraisals came in later on
19  Friday. I have to think about it.
20  But we were given, you know, a balance
21  sheet that described some of the purchased
22  assets. But I don't know if that's called a
23  valuation or not.
24  Q.  At the time, did you consider the
25  absence of a valuation of all the purchased

Page 109

BURIAN

1
2  assets to be a reason to object to the sale?
3  A.  We were very concerned about the
4  lack -- not the lack of valuation, but the lack
5  of clarity as to what exactly was included --
6  sorry, not the -- we were concerned that we were
7  unclear, that no one had the time or the
8  willingness to describe to us what exactly was
9  included in many of these categories, so that
10  was a concern.
11  We decided to make that clear to the
12  judge and to neither support nor object, because
13  we didn't have enough information with which to
14  make a reasonable decision.
15  Q.  Did you consider the lack of
16  information that you just described to be a
17  reason to object to the sale?
18  MS. TAGGART: Objection, form, asked
19  and answered.
20  A.  Did I -- you say consider --
21  Q.  Did you believe --
22  A.  Did I conclude it was a reason or did
23  I think about would it be -- did I consider that
24  issue? Which way do you --
25  Q.  Well, did you conclude that the

Page 110

BURIAN

1
2  committee -- withdrawn.
3      Did you personally ever have the view
4  that the committee should object to the sale
5  because of the lack of information that you just
6  described?
7      A.   I did not conclude personally that if
8  I were the committee I would object based on the
9  lack of information.
10     Q.   Isn't it customary in transactions
11 that are submitted for bankruptcy court
12 approval, for lack of information to be a basis
13 for objecting to the transaction?
14     MS. TAGGART: Object to form.
15     A.   Yes.
16     Q.   Why in these circumstances did you
17 conclude personally that if you were the
18 committee, you would not object based on the
19 lack of information here?
20     A.   I also concluded that I would not
21 support. Let's keep that in mind.
22     And the answer to your question is,
23 you have to look at the context of what was
24 happening at the time. We got retained
25 Wednesday night. The first time the debtors had

Page 111

BURIAN

1
2  time to meet with us and explain to us the
3  transaction was on Thursday.
4      Other than the meeting at which we are
5  told about the dire consequences, the meltdown
6  of Lehman internationally, the takeover of
7  Lehman assets by trustees around the world, and
8  all of -- oh, we were also informed that we may
9  have a SIPC trustee coming in to LBI and we
10 should think about it and address that and look
11 over those court orders.
12     The sale hearing was the next day.
13 There was -- this was nothing traditional or
14 common about this practice, and I think if you
15 look at the transcript, you will see our
16 counsel's telling the judge that this kind of
17 running a case just cannot continue and begging
18 him for some semblance of normalcy going
19 forward.
20     So in the context where we were told
21 by people that I respect and people that in
22 retrospect perhaps did not know the transaction
23 that they were purporting -- that they were
24 supporting, that there would be dire
25 consequences to Lehman, it would be affecting 10

Page 112

BURIAN

1
2  to 12 thousand employees, that the federal
3  government, through its agencies, the Federal
4  Reserve Bank and the SEC, were very focused on
5  asking for this transaction to move forward, we
6  thought -- I thought that instead of saying
7  nothing can happen and let everything blow up
8  unless I, Saul Burian, understand every aspect
9  of it, my judgment at the time was that if
10 highly credible people who purported to look
11 into it and know the facts say, let me explain
12 to you what is happening, and if they put those
13 facts on the record of the case and say, this is
14 what is happening, we could trust and verify.
15     We could say, we can't support this,
16 your Honor, because we can't independently tell
17 the court that we know that that is what is
18 happening, but if what is being described is
19 what is happening, then we have no objection,
20 and we will verify that that is what occurred.
21     In those circumstances, at that hour,
22 in light of all the other things that were going
23 on, being very clear this is not the way we
24 would like to handle 363 sales generally, we --
25 I thought that was the better of the two

Page 113

BURIAN

1
2  options.
3      Q.   So despite the lack of information,
4  there were in your view countervailing
5  considerations that in your view counseled
6  against objecting?
7      MS. TAGGART: Object to form.
8  Misstates his testimony.
9      A.   I think you're trying -- I'm not sure
10 why you are trying to summarize what I said.
11 But yes, I think what I said was there were
12 considerations and that in those circumstances,
13 when we had highly credible representations of
14 what was going to occur, we did not feel that we
15 should block the sale or attempt to block the
16 sale, the question of, you know, whether we
17 should attempt to block the sale, based on us
18 independently verifying the facts.
19     Q.   OK. And did that view change between
20 the time of the closing on September 22 and the
21 end of September?
22     MS. TAGGART: Object to form and calls
23 for privilege as said.
24     I am going to object and instruct you
25 not to answer.

Page 114

BURIAN

1
2  Q.  So --
3  A.  What time frame are you asking me?
4  Q.  I am asking you from the closing on
5  September 22 through the end of September,
6  September 30, whether at any time you had a
7  different view than the view you just described.
8      MS. TAGGART:  Object to form.
9      You can try to answer.
10  A.  I don't recollect having a different
11  view that we made a mistake not supporting and
12  not objecting.  I didn't -- I do remember
13  putting on our -- putting on our tickler sheet
14  to verify, trust and verify.
15  Q.  And the items that you needed to
16  verify were those considerations that you
17  described concerning the employees, effect on
18  the financial system; is that right?
19  A.  No.  I never said that.
20  Q.  Let me make sure I understand your
21  previous answer.  As I understood it, you said
22  that various credible people were saying things
23  such as in the absence of the sale, there would
24  be dire consequences for Lehman?
25  A.  That's not what I said.  What I said

Page 115

BURIAN

1
2  was that -- that is also true.  That's not what
3  I said.
4      What I said was credible people were
5  explaining to us what the transaction was and
6  what the import of these documents meant.  So
7  that even though I couldn't verify whether what
8  A or B or C exactly was, I had a degree of
9  comfort that highly credible people were telling
10  me they looked into those questions and this is
11  what it means.  And based on those
12  representations, even though I didn't have
13  enough information to support, I felt
14  comfortable not objecting.
15      It is also true that we were told by a
16  variety of people about the dire consequences to
17  the world as we know it, you know, if the
18  transaction did not close, but that's not what I
19  was referring to, you know, when I talked about
20  relying on third parties.
21  Q.  OK.  But those statements about the
22  dire consequences --
23  A.  I am sorry.  And it also was not what
24  I meant when I said trust and verify.  I was not
25  going to go verify whether the deal didn't

Page 116

BURIAN

1
2  happen, you know, financial markets would have
3  been disturbed.
4      When I said trust and verify, I wanted
5  to verify that the representations as to what
6  the deal was, is, were in fact what occurred in
7  connection with the deal.  I mean it wasn't to
8  figure out whether or not the SEC governors
9  would have preferred the deal to close or not.
10  Commissioners, not governors.
11  Q.  In forming your view that despite the
12  lack of information the committee should not
13  object to the sale, did you take into
14  consideration the other factors that were being
15  described at the time?  In other words, the dire
16  consequences for Lehman, the dire consequences
17  for employees, the consequences for the
18  financial system, the concerns of the federal
19  regulators, did you take those factors into
20  consideration?
21      MS. TAGGART:  Objection to form.  The
22  preface misstated his testimony.
23      But you can answer.
24  A.  I took those into consideration in
25  terms of context and timing.  Not in terms of

Page 117

BURIAN

1
2  substance.  Should I explain?
3  Q.  Yes.  What does that mean?
4  A.  The fact that a regulator or any third
5  party is saying I'm worried about the impact on
6  something else, that's not -- that's extraneous
7  to the bankruptcy estate, is relevant to the
8  speed and timing of the transaction, but would
9  not be a reason to compromise rights and assets
10  of the estate.  My fiduciary duty is to
11  creditors of the Lehman estates.
12      But vis-a-vis timing of hey, there is
13  a reason why there are going to throw some of the
14  procedural protections out the window and do
15  this in an unbelievably quick time frame and
16  instead of doing direct diligence, you are going
17  to rely on other people's representations,
18  there, I did feel that those considerations as
19  to timing were relevant.
20      It was also true that those timing
21  issues also had some impact directly on the
22  Lehman estate, vis-a-vis the desire to transfer
23  customer accounts and bring in a SIPC trustee.
24  The issues relating to other foreign
25  jurisdictions and Lehman operations and a

Page 118

BURIAN

1 concern of would the Lehman franchise be less
2 valuable to Barclays if there were a significant
3 delay, vis-a-vis the retention of employees and
4 the rest.
5      So the factors that you provided were
6 relevant in the time frame and procedural
7 context of the matter, but would not alone have
8 been enough to say, sure, you know, we don't
9 care what happens, or give away estate assets,
10 or the estate should assume liabilities it
11 wouldn't otherwise have to assume.
12      You seem confused. I know I'm not
13 supposed to help, but for instance --
14      Q.   No, just --
15      A.   -- one could have asked for an
16 adjournment of the hearing, right? My options,
17 if I were the committee, is not limited to
18 support or object. And whether we looked for an
19 adjournment to delay consideration of the
20 hearing was impacted by all those issues I
21 raised in my answer.
22      Q.   OK. Now, going back to the APA,
23 page 12, on page 12, there is a continuation of
24 a list of assumed liabilities, and item 1 lists

Page 119

BURIAN

1 all short positions. Do you see that?
2      A.   Yes.
3      Q.   Now, at the time in September of 2008,
4 did you recognize that those short positions
5 might have been more profitable to Barclays to
6 own than the long positions?
7          MS. TAGGART: Object to form.
8      A.   Did I believe that the short positions
9 were more profitable than the longs?
10      Q.   Did you consider whether in those
11 circumstances, in that week of September 2008,
12 the short positions might be more profitable to
13 own than the long positions? Did you consider
14 that?
15      A.   We were told the opposite.
16      Q.   Who told you that?
17      A.   These were listed as liabilities, and
18 my understanding when we met that Thursday at
19 Weil, when the deal was presented to us, whether
20 it was by Harvey Miller or by one of his
21 partners or by Mark Shapiro or Jim Seery, it was
22 a give and take.
23      We were told that Barclays was taking
24 all the short positions related to the book, and

Page 120

BURIAN

1 these were liabilities and obligations that
2 you -- that Barclays, not you -- that Barclays
3 was taking, and therefore, we needed to look at
4 the net impact of the transaction, which is
5 essentially even exchange.
6      The context of that conversation is
7 that these positions were contras and not
8 positives.
9      Q.   I understand these positions were
10 listed as liabilities, but you understood at the
11 time what a short position was?
12      A.   I understand what a short position is.
13      Q.   And did you understand that a short
14 position in certain circumstances may be more
15 profitable than a long position?
16      A.   The -- this is not just shorts,
17 though. These are also repos, obligations.
18 So --
19      Q.   I understand. I am focusing on short
20 positions.
21      A.   Theoretically could a short position
22 be positive? Yes. But then theoretically a
23 long could be negative, if it is an option and
24 not ownership of that security.

Page 121

BURIAN

1      By the way, can we back up. This is
2 as of when? Because we were told that all these
3 shorts were closed out and that you didn't take
4 any shorts. So is this before Thursday or after
5 Thursday, the 18th?
6      Q.   Well, I'm just asking -- I was asking
7 about your understanding based on reading the
8 agreement.
9      A.   But when? My understanding reading
10 the agreement on Friday --
11      Q.   Well, you understand that the short
12 positions ultimately were not available, is what
13 you are saying?
14      A.   My understanding is that Barclays did
15 not take any short positions.
16      Q.   Right. So my question was simply
17 whether at one point when it was contemplated
18 that Barclays would take short positions,
19 whether those positions might be under certain
20 circumstances more valuable than the long
21 positions.
22          MS. TAGGART: Object to form. Asked
23 and answered.
24      Q.   I agree.

Page 122

BURIAN

1
2  A.  Specifically the answer is -- now you
3  are asking more generally as opposed to
4  specifically.  You said before could a -- let me
5  finish -- could a short be more valuable than a
6  long, but now you are asking me whether I
7  considered whether the short positions were more
8  valuable than the long positions.
9     No, that was not our contemplation and
10 not what we thought.
11    Q.  You didn't recognize at the time that
12 that was a possibility?
13    MS. TAGGART:  Objection, asked and
14 answered.  Object to form.
15    A.  In the aggregate, we were specifically
16 told that the aggregate of paragraph I was a
17 69 billion dollars contra, and the aggregate of
18 paragraph -- the definition of the purchased
19 assets you showed me before, was approximately
20 170 billion positive.
21    So could there have been a single
22 position that was a positive versus a negative?
23 But in the aggregate this was a one --
24 approximately a 1 billion dollar positive
25 differential.

Page 123

BURIAN

1
2  Q.  I understand that you were told there
3  was a liability, but my question was simply
4  whether short positions, short positions in the
5  aggregate could have had more positive value
6  under the circumstances than the long positions.
7  A.  No.
8     MS. TAGGART:  Object to form.  Asked
9  and answered.
10 Q.  That's not -- that was impossible?
11 A.  That was not even a remote
12 contemplation at the time in any of the meetings
13 or discussions that I attended.  Nor would that
14 be consistent with anything that was told to us
15 or explained to us.
16    And this is a perfect example of what
17 I described before, which is trust and verify.
18 Which is read the -- read the agreement and
19 understand what it says, but not have the
20 opportunity to look beneath those words to look
21 at and diligence it, and why we took no position
22 at the hearing.
23 Q.  So let's move on to verification.  You
24 did do some verification work before the
25 closing; is that right?

Page 124

BURIAN

1
2  MS. TAGGART:  Object to form.
3  A.  We attempted to do some verification
4  work.
5  Q.  You attempted to do some verification
6  work before the closing, correct?
7  A.  Correct.
8  Q.  Time was limited, correct?
9  A.  Time and cooperation.
10 Q.  Whose cooperation was limited?
11 A.  Barclays and Lehman.
12 Q.  What did Barclays fail to provide to
13 you that you requested of Barclays?
14 A.  We requested innumerable times for a
15 complete list of what assets were transferring,
16 what liabilities were being assumed and what the
17 marked values, the book values were, and as of
18 what dates those marks related to.
19 Q.  Are you talking about the Lehman
20 marks?
21 A.  I'm talking about the marks relevant
22 to the transfer of those assets.  Our
23 understanding was that Barclays was not marking
24 the Lehman assets and that the book value
25 references in the contract were the Lehman

Page 125

BURIAN

1
2  marks.
3     So when Lori Fife, Ms. Fife stood up
4  in court and says a number, that was the Lehman
5  marks against which these transfers were being
6  measured.
7  Q.  So just to be clear, are you saying
8  that you made specific requests from Barclays
9  for information concerning Lehman's marks?
10 A.  To be clear, we made specific requests
11 of anyone and everyone who would listen to us,
12 sort of like the Old Testament prophet screaming
13 out in the wild and no one listening, saying
14 could we please have some understanding, a list
15 of what assets are moving, to whom they are
16 moving and how they are marked.
17 Q.  And you're saying you did not receive
18 that information?
19 A.  We did not receive that information.
20 Well, what time period, sir?
21 Q.  Well, I am focusing on the time period
22 between the sale approval hearing and the
23 closing.
24 A.  That is correct.
25    Oh, what I should actually say --

Page 126

BURIAN

1
2    Q.   There is no question.
3    A.   I know, but I am finishing my answer.
4    What I should actually say is I never got
5    anything that was so described to me or Houlihan
6    as representing such a list.
7    Q.   Let's mark this as the next exhibit.
8    (Exhibit 460-B, document Bates stamped
9    WGM Lehman E1592 with attachments marked for
10   identification, as of this date.)
11   (Exhibit 461-B, document Bates stamped
12   HLHZ11913 with attachment marked for
13   identification, as of this date.)
14   Q.   Let me show you what we have marked as
15   461-B. And have -- 461-B in front of you.
16   A.   This one?
17   Q.   Yes, take 461-B. We will get to the
18   others.
19        Do you see that 461-B is a document
20   dated Sunday, September 21, 2008, 11:34 a.m.,
21   addressed from Brian Kelly at Milbank to Ann
22   Comisky and Brian -- and Michael Fazio?
23   A.   Yes.
24   Q.   And what do you understand this
25   material to be?

Page 127

BURIAN

1
2    A.   The material attached to the e-mail?
3    MS. TAGGART:  Objection, vague as to
4    time.  Do you mean sitting here today or
5    then?
6    Q.   Do you recall reviewing this material
7    at the time it was received on September 21?
8    A.   No.
9    Q.   Do you know whether others at Houlihan
10   did?
11   A.   Yes.
12   Q.   Who conducted that review?
13   A.   For the most part, Michael Livanos.
14   Q.   And did Mr. Livanos report to you
15   concerning his review of this information?
16   MS. TAGGART:  This is just asking for
17   a yes or no.
18   A.   Who is "you"?
19   MS. TAGGART:  So I think he is
20   asking --
21   Q.   You personally.
22   MS. TAGGART:  -- Mike Livanos to you,
23   Saul Burian?
24   A.   Me personally.
25   Q.   Yeah.

Page 128

BURIAN

1
2    A.   Not as a 30(b) rep.
3        No.
4    Q.   Did Mr. Livanos report to others at
5    Houlihan concerning the information contained in
6    this exhibit?
7    A.   Yes.
8    Q.   And what did he report?
9    MS. TAGGART:  I am going to object and
10   I think that calls for privileged
11   information on work product. I am willing
12   to have some testimony about that
13   discussion, but I am going to need to have
14   an agreement from you that that doesn't
15   waive privilege. I think there is a work
16   product privilege that can be waived about
17   that discussion.
18   THE WITNESS:  So I can answer, but it
19   doesn't --
20   MS. TAGGART:  I need an agreement from
21   him that that's not going to waive
22   privilege.
23   MR. STERN:  I have no idea what you
24   are talking about with privilege.
25   Q.   All I am asking is, with respect to

Page 129

BURIAN

1
2    the information that's in Exhibit 461-B, if
3    Houlihan ever developed an understanding
4    concerning what this information was.
5    MS. TAGGART:  That's a different
6    question. I would object to form.
7        You can answer that yes or no to the
8    extent you understand it.
9    A.   Yes.
10   Q.   What was that understanding?
11   MS. TAGGART:  That's -- I am sorry,
12   objection to anything past the closing. You
13   can say what was your understanding of
14   Houlihan's understanding preclosing of what
15   this information was.
16   A.   It changed over time. But our
17   understanding was that this was a preliminary
18   list of securities as of an indeterminate date
19   that may or may not go over to Barclays with
20   marks that were as of a -- that were as of a
21   date that we weren't sure. At different times,
22   Monday, Tuesday, Wednesday or Thursday, unclear
23   as to what the marks represented.
24        So that's what we understood this
25   document to be.

Page 130

BURIAN

1
2    MR. STERN: I think we need to change
3  the tape, so we will take a short break.
4    THE VIDEOGRAPHER: That is the end of
5  tape number 2. The time is now 12:20 p.m.
6  We are now off the record.
7    (Recess)
8    THE VIDEOGRAPHER: This is the start
9  of tape number 3. The time is 12:33 p.m.
10  We are now back on the record.
11  BY MR. STERN:
12    Q.  Let's go back to Exhibit 461-B. As of
13  Sunday, September 21, did you or anyone at
14  Houlihan understand this listing to relate to
15  the Barclays replacement of the Fed repo?
16    A.  Relate? Yes.
17    Q.  And how did it relate?
18    A.  We were told that this was a likely
19  incomplete list with old marks regarding a
20  variety of assets that were going to be retained
21  or transferred to Barclays as part of the
22  transaction.
23    Q.  And who told you that?
24    A.  There were -- I don't remember
25  specifically if it was, you know, in connection

Page 131

BURIAN

1
2  with the e-mail to Milbank, but there was
3  clearly conversations with the Lehman team that
4  were trying to reconcile the securities.
5    What you need to know for context to
6  answer that question is, I believe Saturday
7  night and Sunday morning there seemed to be a
8  surprisingly large amount of confusion as to
9  what the security repos -- securities subject to
10  repos were and an effort to determine them, I
11  call them younger kids but younger professionals
12  trying to compile lists, go down to the DTC and
13  otherwise try to figure it out.
14    At some point on Sunday, through
15  Milbank, we were given this and said we are
16  trying to reconcile it, but this is what we
17  currently have, but don't rely on the marks
18  because they are old.
19    Q.  Who said the marks were old?
20    A.  There were two conversations with Jim
21  Seery and his team, one in which we -- I believe
22  there were two conversations between Seery and
23  his team, one in which we got this or were told
24  it was coming. That meeting was rushed, and I
25  was told it was part of the normal hubbub and

Page 132

BURIAN

1
2  therefore wasn't complete.
3    And then after we got this, several
4  hours later towards the -- later in the night,
5  there was a follow-up conversation with Mike
6  Fazio and Brad Geer where Jim Seery and perhaps
7  others from his team saying whoa, whoa, whoa,
8  what exactly is this, because we have a lot of
9  questions about it.
10    Q.  This is on the evening of Sunday, the
11  21st?
12    A.  This is Monday morning, Sunday night.
13    Q.  Looking at the first page under the
14  tab A, do you see there is a column labeled
15  "Collateral" and a column labeled "Market
16  Value"?
17    A.  Yes.
18    Q.  What did you understand these figures
19  to represent?
20    MS. TAGGART: Objection, can you
21  specify whether it is in his personal
22  capacity or Houlihan's capacity that you ask
23  that?
24    Q.  First personally, did you have any
25  understanding concerning what these figures

Page 133

BURIAN

1
2  represented?
3    A.  I don't remember seeing these figures
4  that night. It never percolated up to me.
5    Q.  Did Houlihan, to your knowledge, have
6  an understanding concerning what these figures
7  represented?
8    A.  Well, we had -- I can tell you what
9  our understanding was. I can't tell you that we
10  understood correctly. We were -- our
11  understanding was that this was the roll-up of
12  the four different classes of assets based on
13  Lehman's marks as of an indeterminate date or
14  time.
15    Q.  Which four different classes of
16  assets?
17    A.  Well, the thing you showed me, the
18  page you showed me, has four lists of assets,
19  Fed collateral, DTC 074, DTC 636 and TP cash,
20  and it added up to 49,902,000 and change.
21    So our understanding was that -- we
22  didn't -- I don't believe anyone at Houlihan
23  re-added all the columns, but our understanding
24  was that this summary page was the roll-up of
25  all the pages thereafter which said that these

Page 134

BURIAN

1  BURIAN
2  securities listed had a market value as of some
3  date, based on someone's marking, of 49,902,924.
4      Q.   Staying with this page, you see there
5  is a line that says TP cash, 7 billion?
6      A.   Yes.
7      Q.   What was your understanding at the
8  time of what that meant?
9      MS. TAGGART: Personally or Houlihan?
10     Q.   Start personally.
11     A.   Again, I hadn't seen this page. So
12  you may be better off --
13     Q.   All right. Did Houlihan have an
14  understanding at the time as to what that meant?
15     A.   No.
16     Q.   Did Houlihan ask anybody what it
17  meant?
18     A.   We did.
19     Q.   What were you told?
20     A.   Well, there are two conversations that
21  were important. One was after this was
22  reviewed, when Mike Fazio and Brad Geer sat down
23  and tried to get an explanation, and the other
24  one, which was the more important one, where I
25  got pulled into the room and participated in

Page 135

BURIAN

1  BURIAN
2  that conversation about what the transaction was
3  and what we believed it was shortly before
4  closing.
5      Q.   I'm focusing on the 7 billion dollar
6  figure. Can you tell me what Houlihan was told
7  that represented?
8      A.   Again, I can't say specifically this
9  7 billion, what it represented. I can tell you
10  that when we -- before we left that night, we
11  were given an explanation of why there was cash
12  being delivered, and our understanding was this
13  cash was in replacement of securities that were
14  or should have been in the repo securities but
15  somehow or another got sold or converted to
16  cash, and therefore, to make Barclays whole,
17  they were merely, in lieu of giving the
18  securities, giving the cash that represented --
19  that were the proceeds of those securities.
20     Q.   You're sure that's precisely what you
21  were told?
22     MS. TAGGART: Objection, object to
23  form. Argumentative.
24     I guess you can answer.
25     A.   Am I sure that's precisely what I was

Page 136

BURIAN

1  told? Again, I didn't see this 7 million (sic)
2  dollar number on this page that night, so I am
3  answering generally about why was there cash
4  included in the exchange as opposed to this
5  particular number.
6      And I am fairly comfortable that my
7  recollection is that I was told that the reason
8  cash was included when cash was not otherwise
9  part of the asset purchase agreement, was
10  because it was in substitution of securities
11  that were liquidated.
12     Q.   You are fairly comfortable but are you
13  sure that that is what you were told?
14     MS. TAGGART: Objection, object to
15  form. Asked and answered, argumentative.
16     If you want to answer again, go ahead.
17     A.   Am I sure if that's what I was told.
18  Yeah, I mean -- there could have been a piece
19  maybe that a security wasn't sold but somehow
20  got held up in transfer, so maybe it was not
21  directly the proceeds of those transfers, but I
22  think that -- I have to go back and look at the
23  manila folder and remind myself exactly how it
24  was described, but it was either proceeds of

Page 137

BURIAN

1  BURIAN
2  securities that were supposed to be part of it,
3  or cash reflecting securities that were not in
4  that bucket anymore for some other reason.
5      Q.   OK. So it was either or the other?
6      A.   I -- my impression was mostly
7  proceeds, but I'm not -- I can't be sure.
8      Q.   OK. Did Houlihan understand that the
9  marks in this document 461-B were marks that
10  JP Morgan had put on these securities?
11     A.   Absolutely not.
12     Q.   You had no understanding one way or
13  the other?
14     A.   No, no. We understood, we believed at
15  the time that these came off the Lehman
16  system -- now, maybe you are telling me the
17  Lehman system is derivative of JP Morgan, I
18  don't know. But the words "JP Morgan" and
19  "marks" were never in the same sentence, to the
20  best of my knowledge.
21     Q.   So as far as you knew on the evening
22  of the 21st, the morning of the 22nd, the market
23  values listed here were from Lehman's books and
24  records?
25     MS. TAGGART: Personal or Houlihan?

