# BCI EXHIBIT

# 59

Page 1

1        HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2            UNITED STATES BANKRUPTCY COURT
3            SOUTHERN DISTRICT OF NEW YORK
4    - - - - - - - - - - - - - - - - - - - - -
5    In Re:

                                    Chapter 11
6
7    LEHMAN BROTHERS    Case No. 08-13555(JMP)
     HOLDINGS, INC. et al., (Jointly Administered)
8
9                    Debtors.
10   - - - - - - - - - - - - - - - - - - - - -
11              HIGHLY CONFIDENTIAL
12          DEPOSITION OF PATRICK CLACKSON
13            Friday, September 4, 2009
14              At:  9:00 am
15              Taken at:
16              Barclays
             1 Churchill Place
17              London
             United Kingdom
18
19   Reported by: AILSA WILLIAMS
     Certified LiveNote Reporter
20
21
22
23
24
25

## Page 2

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    A P P E A R A N C E S
3    JONES DAY, LLP
      Attorneys for Lehman Brothers, Inc.
4    222 East 41st Street
      New York, NY 10017-6702
5    BY: JAYANT W. TAMBE, ESQ
      BRIDGET CRAWFORD, ESQ
6
      BOIES, SCHILLER & FLEXNER, LLP
7    Attorneys for Barclays Capital and the
      Witness
8    5301 Wisconsin Avenue N.W
      Washington D.C 20015
9    BY: HAMISH HUME
10   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES,
      LLP
11   Attorneys for the Creditors Committee
      16 Old Bailey
12   London, United Kingdom EC4M 7EG
      BY: MATTHEW BUNTING, ESQ.
13
      HUGHES, HUBBARD & REED, LLP
14   Attorneys for the SIPA Trustee
      1775 I Street, N.W
15   Washington D.C. 20006-2401
      BY: JOHN F. WOOD
16   Also Present:
17      PHILIP E. KRUSE: Alvarez & Marsal
18
19
20
21
22
23
24
25

## Page 3

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2
3       I N D E X

4   PATRICK CLACKSON ... ... ... ... ... ... ...5
5   DIRECT EXAMINATION BY MR. TAMBE: ... ... ... ...5
6   CROSS-EXAMINATION BY MR. WOOD: ... ... ... ... 149
7   CROSS-EXAMINATION BY MR. BUNTING: ... ... ... 163
8   FURTHER CROSS-EXAMINATION BY MR. ... ... ... 170
9   WOOD:

10      INDEX OF EXHIBITS
11   Exhibit 349A (Privileged, not ... ... ... ... ...27
      attached)
12
13   Exhibit 350A (Privileged) ... ... ... ... ... ...30
14   Exhibit 351A E-mail, Sept 15, 08 ... ... ... ...31
15   Exhibit 352A E-mail, Sept 16, 08 ... ... ... ...36
16   Exhibit 353A E-mail, Sept 24, 08 ... ... ... ...41
17   Exhibit 354A E-mail, Sept 16, 08 ... ... ... ...42
18   Exhibit 355A E-mail, Sept 16, 08 ... ... ... ...59
19   Exhibit 356A E-mail, Sept 17, 08 ... ... ... ...71
20   Exhibit 357A E-mail, Sept 17, 08 ... ... ... ...73
21   Exhibit 358A E-mail, Sept 18, 08 ... ... ... ...85
22   Exhibit 359A E-mail, Sept 20, 08 ... ... ... ...87
23   Exhibit 360A E-mail, Sept 20, 08 ... ... ... ...88
24   Exhibit 361A E-mail, Sept 22, 08 ... ... ... ...88
25   Exhibit 362A E-mail, Sept 19, 08 ... ... ... ...98
      Exhibit 363A E-mail, Sept 23, 08 ... ... ... 101
      Exhibit 363A E-mail, Sept 23, 08 ... ... ... 101

## Page 4

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2

      Exhibit 364A E-mail, Sept 23, 08 ... ... ... 104
3   Exhibit 365A E-mail, Sept 24, 08 ... ... ... 105
4   Exhibit 366A E-mail, Sept 21, 08 ... ... ... 112
5   Exhibit 367A E-mail, Sept 21, 08 ... ... ... 113
6   Exhibit 368A E-mail, Sept 23, 08 ... ... ... 118
7   Exhibit 369A E-mail, Sept 24, 08 ... ... ... 123
8   Exhibit 370A E-mail, Sept 23, 08 ... ... ... 124
9   Exhibit 371A Barclays Results ... ... ... ... 146
10   Exhibit 372A E-mail, Sept 17, 08 ... ... ... 150
11   Exhibit 373A E-mail, Sept 22, 08 ... ... ... 158
12   Exhibit 374A E-mail, Sept 23, 08 ... ... ... 160
13   Exhibit 375A E-mail, Sept 29, 08 ... ... ... 161
14   Exhibit 376A E-mail, Sept 17, 08 ... ... ... 169
15   Exhibit 377A BCI-EX-00115843-46 ... ... ... ... 178
16
17
18
19
20
21
22
23
24
25

## Page 5

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2       PATRICK CLACKSON
3       Having been duly sworn,
4       Testified as follows:
5     DIRECT EXAMINATION BY MR. TAMBE:
6      MR. TAMBE: Morning, Mr. Clackson. My
7 name is Jay Tambe with the law firm Jones Day,
8 special counsel to Lehman Brothers Holdings Inc.
9 With me is my colleague, Bridget Crawford.
10      I will have the lawyers in the room
11 introduce themselves and we will get started.
12      MR. BUNTING: Morning, I am Matthew
13 Bunting from Quinn, Emanuel, Urquhart, Oliver &
14 Hedges representing Creditors Committee.
15      MR. KRUSE: Phillip Kruse with Alvarez &
16 Marsal on behalf of the LBHI estate.
17      MR. WOOD: John Wood from Hughes,
18 Hubbard & Reed. We represent the SIPA Trustee.
19      MR. HUME: Hamish Hume, Boies, Schiller
20 & Flexner, representing Barclays and the witness.
21      MR. TAMBE : Mr. Clackson, you are
22 currently employed by Barclays, correct?
23     A. Yes.
24     Q. And you are the Chief Financial Officer
25 of Barclays?

Page 6

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  A.  I am the Chief Financial Officer of
2  Barclays Capital, which is the investment banking
3  division of Barclays.
4     Q.  To whom do you report?
5     A.  I report to Rich Ricci, who is the Chief
6  Operating Officer of Barclays Capital, and Chris
7  Lucas, the Chief Financial Officer of Barclays.
8     Q.  How long have you been with Barclays?
9     A.  I have been with Barclays just over
10  10 years.
11    Q.  How long in your current position?
12    A.  Probably about 5 years in my current
13  position.
14    Q.  In broad strokes, if you can tell me
15  what role you played in the days leading up to the
16  Lehman bankruptcy in discussions with Lehman or
17  any due diligence of Lehman, so in the
18  pre-bankruptcy period what role you played?
19    A.  I didn't have any discussions with
20  Lehman.  I was involved in various internal
21  Barclays discussions.  Really at a very high
22  level, we looked at Lehman's financials and the
23  possibility of what a Lehmans/Barclays merger may
24  look like, but it was from publicly available

Page 7

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  information and very high level.
2     Q.  Are you aware that there was a due
3  diligence session on the weekend of
4  13/14 September where more detailed information
5  was provided to Barclays by Lehman?
6     A.  Yes.  So during that period, I went to
7  New York on Friday night, so I can't remember what
8  the date of that Friday was.
9     Q.  The 12th?
10    A.  That was the 12th, and I arrived in New
11  York on probably quite a late flight.  I arrived
12  in New York about midnight and I went to our
13  offices, where I think the results of some of that
14  due diligence or the early results of that due
15  diligence were being discussed.
16    Q.  Do you remember anything in particular
17  that you were asked to comment on or participate
18  in in that period, so the night of the 12th
19  through the weekend?
20    A.  Through that weekend we were doing quite
21  a lot of work to try and pull together proforma
22  statements for Barclays and Lehmans, and to look
23  at what synergies there might be going forward if
24  we were to acquire the whole of Lehmans.  So by

Page 8

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  synergies I mean whether there is areas where we
2  would have got additional income, were there areas
3  where we would have had income overlaps at lower
4  income, where we may have been able to take out
5  costs, where we had costs overlap, and equally
6  what we thought the costs of integration were
7  likely to be.
8     I was also involved in trying to look at the
9  balance sheet we would be acquiring would look like, because
10  we are under different accounting rules.  We are under
11  international accounting standards, where Lehman was under
12  US GAAP, and their numbers, trying to convert their numbers
13  with very limited data to have an international accounting
14  standards equivalent to work out what their numbers would
15  look like, and also calculate what the regulatory capital
16  impact of acquisition would be.
17    Q.  Is it fair to say that over that weekend
18  broadly the types of issues that you were involved
19  in were accounting and tax related issues
20  concerning the contemplated transaction?
21    A.  The issues I was involved in were
22  I suppose accounting.  I am talking about
23  estimated future projections -- I don't know if
24  you call that accounting or planning -- and

Page 9

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  regulatory issues.  Also I suppose I was loosely
2  involved in tax, but more in regulatory and
3  accounting rather than tax issues.
4     Q.  Do you recall any discussions that
5  weekend, so the Friday 12th through the 14th,
6  about marking down the Lehman valuations on their
7  trading positions?
8     A.  The meeting I referred to earlier, when
9  I arrived late on the Friday night, was the
10  initial result of our different business heads who
11  had looked at -- who had preliminary reviews of
12  the balance sheets of the different businesses.
13  In most cases the conversations at that time were
14  very preliminary, in terms of they had only had
15  four or five hours to try and look at an entire
16  activity in a location.  They probably had talked
17  to the head of the desk and some of them may have
18  looked at information.
19    The main focus I remember was on some of the areas
20  such as the commercial real estate and private equity, where
21  even from that very preliminary work we had significant
22  concerns in the valuations, and we also had significant
23  concerns in the regulatory capital impact of taking on those
24  businesses, because the regulatory rules are different in

## Page 10

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 the UK from the US, and particularly around the private
2 equity holdings, they are very capitally prohibitive to
3 hold.
4 So, I suppose, yes, from that there was
5 some involvement looking at some of that activity.
6 We didn't think we would be able to take on,
7 partly due to the very high level of uncertainty
8 and partly due to the fact that we didn't have
9 sufficient regulatory capital, to take on some of
10 those activities. So that was a particular focus
11 I remember.
12 In terms of the other areas, ongoing
13 through the weekend, people were continuing to do
14 that work, and I suppose I was not directly
15 controlling that work but I remember that I recall
16 that there were changes and adjustments coming
17 through as people got into more detail. I don't
18 think that -- my recollection was that continued
19 until actually we stopped doing the transaction,
20 when we had to stop the people -- we had not
21 actually finished doing that.
22 **Q. Let me just backtrack through the answer**
23 **a little bit. You have described a discussion or**
24 **process where you identified certain types of**

## Page 11

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 assets like the private equity investments and
2 possibly others that you felt you could not in
3 fact acquire. Is that fair?
4 A. We identified, I suppose, two major
5 classes, being the private equity business and the
6 commercial real estate, where we thought either
7 for regulatory capital purposes but also for
8 difficulty around those valuations, we thought the
9 level of uncertainty was so high it was a risk
10 that we were not prepared to take. There may have
11 been other areas which we looked at, I cannot
12 recall.
13 **Q. With respect to those two areas, private**
14 **equity, commercial real estate, those stayed off**
15 **the table as the week progressed and the nature of**
16 **the transaction changed, correct?**
17 A. I suppose so. Those were not part of
18 the initial transaction. The subsequent
19 transaction was a completely new and different
20 transaction, specifically looking at the North
21 American businesses, and specifically I think we
22 excluded those two activities for commercial real
23 estate and any private equity activities from
24 there.

## Page 12

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 **Q. Moving into the transaction that is**
2 **discussed in the week, so after Lehman Brothers**
3 **Holdings files for bankruptcy, other than those**
4 **two items, do you recall any other asset classes**
5 **being specifically excluded?**
6 A. What then happened, so we are talking
7 just to clarify your question specifically about
8 the valuations of assets, we were looking at
9 acquiring as part of the North American
10 business --
11 **Q. No, I am not getting to valuation yet.**
12 **I am still at the level of are there buckets of**
13 **assets where you say: "Look, given the uncertainty**
14 **or other issues, regulatory issues, regulatory**
15 **capital issues about those assets, we don't even**
16 **want to look at them, we don't want them to be**
17 **part of the discussion." You have identified**
18 **private equity, commercial real estate. Were**
19 **there any other buckets like that?**
20 A. There may have been, I can't recall, but
21 those were the two big ones which stand out in my
22 mind. There could have been others, I can't
23 recall precise details.
24 **Q. Let's go back to the weekend. You**

## Page 13

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 talked about some aspects of this process but you
2 also said as the weekend went on there were some
3 adjustments being made to values of assets that
4 you were interested in acquiring. Is that
5 correct?
6 A. I am not sure I said that.
7 **Q. If you didn't say that let me phrase it**
8 **as a question. Were there any discussions over**
9 **the weekend 12th, 13th, 14th, where for the assets**
10 **that Barclays was contemplating acquiring, in the**
11 **transaction that was being contemplated that**
12 **weekend, where Barclays folks went through and**
13 **adjusted the values that Lehman had ascribed to**
14 **those assets?**
15 A. I think, as I said, that process was
16 ongoing throughout that weekend. I am never sure
17 if we quite completed that, but we were going
18 through business by business and looking at those
19 assets and ascribing what we thought were the fair
20 values to those assets. When I say "we", the
21 respective trading desk. This is a vague
22 recollection. Somewhere there was, yes, a list of
23 adjustments coming out of that, because we did
24 have adjustments from different businesses when

Page 14

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  going through that. So that was obviously
2  something we were taking account of in terms of
3  looking at the acquisition, in terms of what the
4  impact of that would be.
5      So effectively what we would have do, if we had
6  acquired the whole of Lehmans, was when we took it on we
7  would have to do a fair value exercise, where we fair valued
8  all the assets, which would mean their opening balance sheet
9  at that time would be different from the Lehman closing
10 balance sheet, so we were trying to estimate what those
11 differences were.
12 Q. This may be an issue that will recur as
13 we talk about the rest of the week, but that
14 weekend was there any discussion about whether
15 from an accounting or a tax perspective it made
16 a difference whether the adjustments, the fair
17 value adjustments were done while the assets were
18 still on Lehman's books, as opposed to doing the
19 fair value adjustments after you had acquired the
20 assets? Do you recall any discussions along those
21 lines?
22     MR. HUME: Object to the form of the
23 question.
24 A. I suppose at no point did I have in that

Page 15

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  transaction any interest in what was in Lehman's
2  books. I suppose what I was interested in was
3  when we acquired Lehmans what the fair values
4  would be in terms of my books and taking on my
5  books, so that was my focus. I don't recall any
6  conversation about that.
7 Q. This is a more generic question now.
8 When you are looking at a particular security and
9 doing a fair value adjustment, how would you go
10 about doing fair value adjustment for a security?
11 A. That is a very general question.
12 Q. It is a very general question. What
13 kinds of -- let me back up. Lehman had certain
14 values ascribed to its assets, its balance sheet,
15 as of the close of business on Friday the 12th,
16 correct?
17 A. Yes.
18 Q. Over the weekend Barclays is making some
19 educated guesses about fair value adjustments to
20 some of those assets, correct?
21 A. We were looking at assets to make sure
22 that we thought they were held at appropriate fair
23 value.
24 Q. That is my question. How would Barclays

Page 16

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  determine whether or not Lehman's valuation of an
2  asset was appropriate or not over the weekend?
3 A. What we tried to do over the weekend was
4 we tried to get the experts, so the business
5 people who have experience of operating in those
6 different markets to look at the assets, because
7 they, I suppose, if you just ratchet back, it was
8 obviously a pretty -- there was a lot of turmoil
9 at that time.
10     I think as you probably recall Fanny and Freddy
11 the previous weekend had gone into receivership. There was
12 a lot of problems, a lot of distrust in the market, a lot of
13 volatility, and so in terms of what is an asset worth and
14 what could you actually liquidate an asset for were more
15 difficult than normal in terms of determining that.
16     So the people we had looking at the assets were
17 ,the people who had experience of operating in those
18 different markets, who would know at what level assets --
19 I mean, there may be not many assets trading but at what
20 level assets were trading which were trading, and what
21 liquidation values of assets might be.
22 Q. Do you recall whether the exercise that
23 weekend was in fact to ascribe liquidation values
24 to the assets that Barclays was contemplating

Page 17

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  acquiring?
2 A. I go back to what I said. I think we
3 were trying to ascribe fair values, which is what
4 we had to do in terms of taking on an acquisition.
5 Q. Did you give any instructions to the
6 traders or business people as to what approach
7 they should use to ascribing fair value?
8 A. I was not as I said in New York earlier
9 on, so I didn't give the instructions for the
10 exercise they did.
11 Q. Do you know what measures or approaches
12 those trading folks, the traders, used to ascribe
13 fair value adjustments to the assets over the
14 weekend beyond --
15 A. What I said earlier, I think what
16 I used, the prices in terms of what they were
17 seeing trading in the market, in terms of where
18 they thought the books should be appropriately
19 marked.
20 Q. Do you recall whether that adjustment,
21 fair value adjustment over the weekend was done
22 asset by asset, CUSIP by CUSIP or by asset
23 category?
24 A. I suppose, as I said, I don't think the

## Page 18

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1
2  exercise was ever quite completed, but it was at
3  a very -- my recollection is it was at a very high
4  level, given the time. We only I think mobilized
5  people on Friday and had to sort of make
6  a decision on Sunday, so I think it almost
7  definitely wouldn't be done on a CUSIP by CUSIP
8  basis.
9      The meeting when I arrived in New York, the
10  general thinking of people was: "I have talked to a head
11  trader, had a very quick look at the sort of asset classes
12  they have got and I have not been able to drill into these
13  bits or those bits", so it definitely was not a CUSIP by
14  CUSIP review at that time.
15      Q. Okay. Let's go into the week then. It
16  sounded from one of your earlier answers that the
17  exercise that was conducted over the weekend, that
18  did not directly relate to -- did not directly
19  result in a transaction being entered into,
20  correct?
21      A. Yes.
22      Q. And the effort over the weekend was
23  really for an acquisition of all of Lehman, is
24  that correct?
25      A. Yes. The work over the weekend was

## Page 19

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1
2  looking at acquiring all of Lehman, with the
3  exception of pieces we excluded which I mentioned
4  earlier.
5      Q. Let's get to Monday now. The
6  discussions get resurrected at some point on
7  Monday, is that correct?
8      A. Yes. I suppose I heard about it first
9  thing mid-Monday morning, probably about
10  10 o'clock Monday, 10 or 11 o'clock Monday
11  morning, that we had a chance to buy the North
12  American business out of receivership.
13      Q. Were you still in New York?
14      A. I was still in New York, yes.
15      Q. Who did you hear the news from?
16      A. I heard that from Rich Ricci.
17      Q. So now describe what you did in response
18  to hearing that?
19      A. I heard that news from Rich Ricci, and I
20  was part of a group of people who went down to 745
21  probably about midday Monday to negotiate the
22  transaction to buy that business. I can't
23  remember which floor it was, 32nd floor I think,
24  where they have all their meetings rooms. We went
25  up to that floor and I stayed there I suppose from

## Page 20

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1
2  midday Monday until some point on Tuesday.
3      Q. In Mr. Varley's deposition yesterday we
4  defined or talked about Lehman one, Lehman two and
5  Lehman three, where he described Lehman one as the
6  weekend exercise, Lehman two as the transaction
7  that was discussed and negotiated on the early
8  part of the week and Lehman three as the
9  transaction that ultimately is consummated, closed
10  on 22nd September. Yes.
11      A. Yes.
12      Q. Is it fair if I use those phrases to
13  describe the three different aspects of the
14  transaction, just as shorthand?
15      A. I am happy for you to use the shorthand.
16  I am not sure about the distinction between Lehman
17  two and Lehman three but I am happy for you to use
18  that shorthand.
19      Q. Let's focus on that. In your mind, in
20  terms of the transaction that was negotiated in
21  the early part of the week of the 15th, versus the
22  transaction that ultimately closed on the morning
23  of the 22nd, what differences if any were there,
24  in your view?
25      A. I suppose the most significant

## Page 21

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1
2  differences in my view were we had initially
3  transacted to acquire various assets and take on
4  various liabilities. What we found out during
5  that week is a lot of those assets were encumbered
6  in some way. So the deal which had been agreed
7  with us, the other side would no longer deliver
8  the assets they said they had delivered and/or it
9  was not necessarily possible to assume the
10  liabilities in that deal as well, and the initial
11  transaction which was really taking a long
12  portfolio of assets and a short portfolio of
13  assets, a lot of those assets which were included
14  in that original transaction were no longer
15  available, and the transaction became taking
16  a different portfolio of assets and paying cash
17  for that different portfolio of assets. That
18  different portfolio of assets were not assets
19  which had necessarily been subject to our detailed
20  reviews on the Monday when we went through the
21  assets we thought we were acquiring.
22      So we were suddenly taking on an uninspected pool
23  of assets which, using your terminology, despite the Lehman
24  one work we had done, a number of the assets involved were
25  assets which I don't think we had ever seen, and I think

Page 22

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1   some of them possibly were assets which were part of or had
2   been part of the commercial real estate business that we had
3   never really looked at in any detail, but I don't know that
4   for sure.
5       To sum that up, we were taking a long and a short
6   portfolio initially, and a portfolio which we had done
7   a fair amount of due diligence on, and then we ended up
8   taking a different long portfolio which we had not done due
9   diligence on.
10      Q. In terms of the overlap of the assets
11  between the portfolio that you had done the due
12  diligence on and the portfolio that you ultimately
13  end up acquiring, how much was there in terms of
14  an overlap. Some, a lot?
15      A. You would have thought that was an easy
16  question to answer, but it was not something --
17  I could not answer the question. It was not
18  something we were able to determine. So I think
19  there probably was not a lot of overlap but it was
20  not something which you could say: "We have looked
21  at this bit and this bit is new", because the
22  records were so completely different.
23      Q. The legal documentation for the
24  transaction, how familiar were you with that

Page 23

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1   documentation during that week?
2       A. I looked at various drafts of legal
3   documentation, and having been involved in trying
4   to negotiate the transaction wanted to ensure that
5   the legal documentation reflected the transaction
6   I thought which we had done.
7       I was not directly involved in the negotiation
8   with Lehmans out of which the legal documentation came, so
9   the first I saw were various drafts. I went through those
10  drafts -- I should say I am not a lawyer. So I went through
11  those drafts just trying to make sure I could sort of
12  understand, as a layman, did they appear to reflect the
13  transaction I thought we had done, and where I had questions
14  or did not understand them I went back and talked to the
15  lawyers to get clarification around those.
16      Q. The Asset Purchase Agreement, do you
17  recall the first time you saw the Asset Purchase
18  Agreement or any version of it?
19      A. It probably was -- I don't recall
20  precisely when it was. It would have been earlier
21  that week though.
22      Q. Do you recall seeing the Asset Purchase
23  Agreement or any version of the Asset Purchase
24  Agreement before it was actually executed by the

Page 24

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1   parties?
2       A. I couldn't say precisely. I think it is
3   possible I did but I can't remember precisely the
4   time.
5       Q. Are you aware of a document that is
6   referred to as a clarification letter?
7       A. Yes, I am. I am aware there was
8   a clarification letter as well.
9       Q. What is your understanding -- withdraw
10  that.
11      When was the first time you recall having seen the
12  clarification letter or any version of it?
13      A. I suppose it is obviously after I saw
14  the Asset Purchase Agreement and read through the
15  Asset Purchase Agreement. Obviously, as you said,
16  the movement from transaction two to transaction
17  three, using your terms, there were significant
18  changes. I think during that time I did see
19  various different versions of the clarification
20  letter, and as the transaction was changing,
21  again, in the same way as I said I looked at the
22  Asset Purchase Agreement to make sure it reflected
23  the economics of the transaction I thought we had
24  done, I tried to do the same with the

Page 25

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1   clarification letter, to make sure I thought that
2   reflected what I understood had been agreed.
3       I should tell you I flew back from New York to
4   London on Wednesday night, so some point later in the week
5   I was continuing to be involved but I was not so directly
6   involved in a number of things.
7       Q. After the transaction closed, can you in
8   broad terms give us an overview of what roles you
9   played or tasks that you undertook in connection
10  with the valuation of the assets, the accounting
11  for the assets or the acquisition?
12      A. I had a team of people both in London
13  and in New York who were involved in making sure
14  that we booked all the transactions we had
15  acquired, all the positions we had acquired
16  correctly. Some of that was obviously done by the
17  operations department, that those positions got on
18  to our system, were valued, fed into our books and
19  records, so that at an ongoing level we were able
20  to risk manage those positions. As I said, there
21  were some people trying to work out what the
22  acquisition balance sheet -- so under ISRF
23  accounting what the fair value of the assets and
24  liabilities we had acquired would be, so what the

## Page 26

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1
2 sort of opening balance sheet would be.
3     So I was directing that work. It took
4 a significant amount of time, from really probably up until
5 about January or February time until it was finally
6 completed.
7     Q.  In terms of the assets acquired by
8 Barclays in the acquisition, does Barclays now
9 have all of the assets -- withdrawn.
10     Did Barclays get all of the assets it believes it
11 acquired in the acquisition?
12     A.  No.  There is a significant number of
13 the assets which we acquired which still have not
14 been released by the estate or various third
15 parties who are holding those assets.  I think the
16 precise quantum of that -- we disclosed something
17 in our half year financial statement setting out
18 what that was.
19     Q.  Do you know generally what categories or
20 types of assets those are?
21     A.  Yes.  There is quite a list of different
22 assets, I think 10 or 15 types.  I am not sure if
23 I would be able to recall off the top of my head
24 what all of those are but I know I could mention
25 some.  It probably won't be a complete list.

## Page 27

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1
2     Q.  I just want to know which ones are in
3 you mind, and we will look at some documents as
4 the day goes on.
5     A.  There are some, the 15c3 receivable
6 assets.  There are various security positions.  I
7 think there are some collateral and positions of
8 various exchanges.  Then there are significant
9 amounts of client balances relating to the Lehman
10 PIM business.  I think it stands for Private
11 Investment Management.  As I said, I think there
12 are some other classes which I can't recall.
13     Q.  And the total amount of those assets is
14 the number that is reflected in the quarterly
15 statement that was issued by Barclays in June?
16     A.  In the June statement, yes.  We issue
17 six monthly statements generally, so in the June
18 statement it is referred to.
19     (Exhibit 349A marked for identification)
20     Q.  I have placed before you a document
21 marked 349A, a 3-page document.  Take a moment to
22 review it.
23     MR. HUME:  Before you go any further,
24 let me ask, this is a document -- I see a Bates
25 stamp so I assume it came from our production.

## Page 28

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1
2     MR. TAMBE:  Yes.
3     MR. HUME:  But I see the name
4 Ian Mackinnon, whom I understand to be a tax
5 lawyer, an internal tax lawyer of Barclays.  I had
6 thought -- well, what our production team did --
7 this document I believe is privileged.  I have not
8 seen this particular document before but it looks
9 like it involved communications by Ian Mackinnon
10 to business people at Barclays about the tax
11 issue.  I would like a moment off the record to
12 review it because I think we will assert privilege
13 over this document.
14     MR. TAMBE:  Okay.
15     MR. HUME:  And claw back this and any
16 other documents involving Ian Mackinnon giving tax
17 advice or raising tax issues.  Can I have a moment
18 off the record?
19     MR. TAMBE:  You can have a moment, yes.
20 I am not saying I agree with you but you can have
21 a moment off the record, that is fine.
22     (A short break).
23     MR. TAMBE:  What is it going to be?
24     MR. HUME:  Do you want to do it on the
25 record?

## Page 29

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1
2     MR. TAMBE:  Yes.
3     MR. HUME:  I do think we are asserting
4 a privilege over the document and over any other
5 documents relating to tax issues communicated with
6 Ian Mackinnon, so we would assert our claw back
7 rights over this document.
8     MR. TAMBE:  My next question is will you
9 allow me to examine this witness about this
10 document?
11     MR. HUME:  Since I am asserting my claw
12 back right, no.
13     MR. TAMBE:  Fine, okay.  Since you are
14 asserting your claw back right now, no, you are
15 not going to allow me to question him about this
16 document.  Is that right?
17     MR. HUME:  I think my understanding of
18 the way it works is I am asserting my claw back
19 right and therefore I think immediately I am
20 entitled to essentially receive all of the
21 versions of the document that you have, and
22 therefore you don't have the document anymore, and
23 therefore you cannot ask the witness about the
24 document, correct.
25     MR. TAMBE:  And the only reason I press

Page 30

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    the point is if you are unsure as to whether or
3    not you are going to claim privilege over this
4    document, we have the witness here, I can question
5    the witness about this document, if there is any
6    uncertainty in your mind as to whether or not this
7    is privileged.
8         MR. HUME: No.
9         MR. TAMBE: That is the reason I am
10   asking the question.
11        MR. HUME: Sorry, I didn't mean to
12   suggest that. I believe it is privileged. We are
13   asserting privilege and I am asserting the claw
14   back right.
15        MR. TAMBE: On that basis let's move on
16   to the next exhibit. It should probably remain
17   marked for identification purposes because it was
18   the subject of discussion on the record. Just to
19   be clear, that will be your position on any
20   documents authored by Mr. Mackinnon?
21        MR. HUME: Yes, I would expect so.
22        MR. TAMBE: Let's just mark this for the
23   record. I suspect you will take the same view,
24   but let's mark this document.
25        (Exhibit 350A marked for identification.)

Page 31

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2         MR. HUME: Yes, this is more substantive
3    relating to tax and I assert the privilege.
4         MR. TAMBE: Let's get the record. We
5    have marked the document as Exhibit 350A for
6    identification purposes. Mr. Hume?
7         MR. HUME: Yes, we assert privilege over
8    this document as it appears to relate to tax
9    advice from Mr. Mackinnon.
10        MR. TAMBE: Without agreeing to your
11   assertion of privilege on the basis that you have
12   asserted it, I will move on to another document
13   with the witness, but we reserve our rights
14   obviously to challenge your claim of privilege.
15        (Exhibit 351A marked for identification)
16        I have placed before you a document
17   marked Exhibit 351A for identification purposes.
18   Can you take a moment to review the document and
19   let me know when you are done and I will ask you
20   a question or two about it. There is an e-mail
21   exchange at the top of the page. There is an
22   e-mail from you to Rich Ricci and Robert Le Blanc.
23   Who is Robert Le Blanc?
24        A.  Robert Le Blanc is Barclays group head
25   of risk, so he runs market risk and credit risk

Page 32

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    for Barclays group.
3         Q.  And you are responding to an e-mail that
4    you had received from Rich Ricci in which he
5    states: "Looks like roughly 50 billion will get
6    them to call." Do you have an understanding as to
7    what that was a reference to, the
8    50 billion-dollar number?
9         A.  I don't really recall the numbers in
10   this e-mail at all. My assumption is it is
11   referring to assets, which is the title of the
12   e-mail, but I don't recall the e-mail or the
13   detail.
14        Q.  If you look at the date of these
15   e-mails, these are all dated Monday September 15.
16   Do you see that?
17        A.  Yes, I can see the date.
18        Q.  Right after the filing of the bankruptcy
19   of Lehman Brothers correct? The filing was Monday
20   morning?
21        A.  Yes.
22        Q.  And you had described earlier around
23   midday Monday you had with your colleagues gone
24   over to 745 Seventh Avenue to pick up the
25   discussions on the transaction, correct?

Page 33

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2         A.  Yes, we went over there.
3         Q.  And at the very bottom of the chain
4    there is an e-mail from Robert Le Blanc to Rich
5    Ricci and you. He is asking the question: "Trying
6    to understand the assets that would be included."
7    Do you see that?
8         A.  Yes, I read the e-mail.
9         Q.  Is it your general recollection that the
10   magnitude of the assets that were being considered
11   early in the week of September 15 were in that
12   50 billion-dollar range?
13        MR. HUME: Objection, vague and
14   ambiguous.
15        A.  I can't recall actually. The numbers
16   moved around so much every time, I can't recall
17   precisely what the numbers were, but they were all
18   over the place during that period.
19        Q.  And there is a reference in Rich Ricci's
20   e-mail, which is the middle e-mail in this chain.
21   He states:
22        "Will be Keegan and Mahon. All good and
23   clean".
24        Do you see that?
25        A.  Yes.

Page 34

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    Q. Do you know what that is a reference to,
3  the "all good and clean"?
4    A. Looking at the e-mail, I think Mike
5  Keegan and John Mahon are the two people I think
6  it is referring to, and in terms of the people
7  reviewing the assets I think Mike Keegan and John
8  Mahon were the people given that responsibility to
9  review that, together with their teams.
10    In terms of the "all good and clean", I don't know
11  precisely what that is referring to. I think you should ask
12  Rich, talk to him.
13    Q. We will. Putting the document aside,
14  was it your recollection that when discussions
15  resumed midday Monday with Lehman that Barclays
16  were seeing this as an opportunity to identify the
17  assets that Barclays wanted to purchase and leave
18  behind the assets that Barclays had questions
19  about?
20    A. What we were looking at doing was -- the
21  transaction we were looking at was effectively
22  buying the assets and liabilities of the broker
23  dealer, so Lehman Brothers Inc. We couldn't buy
24  the broker dealer itself because of litigation
25  around the Lehman estate, and obviously the broker

Page 35

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  dealer was conjoined in a lot of that litigation.
3    There were a number of other transactions which
4  a broker dealer has, such as OTC derivative transactions and
5  contracts, which were also subject to cross-default
6  provisions and ISDA Master Agreements with other Lehman
7  entities. So we felt we would be unable to buy or we would
8  be unable to take on those transactions because they didn't
9  have -- we didn't understand the liability around those or
10  if they had good titles in them.
11    So the transaction was looking at buying
12  the assets of the broker dealer which were not
13  contractual assets at that time, and the main
14  classes of assets as I recall were securities and
15  exchange traded derivatives.
16    The broker dealer, because of the nature
17  of regulated -- broker dealers had a more limited
18  group of assets than we had seen in the total
19  Lehman estate, so generally things like the
20  commercial real estate assets and private equity
21  assets were not part of the broker dealer.
22    I am not sure, as I said, what this
23  refers to, but I do know that Robert Le Blanc was
24  very concerned about Barclays taking on some of
25  those commercial real estate, private equity

Page 36

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  assets and would have been concerned when we had
3  the new transaction about had any of those assets
4  seeped back into the transaction, so the assets we
5  had excluded from what you referred to as Lehman
6  one, whether those assets had come back into this
7  transaction. So I suspect, though as I said I
8  don't know, but I suspect this will be referring
9  to and he may have had conversations with Rich
10  about does it have any of those assets, and
11  I assume that is what Rich is responding to, but
12  as I said I don't know precisely.
13    (Exhibit 352A marked for identification)
14    Q. I have placed before you a 3-page
15  document marked Exhibit 352A. Take a moment to
16  review it and let me know when you are done and I
17  will ask you a couple of questions.
18    Do you recognize this as an e-mail from Tom
19  McCosker to various people at Barclays on which you were
20  cc'd?
21    A. I think it is an e-mail from Gary
22  Romain, if you look at the first page of the
23  e-mail.
24    Q. Right.
25    A. It says it is from Gary Romain using Tom

Page 37

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  McCosker's e-mail.
3    Q. Fair point. Do you recognize it as
4  such?
5    A. Yes. I don't recall the specific e-mail
6  but I can see it is an e-mail from Gary, yes.
7    Q. Who is Gary?
8    A. Gary Romain is head of our technical
9  accounting group and some of our other functions
10  within finance, and on this transaction was -- he
11  is based in London but he was in New York. He was
12  the person I suppose I tasked with putting
13  together the initial acquisition balance sheet
14  drawn up under IFRS for Barclays.
15    Q. If you look at the date of this e-mail,
16  it is dated September 16, 2008. Do you see that?
17    A. Yes, GMT, which means I think it
18  was sent from New York. It would have been about
19  midnight New York time on Monday the 15th.
20    Q. Monday night into Tuesday?
21    A. Yes.
22    Q. On the acquisition summary, which is the
23  third page of Exhibit 352A, the entry at the
24  bottom of the page states "negative goodwill". Do
25  you see that?

Page 38

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1
2    A. Yes.
3    Q. Was negative goodwill basically profit?
4    MR. HUME: Objection, vague and
5    ambiguous.
6    A. I suppose under UK accounting when you
7    do an acquisition you have to work out the fair
8    value of the assets and the fair value of the
9    liabilities which you acquire, and the balance is
10   goodwill, to make your acquisition balance sheet
11   balance.
12   Q. So is it the same as profit?
13   A. It is not the same as profit.
14   Q. It is just the difference between assets
15   and liabilities?
16   A. It is the difference between the assets
17   and the liabilities.
18   Q. And in this acquisition summary the
19   value of the assets over the liabilities was
20   $3.7 billion?
21   A. This document appears to be a working
22   draft. I think if you read what it says it says
23   it is the current summary produced in the middle
24   of the night, and at that point it shows the sum
25   of assets which have been included. I am not sure

Page 39

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1    if this was complete in terms of the assets or the
2    liabilities included, but at that point in time it
3    does show the sum of the assets is greater than
4    the sum of the liabilities in terms of what was
5    put on the schedule.
6    Q. And the values that would appear under
7    the value of the assets on page 3 of Exhibit 352A,
8    where would those values have come from?
9    A. You would really have to ask Gary
10   precisely, but as we were I suppose standing back
11   from this, we went into the Lehman building and
12   Lehmans were providing us with some information.
13   We had no access to their underlying accounting
14   records or any other records, so we were getting
15   fed bits of information from Lehmans.
16        I think as I mentioned earlier we had obviously
17   people like Mike Keegan and John Mahon reviewing areas like
18   securities and the valuation of those securities. So as we
19   were getting updates on any work which was going on this
20   working document would have been updated for what those
21   were.
22   Q. And there is a valuation adjustment, do
23   you see, at the top of the spreadsheet,
24   $3.5 billion. Do you see that?
25

Page 40

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1
2    A. Yes.
3    Q. Would that valuation adjustment have
4    been arrived at through the process you talked
5    about before, where the Barclays folks would have
6    put a fair value adjustment?
7    A. So what happened, there was an arm's
8    length, a very arm's length, that is completely my
9    recollection, negotiation between ourselves and
10   Lehmans in terms of the assets we were taking on,
11   the liabilities which we were going to take on and
12   about the valuations of those.
13        In terms of the assets, our experts went through,
14   and I think in this level it possibly was down to a CUSIP by
15   CUSIP level, but I think you should probably talk to them
16   and get the precise details from them, went through the
17   details of the portfolio together with Lehmans people to
18   agree what the fair value for taking on that portfolio would
19   be. I think the valuation adjustment, my understanding,
20   came out of that negotiation. So it was not just what the
21   Barclays people thought.
22        My specific recollection is that there were some
23   portfolios where we had a disagreement, that we thought the
24   valuations were lower than Lehmans and we could not
25   triangulate the difference, and therefore we agreed to

Page 41

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1    exclude those portfolios because we could not triangulate
2    them. So where we had a valuation adjustment it was agreed
3    through negotiation, is my understanding.
4    Q. And then that negotiated value was
5    listed in the total assets category as a value of
6    the assets being acquired?
7    A. Yes, so in terms of the agreement that
8    would then have been the agreed value of those
9    assets which were taken on under the contract.
10   (Exhibit 353A marked for identification)
11   Q. I have placed before you a one page
12   document marked Exhibit 353A. Let me know when
13   you are done looking at it.
14        You will see this is a discussion between John
15   Varley, the Group Chief Executive, and Chris Lucas about
16   negative goodwill. Do you see that? Is it fair to say, if
17   I read this correctly, Mr. Lucas is saying his current
18   thinking, as of September 24, was negative goodwill was hard
19   to exclude, given that it is both accounting profit and tier
20   one for regulatory purposes. Do you see that?
21   A. Yes.
22   Q. Is it the case Mr. Lucas just has
23   a different view of whether or not negative
24   goodwill constitutes profit than you do?

Page 42

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  A.  What he is talking about here, just to
2  be clear, he is saying it constitutes economic
3  profit.
4  Q.  "Accounting profit" it says?
5  A.  Sorry, accounting profit.  I think I am
6  probably saying technically what it constitutes,
7  in terms of I think what Chris is saying is
8  technically it works out -- technically it is
9  goodwill, but in terms of -- it rolls up into
10  consolidated profit at a group level, so that
11  would be correct, yes.
12      (Exhibit 354A marked for identification)
13  Q.  I have placed before you a one page
14  document marked Exhibit 354A.  If you can take
15  a moment to review it, let me know when you are
16  done.
17  A.  Yes.
18  Q.  Did you play any role in the preparation
19  of this document?
20  A.  I can't recall.  I suspect some of the
21  numbers or some of the numbers would obviously
22  have come from me or my staff.
23  Q.  There is the question in the sub-line in
24  this e-mail from Darren to you and Rich Ricci and

Page 43

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  Mr. Haworth.  "Exec summary - is it 250 million or
2  1.55 billion consideration?"  Do you see that?
3  A.  Yes.
4  Q.  What was your understanding of the total
5  consideration that was being paid by Barclays to
6  Lehman under the Asset Purchase Agreement?
7  A.  We were paying -- my recollection is we
8  were paying for three different things.  We were
9  paying 250 million for the business and we were
10  paying for the buildings and we were paying for
11  the data centers, and there were specifically
12  itemized amounts for those other two areas.
13  Q.  And for the building and data centers is
14  it your understanding that ultimately the amount
15  that Barclays paid for those two items was based
16  on appraised values for those two items?
17  A.  Yes, I think the final calculation of
18  those was based on appraised values, less some
19  deduction I think.
20  Q.  This set of bullet points doesn't
21  discuss any consideration that was paid by
22  Barclays in the form of assumed liabilities.  What
23  was your understanding early in the week
24  of September 15 as to the nature of the assumed

Page 44

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  liabilities by Barclays?
2  A.  Sorry, I don't quite understand the
3  question.
4  Q.  Let me rephrase it.  Is it your
5  understanding that in connection with the
6  Lehman/Barclays transaction, as contemplated early
7  in the week and finally as consummated, that
8  Barclays assumed certain liabilities?
9  A.  Yes, so as part of the transaction we
10  assumed various liabilities, yes.
11  Q.  Would you consider those assumed
12  liabilities to be part of the consideration paid
13  by Barclays to Lehman?
14      MR. HUME:  Object to the question as
15  calling for a legal conclusion.
16  A.  Yes, my understanding is what it said in
17  the Asset Purchase Agreement, that that set out
18  various assets which we were acquiring and various
19  liabilities we assumed, and it set out
20  consideration of 250 million for those other
21  things.  As Hamish says, in terms of legal points,
22  I am not the person to ask.
23  Q.  I am not making a legal point.  Just in
24  terms of your understanding of the economics of

Page 45

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  the deal, would you consider the liabilities
2  assumed by Barclays to be part of the value paid
3  by Barclays to Lehman?
4  A.  I think what I considered the deal was,
5  what it said in the purchase agreement, that we
6  were taking on various assets and assuming
7  liabilities as set out in that agreement for a sum
8  of 250 million.
9  Q.  Some or all of these bullet points make
10  their way into a presentation to the board of
11  Barclays.  Is that your understanding?  Do you
12  know that?
13  A.  I know there were various presentations
14  to the board.  I don't know that directly though.
15  Q.  I will show you a board presentation
16  document, but did you make any presentations to
17  the board on around 15/16/17 September about the
18  Lehman/Barclays transaction?
19  A.  I don't recall making any presentations
20  myself to the board.  It is possible I could have
21  been in the room in New York when other people
22  were talking to the board, but I can't precisely
23  recall whether I was or was not.
24  Q.  But you recall that there was board

Page 46

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2  approval sought specifically for the transaction?
3      A.  I do know there was board approval
4  sought, yes.
5      Q.  I have placed before you, sir,
6  a document marked Exhibit 342A, which was
7  a document previously marked.  If you can take
8  a moment to review the cover e-mail and the
9  attachment and let me know when you are done.
10     A.  I have looked at the document generally.
11 I have not read it in detail.
12     Q.  Okay.  There is a cover e-mail and
13 a Powerpoint presentation.  The cover e-mail,
14 there is two e-mails, one from you to James
15 Walker.  Who was Mr. Walker?
16     A.  He was the CFO of Barclays Capital North
17 America, so based in New York.
18     Q.  And you were forwarding a board deck
19 that had been sent to you by Richard Haworth.  Do
20 you see that?
21     A.  Yes.
22     Q.  And if you turn to the board deck and
23 page 2 of the deck you will see an executive
24 summary there.  Do you see that?
25     A.  Yes.

Page 47

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2      Q.  And that identifies some of the same
3  points that we were discussing on one of the
4  earlier exhibits we looked at, right?
5      A.  Right, page 2 looks quite similar to
6  your Exhibit 354A.
7      Q.  In the top third of the page, page 2 of
8  this exhibit, 342A, the third arrow begins: "We
9  would offer 250 million..."  Do you see that?
10     A.  Yes.
11     Q.  That arrow ends with the sentence:
12 "The recognition of negative goodwill amounts
13 to 3 billion pre tax (2 billion post tax)".
14     Do you see that?
15     A.  I see that, yes.
16     Q.  Do you recall any discussion at this or
17 any board meeting about the amount of the negative
18 goodwill that would be recognized in the Lehman
19 transaction?
20     MR. HUME:  Objection, lacks foundation.
21     A.  I don't recall any discussion at any
22 board meeting.  As I said I don't recall whether
23 I attended it.
24     Q.  Flipping to page 5 of the Powerpoint,
25 that is a slide that is titled: "Total assets in

Page 48

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2  new transaction are 75 billion".  Do you see that?
3      A.  Yes.
4      Q.  I just have a question about that
5  number, that $75 billion number and the number we
6  were looking at in Exhibit 352A, which was the
7  acquisition summary exhibit, if you have that
8  before you, and the third page of that exhibit,
9  352A, had an acquisition summary with total assets
10 of 62.7, inventory assets of 60.5.
11     If you look at the cover e-mails on both these
12 documents they are within hours of each other.  Do you have
13 an explanation as to why there is that difference between
14 the board deck and that Exhibit 352A?
15     A.  You say the documents were within hours
16 of each other.  This whole transaction was done in
17 a very small number of hours.  I think, as I said
18 earlier, this looks to me like a working document,
19 so numbers were changing minute by minute rather
20 than hour by hour.  So the fact that the two
21 documents are different does not surprise me, and
22 over that period there were many different
23 documents produced with many different numbers and
24 probably, as I am sure you know, the final deal
25 and where it finally ended up, all of those

Page 49

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2  numbers and all of those assumptions ended up
3  being incorrect, so yes, there were many drafted
4  documents.
5      Q.  The chart that appears on page 5 of the
6  board deck, that is Exhibit 342A, do you have an
7  understanding of what those columns in that chart
8  mean, what that information is?
9      A.  My recollection, looking at page 5, is
10 that this is trying to show I think -- I can't
11 remember exactly what you called it but you called
12 it Lehman one, so the third two columns would have
13 been the items shown to the board in terms of the
14 initial Lehman transaction.  I don't know if they
15 are precisely the same or not but that is my
16 assumption, in trying to represent that.
17     So as I mentioned earlier you had what was in the
18 original transaction, there were various assets which were
19 excluded from that original transaction, and this is then it
20 looks like excluded, new transaction will be a balancing
21 figure, and the new transaction will be one of the versions
22 of the documents of the assets we thought we were acquiring.
23     Q.  Just so we have a clear record, the
24 Lehman one transaction, that is the column titled
25 "Long Island Starting Position".  Is that correct?

Page 50

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    A.  I think the Lehman one transaction would
3    have been the Long Island starting position less
4    the excluded original transaction.
5    Q.  Okay.
6    A.  But whether those are precisely the
7    numbers, I don't know, but I think that is what
8    this is trying to show.
9    Q.  And the next column over, which is
10   "excluded new transaction" those are additional
11   assets that are excluded from the Lehman assets?
12   A.  I think, as I said, that column looks to
13   me like a balancing figure.  We obviously knew
14   what was included in Lehman two, in terms of the
15   new transaction, that is just the balance you get
16   from -- so that the schedule sums across, would be
17   my assumption.
18   Q.  There is an item in the "new transaction
19   included" column on the row that is titled
20   "other", and it has an amount of 19.9 billion.  Do
21   you have any understanding as to what assets were
22   included in that category?
23   A.  I can't recall.
24   Q.  Would the values shown in the new
25   transaction included column be values that had

Page 51

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    been adjusted, the fair value adjustments done by
3    Barclays, or are these Lehman marks?
4    A.  I suppose, just going back to what
5    I said earlier, we didn't do a unilateral
6    adjustment to the marks, so in negotiation we
7    agreed valuations.  So we had an arm's length
8    negotiation to get to the valuations.  I don't
9    know precisely what these numbers here represent.
10   Q.  Whether these are the negotiated marks
11   or the original Lehman marks?
12   A.  I don't know.
13   MR. TAMBE:  Let's take a short break
14   and then resume.
15   (A short break).
16   MR. TAMBE:  On some of the documents we
17   have looked at there is a reference to RWA.  What
18   is RWA?
19   A.  RWA is risk weighted assets.  There is
20   a measure by which bank's capital adequacy is
21   calculated, so different assets are given
22   different weightings depending on the risk of
23   those assets.  So I suppose, it is a very simple
24   example, a private equity or a risky asset is
25   given a very high rating, whereas a less risky

Page 52

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    asset, like a Government bond, is given quite
3    a low weighting.  So it is a method to try and
4    sort of equate the risk in assets to get
5    a measure -- I suppose in the US you have
6    a leverage ratio, but to try and produce a sort of
7    equivalent amount of risk across different asset
8    types.
9    Q.  Okay.
10   A.  Also in one of the exhibits, 342A in
11   front of me, I can see the term "WRA", and the
12   terms RWA and WRA, standing for weighted risk
13   assets or risk weighted assets are the same thing.
14   Q.  Turning to page 2 of the deck,
15   Exhibit 342A, and it is the second page of the
16   deck which is the attachment, that is the
17   executive summary, and near the top of the page we
18   have those arrows.  The second arrow reads:
19   "We would acquire 75 billion of assets and
20   liabilities.  The business would include RWA of
21   13.5 billion."
22   Do you see that?
23   A.  Yes, I can see that.
24   Q.  Is that the risk weighted asset
25   calculation, that $13.5 billion number, that is

Page 53

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    the risk weighted asset calculation of 75 billion
3    of assets and liabilities?
4    A.  It is actually a bit more complicated
5    than that, because in this case the assets and
6    liabilities would be in a US broker dealer, and to
7    calculate the -- so the RWA is the way the bank
8    works out its capital.  To calculate its
9    consolidated capital, which is what a bank has to
10   do, it has to add up the capital in its
11   subsidiaries, and that RWA would be computed by
12   what the broker dealer capital charges for those
13   assets and liabilities would be, and then
14   converting that from the broker deal methodology
15   to a sort of bank equivalent, but those would then
16   be on a consolidated basis what the RWA equivalent
17   would be.
18   Q.  I think my question may have been
19   narrower.  The line that reads: "The business will
20   include RWA of 13.5 billion", that is
21   a calculation or a number that relates to the
22   business being acquired.  Correct?
23   A.  Yes, that is a calculation relating to
24   the 75 billion.
25   Q.  There was a reference in one of the

Page 54

1      HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    other e-mails we looked at to tier one regulatory
3    capital. Do you remember the phrase was used,
4    "tier one regulatory capital"?
5        A. Yes.
6        Q. Are the calculations for tier one
7    regulatory capital based on RWA or based on fair
8    value of the assets and liabilities?
9        A. The calculation of tier one capital are
10   quite complicated and have quite a lot of inputs
11   into them. RWA's are one of the inputs. The fair
12   value of assets and liabilities does feed into the
13   RWA calculation and also feeds into the reported
14   profit calculation, which also feeds into the tier
15   one calculation. So it is a very complicated
16   framework, but both of those feed into it.
17       Q. Do you recall being party to any
18   discussions in which the amount of negative
19   goodwill generated in this transaction was being
20   considered in light of the regulatory capital
21   needs for the businesses being acquired?
22       A. I suppose standing back from my -- part
23   of my role in looking at this transaction was to
24   make sure that at the time when the world was
25   collapsing and capital was a very scarce resource

Page 55

1      HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    that overall the impact of this transaction was
3    not going to be negative to the capital of
4    Barclays as a group, and therefore one of the many
5    metrics in terms of looking at the transaction was
6    the effect of the transaction on the regulatory
7    capital of the group as a whole, and obviously the
8    effects of the assets you acquire, the effects are
9    any capital deductions which might be part of the
10   transaction, and if you had positive goodwill it
11   would be a negative to capital and if you had
12   negative goodwill it would be a positive to
13   capital.
14       Q. So to the extent you had negative
15   goodwill it would help you meet your regulatory
16   capital requirements?
17       A. So taking all the business, all these
18   different factors would affect the capital, yes.
19   The negative goodwill would be positive any assets
20   you acquire would be negative and any capital
21   deductions acquired would be highly negative.
22       Q. I appreciate the fuller answer, but just
23   focusing on the negative goodwill, if I understand
24   your answer correctly, having the negative
25   goodwill helps you meet your regulatory capital

Page 56

1      HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    requirements?
3        A. I suppose I am giving you a full answer
4    because I think the transaction -- we were looking
5    at the transaction as one transaction, i.e. do we
6    buy the business or not buy the business.
7    Obviously, the transaction came as a whole and
8    therefore we were looking at the impact on a whole
9    on capital, which is why I think it is
10   inappropriate just to pull one part out.
11       Q. Okay. All I am saying is, all other
12   things being equal, the more negative goodwill you
13   had, the more regulatory capital you had.
14   Correct?
15       A. I think I have said, if you had negative
16   goodwill it is positive to capital.
17       Q. Was it contemplated that Barclays would
18   raise capital to satisfy the regulatory capital
19   needs of this acquisition?
20       A. I was not directly involved but I know
21   there was some talk and there was some reference
22   in these documents to Barclays doing some
23   transaction with Sumitomi to raise some additional
24   capital.
25       Q. In fact, at the bottom of the executive

Page 57

1      HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    summary there is a request for board approval to
3    approve the transaction and to issue 612 million
4    Barclays shares. Do you see that?
5        A. Yes.
6        Q. Was it your understanding that these
7    shares were being raised in order to help Barclays
8    meet the regulatory capital requirements of its
9    business or for some other purposes?
10       A. I suppose my understanding was that in
11   total Barclays was looking at doing this
12   capital -- doing this transaction in its total
13   capital needs and yes, I don't know what the
14   segregation of the different pieces was.
15       Q. Going back to our negative goodwill
16   discussion, the less negative goodwill you had in
17   this transaction, the more need there would be for
18   Barclays to obtain regulatory capital from other
19   sources. Correct?
20       A. I suppose, standing back from the
21   transaction, if we took on different assets, that
22   would consume more capital. If we had more
23   negative goodwill it would produce capital. So
24   all of those different factors of the transaction
25   would affect, as I said before, the capital

Page 58

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  ratios, and I think, as I mentioned earlier, in
3  the initial transaction one of the reasons why we
4  didn't look at taking on the private equity
5  business was not just the valuations but also the
6  capital impact of taking on that private equity
7  business would have been very onerous.  So capital
8  at this time, when capital was very scarce in the
9  world was clearly a consideration and an important
10  consideration.
11    Q.  And at least one of your aims was to
12  reduce the need to have to go out and raise fresh
13  capital in this environment, was that fair?
14    A.  In terms of raising capital and going at
15  sterling and raising capital, that was not really
16  something which was under my remit.
17    Q.  Do you know one way or the other what
18  Barclays' view was or appetite was for raising new
19  capital in this environment?
20    A.  I think it is really more something you
21  should talk to people like John Varley, who you
22  talked to yesterday, or Bob Diamond about, rather
23  than myself, but as I said it was a very difficult
24  market environment, as we know, and capital was
25  very scarce and raising capital was very

Page 59

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  difficult.
3    (Exhibit 355A marked for identification)
4    Q.  I have placed before you a 2-page
5  document marked Exhibit 355A.  Take a moment to
6  review it.  Let me know when you are done.  Have
7  you had a chance to review it?
8    A.  Yes.
9    Q.  At the bottom of page 1, carrying over
10  on to page 2, is an e-mail from Bill Castell to
11  various people, and you are cc'd on that.  Do you
12  see that?
13    A.  Yes.
14    Q.  There is a calculation of sorts set out
15  at the bottom of page 1 over on to page 2,
16  yielding a negative goodwill number of 3 billion
17  pre tax.  Do you see that?
18    A.  Sorry, precisely which calculation are
19  you referring to?
20    Q.  The calculation which begins with the
21  heading "FV inventory".  I assume that is fair
22  value inventory, is that right?
23    A.  I think that is probably what it is.
24    Q.  It carries on through various other
25  calculations but the last line is "Negative

Page 60

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  goodwill 3 billion".  Do you see that?
3    A.  Yes.
4    Q.  Do you have an understanding as to what
5  that calculation is, starting with "fair value
6  inventory" all the way down?
7    A.  I don't recall specifically this e-mail
8  but it would appear to be Bill Castell, who works
9  in the corporate development group of Barclays,
10  trying to calculate his own acquisition balance
11  sheet.
12    Q.  You will see the numbers are somewhat
13  different than the numbers we saw in the board
14  presentation, Exhibit 342, correct?
15    A.  As I said, I think the numbers were
16  changing minute by minute so I wouldn't be
17  surprised if the numbers were different.
18    Q.  At the end of his e-mail he has a note
19  about the board deck and the board deck's
20  reference to $3 billion of negative equity.  Do
21  you see that?
22    MR. HUME:  Are you on the first page?
23    MR. TAMBE:  On the second page.
24    A.  Yes.
25    Q.  Was there a question or concern about

Page 61

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  whether the calculation of negative goodwill had
3  been done correctly in the board presentation?
4    A.  I couldn't answer specifically on what
5  Bill is referring to here, but there was -- I mean
6  this transaction, as I said, numbers were changing
7  all the time.  It was being done overnight.  There
8  were people in London and New York.  There was
9  a lot of confusion and misunderstanding about
10  precisely what was what and what did it mean, and
11  therefore there was a lot of confusion and there
12  will be a lot of misunderstandings during that
13  period.  So I would not be surprised if this
14  reflected some confusion and misunderstanding.
15    Q.  To your recollection, was there a target
16  negative goodwill number that Barclays were
17  shooting for as circumstances changed and the deal
18  evolved?
19    MR. HUME:  Objection, vague and
20  ambiguous.
21    A.  Just to be clear, my recollection, we
22  went in on the Monday, my job in terms of the
23  transaction and trying to negotiate a transaction
24  was trying to negotiate something which protected
25  Barclays from the huge amount of uncertainty which

Page 62

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    was in the environment and to make sure that the
3    business we were taking on did not have a negative
4    impact on Barclays.
5        I don't recall having any target. As we
6    were going through we worked out some numbers.
7    I remember those numbers changing as we got
8    different data coming through, and I remember
9    those numbers continuing to change at that early
10   time in the deal and then continuing to change
11   afterwards for a long period of time as we tried
12   to work out precisely what we had acquired and
13   what liabilities we had taken on.
14       Q.  At any time during that week
15   of September 15, do you recall Barclays taking any
16   steps to ensure that the negative goodwill
17   generated by the transaction would equal or exceed
18   $3 billion?
19       A.  I suppose, going back to what I said, we
20   initially negotiated a transaction where we took
21   on various -- we acquired various assets and took
22   on various liabilities. As we went through the
23   week and the transaction changed, at all times we
24   really tried to make sure that we were continuing
25   to protect Barclays. So I suppose what happened

Page 63

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    during that week, the difference between Lehman
3    two and Lehman three, which I think I said before
4    we went from a long position and a short position
5    which largely offset each other to suddenly having
6    a very big long position, at a time of extreme
7    market volatility and at a time -- and a long
8    position where we had not done the due diligence,
9    we had not been able to do like the detailed
10   review of the assets we were taking on.
11       The one thing we knew about the assets we were
12   taking on was the Fed was trying to get out of those assets,
13   the Fed did not want to hold them and wanted us to take
14   them, but we had not had time to really say what were those
15   assets worth and what was a fair value of them.
16       So I was aware at that point as the transaction
17   changed that we did try and take on further assets to
18   protect ourselves against the huge uncertainty and risks
19   which had suddenly moved into the transaction, which had not
20   existed in the original transaction.
21       Q.  And these further assets that you tried
22   to take on, did you have a total value size or
23   a target size in mind as to how much more you
24   needed in terms of further assets for this
25   protection?

Page 64

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2       A.  I suppose what we knew is that we had
3    taken on some potential liabilities, so we knew at
4    a minimum we had taken on potential liabilities,
5    both of staff and suppliers. A lot of the assets
6    we thought we had been acquiring looked like they
7    were encumbered and we were no longer going to
8    acquire. We knew we were taking on some
9    liabilities. So I suppose as a minimum, in my
10   mind, to protect Barclays we needed to ensure that
11   we had sufficient assets to cover the liabilities
12   which we were assuming.
13       Q.  And these further assets that Barclays
14   tried to take on, and generally by asset category
15   or description can you give us a sense of what
16   those further assets were?
17       A.  I think as I said I flew back to London
18   on Wednesday night, and I think a lot of the
19   changes between these transactions were happening
20   during the week, where we found a lot of the
21   assets we contracted to buy were no longer or were
22   encumbered, and so it was looking like the deal
23   was all falling apart.
24       In terms of the detail of the assets, I was quite
25   removed because I was sitting in London. I was on a few

Page 65

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    calls. I remember one call, I think it was probably on the
3    Thursday night, where I had to be shaken awake by my wife in
4    the middle of the night to go on to a call, where there was
5    some talk about assets, but I was not very -- you know, I
6    didn't have -- Lehmans were the only people that had the
7    information on the assets. I didn't have any information or
8    understanding, apart from it suddenly looked like we had
9    a deal where we were taking on or assuming some large
10   potential liabilities and potentially would be realizing
11   I suppose a large positive goodwill at that point.
12       Q.  And this effort to try and find or try
13   and identify further assets, did that effort
14   continue into the weekend of the 20th, 21st and
15   thereafter?
16       A.  I can't recall the precise detail around
17   all the timings. As I said, I was not on the
18   ground so I am not the right person to answer
19   that.
20       Q.  In trying to identify the further assets
21   that were to be acquired, were there any
22   limitations in terms of whether they were part of
23   the deal or not, whether they were included in the
24   Asset Purchase Agreement or the clarification
25   letter?

Page 66

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2   A.  Sorry, I don't know if you can repeat
3   the question. It is not very clear what you said.
4   Q.  You described Lehman two as
5   a transaction where you had identified long
6   positions and short positions that were going to
7   be acquired. Correct?
8   A.  Yes.
9   Q.  Then things change, the Fed makes the
10  demand it does, you get collateral that you have
11  described as very different from the collateral
12  that you had agreed to purchase in the Lehman two
13  transaction, and you perceive greater risk.
14  Correct?
15  A.  Yes. Not just perceive greater risk;
16  there was a significantly different risk profile.
17  I suppose --
18  Q.  But here is where I am getting too --
19  MR. HUME: Let him answer.
20  MR. TAMBE: Let me finish my question.
21  I was in the middle of responding to your earlier
22  point as to where we are going with this, and then
23  you identify further assets. In identifying those
24  further assets, did you believe there were any
25  limitations as to what assets could be identified

Page 67

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2   and transferred to Barclays, any limitations
3   imposed by either the Asset Purchase Agreement or
4   the clarification letter.
5   A.  It sounds quite a sort of technical
6   legal question to me. We had obviously done
7   a transaction with Lehman Brothers Inc to acquire
8   assets from Lehman Brothers Inc, who were party to
9   the transaction. So I suppose in my mind they
10  only had the power obviously to agree to transfer
11  any assets which were owned by Lehman Brothers
12  Inc. They would not have the power to transfer
13  any other assets. But obviously if assets were
14  within the original agreement those assets would
15  already have been covered by the original
16  agreement. The issue was that those assets, under
17  the original agreement, Lehman Brothers Inc did
18  not have the power to transfer them.
19  Q.  Did you have an understanding that
20  assets that were not included in the original
21  agreement would be included by virtue of the
22  clarification letter?
23  A.  Yes. So that was my understanding, that
24  the clarification letter -- yes, the clarification
25  letter specifically brought in various assets to

Page 68

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2   make clear what assets were part of that
3   agreement.
4   I just wanted to say, back to when you interrupted
5   me --
6   Q.  I am sorry, I wanted to get that
7   question down but I am done. Go ahead.
8   A.  The difference between buying a long and
9   short portfolio and just a long portfolio, there
10  is one difference, which is we didn't know the
11  assets, but at that time of market volatility,
12  which was horrific during that time, and still
13  today, if we look at the last two years, they were
14  the most volatile days around that time, if you
15  had a long and short position there was some
16  natural offset, the market went down, you would
17  lose on your long positions and gain on your short
18  position. The market went up, vice versa.
19  Suddenly the risk involved with the portfolio we
20  were taking on was very different, because we just had
21  a long position, and therefore we were exposed. Obviously,
22  if the market fell, which felt like that was what was
23  happening in the world, and the assets we had taken on,
24  I suppose not only had we not done the due diligence but
25  most of them were not liquid assets or assets which were

Page 69

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2   easily hedged or managed, so we took on a very large
3   portfolio at a time when it was very difficult to hedge
4   that, and probably also very difficult to sell that, because
5   people would not want to buy those assets at that time.
6   So it is not a small change in terms of the risk
7   profile we were taking on. It was a completely, I suppose,
8   in retrospect, I think if the transaction had been that
9   Lehman three transaction initially, I am not sure if we
10  would have done it, because it was almost unquantifiable
11  risk we were taking on from that transaction.
12  Q.  Given how horrific conditions were that
13  week, why do the transaction at all? Why take on
14  all this risk?
15  A.  There were lots of -- there were
16  conversations later in that week about, you know,
17  should we do it and was it really a sensible thing
18  to do. Clearly the reason we were doing the
19  transaction in the first place was because of the
20  strategic rationale of buying the business going
21  forward, but the risk around the transaction was
22  very high. But also we had people like the Fed,
23  as I said earlier, who were pushing us very hard
24  to take on those positions, and that was an
25  element. We got into quite a difficult position

Page 70

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2  to try and get out of that as well.
3      Q.  But you did take steps to address or
4  mitigate the risk you were facing, correct?
5      A.  Yes.
6      Q.  And that included identifying the assets
7  that you wished to purchase and the assets that
8  you wished to exclude, correct?
9          MR. HUME:  Objection, vague and
10 ambiguous.
11     A.  Yes, sorry, you are right, I do not
12 understand the question.
13     Q.  In terms of addressing or mitigating the
14 risk of the transaction, you took various
15 different steps to do that, correct?
16     A.  We had done initially -- going back to
17 the Monday Lehman two transaction, as we said,
18 where we had not agreed to a price on the assets,
19 we had excluded those, and we had excluded assets
20 such as OTC contracts, where we thought there was
21 unquantifiable risk around them.  Later on in the
22 week, and again I was not in New York so I was one
23 step removed, I think it was much harder for us
24 because we actually, more or less, we had the Fed
25 saying that: "We want you to take on these

Page 71

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2  assets", and I am not sure if we had any ability
3  to exclude anything from that.
4      Q.  So what steps, if any, did you take
5  later on in the week to try and mitigate the risk
6  of the assets that the Fed was asking you to take
7  on?
8      A.  I am not really the person to know that.
9      Q.  Would the identification of further
10 assets that we talked about be part of that?
11     A.  Yes, I suppose, apart from what we
12 discussed earlier, that we knew we were taking on
13 various liabilities, we knew we were taking on
14 these very open-ended liabilities with these --
15 well, we were paying cash.  I can't remember
16 precisely what it was but about $45 billion for
17 some assets of uncertain value in a very risky
18 market.  So to cover all of those risks we then
19 did look at other assets we could take on, and
20 again we negotiated that, which I suppose from the
21 Barclays side seemed completely the appropriate
22 thing to do in terms of a fair contract.
23         (Exhibit 356A marked for identification)
24     Q.  I have placed before you a one page
25 document marked Exhibit 356A.  Would you take

Page 72

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2  a moment to review it and please let me know when
3  you are done.
4      A.  Yes.
5      Q.  The subject of the e-mail in Exhibit
6  356A is "Potential problem".  Do you see that?
7      A.  Yes.
8      Q.  In fact, the e-mail lists more than
9  a problem, it lists several potential problems.
10 Do you see that?
11     A.  Yes, I can see it says "couple of
12 problems" further down.
13     Q.  These e-mails are dated
14 Wednesday September 17.  Do you see that?
15     A.  Yes.  The only thing I am not quite
16 clear on is if it is London or New York time.
17     Q.  Okay.  If you look at the bottom e-mail
18 from John Mahon to Mike Keegan and others, there
19 is four bullet points that appear at the bottom.
20 Do you recall whether that exercise of those four
21 bullet points were ever executed on?
22     A.  I don't know.
23     Q.  Do you recall any discussions that you
24 were involved in upon learning about the couple of
25 problems identified in this e-mail as to ways to

Page 73

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2  rectify those problems?
3          MR. HUME:  Objection to the form, vague
4  and ambiguous, compound.
5      A.  I suppose these were in my recollection
6  some of the problems which, as we discussed
7  earlier, meant that the assets which we had
8  acquired and liabilities, some of the trading
9  liabilities we thought we had took on no longer
10 appeared to be in LBI's power to deliver to us.
11 So these were some of the changes which happened
12 in the week.
13     I mean, just sort of standing back a little bit
14 from this, I think we were probably slightly naive on Monday
15 when we did the transaction, thinking that we would be able
16 to buy -- you know, we were looking at I suppose a trade day
17 balance sheet and going through all those assets on the
18 books of the broker dealer thinking we could buy those.  I
19 think we just underestimated the complexity of the
20 bankruptcy of the Lehman group happening all around and the
21 effect that would have on third parties.  So yes, these are
22 just some of the many problems which happened during that
23 week.
24         (Exhibit 357A marked for identification)
25     Q.  I have handed you a one page document

Page 74

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2  marked Exhibit 357A. Take a moment to review it,
3  let me know when you are done.
4      A.  Yes.
5      Q.  Is this another example of Barclays
6  realizing that some of the assets that it had
7  wished to purchase in Lehman two were in fact not
8  available to be purchased as the week wore on?
9      A.  Yes, I suppose as I said we had looked
10 at a series of assets on the balance sheet of LBI
11 which we have been through. I don't know
12 specifically about this case but it appears to be
13 this is another case where those assets which were
14 on the balance sheet of LBI, LBI did not have
15 entitlement to those assets to transfer to us,
16 though I can't respond specifically to this case.
17     Q.  There is an e-mail from Stephen King.
18 Who was Stephen King?
19     A.  Stephen King was or is a trader in our
20 New York office. He was working together with
21 John Mahon and Mike Keegan in terms of valuing
22 assets. He is an ABS trader, and so his
23 particular expertise is asset backed securities,
24 and so he was involved in looking at the asset
25 backed securities positions.

Page 75

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2      Q.  If you go back to Exhibit 352A, the
3  acquisition summary. That is the 3-page.
4      A.  Okay.
5      Q.  On the covering e-mail and in the
6  attached spreadsheet there is a bonus accrual
7  number of a negative $1.3 billion. Do you see
8  that?
9      A.  Yes.
10     Q.  Do you have any understanding where that
11 number had come from? This is on 16 September.
12     A.  I think, and you know I can't recall
13 precisely, but my recollection is that as we were
14 doing this work there were some people from our HR
15 function who were trying to segment the population
16 of people we were taking on, and were trying to
17 estimate the bonus numbers, and I think it was
18 a number which we got from them. I can't remember
19 if it came to me or came to someone else. So it
20 was an early estimate from our HR people. Yes, it
21 was a provisional estimate we had at that time. I
22 think you will find during that week that number
23 changes as well.
24     Q.  In fact, what you find during that week
25 is the number that you ascribed to bonus accrual,

Page 76

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2  as the week wears on, is a 2 billion-dollar
3  number. Correct?
4      A.  The number which Lehmans produced, there
5  were various versions, but their proforma balance
6  sheets, and they produced a balance sheet which
7  had a 2 billion-dollar number for comp accrual.
8  At that time my understanding of that number for
9  comp accrual was that that would cover us for all
10 compensation costs, which may be costs which were
11 costs on day one in terms of taking on the
12 business and, ratcheting back, we were taking on
13 about 10,000 people. In the middle of the night I
14 had the conversation about some of those people we
15 knew would be duplicating with functions we had,
16 so we knew we were not going to continue to employ
17 all 10,000 people. Therefore we knew that we
18 would have to -- if we did take on those people we
19 would have to sever a number of those people. So
20 we were taking on potentially -- we didn't know
21 what it was, an unknown severance liability.
22     Some of that severance cost, and again I was not
23 sure how that would be accounted for, whether that would be
24 accounted for as a day one cost in terms of the acquisition
25 balance sheet, which would be reflected in the acquisition

Page 77

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2  balance sheet or was ongoing running costs of the business,
3  and I think my assumption at this time was that it would be
4  taken as ongoing running costs of the business.
5      The 2 billion number which appeared in the
6  documents, though, was a number which I think was produced
7  by Lehmans. I know it was not produced by us anyway.
8      Q.  I have handed you a document that was
9  previously marked as Exhibit 285B. If you could
10 take a moment to review it and let me know when
11 you are done.
12     A.  Yes.
13     Q.  You will see that this is an exchange of
14 e-mails between yourself and Michael Evans and
15 Rich Ricci. Do you see that?
16     A.  Yes.
17     Q.  In your e-mail you state to Mr. Evans
18 and Mr. Ricci:
19     "I was relying on you guys telling me
20 I needed 1.35 billion, which gave me 650 million of the
21 goodwill but the para below says we have to pay it to
22 them/can't use."
23     Do you see that?
24     A.  Yes.
25     Q.  Where had you gotten the 1.35 billion

Page 78

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2 number from?
3    A. I think, as I said earlier, the numbers
4 I had, the sort of working estimates I was getting
5 from HR, and they were changing, so you can see in
6 this case 1.35 is different from the 1.3 billion
7 you referred me to earlier, so those were the
8 estimates I was getting from HR in terms of the
9 bonus accrual.
10    As I said, my understanding of the document, there
11 was a total 2 billion compensation accrual or provision,
12 which my understanding was would cover acquisition amounts
13 and other costs such as severance. But in terms of day one,
14 as I said, my understanding at that time, which was not
15 correct, was that I wouldn't have to accrue for some of that
16 severance. So my estimate was that on day one in my UK --
17 not my UK, my IFRS balance sheet, I would have 650 million
18 goodwill, as said here.
19    Now, when I saw the agreement, so I think this
20 must be the first time I saw this clause in the agreement,
21 it appeared to me to be more definitive than I had been led
22 to understand earlier. Hence my e-mail. Clearly, I am not
23 a lawyer. It was a layman's reading of this.
24    Q. I am trying to get a better
25 understanding of how the 2 billion-dollar number,

Page 79

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2 the $1.35 billion number and the
3 650 million-dollar number for goodwill relate to
4 one another. Was the $650 million of goodwill
5 simply the difference between the 2 billion versus
6 the 1.35 that you had at your accrual estimate?
7 Is that what it was?
8    MR. HUME: Objection, vague and
9 ambiguous.
10    A. I suppose going back to -- we were
11 taking on a business and we were taking on various
12 liabilities. What I said, let me go back to that
13 again, is some of those liabilities were bonus
14 liabilities, my understanding, some were severance
15 liabilities, and therefore I suppose my
16 expectation was I was going to have taken on those
17 sort of liabilities, but some of those liabilities
18 would appear in my opening balance sheet and some
19 of those liabilities would appear throughout the
20 period. Therefore, my expectation when I wrote
21 this was my opening balance sheet was 650 million;
22 obviously, the offset would be -- my profits for
23 the period would be 650 million, wrong.
24    Q. Sorry, are you using the word "wrong"?
25    A. I am saying my earlier estimates, which

Page 80

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2 are based on the data I got and my understanding
3 would have been incorrect.
4    Q. And the goodwill you are referring to
5 here, I hope I am not confused on this, is it
6 positive goodwill or negative goodwill?
7    A. I suppose going back to simple
8 accounting, you sum up the assets and the
9 liabilities and the difference between those is
10 a goodwill balance. Numerically, what I was
11 saying here is if on my opening balance sheet I
12 was going to have to show a higher liability on my
13 opening balance sheet, it would reduce the amount
14 of negative goodwill in my IFRS, you know,
15 estimates.
16    Q. And the way you were as lay person
17 reading this provision of the agreement, you were
18 reading it as requiring you to show the higher
19 2 billion dollar number in your liabilities in
20 your opening balance sheet?
21    A. Actually, I don't think this agreement
22 necessarily pertains to my IFRS accounting, but in
23 terms it to me felt more definitive in the wording
24 than I understood the wording was, than
25 I understood from conversations. I obviously had

Page 81

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1
2 not seen this wording before, which is why I said
3 it appeared to be a problem.
4    I suppose I should say one other thing about this,
5 to be clear, which was this was all based on working drafts.
6 As we got new numbers and things and I suppose, just
7 ratcheting back, part of the whole uncertainty of this deal,
8 we had taken on some assets, we had taken on some
9 liabilities. We were still trying to calculate what those
10 assets and liabilities were as we went through this week.
11    Q. I have handed you a document that was
12 previously marked as Exhibit 286B. If you could
13 take a moment to review it. It is the same bottom
14 e-mail that we were just looking at on 285B but it
15 has a different response at the top. This is one
16 from Michael Evans to you in 286B. Let me know
17 when you are done looking at that.
18    A. I have reviewed it.
19    Q. In Michael's e-mail to you, who is
20 Michael Evans?
21    A. Michael Evans is the head of human
22 resources for Barclays Capital.
23    Q. And in Michael's e-mail to you he states
24 that they had already accrued 1.5, meaning Lehmans
25 had already accrued 1.5. Is that how you read it?

Page 82

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2        A:  Yes.  I am not quite sure that that is
3    what is meant but I am not sure what else it would
4    mean though.
5        Q.  In that same sentence he goes on to say
6    "and we collectively tried to back into the bonus
7    number for the parts we were taking."  Do you have
8    an understanding as to what he meant by that?
9        A.  Having gone back and said he had given
10   me various estimates, I presume he is trying to
11   tell me how has tried to calculate those
12   estimates.  Yes, there is quite a lot of
13   confusion about this, and I suppose this is just
14   one factor.  So you can understand this, Lehmans
15   just accrued for the cash portion of their bonuses
16   and they deferred quite a high proportion of their
17   bonuses into -- they charged those in future
18   years.  So if they paid 100 to someone they would
19   accrue 50 and 50 of the bonus they would charge,
20   they accrue 50 in year one and 50 they would
21   charge, say they were deferring it over 3 years,
22   in year two, three and four, spread over these
23   3 years.
24       Barclays accrues bonuses differently.  If we pay
25   someone 100, we accrue for all of the 100 in year one.  So

Page 83

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    actually now I am not quite sure in terms of this what these
3    numbers represent.
4        Q.  I am handing you a document that was
5    previously marked as Exhibit 19.  Would you take
6    a moment to review it.  Let me know when you are
7    done.
8        A.  Yes.
9        Q.  Have you seen this document before?
10       A.  Yes, I have.  I think it is
11   a document -- I think it is a document referred to
12   in this paragraph here.  My recollection is that I
13   had asked Michael Evans for a copy of it and I
14   think he found it and sent me a copy of it, which
15   is where I saw it.
16       Q.  If you look at the total line both for
17   assets and liabilities, those balance out on this
18   document at 72.65 billion.  Do you see that?
19       A.  Yes, I can see that.
20       Q.  If you exclude the cure payment and comp
21   category from the liabilities section, there is
22   a differential between the total assets versus the
23   total liabilities excluding those two items, a
24   delta of about $4 billion.  Do you see that?
25       A.  Arithmetically, if I exclude any of the

Page 84

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    liabilities, there would be a delta equal to what
3    I excluded, I agree.
4        Q.  Was it your sense that the amount set
5    forth for cure payment and comp were designed to
6    balance out this balance sheet, that is how those
7    numbers were arrived at?
8        A.  That was not my understanding but --
9    well, my understanding, this is as I said before,
10   in terms of the numbers, was numbers produced by
11   Lehmans, who said that they were producing numbers
12   in terms of trying to estimate what the LBI
13   balance sheet was.  They came up with all the
14   estimates of the numbers.  So my understanding is
15   that they came up with -- I don't know how they
16   came up with these numbers but they came up with
17   the numbers for the cure payment and they came up
18   with the number for a comp payment.
19       My understanding at the time was they had some
20   support or documentation behind those numbers.  So I never
21   thought that the numbers were anything other than bona fide
22   numbers produced by Lehmans.
23       Q.  In Exhibit 286B, the e-mail from
24   Mr. Evans to you, when he states "We collectively
25   tried to back into the bonus number for the parts

Page 85

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    we were taking", is it your belief that he was
3    simply mistaken about how the bonus number was
4    calculated?
5        A.  I think he is there, as I think
6    I said -- I may not have been explicit enough --
7    he is there describing the estimates he was giving
8    me of the bonuses, so the 1.35 billion, so I don't
9    think he would have had any input into the numbers
10   which Lehman came up with.  I may be wrong but
11   that is my reading of that document.
12       Q.  And the phrase "collectively tried to
13   back into the bonus numbers", do you have any idea
14   what he means by that?
15       A.  I don't.
16       (Exhibit 358A marked for identification.)
17       Q.  I have handed you a one page document
18   marked Exhibit 358A.  Please take a moment to
19   review, tell me when you are done.
20       A.  Yes.
21       Q.  There is an e-mail chain that begins at
22   the bottom from Paul Copson to you.  Who is
23   Mr. Copson?
24       A.  He is the head of product control for
25   Barclays Capital, which is a group which price

Page 86

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    checks our inventory valuations and produces daily
3    profit and loss and reconciles our balance sheet.
4        Q.  He makes a reference in his e-mail to
5    the following: "We successfully bid on and got the
6    LEH exchange positions", and he mentions several
7    different exchanges.  Do you see that?
8        A.  Yes.
9        Q.  Was it your understanding that this
10   bidding on and getting those LEH positions was
11   something separate and apart from the Asset
12   Purchase Agreement?
13       A.  Yes, my understanding was that, and it
14   is my recollection, so it may not be correct, but
15   I think it was, the exchanges directly, not
16   Lehmans, who were trying -- I think they may have
17   taken on all the Lehman positions.  I don't think
18   these positions were in Lehman Brothers Inc. I
19   think they were in a different entity, but
20   I wouldn't be certain about that.  I think the
21   exchanges took on those positions and asked
22   different market participants to bid for taking on
23   those portfolios to close down the differences in
24   the portfolios.
25       My understanding is that there was a tender,

Page 87

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    various different firms bid, and our bid was the lowest.
3    That is what it relates to.  It is nothing to do with the
4    other acquisition.  I don't know if we gave these papers
5    erroneously or whatever, Hamish?
6        MR. HUME: I will check.
7        A.  Anyway, that is what I believe that
8    relates to.
9        (Exhibit 359A marked for identification)
10       Q.  I have handed you a one page document
11   marked Exhibit 359A.  Take a moment to review it.
12   Let me know when you are done.
13       A.  Yes, I have read it.
14       Q.  This e-mail exchange, do you recognize
15   that it also related to the portfolios that were
16   being discussed?
17       A.  Yes, I think it related to precisely the
18   same portfolios we discussed before, so nothing to
19   do with this other transaction.
20       Q.  If I am reading this correctly, James
21   Walker is reflecting a profit/loss of greater than
22   $200 million on the portfolio.  Is that right?
23       A.  Yes.  I mean, it appears to be, just
24   from reading this, that NYMEX or the exchanges
25   paid us a fee of $450 million for taking on those

Page 88

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    portfolios, and against that we had the cost of
3    hedging and liquidating and risk management. It
4    appeared to be the belief at that point was that
5    the profit would be about 200 million, so the cost
6    of risk management would be $250 million, but
7    again, as I have said, I am pretty certain this is
8    a completely independent transaction.
9        (Exhibit 360A marked for identification)
10       Q.  I have handed you a one page document
11   marked Exhibit 360A.  Would you take a moment to
12   review it, let me know when you are done.
13       Who is Ian Abrahams?
14       A.  He is a member of our structuring group.
15       Q.  In the discussion about negative
16   goodwill, in his e-mail to you, he refers to
17   suppliers as being among the parties affected by
18   a restructuring.  Do you see that?
19       A.  Yes.
20       Q.  Is this a discussion that concerns the
21   cure amount entry on the liabilities section of
22   the balance sheet that we were discussing before?
23       A.  I am not specifically sure. I don't
24   recall receiving this e-mail at all.
25       (Exhibit 361A marked for identification)

Page 89

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2        Q.  Sir, I have placed before you a 3-page
3    document marked Exhibit 361A.  Would you take
4    a moment to review that document, which is
5    a cover, a series of e-mails with a spreadsheet
6    attached.  Let me know when you are done.
7        A.  Yes.
8        Q.  Do you see the cover e-mails are
9    correspondence between Gary Romain, Rich Ricci and
10   yourself and others.  Do you see that?
11       A.  Yes.
12       Q.  The title is: "Long Island - Draft
13   balance sheet/goodwill calc".  Calculation, is
14   that right?
15       A.  Yes, I presume that is what it means.
16       Q.  Turning to the attachment to the cover
17   e-mails, is that a document you have seen before
18   today?
19       A.  There were so many different versions of
20   these documents, I can't recall if I have seen
21   this one precisely.  I have obviously seen
22   different versions.
23       Q.  You are familiar with the form of this
24   document.
25       A.  I am familiar with the form of the

## Page 90

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 document. yes.
2 Q. You will see the cover e-mail
3 dated September 22, 2008. Do you see that?
4 A. Yes.
5 Q. Turning your attention to the
6 spreadsheet, the first page of the spreadsheet has
7 a negative goodwill number of 2.98 billion. Do
8 you see that?
9 A. Yes.
10 Q. If you go back to your e-mail, that is
11 the middle e-mail on page 1 of Exhibit 361A, from
12 you to Rich Ricci, you state:
13 "So some things we have to keep working on to
14 squeeze out what we can, but looks more like 3 to 3.5 rather
15 than 4 plus."
16 Do you see that?
17 A. Yes.
18 Q. Your reference to the 3 to 3.5, what was
19 that a reference to?
20 A. I assume my reference was to the
21 negative goodwill number, which is on the next
22 page.
23 Q. And when you say it looks more like 3 to
24 3.5 rather than 4 plus, had you ever —

## Page 91

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 A. I suppose the numbers were, as I think I
2 have said to you before, moving all the time, so
3 it must have been some point where the numbers
4 were looking higher. There were huge amounts of
5 double accounting of assets and different things
6 in these schedules and, as I think I said before,
7 until we actually had booked everything and
8 finalized the valuation of everything, which took
9 several months to do, we didn't get to the final
10 answer. So there were many different drafts of
11 this as the numbers changed.
12 Q. In the line number 15 on the
13 spreadsheet, the second page of 361A, it says:
14 "Friday P&L (approx)". Do you see that?
15 A. Yes.
16 Q. And that is a positive
17 200 million-dollar number there?
18 A. Yes.
19 Q. Is that the P&L gain on the assets that
20 were transferred over Thursday night?
21 A. Again, I couldn't definitively tell you,
22 as I didn't produce this, but it would appear it
23 would be some sort of approximation. My
24 recollection, which may be incorrect, was that the

## Page 92

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 market moved a lot on Friday. I thought there was
2 a much bigger gain on Friday, but I could be
3 incorrect or it could be that this is an earlier
4 approximation. This is dated what?
5 Q. 22nd September. The cover e-mails are
6 dated 22nd September.
7 A. Yes. So probably in terms of the —
8 well, the problem was, because we had none of
9 these things booked on our system, all we had, the
10 opening valuation, how much you make from
11 something when you do not know what the starting
12 point is, is quite difficult to determine.
13 Q. But your recollection, I believe your
14 answer was you believed the gain on Friday was
15 larger than that?
16 A. My recollection, that is going back to
17 what I say, we took on a very large, long
18 inventory. That inventory, again my recollection,
19 was about $8 billion of equities. The equity
20 market rallied quite significantly on Friday. I
21 remember from being extremely worried Wednesday,
22 Thursday, Friday, hearing — I can't remember when
23 it was, Friday night or Saturday some time, or
24 some time over the weekend, that the market had

## Page 93

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 rallied a bit. I felt we had a little bit more
2 protection because the assets had gone up.
3 Q. I think your exact words were: "Yep, we
4 made a load". Right?
5 A. They could have been, yes.
6 Q. The line 14: "Inventory - Thursday
7 close", the 45 billion-dollar number, that was
8 a number based off of the Bank of New York marks.
9 Correct?
10 A. I am not sure.
11 Q. There is a valuation adjustment line,
12 line 16, a negative $2.83 billion number. Do you
13 see that?
14 A. Yes.
15 Q. There is a note associated with that on
16 the third page of the exhibit, Exhibit 361A. It
17 describes the 2.83 billion as an initial estimate
18 off the adjustment Barclays marks. Do you see
19 that?
20 A. Yes.
21 Q. Do you know the process that led to that
22 estimate of valuation adjustment of 2.83 billion?
23 A. If you go back to the front page of this
24 it also says the 2.83 billion valuation adjustment

Page 94

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    is S King, which would be Stephen King's first cut
3    only. I think, as I said to you before, Stephen
4    King was a trader who looked at asset backed
5    securities. A lot of the securities which were
6    under the repo were asset backed securities, which
7    as we all know are illiquid and difficult to
8    price. So Stephen was given the job of trying to
9    process those. In terms of -- I remember the
10   custodian marks were almost meaningless for those
11   assets, which is not surprising as you really need
12   almost asset by asset to have the expertise to
13   understand how to mark them, whereas the custodian
14   would not have access to them. So I know Stephen
15   spent a lot of time trying to work out what the
16   appropriate valuation was.
17       Q. Has Barclays concluded its valuation
18   adjustment process for the collateral that was
19   delivered Thursday night into Friday morning?
20       MR. HUME: As of when?
21       Q. As of today. Are you done?
22       A. As of the close of our financial
23   statements for the end of 2008, we concluded and
24   got to a point where we presented our opening
25   balance sheet with audited valuations for all of

Page 95

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    those positions. You may or may not know that we
3    have a year subsequent to the date of when a
4    transaction happens, if anything comes up, to
5    revise those numbers, and that is coming close to
6    expiry now, in September. Our current expectation
7    is we are not going to make any further
8    adjustments.
9        Q. Do you know whether the adjustments that
10   were made to the inventory, the valuation of the
11   inventory that came over Thursday night, whether
12   those are more or less than this $2.83 billion
13   valuation adjustment shown on this document, 361A?
14       A. I can't remember to be honest. I know
15   the numbers moved around a lot but I can't
16   remember precisely what.
17       Q. Orders of magnitude, is your adjustment
18   twice that, half that?
19       A. I can't remember.
20       Q. On page 2 of the exhibit, the
21   spreadsheet, line number 31 "cure payment", there
22   is an entry of what looks like $800 million for
23   cure payment. Do you see that?
24       A. Yes.
25       Q. On September 22 what was the basis for

Page 96

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    including an 800 million-dollar number for cure
3    payment?
4        A. I can't remember what the precise basis
5    was for all these. As I said, Gary was running
6    this process so you should talk to Gary to get the
7    details. We were doing a lot of work to try and
8    determine detailed lists of suppliers, et cetera,
9    et cetera, so there was a lot of low level work
10   going on. I don't know what stage it was at at
11   this point. I don't know if that was a bottom up
12   or a top down number.
13       Q. For bonus accrual, line 33, you had
14   a number of 1.7 billion. Do you see that?
15       A. Yes.
16       Q. Is there any reason why the
17   2 billion-dollar number does not appear there?
18       A. I am not sure if this is precisely the
19   reason, again you should check with Gary, but in
20   our final acquisition balance sheet, because of
21   the way bonus payable in way of shares is
22   accounted for, there is a different treatment for
23   the share element. My recollection, if a share
24   element is about 300 million -- I am not sure if
25   in this version that was a difference but I do

Page 97

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    know there is a different -- you have to accrue
3    for the liability for the cash element, the share
4    element gets deducted straight against your
5    capital, so it is treated in a slightly different
6    way. You should check with Gary if that was -- if
7    they had a different number here. Again, as
8    I said, we were getting different estimates all
9    the time on the provisional numbers we had.
10       Q. Was it your understanding that the share
11   element calculation is something that would have
12   been done as early as 22 September?
13       A. I think it is unlikely but I can't
14   remember.
15       Q. The number for negative goodwill on the
16   spreadsheet, page 2 of 361A is 2.98 billion. In
17   the cover e-mail you have a range of 3 to 3.5. Do
18   you have a sense of where you believed the
19   additional .02 to .5 of goodwill was coming from?
20       A. I really cannot recall.
21       Q. Did you contemplate that there were
22   certain tweaks in these numbers that would yield
23   that goodwill?
24       A. I think if you look over time these
25   numbers went up and down. I was obviously feeling

Page 98

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  optimistic, probably after a good day in the
3  market or over the weekend, I was feeling a bit
4  more optimistic, but I can't recall any specifics
5  I am afraid.
6    Q.  Columns H and I in this spreadsheet, H
7  is labeled "BCI dollars million" and then I is
8  labeled "LLC's dollars billion". Is that just
9  something, allocation of these items, two
10 different entities?
11   A.  Yes, various different entities within
12 the Barclays group were purchasing the different
13 assets. I think this was trying to allocate the
14 assets to the appropriate entities.
15   Q.  And the allocation of assets, what was
16 the basis on which assets were allocated to
17 different Barclays entities?
18   A.  I am not really the person to talk to
19 you on that.
20   (Exhibit 362A marked for identification)
21   Q.  I have handed you a one page document
22 marked Exhibit 362A. Take a moment to review it.
23 Please let me know when you are done.
24   A.  I have reviewed it.
25   Q.  The bottom e-mail is an e-mail from

Page 99

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  James Trevelyan.
3    A.  Yes, he is a member of the Barclays
4  corporate development group.
5    Q.  To you, and he is again discussing
6  negative goodwill, and in particular the comp and
7  cure provisions. Do you see that?
8    A.  Yes.
9    Q.  He states in his second paragraph of his
10 e-mail:
11   "We understand broadly that the negative goodwill
12 arises because the 2.25 cure payment and 2.0 comp provision
13 won't be valued at that amount but instead circa 1.3 or
14 C1.3."
15   Do you see that?
16   A.  Yes.
17   Q.  Do you understand that as circa 1.3?
18   A.  Yes.
19   Q.  Approximately 1.35. "The difference
20 (2.95) giving rise to net assets for which we pay
21 250 million." Is that how you understand that?
22   A.  Yes, I think that is right.
23   Q.  "Leading to a negative goodwill of
24 $2.7 billion." Is that right?
25   A.  Yes.

Page 100

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    Q.  Was his description of the source of the
3  negative goodwill accurate in your view?
4    A.  In many ways you can calculate things in
5  different ways, but in terms of the estimates we
6  had at that time, and looking at the balance sheet
7  which we thought under the agreement we were
8  taking on, the assets and the liabilities we were
9  taking on, that was the estimate. I suppose there
10 was a lot of confusion, as I said, a lot of
11 different versions, things changing by the minute
12 over time, and going on for quite a long period of
13 time. So I suppose what I tried to share was what
14 was my provisional understanding at the time,
15 which was in terms of -- which I think I have set
16 out here, in terms of the compensation we were
17 taking, and we had to take a lot of liabilities to
18 people, it looks like my understanding at the time
19 was -- I mean all these things developed and
20 changed but I was saying here I thought in terms
21 of what we accounted for was the cash portion
22 rather than the deferred portion of the bonuses.
23 So that would be the compensation in the opening
24 balance sheet, which as I said I think I mentioned
25 earlier I was erroneous in my estimate on that,

Page 101

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  and on the cure payments we had potential
3  liabilities, and I hoped at the time that we would
4  be able to find ways of negotiating with our
5  suppliers, so we were taking on suppliers and we
6  would find ways of negotiating with our suppliers.
7  So that because of the existing relationship of
8  Barclays and the combined relationship of the
9  combined Barclays and Lehman group, that the cure
10 payments could be kept to a low level. So that
11 was my hope at that point.
12   Q.  And to date what has Barclays paid out
13 in the cure payments related to this transaction?
14   A.  I can't precisely remember. I think
15 again it is -- I am sure we disclose it in our
16 financials.
17   Q.  Does a number around $300 million ring
18 a bell?
19   A.  Not really, but it could be.
20   Q.  If you can pull before you Exhibit 361A.
21 That was the September 22 draft balance sheet that
22 we were looking at.
23   (Exhibit 363A marked for identification)
24   This 2-page document I have placed
25 before you, marked 363A, please review it and let

## Page 102

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 me know when you are done. You will see Exhibit
2 363A, if you look at the back of the e-mail chain
3 begins with an e-mail that we were looking at
4 previously when we looked at Exhibit 361A, which
5 was the e-mail from Gary Romain to you and Rich
6 Ricci and others.
7     A. Yes.
8     Q. On Exhibit 363A, on the first page,
9 there is an e-mail from Rich Ricci to you in the
10 middle of that page. Do you see that?
11     A. Yes.
12     Q. He states: "Need to get to 4 or no write
13 down capacity".
14     Do you see that?
15     A. Yes.
16     Q. What does he mean by that?
17     MR. HUME: Objection, calls for
18 speculation.
19     Q. Do you know what he meant by that?
20     A. No, I can't recall precisely what he
21 meant by that.
22     Q. And the phrase "write down capacity"
23 does that have any meaning to you?
24     A. No. I think you would have to ask

## Page 103

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 Mr. Ricci about it.
2     Q. And then the e-mail, picking it up again
3 from Mr. Ricci to you, he says: "I am worried".
4 Do you see that?
5     A. Yes.
6     Q. Did you have any discussions with him
7 about this topic, write down capacity?
8     A. This is interesting. When I read that
9 "I am worried" I just read it as general
10 nervousness around this deal and the level of risk
11 we were taking, because we obviously still at the
12 time had this huge unhedged inventory arising from
13 that deal, and market meltdown. So my assumption
14 is that is what he is referring to. I don't know
15 otherwise.
16     Q. Putting this exhibit aside, do you
17 recall having any discussions that you needed to
18 have a certain level of negative goodwill so you
19 would have the capacity to write down assets that
20 had been acquired?
21     A. No, I can't remember that. I can't
22 recall it.
23     MR. TAMBE: This is probably as good a
24 time as any to take a break for lunch.

## Page 104

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1     (Break for lunch)
2     (Exhibit 364A marked for identification)
3     MR. TAMBE: I have handed you a
4 document marked Exhibit 364A. I will give you
5 a moment to review that document. Let me know
6 when you are done.
7     A. I have reviewed the document.
8     Q. There is a series of e-mails here. The
9 second e-mail from the top is an e-mail from Paul
10 Copson to Rich Ricci and Benoit de Vitry, and that
11 refers to a 350 million P&L from the Lehman
12 exchange traded portfolio acquisitions. Do you
13 see that?
14     A. Yes.
15     Q. Is that a reference to the exchange
16 traded contracts we were talking about this
17 morning, which were not part of the acquisition
18 but were part of the portfolio that Barclays had
19 bid for and obtained from NYMEX and other
20 exchanges?
21     A. Looking at this, yes, this relates to --
22 we put a bid in for NYMEX to take on various
23 commodities exchange rated positions from NYMEX,
24 and we won, as I said, that bid, and this relates

## Page 105

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 as far as I can tell to that transaction.
2     Q. And that is the bid where I guess you
3 were paid 450 million to take on those positions
4 but then had to hedge that exposure that you had
5 acquired, correct?
6     A. In this case how the transaction was
7 arranged is NYMEX transferred a fee. I am just
8 checking the earlier documents what that fee was.
9     Q. I believe it was 400 or 450 million, if
10 you look at Exhibit 359A.
11     A. Yes, $450 million. Against that fee we
12 had the cost of liquidating or hedging that
13 portfolio.
14     Q. And after accounting for those costs you
15 had a 350 million-dollar gain?
16     A. Yes. So in this transactions those
17 costs must have been about 100 million, though I
18 am not sure these were the final numbers in terms
19 of -- as you can see from the e-mail, there is
20 still some work going on finalizing those numbers.
21     Q. We are done with that document. If you
22 could pull Exhibit 361A. It is the September 22nd
23 acquisition balance sheet draft.
24     (Exhibit 365A marked for identification)

## Page 106

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 I have placed before you a document marked
2 Exhibit 365A. Would you take a moment to review that
3 document and just let me know when you are done.
4  A. I have reviewed the document.
5  Q. You will see in Exhibit 365A there is
6 a spreadsheet attached as page 2. Do you see
7 that?
8  A. Yes, I see it.
9  Q. That is another version of the
10 acquisition summary. Do you recognize it as such?
11  A. Yes, I recognize it as a version. There
12 were many versions I saw, so I can't recall this
13 one.
14  Q. The cover e-mail is an e-mail from Gary
15 Romain to you, subject line: "Acquisition balance
16 sheet", dated 24 September. Do you see that?
17  A. Yes.
18  Q. It says "Latest version".
19  A. Yes.
20  Q. On this particular version of the
21 acquisition balance sheet, the negative goodwill
22 number is 4.47 billion. Do you see that?
23  A. Yes.
24  Q. Almost 1.5 billion greater than the

## Page 107

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 version we have been looking at before, the one
2 from the 22nd, Exhibit 361A.
3  A. Yes, I can see that.
4  Q. It appeared to me, on a quick look at
5 the spreadsheets, that the entire differential is
6 explained by the change in the valuation
7 adjustment, as opposed to a $2.8 billion negative
8 adjustment on the 22nd, the 24th there is a 1.38
9 billion dollar negative adjustment. Do you see
10 that?
11  A. Yes, I can see there is a big change and
12 I suppose it just goes to something I was saying
13 about the level of uncertainty, that there were
14 large changes happening in both directions. I am
15 sure, as you know from looking at these documents,
16 later you will find other changes in the other
17 direction as well.
18  Q. In that time period between the 22nd and
19 24th, are you aware of any particular reason why
20 there would have been a $1.5 billion swing in the
21 valuation adjustment?
22  A. I can't recall a specific rationale.
23 There does seem to be some reference here in the
24 document to the timing of the prices. I am not

## Page 108

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 sure. I cannot recall what that difference was.
2  Q. For the assets that were transferred
3 over on Thursday night, the inventory that was
4 transferred over on Thursday night, as of what
5 date does Barclays value that inventory for
6 purposes of its accounting?
7  MR. HUME: Objection, lacks foundation.
8  A. There was quite a long period where we
9 were trying to determine precisely at what point
10 for Barclays the acquisition occurred. I think
11 the final position was that the acquisition was
12 Monday morning, but you would have to confirm that
13 with Gary Romain. That is my recollection, but
14 there was some time in terms of getting the legal
15 opinion about what was the appropriate time.
16 There was a lot of confusion around that.
17  Q. And it is your understanding that a
18 legal opinion was obtained on that subject, is
19 that right?
20  A. I think we got -- I don't know if we got
21 internal or external lawyers involved. We
22 definitely got internal lawyers involved.
23  Q. If the appropriate point in time would
24 have been Monday morning, the 22nd, for

## Page 109

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1 securities, what prices would have been used? The
2 Friday night prices?
3  A. Again, I remember a lot of discussion
4 around it. I can't remember what the final
5 conclusion on it was, but I know there were
6 detailed discussions to work out what was the
7 appropriate output. I think, as I mentioned
8 before, the market was incredibly volatile at that
9 time, and things at the close on the Friday night
10 were very different from the open on Monday, I
11 think you will find in quite a few days around
12 that time, and therefore I think there was some
13 time taken to work out what was the right and the
14 appropriate point in time to use.
15  Q. Do you know whether the transaction
16 actually closed before the open on Monday or after
17 the open on Monday?
18  A. I think my understanding is that the
19 court hearing was on Friday night, but in terms of
20 precisely what time -- yes, I can't recall
21 precisely, or I didn't know I don't think
22 precisely what time the documents were signed or I
23 can't recall.
24  Q. I have placed before you, sir, a 2-page

## Page 110

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  document previously marked as Exhibit 275. If you
3  can take a moment to review it and let me know
4  when you are done.
5      A.  Yes, I have reviewed it.
6      Q.  You will see that this is a listing of
7  the financing facility assets. That is what the
8  subject line says. Do you see that?
9      A.  Yes.
10     Q.  Do you understand that to be a listing
11 of the assets that were transferred over Thursday
12 night?
13         MR. HUME:  Objection, lack of
14 foundation.
15     A.  As I said, I was not in New York so
16 precisely what you mean by the assets transferred
17 Thursday night, I am not clear on the sort of
18 operation of what was moved when.
19     Q.  The question is slightly different. Do
20 you understand this e-mail to be a purported
21 listing of the assets that were transferred over
22 on Thursday night?
23         MR. HUME:  Objection, asked and
24 answered.
25     A.  I think I said earlier I didn't know

## Page 111

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  when the assets were transferred.
3      Q.  Do you have any understanding what this
4  table is?
5      A.  It says it is -- it seems to be to do
6  with the assets in the Fed financing facility.
7  That is what it states in the document.
8      Q.  Was it your understanding that the
9  assets in the Fed financing facility had in fact
10 been transferred over to Barclays Thursday night?
11     A.  I think I told you already I was not in
12 New York and I am not aware of when assets moved
13 and things happened.
14     Q.  In discussion this morning you said some
15 of the assets that were in the Fed financing
16 facility and that were transferred to Barclays
17 were assets that Barclays had sought to exclude in
18 the Lehman two transaction. Is that fair?
19     A.  I said potentially some, yes. I don't
20 think I said I had any certainty, but potentially
21 some of them were.
22     Q.  Looking at the list of assets listed on
23 this Exhibit 275, are there any assets here that
24 you would identify as assets that Barclays had
25 sought to exclude in the Lehman two transaction?

## Page 112

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2      A.  I don't think from this level of detail
3  I would be able to determine that.
4         (Exhibit 366A marked for identification)
5      Q.  I have handed you a 3-page document
6  market Exhibit 366A. If you could take a moment
7  to review it, let me know when you are done.
8      A.  Yes, I have reviewed that document.
9      Q.  You will see that this is an e-mail
10 chain that begins on page 2 of the chain with an
11 e-mail from you to James Walker. Do you see that?
12     A.  Yes.
13     Q.  And you were requesting a balance sheet
14 of the assets and liabilities finally acquired?
15     A.  Yes.
16     Q.  And Mr. Walker then sends that request
17 on to Martin Kelly at Lehman?
18     A.  Yes.
19     Q.  Going up the chain, there is a response
20 from Martin Kelly that gets forwarded to you by
21 James Walker. Do you see that?
22     A.  Yes.
23     Q.  And you in turn forward that on to Chris
24 Lucas, correct?
25     A.  Yes.

## Page 113

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2      Q.  And Mr. Lucas, in the top e-mail on page
3  1, says to you:
4         "If this is what comes to pass, we are fine."
5         Do you see that?
6      A.  Yes, I did see that, and looking at this
7  e-mail I don't have any understanding of that,
8  particularly as I read further down the comment
9  from James that seems to think that the situation
10 is not very good, so I don't know how Chris came
11 to that conclusion.
12     Q.  Do you recall having any discussion with
13 Chris about this listing of assets and
14 liabilities?
15     A.  I don't have any recall at all about
16 having a discussion so I do not understand his
17 conclusion.
18         (Exhibit 367A marked for identification)
19     Q.  I have handed you a one page document
20 marked Exhibit 367A. Would you take a moment to
21 review it.
22     A.  Yes.
23     Q.  Earlier this morning we discussed
24 a gain, a Friday gain on some equity positions.
25 Do you remember that discussion?

Page 114

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2       A.  We had, as I think I said, we suddenly
3    ended up with a position where we were acquiring
4    solely a long inventory without offsetting short
5    positions.  We suddenly had a much more risky
6    position, and that inventory lost a significant
7    amount of money in the week.  There was a market
8    rally I think on the Friday, when the equity part
9    of the position made some money, so from being
10   incredibly depressed I think I felt it was good
11   news on the Saturday for that market move.  The
12   level of timing -- well, as I have said, we didn't
13   book the original transactions, so any estimate of
14   what money we made from that market move would
15   have been a very rough and ready: "We are long and
16   the market went up."
17      Q.  Your reference to "Yep, so we made
18   a load", is to that sentiment that the market went
19   up?
20      A.  Yes, that is my recollection.
21      Q.  The e-mail at the bottom of this chain
22   is from Lee Guy to you.  Do you see that?
23      A.  Yes.
24      Q.  And the question he asks you I believe,
25   first sentence, is: "What was the trade date for

Page 115

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    the assets that you had bought." Correct?
3       A.  Yes.
4       Q.  And you stated on your e-mail back to
5    him: "Trade date is Monday, completion 7 am." Do
6    you see that?
7       A.  Yes.
8       Q.  Any recollection as to why you were so
9    precise in the completion time trade date is
10   Monday, completion 7.00 am?
11      A.  No, I have not really got
12   a recollection.  I presume at some point a lawyer
13   or someone must have told me that was the case.
14      MR. HUME:  To the extent that a lawyer
15   told you anything it is privileged.  If you are
16   not sure --
17      A.  I am not sure.
18      Q.  Then you go on to say in your e-mail to
19   Lee Guy: "Equity positions, we need to close down
20   as quickly as possible." What did you mean by
21   "close down"?
22      A.  As I said before, we had an incredibly
23   risky position that we had taken on a huge long
24   position in a very volatile market, so what I was
25   specifically referring to here was that the amount

Page 116

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    of capital we had in the broker dealer is limited
3    by how large your positions are, so your cap
4    positions consume the capital, and if you have
5    a very long outright long position or outright
6    short position you need a huge amount of capital
7    to support that, but also just in terms of the
8    volatility of that market we obviously wouldn't
9    want to sit on a huge outright exposure.
10      Q.  So to close down the position would be
11   what, to either sell it or to hedge it?
12      A.  Yes, in some way to reduce the risk from
13   it.
14      Q.  And the reference to DVAR in Lee Guy's
15   e-mail to you, that is to daily VAR limits?
16      A.  Yes.  Lee Guy is head of market risk for
17   Barclays Capital and would be the person who sets
18   and monitors all the daily value at risk limits.
19      Q.  So DVAR stands for daily value at risk?
20      A.  Yes.
21      Q.  In response to your e-mail stating that
22   trade date is Monday, completion 7 am, Lee Guy
23   writes back to you and says: "I thought valuations
24   were agreed for an earlier date". Do you see
25   that?

Page 117

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2       A.  Yes.
3       Q.  Do you know what he was referring to?
4       A.  Yes.  I mean, here I am saying I think,
5    and actually I probably would be speculating, but
6    we had taken on various position, and the
7    positions were agreed.  As I said, we were exposed
8    to these large positions.  So whenever the market
9    value was going to move up or down the value of
10   those positions was going to move up or down.  I
11   think my original understanding was that the
12   valuations had been agreed from the Monday of the
13   previous week when we did the original
14   transaction.  I am not sure after a week of sleep
15   deprivation quite if my mind would have tallied
16   up, so it reads rather tautologous, this e-mail.
17   At the moment I am not sure what it means.
18      Q.  Do you recall there being any agreement
19   with Lehman as to the date as of which the
20   valuations would be agreed?
21      A.  I think I would have to look back to see
22   precisely what the contract said.
23      Q.  Do you recall having a discussion about
24   completion of the transaction taking place over
25   the weekend, as opposed to Monday?

Page 118

1　HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2　　A. As I said, there was lots of discussions
3　about lots of things. I am sure that there was
4　some. I don't think I was really involved in it.
5　I may have been copied on things but I can't
6　remember specifically.
7　　Q. Do you recall there being any
8　discussions about closing the transaction on
9　Monday or as of Monday so that Barclays should
10　benefit from the rallying in the markets on
11　Friday?
12　　A. I can't recall anything to do with that.
13　　(Exhibit 368A marked for identification)
14　　Q. I have placed before you a document
15　marked 368A. If you could take a moment to review
16　it, please let me know when you are done.
17　　A. Yes, I have read the document.
18　　Q. This is an e-mail exchange from Stephen
19　King to Rich Ricci, you and others. There is
20　a reply e-mail from Eric Bombensath to Stephen
21　King, Rich Ricci and others. Do you see that?
22　　A. Yes.
23　　Q. This is an e-mail exchange that takes
24　place on September 23, in the morning.
25　　A. Yes.

Page 119

1　HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2　　Q. In Stephen King's e-mail at the bottom,
3　he states:
4　　"We have largely identified the day one
5　remark gap."
6　　Let me stop there. Does the phrase "remark
7　gap" have any meaning to you?
8　　A. That phrase doesn't mean anything but I
9　think, as we discussed earlier, Stephen was
10　involved in doing the work in terms of valuing the
11　assets we acquired, and my assumption is this is
12　a reference to him trying to get an appropriate
13　fair valuation on the assets.
14　　Q. If I continue reading the rest of that
15　sentence, he goes on to state: "and necessary
16　primary hedges for the positions in the repo
17　period". Do you have an understanding as to what
18　he meant by that?
19　　A. I suppose as we discussed earlier the
20　transaction now involved us taking this outright
21　long significant portfolio at a time of extreme
22　market volatility, so we were trying to reduce the
23　risk, and Stephen had the responsibility for
24　managing that risk on a forward looking basis. So
25　because we didn't have the transactions recorded

Page 120

1　HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2　or booked in our system, and there were thousands
3　of these transactions, I think Stephen was trying
4　to work out what exposures we had, and therefore
5　trying to work out what proxy hedges he could use
6　to cover those exposures.
7　　Q. His next sentence reads:
8　　"Those hedges are almost executed, other than
9　2 billion off sand features, which are work in
10　progress."
11　　Do you see that?
12　　A. Yes.
13　　Q. Do you understand from that sentence
14　that the portfolio either on a proxy basis or an
15　actual basis was almost fully hedged, except for
16　this 2 billion-dollar position?
17　　MR. HUME: Objection, lacks foundation.
18　　A. Yes, I am not sure if it is quite that
19　clear, because if you read what he says here, he
20　says: "We have not reviewed the other positions in
21　the box", and he talks about exchange traded
22　derivatives. So what he says is primary hedges --
23　I don't know what proportion of the repo those
24　primary hedges relate to. You would have to talk
25　to Stephen King to determine that.

Page 121

1　HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2　　Q. Just to get a better understanding of
3　this phrase "sand futures", do you think that is
4　S&P futures or can you divine what he might have
5　meant by that?
6　　A. I would speculate that it was S&P
7　futures, but again I don't know that is correct
8　and you would have to check that with Stephen
9　King.
10　　Q. The last paragraph of Stephen King's
11　e-mail to you begins with the discussion of the
12　exchange traded derivatives. Do you see that?
13　　A. Yes.
14　　Q. He goes on to state:
15　　"Primarily the exposure is via the OCC."
16　　Do you see that phrase in the second sentence at
17　the end?
18　　A. Yes.
19　　Q. What was your understanding of the OCC
20　position or positions that were part of the
21　acquisition?
22　　A. As I think I mentioned earlier, I knew
23　we were taking on the OCC futures positions. I
24　can't remember now or I can't recall the precise
25　terms beyond that of exactly what we were taking

Page 122

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    on.
3        Q.  Do you have any understanding as to
4    whether you were also obtaining in addition to the
5    positions any margin or excess margin associated
6    with those positions?
7        A.  If we were taking -- I suppose my very
8    basic understanding, if you are taking on OCC
9    futures, they are the margin, and the margin is
10   what those positions are, because obviously they
11   are daily margined every day.  You have initial
12   margin as well.  So again, as I have said, I have
13   not looked at the documents in detail but my
14   assumption was always when we talk about OCC
15   futures it was the total balances relating to
16   those transactions.
17       Q.  Do you recall whether the OCC futures
18   were one of the items, one of the further or
19   additional assets that were discussed on the
20   Friday of the week, the prior week?
21       MR. HUME: Objection, lacks foundation.
22       A.  I think, as I said a bit earlier, I do
23   recall the OCC futures were part of the original
24   documentation and the original transaction.  I was
25   not in New York for that latter part of the week

Page 123

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    and I know there were other discussions.  I am not
3    the person to ask about precisely where the OCC
4    futures fell into that.
5        (Exhibit 369A marked for identification)
6        Q.  I have placed before you a multipage
7    document marked Exhibit 369A.  Please take
8    a moment to review it and let me know when you are
9    done.
10       A.  I have reviewed it.
11       Q.  There is an e-mail exchange that forms
12   I guess the first two pages of this exhibit, and
13   it starts with an e-mail from Mark Merson to you
14   at the bottom of page 1 over to page 2.  Do you
15   see that?
16       A.  Yes.
17       Q.  And Mark Merson is identified from his
18   signature block as someone with investor
19   relations.  Do you see that?
20       A.  Yes.
21       Q.  Was the attachment to this e-mail which
22   is pages 3 and 4 onwards of this Exhibit 369A,
23   a document that was being prepared for some
24   disclosure purpose or some public announcement
25   purpose?

Page 124

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2        A.  We were preparing, and Gary Romain was
3    specifically preparing it, so that we had for the
4    internal accounting and for PWC a clear view of
5    what we had acquired, what assets we had acquired,
6    so that we had an accounting list of the assets
7    rather than a lot of complicated legal documents,
8    so something simple for a layman to understand.
9        Q.  And the transaction summary that is
10   attached to this e-mail chain, is that a document
11   you had any hand in drafting?
12       A.  That document is a document which
13   I referred to -- Gary pulled together.  I think it
14   was mainly Gary who did it.  I probably reviewed
15   it but most of the drafting I think was done by
16   Gary and his team.
17       (Exhibit 370A marked for identification)
18       Q.  I have handed you a 2-page document
19   marked Exhibit 370A.  Would you take a moment to
20   review it and let me know when you are done.
21       A.  I have read the document.
22       Q.  At the top of the first page of
23   Exhibit 370A, that is your e-mail to Teri Scott
24   and others.  Do you see that?
25       A.  Yes.

Page 125

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2        Q.  And you are providing at least a summary
3    of the balance sheet, based on information that
4    you had as of the date that you provided this
5    response, correct?
6        A.  Yes.
7        Q.  The subject line is "FSA meeting".  Do
8    you see that?
9        A.  Yes.
10       Q.  What was your understanding of what
11   discussions were going on or were contemplated to
12   be had with the FSA on the issue of the balance
13   sheet?
14       A.  I think my understanding is probably
15   what it says in this e-mail, which you can read in
16   the e-mail from Rupert Fowden, that they wanted
17   a balance sheet net asset value diagram of a trade
18   and they wanted to talk to the FSA about the
19   Lehman models.
20       Q.  Looking at item four of Rupert's e-mail,
21   he states: "We neither need the FSA to grant us
22   a waiver that accepts the Lehman models for FSA
23   purposes."  Do you see that?
24       A.  Yes.
25       Q.  Was that something that Barclays in fact

Page 126

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    requested from the FSA?
3        A.  Yes, we did.  Just so you can
4    understand, so Lehmans had a broker dealer, and
5    for their local regulation they used various
6    models to calculate their capital.  When we moved
7    that business across to Barclays' broker dealer in
8    the US we didn't have that same model approval
9    from the regulators.  So there were two separate
10   things we did.  One was to get the SEC to agree
11   that we could move those models across, so for US
12   reporting we could use the same models that Lehman
13   had used beforehand.
14       The second thing was to get the FSA to recognize
15   those models as part of our consolidated capital filings, so
16   we did ask them for a waiver.
17       Q.  And you obtained such a waiver?
18       A.  We have not been given one.  We have not
19   been given a waiver.
20       Q.  And the fact that you have not been
21   given a waiver, has that affected the way that you
22   have accounted for the acquisition?
23       A.  It has nothing to do with the accounting
24   for the acquisition.  It means that we have a lot
25   more capital against positions than we thought we

Page 127

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    would have when we thought we would have a waiver.
3    So this waiver is nothing to do with accounting;
4    it is a regulatory capital point.
5        Q.  I have placed before you a document that
6    we have previously marked as Exhibit 86B.  If you
7    can take a moment to review it and let me know
8    when you are done.
9        A.  I have reviewed it.
10       Q.  Are you familiar with this document,
11   sir?
12       A.  It feels like a bit of a floating
13   document.  Do you know where it came from?
14       Q.  I can tell you what I do know about this
15   document.  It was produced by Barclays, so we will
16   start with that, and at least your lawyers have
17   referred to this document, 9519, and the
18   continuing documents behind that as a spreadsheet
19   containing information provided to Barclays'
20   auditors relating to values that Barclays booked
21   for the securities received from Lehman and JPM.
22   Does that help you place the document?
23       A.  I am not sure I have seen this document.
24   I have seen similar documents.
25       Q.  Do you generally understand what the

Page 128

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    information that has been provided in the columns
3    or the column headings mean and what the row
4    headings mean?
5        A.  I think I would understand the first
6    column as being the notional.
7        Q.  Column B?
8        A.  Column B, yes.  Column C being Bank of
9    New York valuations and column D being the product
10   control and product control value.  I am not quite
11   sure what the other columns here mean.
12       Q.  And the other columns, column E, let's
13   look at E and F on page 1 of Exhibit 86B, column E
14   says "MV", market value.  Do you understand that
15   as market value?
16       A.  Yes, it would be.  I am just not quite
17   sure what the hieroglyphics on column E means.
18   There is a collection of hieroglyphics there which
19   are not intuitively clear.
20       Q.  Putting the document aside, are you
21   aware of any bid offer adjustments being made to
22   valuations of the securities acquired from Lehman?
23       A.  When we value the securities we have to
24   value them at the bid level.  So in our opening
25   balance sheet we would have had to value all the

Page 129

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    positions and securities in that balance sheet and
3    bid, and I was aware there was a lot of work.
4    This is during September, but I don't think as
5    I said before that work was really finally
6    completed until the end of the year, end of 2008
7    or early 2009, to actually get the appropriate bid
8    offer value, so there are a lot of changes to
9    these schedules over time.
10       Just so you understand, at this point,
11   as I think I have said earlier, we still had not
12   booked these positions on to our systems, and we
13   had many thousands of positions we were taking on,
14   and so I assume this exercise was done at some top
15   down level or on spreadsheets or something, but it
16   was not sort of an official books and records
17   calculation.
18       Q.  Column F is titled "PCG liquidity
19   values".  Do you see that?
20       A.  Yes.
21       Q.  Putting aside the bid offer adjustment,
22   was it your understanding that in addition to the
23   bid offer adjustment there was a liquidity
24   adjustment that was made for certain of the
25   assets?

Page 130

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1    A. I am not quite sure what that
2    represents. What I do recall is that the desk,
3    going back to Stephen King and those people did
4    valuations of the assets, and product control,
5    which is the independent valuation group tried to
6    do a valuation of the assets. The problem product
7    control had, which took them some time, they
8    didn't have necessarily all the details or all the
9    information to mark those assets, and I suspect,
10   and I may not be correct but I think there was
11   a time where the difference between what the desk
12   valuation was and product control valuation was,
13   there was a difference, which may be what this
14   liquidity value is.
15       As I said, we spent a lot of time
16   between September and earlier this year going through detail
17   by detail to iron that out, to make sure that what we
18   reflected was the right bid value across the whole
19   portfolio. So I am pretty sure we didn't have any liquidity
20   adjustment when we got to our final numbers.
21       Q. As of today, have you in fact completed
22   your analysis of the valuation of the securities
23   that were acquired as part of the Lehman/Barclays
24   transaction?

Page 131

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1    A. I think I said to you before that
2    effectively we had more or less in our financials
3    for 2008, we had that option to keep our
4    financials open for a year, to the end
5    of September, but in terms of valuations or
6    positions I am not aware of any intention to
7    change those numbers.
8        Q. Do you have a CUSIP by CUSIP report at
9    Barclays for each CUSIP acquired, the value at
10   which it was acquired and booked into your
11   systems?
12       A. I they we have done all the work. In
13   terms of precisely what level of reports we have,
14   I am not the person to ask.
15       Q. Who would be the person to ask?
16       A. It would be the people probably in the
17   product control department who had done that
18   work --
19       Q. Any particular names?
20       A. -- or their managers. I am trying to
21   think who. I think Marcus Mortimer was a guy who
22   was running that valuation work so it would be him
23   or people in his team.
24       Q. And is that exercise or that valuation

Page 132

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1    exercise something that you would be consulted on
2    and providing input to?
3        A. No, because Marcus Mortimer runs the
4    independent valuation group. So his group job is
5    to do independent valuations of positions. As I
6    think I said, this is going through thousands and
7    thousands of positions. I don't have the
8    expertise to go through thousands of position and
9    say "This is worth this, that or the other", so it
10   would be his group. It was his group who did the
11   work.
12       Q. When you say independent valuation group
13   you mean it is a group independent of the traders?
14       A. We have, yes, a system where the traders
15   primarily mark positions, on the basis that they
16   are the people who are trading in the market every
17   day, understand what price the assets are trading
18   at in the market, and therefore have the best
19   information. Marcus Mortimer's group go and
20   independently validate the positions, the prices
21   on all of our positions across all of our
22   different trading desks. So that is our normal
23   process. We followed the same process in terms of
24   this opening balance sheet. So the primary

Page 133

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1    valuation was done by the trading group, the
2    product control valuation was effectively this
3    price validation group testing.
4        What I said before is it took some time and there
5    were some differences, to my understanding, on both sides.
6    So the trader valuation changed, the product control
7    valuation changed, to true those up, but that was trued up
8    in terms of what we reported at the end of last year and
9    audited.
10       Q. I have handed you a one page document
11   marked previously as Exhibit 87B. Would you take
12   a moment to review it and I will ask you some
13   questions about it.
14       A. Could I just ask the same question about
15   precisely where the document comes from?
16       Q. I believe it is in the same range of
17   documents as before, but let me confirm that for
18   you. Yes, this too has been identified, produced
19   by Barclays, identified by your counsel as the
20   spreadsheets containing information that were
21   provided to Barclays' auditors relating to values
22   that Barclays booked for the securities received
23   from Lehman and JPM.
24       A. Just one thing, we talked about various

Page 134

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  drafts of the acquisition balance sheet and
3  I talked about this process being a quite long,
4  involved and complex process, taking until
5  early January to complete in the 2008 financials.
6  I also think as part of that there was a series of
7  documents which were provided to
8  PriceWaterhouseCoopers. I was not involved
9  necessarily in those chains so I just don't have
10 an understanding of what versions these are in
11 terms of that, just so you understand that.
12     Q.  Putting aside whether this is a final
13 version or interim version, I want to get your
14 understanding of again the types of data that are
15 included on this document. Can you help us with
16 that? You can go column by column if you like.
17     A.  Looking at this document, Exhibit 87B,
18 for a change, column B would appear to be the
19 notional of the exposures. Column C says, as at
20 30 September, what the front office valuation of
21 those positions were. I am assuming this is as of
22 30th September.
23        Column D seems to be a JP value, which I would
24 assume applies to JP Morgan, as of 30 September.
25        Column E seems to be a 22nd December valuation.

Page 135

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  It seems a rather strange date and I don't know that would
3  be a valuation prepared on that date or as of that date. It
4  seems slightly strange. I do not understand what the last
5  two columns refer to, liquidity or -- column F and G.
6     Q.  The assets that were acquired from
7  Lehman, do you know if any of those assets have
8  been sold?
9     A.  The assets acquired from?
10    Q.  Lehman?
11    A.  Lehman, as a whole?
12    Q.  Yes.  Have any of those assets been
13 sold?
14    A.  Yes, I think quite a lot of the assets
15 which we did acquire from Lehmans were sold and
16 liquidated in the period from the transaction to
17 now. I think the majority, I don't know precisely
18 how much.
19    Q.  With respect to assets that were sold,
20 are you aware of any convention or practice that
21 was followed by Barclays in valuing those
22 transactions, as apart from assets that in fact
23 have not yet been sold?
24    A.  I don't really quite understand the
25 question, in terms of we revalue transactions all

Page 136

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  the time, so on a daily basis in most cases,
3  sometimes on a monthly basis, if the market is
4  very liquid, and you are unable to do it more
5  frequently than that. Assets which are sold would
6  be valued up until the point when they are sold,
7  and then they will be sold and obviously realized
8  whatever the sale proceeds are.
9     Q.  So if you have an asset that was valued
10 at a million dollars, you sold it for 900,000, you
11 wouldn't go back and change the value of that
12 asset, you would record a loss on the sale of that
13 asset. Is that fair?
14    A.  Yes, you have not got an asset to change
15 the value, it is no longer in your books and
16 records, so if you -- well, just to be clear, if I
17 have an asset and if I acquire an asset from
18 Lehmans which was worth a million at acquisition
19 date, and I finally got it on my books and records
20 and finally reconciled it quite a lot later than
21 acquisition date, I then have to back-calculate
22 what was it worth then. So at the end of the
23 first month after acquisition I would revalue it
24 at the prevailing mark price. If I sold -- let's
25 say I bought it for a million, it was worth

Page 137

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  900,000 the end of the first month, I would
3  recognize there is 100,000 loss in that first
4  month. If I sold it for 900,000 the second month,
5  I would recognize in that case no gain or loss in
6  the second month. That is a standard convention
7  which we would do, and we follow the same
8  convention in terms of these.
9     Q.  That was one of my questions. You know
10 of no deviation from that convention with respect
11 to the Lehman assets?
12    A.  The only deviation, which is the one I
13 have explained, is normally on transactions we
14 have booked in our systems and therefore would be
15 subject to sort of automatic processes and
16 revaluations. Because these assets took a time to
17 book on our systems, which they were not fully
18 booked until after the date of the acquisition
19 balance sheet, you then had to do some -- I don't
20 know as I said before precisely how this was
21 done -- you had to do some work to work out what
22 was the acquisition value of those assets.
23 Because at the time, the earlier time of the deal,
24 we didn't. So Monday morning we didn't walk in
25 and all thousands of positions had miraculously

Page 138

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  got into our books and records.
3       Some of those positions, such as these JP Morgan
4  Chase ones, for example, were not actually delivered until
5  at the end of the year, during December, and some of the
6  positions, as you are aware, still have not been delivered.
7       So we had to value the assets but we don't have
8  a sort of physical stock record for those assets on our
9  books and records.
10     Q.  Let me ask you a follow-up question on
11  the assets that have not yet been delivered.  Have
12  any of those assets been reflected in your
13  accounting assets that you acquired but you don't
14  actually have possession of yet?
15     A.  I think I told you before that they have
16  been reflected in our accounting records because
17  we have legal title to those assets, and we did
18  disclose in our June 09 financials in a note the
19  amount of the assets which had not been delivered
20  which were disclosed in our financials.
21     MR. TAMBE:  We can take a short break
22  now if you want.
23          (A short break).
24     MR. TAMBE :  I have handed you
25  a multipage document previously marked as

Page 139

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  Exhibit 88B.  Take a moment to review it and let
3  me know when you are done.
4     A.  Could you explain what this document is?
5     Q.  The document, in the cover letter
6  producing this document your lawyer has described
7  this as a collection of documents containing
8  information that was provided to Barclays'
9  auditors related to the acquisition balance sheet.
10  This seems to be a collection of various
11  spreadsheets, but let's start with the first
12  2 pages, which appear to go together.  Are you
13  familiar with that spreadsheet?
14     A.  This appears to be broken down in
15  sterling and dollars of the items on the
16  acquisition balance sheet.  I think this appears
17  to be a fairly final version, though I am not sure
18  if I can confirm if this was the final version.
19     Q.  How would you confirm whether this was
20  the final version?
21     A.  I suppose I would ask the people, I
22  think it was Gary Romain who was doing the work on
23  this, and check that this reconciled to the
24  amounts which we finally had in our books and
25  records and disclosed.

Page 140

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2     Q.  The sterling gain shown on page 2 of
3  this exhibit, 2.2 billion sterling gain, is in
4  fact the number that is disclosed in the figures
5  for 2008, the results announcement?
6     A.  Okay, which is why I thought it looked
7  fairly final, but whether this -- it is just
8  confirming whether all the other numbers are the
9  final numbers, I am not sure.
10     Q.  Moving further down this exhibit, 88B,
11  the third and fourth page appear to be another
12  version of the Long Island acquisition balance
13  sheet.  Do you see that?
14     A.  Yes.
15     Q.  On the fourth page, so that is the page
16  that has the little number at the bottom, it says
17  9157.  Do you see that?
18     A.  Sorry, the fourth page?
19     Q.  And the number I have pointed to is this
20  number on the right-hand corner, 9157.
21     A.  Yes.
22     Q.  On that page there is a negative
23  goodwill pre deferred tax amount of 3.7 billion.
24  Do you see that?  Line 52.
25     A.  Yes, I can see that.

Page 141

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2     Q.  Can you tell by looking at this sheet,
3  page 9156 and 9157, whether this is a near final
4  version of the acquisition balance sheet in this
5  format?
6     A.  As I said, some of the numbers look
7  fairly final.  I don't have a photographic
8  recollection of numbers so I am not the person to
9  ask.
10     Q.  This type of documents would have been
11  prepared by whom?
12     A.  By Gary Romain or people in his team.
13     Q.  If you turn to page 9156, the first page
14  of this particular spreadsheet, so it is 9156, you
15  will see on that page there are amounts listed for
16  cure payment of about $220 million?
17     A.  Yes.
18     Q.  Again, do you have an understanding as
19  to whether that was the final cure amount?
20     A.  Yes, as I said, I think the acquisition
21  balance sheet was fairly finalized at the end of
22  last year.  I am aware that there have been some
23  small additional amounts this year but as I think
24  I said earlier we don't currently plan to adjust
25  the acquisition balance sheet.

Page 142

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1     Q. Do you have Exhibit 86B before you. We
2  discussed that document before the last break and
3  one of the columns we were talking about was the
4  column that has the MV 09-22. Then it says:
5  "W.bid - offer". Do you see that?
6     A. Yes.
7     Q. You said that the positions were valued
8  at the bid. Do you remember that?
9     A. Yes.
10    Q. Why were the positions valued at the
11 bid?
12    A. Because that is what they have to be
13 valued at under the accounting rules.
14    Q. What accounting rules?
15    A. Under IFRS accounting rules. All
16 trading positions, where you have a long position
17 you value it at the bid and short position you
18 value at the offer price. The specific accounting
19 rules around acquisitions are you have to fair
20 value all the assets and liabilities when you
21 acquire, when you do the acquisition, and in terms
22 of fair valuing financial instruments you have to
23 value long at bid and short at offer.
24    Q. And for the assets that were acquired

Page 143

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  from Lehman, Barclays and Lehman did not have
2  a bid offer spread quoted for of those assets,
3  correct?
4     A. Sorry, Barclays and Lehman?
5     Q. Barclays/Lehman, when they were doing
6  the negotiations, there was not a bid offer spread
7  being negotiated between the two parties, correct?
8     A. The original, going back to the original
9  Monday balance sheet which was being negotiated,
10 it was the bid price which was the price which was
11 being negotiated for those assets. That was what
12 the negotiations were about, agreeing that bid
13 price to acquire that portfolio of assets.
14    Q. How about for the transaction that was
15 actually executed, were there any such
16 negotiations?
17    A. I think because of the timing and the
18 lack of availability of the information on that, I
19 am not aware, as I said I was not in New York, but
20 I was aware of discussions that were held, but we
21 went through exactly the same process, but in this
22 time, as I went through earlier, we went through
23 that process with the desk and through the
24 independent process with product control, testing

Page 144

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  those bid prices, and then our auditors have gone
2  through that as well, to make sure that those
3  prices they thought were appropriate. So you had
4  three groups of people looking at it.
5     Q. Where would the bid information have
6  come from for the assets that were acquired from
7  Lehman?
8     A. For each asset in each market you have
9  to try and work out what the bid price was, so
10 that obviously different things -- some markets
11 you would be able to see transactions and bid
12 offer quotes on the day of the valuation, so you
13 would be able to see back to, for this portfolio,
14 which came from JP Morgan, and I think it is the
15 22nd. No, this is the day before. This portfolio
16 is 22nd September. So for some things you would
17 be able to see bid offer quotes on things for
18 those markets at that point in time, and where
19 those are available those are what we used.
20         For more illiquid markets you would have to try
21 and look at trades or trades near that date to try and work
22 out what the right bid price for those assets were. As
23 I said, it was a lot of work done, which is partly why it
24 took a lot of time to complete the acquisition balance

Page 145

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  sheet.
2     Q. Then you described a process where once
3  the assets were on or were recorded in your
4  systems you would on a periodic basis, either
5  weekly or monthly, be revaluing those assets?
6     A. Yes.
7     Q. Now, that revaluation exercise, would
8  that be done at the bid or the offer or would that
9  be done on midmarket prices?
10    A. We do different things for different
11 portfolios. So for some portfolios we revalue
12 them daily at midmarket, and then we have a bid
13 offer adjustment across the whole portfolio. For
14 other portfolios we may value individual positions
15 on bid and offer. More normally I think for the
16 bigger portfolios we have a bid offer adjustment
17 across the portfolio and we use a similar
18 mechanism to work out what that should be.
19    Q. Again, in the revaluation phase or
20 process, the requirement to value at bid offer, is
21 that an IFRS requirement?
22    A. Yes, it is actually the same requirement
23 I think under US GAPP, but it is an IFRS
24 requirement.

Page 146

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    (Exhibit 371A marked for identification)
3    Q.  I have handed you a document marked
4    Exhibit 371A.  It is a copy of Barclays' interim
5    results announcement as of 30 June 2009.  If you
6    want to take a moment to look through the
7    document, just let me know when you are done.
8    MR. HUME:  Might take more than
9    a moment.  It is quite long.
10   Q.  You can look at it to make sure it is
11   what in fact it purports to be.
12   A.  I was going to say it looks like it from
13   the investor relations page, something downloaded
14   from the internet rather than --
15   Q.  That is probably right.
16   A.  We will have to assume that it is the
17   final version of the announcement I think for the
18   purposes of this.
19   Q.  You had earlier referenced that in this
20   report Barclays had identified certain assets that
21   were yet to be -- that it had yet to gain
22   possession of relating to the acquisition.  I
23   don't know whether you know where that entry is.
24   If I can I will direct you to it.
25   A.  Note 15 on page 57.  Sorry, you said you

Page 147

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    couldn't find it?
3    Q.  I couldn't find it before.  You have
4    directed me to it.  This is the part I was looking
5    for.  I am focusing on the second paragraph of
6    this note.  It states:
7    "Approximately 2.2 billion pounds of the assets
8    acquired had not been received by June 30".
9    Then it goes on to discuss the fact that
10   approximately 1.8 billion of these assets were recognized as
11   part of initial accounting?
12   A.  Yes.
13   Q.  What is the explanation, if any, for the
14   400 million or so that were not recognized as part
15   of the initial accounting?  Why were they not
16   recognized as part of the initial accounting?
17   A.  At the 31 December, when we drew up the
18   acquisition balance sheet, we reflected all the
19   assets which we were clear that we had legal title
20   on, and also we were clear that we could, you
21   know, we had valuations and identity of the
22   assets.  There are some assets which at that time
23   we had legal title to or believed we had legal
24   title to them but we didn't have access or we
25   didn't have the information around those assets,

Page 148

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    so we didn't reflect those assets because we
3    didn't have sufficiently reliable estimates of
4    those valuations to include them in our accounting
5    records.
6    Q.  Was that still the case as of
7    30 June 2009 in respect to that 400 million pound
8    number?
9    A.  No, because at 30 June we had actually
10   quantified and calculated what these assets were
11   worth.  I think we made it fairly clear here that
12   we have not recognized them at 30 June.
13   Q.  Of the 2.2 billion, this report states
14   that the amount is largely comprised of margin and
15   collateral attributable to the acquired businesses
16   and cash and securities receivable under the terms
17   of the acquisition.  Can you offer any further
18   sort of granularity on that?  How much is margin
19   and collateral, how much is cash, how much is
20   securities?
21   A.  As I think I told you before, I am not
22   very good at having a photographic memory for
23   numbers, so I am not sure I could, but I think
24   I did mention before that quite a significant
25   portion of these balances relate to client assets

Page 149

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    from the Lehman PIM business, private investment
3    management business.  Actually, sorry, I think it
4    may mention that specifically here in this note.
5    Q.  I guess that is what I am trying to
6    figure out.  There is a reference further down
7    that paragraph to the recognizing of a receivable
8    from the LBI bankruptcy estate of approximately
9    700 million pounds?
10   A.  That relates to the PIM, so they split
11   it out separately.
12   Q.  And that 700 million pounds number, is
13   that included in either of the 2.2 or the 1.8 or
14   is that separate?
15   A.  I think if you read what it says here,
16   it says "in addition", so I am fairly sure it is
17   in addition.
18   MR. TAMBE:  Let's take a short break.  I
19   don't think I have any more questions.  Let me
20   make sure.
21   (A short break.)
22   CROSS-EXAMINATION BY MR. WOOD:
23   MR. WOOD:  Mr. Clackson.  I am John Wood
24   from Hughes, Hubbard & Reed and we represent the
25   SIPA Trustee.

Page 150

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    (Exhibit 372A marked for identification)
3    I am handing you a copy of what has been
4    marked as Exhibit 372A. Go ahead and take
5    a moment to look it over.
6    MR. HUME: Before you answer any
7    questions on the document, let me just ask the
8    witness if there are, since it is a tax question
9    again, if there are tax lawyers on here.
10    A. No, there are not any tax lawyers.
11    MR. WOOD: I will just note on the
12    record I didn't see any Bates number on here but
13    I do believe this is part of the production from
14    Barclays.
15    MR. HUME: That is odd.
16    MR. WOOD: Have you had a chance to look
17    over the document?
18    A. Sorry, can I have a minute more to
19    understand it?
20    MR. WOOD: Of course.
21    A. Yes.
22    Q. You see it is a one page document
23    containing two e-mails, the first one
24    chronologically is from Derek Masser
25    on September 17, 2008. Subject is "Lehman gain".

Page 151

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    You replied later that same day, September 17.
3    The disparity in the time I think is only because
4    on the top it is GMT and the lower one is not. In
5    your reply you write:
6    "Tax rate is correct for the deal. Keep to
7    1475. I don't want to oversell".
8    Do you see that?
9    A. Yes.
10    Q. Where did the 1475 number come from?
11    A. I can't recall but it looks like if you
12    look at the e-mail below he said 1485, which he
13    was rounding up to 1500. I am not sure if I was
14    trying to repeat the 1485 but got it wrong or
15    whether I was rounding it down 10, rather than
16    rounding it up 15. I can't recall which of those
17    two I was doing.
18    Q. Do you recall what you meant by: "I
19    don't want to oversell"?
20    A. I think at this time he was saying what
21    is the forecast gain, so the RAF here means the
22    revised annual forecast, and I would think I was
23    just saying if you round up a number, people
24    believe it is a bigger number, so I thought it was
25    unwise to round up. I think that is all I meant

Page 152

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    by this.
3    Q. When you wrote "oversell", oversell to
4    whom?
5    A. This was going into, as I said, an
6    internal forecast, so it would be internally, for
7    people to oversell internally.
8    Q. 366A, you should already have in your
9    pile there. Let me make sure that is correct.
10    This is 366A. The top of it is an e-mail from
11    Chris Lucas. The one that is already marked as
12    366A is the one you should focus on.
13    A. Shall I retain this one?
14    Q. No, you can discard that one and focus
15    on the one that is already marked. Mr. Tambe
16    already asked you some questions about that.
17    I just have one follow-up question. You see in
18    the middle there there is an e-mail from James
19    Walker to you, Sunday, September 21st. 2:52 is
20    the time. It says: "FYI, which combined with
21    Stephen's situation is not great". Do you
22    remember that to be Stephen King?
23    A. Yes, I think I assumed that was Stephen
24    King. I can't recall precisely what James is
25    referring to here.

Page 153

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    Q. You don't know what the situation is?
3    A. No. But as I said before Stephen was
4    looking at the inventory and evaluation of the
5    inventory. We had great concerns that we had not
6    done the due diligence of that inventory, and
7    Stephen was looking at trying to work out what it
8    was worth.
9    Q. Do you know what the "is not great"
10    referred to?
11    A. I presume that meant going back to the
12    work Stephen was doing. His early review of that
13    inventory was not looking positive in terms of the
14    valuations of it.
15    Q. That is all I have on that document.
16    Would you look at Exhibit 209. Mr. Clackson, I
17    have just handed you what has already been marked
18    as Exhibit 209, a 3-page e-mail string.
19    A. Yes.
20    Q. The earliest chronologically was on
21    Sunday September 21st, the latest one was from
22    Rich Ricci to you, cc-ing Gerard LaRocca, on
23    Monday September 22nd. The subject line for all
24    of these appears to be "Updated opening balance
25    sheet". Do you see on the first page there is an

Page 154

1     HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2     e-mail from Gary Romain to you, dated
3     Monday September 22nd, at 10:14 am. It says:
4         "Patrick, Martin confirmed below (and verbally)
5     that the $1.9 billion assets left in their box is already
6     included in the 44.88 billion of billion assets (per his
7     balance sheet)."
8         First of all, do you know if that is correct, and
9     if it is helpful I can show you other documents that have
10    used the 44.88 to fill you in on some more numbers.
11        A.  I am not clear what the reference to per
12    Martin's balance sheet is so, yes, I can read what
13    it says here but I can't confirm it is correct.
14        Q.  I may come back to that when I go to
15    another document that has a similar number in it.
16    If you look just above that there is an e-mail
17    from you on September 22nd at 5:46 pm, in which
18    you write: "Not looking good for the 1.9 billion."
19    Do you know what you meant by that?
20        A.  As we were trying to work out precisely
21    what we had acquired on the deal, and as I think
22    I said various times there were lots of different
23    versions and estimates and approximations, I think
24    at some point we had understood that the 1.9 had
25    been in addition to other things.  It looks from

Page 155

1     HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2     here that that assumption was wrong and we had
3     double counted 1.9 billion in our early estimates.
4         I can't recall precisely which version of
5     estimates would have had had that double counting in but I do
6     remember, as I have said before I think, that we had a lot
7     of numbered bounced up and numbers bounced down as we got
8     new and better data.
9         Q.  And then after that Rich Ricci writes to
10    you cc-ing Gerard LaRocca:  "Gerard, any view?"
11    Do you see that?
12        A.  Yes.
13        Q.  Do you know whether
14    Mr. LaRocca expressed any view on that?
15        A.  I can't recall.  I think Gerard was
16    working with the operations people, who were sort
17    of physically looking at the assets, and so I know
18    Rich would have reached out to him because he
19    would have had a closer understanding of were
20    these double counted or not, et cetera, but I am
21    not aware of any response from Gerard.
22        Q.  I have handed you what has already been
23    marked as Exhibit 85B.  This has already been
24    marked.  As you see there is a 2-page e-mail cover
25    sheet and then a lengthy attachment.  The first

Page 156

1     HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2     page of the attachment marked number 1, ending in
3     Bates number 4398, you will see is entitled
4     "Lehman Brothers/Barclays APA lead sheet".  Take
5     a moment to look that over.
6         MR. HUME:  Can you just look at the ...
7         A.  This is an Alvarez & Marsal document?
8         Q.  It was e-mailed by somebody at Alvarez &
9     Marsal.  That does not necessarily mean that they
10    created everything in the attachment.
11        A.  You wanted me to look at page 1 of the
12    attached document?
13        Q.  Yes.  Feel free to look at more,
14    obviously.
15        A.  Yes.
16        Q.  First of all, have you seen that page
17    before?
18        A.  I have never seen this page before, no.
19        Q.  You will see at the top it says:
20    "Securities transferred under Barclays repo
21    agreement (APA schedule A)", and lists some
22    figures totaling a little over $44 billion.  Then
23    it has: "Unencumbered box 'as of Sunday 9/21/08
24    (aka Clearance Boxes) (APA schedule B)".
25        Now, this 44.1 is slightly different from the

Page 157

1     HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2     44.88 that we were just looking at on that e-mail Exhibit
3     209, but as you will see this APA lead sheet in Exhibit 85B
4     has broken out schedule A and schedule B with separate
5     numbers.  Do you know whether any of the assets listed there
6     under schedule B are also within that total for schedule A?
7         MR. HUME:  Objection, lacks foundation.
8         A.  I have never seen these schedules
9     before.  At this time, the start of this e-mail
10    chain, Martin's schedule, which I said I didn't
11    recognize, of acquired assets, these were all
12    Lehman schedules.  I have no knowledge of what was
13    in them or what was not in them.
14        Q.  If you look at page 2, the footnote A:
15    "Securities transferred under Barclays repo
16    agreement", do you see the bracket says: "Source
17    file Barclays financing collateral list".  So I am
18    just — that does not mean you have seen it.  I
19    wanted to bring your attention to maybe
20    Barclays —
21        A.  I have no idea about Barclays financing
22    collateral list, Barclays ops.  I am not clear
23    what this is purporting to be or what it has
24    pulled together to tell you the truth.
25        Q.  On the first page under schedule A is it

## Page 158

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  fair to say you don't know whose marks those are?
2    A.  Definitely fair to say I don't know
3  whose marks they are.  I suppose my assumption
4  would be that these are definitely not marks which
5  are anything to do with Barclays though, but I
6  don't know if that is correct.
7    Q.  If you look a little further down on
8  that same page, do you see a reference to "Friday
9  9/26 transfer"?  Do you see that?
10    A.  Yes.
11    Q.  Do you know if there were transfers on
12  9/26?
13    A.  I think I was asked before.  I was in
14  London at that time and operational -- when stuff
15  moved, I have no knowledge of any transfers when
16  they happened.  I may well have received different
17  e-mails on different things but I have no
18  recollection.
19    (Exhibit 373A marked for identification)
20    Q.  I have just handed you what has been
21  marked as Exhibit 373A, a one page of two e-mails.
22  The first one chronologically is from you to John
23  Rodefeld, Monday September 22.  Subject: "Have we
24  moved the 1.9 billion dollars yet?"  Then there is
25

## Page 159

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  no text to that e-mail.  What was the 1.9 billion
2  you were asking about there?
3    A.  I can't recall, but my assumption would
4  be it was the same 1.9 billion which is referred
5  to in the other e-mail, so the assets left in the
6  box.  That would be my assumption but I can't
7  recall if that is what it was.
8    Q.  When you say "the box", which box is
9  that?
10    A.  Sorry, I am just reading from this other
11  e-mail, but in terms of which box I would not know
12  those details.
13    Q.  Do you know whether that was a box at
14  DTC?
15    A.  I wouldn't know.
16    Q.  Do you know what prompted you to ask
17  whether the 1.9 billion had moved?
18    A.  I suspect someone asked me the question
19  and I asked the question to John Rodefeld to find
20  out, but I can't remember who did that, but
21  I suspect that is why.
22    Q.  And then John Rodefeld replies with
23  three sentences.  The last one is: "Some of the
24  1.9 moved to us on Friday".  Do you know if that
25

## Page 160

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  is correct?
2    A.  No, I don't know if that is correct.
3    Q.  So I take it you would not know how much
4  moved on Friday?
5    A.  I wouldn't, I am afraid.
6    (Exhibit 374A marked for identification)
7    Q.  I am handing you what has been marked
8  Exhibit 374A.  It is a very short e-mail.  Again,
9  this one does not have any Bates numbers but I
10  believe this was part of a Barclays production.
11    MR. HUME:  Do you have any idea why it
12  doesn't have a Bates number?
13    MR. WOOD:  I don't know.  I don't know
14  if that is a problem on our end in terms of
15  printing or if it came across that way.  I did
16  have an associate check last night and she said
17  she believed it was part of the production.
18    MR. HUME:  I note that the subject is
19  "BS".
20    MR. WOOD:  You will see this is an
21  e-mail from you to Gary Romain, Tuesday,
22  September 23.  Mr. Hume points out the subject is
23  "BS", which I am hoping refers to box securities.
24  The e-mail text says:
25

## Page 161

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1    "Box securities worth 1.5 and exchange
2  traded zero and maybe some upside - may need
3  a provision".
4    Do you know what you were referring to
5  by the box securities?
6    A.  No.  Again, rather like the earlier
7  e-mail, it feels like I was hearing from people
8  sort of sound bites of this and that, and I was
9  just trying to make sure Gary Romain had all the
10  information I had, so I was trying to pass that
11  information on to Gary.  But in terms of any
12  granular understanding of this, you know,
13  I couldn't tell you anything else I am afraid.
14    Q.  Do you recall why the 1.5 differs from
15  the 1.9 we were looking at earlier?
16    A.  I don't recall why.
17    (Exhibit 375A marked for identification)
18    Q.  I have handed you what has been marked
19  as Exhibit 375A, a one page e-mail string.  The
20  earliest chronologically is Friday September 26,
21  the latest chronologically appears to be Monday,
22  September 29, ending in Bates 49565.  Go ahead and
23  take a moment to look it over.
24    A.  I have looked at it.
25

Page 162

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    Q.  The earliest one chronologically, the
3    bottom e-mail is from Stephen King to you and
4    James Walker, dated Friday, September 26.
5    Subject: "1.93 collateral".  The first sentence
6    says:
7         "The file containing the extra 1.9 billion
8    has not been delivered and cannot be right because it
9    contains some bonds which are already in the BarCap
10   repo."
11        First of all, do you know what the file is
12   that he was referring to.
13   A.  No, I don't know what that is.
14   Q.  And 1.9 billion, do you know what that
15   is?
16   A.  I presume the heading on this is free
17   collateral, which I think is some of the
18   collateral in boxes.
19   Q.  And do you know whether that is boxes at
20   DTC?
21   A.  No.
22   Q.  He writes: "It contains some bonds which
23   are already in the BarCap repo."  Do you know
24   whether that was correct?
25   A.  Sorry, my answer, you said do I know

Page 163

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    whether it is boxes at DTC and I said "no".  I
3    didn't mean no, it was not at DTC.  For clarity,
4    I meant no, I don't know where it is.
5    Q.  I understand.
6    A.  Sorry, what was your question?
7    Q.  Looking at the end of that first
8    sentence of the earliest e-mail, where it says:
9    "It contains some bonds which are already in the
10   BarCap repo", and it appears to refer to the
11   1.9 billion, do you know if that statement is
12   correct?
13        MR. HUME:  Objection, lacks foundation.
14   A.  Again, I don't know whether that
15   statement is correct.
16        MR. WOOD : That is all I have.  Thank
17   you.
18        CROSS-EXAMINATION BY MR. BUNTING:
19        MR. BUNTING: I can be fairly brief.  I
20   am Matthew Bunting from Quinn, Emanuel, Urquhart,
21   Oliver & Hedges for the Creditors Committee.  I
22   wanted to touch very, very briefly on the negative
23   goodwill.  Could you just explain for me in
24   summary how that has been treated in Barclays'
25   accounts to date?

Page 164

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2         MR. HUME:  Objection, vague and
3    ambiguous.
4    A.  I was going to ask you precisely what
5    you mean by that.
6    Q.  We have spoken about the negative
7    goodwill which was booked on the acquisition of
8    these assets.
9    A.  Yes.
10   Q.  Where would I go in Barclays plc's
11   accounts to see that booking?
12   A.  It was fully disclosed in the
13   31st December 2008 accounts, and I think it is
14   disclosed on the face of the group accounts and
15   extensively in the notes behind that.  I think if
16   you looked at the results announcement for the end
17   of 2008 it is disclosed there and it is disclosed
18   in more detail in the full financial statements.
19   Q.  Were there discussions that you were
20   party to with Barclays' auditors about that
21   number?
22   A.  There are numerous discussions with
23   Barclays' auditors, who spent some time
24   extensively auditing all the components, the
25   opening balance sheet, the valuations on the

Page 165

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    opening balance sheet and all the components of
3    the opening balance sheet, the assets and the
4    liabilities.
5    Q.  Did you meet with them?
6    A.  Yes, I have extensive meetings with them
7    and the meetings I have with them, that was one of
8    the agenda topics which we discussed.
9    Q.  How did you describe to them, can you
10   recall, the negative goodwill concept?
11   A.  I am not sure if there is a concept
12   described.  I think what we talked about was the
13   opening balance sheet, and the opening balance
14   sheet shows all the assets and the liabilities,
15   and I think as I said before the balancing figure
16   on any acquisition, which is either goodwill or
17   negative goodwill, so we discussed the opening
18   balance sheet.  I don't remember any conceptual
19   discussions.
20   Q.  Did they accept your calculations?
21   A.  They did all the work of auditing all
22   the detailed components of those calculations, and
23   in terms of the financial statements we produced
24   were audited and unqualified, so yes.
25   Q.  Moving on, you said earlier on this

Page 166

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1  morning that what we have described today as
2  Lehman three was a very different deal to Lehman
3  two?
4      A.  Yes.
5      Q.  You also mentioned that at some time, at
6  some points during the week there were discussions
7  with the FSA that you were aware of.  Is that
8  right?
9      A.  During which week?
10     Q.  During the week starting 14th September,
11 the week in which Lehman two became Lehman three.
12     A.  I think we talked about discussions with
13 the FSA about a meeting the subsequent week is my
14 recollection, from what we talked about.
15     Q.  Were there meetings with the FSA during
16 that week of Lehman two becoming Lehman three?
17     A.  I can't recall, because for most of that
18 week I was in New York and for some of that week I
19 was in London.  I was not involved in any myself.
20 Barclays has fairly continuous liaison and
21 dialogue with the FSA so I think there probably
22 was but I can't recall.
23     Q.  Would you have attended any meetings
24 that occurred with the FSA?

Page 167

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1      A.  As I said, I was in New York for some of
2  that time and I didn't attend any meetings.
3  I attend some meetings with the FSA and not other
4  meetings.  It really depends what the topic is and
5  who we are talking to at the FSA.
6      Q.  Just to clarify on the move, your travel
7  back from New York, what was the reason for coming
8  back from New York that week, on the Wednesday?
9      A.  I can't actually recall, apart from I
10 had left on a hurry on the Friday to go to New
11 York and I am not sure even if I had sufficient
12 clothes, so it may have been practical or boring
13 reasons, but I also I suppose at the time I left,
14 having done the Lehman two transaction, I think at
15 the time we believed we had done the transaction
16 and it would just go through.  So when I left we
17 had not -- or when I left some of the problems had
18 not started arising.
19     Q.  Could I ask one question about an
20 exhibit we looked at earlier, which I think is
21 Exhibit 362A, a single page e-mail about an inch
22 and a half down the stack.
23     A.  Yes.
24     Q.  As discussed earlier, the first e-mail

Page 168

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1  in that chain is from James Trevelyan, asking for
2  an understanding of how the negative goodwill
3  works?
4      A.  Yes.
5      Q.  And you respond by saying that this is
6  "the official line".
7      A.  Yes.
8          MR. HUME:  Objection.
9      Q.  Your e-mail and reply states that the
10 official line is as follows.
11     A.  No, it is not a reply to James.
12     Q.  Okay.
13     A.  I forward this e-mail to Rich.
14     Q.  Were there other lines?
15     A.  There was a lot of confusion around the
16 deal and a lot of numbers changing.  You will have
17 seen from some of the equities and some of the
18 other e-mails that a lot of people were saying how
19 does this work and how does that work, and there
20 were not any other lines.  What I was trying to do
21 is just to make sure that Rich and I had the same
22 clear understanding so that we didn't harbor any
23 more confusion around the organization.
24     Q.  So was it your --

Page 169

HIGHLY CONFIDENTIAL - PATRICK CLACKSON
1      A.  It was my understanding.
2      Q.  Was it your role to determine the
3  official line?
4          MR. HUME:  Objection, vague and
5  ambiguous.
6      A.  I am not quite sure what that means, but
7  just in terms of explaining the transaction,
8  Mr. Ricci and myself were the two main people
9  involved.  So in terms of how did I look at or
10 understand some of these things, I wanted to make
11 sure he understood that as well.
12     Q.  Finally I want to show you a very short
13 e-mail, which should be marked 376A.
14         (Exhibit 376A marked for identification)
15         This is an e-mail from you to Rich Ricci
16 consisting of no more than four words: "Careful
17 about bankruptcy courts".  I was wondering if you
18 could provide us with any context for this e-mail?
19     A.  I can't recall I am afraid.
20     Q.  You don't recall seeing the e-mail?
21     A.  No, I don't recall sending it and I
22 don't recall what it was about either.
23     Q.  Had you had any dealings with bankruptcy
24 courts in previous --

Page 170

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2         A.  I have not had any dealings with
3    bankruptcy courts.
4         MR. BUNTING:  Thank you.
5         MR. WOOD:  If I can have just one minute
6    I may have a couple more questions.
7              (A short break)
8         FURTHER CROSS-EXAMINATION BY MR. WOOD:
9         MR. WOOD:  A few more questions,
10   Mr. Clackson.  If you can take another look at
11   Exhibit 376A.
12        A.  Yes.
13        Q.  Again, that is the e-mail from you to
14   Rich Ricci, where you write: "Careful about
15   bankruptcy courts", dated Wednesday, September 17.
16   Did you go to the bankruptcy court at all?
17        A.  No, I didn't.
18        Q.  Do you know whether Rich Ricci did?
19        A.  I don't know.
20        Q.  I am going to hand you what has
21   previously been marked as Exhibit 22.  Do you
22   recognize that document?
23        A.  It looks like a full year results
24   announcement for Barclays plc.
25        Q.  For 2008?

Page 171

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2         A.  For 2008, yes.
3         Q.  And you worked on this document, did you
4    not?
5         A.  Yes.
6         Q.  What was your responsibility with regard
7    to this document?
8         A.  I have responsibility for the pieces
9    which relate to Barclays Capital in the document
10   and actually the pieces which relate to Barclays
11   worth as well in this document.
12        Q.  Can you take a look at page 95.  You
13   will see a heading number 11, "Acquisitions".
14        A.  Yes.
15        Q.  Did you work on that section?
16        A.  Yes, my staff would have worked on this
17   section, yes.
18        Q.  If you would like to pause to take
19   a moment to look it over, that would be fine.
20        A.  Sure.  Yes.
21        Q.  You will see the second paragraph from
22   the bottom of that page says:
23             "The excess of the fair value of net assets
24   acquired over consideration paid resulted in a 2.262 million
25   pounds of gains on acquisitions."

Page 172

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2         Do you see that?
3         A.  Yes.
4         Q.  As far as you know, is that statement
5    correct?
6         A.  Yes, as far as I know that is a correct
7    statement.
8         Q.  Do you know whether that figure includes
9    any assets held in Lehman's clearance box at DTC?
10        A.  I think we discussed this before.  In
11   the June financial statements it tells you the
12   total amount of assets which are included in the
13   gain which have not yet been delivered.  I think
14   I said before when we looked at that I didn't have
15   the exact split of the numbers of what was
16   offsetting there.  I think the assets held in
17   clearance boxes at DTC are some of those but I
18   don't know.  I could not quantify the amount.
19        Q.  Just to be clear, when you say some of
20   those, you mean some of the 2.262 billion?
21        A.  Some of those assets which have not been
22   received are included in the June financial
23   results, which was Exhibit 371A, and as it said in
24   Exhibit 371A, that we had recognized this gain
25   included a number -- I can confirm the number if

Page 173

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    you want on note 15, page 57 of that exhibit, it
3    says in the second paragraph, second sentence of
4    the second paragraph: "Approximately 1.8 billion
5    of these assets were recognized as part of the
6    initial accounting for the acquisition."
7         So if those assets were recognized as part of the
8    initial accounting they would have been included in the
9    computation of that gain.
10        Q.  So that the 2.262 billion of gain in
11   Exhibit 22, you say that that includes 1.8 billion
12   pounds of assets that had not been acquired yet?
13        A.  This is as at 30th June, so 1.8 billion
14   of assets, including 1.8 billion of assets had not
15   been acquired as of 30 June.
16        Q.  So would it be fair to say that if 1.8
17   billion pounds had not been provided as
18   of June 30, 2009, that this figure in Exhibit 22,
19   which is for 2008, that at least 1.8 billion, if
20   not more of that --
21        A.  Would not have been received.
22        Q.  -- had not been received as of that
23   date?
24        A.  That would be correct, yes.
25        Q.  But do you know whether or not any of

Page 174

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    the clearance box assets at DTC were included in
3    that figure that had not been received but were
4    included in this number?
5        A.  To repeat what I said, I think some of
6    those assets are included in that number. I don't
7    know precisely how much and I can't recall
8    precisely how much.
9        Q.  Do you know whether any assets held
10   pursuant to rule 15c3 were included in that?
11       A.  I know they were included in that
12   number.
13       Q.  They were included?
14       A.  Yes, I know definitely.
15       Q.  What was the value of assets included?
16   Just to be clear on that, what was the value of
17   15c3 assets that were included?
18       A.  The value which was included there was
19   the full amount of claim. I can't remember
20   precisely how much that was.
21       Q.  Do you know whether it was $769 million?
22       A.  That sounds to me like the correct
23   number.
24       Q.  Do you know whether any margin held at
25   the OCC is included in that 2.262 billion pounds

Page 175

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    of gain?
3        MR. HUME: Object to the vagueness of
4    "included" in that number. I think I know what
5    you mean. Included in all the numbers that result
6    in that number? I am sorry, I am not trying to
7    make a speaking objection. I am trying to
8    clarify. Is that what you mean?
9        MR. WOOD: Yes.
10       A.  I think there are some other exhibits
11   which showed the composition of the acquisition
12   balance sheet and the assets in the composition
13   balance sheet which I think set out what is
14   included in there. I feel like I am speculating
15   saying what do I think is included and what is
16   not.
17       Q.  We have seen a lot of different balance
18   sheets so I am not sure exactly which one. The
19   figure we see here on page 95 of Exhibit 22 --
20       A.  I think there was -- let me find the
21   exhibit for you. I think Exhibit 88B.
22       MR. HUME: 88B is the one that had the
23   one page redacted and has a clerical error.
24       MR. WOOD: The clerical error is not
25   implicated by what we are talking about.

Page 176

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2        MR. HUME: It may be.
3        MR. WOOD: It may be?
4        MR. HUME: I have the corrected version
5    if you want it.
6        A.  Exhibit 88B, which reconciles --
7        MR. WOOD: Can I take a look at the
8    corrected version?
9        MR. HUME: Yes, sorry it is not stapled.
10       MR. WOOD: That is fine.
11       A.  Page 3 of that exhibit, I think, breaks
12   down the different assets.
13       Q.  Are you looking at the uncorrected
14   version, the original version?
15       A.  Yes. On page 3 of the exhibit I think
16   it breaks down the -- balance is included in that
17   acquisition balance sheet.
18       Q.  Before we go any further, I just want to
19   ask a couple of questions. Exhibit 88B, at the
20   top of page 2 of the uncorrected version, the two
21   versions are formatted differently. The top of
22   page 2 of the uncorrected, it says: "Gain on
23   acquisition 2,262." Do you read that to be the
24   2.262 billion pounds gain which is then reflected
25   on page 95 of Exhibit 22?

Page 177

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2        A.  Yes, so I am assuming this is the final
3    version. As I said beforehand, I don't know what
4    the details are of the final version, but because
5    the total is the same total I am assuming this is
6    the final version. Talk to Gary Romain, he will
7    be able to confirm the final version.
8        Q.  Looking at that document, are you able
9    to answer whether or not any margin held at the
10   OCC is included in the 2.262 billion pounds gain?
11       A.  Sorry, having led you here I am not sure
12   if there is sufficient detail for me to be able to
13   aver to that.
14       Q.  If you look at page 3 of the uncorrected
15   version, line 18 is "OCC customer and clearing
16   margin", and then there is a zero.
17       MR. HUME: I believe that may be
18   a clerical error. If you want to take a moment go
19   off the record and look at this.
20       MR. WOOD: Yes, that would be good.
21       MR. HUME: Do you want to mark it?
22   Mr. Wood is going to mark an exhibit which I just
23   gave him that was printed out. There was
24   a correction to a clerical error in the document
25   marked Exhibit 88B, which corrected version was

Page 178

HIGHLY CONFIDENTIAL - PATRICK CLACKSON

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  produced to all the parties a couple of weeks ago,
3  and it has a valid Bates number. I have had
4  a version of that e-mailed here and printed by an
5  assistant and I just don't know if the complete
6  thing has been printed. I think as we look
7  through it we will be able to tell. I assume it
8  has. So then you can proceed to use that
9  document.
10    (Exhibit 377A marked for identification)
11    Q. It may be cumbersome but I am going to
12  back up and make the record clear. You now have
13  Exhibit 377A in front of you?
14    A. Yes.
15    Q. Do you know what this document is?
16    A. It looks like a spreadsheet breaking out
17  or analyzing the acquisition balance sheet. It
18  seems to reconcile to the final gain and so I
19  think it could be the final version, but in terms
20  of the detail I am not sure if this is the final
21  version.
22    Q. Was this at least a version, whether
23  final or no —
24    A. It is, yes.
25    Q. — of a document that was used to come

Page 179

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2  to the conclusion -- let me finish the question --
3  was a version of this document used to reach the
4  conclusion in Exhibit 22, which is the Barclays
5  plc results announcement for 2008, that the excess
6  of fair value of net assets acquired over
7  consideration paid resulted in 2.262 million
8  pounds of gains on acquisition?
9    A. Yes, a version of this document, yes,
10  would have been used for that, together with the
11  supporting documentation behind them.
12    Q. Having said that, can you tell from this
13  document whether or not margin held by Lehman at
14  the OCC was included in that 2.262 billion figure?
15    A. If you look at page 2 of the document,
16  on line 18, it does have a line saying: "OCC
17  customer and clearing margin". It does not here
18  itemize how much of that was received or not
19  received, but it does show that OCC customer and
20  clearing margin to that extent was included in
21  that opening balance sheet.
22    Q. And the amount was 530 million pounds,
23  is that correct?
24    A. I am just trying to read across the
25  page. That is what it says on this document, yes.

Page 180

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    Q. Can you tell from this document whether
3  margin held by Lehman to secure derivatives at
4  other exchanges is included in the 2.262 billion?
5    A. I am not quite sure if you can from this
6  document.
7    Q. Leaving aside the document, do you know
8  the answer?
9    A. No, I can't remember the details of what
10  we included and what we didn't include. As I said
11  before, we included the stuff where we had clear
12  details and evidence behind the balances in time
13  to produce our financial statement. There were
14  some other balances where we have equally strong
15  legal claim over them and we have been able to
16  quantify the balances subsequent to this which
17  were noted in our June results but which we did
18  not include in our acquisition gain. The exact
19  split between those items we did not include and
20  we did include I can't recall the details of.
21    Q. Do you know approximately what value you
22  did not include in the gain?
23    A. I think if you look at note 11 of the
24  results announcement for June, I think it is
25  exhibit -- sorry, that is the wrong one.

Page 181

1  HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    Q. Do you mean note 15? We previously
3  discussed note 15 of Exhibit 371A, page 57.
4    A. Yes, sorry it was note 15, you are
5  right. I think that shows approximately
6  2.2 billion of assets acquired as part of the
7  acquisition had not been received by 30 June 2009.
8  It goes on to say 1.8 billion of these were
9  recognized, so 400 million of the 2.2 billion had
10  not been recognized.
11    Q. Do you know why it was not recognized?
12    MR. HUME: Objection, asked and
13  answered.
14    A. Yes, you have asked and answered it. I
15  can repeat my answer if you want me to.
16    Q. That would be great.
17    A. What we reflected in our 30 June
18  financial statement was the balances where we had
19  received full evidence of the value and the
20  composition of those balances, as well as having
21  legal confirmation that they were our assets,
22  where at 30 June -- sorry, 31 December 2008 -- and
23  the time it took to produce the accounts, which
24  were produced in February, where we still did not
25  have sufficient evidence at that point in time to

Page 182

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    quantify the valuation. To account for something
3    included, it needs to be something which you can
4    estimate in a reliable way, so where we did not
5    have sufficient information to estimate it in
6    a reliable way, at that point we did not include
7    it in our acquisition balance sheet.
8        Subsequently to that, we have got more detail, so
9    we now can estimate in a reliable way, and we still -- and
10   we have the legal title to those goods, 400 million more
11   than we included in our December numbers.
12       Q.  Looking again at Exhibit 377A, I asked
13   you, and this is on the page that ends in Bates
14   844, before we had the document in front of us
15   I asked you whether the 15c3 assets were included
16   in the 2.262 billion pounds, and is that reflected
17   in line 15?
18       A.  If you look at page 2 of Exhibit 377A,
19   you are correct, on line 15 it shows 15c3 assets
20   and $770 million. It was one of the assets which
21   was included in the opening balance sheet.
22       Q.  Can you tell on this page whether or not
23   clearance box assets held at DTC are included?
24       A.  I am not sure if I can tell from this
25   schedule. As I said before, I do believe some of

Page 183

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    them are included but I don't think it is
3    something which is separately identified on this
4    schedule.
5        Q.  Could it be included in line 11,
6    additional unencumbered assets?
7        A.  It could be included in the schedule.
8    It could be in line 11, I am not sure.
9        MR. WOOD:  I don't have anything
10   further.
11       MR. TAMBE:  Nothing, thank you.
12       MR. WOOD:  Thank you for your time.

Page 184

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON

2    CERTIFICATE OF DEPONENT

4
5    I, Patrick Clackson, hereby certify that I have
     read the foregoing pages, numbered 1 through 186,
6    of my deposition of testimony taken in these
     proceedings on Friday, 4 September, 2009, and,
7    with the exception of the changes listed on the
     next page and/or corrections, if any, find them to
8    be a true and accurate transcription thereof.
9
10
11
12
13   Signed: .......................
14   Name:  Patrick Clackson
15   Date: .......................

Page 185

1    HIGHLY CONFIDENTIAL - PATRICK CLACKSON
2    CERTIFICATE OF COURT REPORTER
3
4    I, AILSA WILLIAMS, an Accredited LiveNote Reporter
     with European Deposition Services, London,
5    England, hereby certify that the testimony of the
     witness Patrick Clackson in the foregoing
6    transcript, numbered pages 1 through 186, taken on
     Friday, 4 September, 2009 was recorded by me in
7    machine shorthand and was thereafter transcribed
     by me; and that the foregoing transcript is a true
8    and accurate verbatim record of the said
     testimony.
9
10   I further certify that I am not a relative,
     employee, counsel or financially involved with any
11   of the parties to the within cause, nor am I an
     employee or relative of any counsel for the
12   parties, nor am I in any way interested in the
     outcome of the within cause.
13
14
15
16
17   Signed: .......................
18   AILSA WILLIAMS
19   Dated: 9/4/2009

Page 186

```
 1        HIGHLY CONFIDENTIAL - PATRICK CLACKSON
 2
 3               E R R A T A
 4            Deposition of Patrick Clackson
 5     Page/Line No.    Description      Reason for
 6     change
 7
 8
 9
10                       .
11
12
13
14
15
16
17
18
19
20
21
22
23     Signed:  ...................
24     Name:   Patrick Clackson
25     Date:   ...................
```

# BCI EXHIBIT

# 60

1        HIGHLY CONFIDENTIAL - J. COGHLAN

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                        Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                   Debtors.

10

     ----------------------x

11

12        * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF JOHN COGHLAN

14            New York, New York

15            August 13, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24122

Page 2

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2      HIGHLY CONFIDENTIAL - J. COGHLAN
3              August 13, 2009
4              9:30 a.m.
5
6          HIGHLY CONFIDENTIAL deposition
7      of JOHN COGHLAN, held at Jones Day
8      LLP, 222 East 41st Street, LLP, New
9      York, New York, before Kathy S.
10     Klepfer, a Registered Professional
11     Reporter, Registered Merit Reporter,
12     Certified Realtime Reporter, Certified
13     Livenote Reporter, and Notary Public
14     of the State of New York.

Page 3

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2
3          A P P E A R A N C E S :
4
5      JONES DAY, LLP
6      Attorneys for Lehman Brothers, Inc.
7          222 East 41st Street
8          New York, New York 10017-6702
9      BY: WILLIAM J. HINE, ESQ.
10         GEORGE E. SPENCER, ESQ.
11
12     BOIES, SCHILLER & FLEXNER, LLP
13     Attorneys for Barclays
14         575 Lexington Avenue - 7th Floor
15         New York, New York 10022
16     BY: JACK G. STERN, ESQ.
17
18     SCARING & BRISSENDEN, PLLC
19     Attorneys for the Witness
20         666 Old County Road
21         Ste. 501
22         Garden City, New York 11530-2004
23     BY: STEPHEN P. SCARING, ESQ.
24
25

Page 4

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2
3          A P P E A R A N C E S : (Cont'd.)
4
5      QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
6      Attorneys for the Creditors Committee
7          51 Madison Avenue
8          22nd Floor
9          New York, New York 10010
10     BY: ERIC M. KAY, ESQ.
11
12     JENNER & BLOCK, LLP
13     Attorneys for the Examiner
14         330 N. Wabash Avenue
15         Chicago, Illinois 60611-7603
16     BY: DAVID C. LAYDEN, ESQ.
17
18     HUGHES, HUBBARD & REED, LLP
19     Attorneys for the SIPA Trustee
20         One Battery Park Plaza
21         New York, New York 10004-1482
22     BY: NEIL J. OXFORD, ESQ.
23
24     Also Present:
25         RAJESH ANKALKOTI, Alvarez & Marsal

Page 5

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2      JOHN COGHLAN, called as a
3          witness, having been duly sworn by a Notary
4          Public, was examined and testified as
5          follows:
6      EXAMINATION BY
7      MR. HINE:
8      Q.   Good morning, Mr. Coghlan.
9      A.   Good morning.
10     Q.   We met briefly off the record just
11     before this, but my name is Bill Hine. I'm from
12     the firm of Jones Day and we are special counsel
13     to the Lehman Brothers Holdings, Inc. in
14     connection with the pending bankruptcy
15     proceedings. This deposition is to take some
16     discovery in connection with that effort.
17         Have you ever been deposed before?
18     A.   I have.
19     Q.   You have not?
20     A.   I have.
21     Q.   You have, okay. So you know the
22     drill, generally. I'm going to ask you some
23     questions.
24     A.   Uh-huh.
25     Q.   You're going to give me answers. On

Page 6

1        HIGHLY CONFIDENTIAL - J. COGHLAN
2    occasion, your counsel might state objections
3    for the record or to instruct me that he thinks
4    my questions are unclear or something wrong with
5    my question. That doesn't relieve you of the
6    obligation to answer the question.
7        A.    Uh-huh.
8        Q.    It just gives me a chance to correct
9    it.
10        In that vein, throughout the course of
11    the day, undoubtedly I will misuse a word or
12    some technical term or some acronym that you
13    folks use every day in your business, so I would
14    ask you to just correct me or ask me to
15    clarify --
16        A.    Uh-huh.
17        Q.    -- any questions you think I might not
18    be getting the concept or might be asking an
19    unclear question. I think it's in everyone's
20    interests to have clear questions so you can
21    answer them.
22        MR. STERN: Let me just point out the
23    reporter is noting your "uh-hum" comments.
24    So going forward, "yes" or "no."
25        Q.    Okay. The reporter takes down -- can

Page 7

1        HIGHLY CONFIDENTIAL - J. COGHLAN
2    only take down verbal answers, so when you nod
3    your head, she can't note that.
4        Can we start off briefly with your
5    previous employment at Lehman Brothers? Were
6    you an employee of LBI?
7        A.    I was.
8        Q.    Okay. And could you tell me what your
9    last position you held at LBI was.
10        A.    I worked in the prime broker. I was a
11    managing director and I was responsible for the
12    secured financing of the firm.
13        Q.    When you say "prime broker," is
14    that -- I see references in some of the
15    documents to Prime Services?
16        A.    Prime Services, yes.
17        Q.    Can you just explain to me what that
18    is?
19        A.    Prime Services has several businesses
20    within it. From a -- the primary businesses or
21    the major businesses are financing businesses,
22    both in fixed income and equities. There is a
23    futures business resides in prime broker, where
24    there are fees for execution and settlement.
25    There is other execution and settlement activity

Page 8

1        HIGHLY CONFIDENTIAL - J. COGHLAN
2    that goes on in prime brokerage relative to
3    equity executions as well. So the piece I was
4    responsible for was the financing piece within
5    the prime brokerage.
6        Q.    Could you explain to me what that
7    means?
8        A.    Yes. The firm basically has two types
9    of assets that it needs to finance on a daily
10    basis. It has assets that it owns as principal
11    that we have bought and put into our position.
12        Q.    Okay.
13        A.    Those trading decisions and those
14    positions are managed outside of the prime
15    brokerage business. And within the prime
16    brokerage business there is a financing business
17    which basically does lending and borrowing of
18    money, collateralized normally by securities,
19    with the objective of making a spread in between
20    the borrowing and the lending on the money. So
21    that's the activity that I manage.
22        Q.    Okay. And you have a team of folks
23    that work for you in that activity, I take it?
24        A.    Yes, I do.
25        Q.    And does that activity entail use of

Page 9

1        HIGHLY CONFIDENTIAL - J. COGHLAN
2    repo transactions or repurchase transactions?
3        A.    It does.
4        Q.    So if we use the term "repo," you will
5    understand what that means throughout this
6    deposition?
7        A.    Yes.
8        Q.    And can you explain to me generally
9    what a repo transaction is?
10        A.    Repo transaction is when I either --
11    well, when I lend money to a third party, I
12    normally do that by lending the money and they
13    will give me some sort of collateral to secure
14    that loan.
15        Q.    Right.
16        A.    Normally, the collateral that they
17    would post are relatively liquid marketable
18    securities. Normally, I'm taking more
19    collateral than I'm lending money so I have some
20    sort of over collateralization protection, and
21    so that would be one leg of the transaction.
22        Once I lend that money, I have to take
23    those securities and repledge them to someone
24    else who will give me money. And so that is the
25    basic dynamic of a repo transaction.

Page 10

HIGHLY CONFIDENTIAL - J. COGHLAN
1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    Q.   And Lehman makes money by the
3    difference in --
4    A.   Where I borrow the money and when I
5    loan the money.
6    MR. STERN:  Wait.  He has to finish
7    the question.  Let's let him finish the
8    question.
9    Q.   I just want to understand.  The goal
10   of your department is to make money on these
11   seemingly opposite transactions, right?
12   A.   That's one of the objectives of the
13   department, yes.
14   Q.   So you say you were managing director
15   of this department?
16   A.   Yes.
17   Q.   Okay.  And how long have you held that
18   position?
19   A.   In that department, I believe it was
20   four years.
21   Q.   So roughly since 2004?
22   A.   I believe that's the date, yes.
23   Q.   And what was your position before
24   that?
25   A.   My position immediately before that is

Page 11

HIGHLY CONFIDENTIAL - J. COGHLAN
1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    I had a similar position running just the fixed
3    income piece of repo.
4    Q.   And how long --
5    A.   Whereas this position included both
6    fixed income, financing and equity financing.
7    Q.   I gotcha.  And how long were you in
8    charge of the fixed income piece of repo?
9    A.   Probably since 1998, I believe.
10   Q.   Prior to that?
11   A.   What was I doing before that?
12   Q.   Yes.
13   A.   Before that, I was running the
14   Investment Grade and High Grade Division for
15   Lehman.
16   Q.   Did that involve repo transactions as
17   well?
18   A.   It did not.
19   Q.   How long have you worked for Lehman?
20   A.   I was there 27 years.
21   Q.   Okay, you started -- do you recall
22   what year you started?
23   A.   1981.
24   Q.   Okay.  The two positions that you just
25   discussed with me, are those the only positions

Page 12

HIGHLY CONFIDENTIAL - J. COGHLAN
1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    you held that involved repo transactions?
3    A.   Yes.
4    Q.   Is it fair to say --
5    A.   Well, let me clarify.  I did have
6    supervisory responsibility for a year of repo,
7    but I can't recall the date.
8    Q.   Okay.
9    A.   It was in the mid '90s.  So I
10   supervised it for a period of time, moved on to
11   a different position, and then came back in
12   1998.
13   Q.   Fair to say you're very familiar with
14   repo transactions?
15   A.   Yes.
16   Q.   Among the senior management team at
17   Lehman, are you the guy they would usually go to
18   with a question about repo transactions if
19   something came up?
20   A.   I wouldn't be the only person because
21   there are other people that are familiar with
22   the repo business and there are other senior
23   people within it, but, you know, they would
24   obviously ask me questions at times.  But not
25   exclusively.

Page 13

HIGHLY CONFIDENTIAL - J. COGHLAN
1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    Q.   Okay.  Now I just want to talk about
3    the last position you held, which is the
4    managing director position that you described.
5    Who did you report to in that position?
6    A.   I reported to John Wickham.
7    Q.   Anyone else?
8    A.   No.
9    Q.   And who reported directly to you?
10   A.   Who reported directly?  In that
11   position, David Lohuis, John Nicholson, John
12   Feraca, Janet Hurley, Ian Maynard.
13   Q.   Are these folks traders?
14   A.   Yes.
15   Q.   So your department handles the trades
16   that are involved in effecting a repo
17   transaction, is that fair to say?
18   A.   Yes.
19   Q.   Can you explain to me the
20   difference --
21   A.   Well, repo and stock loan.  So the
22   normal phrase for fixed income financing
23   transactions is repo.  The normal phrase for
24   equity financing transactions is stock loan.
25   Q.   Okay.

## Page 14

HIGHLY CONFIDENTIAL - J. COGHLAN

1      A. They both are financing transactions
2 where we are lending money versus collateral and
3 then relending the collateral to get the money.
4      Q. Okay. Again, I'm not trying to
5 mischaracterize. Is it fair to say it's
6 generally the same mechanics of the transaction,
7 you just call it two different things for those
8 two different types of securities?
9      A. Yes.
10      Q. Can you explain to me the difference
11 between what your department does and what Mr.
12 Blackwell's department does as they relate to
13 repo transactions?
14      A. Well, I can describe what I do. What
15 I do is, as I said, I manage all the collateral
16 that needs to be financed both for the firm and
17 for the financing business --
18      Q. Okay.
19      A. -- in a way I just described, by
20 buying and borrowing and lending money. And,
21 you know, the kind of the settlement of those
22 transactions are handled by, you know, the
23 treasury. And Alastair Blackwell has a group of
24 operations people that work with Treasury to

## Page 15

HIGHLY CONFIDENTIAL - J. COGHLAN

1 settle trades.
2      Q. When you say "settle trades," what
3 does that mean?
4      A. To make sure that the securities go to
5 where they're supposed to go and the cash goes
6 to where it's supposed to go to, make sure all
7 the securities and cash move to their proper
8 locations.
9      Q. I've heard the phrase "back office."
10 Is that what you would consider what you just
11 described?
12      A. That's the phrase, yes, that would
13 describe it, yes.
14      Q. Does your organization that you
15 head -- and again, I'm talking about your time
16 at Lehman.
17      A. Uh-huh.
18      Q. Well, let's just take a step back.
19      There came a time when you left
20 Lehman; is that right?
21      A. Yes.
22      Q. And when was that?
23      A. September of 2008.
24      Q. Okay. Was it on the date of the

## Page 16

HIGHLY CONFIDENTIAL - J. COGHLAN

1 closing of the sales transaction whereby LBI's
2 assets were sold to Barclays?
3      MR. STERN: Objection to the form.
4      A. Yeah, I --
5      Q. Do you know an exact date when you
6 considered yourself to have become a Barclays
7 employee?
8      A. I do not have an exact date. I became
9 a Barclays employee, you know, as a result of
10 the Lehman result with Barclays.
11      Q. Okay. And what position do you hold
12 at Barclays now?
13      A. I am in Prime Services business at
14 Barclays. I'm a managing director and I run the
15 secured financing in the Prime Brokerage.
16      Q. Does that entail the same type of
17 duties and responsibilities as you previously
18 held at Lehman?
19      A. It's similar, but not identical.
20      Q. What's the difference?
21      A. There were certain parts of my
22 responsibility at Lehman that are not part of my
23 responsibilities at Barclays.
24      Q. Okay. And do you report to someone at

## Page 17

HIGHLY CONFIDENTIAL - J. COGHLAN

1 Barclays?
2      A. I do.
3      Q. Who is that?
4      A. Ajay Nagpal.
5      Q. Nagpal?
6      A. N-A-G-P-A-L.
7      Q. Anybody else that you directly report
8 to?
9      A. No.
10      Q. And who reports to you directly at
11 Barclays?
12      A. Dave Lohuis, John Feraca, Janet
13 Hurley, John Nicholson, Rich Coffin.
14      Q. What was the last name?
15      A. Rich Coffin, C-O-F-F-I-N.
16      Q. Is it fair to say as a general matter
17 your team moved from Lehman to Barclays with you
18 still in charge of them?
19      A. In New York, the team moved, yes.
20      Q. Okay. I take it Barclays had an
21 existing team elsewhere that did a similar
22 function?
23      A. Yes.
24      Q. Okay.

Page 18

```
 1        HIGHLY CONFIDENTIAL - J. COGHLAN
 2     A.   Yes. They didn't take LBIE and they
 3   didn't take LBJ, so the people that are
 4   operating those seats at Barclays are the people
 5   that are operating those seats today.
 6     Q.   Okay. Fair enough. Now I want to
 7   talk about your last position you held at Lehman
 8   again.
 9         Does your, the group that you managed,
10   which I take it are a group of traders
11   primarily, are they responsible for putting
12   values on securities that you work with?
13     A.   In a lending relationship, we would
14   value securities and mark the securities to
15   market in order to determine what margin
16   requirements are necessary.
17     Q.   So in a typical repo transaction your
18   team would be responsible for assigning a value
19   to the securities that were being assigned as
20   collateral; is that right?
21     A.   Yes.
22     Q.   Okay. I understand that in most repo
23   transactions there's someone called -- someone
24   who serves as a custodian?
25     A.   Uh-huh.
```

Page 19

```
 1        HIGHLY CONFIDENTIAL - J. COGHLAN
 2     Q.   And does the custodian typically place
 3   a value on the securities as well?
 4     A.   Yes.
 5     Q.   Why --
 6     A.   In the tri-party relationship. When
 7   they're acting on behalf of -- in a custodian
 8   capacity, when there's another counterparty
 9   involved, they would be valuing those securities
10   on behalf of both parties.
11     Q.   Okay. Why is it necessary for you and
12   the custodian to place values on the securities?
13        MR. STERN: Objection to the form.
14        I just want to make a statement so
15   that I don't have to object repeatedly.
16        MR. HINE: Sure.
17        MR. STERN: And that is that Mr.
18   Coghlan, to the best of my knowledge, is not
19   an attorney and his testimony is concerning
20   his business understanding of these
21   transactions, not the legalities of them.
22        Is that a fair --
23        MR. HINE: Fair enough. I'm not --
24     Q.   Mr. Coghlan, I'm not trying to inquire
25   into your -- any conversations you've had with
```

Page 20

```
 1        HIGHLY CONFIDENTIAL - J. COGHLAN
 2   counsel, which would be privileged, or your
 3   legal understanding. I'm trying to understand
 4   your business.
 5     A.   Okay.
 6     Q.   We'll come back to this valuation
 7   question. I just wanted to --
 8        MR. STERN: There was a pending
 9   question:
10        Why is it necessary for you as a
11   custodian to place values on the securities?
12   I objected to the form, but you can answer.
13     A.   You know, what the role of a tri-party
14   agent is is not directly my responsibility, that
15   is managed through Treasury, and so the
16   framework of tri-party operations, you know,
17   does not report to me.
18     Q.   Okay.
19     A.   So I don't know if I have enough
20   knowledge to describe that.
21     Q.   Okay. Could you explain to me the
22   difference between a tri-party repo and the ones
23   you were previously discussing?
24     A.   In the ones I was previously
25   discussing, they could have settled through
```

Page 21

```
 1        HIGHLY CONFIDENTIAL - J. COGHLAN
 2   tri-party. In the repo market, there's
 3   basically two types of transactions that you can
 4   do.
 5        You can do a bilateral transaction
 6   where Party A and Lehman faced off together and
 7   we settle that directly. So I would send or the
 8   firm would send collateral to whoever we were
 9   instructed, the other party would send cash to
10   where we were instructed, and that would be one
11   way of settling the trade.
12     Q.   Okay.
13     A.   In a tri-party situation, there is a
14   custodian appointed, for Lehman Brothers, it was
15   Chase, and they would be responsible for
16   settling that trade for the benefit of Lehman
17   Brothers and the counterparty. So some trades
18   settle bilaterally and some trades settle
19   through the tri-party.
20     Q.   Okay. I'm going to come back to your
21   repo experience in a minute, but I apologize for
22   being intrusive, but I do need to ask you some
23   questions about your compensation at both Lehman
24   and Barclays.
25        MR. STERN: This is designated as
```

Page 22

1        HIGHLY CONFIDENTIAL - J. COGHLAN
2 highly confidential.
3      THE WITNESS: Okay.
4      MR. HINE: Yes.
5      Q. Could you tell me or is it fair to say
6 that your compensation package at Lehman
7 consisted of a couple different elements,
8 namely, a base salary and some form of bonus; is
9 that right?
10      A. That's true.
11      Q. And did the bonus take both a cash and
12 an equity form?
13      A. Yes.
14      Q. Okay. Could you tell me, if you
15 remember, your compensation for the year 2000?
16 And we can break it out into those three
17 components, if you recall.
18      A. I don't recall what I got paid in
19 2000.
20      Q. Okay. Is it fair to say the base
21 salary portion is much smaller than the amounts
22 that ended up being paid in bonuses generally?
23      A. Yes.
24      (Exhibit 115, a document bearing Bates
25 Nos. BCI-EX-00077294 through 77295, marked

Page 23

1        HIGHLY CONFIDENTIAL - J. COGHLAN
2 for identification, as of this date.)
3      Q. Mr. Coghlan, I'm handing you a
4 document which I have marked as Exhibit 115,
5 which appears to be an agreement between
6 Barclays and yourself. It's Bates-stamped
7 BCI-EX-00077294 through 296.
8      My first question is do you recognize
9 this document?
10      A. Yes, I do.
11      Q. What is this?
12      A. I believe this is a document that I
13 needed to sign as a condition of employment at
14 Barclays.
15      Q. Is this your employment contract with
16 Barclays?
17      A. I don't know -- I don't know the
18 definition of an employment contract, so ...
19      Q. Well, do you consider this document to
20 lay out the amounts that you were expected to be
21 paid when you went to work at Barclays?
22      A. Yes.
23      Q. So let me just go through a couple of
24 components here. As I read this first, you see
25 an entry called -- or, third entry down is

Page 24

1        HIGHLY CONFIDENTIAL - J. COGHLAN
2 entitled "Compensation" which discusses a base
3 salary. Do you see that?
4      A. Yes.
5      Q. And that says ████ per year?
6      A. Uh-huh.
7      Q. That's the base salary that Barclays
8 promised to pay you once you went to work for
9 them?
10      A. Yes.
11      Q. Okay. And is that the same as the
12 base salary you previously had at Lehman?
13      A. Yes.
14      Q. And that would be through the year
15 2008?
16      A. Yes.
17      Q. Now, I see a 2008 guaranteed cash
18 bonus of approximately ████, do you see
19 that?
20      A. Yes, I do.
21      Q. And what is that?
22      A. That was the bonus I was to receive if
23 I continued employment up to February 2009.
24      Q. And did you in fact receive that
25 bonus?

Page 25

1        HIGHLY CONFIDENTIAL - J. COGHLAN
2      A. Yes, I did.
3      Q. Am I correct to say that that's a
4 bonus that was paid by Barclays in connection
5 with your work throughout the year 2008?
6      A. Yes.
7      Q. Okay. So my -- and I'm not trying to
8 be misleading, I just want to understand. So is
9 that the cash bonus compensation for your work
10 at both Lehman for a portion of 2008 and
11 Barclays for a portion of 2008?
12      A. What the rationale is around deriving
13 that number, Lehman, that I don't know.
14      Q. Okay. Let's skip down to the next
15 one, which says EPP -- 2008 EPP Recommendation,
16 and it discusses a share award, 2008 share award
17 in the amount of approximately ████, do you
18 see that?
19      A. Yes, sir.
20      Q. And that says to be awarded no later
21 than March 15, 2009. Do you see that?
22      A. Yes.
23      Q. Were you in fact paid that award?
24      A. Yes.
25      Q. Okay. And now do you know what that

Page 26

HIGHLY CONFIDENTIAL - J. COGHLAN

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    was for?
3    A.    I don't understand the question.
4    Q.    Well, is that to compensate you for
5    your work in 2008 for both Lehman and Barclays?
6    A.    Again, I don't know what the rationale
7    was, you know, what metric was used to
8    determine, you know, so what the -- what piece
9    contributed from Lehman versus Barclays Capital
10   I don't know.
11   Q.    Okay.  Is that greater or lesser than
12   the amount of stock bonus award that you would
13   have received at Lehman or that you expected to
14   have received at Lehman for 2008?
15   A.    I don't -- I don't know what I would
16   have received at Lehman in 2008, so I can't
17   benchmark it versus --
18   Q.    Okay.
19   A.    Because there was no indication of
20   what bonuses were going to be or not be.
21   Q.    Was it the practice that at Lehman you
22   did not learn of what your cash or stock bonus
23   awards were going to be until the end of the
24   year?
25   A.    Correct.

Page 27

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    Q.    Do you consider these amounts to be
3    greater or lesser in general from what you were
4    being paid at Lehman?
5    A.    That I don't -- I don't recall what my
6    previous comp was exactly.
7    Q.    Okay.  Let's skip down to the
8    special -- you see it says Special Cash Award
9    and it mentions an amount of about ▮▮▮▮▮▮▮?
10   A.    Uh-huh.
11   Q.    Do you know what that was for?
12   A.    Again, I don't know what Barclays
13   versus the Lehman and what contribution
14   contributed to these outcomes.  I mean, you
15   know --
16   Q.    Okay.
17   A.    -- I wasn't --
18   Q.    This one you have not yet received; is
19   that right?
20   A.    Yes, I have not received it.
21   Q.    And this is to be paid in installments
22   on the first and second anniversaries of your
23   start date at Barclays, right?
24   A.    Yes.
25   Q.    So do you believe that this award is

Page 28

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    to compensate you for your work from the time --
3         MR. SCARING:  Objection.
4    Q.    -- you started at Barclays forward?
5         MR. SCARING:  I object to the
6    question.
7    Q.    You can answer.
8    A.    Okay.  I don't know how these bonuses
9    were derived --
10   Q.    Okay.
11   A.    -- and what the consideration was for
12   Lehman versus Barclays.  I don't know.
13   Q.    Well, when did you first see this
14   document from Barclays?
15   A.    Somewhere around this date.  I can't
16   remember exactly what date.
17   Q.    When you say "this date," you're
18   pointing to September 24, 2008?
19   A.    24, 2008.
20   Q.    Did you have any discussions with
21   folks at Barclays during the week of September
22   15 about your going to work for Barclays after
23   the sale transaction?
24   A.    I can't recall.
25   Q.    Now, throughout this deposition we're

Page 29

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    going to talk about the week of September 15,
3    and just to reorient you, and I'm sure you're
4    familiar with this, I'm talking about the week
5    from September 15 when LBHI declared bankruptcy
6    until the end of that week.  I believe on that
7    Friday LBI declared bankruptcy.
8    A.    Uh-huh.
9    Q.    And then when I talk about the closing
10   of the sale transaction, I believe that took
11   place on the following Monday.
12   A.    Uh-huh.
13   Q.    Okay?  So what I'm interested in is in
14   the week from September 15 to the closing of the
15   sale transaction.  Did you have any
16   conversations with anyone about the possibility
17   of you going to work for Barclays?
18   A.    There were conversations about going
19   to work at Barclays, and I had those
20   conversations with John Wickham, but I can't put
21   a date on when those conversations were held.
22   Q.    Do you think they were during that
23   week that we just talked about?
24   A.    I don't know.  I don't recall.
25   Q.    Okay.  What do you recall about those

Page 30

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  conversations?
3      A.   At some point in time, you know, John
4  indicated to me that, you know, I was going to
5  go to Barclays as a Barclays employee, that
6  there would be some sort of compensation
7  associated with that.
8      Q.   Okay.
9      A.   And then, additionally, we had some
10 conversations about the employees that work for
11 me and would they be treated similarly.
12     Q.   Did you have any expectations during
13 that week about what your compensation would be
14 when you went to work for Barclays?
15         MR. STERN:  Objection to the form.  He
16     said he didn't know when those conversations
17     took place and now your question
18     incorporates that week.
19     Q.   Okay.  You can answer the question.
20     A.   Could you restate the question,
21 please?
22     Q.   Did you have any expectations during
23 the week of September 15 about what you might be
24 paid should you move to Barclays?
25     A.   I -- I can't put the timing of it.

Page 31

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2      Q.   Okay.
3      A.   I would say that any conversations
4  relative to compensation were held either late
5  on the week, something like that.  So in the
6  beginning there were no expectation
7  conversations or --
8      Q.   Okay.
9      A.   There was, you know, there was no
10 communication whatsoever.
11     Q.   Okay.  When is the first time -- well,
12 at some point you spoke with someone from
13 Barclays about you going to work for Barclays,
14 correct?
15     A.   Yes.  Yep.
16     Q.   And who was that?
17     A.   Ivan Ritossa, who was on the -- who
18 was an employee at BarCap who was supervising
19 the prime brokerage business at BarCap.
20     Q.   Okay.
21     A.   And I had a conversation with him.
22     Q.   Do you recall when that was?
23     A.   I don't have the exact date.  I don't
24 have the exact date.
25     Q.   Do you recall if it was after the

Page 32

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  closing of the sale transaction?
3      A.   Yes.  I can't -- I don't -- I don't
4  remember the closing date, so whether it was
5  before the closing or after closing, I can't
6  say.
7      Q.   Do you recall if it was after Monday,
8  September 22?
9      A.   I can't recall the date that I had
10 this conversation.
11     Q.   Okay.  And what was -- what do you
12 recall about the conversation?
13     A.   We had a breakfast.  Some of the
14 people that work for me attended.  Ivan was
15 there, and he basically discussed that he was
16 looking forward for us to come and join Barclays
17 and, you know, we discussed some of the things
18 that we needed to do in order to make that
19 transition work effectively.
20     Q.   Did he discuss compensation?
21     A.   Not at breakfast, no.
22     Q.   When did you first discuss
23 compensation with Barclays?
24     A.   Again, I can't put a date on when that
25 first happened.

Page 33

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2      Q.   I guess I'm trying to find out, Mr.
3  Coghlan, was there a negotiation with respect to
4  your compensation between you and Barclays --
5      A.   No.
6      Q.   -- at some point?
7      A.   No.  No, there was no negotiation.  I
8  was told at some point this is the terms,
9  similar to what's outlined in this letter, and,
10 you know, I needed to sign the document and get
11 it back, you know, with a certain date, which,
12 again, I can't remember, you know, in order to
13 finalize the paperwork.
14     Q.   And who told you that?
15     A.   John Wickham.
16     Q.   And were you surprised at all by the
17 terms that were in this letter?
18         MR. STERN:  Objection to the form.
19     Q.   Let me rephrase that.  I take it what
20 you just mentioned is the letter that we marked
21 as Exhibit 115?
22     A.   I was not surprised or unsurprised
23 by --
24     Q.   Did you consider it a pay cut?
25     A.   No, I did not.

Page 34

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2    Q.   Did you consider it an increase in
3  your pay?
4    A.   No, I did not.
5    Q.   Okay. You're aware that there was an
6  Asset Purchase Agreement signed between Barclays
7  and Lehman, correct?
8        MR. STERN: Objection to the form.
9    A.   I don't know the definition of asset
10 agreement.
11   Q.   Okay. Well, we're going to look at it
12 in a minute, but I guess my general question is
13 if you could describe for me your role in the
14 early negotiations, if any, between Barclays and
15 Lehman. And I'm talking, when I say "early" --
16 let's break it into two different periods.
17       As I understand it, there was some
18 negotiation between Barclays and Lehman prior to
19 LBHI filing bankruptcy. Are you aware of that?
20   A.   Yes.
21   Q.   Were you involved in those
22 negotiations at all?
23   A.   I was not.
24   Q.   Do you have any understanding of what
25 took place in those negotiations?

Page 35

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2        MR. STERN: Objection to the form.
3    A.   I do not recall.
4    Q.   Okay. Do you have any understanding
5  or recollection about any terms that might have
6  been discussed at that time? And again, I'm
7  talking about prior to LBHI's filing bankruptcy.
8        MR. STERN: Objection to the form.
9    A.   Can you repeat the question?
10   Q.   Again, I'm looking at the period prior
11 to --
12   A.   Uh-huh.
13   Q.   -- September 15, prior to LBHI filing
14 bankruptcy, I understood that Barclays and
15 Lehman had some meetings about a possible
16 transaction. So my question is, do you have any
17 understanding or recollection about any terms
18 that might have been discussed during that
19 period?
20   A.   No, I do not.
21   Q.   And is it fair to say you did not
22 participate in those discussions?
23   A.   That is correct.
24   Q.   Now let's talk about the period
25 immediately after the filing of LBHI's

Page 36

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  bankruptcy going forward.
3    A.   Uh-huh.
4    Q.   You're aware, aren't you, that at some
5  point in time Barclays and Lehman came to some
6  agreement with respect to a transaction between
7  the two entities, correct?
8    A.   Correct.
9    Q.   Okay. And were you involved in the
10 initial negotiations of that agreement?
11   A.   I was not.
12   Q.   Were you called in to assist in any
13 meetings relating to that negotiation?
14   A.   I was asked to provide certain
15 information -- certain information.
16   Q.   What types of information?
17   A.   Michael Gelband, who ran Capital
18 Markets, was asking me what -- what was the
19 balance sheet of the financing business going to
20 look like at, you know, at the end of the week.
21   Q.   At the end of the week of September
22 15?
23   A.   Yes.
24   Q.   And what did you tell him?
25   A.   $40 billion.

Page 37

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2    Q.   And I just want to understand what you
3  just told me now. The balance sheet of the
4  financing business includes what?
5    A.   Both the fixed income matched book and
6  the stock loan business. When you borrow in
7  securities and move cash, it creates assets on
8  the balance sheet.
9    Q.   Okay.
10   A.   So Michael wanted to know what the
11 size of that balance sheet was going to be at
12 the end of business that week.
13   Q.   Okay. And you took that to mean the
14 Friday after September 15?
15   A.   Yes.
16   Q.   And how did you come up with the $40
17 billion number?
18   A.   I circled the traders. We were, you
19 know, during the week, the firm and the matched
20 book was downsizing very rapidly and, you know,
21 we were, you know, customers wanted their
22 collateral back.
23       MR. STERN: Excuse me. I just I think
24 the reporter -- I want to make sure the
25 reporter has what you said right. Did you

Page 38

1           HIGHLY CONFIDENTIAL - J. COGHLAN
2     say the firm and the matched book or the
3     firm in the matched book.
4         A.   No, the firm and the matched book were
5     both -- both returning collateral and returning
6     cash in the matched book as, you know, in rather
7     rapid fashion, and the firm was trying to
8     dispose of assets in a rapid fashion.
9         Q.   When you say "the firm," are you
10    referring to LBI or are you referring to a
11    larger Lehman entity?
12        A.   No, there's two businesses that I
13    touch. One is the financing business and the
14    other is I financed firm positions. So when the
15    firm buys a security, I have to repledge that to
16    raise cash to pay for that security.
17        Q.   Okay.
18        A.   So that activity, which does not
19    report to me, was also downsizing as well.
20        Q.   So the $40 billion figure that you
21    gave to Mr. Gelband reflected both of those
22    businesses?
23             MR. STERN: Objection to the form.
24        A.   No. The $40 billion was relative to
25    the financing business, where I was responsible

Page 39

1           HIGHLY CONFIDENTIAL - J. COGHLAN
2     for and managed the balance sheet for the
3     financing business.
4         Q.   Okay. And was the $40 billion figure
5     that you gave him a projection of a figure that
6     was declining during that week?
7         A.   Yes.
8         Q.   And so you were estimating that by
9     Friday it would be at $40 billion?
10        A.   Yes.
11        Q.   What did you base that estimate on?
12        A.   In looking at, you know, those
13    securities and those transactions where we
14    thought we could return the cash end of the
15    collateral where there was liquidity in the
16    secondary markets that we could unwind trades,
17    and so I worked with the people that work for me
18    and tried to, you know, project where we thought
19    we would be at the end of the week.
20        Q.   So was the decline in this value the
21    result of market declines in the values of the
22    securities, or were you -- and again, I'm going
23    to probably misstate something, but -- or were
24    you unwinding positions and just getting rid of
25    securities?

Page 40

1           HIGHLY CONFIDENTIAL - J. COGHLAN
2         A.   We basically were returning collateral
3     back to clients and cash to clients. So the
4     amount of transactions that sat in the business
5     was declining as a result of primarily credit
6     considerations by clients wanting to exit their
7     relationship with LBI as quickly as possible.
8         Q.   And do you know what the amount of
9     that --
10             MR. STERN: Excuse me. The business,
11    what are you referring to, the business?
12    Financing business?
13             THE WITNESS: Yes, the financing
14    business.
15             MR. HINE: Jack, you'll get a chance
16    to do follow-up questions.
17             MR. STERN: I just want the record to
18    be clear. Let's go off the record for a
19    second.
20             (Discussion off the record.)
21    BY MR. HINE:
22        Q.   We previously were discussing the
23    estimate they gave Mr. Gelband a $40
24    billion figure by Friday. What was the level of
25    this business on Monday?

Page 41

1           HIGHLY CONFIDENTIAL - J. COGHLAN
2         A.   I don't recall.
3         Q.   Could you give me an estimate or do
4     you have any general understanding?
5         A.   I don't recall where we were on
6     Monday.
7         Q.   Okay. And what did Mr. Gelband do
8     with this figure?
9         A.   I don't know.
10        Q.   Did you have any further conversations
11    with him about this estimate?
12        A.   No.
13        Q.   Did you have any discussions with
14    anyone else involved in the negotiations of the
15    transaction between Barclays and Lehman? And
16    let's just talk about it say on Monday, the
17    15th.
18        A.   To the best of my knowledge, I did not
19    discuss -- have any conversations with people
20    negotiating. That being said, I don't know who
21    exactly were the negotiators and who was playing
22    what role.
23        Q.   Okay.
24        A.   So, inadvertently, but not -- not in a
25    capacity of discussing an identified person

Page 42

1  HIGHLY CONFIDENTIAL - J. COGHLAN
2  negotiating the transaction, you know, giving
3  them information one way or the other.
4      Q.   Okay.  So I understand what you said,
5  but, I mean, other than this one incident with
6  Mr. Gelband, is it correct to say that's the
7  only incident where you recall being called in
8  to provide some information that is going to be
9  used in some negotiation?
10      MR. STERN: Objection to the form.
11      A.   Could you repeat the question?
12      Q.   Let's try that again.  Were you aware
13  on Monday, the 15th, that there was some
14  discussions going on between Barclays and
15  Lehman?
16      A.   I don't recall what I knew about the
17  Barclays situation on Monday.
18      Q.   Okay.  But at some point on Monday you
19  were called by Mr. Gelband and asked this
20  question that we previously discussed?
21      A.   I don't know if it was Monday.  I
22  don't recall if it was that Monday.  It was
23  during the week at some point he asked me that
24  question.
25      Q.   Do you have any understanding -- let's

Page 43

1  HIGHLY CONFIDENTIAL - J. COGHLAN
2  just step back a minute.  Do you have any
3  understanding of what the actual transaction was
4  that was signed on Monday, the 15th, between
5  Lehman and Barclays?
6      A.   No.
7      Q.   Did you ever review the Asset Purchase
8  Agreement that was entered into between Lehman
9  and Barclays on Monday?
10      A.   No, I did not.
11      Q.   Have you ever seen the Asset Purchase
12  Agreement?
13      A.   No, I have not.
14      Q.   Do you have an understanding of what
15  its terms were?
16      A.   No, I do not.
17      Q.   Well, let me just take a minute and
18  let's mark -- let's just use Exhibit 1.
19      MR. STERN:  You want Mr. Coghlan to
20  sit here and read this now?
21      MR. HINE:  No, I do not.  I'm going to
22  refer to specific pages.
23      Q.   Mr. Coghlan, I'm handing you a copy of
24  what has been previously marked as Exhibit 1.
25  That's a document entitled Asset Purchase

Page 44

1  HIGHLY CONFIDENTIAL - J. COGHLAN
2  Agreement among several of these entities and
3  Barclays Capital.  And my question is have you
4  ever seen this document before?
5      A.   To the best of my knowledge, I have
6  not.
7      Q.   And is it fair to say you did not see
8  it during that week of September 15th, I take
9  it, right?
10      A.   Again, to the best of my knowledge, I
11  have not seen this document.
12      Q.   Okay.  And is it fair to say that,
13  while you might have some ancillary role in
14  providing information to people who were
15  involved in this negotiation, you were really
16  not involved in the negotiation of this
17  agreement or any such agreement between Barclays
18  and Lehman, is that right?
19      A.   I don't recall being part of any
20  negotiation relative to this agreement.
21      Q.   Were you involved in any later
22  negotiations between Barclays and Lehman?
23      And let me be more specific with my
24  question.  Were you involved in negotiations
25  surrounding what has been called a clarification

Page 45

1  HIGHLY CONFIDENTIAL - J. COGHLAN
2  letter later in that week?
3      A.   Rephrase the question.
4      Q.   We see a document which has been
5  called a clarification letter which was entered
6  into over the following weekend at some point.
7      Were you involved in any negotiations
8  relating to the terms of that letter?
9      A.   To the best of my knowledge, no.
10      Q.   Okay.  Were you involved in any
11  negotiations relating to a First Amendment to
12  this Asset Purchase Agreement later during that
13  week?
14      A.   Again, to the best of my knowledge,
15  no.
16      Q.   Okay.  Is it fair to say that during
17  the week of September 15 you were not directly
18  interacting with anyone at Barclays?
19      A.   Say the question again.
20      Q.   I'm just trying to identify any
21  contacts or interactions you might have had
22  during the week of September 15 with folks at
23  Barclays.
24      Do you recall if you had any?
25      A.   Yeah, I had some contact with a

Page 46

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  gentleman named Marty Malloy.
3      Q.   Okay.
4      A.   And Marty Malloy was a BarCap
5  employee. He was the head of the Prime
6  Brokerage over there.
7      Q.   Okay.
8      A.   And he was on the premises and we had
9  a few conversations relative to the business,
10  you know, what the business looked like. We had
11  some conversations about, you know, the
12  business.
13      Q.   Do you recall when this -- let me just
14  back up a second. Was this one meeting with Mr.
15  Malloy?
16      A.   No, there was more than one meeting.
17      Q.   Okay. Do you recall --
18      A.   Probably like two, maybe three.
19      Q.   Do you recall when these meetings
20  were?
21      A.   They were in the earlier part of the
22  week. I don't recall the exact day.
23      Q.   Can we drill down a little on the
24  specifics of what you discussed? Was that
25  discussion about specific securities that

Page 47

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  comprise collateral with respect to any
3  agreements or --
4      A.   The discussion was, you know, were we
5  going to transfer any of the assets that were in
6  the matched book over to BarCap and, to the
7  extent that we did that, how would we do that.
8      Q.   All right. When you say "that," are
9  you talking about the mechanics of doing that
10  transition?
11      A.   I'm talking, yeah, about the
12  mechanics, how do we move securities and the
13  positions and the books and records, et cetera,
14  over to BarCap.
15      Q.   Did you discuss with him the value of
16  the collateral that was going to be moved and
17  the securities?
18      A.   No, I did not.
19      Q.   Did you discuss with him the
20  composition of the pool of securities that was
21  going to be moved?
22      A.   No, I did not.
23      Q.   Okay. Did you discuss with him any
24  asset classes that might or might not be moved
25  to Barclays?

Page 48

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2      A.   No, because, you know, basically Marty
3  was indicating that we were not going to
4  transfer the assets over to BarCap, that they
5  would not be transferred.
6      Q.   And so what was he asking about, then?
7      A.   When I was discussing with him was my
8  impression was that perhaps some of the matched
9  book positions in LBI would be transferred to
10  BarCap and discussed if we were going to do that
11  and, if so, how, he was indicating that he was
12  under the belief that the assets that are in the
13  financing business were not going to be
14  transferred.
15      Q.   Did he say anything else about that?
16      A.   I don't recall.
17      Q.   Is he the only person at Barclays that
18  you had direct interaction with during the week
19  of September 15?
20      A.   I don't recall.
21      Q.   You've used the phrase "matched book"
22  several times. Could you explain to me what
23  that means?
24      A.   So there's two phrases. One is called
25  matched book. That normally is a

Page 49

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  characterization of fixed income financing book.
3  The equity financing book is described normally
4  as stock loan.
5      Q.   Okay.
6      A.   A matched book is basically a
7  combination of reverse repos and repos
8  collateralized by various fixed income
9  instruments that we, you know, that we manage
10  with the objective of making a financing spread
11  between the borrowing and the lending of the
12  money and the collateral.
13      Q.   And is it -- again, I'm getting close
14  to my limit of knowledge here, but I think you
15  just said your goal is to make the financing
16  spread between repos and reverse repos; is that
17  right?
18      A.   Yes.
19      Q.   Generally?
20      A.   In the fixed income matched book.
21      Q.   And in that matched book, when you say
22  "matched," does that mean that you try to have
23  the amount or value of the repos equal to the
24  amount of the reverse repos?
25      A.   Not necessarily, because some of the

Page 50

HIGHLY CONFIDENTIAL - J. COGHLAN

1    repos you would finance with firm cash.
2    Q.    Okay.
3    A.    Some of the repos may reside in other
4    Lehman entities. So it would not necessarily --
5    a better way to describe it is probably that the
6    assets and the liabilities would be similar, but
7    not necessarily the reverses and repos.
8    Q.    Okay. I understand.
9        Now, I've seen the phrase "long
10    positions" and "short positions"?
11    A.    Uh-huh.
12    Q.    Is that a surrogate for what you just
13    called assets and liabilities in this context?
14        MR. STERN: Objection to the form.
15    Q.    Let me rephrase it. What does the
16    term "long position" mean in this context?
17    A.    Well, there would be two types of
18    longs that I would describe.
19    Q.    Okay.
20    A.    One would be in firm inventory. So a
21    trader buys some sort of security, whether it's
22    a convertible bond, investment grade bond,
23    listed equity --
24    Q.    Okay.

Page 51

HIGHLY CONFIDENTIAL - J. COGHLAN

1    A.    -- et cetera.
2        When a trader buys those, he is long.
3    Q.    Right.
4    A.    Similarly, if a trader sells those, he
5    is short.
6    Q.    Okay.
7    A.    In the financing or the matched book,
8    the reverses would be an equivalent of a long,
9    although a different risk characteristic, and
10    the repos would be equivalent of a short.
11    Q.    Okay.
12    A.    One being on the asset side of the
13    balance sheet, one being on the liability side
14    of the balance sheet.
15    Q.    So in your matched book is it correct
16    to say that you try to balance the size of the
17    long positions with the size of the short
18    positions, as a general matter?
19        MR. STERN: Objection to the form.
20    A.    No, as I said earlier, the -- the
21    assets and liabilities would be similar, not
22    necessarily identical, because there's margins.
23    But they would be similar, but it would not
24    necessarily be reverses and repos, because we

Page 52

HIGHLY CONFIDENTIAL - J. COGHLAN

1    would have, on occasion, securities financed
2    with firm cash, securities financed in other
3    legal entities, i.e., a bank, so it would not
4    necessarily be all reverses and repos.
5    Q.    Okay. Mr. Coghlan, could you turn to
6    page 6 of this document, and again, I'm just
7    going to ask a particular document.
8        You can review the document, but you
9    see in the middle of page 6, you see something
10    called Purchased Assets?
11    A.    Uh-huh.
12    Q.    And then scrolling down, you will see
13    item D?
14    A.    Uh-huh.
15    Q.    Which lists several different
16    securities and it talks about those securities
17    having a book value as of the date hereof of
18    approximately 70 billion and they're defined as
19    long positions, do you see that?
20    A.    Uh-huh. Uh-huh.
21    Q.    Early in the week of September 19, did
22    you have any discussions with anyone about the
23    size of your long positions?
24        MR. STERN: Objection to the form.

Page 53

HIGHLY CONFIDENTIAL - J. COGHLAN

1    A.    The conversation I had that we -- I
2    described to Mike Gelband what I thought the
3    balance sheet was going to look like in the
4    financing of that business.
5    Q.    Okay.
6    A.    The concept of this number, I don't
7    know. The concept of long positions, I, as I
8    described, I understand the jargon of long
9    positions.
10    Q.    Right.
11    A.    How long positions fit into this
12    document I don't know.
13    Q.    Okay. When you say the financing
14    business, the projection you gave to Mr.
15    Gelband, is there another business that would be
16    outside of your financing business that would
17    have long positions?
18    A.    Yes.
19    Q.    And what business is that?
20    A.    Many, many of the Lehman Brothers --
21    as I said, the Equity Division could be long,
22    the Fixed Income Division could be long. Again,
23    it's important to differentiate inventory, where
24    the firm is taking principal risk on that

Page 54

HIGHLY CONFIDENTIAL - J. COGHLAN
1   security, and the financing business, where the
2   firm is lending money on a collateralized basis.
3   Q.   Okay.  And when you say "inventory,"
4   you're talking about securities that the firm
5   buys and holds for whatever reason --
6   A.   Yes.
7   Q.   -- is that correct?
8        Okay.  And is that typically larger or
9   smaller than the pool of financing business that
10  you were managing?
11       MR. STERN: Objection to the form.
12  A.   I don't -- I can't recall.
13  Q.   Okay.  I realize I might be asking
14  some naïve questions here, but I'm trying to
15  understand where this $70 billion came from, and
16  before you answer it, if you might turn to page
17  12, you'll see a reference to item little (i) to
18  69 billion in short positions.
19       So my question to you is, I'm trying
20  to understand what those two numbers entail.
21       MR. STERN: Objection to the form.
22  Q.   If you know.
23  A.   I can't -- I can't opine what those
24  numbers entail.  I have no involvement in this

Page 55

HIGHLY CONFIDENTIAL - J. COGHLAN
1   document.  I don't know --
2   Q.   I understand.
3   A.   This is the first time I've seen it,
4   so I would be -- I don't know.
5   Q.   Could you tell me what the size of
6   your long and short positions were within the
7   aspect of the firm that you managed on Monday,
8   the 19th?
9   A.   I don't recall.
10       MR. STERN: Objection to the form.
11       Monday the 19th?
12       MR. HINE: I'm sorry, Monday the 15th.
13  A.   I don't recall.
14  Q.   On Monday, the 15th, were the long
15  positions in the segment of the firm that you
16  managed $70 billion?
17  A.   I don't recall.
18  Q.   Does it sound like it could have been
19  $70 billion?
20       MR. STERN: Objection to the form.
21  A.   I don't recall.
22  Q.   Let me ask you this way:  You have
23  previously said you gave Mr. Gelband an estimate
24  of a $40 billion number --

Page 56

HIGHLY CONFIDENTIAL - J. COGHLAN
1   A.   Uh-huh.
2   Q.   -- as an estimate for the following
3   Friday.
4        Was the decline in value of that pool
5   of assets so great that it would have declined
6   from 70 billion on Monday to 40 billion on
7   Friday?
8        MR. STERN: Objection to the form.
9   A.   I don't -- I just don't recall.
10  Q.   Okay.
11  A.   I just don't have that --
12  Q.   Okay.  When you use the term "matched
13  book," is that used outside of just your
14  department as well?
15       MR. STERN: Objection to the form.
16  A.   The phrase "matched book" generally
17  refers to fixed income financing trades which
18  are, you know, which I supervise.
19  Q.   Uh-huh.  Well, let me just see if I
20  can understand this.  We had talked about the
21  financing business which you supervise versus
22  the firm inventory and the other businesses that
23  the firm was engaged in.
24       Would those other businesses employ a

Page 57

HIGHLY CONFIDENTIAL - J. COGHLAN
1   concept of a matched book, to your knowledge?
2   A.   They may have done, independent of our
3   group, repurchase or reverse repos, yes.
4   Q.   Okay.  So is it correct to say that,
5   as an entire entity, Lehman would try to
6   maintain a matched book, as a general matter?
7        MR. STERN: Objection to the form.
8   A.   Can you repeat the question?
9   Q.   I understand you said that within your
10  finance business you tried to maintain a matched
11  book as a general matter?
12  A.   Uh-huh.
13  Q.   Correct?
14       MR. STERN: Objection to the form.
15  A.   Can you repeat the question again?
16  Q.   Within your finance business, you
17  mentioned the notion of a matched book, correct?
18       MR. STERN: Objection to the form.
19  A.   In the finance business, I described
20  that normally the assets and the liabilities,
21  absent some variations, because of margin and
22  some other cash flows, would be somewhat
23  similar, and that's the way, you know, the
24  composition of the matched book would be.

Page 58

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2    MR. STERN: Can we take a short break?
3    MR. HINE: Sure.
4    (Recess; Time Noted: 10:33 A.M.)
5    (Time Noted: 10:38 A.M.)
6    BY MR. HINE:
7    Q.    Mr. Coghlan, I have -- if you could
8    look at page 6 of that document again. And
9    again, I apologize, I know you didn't see this
10    document, but if you look on the Purchased
11    Assets, item D, the item we were talking about
12    previously on long positions?
13    A.    Uh-huh.
14    Q.    If you look through that list of
15    different types of securities, could you tell me
16    which ones fall within the purview of your
17    financing business?
18    MR. STERN: Objection to the form.
19    You can answer.
20    A.    There's two types of these types of
21    securities that -- these securities could be in
22    two ways. They could be in the firm inventory.
23    Again, a government trader could have bought a
24    government bond.
25    Q.    Okay.

Page 59

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2    A.    And so those securities could be part
3    of the government trading business or those
4    could be securities that I borrowed to make a
5    loan and then repo on the other side to raise
6    cash.
7    Q.    Okay. So am I correct to say that
8    each of these types of securities could reside
9    both in your part of the business as well as the
10    inventory part of the business you have
11    discussed?
12    MR. STERN: Objection to the form.
13    You can answer if you understand the
14    question.
15    A.    Well, why don't you repeat the
16    question again. I'm sorry.
17    Q.    Let me try it this way. Are there any
18    securities listed here, types of securities
19    listed here, that would not be in your financing
20    part of the business?
21    A.    Perhaps exchange-traded derivatives
22    and perhaps collateralized short-term
23    agreements, because I don't know what those
24    definitions mean.
25    Q.    Okay. When you say "perhaps," you're

Page 60

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2    just not --
3    A.    I don't know what the definitions,
4    what -- I don't know what section D means when
5    it describes those.
6    Q.    Okay. Let's try Exhibit 19. Mr.
7    Coghlan, I'm handing you a copy of a document
8    marked as Exhibit 19, which is a single-page
9    document with a Bates range BCI-CG-00033789?
10    MR. STERN: Hang on one second. Where
11    do you see that Bates number?
12    Q.    Let me redescribe it then. Mine has a
13    Bates number. The exhibit 19, what's been
14    previously marked as Exhibit 19, is a balance
15    sheet of some sort. My question to you is if
16    you've ever seen this document before.
17    A.    I have.
18    Q.    You have, okay. And when did you see
19    this?
20    A.    I saw this document two days ago when
21    prepping for this meeting with counsel.
22    Q.    Okay. Other than that meeting, have
23    you ever seen this document before?
24    A.    I have not.
25    Q.    You see the date in the upper

Page 61

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2    right-hand corner is 9/16/08, you see that?
3    A.    I do.
4    Q.    Again, I'm wrestling with the same
5    issue. Are there entries on a balance sheet
6    like this that would apply solely to your
7    financing business as a general matter?
8    MR. STERN: Objection to the form.
9    A.    Say the question again. I'm sorry.
10    Q.    We've discussed the distinction
11    between the financing business at Lehman and
12    other businesses at Lehman?
13    A.    Uh-huh.
14    Q.    And my question is, on balance sheets
15    that were typically generated at Lehman, did
16    your financing business typically fall within
17    certain of these categories that are listed on a
18    document like this?
19    MR. STERN: Objection to the form.
20    Q.    Very awkward question, but --
21    MR. STERN: I'm going to object to
22    every question until you establish whether
23    he knows anything about this document, so...
24    A.    Yeah, I -- when I saw this document
25    for the first time, I don't know what this

Page 62

HIGHLY CONFIDENTIAL - J. COGHLAN

1    document is. I haven't seen -- I just don't
2    know what it means.
3    Q.    Okay. Have you ever seen a balance
4    sheet in this form generated at Lehman?
5    A.    Not to the best of my memory.
6    Q.    Have you ever seen a balance sheet at
7    all during your years at Lehman?
8    A.    I have seen balance sheets in the
9    financial statements, yes.
10   Q.    Understand that you've never seen --
11   you haven't seen this document prior to your
12   meeting with counsel. Is there any way you can
13   tell me just by looking at these lists of assets
14   whether there's a way to divide this between the
15   financing business that you run and the other
16   entities at Lehman?
17   A.    I don't know how -- I don't know what
18   the document means, so I don't -- I can't answer
19   that question.
20   Q.    Okay. On September 15 or 16, did you
21   have any understanding that the level of assets
22   at Lehman was in the range of $70 billion?
23   A.    No, I did not.
24   Q.    Did you have any understanding about

Page 63

HIGHLY CONFIDENTIAL - J. COGHLAN

1    the overall level of assets at Lehman at that
2    period of time?
3    A.    No, I did not.
4    Q.    And so is it fair to say that your
5    understanding of the asset levels of Lehman at
6    that time would relate solely to the financing
7    business that you ran?
8    A.    Say the question again. I'm sorry.
9    Q.    At that time, September 15 or 16?
10   A.    Uh-huh.
11   Q.    Would you have had any knowledge or
12   did you have any knowledge of the amounts of
13   assets at Lehman in other businesses other than
14   the one that you ran?
15   A.    I don't recall having knowledge of
16   that.
17   Q.    Do you have any recollection of any
18   discussions about $70 billion worth of assets at
19   that time?
20   A.    Say the question one more time. I'm
21   sorry.
22   Q.    Do you have any recollections of any
23   discussions during the week of September 15th
24   about --

Page 64

HIGHLY CONFIDENTIAL - J. COGHLAN

1    A.    I don't.
2    Q.    -- a figure in the ballpark of around
3    $70 billion worth of assets?
4    A.    I don't recall having conversations
5    about that.
6    Q.    Did you ever hear that mentioned
7    anywhere during that week?
8    A.    I don't recall that.
9    Q.    Did you ever hear the figure $$69
10   billion in liabilities mentioned during that
11   week?
12   A.    I did not hear that. I don't recall
13   hearing that.
14   Q.    Okay. While we're marking that, let
15   me ask you another question, too, on that one
16   document.
17       MR. STERN: On 19?
18       MR. HINE: Yes.
19   Q.    You see in the lower right-hand corner
20   of that document, Mr. Coghlan, the two entries,
21   one for cure payment and one for comp? Do you
22   see that?
23   A.    Yes, I do.
24   Q.    Did you have any discussions during

Page 65

HIGHLY CONFIDENTIAL - J. COGHLAN

1    that week, and that's the week of September 15,
2    about issues relating to cure payments?
3    A.    No, I did not.
4    Q.    Is that something that would normally
5    fall within your purview of your business?
6    A.    No, it does not.
7    Q.    Do you recall any discussions during
8    that week about agreements between Barclays and
9    Lehman as to compensation?
10   A.    I don't recall if the compensation
11   discussions that I had with Barclays occurred
12   during that week.
13   Q.    Okay. And let me draw a distinction
14   between the compensation discussions we
15   discussed earlier about your own personal
16   compensation and just the compensation for a
17   pool of Lehman employees that were eventually
18   going to go to Barclays.
19       So do you recall any discussions
20   during that week about an aggregate type of
21   agreement between Lehman and Barclays as to
22   compensation?
23   A.    I don't recall that, no.
24   Q.    Do you recall any discussion or ever

Page 66

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  hear any mention of a $2 billion figure relating
3  to compensation?
4     A.  I do not recall hearing that.
5     Q.  Did you hear or have any understanding
6  that that figure had been bandied about?
7     MR. STERN:  Objection to the form.
8     A.  Not to the best of my knowledge, no.
9     Q.  Did you have any understanding during
10 that week at all about a $2 billion figure
11 relating to compensation?
12    A.  No, I did not.
13    Q.  Mr. Coghlan, do you -- again, I'm
14 asking you to put yourself back in the week of
15 September 15.
16    A.  Uh-huh.
17    Q.  Did you have any understanding or did
18 you ever hear any mention that there was supposed
19 to be some sort of discount involved in the
20 transaction between Barclays and Lehman?
21    A.  I did not hear that, no.
22    Q.  Did you ever hear any mention of the
23 notion that Barclays was going to pay $5 billion
24 less than the value of Lehman's marks?
25    A.  I did not hear that, no.

Page 67

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2     Q.  Did you ever hear any -- again, I'm
3  not asking you if you heard that phrase in
4  particular, but did you hear any general
5  discussions about a discount with respect to the
6  transaction between Barclays and Lehman?
7     A.  I did not.
8     Q.  Did you ever hear the phrase "block
9  discount" used with respect to a transaction
10 between Barclays and Lehman?
11    A.  I have not heard that.
12    Q.  Did you ever hear any discussions of
13 the use of the phrase "haircut" with respect to
14 the transaction between Barclays and Lehman?
15    A.  I did not hear that, no.
16    Q.  In your business, what is the term
17 "haircut" typically used for?
18    A.  Normally in a lending relationship, a
19 haircut is the amount of over-collateralization
20 you would receive in order to give you a better
21 credit protection.  As an example, if I was
22 doing a trade with mortgage securities and a
23 financial institution wanted to borrow $100
24 million from me, I would probably take $105
25 million worth of collateral, mortgage

Page 68

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  collateral, from that financial institution as
3  over-collateralization.
4     So that difference between $100
5  million lent and market value of securities of
6  105 million, that 5 million is called the
7  over-collateralization.
8     Q.  And using your hypothetical, the
9  over-collateralization of 5 million is called
10 the haircut, typically?
11    A.  Yes.
12    Q.  And in a repurchase transaction -- I'm
13 sorry, was your hypothetical involving a
14 repurchase transaction?
15    A.  Yes.
16    Q.  I just want to draw some distinctions
17 about some terms.  Using your hypothetical, the
18 buyer would pay $100 million and receive $105
19 million worth of collateral; is that right?
20    A.  I would lend money to a financial
21 institution, for example.
22    Q.  Okay.
23    A.  I would lend him $100 million.
24    Q.  Right.
25    A.  Financial Institution A.

Page 69

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2     Q.  Right.
3     A.  They would have to give me collateral.
4     Q.  Okay.
5     A.  Because I don't do business unsecured.
6  So I would require them to post a margin, and
7  like in mortgage securities, that would be
8  probably something like 5 percent, which would
9  result in them giving me $105 million worth of
10 collateral against the $100 million loan.
11    Q.  When you say "margin," is that the
12 same as haircut?
13    A.  Yes.
14    Q.  Okay.  And now, to unwind that
15 transaction, is there something called a
16 repurchase price that allows that institution to
17 buy back its collateral?
18    A.  A repurchase price that would allow
19 them to buy back?
20    Q.  Well, I'm trying -- how would you
21 typically unwind that transaction --
22    A.  So --
23    Q.  -- when it ended?
24    A.  I would return the $105 million worth
25 of collateral, he would give me my $100 million

## Page 70

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  back, and the trade would unwind.
3      Q.   And how does Lehman make money on
4  that?
5      A.   Because I -- I would that I collateral
6  from the financial institution and I would
7  borrow money to pay for that collateral, and
8  hopefully the money I lent to the financial
9  institution is higher than what I borrowed from
10 the lender to me.
11     Q.   I guess what I'm trying to find out
12 is, what does the term "repo rate" mean?
13     A.   I don't know that legal definition.
14     Q.   Okay.  No, I didn't think it was a
15 legal definition.  I have seen it in documents.
16 I was wondering what your understanding of the
17 term "repo rate" means.
18     A.   I don't understand that definition.
19     Q.   Okay.  In some repurchase transactions
20 isn't it the case that the party that lent the
21 collateral initially has to buy it back at a
22 higher price than it was provided in the loan?
23     A.   I don't understand the question.
24     Q.   Okay.  Have you seen repo transactions
25 where -- let's use your hypothetical.

## Page 71

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2      A.   Uh-huh.
3      Q.   Institution A gives you $105 million
4  worth of collateral --
5      A.   Uh-huh.
6      Q.   -- and you pay them $100 million.
7      A.   Uh-huh.
8      Q.   Again, I'm beyond my area of expertise
9  here, but I understand that in some repo
10 transactions if Institution A wants to unwind
11 that transaction, he has the right to buy back
12 that $105 million --
13     A.   Uh-huh.
14     Q.   -- worth of collateral, but instead of
15 paying 100, he might have to pay 101.
16          Is that ever the case?
17          MR. STERN:  Objection to the form.
18     A.   I don't know that.  I just don't
19 understand the question.
20     Q.   Okay.  Have you ever seen what's
21 called a repurchase price in a repo transaction?
22     A.   I don't know the definition of a
23 "repurchase price."
24     Q.   That's not a term you would see in the
25 normal course of your business?

## Page 72

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2      A.   No.
3          (Exhibit 116, a document bearing Bates
4      Nos. 10303063, marked for identification, as
5      of this date.)
6      Q.   Mr. Coghlan, I'm handing you a
7  document marked as Exhibit 116, which has the
8  number at the bottom 10303063, and it appears to
9  be an e-mail dated September 15, 4:22 A.M.,
10 Greenwich Mean Time, between Mr. Feraca and
11 yourself.
12          Am I correct to say that 4 A.M.
13 Greenwich Mean Time would be Sunday night here
14 in the U.S.?
15     A.   I don't know.
16     Q.   Okay.  My question about this e-mail,
17 it says -- you'll read in the e-mail it says,
18 "By his estimate, the amount of tri-party
19 maturities for tomorrow plus all tri-party
20 financings on open amounts to about 102 billion.
21 This includes all current tri-party products in
22 LBI only."
23          Do you recall this e-mail, Mr.
24 Coghlan?
25     A.   No, I don't.

## Page 73

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2      Q.   Can you tell by looking at it what
3  he's talking about with that $102 billion
4  figure?
5      A.   "... to about 102 billion."
6      Q.   Yeah.
7      A.   That probably means that we have to
8  have raised $102 billion in tri-party to, you
9  know, to do a financing of trades.
10     Q.   Okay.  So this is he's talking about
11 you're financing part of the business, right?
12     A.   Yes.
13     Q.   And he works for you, correct?
14     A.   John Feraca, yes.
15     Q.   Okay.  You remember previously we
16 talked about the $40 billion estimate you gave
17 to Mr. Gelband about Friday, the value of the
18 business as of Friday?
19     A.   Uh-huh.
20     Q.   The upcoming Friday?
21     A.   Uh-huh.
22          MR. STERN:  Objection to the form.
23     Q.   I'm just trying to get you back to
24 that testimony.
25          Does this $102 billion figure

Page 74

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2   mentioned here on the previous Sunday or Monday
3   relate in any way to the estimate that you gave
4   Mr. Gelband about the $40 billion?
5        MR. STERN: Objection to the form.
6    A.   I don't recall this document.
7    Q.   Right.
8    A.   So I can't say how this document foots
9   to the information, if at all, to the numbers I
10  gave Mr. Gelband.
11   Q.   Okay. Does this refresh your
12  recollection in any way about the level of the
13  value of the business as of the Monday?
14   A.   No, it does not.
15       MR. STERN: Objection to the form.
16   Q.   Okay.
17       MR. STERN: When you say "the
18  business," I assume you are referring, Mr.
19  Hine, to the financing business?
20       MR. HINE: I was.
21   Q.   Mr. Coghlan, I'd like to ask one
22  follow-up question about the previous exhibit,
23  the APA, the $70 billion figure that we had
24  looked at previously, and the balance sheet,
25  which is Exhibit 19. So it will be Exhibits 1

Page 75

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2   and 19, if you just open them to page 6 of
3   Exhibit 1 and page 19.
4    A.   Uh-huh.
5    Q.   And I understand your limited or lack
6   of access to these two documents, but could you
7   just -- is there any way you could tell me --
8        Here's my problem: I see on Exhibit
9   19 the figure $73 billion in assets, do you see
10  that?
11   A.   Yes, I do.
12   Q.   And I'm trying to reconcile that with
13  the $70 billion long position that's mentioned
14  in the other document. Is there any way you
15  could speculate or hazard a guess as to how
16  those numbers could be different?
17       MR. STERN: Objection to the form.
18  Calls for speculation.
19   Q.   You can answer.
20   A.   No, I don't know.
21   Q.   Same question with respect to the
22  liabilities. You wouldn't know either?
23       MR. STERN: Same objection.
24   A.   No, I don't know.
25   Q.   Okay. That's all I have with those

Page 76

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2   exhibits.
3        Mr. Coghlan, do you have any role in
4   the preparation of LBHI's or LBI's bankruptcy
5   filing?
6    A.   No, I did not.
7    Q.   Were you ever consulted as to anything
8   with respect to those filings?
9    A.   Not to the best of my knowledge.
10   Q.   I take it you never appeared in court
11  with respect to the bankruptcy proceedings of
12  either of those entities?
13   A.   That's true.
14   Q.   Okay. Could we just talk for a minute
15  about repo agreements in general? As I
16  understand it, there's something called a Master
17  Repurchase Agreement?
18   A.   There is.
19   Q.   And what is the role of that
20  agreement, if you know?
21   A.   It documents the terms of the repo
22  agreement between an institution, such as
23  Lehman, and counterparties that we do financing
24  transfers.
25   Q.   So there would be a master agreement

Page 77

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2   between Lehman and Barclays, for example?
3    A.   There could be, yes.
4    Q.   I'm not trying to trick you. I'm
5   going to introduce an exhibit here. I just want
6   to not so much ask you questions about this
7   exhibit, I just don't want to be seen to try to
8   be misleading here. So I'm going to give you
9   the agreement and ask you if you've seen it
10  before.
11       (Exhibit 117, Master Purchase
12   Agreement, marked for identification, as of
13   this date.)
14   Q.   Mr. Gelband, I'm handing you two
15  documents. One is Exhibit 117, which is
16  entitled Master Repurchase Agreement.
17       MR. STERN: This is Mr. Coghlan.
18       MR. HINE: Oh, I'm sorry. You
19  apologize. I got Mr. Gelband on the brain.
20   Q.   Mr. Coghlan, I'm handing you Exhibit
21  117, which is entitled Master Repurchase
22  Agreement, and you'll see it's dated as of July
23  23, 1998.
24       Have you ever seen that document
25  before?

Page 78

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.    No, I have not.
3    Q.    Is it fair to say that this document
4    is not something you normally use in the course
5    of your business?
6    A.    It's not something that I would
7    personally review or, you know, and execute,
8    yes.
9    Q.    And fair to say that you're not
10   involved in negotiating the terms of this
11   agreement?
12   A.    To the best of my knowledge, I did not
13   negotiate terms of this agreement.
14   Q.    I also handed you a document which has
15   been previously marked as 57B.
16   A.    Uh-huh.
17   Q.    Which is entitled Amendment Agreement,
18   dated as of September 15. Do you see that?
19   A.    Yes, I do.
20   Q.    Have you ever seen this document
21   before?
22   A.    Not to the best of my knowledge.
23   Q.    I take it, then, you were not involved
24   in any kind of negotiations or discussions
25   around this amendment, which is filed on Monday

Page 79

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    or dated as of Monday, the 15th?
3    A.    Not to the best of my knowledge.
4    Q.    Do you have any understanding of why
5    an amendment was entered into on that Monday
6    with respect to the master agreement?
7    A.    I do not know why.
8    Q.    Did you ever hear an amendment to the
9    Master Repurchase Agreement being discussed?
10   A.    Not to the best of my knowledge.
11   Q.    Ever hear any mention of any kind of
12   amendments to the Repurchase Agreements?
13   A.    Not to the best of my knowledge.
14   Q.    Is this something that would be
15   handled by another department?
16   MR. STERN: Objection to the form.
17   Q.    Let me rephrase that. Is the
18   documenting of the Master Repurchase Agreement
19   and amendments generally something that's
20   handled by another department within Lehman?
21   A.    The GMRAs and amendments to the GMRAs
22   normally would be handled by contract -- a group
23   called Contract Finance that do the
24   documentation work. Whether they did that in
25   this case I don't know.

Page 80

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    Q.    That's within the Legal Department?
3    A.    Yes.
4    Q.    My question wasn't who handles the
5    documentation, but who would decide -- who
6    generally enters -- decides when an amendment is
7    needed?
8    A.    I don't know.
9    Q.    Okay. Does your department ever get
10   involved in amending the MRA?
11   A.    There may be times when there's
12   certain issues brought to my attention that they
13   would want my opinion about if we were going to
14   make, not necessarily an amendment, but any sort
15   of adjustment in the MRA, GMRA.
16   Q.    Do you recall any discussions during
17   the week of September 15 about making any
18   adjustments to the MRA?
19   A.    I do not recall having any of those
20   conversations.
21   Q.    Did you hear any mention during that
22   week of any kind of adjustments that were going
23   to be made to the MRA?
24   A.    I did not.
25   Q.    Do you have any understanding of why

Page 81

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    an amendment was made to the MRA on September
3    15?
4    A.    I have no understanding why an
5    amendment was executed.
6    Q.    If I walk you through various
7    provisions of this agreement, I would take it
8    you would not know why they were -- why those
9    provisions were changed?
10   A.    I haven't seen this document. I don't
11   know the framework on which the document was
12   negotiated.
13   Q.    Fair enough.
14   A.    So --
15   Q.    Let me ask you, if you turn to the
16   page which is marked at the top Schedule VIII.A
17   in Roman numeral VIII.A?
18   MR. STERN: Where is this?
19   MR. HINE: In the upper left-hand
20   corner it says Schedule VIII.A.
21   MR. SCARING: I'm sorry, what
22   agreement are you referring to? What
23   exhibit?
24   MR. HINE: Same Exhibit, 57B. I'm
25   sorry. The seventh page of 57B entitled

Page 82

HIGHLY CONFIDENTIAL - J. COGHLAN

1     "Schedule VIII.A."
2     Q.   You see in paragraph 2, Mr. Coghlan,
3  there's an amendment to paragraph 7 of Annex
4  VIII and it deals with the rights of the buyer
5  in purchased securities, and I know you have
6  never seen this document before.
7        Do you recall any discussions during
8  the week of September 15 about any reason to
9  amend or change the rights of buyers in
10 purchased securities?
11    A.   I don't recall, no.
12    Q.   You don't have any understanding of
13 why that might have been done during that week?
14    A.   No, I do not. No.
15    Q.   Could you turn two more pages to
16 something called "Schedule A dated as of
17 September 15." Have you ever seen a schedule
18 like this to an MRA?
19    A.   Yes.
20    Q.   And what are these schedules typically
21 used for?
22    A.   To talk about the haircuts that the
23 parties proposed.
24    Q.   So when I see the column that says

Page 83

HIGHLY CONFIDENTIAL - J. COGHLAN

1     "Margin Percentage," is that a haircut?  Is that
2  the haircut?
3     A.   Yes.
4     Q.   And previously we talked about the
5  word "margin" versus "haircut."  They're used
6  simultaneously in this context?
7     A.   Yes.
8     Q.   Now, with respect to this particular
9  Schedule A, do you recall any discussions during
10 the week of September 15 about amending Schedule
11 A to the MRA?
12    A.   I don't recall having any
13 conversations.
14    Q.   Was there any need during that week to
15 amend this schedule with respect to any repos
16 that you were working on during that time?
17    A.   Could you say that -- repeat?
18    Q.   Let me try again.  Do you recall
19 during that week any need or discussions or
20 suggestion that Schedule A to the agreement
21 between -- the Master Agreement between Lehman
22 and Barclays would have to be amended in some
23 way?
24    A.   I don't recall having any of those

Page 84

HIGHLY CONFIDENTIAL - J. COGHLAN

1  discussions.
2     Q.   Any mention or understanding of the --
3  discussions about a haircut between -- with
4  respect to the Lehman/Barclays Repurchase
5  Agreements?
6     A.   Not that I can recall.
7     Q.   Okay.  Does this list here look like
8  the haircuts that were being used during that
9  week?
10       MR. STERN:  Objection to the form.
11    A.   I can't recall.
12    Q.   Do you recall if the haircuts were
13 much larger that week than this, this type of
14 level?
15       MR. STERN:  Objection to the form.
16    Q.   Or no recollection at all?
17    A.   No recollection.
18    Q.   Am I correct to say that a Schedule A
19 like this would also be used to list the types
20 of collateral that could be eligible -- I'm
21 sorry, the types of securities that could be
22 considered eligible to be used as collateral in
23 a repo agreement?
24    A.   This is a tri-party agreement.

Page 85

HIGHLY CONFIDENTIAL - J. COGHLAN

1     Q.   Okay.
2     A.   And there's a concept called Schedule
3  A --
4     Q.   Right.
5     A.   -- which lists the collateral that the
6  counterparty will take and the haircut
7  associated with it.
8     Q.   Okay.  And that's typical of a
9  tri-party agreement?
10    A.   To the best of my knowledge, yes.
11    Q.   Is it not typical of a regular repo?
12       MR. STERN:  Objection to the form.
13    A.   I --
14    Q.   I guess let me rephrase it.  I'm
15 trying to understand why you said this is a
16 tri-party agreement.
17       Is there something distinct with
18 respect to Schedule A between tri-party repos
19 and other types of repos?
20    A.   As I said earlier, some repos are
21 bilateral, so they would -- the haircuts would
22 be negotiated at the point of transaction.
23    Q.   Right.
24    A.   Here, the transaction is settled

## Page 86

HIGHLY CONFIDENTIAL - J. COGHLAN

1. through a tri-party, where the tri-party agent
2. is settling the trade and the parties agree to
3. what the terms are, you know, at the initiation
4. of the tri-party level and the tri-party agent
5. would operate and settle trades based on this
6. schedule.
7. Q. Okay. I see. Do you recall any
8. discussions on the week of September 15 about
9. redefining what could be considered eligible
10. collateral for the Lehman/Barclays repo
11. agreement?
12. A. I don't recall having any of those
13. conversations.
14. Q. Who at Lehman would have been involved
15. in this type of amendment to the MRA?
16. MR. STERN: Objection.
17. Q. If you know?
18. MR. STERN: Objection to the form.
19. A. As I said, there was a group of people
20. called -- described as Contract Finance --
21. Q. Okay.
22. A. -- that would handle negotiations and
23. documentation. I don't know if this document
24. was part of that because I was not privy to

## Page 87

HIGHLY CONFIDENTIAL - J. COGHLAN

1. that.
2. Q. Is a Mr. Guglielmo part of that group?
3. A. He's an employee in that group, yes.
4. Q. Mr. Coghlan, I'm handing you a
5. document that's previously been marked as
6. Exhibit 56. On the front cover is an e-mail, in
7. which I believe you're not involved, but I would
8. direct your attention to the document that
9. starts on page 3 which is entitled "Custodial
10. Undertaking in Connection With Master Repurchase
11. Agreement."
12. MR. STERN: Are you going to give him
13. an opportunity to review this document?
14. Q. You can if you like, but my real
15. question is have you ever seen this document
16. before?
17. A. I have not.
18. Q. I think I can save you the time to
19. review it if I can just ask you a couple of
20. questions.
21. Were you involved in any discussions
22. during the week of September 15 with respect to
23. a custodial undertaking agreement involving
24. Lehman and Barclays and JPMC?

## Page 88

HIGHLY CONFIDENTIAL - J. COGHLAN

1. A. To the best of my knowledge, no.
2. Q. Would that be handled by the same
3. group you just mentioned, the Contract Group?
4. A. I don't know.
5. MR. STERN: Objection to the form.
6. Q. Do you recall any discussions or
7. rumors or any understanding you might have had
8. during that week about the need to amend or
9. change a custodial undertaking agreement
10. involving JPMC during that week?
11. MR. STERN: Objection to the form.
12. A. Could you repeat that again? I'm
13. sorry.
14. Q. Do you recall any understanding or
15. rumors you might have heard about why a
16. custodial undertaking agreement involving JPMC
17. was going to be amended or -- during that week?
18. MR. STERN: Objection to the form.
19. A. I do not recall hearing anything about
20. any documentation adjustments with Barclays.
21. Q. Okay. This involves JPMC as well, who
22. is apparently the custodian?
23. A. I do not recall.
24. Q. Just as a general matter, JPMC was

## Page 89

HIGHLY CONFIDENTIAL - J. COGHLAN

1. Lehman's custodial agent in repos; is that
2. correct?
3. A. It was one of them.
4. Q. Okay. And was Bank of New York
5. Barclays' custodial agent?
6. A. It was one of them.
7. Q. Can we just talk generally? Am I
8. correct to say you really don't have any
9. familiarity with this document?
10. A. I have never seen the document. I've
11. never heard the phrase "custodial undertaking,"
12. so I've never seen this document before.
13. Q. Okay. Fair enough.
14. I want to just talk generally about
15. the different -- some of the different
16. financings during this week. Were you involved
17. in securing financing from the Fed for LBI
18. during the week of September 15?
19. A. I was not directly involved.
20. Q. Okay. And would that have been
21. handled by a department outside of your
22. financing business?
23. A. It would have been the responsibility
24. of Treasury to do that.

## Page 90

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2  Q.  Okay.
3  A.  There were probably people in my group
4  that helped them, but the, you know, the
5  settlement of the securities and the tri-party
6  was managed by Treasury.
7  Q.  Okay.  This was a new financing for
8  LBI during that week; is that right?
9  A.  I believe it was, yes.
10  Q.  And do you recall why LBI undertook
11  this financing arrangement with the Fed?
12  A.  I do not know why, no.
13  Q.  Do you recall any discussions about a
14  decision to try to keep LBI open during that
15  week while LBHI declared bankruptcy?
16  A.  Could you say the question again?
17  Q.  Do you recall any discussions or
18  understanding about an effort to keep LBI open
19  or in business during that week while LBHI --
20  A.  I was not part of any discussions
21  about that.
22  Q.  Okay.  Do you have any understanding
23  of why LBI did not file bankruptcy until the
24  following Friday, when other entities filed on
25  Monday?

## Page 91

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2  A.  I do not know why.
3  Q.  Do you know why LBI entered into this
4  Fed financing arrangement?
5  A.  No, I don't.  I do not know why.
6  Q.  Were you involved in the efforts
7  during the middle of the week to substitute this
8  Fed financing with a different financing vehicle
9  involving Barclays?
10  A.  I was not --
11  MR. STERN:  Objection to the form.
12  A.  I was not directly involved.
13  Q.  Do you have understanding what was
14  supposed to take place in that regard?
15  A.  I don't recall.
16  Q.  Did you have any understanding during
17  that week that Barclays was going to enter into
18  a tri-party repo with Lehman and Bank of New
19  York that was supposed to replace financing that
20  had been provided during the early part of the
21  week by the Fed?
22  MR. STERN:  Objection to the form.
23  A.  I understood that there was going to
24  be -- the collateral was going to be moved out
25  of Chase into Bank of New York.  So I understood

## Page 92

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2  that that was going to happen.
3  Q.  Do you know the value of the
4  collateral that was posted to the Fed financing?
5  A.  No, I don't.
6  Q.  Would your team have been involved in
7  determining that value?
8  A.  I don't believe so.
9  Q.  Who do you think would have been
10  involved in that?
11  A.  I don't know.
12  Q.  Did you have any involvement in
13  selecting the collateral that was posted in
14  support of the Fed financing?
15  A.  No.
16  Q.  Do you know who was involved in that?
17  A.  No, I don't know.
18  Q.  Would it have been anyone within your
19  business group?
20  A.  To the best of my knowledge, no.
21  Q.  But you have to have some knowledge of
22  what collateral is -- has been pledged to the
23  Fed, correct, at that time?
24  MR. STERN:  Objection to the form.
25  A.  No, I would not necessarily know that.

## Page 93

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2  Q.  Well, let me ask you a question:  If a
3  certain pool of collateral gets pledged to the
4  Fed on Monday, the 15th?
5  A.  Uh-huh.
6  Q.  Is that collateral no longer something
7  that you can use in your matched book financing
8  arrangements?
9  MR. STERN:  Objection to the form.
10  A.  You know, that collateral would have
11  been already financed, so it would not be
12  required for me to finance that if the Fed was
13  financing that.
14  Q.  Okay.  I'm trying to get a distinction
15  between the financing business that we talked
16  about earlier versus the other businesses.
17  A.  Uh-huh.
18  Q.  Was the collateral that was posted to
19  the Fed finance -- or, used to collateralize the
20  Fed financing on September 15, did that come out
21  of the pool of collateral that you would
22  normally manage in your matched book?
23  A.  I don't know.
24  Q.  Who would know that?
25  A.  Probably Treasury.

Page 94

HIGHLY CONFIDENTIAL - J. COGHLAN

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2       Q.   Okay.
3       A.   Would know what collateral was pledged
4    to the Fed.
5       Q.   That's Mr. Tonucci's group?
6       A.   I believe so, yes.
7       Q.   So if it had come out of -- had the
8    collateral that was pledged to the Fed come out
9    of the assets that you would normally be
10   managing, would that have had some impact on
11   your ability to manage your balanced book?
12      MR. STERN:  Objection to the form.
13      A.   If the firm had pledged collateral to
14   the Fed, that would be collateral that I would
15   not have to finance.  We would already have
16   raised cash against it.
17      Q.   Okay.
18      A.   So the amount of cash I would have to
19   raise would go down because the Fed would be
20   lending us money as opposed to other third
21   parties.
22      Q.   Okay.  Now, were you involved in the
23   transferring of the collateral that was posted
24   to the Fed financing to this new repo -- let's
25   just get some terms here first.

Page 95

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2       If I talk about the Fed financing,
3    you'll understand that I'm talking about the
4    financing that was entered into earlier in the
5    week --
6       A.   Uh-huh.
7       Q.   -- involving the Fed, correct?
8       A.   Uh-huh.
9       MR. STERN:  Objection to the form.
10      Q.   Then I would like to refer you to the
11   shorthand to refer to the Barclays repo, which
12   in my parlance is a repurchase -- a tri-party
13   agreement between Barclays, Bank of New York,
14   and Lehman.
15      MR. STERN:  What's your basis for that
16   assertion?
17      MR. HINE:  Well, I'm not asserting
18   anything.  I just want to -- let's --
19      MR. STERN:  Well, wait.  Look.  Look.
20   Look.
21      MR. HINE:  Let me ask the question
22   again, Jack, okay?
23      MR. STERN:  Well, if you have a
24   question about whether it's a tri-party,
25   that's fine, but to make an assertion --

Page 96

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2       MR. HINE:  I'm not making an
3    assertion.  I'm trying to clarify something.
4    So let me fix -- I hear your objection.  Let
5    me just fix it.
6       MR. STERN:  I'm curious what caused
7    you to say it was a tri-party between
8    Barclays, Bank of New York and Lehman.  I'm
9    very interested in --
10      MR. HINE:  Jack, do you have an
11   objection you want to put on the record?
12   Otherwise, stop coaching the witness.
13      MR. STERN:  I'm not coaching the
14   witness.  I'm asking you, can you ask him a
15   question?
16      MR. HINE:  I will.
17      Q.   Mr. Coghlan, are you aware of any
18   financings during that week between Barclays and
19   Lehman?  And I mean the week of September 15.
20      A.   Barclays and Lehman?  No, I'm not
21   aware of one.
22      Q.   Are you aware of any repo agreements
23   between Barclays and Lehman during the week of
24   September 15?
25      A.   Not that I can recall.

Page 97

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2       Q.   Okay.  Are you aware of any efforts to
3    take the collateral from the Fed financing and
4    place it into another repo arrangement involving
5    Barclays during the week of September 15?
6       A.   I was aware that we were moving
7    collateral from the Fed financing to Bank of New
8    York, and I was aware of that.
9       Q.   Okay.  And did that involve a repo
10   arrangement with Barclays?
11      A.   I don't know.  I don't recall.
12      Q.   And why were you moving collateral
13   from the Fed financing to Bank of New York?
14      A.   I don't know why we did that.  I don't
15   recall.
16      Q.   What was your role in that?
17      A.   My role in that was limited in the
18   sense that I was not involved in that operation,
19   if you would, and -- other than one of my
20   employees was working long hours to help in that
21   transfer from -- from the Fed to the Bank of New
22   York.
23      Q.   And who was that?
24      A.   John Feraca.
25      Q.   Feraca?

Page 98

HIGHLY CONFIDENTIAL - J. COGHLAN
1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.   John Feraca.
3    Q.   Okay. And what was he doing in that
4    context?
5    A.   Helping identify collateral and what
6    collateral, you know, we were transferring and
7    getting kind of books and records right and
8    working with others in Treasury and Operations
9    to get it right.
10   Q.   Was he involved in placing values on
11   that collateral?
12   A.   Not to my knowledge, no.
13   Q.   Did Bank of New York place values on
14   that collateral?
15   A.   I don't know that information.
16   Q.   So what was your understanding of why
17   the collateral was being transferred to Bank of
18   New York --
19       MR. STERN: Objection to the form.
20   Q.   -- during that week?
21       MR. STERN: Objection to the form.
22   A.   I was not part of the decision to do
23   that. It was simply a decision that was made
24   by -- I don't know who. Treasury and the normal
25   settlement groups were doing their normal job of

Page 99

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    settling a trade from one place to another. So
3    that was consistent.
4        One of the employees that worked for
5    me that could be helpful in this worked, you
6    know, extensive hours to help facilitate the
7    transfer to BoNY, Bank of New York.
8    Q.   After it was transferred to Bank of
9    New York, did you have any understanding what
10   happened to it after that?
11   A.   No, I do not.
12   Q.   Do you have any understanding how that
13   collateral might have been transferred to
14   Barclays eventually?
15   A.   Not that I -- no, I do not.
16       (Exhibit 118, a document bearing Bates
17   Nos. 10297296 and 10300641, marked for
18   identification, as of this date.)
19   Q.   Mr. Coghlan, I'm handing you a copy of
20   an exhibit marked 118, which is an e-mail dated
21   September 15, and you are not a party to the
22   e-mail.
23       My question involves the chart that's
24   attached as the second page. I was wondering if
25   you have ever seen a chart like this before.

Page 100

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.   I've never seen this document before.
3    Q.   Okay. Have you ever seen a chart that
4    listed Fed haircuts in another form?
5        MR. STERN: Objection to the form.
6    A.   Repeat the question, please.
7    Q.   You see the entry in there entitled
8    "Fed Haircut"?
9    A.   Uh-huh.
10   Q.   Do you have any awareness of what the
11   Fed's haircut was in connection with its
12   financing provided the week of September 15?
13   A.   No, I do not know what the haircuts
14   were.
15   Q.   Did you have any understanding of what
16   the Fed typically would ask for a haircut in
17   connection with financings like this?
18   A.   I do not know that.
19   Q.   If you look at the same chart, you see
20   the title "Current Haircut" at one of the
21   columns?
22   A.   Yes.
23   Q.   Do you have any understanding what
24   that might be referring to?
25   A.   No, I do not. I've never seen this

Page 101

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    document before, so I don't know what that
3    means.
4    Q.   I understand that. Do you have any
5    understanding of the haircuts that Chase was
6    demanding in its -- or, getting in its
7    transactions during this period?
8    A.   No, that would -- I didn't handle the
9    tri-party, so that would be handle by Paolo
10   Tonucci. So I would not be privy to that.
11   Q.   When you said the "tri-party," you're
12   talking about the Fed financing?
13       MR. STERN: Objection to the form.
14   A.   No, I'm talking about the tri-party
15   relationship between Lehman Brothers and Chase,
16   and I would not be privy to that.
17   Q.   Okay. Just so I understand what you
18   just said, the tri-party to which you are not
19   privy would be between Lehman Brothers, Chase
20   and Barclays?
21       MR. STERN: Objection to the form.
22   A.   No. No, that's not correct.
23   Q.   Okay. I'm not trying to
24   mischaracterize what you said.
25   A.   I'm referring to this document. This

Page 102

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  document is a tri-party haircut schedule.
3      Q.   Right.
4      A.   What I'm saying is, if those haircuts,
5  if they applied to Lehman Brothers, would have
6  been negotiated, if you would, and understood by
7  Paolo Tonucci.
8      Q.   Okay.  And this is outside of the
9  financing business that you run?
10     A.   Yes.
11     Q.   I apologize.  I have to show you a
12 bunch of documents during our deposition, but...
13     A.   That's fine.
14          (Exhibit 119, a document bearing Bates
15     Nos. 10302495, marked for identification, as
16     of this date.)
17     Q.   Mr. Coghlan, I'm handing you a
18 document marked as Exhibit 119, which is --
19 appears to be an e-mail dated September 17
20 between Mr. Azerad and Mr. Tonucci.
21          I direct your attention to the first
22 line, which says, "We need to have a meeting
23 with Coughlin," and then it goes on to describe,
24 "Lista is starting to unwind some term repos for
25 commercial reasons (e.g., State Street), which

Page 103

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  is going to use liquidity (increased haircuts)."
3          My first question is, do you recall
4  this -- actually, I take it that since you're on
5  this e-mail, you don't recall it?
6      A.   Correct.
7      Q.   My question is, do you recall having a
8  meeting at or about Wednesday of that week
9  between either Mr. Azerad or Mr. Tonucci about
10 this topic?
11     A.   I don't recall.
12     Q.   Could you explain to me what this
13 topic is?
14          MR. STERN:  Objection to the form.
15     A.   I don't know.  I never saw this
16 before.  I don't know what it means.
17     Q.   Okay.  Could I ask just a technical
18 question.  What does the phrase "State Street"
19 mean?
20     A.   State Street is a securities lender
21 that would have been a counterparty to LBI,
22 where we would have borrowed securities with
23 them and we would have maybe borrowed money with
24 them.
25     Q.   Do you understand who Lista is?

Page 104

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2      A.   Yes.
3      Q.   Who is that?
4      A.   He was the head of short-term sales at
5  Lehman Brothers at the time.
6      Q.   What's his full name, do you know?
7      A.   William.
8      Q.   William Lista?
9      A.   William Lista.
10     Q.   It mentions him starting to unwind
11 some term repos for commercial reasons.  Do you
12 understand what that could be referring to?
13     A.   No, I do not.
14     Q.   Previously you had, when we talked
15 about the $40 billion estimate you gave to Mr.
16 Gelband --
17     A.   Uh-huh.
18     Q.   -- you had talked about, as -- and I'm
19 not trying to mischaracterize your testimony --
20 I thought you had talked about unwinding repos
21 because counterparties wanted to move the assets
22 elsewhere or for whatever reason?
23     A.   Uh-huh.
24     Q.   Could this be referring to that
25 process?

Page 105

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2      A.   I don't -- it might.  I just don't
3  know.
4      Q.   Okay.  Does the phrase "which is going
5  to use liquidity" have any meaning to you in
6  this context?
7      A.   No, it does -- I just don't know what
8  this document -- I just don't know what it
9  means.
10     Q.   And you don't recall any discussions
11 around that week between either yourself and Mr.
12 Tonucci or Azerad about this issue?
13     A.   No, I don't recall.
14     Q.   Can we just take a minute and just
15 take a step back about what you were doing
16 during this week?
17     A.   Uh-huh.
18     Q.   I know we've talked about the APA that
19 was entered on Monday, but I was just wanting to
20 see if you could give me a general description
21 of what you were doing during this week.
22 Whether it relates to the Barclays/Lehman
23 transaction or not --
24     A.   Uh-huh.
25     Q.   -- I just want to kind of get a

## Page 106

HIGHLY CONFIDENTIAL - J. COGHLAN

1    picture of what your involvement was, if any.
2        A.    Well, the primary occupation of the
3    group, if you would, that reports to me in LBI,
4    we were basically being -- we were basically
5    unwinding trades. We were sending back
6    collateral and cash. And so that was what the
7    primary objective of the business was, was to
8    try to downsize and return collateral and return
9    cash.
10       Q.    And why was that?
11       A.    Because, primarily -- there was two
12   primary reasons: Customers wanted their cash
13   and collateral back. That was one reason. And
14   second of all, given all what happened at the
15   holding company, you know, it was obvious that
16   we were going to have a difficult time financing
17   ourselves. So we needed to get the positions
18   smaller and minimize the financing risk.
19       Q.    And did there come a point when you
20   could no longer finance yourself?
21       A.    I don't recall that happening.
22       Q.    So now, all right, is that correct to
23   say that that was the primary focus of you and
24   your department during that period of time?

## Page 107

HIGHLY CONFIDENTIAL - J. COGHLAN

1        A.    Yes.
2        Q.    Did you have any -- I'm just trying to
3    get a general sense of the role you might have
4    played in any dealings between Lehman and
5    Barclays during that period.
6        A.    Uh-huh.
7        Q.    Do you recall any involvement in that?
8        A.    No, other than the conversations I
9    have referenced with Marty Malloy, to the best
10   of my recollection, I did not have any
11   conversations with anybody at Barclays.
12       Q.    Were you involved at all in any kind
13   of -- again, we might have asked this already,
14   I'm just trying to get a sense of what you're
15   doing -- were you involved in any way in efforts
16   to transfer collateral to Barclays either during
17   that week or the following weekend?
18       A.    I was not directly involved. Again,
19   that's the role of Treasury, and John Feraca,
20   who works for me, was engaged in trying to be
21   helpful. But the responsibility for that and
22   the decision-making and control was Treasury.
23       Q.    Okay. Were you involved in any
24   efforts during the weekend -- and I guess that's

## Page 108

HIGHLY CONFIDENTIAL - J. COGHLAN

1    September 21 -- 20th and 21st -- to locate
2    unencumbered assets that could be transferred to
3    Barclays?
4        A.    No.
5        Q.    Were you involved in any efforts
6    during that weekend with respect to a 15c3
7    calculation?
8        A.    No, I was not.
9        Q.    Were you involved in any efforts
10   during that weekend with respect to a
11   transaction -- OCC-related transactions?
12       A.    I don't know what OCC-related
13   transactions are. So, to the best of my
14   knowledge, no.
15       Q.    Were you involved in anything during
16   that weekend, or were you home having a nice
17   weekend?
18       A.    I don't believe I was involved in
19   business relative to that weekend. Now, at some
20   point, you know, we did start discussion of
21   compensation, and I don't know if it was that --
22   and the transition and things like that. I
23   don't know if that was over the weekend or -- I
24   was out of town over the weekend, and I don't

## Page 109

HIGHLY CONFIDENTIAL - J. COGHLAN

1    know if that began over the weekend or Monday,
2    Tuesday, when.
3        Q.    So where were you on the weekend?
4        A.    I was out of town.
5        Q.    Where was that?
6        A.    Philadelphia.
7        Q.    And do you know when you left?
8        A.    Friday afternoon.
9        Q.    I assume it wasn't a business-related
10   trip?
11       A.    Right.
12       Q.    Okay. And when did you get back to
13   town?
14       A.    Sunday afternoon.
15       Q.    Sunday afternoon?
16       A.    Uh-huh.
17       Q.    Were you involved in the closing of
18   the sale transaction between Barclays and Lehman
19   in any way?
20       A.    No, I was not.
21       Q.    Okay. I'm just trying to limit my
22   questions and see what -- were you contacted
23   over the weekend when you were out of town by
24   anyone involved in the transaction between

## Page 110

HIGHLY CONFIDENTIAL - J. COGHLAN

1 Barclays and Lehman?
2    A.   Not to the best of my knowledge, no.
3    Q.   Were you ever asked to provide any
4 information to that -- to the group involved in
5 that?
6    A.   Not to the best of my knowledge, no.
7        (Exhibit 120, an e-mail string, the
8     first one in time dated September 17, 2008,
9     at 6:31 P.M., marked for identification, as
10    of this date.)
11    Q.   Mr. Coghlan, I'm handing you a copy of
12 an exhibit marked as 120, which appears to be an
13 e-mail string dated September 17, in which you
14 are CC'd on a bunch of e-mails. If you wouldn't
15 mind just taking a second, take whatever time
16 you need to review that document.
17        (Document review.)
18    A.   Uh-huh.
19    Q.   Have you had a chance to look at the
20 document?
21    A.   I have.
22    Q.   Before we get to the document, are you
23 sometimes referred to as "Cogs"?
24    A.   Yes.

## Page 111

HIGHLY CONFIDENTIAL - J. COGHLAN

1    Q.   That's a nickname that your colleagues
2 use, that name?
3    A.   Yes.
4    Q.   If we could -- if you wouldn't mind,
5 let's start from the bottom up.
6    A.   Okay.
7    Q.   Which is how --
8        (Discussion off the record.)
9        (Recess; Time Noted:  11:36 A.M.)
10       (Time Noted:  11:41 A.M.
11 BY MR. HINE:
12    Q.   Mr. Coghlan, before we get to this
13 document, your counsel clarified something for
14 me off the record.  I just wanted to make sure
15 it doesn't change some of the testimony you
16 previously gave.
17        I think we talked about the
18 transfer -- an effort to transfer collateral
19 from the Fed financing to Bank of New York; do
20 you recall that testimony?
21    A.   Say that one more time.  I'm sorry.
22    Q.   I think we previously talked about an
23 effort during the week of September 15 to
24 transfer collateral from the Fed financing to

## Page 112

HIGHLY CONFIDENTIAL - J. COGHLAN

1 the Bank of New York?
2    A.   Correct.
3    Q.   And I might have misstated the notion
4 that it might have been a tri-party repo
5 involved.
6    A.   Uh-huh.
7    Q.   Do you have any understanding of what
8 type of vehicle was involved in that effort with
9 respect to the Bank of New York?
10    A.   No, the only thing I, as I said, I was
11 indirectly involved because one of my employees
12 was involved --
13    Q.   Okay.
14    A.   -- was transferring collateral to the
15 Bank of New York.
16    Q.   Okay.
17    A.   Under what documents, I don't --
18    Q.   So do you have any knowledge of
19 whether that was a bilateral repo arrangement?
20    A.   I don't, no.  I don't know if it was
21 tri-party, repo, I don't know.
22    Q.   Is it correct to say that that,
23 whatever the arrangement was, it was handled by
24 the Treasury Department at Lehman?

## Page 113

HIGHLY CONFIDENTIAL - J. COGHLAN

1    A.   I don't know.  Normally, they would
2 handle the tri-party.
3    Q.   Okay.
4    A.   You know, but given the circumstances
5 of discussions with Barclays, someone else may
6 have done that.
7    Q.   Okay.  If you could turn your
8 attention to Exhibit 20.
9        Have you had a chance to look through
10 that?
11    A.   Yes, I have.
12        MR. STERN:  Exhibit 120.
13    Q.   I'm sorry, Exhibit 120.  First of all,
14 do you recall this e-mail exchange at all?
15    A.   No, I do not.
16    Q.   Do you recall any discussions along
17 these lines that you might have had with either
18 Mr. Lowitt or Tonucci during this period?
19    A.   No, I do not.
20    Q.   Do you recall any discussions you ever
21 had with Mr. Lowitt during the week of September
22 15?
23    A.   No, I do not recall.
24    Q.   Do you ever recall meeting with him?

Page 114

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2     A.   I don't recall meeting with him.
3     Q.   Do you ever recall him talking to you
4  on the phone about his dealings with the
5  Lehman/Barclays transaction?
6     A.   No, I never talked to him about the
7  Lehman/Barclays transaction.
8     Q.   How about Mr. Tonucci, do you recall
9  meeting with him during that week?
10    A.   No, I don't recall meeting with him.
11    Q.   Do you recall speaking on the phone
12 with him at all?
13    A.   No, I don't recall having, no,
14 speaking with him on the phone.
15    Q.   Do you recall speaking with him in any
16 way or communicating with him in any way during
17 that week?
18    A.   No, I don't recall.
19    Q.   If we look at the title of this
20 e-mail, it says, "If we had to novate the OMO
21 transactions rather than have them collapsed,
22 does that matter?"
23       Does that refresh your recollection at
24 all about any discussions you might have had on
25 this topic?

Page 115

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2     A.   No.   I -- no, it does not.
3     Q.   Do you understand OMO transactions to
4  be the Fed financing?
5     A.   No, I do not.
6     Q.   Do you know what the term "OMO" refers
7  to?
8     A.   No, I do not.
9     Q.   Do you understand what "collapsing"
10 that transaction might have referred to?
11    A.   No, I do not.
12    Q.   If you read further up on the second
13 page, it says, "It has left us short financing"
14 (sic).   "We may need to ask JP to cover."
15       Do you have an understanding what that
16 was referring to?
17    A.   No.
18    Q.   Could you speculate about what it
19 might be referring to?
20    MR. STERN:   Objection to the form.
21 Calls for speculation.
22    Q.   You can still do it.
23    MR. STERN:   Objection.
24    A.   It probably means that there's a cash
25 deficit that JP Morgan would have to cover.

Page 116

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2     Q.   And do you have any understanding why
3  there might be a cash deficit?
4     A.   No, I will not.
5     Q.   Do you know why they're copying you on
6  this e-mail exchange?
7     A.   No, I do not.
8     Q.   Further up on that page it says,
9  "Current plan, as I understand it, is to have
10 trades with OMO unwind and take the collateral
11 to Barclays."
12       Does that remind you in any way of any
13 discussions on that topic?
14    A.   No.   This is the first I've heard of
15 OMO.
16    Q.   Can you -- okay.  Can you speculate or
17 suggest any explanation for what they're talking
18 about when they're saying "take the collateral
19 to Barclays"?
20    A.   I -- no, I couldn't.  I just don't
21 know.
22    Q.   If we turn to the first page of this
23 exhibit, it says here, "I think" -- "This is
24 different I think.  It is a trade with State
25 Street that they matured early."

Page 117

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2       Do you have any understanding of what
3  trades with State Street might have been
4  maturing early during that week?
5     A.   I don't know the transaction.  It
6  probably references that State Street had a
7  financing trade that they matured early, but I
8  don't know it firsthand.  I'm just referencing
9  what the language says.
10    Q.   I understand.  What is normally the
11 consequence of when a financing matures early?
12 What does that mean?
13    A.   There's usually some sort of mark to
14 market event.  Sometimes there's a penalty-type
15 event.
16    Q.   Trades with State Street are typically
17 repos?
18    A.   They would be borrows.  Probably
19 borrows with State Street.  We were borrowing
20 collateral from them.
21    Q.   So you would borrow securities from
22 State Street and pay a fee?
23    A.   Yes.
24    Q.   And "maturing early" suggests that the
25 securities now have to go back to State Street?

| Page 118 |
|---|

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    A.   Yes, so they probably had a term lend
3    to LBI that they wanted back immediately after
4    the holding company bankruptcy. They wanted it
5    back.
6    Q.   And then when you give them back their
7    securities, they would give you back --
8    A.   Cash.
9    Q.   -- the cash? Okay.
10        If you'll read further up, it talks
11   about, "Plan is to early terminate the OMO and
12   TSLF transaction."
13   A.   Uh-huh.
14   Q.   Do you know what "TSLF" is?
15   A.   It is one of the Fed liquidity
16   programs.
17   Q.   Okay.
18   A.   Which one I can't recall off the top
19   of my head, but it was a program established by
20   the Fed to provide financing.
21   Q.   Okay. And do you recall any
22   discussions of early terminating that financing?
23   A.   No.
24   Q.   Or that transaction?
25   A.   No, I don't recall.

| Page 119 |
|---|

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    Q.   Is that TSLF transaction something
3    that was not handled by your department?
4    A.   The TSLF transaction, we would have
5    given the collateral to the TSLF and we would
6    have used the TSLF and given them the
7    collateral. We would have executed the trade.
8        So I forget what the mechanism is, but
9    whatever where you get the collateral into the
10   TSLF and some of these were different types of
11   auction process, we would have gone into the
12   TSLF, we would have put the bid in, and if we
13   were successful in raising the cash, we would
14   have given the TSLF, we would have pledged the
15   money to TSLF.
16   Q.   When you say "we," you're talking
17   about your Financing Department?
18   A.   The decision to use TSLF was made by
19   Treasury, so we would tell them we want to go
20   and use that. They would agree. We would
21   execute the trade off the desk that works for
22   me. The settlement of the trade would be
23   through the normal settlement procedures.
24   Q.   Okay. So do you select the collateral
25   that would be used in this trade?

| Page 120 |
|---|

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    A.   Well, the TSLF only takes certain
3    collateral.
4    Q.   Okay.
5    A.   So we would be limited in the types of
6    collateral they would take. Relative to those
7    guidelines, we would give the collateral into
8    them. We would determine what collateral goes
9    in.
10   Q.   And where do you find those
11   guidelines?
12   A.   They were published by the Fed.
13   Q.   And so, within those guidelines, your
14   department selected the securities that were
15   going to go into that trade?
16   A.   No, we would put the types of
17   securities. So if they were mortgage-backed
18   securities, we would say, okay, we want to
19   borrow a billion dollars. The actual settlement
20   would be taken through the normal settlement
21   processes.
22   Q.   When you say "the actual settlement,"
23   you mean the actual selecting of particular
24   securities?
25   A.   Right, that bond is going to go, that

| Page 121 |
|---|

HIGHLY CONFIDENTIAL - J. COGHLAN

1
2    bond is going to go, and that bond is going to
3    go, and that bond is not going to go. That was
4    done by the settlement people.
5    Q.   And just to remind me, who were the
6    settlement people again? Was that Mr. Hraska?
7    A.   No, that would be both Paolo's group
8    and Alastair Blackwell's group.
9    Q.   Okay. If you read further up -- well,
10   okay, and then further in that sentence it says,
11   "And then all the collateral to Barclays, so no
12   ongoing Fed financing of Lehman."
13        Do you recall any discussion of ending
14   the Fed financing of Lehman during that week?
15   A.   I don't recall any of the -- any
16   conversation relative to the Fed financing other
17   than that the Fed -- I was told that the Fed
18   wanted Barclays to step in as opposed to the Fed
19   stepping in.
20   Q.   And what were you told about that?
21   A.   When was I told about that?
22   Q.   What were you told about that?
23   A.   When John Feraca got involved in the
24   settlement process, he said that the motivation
25   is to get Barclays to face the Fed as opposed to

Page 122

HIGHLY CONFIDENTIAL - J. COGHLAN

1 have Lehman Brothers face the Fed, and so I did
2 know that there was a motivation to restructure
3 the relationship so the Fed was facing Barclays
4 as opposed to facing Lehman.
5    Q.    Were you told anything about how that
6 was going to take place?
7    A.    No. No, I was not told.
8    Q.    Do you have any understanding of how
9 that was going to take place?
10    A.    No, I didn't have any input,
11 communication around that.
12    Q.    Did you ever hear anything about how
13 that was going to take place?
14    MR. STERN: Objection to the form.
15    A.    What I knew about it was that we were
16 working hard to transfer collateral over to Bank
17 of New York and we were trying to facilitate
18 that.
19    Q.    That's all you knew about the whole
20 effort to have Barclays --
21    A.    To the best of my knowledge, yes.
22    Q.    If you read a little further up, it
23 talks about -- it mentions two different things.
24 One is the Chase acceleration.

Page 123

HIGHLY CONFIDENTIAL - J. COGHLAN

1    Do you understand what that phrase
2 means?
3    A.    No, I do not.
4    Q.    You ever heard that phrase during that
5 week?
6    A.    No, I did not.
7    Q.    Did you have anything -- did you
8 speculate about what it might be referring to?
9    MR. STERN: Objection to the form.
10    A.    "Chase accelerate" -- no, I don't know
11 what that means.
12    Q.    If you read further on in that
13 sentence, it says, "Perhaps that is State
14 Street. PCDF will get bigger as a result."
15    Do you have any understanding what
16 that could be referring to?
17    A.    I don't understand what the reference
18 to State Street is. The PCDF was another Fed
19 program, so if these two things happened, which
20 I don't understand what these two things are,
21 it's too vague, the result would be that we
22 would be borrowing more from the Fed.
23    Q.    Oh, I see. Okay. I gotcha.
24    You might as well keep that e-mail,

Page 124

HIGHLY CONFIDENTIAL - J. COGHLAN

1 because this is a continuation, it appears to
2 me.
3    (Exhibit 121, an e-mail string, the
4    first one in time dated September 17, 2008,
5    at 6:25 P.M., marked for identification, as
6    of this date.)
7    Q.    Mr. Coghlan, I'm handing you an
8 exhibit marked 121, which appears to be a
9 continuation of the same e-mail stream we've
10 been discussing, only it looks like in the most
11 recent two e-mails you're no longer a CC. Do
12 you see where I'm referring to?
13    Oh, I correct that. You are still a
14 CC on the second-to-last one.
15    A.    Which two --
16    Q.    Let me rephrase that.
17    MR. STERN: You mean the
18    third-to-last?
19    Q.    You'll notice, if you compare it to
20 the prior e-mail, the prior e-mail stream ends
21 with, "Got it. I am dealing with the State
22 Street issue." Do you see that?
23    A.    Yes.
24    Q.    And then there are two more e-mails

Page 125

HIGHLY CONFIDENTIAL - J. COGHLAN

1 above that, do you see that?
2    A.    Uh-huh.
3    Q.    The first one says, "OK'd to increase
4 PCDF. Ian." Do you have any understanding what
5 he's referring to there?
6    A.    I don't see that.
7    (Mr. Stern indicating.)
8    Q.    Do you see it now?
9    A.    Yes, I'm sorry. Rephrase the
10 question. Restate the question again. I'm
11 sorry.
12    Q.    Do you see the message that says,
13 "OK'd to increase PCDF. Ian." Do you see that?
14    A.    Yes.
15    Q.    Do you have any understanding what
16 that's referring to?
17    A.    Well, the PCDF, as I said, was a Fed
18 program.
19    Q.    Right.
20    A.    And somebody okayed an increase in
21 borrowing through the PCDF program.
22    Q.    Was that in fact done?
23    A.    I don't know.
24    Q.    Did you have a role in monitoring the

## Page 126

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2    level of borrowing from the PCDF program?
3       A.   No, that was controlled by Treasury.
4       Q.   Further up on the e-mail it says --
5    this is now an e-mail in which you are not a
6    party, or you're not copied, apparently, but it
7    says, "Hoping to do more with Barclays to avoid
8    haircut impact."
9       Do you have any idea what that could
10   be referring to?
11      MR. STERN:  Objection to the form.
12      A.   No, I do -- I don't know what that
13   means.
14      Q.   Could that be referring to the haircut
15   impact of borrowing more from the PCDF?
16      A.   That could be an outcome.
17      Q.   Okay.  I'm going to hand you one more
18   exhibit which involves the same e-mail stream,
19   so you might as well keep those in front of you.
20      (Exhibit 122, an e-mail string, the
21      first one in time dated September 17, 2008
22      at 6:39 P.M., marked for identification, as
23      of this date.)
24      Q.   Mr. Coghlan, I'm handing you an
25   Exhibit marked 122, which appears to be a

## Page 127

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2    further continuation of the same e-mail stream.
3    The most recent messages appear to not include
4    you as a CC, but I refer to you to midway down
5    on the first page.  It says, "Hope to do more
6    with Barclays to avoid haircut impact."
7       Do you see that?
8       A.   Yes.
9       Q.   If we continue up the page, you'll see
10   a reference eventually to a statement that says,
11   "Barclays thinks they can get cash ... need
12   approval from Gerard.  Can you ask him?  $2.8
13   billion versus equities."
14      Do you have any understanding what
15   that could be referring to?
16      MR. STERN:  Objection to the form.
17      A.   Well, I mean, a couple of things.
18   Take it that -- one piece is obvious Barclays
19   thinks they can raise some cash.  They need to
20   get approval from Gerard LaRocco, who is a
21   senior official at BarCap.
22      Q.   Okay.
23      A.   And I don't know what the "2.8 billion
24   versus equities" means.
25      Q.   Any recollection of Barclays raising

## Page 128

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2    2.8 billion for any reason during that week?
3       A.   No, I don't recall that.
4       Q.   If you go further up on the page, it
5    says, "Spoke to Barclays.  They have the
6    money and will do the trade with us for 2.8
7    billion."
8       Does that refresh your recollection at
9    all about the 2.8 billion?
10      A.   No, it does not.
11      Q.   Do you recall doing any kind of trade
12   with Barclays for 2.8 billion during that week?
13      A.   No, I don't recall.
14      Q.   Okay.  Would that be done in your
15   group or --
16      MR. STERN:  Objection to the form.
17      A.   The discussions with Barclays and the
18   settlement and the transfer out of the Fed into
19   BoNY was handled outside my group.
20      Q.   Okay.
21      A.   The only role my group would play
22   would be coordinating with Treasury on the
23   settlement of whatever was negotiated.
24      Q.   Okay.
25      (Exhibit 123, a document bearing Bates

## Page 129

1       HIGHLY CONFIDENTIAL - J. COGHLAN
2    Nos. 68985, marked for identification, as of
3    this date.)
4       Q.   Mr. Coghlan, I'm handing you an
5    exhibit marked 123, which is an e-mail string
6    from Thursday, September 18, and if you -- you
7    do not appear to have been CC'd on this e-mail,
8    but if you look in the second message down, it
9    says, "Do you want me to talk to Coghlan about
10   not doing any more repo unwinds?"
11      I would like to give you a chance just
12   to review the document first, but I want to
13   point you to that sentence just to see if it
14   triggers any recollections.
15      MR. STERN:  Please read the document.
16      A.   Okay.
17      Q.   Do you have any recollection of
18   speaking with either Mr. Tonucci or Mr. Azerad
19   during that week about this issue?
20      MR. STERN:  Objection to the form.
21      A.   There's a lot of issues covered in
22   this, so it's hard to --
23      Q.   Okay.  Well, my question is it says,
24   "Do you want me to talk to Mr. Coghlan," meaning
25   yourself, I take it, about some of the issues in

## Page 130

HIGHLY CONFIDENTIAL - J. COGHLAN

the e-mails below. So my question is, did you
have any discussions with these individuals, Mr.
Tonucci or Mr. Azerad, about any of the issues
raised in the e-mail below?

MR. STERN: Objection to the form.

A.   I did not talk to Mr. Tonucci. I
don't recall talking to Mr. Tonucci or Mr.
Azerad about any of the specific haircut changes
and cash impact changes outlined in the e-mail.
I don't recall having those conversations.

Q.   Did you recall speaking to them in
general about haircut changes or --

A.   I did talk to Paolo briefly about, as
we unwound repo trades, the impact that the cash
movements would have, and I had spoken to him
about, you know, how many unwinds are we
supposed to do.

Q.   Can you explain to me what you meant
by what you just said?

A.   Sure.  In places where we had positive
margin, okay, where people were posting
collateral and cash to us, that created a cash
surplus. As we started to unwind trades, that
sometimes affected the cash surplus. So we had

## Page 131

HIGHLY CONFIDENTIAL - J. COGHLAN

to be thoughtful about what trades we could
unwind because we couldn't -- we didn't want to
go into negative cash flows.

Q.   Okay. You spoke to Mr. Tonucci about
that topic sometime during that week?

A.   Yes.

Q.   And what did he say about it?

A.   He said that we should, you know, get
as much -- we should get many of the financing
trades eliminated but try not to do ones that we
are positively cash flow. So try to do the ones
where it would be cash neutral or cash additive.

Q.   When you say "cash additive," what
does that mean?

A.   If I do a repo on a mortgage product
for $100 million and I have $105 million worth
of collateral, I can take that extra 5 percent,
that 5 million, and I can pledge it and raise
cash. When that trade goes back to the client,
he takes my 105 million, I get my 100 million
of cash, but that 5 million of surplus I have
created by pledging his 5 percent is no longer
there.

Q.   So would that be cash additive?

## Page 132

HIGHLY CONFIDENTIAL - J. COGHLAN

A.   No, cash negative.

Q.   So those are the ones you would want
to unwind?

A.   No, we wouldn't want to unwind.

Q.   Okay. I understand.

So you proceeded to unwind various
transactions based on those instructions from
Mr. Tonucci?

A.   Yeah, those were broad guidelines, I
would say.

Q.   And was that your mandate during that
week with respect to unwinding transactions?

A.   That was kind of the guideline that
Paolo told me to follow, you know, where
possible.

Q.   Did that change at all during toward
the end of the week?

A.   Not to the -- not to the best of my
knowledge.

Q.   Okay.

(Exhibit 124, a document bearing Bates
Nos. 10303258, marked for identification, as
of this date.)

Q.   Mr. Coghlan, I'm handing you a

## Page 133

HIGHLY CONFIDENTIAL - J. COGHLAN

document marked as Exhibit 124, which is an
e-mail stream dated September 18, in which you
are a recipient from Mr. Feraca.

Do you recall seeing this e-mail at
all?

A.   No, I do not.

Q.   Have you had a chance to take a look
at it briefly.

(Document review.)

A.   I've looked at it now, yes.

Q.   In the first phrase toward the top, it
says, "This is a process that was agreed to by
Ops, BCI, JPM, and BONY late last night to
transfer the positions funded by the Fed's three
financing programs (OMO, TSLF and PDCF) to
Barclays for funding CLB today."

And my question is were you involved
in those discussions that night?

A.   No, I was not.

Q.   Do you know anything about what took
place that night with respect to those
discussions?

A.   No, I do not.

Q.   Okay. If you look further down the

Page 134

HIGHLY CONFIDENTIAL - J. COGHLAN

1    e-mail, which contains a list of the
2    logistics -- it's entitled Logistics of
3    Collateral Movements?
4        A.    Uh-huh.
5        Q.    Do you see that? And it's a listing
6    of seven items.
7            Were you involved in any of those
8    logistical efforts to move collateral?
9        A.    I'm sorry, can you repeat the
10    question?
11    Q.    Do you know what these seven items are
12    referring to?
13    A.    No.
14    Q.    Were you involved in any of the items
15    or in trying to give effect to any of the items
16    listed in this list?
17    A.    No, I was not involved.
18    Q.    If you look at number 6, it mentions
19    book free repos. Do you see that?
20    A.    Yes, I do.
21    Q.    Can you tell me what free repos are?
22    A.    I don't know how it applies here. The
23    notion of free repo is that you normally are
24    delivering without getting payment at the same

Page 135

HIGHLY CONFIDENTIAL - J. COGHLAN

1    time. So you would give collateral before you
2    get paid.
3        Q.    Okay.
4        A.    I don't know if that's what this is
5    referring to. So I know what a free repo is. I
6    just don't know how it relates to this
7    transaction.
8        Q.    And under what context have you seen
9    "free repos" used?
10    A.    I can't recall.
11    Q.    Okay. How about further down where it
12    says, "Funding Considerations" and then it
13    mentions "shell trades." Is that a phrase you
14    have ever used in your work at Lehman?
15    A.    Yeah, the shell normally refers to the
16    collateral types that people -- that we were
17    going to pledge, and the shell normally refers
18    to kind of like the schedule of collateral that
19    we are going to book. But again, I don't know
20    how that phrase fits into this protocol.
21    Q.    Fair to say you had no involvement in
22    this protocol mentioned in this e-mail?
23    A.    Yes, that's accurate.
24    Q.    Is it also fair to say that the group

Page 136

HIGHLY CONFIDENTIAL - J. COGHLAN

1    that you managed at Lehman was not involved in
2    this protocol?
3        A.    No, there would be people that, you
4    know, know settlements and know operations that
5    would have been, you know, involved and helpful
6    to, you know, understanding what is the best way
7    to get this transaction settled.
8            So, as I said, John Feraca, you know,
9    clearly was involved. There's another guy,
10    Larry Servidio. So my people know the
11    settlement processes, but they're not
12    responsible for the settlement itself.
13    Q.    So --
14    A.    So they would take their knowledge and
15    ask for input and advice about how to get some
16    of these things done.
17    Q.    And so were they reporting to people
18    within the Treasury Department with respect to
19    doing this?
20    A.    No, they would be reporting to me.
21    Q.    But you weren't really monitoring what
22    they were doing with respect to this
23    transaction?
24    A.    No, because the responsibility for

Page 137

HIGHLY CONFIDENTIAL - J. COGHLAN

1    this trade would have been in Treasury.
2        Q.    Okay.
3        A.    It would have been, you know, through
4    Ian Lowitt, Paolo Tonucci, Robert Azerad. My
5    folks were there just to provide advice, provide
6    input, have suggestions, because they do have an
7    understanding of all this.
8        Q.    Okay. Did you ever have discussions
9    with your people, Mr. Feraca or Mr. Servidio,
10    about this process?
11    A.    I've talked to John Feraca about it.
12    Q.    Uh-huh.
13    A.    I didn't talk about this process per
14    se, but the general process, and the only -- the
15    primary input was the amount of effort it was
16    taking to get this done, the amount of people
17    that needed to be involved, and the time, you
18    know, the late nights that everyone was working
19    to facilitate this result.
20    Q.    Did he mention any problems that arose
21    during the course of this transaction?
22    A.    Not specifically, no.
23    Q.    Did he mention generally any problems
24    that arose during this effort?

Page 138

HIGHLY CONFIDENTIAL - J. COGHLAN

1    A.   Not specific ones. Not specifically,
2  no.
3    Q.   I meant did he mention any general
4  problems that arose during that transaction?
5    A.   No, he didn't bring any of the
6  specific problems or the general problems to me.
7    Q.   Was he there all that weekend while
8  you were out of town?
9    A.   I don't know.
10   Q.   Okay.
11       (Exhibit I25, covering e-mail with
12   chart with the heading "Booking Amounts,"
13   marked for identification, as of this date.)
14   Q.   Mr. Coghlan, I'm going to hand you two
15  exhibits. One has previously been marked as
16  Exhibit 60B and the other one was marked as
17  Exhibit I25.
18       I understand your name does not appear
19  on these, the covering e-mails. My questions
20  are really directed at the two charts that are
21  attached to them. So if you might take a second
22  or a minute just to look at the two charts.
23       MR. STERN: Well, look at the whole
24  document. Start with 60B --

Page 139

HIGHLY CONFIDENTIAL - J. COGHLAN

1    A.   Which one am I going to --
2        MR. STERN: Start with 60B.
3    Q.   Have you had a chance to look at the
4  two documents?
5    A.   I have.
6    Q.   Let's turn to the one attached to
7  Exhibit 60B. Have you ever seen this chart
8  before?
9    A.   No, I have not.
10   Q.   Have you ever seen a chart like this
11  before?
12   A.   No, I have not.
13   Q.   Do you have any understanding what
14  this could be relaying?
15       MR. STERN: Objection to the form.
16  Calling for speculation.
17   A.   No, I -- I'm trying to -- I just don't
18  understand it.
19   Q.   Do you have any understanding of the
20  phrase "Anticipated Prefunding Dollar Amount"
21  used in the upper right-hand corner?
22   A.   No.
23   Q.   Have you ever heard that phrase
24  used --

Page 140

HIGHLY CONFIDENTIAL - J. COGHLAN

1    A.   No.
2    Q.   -- in connection with the Fed funding?
3        Do you have any understanding of the
4  amounts that were pledged as collateral to the
5  Fed during the week of September 15?
6    A.   No.
7    Q.   Do you have any understanding of the
8  phrase, which the phrase "Paydown Amount" could
9  mean in this context?
10   A.   That's the first I've heard of it.
11   Q.   Turn to the chart attached to the next
12  exhibit. Have you ever seen this chart before?
13   A.   No, I have not.
14   Q.   You have any understanding what the
15  phrase "booking amounts" would mean in
16  connection with this chart?
17       MR. STERN: Objection.
18   A.   I'm sorry. Rephrase the question.
19   Q.   Do you have any understanding what the
20  phrase "booking amounts" could mean with respect
21  to this chart?
22   A.   No, I do not.
23   Q.   Do you know who at Lehman or if you
24  could suggest who at Lehman might have been

Page 141

HIGHLY CONFIDENTIAL - J. COGHLAN

1  handling charts like this for this Fed funding
2  program?
3    A.   No, I don't know who would be putting
4  these things together.
5    Q.   Okay. Fair enough.
6        Mr. Coghlan, I'm handing you a copy of
7  an exhibit previously marked as Exhibit 21,
8  which is an e-mail stream dated September 18 in
9  which you are a recipient.
10   A.   Uh-huh.
11   Q.   If you could take a minute just to
12  review the document.
13       MR. STERN: Start from the bottom.
14       (Document review.)
15   A.   Okay.
16   Q.   Have you had a chance to look at the
17  document?
18   A.   Yes, I have.
19   Q.   Have you ever seen this document
20  before?
21   A.   Not to my -- not to my best
22  recollection.
23   Q.   Do you recall receiving this e-mail?
24   A.   No, I do not.

Page 142

1          HIGHLY CONFIDENTIAL - J. COGHLAN
2      Q.   On or about September 18?
3      A.   No, I do not.
4      Q.   Let's look down at the bottom where
5  you have an e-mail from Mr. Reilly to Mr. Lowitt
6  and Gelband. Do you see the e-mail I'm talking
7  about?
8      A.   Yes.
9      Q.   It says "open issues on deal"?
10     A.   Uh-huh.
11     Q.   The first issue that he mentions
12 involves auction rate book, and it says, "We
13 have been making the assumption this is going.
14 I am not sure BarCap knows that and assume there
15 could be no auction process if it stayed. Can
16 we leave it behind?"
17         Do you recall any discussions during
18 this week about the auction rate book?
19     A.   No.
20     Q.   Did you have any discussions with Mr.
21 Tonucci or Reilly or Lowitt or Gelband about
22 that topic?
23     A.   To the best of my knowledge, no.
24     Q.   Is that a topic -- what is the auction
25 rate book?

Page 143

1          HIGHLY CONFIDENTIAL - J. COGHLAN
2      A.   Auction rate securities are securities
3  that are long dated securities that coupon or
4  the dividend reset on a 30-day, 60-day,
5  whatever, you know, on a short-term basis. So
6  you have this process where you auction the
7  coupon or the dividend and the auction
8  determines what that coupon or the dividend is.
9  That's a book that's not under my jurisdiction.
10 It was managed ultimately by Eric Felder.
11     Q.   That was going to be my question.
12 That is not a book that's involved in your
13 financing business?
14     A.   No. No. It's an inventory position
15 that the firm would own, and that, you know,
16 book is managed not by Eric himself, but for
17 people that work for Eric.
18     Q.   So if we look toward the top of the
19 page, it says, "Eric should dig in on auction
20 rates." Do you take that to be referring to
21 Eric Felder?
22     A.   Yes.
23     Q.   Okay. So that would be an issue that
24 he would probably handle?
25     A.   Uh-huh.

Page 144

1          HIGHLY CONFIDENTIAL - J. COGHLAN
2      Q.   Okay. The second item on the list
3  toward the bottom mentions something called "PB
4  financing balances" --
5      A.   Uh-huh.
6      Q.   -- "left in LBI."
7          What are PB financing balances?
8      A.   Those would be equity financing that
9  we've done where we're financing long positions
10 for clients in the equity financed space. So
11 this would be referring that there was still
12 client balances that have not been returned. So
13 that's what the PB financing balances would be.
14     Q.   What does "PB" stand for?
15     A.   Prime brokerage.
16     Q.   Okay. And it says, "Looks like we
17 will have PB financing balances left in LBI, and
18 according to Cogs, they do not want it."
19         That "Cogs" is referring to you,
20 correct?
21     A.   I would believe so, yes.
22     Q.   And do you recall any discussions as
23 to this issue?
24     A.   The conversation I do recall is the
25 one I talked about with Marty Malloy in the

Page 145

1          HIGHLY CONFIDENTIAL - J. COGHLAN
2  beginning of the week, that I approached him, as
3  I said, to discuss, you know, what positions
4  would be transferred over to Barclays and, you
5  know, got a response from him that they would
6  not be taking the positions over.
7          So this is, I think, referring to me
8  relaying that information that you, know, the PB
9  balances or the PB financing positions would not
10 be transferring to Barclays.
11     Q.   Okay. I guess I misunderstood your
12 prior testimony. I thought you said it was
13 mainly a discussion about transitioning the
14 business. Did you actually go over --
15         MR. STERN: Objection to the form.
16     Q.   -- go over the securities they did or
17 did not want to be transferred to Barclays?
18     A.   No, we did not get into that detail,
19 no.
20     Q.   Okay. And why did you think that Mr.
21 Malloy or Barclays did not want the PB financing
22 balances?
23     A.   I don't know --
24         Could you restate the question?
25     Q.   You might have just said it. I just

## Page 146

HIGHLY CONFIDENTIAL - J. COGHLAN

1 want to understand it. Is it correct to say
2 that you got the impression based on your
3 meeting with Mr. Malloy that Barclays did not
4 want the PB financing balances transferred to
5 it?
6     A.   Yes.
7     Q.   And why was that?
8     A.   I was not given a reason. I was just
9 told that it was Marty's understanding that the
10 fixed income repo and the PB financing would not
11 be going over to Barclays, you know, when the
12 deal closed.
13     Q.   So your understanding that you got
14 from Mr. Malloy was that not just -- they did
15 not just want the PB financing; they didn't want
16 the other three items you just mentioned,
17 correct?
18         MR. STERN: Objection to the form.
19     A.   I --
20     Q.   Let me rephrase the question.
21         Did the position that you understood
22 after your conversation with Mr. Malloy relate
23 only to PB financings or other types of
24 securities?

## Page 147

HIGHLY CONFIDENTIAL - J. COGHLAN

1     A.   All financings. All the financings
2 that were residing in LBI, fixed income and
3 equities.
4     Q.   So that would be all the financings
5 that are managed by your group?
6     A.   Yes.
7     Q.   And you understood, based on your
8 conversations with him, that Barclays was not
9 going to be taking them over?
10     A.   Correct.
11     Q.   Okay. If you see that line goes
12 further, it says, "What does it mean to leave it
13 behind?"
14         Do you have any understanding what the
15 discussion was on that point?
16     A.   I do not recall.
17     Q.   Do you recall any discussions with any
18 of these folks here, Mr. Reilly, Lowitt,
19 Gelband, Tonucci or Kelly, about this issue?
20     A.   No, I don't remember any conversations
21 relative to this.
22     Q.   Would you have told Mr. Reilly this,
23 because he says "according to Cogs"?
24     A.   Mr. Reilly was the CFO for Capital

## Page 148

HIGHLY CONFIDENTIAL - J. COGHLAN

1 Markets, so, you know, he may have had a
2 conversation with me or I may have had a
3 conversation with him, you know, reflecting, you
4 know, what I learned after speaking to Marty
5 Malloy, but I don't recall that specifically.
6     Q.   Okay. Is it likely that you reported
7 back to him based on your conversation -- about
8 what took place in your conversation with Mr.
9 Malloy?
10     A.   It's likely that I told somebody that
11 Barclays was not going to be taking the
12 financing positions. Who I reflected that to I
13 can't recall.
14     Q.   Okay. If you look further up on the
15 e-mail, it says, "Wickham should answer PB."
16         What do you understand that to mean?
17     A.   Well, John ran the prime brokerage.
18 So I would think they're just trying to say, you
19 know, Wickham should provide the answer about
20 what to do about the PB balances that are left.
21     Q.   And do you recall what answer he
22 provided?
23     A.   No, I do not.
24     Q.   Were you party to any further

## Page 149

HIGHLY CONFIDENTIAL - J. COGHLAN

1 discussions about the PB balances after this
2 e-mail?
3     A.   Not that I recall.
4     Q.   Okay. If you continue on that line,
5 it says -- toward the end, it says, "Third
6 question is definitely for Cogs." That's you,
7 right?
8     A.   Uh-huh.
9     Q.   Let's look at the third question.
10 "Not clear on the amount of block discount or
11 how we make it happen."
12         Do you understand what that means?
13     A.   No.
14     Q.   If you read this whole item number 3,
15 do you have any recollection about discussions
16 on any of these issues mentioned there?
17     A.   No, I do not recall having any
18 conversations on these issues.
19     Q.   Do you have any understanding of what
20 these issues are referring to?
21     A.   No, I don't -- I don't understand what
22 this paragraph means.
23     Q.   Well, "The third question is
24 definitely for Cogs," was this question posed to

Page 150

HIGHLY CONFIDENTIAL - J. COGHLAN

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    you?
3    A.    I don't recall.
4    Q.    Did you have to take any action after
5    receiving this e-mail because the third question
6    was definitely for you?
7        MR. STERN: Objection to the form.
8    A.    I don't recall having any discussion
9    relative to the issues over which is discussed
10   in this paragraph. I don't --
11   Q.    My question was, did you take any
12   action as a result of receiving this e-mail
13   which points to the third question as being
14   definitely for you?
15   A.    I don't recall that we took any
16   action.
17   Q.    Did you have any meetings with anyone
18   about this e-mail?
19   A.    I don't recall.
20   Q.    So let's look at number 3. It says,
21   "Not clear on the amount of the block discount."
22       Do you know what block discount that's
23   referring to?
24   A.    I never heard that phrase before.
25   Q.    You've never heard the phrase "block

Page 151

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    discount"?
3    A.    No, I don't know what that means.
4    Q.    Did you ask someone when you received
5    this e-mail, what does "block discount" mean?
6    A.    I don't recall that, no.
7    Q.    Would you have asked someone what are
8    you talking about when you referred this
9    question to me?
10       MR. STERN: Objection to the form.
11   A.    I don't recall acting on this -- on
12   this issue. I don't understand what it means in
13   this e-mail and I don't recall addressing it
14   during the week of the, whatever, the 15th.
15   Q.    Did you ask anyone what this means?
16       MR. STERN: Objection to the form.
17   A.    I don't recall discussing this issue.
18   First of all, I'm not sure what this issue is on
19   the e-mail, and I don't -- discuss -- I don't
20   remember -- recall discussing this issue.
21   Q.    Do you have any understanding what the
22   phrase "block discount" means in this context?
23       MR. STERN: Objection. Asked and
24   answered.
25   A.    I don't know what the phrase "block

Page 152

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    discount" means.
3    Q.    Did you have any understanding?
4    A.    No.
5    Q.    Can you speculate about what it's
6    referring to in this context?
7        MR. STERN: Objection. Calls for
8    speculation.
9    A.    I couldn't speculate. I don't know.
10   Q.    You have absolutely no idea what the
11   phrase "block discount" means in this context?
12       MR. STERN: Objection.
13   A.    This is the first I've ever heard the
14   term "block discount," so I have no
15   understanding of what that term means.
16   Q.    Let's go to the next sentence. Well,
17   let's go to the remainder of that sentence where
18   it talks to "how we make it happen."
19       Do you recall any discussions about
20   how we -- how Lehman could make happen any kind
21   of discount?
22   A.    No.
23   Q.    Do you have any understanding what
24   that was referring to about "how we make it
25   happen"?

Page 153

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.    I don't have any recollection of
3    how -- what that means or having any discussion
4    about it.
5    Q.    The next sentence says, "Defaulting on
6    repo could be the best, as discount could be
7    taken from haircut."
8        What does that mean?
9        MR. STERN: Objection to the form.
10   A.    I don't know. I mean, I -- it's very
11   confusing. I don't know what it means.
12   Q.    Do you recall any discussion about
13   defaulting on a repo during this week, the week
14   of September 15?
15   A.    I'm sorry, say the question again.
16   Q.    Do you recall having any discussions
17   with anyone about defaulting on a repo during
18   the week of September 15?
19   A.    We did have situations where we were
20   defaulting not on repo, but on stock loans, and
21   so we had situations where we did default and
22   people put us in default, but that was third
23   parties defaulting us for failure to operate
24   under the contract.
25       But it had -- it has nothing to do

Page 154

HIGHLY CONFIDENTIAL - J. COGHLAN
1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    with what's being -- I don't even know what's
3    being discussed here, what this is referring to.
4    Q.    How do you know it has nothing to do
5    with it?
6    A.    Because I don't understand what
7    this -- what this means.
8    Q.    Let's just take a step back from this.
9    On a normal repo, what happens when the party
10   who transferred the collateral defaults?
11   A.    So --
12   Q.    Let's just posit a situation like we
13   talked about earlier. One party A is going to
14   give you $50 million in collateral?
15   A.    Uh-huh.
16   Q.    And you're going to give me $45
17   million in cash?
18   A.    Right.
19   Q.    What happens if I default under normal
20   circumstances?
21   A.    I'm sorry, can you just go through --
22   your party?
23   Q.    If I'm the party that is giving you
24   have $50 million in collateral?
25   A.    You're giving me collateral. I'm

Page 155

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    going to give you cash.
3    Q.    You're giving me 45 million in cash?
4    A.    Right.
5    Q.    What happens under normal
6    circumstances if I default?
7    A.    If you -- the person who borrowed the
8    cash?
9    Q.    Yes.
10   A.    The party that has the collateral
11   would take the collateral, liquidate the
12   collateral, and pay off the loan.
13   Q.    And do you get to keep the haircut?
14   A.    Only to the extent that it covers your
15   principal. To the extent that it's larger than
16   your principal, you're required to return that.
17   Q.    Why are you required to do that?
18   A.    Because the collateral is there only
19   to pay down principal.
20   Q.    So, just so I understand, in our
21   hypothetical if I default, you would liquidate
22   the $50 million in collateral and then do what?
23   A.    Well, normally what I would have is
24   I'd have -- let's go back to my example. I
25   would give you $100 million in cash and you

Page 156

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    would give me $105 million in collateral. You
3    default. I call you up and say give me back my
4    cash.
5    Q.    Right.
6    A.    You said I can't do that. So I put
7    you in default.
8    Q.    Okay.
9    A.    I take your collateral, I sell it,
10   okay? And liquidate it.
11   Q.    Okay.
12   A.    And I use that extra 5 percent to pay
13   off my principal, my 100 million that I lent
14   you.
15   Q.    Do you pay off anything else with it?
16   A.    No. I just have to pay that off.
17   Now, to the extent there's a deficit,
18   I take a loss. So if your collateral is only
19   worth 98 million, I lose money; and if your
20   collateral is worth still 105, I would have to
21   return the 5 million excess to you.
22   Q.    Okay. That's the normal course of
23   business in the event of a default?
24   A.    Yes.
25   Q.    Does that change at all in the event

Page 157

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    of a bankruptcy?
3    A.    Well, no, because what I described was
4    a situation where the governing document would
5    have been a GMRA or, you know, or a stock loan
6    agreement.
7    In the bankruptcy, those contracts are
8    no longer valid. The bankruptcy court is, you
9    know, running the outcome. So, in an event of a
10   bankruptcy, I believe it's different.
11   Q.    How is it different?
12   A.    I'm not a lawyer. I don't know.
13   Q.    How do you believe it differs?
14   A.    Because if the entity is bankrupt, it
15   can't operate any longer, it can't honor the,
16   you know, move cash and collateral back and
17   forth and so your rights, you know, under that
18   are different because, you know, I think the
19   bankruptcy proceedings are different.
20   What I described is when an entity is
21   still operating and they just default under the
22   agreement.
23   Q.    So whose rights are different in the
24   bankruptcy context?
25   MR. SCARING: I'm going to object to

Page 158

HIGHLY CONFIDENTIAL - J. COGHLAN
1  that.
2  A.   I'm not qualified -- what I described
3  to you is the normal operating procedure in
4  entities that are still viable that are governed
5  by traditional financing contracts.
6  Q.   Okay.
7  A.   What happens in bankruptcies, I'm not
8  qualified to discuss what -- I just don't know.
9  Q.   Do you have any experience in
10 bankruptcies other than the one that we're
11 talking about here?
12 A.   No.
13 Q.   Okay.  Do you have any experience in
14 defaults in the bankruptcy context other than
15 the Lehman situation?
16 A.   No.
17 Q.   Okay.  Did you ever discuss with
18 anyone during this week what happens to the
19 collateral in the event of a default?
20        MR. STERN:  Objection to the form.
21        What week?
22 Q.   The week of September 15.
23 A.   Well, as I said, we were -- LBI was
24 still operating.

Page 159

HIGHLY CONFIDENTIAL - J. COGHLAN
1  Q.   Right.
2  A.   We had contracts that govern our
3  behavior.  To the extent that we could not
4  operate as per the requirements of the contract,
5  parties were able to put us in default.  That in
6  fact happened.
7  Q.   Which parties put you in default?
8  A.   I don't know off the top of my --
9  various securities lenders.  Other
10 counterparties that did trades with us.
11 Q.   Could you name any of them?
12 A.   I -- I don't recall which ones did and
13 didn't.
14 Q.   So, in those default situations that
15 you mentioned, was Lehman the lender of the
16 collateral or was Lehman --
17 A.   Both.  Lehman would be both.
18 Q.   So, in the situations where Lehman was
19 lending collateral and it was declared in
20 default, did Lehman get back any excess
21 collateral after it was liquidated?
22 A.   I -- I don't know.  I don't -- I just
23 can't answer that question.  I mean, there's so
24 many transactions that are going through during

Page 160

HIGHLY CONFIDENTIAL - J. COGHLAN
1  the course of the day, you know, the speed is --
2  so to know exactly what the cash flows were on a
3  trade-by-trade basis would be difficult to
4  monitor, you know, given the circumstances.
5  Q.   Do you know of any situation where
6  Lehman was put in default during that week and
7  received back part of the haircut?
8  A.   I don't know that.  I don't recall,
9  no.
10 Q.   Who would know that?
11 A.   I don't know.
12 Q.   Were there any situations during that
13 week where Lehman was the provider of the cash
14 in the transaction where Lehman was declared in
15 default?
16 A.   Yes, I believe so.
17 Q.   Do you know which entities declared
18 Lehman in default in that context?
19 A.   I don't know off, you know, off the
20 top of my head, no.
21 Q.   And what happened in those situations?
22 Did Lehman liquidate the collateral?
23 A.   No, the counterparty would be
24 liquidating us.  If we lent them the cash, if we

Page 161

HIGHLY CONFIDENTIAL - J. COGHLAN
1  couldn't get back, they would take out cash back
2  and then they would just buy us in.
3  Q.   What do you mean, what does "buy us
4  in" mean?
5  A.   In a stock trade, for example, if you
6  are State Street and you gave me $100 million
7  worth of IBM, you would put us in default
8  because I can't return the IBM.  I may not have
9  been able to return the IBM because I couldn't
10 get it back from the person I lent it to.
11       So then I couldn't deliver back to a
12 State Street -- this is just an academic
13 example -- State Street that collateral.  So
14 they would have the right to put us in default
15 because I couldn't make delivery, and then they
16 would buy us in the collateral that we owed
17 them.
18 Q.   I guess I just don't understand the
19 phrase "buy us in."  What does that mean?
20 A.   So they gave me $100 million worth of
21 IBM, and they would have to go back and buy it,
22 you know, because I couldn't make delivery to
23 them.  They want it back.  I couldn't make
24 delivery to them.  So they would go into the

Page 162

HIGHLY CONFIDENTIAL - J. COGHLAN

1    marketplace on the exchange, buy $100 million
2    worth of IBM, and hopefully they had enough
3    margin to make sure that they were made whole.
4        Q.    And if they had extra, what would they
5    do?
6        A.    I believe they over time would have to
7    return it to us, but, you know, again, that's
8    something for counsel to discuss.
9        Q.    I understand that. I'm not asking a
10   legal question.
11       Do you recall any questions -- any
12   discussions during this week about the issues
13   you and I have just been talking about?
14       A.    I -- can you restate the question,
15   please?
16       Q.    Do you recall any discussions during
17   this week of September 15th through the closing
18   of the sale transaction the following Monday
19   concerning what happens in the event of a
20   default of a repo?
21       A.    I'm sorry, I just don't understand the
22   question.
23       Q.    Did you have any discussions with
24   anyone at Lehman during this week of November --

Page 163

HIGHLY CONFIDENTIAL - J. COGHLAN

1    of September 15 about what happens to the
2    collateral in the event of a default of a repo?
3        A.    No. I would say we hadn't talked
4    about the collateral, no.
5        Q.    Did you have any discussion with
6    anyone at Lehman during this week about anything
7    to do with what happens in the event of a
8    default on the repo?
9        A.    Yes, I was talking to counsel around
10   some of the defaults and, you know, and what,
11   you know, do we need to do relative to defaults.
12       Q.    Okay.
13       A.    So I was letting counsel know that we
14   were, you know, defaulting and then we were
15   getting notices to support those defaults.
16       Q.    Now you're talking about Lehman's
17   in-house counsel?
18       A.    Yes.
19       Q.    I don't want to talk about --
20   conversations with counsel are privileged
21   conversation. I want to talk about any
22   conversation you might have had with business
23   people at Lehman about the consequences of an
24   event of default under a repo.

Page 164

HIGHLY CONFIDENTIAL - J. COGHLAN

1        MR. STERN: I assume you want to
2    finish this line of questions, but at some
3    point we should figure out a time for lunch.
4        MR. HINE: Yeah.
5        Q.    Are you okay for a little bit?
6        A.    Sure. Sure.
7        Q.    So, putting aside conversations that
8    you might have had with counsel during that week,
9    did you have any conversations with business
10   people, including Mr. Reilly or Lowitt or
11   Gelband or Tonucci or Kelly, about the
12   consequences of a default under a repo?
13       A.    I don't recall having those
14   conversations, no.
15       Q.    Do you have any recollection of these
16   folks talking amongst themselves or this being
17   an issue for consideration during that week?
18       A.    Not to the best of my knowledge. I
19   just don't know.
20       Q.    Why do you think he would be writing
21   you an e-mail about -- which discusses
22   defaulting on repos?
23       A.    I --
24       MR. STERN: Objection to the form.

Page 165

HIGHLY CONFIDENTIAL - J. COGHLAN

1    Calls for speculation.
2        A.    Well, it's unclear to me what this
3    says and what it means. That's one issue. And
4    the second issue is I never -- I don't recall
5    having conversations about defaulting on repos
6    as it relates to the Barclays transaction or the
7    transfer of assets.
8        Q.    Could this possibly suggest that they
9    were discussing whether defaulting on the repo
10   could be used as a means to give Barclays a
11   discount because the assets would be taken from
12   the haircut?
13       MR. STERN: Objection to the form.
14       A.    I don't -- I don't have an
15   understanding of what this says. I don't recall
16   discussing this, so what this means as a --
17   relative to the Barclays transaction -- I don't
18   even know if it's related to the Barclays
19   transaction, per se. So it would be impossible
20   for me to -- to know the answer to that
21   question.
22       Q.    Could you speculate at all about what
23   this sentence means? I'm talking about the
24   sentence that starts, "Defaulting on repo could

Page 166

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  be the best as discount could be taken from
3  haircut."
4      MR. STERN: Objection to the form.
5  Calls for speculation.
6      A.  I don't know what this means. I don't
7  know what they're proposing. I don't know --
8      Q.  Could you posit any plausible
9  explanation for what this means?
10      MR. STERN: Objection. Calls for
11  speculation.
12      A.  I don't have -- I don't know what it
13  means. I -- I can't surmise what it means.
14      Q.  You're the guy at Lehman that they
15  would ask repo questions to, right?
16      A.  Absolutely.
17      MR. STERN: Objection to the form.
18      Q.  Why would they --
19      MR. STERN: That's a
20  mischaracterization of what he said.
21      Q.  And they clearly identified this
22  question as definitely for you, right?
23      MR. STERN: Objection to the form.
24      A.  In the e-mail it says that, "The third
25  question is definitely one that should be

Page 167

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  reviewed with Cogs."
3      Q.  And you have no recollection of ever
4  reviewing this question with anyone?
5      A.  I do not have any recollection.
6      Q.  Do you think you ever reviewed this
7  question with anyone?
8      A.  To the best of my knowledge, no.
9      Q.  You think you ever tried to address
10  any portions of this question with anyone?
11      A.  To the best of my knowledge, no.
12      Q.  Let's continue on the item number 3.
13  It says, "If not that" --
14      MR. STERN: Excuse me, Bill. How much
15  longer are you going to go on this? Because
16  we should have a chance to take a lunch
17  break, I think.
18      MR. HINE: I'm planning on taking a
19  lunch break. Can we go another five, ten
20  minutes?
21      MR. STERN: Five, ten minutes? Okay.
22      MR. HINE: I would like to exhaust
23  this one topic.
24      MR. STERN: I think you have, but go
25  ahead.

Page 168

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2      Q.  The next sentence says, "If not that,
3  then we need to give business an allocation of
4  block discount so they can mark down the books
5  tonight."
6      Does that ring any bells about what
7  was being discussed on this issue?
8      A.  No. Again, I don't know what the
9  phrase "block discount" means.
10      Q.  Do you recall any recollection of
11  people talking about marking down the books
12  tonight?
13      A.  I do not recall that.
14      Q.  Did Lehman mark down any of its books
15  during the week of September 15, to your
16  knowledge?
17      A.  Not to my knowledge.
18      Q.  Did --
19      A.  I don't know if they did or they
20  didn't.
21      Q.  Okay. Would you know that under
22  normal circumstances?
23      A.  No. Not necessarily, no.
24      Q.  When it says "mark down the books,"
25  what books would that be referring to?

Page 169

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2      MR. STERN: Objection. Calls for
3  speculation.
4      A.  I don't know.
5      Q.  Could you posit any explanation for
6  what that sentence might mean?
7      MR. STERN: Objection. Calls for
8  speculation.
9      A.  No, there was something about marking
10  down books, you know, and marking the books,
11  which is obviously in here, but, you know,
12  again, it's -- I just don't know what it means.
13  I can't really put it into context and, you
14  know, when they say "give business," I don't
15  know what business means. There were literally
16  dozens of business in Lehman Brothers. So it
17  may not even be referencing the financing
18  business.
19      Q.  Well, it's talking about allocating a
20  discount among businesses, some businesses,
21  right?
22      MR. STERN: Objection to the form.
23      A.  Ask the question again.
24      Q.  It's talking about allocating some
25  sort of discount among businesses, correct?

## Page 170

HIGHLY CONFIDENTIAL - J. COGHLAN

1   MR. STERN: Objection to the form.
2   A.    The letter says something to the
3   effect of an allocation of a block discount.
4   Where and how that's done I have no
5   recollection. I have no understanding of how,
6   you know, the asset transfer, you know, took
7   place. I wasn't involved in those discussions,
8   so I don't understand because I wasn't part of
9   it, you know, what this, I think, refers to.
10  Q.    As the manager of one of Lehman's
11  businesses, were you ever allocated any form of
12  discount during that week?
13  A.    Not to my knowledge, no.
14  Q.    Were you ever asked to mark down any
15  of your books during that week?
16  A.    Not to my knowledge, no.
17  Q.    Did you ever mark down any of your
18  books that week?
19  A.    I -- not to my knowledge. I don't
20  know.
21  Q.    Who would know about within your
22  financing business?
23  A.    In the normal course of business, we
24  would mark to market positions. Given the fact

## Page 171

HIGHLY CONFIDENTIAL - J. COGHLAN

1   that the goal was to return collateral as
2   quickly as possible, we were more focused on
3   that. And I'm not sure, I don't recall what
4   marking we were doing on an overnight basis
5   during that week.
6   Q.    So you have no recollection of marking
7   down any of your books during that week?
8   A.    No, I do not.
9   Q.    The next sentence in that number 3
10  says, "Does that create a problem as it could
11  tip the broker early?" Do you have any
12  understanding what that could be referring to?
13  MR. STERN: Objection. Calls for
14  speculation.
15  A.    No.
16  Q.    Could that be talking about tipping
17  the broker, meaning LBI, into bankruptcy early?
18  MR. STERN: Objection. Calls for
19  speculation.
20  A.    I don't -- I don't know.
21  Q.    Is that a possible reading of that
22  sentence?
23  A.    It is a possible reading of that
24  sentence.

## Page 172

HIGHLY CONFIDENTIAL - J. COGHLAN

1   MR. STERN: Objection. Objection.
2   Calls for speculation.
3   Q.    Do you have any knowledge one way or
4   another whether that's a viable reading of that
5   sentence?
6   MR. STERN: Objection.
7   A.    I have no knowledge one way or the
8   other.
9   Q.    Okay. In the last sentence in that
10  number, number 3, says, "Would we rather have
11  that be in the sale price tomorrow?"
12  Do you have any understanding what
13  that is talking about?
14  A.    No.
15  Q.    Do you know, have any understanding
16  that tomorrow is the hearing before the
17  bankruptcy court?
18  A.    No, I was not aware of that.
19  Q.    Do you have any understanding that the
20  sale price relates in any way to the APA or the
21  transaction between Barclays or Lehman?
22  A.    No, I do not.
23  Q.    Do you have any recollection of any
24  discussions along those lines during that week?

## Page 173

HIGHLY CONFIDENTIAL - J. COGHLAN

1   A.    Can you rephrase the question?
2   Q.    Do you have any recollection of any
3   discussions along the lines of changing the sale
4   price?
5   A.    No, I do not recall any of those
6   conversations.
7   Q.    Do you have any, any recollection of
8   any discussions about the sale price that might
9   be presented in a court hearing?
10  A.    No, I was not involved in any of that.
11  MR. HINE: Why don't we take a break
12  for lunch.
13  (Recess; Time Noted: 12:47 P.M.)

Page 174

HIGHLY CONFIDENTIAL - J. COGHLAN
        AFTERNOON SESSION
        (Time Noted: 1:43 P.M.)
4  JOHN COGHLAN, resumed and
5     testified further as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. HINE:
8     Q.   Good afternoon, Mr. Coghlan. I'd like
9  you to turn back to Exhibit 21, which is the
10 e-mail chain we discussed just before lunch, if
11 you would.
12    MR. STERN:  This is 121?
13    MR. HINE:  Yes.
14    MR. SPENCER:  No, I'm sorry, it's
15 Exhibit 21.
16    Q.   I'm sorry, Exhibit 21, which is the
17 exhibit we just discussed previously.
18    MR. STERN:  21 is a previously marked
19 exhibit?
20    MR. HINE:  It's the last exhibit we
21 looked at.
22    Q.   Do you have the exhibit in front of
23 you?
24    A.   Yes, I do.
25    Q.   And you recall our questions before

Page 175

HIGHLY CONFIDENTIAL - J. COGHLAN
2  lunch about this exhibit?
3     MR. STERN:  Objection to the form.
4     Q.   Mr. Coghlan, is there any reason you
5  have no recollection about this exhibit at all?
6     MR. STERN:  Objection to the form.
7     A.   Can you restate the question?
8     Q.   Well, not to be flip, it just seems
9  odd that in a transaction as big as the
10 Lehman/Barclays transaction, when you receive an
11 e-mail like this, that you have no recollection
12 at all about it. So I'm asking you, is there
13 any reason why you have no recollection at all
14 about it?
15    MR. STERN:  Objection to the
16 commentary and objection to the form.
17    You can try to answer why you have no
18 recollection about this.
19    A.   There is no specific reason why I
20 don't recall this, no.
21    Q.   You didn't ignore this e-mail, did
22 you?
23    A.   I don't recall receiving the e-mail so
24 I don't know how I can, you know -- I don't
25 recall receiving it.

Page 176

HIGHLY CONFIDENTIAL - J. COGHLAN
2     Q.   Okay. Mr. Kirk is a more senior
3  officer at Lehman than you were?
4     A.   Correct.
5     Q.   I take it it's not your normal
6  practice to ignore e-mails from senior officers,
7  correct?
8     A.   Normally if a senior officer asks some
9  information, I would provide information, yes.
10    Q.   You weren't otherwise distracted for
11 any reason that would cause you not to recall
12 this e-mail, is that correct?
13    MR. STERN:  Objection to the form.
14    A.   It was a very busy period of time,
15 yes, and things were moving very, very rapidly.
16 So the environment was such, you know, I just
17 don't recall whether I saw this e-mail or not.
18    Q.   Fair to say you didn't get a lot of
19 e-mails from Mr. Kirk during this period?
20    MR. STERN:  Objection to the form.
21    A.   I don't recall if I saw e-mails from
22 Mr. Kirk.
23    Q.   Since you moved to Barclays, have you
24 learned anything or developed any kind of
25 understanding about any of the issues we

Page 177

HIGHLY CONFIDENTIAL - J. COGHLAN
2  previously discussed about this e-mail?
3     MR. STERN:  I think you can answer
4     provided you don't disclose any discussions
5     with counsel, if you have -- I don't know if
6     you've had such discussions with counsel,
7     but you can answer subject to that, if you
8     understand what I'm saying.
9     THE WITNESS:  No, I don't.
10    Q.   I'm not asking you about any
11 conversations you've had with counsel.
12    A.   Uh-huh.
13    Q.   So let's put those conversations
14 aside.
15    A.   Uh-huh.
16    Q.   Other than those types of
17 conversations, since you moved to Barclays, have
18 you developed any understanding, heard any
19 discussions about the issues we discussed
20 concerning item number 3 on this e-mail?
21    A.   No, I have not.
22    Q.   So, and not to belabor this, you have
23 not, since you moved to Barclays, you have not
24 heard any discussions or developed any
25 understanding about a block discount associated

Page 178

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2    with the Barclays/Lehman transaction?
3      A.  I have not heard that phrase before,
4    no.
5      Q.  And since moving to Barclays, have you
6    heard any conversations or developed any
7    understanding about defaulting on a repo as it
8    related to the Barclays/Lehman transaction?
9      A.  No, I have not heard anything to that
10   effect.
11     Q.  Okay.  Let's mark this exhibit.
12        (Exhibit 126, an e-mail stream, the
13     first one in time dated September 18, 2008,
14     at 6:18 A.M., marked for identification, as
15     of this date.)
16     Q.  Mr. Coghlan, I'm handing you a copy of
17   an exhibit marked as 126, which is an e-mail
18   stream dated September 18, 2008, and appears to
19   be a continuation of the open issues on the
20   e-mail that we previously discussed.
21        If you could take a minute just to
22   review this before I ask you a question.
23        (Document review.)
24     Q.  Do you see in the middle of the page
25   there's an e-mail from Mr. Lowitt to Mr. Reilly

Page 179

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2    and Gelband in which he says, "Also, need to
3    figure out how to shrink down matched book
4    (unless Gerry that hasn't yet been reflected in
5    balance sheet we looked at yesterday)."
6        Do you see that?
7      A.  Uh-huh.
8      Q.  The message continues, "Gerry, please
9    sit with Cogs and Mike to figure out what we
10   need to do and if balance sheet showing matched
11   book at 40 is right."
12        Do you see that?
13     A.  Yes, I do.
14     Q.  That Cogs refers to you, correct?
15     A.  I believe so.
16     Q.  And is it fair to assume that "Mike"
17   is Mike Gelband in that sentence?
18     A.  I don't know.
19     Q.  Okay.  Do you recall any -- I
20   understand you're not copied on this part of the
21   e-mail, but do you recall any discussions along
22   these lines at or about Thursday, September 18,
23   or thereafter?
24     A.  I don't remember conversations on
25   Thursday afternoon specifically about the size

Page 180

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2    of the matched book.
3      Q.  How about at some other time?
4      A.  Well, as I stated earlier, the
5    instructions I got on Monday was to try to get,
6    you know, the matched book as small as possible.
7      Q.  Right.
8      A.  So that was a guideline I was given on
9    Monday and a guideline that we operated with
10   throughout the week.  That was always the goal.
11        The second issue about sitting down
12   and finalizing the matched book being at 40, I
13   don't specifically remember having conversations
14   with Gerry about that.
15     Q.  Just so I understand what you just
16   said, do you understand the phrase in the first
17   sentence, "shrink down the matched book," to be
18   referring to the effort that you were undergoing
19   during that week to reduce the size of the book
20   that you managed?
21     A.  I haven't -- I have never seen this
22   before and I wasn't copied on it, but getting
23   the matched book smaller was an instruction I
24   did receive earlier in the week.
25     Q.  Can you --

Page 181

1      HIGHLY CONFIDENTIAL - J. COGHLAN
2      A.  So this may or may not be consistent
3    with that, I don't know.
4      Q.  Can you think of any other thing that
5    the phrase "shrink down the matched book" could
6    be referring to?
7      A.  No, it -- I was told to get the
8    matched book smaller.  The phrase "shrinking the
9    matched book" is consistent with that.
10     Q.  Okay.
11     A.  But I'm not a hundred percent certain
12   how it's used in this context since I wasn't
13   privy to some of the --
14     Q.  But were you privy to any
15   conversations that followed this e-mail about
16   that topic?
17     A.  Well, I did have one conversation, as
18   said, with Gelband when he asked me where I
19   thought the matched book would be, you know, at
20   the end of the week.  I gave him that number we
21   discussed, and I remember having those two
22   conversations about the matched book.
23     Q.  Which two?  The one --
24     A.  The first one about getting the
25   matched book smaller at the beginning of the

## Page 182

HIGHLY CONFIDENTIAL - J. COGHLAN

1    week and the second conversation about what I
2    thought the projected size of the matched book
3    would be at the end of the week which I
4    reflected to Gelband.
5         Q.   I might have misunderstood your prior
6    testimony.  I just want to clarify something.
7              When you gave Gelband the projection
8    of 40 billion?
9         A.   Uh-huh.
10        Q.   What day of the week was it that you
11   gave it to him?
12        A.   I don't recall, but it was -- it was
13   Wednesday or Tuesday.
14        Q.   Okay.  So that would be prior to this
15   e-mail?
16        A.   Yes.
17        Q.   Correct?
18             And so, just so I understand your
19   conversation, you had one conversation early in
20   the week about shrinking the matched book
21   generally?
22        A.   Yes.
23        Q.   And one conversation on either Tuesday
24   or Wednesday where you gave Mr. Gelband a $40

## Page 183

HIGHLY CONFIDENTIAL - J. COGHLAN

1    billion figure?
2         A.   Yes.
3         Q.   Other than those two conversations, do
4    you recall any other conversations that week
5    about shrinking the matched book or the subjects
6    mentioned in this e-mail?
7         A.   No, I -- I don't recall having other
8    conversations.
9         Q.   Do you think you might have had
10   another conversation after this e-mail?
11        A.   They may have called me and asked to
12   verify where I thought the number would be.
13   That may have happened.
14        Q.   Okay.
15        A.   I don't recall, though.
16        Q.   Was the matched book in fact at 40 at
17   this time?
18        A.   I don't recall.
19        Q.   Do you know what it ended up at on
20   Friday?
21        A.   I do not.  I don't recall.
22        Q.   Would you have expected to have
23   recalled if it was radically different from 40?
24        A.   Can you repeat the question?

## Page 184

HIGHLY CONFIDENTIAL - J. COGHLAN

1         Q.   Well, I mean, you gave a projection --
2         A.   Right.
3         Q.   -- earlier in the week to Mr. Gelband.
4              Do you have any recollection that your
5    projection was off?
6         A.   I don't recall.  I don't remember.
7         Q.   Do you have any recollection of him
8    saying -- call on you and saying, How could you
9    have given me that projection?  It was way off?
10        A.   No, I don't recall that.
11        Q.   So is it your understanding that your
12   projection was probably close to accurate?
13        A.   I don't recall.  I don't know where
14   the matched book ended up at the close of
15   business that Friday.
16        Q.   Okay.  And now, whatever it ends up on
17   the close of business that Friday, it wouldn't
18   change on Saturday or Sunday, correct?
19        A.   Correct.
20        Q.   So it would reopen the following
21   Monday morning at the same level?
22        A.   But we never reopened, so ...
23        Q.   Okay.  Had you --
24        A.   Had we reopened, yes.

## Page 185

HIGHLY CONFIDENTIAL - J. COGHLAN

1         Q.   How do I find out what the matched
2    book closed at that Friday?
3         A.   I don't know.  I don't know.
4         Q.   Is there some kind of report that's
5    generated on the weekend that showed what the
6    matched book was that week?
7         A.   I don't know.  You'd have to ask the
8    financial people what, you know, documents they
9    would -- they kept and preserved and what have
10   you, what information they had.
11        Q.   And the financial, by "financial
12   people," you mean who?
13        A.   Gerry Reilly's group, et cetera, and
14   people that work for him, you know, would report
15   the balance sheet for Fixed Income and for
16   Capital Markets.  So they would be the people
17   that would have that information.
18        Q.   Okay.  So when this sentence says,
19   "Gerry" -- it's questioning Gerry about whether
20   this has been reflected on the balance sheet,
21   that -- is it reasonable to take that as meaning
22   the balance sheet that his group prepares?
23        A.   I believe that Gerry prepares the
24   balance sheet information, so I would think that

Page 186

HIGHLY CONFIDENTIAL - J. COGHLAN

1  this means, Gerry, please, see if your numbers
2  and the numbers I anticipated to hit would check
3  out.
4      Q.   Okay.  Then if we go up to the next
5  e-mail in the chain, if you'll take a look,
6  you'll see that it's talking about, "Practically
7  the issue of what goes is complicated by the LBI
8  cash position and who is going to fund the
9  remaining assets.  It is either the Fed, which
10 they will not take, or Barclays."
11     Do you have any understanding of what
12 that's referring to?
13     A.   No, I don't.
14     Q.   Do you have any understanding of
15 whether the phrase "what goes" is talking about
16 assets that would go to Barclays?
17     A.   Could you ask that question again?
18 I'm sorry.
19     Q.   You see the use of the term "what
20 goes"?
21     A.   I don't know what that means.
22     Q.   Okay.  Is it possible that it's
23 referring to what assets would go to Barclays?
24     A.   I -- it could be possible.  I don't

Page 187

HIGHLY CONFIDENTIAL - J. COGHLAN

1  know.
2      Q.   Okay.
3      A.   I don't know what that -- how that's
4  used in the context of that, but ...
5      Q.   It continues, the e-mail continues,
6  "So I think auction rates may be impossible to
7  exclude."
8      Do you recall any discussions about
9  excluding auction rates?
10     A.   No, I do not.
11     Q.   In any context?
12     A.   No, I do not.
13     Q.   Any understanding that auction rate
14 securities were not going to be transferred to
15 Barclays during that week?
16     A.   No, I had no knowledge of what was
17 going on with auction rates.
18     Q.   Did you ever subsequently develop any
19 knowledge about what was going on, what happened
20 with auction rates?
21     A.   There were a few auction rate
22 securities that were transferred in the
23 transaction.  There were a few auction rate
24 securities that were transferred.  That I know.

Page 188

HIGHLY CONFIDENTIAL - J. COGHLAN

1      Q.   Do you have any estimate of the amount
2  of the value of those securities?
3      A.   No, I do not.
4      Q.   Previously you said that -- we talked
5  about whether the matched book at close of
6  business Friday is the same as the value the
7  following Monday?
8      A.   Uh-huh.
9      Q.   And you said we didn't open Monday.
10     How did -- was the matched book
11 transferred to Barclays ultimately?
12     A.   My understanding was it did not get
13 transferred.
14     Q.   So what got transferred within the
15 shop that you were working in?
16     A.   The division I was in, I believe
17 nothing got transferred.
18     Q.   So your understanding is the --
19     A.   I was not told to transfer anything.
20 There was no protocol set up to do transfer, so
21 I'm surmising that nothing was transferred.  I
22 certainly did not knowingly transfer assets to
23 Barclays.
24     Q.   Okay.  And when you went to work for

Page 189

HIGHLY CONFIDENTIAL - J. COGHLAN

1  Barclays, were the same assets there that you
2  had previously been working on in Lehman?
3      A.   Not to my recollection, no.
4      Q.   So what did you do at Barclays?  Start
5  a whole new book?
6      A.   Barclays already had an existing
7  business that was operating and trading.  So
8  they continued to operate and trade under their
9  normal business structure and continued to do
10 business at Barclays as an operating
11 institution.
12     Q.   So you, in your current capacity at
13 Barclays, is it your belief that you're working
14 with a completely new book of business than what
15 you were working at when you were at Lehman?
16     A.   Actually, I was not -- on day one, it
17 wasn't agreed or who was going to be responsible
18 for what going forward.
19     Q.   Uh-huh.
20     A.   So I actually had very little standing
21 at Barclays, so I wasn't really operating the
22 business.  I was helping in transition, people,
23 things like that, discussing technology
24 transitions, but in terms of operating the

Page 190

HIGHLY CONFIDENTIAL - J. COGHLAN
1  business, I had no authority to do so.
2  Q.   I thought earlier you said your
3  responsibilities are essentially the same at
4  Barclays?
5  A.   It took time to get to that.  It took
6  several weeks for those decisions to be made.
7  Q.   And now do you have an understanding
8  of whether your Lehman book of business stayed
9  with Lehman?
10  A.   I believe that the Lehman book of
11  business, based on what I know, stayed at
12  Lehman.
13  Q.   Okay.  And when you say that, you're
14  talking about the book of business within your
15  financing --
16  A.   Correct.
17  Q.   -- business at Lehman?
18  A.   Correct.
19  Q.   Okay.
20  (Exhibit 127, an e-mail stream, the
21  first one in time dated September 18, 2008,
22  at 6:04 A.M., marked for identification, as
23  of this date.)
24  Q.   Mr. Coghlan, I'm handing you a

Page 191

HIGHLY CONFIDENTIAL - J. COGHLAN
1  document marked as Exhibit 127, which again
2  appears to be a different continuation from the
3  e-mail we've been discussing for a while here,
4  so I direct your attention if you want to take
5  some time to read the upper portion, which
6  appears to be a new portion.
7  (Document review.)
8  A.   I've read the document.
9  Q.   Okay.  I understand you're not copied
10  on the newer portion of these e-mails, but I was
11  wondering if they remind you or suggest anything
12  to you about what was being discussed at this
13  time?
14  A.   No, I have not seen this e-mail and I
15  don't know what would be being discussed other
16  than what the letter says, which is open issues.
17  I don't know.
18  Q.   You see the reference to a meeting --
19  "Please set up a meeting" -- or it says, "Gerry,
20  please set up a meeting first thing this morning
21  to work through these issues with Mike, Eric and
22  Hyung."
23  Do you recall any such meeting that
24  morning?

Page 192

HIGHLY CONFIDENTIAL - J. COGHLAN
1  A.   No, I do not.
2  Q.   Can you speculate on what they might
3  have been meeting about?
4  A.   No.  I mean, they were meeting
5  relative to open issues on the deal.  What those
6  issues were I do not know.
7  Q.   Do you know if that meeting had to do
8  with issue number 3 at the bottom?
9  A.   I do not know if that had to be part
10  of that.
11  Q.   At the very top it says, "Barclays
12  guys chose the assets.  We did not have anything
13  to do with it."
14  Do you know what that's referring to
15  at all?
16  A.   No.
17  Q.   Do you know who chose the assets that
18  ultimately got transferred to Barclays?
19  A.   No, I do not.
20  Q.   Do you know if Barclays did versus
21  Lehman?
22  A.   I do not know.
23  Q.   Did you have any involvement in what
24  assets ultimately got transferred to Barclays?

Page 193

HIGHLY CONFIDENTIAL - J. COGHLAN
1  A.   To the best of my knowledge, no.
2  Q.   Did you have any discussions along the
3  lines of who chose the particular assets that
4  went to Barclays?
5  A.   No, I did not hear those discussions.
6  Q.   Since moving to Barclays, have you
7  learned anything that would suggest who chose
8  the assets that Barclays ultimately acquired?
9  A.   No, I do not know who chose the
10  assets.
11  Q.   You haven't heard anything since
12  you've been at Barclays about that?
13  A.   No, I have not heard.
14  Q.   Have you heard anything since you've
15  been at Barclays about how the assets were
16  transferred to Barclays?
17  A.   No, I have not heard about the asset
18  transfer, no.
19  Q.   Since you've been at Barclays, have
20  you heard anything about the terms of the
21  transaction between Lehman and Barclays?
22  A.   No.  No.  I mean, the things I knew
23  about the terms were that they bought the
24  building.  I know that.  And away from that, I

Page 194

HIGHLY CONFIDENTIAL - J. COGHLAN
1    wasn't really sure how the asset transfer or
2    asset sale or whatever legal definition
3    surrounded the deal would happen beyond that,
4    but I did know the building was bought.
5        Q.    Since you've been at Barclays, have
6    you develop an understanding about what assets
7    Barclays now has that previously were at Lehman?
8        A.    No, I do not know.
9        Q.    Since you've been at Barclays have you
10    developed an understanding of what assets
11    Barclays thinks it's still owed from Lehman?
12        A.    No, I do not know.
13        Q.    Have you ever heard any discussion
14    about what Barclays thinks it's still owed from
15    Lehman?
16        A.    No, I have not heard anything like
17    that.
18        Q.    Okay. Mr. Coghlan, I'm handing you a
19    copy of a document that's previously been marked
20    as Exhibit 66B. It's an e-mail stream dated
21    Friday, the 19th, September 19th, and you'll see
22    your name towards the top of the e-mail as a
23    recipient.
24        Do you see your name?

Page 195

HIGHLY CONFIDENTIAL - J. COGHLAN
1        A.    I see my name. December 19 at 12:51.
2        Q.    Correct. Could you please take a
3    moment to review this document?
4        (Document review.)
5        A.    Okay.
6        Q.    Do you see the phrase in the -- toward
7    the bottom half of the page where Mr. Aronow
8    writes, "Barclays operations team has
9    recalculated the value of the collateral that
10    they received from us last night and they are
11    more than fully collateralized, including the
12    haircuts applied." Do you see that?
13        A.    Yes.
14        Q.    Do you have any understanding of what
15    that's referring to?
16        A.    I'm sorry, could you ask the question
17    again?
18        Q.    Do you have any understanding what
19    that sentence is referring to?
20        A.    Not specifically, no.
21        Q.    How about generally?
22        A.    No. No. No. Again, no, I don't --
23    it may be referring to this BoNY transfer, but I
24    don't know that for sure.

Page 196

HIGHLY CONFIDENTIAL - J. COGHLAN
1        Q.    When you say "the BoNY transfer," what
2    are you talking about?
3        A.    There was a period of time during the
4    week where we moved assets out of the Fed
5    account and forwarded to BoNY, which was
6    Barclays' clearing agent, and this may be
7    referring to that transfer.
8        Q.    Okay. Is that the transaction we
9    discussed earlier this morning?
10        A.    I believe so, yes. It may be the
11    transfer.
12        Q.    Is it your understanding that that was
13    not a tri-party repo arrangement?
14        A.    As I said --
15        MR. STERN: Objection to the form.
16        A.    As I said, I don't know what form of
17    transfer took place. The only thing that I was
18    aware of the people on my team were working on
19    was helping the Treasury Department, you know,
20    settle the trade. So whether it was done in
21    tri-party, bilaterally, or some other
22    documentation, I just don't know what the
23    relationship between the parties were.
24        Q.    Well, if it was not a tri-party, would

Page 197

HIGHLY CONFIDENTIAL - J. COGHLAN
1    Barclays' operations team have had any interest
2    in what the collateral that was transferred?
3        MR. STERN: Objection to the form.
4        A.    That I wouldn't know. I mean, I
5    wasn't even a member of BarCap at the time, so I
6    wouldn't even -- I wouldn't know what their
7    collateral requirements were or weren't.
8        Q.    Well, do you have any understanding at
9    all, whether during the week of September 19 --
10    September 15th or that you've developed later,
11    as to Repurchase Agreements involving BarCap,
12    Barclays Capital, and Lehman?
13        MR. STERN: Objection to the form.
14        A.    Can you rephrase?
15        Q.    Do you know of any repurchase repo
16    arrangements between Barclays and Lehman during
17    this period of time?
18        A.    No, I didn't know how this -- what was
19    going on between Barclays and Lehman and how --
20    what was happening with the transfer of assets
21    other than, as I said, helping people settle
22    whatever was agreed to. So I didn't -- again, I
23    don't know if it was done in repo or tri-party
24    or whatever form, you know, sale, I just don't

Page 198

HIGHLY CONFIDENTIAL - J. COGHLAN

1   know.
2   Q.   Do you have any understanding of any
3   financing arrangements between Barclays and
4   Lehman during this period of time?
5   A.   Well, I don't have any understanding
6   of the financing relationship between the
7   parties.  I was -- people that worked for me
8   helped settle whatever financing arrangement, if
9   any, was negotiated between the parties.
10  Q.   When you say "settle," that entails
11  the transfer of some securities?
12  A.   Collateral, yeah, collateral and
13  getting collateral available to settle the
14  trade.
15  Q.   Have you ever heard of anything called
16  the replacement transaction?
17  A.   No, I have not.
18  Q.   Have you ever heard of anything called
19  the September 18 Repurchase Agreement?
20  A.   No, I have not.
21  Q.   Do you know of any transaction
22  involving Barclays that took place on September
23  18, which is the Thursday of that week?
24  A.   No, I do not.

Page 199

HIGHLY CONFIDENTIAL - J. COGHLAN

1   Q.   Do you know why Mr. Aronow would be
2   copying you on this e-mail?
3   A.   No, I do not.  I don't know.
4   Q.   What is Mr. Aronow's position?
5   A.   David was in Customer Service in the
6   Prime Broker, but David's background was a heavy
7   operations background and settlement background,
8   so he may have been asked to help out given his
9   knowledge and experience.
10  Q.   Was David part of your team?
11  A.   No, he does not report to me.
12  Q.   He's a separate report to Mr. --
13  A.   He did not report directly to John
14  Wickham, but indirectly he reported to John.
15  Q.   You see on the following line of this
16  e-mail it says, "Senior management at Barclays I
17  am told are very satisfied with the results of
18  the effort."
19       Do you have any knowledge about senior
20  management at Barclays satisfaction with respect
21  to anything during that week?
22  A.   No, I don't know what the management
23  was thinking or opining.
24       (Exhibit 128, an e-mail stream, the

Page 200

HIGHLY CONFIDENTIAL - J. COGHLAN

1   first in time dated September 19, 2008, at
2   2:44 P.M., marked for identification, as of
3   this date.)
4   Q.   Mr. Coghlan, I'm handing you a copy of
5   Exhibit 128, which appears to be an e-mail with
6   multiple recipients dated September 19 at 10
7   P.M.  If you look through the list of
8   recipients, your name is in the top third of the
9   page, I believe.  Do you see it?
10  A.   I see that, yes.
11  Q.   My first question is, do you recall
12  seeing this e-mail before?
13  A.   I don't recall seeing this specific
14  e-mail.
15  Q.   Do you have an understanding of why
16  you were included in this lengthy list of
17  recipients here?
18  A.   Yes.  ESEP was an old Lehman Brothers
19  deferred compensation program, and I was a
20  participant in that as an employee of Lehman
21  Brothers.
22  Q.   Okay.
23  A.   So I was a participant in that
24  program.

Page 201

HIGHLY CONFIDENTIAL - J. COGHLAN

1   Q.   And who was Craig Schiffer?
2   A.   Craig Schiffer is a former Lehman
3   employee, and I'm not sure exactly what his role
4   in all this was.
5   Q.   Do you have any understanding why he's
6   sending this large group of people an e-mail
7   that Friday night?
8   A.   Yes.  There is some, in this program,
9   there's some sort of credit exposure to Lehman
10  Brothers.  So, to get your benefit, it's
11  somehow, and I don't know the structure
12  specifically, somehow you have credit exposure
13  to Lehman Brothers.
14       When the LBI filed, the value of this
15  benefit diminished, potentially significantly,
16  depending on what the recovery rate on the debt
17  is.  So there is a Working Committee formed to
18  try to figure out where the ESEP program fits
19  into the bankruptcy proceedings, and Craig was
20  one of the first people to get involved.
21  Q.   Okay.  So am I correct to say that
22  this is just a report to your group about what
23  took place at the court hearing on Friday?
24  A.   I don't know what this document

Page 202

HIGHLY CONFIDENTIAL - J. COGHLAN

1 specifically says. I haven't had a chance to
2 read it.
3     Q.  Well, take --
4         MR. STERN: Why don't you read the
5 whole thing.
6     Q.  Take your chance to review it.
7         (Document review.)
8     A.  Okay.
9     Q.  So does it appear to you to be a
10 report of what took place at the court that
11 Friday night?
12    A.  Yes, it appears that certain
13 participants in the ESEP program attended the
14 bankruptcy hearing and are reporting back the
15 information they learned at the bankruptcy
16 hearing.
17    Q.  This was sent at 10 P.M. on Friday
18 night.
19        Are you already in Philadelphia by
20 then?
21    A.  I believe so, yes.
22    Q.  Any reason you went to Philadelphia
23 that weekend?
24    A.  I had a family affair, yes.

Page 203

HIGHLY CONFIDENTIAL - J. COGHLAN

1     Q.  It wasn't to seek employment
2 elsewhere?
3     A.  No.
4     Q.  Okay. My question has to do with the
5 third entry in this report, where it says, "The
6 assets of the deal dropped from 70 billion to 47
7 billion, mostly due to dealers not returning the
8 repos." Do you see that?
9     A.  Yes.
10    Q.  Do you have any understanding about
11 whether the assets of the deal in fact dropped
12 from 70 billion to 47 billion?
13    A.  I do not.
14    Q.  Do you have any understanding of
15 whether there was a problem associated with
16 dealers not returning repos?
17    A.  I -- there were certain dealers that
18 were not returning repos. How it affected the
19 outcome of the deal I don't know.
20    Q.  What does "not returning repos" mean?
21    A.  They didn't want to give us back
22 collateral and get cash because they were afraid
23 that they would not get the cash back. So they
24 just took the collateral and put us in default.

Page 204

HIGHLY CONFIDENTIAL - J. COGHLAN

1     Q.  Okay. So it's not renewing repos,
2 it's --
3     A.  It's just, I'll keep what I have and,
4 you know, and I'm not giving it back to you,
5 because if I give it back to you, you may have
6 my cash and my collateral.
7     Q.  Okay. So was that a problem at this
8 period of time, do you think?
9     A.  I know that it was occurring. How
10 much of that in terms of volume I don't know.
11    Q.  Okay. It says further in that entry,
12 "Barclays is assuming 45 billion of
13 liabilities."
14        Do you have any knowledge about the
15 amount of liabilities Barclays was assuming?
16    A.  No.
17    Q.  Fair to say that this -- the level of
18 assets and liabilities in the Barclays/Lehman
19 deal is not something that you were working on
20 at the time?
21    A.  Can you say the question again?
22    Q.  Is it fair to say that you, at the
23 time, didn't have any knowledge of the level
24 of assets and liabilities that were being

Page 205

HIGHLY CONFIDENTIAL - J. COGHLAN

1 transferred between Barclays and Lehman?
2     A.  I had no knowledge of that, no, sir.
3     Q.  Did you later obtain any knowledge
4 after you moved to Barclays about that?
5     A.  No, I did not.
6     Q.  Do you have any understanding as you
7 sit here today about how many assets were
8 transferred to Barclays?
9     A.  I can't recall, no.
10    Q.  Do you have any understanding as you
11 sit here today about how many liabilities were
12 transferred to Barclays?
13    A.  No, I do not.
14    Q.  Do you have any understanding of how
15 Barclays was able to declare a gain on
16 acquisition of some $4 billion shortly after
17 acquiring Lehman assets?
18    A.  Say the question again.
19    Q.  Do you have any understanding as we
20 sit here today how Barclays was able to declare
21 a $4 billion gain on this acquisition?
22    A.  No, I do not know.
23    Q.  Do you have any -- in the context of
24 your work for Barclays, have you ever had any

## Page 206

HIGHLY CONFIDENTIAL - J. COGHLAN

1 dealings with the calculation of a gain on the
2 acquisition?
3 A. No, I have not.
4 Q. Have you ever had any discussions with
5 anyone about input that would go into the
6 calculation of a gain on acquisition?
7 A. Not that I know of, no.
8 Q. Do you know who at Barclays would work
9 on that calculation?
10 A. I do not know.
11 Q. Is it fair to say you've never had
12 conversations with people where they asked you
13 for some input with respect to what was going to
14 go into the Barclays balance sheet after the
15 acquisition?
16 A. I'm sorry, I don't understand the
17 question. Would you ask that again, please?
18 Q. Is it fair to say that you have not
19 had any conversations with anyone where they
20 asked you for input into any calculations that
21 were going to go into the Barclays balance sheet
22 after the acquisition?
23 A. To the best of my knowledge, that's
24 true, yes. Best of my knowledge, I have not had

## Page 207

HIGHLY CONFIDENTIAL - J. COGHLAN

1 conversations about what was going into the
2 balance sheet after the acquisition.
3 Q. Fair enough.
4 (Exhibit 129, an e-mail stream, the
5 first one in time dated September 19, 2008,
6 at 2:26 P.M., marked for identification, as
7 of this date.)
8 Q. Mr. Coghlan, I'm handing you a copy of
9 an exhibit marked 129, which is an e-mail stream
10 dated September 19 between Mr. Aronow, Mr.
11 Hraska and some others.
12 As far as I can tell, you're not a
13 participant in the e-mail stream, but if you
14 look towards the upper middle part of the page,
15 Mr. Aronow is saying, "I will be with Coghlan
16 from 3:30 to 5." Do you see that?
17 MR. STERN: Why don't you take the
18 time to read the document.
19 (Document review.)
20 A. Okay.
21 Q. Do you see the reference to a meeting
22 between -- or, Mr. Aronow being with you from
23 3:30 to 5 o'clock?
24 A. Yes.

## Page 208

HIGHLY CONFIDENTIAL - J. COGHLAN

1 Q. Do you recall having a meeting with
2 Mr. Aronow at that time?
3 A. No, I don't recall.
4 Q. Do you recall having a meeting with
5 Mr. Aronow at any time during this week?
6 A. I don't recall having a meeting with
7 him, no.
8 Q. Do you recall any discussions you
9 might have had with Mr. Aronow during that week?
10 MR. STERN: I'm sorry, Bill, are you
11 referring to a meeting with Aronow? Maybe
12 I'm confused about this e-mail message.
13 MR. HINE: I think you're right. I
14 think I misspoke.
15 Q. Let's start again. Mr. Coghlan, you
16 see the reference -- apparently it's an e-mail
17 from Jim Hraska to Mr. Aronow where he mentioned
18 that he will be with Coghlan from 3:30 to 5, do
19 you see that?
20 A. Yes.
21 Q. So do you recall having any kind of
22 meetings with Mr. Hraska at that time?
23 A. No, I do not recall.
24 Q. Do you recall any meetings with Mr.

## Page 209

HIGHLY CONFIDENTIAL - J. COGHLAN

1 Hraska during that week of September 15?
2 A. No, I don't recall any meetings with
3 Jim.
4 Q. Do you have any recollection of any
5 conversations you might have had with Mr. Hraska
6 during that week?
7 A. No, I don't recall any specific
8 conversations.
9 Q. Do you recall generally whether you
10 had any conversations with Mr. Hraska?
11 A. No, I don't recall having
12 conversations with Jim.
13 Q. If you look further down into the
14 e-mail chain, you will see a reference to --
15 looks like an e-mail from Mr. Palchynsky where
16 he says, toward the bottom, "Chase has agreed to
17 replace last night's unauthorized $15.8 billion
18 Barclays tri-party trade with a JPChase bank
19 loan." Do you see that?
20 A. Yes.
21 Q. Do you have any understanding of what
22 those transactions are?
23 A. I don't know.
24 Q. Do you have any understanding of any

Page 210

HIGHLY CONFIDENTIAL - J. COGHLAN

1    kind of Barclays tri-party trade during this
2    week?
3        A.    No, I was not aware of any tri-party
4    trade with Barclays.
5        Q.    So if there was such a trade, it's not
6    something that you were working on during that
7    week?
8        A.    No, the one trade I was aware of is
9    that we were moving collateral from the Fed to
10    BoNY. Again, the legal relationship and how
11    that was structured, I was just working on the
12    settlement side with a bunch of other settlement
13    people.
14        Q.    Okay.
15        A.    I was aware of that, but I was not --
16    I didn't know it was tri-party, I don't know
17    15.8, I don't know what date, et cetera.
18        Q.    Are you aware of any Chase bank loan
19    that was effected during that week?
20        A.    No, I was not aware of it.
21        Q.    Is that something you would normally
22    work on, or is that handled by a different
23    party?
24        A.    That would normally be handled by cash

Page 211

HIGHLY CONFIDENTIAL - J. COGHLAN

1    management and Paolo, Dan Fleming and Paolo
2    Tonucci.
3        Q.    Fair enough.
4            (Exhibit 130, an e-mail dated
5    September 19, 2008, at 3:22 P.M., marked for
6    identification, as of this date.)
7        Q.    Mr. Coghlan, I'm handing you a copy of
8    an exhibit marked 130, which is an e-mail stream
9    dated September 19, in which you are a
10    recipient. Take a minute just to look at that
11    e-mail.
12        A.    Okay.
13            (Document review.)
14        A.    Okay.
15        Q.    Do you see the reference in the middle
16    of the page to a statement that says, "Our LBI
17    positions are not moving today. The intent is
18    for us to start business from scratch as
19    Barclays on Monday morning." Do you see that?
20        A.    Yes, I do.
21        Q.    Do you have any recollection or
22    understanding of what that's referring to?
23        A.    No, I -- no, I -- I'm not sure what
24    that -- what that means. I don't recall.

Page 212

HIGHLY CONFIDENTIAL - J. COGHLAN

1        Q.    Do you have any guess about what it
2    means?
3        A.    Well, it's consistent with what I
4    understood that the matched book -- the
5    financing books were not moving. So to the
6    extent that LBI positions are not moving and
7    that we were going to start from scratch as
8    Barclays on Monday would be consistent with the
9    understanding that I had, and whether this is
10    referencing that I'm not a hundred percent sure.
11        Q.    Where it says -- well, who is Carlos
12    Recalde?
13        A.    He was an Operations person.
14        Q.    He doesn't work in your department?
15        A.    He doesn't work in my department. He
16    did work in Prime Brokerage and reported to --
17    in to John Wickham, again, indirectly through
18    layers of management, but was not part of my
19    reporting line.
20        Q.    Where it says, "Our LBI positions are
21    not moving today," does that suggest that they
22    moved some other day?
23        A.    No, I don't -- no, I wouldn't -- I
24    don't think that's what that means.

Page 213

HIGHLY CONFIDENTIAL - J. COGHLAN

1        Q.    What positions do you think he's
2    referring to?
3        A.    The -- I think he's referring to
4    financing positions in the either equity finance
5    or fixed income repo.
6        Q.    So the positions that you would manage
7    in your book?
8        A.    Yes.
9        Q.    If you would read down towards the
10    bottom, it says, "We may still need the service
11    LBI assets on Monday. This part is still in
12    flux." You see that?
13        A.    Yes.
14        Q.    Do you have any understanding of what
15    that could mean?
16        A.    No, I do not.
17        Q.    If you moved your operations to
18    Barclays on Monday and started anew, would there
19    be any need to service assets that had been left
20    back at LBI?
21        A.    We may have had to support SIPC. I
22    don't know. That's not my area of expertise.
23    But there may have been people dedicated to
24    support the SIPC positions that were being made.

Page 214

```
1           HIGHLY CONFIDENTIAL - J. COGHLAN
2      Q.   Your crew was not involved in that?
3      A.   Not to my knowledge, no.
4           (Exhibit 131, an e-mail stream, the
5      first one in time dated September 19, 2008,
6      at 11:03 A.M., marked for identification, as
7      of this date.)
8      Q.   Mr. Coghlan, I'm handing you a copy of
9      an exhibit marked 131, another e-mail stream
10     dated on the 19th of September.
11          After you've had a chance to look at
12     it, I'm going to ask you if you have any
13     recollection about the topic.
14     A.   No.
15     Q.   "No," meaning no recollection?
16     A.   No recollection about --
17          MR. STERN:  Have you read the whole
18     thing?
19          THE WITNESS:  I didn't see the part up
20     there.
21          MR. STERN:  Read from the bottom up.
22     Usually that's the way these go.
23     Q.   Mr. Coghlan, have you had a chance to
24     look at the document?
25     A.   I have.
```

Page 215

```
1           HIGHLY CONFIDENTIAL - J. COGHLAN
2      Q.   Do you have any recollection about
3      what was being discussed in this e-mail stream?
4      A.   I don't remember this e-mail
5      specifically.
6      Q.   Do you have any recollection about
7      what was being discussed in this e-mail stream?
8      A.   I don't remember this e-mail
9      specifically.  There was discussion about
10     whether FICC was going to continue to clear
11     trades.
12     Q.   What is FICC?
13     A.   It's an interdealer clearing and
14     settlement engine and, you know, we wanted them
15     to continue to clear trades for us so we could
16     continue to wind-down positions.  And so I do
17     remember having -- getting posted, you know, is
18     FICC still clearing for us.
19     Q.   And were they?
20     A.   I believe at the open of business
21     on -- they cleared up through the opening of
22     business on Friday.
23     Q.   And at some point did they stop
24     clearing?
25     A.   I don't recall.  I don't recall.
```

Page 216

```
1           HIGHLY CONFIDENTIAL - J. COGHLAN
2      Q.   Do you recall any other further
3      discussions about that issue?
4      A.   I'm sorry?
5      Q.   Do you recall any other discussions
6      you might have had about that issue?
7      A.   No, you know, we just wanted to make
8      sure that FICC was going to continue to clear
9      trades because we needed them to do that to be
10     able to shrink, you know, get the matched book
11     to be smaller.
12     Q.   Okay.
13          (Exhibit 132, an e-mail stream, the
14     first one in time dated September 20, 2008,
15     at 5:43, marked for identification, as of
16     this date.)
17     Q.   Mr. Coghlan, I'm handing you a
18     document marked as Exhibit 132, which is an
19     e-mail stream from Sunday, September 21, in
20     which you are a CC recipient.  If you would take
21     a minute just to review this.
22          (Document review.)
23     A.   Uh-huh.  I've reviewed this document.
24     Q.   Do you have any recollection of what's
25     being discussed in this e-mail stream?
```

Page 217

```
1           HIGHLY CONFIDENTIAL - J. COGHLAN
2      A.   No, I do not.
3      Q.   Do you have any understanding of, when
4      it's talking about segregated funds, and
5      specifically I'm looking at the bottom of the
6      second page where it says, "We are obligated by
7      CFTC regs to return 100 percent of segregated
8      funds to our futures customers."  Do you see
9      that?
10     A.   Yes.
11     Q.   Any understanding what is being
12     discussed there?
13     A.   It has to do with, I believe, the
14     rules of the Futures Trading Commission relative
15     to the segregation of funds, customer funds, and
16     what behavior is required under the rules of the
17     exchange.
18     Q.   Do you have any recollection of
19     discussions during this period about that issue?
20     A.   No, that's not my -- this was in Prime
21     Services, but it was part of the futures
22     business.  It was run by Jeff Jennings.
23     Q.   Why would you be CC'd on this?
24     A.   I don't know.  I don't know.
25     Q.   Further up in that e-mail chain, the
```

Page 218

HIGHLY CONFIDENTIAL - J. COGHLAN
1 next e-mail says, "In part, the only alternative
2 would be to repo the assets to Barclays if they
3 were amenable." Do you see that?
4     A.    Yes.
5     Q.    Do you recall any discussions about
6 repoing assets to Barclays during this period?
7     A.    No, I do not.
8     Q.    We're done with the e-mails, but I do
9 have a couple more questions. I'll try to make
10 it as quick as possible.
11        Mr. Coghlan, I'm handing you a copy of
12 a document marked -- previously marked as
13 Exhibit 25, which is a letter dated as of
14 September 20, 2008, and after you've had a
15 chance to look at it, my first question is did
16 you ever see this document before.
17        (Document review.)
18     A.    I have never seen this document
19 before.
20     Q.    Okay. If you look on the first page,
21 you'll see at the bottom there's a clause two
22 little ii?
23     A.    Uh-huh.
24     Q.    And it mentions in it Schedule A and

Page 219

HIGHLY CONFIDENTIAL - J. COGHLAN
1 then you'll see later it mentions a Schedule B.
2        Do you see that?
3     A.    Okay, yeah.
4     Q.    Do you have any understanding of what
5 Schedule A and Schedule B is in connection with
6 the Barclays/Lehman transaction?
7     A.    I do not.
8     Q.    Have you ever heard those terms
9 before?
10     A.    In terms of the Barclays transaction,
11 I've never heard those terms before.
12     Q.    You meant the Barclays/Lehman --
13     A.    I mentioned to you earlier, in the
14 tri-party, they have a Schedule A in the
15 tri-party. I've heard of that --
16     Q.    Okay.
17     A.    -- in the context of tri-party. In
18 terms of -- I've never heard the phrase
19 "Schedule B," but in terms of the transaction
20 between Lehman and Barclays, I've never heard
21 the phrase "Schedule A" and "Schedule B."
22     Q.    Have you ever heard of the phrase
23 "clarification letter" with respect to the
24 Barclays/Lehman transaction?

Page 220

HIGHLY CONFIDENTIAL - J. COGHLAN
1     A.    No, I have not.
2     Q.    When you read about Schedule A, it
3 talks about -- and I'm reading at the bottom of
4 page 1 -- "Securities owned by LBI and
5 transferred to purchaser, or its affiliates,
6 under the Barclays Repurchase Agreement."
7        Have you ever seen anything that
8 reflected a schedule of securities that were
9 going to be transferred to Barclays?
10     A.    Have I ever seen a schedule of
11 securities? I don't believe so, no.
12     Q.    Have you ever -- have any of your
13 people in your segment of Lehman, were any of
14 them involved in preparing a schedule of
15 securities that were to be transferred to
16 Barclays?
17     A.    As I said, you know, some of the
18 people that work for me helped settling.
19     Q.    Right.
20     A.    So they might have some knowledge of
21 the securities that were going, but I did not
22 directly have any knowledge and I can't opine
23 whether they did have firsthand knowledge.
24     Q.    Okay. Fair to say that if any of your

Page 221

HIGHLY CONFIDENTIAL - J. COGHLAN
1 people did have knowledge of such a schedule,
2 you were not involved in supervising their
3 efforts?
4     A.    That's correct.
5     Q.    Okay. Were any of your -- okay.
6 Scratch that. Do you know which entity within
7 Lehman was responsible for preparing schedules
8 of securities that were going to be transferred
9 to Barclays?
10     A.    I do not know who did that, no.
11     Q.    If you could turn to page 5 of this
12 agreement. Would you look at paragraph 13. It
13 refers to a September 18, 2008 repurchase
14 arrangement among the purchaser and/or its
15 affiliates and LBI and/or its affiliates and
16 Bank of New York, as collateral agent.
17        MR. STERN: I think if you're going to
18 ask about this, he should have a chance to
19 read the whole paragraph.
20        MR. HINE: He can.
21        MR. STERN: Why don't you take your
22 time.
23        MR. HINE: But I just want to direct
24 his attention to that definition of what's

Page 222

1        HIGHLY CONFIDENTIAL - J. COGHLAN
2    termed the "Barclays Repurchase Agreement."
3        Q.    Do you see that, Mr. Coghlan?
4        A.    I see that, yes.  In parentheses,
5    correct?
6        Q.    Yes.  Take your time to read that
7    paragraph.
8            (Document review.)
9        A.    Okay.
10        Q.    Do you have any understanding of what
11    the Barclays Repurchase Agreement is?
12        A.    No, I've never heard -- no, I do not
13    know.
14        Q.    I think we've danced around this issue
15    today.  I just want to make sure that we're on
16    the same page here.
17            You had previously talked about
18    transferring assets, being involved in
19    transferring assets to Bank of New York,
20    correct?
21        A.    Yes.
22        Q.    Did you have any understanding of
23    whether that transfer had to do with a Barclays
24    Repurchase Agreement, as described here?
25        A.    No, I had no knowledge of a Barclays

Page 223

1        HIGHLY CONFIDENTIAL - J. COGHLAN
2    Repurchase Agreement existing or what its terms
3    and conditions would be.
4        Q.    Okay.  So you don't know one way or
5    another whether that transfer that you were
6    doing towards Bank of New York was in connection
7    with that agreement or not; is that right?
8        A.    Correct.
9        Q.    Am I correct to say all you were --
10    you were involved in the actual settling and
11    transferring of those assets, of those
12    securities, not in the agreement itself?
13        A.    Correct.
14        Q.    Okay.  If you read further down in
15    that paragraph, you see reference to a Notice of
16    Termination relating to the Barclays Repurchase
17    Agreement, you see that?  Last sentence of that
18    paragraph?
19        A.    "Additionally notice" -- okay.
20        Q.    Do you have any understanding of
21    whether Notice of Termination was ever sent out
22    during this week?
23        A.    I have -- I have no knowledge of that.
24    I have no knowledge of what the terms and
25    conditions of that.

Page 224

1        HIGHLY CONFIDENTIAL - J. COGHLAN
2        Q.    Okay.  As a general matter, what's a
3    Notice of Termination with respect to a repo?
4        A.    I don't -- I don't know what that term
5    means per se.  I don't know.  I don't know what
6    a Notice of Termination would be.
7        Q.    Okay.  Have you ever, in your
8    experience with repos, have you ever come across
9    a Notice of Termination at all?
10        A.    No, I've never --
11        Q.    Fair enough.
12        MR. STERN:  I'm sorry, did you
13    complete your answer?
14        A.    I said I have never, to my
15    recollection, I have never been involved with a
16    Notice of Termination.
17        Q.    Mr. Coghlan, I have a -- oh, I'm
18    sorry, I have one more document I need to show
19    you before I get to my last --
20            (Exhibit 133, a document bearing Bates
21    Nos. BCI-EX-00079850 and 79849, marked for
22    identification, as of this date.)
23        Q.    Mr. Coghlan, I handed you a copy of an
24    exhibit marked 133, and I just have a brief
25    question about that.

Page 225

1        HIGHLY CONFIDENTIAL - J. COGHLAN
2            (Document review.)
3        Q.    Mr. Coghlan, have you had a chance to
4    look at the document?
5        A.    I have.
6        Q.    My question relates to the chart
7    that's on the second page.  Previously we had
8    discussed haircuts for the Fed repo, and my
9    question is, have you ever seen a chart like
10    this during your days at Lehman?
11        A.    No, I have not.
12        Q.    Does this look like the form of a
13    chart that may have been prepared by your
14    department?
15        A.    I don't recall my department ever
16    preparing, you know, preparing this information.
17        Q.    Okay.  Do you see up at the top it
18    says "Fed Facility" and then it has a column
19    that says "Haircut"?
20        A.    Uh-huh.
21        Q.    We had previously talked about what
22    kind of haircut the Fed was insisting on in its
23    financing that was provided to Barclays during
24    this period.
25            Do you have any understanding of

Page 226

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    whether those are the haircut amounts that the
3    Fed used in connection with that financing?
4        A.    No, I --
5        MR. STERN:  I just need to -- let me
6    just --
7        Can you read that question?
8        (Record read.)
9        MR. STERN:  You can answer.
10       A.    I don't know of these -- how these
11   haircuts compared to the Fed haircuts.
12       Q.    Okay.  Is it fair to say that's not an
13   issue that you were working on at the time?
14       A.    The haircuts at the Fed are determined
15   by the Fed.
16       Q.    Right.
17       A.    To borrow money from the Fed, you have
18   to post the required haircuts.
19       Q.    Right.
20       A.    So there's no -- it's a, you know,
21   standard schedule.  What these haircuts are, I
22   don't know what they -- I don't know what these
23   haircuts refer to.
24       Q.    Okay.
25       A.    I don't know what facility they're

Page 227

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    talking about and what the data means relative
3    to the facility.
4        Q.    Mr. Coghlan, did you ever hear any
5    reference during the week of September 15 to a
6    HIC loan in connection with the Barclays/Lehman
7    transaction?
8        A.    Between Barclays and Lehman?  A HIC
9    loan?
10       Q.    No, just in relation to that
11   transaction in any way.
12       A.    No, I did not hear anything.
13       Q.    HIC loan, what does that mean?
14       A.    Hold in custody.  So what it means is
15   you lend me money, but instead of me delivering
16   the collateral to where you would like it
17   delivered, the counterparty holds it in custody
18   for your behalf.
19       Q.    Did you have any understanding of any
20   HIC loans that were being entered into during
21   that week of September 15?
22       A.    I did not know of any HIC loans being
23   originated during that week.
24       Q.    Is that something that would have
25   fallen within your department, or elsewhere?

Page 228

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2        A.    We at times traded hold in custody,
3    yes, at times we would have hold in custody
4    arrangements with counterparties in my business
5    and to finance the firm.  I was not aware of any
6    hold in custody as it related to the Barclays
7    transaction.
8        Q.    Are you aware of any
9    discussions involving residential mortgages that
10   related in any way to the Barclays/Lehman
11   transaction?
12       A.    No, I was not privy to any
13   conversations relative to residential mortgages.
14       Q.    Okay.  Mr. Coghlan, I'm very close to
15   the end here.  I just wanted to go over a couple
16   of documents to see if you could help me with
17   respect to just understanding some of the
18   systems at Lehman.
19       A.    Okay.
20       Q.    In your department did you work with
21   something called an MTS system?
22       A.    MTS was a system that we used.
23       Q.    And what is that system?
24       A.    It's one of the systems used to
25   support financing and firm market-making

Page 229

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    activities.  It's a settlement -- it's a system
3    to help settle those types of transactions.
4        Q.    And are you familiar with that system?
5        A.    I'm familiar with that we use the
6    system.  I would not view myself as an expert in
7    what the system does and doesn't do.
8        Q.    Okay.  How about something that's
9    known as a blotter; is that a term you've heard
10   used at Lehman?
11       A.    I don't recall hearing that term.
12       Q.    Okay.  Have you ever heard of anything
13   referred to as an MTS blotter?
14       A.    I've heard of the term "MTS."  I'm not
15   certain what an MTS blotter would be.
16       Q.    Okay.  I'm going to parade out a huge
17   exhibit right now and I just want to see if you
18   have any knowledge of it.  And please don't get
19   scared by its size.
20       A.    Oh, ghees.  Okay.
21       Q.    You're welcome to page through it as
22   you like, but I just have a couple of questions
23   about it.
24       (Exhibit 134, MTS Blotter, marked for
25   identification, as of this date.)

Page 230

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2    Q.    Mr. Coghlan, it's a huge exhibit. I
3  don't expect you to be familiar with everything
4  in it. My question is, have you ever seen a
5  document or a spreadsheet like this?
6          My understanding it's known as MTS
7  blotter, so I wanted to see if you have ever
8  seen anything like this.
9    A.    I have not seen this report before.
10    Q.    Okay. I don't mean to limit your
11  question to a printed out version of this
12  report. Does this look like a database that
13  would be maintained on the MTS system?
14    A.    I don't know. I just don't know.
15    Q.    Are you not sufficiently familiar with
16  the MTS system to answer that question?
17    A.    Yeah, I -- I would say that's
18  accurate. That's true.
19    Q.    Okay. Are there others at Lehman that
20  I could more fruitfully ask questions about the
21  MTS system?
22    A.    I'm sure there are people that know
23  the MTS system. Who those people are I don't
24  know off the top of my head.
25    Q.    Let me ask it this way: Is the folks

Page 231

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  that work for Mr. Blackwell, like Mr. Hraska,
3  would he be familiar with the MTS system, do you
4  think?
5    A.    I believe so.
6    Q.    Do you think he uses that on a regular
7  basis?
8    A.    I don't know how often he was involved
9  in it.
10    Q.    Okay. If I asked you questions about
11  this document, do you have any familiarity with
12  the entries in the different columns?
13    A.    I'll try to answer as best I can.
14          This is not my area of knowledge.
15    Q.    Okay. I understand.
16    A.    So I --
17    Q.    I'm not trying to do anything cute
18  here. I'm just trying to better understand the
19  systems at Lehman.
20    A.    There are people more qualified than
21  I --
22    Q.    Okay.
23    A.    -- to do that. I mean, again, I'm
24  happy to answer your questions.
25    Q.    Well, maybe you can -- let's just try

Page 232

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2  a couple and then we'll see where it goes.
3          On the front page, there's a series of
4  entries leading down to -- in the column
5  entitled "Net Amount," there's a series of
6  entries that appear to total --
7    A.    Uh-huh.
8    Q.    -- to a $44.9 billion number, do you
9  see that?
10    A.    Uh-huh. Uh-huh.
11    Q.    And then there's followed by a series
12  of entries with zeros in that column. Are those
13  free repos, the ones that are denominated with a
14  zero?
15    A.    I, from this report, I couldn't tell.
16    Q.    You couldn't tell. Okay.
17          In the left hand, toward the left-hand
18  side, there's something called "Security
19  Descriptor," and you see terms like -- two
20  terms: "Specified Corporate" and the other one
21  is "AGY Secured Cash for Carry."
22    A.    I'm sorry, we're looking at where?
23    Q.    I'm in the fourth column which is
24  entitled "Security Descriptor"?
25    A.    Yes.

Page 233

HIGHLY CONFIDENTIAL - J. COGHLAN
1
2    Q.    Do those terms mean anything to you,
3  "Specified Corporates"?
4    A.    No.
5    Q.    How about A --
6          MR. STERN: Let's go off the record
7    for a second.
8          (Discussion off the record.)
9    Q.    Does that other entry on that column
10  entitled "AGY Secured Cash for Carry" mean
11  anything to you, Mr. Coghlan?
12    A.    No, I don't know what that means.
13    Q.    Okay. Let's put that exhibit aside.
14          (Exhibit 135, screen shot from the MTS
15    system, marked for identification, as of
16    this date.)
17    Q.    Mr. Coghlan, I'm handing you a copy of
18  an exhibit marked 135, which appears to be a
19  screen shot of some sort from what I believe to
20  be the MTS system, but I wanted to ask you if
21  you recognize this.
22    A.    I do not recognize this.
23    Q.    Okay. This is not a screen shot that
24  you would be familiar with in the normal course
25  of your business?

Page 234

HIGHLY CONFIDENTIAL - J. COGHLAN

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.   No, I've never seen this before.
3    Q.   Okay.  Fair enough.
4         Mr. Coghlan, just one or two more
5    questions.  Does Barclays run a matched book now
6    that you have been there?
7    A.   Yes, they do.
8    Q.   So the same -- you had previously
9    described for me what a matched book is.  The
10   same effort to maintain a matched book to a
11   certain extent is being undertaken by Barclays
12   today?
13        MR. STERN: Objection to the form.
14   Q.   That was a bad question.  Let me try
15   again.
16        In your current function at Barclays,
17   is it your general understanding that you're
18   trying to maintain a matched book?
19        MR. STERN: Objection to the form.
20   A.   We run a matched book, and as I
21   described, similarly, it means that the assets
22   and the liabilities are fairly close to each
23   other, other than haircuts and things like that,
24   and to that extent that it's, quote, matched
25   assets and liabilities, it would be similar to

Page 235

HIGHLY CONFIDENTIAL - J. COGHLAN

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    what the matched book activities were at Lehman.
3    Q.   Okay.  And is Stephen King involved in
4    that activity?
5    A.   Stephen?
6    Q.   A man named Stephen King?
7    A.   No, he's not.
8    Q.   Do you know what his role is at
9    Barclays?
10   A.   I do not know what he does.
11   Q.   Okay.  Do you know him?
12   A.   I know the name.
13   Q.   Do you have any understanding of how
14   Barclays valued the assets that it acquired from
15   Lehman?
16   A.   No, I have no understanding of that.
17   Q.   Okay.  Do you have any understanding
18   of whether they adopted the valuations placed in
19   those assets by Bank of New York?
20   A.   I do not know what the valuations are,
21   so I wouldn't know how -- the difference, if
22   any, between Bank of New York and Barclays.
23   Q.   Do you know the name of someone at
24   Barclays that I could ask who might have
25   knowledge about how Barclays valued the assets

Page 236

HIGHLY CONFIDENTIAL - J. COGHLAN

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    that it received from Lehman?
3    A.   I don't know who did that firsthand.
4    I assume we could go back and find out, but I
5    don't know who -- I don't know who did that.
6    Q.   Do you know what department did that?
7    A.   No, I do not.
8         MR. HINE: Mr. Coghlan, I have no
9    further questions.  I think some of my
10   colleagues might, but we're done.
11        MR. KAY: No questions from the
12   Committee.
13        MR. LAYDEN: No.
14        MR. STERN: Let's take a little break.
15   I may take a couple of minutes.
16        (Pause in the proceedings.)
17   EXAMINATION BY
18   MR. STERN:
19   Q.   I have just a few clarifying
20   questions.  Mr. Coghlan, you were asked some
21   questions earlier concerning your understanding
22   as to how excess collateral is treated in
23   certain repo default situations.
24        What was the basis for the
25   understanding you testified to?

Page 237

HIGHLY CONFIDENTIAL - J. COGHLAN

1    HIGHLY CONFIDENTIAL - J. COGHLAN
2    A.   The answer given was based on
3    conversations I've had with counsel on several
4    occasions at Lehman Brothers.
5    Q.   Do you recall the specific Repurchase
6    Agreements or arrangements Lehman counsel was
7    considering when you received that legal advice?
8         MR. HINE: Objection.  You are not
9    authorized to waive privilege with respect
10   to those conversations with counsel.
11        MR. STERN: I'm just asking whether he
12   recalls what those agreements were.  It's a
13   yes or no answer.
14   Q.   Let me restate the question.  Do you
15   recall the specific Repurchase Agreements or
16   arrangements that Lehman counsel was considering
17   when you received that legal advice, yes or no?
18   A.   No.
19   Q.   Have you had any personal experience
20   where, in actual practice, excess collateral was
21   returned after a repo default?
22   A.   Not that I can recall.
23   Q.   You were asked questions earlier about
24   running a matched book.  Can you describe to us
25   what you understand that term "matched book" to

Page 238

HIGHLY CONFIDENTIAL - J. COGHLAN

1   mean?
2       A.   The matched book was a business at
3   Lehman that was a revenue-generating department
4   whose revenues were generated by the lending of
5   cash and collateral with counterparties, with
6   the intent of making a positive spread on that
7   lending activity.
8       MR. STERN:  I have no further
9   questions.
10      MR. HINE:  I have no further
11  questions.
12      MR. KAY:  No questions.
13      MR. STERN:  Thank you, Mr. Coghlan.
14  We're off the record.
15      MR. HINE:  Thank you very much.
16      (Time Noted: 3:11 P.M.)
17          oOo
18
19
20
21          JOHN COGHLAN
22
23  Subscribed and sworn to
    before me this    day
24  of      2009.
25
    _____

Page 239

HIGHLY CONFIDENTIAL - J. COGHLAN
CERTIFICATE

1
2
3   STATE OF NEW YORK )
                      : ss
4   COUNTY OF NEW YORK)
5       I, Kathy S. Klepfer, a Registered
6   Merit Reporter and Notary Public within and
7   for the State of New York, do hereby
8   certify:
9       That JOHN COGHLAN, the witness whose
10  deposition is herein before set forth, was
11  duly sworn by me and that such deposition is
12  a true record of the testimony given by such
13  witness.
14      I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18      I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23      In witness whereof, I have hereunto
24  set my hand this 13th day of August, 2009.
25
    ----------------------------------

Page 240

HIGHLY CONFIDENTIAL - J. COGHLAN
INDEX

1
2
3   TESTIMONY OF J. COGHLAN:            PAGE
4   Examination by Mr. Hine ..................   5
5   Examination by Mr. Stern ..................   236
6
7   EXHIBITS:                          PAGE
8   Exhibit 115, a document bearing Bates ......   22
9   Nos. BCI-EX-00077294 through 77295
10  Exhibit 116, a document bearing Bates ......   72
11  Nos. 10303063
12  Exhibit 117, Master Purchase Agreement .....   77
13  Exhibit 118, a document bearing Bates ......   99
14  Nos. 10297296 and 10300641
15  Exhibit 119, a document bearing Bates ......   102
16  Nos. 10302495
17  Exhibit 120, an e-mail string, the first ...   110
18  one in time dated September 17, 2008, at
19  6:31 P.M.
20  Exhibit 121, an e-mail string, the first ...   124
21  one in time dated September 17, 2008, at
22  6:25 P.M.
23  Exhibit 122, an e-mail string, the first ...   126
24  one in time dated September 17, 2008 at
25  6:39 P.M.

Page 241

HIGHLY CONFIDENTIAL - J. COGHLAN
INDEX (Cont'd.)

1
2
3   EXHIBITS:              PAGE
4   Exhibit 123, a document bearing Bates .....   128
5   Nos. 68985
6   Exhibit 124, a document bearing Bates .....   132
7   Nos. 10303258
8   Exhibit 125, covering e-mail with chart ....   138
9   with the heading "Booking Amounts"
10  Exhibit 126, an e-mail stream, the first ...   178
11  one in time dated September 18, 2008,
12  at 6:18 A.M.
13  Exhibit 127, an e-mail stream, the first ...   190
14  one in time dated September 18, 2008,
15  at 6:04 A.M.
16  Exhibit 128, an e-mail stream, the first ...   199
17  in time dated September 19, 2008, at
18  2:44 P.M.
19  Exhibit 129, an e-mail stream, the first ...   207
20  one in time dated September 19, 2008,
21  2:26 P.M.
22  Exhibit 130, an e-mail dated September 19,   211
23  2008, at 3:22 P.M.
24
25

Page 242

HIGHLY CONFIDENTIAL - J. COGHLAN
INDEX (Cont'd.)

| EXHIBITS: | PAGE |
|---|---|

Exhibit 131, an e-mail stream, the first ...   214
one in time dated September 19, 2008, at
11:03 A.M.
Exhibit 132, an e-mail stream, the first ...   216
one in time dated September 20, 2008,
at 5:43
Exhibit 133, a document bearing Bates .......   224
Nos. BCI-EX-00079850 and 79849
Exhibit 134, MTS Blotter ...................   229
Exhibit 135, screen shot from the MTS system   233

Page 243

HIGHLY CONFIDENTIAL - J. COGHLAN
NAME OF CASE:  In re Lehman Brothers
DATE OF DEPOSITION:  August 13, 2009
NAME OF WITNESS:  John Coghlan
Reason Codes:
   1. To clarify the record.
   2. To conform to the facts.
   3. To correct transcription errors.

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

# BCI EXHIBIT

# 61

Page 1

1          HIGHLY CONFIDENTIAL – A. COX

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4  ----------------------x

5  In Re:

6                          Chapter 11

7  LEHMAN BROTHERS        Case No. 08-13555(JMP)

8  HOLDINGS, INC., et al.,   (Jointly Administered)

9

                    Debtors.

10

   ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF ARCHIBALD COX

14              New York, New York

15              September 11, 2009

16

17

18

19

20

21

22

23  Reported by:

24  KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25  JOB NO. 24300

| | |
|---|---|
| **Page 2** | **Page 3** |

**Page 2**

1　　　HIGHLY CONFIDENTIAL - A. COX
2　　　　　September 11, 2009
3　　　　　　10:19 a.m.
4
5　　　HIGHLY CONFIDENTIAL deposition
6　　of ARCHIBALD COX, held at the law
7　　offices of Jones Day, LLP, 222 East
8　　41st Street, New York, New York, before
9　　Kathy S. Klepfer, a Registered Professional
10　Reporter, Registered Merit Reporter,
11　Certified Realtime Reporter, Certified
12　Livenote Reporter, and Notary Public
13　of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide (877) 702-9580

**Page 3**

1　　　HIGHLY CONFIDENTIAL - A. COX
2
3　　　A P P E A R A N C E S:
4　JONES DAY, LLP
5　　Attorneys for Lehman Brothers, Inc.
6　　　222 East 41st Street
7　　　New York, New York 10017-6702
8　BY: JAYANT W. TAMBE, ESQ.
9　　　BART GREEN, ESQ.
10
11　BOIES, SCHILLER & FLEXNER, LLP
12　　Attorneys for Barclays and the Witness
13　　　575 Lexington Avenue - 7th Floor
14　　　New York, New York 10022
15　BY: JACK G. STERN, ESQ.
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide (877) 702-9580

**Page 4**

1　　　HIGHLY CONFIDENTIAL - A. COX
2　　　A P P E A R A N C E S: (Cont'd.)
3　JENNER & BLOCK, LLP
4　　Attorneys for the Examiner
5　　　330 N. Wabash Avenue
6　　　Chicago, Illinois 60611-7603
7　BY: VINCENT LAZAR, ESQ.
8
9　QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
10　Attorneys for the Creditors Committee
11　　　51 Madison Avenue
12　　　22nd Floor
13　　　New York, New York 10010
14　BY: JAMES C. TECCE, ESQ.
15
16　HUGHES, HUBBARD & REED, LLP
17　　Attorneys for the SIPA Trustee
18　　　1775 I Street, N.W.
19　　　Washington, D.C. 20006-2401
20　BY: JOHN WOOD, ESQ.
21　　　FARA TABATABAI, ESQ. (Afternoon Session)
22
23　Also Present:
24　　　PHILIP E. KRUSE, Alvarez & Marsal
25

TSG Reporting - Worldwide (877) 702-9580

**Page 5**

1　　　HIGHLY CONFIDENTIAL - A. COX
2　ARCHIBALD COX, called as a
3　　witness, having been duly sworn by a Notary
4　　Public, was examined and testified as
5　　follows:
6　EXAMINATION BY
7　MR. TAMBE:
8　　Q.　Good morning, Mr. Cox. My name is Jay
9　　Tambe. I'm with Jones Day. We're special
10　counsel to Lehman Brothers Holdings, Inc. With
11　me is my colleague Bart Green, and I'll let the
12　other lawyers around the table introduce
13　themselves to you.
14　　　MR. WOOD:　John Wood from Hughes,
15　Hubbard & Reed. We represent the SIPA
16　Trustee.
17　　　MR. SPENCER:　George Spencer. I'm
18　also with Jones Day.
19　　　MR. TECCE:　James Tecce with Quinn
20　Emanuel. We are counsel to the Creditors
21　Committee.
22　　　MR. LAZAR:　Vince Lazar from Jenner &
23　Block, representing the Examiner.
24　　　MR. KRUSE:　Phil Kruse with Alvarez &
25　Marsal on behalf of the LBHI Estate.

TSG Reporting - Worldwide (877) 702-9580

2

Page 6

HIGHLY CONFIDENTIAL - A. COX
1     HIGHLY CONFIDENTIAL - A. COX
2  BY MR. TAMBE:
3     Q.  Mr. Cox, by whom are you currently
4  employed?
5     A.  Barclays.
6     Q.  And you've been with Barclays for how
7  long?
8     A.  Since May last year.
9     Q.  And what's your current position with
10  Barclays?
11     A.  Title is Chairman of the Americas.
12     Q.  And was that the title you had when
13  you joined Barclays a year ago?
14     A.  Yes.
15     Q.  I'm going to ask you a series of
16  questions about the Lehman/Barclays transaction
17  and your involvement in it.
18         What's your earliest recollection of
19  your personal involvement in the Lehman/Barclays
20  transaction?
21     A.  It was on the Friday, I guess,
22  preceding the week -- the Monday that Lehman
23  filed for bankruptcy.
24     Q.  You got a calendar that's for your
25  reference before you that's for the month of

TSG Reporting - Worldwide (877) 702-9580

Page 7

1     HIGHLY CONFIDENTIAL - A. COX
2  September 2008.  You can keep that in front of
3  you for reference.  I believe the Friday before
4  Lehman filed for bankruptcy was the 12th?
5     A.  Yes.
6     Q.  Prior to the 12th, had you been
7  involved in any preliminary discussions with
8  Lehman about a possible transaction or
9  acquisition?
10     A.  I was not involved in any discussions
11  with Lehman.
12     Q.  Do you know if Barclays had been
13  involved in any discussions prior to the 12th
14  with Lehman?
15     A.  I don't know of any.
16     Q.  Starting from the 12th, Friday the
17  12th, how long did your personal involvement in
18  the Barclays/Lehman transaction last in the
19  negotiation, execution, et cetera, of that
20  transaction?
21     A.  It lasted through the morning of the
22  22nd or -- yes.
23     Q.  And the morning of the 22nd was when
24  the clarification letter was executed and the
25  transaction closed; is that correct?

TSG Reporting - Worldwide (877) 702-9580

Page 8

1     HIGHLY CONFIDENTIAL - A. COX
2     A.  Correct.
3     Q.  After the 22nd, just broadly, what has
4  been your involvement with the either the
5  accounting for the transaction or the valuation
6  of the transaction?  Have you had any
7  involvement in that?
8     A.  No.
9     Q.  If you could broadly describe what
10  role you played during that time period between
11  the 12th of September and the 22nd of September
12  in connection with the Lehman/Barclays
13  transaction.
14     A.  I was one of several people involved
15  in the negotiations around the transaction.
16     Q.  Who were the other people involved in
17  the negotiation of the transaction from the
18  Barclays side?
19     A.  Well, there were numerous people
20  involved in various aspects of it.  What aspects
21  in particular are you talking about?
22     Q.  As Barclays approached the
23  negotiation, was there a lead negotiating team
24  or core negotiating team?
25     A.  I guess Michael Klein and I were

TSG Reporting - Worldwide (877) 702-9580

Page 9

1     HIGHLY CONFIDENTIAL - A. COX
2  initially the lead negotiators.
3     Q.  And you said "initially."  Did that
4  change as the week went on?
5     A.  As matters progressed, other people
6  became involved, heavily involved, as well.
7     Q.  And other than yourself and Michael
8  Klein, who were the other people who became
9  heavily involved as things progressed?
10     A.  Well, Rich Ricci became involved.
11  Gerard LaRocca became involved in certain
12  aspects of it.  There were people in the Fixed
13  Income Department that became involved in
14  valuations, you know, valuations of securities.
15  Obviously there were a lot of people involved in
16  a transaction of this size.
17     Q.  As part of your involvement with the
18  transaction, did you ever go down to bankruptcy
19  court for any of the hearings?
20     A.  I went down for the hearing on the
21  19th I guess it was.
22     Q.  And did you stay for the duration of
23  that hearing?
24     A.  I'm afraid to say I did.
25     Q.  You did or you didn't?

TSG Reporting - Worldwide (877) 702-9580

3

Page 10

HIGHLY CONFIDENTIAL - A. COX
1       HIGHLY CONFIDENTIAL - A. COX
2       A.   I did.
3       Q.   You did.  So you were there for the
4    applause after midnight?
5       A.   I was there until 1, 1 something, yes.
6    I don't remember the applause, but yes.
7       Q.   In terms of the legal documentation
8    for the transaction, the Asset Purchase
9    Agreement, the Clarification Letter, the First
10   Amendment, did you play any role in reviewing
11   drafts or commenting on drafts of those
12   documents?
13      A.   Very limited.  We left that largely in
14   the hands of the lawyers.
15      Q.   We've had the opportunity to speak
16   with Mr. Varley about his understanding of the
17   transaction, and he has described that period
18   between the 12th and the 22nd as broken up into
19   sort of the way he defines it is three
20   transactions, Lehman 1, Lehman 2 and Lehman 3.
21      Is that a nomenclature that you're
22   familiar with?
23      A.   No.
24      Q.   What he meant by that was the change
25   in the contemplated transaction from the

TSG Reporting - Worldwide (877) 702-9580

Page 11

1       HIGHLY CONFIDENTIAL - A. COX
2    pre-bankruptcy weekend and then the change that
3    took place during the week of the 15th.  Is that
4    your recollection, that this was an evolving
5    transaction during that time period?
6       A.   I'm sorry, you said he said there were
7    three.  You only mentioned two.
8       Q.   One was over the weekend
9    pre-bankruptcy, two was the APA Asset Purchase
10   Agreement, three is the deal that actually was
11   executed.
12      A.   I would regard it was two.  One was
13   the pre-bankruptcy and one was the when the deal
14   was finally negotiated.
15      Q.   In your mind, sir, was there any
16   significant difference between the deal that was
17   negotiated on the Monday and Tuesday of the
18   week, the 15th and the 16th of September, and
19   the deal that was executed on the 22nd of
20   September?
21      MR. STERN:  Objection to the form.
22      A.   I'm not -- would you repeat the
23   question?  I'm not sure I follow that.
24      Q.   Sure.  In your mind was there any
25   significant difference between the deal

TSG Reporting - Worldwide (877) 702-9580

Page 12

1       HIGHLY CONFIDENTIAL - A. COX
2    negotiated on the 15th and the 16th of September
3    and the deal that was executed, that was closed
4    on, on the 22nd of September?
5       A.   Not significant difference, no.
6       Q.   What differences, if any, what
7    differences, if any, come to your mind between
8    the deal negotiated on the 15th and 16th and the
9    one that closed on the 22nd?
10      A.   There were, to my mind, there were
11   clarifications of certain points that were made,
12   but that's, as to the detail, I simply don't
13   remember.
14      Q.   In terms of any differences in the
15   assets that were contemplated to be purchased in
16   the deal that was negotiated on the 15th and
17   16th and the assets that were actually purchased
18   at the closing on the 22nd, any significant
19   differences in those assets, in your mind?
20      A.   There were some differences, yes.
21      Q.   And what accounted for those
22   differences?
23      A.   There were some differences, as I
24   remember it, in the availability of some
25   securities and there were some differences

TSG Reporting - Worldwide (877) 702-9580

Page 13

1       HIGHLY CONFIDENTIAL - A. COX
2    occasioned by JPMorgan not releasing some
3    securities.  Exactly which securities I can't
4    tell you.
5       Q.   And did you have a sense that these
6    differences in the securities and the
7    differences between the transaction as
8    negotiated and the transaction as closed,
9    whether those affected the fundamental economics
10   of the transaction from Barclays' perspective?
11      MR. STERN:  Objection to the form.
12      A.   Repeat the question, please.
13      Q.   Basically, did you end up with -- did
14   you end up closing a transaction that, from an
15   economic perspective, from Barclays'
16   perspective, was fundamentally different than
17   the deal you had negotiated at the beginning of
18   the week?
19      A.   To my mind, the fundamental difference
20   was the situation we were in with JPMorgan,
21   which -- where we had a significant exposure,
22   very significant exposure, that we didn't
23   envisage at the beginning of the week.
24      Q.   Other than the JPMorgan situation in
25   terms of the assets acquired from Lehman, did

TSG Reporting - Worldwide (877) 702-9580

4

Page 14

HIGHLY CONFIDENTIAL - A. COX
1
2  you believe that there was a significantly
3  different economic effect of those assets that
4  were actually acquired versus what you
5  contemplated acquiring?
6      A.   There was a lesser quantity, but not a
7  significant difference, no.
8      Q.   Were you involved in making any
9  presentations to the Barclays board about any
10 iteration or aspect of the Lehman transaction?
11     A.   No.
12     Q.   Let's start with the 12th, and if you
13 could describe for us the period between the
14 12th and the 14th, the Sunday, so the Friday
15 through the Sunday, what your involvement was
16 with the contemplated Lehman transaction at that
17 time period?
18     A.   On the late afternoon I believe of the
19 12th, as best I can remember, it was a busy
20 time. We met at the offices of Simpson Thacher
21 for most, if not all of the night. Then the
22 next day we met down at the Federal Reserve on
23 the Saturday and were there for most of the day,
24 and the following morning we reconvened at the
25 Federal Reserve until -- I guess we left the
TSG Reporting - Worldwide (877) 702-9580

Page 15

HIGHLY CONFIDENTIAL - A. COX
1
2  Federal Reserve sometime after noon.
3      Q.   On Sunday?
4      A.   On Sunday.
5      Q.   And when you left the Federal Reserve
6  at noon on Sunday, what was the status of the
7  discussions with Lehman or concerning Lehman?
8      A.   The transaction as originally
9  envisaged was off, was -- was off, period.
10     Q.   And the transaction that was
11 envisioned, could you describe what that
12 transaction was?
13     A.   It was a transaction that involved
14 splitting -- it was similar to the transaction
15 that Lehman had proposed actually initially for
16 themselves.  Splitting the bad bank, good bank
17 transaction.
18     Q.   And the contemplation was that
19 Barclays would invest in the good bank?
20     A.   Yes.
21     Q.   And the government would provide a
22 backstop or some kind of guarantee with respect
23 to the bad bank?
24     A.   Yes, that some party was.  The
25 government, either the Fed or the Treasury.
TSG Reporting - Worldwide (877) 702-9580

Page 16

HIGHLY CONFIDENTIAL - A. COX
1
2      Q.   Do you have an understanding of the
3  type of due diligence, if any, that was done by
4  Barclays over the weekend?
5      A.   We did as much as we could in the
6  timeframe allowed.
7      Q.   Do you know any of the components of
8  the due diligence?
9      A.   Not specifically.
10     Q.   Why did that contemplated transaction
11 not go forward?
12     A.   It went forward because there was no,
13 no entity that was -- that was able to -- would
14 or was able to guarantee the ongoing obligations
15 of Lehman Holdings before a transaction could
16 close.
17     Q.   I just want to make sure we have your
18 answer down.  It did not go forward because
19 there was no party that would guarantee the
20 ongoing obligations?
21     A.   That could or would guarantee is what
22 I said.
23     Q.   Now, on Monday, the 15th, Lehman filed
24 for bankruptcy, right?
25     A.   Yes.
TSG Reporting - Worldwide (877) 702-9580

Page 17

HIGHLY CONFIDENTIAL - A. COX
1
2      Q.   At some point on Monday, Barclays
3  reengaged in discussions with Lehman; is that
4  correct?
5      A.   Yes.
6      Q.   How did that come about?
7      A.   It came about, as I understand it,
8  through a telephone call on Sunday evening to
9  Bob Diamond.
10     Q.   From?
11     A.   I believe it was from Bart McGee.
12          Bart -- not McGee.
13          MR. STERN:  McDade.
14     A.   Yes, McDade.
15     Q.   And did Bart McDade propose any
16 particular type of transaction to Mr. Diamond?
17     A.   I don't know.
18     Q.   I assume you and Mr. Diamond had a
19 conversation about that overture from Bart
20 McDade?
21     A.   We did on -- yes, we did.
22     Q.   And then you reengaged in discussions
23 with Lehman, correct?
24     A.   Correct.
25     Q.   Before you reengaged with Lehman, did
TSG Reporting - Worldwide (877) 702-9580

**Page 18**

HIGHLY CONFIDENTIAL - A. COX

1  HIGHLY CONFIDENTIAL - A. COX
2  you have conversations with other folks at
3  Barclays about the terms under which you were
4  going to reengage, what kind of deal you were
5  going to discuss with Lehman?
6      A.  I don't remember exactly what we
7  discussed.
8      Q.  Now, Michael Klein, was he on the
9  scene this weekend, the 12th, 13th, 14th?
10     A.  Yes.
11     Q.  And I assume he had been involved in
12  these discussions over the weekend; is that
13  right?
14     A.  Isn't that what the 12th, 13th and
15  14th was?  Didn't you just ask that question?
16     Q.  Yeah.  And he was involved in those
17  discussions?
18     A.  That's what I said.
19     Q.  And he was at the Fed?
20     A.  That's what I said, yes.
21     Q.  And when you reengaged with Lehman on
22  the 15th, is he also involved in those
23  discussions?
24     A.  I don't remember specifically.
25     Q.  When you go back and reengage with

TSG Reporting - Worldwide (877) 702-9580

**Page 19**

HIGHLY CONFIDENTIAL - A. COX

1  HIGHLY CONFIDENTIAL - A. COX
2  Lehman on the 15th, what's the deal that you're
3  seeking?
4      A.  I don't really remember exactly how
5  the transaction came into being, the idea of
6  what form the transaction would take.
7      Q.  The deal that was negotiated and
8  signed on the 16th was the deal for the purchase
9  of certain assets of Lehman, correct?
10     A.  Yes.
11     Q.  What role did you play in structuring
12  that deal?
13     A.  I was involved in the negotiations
14  around part of the structuring of the deal, not
15  in the identifying of the assets that we would
16  take.
17     Q.  So what part of the structuring of the
18  deal were you involved in?
19     A.  Well, in the decisions of what did we
20  want, did we want people in the U.S., did we
21  want the people in Europe, did we want the
22  people in as well in Asia, did we want -- so it
23  was more a question of how the deal would be
24  structured, in a sense, not just purchase of
25  assets, but what did we want -- what parts of

TSG Reporting - Worldwide (877) 702-9580

**Page 20**

HIGHLY CONFIDENTIAL - A. COX

1  HIGHLY CONFIDENTIAL - A. COX
2  their business did we want to try to acquire,
3  basically people.
4      Q.  Was there --
5      A.  And how would we do that.
6      Q.  Was there someone on the Barclays
7  negotiating team who was charged with focusing
8  on what assets to purchase, physical assets?
9      A.  It would have been from the Fixed
10  Income Department, yes.
11     Q.  And who would that have been?
12     A.  Largely I believe it was Mike Keegan
13  and Stephen.
14     Q.  Stephen?
15     MR. STERN:  King.
16     A.  King.
17     Q.  Describe the scene on the 15th when
18  you reengaged with Lehman.  Who is at the
19  meeting?  What are the discussions?  I want to
20  understand the process that resulted in the
21  Asset Purchase Agreement that gets signed the
22  next day.
23     A.  I don't remember exactly who -- who
24  was there and what the process was at this point
25  in time.

TSG Reporting - Worldwide (877) 702-9580

**Page 21**

HIGHLY CONFIDENTIAL - A. COX

1  HIGHLY CONFIDENTIAL - A. COX
2      Q.  Do you remember the physical setting,
3  where it took place, where the discussions took
4  place?
5      A.  I do not remember specifically where
6  the discussions took place.  During -- I will
7  say during the week, the early part of the week,
8  many of the discussions took place in Lehman's
9  offices.
10     Q.  The Asset Purchase Agreement has a
11  definition of "Purchased Assets."  Are you
12  familiar with that, sir?
13     A.  I'm familiar with the existence of the
14  agreement, yes.
15     Q.  In the Asset Purchase Agreement,
16  there's a reference to $70 billion of long
17  positions and roughly $69 billion of short
18  positions.  Are you familiar with those
19  definitions?
20     A.  I'm familiar with the approximate
21  amounts; not with the exact language in the
22  agreement.
23     Q.  Do you have an understanding as to how
24  those numbers were arrived at, the 70 billion in
25  long and the 69 in short?

TSG Reporting - Worldwide (877) 702-9580

6

Page 22

HIGHLY CONFIDENTIAL - A. COX
1
2    A.    No.
3    Q.    Were you aware of any efforts on
4    Monday, the 15th, or Tuesday, the 16th, to mark
5    down the assets that were on Lehman's books and
6    that were going to be purchased by Barclays?
7    A.    I don't believe there was any attempt
8    made to mark down assets as that -- in the
9    connotation I understand your question.
10    Q.    Are you aware of any discussions for a
11    haircut or a cushion on the value of those
12    assets versus what Barclays would be paying for
13    those assets?
14    A.    No.
15    Q.    Are you aware if the deal as
16    negotiated and set forth in the Asset Purchase
17    Agreement contains a discount or a cushion for
18    Barclays?
19    A.    No.
20    Q.    You don't know one way or the other?
21    A.    I don't know one way or the other. I
22    will say -- let's not forget the environment in
23    which one was dealing and where valuation of
24    securities was a very difficult matter, and I
25    believe there were attempts made by both parties

TSG Reporting - Worldwide (877) 702-9580

Page 23

HIGHLY CONFIDENTIAL - A. COX
1
2    to reasonably value the securities and I think
3    that's the environment in which we were
4    operating.  But it was a very difficult
5    environment in which to value securities.
6    Q.    That's kind of why I asked the
7    question.  It was a difficult environment.  You
8    were contemplating taking onto your books a
9    fairly large collection of securities, correct?
10    A.    Yes.
11    Q.    What efforts, if any, did Barclays
12    make on Monday and Tuesday of that week to try
13    and put a value on those securities that it was
14    taking on?
15    A.    I think, I believe a -- an effort was
16    made to mark the securities and tend to agree
17    with Lehman as to what those reasonable marks
18    were.
19    Q.    That process, to mark the securities
20    and to agree with Lehman as to what the
21    reasonable marks were, who was running that
22    process from the Barclays side?
23    A.    I don't know.  The Fixed Income
24    Department was responsible for that.
25    Q.    Are you aware if the Fixed Income

TSG Reporting - Worldwide (877) 702-9580

Page 24

HIGHLY CONFIDENTIAL - A. COX
1
2    Department was given any target of a cushion or
3    a discount to build into that marking process?
4    A.    No.
5    Q.    You don't know one way or the other?
6    A.    I don't believe they were. I know of
7    no such.
8    Q.    Did you see any drafts of the Asset
9    Purchase Agreement before it gets executed by
10    the parties?
11    A.    Did I see drafts? You mean did
12    somebody show me the document? Yes.
13    Q.    Did you review them?
14    A.    No, that was -- the review of them was
15    really left to the lawyers.  If there were
16    business issues, I might have been involved in
17    those, but not in reviewing the documents.
18    Q.    Who, if anyone, was checking the
19    document that's being processed, the Asset
20    Purchase Agreement, versus the business terms
21    that are being negotiated between the business
22    people?
23    A.    Counsel, both internal and external.
24    Q.    And you were specifically negotiating
25    particular business terms of this transaction,

TSG Reporting - Worldwide (877) 702-9580

Page 25

HIGHLY CONFIDENTIAL - A. COX
1
2    correct?
3    A.    Yes.
4    Q.    Did you check the Asset Purchase
5    Agreement to see if the business terms that you
6    individually had negotiated were reflected in
7    the Asset Purchase Agreement?
8    A.    In a -- in some cases, a few cases,
9    yes.
10    Q.    What specific business terms were you
11    individually negotiating?
12    A.    I don't recall at this point.
13    Q.    You've told us earlier about, you
14    know, what aspects of the business would be
15    acquired by Barclays.  Was that one of the
16    things that you were focused on?
17    A.    Yes. Yes.
18    Q.    In terms of employees and operations?
19    A.    Yes.
20    Q.    I understand from your earlier answers
21    you were not the person focusing on the
22    particular assets to be purchased, the
23    securities to be purchased?
24    A.    Correct.
25    Q.    Correct?

TSG Reporting - Worldwide (877) 702-9580

Page 26

HIGHLY CONFIDENTIAL - A. COX
1
2    A.    Correct.
3    Q.    Someone else was doing that?
4    A.    Yes.
5    Q.    And that someone else would be
6    reviewing, presumably, the Asset Purchase
7    Agreement to make sure that the document
8    reflected the business deal, correct?
9         MR. STERN: Objection to the form.
10   A.    At least they would be making sure
11   with counsel that that was what happened.
12   Q.    At the beginning of the week, as far
13   as you knew, there was no contemplation of
14   Barclays stepping into the shoes of the Fed
15   repo, correct?
16   A.    I don't remember specifically, but --
17   at the very beginning of the week?
18   Q.    Yes, the Monday/Tuesday.
19   A.    I don't think on Monday that was --
20   that was an issue.
21   Q.    And as far as you know, when the Asset
22   Purchase Agreement was executed on the 16th,
23   that was not an issue, correct?
24   A.    I don't remember the exact sequencing
25   of the timeframe of when the Asset Purchase

TSG Reporting - Worldwide (877) 702-9580

Page 27

HIGHLY CONFIDENTIAL - A. COX
1
2    Agreement was executed and when -- and when we
3    were asked to step into the shoes.
4    Q.    What's your earliest recollection of
5    when you were asked to step into the shoes of
6    the Fed?
7    A.    Middle of the week.
8    Q.    And what is it that you recall about
9    that?
10   A.    Very little other than the fact that
11   we were asked to step into the shoes.
12   Q.    Were you involved in that aspect of
13   the transaction, which is having conversations
14   with the Fed or internally about what it meant
15   to step into the shoes of the Fed?
16   A.    No.
17   Q.    Was there someone else on the
18   negotiating team who led that effort?
19   A.    Yes.
20   Q.    Who was that?
21   A.    Gerard LaRocca, principally, I
22   believe. I'm also sure there were others
23   involved as well.
24   Q.    Do you recall there being any
25   discussions as to whether the Asset Purchase

TSG Reporting - Worldwide (877) 702-9580

Page 28

HIGHLY CONFIDENTIAL - A. COX
1
2    Agreement should be amended in the middle of the
3    week when you learned about the Fed repo issue?
4    A.    I don't recall that.
5    Q.    Do you know if the Asset Purchase
6    Agreement was ever amended to reflect the Fed
7    repo?
8    A.    No, I don't know if it was amended
9    specifically for that.
10   Q.    There were certain operational
11   difficulties that were experienced later on in
12   the week in connection with the Fed repo, do you
13   recall that?
14   A.    Yes, I know that -- yes.
15   Q.    What was your involvement, if any, in
16   assessing those difficulties, responding to
17   those difficulties, dealing with those
18   difficulties?
19   A.    I only knew of them. I wasn't
20   involved in the negotiations.
21   Q.    And who was involved in the
22   negotiations?
23   A.    Again, Gerard LaRocca was clearly
24   involved. There were undoubtedly other people
25   involved as well.

TSG Reporting - Worldwide (877) 702-9580

Page 29

HIGHLY CONFIDENTIAL - A. COX
1
2    Q.    When you were down in court on Friday,
3    the 19th, do you know whether a copy of the
4    clarification letter was submitted to the court?
5    A.    I do not know.
6    Q.    Over the weekend, the weekend of the
7    20th/21st, do you recall whether you reviewed
8    any draft of the clarification letter?
9    A.    I do not.
10   Q.    Do you have any memory of having seen
11   the clarification letter before it was executed?
12   A.    No.
13   Q.    Is it your belief that in fact you
14   were not provided with drafts of the
15   clarification letter?
16   A.    I simply don't remember.
17   Q.    When is the last time you reviewed the
18   clarification letter?
19   A.    I think I said I don't remember
20   reviewing it at all, so I -- I guess I haven't
21   reviewed it.
22         (Exhibit 413B, a document bearing
23         Bates Nos. BCI-EX-(S)-26269, marked for
24         identification, as of this date.)
25   Q.    Sir, I have placed before you a

TSG Reporting - Worldwide (877) 702-9580

Page 30

HIGHLY CONFIDENTIAL - A. COX

1        HIGHLY CONFIDENTIAL - A. COX
2   document we marked Exhibit 413B. Take a moment
3   to review it and let me know when you're done.
4        (Document review.)
5   Q.   You've had a chance to review it?
6   A.   I have.
7   Q.   You'll see this is an e-mail from
8   Richard Haworth dated August 26 to you and
9   others at Barclays, do you see that?
10  A.   Yes.
11  Q.   And the subject line is "BarCap Exco"?
12  A.   Yes.
13  Q.   What is "Exco" a reference to?
14  A.   Barclays Capital Executive Committee.
15  Q.   Are you a member of that committee?
16  A.   I am a member of the committee or an
17  ex officio member of the committee.  I'm not
18  sure the proper language.
19  Q.   There are two bolded items that appear
20  in that e-mail.  The first one is "JPMorgan -
21  new flow business" and the second item reads
22  "Long Island - Asset Management update," do you
23  see that?
24  A.   Yes.
25  Q.   And do you understand the "Long

TSG Reporting - Worldwide (877) 702-9580

Page 31

HIGHLY CONFIDENTIAL - A. COX

1        HIGHLY CONFIDENTIAL - A. COX
2   Island" to be a reference to Lehman Brothers?
3   A.   Yes.
4   Q.   And there's a discussion there about
5   Lazard and Lazard's views, do you see that?
6   A.   Yes.
7   Q.   Do you have any recollection of any
8   discussions with Lazard as early as August of
9   2008 about Lehman Brothers?
10  A.   I was not involved in any discussions
11  with Lazard.
12  Q.   Other than what you see in this
13  e-mail, are you aware of discussions that others
14  at Barclays were having with Lazard about Lehman
15  prior to the September 12th date?
16  A.   No. No.
17  Q.   And do you have any understanding of
18  what role Lazard was playing prior to September
19  12th in connection with Lehman?
20  A.   No.  No knowledge.
21       (Exhibit 414B, a document bearing
22  Bates Nos. BCI-EX-115878 through 115879,
23  marked for identification, as of this date.)
24  Q.   Sir, I have placed before you two
25  pages of handwritten notes marked Exhibit 414B.

TSG Reporting - Worldwide (877) 702-9580

Page 32

HIGHLY CONFIDENTIAL - A. COX

1        HIGHLY CONFIDENTIAL - A. COX
2   I'll give you a chance to review these notes,
3   but is that your handwriting on these notes?
4   A.   Yes, it is, such as it is.
5   Q.   Take a moment to review those two
6   pages.  Let me know when you're done and I'll
7   ask you some questions about the notes.
8   A.   All right.
9   Q.   Having reviewed those two notes, can
10  you help place those notes in the process
11  between the 12th and 22nd?  When do you believe
12  you made those notes?
13  A.   I don't know for sure.
14  Q.   There's a reference to -- I believe
15  you have written "Harvey" at the top right-hand
16  side of this page?
17  A.   Yes.
18  Q.   Do you recognize that as reference to
19  Harvey Miller?
20  A.   I would assume so.
21  Q.   And there's a reference to "DIP, 500
22  mill," do you see that?
23  A.   Yes.
24  Q.   Is it safe to assume that this is a
25  set of notes prepared on and after the

TSG Reporting - Worldwide (877) 702-9580

Page 33

HIGHLY CONFIDENTIAL - A. COX

1        HIGHLY CONFIDENTIAL - A. COX
2   bankruptcy filing of Lehman Brothers?
3        MR. STERN:  Objection to the form.
4        You're asking him to infer that?
5        MR. TAMBE:  Yes.
6        MR. STERN:  Okay.
7   A.   No, I don't think that's a safe
8   assumption.
9   Q.   Any reason to believe that these were
10  notes you prepared before the bankruptcy filing?
11  A.   Yes.
12  Q.   And what in particular about these
13  notes?
14  A.   The reference to Fuld having talked to
15  Schumer, Hillary and Bloomberg leads me to
16  believe, but not -- but I don't know, that these
17  were made during the weekend of the 13th/14th.
18  Q.   Just going through your handwritten
19  notations, the second line from the top which
20  begins with the number 75 percent, you see that?
21  A.   Yes.
22  Q.   If you just help decipher what you
23  have written there?
24  A.   Because you can't read it or
25  because --

TSG Reporting - Worldwide (877) 702-9580

Page 34

HIGHLY CONFIDENTIAL - A. COX
1
2    Q.   Because I can't read it and it's in
3    script.
4    A.   "75 percent of 200 employees," and
5    then I put in "70 percent signed up before
6    closing. Want two-thirds." Is that clear?
7    Q.   Yes. This collection of points, each
8    with a dash, can you help us understand what
9    this is? Are these your negotiating points?
10    Are these discussion points? What are they?
11    A.   They're a combination of notes to
12    myself of things that we needed to cover in --
13    as -- in negotiation.
14    Q.   About five bullet points down, there's
15    a line that begins "portfolio," do you see that?
16    A.   I do.
17    Q.   If I'm reading that correctly, it
18    states, "Portfolio: Purchase price adjustment
19    or not?" And then you have typewritten word
20    "no," do you see that?
21    A.   Yes.
22    Q.   What was the reference to "purchase
23    price adjustment"?
24    A.   I don't remember exactly now.
25    Q.   The next item below that, if I'm

TSG Reporting - Worldwide (877) 702-9580

Page 35

HIGHLY CONFIDENTIAL - A. COX
1
2    reading that correctly, it reads "deal
3    protection"; is that right?
4    A.   Yes.
5    Q.   What did you mean by that?
6    A.   Should we have some form of protection
7    in the deal in some form in case it didn't go
8    forward.
9    Q.   You mean along the lines of a breakup
10    fee?
11    A.   Yes.
12    Q.   Do you recall having any discussion
13    about a breakup fee with Lehman?
14    A.   No.
15    Q.   You don't recall or there were no such
16    discussions?
17    A.   I don't recall any such discussions.
18    Q.   As you go further down the page,
19    there's a line that reads, "Bonus pool 'up to 2
20    billion,'" do you see that?
21    A.   Yes.
22    Q.   Do you have any understanding as to
23    where you got that information from, "up to 2
24    billion"?
25    A.   It would have been in discussions with

TSG Reporting - Worldwide (877) 702-9580

Page 36

HIGHLY CONFIDENTIAL - A. COX
1
2    Lehman people.
3    Q.   The next page of the exhibit, I'm
4    going to need your help to decipher what you've
5    written there. I get the first word, "Rich,"
6    but I'm not sure I follow the rest of what you
7    say.
8    A.   "Senior guy in IB. Retention top 200
9    guys. Lock them. 2. Europe and Asia important
10    to them. 3. Hearing pitch. Private equity
11    firm called. People unsettled, being
12    recruited."
13        (Exhibit 415B, a document bearing
14        Bates Nos. BCI-EX-115964 through 115972,
15        marked for identification, as of this date.)
16    Q.   Sir, I've handed you a document marked
17    Exhibit 415B. It's a set of handwritten notes.
18    A.   Yes.
19    Q.   If you could first flip through the
20    notes and confirm that this is your handwriting
21    that appears in the notes?
22    A.   Looks like it.
23    Q.   And there are some dates that appear
24    on some of the pages. The first page has a date
25    of September 12, '08, and further down I see

TSG Reporting - Worldwide (877) 702-9580

Page 37

HIGHLY CONFIDENTIAL - A. COX
1
2    references to the 13th and the 14th.
3    A.   Yes.
4    Q.   Can you confirm that these notes all
5    relate to the discussions over the weekend?
6    A.   I believe they do.
7    Q.   Drawing your attention to the first
8    page to about the middle of the page, in the
9    left-hand margin, there's a number 8:29 written.
10    If you cut across there, I want to draw your
11    attention to what you have written, "They think
12    reasonably marked." Do you see that?
13    A.   Yes.
14    Q.   Do you have any understanding as to
15    what you meant by that?
16    A.   That would be a reference to how they
17    had -- how they, Lehman, thought that they had
18    reasonably marked things.
19    Q.   Your next line right below that reads,
20    "Risk - 1 billion," do you see that?
21    A.   Yes.
22    Q.   And what is your understanding of what
23    you meant by that?
24    A.   That if they were wrong, there was a
25    downside exposure of about a billion dollars.

TSG Reporting - Worldwide (877) 702-9580

Page 38

HIGHLY CONFIDENTIAL - A. COX

1  HIGHLY CONFIDENTIAL - A. COX
2  Q.   And the third line right below that, I
3  believe it reads "to sell." If you could help
4  me decipher what that line is?
5  A.   "To sell, marks down 10 or 15
6  percent." If you went to sell them, you'd have
7  to mark them down probably 10 to 15 percent,
8  which gets back to the type of market
9  environment we were in at the time.
10  Q.   Do you know whether Barclays used a 10
11  to 15 percent markdown range to mark down the
12  assets acquired from Lehman?
13  A.   No, but I believe these -- this
14  reference only refers to private equity, as
15  headed above where you started reading.
16  Q.   If you turn the page to the next page,
17  there's some names that appear at the top of the
18  page. Do you -- can you decipher those names?
19  There's about five names that appear there,
20  written up there.
21  A.   I'm sorry, but I only see three names.
22  Q.   Okay.
23  A.   Maybe we're looking at different
24  pages.
25  Q.   No, we're looking at the same page.

TSG Reporting - Worldwide (877) 702-9580

Page 39

1  HIGHLY CONFIDENTIAL - A. COX
2  965, the last three numbers?
3  A.   Yeah, jerry, Michael and Ashay.
4  Q.   And then over to the right?
5  A.   "Equities, Prime Services."
6  Q.   Do you know what that's a reference
7  to? Who are those people?
8  A.   I think Jerry -- I do not remember
9  whether exactly which Jerry that refers to.
10  Q.   Are you identifying people at Lehman
11  or are you identifying people at Barclays? Can
12  you tell?
13  A.   With the "Jerry" reference, I'm not
14  certain.
15  Q.   How about Michael?
16  A.   I think, I think they're -- Michael is
17  probably Michael -- I presume would be Michael
18  Klein.
19  Q.   And is it Ashay?
20  A.   Ashay.
21  Q.   Who is that?
22  A.   I believe that he was in Prime
23  Services.
24  Q.   At?
25  A.   I believe at Barclays. I'm not

TSG Reporting - Worldwide (877) 702-9580

Page 40

1  HIGHLY CONFIDENTIAL - A. COX
2  certain of that.
3  Q.   The next line below that reads, if I
4  am reading it correctly, "Admitted do very
5  little risk management." Do you see that?
6  A.   Uh-huh.
7  Q.   Do you know what that's a reference
8  to?
9  A.   No, I do not know. And I must say I'm
10  not a hundred percent certain of my presumption
11  as to who the individuals referred to above
12  were. They may have been Lehman people.
13  Q.   I've handed you, sir, a document that
14  was previously marked Exhibit 378, and it's a
15  cover e-mail, a placeholder page, and then a
16  PowerPoint presentation. If you could take a
17  moment just to flip through it and let me know
18  when you're done.
19  (Document review.)
20  MR. STERN:   There's a lot of material
21  here, Jay. I'm just wondering if you want
22  to ask Mr. Cox if he knows what it is or if
23  he's ever seen it.
24  MR. TAMBE:   That's why I've asked him
25  just to review. That will be my first

TSG Reporting - Worldwide (877) 702-9580

Page 41

1  HIGHLY CONFIDENTIAL - A. COX
2  question, if he's ever seen it before.
3  MR. STERN:   If you're going to ask him
4  specific questions, maybe you can point him
5  to sections.
6  MR. TAMBE:   That is exactly what I'm
7  going to do.
8  MR. STERN:   Okay. I think you should
9  read through the executive summary and that
10  may remind you if you've ever seen it.
11  THE WITNESS:   Okay.
12  (Document review.)
13  A.   All right.
14  Q.   The attachment to the cover e-mail,
15  which is the PowerPoint presentation that's
16  titled "Project Long Island, Board Discussion
17  Material, 16 September 2008"?
18  A.   Yes.
19  Q.   Is that a document you've seen before
20  today?
21  A.   No.
22  Q.   I believe you took a look at the
23  executive summary that appears on page 2 of that
24  deck, correct?
25  A.   Yes.

TSG Reporting - Worldwide (877) 702-9580

Page 42

HIGHLY CONFIDENTIAL - A. COX
1
2    Q.   Is that describing the transaction
3  that was negotiated on the 15th and 16th of
4  September, 2008?
5    MR. STERN: Objection to the form.
6    A.   I would have to compare it with the --
7  with the actual -- with what we actually -- the
8  actual document, but in -- in major substance,
9  it looks like, it certainly would appear that it
10  captures the major items.
11    Q.   About a third of the way down the
12  page, the Executive Summary page, page 2,
13  there's a arrow which begins, "We would offer
14  $250 million," do you see that?
15    A.   Yes.
16    Q.   The end of that bullet, that arrow,
17  there's a sentence that reads, "The recognition
18  of negative goodwill amounts to $3 billion
19  pretax (2 billion post-tax)," do you see that?
20    A.   I do.
21    Q.   Was that your understanding of the
22  negative goodwill that would be generated by the
23  transaction that you negotiated on the 15th and
24  16th of September?
25    A.   I never fully understood the

TSG Reporting - Worldwide (877) 702-9580

Page 43

HIGHLY CONFIDENTIAL - A. COX
1
2  calculation of negative goodwill.  The
3  accounting, arcane accounting in the UK is
4  somewhat foreign to me.  So the answer is I -- I
5  know there was some negative goodwill that might
6  be created, but I don't know other than that.
7  I'm not very familiar with it.
8    Q.   Did you have any discussions with
9  anyone within Barclays about the negative
10  goodwill that would be generated by the
11  transaction that you were negotiating?
12    A.   Not really, no.  No.
13    Q.   Did you have any discussions with
14  anyone at Barclays about the regulatory capital
15  requirements that would be imposed on Barclays
16  as a result of the transaction that you were
17  negotiating?
18    A.   No, I did not have discussions about
19  that.
20    Q.   But you did understand that there were
21  regulatory capital implications of the
22  transaction you were doing?
23    A.   I understand there are regulatory
24  capital implications to anything we do.
25    Q.   Was there someone on the negotiating

TSG Reporting - Worldwide (877) 702-9580

Page 44

HIGHLY CONFIDENTIAL - A. COX
1
2  team who was charged with calculating the
3  regulatory capital requirements of the
4  transaction that was being negotiated?
5    A.   Those would have been calculated in
6  London.
7    Q.   At any time did anyone from within
8  Barclays convey to you any target regulatory
9  capital ratios or requirements in connection
10  with this transaction?
11    A.   Not that I recall.
12    Q.   Did you have any discussions with
13  anyone at Barclays about raising new capital to
14  support the capital requirements implicated by
15  this transaction?
16    A.   Yes.  Yes, I mean, I knew -- we knew
17  we would have to raise -- you mean did I know we
18  would have to raise additional capital?
19    Q.   Yes.
20    A.   Yes.
21    Q.   Do you know how much additional
22  capital you would have to raise?
23    A.   I don't recall the specific amount
24  now.
25    Q.   Did you have an understanding that the

TSG Reporting - Worldwide (877) 702-9580

Page 45

HIGHLY CONFIDENTIAL - A. COX
1
2  transaction itself was going to generate some
3  capital to satisfy the regulatory capital
4  requirements?
5    A.   I certainly hoped that it would not --
6  that it would not generate a significant,
7  significant capital charge.
8    Q.   So you certainly hoped that you
9  wouldn't have to go out and raise a lot of
10  additional capital?
11    A.   Yeah, we knew we would have to raise
12  some additional capital.
13    Q.   But your hope was you wouldn't have to
14  raise a significant amount of additional
15  capital?
16    A.   Well, I think we raised a significant
17  amount.  So we're talking about -- we're talking
18  about differences of significant amounts -- in
19  significant amounts.
20    Q.   About how much did you raise in new
21  capital to support the transaction, the Lehman
22  transaction?
23    A.   I honestly don't remember.
24    Q.   About a billion?
25    MR. STERN: Objection to the form.

TSG Reporting - Worldwide (877) 702-9580

Page 46

```
 1        HIGHLY CONFIDENTIAL - A. COX
 2     A.   I just said I don't remember.
 3     Q.   Even orders of magnitude, whether it's
 4  one billion or ten billion?
 5     A.   I just said I don't remember.
 6     Q.   Who would have been charged with
 7  identifying the amount of new capital to raise?
 8     A.   It would have been done in London.
 9     Q.   As you look further down the Executive
10  Summary, there's an arrow that reads, "We
11  extract 'clean' assets and contracts out of Long
12  Island," do you see that?
13     A.   Yes.
14     Q.   Was it your understanding that the
15  negotiations that you were involved in involved
16  the extraction of clean assets out of Lehman
17  Brothers?
18        MR. STERN:  Objection to the form.
19     A.   I don't believe that we -- I do not
20  recall using the word "clean" or hearing the
21  word "clean assets" in any negotiations we had.
22     Q.   The bullet point that's right above
23  the negative goodwill point that we were
24  discussing reads, "We would acquire 75 billion
25  of assets and liabilities."  Do you see that?
```
TSG Reporting - Worldwide (877) 702-9580

Page 47

```
 1        HIGHLY CONFIDENTIAL - A. COX
 2     A.   Yes.
 3     Q.   Do you know where that valuation comes
 4  from?
 5     A.   Could you -- I'm not sure I fully
 6  understand your question.
 7     Q.   Do you have any understanding of where
 8  the $75 billion number would have been derived
 9  from to insert in this board presentation?
10     A.   I do not know exactly how that number
11  was arrived at.
12     Q.   Was there someone in the negotiating
13  team that was negotiating with Lehman that was
14  responsible for passing those numbers up to the
15  board for board consideration?
16     A.   I just said I do not know how -- I do
17  not know how the $75 billion number was arrived
18  at.
19     Q.   There's a reference in that same
20  sentence to the following, "The business would
21  include RWA of 13.5 billion."  Do you see that?
22     A.   Yes.
23     Q.   Do you have an understanding as to
24  what that means?
25     A.   "RWA" usually means risk-weighted
```
TSG Reporting - Worldwide (877) 702-9580

Page 48

```
 1        HIGHLY CONFIDENTIAL - A. COX
 2  assets.
 3     Q.   Do you know how that number, the
 4  risk-weighted asset number of 13.5 billion, what
 5  the relationship is between that number and the
 6  $75 billion number in that line?
 7     A.   There would be a calculation that
 8  would be made of various buckets that the assets
 9  would fall into and with the appropriate risk
10  weightings, and the aggregate I presume would be
11  13.5 billion.
12     Q.   For what purpose would Barclays be
13  doing an RWA calculation of these assets?
14        MR. STERN:  Objection to --
15     Q.   Is it to determine regulatory capital
16  requirements?
17        MR. STERN:  Objection to the form.
18     A.   Risk-weighted assets is a number that
19  we're always very conscious of, the aggregate
20  amount of our risk-weighted assets.
21     Q.   And are your regulatory capital
22  requirements driven off of your RWA numbers?
23     A.   It is a factor.  It's also a factor in
24  what investors look at.
25     Q.   If you turn to page 5 of the deck, you
```
TSG Reporting - Worldwide (877) 702-9580

Page 49

```
 1        HIGHLY CONFIDENTIAL - A. COX
 2  will see a chart for a spreadsheet on that page,
 3  do you see that?
 4     A.   Yes.
 5     Q.   Have you ever seen that --
 6     A.   No.
 7     Q.   -- collection of information before
 8  today?
 9     A.   No.
10        (Exhibit 416B, a document bearing
11        Bates Nos. BCI-EX-116023 through 116030,
12        marked for identification, as of this date.)
13     Q.   I handed you a document marked 416B.
14  If you could take a moment to review the
15  document and let me know when you're done.
16        (Document review.)
17     A.   Yes.
18     Q.   There's some handwriting that appears
19  on page 2 of Exhibit 416B.  That's yours?
20     A.   I only -- I see no handwriting on page
21  2.
22     Q.   It's the second page of the exhibit.
23  It's page 1, page numbered 1 of the exhibit.
24     A.   That is my handwriting, yes.
25     Q.   What is this deck, Exhibit 416B?
```
TSG Reporting - Worldwide (877) 702-9580

Page 50

HIGHLY CONFIDENTIAL - A. COX
1
2    A.    It's a deck that I received a copy of
3    from -- that was prepared by Lehman Brothers.
4    Q.    There's a reference to Project Green
5    on the front page, do you see that?
6    A.    I do.
7    Q.    Does that have any meaning to you?
8    A.    None.
9    Q.    I handed you a two-page document
10    marked Exhibit 330. Please take a moment to
11    look at it. Let me know when you're done.
12        (Document review.)
13    A.    All right.
14    Q.    There's a reference in the e-mail in
15    the middle of the first page, it's an e-mail
16    from John Varley to Bob Diamond, to the
17    following, "Cox has telephoned McCarthy," do you
18    see that?
19    A.    I do.
20    Q.    Do you know what that's a reference
21    to?
22    A.    I have no idea. I don't believe it
23    refers to me.
24        (Exhibit 417B, a document bearing
25    Bates Nos. BCI-EX-115898 through 115900,

TSG Reporting - Worldwide (877) 702-9580

Page 51

HIGHLY CONFIDENTIAL - A. COX
1
2    marked for identification, as of this date.)
3    Q.    I've handed you a three-page document
4    marked 417B. Take moment to review all three
5    pages. Let me know when you're done.
6        (Document review.)
7    A.    All right.
8    Q.    There's various handwriting on all
9    three pages. Some of the handwriting is yours,
10    correct?
11    A.    Some of it is mine. On two of the
12    pages, some of it's mine.
13    Q.    On the middle page the handwriting
14    that appears, that's not your handwriting at
15    all, correct?
16    A.    That's correct.
17    Q.    So, putting aside that handwriting,
18    which also shows up on the first page, the
19    handwriting on the right-hand side of the page
20    on the first page?
21    A.    Yes.
22    Q.    If you could help us understand what
23    you have written there?
24    A.    I can read it to you.
25    Q.    Yes, if you could, and then I'll ask

TSG Reporting - Worldwide (877) 702-9580

Page 52

HIGHLY CONFIDENTIAL - A. COX
1
2    you some follow-up questions about it.
3    A.    "We need these contracts. No one
4    knows where the 800 million came from. The 200
5    million is for more than 3,000 contracts.
6    Mission critical." And then, "How big will this
7    number be? 200 million estimated for more than
8    3,000 contracts. Martin Kelly, Lehman
9    Brothers."
10    Q.    And having read those notes, can you
11    help us understand what those notes are
12    referring to?
13    A.    They refer to the contracts that
14    Lehman had that we might have to -- that we
15    would either assume, or some of which we had --
16    we hadn't decided which ones we were going to
17    assume and what the cure payments might be for
18    the contracts.
19    Q.    And the $200 million figure, was that
20    the cure figure for the 3,000 mission -- the
21    greater than 3,000 mission critical contracts?
22    A.    I don't remember specifically, but
23    I -- I believe that's what the number refers to.
24    Q.    And was that a number that was
25    conveyed to you by Mr. Kelly during that week of

TSG Reporting - Worldwide (877) 702-9580

Page 53

HIGHLY CONFIDENTIAL - A. COX
1
2    the 15th?
3    A.    I do not remember specifically.
4    Q.    Do you see the typewritten information
5    on page 1 of Exhibit 417B has a line that reads,
6    "Cure PMT," payment; do you see that?
7    A.    Yes.
8    Q.    There's a $2.25 billion number there?
9    A.    Yes.
10    Q.    Do you have any understanding where
11    that $2.25 billion number was derived from?
12    A.    I believe that was a number given to
13    us by Lehman, their estimate of what the cure
14    payments would be.
15    Q.    Did Barclays have its own estimate of
16    what the cure payments would be?
17    A.    We couldn't. We didn't have time
18    to -- we didn't have time to review all the
19    contracts.
20    Q.    Was there someone on the negotiating
21    team who was charged with trying to estimate
22    that cure payment number for Barclays?
23    A.    Not specifically that I remember.
24    Q.    Do you know ultimately how much
25    Barclays has paid in cure payments?

TSG Reporting - Worldwide (877) 702-9580

Page 54

HIGHLY CONFIDENTIAL - A. COX

1    HIGHLY CONFIDENTIAL - A. COX
2        A.   I do not know.
3        Q.   There's a reference to the 800
4    million, the $800 million in your handwritten
5    notes, do you see that?
6        A.   Yes.
7        Q.   Do you know what that's a reference
8    to?
9        A.   No.
10       Q.   The typewritten version, the
11   typewritten information that appears on this
12   document, do you know what that is?
13       A.   That was, at that particular point in
14   time that it was put together, was the -- was
15   the list of assets and liabilities that Barclays
16   would be assuming.  Taking on, assuming, however
17   you want to ...
18       Q.   In the "Assets" column, at the bottom
19   of the "Assets" column, a typewritten
20   entry, "80J, adjusted total assets, 72.65," do
21   you see that?
22       A.   Yes.
23       Q.   Do you know how that number was
24   derived?
25       A.   That's -- I guess that was the sum of

TSG Reporting - Worldwide (877) 702-9580

Page 55

1    the total of the two items, two separate
2    categories above.
3        Q.   Do you know whether that number
4    reflected any markdown of asset values?
5        A.   I assume that that number reflected --
6    I do not -- I assume that number reflected the
7    marks that were agreed to between the two
8    parties.
9        Q.   And that's the process you had
10   referred to before?
11       A.   Yes.
12       Q.   Do you know whether that number is the
13   same number at which those assets were carried
14   on Lehman's books on or about September 16,
15   2008?
16       A.   I do not know exactly.  I do not know
17   what the difference was and I do not know,
18   therefore, if it was the same number or not.  I
19   do know that some of their marks were higher
20   than ours, some of their marks would have been
21   lower than ours.  I think there was a good faith
22   agreement between the parties what the marks
23   should be.
24       Q.   Do you know any of the individuals who

TSG Reporting - Worldwide (877) 702-9580

Page 56

1    HIGHLY CONFIDENTIAL - A. COX
2    were involved in reaching that good faith
3    agreement as to what the marks should be?
4        A.   I do not know -- well, I do not know
5    specifically all the people who would have been
6    involved because there would have been a large
7    number of people involved given all the
8    different categories of securities.
9        Q.   Do you know who would have led that
10   effort from the Barclays side?
11       A.   Certainly Stephen King was involved
12   and Michael -- I always get his name --
13           MR. STERN:  Keegan.
14       A.   Keegan was getting involved.
15           I always say Keating.  Keegan was
16   involved.
17       Q.   Do you know any of the people involved
18   on the Lehman side in that process?
19       A.   I'm going to go blank on a name again.
20           Alex, their head of fixed income would
21   have been involved.
22       Q.   Alex Kirk?
23       A.   Yeah, Alex Kirk would have been
24   involved.
25       Q.   Do you have any --

TSG Reporting - Worldwide (877) 702-9580

Page 57

1    HIGHLY CONFIDENTIAL - A. COX
2        A.   And presumably a bunch of other people
3    as well, because these are all different trading
4    books.
5        Q.   Do you have any idea as to
6    mechanically how the marking was done?  Was it
7    done cusip-by-cusip, is it done by asset
8    category, or some other method?
9        A.   I do not know.
10       Q.   Continuing down --
11       A.   I will say in all of the marking and
12   in all of the discussions between the parties on
13   the assets and liabilities, there was always a
14   really good faith effort to come up with numbers
15   that were fair to both parties.  That was the
16   principle that we followed throughout the entire
17   negotiation.
18       Q.   If you look at the handwritten notes
19   that appear, you know, below the "Martin Kelly
20   LEH" entry you have written the number 1.5 and
21   then below that 1.35 bill, billion, number.  I
22   can't decipher the rest of that phrase.  If you
23   could just read that.
24       A.   Number Rich came up with may be
25   questionable.

TSG Reporting - Worldwide (877) 702-9580

15

Page 58

HIGHLY CONFIDENTIAL - A. COX
1    HIGHLY CONFIDENTIAL - A. COX
2    Q.    What's that a reference to?
3    A.    Both of the notes on this page or all
4    the notes on this page relate to questions I had
5    about the cure payment and the compensation
6    liability pool that we were assuming, in that I
7    wanted to make sure that we were not overstating
8    or understating the numbers.
9         The notes you have specifically
10   referred to came about as a result of looking at
11   the 2 billion accrual number that we had for the
12   comp -- potential liability number that we had
13   for the comp, compensation, and I do not -- my
14   notes are not full. I do not remember exactly
15   what the 1.35 billion was, whether that referred
16   to just the U.S. entity or whether it referred
17   to what they had accrued on their books so far
18   for cash payments but excluding their
19   compensation paid in stock.
20        I do not remember. I think what I was
21   satisfied with was that the 2 billion number was
22   as accurate a number as we could come up with.
23   Q.    When you say "as accurate a number as
24   you could come up with," was that $2 billion
25   number a number that Barclays was generating an

TSG Reporting - Worldwide (877) 702-9580

Page 59

HIGHLY CONFIDENTIAL - A. COX
1    HIGHLY CONFIDENTIAL - A. COX
2    estimate of?
3    A.    No. No. No. Working with Lehman.
4    Because obviously they had accrued numbers on
5    their books. They had some facts we didn't
6    have.
7    Q.    So your belief is that the $2 billion
8    number was the number accrued on Lehman's books?
9         MR. STERN: Objection to the form.
10   A.    I did not say that.
11   Q.    That's what I'm trying to understand.
12   A.    That's not what I said. I said
13   they -- we had to do it with them. They had
14   some numbers that were accrued on their books.
15   They had -- they knew what they were going --
16   they knew what approximately their liability
17   would be for the year that they thought they had
18   to pay. We obviously had to be working with
19   Lehman to come up with a number that was arrived
20   at.
21   Q.    Do you know whether 2 billion was the
22   number that Lehman had accrued on its books?
23   A.    Well, first of all, I don't believe
24   that it was because the 2 billion number applied
25   to a year and they would only have accrued for

TSG Reporting - Worldwide (877) 702-9580

Page 60

HIGHLY CONFIDENTIAL - A. COX
1    HIGHLY CONFIDENTIAL - A. COX
2    through the end of August, so for only for
3    two-thirds of the year.
4         So it's highly unlikely that they
5    would have had a full year's accrual in eight
6    months given the environment in which we were
7    operating. Secondly, I don't know that they
8    accrued for the stock portion of their
9    compensation. They may have only been accruing
10   for the cash portion of their compensation.
11        So I would think it highly unlikely
12   that the 2 billion number was accrued on their
13   books at that time.
14   Q.    Did you ever see any calculations from
15   Lehman of their accruals?
16   A.    Did I ever see their actual books and
17   records that showed that number?
18   Q.    Yes.
19   A.    No. What their accrual was, no.
20   Q.    The 1.35 billion number Rich came up
21   with, what's that a reference to?
22   A.    Rich Ricci had -- the 1.35 billion is
23   the number that Rich gave me.
24   Q.    You said "may be questionable." Is
25   that Rich's number that will be questionable or

TSG Reporting - Worldwide (877) 702-9580

Page 61

HIGHLY CONFIDENTIAL - A. COX
1    HIGHLY CONFIDENTIAL - A. COX
2    the $2 billion number would be questionable?
3    A.    The 1.35 billion.
4    Q.    Did you ask Rich Ricci questions about
5    how he came up with that number?
6    A.    Yes. We asked -- we asked a lot of
7    questions about this. That's why I say when we
8    ended up with the $2 billion number, that was
9    the number that we felt was the correct number.
10   Q.    Do you know the amount of the comp
11   payments that Barclays has made under the
12   contract, under the Asset Purchase Agreement?
13   A.    I don't know the exact number, but my
14   understanding is it's somewhere in that area of
15   2 billion.
16   Q.    How do you have that understanding?
17   A.    From what I've been told.
18   Q.    By counsel?
19   A.    No. Internally.
20   Q.    By whom?
21   A.    I don't recall.
22   Q.    If you look at the last page of this
23   exhibit, 417B, I believe that's your handwriting
24   on the right-hand side, correct?
25   A.    I think we've covered that.

TSG Reporting - Worldwide (877) 702-9580

16

Page 62

HIGHLY CONFIDENTIAL - A. COX

1          HIGHLY CONFIDENTIAL - A. COX
2      Q.   So next to the word "cure payment" in
3   the amount 2.25, you have written, "How big will
4   this number be?  Is Lehman expecting this?
5   Creditors."  Do you see that?
6      A.   Yes.
7      Q.   What's your reference to creditors
8   there?
9      A.   It's are the creditors expecting a
10  number this big.
11     Q.   Are these questions that you posed to
12  Lehman?
13     A.   They're questions that I asked of
14  myself.  I would -- I do not remember
15  specifically asking people, others, but logical
16  to assume I did.
17         MR. TAMBE:  Let's just take a short
18     break.
19     (Recess; Time Noted: 11:36 A.M.)
20     (Time Noted: 11:49 A.M.)
21     (Exhibit 418B, a document bearing
22  Bates Nos. BCI-EX-79546, marked for
23  identification, as of this date.)
24  BY MR. TAMBE:
25     Q.   Sir, I have placed before you a
TSG Reporting - Worldwide (877) 702-9580

Page 63

HIGHLY CONFIDENTIAL - A. COX

1          HIGHLY CONFIDENTIAL - A. COX
2   document marked 418B.  Please take a moment to
3   review it.  Let me know when you're done.
4      A.   Okay.
5      Q.   This is an e-mail chain that begins
6   with an e-mail from you to Bob Diamond and
7   others, do you see that?
8      A.   Yes.
9      Q.   And you're describing an interaction
10  that you have with Bart McDade, correct?
11     A.   Yes.
12     Q.   And that was on the 16th of September?
13     A.   The e-mail was on the 16th of
14  September.
15     Q.   Okay.
16     A.   From me, yes.
17     Q.   And your interaction with Bart, was
18  that on the 16th or earlier, the one you
19  described?
20     A.   I do not know.  I do not know.  It
21  might well have been the day before.
22     Q.   And when you say, "I guess that means
23  he has signed on," what did you mean?
24     A.   I guess my question is what -- what
25  don't you understand?  I guess that means he
TSG Reporting - Worldwide (877) 702-9580

Page 64

HIGHLY CONFIDENTIAL - A. COX

1          HIGHLY CONFIDENTIAL - A. COX
2   signed on.
3      Q.   To join Barclays?
4      A.   Yes.
5      Q.   Were there others like Bart McDade who
6   had sort of shaken your hand and signed on prior
7   to the closing of the transaction?
8      A.   Bart McDade is the only one I shook
9   hands with.
10     Q.   Are there others who signed on before
11  the closing of the transaction?
12     A.   I believe there were a number of
13  others that signed on.
14     Q.   Do you know any of the others who
15  signed on prior to the closing of the
16  transaction?
17     A.   I guess I don't know the exact timing
18  of when people signed on and when they didn't.
19     Q.   You talked earlier about the process
20  by which values were agreed to between Lehman
21  and Barclays, do you remember that?
22     A.   Yes.
23     Q.   You said that people tried to come up
24  with fair values, correct?
25     A.   Yes.
TSG Reporting - Worldwide (877) 702-9580

Page 65

HIGHLY CONFIDENTIAL - A. COX

1          HIGHLY CONFIDENTIAL - A. COX
2      Q.   And you wanted those values to be fair
3   both for Lehman and for Barclays, correct?
4      A.   Yes.
5      Q.   Who do you believe was making sure
6   that the values were fair to Lehman?
7      A.   Alex Kirk and his -- presumably his
8   people in fixed income.
9      Q.   And do you know whether Mr. McDade
10  played any role in making sure the transaction
11  was fair to Lehman?
12     A.   No, I would have thought -- well, in
13  terms of the values on fixed income, I don't
14  believe he was involved at all.
15     Q.   How about the overall transaction?
16     A.   He was involved in various parts of
17  it.
18     Q.   And continued to be involved in
19  various parts of it on and after the 16th,
20  correct?
21     A.   Correct, although not the lead
22  negotiator.
23     Q.   Who would you consider to be the lead
24  negotiator for Lehman?
25     A.   Mark Shafir.
TSG Reporting - Worldwide (877) 702-9580

Page 66

HIGHLY CONFIDENTIAL - A. COX

1  HIGHLY CONFIDENTIAL - A. COX
2  Q.  Do you know when Mark Shafir left the
3  process? He exited the process at some point,
4  do you remember?
5  A.  It was, to the best of my
6  recollection, it was towards the end of the
7  week.
8  Q.  Before the hearing on Friday, correct?
9  A.  I don't remember exactly.
10  Q.  Do you know why he left the process?
11  A.  He decided to join another firm.
12  Q.  Citibank?
13  A.  I didn't know that at the time.
14  Q.  And once he left the process, you had
15  no further dealings with him with respect to the
16  Lehman transaction, correct?
17  A.  Correct.
18  Q.  Who took his place?
19  A.  Mark Shapiro I believe largely took
20  his place.
21  (Exhibit 419B, a document bearing
22  Bates Nos. BCI-EX-79067, marked for
23  identification, as of this date.)
24  Q.  Sir, I handed you a document marked
25  419B. Please take a moment to review it and let

TSG Reporting - Worldwide (877) 702-9580

Page 67

HIGHLY CONFIDENTIAL - A. COX

1  HIGHLY CONFIDENTIAL - A. COX
2  me know when you're done.
3  (Document review.)
4  A.  Yes.
5  Q.  Do you recall seeing this e-mail
6  before today?
7  A.  Do I recall seeing it?  No.
8  Q.  The e-mail from John Mahon to you and
9  others has a subject line of "potential
10  problem," do you see that?
11  A.  Yes.
12  Q.  Do you recall discussing any of these
13  issues with John Mahon or others at Barclays on
14  about the date of this e-mail?
15  A.  I had no discussions with John Mahon.
16  Q.  Do you know who he is?
17  A.  No.
18  Q.  Do you recall having discussions with
19  anyone at Barclays on or about the date of this
20  e-mail, Wednesday, September 17, about the
21  topics that are discussed in this e-mail?
22  A.  No. I knew the topics were being
23  discussed, but I wasn't involved in the
24  discussions.
25  Q.  I've handed you what has been

TSG Reporting - Worldwide (877) 702-9580

Page 68

HIGHLY CONFIDENTIAL - A. COX

1  HIGHLY CONFIDENTIAL - A. COX
2  previously marked as Exhibit 285B. Please take
3  a moment and review it and let me know when
4  you're done.
5  (Document review.)
6  A.  Yes.
7  Q.  We had earlier discussed the $2
8  billion item on the 9/16 balance sheet, do you
9  recall that discussion?
10  A.  Yes.
11  Q.  And in the top e-mail in Exhibit 285B,
12  Rich Ricci has written to Patrick Clackson,
13  Michael Evans, with a copy to you about that
14  accrual, correct, that $2 billion number?
15  A.  Yes.
16  Q.  And he says, "Never agreed to it.
17  Archie, this is the problem. We can't have this
18  clause, I don't think." Do you see that?
19  A.  Yes.
20  Q.  Agreeing to the $2 billion, was that
21  something that you were involved in doing, sir?
22  A.  I was certainly involved in
23  discussions about the 2 billion. I don't
24  remember exactly who agreed to it, as you put
25  it.

TSG Reporting - Worldwide (877) 702-9580

Page 69

HIGHLY CONFIDENTIAL - A. COX

1  HIGHLY CONFIDENTIAL - A. COX
2  Q.  If you'll look in the e-mail below
3  from Patrick Clackson to Michael Evans and Rich
4  Ricci, he states in the middle of his
5  introductory line, "I was relying on you guys
6  telling me I needed 1.35 billion, which gave me
7  650 million of the goodwill." Do you see that?
8  A.  Yes.
9  Q.  Do you know what that's a reference
10  to?
11  A.  I know what it says, that he thought
12  that the bonus amount paid out -- to be paid out
13  would be only 1.35 billion.
14  Q.  Against the 2 billion set forth in the
15  agreement?
16  A.  Yes.
17  Q.  Which would then yield a negative
18  goodwill or a goodwill number of 650 million,
19  correct?
20  A.  The difference, I assume, yes.
21  Q.  Do you know how Mr. Clackson would
22  have gotten that understanding?
23  A.  I do not know how he got it, no.
24  Q.  And what's his position at Barclays?
25  A.  He is in the Finance Department.

TSG Reporting - Worldwide (877) 702-9580

Page 70

HIGHLY CONFIDENTIAL - A. COX
1    HIGHLY CONFIDENTIAL - A. COX
2    Q.   What's his title or position?
3    A.   Managing director, I --
4    Q.   At the beginning of the deposition we
5    talked about some issue or development
6    concerning JPMorgan Chase, do you remember that?
7    A.   Yes.
8    Q.   Can you give me some more detail on
9    what the issue was concerning JPMorgan Chase
10   that arose later on during the week of the 15th?
11   A.   I could only give it to you generally,
12   not specifically.
13   Q.   Is it fair to say that's something
14   you're aware of but that you were not personally
15   involved in addressing?
16   A.   That is correct.
17   Q.   Do you know who within Barclays was --
18   A.   Although, having said that, I was
19   involved in one or two meetings with JPMorgan
20   just prior to the -- over the weekend before the
21   Asset Purchase Agreement was -- the deal was
22   closed.
23   Q.   Describe for me the nature of the
24   issue or the problem and the meeting that you
25   attended.

TSG Reporting - Worldwide (877) 702-9580

Page 71

HIGHLY CONFIDENTIAL - A. COX
1    HIGHLY CONFIDENTIAL - A. COX
2    A.   Well, I think there was more than one
3    problem. There was a problem, as I remember it,
4    and others would have more specific knowledge
5    than I, there was a problem of that when we
6    stepped into the tripartite agreement with the
7    Fed, not all the securities that we thought were
8    part of that agreement turned out to be part of
9    it. It's not clear to me whether JPMorgan
10   substituted some securities or simply withheld
11   them. And there was another problem relating to
12   7 billion of cash and securities that we thought
13   we had that JPMorgan at one point pulled back
14   and which I think is still not finally settled
15   in -- in all its detail.
16        You know, you have to -- it seems like
17   a simple transaction to acquire X amount of
18   assets and assume Y amount of liabilities, the
19   same amount of liabilities, but in fact it was a
20   very complicated transaction due to the
21   involvement of JPMorgan Chase, the Fed,
22   securities being pledged, Lehman's records being
23   somewhat not up to date, perhaps.
24        And there was a great deal of risk to
25   the transaction from Barclays' standpoint. We

TSG Reporting - Worldwide (877) 702-9580

Page 72

HIGHLY CONFIDENTIAL - A. COX
1    HIGHLY CONFIDENTIAL - A. COX
2    were dealing in markets that were never seen
3    before in history. So all of this was being
4    done in an environment that was extremely
5    difficult, and we, you know, people were doing
6    their best, but it wasn't always easy.
7    Q.   So, coming back to the JPMorgan
8    problem, you said there were two aspects to it.
9    They may have substituted some collateral and
10   there was some $7 billion in cash?
11   A.   We didn't get some of the securities
12   we thought we were going to get, and in fact, we
13   didn't get the volume of securities that we
14   thought we were going to get, if I remember
15   correctly.
16   Q.   In your prior answer you talked about
17   acquiring X amount of assets and Y amount of
18   liabilities?
19   A.   The same amounts.
20   Q.   The same amounts. Is that your
21   understanding of the transaction that Barclays
22   was doing, that it was acquiring basically the
23   same amount of assets and liabilities?
24        MR. STERN: Objection to the form.
25   A.   With respect to assets and liabilities

TSG Reporting - Worldwide (877) 702-9580

Page 73

HIGHLY CONFIDENTIAL - A. COX
1    HIGHLY CONFIDENTIAL - A. COX
2    we were taking on, in addition to that, we were
3    purchasing certain assets, and we were paying
4    250 million in excess of that. Purchasing the
5    three buildings.
6    Q.   Putting the buildings aside, just
7    looking at securities, were you basically
8    purchasing those securities and paying
9    equivalent value for those securities?
10        MR. STERN: Objection to the form.
11   A.   I'm not sure I follow your question.
12   Q.   The question is were you acquiring
13   assets at less than the stated value of those
14   assets?
15   A.   No. Stated value -- we were acquiring
16   assets at values that had been agreed to between
17   the two parties. If that's what you mean by
18   "stated values," yes.
19   Q.   I handed you a two-page document, sir,
20   marked 149A. Take a moment to review it and
21   I'll ask you a couple of questions about it when
22   you're done.
23        (Document review.)
24   A.   Yes.
25   Q.   The top of the first page of this

TSG Reporting - Worldwide (877) 702-9580

Page 74

HIGHLY CONFIDENTIAL - A. COX
1
2    exhibit there's an e-mail from Michael Klein to
3    Bob Diamond, do you see that?
4        A.    Yes.
5        Q.    And Mr. Klein makes a reference to the
6    following, he says, "We clawed back 3 billion
7    more of value in the transaction," and it goes
8    on.
9        Do you know what that's a reference
10   to?
11       A.    No.
12       Q.    Were you aware of any efforts or
13   attempts to clawback $3 billion in value in the
14   transaction?
15       MR. STERN:  Objection to the form.
16       A.    No.  No.
17       Q.    Were you aware of any efforts on
18   Friday, the 19th, and continuing into the
19   weekend of the 20th and 21st to identify
20   additional assets to be transferred from Lehman
21   to Barclays?
22       A.    Not specifically, no.
23       Q.    Generally?
24       A.    No, I'm -- "no" is the answer to that.
25   The only reason I hesitate at all is there was
TSG Reporting - Worldwide (877) 702-9580

Page 75

HIGHLY CONFIDENTIAL - A. COX
1
2    some questions about, and I don't remember
3    whether the timing with assets at the DTCC that
4    were tied up and the DTCC had to do -- they had
5    to be released somehow, but I don't think that
6    involved clawing back of any assets.
7        Q.    Putting aside the DTCC assets and the
8    issue regarding the DTCC assets, you're not
9    aware of any other efforts to identify and
10   transfer other assets to --
11       A.    No.
12       Q.    -- Barclays?
13       A.    No.
14       Q.    I handed you a two-page document
15   marked Exhibit 275.  Take a moment to review it.
16   Let me know when you're done.
17       (Document review.)
18       A.    Yes.
19       Q.    You'll see, sir, this is an e-mail
20   from Jasen Yang addressed to you, do you see
21   that?
22       A.    Uh-huh.  Yes.
23       Q.    Is this information or a document that
24   you had asked Mr. Yang to provide you with?
25       A.    No.
TSG Reporting - Worldwide (877) 702-9580

Page 76

HIGHLY CONFIDENTIAL - A. COX
1
2        Q.    Do you know what this document is,
3    what information is contained on this document?
4        A.    I don't recall having seen this
5    document before, even though it's addressed to
6    me.  I'm assuming that the repo custodian has
7    put some value, just as it says, has assigned
8    some market values to the various assets that
9    were in the Fed financing facility as collateral
10   to the fed financing facility.  Repo custodian I
11   assume is the Bank of New York.
12       Q.    Do you have an understanding that
13   there were discussions within Barclays about the
14   valuation of the collateral that had been
15   transferred over as part of the Fed repo?
16       A.    Yes.
17       Q.    Were you involved in any way in those
18   discussions?
19       A.    No.
20       Q.    I've handed you a document previously
21   marked as 401A.  If you could take a moment to
22   review it and let me know when you're done.
23       (Document review.)
24       A.    Yes.
25       Q.    You're not shown as a recipient of the
TSG Reporting - Worldwide (877) 702-9580

Page 77

HIGHLY CONFIDENTIAL - A. COX
1
2    cover e-mail.  My question for you, turning your
3    attention to the third page of the exhibit,
4    Exhibit 401A, are you familiar with that form of
5    document?
6        A.    No.
7        Q.    At any time after the closing of the
8    Lehman transaction did anyone report to you the
9    total value of the assets and liabilities, the
10   net assets, and the negative goodwill generated
11   by the transaction?
12       A.    No, not to my knowledge.
13       Q.    Were you involved at all in any
14   discussions within Barclays about accounting for
15   the transaction?
16       A.    No.  Very, very limited.  Only on the
17   periphery.  I knew they were going on.
18       Q.    In terms of your day-to-day
19   responsibilities, do you have any responsibility
20   for reviewing the regulatory disclosures that
21   are made by Barclays about its accounts, about
22   its financial statements?
23       A.    No.
24       Q.    You are aware that Barclays has
25   reported a gain on the acquisition, are you not?
TSG Reporting - Worldwide (877) 702-9580

Page 78

HIGHLY CONFIDENTIAL - A. COX
1
2     A.   Yes.
3     Q.   Do you have an understanding as to the
4  source of that gain?
5     A.   Not specifically, no.
6     Q.   Just generally what's your
7  understanding of the source of that gain?
8     A.   "I don't know" is the answer to the
9  question. I can only speculate.
10    Q.   The issues with JPMorgan, are you
11 aware of any discussions that continued on into
12 the fall in an effort to try and resolve those
13 issues?
14    A.   I know discussions continued. I'm not
15 sure they have been entirely resolved even
16 today.
17    Q.   Did you play any role in those
18 discussions as they continued?
19    A.   No.
20    Q.   Who at Barclays did?
21    A.   Gerard LaRocca would be the person
22 that I would think would have had most of them.
23    Q.   Are you aware of, generally aware of a
24 settlement agreement that was signed up sometime
25 in December 2008?

TSG Reporting - Worldwide  (877) 702-9580

Page 79

HIGHLY CONFIDENTIAL - A. COX
1
2     A.   As it relates to the Lehman
3  transaction?
4     Q.   As it relates to the Lehman
5  transaction and JPMorgan and Barclays.
6     A.   Yes, generally.
7     Q.   And what is your understanding about
8  that settlement agreement?
9     A.   I believe a settlement was reached
10 that included a settlement of the lawsuit that
11 Barclays had in connection with the Bear Stearns
12 transaction.
13    Q.   Do you have any understanding as to
14 any other aspects of that settlement?
15    A.   No, except it was part of the
16 settlement of the Lehman dispute, I believe.
17        (Exhibit 420B, a document bearing
18    Bates Nos. BCI-EX-80849, marked for
19    identification, as of this date.)
20    Q.   I placed before you a document marked
21 Exhibit 420B. Let me know when you're done
22 reviewing it.
23        (Document review.)
24    A.   Yes.
25    Q.   This is an e-mail from you to Bob

TSG Reporting - Worldwide  (877) 702-9580

Page 80

HIGHLY CONFIDENTIAL - A. COX
1
2  Diamond written in the early hours of Monday,
3  September 22nd, right?
4     A.   Yes.
5     Q.   And you state, "We have an agreement"?
6     A.   Yes.
7     Q.   And you are referring to an agreement
8  with JPM or with someone else?
9     A.   I believe so.
10    Q.   And what was the nature of the
11 agreement that you had reached on the early
12 hours of Monday, September 22?
13    A.   It would have related to the releasing
14 of collateral.
15    Q.   And is it your understanding that that
16 agreement ran into some difficulties or fell
17 apart after the closing?
18    A.   I believe it fell apart after 12:29
19 A.M. and before 7 A.M.
20    Q.   And the agreement you're referring to,
21 that was not a signed document of any kind; is
22 that right?
23    A.   No.
24    Q.   It was -- who were you discussing --
25    A.   No. As I said, we hoped to have it

TSG Reporting - Worldwide  (877) 702-9580

Page 81

HIGHLY CONFIDENTIAL - A. COX
1
2  papered before the opening in New York.
3     Q.   And that never happened before the
4  opening in New York on the 22nd?
5     A.   Well, there were some further
6  discussions early in the morning -- sorry, later
7  than 12:29 A.M., but before 7 A.M. in the
8  morning.
9     Q.   And what happened as a result of those
10 discussions?
11    A.   First, I think it turned out we didn't
12 have an agreement. Then they agreed to -- then
13 they -- we reached enough of an agreement that
14 we felt comfortable signing, but still to us
15 with tremendous risk. I mean, there was still
16 significant, you know, billions of dollars
17 outstanding that we were worried about.
18    Q.   What did you do to prepare for this
19 deposition, other than talk with counsel?
20    A.   I gave him my file, which I looked
21 through, and that's about all.
22    Q.   Did you go back and review any e-mails
23 or documents?
24    A.   No.
25    Q.   Have you reviewed any of the

TSG Reporting - Worldwide  (877) 702-9580

Page 82

HIGHLY CONFIDENTIAL - A. COX
1
2  submissions that have been made by Lehman
3  Brothers in connection with the discovery that
4  we're conducting, these depositions that we're
5  conducting?
6      A.  I'm sorry.  Again?
7      Q.  Let me restate that.  Have you
8  reviewed any of the court filings made by Lehman
9  or Barclays --
10     A.  No.
11     Q.  -- concerning this discovery?
12     A.  No.
13         MR. TAMBE:  I have no further
14  questions.  Thank you.
15         (Discussion off the record.)
16         (Luncheon Recess; Time Noted: 12:22
17  P.M.)
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide (877) 702-9580

Page 83

HIGHLY CONFIDENTIAL - A. COX
1
2              AFTERNOON SESSION
3          (Time Noted: 1:07 P.M.)
4  ARCHIBALD COX, resumed and
5      testified further as follows:
6  EXAMINATION BY
7  MR. WOOD:
8      Q.  Mr. Cox, again, I'm John Wood from
9  Hughes, Hubbard & Reed, and I represent the SIPA
10  Trustee.
11         I'm handing you what has previously
12  been marked as Exhibit 25, and that is the
13  signed version of what we have been referring to
14  earlier as the clarification letter.  I believe
15  you testified earlier that you don't recall
16  reviewing any drafts of this document.
17         Do you recall whether you have seen
18  this final executed version of this?
19     A.  I may have seen it, but not -- didn't
20  have read it, to my knowledge.
21     Q.  Okay.  If you can just keep that handy
22  because I may refer back to that in a moment.
23         Mr. Cox, I'm handing you what's
24  previously been marked as Exhibit 229.  As
25  you'll see, it's an e-mail from Robert Azerad

TSG Reporting - Worldwide (877) 702-9580

Page 84

HIGHLY CONFIDENTIAL - A. COX
1
2  dated Sunday, September 21, at 6:20 P.M.
3  Subject is "Updated Opening Balance Sheet," and
4  then attached to it is just a one-page document.
5         Feel free to look that over.
6      A.  Yes.
7      Q.  And the attachment appears to be a
8  draft of an opening balance sheet, is that fair
9  to say?
10         MR. STERN:  Objection to the form.
11     A.  I've never seen it before.
12     Q.  Okay.
13     A.  It, since it -- all I know is what it
14  says.  It says in the cover sheet it's a copy of
15  opening balance sheet, version PB2.xls.
16     Q.  If you look at the attachment, you'll
17  see about midway down on the left the word
18  "receivables"?
19     A.  Yes.
20     Q.  And then a parenthetical, "15c3 lockup
21  release"?
22     A.  Yes.
23     Q.  And the number a thousand there?
24     A.  Yes.
25     Q.  Which, first of all, these numbers

TSG Reporting - Worldwide (877) 702-9580

Page 85

HIGHLY CONFIDENTIAL - A. COX
1
2  here all appear to be in thousands, don't they?
3         MR. STERN:  Objection to the form.
4      A.  I guess I don't understand what your
5  question is.
6      Q.  Meaning that number you see for a
7  thousand for receivables, for purposes of my
8  next question, let's assume that's a billion
9  dollars.
10         MR. STERN:  Objection to the form.  Is
11  that a question?  You're just making that
12  assumption?
13         MR. WOOD:  I'm just telling him that
14  my next question will assume that.
15     Q.  That reference, which I read as being
16  a thousand -- sorry, which I read as being a
17  billion dollars from the 15c3 lockup, that was
18  not the number ultimately agreed upon between
19  the parties, was it?
20         MR. STERN:  Objection to the form.
21     A.  I do not know.
22     Q.  Okay.  If you'll take a look at
23  Exhibit 25, on page 4, numbered paragraph 8,
24  you'll see a little Roman ii, says "to the
25  extent permitted by applicable law, and as soon

TSG Reporting - Worldwide (877) 702-9580

Page 86

```
 1          HIGHLY CONFIDENTIAL - A. COX
 2  as practicable after closing, $769 million of
 3  securities."
 4          MR. STERN: Do you want to let Mr. Cox
 5  read this paragraph?
 6          MR. WOOD: Sure. He can take as long
 7  as he'd like.
 8          MR. STERN: Paragraph 8.
 9          (Document review.)
10      A.  Yes.
11      Q.  As you'll see the reference to $769
12  million of securities?
13      A.  Yes.
14      Q.  Do you know how that number was
15  chosen?
16      A.  No idea.
17      Q.  As far as you can recall, did anybody
18  say that cash from LBI's 15c3-3 account could
19  not be included in the deal?
20      A.  I have no recollection of any -- of
21  that.
22      Q.  If you look again on page 4 of Exhibit
23  25, the Clarification Letter, you'll see the
24  Roman numeral ii, "to the extent permitted by
25  applicable law"?
```

TSG Reporting - Worldwide (877) 702-9580

Page 87

```
 1          HIGHLY CONFIDENTIAL - A. COX
 2      A.  Yes.
 3      Q.  Have you seen that language before, as
 4  far as you can recall?
 5          MR. STERN: Objection to the form.
 6      A.  Have I seen what language, the phrase
 7  "to the extent permitted by applicable law"?
 8      Q.  Have you seen that in the
 9  Clarification Letter?
10      A.  No, I'm not sure whether I've read
11  the Clarification Letter before, so ...
12      Q.  So is it fair to say you don't recall
13  any conversations about the inclusion of that
14  language in the clarification letter?
15      A.  I do not -- I was not party to any
16  conversations about that.
17      Q.  And then later in that same sentence,
18  the very end of that sentence, you see
19  "substantially the same" -- "securities of
20  substantially the same nature and value"?
21      A.  Again --
22      Q.  You don't recall any conversations
23  about the inclusion of that?
24      A.  No. No.
25      Q.  Do you recall any discussions
```

TSG Reporting - Worldwide (877) 702-9580

Page 88

```
 1          HIGHLY CONFIDENTIAL - A. COX
 2  regarding whether or not to include margin or
 3  collateral held to secure derivatives either at
 4  the OCC or other exchanges as part of the
 5  purchased assets in the deal?
 6      A.  I wasn't party to any discussions
 7  about those.
 8      Q.  Mr. Cox, I'm handing you what's
 9  previously been marked as Exhibit 51. You'll
10  see at the top it is entitled "Transfer and
11  Assumption Agreement"?
12      A.  I do.
13      Q.  And as you see, this is a signed
14  version. Do you recall whether you've ever seen
15  that document before?
16      A.  No.
17      Q.  Were you previously aware that there
18  was a Transfer and Assumption Agreement?
19      A.  No.
20      Q.  Did you want more time to keep looking
21  it over?
22          MR. STERN: No, I think he's answered
23  the question.
24          MR. WOOD: Oh, okay. He was just
25  looking at it. I wanted to --
```

TSG Reporting - Worldwide (877) 702-9580

Page 89

```
 1          HIGHLY CONFIDENTIAL - A. COX
 2      A.  No, I've never seen the document
 3  before.
 4      Q.  Okay. Mr. Cox, I'm handing you what's
 5  previously been marked as Exhibit 76B. It's an
 6  e-mail chain. As you'll see, you're not on
 7  that, but subject is, "If Bart is speaking to
 8  Archie Cox, why can't Archie just show Barclays
 9  everything we have at DTC. It's third-party
10  data and definitive," although "definitive" is
11  misspelled there. The text of the e-mail says,
12  "We are trying to explain what's in DTC. It
13  might make them more comfortable."
14          In that subject line where it refers
15  to Bart, is that Bart McDade?
16          MR. STERN: Objection.
17      Q.  As far as you can tell?
18          MR. STERN: Objection to the form.
19      A.  That's a presumption.
20      Q.  Do you recall speaking to Bart McDade
21  regarding any of the subject matter discussed in
22  this e-mail?
23      A.  No, I don't believe I ever did. I
24  certainly don't recall it. Nor does it make any
25  sense to me, but that's another matter. It's
```

TSG Reporting - Worldwide (877) 702-9580

Page 90

1        HIGHLY CONFIDENTIAL - A. COX
2    from Lehman.
3        (Exhibit 421B, a document bearing
4    Bates Nos. BCI-EX-81179, marked for
5    identification, as of this date.)
6        Q.    We're handing you what has been marked
7    as Exhibit 421B.  Feel free to take moment to
8    look that over.
9        (Document review.)
10       Q.    Have you had a chance to look that
11   over?
12       A.    No.
13       (Document review continues.)
14       A.    All right.
15       Q.    As you'll see, it's a single page of
16   e-mails, Bates number at the bottom ends in
17   81179.
18       At the bottom of the e-mail chain, so
19   the earliest one chronologically, appears to be
20   an e-mail from you to Bob Diamond, CC-ing Rich
21   Ricci and Michael Klein, sent Sunday, September
22   21, at 9:06 A.M.  Subject is closing.  As you'll
23   see, you wrote, "You should be aware, and may
24   be, that there are issues around clearing which
25   could be significant and thus affect closing."

TSG Reporting - Worldwide (877) 702-9580

Page 91

1        HIGHLY CONFIDENTIAL - A. COX
2        Do you recall what those issues were?
3        A.    Not specifically.
4        Q.    Do you recall generally?
5        A.    It may have been related to JPMorgan
6    situation.  I don't know what else -- I don't
7    know what else it could have been related to.  I
8    don't recall it.  I don't recall it.
9        Q.    Could it also have been regarding
10   issues involving the DTC?
11       A.    Possibly.
12       Q.    Were you involved in the issues
13   regarding DTC?
14       A.    Limited.  Only on the periphery.
15       Q.    Could you describe the nature of your
16   involvement?
17       A.    Very limited.  I knew there were
18   issues.  I knew that Gerard LaRocca was talking
19   to the DTC trying to get them clarified.
20       Q.    Do you recall what the issues were?
21       A.    If I remember correctly, DTC was
22   concerned that they wouldn't -- I think they
23   would not unfreeze Lehman's account because of
24   some potential liability that they would have
25   and it needed to be unfrozen.

TSG Reporting - Worldwide (877) 702-9580

Page 92

1        HIGHLY CONFIDENTIAL - A. COX
2        (Exhibit 422B, a document bearing
3    Bates Nos. BCI-EX-81116, marked for
4    identification, as of this date.)
5        Q.    We've just handed you what has been
6    marked as Exhibit 422B.  Again, a single page of
7    e-mails.  Bates numbers end in 81116.  Go ahead
8    and take a moment to look that over.
9        (Document review.)
10       A.    Okay.
11       Q.    This one is from, at the bottom, so
12   the earliest chronologically, is from you to
13   Jerry del Missier, subject "Closing sent Sunday,
14   September 21."  You write, "Right now we have
15   some major hurdles to overcome around DTCC and
16   JPM's intransigence."
17       Do you recall what that referred to?
18       A.    Yeah, DTCC was the, I think the
19   freeing up of Lehman's account and JPMorgan
20   was -- was with regard to the tripartite
21   agreement and the substitution of collateral and
22   so forth.
23       Q.    And do you recall what the major
24   hurdles you were referring to there that had to
25   be overcome with the DTCC were?

TSG Reporting - Worldwide (877) 702-9580

Page 93

1        HIGHLY CONFIDENTIAL - A. COX
2        A.    That I believe it was just the
3    freeing, the freeing up of, the unfreezing of
4    their account.
5        Q.    Were you concerned that the deal
6    between Lehman and Barclays would not go through
7    if they didn't unfreeze the account?
8        A.    Yes.
9        Q.    Why?
10       A.    Because there was, without the ability
11   to clear trades, so after all, we were taking on
12   Lehman's accounts, third-party accounts, and you
13   had to be able to clear Lehman's trades with
14   those third-party accounts would be
15   disadvantaged.
16       Q.    Handing you what's previously been
17   marked as Exhibit 52.  As you'll see, it's a
18   letter dated September 22, 2008 on the
19   letterhead of the Depository Trust & Clearing
20   Corporation to Mr. John Rodefeld.  Subject is
21   "Winding Down of Accounts and Guarantee."
22       MR. STERN:  Do you want Mr. Cox to
23   review this or do you want to ask him --
24       MR. WOOD:  If he would like.  My
25   questions are going to be pretty general.

TSG Reporting - Worldwide (877) 702-9580

24

Page 94

HIGHLY CONFIDENTIAL - A. COX
1
2    MR. STERN: Did you want to ask him if
3  he's ever seen it before?
4    MR. WOOD: I will.
5    Q.  Do you want to look it over before
6  I -- well, I'll ask you the question: Have you
7  seen it before?  And feel free to take time to
8  look at it.
9    A.  No, I have not seen it before.
10    Q.  Were you aware that such a letter
11  existed?
12    A.  No.
13    Q.  So I take it you would not be aware of
14  who from Barclays was involved in negotiating
15  this letter?
16    A.  Only by presumption.
17    Q.  And what's your presumption?
18    MR. STERN: Objection to the form.
19  He'd have to read in order to make the
20  presumption.
21    A.  I don't know -- well, if it related to
22  the DTCC, I presume that Gerard LaRocca would
23  have been involved in it as well as John
24  Rodefeld.
25    (Exhibit 423B, a transcript from the
TSG Reporting - Worldwide (877) 702-9580

Page 95

HIGHLY CONFIDENTIAL - A. COX
1
2  United States Bankruptcy Court on September
3  19, 2008, marked for identification, as of
4  this date.)
5    Q.  Mr. Cox, we've handed you what has
6  been marked as Exhibit 423B.  As you'll see,
7  it's a transcript from the United States
8  Bankruptcy Court on September 19, 2008.
9  Needless to say, I'm not going to ask you to
10  review the document while we sit here.
11    A.  Thank you. Nor, I hope, after we sit
12  here.
13    Q.  What you do in your free time is up to
14  you, sir.
15    If you'll look at the -- towards the
16  bottom of page 46.
17    A.  I presume that's between 45 and 47,
18  since I can't see.
19    Q.  The odd-numbered pages are somewhat
20  obscured by the binder, but your assumption is
21  correct.  You'll see where it says "Ms. Fife."
22  She says, "Thank you, your Honor," introduces
23  herself as Lori Fife of Weil Gotshal on behalf
24  of the debtors.
25    Turning over to the beginning or top
TSG Reporting - Worldwide (877) 702-9580

Page 96

HIGHLY CONFIDENTIAL - A. COX
1
2  of page 47, you'll see she said, "So originally
3  we were selling assets that had a value of 70 --
4  approximately $70 billion, and today, your
5  Honor, we're only selling assets that have a
6  value of $47.4 billion."
7    Do you know whether that $47.4 billion
8  as represented in court includes the -- any
9  assets in LBI's clearance boxes at DTC?
10    MR. STERN: Objection to the form.
11    A.  I have no knowledge at all.
12    Q.  Do you know whether it includes that
13  $769 million that we were discussing earlier
14  from the 15c3 account?
15    A.  No idea.
16    Q.  So then I also assume you don't know
17  whether it includes margin held to secure
18  derivatives?
19    A.  Correct.
20    Q.  Do you know whether the bankruptcy
21  court was ever notified that margin held to
22  secure derivatives would be included in
23  purchased assets under the deal?
24    MR. STERN: Objection to the form.
25    A.  No knowledge.
TSG Reporting - Worldwide (877) 702-9580

Page 97

HIGHLY CONFIDENTIAL - A. COX
1
2    Q.  Do you know whether the bankruptcy
3  court was ever notified that $769 million of
4  15c3-3 assets would be included?
5    A.  No knowledge.
6    Q.  Other than conversations with counsel,
7  were you involved in any conversations about
8  whether to notify the court of the inclusion of
9  any of those assets in the deal?
10    A.  No.
11    MR. WOOD: I have nothing further
12  right now.
13    MR. STERN: James, you have some
14  questions?
15    MR. TECCE: I do.  I'll be very brief.
16  EXAMINATION BY
17  MR. TECCE:
18    Q.  Mr. Cox, good afternoon. I'm James
19  Tecce. I'm counsel for the Creditors Committee.
20    Briefly, sir, could I direct your
21  attention back to what I believe is 423B?
22    A.  423B.
23    Q.  The sales transaction hearing. I also
24  am not going to ask you to read the whole
25  transcript.
TSG Reporting - Worldwide (877) 702-9580

Page 98

HIGHLY CONFIDENTIAL - A. COX
1  HIGHLY CONFIDENTIAL - A. COX
2      A.   Thank you.
3      Is that for your benefit or mine.
4      Q.   That's for both of our benefit.
5      MR. STERN:  Good question.
6      Q.   I would just like to direct your
7  attention to page 52, if I could.
8      A.   52, yes.
9      Q.   Okay.  Starting on line 16, where it
10 says "Mr. Hirshon," he is counsel to the DTC?
11     A.   I'm sorry, page 50?  What number did
12 you say?
13     Q.   52.
14     A.   52.  I'm sorry.  Line 16, "Mr.
15 Hirshon."
16     Q.   Right.
17     A.   He was counsel?
18     Q.   To the DTC.
19     A.   Right.
20     Q.   Depository Trust Clearance
21 Corporation.  About five or six lines down, he
22 starts on line 21, he says, "The arrangement,
23 now the arrangement is that the whole $6 billion
24 of residential mortgages will be there and
25 subject to settlement, but the anticipation is

TSG Reporting - Worldwide (877) 702-9580

Page 99

1  HIGHLY CONFIDENTIAL - A. COX
2  that, once all these claims settle, the trades
3  that are from Wednesday through Monday settle,
4  there will not be a need for all of that
5  collateral.  So what the amendment to the APA
6  says is that the 50 percent will be returned as
7  long as it is there."
8      Do you have an understanding of what
9  securities Mr. Hirshon is referring to in that
10 section?
11     MR. STERN:  Objection to the form.
12     A.   I'm not sure I understand the
13 question.  It says that there -- it says -- he
14 says here that the $6 billion of residential
15 mortgages is -- I assume that that's what you're
16 asking?
17     Q.   Correct.
18     A.   Do I understand?  I understand only
19 what I read.
20     Q.   Sure enough.  Allow me to ask the
21 question differently.
22     Do you have an understanding as to
23 whether or not Barclays received any residential
24 mortgage securities in connection with this sale
25 transaction?

TSG Reporting - Worldwide (877) 702-9580

Page 100

1  HIGHLY CONFIDENTIAL - A. COX
2      A.   The residential mortgages were subject
3  to a good deal of negotiation and discussion.  I
4  do not recall where we came out on those.
5      Q.   Okay.  Do you have an understanding as
6  to whether or not they were pledged to the DTC
7  in connection with the sale transaction?
8      A.   I do not know for certain, no.
9      Q.   Do you have an understanding as to
10 what the value of the residential mortgages that
11 were discussed in the sale transaction
12 negotiations was?
13     MR. STERN:  Objection to the form.
14     A.   Could you repeat the question, please?
15     Q.   Sure.  The residential mortgage
16 securities -- just reading back your answer, you
17 said, "The residential mortgages were subject to
18 a good deal of negotiation and discussion."
19     A.   Right.
20     Q.   My question is, what's your
21 understanding of what the value of those
22 mortgages was?
23     A.   I don't -- value in terms of -- I'm
24 sorry, I still don't understand your question.
25 Are you talking about the face value or the

TSG Reporting - Worldwide (877) 702-9580

Page 101

1  HIGHLY CONFIDENTIAL - A. COX
2  approximate market value of the securities?
3      Q.   The market value of the securities.
4      A.   I think it changed.  It started off at
5  a fairly high number and it came down in time to
6  a very different number, but I don't remember
7  what number it exactly ended up at, if any.  If
8  any.
9      Q.   Do you remember if it was $6 billion?
10     A.   No, I don't.  I don't.
11     Q.   Do you have an understanding as to
12 whether or not -- strike that.  Just going back
13 to your Exhibit 420B.  This is an e-mail dated
14 Monday, September 22, at 12 --
15     MR. STERN:  One second.
16     MR. TECCE:  Sure.  Sure.  Sorry.
17     (Document handed to the witness.)
18     MR. STERN:  Okay.
19     Q.   Okay.  This is your e-mail dated
20 Monday, September 22, 2008, 12:29 A.M.
21     The text of the e-mail reads that, "We
22 have an agreement," correct?  Were you involved
23 in negotiations the Sunday night prior?  Is that
24 what took place with JPMorgan Chase?
25     A.   It's the same night.

TSG Reporting - Worldwide (877) 702-9580

26

## Page 102

HIGHLY CONFIDENTIAL - A. COX

1
2      Q.   That's what I mean.  This is Monday
3  morning at 12:29, the Sunday night prior,
4  correct?
5      A.   Yes, I guess, yes.  I think I
6  understand your question.  It's the same, same
7  night as Sunday night and at this time Monday --
8      Q.   That's correct.
9      A.   -- Monday morning.
10      Q.   Right.  Do you recall whether the DTC
11  was a party to any of those discussions?
12      A.   I do not have any recollection of the
13  DTC being a party to any discussions that
14  involved JPMorgan.
15      Q.   Okay.  Were you involved in any
16  discussions directly with the DTC that did not
17  involve JPMorgan?
18      A.   No, I was not.  Might I have been in
19  the room when there was a conference call?
20  Possibly, but I did not participate in the call.
21      Q.   And do you recall whether or not the
22  issue of residential mortgage securities was
23  discussed that night?
24      A.   I have no recollection of that.
25      Q.   That's all I have.

TSG Reporting - Worldwide (877) 702-9580

## Page 103

HIGHLY CONFIDENTIAL - A. COX

1
2      A.   I'm sorry.  I just don't remember the
3  nature of the discussions with the DTCC and how
4  that was finally -- the final resolution that
5  untied that knot.
6      MR. TECCE:  Thank you.
7      MR. WOOD:  Nothing else from us.
8      MR. STERN:  Thanks very much.
9      MR. TECCE:  Thank you for your time.
10      (Time Noted:  1:34 P.M.)
11
12
13
14
15
16
17
18
                    ARCHIBALD COX
19
20      Subscribed and sworn to
       before me this    day
21     of     2009.
22
23
24
25

TSG Reporting - Worldwide (877) 702-9580

## Page 104

HIGHLY CONFIDENTIAL - A. COX

1
2                 CERTIFICATE
3  STATE OF NEW YORK )
                    : ss
4  COUNTY OF NEW YORK)
5      I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9      That ARCHIBALD COX, the witness whose
10  deposition is herein before set forth, was
11  duly sworn by me and that such deposition is
12  a true record of the testimony given by such
13  witness.
14      I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18      I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23      In witness whereof, I have hereunto
       set my hand this 11th day of September,
24  2009.
25      --------------------------------

TSG Reporting - Worldwide (877) 702-9580

## Page 105

HIGHLY CONFIDENTIAL - A. COX

1
2                 INDEX
3  WITNESS:        EXAMINATION BY        PAGE
4  A. COX       Mr. Tambe          5
5               Mr. Wood          83
6               Mr. Tecce         97
7  EXHIBITS:                     PAGE
8  Exhibit 413B, a document bearing Bates Nos.   29
9  BCI-EX-(S)-26269
10  Exhibit 414B, a document bearing Bates Nos.   31
11  BCI-EX-115878 115879
12  Exhibit 415B, a document bearing Bates Nos.   36
13  BCI-EX-115964 through 115972
14  Exhibit 416B, a document bearing Bates Nos.   49
15  BCI-EX-116023 through 116030
16  Exhibit 417B, a document bearing Bates Nos.   50
17  BCI-EX-115898 through 115900
18  Exhibit 418B, a document bearing Bates Nos.   62
19  BCI-EX-79546
20  Exhibit 419B, a document bearing Bates Nos.   66
21  BCI-EX-79067
22  Exhibit 420B, a document bearing Bates Nos.   79
23  BCI-EX-80849
24  Exhibit 421B, a document bearing Bates Nos.   90
25  BCI-EX-81179

TSG Reporting - Worldwide (877) 702-9580

27

Page 106

```
1          HIGHLY CONFIDENTIAL - A. COX
2                 INDEX (Cont'd.)
3       EXHIBITS:                    PAGE
4       Exhibit 422B, a document bearing Bates Nos.    92
5       BCI-EX-81116
6       Exhibit 423B, a transcript from the United    94
7       States Bankruptcy Court on September 19, 2008
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide (877) 702-9580

Page 107

```
1          HIGHLY CONFIDENTIAL - A. COX
2      NAME OF CASE: In re Lehman Brothers Holdings, Inc.
3      DATE OF DEPOSITION: September 11, 2009
4      NAME OF WITNESS: Archibald Cox
5      Reason Codes:
6         1. To clarify the record.
          2. To conform to the facts.
7         3. To correct transcription errors.
8      Page _____ Line _____ Reason _____
       From _____ to _____
9
10     Page _____ Line _____ Reason _____
11     Page _____ Line _____ Reason _____
       From _____ to _____
12
13     Page _____ Line _____ Reason _____
14     Page _____ Line _____ Reason _____
       From _____ to _____
15
16     Page _____ Line _____ Reason _____
17     Page _____ Line _____ Reason _____
       From _____ to _____
18
19     Page _____ Line _____ Reason _____
20     Page _____ Line _____ Reason _____
       From _____ to _____
21
22     Page _____ Line _____ Reason _____
23     Page _____ Line _____ Reason _____
24
25
```

TSG Reporting - Worldwide (877) 702-9580

# BCI EXHIBIT

# 62

Page 1

1

2              UNITED STATES BANKRUPTCY COURT

3               SOUTHERN DISTRICT OF NEW YORK

4      ------------------------x

5      In Re:

6                          Chapter 11

7      LEHMAN BROTHERS        Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al,    (Jointly Administered)

9                  Debtors.

10     ------------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF NANCY DENIG

14             New York, New York

15             August 21, 2009

16

17     Reported by:

18     MARY F. BOWMAN, RPR, CRR

19     JOB NO. 24044

20

21

22

23

24

25

Page 2

```
 1
 2
 3
 4                    August 21, 2009
 5                      9:35 a.m.
 6
 7
 8
 9        Deposition of NANCY DENIG, held at
10   the offices of Jones Day, LLP, 222 East 41st
11   Street, New York, New York, before Mary F.
12   Bowman, a Registered Professional Reporter,
13   Certified Realtime Reporter, and Notary Public
14   of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2              APPEARANCES:
 3   JONES DAY, LLP
 4   Attorneys for Lehman Brothers, Inc.
 5      222 East 41st Street
 6      New York, New York  10017-6702
 7   BY:  WILLIAM J. HINE, ESQ.
 8        GEORGE E. SPENCER, ESQ.
 9
10   BOIES, SCHILLER & FLEXNER, LLP
11   Attorneys for Barclays and The Witness
12      5301 Wisconsin Ave. NW
13      Washington, DC 20015
14   BY:  JONATHAN M. SHAW, ESQ.
15
16   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
17   Attorneys for the Creditors Committee
18      51 Madison Avenue
19      New York, New York  10010
20   BY:  ROBERT K. DAKIS, ESQ.
21
22
23
24
25
```

Page 4

```
 1
 2
 3   JENNER & BLOCK, LLC
 4   Attorneys for the Examiner
 5      330 N. Wabash Avenue
 6      Chicago, Illinois  60611-7603
 7   BY:  DAVID C. LAYDEN, ESQ.
 8
 9   HUGHES, HUBBARD & REED, LLP
10   Attorneys for the SIPA Trustee
11      One Battery Park Plaza
12      New York, New York  10004-1482
13   BY:  NEIL J. OXFORD, ESQ.
14        FARA TABATABAI, ESQ.
15
16   Also Present:
17      RAJESH ANKALKOTI, Alvarez & Marsal
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2
 3
 4
 5        IT IS HEREBY STIPULATED AND AGREED, by
 6   and between the attorneys for the respective
 7   parties herein, that filing and sealing be
 8   and the same are hereby waived.
 9        IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15        IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25
```

Page 6

DENIG - CONFIDENTIAL

1   NANCY DENIG,
2       called as a witness by the parties,
3       having been duly sworn, testified as
4       follows:
5   EXAMINATION BY
6   MR. HINE:
7       Q.   Good morning, Ms. Denig. How are you?
8       A.   Good.
9       Q.   I introduced myself before, but my
10  name is Bill Hine. I am from the firm of Jones
11  Day, which is special counsel to Lehman Brothers
12  Holdings, Inc. in connection with all the
13  bankruptcy proceedings that are going on.
14      So your deposition today is in
15  connection with those proceedings and some
16  discovery that we are taking in those proceedings.
17  Have you ever been deposed before?
18      A.   I have not.
19      Q.   Very simple. I am going to ask you a
20  bunch of questions. You are under oath, so you are
21  going to give me truthful answers.
22      On occasion your counsel will raise an
23  objection or interpose an objection. He is either
24  doing that for any number of reasons, but I just

Page 7

DENIG - CONFIDENTIAL

1   wanted to let you know that it doesn't relieve you
2   of the obligation to answer the question. You
3   still have to answer the question, unless of
4   course your counsel instructs you not to answer
5   the question, which he may do on occasion as well.
6       I think all the other counsel around
7   the table will introduce themselves as they get up
8   to ask you questions, if they have any, but if you
9   have any questions -- unless you have any
10  questions, we can get started.
11      One point of clarification before we
12  get started. I see e-mails addressed to N. Bayne.
13  Is that you?
14      A.   That is my maiden name.
15      Q.   So if I see --
16      A.   Unfortunately when you were at Lehman,
17  when I got married -- my user profile before I got
18  married was N. Bayne, which was my maiden name.
19  When I got married, in order for them to change
20  the user name, they would have had to delete me
21  from the system altogether and I would have to
22  reapply for all my applications, which I didn't
23  want to do because I was already four years into
24  the company, so I left my user name as N. Bayne.

Page 8

DENIG - CONFIDENTIAL

1       Q.   If I see an e-mail addressed to
2   N. Bayne at Lehman --
3       A.   That's me.
4       Q.   Could you tell me how long you worked
5   for Lehman?
6       A.   15 years.
7       Q.   So that's starting in --
8       A.   1994, January 20.
9       Q.   OK. And could you kind of briefly
10  walk me through the progressions of positions you
11  held up until the end?
12      A.   I started as an analyst in customer
13  service, which dealt with like trade discrepancies
14  for fixed income products.
15      Moved to P&L in the finance division,
16  where I supported the repo desk for central
17  funding for all types of fixed income assets.
18      I then took on various different
19  groups throughout the life, sales support, trade
20  support, P&L, structured repo, EMG, trade and
21  sales support, and probably that was pretty much
22  it. So I pretty much stayed on the fixed income
23  side pretty much all my career.
24      Q.   What was the last position you held?

Page 9

DENIG - CONFIDENTIAL

1       A.   Last position, regional head for fixed
2   income repo, middle office, so that was trade
3   support, so we supported the traders in the daily
4   transactions that they executed.
5       We did sales support, which also
6   supported any trade confirmations, sales
7   confirmations, trade discrepancies with regards to
8   the salespeople.
9       We did -- we reported the P&L to the
10  business lines, and, you know, some various little
11  odds and ends, but nothing that needs to be
12  clarified.
13      Q.   Who did you report to in that
14  position?
15      A.   Jim Hraska.
16      Q.   Any other people that you reported to
17  directly?
18      A.   No.
19      Q.   How long have you held this position?
20      A.   Three years of all that. I just kept
21  getting more stuff added to me as my career
22  progressed. So I started with one group and got
23  another one, another, another, another. But
24  basically all in the same business line.

Page 10

```
 1          DENIG - CONFIDENTIAL
 2      Q.   So the description you just gave me of
 3   your job --
 4      A.   With everything was about three years
 5   that I had that.
 6      Q.   For about three years?
 7      A.   Yeah.
 8      Q.   And who reported directly to you in
 9   the last three-year period?
10      A.   Carroll Schirmacher, Anthony
11   D'Agostino, Anthony Rivera, who was -- job
12   elimination at some point during the layoffs at
13   Lehman Brothers, Tom Rogers and Dave Regan. And
14   that was pretty much it.
15      Q.   I believe you said, you mentioned the
16   phrase "repo" in your description of your job.
17   Could you just -- did you focus primarily on
18   repurchase transactions?
19      A.   Yes. As it related -- well, I
20   wouldn't say repo transactions. The desk was
21   defined that we supported as the repo desk, but
22   they had different facets of the business. They
23   had a business -- they did plain vanilla swaps.
24   They did outright trades. They did other
25   disciplines.
```

Page 11

```
 1          DENIG - CONFIDENTIAL
 2          But for the most part, the name of the
 3   department was the financing desk that dealt with
 4   repos.
 5      Q.   OK. And at some point in time, you
 6   went to work for Barclays, correct? When was
 7   that?
 8          MR. SHAW: You need to answer things
 9   orally. They can't get a head shake or nod.
10      A.   September 22nd.
11      Q.   And when -- you are still at Barclays?
12      A.   I am.
13      Q.   What's your position at Barclays?
14      A.   Pretty much the same. Same role
15   without P&L.
16      Q.   Without P&L meaning --
17      A.   We had a middle office construct in
18   Lehman that included the reporting of P&L. At
19   Barclays they don't have that model, so basically
20   it is just the support.
21      Q.   Where is the P&L operation run?
22      A.   In finance.
23          MR. SHAW: You need to let him finish
24   his answer, and give me a chance to get an
25   objection in if I need to.
```

Page 12

```
 1          DENIG - CONFIDENTIAL
 2      Q.   Who is the head of finance at Barclays
 3   that runs the P&L department?
 4      A.   In our division, it is Kevin Horan.
 5      Q.   Above him?
 6      A.   I don't remember his name. Martin
 7   Kelly. Martin Kelly.
 8      Q.   And when you did the P&L work during
 9   your time at Lehman, did you -- did that work get
10   provided to Martin Kelly?
11      A.   No. Ultimately with Ian Lowitt.
12      Q.   I just want to take a quick diversion
13   here. I don't mean to pry into personal matters,
14   but I do have to ask you about your compensation.
15          MR. SHAW: Just so you know, this is
16   all highly confidential, so you can feel
17   free to speak about that.
18      Q.   Do you have an employment contract
19   with Barclays?
20      A.   No. Well, except for the "can" letter
21   that every employee received on the Monday morning
22   of September 22nd, that we accepted or rejected.
23      Q.   And you accepted?
24      A.   I accepted.
25      Q.   You sent in an e-mail that said
```

Page 13

```
 1          DENIG - CONFIDENTIAL
 2   accepted?
 3      A.   Yes.
 4      Q.   Could you just tell me what you made
 5   in your last position at Lehman?
 6      A.   Total comp?
 7      Q.   Annual basis, yes.
 8      A.   Annual was ███ base, and bonus in 2008
 9   was ███
10      Q.   ███?
11      A.   ███
12      Q.   Was that paid in the form of cash
13   bonus or stock?
14      A.   6 percent was stock. The rest was
15   cash bonus.
16      Q.   And were you paid that before you left
17   Lehman?
18      A.   Yes.
19          MR. SHAW: Just so we are clear, when
20   you say '08, that would be February of '08?
21          THE WITNESS: Yes, February of '08.
22      Q.   So is that the bonus for the year
23   2007?
24      A.   No -- well, yeah, yes. Yes. Sorry.
25      Q.   Just so I have that clear, your base
```

Page 14

DENIG - CONFIDENTIAL

1  salary was ▮?
2  A.  Um-hm, yes.
3  Q.  Was that for 2007?
4  A.  No.  The base salary was 2008's base
5  salary, but in February of 2008, I was paid the
6  ▮ as my bonus for 2007.
7  Q.  And that bonus consisted of 6 percent
8  stock and the rest was in cash, correct?
9  A.  Yes.
10 Q.  Now, you did get a bonus for 2008?
11 A.  Yes.
12 Q.  When did you get that?
13 A.  When?  February 23rd.
14 Q.  This is after you --
15 A.  Had been employed at Barclays.
16 Q.  And how much was that?
17 A.  ▮
18 Q.  Was that also in stock and cash?
19 A.  No, just cash.
20 Q.  And do you know how that figure was
21 arrived at?
22 MR. SHAW:  Objection.
23 A.  No.
24 Q.  Do you have any input into how that

Page 15

DENIG - CONFIDENTIAL

1  figure was --
2  A.  How mine is?
3  Q.  Yeah.
4  A.  No.
5  Q.  And so in your current position at
6  Barclays, is your base salary still ▮?
7  A.  It is ▮
8  Q.  That's ▮?
9  A.  Yes.
10 Q.  And am I correct to say on
11 February 23, you were paid ▮ as a bonus to
12 reflect the work you did in 2008?
13 A.  Yes.
14 Q.  Some of which was for Barclays and
15 some of which was for Lehman, right?
16 A.  Yes.
17 Q.  Did they break down the percentage of
18 the bonus that was related to your Barclays work
19 as opposed to your Lehman work for that year?
20 A.  No.
21 Q.  I've seen -- since you went to
22 Barclays, have you been offered any other forms of
23 compensation?
24 A.  At Barclays?

Page 16

DENIG - CONFIDENTIAL

1  Q.  Yeah.
2  A.  No.
3  Q.  You don't have any kind of special
4  cash award?
5  A.  No.
6  Q.  Were you offered any kind of retention
7  bonus to promote you staying there for a long
8  period of time?
9  A.  No.
10 Q.  So far as you know, your Barclays
11 compensation consists of a base salary of ▮
12 plus a bonus?
13 A.  Subject to whatever going forward.
14 Q.  So you don't know what the bonus is
15 going to be for this year, 2009, correct?
16 A.  I do not.
17 Q.  Do you expect to be paid that in
18 February of 2010?
19 A.  2010.
20 Q.  Throughout this deposition, we are
21 going to talk about different dates, so let's get
22 some of them out of -- I believe you mentioned
23 September 22, which is the Monday that the sale
24 transaction closed, correct -- let me just clarify

Page 17

DENIG - CONFIDENTIAL

1  that.
2  You understand that at some point in
3  time, Lehman sold its North American broker/dealer
4  business to Barclays, correct?
5  A.  Yes.
6  Q.  And that closed, the closing of that
7  transaction was on September 22, 2008, right?
8  A.  Yes.
9  Q.  And so my question has to do with your
10 compensation.  Did you have any conversations with
11 anyone at Barclays about your going to work for
12 Barclays prior to September 22, 2008?
13 A.  No.
14 Q.  Did you have any conversations with
15 anyone at Lehman about the possibility of you
16 moving over and becoming a Barclays employee
17 before September 22?
18 A.  No.
19 Q.  When did you first -- so on
20 September 22, did you have any expectation that
21 you would become a Barclays employee?
22 A.  I was hopeful, but no.
23 Q.  Did you hear any rumors around Lehman
24 the week before September 22 about what was going

Page 18

DENIG - CONFIDENTIAL

1
2 to happen to all the Lehman employees?
3     Q.    No. We -- as far as we were told, we
4 were all to be retained.
5     Q.    Who told you that?
6     A.    TV, CNN, documents that were posted on
7 Reuters and Bloomberg.
8     Q.    Did you hear that from any senior
9 executives at Lehman?
10    A.    No. Again, all hopeful. Everybody
11 was hopeful.
12    Q.    And so was there any -- when you --
13 when September 22 came around, you were hopeful of
14 getting a job, but you had no guarantee of getting
15 a job until you received an offer from Barclays?
16    A.    Yes.
17    Q.    What did that offer consist of?
18    A.    A "can" letter just saying that you
19 were to retain employment until December 31 of
20 2009 -- 8. Basically it was a three-month
21 contract.
22    Q.    Did that letter contain any
23 description of the compensation that was going to
24 be paid to you?
25    A.    No, it did not.

Page 19

DENIG - CONFIDENTIAL

1
2     Q.    So you clicked on e-mail and accepted
3 the employment?
4     A.    Yes.
5     Q.    Not knowing how much you were going to
6 be paid?
7     A.    Yes.
8     Q.    And when did you learn what you were
9 going to be paid?
10    A.    I guess I didn't ever. Like they
11 just -- the salary continued. It was no -- there
12 was no talk of it or any official letters coming
13 to any of the employees around -- well, not
14 anyone, at least anybody that worked for me, of
15 figures and where we signed anything.
16    Q.    Did you have any conversation with
17 anyone about the ████ bonus you received around
18 February of 2009?
19    A.    No.
20    Q.    You just got a check in the mail?
21    A.    For in February or --
22    Q.    Well, I thought you said you got, in
23 February you got a bonus -- I am sorry, ████
24 bonus --
25    A.    ███, yeah.

Page 20

DENIG - CONFIDENTIAL

1
2     Q.    -- from Barclays that was to
3 constitute compensation for the year 2008,
4 correct?
5     A.    Yes. That got communicated to me on
6 February 15, that that was -- of 2009, and that
7 would be what would be my number.
8     Q.    Who told you that.
9     A.    Jim Hraska.
10    Q.    How did he find that out, do you know?
11    A.    I think he determined it.
12    Q.    Was there any negotiation around that
13 amount?
14    A.    No.
15    Q.    We are going to leave your
16 compensation. Can I take a step back and get a
17 sense of your role in this whole Lehman Barclays
18 transaction which encompasses several different
19 aspects. I think it will just make the deposition
20 go quicker.
21        Let's go to a date. September 15 of
22 2008, which is the Monday prior to the closing,
23 which we understand to be the date -- well, that
24 is the date when Lehman Brothers Holdings, Inc.
25 filed for bankruptcy.

Page 21

DENIG - CONFIDENTIAL

1
2        Did you have any -- prior to that
3 date, did you have any knowledge that Barclays and
4 Lehman had been in some kind of discussions about
5 a transaction?
6     A.    CNN over the weekend, and we were --
7 basically 7 p.m. we were told that Barclays PLC
8 could not do the whole company or they were on the
9 table as one company that was going to be
10 interested in buying Lehman, and then at 7:30 the
11 Sunday night before, we were told that they
12 weren't able to get -- do the deal.
13    Q.    And you were told through what means?
14    A.    E-mails and phone calls from Jim.
15    Q.    From Jim Hraska?
16    A.    Yes.
17    Q.    Did you -- so let's talk about the
18 period before you're told that. Any involvement
19 at all with those discussions between Barclays and
20 Lehman?
21    A.    No.
22    Q.    Were you asked to provide any
23 information in support of those discussions?
24    A.    No.
25    Q.    Ever called into a conference room and

Page 22

DENIG - CONFIDENTIAL
1
2   asked, or asked to provide a spreadsheet or
3   anything?
4       A.   Not before the 15th of September.
5       Q.   OK.  Then on the 15th, Lehman Holdings
6   files for bankruptcy.  Did you have any role in
7   preparing the bankruptcy filing?
8       A.   No.
9       Q.   Did you have any role in providing
10  information to those who were preparing a
11  bankruptcy filing?
12      A.   No.
13      Q.   Did the bankruptcy filing come as a
14  surprise to you that Monday?
15      A.   No.
16      Q.   Why not?
17      A.   Just from what we heard throughout the
18  weekend.  It was all over CNN and, you know,
19  everybody and every one of my friends calling me,
20  giving me updates as to what was going on with
21  Lehman.
22      Q.   OK, but internally from your superiors
23  at Lehman --
24      A.   No --
25      Q.   -- you didn't hear anything?

Page 23

DENIG - CONFIDENTIAL
1
2       MR. SHAW:  Let him finish.
3       Q.   Now, there comes a time on the 15th
4   when Barclays comes back and starts speaking to
5   Lehman again about a transaction.  Did you have
6   any role in that negotiations between Barclays and
7   Lehman?
8       A.   No.
9       Q.   Well, could you describe generally
10  what you did that week, the week of October --
11  from September 15th to the 22nd?
12      A.   Well, starting on September 15, it was
13  just a matter of trying to keep the broker/dealer,
14  LBI portion of it running, going.  Supporting the
15  traders that were trying to get liquidity within
16  the firm.
17      And Barclays was a big part of that,
18  as far as providing additional funding, when
19  other liquidity providers stopped giving us the
20  cash and the Fed basically -- the Fed programs
21  that were available at the time were being used to
22  do that facilitation.  And we were just very close
23  to it.
24      My job was just to make sure that all
25  the positions that we had were settling, that all

Page 24

DENIG - CONFIDENTIAL
1
2   the lines of communication between our group, the
3   traders and settlements was open, and that
4   everything was being transacted properly so we
5   wouldn't have any misbookings.
6       Q.   You said a lot there so I am going to
7   take it piece by piece.
8       You said there was an effort during
9   that week to keep the broker arm, LBI, going.
10      A.   Yes.
11      Q.   Now, why did they want to keep LBI
12  going?  Do you know?
13      MR. SHAW:  Objection, foundation.
14      Q.   You can answer.
15      A.   Well, at that point, we didn't know
16  any other -- that we felt the broker/dealer was
17  going to stay as a going concern.
18      Q.   OK.  Had you had any idea that the
19  broker/dealer would file for bankruptcy later that
20  week?
21      A.   No, not on Monday.
22      Q.   Did you later learn that?
23      A.   Yes.
24      Q.   When did you learn that?
25      A.   Wednesday.

Page 25

DENIG - CONFIDENTIAL
1
2       Q.   What did you hear about that?
3       A.   That we were going to be -- that the
4   Fed was going to be stepping out of the
5   transaction of all the collateral that we had
6   being funded by them.  That they wanted Barclays
7   to take over that transaction.
8       Q.   How did that relate to the LBI filing
9   for bankruptcy?
10      A.   Because -- at that particular time, if
11  we got rid of everything we had, the only funding
12  we were getting was from the Fed, and Barclays was
13  now going to have it, we would have nothing to
14  go -- we would have nothing to be able to continue
15  going as a going concern.  We would have no
16  assets.
17      Q.   So did you surmise that LBI was going
18  bankrupt or were you told that that was going to
19  take place?
20      A.   I don't know if I was told outright.
21  I think there was sort of speculation that that
22  was the way it was going until, say, Thursday,
23  when it was definitive that that was what was
24  going to happen.
25      Q.   And what did you hear on Thursday that

Page 26

DENIG - CONFIDENTIAL

1  made you think it was definitive?
2
3      A.    I think they said that Barclays was
4  going to file Chapter 11 or Chapter 7 for the
5  broker/dealer.
6      Q.    Barclays?
7      A.    Yes.
8      Q.    Not LBI?
9      A.    No. I think Barclays was going to
10  file for -- I think they owned it at that
11  particular time, and they were going to file for
12  bankruptcy on behalf of the broker/dealer.
13      Q.    OK. Let me just step back and try to
14  piece some of this together.
15            You mentioned the Fed program.
16      A.    Um-hm.
17      Q.    Tell me what your role was in
18  connection with the Fed program again.
19      A.    Well, there were three specific Fed
20  programs that were available to broker/dealers.
21  And my groups were responsible for booking the
22  transactions and then reconciling them with the
23  Fed on a daily basis.
24      Q.    So these are overnight financings,
25  correct?

Page 27

DENIG - CONFIDENTIAL

1
2      A.    Yes, except for the TSLF, which is
3  more term. There is a 30-day term or 28-day term
4  program.
5      Q.    That's TCLF?
6      A.    TSLF.
7      Q.    Are you familiar with the term
8  "haircut" in connection with the Fed transaction?
9      A.    Am I familiar with the word "haircut"
10  as it relates to --
11      Q.    Yes.
12      A.    Yes.
13      Q.    What does a haircut mean when you're
14  talking about these Fed programs?
15      A.    It would be an amount in addition to
16  the par value of the securities that you would
17  have to give them in order to do the transaction.
18            So -- do you need a for instance?
19      Q.    Yeah.
20      A.    If you have a 100 million trade that's
21  worth 100 million in price, the Fed would require
22  you to pay 2 percent more for that transaction.
23      Q.    So meaning you would have to --
24      A.    Pay 102 million for the same
25  transaction.

Page 28

DENIG - CONFIDENTIAL

1
2      Q.    Just so I can finish my -- just so I
3  can understand, in your hypothetical, if you
4  wanted the Fed to pay you 100 million, you would
5  have to post 102 million in collateral?
6      A.    Yes.
7      Q.    So in connection with these Fed
8  programs that you were working on to support LBI,
9  what was the haircut that the Fed insisted on?
10      MR. SHAW: Objection. Foundation.
11            Go ahead.
12      Q.    You can answer.
13      A.    It depended.
14      Q.    On what?
15      A.    On the collateral itself.
16      Q.    Can you explain that?
17      A.    Different types of collateral had more
18  favorable haircuts than the more exotic or toxic
19  type of assets.
20      Q.    When you say more favorable, you mean
21  lower percentage?
22      A.    Lower grade like Treasuries, agencies,
23  mortgage collateral, was more liquid in the
24  market, and you wouldn't -- they didn't make you
25  pay as much for them.

Page 29

DENIG - CONFIDENTIAL

1
2      Q.    And then some more exotic
3  instruments --
4      A.    Yes.
5      Q.    -- you would have to pay a higher
6  haircut?
7      A.    Yes.
8      Q.    Is that right?
9      A.    Yes.
10      Q.    Was there an aggregate haircut that
11  you folks calculated as relates to all these Fed
12  programs in connection with your financing of LBI?
13      MR. SHAW: Objection, foundation.
14      A.    I don't remember actually.
15      Q.    I've seen references to a 20 percent
16  haircut in some of the e-mails. Does that ring a
17  bell or is that --
18      A.    With regards to the actual Fed
19  programs?
20      Q.    Yeah.
21      A.    It could be for the PDCF, which is a
22  primary dealer credit facility. They were all
23  corporate and exotic type of assets, so I would
24  say yes. But the TSLF and our overnight program,
25  I would think that was way too high.

Page 30

DENIG - CONFIDENTIAL
1
2     Q.    So they were much smaller for those
3  two programs?
4     A.    Yeah.
5     Q.    Is -- I apologize if I am outside my
6  area of expertise here.  I am trying to understand
7  the business that you guys consider everyday
8  activity.
9          But if -- am I correct to say that the
10  Fed -- in connection with these Fed programs, by
11  Wednesday, you had posted about 50 billion dollars
12  in collateral in exchange for 45 billion in cash
13  for the Fed; is that right?
14     A.    I don't know if that was the final
15  figure from the Fed.  What I do know is that we
16  got a file from Chase that told us what the
17  individual collateral was that we had to the Fed
18  and what they anticipated market value of it was.
19     Q.    And what was that market value?
20     A.    The first file that we received was
21  42,2.
22     Q.    Now, why is --
23     A.    44,2.  42,2 or 44,2.
24     Q.    Well, tell you what.  You mentioned
25  this file.  I think I have seen that, so let me

Page 31

DENIG - CONFIDENTIAL
1
2  try to find a copy and we can talk about that,
3  because that was going to be one of my questions.
4          Ms. Denig, I am handing you a copy of
5  an exhibit that we previously marked as 125.
6          MR. SHAW:  Take whatever time you need
7  to look at it.
8     Q.    Please take a moment to look at it.  I
9  have a question once you're ready.
10     A.    I am ready.
11     Q.    You have had a chance to look at that?
12     A.    Yes.
13     Q.    Is this the document to which you were
14  just referring?
15     A.    Yes.
16     Q.    And can you tell me what this document
17  is?  Again, I'm not so much concerned about the
18  covering e-mail but the one-page chart that's
19  attached that's entitled "Booking Amounts."
20     A.    Yes.  This is not the original that we
21  received from Chase.  This is my version of what
22  the denominations were of the trades that my guys
23  booked that day.  But the totals are exactly the
24  same that we received from Chase.
25     Q.    So this started as a document from

Page 32

DENIG - CONFIDENTIAL
1
2  Chase?
3     A.    Yes.
4     Q.    Why is Chase sending this document?
5     A.    They were our custodian.
6     Q.    In connection with the Fed financings?
7     A.    Yes.
8     Q.    And what was the purpose of Chase
9  sending this to you?
10     A.    To tell us what each facility that we
11  had on with the Fed, what the value of it was
12  worth.
13     Q.    And Chase was placing its own value on
14  those securities?
15     A.    I can't be sure of where they came up
16  with the market value.
17     Q.    And was it the same as the values you
18  folks placed on those securities?
19          MR. SHAW:  Objection, foundation.
20     A.    We -- well, the way we booked it is a
21  lot different than actually assigning market
22  values, which we didn't do.  The transfer of or
23  the delivery of these securities were booked with
24  no value on them.
25          And, you know, I don't know if you

Page 33

DENIG - CONFIDENTIAL
1
2  want to get into that now or just concentrate on
3  this document first, but I mean the way we booked
4  the trade is a lot different than probably your
5  understanding of it.
6     Q.    I would like to understand what's the
7  difference.  Why the difference?
8     A.    So typically when you book a DVP
9  transaction and there would be a par value, a
10  principal value based on a price, and when you
11  make delivery, the assets go and cash is received,
12  and it is a simultaneous transaction.
13          For these that was not the case.  We
14  actually booked the trades for par value,
15  delivered them for free to a particular -- a BoNY
16  location of where Barclays' accounts were, and we
17  booked separately the cash that they sent us.
18     Q.    Are you talking about the Fed program
19  now or Barclays?
20     A.    Well, we stepped into the Barclays
21  role.  This, this particular transaction, it was
22  related to how we booked the trade to Barclays.
23  This spreadsheet was how we booked the trade to
24  Barclays.  The original amounts is what we had at
25  Chase.

Page 34

```
 1        DENIG - CONFIDENTIAL
 2     Q.   Let me just understand this chart and
 3  then we can talk about -- when you say booking
 4  amounts, what does that refer to?
 5     A.   This is on September 18.
 6     Q.   OK.
 7     A.   Which is the day we booked the trade
 8  and Fed stepped out of the trade, and now Barclays
 9  was our liquidity provider for these securities.
10  These are the amounts that I booked.  So these
11  amounts were to Barclays.  But the -- this column,
12  the second -- this column here with the par
13  amounts was given to us by Chase.
14     Q.   OK, let's just step back for a second.
15  On the 18th, you were involved in the transferring
16  of the securities from the Fed program to a new
17  repo that was executed with Barclays?
18     A.   Yes.
19     Q.   Correct?
20     A.   Yes.
21     Q.   So going forward, can we call that the
22  September 18 repo, just so we are on the same
23  page?
24     A.   Sure.
25     Q.   And Bank of New York was the --
```

Page 35

```
 1        DENIG - CONFIDENTIAL
 2     A.   Custodian for Barclays.
 3     Q.   And who was your custodian?
 4     A.   Chase.
 5     Q.   So on the 18th, you are -- when you
 6  talk about booking, you are talking about
 7  transferring assets or securities that were
 8  previously in the Fed program held by Chase,
 9  correct?
10     A.   Yes, um-hm.
11     Q.   Into what, an account at BoNY for the
12  benefit of Barclays?  Is that right?
13     A.   Yes.
14     Q.   You talked about a bunch of columns.
15  I just want to get it clear on the record.
16          The second column, second large column
17  on this chart, which starts with 7.1 billion
18  dollars, do you see that?
19     A.   Yes.
20     Q.   That, those numbers are what?
21     A.   Those are the par value of the assets
22  that were in the OMO program with the Fed.
23     Q.   And what's the column to the left of
24  that which talks about 109,406,353?  Do you see
25  that?
```

Page 36

```
 1        DENIG - CONFIDENTIAL
 2     A.   This is the market value that Chase
 3  put on it.
 4     Q.   So that column, which totals 47,
 5  approximately 47.5 billion dollars, is the --
 6  reflects the market value that Chase ascribed to
 7  the securities that were in the Fed program?
 8     A.   That's correct.
 9     Q.   Now, let's continue on the chart a
10  little to the right, and again, I'm not trying to
11  be laborious here, I just need to get a clear
12  record.
13          The column which starts with
14  108.49 billion -- million, do you see that?
15     A.   Yes.  Million.  These are actual
16  figures.
17     Q.   OK.  Now, that totals down to 44.2
18  billion dollars.  Do you see that column?
19     A.   Yes.
20     Q.   What does that column reflect?
21     A.   The par value -- I am sorry, the cash
22  value that we booked the trades at.
23     Q.   Can you explain that to me?
24     A.   So they came and said that the
25  projected value -- again, this is not the original
```

Page 37

```
 1        DENIG - CONFIDENTIAL
 2  that we received from Chase.  This is after I
 3  determined how I was going to physically book the
 4  trades.  This is my breakout of how we physically
 5  booked them to Barclays.
 6          The total that -- of this forty-four
 7  two was the projected value of the collateral that
 8  Chase gave it as far as the cash.  This is --
 9  includes market value and haircuts.  This 42,2 was
10  what the cash value, projected cash value was that
11  Barclays was going to pay us.
12     Q.   You pointed to different columns.
13  When you're testifying, we have to do it a little
14  formally here.  So I think you just pointed to the
15  column that had the 47.5 and said --
16     A.   Yes.
17     Q.   And said that is Chase's market value
18  for those securities, right?
19     A.   Yes, yes.
20          MR. SHAW:  Let him finish the
21     questions.  We have time, we will get
22     through all of it.
23     Q.   The column that totals the 44.2 is the
24  amount of cash that Barclays was going to convey
25  to Lehman in exchange for posting those securities
```

Page 38

DENIG - CONFIDENTIAL

1
2  as collateral?
3      A.   Yes.
4      Q.   So the difference in the two is the
5  haircut for the September 18 repo?
6      A.   For all intents and purposes, yes.
7      Q.   And now the column on the far right
8  has 108-some-odd million dollars. That's the
9  first entry. Do you see that?
10     A.   Yes.
11     Q.   And what is that?
12     A.   That is the cash ticket that I booked.
13     Q.   So that's to reflect an actual receipt
14  of cash?
15     A.   Yes.
16     Q.   So --
17     A.   So the same 42,2 was broken down into
18  the column -- all the way over to the right, those
19  are the individual specific trades that I booked.
20  So there is one, two, three, four, five, six,
21  seven, eight, nine, ten trades that I booked cash
22  value-wise that totaled the forty-four two.
23     Q.   So you ultimately did book into
24  Lehman's system 44.2 billion dollars?
25     A.   Yes.

Page 39

DENIG - CONFIDENTIAL

1
2      Q.   And that's the cash that Lehman
3  received from Barclays on the 18th?
4      A.   The cash was 45 million (sic)
5  eventually, but --
6      Q.   Well --
7      A.   This was the original, this was the
8  original pass that we got. When it was determined
9  that it was going to be 45 billion, those numbers
10  did get changed, so this is not the final
11  document.
12     Q.   OK. This is sometime --
13     A.   This was about 1 o'clock on Thursday
14  afternoon that this was put together.
15     Q.   On Thursday afternoon?
16     A.   Right, for September 18th.
17     Q.   Then ultimately 45 billion was
18  transferred to Lehman?
19     A.   Yes.
20     Q.   From Barclays?
21     A.   Yes.
22     Q.   Why the difference?
23     A.   No idea.
24     Q.   No idea, OK. So did you -- so this
25  is -- is this one of several spreadsheets you

Page 40

DENIG - CONFIDENTIAL

1
2  prepared during the day to reflect all this?
3      A.   Yes.
4      Q.   So is there -- there probably exists
5  somewhere another spreadsheet that totals to
6  45 billion?
7      A.   Yes.
8      Q.   OK. Did the valuations in the
9  left-hand column change at all during the day, the
10  ones that total to 47.5 billion?
11     A.   I do not believe it did.
12     Q.   OK. I apologize but some of today is
13  going to be walking through spreadsheets that we
14  are just trying to understand. So I want to show
15  you another document, which is marked as
16  Exhibit 60B, which was previously marked as
17  Exhibit 60B, which appears to me, as the
18  uninitiated, a similar type of spreadsheet, so I
19  wanted to see if you could explain to me the
20  difference between the two.
21         First of all, take a minute to look at
22  Exhibit 60B. Have you had a chance to look at
23  that?
24     A.   Yes, I have.
25     Q.   Can you tell me what this -- again, I

Page 41

DENIG - CONFIDENTIAL

1
2  am not so much concerned about the covering e-mail
3  but the chart that consists of page 2 of this
4  document, could you tell me what this is?
5      A.   This is the actual trades that Chase
6  had on its books and records of the program
7  facilities that we had out to the Fed the end of
8  day 17th, September 17th. So Wednesday, end of
9  day Wednesday, this is what they had in the
10  program.
11     Q.   So this is a chart prepared by Chase?
12     A.   Yes.
13     Q.   As your -- as the custodian for the
14  Fed programs?
15     A.   Yes.
16     Q.   And now could we just walk through the
17  columns here.
18         Par amount is just a par value that
19  Chase ascribes to all the securities posted to
20  those programs?
21     A.   Yes.
22     Q.   Current market value is the -- the
23  column that's marked "current market," what is
24  that?
25     A.   That would be the market value that it

Page 42

DENIG - CONFIDENTIAL

1    DENIG - CONFIDENTIAL
2    assigned to those securities.
3    Q.    "It" being Chase?
4    A.    Yes.
5    Q.    And now pay-down amount, what is that?
6    A.    I'm not sure. But the anticipated
7    prefunded dollar amount, that was what technically
8    they were saying that the -- to be conservative,
9    that's what Barclays was going to pay us for those
10    assets.
11    Q.    OK. And do you have any idea why that
12    number is different than the pay-down amount?
13    A.    No.
14    Q.    Could pay-down amount be the amount
15    that the Fed was expecting to get paid back when
16    it released the securities?
17    MR. SHAW: Objection, foundation.
18    A.    I'm not sure.
19    Q.    OK. Do you know if the haircut for
20    the Barclays -- for the September 18 repo was any
21    different than that haircut used in the Fed
22    programs?
23    A.    No.
24    Q.    No, you don't know, or no, it was not
25    different?

Page 43

1    DENIG - CONFIDENTIAL
2    A.    No, it was not different.
3    Q.    It was not different?
4    A.    No.
5    Q.    So my -- so to your understanding, the
6    same haircut was applied -- let's step back.
7    I thought you said there were
8    different haircuts applied to different types of
9    securities in the Fed program, correct?
10    A.    Yes.
11    Q.    Were the same haircuts applied to the
12    same types of securities for the September 18
13    repo?
14    MR. SHAW: Objection, foundation.
15    A.    Yes, yes.
16    Q.    Yes, to your knowledge?
17    A.    To my knowledge.
18    Q.    Do you have any -- were you involved
19    in any negotiations and discussions about the
20    amounts of haircuts?
21    A.    I'm sure there was e-mails, but no, I
22    wasn't the one determining any -- if anything, I
23    was cc'd on mails to the traders.
24    Q.    OK.
25    (Exhibit 232, document Bates stamped

Page 44

1    DENIG - CONFIDENTIAL
2    10303555, two pages, marked for
3    identification, as of this date.)
4    Q.    Ms. Denig, I am handing you a copy of
5    a document we have marked as Exhibit 232, which is
6    an e-mail stream dated Monday, September 15, in
7    which you are a recipient. If you could take a
8    moment to look at that.
9    A.    OK.
10    Q.    Do you recall receiving this e-mail at
11    all?
12    A.    Yes.
13    Q.    Can you just generally describe for me
14    what the debate was that's going on in connection
15    with this e-mail?
16    A.    I'm not sure it is a debate. I think
17    it is more informational purposes, just to tell
18    them relatively based on asset class what type of
19    haircuts are provided.
20    As I explained before, I said that
21    better collateral, like agencies and U.S.
22    Treasuries, mortgages, have a lower haircut.
23    Private labels, asset backs and equity corporates
24    have higher haircuts.
25    So he basically is explaining that in

Page 45

1    DENIG - CONFIDENTIAL
2    here. So it looks like haircuts 20 percent for
3    nongovernment agency, and equities and corporates
4    are 15 percent wider, which means that they are
5    going to be higher than general liquid assets.
6    And at the last one, where it says for
7    all AAA and AA, which is around corporates and
8    equities, 10 percent higher than this 20 percent,
9    and for all others flat to lower than 15 percent,
10    which means that for Treasuries and agencies you
11    are either going to have no haircut or up to 10
12    percent based on the type of collateral it is.
13    And basically everybody on here are
14    senior people that understand that that's the
15    nature of how the collateral works and haircuts
16    work.
17    Q.    At the bottom it says -- one e-mail
18    from Mr. Tonucci, it says, "Do you have haircuts
19    from Fed versus our normal haircuts?" Are the
20    haircuts you just described --
21    A.    Yes.
22    Q.    -- abnormal?
23    A.    No. The ones that I -- these
24    10 percent, 20 percent, no, they are very normal.
25    Q.    They are very normal?

Page 46

DENIG - CONFIDENTIAL

1
2    A.   Yes.
3    Q.   Did the -- do you have any notion of
4 the types of securities that were posted to the
5 Fed, were they predominantly the safer securities
6 that you have discussed or the ones with the lower
7 haircuts?
8    A.   I would say it was a 50/50 mix.
9 Actually maybe more, more liquid assets.
10    Q.   More liquid assets which would mean a
11 higher haircut?
12    A.   No, lower haircut. These would be
13 assets that are no problem being funded on the
14 street. Even based on this, you could see that.
15    Q.   Let me ask -- this is my outsider's
16 question so I apologize if this sounds naive, but
17 I understand to the Fed program, Lehman posted
18 about 50 billion dollars in collateral and
19 received 45 billion dollars in cash. Does that
20 sound about right to you?
21    A.   Yes.
22    Q.   Doesn't that 5 billion dollar haircut
23 reflect about a 10 percent haircut, 5 over 50?
24    A.   Yes.
25    Q.   So that seems lower than the numbers

Page 47

DENIG - CONFIDENTIAL

1
2 you're talking about in this e-mail chain?
3    A.   Well, if it was an average, then it
4 would make sense.
5    Q.   How is that?
6    A.   Because the higher -- the worse the
7 collateral is, like the corporate bonds that are,
8 you know, BBB rated and lower, equities and, you
9 know, some of the mortgage type of assets have a
10 much higher haircut than general collateral, which
11 would be liquid markets, U.S. Treasuries and
12 agencies, which would have 2 percent, versus the
13 equities and stuff would have, say, anywhere from
14 15 to 35 percent haircut.
15       So I guess as an average, that
16 20 percent would sort of make sense.
17    Q.   Well, it comes to 10 percent.
18    A.   I am sorry, 10 percent would make
19 sense.
20    Q.   The 10 percent suggests that the
21 majority of the collateral posted to the Fed was
22 the more -- the safer assets, right?
23       MR. SHAW: Objection to form.
24    A.   Um-hm, yes.
25    Q.   Was there any difference between the

Page 48

DENIG - CONFIDENTIAL

1
2 collateral that was posted to the Fed and
3 collateral that ultimately made it into the
4 September 18 repo?
5    A.   The individual CUSIPs? Yes.
6    Q.   What was -- can you describe for me
7 the difference?
8    A.   Well, for the Fed programs, they
9 basically take whatever is left in the box at the
10 custodian, at Chase. After all of the regular
11 delivery versus payment activity is finished for
12 the day, which is done at probably by 3:30 in the
13 middle of a regular business day, OK, from that
14 point going forward, we see what we have left and
15 they book trades to reflect the values of the
16 collateral that were going into the Fed.
17    Q.   OK, I think you're losing me here.
18    A.   OK. So say, for instance, you have
19 50 billion left in collateral. We would write
20 tickets that would go down to Chase, and Chase
21 would fill these -- they are called shells, with
22 certain types of assets based on the shell we
23 booked.
24       At the end of day, that's what we
25 would do. After everything was done, that is

Page 49

DENIG - CONFIDENTIAL

1
2 business as usual.
3    Q.   This gets done on Monday night,
4 Tuesday night and then Wednesday night?
5    A.   Yes.
6    Q.   All right. Finish your -- I didn't
7 mean to interrupt your story. Keep going.
8    A.   At the end of Wednesday we got a list
9 of collateral, individual pieces that went into
10 the Fed programs, that was what we thought was
11 going to be what we sent to Barclays on Thursday.
12    Q.   Right.
13    A.   On Thursday when we started booking to
14 transactions, it became clear very quickly that we
15 didn't have the assets on our books that we were
16 booking, and there is systems within the front-end
17 trader systems that would reflect where the
18 position sat. So as I booked them, their
19 positions get decremented or increased depending
20 on the direction.
21       Here I was booking repo transactions,
22 which was sells, and it was showing they are short
23 instead of flat.
24    Q.   You are talking about Thursday you are
25 doing this?

Page 50

DENIG - CONFIDENTIAL

1
2    A.   Yes, yup.
3    Q.   So you're -- just so I can understand
4    this, you're trying to book a transaction that
5    would post this collateral to the Bank of New York
6    account on behalf of Barclays, correct?
7    A.   Yes.
8    Q.   And you're finding out that some of
9    the collateral is not available for you to do
10   that, right?
11   A.   That's correct.
12   Q.   What types of collateral is not
13   available for you to do that?
14   A.   Fed deliverable collateral.
15   Q.   And what does that mean?
16   A.   Treasuries, agencies, mortgages.
17   Q.   So those were -- a group of those were
18   not available for you to post to Barclays, right?
19   A.   That's correct.
20   Q.   And how much were you unable to post
21   to Barclays?
22   A.   8 billion.
23   Q.   8 billion. OK. And so what did you
24   do instead?
25   A.   We reached out to the settlements

Page 51

DENIG - CONFIDENTIAL

1
2    group and we asked them what they had long in the
3    box, versus trade -- pending deliveries or actual
4    trades that were booked, and substituted the
5    collateral that we originally booked.
6    Q.   Now, you say the settlements group.
7    Is that at Chase?
8    A.   No. At Lehman.
9    Q.   Who was that?
10   A.   Lenny Legotte.
11   Q.   Who does he work for?
12   A.   He worked for Jack Fondacaro, who
13   ultimately worked for Neal Ullman.
14   Q.   Just trying to get people's positions.
15   A.   Sure.
16   Q.   What type of collateral was ultimately
17   substituted for this 8 billion that you were
18   unable to transfer?
19   A.   Same type, Treasuries, agencies.
20   Q.   Were there certain types of collateral
21   that Barclays would not accept into their
22   September 18 repo?
23   A.   Yes.
24   Q.   Like what?
25   A.   Lehman paper, real estate type of

Page 52

DENIG - CONFIDENTIAL

1
2    CUSIPs, certain equities, just more toxic, no
3    value, you know, not able to determine a market
4    value, they didn't want it.
5    Q.   So they excluded the more toxic
6    securities from their September 18 repo?
7    A.   Yes, yes, yes.
8    Q.   Were some of those assets previously
9    posted to the Fed for their financing?
10   A.   I wouldn't be able to tell that.
11   Q.   How do you know what Barclays
12   excluded?
13   A.   We received a list.
14   Q.   OK. From who?
15   A.   Jim Hraska.
16   Q.   This is not going in the order I
17   planned so I have to get a new exhibit.
18        So other than this 8 billion dollars
19   in securities, were you able to transfer all the
20   securities from the Fed financings to the Barclays
21   September 18 repo?
22   A.   No. Because there were other issues
23   throughout the day that were pending deliveries
24   of -- you know, there was a regular day of
25   transactions going on, and there were pending

Page 53

DENIG - CONFIDENTIAL

1
2    deliveries that were queued up at Chase. So when
3    this transaction started, or when they gave us the
4    first 5 billion, they were -- the cash came in,
5    Chase would release the securities to the free box
6    to start making the deliveries over to BoNY, but
7    because there were other pending deliveries out
8    there, some -- those securities were made on those
9    deliveries instead of to BoNY, again, creating the
10   same problem, that we needed to substitute the
11   collateral that was originally expected to go.
12   Q.   So am I correct, just so I can
13   understand this, the trading desk was in the
14   process of doing their normal trades, so they took
15   priority over some of the assets that were
16   released by Chase?
17   A.   I wouldn't think it was priority.
18   Q.   This is just a queue system?
19   A.   It's just a queued system.
20   Q.   What did you do to make up that
21   shortfall?
22   A.   Same type of scenario. Went to the
23   clearance folks, they went to the DTC terminals to
24   try to determine what collateral was available.
25   Q.   Were you able to make up the entire

Page 54

DENIG - CONFIDENTIAL

1 shortfall?
2     A.    We weren't.
3     Q.    And so what did you do then?
4     A.    Because we basically ran out of time,
5 the Fed and the DTC depositories ended up shutting
6 down at a particular time and we didn't get
7 everything that we wanted to over, because it
8 wasn't enough time to do all the research.
9     Q.    And you're talking about Thursday
10 evening?
11     A.    Thursday evening around 11 o'clock.
12     Q.    So what was the shortfall by the time
13 of -- by the time you ended on Thursday night?
14     A.    I am not 100 percent sure of what the
15 final figure was, but I want to say it was
16 42 billion is what they received.
17     Q.    OK. So 42 is not the shortfall, 42 is
18 what ultimately did make it?
19     A.    Yeah.
20     Q.    Was there a 7 or 8 billion dollar
21 shortfall, do you recall?
22     A.    Yes.
23     Q.    Is that the genesis of what I have
24 seen referred to as box loan?

Page 55

DENIG - CONFIDENTIAL

1     A.    Yes.
2     Q.    And can you tell me what that is?
3     A.    Well, because we didn't -- we couldn't
4 make the rest of the collateral, because of the
5 timing, they didn't receive the value of
6 7 million -- 7 billion worth of collateral. So
7 Chase lent Lehman 7 billion dollars to give back
8 to -- to give to Barclays to make up that.
9     Q.    Typically you wouldn't collateralize
10 cash with cash, but at that late hour, that was
11 really the only way to facilitate that so that
12 Barclays was made whole.
13     Q.    And what secured that loan?
14     A.    Chase. The assets that we still had
15 in the box, that Lehman still had in the box.
16     Q.    And the box meaning what?
17     A.    Our free collateral box, meaning any
18 assets that didn't get delivered over to BoNY and
19 was still in the possession of Lehman Brothers,
20 Inc.
21     Q.    And is that the 074 box?
22     A.    No, it was a Chase box.
23     Q.    OK. 074 box is separate?
24     A.    That's a DTC box.

Page 56

DENIG - CONFIDENTIAL

1     Q.    I understand. OK.
2         So now you have gotten us through
3 Thursday night. What did you do Friday morning or
4 Friday during the day?
5     A.    Well, we -- there was a lot of --
6     Q.    I just mean Friday, the 19th of
7 September.
8     A.    19th. So first thing in the morning,
9 what we thought was pulled, that they were short
10 collateral that we didn't finish, to try to get as
11 much collateral that we knew was available in the
12 DTC, because at this point the Fed collateral was
13 all exhausted. We didn't have Treasuries,
14 agencies. They went. They were delivered and
15 they were reconciled with Barclays, that they
16 received them.
17         The assets that we ran out of time to
18 send were the DTC, what you referenced as 074
19 collateral, 636 collateral, which are the two DTC
20 boxes that Lehman Brothers, Inc. owned.
21         The traders were basically using their
22 front-end capture system to determine what the
23 positions were that they had available and what
24 they knew as unencumbered, and they delivered

Page 57

DENIG - CONFIDENTIAL

1 those via pledge mechanism to DTC, a DTC box for
2 BoNY, which was owned technically by Barclays.
3     Q.    And how much collateral was
4 transferred to the BoNY box in connection with
5 that effort?
6     A.    A billion dollars, a billion and
7 change.
8     Q.    And now what was the purpose of
9 transferring that to that BoNY box?
10         MR. SHAW: Objection, foundation.
11     A.    We were under the impression we were
12 still short market value.
13     Q.    So that was short market value in
14 connection with the September 18 repo?
15     A.    Yes.
16     Q.    So was that billion and change to
17 substitute in for the cash that had been placed in
18 the repo through the box loan?
19         MR. SHAW: Objection, foundation.
20     A.    It wasn't my -- it wasn't my
21 understanding, no.
22     Q.    What did you understand it to be for?
23     A.    It was just that BoNY said that they
24 didn't have enough market value, you need to give

Page 58

DENIG - CONFIDENTIAL

1      DENIG - CONFIDENTIAL
2  us more collateral to make up for the 45 billion.
3      Q.   That's the 45 billion that we had
4  talked about previously on these charts?
5      A.   Yes.
6      Q.   So -- well, so is it your
7  understanding that the -- OK.  So that was your
8  work on Friday, to transfer a billion one into the
9  BoNY box in support of the September 18 repo?
10     A.   Yes.
11          MR. SHAW:  Objection to form.
12     Q.   And what ended up happening to the
13 September 18 repo?
14          MR. SHAW:  Objection.  Vague.
15     A.   Yeah, I -- what do you mean by that?
16     Q.   Well, was it terminated, defaulted, or
17 do you recall what ultimately happened to all the
18 collateral that was posted toward the September 18
19 repo?
20          MR. SHAW:  Objection, foundation.
21     A.   On the 19th, no.  But the 22nd, yes.
22     Q.   What happened on the 22nd?
23     A.   They said that the repo went into
24 default.
25     Q.   Who is "they"?

Page 59

1      DENIG - CONFIDENTIAL
2      A.   Barclays to my senior management to
3  me.
4      Q.   What did that mean as far as where the
5  collateral went?
6      A.   The collateral was there at Barclays
7  already.  We had trade bookings in Lehman Brothers
8  of a repo transaction that went from September 18
9  to September 25.  The fact that they deemed the
10 repo to be in default, we had to term the trade
11 earlier than -- and put an end date of
12 September 22 on it.
13     Q.   OK, I was -- I'm seeing -- we are
14 going to bring out a chart which I think is what
15 you're talking about.  Are you talking about on
16 the MTS system how you booked the trades?
17     A.   Yes, yes.
18     Q.   And so how -- the original, back to
19 Thursday, how is that booked?  What was the end
20 date for the repo on Thursday?
21     A.   September 25.
22     Q.   And then when did you change it to the
23 22nd?
24     A.   Monday.
25     Q.   On the 22nd itself?

Page 60

1      DENIG - CONFIDENTIAL
2      A.   Yes.
3      Q.   And were there any other changes made
4  to it?
5          MR. SHAW:  Objection, foundation.
6      A.   Yes, because the original value of the
7  cash was forty-four two.  We had to adjust it to
8  45 billion.
9      Q.   And why did -- where did that 45 come
10 from?
11     A.   That's what Barclays ended up
12 physically paying us for the assets.  Where that
13 figure came up with -- I was just told to change
14 the total cash values to be -- to equal 45 billion
15 instead of the forty-four two which was originally
16 given to me.
17     Q.   OK.  Forty-four two is the number we
18 talked about earlier?
19     A.   Yes.
20          MR. SHAW:  Whenever you reach a good
21 stopping point, we have been going about an
22 hour.
23          MR. HINE:  Sure, let's take a break.
24          (Recess)
25 BY MR. HINE:

Page 61

1      DENIG - CONFIDENTIAL
2      Q.   Ms. Denig, I just want to follow up on
3  a couple things we talked about.  I guess I am
4  trying to understand the 1 point -- one and change
5  billion dollars that you said was transferred on
6  Friday.  What was the total amount that was
7  supposed to have been transferred to the September
8  18 repo in terms of collateral?
9      A.   The 49 and change billion market
10 value.
11     Q.   And so how much did you transfer as of
12 Thursday night?
13     A.   I don't actually know the final
14 figure.  So basically it was communicated to me
15 Monday morning that we still needed -- there was a
16 shortfall and we needed to get more to them.
17     Q.   So you understood from that
18 communication that the amount that had been
19 transferred Thursday night plus the box loan was
20 not enough to cover what was supposed to have been
21 transferred to the repo?
22     A.   Yes.
23     Q.   And who determined that?
24     A.   I don't know who determined it.  I
25 just know I was told by my boss that we were

Page 62

DENIG - CONFIDENTIAL

1
2 short.
3    Q.    And who placed a value on these
4 securities?
5        MR. SHAW: Objection, foundation.
6    A.    I don't know.
7    Q.    Well, let's go back. The 42 and
8 change, whatever was transferred Thursday night,
9 is that figure Lehman's valuation of those -- of
10 that collateral?
11        MR. SHAW: Objection, foundation.
12    A.    I don't believe -- I don't believe so.
13    Q.    Whose do you think it was?
14    A.    I think it was between Chase and BoNY.
15    Q.    OK. Do you recall any differences
16 between the BoNY valuation -- I have seen e-mails
17 referencing the BoNY valuations or Bank of New
18 York valuations. Do you recall any differences --
19 differences between the Bank of New York
20 valuations and the Lehman, the values Lehman had
21 placed on these securities?
22    A.    I don't, I don't recall.
23    Q.    Do you recall any discussions or
24 documents suggesting that Bank of New York placed
25 a value of about 45 billion on securities that

Page 63

DENIG - CONFIDENTIAL

1
2 Lehman valued in the 42 billion dollar range?
3    A.    I don't recall, sorry.
4    Q.    Would you know why the two entities
5 would come up with different valuations?
6    A.    No.
7    Q.    Do you have a -- could you speculate?
8 What do you think?
9        MR. SHAW: Objection, calls for
10 speculation.
11        Don't speculate.
12    Q.    You can speculate.
13    A.    Yeah, I don't know. I don't know what
14 the models they use in each bank to come up, or
15 determine what their market values are.
16    Q.    You mentioned the 1 billion and change
17 that was transferred Friday.
18    A.    Um-hm. Yes.
19    Q.    I've seen references in some of the
20 e-mails to an effort to locate unencumbered assets
21 on -- starting I guess Friday into Saturday. Is
22 that -- were you involved in that at all?
23    A.    Yes, I was.
24    Q.    Is that -- I've seen e-mails
25 suggesting there was a goal of 1.9 billion dollars

Page 64

DENIG - CONFIDENTIAL

1
2 at some point. Do you recall that?
3    A.    Yes.
4    Q.    Is that different than the 1 billion
5 and change that you mentioned earlier?
6    A.    No.
7        MR. SHAW: Objection to form.
8    A.    No.
9    Q.    Let me rephrase here.
10        Were you ever told Friday through the
11 weekend, you were supposed to be looking for
12 unencumbered assets?
13    A.    Yes.
14    Q.    What did you understand that to be
15 for?
16    A.    A shortfall from the repo transaction.
17    Q.    OK. And so what did you do in
18 connection with searching for unencumbered assets?
19    A.    We received files from our GFS
20 technology, which is a system that did an
21 aggregation of all the collateral we had broken
22 down to individual trading accounts, and the
23 definitions of those trading accounts were to --
24 able to let us determine whether or not it was
25 firm inventory or customer inventory.

Page 65

DENIG - CONFIDENTIAL

1
2        So based on the information that we
3 received from our -- the books and records that
4 Lehman had at the time, we were potentially able
5 to determine what was not customer collateral and
6 that would be free and clear to deliver to
7 Barclays.
8    Q.    Free and clear is unencumbered?
9    A.    Yes.
10    Q.    Is that what I see referred to as the
11 O74 and the 636 boxes?
12    A.    Yes.
13    Q.    So were you ever told at any point
14 that there was a goal of getting 1.9 billion in
15 unencumbered collateral?
16    A.    Yes.
17    Q.    Who told you that?
18    A.    Jim.
19    Q.    Did that goal change over time?
20        MR. SHAW: Objection, foundation.
21    Q.    Over the weekend?
22    A.    Not over that weekend, no.
23    Q.    So once you -- what did you understand
24 the 1.9 billion goal came from? Or where the
25 1.9 billion dollar goal came from?

Page 66

DENIG - CONFIDENTIAL

1
2    A.    We were under the impression it was a
3    shortfall of the market value of the repo.
4    Q.    So that -- so the September 18 repo?
5    A.    Yes.
6    Q.    And did you, you folks in fact find
7    1.9 billion dollars in unencumbered assets?
8    A.    We did.
9    Q.    And what happened with those assets?
10        MR. SHAW:  Objection, foundation.
11   A.    They were to be delivered to Barclays
12   after we determined whether or not they really
13   were unencumbered.
14   Q.    And were they delivered to Barclays?
15        MR. SHAW:  Objection, foundation.
16   A.    I believe they were.
17   Q.    And how much of those unencumbered --
18   what was the value of the unencumbered assets that
19   were delivered to Barclays?
20   A.    That I do not know.
21   Q.    Do you think that's different than the
22   one billion and change you mentioned earlier that
23   was transferred Friday?
24        MR. SHAW:  Objection, form.
25   A.    I wouldn't know that.

Page 67

DENIG - CONFIDENTIAL

1
2    Q.    You wouldn't know that?
3    A.    No.
4    Q.    Were these unencumbered assets that we
5    just talked about transferred to Barclays over the
6    weekend?
7    A.    No.
8    Q.    When were they transferred?
9    A.    There were some that were transferred
10   on the 29th of September.  There were some that
11   were transferred on the 30th of September.  And
12   then sometime in December, there was more assets.
13   But literally my role ended after probably the
14   next -- after the end of the next week, I wasn't
15   involved anymore.
16   Q.    Let me get some dates here.  So the
17   closing is on Monday, the 22nd?
18   A.    Um-hm.
19   Q.    So there is an effort even after the
20   closing to find unencumbered assets?
21   A.    Yes, yes.
22   Q.    And those assets were transferred on
23   the 29th and 30th of September to Barclays?
24   A.    Yes, they were.
25   Q.    And do you recall the amount of those

Page 68

DENIG - CONFIDENTIAL

1
2    assets that were transferred on the 29th and 30th?
3    A.    I remember one box was 235 millionish,
4    the other box wasn't as much, just under 200.
5    Q.    And those boxes you are talking about
6    are 074 box and 636 box?
7    A.    Yes.
8    Q.    You say there were further securities
9    transferred in December?
10   A.    I heard that.  So I wasn't involved at
11   all in that determination, but I knew that there
12   was another delivery at some point.
13   Q.    Am I correct to say your involvement
14   in that search for unencumbered assets ended at or
15   around the 29th and 30th of September?
16   A.    I would say yes.
17   Q.    And then someone else did it
18   thereafter?
19   A.    Yes.
20   Q.    Did you ever hear of anything called
21   Schedule B?
22   A.    Yes.
23   Q.    What is it?
24   A.    I don't know actually.  I knew there
25   was another schedule.  I know that Jim had

Page 69

DENIG - CONFIDENTIAL

1
2    forwarded me the schedule a few times or list of
3    assets to cut up in different ways so that he
4    could determine things, but as far as determining
5    anything, it was just me playing around with the
6    spreadsheet and sending it back to him.
7    Q.    Let me ask you this.  Did you ever see
8    the asset purchase agreement that -- relating to
9    the transaction between Lehman and Barclays?
10   A.    The physical agreement?
11   Q.    Yeah.
12   A.    No.
13   Q.    Did you have any understanding during
14   the week of September 15 what its terms were?
15   A.    No.
16   Q.    Did you have any understanding during
17   the week of September 15 what the deal was in
18   general between Barclays and Lehman?
19   A.    No.
20   Q.    What did you think was going on with
21   all this activity between Barclays and Lehman
22   during that week?
23   A.    That we were to -- that they were
24   purchasing our assets.
25   Q.    But you weren't -- you had no

Page 70

DENIG - CONFIDENTIAL

1 understanding of what assets; is that right?
2     A.   Just the list that -- the
3 understanding that we had was the Fed was stepping
4 out of the transaction, Barclays was going to take
5 it in.  The fact that we had no other liquidity
6 providers besides the Fed at that particular time
7 and Barclays, that was all -- basically once we
8 transferred the assets, we would have nothing left
9 of the company.
10     Q.   So you understood the September 18
11 repo was -- part of the reason you had entered
12 into that would be to transfer assets to Barclays?
13     MR. SHAW:  Objection to form.
14     A.   Yes.
15     Q.   And did you ever hear any discussions
16 about defaulting on the repo, on that repo?
17     A.   Not that week.
18     Q.   What did you hear the following week?
19     A.   That we went bankrupt, they filed for
20 bankruptcy at -- on Friday at 4 o'clock and that
21 the repo was now in default.
22     Q.   Did you ever hear any discussions or
23 mention of a possibility of terminating the repo
24 on, say, Friday the 19th?

Page 71

DENIG - CONFIDENTIAL

1     A.   No.
2     Q.   Did you ever see a notice of
3 termination issued for that repo?
4     A.   No.
5     Q.   Did you ever hear anything about a
6 notice of termination being issued for that repo?
7     A.   No.
8     Q.   Did you ever hear any discussions
9 about changing the September 18 repo into a sale
10 of assets?
11     A.   It wouldn't be a sale.  We did reflect
12 in Lehman's books the fact that they are no longer
13 on our books because the trade became a default,
14 like they kept the assets at that particular time,
15 and that's by nature how a default is transacted.
16     Q.   What do you mean?
17     A.   Because we delivered securities to
18 them, they delivered us cash, they now have the
19 assets.  When the company goes bankrupt, they
20 can't return the assets because we are no longer a
21 company.
22          So they go out to the open market to
23 raise the cash that they lost or what they paid
24 for the assets.

Page 72

DENIG - CONFIDENTIAL

1     Q.   Do they get to keep all the assets or
2 do they have to return the haircut?
3     A.   No.  They get to keep all the assets.
4     Q.   Did you ever hear any discussion
5 during the week of September 15 about a discount
6 being granted to Barclays as to the assets they
7 were going to buy?
8     A.   No.
9     Q.   Did you ever hear any discussion or
10 mention of the notion of using the repo as a means
11 of giving Barclays a discount on those assets?
12     A.   No.
13     Q.   Did you ever hear any discussions or
14 mention of the notion of Barclays keeping the
15 haircut portion of the September 18 repo?
16     A.   No.
17     Q.   How about since you have been at
18 Barclays, have you ever heard any discussions
19 about any of those things?
20     A.   No.
21     Q.   Since you have been at Barclays,
22 anyone mention the notion of a discount associated
23 with the Lehman/Barclays transaction?
24     A.   No.

Page 73

DENIG - CONFIDENTIAL

1     Q.   Since you have been at Barclays, has
2 anyone said, hey, we got a good deal on those
3 assets, we got them at a discount?
4     A.   No.
5     Q.   Or words to that effect?
6     A.   No.
7     Q.   Can I just ask you a question about
8 the M -- I think it's called MTS system.  Can you
9 tell me what that is generally?
10     A.   It is our official books and records.
11 It's our settlement system.  It is how we had
12 connectivity to all our custodians and -- what are
13 they called -- depositories.
14     Q.   So you use this system all the time?
15     A.   Yes.
16     MR. SHAW:  Can we clarify the
17 difference between use at Lehman, use at
18 Barclays.
19     Q.   Yeah, let's do that.  When you were
20 working for Lehman, you regularly used this MTS
21 system?
22     A.   Yes.
23     Q.   How is that different from GFS?
24     A.   GFS was an aggregator of information.

Page 74

DENIG - CONFIDENTIAL
1    DENIG - CONFIDENTIAL
2    MTS was how deliveries were physically transmitted
3    to our custodians.
4        Q.   Did you have any role in valuing
5    securities in your position?
6        A.   No.
7        Q.   Again I am talking about in your days
8    at Lehman.
9        A.   Yes.
10       Q.   Who placed the values on these, all
11   the securities we have been talking about that
12   were used to post as collateral?
13       A.   I have no idea.  I am assuming very
14   higher-up people.  The fact that we -- we booked
15   the trades at no value and we received in cash, as
16   a bifurcated transaction.
17       Q.   Ms. Denig, I am going to show you a
18   document which I think relates to what you just
19   told me, but I'm not sure.  It has been previously
20   marked as Exhibit 134.
21       And I'm not sure you have seen it in
22   this form, in written form, but I believe this is
23   a printout from this MTS system we are talking
24   about, and so my first question is, does this look
25   like what I just -- does this look like the

Page 75

DENIG - CONFIDENTIAL
1    DENIG - CONFIDENTIAL
2    information contained on the MTS system?
3        MR. SHAW:  Take whatever time you need
4    to make sure that you are comfortable
5    answering the question on the basis of that.
6        A.   I'm not going to ask you -- you can
7    review the document as much as you want.  I am not
8    going to ask you detailed information about all
9    the entries other than probably the first page.  I
10   just want to get an understanding of what this is.
11       A.   Can you repeat your question.
12       Q.   Is this the type of information that's
13   contained in the MTS system?
14       A.   Yes, it is.
15       Q.   Does this look like a printout of the
16   MTS system that you would use in your position at
17   Lehman?
18       A.   Our historical database, yes.
19       Q.   That's a portion of the MTS system?
20       A.   Yes.
21       Q.   If you look on the first page, you
22   will see a series of entries that -- I am looking
23   under the net amount column.  You will see a
24   series of entries that total down to approximately
25   44.99 billion dollars.  Do you see that?

Page 76

DENIG - CONFIDENTIAL
1    DENIG - CONFIDENTIAL
2        A.   Yes.
3        Q.   Below that is a series of entries with
4    zero in that column.  Do you see that?
5        A.   Yes.
6        Q.   Is that the booking of that zero cost
7    you were talking about?
8        A.   Yes.
9        Q.   Can you tell me again why you do it
10   this way?
11       A.   We don't typically do it this way.
12   Because they were the specific assets that went to
13   the Fed program, and that's basically what we were
14   to transfer to Barclays as part of this repo, to
15   ensure that's the assets we were sending, we did
16   them as a one-for-one security delivery instead of
17   letting Chase's triparty allocation system do it
18   for us.
19       Q.   Is that what they call free repos?
20       A.   These are booked as free repos, but
21   the transaction was traditionally papered as a
22   triparty transaction.
23       Q.   So am I correct to understand what you
24   just said, rather than having Chase allocate the
25   approximately 45 billion dollars to individual

Page 77

DENIG - CONFIDENTIAL
1    DENIG - CONFIDENTIAL
2    repos which amounted to -- or individual
3    securities which amounted in the thousands, I
4    imagine, you just booked it this way for
5    simplicity purposes?
6        A.   No.  As a matter of fact, it was a lot
7    more arduous booking it this way.  We booked
8    individual trades, where typically you just book a
9    shell and Chase's allocation system fills the
10   shell.
11       Q.   So why did you want to do it this way
12   then?
13       A.   We needed specific assets to go.  We
14   didn't want a random mix.  We wanted -- these are
15   the -- this is the securities that were supposed
16   to go.  This is what we needed to book.
17       Q.   OK.  So in other words, the excluded
18   securities you didn't want included in here, so
19   you had to go CUSIP by CUSIP?
20       A.   Yes.
21       Q.   OK.  When you see towards the
22   right-hand column of this, when you see something
23   called product subtype -- do you see that?
24       A.   Yes.
25       Q.   Third-to-last column, and then it

Page 78

DENIG - CONFIDENTIAL

1 refers to -- some of the entries say HIC and
2 others say receipts.
3    A.    Yes.
4    Q.    Do you know what that means, those two
5 entries?
6    A.    No.
7    Q.    Do you ever --
8    A.    I know what a HIC is, a HIC
9 transaction, but why they are classified as such,
10 I don't know.
11    Q.    See where it says -- toward the
12 right-hand side of the column is a column entitled
13 "Fin Rate." Finance rate, I assume?
14    A.    Yes.
15    Q.    And it has "4" under it for a lot of
16 the entries. Do you see that?
17    A.    Yes.
18    Q.    Is that the repo rate?
19    A.    Yes.
20    Q.    So that's the repo rate for the
21 September 18 repo?
22    A.    Yes.
23    Q.    And then further to the right you see
24 something called clear date?

Page 79

DENIG - CONFIDENTIAL

1    A.    Yes.
2    Q.    What is that?
3    A.    That's the date that the settlement
4 took place.
5    Q.    So this is booked on the 18th. It
6 says the 18th there?
7    A.    Well, it is booked on the 18th to
8 settle on the 18th -- and it was settled on the
9 18th.
10    Q.    Why is the first one booked on the
11 23rd then?
12    A.    It could have been modified.
13 Remember, I had to modify the amounts from
14 forty-four two to 45 billion. That might have
15 been the day that I did that transaction. It
16 is -- because if you look in entry date, which is
17 E/D --
18    Q.    E/D.
19    A.    -- that trade was entered -- trade
20 date the 18th to settle on the 18th, but it was
21 entered on the 23rd, so that had to be cleared on
22 the 23rd.
23    Q.    And that's 8.7 billion dollars?
24    A.    Yes.

Page 80

DENIG - CONFIDENTIAL

1    Q.    And tell me again why you were doing
2 that on that date?
3    A.    Because we originally booked the trade
4 cash value to total forty-four billion two. I was
5 told to modify it to 45 billion.
6    Q.    And this was on the 23rd after the
7 closing?
8    A.    Yes.
9    Q.    You don't know why you were told to
10 modify it like that?
11    A.    Barclays physically paid us
12 45 billion. That was why.
13    Q.    That's the distinction between the
14 45 billion and forty-four two we talked about
15 earlier?
16    A.    Yes.
17    Q.    If you turn to the second blue sheet,
18 in the first -- the page right behind the first
19 blue sheet in this document.
20    A.    Blue sheet.
21    Q.    It is about a third of the way down
22 the document. Do you see -- I don't have a Bates
23 number on this page, but it is a similar type of
24 spreadsheet, and you will see, if you look at the

Page 81

DENIG - CONFIDENTIAL

1 net amount column, it adds down to 44.9 billion
2 midway through it, and further down it adds to
3 45 billion. Do you see that?
4    A.    I do.
5    Q.    Can you tell me why that's the case?
6    A.    I don't know.
7    Q.    If you look in the E/D column, now you
8 see a lot of entries saying September 30, 2008.
9 Do you see that?
10    A.    Um-hm.
11    Q.    Were you entering new data on
12 September 30?
13    A.    No. We changed the end dates.
14    Q.    So E/D is end date?
15    A.    E/D is entry date. But the
16 modifications were -- we needed to term the trade
17 early, so they had to modify the original trade
18 that we booked.
19    Q.    Why did you change the end date?
20    A.    Because it defaulted on the 22nd
21 instead of the 25th, so we had to change the end
22 date from the original repo date from the 25th to
23 the 22nd.
24    Q.    Just so I understand, originally when

DENIG - CONFIDENTIAL

1  you booked it, it had an end date of the 25th?
2  A.  Yes.
3  Q.  And then on the 22nd, after you
4  learned it had defaulted on the 22nd, you changed
5  the end date to what?
6  A.  To the 22nd.
7  Q.  OK.  And why did you do that, just --
8  A.  Because that was the day that they
9  deemed the repo to be in default.
10  Q.  OK.  Now, the values on this, these
11  charts, where it says principal amount or even net
12  amount, where are those values taken from?
13  MR. SHAW:  Objection, foundation.
14  A.  MTS.
15  Q.  So this is -- these are Lehman values?
16  A.  Oh, no, no.  I am sorry.  These are --
17  these are all the -- these are the cash values.  I
18  booked these trades.  I put the cash values on
19  these.
20  Q.  When you say "these," are you talking
21  about the --
22  A.  These groupings of trades that you are
23  talking about --
24  Q.  Right.

DENIG - CONFIDENTIAL

1  A.  -- were all in relation to the repo
2  transaction from the 18th.
3  Q.  OK.  So the 44.9 billion dollars that
4  you will see a net amount, it totals to 44.9 in
5  the upper half of the chart.
6  A.  Yup.
7  Q.  What is that?
8  A.  That was the cash value of the
9  collateral that we were to have given Barclays in
10  this transaction, and that was the cash that they
11  paid us.
12  Q.  And why does -- why is it in a
13  separate series of entries that total the 45.004
14  billion?
15  A.  I don't recall, to be honest with you.
16  As far as my understanding, it was still supposed
17  to be 45.
18  Q.  OK.  Ms. Denig, I am going to show you
19  two or three exhibits that have been previously
20  marked.  The first one I am going to give you is
21  Exhibit 135.  And then I am going to mark as a new
22  exhibit a separate document, which we will mark as
23  Exhibit 233.
24  (Exhibit 233, screen shot marked for

DENIG - CONFIDENTIAL

1  identification, as of this date.)
2  Q.  The two exhibits, 135 and 233, appears
3  to be screen shots from what I believe to be your
4  MTS system or Lehman's MTS system, and I just have
5  a few questions about it after you have had a
6  chance to take a look at it.
7  A.  OK.
8  Q.  I think this has to do with what we
9  just talked about.  If you look on Exhibit 135, it
10  says end date, 9/25/08.  Do you see that?
11  A.  Yes.
12  Q.  And I realize there's different
13  CUSIPs, but we just took shots of the ones we
14  could get a clear shot of.
15  When it says 9/25, that's how this was
16  originally booked as an end date of 9/25; is that
17  right?
18  A.  Yes.
19  Q.  If you look at Exhibit 233, it looks
20  like the end date was changed to 9/19.
21  MR. SHAW:  Objection, assumes facts
22  not in evidence.
23  Q.  Do you see the entry end date 9/19/08?
24  A.  Yes.

DENIG - CONFIDENTIAL

1  Q.  Was it changed to 9/19?  I thought you
2  previously said it was changed to 9/22?
3  A.  It was changed to 9/19 originally
4  because that was the date we thought it was going
5  to be, and then we found out Barclays defaulted it
6  on the 22nd, and we had to modify it again to the
7  22nd.
8  Q.  When was it changed to the 19th?
9  A.  I don't recall the exact date.
10  Q.  Could you tell from this chart, in the
11  upper right-hand column -- I'm sorry.
12  Is there any way to tell from this
13  chart when those entries were changed?
14  A.  From the chart, yes.  From here, no.
15  Q.  Can you tell me from the chart when
16  the dates were changed to the 19th?
17  A.  23rd.
18  Q.  So just so I understand it, originally
19  the end dates were the 25th?
20  A.  Yes.
21  Q.  On the 23rd, you originally changed
22  the end dates to the 19th because you thought that
23  was the date it defaulted?
24  A.  Yup.  Yes.

Page 86

DENIG - CONFIDENTIAL

1  DENIG - CONFIDENTIAL
2  Q.  And eventually you were told to change
3  them to the 22nd as the default date?
4  A.  Yes.
5  Q.  Why all these changes?
6  A.  Because the management told us to do
7  it. That Barclays defaulted the repo on the 22nd,
8  not the 19th. We originally thought the default
9  was on the 19th, so that's why we transacted it
10  that way.
11  Q.  Who from Barclays management told you
12  this?
13  A.  Not me personally, so I can't -- my
14  orders came from Jim.
15  Q.  Do you know -- do you have any
16  understanding why all these changes?
17  A.  Nope.
18  Q.  Were you involved in any way in
19  assisting Barclays in preparing its opening
20  balance sheets after the closing of the
21  transaction?
22  A.  No.
23  Q.  Were you involved in any way in
24  assisting Barclays in preparing its financial
25  statements that reflect the Lehman/Barclays

Page 87

1  DENIG - CONFIDENTIAL
2  transaction?
3  A.  No.
4  Q.  Do you have any role now or during the
5  week of the 22nd in providing financial or --
6  information at all to the folks at Barclays who
7  prepare their financial statements?
8  A.  No.
9  MR. SHAW:  You need to speak up a
10  little bit.
11  A.  No.
12  Q.  So this change was just as a result
13  of -- changes of the end dates were as a result of
14  you being told by Jim Hraska that they wanted it
15  done?
16  A.  Yes.
17  Q.  Did you make any other changes to
18  the -- to this Exhibit 1 -- entries in Exhibit 134
19  after the closing?
20  A.  This shows a history of all the
21  changes that were made along the way.
22  Q.  So is this a chronological history?
23  In other words, if I read from the top to the
24  bottom, I am going in time?
25  A.  I can't tell based on this. I have to

Page 88

1  DENIG - CONFIDENTIAL
2  flip through it to see.
3  Q.  Could you see whether you can
4  ascertain that.
5  A.  Sure.
6  Q.  Just to clarify the question maybe, we
7  put in blue sheets halfway through, and I'm not
8  sure they are entries on different dates or if you
9  can just tell me.
10  MR. SHAW:  Do you know if this is a
11  complete --
12  MR. HINE:  No, I don't. No, I don't.
13  I am just trying to get a sense of how the
14  system works.
15  A.  As I see it, this is in chronological
16  order, but you definitely don't have a completed
17  list here. And the reason I could tell that is
18  from the entry dates, because there were multiple
19  changes to the original trade booking.
20  Q.  OK. That's what you previously
21  described from originally the 18th and then to the
22  19th and then to the 22nd.
23  A.  And then to change the money on the
24  trades from 44 to 45 million, so there was
25  multiple modifications to the original trade

Page 89

1  DENIG - CONFIDENTIAL
2  booking.
3  Q.  This is after the closing?
4  A.  Yes.
5  Q.  And other than the changing the
6  forty-four two to 45 billion, were there any other
7  changes made to the valuations of the securities
8  that were transferred to Barclays?
9  MR. SHAW:  Objection.
10  A.  No.
11  Q.  While I am trying to find a couple of
12  exhibits, Ms. Denig, were you involved in any way
13  in the calculation of the 15c3 calculation as it
14  relates to collateral that was being transferred
15  to Barclays?
16  A.  I was not.
17  Q.  Do you have any understanding of how
18  that calculation was changed or modified during
19  the course of the week of the 15th?
20  A.  No.
21  Q.  I see you copied on an e-mail or two
22  involving the 15c3 calculation. Why would you be
23  copied on that?
24  MR. SHAW:  Objection to form.
25  A.  Regularly business as usual, I would

Page 90

DENIG - CONFIDENTIAL

1   be cc'd on what the 15c3 lock-up was going to be
2   so we would know how much Ginnie Mae collateral we
3   would have to lock up. That was an acceptable
4   form of payment or lock-up amount.
5       Q.   Lock up meaning you couldn't use it
6   for any other purposes?
7       A.   That's correct.
8       Q.   Is it correct to say you would receive
9   periodic reports on what that amount was?
10      A.   Weekly.
11      Q.   And during the week of the 15th on
12  into the following week, do you recall any
13  discussions about redoing that calculation to see
14  if we can find any more assets to transfer to
15  Barclays?
16      A.   No.
17      Q.   Do you recall any efforts at all to
18  recalculate the 15c3 amount?
19      A.   For what time period?
20      Q.   During those two weeks.
21      A.   I think they were doing it every day
22  at that point.
23      Q.   Why?
24      A.   Because of the nature of the issue

Page 91

DENIG - CONFIDENTIAL

1   going on.
2       Q.   So would you be receiving reports
3   every day during that period?
4       A.   Yes.
5       Q.   Do you have any understanding of why
6   they were doing it every day?
7       A.   No. No one told me.
8       Q.   Did you have an understanding of
9   whether any assets were ultimately transferred to
10  Barclays as a result of changes in the 15c3
11  calculation?
12      A.   I was not aware.
13      Q.   OK. I want to show you a, several
14  spreadsheets, just because I want to understand
15  the genesis of what you were doing in the
16  different spreadsheets, because we have seen
17  dozens of them. I just want to try to get a sense
18  of that.
19      A.   This exhibit, by the way, is a data
20  dump into a report writer. So it is -- this is
21  the transaction that was booked, this is just a
22  reflection of what it looked like in individual
23  columns.
24      Q.   When you're -- we have to make the

Page 92

DENIG - CONFIDENTIAL

1   record clear, you are pointing to Exhibit 233?
2       A.   233.
3       Q.   That's the transaction that was
4   actually booked?
5       A.   Yes.
6       Q.   That's the screen shot?
7       A.   Yes.
8       Q.   And the other exhibit you pointed to
9   is 134, and that's what?
10      A.   That's just the database that housed
11  this information, and it was spit out to you in a
12  report form.
13      Q.   So the person entering the transaction
14  enters it on the screen similar to those in
15  Exhibit 233, right?
16      A.   No. It goes from a trader input
17  screen, this -- and it has throughput to our
18  settlement system, which is this.
19      Q.   So Exhibit 233 is your settlement
20  system?
21      A.   Yes.
22      Q.   And Exhibit 134 is just a large
23  database containing every entry?
24      A.   Yes.

Page 93

DENIG - CONFIDENTIAL

1       Q.   OK. Let's mark this.
2           (Exhibit 234, document Bates stamped
3   10031692 with attachment marked for
4   identification, as of this date.)
5       Q.   Ms. Denig, I am handing you a copy of
6   an exhibit marked 234, which is an e-mail stream
7   on Friday, the 19th, with an attached spreadsheet.
8           My question to you is, do you recall
9   this e-mail?
10      A.   Yes.
11      Q.   What do you recall about what's going
12  on at this time in connection with this e-mail?
13      A.   They were trying to figure out what
14  prices that Lehman had at the time.
15      Q.   Prices of what?
16      A.   The market value of the individual
17  CUSIPs that were sent to Barclays.
18      Q.   In connection with the September 18
19  repo?
20      A.   Yes.
21      Q.   So if you turn to the attachment,
22  which is a spreadsheet, were you involved in
23  preparing that spreadsheet?
24      A.   No, I was not.

Page 94

DENIG - CONFIDENTIAL

1
2    Q.    Who prepared this?
3    A.    The technology guy from GFS.
4    Q.    And do you know what this spreadsheet
5    is meant to reflect?
6    A.    Details of the individual positional
7    data, with quantities and prices and the pricing
8    sources and what the total market values were.
9    Q.    Of what pool of securities?
10   A.    The securities that were sent to
11   Barclays.
12   Q.    So we have talked about a lot of
13   different securities. Is this the securities --
14   A.    That were physically sent to Barclays.
15   Q.    On the --
16   A.    18th.
17   Q.    When you say sent to Barclays, you
18   mean posted into the BoNY account on behalf of
19   Barclays in connection with the September 18 repo?
20   A.    Yes.
21   Q.    Where does this pricing data come
22   from? You will see to the left --
23   A.    For this, it is GFS. But where GFS
24   gets its pricing from, it is multiple sources, and
25   that's defined here in the price source column,

Page 95

DENIG - CONFIDENTIAL

1
2    and then each system, TMS has a pricing hierarchy,
3    MTS has a pricing hierarchy.
4    Sometimes you see Chase is one of the
5    things. That's when there is no price in MTS or
6    TMS.
7    Q.    So most of these prices are coming
8    from MTS, correct?
9    A.    Yes.
10   Q.    Do you know what use, to what use this
11   spreadsheet was put?
12   A.    No.
13   Q.    Do you recall discussions with
14   Mr. Forrest on Friday about the spreadsheet?
15   A.    No.
16   Q.    Why is he copying you? Why is he
17   sending the copy to you?
18        MR. SHAW:  Objection, foundation.
19   A.    I had the relationship with the
20   technology folks from GFS.
21   Q.    So is he asking you to make sure they
22   got it right or is he --
23   A.    He is making sure that they got it not
24   particularly right, but that they were able --
25   that Bill was able to provide the values.

Page 96

DENIG - CONFIDENTIAL

1
2    Q.    Let's mark this.
3        (Exhibit 235, document Bates stamped
4    10253250 with attachment marked for
5    identification, as of this date.)
6    Q.    Ms. Denig, I am handing you a copy of
7    a document marked Exhibit 235, which is an e-mail
8    stream from Friday, September 19, also with an
9    attachment.
10       My -- so my question to you is, have
11   you ever seen this e-mail?
12   A.    I do.
13   Q.    And what is this?
14   A.    It was a download from GFS of all the
15   individual securities that we physically sent to
16   Barclays with what GFS determined is the market
17   value.
18   Q.    So the market value prices on these
19   securities were determined by GFS?
20   A.    Yes.
21   Q.    And if we look on the first page of
22   this, of the attachment, do you see the little
23   chart of collateral, market value? Do you see
24   that?
25   A.    Um-hm, yes.

Page 97

DENIG - CONFIDENTIAL

1
2    Q.    And so is that -- what does that chart
3    reflect?
4    A.    The market value for the collateral
5    that was -- it was Fed deliverable securities like
6    U.S. Treasuries, agencies, was worth 28 billion
7    based on the information that GFS came up with.
8    The collateral that was sent from the DTC
9    location, 074, valued 10 million.
10       The DTC -- the value of the collateral
11   that was in DTC location 636 was worth the
12   4 billion, and the TP cash was the 7 billion in
13   cash.
14   Q.    So this totals to 49.9 billion. Is
15   that -- does that reflect all the collateral and
16   cash that was posted to the September 18 repo?
17   A.    Not based on Friday, no. This was
18   missing data.
19   Q.    What was it missing?
20   A.    The stuff we did Friday morning and
21   any subsequent data, any other subsequent
22   deliveries.
23   Q.    So as of Friday, this is the amount
24   that had been posted to the September 18 repo?
25   A.    Yup, yes.

Page 98

DENIG - CONFIDENTIAL

1
2    Q.    And when you see --
3    A.    That little summary was my summary
4    based on this information.
5    Q.    Well, here is my question. I am
6    trying to figure out what's the difference between
7    Exhibit 235 and Exhibit 234.
8    A.    What's 235? And 234?
9    Q.    234 is the one we previously looked
10    at.
11    A.    I don't think anything. I think it
12    was the same stuff. I think I took the same file
13    and just made it more in a way that people
14    understood what it was. Deleted some columns and
15    only included the things I needed.
16    Q.    Well, it is ten times as thick as
17    Exhibit 234. How could it be the same data?
18    A.    This is the whole file here?
19    Q.    That's what we received. I don't know
20    if it was --
21    A.    Oh, then this. This is definitely not
22    the whole file.
23    Q.    That was my question.
24    A.    Yeah.
25    Q.    So 234 is incomplete?

Page 99

DENIG - CONFIDENTIAL

1
2    A.    Yes.
3    Q.    235, Exhibit 235 is a complete file
4    reflecting the collateral that was posted to this
5    September 18 repo?
6    A.    It was a complete file based on the
7    stuff that actually physically got delivered, yes.
8    Q.    As of Thursday --
9    A.    As of Thursday evening.
10    Q.    And the 7 billion for TP cash is the
11    amount of the box loan that went to that repo?
12    A.    Yes, it was.
13    Q.    As to this set of collateral, and I'm
14    not talking about stuff that was transferred
15    later, as to this set of collateral, did the
16    valuation of any of it change over the weekend?
17    A.    I have no idea.
18    MR. SHAW: Objection to form.
19    A.    I have no idea.
20    Q.    Because I see --
21    A.    Just to clarify, like the market
22    values that are done here is just based on what we
23    are getting spitted out. It is not anything that
24    we are determining. It is not anything that
25    are manipulating. It was literally a data dump

Page 100

DENIG - CONFIDENTIAL

1
2    from our GFS system.
3    Q.    That's the GFS system that you guys
4    use in the regular course of business?
5    A.    It is.
6    But market values, market value is
7    only needed to determine exposure with clients,
8    not really any other value.
9    With repos, it is all about the cash
10    that gets actually transferred to and from. So we
11    always cared about the physical principal value of
12    what was transacted on the day that the trade
13    settled.
14    Q.    I'm not sure I understood that. You
15    mean the party receiving the collateral cares how
16    much it is worth, they have a haircut associated
17    with it?
18    A.    And they have like an everyday
19    exposure calculation that gets done, so that's the
20    only thing where market value comes into play.
21    Q.    Well, this is the market value that
22    your GPS system --
23    A.    GFS.
24    Q.    GFS system spit out when you asked for
25    a list of all the collateral that had been posted

Page 101

DENIG - CONFIDENTIAL

1
2    to the September 18 repo, correct?
3    A.    That's correct.
4    Q.    That's the market value that was
5    carried on your system in the normal course of
6    business?
7    A.    For that day, yes.
8    Q.    And so did you adjust it, did you
9    adjust the market value based on the amount of
10    cash that was paid for these securities?
11    A.    I did not touch the market value of
12    anything. This is literally a determined field
13    that was spit out to us. We didn't touch that.
14    Q.    I guess I am trying to understand your
15    explanation previously about all that matters is
16    the amount of cash.
17    A.    But the cash was booked as 45 billion.
18    We delivered everything with zero value. You know
19    that.
20    Q.    So you're saying when you posted the
21    transaction, you posted the actual amount of cash
22    and ascribed a zero value to the collateral?
23    A.    That's correct.
24    Q.    OK. So again just taking this list of
25    collateral that you assembled either Thursday

Page 102

DENIG - CONFIDENTIAL

1   DENIG - CONFIDENTIAL
2   night or Friday morning and not including the
3   things that were transferred later, right, but to
4   your knowledge, did this list of collateral change
5   at all over the weekend?
6        MR. SHAW:  Just so we are clear, you
7   are indicating Exhibit 235?
8        MR. HINE:  Yes.
9        MR. SHAW:  Objection to form.
10       A.   Why would it -- why and how could it
11  change?  This was physically delivered to the
12  client.
13       Q.   This list was physically delivered to
14  the client?
15       A.   Yeah.
16       Q.   By the client, you mean Barclays?
17       A.   Barclays.
18       Q.   Ms. Denig, I see you reference in some
19  e-mails to something called a depot analysis.
20  What is that?
21       A.   I don't know, I have to see it.
22       Q.   Do you have a recollection of the term
23  "TMS depot analysis"?
24       A.   Yes.
25       Q.   What do you recall?  While we are

Page 103

DENIG - CONFIDENTIAL

1   DENIG - CONFIDENTIAL
2   pulling out the chart.
3        A.   It was securities that we were to --
4   where we thought we were able to determine as
5   unencumbered, and then a -- give it to the
6   clearance folks to look into DTC terminals
7   directly to determine whether or not it was in
8   fact unencumbered.
9        Q.   So this is in connection with the
10  search for unencumbered assets that were
11  eventually going to be transferred to Barclays?
12       A.   Yes.
13       Q.   So just so --
14       A.   I think.
15       Q.   See if I understand.  A depot --
16       A.   I don't know, to be honest with you.
17  I really shouldn't have answered it.
18       Q.   Let me have the document.
19            (Exhibit 236, document Bates stamped
20       10328102 with attachment marked for
21       identification, as of this date.)
22       Q.   Ms. Denig, I am handing you a copy of
23  a document marked as Exhibit 236, which is a
24  September 20th e-mail from yourself, and the
25  subject is "TMS Depot Analysis Detail, Main."  And

Page 104

DENIG - CONFIDENTIAL

1   DENIG - CONFIDENTIAL
2   it has a lengthy spreadsheet attached to it.
3        Have you ever seen this document
4   before?
5        A.   This is -- this document was provided
6   to us by the Treasury, Rob Azerad and John Vergel
7   de Dios, and I just forwarded it to Jim.
8        Q.   And what is your understanding of what
9   this document is supposed to reflect?
10       A.   Everything we knew in some depot that
11  was still belonging to LBI.
12       Q.   Depot meaning --
13       A.   Depot.
14       Q.   What is that?
15       A.   Depository -- I don't know how to
16  explain it to you.  Box, they call it boxes.
17       Q.   Does that include the 074 box?
18       A.   Yes.
19       Q.   Does it include the 636 box?
20       A.   Yes, it does.
21       Q.   And any other boxes or possible
22  location where Lehman could have some securities,
23  correct?
24       A.   Yes.
25       Q.   So this, does this depot analysis, is

Page 105

DENIG - CONFIDENTIAL

1   DENIG - CONFIDENTIAL
2   this the starting point for the effort to locate
3   unencumbered assets?
4        A.   Yes, it was.
5        Q.   So in other words, whoever was engaged
6   in that effort would look through these securities
7   and try to figure out which ones were
8   unencumbered?
9        A.   Yes.
10       Q.   We have to be careful not to talk over
11  each other when we are answering questions.
12       Ms. Denig, I am handing you a copy of
13  the document previously marked as Exhibit 145B.
14  If you could take a moment to look at it.
15       Have you had a chance to look at it?
16       A.   Um-hm.
17       Q.   Have you ever seen this document
18  before?
19       A.   Yes.
20       Q.   Can you tell me what it is?
21       A.   It is what we determined that night to
22  be what we felt, based on the information that we
23  had at the time, to be unencumbered assets.
24       Q.   This is Sunday night?
25       A.   Saturday night to Sunday morning.

Page 106

```
                    DENIG - CONFIDENTIAL
 1
 2      Q.   So it is Saturday night, September 20?
 3      A.   September 20 to 4:30 in the morning on
 4   Sunday, the 21st.
 5      Q.   So this, it is entitled "Depot
 6   Analysis," and who was making the determination
 7   that you just described?
 8      A.   Do you mean whether these assets were
 9   available?
10      Q.   I thought you just said that this is a
11   spreadsheet reflecting what you thought as of the
12   end of Saturday, the 20th, might be unencumbered
13   assets; is that right?
14      A.   Yes.
15      Q.   Who made that determination?
16      A.   Jim Hraska, myself and Bill Panneillo.
17      Q.   And is it in fact -- let me back up.
18          If you turn to page 2, you will see a
19   small spreadsheet which totals market value of
20   1.19 billion. Do you see that?
21      A.   Yes.
22      Q.   Is that the 1 billion and change that
23   you discussed earlier in your testimony that was
24   transferred to Barclays on Friday?
25      A.   No, it was not.
```

Page 107

```
                    DENIG - CONFIDENTIAL
 1
 2      Q.   How is this different?
 3      A.   This is in addition to that.
 4      Q.   All right. So this, just so I
 5   understand the sequence, that 1 billion and change
 6   is transferred on Friday, and then there is a
 7   continuing effort to find unencumbered assets
 8   after that?
 9      A.   Yes.
10      Q.   This is as of Saturday night, you or
11   whoever had determined that there was a
12   1.19 billion in unencumbered assets available?
13      A.   As far as we could tell from the
14   information that we had.
15      Q.   And did you find further unencumbered
16   assets later?
17      A.   I wasn't involved after this, as far
18   as trying to locate them. I was involved in
19   trying to determine the ones that we felt were,
20   and work with settlements to determine whether or
21   not they were in fact, but any further
22   determination of assets, I was not a part of
23   anymore.
24      Q.   I thought you said you were involved
25   up until the 29th and 30th of September?
```

Page 108

```
                    DENIG - CONFIDENTIAL
 1
 2      A.   For these.
 3      Q.   For the ones that -- on this chart?
 4      A.   Yes.
 5      Q.   And were these, were these 1.19
 6   billion in assets eventually transferred to
 7   Barclays?
 8          MR. SHAW: Objection, foundation.
 9      A.   I don't know for sure.
10      Q.   They could have been but you don't
11   know either way?
12      A.   That's right.
13      Q.   You can't tell from this chart?
14      A.   No.
15      Q.   Let's try this.
16          (Exhibit 237, document Bates stamped
17      10252914 with attachment marked for
18      identification, as of this date.)
19      Q.   Ms. Denig, I am handing you a copy of
20   a document marked Exhibit 237, which is an e-mail
21   dated September 22, which forwards an earlier
22   e-mail in which you are the author and also
23   attaches a chart of some -- a spreadsheet of some
24   sort.
25          After you have had a chance to look at
```

Page 109

```
                    DENIG - CONFIDENTIAL
 1
 2   that, let me know.
 3      A.   OK.
 4      Q.   Have you had a chance to look at that?
 5      A.   I did.
 6      Q.   Have you seen this document before?
 7      A.   I have.
 8      Q.   Can you tell me what it is?
 9      A.   It is a file from BoNY telling us what
10   was pledged Friday morning.
11      Q.   So this chart, this spreadsheet was
12   prepared by BoNY?
13      A.   Yes.
14      Q.   And the values on here are values that
15   BoNY assigned to the securities in question?
16          MR. SHAW: Objection, foundation.
17      A.   I assume so.
18      Q.   Now, again I'm just trying to
19   understand it in terms of all the other pools of
20   securities we have been talking about. This is
21   what BoNY reports was transferred to its account
22   from Lehman on Friday?
23      A.   Yes.
24      Q.   Is this -- to your understanding, is
25   this the 1 billion plus securities that we talked
```

Page 110

DENIG - CONFIDENTIAL

1  about earlier?
2
3  A.  Yes.
4  Q.  Is that the only pool of securities
5  that you know of that was transferred on Friday?
6  A.  Yes.
7  Q.  OK, OK.  Do you know why BoNY was
8  sending you this?
9  A.  We asked for it.
10  Q.  And what -- why did you want it?
11  A.  Because we wanted to be able to
12  reflect on, through our reconciliation process,
13  which securities physically did go to Barclays.
14  Q.  As to the securities that went on
15  Friday morning, was there any difference between
16  the pool of securities that BoNY had identified
17  and the ones that you thought went?
18  A.  No, I don't know if I can answer that
19  question.
20  Q.  Well, in the reconciliation -- you had
21  a reconciliation process?
22  A.  Yes.
23  Q.  After the 22nd, between -- to try to
24  reconcile the securities that had been transferred
25  in connection with the September 18 repo; is that

Page 111

DENIG - CONFIDENTIAL

1  right?
2
3  A.  Yes.
4  Q.  And you were involved in that?
5  A.  Yes.
6  Q.  Did you ultimately successfully
7  reconcile all the transfers?
8  A.  All but five I think.
9  Q.  And was there a great disparity
10  between what BoNY had reported and what Lehman had
11  reported?
12  A.  No.
13  Q.  So it was fairly straightforward --
14  A.  It was a three-way rec.  It was a rec.
15  that BoNY sent us, a rec. that Barclays knew on
16  their books and Lehman knew on their books, so it
17  was all three reconciled.  There was five
18  discrepancies originally.
19  Q.  The scope of the reconciliation was
20  the assets that were transferred on the Thursday,
21  the 18th, as well as what was transferred on
22  Friday, the 19th?
23  A.  Yes, it was.
24  Q.  Were there any other transfers that
25  were part of that reconciliation?

Page 112

DENIG - CONFIDENTIAL

1
2  A.  No, there was not.
3  Q.  So just those two days worth of
4  transfers?
5  A.  Yes.
6  Q.  I apologize about walking through all
7  these spreadsheets, but I am trying to understand
8  what happened during that week.
9  OK, Ms. Denig, I am handing you a copy
10  of an exhibit marked 146B, which is an e-mail with
11  several spreadsheets attached to which you were a
12  recipient.
13  Have you ever seen that document
14  before?
15  A.  Um-hm.
16  MR. SHAW:  You need to say yes or no.
17  A.  Yes.
18  Q.  What is this document?
19  A.  To be honest with you, right from the
20  get-go, we are like what are you talking about?
21  We knew five securities being reconciled, so I
22  don't know what his list, what he is calling
23  Lehman referred to.
24  Q.  "He" meaning Mr. Azerad?
25  A.  Yes.

Page 113

DENIG - CONFIDENTIAL

1
2  Q.  Do you recall a discussion about
3  reconciling 1,165 CUSIPs?
4  A.  No.  I think we alleviated the fact
5  that the records that he had was to try to
6  determine what he was talking about, because it
7  wasn't the reconciliation that we had already
8  performed at this particular time, and we were
9  reconciled.
10  Q.  This is September 28, so in your view,
11  you and Mr. Hraska had already reconciled the
12  transactions from the Thursday and Friday,
13  correct?
14  A.  Yes.
15  Q.  So this is a --
16  A.  With Barclays, with BoNY, so --
17  Q.  This is after the fact, Mr. Azerad
18  raising an issue?
19  A.  Um-hm.
20  Q.  How did it end up?
21  A.  That I don't recall actually.
22  Q.  If you turn to behind the first blue
23  sheet, you will see a kind of summary spreadsheet.
24  Do you see that?
25  Do you have an understanding of what

Page 114

DENIG - CONFIDENTIAL

1    this chart means?
2
3    A.   I have a vague recollection of seeing
4    it. I don't remember what it was about.
5    Q.   Does this whole -- is it fair to say
6    this whole e-mail proved not to be a very big
7    issue and was reconciled in the end?
8    A.   I would believe so, yes.
9    Q.   Maybe you could answer me a question
10   while we wait for the exhibit. I see -- I am
11   fascinated with the titles of the different
12   spreadsheets that we see here, and we are trying
13   to figure out what they are.
14       I see some spreadsheets entitled
15   "Book 1" and "Book 2," "Book 3," all the way up to
16   Book 10. Do you recall what they were?
17   A.   Yes. Book 1, when you create a
18   spreadsheet and you don't save it with any
19   particular name, it will save as Book 1, and if
20   you had multiple books open on your machine, it
21   will save whatever sequence of numbers there is or
22   there are at the time.
23   Q.   It is not booking transactions, it is
24   a name that the system ascribes to it?
25   A.   Automatically.

Page 115

DENIG - CONFIDENTIAL

1
2    Q.   OK, I've got you. That is no longer
3    an issue in the case anymore.
4        Let's mark this.
5        (Exhibit 238, document Bates stamped
6    BCI-EX4324 with attachment marked for
7    identification, as of this date.)
8    Q.   Ms. Denig, I am handing you a copy of
9    a document marked 238, which is an e-mail dated
10   September 27. The subject is "Fed Collateral with
11   Original Face." Take a minute and take a look at
12   it.
13       Have you had a chance to look at it?
14   A.   Yes.
15   Q.   Have you ever seen this before?
16   A.   Um-hm, yes.
17   Q.   What is it?
18   A.   The original download that GFS gave or
19   when -- Paolo's group was doing the same type of
20   reconciliation that we were with the more senior
21   folks at Barclays. Mine were with the ops folks
22   at Barclays. They -- the file that -- when they
23   downloaded it, they didn't include something
24   called original face. So when you have a mortgage
25   security, you have an original face, and then

Page 116

DENIG - CONFIDENTIAL

1
2    there is a factor associated to it, and then a
3    current face and then the principal value or
4    market value.
5        Here our system, the GFS system only
6    took in the current face and not the original
7    face, or it was a separate column. It was just
8    not a column that they deemed -- they took in when
9    they did, built the query in GFS.
10   Q.   Face meaning face value?
11   A.   Yes, par value or whatever.
12   Q.   So this was Mr. Tonucci asking you to
13   provide him some additional data on the face
14   value, the original face values of certain
15   securities that he was trying to reconcile?
16   A.   Yes. So basically they took the
17   original list and said, they had a column called
18   "Quantity," OK, but the quantity was technically
19   current face, which would be the par value times
20   any factor, and then that would deposit into the
21   column named "Quantity" in GFS.
22       So they needed to include "Original
23   Face" as the column heading, so I just did it. I
24   literally took the same query.
25   Q.   Do you know why they wanted that?

Page 117

DENIG - CONFIDENTIAL

1
2    A.   Because I think that was -- ended up
3    being the 1100 discrepancies they had with
4    Barclays.
5    Q.   You are referring to the 1100
6    discrepancies on Exhibit 146?
7    A.   Yes.
8    Q.   So just to understand this
9    reconciliation process, you and Mr. Hraska were
10   involved in -- am I correct to say you and
11   Mr. Hraska were involved in reconciling between
12   the three entities the CUSIPs and actual pool of
13   securities that went over?
14   A.   It was me.
15   Q.   OK. And did you -- did your
16   reconciliation involve at all the pricing for
17   those securities?
18   A.   No, it did not.
19   Q.   Or valuation of those securities?
20   A.   It did not.
21   Q.   Was Mr. Tonucci's crew engaged in a
22   reconciliation that had to do with the valuation
23   of these securities?
24   A.   I believe they did.
25   Q.   And were you involved in that at all?

Page 118

DENIG - CONFIDENTIAL

1
2    A.    I was not.
3    Q.    Is it fair to say that you were
4  providing data to Mr. Tonucci as he needed it, but
5  you weren't involved in reconciling the prices of
6  the securities that went over to Barclays?
7    A.    That's correct.
8    Q.    Let's mark this, please.
9        (Exhibit 239, document Bates stamped
10   BCI-EX13384 through 86 marked for
11   identification, as of this date.)
12   Q.    Ms. Denig, I am handing you a copy of
13  a document marked Exhibit 239, which is an e-mail
14  stream from September 23, 2008. I will note that
15  you are not on this e-mail stream. But I did have
16  a question about it.
17        In particular, my question is going to
18  have to do with the e-mail from Mr. Vergel de Dios
19  on the first page.
20        Have you had a chance to look at the
21  document?
22   A.    Yup. I don't understand it, to be
23  honest with you.
24   Q.    I just wanted to ask you a question
25  about the sentence in the middle of the page where

Page 119

DENIG - CONFIDENTIAL

1
2  it says, "We do see a large position break which
3  leads to the conclusion that there are price
4  factor differences between Lehman and Barclays,"
5  and then it is followed by a chart. Do you see
6  that?
7    A.    OK.
8    Q.    Do you see where I am referring to?
9    A.    The 19 billion you're talking about?
10   Q.    Well, there is a chart that shows
11  position, 92 billion, and then there is a Barclays
12  position of 92 billion, and there is a Lehman
13  position of 72 billion. Do you see that?
14   A.    Yes.
15   Q.    Do you have any understanding of what
16  this is reflecting?
17   A.    I believe it is because they did not
18  take into account quantity. They were taking into
19  account current value, which is a --
20   Q.    Who is "they"?
21   A.    Paolo Tonucci's team.
22        When querying the data from GFS, you
23  have to define the fields that you are going to
24  take in. If they were taking in quantity, it was
25  current -- like the definition GFS had was that it

Page 120

DENIG - CONFIDENTIAL

1
2  was current face and not the original par value.
3        In order -- the reconciliation that I
4  did was original par value. What they were trying
5  to determine included a factor -- the factors,
6  which was wrong, which I think they subsequently,
7  very quickly realized that.
8    Q.    So this was --
9    A.    Based on some communications.
10   Q.    This eventually became --
11   A.    A non-event.
12   Q.    A non-event? OK.
13        Were you involved, Ms. Denig, in
14  preparing what has been called Schedule A in
15  connection with the Barclays/Lehman sale
16  transaction?
17   A.    I was not involved in preparing it,
18  no.
19   Q.    Do you know what it is?
20   A.    I was under the assumption it was
21  regarding the repo transaction or the collateral
22  that went in the repo.
23   Q.    Do you have any other understanding?
24   A.    No.
25   Q.    Did you ever hear of anything called

Page 121

DENIG - CONFIDENTIAL

1
2  the clarification letter in connection with the
3  Lehman/Barclays transaction?
4    A.    No.
5    Q.    Did you have any understanding that
6  Schedule A was a schedule to a clarification
7  letter of any kind?
8    A.    No.
9    Q.    What is -- would it be fair to say
10  that your role in connection with what became
11  Schedule A was simply preparing the spreadsheets
12  we have been going over?
13   A.    In most cases I did not prepare them.
14   Q.    OK.
15   A.    I received them.
16   Q.    OK, but -- let me try it this way.
17  Other than what you have described for us today as
18  to your role during that week, particularly
19  Thursday, Friday, on into the following week, did
20  you have any role in preparing what later became
21  known as Schedule A?
22   A.    I guess so.
23   Q.    In what way?
24   A.    Because I was -- after the
25  reconciliations, then we got our files from BoNY

Page 122

DENIG - CONFIDENTIAL
2 as to what they physically received. That is what
3 was communicated upstream to management.
4    Q.    So you were -- wasn't that part of the
5 reconciliation process?
6    A.    Um-hm, yes.
7    Q.    So BoNY communicated to you what they
8 had received, you compared that to what you
9 thought you had sent --
10    A.    Was booked.
11    Q.    And Barclays compared it to what they
12 recorded as well?
13    A.    That's correct.
14    Q.    So the net effect, the net result of
15 that reconciliation process is a list of
16 securities that all parties agreed were
17 transferred on either Thursday or Friday of the
18 week of the 15th?
19    A.    That's correct.
20    Q.    And is it your understanding that that
21 becomes Schedule A?
22    A.    That was my understanding.
23    Q.    I think we might have asked this
24 earlier. Do you have any understanding of what
25 Schedule B is to the clarification letter?

Page 123

DENIG - CONFIDENTIAL
2    MR. SHAW:  Asked and answered.
3    A.    No.
4    Q.    Did you have any role in assembling
5 pieces of information for anything that you
6 understood to be Schedule B?
7    A.    No.
8    MR. SHAW:  Asked and answered.
9    Q.    A follow-up on a question we had
10 earlier.  If I could show you a copy of what has
11 been previously marked as Exhibit 143B. I'm not
12 sure if you have ever seen this before, Ms. Denig,
13 but my question has to do with the spreadsheet
14 that's attached to this e-mail and whether you
15 have ever seen that before.
16    Have you ever seen that spreadsheet
17 before?
18    A.    I have.
19    Q.    What is that?
20    A.    It was a list given to us by Barclays
21 saying that these are the assets they don't want.
22    Q.    So this is the list of excluded assets
23 that you were not allowed to put into the
24 September 18 repo?
25    A.    That's correct.

Page 124

DENIG - CONFIDENTIAL
2    Q.    Did you ever have any discussions with
3 folks at Barclays about why they didn't want those
4 assets?
5    A.    No, I did not.
6    (Exhibit 240, document Bates stamped
7    BCI-EX18553 with attachment marked for
8    identification, as of this date.)
9    Q.    Ms. Denig, I am handing you a copy of
10 an exhibit marked 240, which is an e-mail dated
11 Monday, the 29th, from yourself to several people
12 with an attached file.
13    And after you have had a second to,
14 minute to look at it, I want to ask you questions
15 about it.
16    A.    OK.
17    Q.    Have you ever seen this document
18 before?
19    A.    Yes.
20    Q.    What is this?
21    A.    This is the list of CUSIPs that were
22 reconciled between Lehman and Barclays as part of
23 the 9/18 repo transaction.
24    Q.    This is -- is this what we previously
25 talked about, you had this three-way

Page 125

DENIG - CONFIDENTIAL
2 reconciliation, and this is the agreed-upon list
3 of the securities that were transferred on the
4 Thursday and Friday of the week of the 15th?
5    A.    Yes.
6    Q.    And it says here master file of CUSIP,
7 so is this -- is it your understanding that this
8 is the final list of the securities that were
9 transferred on those two dates?
10    A.    Yes, it was.
11    Q.    You see in this chart it says market
12 price? Do you see that?
13    A.    Yup.
14    Q.    Where did that price come from?
15    A.    GFS.
16    Q.    That's the Lehman GFS price?
17    A.    Yes.
18    Q.    OK. Thank you.
19    Let's mark this, please.
20    (Exhibit 241, document Bates stamped
21    BCI-EX17607 and 08 with attachment marked
22    for identification, as of this date.)
23    Q.    I am handing you a copy of a document
24 marked as Exhibit 241, which is an e-mail from
25 Monday, September 29, and an attached spreadsheet.

## Page 126

DENIG - CONFIDENTIAL
1
2   When you get a chance to look at it, let me know.
3   I have a question or two about it.
4        Have you had a chance to look at that?
5        A.   I have.
6        Q.   Have you ever seen this before?
7        A.   Yes.
8        Q.   Could you tell me what it is?
9        A.   It is CUSIPs that we determined to be
10  unencumbered on the weekend of -- or the 20th,
11  Saturday, the 20th, and the 21st. This was then
12  sent to our securities clearance area for them to
13  determine whether or not in fact they were
14  unencumbered, and then they went ahead and made
15  delivery of these.
16       Q.   So this -- am I correct to say this --
17  you will see the spreadsheet reflects 269 million
18  dollars worth of securities, correct,
19  approximately?
20       A.   Market value.
21       Q.   Yes.
22       A.   Yes.
23       Q.   And those securities were, in fact,
24  transferred to Barclays?
25       A.   As my -- I believe they were.

## Page 127

DENIG - CONFIDENTIAL
1
2        Q.   Is this the sum total of the
3   securities that were found in the 636 box in
4   connection with the unencumbered, search for
5   unencumbered assets that we talked about before?
6        MR. SHAW: Objection to form.
7        A.   Yes, it was.
8        Q.   Do you recall after this whether any
9   further securities were found in the 636 box?
10       A.   No idea.
11       Q.   No?
12            You see in the e-mail toward the
13  bottom, it talks about getting the chill listed on
14  two CUSIPs. Do you see that?
15       A.   Yes.
16       Q.   What does that refer to?
17       A.   It is an action that DTC takes with
18  regard to certain securities. If -- when they put
19  something on a chill, that means that they are
20  subject to a corporate action. Once the corporate
21  action is either deemed to not be valid or they
22  are not going to -- or they have transacted the
23  corporate action, they take it off of chill and
24  now it is available for deliveries.
25       Q.   So if the chill is removed, it becomes

## Page 128

DENIG - CONFIDENTIAL
1
2   unencumbered.
3        A.   Yes.
4        Q.   And now, when you see toward the top,
5   there is an e-mail from Mr. Hraska saying, "Here
6   is additional collateral from 636 today delivered
7   by the administrator."
8            And maybe you have answered this
9   already. Is this the -- you had previously talked
10  about a delivery of collateral to Barclays on the
11  29th, right?
12       A.   Yes.
13       Q.   And so this is the collateral that was
14  delivered on the 29th, to your understanding?
15       A.   Yes.
16       MR. HINE: We can take a break for
17  lunch.
18       (Recess)

## Page 129

DENIG - CONFIDENTIAL
1
2   AFTERNOON SESSION
3        12:48 p.m.
4   BY MR. HINE:
5        Q.   Good afternoon, Ms. Denig.
6        A.   Good afternoon.
7        Q.   Hope you had a nice lunch.
8        A.   I did.
9        Q.   If you wouldn't mind, I would like to
10  continue through a parade of a couple of
11  documents, ask you some questions about them.
12            Let's mark this as 242.
13            (Exhibit 242, document Bates stamped
14  BCI-EX17576 marked for identification, as of
15  this date.)
16       Q.   I am handing you a copy of a document
17  marked as Exhibit 242, which is an e-mail dated
18  September 29th from Mr. Hraska, cc to you. If you
19  could take a minute and just review it.
20       A.   OK.
21       Q.   Have you had a chance to look at that?
22       A.   Yes.
23       Q.   Have you seen this document before?
24       A.   Yes.
25       Q.   What is this document about?

Page 130

DENIG - CONFIDENTIAL
A. It is just about how we are going to adjust Lehman's books and records for the fact that the defaulted repo no longer exists on their books.
Q. Do you see the title or subject talks about balance sheet reduction? What does that mean?
A. It means that as a reverse repo or I mean as a repo transaction, because it is a loan, the inventory still sits on the balance sheet of Lehman Brothers. What we are trying to do here is, the fact that Barclays took ownership of those securities due to the defaulted repo, we had to remove those assets from Lehman's books.
Q. So this is removing them from Lehman's balance sheet?
A. That's correct.
Q. Is this part of helping Barclays establish an opening balance sheet for the Lehman assets it has now acquired?
A. No. This was strictly on the Lehman side.
Q. Did the result of this exercise get somehow translated into Barclays' books?

Page 131

DENIG - CONFIDENTIAL
MR. SHAW: Objection.
A. No.
Q. Did you have any role -- I think we might have covered this before. Did you have any role in how Barclays accounted for the transaction?
A. No, I did not.
Q. Did you have any role in how Barclays accounts for the securities that it acquired in the -- through the September 18 repo?
A. No.
Q. Do you know how Barclays values the securities that it acquired through the September 18 repo?
A. No.
Q. You see in this e-mail there is a section called "Fed Eligible Collateral"? Do you see that?
A. Yes.
Q. The first item talks about reconciling the Fed deliverable securities sent on the 18th. Do you see that?
A. Yes.
Q. I thought you said your reconciliation

Page 132

DENIG - CONFIDENTIAL
was completed by early in that week.
A. Yes, it was.
Q. So what is this referring to?
A. I think he was just listing out all the steps that are taken to do this.
Q. So that step had been completed by Monday, the 29th?
A. It was.
Q. Next it talks about unwinding cash only, I guess that means cash only trades in MTS that represent triparty cash total. Do you see that?
A. Yes.
Q. What does that mean?
A. The way that we booked the transaction, where the securities were booked for free for the individual CUSIPs, and we represented the cash via the shell tickets.
Q. Um-hm.
A. Those are considered the cash only ticket, so they had a problem reconciling to Chase because Chase wasn't giving us certain records as to what the -- all the cash unwinding was about.
I wasn't involved in that

Page 133

DENIG - CONFIDENTIAL
reconciliation. That was done by cash management.
Q. So that the cash only trades are the way you booked them in Exhibit 134 that we talked about earlier?
A. Yes.
Q. Now, unwinding them has to do with problems associated with Chase?
A. Yes.
Q. And you weren't involved in that?
A. I was not.
Q. Do you have any understanding of how they are unwound?
A. The same way we did ours, just putting the end dates of the 22nd on all the transactions and then reconciling the cash that physically moved from Barclays that came into Chase, and then it is supposed to clear it against the actual securities that we have booked at Lehman.
That reconciliation, because it is not a traditional delivery versus payment type of scenario, that they need you to represent that somehow. I don't know how they did their reconciliation, though.
Q. You weren't involved in their --

Page 134

DENIG - CONFIDENTIAL
1
2    A.    I was not. I was involved in just the
3    transfer of assets.
4    Q.    Do you have any understanding of the
5    dispute that arose involving Chase over the
6    weekend of the 21st?
7    A.    Heard things, but not definitively.
8    Q.    What did you hear?
9    A.    That they were basically stuck -- they
10   kept all the -- they took ownership of our Lehman
11   box and they were going to try to sell the
12   securities to raise cash, to recoup some of the
13   box loan scenario that they had. Because there
14   was more to it than just the 7 billion. There was
15   an additional -- we were short cash -- Lehman was
16   short cash at the end of that night as well.
17   Q.    When you said "they," you were talking
18   about Chase?
19   A.    Yeah, yes.
20   Q.    That night is Friday night?
21   A.    Saturday -- sorry, Thursday,
22   September 18.
23   Q.    In addition to the 7 billion dollars
24   box loan that we talked about earlier, Lehman was
25   short cash of an additional amount?

Page 135

DENIG - CONFIDENTIAL
1
2    A.    Yes.
3    Q.    Is that due to the failure of a
4    rollover of a repo that Barclays had previously
5    supplied every night?
6    A.    Well, the fact that they provided
7    funding for the additional assets that were in our
8    box, yes, so we didn't have the cash to represent
9    that.
10   Q.    Do you know how much cash we are
11   talking about?
12   A.    15 billionish.
13   Q.    Just so I can understand it, and there
14   is two separate repos here, a September 18 repo
15   that we have been talking about?
16   A.    Yes.
17   Q.    And then Barclays had an individual
18   nightly repo starting on Monday, the 15th; is that
19   right?
20   A.    Yes.
21   Q.    And that's the repo that failed to
22   roll over into Thursday?
23   A.    I wouldn't call it failed to roll
24   over. They didn't provide us funding for the
25   additional assets.

Page 136

DENIG - CONFIDENTIAL
1
2    Q.    And that came as a surprise to you
3    guys?
4    A.    A little bit.
5    Q.    How did you learn about that?
6    A.    It wasn't until probably in the wee
7    hours of the night that that wasn't done.
8    Q.    And what -- do you have any
9    understanding of why it wasn't done?
10   A.    No.
11   Q.    So what actions did you take to -- I
12   assume the failure to provide that funding caused
13   you folks some troubles, right?
14   A.    Yes, it did.
15   Q.    What problems did that cause, that
16   night?
17   A.    The fact that there was no more cash
18   to collateralize that. Chase was basically short
19   the cash. They had the assets that we had, but we
20   had no cash to back those assets from anybody.
21   Q.    So what does that cause?
22   A.    Basically the inability to function as
23   a broker/dealer.
24   Q.    OK. And so what did you do, what did
25   Lehman do to correct that?

Page 137

DENIG - CONFIDENTIAL
1
2    A.    They took a box loan from Chase.
3    Q.    So this is now in addition to the
4    7 billion dollar box loan we talked about earlier?
5    A.    Yes, yes.
6    Q.    So, and how much was this other box
7    loan?
8    A.    I want to say 21 billionish, because
9    there was 5 billion in assets we knew we weren't
10   going to be sending over, and then the 15 billion
11   and change that -- of the repo that we thought we
12   were going to be doing.
13   Q.    Just as of Thursday night then, you
14   had a 7 billion dollar box loan in support of the
15   September 18 repo and you had an additional box
16   loan with Chase in the low 20s?
17   A.    Um-hm.
18   Q.    For just operating capital?
19   A.    Yeah.
20        (Exhibit 243, e-mail dated September
21   19, 2008 at 1:43 a.m. marked for
22   identification, as of this date.)
23   Q.    Ms. Hraska -- Ms. Denig, I am handing
24   you a copy of a document marked as Exhibit 243. I
25   apologize.

Page 138

DENIG - CONFIDENTIAL
1
2    A.   That's OK.
3    Q.   It is an e-mail dated September 19.
4    If you could take a moment to look at it before I
5    ask you a question.
6    A.   OK.
7    Q.   Have you ever seen this e-mail stream
8    before?
9    A.   Yes.
10   Q.   Am I correct in assuming that this
11   e-mail stream is reflecting what we just talked
12   about as far as the need for a box loan?
13   A.   Yes.
14   Q.   If you look at the top of the first
15   page, Mr. Hraska writes, "Ties out.  This is a
16   15.8 tri."  Do you see that?
17   A.   Yes.
18   Q.   That's referring to a 15.8 triparty
19   repo between Lehman, Barclays and --
20   A.   Lehman, Barclays.
21   Q.   Why is it called a triparty then?
22   A.   It is a triparty transaction, to tell
23   you how the trade was transacted -- was papered
24   basically.
25   Q.   But there is no custodian?

Page 139

DENIG - CONFIDENTIAL
1
2    A.   Well, Chase is the custodian.
3    Q.   OK.
4    A.   Sorry.
5    Q.   So that's the third party, Chase?
6    A.   Well, yeah, yes.
7    Q.   So that is the triparty transaction
8    that failed to roll over to the following day on
9    Thursday?
10   A.   Yes.
11   Q.   When it says RACER 5 billion, do you
12   see that?
13   A.   Yes.  That was a security that we had
14   on the books and records of Lehman that they
15   definitely did not want?
16   Q.   "They" meaning?
17   A.   Barclays.  That was never going to go
18   to them.
19   Q.   RACER securities had been in the Fed
20   program?
21   A.   Yes.
22   Q.   And Barclays did not want them?
23   A.   Did not.
24   Q.   Why not?
25       MR. SHAW:  Objection to form, calls

Page 140

DENIG - CONFIDENTIAL
1
2    for speculation, foundation.
3    A.   I don't know.
4    Q.   You don't know?
5    A.   I don't know why they didn't want it.
6    Q.   Do you have any understanding of why
7    they didn't want it?
8    A.   No.
9    Q.   Can you speculate about why they
10   didn't want it?
11       MR. SHAW:  Objection, calls for
12   speculation.
13   A.   No.
14   Q.   No idea why they didn't want it?
15   A.   Well, it was Lehman-backed RACER.
16   Q.   When I read this e-mail, now back to
17   the e-mail, the box loan was approximately
18   21 billion to cover those two shortfalls, if you
19   will?
20   A.   Well, the value, what was deemed the
21   value of the collateral that we still had in the
22   box, that was not funded, meaning that nobody
23   extended us cash to represent that collateral.
24   Q.   Maybe I am misunderstanding.  The
25   RACER securities were part of the 8 billion

Page 141

DENIG - CONFIDENTIAL
1
2    shortfall that we talked about earlier?
3    A.   No.
4    Q.   No?
5    A.   No.
6    Q.   So we talked earlier about the Fed
7    collateral that was being placed into the
8    September 18 repo, right?
9    A.   Yes.
10   Q.   And you said there was an 8 billion
11   dollar shortfall, approximately?
12   A.   Yes.
13   Q.   That does not include the RACER?
14   A.   That does not.  We substituted all
15   that collateral and made up the difference, so --
16   Q.   For what?
17   A.   For other types like collateral.
18   Q.   Well, wait.  I am missing -- I'm
19   mixing things.  You substituted collateral for the
20   8 billion shortfall?
21   A.   Yes.
22   Q.   What did you do about the RACER?
23   A.   There was nothing to do.  RACER had
24   nothing to do with anything.  We were never giving
25   the RACER as part of the transaction.  The RACER

Page 142

DENIG - CONFIDENTIAL
1  was part of the excluded list.
2  Q.  So the RACER was in the Fed program
3  and just went back into Lehman's box?
4  A.  Yes.
5  Q.  OK. And then the 7 billion dollar box
6  loan was to make up for the difference between --
7  it was to make up for what you were unable to put
8  into the September 18 repo, right?
9  A.  That's correct.
10  Q.  Now, this other box loan that we are
11  talking about in this e-mail is just to provide
12  operating funding for Lehman?
13  A.  It's what was left, the collateral
14  that was left in the box that we did not get any
15  additional funding for from anybody on the street,
16  because we didn't have any more liquidity
17  providers. We didn't have the Fed programs. We
18  had no more ways to raise cash with the assets
19  that we had in the box. So technically, Lehman
20  didn't have any cash.
21  Q.  OK. So you borrowed against the box?
22  A.  Yes.
23  Q.  Approximately 21 billion dollars?
24  A.  Correct.

Page 143

DENIG - CONFIDENTIAL
1  Q.  And to what use was that money put?
2  MR. SHAW:  Objection, foundation.
3  A.  I have no idea. What do you mean?
4  Like -- it was just to collateralize the assets
5  that we had, to --
6  Q.  Why do you have to do that?
7  A.  You won't be able to operate without
8  it.
9  Q.  So that's operating funds?
10  A.  They won't be able to make any
11  deliveries the next day if we didn't have cash to
12  represent those assets.
13  Q.  Now, that box loan, was that box loan,
14  the 21 billion dollar one, eventually paid off?
15  A.  They seized all the assets.
16  Q.  Who is "they"?
17  A.  Chase.
18  Q.  So Chase was effectively paid off by
19  seizing the assets that provided security for that
20  loan?
21  A.  That's correct.
22  Q.  So those -- so the security,
23  securities that supported the 15.8 billion dollar
24  triparty transaction as well as the RACER was

Page 144

DENIG - CONFIDENTIAL
1  eventually taken by Chase?
2  A.  That's correct.
3  Q.  So that effectively satisfied that 21
4  billion dollar box loan obligation?
5  A.  That's correct.
6  Q.  Could you just turn to the last page
7  of this document. I just want to try to
8  understand what this e-mail that you are writing
9  to Mr. Hraska means.
10  It says, "Jim, the total cash booked
11  is still 44.2 billion dollars." Do you see that?
12  A.  Yes.
13  Q.  That's the figure we talked about
14  earlier on the booked amounts chart?
15  A.  Yes.
16  Q.  And it says, "Even though we took the
17  TIBs out, we replaced it with other collateral,
18  and I am pretty sure at the end of the day, the
19  Fed collateral wasn't the problem."
20  What are you referring to there?
21  A.  Well, being -- at 1:30 in the morning,
22  they basically said that there is a problem with
23  the whole transaction that we did after pens were
24  down. I basically started driving home, I got a

Page 145

DENIG - CONFIDENTIAL
1  phone call, log on when I get home, don't really
2  kind of know what's going on at that particular
3  time. All I know, that there was a problem with
4  the trade.
5  So I was basically giving him an
6  Overview, saying we delivered all the assets from
7  the Fed -- I have all the delivery settlement
8  instructions saying that they did go, so it wasn't
9  the Fed deliverable type of collateral that was
10  potentially a problem. I didn't know what the
11  problem was.
12  At the end of the day we knew we were
13  short cash, we didn't know how that happened. So
14  I was saying it wasn't from my bookings.
15  Q.  This is the 7 billion dollar shortfall
16  you are talking about?
17  A.  No, this is that -- via phone call, he
18  basically said that there is a problem with -- we
19  are short cash and we potentially have to take
20  this 20 billion dollar box loan.
21  Q.  So this relates to the 20 billion
22  dollar box loan, not the 7 billion dollar
23  shortfall?
24  A.  No, no. That was all finished at that

Page 146

DENIG - CONFIDENTIAL

1 particular point.
2    Q.  Is it correct --
3    A.  I went home after that 7 billion was
4 satisfied.
5    Q.  That's done and now this issue comes
6 up?
7    A.  Yes.
8    Q.  Is it probably safe to assume
9 Mr. Hraska was trying to figure out why there was
10 a shortfall at this time?
11    A.  That's right.
12    Q.  And he wasn't aware of the failure of
13 the triparty to roll over?
14    A.  We didn't know it didn't roll at that
15 point, yes.
16    Q.  Any idea --
17    A.  As the e-mails were going on, we were
18 also on the phone, so there was a few things kind
19 of going on. So you are missing some context
20 here.
21    Q.  Did you eventually figure out even
22 after you went to Barclays why they didn't roll
23 over that triparty?
24    A.  No.

Page 147

DENIG - CONFIDENTIAL

1    Q.  No? Did you ever say, hey, you guys
2 caused us a lot of problems, why didn't you do it?
3    A.  At that point we were bankrupt, so we
4 were employees of Barclays and it was never
5 really -- it didn't matter anymore.
6    Q.  You never found out subsequently why
7 it wasn't rolled over?
8    A.  Nope.
9       (Exhibit 244, document Bates stamped
10    BCI-EX18095 marked for identification, as of
11    this date.)
12    Q.  Ms. Denig, I am handing you a document
13 marked as Exhibit 244, which is an e-mail from
14 September 24 from Mr. Hraska to yourself.
15       My question is, have you ever seen
16 that before?
17    A.  Yes.
18    Q.  Can you -- it says here in the subject
19 line, he is saying to you apparently that you
20 don't say that BoNY is not reputable. Can you
21 give me some context here of what he was talking
22 about?
23    A.  Yes. We were in a meeting and they
24 were taking about prices, whose prices were good,

Page 148

DENIG - CONFIDENTIAL

1 because they were trying to determine where are we
2 getting prices from, how a trade is being booked,
3 based on what prices. The files that we had up
4 until that point had only been provided to us from
5 BoNY. We didn't have anything from Chase.
6       Somebody had made mention from
7 Barclays that Barclays -- that BoNY's prices
8 sometimes are not reputable, and I repeated it in
9 a meeting, and he basically just was e-mailing me
10 you can't say those types of things at meetings,
11 as a boss to a junior.
12    Q.  He is --
13    A.  He is my boss. He is just giving me
14 advice, don't make these generalizations in
15 meetings with these type of people in it, which
16 were senior folks.
17    Q.  This is a meeting after -- you're now
18 working for Barclays?
19    A.  Yes.
20    Q.  And what's the meeting about?
21    A.  It is just, they are trying to -- they
22 are -- the Treasury folks, which is Paolo Tonucci
23 and his team, they are trying to come up with a
24 reasonable price of where they are coming -- you

Page 149

DENIG - CONFIDENTIAL

1 know, to value the assets that they had.
2       So the -- we were providing them what
3 our systems were saying and the files that we had,
4 and they were asking me where did you get the
5 prices? And I said I got them from BoNY, but I
6 said I don't know if BoNY's prices are very
7 reputable.
8       And when I said that, Jim e-mailed me,
9 don't say that because I don't know that.
10    Q.  These are the prices for what?
11    A.  Market value of the assets.
12    Q.  Assets that supported the September 18
13 repo?
14    A.  That's correct.
15    Q.  And BoNY valued them because they had
16 a custodial role in that transaction?
17    A.  Yes.
18    Q.  And this is -- is this Barclays trying
19 to figure out how to value these assets?
20    A.  No.
21       MR. SHAW: Objection.
22    Q.  What is --
23    A.  These were Lehman folks that were
24 asking the questions.

Page 150

DENIG - CONFIDENTIAL

2     Q.   And why are they trying to determine
3 the value?
4       MR. SHAW: Objection to form. Calls
5 for speculation. Foundation.
6     A.   Why are who? The Lehman folks?
7     Q.   In this meeting. This is
8 Mr. Tonucci's crew trying to figure out --
9     A.   They are asking from the files that
10 were sent from me, where did you come up with the
11 prices, similar to how you are asking, and I was
12 basically saying BoNY had them. Those are the
13 prices that BoNY provided.
14     Q.   OK. So these are the securities that
15 were transferred on Thursday, Friday that week?
16     A.   Yeah. This is the determination that
17 they came up with the market value, and then I
18 made that comment, well, BoNY's prices potentially
19 are not reputable. And he basically said you
20 can't say that.
21     Q.   Did you think that was true when you
22 said that?
23     A.   Well, that was what I was -- I know,
24 and that's basically why I was saying it, because
25 sometimes I make generalizations without having

Page 151

DENIG - CONFIDENTIAL

2 the full facts. Chase was our custodian for 15
3 years of the company that I have been working for.
4 BoNY has never been. So how can I make that
5 general statement about their prices?
6     Q.   You don't know one way or the other
7 whether their prices were good or bad?
8     A.   No.
9     Q.   Or reputable or not?
10     A.   No.
11     Q.   I asked you a lot of questions about
12 prices here. Is there any kind of chart or
13 something that you could point me to that allows
14 me to reconcile the different prices?
15     A.   That I know was being done like at a
16 much higher level.
17     Q.   How do you -- for example, on
18 Exhibit 134, this big thing, you booked the cash
19 in the transaction, right?
20     A.   Yes.
21     Q.   And you break it down into about eight
22 or ten different entries, right?
23     A.   Yes.
24     Q.   Is there any valuation that you used
25 to break it down in that way?

Page 152

DENIG - CONFIDENTIAL

2     A.   Yes, based on the -- what Chase came
3 to us as what the value was to the individual Fed
4 programs that we had on the previous night.
5     Q.   So those entries are tied to
6 particular Fed programs?
7     A.   Yes.
8     Q.   For particular days?
9     A.   Yes, they are.
10     Q.   So that's --
11     A.   For a particular day. That was from
12 September 17. The end of day September 17.
13     Q.   The Fed programs vary from Monday,
14 Tuesday, Wednesday?
15     A.   Yes. This was end of day Wednesday's
16 information. I don't know what exhibit it was,
17 but the one that had sixteen million one, 7.1, and
18 the total was 44.2.
19     Q.   Right.
20     A.   That was -- that I broke up the
21 bookings, those ten bookings, based on that file
22 that they sent me.
23     Q.   So those are Chase prices that you
24 used in -- into the -- you put that into the MTS
25 system?

Page 153

DENIG - CONFIDENTIAL

2     A.   That's correct.
3     Q.   Those are Chase prices?
4     A.   Not Chase prices. It was what Chase
5 values were. I booked shell tickets to represent
6 the cash.
7     Q.   I understand, I understand.
8      So then -- I guess I don't understand.
9 You have Chase prices on some securities or on
10 those. You have MTS prices for other securities
11 that we have talked about during the day. You
12 have BoNY prices for a different set of
13 securities.
14      Which price does Barclays eventually
15 use when it is booking all this stuff?
16       MR. SHAW: Objection to form. Calls
17 for speculation, foundation.
18     A.   I have no idea. Like that was done
19 way away from us. Our role was to transfer these
20 par values to this particular place, and that's
21 what we did. As far as what the market value was
22 of these, each of these assets, were done at a
23 much higher level.
24     Q.   Higher level or separate level? I
25 mean is it in the treasury department at Barclays?

Page 154

DENIG - CONFIDENTIAL

2    A.   Yes. Well, not Barclays. As far as I
3    knew, it was Paolo Tonucci's team that was dealing
4    with whomever at Barclays to come up to an
5    agreement as to what the value of those assets
6    were.
7    Q.   Now, you're now working at Barclays
8    and do they have a system like MTS or an analogue
9    to MTS?
10   A.   Now?
11   Q.   Yes.
12   A.   Yes.
13   Q.   So the securities that came across
14  from Barclays from the September 18 repo, have the
15  prices changed in the Barclays booking system
16  versus what they were in the Lehman system?
17     MR. SHAW: Objection, foundation.
18   A.   I have no idea because it wasn't part
19  of my role. That's still not part of my role here
20  at Barclays.
21   Q.   So you get on -- nowadays at Barclays,
22  you get on and book transactions, right, and do
23  what you used to do?
24   A.   No. The way they do it here at
25  Barclays is that there is a separate group that

Page 155

DENIG - CONFIDENTIAL

2  has the ability to type the trades directly into
3  the mainframe, that they only receive information
4  from the front-end system. So the front-end
5  trader system flows down to the back-end system,
6  which is something they call Impact. But we as
7  trade support people are not allowed to have the
8  ability to book directly into the back end.
9     MTS, there was -- infrastructure was
10  very different at Lehman than it is at Barclays,
11  and there was a two-way pipe, so that anytime you
12  did something in one system, it would reflect it
13  back to the front-end system.
14     There is only a one-way pipe here at
15  Barclays, so there is a conflict of interest, and
16  they don't allow us to affect the books and
17  records in the role that we have now.
18   Q.   Only the traders at Barclays can
19  affect the books and records?
20   A.   And the back office settlements area
21  can book. We are middle office. So we help the
22  traders transact their trades, so they felt it was
23  a conflict of interest, and they don't allow us to
24  be able to go into the system and book anything
25  directly into the system.

Page 156

DENIG - CONFIDENTIAL

2   Q.   What do you mean by front, middle and
3  back office, just so I -- I hear these terms all
4  the time.
5   A.   Front office represents the traders,
6  salespeople, the people that are licensed that are
7  physically executing the trades.
8     Middle office does the confirmations
9  and ensures that the trades make it from the
10  front-end system to the back-end system.
11     And the back office, it gives you the
12  ability to fix any of the problems that might
13  happen through the throughput.
14   Q.   So you are in the middle office?
15   A.   I am in the middle office.
16   Q.   Can you get on the Sparkly system and
17  see whether the securities that came over from
18  Lehman are priced any different than they were
19  then?
20   A.   Well, they booked them the same way we
21  did.
22   Q.   Meaning what?
23   A.   They booked it as a free security
24  receipt.
25   Q.   There is no price in the Barclays

Page 157

DENIG - CONFIDENTIAL

2  system?
3   A.   There is no price. They have zero on
4  their trades as well. And they built cash tickets
5  to represent the cash that they paid.
6   Q.   So they have the opposite entries that
7  you would have, they have cash going out of
8  45 billion, and then they have all the securities
9  booked at zero price?
10   A.   Yes.
11   Q.   Is there any way, any document that
12  you could point me to, anything that I could ask
13  your counsel to produce in this case that would
14  let me determine whether a security that was
15  booked on the Lehman system as part of the
16  September 18 repo, what it is now priced at in the
17  Barclays system?
18     MR. SHAW: Objection to form.
19  Foundation, calls for speculation.
20   A.   I have no idea. I have no idea how
21  that -- how you would do that. First of all, they
22  probably don't have them anymore, because a lot of
23  them were liquid assets. They are not sitting on
24  our books and records anymore, because they have
25  been sold subsequently.

Page 158

DENIG - CONFIDENTIAL
1
2     Q.    Do you know how many of those, of the
3  assets that came over from Lehman, have now been
4  sold?
5     A.    No.
6     Q.    Is there some kind of report generated
7  that would show that?
8           MR. SHAW: Objection, form. Calls for
9  speculation.
10    A.    Probably, but you would need, you
11  would need the list of CUSIPs and someone would
12  have to go in and one by one see that.
13    Q.    So it is theoretically possible to
14  trace those securities and see what happened to
15  them since they went over to Barclays?
16    A.    I guess it would be possible.
17    Q.    Do you know, to the extent securities
18  were sold after they -- by Barclays after they
19  went over from Lehman, do you know what prices
20  they were sold at?
21    A.    I do not.
22    Q.    Is there a report or some way to find
23  that out?
24          MR. SHAW: Objection to form. Calls
25  for speculation, foundation.

Page 159

DENIG - CONFIDENTIAL
1
2     A.    I'm sure there is.
3     Q.    You don't have any knowledge of that?
4     A.    Nope.
5     Q.    That's not something that you deal
6  with?
7     A.    We do not.
8     Q.    Do you know of any programs at
9  Barclays to liquidate these securities that they
10  just acquired from Lehman?
11    A.    Not that I am aware of.
12    Q.    Ms. Denig, I just want to show you a
13  couple of spreadsheets now. I'm not sure whether
14  you are -- I don't know if they are Lehman
15  spreadsheets, Barclays spreadsheets or any other
16  entity's spreadsheets. I just want to see if you
17  can help me out and try to identify them.
18          (Exhibit 245, document Bates stamped
19          BCI-EX99802 through 807 and 862 through 865
20          marked for identification, as of this date.)
21    Q.    Ms. Denig, I am handing you a document
22  marked as Exhibit 245. And my question is if you
23  have ever seen this document before.
24    A.    I have not.
25    Q.    Let me describe it for the record. It

Page 160

DENIG - CONFIDENTIAL
1
2  was marked with the Bates stamps BCI-EX00099802
3  through 865.
4           Did I hear you correctly you have
5  never seen this before?
6     A.    I have not.
7     Q.    Did I hear -- can you tell me whether
8  it is a Barclays spreadsheet or Lehman
9  spreadsheet?
10    A.    Yes.
11    Q.    What --
12    A.    It is a Barclays spreadsheet.
13    Q.    If you look on the third page, there
14  appears to be a series of columns carrying over
15  three pages, and on the third page it talks about
16  price sold, and then market value, sales. Do you
17  see those entries?
18    A.    Yes.
19    Q.    Does this appear to be some kind of
20  analysis of the sales that they might have made of
21  securities after they went from Lehman to
22  Barclays?
23          MR. SHAW: Objection to form. Calls
24  for speculation, foundation.
25    A.    I couldn't, I couldn't be sure.

Page 161

DENIG - CONFIDENTIAL
1
2     Q.    Could you speculate about what the
3  spreadsheet is?
4           MR. SHAW: Same objections.
5     A.    It could be that or it could be what
6  we sold -- what they booked the sale on their
7  books at with the default of the repo.
8           No, I really wouldn't be able to tell.
9     Q.    OK. Ms. Denig, I am handing you a
10  copy of a document previously marked as
11  Exhibit 207, and I wanted to ask you if you have
12  ever seen that document.
13          Again, just for the record, this is
14  document Bates stamped BCI-EX00099493 through 517.
15    A.    OK.
16    Q.    Have you had a chance to look at that?
17    A.    Yes.
18    Q.    Is this -- have you seen this document
19  before?
20    A.    I have not.
21    Q.    Can you tell whether it is a Barclays
22  or Lehman document?
23    A.    Yes.
24    Q.    Which one is it?
25    A.    Barclays.

41

Page 162

DENIG - CONFIDENTIAL

2  Q.  If you look at the last page, it
3  totals to about 5.9 billion dollars in value. I
4  wonder if that figure reminds you in any way of
5  what this could be about.
6  A.  Nope. It looks like it was assets
7  that went to a PDCF.
8  Q.  PDCF is a Fed program?
9  A.  A Fed program.
10  Q.  So assets that came from PDCF?
11  A.  No. It looks like ones that probably
12  went to PDCF.
13  Q.  Assets posted as collateral to PDCF by
14  Lehman on the 15th?
15  A.  I think this is Barclays, because
16  remember Fed was out of the transaction with
17  Lehman, so Barclays basically took the assets and
18  then they did a trade with the Fed.
19  Q.  Can you explain that to me?
20  A.  So we originally were getting
21  liquidity from the Fed via these type of programs.
22  When we transferred all the assets from Lehman
23  Brothers to Barclays, Barclays then did the trade
24  with the Fed.
25  Q.  Does Barclays still do trades with the

Page 163

DENIG - CONFIDENTIAL

2  Fed?
3  A.  Yes.
4  Q.  So they still get financing through
5  the PDCF?
6  A.  No, not the PDCF but PSLF.
7  Q.  So this might relate to that?
8  A.  Yeah, that's what it looks like.
9  Q.  Thank you.
10     In that regard, were they using the
11  same assets that they had acquired from Lehman?
12     MR. SHAW: Objection, foundation.
13  A.  That was my understanding.
14  Q.  And do you know if they got the same
15  haircut that Lehman got?
16     MR. SHAW: Objection, foundation.
17  A.  I have no idea.
18  Q.  Do you know whose value, valuation
19  they used on those assets in posting them to the
20  Fed program?
21  A.  Barclays? No idea.
22  Q.  Who is their custodian in connection
23  with the Fed program?
24  A.  BoNY.
25  Q.  BoNY? OK.

Page 164

DENIG - CONFIDENTIAL

2     Do you know how much Fed funding
3  Barclays has secured in connection with any of the
4  Fed programs?
5  A.  Currently?
6  Q.  Yeah.
7  A.  Not much.
8  Q.  At any time?
9  A.  I'm not understanding that question.
10  Q.  Well, you said, I think you said that
11  once Lehman exited the Fed program, Barclays
12  itself engaged in securing financing from the Fed
13  program, right?
14  A.  Right.
15  Q.  Do you know how much Barclays secured
16  in that way?
17  A.  I do not. I don't know what their
18  total numbers were.
19  Q.  Do you have any approximate amounts?
20  A.  Not at that time. Currently, I know
21  what they have currently, which is probably around
22  6 billion.
23  Q.  Was that -- what is -- did Barclays
24  use any of the funds that it secured from the Fed
25  in connection with the sale transaction between

Page 165

DENIG - CONFIDENTIAL

2  Lehman and Barclays?
3     MR. SHAW: Objection, foundation.
4  A.  And I would like you to repeat the
5  question. Sorry.
6  Q.  What did Barclays use the money for
7  that it got from the Fed?
8     MR. SHAW: Objection, foundation.
9  A.  I have no idea. I'm not privy to that
10  conversation or those conversations.
11  Q.  Let's mark this one, please.
12     (Exhibit 246, document Bates stamped
13     BCI-EX108184 through 189 marked for
14     identification, as of this date.).
15  Q.  Ms. Denig, I am handing you a copy of
16  a document marked as 246, another spreadsheet. I
17  ask you if you had ever seen this before.
18  A.  I have not.
19  Q.  Does this appear to be a Barclays
20  document?
21  A.  Yes, it does.
22  Q.  Do you have any speculation, best
23  guess about the purpose of this spreadsheet?
24     MR. SHAW: Objection, form, calls for
25  speculation, foundation.

Page 166

DENIG - CONFIDENTIAL
1
2     A.   No idea.
3     Q.   OK.  Could you think of who at
4  Barclays we should ask about this?
5          MR. SHAW:  Same objection.
6     Q.   Who at Barclays might know what --
7     A.   Might know what the -- what this is?
8     Q.   Yeah.
9          MR. SHAW:  Same objection.
10    A.   Where did you get the file from?
11    Q.   From Barclays.
12    A.   Neal Ullman potentially.  I mean
13  looking at the list, it is all Lehman Brothers
14  assets.  I know that Delta was in default, Solar
15  Cap was in default.  So it could be securities
16  that they got that they really didn't want.
17  That's my only speculation.
18    Q.   OK, thank you.
19         (Exhibit 247, document Bates stamped
20     BCI-EX108708 marked for identification, as
21     of this date.)
22    Q.   Ms. Denig, I am handing you a copy of
23  a document marked Exhibit 247.  It is a one-page
24  spreadsheet.
25         And my question is if you have ever

Page 167

DENIG - CONFIDENTIAL
1
2  seen this before.
3     A.   No.
4     Q.   Any idea what this is?
5          MR. SHAW:  Objection to form.  Calls
6  for speculation, foundation.
7     Q.   You can still answer.
8     A.   It is a list of the type of assets
9  that are still in the box that they, Barclays now
10  funds.
11    Q.   So when you say that, you mean assets
12  acquired from Lehman?
13    A.   It doesn't appear to be that.
14    Q.   These are the types of assets that
15  were acquired from Lehman, where it says asset
16  type?
17         MR. SHAW:  Same objection, objection
18     to form, speculation, foundation.
19    A.   There were all these asset types on
20  the transfer.
21    Q.   The second column says "Sum of P3 Face
22  Value."  Do you see that?
23    A.   Yeah.  I don't know what that means.
24    Q.   You don't know what P3 means?
25    A.   No.

Page 168

DENIG - CONFIDENTIAL
1
2     Q.   The next column says "Sum of PCG MV."
3  Do you see that?
4     A.   Um-hm.
5     Q.   Is that a Lehman valuation?
6     A.   It is not.
7     Q.   What does PCG stand for?
8     A.   Product control group.  So it would be
9  Barclays Finance.
10    Q.   PCG is a Barclays entity?
11    A.   Yes, it is.
12    Q.   There was no product control group at
13  Lehman?
14    A.   There was but this is not a Lehman
15  doc.
16    Q.   Could that be the valuation from the
17  Lehman PCG that they are reflecting in the chart?
18         MR. SHAW:  Objection, calls for
19     speculation, foundation.
20    A.   No idea.
21    Q.   I have seen several charts that talk
22  about PCG value.  Am I understanding you correctly
23  there is a PCG at Lehman?
24    A.   We didn't call it PCG.  Barclays calls
25  it PCG.

Page 169

DENIG - CONFIDENTIAL
1
2     Q.   Barclays refers to the Lehman entity
3  as PCG?
4          MR. SHAW:  Objection.
5     A.   No.
6          MR. SHAW:  Mischaracterizes the
7     testimony.
8          Go ahead.
9     A.   The product controllers who are the
10  people that are employed in the finance division
11  within Barclays, everybody at Barclays calls that
12  division PCG, product control group.
13         Lehman Brothers people, yes, we had
14  product controllers, but we didn't call them PCG.
15  We called them something completely different.  So
16  that would be finance group or something to that
17  effect.
18         The fact that this is a Barclays
19  document and says "Sum of PCG Market Value," is
20  probably market value that they got from their
21  financial controllers.
22    Q.   But does Barclays refer to the same
23  function at Lehman as PCG?
24    A.   Yes.
25    Q.   And what is -- what did you guys call

Page 170

DENIG - CONFIDENTIAL

1    that function at Lehman?
2        A.    Finance.
3        Q.    Finance?
4        A.    Yes.
5        Q.    Is that -- OK.  And who runs that?
6        A.    Who ran it at Lehman?
7        Q.    Who ran it at Lehman?
8        A.    The ultimately?  It was --
9        Q.    Yeah.
10        A.    Ian Lowitt.
11        Q.    Ian Lowitt.  OK.
12              You see two columns over it talks
13    about liquidity?  Do you see that?
14        A.    Yes.
15        Q.    Where it says "Sum of MV-2-22 with
16    liquidity."  Any idea what liquidity means?
17              MR. SHAW:  MV-12-22.
18        Q.    Yes, I am sorry.  I am sorry.
19        A.    Yes, I know what liquidity is.  It is
20    probably what they actually received in cash for
21    those values.
22        Q.    Did you ever hear of anything called
23    the liquidity discount?
24        A.    No.

Page 171

DENIG - CONFIDENTIAL

1        Q.    In the valuing of any of the
2    securities, did you guys ever apply a liquidity
3    discount?
4        A.    No.
5              (Exhibit 248, document Bates stamped
6        BCI-EX00107848 through 939 marked for
7        identification, as of this date.).
8        Q.    Ms. Denig, I am handing you a copy of
9    what's marked as Exhibit 248, which is marked with
10    the Bates stamp BCI-EX00107848 through 7939.
11        A.    OK.
12        Q.    My question is, have you ever seen
13    this spreadsheet before?
14        A.    I have not.
15        Q.    Any idea what this is?
16              MR. SHAW:  Objection to form, calls
17        for speculation, foundation.
18        A.    It looks like a repo transaction, or
19    this -- the desk here is a trading book that
20    belongs to the repo desk at Barclays.
21        Q.    OK.
22        A.    These could be free collateral that
23    they booked.
24        Q.    When you say it could be free

Page 172

DENIG - CONFIDENTIAL

1    collateral that they booked, in connection with
2    what?
3        A.    Lehman purchase.
4        Q.    In other words -- well, if you see on
5    the top of the first page, it has a total of
6    42.1 billion dollars.  Do you see that?
7        A.    Yes.
8        Q.    Does that suggest any kind of
9    connection with the collateral they received from
10    Lehman?
11              MR. SHAW:  Objection to form.  Calls
12        for speculation.  Foundation.
13        A.    I would agree, yeah, it could have
14    been, but there is no way for me to 100 percent
15    know that.
16        Q.    Does this appear to be some Barclays
17    booking of the collateral associated with the
18    Lehman transaction?
19              MR. SHAW:  Objection to form.
20        A.    It does.
21        Q.    If you turn to page 3, the third page,
22    you will see there is a series of columns that
23    mention auctions or auction values.  Do you see
24    that?

Page 173

DENIG - CONFIDENTIAL

1        A.    Yes.
2        Q.    Do you have any understanding of what
3    that could be talking about?
4              MR. SHAW:  Objection to form.
5        A.    I know what an auction is, and when
6    you don't have like a price from Bloomberg or any
7    other reputable pricing source, they take these
8    securities and go out to the street and try to get
9    a bid as far as what value and who would take it,
10    and these could be -- that's what an auction is.
11    But I don't -- I don't know what the prices are,
12    or where they come from.
13        Q.    Do you have any understanding that
14    Barclays went out and tried to secure pricing in
15    that method, in that manner, in connection with
16    the securities they received from Lehman?
17        A.    I'm not aware that they did that.
18        Q.    Would you be in a position to have
19    heard that if they had?
20        A.    Yes.  Now in my current role, yes.
21        Q.    And despite holding that position, you
22    haven't heard anything to that effect?
23        A.    Not at that time, no.  Not even after.
24        Q.    How about now?

Page 174

DENIG - CONFIDENTIAL

A. No.

(Exhibit 249, document Bates stamped
BCI-EX99522 through 532 marked for
identification as of this date.)

Q. Ms. Denig, I am handing you a copy of
a document marked as Exhibit 249, Bates stamped
BCI-EX99522 through 532.

A. OK.

Q. My question is if you have ever seen
that before.

A. I have not, no.

Q. Do you have any idea what it could be?

MR. SHAW: Objection to form. Calls
for speculation. Foundation.

A. I can't be sure, because I don't even
know like what these values are representing, what
denomination, and these are -- they are in
millions, thousands or whatever. So --

Q. You're pointing to something. What
are you pointing to?

A. Just the whole spreadsheet in general.

Q. You're looking at the third page of
this document?

A. Yes, yes.

Page 175

DENIG - CONFIDENTIAL

Q. Do you have any idea what adjusted PCG
value is in the last column?

A. I do not.

Q. So this is a completely foreign
document to you?

A. It is.

Q. Ms. Denig, were you involved in
sending any information to Barclays' auditors
after you have been at Barclays?

A. Not related to this.

Q. Have you ever sent any reports to the
auditors about the value of the securities that
were transferred over from Lehman?

A. No, I did not.

Q. No interaction at all with Barclays'
auditors?

A. No, not with regards to Lehman.

Q. OK. Do you have any idea how Barclays
was able to declare a 4 billion dollar gain on
their acquisition of Lehman?

A. No.

Q. Do you have any -- did you ever hear
anything since you have been at Barclays about how
they were able to declare such a large gain after

Page 176

DENIG - CONFIDENTIAL

acquiring Lehman?

A. No, I have not. This is the first
time I am hearing it.

Q. Do you review Barclays' financial
statements?

A. No. Not recently.

Q. You haven't heard any scuttlebutt
around Barclays about what a great deal the Lehman
acquisition was?

A. No.

Q. No? OK.

A. Was it?

Q. I don't know. I am asking you, have
you heard anything in the hallways, at the water
cooler or anything, people talking about, raving
about the acquisition of Lehman at Barclays?

A. No. No. I seriously haven't.

Q. In the interest of trying not to show
you every document in my collection here, have
you -- you are aware of the master repurchase
agreement that Lehman had with Barclays before
September 15?

A. Yes.

Q. Did you have any role in negotiating

Page 177

DENIG - CONFIDENTIAL

that agreement or making amendments to that
agreement?

A. No.

Q. Did you ever hear anything during the
week of September 15 that that agreement was going
to be amended in any way?

A. Not that I recall.

Q. Do you recall any discussions about
amending any custodial agreements relating to
repos that Lehman was going to enter into with
Barclays?

A. Not that I recall.

Q. Absolutely no discussions at all about
amendments or modifications to any underlying repo
transactional documents; is that fair to say?

A. The only thing that I vaguely
recollect is that they may have adjusted the
schedule of the allowable collateral they could
take.

Q. And "they" meaning --

A. Barclays.

Q. So those --

A. It could be more broad. So when you
set up a triparty arrangement or a repo agreement,

Page 178

```
1              DENIG - CONFIDENTIAL
2    you identify the type of assets that you will
3    accept --
4         Q.   OK.
5         A.   -- as collateral.
6         Q.   OK.
7         A.   I think there was an amendment based
8    on, as you are just seeing it, that they could
9    amend the allowable collateral that they would --
10   you know, they could make it more broad range,
11   which I think --
12        Q.   Do you recall that taking place?
13        A.   I do recall that.
14        Q.   Is that what is called Schedule A to
15   the MRA?
16        A.   Yes, it is.
17        Q.   And have you ever seen that document
18   before?
19        A.   A schedule, a Schedule A or --
20        Q.   No, the Schedule A that was amended
21   that week.
22        A.   I did not, no.
23        Q.   So is it correct to say that your
24   understanding was that it was amended to allow for
25   more types of collateral to be posted towards the
```

Page 179

```
1              DENIG - CONFIDENTIAL
2    September 18 repo?
3         A.   Yes.
4         Q.   And what was added to the list of
5    allowable collateral?
6         A.   That I don't know. I don't know what
7    was originally on the list versus what they added.
8    I don't know. There is a -- you know,
9    documentation group handles that.
10        Q.   Who was that?
11        A.   Rob Guglielmo, Lisa-Lynn Boron.
12        Q.   Do you have any sense of whether it
13   was to allow less secure types of collateral to be
14   posted?
15        A.   Yes.
16        Q.   Yes, you have an understanding, or
17   yes, it was?
18        A.   That's my understanding.
19        Q.   That it was amended to allow less
20   secure types of collateral to be posted than
21   previously?
22        A.   Yes.
23        Q.   Do you know if the amendment was in
24   any way to set haircuts for those particular types
25   of collateral?
```

Page 180

```
1              DENIG - CONFIDENTIAL
2         A.   I do not know that.
3         Q.   Is that what typically is done in a
4    Schedule A?
5         A.   I don't think so. Not on the
6    haircuts.
7         Q.   So it's just --
8         A.   Allowable collateral.
9         Q.   OK. Now, was that done in conjunction
10   with Barclays preparing an excluded list of
11   collateral or list of excluded collateral that we
12   talked about earlier?
13            MR. SHAW: Objection, foundation.
14        A.   I have no idea.
15        Q.   Not something that you would be
16   dealing with every day?
17        A.   No.
18            (Exhibit 250, document Bates stamped
19   10328232 marked for identification, as of
20   this date.)
21        Q.   Ms. Denig, I'm handing you a copy of a
22   document marked as Exhibit 250. It is just a
23   one-page document dated September 16, which
24   appears to be an e-mail in which you are involved.
25            And my question is, first of all, have
```

Page 181

```
1              DENIG - CONFIDENTIAL
2    you ever seen this e-mail before?
3         A.   Yes.
4         Q.   And what is this e-mail discussing?
5         A.   It is telling one of my guys to book
6    the overnight repo with Barclays.
7         Q.   So this is -- is this -- am I correct
8    in reading this is about 5.5 billion dollars worth
9    of securities?
10        A.   Yes.
11        Q.   So this was the Tuesday night repo and
12   they are booking it that night and you're
13   instructing them to do it?
14        A.   Yes.
15        Q.   This has nothing to do with the
16   September 18 repo or anything else. This is the
17   individual nightly repos that Barclays had with
18   Lehman, correct?
19        A.   Yes.
20        Q.   That is all I have. I just wanted to
21   understand what that was.
22            (Exhibit 251, document Bates stamped
23   102378755 (7 pages) marked for
24   identification, as of this date.)
25        Q.   Ms. Denig, I am handing you a copy of
```

Page 182

DENIG - CONFIDENTIAL

a document marked Exhibit 251, which is an e-mail,
and it is -- this is a subject and attachment
which discusses cash user/generator report.

So after you have had a chance to look
at it, my first question is whether you have ever
seen this before.

A. Yes.

Q. Have you had a chance to look at that?

A. Yes.

Q. And you have seen this before?

A. Yes.

Q. What is this?

A. It is a document that we used to
provide to the Lehman traders on trades that would
have generated cash or used cash based on asset
type.

So if we reverse securities in, you
would be paid a certain value. So if you had
100 million in and we paid 100 million for it and
we sold it or repo'd it out for 100 million but
paid 102, we actually paid out or received in cash
of 2 percent, and that would be considered a cash
generator trade.

Q. OK. You completely lost me there.

Page 183

DENIG - CONFIDENTIAL

A. So the traders -- or the traders have
a business, it is called matchbook trading.

Q. Is this Mr. Coughlin's group?

A. Yes, this is Coughlin's financial
traders.

Q. OK.

A. So they would repo or reverse repo in
certain collateral and then repo out certain
collateral. And the spread differential on the
transaction would be how they would make money.

Q. Right.

A. So in the event that you borrowed in
and repo'd out or loaned out the same value of the
collateral, the cash differential would determine
whether you were a cash generator or user. So at
this point it had nothing to do with the assets
themselves. It had all to do with the cash that
was generated from these transactions.

So I will give another example. When
we buy something, or reverse something in, we buy
it. So we buy the assets, take in the assets,
send out cash. We have to pay interest on that
cash or the customer has to pay us interest on the
cash that we gave them.

Page 184

DENIG - CONFIDENTIAL

Then we lend out the same securities,
and they send us in cash, and whoever we sent that
to, there is a cash representation there. The
difference between them would be a cash usage or
generation, and the difference between the rates
would be how the traders make their money.

If the value of the collateral that we
got in exceeds the value of the collateral that we
put out, it would be a generator, and vice versa,
and you would be a user.

And then there is another unsecured --
it is considered unsecured cash, which then we
would have to go try to get -- take it and do
something else with it, and there is a rate that's
applied to that.

Q. So this is not a report that's
generated within your shop at Lehman?

A. At Lehman it was. At Barclays it is
not.

Q. But it relates primarily to how well
the traders are doing in either making money on
the spread or not?

A. Yes.

Q. And is it in any way related to the

Page 185

DENIG - CONFIDENTIAL

September 18 repo?

A. It is not.

Q. So it is --

A. This is business as usual.

Q. When I look at the bottom and see
51 billion dollars in cash on page 2, the fact
that that's in the ballpark with the numbers we
are talking about is purely circumstantial?

A. It is, to the extent that the only
liquidity providers we had at that particular
moment was the Fed, and ultimately if that is all
we had in the Fed, then it makes sense that that's
what we had.

Q. Just so I understand what you just
said, this is Wednesday of that week, so the only
liquidity provider you have is the Fed who has
given you approximately 45 billion in cash, right?

A. Yeah. And then there was other little
transactions that we had there, here and there.

Q. Barclays has a repo of about 5 billion
at that time?

A. On the end of Tuesday, yes. They get
increased -- each day it increased. I just don't
remember what the final -- what the increments

Page 186

```
 1              DENIG - CONFIDENTIAL
 2    were on a daily basis.
 3        Q.   So this report basically models what
 4    Lehman is doing with that cash that all these
 5    liquidity providers are giving it, right?
 6        A.   Yes.
 7            (Exhibit 252, document Bates stamped
 8        10302702 marked for identification, as of
 9        this date.)
10        Q.   Ms. Denig, I am handing you a copy of
11    a document marked Exhibit 252, which is an e-mail
12    stream dated September 17, 2008.
13            My question is, have you ever seen
14    that document before?
15        A.   I vaguely recollect this e-mail.
16        Q.   Could you just describe for me in your
17    own terms what this is, what the issue is here in
18    these e-mails?  This is something to do with
19    intercompany trades?
20        A.   LBI provides the funding for --
21    provided the funding for a majority of the legal
22    entities that Lehman owned.  When they do the
23    transactions, they are repo transactions, in order
24    to fund those securities.  So if they are sitting
25    long in one entity, they would do an intercompany
```

Page 187

```
 1              DENIG - CONFIDENTIAL
 2    trade to move the assets over to LBI so they could
 3    get funded via triparty, via repo client,
 4    something like that.
 5            When you do that, do we pay a haircut?
 6    Sometimes we did and sometimes you didn't, and
 7    that would be determined based on the trader at
 8    the time.  So sometimes you just did a flat
 9    haircut.  They don't really care.  It is
10    intercompany, it is from one pocket to another.
11            So I think they were trying to
12    determine, based on the fact that the Holdings
13    company was now bankrupt, these -- that they
14    wanted to make sure that any intercompany trades
15    that were still being transacted, they would
16    get -- they were paying a haircut on.
17        Q.   And that haircut --
18        A.   Was equivalent to what we were getting
19    from the Fed.
20        Q.   And was that eventually determined
21    that that was being done properly?
22        A.   I honestly don't remember.  I am
23    sorry.
24        Q.   OK.  Ms. Denig, do you ever recall
25    hearing early in the week of September 15 any
```

Page 188

```
 1              DENIG - CONFIDENTIAL
 2    mention of the fact that Lehman was going to be
 3    selling to Barclays about 70 billion dollars in
 4    assets?
 5        A.   No.
 6        Q.   Do you recall any mention during that
 7    week or ever having any understanding that
 8    70 billion dollars was the value of Lehman's
 9    assets?
10        A.   I did not hear 70 billion.
11        Q.   Did you ever hear that number used
12    during this two-week period?
13        A.   No, no.
14        Q.   How about the notion that Lehman was
15    at 69 billion dollars in liabilities?
16        A.   No.
17        Q.   You never heard that number used
18    during the two-week period from September 15 on?
19        A.   I did not.
20        Q.   I think I am done with my questions,
21    so thank you very much.  Some of my colleagues I'm
22    sure will have some more questions for you, and if
23    I think of any while I am taking a break, I might
24    come back to ask you, but thank you very much.
25            MR. HINE:  Do we want to take a break?
```

Page 189

```
 1              DENIG - CONFIDENTIAL
 2            (Recess)
 3    EXAMINATION BY
 4    MR. OXFORD:
 5        Q.   Good afternoon, Ms. Denig.  We met off
 6    the record.  As you know, my name is Neil Oxford.
 7    I work with Hughes, Hubbard & Reed, and we
 8    represent the SIPA trustee in this action.
 9            Following up on some of the questions
10    that Mr. Hine asked you, do you recall testifying
11    about the search for additional unencumbered
12    assets on the 19th, 20th and 21st of September?
13        A.   It was the 20th and the 21st.
14        Q.   You do not recall looking for
15    additional unencumbered assets on the 19th?
16        A.   That's correct.  We didn't receive the
17    file until about 4 o'clock on the afternoon on
18    Saturday.
19        Q.   Which file did you not receive?
20        A.   There was a file, I think it was
21    labeled "DTC Collateral Analysis" or something
22    like that in one of the exhibits.
23        Q.   Until you received that file, on the
24    afternoon of Saturday, the 20th, it is your
25    recollection that you did not have any involvement
```

## Page 190

DENIG - CONFIDENTIAL

in a search for additional unencumbered
collateral; is that correct?

   A.  That's correct.

   Q.  Did you have an understanding of why
you were looking for this additional unencumbered
collateral?

      MR. SHAW: Objection, asked and
answered.

   A.  My impression was that we were -- we
had a shortfall in the delivery of the original
repo, and we were just trying to find the rest of
the -- the collateral to make up the shortfall in
market value.

   Q.  Again, I am a little confused. Is the
shortfall in the market value of assets that were
delivered -- withdrawn. I'll try that question a
better way.

      Can you be more specific about the
shortfall in the market value of securities that
were delivered that you just told me about?

   A.  Sure. When pens went down on the end
of September 18, they came back to us, and who,
I'm not really sure who, but saying -- and it was
communicated down to us that we were short in the

## Page 191

DENIG - CONFIDENTIAL

value, in I believe the 1.9 billion dollar range.

      A billion of it was transferred Friday
morning, which we didn't know what the total
market value of that was until Monday, the 22nd,
but on Saturday, those assets were not reflected
in any of the documentation that anybody had at
that point, because we didn't receive the file
from BoNY until Monday morning.

      So Saturday basically we were told to
look for -- we were told, tasked to look for
1.9 billion. We kept referring to a billion of it
was delivered already, so we were really on the
search for 900 million odd.

   Q.  And your understanding about what you
were looking for and why came from conversations
with Mr. Hraska; is that correct?

   A.  Mr. Hraska and Mr. Forrest.

   Q.  Did anyone ever tell you, Ms. Denig,
that one of the reasons that additional collateral
was transferred to BoNY on Friday, the 19th, was
because Lehman had had to transfer cash as part of
the repo?

   A.  I knew Lehman transferred cash as part
of the repo, so I wasn't sure how that was going

## Page 192

DENIG - CONFIDENTIAL

to be reconciled. I thought that potentially
Chase and BoNY were kind of discussing that and
working that out. I wasn't sure that they -- they
segregated that collateral were going to just
deliver it the very next day, if Barclays would
have given us the cash -- given Chase the cash
back, and then they were given collateral worth
that value.

      I wasn't sure how they were going to
make that whole or whether they were just going to
leave it as cash.

   Q.  When Mr. Hraska testified last week,
he told me that the reason additional collateral
was transferred on the 19th from Lehman to BoNY
for the benefit of Barclays, it was with the
intention of releasing some of the cash that had
been pledged as part of the September 18 repo.
Did Mr. Hraska ever tell that information to you?

      MR. SHAW: Objection, form,
mischaracterizes Mr. Hraska's testimony.

      But you can answer the question.

   A.  As far as my recollection was, it was
to satisfy the shortfall of collateral. How that
was -- the 7 billion really didn't come more clear

## Page 193

DENIG - CONFIDENTIAL

to me or people told me about it until later on,
but not at that particular time, no.

   Q.  Have you ever heard at any time that
the reason additional unencumbered collateral was
moved to BoNY on the Friday, the 19th, was to
release the cash that had been transferred as part
of the repo on the 18th?

   A.  I did not.

   Q.  Do you have in front of you what has
previously been marked as Exhibit 237?

   A.  Yes.

   Q.  I am also handing you what has
previously been marked as Exhibit 150B. I don't
think Mr. Hine marked that this morning.

      You will see, Ms. Denig, that both
Exhibit 237 and Exhibit 150B have attachments; is
that right?

   A.  Yes.

   Q.  And both the attachments appeared out
of the file name TRI09192008.xls?

   A.  Yes.

   Q.  But Exhibit 237 appears to be
version 3 of a spreadsheet with that same file
name; is that correct?

Page 194

DENIG - CONFIDENTIAL

1
2     A.   OK, OK.
3     Q.   Do you have any understanding of the
4   difference between those two spreadsheets? I am
5   obviously not expecting you to go through them
6   line by line, CUSIP by CUSIP, but just if you
7   could take a moment to look at them and tell me
8   whether you have any understanding of the
9   difference between the two, if any.
10     A.   I don't see a difference.
11     Q.   Just looking for the moment at
12   Exhibit 237. Is that the spreadsheet that you
13   created?
14     A.   No.
15     Q.   It appears to be sent from you to
16   Kendall McLaughlin, William Bach and Bob Azerad?
17     A.   Correct, but I did receive it from the
18   Magics technology team. It is either Magics or
19   BoNY, to be honest with you. No, it was
20   definitely Magics.
21     Q.   Can you explain what you mean by
22   Magics?
23     A.   Magics is a front-end system that
24   would have been the mechanism that we did the
25   pledges. So a trader inputs the information in,

Page 195

DENIG - CONFIDENTIAL

1
2   feeds into a trader system, feeds down to a
3   settlement system, and then a delivery is made.
4     So according to the front-end system,
5   this is what the individual CUSIPs were that were
6   sent to BoNY on the 19th, the morning of the 19th.
7   And the market value -- where I wanted to see if
8   it is different is that the values on the last
9   page of both equal the same amount of money, one
10   billion eighty.
11     One of them is a warrant which they
12   didn't want, so I think they ended up delivering
13   that back. So in Exhibit 237, you see how the
14   last page, you have a total market value of
15   1,035,000,000, and then there is this one line
16   that says 54 million?
17     Q.   Um-hm.
18     A.   And if you look at the file on the
19   last page of Exhibit 150, the total value was
20   1,090,059,000. If you add up the two, it is the
21   same value. So I'm assuming that the information
22   is consistent, that it reflects the same
23   information.
24     Q.   OK.
25     A.   The different version could just be

Page 196

DENIG - CONFIDENTIAL

1
2   the fact that something, you know, was shuffled
3   around a little bit.
4     Q.   And the market values that you see
5   reflected on these two spreadsheets, Ms. Denig, is
6   a market value that's assigned by Lehman, correct?
7     A.   Yes.
8     Q.   And if I understand your testimony
9   correctly, these were CUSIPs that were transferred
10   out from Lehman's box of DTC to BoNY for the
11   benefit of Barclays on the 19th?
12     A.   That's correct.
13     Q.   And do you know whether or not the
14   CUSIPs reflected in Exhibits 150B and 237 were
15   ever returned to DTC's clearance boxes?
16     A.   I think this one asset was. I think
17   that's why it is highlighted. I'm pretty sure my
18   recollection is this was on the excluded list so
19   they kicked it back. So in --
20     Q.   Just so we have a clear record --
21     A.   In Exhibit 237, you see there was this
22   one security, the last page that's highlighted,
23   and it is called the warrant, that's the type of
24   product it is. Usually that was not something
25   that you can go raise cash for. And it had a

Page 197

DENIG - CONFIDENTIAL

1
2   market value of 54 million. I think that was on
3   the excluded list and they did kick it back.
4     Q.   With the exception of that one warrant
5   worth 54 million dollars, is it correct that the
6   assets reflected in Exhibit 237 were not held in
7   LBI's clearance boxes as of the close of business
8   on the 19th of September?
9     A.   That's correct.
10     Q.   And is it also correct that, again
11   with that one exception of that one line item, the
12   54 million dollars, the assets reflected on
13   Exhibit 237 were not at any time after close of
14   business on September 19 ever included in LBI's
15   clearance boxes?
16     MR. SHAW: Objection to form,
17     foundation.
18     A.   And I'm not 100 percent sure that
19   there weren't other discrepancies, but as of this
20   particular moment, when this particular file was
21   done, this is the only one that we knew of that
22   got kicked back. In subsequent reconciliations
23   there could have been others.
24     Q.   Let me try it this way. As of close
25   of business on Friday, with that one exception we

Page 198

DENIG - CONFIDENTIAL

have talked about, the CUSIPs that are reflected
on 237 were not in Lehman's clearance box,
correct?

A.    That's correct.

Q.    As of Monday morning, again with this
one exception, the CUSIPs reflected on 237 were
not contained in Lehman's clearance boxes,
correct?

A.    That's correct.

Q.    Thank you.  That is all I have for
those documents at the moment, I think.

(Exhibit 253, document Bates stamped
BCI-EX-S-00018190 through 191 marked for
identification, as of this date.)

Q.    Ms. Denig, you have in front of you
what has been marked as Exhibit 253, which is a
two-page document I'll identify for the record as
bearing the Bates range BCI-EX-S-00018190 through
91.

If you'd just take a moment to
familiarize yourself with that and let me know
when you have finished doing so.

OK.  Do you see below the --
Mr. Hraska's emoticon?

Page 199

DENIG - CONFIDENTIAL

A.    Is that what it is called?

Q.    I believe so.  It is the first time I
have had a chance to say "emoticon" on the record
anywhere.

It is an e-mail from you, Ms. Denig,
to John Rodefeld at Barclays, Wednesday, September
24th.

A.    Yes.

Q.    With a re: line "Just to summarize."

Can you explain to me the context in
which you sent this e-mail to Mr. Rodefeld,
please?

A.    Yes.  Jim asked me to follow up with
the clearance folks to find out if, in fact, we
did pledge this particular CUSIP to Barclays.
They didn't have it on their books anywhere, and I
didn't have it as a discrepancy on my
reconciliation with John.

So we went to the clearance folks, who
was this guy Ed Steffens.  He went -- which is the
original one.  He said this to Jim, which is
basically a reflection of what was in each box for
these three CUSIPs, so he was saying 074, there
was nothing in the box.  In 636 we had 20 billion,

Page 200

DENIG - CONFIDENTIAL

210 in the box and nothing in the other two.

I was telling him in this e-mail that
we already did pledge to him, which isn't
reflected anywhere else in the e-mail, that at 70
million, 210, and that we had additional 200 -- 20
million, 210 in the box.

Q.    Do you know at which point these
CUSIPs were pledged to Barclays?

A.    For the 70 million, 210, it was done
on -- it could have been done on a combination of
the 18th and the 19th, because ultimately my list
ended up being combined and I only knew of one
list, so I combined those as could have been
delivered on either date.  Though we could -- it
could be looked to see where.

Q.    And that answered my question with
respect to the 70 million.  The 20 million figure?

A.    Yes.

Q.    Is that the same answer?  Was it
pledged on either the 18th or the 19th?

A.    No, it was not.  It was still as of
September 24 sitting in the DTC box, 22 -- 636,
which is LBI's DTC box location.

Q.    At any point did that CUSIP get

Page 201

DENIG - CONFIDENTIAL

transferred or pledged to Barclays?

MR. SHAW:  Objection, foundation.

A.    I can't be sure.

Q.    To the best of your knowledge, was it
ever pledged or transferred to Barclays?

A.    I think so.

Q.    And when do you believe it was pledged
or transferred to Barclays?

A.    On the 29th or the 30th.

Q.    Thank you.  That is all I have about
that document.

(Exhibit 254, document Bates stamped
BCI-EX-S-18206 with attachment marked for
identification, as of this date.)

Q.    Ms. Denig, I have handed you what has
been marked as Exhibit 254, which is a one-page
e-mail having the Bates range BCI-EX-S-00018206,
and it has an attachment that was produced to us
in native form, and the place holder is
BCI-EX-S-00018207.

My question to you is a simple one,
Ms. Denig:  Do you know what this document is?

A.    It looks like a dump of information
that was in our DTC boxes as of 9/24 based on what

Page 202

DENIG - CONFIDENTIAL

1    GFS knew.

2    Q.  Is there any information in this

3    spreadsheet that tells you whether the assets are

4    encumbered or unencumbered?

5    A.  It could be -- you can't be sure based

6    on this information because it was corrupted after

7    the 19th, because we didn't get all our records in

8    from Chase, and there were stock record breaks of

9    things that were done.

10    So this information is only as good as

11    the systems he was retrieving the data from, and

12    at that time, there were problems.

13    So on September 24, there was not a

14    good clean record of what we had in our box

15    without physically looking in the box.

16    So based on the best of our abilities,

17    based on this report, in a regular common

18    environment, yes, you would be able to tell what

19    was unencumbered from this report.  But this is

20    not a common environment, and the information that

21    we had we know was not 100 percent correct.

22    Q.  I am understanding --

23    A.  So if we could determine if anything

24    was unencumbered, then we would have to look in

Page 203

DENIG - CONFIDENTIAL

1    DTC to verify, because there was no way to verify

2    from here.

3    Q.  Do you have an understanding,

4    Ms. Denig, of why Mr. Panneillo sent you this?

5    A.  Yes.

6    Q.  Tell me what that is, please.

7    A.  I was asked to ask this technology guy

8    who was in the GFS technology team to provide me a

9    list of all assets that were in accounts that

10    began with the prefix of 931.

11    Q.  Does the prefix 931 have any

12    significance to you?

13    A.  That is supposed to represent firm

14    collateral.

15    Q.  Is there a reason you qualified your

16    answer with "supposed to"?

17    A.  No.  No, I don't, actually.  That is

18    my -- there is a few exceptions to it, but for the

19    most part, that would be firm collateral.

20    Q.  Are you aware of any transfers --

21    withdrawn.

22    Is 931 a particular location in DTC?

23    A.  No.  It was just a range where you

24    booked the trades in another front end system.  So

Page 204

DENIG - CONFIDENTIAL

1    for equities and corporate collateral, and they

2    would be looked in a settlement system called

3    TMS -- not MTS but TMS.  TMS hooked up to DTC,

4    whereas the MTS sort of hooked up to DTC and

5    Chase.  Here, they didn't.

6    When you booked a trade in TMS, there

7    was a trader book that is referenced and a trader

8    books that began with 931 were to be firm

9    inventory.

10    Q.  Is TMS a proprietary Lehman system?

11    A.  Yes, it is.

12    Q.  What does TMS stand for?

13    A.  Trade Management System.  MTS was

14    Management Trading System and ITS was

15    International Trading System.  Nothing fancy.

16    Q.  It all sounds pretty fancy to me.

17    Do you know, Ms. Denig, whether any

18    securities that are designated with the prefix

19    "931" were transferred from -- Lehman to Barclays

20    on the 19th of September 2008?

21    A.  Yes.

22    Q.  You know that CUSIPs with that prefix,

23    931, were, in fact, transferred?

24    A.  Yes.

Page 205

DENIG - CONFIDENTIAL

1    Q.  Do you know whether securities with

2    that prefix, 931, were transferred from Lehman to

3    Barclays subsequent to the 19th of September?

4    A.  Yes.

5    Q.  And were those the transfers on the

6    29th and 30th of September that you referenced

7    earlier in your discussions with Mr. Hine?

8    A.  They were.

9    Q.  Thank you.  That is all I have for

10    that exhibit.

11    (Exhibit 255, document Bates stamped

12    BCI-EX-S 18278 through 79 with attachment

13    marked for identification, as of this date.)

14    Q.  Ms. Denig, do you have in front of you

15    what has been marked as Exhibit 255?  Which I will

16    identify for the record as bearing Bates range

17    BCI-EX-S-00018278 through 279 and then there is a

18    four-page spreadsheet which was produced to us in

19    native form and has no Bates range.

20    If you could take a moment to look at

21    both the e-mail and the attachment and let me

22    know when you have done that and I will ask

23    some questions for you.

24    Do you recognize this document,

Page 206

DENIG - CONFIDENTIAL

1    DENIG - CONFIDENTIAL
2    Ms. Denig?
3        A.    I do.
4        Q.    The initial chain is an e-mail from Ed
5    Steffens, is that correct?
6        A.    Yes.
7        Q.    Did you tell me earlier he works at
8    DTC?
9        A.    He works in clearance but he was a
10   manager for DTC clearance.
11       Q.    When you say he works in clearance --
12       A.    In Lehman, at Lehman.
13       Q.    And at the -- this e-mail is dated
14   September 25. Had he transferred to Barclays at
15   this stage?
16       A.    He did. He doesn't currently have a
17   Barclays role but he is working on the unwind with
18   Deloitte & Touche at Barclays though, employed at
19   Barclays though.
20       Q.    Is he part of that ring fence team?
21       A.    Yes, he was.
22       Q.    Mr. Steffens writes, "Ricky, we had a
23   call this morning surrounding firm assets in 636."
24   Do you see that?
25       A.    Yes.

Page 207

DENIG - CONFIDENTIAL

1    DENIG - CONFIDENTIAL
2        Q.    636 is a reference to one of Lehman's
3    boxes at DTC, correct?
4        A.    That's correct.
5        Q.    Were you on this conference call?
6        A.    I don't recall, but most likely.
7        Q.    Mr. Steffens goes on to say, "There is
8    an effort to confirm what those assets are and if
9    the positions in the box match up against what we
10   know to be firm inventory. A similar exercise was
11   done for the 074 box with Jim and Nancy, got a
12   file from DTCC of the positions and now that is
13   needed for the 636 box. Thanks."
14            He goes on, "Nancy, Jim, is that
15   essentially what we are looking for."
16            Can you explain to me the exercise, to
17   the extent you're aware of it, that
18   Mr. Steffens is talking about in this e-mail?
19       A.    So based on the effort that was done
20   on the weekend of the 20th and the 21st, we
21   identified what we thought or it looked like was
22   firm inventory that we would be able to send over
23   to Barclays, unencumbered in the box. We needed
24   to do an exercise to say take these assets in DTC
25   box location 074 and tell me exactly what's in

Page 208

DENIG - CONFIDENTIAL

1    DENIG - CONFIDENTIAL
2    there. We can't be 100 percent sure that the
3    records we have were valid, so we needed to
4    physically go into the terminal at DTC and tell us
5    what's in there.
6            So what we determined was -- and I
7    think that's what the color coded are, color-coded
8    were. It says CUSIPs in yellow, I believe, are
9    contra, which -- the reds are no longer in the
10   box; greens are additions; and orange, the balance
11   is changed; yellows means that you could go.
12   Yellow securities are valid.
13       Q.    OK, what does the phrase "contra
14   CUSIPs" mean to you?
15       A.    How do I explain this? I don't know
16   how to explain this to you.
17       Q.    In terms that I have half a chance of
18   understanding.
19       A.    Let's see. How do I explain this.
20   Let me see if I can determine which ones they are.
21            I can't explain that to you in a way
22   that would make any sense.
23       Q.    I hesitate to say this, do you want to
24   try me?
25       A.    It is a CUSIP that DTC -- let's see,

Page 209

DENIG - CONFIDENTIAL

1    DENIG - CONFIDENTIAL
2    how do I -- I don't even know. I can't answer the
3    question. I am sorry. I don't know how to -- how
4    to -- contra CUSIPs?
5        MR. SHAW: Can you give us a
6    definition of what the words "contra CUSIP"
7    or the phrase "contra CUSIP" means to you?
8    Not in context of this document, just
9    generally.
10       THE WITNESS: I know I am trying to
11   think.
12       MR. SHAW: Use whatever technical
13   language you need to use and he can ask for
14   explanations if he doesn't understand.
15       A.    I honestly can't find the words to
16   describe it. I can't answer the question. I am
17   sorry.
18       Q.    Well, why don't we come back to it.
19       A.    We will come back to that. It will be
20   bothering me so.
21       Q.    If at any point during the rest of my
22   questions the definition comes back to you, feel
23   free to hold up your hand and blurt it out.
24       A.    See, so for red, the red ones we said,
25   our files showed that they were in the box, but

Page 210

DENIG - CONFIDENTIAL

2  when we went to actual DTC terminal, they were
3  not, that's why it says red ones are no longer.
4  Green CUSIPs are stuff that were deemed to be in
5  the box that we didn't have in the original file,
6  and the orange, the balance is changed from what
7  we knew from JFS to the end.
8      Q.   What do you mean when you use the
9  phrase in that last answer "original file"?
10     A.   The file that was given to us on
11  Saturday evening, on September 20.
12     Q.   The one that was marked as an exhibit
13  by Mr. Hine?
14     A.   Yes.
15     Q.   I forget the exhibit number, but we
16  are talking about the same thing?
17     A.   Yes, um-hm.
18     Q.   If you can put that to one side and
19  when we come back to contra CUSIPs, we can pick it
20  up.
21         (Exhibit 256, document Bates stamped
22         BCI-EX-S-I824I marked for identification, as
23         of this date.)
24     Q.   Ms. Denig, you have in front of you
25  that I have marked as Exhibit 256, a one-page

Page 211

DENIG - CONFIDENTIAL

2  e-mail were the Bates range is BCI-EX-S-000I824I.
3  If you would take a moment to look at that and let
4  me know when you're ready.
5      A.   OK.
6      Q.   This appears to be an e-mail
7  discussion about the same spreadsheet that was
8  attached to what I marked as Exhibit 255. Does
9  that seem accurate?
10     A.   It seems accurate.
11     Q.   And just -- I think I have one
12  question only with respect to this document.  In
13  the chain just below where you are copied, you
14  will see that someone called Marielena Russo
15  writes to Ed Steffens asking if he wants the
16  available or total positions.  Do you see that?
17     A.   Um-hm, yes.
18     Q.   Do you have an understanding of what
19  that means?
20     A.   Yes.  So in the DTC box location that
21  is owned by LBI, we also have a prime service
22  business and a wealth business that would just be
23  a segregated position that -- but is owned by
24  somebody else.  We don't have the legal rights to
25  use that collateral.  It is locked up to be given

Page 212

DENIG - CONFIDENTIAL

2  to somebody else.  So those are still sitting in
3  our box that is owned by LBI but is not available
4  for delivery.
5         Also, if there is a corporate action
6  pending on a particular CUSIP, that would also be
7  segregated out where we wouldn't be able to make
8  delivery.  And then there is another type where if
9  there is a stock record break on the any of the
10 positions, they would also freeze it so you
11 couldn't make delivery.  So if there were any
12 pending adjustments that potentially would affect
13 the position in that box, you couldn't send it.
14        So there is a total position that
15 wasn't seg'd. which was available and then
16 there is the total position overall that would
17 include stock record breaks, wealth client
18 assets, and prime broker.  Prime broker
19 positions, in essence, not ours, they are not
20 our positions.
21     Q.   Was part of the analysis of the CUSIP
22 with the 931 prefix, was part of that analysis to
23 determine whether or not those assets were truly
24 unencumbered?
25     A.   Yes.

Page 213

DENIG - CONFIDENTIAL

2      Q.   And I think we have a clear record on
3  it, but can you explain to me whether or not you
4  and the team you worked on did anything to
5  determine whether or not those assets were
6  unencumbered other than look into DTC boxes?
7      A.   No, we just looked in the DTC boxes.
8      Q.   And when you say you looked in the DTC
9  boxes, can you explain in a little more detail
10 what you mean by that?
11     A.   So the people that are referenced
12 here, Steffens and Marielena, they worked in the
13 clearance area of Lehman Brothers or Barclays at
14 the time.  And she had access to a DTC terminal
15 that's tied into the actual custodian of DTC and
16 they looked to see what the available positions
17 were referencing.  If you put the CUSIP in the DTC
18 box location, you would be able to tell what it
19 is.  There is certain codes within the clearance
20 screens that tell you if it is available or if it
21 is seg'd or if it is a break, if it is a corporate
22 action.  There are specific codes on there so you
23 are able to -- you determine by the DTC screens
24 what the real position is.
25     Q.   You made reference a couple of times

Page 214

DENIG - CONFIDENTIAL

1     today, Ms. Denig, that the quality of the
2     information in Lehman's systems over the week
3     following the filing of the holding company
4     bankruptcy on the 15th carrying through I think
5     the weekend of the 20th and 21st of September was
6     imperfect.
7      A.   It didn't get imperfect until the
8     18th.
9      Q.   OK, thank you for the clarification.
10   From the 18th through the 22nd, the information in
11   Lehman's systems was imperfect, correct?
12    A.   Yes.
13    Q.   Was the information in DTC's systems
14   about the assets in Lehman's boxes also imperfect?
15    A.   No. That's why we went to them as a
16   second check.
17    Q.   Can you explain to me why DTC's
18   systems didn't suffer from the same imperfections
19   as Lehman's internal systems?
20    A.   Because Chase, who is our custodian
21   who handled the deliveries from our Chase box to
22   DTC's boxes, didn't provide us the files necessary
23   to determine whether or not the assets were even
24   there, were there. DTC now received them from

---

Page 215

DENIG - CONFIDENTIAL

1     Chase. Chase was our main -- like our generator
2     of all our information. So they sent us the
3     position files of anything they would have done
4     via pledging securities, delivering securities on
5     behalf of Lehman Brothers. The fact that we did
6     not receive any files on the night of the 18th and
7     the 19th from Chase definitely screwed up our
8     records.
9      Q.   Do you know at what point DTC received
10   the information from Chase that you at Lehman did
11   not?
12    A.   DTC is an actual depository and is a
13   true reflection of what securities are sitting in
14   there. Same as Chase was. And the only way to
15   get the information is to get the reports from
16   them.
17     We didn't get reports from DTC. We
18   got all of our reports and files from Chase. That
19   would be up loaded to our stock record and then
20   would tie to the boxes, the individual boxes, and
21   that was -- like the back office would do that
22   type of reconciliation on a daily basis.
23     After the 19th, we couldn't do that
24   reconciliation because the fact that we never

---

Page 216

DENIG - CONFIDENTIAL

1     received any files from Chase. So the only way to
2     really determine if the assets were there were
3     from looking into the boxes directly. And we
4     didn't get access to DTC right away either. It
5     took us until like the middle of the week in order
6     to get it because we were now Barclays employees
7     and they were LBI's boxes. So we needed somebody
8     to approve that.
9      Q.   How was it, Ms. Denig, that you and
10   the others who were working with you were able to
11   identify to any unencumbered collateral at DTC's
12   boxes over the weekend?
13    A.   Experience in the firm, experience on
14   the Lehman infrastructure, experience on how the
15   trades were executed and the nature of what all
16   the trade codes mean.
17    Q.   Are you able to estimate the degree to
18   which you were correctly able, over the weekend of
19   the 20th and 21st, to identify securities that
20   were, in fact, unencumbered at DTC?
21    A.   Were unencumbered you said? They were
22   easy to -- more easy to determine because we
23   didn't touch them. Let's -- let me put it another
24   way. If it was a segregated position, it was

---

Page 217

DENIG - CONFIDENTIAL

1     never on any list to be going over; therefore,
2     even if we didn't receive any files from Chase,
3     the positions were there.
4      Q.   Right, I think we are talking past
5     each other a little bit. I'm sure it is me asking
6     a bad question.
7     Let's try it this way. Over the
8     weekend with others in your team, you were
9     tasked with identifying unencumbered collateral
10   within DTC's boxes, correct?
11    A.   Yes.
12    Q.   And you were hampered in that effort
13   by Chase's failure to send over certain important
14   data as to transactions affecting those
15   securities, correct?
16    A.   That's correct.
17    Q.   Nevertheless, you managed to
18   accomplish some sort of conclusion as to the
19   existence and extent of unencumbered collateral in
20   Lehman's DTC boxes over that weekend of the 20th
21   and 21st, correct?
22    A.   Yes.
23    Q.   You later appeared to have undertaken
24   an effort to reconcile that with the true records

Page 218

DENIG - CONFIDENTIAL

1 at DTC, correct?
2    A.    That's correct.
3    Q.    How close did you get over the
4 weekend?
5    A.    Oh, well, we had -- we thought we
6 identified about 900 something million and I think
7 it was 485 million that was actually good.
8 Verified.
9    Q.    So 50?
10    A.    Fifty percent.
11    Q.    And that 900 million, just so we are
12 clear, that you believe you identified is over and
13 above the -- what you described as the billion and
14 change that was transferred ostensibly under the
15 repo on the 19th,correct?
16    A.    Yes.
17    MR. SHAW:    Objection to form.
18    A.    Yes.
19        (Exhibit 257, document Bates stamped
20        BCI-EX-S-18293 through 294, with attachment,
21        marked for identification, as of this date.)
22    Q.    Ms. Denig, I have placed in front of
23 you what I have marked as 257 which is identified
24 for the record as BCI-EX-S-00018293 through 294,

Page 219

DENIG - CONFIDENTIAL

1 294 is a place holder for the attachment which was
2 produced in native form.
3        Ms. Denig, have you had a chance to
4 look at 257?
5    A.    Yes.
6    Q.    Do you recognize that document?
7    A.    Yes.
8    Q.    Can you tell me what it is, please.
9    A.    After those steps taken when we were
10 looking at one file from GFS, asked the clearance
11 folks to determine whether or not we didn't have,
12 in fact, have the assets in the box and this was
13 the ultimate result which was on page 4 of this
14 document.
15    Q.    By page 4 of the document, are you
16 referring to the page following?
17    A.    Yes.
18    Q.    18294?
19    A.    Yeah.
20    Q.    That's has some headings at the top,
21 CUSIP, what I am assuming is security description?
22    A.    Correct.
23    Q.    S&P Moody quality and Lehman market
24 value?

Page 220

DENIG - CONFIDENTIAL

1    A.    That's correct.
2    Q.    For the record, that is a spreadsheet
3 that has a total in the last column of
4 269,921,368?
5    A.    Correct.
6    Q.    Ms. Denig, you write to Mr. Hraska,
7 Monty Forrest and Neal Ullman, if my math is
8 right, at 3 o'clock eastern on the 25th of
9 September. "OK, this should be everything in 636
10 and 074. No issues on 636 collateral. All not
11 highlighted. Can do."  Do you see that?
12    A.    Yes, very grammatically incorrect, but
13 yes.
14    Q.    I don't think anybody writes
15 grammatically correct e-mail these days.
16    A.    I was tired.
17    Q.    When you say, "This should be
18 everything in 636 and 074," what do you mean?
19    A.    Everything we could have determined
20 was good to go to Barclays. Based on the assets
21 that we were able to determine were unencumbered
22 and after the verification that we had with the
23 clearance folks, this was my e-mail to my bosses
24 saying go ahead, you can deliver these. These

Page 221

DENIG - CONFIDENTIAL

1 guys then had other steps and Jim and Monty had to
2 go through other steps getting certain approvals,
3 getting other people involved, and they were
4 basically hounding me all day to get me this list
5 so that's kind of where it comes from, like OK,
6 this should be everything.  At that time.  That's
7 the whole thing.  On this particular day, based on
8 the information that we did already, based on the
9 assets that we were able to determine, this is
10 everything that should be able to go.
11    Q.    When you say no issues on 636
12 collateral, what do you mean?
13    A.    Everything we determined in 636, there
14 were no issues with the availability of that
15 collateral.
16    Q.    I notice you don't tell Mr. Hraska
17 that there are no issues with 074.
18    A.    Um-hm.
19    Q.    Was that --
20    A.    That is why I said on the highlighted
21 ones will go, so the ones that are highlighted had
22 issues.
23    Q.    And they were part of the 074 box at
24 DTC, is that right?

Page 222

DENIG - CONFIDENTIAL

1    DENIG - CONFIDENTIAL
2        A.   Yes.
3        OK, thought of a way to describe
4    contra CUSIP.
5        Q.   OK, the whole table is on the edge of
6    its seat.
7        A.   It is an identifier that DTC would
8    use, but it is not a street CUSIP that's used. So
9    another shop can have a different name for it
10   basically, but DTC would have a generic one.
11       So it is different from a regular
12   CUSIP where it is a street CUSIP, everyone uses
13   the same one. We can call it something and
14   somebody else could call it something
15   different. There is no -- those are hard to
16   determine are they real or not. That's why we
17   didn't put them in the list to go and they were
18   highlighted we need further investigation on
19   it.
20       I don't know how to explain it. It is
21   very hard to explain. They are dummy CUSIPs in
22   essence. How it that.
23       Q.   Did you say dummy CUSIPs?
24       A.   Dummy, they are not street-used
25   CUSIPs.

Page 223

1    DENIG - CONFIDENTIAL
2        Q.   Are you aware of whether or not any of
3    the contra CUSIPs that were referred to in this
4    earlier exhibit were ever transferred from Lehman
5    to Barclays?
6        A.   It is not my -- I have no idea. I
7    don't know for sure.
8        Q.   Do you have an understanding of what
9    the issues were with the highlighted entries on
10   the spreadsheet marked as Exhibit 257?
11       MR. SHAW: Objection, compound.
12       A.   And there was a reference earlier in
13   another exhibit, ones that were highlighted in
14   certain colors. Here, in Exhibit 255. Where we
15   say CUSIPs in yellow I believe would be contra;
16   red are no longer in the box; green are in
17   additions; and orange is balances, we didn't want
18   to muddy the waters. We just wanted the pure and
19   simple clean ones, based on the records that we
20   had versus records that DTC had, and anything that
21   needed further research and I guess the time was
22   of the essence because, again, they are basically
23   saying get us the list, get us the list, get us
24   the list. So they needed information quickly and
25   so these were done, we knew that these were there,

Page 224

1    DENIG - CONFIDENTIAL
2    these could go, these can go right now. The
3    others need to be more -- investigated a little
4    bit further.
5        Q.   When you say they were saying get us
6    the list, who is the they?
7        A.   Monty and Jin and Alastair.
8        Q.   Alastair is Alastair Blackwell?
9        A.   Yes.
10       Q.   And did you have any understanding of
11   why they were so impatient to receive your list?
12       A.   I was assuming that Barclays was
13   impatient in receiving the assets.
14       Q.   Is it your understanding that the
15   CUSIPs listed in Exhibit 257 were not part of any
16   repo transaction?
17       Withdrawn, withdrawn. Let me ask a
18   better question. Is it your understanding that
19   the securities listed in Exhibit 257 that you
20   are saying are good to go, presumably to
21   Barclays, yes?
22       A.   Yes.
23       Q.   Were not part of the repo transaction
24   on the 18th and 19th of September?
25       A.   See, I still -- me, personally still

Page 225

1    DENIG - CONFIDENTIAL
2    thought that this was the true-up piece of the 1.9
3    billion. This was my understanding at the time
4    still. Again, no -- I didn't have any idea about
5    the schedule B thing, but this was still trying to
6    determine that 1.9 billion that they asked us to
7    find that night. So still all in relation to
8    that.
9        Q.   Have you subsequently come to a
10   different understanding with respect to whether or
11   not these securities are part of the repo or not?
12       A.   Yes.
13       Q.   Can you tell me from whom you gained
14   that understanding?
15       A.   Jim Hraska.
16       Q.   And what did Jim Hraska tell you?
17       A.   That there is a schedule B out there.
18       Q.   And did he tell you about the schedule
19   B that was out there?
20       A.   They were to get all unencumbered
21   assets and not just the repo.
22       Q.   When did you have that conversation
23   with Mr. Hraska?
24       A.   I can't be sure of the exact date.
25   But it was after this.

## Page 226

DENIG - CONFIDENTIAL

2  Q.  And by this, you mean after the date
3  of --
4  A.  September 25. September 25, 2008.
5  Q.  The securities listed in 257 total,
6  according to Lehman's marks, just south of 270
7  million, is that correct?
8  A.  That's correct. Yes.
9  Q.  Was this 270 million a portion of the
10  450 million, the approximately half that you ended
11  up determining?
12  A.  Yes.
13  Q.  That's a terrible question.
14  A.  But I understand what you are saying.
15  Q.  You testified earlier that you
16  believed of the 900 million in additional
17  unencumbered collateral that you and your team
18  identified over the weekend of September 20 and
19  21st, your subsequent reconciliations confirmed
20  that approximately half, in the region of 450
21  million, turned out to be truly unencumbered,
22  correct?
23  A.  Correct.
24  Q.  And is this 260.9 million that's
25  referenced in Exhibit 257 part of that 450

## Page 227

DENIG - CONFIDENTIAL

2  million?
3  A.  Yes, it is.
4  (Exhibit 258, document Bates stamped
5  BCI-EX-S 16935, with attachment, marked for
6  identification, as of this date.)
7  Q.  Ms. Denig, you have in front of you
8  what I have marked as Exhibit 258 which is an
9  e-mail bearing the Bates range BCI-EX-S-00016935
10  and it has an attachment which is one page. Do
11  you recognize this document?
12  A.  I do.
13  Q.  Can you tell me what it is please?
14  A.  It is the assets in 636 that were
15  being delivered, that we were telling Barclays
16  that you're getting.
17  Q.  And the assets in 636, are those the
18  same 269.9 million dollars worth of collateral
19  that you had told Mr. Hraska was unencumbered and
20  OK to send to Barclays in Exhibit 257?
21  A.  Yes.
22  Q.  Do you see in the second paragraph of
23  his e-mail to John Rodefeld, Mr. Hraska says, "In
24  addition can you provide the market value of the
25  DTC collateral taken in by yourselves on 9/19/08.

## Page 228

DENIG - CONFIDENTIAL

2  We want to compare to our figures and evaluate for
3  additional requirements."
4  Do you know whether Mr. Rodefeld or
5  anyone else at Barclays ever provided information
6  in response to that request from Mr. Hraska?
7  A.  I don't recall.
8  Q.  OK, that is all I have for that
9  exhibit.
10  (Exhibit 259, document Bates stamped
11  BCI-EX-S18485 through 486 marked for
12  identification, as of this date.)
13  Q.  Ms. Denig, you have in front of you
14  what I have marked as Exhibit 259 which has the
15  Bates range BCI-EX-S-00018485 through 486. Do you
16  recognize this document?
17  A.  I do.
18  Q.  Focusing in particular on the e-mail
19  from John Haley at Barclays to Jim Hraska, which
20  is the penultimate entry in the chain, Mr. Haley
21  writes, "Jim, can you take a look at these CUSIPs
22  on Monday. BoNY has said they returned these to
23  you on 9/19." Do you see that?
24  A.  Yes.
25  Q.  Can you tell me if you know what

## Page 229

DENIG - CONFIDENTIAL

2  Mr. Haley is asking Mr. Hraska to do?
3  A.  Yes. On 9/18, we were reflecting them
4  on our books and records or reflecting them as a
5  pledge that we sent them. It is one of -- there
6  is four -- these four discrepancies were part of
7  the reconciliation that we did. Upon further
8  reconciliation on their part, they went to BoNY
9  and said Lehman says they delivered them to you,
10  and BoNY came back and said oh, no, we DK'd them,
11  meaning the next day, meaning we didn't know them,
12  and we kicked them back to the box.
13  We still at this particular moment
14  didn't show that. They have references on when
15  BoNY released the shares back to Lehman at 636,
16  but I -- it is not seen in this, but at the end
17  of the day, we looked and said DTC and we
18  didn't see the same reflection they told us.
19  Remember, they were five CUSIPs in
20  question. These four of them were -- four of
21  the five were these that we had issues with.
22  Q.  Those were the five CUSIPs that were
23  referenced I believe in an exhibit that was marked
24  1 think had been created by Mr. Azerad?
25  A.  Yes.

Page 230

DENIG - CONFIDENTIAL

Q.    Were these transfers to BoNY transfers made out on the 18th?

A.    They were. And you can see here like this is technically a screen shot from a DTC terminal or their DTC terminal saying that this was paid to Lehman, 636 pledge, to BoNY's 855 at this particular time on 9/18. Then they come back and say on 9/19, BoNY released these shares to Lehman 636 at 231.

Lehman didn't take them in. So they could have released them to it, but we never -- like the boxes, 636 never took the securities in. So this basically went back to them for further review. It is almost like saying here, throw the ball, and you are throwing it right back to me and that's basically what happened with these. BoNY threw them to us and we kicked them back.

Q.    So the CUSIPs that are listed in Exhibit 259, the four sets of CUSIPs were rejected by BoNY on the 19th?

A.    No. Well, they were -- they were accepted on the 18th, they took it into their box, and on the 19th, they tried to deliver them back

Page 231

DENIG - CONFIDENTIAL

to Lehman's LB1 box, 636. Lehman never took them in.

Q.    So they were not, these four CUSIPs were not in Lehman's clearance box?

A.    They did not go to Lehman's box.

Q.    On the 19th?

A.    On the 19th.

Q.    Are you aware if they went to Lehman's clearance box any time after the 19th?

A.    They were not and that has subsequently come out in other reconciliations they just basically had incomplete data. You had this, this, and one showing that Lehman went back to them and then they kept them.

Q.    Thank you. That is all I have for that.

(Exhibit, 260ationu , document Bates stamped BCI-EX-S-18577 through 78 marked for identification, as of this date.)

Q.    Ms. Denig, you have in front of you what I have marked as Exhibit 260 which is a two-page e-mail, BCI-EX-S-00018577 through 78. If you can just let me know when you have had a chance to review that. Do you recognize this

Page 232

DENIG - CONFIDENTIAL

document?

A.    I have a.

Vague recollection., Can you tell me what your vague recollection is, please?

A.    That they supposedly got, received money from, that was for LBI and they didn't know what it was for.

Q.    And who is the "they"?

A.    They, I am sorry, Barclays operational folks said that they received cash from Chase that particular night and they didn't know why. Jim is reaching out to Dan and Craig who are on the Treasury area or were in the Treasury area of Lehman, now are in the Treasury area of Barclays.

Q.    Did you ever understand that there was a final resolution as to the reason why these funds had been received from Chase?

A.    No.

Q.    That is all I have for that document.

(Exhibit 261, document Bates stamped BCI-EX-S-18505 and 06 with attachment marked for identification, as of this date.)

Q.    Ms. Denig, you have in front of you

Page 233

DENIG - CONFIDENTIAL

what I have marked as Exhibit 261, which is a two-page e-mail BCI-EX-S-00018505 to 506. And then there is a very substantial spreadsheet, probably two spreadsheets attached to it. Do you recognize this document?

A.    I don't, believe it or not. I don't remember this.

Q.    At the bottom of the e-mail chain, someone called Duane McLaughlin writes to a large group of people, not to you at this stage. He says, "Attached please find two files which include what Barclays believes should be included on schedules A and B. Please reflect conversation with Paolo over the weekend and we believe are agreed between Barclays and Lehman." He goes on to say at the bottom, "Please provide your sign-off on these files as soon as possible so they can be filed under seal with the bankruptcy court in the morning." Do you see that?

A.    Um-hm.

Q.    And do you see then Mr. Tonucci forwards this to Mr. Azerad?

A.    Um-hm.

MR. SHAW: Say yes.

Page 234

DENIG - CONFIDENTIAL

1
2      A.   Yes.
3      Q.   Saying, "Can you check this
4   correspondence to our version of the schedules."
5   Do you see that?
6      A.   Yes.
7      Q.   Do you know what Mr. Tonucci is
8   referring to as "our version of the schedules"?
9      A.   No.
10     Q.   He says, "I believe there are some of
11  differences, open (five CUSIPs that didn't make it
12  and five that seem to be replacements)." Do you
13  see that?
14     A.   Yes.
15     Q.   Do you believe those are the five
16  CUSIPs you testified about earlier?
17     A.   Yes.
18     Q.   Mr. Azerad sends this e-mail on to you
19  about 29th of September at 1:39 in the afternoon
20  GMT, so 9:39 in the morning.
21     A.   Um-hm.
22     Q.   Do you have an understanding of why
23  Mr. Azerad forwarded this document to you?
24        MR. SHAW:  Objection, foundation.
25     A.   Knowing that I was the one that did

Page 235

DENIG - CONFIDENTIAL

1
2   the reconciliation with Barclays, is potentially
3   why he sent it to us, though he seemed to have
4   done his own reconciliation. And as far as
5   schedules As and Bs, I didn't -- I just knew of
6   schedule A really and that there was a B being
7   constructed.
8      Q.   Do you recall doing any -- withdrawn.
9        You don't recall after reading this
10  e-mail again receiving it?
11     A.   I don't recall, no. Obviously I did,
12  but I don't remember. I don't remember it.
13     Q.   Is it safe then to assume that you did
14  not -- you don't recall doing any work on or
15  analysis of the file that was attached to this
16  e-mail?
17     A.   No. I do remember getting a file --
18  but it is not what's referenced here -- from him
19  with Barclays' positions and Lehman's positions on
20  it and my same discrepancies he had as
21  discrepancies, but that doesn't seem to be this
22  file. That's what I thought it was at first but
23  I'm not sure it was.
24     Q.   The file you remember receiving was a
25  document marked by Mr. Hine this morning, is that

Page 236

DENIG - CONFIDENTIAL

1
2   correct?
3      A.   It could have been.
4      Q.   You said in an answer to one of
5   Mr. Hine's questions that you recall receiving a
6   spreadsheet that you believed to be schedule B
7   from Mr. Hraska, is that correct?
8      A.   Yes.
9      Q.   And I think I wrote down that what you
10  did with it was play around with it. Can you be a
11  little more precise?
12     A.   He wasn't very Excel savvy. So
13  sometimes he would send me spreadsheets and I
14  would cut them up for him and send them back so he
15  could see what he was working with. He would say
16  here is a file, fix -- cut out just 931 accounts
17  and, you know, put just include this range, just
18  include these type of securities that begin with
19  these three letters. He doesn't know how to do
20  that, so he would give me instructions on what to
21  do with it.
22        There was a set to determining and the
23  same with the unencumbered assets that we worked
24  on that weekend, there was a particular method
25  that we used to try to pertain -- to know what it

Page 237

DENIG - CONFIDENTIAL

1
2   is and that's based on knowing what the CUSIPs
3   are, what the trading accounts are within Lehman
4   Brothers, certain descriptions from -- for
5   collateral and there were certain subtypes that we
6   knew to exclude and not to exclude and he was
7   doing -- he went on further to determine what the
8   schedule B was with Paolo Tonucci and Azerad and
9   John Virgel del Dios which I was not doing
10  anymore, he was doing with them. Once in a while,
11  he would send me a spreadsheet to play with, to
12  sort in essence.
13     Q.   So I am clear, it is your
14  understanding that Mr. Hraska along with
15  Mr. Tonucci and the other individuals you
16  mentioned were working on a spreadsheet that you
17  believed to be called schedule B, is that correct?
18     A.   Yes.
19     Q.   And that at Mr. Hraska's direction,
20  you manipulated that spreadsheet?
21     A.   I wouldn't say manipulated. I just
22  sorted it in a different way. I didn't touch
23  anything or delete any columns. I just literally
24  shifted the -- shifted things around a little bit.
25     Q.   So the presentation of the data was --

Page 238

DENIG - CONFIDENTIAL

1
2     A.    Was more favorable for him. He had
3 columns, he had filters, upon filters, upon
4 filters.
5     Q.    But you, yourself did no independent
6 analysis or editing or manipulation of this
7 document?
8     A.    No. Or yes.
9     Q.    Let me ask it a better way. Did you,
10 other than following instructions of Mr. Hraska,
11 do anything that with this spreadsheet that you
12 believed to be called schedule B?
13     A.    No.
14     Q.    Ms. Denig, the last document, at least
15 from me, I have handed you what has previously
16 been marked as Exhibit 155B. Can you take a
17 moment to review both the spreadsheet that's
18 attached to the e-mail and the e-mail itself and
19 let me know when you have done that, please.
20     A.    OK.
21     Q.    Actually independent of this document,
22 I have one more general question. The securities
23 of 1 billion and change that has been much
24 discussed today that were transferred on the 19th
25 from Lehman to BoNY for Barclays, did you

Page 239

DENIG - CONFIDENTIAL

1
2 understand that those were included in what we
3 have been discussing as schedule B?
4     A.    No. It was -- I thought it was part
5 original repo transaction. That was my
6 understanding at that time. I know that's not the
7 case now but at that time, I thought it was
8 part -- to satisfy the additional shortcomings for
9 the repo.
10     Q.    Have you subsequently gained an
11 understanding that that billion and change
12 transferred on the 19th was part of schedule B?
13     A.    Yes.
14     MR. SHAW:  Asked and answered.
15     Q.    Thank you.
16     Do you recognize the document that I
17 have marked as 155? Do you recognize Exhibit
18 155B?
19     A.    I do.
20     Q.    And can you tell me how it is that you
21 recognize it?
22     A.    The fact that my boss' boss put this
23 out to different people basically saying that of
24 the 1.95 billion, we have made all deliveries to
25 them, that satisfied that.

Page 240

DENIG - CONFIDENTIAL

1
2     Q.    When you say you have made all
3 deliveries and satisfied that, do you mean to say
4 that it is your understanding that 1.95 billion of
5 additional collateral had been moved to Barclays?
6     A.    Yeah, but actually, the last page says
7 362 didn't go.
8     Q.    And you're looking at the last page of
9 the spreadsheet that has the heading summary of
10 collateral moved, is that correct?
11     A.    Yup.
12     Q.    The column "MV" stands for market
13 value, is that correct?
14     A.    Yes.
15     Q.    Do you have an understanding of
16 whether market value here reflects Lehman's market
17 value or Barclays'?
18     A.    I don't know. I'm assuming it is
19 Lehman's.
20     Q.    And what's the basis for that
21 assumption, Ms. Denig?
22     A.    Because the two -- I see the 269 and
23 the 161 were the market values of -- Lehman had
24 determined and in subsequent files that we looked
25 at today. Like this one. Like the one before

Page 241

DENIG - CONFIDENTIAL

1
2 that last one. That, that column, that totaled
3 the 269, it had a column heading called Lehman
4 market value.
5     Q.    And that 269.9 million is the same
6 figure as the 269.9 that you see reflected on this
7 last page?
8     A.    Yes.
9     Q.    155?
10     A.    Yes.
11     Q.    The line below that 269.9 million
12 reads 074-transferred 9/30/09. Do you see that?
13     A.    Yes.
14     Q.    I am assuming -- I hadn't noticed it
15 before, that that's an error and the date should
16 be 9/30/08?
17     A.    Oh, yeah. All of them.
18     Q.    And just so we have a clear record, it
19 is your understanding that the dates reflected on
20 the last page of Exhibit 55B have an error?
21     A.    Yes.
22     Q.    And is it your understanding that the
23 days of 9/19, 9/29 and 9/30 are not as reflected
24 here, 2009, but actually 2008?
25     A.    That's correct.

Page 242

DENIG - CONFIDENTIAL

1  DENIG - CONFIDENTIAL
2    Q.   The line entry 074 transferred 9/30/09
3  or 9/30/08, do you understand that to be a
4  transfer from Lehman's DTC box 074 to Barclays of
5  a little over 161 million dollars worth of
6  securities?
7    A.   Yes.
8    Q.   Were you involved in that transfer,
9  Ms. Denig?
10   A.   I was not.
11   Q.   Do you know who at Lehman was?
12   A.   Neal Ullman.
13   Q.   Is there a reason that you are aware
14 of that you were not involved in that transfer?
15   A.   Well, at this particular time, I was
16 on to my next project or working on getting the
17 asset, rid the assets off of Lehman's books, so
18 I -- it was passed to somebody else at that point.
19   Q.   Can you give me a little more detail
20 on your next project getting rid of the assets --
21   A.   Meaning we had reflected the sale of
22 defaulted repo on Lehman books and records to
23 reduce the balance sheet of that.
24   Q.   The entry for BoNY tripledge in 9/19,
25 what should be 08 is 1.155,820,860 billion?

Page 243

1  DENIG - CONFIDENTIAL
2    A.   Um-hm.
3    Q.   Do you have any understanding of
4  whether that's an accurate number or not?
5    A.   I do not and in the previous
6  documents, it was 1 billion, 035.
7    Q.   So if I wanted to know if that was
8  accurate or not, would I have to talk to
9  Mr. Forrest?
10   A.   You would.
11   Q.   Do you have any involvement in
12 transfers of assets at the options clearing
13 corporation from Lehman to Barclays?
14   A.   No.
15       MR. SHAW:  You need to speak.
16   A.   I did speak first.
17       MR. OXFORD:  Ms. Denig, thank you very
18 much for your testimony.  I appreciate your
19 time.  I don't have any further questions at
20 this time.
21   A.   Great, thank you.
22       (Recess)
23 EXAMINATION BY
24 MR. DAKIS:
25   Q.   My name is Robert Dakis from the law

Page 244

1  DENIG - CONFIDENTIAL
2  firm of Quinn, Emanuel, Urquhart, Oliver & Hedges.
3  We represent the committee of unsecured creditors.
4  I am going to ask you a few follow-up questions to
5  something that Mr. Hine asked you about today.  If
6  you could look at 243 in front of the witness,
7  could you take a second to look at it.
8    A.   OK.
9    Q.   I believe you testified earlier that
10 this e-mail string started as series of phone
11 calls between you and Mr. Hraska when you were
12 driving home?
13   A.   Yes.
14   Q.   Do you remember the subject of those
15 phone calls?
16   A.   Yes.
17   Q.   Could you just tell us what was
18 changed?
19   A.   Basically we had no cash, that after
20 everything was all said and done, there was a
21 shortfall of cash in the 21 billion range.
22   Q.   Did you have any --
23   A.   We thought, like my original thought
24 pattern was we messed up on some type of booking.
25 He was asking me about that and when I got back, I

Page 245

1  DENIG - CONFIDENTIAL
2  checked over everything and came back and said no,
3  all our deliveries made and there were no other
4  additional issues.  Then we come to realize it was
5  these other factors that came about you.
6    Q.   And what do you mean by you checked
7  over everything?
8    A.   When I got home I logged on to my
9  machine, we have remote access at work.  I looked
10 over the contracts we had, literally by paging
11 down and looking at the delivery instructions if
12 they made or not based on MTA, at that point MTA
13 and all our systems were still good.
14   Q.   You were able to tell that night how
15 much cash went in and what securities went out?
16   A.   I can tell what securities went out.
17 The cash I didn't have any reflection of.  And
18 that's what the cash tickets still in fail means.
19 It says, "All cash tickets are still in fail,"
20 that was because cash management would clear
21 those.  I verified that we made delivery of all
22 the collateral that we had to.
23   Q.   During this period late at night, did
24 you have any phone calls with anyone else at
25 Lehman Brothers?

## Page 246

DENIG - CONFIDENTIAL

1
2      A.    I did not.
3      Q.    Did you have any phone calls with
4  anyone at Barclays?
5      A.    I did not.
6      Q.    Could you turn to page 3 of the
7  exhibit, the second sentence of the e-mail string
8  on page 3, and this is an e-mail from you to Jim
9  Hraska and says, "Even though we took the TIBs
10 out, we replaced it with other collateral."  Could
11 you just explain to me what you meant by we took
12 the TIBs out?
13     A.    TIBs is a particular type of asset.
14 They are Treasury Inflationary Bonds.  They
15 were -- they were part of the 8 billion shortfall.
16 When originally we delivered -- from the original
17 list of assets that we were supposed to send to
18 Barclays because we come to realize that those
19 assets were GCF collateral that went back to FICC
20 in the morning, we gave them something different
21 in return.
22     Q.    We need to slow down and pretend I
23 know absolutely nothing about finance for the
24 minute.
25     A.    As part of the original repo, there

## Page 247

DENIG - CONFIDENTIAL

1
2  was a list that we got from somebody saying, OK,
3  deliver these assets.  My guys went and booked all
4  the trades, but then it reflected that we didn't
5  actually have position in a lot of these cases
6  because of subsequent issues with the way the
7  collateral is financed.
8           So we substituted them for different
9  ones, but like collateral, worth around the same.
10 So what I was telling him is what we substituted
11 was for the same value.  So that's not the
12 problem, and they -- and those, in fact, did get
13 delivered.
14     Q.    And this is all being caused by the 8
15 billion dollars of securities that Barclays didn't
16 want to take delivery of or is this a different
17 issue?
18     A.    This was a different issue, start of
19 the day.  When we first started doing the
20 transaction, we realized this.
21     Q.    Turning now to page 1 of the e-mail
22 string, the first e-mail on this page, Mr. Hraska
23 writes to you "ties out" and then has underneath a
24 couple of figures.  Do you understand what he
25 meant by "ties out"?

## Page 248

DENIG - CONFIDENTIAL

1
2      A.    Meaning, yes, mean it reconciles,
3  saying that we gave them everything we had in the
4  box, via the repo transaction.  What we had left
5  was 15 billion that we didn't do with the repo,
6  there was an overnight repo that was being done.
7  That didn't get put on.  It didn't get booked
8  again.  And then there was 5 billion worth of
9  racers that were definitely not going.
10          So "ties out" is the collateral, the
11 value of the collateral that Barclays took the
12 night before, they didn't take this time, so
13 that got left in the box and this 5 billion
14 dollars worth of racer trades also got left in
15 the box.  That's the 21 billion.  We didn't
16 have any other liquidity providers giving us
17 cash for that collateral, so we were short cash
18 which we needed a box loan for.
19     Q.    And if I remember correctly, Chase
20 provided that box loan?
21     A.    They did.
22     Q.    And the 15 billion dollars of
23 collateral that's left in the box, 8 billion of
24 that is the collateral that Barclays said that
25 they didn't want as part of the repo?

## Page 249

DENIG - CONFIDENTIAL

1
2      A.    Oh, I have no idea.  That part I
3  don't -- you mean the excluded part?
4      Q.    Yeah?
5      A.    The exclusion?  Yeah, I wasn't privy
6  to that.
7      Q.    Do you know who would know that?
8      A.    The -- probably the Treasury folks,
9  paolo Tonucci and his teams.
10     Q.    One more sort of general question, at
11 the time this e-mail string is being drafted, you
12 said there was -- I believe it says, "The cash
13 booked is still 44.2 billion dollars."  That's on
14 page 3?
15     A.    That's right.
16     Q.    We have been saying today that the
17 cash at some point increased from 44.2 to 45
18 billion, correct?
19     A.    That's correct.
20     Q.    Do you know when Barclays paid that
21 other 800 million?
22     A.    They paid it on 9/18.  They paid the
23 whole 45 billion which is why I needed to reflect
24 that on my trades.
25     Q.    At 1 o'clock in the morning on the

## Page 250

DENIG - CONFIDENTIAL

1  19th, you said the cash was still at 44.2?
2
3       A.   Meaning I knew they paid 45 and I
4  didn't change them.  I hadn't changed it yet
5  because it was 1:35 in the morning and I didn't
6  feel like it.
7       Q.   Understandable.
8            MR. DAKIS:  I have nothing further.  I
9       understand Mr. Hine has a few more
10      questions.
11  EXAMINATION BY
12  MR. HINE:
13      Q.   I have a series of fairly ministerial
14  questions about a couple of documents I want to
15  run past you.  We talked all during the day about
16  pricing and where different prices come from.
17  Some come from Chase.  Some come from BoNY.  Some
18  come from the GPS system.  So I wanted to see if
19  we could nail down different documents and where
20  that pricing came from if you could.
21           So let me start with what has
22  previously been marked as Exhibit 234, which is a
23  spreadsheet after -- but when you get past the
24  e-mail, the spreadsheet is entitled, "BarCap,
25  9/18/08 with price and MV.XLS."  Do you see that?

## Page 251

DENIG - CONFIDENTIAL

1
2  Do you know the source of the valuation data
3  that's embodied in that spreadsheet?
4       A.   There is a pricing source in the
5  second to last column.
6       Q.   Right?
7       A.   Right?  You mean how MTS has its
8  pricing hierarchy?
9       Q.   These are MTS prices, correct?
10      A.   MTS -- TMS in a lot of cases --
11  sometimes it reflects Chase, if Chase is the one.
12      Q.   There is no Chase entries there?
13      A.   I don't see any Chase entries.
14      Q.   So that chart is based on MTS pricing
15  data?
16      A.   Yes.
17      Q.   That is all I have for that chart.
18  Let's mark this.
19           (Exhibit 262, document Bates stamped
20      74-636.XLS marked for identification, as of
21      this date.)
22      Q.   Ms. Denig, I have handed you a
23  document marked as Exhibit 262 which is a new
24  document.  I wanted to give you a second to look
25  at it.  I will ask you a similar question once you

## Page 252

DENIG - CONFIDENTIAL

1
2  have had a chance to look at it.
3       A.   Are these different documents?
4       Q.   Well, I was going to ask you that
5  question.  First of all, have you ever seen this
6  document before?
7       A.   No.
8       Q.   No?
9       A.   I guess I had to, I sent it, but I
10  don't --
11      Q.   Let me --
12      A.   Is it broken up into different
13  columns?
14      Q.   I don't know.  This is how we received
15  it.
16      A.   It is funny because I recognize the
17  first before the first blue, but the two middle
18  sections here, I don't recognize, and then I
19  recognize the last section.
20      Q.   Let's take them one at a time then.
21  First of all, the attachment is entitled
22  74-636.XLS?
23      A.   Um-hm.
24      Q.   Do you have any familiarity with that
25  spreadsheet, a spreadsheet entitled that?

## Page 253

DENIG - CONFIDENTIAL

1
2       A.   Yes.
3       Q.   And what is that?
4       A.   It is just basically all the
5  collateral that -- individual pieces that went to
6  Barclays.
7       Q.   OK.
8       A.   And all the details, basically all the
9  trade details.
10      Q.   From those two boxes?
11      A.   Yeah.
12      Q.   Is that the first spreadsheet we see
13  here attached?
14      A.   Yes, I don't -- I don't know -- I
15  can't insure that this is complete, but that's
16  what it looks like.  I don't know what this is.
17      Q.   OK, we will get to -- take it section
18  by section.  In the first section in front of the
19  first blue sheet, you say you recognize the
20  spreadsheet but you can't determine whether it is
21  complete?
22      A.   Right.
23      Q.   Do you know what the source of the
24  pricing data is for that spreadsheet?
25      A.   GFS.

Page 254

DENIG - CONFIDENTIAL

1
2    Q.    Lehman's GFS system?
3    A.    Yes.
4    Q.    If we turn to the second spreadsheet
5    which is behind the first blue tab and you say you
6    don't recognize that spreadsheet?
7    A.    I don't.  And the only thing that is
8    throwing me off is the "deal MOP" in the first
9    column.  I never -- I never seen that before.
10    Q.    So you couldn't tell me what the
11    source is for this pricing data?
12    A.    No, I am sorry.
13    Q.    OK.  Let's turn to the third
14    spreadsheet which is behind the second blue tab
15    and I have the same question for you.
16    A.    The GFS.
17    Q.    You do recognize this spreadsheet?
18    A.    Yes.
19        MR. SHAW:  I think you skipped one.
20    A.    This one?  Yeah, I don't recognize
21    this either.
22    Q.    So you don't know the source of that
23    pricing data?
24    A.    I don't.
25    Q.    Let's skip to the fourth spreadsheet

Page 255

DENIG - CONFIDENTIAL

1
2    in the packet which is behind the third blue tab.
3    Do you recognize that one?
4    A.    Yes, I do.
5    Q.    Is that also part of a spreadsheet
6    titled 74-636?
7    A.    I can't be sure.  I really can't be
8    sure.  I don't think so because the column
9    headings are different.
10    Q.    Do you know the source of pricing
11    data?
12    A.    This is definitely GFS, the data
13    coming from here are the column headings that I
14    get from GFS.
15    Q.    So this data is from the GFS system?
16    A.    Yes.
17    Q.    Finally we have the last spreadsheet
18    in this package.  Do you recognize this one?
19    A.    Yes.
20    Q.    What's the source of that pricing
21    data?
22    A.    GFS.
23    Q.    Do you know what this spreadsheet is
24    in particular?
25    A.    Yes.

Page 256

DENIG - CONFIDENTIAL

1
2    Q.    What is it?
3    A.    Well, in particular, no.  But it is
4    along the same lines that it was produced out of
5    GFS and it is something that I did.
6    Q.    OK.  Very good.
7    A.    The signature and column heading.
8    Q.    OK.  Let's mark this.
9        (Exhibit 263, e-mail dated September
10    19, 2008 at 4:26 p.m. marked for
11    identification, as of this date.)
12    Q.    Handing you a copy of another document
13    which was marked as Exhibit 263 which is an e-mail
14    dated September 19 and attached to it is a
15    spreadsheet as well.  My first question is do you
16    recognize this document?
17    A.    Yes.
18    Q.    And what is this document?
19    A.    This document again is all the assets
20    that -- just a data dump of old assets that we
21    knew were delivered on 9/18 to Barclays.
22    Q.    And the title of this attachment is
23    "BarCap 9/18/08" with price and
24    "MV-074-636-revised price.XLS," correct?
25    A.    That's correct.

Page 257

DENIG - CONFIDENTIAL

1
2    Q.    What is the source of the pricing
3    information for this --
4    A.    GFS.
5    Q.    Spreadsheet?
6    A.    GFS.
7    Q.    Finally, if you could turn to an
8    exhibit previously marked as 146B.  I am going to
9    ask you a similar question first based on perhaps
10    if you could tell me from the title of the
11    documents.  Do you see -- if you need to look at
12    the underlying spreadsheets, I can give you them
13    too.  First page there is a spreadsheet which is
14    referenced with the title, "Barclays financing
15    collateral list (bark ops) 09-20-2008.XLS."  Do
16    you see that?
17    A.    Um-hm.
18    Q.    Are you familiar with that
19    spreadsheet?
20    A.    I am not.
21    Q.    Let me give you a copy of it then and
22    see if it refreshes your recollection.  I am
23    handing you a copy of an exhibit that previously
24    has been marked as 84B which I understand to
25    contain that spreadsheet and you will see the

Page 258

DENIG - CONFIDENTIAL

1 first page, it references the title of the
2 attachment with that same title. Do you see that?
3
4 A. Um-hm. Yes.
5 Q. If you turn to the spreadsheet, my
6 first question is, have you ever seen that
7 spreadsheet before?
8 A. I can't say that I have.
9 Q. Could you tell from the spreadsheet
10 whether it is generated through the Lehman system
11 or the Barclays system?
12 A. It is generated in the Barclays
13 system.
14 Q. OK.
15 A. I can tell from the trading books that
16 these are booked into.
17 Q. OK. If you look on the fourth column,
18 column D of the spreadsheet, next to market value,
19 do you see that?
20 A. Yes.
21 Q. Do you know what the source is of that
22 pricing data?
23 A. No idea. This is mortgage collateral.
24 It would be Impact, which is Barclays' settlement
25 system, and they had their own pricing hierarchy.

Page 259

DENIG - CONFIDENTIAL

1
2 Q. So is it correct to say --
3 A. I just know from working at Barclays
4 now but not from -- I don't know from this
5 particular spreadsheet that that's what it was
6 used. But if this is a dump from the settlement
7 system at Barclays, then Impact, which is their
8 settlement system, also has its own pricing
9 hierarchy which is where their pricing mode and
10 models would have come from.
11 Q. It is the Barclays' comparable to the
12 GPS system --
13 A. GFS system --
14 Q. -- GFS system that Lehman would have
15 used?
16 A. Yes.
17 Q. This would not be BoNY numbers or
18 Chase numbers?
19 MR. SHAW: Objection, foundation.
20 A. Yeah, I wouldn't be able to 100
21 percent say. It is a spreadsheet.
22 Q. So referring back to Exhibit 146B
23 which is the e-mail Mr. Azerad sent you and James
24 Hraska in connection with your reconciliation
25 efforts, does that refresh in any way your

Page 260

DENIG - CONFIDENTIAL

1 recollection of --
2 A. I do, I remember getting this e-mail,
3 going what the hell is he talking about, we had
4 five discrepancies, not a 1,065. So I don't
5 remember even opening it up. It killed my e-mail
6 box because it was 500 megabytes and I didn't
7 think that the information was proper. So I don't
8 think I did anything with it.
9 Q. Aside from the death of your e-mail
10 box, does it refresh your recollection as to the
11 source of the pricing in any way that would be
12 contained in that?
13 A. For the Lehman stuff, in the
14 beginning, when we started looking at prices, we
15 took everything. We really took every price from
16 GFS in every way we could.
17 Q. But this spreadsheet --
18 A. This spreadsheet is from GFS for the
19 Lehman, for the Lehman side of the scenario and
20 that would be from GFS.
21 Q. I think you're paging through as you
22 speak you are referring to the spreadsheet
23 attached to Exhibit 146B, correct?
24 A. That's correct.

Page 261

DENIG - CONFIDENTIAL

1
2 Q. And if I look on the cover page of
3 146B, I see a spreadsheet at the bottom entitled
4 "LEH/BARRreconciliation.XLS," do you see that?
5 A. Yes.
6 Q. Do you see that on the first page of
7 that exhibit?
8 A. Um-hm. Bar rec. Yup.
9 Q. So that spreadsheet is based on Lehman
10 pricing data?
11 A. Yes, it is.
12 Q. Do you have any knowledge of the first
13 spreadsheet, whether that's based on -- I believe
14 you said you think it is based on Barclays pricing
15 data?
16 A. Yes.
17 Q. But you're not sure?
18 A. I am not sure.
19 Q. So now if we go one last, look further
20 down on that cover e-mail, it talks about a
21 corrected spreadsheet. Do you see the spreadsheet
22 entitled, "Corrected Thursday transfers to
23 Barclays BONY, agreed." Do you see that?
24 A. Yes. It means that it is included
25 9/19's -- what do you call it. 9/19's transfers

Page 262

DENIG - CONFIDENTIAL

2 as well which is probably why it was corrected.
3    Q.    But do you have any understanding of
4 where the pricing data came from for that
5 corrected spreadsheet?
6    A.    No.  That spreadsheet came from
7 Magics, so I don't know how magic gets its
8 pricing.
9    Q.    Magic is what?
10    A.    Front end system within Lehman.
11    Q.    Lehman or Barclays?
12    A.    Lehman.
13    Q.    So the corrected spreadsheet came from
14 the Lehman system?
15    A.    Yes.
16    Q.    But you are not familiar with how it
17 was derived?
18    A.    Right.
19    Q.    When you say Magics, is that different
20 than the GPS prices?
21    A.    Yes. GFS.
22    Q.    I am sorry.  Magics has -- Magic is a
23 Lehman system, correct?
24    A.    Yes.
25    Q.    And it has pricing data in it?

Page 263

DENIG - CONFIDENTIAL

2    A.    Yes.
3    Q.    Is that pricing data different from
the pricing data from the GFS system?
5    A.    It could be.
6    Q.    So that's --
7    A.    There is no consistent pricing source.
8    Q.    OK.  So the pricing information that
9 went into this corrected spreadsheet entitled
10 "Corrected Thursday transfers" was from the Magic
11 system within Lehman?
12    A.    That's correct.
13        MR. HINE:  Thank you, that is all I
14 have.  Unless, Jonathan, you have any
15 questions.
16        (Continued on next page for jurat)

Page 264

DENIG - CONFIDENTIAL

2    MR. SHAW:  Nope.
3    Anyone else have any questions?
4    MR. HINE:  I think we are concluded.
5    (Time noted: 3:55 p.m.)


7        _____
            NANCY DENIG

9 Subscribed and sworn to
10 before me this    day
11 of   , 2009.

13        _____

Page 265

DENIG - CONFIDENTIAL


3        CERTIFICATE
4 STATE OF NEW YORK )
5                   )ss:
6 COUNTY OF NEW YORK)
7        I, MARY F. BOWMAN, a Registered
8 Professional Reporter, Certified Realtime
9 Reporter, and Notary Public within and for
10 the State of New York, do hereby certify:
11        That NANCY DENIG, the witness whose
12 deposition is hereinbefore set forth, was
13 duly sworn by me and that such deposition is
14 a true record of the testimony given by such
15 witness.
16        I further certify that I am not
17 related to any of the parties to this action
18 by blood or marriage and that I am in no way
19 interested in the outcome of this matter.
20        In witness whereof, I have hereunto
21 set my hand this 21st day of August, 2009.


23        _____
            MARY F. BOWMAN, RPR, CRR

Page 266

```
 1              DENIG - CONFIDENTIAL
 2
 3                    INDEX:
 4    WITNESS      EXAM BY:         PAGE:
 5    N. Denig     Mr. Hine         6, 250
 6                 Mr. Oxford       189
 7                 Mr. Dakis        244
 8
 9               EXHIBITS
10    Exhibit No.                 Marked
11    Exhibit 232 document Bates stamped      44
            10303555, two pages,
12    Exhibit 233 screen shot               84
      Exhibit 234 document Bates stamped      93
13          10331692 with attachment
      Exhibit 235 document Bates stamped      96
14          10253250 with attachment
      Exhibit 236 document Bates stamped     103
15          10328102 with attachment
      Exhibit 237 document Bates stamped     108
16          10252914 with attachment
      Exhibit 238 document Bates stamped     115
17          BCI-EX4324 with attachment
      Exhibit 239 document Bates stamped     118
18          BCI-EX13384 through 86
      Exhibit 240 document Bates stamped     124
19          BCI-EX18553 with attachment
      Exhibit 241 document Bates stamped     125
20          BCI-EX17607 and 08 with
            attachment
21    Exhibit 242 document Bates stamped     129
            BCI-EX17576
22    Exhibit 243 e-mail dated September 19,  137
            2008 at 1:43 a.m.
23    Exhibit 244 document Bates stamped     147
            BCI-EX18095
24    Exhibit 245 document Bates stamped     159
            BCI-EX99802 through 807 and
25          862 through 865
```

Page 267

```
 1              DENIG - CONFIDENTIAL
 2                  EXHIBITS
 3    Exhibit No.                 Marked
 4    Exhibit 246 document Bates stamped     165
            BCI-EX108184 through 189
 5    Exhibit 247 document Bates stamped     166
            BCI-EX108708
 6    Exhibit 248 document Bates stamped     171
            BCI-EX0010784B through 939
 7    Exhibit 249 document Bates stamped     174
            BCI-EX99522 through 532
 8    Exhibit 250 document Bates stamped     180
            10328232
 9    Exhibit 251 document Bates stamped     181
            102378755 (7 pages)
10    Exhibit 252 document Bates stamped     186
            10302702
11    Exhibit 253 document Bates stamped     198
            BCI-EX-S-00018190 through 191
12    Exhibit 254 document Bates stamped     201
            BCI-EX-S-18206 with attachment
13    Exhibit 255 document Bates stamped     205
            BCI-EX-S 18278 through 79 with
14          attachment
      Exhibit 256 document Bates stamped     210
15          BCI-EX-S-18241
      Exhibit 257 document Bates stamped     218
16          BCI-EX-S-18293 through 294.
            with attachment,
17    Exhibit 258 document Bates stamped     227
            BCI-EX-S 16935, with
18          attachment.
      Exhibit 259 document Bates stamped     228
19          BCI-EX-S18485 through 486
      Exhibit 260 document Bates stamped     231
20          BCI-EX-S-18577 through 78
      Exhibit 261 document Bates stamped     233
21          BCI-EX-S-18505 and 06 with
            attachment
22    Exhibit 262 document Bates stamped     251
            74-636.XLS
23    Exhibit 263 e-mail dated September 19,  256
            2008 at 4:26 p.m.
24
25
```

Page 268

```
 1    NAME OF CASE:
 2    DATE OF DEPOSITION:
 3    NAME OF WITNESS:
 4    Reason Codes:
 5       1. To clarify the record.
 6       2. To conform to the facts.
 7       3. To correct transcription errors.
 8    Page _____ Line _____ Reason _____
 9    From _____ to _____
10    Page _____ Line _____ Reason _____
11    From _____ to _____
12    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    From _____ to _____
24             _____
25
```