Page 138

BURIAN

1
2    A.    No.
3    Q.    Houlihan.
4    A.    No.  As I said to you before, we were
5    specifically told that these were not the market
6    values of these assets as of that time.
7    Q.    And who specifically told you that?
8    A.    The last conversation on which we
9    relied on was a conversation with Michael Klein,
10   Harvey Miller, I believe Tom Roberts was there,
11   Mike Fazio.
12   Q.    Did you ask what the source of these
13   market value figures was?
14   A.    Houlihan did ask.
15   Q.    And what was Houlihan told?
16   A.    They were told these were old marks
17   from Lehman of securities that may or may not be
18   still at Lehman.
19   Q.    Did you understand that this was a
20   list of securities that Barclays was to have
21   received in connection with replacing the Fed
22   repurchase agreement?
23   A.    That is a nuance or detail that I am
24   not 100 percent sure.  The conversations were
25   not about the repo.  The conversations were what

Page 139

BURIAN

1
2    is Barclays getting.
3    Obviously, when you look at the
4    clarification letter, which we did not have at
5    the time, you could say these were backing the
6    repo or should have been backing the repo in the
7    sense of the cash substitution, but I don't
8    think that we understood Sunday morning that
9    nuance.
10   Our understanding was this was a list
11   of assets that was a working list of assets that
12   some large portion of were going to be
13   transferred to Barclays.
14   Q.    You didn't have a draft clarification
15   letter by the time you left in the early morning
16   of September 22?
17   A.    Oh, yeah, by then I did.  But you were
18   asking about our initial understanding of what
19   this document represented, what this list of
20   securities represented.  And that's what I was
21   answering.
22   Q.    Did there ever come a time before the
23   closing when Houlihan understood that this list
24   was intended to represent securities to be
25   transferred to Barclays in connection with

Page 140

BURIAN

1
2    replacing the Fed repo?
3    A.    No.
4    Q.    Did anyone from Houlihan ever sit down
5    with anybody from Lehman or Barclays or Weil or
6    Lazard and review this list with them?
7    A.    We tried.  There was a very excited
8    environment at the time.  There were huge
9    meetings that we were asked not to attend that
10   appeared to be or were described to us to relate
11   to JP Morgan holding back -- someone used the
12   word "stealing," someone used the word
13   "selling," someone used the word "set offing" --
14   securities that we were led to believe or we
15   thought meant some of these securities, and with
16   all the hubbub going around about what actually
17   was being transferred, in that context, we would
18   say to people what -- where are you, what are
19   being transferred?
20   At one point in time, we finally did,
21   we, Houlihan finally did sit down with Jim Seery
22   and with -- there were maybe some of his junior
23   people there, and said OK, we got this list, we
24   have looked at this list, we are confused by the
25   list, explain it to us.

Page 141

BURIAN

1
2    And we did make several comments about
3    the list, and he responded.  It was a relatively
4    short, though, almost like doing us a favor by
5    giving us -- you know, giving us some time on
6    that busy night.
7    Q.    What comments did you make about the
8    list, or did Houlihan make about the list?
9    A.    I was not --
10   Q.    What comments did Houlihan make about
11   the list?
12   A.    Right.  So I will give you the
13   substance of the comments, as they percolated up
14   to me generally, and in light of my following up
15   with them.
16   But our comments were, do we now know
17   which -- whether this is the list of
18   securities -- have you been able to determine
19   what actually is there and being transferred?
20   Is this something we can rely on as the core
21   business securities?
22   The second issue was -- and this was
23   the main issue -- when were these marks as of?
24   And our understanding was that these marks were
25   from earlier in the week.  Can you explain all

36

Page 142

BURIAN

1 the noise we are hearing about how these
2 securities dropped in value? Because when you
3 look at a variety of the categories, it looks
4 like they went up in value or stayed stable, so
5 can you explain to us what is going on. What is
6 the concern, what is the give and take, what's
7 going on.
8 Q. And who had this conversation?
9 A. This was Brad Geer and Mike Fazio with
10 Jim Seery and his juniors.
11 Q. Now --
12 A. Well, you asked generally did we have
13 any -- that percolated up to me, and then that
14 led to several hours later, you know, my telling
15 Harvey, I know we are very busy, I know there is
16 a lot going on and we are only the committee,
17 but we need an explanation of what is happening,
18 partly because of concerns that were percolating
19 up about what's going on.
20 And that led to what we still believe
21 is the single most important conversation, the
22 one with the principals right before we left.
23 Q. That was a conversation with Harvey
24 Miller?

Page 143

BURIAN

1 A. Harvey Miller, Michael Klein,
2 et cetera.
3 Q. Anybody else?
4 A. I told you before I believe Tom
5 Roberts was there. I believe Lori Fife was in
6 and out. Mike Fazio was the Houlihan person
7 with me.
8 Q. Now, before you left the building,
9 before you left Weil in the early morning hours
10 of September 22 --
11 A. It could have been late morning hours.
12 Q. Or late morning hours, were -- was
13 Houlihan invited to stay through the closing, in
14 order to review and finalize the schedules?
15 A. Definitely not to review and finalize
16 schedules. Was I invited to stay? I was
17 welcome to eat as much pizza as I liked. I
18 can't tell you how many football games I watched
19 during the first month of Lehman sitting in
20 rooms being ignored by lawyers, you know,
21 starting on the 19th through October.
22 We were specifically disinvited from
23 many of the important meetings. We asked to sit
24 during the negotiation by Tom Roberts of the

Page 144

BURIAN

1 clarification letter, where the estate was going
2 through the issues, and we were told you are not
3 permitted to.
4 I walked into one of the very large
5 meetings and just sat down in a chair and
6 listened to the SEC, to the DTC, Barclays, and
7 Lehman and JP Morgan go in and out, everybody
8 yelling at JP Morgan about issues. I certainly
9 was not invited, but they were not so impolite
10 as to demand that I leave. Although there was a
11 time when people took a break, and we purposely
12 stayed in our seat so we didn't have to walk in
13 the room again and be asked to leave.
14 So to say invited is a tough one. We
15 spent so much time begging to be paid attention
16 to, that to them, if we wanted to sit there, we
17 were welcome, but we were not included in
18 discussions. So --
19 MR. STERN: Mark this as the next
20 exhibit, please.
21 A. If you are asking me was I invited, I
22 would say no. Was I welcome to hang around, the
23 answer was yes.
24 (Exhibit 462-B, document Bates stamped

Page 145

BURIAN

1 MTHM5739 marked for identification, as of
2 this date.)
3 Q. We have marked as Exhibit 462-B an
4 e-mail exchange between Harvey Miller and Luc
5 Despins and others, and I am just going to focus
6 on one part of the message from Harvey Miller.
7 In his e-mail to Mr. Despins and
8 others, September 25, 10:28 a.m., he states,
9 "You were invited to stay Monday a.m. as the
10 schedules were reviewed and finalized."
11 Is it your testimony that that is not
12 accurate?
13 A. My testimony is I'm defining what
14 "invited" means. Harvey was not involved in --
15 to the best of my knowledge, in these schedules,
16 and I think that anyone who was there would
17 recollect that we were certainly not involved or
18 invited to finalize schedules and be there.
19 I think that we were welcome to remain
20 on the floor, to walk around the 25th conference
21 center, eat as much popcorn as we liked, and to
22 see people exchanging schedules or signing
23 documents, and I was clear that I felt welcome
24 to stay, but was I invited to actively

Page 146

BURIAN

1 participate in the negotiation or determination
2 or compilation of these documents? Absolutely
3 not.
4    Q.   Do you deny that the committee was
5 given an opportunity to review the schedules
6 that were reviewed in connection with the
7 closing?
8    MS. TAGGART: Object to form, asked
9 and answered.
10    A.   I don't deny. I am telling you that
11 we did not get them until after the closing.
12 Hard to review what you don't have.
13    Q.   But you don't deny that the committee
14 was given that opportunity?
15    A.   Opportunity to review what I don't
16 have?
17    MS. TAGGART: Object to form. Asked
18 and answered.
19    A.   I'll -- we were not given the
20 opportunity to review the schedules prior to
21 closing.
22    Q.   So it is your testimony that you were
23 not given an opportunity to stay for the
24 closing?

Page 147

BURIAN

1    MS. TAGGART: Objection to form.
2 Asked and answered.
3    A.   I was given the opportunity to sit in
4 a room in the Weil Gotshal building through the
5 time at which the closing purportedly occurred.
6    Q.   And do you know whether in connection
7 with that closing schedules were reviewed?
8    A.   I am sure that schedules -- well, I
9 don't know, but I would assume that since
10 schedules were prepared, that someone in many of
11 the rooms that we were told that we couldn't go
12 into were reviewing schedules. As a matter of
13 fact, as you know --
14    Q.   Let me just -- were you told that you
15 couldn't attend the closing?
16    MS. TAGGART: Object to form. Asked
17 and answered.
18    A.   Can you please define exactly where
19 the closing occurred and exactly at what time it
20 occurred, so that I can then answer whether I
21 happened to have been in that vicinity or could
22 have been in that vicinity at that time?
23    Was it in Conference Room 25A, 25B?
24 Was it C?

Page 148

BURIAN

1    I was allowed to go in the kitchen. I
2 had all the popcorn and pretzels that I wanted.
3 Was that where the closing occurred, sir?
4    Q.   You know that the closing occurred
5 after you left the building, right?
6    A.   I was told that it occurred.
7    Q.   Did anybody tell you that you couldn't
8 remain and attend the closing? Did anybody tell
9 you that?
10    A.   No one told me that I could attend the
11 closing.
12    Q.   But nobody told you you couldn't
13 either?
14    A.   I am telling you point blank, as
15 clearly as I can without legal manipulation of
16 words, that I felt perfectly comfortable
17 remaining at Weil Gotshal for as long as I
18 liked.
19    Q.   OK.
20    A.   I probably could be there until now
21 and grow old in a conference room if I could
22 have kept myself occupied and if pretzels and
23 popcorn had enough nutrients to keep me healthy.
24    Q.   Let's look at Exhibit 460-B.

Page 149

BURIAN

1    A.   Which one is that, sir?
2    Q.   There you go.
3    A.   In full answer to my question, I was
4 specifically told that my presence was not
5 necessary at the closing.
6    Q.   Who told you that? Who told you that?
7    A.   Mr. Miller.
8    Q.   Did you agree?
9    A.   Did I agree that my presence wasn't
10 necessary at the closing? I didn't have a firm
11 view. I asked the question, was given the
12 answer, and therefore went home.
13    Q.   Let's look at Exhibit 460-B. Do you
14 recognize this material as schedules that
15 Milbank received and that Houlihan ultimately
16 received after the closing?
17    A.   You will notice it is dated the 25th,
18 which is, you know, Thursday after the Monday
19 closing. You will notice that it appears that
20 it was sent over and that even then, it was
21 still represented as not the actual list of the
22 assets that were transferred to Barclays.
23    So five days later, we still did not
24 have a list of what was transferred.

Page 150

BURIAN

1
2     Q.   If you can answer my question, we will
3  get through this a lot faster.
4        My question is, do you recognize this
5  material as including schedules that Milbank
6  received and Houlihan ultimately received after
7  the closing?
8     A.   Are you asking me if I got this after
9  the closing?
10    Q.   Did Houlihan receive this?
11    A.   I can't look at every single page, but
12  yes, Houlihan got a list from Milbank of what
13  Weil sent to Milbank of the not final list of
14  assets that purportedly went across or in the
15  repo transaction remained at Barclays.
16    Q.   Did Houlihan understand what these
17  schedules were?
18    A.   I told you that we understood them to
19  be exactly what I said, a list of indeterminate
20  date with indeterminate marks as of an unknown
21  date of assets that comprise -- that was not the
22  final list of what went over to Barclays.
23    Q.   Did you understand -- did Houlihan
24  understand that the first attachment was a
25  preliminary version of Schedule A to the

Page 151

BURIAN

1
2  clarification letter?
3     A.   We understood that the first part was
4  a preliminary schedule of Schedule A to the
5  clarification letter relating to the collateral
6  on the repo.
7     Q.   Did Houlihan understand that the
8  second part was a preliminary Schedule B to the
9  clarification letter?
10    A.   We did.
11    Q.   And did Houlihan ask any questions of
12  Lehman concerning these lists?
13    A.   I can't tell you it was directly
14  related to this list, but it is the same
15  questions that we asked repeatedly over that
16  time frame from the closing until today.
17    Q.   Did Houlihan compare the Schedule A
18  attached to 460-B to the Schedule A it
19  previously received as reflected in 461-B?
20        MS. TAGGART:  When?
21        Wait.  Don't answer yet.
22        When?  Are you saying at any time?  I
23  need to know for my privilege objection.
24    Q.   Did Houlihan compare the Schedule A in
25  460-B and Schedule A in 461-B at any time after

Page 152

BURIAN

1
2  Houlihan received 460-B?
3        MS. TAGGART:  I will object on work
4  product grounds and instruct you not to
5  answer as to the internal analysis that
6  Houlihan did of the schedules.
7        MR. STERN:  Why don't we stop for
8  lunch.  Let's go off the record.
9        THE VIDEOGRAPHER:  Time is 1:01 p.m.
10  We are now off the record.
11        (Recess)
12        (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 153

BURIAN

1
2        AFTERNOON SESSION
3           1:41 p.m.
4        THE VIDEOGRAPHER:  The time is the
5  time is now 1:41 p.m.  We are now back on
6  the record.
7  BY MR. STERN:
8     Q.   Mr. Burian, this morning, I believe
9  you referred to your approach as one of trust
10  and verify.  Do I have that right?
11    A.   Correct.
12    Q.   What did Houlihan do after the
13  closing to verify the information it had been
14  given?
15    A.   In what period of time?
16    Q.   After the closing.
17    A.   Well, there are different periods of
18  time.
19    Q.   Go chronologically.?
20        MS. TAGGART:  Well, object to form.
21        You can answer what you did with
22  anyone outside of Houlihan or the committee,
23  and why don't we take it up through
24  December, and if he wants to go on after
25  that, we will take it one at a time.

Page 154

BURIAN

1
2    A.    The main thing we did was to request
3  reconciliation from the company as to what
4  exactly occurred in order to be able to verify
5  that the representations were true and that what
6  happened was consistent with the court order.
7        At that point in time, we fully
8  expected -- we did not expect there to be any
9  problems.  We thought that what we were
10  concerned about, there must be logical
11  answers for and there was not great concern
12  or urgency and we also knew that as an
13  official committee and a more normal
14  environment, we would have the opportunity,
15  the debtor would be responsive now that the
16  crisis was over.
17        So for the most part, in the October
18  and November time frame, it was mainly asking
19  for reconciliations of and getting, you know, a
20  better understanding of what exactly Barclays
21  got and did not get.
22        Obviously, at some point in time, you
23  file, someone filed, maybe the SIPA trustee
24  filed a settlement motion which described the
25  transaction by the affidavits, by the Barclays

Page 155

BURIAN

1
2  and other parties to that transaction and that
3  took it up a notch.  That made us nervous
4  because then we were much more concerned because
5  there seemed to be facts that contradicted what
6  we had heard.
7        We still expected there to be
8  perfectly rationale explanations, so during
9  that period of time, I believe we started
10  interacting based on the judge's direction
11  directly with Barclays and its
12  representatives through Cleary Gottlieb, its
13  law firm.  That's when we met for the first
14  time in an effort to --
15    Q.    February 3?
16    A.    That sounds right.
17    Q.    Now, let's just go back in time to the
18  week after the closing.  The period between
19  September 22 and September 30.  What
20  verification efforts did Houlihan undertake in
21  that period of time?
22    A.    To the best of my knowledge, we merely
23  wanted to get a complete and final list of what
24  exactly -- what the documents were.  As you see,
25  you gave me an exhibit earlier in the morning

Page 156

BURIAN

1
2  that was saying, well, here is a preliminary
3  list and I'm sure that either directly or
4  indirectly, we would have said OK, the deal
5  closed, where is the final list.
6        But other than asking for verification
7  of what transferred and, you know -- we probably
8  did not do much.
9    Q.    Were you aware that on September 30,
10  Weil filed with the court the final versions of
11  Schedule A and Schedule B?
12    A.    I don't remember the exact date, but I
13  do know at some point schedules -- at some
14  point, the document you handed me as an exhibit
15  was filed with the court.  You probably know the
16  date.
17        But at some point the schedules were
18  filed, although that was not what we asked
19  for in the sense of that was a redacted
20  version for public consumption.  I don't
21  remember if it was under seal, but I think
22  the marks were all off, it was not directly
23  responsive to what we were looking for.
24    Q.    At some point, at some point in
25  October, did Houlihan meet with Alvarez & Marsal

Page 157

BURIAN

1
2  to get more information concerning the asset
3  transfers?
4    A.    To Barclays?
5    Q.    Yes.
6    A.    We never met with Alvarez & Marsal
7  specifically about the asset transfers.  We met
8  with Alvarez & Marsal about a broad variety of
9  topics on a consistent basis.  There were
10  meetings where Barclays issues were raised, but
11  it wasn't -- the purpose of the meetings were
12  not to talk about Barclays.
13    Q.    Did either Houlihan or FTI, to the
14  best of your knowledge, ever receive information
15  from Alvarez & Marsal concerning the assets that
16  had been transferred to Barclays?
17    A.    That's a very broad question because
18  it could relate to a lot of different pieces.
19  So it is hard.
20    Q.    Let me try to make it more specific.
21    A.    I'm in a meeting --
22    Q.    Let me try to make it more specific.
23        (Exhibit 463-B memo dated October 6,
24  2008 marked for identification, as of this
25  date.)

Page 158

BURIAN

1
2    A.   OK.
3    Q.   I have handed you a document that we
4    have marked as Exhibit 463. I'll ask you to
5    take a look at the document. It is a multi-page
6    document, and after you have had a chance to
7    review this, I'll ask you if you have ever seen
8    this before or any part of it before.
9         MS. SCHAFFER: If I could just ask a
10   question, do you know where this document is
11   from?
12        MR. STERN: Yes, I do.
13        MS. SCHAFFER: Where is it?
14        MR. STERN: It was a part of the
15   e-mails of the Lehman people, individuals
16   who are listed on it. And I believe that
17   just recently Alvarez has produced it as
18   well.
19   A.   OK, I have perused the first two pages
20   of the exhibit.
21   Q.   Is this a document you have ever seen
22   before?
23   A.   I have no specific recollection. I
24   wouldn't be surprised if it was e-mailed to me
25   but I -- if it was -- I don't remember. I don't

Page 159

BURIAN

1
2    have a specific recollection about this
3    document.
4    Q.   Who is Connor Tully?
5    A.   Connor Tully is one of the FTI
6    employees working on the Lehman case.
7    Q.   And what is his role in relation to
8    the creditors committee?
9    A.   He reports, I believe to Sam Star and
10   he is sort of the day-to-day, sort of
11   Jack-of-all-trades FTI representative, attends
12   committee meetings. We are working with him now
13   on several financial analyses for different open
14   issues.
15   Q.   Who is Sam Star?
16   A.   Sam Star is an FTI officer who is also
17   working day-to-day on the Lehman case.
18   Q.   For the committee?
19   A.   For the committee.
20   Q.   And William Fox?
21   A.   Where do you have William Fox? Oh,
22   Bill Fox. I'm not sure who it was. That could
23   either be a Lehman FTI person or it could be
24   someone else over at FTI.
25   Q.   Now, looking at the first page, the

Page 160

BURIAN

1
2    cover e-mail, there is a heading that says LBI
3    repo transactions on the first page. Do you see
4    that heading?
5    A.   Yes.
6    Q.   Do you recall whether FTI reported to
7    Houlihan any of the information --
8    A.   I am sorry, you are asking about the
9    subject line e-mail? You are talking about the
10   bold letters?
11   Q.   Bold letter heading, "LBI repo
12   transactions."
13   A.   Sure.
14   Q.   You see that?
15   A.   Sure.
16   Q.   Do you recall whether FTI reported to
17   Houlihan any of the information reflected in
18   this section?
19        MS. TAGGART: Objection, vague and
20   also objection on the privilege. And I'm
21   going to instruct not to answer.
22   Q.   In this section, LBI repo
23   transactions, Mr. Connor states, "Close of
24   business Wednesday, September 17, Lehman had a
25   45 billion dollar repo with the Fed primary

Page 161

BURIAN

1
2    dealer credit facility, PDCF against collateral
3    with a market call of 49.7 billion."
4         Did FTI ever report that information
5    to Houlihan?
6    A.   I don't -- I would rather say whether
7    I knew this as not -- as opposed to who reported
8    it to me. I can't remember back then whether I
9    read it or knew it.
10   Q.   I realize you might rather say it, but
11   I would like an answer to my question.
12   A.   Whether FTI specifically reported this
13   sentence to me?
14   Q.   Whether it reported that information
15   to you.
16   A.   I can't recollect if I heard it from
17   FTI or another source.
18   Q.   Then it goes on to say, "Close of
19   business on Thursday, Fed wanted out of the repo
20   and required Barclays to step into the trade. I
21   am not totally clear on how this worked or if
22   Barclays agreed to this. But I believe as part
23   of the Barclays transaction, they settled up
24   with the Fed on Friday. See the attached
25   summary I received from A&M, Jim Fogarty's

Page 162

BURIAN

1
2  group."
3      Now, Focusing for now just on the
4  text, we will get to the attached
5  settlement, is this information concerning
6  the Fed repo information that FTI reported to
7  Houlihan?
8      A.  Again, it is the same answer.  I am
9  aware of these facts.  I can't time my awareness
10 specifically to this e-mail.
11     Q.  Now, further down, in the fourth
12 paragraph, third sentence says, "Discussed 7
13 billion dollars."  Do you see that line?
14 "Discussed 7 billion dollars of collateral."
15     A.  One, two, three, four -- as an aside.
16 How does the paragraph start?
17     Q.  Next paragraph.
18     A.  "It was an incredible amount of work
19 to simply reconcile and gets trade to clear."
20     Q.  Next paragraph which starts on
21 Thursday night?
22     A.  "15.8 was booked by Chase."
23     Q.  Next line and line after that.
24     A.  On Friday morning, Chase's top
25 priority was to reconcile this trade and

Page 163

BURIAN

1
2  contacting Barclays" --
3      Q.  Let me focus you on the next line.  It
4  says, "Discussed," you see it says, "Discussed 7
5  billion dollars of collateral missing.  But I
6  believe this just means everything didn't clear,
7  so Chase ended up doing a 7 billion dollar box
8  loan."
9      A.  I see that language.
10     Q.  OK.  Is that information that FTI
11 reported to you at the -- at or around the time
12 of this e-mail?
13     A.  I don't recollect specifically that it
14 was communicated or not communicated.
15     Q.  Let's turn to the next page, top of
16 the page.  "In trying to tie this together to
17 the Barclays transaction, I noted that the
18 attached summary reflects a line called
19 'Extinguish liability to Fed 38 billion
20 dollars.'  Is this the 45 billion dollar Fed
21 repo reduced for the 7 billion dollar box loan?"
22     Is that a question or an issue that
23 FTI discussed with Houlihan around this time?
24     MS. TAGGART:  Objection to form.
25     You can answer yes or no if that issue

Page 164

BURIAN

1
2  was discussed between FTI and Houlihan, that
3  subject was discussed.
4      A.  You asked this question or an issue
5  that was discussed and the answer is that the
6  issue of reconciling what JP Morgan took or
7  didn't take was an important topic among all the
8  parties to the transaction and FTI was taking
9  the lead in trying to figure out the flow of
10 funds to figure out how much JP Morgan owed or
11 did not owe.
12     So the issue being addressed here on
13 is something that was certainly discussed.
14 The specifics that Connor was trying to
15 figure out if that entry was a net or gross
16 entry, I can't recollect if that rose to my
17 level or was communicated to Houlihan.
18     Q.  Fair enough.  Let's look at the
19 attached summary which at the bottom is labeled
20 "Alvarez & Marsal draft Barclays deal recap,"
21 and there are page numbers at the bottom running
22 from 1, 2, 3, 4 through 5.  Focusing on the
23 first page, do you recall ever seeing or
24 reviewing this information?
25     A.  Never saw this.

Page 165

BURIAN

1
2      Q.  Looking at the asset side of the
3  sheet, there is a line that says, "Negotiated
4  mark haircut" and it lists a figure of 5
5  billion.  Do you know what that means?
6      MS. TAGGART:  Objection, foundation,
7  calls for speculation.
8      Q.  Do you know?
9      A.  I know what the words mean, but what
10 exactly are you asking me?
11     Q.  I'm asking if you know what this means
12 in this document?
13     A.  I don't know specifically what it
14 means in this document.  I know what it may mean
15 in reference to the issues in dispute in the
16 litigation.
17     Q.  And what's your understanding?
18     MS. TAGGART:  Objection, calls for
19 speculation.
20     Testify to what you know.  Don't
21 speculate.
22     MS. SCHAFFER:  Objection.
23     A.  Well, I've never seen this document
24 before and I didn't prepare the document.  So I
25 can't -- it looks to me, looking at the

Page 166

BURIAN

1 document, that it is saying that there was a
2 negotiation and that the assets had a haircut.
3 Q.   Now, are you sure you never saw this
4 document before?
5         MS. TAGGART: Objection, asked and
6 answered.
7     A.   Am I sure? I can tell you that
8 sitting here, I don't remember seeing it.
9 Whether this is in my in box somewhere, that's a
10 possibility. But I don't remember seeing this
11 document before. I've heard the phrase
12 "negotiated mark haircut" before.
13 Q.   Do you know whether anyone else at
14 Houlihan had this document?
15     A.   I don't. I don't.
16 Q.   Now, further down on the asset side,
17 you see there is a line for unencumbered box and
18 it lists a figure of 1.9.
19     A.   Yes.
20 Q.   Do you know what that is a reference
21 to?
22         MS. TAGGART: Objection, foundation,
23 calls for speculation.
24     A.   Only by what I know elsewhere in the

Page 167

BURIAN

1 transaction that there was, to fill the hole in
2 the transaction, 1.9 billion of the securities
3 unconnected to the repo were purportedly
4 transferred to Barclays.
5 Q.   Up above that, there is a line that
6 says, "Assets transferred under repo, stale
7 marks, 43.07." Do you see that?
8     A.   Yes.
9 Q.   Do you know what that 43 billion
10 dollar figure relates to?
11         MS. TAGGART: Objection, foundation,
12 speculation.
13     A.   It A a footnote? Is there a
14 description I can look at it? The answer is no,
15 I have no idea what that is.
16 Q.   And then on the liability side, there
17 is a line that says, "Extinguish liability to
18 Fed," and it lists a figure of 38. Do you see
19 that?
20     A.   I do.
21 Q.   What do you understand that figure to
22 represent?
23         MS. TAGGART: Objection, foundation.
24     A.   Just what it says, it sounds like I

Page 168

BURIAN

1 would have a -- frankly, I find this number to
2 be surprising. It sounds like this piece of
3 paper is saying that the Fed liability was only
4 38 billion.
5 Q.   And you understood it to be more than
6 in the range of 45?
7     A.   No, I understood it to be more in the
8 range of 45.5. 500 million matters.
9 Q.   So you understood it to be 45.5 and
10 this says 38?
11     A.   Correct.
12 Q.   Did you also understand that there was
13 a 7 billion dollar shortfall in delivery?
14     A.   Again, what I understood was -- what
15 was described to us that night, that 7 billion
16 for a variety of reasons, whether shortfall in
17 delivery because they were closed out and not
18 transferred, that 7 billion was missing. But
19 that 7 billion was inclusive of the assets. It
20 wasn't the assets plus 7 billion. It was
21 included in the number.
22 Q.   It was included in the 45.5?
23         MS. TAGGART: Object to form.
24     A.   No. It was included in the A assets

Page 169

BURIAN

1 to balance against the 45.5.
2 Q.   Looking at the next page, page 2, do
3 you recall ever seeing this document before?
4     A.   Nope.
5 Q.   Do you -- do you know whether the
6 amounts listed here are Lehman marks or Bank of
7 New York marks or JP Morgan marks?
8         MS. TAGGART: Objection, lack of
9 foundation.
10 Q.   If you know.
11     A.   I don't know that they are marks as
12 opposed to face amounts, but if you are telling
13 me they are marks, we can compare them to the
14 other schedule and see if they match up and then
15 I can tell you by looking at this document
16 alone, I do not know.
17 Q.   OK. Fair enough. Now, did there come
18 a time in October that you attended the meeting
19 or presentation that Alvarez gave to the
20 creditors committee?
21     A.   Yes, I did.
22 Q.   Did anybody else from Houlihan attend
23 that presentation?
24     A.   Yes. I can't tell you exactly because

Page 170

BURIAN

1  BURIAN
2  depending on the issue, people would come in and
3  out because of their particular issue. I know I
4  was there for the whole meeting. I know Mike
5  Fazio sat next to me at the meeting. If it is
6  critical, I can try to remember who came for
7  what or look at the agenda for other issues.
8      Are you talking about the meeting
9  shortly after this e-mail that was the first
10  week in October?
11  Q.  Yes.
12  A.  Yes, that was the committee meeting at
13  which Alvarez presented.
14      (Exhibit 464-B, document Bates stamped
15  LAZ-A4419 through 4424 marked for
16  identification, as of this date.)
17  MR. STERN:  Let's mark this document
18  as 465-B.
19      (Exhibit 465-B, document Bates stamped
20  LAZ-A 4419 through 44511 marked for
21  identification, as of this date.)
22  Q.  I am only going to reference 464-B,
23  the excerpts from this, but for the sake of
24  completeness, I marked 465-B which appears to be
25  the complete presentation. So I would like to

Page 171

BURIAN

1  BURIAN
2  direct your attention to the abbreviated
3  document, 464-B.
4  A.  OK.
5  Q.  Let's start by looking at the third
6  page of the document, which is the contents
7  page.
8  A.  Contents page?
9  Q.  And you see there a list of agenda
10  items.
11  A.  I do.
12  Q.  And your recollection is that you were
13  present for the entire presentation?
14  A.  I was.
15  Q.  The second item -- I am sorry, it is
16  actually. It looks like there is a typo. There
17  is a line in the agenda for significant
18  transactions. And it lists Fogarty, Ehrmann and
19  Coles next to it.
20  A.  Yes.
21  Q.  Do you see that?
22  A.  I do.
23  Q.  Who are Fogarty, Ehrmann and Coles?
24  A.  Fogarty and Ehrmann are both members
25  of the A&M team that I believe are full-time

Page 172

BURIAN

1  BURIAN
2  over at Lehman. Coles, I forget. I think he is
3  also an A&M -- I think he is A&M and not legacy
4  Lehman, but I can't be sure.
5  Q.  Let's turn to the next page of this
6  document which is in the bottom left. It has a
7  page number 28. At the top, it is labeled,
8  "III, significant transactions"?
9  A.  I see that.
10  Q.  And then capital letter A, it states
11  "Sale of Lehman Brothers Inc. broker/dealer to
12  Barclays," and in parentheses, it lists Fogarty
13  as the presenter.
14  A.  Right.
15  Q.  Under this, it has some bullet points
16  and it refers to "assets purchased." Do you see
17  that?
18  A.  Yes.
19  Q.  There is a reference to 43.1 billion
20  dollar repo assets. What was said about that
21  item if you recall?
22  A.  I recall really there was -- it was
23  just read off as this is what the transaction
24  was. I don't remember the number even was
25  mentioned orally as opposed to being up on the

Page 173

BURIAN

1  BURIAN
2  screen. They had a pretty heavy, heavy agenda
3  with a lot of other pressing issues.
4  Q.  Did anybody from Houlihan ask what the
5  43.1 billion represented?
6  A.  I don't recollect anyone asking what
7  that particular number represented. It was not
8  the environment for that sort of give-and-take.
9  I do remember that we asked if this was an
10  example of a need for greater detail to
11  reconcile what occurred.
12  Q.  Did anybody from Alvarez ever tell you
13  whether this figure was based on Bank of New
14  York marks?
15  A.  No.
16  Q.  Did they ever tell you what -- whether
17  this reflected the collateral that had actually
18  been transferred to Barclays?
19  A.  Yeah, we assumed. Did they actually
20  say that, was it explicit, or I just knew that?
21  I remember you say collateral, that number I
22  think included a 7 billion in cash.
23  Q.  You think the 43 included the 7? Or
24  excluded the 7?
25  A.  I thought, at the time, I thought that

Page 174

BURIAN

1 included.
2 Q. Did anybody tell you that?
3 A. No. I see here the 7 billion is not
4 mentioned at all. It is strange for it not to
5 be mentioned.
6 Q. Was -- after the -- I understand you
7 said this meeting was really not the setting in
8 which to question these points. Was there a
9 subsequent opportunity to question these points?
10 A. It is sort of like the word "invite"
11 before, you are talking about opportunities. I
12 am trying to give you a complete explanation.
13 The answer is of course we had an
14 opportunity, but you have to understand that
15 A&M's position was this was not their
16 problem. They didn't do this transaction,
17 they weren't party to this transaction, and
18 if we had issues or concerns, we should get
19 the information from Weil, from Lehman or
20 from Barclays.
21 We raised questions -- for instance,
22 this is the first time I remember ever
23 hearing the phrase "negotiated 5 billion
24 reduction" and sitting there, it did make me

Page 175

BURIAN

1 nervous and that was something that I don't
2 know if I raised my hand or someone else
3 raised their hand and said, you know, we've
4 really got to dig into this. But -- and the
5 answer was, as the answer always was, of
6 course, open Kimono, we will find, you know,
7 let's reconcile away.
8 But --
9 Q. That's what Alvarez said?
10 A. Yes.
11 Q. Was anybody from Weil present at this
12 meeting?
13 A. Sure.
14 Q. Anybody from Lazard?
15 A. May I look at the larger document?
16 Q. Sure.
17 A. I don't believe -- Lazard really had
18 wound down their involvement to very specific
19 M&A assignments at that time. I don't have a
20 particular memory of them being active, you
21 know -- it was still early in the case,
22 October 8.
23 I would think that at least Matthew
24 Whiting or someone was there, but I can't --

Page 176

BURIAN

1 there is nothing on this list that is a
2 Lazard assignment and I don't have any
3 recollection of interacting with Lazard at
4 this meeting.
5 Q. So let's go back to the page we were
6 looking at where you identified the phrase
7 "negotiated to 5 billion dollar reduction." You
8 said that made you nervous and you really had to
9 dig into this. What did Houlihan do at the time
10 to dig into that?
11 A. I answered you earlier and you cut me
12 off when I was giving you the chronology of what
13 we did and I was telling that you there really
14 were three stages. I started describing the
15 first stage of our involvement. Stage number 1
16 was closing through the filing of the SIPA
17 motion. That's the December motion I'm
18 referring to as the SIPA settlement motion. And
19 this falls within that time period where --
20 Q. This is in October. What did you do
21 in October?
22 A. I'm saying this is during the time
23 period from the closing through December --
24 Q. I'm not talking about December. I am

Page 177

BURIAN

1 talking about in October. Let me ask you a
2 different question. In the month of October
3 2008, what did Houlihan do to dig into this
4 negotiated 5 billion dollar reduction?
5 A. We asked for -- let's make clear --
6 Q. Can you answer my question first?
7 MS. TAGGART: He is trying to answer
8 your question.
9 A. I am trying to put it in context, but
10 I'm happy --
11 Q. I am asking very specific question.?
12 MS. TAGGART: He gets to finish his
13 answer to your question.
14 A. What exactly do you want to know and I
15 will answer it particularity.
16 Q. I think my question is very clear.?
17 MS. TAGGART: You either withdraw
18 start a question or start a new one.
19 MR. STERN: I am going to start a new
20 one?
21 MS. TAGGART: Then he needs to finish
22 the answer.
23 MR. STERN: No, no, no.
24 MS. TAGGART: No. Then read back the

Page 178

BURIAN

1  question.
2  Q.  Let me ask a new question. What did
3  Houlihan do in October 2008 to dig into
4  questions relating to this line negotiated 5
5  billion dollar reduction?
6  A.  At my direction and supervision, we
7  renewed our request for a reconciliation of what
8  exactly was transferred to Barclays, when it was
9  transferred, what the Lehman marks of those
10 assets were, and as of what date.
11 Q.  And in October of 2008, did you get
12 responses to those inquiries?
13 A.  I don't remember specifically when we
14 got responses, how. I know there was a catty
15 sort of response at Weil at one point, why do
16 you care, the transaction closed, the appeal
17 period is over, something like that. But
18 generally speaking, I'm sure there was back and
19 forth, but I do not remember receiving any
20 reconciliation or any, you know, global answer
21 to the questions we were asking.
22 Q.  If you didn't receive the information,
23 did you or the committee consider going to the
24 judge to ask for expedited discovery concerning
25

Page 179

BURIAN

1  these questions?
2  MS. TAGGART:  Object to form and
3  privilege and I am going to instruct not to
4  answer on attorney/client and work product.
5  So don't answer.
6  Q.  If you felt there was information that
7  was important information you needed, did you
8  personally realize that you could go to the
9  court and request the court's assistance?
10 A.  Yes.
11 Q.  Did you do anything to request the
12 court's assistance?
13 A.  Obviously, it is up to counsel to make
14 these decisions. But in my view, there was
15 nothing that would warrant expedited transaction
16 because the transaction closed, security is
17 probably not there anymore. Barclays was good
18 for the money. So if there was a mistake and
19 money had to be returned, that's not the type of
20 thing that you would run to court with your hair
21 on fire saying there has to be an expeditious
22 resolution.
23 We also were dealing with an estate
24 that was beleaguered by a number of issues
25

Page 180

BURIAN

1  that we had never seen before in a
2  restructuring where the senior parties at
3  Weil and others were burning night after
4  night and, therefore, to take what we hoped
5  was merely going to be a reconciliation of
6  what happened in a manner consistent with the
7  court order to the level of running to a
8  judge to say it has got to be dealt with
9  today seemed disproportionate and
10 unnecessary.
11 Q.  So a 5 billion dollar reduction did
12 not rise to the level, in your view, as
13 something worth bringing to the court's
14 attention?
15 MS. TAGGART:  Object to form,
16 misstates the testimony.
17 A.  Oh, no -- that's completely --
18 MS. TAGGART:  Argumentative.
19 A.  That's completely not what I said.
20 Q.  Let's go back to October of 2008.
21 A.  I want to finish my answer.
22 Q.  Let me ask the question.?
23 MS. TAGGART:  Again, he needs to
24 finish his answer to the question that you
25

Page 181

BURIAN

1  posed.
2  MR. STERN:  I think he answered?
3  MS. TAGGART:  No, he didn't answer.
4  Finish your answer.
5  Q.  Go ahead.
6  A.  That's --
7  MS. TAGGART:  Do you want to hear the
8  question again?
9  THE WITNESS:  Sure.
10 MS. TAGGART:  "So a 5 billion dollar
11 reduction did not rise to the level, in your
12 view, as something worth bringing to the
13 court's attention?"
14 A.  Five billion dollars is an enormous
15 amount of money and it is certainly something
16 that we will take very careful attention to, and
17 if we believe we are owed, we will bring to the
18 court's attention to collect.
19 The question that I was answering was
20 whether or not at that time, we thought
21 expeditious discovery was something that I
22 personally would recommend to counsel and to
23 the committee and what I answered was that at
24 that time, our expectation was we were not
25

Page 182

BURIAN

1  owed, that no one had taken improperly 5
2  billion dollars. Frankly, even at that time,
3  I found it hard to believe that someone would
4  misrepresent to the court or that people
5  would not tell counsel what the full
6  transaction was and, therefore, that the
7  judge would not be apprised of something as
8  important as 5 billion dollars.
9      And therefore, even then, my
10  assumption as a supervisor of the assignment was
11  that we, at the direction of the committee,
12  merely had a bookkeeping reconciliation and we
13  would write a report that would just balance the
14  books and we would be done. There was
15  confusion, but that there wouldn't be any real
16  serious problem here.
17      Q.  Now, I believe you said that when you
18  saw this reference to negotiated a 5 billion
19  dollar reduction, it made you nervous, is that
20  right?
21      A.  That is correct.
22      Q.  And it was something that you felt you
23  needed to dig into, is that correct?
24      A.  It was something that confirmed to me

Page 183

BURIAN

1  the need to get the reconciliation done and make
2  sure that the transfers were as described.
3      Q.  But it is not something that you felt
4  in October 2008 warranted an effort to enlist
5  the court's assistance in getting further
6  information?
7      MS. TAGGART:  Object to form,
8  mischaracterizes his testimony and asked and
9  answered.
10      A.  At that time, I had the expectation of
11  cooperation. There was no reason to go to Judge
12  Peck.
13      Q.  And did you get cooperation in the
14  month of October?
15      A.  Again, I told you I think of these
16  time periods in buckets and not in particular
17  days and I was getting enormous cooperation in
18  the month of October from the debtor on a myriad
19  of issues worth many, many billions of dollars
20  besides Barclays.
21      So you have to look at cooperation in
22  a broader context when you want to criticize
23  a debtor estate or demand a court order for
24  expeditious discovery. So the answer is I

Page 184

BURIAN

1  was getting a lot of cooperation.
2      Did I get answers to this particular
3  question in October? Well, I still haven't
4  gotten the answers so the answer is no.
5      Q.  Your testimony is as of today, you
6  still haven't gotten the answers?
7      MS. TAGGART:  Objection, he just said
8  his testimony. I object to form and
9  argumentative.
10      If you want it say it again, you can.
11      A.  As of today, to the best of my
12  knowledge, I have never received a
13  reconciliation of what was originally part --
14  assumed to be part of or contemplated to be part of
15  the transaction as signed on that Tuesday and
16  described that Wednesday in court which got the
17  70 billion and 69 billion. I never got a
18  reconciliation of what exactly was intended by
19  the numbers Ms. Fife said in court and what the
20  basis of that was and whose marks they were as
21  of what date.
22      I have never received the bridge
23  between the 70 and the -- now I am getting a
24  little confused, if I am wrong, the 47.4

Page 185

BURIAN

1  number, I think, as to how much of that was
2  purported to be, as she described and
3  everyone was saying in conference rooms,
4  market deterioration in the portfolio as
5  compared to closeouts or securities that
6  turned out not to have been returned to
7  Lehman. Nor have I even received, to the
8  best of my knowledge, even the most simplest
9  request of what exactly did go over and what
10  were the marks on that date that they went
11  over.
12      So I haven't gotten, to the best of my
13  knowledge, even the simplest stuff, let alone
14  what we really need to write the memo and be
15  done.
16      Q.  In October, did you request an
17  opportunity to discuss those questions with Ms.
18  Fife or Mr. Miller?
19      A.  I don't remember if it was done
20  through a formal invitation or request. We said
21  in meetings -- at that point in time, I was
22  spending many, many, many nights with Ms. Fife
23  working on a variety of things and in those
24  meetings, we would always -- we would say

Page 186

1   BURIAN
2   periodically where are we on the reconciliation,
3   when are we getting those documents, how is it
4   going.
5       Q.   Did you ever ask Ms. Fife what the
6   47.4 represented in relation to the 70? Or any
7   of those other figures that you just mentioned?
8       A.   Ms. Fife wouldn't be the right person
9   to ask for the back-up for it because she said
10  in court -- and I believe, you know, either she
11  or someone else at Weil said to us that was the
12  numbers we got from our clients as to what was
13  available to be transferred.
14      Our assignment was not, you know,
15  repeat to me that you repeated numbers from
16  Lehman. Our assignment was to go beyond what
17  Weil was told and balance the book.
18      At that point in time, there was
19  absolutely no great urgency. The expectation
20  was this was going to be fine and we would
21  get the numbers and we would move on. It
22  wasn't like we need to go track an asset that
23  was a melting ice cube, that value was being
24  lost. What was done was done and we expected
25  a explanation, and if the explanation didn't

Page 187

1   BURIAN
2   comport to what was supposed to happen, we
3   felt confident we would be able to get the
4   assets back.
5       Q.   Do you remember on February 3, 2009,
6   you came to these offices and met with certain
7   executives from Barclays and certain lawyers
8   from Barclays?
9       A.   I believe you were there.
10      Q.   And you had an opportunity to ask
11  questions concerning the transaction?
12      A.   We did.
13      Q.   After that meeting, did you or anyone
14  else from Houlihan raise any follow-up
15  questions?
16      A.   Sure.
17      Q.   Who did you call?
18      A.   Well, we were not allowed to call
19  Barclays directly. We were told not to.
20      Q.   Did you ask for a follow-up meeting?
21      MS. TAGGART: Wait, wait. He is still
22  finishing his answer.
23      Q.   Did you ask for follow-up meeting?
24      MS. TAGGART: He is finishing his
25  answer to the first question.

Page 188

1   BURIAN
2       A.   I understand the communications were
3   through counsel. We followed up by asking for
4   information and I remember reviewing one or two
5   letters in that regard and I remember the
6   conference call with Lindsey Greenfield that I
7   believe it was either before or after that
8   meeting where I once gain explained what I was
9   tying to do, what we were trying to do.
10      It was not hostile. We just wanted to
11  write a report and be done because we assumed
12  there were reasonable answers, and so my
13  understanding from the -- again, I told you
14  there were buckets. So there was a bucket of
15  times from September to the filing of the
16  motion in December. You're now asking about
17  the second bucket of time from December
18  through mid February, right?
19      Q.   Let me just ask you a specific
20  question. When you were talking about this
21  reference, Exhibit 464-B, to a 5 billion dollar
22  reduction.
23      A.   Correct.
24      Q.   At that meeting on February 3, 2009,
25  did you ask Barclays' executives any questions

Page 189

1   BURIAN
2   concerning that issue?
3       MS. TAGGART: Which meeting is that?
4       Q.   February 3, 2009 meeting.
5       A.   The Barclays executives at that
6   meeting, to the best of my knowledge, said they
7   were not involved in any way in the negotiations
8   of the transaction, but had two roles; one was
9   to compare taking the assets and hedging them,
10  and the other one spoke a lot about the
11  mechanics of transfer.
12      At that meeting, we specifically asked
13  about negotiations, development of marks and
14  were told that they were not involved.
15      I also think we followed up and said
16  whose marks were they. They were taking
17  these assets at and I believe they were told,
18  but I can't -- I can't tell you with certainty
19  who said it, but I think we were told that they
20  were the Lehman marks.
21      But again, the three individuals from
22  Barclays were very clear at that meeting they
23  were not -- that's why we followed up and asked
24  for meetings with the former Lehman CFO who is
25  now a Barclays employee to talk about

Page 190

BURIAN

1    developments of marks.
2         So indirectly -- so to answer your
3    question with clarity and specificness,
4    specificity, sorry, we asked about marks and
5    who developed them, but it became obvious
6    those were the wrong people to ask those
7    details to.
8    Q.   Again, referring to 464-B and this
9    reference to a 5 billion dollars reduction, did
10   you understand that 5 billion dollars to relate
11   to the repo or to something else?
12        MS. TAGGART: Objection, foundation.
13        MS. SCHAFFER: Objection to form.
14   A.   It is on the line of repo. Looking at
15   it now, it looks likes it relates to that line.
16   But I honestly had -- I, to make this go
17   quicker, I understood the 5 billion reduction to
18   relate to marks on securities that were
19   purportedly transferred to Barclays.
20        I wasn't thinking whether it was the
21   repo assets or not, because it was a Schedule
22   A and Schedule B, but it is on the same line
23   as the Schedule A, what looks like Schedule A
24   type assets.

Page 191

BURIAN

1    Q.   You didn't know whether that figure
2    related to the haircut in the repo or whether it
3    related to something else?
4         MS. TAGGART: Objection, form.
5    Q.   Is that fair?
6    A.   I certainly had no idea. The word
7    "haircut" never came up.
8    Q.   And you never asked?
9    A.   OK, are you talking about at the
10   February meeting with you?
11   Q.   I am talking about October.
12   A.   Or talking about the committee meeting
13   with the committee?
14   Q.   I am talking about October. This
15   presentation by Alvarez, Exhibit 464-B.
16   A.   The word "haircut" never came up, to
17   the best of my knowledge, at the committee
18   meeting with Alvarez.
19   Q.   But I think you testified earlier that
20   you were generally aware that the purchase
21   agreements typically involve a haircut, is that
22   right?
23        MS. TAGGART: Objection, asked and
24   answered, misstates the testimony.

Page 192

BURIAN

1    Q.   Is that right?
2    A.   What I said before, I said my
3    understanding was this repo was short
4    collateral. But generally speaking, repo
5    participants will lend or advance less than the
6    full value of the securities.
7    Q.   And you were given information that JP
8    Morgan had marked the repo collateral at 49.9
9    billion, is that right?
10   A.   Nope.
11   Q.   You were not given that information?
12   A.   Nope. We talked earlier that the only
13   person who ever told me about JP Morgan marks is
14   you.
15   Q.   You were given information that
16   somebody had marked the repo collateral at 49.9
17   billion, correct?
18        MS. TAGGART: Object to form.
19   A.   Yes, we were told at some point in
20   time there was a bucket of assets to be
21   transferred to Barclays or retained by Barclays
22   that had a Lehman mark of around 49. something
23   billion dollars.
24        MR. STERN: Let's mark as the next

Page 193

BURIAN

1    exhibit this document.
2         (Exhibit 466-B, document Bates stamped
3    HLHZ 35872 through 74 marked for
4    identification, as of this date.)
5    Q.   My only question about 466-B is
6    whether this is a document you recall seeing?
7    A.   I don't have a specific recollection
8    about this e-mail. October 10?
9    Q.   Let's take a short break.
10        THE VIDEOGRAPHER: The time now is
11   2:33 p.m., we are now off the record.
12        (Recess)
13        THE VIDEOGRAPHER: This is the start
14   of tape number 4. The time is now 2:43 p.m.
15   We are now back on the record.
16   Q.   Let's go back to September 17, the
17   Wednesday I believe you testified that Houlihan
18   was first engaged, at least informally. At that
19   point in time, did you receive the sale motion
20   that Weil had made?
21   A.   At that point in time, did I receive
22   it?
23   Q.   Yeah.
24   A.   I already had it.

Page 194

BURIAN
1
2    Q.    You had it.  OK.  And you reviewed
3    that?
4    A.    I did.
5    Q.    As of that date, the 17th, were you
6    aware that Barclays had issued a press release
7    and had an analyst call concerning the
8    transaction?
9    A.    I can't tell you that I knew that the
10   17th. I don't remember if I knew it on the
11   17th. I don't think -- I don't know if I knew
12   it on the 17th.
13          MR. STERN:  All right, let's mark this
14   as the next exhibit.
15          (Exhibit 467-B, document Bates stamped
16   HLHZ 16856 through 57 marked for
17   identification, as of this date.)
18   Q.    I have shown you the document that we
19   have marked as 467-B, and before you take a look
20   at it, let me just tell you where I am going to
21   focus you on, then I will give you a chance to
22   review it.
23          First I am going to ask you who Ann
24   Marie Miller is.  And then I am going to
25   focus you on the first two paragraphs on page

Page 195

BURIAN
1    1 of this exhibit and then on the second
2    page, the 6th and 7th paragraph.
3    A.    OK.
4    Q.    Is this something -- well who is Ann
5    Marie Miller?
6    A.    Ann Marie Miller works for me.  She is
7    an officer, a junior officer in the group who
8    has been active in the Lehman matter.
9    Q.    Do you recall seeing this document on
10   or around September 17?
11   A.    Yeah, I -- I don't remember seeing
12   this e-mail in particular.  I'm not on it.  Are
13   you asking me about the e-mail or the press
14   release that's copied on the e-mail?
15   Q.    Well, the substance of the e-mail?
16   A.    I mean, I was in the room.  I knew --
17   I don't have a specific recollection of
18   receiving a copy of this news article.
19   Q.    OK.  Let's turn to the second page.
20   A.    Obviously Houlihan had it, Ann Marie
21   had it.
22   Q.    Yes, looking at the second page, the
23   sixth paragraph down states, "For Barclays, the
24   deal will have an immediate positive impact.

Page 196

BURIAN
1
2    Expected to add to earnings in the first year
3    and will provide a very high return on
4    investment, Varley said.  The deal would also
5    lift Barclays' capital ratio even before the
6    bank completes a planned capital injection
7    alongside the deal because of a negative good
8    will adjustment from the deal, amounting to
9    about 2 billion dollars after tax."
10          That information that I just read, is
11   that information that you were aware of on or
12   around September 17?
13          MR. SNOO::  Object to form.
14   A.    Not the 17th itself.  I got the -- I
15   saw either a summary or the press release itself
16   or that information about those statements
17   sometime the morning of the 18th to the 21st.  I
18   don't remember exactly when I saw this.
19   Q.    Do you recall whether you were aware
20   of this before the sale approval hearing?
21          MS. TAGGART:  Object to form.
22   A.    My memory is that I was given this
23   Saturday night, the 20th, is my best
24   recollection, but I can't be sure.  I just
25   honestly don't know.  I wasn't -- the problem is

Page 197

BURIAN
1
2    I wasn't in the office and didn't have access to
3    e-mail for an extended period of time.
4          So my -- I was in the office Friday
5    morning, but I was doing other things.  We
6    can talk about that if you want later, but
7    I -- I just -- I know I knew it, these
8    quotes.  I remember talking about knowing
9    these quotes on the 20th -- I mean on the
10   21st and I believe I got them on the night of
11   the 20th.  I don't have any firm recollection
12   before that.
13   Q.    Was the fact that Barclays had
14   announced that it anticipated a negative good
15   will adjustment of 2 billion dollars after tax
16   something that you considered at the time to be
17   a basis for objecting to the sale?
18          MS. TAGGART:  Object to form.
19   A.    A basis, that alone a basis for
20   objection?  No.
21   Q.    Let's move to the 18th of September,
22   which was a Thursday.  And I'll ask you if you
23   can tell me what meetings and conversations you
24   took part in -- that is, you personally -- on
25   that Thursday, September 18, in connection with

50

Page 198

BURIAN

1
2 the sale transaction.
3    A.   "In connection" is very broad, but the
4 main thing was, we had an organizational meeting
5 at Weil where the committee advisors sat down
6 with the Weil and Lehman teams in a big room,
7 chaired by Harvey, and the purpose was, the main
8 purpose of the Weil Gotshal and Lehman teams
9 were, we know you only got retained and this is
10 your first meeting, but we have a hearing
11 tomorrow to approve the sale. And there was a
12 clear understanding that you are not going to
13 get to do much and we are going to tell you what
14 we did and that's going to have to be enough.
15    So we spent time at that meeting going
16 through some of the history and some of the
17 details of the transaction. We also talked
18 about other things at that meeting beyond
19 Barclays. So that was the main opportunity
20 or meeting with representatives of the estate
21 about this transaction.
22    Obviously the transaction -- you asked
23 a very broad question. The transaction came up
24 at other subsequent meetings either directly or
25 indirectly.

Page 199

BURIAN

1
2    Q.   During the day on the 18th, let's say
3 from 8 a.m. to 6 p.m., were you at Weil Gotshal
4 for that entire period?
5    A.   No.
6    Q.   You were there for meetings or a
7 meeting?
8    A.   I don't know how you define "meeting."
9 In bankruptcy land, meetings sort of never end.
10 They sort of move from one to the other.
11    Q.   That's my question.
12    A.   Yeah, we met, I spoke to my guys. We
13 met with FTI and Milbank, started comparing
14 notes of what was going on. We had a big
15 meeting that all the estate reps came in. I'm
16 sure we had a huddle thereafter. And at some
17 point, you know, I left Weil and actually went
18 to Lehman itself.
19    Q.   While you were at Weil for the meeting
20 or meetings that took place there, what were you
21 told in connection with the Barclays
22 transaction?
23    A.   I can't repeat everything verbatim. I
24 can tell you that we were given a balance sheet
25 which I have seen as an exhibit somewhere that

Page 200

BURIAN

1
2 was -- that was produced by someone. And we got
3 the whole speech about how the world rests on
4 this transaction closing, and the Fed, the
5 Treasury and everyone else.
6    We had a long conversation about, you
7 know, the fact that there were no
8 alternatives, and this made sense, and that
9 Barclays is getting a great deal because they
10 are getting a franchise asset, you know, of
11 the whole Lehman trading division for only
12 250 million, but it is worthless to us if we
13 don't do the deal. So don't look in their
14 pocket, look in your own pocket.
15    We had a whole discussion about what
16 the company was trying to do to finalize
17 timing-wise and to -- what was left open to
18 negotiate and what were the hurdles to
19 closing and then we had someone walk us
20 through the economics of the securities
21 transfer.
22    Q.   Now, given your experience in
23 restructuring and in bankruptcy-related work, I
24 assume that you had existing relationships with
25 a number of people who were involved in these

Page 201

BURIAN

1
2 meetings?
3    A.   I knew many of the people in the room.
4    Q.   You knew some of the people from Weil?
5    A.   I knew -- yes.
6    Q.   Were people from Lazard at any of
7 these meetings?
8    A.   You know, it's funny, they really
9 played, in correlation to us, a very small role.
10 I don't -- again, it is like the answer to the
11 other question about the Alvarez & Marsal
12 meeting where I said I don't remember them being
13 there, but my gosh, that's the kind of meeting
14 they would be at. I don't know for sure. I
15 don't recall. I would assume they were, but I
16 don't know.
17    Q.   Did you know Barry Ridings from
18 previous work?
19    A.   Sure. I don't remember if Barry was
20 there or not.
21    Q.   And you knew Jim Seery from prior
22 experience?
23    A.   I knew Jim Seery.
24    Q.   And on the 18th, am I right that in
25 addition to this larger meeting, what you and

51

Page 202

BURIAN

1
2  your team really wanted to do was to talk to Jim
3  Seery?
4       MS. SCHAFFER: Object to form.
5       MS. TAGGART: Objection to form.
6    A.  Not to the exclusion of a lot of other
7  things.
8    Q.  I'm not saying to the exclusion of
9  other things, but wasn't one of your concerns
10 that you have an opportunity to talk to Jim?
11   A.  We weren't concerned. We expected to
12 talk to the business people, whether it was Mark
13 Shapiro, Alex Kirk or Jim. These people looked
14 horrible. I mean, they looked like they hadn't
15 slept or changed their clothes in days and
16 really the question was who was available to
17 walk us through.
18      I can't tell you there was specific
19 anxiety, concern about talking to Jim. Jim
20 was someone we knew and was someone that was
21 offered as someone that could explain to us
22 and he continued to be a contact person who
23 interacted with us.
24   Q.  Sure. And do you recall at some point
25 writing to your team concerning the larger

Page 203

BURIAN

1
2  meeting and saying this is a waste for the four
3  of us, if Seery is available, we should talk to
4  him now?
5    A.  I remember being very frustrated at
6  that meeting because I personally tried to get
7  into details and any time we asked a detail,
8  Mark Shapiro would start answering and someone
9  would say, oh, wow, that's really interesting,
10 but that's a detail. The big picture is we have
11 got to close this transaction. The markets
12 depend on it. There is no alternative.
13      And we really -- I won't say we were
14 prevented from, but it was made very, very
15 clear. This was a 35 or 50,000-foot meeting
16 and that, you know, getting into behind the
17 numbers or details was not -- was not -- and,
18 therefore, either I wrote it or I said it or
19 I felt it, I can't be sure. If you are
20 looking at an e-mail from me, share it with
21 me please.
22      I know that sitting in the meeting, I
23 did feel it was a waste of time and we
24 learned some interesting things and important
25 things, but we weren't getting into enough

Page 204

BURIAN

1
2  detail to carry it forward.
3    Q.  You mentioned Mark Shapiro. You knew
4  Mark from previous experience?
5    A.  I had worked with him on one other
6  deal, at least one other deal.
7    Q.  When he got into certain details, who
8  was it who tried to shift attention away from
9  those details to larger picture issues?
10      MS. TAGGART: Object to form,
11 mischaracterizes the testimony.
12      MS. SCHAFFER: Object to form.
13   A.  It was, oh, you want to know about the
14 employee liabilities, we've got to follow up on
15 that. What it really -- OK, good, let's follow
16 up on that. It wasn't like don't tell him
17 anything. It was there were a lot of people in
18 the room who have a lot of things they have to
19 do. This is an organizational meeting and a
20 download and it really was Tom Roberts, Harvey,
21 maybe Barry actually may have, some point may
22 have talked about alternatives and whether there
23 were alternatives. It was not about the
24 specific structure of the -- the details of
25 lines.

Page 205

BURIAN

1
2       They did walk us through the assets
3  and liabilities, going over, and they did,
4  similar to what Harvey did in court on
5  Wednesday, walk us through the big picture of
6  what they were accomplishing and what the
7  transaction was.
8    Q.  Who controlled the meeting agenda?
9    A.  Oh --
10      MS. TAGGART: Object to form,
11 foundation.
12   A.  There was no question that it was --
13 that Harvey was in charge. Mr. Miller. Am I
14 supposed to use first names, last names?
15   Q.  That's fine.
16   A.  You all know who Harvey is.
17   Q.  Did there come a time when you and
18 your team did get to speak with Jim Seery?
19   A.  Yes.
20   Q.  And when did that occur?
21   A.  Well, I spoke to him, I spoke to him
22 at that meeting when he was there, but there was
23 a follow-up conference call that I did not
24 participate in that we sent you both handwritten
25 and typed up notes regarding -- that a subset of

Page 206

BURIAN

1  our team was on. I was not on that call.
2      MR. STERN: Let me mark the exhibit
3  and I will ask you who was on this call?
4  A.    That's fine.
5      (Exhibit 468-B, document Bates stamped
6  HLHZ 28090 through 91 marked for
7  identification, as of this date.)
8      MR. STERN: By the way, do you have
9  the originals that we requested?
10     MR. WHITMER: I think we do.
11     MR. STERN: Could we take a look at
12  that.
13     (Exhibit 469-B, document Bates stamped
14  HLHZ 00001 through 0006 marked for
15  identification, as of this date.)
16     (Exhibit 470-B, document Bates stamped
17  HLHZ 16324 marked for identification, as of
18  this date.)
19     (Exhibit 471-B, document Bates stamped
20  HLHZ 16325 marked for identification, as of
21  this date.)
22     THE VIDEOGRAPHER: The time is now
23  3:03 p.m. We are now back on the record.
24  We went off the record at 3 p.m.

Page 207

BURIAN

1  Q.    Mr. Burian, I have placed in front of
2  you four related document, documents I think are
3  related, 468-B, 469B, 470B, and 471B.
4      Let me start by focusing on 468-B and
5  469-B.
6  A.    OK.
7  Q.    The notes in 469-B, whose are those
8  notes?
9  A.    I believe they are Dan Metrikin.
10  Q.    Who is Dan Metrikin?
11  A.    Dan is an analyst that works for me in
12  the New York office.
13  Q.    And these are notes of a meeting with
14  Jim Seery or call with Jim Seery?
15  A.    I believe it is notes of a conference
16  call with Jim Seery.
17  Q.    And you did not participate in that
18  call?
19  A.    I did not.
20  Q.    Who else did participate?
21  A.    I wasn't on the call. My
22  understanding is that from Houlihan, it was
23  Mike Fazio.
24  Q.    And Dan Metrikin?

Page 208

BURIAN

1  A.    Correct.
2  Q.    After Mike and Dan had this call with
3  Jim Seery, did either of them report to you on
4  what they had learned?
5  A.    At some point after, yeah. Not
6  immediately after.
7  Q.    And the typed notes, 468-B, is that
8  something that you were given around the time on
9  the 18th or the 19th?
10  A.    I don't remember if I was given the
11  written notes. I certainly was given a summary
12  of the gist.
13  Q.    And what was the summary of the gist
14  that you got?
15  A.    The -- things had been relatively busy
16  at Lehman; that they had a Barclays deal that
17  Barclays walked away from; that they were forced
18  to file by the Fed; that they really thought,
19  Jim Seery thought there was no way that B of A
20  or the Korean Development Bank would jump back
21  in, from a timing perspective, from a risk
22  appetite perspective.
23      The discussion about, you know, what's
24  going on with respect to the book, generally

Page 209

BURIAN

1  that the deal was cut on these numbers and
2  that the book is holding up relatively well,
3  although a lot of concern about assets
4  disappearing, not coming back to Lehman, and
5  therefore, concern -- I could read this and
6  repeat this to you. I'm asking you --
7  Q.    I'm not asking you to do that.
8  A.    You are asking my recollection at the
9  time of what was said, what I understood. So
10  this is a summary, so we can go back and look at
11  the notes obviously in more detail.
12  Q.    Let me interrupt for one second
13  then --
14      MS. TAGGART: Do you have more to say?
15  A.    I am happy to be interrupted.
16  Q.    I will interrupt and let you come back
17  to add to the summary.?
18      MS. TAGGART: I don't know if it works
19  like that, but it sounds like he is done.
20  Q.    In this call, did Mr. Seery say
21  anything to your team about Barclays stepping
22  into the shoes of the Fed in relation to the
23  Fed's repurchase agreement?
24  A.    Without looking at the notes, I don't

Page 210

BURIAN

1
2  have a recollection.
3      Q.  OK.
4      A.  I knew that fact leading into Friday.
5  I can't tell you if I found that out, you
6  know -- exactly where I found that out or from
7  whom, you know, Thursday or Friday morning.
8      Q.  OK. Did Mr. Seery discuss with you,
9  your team whether exchange-traded derivatives
10  would be part of the purchased assets under the
11  asset purchase agreement?
12      A.  There was confusion about -- there was
13  confusion about which derivatives was going and
14  not going and we were told both at the Thursday
15  meeting at Weil and then later at the Seery call
16  that certain derivatives were intended to go.
17      Q.  In other words, exchange-traded
18  derivatives were intended to go, but
19  over-the-counter were not?
20          MS. TAGGART:  Objection to form,
21  foundation.
22          MS. SCHAFFER:  Objection to form.
23      A.  I don't remember if the words
24  over-the-counter were ever used. Maybe like
25  privately negotiated. There were other phrases

Page 211

BURIAN

1
2  for them. But generally, what could be priced
3  and traded by Barclays immediately was supposed
4  to go and the other stuff was not. That was my
5  understanding. I'm still not sure if that's
6  what happened, but that's my understanding.
7      Q.  Who prepared the document that we have
8  marked as 468-B, if you know?
9      A.  These notes?
10      Q.  Yes, the typed notes.
11      A.  My best of my understanding is Dan
12  typed up his notes.
13      Q.  And 469-B are his notes?
14      A.  Yeah, that's my understanding.
15      Q.  Let's look at Exhibit 470-B. This is
16  an e-mail --
17      A.  470?
18      Q.  470. This is an e-mail from Dan
19  Metrikin to others. Is this e-mail, to the best
20  of your recollection, referring to the
21  conversation with Jim Seery and his notes from
22  that conversation?
23      A.  That's what it purports to say.
24      Q.  And Connor Gillen is a Houlihan
25  employee?

Page 212

BURIAN

1
2      A.  No, Connor is an FTI employee. So it
3  looks like from this e-mail that Connor was on
4  the call and that Dan and Connor -- I mean,
5  listen, you can read this as much as I can.
6      Q.  Connor Gillen, is he, that's a
7  different Connor from Connor Tully.
8      A.  Oh, I am sorry.
9      Q.  So I'm just asking if Connor Gillen is
10  a Houlihan person if you know?
11      A.  You know, I'm -- maybe I'm nervous,
12  I'm just blacking out.
13      Q.  You're not sure. You're not sure, OK.
14      A.  We do have an analyst named Connor
15  that works in my group. We have many analysts.
16  I apologize.
17      Q.  No, no.
18      A.  Do you have a copy of the -- my
19  response to the interrogatories? Can I please
20  have the list of employees that worked on the
21  Lehman matter during September and October?
22      Q.  I don't have that with me, but we can
23  dig it out.
24      A.  It is just embarrassing.
25      Q.  It is fine. It was a minor thing.?

Page 213

BURIAN

1
2          MS. TAGGART:  We can try to figure it
3  out on a break.
4      Q.  Let's look at 471-B.
5      A.  Thank you for pointing out. I saw
6  Connor. I think the point is that was not
7  Connor Tully. Sorry, what do you want me to
8  look at?
9      Q.  471-B.
10      A.  471-B.
11      Q.  Now, this is an e-mail exchange
12  between Eric Siegert and Jim Seery.
13      A.  Correct.
14      Q.  Eric -- Eric Siegert and Jim Seery
15  knew each other from before this transaction?
16      A.  That's my understanding.
17      Q.  And did Eric participate in any of the
18  discussions with Jim Seery concerning the
19  transaction?
20      A.  I don't think so. I don't know. I
21  don't know of any material -- certainly nothing
22  material that came back to me. I was told that
23  he was not on that Thursday call and he was
24  definitely not part of any of the in-person --
25  early in the morning, we talked about a couple

54

Page 214

BURIAN

1    of Seery conversations.
2    Q.   Yes.
3    A.   He was not part of those either.
4    Q.   Do you know whether Eric Siegert had
5    any separate conversations with Jim Seery about
6    the transaction?
7    A.   I have not been informed that there is
8    anything, meaning in person or by telephone.
9    Q.   By phone?
10   A.   Not by -- I mean, obviously there is
11   an e-mail here, but not --
12   Q.   Well, Siegert was not in New York
13   City?
14   A.   Correct. Thursday he was.
15   Q.   Oh, he was?
16   A.   Thursday he was and, therefore, they
17   clearly communicated at the big Weil meeting.
18   He was at the meeting and I'm sure Eric must
19   have said something, I don't remember. But to
20   the best of my knowledge, there was no
21   substantive follow-up diligence meeting that
22   Eric was part of.
23   Q.   OK, with Jim Seery. All right. So
24   this call with Jim Seery took place the evening

Page 215

BURIAN

1    of the 18th around 9 p.m., is that right?
2    A.   Thursday night.
3    Q.   OK. Where were you Thursday night?
4    A.   I was at Lehman, the building -- now
5    the Barclays building.
6    Q.   745 Seventh?
7    A.   The one that is now that ugly color of
8    blue or green -- used to be green. Now it is
9    blue.
10   Q.   What were you doing at that time?
11   A.   I was meeting with senior management
12   of Lehman focused on what else was melting down
13   outside of the Barclays transaction.
14   Q.   And what else was melting down?
15   A.   I mean, it was a very broad, long
16   conversation. I produced my notes to you of
17   that conversation, which only doesn't even do
18   full justice, I guess, to all the details.
19         But Lehman is a, was a multinational
20   investment bank, stopped cold turkey an
21   arbitrary time and date. There was just a
22   never ending number of issues and concerns
23   and we wanted to know what was it that
24   impacted creditors that we needed to jump on

Page 216

BURIAN

1    to immediately to preserve and protect value.
2    Q.   We will take a look at your notes.
3         MR. STERN: Let's mark this as the
4    next exhibit.
5         (Exhibit 472-B, document Bates stamped
6    HLHZ 38187 through 191 marked for
7    identification, as of this date.)
8    Q.   What is the document that we have
9    marked as 472-B?
10   A.   Looks like pages of notes I took the
11   evening of the 25th through the morning of the
12   26th.
13   Q.   I am sorry, you mean the 18th--
14   A.   I am sorry, the morning -- the evening
15   of the 18th through the morning of the 19th, I
16   apologize.
17   Q.   That's OK. Aside from these notes,
18   did you take any other notes concerning the
19   transaction at any time from the 17th through
20   the 22nd?
21   A.   I definitely remember writing things
22   down. But they were not -- like, for instance,
23   the answer is I -- there is nothing that I have
24   or could find that I haven't given to counsel

Page 217

BURIAN

1    and been reviewed by them. I do have a
2    recollection of things, but not notes like this,
3    not coherent, but for instance, the balance
4    sheet nits and jottles, but I --
5         MS. TAGGART: I don't want to
6    misrepresent, there are -- and if it hasn't
7    been there, it will be on a privilege log
8    there have been some notes that have been
9    withheld on the privilege grounds.
10        MR. STERN: From the 17th through the
11   27th?
12        MS. TAGGART: Maybe, I could check the
13   dates if that's possible. It wasn't
14   withheld because it was after that time. It
15   was withheld because there was
16   attorney/client communications.
17   A.   I can help you go through and see what
18   dates they were from.
19   Q.   The balance sheet that you are
20   referring to, can you describe that to me?
21   A.   Can I ask someone to give it to you?
22   Q.   Sure, if you have it.
23   A.   Could someone give that exhibit that
24   was handed out at the --

Page 218

BURIAN

1    MS. TAGGART: It is Exhibit 19. I
2  don't think we have a copy of it, but that's
3  what he is talking about.
4    Q.    OK. All right. Looking back at
5  Exhibit 472-B, were these --
6    A.    Now these are my notes.
7    Q.    472-B? These are your notes, this is
8  your handwriting?
9    A.    Yes. My mother would be appalled, but
10  yes.
11    Q.    I think we can make it out.
12        Did these notes reflect more than one
13  meeting?
14    A.    These multiple pages?
15    Q.    Yes.
16    A.    Yes.
17    Q.    Can you take me through the notes and
18  tell me which sections relate to different
19  meetings if you can recall starting at the top?
20    A.    Sure, to the best of my knowledge,
21  Thursday night the 18th, first page, second
22  page, and probably, I can't be certain, but
23  probably up to where it says A/R on the third
24  page.

Page 219

BURIAN

1    Q.    OK.
2    A.    No, including the A/R.
3    Q.    Including the A/R, OK, and then after
4  the A/R, when would you have taken those notes?
5    A.    I believe this was early on Friday
6  morning, the -- here is the issue. I don't
7  remember if the balance of this page and the
8  next page up to the line that goes like this --
9  with the camera, up to this line.
10    Q.    OK.
11    A.    I don't remember if that was one call
12  or a quick call, hang up, and then a call back,
13  you know, 20 minutes later. If I had to swear
14  or guess, I think it was two, but it was such --
15  so close to each other, I don't know if it
16  matters.
17    Q.    After that line with the diamond and
18  the line through it on page 38190, the notes
19  after that, when were those taken?
20    A.    I believe that that was -- I'm not
21  sure, but I believe that that was a subsequent
22  call later in the morning on Friday before the
23  hearing.
24    Q.    The hearing was in the afternoon.

Page 220

BURIAN

1  Could these notes have been taken in the
2  afternoon?
3    A.    They were -- well, let me back up and
4  make it easier for you. If you turn the page,
5  these are my contemporaneous notes of what I was
6  told, the transaction was going into the hearing
7  on Friday. I remember being anxious and nervous
8  that I got these and I had to figure out like --
9  I missed the beginning of the hearing and I had
10  to get moving and also wanted to describe this
11  to the committee before the hearing started.
12    Q.    You're talking about page 38191?
13    A.    The last page.
14    Q.    OK, fine.
15    A.    So if you work backwards, this was the
16  final communication to me before the hearing and
17  then the one -- so now backing up, I don't
18  remember if this little bottom piece was part of
19  that same conversation, but it got so confusing
20  if I turn the page and said -- it would be like
21  me, and what I think happened is I started
22  taking notes at the bottom, trying to figure out
23  how what they are now telling me comports with
24  what they told me earlier in the day, and I said

Page 221

BURIAN

1  forget it, switch, just tell me what was, what
2  is, and let's ignore the previous two
3  conversations that we had because if you are
4  telling me those are all wrong anyway.
5        So let's get what was as of the
6  hearing date on Wednesday and what is as of
7  now that I am going to court. So my point is
8  I don't remember exactly if these notes below
9  that squiggly -- not the squiggly line, the
10  arched line, were part of the previous
11  conversation or part of the next one.
12    Q.    OK, fine. Let me just go through this
13  with you and I'm going to skip through the first
14  two pages and I'm going to start with the third
15  page which is Bates number 38189. The bottom
16  half of that page with the X through it, do you
17  see that?
18    A.    Well, for the camera, the X and these
19  lines.
20    Q.    Yes, and we have this as an exhibit,
21  so we will be able to refer to it.
22    A.    OK.
23    Q.    The bottom half of the page, can you
24  tell me what that says?

Page 222

BURIAN

1
2    A.    You want me to read my handwriting?
3    Q.    Yes.  It looks like it says
4  L-B/something?
5    A.    S-B.
6    Q.    S-B.  What does the S-B relate to?
7  What does that mean?
8    A.    Long book/short book.
9    Q.    And then what does it say?
10    A.    50.64 B, assets; 27.4 B agencies,
11  equities, corporate.
12    Q.    And then what does it say?
13    A.    Collateralized repo of Barclays Fed
14  loan.
15    Q.    And then what does it say?
16    A.    They took all the Fed securities,
17  Corp. something or other, CDO, financing of -- I
18  think it says Corp. loan sales, but I'm not
19  sure.
20          MR. STERN:  Do we have the original of
21    these notes?
22          MR. WHITMER:  It is going to take me a
23    minute to make sure I don't have any
24    anything privileged in them.
25    Q.    What does the next line say?

Page 223

BURIAN

1
2    A.    The original is not going to help you.
3  It is my handwriting.  Do you want me to keep on
4  reading?
5    Q.    You think it says Corp. loan sales,
6  but you're not sure.  CDO --
7    A.    It says financing of, I think it says
8  Corp. loan something.
9    Q.    OK.  And then the next line, what does
10  that say it?  It looks like there is a number?
11    A.    5 billion.
12    Q.    What does that relate to?
13    A.    I don't know.  I mean --
14    Q.    Next line.
15    A.    Total extension, 45.5 billion.
16    Q.    Below that?
17    A.    Cure payments, 250, underneath an
18  arrow that says 250, good will payment, and then
19  another below that, an arrow that says, comp and
20  severance.
21    Q.    Hold on for a second.  We need to give
22  her a break.
23          So below comp and severance, what does
24  it say?
25    A.    I think it says 1.02 and then it says

Page 224

BURIAN

1
2  New Jersey appraisals, 110 million shy.
3    Q.    OK, and then next line?
4    A.    Repo 50.6, here it says million.
5    Q.    It says MM?
6    A.    MM.
7    Q.    And then below that?
8    A.    No upside in the portfolio.
9    Q.    And to the bottom left, it says 5
10  p.m.?
11    A.    Correct.
12    Q.    What is that a reference to?
13    A.    I honestly don't know.
14    Q.    And going back to the 5 billion dollar
15  figure in the middle of your notes, did you tell
16  me that you don't recall what that represents?
17    A.    We have to --
18          MS. TAGGART:  Wait, hold on, let me
19    just read that.  I was dealing with
20    originals.
21          OK, go ahead.
22    A.    You need to be more clear about the
23  question, about what I thought it represented.
24    Q.    Well, let's do it both ways.  I think
25  you read your notes under -- it says they took

Page 225

BURIAN

1
2  all the Fed securities and under that, there is
3  a figure with a dollar sign, 5B.  Do you see
4  that?
5    A.    Yup.
6    Q.    Do you know or do you remember what
7  that is a reference to?
8    A.    No.  Because -- no.
9          MS. TAGGART:  For the record, we have
10    the original of that page.  Well --
11    Q.    Do you know with whom you were
12  speaking when you took those notes?
13    A.    Yeah.  I also want to explain the
14  cross-out.  Jim Seery and Mark Shapiro, one or
15  both of them were on the phone for all three of
16  these pages.  That's where the information came
17  from on all three of these pages and --
18    Q.    In the last page --
19          MS. TAGGART:  Let him finish.
20    A.    -- and the 5 billion I think it was
21  the netting of the 50 billion to get to 45
22  billion, 45.5.  Although I honestly don't
23  remember how that correlates to 27.4 on the
24  right side.
25    Q.    Why do you think the 5 billion was

Page 226

BURIAN

1  netting of the 50 billion to get to 45.5?
2      A.   I don't know if I can -- I am happy to
3  explain to you the -- they were on the phone
4  rattling this off. I didn't get a chance to ask
5  them questions. And then as soon as they were
6  done, like there was like a lot of noise in the
7  background, like whispering or shuffling and
8  talking, and then they came back on the phone
9  and said something to the effect of, oh, my,
10  although the language was more investment
11  banking then oh, my. That's all wrong, scratch
12  that and forget it.
13      I told you before I don't remember if
14  they said scratch that, forget it. I turned
15  the page and then was told the top of the
16  next page or if they hung up on me and then
17  came back shortly thereafter and gave me the
18  information on the top of the page. So this
19  was OK, Saul, here is what's going on, 50.64,
20  we got 25, 4 -- -collateralized, running
21  through the issues, and then oh, mumble,
22  mumble, mumble, noise, noise, noise, forget
23  that, scratch it. Let me tell you what's
24  really going on.

Page 227

BURIAN

1      I believe they hung up on me -- not
2  hung up on me being nasty, I have got to go.
3  There was a lot of noise in the background
4  and bedlam and they were preparing for the
5  hearing and yada, yada, yada, but it wasn't a
6  two-way conversation where I could say, what
7  is that 5 billion, what is that, what is the
8  127.4.
9      It was write down what someone was
10  very very, very quickly, next page -- two
11  pages over is much more of me participating
12  in the conversation and saying, whoa, whoa,
13  whoa, not that page, next page, of me saying
14  I want to understand it better, I need to get
15  this right, and you need to explain this to
16  me.
17      That's why I don't want to sound like
18  an idiot, someone says what did you write
19  down, what's your recollection. I was really
20  trying to write down as fast as I could what
21  someone was throwing at me and then they hung
22  up or said scratch it and move on. So if you
23  look at the next page, what they said to me
24  was -- I am sorry I don't know if there is a

Page 228

BURIAN

1  question.
2      Q.   What was the question?
3      A.   What is --
4      Q.   Let's hear the question because we are
5  going to be here late in the evening if you
6  don't answer the question.
7      (Record read as follows:)
8      "Q:  Why do you think the 5 billion
9  was netting of the 50 billion to get to
10  45.5?"
11      A.   I don't have -- I do not have a
12  specific recollection of what that number was.
13      MR. STERN: Can you in the record
14  reflect the question again.
15      Q.   You believe at some point in this
16  conversation with Jim Seery and possibly Mark
17  Shapiro, that they ended the conversation?
18      A.   Correct.
19      Q.   And then did they call you back or did
20  you call them back?
21      A.   As I said earlier, I don't remember if
22  I was on hold for a period of time and there was
23  a conversation that continued or they hung up
24  and one of us called each other back.

Page 229

BURIAN

1      My impression was they were running
2  from room to room or, I don't know if they
3  were Lehman or Weil, so it was hard to reach
4  them. So I -- subject to the fact that I am
5  not 100 percent sure if there was one long
6  conversation or a separate one, I think that
7  they called me back. I'm not 100 percent
8  sure.
9      Q.   On this sheet that's bearing Bates
10  number 38189, do you recall when you crossed out
11  the information at the bottom half of the page?
12      A.   During the conversation -- at the end,
13  when they said scratch that, forget it, ignore
14  that, that is all wrong, I crossed it out and
15  turned the page.
16      Q.   When -- and you have specific
17  recollection that they said that is all wrong?
18      MS. TAGGART: Object to form,
19  argumentative.
20      A.   Absolutely -- I am sorry, absolutely.
21      Q.   Who said that?
22      A.   I believe it was Seery, but it could
23  have been Mark Shapiro.
24      Q.   Do you recall whether both of them

Page 230

BURIAN
1
2   were on that call?
3       A.   I do not recall if both were on the
4   call.
5       Q.   OK.  Do you recall whether they said
6   that all of this information that you crossed
7   out was wrong or some parts of it were wrong?
8       A.   It wasn't that specific.  It was let's
9   start all over, let's not be confused, that's
10  wrong, that's wrong, let me tell you what the
11  deal was.  As you --
12      Q.   So then you --
13          MS. TAGGART:  Wait, he is finishing.
14      A.   As you can see in the context of the
15  conversation, they came back, I was still
16  confused, and then we had the last conversation
17  before the hearing.  So this was iterative.
18      Q.   You say as you can see, but I can't
19  necessarily see that.  I am really relying on
20  your testimony and your recollection.  Because I
21  don't think it is obvious from what's on the
22  page.
23      A.   Well, what's on the --
24          MS. TAGGART:  What's the question?
25      Q.   Let's turn to the next page --

Page 231

BURIAN
1
2       A.   Can I just be clear because I think
3   the question was when did I --
4          MR. STERN:  Is something the matter?
5          MS. TAGGART:  You were making a speech
6   about your comment on his testimony.
7          MR. STERN:  I wasn't making a speech,
8   certainly not compared to your speech making
9   today.
10         MS. TAGGART:  Are you going to let me
11  to answer you questions now?  Would you like
12  to know what's the matter.
13         MR. STERN:  I have given you plenty of
14  time to make speeches.  Let's ask the next
15  question.
16         MS. TAGGART:  You ask questions and he
17  will give you the answer.
18      A.   I am answering your question.
19      Q.   You have to answer questions, OK?  It
20  is not an opportunity just to speak.?
21         MS. TAGGART:  Let's get on with a
22  question, not a little talk about this.
23      Q.   Looking at the next page, 38190, what
24  does that information reflect?
25      A.   The top half above the curved line, as

Page 232

BURIAN
1
2   I previously testified, represents a telephone
3   conversation with Lehman representatives that
4   followed them telling me to ignore the previous
5   information.
6       Q.   OK.  So above the curved line is a
7   conversation with whom?
8       A.   I believe it was Jim Seery and Mark
9   Shapiro or just Mark Shapiro.
10      Q.   And read to me these notes, so that we
11  know what they say.
12      A.   45.5 -- dollar line sign, 45.5 long,
13  all shorts closed out, I wrote in paren, maybe
14  some.  And then I crossed out at that time, the
15  maybe some.
16      Loan is at 45.5, real estate, real
17  estate, RE --- losing 100 MM.  Comp and
18  severance losing the upside in the portfolio,
19  no cash.  350 PIM broker, I can't reed what
20  the next two items are with the numbers.  I
21  know what they represent, but I'll stick to
22  answering the question and reading it to you.
23  So I can't read it, it was P, and then
24  something and then 220 and then 300.  Then
25  something else, 110 and then 1150.  And they

Page 233

BURIAN
1
2   have totalling of those columns which have
3   the 330 to 450.
4       Then 20-30-B closed out, space,
5   crossed out and beneath that is a line,
6   repo-but nothing after the dash, and then
7   below that, I believe that scrawl is
8   agencies-1 to 2.  I think it may say pass
9   through, but I'm not sure what that says,3 to
10  5 percent, Corp., 5 to 10 percent,
11  ill-liquid, empty, nothing there, space.
12      Should I stop at the line?
13      Q.   Is that when the conversation ended?
14      A.   As I said to you earlier, I wasn't
15  sure if below the line was that conversation or
16  the beginning of the next conversation when I
17  continued to be confused and insisted on not
18  relating back to things, but starting all over
19  Wednesday to Friday as opposed to interim
20  conversations that I was told don't -- that's
21  why I was not sure.
22      Q.   What would help me to understand --
23         MS. TAGGART:  I have the originals and
24  I will note there is a change in pen color,
25  so if you want to refer to that, there is

Page 234

BURIAN

1 the original page.
2 Q.   On page 3841 --
3 A.   Am I allowed to see that, too?
4        MS. TAGGART: Sure this is the next
5 page, but the back of it has some privilege,
6 so please don't look under that.
7 Q.   This is a separate pen. OK.
8        So just --
9 A.   Were you asking me if that's a
10 separate pad?
11 Q.   It is a different -- on page 38191, it
12 appears from the original that that's written in
13 a different pen.
14 A.   Different pen, it is the same pad.
15 Q.   I said pen.
16 A.   Oh, yeah, OK. I thought you said pad,
17 P-A-D.
18 Q.   So does that refresh your
19 recollection, looking at the original, that the
20 last page of this exhibit 38190 -- I am sorry,
21 38191 was written at a different time than most
22 of the blue notes on 38190?
23 A.   It doesn't refresh my recollection.
24 It is what I said now at least three times,

Page 235

BURIAN

1 which is the last page of these notes was from
2 that last conversation before the hearing. My
3 only ambiguity was on the previous page which is
4 page -- where is the squiggly line page? Here,
5 it ended 190 and now looking at this, I notice
6 that the numbers on the right side, 47.4, 45.5,
7 2 cure, two employees is in a different color
8 pen, and that's consistent with what I said
9 before, that some portion of this page may have
10 been the beginning of the next conversation and
11 not only, you know, part of that conversation.
12 Q.   And when did the next conversation
13 take place, the conversation that's reflected on
14 38191?
15 A.   That was -- well, I have a firm
16 recollection that this conversation ended with
17 Saul, I got to go to the hearing.
18 Q.   Who said that?
19 A.   Probably I think Mark Shapiro; I got
20 to go. So this was whatever period of time that
21 the people with Mark felt he had to get there in
22 time for. So back it up from when the hearing
23 started to when someone would have thought
24 travel was necessary, the hearing was 2 o'clock.

Page 236

BURIAN

1 Probably 1, 1:30.
2 Q.   So you believe this last page reflects
3 notes of a conversation with Mark Shapiro?
4 A.   I don't remember if Jim Seery was on
5 that call or not and who else was on the call,
6 but definitely I believe Mark was on this call.
7 Q.   So this -- OK. So this last page is
8 the 19th which is a Friday?
9 A.   Correct.
10 Q.   And --
11 A.   Well, the other page is also the 19th.
12 Q.   And the previous two pages were early
13 Friday, I think you said the very beginning of
14 the notes started on the 18th?
15 A.   The top, I don't know the squiggles of
16 189, where it says 4.6, 9, 3-6, 1.5, 2. I don't
17 know when that was from. But above that, up to
18 the A/R that we drew a line by A/R, that was
19 from the night before.
20 Q.   Now, looking at the top of page 38190,
21 where 45.5 long, all shorts closed out,
22 loan is at 45.5?
23 A.   Um-hm.
24 Q.   What did you understand all that to

Page 237

BURIAN

1 mean?
2 A.   It was exactly what I told you
3 earlier, that it was no haircut, it was a direct
4 even-for-even match.
5 Q.   So your recollection is that you were
6 told by Jim Seery and/or Mark Shapiro that there
7 was no haircut in the repo?
8 A.   The word "haircut" never came up in
9 the conversation. So the answer is no to that
10 question.
11 Q.   So they never told you there was no
12 haircut?
13 A.   They told me that we had a 45.5 asset
14 position against a loan of 45.5. I then
15 deducted 45.5 from 45.5 and determined that
16 there was nothing, no value in excess of the
17 loan on my own without being told that.
18 Q.   And you're sure as you sit here today
19 that that is what they told you concerning the
20 terms of the repo?
21        MS. TAGGART: Objection to form.
22        MS. SCHAFFER: Objection to form.
23        MS. TAGGART: Asked and answered.
24 A.   The terms of the repo never came up in

Page 238

BURIAN

1
2  the conversation.
3      Q.  What was this a reference to?
4      A.  I was told that it was 45.5 billion
5  dollars of assets going to Barclays against a
6  45.5 billion dollar loan from Barclays. The
7  mechanics of Fed portfolio securities, cash,
8  noncash, all that stuff in these quick
9  conversations was irrelevant. We were just
10 focusing on the substance of what was moving to
11 whom.
12     Q.  You say there was no discussion of
13 there being a repo?
14     A.  This was described as, right, the loan
15 was described as Barclays' loan to us which at
16 the time we thought it was a simple transaction
17 at Barclays stepping into the full amount that
18 the Fed was owed. The -- there was no
19 discussion on the mechanics of that step in.
20     Q.  So in other words, this discussion at
21 the top of 38190, you did understand to relate
22 to the repo?
23     A.  Getting back to what I said was -- I
24 didn't give it it a second thought of whether it
25 related or didn't. I can't tell you if I knew

Page 239

BURIAN

1
2  then what I know how about the clarification
3  letter and the mechanic for execution. The
4  conversation was quick. It was short. It was
5  pressured and it was about, hey, just tell me
6  the substance of what is happening, what are we
7  giving, what are we getting. I don't have -- we
8  didn't talk about haircuts or mechanics.
9      Q.  Did you have an opportunity to ask
10 them what the basis was for the 45.5 long figure
11 at the top of page 38190?
12     MS. TAGGART:  Object to form.
13     A.  I did later in the next page in that
14 conversation. But at this conversation, I
15 merely wrote down what they told me.
16     Q.  What did they tell you was the basis
17 for the 45.5 long?
18     A.  I don't remember specifically if they
19 said the basis for the 45.5 is, but all the
20 conversations, these were -- I thought they were
21 the Lehman marks.
22     Q.  OK.
23     A.  And --
24     Q.  Did you have a chance to find out from
25 them how that 45.5 long on page 28190 related,

Page 240

BURIAN

1
2  if it did, to the 50.64 billion dollar figure on
3  page 38189?
4      A.  I was told that that number -- that
5  that whole thing was wrong or misunderstanding
6  of the transaction, I should rely on these
7  numbers, and then of course, they call back and
8  said this is what you should rely on.
9      Q.  I don't think that answers my
10 question.
11     A.  We didn't go back and forth comparing
12 this to the conversation they told me to ignore.
13     Q.  Let me ask you my question again. Did
14 you have a chance to ask or did you ever find
15 out whether there was any relationship between
16 the 45.5 long at the top of page 38190 and the
17 50.64 at the middle of page 28189?
18     MS. TAGGART:  Objection, asked and
19     answered.
20     A.  Only in the context of the
21 conversations that revolved around -- that ended
22 in my notes on page 191.
23     Q.  And what did you find out about the
24 relationship between those two figures?
25     A.  That they were wrong.

Page 241

BURIAN

1
2      Q.  Both figures were wrong?
3      A.  No, that the 45.5 was right, but did
4  not represent a par value. It represented a
5  mark value.
6      Q.  What did you -- what were you told the
7  45.5 represented?
8      A.  Let's back up to when?
9      Q.  During this conversation?
10     A.  On page 190?
11     Q.  Yes.
12     A.  That these were the value of the long
13 position being transferred to Barclays.
14     Q.  And do you know, did they tell you who
15 arrived at that value?
16     A.  I don't remember a specific
17 conversation about who marked the book, but the
18 understanding of the conversation was we were
19 talking a common language and that these were
20 the Lehman marks.
21     Q.  Did they explain to you what the
22 figure 50.64B on page 38189 represented?
23     A.  I am sorry?
24     Q.  Did they explain to you what the 50.64
25 billion figure on page 38189 represented?

Page 242

BURIAN

1
2  A.    In the subsequent conversations?
3  Q.    In any conversation.
4  A.    Well, as I said to you before, in that
5  very quick conversation, they said, OK, here's
6  numbers, he rattled down, we got 50.64 billion
7  of assets with 27.4 billion representing these
8  things and he ran through the numbers, I took
9  notes as quickly as I could, and then he told me
10  scratch that, it is all wrong, I'll get back to
11  you. Or I was on hold for a while. I don't
12  remember if it was the same conversation or
13  separate.
14    In the subsequent conversation, we did
15  not go back to that, and as I said earlier,
16  because we were so confused about what we are
17  going back to and what we are not going back
18  to, we decided to scrap all the conversations
19  and start all over on 191, just tell me what
20  the deal is.
21  Q.    That doesn't answer my question.
22  A.    I tried.
23  Q.    My question is very narrow. Did
24  Mr. Seery or Mr. Shapiro, whoever else was in
25  this conversation with you, explain to you the

Page 243

BURIAN

1
2  basis of the 50.64 billion dollar figure at the
3  middle of page 38189?
4  A.    No.
5    MS. TAGGART:  Is this a good time for
6  a break?
7    MR. STERN:  You need a break? OK.
8    THE VIDEOGRAPHER:  The time is now
9  3:49 p.m., we are now off the record.
10    (Recess)
11    THE VIDEOGRAPHER:  This is the start
12  of tape number 5. The time is 4:01 p.m., we
13  are now back on the record.
14  Q.    Let me hand you an exhibit previously
15  marked as Exhibit 338-B. And we have the
16  original of this. Could you for the record just
17  describe the original to us?
18  A.    Can I hold it up to the camera? Does
19  that help?
20  Q.    Sure.
21  A.    It's a -- a manila folder with -- the
22  back of the manila folder has two different
23  handwritings on it. The predominant one is blue
24  and that's a felt-like pen or Roller Ball, and
25  then a more cheaper pen, there is a different

Page 244

BURIAN

1
2  shade of blue or black that's on the center.
3  Q.    And the different shade says the word
4  "RESIs" and there are two numbers 2.5 and 3.5
5  below it.
6  A.    Correct.
7  Q.    Can you tell us what this is?
8  A.    This is an exhibit, this is a
9  document -- how is that for a neutral phrase? --
10  that was given to me by Michael Klein early the
11  morning of the 22nd of September.
12  Q.    Are the notations on this document
13  notations that were made during the course of
14  the meeting that you had?
15  A.    Yes.
16  Q.    And tell me who was in the meeting?
17  A.    From Houlihan, it was me and Mike
18  Fazio. I believe Lori Fife was in for the part
19  or all of the meeting but certainly Harvey
20  Miller was there for the whole meeting. I think
21  Tom Roberts. Maybe Krasnow, I don't remember.
22    MS. TAGGART:  Off the record for just
23  a moment.
24    THE VIDEOGRAPHER:  Off the record.
25    (Recess)

Page 245

BURIAN

1
2    (Exhibit 473-B, document Bates stamped
3  LBHI 4414 through 4415 marked for
4  identification, as of this date.)
5    (Exhibit 474-B, document Bates stamped
6  MTHM 5778 marked for identification, as of
7  this date.)
8    THE VIDEOGRAPHER:  The time is 4:07
9  p.m., we went off the record at 4:04 p.m.
10  Q.    When we went off the record, we were
11  looking at 338-B and I asked you who was in the
12  meeting and you told me from Houlihan, it was
13  you and Mike Fazio, Lori Fife for part of the
14  meeting, certainly Harvey Miller was there for
15  the whole meeting, you said you thought Tom
16  Roberts, maybe Krasnow, you didn't remember.
17  Anybody else?
18  A.    Well, Richard Klein from --
19  Q.    Michael Klein?
20  A.    Michael Klein, the Barclays
21  representative.
22  Q.    And where did the meeting take place?
23  A.    One of the smaller conference rooms on
24  the 25th floor of Weil.
25  Q.    At what point in the meeting did

Page 246

BURIAN

1 Mr. Klein write on the Manila folder that we
2 have marked as Exhibit 338-B?
3    A.    Very, very early. It was -- when we
4 say meeting --
5    Q.    Conversation.
6    A.    It was very early. I mean, that's
7 what this was about.
8    Q.    And describe to me how the
9 conversation went.
10    A.    To do that accurately, I need to give
11 you the five seconds before the conversation
12 started, because there was a --
13    Q.    Sure.
14    A.    So pressure is building throughout the
15 night and it is now morning. We are hearing
16 things about the clarification letter, things
17 changing. My guys are telling me that there is
18 this list of assets that doesn't match what we
19 have been told was going to be the deal and the
20 court, we are getting anxious and upset and
21 finally I turned to Harvey and said, we are
22 tired and we are being ignored and we are not
23 doing anything or something to that effect, we
24 need to know what is going on, what is the deal,

Page 247

BURIAN

1 do we have a problem, is there a problem.
2    And he was like, well, I don't know,
3 negotiations, yada, yada, yada. And I say,
4 Harvey, we can't delay anymore. We need to
5 know. He turned, like said, wait there a
6 second, and he basically grabbed Michael and I
7 wasn't part of the conversation, but the
8 implication from the body language was I know
9 you're busy, there was a separate room where
10 Archie Cox was, a lot of other important people,
11 and my impression, he said this is something
12 that you have to make time for and I won't say
13 in an exasperated way, because he is very
14 polite, but in a time-sensitive way, he came
15 into the room and it wasn't like, hey, wait for
16 me, I am going to bring other people. It was
17 like now is your opportunity to get information.
18    So Mike and I sat down and he came in
19 and I think Harvey may have said a preamble
20 or something like, hey, you tell us what the
21 deal is. I believe he said us, including
22 him, he may have meant me, but he said, I
23 think he said us, I think he wanted to hear
24 it himself, and then Mike launched into what

Page 248

BURIAN

1 purported to be the final negotiated deals,
2 now 1:30 to 2:30 in the morning, and he, you
3 know, there has been a lot of confusion and
4 he said this is what happened and this is
5 what's going on, and this is why you should
6 be comfortable. And he -- all the markings
7 on that page are his markings. Other than me
8 writing the other print, the RESIs 2.5, 3.5.
9    Q.    I see. That's your handwriting.
10    A.    That's my handwriting.
11    Q.    And what was your basis for making
12 that notation?
13    A.    It was after the conversation -- it
14 was after he finished and he handed me the
15 folder and then I asked him how does -- he
16 didn't understand the context of the whole
17 conversation, like we were doing the back first
18 I asked him how does that split, 50/50 or RESIs
19 at 2 and a half, 3 and a half, all the numbers
20 we have been reading, and as my wont, I doodled
21 "RESIs 2 and a half, 3 and a half." And he --
22    Q.    What did you understand that to
23 represent?
24    A.    My doodle?

Page 249

BURIAN

1    Q.    Yes.
2    A.    That I had said 2 and a half, 3 and a
3 half, I wanted to understand how that correlated
4 to which assets were going or not going. And
5 then I doodled -- I guess I figured it would be
6 somewhere in this quadrant that those would
7 belong in one of the boxes, but I --
8    Q.    You were not sure?
9    A.    No, I was sure what my question was,
10 explain to me in this morass why the deal was
11 50/50, why it was we had upside in some of these
12 things, how come originally in court it was
13 going to the DTC, and I think 2 and a half or 3
14 and a half was going to stay or go, those
15 details are fuzzy now in your whole explanation
16 of what the deal is, where do the RESIs fit in.
17 That is what I was saying when I doodled that on
18 the manila folder.
19    Q.    Did you understand that Barclays was
20 receiving certain of the RESIs through the repo
21 replacement?
22    A.    I had no idea if it was through or not
23 through. I did know that the new deal included
24 some RESIs. I asked how those RESIs compared to

Page 250

BURIAN

1  other RESIs, because there were three sets of
2  RESIs. It was -- at different times, there was
3  confusion in my mind of RESIs that were not
4  going to Barclays, RESIs that were going
5  Barclays, RESIs staying at DTC, RESIs that were
6  being split, and until today, I have never
7  gotten an explanation.
8      Q.   Did you know whether there are certain
9  RESIs that would be seized by JP Morgan?
10     A.   That would be subsequently seized?
11     Q.   Or had been?
12         MS. TAGGART: Object to form,
13  foundation.
14     A.   I am sorry, what's the question?
15     Q.   Did you know whether there were
16  certain RESIs that either had been or would be
17  seized by JP Morgan?
18         MS. TAGGART: Object to form,
19  foundation.
20     A.   Not with particularity. I knew
21  leading up to this meeting Wednesday -- sorry,
22  Thursday and Friday hearing about how assets
23  weren't coming back and Saturday and Sunday were
24  endless meetings and wranglings, the deal is go

Page 251

BURIAN

1  to blow up, JP Morgan won't cooperate, can't the
2  Fed do something, all that stuff. About
3  transfers from JP Morgan, I do not remember
4  whether the word "RESIs" were particularly
5  referenced in that connection.
6      Q.   So going back to the manila folder,
7  upper left quadrant, there is a notation 49.9
8  that's circled.
9      A.   The upper left is 72.68.
10     Q.   I am focusing on 49.9 and next to
11  that, it says, "Premarked." What did you
12  understand that 49.9 figure to be?
13     A.   I have a very clear recollection.
14  The -- what was going on was we were trying to
15  understand what the deal was and when Mike told
16  us, Mr. Klein told us was, yes, you're right,
17  you have seen reports and you have seen numbers
18  that's close to 50 million dollars, and you've
19  seen -- and that basically we are getting -- we,
20  Barclays is getting -- I'm not sure 44.4 or 44.9
21  now that I am looking at it carefully, but we
22  are getting roughly 50 billion of assets with a
23  premark value --
24     Q.   Excuse me for a second. Are you

Page 252

BURIAN

1  saying you don't know whether this number that's
2  circled --
3         MS. TAGGART: No, no, he gets to do
4  the whole answer and then you can have a
5  clarification. But --
6      Q.   You mentioned 44.4 or 44.9.
7         MR. STERN: Please, Erica.
8         MS. TAGGART: No, he gets to finish --
9  you have got a transcript. You can ask
10  things, but he gets to answer.
11     Q.   Are you saying that figure is 49.9 or
12  44 --
13         MS. TAGGART: No, no --
14         MR. STERN: Please, would you stop?
15         MS. TAGGART: No, you interrupted. He
16  has to put his answer on the record and then
17  you can clarify anything that you want.
18         Why don't you go back to what you were
19  answering, and then you can ask the
20  clarification. We have the whole transcript
21  you can go back to any part to get
22  clarification.
23         Why don't you keep going.
24     A.   I must admit, Erica, I am a little

Page 253

BURIAN

1  lost.
2      Q.   I think that's because your counsel is
3  interrupting. Let me ask a question.?
4         MS. TAGGART: Wait, wait, wait.
5         MR. STERN: We are going to be here
6  very late tonight.
7         MS. TAGGART: No, we are going to stop
8  it at 7.
9         MR. STERN: No, we are not.
10         MS. TAGGART: Do you have any more to
11  add to your answer. Is there any more that
12  you want to add to your answer? It is OK,
13  if you don't know and we can do a new
14  question and new answer.
15     A.   I was explaining the 49.49 premarked
16  number that's circled on the page, and then I
17  said, wow, look, the jiggle is not closed. But
18  there is no question in my mind that that was,
19  at the time, it was 49.9 billion and that the
20  intention was that he was saying to me you're
21  right, you showed me an exhibit earlier, you're
22  right that your concern was that roughly 50
23  billion of securities, which matches up to
24  Exhibit 461-B, at the time I didn't have this.

Page 254

BURIAN

1
2  Q.  You did not have 461-B?
3  A.  Not in my hands, and as I said
4  earlier, I knew that there was confusion and we
5  were concerned about what securities were going
6  and what appeared to be a difference in the
7  valuation, in the value of what Barclays was
8  getting, and that, you know, was there a 45.5
9  billion in liabilities against 50 billion of
10 assets, and therefore, what he said to me was,
11 hey, 49.9 that you have been looking at is
12 premark.  That's stuff that relates to not
13 today's value, that's premark.
14      We asked at one point premarked as of
15 when and he says, listen, it doesn't matter
16 if it is, you know, what the date and when,
17 but I am telling you, when we came in this
18 meeting today and we are trying to close the
19 transaction, 49.9 is the old value of what it
20 was we are getting.
21      And then he said, post mark, which
22 means, which was we have lost 4 to 5 billion
23 dollars over the last period of time.
24 Markets have been, a lot of ill-liquids.  We
25 said what time period did it happen.

Page 255

BURIAN

1
2  Saturday.  You know, it was like listen, you
3  want an explanation of the deal, here is the
4  deal.  50 billion of assets, they have
5  dropped in value, and they are now -- we
6  agree with Lehman that these assets are worth
7  44 to 45, and therefore, you know, we were
8  short.  We are adding 1.9 billion of assets
9  that are unencumbered that were not part of
10 the repo to get to a total of what Barclays
11 is getting of 47.
12      And that is my absolute understanding
13 of the left, top left quadrant of the page
14 and that 47 is tied to -- is the final number
15 as compared to the 72 which is where what he
16 said was the original contemplation when the
17 document was originally signed.
18 Q.  I think you said that you personally
19 did not have the information contained in 461-B
20 at the time of this conversation with Mr. Klein
21 and Mr. Miller.  Is that right?
22 A.  That is correct.
23 Q.  But your team -- the Houlihan team,
24 that is -- did have the information reflected in
25 Exhibit 461, is that right?

Page 256

BURIAN

1
2  A.  That is correct.
3  Q.  Did anybody from your team bring to
4  your attention the information in 461-B that is
5  summarized right under tab A?
6  A.  Yes.
7  Q.  Who did that?
8  A.  It came up a number of times.  The
9  most obvious one is Mike Fazio who goaded me or
10 convinced me I need to be much more firm to get
11 an explanation of what was going on, following
12 his conversations with Seery where we were told
13 those numbers are no longer relevant and that
14 both the corpus of what was being transferred
15 may not be accurate and the value of what was
16 being transferred has degraded.
17      And therefore, that was in my mind
18 when I said in an aggressive manner, we need
19 to understand what is going on and, frankly,
20 that is also why when Michael Klein, not
21 Fazio, explained this to me, I was relieved.
22 Because it footed in a positive way, it
23 footed in a benign explanation to what it is
24 that I had been hearing from my team and
25 things were OK, as opposed to nefarious.

Page 257

BURIAN

1
2  Q.  Did you believe at the time that there
3  was a certain valuation, in other words, a
4  valuation with certainty of the repo collateral
5  that Barclays had received?
6  MS. TAGGART:  Object to form.
7  A.  When Michael said to me, Mr. Klein
8  said it was between 44 and 45, so obviously
9  that's a range.
10 Q.  It's a range.  Did you know whether
11 that was a figure that reflected a valuation by
12 Barclays?
13 A.  It was -- is there a rest of the
14 question?
15 Q.  No, that was the question.  Did you
16 know whether that was a range that reflected a
17 valuation by Barclays?
18 A.  Michael told me that there was
19 deterioration in value from the premark.  I know
20 that we were discussing all day long, they
21 appeared to be discussing all day long what
22 securities were there and what the values were.
23 The implication was that for the purposes of
24 closing the transaction, they agreed that the
25 securities were worth 44 to 45.

Page 258

BURIAN

1
2       Q.    Did that reflect a formal valuation or
3   an agreement?
4           MS. TAGGART: Object to form.
5       A.    I -- the Lehman books were either
6   ill-liquids and other things, the marking
7   process at Lehman was complicated. It wasn't a
8   formal valuation in my understanding. So I
9   can't tell you -- the distinction between a
10  valuation and an agreement is short of vague
11  because of the way in which Lehman marked their
12  books. My understanding, this was a good faith
13  number agreed upon by the parties as to the
14  value of the securities, actually tangible
15  value.
16      Q.    Did you understand it to be an
17  estimated value?
18      A.    There is a range, 44 to 45. So it has
19  got to be an estimate, right?
20      Q.    Further down on the folder, there is a
21  line that says, "Timing of 49.9." Do you see
22  that?
23      A.    I do.
24      Q.    Could you explain to me the notes that
25  appear below that?

Page 259

BURIAN

1
2       A.    Do you want me to read them to you?
3       Q.    Read them and then tell me what you
4   understood them to mean.
5       A.    Well, we only did the top left
6   quadrant, not the top right. But first they
7   described to me what the economic substance of
8   the transaction is and then below the line, I
9   said OK, now all the nonsense, the last two
10  days, let's talk about what the problems have
11  been and how we are actually going to effectuate
12  the transaction described above and, therefore,
13  timing of 49.9 is shorthand for how the premark
14  securities were going to move. And to make
15  things simple, I thought that all these
16  numbers -- well, since -- it says 41 to 42 of it
17  was transferred to Barcap from JPM. I think
18  that was as of Friday, but -- it says Friday, as
19  of Friday. But 8.55 was held up.
20          As you know from my affidavit, I have
21  questions about that 8.55 number. Then there
22  is an arrow there that says somehow or
23  another decided that in lieu of 8.55, that is
24  not -- that didn't make it across, that a
25  substitute 7.4 of cash for that 8.55. So on

Page 260

BURIAN

1
2   a premark basis, what he was telling me is
3   you're getting, we are taking 48.4 to 50.4 of
4   premark value and that's how this stuff
5   spread across.
6       Q.    Now, these part of the notes, did
7   Mr. Klein provide this information on his own or
8   did Mr. Miller, Harvey Miller provide some of
9   the information that Michael Klein wrote down?
10      A.    Mr. Miller didn't say a word. This is
11  all Michael Klein explaining this to me in a
12  charged environment to explain that there was
13  nothing nefarious going on.
14      Q.    So Harvey Miller, nobody else in the
15  meeting said anything relating to the 8.55 or
16  the 7.4?
17      A.    Certainly not at the beginning when
18  this was being written. This is Michael telling
19  us what the day's resolution was, Michael Klein,
20  I am sorry, I will say Mr. Klein. Whether there
21  was a subsequent conversation, I don't remember.
22      Q.    Did anyone in that conversation
23  reference a box loan that JP Morgan had made to
24  Lehman?
25      A.    Not in this conversation.

Page 261

BURIAN

1
2       Q.    Now, I think you said that Mike Fazio
3   had reviewed 461-B?
4       A.    What I said to you is Mike Livanos
5   reviewed it. I can't tell you how much time
6   Fazio did or did not. He certainly saw the
7   summary of the front page.
8       Q.    OK. You think that Mike Fazio saw the
9   summary?
10      A.    Definitely saw the summary.
11      Q.    OK, and the summary refers to a cash
12  line of 7 billion. Do you see that?
13      A.    I do.
14      Q.    In this meeting with Mr. Klein, did
15  Michael Fazio ask any questions about the
16  relationship between the 7.4 and the 7 billion
17  that is listed on Exhibit 461-B?
18      A.    Nope.
19      Q.    Did Mr. Fazio, during this
20  conversation, ask any questions about the
21  relationship between the total figure, the 49.9
22  billion in Exhibit 461-B and the 49.9 figure
23  that appears on Exhibit 338-B?
24      A.    No.
25      Q.    How long was the conversation in which

Page 262

BURIAN

1  BURIAN
2  Mr. Klein wrote these notes?
3      A.    Ten to 20 minutes, 10 to 15 minutes.
4      Q.    And then how did the conversation end?
5      A.    Well, I started to ask a question
6  about the RESIs and didn't get an answer. There
7  was agitation that Michael Klein was needed
8  elsewhere. Mike Fazio tried to have the
9  conversation about mark, when, post mark, how,
10  as of what date. We didn't make specific
11  reference to this, but the idea was --
12      Q.    This being 461-B?
13      A.    Yeah, yeah. I mean, I frankly -- and
14  maybe I was naive -- I took comfort in the fact
15  that the number footed because it showed that
16  this -- what Michael Klein said to me was
17  consistent with what I was told by my guys,
18  which is, hey, there is a list of securities
19  that purport to be part of the transfer. It is
20  close to 50 billion dollars. Hey, what's up,
21  when the Barclays loan is 45.5, and here I had
22  a, not only a plausible but consistent
23  explanation of the mismatch, that there was some
24  significant deterioration in value in the
25  interim. Mike wanted to ask about that and that

Page 263

BURIAN

1  BURIAN
2  was cut off or not included and then I know I
3  turned to Harvey and said Harvey, are you
4  comfortable with this, is this what's going on,
5  and he said, yeah, or something to that effect.
6  You know, and then the conversation clearly
7  ended with us saying, gentlemen, or something
8  like that, if this is what's going on, this is
9  an explanation, I got it, I understand it, you
10  know, I can't diligence this, I have to trust
11  you and what you're telling me is going on.
12      But this is going on, it sounds like
13  there is a mess up with JP Morgan and the
14  values have dropped in value. You know, we
15  don't understand why those values would have
16  dropped, but if that's where Lehman and you
17  guys are and the values dropped, we will get
18  a reconciliation and it is what it is.
19      Q.    There is a reference here to add box
20  1.9. What is that a reference to?
21      A.    Again, we do need for completion --
22  because I don't think -- this part of the story
23  you're not hearing, talk about the top right
24  corner which you --
25      Q.    I am asking about the add box, 1.9,

Page 264

BURIAN

1  BURIAN
2  that's my question?
3      A.    The add box, that was basically
4  Michael Klein telling me in order to match up
5  with the right side of the page, Barclays needed
6  to be paid additional securities to balance the
7  transaction. And therefore, we had to give him
8  that -- they had to find securities that were
9  not originally part of the Fed loan in order to
10  make up for the liabilities being assumed and
11  the deterioration in value.
12      Q.    Now, this meeting or this conversation
13  was not the first time you had heard of that
14  asset category?
15      A.    Of the 1.9 asset category?
16      Q.    Yeah.
17      A.    Oh, again, there was lack of precision
18  about numbers have been flying around, but
19  before this, I saw a clarification letter that
20  talked about assets on a B list or something.
21      Q.    Do you recall any discussion before
22  the approval hearing concerning the clearance
23  box assets being estimated by Lehman to be worth
24  1.9 billion?
25      A.    I think my notes have a reference

Page 265

BURIAN

1  BURIAN
2  to -- the night, right before the hearing in the
3  final summary of the hearing -- I am trying to
4  remember when I first heard about this.
5      But I do know that some point, whether
6  it was Friday before the hearing or it was
7  Saturday night or Sunday, that they were
8  looking for additional assets to make up for
9  the deterioration in value or the stuff that
10  JP Morgan took or that didn't show up, you
11  know, when they were trying to do the repo.
12      Q.    You don't recall whether you were told
13  that before the hearing?
14      A.    It is sort of like the name of the
15  analyst.
16      Q.    You don't remember?
17      A.    I'm a little nervous to say yes
18  because I don't have a specific recollection.
19      Q.    Then that's fine.
20      Now, you wanted to tell me about the
21  upper right-hand corner of this chart,
22  Exhibit 338-B? Did you want to tell me about
23  that?
24      A.    I wanted to give you the context for
25  understanding how the 1.9 was used to foot to

Page 266

BURIAN

1  the 47. That's the reason for that.
2     Q.   OK, was there anything else you
3  thought I should know about Exhibit 338-B?
4     MS. TAGGART: Objection to form.
5     A.   Yeah, yeah, I think the most important
6  part of the whole conversation was the right
7  side of the balance sheet, not the left, and
8  that is Michael Klein said, hey, we are owed 45
9  and a half billion dollars, as you know, Saul,
10  the extra liabilities we are assuming on the
11  cures and employee severance is 4 and a quarter.
12  Even after taking the 1.9 billion of additional
13  securities, we are short, and this is about as
14  close to a quote as I can tell you, is you made
15  2 billion dollars this weekend. If anything,
16  you should be happy.
17     Q.   Now, the 4.25 billion, what did you
18  understand that to be comprised of?
19     A.   There was, in some notes it is 4
20  billion, some it is 4.25, but that was described
21  as Barclays -- Barclays was supposed to --
22  whether they did or not, we can talk about if
23  you want, but at this time, my understanding was
24  Barclays was going to be responsible for paying

Page 267

BURIAN

1  all the accrued compensation and severance
2  liabilities of the 10 to 12,000 Lehman employees
3  that were supposed to -- that were going to go
4  over to Barclays and -- and that included the
5  severance for people who declined to go to
6  Barclays and the accrued comp for those who went
7  to Barclays and the other portion of this was
8  someone's estimate of what the cure costs were
9  for those contracts necessary to deliver the
10  franchise to Barclays.
11     Q.   OK. On the comp portion of what you
12  just discussed, what did you understand the
13  estimate of Barclays' potential exposure to be?
14     A.   I only understood what people told me
15  and I can go look at the balance sheet that's
16  Exhibit 19, if it was 2 or 225, one of them had
17  a 25 at the end. Whether it was the cure or the
18  severance, but so someone -- I was told that
19  that number was either 2 billion or 2.25
20  billion, was the assumed liabilities in respect
21  of employees.
22     Q.   You had the APA though, didn't you?
23     A.   Sure.
24     Q.   And you -- did you read the APA on,

Page 268

BURIAN

1  provisions on compensation and severance for
2  transferred employees?
3     A.   I did.
4     Q.   And from that, did you understand what
5  Barclays' potential exposure was?
6     A.   No.
7     Q.   Nobody gave you an estimate?
8     A.   I just told you what the estimate was
9  and then you asked me if I got it from the APA.
10  The APA has words, it says I am picking up
11  liabilities. I got the estimate from Weil and
12  Lehman and at the court hearings. I didn't get
13  that from the APA. I don't believe the APA has
14  a number.
15     Q.   But you had access to the APA?
16     A.   I had more than access to the APA. I
17  had a copy of the APA.
18     Q.   And with respect to cure payments, did
19  you understand that under Section 2.5 of the
20  APA, Barclays had discretion concerning which
21  contracts it would and would not assume?
22     MS. TAGGART: Objection, form, calls
23  for a legal conclusion. The document speaks
24  for itself.

Page 269

BURIAN

1     A.   I understood that Barclays had the
2  right to cherry-pick those contracts necessary
3  for the operation of the Business, capital B.
4     My comment earlier was not about cure,
5  it was about the severance and accrued comp,
6  not about the cure.
7     Q.   What did you understand Weil Gotshal
8  to have told the court concerning Barclays'
9  exposure with respect to cure payments?
10     MS. TAGGART: Object to form.
11     MS. SCHAFFER: Objection.
12     A.   Again, at the hearings I was at, you
13  know, I don't remember particularly every single
14  reference. I can tell you that my understanding
15  at the time was that the liabilities that
16  Barclays -- that Barclays was going to assume
17  the cure, severance, and accrued comp of the
18  Lehman employees.
19     Q.   Did you understand that there was some
20  uncertainty concerning the actual cure payments
21  that Barclays would ultimately make?
22     MS. TAGGART: Object to form,
23  foundation.
24     A.   Sure. I understood that there was

Page 270

BURIAN

1 still open as to which contracts Barclays would
2 take.
3    Q.    And did you or did anybody on your
4 team review the list of closing date contracts
5 that were filed on September 18?
6    A.    I don't have a firm recollection on
7 that topic.
8    Q.    You don't recall whether anybody on
9 your team looked at that list and added up the
10 cure amounts that were on that list?
11    A.    I don't know for sure if someone
12 mechanically added up the -- the cure was
13 discussed and we moved on pretty quickly from
14 that issue.
15    Q.    Let's go back to Friday before the
16 approval hearing. Let me give you what we have
17 marked as Exhibit 473-B.
18    A.    Is this a.m. or p.m.?
19    Q.    Well, it is -- I think it is 20
20 minutes after midnight on the 19th. Because it
21 is GMT time. So you should subtract four hours.
22    I want to first ask you if this is
23 something you have seen before?
24    A.    Never saw this before. Well, I don't

Page 271

BURIAN

1 recall seeing this before.
2    Q.    It says, "Please see questions below
3 from Houlihan," and then you see there is a list
4 of questions.
5    A.    Yes, do you want me to read them.
6    Q.    No, I am asking you if you see that
7 there is a list of questions here.
8    A.    Yes, I see a list of 1 through 19.
9    Q.    Do you know who prepared that list?
10    A.    I do not.
11    Q.    Do you know whether anybody from
12 Houlihan followed up with Lehman on some or all
13 of the questions that were listed here?
14    A.    You are making it sound like this is a
15 Houlihan list as opposed to Jackie Marcus taking
16 notes in a meeting and saying here, here are the
17 things that Houlihan wants to know. And I can't
18 make that assumption.
19    Q.    OK, all right, so this may be a list
20 that Jackie Marcus prepared based on
21 conversations with Houlihan?
22    A.    Yeah, I mean, again, we are not -- I'm
23 not supposed to guess in a deposition.
24    Q.    But that's --

Page 272

BURIAN

1    A.    Typically if there is a Houlihan list,
2 we probably would have e-mailed it to her and
3 she would have forwarded it as opposed to this
4 looks like it has been typed into the body of
5 the e-mail itself.
6    Q.    OK. Let me show you Exhibit 474-B.
7 Unfortunately, this is a difficult document to
8 read, but this is the way it was produced to us.
9 Now, do you see at the top that you are copied
10 or you are sent an e-mail with a list of e-mails
11 below it?
12    A.    I do.
13    Q.    Do you recall receiving this e-mail?
14    A.    I don't recall specifically receiving
15 this e-mail. I read it and I don't -- I'm not
16 going to question or debate that I got it. I
17 don't specifically remember the e-mail.
18    Q.    All right, let me start at the bottom
19 and I'll just read the bottom e-mail which is
20 September 19, 8:51 a.m. and it looks like it is
21 an e-mail from somebody at Goldman Sachs to
22 Danny Golden. Who is Danny Golden?
23    A.    Danny is a partner at Akin Gump, the
24 law firm.

Page 273

BURIAN

1    Q.    And he represented bond holders in
2 connection with the Lehman bankruptcy?
3    A.    He represented an ad hoc group of
4 Lehman creditors. I read it. I just quickly
5 read it, if you want to save the time of
6 reading.
7    Q.    I'm happy to read it. It says,
8 "Danny, details of our argument are that the
9 estate should only be authorized to sell
10 Barclays those assets which are necessary to
11 obtain the U.S. investment banking and
12 broker/dealer business. The proposed sale goes
13 way beyond this in that it allows Barclays to
14 cherry-pick owned inventory, investment and
15 other assets at windfall discount to FNV. The
16 discount is at least several billion dollars."
17    Now, is that a statement that you were
18 aware of before the approval hearing?
19    A.    I don't recollect whether I
20 specifically read that statement. I was aware
21 of chatter, as there is in every bankruptcy
22 sale, about people who are not informed of
23 what's going on, worried that Barclays was
24 getting a good deal in a variety of respects.

Page 274

BURIAN

1  11 o'clock in the morning, you know, as I
2  testified earlier, there are at least two,
3  probably three conversations with Barclays -- I
4  mean with Lehman about this topic. And there
5  are clear mistakes in the e-mail about how the
6  transaction was structured, and typically, while
7  it is interesting to hear the uninformed market,
8  what I rely on is my access, my diligence, and
9  the information I get directly from the horses'
10 mouth and my understanding of the transaction,
11 directly.
12
13      So yeah, I heard from Danny in court,
14 out of court or at some time, maybe I read
15 this, maybe I didn't. I knew generally that
16 there was a concern just like there was a
17 concern about whether it was Barclays taking
18 over European businesses. I mean, this is
19 just one of many rumors or concerns about
20 what was going on worldwide in Lehman. That
21 creditors brought up.
22      Q.  And you did not attach much weight to
23 it?
24      MS. TAGGART: Object to form.
25      A.  It is not about attaching much weight

Page 275

BURIAN

1  about it. But the deal never was that Barclays
2  was only getting what was the minimum necessary
3  to run the U.S. I-B business.
4
5      The deal, as I was explained in the
6  conference rooms, were that there was going
7  to be a balanced exchange of the owned
8  securities to match against, you know, the
9  liabilities, and frankly, that was a positive
10 for us, not a negative, because we were a
11 bankrupt estate. We wouldn't be able to
12 manage the book or hedge against the book.
13 So the premise was wrong.
14      So when you are looking at that, hey,
15 in retrospect, he may be dead on, but at the
16 time, I would have, A, been very, very busy
17 and not sleeping and I was probably on the
18 phone with either the committee or trying to
19 reach the Lehman folks, Mark Shapiro, et
20 cetera. So this is not something that would
21 be like a hold-your-horses, material moment.
22      Q.  You referred to a balanced exchange of
23 assets and liabilities. Does that mean the
24 assets would equal the liabilities.
25      A.  Other than Michael telling me I made 2

Page 276

BURIAN

1  billion dollars at the end, and I have asked
2  twice for that exhibit which I know you have, I
3  think Exhibit 19 from the Weil meeting, what was
4  described to us was we are selling the franchise
5  cheaply for 250 million and we all recognize
6  that was -- people thought that was a great deal
7  for the franchise and we are selling the
8  buildings for fair value.
9
10     But when it came to the securities
11 being transferred, the tradeable book, that
12 that was a 100 percent balanced transaction
13 against the liabilities against the book,
14 plus the assumptions of cure, severance,
15 and -- cure, severance and accrued
16 compensation. There is no question that's
17 the way it was described. And that's what
18 Michael was addressing at that meeting when
19 he went back to it that night.
20     Q.  So you made a comment that Michael is
21 telling me I made 2 billion dollars. What does
22 that mean?
23     A.  What it means is when --
24     Q.  Who is the "I" in Michael telling me I
25 made 2 billion dollars, who is the I?

Page 277

BURIAN

1      A.  Being facetious, I am, the creditors
2  of Lehman. I am the embodiment of the creditors
3  of Lehman.
4      Q.  Oh, in other words, he is saying the
5  creditors made 2 billion.
6      A.  The estate, we are up, we did well.
7      Q.  Now, going back to the assets, the
8  purchased assets --
9      A.  You asked a question about what I
10 think he meant when he said that I trade 2
11 billion dollars which is what I reached for this
12 to explain.
13     Q.  I think you answered it. My question
14 was who was the "I" he was referring to.?
15     MS. TAGGART: Hold on, let me see.
16     A.  Can you read that back, I don't know
17 if I answered that.
18     MS. TAGGART: OK, there is a pending
19 question. "So you made a comment that
20 Michael telling me I made 2 billion dollars,
21 what does that mean?"
22     Do you want to -- is there any more
23 that you would like to answer on that
24 question?

Page 278

BURIAN

1
2    A.   I don't think I was finished.  You
3 interrupted when you said who is the I.  I think
4 I could be wrong.
5    But that the 2 billion I made was I
6 was told golly, gee whiz, they are getting 44
7 to 45 in securities plus the 1.9 for a total
8 of approximately 46 to 47.  He rounded it up
9 to 47, but they are taking 49.75 billion of
10 liabilities and it is no longer in balance.
11 I made 2 billion bucks over the weekend.  And
12 that is all there is.  That's what the value
13 is and Barclays is going -- not do me a
14 favor, but Barclays is going to close and
15 this is what the deal now is.  So that's what
16 the conversation about the I as in the
17 creditors made money.
18    Q.   In other words, assuming those
19 estimated figures were accurate?
20    A.   No.
21    MS. TAGGART:  Object to form,
22 misstates the testimony.
23    A.   No, being told these are the figures
24 upon which the closing is going to proceed and
25 all that's left going on is lawyers documenting

Page 279

BURIAN

1
2 being told this is the deal.
3    Q.   Sir, you did not understand that the
4 figures were estimates?
5    MS. TAGGART:  Objection to form and
6 argumentative.
7    A.   You did not say that before.  Yes, I
8 knew it was 44 to 45.  So I made approximately 2
9 billion over the weekend.
10    Q.   Did you --
11    A.   But the corpus of securities were now
12 nailed down and their value was 44 to 45
13 billion.
14    Q.   Did you understand that both on the
15 asset side and the liability side, the figures
16 Mr. Klein and others discussed with you were
17 estimates?
18    A.   Let's take that compound question.  On
19 the liability side, no.  I thought that 45
20 was -- 45.5 was as consistent as a number gets
21 throughout this whole thing.  And therefore,
22 that was the balance of a loan.  That did not
23 appear to be an estimate, other than, other than
24 as a rounding, right, because I doubt it was
25 exactly 45.5 with no cents.  But it was not a

Page 280

BURIAN

1
2 number that was moving or subject to change.  It
3 was a rounding of a number.
4    The 4.25 was always consistent of what
5 the -- I was told the cure -- not the cure.
6 The severance and the accrued comp came off
7 Lehman's books and records as what they
8 accrued on their balance sheet.  So that was
9 the Lehman number for what was the liability.
10    I don't know if the camera can see the
11 expression on the face because you are making
12 it hard --
13    Q.   Did you --
14    A.   I don't know if the camera can see,
15 you are making a lot of funny faces and I'm not
16 done answering the question.
17    Q.   When you finish, I am going to follow
18 up with a question because I found your
19 testimony incredible.
20    MS. TAGGART:  No, no, no, you are not
21 testifying about his testimony.
22    Why don't you answer --
23    Q.   Go ahead.
24    A.   That's fine, I am telling you what I
25 thought in the room at the time and why --

Page 281

BURIAN

1
2    Q.   What question are you answering?  What
3 is my question?
4    MS. TAGGART:  Wait, wait, he will just
5 answer the question that's fending.
6    Q.   I want to find out, do you know what
7 my question is?
8    MS. TAGGART:  You can ask that after
9 he answers the question.
10    MR. STERN:  I am entitled to know if
11 the witness is answering my question.
12    MS. TAGGART:  You can read the
13 question back next.
14    Q.   Sir, do you know what question you are
15 answering?
16    MS. TAGGART:  Why don't you read back
17 the last question.
18    Q.   No, no, no.  Mr. Burian, do you know
19 what question you are answering?
20    MS. TAGGART:  Don't answer that.  You
21 don't have to answer that.
22    Q.   What is the question?
23    MS. TAGGART:  If we have a question
24 about --
25    Q.   What is the question you are

Page 282

BURIAN

1  answering?
2      MS. TAGGART: If we have a question
3  about what question is pending, let's go to
4  the court reporter. You don't have to --
5  just don't answer that.
6      Q. What question are you answering now?
7      MS. TAGGART: Don't answer it.
8      Q. The question is whether you understood
9  that the liabilities were estimates. You told
10 me about the 45 or the 45.5. Now, on the 4.25,
11 didn't you understand, based on what Weil
12 Gotshal told the court, that those were
13 estimates?
14     MS. TAGGART: Objection to form, asked
15 and answered. Argumentative.
16     But if you want to answer, you can go
17 ahead and answer that question.
18     A. Your question related to assets and
19 liabilities. And I directed you to liabilities.
20     Q. What is the question I am asking now,
21 what is the question I am asking now?
22     A. So therefore --
23     Q. Let's have the question reread.
24     A. On the liability side.

Page 283

BURIAN

1      Q. Let's have the question reread?
2      MS. TAGGART: He is answering the
3  question that you had.
4      Q. You are not answering the question.
5  My question was very clear. Could you please
6  reread it. I didn't use the word "assets"?
7      A. The first time or the second time?
8      Q. Listen to the question that has just
9  been asked.?
10     MS. TAGGART: We are going to take a
11 break after this one.
12     (Record read)
13     A. As I was saying, the balance sheet
14 number, the employee-related obligations, was --
15 however accountants accrue for that stuff. So I
16 guess if you are saying that accrual was an
17 estimate, that's fine, but it was a firm number
18 off what the balance sheet said the liabilities
19 were as accrued by Lehman.
20     On the cure amounts, obviously, it
21 depended on which contracts were taken and
22 subject to negotiation with third parties as
23 to how much they think they were owed. So
24 with respect to the liability side, the

Page 284

BURIAN

1  preponderance of the number, my understanding
2  was was a rounding number. The 45.5 was
3  pretty firm. On the extra liabilities side,
4  I understood that this was a consistent
5  number throughout that had whatever weight
6  you want to give the source of that
7  information.
8      MS. TAGGART: OK, let's take a break.
9      MR. STERN: Let me finish this line of
10 questions.
11     MS. TAGGART: No, I don't like -- we
12 are taking a break.
13     MR. STERN: When you are taking
14 depositions, we finish lines of questions.
15     MS. TAGGART: We are still going to
16 count it by the video record. This won't
17 count against you. It is still going to be
18 seven video, but we need to take a break.
19     MR. STERN: Let me finish the line of
20 the questions.
21     MS. TAGGART: You get to ask your
22 question -- I don't like the whole temper
23 of the room.
24     MR. STERN: Let's continue with this

Page 285

BURIAN

1  line of questions, please.
2      MS. TAGGART: No, go off the record.
3      MR. STERN: I am entitled to finish my
4  line of questions?
5      MS. TAGGART: You are entitled to
6  finish your question. I let him answer your
7  question. Now we are going to take a break.
8      Let's go. Would you, please.
9      THE WITNESS: Fine.
10     MR. STERN: Are we still on the
11 record?
12     MS. TAGGART: No, we are off the
13 record. If you want to count the time
14 against your seven hours, we will stay on
15 the record.
16     MR. STERN: I want to state on the
17 record that during this break, I don't want
18 you discussing this area of questioning with
19 the witness.
20     MS. TAGGART: We won't talk anything
21 about the substance of the testimony.
22     THE WITNESS: Do you want me to stay
23 in here?
24     MS. TAGGART: No, I want you to come

Page 286

BURIAN

1 with me.
2 THE VIDEOGRAPHER: The time is now
3 4:57 p.m., we are now off the record.
4 (Recess)
5 THE VIDEOGRAPHER: This is the start
6 of tape number 6. The time is now 5:10 p.m.
7 we are now back on the record.
8 Q. We were on the subject of whether
9 there was a balance in the transaction between
10 assets and liabilities. Was it your
11 understanding prior to the closing that there
12 would be perfect, equivalent, mathematical
13 balance between purchased assets and assumed
14 liabilities?
15 A. I'm struggling with the word "perfect
16 mathematical balance." And I don't know if
17 there is a special meaning your attaching to
18 that term. And certainly there was not a
19 balance with respect to the 250 million for the
20 franchise.
21 We believed and we still believe the
22 franchise was worth more than that. But I
23 did believe that when it came to the
24 securities side and either the set-off or the

Page 287

BURIAN

1 repo, plus the liabilities assumed in respect
2 of employees and cures, that the intent of
3 the transaction was that, based on the
4 estimates as of closing, they would be in
5 balance.
6 Q. So that view is limited to the
7 tradeable financial assets?
8 MS. TAGGART: Object to form,
9 mischaracterizes the testimony.
10 A. Yeah, tradeable -- some of these
11 stocks were ill-liquids, they didn't trade much.
12 But when you talk about the kind of things you
13 find on Exhibits A and B, the securities, the --
14 they were supposed to -- I will get yelled at
15 for not answering the question, so I am trying
16 to be very, very careful to answer exactly the
17 question.
18 So my understanding was that the other
19 parts of the transaction were what they were,
20 but vis-a-vis the Fed and then Barclays
21 liabilities plus those assumed liabilities I
22 referred to, they were supposed to match the
23 assets, and net, net, net, what this
24 transaction was about, was getting rid of the

Page 288

BURIAN

1 book, which is supposed to be a benefit to
2 us, and selling the real estate.
3 You could argue whether that was pure
4 balance on the real estate, the appraisals
5 were what they were, and I'm not challenging
6 those appraisals, and then 250 for the
7 franchise which that franchise could be worth
8 more or less. So there was no balance there.
9 Q. OK. And you understood that there
10 were a number of additional purchased assets in
11 addition to the securities, correct?
12 MS. SCHAFFER: Objection.
13 A. There was a real estate, yes, there
14 was the real estate and assets associated with
15 the business, the franchise.
16 Q. And the list of purchased assets that
17 we went through earlier today?
18 MS. TAGGART: Object to form.
19 A. I don't know if you are saying that as
20 in addition to what I said or as further
21 clarification to what I said because most of the
22 list of assets and purchased assets relate to
23 lawyers being careful in my understanding to
24 define what is the franchise being transferred

Page 289

BURIAN

1 for 250 million dollars.
2 Q. You did not have a definite valuation
3 for all purchased assets in the aggregate as of
4 the closing, is that right?
5 A. Yes.
6 Q. You did not have a definite valuation
7 of all the assumed liabilities in the aggregate
8 as of the closing, is that correct?
9 A. Define valuation. We had -- we,
10 again, 45.5 doesn't require a valuation. It is
11 a number I'm told. There is a loan. The
12 balance is rounded to approximately 45.5, that's
13 a number. It is not a valuation.
14 So I had that and I had on the other
15 liabilities, I had a description of how they
16 were derived. One wouldn't value those
17 liabilities. One would describe them and would
18 perhaps, using your words from before, provide
19 the estimate of them.
20 Q. So you did not have a definite
21 valuation of all the assumed liabilities in the
22 aggregate as of the closing?
23 MS. TAGGART: Object to form, asked
24 and answered.

73

Page 290

BURIAN

1
2    Q.   Am I right about that?
3    A.   I did not know at the closing which
4    contracts you were going to take. I did not
5    know at the closing the precise exact number of
6    what the severance and accrued comp was for
7    employees. I didn't know if an employee might
8    have died between Saturday and Monday. I just
9    didn't know that.
10   Q.   In other words, there were conditions
11   that might bear on the amounts ultimately paid
12   for comp and severance?
13   A.   On the comp and severance side, sure.
14   Q.   If you look at your copy of the APA
15   which is in front of you tab A of Exhibit 92.
16   A.   Exhibit 92.
17   Q.   This is the exhibit you have in front
18   of you, I am sorry, Exhibit 26. Exhibit 26.
19   Looking at Exhibit 26, tab A, page 11, do you
20   see there under Section 2.3, there is a list of
21   assumed liabilities.
22   A.   There are.
23   Q.   Did you have a valuation for the
24   assumed liabilities listed under categories A,
25   B, D, E, and F?

Page 291

BURIAN

1
2    A.   You said A, I was reading A, what --
3    Q.   B, D, E, and F. My question is
4    whether you had a valuation or an estimated
5    valuation for those categories as of the
6    closing?
7    A.   No.
8    Q.   And looking at the next page, looking
9    at categories G and H, did you have a valuation
10   or an estimated valuation for those categories
11   of assumed liabilities?
12   A.   Not a specific valuation, no.
13   MR. STERN: Let's mark as the next
14   exhibit e-mail dated September 19, 2008.
15   (Exhibit 475-B, e-mail dated September
16   19, 2008 marked for identification, as of
17   this date.)
18   Q.   I have put in front of you Exhibit
19   475-B. I will ask you to look at it and tell me
20   if you recognize it?
21   A.   I do not. I recognize it is an e-mail
22   from Barry Ridings to Mark Shapiro.
23   Q.   That's the e-mail at the top and then
24   below that, there is an e-mail from Eric Siegert
25   to Barry Ridings copying you. Do you see that?

Page 292

BURIAN

1
2    A.   Yup.
3    Q.   Mr. Siegert writes, and this is as of
4    September 19, I believe it is listed as
5    Minneapolis time, so I believe in New York, it's
6    about 10:11 a.m. Mr. Siegert writes, how did
7    the Fed actions --
8    A.   Minneapolis is one-hour difference?
9    Q.   Is it one or two?
10   A.   I think it is one, right?
11   Q.   In any event, it is 8:11 a.m. in
12   Minneapolis. And Mr. Siegert writes, "How did
13   the Fed actions potentially impact the value of
14   the book. Will Barclays maybe get a windfall
15   selling our marked down book at some stupid
16   price to the Feds. We can't let that happen."
17   Do you recall seeing that message from
18   Mr. Siegert to Mr. Ridings?
19   A.   I remember talking about this issue.
20   I don't remember this particular e-mail.
21   Q.   What was the issue that this e-mail
22   addresses?
23   A.   I mean, shortly after the Fed let --
24   after the government let Lehman fail, they
25   announced a rescue package of some sort that

Page 293

BURIAN

1
2    allowed a modification to the program under
3    which real estate and other types of securities
4    could be borrowed against to preserve liquidity
5    in the system and the question was whether or
6    not there was -- whether or not that change in
7    the Fed -- the first step was whether or not we
8    were eligible for the Fed program because did
9    we -- could we get liquidity and preserve the
10   value of the assets that way.
11   And secondly, whether there was a
12   quick flip going on where we were going to
13   give assets based on Lehman's marks of value,
14   but then the government program would ascribe
15   higher values for the purposes of collateral
16   to those same exact securities.
17   Q.   And when Mr. Siegert referred to our
18   marked down book, what do you understand he was
19   referring to?
20   MS. TAGGART: Objection, foundation.
21   A.   He was -- I believe he was referring
22   to "our" as in Lehman, we take our -- we take
23   things personally, and we were told that values
24   had been dropping over the four to nine weeks
25   prior to the sales transaction, and therefore,

Page 294

BURIAN

1 the assumption was that fair market value was
2 marked down over a period of time based on
3 drop -- concerns in the marketplace about Bear
4 Stearns, Lehman, Merrill Lynch.
5    Q.    Whose assumption was that?
6    A.    I can't go into every person that
7 assumed that. I think it was a fact that there
8 was a lot of concern in the financial community
9 about investment banks and that going into the
10 Lehman filing, there was a -- my recollection is
11 there was a period of time where real estate and
12 structured vehicle securities were becoming less
13 liquid and, therefore, being priced at a lower
14 rate.
15       MS. TAGGART:  Can you say who produced
16 this document?  There is not a Bates number
17 on it.
18       MR. STERN:  We will have to get back
19 to you on that.  It may be that it's a
20 Lehman -- it is -- Mark Shapiro is copied on
21 it.  It may simply be a Lehman e-mail that
22 was not produced.
23       MS. TAGGART:  I guess we will take
24 this up after.

Page 295

BURIAN

1       MR. STERN:  It is not a controversial
2 issue.
3       Let's mark this as the next exhibit.
4       (Exhibit 476-B, document Bates stamped
5 HLHZ 9125 through 9144 marked for
6 identification, as of this date.)
7    Q.    This will be 476-B.
8    A.    This whole thing?
9    Q.    Yes. I'll ask you if you can, to
10 identify what this document is.
11    A.    The front page appears to be an e-mail
12 from Ed Gilbert to a variety of people,
13 including me. Someone help me out here, yes,
14 including me. Including me.
15    Q.    Yes. And there is an attachment, if
16 you look at the page ending with the Bates
17 numbers 9127, do you recognize that document?
18    A.    I do.
19    Q.    And what is it?
20    A.    This is the transcript of the Barclays
21 investor call or, you know, public call
22 regarding the Lehman transaction.
23       MR. STERN:  Let's mark as the next
24 exhibit this document.

Page 296

BURIAN

1       (Exhibit 477-B, document Bates stamped
2 CMTE 911 marked for identification, as of
3 this date.)
4    Q.    This will be 477-B.  Looking at
5 Exhibit 477-B.  Can you tell me if this is a
6 document you have ever seen before?
7    A.    This is the one pager?
8    Q.    Yes.
9    A.    It does not look familiar to me.
10    Q.    The bottom of the text, it says,
11 "Subject: Barclays investor call transcript
12 from Wednesday where they described how great
13 the Lehman buy is; 2 billion dollars negative
14 good will after tax," or minus 2 billion good
15 will after tax, it says.
16       Then above that, there is a note from
17 Ed Gilbert. Who is Ed Gilbert?
18    A.    Ed Gilbert is a member of the
19 creditors committee, the representative of
20 Shinsei Bank on the creditors committee.
21    Q.    He says, "We will make sure this
22 information is considered in the Lehman
23 proceeding." Do you see that?
24    A.    I do.

Page 297

BURIAN

1    Q.    Do you know whether this
2 information -- namely, how Barclays described
3 how great the Lehman buy is -- is something that
4 the committee felt should be considered in the
5 Lehman proceeding?
6       MS. TAGGART:  Object to form,
7 foundation. As described, I think
8 privileged, so I'll instruct not to answer.
9       MR. STERN:  Let's move on. This
10 document.
11       (Exhibit 478-B, document Bates stamped
12 CMTE 2527 through 278 marked for
13 identification, as of this date.)
14    A.    Should I put this one aside?
15    Q.    Yeah.
16    A.    We never talked about it.
17    Q.    Yes, we did, briefly.
18       Looking at Exhibit 478-B, this appears
19 to be an e-mail at the top from L. Edward
20 Gilbert to J. Becker. Who is Julie Becker?
21    A.    Julie Becker is a representative on
22 the creditors committee from Wilmington.
23    Q.    At the bottom, she says, "Thanks much
24 for sharing this transcript," referring to the

Page 298

BURIAN

1 transcript we looked at in 476-B, and then above
2 he says, "Interesting to understand what a
3 bargain Barclays thinks it has."
4       And my question is, at any time before
5 the sale approval hearing or after the sale
6 approval hearing, did the committee believe
7 that the acquisition gain that Barclays
8 anticipated was a basis to object to the
9 transaction?
10       MS. TAGGART: I am going to object to
11 form and also for calling for privileged
12 communications and instruct not to answer.
13       Q.   Did the committee ever have a view --
14 withdrawn.
15       Did you ever have an opinion one way
16 or the other concerning whether the
17 anticipated gain that Barclays announced on
18 September 17, 2008, was a basis for the
19 committee to object to the sale?
20       A.   I got the transcript as you saw on
21 Sunday.  After the transaction was approved.
22 And we were in effectuation mode, not objection
23 mode.  The judge had signed an order.
24       So the context of your question about

Page 299

BURIAN

1 objecting isn't really relevant.  The idea
2 that Barclays had said that they are going to
3 book a profit on the transaction was
4 extremely troubling and it was together with
5 the other stuff we talked about, Fazio and
6 Geer's review of those schedules that
7 prompted me to demand that we get a full
8 understanding and update as to what, exactly
9 what was being transferred and at what values
10 to whom.  And that's why I was so aggressive
11 in demanding that we have that meeting.
12       Q.   OK.  Houlihan was aware, as of
13 September 17, was it not, that Barclays had
14 announced on September 17 that it anticipated
15 booking a profit on the transaction?
16       A.   I told you earlier I'm not sure if I
17 knew about it or we knew about on the 17th or
18 18th because we got retained the night of the
19 17th and we were not -- I was not at my own
20 office.  We were awaiting our turn to interview
21 until very late.  So as you said earlier, I
22 don't know if I knew about that, 17th or the
23 18th.
24       Q.   But you may have?

Page 300

BURIAN

1       A.   Yes, when I -- I'm not sure if I knew
2 it, then I guess I may have.
3       Q.   Earlier in the deposition, we looked
4 at a Houlihan e-mail as of the 17th that
5 referred to it, correct?
6       MS. TAGGART: Object to form and asked
7 and answered.
8       A.   I don't remember that, particularly
9 telling you on the 17th.  I can't tell you now
10 whether I knew that fact on the 17th or the
11 18th.
12       Q.   But you may have?
13       A.   I may have.
14       MS. TAGGART: Object to form.
15       Q.   At that time, at that time, did you
16 consider that to be a basis for objecting to the
17 sale?
18       MS. TAGGART: Object to form.
19       A.   A single isolated fact out of context
20 is not or is a basis for objection?  You object
21 to a transaction based on the totality of the
22 transaction and whether it is fair.  The right
23 response to that was to investigate, to ask
24 questions, to find out.  It was a basis for

Page 301

BURIAN

1 asking follow-up questions to understand what
2 was going on.
3       I did not spend a lot of time thinking
4 about the accounting treatment by Barclays.
5 The fact that they booked was less relevant
6 than understanding what we were giving and
7 what we were getting.  And I was positive
8 that, for instance, they were getting a great
9 deal on the franchise.  I didn't dive into at
10 the time what made up the negative 2 billion
11 of good will, how it was calculated, or what
12 that number meant other than to do the
13 investigations and ask the questions that we
14 talked about earlier.
15       Q.   And in itself, in isolation, that
16 fact, in your view, was not a basis to object?
17       MS. TAGGART: Objection, asked and
18 answered, objection to form.
19       A.   Again, if someone said to me what
20 those words mean is, and not understanding what
21 you are hearing from everyone else in the
22 transaction, Barclays is taking the book for 2
23 billion less than what it's worth, it certainly
24 would have been a basis for objection and would

76

Page 302

BURIAN

1
2  have been a very, very serious conversation.
3      But telling me that some foreign
4  company through accounting rules that I was not
5  familiar with was taking a position on the
6  assets that they were getting for accounting
7  treatment when the transaction was complex,
8  multifaceted and involved assets that I did
9  know, I did believe they were getting on the
10 cheap, e.g., the global franchise, the Lehman
11 name and the rights thereto, wasn't a huge --
12 was it was important enough to follow up and
13 ask, but not enough to run into court with my
14 hair on fire.
15     Q.   You say it was important enough to
16 ask. Did you ask anybody from Barclays before
17 the sale approval hearing on what basis Barclays
18 anticipated such a gain?
19     A.   We were not given that opportunity.
20     Q.   Did you attempt to ask that question?
21     A.   We were going to play linguistics
22 about what does it mean to attempt. But when
23 you are on the phone with somebody who says I
24 only have a couple of seconds, here is the
25 story, no, no, no scratch that, click, I am

Page 303

BURIAN

1
2  going to call you back, call you back, here is
3  the final numbers, it is bedlam here, I am
4  really busy, you don't spend a lot of time
5  asking them about what -- their adversary is --
6  their accounting treatment.
7      You are saying, hey, Mark, hey Jim,
8  what is the deal, what are you giving and
9  what are you getting. And I walked you
10 through the time frame there. So to say that
11 I didn't attempt is not fair, but to say in a
12 short window we had of communication, it
13 didn't come up, that is fair.
14     Q.   I am not asking you to make a judgment
15 what's fair and not fair. I am asking you did
16 you attempt to ask Barclays on what basis it
17 anticipated recording a gain on the transaction?
18     A.   Before the sale hearing?
19     Q.   Yes.?
20         MS. TAGGART: Object to form, asked
21 and answered.
22     A.   I amend my answer. Sorry, I confused
23 the Lehman employees with Barclays.
24     I never had a conversation with
25 Barclays about any topic prior to the sale

Page 304

BURIAN

1
2  hearing. So there was no discussion with
3  them about any of these topics.
4      Q.   Did you request any conversations --
5  withdrawn.
6      Did you request an opportunity to
7  speak with anybody at Barclays about its
8  anticipated gain?
9      A.   No.
10         MR. STERN: Let's mark this as the
11 next exhibit. This will be 479-B.
12     (Exhibit 479-B, document Bates stamped
13 CMTE 882 marked for identification, as of
14 this date.)
15     Q.   Is this a document that you recognize
16 or had ever seen before?
17     A.   It does not look familiar.
18     Q.   Do you recognize any of the names on
19 this exhibit 479-B?
20     A.   Nope, I do not.
21         MR. STERN: This will be the next
22 Exhibit 480.
23     (Exhibit 480-B, document Bates stamped
24 HLHZ 9119 through 9120 marked for
25 identification, as of this date.)

Page 305

BURIAN

1
2         MS. TAGGART:
3         THE WITNESS: Do this mean it came
4  from us, CMTE.
5         MS. TAGGART: The committee.
6         THE WITNESS: It came from us?
7         MS. TAGGART: The committee members,
8  instead of Houlihan.
9         THE WITNESS: Oh, so it could be
10 internal by the committee members.
11         MS. TAGGART: Right.
12     Q.   So looking at Exhibit 480-B, is this a
13 series of e-mails that you recognize?
14     A.   I mean, it is redacted. So I do
15 remember reading the last -- second to last
16 e-mail, the response by Harvey to Luc.
17     Q.   Let's go to the part that's not
18 redacted, starting with the bottom e-mail from
19 Luc Despins, 9/22/2008, 7:15 a.m. AST, to Harvey
20 Miller. "One, did it close; two, what happened
21 to regulated capital." And what I wanted to ask
22 is on the second question, what did you
23 understand that to relate to?
24     A.   The controversy or discussions
25 relating to the 15c3 accounts.

## Page 306

BURIAN

2  Q.  What did you know about those
3  discussions?
4      MS. TAGGART: Object to form.
5  A.  In what time period?
6  Q.  For the closing.
7  A.  I told you earlier that I walked into
8  the room at one point, sort of sat myself down
9  to listen, uninvited.
10      One of the conversations I heard in
11  that room and later or at the time the
12  clarification letters a reference to 15c3 was
13  the discussion or argument or negotiation
14  about who was going to get the cash and
15  securities that were posted with regulators
16  to back up the trading.
17      I remember a discussion about was it
18  in the deal or out of the deal and was it
19  appropriate to be in or out of the deal and
20  this may explain why I wasn't invited to any
21  more rooms, but I did sort of raise my hand
22  and say, wait a minute, to the extent this
23  stuff is cash, it can't be an acquired asset.
24  There can't be any ambiguity. To the extent
25  it is a deposit of securities, where their

## Page 307

BURIAN

2  argument could be, you know, whether those
3  securities are necessary for the functioning
4  of the business. Because when Lehman owned
5  the business, they were necessary. But
6  Barclays doesn't need them, you know. If
7  that's an argument going on, I don't know
8  what the intention of the parties were. But
9  cash is cash and it is clear that cash
10  doesn't go. And everyone was like not happy
11  that I said that.
12  Q.  Who was the "everyone" in the room?
13  A.  The main conversation I had was
14  actually spillover in the hallway with Harvey
15  where I said to him I don't know how you have a
16  modification to an agreement that has cash going
17  across that's Lehman cash. The document is
18  clear that we keep cash.
19      The context was, I heard from him, I
20  heard from someone else, I heard in the
21  meeting, at one point I had heard that there
22  was roughly a billion, 5 -- no, I forget -- I
23  don't remember the exact number, but
24  including the cash and security is a large
25  number and they were going split the baby in

## Page 308

BURIAN

2  half and they would get half the cash, we get
3  half the cash, Barclays got half the
4  securities and we get half the securities,
5  and I made probably an obnoxious comment at
6  the time of even in Lehman, a couple hundred
7  in million in cash matters and cash is cash
8  and it shouldn't go to Barclays.
9      So --
10  Q.  So aside from Harvey Miller, who else
11  participated in this conversation?
12  A.  It was in the hallway by where the
13  secretaries were typing.
14  Q.  I see.
15  A.  Luc was there, the spillover
16  conversation when I said these things. Harvey
17  was there. I think Tom Roberts was there. The
18  representatives of Barclays were sort of like
19  down the hall, coming in, listening. There was
20  a lot of milling around going on, so it is hard
21  to say who exactly was there.
22  Q.  Do you recall approximately when that
23  conversation took place? Was it Sunday
24  afternoon?
25  A.  No, no. It was later. It was before

## Page 309

BURIAN

2  I sort of got more angry and demanded a meeting
3  with Michael Klein. So it must have been
4  between -- I think it was before that meeting,
5  between 11 and 1. Could it have been after?
6  It's possible, but I don't think so.
7  Q.  OK. So when you had the meeting with
8  Michael Klein and Harvey Miller that's reflected
9  in the -- on the manila folder, Exhibit 338-B,
10  did you ask Mr. Klein or Mr. Miller where the
11  15c3 asset was?
12  A.  After Mr. Klein left, I think I said,
13  hey, where are we on the other open issues
14  because remember or you don't remember, the 15c3
15  issue was not -- what was the term you used
16  before, tradeable securities, the bucket of
17  securities, we were using that term, it was not
18  part of the bucket of securities. That whole
19  thing related to what was it that Barclays was
20  getting for 250 million. What was the franchise
21  they were getting. It was a different topic.
22  And that was whatever was necessary to operate
23  the business and the argument was whether the
24  regulatory capital was or was not necessary.
25      So I recollect I did ask hey where

Page 310

BURIAN

1    does that stand.
2        Q.    What were you told?
3        A.    As you can see from Luc's e-mail as of
4    7:15 in the morning, we still weren't sure how
5    that played out other than my comment to Harvey
6    and others that were standing there that you
7    guys say this is all kosher pursuant to the
8    court order and the hearing, I don't know how
9    you transfer cash and say that that isn't a
10    change.
11        (Exhibit 481-B, document entitled,
12    "Notice of Assumption and Assignment" marked
13    for identification, as of this date.)
14        Q.    Looking at Exhibit 481-B, this appears
15    to be a notice of assumption and assignment of
16    amounts necessary to cure defaults under
17    contracts and leases to be assumed and assigned
18    to successful purchaser.
19        On the second page, it appears to be
20    dated September 18, 2008. At the bottom of
21    the first page, it refers to an Epic Systems
22    website. It says, "The debtors will compute
23    the appropriate cure amount for each closing
24    date contract and will list such cure amounts

Page 311

BURIAN

1    on the website prior to the hearing."
2        Do you recall one way or the other
3    whether anybody at Houlihan reviewed the
4    information that was available on that
5    website concerning cure amounts for closing
6    date contracts?
7        A.    You're assuming it was available and
8    when it was available. I didn't and I did not
9    go to that website. Do you know what time this
10    was filed?
11        Q.    I don't know for sure.
12        A.    So you don't know how much time
13    elapsed between the filing of this document and
14    the hearing itself?
15        Q.    I don't know. But it is a matter of
16    record. We can find that out, and my question
17    is really just simply whether if you know anyone
18    at Houlihan reviewed the information that was
19    available on that website when it became
20    available?
21        A.    In respect of this estimate of cures?
22        Q.    Yes.
23        A.    I don't know.
24        MR. STERN: Let's take a short break.

Page 312

BURIAN

1        THE VIDEOGRAPHER: The time is now
2    5:49 p.m., we are now off the record.
3        (Recess)
4        THE VIDEOGRAPHER: The time is now
5    5:55 p.m., we are now back on the record.
6        Q.    I want to go back to the date of the
7    sale approval hearing, September 19, and ask you
8    if you recall at any point that day, that Friday
9    meeting with Barry Ridings or having
10    conversation with Barry Ridings from Lazard?
11        A.    I do.
12        Q.    And do you recall when you met with
13    him or spoke to him?
14        A.    I believe I spoke to him in the
15    courtroom between the bench and the counsel
16    tables.
17        Q.    Did you have any discussion with
18    Mr. Ridings that Friday concerning the substance
19    of the transaction?
20        A.    Yes.
21        Q.    What did he say to you about the
22    substance of the transaction?
23        A.    In the context of a huddle in front of
24    the counsel table where someone, Lori was

Page 313

BURIAN

1    walking through what the changes in the
2    transaction were and what was going to be told
3    to the court and I was like looking and making
4    sure it was consistent with what I had been told
5    on the phone when I made that list a little bit
6    earlier.
7        And Barry basically said at one point,
8    hey, this has to happen, enormous pressure
9    for this to happen, there were no
10    alternatives, you definitely don't want to
11    own these securities in a meltdown bankruptcy
12    environment or something to that effect. You
13    know, continuing the theme of today's really
14    important and we have got to get approval
15    today.
16        Q.    Was that something that he said during
17    the courtroom recess?
18        A.    I don't remember if it was a recess or
19    it was immediately before the hearing started.
20    I don't remember when -- I know I was on the
21    other side. I was on the lawyer's side of the
22    BAR, so it couldn't have been when the hearing
23    was in process. It could have been right before
24    or shortly -- they could have started and then

Page 314

BURIAN

1
2  stopped.
3      Q.    In that discussion or huddle, do you
4  remember what the lawyers from Weil said?
5      A.    Not with specificity. I remember, it
6  was for the most part, consistent with what I
7  was told right before the hearing. You know, I
8  think there was confusion about how we are going
9  to handle DTC, which then played out in the
10 hearing when Sheldon Hirschhorn stood up and
11 going back and forth. I think there was some
12 confusion about which RESIs were in and out. I
13 think Lori was trying to explain to Luc some of
14 what had already been explained to me since I
15 got down to the hearing, I didn't have a chance
16 to talk to Luc beforehand.
17     Q.    Did you or anybody else from Houlihan
18 take notes of that discussion?
19     A.    To my knowledge, no. Just a
20 conversation.
21     Q.    Any other recollection of what was
22 said in that huddle?
23     A.    You know, it is not really relevant.
24 I mean, wow, look at this crowd, I can't believe
25 we are all at full capacity.

Page 315

BURIAN

1
2      Q.    General commentary?
3      A.    When was the last time the bankruptcy
4  court had the media staked out outside.
5      Q.    In that huddle, did Mr. Miller, Harvey
6  Miller speak?
7      A.    I don't remember whether it was Lori
8  or Harvey that went through what the changes
9  were. I'm sure if we were talking about -- it
10 was commentary about, wow, this is really,
11 really short and it may go all night and kind of
12 deal with all the objections and what are you
13 going to do about people showing up who don't
14 know where their assets are and cures and the
15 attitude was it will be what it will be and we
16 will muddle through.
17     Q.    At the courthouse, did anyone
18 representing the committee complain to Lehman or
19 Barclays about the inclusion in the sale of
20 clearance box assets?
21         MS. TAGGART: Objection, foundation.
22     Q.    The so-called 1.9 bucket?
23     A.    I understood that this was necessary
24 to balance the transaction because of a
25 combination of a loss of value in the portfolio

Page 316

BURIAN

1
2  and/or the fact that securities that were
3  supposed to be in that bucket weren't there and
4  the reason I am giving an explanation was is
5  that "complain," we said we would like to
6  understand that, is that true. But it wasn't
7  like how dare you add those securities to the
8  package. It wasn't don't do it. It was why are
9  they necessary and let's make sure we understand
10 this later.
11         MR. STERN: Can you reread my question
12 please.
13         (Record read).
14         MS. TAGGART: Same objection.
15     A.    Is there a question?
16     Q.    Yes, that question.
17     A.    As I just said, don't think I would
18 characterize it -- I don't know if you would
19 characterize it as a complaint or not, but it
20 was what -- explain to us how this is and why it
21 is necessary.
22     Q.    And your previous answer referred to
23 what you understood as of the hearing?
24     A.    My previous answer?
25         MS. TAGGART: Object to form.

Page 317

BURIAN

1
2          MR. STERN: Withdrawn. Withdrawn.
3  Let's go off the record for a second.
4          THE VIDEOGRAPHER: The time is 6:02
5  p.m., we are going off the record.
6          (Recess)
7          THE VIDEOGRAPHER: The time is 6:04
8  p.m., we are now back on the record.
9      A.    Are you going to reask me the question
10 you asked off record?
11     Q.    Let me think about it.?
12         MS. TAGGART: Off the record, there
13 was some discussion about a prior question,
14 answer.
15         I guess, all my question to you, and
16 Jack can ask his own, is there anything that
17 you want to clarify based on some of the
18 off-the-record conversation?
19     A.    Yeah, I, sitting here, I don't
20 remember whether or not I am combining pre and
21 post hearing information and the explanation for
22 1.9 billion box assets and honestly it has been
23 a long day, I don't remember if I knew it at the
24 hearing or I found out Saturday night or Sunday
25 following the hearing. I just don't recollect

Page 318

```
1           BURIAN
2    right now.
3           THE VIDEOGRAPHER: Counsel, can I have
4    one second. When you said off the record, I
5    thought you were going off the record.
6           Can you please reiterate for the
7    record what you said I had taken under the
8    sound out.
9           MS. TAGGART: Before the witness
10   answered, I had said that while we were off
11   the record previously, there had been some
12   discussion about an earlier question and
13   answer that the witness had had and I asked
14   the witness if he wanted to clarify anything
15   on the record now.
16          THE WITNESS: Did you get my answer on
17   the sound.
18          MS. TAGGART: I believe I did. Yes.
19   Thank you.
20   A.    That related to whatever my counsel
21   just said.
22   Q.    Let's go back to the sale approval
23   hearing. At any point before that hearing or
24   during the recess at that hearing, did anyone
25   acting on behalf of creditors committee express
```

Page 319

```
1           BURIAN
2    concern to Lehman or Barclays about the prospect
3    of including clearance box assets, the so-called
4    1.9 bucket among the purchased assets, if you
5    remember?
6           MS. TAGGART: Objection, foundation.
7    A.    I don't specifically remember a
8    conversation about the clearance box assets, but
9    it was a consistent theme of what assets were
10   being added, whether assets were being added and
11   whether -- and why. So it wouldn't surprise me
12   or not surprise me. I don't specifically
13   recollect it being narrow to clearance box
14   assets.
15   Q.    Now, the next day after you returned
16   from the Sabbath and went to Weil, what was the
17   first thing you did?
18   A.    I don't remember the first thing I
19   did.
20   Q.    Do you remember generally what your
21   activities were?
22   A.    Yeah, I found Mike Fazio and anybody
23   else that was there, that was my people. I got
24   an update on what occurred and where things
25   stood.
```

Page 320

```
1           BURIAN
2    Q.    Which of your people were there?
3    A.    I know for sure Mike Fazio was there.
4    I don't remember whether Ann Miller and/or Tanja
5    Aalto was there, A-A-L-T-O, and there probably
6    was, there may have been probably was associate
7    or analyst. But I don't have a firm
8    recollection.
9    Q.    And while you were at Weil that
10   Saturday evening, did you review any drafts of
11   the clarification letter?
12   A.    I don't remember whether I got drafts
13   of the clarification letter Saturday night into
14   Sunday morning or after I went home to change
15   and came back, whether I got it sometime on
16   Sunday. I don't have a specific recollection of
17   that timing.
18   Q.    Now, over what weekend, did you
19   participate in any meetings with the creditors
20   committee or any conversations with the
21   creditors committee?
22   A.    I did.
23   Q.    Did you report to the creditors
24   committee concerning the status of the
25   transaction?
```

Page 321

```
1           BURIAN
2           MS. TAGGART: Just respond yes or no
3    to that.
4    A.    I reported to the creditors committee
5    my understanding of the status of the
6    transaction.
7    Q.    And what did you tell the creditors
8    committee.?
9           MS. TAGGART: I am going to object on
10   privilege and instruct not to answer.
11   Q.    What was the purpose of the your
12   report to the committee concerning the status of
13   the transaction?
14          MS. TAGGART: OK, you can answer that.
15   Don't reveal any of the substance of the
16   communication and I object to form, but if
17   you understand it, you can go ahead and
18   answer it.
19   A.    We were to keep the committee up to
20   date on what we knew about a very important
21   transaction of an estate that they were
22   fiduciaries of.
23   Q.    Were you providing any legal advice to
24   the committee?
25   A.    Me personally? Houlihan, me --
```

Page 322

BURIAN

1
2    Q.    Houlihan?
3    A.    No, we don't provide legal advice to
4    clients.
5    Q.    What did you tell the committee about
6    the status of the transaction?
7        MS. TAGGART: I am going to object and
8    instruct not to answer on privilege.
9    Q.    Were there certain decisions that the
10   committee needed to make based on the
11   information you were providing?
12       MS. TAGGART: Hold on. Object to form
13   and foundation, but if you know, you can
14   answer.
15   A.    Can you read me back the question.
16       (Record read)
17   A.    It turned out to be no.
18   Q.    If the committee did not have any
19   decisions to make, then what was the purpose of
20   reporting information to them?
21       MS. TAGGART: Objection to form.
22   A.    I could tell you have never
23   represented a creditors committee before.
24   Q.    Actually, I have.
25   A.    Oh, well, it's -- the creditors

Page 323

BURIAN

1
2    committee wanted to be up to speed and informed
3    about what was going on; was the Barclays
4    transaction going to close or not going to
5    close. Was there -- they had heard about JP
6    Morgan issues, what were they, they wanted to be
7    informed. They wanted to exercise their
8    reasonable diligence to know what was going on.
9    Q.    Well, did the committee consider
10   whether there might be an opportunity post
11   closing to challenge the transaction?
12       MS. TAGGART: I am going to object
13   to --
14   Q.    Or a reason to challenge the
15   transaction?
16       MS. TAGGART: I will object on form
17   and privilege and instruct not to answer.
18   Q.    Over the weekend leading to the
19   closing, did the committee consider whether it
20   should challenge the transaction or bring to the
21   court's attention any aspects of the
22   transaction?
23       MS. TAGGART: Objection, form,
24   foundation and privilege, and I'll instruct
25   not to answer.

Page 324

BURIAN

1
2    Q.    Did you have any discussions with
3    anybody at Weil either before the closing or
4    after the closing, concerning whether it might
5    be necessary to return and appear before Judge
6    Peck to provide a further description of the
7    transaction?
8        MS. SCHAFFER: Objection to form.
9        MS. TAGGART: I am just going to --
10   what time period are you asking?
11   Q.    Let's say over the weekend leading to
12   the closing or in the few days following the
13   closing.?
14       MS. TAGGART: You can answer.
15   A.    Yes.
16   Q.    And with whom did you have any such
17   discussion?
18   A.    Mainly with Mr. Miller in connection
19   with my asking him if he was comfortable that he
20   could close this transaction without going back
21   to court and without committee consent.
22   Q.    When did that discussion take place?
23   A.    That conversation took place before we
24   left, obviously. It took place in connection
25   with my objection to the transfer of 15c3 cash,

Page 325

BURIAN

1
2    when I said something to the effect of how do
3    you transfer cash when a document is clear on
4    its face that the cash is not part of that
5    transaction. And then it came up in connection
6    with our leaving when I asked whether or not we
7    needed to consent to this or not.
8    Q.    So am I right that you had a number of
9    conversations with Mr. Miller on this subject?
10       MS. SCHAFFER: Objection to form.
11   A.    The first one I tried to give you a
12   context because it wasn't about this subject.
13   It was about whether or not the estate should
14   agree to give all that cash to Barclays. It
15   wasn't like the conversation wasn't about going
16   back to Judge Peck. The conversation was about,
17   I don't know, I wouldn't be giving away that
18   cash, and as you can see from the result,
19   someone ultimately agreed with me that giving
20   that cash was not the right answer.
21       The second conversation, I do agree
22   with your characterization which is it was
23   about, do you need me, and do you need, you
24   know -- are you going to close and how are you
25   going to close.

Page 326

BURIAN

1
2      Now that I think about it, there may
3  have been a very short other conversation
4  somewhere in the 11 to 12 o'clock range when we
5  told the debtor that our committee was going to
6  bed and that we were concerned that we were
7  going to not be able to muster a quorum, and
8  again, we are not involved in all these
9  conversations, the clarification letter.
10      I think I may have said this earlier,
11  if I didn't, I will say it again, we were not
12  permitted to audit, to sit in the meeting
13  where the clarification letter was discussed
14  and negotiated and we said, you guys are
15  going in there, we are just telling you if
16  modifications come out of that meeting where
17  you need our consent, we are losing the
18  committee and we are concerned about a
19  quorum.
20      So maybe that was more of an
21  announcement and not a conversation. But it
22  was, I want to be complete in those
23  conversations -- in those interactions.
24      Q.   What did Mr. Miller say to you
25  concerning whether he was comfortable closing

Page 327

BURIAN

1
2  the transaction without going back to court?
3      A.   I think his quote was I don't need
4  you. I wasn't sure at the time --whether he
5  meant generally I was worthless or about this
6  transaction. But following up, he made it clear
7  that I was welcome to stay or go, I was welcome
8  to have quorum of the committee or not, but it
9  was irrelevant and unnecessary.
10      Q.   I want to distinguish between two
11  things which I think you said you discussed with
12  Mr. Miller, with Harvey Miller.
13      One was whether he was comfortable
14  closing the transaction without going back to
15  court. Second was whether he was comfortable
16  closing the transaction without creditors
17  committee consent.
18      Let me focus on the first. What
19  did Harvey Miller say to you about whether he
20  was comfortable closing the transaction
21  without going back to court?
22      A.   I apologize. When I said he was
23  comfortable closing without me, I thought it was
24  obvious that of course that meant he didn't need
25  to go to court.

Page 328

BURIAN

1
2      He did not -- I don't remember the
3  exact words, but he told me that this
4  transaction was closing tonight, there was --
5  they were not going back to court.
6      Q.   Did he say anything to explain to you
7  why he was comfortable closing the transaction
8  without going back to court?
9      A.   It was not a debate. It was not a
10  let's go through the following issues and
11  analyze each one. It was his conclusion that
12  this transaction was closing and I didn't say do
13  you need to go to court. I said do you need my
14  consent, my committee consent which was a lower
15  standard than going back to court, and when he
16  said to me no, you can do what you want, we
17  don't need you, to me, that was obvious that he
18  was not going back to court.
19      Q.   Did Mr. Miller explain to you why in
20  his view committee consent was not necessary to
21  close the transaction?
22      MS. SCHAFFER: Objection to form.
23      A.   We did not have a long discussion.
24  The implication was clear that this was -- he
25  did not explain it to me. I had my impressions,

Page 329

BURIAN

1
2  but he did not verbalize in that conversation a
3  detailed explanation as to why he was
4  comfortable.
5      Q.   What were your impressions?
6      MS. TAGGART: Objection to form, asked
7  and answered.
8      A.   Well, throughout the conversation
9  really it was the follow-up, the repercussions
10  of the main meeting with Michael Klein that all
11  this stuff was plumbing, that when it came to
12  what was in or out of the business, e.g., what
13  was, you know, a contract or not a contract or
14  was -- you know, the details with respect to
15  particular assets that were necessary for
16  operating the business, those were details that
17  were consistent with the court order, they were
18  transferring the operating business and lawyers
19  will be lawyers they will fight about it. But
20  these were not big deals vis-a-vis the real
21  estate, they had compromised it and that was
22  done and consistent with more or less what Lori
23  said. And the big issue was on the securities
24  where we were both comfortable that if anything
25  net, net, net, this was better, not worse, than

Page 330

BURIAN

1    BURIAN
2    what was described to the court.
3         So the conversation with Harvey was --
4    the foundation of the conversation with
5    Harvey about do you need me, e.g., do you
6    need this committee to consent to anything
7    was premised on or following the explanation
8    we both received as to what the transaction
9    was.
10    Q.    Now, what you just testified to, are
11    those statements that Mr. Miller made to you or
12    are those are inferences that you are drawing?
13         MS. TAGGART: Object to form.
14    A.    I was clear in explaining to you the
15    context of his statements and then you followed
16    up and asked me what were my impressions and I
17    explained to you why I believe Harvey was
18    comfortable at the time or my understanding of
19    why Harvey was comfortable at the time because
20    of the background of our interaction just a
21    short period before the conversation.
22    Q.    So those were your impressions, not
23    precisely what he said?
24    A.    As I said to you before, it was not a
25    debate or an explanation. Harvey told me his

Page 331

BURIAN

1    BURIAN
2    conclusion in -- as a summation of our
3    conversations.
4    Q.    What did he say specifically on that?
5         MS. TAGGART: Objection form, asked
6    and answered.
7    A.    Define "what." You said, What did he
8    say about that? Define "that."
9    Q.    What, if anything, did he say
10    specifically concerning whether in his view it
11    was necessary to have committee consent in order
12    to close the transaction?
13         MS. TAGGART: Objection, asked and
14    answered.
15    A.    The best I can do for -- as close as I
16    can get to for a quote was I don't need you. I
17    don't care if you stay or go.
18         MR. STERN: Go off the record.
19         THE VIDEOGRAPHER: The time is 6:25
20    p.m., we are now off the record.
21         (Recess)
22         THE VIDEOGRAPHER: The time is 6:25
23    p.m., we are now back on the record.
24    Q.    We have been talking about
25    conversations that you had at Weil Gotshal on

Page 332

BURIAN

1    BURIAN
2    the 21st going into the 22nd of September, 2008.
3         Based on everything you learned about
4    the transaction over that weekend before the
5    closing, based on what you were told about
6    the transaction, based on what you read in
7    the agreements that you were given, at any
8    time after the closing, let's say between
9    September 22 and September 30, did you have a
10    discussion with anyone concerning whether it
11    would be prudent or necessary to return to
12    Judge Peck concerning the transaction?
13         MS. TAGGART: I am going to object on
14    privilege to the extent that's a discussion
15    with the committee, but if you spoke to
16    anyone outside of Houlihan and the committee
17    on that topic, you should go ahead and
18    answer.
19    A.    I don't recollect conversations with
20    third parties about going back to Peck other
21    than as someone else might have thought it was
22    an implied threat when they said things like we
23    want to understand it better, we want a list of
24    the assets, we want to understand the marks, we
25    want to know why the premark was 50 and post

Page 333

BURIAN

1    BURIAN
2    mark was 44, 45. So when you're pushing for
3    that information, but I don't believe I ever
4    said the words "or else" or said, you know, we
5    are going to Judge Peck or something like that.
6    Q.    After the closing, did you ever have
7    any discussion with anybody at Weil or do you
8    know whether Milbank had any discussion with
9    anybody at Weil concerning whether it would be
10    necessary or appropriate or warranted to return
11    to Judge Peck concerning the transaction?
12    A.    Yes.
13    Q.    What were those discussions?
14         MS. TAGGART: I am going to just
15    caution you not to reveal any
16    attorney/client privilege. You can answer
17    if you communicated with someone other than
18    Milbank and the committee and Houlihan and
19    also why don't we take it through April of
20    this year.
21    A.    Well, --
22    Q.    Let me rephrase the question. Between
23    the time of the closing and November 11, 2008,
24    did anyone from Houlihan or Milbank have any
25    discussion with anybody from Weil concerning

Page 334

BURIAN

1  BURIAN
2  whether it would be necessary or warranted to
3  return to Judge Peck concerning the transaction
4  or whether it would be appropriate to appeal his
5  sale order?
6      MS. TAGGART: Objection, foundation as
7  to Milbank.
8      You can go ahead and answer.
9      A.  I don't know about Milbank. And I
10  don't remember any nonprivileged conversation
11  with a third party regarding appeal of the sale
12  order.
13      What I -- I said yes before, but I
14  think we are miscommunicating about my yes.
15      Q.  Well, do you recall discussions on
16  this subject that occurred between the time of
17  the closing and November 2008?
18      A.  Again, this subject being narrowly to
19  appeal?
20      Q.  To go back to Judge Peck or to appeal.
21      A.  And go back to Judge Peck for what
22  reason?
23      Q.  Well, either to seek reconsideration,
24  to provide him with information. Or any other
25  reason you may have discussed?

Page 335

1  BURIAN
2      MS. TAGGART: Same limitation.
3      A.  I don't remember the specific dates
4  and in that November time period, I was still in
5  my trust-and-verify mode where I guess naively,
6  in retrospect, I assumed the transaction was as
7  described and no assets were taken in excess of
8  the values we were told.
9      So in that time frame, we really, my
10  focus and Houlihan's focus was to get a
11  reconciliation. I would be surprised but I
12  can't be clear if it is in the November time
13  frame if there wasn't a nonprivileged
14  conversation where it was said in my presence
15  or said to Weil or someone else, if this is
16  not right, we have got to get those assets
17  back and that would presume an action before
18  Peck. But it was not about appealing the
19  order because it was way after the ten-day
20  period and I can't even tell you for sure
21  that was in the November time frame.
22      MS. TAGGART: I think that we have
23  gone over time. I'm willing to make some
24  small accommodation.
25      MR. STERN: Just a few more questions.

Page 336

1  BURIAN
2      Q.  Did the committee ever consider making
3  a motion for reconsideration on the sale order?
4      MS. TAGGART: Objection and instruct
5  not to answer on privilege.
6      Q.  Did the committee ever consider
7  appealing the sale order?
8      MS. TAGGART: Same objection and
9  instruction.
10      Q.  Did the committee ever consider making
11  a motion for expedited discovery in order to
12  obtain information that the committee believed
13  it was missing?
14      MS. TAGGART: Same objection and
15  instruction.
16      MR. STERN: Thank you. No further
17  questions.
18      MS. SCHAFFER: I don't have any
19      (Continued on next page for jurat)
20
21
22
23
24
25

Page 337

1  BURIAN
2  questions.
3      MS. TAGGART: That concludes the video
4  record for today. The time is now 6:32
5  p.m., we are off the record.
6
7
8      _____
9      SAUL BURIAN
10  Subscribed and sworn to
11  before me this    day
12  of December, 2009.
13
14      _____
15
16
17
18
19
20
21
22
23
24
25

Page 338

```
 1              BURIAN
 2            INDEX:
 3   WITNESS       EXAM BY:          PAGE:
 4   S. Burian      Mr. Stern           6
 5
 6              EXHIBITS
 7   Exhibit No.              Marked
 8   Exhibit 457-B Notice of Deposition        9
 9   Exhibit 458-B Document labeled "Limited      31
10       Objection of Official
11       Committee of Unsecured
12       Creditors"
13   Exhibit 459-B Transcript dated December      48
14       22, 2008
15   Exhibit 460-B Document Bates stamped WGM     129
16       Lehman E1592 with attachments
17   Exhibit 461-B Document Bates stamped      129
18       HLHZ11913 with attachment
19   Exhibit 462-B Document Bates stamped      148
20       MTHM5739
21   Exhibit 463-B memo dated October 6, 2008    160
22   Exhibit 464-B Document Bates stamped      173
23       LAZ-A4419 through 4424
24   Exhibit 465-B Document Bates stamped LAZ-A   173
25       4419 through 44511
```

Page 339

```
 1              BURIAN
 2            EXHIBITS
 3   Exhibit No.            Marked
 4   Exhibit 466-B Document Bates stamped HLHZ    196
 5       35872 through 74
 6   Exhibit 467-B Document Bates stamped HLHZ    197
 7       16856 through 57
 8   Exhibit 468-B Document Bates stamped HLHZ    209
 9       28090 through 91
10   Exhibit 469-B Document Bates stamped HLHZ    209
11       00001 through 0006
12   Exhibit 470-B Document Bates stamped HLHZ    209
13       16324
14   Exhibit 471-B Document Bates stamped HLHZ    209
15       16325
16   Exhibit 472-B Document Bates stamped HLHZ    219
17       38187 through 191
18   Exhibit 473-B Document Bates stamped LBHI    248
19       4414 through 4415
20   Exhibit 474-B Document Bates stamped MTHM    248
21       5778
22   Exhibit 475-B E-mail dated September 19,     294
23       2008
24   Exhibit 476-B Document Bates stamped HLHZ    298
25       9125 through 9144
```

Page 340

```
 1              BURIAN
 2            EXHIBITS
 3   Exhibit No.            Marked
 4
 5   Exhibit 477-B Document Bates stamped CMTE    299
 6       911
 7   Exhibit 478-B Document Bates stamped CMTE    300
 8       2527 through 278
 9   Exhibit 479-B Document Bates stamped CMTE    307
10       882
11   Exhibit 480-B Document Bates stamped HLHZ    308
12       9119 through 9120
13   Exhibit 481-B Document entitled, "Notice     313
14       of Assumption and Assignment"
15
16
17
18
19
20
21
22
23
24
25
```

Page 341

```
 1              BURIAN
 2
 3            CERTIFICATE
 4   STATE OF NEW YORK )
 5           )ss:
 6   COUNTY OF NEW YORK)
 7       I, MARY F. BOWMAN, a Registered
 8   Professional Reporter, Certified Realtime
 9   Reporter, and Notary Public within and for
10   the State of New York, do hereby certify:
11       That SAUL BURIAN, the witness whose
12   deposition is hereinbefore set forth, was
13   duly affirmed by me and that such deposition
14   is a true record of the testimony given by
15   such witness.
16       I further certify that I am not
17   related to any of the parties to this action
18   by blood or marriage and that I am in no way
19   interested in the outcome of this matter.
20       In witness whereof, I have hereunto
21   set my hand this 18th day of December, 2009.
22
23
24   _____
     MARY F. BOWMAN, RPR, CRR
25
```

Page 342

```
 1              BURIAN
 2         * * *ERRATA SHEET* * *
 3    NAME OF CASE:  In Re: Lehman Bros.
 4    DATE OF DEPOSITION: 12/17/09
 5    NAME OF WITNESS:  Saul Burian
 6    Reason codes:
 7       1. To clarify the record.
          2. To conform to the facts.
 8       3. To correct transcription errors.
 9    Page ____ Line ____ Reason____
      From _____ to _____
10
11    Page ____ Line ____ Reason____
      From _____ to _____
12
13    Page ____ Line ____ Reason____
      From _____ to _____
14
15    Page ____ Line ____ Reason____
      From _____ to _____
16
17    Page ____ Line ____ Reason____
      From _____ to _____
18
19    Page ____ Line ____ Reason____
      From _____ to _____
20
21    Page ____ Line ____ Reason____
      From _____ to _____
22
23
24         _____
               SAUL BURIAN
25
```