# BCI EXHIBIT

# 63

Page 1

1

2                  UNITED STATES BANKRUPTCY COURT

3                  SOUTHERN DISTRICT OF NEW YORK

4        ------------------------x

5        In Re:

6                                    Chapter 11

7        LEHMAN BROTHERS          Case No. 08-13555(JMP)

8        HOLDINGS, INC., et al,    (Jointly Administered)

9                     Debtors.

10       ------------------------x

11

12             * * *HIGHLY CONFIDENTIAL* * *

13         DEPOSITION OF ROBERT EDWARD DIAMOND, JR.

14                  New York, New York

15                  September 11, 2009

16

17       Reported by:

18       MARY F. BOWMAN, RPR, CRR

19       JOB NO. 24378

20

21

22

23

24

25

Page 2

```
 1
 2
 3
 4
 5                September 11, 2009
 6                10:35 a.m.
 7
 8
 9          Deposition of ROBERT DIAMOND, held
10    at the offices of Jones Day, LLP, 222 East 41st
11    Street, New York, New York, before Mary F.
12    Bowman, a Registered Professional Reporter,
13    Certified Realtime Reporter, and Notary Public
14    of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2                    APPEARANCES:
 3    JONES DAY, LLP
 4    Attorneys for Lehman Brothers, Inc.
 5        222 East 41st Street
 6        New York, New York   10017-6702
 7    BY:  ROBERT GAFFEY, ESQ.
 8         BRIDGET CRAWFORD, ESQ.
 9
10    BOIES, SCHILLER & FLEXNER, LLP
11    Attorneys for Barclays and The Witness
12        5301 Wisconsin Avenue, NW
13        Washington, DC  20015
14    BY:  HAMISH HUME, ESQ.
15         JONATHAN SCHILLER, ESQ.
16
17    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
18    Attorneys for the Creditors Committee
19        51 Madison Avenue
20        New York, New York  10010
21    BY: ROBERT DAKIS, ESQ.
22
23
24
25
```

Page 4

```
 1
 2                 APPEARANCES:
 3    JENNER & BLOCK, LLC
 4    Attorneys for the Examiner
 5        330 N. Wabash Avenue
 6        Chicago, Illinois  60611-7603
 7    BY:  DAVID C. LAYDEN, ESQ.
 8
 9    HUGHES, HUBBARD & REED, LLP
10    Attorneys for the SIPA Trustee
11        One Battery Park Plaza
12        New York, New York  10004-1482
13    BY:  WILLIAM MAGUIRE, ESQ.
14         FARA TABATABAI, ESQ
15
16    Also Present:
17        THOMAS E. HOMMEL, ESQ.
18        Lehman Brothers Holdings
19
20
21
22
23
24
25
```

Page 5

```
 1
 2
 3
 4
 5          IT IS HEREBY STIPULATED AND AGREED, by
 6    and between the attorneys for the respective
 7    parties herein, that filing and sealing be
 8    and the same are hereby waived.
 9          IT IS FURTHER STIPULATED AND AGREED
10    that all objections, except as to the form
11    of the question, shall be reserved to the
12    time of the trial.
13
14
15          IT IS FURTHER STIPULATED AND AGREED
16    that the within deposition may be sworn to
17    and signed before any officer authorized to
18    administer an oath, with the same force and
19    effect as if signed and sworn to before the
20    Court.
21
22
23
24
25
```

## Page 6

DIAMOND - HIGHLY CONFIDENTIAL
1  DIAMOND - HIGHLY CONFIDENTIAL
2  ROBERT EDWARD DIAMOND, JR.,
3    called as a witness by the parties,
4    having been duly sworn, testified as
5    follows:
6  EXAMINATION BY
7  MR. GAFFEY:
8    Q.  Good morning, Mr. Diamond. We've met
9  briefly before. My name is Bob Gaffey. I am with
10  Jones Day. We are special counsel to the estate
11  of Lehman Brothers Holdings, Inc., and as I am
12  sure you know, what we are going to focus on today
13  is the transaction in September of 2008 in which
14  Barclays purchased assets of Lehman.
15    Just a few quick ground rules. If you
16  need a break at any time, just say so and we will
17  obviously take it. I would prefer if there is a
18  question pending at that point that you answer the
19  question and then take whatever break you like.
20    If at any point you need me to
21  rephrase a question, so that we understand each
22  other, just speak up and I will try to do that.
23    I tell this to every witness. I am a
24  bit of a fast talker, so sometimes I get a
25  cluttered record, and I will try and speak slowly,

## Page 7

1  DIAMOND - HIGHLY CONFIDENTIAL
2  and ask you to try to wait until I have finished a
3  question before you answer it, for the sake of
4  Mary here, so she can get down clearly what my
5  questions are and what your answers are.
6    How are you employed, sir?
7    A.  Sorry.
8    Q.  Can you tell me by whom you are
9  employed?
10    A.  Barclays.
11    Q.  And would you tell me, please,
12  Mr. Diamond, what is your title at Barclays, title
13  or titles?
14    A.  I am president of Barclays PLC and
15  chief executive of the investment banking and
16  investment management businesses.
17    Q.  And how long have you held those two
18  positions?
19    A.  I have been with Barclays for,
20  goodness, 13 years. I have been president of
21  Barclays PLC since circa 2004, 2005. I forget the
22  exact date.
23    I have been chief executive of the
24  investment banking/investment management
25  businesses progressively since 2007, beginning

## Page 8

1  DIAMOND - HIGHLY CONFIDENTIAL
2  with Barclays Capital, taking additional
3  responsibility for Barclays Global Investors circa
4  2002, 2003, and for Barclays Wealth around the
5  time I joined the board.
6    Q.  Now, you mentioned joining the board,
7  but the board of which entity, sir? Entity or
8  entities?
9    A.  Barclays PLC, I think. I'm not very
10  good at corporate identity.
11    Q.  And how long have you been a board
12  member?
13    A.  About the same time, 2004, 2005. I
14  think you might have to check the records for
15  that, but I'm sure there will be a record of it.
16    Q.  For our purposes, it suffices if I
17  ask, you were on the board -- you held these
18  positions you described and you were on the board
19  in and around September of 2008, when the events
20  we are talking about were going on; is that right?
21    A.  Yeah, that would be right.
22    Q.  In September of 2008, Mr. Diamond,
23  would you describe to me, please, when it first
24  hit your screen that there may be a potential
25  transaction to be had between Barclays and Lehman?

## Page 9

1  DIAMOND - HIGHLY CONFIDENTIAL
2    A.  It wasn't in September. I don't know
3  how to answer your question.
4    Q.  When did Barclays first give
5  consideration to purchasing all or part of Lehman
6  or its assets?
7    A.  There was a call I received within a
8  month after the Bear Stearns-JP Morgan deal from
9  one of the undersecretaries at the U.S. Treasury
10  that asked unofficially, if there were a situation
11  with Lehman Brothers similar to that with Bear
12  Stearns, whether there was a price at which
13  Barclays would be interested in purchasing Lehman,
14  and if so, what -- how would we see working --
15  what would we need in terms of a working
16  relationship with the U.S. Treasury.
17    Q.  Who was the undersecretary who called
18  you?
19    A.  Bob Steel.
20    Q.  Had you known Mr. Steel prior to
21  this -- had you spoken to or known Mr. Steel prior
22  to this telephone call?
23    A.  Yes.
24    Q.  How long had you known Mr. Steel?
25    A.  Timing can be way off, but it is in

Page 10

DIAMOND - HIGHLY CONFIDENTIAL
1  the order of two to three years, something like
2  that.
3      Q.   It is not a week, it is a period of a
4  couple of years?
5      A.   Yeah.
6      Q.   When Mr. Steel -- did anybody else
7  participate in that telephone conversation or just
8  the two of you?
9      A.   I don't know of anyone else that was
10 on the phone.
11     Q.   And tell me as best you remember, sir,
12 what you said to Mr. Steel when he made this
13 inquiry of you.
14     A.   I don't recall what I said.
15     Q.   Did you express any interest in, for
16 lack of a better term, the proposal that he was
17 making or the suggestion that he made?
18     A.   My best recollection of my reaction,
19 without recalling what words I used, was that that
20 was interesting and thought provoking, and that I
21 appreciated getting the call.
22     Q.   And in sum or substance, did you say
23 anything else to him other than it was interesting
24 and thought provoking and thanking him for -- that

Page 11

DIAMOND - HIGHLY CONFIDENTIAL
1  you appreciated getting the call?
2      A.   My recollection is I did mostly
3  listening.
4      Q.   Did you say anything in that call to
5  express an interest in going forward with the idea
6  in any way?
7      A.   I don't recall that. I certainly
8  don't recall that, but as I said, I don't recall
9  what was said.
10     Q.   Your memory of that conversation is,
11 to sort of sum it up, your response, whatever
12 words you used, was essentially noncommittal one
13 way or the other?
14     A.   That's absolutely correct.
15     Q.   Now, after that call with Mr. Steel --
16 well, after the call with Mr. Steel, did you relay
17 to anyone else that the call had occurred?
18     A.   Yes.
19     Q.   Who did you talk to about it?
20     A.   The first conversation was with John
21 Varley.
22     Q.   Just to be a bit efficient here, let
23 me cut ahead, and I will ask you about the
24 conversation with Mr. Varley, but was there a

Page 12

DIAMOND - HIGHLY CONFIDENTIAL
1  group of people that you called to tell? Was it
2  more than Mr. Varley who you let know about the
3  call? You said he was the first conversation.
4      A.   Well, over time, up until today, there
5  was certainly other conversations, but in the
6  immediate aftermath, which is what I suspect you
7  are asking --
8      Q.   It is.
9      A.   -- my conversation was with John.
10     Q.   And what did you say to Mr. Varley and
11 what did he say to you?
12     A.   I can only give you a sense of what I
13 said, because I think it is impossible to recall
14 the words or the exact --
15     Q.   Sure. I am really looking for sum or
16 substance.
17     A.   I think the sum or substance was, it's
18 a positive that we were considered when thoughts
19 like this are going through the minds of people of
20 the Treasury, so the fact that Barclays is being
21 consulted and called is a positive.
22         Two, I most likely asked what his
23 visceral reaction was and provided my visceral
24 reaction, and my visceral reaction was, you know,

Page 13

DIAMOND - HIGHLY CONFIDENTIAL
1  prior to Bear Stearns-JP Morgan, it had never
2  dawned on me that there would be an opportunity
3  for an acquisition, deal, whatever the terminology
4  would be, with one of the U.S. bulge-bracket firms
5  at a distressed price. And while Bear Stearns
6  wasn't in my mind one of the bulge-bracket firms,
7  it was a big U.S. firm that was at a distressed
8  price, so it would warrant thinking through.
9          And I think the context of that that's
10 important is, we had had many calls over the years
11 at Barclays and at Barclays Capital about were we
12 interested in doing things that were strategic
13 between Barclays Capital and other firms,
14 certainly from Bear Stearns over the years, and we
15 never had an interest, because the history was
16 very clear that combining two investment banks had
17 no success background. They were generally very
18 poor deals.
19         I think the new information that was
20 coming in the wake of Bear Stearns, or actually
21 through Bear Stearns and in the wake of Bear
22 Stearns, is if in fact it happens at a distressed
23 as opposed to a premium or book value price,
24 does that change the opportunity.

Page 14

DIAMOND - HIGHLY CONFIDENTIAL

1    DIAMOND - HIGHLY CONFIDENTIAL
2    And that was the sum and substance of
3    the conversation with John, as opposed to Lehman
4    versus someone else. It was more, the paradigm
5    shift was around distress.
6    The second part we discussed was that
7    when we realized that the market turmoil around
8    July and August of 2007 was going to be real and
9    serious, the immediate thing John and I talked
10    about in terms of opportunity was, is this going
11    to give us an opportunity to strategically improve
12    the position of Barclays and Barclays Capital and
13    BGI as well. In other words, if we look at the
14    overall organization of Barclays and our
15    businesses, are we going to be presented -- first
16    of all, we're going to be presented with terrible
17    markets and a lot of challenges because this is
18    going to be difficult.
19    But if we can keep focused and keep
20    driving our business, can we also see opportunity,
21    and the opportunity that John and I talked to the
22    board about in the immediate aftermath of
23    recognizing it was going to be difficult was, this
24    is going to present an opportunity for Barclays
25    Capital to improve in the area where it has its

Page 15

1    DIAMOND - HIGHLY CONFIDENTIAL
2    greatest opportunity, which is the U.S., where we
3    are subscale. Top tier in U.K. and Europe and
4    throughout Asia but subscale in the U.S.
5    But interestingly, that initial
6    conversation was completely about hiring people.
7    We had never even contemplated doing a strategic,
8    for the reason I said, as there was just no
9    history of successful strategic.
10    That was the conversation I had with
11    John. Again, the words are hard to recall, but
12    that was the spirit of the conversation.
13    Q.    Was he essentially in agreement with
14    the thoughts you expressed or did he have a
15    contrary view? Again, just in substance, what was
16    his response to the things that you said?
17    A.    Well, keep in mind that John and I had
18    already discussed that this is going to present
19    opportunities. We said that to the board, and we
20    said specifically those opportunities will be best
21    in the U.S., both because we were subscale, but
22    also because we saw big writeoffs from Citi and
23    Merrill, two of the big U.S. firms.
24    So there was a paradigm shift. So
25    there was a basis for the conversation. I think

Page 16

1    DIAMOND - HIGHLY CONFIDENTIAL
2    both of us were somewhat dismissive of whether
3    Lehman presented that opportunity or not. So it
4    was much more about distress price, strategic
5    opportunity, versus Lehman specific, because
6    frankly we had never done much work on it.
7    Q.    When you say -- I just want to probe a
8    little bit on the word that you used. You say you
9    were dismissive about the Lehman thing. Do you
10    mean that you didn't know enough one way or
11    another to know?
12    A.    "Dismissive" is probably a poor choice
13    of words. It wasn't focused on Lehman as much as
14    it was focused on there might be strategic
15    opportunities.
16    Q.    As a general matter, without regard to
17    particular --
18    A.    And the real focus was, does the
19    distressed price as opposed to a book value or
20    premium price change our outlook, which John and I
21    have always locked arms on since the day we opened
22    BarCap, which is that growth would be organic, not
23    strategic.
24    There is always opportunities to buy
25    investment banks, but there is very little

Page 17

1    DIAMOND - HIGHLY CONFIDENTIAL
2    evidence that it has ever worked, because of the
3    nature of investment banking being so much about
4    the people.
5    Q.    So this sort of generalized potential
6    for opportunity that you are describing, markets
7    broiled, you know, there is a possibility for a
8    purchase or deal of some kind that would involve a
9    distressed price as opposed to a book value or
10    premium price, was that -- did that form the
11    thinking that you and Mr. Varley had about what
12    opportunities you could look for?
13    That is a very bad question. He is
14    going to say vague and ambiguous and he's going to
15    be right.
16    How big a focus was it for you and
17    Mr. Varley that if you were going to do a deal
18    with anybody, it would be at a distressed price as
19    opposed to a book value or premium price?
20    A.    I think it was always a given. You
21    need to put it in the context of -- it is not like
22    we spent much time over the years thinking about
23    acquisitions, because it was kind of a given that
24    mergers in investment banking don't work, CSFB and
25    DLJ probably being the poster child for value

Page 18

DIAMOND - HIGHLY CONFIDENTIAL

1       DIAMOND - HIGHLY CONFIDENTIAL
2 destruction, Citi-Salomon to some extent being
3 another one.
4      So every deal that was out there
5 had -- and John and I had been committed, while I
6 was CEO of BarCap and during the various times
7 when we were on the executive committee together
8 and he was head of retail banking and chief
9 financial officer and then the chief executive and
10 my boss, and while we were both on the board, had
11 always been very focused on organic growth and had
12 built the whole plan around it.
13      And so I used that word "dismissive"
14 which is probably wrong, but in a sense we,
15 because of the history, had just always kind of
16 put -- never considered a strategic deal in
17 investment banking. We had done strategic deals
18 in retail banking, for example, in Spain and in
19 the U.K., but not in investment banking.
20      Is that what you are asking?
21   Q.  Yes, it is and thank you.
22      Again, this is all very generally
23 speaking on my part, but in 2008, after Bear
24 Stearns-JP Morgan and with things changing as they
25 were in the general economy, is it fair to say

Page 19

1       DIAMOND - HIGHLY CONFIDENTIAL
2 that your view was, while Barclays had not had an
3 interest prior to that in a strategic -- in a
4 strategic partnership on the investment banking
5 side, it could now look for an opportunity at a
6 distressed price as opposed to a book value or
7 premium price?
8      MR. HUME: We will object to that
9 question as compound and vague.
10   Q.  Nonetheless, I think you can answer
11 it.
12   A.  I'm not sure what the question is.
13 Can you try to hone in on the question?
14   Q.  What I am trying to hone in on is how
15 important was it to you and Mr. Varley, if an
16 opportunity did arise for BarCap, that it would
17 have to be at a distressed price as opposed to a
18 book value or premium price?
19      MR. HUME: I object again as compound
20     and vague, in terms of precisely what you
21     mean by book value or premium price.
22   Q.  I -- I think you can answer the
23 question, sir.
24   A.  Well, we had, from the beginning,
25 focused on organic, hiring people. The Alpha Plan

Page 20

1       DIAMOND - HIGHLY CONFIDENTIAL
2 in 2004 was a great example of that. We doubled
3 the size of the firm in under four years, and it
4 was done organically without acquisition.
5      I think in the history of BarCap there
6 had been, I mean, like a 5 million dollar
7 acquisition of a tiny business at one point. So
8 in any scale, it was never anything we considered.
9 We recognized the value destruction of these
10 deals.
11      The first reaction to Bear Stearns
12 clearly was one of market dislocation and fear and
13 the shock that Bear Stearns was -- virtually had
14 to be rescued. We were still pursuing our organic
15 strategy and still hiring in New York, but I think
16 the combination of Bear Stearns-JP Morgan and the
17 call from Bob Steel led to a discussion between
18 John and I, which is, would we look at this
19 differently at a distressed price than we would at
20 a full market price.
21      Now, I think one of the reasons book
22 value is hard to -- no one knew what book values
23 were at this point, so -- traditionally book value
24 I would say, but in this period, I think that
25 there was a lot of confusion around book value, so

Page 21

1       DIAMOND - HIGHLY CONFIDENTIAL
2 I think it would probably be a poor choice of
3 terms to have a discussion.
4      But in spirit, I think what we are
5 saying is the full price of the better market.
6   Q.  After the -- this conversation with
7 Mr. Varley -- I want to sort of fast forward
8 through the summer and get us to September, which
9 is where we are going to spend most of our time
10 today -- when is the next time that the issue of a
11 potential deal with Lehman crossed, hit your desk
12 or wound up on your screen?
13   A.  I'm not sure.
14   Q.  We know a deal of some kind was done
15 in September of 2008?
16   A.  A deal of some kind was done in
17 September of -- 2008 or --
18   Q.  2008.
19   A.  2008.
20   Q.  We are all sure of that.
21   A.  That's why it is the anniversary.
22   Q.  That's why I put the September 2008
23 calendar there.
24      In between this call from the
25 undersecretary and this conversation with

Page 22

1     DIAMOND - HIGHLY CONFIDENTIAL
2   Mr. Varley, and September of 2008, when the deal
3   that has brought us here today occurred, what, if
4   anything, happens next with respect to a potential
5   for a deal with Lehman?
6       A.   The context would be that we were
7   working on various opportunities to increase scale
8   in the U.S., so there were a number of projects
9   that I was working on for John and for the board.
10   Lehman in particular, without knowing the timing,
11   because it is quite difficult, but from the time
12   of the call from Bob Steel, over the next couple
13   of months, with John's approval, the Barclays
14   Capital executive committee took a look at, I
15   suppose what you would expect, is there a
16   combination of Lehman Brothers and Barclays
17   Capital that makes sense, and if it does, is there
18   a price at which it would make sense.
19       So I think step one was, is there any
20   logic to the combination, what is that logic, and
21   step two is financially how would it work.
22       There were at least two, possibly
23   three, I can't recall, but at least two very good
24   intense goes at that with the Barclays Capital
25   executive committee, and there was also reporting

Page 23

1     DIAMOND - HIGHLY CONFIDENTIAL
2   of that to the group executive committee, although
3   on a much briefer summarized form, because the
4   group executive committee was four of us, two of
5   which were John and I, and we were in constant
6   contact on it.
7       And at some point prior to September,
8   probably more likely the June-July time frame,
9   John and I updated the board on, when we are
10   talking about some of the other opportunities that
11   we were looking at again to build scale, that
12   Lehman is there as well, and reported to the board
13   on the conversation and the phone call from Bob
14   Steel.
15       Q.   Who were the other two members of the
16   group executive committee?
17       A.   Frits Seegers and Chris Lucas.
18       Q.   Now, there comes a point, does there
19   not -- withdrawn.
20       What you have described to me up until
21   now, do I understand correctly it is essentially
22   an internal analysis at Barclays, there is no
23   conversation with Lehman going on at this point?
24       A.   Correct.
25       Q.   At what point do conversations of any

Page 24

1     DIAMOND - HIGHLY CONFIDENTIAL
2   kind begin with Lehman personnel about any
3   potential transaction?
4       A.   I knew this would come in handy.
5       Q.   That's why we put it in front of you.
6       A.   I may be off by a day. It is really
7   hard. But I'm pretty sure it was on Friday, the
8   12th of September.
9       Q.   Tell me the nature, what you remember
10   about that first contact, who initiated it, who
11   was involved.
12       A.   After conversations with Secretary
13   Paulson and President Geithner, in the previous
14   and earlier in that week, so over the course of
15   somewhere in the six to seven days before that --
16   I'm jumping ahead, you may want more detail -- the
17   decision was made by the Barclays board, with the
18   support of Secretary Geithner -- sorry, Secretary
19   Paulson, it is now Secretary Geithner, and
20   New York Fed President Geithner, that we would
21   pursue due diligence to see if there was an
22   opportunity.
23       And so with a number of my colleagues
24   on Thursday, I flew to the United States and we
25   had another board meeting scheduled for Friday

Page 25

1     DIAMOND - HIGHLY CONFIDENTIAL
2   morning U.K. time, to give kind of the official
3   go-ahead of whether or not our board would support
4   us pursuing this deal or pursuing, I guess not a
5   deal, but pursuing due diligence to see if there
6   was the basis for a deal.
7       John Varley had had discussions during
8   that week with Hector Sants at the FSA to make
9   sure that our regulators were aware, and John and
10   I had a number of conversations with
11   Secretary Paulson and New York Fed President
12   Geithner, and there came a point when we wanted
13   to actually engage with Lehman Brothers.
14       So at the request -- I can't recall
15   now, I think it was of President Geithner as
16   opposed to Hank Paulson, I should put in a call to
17   Dick Fuld and explain to him what our interest was
18   and what it wasn't. So I called him Friday
19   morning, after our board meeting and after we had
20   approval, to arrange an off-site meeting, because
21   I felt that -- you may recall this, but the TV
22   cameras were out in front of the Lehman building
23   by this time and I didn't want to go walking up
24   into the Lehman building, and I thought it would
25   be difficult for him to walk into our building, so

Page 26

DIAMOND - HIGHLY CONFIDENTIAL
1  I suggested some off-site locations.
2          And he called back and said he would
3  have his driver pick me up in front of my building
4  and take me into Lehman through the -- what is
5  it -- the garage, I guess, the back way.  I agreed
6  to do that.  I felt it was difficult for him to
7  get out of the building and be seen.
8          So I went up the service elevator to
9  the 31st floor and had somewhere around an hour,
10  might have been a little bit less, might have been
11  a little bit more, with Dick to lay out for him
12  what our interest was and what it wasn't.
13          And that was -- other than -- yes,
14  that was the first meeting I had on this.  For the
15  sake of completeness -- I don't think this is what
16  you asked, but I just want to make sure I have
17  everything on the record -- there were one or two
18  calls that I received from Dick over the previous
19  six months, asking if we had an interest, and in
20  each case, I explained to him -- in both cases.
21  It is possible it was three.  I think it was two.
22  There might have been one or two that came
23  together toward the end.
24          What I explained to him is that Lehman

Page 27

DIAMOND - HIGHLY CONFIDENTIAL
1  was an incredibly great firm, that we were really
2  proud of what we had built, but that it was
3  impossible for me to imagine how we would overcome
4  the overlap and the risk associated with doing a
5  deal at a market price.  And in essence, the
6  overlap and the risk was too great to even
7  contemplate, and knowing, I guess from the market,
8  that Lehman was at least considering something, it
9  was very important to me to be very clear with him
10  and not lead him on.
11          And in essence, it was a way for me to
12  say in the most polite way possible that there is
13  no deal at a market price, the current market
14  price, because of the risk and because of the
15  overlap.
16      Q.  I want to back up a bit to the
17  conversations with Secretary Paulson and
18  President Geithner in the previous days, but let
19  me first establish, when you met with Mr. Fuld on
20  the 31st floor and went into the building on the
21  service elevator, was anyone else present?
22      A.  Just Dick and I.
23      Q.  What had been the substance of your
24  conversations with Secretary Paulson and

Page 28

DIAMOND - HIGHLY CONFIDENTIAL
1  President Geithner about Lehman and in particular
2  their recommendation that you should give Dick
3  Fuld a call?  Can you give that to me in sum or
4  substance?
5      A.  Let me take them in piece parts.
6      Q.  Sure.
7      A.  Come to the last one about why they
8  thought I should give him a call, because I think
9  that is kind of different.
10          The sum and essence of the
11  conversations with Secretary Paulson and President
12  Geithner -- I think with Secretary Paulson, who I
13  had had, I guess, conversations with about this --
14  I had had discussions with Bob Steel, as you know,
15  and when Bob left to run Wachovia, my contact
16  there was Tony Ryan, and we never really came back
17  to this in any substance, other than I know you
18  had the call.
19          And I went back post the board meeting
20  with the answer that if there were a distressed
21  situation, yes, we would like a call, in
22  substance.  It wasn't exactly that, but in
23  substance I did leave the word with the Treasury
24  that if that situation came about, we would like

Page 29

DIAMOND - HIGHLY CONFIDENTIAL
1  to know about it.  We can't commit to anything, we
2  can't say what we would do, but if it was a
3  distressed situation, we would like to be on your
4  list of calls, and I was very, very clear, because
5  I didn't have approval from the board to lead,
6  that anything could happen other than we would
7  like a call.
8          When it then appeared somewhere in
9  this area, and again maybe from the 4th on or the
10  3rd on, somewhere in that period, when it was
11  clear that there might be an interest -- and I
12  suspect it was the same week of the 12th, but it
13  could have been a little bit earlier, I think the
14  sum and essence of Secretary Paulson's
15  conversation was twofold.
16          One is that certainly the Treasury
17  would be pleased to have Barclays take a look at
18  the situation, but he was very, very clear that he
19  saw this as a situation where there would be no
20  government money and was quite clear with me that
21  unlike Bear Stearns, they were not prepared to put
22  government money into this deal.
23          With Secretary Geithner, it was
24  slightly different, and I don't recall him being

Page 30

DIAMOND - HIGHLY CONFIDENTIAL
1 on the issue about the government money, I suspect
2 because he knew Hank or Secretary Paulson had
3 already had that conversation with me.
4        Tim was encouraging me to call Dick
5 directly, and I resisted because, as I said to
6 President Geithner, the only way this would work
7 for us, if it works at all, is at a distressed
8 price, and at a distressed price this is a rescue
9 and you are not going to want Dick Fuld there. So
10 it is inappropriate for me to be having this
11 conversation with Dick Fuld.
12       I am happy to have the conversation
13 and I am authorized by the board to have it with
14 the Treasury or the Fed, but not directly with
15 Lehman. We don't believe there is a market-based
16 deal. It's only if you need a rescue and it's at
17 a distressed price. Otherwise, the risks are
18 going to be way too high.
19    Q.   When Geithner suggested that you call
20 Fuld, did you have a sense that he had spoken to
21 Fuld? Did he tell you -- I'm not quite sure how
22 to frame this.
23       Did he indicate to you that he had
24 spoken to Fuld and a call was invited, he knew

Page 31

DIAMOND - HIGHLY CONFIDENTIAL
1 Fuld would take your call, as it were, or was he
2 suggesting that you make a cold call to Fuld?
3 There may be other possibilities, but you see the
4 range I am talking about.
5       MR. HUME:  Just object to the compound
6    and vague nature of the question.
7    A.   Try them one at a time and maybe we
8 can get through them.
9    Q.   OK. When you spoke to Geithner, did
10 he say, in sum and essence, I have spoken to Fuld
11 and I would like you to call him?
12    A.   No.
13    Q.   Did he say, in sum or essence, I
14 haven't spoken to Fuld but I think you should?
15    A.   Let me try to answer it.  I think
16 there were two or three times -- I said there is
17 two or three times, and I can't remember, from my
18 conversation with Bob Steel until my visit, where
19 I had a call from Dick Fuld, and in each of those
20 times, it was soon after I had had a conversation
21 with President Geithner.
22       I surmised later, after the rapidity
23 of it, that after I would have a conversation with
24 Secretary Geithner, he would ask Dick to call me.

Page 32

DIAMOND - HIGHLY CONFIDENTIAL
1 I don't know if that's true.  By the end of it, I
2 said I think I figured this out.
3    Q.   There seemed to be a pattern?
4    A.   Yes.
5    Q.   Let's go back to the meeting with Fuld
6 on the 31st floor, and I say that just to give us
7 a time point.  Whenever that was.  You think it
8 might have been the Friday --
9    A.   I'm pretty sure it was the Friday.  I
10 mean I could be off on days.  I'm pretty sure it
11 was the Friday.  We didn't have the board meeting
12 Friday morning and it wasn't Saturday.  It was
13 Friday.
14    Q.   And in that meeting with Dick Fuld,
15 again in sum and essence, can you tell me what was
16 the nature of the discussion, what did you say and
17 what did he say, as best you remember?
18    A.   After the normal platitudes, my
19 message was, in sum and essence, we have an
20 interest if this is a rescue situation, meaning if
21 this is a very, very distressed price.  That will
22 make it very difficult for you.
23       I would like to work directly with
24 your team and keep you informed, and if we were

Page 33

DIAMOND - HIGHLY CONFIDENTIAL
1 able to structure something, there would not be a
2 role for you.
3    Q.   And again in sum and essence, if you
4 would, what was Fuld's response?
5    A.   It was, in sum and essence, two
6 things.  One is, can't we do a deal as principals
7 that's not a rescue, and I think I can help in a
8 continued role.
9    Q.   And again, in essence, you said to him
10 neither of those things were possible?
11    A.   Sorry.  Yes.  I caught myself there.
12    Q.   Have you had your deposition taken
13 before?
14    A.   For this?
15    Q.   In anything?
16    A.   Why?
17    Q.   Just -- never mind.  You don't even
18 have to tell me.
19       So you had told Fuld you wanted to
20 work directly with his team.  Did that happen?
21 Did that come about?  Tell me what happened next.
22    A.   A bit of speculation of why, but
23 having had the go-ahead to do full due diligence
24 once our board met again before U.S. opening

Page 34

DIAMOND - HIGHLY CONFIDENTIAL

1    hours, and we had the go-ahead, we really
2    struggled Friday to get any engagement from the
3    senior Lehman team or their lawyers or access to
4    the data. We think -- this is speculation -- that
5    that's because they were dominated by B of A, and
6    we had never been told that there was another bank
7    looking at this, but we had suspected and then
8    kind of heard through the market that B of A was
9    looking at it.
10        The first time I got engagement from
11   the senior team, and the hours blended into the
12   hours, I can assure you, I think was around
13   somewhere between 8 and 11 p.m. Friday night. By
14   this time we had had better access to the data
15   room and had begun the due diligence on the
16   positions, but it was between those hours roughly
17   when I was able to get real engagement with the
18   senior team, including Bart McDade, who was the
19   last one of the senior team I saw that night.
20        Q.   Tell me, who was the senior team you
21   met with, with McDade as the last one?
22        A.   I am going to try and do the best I
23   can.
24        Q.   Sure.

Page 35

DIAMOND - HIGHLY CONFIDENTIAL

1        A.   But in each case I was meeting these
2    people for the first time.
3        There was a session with Alex Kirk,
4    Jerry Donini, and there were one or two others.
5    There were visits from time to time, I think the
6    gentleman's name was Mark Shafir, who was the
7    senior M&A banker who was running the deal for
8    Lehman. I think it was Mark Shafir.
9        And then having gone through those
10   meetings, Ajay Nagpal was part of that meeting,
11   and then after those, I had a chance to meet with
12   Bart and we spent an hour or so together, and that
13   was all -- I could be off by a few hours, but I am
14   thinking it was kind of 8 to 11 p.m. on Friday
15   night.
16        Q.   It is late at night on the Friday
17   night?
18        A.   Yes. And it's in the lawyers'
19   offices. I can't remember which lawyer.
20        Q.   Was the meeting with Bart one on one
21   or were there --
22        A.   Yeah.
23        Q.   And the meetings with these other
24   people, Kirk, Donini, et cetera, were they serial

Page 36

DIAMOND - HIGHLY CONFIDENTIAL

1    one-on-one meetings or were they --
2        A.   No. They were a combination of big
3    group, small group, very focused on businesses.
4    So for example, Jerry Donini had a deck and took
5    me through how the equities business was
6    performing, how it worked, how it was organized.
7    I talked to him about the culture of Barclays
8    Capital and how the fit might happen and what we
9    were like.
10        And then there was another group that
11   came in with another business. The one that I
12   spent most of my time on, because it was of the
13   greatest interest to me, was the equity business.
14        Q.   So none of those were one on one?
15        A.   I also had various people coming in
16   and out from my team. So, I don't recall Rich
17   being there. I think Jerry was there for some of
18   it. I think Benoit and Eric Bommensath might have
19   been there for some of it.
20        But there were many conference rooms
21   and many people. By this time a lot of us were
22   engaging with a lot of them, so there were
23   meetings going on. So clearly the paradigm --
24   "paradigm" is the wrong word. The engagement

Page 37

DIAMOND - HIGHLY CONFIDENTIAL

1    shifted sometime late Friday.
2        Q.   In what way did it shift? It became
3    more --
4        A.   We were getting attention and access.
5        Q.   You mentioned Rich and Jerry. Is that
6    Rich Ricci and Jerry del Missier?
7        A.   Yes.
8        Q.   In addition to Rich Ricci and Jerry
9    del Missier, who would you describe as your senior
10   team on this thing, if anyone?
11        A.   The other members of my executive
12   committee who were part of this in addition to
13   Rich and Jerry were Tom Kalaris, Roger Jenkins,
14   and Archie Cox, Archie having just joined. There
15   were a number of very important senior people, but
16   they reported directly to Rich or reported
17   directly to Jerry.
18        Q.   I am really looking for your circle of
19   top guys.
20        A.   I don't think I missed anyone.
21        Q.   Did you have any outside advice?
22        A.   Michael Klein.
23        Q.   Michael Klein. What was -- when did
24   Michael Klein first get involved in the project?

Page 38

DIAMOND - HIGHLY CONFIDENTIAL

1      A.  Again, I could be late by a day, but
2  I'm pretty sure I have it right. Friday
3  morning -- we had arrived late Thursday night, and
4  we decided we really should have -- we very much
5  wanted to do the due diligence ourselves. This
6  was the single most important risk decision you
7  could possibly make.
8      But it would be good to have some
9  strategic advice, and a number of my colleagues,
10  in this case Hans-Joerg Rudloff, who was chairman
11  of our operations in Barclays Capital and located
12  in Europe, I knew he had a relationship with
13  Michael, and I called Hans-Joerg to ask if he
14  thought Michael, A, would be interested, and B,
15  would be good at this, and he arranged for Michael
16  to come in Friday morning.
17      We did all we had to do -- it gets a
18  bit complicated. I'm not sure if this is of
19  interest to you. But he had some arrangements
20  with Citi, and which I had to call Vikram and then
21  he called the lawyer just to make sure that we
22  could use him and it didn't compromise his -- I
23  think he was in a separation agreement with them.
24      Q.  I think I can -- just so we can move

Page 39

DIAMOND - HIGHLY CONFIDENTIAL

1  past that topic. Effectively, if I can shorthand
2  this, he had some sort of noncompete or garden
3  leave with Citi, and Vikram Pandit relieved him of
4  that so he could help you?
5      A.  And Vikram and I know each other quite
6  well, so I was able to call Vikram.
7      Q.  Was Mr. Klein at that point associated
8  with any firm or --
9      A.  No.
10      Q.  He was a solo practitioner?
11      A.  Yes.
12      Q.  You know what --
13      A.  There was some debate afterwards of
14  whether Citi would get lead table credit for it.
15  But other than that, no, it was Michael on his
16  own, and I think the arrangement was specifically
17  with him, and I think once the deal was done,
18  there was an interest on Citi's part of getting
19  lead table credit. Other than that, there was
20  nothing from Citi.
21      Q.  I am going to leave lead table credit.
22      A.  So I think we are agreeing in
23  substance it was Michael alone.
24      Q.  And was Michael paid a fee or what

Page 40

DIAMOND - HIGHLY CONFIDENTIAL

1  arrangements were made with respect to paying him?
2      A.  He was paid. That was done by Rich.
3  I'm not familiar.
4      I am remembering now, with apologies,
5  I think we also had a team from CS, because we
6  needed people to help us with a lot of the aspects
7  of the due diligence. That was all reporting in
8  through Rich. So there was a team from CS we had
9  as well.
10      But Michael was clearly the lead
11  strategic advisor who was working closely with
12  Rich and Jerry and I.
13      Q.  We were talking about the circle of
14  the senior people, and was anyone from CS within
15  that circle, or were they more of the troops you
16  needed to do the due diligence you're talking
17  about?
18      A.  I think the latter.
19      Q.  I had asked you about Klein's
20  compensation. Do you know what the terms were at
21  all?
22      A.  No.
23      Q.  Do you know, for example, if it was a
24  flat fee or if there was any arrangement for a

Page 41

DIAMOND - HIGHLY CONFIDENTIAL

1  bonus or reward or success?
2      A.  Rich discussed that with him. I'm
3  sure I was involved in approving it at the time.
4  I don't have any recollection.
5      Q.  When -- at this stage, late Friday
6  night, you have had the meetings, you know, you've
7  met Kirk, Donini and others and had the meeting
8  with McDade, did you talk to any of those people,
9  Kirk, Donini, McDade -- did you meet with Eric
10  Felder, do you know?
11      A.  I don't recall. I don't think so.
12      Q.  You met with Kirk --
13      A.  I think I met with -- is it Mike --
14      Q.  Mike Gelband?
15      A.  Yeah. I think Gelband was part of the
16  group that was in the office. I don't think
17  Felder was, but he might have been.
18      Again, every single person that we
19  have mentioned, this is the first time I had met
20  them. So it wasn't faces that I recognized.
21      Q.  And it was the first time -- that
22  includes McDade was the first time you met him?
23  Yes?
24      A.  Yes.

Page 42

DIAMOND - HIGHLY CONFIDENTIAL

1
2    Q.    And when you spoke to Kirk and Donini
3    and Gelband and McDade, Ajay and Shafir and
4    whatever others, did you talk to them at that
5    point on late Friday night about the possibility
6    of coming to work for Barclays?
7        MR. HUME: Objection, vague.
8    A.    I think that was the whole purpose we
9    were there. But it was very much -- I would have
10   said it differently. It was a possibility of
11   combining the organizations. That implies they
12   would come to work for Barclays.
13       The reason we were there was to see if
14   there was an opportunity to combine Barclays
15   Capital and Lehman Brothers.
16   Q.    I guess I should follow up a little
17   bit on whether on that Friday night there was any
18   discussion about what the structure of the
19   transaction would be. It winds up as an asset
20   purchase agreement, right?
21       MR. HUME: Objection, vague. Which
22   transaction?
23   Q.    Let me break it down.
24       Ultimately the deal that was done was
25   done in the form of an asset purchase, correct?

Page 43

DIAMOND - HIGHLY CONFIDENTIAL

1
2    A.    I don't know what that means.
3    Q.    It means you buy their stuff, you buy
4    their property, as opposed to --
5    A.    I am happy to describe the deal we
6    did.
7    Q.    OK.
8    A.    I am uncomfortable accepting your
9    terminology.
10   Q.    Did you ever hear the deal described
11   as an asset purchase agreement?
12   A.    Only when you just said it.
13   Q.    Did you have an understanding -- let's
14   cut to the very end. When the deal got done and
15   approved by the bankruptcy court, did you have an
16   understanding of what the structure of the deal
17   was?
18   A.    I'm very happy to tell you what I
19   thought the structure was.
20   Q.    OK.
21   A.    If you want to ask that question, but
22   your --
23   Q.    What was your understanding of the
24   structure --
25   A.    I'm not comfortable in your

Page 44

DIAMOND - HIGHLY CONFIDENTIAL

1
2    speculation.
3    Q.    OK. What was your understanding of
4    the structure of the deal as approved by the
5    bankruptcy court?
6    A.    Broadly speaking, because this was
7    with the full authority from the board and John to
8    meet to negotiate the details and the specifics,
9    this was delegated to Rich, who I know you have
10   had a chance to talk to, so I am giving you the
11   general --
12   Q.    Sure.
13   A.    The structure was an opportunity for
14   us to purchase the U.S. broker/dealer of Lehman
15   Brothers.
16   Q.    That general description of the
17   opportunity to purchase the U.S. broker/dealer of
18   Lehman Brothers, did anyone take your time with or
19   explain to you what the nuts and bolts of the
20   transaction were in terms of the structure?
21       MR. HUME: I will object to the extent
22   that question would require the witness to
23   divulge conversations with counsel going
24   through the agreement. I would instruct the
25   witness not to answer on privilege.

Page 45

DIAMOND - HIGHLY CONFIDENTIAL

1
2    Q.    That's fair. Outside the presence of
3    any lawyers or counsel giving legal advice, did
4    you have a discussion with anyone about what the
5    nuts and bolts of the structure were?
6    A.    I don't think there were any nuts or
7    bolts in there. I don't know what "nuts and
8    bolts" means.
9        MR. GAFFEY: Can I have Exhibit 1,
10       please.
11   Q.    Let me show you what has previously
12   been marked, Mr. Diamond, as Exhibit 1. Have you
13   ever seen that document before?
14       Let me rephrase the question.
15   A.    Should I read the whole thing?
16   Because I can't answer it unless I read the whole
17   thing.
18   Q.    Take a look at it sufficient to tell
19   me whether you have ever seen it before. I don't
20   need you to read it word for word, but read it
21   sufficiently to tell me whether you have ever seen
22   that document before.
23   A.    My memory is that this was the -- I
24   can't be sure, but my memory is that this is the
25   document that was the responsibility of Rich to

Page 46

DIAMOND - HIGHLY CONFIDENTIAL
1
2  execute. So I don't have any specific
3  recollections.
4      Q.   Do you have a general recollection
5  that a contract like this was signed on or about
6  September 16th? That's the Tuesday.
7      A.   That's a very general statement. Do I
8  have a recollection that we made an agreement
9  pending approval of the bankruptcy court on
10 Tuesday --
11     Q.   Let me back it up a little bit.
12     A.   I would like to finish actually. I
13 prefer not to be interrupted.
14          Tuesday the 16th, yes.
15     Q.   Do you recall if the agreement that
16 was made pending approval of the bankruptcy court
17 was in writing?
18          MR. HUME: Objection, vague.
19          MR. GAFFEY: Let me just probe the
20 objection a little bit. I want to make sure
21 I have a clear question here. What's vague
22 about that question?
23          MR. HUME: Which agreement are you
24 talking about? This, the agreements later
25 in the week?

Page 47

DIAMOND - HIGHLY CONFIDENTIAL
1
2      Q.   The agreement that's right there in
3  front of you, sir, that we have been talking about
4  for the last five or ten minutes marked Deposition
5  Exhibit 1, is that the agreement in writing that
6  reflects the agreement you just described to me?
7      A.   I think you would have to ask Rich
8  that.
9      Q.   Do you know?
10     A.   I would consult with Rich.
11     Q.   Do you have any knowledge of your own
12 sufficient to answer that question?
13          MR. HUME: Objection, asked and
14 answered.
15     A.   I am happy with my answer.
16     Q.   I'm not. I don't think it is
17 responsive.
18          I have asked you if you have any
19 independent knowledge about that document. You
20 told me who you would have to ask. I am asking if
21 you have any knowledge independent of the
22 conversation you say you would have to have.
23     A.   If this is the document that is the
24 record of the agreement on the 16th, it would have
25 been executed and the responsibility of Rich, not

Page 48

DIAMOND - HIGHLY CONFIDENTIAL
1
2  me.
3      Q.   At the time the negotiations were
4  going on and at the time the deal was submitted to
5  the bankruptcy court for approval, as a general
6  matter, do you have a recollection of anybody
7  showing you the deal documents?
8      A.   Again, that was the responsibility of
9  Rich to execute.
10     Q.   Did anybody show you the deal
11 documents?
12          MR. HUME: Objection.
13          To the extent it calls for any meeting
14 with counsel or communication with counsel,
15 we would instruct you not to answer on
16 privilege grounds.
17          MR. GAFFEY: As to whether anybody
18 showed it to him? That's the basis of a
19 privilege objection?
20          MR. HUME: You may be asking about a
21 meeting with counsel.
22          MR. GAFFEY: It might be, but the verb
23 is, did anybody "show" you. Do you think
24 showing the agreement is a privileged act?
25 I just want to know so I understand the

Page 49

DIAMOND - HIGHLY CONFIDENTIAL
1
2  privilege you are asserting.
3          MR. HUME: Whether he had a
4  communication with counsel about the
5  document.
6      Q.   I don't want to know any words anybody
7  said. I just want to know if at any point while
8  the deal was being negotiated, anybody showed you
9  the document marked as Deposition Exhibit 1.
10     A.   I think I answered. This was Rich's
11 responsibility and I wasn't involved in the
12 execution of this document. You are asking me to
13 speculate and I can't speculate.
14     Q.   That's -- maybe we are missing each
15 other here. When you say it was Rich's
16 responsibility, does that mean you don't have a
17 recollection of being involved with it?
18     A.   I don't think that's what you asked
19 me. You asked me if I had seen it.
20     Q.   OK, that's still my question.
21 Whoever's responsibility it was to execute it, did
22 you see it at or around the time that it is dated,
23 September 16?
24     A.   So did I see this document on the
25 16th?

Page 50

1      DIAMOND - HIGHLY CONFIDENTIAL
2        Q.   At or around the 16th, yeah.
3        A.   It is unlikely, but it is possible.  I
4    can't, I can't recall everything that I would have
5    seen that day.
6        Q.   No, that's --
7        A.   Since this was a delegated
8    responsibility to Rich, I sense that it is
9    unlikely that I would have seen the document in
10   full.
11       Q.   Mr. Diamond, I am putting before you
12   what we have previously marked as Deposition
13   Exhibits 24 and 25.  Again, sir, I would ask you
14   to take a look through the documents sufficiently
15   to tell me whether you have seen them before.
16           Have you had a chance to go through
17   Exhibit 25?
18       A.   I have.
19       Q.   Have you seen that document before?
20       A.   I would give you the same answer I
21   gave before, which is the document agreement --
22   document preparation was delegated to Rich and his
23   team, and it is possible someone showed me this,
24   but I have no recollection.
25       Q.   Have you ever heard the term

Page 51

1      DIAMOND - HIGHLY CONFIDENTIAL
2    "clarification letter" used in connection with the
3    transaction?
4        A.   I may have, but I don't recall.
5        Q.   And if you take a look, sir, at
6    Exhibit -- the first amendment, which I think is
7    Exhibit 23, have you seen that before?  Exhibit
8    24, sir.  Take a look at that, please, and tell me
9    if you have seen it before.
10       A.   The question is have I seen this
11   before?
12       Q.   Yes, sir.
13       A.   I think the answer is the same, which
14   is that the negotiation and discussion around
15   all -- I don't mean to pick on words, but the
16   agreement preparation was a responsibility of
17   Rich, so I have no specific recollection.
18           MR. GAFFEY:  Can we take a five-minute
19   break.
20           MR. HUME:  Sure.
21           (Recess)
22   BY MR. GAFFEY:
23       Q.   Mr. Diamond, I would like to go back
24   to the Friday night period we were talking about,
25   sometime between 8 and 11.

Page 52

1      DIAMOND - HIGHLY CONFIDENTIAL
2    I think you told me that it was
3    important, that you wanted to do the due diligence
4    yourselves, as a general matter.  Did you get the
5    opportunity to perform -- withdrawn.
6           Did your team get the opportunity to
7    perform the due diligence that you wanted to do?
8           MR. HUME:  I am going to object as
9    vague and ambiguous.
10       A.   What I don't know what you are saying
11   is, in total or Friday night?  What are you
12   asking?
13       Q.   I am sort of at a higher level.
14       A.   We began to get the documents we
15   needed on Friday.  We didn't before that.
16       Q.   Just to sort of set the framework and
17   see how much I have to ask you, can you give me a
18   sense of what you know about the due diligence
19   process, if anything, that started on Friday and
20   occurred through the weekend?
21       A.   Yeah, that's a great question.
22           The quality of information from Lehman
23   and their clearing banks changed continually.  Was
24   that Lehman being out of control?  Was it poor
25   recordkeeping?  Was it their clearing bank being

Page 53

1      DIAMOND - HIGHLY CONFIDENTIAL
2    underhanded?  Was it, as Chairman Bernanke had
3    said, the beginning of the riskiest time in the
4    history of the financial markets so that certainty
5    of values was never less -- uncertainty of values
6    was never greater?  I think all those things had
7    to be considered in whether or not and how we were
8    able to propose a deal.
9           So I think, just to repeat, your
10   question is an excellent one, which was, how did
11   we feel about the due diligence process and how
12   did we feel about the environment we were doing
13   due diligence in.
14           I just finished the book by David
15   Wessel, In The Fed We Trust, which just came out
16   and was on the best seller list.  It is a great
17   book.  And it quotes Chairman Bernanke as saying
18   that this period was the riskiest he had ever
19   seen, and he did a lot of work on the Great
20   Depression, as you know.  The stress was never
21   higher, the uncertainty was never higher, the risk
22   in the markets was never higher.
23           The only other person who had an
24   opportunity to bid for Lehman Brothers had walked
25   away in Bank of America, someone who was prepared

Page 54

DIAMOND - HIGHLY CONFIDENTIAL
1  to pay 50 billion for Merrill Lynch and couldn't
2  put a price on this.
3       So we knew we were operating in an
4  environment of incredible uncertainty, very poor
5  data and records, and it was very stressful as a
6  result of that.
7       Q.  My question was more along the lines
8  of, did you get to look at anything?
9       A.  I think I answered your question
10 actually.  If you have another one, I would be
11 happy to answer it.  I think I answered your
12 question.
13      Q.  Did you look at the books?
14      A.  Is that another question?
15      Q.  Did you get to look at the books?
16      A.  Is this a follow-on question?
17      Q.  Just answer my question.  Did your
18 people get to look at the books?
19      A.  Is it a follow-on question or the same
20 one?
21      Q.  It is just a question, sir.
22      A.  I don't know what "books" means.
23      Q.  Did you get to look -- did your people
24 get to look at the books and records of Lehman

Page 55

DIAMOND - HIGHLY CONFIDENTIAL
1  Brothers?
2       A.  I think I just answered that.
3       Q.  I don't think you did.  Did your
4  people get to look at the books and records of
5  Lehman Brothers?
6       MR. HUME:  I think the witness did
7       answer the question.
8       A.  I think we looked at information in an
9  environment where in the history of the financial
10 markets it has never been more difficult to assign
11 value, where there were clearly data errors coming
12 out of Lehman, misinformation coming out of
13 Lehman, lack of information coming out of Lehman.
14 Whether or not that was their finance function
15 being out of control, something happening from
16 their clearing bank or other clearing agencies,
17 those are all the facts.  There was huge gaps in
18 information.  Massive gaps in information, in an
19 environment which Chairman Bernanke has said is
20 the most stressful, high-risk environment that
21 anyone could deal in.
22      In that context, we looked at a lot of
23 information.  There were significant gaps and
24 there was information that wasn't accurate.

Page 56

DIAMOND - HIGHLY CONFIDENTIAL
1       Q.  Describe for me, if you would, the
2  process of looking at a lot of information.  Who
3  was involved?  Where were they?
4       A.  Can you be more specific?
5       Q.  Well, you didn't yourself open up the
6  books and ledgers of Lehman and review them,
7  right?  People did that at your direction?
8       A.  What's the question?
9       Q.  The one I just asked you.  Would you
10 like it read back?
11      A.  Yeah.
12      MR. GAFFEY:  Read it back.
13      (Record read)
14      A.  At various times I was very involved
15 in specific looks.  I was not responsible.  That
16 was a function that was run by Rich Ricci.  My
17 interest in understanding the gaps, the
18 inconsistencies was high, but I did not run the
19 process, you're correct.
20      Q.  And who, if anyone -- who reported to
21 you about the -- this due diligence process?  Was
22 it Ricci who was keeping you up to date?
23      A.  As I just said, I delegated that to
24 Rich Ricci, and as a direct report to me, he kept

Page 57

DIAMOND - HIGHLY CONFIDENTIAL
1  me informed.
2       Q.  And did Mr. Ricci discuss with you,
3  when he made those direct reports, what, if
4  anything, he was -- he and his team were finding
5  out about the book value at which Lehman carried
6  its assets?
7       A.  How are you using the phrase "book
8  value"?
9       Q.  Did he use the phrase?
10      A.  No.  You just used it.
11      Q.  Withdrawn.
12      A.  Can you tell me what --
13      Q.  Sir, I don't mean to be rude.  The way
14 this works is I ask the questions.
15      MR. HUME:  He understands that.
16      A.  You used a phrase that I don't
17 understand.  I can ask you how you define that
18 phrase.
19      Q.  I will just rephrase the question.
20      A.  If there is a rule against that, let's
21 get it on the table.
22      Q.  I'll rephrase the question.
23      When Mr. Ricci reported to you about
24 this due diligence project, did he use the phrase

Page 58

DIAMOND - HIGHLY CONFIDENTIAL
1  "book value"?
2
3      A.   I think it would be very unusual for
4  me to recall specific terms that were used. I
5  have absolutely no recollection of specific terms
6  that were used.
7      Q.   Let's cut again to the Tuesday when an
8  agreement is made, Tuesday, the 16th. Did
9  Barclays agree to buy assets from Lehman at the
10 book value as of September 16?
11     A.   Can you tell me how you define "book
12 value"?
13     Q.   I don't have a definition, sir. I am
14 asking if that's the nature of the agreement that
15 was made. Did Barclays agree to buy assets --
16     A.   I can tell you what we did, which was,
17 we had a very clear mandate and agreement with our
18 board that notwithstanding the incredible
19 uncertainties, the incredible lack of information,
20 the environment that as Chairman Bernanke has been
21 quoted recently as saying it was the highest risk,
22 most stressful, most difficult to value
23 environment he had ever worked in, we structured a
24 deal that with the mandate of our board would be
25 capital accreted and included groups of assets and

Page 59

DIAMOND - HIGHLY CONFIDENTIAL
1  groups of liabilities. End of story.
2
3      It was a very difficult environment to
4  have certainty.
5      Q.   Was among the things that Barclays
6  agreed to purchase on September 16th a long
7  position of securities at book value as of
8  September 16th?
9      MR. HUME: Objection, asked and
10 answered.
11     Q.   You can answer it.
12     A.   In an environment that was -- I'm sure
13 you recall, in the years since the Great
14 Depression, I don't think we have been through a
15 period -- Chairman Bernanke was quoted on this --
16 that had greater risk, less certainty around
17 values, more stress, that put the global economy
18 at risk.
19     Where the data coming from Lehman
20 Brothers was uncertain, had huge gaps, was
21 constantly changing, we made a -- where our board
22 was clear that within all those parameters, we
23 still had to assure them as best we could that any
24 agreement would be accretive to capital.
25     You probably recall that in this

Page 60

DIAMOND - HIGHLY CONFIDENTIAL
1  period, capital was a big issue for the banks and
2  for the regulators, and within a little over a
3  month from this time, we had to agree to a capital
4  plan with our regulator that led to almost 7
5  billion pounds of additional capital being raised
6  in the Middle East. So doing a transaction that
7  was accretive to capital was very, very important
8  to our board and was a strong instruction to me.
9      Notwithstanding that, it was very
10 difficult to value the group of assets and the
11 group of liabilities that we agreed on, and more
12 than telling you that we agreed on a group of
13 assets or discussed a group of assets and a group
14 of liabilities, any -- that is how we -- that is
15 how we managed this, with clarity around the fact
16 that, again, with all the risks and nothing could
17 be guaranteed, being capital accretive was
18 important.
19     I hope that's helpful.
20     Q.   Could you take a look at Deposition
21 Exhibit 1, please. Would you turn to page 6 of
22 it.
23     I would ask you, Mr. Diamond, take a
24 look, if you would -- this is the definition

Page 61

DIAMOND - HIGHLY CONFIDENTIAL
1  section of that document. Take a look at the
2  definition of "purchased assets." Do you see
3  where I am on the page?
4      A.   No, sir.
5      Q.   No, you don't, or --
6      A.   Yeah, about halfway down?
7      Q.   Yes.
8      Scan through it as much as you need
9  to, to familiarize yourself with it, but my
10 question will go to Subsection D, so that's what I
11 would ask you to focus on.
12     Have you had a chance to look through
13 definition Subsection D? And you see it
14 describes -- I'm quoting -- "Government
15 securities, commercial paper, corporate debt,
16 corporate equity, exchange traded derivatives and
17 collateralized short-term agreements with a book
18 value as of the date hereof of approximately
19 70 billion collectively long positions."
20     Does that accurately describe assets
21 that Barclays agreed to buy from Lehman?
22     A.   The agreement that Barclays made was
23 that we would take a group of assets and a group
24 of liabilities with the -- with an additional and

Page 62

DIAMOND - HIGHLY CONFIDENTIAL

1  important commitment to our board that
2  notwithstanding all the risk associated with this,
3  and the difficult valuations, it would be capital
4  accretive.
5       I'll stick to that answer rather than
6  try and do anything else.
7       Q.   Well, my question doesn't go -- I will
8  ask you, and I will spend some time on it again,
9  what it was you spoke to your board about, but my
10 question goes to what agreement Barclays made with
11 Lehman.
12      A.   I think I have said to you that the
13 document here was the responsibility of Rich. I
14 think you had an opportunity to do his deposition.
15      I can tell you what the agreement that
16 I was involved in discussing was, which I just
17 did.
18      Q.   OK. Was the agreement that you were
19 involved in discussing, did it include the
20 purchase of government securities, commercial
21 paper, corporate debt, corporate equity, exchange
22 traded derivatives and collateralized short-term
23 agreements with a book value as of September 16th
24 of approximately 70 billion dollars?

Page 63

DIAMOND - HIGHLY CONFIDENTIAL

1       A.   The -- there was a group of assets and
2  a group of liabilities, and there was the
3  condition that notwithstanding the risk in the
4  markets and the difficult valuations in the
5  markets, that at the end of this we had a
6  commitment that to the best of our ability --
7  again, nothing could be guaranteed -- that it
8  would be capital accretive.
9       Q.   Do you have any knowledge, sir, as to
10 whether the bankruptcy court was informed in any
11 way that it was a condition of the agreement that
12 notwithstanding the risk in the markets and
13 difficult valuations in the markets, that at the
14 end, this had to be a commitment that to the best
15 of your ability would be capital accretive? Was
16 that told to the bankruptcy court?
17      MR. HUME: Objection, lacks
18 foundation.
19      Q.   You can answer.
20      A.   I wasn't at that session.
21      Q.   Did you ever learn if the bankruptcy
22 court was told that it was a condition to the deal
23 that it had to be capital accretive to Barclays?
24 Other than from lawyers?

Page 64

DIAMOND - HIGHLY CONFIDENTIAL

1       MR. HUME: Objection, misstates the
2  testimony and lack of foundation.
3       A.   The transaction that we were agreeing
4  to at all steps and every step in a very clear
5  way, notwithstanding all the risks,
6  notwithstanding all the valuation difficulties,
7  notwithstanding all the holes in data, capital
8  accretion was a condition that was very important
9  to agreeing to a deal for our board and giving us
10 the authority.
11      I was not a part of the specific
12 meeting that you are referring to.
13      Q.   As a general matter -- I know you
14 didn't talk to the judge, but did it come to your
15 attention whether or not the bankruptcy court was
16 told it was a condition of the deal that it be
17 capital accretive?
18      MR. HUME: Objection, asked and
19 answered.
20      MR. GAFFEY: Asked.
21      Q.   You can answer the question, sir.
22      A.   I did.
23      Q.   Respectfully, sir, I don't think you
24 did.

Page 65

DIAMOND - HIGHLY CONFIDENTIAL

1       Do you know if the bankruptcy court
2  was told it was a condition of the deal that it
3  had to be capital accretive to Barclays?
4       A.   I'll take one more shot.
5       Q.   I will take as many as it takes, sir.
6       A.   I was not at the meeting.
7       Q.   You were not at the meeting with the
8  judge? Is that what you mean when you say --
9       A.   What meeting are you referring to?
10      Q.   Sir, you're telling me you weren't at
11 the meeting. What meeting are you telling me you
12 weren't at?
13      A.   What meeting did you just ask me?
14      Q.   Sir, in any way, in sum or essence --
15      A.   I am trying to help you, so I don't
16 know why you are laughing and doing all the
17 shenanigans. If you can ask the question
18 straight, I will give you a straight answer. But
19 you don't need all the drama.
20      Q.   I think you can leave it to your
21 lawyer to suggest whether I am laughing or not. I
22 am actually not laughing, sir. This is a very
23 serious matter.
24      My question is whether the bankruptcy

Page 66

DIAMOND - HIGHLY CONFIDENTIAL

1 judge who approved this deal was told it was a
2 condition of the deal that it would be capital
3 accretive to Barclays. Do you have any knowledge
4 about that one way or the other?
5        MR. HUME: I object to the use of the
6    word "condition" as vague and ambiguous, and
7    I object because the question has been asked
8    and answered.
9    Q.   You can answer the question, sir.
10    A.   I was not present at any discussions
11 personally.
12    Q.   Did you ever learn indirectly whether
13 the bankruptcy court was told it was a condition
14 to the deal that it be capital accretive to
15 Barclays?
16    A.   The condition to the deal from the
17 beginning was capital accretion. I have explained
18 this many times.
19    Q.   Did you ever learn indirectly whether
20 the bankruptcy court was told, whether Judge Peck
21 was told about that condition to the deal?
22    A.   I never had a discussion with Judge
23 Peck.
24    Q.   Did anyone ever relay to you any

Page 67

DIAMOND - HIGHLY CONFIDENTIAL

1 report of the hearings that took place before
2 Judge Peck? Just answer that yes or no.
3        MR. HUME: Objection. Can I just
4    object.
5        To the extent it calls for any
6    discussion with counsel, we instruct you not
7    to answer. So any discussions about the
8    hearing with someone other than counsel is
9    what you are asking, what the question is.
10    A.   In a summary way, not a detailed way
11 certainly.
12    Q.   And in is summary way, when you had
13 these summary descriptions, did you learn one way
14 or the other whether Judge Peck was told that it
15 was a condition to the deal that it be capital
16 accretive to Barclays?
17        MR. HUME: Objection. I think the use
18    of the word "condition" in these questions
19    is highly ambiguous. The witness has
20    testified that it was an internal condition.
21    He didn't testify to anything beyond that.
22    Q.   Could you answer the question,
23 Mr. Diamond?
24    A.   I think I have been very, very clear

Page 68

DIAMOND - HIGHLY CONFIDENTIAL

1 with you that the agreement was the responsibility
2 of Rich, and that I wasn't at the bankruptcy
3 proceedings here. You are asking me something
4 that I -- you are asking me about a conversation
5 where I wasn't there.
6    Q.   Is the answer that you don't know one
7 way or the other directly or indirectly?
8    A.   I think I have answered the question.
9 I will stand by my answer.
10    Q.   Did you -- were you personally engaged
11 in any of the negotiations with personnel at
12 Lehman about the deal?
13    A.   Rich ran the deal. I didn't run it.
14    Q.   Did you have -- you yourself have
15 conversations with any personnel at Lehman in
16 negotiating the deal?
17    A.   It is a very good question. I can't
18 think of any situation where I was part of the
19 specific negotiations, because I have delegated
20 that to Rich and it would be my style not to then
21 try and get it confused.
22        And I have absolutely no recollection
23 of having been involved in specific negotiations
24 myself.

Page 69

DIAMOND - HIGHLY CONFIDENTIAL

1    Q.   Were you present in New York over the
2 weekend of the 13th and the 14th? That's the
3 Saturday and Sunday before the bankruptcy filing.
4    A.   Yes.
5    Q.   Were you present in New York on the
6 15th and the 16th? Actually rather than drag this
7 out, sir, did you stay in New York the whole week?
8    A.   I'm pretty sure -- I am trying to
9 think. I was certainly there through the 16th,
10 and I'm pretty sure I stayed the whole week.
11    Q.   And you had delegated to Mr. Ricci the
12 task, the responsibility for negotiating the terms
13 of the agreement. What were you doing during that
14 week?
15    A.   Among other things.
16    Q.   Among other things.
17        What were you doing, if anything, in
18 connection with the transaction during that week?
19    A.   The week you are referring to is the
20 week of the 15th?
21    Q.   Correct, sir. Well, let's include the
22 13th, 14th, through, say, Friday, the 19th. I
23 have to have the weekend in there because that's
24 when the due diligence was going on.

Page 70

DIAMOND - HIGHLY CONFIDENTIAL

1    A.    What was I doing?
2    Q.    What were you doing in connection with
3 the deal from Saturday, the 13th, through Friday,
4 the 19th, if anything?
5        MR. HUME:  Object to the vagueness of
6    the question.
7    A.    Wow. I'm doing my job.
8    Q.    In connection with the deal. That is
9 sort of why I asked that. I know you have a big
10 job, and I know you have a lot of things to do.
11 What are you doing in connection with this
12 transaction?
13    A.    There was very many discussions with
14 the Barclays group, our CEO, the executive
15 committee and the board to keep them abreast. And
16 there were many internal meetings to review the
17 results of different valuations, as specious as
18 they were.
19        There was many -- so I was quite
20 active. And that's the reason I was -- I would
21 say that between Thursday and Tuesday or
22 Wednesday, I'm not sure I got more than an hour or
23 two of sleep on any given time, and that's one of
24 the reasons that I asked Rich to take full

Page 71

DIAMOND - HIGHLY CONFIDENTIAL

1 responsibility for negotiating the agreement
2 within the authority that we were given from the
3 board to John, John to me and me to Rich. Some of
4 that a little bit more collectively than it
5 sounds, it wasn't quite that big a channel.
6        But I probably never had a busier
7 period in my career.
8    Q.    What I am hearing you describe, sir,
9 if I'm understanding correctly, is what is -- I'd
10 use the word "internal." You were reporting to
11 the board and keeping the board abreast of the
12 situation and you were talking to your team. Let
13 me shift the focus a little bit.
14        Again, over the same time period from
15 the Saturday, the 13th, through Friday, the 19th,
16 what, if any, contact were you having with the
17 Lehman folks, you yourself?
18        MR. HUME:  Objection. I think you
19    asked that already.
20    A.    It varied during the week. So, you
21 know, you asked -- on the 13th and the 14th, it
22 was primarily through Bart McDade, who had been
23 given responsibility to try and find a
24 transaction, which ended up in bankruptcy. And

Page 72

DIAMOND - HIGHLY CONFIDENTIAL

1 Monday and Tuesday, Bart would have been probably
2 my primary contact.
3        And then at the senior level, I
4 engaged with people, as I've said, people like
5 Jerry Donini to learn more about the equities
6 business, find out more about would he want to
7 join, what does he think about Barclays, how does
8 he feel the combination works.
9        Bart and I visited thousands of people
10 on Tuesday to tell them about the opportunity
11 pending bankruptcy approval. There was 10,000
12 jobs that were at risk. I don't know if you know
13 this, but when we announced this deal on Tuesday,
14 there were 10,000 people, many of whom were very
15 low salaried, many of whom had worked at Lehman
16 for 20 or 30 years, that were losing their
17 pensions, going to get no severance, no
18 healthcare. Many main breadwinners were going to
19 go home -- had gone home Monday, were going to go
20 home any day, with all of that gone, a dramatic
21 change to their lives.
22        So when I spent Tuesday with thousands
23 of the employees, the emotion, the tears, the --
24 it took a lot to manage, and that was a lot of

Page 73

DIAMOND - HIGHLY CONFIDENTIAL

1 Tuesday and Wednesday, in groups, large groups and
2 small groups, the emotion.
3        I also spent time with many people,
4 such as Mayor Bloomberg and others, who were very
5 interested in the opportunity to save jobs for
6 New York.
7        There was preparation of
8 communications. And specifically with the Lehman
9 people, I was doing a lot of things, but certainly
10 not trying to intrude on the actual specific
11 negotiations and documentation of the agreement.
12    Q.    Let's talk a little bit about the
13 saving jobs piece. Did you offer Mr. McDade a
14 job?
15    A.    I would say it slightly differently,
16 but I'm happy to get pushed back on if you don't
17 understand the context.
18        I definitely wanted Bart to stay, and
19 I wanted him to engage with me about what the best
20 role would be. I think one of the difficult
21 things for Bart was I had a very strong executive
22 committee and I was the head of the business, so
23 trying to find exactly the right role rather than
24 me say here is the job.

Page 74

DIAMOND - HIGHLY CONFIDENTIAL
1
2    So I didn't say here is the job, but I
3    said, I would love you to do this, I'd love you to
4    do this, I'd love you to do this. There is a
5    series of things. Actually I never got to a
6    specific, but let's engage, I want you to stay.
7        Q.    Without regard to the particulars of
8    what he would do, what his title would be, what
9    his specific portfolio would be, did you talk to
10   him about how much he would be paid if he took
11   such a job?
12       A.    I had a discussion with him -- I have
13   to give this some thought because so many of these
14   conversations were without sleep.
15       It was important to us that if we are
16   going to do this deal and announce it on Tuesday,
17   that we had a certainty that the senior team was
18   engaged and going to be a part of it as opposed to
19   go to someone else.
20       We had a situation, for example, I
21   think it was Mark Shafir -- I know it is a name I
22   used earlier. It is the same guy. If I had the
23   wrong name, then I have it wrong now. He was the
24   cohead of M&A who had told us, when we tried to
25   engage him, he was one of the people, that he was

Page 75

DIAMOND - HIGHLY CONFIDENTIAL
1
2    actually going to leave and go to Citigroup.
3        So you can imagine if we were going to
4    put Barclays at risk and our shareholders at risk
5    in an environment with so much risk and so much
6    uncertainty and so much stress and so difficult to
7    value, that if the senior team wasn't in place, we
8    were not going to do this deal.
9        When I discussed that with Bart, and
10   part of that discussion is an agreement of what
11   the compensation would be, he said he was on
12   board, he would see this through, but he didn't
13   need a discussion on compensation.
14       Q.    Was a -- if you remember, was a
15   written offer of employment put together for
16   Mr. McDade?
17       A.    I can't recall. I think in most of
18   the discussions we were certainly planning on
19   having written agreements. That was the intent.
20   And I had a couple of those meetings. Whether or
21   not we actually followed up and had a signed
22   agreement with Bart, I don't recall. I do
23   remember him saying he doesn't need a signed
24   agreement, that his handshake would be good
25   enough.

Page 76

DIAMOND - HIGHLY CONFIDENTIAL
1
2    It is very possible that our HR people
3    would have followed up and made sure we had all
4    those signed, but it was a pretty crazy time.
5        Q.    Do you recall a communication that you
6    made to Michael Evans in which you told him to
7    prepare a written offer and just give it to you?
8        A.    I'm sorry?
9        Q.    Do you recall a communication between
10   you and Michael Evans -- Michael Evans is head of
11   HR, right?
12       A.    Right.
13       Q.    Do you recall a communication between
14   you and Michael Evans in which you instructed
15   Evans to provide a written offer for McDade but
16   send it just to you, not to send it directly to
17   Mr. McDade?
18       A.    I recall asking Michael to get me some
19   background on what Bart had earned in the past,
20   and I might have said that. I certainly would
21   have wanted to see it before he gave it to Bart,
22   so it is not crazy, but I don't recall
23   specifically.
24       I remember being interested more in
25   what was his comp history so I could help get

Page 77

DIAMOND - HIGHLY CONFIDENTIAL
1
2    myself prepared for what -- I mean that's one of
3    the inputs that one would want.
4        Q.    Sure. I'll come back to that later
5    with some documents. I don't want to take time
6    with that now.
7        A.    It could have been something like
8    that. I'm sure if I was doing something with
9    Bart, I would have wanted to see it with Michael
10   first.
11       Q.    I have some -- I don't want to take
12   time with it now. I have some documents I will
13   show you that might refresh your recollection a
14   little more precisely.
15       Apart from conversations with McDade,
16   did you -- did you talk to any of the other senior
17   executives, Lehman executives, along these lines,
18   about what they --
19       A.    Oh, boy. I think there were -- sorry,
20   I jumped ahead.
21       Q.    Along the same lines.
22       A.    My recollection is that there were
23   eight or nine people that we wanted to get
24   agreement with before we would go through with the
25   deal, and there was a larger group that they were

Page 78

DIAMOND - HIGHLY CONFIDENTIAL

1  committing to that they would insure we would
2  engage with.
3      So I was part of our management team
4  that had some of those discussions, and my
5  recollection is it would have been deep into the
6  morning, maybe late Monday night and deep into
7  Tuesday morning.
8      And I definitely had a conversation
9  with Bart. I definitely had a conversation with
10  Skip. I think I was part of the Alex Kirk
11  conversation, and I think there were a couple of
12  people where I might not have been the key
13  conversation but I might have said, how did it go,
14  let me catch up with you.
15      But my memory -- and this -- I am
16  telling you it is hazy, so I don't mean to skip
17  over anything, but I think my responsibility
18  amongst our senior team was to have the
19  conversation about kind of signing on with Bart
20  and with Skip, and I think I was additive on Alex.
21      Q.   Alex is Alex Kirk?
22      A.   Alex Kirk. And it's possible I was in
23  on one or two others, but I don't recall. I think
24  it was eight or nine in total.

Page 79

DIAMOND - HIGHLY CONFIDENTIAL

1      Q.   Recognizing it is hazy, I will just
2  use your phrase "in on," and we both agree that is
3  a vague term, but were you in on or involved in
4  connection with such conversations with Paolo
5  Tonucci?
6      A.   Who?
7      Q.   Paolo Tonucci?
8      A.   I don't recognize the name.
9      Q.   Ian Lowitt?
10      A.   No.
11      Q.   Martin Kelly?
12      A.   I don't know the name.
13      Q.   Gerard Reilly?
14      A.   I don't know the name.
15      Q.   Did you talk to Donini along these
16  lines?
17      A.   I don't think it was me. I think that
18  was Jerry del Missier. I can't be sure. It's
19  possible I did Donini. It's possible. In fact, I
20  think Jerry might have been in Europe by this
21  time, because we were dealing with the whole issue
22  of Lehman Europe at the same time. Jerry del
23  Missier.
24      It is possible I'm the one that had

Page 80

DIAMOND - HIGHLY CONFIDENTIAL

1  the conversation with Donini, but I don't think
2  so. I definitely had a follow-up with him. He
3  was someone we were very, very interested in
4  making sure he was on the team and engaged. The
5  equity business was such a key part of whether
6  this would create value.
7      Q.   Now, again sort of to frame what I
8  want to follow up on, I want to focus now on the
9  point at which an agreement is reached. Forget --
10  and I don't mean document. I mean when in your
11  mind there is an agreement with Lehman.
12      When do you first -- when is it first
13  your understanding that an agreement has been
14  reached between Barclays and Lehman?
15      A.   My recollection of time, if I go
16  backwards, is I had John Varley's approval to say
17  publicly to the Lehman people, I think it was mid
18  to late afternoon Tuesday, and so we only would
19  have done that if we had had the agreement. So if
20  I am trying to put a pin in it, it would have been
21  early afternoon Tuesday.
22      Q.   Is there any event that would help you
23  put a pin in it? A conversation that you had --
24  I'm not looking for an eureka moment, but where

Page 81

DIAMOND - HIGHLY CONFIDENTIAL

1  you knew --
2      A.   If I knew it, I would say it.
3      Q.   Well, I have to ask you. How precise
4  can you be about at what point in the day on
5  Tuesday? Was it after lunch? Was it before
6  lunch? Was it at lunch?
7      A.   Early afternoon would suggest after
8  lunch, but I am not precise. It would be -- there
9  was a real concern that every minute that went by,
10  the business was atrophied.
11      It was incredibly helpful that we had
12  confirmation, I think that day or earlier, that
13  the bankruptcy judge could judge possibly as early
14  as Friday. I think it was that day. We didn't
15  believe that if we didn't have -- we didn't
16  believe we could go much beyond Monday, because
17  clients weren't doing business, people were going
18  home. So it was that kind of thing.
19      That leads me to believe that I would
20  have been announcing it to the floor as soon after
21  getting the agreement as possible. I don't know
22  why I would have wasted time. The only reason
23  would have been to make sure we had all our ducks
24  in order with the board and the group, and by that

Page 82

DIAMOND - HIGHLY CONFIDENTIAL

1    time the conversations with John were all set up
2    so they were pretty snappy.
3        It's possible you could show me
4    something that would make it more -- but I'm
5    pretty sure that would have been the time frame.
6        Q.    As best you can, sir, and we will
7    spend more time on this today, what's your --
8    outline for me, please, the deal that was made.
9    What were the components of the deal?
10        MR. HUME: Objection, vague.
11        A.    Sorry.
12        Q.    You can answer.
13        A.    The question is what was the deal?
14        Q.    What were the components of the deal
15    in your mind?
16        A.    We were acquiring the U.S.
17    broker/dealer operation of Lehman Brothers with
18    commitments from, as discussed, people, and a
19    group of assets and a group of liabilities, which
20    notwithstanding the uncertainty in valuations,
21    notwithstanding the uncertainty in information and
22    the gaps, notwithstanding the volatility in the
23    market, gave us great confidence that we could say
24    to our board that the deal would be capital

Page 83

DIAMOND - HIGHLY CONFIDENTIAL

1    accretive. Because the environment we were in,
2    the share price would be attacked if we were not
3    capital accretive, and that was the -- that was
4    what the board required of me.
5        Now, I did say to the board, and I
6    want to be fair, there are no guarantees in this,
7    because it was -- I don't know -- it was, it was
8    very difficult to agree to a transaction when
9    there kept being misinformation, lack of
10    information, assets that couldn't be found,
11    information that couldn't be found, antagonism and
12    difficulty with clearing agents and clearing
13    mechanisms, and just the volatility in the market.
14        And you may recall that once we had
15    the idea Sunday night and early Monday morning
16    that potentially even post bankruptcy we might be
17    able to do a deal for the U.S. broker/dealer, you
18    know, by this time there was buzz all over the
19    market that there was a U.S. Government rescue of
20    AIG, Merrill Lynch was joining with Bank of
21    America, Wachovia was on the rocks, Morgan Stanley
22    was on the rocks. It was an incredibly -- as
23    Chairman Bernanke has said, it was the week of
24    most stress in the history of the financial

Page 84

DIAMOND - HIGHLY CONFIDENTIAL

1    markets.
2        So that was the deal. And we were
3    willing to go forward with that.
4        Q.    At a 30,000-foot level, what were the
5    nature of the assets that you agreed to purchase?
6    Securities, right?
7        A.    It was a large group of assets and
8    large group of liabilities. I think Rich is
9    really the one that could answer that better than
10    I could.
11        Q.    He could give me more detail. What I
12    want to know is your view, as I said, the
13    30,000-foot view. What was your understanding? I
14    will accept that it is not detailed.
15        A.    It was very broad.
16        Q.    What was your broad understanding?
17        A.    It was very broad.
18        Q.    You understood it included some
19    buildings, yes?
20        A.    It was a very broad group of assets
21    and very broad group of liabilities, and I was
22    aware that some buildings were included. That was
23    one of the biggest stress issues, because as you
24    go back today and look at those buildings in

Page 85

DIAMOND - HIGHLY CONFIDENTIAL

1    Manhattan, there had been a complete collapse in
2    commercial real estate, and the value that we were
3    thinking would be appropriate for the headquarters
4    building in New York, for example, is probably
5    worth half of that today, and Barclays has lost a
6    huge amount of money as a result of that asset.
7        And it is a good example of how
8    difficult this whole transaction was, because once
9    we made this agreement, in the environment that
10    I -- it's like catching a knife, the commercial
11    real estate market in New York. So we destroyed
12    50 percent of the value of what we included for
13    that building and probably more. My understanding
14    is there was some data centers as well. So real
15    estate is at a horrible time since this happened.
16        But a lot of that was happening in
17    just this week. It was the most unstable week.
18    Equities were down almost 500 points on Monday. I
19    told you what Chairman Bernanke said about this
20    week, as Secretary Paulson said. Unbelievable,
21    unbelievable, how proud I am that our board and
22    our group executive committee and our executive
23    committee were able to stay steady through this
24    and actually complete a transaction that is very

Page 86

1          DIAMOND - HIGHLY CONFIDENTIAL
2    good strategically for the reasons that we had
3    talked about, but also saved 10,000 jobs in
4    Manhattan.
5          MR. GAFFEY: Can we go off the record
6    for one second.
7          (Discussion held off the record)
8    BY MR. GAFFEY:
9          Q.   Back to -- apart from the issues with
10   the real estate market today, I want to go back to
11   the day a deal was agreed, September 16th, and
12   what the picture was then.
13          Actually withdrawn.
14          Let me ask you a bit -- ask you, sir,
15   what you mean by capital accretive. Can you
16   explain that term to me.
17          A.   The regulators that we are responsible
18   to, the Financial Services Authority in the U.K.,
19   holds us to specific capital standards, so for
20   example, core equity, tier 1 equity, and it was
21   becoming increasingly clear during this time that
22   they were focusing more on core equity than tier 1
23   equity, and they were thinking the banks would
24   potentially have to hold higher core equity.
25          So when I say capital accretive,

Page 87

1          DIAMOND - HIGHLY CONFIDENTIAL
2    accretive to the capital ratios, which means that
3    the asset liability mismatch had to have a
4    mismatch in favor of a positive capital accretion
5    or we weren't authorized to do a deal.
6          I think there were other times in the
7    financial markets where an organization like
8    Barclays would be willing to do something that
9    wasn't capital accretive. Maybe they had excess
10   capital or maybe times were better. But in times
11   of stress, as I have said -- and keep in mind it
12   was weeks later, five weeks later when World Bank
13   of Scotland, the largest bank in the U.K.,
14   couldn't fund itself and was rescued by the
15   government.
16          And the government came to Barclays
17   and required a capital plan. That meant we had to
18   either raise significantly more capital or become
19   part of the government. And you can imagine how
20   important it was, looking back, that we did a
21   deal that was capital accretive and wasn't another
22   drain on capital for the group.
23          Q.   Describe to me what you meant when you
24   said there had to be a mismatch between assets and
25   liabilities in favor of capital accretion. Which

Page 88

1          DIAMOND - HIGHLY CONFIDENTIAL
2    had to be higher?
3          A.   I would ask you to go to an accountant
4    for that. But you can't have -- you can't have --
5    I'm not a very good accountant.
6          Q.   It is a fair fight. Neither am I.
7          A.   Which is why I relied on the team to
8    do this.
9          I think clearly the mismatch is what
10   creates the capital accretion, and, you know,
11   listen, fair enough. I have said it before in
12   other situations and I'll say it again. It's not
13   that there was certainty in valuations, not that
14   there was certainty in the information, and it is
15   clear that the volatility of the market -- even if
16   there was certainty in valuation that day and
17   certainty in information, of which there was
18   neither, when the equity market is swinging around
19   500 points a day, you can imagine the volatility.
20          So this was a very stressful
21   situation, for me as a main board member, to be
22   able to say to my board that you have the highest
23   certainty possible of capital accretion as we are
24   showing it to you, notwithstanding the
25   uncertainty, the lack of valuations, lack of

Page 89

1          DIAMOND - HIGHLY CONFIDENTIAL
2    information and the volatility in the market, and
3    I was -- to be fair, we could only do the best we
4    could. There were no guarantees.
5          Q.   Let me press back a little bit,
6    because I want to make sure that I understand what
7    you are talking about with the mismatch in capital
8    accretion.
9          In layman's terms, because I'm a lousy
10   accountant too, are you saying that assets had to
11   exceed liability -- you needed as much confidence
12   as you could get in these circumstances that
13   assets exceeded liabilities? That's the mismatch
14   you are talking about?
15          MR. HUME: Objection to form.
16          A.   I think, you know, not being an
17   accountant, I would ask you to talk to -- and I
18   know you have been able to depose Rich and Patrick
19   and others who were doing the accounting. I think
20   I will stick to my level of knowledge.
21          Q.   A few answers ago it is a phrase you
22   used, sir, the mismatch between assets and
23   liabilities, so I will take whatever explanation
24   you can give me of what you meant when you talked
25   about a mismatch between assets and liabilities.

Page 90

DIAMOND - HIGHLY CONFIDENTIAL

1   How were they mismatched?
2
3   A.   To provide capital accretion. I'm
4   sure someone who knows more than I can tie those
5   together for you.
6   Q.   When you talk about the mismatch, you
7   are talking about assets exceeding liabilities,
8   yes? Not liabilities exceeding assets. Is that
9   right?
10   A.   As I said, I am not an accountant. I
11   am not going to get into accounting terms. There
12   is a good reason why they don't let me do the
13   accounting.
14   Q.   Let me try it another way. In order
15   to have capital accretion, sir, did you have to
16   pay less for what you got? Did you have to get
17   more in value than you paid? Is that what leads
18   to capital accretion?
19   A.   I think there is --
20   MR. HUME: I will object to the
21   question as vague.
22   A.   I -- my answer is somewhat associated
23   with the objection, which is that there is no one
24   way to do anything. So again, I think I made
25   clear I'm not the right person to go into the

Page 91

DIAMOND - HIGHLY CONFIDENTIAL

1
2   details, and, you know, I had a staff that
3   prepared us very well and prepared the documents
4   for the executive committee and for the board.
5   But I'm not comfortable in answering
6   questions that seem to me to be of an accounting
7   nature, which I have no expertise in. And I'm
8   kind of glad I don't.
9   Q.   Did you have a sense when the deal was
10   agreed that Barclays was going to have a gain as
11   opposed to a loss on the deal?
12   A.   I was highly confident,
13   notwithstanding the environment we were in, that I
14   could hold my head up to the board and say yes, it
15   is capital accretive. But I knew there was risk,
16   and particularly in this environment where there
17   were so many gaps up until the last minute of
18   information, assets and liabilities that are
19   turning out to be different than what were first
20   reported, valuations that were different than they
21   had been recorded on the books for, valuations
22   that were changing minute to minute because of the
23   volatility in the markets, and information coming
24   in to us from clearing agents and clearing
25   organizations that were different than we were

Page 92

DIAMOND - HIGHLY CONFIDENTIAL

1
2   receiving inside.
3   Yet, through this time, we were able
4   to do enough work through there and through the
5   rest of the week to insure that we could say to
6   the board that we -- that the deal will be capital
7   accretive, and that's why I refer to it, and it is
8   difficult, as there were a group of assets and a
9   group of liabilities.
10   Q.   What were the liabilities that
11   Barclays took on?
12   A.   You know. They are all --
13   Q.   Well, I'm not the witness, sir. What
14   is your understanding?
15   A.   There was a group of liabilities.
16   Q.   Do you have any greater understanding
17   than there was a group of liabilities?
18   MR. HUME: Did he then or does he now?
19   Q.   How about -- I'll take it either way
20   and we will follow up.
21   A.   I'm sure there were some that I had
22   more knowledge of than others and had been briefed
23   and aware.
24   Q.   What's your recollection of what your
25   understanding was at the time of what constituted

Page 93

DIAMOND - HIGHLY CONFIDENTIAL

1
2   the group of liabilities that Barclays took on?
3   A.   Any question in particular?
4   Q.   How about we go with that one?
5   A.   Oh. Well --
6   Q.   Let's read it back.
7   (Record read)
8   A.   There was a wide variety of
9   liabilities. If you have a question about any in
10   particular, I'm happy to give you all the
11   information I can.
12   Q.   Did you have an understanding that it
13   included short positions against long positions?
14   That those liabilities would be assumed?
15   A.   Again, I would have to refer you to
16   Rich in terms of the specific. I don't really
17   look at that as -- I don't recognize that way to
18   state a liability position.
19   Q.   Let's go back to capital accretive.
20   Was there some goal or target that you were aiming
21   for in terms of capital accretion?
22   A.   I think more than a target, it was the
23   fear of being able to assure the board and our
24   regulators, because the FSA was very involved in
25   this as well, that the deal would be capital

Page 94

DIAMOND - HIGHLY CONFIDENTIAL

1  accretive, knowing that information was moving
2  around, markets were moving around, valuations
3  were misstated.
4       I think that was the bigger issue for
5  us, being able to insure it, rather than what the
6  target was. If there was a target, I don't
7  recall.
8       Q.   That's really my question. Was there
9  a target? Was it a dollar? Was it 3 billion
10 dollars?
11      A.   It's very possible there was. I
12 certainly don't recall.
13      Q.   Let me just for clarity, my clarity,
14 you don't recall what it was or you don't recall
15 even whether there was one?
16      A.   I would be surprised if we didn't
17 start with a target, and I would think that target
18 would include recognition that the target would
19 have to have enough buffer in it, because of the
20 lack of information, the incorrect information,
21 the volatility in the prices minute to minute and
22 day-to-day, and the uncertainty and misinformation
23 regarding the prices that were listed on the
24 books, but I don't recall what it was.

Page 95

DIAMOND - HIGHLY CONFIDENTIAL

1  Q.   Did Barclays purchase those assets at
2  the prices that were listed on the books?
3       A.   The way we look at it, again, is
4  different from the way you're looking at it, which
5  is that we looked at a series of -- you know,
6  groups of assets and groups of liabilities that
7  came out with the answer we wanted.
8       Q.   Was the process to go through the
9  prices listed on the books asset by asset or asset
10 class by asset class and come up with a price that
11 Barclays would agree to pay?
12      MR. HUME:  Objection, lacks
13 foundation.
14      A.   Again, I think Rich is the best one to
15 ask exactly what the process was.
16      Q.   Let me ask you generally --
17      A.   I wasn't involved in the
18 minute-to-minute process.
19      Q.   And I understand that, but my question
20 is whether you had a general understanding of
21 whether the process was to review the prices
22 listed on the books as a means of determining the
23 price that Barclays was willing to pay.
24      A.   Certainly the due diligence meant that

Page 96

DIAMOND - HIGHLY CONFIDENTIAL

1  we went in -- the difficulty was that there were
2  many assets and liabilities with no prices and
3  many cases where they were incorrect prices.
4       So this is why I asked you earlier to
5  define how you mean book value. Does it mean
6  what's listed on the books or does it mean what
7  the value was on that day? It is such a
8  nebulous -- it can be used in so many different
9  ways.
10      So what we were trying to do is,
11 wherever possible, to determine value. We
12 couldn't do it in every case. There was not
13 enough information.
14      Q.   When you say book value is a term that
15 can be used in different ways, you are speaking as
16 a nonaccountant who has other people who make that
17 definition for him? You don't have a definition
18 of book value?
19      A.   I am probably responding more to a
20 question earlier. It is probably a fair question
21 on your part. When one is looking at the books
22 and trying to determine what's the value on the
23 books, and there is information that changes or
24 information that's missing or prices that aren't

Page 97

DIAMOND - HIGHLY CONFIDENTIAL

1  there, then it just -- it gets hard.
2       Q.   Was there any difference, any delta
3  agreed between Barclays and Lehman, between the
4  price Barclays would pay and what Lehman did have
5  listed on its books?
6       A.   That's a detail that I wouldn't have
7  been involved in, and again, I wasn't involved in
8  what was kind of on the books. I was involved in
9  more what's the real value.
10      Q.   Other than you, within the sort of
11 senior team dealing with this transaction, other
12 than you, was anyone else reporting to John Varley
13 about the deal? Or did it always go through you?
14 Do you know?
15      A.   A number of people would have been on
16 many, if not all, of the calls that I had with
17 John. Archie would have been on some. Rich would
18 have been on many.
19      So if you're asking from the
20 organizational design point of view, those guys
21 reported to me, not to John. But if you are
22 asking from an information point of view, we would
23 often have many people on the phone with John and
24 the board, for just the reason I'm saying. Often

Page 98

DIAMOND - HIGHLY CONFIDENTIAL
1    DIAMOND - HIGHLY CONFIDENTIAL
2    Rich would be there because he was the one
3    responsible.
4        Q.   Do you know if anyone gave John Varley
5    the understanding that there was a negotiated
6    discount of 5 billion dollars on the price?
7        A.   I can't speculate as to what John
8    might have known.
9        Q.   Have you ever been in a conversation
10   with Mr. Varley where he told you he understood
11   there was a negotiated discount of 5 billion
12   dollars on the price?
13       A.   I don't recall hearing that phrase
14   from John or anyone else.
15       Q.   Has Mr. Varley ever shown you a
16   document that refers to a negotiated discount of
17   5 billion dollars in the price?
18       A.   Not to my recollection.
19       Q.   Do you recall hearing any discussion
20   with Mr. Varley or anyone else on the senior team
21   about there being a negotiated 5 billion dollar
22   discount on the price?
23       A.   I think I answered that in the
24   question before the last.
25       Q.   The question before was just

Page 99

1    DIAMOND - HIGHLY CONFIDENTIAL
2    Mr. Varley.  I am broadening it out.
3        Any discussion with anyone on the
4    senior team about a negotiated 5 billion dollar
5    discount on the price?
6        A.   I have no recollection of that phrase.
7        Q.   Is it your understanding that there
8    was a negotiated discount on the price?
9        A.   I told you what my understanding was.
10   And I didn't lie.
11       Q.   I'm not suggesting you did.  I truly
12   am not.  I am just trying to get a --
13       A.   My understanding was, we needed to
14   have capital accretion, a group of assets, group
15   of liabilities.  We talked about the buildings.
16   Those are my understandings.
17       And I just said I don't recall that
18   phrase, so obviously I don't recall conversation.
19       Q.   Let me not nail it to that phrase, and
20   I truly don't mean to suggest you are not being
21   truthful, sir.  I am trying to get an
22   understanding so we can follow up here.
23       Apart from the phrase negotiated
24   discount of 5 billion dollars on the price, did
25   you have an understanding that the price paid was

Page 100

1    DIAMOND - HIGHLY CONFIDENTIAL
2    less than the market value of the assets acquired?
3        A.   I had a very clear understanding that
4    this deal would be, to the extent we could
5    guarantee it, capital accretive.  That's the
6    phraseology that I am most comfortable with.
7        If you feel those are saying the same
8    things, that's fine, but I'm not an accountant.
9        Q.   Let me see if they are saying the same
10   things, and I can move on to something else.
11       By capital accretive, do you mean that
12   the price paid was less than the market value of
13   the assets acquired?  Does one relate to the
14   other?
15       A.   You know what?  I think anybody can
16   figure out capital accretive.
17       Q.   You may have met the only man who
18   can't.
19       A.   I would get some experts.
20       Q.   Does capital accretive --
21       A.   I am not an accountant, and I am not
22   going to get sucked into trying to define
23   accounting terms.
24       Q.   I am asking you what you mean by your
25   use of the term "capital accretive."

Page 101

1    DIAMOND - HIGHLY CONFIDENTIAL
2        A.   I'm sure there is a very specific
3    clarity around what we mean by capital accretive.
4    It meant it was accretive to the core equity
5    capital of Barclays, so that everything else being
6    equal, this transaction, the core equity ratio
7    would be positive, would have a delta that's
8    positive, not negative.
9        Q.   Did Barclays have a gain on
10   acquisition when this deal was completed?
11       A.   I know there was -- I don't know --
12   how would I say this.  My understanding is, in our
13   financial reporting at the end of the year, there
14   was a gain on acquisition.  That's my
15   understanding.
16       Q.   I am showing you, Mr. Diamond, what
17   previously has been marked as Deposition
18   Exhibit 22.  It is a long document, but just take
19   a look at it sufficiently to tell me whether you
20   recognize the document.
21       A.   I certainly recognize the cover and
22   the first few pages and assume that everything
23   else is as it was at the time.
24       Q.   You recognize it to be Barclays'
25   results announcement that was issued in or around

Page 102

1    DIAMOND - HIGHLY CONFIDENTIAL
2    February of 2009?
3        A.    I haven't gone through all the pages,
4    but it certainly appears to be, yeah.
5        Q.    Would you turn to page 95 of that
6    document, please. And specifically, sir, I would
7    like you to look through it sufficiently so I can
8    ask you questions in context, but you will see
9    there is a description in Note 11, Section A,
10   about the acquisition of Lehman Brothers North
11   American businesses.
12            Would you just scan through that and
13   let me know when you have had a chance to do that.
14       A.    OK.
15       Q.    You have had a chance to look through
16   Section 1A describing the acquisition of the
17   Lehman Brothers North American businesses, yes?
18   For the record, sir, you have to answer me out
19   loud.
20       A.    Sorry. I said yes. Sorry.
21       Q.    In the fourth paragraph of that, it
22   says, "The excess of the fair value of net assets
23   acquired over consideration paid resulted in
24   2,262,000,000 of gains -- pounds of gains on
25   acquisition." Is that a correct statement?

Page 103

1    DIAMOND - HIGHLY CONFIDENTIAL
2        A.    That's what is said there, yeah.
3            MR. GAFFEY:  Let's go off the record
4    for a second.
5            (Luncheon recess)
6            (Continued on next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 104

1    DIAMOND - HIGHLY CONFIDENTIAL
2    AFTERNOON SESSION
3            1:09 p.m.
4    BY MR. GAFFEY:
5        Q.    We talked at some length before the
6    break, Mr. Diamond, about this concept that the
7    deal needed to be capital accretive. Did you
8    personally tell anyone at Lehman that the deal had
9    to be capital accretive to Barclays?
10       A.    I didn't have any of the discussions
11   about the deal with anyone from Lehman. Could
12   that phrase have come up at some point? I can't
13   imagine it. I have no recollection. But I was
14   definitely not one of the people who actually
15   discussed it.
16       Q.    So when you say it could have come up,
17   I just want to probe what's your memory and what
18   might be speculation.
19       A.    Let me say it more clear. I have
20   absolutely no recollection, and I can't imagine,
21   but I just -- I might have used the phrase in an
22   unofficial way with someone, because capital
23   accretion was so important to us, but I don't
24   think I did, and I can't imagine it, and I wasn't
25   on the front line of the negotiation at all. I

Page 105

1    DIAMOND - HIGHLY CONFIDENTIAL
2    was very much behind.
3        Q.    To your knowledge, did anyone who was
4    on the front line of the negotiation for Barclays
5    tell anyone at Lehman that the transaction had to
6    be capital accretive to Barclays?
7        A.    That would be speculation on my side.
8    But I would imagine that they did.
9        Q.    Apart from speculating --
10       A.    I'm just speculating.
11       Q.    You have no knowledge one way or the
12   other of whether anyone did?
13       A.    No.
14       Q.    Is that right?
15       A.    That's correct.
16       Q.    Mr. Diamond, I am handing you what
17   previously has been marked as Deposition
18   Exhibit 380. Take a look through the document,
19   please, and tell me whether you have seen it
20   before.
21       A.    I have no specific recollection, but
22   since it is Project Long Island, I think it is
23   likely that it would have been shown to me in some
24   manner, but I have no specific recollection of
25   seeing this.

Page 106

DIAMOND - HIGHLY CONFIDENTIAL
1
2    Q.    I don't think we have used the term on
3    the record before, so for clarity, "Project Long
4    Island" was the term Barclays used for the
5    transaction with Lehman?
6    A.    Yes.
7    Q.    Do you recognize this to be a
8    presentation that was made to the board in
9    connection with the transaction?  And I direct
10   your attention to the fact that it is dated
11   15 September, 2009.
12   A.    Yes.  As I said, I don't have any
13   specific recollection, but being Project Long
14   Island, I expect I probably did, but I don't
15   recognize it.
16   Q.    Let me ask you to turn to the third
17   page of the document, which bears Bates number
18   81882.  It is entitled "Opportunity," and then
19   there is a list of bullet points down the
20   left-hand side.  Are we in the same place?
21   A.    Um-hm.
22   Q.    And on each -- the first bullet point
23   there is the "addition of significant scale to
24   U.S. global equities and fixed income franchise,"
25   with some subpoints.  That was, to your mind that

Page 107

DIAMOND - HIGHLY CONFIDENTIAL
1
2    was one of the opportunities presented by the
3    transaction with Lehman; is that correct?
4    A.    I am sorry, I missed -- which bullet?
5    Q.    Page 3, top bullet on the left,
6    "Addition of significant scale."
7    A.    Yup.  I just missed the question.  I
8    apologize.
9    Q.    My question is, in your mind was the
10   addition of significant scale as described in that
11   bullet point one of the opportunities presented by
12   the transaction?  I am asking if you agree with
13   this PowerPoint.  That point there.
14   A.    I do believe that one of the key
15   strategic drivers to this was U.S. scale, yes.
16   Q.    And the next bullet point down,
17   "Complete acquisition of firm architecture," was
18   that also a key strategic consideration in doing
19   the deal with Lehman?
20   A.    I think this opportunity for the U.S.
21   broker/dealer came up this day.  So this was
22   probably, judging by the date, the first
23   presentation that had been put together -- you're
24   saying the board, I suspect you're right, although
25   I don't know that it was to the board -- on the

Page 108

DIAMOND - HIGHLY CONFIDENTIAL
1
2    difference between what we had been looking at
3    over the weekend and what we were looking at with
4    the broker/dealer.
5    So without pushing back, I think after
6    getting scale in the U.S., things -- I mean there
7    is things that are important to have and things
8    that aren't important to have, and I think the
9    talent was critical.  I think physical facilities
10   were nice to have, but the deal could have
11   happened without physical facilities, and I think
12   as it says here, it is either purchase or lease,
13   but if we didn't have the physical facilities, it
14   would be possible to do a deal and use others, but
15   very, very much less positive.
16   But you're asking if they are
17   strategic, and I don't know enough about the
18   platforms and infrastructure to know how strategic
19   that was, but I suspect in many cases, if you were
20   in the business, the equities business, getting
21   the technology and infrastructure was critical.
22   So I think that is a fair presentation
23   in the order it goes.
24   Q.    The third point in the presentation,
25   which refers to a clean broker/dealer, take a look

Page 109

DIAMOND - HIGHLY CONFIDENTIAL
1
2    through that and the subpoints in it, please.  Do
3    you know what is meant by the term "clean
4    broker/dealer"?
5    A.    I wouldn't want to speculate what
6    someone meant by that.
7    Q.    With regard -- without regard to the
8    particular document, from your involvement in the
9    transaction, was it important to Barclays that it
10   receive a clean broker/dealer?
11   A.    What I suspect this meant is in light
12   of the transaction that had just passed, that the
13   troublesome assets, in particular those around
14   commercial real estate and illiquid private
15   equity, that were one of the difficult hurdles of
16   doing the full transaction, would not be included
17   here.  In other words, what we are trying to say
18   is, it is the U.S. broker/dealer and some form of
19   U.S. broker/dealer assets as opposed to the assets
20   of the full integrated Lehman Brothers which had
21   been the discussion over the weekend.
22   And again, I think this was the first
23   foray with the board, so this was early days.  We
24   hadn't begun discussions yet.  But the concept of
25   it would be a completely different slice of assets

## Page 110

DIAMOND - HIGHLY CONFIDENTIAL

1     DIAMOND - HIGHLY CONFIDENTIAL
2 and liabilities than the deal we had discussed
3 earlier, and those assets and liabilities would
4 relate more to the U.S. business.
5     Q.   The next bullet point down, was --
6 that says, "Freedom to pick and choose assets," do
7 you have an understanding of whether that was a
8 concept of the deal?
9     A.   I think we were speculative at this
10 point in terms of how this would work, but the
11 concept going in is that we are going to have to
12 do a lot of work to decide which assets and
13 liabilities came with the deal and which didn't.
14     Again, given the knowledge we already
15 had of how much misinformation, lack of
16 information, lack of pricing, concern with the
17 clearing agents and clearing firm, so there would
18 be a fair amount of work to do to decide which
19 assets and which liabilities would come, and it
20 was certainly not clear in specific on this
21 Monday.
22     Q.   You have referred a couple of times
23 today to the clearing agent.  Is there a
24 particular clearing agent you have in mind?
25     A.   I think Lehman's main clearing agent

## Page 111

1     DIAMOND - HIGHLY CONFIDENTIAL
2 was JP Morgan, and I know there were a lot of
3 issues with them that we were involved with. They
4 may have had other clearing agents as well, and I
5 suspect given the situation of bankruptcy, they
6 probably had a lot of outs with clearing agents
7 all around the street.
8     I think JP Morgan was their primary
9 clearing agent, but I'm not positive on that.
10     Q.   I will come to it later, but you had
11 some involvement with JP Morgan in connection with
12 this transaction, had calls with them, discussions
13 with them?
14     A.   Not at this point.
15     Q.   Later in the week?
16     A.   I had some discussions, yes.
17     Q.   Was Barclays -- on the 15th, was
18 Barclays taking the negotiating position, as it
19 were, with Lehman that it wanted freedom to pick
20 and choose the assets it would take?
21     A.   I think at this point we hadn't even
22 had discussions with Lehman, other than to say we
23 should pursue the U.S. broker/dealer.  So this is
24 a very early version of how we are going to
25 approach a different transaction.

## Page 112

1     DIAMOND - HIGHLY CONFIDENTIAL
2 Exactly the timing of this document
3 versus that, if this was a -- so.
4     Q.   I'm afraid for this one I don't have a
5 time stamp, and I don't have an e-mail, so I can't
6 put it in a sequence for you in the day.
7     A.   As I said, I don't have a specific
8 recollection of where and when this was presented,
9 but it resonates, if you follow.
10     Q.   Putting before you, Mr. Diamond, what
11 has previously been marked as Deposition
12 Exhibit 330, an e-mail from you to Mr. Ricci and
13 Mr. del Missier with an e-mail chain below it
14 entitled "Long Island broker/dealer."
15     Take a minute, sir, and tell me
16 whether you recall seeing the document before
17 today.
18     A.   I'm refreshing myself now.  Since I
19 wrote it, I'm sure I did.  It is my e-mail box.
20     Q.   All right then.  Do you recall -- down
21 in the -- if you go to the e-mail in the bottom of
22 the chain, the one from you to Mr. Varley and
23 Mr. Lucas with cc's to Harding, Ricci, Clackson,
24 you give what are high-level numbers,
25 10,000 people, 100 billion dollar balance sheet,

## Page 113

1     DIAMOND - HIGHLY CONFIDENTIAL
2 et cetera, et cetera, and you say, "Need U.S.
3 business, broker/dealer capitalized at 5 billion,
4 we have 2 in BarCap, so need 3 to 5 billion equity
5 raising, I think."
6     Do you see that?  What were you
7 conveying to Mr. Varley and Mr. Lucas when you
8 wrote that?  Can you explain that to me?
9     A.   Yes.  Monday being the first day,
10 looking at this, I was trying to get them a
11 very -- kind of frame -- and you can see how I am
12 framing it with big round numbers.
13     And I'm trying to figure out whether
14 the 6:32 would have been U.K. time or U.S. time.
15 I suspect it was U.K. time, because all my
16 computers were on U.K. time.  But I'm not positive
17 of that.
18     So I would suspect I wanted to get
19 them before they went home that evening to kind of
20 frame the issues, because time was of the essence
21 and we were going into further discussions that
22 night.  So that's how I think of it.
23     Q.   So we're talking late afternoon London
24 time, here, four hours earlier?
25     A.   Yes.  It is either 6:30 p.m. in London

Page 114

DIAMOND - HIGHLY CONFIDENTIAL
1    or it's 1:30 p.m. in New York.
2        Q.    Regardless of the time of day, and we
3    will -- I'm not able to help you on it because the
4    documents were produced to me by your counsel, I
5    just don't know. I don't see the New York time.
6        But regardless of the time of day, can
7    you explain to me what it is that you are trying
8    to convey to Mr. Varley et. al. when you say "need
9    U.S. business, broker/dealer capitalized at
10   5 billion, we have 2 in BarCap so need 3 to 5
11   billion equity raising I think."
12       A.    There is a -- let me take the last one
13   you bring -- around the capital?
14       Q.    OK.
15       A.    Yes? Is that what you want me to
16   address?
17       Q.    Whatever order you want to take it in,
18   that's fine. Sure.
19       A.    That's the regulatory capital
20   requirement. But it was a very high-level look,
21   so that the finance department under Chris would
22   understand that we may have to move more capital
23   into the U.S. business. Because there is a -- if
24   you are going to have a bigger U.S. broker/dealer,

Page 115

DIAMOND - HIGHLY CONFIDENTIAL
1    you will have a bigger capital requirement in the
2    U.S.
3        Q.    I take it you would need to raise
4    capital to the extent it didn't turn out to be
5    capital accretive. Am I understanding that
6    correctly?
7        A.    Yes, or you would have to move it from
8    somewhere else. That's why I am saying -- I am
9    actually not an expert here, and I am throwing it
10   to Chris, who is the finance director, with very
11   round numbers, so he can get his head under it.
12       Q.    At a very raw level, for my
13   understanding, and again this goes to the concept
14   of capital accretion we have been talking about,
15   to the extent the deal itself is capital
16   accretive, you need to raise less capital
17   extraneously, yes?
18       A.    Um-hm -- sorry. Let me -- I need to
19   think about that, because I get myself so
20   confused.
21       To the extent that it is capital
22   accretive -- there are two different issues here.
23   There is the group capital, and from a group
24   capital point of view of our core equity ratio,

Page 116

DIAMOND - HIGHLY CONFIDENTIAL
1    that is the most sensitive to the FSA. And the
2    FSA is our lead regulator, and they were the ones
3    that required a capital plan, as I said, weeks
4    later, in the depth of World Bank of Scotland
5    being bailed out by the government, Lloyds being
6    bailed out by the government, a very, very crisis
7    in the capital markets around the world.
8        Those discussions were all about our
9    core equity primarily and our tier 1 equity behind
10   that at a group level.
11       It is possible that a group could have
12   their regulatory capital in one jurisdiction going
13   up and down and being replaced from somewhere else
14   where it doesn't affect the core. But in a case
15   like this where there is an acquisition of new
16   business and new assets and new -- it would take
17   us -- we will use up some of our existing capital
18   resources.
19       While this specifically refers to the
20   U.S. broker/dealer, the point you're asking is,
21   did this transaction, everything else being equal,
22   if it weren't capital accretive, use up the group
23   capital. Yes, it would. That's why it was so
24   important to the group that the deal was capital

Page 117

DIAMOND - HIGHLY CONFIDENTIAL
1    accretive, not reducing our core equity ratio.
2        But there is a difference between this
3    comment, which refers to the U.S. broker/dealer,
4    and capital required in the U.S. broker/dealer.
5    Technically that could come from another area of
6    the company.
7        Q.    I think I understand that. To pull
8    the piece out of that answer -- regardless of
9    which entity's capital we are talking about, as a
10   general matter, to the extent the transaction
11   itself is capital accretive, you won't need to
12   raise capital elsewhere, yes?
13       A.    If the deal is capital accretive --
14   there are two different statements. One of the
15   reasons the deal needed to be capital accretive
16   was because there wasn't much capacity in the
17   markets to raise capital outside.
18       Now, if you think about this, within a
19   couple of weeks, when the Fed -- sorry -- when the
20   FSA came to us for a capital plan, and we went to
21   the Middle East and raised about 7 billion pounds,
22   6 to 7 billion pounds in equity -- this isn't
23   one -- this may not be 100 percent correct, but it
24   is pretty darn close -- within weeks of this deal

Page 118

DIAMOND - HIGHLY CONFIDENTIAL

1 when we raised that equity, there was no more
2 equity raised for a financial institution in the
3 world until the second quarter of 2009. The
4 markets locked up.
5        Our board was so appropriate to say
6 this can only be done -- we will put the entire
7 franchise of Barclays and the U.K. financial
8 system at risk if we don't pay attention to
9 capital. That's why capital accretion was so
10 important, because back to Bernanke's comment
11 about the period, the uncertainty of assets.
12        This was the riskiest transaction. If
13 you step back and think about it for a second, the
14 transaction that was proposed with the headline
15 price that we all know was in the market and all
16 the pieces on Tuesday became public, and there was
17 a -- most of a week before that transaction was
18 completed and closed, which I think was Monday
19 morning the following week.
20        In that time, there was no other
21 inquiry or bid or suggestion of a bid or inquiry,
22 from Goldman Sachs or Morgan Stanley, from Merrill
23 Lynch, from Bank of America, from Wells Fargo,
24 from any other bank in the United States, not from

Page 119

DIAMOND - HIGHLY CONFIDENTIAL

1 Deutsch, not from Credit Suisse, not from any
2 Swiss Banks, not from any French banks, not from
3 any German banks, not from any hedge funds, not
4 from any private equity funds, not from China, not
5 from Japan, not from anywhere in the world. The
6 only transaction proposed to save Lehman Brothers
7 U.S. from bankruptcy was the Barclays transaction.
8 No one else even inquired.
9        This was the most destabilizing period
10 in the history of the financial markets. The risk
11 was incredible, and the board said to me, we can't
12 do a transaction that isn't capital accretive for
13 those reasons.
14        Q.    When you were -- after the bankruptcy
15 filing, you were contacted by some of the senior
16 executives of Lehman, perhaps Mr. McDade; is that
17 right?
18        A.    I don't recall.
19        Q.    I'm trying to put a time piece on
20 this. The bankruptcy filing happens, and when is
21 the next time you speak with somebody from Lehman?
22        MR. HUME:  Objection, lacks
23 foundation. You haven't established when
24 the filing was for the witness.

Page 120

DIAMOND - HIGHLY CONFIDENTIAL

1        Q.    OK. The filing was in the early
2 morning hours of Monday, the 15th of September,
3 1 a.m., 2 a.m., something like that.
4        After that point, when did you first
5 have any conversation with anyone at Lehman about
6 a renewed negotiation, renewed deal?
7        A.    We had a conference call somewhere
8 around 5 or 6 a.m.
9        Q.    Who was on the call?
10        A.    Where I am -- I know I was. I know
11 Bart was. I think Bart had a number of people
12 with him in his office, and I knew he did, but I
13 don't think I asked who was there.
14        Q.    OK.
15        A.    Rich was with me, and I can't recall
16 whether -- it's was possible that Michael Klein
17 and Archie were with me, but I can't recall. But
18 I would expect it would have been the four of us.
19 Jerry, if he hadn't gone back to Europe yet,
20 probably would have been there as well.
21        Q.    Now, when these conversations began,
22 again, starting with that call, it is -- again, I
23 am trying to save us all some time here -- the
24 conversations then continued, the negotiations

Page 121

DIAMOND - HIGHLY CONFIDENTIAL

1 continued after that first call, yes? Yes, is
2 that right?
3        A.    Yes. Sorry.
4        Q.    Did you receive an assurance from the
5 leadership team at Lehman that this was a
6 conversation that was taking place only with
7 Barclays?
8        A.    That's a very good question. There
9 wasn't any other conversations going on. I don't
10 recall a specific conversation, but there very
11 likely was. It was kind of the environment where
12 news was moving so quickly, that it kind of would
13 have been known, but it is a good question, and I
14 don't have a specific moment in time when that
15 conversation happened, but I suspect -- I suspect
16 it was unnecessary.
17        Q.    Let me give you, Mr. Diamond, what has
18 been previously marked as 348-A. It is an e-mail
19 from Marie Smith to a long list of people,
20 including yourself. You will see your name near
21 the end of the "to" line there.
22        It's entitled "Project Long Island
23 Communications," and attached to it is a note from
24 John Varley on Project Long Island. You see the

Page 122

DIAMOND - HIGHLY CONFIDENTIAL
1 reference to it in the cover sheet, yes?
2 Well, it doesn't matter. Let's turn
3 to the second page. To the third page, I mean, at
4 Bates number 7917 -- 79166, a memorandum to the
5 directors from John Varley dated 15 September,
6 2008, subject Long Island.
7 Do you recall receiving a copy of this
8 memo from Mr. Varley?
9 A. No, but I'm sure I did. I don't
10 object to that. I would have been on the
11 distribution, yes.
12 Q. That's why I directed your attention
13 to the front. You are not on the face of the memo
14 itself, but --
15 A. Right.
16 Q. If you would take a look at the second
17 paragraph, it says, "As we anticipated, RED was
18 contacted overnight by Long Island leadership
19 team." Do you see where I am?
20 A. Um-hm.
21 Q. Robert E. Diamond, are you referred to
22 as RED in office memoranda?
23 A. Yes.
24 Q. Further on, it says this leadership

Page 123

DIAMOND - HIGHLY CONFIDENTIAL
1 team was "asking whether we might be in a position
2 to acquire large parts of the business from the
3 administrators, and that if so, they would seek to
4 protect as much of the business as they could as a
5 going concern. We received assurance from them
6 that this was a conversation taking place only
7 with Barclays, and we have no reason to doubt that
8 assurance, although of course Long Island staff
9 are being raided freely around the world as I
10 write."
11 Looking at that paragraph in
12 Mr. Varley's memorandum, does that refresh your
13 recollection as to whether you received in your
14 communications with the leadership at Lehman
15 assurances that they were talking only to
16 Barclays?
17 A. Let me finish reading it. That's a
18 good question.
19 I am sorry, it took me a while to read
20 it, and I think I remember the question, but I
21 think I would feel better if I ask you to say it
22 again.
23 Q. Now having read it, does it refresh
24 your recollection as to whether in your

Page 124

DIAMOND - HIGHLY CONFIDENTIAL
1 conversations with Lehman leadership they gave you
2 assurances that the conversation was taking place
3 only with Barclays?
4 A. It doesn't, but I see it here, and so
5 it would appear that we did have those
6 conversations, but I have no specific recollection
7 of it. But I don't -- I take it at face value of
8 John saying that we had those conversations and --
9 I think what -- and the reason, as you can
10 imagine, would be as he goes down the severity of
11 the risk of us continuing to proceed.
12 Q. As he goes down -- I've seen this in a
13 couple of documents -- there is a reference to
14 Long Island 2. It may not be referred to here,
15 but I have seen references to Long Island 1. Is
16 that vernacular that was used within Barclays?
17 A. I interpret this and interpreted it at
18 the time as he was talking about the deal as
19 proposed to Secretary of the Treasury Paulson and
20 Fed President Geithner, which didn't consummate on
21 Sunday, and I think he is taking a license of
22 shorthand here. There was no official we have two
23 projects. I think he was saying the first one
24 ended Sunday, now we are on to the second one.

Page 125

DIAMOND - HIGHLY CONFIDENTIAL
1 Q. 2 would be the second one. It is the
2 second one.
3 A. Yes.
4 Q. Long Island 1 would be the deal before
5 the weekend that didn't conclude, yes?
6 A. Yeah.
7 Q. And Long Island 2 would be the deal
8 after the bankruptcy?
9 A. That would be my assumption.
10 Q. Was there a Long Island 3?
11 MR. HUME: Objection, vague.
12 Q. That's a good point. Let me rephrase
13 the question.
14 Was the term "Long Island 3" also
15 used?
16 A. If you asked me earlier did we use 1
17 and 2, I wouldn't have remembered. I can't
18 imagine why we would have used a 3, because -- I
19 can't imagine that we would have used Long Island
20 3, but this is kind of John's shorthand. It
21 wasn't an official project name.
22 Q. Did the deal change over the week,
23 Long Island 2, did it change over the week before
24 it closed?

Page 126

DIAMOND - HIGHLY CONFIDENTIAL
1
2     A.   There wasn't a deal at this point.
3     Q.   Once the deal was made, did it change
4  over the week before it closed?
5         MR. HUME: I am going to object to
6  that question as vague as well.
7     A.   The deal, which is -- I think I see
8  what you are getting at. Well, at this point
9  there wasn't a deal. There was a we are going to
10 have to do some work and see if we can put
11 together the framework of a deal, which we would
12 be acquiring the U.S. broker/dealer with a group
13 of assets and a group of liabilities, and
14 assurances, as we had talked about, to the best of
15 our ability to ensure capital accretion. The
16 broad parameters were what we consummated on
17 Monday morning.
18        In terms of the specifics, that was
19 negotiated by Rich, and I really wasn't close to
20 the specifics and the writing.
21    Q.   Given that, would you know one way or
22 the other whether once a deal was made on the
23 Tuesday, on the 16th, was agreed, whether the
24 component parts, whether the terms of that deal
25 changed in between that day, the 16th, and the

Page 127

DIAMOND - HIGHLY CONFIDENTIAL
1
2  closing on Monday, September 22nd?
3     A.   The deal, as I just defined it, didn't
4  change at all. The components sadly were all over
5  the place. The inability of Lehman to deliver
6  things that they had said they could deliver early
7  on, the confusion between the clearing agent and
8  the broker/dealer, the need to recognize what we
9  would need to do a transaction, therefore find
10 other assets and other liabilities, those things
11 kept evolving during the week.
12        But the broad parameters of the deal
13 never changed, but sadly the world was falling
14 apart. Lehman very sadly was well into falling
15 apart, with clearing firms and clearing agents
16 grabbing collateral wherever they could and not
17 returning it. Things that we were looking at in
18 the records of the firm not actually being where
19 they said they were going to be.
20        It was a probably -- I'm trying to be
21 sure not to overstate it, but it was crisis, it
22 was chaos, it was out of control, and for us to be
23 able to save the 10,000 jobs in the firm and the
24 broker/dealer was very, very difficult that week,
25 because this was a firm that had spun out of

Page 128

DIAMOND - HIGHLY CONFIDENTIAL
1
2  control with bankruptcy and with all of the
3  counterparties around the world, including the
4  clearing agencies and the clearing agent grabbing
5  anything they could.
6         So sadly it was all over the place.
7     Q.   The deal as it ultimately closed, was
8  that deal capital accretive to Barclays, after all
9  this tumult?
10    A.   On what date?
11    Q.   On the 22nd of September, 2008.
12    A.   I am trying to think if we actually do
13 capital reporting on that date. What it depends
14 on is in a market such as the market we were
15 operating in, with the value that day of the
16 assets and the liabilities of the organization,
17 but we had agreed to deal -- again I am sorry to
18 say it this way -- to the best of our ability to
19 deliver to the board what they required of us, it
20 was a deal that was capital accretive, but it
21 depends on what day you say you are valuing all
22 those securities.
23    Q.   When the deal closed, on the day the
24 deal closed, the 22nd of September, were you able
25 to report to your board that you satisfied the

Page 129

DIAMOND - HIGHLY CONFIDENTIAL
1
2  demand that it be capital accretive?
3     A.   That's my understanding. I don't
4  recall a report going in, but that would be my
5  understanding.
6     Q.   Now, you mentioned as the deal
7  continued over the week, that there was a need to
8  find other assets and other liabilities. Do you
9  recall that?
10    A.   I am sorry.
11    Q.   You mentioned in your answer a moment
12 ago, as the deal went through the week, there was
13 a need to find other assets and other liabilities?
14    A.   Lehman was scrambling quite a bit, not
15 Barclays, but Lehman was scrambling quite a bit.
16 It wasn't a Barclays request. It was -- sadly,
17 very sadly, Lehman Brothers was in chaos and out
18 of control. So very often things that they would
19 report they could do they actually couldn't do,
20 because they couldn't locate them or a clearing
21 agent had taken them away.
22        So it was very, very touch and go
23 whether or not we would complete this transaction,
24 and Barclays never changed anything. But Lehman
25 Brothers was changing second to second and minute

Page 130

DIAMOND - HIGHLY CONFIDENTIAL

1  to minute.
2      Q.   Are you quite certain in your memory,
3  sir, as you sit here, that it was not a Barclays
4  request?
5      A.   If you can tell me the request, I'm
6  happy to answer it.
7      Q.   The request that additional assets be
8  found.  Are you quite certain that that request
9  did not come from Barclays?
10     A.   As I said, I was not involved -- what
11  I said, and I would prefer my words don't get
12  twisted, what I said is the changes were driven by
13  Lehman's inability to deliver the things that they
14  had assured they could deliver.
15          They were finding that assets that
16  they thought were there weren't there, that
17  clearing agents or clearing firms had taken them,
18  and it was in chaos, and it was very difficult for
19  the people from Lehman Brothers to deliver on what
20  they had hoped to be able to deliver on.  That's
21  what I said.
22     Q.   Did Barclays request that Lehman add
23  additional assets to the transaction?
24     A.   I wasn't a part of any specific

Page 131

DIAMOND - HIGHLY CONFIDENTIAL

1  negotiation, so I think you may have had a chance
2  to discuss that with Rich.
3      Q.   To your knowledge, to your knowledge,
4  did Barclays ask or demand that Lehman add assets
5  to the transaction?
6      A.   To my knowledge and understanding,
7  there was always a group of assets and a group of
8  liabilities that when we settled the deal needed
9  to give us the highest chance of having capital
10  accretion or I couldn't approve the deal.
11          The specifics of that between Lehman
12  and Barclays were negotiated by Rich and his team,
13  and I wasn't involved, so I can't comment on that.
14  I think you had an opportunity to talk to
15  Rich and his staff.
16     Q.   I get it about how you don't have the
17  specifics.  I understand that.  I know you are a
18  chief executive.
19     A.   President actually.
20     Q.   President.  You're up there.  OK.
21          I am not going to ask you what the
22  particular assets were.  But did it come to your
23  attention during the week that additional assets
24  were needed to complete the transaction?

Page 132

DIAMOND - HIGHLY CONFIDENTIAL

1      MR. HUME:  Objection, asked and
2  answered.
3      A.   I will try one more time.
4      Q.   I am doing the best I can to
5  understand you, sir.
6      A.   OK.  Can you understand the fact that
7  Lehman was in chaos?  Do you disagree with that?
8      Q.   We talked about this before, sir.  I
9  ask the questions, you answer them.
10     A.   You said you were doing the best you
11  could to understand it.
12     Q.   Do you need the question read back,
13  sir?
14     A.   One, Lehman was in chaos.  They
15  couldn't locate things that they said they could
16  deliver to us.  They couldn't understand the value
17  of many things.  They had misstated values.  I
18  could go on and on and on and on.  It was in
19  chaos, and they were under attack from their
20  counterparties and their clearing agents.
21          So we had to be flexible, and I'm sure
22  there were discussions with our team and their
23  team about how we were going to resolve this, and
24  I know they were making changes and suggestions to

Page 133

DIAMOND - HIGHLY CONFIDENTIAL

1  the collateral right up to the 11th hour.
2      Q.   Did it ever come to your attention
3  while all this was going on that there might be
4  insufficient assets for Barclays to close the
5  deal?
6      A.   There were many times leading right up
7  until getting to the bankruptcy hearing when it
8  was unclear whether or not the things that Lehman
9  felt they could provide, they could provide, and
10  they were continuing, continuing right up until
11  the 11th hour, to look for assets so they could
12  satisfy the pool of assets and liabilities that we
13  had talked about in concept and the accretion that
14  we had talked about in concept.
15          And yes, that was being worked on
16  until very, very late Friday, so much so that I
17  recall it was a period when we thought we might
18  not be able to complete the transaction and a
19  period when we weren't sure that Lehman would get
20  to the bankruptcy hearing on time.
21     Q.   When was the point?  When was the
22  point you just described?  When during the week
23  did it appear that they might not be able to get
24  enough assets?

Page 134

DIAMOND - HIGHLY CONFIDENTIAL

1  A.  Many times.
2  Q.  Do you recall a meeting on Friday
3  morning devoted to that topic?  Friday, the 19th?
4  A.  I remember many conversations on
5  Friday that these situations were going on.
6  Q.  And on that Friday, the 19th, did it
7  come to your attention that personnel at Barclays
8  told Lehman that needed to find additional
9  assets to add into the deal?
10  A.  I knew Lehman was still looking for
11  assets on Friday.  That is all I can say.
12  Q.  When you say that is all you can say,
13  I think we are missing each other a little bit
14  here.  My question is, did it come to your
15  attention that anyone from Barclays said to anyone
16  at Lehman you need to find more assets?
17  A.  I know Lehman was not able to deliver
18  on some assets that they promised and therefore
19  they had to get others, and I'm not privy to any
20  conversations from Barclays.
21  Q.  Do you know one way or another,
22  whether you were privy to conversations or have
23  knowledge direct or indirect, do you know whether
24  anyone at Barclays demanded from Lehman on Friday,

Page 135

DIAMOND - HIGHLY CONFIDENTIAL

1  September 19th, that Lehman add assets to the
2  transaction?
3  A.  My patience is doing a great job so I
4  am going to try one more time.
5  There were many times on Friday and
6  many times during the week from Tuesday through
7  Friday where the people from Lehman were screwing
8  around trying to find assets.  I didn't have any
9  direct conversations with someone from Barclays.
10  You keep asking me to confirm
11  something from Barclays.  What I can confirm to
12  your question is Lehman was in chaos and Lehman
13  was scrambling to find enough assets to complete
14  the deal, and that was happening from the moment
15  we signed Tuesday right through the 11th hour
16  Friday.  It was very sad.
17  Q.  You don't know one way or the other
18  whether someone from Barclays said to someone from
19  Lehman on Friday, the 19th, you need to get more
20  assets?
21  A.  I am not going to speculate who said
22  what, but I certainly answered that very, very
23  directly.  Lehman was looking for assets until the
24  11th hour.  Whether it was asked for or not asked

Page 136

DIAMOND - HIGHLY CONFIDENTIAL

1  for, Lehman was still trying to fulfill the
2  assets.
3  Q.  Do you know if it was --
4  A.  Let me finish, please.
5  Q.  Sure.
6  A.  Don't interrupt me.
7  And I don't have any specific
8  inclusion in any requests made from Barclays in
9  terms of the negotiation of the assets.  I think
10  that answers the question directly.
11  Q.  Do you have any general recollection
12  of any requests made from Barclays in terms of the
13  negotiation of the assets?
14  A.  I wasn't involved.
15  Q.  Did anyone report to you as a result
16  of the scrambling that you are discussing on
17  Friday, Barclays clawed an additional 3 billion
18  dollars of value back into the deal?
19  A.  There was a need on Friday because of
20  the sad nature of what had happened to Lehman
21  Brothers for Lehman to find assets or we weren't
22  going to be able to settle with the deal.
23  It is very possible that 3 billion was
24  the number.  I have a vague recollection of that

Page 137

DIAMOND - HIGHLY CONFIDENTIAL

1  number, but I'm not sure if it was 1 or 4.  It was
2  a big number.  And I can absolutely confirm, as
3  sad as it was, that Lehman was in chaos and out of
4  control, and the deal almost didn't close because
5  they couldn't deliver the assets that they had
6  committed to.
7  Q.  From whom did you learn that
8  additional assets had been added to the deal?
9  A.  I didn't say that additional assets
10  had been added to the deal.  What I said was
11  Lehman was scrambling.
12  Q.  I guess I need to ask again.  My
13  question was, did anyone report to you as a result
14  of the scrambling you were discussing on Friday
15  that Barclays had clawed an additional 3 billion
16  dollars of value back into the deal?  The question
17  is, did anyone tell you that?  Can you give me a
18  name?  Can you tell me if you spoke to anyone
19  about that topic or communicated with anybody
20  about that topic?
21  A.  Can you read my answer to that.  I
22  already gave an answer.
23  (Record read)
24  Q.  Now can you answer the question that's

Page 138

DIAMOND - HIGHLY CONFIDENTIAL

1  pending?
2      A.  I don't recall any specific
3  conversations.  I was in many -- I was in and out
4  of many meetings while this was going on, but I
5  was not in charge.  I was not running the process,
6  so.
7      Q.  Do you recall --
8      A.  And I recall that through the day we
9  got to the number we needed to get to so the deal
10  could be capital accreted, but I think there was a
11  large amount of assets that had not been
12  identified or delivered to get to the deal that we
13  had agreed.
14      Q.  Do you recall that it was Michael
15  Klein who communicated to you that 3 billion in
16  value had been clawed back into the deal?
17          MR. HUME:  Objection, you have asked
18      that and he said he had no specific
19      recollection.
20          MR. GAFFEY:  Not with regard to
21      Michael Klein, I haven't.
22      Q.  Do you recall that it was Michael
23  Klein who communicated to you that 3 billion had
24  been clawed back into the deal?

Page 139

DIAMOND - HIGHLY CONFIDENTIAL

1      A.  Well, Michael Klein was right at the
2  coal face working for Rich.  And I don't actually
3  recall if it was 3 billion or what we were able to
4  arrive -- I think it was 3 billion, when you say
5  it, because if you look at the 15c3-3 assets and
6  some of the other things they were working on, I
7  think it was on the order of 3 billion.
8          I don't know if it was Michael or
9  Archie or Rich.  It probably would have been one
10  of them, and it would have been in the context of,
11  you know, we can complete.
12      Q.  Do you know -- you made a reference to
13  15c3-3 assets.  Do you know that was one of the
14  components of additional value that was added on
15  Friday?
16      A.  I wasn't at the coal face, so this is
17  difficult, but I have a recollection of that being
18  part of what was happening on Friday, but I wasn't
19  doing the negotiation at the coal face.
20      Q.  One way or another, word came back
21  from the coal face that one of the things that was
22  added to the deal was 15c3 assets?
23      A.  Well, I was in and out of many
24  conference rooms that were going on.

Page 140

DIAMOND - HIGHLY CONFIDENTIAL

1      Q.  Do you know what other types of assets
2  were added to the deal on Friday?
3      A.  I probably would if I went back and
4  read all the notes, but it is hard to recall off
5  the top of my head.  It was chaos.
6      Q.  Did you keep notes at the time?
7          MR. HUME:  He didn't say his notes.
8          MR. GAFFEY:  I know what he didn't
9      say.  I would like him to say as an answer
10      to the question I asked.
11      Q.  Did you keep notes at the time?
12      A.  I don't think I did.  I am trying to
13  think through.  I am a note taker and I kept a lot
14  of notes of conversations with Secretary Paulson
15  because of the official nature of them.
16          I don't think I even had a notebook
17  with me during the week, so I am going to say no,
18  but I'm sure I could have scribbled something
19  somewhere, and again, it kind of comes to the fact
20  that I wasn't running the meetings, so I wasn't
21  trying to note take, whereas if I was having an
22  official conversation with a public official, I
23  would want to kind of report that.  So I don't
24  think I did.

Page 141

DIAMOND - HIGHLY CONFIDENTIAL

1      Q.  Let me show you what previously has
2  been marked as Exhibit 149-A, an e-mail chain
3  beginning at the bottom with an e-mail from
4  Michael Klein to you, Rich Ricci, Jerry del
5  Missier, Archie Cox, on 20 September, a response
6  from you to Mr. Klein and a response from
7  Mr. Klein to you.
8          Would you read through that chain of
9  e-mails and let me know when you have had a chance
10  to do that.
11          Have you had a chance to look through
12  it?
13      A.  I have.
14      Q.  Do you recall exchanging these e-mails
15  with Mr. Klein when he reported to you that the
16  court has approved Barclays' acquisition of Lehman
17  Brothers?
18      A.  I remember he is the one that -- he is
19  not the only one, by the way, that told me, but I
20  do remember Michael e-mailed me with glee, and I
21  had not gone to bed yet.  I was still waiting up
22  to find out.
23          So that's a very typical response from
24  me of yes with exclamation points.

Page 142

DIAMOND - HIGHLY CONFIDENTIAL

1   
2  Q.   I won't count them up, but there is a
3  lot of them.
4  A.   There is a lot of them.  Sometimes
5  they go across the whole page when I am really
6  excited.
7  Q.   Mr. Klein reports to you, "Bob, great
8  day.  We clawed back 3 billion more of value in
9  the transaction and cut the building prices by
10  160 million tonight, but all of that pales in
11  comparison to Barclays' share price today.  All
12  the best."
13  What did you understand Mr. Klein to
14  be reporting to you with his reference to clawing
15  back 3 billion of value in the transaction?
16  A.   That was getting us to the place we
17  had to be in the transaction.  So it was kind of
18  repetition.  It's what we were all working toward
19  all day Friday and time -- and the share price, to
20  be honest with you, I can't remember what the
21  share price was, but I don't think he would have
22  written that if it was going down.
23  Q.   Probably not.  I am a little more
24  focused on the additional value piece.
25  A.   That was in the context of that's what

Page 143

DIAMOND - HIGHLY CONFIDENTIAL

1  we were all working for.
2   
3  Q.   I asked you this morning and I think
4  you told me you didn't recall whether or not the
5  mandate of being capital accretive had a number on
6  it, had a target.  Does this refresh your
7  recollection that the degree of capital accretion
8  was in the area of 3 billion dollars?
9  A.   It didn't really have a target.  This
10  talked about the value in the transaction, not the
11  capital accretion.  But I think the thing that's
12  important to understand is that every single day
13  we are waiting for this transaction to settle, the
14  markets are all around the place.  Monday morning
15  the equity markets were down 500 points.  It was,
16  I think, the worst day of the year.
17  And the asset prices -- and AIG had
18  gone 80 percent owned by the government.  On
19  Friday night, as we went home, it looked like
20  Morgan Stanley wouldn't survive until Monday
21  morning.
22  So we were pretty stressed that if we
23  didn't get to the numbers that we had laid out,
24  and again I haven't got those numbers, we were going to
25  Rich and team working on this, we were going to

Page 144

DIAMOND - HIGHLY CONFIDENTIAL

1  have to walk away and not do the transaction.  We
2  couldn't put Barclays at risk of bankruptcy.
3  Q.   Just take a quick look back, if you
4  would, and I lost track of the exhibit number of
5  the memorandum from Mr. Varley, Project Long
6  Island, the memorandum we looked at a moment ago.
7  That one there.  Just so I can read it into the
8  record, Exhibit 348-A.
9  Just at the end of the memo, you see
10  Mr. Varley writing that "as Long Island develops,
11  it is likely to develop quickly.  The purpose of
12  this note is to give you some initial briefing and
13  as well to say that if we make progress overnight
14  we'll arrange a board telephone conference on
15  Tuesday to brief you."
16  Do you recall there being a board
17  telephone conference on the Tuesday?
18  A.   There were almost -- sometimes they
19  were two or three times a day over this week, so
20  without a specific -- if you said to me did we
21  have one, we would have had to or I would not have
22  been able to announce the deal.
23  So I think that is a long way of
24  saying yes without specifics.  Of course we had --

Page 145

DIAMOND - HIGHLY CONFIDENTIAL

1   
2  Q.   It may not have been the only one?
3  A.   Yeah.  But we would have had to or I
4  would not have been able to announce it.
5  Q.   Let me show you what has been marked
6  as Exhibit 378.  I ask you to look through that
7  document, sir, and let me know whether you
8  recognize it.
9  A.   I may have to go back through more,
10  depending where you ask the questions, but I am
11  getting the gist of it.
12  Q.   The question is, do you remember
13  seeing it before?
14  A.   I'm sure --
15  Q.   If not, we will go to the gist.
16  A.   No.  I'm sure I did.  I would have
17  been part of -- did this go to the board meeting?
18  Q.   Well, it is entitled "Board Deck" on
19  the cover, so.
20  A.   I can't tell you this was the document
21  that came or whether it was a draft.  It is
22  impossible.  But we should go ahead.  It probably
23  was, but I can't be sure.
24  Q.   There are some particular pieces that
25  I wanted to ask you about.  If you go to the board

Page 146

```
1           DIAMOND - HIGHLY CONFIDENTIAL
2   deck itself --
3        A.   This looks like it was still in
4   preparation phase to me, actually, as opposed to
5   actually the deck that went to the board. I don't
6   mean to be difficult. Usually we would come out
7   with different covering and stuff if it was a
8   board document as opposed to in corporation.
9        Q.   If you would, turn to the executive
10  summary and then the board discussion -- it is
11  entitled "Board Discussion Materials," and turn to
12  the executive summary on page 2 of the document.
13  Do you see that?
14       A.   Yes.
15            MR. HUME: I am sorry, Bob, can I ask
16       one question? There is no Bates number on
17       this.
18            MR. GAFFEY: I just noticed the same
19       thing, and I don't know why. I just this
20       moment noticed the same thing. I don't know
21       why. But I do know it was marked at
22       Mr. Ricci's -- and it has got a Bates
23       number -- oh, excuse me, I do know why.
24       Let's go off the record and discuss it.
25            (Discussion held off the record)
```

Page 147

```
1           DIAMOND - HIGHLY CONFIDENTIAL
2            MR. GAFFEY: Back on.
3            The record should reflect the board
4       discussion materials were produced by
5       Barclays' counsel in what's called native
6       format along with a placeholder which bears
7       Bates number BCI-EX-S 00023788 identifying
8       the subject, and I think that's the reason
9       why there are no Bates numbers on the
10      attachment.
11       Q.   In any event, sir, back at page 2, the
12  executive summary. It appears to be a description
13  of the transaction being contemplated. Do you
14  agree with me?
15       A.   Yes.
16       Q.   And in the transaction it says that
17  Barclays would hire the staff of the broker/dealer
18  and assume a portion of its assets and
19  liabilities. Do you see that?
20       A.   Where is that?
21       Q.   Third bullet point on the executive
22  summary.
23       A.   I see that.
24       Q.   Then the second subpoint within that
25  bullet point says, "We would acquire 75 billion of
```

Page 148

```
1           DIAMOND - HIGHLY CONFIDENTIAL
2   assets and liabilities. The business would
3   include risk-weighted assets of 13.5 billion."
4        Do you see that?
5        A.   I see that.
6        Q.   Is the 75 billion dollar number
7   attributed to the assets and liabilities an
8   accurate description of the deal that was
9   contemplated?
10            MR. HUME: Objection, lacks
11       foundation.
12       A.   I mean this isn't a deal document.
13  This is kind of a setting the context with very
14  round, broad numbers, 13 and a half billion in
15  RWAs, so if you will notice as you look through
16  this, this is a document where every number is
17  2 billion, 3 billion, 1 and a half, 75. This is a
18  planning document as opposed to a deal document.
19  And it is giving at this point the gist of the
20  deal that we were contemplating.
21       As far as I can tell, this didn't go
22  to the board. This was a planning document being
23  prepared for what I can't tell. Whether it went to the
24  board or not, I'm not sure.
25       Q.   Is the gist that it is telling you
```

Page 149

```
1           DIAMOND - HIGHLY CONFIDENTIAL
2   that the approximate value of the assets to be
3   purchased was 75 billion dollars?
4        A.   I think the gist was in the last
5   penultimate bullet, this will be subject to U.S.
6   legal process which is unpredictable. Sorry, just
7   trying to get a little humor in there.
8        Q.   That's OK.
9        Now that we both had our giggle, can
10  we go back to whether the gist of it, as you
11  understand it, was approximately 75 billion
12  dollars in assets was being purchased?
13       A.   Well, they are using the 75 billion
14  here for what I have described as a pool of assets
15  and a pool of liabilities, and it is an
16  approximate number.
17       Q.   So was it your understanding on the
18  morning of the 16th that the pool of assets to be
19  purchased had an approximate value of 75 billion
20  dollars?
21            MR. HUME: Objection, asked and
22       answered.
23       A.   I am a bit confused.
24       Q.   Are you looking for something in the
25  exhibits?
```

Page 150

DIAMOND - HIGHLY CONFIDENTIAL

1
2    A.    Tuesday?
3    Q.    Yeah, Tuesday, the 16th.
4    A.    That's the estimate used in this
5    document, is all I can say.
6    Q.    One of the issues, one of the
7    considerations in the transaction, Mr. Diamond,
8    was the retention of talent from Lehman, correct?
9    We have talked about that?  You needed at least
10   some key people to come over?
11   A.    Correct.
12   Q.    To run the business?
13   A.    More than just the key people.  Talent
14   was very important.
15   Q.    Were any estimates prepared of the
16   amount that Barclays thought it would need to pay
17   in bonus for the retained talent?
18   A.    There were estimates, and the
19   principle -- yes, there were.
20   Q.    You were about to say the principal.
21   Where was the principal talent?
22   A.    No.  The principle of why we would do
23   that was that in acquiring a business that late in
24   the year, the business would have accrued
25   compensation during the year, and that would have

Page 151

DIAMOND - HIGHLY CONFIDENTIAL

1
2    to be a part of the deal as opposed to
3    compensation being a responsibility of Barclays.
4         So there was an attempt made to get a
5    good estimation and a good accrual as part of the
6    deal for compensation that was required to keep
7    the people and talent in place.
8    Q.    Did you have a concept at the time the
9    deal was agreed as to what that amount would be,
10   what would be needed?
11   A.    We did.  I know the -- yes, we did.
12   Q.    What was your concept?
13   A.    I didn't do any of the detailed work.
14   And I -- so I'm happy to answer questions, but I
15   didn't do the financial analysis.
16   Q.    My question is, what's your
17   understanding of what it was, not how you came to
18   the number.  I know you didn't --
19   A.    Well, it was in all the documents
20   specifically what it was.  And there was an
21   approximation of what would be required for
22   compensation for completing this transaction, and
23   importantly, it would include -- we would have to
24   make some tough decisions in areas of overlap, and
25   it would include compensation for some of the

Page 152

DIAMOND - HIGHLY CONFIDENTIAL

1
2    people that would be terminated later in the year
3    as we got through that, but before year end.
4         So it was compensation broadly defined
5    as the compensation bill for the Lehman business
6    that we were acquiring.  Of course, no one would
7    do the deal and say we are going to decide to pay
8    the compensation at the end of this without it
9    being part of the accruals in the deal.
10   Q.    Did you ask --
11   A.    I know the number --
12   Q.    Sorry, go ahead.  I didn't mean to
13   interrupt you.
14   A.    No.
15   Q.    Did the number, whatever it was, that
16   was arrived at for compensation, was it
17   contemplated that the assets required in the deal
18   would be sufficient to fund that assumed
19   liability?
20   MR. HUME:  Objection, vague.
21   A.    I don't understand the terminology
22   you're using.  It was a part of the deal that the
23   compensation expense would be -- the accrual for
24   that would be acquired as part of the deal.
25   My recollection is that number was

Page 153

DIAMOND - HIGHLY CONFIDENTIAL

1
2    right around 2 billion.  I wasn't in on the final
3    document, so it might have varied from that a
4    little bit, but that was my understanding.
5         (Exhibit Exhibit 412-A, document Bates
6         stamped BCI-EX-S 25413 marked for
7         identification, as of this date.)
8    Q.    Mr. Diamond, I am showing you what we
9    have marked as Exhibit 412-A, a one-page document
10   bearing Bates number BCI-EX-S 00025413, an e-mail
11   from Heidi Smith to you, del Missier, Tara
12   Callaghan and Allana Reynolds.
13        Is Heidi Smith your assistant?  Is
14   that a yes?  You have to for the reporter --
15   A.    Yes.  Sorry.  I should have learned by
16   now.
17   Q.    And Ms. Smith recounts to you, "Bob
18   and Jerry, Julian Sainty called.  He advised that
19   a senior Lehman's person in London is available to
20   assist if you are acquiring Lehman's.  He said we
21   would need to act within the next couple of
22   hours."
23        Do you recall getting this message
24   from Ms. Smith?
25   A.    Kind of.  I mean now that I see it, I

Page 154

DIAMOND - HIGHLY CONFIDENTIAL
1  do, if you know what I mean. I kind of remember
2  Julian calling. I'm sure I got it, yeah.
3
4      Q.    It is not going to surprise you I need
5  you to unwrap a small mystery for me, did you
6  learn who the senior Lehman's person was?
7      A.    I think I did. It was one of the
8  European people. So this had to do with -- my
9  recollection, which I'm pretty sure was correct,
10  at the same time we were trying to complete the
11  transaction that has now become known as Long
12  Island 2, there was scrambling about the European
13  business and it is a really long story of whether
14  that was something we would be interested or not
15  interested in and this phone call was someone over
16  there, if you want the European business, I can
17  help you get that.
18      Q.    Just so I can get this off the table
19  and we will move on to something else, let me make
20  sure I understand correctly whatever it is this
21  person said to you, it had to do with an another
22  transaction on the European side, no relation to
23  the Long Island deal, correct?
24      A.    Yes. I am shaking my head I
25  apologize, correct.

Page 155

DIAMOND - HIGHLY CONFIDENTIAL
1
2      Q.    Did there come a time when a release
3  was issued describing to the public the deal that
4  had been made?
5      A.    I'm sure.
6      Q.    Do you recall if you saw the release
7  when it was issued?
8      A.    I'm sure I did.
9      Q.    Let me show you what has been marked
10  previously as Exhibit 344-A. Keep them in a nice
11  pile there, done with that.
12          344-A, and do you recognize that to
13  be a release that was issued on 17 September
14  2008 announcing the acquisition of Lehman
15  Brothers' North American investment banking
16  capital markets business?
17      A.    It certainly looks like the document
18  that went out, yeah.
19      Q.    Did you ever express any concern to
20  anyone about the way the price described in this
21  press release was characterized?
22      A.    Where is the price characterized?
23  Help me get to the thing.
24      Q.    Let me show you a couple of pieces of
25  this. In the second paragraph, "Barclays will

Page 156

DIAMOND - HIGHLY CONFIDENTIAL
1
2  acquire trading assets with a current estimated
3  value of..." Do you see where I am?
4      A.    Um-hm.
5      Q.    It describes a current estimated value
6  of 72 billion and trading liabilities with a
7  current estimated value of 68 billion, both of
8  those being in dollar numbers for cash
9  consideration of 250 million. That's one piece
10  I'll direct your attention to.
11      A.    Um-hm.
12      Q.    And then if you look further in at
13  page 3, there is a paragraph entitled,
14  "Transaction Structure."
15      A.    Um-hm.
16      Q.    And in the second paragraph there, you
17  see the first paragraph recites the same numbers,
18  72, 68, 250 million, and then in the next
19  paragraph there is a reference to 1.75 billion
20  U.S. paid for the head office building and the
21  data centers. Do you see where we are?
22      A.    Um-hm, yes.
23      Q.    With those two pieces in mind, did you
24  ever express concern to anyone about the manner in
25  which the pricing of the deal was described in

Page 157

DIAMOND - HIGHLY CONFIDENTIAL
1
2  this press release?
3      A.    Yes, I do recall doing that.
4      Q.    Just for the sake of clarity, I am
5  going to ask you to go off the record for a
6  second.
7          (Pause)
8          MR. GAFFEY: The record should reflect
9      the witness absently is sort of doodling a
10      bit on the document in the handwritten notes
11      of the first page, a caret next to the
12      second paragraph and small square with a dot
13      in the middle were added during the
14      deposition. I understand that they are of
15      no meaning, but I need to explain that in
16      case the document is put in.
17          Don't make me tell you to put down the
18      pen.
19      Q.    Did you ever express any concern to
20  anyone about the way the price was characterized
21  in here?
22      A.    I do think I did, yes.
23      Q.    What do you recall about that?
24      A.    When we talked about the headline
25  price, which was the amount of cash that we were

Page 158

DIAMOND - HIGHLY CONFIDENTIAL

1 paying, I had thought about it as one and
2 three-quarter billion dollars and that was how
3 most of the documents that we were working on
4 here -- and that included the price of the
5 building and price of the data centers.
6       When I think Chris or Cathy, Chris is
7 CFO or Cathy as head of corporate
8 communications began drafting this note, it was
9 difficult to find that number. In fact, it
10 might have been, if I recall, impossible or
11 they broke it into the 250 premium and 1 and a
12 half for specific properties.
13       And I think the intent was that you
14 can describe it either way; one way looks like
15 a better deal, quote/unquote, for the
16 shareholder, the other looks like a better deal
17 for Lehman and a more fair representation. And
18 I recall saying we should really use the one
19 and three-quarter because that's what we have
20 been using all along, and it is going to look
21 like -- it is just a different number, and my
22 memory is that the one and three-quarter did
23 end up in here, but not in the beginning.
24       Q.    That's why I directed you to the third

Page 159

DIAMOND - HIGHLY CONFIDENTIAL

1 page, that's where you find the 1.57?
2       A.    To be honest, I prefer it here, I
3 think that would have been the appropriate way to
4 represent the transaction, so I was a bit
5 frustrated and disappointed.
6       Q.    Did you express to them your view that
7 it was important the bankruptcy court see it the
8 way you described, with the big number up front?
9       A.    I don't recall that, but I think
10 that's how we described it to the bankruptcy
11 court. So it would be -- what day is this?
12       Q.    This is the 17th, Wednesday?
13       A.    This is before we went to the
14 bankruptcy court.
15       Q.    Let me add in, because I don't want to
16 mislead you here, there is a hearing on the 17th.
17       A.    Certainly for all those types of
18 reasons, I felt it would be inelegant to change
19 the way we were talking about the transaction in
20 order to make it look better than it was.
21       Q.    Did you think it was important in the
22 release -- in this release which described the
23 price, either using the big number or not, that
24 the assumed liabilities also be described?

Page 160

DIAMOND - HIGHLY CONFIDENTIAL

1       MR. HUME: Let me object to vagueness
2 in that question, the phrase is sort of --
3       Q.    Let me withdraw that question.
4       You do recall commenting on the
5 manner in which the price was characterized.
6 Do you recall commenting on the fact that
7 neither the 2 billion dollar assumed liability
8 for compensation or the assumed liability for
9 contract cures were mentioned in this press
10 release?
11       A.    The only thing that I commented on
12 that I recall was the headline figure, that's what
13 I was worried about, and it was an issue of
14 perception and communications. Again, I think on
15 the other things, it would be more appropriate for
16 Rich or someone who was really driving the
17 transaction. I was thinking more from a corporate
18 communications point of view and a disclosure
19 point of view. But the only thing I recall
20 commenting on was the headline price.
21       Q.    You did, though, consider the
22 assumption of the liabilities for compensation and
23 contract cure to be part of the consideration
24 Barclays was giving in the deal apart from this --

Page 161

DIAMOND - HIGHLY CONFIDENTIAL

1       A.    You are going into a whole different
2 thing, so close this and put it away?
3       Q.    Sure. You --
4       A.    So what's the new question?
5       Q.    You did consider the assumed
6 liabilities, the compensation and contract cure to
7 be part of the consideration that Barclays was
8 giving in the deal, is that right?
9       MR. HUME: I am going to object to the
10 vagueness of that question.
11       A.    I think I have answered this, but let
12 me try again. In the pool of assets and pool of
13 liabilities and what was included and driving
14 toward accretive capital, Rich was driving that,
15 and there were things changing all the time
16 because of the very sad state, the chaos at Lehman
17 Brothers.
18       In specific, I have already said to
19 you I would not approve this deal if we did not
20 have an accrual for compensation because that
21 wouldn't be appropriate for that compensation
22 to be paid for by the Barclays shareholders
23 when the full year of work had been at Lehman.
24 So of course, we had a -- I don't know why you

Page 162

DIAMOND - HIGHLY CONFIDENTIAL

1    are asking again, but of course we had an
2    accrual for compensation.
3        Q.   I know there was an accrual for
4    compensation and I know there was an accrual for
5    contract cures. My question, and maybe I am not
6    being clear about it, my question is did you
7    consider the assumption of those accrued
8    liabilities to be part of the price that Barclays
9    was paying for what it was buying?
10        A.   You are asking me detailed questions
11    in the structure of the deal that I think Rich is
12    better able to answer. I gave you as much
13    information as I can about the comp and I think in
14    terms of the pool of assets and pool of
15    liabilities, that was really Rich's to drive.
16        Q.   When you were making the determination
17    as to whether you could recommend it to the board
18    as capital accretive, did you take into account
19    the assumed liabilities for compensation and for
20    contract cure?
21        A.   When I recommended this deal to the
22    board as capital accretive, I took into
23    consideration every aspect of the deal.
24        Q.   Those aspects include the assumption

Page 163

DIAMOND - HIGHLY CONFIDENTIAL

1    of liabilities for compensation and contract
2    cures?
3        MR. HUME:   Asked and answered.
4        A.   I answered all aspects of the deal, so
5    if those were aspects of the deal, yes.
6        Q.   Showing you, Mr. Diamond, what
7    previously has been marked as Exhibit 341A, an
8    e-mail chain beginning at the bottom with an
9    e-mail from you to Chris Lucas, copy Varley, and
10    Ricci and a chain that follows from Lucas to you,
11    and again, so you are not misled in any way, the
12    top e-mail from Lucas to Varley appears to exclude
13    you.
14        Could you take a look through that and
15    tell me if you recall seeing the parts of it that
16    are to or from you?
17        A.   Sorry, question?
18        Q.   Do you recall seeing --
19        A.   Yes.
20        Q.   Do you remember sending the one that
21    you sent here at the bottom, yes?
22        A.   I do now that I see it, yes.
23        Q.   And there is a reference in there to,
24    "It is very important to the bankruptcy court to

Page 164

DIAMOND - HIGHLY CONFIDENTIAL

1    see the larger number." Is that a reference to
2    how the deal is characterized in the press release
3    or is it a reference to something else?
4        A.   This note was in reference to the
5    press release that we had just talked about, yes.
6        Q.   So to go back to something I answered
7    and I think your recollection was not clear or you
8    didn't have one, do you recall now whether when
9    you commented on the press release, one of your
10    concerns was how the bankruptcy court would see
11    the deal described?
12        A.   I felt that all audiences, including
13    the bankruptcy court, it was more appropriate to
14    use the one and three-quarter billion number than
15    it was the 250 number, so I felt it more broadly
16    than that, but including the bankruptcy court.
17        Q.   Is there a reason that you referred
18    not to all audiences but to the bankruptcy court
19    itself in this e-mail? Is there a reason you
20    chose to refer to the bankruptcy court and not all
21    the rest of those audiences?
22        A.   Not that I can think of.
23        (Exhibit Exhibit 413-A, document Bates
24    stamped BCI-EX-S 79546 marked for

Page 165

DIAMOND - HIGHLY CONFIDENTIAL

1    identification, as of this date.)
2        Q.   Mr. Diamond, I have put before you
3    what we have marked as deposition Exhibit 413-A, a
4    one page document bearing Bates number BCI-EX
5    00079546. And it appears to be an e-mail exchange
6    between Archie Cox and you, beginning with a
7    message from Cox to you and there are others on
8    here; a response from Michael Evans to Cox and
9    you; and then a final response from you to Evans,
10    Cox and Ricci. Do you see that?
11        A.   Yes.
12        Q.   Now, there is a reference in the
13    original e-mail to something you referred to
14    before when I asked you if you had spoken to
15    Mr. McDade about joining Barclays and whether you
16    had talked about compensation. In sum or essence,
17    he said a handshake was good enough at that point,
18    do you recall that testimony?
19        MR. HUME:   Objection, mischaracterizes
20    the testimony I believe.
21        A.   I think you can go back and hear what
22    I said or you can reask the question.
23        Q.   Let me reask the question. Do you
24    recall a time when you were speaking to -- you

Page 166

DIAMOND - HIGHLY CONFIDENTIAL

1 learned that Bart was in the room with Archie Cox
2 and Cox talked to him about signing on with
3 Barclays and Bart stuck out his hand and said,
4 "I'm done, a handshake is good enough for me," as
5 recounted in this e-mail?
6 A.   This is -- only from this e-mail would
7 I know that.
8 Q.   You have no recollection, apart from
9 what you read in this e-mail, about anybody
10 talking about a handshake being good enough for
11 Bart McDade rather than a written agreement?
12 A.   I am sorry, I thought you asked me if
13 I recalled Archie.
14 Q.   Let's let me ask another question.
15 A.   Come on, let's play fair.
16 Q.   I am playing fair, sir. I don't want
17 to take time to read back the testimony --
18 A.   This is ridiculous.
19 MR. GAFFEY:   Would you search through
20 the time "handshake."
21 A.   No, I'll answer it.
22 Q.   No, we will take the time. I don't
23 want to be unfair.
24 MR. GAFFEY: Find the word

Page 167

DIAMOND - HIGHLY CONFIDENTIAL

1 "handshake."
2 (Record read)
3 Q.   Mr. Diamond, having had that testimony
4 about a handshake read back to you, do you
5 recall -- do you recall, again, a discussion where
6 Mr. McDade said a handshake would be good enough?
7 A.   There is a difference between what I
8 was testifying to, and I'm happy to answer, which
9 is my conversations with Bart, and this is a
10 representation of a Lehman lawyer in a room I
11 wasn't in.
12 So do I have any recollection of this?
13 No, I don't, other than the memo from Archie
14 and it had nothing to do with me. There was a
15 different testimony as I described to get you
16 to understand which is my conversations with
17 Bart which I have already answered for you.
18 Q.   When you got this e-mail from Archie
19 Cox, did you understand he had had a similar
20 conversation with Bart where Bart said --
21 referenced that a handshake was good enough? Did
22 that conversation take place twice with two
23 different Barclays people?
24 A.   It was a conversation he was relaying

Page 168

DIAMOND - HIGHLY CONFIDENTIAL

1 that Bart had with a Lehman lawyer, not the
2 Barclays person. That's the third time I've told
3 you.
4 Q.   You respond at the end of this,
5 "Please get me the numbers and contract ASAP. No
6 other conversation. Just get to me."
7 Do you see that? Why are you
8 directing Mr. Evans to have no other
9 conversation and just get a written contract to
10 you?
11 A.   It is really simple. The people that
12 were going to join from Lehman, the one that would
13 be a direct report to me was Bart. So I was
14 handling that and I wanted to see the contract
15 that it refers to as structuring here so I could
16 continue to think through what the appropriate way
17 to handle this was. The conversation I had with
18 Bart was previous to the conversation here. It
19 was during the early morning hours of Tuesday.
20 Q.   Can I have Exhibit 282-B, please.
21 Showing you what has previously been
22 marked as Exhibit 282, Mr. Diamond, a letter on
23 Barclays Capital letterhead dated September 18,
24 2008, addressed to Mr. Herbert McDade III,

Page 169

DIAMOND - HIGHLY CONFIDENTIAL

1 signed on page 3 by Michael Evans. Have you
2 seen that document before?
3 A.   I don't recall, but I suspect I did.
4 Q.   Do you recall if, as you had
5 instructed, Mr. Evans sent the document -- the
6 numbers in the contract to you?
7 A.   I suspect, with good reason, that this
8 is the document that I asked Michael to get to me.
9 Q.   Do you recall receiving that document?
10 Whether it is this one in front of you or not, do
11 you recall getting the document?
12 A.   I don't, but I'm sure I did. It was
13 days and days without sleep. I asked Michael very
14 clearly in capital letters to get it to me and
15 there is a document, so I'm sure it came to me.
16 Q.   Do you know whether -- did you give
17 this document to Mr. McDade?
18 A.   I did not.
19 Q.   Did anyone give it to Mr. McDade on
20 your instructions?
21 A.   Not on my instructions.
22 Q.   Do you know if anyone at Barclays gave
23 this document to Mr. McDade?
24 A.   I would be surprised because Bart

Page 170

DIAMOND - HIGHLY CONFIDENTIAL

1    worked for me and it would not have gone to him
2    without approval from me, I would think. These
3    were crazy times and under stress, so my
4    understanding is this did not go to Bart because
5    Bart and I had already had the conversation
6    earlier.
7        Q.    Bart did for a short time come --
8    Mr. McDade did come for a short time and work for
9    Barclays after the transaction, is that right?
10        A.    Bart continued to work for us until
11    October, kind of the October, November time frame.
12        Q.    Did he receive any bonus payments?
13        A.    He did not.
14        Q.    Did he receive any severance payments?
15        A.    Not -- severance is a funny word. So
16    I'm only caveating it, there might have been
17    something around health insurance or staying on
18    healthcare. But I think in the meaning you are
19    saying severance no, there was no bonus or
20    severance or anything special. I could get caught
21    in the technicality, but I think in the principle
22    you are asking it, the answer is no, there was no
23    additional compensation.
24        Q.    It is a fair comment. I don't want to

Page 171

DIAMOND - HIGHLY CONFIDENTIAL

1    tie it just to severance. Did he get any sort of
2    departure bonus, severance, noncompete?
3        A.    No, he did not.
4        MR. SCHILLER:  Do you have much more?
5        MR. GAFFEY:  Yes.
6        MR. SCHILLER:  Can I ask that you
7    really try to focus on what's important and
8    not take the whole day to ask questions and
9    introduce documents?  You seem to be
10    conducting a deposition that covers the
11    universe, as opposed to working with
12    whatever is important to you at this point
13    in this proceeding at this time, and I might
14    ask that you focus on what's important and
15    complete your examination.
16        You asked for this discovery in order
17    to consider whether there are claims and you
18    are conducting this like it is some
19    five-year lawsuit, you are just going to
20    examine someone all day and showing him all
21    the things you want and then other things.
22    So I would ask that you move on and ask what
23    is important to you of this CEO.
24        MR. GAFFEY:  Can I have document

Page 172

DIAMOND - HIGHLY CONFIDENTIAL

1    number 338, please.
2        Q.    Do you recall the time, Mr. Diamond --
3    you mentioned before when you spoke with Mark
4    Shafir or you -- withdrawn.
5        You mentioned before that you
6    learned that Mark Shafir was going to go to
7    Citibank and that was in the context of when we
8    were talking about whether employment offers
9    were being made to Lehman employees. Did there
10    come a time when you learned Mr. Shafir
11    actually left Lehman during the week that the
12    deal was being executed and prior to the
13    closing?
14        A.    No.
15        Q.    Did you have an understanding of what
16    Mr. Shafir's role was during the dealings between Lehman and Barclays?
17        A.    My understanding was that Mark Shafir
18    was working for originally Dick Fuld to try and
19    find a buyer for Lehman. I'm not sure I'm
20    correct, but that was my understanding.
21        Q.    That would put us back in the period
22    prior to the arrival of Barclays as it were. I am
23    in the week starting on Monday the 15th through

Page 173

DIAMOND - HIGHLY CONFIDENTIAL

1    the closing on the 22nd. What do you know, if
2    anything, about Shafir's role and activities
3    during that week?
4        A.    Nothing.
5        Q.    Was he ever described to you or did
6    you come to understand him to be one of the
7    principal negotiators for Lehman?
8        A.    Rich was really managing that. I was
9    not in on any of the negotiations, so it was very
10    possibly the case, but I wouldn't know.
11        Q.    Did Rich mention who he was
12    negotiating with during that week in his periodic
13    reports to you about the progress of the deal?
14        A.    He may have, but it wasn't memorable.
15        Q.    We talked a little bit, Mr. Diamond,
16    about, from time to time we have talked about the
17    clearing agent and I asked you before and told you
18    I would come back to the topic about difficulties
19    that may have arisen with JP Morgan. Do you have
20    any -- could you describe for me the nature of the
21    difficulties that arose with JP Morgan near the
22    end of the week? Anything in particular?
23        A.    Is there any specific question you
24    have?

Page 174

DIAMOND - HIGHLY CONFIDENTIAL

1    Q. Yes, it is a general question. Were
2 there difficulties with -- let me --
3    A. Difficulties with clearing agents?
4    Q. Were there difficulties with the
5 clearing agent that created an obstacle to the
6 completion of the transaction?
7    MR. HUME: Objection, vague.
8    A. You know, I think all of that again is
9 the responsibility of Rich. I think you have had
10 a chance to do a deposition with him. I'm
11 surprised you are asking.
12    Q. I am looking for your knowledge.
13 That's why I am asking you.
14    A. I don't know where to begin or where
15 to end. Can you narrow that down at all?
16    Q. I really can't until I get an answer
17 from you, sir. To your knowledge, were there
18 issues arising with JPM that presented an obstacle
19 to the completion of the deal? To your knowledge?
20    A. The deal completed over the night by
21 Monday morning, so we had completed a deal. We
22 found out after that that JP Morgan had removed 7
23 billion dollars from a custodian account but
24 technically that was after the deal was signed.

Page 175

DIAMOND - HIGHLY CONFIDENTIAL

1    Q. And was the removal of the 7 billion
2 dollars from the account something that Barclays
3 learned only after the closing on September 22?
4    A. To the best of my knowledge, yes. It
5 was not discovered until after the closing later
6 Monday morning.
7    Q. And apart from that issue that arose
8 later Monday morning on the 22nd, were there any
9 other issues with JP Morgan about cash -- that
10 involved the amount of 7 billion dollars in cash?
11    MR. HUME: You are asking the witness'
12 knowledge?
13    MR. GAFFEY: Yes.
14    A. The only time the 7 billion in the
15 custody account was taken -- the only time we knew
16 it was taken, I'm pretty sure anyone at Barclays,
17 was after the close.
18    Q. Did you have a conversation with
19 anyone at JPM on Friday the 19th concerning a 7
20 billion dollar issue?
21    A. No.
22    Q. Let me show you what has previously
23 been marked as Exhibit 299. It is an e-mail from
24 Dan -- from Paolo Tonucci to Dan Flemming and it

Page 176

DIAMOND - HIGHLY CONFIDENTIAL

1 says, "Bob Diamond is speaking to JPM about the 7
2 billion of cash allocated to Barclays in the
3 triparty last night."
4    Do you have any -- can you illuminate
5 me in any way, sir, as to whether you did speak
6 to JPM about the 7 billion of cash allocated to
7 Barclays in a triparty on the 18th of
8 September?
9    A. What day of the week was that?
10    Q. That would be the Thursday prior to
11 closing. The e-mail is sent the 19th, it refers
12 to last night. That's why I am referring to
13 Thursday night, the 18th?
14    A. I don't recall any conversation about
15 7 billion in cash. I'm -- I don't -- well, I
16 wasn't on that note, but no, I didn't.
17    Q. I understand that. I am wondering
18 whether you could illuminate for me why one person
19 is writing to another guy saying that?
20    A. No. Couple of Lehman guys?
21    Q. Yeah.
22    A. Then no.
23    Q. Did anyone on your team bring to your
24 attention prior to the closing that there was

Page 177

DIAMOND - HIGHLY CONFIDENTIAL

1 difficulties with JP Morgan about the transferring
2 of assets that presented obstacles to the deal?
3    MR. HUME: Objection, vague.
4    A. There were -- not that presented
5 obstacles to the deal, no.
6    Q. So is it fair to say --
7    A. I know there was a lot of things that
8 were resolved during the night Sunday, but I
9 wasn't there.
10    Q. My question goes to whatever knowledge
11 of the issues there were. Did you get involved in
12 any issue with JPM before the afternoon of the
13 closing when it was learned that JPM had removed 7
14 billion dollars from an account?
15    A. I had a call from Heidi Miller when a
16 repo that was on with JP Morgan, a day-to-day repo
17 wasn't renewed, where she was surprised it wasn't
18 renewed. And I kind of took her through the
19 reasons why we didn't need to renew it and it was
20 a day-to-day repo. And there was a second
21 interaction on Friday evening I think, as we were
22 preparing all of the Fed repo transfers, that very
23 big, 45 billionish repo, where I spoke with Gerard
24 LaRocca and I think Rich were on the phone with me

Page 178

DIAMOND - HIGHLY CONFIDENTIAL
1    DIAMOND - HIGHLY CONFIDENTIAL
2    and Jonathan Hughes and on the phone for JP Morgan
3    were Steve Cutler and Frank Bisignano and Bill
4    Winters and Heidi Miller. And the two things that
5    had come up then were that I had had knowledge --
6    that I had committed to JP Morgan that we would
7    keep rolling the repo and we discussed that and I
8    asked Heidi to please clarify for Bill Winters and
9    Steve Cutler and Frank Bisignano that she and I
10   never had a conversation until it rolled off, it
11   was the first time we had ever talked, and she
12   recanted her story that I had committed and said
13   Bob's right actually, he didn't, I still think he
14   should have, but you didn't.
15       The second thing we discussed is how
16   were we going to transact such a large settlement
17   so that we could open on Monday morning, for us
18   stepping into the Fed's position, and through a
19   long series of events, the decision I made was
20   that if someone has to send the money first and
21   then the securities or the securities first and
22   then the money, if I had Bill Winters' assurance
23   with his chief legal counsel there and with Frank
24   and with Heidi that JP Morgan stood behind
25   guaranteeing that they would complete the

Page 179

1    DIAMOND - HIGHLY CONFIDENTIAL
2    transaction, that I would authorize our people to
3    send the money first and we all agreed on that on
4    the phone call Friday night.
5        I think that was the last conversation
6    I had. I had many conversations with Rich.
7        I had a conversation Sunday night with
8    Jamie Dimon who called me as Rich and team and
9    JP Morgan and team were going into the
10   negotiations that lasted most of the night
11   where I assured Jamie that Rich could act on my
12   behalf and he assured us that Frank Bisignano
13   could act on their behalf and we would get
14   something signed that night. So I relayed that
15   to Rich and Rich executed during the night.
16   But I assured him that Rich had my authority to
17   act.
18       MR. SCHILLER: Let me try to help you.
19   Mr. Diamond, look at this screen.
20       MR. GAFFEY: Are you going to question
21   your witness now?
22       MR. SCHILLER: I am going to help you
23   clarify something.
24       MR. GAFFEY: I haven't asked for help.
25   If you want to object, instead of Hamish, go

Page 180

1    DIAMOND - HIGHLY CONFIDENTIAL
2    ahead. But nobody has invited you to
3    interrogate the witness. You get your
4    chance at the end. You don't do this now.
5    You know you don't do this now. This is a
6    violation.
7        MR. SCHILLER: I am just trying to
8    help you get this done in a practical way.
9        MR. GAFFEY: When I need help, believe
10   me, I will be the first guy to speak up.
11       MR. SCHILLER: There is an error in
12   the transcript. I just trying to clear
13   it up.
14       Q. Did the 7 billion dollar issue get
15   resolved, the one you learned about or Barclays
16   learned about after the closing on Monday the
17   22nd?
18       MR. HUME: I want to object to the --
19   I understand, I understand.
20       I thought it might be vague in terms
21   of what you were just talking about and the
22   7 billion might be vague, so I am objecting
23   to that.
24       Q. The, issuationu about the money being
25   taken out of the account, did that issue get

Page 181

1    DIAMOND - HIGHLY CONFIDENTIAL
2    resolved?
3        A. There was ultimately an agreement made
4    between ourselves and JP Morgan and the Fed to
5    draw a line under it and.
6
7    Move on., I am sorry, I didn't hear that.
8    Draw a line under it and move on. And I'm not
9    sure -- I don't know what you mean when you say
10   draw a line under it and move on.
11       A. A settlement.
12       Q. A settlement was reached, when did
13   that occur?
14       A. Months later.
15       Q. Do you have an understanding, again,
16   30,000-foot view, what the terms of that
17   settlement were?
18       A. I do.
19       Q. Can you describe them to me?
20       A. The 7 billion in cash that was taken
21   illegally from our custody account was -- we ended
22   up settling for something significantly less. I
23   think the exact amount you can get from someone, I
24   haven't got testimony off the top of my head but
25   it was significantly less.

Page 182

DIAMOND - HIGHLY CONFIDENTIAL

1    DIAMOND - HIGHLY CONFIDENTIAL
2        MR. GAFFEY: Let's take a five-minute
3    break.
4        (Recess)
5    Q.    Mr. Diamond, I placed before you, at
6    the top of the pile, what was previously marked as
7    deposition Exhibit 343-A on Barclays letterhead
8    entitled "Barclays PLC Announcement." Take the
9    time to look through that and tell me whether you
10    have seen the document before?
11    A.    I have not.
12    Q.    Do you recall on Wednesday, 17
13    September 2008 attending a conference with
14    journalists about the deal?
15    A.    I don't.
16    Q.    Just for completeness then, let me
17    direct your attention -- you will see in the
18    lower, left-hand corner, it has the page numbers,
19    1 of 18, 2 of 18, I need you to take a look at --
20    actually, it is not journalists. Do you recall
21    attending an analysts call?
22    A.    I do.
23    Q.    Looking through this document, does it
24    reflect the analyst call that you attended on 17
25    September 2008?

Page 183

1    DIAMOND - HIGHLY CONFIDENTIAL
2    A.    I'm sure it does. I haven't read it,
3    but it looks like a transcript of that meeting.
4    Q.    We can take the time if you like, but
5    I have one question and answer that I want ask you
6    about.
7    A.    Why don't we try that and if I need to
8    read it, I can do that.
9    Q.    Fine. Page 3 of 18, the question and
10    answer session and the questions that follow are
11    being asked by Michael Trippett, Oriel Securities,
12    that's just for context.
13        There is a further question by Mike
14    which I'll read into the record, "Yes, the
15    second question was just trying to get a sense
16    of good assets, bad assets and impairments that
17    would have been already taken either through
18    the P&L or AFS on the assets that you are
19    acquiring," and then John Varley says, "Let me
20    ask Chris to comment and, Bob, you may want to
21    add."
22        If you -- your answer is reflected on
23    page 4, I believe, where Mr. Varley asks
24    anything you want to add. And you make a
25    reference in there where you say, "First and

Page 184

1    DIAMOND - HIGHLY CONFIDENTIAL
2    foremost, as Chris said, we got to choose which
3    inventory came with the deal."
4        Do you see that?
5    A.    I do.
6    Q.    Was there at any point in the
7    transaction, from the time it was agreed until the
8    time it closed where Barclays did not have -- did
9    not get to choose which inventory came with the
10    deal?
11    A.    I think, as I had explained to you --
12    and Friday was probably a good example -- there
13    was a number of times when Lehman couldn't
14    substantiate or couldn't locate, so I think it is
15    fair to say that we had to approve as opposed to
16    choose in some cases. In other words, some of the
17    things that we would like weren't able to be
18    located or, in fact, weren't there or the
19    valuations were wrong.
20        The context here is to differentiate
21    it from Long Island 1, which was, by and large,
22    the entire balance sheet of Lehman Brothers. So
23    that's the context which is it is a smaller
24    portion, it is more related to the businesses as
25    opposed to, for example, Japanese equities or

Page 185

1    DIAMOND - HIGHLY CONFIDENTIAL
2    commercial real estate from Hong Kong.
3    Q.    So as I understand it, in Long Island
4    2, you could pick and choose because you're taking
5    less than the whole, yes?
6    A.    Yes.
7    Q.    And were you able to pick and choose
8    all the way through or was there -- let me
9    rephrase.
10        At any point, was there a point where
11    Barclays was required to take assets it did not
12    want?
13    A.    I wasn't close enough to the -- I
14    wasn't part of the team that was choosing the
15    assets, so I couldn't say.
16        MR. GAFFEY: I don't have anything
17    further.
18    EXAMINATION BY
19    MR. MAGUIRE:
20    Q.    Mr. Diamond, my name is Bill Maguire
21    at the law firm of Hughes Hubbard & Reed and I
22    represent the trustee of the Estate of Lehman
23    Brothers.
24        You testified a little earlier about
25    the public disclosure by Barclays, that large

Page 186

DIAMOND - HIGHLY CONFIDENTIAL

1  thick document with 2008 accounts. I will
2  represent to you -- you are feel free to look
3  at it if you want -- but there is a reference
4  there to restating the acquisition accounting.
5  I'm just directing your attention to that. Are
6  you with me?
7      A.   Yes.
8      Q.   Have you had any discussions with
9  anyone --
10     A.   Where is it in here?
11     Q.   You will see it at -- that large
12  document, The results marked Exhibit 22.
13         MR. HUME:  Which page is it, Bill?
14         MR. MAGUIRE:  Page 95.
15     Q.   You don't need to look at this for the
16  purpose of my questions, but feel free if you
17  wish, sir.
18     A.   I do.
19         MR. HUME:  Could you direct us to
20  where that is stated.
21     Q.   Sure. Sir, I will direct your
22  attention to note 11. See there is a reference
23  under A to Lehman Brothers' North American
24  businesses?

Page 187

DIAMOND - HIGHLY CONFIDENTIAL

1      A.   Um-hm.
2      Q.   And if you go down four paragraphs
3  down, you will see a paragraph that begins, "The
4  initial accounting for the acquisition." Are you
5  with me?
6      A.   I see the sentence, yes.
7      Q.   If you look at the last sentence of
8  that paragraph, you will see a reference to a
9  restatement.
10         MR. HUME:  I am sorry, Bill, which
11  paragraph?
12     Q.   The fourth paragraph down starts, "The
13  initial accounting for the acquisition," and the
14  last sentence says, "Any such revisions must be
15  effected," and it continues.
16         MR. HUME:  I see, thank you.
17         MR. MAGUIRE:  Are we all together?
18         MR. HUME:  Sorry, thank you.
19     A.   I don't know if we are all together
20  but I see where you --
21     Q.   That's a good start. Let me put it
22  that way.
23         Have you had any discussions with
24  anyone about such a restatement?

Page 188

DIAMOND - HIGHLY CONFIDENTIAL

1      A.   Have I, Bob Diamond?
2      Q.   Yes.
3      A.   No.
4      Q.   Are you aware whether Barclays is
5  making such a restatement?
6      A.   I think you can read here that this is
7  very technical accounting, that there is an
8  initial accounting, which has been determined only
9  provisionally, and as more information and more
10  certainty comes in and one gets to a pretty
11  certain date. This looks like pretty standard
12  accounting. I'm not sure what the question is.
13     Q.   Are you aware there is a restatement
14  at Barclays --
15     A.   I'm aware of this paragraph, that is
16  all I can tell you.
17     Q.   Beyond that paragraph, you have no
18  personal knowledge?
19     A.   One way or the other. It is not
20  something that I would be involved in.
21     Q.   And you had no discussions with any of
22  your direct reports concerning any restatement by
23  Barclays of the accounting for this acquisition?
24     A.   I can't answer a general question like

Page 189

DIAMOND - HIGHLY CONFIDENTIAL

1  that. There are accounting issues that come up
2  all the time at Barclays around a lot of things
3  and I have a lot of conversations. If you have
4  something specific, you should ask me. I can in
5  no way answer a question about the most strategic
6  and most dangerous transaction in the history of
7  the financial markets and say I have never had a
8  conversation on the accounting.
9      Q.   My question is only to the best of
10  your recollection. Do you have any recollection
11  of discussing a restatement of the accounting with
12  anyone?
13     A.   I'm sure I have had many discussions
14  about the accounting.
15     Q.   And --
16     A.   If you want to ask me about a specific
17  one, I'm happy to answer. I'm sure I have had
18  many, many conversations. So my answer to you is
19  the accounting for Barclays Capital, which now
20  includes this, has a lot of accounting entries and
21  I'm sure I have discussed many, many of them.
22     Q.   With whom do you discuss, have you had
23  discussions concerning the accounting for the
24  acquisition?

Page 190

DIAMOND - HIGHLY CONFIDENTIAL

1     
2    A.    I would say it differently. I have
3    had discussions about accounting in Barclays
4    Capital of which the acquisition is a part with my
5    staff at the finance committee on a regular basis.
6    Q.    And who on your staff is responsible
7    for that accounting?
8    A.    The accounting in Barclays Capital
9    reports up to the chief financial officer, Patrick
10    Clackson, and Patrick reports to Rich Ricci, the
11    chief operating officer.
12    Q.    Taking Mr. Ricci and Mr. Clackson,
13    have you had discussions with either of those
14    gentlemen concerning a restatement of the
15    acquisition accounting?
16    A.    I've had numerous conversations since
17    this acquisition on all aspects of accounting at
18    Barclays Capital -- excuse me, I almost said
19    Barclays Group. You would have to be more
20    specific to ask -- I think the terminology of
21    acquisition accounting is something that flows
22    into a lot of other things. I would be really
23    happy to help you if you could ask something
24    specific because the answer is I talk about
25    accounting issues all the time.

Page 191

DIAMOND - HIGHLY CONFIDENTIAL

1    Q.    Let me ask you to focus on the gain on
2    the acquisition here. You see that number is
3    specifically set forth on page 95?
4    A.    On this date?
5    Q.    Yeah.
6    A.    As of this date.
7    Q.    Exactly. Have you had any discussion
8    with Mr. Ricci or Mr. Clackson about revising the
9    amount of that gain?
10    A.    I think what it says here -- do you
11    see the paragraph?
12    Q.    Yeah.
13    A.    That revisions can happen for 12
14    months, with changes in valuation and all that.
15    Q.    Sure. My question is what discussions
16    have you had with Mr. Clackson and Mr. Ricci
17    concerning revising that number?
18    MR. HUME: Objection, asked and
19    answered.
20    A.    I've answered it about five times.
21    Q.    I'm just asking you to tell me what
22    those discussions were.
23    MR. HUME: Objection, vague.
24    A.    I don't know what you're asking other

Page 192

DIAMOND - HIGHLY CONFIDENTIAL

1    than I have conversations about the financials and
2    accounting at regular meetings with them all the
3    time about everything at Barclays Capital. I
4    don't have anything specific to relay to you,
5    unless you could ask a more specific question.
6    Q.    What I am asking you now specifically
7    is, with respect to the number, have you
8    had any discussions with anyone about revising
9    that specific number?
10    A.    I am just going to stick to my answer,
11    we deal with accounting issues all the time and if
12    there were any revisions that were to come up
13    through the finance committee and I would have
14    been a part of those.
15    Q.    Do you recall any discussion with Mr.
16    Ricci specifically on the subject of disclosing a
17    different gain?
18    A.    Without more specificity, I can't
19    think of any specific conversations.
20    Q.    Do you recall any specific number that
21    you discussed with Mr. Ricci concerning --
22    A.    Again, without more specific inquiry
23    than this general line of questioning, because
24    part of my job is the financials. I can't give

Page 193

DIAMOND - HIGHLY CONFIDENTIAL

1    you a specific recollection without a more focused
2    question.
3    Q.    Has Mr. Clackson --
4    A.    I guess that's to say I don't have any
5    specific recollection of a specific conversation
6    unless you tell me what the conversation was.
7    Q.    Did Mr. Clackson advise you that
8    Barclays would be revising its gain upwards by an
9    amount of approximately 400 million?
10    A.    There were financial issues that come
11    up every week at our finance committee that we
12    deal with. It's very possible that issues around
13    this came up. I don't have any specific numbers
14    in mind.
15    Q.    Do you recall generally a ballpark
16    that Mr. Clackson gave you?
17    A.    I don't have a specific or a general,
18    but good try.
19    Q.    You described earlier how you worked
20    with Mr. Ricci and how you understood that he had
21    the authority that you had from the board in
22    effectuating this transaction, do you recall
23    generally that testimony?
24    A.    No. But --

Page 194

DIAMOND - HIGHLY CONFIDENTIAL
1
2    Q.   Let me step back then and ask you what
3    was the authority that you had from the board to
4    do this transaction?
5        MR. HUME: Object to the extent it
6    calls for a legal conclusion.
7        A.   I think the board had the authority.
8    I didn't have the authority from the board.
9        Q.   Did you get any authority from the
10   board in connection with this transaction?
11       A.   I actually don't know how to answer
12   it. The board is the only authority. So I
13   present to the board and the board approves. Does
14   that make sense to you?
15       Q.   Yes.
16       A.   So don't ask me again about authority
17   because the board decides, I don't.
18       Q.   Did you give Mr. Ricci any authority
19   in connection with this transaction?
20       A.   I gave Mr. Ricci a lot of
21   responsibility which then reported in to me and
22   reported in to the board, who -- reported actually
23   into John and then to the board. So I gave him
24   quite a bit of responsibility.
25       Q.   Did you have any authority from the

Page 195

DIAMOND - HIGHLY CONFIDENTIAL
1
2    board to provide any or to agree to any
3    unconditional guarantee of Lehman liabilities?
4        MR. HUME: Objection, vague.
5        A.   I have no idea what you're talking
6    about.
7        Q.   Was there a time when you understood
8    that Lehman wanted you, wanted Barclays to step
9    into the shoes -- to assume all its liabilities?
10       A.   On what date?
11       Q.   At any date?
12       A.   No recollection.
13       Q.   Was there an occasion when Barclays
14   sought a waiver from the FSA?
15       A.   For?
16       Q.   To waive a requirement of a
17   shareholder vote?
18       A.   You're referring to the previous
19   transaction?
20       Q.   In connection with any Lehman
21   transaction, did Barclays ask the FSA to waive a
22   requirement for a shareholder vote?
23       A.   There were two very different
24   transactions and to be fair, I feel that's
25   inappropriate and broad.

Page 196

DIAMOND - HIGHLY CONFIDENTIAL
1
2    Are you talking about the first
3    transaction or the second?  If you want to go
4    through both, I will try and go through both,
5    but they were very different in nature and
6    different in degree and kind.
7        Q.   I don't want to confuse two different
8    transactions. I am asking about whether in
9    connection with either transaction there was any
10   occasion in which a request was made for a waiver
11   of a shareholder vote?
12       A.   From?
13       Q.   The FSA?
14       A.   Not my request that I can recall. The
15   FSA -- I don't think there ever a situation came
16   up where the FSA would have required a shareholder
17   vote. So if there is something more specific, I
18   will try and answer, but I have no recollection of
19   a situation where we would have needed to go to
20   the FSA for their approval to forgo a shareholder
21   vote.
22       Q.   You're not aware of any such request
23   having been made by anyone at Barclays to anyone
24   at the FSA?
25       A.   I think if you read it back, I was

Page 197

DIAMOND - HIGHLY CONFIDENTIAL
1
2    referring to me, which I thought was the question.
3        Q.   That's fine. When you say referring
4    to me, you are not aware of whether anyone other
5    than you made such a request at the FSA?
6        A.   That's a different question. Let me
7    make sure I think it through.
8        I don't recall any situation where I
9    or anyone else at Barclays -- although things
10   could have happened without my knowledge, but I
11   wasn't aware -- where they would have requested
12   in the spirit of the Lehman transaction the FSA
13   to waive a shareholder vote. There was so many
14   that went on, I hope I'm not forgetting
15   something that -- but I can't, I can't think of
16   it.
17       Q.   You mentioned in your testimony at one
18   point that Lehman was under attack from their
19   clearing agents?
20       A.   I don't think I used the word
21   "attack."
22       Q.   Well, the record will stand. Did you
23   understand that Lehman had some issues with its
24   clearing agents?
25       A.   I didn't know anything about issues,

Page 198

DIAMOND - HIGHLY CONFIDENTIAL

1  no.
2      Q.  Did you understand that the clearing
3  agents expressed concern about their exposure to
4  Lehman during the week of September -- the week
5  that we have been talking about, week ending
6  Friday September 19?
7      A.  I didn't have any knowledge of
8  Lehman's interaction with their clearing agents.
9  I suspect some of the staff did, but I didn't.
10     Q.  Did you ever hear that the Depository
11 Trust Clearing Corporation had expressed concern
12 about its exposure to Lehman?
13     A.  I don't recall myself being informed
14 of that, no.
15     Q.  Did you ever understand that the DTCC,
16 Depository Trust Clearing Corporation had
17 requested that Barclays step into the shoes of
18 Lehman and assume all of Lehman's liabilities to
19 the DTCC?
20     A.  There were many, many organizations,
21 very anxious that week, and there were many
22 organizations that, it was my kind of broad
23 understanding, were coming to us and that's why we
24 were so conscious that there was a very short

Page 199

DIAMOND - HIGHLY CONFIDENTIAL

1  period of time.  I don't recollect any specific
2  conversations, but they may have happened, very
3  well may have happened.  I don't recall them
4  happening with me for sure.  But that doesn't mean
5  they didn't happen.
6      Q.  Did you --
7      A.  I am aware that there was chaos in the
8  markets triggered by the Lehman bankruptcy and
9  that chaos had a huge impact on Lehman.
10     Q.  Did you ever authorize Mr. Ricci or
11 anyone else to enter into an agreement whereby
12 Barclays would assume all Lehman's liabilities to
13 any clearing agency?
14     A.  If you have one in particular --
15     Q.  DTCC?
16     A.  I don't recall.  Or I have no
17 recollection, I think is a better way to say it.
18     Q.  Did you have authority from the board
19 to assume all of the liabilities of Lehman to the
20 DTCC?
21     A.  Hypothetically, if I wanted to use it,
22 are you saying did I have that authority?
23     Q.  Had the board given you that
24 authority?

Page 200

DIAMOND - HIGHLY CONFIDENTIAL

1      A.  I don't recall any conversation with
2  the board on that.
3      Q.  What about with respect to the OCC,
4  did you ever get authority from the board to enter
5  into or authorize anyone to assume --
6      A.  That's nothing that I recall.
7      Q.  Let me finish the question so we have
8  a clear record -- to assume all the liabilities of
9  Lehman to the Options Clearing Corporation or OCC?
10     A.  Same answer.
11     Q.  Did you ever give Mr. Ricci that same
12 authority?
13     A.  So your last question was did I
14 request it from the board?
15     Q.  Did the board give you that authority,
16 and my question to you now is did you give such
17 authority to Mr. Ricci?
18     A.  Your question is without authority
19 from the board would I have given it to Rich?  No
20 recollection of the situation.
21     Q.  Did Mr. Ricci have any discussion --
22 let me focus you specifically -- and feel free to
23 look at the calendar if you want -- but on Friday
24 the 19th of September -- are you with me?

Page 201

DIAMOND - HIGHLY CONFIDENTIAL

1      A.  Am I with you?
2      Q.  Yes, do you understand what I am
3  saying?
4      A.  Yes, I understand Friday is the 19th.
5      Q.  Just focusing on that day, do you
6  recall any discussion with Mr. Ricci about blowing
7  up the trade?
8      A.  What do you mean by blowing up the
9  trade?
10     Q.  Do you recall Mr. Ricci using those
11 words?  Or more specifically, do you recall him
12 telling you that he would not blow up this trade
13 by being a pig?
14     A.  I recall many times on Friday where we
15 were considering whether or not we could complete.
16 I don't recall specifically the phraseology
17 "blowing up" as not completing, but I suspect
18 that's what it would have done and there was a
19 high degree of tension.  So it is possible slime
20 was used.
21          But in answer to your question, there
22 were many times on Friday when I didn't think
23 we would get the transaction completed and Rich
24 didn't think we would get a transaction, for

Page 202

DIAMOND - HIGHLY CONFIDENTIAL

1 the things we talked about.
2 Q.   When you say Rich, you are referring
3 to Mr. Ricci?
4 A.   Yes.
5 Q.   Did Mr. Ricci advise you that he had
6 told anyone at Lehman that he would not blow up
7 the deal by being a pig?
8 A.   I don't recall any conversation like
9 that, but I can assure you that if -- "pig" infers
10 what?  So I don't recall a conversation where
11 "pig" was used.
12 Q.   In your discussions with Mr. Ricci on
13 Friday, you understood that he was attempting to
14 get additional assets from Lehman into the sale?
15 A.   What I understood was that Lehman was
16 trying to find assets because other assets, in
17 terms of the frame of the deal, couldn't be
18 located or weren't the value that they thought, so
19 I was aware that Lehman was scrambling for assets
20 and wouldn't be able to complete the deal without
21 them.
22 Q.   Did you understand that Mr. Ricci had
23 spoken with Mr. McDade about getting additional
24 assets?

Page 203

DIAMOND - HIGHLY CONFIDENTIAL

1 A.   Rich was executing, so in your first
2 question, I was aware that Lehman was scrambling
3 to find assets and I was aware that Bart was part
4 of the Lehman team doing it, but I have no
5 particular -- there was no particular conversation
6 that I was aware of with Bart and Rich that I
7 recall.  I was in and out of many conference
8 rooms.  This is being run, managed by Rich, so I
9 was not part of any conversation where the assets
10 were going to come from other than being in and
11 out of conference rooms and hearing some of it and
12 knowing what the objective was.
13 Q.   Do you understand at some stage a
14 number of people left to go to a bankruptcy court
15 hearing that was commencing that afternoon?
16 A.   I do remember that.
17 Q.   I am going to ask you now about the
18 period up until the time when people left to go
19 down to the bankruptcy court.  Do you understand
20 that?
21 A.   Um-hm, yes.
22 Q.   In the period up to that, did Mr.
23 Ricci inform you that he had been successful in
24 obtaining additional assets from Lehman?

Page 204

DIAMOND - HIGHLY CONFIDENTIAL

1 A.   Right until the 11th hour, right until
2 the 59th minute, we were unsure if we would get
3 the people required from Lehman Brothers to the
4 bankruptcy court -- because it was a Lehman
5 Brothers presentation to the bankruptcy court, not
6 Barclays, and it was their presentation on the
7 deal.
8 So much so, in fact, I think that they
9 took the tube, not a car, because the traffic
10 was so bad and they wouldn't have gotten there
11 on time, so it was right until the last minute
12 and there did come a point, I can't recall
13 when, when we signed off that the deal that was
14 being presented by Lehman was substantially the
15 deal.  But it was a Lehman presentation, so I
16 wasn't a part of it.
17 Q.   When you say it was substantially the
18 deal, what do you mean?
19 A.   I didn't mean to infer anything, but
20 at some point Lehman went down and made a
21 presentation on the transaction and presented it
22 to the judge.  But it was a Lehman presentation,
23 not a Barclays presentation.
24 Q.   How did you hear about the

Page 205

DIAMOND - HIGHLY CONFIDENTIAL

1 presentation?
2 A.   I didn't really.
3 Q.   Did you -- did anybody tell you about
4 the presentation?
5 A.   I'm not sure what you mean by the
6 presentation?  Did I hear it, listen to it?
7 Q.   Anybody tell you what Lehman had said
8 about the deal, how Lehman had described the deal
9 to the bankruptcy judge?
10 A.   I didn't go to the presentation.
11 Q.   Did anybody tell you how Lehman had
12 presented the deal to the bankruptcy judge?
13 A.   I'm sure there were reports.  I don't
14 recall the specifics to them.
15 Q.   Did anyone tell you that the judge had
16 been told that cash was excluded from the deal?
17 A.   As I said, I wasn't at the deal and I
18 have no recollection of any reports back, so --
19 Q.   So you don't recall anyone ever
20 telling you that?
21 A.   I didn't hear the Lehman presentation.
22 I think I will leave it at that.
23 Q.   No, I am not asking you about what you
24 heard at the bankruptcy court.  I understand you

## Page 206

DIAMOND - HIGHLY CONFIDENTIAL

1    weren't there. My question is did anyone on your
2    team, anyone at Barclays tell you that the judge
3    had been told that cash was excluded from the
4    deal?
5        A.   I didn't know any of the details of
6    the presentation, only summary, so, no, I didn't
7    have any details of the conversations.
8        Q.   When you say the summary, to what are
9    you referring?
10       A.   The framework of the deal which goes
11   back to some of the things that we talked about
12   earlier that there was a headline price, there
13   were a series of assets and a series of
14   liabilities and there was the commitment that it
15   would be capital accretive to the best of our
16   knowledge.
17       Q.   Who from your team talked to you about
18   what had been said at the bankruptcy court
19   hearing?
20       A.   I think I just said, I didn't get a
21   report on what was said.
22       Q.   Did you have any discussion with
23   Mr. Klein about the bankruptcy court hearing?
24       A.   I don't recall any discussion. It was

## Page 207

DIAMOND - HIGHLY CONFIDENTIAL

1    the e-mail that we saw earlier but I don't recall
2    any discussion.
3        Q.   Did Mr. Klein tell you that the judge
4    had been told that cash was excluded from the
5    deal?
6        A.   I think I answered that.
7            MR. HUME: Objection, asked and
8    answered.
9        Q.   Do you have any recollection of
10   Mr. Klein telling you that?
11       A.   I think I answered that.
12       Q.   You have no such recollection?
13       A.   I think I answered that.
14       Q.   I want to know, sir, is that your
15   answer, that you have no such recollection?
16       A.   I am happy to have you play back my
17   answer.
18       Q.   Let me ask you this then, do you have
19   any recollection of Mr. Klein telling you anything
20   on that subject beyond what you have testified to?
21       A.   I think I can comfortably go back to
22   what I said and really try and stay focused and
23   consistent. I don't recall any reports of what
24   was said at the bankruptcy, nor was I there.

## Page 208

DIAMOND - HIGHLY CONFIDENTIAL

1        Q.   Did you understand that cash was
2    excluded from this transaction?
3        A.   I understood what I told you I
4    understood, which is that there was a group of
5    assets and a group of liabilities that we agreed
6    on. The result of that would be the headline
7    price that we talked about, the assets and
8    liabilities that we talked about, the very, very
9    high degree of confidence, notwithstanding
10   incredible stress, pressure, volatility,
11   uncertainty in the markets that we could be
12   capital accretive. But I think on detail levels
13   below that, we had delegated that and I wasn't
14   involved in that.
15           So I think specifics of -- specific
16   pieces within that, there are some that we have
17   talked about that I had knowledge of, but
18   technical things like that, I wasn't part of
19   the discussion.
20       Q.   We talked about the period up to
21   people leaving for the bankruptcy court. Did you
22   have any discussion -- what was the last
23   discussion you had with Mr. Ricci before your team
24   departed for the bankruptcy court?

## Page 209

DIAMOND - HIGHLY CONFIDENTIAL

1        A.   I don't recall.
2        Q.   You used the term "signed off." What
3    did you mean by that?
4        A.   I don't recall using that, how do I
5    use it?
6        Q.   It was a lengthy answer you gave on
7    the Livenote at transcript 183, line 14. "Right
8    until the 11th hour, right until the 59th minute,
9    we were unsure if we would get the people required
10   from the Lehman Brothers to the bankruptcy court.
11   It was a Lehman Brothers presentation to the
12   bankruptcy court not Barclays. It was their
13   presentation. So much so I think they took the
14   tube not a car because the traffic was so bad and
15   they wouldn't have gotten there on time. So it
16   was right until the last minute and there did come
17   a point, I don't recall when, that we had signed
18   off on the deal which was being presented by
19   Lehman was substantially the deal. But it was a
20   Lehman presentation, so I wasn't part of it."
21           What did you mean by sir by your
22   reference to "signed off" in that answer?
23       A.   I think it was broadly speaking let's
24   get them down to make their presentation.

## Page 210

DIAMOND - HIGHLY CONFIDENTIAL

2  Q.  Did you preview the presentation that
3  was being made?
4      MR. HUME: Objection, vague.
5  A.  I did not.
6  Q.  Did you have any understanding as to
7  the content of the presentation that Lehman was
8  making?
9      MR. HUME: Objection, vague and lacks
10  foundation.
11  A.  It was a Lehman presentation, it
12  wasn't a Barclays presentation.
13  Q.  Did you have any discussion with
14  anyone at Barclays about that presentation?
15  A.  About the presentation?
16  Q.  Yeah.
17  A.  Not that I recall.
18  Q.  How about with anyone at Lehman?
19  A.  Not that I recall.
20  Q.  Did you and Mr. Ricci have any
21  discussion prior to people departing for the
22  bankruptcy court as to whether Barclays should go
23  forward with the deal or simply tell Lehman that
24  there was no point to making a presentation to the
25  court because Barclays was not interested in

## Page 211

DIAMOND - HIGHLY CONFIDENTIAL

2  proceeding?
3  A.  I think I answered that, there were
4  many times during the day including very, very
5  close to the end where we were unclear whether or
6  not we could get to a deal.
7  Q.  I am looking for last --
8  A.  I don't recall a specific conversation
9  at the end. I wouldn't be surprised. It was a
10  very stressful day. As I said, I was -- I was
11  clearly not trying to get involved in the
12  negotiations. Rich was completely capable of that
13  and was the guy on the spot. I was in and out of
14  conference rooms. I was hearing some things, but
15  I was definitely not -- I was waiting for Rich to
16  tell me whether we could go forward or not. I
17  don't have any specific recollection of sitting
18  down with him and saying kind of this is the
19  moment that we go. It was very, very rushed at
20  the end.
21  Q.  You don't recall a specific
22  conversation in which Mr. Ricci told you we can go
23  forward, but that was your understanding?
24  A.  Yeah, I -- I don't recall the moment.
25  It is a good question, but I don't recall the

## Page 212

DIAMOND - HIGHLY CONFIDENTIAL

2  moment.
3  Q.  But that was in what, sometime mid
4  afternoon around the time they left the bankruptcy
5  court? Is that what you are talking about?
6  A.  My recollection -- and these days just
7  blended one into the other, but my recollection
8  was they needed to be downtown at 4, but it might
9  have been 5, so it was right up until the end. I
10  can't remember if -- maybe the hearing was at 5
11  and they had to leave by 4, it was somewhere
12  around there. I would have said late afternoon.
13  Q.  The cut-off is somewhere around late
14  afternoon?
15  A.  Yeah.
16  Q.  And your conversation with Mr. Ricci
17  it was OK to go forward would have been sometime
18  right around close to the --
19  A.  We had -- we had previously agreed
20  this is what we need to go forward and if he got
21  to what he needed, it was -- we were going to go
22  down.
23      So within that, within that -- yeah.
24  Our intent was to get to what we knew we
25  needed. I think the -- I am probably saying

## Page 213

DIAMOND - HIGHLY CONFIDENTIAL

2  more than you need, but I'm just repeating the
3  issue that was so fearful was because of the
4  complete chaos and lack of control, could we
5  find assets that were trustworthy and were
6  appropriate.
7  Q.  But in any event, you reach by mid or
8  late afternoon the conclusion that it was -- you
9  would go ahead.
10  A.  That we would authorize Lehman to make
11  the presentation, yes, and we would be there,
12  right.
13  Q.  Did you understand that Barclays was
14  going to address the court?
15  A.  I wasn't aware that Barclays addressed
16  the court. I thought it was Lehman, but as I
17  said, I made a decision for a number of reasons
18  not to join the group. I probably -- partly for
19  my mental health.
20      But also we felt quite strongly that
21  it would just attract media if I were there and
22  other people were there and we wanted it, to
23  the extent possible because this is already a
24  media event, to be able to get the facts out
25  and be able to get it so it would be

## Page 214

DIAMOND - HIGHLY CONFIDENTIAL

1 inappropriate for me to be there.
2     It turns out it was such a length of
3 time, I think it was a right decision and
4 probably would have been awfully grueling and
5 emotionally wearing. But I did not intend to
6 go to it.
7     Q.    I ask you now to focus on the period
8 following the bankruptcy court hearing. So that's
9 from any time between the conclusion of that
10 hearing and the closing of the transaction on
11 Monday morning.
12     A.    OK.
13     Q.    At any time in that period of time
14 that you had discussion with Mr. Ricci that
15 Barclays would not go forward with the
16 transaction --
17     A.    It sounds stark the way you are saying
18 it, so I would say it slightly differently, that
19 from late Sunday evening when the discussions took
20 place between Rich and Jonathan and our lawyers
21 and our advisors and Frank Bisignano and Steve
22 Cutler and the JP Morgan team, around all
23 aspects -- and I don't mean to be specific here,
24 so I apologize, and I am trying to make it

## Page 215

DIAMOND - HIGHLY CONFIDENTIAL

1 general, but things like where are the securities,
2 are they perfected, who is going to do cash versus
3 who is going to do securities versus how do we
4 open in the morning so that we can clear trades.
5 This is a firm that had been bankruptcy for a week
6 and stuff was all over the place.
7     Those conversations were incredibly
8 stressful. My memory is they started before
9 Sunday night, but they got to a point where it
10 really looked like we might not open Monday
11 morning.
12     So that was a, as I testified earlier,
13 is my recollection is it was Sunday evening at
14 some point when Jamie Dimon and I discussed on
15 the phone that we should try and find a way to
16 get a transaction done and that I would empower
17 Rich, he didn't have to come and check
18 everything with me, I would empower him within
19 the criterion that he could do it and Jamie
20 would empower -- I'm pretty sure it was Frank
21 Bisignano and there were many phone calls
22 during the night because I frankly couldn't
23 sleep and I kept trying to contact Rich, how it
24 was going, and it was, I think it was 5, 5:30

## Page 216

DIAMOND - HIGHLY CONFIDENTIAL

1 in the morning when we had to open, you know,
2 when the wire opened. So it was very, very
3 close. I don't have a lot of specifics, but it
4 was touch-and-go during the night.
5     Q.    And you have referred specifically to
6 issues with, involving JP Morgan?
7     A.    Yes.
8     Q.    Did Mr. Ricci and you have any
9 discussions about any changes to the transaction
10 over that weekend?
11     A.    I know there were all kinds of ins and
12 outs and things going on. But basically, the
13 structure and components of the deal that we
14 were -- we agreed to go on Monday morning were the
15 structure and components of the deal that we were
16 given coming out of the bankruptcy court Saturday
17 morning.
18     I suspect they were minor ins and outs
19 and overs and unders and that's what they were
20 negotiating, but the structure was by and large
21 and pieces were by and large consistent and
22 appropriate with exactly what was approved.
23     Q.    Do you know whether there were any
24 significant changes between the bankruptcy court

## Page 217

DIAMOND - HIGHLY CONFIDENTIAL

1 hearing and the closing?
2     A.    I don't think -- the key all hinges on
3 what do we mean by "significant." So I will go
4 back to what I said. I think the structure, the
5 spirit, the context of the transaction was in
6 place to open Monday morning, but it was very
7 stressful getting there with all kinds of
8 settlement issues and this and that, but it was on
9 balance the transaction.
10     Q.    If I made 500 million dollars the
11 definition of the word "significant," are you
12 aware of any changes, any significant changes to
13 the transaction over that weekend?
14     MR. HUME:    Objection as a vague
15 question, Bill. 500 million dollars, what,
16 asset, liability, asset net of liability?
17     MR. MAGUIRE:    The witness said is
18 there any -- it is significant is whatever
19 the terms are, so I am putting the term 500
20 million dollars.
21     Q.    Are you aware of any change to either
22 party of anything in the amount of 500 million
23 dollars over that weekend?
24     A.    I can't answer the question the way it

Page 218

DIAMOND - HIGHLY CONFIDENTIAL

1  is asked. Let me explain why. There could be a
2  change because something moved from 500 million
3  long bonds to a billion Treasury bills or a
4  billion Treasury bills were the same as 500
5  million long bonds and someone could interpret
6  that as 500.
7       So there was no value, significant
8  value shift of any kind. There were ins and
9  outs and small things and I am understanding,
10  again, I wasn't at the coal face, but we had a
11  deal, a structure, a component that was in
12  context and principle and degree and kind what
13  was approved and I think the clearing bank and
14  Barclays had small ins and outs and various
15  things going on between them.
16      Q.   You are saying there may have been
17  substitutions but you are not aware of any change
18  in overall value over that weekend, is that
19  correct?
20           MR. HUME: Objection, vague.
21      Objection, vague, mischaracterizes the
22      testimony.
23      A.   I think I said it well. I think in
24  degree, in kind, in substance and structure, the

Page 219

DIAMOND - HIGHLY CONFIDENTIAL

1  transaction that was approved was executed. It
2  was hell getting there overnight because of the
3  chaos and the clearing systems and particularly
4  around Lehman, so there were all kinds of things
5  being negotiated at the margin and at the edges.
6      Q.   You mentioned in your earlier
7  testimony a 15c3. Can you tell me, do you
8  understand that a 15c3 account is a customer
9  reserve account?
10      A.   In general, I understand that.
11      Q.   And you understand that that is an
12  account that a broker/dealer is required to keep
13  the minimum amount of assets to make sure that
14  customers will be paid back their property?
15      A.   I would rather not get into what I
16  know and don't know because I'm not an expert in
17  that regard.
18      Q.   I am not asking you for an expert
19  definition. I am asking you as layperson, is that
20  broadly the understanding that you have?
21      A.   I'm not an expert in the area. I know
22  that, as I said this morning, I know that giving
23  access -- sorry, giving assurances that all of the
24  excess in that account belonged to Lehman and that

Page 220

DIAMOND - HIGHLY CONFIDENTIAL

1  Lehman was willing to make that Barclays' in order
2  to get the assets to where they had committed to
3  get them was something that came up late Friday.
4  But to give more specificity than that would be
5  difficult. Rich was really at the coal face and
6  negotiating, but I know that was something that
7  the Lehman team felt comfortable and offered.
8      Q.   You understood what they were
9  discussing and negotiating was the excess in that
10  account?
11           MR. HUME: Objection, lacks
12      foundation.
13      A.   Again, the discussion on -- certainly
14  the customers were due, the customer, whatever it
15  was, assets and liabilities, those were the
16  customers', those were not Lehman's.
17           MR. HUME: Can we take a break after
18      you ask a few more questions.
19           MR. MAGUIRE: I think we can finish
20      out probably in five minutes so I will try
21      to do that.
22      Q.   Now, did you understand that
23  regulatory approval was required in order for
24  Lehman to transfer the excess amounts in its 15c3

Page 221

DIAMOND - HIGHLY CONFIDENTIAL

1  account?
2      A.   That was again something that was
3  being worked on at the coal face.
4      Q.   When you say the coal face --
5      A.   The people that were actually -- the
6  workers.
7      Q.   Mr. Ricci was the miner?
8      A.   Ricci and the Lehman team and the
9  others, but certainly not something that I was
10  involved in on a day-to-day basis.
11      Q.   Did Mr. Ricci have authority to enter
12  into a deal in which the 15c3 asset, its transfer
13  was contingent on there being an excess in that
14  account?
15      A.   I'm not sure I understand the
16  question.
17      Q.   Did -- let me give a different
18  question then. Did Mr. Ricci ever advise you that
19  the 15c3 asset was contingent on regulatory
20  approval?
21      A.   My understanding is that there were
22  many things during this transaction that required
23  various approvals as you go through. That's the
24  nature of the business that we are in. I think in

Page 222

DIAMOND - HIGHLY CONFIDENTIAL

1    specific was there a specific meeting on that, I
2    don't recall. There may have been, but I don't
3    recall.
4        Q.    And when we talk about the excess in
5    the account, did you understand that there was
6    uncertainty at Lehman as to whether there was an
7    excess in the 15c3 account?
8        MR. HUME: Objection, lacks
9    foundation.
10        A.    You are asking specific questions
11    about a conversation that I wasn't there for.
12    That would be -- if there was a conversation about
13    that, that would be on the detailed level.
14        Q.    You did understand there was chaos
15    this week, is that correct?
16        A.    Certainly.
17        Q.    And you understood there was
18    difficulty in getting fully reliable information
19    from Lehman, is that correct?
20        A.    I have said that, yes.
21        Q.    So did you understand that with
22    respect to any excess in the 15c3 account, that it
23    would be difficult to determine with certainty
24    whether, in fact, there was any such excess?

Page 223

DIAMOND - HIGHLY CONFIDENTIAL

1        A.    With all due respect, Barclays was
2    trying to execute a transaction that would be good
3    for Barclays, good for our shareholders, good for
4    our employees, good for our clients but equally
5    would be good for the financial system and good
6    for Lehman and good for Lehman's clients and good
7    for Lehman's employees and save 10,000 jobs.
8        We are doing this in the midst of the
9    most turmoil that had ever struck the financial
10    markets with a firm that had been in bankruptcy
11    for four or five days, and so we are working hard
12    with Lehman and we certainly trusted, as much as
13    we could, their good intent to be able to deliver
14    the assets that we had talked about. And I think
15    everyone knows what the intents were here and that
16    was to deliver the value that we had talked about.
17        And I think to probe, scratch way
18    beneath that and get the chief executive to
19    discuss minutiae when you have had an
20    opportunity to discuss that with people at the
21    coal face is inappropriate. So I can't help
22    you in that regard because I wasn't at any of
23    those meetings.
24        Q.    Did anybody at the coal face tell you

Page 224

DIAMOND - HIGHLY CONFIDENTIAL

1    that there was certainty concerning the excess in
2    the 15c3 account?
3        MR. HUME: Objection, vague and
4    ambiguous.
5        A.    You are adding two questions together.
6    I didn't have any detailed conversations at all
7    about it, so to then infer there was certainty or
8    uncertainty, I didn't have conversations about it,
9    period. So I wouldn't want it inferred that we
10    were uncertain or certain. That was a
11    conversation that I think it would be appropriate
12    to ask Rich and you did have a chance.
13        Q.    Absolutely, thank you.
14        Did Mr. Ricci ever give you to
15    understand that there was certainty concerning the
16    excess in the 15c3 account?
17        MR. HUME: Objection, asked and
18    answered.
19        A.    I am not going to answer it.
20        Q.    You have nothing to add to your
21    previous answer?
22        A.    Correct.
23        Q.    Did anyone ever give you to understand
24    that there were other assets that Lehman had that

Page 225

DIAMOND - HIGHLY CONFIDENTIAL

1    were available for the sale but that Mr. Ricci had
2    not managed to include within the scope of the
3    sale?
4        A.    That's such a general question. I
5    don't know if I --
6        Q.    Let me try to put it a little
7    differently then. Did Mr. Ricci ever tell you
8    that he had succeeded in getting all available
9    assets that could be gotten and included in the
10    sale?
11        MR. HUME: Objection, vague. I don't
12    know what you mean by "available."
13        A.    I think the conclusion we came to is
14    that, you know, we set out with very clear
15    objectives in terms of the pool of assets, the
16    pool of liabilities, the capital accretion, and it
17    was very difficult getting there. And in that
18    process, there were many times when things looked
19    available and turned out not to be available and
20    it is possible -- and later on they turned out to
21    be available or not available. So it was a
22    difficult process.
23        Q.    Did Mr. Ricci ever tell you that he
24    had gotten all the assets that could be gotten

Page 226

DIAMOND - HIGHLY CONFIDENTIAL

1  from Lehman?
2  A.  I don't recall a conversation like
3  that.
4  Q.  You mentioned a number of
5  constituencies here including employees and so on.
6  Did you understand that it was an important
7  premise of this deal also to protect the customers
8  of Lehman?
9  A.  From what?
10 Q.  From any loss of their property?
11 A.  I have to be careful how I say this.
12 It is not meant to be overly legalistic or under
13 legalistic, but our obligation to the clients
14 would start when we were owners of the business,
15 not before that.
16 Q.  So you felt Barclays had no legal
17 obligation of any kind to any customers of Lehman,
18 at least until they actually came over and became
19 customers of Barclays?
20 A.  I feel that's too general and I feel
21 too broad, but it was a, you know, there is a --
22 there are obligations -- I mean, I think it is
23 clear in law where the obligations were and the
24 obligations weren't.  Is there anything specific

Page 227

DIAMOND - HIGHLY CONFIDENTIAL

1  that you were wondering about?
2  Q.  Let me ask you your understanding
3  about the regulators, did you understand that it
4  was important to the regulators to protect the
5  customers of Lehman?
6  A.  Any particular customers, wholesale,
7  retail, all?
8  Q.  All.
9  A.  Which regulators?
10 Q.  Well, let's start with the SEC.  Did
11 you understand that it was important to the SEC to
12 protect customers of Lehman?
13 A.  Where customers had perfected
14 securities.
15 Q.  Customers who had any property at
16 Lehman?
17 A.  Again, I think it is too broad.  So
18 was it the SEC that was the -- it is just too
19 broad for me to answer.  Of course everyone cared,
20 but then there is -- I'm not sure I am the right
21 one from a legal point of view to differentiate
22 the different types of customers, custody accounts
23 versus transactions that were the holding company
24 or broker/dealer, it was quite confusing.

Page 228

DIAMOND - HIGHLY CONFIDENTIAL

1  Q.  I don't want to get into those
2  distinctions.  I am asking you did you have an
3  understanding at the time that it was important to
4  the SEC that customer property should be protected
5  in the sale?
6  A.  I didn't have any conversations with
7  the SEC.
8  Q.  Did you have an understanding at the
9  time that it was important to the Federal Reserve
10 that customer property should be protected?
11 A.  By whom?
12 Q.  In the transaction?
13 A.  By Lehman?
14 Q.  That the effecting of the transaction
15 should not prejudice customers or their property?
16    MR. HUME:  Objection, vague.  Are you
17 asking him whether the transaction benefited
18 customers?
19    MR. MAGUIRE:  No.
20 A.  I worry here that I am going to slip
21 up on a legal definition and I don't mean to.  But
22 what I would say is I think that the regulators
23 were looking to Barclays only at the point that
24 Barclays was an owner.  And only so much as it was

Page 229

DIAMOND - HIGHLY CONFIDENTIAL

1  an entity that was owned by Barclays and there
2  were so many entities.
3  Q.  Yeah, I want to -- I don't want to get
4  into the legal niceties and legal obligations
5  because that's not my question.  I want to ask you
6  as a matter -- first of all, let me strike that
7  and say, did you understand that the SEC supported
8  the transaction?
9  A.  To the -- the Barclays acquisition?
10 Q.  Yeah.
11 A.  That's my understanding.
12 Q.  Did you understand that the Federal
13 Reserve supported the transaction?
14 A.  That's my understanding.
15 Q.  Did you understand that the Securities
16 Investment Protection Corporation supported the
17 transaction?
18 A.  I don't have any specific knowledge on
19 that, I'm not close to SIPC.  I understood that
20 the support was pretty broad on the regulatory
21 side.
22 Q.  Are you aware that the mission of the
23 SEC is to protect investors?
24 A.  I think the SEC's obligation in this

Page 230

DIAMOND - HIGHLY CONFIDENTIAL
1
2  regard was as the primary regulator of the U.S.
3  broker/dealer, wasn't it?
4      Q.   Do you understand that the mission of
5  the SEC is to protect investors?
6          MR. HUME: Objection, lacks
7  foundation.
8      Q.   If you don't have that understanding,
9  say so.
10     A.   I'm not aware of the mission statement
11 of the SEC.  What I was aware was they were the
12 primary regulator of the U.S. broker/dealer of
13 Lehman Brothers.
14     Q.   Did you understand that the SEC is the
15 regulator responsible for making sure that
16 customer property is protected?
17     A.   I am generally aware of the
18 responsibilities of the regulators.  I worry that
19 you are asking me specifics that I may not be best
20 at answering.
21     Q.   That goes beyond -- that goes to a
22 level of detail where -- beyond your
23 understanding, is that correct?
24     A.   What does?
25     Q.   What I asked you?

Page 231

DIAMOND - HIGHLY CONFIDENTIAL
1
2      A.   Why don't we try again.
3      Q.   OK, do you have an understanding that
4  the SEC -- that it is important to the SEC to
5  protect customers of a broker/dealer?
6          MR. HUME: Objection, lacks
7  foundation.  You are asking him to talk
8  about what is important to the SEC?
9          MR. MAGUIRE: No, I am asking him for
10 his understanding.  He has that
11 understanding or he does not.  Just let me
12 know.
13     A.   So say it again.
14     Q.   Let me try it a little differently.
15 Do you have an understanding that the SEC is the
16 regulator responsible for making sure that
17 customer property of the broker/dealer is
18 protected?
19     A.   I think -- I think there are various
20 regulators that have overlapping responsibilities
21 there.
22     Q.   Do you understand that the SEC is one
23 of those regulators?
24     A.   I'm not close enough to understand who
25 has primacy there or who is responsible.

Page 232

DIAMOND - HIGHLY CONFIDENTIAL
1
2      Q.   Did you have an understanding that any
3  regulator was responsible for protecting customer
4  property?
5      A.   My understanding is when the
6  regulators made a decision to force bankruptcy,
7  that they recognize that many customers would lose
8  money and that there was a difference between
9  customers who might have risk positions on as
10 opposed to customers who had custodian accounts,
11 for example.
12          So it is quite a complex area and I
13 have high admiration and confidence in those
14 regulators to protect customers in those
15 situations, but I also recognize that we have
16 been dealing for a year with many customers who
17 did not have securities in custody who are
18 still working with the bankruptcy court and
19 regulators and other people that got their
20 securities back so I hope that the regulators
21 work through this.
22     Q.   Did you understand it was important to
23 the regulators that customer property be
24 protected?
25     A.   I would always imagine that regulators

Page 233

DIAMOND - HIGHLY CONFIDENTIAL
1
2  would care about customers, yes.
3          MR. HUME: Can we take a break?  Are
4  you finished?
5          MR. MAGUIRE: Finish.  Do you have
6  questions?
7          MR. DAKIS: Just a few.
8          MR. HUME: Can we have a two-minute
9  break?
10         MR. DAKIS: Of course.
11         (Recess)
12 EXAMINATION BY
13 MR. DAKIS:
14     Q.   I am Robert Dakis from the law firm of
15 Quinn, Emanuel, Urquhart, Oliver & Hedges.  We
16 represent the committee of unsecured creditors.  I
17 wanted to ask you some follow-up questions about
18 something that Mr. Gaffey asked you about earlier.
19         Earlier today, you testified that you
20 had a conversation with Heidi Miller regarding
21 Barclays' decision not to roll the repo.  Do
22 you recall that testimony?
23     A.   Yes.
24     Q.   And during that testimony, I believe
25 you said that youk had explained to Ms. Miller

Page 234

DIAMOND - HIGHLY CONFIDENTIAL
1
2    Barclays' reasons for not renewing the repo.  Do
3    you recall that?
4        A.   No.
5        Q.   Do you recall the sum and substance of
6    your conversation with Ms. Miller?
7        A.   Yes.
8        Q.   Could you tell us, please.
9        A.   The sum and essence was an initial
10   feeling that we had made a commitment to continue
11   rolling a day-to-day repo and I said, actually, I
12   don't know where you had that basis.  And I
13   mentioned a couple of people and I said Gerard
14   didn't do it, I've talked to all the people.
15   Possibly it came from someone at Lehman Brothers
16   and Heidi, you and I have never talked before.
17   And the roll-up conversation was, I'm sorry,
18   you're right, the conversation, my people are
19   reporting to me was someone from Lehman Brothers,
20   not someone from Barclays, and you're right, you
21   didn't make any commitments.
22       Q.   Going back to the first conversation,
23   did you at all give any reason why Barclays didn't
24   roll the repo?
25       A.   No.

Page 235

DIAMOND - HIGHLY CONFIDENTIAL
1
2        Q.   Do you have any understanding about
3    why Barclays didn't roll the repo?
4        A.   It is not an obligation, it is a
5    choice, and again, to use an often used phrase,
6    that choice was really driven by the people at
7    coal face.
8        Q.   Who would be the people who would have
9    the best knowledge about why the repo wasn't
10   rolling?
11       A.   It would be in the operations area, so
12   probably someone reporting in to Gerard Larocca.
13       Q.   Aside from these two conversations
14   that you mentioned, the first one with Ms. Miller
15   and second one was Ms. Miller and some other
16   people, did you have any conversations with anyone
17   at JP Morgan Chase regarding this repurchase
18   agreement?  This is the repo that didn't roll, not
19   the larger one.
20       A.   Yes.
21       Let me give you the framework and then
22   tell me if you want more specifics.  There was
23   a continuing disappointment or anger, depending
24   on your point of view, that we didn't roll.
25   Why there was an expectation that we would, I'm

Page 236

DIAMOND - HIGHLY CONFIDENTIAL
1
2    not really sure, but it was not an obligation
3    and it was just a commercial decision not to.
4    And there was no indication given or commitment
5    given to do it.
6        Yet it kept coming back, so I had
7    actually two conversations that first day with
8    Heidi, the first one and then the follow-up
9    when she came back to me -- and I'm pretty sure
10   the only other conversation I had with Heidi
11   ever was the, I think I said Friday evening
12   earlier it was actually Thursday evening when
13   we stepped into the Fed repo.  And I talked to
14   the group of people where Heidi was one of
15   them.
16       I think during that conversation it
17   came up again as a -- but I'm not positive, it
18   did come up again certainly with the
19   discussions that Rich was having Sunday and
20   Sunday night a number of times.  I don't think
21   it came up in the conversation I had with Jamie
22   Dimon, but it may have, and I don't think it
23   did but it was a continuing source of friction
24   between us and it has continued to be.  I think
25   post the completion of the deal, there had been

Page 237

DIAMOND - HIGHLY CONFIDENTIAL
1
2    many other discussions about it, about -- it
3    always comes up when something else is coming
4    up, but nothing substantive, if that helps.
5        Q.   That does.  Just to follow up on
6    something, did you have any other -- you mentioned
7    a conversation with Jamie Dimon on Sunday night
8    regarding the Lehman transaction.  Did you have
9    any other conversations with Mr. Diamond regarding
10   the Lehman transaction?
11       A.   Before the close?
12       Q.   Before the close.
13       A.   That's a good question.
14       I think that's the only one.  I think.
15   I think that's the only one.
16       Q.   Any conversations regarding Lehman
17   Brothers after the close?
18       A.   Well, it was more regarding Barclays
19   after the close if that's what you mean.  It was
20   one more conversation during the difficulties of
21   resolving the 7 billion dollars that was taken out
22   of custody.
23       Q.   And what was the sum and substance of
24   that conversation?
25       A.   Him asking us to sit down and -- him

Page 238

DIAMOND - HIGHLY CONFIDENTIAL

1
2  asking me to sit down with his team or have my
3  team sit down with his team to try and work it out
4  and me saying, Jamie, you took 7 billion dollars
5  out of a custody account, it's against the law, if
6  you put it back we will sit down and discuss it
7  but not until then.
8        MR. DAKIS:  I have nothing further.
9        MR. HUME:  Thanks.
10        (Time noted: 4:18 p.m.)
11
12        _____
13        ROBERT EDWARD DIAMOND, JR.
14  Subscribed and sworn to
15  before me this    day
16  of September, 2009.
17
18        _____
19
20
21
22
23
24
25

Page 239

DIAMOND - HIGHLY CONFIDENTIAL
INDEX:

| WITNESS | EXAM BY: | PAGE: |
|---|---|---|
| R. Diamond | Mr. Gaffey | 6 |
| | Mr. Maguire | 185 |
| | Mr. Dakis | 233 |

EXHIBITS

| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 412-A Document Bates stamped | | 153 |
| BCI-EX-S 25413 | | |
| Exhibit 413-A Document Bates stamped | | 164 |
| BCI-EX-S 79546 | | |

Page 240

DIAMOND - HIGHLY CONFIDENTIAL

1
2
3        CERTIFICATE
4  STATE OF NEW YORK )
5                )ss:
6  COUNTY OF NEW YORK )
7        I, MARY F. BOWMAN, a Registered
8  Professional Reporter, Certified Realtime
9  Reporter, and Notary Public within and for
10  the State of New York, do hereby certify:
11        That ROBERT EDWARD DIAMOND, JR., the
12  witness whose deposition is hereinbefore set
13  forth, was duly sworn by me and that such
14  deposition is a true record of the testimony
15  given by such witness.
16        I further certify that I am not
17  related to any of the parties to this action
18  by blood or marriage and that I am in no way
19  interested in the outcome of this matter.
20        In witness whereof, I have hereunto
21  set my hand this 11th day of September,
22  2009.
23
24        _____
25        MARY F. BOWMAN, RPR, CRR

Page 241

DIAMOND - HIGHLY CONFIDENTIAL
* * *ERRATA SHEET* * *

1
2
3  NAME OF CASE:  In Re: Lehman
4  DATE OF DEPOSITION: 9/11/09
5  NAME OF WITNESS:  ROBERT EDWARD DIAMOND, JR.
6  Reason codes:
7     1. To clarify the record.
       2. To conform to the facts.
8     3. To correct transcription errors.
9
10  Page ____ Line ____ Reason____
11  From _____ to_____
12  Page ____ Line ____ Reason____
13  From _____ to_____
14  Page ____ Line ____ Reason____
15  From _____ to_____
16  Page ____ Line ____ Reason____
17  From _____ to_____
18  Page ____ Line ____ Reason____
19  From _____ to_____
20  Page ____ Line ____ Reason____
21  From _____ to_____
22  Page ____ Line ____ Reason____
23  From _____ to_____
24
25        _____
         ROBERT EDWARD DIAMOND, JR.

# BCI EXHIBIT

# 64

Page 1

1

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4     ------------------------------x
      In Re:                    Chapter 11

5     LEHMAN BROTHERS           Case No. 08-13555 (JMP)
      HOLDINGS, INC., et al.,     (Jointly Administered)

6     ------------------------------)

7

8        * * * HIGHLY CONFIDENTIAL * * *

9        DEPOSITION OF PAUL EXALL

10          New York, New York

11        Thursday, August 27, 2009

12

13

14

15

16

17

18

19

20    Reported by:

      FRANCIS X. FREDERICK, CSR, RPR, RMR

21    JOB NO. 24380

22

23

24

25

Page 2

```
1
2
3
4              August 27, 2009
5              9:30 a.m.
6
7
8
9        HIGHLY CONFIDENTIAL deposition of
10   PAUL EXALL, held at the offices of Jones
11   Day, 222 East 41st Street, New York, New
12   York, pursuant to Notice, before Francis
13   X. Frederick, a Certified Shorthand
14   Reporter, Registered Merit Reporter and
15   Notary Public of the States of New York
16   and New Jersey.
17
18
19                        .
20
21
22
23
24
25
```

Page 3

```
1
2   A P P E A R A N C E S:
3
4   JONES DAY, LLP
5   Attorneys for Lehman Brothers, Inc.
6       222 East 41st Street
7       New York, New York  10017-6702
8   BY:  WILLIAM J. HINE, ESQ.
9        GEORGE E. SPENCER, ESQ.
10
11   BOIES SCHILLER & FLEXNER, LLP
12   Attorneys for Barclays Capital
13       333 Main Street
14       Armonk, New York  10504
15   BY:  CHRISTOPHER M. GREEN, ESQ.
16
17   HUGHES, HUBBARD & REED, LLP
18   Attorneys for the SIPA Trustee
19       1175 I Street, N.W.
20       Washington, D.C.  20006-2401
21   BY:  JOHN F. WOOD, ESQ.
22
23
24
25
```

Page 4

```
1
2   A P P E A R A N C E S:  (Cont'd.)
3   JENNER & BLOCK, LLC
4   Attorneys for the Examiner
5       330 N. Wabash Avenue
6       Chicago, Illinois  60611-7603
7   BY:  VINCENT LAZAR, ESQ.
8
9
10   ALSO PRESENT:
11       INGRID M. CHRISTIAN, Alvarez & Marsal
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1   PROCEEDINGS - HIGHLY CONFIDENTIAL
2       (Deposition Exhibit 279B, Debtors'
3   First Rule 30(b)(6) Deposition Notice to
4   Barclays on Issues Pertaining to Accrued
5   08 FY Liability Under the Asset Purchase
6   Agreement, marked for identification as
7   of this date.)
8                    * * *
9   P A U L   E X A L L,  called as a witness,
10       having been duly sworn by a Notary
11       Public, was examined and testified as
12       follows:
13   EXAMINATION BY
14   BY MR. HINE:
15       Q.   Good morning, Mr. Exall.  We met
16   off the record.  My name is Bill Hine.  I'm
17   from Jones Day which is a law firm that
18   represents the estate of Lehman Brothers
19   Holding, Inc. in connection with some
20   bankruptcy proceedings that are going on with
21   respect to Lehman.  And this deposition is
22   taking place in connection with that.
23       Have you ever been deposed before?
24       A.   No.
25       Q.   I'm sure your counsel has advised
```

Page 6

**P. EXALL - HIGHLY CONFIDENTIAL**

1    you what's going to happen here but basically
2    I'm going to ask you a series of questions.
3    You're under oath. You're going to answer the
4    questions as best you can.
5         At some point during the
6    deposition you might hear your attorney voice
7    an objection to either preserve an objection
8    or challenge a question that I might ask.
9    That doesn't relieve you of the obligation to
10   answer the question. You still have to answer
11   the question. I might change the question in
12   response to his deposition -- to his objection
13   but unless he instructs you not to answer you
14   still have to answer the question. Okay?
15        A.   I understand.
16        Q.   In that regard if I ask a question
17   that's a little bit confusing or I misuse a
18   term that you folks use or an abbreviation
19   that you folks use, please correct me and ask
20   me to clarify the question. I want to have a
21   clear question so I can get a clear answer,
22   okay?
23        A.   Okay.
24        Q.   Did you prepare at all for today's

Page 7

**P. EXALL - HIGHLY CONFIDENTIAL**

1    deposition?
2         A.   Yes, I did.
3         Q.   How did you do that?
4         A.   I obviously met with counsel and
5    prepared over the course of the past week.
6    And I reviewed insofar as I could the
7    documentation and events around the time of
8    the acquisition insofar as I could recall them
9    and reference them.
10        Q.   Okay. Did any of those documents
11   refresh your recollection about anything in
12   connection with this litigation?
13        A.   Yes, they did. Yes.
14        Q.   Which documents are those?
15        A.   I don't recall. I mean, I read
16   through a lot of old e-mail correspondence and
17   things like that that I have in relation to
18   the matter. And I had discussions with people
19   that assisted me in the preparation of the
20   spreadsheet.
21        Q.   And you don't have any specific
22   document that refreshed your recollection
23   about that?
24        A.   Nothing specific.

Page 8

P. EXALL - HIGHLY CONFIDENTIAL

1         Q.   Okay. You're aware that you've
2    been asked to appear by Barclays as a 30(b)(6)
3    witness on specific topics, correct?
4         A.   Yes.
5         Q.   Okay. Well, let's start off with
6    the 30(b)(6) notice. I'm going to hand you a
7    copy of a document marked as Exhibit 279B
8    which is entitled Debtor's First Rule 30(b)(6)
9    Deposition Notice to Barclays on Issues
10   Pertaining to Accrued '08 FY Liability Under
11   the Asset Purchase Agreement.
12        And my question is have you ever
13   seen this deposition notice?
14        A.   I have.
15        Q.   Fair to say you reviewed this in
16   preparation for today's deposition?
17        A.   I have reviewed this, yes.
18        Q.   And if you look on Schedule A
19   which is the third page you'll see that you've
20   been designated as a 30(b)(6) witness in connection
21   with bonus and severance payments made to
22   former Lehman employees, right?
23        MR. GREEN: Object to the form of
24   the question. That's not all the

Page 9

P. EXALL - HIGHLY CONFIDENTIAL

1    schedule says.
2         MR. HINE: Okay.
3         Q.   But in general you're here to
4    testify about bonus and severance payments
5    made to former Lehman employees, right?
6         A.   I'm here to represent that --
7    what's represented on the schedule prepared in
8    respect to this deposition.
9         Q.   Okay. Now, that schedule is the
10   schedule -- the spreadsheet referenced in this
11   Schedule A?
12        A.   I believe it to be, yes.
13        Q.   And then a couple days ago we
14   received a replacement or an updated
15   spreadsheet so you understand that that's the
16   subject of today's deposition as well.
17        A.   I do.
18        Q.   Okay. We'll get to that later.
19   I'm done with that exhibit.
20        Well, before I finish on that did
21   you undertake any investigation in connection
22   with being a 30(b)(6) witness?
23        A.   What do you mean by that?
24        Q.   Well, did you look into any of the

Page 10

P. EXALL - HIGHLY CONFIDENTIAL

1   issues that are embodied in that spreadsheet
2   in preparation for today's deposition?
3       A.   I prepared the spreadsheet,
4   itself.
5       Q.   Okay.
6       A.   So I understand the items on it
7   and can testify to those.
8       Q.   Okay.  Could you just give me a
9   little background about yourself?  You're a
10  Barclays employee; is that correct?
11      A.   Barclays Capital employee, that's
12  correct.
13      Q.   And how long have you been with
14  Barclays?
15      A.   As a permanent employee I've been
16  with Barclays since April 2000.  Prior to that
17  I consulted with Barclays Capital from around
18  June 2008.
19          MR. GREEN:  You mean 1998?  Excuse
20  me.
21      Q.   I think you just lost me.
22      A.   1998, sorry.
23      Q.   All right.  Just so I have it, you
24  consulted with Barclays from June 1998 to

Page 11

P. EXALL - HIGHLY CONFIDENTIAL

1   April 2000?
2       A.   That's correct.
3       Q.   And from April 2000 you've been a
4   permanent employee of Barclays; is that right?
5       A.   That's right.
6       Q.   And in what capacity are you
7   employed by Barclays?
8       A.   Currently my job title would be
9   head of compensation analytics across
10  investment banking and investment management.
11      Q.   How long have you held that
12  position?
13      A.   I would estimate four -- three,
14  four, five years.
15      Q.   Okay.  And what were you before
16  that?
17      A.   I've been a director in HR for
18  several years.  The job role, itself, has
19  existed since -- it sort of -- it's become a
20  formal role so to speak.  I've been doing this
21  particular function for Barclays Capital, for
22  BGI, and for Barclays Wealth, over a period of
23  time since I joined the HR department.
24      Q.   Okay.  And is it fair to say that

Page 12

P. EXALL - HIGHLY CONFIDENTIAL

1   you've been in the HR department since you
2   came to Barclays?
3       A.   No, that's not correct.  Initially
4   in 2008 I joined the investment banking
5   finance department which then amalgamated into
6   the finance global department.  And I worked
7   there until approximately July 2001 when I
8   transferred down to HR.
9       Q.   Did any of your work prior to July
10  21 involve compensation issues?
11      A.   Insofar as it related to finance
12  matters and books and records of Barclays
13  Capital, yes.
14      Q.   Well, let me -- let's take a step
15  back.  If you were to describe your current
16  duties, could you just explain to me what your
17  duties and responsibilities are in your
18  current position?
19      A.   The primary responsibilities that
20  I assume are -- I work for Michael Evans as
21  the global head of HR across investment bank,
22  management.  And this way I can describe it -- the
23  this is the best way I can describe it -- the
24  liaison between Barclays Capital HR and -- or

Page 13

P. EXALL - HIGHLY CONFIDENTIAL

1   IBRAM HR because we span Barclays Global
2   Investors and Barclays Wealth, with the group
3   HR function and the board HR and remuneration
4   committee of Barclays PLC.  So any
5   compensation matters that require approval by
6   the remuneration committee under its terms of
7   reference as a committee of the board of
8   Barclays, those matters come through me
9   subject to approval by management.
10      Q.   Okay.  So --
11      A.   That's one of the primary roles.
12  The other functions I perform are some
13  analytical modeling around internal
14  compensation related matters for Barclays
15  Capital BGI and Wealth.
16      Q.   You keep saying different entities
17  here.  BGI is what?
18      A.   Yes.  Just to explain the
19  structure of what is known as investment
20  banking and investment management -- if you
21  look in the books -- in the published report
22  of the accounts of Barclays PLC there's
23  investment banking and investment management
24  and what's called GICB and then there's the

Page 14

1    P. EXALL - HIGHLY CONFIDENTIAL
2   group center. Investment Banking and
3   Investment Management comprise the three
4   businesses run by Mr. Diamond. Barclays
5   Capital, Barclays Global Investors, now
6   subject to the sale to Blackrock, and Barclays
7   Wealth.
8    **Q.   And your primary role is with that**
9   **group?**
10    A.   That's correct.
11    **Q.   And other groups you have a role**
12   **or not?**
13    A.   No.
14    **Q.   Okay. So did I understand you**
15   **correctly that you interface between that**
16   **group, the one run by Mr. Diamond, with**
17   **respect to compensation matters to the**
18   **committee of the board who approves**
19   **compensation; is that right?**
20    A.   Yes. I do not liaise directly
21   with them. We go through obviously our own
22   management who represent us on that committee.
23   And I liaise with the group HR function who
24   again represent them and others on that
25   committee.

Page 15

1    P. EXALL - HIGHLY CONFIDENTIAL
2    **Q.   Okay. So Mr. Evans is -- and what**
3   **is his title?**
4    A.   Mr. Evans is -- amongst other
5   things he's responsible for several
6   departments. I'll probably to get this wrong
7   but in my capacity he's global head of human
8   resources across global investment global
9   management.
10    **Q.   So you report to him?**
11    A.   I do.
12    **Q.   Do you report to anyone else**
13   **directly?**
14    A.   Not directly.
15    **Q.   Okay.**
16    MR. GREEN: Bill, I just want to
17   without giving a long speech say that
18   when you're getting background from Paul
19   of his understanding of the
20   organization, I mean this is just
21   background from him. He's not speaking
22   as a 30(b)(6) deponent in terms of
23   taking a position for the company on
24   what the organizational structure is.
25    MR. HINE: Fair enough.

Page 16

1    P. EXALL - HIGHLY CONFIDENTIAL
2    MR. GREEN: All right.
3   BY MR. HINE:
4    **Q.   So, Mr. Exall, could you explain**
5   **to me -- you're aware that this whole**
6   **proceeding and these depositions have to do**
7   **with the sale -- a transaction between Lehman**
8   **and Barclays that closed on or around**
9   **September 22nd, 2008, correct?**
10    A.   I understand that, yes.
11    **Q.   Okay. Could you just describe for**
12   **me generally any role you played in connection**
13   **with that transaction through -- what I'm**
14   **asking about is any role you played in the**
15   **negotiations of the transaction or the closing**
16   **or anything else related to it.**
17    MR. GREEN: Object to the form.
18   You may answer.
19    A.   I played no role whatsoever in any
20   negotiations whatsoever.
21    **Q.   Okay. So -- and, again, I just**
22   **want to get a sense of your general background**
23   **here. You were not involved in discussions**
24   **concerning the compensation provisions that**
25   **later made their way into the Asset Purchase**

Page 17

1    P. EXALL - HIGHLY CONFIDENTIAL
2   Agreement; is that right?
3    MR. GREEN: Objection to the form
4   of the question. You may answer.
5    A.   Could you repeat the question,
6   please?
7    **Q.   You were not involved, am I right,**
8   **in the negotiations or discussions concerning**
9   **the compensation provisions that later made**
10   **their way into the Asset Purchase Agreement in**
11   **this case; is that right?**
12    A.   That is right. I was not
13   involved.
14    **Q.   Okay. And how did you learn about**
15   **the compensation provisions that are embodied**
16   **in the Asset Purchase Agreement?**
17    MR. GREEN: Object to the form.
18    A.   I was passed a copy of the
19   purchase agreement by some colleagues in the
20   finance department.
21    **Q.   Okay.**
22    A.   And reading that and -- I came to
23   understand that there were some provisions in
24   there in relation to compensation.
25    **Q.   Okay. And were you passed -- when**

Page 18

P. EXALL - HIGHLY CONFIDENTIAL
1  P. EXALL - HIGHLY CONFIDENTIAL
2  were you passed that agreement?
3      A.   I can't recall the exact date but
4  it would have been on or around the 22nd of
5  September or shortly thereafter.
6      Q.   Okay.  And did you need to consult
7  that agreement to do your job from then on?
8      A.   It was a point of reference, yes.
9      Q.   Okay.  Were you passed any other
10  documents related to compensation in
11  connection with this transaction?
12      A.   Yes.
13      Q.   Like what?
14      A.   I requested to see a copy of the
15  schedule referred to in the APA.
16      Q.   Okay.
17      A.   The sale agreement.
18      Q.   Okay.
19      A.   And I was passed what was
20  represented to me as being that schedule.
21      Q.   Okay.  Anything else?
22      A.   I don't recall getting any other
23  specific sale-related documentation in that
24  regard, no.
25      Q.   Okay.  Have you ever seen a copy

Page 19

P. EXALL - HIGHLY CONFIDENTIAL
1  P. EXALL - HIGHLY CONFIDENTIAL
2  of the first amendment to the Asset Purchase
3  Agreement?
4      A.   I don't believe so, no.
5      Q.   Okay.  Fair to say you don't have
6  any use for that document in connection with
7  the work you've performed with respect to
8  compensating former Lehman employees?
9      MR. GREEN:  Object to the form of
10  the question.
11      MR. HINE:  It was a bad question.
12  Let me try again.
13      Q.   Is it fair to say you haven't had
14  need to consult with the first amendment of
15  the APA in connection with the work you
16  performed with respect to compensation for
17  former Lehman employees?
18      A.   I did not consult it.
19      Q.   Okay.
20      A.   Consequently, I do not know if I
21  needed to.
22      Q.   Okay.  Fair enough.
23      Have you ever seen a document
24  called a clarification letter that was agreed
25  to between Barclays and Lehman in connection

Page 20

P. EXALL - HIGHLY CONFIDENTIAL
1  P. EXALL - HIGHLY CONFIDENTIAL
2  with the Asset Purchase Agreement?
3      A.   I don't recall specifically seeing
4  that document.  I know of its existence but I
5  don't recall actually either seeing it or
6  having read it in any great detail.
7      Q.   Okay.
8      A.   If I did see it.
9      Q.   Do you have any understanding of
10  its purpose?
11      A.   No.  Not particularly.
12      Q.   Do you have any understanding of
13  how it relates in any way, if at all, to
14  compensation issues?
15      A.   No.
16      Q.   Okay.  Is it fair to say that
17  you've been able to do your job with respect
18  to compensation of former Lehman employees
19  without consulting the clarification letter?
20      A.   I believe so.
21      Q.   Okay.  And I believe you said
22  earlier that you prepared the spreadsheet that
23  we're going to be discussing here today?
24      A.   I did.
25      Q.   Okay.  And is that something that

Page 21

P. EXALL - HIGHLY CONFIDENTIAL
1  P. EXALL - HIGHLY CONFIDENTIAL
2  you prepared in the normal course of your
3  employment?
4      A.   It was prepared in the normal
5  course of business in support of various
6  requirements from PriceWaterhouseCoopers as
7  part of their annual audit as well as the
8  ancillary or related regulatory filings that
9  they may or may not have had to prepare.
10      Q.   So when was it prepared?
11      MR. GREEN:  Object to the form.
12  You mean the spreadsheet?  When was the
13  original spreadsheet prepared?
14      MR. HINE:  Well, we'll just wait
15  till I get to the spreadsheet.  I just
16  want to get some background here.
17      Q.   We'll put that question aside.
18      So when did you learn of the
19  Lehman/Barclays sale transaction?
20      A.   I learned -- I don't recall
21  actually specifically learning when it
22  occurred.  I was aware that the initial
23  discussions were being held in New York
24  amongst various parties in relation to the
25  original form of the transaction whereby, I

Page 22

1    P. EXALL - HIGHLY CONFIDENTIAL
2  understand, Barclays was going to acquire the
3  entire Lehman Brothers business.
4        But whenever those discussions
5  began I don't know. I do know that when Mr.
6  Evans flew to New York in support of those
7  negotiations of that initial transaction, I
8  would have understood him to have been there
9  in that respect.
10    Q.   Okay. Let me just kind of get
11 some time frames here. As I understand it,
12 there was an initial series of discussions
13 between Barclays and Lehman prior to September
14 15th, 2008. And the reason I use that date is
15 September 15th, 2008 is the date -- or
16 September 16th, 2008 is the date of the Asset
17 Purchase Agreement. And the 15th is the date
18 that Lehman Brothers Holdings declared
19 bankruptcy. So are you talking about the
20 discussions that took place prior to that?
21    A.   I knew that discussions were
22 taking place prior to that date with respect
23 to the initial form of the transaction, yes.
24    Q.   Okay. And Mr. Evans flew over for
25 that discussion?

Page 23

1    P. EXALL - HIGHLY CONFIDENTIAL
2    A.   I believe so.
3    Q.   Okay.
4    A.   That's my recollection.
5    Q.   Okay. Do you have any
6  recollection or understanding of what was
7  discussed during that period?
8    A.   Nothing.
9    Q.   Okay.
10    A.   Nothing specific.
11    Q.   Okay. Anything general?
12    A.   I was not involved in those
13 discussions.
14    Q.   Okay. Did you hear anything about
15 what was going on over in New York?
16    A.   Sure. I was in contact with Mr.
17 Evans intermittently during that period.
18    Q.   Okay.
19    A.   And we had general discussions
20 notwithstanding about what was happening or
21 not in New York but also my day-to-day
22 activities, I still reported to Mr. Evans and
23 had to do my job. And most of those
24 discussions would have been around things that
25 were ongoing as normal course of business

Page 24

1    P. EXALL - HIGHLY CONFIDENTIAL
2  outside of the Lehman Brothers transaction.
3    Q.   Okay. Did you have any -- I
4  understand that. I'm not trying to look into
5  what you talked to him about that had to do
6  with other business.
7        But did you have any discussions
8  with him during that period about compensation
9  issues with respect to the potential Lehman
10 transaction?
11    MR. GREEN:   Objection to form.
12    What precise period are you talking
13 about?
14    Q.   Okay. Let's -- again, Mr. Exall,
15 I'm talking about the period prior to
16 September 15th, 2008.
17        So did you have any discussions
18 with Mr. Evans about compensation issues that
19 arose in these early discussions with Lehman?
20    A.   Yes, I did.
21    Q.   And what did he tell you?
22    A.   I assisted Mr. Evans and others
23 assisted Mr. Evans with some due diligence
24 work around the initial form of the original
25 transaction through the normal course of any

Page 25

1    P. EXALL - HIGHLY CONFIDENTIAL
2  acquisition or potential acquisition the
3  information was made available to us as part
4  of the data room activities.
5    Q.   Okay.
6    A.   And I discussed with them the
7  various compensation issues with respect of
8  the documents and the data provided to us as
9  part of the data room and as part of those
10 initial activities related to the initial
11 transaction. So I did some due diligence work
12 around that information that was presented to
13 us.
14    Q.   And what did you learn in your due
15 diligence?
16    A.   What do you mean by that?
17    Q.   Well, did you learn of anything
18 relating to the aggregate amount of
19 compensation that was going to have to be paid
20 to Lehman executives, for example?
21    MR. GREEN:   Object to the form.
22    Bill, I've given you a lot of latitude
23 to question Paul on background matters
24 and factual matters at this period but
25 these matters are beyond the scope of

Page 26

1　　P. EXALL - HIGHLY CONFIDENTIAL
2　the 30(b)(6) deposition notice which
3　specifically pertains to bonus and
4　severance compensation as reflected in
5　the spreadsheet produced by Barclays.
6　　　MR. HINE:　Okay.　But, I mean, the
7　bonus and severance compensation relates
8　to more than just the spreadsheet.　This
9　deposition is about those issues.　I'm
10　just trying to get his background as we
11　lead up to decisions that were made as
12　to bonus and severance payments that
13　were actually made.
14　　　MR. GREEN:　Well, our
15　understanding is that the deposition is
16　about the bonus and severance
17　compensation paid to employees who
18　transferred from Lehman to Barclays as
19　reflected in the spreadsheet produced by
20　Barclays.
21　　　MR. HINE:　Right.·
22　　　MR. GREEN:　So this line of
23　questioning is about something other
24　than that because the actual
25　compensation paid is reflected in the

Page 27

1　　P. EXALL - HIGHLY CONFIDENTIAL
2　spreadsheet.　You're now talking about
3　due diligence and matters that occurred
4　before any compensation was paid.
5　　　MR. HINE:　Well, I understand
6　that.　If you're instructing him not to
7　answer, that's fine, we'll move on.　But
8　I feel I'm entitled to explore the
9　background that led to the decisions
10　that were made on what to pay these
11　folks when the transaction was
12　ultimately consummated.　So I'm just
13　trying to get some background
14　information as to whether there were any
15　agreements or understandings back in
16　that early period that led to decisions
17　later.
18　　　MR. GREEN:　I just want to make
19　clear that with respect to background or
20　matters Mr. Exall is being questioned as
21　a fact witness to the extent he has
22　knowledge about any of those matters and
23　not as a 30(b)(6) representative of the
24　company.
25　　　MR. HINE:　I have no problem with

Page 28

1　　P. EXALL - HIGHLY CONFIDENTIAL
2　that.
3　　　MR. GREEN:　He's here to testify
4　about the -- as a 30(b)(6) witness about
5　the spreadsheet and what's on the
6　spreadsheet.
7　　　MR. HINE:　I agree with that.
8　　　MR. GREEN:　These questions are
9　questions that he may or may not be able
10　to answer as a fact witness.
11　　　MR. HINE:　Okay.　I understand
12　that.
13　　　MR. GREEN:　All right.
14　　　MR. HINE:　Let's agree that the
15　scope of his 30(b)(6) questioning will
16　entail what's specifically written on
17　Schedule A which is the payments of
18　bonus and severance as relevant in the
19　spreadsheet.
20　　　MR. GREEN:　Right.　The
21　spreadsheet itself.
22　　　MR. HINE:　But I still feel I'm
23　entitled to get some background
24　information from him outside the scope
25　of the 30(b)(6).

Page 29

1　　P. EXALL - HIGHLY CONFIDENTIAL
2　　　MR. GREEN:　I think that's
3　probably accurate under the prevailing
4　law and so I'm not objecting to that but
5　I just want to make it clear that it's
6　not within the realm of his 30(b)(6)
7　testimony.
8　　　MR. HINE:　Sure.　I understand.
9　BY MR. HINE:
10　　Q.　All right.　Mr. Exall, back to the
11　period before September 15th.　Did you come to
12　any conclusions or view -- Mr. Evans reach any
13　understanding about the aggregate amount of
14　compensation that was going to have to be paid
15　to former Lehman employees in connection with
16　the proposed transaction?
17　　　MR. GREEN:　Objection to form.
18　You may answer.
19　　A.　No.
20　　Q.　Did you have any general sense of
21　how much compensation was going to have to be
22　paid in any transaction with Lehman?
23　　A.　Not to my knowledge.　What I did
24　know and what was supplied as part of the data
25　room was aggregate comp -- or individual

Page 30

P. EXALL - HIGHLY CONFIDENTIAL

1    compensation paid in respect to the 2007
2    performance year at Lehman Brothers and in
3    some respects prior years, as well as any
4    guaranteed bonus commitments that they may or
5    may not have -- may have entered into in
6    respect of individuals currently in their
7    employment.
8        Q.   Okay.  Are you talking about
9    the -- what later gets calls the Elite 8,
10   those type of individuals, the highly
11   compensated individuals?
12       MR. GREEN:  Object to form.
13       A.   I don't know -- I don't -- no, I
14   don't -- can you repeat the question, please?
15       Q.   Well, you mentioned individual
16   compensation.  Are you talking about select
17   individuals at Lehman or did you mean to cover
18   a much broader category of people?
19       MR. GREEN:  In respect of what was
20   provided in the due diligence rooms?
21       MR. HINE:  Yeah.
22       A.   The data room, the information I
23   received, the compensation out of the data
24   room was wide -- relatively wide ranging

Page 31

P. EXALL - HIGHLY CONFIDENTIAL

1    stretching from in general terms the
2    compensation plans that Lehman Brothers had in
3    place and we obviously wanted to do some due
4    diligence around the form and structure of
5    those arrangements in respect of the initial
6    proposed transaction that never took place.
7        In addition, they supplied
8    detailed individual compensation information
9    and what they represented that to be was for
10   the entire Lehman Brothers organization.
11       Q.   Okay.
12       A.   In respect of 2007 performance
13   year, what they paid in the prior year,
14   awarded the prior year, and in some cases
15   before that.
16       And in respect of individuals to
17   whom they'd made contractual bonus commitments
18   in connection with the 2008 performance year.
19       Q.   Okay.  To your knowledge or
20   understanding, were there any agreements
21   reached as to compensation issues during that
22   period of time?
23       MR. GREEN:  Object to form.
24       Agreements as between who?

Page 32

P. EXALL - HIGHLY CONFIDENTIAL

1    MR. HINE:  It would seem to me
2    Lehman and Barclays.  And, again, we're
3    talking about the period prior to
4    September 15th.
5        A.   I have no direct knowledge of
6    that.
7        Q.   Okay.  Do you have any general
8    understanding?
9        A.   No.
10       Q.   Okay.
11       A.   I was not involved in those
12   proceedings.
13       Q.   I know.  I understand.
14       Let's move to the period from
15   September 15th to September 22nd which is the
16   closing -- September 22nd is the closing of
17   the Barclays Lehman deal.  Were you
18   involved -- I believe you said you had no
19   involvement in those discussions; is that
20   right?
21       A.   I had no involvement in the
22   discussions, no.
23       Q.   Okay.  Was Mr. Evans sent over to
24   New York to participate in those discussions?

Page 33

P. EXALL - HIGHLY CONFIDENTIAL

1    MR. GREEN:  Object to the form.
2        A.   I believe Mr. Evans was in New
3    York.  In fact, I came to New York on or
4    around that date.  What he was involved with
5    doing, I don't know.
6        Q.   Okay.  But did you have any
7    discussions with Mr. Evans or anyone else in
8    senior management at Barclays about what was
9    being discussed in terms of compensation with
10   respect to the proposed Lehman/Barclays
11   transaction?
12       MR. GREEN:  Object to form.
13       A.   I don't recall any specific
14   conversation I may or may not have had with
15   Mr. Evans or anyone else in that regard.
16       Q.   Do you have any general
17   recollection of what you might have discussed
18   with them during that period?
19       A.   I have no specific recollection.
20   General recollection, if you're asking me to
21   speculate what I would have talked about I
22   could answer that but that would have been
23   speculation.
24       Q.   I'm not really interested in what

Page 34

P. EXALL - HIGHLY CONFIDENTIAL
1  you speculate you would have talked about.
2  But do you recall any discussions between any
3  of your senior Barclays management about what
4  was being discussed or contemplated in
5  connection with compensation-related issues
6  concerning the Lehman Barclays proposed
7  transaction?
8      MR. GREEN:  These are discussions
9  between Paul and senior management
10  you're asking about.
11     MR. HINE:  Yes.
12     A.  Sorry.  So let me just be clear.
13 You're asking do I know of any discussions
14 that my senior management may have had with
15 Lehman Brothers?
16     Q.  No, no, no.  I'm asking did you
17 have any conversations with senior management
18 during that week, September 15th through
19 September 22nd, about the compensation issues
20 that were being discussed or considered in
21 connection with the Lehman Barclays
22 transaction?
23     A.  I don't recall anything specific.
24 I do know that the initial sale agreement had

Page 35

P. EXALL - HIGHLY CONFIDENTIAL
1  been concluded by the time I had come to New
2  York and was beginning to assist Mr. Evans in
3  whatever he needed me to do.  And it was my
4  understanding that the transaction was closed
5  at that point.
6      Q.  And at that point do you recall
7  the date you were --
8      A.  I look back -- I think it was on
9  or around the 20th or 21st of September that I
10 came across.  I forget the exact date but I
11 believe it was on or around there.
12     Q.  Okay.  So you thought the
13 transaction had closed by then?
14     A.  It was my general understanding
15 that the transaction for all intents and
16 purposes had been completed the prior week.  I
17 have subsequently come to understand that
18 there was a clarification agreement and
19 officially the judge may have sanctioned at a
20 later date.  You know, the legalities for me
21 are neither here nor there.  My understanding
22 is that the transaction had been concluded in
23 all material respects at that point.
24     Q.  Okay.  Did you have any

Page 36

P. EXALL - HIGHLY CONFIDENTIAL
1  understanding during that period about the $2
2  billion compensation figure that appeared on
3  the schedule that you had referenced earlier?
4      MR. GREEN:  Could you show him
5  that figure?
6      MR. HINE:  Okay.  Let's get to
7  the -- let's get to that.
8      MR. GREEN:  Just so it's clear
9  what we're talking about.
10     MR. HINE:  Let's get to the
11 schedule.
12 BY MR. HINE:
13     Q.  Mr. Exall, I'm going to hand you a
14 copy of a document that's previously been
15 marked as Exhibit 1 which is a copy of the
16 Asset Purchase Agreement which I think you've
17 been discussing.  Just so you have it in front
18 of you.  And I'm also going to give you a copy
19 of a document that's been marked as Exhibit 19
20 which I understand is the schedule that is
21 referenced in the APA.  If you want just take
22 a couple minutes to refresh -- review these
23 documents and I'll ask you some questions.
24     (Document review.)

Page 37

P. EXALL - HIGHLY CONFIDENTIAL
1      MR. GREEN:  Are you ready, Paul?
2      THE WITNESS:  Yeah.
3      Q.  Now, my previous question had to
4  do with the schedule.  We'll call this the
5  9/16 schedule if you will.  Do you see the $2
6  billion compensation number in that schedule?
7      A.  I do.
8      Q.  Okay.  Did you, during the week of
9  September 15th to the 22nd say, did you have
10 any conversations with any of Barclays senior
11 management about that $2 billion comp figure?
12     A.  I was made aware of this schedule
13 during that week.
14     Q.  Um-hum.
15     A.  And I'm certain I would have asked
16 someone questions with respect of the schedule
17 and what I understood it -- you know, what I
18 needed to interpret from it.  But, yes, in
19 general I would have had conversations with
20 people on this.
21     Q.  Okay.  And who gave you the
22 schedule?
23     A.  Mr. Clackson passed me the
24 schedule.

Page 38

1    P. EXALL - HIGHLY CONFIDENTIAL
2    Q.    And what did he tell you about it?
3    A.    He represented this as being the
4  schedule referred to in the APA.
5    Q.    Okay. And you were looking down.
6  I think -- are you looking at Section 9.1(c)
7  of the APA?
8    A.    That is correct.
9    Q.    Okay. So this Exhibit 19 is the
10  schedule -- or you understood that the
11  Exhibit 19 is the schedule referred to in
12  paragraph 9.1(c) of the APA, correct?
13    MR. GREEN: Object to the form.
14    A.    This is a copy of the schedule
15  that was represented to me as being the
16  schedule referred to, correct.
17    Q.    Okay. What did Mr. Clackson tell
18  you about that schedule?
19    MR. GREEN: Object to the form.
20    Asked and answered. You may answer.
21    A.    I don't recall what he told me
22  about it. I asked him for a copy of it as
23  part of my own reading of the relevant
24  sections of the APA.
25    Q.    Okay. And you had been previously

Page 39

1    P. EXALL - HIGHLY CONFIDENTIAL
2  provided a copy of the APA?
3    A.    Yes.
4    Q.    And who gave you that?
5    A.    I believe Mr. Gary Romaine gave me
6  a copy of the APA.
7    Q.    Okay. And why did he give it to
8  you?
9    MR. GREEN: Object to the form.
10    A.    He understood there to be
11  compensation related matters that I would
12  probably be -- need to be aware of.
13    Q.    Okay. And I take it you reviewed
14  the APA after receiving a copy of it.
15    A.    In general, yes. I can't testify
16  to having read it in any great depth. I read
17  I think the sections in relation to me and
18  probably, to put a word on it, skimmed the
19  rest.
20    Q.    Okay. I'm not trying to be tricky
21  here but is it fair to say you focused on
22  Section 9.1 of the APA and probably skimmed
23  the rest of it?
24    MR. GREEN: Object to the form.
25    You may answer.

Page 40

1    P. EXALL - HIGHLY CONFIDENTIAL
2    A.    Yes. I think that would be
3  reasonably accurate.
4    Q.    Okay. Well, let's just take a
5  look at 9.1 for a minute. If you wouldn't
6  mind turning to 9.1(a). 9.1(a), as I
7  understand it, has to do with Barclays
8  offering employment to certain individuals who
9  are defined as transferred employees.
10    Do you see that definition in
11  there?
12    A.    I see the term transferred
13  employee referred to.
14    Q.    Okay. Is that a term you're
15  familiar with?
16    A.    No.
17    Q.    Well, I guess the reason I'm
18  asking is you're charged with supervising
19  compensation issues with respect to
20  transferred employees, right?
21    MR. GREEN: Object to the form of
22    the question. I think that
23    mischaracterizes his prior testimony.
24    A.    I would say that part of my
25  responsibility is in relation to compensation

Page 41

1    P. EXALL - HIGHLY CONFIDENTIAL
2  of the former Lehman Brothers employees that
3  Barclays Capital or Barclays acquired under
4  the transaction. The meaning of transferred
5  employee in the sense of this agreement or any
6  other document I can't testify to not being a
7  lawyer and I just have no legal understanding
8  of that.
9    Q.    Okay. So the term -- the defined
10  term transferred employees is not something
11  you use in the normal course of your business?
12    A.    Not in the normal course of my
13  business, no.
14    Q.    Okay.
15    Do you know how many employees --
16  well, let's just explore this for a minute.
17  You work on compensation issues related to
18  former Lehman employees who transferred to
19  Barclays, correct?
20    A.    Compensation of former Lehman
21  employees that came to work for Barclays.
22    Q.    Okay. Now, do you know how many
23  of those folks there are?
24    A.    I recall, and I'm approximating
25  here, that there were in excess of 10,000

Page 42

P. EXALL - HIGHLY CONFIDENTIAL
1
2   former Lehman Brothers employees that were
3   sent the e-mail that -- in respect of coming
4   to work for Barclays.
5       Q.   Okay.  I think I've seen that but
6   that's an e-mail where they respond accepted
7   and they became a Barclays employee; is that
8   right?
9       A.   Without seeing it I can't confirm
10  that but in general terms they were sent an
11  e-mail and that became -- and they arrived at
12  work so, yes.
13      Q.   Do you know how the number of
14  employees that came to work on September 22nd
15  has changed over time?  I mean, have -- what
16  I'm asking about is have any of them left?
17      A.   Yes.
18      Q.   Okay.  So do you have a general
19  sense or do you have an understanding of the
20  number that originally transferred on the 22nd
21  versus the amount that are still here today?
22  Still at Barclays today?
23          MR. GREEN:  Object to the form.
24      A.   I could give a rough estimate.
25      Q.   Okay.

Page 43

P. EXALL - HIGHLY CONFIDENTIAL
1
2       A.   Again, I don't know the exact, but
3   we had two reduction in force exercises
4   subsequent to the acquisition of Lehman
5   Brothers.  One in the fourth quarter of 2008
6   and one in the first quarter of 2009.
7          Again, I'll caveat this by saying
8   I'm really guessing here.
9       Q.   Sure.
10      A.   But I believe to the best of my
11  recollection at the moment, that of the 10,000
12  that originally came across I'm guessing that
13  approximately 6,000 would remain.  And, again,
14  that's -- that would be wide of the mark but
15  it's a gut feel.
16      Q.   Okay.  Now, these reduction in
17  forces, were they related to the group -- the
18  pool of former Lehman employees or are they a
19  Barclays-wide reductions in force?
20      A.   Barclays Capital-wide reduction in
21  force.
22      Q.   Okay.  So it also affected folks
23  who had never been employed at Lehman?
24      A.   Yes.
25      Q.   Okay.  So -- and as a result of

Page 44

P. EXALL - HIGHLY CONFIDENTIAL
1
2   these two reduction in forces the number of
3   former Lehman employees who are now working at
4   Barclays has now been whittled down in the
5   approximate amounts you've told me?
6          MR. GREEN:  Objection to form.
7       A.   That would be my best estimate.
8       Q.   Okay.  And they received some form
9   of severance if they were asked to leave?
10         MR. GREEN:  Object to the form.
11      A.   Any employee who leaves through
12  reduction in force exercises are eligible for
13  severance or consideration for severance.
14      Q.   Okay.  And then if we look at
15  paragraph 9.1(b) that paragraph has to do with
16  severance, correct?
17      A.   Again, I can't interpret the
18  paragraph in a legal manner.
19      Q.   Well, I'm not asking for a legal
20  manner.  I'm just asking for your general
21  understanding.
22      A.   I see the term reduction in force
23  or job elimination.  I see those terms
24  referenced here.
25      Q.   Well, here's my question.  If you

Page 45

P. EXALL - HIGHLY CONFIDENTIAL
1
2   review that paragraph -- and take as much time
3   as you'd like -- it talks about making
4   severance payments in connection with
5   reductions in force or jobs eliminations.
6   "Severance payments and benefits at levels
7   that are no less favorable than such levels as
8   the transferred employee would have been
9   entitled to receive pursuant to the provisions
10  of the seller's severance plans or
11  agreements."
12         Do you see that?
13      A.   I do.
14      Q.   Now, you've been involved in
15  making severance payments to former Lehman
16  employees who have left Barclays; is that
17  right?
18      A.   That's correct.
19      Q.   Did you investigate what the
20  practice had been at Lehman with respect to
21  severance payments before making severance
22  payments from Barclays?
23         MR. GREEN:  Object to the form.
24         You're asking did he personally
25  investigate what the practice had been

Page 46

P. EXALL - HIGHLY CONFIDENTIAL

1   at Lehman Brothers?
2
3   MR. HINE: Yes.
4   A.   Personally I did not as an
5   individual investigating that. I do know that
6   as a matter of course, and it was as part of
7   this process, the severance policy previously
8   applied by the former Lehman Brothers was
9   determined and in most cases applied.
10   Q.   And what is that policy?
11   A.   I can't speak to the specifics.
12   But, in general, severance payments to
13   employees factor in their service at their
14   previous employer, amongst other things. I
15   don't know the specific -- I can't testify to
16   the specific severance arrangements for the
17   former Lehman Brothers employees or in that
18   respect to Barclays Capital employees. I'm
19   not an employee relations expert or a lawyer.
20   But, in general, severance payments factor in
21   prior service with the employer.
22   Q.   Okay. Well, I guess my question
23   is how do you know what to pay severance now
24   for a former Lehman employee who's leaving
25   without knowing the prior Lehman policy?

Page 47

P. EXALL - HIGHLY CONFIDENTIAL

1
2   MR. GREEN: Bill, excuse me. Not
3   to disrupt your deposition but these
4   questions, too, are beyond the scope of
5   the 30(b)(6) notice in the sense that
6   they do not specifically deal with the
7   spreadsheet that was prepared and
8   produced. And so you're asking Paul how
9   he knows certain things that are beyond
10   his job specifications and also outside
11   of the information in the spreadsheet.
12   MR. HINE: Well, I hear your
13   objection but I think this is probably
14   within the scope of the 30(b)(6). He's
15   here to testify about severance payments
16   paid to former Lehman employees and the
17   raw number in the spreadsheet is one
18   thing but I'm trying to figure out how
19   they calculate that number. So your
20   objection can stand but my question
21   still remains.
22   BY MR. HINE:
23   Q.   How do you know or people in your
24   department know how much to pay a former
25   Lehman employee in severance if you don't know

Page 48

P. EXALL - HIGHLY CONFIDENTIAL

1
2   the former Lehman policy?
3   MR. GREEN: Object to the form.
4   And I think it mischaracterizes the
5   testimony. He said he didn't know
6   specifically the former Lehman policy.
7   A.   I'm sorry. I do think you
8   mischaracterized what I said. Maybe I wasn't
9   clear. Personally I don't know the terms of
10   the Lehman Brothers policy. I can't testify
11   to that off the top of my head. I'm not a
12   employee relations professional. In that same
13   breath, I can't testify to a specific policy
14   in relation to our own employees. What I do
15   know is the HR department, relevant people in
16   the HR department did investigate and
17   understand the severance policy for the former
18   Lehman Brothers. And in most cases I
19   understand that to have been applied in
20   respect to former Lehman Brothers employees.
21   In the same way that the Barclays Capital
22   policy would have been applied to former
23   Barclays Capital employees who were affected
24   by these reduction in force exercises.
25   Q.   And were there some cases where

Page 49

P. EXALL - HIGHLY CONFIDENTIAL

1
2   the former Lehman policy was not applied?
3   A.   I don't know for certain. It is
4   my understanding that in most cases the former
5   Lehman Brothers policy was applied to former
6   Lehman Brothers employees.
7   Q.   Okay. And who is the person
8   within your HR department who would know
9   specifically about this issue?
10   A.   Our head of employee relations
11   would be Mr. Mark Kerman who again reports to
12   Mr. Evans. He's our head of employee
13   relations in New York.
14   Q.   And he's -- he has that role with
15   respect to the entity that Mr. Diamond manages
16   that you described earlier?
17   A.   I don't know the specific
18   agreement. My understanding is that he would
19   have -- we would deal in any employee relation
20   or severance matters, amongst others, in
21   respect of US employees.
22   Q.   Okay. I'm not trying to get into
23   areas that you're not expert at. I just want
24   to know is it correct to say your
25   understanding is that this severance provision

13 (Pages 46 to 49)

Page 50

P. EXALL - HIGHLY CONFIDENTIAL

1     P. EXALL - HIGHLY CONFIDENTIAL
2 has been complied with by Barclays with
3 respect to former Lehman employees?
4     MR. GREEN: Object to the form of
5 the question. Calls for a legal
6 conclusion.
7    A. I don't know whether this or any
8 other clause has been complied with.
9    Q. Okay.
10    A. I don't know what Barclays'
11 obligations are under these. What I do know
12 is that when individuals across the firm have
13 been affected by a reduction in force exercise
14 they are subject to -- for consideration to
15 severance payments in the normal course of
16 business.
17    Q. Okay. And I believe you said that
18 you believe that's been done in accordance
19 with the former Lehman's policies?
20    A. I believe that for former Lehman
21 Brothers employees the former Lehman Brothers
22 policy has been applied.
23    Q. Okay.
24    A. That's my understanding.
25    Q. Okay. Now, this provision, 9.1(b)

Page 51

1     P. EXALL - HIGHLY CONFIDENTIAL
2 doesn't refer to the schedule that we talked
3 about earlier, right, that September 16th
4 schedule?
5     MR. GREEN: Object to the form.
6    A. I don't see any specific reference
7 to it.
8    Q. Okay. Now, if we turn to 9.1(c)
9 that has to do with bonus payments, correct?
10 In general?
11     MR. GREEN: Object to the form of
12 the question.
13    A. Again, I can't interpret the
14 clause. I see the word bonus, annual bonuses
15 reflected in the clause. But as to what it
16 may or may not refer to I really can't testify
17 in any legal capacity.
18    Q. I understand. I'm not asking for
19 your legal interpretation. I'm asking as a
20 general matter as a person charged with
21 compensation issues and working with this
22 stuff. Do you have a general understanding of
23 what this provision (c) entails in connection
24 with bonuses that were to be paid to former
25 Lehman employees?

Page 52

1     P. EXALL - HIGHLY CONFIDENTIAL
2     MR. GREEN: Object to form.
3     Do you have the question in mind?
4     THE WITNESS: I'm just re-reading
5 the clause.
6    A. Could you perhaps rephrase the
7 question?
8    Q. Yeah. Let's try again.
9     What is your understanding -- and
10 I understand you're not a lawyer and I'm not
11 asking for a legal conclusion as to this
12 paragraph. But what is your understanding
13 about the amount of bonuses that are supposed
14 to be paid, were supposed to have been paid to
15 former Lehman employees who now are with
16 Barclays?
17    A. I don't understand anything in
18 respect of this clause that refers to any
19 amount, quantum of bonus whatsoever.
20    Q. Well, but it does refer to the
21 schedule, right?
22    A. It refers to a schedule, yes.
23    Q. Okay. And what did you understand
24 that to mean when it refers to that schedule?
25     MR. GREEN: Object to the form of

Page 53

1     P. EXALL - HIGHLY CONFIDENTIAL
2 the question. Calls for a legal
3 conclusion.
4    A. It refers to a schedule. And the
5 schedule, itself, does not have the word bonus
6 anywhere on it.
7    Q. Okay.
8    A. So I can't reach a conclusion as
9 to any -- in any capacity, personal, private,
10 on behalf of the company, as to what quantum
11 of bonus may or may not be referred to in this
12 clause.
13    Q. Okay. I understand. I'm not
14 asking for a legal interpretation. But in the
15 course of preparing the spreadsheet that we're
16 going to talk about and your work in
17 connection with compensation related to these
18 former Lehman employees, what did you
19 understand the $2 billion was supposed to
20 cover?
21     MR. GREEN: Object to the form of
22 the question.
23    Q. And when I say $2 billion I'm
24 referring to the 2 billion in the schedule,
25 the September 16th schedule.

Page 54

P. EXALL - HIGHLY CONFIDENTIAL

1       MR. GREEN: Object to the form of
2   the question.
3       A.  Again -- and to reiterate, I
4   cannot pass a legal opinion as to what the
5   obligations of Barclays may or may not be. It
6   is my personal view, and that may be different
7   to the views of Barclays or anyone else in
8   Barclays that $2 billion is referred to as
9   comp. And my understanding in a personal
10  capacity is that refers to compensation in all
11  its forms.
12      Q.  In all its forms. Meaning what?
13      A.  In respect of pre-acquisition
14  service of the former Lehman Brothers
15  employees.
16      Q.  What do you mean by compensation
17  in all its forms?
18      A.  Again, I'm speaking in my personal
19  capacity as opposed to on behalf of Barclays.
20  Their definition of compensation may be
21  different than mine.
22      I understand personally
23  compensation to mean any manner of awards and
24  payments and reward to employees in general

Page 55

P. EXALL - HIGHLY CONFIDENTIAL

1   that would encompass things like salary,
2   annual bonus, deferred stock, deferred cash.
3   Benefits. Pensions. Recruit -- you know, I
4   would say that there's no standard definition
5   of what is termed as compensation in either
6   the accounting environment or in the human
7   resources environment. But my personal
8   understanding is that compensation is any form
9   of a award delivered to or on behalf of a
10  employee. Or to their benefit.
11      Q.  Okay. I really didn't ask the
12  definition of compensation. I'm trying to
13  find out what in preparing the spreadsheet
14  that we're going to talk about today and in
15  your work in connection with providing
16  compensation to the former Lehman employees,
17  is that $2 billion supposed to cover more than
18  bonuses?
19      MR. GREEN: Object to the form of
20  the question. I think you did ask about
21  his understanding of the term
22  compensation to begin with so I think
23  the lead-in to your question was
24  inappropriate. But, nevertheless, you

Page 56

P. EXALL - HIGHLY CONFIDENTIAL

1   can answer the question.
2       A.  I can testify to the schedule,
3   itself, that's the subject of this deposition
4   which reflects the compensation delivered, the
5   wide discharge of compensation delivered to
6   former Lehman Brothers employees in respect of
7   their pre-acquisition service to Lehman
8   Brothers.
9       Q.  But, Mr. Exall, you have no
10  understanding of what that $2 billion was
11  supposed to encompass in connection with
12  compensation to former Lehman employees?
13      A.  I don't see it defined in the
14  agreement and I can't interpret it.
15      Q.  Okay. When you were asked to
16  prepare the schedule, were you told that it
17  should total up to $2 billion?
18      A.  No.
19      Q.  Were you told what the amount is
20  that in aggregate were supposed to have been
21  paid in any form of compensation to former
22  Lehman employees?
23      A.  No.
24      Q.  Do you have any understanding of

Page 57

P. EXALL - HIGHLY CONFIDENTIAL

1   the amount of compensation that's supposed to
2   be paid to former Lehman employees?
3       A.  No.
4       Q.  Further into this paragraph you
5   see -- and I'm reading starting on the seventh
6   line down onto the eighth line it talks about
7   forms and proportions as are consistent with
8   purchaser's customary practices.
9       And it's referring to the annual
10  bonuses. Do you see that sentence?
11      A.  I do.
12      Q.  What is -- just based on your
13  experience at Barclays, what is form and
14  proportions -- or what is Barclay's customary
15  practice with respect to annual bonuses?
16      MR. GREEN: Object to the form of
17  the question as to the extent it calls
18  for a legal conclusion.
19      A.  Our customary practice prior to
20  2008 in terms of annual bonus awards at
21  Barclays Capital --
22      Q.  Right.
23      A.  -- in general their annual bonuses
24  were delivered in the form of either cash or

Page 58

P. EXALL - HIGHLY CONFIDENTIAL
1  P. EXALL - HIGHLY CONFIDENTIAL
2  cash and stock.
3  Q. Right.
4  A. Whereby above a certain threshold
5  an amount of the annual bonus was deferred or
6  delivered through a stock vehicle which would,
7  based at the time, through a tax table kind of
8  approach so above a certain threshold a
9  proportion was deferred or delivered in stock
10  and beyond a certain -- another step more
11  stock was delivered.
12  Q. Okay. And was this -- when you
13  said tax table you threw me there. What did
14  you mean there?
15  A. Sorry. It's a term I use. I
16  shouldn't use it. We colloquially refer to it
17  as a tax table. It's in effect if your bonus
18  is X, then there is no deferral into stock.
19  If it's above a certain threshold, a certain
20  proportion of the entire bonus is delivered in
21  stock. If it's above another threshold,
22  further proportion of that bonus is delivered
23  in stock.
24  Q. Okay. And as a general matter
25  what percentage of bonus is provided in stock?

Page 59

1  P. EXALL - HIGHLY CONFIDENTIAL
2  A. In general, our customary practice
3  prior to 2008 was that any bonus -- and there
4  were regional fluctuations here based on the
5  exchange rate -- so I will quote this in
6  pounds. Any bonus below 150,000 pounds
7  sterling there was no deferral or no delivery
8  in stock. Any amounts above 150,000 pounds
9  but below 250,000 pounds of annual bonus,
10  10 percent of the entire amount was delivered
11  in stock. Any amounts over and above 250,000
12  pounds, the first 250,000 pounds were
13  delivered -- 10 percent of that was delivered
14  in stock. Any amount above 250,000 25 percent
15  was delivered in stock.
16  Q. And this stock vested over time?
17  A. That's correct. Subject to the
18  rules of the stock -- of the plan itself, the
19  standard practice was to cliff vest at the end
20  of a three-year period.
21  Q. Okay. I saw that term cliff vest.
22  What does many mean?
23  A. In general that means that it
24  vests in equal tranches, so to speak, so some
25  of our competitors in a stock award would --

Page 60

1  P. EXALL - HIGHLY CONFIDENTIAL
2  let's say, as an example, if you had a hundred
3  pounds of an amount deferred into stock,
4  vesting over four years, if -- you can either
5  have pro rata vesting which is you could take
6  a quarter, a quarter, a quarter, and 25 would
7  accrue at the end of one, 25 after -- et
8  cetera.
9  Cliff vesting means that it only
10  vests at the end of the period concerned. So
11  you'd only get the full hundred in this
12  example at the end of the fourth year.
13  Q. And it was a custom to have a
14  three-year cliff vest period for stock
15  bonuses?
16  A. It was our custom, yes.
17  Q. All right. And has this changed
18  since 2008? You said prior to 2008.
19  A. 2008 was a unique year for
20  compensation and we delivered at Barclays
21  Capital -- at Barclays in a different way
22  subject to a different type of arrangement.
23  Q. Are you talking about the former
24  Lehman employees when you say that or --
25  A. No. They were subject to our

Page 61

1  P. EXALL - HIGHLY CONFIDENTIAL
2  standard practice that was employed prior to
3  this.
4  Q. Okay. So as a general matter, and
5  I know there's individuals, but as a general
6  rule this practice -- the prior practice that
7  you just described was applied to the former
8  Lehman employees that came to work at
9  Barclays?
10  A. I believe that to be the case yes,
11  in most cases, yeah.
12  (Deposition Exhibit 280B, document
13  bearing production number
14  BCI-EX-00077287, marked for
15  identification as of this date.)
16  (Deposition Exhibit 281B, document
17  bearing production number
18  BCI-EX-00115843, marked for
19  identification as of this date.)
20  BY MR. HINE:
21  Q. Mr. Exall, I'm handing you two
22  exhibits. One is marked as Exhibit 280B which
23  is Bates stamped BCI-EX-00077287 which I
24  understand to be the original version of the
25  schedule that was provided to us. And the

Page 62

1    P. EXALL - HIGHLY CONFIDENTIAL
2    second document is marked as Exhibit 281B
3    which is Bates stamped BCI-EX-00115843 which,
4    Chris, I think you'll agree is the updated
5    schedule that was recently provided to us.
6        My first question, Mr. Exall, have
7    you ever seen these documents before?
8        A.   Yes.
9        Q.   You prepared these documents?
10       A.   I did.
11       Q.   Okay.  I want to -- and am I
12   correct that 281B is an updated replacement
13   version of 280B?
14       A.   Yes.
15       Q.   Okay.  Before we put away 280B
16   could you explain to me the differences and
17   why you had to update it?
18       A.   Sure.  280B as you referred to
19   here was the original schedule provided around
20   the middle of July I understand.  It reflected
21   what we believed to be an accurate picture of
22   the discharge of compensation to previous --
23   former Lehman Brothers employees in respect of
24   their prior pre-acquisition service.
25       It was thought to be accurate at

Page 63

1    P. EXALL - HIGHLY CONFIDENTIAL
2    that time, although we were still
3    investigating certain items reflected on the
4    schedule.  Subsequent to those investigations
5    and the correction of a couple of
6    typographical errors as well as some of the
7    text was cut off from the narrative on the
8    right-hand side of the original schedule, the
9    updated schedule reflects a more accurate --
10   an accurate picture of the discharge of those
11   compensation items as of the date it was
12   produced.
13       Q.   Okay.  Now, other than typos is it
14   fair to say the main differences have to do
15   with severance entries?
16       A.   Yes.
17       Q.   Okay.  Just take a step back a
18   minute.  Why was this schedule -- and I'll
19   refer to them generically now, why was this
20   schedule prepared?
21       A.   The schedule was prepared in the
22   normal course of business to support the -- or
23   for production to -- primarily for production
24   to PriceWaterhouseCoopers as part of their
25   annual audit as well as any ancillary filings

Page 64

1    P. EXALL - HIGHLY CONFIDENTIAL
2    they may or may not have had to provide as
3    part of their normal course of business as
4    auditors of Barclays.
5        Q.   Okay.  So this is someone from PwC
6    requested a schedule of compensation related
7    to the Lehman acquisition?
8        A.   I was instructed that this would
9    be needed in support of the annual audit and
10   other related filings by my finance
11   colleagues.
12       Q.   Who told you that?
13       A.   Mr. Romaine.
14       Q.   Romaine?
15       A.   Gary Romaine.
16       Q.   Okay.  And he is -- what was his
17   position?
18       A.   I believe -- I don't know -- I
19   can't recall his exact title but he's a
20   technical accountant in the finance
21   department.
22       Q.   Okay.  He's not in the HR
23   department, correct?
24       A.   No, no.
25       Q.   So is it correct to say that the

Page 65

1    P. EXALL - HIGHLY CONFIDENTIAL
2    finance department requested this type of
3    schedule from your department?
4        A.   Mr. Romaine requested it of me,
5    yes.
6        Q.   Okay.  Any other purpose behind
7    this other than to assist PwC?
8        A.   No.  The primary purpose of this
9    was to assist PwC.
10       Q.   Any other purposes?
11       A.   I think we in general in support
12   of our own internal accounting records would
13   have prepared the schedule.  But the primary
14   purpose would be to support the annual audit
15   and regulatory filings that were required.
16       MR. GREEN:  Bill, I'm sorry.
17   Could we go off the record for one
18   second?
19       MR. HINE:  Sure.
20       (Discussion held off the record.)
21   BY MR. HINE:
22       Q.   Mr. Exall, I think you had
23   something you wanted to clarify?
24       A.   If you could repeat that question
25   in respect of why the schedule was prepared

Page 66

P. EXALL - HIGHLY CONFIDENTIAL

1    I'll try to answer.
2        Q.    I know you told me that the
3    primary purpose was for -- in support of PwC
4    work but I asked if there were any other
5    purposes for which the schedule was prepared.
6        A.    No.  My clarification doesn't
7    relate to that specific question.  It relates
8    to the use of the schedule by PwC.  I misspoke
9    in the sense that I think -- I believe I
10   said -- perhaps you could read it back -- I
11   don't know --
12       MR. GREEN:  That's okay.  You can
13       just go right ahead.
14       A.    I incorrectly -- believe I stated
15   the schedule would have been used by PwC for
16   ancillary, regulatory and other filings.  The
17   clarification I would like to make is that the
18   firm at Barclays would have utilized the
19   information for ancillary related filings.
20   And PwC as auditors would in most cases I
21   understand have required support for those
22   filings for which the schedule provides.
23       Q.    Has Barclays, in fact, used the
24   information on this schedule for regulatory

Page 67

P. EXALL - HIGHLY CONFIDENTIAL

1    filings?
2        A.    I believe so.  I don't know the
3    specific names of it but I believe they have.
4    Not the schedule in any regulatory filing, I
5    believe.  I don't know the answer.  I
6    understand that it may have been used in a
7    process that produced some sort of regulatory
8    filing.
9        Q.    Okay.  Do you know which filing?
10       A.    I would be speculating.
11       Q.    Well, go ahead and speculate.
12       A.    Okay.  In my -- I believe
13   something to do with the Section 6 or
14   something.  It's a regulatory filing I
15   wouldn't just have any knowledge of.
16       Q.    Okay.  But --
17       A.    But I think there have been
18   regulatory filings that have been made by
19   Barclays.
20       Q.    Okay.  Has the information from
21   this spreadsheet been used in connection with
22   Barclays' preparation of its annual report?
23       A.    Yes.
24       Q.    Or its annual financial

Page 68

P. EXALL - HIGHLY CONFIDENTIAL

1    statements?
2        A.    Yes.
3        Q.    Okay.
4        A.    Sorry.  Can I clarify that?
5        Q.    Sure.
6        A.    When you referred to this
7    schedule, a form of this schedule or a
8    predecessor thereof would have been used and
9    supplied to PwC as part of their annual audit
10   process.  In respect of the final report of
11   accounts.  That occurred several months ago.
12   And this schedule as you've seen has evolved
13   since then.
14       Q.    Well, that's my question.  Has
15   Barclays produced an annual report as of
16   December 31st, 2008, correct?
17       A.    That's correct.
18       Q.    Now, is this schedule that I have
19   in front of me the schedule that was used in
20   connection with compensation issues with
21   respect to that final report or is there an
22   earlier version of this schedule?
23       MR. GREEN:  Object to the form of
24       the question.

Page 69

P. EXALL - HIGHLY CONFIDENTIAL

1        A.    An earlier version of this
2    schedule would have been in existence at the
3    time.
4        Q.    Okay.  So just tell me -- let's
5    just be specific here.  280B was prepared at
6    or about what date?
7        A.    This was I understand supplied to
8    yourselves on or around the middle of July
9    2009.
10       Q.    Okay.  Now, the question -- my
11   question was when was it prepared by you.
12       A.    The specific spreadsheet?
13       Q.    Yes.  280B.
14       A.    This exact spreadsheet would have
15   been prepared by me on or around that date.
16   This exact spreadsheet.
17       Q.    Mid July.
18       A.    Mid July.
19       Q.    Okay.
20       A.    That said, this spreadsheet
21   existed in previous forms for a period of time
22   well before that.
23       Q.    Okay.  And how often do you update
24   it?

Page 70

P. EXALL - HIGHLY CONFIDENTIAL

1    A.    There was no regular requirement
2    to update it. There were certain points of
3    time that an update was required and as part
4    of the -- whether it be the annual report from
5    PriceWaterhouse or anything else in respect of
6    what they were looking at or passing an
7    opinion on. So there are points in time at
8    which a schedule would have been updated and
9    presented formally to them. I know they've
10   had a copy I believe of this schedule. I'm
11   not sure whether they have a copy of 281B.
12   Q.    So when you said this schedule you
13   meant 280B?
14   A.    I meant 280B, yes.
15   Q.    Okay. Now, did you start
16   preparing a schedule in this form or like this
17   starting in September of 2008?
18   A.    I don't recall the exact time when
19   we first produced the -- a first iteration of
20   the schedule or its predecessor without
21   guessing or consulting prior records, but what
22   I can say is that this schedule was -- or its
23   predecessor would have been prepared in Q4
24   2008.

Page 71

P. EXALL - HIGHLY CONFIDENTIAL

1    Q.    Okay.
2    A.    During that period, yes.
3    Q.    Okay. And it's gone on through a
4    couple iterations between Q4 '08 and mid July
5    of '09; is that right?
6    A.    Of course.
7    Q.    Okay. And the iteration following
8    the mid July version which is Exhibit 280B,
9    what I have in front of me as 280B -- 281B?
10   A.    281B, yes.
11   Q.    Okay. Were there no iterations
12   between these two?
13   A.    That was the iteration.
14   Q.    Okay.
15   A.    We updated this Schedule 280B.
16   It's now become 281B.
17   RQ    MR. HINE: Okay. Chris, we're
18   going to request copies of all these
19   iterations going back to the fourth
20   quarter of '08 just as part of our
21   document requests.
22         MR. GREEN: We'll take that
23   request under advisement.
24         MR. HINE: Okay.

Page 72

P. EXALL - HIGHLY CONFIDENTIAL

1    Q.    All right. Was either 280B or
2    281B prepared in any way in connection with
3    the discovery we're undertaking here in this
4    litigation?
5         MR. GREEN: Object to the form of
6    the question to the extent it calls for
7    a legal conclusion.
8    A.    That is not my understanding.
9    Q.    Okay. Were you ever asked to
10   prepare a schedule in response to discovery
11   requests in this case?
12   A.    No.
13   Q.    Okay. So this is something you
14   had -- were you ever asked to alter these
15   schedules or modify them in any way with
16   respect to providing discovery in this case?
17        MR. GREEN: Object to the question
18   to the extent it invades communications
19   between counsel and client.
20   Q.    I'm not asking you any discussions
21   you may have had with attorneys in connection
22   with this schedule. But were you ever asked
23   to modify this schedule that you've been -- I
24   take it you've been maintaining this schedule

Page 73

P. EXALL - HIGHLY CONFIDENTIAL

1    for several months now, correct?
2    A.    That would be correct.
3    Q.    Since fourth quarter of '08,
4    right?
5    A.    Yes.
6    Q.    Were you ever asked to modify the
7    schedule in response to anything that was
8    taking place in this litigation here in the
9    US?
10   A.    Not to my recollection.
11   Q.    Okay. Were you ever told in any
12   way that the amount of comp at the bottom,
13   you'll see at the bottom of 280B it totals to
14   1.999 billion. Could you see that?
15   A.    Yes.
16   Q.    Were you ever told that that
17   number should be 2 billion when all was said
18   and done you should get down to 2 billion at
19   the end?
20   A.    No.
21   Q.    I'm not talking in connection with
22   this litigation. I'm just asking in general.
23   Did anyone ever tell you that the total amount
24   of compensation should total about $2 billion?

Page 74

**P. EXALL - HIGHLY CONFIDENTIAL**

1    A.   I was asked to prepare the
2    schedule in respect of detailing the discharge
3    of our obligations to former Lehman Brothers
4    employees in respect of their prior service
5    and compensation for their prior service for
6    Lehman Brothers.  And this is what the
7    schedule represents.  It's items relating to
8    pre-acquisition services.
9    Q.   Okay.  But were you ever told that
10    it should be a total of $2 billion?
11    A.   No.
12    Q.   Do you have any understanding of
13    how this schedule and the compensation listed
14    in this schedule relates to the 9/16 balance
15    sheet or the schedule we looked at previously?
16    MR. GREEN:  The Exhibit 19?
17    Q.   Exhibit 19.
18    A.   The only reference point between
19    schedules 280B and 281B and the schedule you
20    have as Exhibit 19 is the OBS compensation
21    accrual line which is reflected on both 280B
22    and 281B.  The source referenced here is the
23    APA which references the $2 billion described
24    as comp on Exhibit 19.

Page 75

P. EXALL - HIGHLY CONFIDENTIAL

1    Q.   Okay.  So let's look at
2    Exhibit 281B.  I don't want to confuse the
3    record here.
4    A.   Okay.
5    Q.   281B is the most recent version of
6    this schedule, right?
7    A.   That's correct.
8    Q.   Just so I understand what you just
9    said, when you see on the -- OBS Compensation
10    Accrual, OBS stands for opening balance sheet;
11    is that right?
12    A.   Yes.  That's my understanding.
13    Q.   Okay.  And the source for the $2
14    billion number is the APA, correct?
15    A.   Yes.
16    Q.   And by that you mean the source
17    for the $2 billion is Exhibit 19 that we just
18    pointed to?
19    A.   That's correct.
20    Q.   Okay.  So now how do you -- I just
21    want to walk through preparing this schedule.
22    How do you get from the $2 billion number --
23    how do you break it into 17 -- into
24    1.7 billion in cash versus 300 million in

Page 76

**P. EXALL - HIGHLY CONFIDENTIAL**

1    equity?
2    A.   I was requested by Mr. Romaine
3    to -- for accounting purposes to estimate the
4    stock component of any such compensation that
5    may total 2 billion with the assumption that
6    we applied -- oh, sorry.  Let me say it again.
7    I was asked to estimate the stock
8    potential of any compensation that may be
9    represented by this 2 billion.
10    Q.   Okay.
11    A.   And the 300 million is an estimate
12    based on historic norms and experience under
13    the Barclays Capital stock deferral scheme.
14    Q.   Is that the scheme we talked about
15    earlier, the normal practice of Barclays?
16    A.   That is correct, yes.
17    Q.   Okay.  And when did he ask you to
18    do this?
19    A.   I believe it's a technical
20    accounting matter.  And it's really a question
21    for Mr. Romaine.
22    MR. GREEN:  I'm sorry.  Did you
23    say when or why?
24    MR. HINE:  Why.

Page 77

P. EXALL - HIGHLY CONFIDENTIAL

1    MR. GREEN:  Oh, I'm sorry.
2    A.   It's a technical accounting matter
3    in respect of how the -- my understanding is
4    how the acquisition is accounted for in the
5    books and records of Barclays PLC.  I don't
6    know the technical aspects behind it.
7    Q.   Okay.  Just a general question.
8    Has this allocation between cash and equity
9    changed at all since the fourth quarter of '08
10    when you first started preparing the schedule
11    to the present?
12    A.   Not to my recollection.  Again,
13    that would have to be something for Mr.
14    Romaine.
15    Q.   Okay.  And again I'm happy if you
16    tell me it's someone else's department.  I'm
17    not trying to get you to testify about things
18    you have no knowledge about.
19    A.   No, I understand.
20    Q.   In the next -- could you just tell
21    in the general structure here.  You have
22    payments -- I see payments in future and other
23    items.  Payments are cash outflows or expenses
24    that have already taken place?

Page 78

P. EXALL - HIGHLY CONFIDENTIAL
1
2          MR. GREEN: Object to the form.
3      Q.   That's a bad question but --
4      A.   My understanding is that these
5   were amounts that had been either paid in cash
6   or awarded in equity or paid as severance at
7   the time that this spreadsheet had been
8   prepared.
9          Payable in the future I understand
10  to be things that in most cases have not yet
11  been paid and were due and payable at a future
12  time through some sort of timing issue, et
13  cetera; whereas, other items were things that
14  were economic costs to Barclay PLC that were
15  related to awards that had already been made.
16         I guess you could actually
17  categorize the other items -- actually, the
18  way they're represented here the ISP awards
19  you could actually have recategorized that as
20  payments. And payroll taxes, you could
21  categorize that as payable in the future.
22     Q.   I see. When I -- again, just to
23  compare 280B and 281B I see in the first entry
24  under Payment it says Pre -- on 281B it says
25  Pre 22/9 Payroll Items and in 280B is says

Page 79

P. EXALL - HIGHLY CONFIDENTIAL
1
2   22/2. Is that just a typo?
3      A.   Yes, it is.
4      Q.   Okay. So back to 281B. What does
5   this entry encompass?
6      A.   There are two general components
7   to the $12 million I believe you're referring
8   to.
9      Q.   Um-hum.
10     A.   In general, the first is a series
11  of payments made by Barclays on behalf of
12  former Lehman Brothers employees that were
13  expatriates. So these are payments made to
14  tax authorities in other jurisdictions -- or
15  it may have been the US jurisdiction but in
16  the UK and other international jurisdictions
17  in respect of their pre-acquisition service.
18         These were liabilities that
19  effectively would have been for Lehman
20  Brothers but Barclays took on those
21  liabilities and funded them and made good on
22  those payments.
23     Q.   These are payments to the
24  individuals or to regulatory authorities?
25     A.   To regulatory authorities on

Page 80

P. EXALL - HIGHLY CONFIDENTIAL
1
2   behalf of individuals.
3      Q.   Okay. Just so I understand it,
4   these are Lehman employees who were ex-pats at
5   the time of the acquisition who had some
6   regulatory obligation to foreign authorities
7   or other authorities and Barclays paid that;
8   is that right?
9          MR. GREEN: Objection to form.
10         You can answer.
11     A.   That is my understanding.
12     Q.   Okay. And how much of this 12
13  million is that?
14     A.   I estimate it to be approximately
15  $7 million.
16     Q.   And that money didn't go to the
17  individuals; it went to some regulatory
18  authority, correct?
19     A.   That's my understanding.
20     Q.   Okay. And then what's the
21  balance, the 7 from the 12?
22     A.   The balance of 5 -- as I said,
23  there were two items. The balance of the 5
24  relates to payrolls that -- for former Lehman
25  Brothers employees that were due and payable

Page 81

P. EXALL - HIGHLY CONFIDENTIAL
1
2   on and around the date of the bankruptcy.
3   Those payables are not going to be made. They
4   were liabilities for the former Lehman
5   Brothers. They were payables that were not
6   going to be paid. My understanding was there
7   was no cash to make them. As part of the
8   ordinary course of business to take on those
9   employees Barclays agreed to fund those
10  payrolls in respect of those pre-acquisition
11  services.
12     Q.   Okay. Just so I understand the
13  pool of people we're talking about, you're
14  talking about payroll -- payroll amounts that
15  were due to the Lehman employees who came to
16  Barclays?
17     A.   Yes.
18     Q.   You're not talking about -- this
19  does not include payroll that was owed to
20  Lehman employees who stayed with Lehman,
21  correct?
22     A.   That's not my understanding.
23     Q.   We have a double negative there.
24     A.   Yeah. There's a double negative.
25         It's my understanding those

Page 82

1    P. EXALL - HIGHLY CONFIDENTIAL
2    amounts relate to payroll in respect to former
3    Lehman Brothers employees in respect of their
4    pre-acquisition services but these employees
5    were employees that transferred or became
6    employees of Barclays Capital.
7       Q.   Okay.  So it's only folks who
8    transferred to Barclays, correct?
9       A.   That is my understanding in most
10   cases.
11      Q.   Okay.  When you say
12   pre-acquisition services, what do you mean?
13   Can I just use my colloquial term and you tell
14   me whether I'm right or wrong.  Is this base
15   salary that was owed to these folks as of
16   September 22nd?
17      MR. GREEN:  Object to the form of
18   the question.  Do you mean --
19      Q.   Well, let me back up.
20      MR. GREEN:  This specific
21   component of the first entry is what
22   you're talking about?
23      MR. HINE:  I'm talking about the
24   $5 million out of the 12 million that
25   we've been talking about.

Page 83

1    P. EXALL - HIGHLY CONFIDENTIAL
2       MR. GREEN:  Right.
3       Q.   Is that what I've seen referred to
4    as base salary?
5       A.   Not only.  I would suggest without
6    reviewing the records in detail or
7    investigating in general, if you're talking
8    payroll, you're talking any base salary paid
9    to the individual amongst other things that
10   are payroll related.
11      Q.   Like what?
12      A.   Benefits, pensions.  Anything that
13   may or may not -- or that may be part of an
14   individual's monthly salary or related items.
15      Q.   I understand.  But it's not bonus.
16   It's not annual bonuses, right?
17      A.   That's not my understanding, yes.
18      Q.   We've got a double negative.
19      A.   My understanding is that that was
20   a payroll item and I do not believe that there
21   were any - as you term them - annual bonus
22   payments incorporated in that.
23      Q.   When you say a payroll item you're
24   talking about the weekly or biweekly or
25   monthly checks that these folks were getting

Page 84

1    P. EXALL - HIGHLY CONFIDENTIAL
2    throughout the year.
3       A.   That's my understanding.
4       Q.   Okay.  And so is this 5 million
5    payments to those folks up to September 22nd
6    or does it go beyond September 22nd?
7       A.   I don't recall the exact dates.  I
8    don't know the exact dates to which the
9    payroll related.  I do know that they were the
10   payrolls that were due and payable at the time
11   that the acquisition was happening.  The risk
12   was -- and this was the commercial risk --
13   that these employees that were going to come
14   to work for Barclays were not going to get
15   paid for that month by Lehman Brothers.  They
16   would have had no monthly salary not being
17   employed by Barclays at that time.  So this
18   was a make-good, I guess goodwill gesture by
19   Barclays to fund the payroll to ensure the
20   smooth transition into the new structure.
21      Q.   Okay.  So presumably most of these
22   employees have been paid August 31st and this
23   is for the period of September for which they
24   worked?
25      MR. GREEN:  Objection to the form

Page 85

1    P. EXALL - HIGHLY CONFIDENTIAL
2    of the question.
3       A.   I don't know that for certain but
4    I believe that to be the case.
5       Q.   Okay.  But when I see the title it
6    says Pre-September 22nd payroll items, my
7    question is does that 5 million continue these
8    payroll items all the way to the end of the
9    year or is it just for the period in
10   September?  Do you understand my question?
11      A.   They do not relate to any payments
12   for the rest of the year.
13      Q.   Okay.  So the 5 million is just to
14   bring these employees up to September 22nd; is
15   that right?
16      A.   I can't testify to whether the
17   22nd of September is the exact date but what I
18   can tell you is that is for their salary and
19   related items as per a payroll that was due
20   and payable at the time in and around the
21   acquisition.  So whether that was the 23rd or
22   the 25th of September I can't testify.  I
23   don't know the exact dates.
24      Q.   Okay.  But assuming the date of
25   around September 22nd, this item, the $5

Page 86

P. EXALL - HIGHLY CONFIDENTIAL

1  million, does not include payments for
2  October, November and December for those
3  employees; is that right?
4      A.  That is right.
5      Q.  Okay.  The next item we see is
6  replacement RSUs.  Could you tell us what that
7  is?
8      A.  RSU is an acronym to stand for
9  restricted stock units.
10     Q.  Okay.  And what are they?
11     A.  They are effectively in general
12 stock awards made to individuals that are
13 restricted in the sense that they either do
14 not vest immediately or can't be sold
15 immediately.
16     Q.  Okay.  Now, these are a form of
17 compensation that Lehman had previously used?
18     A.  Yes.
19     Q.  Okay.  Did Barclays previously use
20 these?
21     A.  Yes, we have.
22     Q.  Okay.  Now, I see that you cite
23 here $11 million and I just want to read your
24 source.  It says new RSUs granted as

Page 87

P. EXALL - HIGHLY CONFIDENTIAL

1  replacements for ex-Lehman employees granted
2  to them in 2008 prior to the acquisition.
3      So just explain to me what's going
4  on here.  This is Barclays replacing some RSUs
5  that Lehman had previously granted to its
6  employees?
7      MR. GREEN:  Object to form.  You
8  may answer.
9      A.  There was a population of people
10 that were given stock awards by Lehman
11 Brothers earlier in 2008.  At the time of the
12 acquisition the value of those awards had
13 declined to zero.
14     Q.  Right.
15     A.  For these specific employees it
16 was decided that as a goodwill gesture,
17 Barclays would give restricted stock awards in
18 respect of that zero -- that original award
19 now valued at zero in effect to split the loss
20 50/50.
21     So as a hypothetical example if
22 the individual had been -- received an award
23 of stock to the value of $100 from Lehman
24 Brothers that had gone to zero at the time of

Page 88

P. EXALL - HIGHLY CONFIDENTIAL

1  the bankruptcy, Barclays' goodwill gesture in
2  respect of that employee would have been to
3  give them a stock award to the value of 50 in
4  Barclays stock.
5      Q.  So it's in Barclays stock now.
6      A.  It's in Barclays stock but relates
7  to the value of stock awarded prior to the
8  acquisition by Lehman Brothers.
9      Q.  And that's based on the value of
10 Barclays stock as of around September '08,
11 correct?
12     A.  That's normal practice, yes.
13     Q.  And does this vest over a period
14 of time?
15     A.  It would have, yes.  I don't know
16 the specific vesting for this particular award
17 but that would be the normal course of events,
18 yes.
19     Q.  Would it be the three-year cliff
20 vest that you mentioned earlier?
21     A.  It may or may not have been.
22 Often -- in many cases we will mirror the
23 original vesting of an award at a previous
24 employer with a replacement award.  I can't

Page 89

P. EXALL - HIGHLY CONFIDENTIAL

1  testify to what the vesting period because I
2  don't know it for this particular award.
3      Q.  Okay.  Well, if it vested over
4  time, would it be entered on the balance sheet
5  for this year?
6      A.  Sorry.  Excuse me?
7      Q.  If it had vested over time would
8  it be entered on the acquisition balance sheet
9  for this year?
10     MR. GREEN:  Object to the form of
11 the question.  You may answer if you
12 know.
13     A.  I believe that's a technical
14 accounting question.  I believe the answer to
15 be yes but I can't pass an exact accounting
16 opinion.  You should refer that to Mr.
17 Romaine.
18     Q.  Okay.  And when you say this is a
19 goodwill gesture are you saying that Barclays
20 wasn't obligated to do this under the APA?
21     MR. GREEN:  Objection to the form
22 of the question.  It calls for a legal
23 conclusion.
24     A.  I don't know what the APA

Page 90

P. EXALL - HIGHLY CONFIDENTIAL

1    specifically obligated Barclays or anyone else
2    to do. I do know that this is a goodwill
3    gesture for those employees. That's my
4    understanding of that award.
5        Q.    Okay. And are these very senior
6    employees?
7        A.    I believe they are -- there are --
8    I -- hum. I would categorize them as
9    employees -- I would suggest -- my
10    recollection is actually that they're a range
11    of employees. There were some senior
12    employees and some junior employees in that.
13    I don't think that they were specifically
14    targeted as the senior group. They were a
15    group of people that had received awards at
16    Lehman Brothers.
17        Q.    Whoever happened to be in the pool
18    of people who received an award.
19        A.    In the specific grouping, yes.
20        Q.    The next entry -- well, another
21    question on that. Why is that not in the
22    equity column, that 11 million?
23        A.    I don't know.
24        Q.    Do you think it should be or is it

Page 91

P. EXALL - HIGHLY CONFIDENTIAL

1    just a -- it's not paid in cash, right?
2        A.    My understanding it was stock
3    awards.
4        Q.    Okay. You don't know why it's
5    in --
6        A.    No.
7        Q.    Okay. You have to answer either
8    yes or no. If you shake your head --
9        A.    Oh, sorry. I don't know why.
10        Q.    The next entry is Bonus Concluding
11    Social Tax. Could you tell me what you mean
12    by social tax? What is that?
13        A.    My interpretation of social tax
14    would be -- my understanding would be these
15    are any ancillary taxes that would be due and
16    payable to various regulatory authorities in
17    respect of any annual bonus payment at any
18    point in time in whatever jurisdiction they
19    have to be made in.
20        Q.    So is this like withholding tax?
21    Income tax?
22        A.    Not personal income tax, no.
23        Q.    Oh. Just any --
24        A.    Let me characterize it again.

Page 92

P. EXALL - HIGHLY CONFIDENTIAL

1    Where withholdings are required, yes, they
2    would be included in that number. It would
3    also include whatever benefits may or may not
4    be derived from any annual incentive payment
5    that is made. So I believe one of those to be
6    FICA in the US.
7        Q.    Okay. So this would -- this
8    figure of 1.529 billion includes all of that
9    type of regulatory requirements, correct?
10        A.    That's my understanding, yes.
11        Q.    Okay. And when you say bonus
12    here, these are annual bonuses?
13        MR. GREEN: Object to the form.
14        Q.    Well, let me show you another
15    document. Maybe that helps me ask the
16    question better.
17        (Pause on the record.)
18        Q.    While we're trying to find the
19    document, do you see in the source it says TCR
20    27 Feb 2009?
21        MR. GREEN: 23rd Feb?
22        Q.    23 Feb.
23        A.    TCR is an acronym for our internal
24    on-line compensation review system. It stands

Page 93

P. EXALL - HIGHLY CONFIDENTIAL

1    for total compensation review. The date 23
2    February 2009 relates to the date the data
3    were extracted from that system from which
4    this -- that element of the schedule was
5    prepared.
6        Q.    Okay. So this is just a database
7    where you track compensation payments to
8    employees?
9        A.    In effect, yes.
10        Q.    Oh, okay. And would that data
11    have changed since February of '09 up until
12    the date you prepared this?
13        MR. GREEN: Object to the form.
14        A.    I don't believe so. The
15    compensation round had closed at that point.
16        Q.    Okay.
17        A.    Whilst there may be movements of
18    items subsequent to that, I think that data
19    extract is accurate.
20        Q.    When you say the compensation
21    round had been concluded, is there like an
22    annual schedule for the award of bonuses at
23    Barclays?
24        MR. GREEN: Object to the form.

Page 94

```
 1      P. EXALL - HIGHLY CONFIDENTIAL
 2       A.   Yes. There's a normal cycle that
 3  is followed.
 4       Q.   Okay. So are you saying that
 5  they've been awarded by February 23rd and they
 6  probably didn't change between then and now?
 7       A.   At the 23rd of Feb the cash
 8  amounts would have been distributed through
 9  the payroll. The equity awards, the value
10  thereof would have been fixed.
11       Q.   Okay.
12       A.   The equity awards I don't believe
13  had been formally made in terms of the amount
14  of stock units at that point. But the value
15  of those awards had been fixed.
16       Q.   But you're relatively confident
17  that there's been no substantial changes from
18  February 23rd to the present.
19       A.   Yes, I am.
20       Q.   Okay. Let me hand you a copy of
21  an exhibit that's been previously marked as
22  216 which is a copy of a contract between
23  Barclays and Mr. Lowitt. I'm just going to
24  use this as an example so I don't expect that
25  you're familiar with the terms but if you want
```

Page 95

```
 1      P. EXALL - HIGHLY CONFIDENTIAL
 2  to just take a minute to take a look at it.
 3       (Document review.)
 4       MR. GREEN:  Bill, while he's
 5  looking at I should say that as I'm sure
 6  you know this entire deposition is
 7  designated highly confidential.
 8       MR. HINE:  Highly confidential.
 9       MR. GREEN:  And don't expect any
10  redesignation because it's all about
11  comp.
12       MR. HINE:  I understand. I
13  understand.
14       MR. GREEN:  So it will remain that
15  way.
16       MR. HINE:  Well, I think our
17  agreement is we'll treat it as all
18  highly confidential and you guys let me
19  know if have you any re-designations.
20  ·    MR. GREEN:  Right.
21       MR. HINE:  So that's fine.
22       MR. GREEN:  Right.
23  BY MR. HINE:
24       Q.   Mr. Exall, have you had a chance
25  to look at this document?
```

Page 96

```
 1      P. EXALL - HIGHLY CONFIDENTIAL
 2       A.   Yes.
 3       Q.   And my question is Mr. Lowitt is
 4  apparently awarded something entitled 2008
 5  guaranteed cash bonus.
 6       Do you see that?
 7       A.   I do.
 8       Q.   Do you understand that that bonus
 9  is part of the bonus including social tax
10  entry that we just talked about on this
11  spreadsheet?
12       A.   Yes.
13       Q.   Okay. Is there anything else on
14  Mr. Lowitt's contract that would be part of
15  that $1.5 billion figure?
16       A.   If I take Mr. Lowitt as the
17  example, the ▮▮▮▮▮ referred to in the
18  contract as being 2008 guaranteed cash bonus
19  would be part of the ▮▮▮ number reflected as
20  cash in that line.
21       Q.   Okay.
22       A.   The EPP -- 2008 EPP recommendation
23  to the value of ▮▮▮▮▮ as reflected in
24  the contract, would be included in the $258
25  million number.
```

Page 97

```
 1      P. EXALL - HIGHLY CONFIDENTIAL
 2       Q.   I see. Okay.
 3       A.   Any ancillary social taxes and
 4  whatever that were due and payable to whatever
 5  authorities or any withholding tax in regard
 6  with are included in those numbers as well.
 7  Those obviously are not specified in the
 8  contract as well.
 9       Q.   I understand that. But any
10  regulatory requirements related to those two
11  entries on its contract would be included in
12  the numbers that you put in the spreadsheet,
13  correct?
14       A.   That's correct.
15       Q.   Okay. And how about where you see
16  he has a special cash award, is that in that
17  entry on the spreadsheet?
18       A.   No, it is not.
19       Q.   Okay. Where would I find that
20  entry on the spreadsheet?
21       A.   It is not on the spreadsheet.
22       Q.   Okay. So what is the special cash
23  award that I see several senior executives
24  from -- former Lehman executives getting?
25       MR. GREEN:  Object to the form of
```

25 (Pages 94 to 97)

Page 98

P. EXALL - HIGHLY CONFIDENTIAL

1  the question.
2  A.   My understanding of these special
3  cash awards is that they are retention awards
4  subject to future service of the employee.
5  They do not relate to pre-acquisition services
6  performed for Lehman Brothers in relation to
7  these individuals. Consequently, they're not
8  on the schedule.
9  Q.   Okay. So just so -- I was
10  confused about that.
11  So where I see special cash award
12  and various contracts that is to encourage the
13  individual to stay at Barclays for a period of
14  time, correct?
15  MR. GREEN: Object to the form.
16  You may answer.
17  A.   That is my understanding of their
18  retention award.
19  Q.   When you say retention award
20  that's an inducement for them to stay a period
21  of time; is that right?
22  A.   Yes. That's my understanding.
23  Q.   Okay. And then -- and because
24  that was not meant to compensate them for work

Page 99

P. EXALL - HIGHLY CONFIDENTIAL

1  they had done at Lehman it's not part of your
2  spreadsheet; is that right?
3  A.   Totally not related to the
4  pre-acquisition service supplied by Lehman
5  Brothers and consequently are not on the
6  schedule.
7  Q.   Okay. So this schedule is only
8  relating to pre-acquisition services that
9  former Lehman employees performed for Lehman;
10  is that right?
11  A.   Yes. That's correct.
12  Q.   All right. Thank you for
13  clarifying that.
14  While we're on Mr. Lowitt's
15  contract, again we'll use it as an example but do
16  you see the provision that says termination
17  other than for cause?
18  A.   I see the provision.
19  Q.   And that lays out certain benefits
20  that he's entitled to if he gets terminated
21  without cause. Is that what I would call a --
22  is that a severance payment?
23  MR. GREEN: Take your time to read
24  the provision before you answer just to

Page 100

P. EXALL - HIGHLY CONFIDENTIAL

1  make sure your answer is addressed to
2  the question.
3  (Document review.)
4  A.   Can you repeat the question?
5  Q.   Well, why don't we do this. We're
6  going to get to some entries called severance
7  on your spreadsheet so we'll come back to that
8  question.
9  A.   Yes.
10  Q.   It has to do with severance so
11  let's just postpone that question.
12  Let's go back to your spreadsheet.
13  The next entry I see is IBD Grad
14  Programs. Could you tell me what that is?
15  A.   These -- the IBD grad program is
16  the graduate program implemented by the
17  former -- well, we had one at Barclays Capital
18  but the majority of the -- well, all the
19  people reflected on here are the former Lehman
20  Brothers graduates that were working in the
21  investment banking division of Lehman Brothers
22  that came on as part of the acquisition. The
23  payments related to them are reflected here in
24  respect of their pre-acquisition service.

Page 101

P. EXALL - HIGHLY CONFIDENTIAL

1  These were made in June of 2009.
2  That is a quirk -- I term it a quirk. It's
3  market practice for Lehman Brothers graduate
4  program to pay their annual bonuses to the
5  graduates at midyear. It's different to the
6  policy that we had at Barclays Capital. We
7  stuck to this -- their policy in respect of
8  the US graduates.
9  Q.   These are investment banking
10  division employees who went to grad school and
11  is this a payment to the grad school for the
12  school?
13  A.   No, no, no. These are payments to
14  the individuals. The graduate program as --
15  these are people as you pointed out are
16  graduates that we recruited off campus to come
17  and work for us. They're on the former
18  graduate program within investment banking.
19  And their compensation is -- I would term it
20  as being quite rigorously standardized in the
21  sense that there's a lot of competition in the
22  market for these individuals and there's quite
23  a standardized form of compensation paid to
24  them. And they're on the specific program

Page 102

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   that is different to let's say non-graduate
 3   employees.
 4       Q.   So this isn't a bonus. This is a
 5   compensation -- this is an extra form of
 6   compensation to them because they went to
 7   graduate school?
 8       A.   No. It's an extra form of
 9   compensation because they're on the graduate
10   program and as part of that program they're
11   entitled to certain awards at certain points
12   in time. June 2009 being the point in time at
13   which they were entitled to them.
14       Q.   Okay. I guess I'm just not
15   understanding that. You've recruited them out
16   of -- Lehman has recruited them out of a grad
17   school and this is a payment they get as an
18   extra incentive to come work for Lehman?
19       MR. GREEN: Objection to form.
20       You may answer.
21       A.   This is for all intents and
22   purposes in general their annual bonus, okay?
23   Their timing is different than the general
24   population for whatever reason. That's
25   standard practice at -- it was standard
```

Page 103

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   practice at Lehman -- the cycle of their bonus
 3   awards or payments were midyear. Whereas
 4   everyone else it's year end.
 5       Q.   Okay. But they are still in grad
 6   school still?
 7       A.   No, no. They have left grad
 8   school. They're all graduates. But they're
 9   part of our formal graduate program having
10   been recruited from grad school.
11       Q.   Okay. And how are they eventually
12   transitioned from this program into becoming a
13   regular -- like, how do they transition to the
14   normal bonus cycle?
15       A.   I can't speak for the exact Lehman
16   policy but in general my understanding of the
17   graduate program that we have is that they
18   rotate for a certain period of time within the
19   business in which they work. They learn their
20   business. They, you know, work, they learn,
21   et cetera. And as and when they -- the
22   graduate program is generally a finite amount
23   of time. In Barclays Capital traditionally it
24   was 18 months. The graduates did a bunch of
25   rotations in various business areas and they
```

Page 104

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2   were either employed or not employed at the
 3   end of that cycle by Barclays Capital.
 4       Q.   Okay. So --
 5       A.   But I -- if the Lehman Brothers
 6   scheme is the same in general as the Barclays
 7   Capital scheme, that's how think I would
 8   transition into what I would term as the
 9   general population.
10       Q.   Okay. I think I understand it.
11   So this is -- these are folks who had been in
12   this graduate program as of September 22nd and
13   now are able to continue in that same program
14   at Barclays?
15       A.   Yes. That's my understanding of
16   it.
17       Q.   Okay. So the $11 million here is
18   in lieu of an annual bonus for them?
19       A.   It's exactly the same for all
20   intents and purposes as any other compensation
21   delivered to any other ex-Lehman employee.
22   It's just that the timing is different.
23       Q.   Well, do they also receive a base
24   salary?
25       A.   Yes, they do.
```

Page 105

```
 1        P. EXALL - HIGHLY CONFIDENTIAL
 2       Q.   Okay. So they have a base salary
 3   and then an additional amount paid in or
 4   around June of every year; is that correct?
 5       A.   That's correct.
 6       Q.   And is this only the additional
 7   amount or does this also include the base
 8   salary?
 9       A.   This is the additional amount.
10       Q.   And where does their base salary
11   fall?
12       A.   In the normal books and records of
13   Barclays Capital.
14       Q.   So that would be up in the first
15   item, the $5 million we talked about earlier?
16       MR. GREEN: Object to the form.
17       A.   I would say that insofar as the
18   IBD graduates may or may not have -- may have
19   been in the payrolls that Barclay made good
20   the answer would be yes.
21       In general, I don't believe -- I
22   believe that most of those investment banking
23   graduates were not part of that payroll cycle
24   and consequently any salary paid to them
25   pre-acquisition would have been borne -- the
```

Page 106

P. EXALL - HIGHLY CONFIDENTIAL

1    costs would have been borne by Lehman Brothers
2    and post acquisition would have been borne by
3    Barclays Capital in the normal course of
4    business. And those payments would not be
5    reflected in the schedule.
6        Q.   Okay. So this $11 million for IBD
7    graduates is only -- does not include the base
8    salary component of their compensation.
9        A.   That's correct.
10       Q.   Okay. It only includes the
11   portion of their compensation that they
12   receive every June. Or thereabouts.
13       A.   It reflects what was paid to them
14   in June 2009.
15       Q.   Okay. And --
16       A.   In respect of their
17   pre-acquisition service for Lehman Brothers.
18       Q.   So it's paid to them in June of
19   2009 but it relates to their work up until
20   September of 2008?
21       A.   Yes.
22       Q.   And how about their work from
23   September onward?
24       A.   This again comes back to the

Page 107

P. EXALL - HIGHLY CONFIDENTIAL

1    difference in treatment between a graduate and
2    a non-graduate. As I mentioned before,
3    graduate compensation is quite highly specific
4    and regulated within specified bands and it's
5    run in a different way to compensation for
6    non-graduates. Consequently, these amounts
7    would have been June payable almost
8    irrespective of the performance of the
9    graduate.
10       So by the fact that we employed
11   them as part of the acquisition those would
12   have been paid in any event. It's simply a
13   timing issue.
14       Q.   Well, does it mean that some of
15   that 11 million relates to work that they did
16   after September?
17       A.   I don't believe so to be the case.
18       Q.   You don't think so?
19       A.   No.
20       Q.   Why not?
21       A.   Because I believe as I mentioned
22   before that those amounts would have been June
23   payable to these graduates in any event.
24   Irrespective of their service. These are --

Page 108

P. EXALL - HIGHLY CONFIDENTIAL

1    as I said, their compensation is treated
2    somewhat differently to compensation among
3    non-graduates.
4        Q.   Okay. And are they informed that
5    this is their annual bonus?
6        MR. GREEN: Object to the form of
7    the question.
8        A.   I haven't seen what was given to
9    them as part of their graduate program.
10       Q.   Okay. If we go back to the bonus
11   in the previous entry, the $1.529 billion,
12   does any of that encompass work that were
13   performed by former Lehman employees since
14   they've come to Barclays? In other words,
15   after September 22nd?
16       MR. GREEN: Object to the form.
17   Asked and answered.
18       A.   This schedule represents
19   compensation paid to former Lehman Brothers
20   employees in respect to their pre-acquisition
21   services for Lehman Brothers.
22       Q.   So am I correct to say that $1.529
23   billion does not relate in any way to work
24   these individuals performed for Barclays after

Page 109

P. EXALL - HIGHLY CONFIDENTIAL

1    September 22nd?
2        A.   That is my understanding, yes.
3        Q.   And so in certain employment
4    contracts if I see anything relating to a 2009
5    bonus recommendation you're saying that would
6    not be in this $1.259 billion number?
7        A.   No, it wouldn't. It would not be
8    in that number.
9        Q.   Okay.
10       A.   Well, could you show me an example
11   if you want to be specific?
12       Q.   I'm not sure I have one but I --
13       A.   I mean, if I refer back to Mr.
14   Lowitt's contract it talks about a 2008
15   guaranteed cash bonus and a 2008 EPP
16   recommendation.
17       Q.   Right.
18       A.   Those amounts are included on the
19   spreadsheet. Had there been two additional
20   clauses referring to 2009 cash and stock,
21   those would not have been on the schedule.
22       Q.   Okay. That was my question.
23       Now, when you see on his contract
24   he has a -- if you see on there it says

Page 110

P. EXALL - HIGHLY CONFIDENTIAL

1  compensation he has a base salary of ███.
2  Do you see that?
3  A.  Yep. I do.
4  Q.  Is that on your spreadsheet at all
5  within any entries?
6  A.  No.
7  Q.  And why is that?
8  A.  Because that salary would have
9  been paid to him post-acquisition. The
10 schedule does not reflect any post-acquisition
11 obligations.
12 Q.  I understand. So that is
13 compensation he's receiving for work he's
14 performing for Barclay post-acquisition.
15 A.  That would be correct. The only
16 way that that -- some of that ███ would
17 have been part of this schedule is if it was
18 part of the pre-2009 payroll we discussed
19 previously.
20 Q.  I understand. Okay.
21 The next entry you'll see is
22 entitled Severance. Could you tell me what
23 that is meant to cover?
24 A.  That relates to payments and

Page 111

P. EXALL - HIGHLY CONFIDENTIAL

1  ancillary -- payments to individuals.
2  Withholding taxes and ancillary liabilities in
3  respect of the reduction in force exercise
4  implemented in Q4 2008 and Q1 2009 in respect
5  of former Lehman Brothers employees.
6  Q.  Okay. When I see RIF in the
7  source that's reduction in force?
8  A.  That acronym stands for reduction
9  in force, yes.
10 Q.  And what does that VIG stand for?
11 A.  I don't know what VIG actually
12 stands for. It is meant to refer to the Q1
13 2009 reduction in force exercise.
14 Q.  So RIF refers to the fourth
15 quarter '08 reduction in force?
16 A.  That's my understanding.
17 Q.  And the second acronym refers to
18 the first quarter of '09 reduction in force?
19 A.  That's my understanding.
20 Q.  Okay. And you got lists of --
21 what do your lists show from HR? I see a
22 reference from HR.
23 A.  We maintained -- we, HR,
24 maintained databases of payments made to

Page 112

P. EXALL - HIGHLY CONFIDENTIAL

1  individuals and related items on a
2  name-by-name-basis reflecting these items
3  totalling these amounts on the schedule.
4  Q.  Okay. Now, these individuals came
5  to work for Barclays at or around September
6  22nd and had left since then?
7  A.  These are former Lehman Brothers
8  employees that came and worked for Barclays
9  and then were part of the reduction in force
10 exercises, yes.
11 Q.  Okay. So they're not -- that list
12 does not include people who ever came to
13 Barclays at all.
14 A.  That's not my -- I believe that to
15 be the case, yes.
16 Q.  Okay. So if they received
17 severance it was from Lehman, not Barclays,
18 correct?
19 MR. GREEN: Object to the form of
20 the question. You can answer if you
21 know.
22 A.  I don't know.
23 Q.  Okay. Fair enough.
24 A.  I don't know.

Page 113

P. EXALL - HIGHLY CONFIDENTIAL

1  Q.  And how was their severance
2  calculated?
3  A.  The standard severance policy of
4  Lehman Brothers was applied in respect to --
5  in most cases in respect of former Lehman
6  Brothers employees and the application of that
7  policy resulted in severance payments being
8  calculated and awarded to individuals
9  concerned.
10 Q.  Okay. Now, this is -- these
11 severance payments are separate from the bonus
12 payments we talked about earlier.
13 A.  Yes, they are.
14 Q.  Okay. So these are -- is it
15 correct all of these payments have been made
16 to people who no longer work for Barclays,
17 correct?
18 A.  Yes.
19 Q.  Now, why in the entry do we have
20 some severance and it looks like it's payable
21 in the future? Do you see the entry I'm
22 talking about? The $27 million?
23 A.  I do.
24 Q.  What is that meant to cover?

Page 114

P. EXALL - HIGHLY CONFIDENTIAL

1     A.   These are meant to cover exactly
2 the same thing in that they are severance
3 related to former Lehman Brothers employees
4 that are part of the reduction in force
5 exercise. But these are amounts that had not
6 at the time of the production of the schedule
7 either been paid or had been reconciled fully
8 to the extent that they had -- we can trace
9 the item to a payroll.
10     Q.   Can you explain that last part to
11 me.
12     A.   For the most part these amounts
13 have been paid. Have actually been discharged
14 and the cash has left the account. The 27
15 million reflect payments that have not as yet
16 been made. All are still in the process of
17 being reconciled.
18     Q.   Meaning negotiating with the
19 individuals leaving?
20     A.   No. Reconciling between what
21 people originally estimated their -- an
22 individual severance to be and what they were
23 eventually paid on the payroll. There may be
24 differences between those two points.

Page 115

P. EXALL - HIGHLY CONFIDENTIAL

1     Q.   So am I correct to say that that
2 27 million entails either a reconciliation
3 issue that you just mentioned or something
4 that's been promised to someone after they
5 left but that's payable in the future.
6     A.   That's my understanding, yes.
7     Q.   Okay. So if I wanted to know the
8 total amount of severance paid to former
9 Lehman employees or to be paid to former
10 Lehman employees I would add up the 238 and
11 the 27 million, correct?
12     A.   Yes. And that would cover not
13 only the payment made to individuals and the
14 withholding associated with those but also an
15 estimate for ancillary benefits and amounts
16 that may be payable on those amounts to
17 various regulatory bodies.
18     Q.   So do you have any understanding
19 whether these severance entries related in any
20 way to the clause 9.1(c) of the APA that we
21 discussed earlier which talked about bonuses?
22     MR. GREEN:  Object to the form to
23 the extent it calls for a legal
24 conclusion.

Page 116

P. EXALL - HIGHLY CONFIDENTIAL

1     A.   I don't have a specific -- I don't
2 have specific knowledge as to how the two are
3 tied together or not as the case may be. I'm
4 not qualified to interpret that. What I can
5 say is that again these are severance related
6 to former Lehman Brothers employees related to
7 their service with Lehman pre-acquisition.
8     Q.   Okay. In the Future Severance
9 entry in your note you talk about the RIF and
10 VIG list from HR and then you write, "And
11 includes 25 percent for benefits for RIF."
12     What does that refer to?
13     A.   We have made an estimate in these
14 amounts in this 27 million in respect of, as I
15 mentioned earlier, payments that may be due
16 and payable to regulatory bodies in respect of
17 benefits or people that are on salary
18 continuation. So these are people that don't
19 get their severance upfront, they take it over
20 a period of time, and they're still covered by
21 benefits. So those are payments, estimates in
22 respect of the benefit amounts that they're
23 still covered for during the period of their
24 severance.

Page 117

P. EXALL - HIGHLY CONFIDENTIAL

1     Q.   So is it correct to say 25 percent
2 of the 27 million is that type of benefit?
3     A.   I don't know if that's the exact
4 calculation. I haven't got an answer for
5 that.
6     Q.   Okay. If you refer back to
7 Exhibit 19 are these severance payments part
8 of the $2 billion in comp that you see listed
9 there or do you have any understanding about
10 that?
11     MR. GREEN:  Object. Calls for a
12 legal conclusion.
13     A.   I don't know what that represents.
14 So I can't say whether those services are
15 included or not.
16     Q.   When you said that you were
17 pointing to the $2 billion on figure 19?
18     A.   Described as comp, yes.
19     Q.   Oh, okay. When I looked at the
20 prior version, 280B, it says Severance 2 as
21 the title. Or is that just a typo?
22     A.   Typo.
23     Q.   Okay. And now you might have
24 covered this already but how did the severance

Page 118

P. EXALL - HIGHLY CONFIDENTIAL

1  figures change from the time you prepared the
2  first version of this -- or version marked as
3  280B versus the most recent version?
4     I mean, I see they've gone down in
5  terms of the payment severance version but
6  they've gone up -- oh, no. I guess they've
7  gone down in both instances.
8     MR. GREEN: Object to the form.
9     A. Could you just restate that
10 question?
11    Q. If I compare the two severance
12 entries on Exhibit 280B with 281B it's fair to
13 say the severance numbers have reduced,
14 correct?
15    A. That is correct.
16    Q. And my question is why.
17    A. If you aggregate them I believe
18 the Schedule 280B, the amounts of severance
19 total $314 million. On Schedule 281B they
20 total $265 million. That's approximately a
21 $40 million difference.
22    Is that right?
23    $50 million difference. Excuse
24 me.

Page 119

P. EXALL - HIGHLY CONFIDENTIAL

1     MR. GREEN: Forty-nine.
2     A. $49 million. Okay.
3     The reason for the movement --
4  there are two reasons in general. One was a
5  pure error on the spreadsheet. There were
6  amounts paid -- there were amounts of
7  severance that were paid to individuals that
8  were included both in the bonus including
9  social tax line and in the severance line.
10 That related to approximately $28 million that
11 if I refer back to 280B that $28 million was
12 reflected in the 261 and was reflected in the
13 1,529.
14    Q. So you're just removing the double
15 counting.
16    A. We removed the double count and
17 moved it to the second schedule which we
18 discovered for the reconciliation award.
19    Q. Okay.
20    A. The other reduction of the
21 additional, what? -- $21 million relates to a
22 full -- a more full reconciliation of the
23 severances yet to be paid. As I mentioned
24 earlier, we were in the process of reconciling

Page 120

P. EXALL - HIGHLY CONFIDENTIAL

1  what original severances were estimated to be
2  for individuals versus what was actually
3  processed and paid ultimately to those
4  individuals.
5     And in the cross-comparisons of
6  the original database to the payroll we
7  discovered that people had been estimated to
8  receive severances substantially in excess to
9  what they actually received. So the
10 difference between A and B is a reduction as
11 you see reflected on the schedule.
12    Q. Okay. Is any of the difference
13 between these two schedules -- the severance
14 entries on these two schedules the result of
15 any kind of change in policy at Barclays as to
16 severance payments?
17    A. Not at all.
18    Q. Okay. And who would I ask if I
19 really wanted specifics on that question?
20 That would be --
21    MR. GREEN: On which question?
22    Q. On just severance payments.
23    A. On policy or specific severance
24 payments?

Page 121

P. EXALL - HIGHLY CONFIDENTIAL

1     Q. Both.
2     A. On policy I think you could direct
3  both sets of questions through to Mr. Kerman.
4     Q. Okay.
5     A. Although he's not responsible for
6  payroll. You know, he may or may not pass
7  that question on.
8     Q. But when you get the lists from
9  HR, is he the person preparing those lists?
10    A. No. It would be -- it's prepared
11 by, you know, people within HR function.
12    Q. Okay.
13    A. He doesn't prepare them, no.
14    Q. Well, does he supervise those who
15 prepare them?
16    A. He's the head of employee
17 relations. I don't know whether he
18 particularly supervised the preparation of
19 these databases. He knows of their existence.
20    Q. But am I correct -- I mean, as
21 you've described it, it seems to be -- the
22 difference in the two schedules appears to me
23 to be just reconciling accounting errors or
24 reconciliation type errors; is that right?

Page 122

P. EXALL - HIGHLY CONFIDENTIAL

1        MR. GREEN: Object to form.
2     A.   The errors -- well, the two items
3  represent a double count of particular
4  individuals.
5     Q.   **Right.**
6     A.   Which were clear errors in the
7  production of the original spreadsheet. As
8  well as a further reconciliation as to
9  estimated severance amounts versus actual
10  payments to former Lehman Brothers employees.
11  The reconciliation effort is a -- you know,
12  was -- is a joint effort between HR and
13  finance professionals.
14     Q.   **Okay. Now, if we looked at your**
15  **spreadsheets over time which you said you**
16  **started preparing them in the fourth quarter**
17  **of '08, is it fair to assume that the**
18  **severance numbers would have increased over**
19  **time?**
20        MR. GREEN: Object to the form.
21     A.   I don't recall.
22     Q.   **I mean, the more people leave, the**
23  **more gets paid out in severance and these**
24  **numbers increase, correct?**

Page 123

P. EXALL - HIGHLY CONFIDENTIAL

1     A.   I would be speculating. It sounds
2  plausible but I can't answer directly. I
3  don't have the previous schedules in front of
4  me.
5     Q.   **Okay. Well, my question is how do**
6  **you know that these severance payments are**
7  **made in respect of work they did at Lehman**
8  **when they've been working for Barclays for six**
9  **or eight months now? Where's the cutoff?**
10        MR. GREEN: Object to the form.
11     A.   In general, severance payments are
12  based on previous service at an employer. The
13  vast majority of any individual receiving a
14  severance, the vast majority of their previous
15  service would have been in respect of Lehman
16  Brothers, services rendered to Lehman
17  Brothers.
18     Q.   **So in preparing this schedule**
19  **which is only supposed to reflect service or**
20  **costs associated with their service at Lehman,**
21  **you're assuming that the entire amount of**
22  **severance paid to these individuals is in**
23  **respect of their service at Lehman; is that**
24  **right?**

Page 124

P. EXALL - HIGHLY CONFIDENTIAL

1     A.   That is what I am assuming on the
2  schedule, correct.
3     Q.   **And theoretically at some point**
4  **any severance payment they received should**
5  **also include a component that relates to their**
6  **work at Barclays, right?**
7        MR. GREEN: Object to the form.
8     A.   Just repeat that question, please.
9     Q.   **Well, theoretically over time if**
10  **these folks worked for Barclays for a period**
11  **of time, a portion of their severance has to**
12  **be allocated to the work they did at Barclays**
13  **as opposed to Lehman, right?**
14     A.   That would be correct.
15     Q.   **Okay. But you haven't made that**
16  **allocation in preparing this spreadsheet?**
17     A.   I don't believe so. I can't
18  answer for my -- I believe that these
19  represent amounts paid to individuals for
20  their pre-acquisition service.
21     Q.   **Okay. The next entry talks about**
22  **the payroll tax on equity compensation.**
23     A.   Yes.
24     Q.   **Could you explain to me what that**

Page 125

P. EXALL - HIGHLY CONFIDENTIAL

1  **is?**
2     A.   Those would be amounts due and
3  payable to relevant tax authorities once the
4  equity awards reflected on the schedule are
5  vested and become vested by the employees.
6     Q.   **So is this the three-year cliff**
7  **vest you talked about?**
8     A.   Yes.
9     Q.   **So three years from now there will**
10  **be some kind of obligation to regulatory**
11  **authorities based on individuals' receipt of**
12  **their stock bonus?**
13     A.   That's my understanding.
14     Q.   **And the 1.79 percent what is that**
15  **based on?**
16     A.   That's an estimate made by finance
17  based -- you'd have to ask them. My
18  understanding is it's based on a blended rate
19  of tax which is standard practice across
20  Barclays Capital.
21     Q.   **Okay. And then what is that --**
22  **1.9 percent of that --**
23        MR. GREEN: 1.79 percent you mean?
24     Q.   **I'm sorry. 1.79 percent of what?**

Page 126

P. EXALL - HIGHLY CONFIDENTIAL

2  A.  It relates to the $258 million
3  of -- in the equity column of bonuses
4  including social taxes. I should point out
5  here if you do a calculation of 1.79 on the
6  258 you don't get 9.
7  Q.  Right. That's my question.
8  A.  The difference is the growth in
9  the Barclays stock price subsequent to the
10 award being made. The tax will be payable,
11 due and payable, based on the ultimate value
12 of those awards when the vest. So that 9
13 could increase over time.
14 Q.  Well, so this 1.79 assumes a
15 growth in the value of the stock that's
16 vesting over that three-year period, right?
17 A.  The 1.79 is the blended -- my
18 understanding is that the 1.79 is the blended
19 rate applied to the equity award respect of
20 tax.
21 Q.  Right.
22 A.  You will notice that's being
23 increased by a multiple of 2 on the
24 spreadsheet.
25 Q.  Right.

Page 127

P. EXALL - HIGHLY CONFIDENTIAL

2  A.  The reflects the fact that between
3  the date of award of these stock -- these
4  amounts of stock and the date at which these
5  schedules were prepared, the stock price of
6  Barclays underpinning the value of these
7  awards had roughly doubled.
8  Q.  From when to when? From
9  September --
10 A.  These stock awards were made in
11 May 2009. And the schedule is done as you see
12 it with all these -- it is an estimate of a
13 liability that is due and payable at some
14 future time. That liability may or may not be
15 $9 million. It could be different.
16 Q.  Okay. But at present you're
17 estimating it at 9 million.
18 A.  That's correct.
19 Q.  And that's assuming or it's based
20 on an increase in the value of the Barclays
21 stock which is the item that you multiple by
22 1.79.
23 A.  My calculation would be the $258
24 million multiplied by 1.79 percent times 2,
25 the 2 factor representing the growth of the

Page 128

P. EXALL - HIGHLY CONFIDENTIAL

2  Barclay stock price.
3  Q.  Okay. And now this $9 million
4  doesn't get paid to former Lehman employees,
5  right? It gets paid to regulatory authorities
6  around the globe?
7  A.  Yes.
8  Q.  The next entry talks about
9  acquisition buyout vesting over two years.
10 Do you see that?
11 A.  I do.
12 Q.  ███████. What is that meant
13 to encompass?
14 A.  As described here, it's a bonus
15 relating to pre-acquisition performance by an
16 individual or individuals that worked for
17 Lehman Brothers and now work for Barclays.
18 These are commitments that we assumed and
19 embodied in contracts in respect of this
20 individual or individuals to deliver this
21 ███████ over the next two years.
22 Q.  Okay. Now, let's turn back to Mr.
23 Lowitt's contract.
24 A.  Yeah.
25 Q.  Do you see the special cash award

Page 129

P. EXALL - HIGHLY CONFIDENTIAL

2  to be awarded over two years?
3  A.  I do.
4  Q.  Is that this 50 -- part of this
5  $53 million you're talking about?
6  A.  No.
7  Q.  Okay. So I don't see any other
8  entries here that could be that. You're
9  saying that he's not one of the recipients of
10 the ███████ that you're talking about
11 here?
12 A.  No, he is not.
13 Q.  Okay. And who is getting that
14 money?
15 MR. GREEN:  You can go ahead and
16 answer.
17 A.  A gentleman by the name of Mr.
18 Jonathan Hoffman.
19 Q.  And who is he?
20 A.  He is a principal trader in the
21 global markets business at Barclays Capital.
22 Q.  And why is he getting this money?
23 A.  The amount was owed -- was due and
24 payable to him by Lehman Brothers under his
25 contract with Lehman Brothers pre-acquisition.

Page 130

P. EXALL - HIGHLY CONFIDENTIAL
1  Barclays assumed that liability as part of the
2  acquisition process and embodied these amounts
3  of that compensation amongst others in that
4  contract and those amounts are due and payable
5  to him over time as specified in that
6  contract.
7      Q.   Okay.  Now, this is all -- the
8  entire ███████ goes to this one individual?
9      A.   That is correct.
10     Q.   Over a three-year period?
11     A.   He receives two tranches of
12  ███ in February '10 and February '11.  And
13  the additional ███ will effectively be
14  delivered in February of 2010.
15     Q.   Okay.  When I -- just for
16  clarification when it says February '10 that
17  means February 2010?
18     A.   That is correct.
19     Q.   And February '11 means February
20  2011?
21     A.   That is correct.
22     Q.   And maybe you explained this but
23  is this -- what is this to reflect as far as
24  his performance at Lehman?

Page 131

P. EXALL - HIGHLY CONFIDENTIAL
1      A.   He was owed -- under his contract
2  with Lehman Brothers, that was the amount due
3  and payable to him -- well, that is not the
4  entire amount.  But that is the amount
5  included on this spreadsheet.  Well, the
6  entire amount is included on this spreadsheet.
7  There's another element sitting in bonus
8  including social taxes.  The ████
9  represents the amount outside of the bonus
10  including social taxes amount and is in
11  respect -- the entire amount is in respect of
12  the contract that he had at Lehman Brothers
13  which guaranteed him a payout on his trading
14  performance.  And the amount relates to the
15  trading performance he did, for want of a
16  better word, pre-acquisition.
17     Q.   Okay.  So this is a con -- he had
18  a contract with Lehman that provided him X
19  amount of compensation based on his trading
20  performance and this number is the amount due
21  and payable to him up to September 22nd, 2008
22  under that contract?
23         MR. GREEN:  Object to the form of
24  the question.

Page 132

P. EXALL - HIGHLY CONFIDENTIAL
1      A.   That's correct.
2         MR. GREEN:  Well, could we go off
3  the record for one second?  Because I
4  think the record is unclear.  Or I can
5  add a clarification.
6         MR. HINE:  You want to add a
7  clarification?
8         MR. GREEN:  But I don't want to
9  testify.
10        MR. HINE:  No, no.  You can take a
11  break.
12        MR. GREEN:  Take a short break.
13        (Recess taken.)
14        MR. HINE:  Let's go back on the
15  record.
16     A.   A clarification of the previous
17  question perhaps is relevant.  The amounts --
18  the amounts payable to Mr. Hoffman were
19  amounts that were due and payable to him under
20  the contract with Lehman Brothers.  And the
21  clarification is they had not as yet at that
22  time been paid to him at all.  They were just
23  due and payable to him.  He hadn't received
24  any of that compensation.

Page 133

P. EXALL - HIGHLY CONFIDENTIAL
1      Q.   So Barclays undertook that
2  obligation to pay him what he was owed by
3  Lehman.
4      A.   That is correct.
5      Q.   Okay.  But in your note here it
6  says bonus relating to performance for one
7  January to 22 September '08.
8         Do you see that?
9      A.   I do.
10     Q.   Then it says but with future time
11  served criteria and a portion linked to future
12  production.
13        What does that mean?
14     A.   I can't -- I'll give you my
15  general interpretation of the terms.  The
16  specific legal interpretation of the
17  forfeiture clauses I can't really speak to all
18  that.
19     Q.   Sure.
20     A.   The intention was to deliver two
21  payments or two tranches of ████ in
22  each of February 2010 and February 2011.
23  Those payments could be reduced -- each
24  payment could be reduced by up to ████

Page 134

P. EXALL - HIGHLY CONFIDENTIAL
1  P. EXALL - HIGHLY CONFIDENTIAL
2  should Mr. Hoffman had made losses in his
3  trading for Barclays Capital post-acquisition.
4     So for all intents and purposes we
5  promised Mr. Hoffman to pay him ████████
6  ████████ of that ███ -- of each of the ███
7  could be re -- that ███ could be
8  reduced by up to ████████ should he have
9  made losses for Barclays Capital in the
10 performance period subsequent to the
11 acquisition.
12    Q.   So part of the ███ is based on his
13 performance at Barclays, right?
14    MR. GREEN:  Object to the form.
15    A.   No.  The entire fee is based on
16 his pre-acquisition performance.  The delivery
17 of the residual ███ is to an extent relative to
18 his trading performance at Barclays.
19    Q.   All right.  So am I correct to
20 say -- and how much is at issue with respect
21 to his performance at Barclays?  I thought you
22 said ████████ --
23    A.   ████████ of each of the ███ --
24 again, you would need a lawyer to interpret
25 the contract.

Page 135

1  P. EXALL - HIGHLY CONFIDENTIAL
2    Q.   Sure.  Sure.
3    A.   I'm giving you a general
4  intention, and my interpretation personal and
5  it may or may not -- somebody may or may not
6  agree with that or not.  Ten of the 20 -- of
7  each ███ was subject to forfeiture depending on
8  the extent of Mr. Hoffman's loss -- trading
9  loss for Barclay in each of those years.  And
10 the ████████ is also subject to him having
11 made money for Barclays subsequent to his --
12    Q.   So am I correct to say that the ███
13 ████████ is based on his pre-acquisition
14 performance at Lehman but Barclays'
15 willingness to assume that liability is in
16 part based on how well he performs at
17 Barclays?
18    MR. GREEN:  Object to the extent
19 it calls for a legal conclusion.
20    A.   Barclays assumed the entire
21 liability and has structured some terms and
22 conditions around the delivery of that
23 liability.
24    Q.   Well, but that's a modification to
25 the agreement he had at Lehman, right?

Page 136

1  P. EXALL - HIGHLY CONFIDENTIAL
2    A.   The two agreements are distinct
3  and separate.  They're two individual
4  contracts that stand alone.
5    Q.   Okay.  But Barclays assumes a
6  ████████ obligation based on his work prior
7  to the acquisition, right?
8    A.   That's correct.
9    Q.   But Barclays' willingness to pay
10 that is contingent on at least in substantial
11 part on bow well he performs for Barclays
12 thereafter, correct?
13    A.   That is correct.  As well as Mr.
14 Hoffman being in employment with Barclays at
15 the time.
16    Q.   Okay.  So he has to stay an
17 employee at Barclays at least througb the
18 third payment.
19    A.   I don't know that for certain.
20 Again, I can't interpret the specific leaving
21 clauses or termination clauses under his
22 agreement.  But in general that's -- you know,
23 I would say it's based on future time served
24 criteria as well trading performance.
25    Q.   Okay.  And so is there an

Page 137

1  P. EXALL - HIGHLY CONFIDENTIAL
2  individual agreement with this Mr. Hoffman?
3    A.   Yes, there is.
4    Q.   Okay.  And -- okay.  Is there
5  anything else in this entry of ████████
6  other than tbe Mr. Hoffman deal?
7    A.   Nope.
8    Q.   Okay.  I bad a follow-up question
9  on tbe -- you bad previously talked about tbe
10 social tax and the payroll tax in certain of
11 these entries.  Do you remember that?
12    A.   Yes.
13    Q.   And I didn't understand whether
14 you're talking about -- when you have an entry
15 for one of those taxes, are you talking about
16 tbe withholding obligation of Barclays or
17 Barclays' own obligation to pay those
18 authorities?
19    I don't know if that's a clear
20 question but --
21    A.   No, it's not.
22    MR. GREEN:  Object to the form.
23    Q.   Barclays has an obligation to
24 withhold personal income tax as to certain
25 individuals, rigbt?

Page 138

P. EXALL - HIGHLY CONFIDENTIAL

1   A.  Yes.
2   Q.  So when you have an entry in here
3 on payroll tax, for example, is that -- where
4 it says payroll tax on equity compensation, do
5 you remember that discussion?
6   A.  Yes.
7   Q.  Is that just a withholding tax or
8 is it an obligation of Barclays to pay the tax
9 authorities?
10   MR. GREEN:  Object to the form.
11   A.  I actually don't know the answer
12 to that.  It is a tax that's due and payable
13 to the regulatory authorities.  As to whom
14 that liability relates, I don't know.
15   Q.  Okay.  And would that be the same
16 answer with respect to the social tax up in
17 the bonus entry?
18   A.  Yes.
19   Q.  Okay.
20   A.  What I can say is that the
21 withholding taxes that you referred to that
22 are -- these are the gross amounts payable to
23 those individuals in terms of -- so if I refer
24 again back to Mr. Lowitt's contract, we've got

Page 139

P. EXALL - HIGHLY CONFIDENTIAL

1 to pay him a cash advance of ███████.
2 That's a gross amount payable to him.  He in
3 his individual capacity has to pay income tax
4 which we will withhold in entirety.  The
5 entire ███ is embodied in the ███ cash
6 component effectively.
7   Q.  Okay.  And I don't think I asked
8 you this but if we go to that bonus entry with
9 social tax, do you see that?
10   A.  Yes.
11   Q.  The 1.529 billion.  Could you give
12 me a percentage -- how much of that is the
13 social tax portion and how much is the actual
14 bonus paid to that individual?
15   MR. GREEN:  Object to form.
16   Q.  Gross bonus paid to that
17 individual.
18   A.  I don't have the exact amount but
19 I would categorize it as not significant.
20   Q.  Can you ball park percentages?
21   A.  Crickey.
22   If I had to guess I'd say maybe
23 $50 million.
24   Q.  $50 million?  Okay.  And --

Page 140

P. EXALL - HIGHLY CONFIDENTIAL

1   A.  And the reason I say that -- and,
2 again, not being a payroll professional I
3 can't speak for every social tax that may or
4 may not be payable as part of a payroll.
5   Q.  Sure.
6   A.  But one of the --the only one is
7 the FICA taxes that are payable to the US tax
8 authorities in whichever form that may be.
9 That's -- I know is 1 point something percent.
10 It's a very small percentage.  So I'm basing
11 my estimate on that primarily.
12   I do not believe that that -- if I
13 was to look at that line and if you -- I would
14 categorize the social tax item as being not
15 significantly material.
16   Q.  Okay.  And there are documents
17 somewhere at Barclays that would specify how
18 much that social tax is with respect to those
19 bonuses?
20   A.  Yes.
21   Q.  Okay.  How about the payroll tax
22 on equity compensation?
23   A.  What's your question?
24   Q.  That's a separate entry so I don't

Page 141

P. EXALL - HIGHLY CONFIDENTIAL

1 need to ask that question.  I apologize.  I
2 misunderstood that.
3   A.  Okay.
4   Q.  Okay.  The payroll tax on
5 acquisition buyout, what is that?
6   A.  The ███████ reflected on the
7 schedule, I believe or I understand the
8 calculation to be similar to the one
9 referenced in the payroll tax and equity tax
10 line in compensation of ███████ shown
11 directly above it on the schedule.
12   Q.  So that relates only to Mr.
13 Hoffman's deal with Barclays?
14   A.  That's my understanding.
15   Q.  And that money doesn't get paid to
16 him; it he gets paid to a regulatory
17 authority?
18   A.  That's my understanding.
19   Q.  Can we skip down to ISP awards.
20 Could you explain to me what that is?
21   A.  The acronym?
22   Q.  Yes.
23   A.  The ISP stands for incentive share
24 plan.  It is a stock award program -- it's the

Page 142

1    P. EXALL - HIGHLY CONFIDENTIAL
2    name of the stock award program we have in
3    place at Barclays and which we will utilize to
4    make these relevant awards.
5    Q.   Is this a plan that was in place
6    at Lehman prior to the acquisition?
7    A.   This plan was not in place at
8    Lehman, no. They had similar stock award
9    programs under their own compensation schemes.
10   Q.   Okay. And so what is this
11   ██████████ being paid for?
12   A.   Okay. So these -- the ██████████
13   directly relates to the $258,000,000 further
14   up in the Equity column under Bonus Including
15   Social Taxes.
16       The sequence of events was as
17   follows. Under normal Barclays policy stock
18   awards are made in March of every year. So
19   under the normal practice Barclays would have
20   made stock awards to individuals in March of
21   2009 in respect of their 2008 annual bonuses.
22   Q.   Okay.
23   A.   The stock awards for various
24   reasons were made in May 2009. The value of
25   the awards -- well, because of the unforeseen

Page 143

1    P. EXALL - HIGHLY CONFIDENTIAL
2    and unanticipated delay in making the awards
3    to individuals, during that period the stock
4    price at Barclays appreciated substantially
5    and in effect individuals received an amount
6    of stock units of less than what they would
7    have received had the awards been made under
8    the normal process in March 2009 because of
9    the increase in the stock price.
10       The ██████████ reflects
11   additional shares awarded to those -- to
12   former Lehman Brothers employees and the
13   awards were not exclusive to former Lehman
14   Brothers employees. This just reflects the
15   component related to former Lehman Brothers
16   employees to compensate them for that loss of
17   value that they had suffered as a result of
18   the normal process not having been followed in
19   that particular year.
20   Q.   So just so I understand why --
21   what caused the delay in the award of the
22   bonus -- of the stock bonuses?
23   A.   I can't speak for the specific
24   reason why. I know there was a delay.
25   Q.   Was it related to the

Page 144

1    P. EXALL - HIGHLY CONFIDENTIAL
2    Barclays/Lehman acquisition?
3    A.   No. Not to my knowledge.
4    Q.   Okay. So this -- if I understand
5    you correctly, this ██████████ only relates
6    to stock awards granted to former Lehman
7    employees, right?
8    A.   This ██████████ dollars, yes.
9    Q.   All right. And it's to compensate
10   them for the delay in awarding that award from
11   March until May.
12   A.   That's correct.
13   Q.   But aren't the Lehman Brothers
14   employees granted their award back in
15   September?
16   A.   They were given a value, a dollar
17   value of award. When it comes to granting an
18   amount of stock units they get an amount of
19   stock units based on the prevailing share
20   price at the time of the award grant.
21       So they would have received --
22   I'll give you a hypothetical example. An
23   individual would have had $100 worth of stock
24   of value that was to be delivered to him in
25   March of 2009. Assume the stock price in

Page 145

1    P. EXALL - HIGHLY CONFIDENTIAL
2    March 2009 was a dollar. He would have got a
3    hundred shares. Those awards were never made
4    in March. What happened was they were made in
5    May. In May let's assume for argument's sake
6    the stock was $2. He would only have got 50
7    shares. He got -- and he's lost the stock
8    price appreciation he would have got on the
9    hundred shares had he been awarded them three
10   months prior.
11       The ██████████ is to compensate
12   him for that loss of value in the respect of
13   the fewer amounts of shares that he ultimately
14   received.
15   Q.   Okay. So it's actually the --
16   it's the value of the appreciation of the
17   stock he would have received from March to
18   May.
19   A.   It's not the entire value. It's
20   to compensate him for that loss of value. I
21   don't believe that the entire value is
22   reflected in this number. It was to
23   compensate him for an extent of that, yes.
24   Q.   Well, here's my question. If he's
25   granted in September $100 worth of stock bonus

Page 146

P. EXALL - HIGHLY CONFIDENTIAL

1  P. EXALL - HIGHLY CONFIDENTIAL
2  he would have gotten a hundred shares in
3  March -- or he would have gotten a hundred
4  shares in March if the price was a dollar
5  using your hypothetical, right?  He would also
6  have gotten his hundred shares in May if he
7  gets 50 shares at $2.  Why --
8       MR. GREEN:  Object to the form.
9       Q.  Well, I'm trying to use your
10  hypothetical.
11      A.  My hypothetical is that he would
12  not have got the hundred shares in May.  He
13  would have only got 50 shares in May.
14      Q.  But it would be worth $2 at that
15  time.
16      A.  That's correct.  The value would
17  have been the same.  But he has lost that.
18  Rewind to March.  If he had been awarded the
19  shares in March he would have a hundred shares
20  worth a dollar.  Those shares by May would
21  have been worth 200 at the stock price of 2.
22      Q.  Okay.
23      A.  You're giving him only a hundred
24  of value in May.
25      Q.  Okay.

Page 147

1  P. EXALL - HIGHLY CONFIDENTIAL
2       A.  That's the difference.
3       Q.  I see.  So this is done not only
4  for the former Lehman employees.  It's also
5  done for all the other Barclays employees who
6  suffered this same type of loss, right?
7       A.  They were granted for the
8  majority -- for other Barclays Capital
9  employees that received stock awards at the
10  time for the most part, yes.
11      Q.  So this is not --
12      A.  This is a subset of a wider
13  population.
14      Q.  This program, this ISP award was
15  not granted to former Lehman employees.  It
16  was granted Barclays wide to those who
17  qualified, right?
18      A.  To my knowledge, it was not
19  granted Barclays wide.  It was Barclays
20  Capital wide.
21      Q.  Okay.
22      A.  I don't -- I can't testify as to
23  if it was that specific, but there were more
24  individuals concerned than this.  I cannot say
25  it was a Barclays wide policy.  I don't know

Page 148

1  P. EXALL - HIGHLY CONFIDENTIAL
2  that to be true.
3       Q.  But it's not a former Lehman
4  employees policy only.
5       A.  Not only, no.
6       Q.  Okay.  So then why is this
7  award -- how is this award related to the work
8  they performed at Lehman?  Because, I mean,
9  basically it's compensating them for a delay
10  in a stock payment while at Barclays.
11      MR. GREEN:  Object to the form.
12      A.  The amount of the award is derived
13  directly from the equity awards that would
14  have been made under the normal course of
15  business.  And insofar as they are related to
16  pre-acquisition service on behalf of Lehman
17  Brothers, these -- the value of these awards,
18  the economic cost of these awards relate to
19  that pre-acquisition service.  It relates to
20  the delivery of the stock component of
21  compensation in many cases embodied in
22  contracts such as Mr. Lowitt's here.  Had they
23  been awarded in the normal course of business
24  in March of 2009.
25      Q.  Okay.  But --

Page 149

1  P. EXALL - HIGHLY CONFIDENTIAL
2       A.  They all relate to the awards
3  embodied -- well, if I take Mr. Lowitt as an
4  example, any additional shares he would have
5  been awarded under that program relate to the
6  2008 EPP recommendations that embodied in his
7  contract and the value thereof.
8       Q.  I understand how they relate to
9  it.  But the award -- isn't it true that the
10  award itself of the ISP is to compensate them
11  for mistakes or whatever problems occurred at
12  Barclays that caused this delay from March to
13  May, right?
14      MR. GREEN:  Object to the form.
15      A.  I can say that the ▮▮▮▮▮ has
16  nothing to do with post-acquisition service of
17  Barclays PLC.  It has everything to do with
18  the services that they provided
19  pre-acquisition to Lehman Brothers.
20      Q.  I'm not sure you've answered my
21  question.  I understand that the 258 million
22  comes from their pre-acquisition services.
23  But this additional ▮▮▮▮▮▮, isn't it the
24  case, is paid to them because of some mistakes
25  or whatever happened at Barclays that caused

Page 150

P. EXALL - HIGHLY CONFIDENTIAL

1  this delay in awarding the bonus, right?
2      MR. GREEN: Object to the form.
3      A.  It directly relates to the $258
4  million insofar as the ▮▮▮▮▮ is derived
5  specifically from the $258 million reflected
6  on the schedule.
7      Q.  All right. I understand how it's
8  derived from the 258 million and I understand
9  how the 258 million is derived from their
10 pre-acquisition work. But the ▮▮▮▮ is
11 not compensation for pre-acquisition work.
12     MR. GREEN:  Asked and answered.
13 Bill, I think you've asked this question
14 three times and he's given you his
15 answer.
16     MR. HINE:  Well, I'm getting what
17 seems to be an evasive answer.
18     MR. GREEN:  No. He's given you an
19 answer and it's an entirely appropriate
20 answer and there's no reason to ask it
21 until you get the answer you want.
22     MR. HINE:  All right. I just want
23 an answer to the last one I asked.
24     MR. GREEN:  Could you repeat the

Page 151

P. EXALL - HIGHLY CONFIDENTIAL

1  question?
2      (Record read.)
3      Q.  Is that right?
4      A.  No. In my personal opinion it is
5  not. The ▮▮▮▮ would have been
6  valued -- would have accrued to these
7  individuals had they received their stock
8  awards under the normal course of business.
9  It was directly compensation related to
10 pre-acquisition services in relation to Lehman
11 Brothers as derived from the shares that they
12 would have got had the normal course of
13 business been followed.
14     Q.  Okay. Now, the payroll tax on
15 those awards, what is that?
16     A.  The calculation of those again is
17 an accounting -- is an estimate similar to the
18 one reflected previously on the schedule
19 entitled Payroll Tax on Equity Compensation.
20     Q.  So same method of estimating only
21 now you're estimating it based on ▮▮▮▮?
22     A.  That's correct.
23     Q.  Okay. Back to the ▮▮▮▮ for
24 a second. It says here Additional shares

Page 152

P. EXALL - HIGHLY CONFIDENTIAL

1  awarded at 25P. What does that P mean?
2      A.  Pence. English pence. English
3  pounds.
4      Q.  So is that the equivalent of
5  25 percent?
6      A.  Yes. 25 cents on the dollar.
7      Q.  Okay. So 25 cents on the dollar
8  as measured against the value of a Barclays
9  share from March to May?
10     A.  No. That's not correct. So if
11 you related back to the 258 it's roughly a
12 quarter.
13     Q.  Oh, I gotcha. 25 cents on the
14 dollar as compared to the 258 million.
15     A.  That would be correct.
16     Q.  Okay. And 25 cents is not total
17 compensation for the value increase in
18 Barclays' share but it's a portion of the --
19 it's based on the -- as a portion of the
20 increase in Barclays' share price from March
21 to May?
22     MR. GREEN: Object to form.
23     A.  I don't recall the loss of value
24 or the notional loss of value. I don't recall

Page 153

P. EXALL - HIGHLY CONFIDENTIAL

1  the exact amounts. I don't believe it's an
2  exact lack-for-lack replacement. I can't
3  speak to whether it was more or less but I
4  believe it was less.
5      Q.  Okay. Substantially less or
6  just --
7      A.  I don't recall.
8      Q.  Okay. But if I wanted to find
9  that out I would take the share price from
10 Barclays in March and compare it to May?
11     A.  You would think so. That's not
12 practically how things work. The stock awards
13 at any point in time are generally based on an
14 average stock price calculated over a number
15 of days in which stock would have been
16 purchased in the market to hedge the awards.
17     So there is a process underpinning
18 it. There is some math -- there is
19 mathematical calculations behind all this that
20 had been produced. But you can't simply just
21 take a spot price at a point in time.
22     Q.  I gotcha.
23     Now, if I look at the bottom line
24 it says Total Spend. Do you see that?

Page 154

P. EXALL - HIGHLY CONFIDENTIAL

1    A.    I do.
2    Q.    That is -- that's not what
3  Barclays has spent to date, correct? Because
4  that includes future payment.
5        MR. GREEN:  Object to the form.
6    A.    Not all those cash payments have
7  been made, no.
8    Q.    Okay.  In other words, if I wanted
9  to know the total amount that has been paid to
10  date, I would look up to the $1.543 billion
11  number?
12    A.    On this schedule that would be
13  correct.  I would suspect that on further
14  reconciliation some of the 27 million
15  reflected as severance under the payable in
16  the future may well flip up into the previous
17  category.
18    Q.    Okay.
19    A.    And obviously as time moves on
20  other amounts will.
21    Q.    Well, in the course of working on
22  the compensation for these former Lehman
23  employees were you aware that there's a
24  provision in the APA that required them to be

Page 155

P. EXALL - HIGHLY CONFIDENTIAL

1  paid by March 15th of 2009?
2        MR. GREEN:  Object to the form.
3    A.    I've seen the date March 15th,
4  2009.  I'm unsure as to what that obligates
5  Barclays to do or what it doesn't obligate
6  Barclays to do.
7    Q.    Okay.  So, in other words, the
8  March 15th, 2009 date is not something you've
9  been shooting to comply with in the course of
10  compensating these employees?
11        MR. GREEN:  Object to the form of
12  the question.  Are you speaking to him
13  personally?
14        MR. HINE:  Well, he's not paying
15  them.  Barclays is paying them.
16        MR. GREEN:  Okay.  So --
17    Q.    Is the March 15th, 2009 date
18  something that Barclays has taken into
19  consideration when it's paid these employees
20  these various forms of compensation?
21        MR. GREEN:  Object to the form.
22  You may answer if you know.
23    A.    I don't know specifically whether
24  we've taken -- it's a date that we know of.

Page 156

P. EXALL - HIGHLY CONFIDENTIAL

1  But I can't answer for the specific wording of
2  your question when you refer to paid.  Can you
3  rephrase that perhaps in some different way?
4    Q.    Yeah, let's try this.  You see the
5  entry for bonuses, bonus including social tax?
6    A.    Excuse me.  Oh, sorry.  On the
7  schedule?
8    Q.    On the spreadsheet.
9    A.    Yes.
10    Q.    Was that all paid or committed by
11  March 19th, 2009?
12    A.    The cash amounts -- certainly I
13  would say the vast majority if not all, but
14  there's always an exception.  People sometimes
15  don't want to be paid at a particular point in
16  time.  Those cash amounts would in the
17  majority have been paid and discharged by that
18  time.
19    Q.    Okay.
20    A.    The equity awards, again, I've
21  explained to you the delay in the award of
22  value -- the award of the amount of shares.
23  But I believe that at the time of bonus there
24  were compensation communications for employees

Page 157

P. EXALL - HIGHLY CONFIDENTIAL

1  they would have been aware of the value of
2  that stock.
3    Q.    Okay.
4    A.    As opposed to the amount of units
5  they would receive.  But, again, I'm not
6  specific on the date.
7    Q.    And the delay you talked about was
8  the one you previously mentioned from March to
9  May?
10    A.    That's correct.  In terms of the
11  equity awards, yes.
12    Q.    Any other entries on this
13  spreadsheet that were made before March 15th
14  2008 -- 2009?
15    A.    March 15th?  Sorry?  Could you
16  say that again?  Sorry.  I missed the
17  question.
18    Q.    Were any other entries on this
19  spreadsheet paid before March 15th, 2009?
20        MR. GREEN:  Objection to form.
21  You may answer if you know.
22    A.    Yes.  There were entries on the
23  spreadsheet prior to March 15th, 2009.
24    Q.    Like what?

Page 158

P. EXALL - HIGHLY CONFIDENTIAL
1
2    A.    An example would have been
3    severance payments made to individuals
4    terminated under the RIF, reduction in force
5    program in Q4 2008 and Q1 2009 as one example.
6    Q.    Okay.  Any others?
7    A.    There are likely to be some bonus
8    advances that were made to particular
9    individuals that are included in the 1,271
10    number which is bonus to clean social taxes.
11    They may well have been paid prior to the 15th
12    of March 2009.
13    Q.    Okay.  Any others?
14    A.    Off the -- obviously, the pre-22/9
15    payroll items would have been discharged and
16    paid prior to the 15th of March 2009.
17    Q.    Why?  When were they paid?
18    A.    Well, as I've said to you 5
19    million of the $12 million relate to payrolls
20    that had to be made in September of 2008.
21    Q.    So they were paid in September
22    2008.
23    A.    That's my understanding.
24    Q.    Okay.  And the ex-pat regulatory
25    sum of $7 million, that was --

Page 159

P. EXALL - HIGHLY CONFIDENTIAL
1
2    A.    I don't know exactly when that was
3    paid.
4    Q.    Okay.  Could you turn to the APA
5    again.  Section 9.1(c).
6    A.    (Witness complies.)
7    Q.    And I know you're not a lawyer and
8    I'm not trying to trip you up here but if you
9    refer to the section where it says -- do you
10    see the sentence about a third of the way down
11    the paragraph that starts, "Any amounts that
12    would have been allocated in respect of any
13    transferred employee who voluntarily
14    terminates employment before such award is
15    made shall instead be allocated among the
16    remaining transferred employees."
17    Do you see that?
18    A.    I do.
19    Q.    Did that ever happen?
20    MR. GREEN:  Objection to form.
21    You can answer if you know.
22    A.    I don't know.  Did what ever
23    happen?
24    Q.    Well, did someone who was supposed
25    to get a bonus, for example, and voluntarily

Page 160

P. EXALL - HIGHLY CONFIDENTIAL
1
2    terminated did the bonus that he was supposed
3    to get thrown back in and get distributed
4    among the remaining transferred employees?
5    A.    I don't know.  I mean, there were
6    people that resigned.
7    Q.    Yeah.
8    A.    And they got nothing as they left.
9    Q.    Okay.  Let me give you a specific
10    question then.
11    MR. HINE:  Let's mark this.
12    (Deposition Exhibit 282B, document
13    bearing production numbers
14    BCI-EX-00113161 through BCI-EX-00113163,
15    marked for identification as of this
16    date.)
17    BY MR. HINE:
18    Q.    Mr. Exall, I'm handing you a copy
19    of an exhibit marked 282B which appears to be
20    a form of employment contract offered to Mr.
21    McDade dated December 18th, 2008.  It has
22    Bates stamps BCI-EX 00113161 through -63.
23    My first question is have you ever
24    seen this document before?
25    A.    I may have seen it.  I don't

Page 161

P. EXALL - HIGHLY CONFIDENTIAL
1
2    recall.
3    Q.    Do you know if Mr. McDade signed
4    this employment contract with Barclays?
5    A.    No, I don't.
6    Q.    You don't know?
7    A.    I don't know.
8    Q.    Okay.  Just as an aside, do you
9    see the date is September 18th, 2008?
10    A.    I do.
11    Q.    Which is prior to the September
12    22nd closing.
13    Do you know how many Barclays
14    employees were offered employment contracts
15    before the closing?
16    A.    Before the 22nd of September?
17    Q.    Yeah.
18    A.    No.  I don't know.
19    Q.    Do you know how I could find that
20    out?  Would Mr. Evans know that?
21    A.    He wouldn't know off the top of
22    his head.  I guess it's a request you could
23    make.  And it could be found out.  It's
24    possible.
25    Q.    Okay.

Page 162

P. EXALL - HIGHLY CONFIDENTIAL

1    A.   We could count contracts.
2    Q.   Do you know if there was any
3    effort to offer employment terms to the --
4    what I've seen called as the Elite 8 or the
5    top eight people at Barclays prior to the
6    closing?
7         MR. GREEN: Object to the form of
8    the question. When you say closing what
9    date are you referring to?
10        MR. HINE: I'm talking about
11   September 22nd, 2008.
12        A.   Sorry. Could you repeat the
13   question?
14   Q.   Are you aware of any efforts to
15   offer employment or to discuss the terms of
16   employment with former Lehman executives prior
17   to September 22nd?
18        A.   I have no direct knowledge. I
19   wasn't involved in any negotiations with any
20   of these employees.
21   Q.   Okay. Have you heard anything
22   about that?
23        A.   I don't recall.
24   Q.   Do you have any understanding

Page 163

P. EXALL - HIGHLY CONFIDENTIAL

1    about former Lehman executives who signed
2    employment contracts with Barclays prior to
3    September 22nd, 2008?
4         A.   Do I have any what? Sorry.
5    Q.   Understanding.
6         A.   What does that mean?
7    Q.   Well, do you have any knowledge
8    that, for example, Mr. Lowitt signed his
9    contract before the closing?
10        A.   I've never examined the contracts
11   in that respect, no.
12   Q.   Well, I didn't ask you if you
13   examined the contracts. Do you have any
14   understanding about whether any of the senior
15   executives at Lehman were signed up by
16   Barclays before the closing?
17        A.   I don't know.
18   Q.   Okay. Back to Mr. McDade's --
19        A.   Okay.
20   Q.   Whether he signed it or not I'm
21   not really sure, but my question is you'll see
22   in this document it refers to a cash bonus of
23   2008, right?  A 2008 EPP recommendation.
24        Do you see that?

Page 164

P. EXALL - HIGHLY CONFIDENTIAL

1    A.   I see that.
2    Q.   Do you see the special cash award?
3    A.   I do.
4    Q.   Now, did Mr. McDade -- Mr. McDade
5    resigned, correct?
6    A.   I don't know how -- I don't know
7    the circumstances around Mr. McDade's joining
8    or not or leaving or not from Barclays.
9    Q.   You don't know whether he was
10   terminated for cause or without cause.
11        A.   I have no knowledge of his
12   arrangements, no.
13   Q.   Okay. Do you have any knowledge
14   of any individual that was supposed to be
15   offered awards like this who then left and my
16   question is what happened to that award money?
17        MR. GREEN: Object to the form.
18   A.   I don't understand the question.
19   Q.   Well, if you look back at 9.1(c)
20   it purports to say -- it appears to say that
21   their award money should go back into the pool
22   and be shared among the all the transferred
23   employees and my question is did that in fact
24   ever happen?

Page 165

P. EXALL - HIGHLY CONFIDENTIAL

1    MR. GREEN: Objection to form.
2    Calls for a legal conclusion.
3         A.   I don't know what Section 9.1(c)
4    obligates Barclays to do so I can't answer
5    that question.
6    Q.   Okay. You don't know one way or
7    the other?
8         A.   I don't have an opinion on that.
9    Q.   Okay. If you skip down further in
10   that paragraph, 9.1(c), you'll see it starts
11   with the word "however" and then from there to
12   the end of the paragraph it talks about a
13   circumstance where perhaps more than
14   10 percent of the transferred employees
15   voluntarily terminate.
16        Do you see that?
17        A.   I do.
18   Q.   Am I safe to assume that that did
19   not happen in connection with the
20   Barclays/Lehman transaction?
21        MR. GREEN: I just want to caution
22   the witness to read the exact language
23   you're referring to.
24   Q.   It says, "However, the accrued '08

Page 166

1    **P. EXALL - HIGHLY CONFIDENTIAL**
2    FY liability shall be reduced if..."
3        MR. GREEN: All the way to the end
4    of the paragraph?
5        MR. HINE: Yes.
6        MR. GREEN: Okay. Take your time
7    to read that.
8        Q. Take your time to read that but my
9    question is did that ever happen or are you
10   aware of that clause ever being invoked or
11   that many people ever left. So just take your
12   time to read it.
13       MR. GREEN: Object to the form
14   before he answers the question.
15       (Document review.)
16       A. I can't speak for the obligations
17   that this places upon Barclays. I don't know
18   what those are. I can't interpret it.
19       Perhaps I can answer in a
20   different way. I don't know what it means by
21   voluntarily terminated. That would be my
22   question. I don't know what exactly you're
23   asking me to answer.
24       Q. Well, I understand you're not a
25   lawyer and I'm not trying to ask for any legal

Page 167

1    **P. EXALL - HIGHLY CONFIDENTIAL**
2    interpretation. Is it correct to say that in
3    the course of your employment in your present
4    position you haven't heard anyone say, Oh,
5    more than 10 percent of the people left, we
6    should reduce the bonus pool?
7        MR. GREEN: Object to form.
8        Q. Or words to that effect?
9        A. No one has said that to me, no.
10       Q. Okay. Did you understand that
11   anyone was ever considering that?
12       A. My understanding is that this is a
13   clause in the APA and people are aware of it
14   and relevant people know what that means. It
15   is a consideration. It has been considered.
16   I do know that.
17       Q. But did more than 10 percent of
18   the employees voluntarily terminate?
19       MR. GREEN: Object to form.
20       A. I can't answer -- I can't give you
21   a factual answer because I don't know the
22   extent to which -- I don't know what you're
23   defining as voluntary termination. Perhaps
24   that means resignation. I don't know what
25   this actually refers to. I've never heard

Page 168

1        P. EXALL - HIGHLY CONFIDENTIAL
2    someone -- I've never personally heard someone
3    say that the section of the clause would
4    apply.
5        Q. Okay. And you don't have -- in
6    your experience working in the compensation
7    field you don't have an understanding of what
8    voluntarily terminate means?
9        A. If you're asking for what I
10   understand by voluntarily termination I can
11   give you my view, my personal view, and that
12   may be different than the interpretation of
13   the APA or the position taken by Barclays.
14       My view is that that refers to
15   voluntary resignations by former Lehman
16   Brothers employees that decided
17   post-acquisition that they no longer wanted to
18   be employed by Barclays Capital and hence
19   resigned.
20       Q. Okay. And in your view did more
21   than 10 percent of the transferred employees
22   do that?
23       A. I would like to -- well, I don't
24   know the exact number or the exact proportion.
25   I would -- I'd leave it at that. I don't know

Page 169

1        P. EXALL - HIGHLY CONFIDENTIAL
2    the exact number or exact proportion but --
3    leave it at that.
4        Q. Is it your sense that more than
5    10 percent have resigned?
6        MR. GREEN: Object. Calls for
7    speculation.
8        A. If you want me to speculate I
9    will. I will speculate that not more than
10   10 percent had voluntarily resigned under
11   these -- post-acquisition.
12       Q. Okay. Fair enough. Thank you.
13       A. I mean there would be other points
14   in time. That's not to say that in the future
15   that if you aggregated it all up --
16       Q. Sure.
17       A. Right?
18       Q. But you're speaking as of today.
19       A. I'm speaking as of today. To the
20   best of my knowledge, yes.
21       MR. GREEN: Speculating as of
22   today, I might add.
23       A. Speculating as of today, that's
24   correct.
25       MR. GREEN: To the best of your --

Page 170

P. EXALL - HIGHLY CONFIDENTIAL
1       A.   To the best of my speculation.
2       Q.   Is it fair to say you don't have
3  any personal knowledge or understanding about
4  the circumstances of Mr. McDade leaving?
5       A.   No direct knowledge, no.
6       Q.   Do you have any indirect
7  knowledge?
8       A.   I don't know how or under what
9  circumstances he left, no.
10      Q.   Do you know how or under what
11 circumstances he received any compensation
12 from Barclays?
13      A.   I don't believe he received any
14 compensation from Barclays. I don't know that
15 for fact. But that is my general
16 understanding.
17      Q.   Okay. Well let me introduce this
18 as an exhibit and maybe it will prompt a
19 further question.
20      (Deposition Exhibit 283B, document
21      bearing production number
22      BCI-EX-00113194, marked for
23      identification as of this date.)

Page 171

P. EXALL - HIGHLY CONFIDENTIAL
1  BY MR. HINE:
2       Q.   Mr. Exall, I'm handing you a copy
3  of a document marked as Exhibit 283B which
4  appears to be a W-2 statement in connection
5  with -- issued by Barclays to Mr. McDade and
6  my only question is whether this provides any
7  assistance to you in trying to figure out
8  whether Barclays paid Mr. McDade anything.
9       MR. GREEN: Object to the form of
10 the question. The document speaks for
11 itself.
12      MR. HINE: Okay.
13      MR. GREEN: Are you asking does it
14 refresh his recollection?
15      MR. HINE: Yes.
16      A.   I've never seen this document.
17      Q.   Do you know why Mr. McDade was
18 paid anything if at all by Barclays?
19      A.   I have no idea. As I've said
20 before, I have no knowledge of his
21 arrangements.
22      Q.   Fair enough.
23      (Deposition Exhibit 284B, document
24      bearing production numbers

Page 172

P. EXALL - HIGHLY CONFIDENTIAL
1       BCI-EX-(S)00027190 through
2       BCI-EX-(S)00027197, marked for
3       identification as of this date.)
4  BY MR. HINE:
5       Q.   Mr. Exall, I've handed you a copy
6  of a document marked as Exhibit 284B which is
7  an e-mail dated September 23rd and the
8  attachment thereto is Bates stamped
9  BCI-EX-00027719 through -197. And my first
10 question after you've had a chance to review
11 it is have you ever seen this document before.
12      A.   Yes, I have this.
13      Q.   Could you explain to me what this
14 is?
15      A.   As explained on the front page, an
16 e-mail from Mr. Evans. It represents an
17 update of our present bonus and related spend
18 in respect of the commitments we have made to
19 former Lehman employees as part of the
20 acquisition.
21      Q.   All right. So I see several
22 iterations of this. Is this a periodically
23 prepared analysis?
24      A.   Yes. This was a set of

Page 173

P. EXALL - HIGHLY CONFIDENTIAL
1  analysis -- or this was an analysis prepared
2  daily for the purposes of the Executive
3  Committee of Barclays Capital for a certain
4  period following the acquisition.
5       Q.   Is it still prepared daily?
6       A.   No.
7       Q.   So this is -- immediately
8  following the acquisition this is a daily
9  summary?
10      A.   That's correct.
11      Q.   And how long did those summaries
12 go? Do you know?
13      A.   I don't --
14      MR. GREEN: Object to the form.
15      A.   I don't recall when we ceased
16 producing them. I can't recall.
17      Q.   Who prepared these?
18      A.   I prepared the original one
19 personally drawing on work done by several HR
20 colleagues. Thereafter individuals in my team
21 prepared the document and distributed it to
22 Mr. Evans for distribution.
23      Q.   Okay. So do you have any way of
24 knowing whether you prepared this particular

Page 174

**P. EXALL - HIGHLY CONFIDENTIAL**

1  one on September 23rd?
2  A.  I have no particular way of
3  knowing, no.
4  Q.  **Is it fair to say it was**
5  **prepared --**
6  A.  I will say I would have reviewed
7  it.  If I hadn't prepared it myself I would
8  have reviewed it.
9  Q.  **I gottcha.**
10  **And this was for what use?**
11  A.  Again, it's as it states on the
12  front e-mail, it's an update of our present
13  bonus and related expense.
14  Q.  **But I thought you said it was used**
15  **to report to the Executive Compensation**
16  **Committee; is that right?**
17  A.  The Executive Committee of
18  Barclays Capital.  As you can see, the e-mail
19  was sent or memo was sent to Mr. Diamond, del
20  Missier -- Messrs. Diamond, del Missier,
21  Jenkins and Ricci who formed the Executive
22  Committee of Barclays Capital.
23  Q.  **Okay.  That's the commitment that**
24  **oversees compensation issues for Barclays**
25

Page 175

**P. EXALL - HIGHLY CONFIDENTIAL**

1  Capital?
2  MR. GREEN:  Object to the form of
3  the question.
4  A.  It's the Executive Committee of
5  Barclays Capital that has various
6  responsibilities, compensation being one of
7  them.
8  Q.  **Oh, I misunderstood you.  It's not**
9  **a compensation committee.  It's just the**
10  **Executive Committee in general?**
11  A.  It's the Executive Management
12  Committee of Barclays Capital at that time.
13  Q.  **Okay.  And one of their things --**
14  **one of their functions is to examine**
15  **compensation issues?**
16  A.  In the normal course of business,
17  yes.
18  Q.  **Does this report get passed up**
19  **beyond them?**
20  A.  I don't know.
21  Q.  **Okay.  Could you turn to the --**
22  **page 2 of this document.**
23  A.  Do you mean page 1?
24  Q.  **Well, the first page of the**
25

Page 176

**P. EXALL - HIGHLY CONFIDENTIAL**

1  report.
2  A.  Okay.
3  Q.  **Which is page 2 of the document.**
4  A.  But the page referring to page 1
5  of 7?
6  Q.  **Right.**
7  MR. GREEN:  And that would be the
8  one with the Bates number ending 191?
9  MR. HINE:  Correct.
10  Q.  **Could you explain to me in general**
11  **what this chart is supposed to encompass at**
12  **the top?**
13  A.  Which particular part of the chart
14  would you like to examine?
15  Q.  **Well, I see it broken out into**
16  **entries entitled Elite 8 and then other GB**
17  **proposals.**
18  **Do you see that?**
19  A.  Yes.
20  Q.  **What are those two entries**
21  **supposed to mean?**
22  A.  Okay.  If we begin at the top with
23  what is labeled Elite 8 the footnote describes
24  what that is.
25

Page 177

**P. EXALL - HIGHLY CONFIDENTIAL**

1  Q.  **Right.**
2  A.  And you used the term previously.
3  It relates in actual fact to nine individuals
4  at the time and they're listed there.  And it
5  relates -- the other GB proposals, GB being
6  the acronym for guaranteed bonus.  And that
7  line there relates to the 393 other
8  individuals that at that time we had offered a
9  contractual guaranteed bonus similar to the
10  one that you showed me earlier in the form of
11  Mr. Lowitt's agreement.
12  Q.  **Okay.  So if I look at this I see**
13  **402 people at this time were offered some kind**
14  **of guaranteed bonus.**
15  A.  That is correct.
16  Q.  **And the Elite 8 had a separate**
17  **compensation arrangement that distinguishes**
18  **them from the 393.**
19  MR. GREEN:  Object to the form of
20  the question.  I think that
21  mischaracterizes the testimony.  I don't
22  think he testified to that.
23  Q.  **Well, why do you break out the**
24  **Elite 8 separately?**
25

Page 178

P. EXALL - HIGHLY CONFIDENTIAL
1    A.    They relate -- my understanding,
2    and I was instructed to break them out -- my
3    general understanding was that they were the
4    nine senior individuals at Lehman Brothers
5    that were the heads of the relevant businesses
6    that we were interested in.
7        Q.    And they received different forms
8    of compensation than the rest of the people
9    who were offered GB proposals?
10       A.    No.  They received compensation in
11   the same form as other individuals.
12       Q.    Just different amounts.
13           MR. GREEN:  Object to the form of
14       the question.
15       A.    Every individual received a
16   different amount.
17       Q.    All right.  If you move to the
18   right there's a block which has the title at
19   the top that says Day 1 - 2008 Cost.
20           Do you see that?
21       A.    I do.
22       Q.    Could you explain to me what the
23   different columns signify in that chart within
24   that block?

Page 179

P. EXALL - HIGHLY CONFIDENTIAL
1    A.    The column entitled Actual would
2    at this time have represented the actual
3    dollar value of the guaranteed bonus embodied
4    in these contracts that would have been
5    offered to these 402 individuals.
6        Q.    And when you say the guaranteed
7    bonus, if we refer back to Mr. Lowitt that's
8    the two entries we discussed earlier?
9        A.    To be specific, that would be
10   the -- and referring to Mr. Lowitt's contract
11   they would be the 2008 guaranteed cash bonus
12   plus the 2008 EPP recommendation.
13       Q.    Okay.  Does not include the
14   special cash award?
15       A.    If you're asking me are the
16   special cash awards included in the $862
17   million title here.
18       Q.    Yes.
19       A.    The answer is no.
20       Q.    Okay.  Now, I see the original
21   model.  What does that signify?
22       A.    The original model was an internal
23   reference point or -- to give it a general
24   characterization a rule of thumb that Barclays

Page 180

P. EXALL - HIGHLY CONFIDENTIAL
1    Capital was working to internally.  And as you
2    can see referenced in footnote 3, it is
3    modeled as being the estimated pool
4    requirement for 75 percent of 2007 total
5    compensation for the original 175 to 200
6    population plus the residual now in that
7    bucket and that were guaranteed at 65 percent
8    of the 2005 bonus.
9        It's a modeled amount that we
10   would have at the time, based on our internal
11   reference points, have modeled to offer
12   individuals under the guaranteed bonus
13   contract and is instinct from what was
14   actually offered.
15       Q.    So is this model the result of
16   negotiations between Lehman Brothers and
17   Barclays or is it just a model that Barclays
18   developed on its own based on certain
19   assumptions?
20           MR. GREEN:  Object to the form.
21       A.    I don't know.
22       Q.    Okay.  Well, for example, where
23   did you come up with the notion that there
24   would be 175 or 200 population?  Is that just

Page 181

P. EXALL - HIGHLY CONFIDENTIAL
1    an assumption, an internal Barclays
2    assumption?
3        A.    When I entered into this process
4    for want of a better phrase that was my
5    understanding or what I was told that the
6    original population that Barclays intended to
7    issue guaranteed bonus contract to was 175 to
8    200 people.
9        Q.    Okay.  And why was that changed?
10           MR. GREEN:  Object to the form.
11       A.    I don't know.
12       Q.    Was this model developed prior to
13   the APA?
14       A.    I don't know.
15       Q.    Do you know when you -- you're the
16   one that did the first one of these; is that
17   right?
18       A.    That's right.
19           MR. GREEN:  I'm sorry.  When you
20       say model are you referring to --
21           MR. HINE:  Well, let me rephrase
22       it.
23       Q.    You prepared the first one of
24   these summary reports, right?

Page 182

P. EXALL - HIGHLY CONFIDENTIAL
1
2    A.   I did.
3    Q.   And that was dated when?
4    A.   I don't recall the exact date. I
5  would hazard a guess it was on -- I don't
6  believe this was the first one.
7    Q.   Right.
8    A.   I think there might have been one
9  dated the 22nd but I can't be sure.
10   Q.   Do you think there were any dated
11 prior to the 22nd?
12   A.   It's possible. As I said, I
13 produced one the first working day that I
14 arrived in New York as part of the, you know,
15 post-acquisition work. And I don't recall
16 that exact date but I would have been the
17 first person to produce this spreadsheet. Or
18 this document.
19   Q.   Okay. And were you the first
20 person to produce what you called the original
21 model?
22   A.   No.
23   Q.   Who did that?
24   A.   I don't recall.
25   Q.   Was that produced in the week of

Page 183

P. EXALL - HIGHLY CONFIDENTIAL
1
2  the 15th to the 22nd?
3    A.   I don't recall when it was
4  produced.
5    Q.   Could it possibly have been
6  produced prior to September 15th?
7    A.   I don't know.
8    Q.   Okay. And then the next column in
9  that block is entitled Overspend. Could you
10 just explain to me what that means?
11   A.   That is simply the mathematical
12 subtraction between the totals in the actual
13 column and the original column. The numbers
14 in the original model column.
15   Q.   I see. Okay. And why were you
16 looking at that?
17   A.   Again, the original model was a
18 reference point. And all this simply
19 represents is the difference between what we
20 had, in fact, offered people as part of
21 their -- these guaranteed bonus contracts and
22 what we originally modeled them to be.
23   Q.   Okay. And I see to the right of
24 that a block entitled One-Time Deferred Cash
25 Awards.

Page 184

P. EXALL - HIGHLY CONFIDENTIAL
1
2    Do you see that?
3    A.   I do.
4    Q.   What is that supposed to
5  encompass?
6    A.   The entire block. And by way of
7  example, I'll refer back to Mr. Lowitt's
8  contract.
9    Q.   Sure.
10   A.   These amounts here refer to the
11 offers and relevant contracts in respect of
12 the special cash award as mentioned in Mr.
13 Lowitt's contract.
14   Q.   Okay. So am I correct to say that
15 that block in your report summarizes the --
16 all the special cash awards that were offered
17 to special Barclays personnel payable over a
18 three-year period?
19   MR. GREEN:  Object to the form.
20   A.   Well, when you say special
21 Barclays -- I don't -- sorry.
22   Q.   I misspoke. You referred to the
23 special cash award in Mr. Lowitt's contract,
24 right?
25   A.   Yes.

Page 185

P. EXALL - HIGHLY CONFIDENTIAL
1
2    Q.   So how does that relate to the
3  block where you have here with the title
4  One-Time Deferred Cash Award?
5    A.   The ████████ referred to in
6  Mr. Lowitt's contract under special cash award
7  would be embodied in the other GB proposals
8  line in the total of ██████ under the
9  block entitled the One-Time Deferred Cash
10 Award. The split of 2008, '-9 and '-10 is
11 purely the pro rata split of the total over
12 those periods of time based on time served
13 really. That was to assist finance in their
14 accounting work.
15   Q.   But if Mr. Lowitt's is one of the
16 Elite 8 wouldn't he be in the line above?
17   A.   I'm sorry. Yes.
18   Q.   So just so I understand, you took
19 Mr. Lowitt's ████████ which he has payable
20 on two different dates and you put them in two
21 different columns. You put half of those
22 amounts in those two columns?
23   A.   No. Let me say it another way.
24 The full ████████ is shown in the ████
25 ████ total, okay?

Page 186

P. EXALL - HIGHLY CONFIDENTIAL
1    P. EXALL - HIGHLY CONFIDENTIAL
2    Q.   Where do you see ■ --
3    A.   The special cash award in Mr.
4    Lowitt's contract --
5    Q.   Yes. I got it.
6    A.   That is in the ▬▬▬▬ total.
7    Q.   Right.
8    A.   The amounts -- those amounts have
9    been split up into three financial reporting
10   years.
11   Q.   Okay.
12   A.   These do not reflect the dates of
13   payment that the individual would receive
14   them. It reflects the accounting treatment.
15   Q.   I see.
16   A.   Of those cash -- special cash
17   awards and how they would be accounted for
18   over these three financial years.
19   Q.   And how do you get that
20   information? Is that from the finance
21   department?
22   A.   The accounting treatment, yes,
23   from the finance department. And it's a
24   mechanical calculation based on the accounting
25   policy and the length of time under which the

Page 187

1    P. EXALL - HIGHLY CONFIDENTIAL
2    special cash award's there.
3    Q.   Okay. And then that last column
4    is entitled Second Year GB. What is that?
5    A.   That is effectively -- and there
6    is no example in Mr. Lowitt's contract. That
7    is any second year guaranteed bonus that was
8    offered to an individual. So, for example,
9    had Mr. Lowitt had a clause in his contract
10   embodying or describing a 2009 guaranteed cash
11   bonus of 2009 EPP recommendation, that would
12   have been included in that column.
13   Q.   Okay. And is Mr. Hoffman's ▬▬
14   ▬▬ in this chart?
15   A.   No, it would not be.
16   Q.   Why is that?
17   A.   The structure of ▬▬▬▬ is
18   not -- actually, let me say this another way.
19   At the time, I don't recall Mr.
20   Hoffman's contract having been concluded at
21   this time. So I can't speak for what exact
22   numbers Mr. Hoffman represents in these.
23   Q.   Okay.
24   A.   If you were to say if I was to
25   reproduce the schedule again would Mr.

Page 188

1    P. EXALL - HIGHLY CONFIDENTIAL
2    Hoffman's numbers be in there?
3    Q.   Yes.
4    A.   No. The structure of his
5    compensation arrangements are such that they
6    are not what we would term as a second year
7    guaranteed bonus. They are described as
8    something different as mentioned in the
9    schedule earlier.
10   Q.   Okay. When was Mr. Hoffman's
11   contract concluded?
12   A.   I don't recall.
13   RQ      MR. HINE: Chris, I think we're
14      going to want a copy of Mr. Hoffman's
15      contract when you get a chance.
16         MR. GREEN: All right. We'll take
17      that under advisement.
18   Q.   If we continue now on your chart
19   to the lower entries, I see under number of
20   people, 10,111 non-guaranteed population.
21   What does that mean?
22   A.   That is the residual population
23   that at this point in time had not been
24   offered a guaranteed bonus. And when I say
25   residual population I mean individuals that

Page 189

1    P. EXALL - HIGHLY CONFIDENTIAL
2    were former Lehman Brothers employees that at
3    this point in time we consider to be Barclays
4    employees.
5    Q.   Okay. So they've come over to
6    Barclays but they just haven't been provided a
7    guaranteed bonus.
8    A.   They would not have received a
9    contract such as Mr. Lowitt's.
10   Q.   Okay. And is this just a snapshot
11   so that changes over time.
12   A.   That's correct.
13   Q.   Then the next one says 3,300
14   planned redundancies. Do you know what that
15   is?
16   A.   Yeah. As it states there, it's an
17   estimated plan of redundancy. It's an
18   estimated, still moving, and it's net of an
19   expected 3,300 bonuses, expected cost of about
20   $100 million.
21   Those were at the time
22   hypothetical or estimates of population -- of
23   the former Lehman Brothers population that may
24   be subject to a reduction in force
25   arrangement.

Page 190

P. EXALL - HIGHLY CONFIDENTIAL
1    P. EXALL - HIGHLY CONFIDENTIAL
2        Q.   So these are the folks who if --
3    based on the planning would get severance
4    payments later.
5        A.   They would be eligible for
6    severance payments, correct.
7        Q.   And now why in footnote 1 does it
8    say Not funded out of 2008 bonus pool?
9        A.   Well, my answer to that is they
10   wouldn't receive a bonus.  They would just
11   receive a severance.
12       Q.   Okay.  So that's separate from the
13   bonus pool.
14       A.   Yes.
15       Q.   The next entry says 8,798 --
16       A.   6,798?
17       Q.   Oh, I'm sorry.  My eyesight is
18   getting worse than it was.  6,798 folks in
19   what's called residual pool available for
20   non-GB people.  Could you explain that?
21       A.   The 6,798 relates to a notional
22   number of individuals after the estimated
23   redundancy or reduction in force program that
24   would be -- at this point in time that would
25   not have received a contract such as Mr.

Page 191

P. EXALL - HIGHLY CONFIDENTIAL
1    P. EXALL - HIGHLY CONFIDENTIAL
2    Lowitt's.  A guaranteed bonus contract.
3        Q.   So it's reducing the
4    10,000-some-odd people by a planned reduction
5    in force to get to a smaller population of
6    people?
7            MR. GREEN:  Object to the form of
8        the question.
9        A.   That is correct.
10       Q.   And what's the 538 on the
11   right-hand side of the column?
12       A.   That is a number that, with the
13   sum of guaranteed bonuses above it, based on
14   the 62 million totals 1.84 billion.
15       Q.   Okay.  And why are you -- well,
16   let's go to the next item.  Total Pool Funding
17   Available 1.4 billion.  Where did that number
18   come from?
19       A.   I was instructed to utilize that
20   number in the spreadsheet.
21       Q.   Why?
22       A.   I don't know why.
23       Q.   Do you have any understanding of
24   how that number relates to the $2 billion on
25   the Exhibit 19 that we talked about earlier?

Page 192

P. EXALL - HIGHLY CONFIDENTIAL
1    P. EXALL - HIGHLY CONFIDENTIAL
2        A.   No.
3        Q.   Is there any connection between
4    the two?
5        A.   I don't know.
6        Q.   You were never told of any
7    connection?
8        A.   Not to my recollection.
9        Q.   Were you explained why you should
10   use 1.4 billion?
11           MR. GREEN:  Objection.  Asked and
12       answered.
13       Q.   In this chart.
14       A.   I don't recall.
15       Q.   Who told you to use 1.4 billion?
16       A.   Mr. Evans.
17       Q.   Evans?
18       A.   That's right, yeah.
19       Q.   Now, for that -- going over to the
20   left-hand column in that row it says 7,200.
21   What is that?  Is that the 402 plus 6,798?
22       A.   Correct.
23       Q.   Did you have any discussions with
24   Executive Committee about these charts after
25   you provided it to them?

Page 193

P. EXALL - HIGHLY CONFIDENTIAL
1    P. EXALL - HIGHLY CONFIDENTIAL
2        A.   I don't recall any
3    conversations -- direct conversation with
4    them, no.
5        Q.   Did they ever give you any
6    feedback and say, you know, we need to model
7    this or there's something missing?
8        A.   The feedback I received was from
9    Mr. Evans.
10       Q.   What type of feedback was that?
11       A.   I don't recall the exact feedback
12   but it would have been along the lines of
13   things -- as you may see, this report had
14   evolved over time and included other items I
15   think that would have been based on feedback
16   that Mr. Evans had received or ideas he may
17   have had that he may have wished to
18   communicate to the Executive Committee.
19       Q.   Do you have any specific
20   recollections of feedback that he gave you?
21       A.   Without seeing the evolution of
22   this I don't really recall anything specific.
23       Q.   Okay.  Well, we'll get to some
24   other versions in a little bit.  Do you recall
25   anything relating to PIM employees?

Page 194

1    P. EXALL - HIGHLY CONFIDENTIAL
2        A.    Yeah.  The private investment
3    management business from Lehman Brothers, yes.
4        Q.    What do you recall about that
5    issue?
6            MR. GREEN:  Object to the form.
7        Do you mean in connection with this
8        chart?
9            MR. HINE:  Yes.
10        A.    What specific issue?
11        Q.    Well, I see in various iterations
12    of the chart there's modifications made and we
13    can go through them if you want but relating
14    to PIM employees.  So I was wondering what
15    your recollection is of any issues that arose
16    relating to PIM employees.
17            MR. GREEN:  Maybe you show you
18        show him --
19        A.    If you could give an example that
20    would be helpful.
21        Q.    All right.  We'll get there later.
22    I just wanted to ask a general recollection.
23    Do you have any understanding of compensation
24    related issues arising in connection with PIM
25    employees that were coming from Lehman

Page 195

1    P. EXALL - HIGHLY CONFIDENTIAL
2    Brothers to Barclays?
3        A.    I will give you a practical
4    example.  If I refer back to the schedule,
5    281B, the line item entitled Replacement RCU
6    of $11 million, the majority of that related
7    to PIM employees.  That's one example.
8        Q.    Okay.
9        A.    Actually -- let's see.  In fact,
10    it's described on page 4 of 7.
11            MR. GREEN:  Sorry.  What page?
12            THE WITNESS:  Page 4 of 7.
13            MR. GREEN:  It's the page of the
14        Exhibit 284B Bates labeled ending 194?
15            THE WITNESS:  That's correct.
16        Q.    Okay.  So that's the RSU -- RSUs
17    that you're referring to in Exhibit 281B,
18    correct?
19        A.    Yes.
20        Q.    And how come it says here
21    currently these RSU awards have no value?
22            MR. GREEN:  Object to the form.
23        Q.    Do you see on page 4 of 7 of your
24    summary?
25        A.    I think if I refer back to the

Page 196

1    P. EXALL - HIGHLY CONFIDENTIAL
2    explanation I gave in respect of the line item
3    in 281B I can clarify a few things.  Firstly,
4    this describes the fact that these were RSUs
5    or stock awards made to former Lehman Brothers
6    employees in the PIM business that were
7    valueless at the time of acquisition because
8    Lehman Brothers had no value.  It was in
9    bankruptcy.
10        Q.    Oh, I see.
11        A.    Now, the clarification I could
12    make here is you asked me earlier about why
13    that $11 million is not in the equity column.
14        Q.    Um-hum.
15        A.    And this explains it.  If you
16    refer to the third paragraph down it says, "We
17    propose making deferred cash awards that could
18    vest in two years."  And so would we deferred
19    cash awards rather than stock awards.
20        Q.    So they were not really new RSUs;
21    it's a cash award?
22        A.    Yes.  And actually I would suggest
23    it's incorrectly described on 281B.
24        Q.    So Exhibit 281B it would be more
25    accurate to say deferred cash award issued in

Page 197

1    P. EXALL - HIGHLY CONFIDENTIAL
2    lieu of RSUs previously awarded?
3        A.    Based on my reading of this and my
4    recollection having read it, that would be the
5    case.
6        Q.    When you say "this" you're talking
7    about Exhibit 284B?
8        A.    Yes.
9        Q.    Okay.  So that would explain why
10    it's in the cash column and not the equity
11    column.
12        A.    Correct.
13        Q.    Okay.
14            MR. HINE:  Chris, I have some
15        questions about these types of documents
16        so do you want to break for lunch?
17            MR. GREEN:  Do you have any idea
18        of how much longer you're going to be
19        going?
20            MR. HINE:  What I was going to
21        suggest is we break for lunch and I
22        could consolidate it into as neat a pile
23        of questions as I can.
24            MR. GREEN:  That sounds fine.
25            MR. HINE:  Okay.  Let's break for

Page 198

1    P. EXALL - HIGHLY CONFIDENTIAL
2    lunch.
3        (Luncheon recess taken at 12:51
4    p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 199

1    P. EXALL - HIGHLY CONFIDENTIAL
2    A F T E R N O O N    S E S S I O N
3    (Time noted:    1:42 p.m.)
4        (Deposition Exhibit 285B, document
5    bearing production number
6    BCI-EX-00077651, marked for
7    identification as of this date.)
8        (Deposition Exhibit 286B, document
9    bearing production number
10    BCI-EX-00077621, marked for
11    identification as of this date.)
12        (Deposition Exhibit 287B, document
13    bearing production number
14    BCI-EX-00077466, marked for
15    identification as of this date.)
16            * * *
17    P A U L    E X A L L,    resumed and testified
18    as follows:
19    EXAMINATION BY (Cont'd.)
20    MR. HINE:
21        Q.    Good afternoon, Mr. Exall.  I hope
22    you had a nice lunch.
23        A.    Actually, I did.
24        Q.    I want to return back to
25    Exhibit 284B for a minute.  But first can you

Page 200

1    P. EXALL - HIGHLY CONFIDENTIAL
2    help me understand when we look at page 1 of 8
3    and I see you're modeling a $1.4 billion
4    figure there as the total funding pool
5    available.  How -- I'm just trying to
6    understand how that 1.4 billion figure is
7    different from the $2 billion figure you're
8    modeling in the previous exhibit, 281B.
9        MR. GREEN: Object. Asked and
10    answered.
11        A.    I don't understand.  They are
12    different.
13        Q.    Well, do you have any
14    understanding of why you're modeling 2 billion
15    in Exhibit 281B as opposed to 1.4 billion in
16    284B?
17        A.    I'm not modeling 2 billion in any
18    place.  That 2 billion is simply a reference
19    point on that schedule.  I'm not modeling 2
20    billion.  And neither am I modeling
21    1.4 billion in the other schedule.
22        Q.    Well, poor choice of a verb.  Why
23    is the -- the 2 billion is an accounting -- a
24    number that you were provided from the finance
25    department, right?  For Exhibit 281B?

Page 201

1    P. EXALL - HIGHLY CONFIDENTIAL
2        A.    I was told to use that number on
3    the schedule, yes.
4        Q.    Okay.  Well, why were you told to
5    use that number on 281B whereas 284B and
6    documents like that you're using 1.4 billion?
7        MR. GREEN: Object to the form of
8    the question.  You can answer if you
9    know.
10        A.    I don't know.  Mr. Evans told me
11    to use 1.4 billion for the purpose of this
12    schedule.
13        Q.    284B?
14        A.    284B.
15        Q.    Okay.  And the finance folks told
16    you to use 2 billion for the Exhibit 281B?
17        A.    Yes.
18        Q.    Mr. Exall, I'm going to hand you
19    three exhibits marked as 285B, 286B and 287B.
20    They are e-mails with the Bates ranges
21    BCI-EX-00077651, 77621, and 77466
22    respectively.  If you could take a moment to
23    look at them I have a question or two to ask.
24    I think they're in order.
25        (Document review.)

Page 202

P. EXALL - HIGHLY CONFIDENTIAL

1   P. EXALL - HIGHLY CONFIDENTIAL
2       Q.   Just let me know when you've had a
3   chance to look at them.
4           (Document review continuing.)
5       A.   Yeah.
6       Q.   You've had a chance to look at
7   them?
8       A.   Yes.
9       Q.   You'll see in the first exhibit
10  which is an e-mail dated September 17th, Mr.
11  Clackson is writing to Mr. Evans and Mr. Ricci
12  and he writes, "This is a problem. They have
13  2 billion in the agreement. I was relying on
14  you guys telling me I needed 1.35 billion
15  which gave me 650 million of the goodwill.
16  But the paragraph below says we have to pay it
17  to them/can't use. Archie says we have agreed
18  to this."
19          And then he refers to paragraph
20  9.1(c) of the APA.
21          Do you see that?
22      A.   I do.
23      Q.   Do you have any recollections or
24  any understanding of this issue being
25  discussed by senior Barclays management prior

Page 203

1   P. EXALL - HIGHLY CONFIDENTIAL
2   to the closing of the sale transaction?
3           MR. GREEN: Object to the form.
4       Does he have recollection of Barclays
5       senior management discussing this issue?
6           MR. HINE: Yeah.
7       Q.   I understand you're not on this
8   e-mail but I was wondering if this e-mail
9   prompts you to recall any discussions among
10  senior Barclays management about this issue.
11      A.   What I can see is that there is
12  some discussion going on in the e-mail
13  seemingly in respect of this issue. I don't
14  personally have knowledge of any discussions
15  that may or may not have taken place between
16  Mr. Ricci, Mr. Clackson, and Mr. Evans or Mr.
17  Cox in this regard.
18      Q.   Okay. You don't have any
19  recollection of discussing this issue with Mr.
20  Evans at all?
21      A.   I have no recollection. A
22  specific recollection of a specific
23  conversation I had with Mr. Evans. I have --
24  for clarity I received a copy of this e-mail
25  in and around the time but I have no

Page 204

1   P. EXALL - HIGHLY CONFIDENTIAL
2   recollection of the specific conversation I
3   had with Mr. Evans in this regard.
4       Q.   How did you receive a copy of this
5   e-mail?
6       A.   Mr. Clackson forwarded it to me.
7       Q.   Okay. And why did he do that?
8           MR. GREEN: Objection.
9       A.   I don't know why he forwarded it
10  to me. I could speculate but I don't know why
11  Mr. Clackson forwarded it to me.
12      Q.   Well, why do you think he
13  forwarded it to you?
14      A.   I would guess that he realized --
15  let me start again.
16          I worked with Mr. Clackson for
17  several years. We've known each other for
18  several years and he understands my job role
19  and responsibility. And I resume that he
20  thought that I would have needed to know what
21  was contained in these e-mails as part of
22  those responsibilities.
23      Q.   What was Mr. Clackson's role?
24  He's a finance individual?
25      A.   He's a chief financial officer for

Page 205

1   P. EXALL - HIGHLY CONFIDENTIAL
2   Barclays Capital.
3       Q.   Okay. Do you see further on Mr.
4   Ricci writes, "Never agreed to it. Archie,
5   this is a problem. We can't have this clause
6   I don't think."
7           Do you see that?
8       A.   I do.
9       Q.   Any recollection of any senior
10  folks at Barclays discussing whether they
11  could agree to this 9.1(c) clause?
12          MR. GREEN: You mean separate and
13      apart from his testimony that he was
14      forwarded a copy of this e-mail?
15          MR. HINE: Yes, yes.
16      A.   No. I was not involved in any
17  discussion that may or may not have taken
18  place.
19      Q.   Is it possible this 1.35 billion
20  is the reason you were asked to use
21  1.4 billion in 284B?
22          MR. GREEN: Objection. Calls for
23      speculation.
24      A.   I don't know.
25      Q.   Okay. If you'll turn to the next

Page 206

**P. EXALL - HIGHLY CONFIDENTIAL**
1  **P. EXALL - HIGHLY CONFIDENTIAL**
2  exhibit you'll see Mr. Evans' response to Mr.
3  Clackson's original e-mail where he says in
4  part, "They had already accrued 1.5 and we
5  collectively tried to back into the bonus
6  number for the parts we were taking."
7       **Do you see that?**
8   A.  I see this.
9   **Q.  Do you know what he's referring to**
10 **there?**
11  A.  No.
12  **Q.  Do you have any understanding of**
13 **what he's referring to?**
14  A.  I have no specific understanding
15 of that, no.
16  **Q.  How about a general understanding?**
17  A.  Without speculating, I couldn't
18 say.  I was not involved in this conversation.
19  **Q.  What do you think he's talking**
20 **about?**
21       MR. GREEN:  Object.  Calls for
22  speculation.
23  A.  If I was to speculate -- well,
24  personally I would suggest you ask Mr. Evans.
25  I can't speak for Mr. Evans and what he

Page 207

1  **P. EXALL - HIGHLY CONFIDENTIAL**
2  intended by this e-mail.
3       MR. GREEN:  I don't think he
4  should speculate about what Mr. Evans
5  may or may not have meant in the
6  document.
7       MR. HINE:  Well, are you
8  instructing him not to answer?
9       MR. GREEN:  Yeah.  I am going to
10 instruct him not to answer that
11 question.  It calls for speculation on
12 the part --
13       MR. HINE:  All right.  I think I'm
14 allowed to ask him for speculation.
15 You're not allowed to instruct him not
16 to answer on that ground.
17  **Q.  So I'm going to ask you again.**
18 **Can you speculate on what you think he's**
19 **talking about here?  If your counsel tells you**
20 **not to, then, fine but --**
21       MR. GREEN:  You can go ahead
22  and -- if you have an answer.
23  A.  Can I read the e-mail?
24  **Q.  Sure.**
25  **(Document review.)**

Page 208

1  **P. EXALL - HIGHLY CONFIDENTIAL**
2  A.  I would speculate, and I stress
3  this is speculation, I can't speak for Mr.
4  Evans and what he really intends in this
5  e-mail.  What I would infer from this e-mail
6  reading it independently is that Mr. Evans
7  seems to represent that they, and I presume
8  they refers to Lehman Brothers, had already
9  accrued 1.5.  I would speculate that that's
10 $1.5 billion.  And we collectively tried to
11 back into the bonus number for the parts we
12 were taking.  I would speculate that that
13 phrase -- or I would speculate that that
14 sentence implies that Lehman Brothers had a
15 bonus accrual on their books and records to
16 the equivalent of $1.5 billion and that
17 represented the accrual for the firm as a
18 whole internationally; whereas, we were
19 obviously interested at this point in
20 acquiring the US operations of Lehman Brothers
21 under the sale agreement.  Again, that's pure
22 speculation.
23  **Q.  I understand.**
24  A.  I have never seen the books and
25  records of Lehman Brothers and have no way of

Page 209

1  **P. EXALL - HIGHLY CONFIDENTIAL**
2  verifying that number.
3       Mr. Evans then writes, "He has
4  repeatedly said I was nervous about the
5  numbers and how robust and complete they are,"
6  I believe that speaks for itself.
7       "As for the language below I never
8  saw any of it nor was I invited to review it."
9  Again speaks for it.
10      "I will call you when I finish
11 something."
12  **Q.  Do you recall Mr. Evans ever**
13 **saying anything about him being nervous about**
14 **Lehman's compensation numbers?**
15      MR. GREEN:  You mean separate and
16 apart from what's contained in this
17 e-mail?
18  **Q.  Well, it suggests that -- he says**
19 **"I repeatedly said I was nervous."**
20      My question to you is do you
21 recall having any understanding or discussions
22 with Mr. Evans at the time that he was nervous
23 about their numbers?
24  A.  I recall us all being -- and
25  you're saying nervous.  I would say it a

Page 210

P. EXALL - HIGHLY CONFIDENTIAL
1    P. EXALL - HIGHLY CONFIDENTIAL
2    different way. I would say that we were
3    supplied information as part of the due
4    diligence under the initial transaction. And
5    that never took place. And we performed due
6    diligence work on that collectively. I was
7    part of that.
8         I would suggest, though, that
9    you're never really -- you're at the mercy,
10   for want of a better phrase, of what is
11   supplied to you. You have no way of
12   physically verifying the accuracy of those
13   records at the time you're doing such work in
14   such a short time frame.
15   Q.   Sure.
16   A.   That we had no ability to trace,
17   for example, an individual bonus or
18   compensation award made to any individual at
19   Lehman Brothers for the 2007 or prior
20   financial year to any payroll records at
21   Lehman Brothers.
22        Consequently, I think when Mr.
23   Evans refers to being nervous about their
24   numbers and how robust and complete they are,
25   again I'm speculating as to what he means in

Page 211

1    P. EXALL - HIGHLY CONFIDENTIAL
2    that regard and you should ask him. I'll
3    infer that it's an extension of that fact that
4    we just don't -- did not at the time have any
5    access to the books and records of Lehman
6    Brothers other than what they supplied to us.
7    We were taking a lot of this on faith, for
8    want of a better phrase.
9    Q.   I know you said you did some due
10   diligence as to the earlier transaction. Did
11   you do any compensation-related due diligence
12   in the week of September 15th to the 22nd?
13   A.   I think I would have performed
14   work -- I don't recall the specifics of it
15   other than things like preparing these
16   schedules or something or similarly related
17   issues. I wouldn't characterize it as due
18   diligence.
19        For all intents and purposes I've
20   testified before from my perspective this
21   transaction had already effectively completed.
22   I understand the legal technicality of it
23   having been approved on the 22nd of September
24   but I couldn't categorize the work as I was
25   doing as due diligence.

Page 212

1    P. EXALL - HIGHLY CONFIDENTIAL
2    Q.   You did come to New York during
3    the week.
4    A.   Yes.
5    Q.   And I think you previously said
6    you thought the transaction had been closed by
7    then; is that right?
8    A.   Yes. I believe that to be the
9    case. If it was the 22nd of September it's
10   possible I actually arrived on that day in New
11   York.
12   Q.   Okay.
13   A.   I just don't have the exact date
14   at hand.
15   Q.   Okay. And is it fair to
16   characterize the work you did upon your
17   arrival in New York as relating to the signing
18   up of employment contracts with your new
19   employees from Lehman?
20        MR. GREEN: Object to the form.
21   Q.   Or was it more the analysis type
22   of things that were embodied in, for example,
23   Exhibit 284B?
24   A.   I was never involved in
25   negotiations or contractual issues in that

Page 213

1    P. EXALL - HIGHLY CONFIDENTIAL
2    regard with specific individuals. My work was
3    if you want to characterize it more, as you
4    say, in respect to modeling and work done in
5    such.
6    Q.   Okay. Do you see the title in
7    this e-mail is $650 million problem.
8        Do you see that?
9    A.   Yes.
10   Q.   Did you ever hear that phrase used
11   at Barclays at around this time?
12   A.   Other than seeing a copy of this
13   e-mail, no.
14   Q.   Were you copied on the second
15   e-mail as well, Exhibit --
16   A.   I believe Mr. Clackson forwarded
17   me a copy of this e-mail.
18   Q.   Okay.
19   A.   In the same way that he forwarded
20   me a copy of the previous exhibit.
21   Q.   Okay. So you're talking about
22   Exhibit 286B and 285B?
23   A.   That's correct.
24   Q.   Okay. Do you recall any
25   discussions among people at Barclays about an

Page 214

1    P. EXALL - HIGHLY CONFIDENTIAL
2    effort to locate the financial schedule
3    referred to in the APA, in other words
4    Exhibit 19?
5        MR. GREEN: Object to the form.
6    A.    I recall asking Mr. Clackson for a
7    copy of the schedule and I recall receiving a
8    copy of the schedule from him.
9    Q.    Okay. But my question is I've
10   seen some e-mails -- I don't want to introduce
11   every document I have as an exhibit, but I've
12   seen some e-mails where people were asking for
13   copies of it and trying to locate it. Were
14   you involved at all in trying to locate that
15   schedule?
16   A.    No, I wasn't. I received it from
17   Mr. Clackson. I was perhaps one of the people
18   asking for it.
19   Q.    Okay. But you received it shortly
20   after you asked for it?
21   A.    I believe so. I don't recall
22   when.
23   Q.    Fair enough.
24       On the last exhibit I gave you,
25   317 -- or I'm sorry -- 287B, Mr. Clackson

Page 215

1    P. EXALL - HIGHLY CONFIDENTIAL
2    writes, "So it looks like we have to pay them
3    2 billion min bonuses."
4        Do you see that?
5    A.    Yes, I do.
6    Q.    Do you recall any discussions at
7    or around this time where Barclays concludes
8    that it has to pay 2 billion in bonuses to
9    former Lehman employees?
10       MR. GREEN: Object to the form of
11   the question.
12   A.    No.
13   Q.    Did that conclusion prompt you
14   ever to change the $1.4 billion number that
15   you used in your analysis such as that in
16   Exhibit 284B?
17       MR. GREEN: That conclusion being
18   what, Bill?
19   Q.    That Barclays would have to pay 2
20   billion min in bonuses.
21       MR. GREEN: Object to the form of
22   the question.
23   A.    I don't believe there ever was a
24   conclusion as you phrased it.
25   Q.    Okay.

Page 216

1    P. EXALL - HIGHLY CONFIDENTIAL
2    A.    I don't believe I ever changed
3    that 1.4 billion number in any way whatsoever
4    in relation to this series of e-mails you've
5    presented to me.
6    Q.    Okay. Just so I just get a clear
7    record here, you previously testified that you
8    prepared several versions of Exhibit 284B,
9    correct?
10   A.    That's correct.
11   Q.    Okay. So are you saying now that
12   in all of those versions you always used 1.4
13   billion as the total pool funding available?
14   A.    No. That's not what I'm saying.
15   I can't recall what that iterated to over
16   time.
17   Q.    Oh.
18   A.    What I'm saying is that the
19   changes made were never prompted by the --
20   first of all, the e-mails you've placed in
21   front of me, and, secondly, the amount of 2
22   billion that you have referred to.
23   Q.    Okay. Do you recall if any of the
24   iterations of Exhibit 284B uses a $2 billion
25   figure in the total pool funding available

Page 217

1    P. EXALL - HIGHLY CONFIDENTIAL
2    block?
3    A.    I don't recall.
4    Q.    Okay. Do you think it did?
5    A.    I don't know.
6    Q.    Okay. Could you turn to 284B
7    then.
8    A.    Sure.
9    Q.    In the -- below the chart that
10   we've previously discussed it says Material
11   changes since last update.
12       Do you see that?
13   A.    I do.
14   Q.    And it talks about -- the first
15   two entries talk about changes with respect to
16   arrangements for IBD.
17       Do you see that?
18   A.    Yes.
19   Q.    Was there some kind of special
20   arrangement for IBD made during this period
21   that set them apart from other divisions of
22   Lehman employees that you were taking on?
23   A.    No.
24   Q.    Okay. So this is just a report of
25   the current status of the offers made to IBD

Page 218

P. EXALL - HIGHLY CONFIDENTIAL

1  personnel?
2      A.   No. That's not correct. This
3  material changes since last update section
4  refers to the changes made to this table and
5  the movements from the previous day to the
6  previous iteration thereof. So subsequently
7  it states here that the movements in the
8  committed spend number -- well, it says the
9  committed spend is increased by $3 million.
10 In this instance a $3 million movement was all
11 in IBD. In other iterations you'll see it in
12 other places.
13     Q.   Okay. Fair enough. If you skip
14 further down it says Current funding
15 pressures.
16         Do you see that?
17     A.   Yes.
18     Q.   It says, These funding pressures
19 currently exist that are -- I'm sorry.
20         MR. GREEN: I'm sorry. I don't
21     see that. Can you tell me --
22         MR. HINE: Toward the bottom in
23     bold it says Current funding pressures.
24         MR. GREEN: All right. I'm with

Page 219

P. EXALL - HIGHLY CONFIDENTIAL

1  you. Thanks.
2      Q.   And if I read it it says "Three
3  funding pressures currently exist that are
4  putting pressure on the original bonus pool
5  estimate of 1.4 billion."
6         Do you see that?
7      A.   I do.
8      Q.   Do you recall anything about where
9  they came up with an original bonus pool
10 estimate of 1.4 billion?
11         MR. GREEN: Objection. Asked and
12     answered repeatedly.
13     A.   I don't recall, no.
14     Q.   And now that 1.4 billion if I read
15 the parenthetical correctly says Assumed to
16 exclude funding for deferred cash awards.
17         Do you see that?
18     A.   I do.
19     Q.   And I believe you testified
20 earlier about the deferred cash award in the
21 block at the top has to do with what we --
22 what have been called special cash awards in
23 the contracts; is that right?
24     A.   That is correct.

Page 220

P. EXALL - HIGHLY CONFIDENTIAL

1      Q.   So was it your understanding that
2  the 1.4 billion bonus pool did not include
3  that amount?
4      A.   That's correct. And it's
5  reflected that way on the schedule.
6      Q.   Okay. Could you turn to the next
7  page.
8         Well, before you do on this you'll
9  see three bullet points which I can read
10 myself so I don't need you to explain but they
11 basically talk about three funding pressures,
12 right?
13     A.   Yes.
14     Q.   Now, if you turn to the next page
15 it talks about sensitivity analysis.
16         Does that relate to the three
17 funding pressures in any way?
18         MR. GREEN: Object to the form.
19     A.   I would say they do not directly
20 relate. But it is all part of the same thing.
21 If you have a specific question in mind --
22     Q.   Well, I guess I'm trying to figure
23 out what's the sensitivity analysis
24 encompassing?

Page 221

P. EXALL - HIGHLY CONFIDENTIAL

1      A.   Well, as stated here, it considers
2  the impact on the residual population that is
3  not guaranteed assuming 3,300 in redundancies.
4      Q.   All right. Okay. Let's take a
5  minute on that because I can read it, too, but
6  if you look at the chart on the prior page
7  where it says Footnote 3, estimated pool
8  requirement for 75 percent of 2007 total
9  compensation for original.
10     A.   Yes.
11     Q.   Do you see that?
12         And if you continue it talks about
13 a residual population in footnote 3.
14     A.   Yes.
15     Q.   What I'm trying to understand is
16 that residual population -- that use of the
17 word residual population, and I believe
18 previously, and I'm not trying to
19 mischaracterize your testimony, you used that
20 phrase in connection with the 10,000 employees
21 listed as non-guaranteed population.
22         So I'm just trying to understand
23 the use of the phrase residual population.
24         MR. GREEN: Object to the form of

Page 222

1    P. EXALL - HIGHLY CONFIDENTIAL
2    the question. If there is a question.
3    **Q.   Let me be more specific.**
4         **Footnote 3, am I correct to say**
5    **that relates only to the 402 individuals**
6    **listed in the top part of the chart?**
7    A.   Yes, it would.
8    **Q.   So that -- what you're saying**
9    **there is the 75 percent that was originally**
10   **contemplated for between 175 and 200 people**
11   **and then the 65 percent of 2,000 bonuses, that**
12   **residual population is the difference between**
13   **the 175 to 200 and the 402?**
14        MR. GREEN:  Object to the form of
15   the question. I didn't understand the
16   question. I don't know if he understood
17   the question.
18        MR. HINE:  Well, if he did he can
19   answer it.
20   A.   Let me say it another way.
21   **Q.   Yeah.**
22   A.   This schedule states at this point
23   in time 402 people had received contracts in
24   the form of -- similar to the form of those.
25   **Q.   Right.**

Page 223

1    **P. EXALL - HIGHLY CONFIDENTIAL**
2    A.   The footnote 3 relates to what
3    those individuals who received a guaranteed
4    bonus in this form would have originally been
5    modeled at under the reference point rules of
6    the road, again for want of a better phrase.
7    **Q.   Sure.**
8    A.   In terms of our original estimate
9    of what we would offer those individuals as a
10   guaranteed bonus.  What they were actually
11   offered, if I take the population of 402, they
12   were offered guaranteed bonuses of 862
13   million.
14   **Q.   Okay.**
15   A.   Under the original reference
16   points that we were using to model, what we
17   would have offered them under those reference
18   points would have been 704 million.
19        Now, to sent extent that the 175
20   to 200, yes.  To the extent that those 175 to
21   200 are included in the 402, those people
22   would have been modeled at 75 percent of 2007
23   total comp as a bonus.  And that would have
24   been included in the $607 million here.  The
25   residual popula -- or sorry.  $774 million.

Page 224

1    P. EXALL - HIGHLY CONFIDENTIAL
2    Excuse me.
3         The residual population in excess
4    of the original 175 to 200 would have been
5    modeled at 65 percent of their 2007 total
6    bonus and they would also be included in the
7    724 million.
8    **Q.   And so in that sense residual**
9    **population means the people over and above 175**
10   **to 200 that brings you up to the 402, correct?**
11   A.   That's correct.  There were people
12   that would have been in the non-guaranteed
13   bucket on the schedule on the 10,111 that had
14   flipped at this stage into the above bucket.
15   **Q.   Okay.  Now, if you turn to the**
16   **next page you see the impact on the residual**
17   **population.  Are we talking about the same**
18   **people there?**
19   A.   No, we're not.  We're talking
20   about the residual 6,798 people.
21   **Q.   Okay.  So you're basically**
22   **describing the effect of the actual offers**
23   **that have been made and completing the**
24   **expected bonus pool of 1.4 billion in this**
25   **document?**

Page 225

1    **P. EXALL - HIGHLY CONFIDENTIAL**
2    A.   I'm discussing the implication of
3    the 558 million residual pool available for
4    non-GB people.  I'm discussing that impact in
5    relation to their 2007 bonus, correct.
6    **Q.   Okay.  So the more you pay the top**
7    **104 people the less that's available for the**
8    **residual population.**
9    A.   Assuming a 1.4 billion number.
10   **Q.   Was there any discussion among**
11   **senior people about this phenomenon that**
12   **you're describing?**
13   A.   I don't know.
14   **Q.   Do you recall if they ever decided**
15   **to increase the bonus pool from 1.4 billion**
16   **after this summary was presented to them?**
17        MR. GREEN:  The bonus pool
18   indicated on this report?
19        MR. HINE:  Yeah.
20   A.   Are you asking me whether the 1.4
21   billion on page 1 of 7 was ever increased?
22   **Q.   Well, you see on the bottom --**
23   **towards the bottom of page 1 of 7 it says**
24   **Original bonus pool estimate of 1.4 billion.**
25   A.   Um-hum.

Page 226

P. EXALL - HIGHLY CONFIDENTIAL
1
2  Q.  So my question is did your
3  analysis about -- the sensitivity analysis
4  about what would be left for the residual
5  population ever cause Barclay senior
6  management to increase their expected bonus
7  pool?
8        MR. GREEN:  Object to the form of
9  the question.  If you know you can
10  answer.
11  A.  I don't recall -- it's possible
12  that the 1.4 billion reflected on page 1
13  changed and was increased.  I don't recall.
14  Q.  Okay.
15  A.  I would imagine if you have
16  subsequent copies and you can show that to me
17  then, you know, that's fine.
18  Q.  Okay.
19  A.  But I don't recall that number
20  changing in that regard.  It may have.
21  Q.  If it did it would be reflected in
22  subsequent copies in that block where it says
23  1.4 billion right now?
24  A.  I would think so.
25        MR. GREEN:  Well, I understood

Page 227

P. EXALL - HIGHLY CONFIDENTIAL
1
2  your question to be about what did
3  appear on the summary so by definition
4  if it changed it would appear in
5  subsequent copies of the summary.
6        MR. HINE:  Well, I don't
7  understand that objection.  My question
8  is we haven't been provided all the
9  copies.  We requested all the copies.
10  And you guys said you'll take it under
11  advisement.  I can't ask him the
12  question because I don't have all the
13  copies.
14  Q.  So my question is if the Barclays
15  senior management raised the level of the
16  bonus pool over 1.4 billion is it likely I
17  would see it show up in one of your later
18  analyses in that block?
19  A.  It's possible.
20  Q.  Yeah.
21  A.  As I said, I can't testify to the
22  fact.  I haven't seen -- I haven't referred
23  back to the file or any subsequent copies of
24  this particular memo.
25  Q.  Sure.

Page 228

P. EXALL - HIGHLY CONFIDENTIAL
1
2        MR. GREEN:  I have to object to
3  that last question.
4  RQ    MR. HINE:  All right.  That's
5  fine.  And I reiterate our request to
6  have all copies of this document, all
7  iterations provided to us.
8        MR. GREEN:  All right.
9  Q.  Mr. Exall, could you turn to page
10  3 of 7 which ends in Bates number 193.
11  There's an attachment entitled Master
12  Scorecard.
13        Do you see that?
14  A.  Yes.
15  Q.  Could you tell me what this is
16  attempting to model or reflect?
17  A.  If you refer down into the
18  bottom -- if you read from the bottom of the
19  table the last row being Total Pool Difference
20  Based on Current Proposal, if you read five
21  lines up you will see Total Business Proposed
22  Bonus Award of $862 Million.  That refers to
23  or ties back to the $862 million on page 1 of
24  7 under the Actual column in the Day 1 - 2008
25  cost block.

Page 229

P. EXALL - HIGHLY CONFIDENTIAL
1
2        So what page 3 of 7 is a
3  breakout of -- by business area the old Lehman
4  Brothers business area I would say of how that
5  862 million as well as some of the other items
6  reflected in that table are in fact split by
7  business.
8  Q.  And then when I see total head
9  count, 402, that's the 402 we talked about on
10  page 1 of 7, correct?
11  A.  Yes.
12  Q.  Okay.  And then below the total
13  business proposed bonus awards it talks about
14  total BarCap bonus pool per formula.
15        Do you see that?
16  A.  Yes.
17  Q.  And what is that meant to reflect?
18  A.  That $723,773,471 refers back to
19  the 724 million rounded number under the
20  original model column which I believe we've
21  explained.
22  Q.  Yes, okay.  And then continuing
23  down it says Total 2009 Bonus Awards.  What is
24  that?
25  A.  Again, referring back to page 1 of

Page 230

1     P. EXALL - HIGHLY CONFIDENTIAL
2  7 it's the second year GB column totalling
3  $111 million.
4     Q.  Okay.  So that's guaranteed
5  bonuses for the following year, 2009?
6     A.  Yeah.  That's correct.
7     Q.  Okay.
8     A.  You'll find all these numbers tie
9  back.
10    Q.  The total special cash award is
11 the total of the block that's entitled One
12 Time Deferred Cash Award; is that right?
13    A.  Correct.
14    Q.  All right.  And the Total Pool
15 Difference just to complete?
16    A.  Is the difference between the 862
17 million and the 724 million.
18    Q.  So that's the bottom of the
19 Overspend column.
20    A.  That's correct.
21    Q.  Could you just -- in the bottom
22 you have notes.  It says Senior management
23 2008 bonus equals 80 percent of 2007 TC (plus
24 deferred cash) equals 50 percent '07 TC as a
25 special cash award.

Page 231

1     P. EXALL - HIGHLY CONFIDENTIAL
2     Is that the scheme that Barclays
3  was applying at this time to figure out the
4  bonuses that would be awarded to Lehman senior
5  management?
6        MR. GREEN:  Object to the form of
7     the question.
8     A.  I don't think your use of the word
9  "scheme" is correct.
10    Q.  Okay.
11    A.  I would say again these were
12 reference points and rules of the road, so to
13 speak, that were applied generally to these
14 categories of individuals.  Individual
15 contracts were negotiated on an individual
16 basis and individual awards were agreed on
17 that basis.
18    Q.  I understand.
19    A.  That was, as I suggested, a
20 reference point.
21    Q.  Well, I guess my -- I'm trying to
22 figure out the difference between -- you'll
23 see the second entry says Tier 1.
24    A.  Um-hum.
25    Q.  I assume that's one tier of

Page 232

1     P. EXALL - HIGHLY CONFIDENTIAL
2  employees down below senior management?
3     A.  Yes.
4     Q.  How does that -- how do these two
5  terms in this note, senior management and tier
6  1 relate if at all to the Elite 8 entry on the
7  first page?
8     A.  If you look on the first page the
9  Elite 8 is footnoted as actually being nine
10 individuals.
11    Q.  Right.
12    A.  And counted as such in the
13 schedule.
14    Q.  Right.
15    A.  If you refer to page 3 of 7 you'll
16 see in the senior management bucket it is nine
17 individuals.  It is those individuals to which
18 the footnote relates.  The senior management
19 block.
20    Q.  Oh, I see.  I gottcha.  At the
21 bottom of the chart.  Okay.  So senior
22 management is effectively the Elite 8 plus one
23 other individual.
24    A.  I don't think anyone can figure
25 one out.

Page 233

1     P. EXALL - HIGHLY CONFIDENTIAL
2     Q.  Now, who are the tier 1 folks?
3     A.  The tier 1 would refer back to
4  the -- if I refer back to page 1 under
5  footnote 3 to the chart, the phrase original
6  175 to 200 population.  That is in effect the
7  tier 1.
8     Q.  I gottcha.  Okay.  So that's --
9  okay.  Thank you very much for that
10 clarification.
11    Could you turn to page 5 of 7 of
12 this chart.  Could you just tell me what the
13 purpose of this attachment is?
14    A.  Give me a movement to refresh my
15 memory.
16    Q.  Sure.
17    (Document review.)
18    A.  Attachment 3 is labeled on page 5
19 is addressed or elaborates on the attachment 3
20 reference in the sensitivity analysis section
21 on page 2.  And is effectively the workings
22 behind the bullet points contained therein.
23    Q.  Okay.  And is it correct to say
24 that the conclusion of that analysis is if we
25 want to pay 65 percent to the residual

Page 234

P. EXALL - HIGHLY CONFIDENTIAL
1 population we're going to have to add another
2 $275 million to the pool?
3        MR. GREEN: Object to the form.
4    A.    What it means is that with
5 $406 million as reflected in attachment 3 of
6 residual funding based on these assumptions
7 and reference points made in this report, were
8 we to attempt to deliver 65 percent of the
9 residual non-guaranteed population to the
10 extent that we would guarantee -- we would pay
11 them 65 percent of their 2007 total bonus, we
12 would be -- we would require to pay an
13 additional $270 million.
14    Q.    Okay. And did Barclays do that?
15    A.    Do what?
16    Q.    Add 270 million to the bonus pool.
17        MR. GREEN: Object to the form of
18 the question.
19    Q.    Well, let me rephrase it.
20        Did Barclays ever pay the
21 65 percent of '07 bonus to that residual
22 population you just talked about?
23    A.    I don't believe any -- I mean,
24 individual bonus payments are individual

Page 235

P. EXALL - HIGHLY CONFIDENTIAL
1 specific. Some people would have got
2 65 percent. Some people would have got more.
3 Some people would have got less. I can't
4 speak -- but, in general, people were paid as
5 reflected on the schedule discharging -- you
6 know, where the discharge of our obligations
7 under the pre-acquisition service clause for
8 our Lehman Brothers employees.
9        MR. GREEN: 281B?
10    Q.    You're talking about 281B?
11    A.    281B. That is the discharge of
12 the relevant obligations.
13    Q.    Okay. I guess, well, do you
14 recall any discussion or understanding that
15 Barclays was going to try to pay 65 percent
16 level to the residual population?
17    A.    The original modeling as you can
18 see here and throughout there are footnotes to
19 it, a reference point was always 65 percent of
20 prior year bonus for a residual population.
21    Q.    And did Barclays achieve that?
22    A.    I don't recall in aggregate what
23 the -- again, I stress what was paid is
24 reflected in schedule 281B.

Page 236

P. EXALL - HIGHLY CONFIDENTIAL
1    Q.    Okay.
2    A.    If you're asking me what is that
3 in relation to their 2007 comp, I don't know
4 for certain.
5    Q.    Okay. In the second bullet point
6 on page 5 of 7 it says Severances of 2,300 are
7 assumed in the above analysis.
8        Do you see that?
9    A.    Sorry.
10    Q.    The second bullet point under
11 Observations on page 5 of 7.
12    A.    Yes.
13    Q.    And that's -- that is the assumed
14 reductions in force that we talked about
15 earlier reflected on page 1 of 7?
16    A.    Yes.
17    Q.    Okay. So those severances are not
18 part of this bonus pool analysis that you're
19 doing at the top of the page.
20    A.    My recollection is that we would
21 have estimated a reduction in force of 3,300
22 people as specified and that would have
23 been taken into consideration when this model
24 was produced.

Page 237

P. EXALL - HIGHLY CONFIDENTIAL
1    Q.    Well, how was it reflected in this
2 model?
3        And, again, I'm looking at page 5
4 of 7.
5    A.    We would have eliminated 3,300
6 head count from the analysis in determining
7 the gap to 65 percent as labeled on this
8 spreadsheet. We would have eliminated people
9 to that extent that we would have assumed that
10 they are out.
11    Q.    Okay. So that's column -- the
12 third column marked HC, that means head count?
13    A.    Yeah. That -- yes, that's right.
14    Q.    So that 3,300 is removed from the
15 head count to arrive at that column, correct?
16    A.    No. I would suggest that the
17 numbers here are pre -- that 10,950 grand
18 total would have the 3,300 in it. But when we
19 would have modeled -- the numbers as modeled
20 here would have assumed that they had been
21 taken out during the course of the redundancy
22 exercise. That's the starting point position.
23    Q.    Okay. So you would model some
24 form of severance payment to these folks to

Page 238

P. EXALL - HIGHLY CONFIDENTIAL

1  take them out of this bonus analysis.
2      MR. GREEN:  Object to the form of
3  the question.
4      A.   Yes.  If you refer to note 5 on
5  the schedule which relates to column E plus,
6  you know, 65 percent of residual '07 bonus
7  plus severances, footnote 5 states that
8  65 percent of the comparative '07 actual bonus
9  pool relates to the non-targeted, non-GB
10  population (less estimated 3,300 proportional
11  head count reduction).
12      So that would have assumed that
13  3,300 people had been removed from that
14  residual population.
15      Q.   Okay.  And so they don't have to
16  get a bonus.
17      A.   They would have received a
18  severance.  Or would be eligible for a
19  severance.
20      Q.   All right.
21      I just want to show you one other
22  version of this chart.  I'm not going to go
23  line by line but I do have a couple questions.
24      MR. HINE:  Let's mark this

Page 239

P. EXALL - HIGHLY CONFIDENTIAL

1  (Deposition Exhibit 288B, document
2  bearing production numbers
3  BCI-EX-(S)-00027258 through
4  BCI-EX-(S)-00027265, marked for
5  identification as of this date.)
6  BY MR. HINE:
7      Q.   Mr. Exall, I'm handing you a copy
8  of a document marked as Exhibit 288B which is
9  dated Wednesday, September 24th.  It appears
10  to be a similar summary report.  It's got
11  badges BCI-EX-(S)-00027258 through 27265.
12      After you've had a chance to look
13  at it let me know.
14      A.   Yeah.  Okay.  I'm okay.
15      Q.   Am I correct to assume this is the
16  similar summary report prepared the following
17  day?
18      A.   Yes, it is.  I would suggest it's
19  not the subsequent one.  At this point in time
20  I believe we were doing one in the morning and
21  one in the evening.  And this would be the
22  following morning's one.  As you see it's time
23  stamped 7:45, 24 September 2008 in the
24  subject.  That 7:45 would represent the time

Page 240

P. EXALL - HIGHLY CONFIDENTIAL

1  at which we took the download out of the
2  underlying system that held the data.  The one
3  previous is time stamped 8:50 of the prior
4  day.  There would have been an evening
5  version.
6      Q.   I see.  Okay.
7      I just had some select questions
8  on here.  We previously talked about the PIM
9  individuals.
10      A.   Yes.
11      Q.   And so I'm -- I would refer you to
12  page 4 of 7 where -- under the title
13  Forgivable Loan.
14      Do you see that?
15      A.   I do.
16      Q.   And it appears to represent some
17  kind of loan provided to certain PIM
18  employees.  Could you explain to me what's
19  going on with this paragraph or what this is
20  describing?
21      A.   If we read it it says
22  approximately 90 to 100 PIMs will receive an
23  upfront tax-free cash payment as a loan.  This
24  loan has a seven-year term and is then

Page 241

P. EXALL - HIGHLY CONFIDENTIAL

1  forgiven in seven annual installments.  If the
2  PMI leaves during the loan period, he is
3  required to repay that portion of the loan
4  that is not yet forgiven.  This is standard
5  practice in this industry and is utilized as a
6  strong retention tool.  We need to do this to
7  be competitive in terms of recruiting and
8  retaining top producers.
9      Q.   All right.
10      A.   So these are effectively tax-free
11  cash payments made upfront to these
12  individuals that represent a loan and as they
13  serve their time with us under their
14  employment these loans are forgiven and are
15  not required to be paid back in several
16  tranches, in this case over seven years.
17      Q.   Okay.  And this is a means -- this
18  is a method of helping retain these employees?
19      A.   That's correct.
20      Q.   Now, when we previously -- I refer
21  you back to Exhibit 281B.
22      A.   Yes.
23      Q.   Your spreadsheet.  Are these loans
24  to PMI employees reflected in any way on this

Page 242

P. EXALL - HIGHLY CONFIDENTIAL

spreadsheet on Exhibit 281B?

A.   No, they're not.

Q.   And that's because it doesn't relate to their employment back when they were with Lehman; is that correct?

A.   That's correct.
Let me clarify that.

Q.   Okay.

A.   They would have had similar arrangements with Lehman Brothers that are separate and distinct from these. But because these relate to post-acquisition service in respect of service with Barclays looking forward they're not on the schedule.

Q.   Okay. So they're not on the Exhibit 281B.

A.   No, they're not.

Q.   Okay. Mr. Exall, I'm going to hand you a document here just to see if you have any involvement in it. I don't know if you do or not. But I'll mark it as an exhibit that relates to a synergy analysis.

(Deposition Exhibit 289B, document bearing production number

Page 243

P. EXALL - HIGHLY CONFIDENTIAL

BCI-EX-00077557, marked for identification as of this date.)

(Deposition Exhibit 290B, document bearing production numbers BCI-EX-00077542 through BCI-EX-00077543, marked for identification as of this date.)

BY MR. HINE:

Q.   Mr. Exall, I'm handing you two documents. One marked 289B which is Bates stamped BCI-EX-00077557 which is entitled -- subject matter entitled Long Island - Synergy and Integration Assumptions.
Do you see that?

A.   I do.

Q.   And then the second document which is marked as Exhibit 290B is Bates stamped BCI-EX-00077542 through 543. It appears to us to be a document entitled Final Synergy and Integration Assumptions.
But I'm not sure they were produced separately, Chris, so I can't represent that they're the same document.
And my real question to you, Mr.

Page 244

P. EXALL - HIGHLY CONFIDENTIAL

Exall, is did you have any involvement in any type of synergy analysis like this?

A.   I've never seen this before.

Q.   You've never seen this document before?

A.   (Witness shakes head.)

Q.   Do you know who at Barclays would be involved in this type of synergy analysis?

A.   Clearly the people involved here are Mr. Syal, Mr. Ricci, and Mr. Clackson.

Q.   And they're all -- that's the finance group?

A.   Mr. Ricci is the chief operating officer for investment banking and investment management. And Mr. Clackson is our chief financial officer. And Mr. Syal works for Mr. Clackson.

MR. GREEN: And you're indicating the people that received this e-mail.

THE WITNESS: Mr. Syal sent the e-mail to Mr. Ricci and a copy to Mr. Clackson.

MR. GREEN: Right.

MR. HINE: Your counsel is just

Page 245

P. EXALL - HIGHLY CONFIDENTIAL

asking --

MR. GREEN: You don't have any independent -- other understanding independent of this e-mail of who was involved in this process.

THE WITNESS: No. It seems to me these are the right people to be involved.

Q.   Okay. Your department, the human resources folks, is it correct to say that you folks did not get involved in a synergy analysis like this?

MR. GREEN: Object to the form.

A.   I don't know. As I've said, I've never seen these documents particularly. I've never seen these e-mails. Is it possible that Mr. Syal or one of his colleagues or Mr. Clackson or Mr. Ricci, in fact, asked me or myself -- me or one of my colleagues in human resources about certain items that may or may not be represented in these documents, it's possible. I don't know.

Q.   Do you have any recollection of providing compensation related information to

Page 246

P. EXALL - HIGHLY CONFIDENTIAL
1  someone performing a synergy analysis at
2
3  Barclays?
4      MR. GREEN: Object to the form of
5  the question.
6  A.  Not specifically, no.
7  Q.  Do you have any general
8  recollection of providing compensation
9  information to folks at finance for purposes
10 of a synergy analysis?
11 A.  Nothing specific. My primary
12 contact in the finance department in all of
13 this was Mr. Romaine.
14 Q.  Okay.
15 A.  And I do not know what his
16 involvement was or may or may not have been in
17 this regard.
18 Q.  Okay.
19     (Deposition Exhibit 291B, document
20     bearing production numbers
21     BCI-EX-00078069 through BCI-EX-00078071,
22     marked for identification as of this
23     date.)
24 BY MR. HINE:
25 Q.  Mr. Exall, I'm handing you a copy

Page 247

P. EXALL - HIGHLY CONFIDENTIAL
1
2  of Exhibit 291B which is an e-mail chain dated
3  September 19th. It's Bates stamped
4  BCI-EX-00078069 through -071. Please let me
5  know when you've had a chance to look at it.
6  A.  Fine.
7  Q.  Have you ever seen this e-mail
8  before, Mr. Exall?
9  A.  No.
10 Q.  If I draw your attention to the
11 middle of the first page you'll see an e-mail
12 from a Mr. Kohn and then it's referencing a
13 proposed language for clause 9.1(c).
14     Do you see that?
15 A.  I see it referred to.
16 Q.  Okay. And then toward the
17 bottom -- there's a paragraph cited there and
18 toward the bottom it says, "Accordingly,
19 additional amounts shall be paid as bonuses in
20 accordance with Section 9.1(c) and the
21 employees of the PIM business will be treated
22 in a manner consistent with the principles set
23 forth in Section 9.1(c)."
24     Do you see that?
25 A.  I do see it.

Page 248

P. EXALL - HIGHLY CONFIDENTIAL
1
2  Q.  Do you recall any discussion about
3  that issue in connection with any of your work
4  at Barclays?
5  A.  No.
6  Q.  Do you recall any discussion about
7  possibly modifying the Asset Purchase
8  Agreement to reflect the incorporation of the
9  PIM business into Barclays?
10 A.  No.
11 Q.  Okay. I've asked you some
12 questions about the PIM business throughout
13 this deposition. Is there anything related to
14 the PIM business in connection with your
15 analysis that you performed that you haven't
16 already testified about?
17     MR. GREEN: Can you clarify which
18 analysis you're referring to?
19     MR. HINE: I'm talking about
20 Exhibit 281B.
21     MR. GREEN: 281B.
22 A.  In what respect? I don't
23 understand the question.
24 Q.  I'm just trying to see if there's
25 anything out there relating to the PIM

Page 249

P. EXALL - HIGHLY CONFIDENTIAL
1
2  business that you haven't mentioned already.
3  I believe you've told me quite a bit. But as
4  it relates to the compensation issues embodied
5  in your spreadsheet, Exhibit 281B.
6  A.  I think we've discussed their
7  inclusion as part of the general bonus amounts
8  as labeled on 281B.
9  Q.  Okay.
10 A.  We've discussed the replacement
11 RSU items. You've seen those in the attached
12 schedule. We've discussed the forgivable
13 loans issue that was referred to in one of
14 these other exhibits. 288B believe.
15 Q.  Right.
16 A.  I don't recall of anything
17 material that springs to mind regarding the
18 PIM business that we haven't discussed. It's
19 possible but I think we've discussed most of
20 the material items in respect.
21 Q.  Fair enough.
22     (Deposition Exhibit 292B, document
23     bearing production numbers 10267306 and
24     10238222, marked for identification as
25     of this date.)

Page 250

P. EXALL - HIGHLY CONFIDENTIAL

1  BY MR. HINE:
2     Q.  Mr. Exall, I'll hand you a copy of
3  a document marked 292B which has two separate
4  pages with different Bates stamps.  Or
5  actually different markings on the bottom.
6  They're not Bates stamps.  One is marked
7  10267306 and the other is marked 10238222.
8     My question relates to the second
9  page which is entitled Barclays Offers to Key
10  Lehman Employees.
11     Do you see that?
12     A.  Yes.
13     Q.  Have you ever seen --
14     MR. GREEN:  Bill, can I interrupt
15  for a second?  What are these Bates
16  numbers?  Or do you know?
17     MR. HINE:  I don't know.
18     MR. GREEN:  Because they're not
19  Bates numbers that we've put on this
20  document.
21     MR. HINE:  Correct.  They're not
22  Bates stamped by your -- by Barclays.
23     MR. GREEN:  All right.
24     Q.  But I just wanted to ask you about

Page 251

P. EXALL - HIGHLY CONFIDENTIAL

1  this one page that says Barclay Offers to Key
2  Lehman Employees.  Have you ever seen that
3  document before?
4     MR. GREEN:  Take your time to look
5  at it and make sure you have the entire
6  document in mind before answering the
7  question.
8     (Document review.)
9     A.  I did not receive this e-mail.
10     Q.  I understand.
11     A.  I don't recall specifically having
12  seen this e-mail or the attachment to it.
13  That said, I recognize a lot of the things on
14  it but I don't think I necessarily saw this
15  particular schedule.
16     Q.  Okay.  Well, this -- I understand
17  you're not on the e-mail.  My question is does
18  this document entitled Barclays Offers to Key
19  Lehman Employees, is that a document that was
20  produced by Barclays, do you know?
21     A.  I have no idea.
22     Q.  Okay.  Do you have -- I take it
23  you have no knowledge of -- well, strike that.
24     You've never seen it in this form

Page 252

P. EXALL - HIGHLY CONFIDENTIAL

1  before?
2     MR. GREEN:  He said he's never
3  seen it at all before.
4     A.  I don't recall having seen the
5  schedule.  I would note that it's sent out by
6  Anthony Collerton from Lehman's e-mail
7  address.  And this was preclose.  It's dated
8  September the 19th.
9     Q.  I understand all that.
10     A.  Yeah.
11     Q.  I just want to confirm that you
12  don't know whether this was produced by
13  Barclays or Lehman; is that right?
14     A.  No, I don't.  I would point out
15  that it seems that any questions are directed
16  to Anthony Collerton in the schedule itself.
17     Q.  Okay.  Mr. Exall, I think some of
18  my colleagues might have some questions for
19  you but --
20     MR. WOOD:  I don't have any.
21     MR. HINE:  Oh, no.  I apologize.
22  I do have one other document I wanted
23  ask you about.  My colleague has
24  reminded me of one other document.

Page 253

P. EXALL - HIGHLY CONFIDENTIAL

1     (Deposition Exhibit 293B, Barclays
2  PLC Results Announcement 31st December
3  2008, marked for identification as of
4  this date.)
5  BY MR. HINE:
6     Q.  Mr. Exall, I'll hand you a copy of
7  a document marked 293B which is entitled
8  Barclays PLC Results Announcement, 31 December
9  2008.  I'm not going to ask you any detailed
10  questions about this document but if you would
11  like to refer to --
12     A.  No page numbers.
13     Q.  -- the sixth page in.
14     A.  Counting the front?
15     Q.  Yes.  Which is the section
16  entitled Group Finance Directors Review.
17     Do you see that?
18     A.  Yes.
19     Q.  And you'll see in the first bullet
20  point it says Gains on acquisition of 2.406 --
21  I'm sorry.  2,406 million pounds.
22     Do you see that?
23     A.  I do.
24     Q.  Did you have any role in assisting

Page 254

1        P. EXALL - HIGHLY CONFIDENTIAL
2   or helping Barclays prepare its financial
3   statements?
4        A.   These (indicating)?
5        Q.   Yeah.
6        A.   No.
7        Q.   Do you provide compensation
8   related information that would go into the
9   financial statements at all?
10       A.   From time to time, yes, I would.
11       Q.   Okay.  Do you have any knowledge
12  of whether the compensation figures that
13  you've given us in your spreadsheet,
14  Exhibit 281B, were used in arriving at this
15  gain on acquisition listed in this financial
16  statement?
17       A.   That is a technical accounting
18  question that I suggest you refer to Mr.
19  Romaine in that regard.
20       Q.   So your answer is no, you don't
21  have any knowledge one way or the other?
22       A.   I can -- I don't know the chain of
23  events by which that schedule may or may not
24  be embodied within that number.
25       Q.   Okay.  That number being the one

Page 255

1        P. EXALL - HIGHLY CONFIDENTIAL
2   on the financial statement that we just talked
3   about?
4        A.   That is correct.  As I said, I'm
5   not a technical accountant.  That was produced
6   as we've discussed and the reasons why.  And I
7   suggest that if you want to understand more
8   about what's in that number specifically you
9   should discuss that with finance.
10       Q.   Okay.  Is it fair to say that you
11  provide them accounting information -- I mean,
12  compensation information such as that embodied
13  in Exhibit 281B but they take it from there?
14       A.   Yes.
15       Q.   Okay.  So other than providing
16  that general compensation related information
17  you're not involved in the preparation of
18  Barclays' financial statements, correct?
19       A.   I was not specifically involved in
20  the preparation of the financial statements
21  with respect to that number.  There are other
22  instances in terms of individual disclosure
23  that is -- may or may not be required, whereas
24  as a point of fact I am asked to confirm or to
25  give a number.

Page 256

1        P. EXALL - HIGHLY CONFIDENTIAL
2        Q.   Okay.
3        A.   So, yes, I am involved where I'm
4   required.  But in general, no, this is not my
5   responsibility whatsoever.
6        Q.   Very good.  Thank you.  Now I
7   think I'm done with my questions.
8        MR. HINE:  You don't have any?
9        MR. WOOD:  I don't have any.
10       MR. LAZAR:  I don't have any.
11       (Continued on next page to include
12  jurat.)

Page 257

1        P. EXALL - HIGHLY CONFIDENTIAL
2        MR. HINE:  I think no one else has
3   any questions.  So, Chris, unless you
4   have any questions --
5        MR. GREEN:  No, I don't have any
6   questions.
7        MR. HINE:  All right.  Mr. Exall,
8   thank you for your time.
9        THE WITNESS:  My pleasure.
10       MR. HINE:  All right.  We're done.
11       (Time Noted:    2:40 p.m.)

20   _____
         PAUL EXALL

22   Subscribed and sworn to before me
23   this ___ day of _____, 2009.

65  (Pages 254 to 257)

Page 258

```
1
2              C E R T I F I C A T E
3    STATE OF NEW YORK    )
4                        : ss.
5    COUNTY OF NEW YORK   )
6         I, FRANCIS X. FREDERICK, a Notary
7    Public within and for the State of New
8    York, do hereby certify:
9         That PAUL EXALL, the witness whose
10   deposition is hereinbefore set forth,
11   was duly sworn by me and that such
12   deposition is a true record of the
13   testimony given by the witness.
14        I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage, and that I
17   am in no way interested in the outcome
18   of this matter.
19        IN WITNESS WHEREOF, I have
20   hereunto set my hand this 27th day of
21   August, 2009.
22
23
24   _____
25          FRANCIS X. FREDERICK
```

Page 259

```
1
2    ---------------- I N D E X ----------------
3    WITNESS           EXAMINATION BY      PAGE
4    PAUL EXALL           MR. HINE      5
5
6
7
8
9    ---------- INFORMATION REQUESTS ------------
10   DIRECTIONS: NONE
11   RULINGS: NONE
12   TO BE FURNISHED: NONE
13   REQUESTS: 71, 188, 228
14   MOTIONS: NONE
```

Page 260

```
1
2    ----------------- EXHIBITS -----------------
3    EXHIBIT                    FOR ID.
4    Exhibit 279B
5    Debtors' First Rule 30(b)(6)
6    Deposition Notice to Barclays
7    on Issues Pertaining to Accrued
8    08 FY Liability Under the
9    Asset Purchase Agreement................. 5
10   Exhibit 280B
11   document bearing production
12   number BCI-EX-00077287................ 61
13   Exhibit 281B
14   document bearing production
15   number BCI-EX-00115843................ 61
16   Exhibit 282B
17   document bearing production
18   numbers BCI-EX-00113161
19   through BCI-EX-00113163............... 160
20   Exhibit 283B
21   document bearing production
22   number BCI-EX-00113194................ 170
23
24
25
```

Page 261

```
1
2    ----------------- EXHIBITS -----------------
3    EXHIBIT                    FOR ID.
4    Exhibit 284B
5    document bearing production
6    numbers BCI-EX-(S)00027190
7    through BCI-EX-(S)00027197............. 172
8    Exhibit 285B
9    document bearing production
10   number BCI-EX-00077651................ 199
11   Exhibit 286B
12   document bearing production
13   number BCI-EX-00077621................ 199
14   Exhibit 287B
15   document bearing production
16   number BCI-EX-00077466................ 199
17   Exhibit 288B
18   document bearing production
19   numbers BCI-EX-(S)-00027258
20   through BCI-EX-(S)-00027265........... 239
21   Exhibit 289B
22   document bearing production
23   number BCI-EX-00077557................ 242
24
25
```

Page 262

```
 1
 2   ----------------- EXHIBITS -----------------
 3   EXHIBIT                        FOR ID.
 4   Exhibit 290B
 5   document bearing production
 6   numbers BCI-EX-00077542
 7   through BCI-EX-00077543............... 243
 8   Exhibit 291B
 9   document bearing production
10   numbers BCI-EX-00078069
11   through BCI-EX-00078071............... 246
12   Exhibit 292B
13   document bearing production
14   numbers I0267306
15   and I0238222.......................... 249
16   Exhibit 293B
17   Barclays PLC Results
18   Announcement 31st December 2008....... 253
19
20
21
22
23
24
25
```

Page 263

```
 1
 2   NAME OF CASE: IN RE: LEHMAN BROTHERS
 3   DATE OF DEPOSITION: AUGUST 27, 2009
 4   NAME OF WITNESS: PAUL EXALL
 5   Reason codes:
          1. To clarify the record.
 6        2. To conform to the facts.
          3. To correct transcription errors.
 7   Page _____ Line _____ Reason _____
     From _____ to _____
 8
     Page _____ Line _____ Reason _____
 9   From _____ to _____
10   Page _____ Line _____ Reason _____
     From _____ to _____
11
     Page _____ Line _____ Reason _____
12
13   Page _____ Line _____ Reason _____
     From _____ to _____
14
     Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
     From _____ to _____
17
     Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
     From _____ to _____
20
     Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
     From _____ to _____
23
24   _____
              PAUL EXALL
25
```

# BCI EXHIBIT

# 65

Page 1

1

2                   UNITED STATES BANKRUPTCY COURT

3                   SOUTHERN DISTRICT OF NEW YORK

4        -----------------------x

5        In Re:

6                                   Chapter 11

7        LEHMAN BROTHERS         Case No. 08-13555(JMP)

8        HOLDINGS, INC., et al,    (Jointly Administered)

9                   Debtors.

10       -----------------------x

11

12            * * *HIGHLY CONFIDENTIAL* * *

13       DEPOSITION OF ERIC JONATHAN FELDER

14            New York, New York

15            July 31, 2009

16

17       Reported by:

18       MARY F. BOWMAN, RPR, CRR

19       JOB NO. 24018

20

21

22

23

24

25

Page 2

```
 1
 2
 3
 4
 5                    July 31, 2009
 6                    9:35 a.m.
 7
 8
 9          Deposition of ERIC JONATHAN FELDER,
10  held at the offices of Jones Day, LLP, 222 East
11  41st Street, New York, New York, before Mary F.
12  Bowman, a Registered Professional Reporter,
13  Certified Realtime Reporter, and Notary Public
14  of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide  (877) 702-9580

Page 3

```
 1
 2                    APPEARANCES:
 3  JONES DAY, LLP
 4  Attorneys for Lehman Brothers, Inc.
 5      222 East 41st Street
 6      New York, New York  10017-6702
 7  BY:  DAVID L. CARDEN, ESQ.
 8       KELLY CARRERO, ESQ.
 9       JENNIFER DEL MEDICO, ESQ.
10
11  BOIES, SCHILLER & FLEXNER, LLP
12  Attorneys for Barclays and The Witness
13      575 Lexington Avenue - 7th Floor
14      New York, New York  10022
15  BY:  JACK G. STERN, ESQ.
16
17  DEBEVOISE & PLIMPTON, LLP
18  Attorneys for The Witness
19      919 Third Avenue
20      New York, New York  10022
21  BY:  ANDREW J. CERESNEY, ESQ.
22       JULIE SUH, ESQ.
23
24
25
```

TSG Reporting - Worldwide  (877) 702-9580

Page 4

```
 1
 2          APPEARANCES:
 3
 4  QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
 5  Attorneys for the Creditors Committee
 6      865 Figueroa Street, 10th Floor
 7      Los Angeles, California  90017
 8  BY:  ERICA P. TAGGART, ESQ.
 9
10  JENNER & BLOCK, LLC
11  Attorneys for the Examiner
12      330 N. Wabash Avenue
13      Chicago, Illinois  60611-7603
14  BY:  ROBERT L. BYMAN, ESQ.
15
16  HUGHES, HUBBARD & REED, LLP
17  Attorneys for the SIPA Trustee
18      One Battery Park Plaza
19      New York, New York  10004-1482
20  BY:  WILLIAM R. MAGUIRE, ESQ.
21       NEIL J. OXFORD, ESQ.
22
23  Also Present:
24      Rajesh Ankalkoti, Alvarez & Marsal
25
```

TSG Reporting - Worldwide  (877) 702-9580

Page 5

```
 1
 2
 3
 4
 5          IT IS HEREBY STIPULATED AND AGREED, by
 6  and between the attorneys for the respective
 7  parties herein, that filing and sealing be
 8  and the same are hereby waived.
 9          IT IS FURTHER STIPULATED AND AGREED
10  that all objections, except as to the form
11  of the question, shall be reserved to the
12  time of the trial.
13          IT IS FURTHER STIPULATED AND AGREED
14  that the within deposition may be sworn to
15  and signed before any officer authorized to
16  administer an oath, with the same force and
17  effect as if signed and sworn to before the
18  Court.
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide  (877) 702-9580

Page 6

1     FELDER - HIGHLY CONFIDENTIAL
2  ERIC JONATHAN FELDER,
3     called as a witness by the parties,
4     having been duly sworn, testified as
5     follows:
6        MR. CARDEN:  Good morning, Mr. Felder.
7  My name is David Carden.  I represent the
8  estate of Lehman Brothers, and I think what
9  we ought to do is go around the table and
10  have everybody identify who they are before
11  we begin, and then, Jack, you have a
12  statement, right?
13        MR. STERN:  Yes.
14        MR. CARDEN:  I already introduced
15  myself.  My colleague, Kelly Carrero and
16  Jennifer Del Medico.
17        MR. ANKALKOTI:  My name is Rajesh
18  Ankalkoti.  I am with Alvarez & Marsal.
19        MS. TAGGART:  I'm Erica Taggart with
20  Quinn, Emanuel, Urquhart, Oliver & Hedges,
21  LLP, for the creditors committee.
22        MR. MAGUIRE:  Bill Maguire and Neil
23  Oxford from Hughes, Hubbard & Reed for the
24  trustee.
25        MR. BYMAN:  Robert Byman, Jenner &
TSG Reporting - Worldwide  (877) 702-9580

Page 7

1     FELDER - HIGHLY CONFIDENTIAL
2  Block, on behalf of the examiner.
3        MS. SUH:  Julie Suh with Debevoise &
4  Plimpton on behalf of the witness.
5        MR. CERESNY:  Andrew Ceresney from
6  Debevoise representing Mr. Felder
7  personally.
8        MR. STERN:  Jack Stern, Boies,
9  Schiller & Flexner on behalf of Barclays
10  Capital and Mr. Felder.
11        Before we begin the questioning, I
12  just want to state on the record, to avoid
13  time-consuming discussions of
14  confidentiality, we have a confidentiality
15  order in place.  What I would like to do is
16  make a general designation of, anything in
17  the record that should be treated as highly
18  confidential or confidential under the terms
19  of the confidentiality order will be so
20  designated automatically, and more
21  specifically, to the extent that there are
22  questions concerning Mr. Felder's personal
23  compensation, those are deemed highly
24  confidential under the confidentiality
25  order.
TSG Reporting - Worldwide  (877) 702-9580

Page 8

1     FELDER - HIGHLY CONFIDENTIAL
2        MR. CARDEN:  I don't think I have a
3  problem with that.  I am wondering what you
4  think the mechanism ought to be for those
5  aspects which are not highly confidential
6  and confidential, sort of getting out from
7  underneath that designation?
8        MR. STERN:  I think the best way for
9  us to deal with that is to address that
10  after the deposition off the record.
11        MR. CARDEN:  Anybody have any issues
12  with that?
13        MR. MAGUIRE:  Everything is considered
14  highly confidential until anybody sees the
15  need --
16        MR. CARDEN:  I think Jack is concerned
17  that we don't slow things down.  So long as
18  we have a mechanism that, and we can contest
19  the highly confidential designations in any
20  event, so long as we have a designation to
21  get out from underneath that rubric that is
22  not cumbersome, and so long as I have your
23  representation that all this is doing is to
24  sort of accommodate the speed of the
25  deposition and we will deal with this in
TSG Reporting - Worldwide  (877) 702-9580

Page 9

1     FELDER - HIGHLY CONFIDENTIAL
2  good faith thereafter, I don't have a
3  serious problem with it.
4        Does anyone else?
5        MS. TAGGART:  I don't have an
6  objection, although it would be helpful if
7  you would, right after the deposition, say
8  the parts you thought were confidential and
9  highly confidential, then we can deal with
10  it elsewhere.  It might be good to have that
11  specific.
12        MR. STERN:  Understood.
13        MR. CARDEN:  Maybe just to give it a
14  little rigor, unless there is some
15  particular cause for doing it otherwise,
16  shall we say sometime within a week you will
17  have written, having the page numbers of the
18  depositions and the exhibits and the like,
19  and designate what you think ought to be
20  highly confidential and confidential.
21  Therefore, we have a kind of a program, if
22  you will.
23        MR. STERN:  I think that is fair, and
24  I think what Bill said makes sense as a
25  practical matter; designate the entire
TSG Reporting - Worldwide  (877) 702-9580

Page 10

1    FELDER - HIGHLY CONFIDENTIAL
2    transcript as highly confidential, and
3    within a week, we will dedesignate as
4    appropriate under the order.
5    EXAMINATION BY
6    MR. CARDEN:
7    Q.    Good morning, Mr. Felder.
8    A.    Good morning.
9    Q.    You are currently employed by
10   Barclays, correct?
11   A.    Correct.
12   Q.    What is your current position, sir?
13   A.    I'm the head of global credit trading.
14   Q.    And how long have you held that
15   position?
16   A.    Since September '08.
17   Q.    And as head of global trading, just
18   generally speaking, what are your
19   responsibilities?
20   A.    Responsible for secondary trading of
21   cash corporate bonds, credit default swaps, loans,
22   and the municipal securities business rolls into
23   credit.
24   Q.    Prior to being employed by Barclays,
25   you were cohead of fixed income at Lehman

Page 11

1    FELDER - HIGHLY CONFIDENTIAL
2    Brothers, correct?
3    A.    Correct.
4    Q.    Starting on September 9 or thereabouts
5    of 2008?
6    A.    I believe it was September 8.
7    Q.    I am sorry, I meant that -- that's
8    exactly what I meant to say actually.
9    Q.    Prior to that, what was your -- what
10   was your previous title and job?
11   A.    I was global head of global credit
12   products, since June of '08.
13   Q.    And in that position, what were your
14   responsibilities?
15   A.    The businesses that rolled up into
16   global credit products were high-grade, high-yield
17   CDOs, municipals, and the credit portion of
18   emerging markets, the corporate credit portion of
19   emerging markets.
20   Q.    In connection with your
21   responsibilities as global head of credit
22   products, did you have any responsibilities of any
23   kind with regard to repos?
24   A.    No.
25   Q.    And when you took over as head of

Page 12

1    FELDER - HIGHLY CONFIDENTIAL
2    fixed income on September 8, 2008, what were your
3    responsibilities?
4    A.    They were never specifically told to
5    me.
6    Q.    Did you have an understanding as to
7    what they were to be?
8    A.    We had -- I had a brief conversation
9    with Mike Gelband, with Hyung Lee, who is my
10   cohead, about how the portfolio would be split up
11   between the two of us in a normal business
12   environment, and I was going to be responsible
13   for -- or focus on the credit portion and the
14   mortgage portion, and then Hyung would focus on FX
15   and commodities and more focus outside of the U.S.
16   with my focus in the U.S., because he came from
17   Asia.
18   Q.    I would like you to tell me what you
19   consider to have been in the fixed income area at
20   Lehman Brothers as of the time that you had that
21   conversation.
22   A.    In fixed income, you would have had
23   rates, commodities, foreign exchange, credit,
24   mortgages, emerging markets, and financing would
25   have been part of fixed income, or it might have

Page 13

1    FELDER - HIGHLY CONFIDENTIAL
2    been a JV with equity. I don't know exactly how
3    it was set up because you obviously finance more
4    than just fixed-income product. And commercial
5    real estate.
6    Q.    I'm just going to read you a list of
7    asset classes and if you tell me whether you
8    consider them to have been in the fixed income
9    area at Lehman as of September 2008. All right?
10   And I'm just reading now what legends I have been
11   given, so these might not be completely fulsome.
12   Q.    CDs and other money market
13   instruments?
14   A.    Yes.
15   Q.    Total -- corporate obligations and
16   spot?
17   A.    I don't know what that means.
18   Q.    OK. Corporate stocks and options?
19   A.    No.
20   Q.    Derivatives and other -- and it is cut
21   off so I can't -- it would have been some
22   derivative products.
23   A.    There would have been some, yeah.
24   Q.    Some. OK.
25   Q.    Governments and agencies would have

Page 14

FELDER - HIGHLY CONFIDENTIAL

1
2  been a fixed income, correct?
3      A.   Correct.
4      Q.   Mortgages and -- any mortgage-backed
5  securities would have been as well, correct?
6      A.   Correct.
7      Q.   Now, when you had the conversation
8  concerning how to divide the fixed income
9  portfolio, was it -- it was divided along product
10  lines or asset classes as well as geography?
11      A.   That was the initial intention. It
12  was -- nothing was ever put into --
13      Q.   It never functioned?
14      A.   Because, you know, that week was
15  the -- when the firm ultimately went under.
16      Q.   Let's talk about that week. We are
17  now talking about the week of -- I brought a
18  calendar so we have a, as I said before, a prop.
19  Why don't you avail yourself of it as you wish. I
20  don't see any need to mark it. The dates are what
21  they are from time immemorial to the end of time.
22          You were made the head of fixed income
23  on Monday, the 8th of September, correct?
24      A.   Correct.
25      Q.   At some time that week there began to

Page 15

FELDER - HIGHLY CONFIDENTIAL

1
2  be discussions concerning the sale of the entire
3  firm?
4      A.   Correct.
5      Q.   Were you involved in any of those
6  conversations?
7      A.   I was involved in, if people needed
8  information, I was there to help gather
9  information that would have been needed.
10      Q.   OK. Let's talk -- is there any other
11  way in which you were -- strike that.
12          I take it you weren't negotiating for
13  the firm in any respect?
14      A.   I was not negotiating.
15      Q.   You were providing a support, support
16  for those who needed information in connection
17  with the negotiations that were ongoing at the
18  time with Bank of America and perhaps others,
19  correct?
20      A.   Correct.
21      Q.   Was there anyone in particular that
22  was asking you for information during that week?
23      A.   There would be a number of people that
24  would say go get a particular person and send them
25  to a room or tell -- relay instructions throughout

Page 16

FELDER - HIGHLY CONFIDENTIAL

1
2  that -- really from Friday on.
3      Q.   Are we talking about Friday the 12th?
4      A.   Correct.
5      Q.   So your first conversations concerning
6  any transaction in which the firm was to be sold
7  to B of A or anyone else began on that Friday?
8      A.   I never had a conversation about a
9  transaction. It was -- I was told to go to a
10  legal office and help in providing and gathering
11  any information that would have been needed for a
12  due diligence.
13      Q.   What kind of information were you
14  asked to get?
15      A.   In most cases, it was to get a product
16  expert around a specific asset class that either
17  Barclays or Bank America wanted to discuss. Or
18  specifically, within -- within credit, where that
19  business had rolled up in to me, if I had any risk
20  reports or specific information that was asked.
21      Q.   Were you asked to provide any
22  valuations or assist in the obtaining of
23  valuations of any asset classes?
24      A.   No.
25      Q.   Were any of the people with whom you

Page 17

FELDER - HIGHLY CONFIDENTIAL

1
2  worked to your knowledge asked to provide
3  valuations on any asset classes?
4      A.   I would be assuming.
5      Q.   Let's go back to who asked you to help
6  on that Friday. Can you give me any names of
7  people who were involved?
8      A.   Mike Gelband.
9      Q.   What was Mike's position at the time?
10      A.   He was global head of all of debt and
11  equity. So all -- excuse me, all of fixed income
12  and equity.
13      Q.   Did you report to him?
14      A.   I reported to Mike.
15      Q.   Anyone else, anyone other than Mike
16  ask you to provide any information on that Friday
17  the 12th?
18      A.   I believe Ian Lowitt, who was the CFO,
19  and not specifically information but Bart McDade
20  would tell people where to go and be ready for
21  any, you know, any questions or requests. And I'm
22  sorry, also Alex Kirk.
23      Q.   I was going to ask you about Alex.
24  What was Alex's position at that time?
25      A.   I don't know the exact definition of

Page 18

1           FELDER - HIGHLY CONFIDENTIAL
2    it, but he was brought back by Bart and he was on
3    the executive committee, and I believe his title
4    at that time was head of principal investing.
5    He -- but he had been the prior co-COO of fixed
6    income, and so it -- he had a -- he had an
7    institutional knowledge of a broad array of the
8    asset classes within fixed income.
9        Q.  And you said that Bart brought him
10   back.  Did he bring him back from outside the
11   firm?
12       A.  He had left the firm in early '08.
13       Q.  When did Bart bring him back?
14       A.  I believe it was June.  At the same
15   time he brought Mike Gelband back.  They came back
16   together.
17       Q.  Do you have any recollection as to any
18   specific information that either Mike or Ian,
19   Bart, Alex asked you to provide?  I'm talking
20   about documentary information as opposed to simply
21   going to some room at some point.
22       A.  It was generally around position -- it
23   was around the business heads bringing position
24   sheets or risk reports.
25       Q.  So at some time on the 12th, do you
          TSG Reporting - Worldwide  (877) 702-9580

Page 19

1           FELDER - HIGHLY CONFIDENTIAL
2    have a recollection of having been asked to
3    provide the position sheets for some particular
4    area in the fixed income department?
5        A.  On Friday, I don't remember the law
6    firm, but I was with the Bank America people and
7    they asked to look at credit positions.  They
8    didn't seem focused on any of the investment grade
9    securities.  They wanted to look at the leveraged
10   loans.
11          So I had Jim Seery, who ran leveraged
12   loans, come to the law offices and then proceed
13   with those conversations.
14       Q.  Do you have a recollection of having
15   provided any printouts of positions in the fixed
16   income area to B of A?  Not personally but I mean
17   in connection with the work you were doing on
18   behalf of the firm?
19       A.  There were definitely risk reports in
20   these meetings.  I don't know if they were turned
21   over to Bank America or reviewed there and then
22   kept.
23       Q.  What are you calling a risk report?
24   Are they position reports, the positions that the
25   firm had, long and short positions?
          TSG Reporting - Worldwide  (877) 702-9580

Page 20

1           FELDER - HIGHLY CONFIDENTIAL
2        A.  It depends on the asset class, how the
3    risk reports are, are set up.  I'm only
4    knowledgeable really about the credit-specific
5    risk reports.  But they generally give a broad
6    overview and will list top positions as opposed to
7    a very detailed line-by-line summary of the
8    business.
9        Q.  When you say top positions, are you
10   talking about, say, the top 100 positions that the
11   firm is maintaining?  Or how are you
12   characterizing that?
13       A.  Within a business -- the individual
14   risk manager would set it up however they reviewed
15   the risk themselves.  So it might be the top 20
16   longs and the top 20 shorts, or it might be the
17   top jump to default positions or the top current
18   positions, depending on how you would look at the
19   risk.  There would be different buckets.
20       Q.  How are the valuations on the
21   positions in such reports established by the firm
22   or how were they established?
23       A.  Traders mark their positions each day.
24       Q.  You didn't have any responsibility for
25   valuations, I take it?
          TSG Reporting - Worldwide  (877) 702-9580

Page 21

1           FELDER - HIGHLY CONFIDENTIAL
2        A.  The traders within the business that I
3    run had to mark their positions.
4        Q.  But you didn't do it personally?
5        A.  I did not mark positions.
6        Q.  But you were overseeing those who were
7    marking positions to establish valuations for the
8    positions in the area where you had
9    responsibility, correct?
10       A.  I was overseeing desk heads who were
11   overseeing the traders who were marking.
12       Q.  Now, I have seen a phrase used about a
13   dirty valuation.  What's a dirty valuation?  Does
14   that phrase mean anything to you?
15       A.  Dirty price means something to me, not
16   dirty valuation.
17       Q.  OK, dirty price?
18       A.  That would be a security without
19   accrued interest.
20       Q.  Did you ever have occasion during the
21   time that Lehman was speaking to B of A to look at
22   any of the valuations for the positions within
23   your area of responsibility?
24          MR. CERESNY:  To clarify, when you say
25   valuations, you mean marks?
          TSG Reporting - Worldwide  (877) 702-9580

Page 22

FELDER - HIGHLY CONFIDENTIAL

1       THE WITNESS: Yes.
2       (Record read)
3       A.   I saw -- I could see the marks on
4  positions within credit.
5       Q.   When you say the positions within
6  credit, would you amplify upon that for me?  What
7  do you mean by that?
8       A.   Cash corporate bonds, credit default
9  swaps.
10      Q.   Treasuries?
11      A.   Treasuries are in -- would be used as
12  a hedge within the credit space, and any marks on
13  Treasuries would be automatically fed from the
14  Treasury group that marked them.
15      Q.   But at Lehman, Treasuries were not
16  within fixed income?
17      A.   They were within fixed income.
18      Q.   In the credit area of fixed income?
19      A.   Correct.  They were in the interest
20  rate business.
21      Q.   You said you were having a meeting or
22  had a meeting with B of A on the Friday.  Was
23  this -- let's talk a little bit about your
24  meetings with B of A.  Did you have more than one?

TSG Reporting - Worldwide  (877) 702-9580

Page 23

FELDER - HIGHLY CONFIDENTIAL

1       A.   I was there throughout the day.  And
2  there were -- there were different meetings
3  throughout the day.
4       Q.   What was your role in those meetings?
5       A.   I was gathering information for, as I
6  mentioned earlier, for example, when they wanted
7  to talk about leveraged loans, I would go get Jim
8  Seery.  I gave a brief overview of our credit
9  business.
10       And then away from that, I was really
11  facilitating getting the right people to the
12  location in order to have -- for them to have the
13  more detailed conversations by asset class.
14      Q.   And did your meetings with B of A
15  continue through the weekend or was it only on the
16  Friday?
17      A.   It was just Friday.
18      Q.   Did you have any meetings of any kind
19  with regard to the sale of the firm on the weekend
20  of the 13th and 14th of September?
21      A.   I had similar -- I went to a different
22  law firm on Saturday where the Barclays team was
23  and had a similar function, where I was there to
24  try to facilitate anything that people would --

TSG Reporting - Worldwide  (877) 702-9580

Page 24

FELDER - HIGHLY CONFIDENTIAL

1  information people would have needed.
2       Q.   Do you recall with whom at Barclays
3  you were meeting?
4       A.   It was Jerry Del Missier, Eric
5  Bommensath, and I believe Mike Keegan.
6       Q.   Did you have meetings with any B of A
7  people on Sunday?  Pardon me, I apologize.  Did
8  you have any meetings with any Barclays people on
9  Sunday?
10      A.   I don't believe so.
11      Q.   So your meeting with Del Missier,
12  Bommen -- how do you say his name?
13      A.   Bommensath.
14      Q.   And Keegan on Saturday, at a law firm?
15      A.   Yes.
16      Q.   Did you or someone underneath your
17  area of responsibility provide any position lists
18  of any kind to the Barclays people?
19      A.   I would assume so.
20      Q.   But you don't recall?
21      A.   They -- there were risk reports again
22  that were -- that were at the meetings.
23      Q.   OK, let's -- I want to get to the week
24  of the 15th, and before we step off on Monday

TSG Reporting - Worldwide  (877) 702-9580

Page 25

FELDER - HIGHLY CONFIDENTIAL

1  morning, did you have any other meetings of any
2  kind with anybody at Lehman or Barclays or B of A
3  on that weekend in a -- that you haven't spoken
4  about just generally now?
5       A.   Just at the law firm on Friday and
6  Saturday.
7       Q.   Let's start Monday morning.  You
8  arrive at the office on Monday morning, and tell
9  me -- you know, I want to get -- I am going to let
10  you do something I don't like to do.  I would like
11  a narrative of what you ended up doing that week,
12  so it will maybe short focus our questions and
13  maybe shorten this up a little bit.
14       Why don't you tell me what happened
15  Monday morning when you got into the office, and
16  we will start off.
17      A.   It was -- I got to -- I got to the
18  office Monday morning.  I believe I went to Mike
19  Gelband to ask for instructions as to what I was
20  supposed to be doing, what I was supposed to be
21  directing people to be doing, given the firm had
22  filed for bankruptcy.  I was trying to keep people
23  calm and be supportive, you know, and obviously in
24  a tough time.

TSG Reporting - Worldwide  (877) 702-9580

Page 26

FELDER - HIGHLY CONFIDENTIAL

1 And then at some point in the middle
2 of the day, I was told to go up to the 32nd floor
3 because there was a chance that Barclays would --
4 there might be a way for Barclays to buy just the
5 broker dealer of Lehman Brothers, and serve a
6 similar function as I previously described, to be
7 there for any information or to be a -- you know,
8 to help bring people that people -- that people
9 would have needed to speak to.
10 So I was up there waiting for -- just
11 waiting for a long time, and bringing people in as
12 people were needed. So there were a lot of people
13 in different rooms having meetings, and at
14 different points I would have been asked to go get
15 someone or tell someone to come up.
16 **Q.   I want to try to break that down as**
17 **much as I can. I know it is difficult to do, but**
18 **I know there are a lot of people meeting in a lot**
19 **of different rooms.**
20 **Were you reporting most immediately to**
21 **Mike Gelband during that day?**
22 A.   It -- he is who I was trying to get
23 direction from, but at different points, Bart
24 would walk out and say, go get someone or send
25

TSG Reporting - Worldwide  (877) 702-9580

Page 27

FELDER - HIGHLY CONFIDENTIAL

1 someone up here, or Ian Lowitt would say, go get
2 someone and send someone up here, or Alex. That
3 group would -- it wasn't an organized way to
4 communicate, so --
5 **Q.   Let's try it this way. I take it Bart**
6 **for the most part was in one room for most of the**
7 **day, so far as you know?**
8 A.   I actually don't know.
9 **Q.   Was there one main area, one main**
10 **conference room where people were congregating**
11 **as -- I'll call it a center?**
12 A.   It seemed to me to be split up by
13 different -- I don't know what they -- what the
14 different -- it seemed to be split up. There
15 were -- it was a bunch of different rooms. I do
16 remember that HR people went to one room, and I
17 was in -- I was sending -- I was sending people to
18 one room in particular. I don't remember what the
19 number of it was.
20 **Q.   OK. Do you know who generally was in**
21 **that room and why you were sending people to that**
22 **room, what was going on in there?**
23 A.   It would be a -- asset class by asset
24 class, people discussing or answering questions

TSG Reporting - Worldwide  (877) 702-9580

Page 28

FELDER - HIGHLY CONFIDENTIAL

1 that folks from Barclays would have. So I
2 would -- I remember Charlie Spero, for example,
3 who ran mortgages, at one point I was asked to
4 have Charlie come up to the floor and I sent him
5 into that room.
6 **Q.   Were you ever in the room yourself?**
7 A.   I generally didn't stay if it wasn't
8 an asset class or something I could add any value,
9 because I wanted to make sure that I was available
10 if people needed me to get other stuff, other
11 things.
12 So for Charlie, I remember I was there
13 at the very beginning and then left.
14 Kaushik Amin also was called up, who
15 ran our rates and FX businesses, and commodities,
16 actually. So I sent an e-mail to him and said,
17 you should come up, and he came up.
18 And then for credit specifically, I
19 would have -- I was there.
20 **Q.   You were staying in the room?**
21 A.   Yes.
22 **Q.   And presenting information and**
23 **providing --**
24 A.   Answering questions that people had.

TSG Reporting - Worldwide  (877) 702-9580

Page 29

FELDER - HIGHLY CONFIDENTIAL

1 **Q.   Who else was in the room when you were**
2 **doing that, to your recollection?**
3 A.   Mike Keegan. Then I believe there
4 were a bunch of the product control type people.
5 **Q.   Who were the product control people?**
6 A.   Like the middle office folks. So they
7 were coming and going. So I think, I believe I
8 saw Gilles Aublin up there. He was in product
9 control. Then there were a lot of people I didn't
10 know from Barclays.
11 **Q.   Right. Do you recall anybody else**
12 **from Lehman that was in the room when you were**
13 **making those presentations or answering questions?**
14 A.   No.
15 **Q.   Where was Mike Gelband during that**
16 **time period, if you remember?**
17 A.   I don't know. I would see him walking
18 in the hall. He was definitely up there at
19 different points, but I don't know.
20 **Q.   Did you ever make a presentation of**
21 **any kind or provide any information to anyone**
22 **other than in that room, you personally, on the**
23 **Monday, the 15th?**
24 A.   No.

TSG Reporting - Worldwide  (877) 702-9580

## Page 30

FELDER - HIGHLY CONFIDENTIAL

1
2  Q.  And did you ever direct anyone with
3  regard to any of the asset classes that you
4  mentioned to any room other than the room you have
5  just described on the Monday?
6  A.  On the Monday? I don't know if they
7  ended up in other rooms. I would say, come up to
8  the 32nd floor, and then there were just so many
9  people going around that it's possible that
10  someone ended up in a different room than that
11  room.
12  Q.  I understand. I am asking if you
13  recall having directed anybody else to a different
14  room that day.
15  A.  No, I don't.
16  Q.  How long were you at the firm on that
17  Monday, the 15th?
18  A.  I was there until I believe, I believe
19  5 or 6 o'clock. It might have been a little bit
20  later. Everyone was -- there were still a lot of
21  people there, and the requests for me to do things
22  had stopped, so I was just sort of waiting up
23  there. So I went -- so I left.
24  Q.  You went home?
25  A.  I might have gone and grabbed a drink

TSG Reporting - Worldwide  (877) 702-9580

## Page 31

FELDER - HIGHLY CONFIDENTIAL

1  and then gone home.
2
3  Q.  I understand. But did you come back
4  to the office that day?
5  A.  No.
6  Q.  The next time you came to the office
7  was when?
8  A.  Was Tuesday.
9  Q.  First thing in the morning?
10  A.  I believe Tuesday was the day that I
11  met with Jerry Del Missier and Bob Diamond about
12  my role specifically, and I don't recall if I went
13  directly to the Barclays building at 200 Park or
14  to the old Lehman -- I don't recall which I went
15  to first.
16  Q.  When you say your role, you are
17  talking about your role to be at Barclays, if
18  Barclays purchased --
19  A.  If there was -- yes.
20  Q.  If there was a transaction?
21  A.  Correct.
22  Q.  Let's hold on that for just a moment.
23  That was on the Tuesday, you believe?
24  A.  I believe it was on the Tuesday.
25  Q.  So it would have been Tuesday, the

TSG Reporting - Worldwide  (877) 702-9580

## Page 32

FELDER - HIGHLY CONFIDENTIAL

1
2  16th, correct?
3  A.  Correct.
4  Q.  Did you have any conversations with
5  anybody at Lehman Brothers or Barclays the evening
6  of Monday on the telephone?
7  A.  Bart called me and told me that Bob
8  and Jerry would be reaching out to me over the
9  next day to set up a meeting and I should be
10  expecting that.
11  Q.  Were there any other calls from anyone
12  at Lehman Brothers or Barclays on the evening of
13  Monday, September 15?
14  A.  I believe I spoke to Tom Humphrey.
15  Q.  You called Tom or he called you?
16  A.  I don't recall.
17  Q.  Now, Tom Humphrey was one of the
18  people who worked underneath you in the fixed
19  income area, correct?
20  A.  No. He was the global head of fixed
21  income sales.
22  Q.  That was not within your area of
23  responsibility as cohead of global -- pardon me,
24  of global fixed income?
25  A.  That wasn't -- at different points,

TSG Reporting - Worldwide  (877) 702-9580

## Page 33

FELDER - HIGHLY CONFIDENTIAL

1
2  the global head of fixed income sales either
3  reported to the head of fixed income or didn't.
4  Sometimes it was separate up into Steve Lessing,
5  who ran all distribution.
6  So I had never -- I wasn't -- I had
7  never been told specifically whether Tom reported
8  to me or not.
9  Q.  All right, fine.
10  Did -- I am sorry, maybe you said
11  this. Did you call Tom or did he call you?
12  A.  I don't recall.
13  Q.  Do you remember what you spoke to Tom
14  about?
15  A.  I asked him how is it going -- he was
16  still there.
17  Q.  Still at the firm?
18  A.  Still physically at 745 Seventh. So I
19  was trying throughout the night -- I don't think I
20  went to sleep. I was trying to find out are
21  things -- how are things going. And he -- I
22  remember he gave me an update, and he said it
23  seems like things were going OK.
24  Q.  You were checking in with him to check
25  the status of what was happening?

TSG Reporting - Worldwide  (877) 702-9580

Page 34

1    FELDER - HIGHLY CONFIDENTIAL
2    A.   Yes.
3    Q.   When you left the office on Monday,
4    was it your understanding that Barclays was going
5    to purchase the broker dealer or was going to
6    purchase certain assets of Lehman Brothers?
7    A.   All I --
8         MR. STERN: Objection to the form.
9    Q.   Go ahead.
10   A.   What does that mean?
11        MR. STERN: It means --
12   Q.   It means I didn't ask a particularly
13   good question on this particular question, but it
14   is good enough for the present purposes.
15        MR. STERN: Let's hear the question
16   again.
17        (Record read).
18        MR. CARDEN: I would say Lehman
19   Brothers, the assets -- pardon me, the
20   broker dealer is not an asset of Lehman
21   Brothers, so I think the question is fine,
22   but I will rephrase it if you really want me
23   to.
24        MR. STERN: Yeah.
25   Q.   When you left on Monday, was it your

TSG Reporting - Worldwide  (877) 702-9580

Page 35

1    FELDER - HIGHLY CONFIDENTIAL
2    understanding that the negotiations were still to
3    purchase the entire broker dealer or purchase some
4    specific positions or other assets of Lehman
5    Brothers?
6    A.   I didn't have specific knowledge.
7    Q.   Did you have any general knowledge at
8    all?  Had you heard anything?
9    A.   All I had heard during the day was
10   that there was the possibility that Barclays could
11   buy the broker dealer.
12   Q.   When you left on Monday, so far as you
13   knew, that was the conversation that was taking
14   place, it was the purchase of the broker dealer?
15        MR. STERN: Objection to the form.
16   A.   I didn't have any new -- I didn't have
17   any new specifics of the details.
18   Q.   OK. Now, on Tuesday, did there come a
19   time when you understood that Barclays was
20   considering purchasing something less than the
21   entire broker dealer of Lehman Brothers?
22   A.   No.
23   Q.   Did there ever come a time during the
24   week of September 15 when you understood that
25   Barclays was going to be purchasing certain

TSG Reporting - Worldwide  (877) 702-9580

Page 36

1    FELDER - HIGHLY CONFIDENTIAL
2    specific assets, meaning positions, asset classes
3    and the like of Lehman Brothers?
4    A.   I had always heard it was the broker
5    dealer.
6    Q.   When did you first learn that it
7    wasn't the broker dealer that Barclays had
8    purchased?
9    A.   I actually thought they did purchase
10   the broker dealer.
11   Q.   To this day?
12   A.   Yes.
13   Q.   OK.
14   A.   Is that not --
15        MR. STERN: There is a distinction
16   between the assets of the broker dealer and
17   the stock of LBI, so --
18        MR. CARDEN: OK.
19        MR. STERN: That's I think where the
20   confusion lies.  There really shouldn't be
21   any confusion.  Not that you shouldn't be
22   confused, but rather there shouldn't be any
23   confusion on the record because the
24   agreement is a matter of public record.
25   Q.   Let's goes to Tuesday when you're

TSG Reporting - Worldwide  (877) 702-9580

Page 37

1    FELDER - HIGHLY CONFIDENTIAL
2    having your conversation with Mr. Diamond and
3    Mr. Del Missier, right?  That was at Barclays?
4    A.   Correct.
5    Q.   Was anyone else present other than the
6    three of you?
7    A.   I believe Michael Evans was there.
8    Q.   Who is Michael Evans?
9    A.   He runs human resources for Barclays.
10   But I'm not positive.
11   Q.   Do you recall whether that was the
12   morning of the 16th?
13   A.   I believe it was the morning.
14   Q.   You can't recall whether you went
15   straight there or whether you went to the office
16   of Lehman Brothers first?
17   A.   Correct.
18   Q.   How long did you meet with Mr. Diamond
19   and Mr. Del Missier?
20   A.   It was probably about 45 minutes.
21   Q.   Do you know if anyone else at Lehman
22   Brothers was meeting with them as well?
23   A.   I don't.
24   Q.   Did you see any Lehman Brothers people
25   waiting to meet with them?

TSG Reporting - Worldwide  (877) 702-9580

Page 38

1    FELDER - HIGHLY CONFIDENTIAL
2    A.   No.  But I do know that other Lehman
3    people met with them the night before.
4    Q.   Do you know who met with them the
5    night before?
6    A.   I believe Tom Humphrey sent me, I
7    believe, an e-mail saying that he had met with
8    them.  But away from that, I didn't know anyone
9    specifically.
10    Q.   Did you ever learn that other people
11    at Lehman Brothers had met with Mr. Diamond at
12    some point on the Monday or the Tuesday?
13    A.   Jerry Donini told me that he met with
14    them.  I don't recall when.
15    Q.   Tell me as best you can what
16    Mr. Diamond and Mr. Del Missier said to you and
17    what you said to them in that meeting on the
18    morning of September 16.
19    A.   They said that they would like for me
20    to join the firm running the credit business.
21    Then we got into specifics of what that actually
22    meant.  And so it was -- they spoke about that it
23    is credit trading, just high grade, high yield.
24    We were comparing it to my function at Lehman.  So
25    not CDOs, not emerging markets.
      TSG Reporting - Worldwide  (877) 702-9580

Page 39

1    FELDER - HIGHLY CONFIDENTIAL
2    They explained the structure of the
3    firm, how sales trading and research all roll up
4    in separate verticals as opposed to having the
5    whole business, and that I would be running the
6    trading portion of the credit business.
7    We spoke about that for a while,
8    because I thought that was a major structural
9    difference, so we spoke about that for a while.
10    Then we spoke about what compensation
11    they would be willing to offer me.
12    Q.   What did they tell you about
13    compensation?
14    A.   They said they -- I had -- I had
15    contracts from Lehman, and so they said that they
16    were -- you know, they wanted to do what they
17    could do to have me in as close to the same spot
18    that I would have been in if I had stayed at
19    Lehman and Lehman didn't go bankrupt to join
20    Barclays.
21    Q.   Did they give you a specific number,
22    what that meant?
23    A.   The specific numbers within -- for my
24    '08 compensation for Lehman, the cash component
25    was ▆▆▆▆▆.  And so they said they would give
      TSG Reporting - Worldwide  (877) 702-9580

Page 40

1    FELDER - HIGHLY CONFIDENTIAL
2    me ▆▆▆▆▆ for '08 compensation, split in cash
3    and equity.
4    In Lehman, I had that in cash, so I
5    said, you know, I said if it is doable all in
6    cash, that that would be closer to keeping me in
7    the same spot than not.
8    They had to check if that was doable,
9    so there were a few days then after that before
10    anything -- before I got anything back that
11    indicated that -- but they said they would work to
12    see if that made sense.  They wanted to see the
13    Lehman documents, as well.
14    Q.   Meaning Lehman documents related to
15    your compensation --
16    A.   Yes.
17    Q.   -- or the --
18    A.   No, Lehman documents related to the
19    compensation.
20    I told them -- I had gotten the Lehman
21    money, I already had the cash.  I told them I
22    intended to give that money back to Lehman as
23    well.  And so if there was a way to have the
24    Barclays money given to me earlier than the
25    February date, which was the standard date, that
      TSG Reporting - Worldwide  (877) 702-9580

Page 41

1    FELDER - HIGHLY CONFIDENTIAL
2    that would be preferable.  So they had to -- they
3    checked on that.
4    And then we spoke about making sure
5    that -- I said, look, I want this to be fair and
6    us to have -- start to be a very good working
7    relationship, so whatever we need to put in the
8    contract so, you know, I am really going to be
9    here and stay.  I don't want to get this cash from
10    you and then have the ability to leave.
11    So we wrote into the document that I
12    had to stay until March of '09, otherwise I would
13    have had to give that money back.  And then --
14    Q.   Give the '08 money back?
15    A.   Yes.
16    And then -- I am trying to think if
17    there are any other things.  And then I wanted to
18    make sure that most importantly, that I was going
19    to be able to bring -- that the people in the
20    credit business at Lehman, I was going to be able
21    to make sure that they had jobs and that they were
22    coming also, so we could keep the whole business
23    together, and that I would have some ability to
24    decide who of the people would have -- would be in
25    each seat.  So that I was actually empowered in
      TSG Reporting - Worldwide  (877) 702-9580

Page 42

1     FELDER - HIGHLY CONFIDENTIAL
2   the business, so that we spoke about that.
3       Q.   And did they speak in that meeting on
4   the Monday -- pardon me, the Tuesday morning,
5   about '09 compensation?
6       A.   I had '09 guaranteed for Lehman. That
7   wasn't the way the Barclays deals were set up from
8   what I was told. So it was for '08 and then
9   for -- for a portion of the people, I don't know
10  the number, there were retention payments that
11  were one year from your start date and then two
12  years from your start date, and so I was eligible
13  for the retention payments, the two retention
14  payments.
15          And that, I believe, was a set
16  percentage of 25 percent of the '08 number. I
17  believe that was the number. But there was no
18  guaranteed -- no guaranteed '09 compensation.
19      Q.   Other than a retention?
20      A.   Other than a retention.
21      Q.   And were there -- strike that.
22          When they finally got back to you on
23  your request to have it all paid in cash, was the
24  answer that yes, they would pay it all in cash?
25      A.   Yes.
      TSG Reporting - Worldwide  (877) 702-9580

Page 43

1     FELDER - HIGHLY CONFIDENTIAL
2       Q.   And was the answer also that they
3   would pay it earlier than February?
4       A.   Yes.
5       Q.   And when did they pay it?
6       A.   The date I believe was -- set in the
7   contract was October 31st. I don't recall the
8   exact date that the payment occurred.
9       Q.   And no portion of your '08 income then
10  was equity or stock in Barclays. It was all cash?
11      A.   Correct.
12      Q.   Now, when you spoke to them about
13  bringing the people in your area over, did you ask
14  whether or not there would be bonuses or payments
15  available for them as well?
16      A.   Yeah. There was the assumption that
17  people were going to get compensated for -- that
18  people were going to have employment contracts
19  with Barclays.
20      Q.   And when you say there was an
21  assumption, what was that based on in your mind?
22      A.   That people wouldn't -- you wouldn't
23  get the people if you didn't compensate them.
24  People wouldn't have come for nothing.
25      Q.   Did there ever come a time when you
      TSG Reporting - Worldwide  (877) 702-9580

Page 44

1     FELDER - HIGHLY CONFIDENTIAL
2   heard that a specific pool of money had been set
3   aside for purposes of bringing people over
4   from Lehman to Barclays?
5       A.   Only when I read it in the New York
6   Post.
7       Q.   All right. So you have your meeting
8   with Diamond and Del Missier on Tuesday morning,
9   and following that meeting, you went back to
10  Lehman, I take it?
11      A.   Yes.
12      Q.   And I would like you to describe for
13  me your day, if you will, in general terms, and
14  then we will come back as to what you were doing
15  on Tuesday, the 16th.
16      A.   Really for the rest of that week, it
17  was just trying to keep the people together.
18  People were out interviewing, people were getting
19  job offers from other firms. There was a lot of
20  uncertainty.
21          And I was also trying to relay any
22  instructions that were given around what people
23  sitting in the seats should be doing and that
24  was -- that was the rest -- pretty much the rest
25  of the week.
      TSG Reporting - Worldwide  (877) 702-9580

Page 45

1     FELDER - HIGHLY CONFIDENTIAL
2       Q.   Did you ever see a copy of the asset
3   purchase agreement that was entered into between
4   Lehman and Barclays on Tuesday, the 16th?
5       A.   I believe -- there was some document
6   that was made public. I don't remember what day,
7   whether it was Tuesday or Wednesday or Thursday.
8   And I do remember it had -- it was -- it was up on
9   the Web, and I remember it had like hand-scribbled
10  notes all over it on the Web. That got e-mailed
11  around everywhere. I don't know if that is that
12  document, but there was some document that --
13      Q.   Did you read it?
14      A.   That I -- I -- I glanced through it.
15  I didn't specifically --
16      Q.   Do you recall anything about it?
17      A.   I recall that there was -- there was a
18  connotation of specific numbers of people that had
19  to come to Barclays as part of the arrangement, or
20  part of whatever the deal was.
21      Q.   Did you ever see the master repurchase
22  agreement between Lehman and Barclays?
23      A.   No.
24      Q.   Did you ever know there was one?
25      A.   No.
      TSG Reporting - Worldwide  (877) 702-9580

## Page 46

FELDER - HIGHLY CONFIDENTIAL

1  FELDER - HIGHLY CONFIDENTIAL
2      Q.   Just so we are not in terrible doubt,
3  we will find out whether it was the APA you looked
4  at.
5      A.   OK.
6      Q.   You don't know anything else about the
7  document that you saw online that had all the
8  handwriting on it that would help me determine
9  what it was you might have seen?
10     A.   I remember it got sent to me, because
11 this concept of eight people, like they started
12 calling it the elite eight, whatever document that
13 was in was getting sent around the firm. So
14 that, whatever that document was --
15     Q.   That's the document?
16     A.   That would have been the one.
17     Q.   And you were one of the elite eight,
18 correct?
19     A.   I wasn't aware that I was.
20     Q.   The document didn't identify the
21 eight?
22     A.   I was never told that I --
23     Q.   No, but when you read the document,
24 was your name in it?
25     A.   No, I didn't see my name.

## Page 47

1  FELDER - HIGHLY CONFIDENTIAL
2      (Exhibit 1, asset purchase agreement
3  dated September 16, 2008 marked for
4  identification, as of this date.)
5      MR. CARDEN: I think what -- who knows
6  how we will end up with this, but we will
7  make this Felder Exhibit 1. I think we will
8  end up with depositions being taken
9  simultaneously at some point later in the
10 schedule, which will make it awkward if we
11 do it any other way.
12     MR. STERN: What we had proposed, to
13 avoid duplicate exhibits, we have a system
14 of numerical numbering sequential, and when
15 we have multiple depositions, we just say
16 this deposition will take from 200 to 300.
17     MR. CARDEN: That's fine.
18     MR. STERN: This is the first
19 deposition. Why don't we start out that way
20 and see how it works.
21     MR. CARDEN: OK. So what we will do
22 is, 1 through 25, if we get that far, will
23 be Mr. Felder. OK, that's fine by me.
24     So it is Exhibit 1. Not Felder 1,
25 just Exhibit 1.

## Page 48

1  FELDER - HIGHLY CONFIDENTIAL
2      Q.   Have you ever seen this document
3  before, Mr. Felder?
4      A.   No, not -- the document I saw had hand
5  notes on it. So this --
6      Q.   This clearly was not the document that
7  was the elite eight, I appreciate that. The
8  question is not whether this is that document, the
9  question is, have you ever seen this one before?
10     A.   This document, no.
11     Q.   OK. I would like to direct your
12 attention to page 6, and subparagraph D at the end
13 there, do you see the reference to government
14 securities approximating 70 billion?
15     A.   Yes.
16     Q.   Do you ever recall having heard from
17 anybody that Barclays was going to purchase
18 approximately 70 billion in government securities
19 from Lehman Brothers?
20     MR. STERN: Objection to the form.
21     Q.   That's commercial paper, corporate
22 debt. I'm just talking about --
23     MR. STERN: What it says in section D.
24     Q.   Whatever it says in section D. I will
25 rephrase that.

## Page 49

1  FELDER - HIGHLY CONFIDENTIAL
2      Did you ever hear from anyone that
3  Barclays was going to purchase those types of
4  securities identified in subparagraph D which
5  approximated $70 billion?
6      A.   No. I heard they were going to
7  purchase the broker dealer, which I assumed had
8  assets. I didn't know the exact numbers.
9      Q.   You never heard a number 70 billion?
10     A.   I don't recall.
11     Q.   For that matter, you never heard a
12 number 72 billion?
13     A.   I don't know.
14     Q.   Did you ever hear at any time a
15 specific number of the value given to the assets
16 that were purchased by Barclays from Lehman
17 Brothers?
18     A.   After the fact -- after everything, I
19 do recall Eric Bommensath, people throwing around
20 the number 50 billion afterwards.
21     Q.   So this is after the transaction
22 closed, Mr. -- I am having trouble with the name?
23     A.   Bommensath.
24     Q.   Bommensath.
25     A.   I do recall him throwing out the

Page 50

FELDER - HIGHLY CONFIDENTIAL

1  number 50 billion.
2  number 50 billion.
3      Q.   50 billion of assets had been
4  purchased by Barclays?
5      A.   I recall that.
6      Q.   Did he say that to you personally?
7      A.   I was -- I don't know if it was just
8  me and him or whether it was a group. I remember,
9  I remember him saying we have 50 billion worth of
10  assets.
11      Q.   And do you remember when he told you
12  that?
13      A.   It was already over at 200 Park. It
14  was probably in October.
15      Q.   Do you remember what occasioned him to
16  have this conversation with you? Were you talking
17  about the transaction?
18      A.   We were going through, we were going
19  through the, you know, set -- he wanted to set up
20  a series of reports to keep track of -- that the
21  sales force was working on selling, once the firms
22  were together, and I asked the question is there
23  anything that, is there anything that now that we
24  are up and running, that the sales force should be
25  working on, and those -- he said, well, that, that

TSG Reporting - Worldwide  (877) 702-9580

Page 51

FELDER - HIGHLY CONFIDENTIAL

1
2  50 billion is off in a different -- the 50 billion
3  is off in a different group basically.
4      Q.   So the 50 billion in assets that had
5  been purchased by Barclays were not in your
6  group --
7      A.   Right, exactly.
8      Q.   -- for the purposes of the sale?
9      A.   Exactly.
10      MR. STERN: Let him finish the
11  question.
12      Can I hear the question?
13      (Record read)
14      MR. STERN: Objection to the form.
15      You can answer.
16      A.   They weren't in, they weren't in the
17  credit business that I was going to be responsible
18  for.
19      Q.   Did he tell you where they were?
20      A.   It was in a group called P -- PMTG.
21      Q.   Do you know who -- do you know what
22  that group is, what it does?
23      A.   I believe it is -- I believe PMTG
24  stands for principal mortgage -- I don't know the
25  last two letters. So it was principal positions.

TSG Reporting - Worldwide  (877) 702-9580

Page 52

FELDER - HIGHLY CONFIDENTIAL

1
2      Q.   Do you know who is head of that group
3  at Barclays?
4      A.   It is either Stephen King or I believe
5  at the time it was David Martin. It was one --
6  David Martin is no longer with the firm. It is
7  one of those two people, and it might roll up into
8  John Mann now. I don't know the exact setup.
9      Q.   Do you have an understanding of what
10  that group at Barclays does?
11      A.   Not with precision. I know that they
12  have assets and that they -- and that they trade
13  in the securities.
14      Q.   Am I right in understanding what you
15  are saying is that that group deals with
16  proprietary positions at Barclays?
17      A.   I don't know if it was proprietary. I
18  have only heard the word "principal."
19      Q.   So you don't have an understanding of
20  whether that's a category of investments, or
21  pardon me, a category of assets that are
22  considered proprietary assets to Barclays?
23      A.   I don't know how they categorize it.
24      Q.   Before that conversation with
25  Mr. Del Missier in which he said there had been

TSG Reporting - Worldwide  (877) 702-9580

Page 53

FELDER - HIGHLY CONFIDENTIAL

1
2  $50 billion dollars assets --
3      MR. STERN: Objection, objection.
4      A.   Mr. Bommensath.
5      Q.   I'm sorry, Mr. Bommensath.
6      MR. STERN: Objection to the form.
7      Q.   Before the conversation with
8  Bommensath in which he told you there had been
9  $50 billion of assets purchased by Barclays, did
10  you have any conversations with anyone in which
11  the value of the assets purchased by Barclays was
12  discussed?
13      A.   No, just those -- the meetings that I
14  had mentioned over the weekend.
15      Q.   Let's make this Exhibit 2.
16      (Exhibit 2, e-mail with attachment
17      dated September 18, 2008 marked for
18      identification, as of this date.)
19      Q.   Have you ever seen Exhibit 2 before,
20  Mr. Felder? Let me rephrase.
21      Have you ever seen any part of
22  Exhibit 2 before, if you haven't seen the whole?
23      A.   No, I don't recall seeing this.
24      Q.   Have you ever seen a document like
25  page 2? This chart, summary chart?

TSG Reporting - Worldwide  (877) 702-9580

Page 54

FELDER - HIGHLY CONFIDENTIAL

1  
2      A.   I would have summary risk reports for
3  my business -- for the businesses. But it was
4  credit. We hadn't gotten to the point in fixed
5  income where -- because it was only four days.
6      Q.   Which of the areas identified on
7  page 2, if you could tell me, were the areas for
8  which you had responsibility, which asset classes?
9      A.   At what -- when?
10     Q.   The week of September 15, or the last
11 days of the week before, if you weren't really
12 doing anything the 15th. Let me say it another
13 way.
14         Which of these asset classes were,
15 given your understanding of what position you were
16 to have starting on September 8, would have been
17 within your areas of responsibility?
18     A.   Total CDs and nonmoney market.
19     Q.   OK.
20     A.   I don't know what the second term
21 means with "spot." If it is just corporate bonds,
22 then it would, but I don't know what the term
23 "spot" --
24     Q.   Are you talking about total corp.
25 obligations and spot, that category?

TSG Reporting - Worldwide  (877) 702-9580

Page 55

FELDER - HIGHLY CONFIDENTIAL

1  
2      A.   Yeah. If it is corporate credit risk
3  and bonds, then it would. But I don't know what
4  corporate obligations -- I don't know what that
5  phrase means.
6      Q.   OK.
7      A.   A portion of derivatives, if it was
8  within fixed income.
9      Q.   OK.
10     A.   And this would have been in my role as
11 cohead of fixed income if I had been told what I
12 would have been responsible for. Governments and
13 agencies and mortgages and mortgage backs.
14     Q.   Do you ever remember participating in
15 any effort to create a balance sheet for just LBI
16 itself?
17     A.   No.
18     Q.   And did you ever do any kind of
19 calculations to determine the value, the marks of
20 the positions if you will, that were within your
21 area of responsibility?
22     A.   No.
23     Q.   And do you know if there at page 2 of
24 this exhibit is, in fact, an effort to do just
25 that as to certain aspects of the portfolio?

TSG Reporting - Worldwide  (877) 702-9580

Page 56

FELDER - HIGHLY CONFIDENTIAL

1  
2      A.   I don't know.
3      Q.   Do you recognize the spreadsheets that
4  follow page 2 as being listings of the investments
5  or the securities within the various asset classes
6  and the summary page 2?
7          MR. STERN: Objection to the form.
8      A.   It looks like a list of securities to
9  me.
10     Q.   And the valuations that are provided
11 would have been provided by the various traders on
12 the desks in question, correct, whoever was
13 trading these particular securities?
14     A.   I don't know what the data -- where
15 this -- where the data from this report would have
16 come from.
17     Q.   Could the valuations have come from
18 anyone other than the traders?
19         MR. STERN: Objection to the form.
20     A.   I don't know.
21     Q.   And in any event, you didn't provide
22 any valuations?
23     A.   No.
24     Q.   To any of these positions?
25     A.   No.

TSG Reporting - Worldwide  (877) 702-9580

Page 57

FELDER - HIGHLY CONFIDENTIAL

1  
2      Q.   Now, did there ever come a time,
3  Mr. Felder, where you were asked to help prepare
4  Mr. McDade for his testimony on Friday before the
5  bankruptcy court?
6      A.   No.
7      Q.   Did there come a time when you were
8  asked to provide a fire sale liquidation price for
9  the positions within your area of responsibility?
10     A.   No.
11         (Exhibit 3, document Bates stamped
12     1029780 marked for identification, as of
13     this date.)
14     Q.   Mr. Felder, I show you what has been
15 marked as Exhibit 3, which is an e-mail from
16 Mr. Kirk to some unknown address. But it has with
17 it underneath an e-mail that was sent from -- by
18 Mr. Flores to a group of people including yourself
19 on Thursday evening at 8:40.
20         Do you recall having gotten this
21 e-mail, sir?
22     A.   I don't.
23     Q.   Do you have an understanding of what
24 is meant by the phrase a fire sale liquidation of
25 the securities that are being transferred to

TSG Reporting - Worldwide  (877) 702-9580

**FELDER - HIGHLY CONFIDENTIAL**

2  Barclays?

3      MR. STERN: Objection to the form.

4    A.  Can you repeat the question.

5    (Record read)

6    A.  My understanding of the term "fire

7  sale" would be someone who had to sell securities

8  in a very short time frame.

9    Q.  Most of the securities in your area of

10  responsibility were very high grade, were they

11  not?

12    A.  In credit, there was high grade, there

13  was high yield, there was distressed.  There were

14  different types of securities within credit.

15    Q.  Would you just go back to Exhibit 2

16  for a moment and look at the summary chart.  The

17  listing there for total governments and agencies

18  at 37.6 billion long, do you see that?

19    A.  Yes.

20    Q.  Those are very high grade, are they

21  not?

22    A.  I don't know what's in there, but if

23  it is -- if it was U.S. Government bonds, that

24  would be very high grade.  If it was senior agency

25  paper, that would be very high grade, that would

1    FELDER - HIGHLY CONFIDENTIAL

2  be high quality.  But if it was subordinated, it

3  might not be.

4    Q.  Anything else that would be very high

5  grade that would be within the asset classes that

6  were in your area of responsibility, other than

7  those two?

8    A.  Investment grade corporate bonds would

9  be high quality.  And then I would assume that

10  there is some very high quality mortgage paper,

11  but I'm not a mortgage expert.

12    Q.  The sale of those kinds of high-grade

13  securities, does it ever -- strike that.

14      The markets for those very high grade

15  securities that you just articulated are quite

16  large, are they not?

17    A.  The aggregate markets, yes.

18    Q.  And the amounts that are listed here

19  of 37 billion, if that includes all of them,

20  that's not a very big number in terms of the

21  overall market in those securities, is it?

22    A.  No.

23    Q.  The market can easily absorb those

24  sales without changing the market, couldn't it?

25    A.  It would depend on -- it would depend

1    FELDER - HIGHLY CONFIDENTIAL

2  on the securities.  If there were ten-year

3  Treasuries, the market could withstand that, yes.

4    Q.  Could you contemplate a situation in

5  which there would ever be a fire sale price for

6  the sale of ten-year securities -- ten-year

7  Treasuries?  I mean you would have to actually

8  sell it for a lower price because the market

9  couldn't bear it?

10    A.  There have been times in history where

11  even the government market had has been very

12  illiquid, like around long-term capital

13  management, for example.

14    Q.  OK.  That wasn't the case on the week

15  of September 15, though, was it?

16    A.  The markets were certainly very

17  volatile, given everything that happened to

18  Lehman.  But government bonds were trading

19  liquidly, I believe.

20    Q.  Do you have any understanding or

21  recollection of what was meant then in connection

22  with the phrase "fire sale liquidation" when -- I

23  know you don't remember getting the e-mail, I'm

24  not trying to suggest that.

25    MR. STERN: Can I hear the question.

1    FELDER - HIGHLY CONFIDENTIAL

2    Q.  It really is -- I have got to rephrase

3  it.

4      I'm trying to understand, if you can

5  assist me, Mr. Felder, what possibly could have

6  been meant by that "fire sale liquidation" phrase

7  on that Thursday night in this memo.

8    MR. STERN: Objection to the form.

9    A.  I can only make a -- I can only make

10  an assumption, if I had -- what I would think, not

11  what the writer meant.

12    Q.  Of course.  Tell me what you think.

13  You -- I mean after all, you presumably were --

14  let me start again.

15      Someone asked you to make this

16  assumption for the purposes of valuing a portion

17  of the portfolio for which you had responsibility,

18  correct?  That's what this is asking you for?

19    MR. CERESNY: Objection.

20    MR. STERN: Objection to the form.

21    What's the question?

22    (Record read)

23    Q.  Let me be more precise.  Mr. Daniel

24  Flores asked you on Thursday evening,

25  September 18, to assume a fire sale scenario for

Page 62

1  **FELDER - HIGHLY CONFIDENTIAL**
2  **the purposes of valuing the portfolio for which**
3  **you had responsibility, did he not?**
4  A.  That's what this e-mail looks like it
5  requested.
6  **Q.  So what you thought "fire sale**
7  **liquidation" meant means something to me. How**
8  **would you have understood this when you received**
9  **it?  Even if you don't recall now having gotten**
10  **it, what would be your assumption as to what was**
11  **meant?**
12  MR. STERN: Objection to the form. I
13  think he has already answered that.
14  But you can answer again.
15  A.  I would say it would mean what would
16  the price be for selling the securities in a very
17  short time frame.
18  **Q.  What time frame?**
19  A.  Basically instantaneously -- like --
20  close to instantaneously.
21  **Q.  Would the need to sell U.S. Treasuries**
22  **instantaneously, let's call it on Friday morning,**
23  **the 19th, have resulted in significantly or any**
24  **lower price for the Treasuries in your mind?**
25  A.  I'm not a Treasury expert.

TSG Reporting - Worldwide  (877) 702-9580

Page 63

1  FELDER - HIGHLY CONFIDENTIAL
2  **Q.  Let me ask it this way.  Of the asset**
3  **classes for which you had responsibility on Friday**
4  **morning, September 19, which, if any, would have**
5  **had a reduction in their value as a consequence of**
6  **having to sell them instantaneously, given the**
7  **quantities involved and the asset classes**
8  **involved?**
9  A.  I don't -- I can really talk about
10  credit.
11  **Q.  Talk about what you can talk about,**
12  **Mr. Felder.**
13  A.  I think credit, credit, there would be
14  a credit -- the liquidity in the credit market is
15  substantially lower than the government bond
16  market.  So that there would be, in my opinion, a
17  discount to move a block of corporate credit in an
18  instantaneous fashion.
19  **Q.  Without regard to the quantity?**
20  MR. STERN: Objection.
21  Have you finished your answer?
22  I mean there was a question pending
23  and an answer being given.  Can I get the
24  question?
25  (Record read)

TSG Reporting - Worldwide  (877) 702-9580

Page 64

1  FELDER - HIGHLY CONFIDENTIAL
2  THE WITNESS:  What was my answer?
3  (Record read)
4  MR. STERN: Did you finish?
5  THE WITNESS: Yes, I am finished.
6  **Q.  Finished?  OK.**
7  **Look at Exhibit 2, if you will, on the**
8  **summary chart that has been helpful to us in the**
9  **past.  Can you tell us which securities to which**
10  **you were just referring were corporate credits?**
11  A.  I don't know what these definitions
12  are.
13  **Q.  OK.**
14  A.  As I have said.  So if the definition
15  of this second bucket, corporate obligations,
16  would be corporate credit, then I would say that
17  that would -- that would be an example.
18  **Q.  You are referring now to the second**
19  **entry there in the column "Total Corporate**
20  **Obligations and Spot," which shows a long position**
21  **of 4 -- about 4.9 billion?**
22  A.  That's what it looks like.
23  **Q.  Are there any other securities on this**
24  **chart that you think would, if they had to be sold**
25  **instantaneously on Friday morning, have resulted**

TSG Reporting - Worldwide  (877) 702-9580

Page 65

1  **FELDER - HIGHLY CONFIDENTIAL**
2  **in a diminution in their value in the market?**
3  MR. STERN: Objection to the form.
4  A.  I'm really only comfortable talking
5  about credit, because that's the market I knew.
6  **Q.  OK.  But you did have responsibility**
7  **for derivatives, right?  In the fixed income area.**
8  A.  For credit derivatives.
9  **Q.  Credit derivatives?**
10  A.  Correct.
11  **Q.  Would they have had significant**
12  **diminution in their value on Friday morning as a**
13  **consequence of the need to sell them**
14  **instantaneously?**
15  A.  They would trade like a credit
16  product, so there would be -- to move a big block
17  of CDS would definitely create -- you would need
18  some discount.
19  **Q.  What would you mean by a big block?**
20  A.  I would say north of 2 billion.
21  **Q.  OK.  What kind of discount would you**
22  **give it?**
23  MR. STERN: Objection to the form.
24  A.  It would depend on the names that were
25  in the portfolio.

TSG Reporting - Worldwide  (877) 702-9580

Page 66

FELDER - HIGHLY CONFIDENTIAL
1
2    Q.    Can you give me a range? I'm just
3    trying to get a feel, half a percent, 20 percent?
4    I'm trying to get a feel for what the discount
5    would be in your mind.
6        A.    It would depend -- the market trades
7    on spread, so it would depend on which the
8    specific credits were and then what the aggregate
9    size was.
10        So, for example, financials were under
11    a tremendous amount of pressure at this point. If
12    it was an entire financial credit portfolio, that
13    would be very difficult to move.
14        Q.    Would your answer be different if they
15    were exchange traded? And by that I mean would
16    the discount be either nonexistent or small in the
17    disposition of an exchange-traded derivative on an
18    instantaneous basis the morning of September 19?
19        A.    If it was a liquid product traded
20    on -- if there was more liquidity in the product
21    based on it being on an exchange, then the answer
22    would be yes.
23        Q.    Yes, that there would be --
24        A.    If the product were more liquid
25    because it was on an exchange, then a discount

TSG Reporting - Worldwide  (877) 702-9580

Page 67

FELDER - HIGHLY CONFIDENTIAL
1
2    would be lower if there was more liquidity because
3    of that.
4        Q.    Why would there be a discount at all
5    on -- you would either be able to sell it on the
6    exchange or you couldn't. Why would there be a
7    discount in any respect with regard to the
8    exchange-traded derivative?
9        A.    What I mean by discount, if you went
10    to go on -- in any market, there is a size on
11    let's say the bid or the offer, and if you go to
12    transact, when you're done transacting, the price
13    isn't necessarily at the same spot that you
14    started.
15        Q.    OK.
16        A.    So I would mean the average price that
17    you ultimately sold compared to where it started
18    could be different, even on an exchange.
19        Q.    OK, OK. Let's go back to our chart
20    here for a moment. You covered corporate
21    obligations and you covered the derivatives. You
22    say you don't --
23        MR. STERN: Objection to the form.
24        Q.    You say you don't have specific or
25    personal knowledge of the Treasuries, but the

TSG Reporting - Worldwide  (877) 702-9580

Page 68

FELDER - HIGHLY CONFIDENTIAL
1
2    Treasuries is a huge market and the -- clearly
3    there would not be any meaningful discount with
4    regard to the disposition of those on an emergency
5    basis, would there?
6        A.    I would say for on-the-run Treasuries,
7    I wouldn't think there would be, but I assume
8    there are some Treasury securities that have less
9    liquidity than others. But in aggregate the U.S.
10    Treasury market is a very, very liquid market.
11        Q.    Let me ask it this way. Did there
12    ever come a time, Mr. Felder, where you asked your
13    traders to price the securities in Exhibit 2 as
14    though they were going to be sold on a fire sale
15    basis on Friday, September 19?
16        A.    I don't recall doing that.
17        Q.    Do you recall having been asked by
18    anybody to do that?
19        A.    I don't, because I don't recall that
20    e-mail.
21        Q.    Is there -- do you have any
22    explanation for me at all as to why anybody would
23    have wanted you to do that?
24        A.    I can make an assumption.
25        Q.    Tell me.

TSG Reporting - Worldwide  (877) 702-9580

Page 69

FELDER - HIGHLY CONFIDENTIAL
1
2        A.    That to put a theoretical price on a
3    pool of assets that would be a worst-case
4    scenario.
5        Q.    But you never recall having done that?
6        A.    No.
7        Q.    Or having talked to Mr. McDade or
8    Mr. Flores or Mr. Kirk about having done so?
9        A.    No.
10        Q.    Did you ever hear anybody else at the
11    firm had done so with regard to the portfolios for
12    which they had responsibility?
13        A.    I recall getting a -- I recall getting
14    an e-mail around the -- around mortgages and
15    around a discount, a discount to the market price
16    for mortgages, and I believe I forwarded it to
17    Mike Gelband. I do remember that.
18        Q.    From whom did you get it?
19        A.    I don't remember. I would just have
20    to assume that Charlie Spero would have been on it
21    because he ran mortgages.
22        Q.    Did you ever get an explanation for
23    why that -- strike that.
24        OK. Let's soldier on here with regard
25    to Thursday night.

TSG Reporting - Worldwide  (877) 702-9580

| Page 70 |
| --- |

**FELDER - HIGHLY CONFIDENTIAL**

1        **FELDER - HIGHLY CONFIDENTIAL**
2      MR. STERN: How are we doing in terms
3  of taking a break? It is about 11. Are you
4  at a point --
5      MR. CARDEN: Yeah, maybe in about
6  15 minutes. Is that OK?
7      THE WITNESS: I'm fine.
8    Q.  You told me you don't remember getting
9  Exhibit 3, which was Thursday night, right? Do
10  you remember whether you were in the office on
11  Thursday evening, the 18th?
12    A.  I don't.
13    Q.  You note in Exhibit 3, it references a
14  list of top 100 positions, which is going to be
15  left on the desks of each of the people to whom
16  the e-mail is addressed. Do you see that?
17      Do you recognize or can you tell me if
18  Exhibit 2 is in fact a list of the 100 largest
19  securities in the area for which you had
20  responsibility?
21    A.  I -- only the cover e-mail says, "Here
22  are the position level details for the top hundred
23  longs and shorts," so I can only assume that this
24  document is that.
25    Q.  I will draw your attention to the fact
TSG Reporting - Worldwide  (877) 702-9580

| Page 71 |
| --- |

1        **FELDER - HIGHLY CONFIDENTIAL**
2  that Exhibit 3, which is in Greenwich Mean Time,
3  with the hour difference then I can tell you is
4  four hours. Do you remember that time period?
5  There's about a week or two in the year where the
6  time change is four hours. We are in that period
7  right here.
8      So to start again, I will tell you
9  that Exhibit 3 is 8:41 in the evening on Thursday.
10    A.  OK.
11    Q.  And you can observe -- actually this
12  is in Greenwich Mean Time as well, but Exhibit 2
13  is at 7:17. So it is within an hour or so, the
14  same time period. Do you see that?
15      MR. STERN: You are asking if he sees
16  what?
17    Q.  Well, let me ask it this way. Do you
18  know, Mr. Felder, whether Exhibit 2 is the list of
19  securities, your portion of it, that was left on
20  your desk or was going to be left on your desk
21  pursuant to the paragraph in Exhibit 3?
22    A.  I know that this says, "Here are
23  position level details for top hundred longs and
24  shorts," so I would assume that's what this is.
25    Q.  That's what I had done, but you don't
TSG Reporting - Worldwide  (877) 702-9580

| Page 72 |
| --- |

1        **FELDER - HIGHLY CONFIDENTIAL**
2  have a recollection of it?
3    A.  No.
4    Q.  And you don't remember having sat at
5  your desk on Thursday evening and have somebody
6  come in and say, here is the hundred largest
7  positions in your area, go value them?
8    A.  No, no.
9    Q.  And you have no recollection of having
10  told anyone in your area to go do that?
11    A.  No.
12    Q.  Would there have been anyone else in
13  your area that would have done that for you if you
14  weren't available?
15    A.  The people below me, there is always a
16  chance that someone like Alex would have reached
17  out to someone directly if he didn't get me and
18  there was something that was time sensitive.
19    Q.  You carry a BlackBerry, right?
20    A.  Yes.
21    Q.  So there is no doubt in your mind, is
22  there, that you would have seen Exhibit 3 on or
23  about the time it was sent to you, right?
24    A.  If I was looking at my BlackBerry, I
25  would have seen it.
TSG Reporting - Worldwide  (877) 702-9580

| Page 73 |
| --- |

1        FELDER - HIGHLY CONFIDENTIAL
2    Q.  And you have no recollection of having
3  asked for anybody to assist you in responding to
4  the request in Exhibit 3 then?
5    A.  I don't recall doing that.
6    Q.  It is a total blank?
7    A.  I don't remember doing it.
8    Q.  OK. Do you remember anything about
9  Friday morning, the 19th, where you were, what you
10  were doing?
11    A.  I believe I had breakfast with Tom
12  Montag that morning.
13    Q.  Who is Tom Montag?
14    A.  He runs capital markets at Merrill
15  Lynch. Or Merrill Lynch, B of A.
16    Q.  Why were you having breakfast with
17  him?
18    A.  He expressed interest in having me
19  come and run the credit business over there.
20    Q.  Now, by Friday morning, the 19th, had
21  you received a contract from Barclays?
22    A.  I believe I got a draft on Friday, but
23  I don't believe it was Friday morning. I don't
24  recall exactly.
25    Q.  Do you recall having gotten a draft
TSG Reporting - Worldwide  (877) 702-9580

Page 74

**FELDER - HIGHLY CONFIDENTIAL**

1
2 dated the 18th?
3    A. I don't recall the exact date.
4    Q. Do you recall where you were when you
5 got the draft?
6    A. I believe it was e-mailed to me, not
7 hard copy.
8    Q. Was it on a personal e-mail as opposed
9 to an office e-mail?
10    A. No, it was an office e-mail.
11    Q. Do you remember when you had breakfast
12 on Friday morning with the gentleman from Merrill
13 Lynch?
14    A. I don't remember the exact time.
15    Q. Do you remember there having been a
16 meeting with Mr. McDade on Friday morning at
17 7 a.m.?
18    A. I don't remember. I definitely went
19 to the office first and then to the breakfast.
20    Q. Do you recall having gotten requested
21 by Mr. Kirk to come to Mr. McDade's office on
22 Friday morning?
23    A. I don't remember specifically.
24      MR. STERN: If we could just take a
25 break for five minutes, I would appreciate

Page 75

**FELDER - HIGHLY CONFIDENTIAL**

1
2 it.
3      MR. CARDEN: I will be done here in
4 just a second and then we will have a
5 logical spot here, if we can do that.
6      Mark this as Exhibit 4.
7      (Exhibit 4, e-mail dated September 19,
8 2008 at 1:30 p.m. marked for identification,
9 as of this date.)
10    Q. Have you ever seen Exhibit 4 before,
11 Mr. Felder?
12    A. It looks like an e-mail that -- or
13 series of e-mails to and from me. I don't
14 remember it specifically.
15    Q. Do you recall Mr. Kirk having asked
16 you to come see him in 3E that morning?
17    A. I don't recall specifically.
18    Q. And do you recall having been over at
19 Barclays that morning, which is your response
20 here?
21    A. I don't recall.
22    Q. This is the last one.
23      (Exhibit 5, e-mail dated September 19,
24 2008 at 10:34 a.m. marked for
25 identification, as of this date.)

Page 76

**FELDER - HIGHLY CONFIDENTIAL**

1
2    Q. I realize Exhibit 5 is not addressed
3 to you, but I am wondering whether you have ever
4 seen it before.
5    A. I haven't seen it before.
6    Q. Do you -- does it assist you in
7 recalling at all about having been requested to
8 participate in a meeting with Mr. McDade on Friday
9 morning?
10    A. No.
11    Q. And on Friday morning, is it still
12 your belief that the entire broker dealer is being
13 sold, not specific inventory?
14      MR. STERN: Objection to the form.
15    A. I still thought, I still thought
16 that's what was sold.
17    Q. Do you recall having met with
18 Mr. McDade on Friday before he testified in the
19 bankruptcy court?
20    A. I don't believe that I did.
21      MR. CARDEN: Mark the last one, I
22 think.
23      (Exhibit 6, document Bates stamped
24 10242982 marked for identification, as of
25 this date.)

Page 77

**FELDER - HIGHLY CONFIDENTIAL**

1
2    Q. You have seen Exhibit 6 before, right?
3    A. Yes. This is that e-mail I was
4 referring to.
5    Q. Correct.
6      Mr. Haseruck, is that how you say his
7 name?
8    A. I don't know who he is.
9    Q. You don't know who he is?
10    A. No.
11    Q. He writes to you on Thursday, the
12 18th, about 6:14, about some mortgage inventory,
13 questioning essentially why it has been -- well,
14 what's your understanding of what he is
15 questioning?
16    A. He is questioning what he deems
17 material write-downs on the portfolio.
18    Q. Significant write-downs on the
19 mortgage portfolio being acquired by Barclays,
20 correct?
21    A. He wrote "material."
22    Q. And he is questioning -- why is he
23 writing to you?
24    A. I'm the head of fixed income.
25    Q. This is within your area?

Page 78

FELDER - HIGHLY CONFIDENTIAL
1    A.    And so he sent -- so he sent it to me
2    and put all the other people on it.
3    Q.    Are you in a position, Mr. Felder, to
4    tell me whether or not you think on a fire sale
5    basis the mortgage inventory being purchased by
6    Barclays should have been marked down to this
7    degree?
8        MR. STERN: Objection to form.
9    A.    I'm not expert enough -- I'm not
10   expert in the mortgage asset class or the
11   specifics of the positions to say.
12   Q.    Are you in a position to -- strike
13   that.
14       When you got this, did you have any
15   reaction to the size of the markdown?
16       MR. STERN: Objection to form.
17   A.    I just wanted to make sure that I got
18   it to someone above me, which is why I got it to
19   Mike Gelband, who had run mortgages prior. He was
20   the old head of fixed income.
21   Q.    Who are these other people who were
22   cc'd, Charles Spero, James Guarino?
23   A.    Charlie Spero ran mortgages. I don't
24   know who James Guarino is. Jeff Goodman was in

Page 79

FELDER - HIGHLY CONFIDENTIAL
1    the, I believe in the risk group. I don't know
2    who Kieron Keating is. I don't know Rajat
3    Malhotra. Gary is a product controller. And I
4    don't know who Joseph Sapia is.
5    Q.    OK, let's take a break.
6        (Recess)
7    BY MR. CARDEN:
8    Q.    Do you remember having met with anyone
9    from Barclays on Friday, September 19?
10   A.    I don't remember.
11   Q.    I do draw your attention to one of the
12   exhibits that I gave you that says you were over
13   at Barclays. That was not a trick question. Do
14   you remember -- let's rephrase.
15       Do you recall with whom you were
16   meeting at Barclays on the morning of
17   September 19?
18   A.    I don't.
19   Q.    And you have no recollection as to why
20   you went over there?
21       MR. STERN: Objection to the form.
22   A.    I don't.
23   Q.    Do you remember having met with
24   anybody at Barclays at Lehman Brothers on

Page 80

FELDER - HIGHLY CONFIDENTIAL
1    September 19?
2    A.    No.
3    Q.    Do you have any memory at all,
4    Mr. Felder, of what you were doing on
5    September 19?
6    A.    The one -- I do remember going to
7    that, I believe going to that breakfast.
8    Q.    The Merrill breakfast?
9    A.    Yes.
10   Q.    Now, to help you perhaps remember, it
11   was the evening of September 19 when the
12   transaction was presented to the bankruptcy court
13   for approval. Do you recall that?
14   A.    I recall that.
15   Q.    You weren't there, though, were you?
16   A.    I was not there.
17   Q.    Where were you when that was
18   happening?
19   A.    I wasn't in the office, but I don't
20   remember where I was.
21   Q.    I am sorry, you were --
22   A.    I was not at the office.
23   Q.    Did you ever read the transcript of
24   that hearing before the bankruptcy court?

Page 81

FELDER - HIGHLY CONFIDENTIAL
1    A.    No.
2    Q.    Did you ever get a summary of it from
3    anyone?
4    A.    People were -- would send around like
5    e-mail updates as to how things were going. I
6    remember that.
7    Q.    And you received some of those?
8    A.    I recall receiving some of those, yes.
9    Q.    Do you recall there had been a hearing
10   before the bankruptcy court on Wednesday, the 17th
11   of September?
12   A.    I knew -- I remember Bart going to
13   court, and I think it was on his anniversary,
14   which is why I remember it, or his birthday. And
15   it was that week.
16   Q.    But you don't --
17   A.    I don't know what it was.
18   Q.    You don't remember what day or --
19   A.    No.
20   Q.    You never went to the bankruptcy court
21   that --
22   A.    No.
23   Q.    Let's mark this as Exhibit 7.
24       (Exhibit 7, document Bates stamped

## Page 82

FELDER - HIGHLY CONFIDENTIAL

1    BCI-EX70957 marked for identification, as of
2    this date.)
3    Q.  Mr. Felder, showing you what has been
4    marked as Exhibit 7, which is an e-mail from
5    Mr. Lowitt to three people, I think, including
6    yourself. Do you see that?
7    A.  Yes.
8    Q.  Maybe that's four people.
9        Do you recall having gotten this
10   e-mail?
11   A.  No, not specifically.
12   Q.  Well, do you remember generally having
13   met with anybody at Barclays, now that you have
14   seen this, on September 19th, to talk about
15   positions and marks?
16   A.  No.
17   Q.  Do you remember having received, in
18   the early morning hours of September 19 and into
19   the morning, spreadsheets reflecting positions in
20   areas for which you had responsibility?
21   A.  Not specifically.
22   Q.  Let's mark a couple of them here.
23   Mark this as Exhibit 8.
24       (Exhibit 8, e-mail September 19, 2008

*Note: lines 1-24 renumbered below*

1    FELDER - HIGHLY CONFIDENTIAL
2    BCI-EX70957 marked for identification, as of
3    this date.)
4    Q.  Mr. Felder, showing you what has been
5    marked as Exhibit 7, which is an e-mail from
6    Mr. Lowitt to three people, I think, including
7    yourself. Do you see that?
8    A.  Yes.
9    Q.  Maybe that's four people.
10       Do you recall having gotten this
11   e-mail?
12   A.  No, not specifically.
13   Q.  Well, do you remember generally having
14   met with anybody at Barclays, now that you have
15   seen this, on September 19th, to talk about
16   positions and marks?
17   A.  No.
18   Q.  Do you remember having received, in
19   the early morning hours of September 19 and into
20   the morning, spreadsheets reflecting positions in
21   areas for which you had responsibility?
22   A.  Not specifically.
23   Q.  Let's mark a couple of them here.
24   Mark this as Exhibit 8.
25       (Exhibit 8, e-mail September 19, 2008

TSG Reporting - Worldwide  (877) 702-9580

## Page 83

1    FELDER - HIGHLY CONFIDENTIAL
2    at 10:51 a.m. with attachment marked for
3    identification, as of this date.)
4    Q.  Have you ever seen Exhibit 8 before?
5    A.  No.
6        (Exhibit 9, e-mail dated September 19,
7    2008 at 2:06 p.m. with attachment marked for
8    identification, as of this date.)
9    Q.  Mr. Felder, showing you what has been
10   marked as Exhibit 9, which is an e-mail from
11   Mr. Kirk to, again, an address that is
12   unrecognizable, but it has attached to it an
13   e-mail from Mr. McGarvey to a group of people
14   including yourself on Friday morning at
15   10 o'clock.
16       Do you remember having gotten this
17   e-mail?
18   A.  I don't.
19   Q.  And I take it you have no recollection
20   of having gotten the attachment?
21   A.  Correct.
22   Q.  And this CD and MM pricing, CD and MM,
23   that would be in your area, right? That would be
24   money market and CDs. That was something that you
25   identified previously as being something that was

TSG Reporting - Worldwide  (877) 702-9580

## Page 84

1    FELDER - HIGHLY CONFIDENTIAL
2    in fixed income?
3    A.  That would have been in fixed income.
4    Q.  Does this document assist you in any
5    respect in recalling what was taking place on
6    Friday morning with regard to the valuation of
7    positions that were within your area of
8    responsibility?
9    A.  No. I don't recall being in the
10   meeting.
11   Q.  And it is still your recollection --
12   strike that.
13       It is still the fact that you don't
14   recall having met with anybody from Barclays about
15   pricing of any of these securities?
16   A.  I don't recall.
17   Q.  Going back to Exhibit 7 for just a
18   moment. Would there have been anyone else in --
19   among Mr. Amin and Mr. Donini and Mr. Spero who
20   would have understood or known the process of
21   providing valuations for assets within your area?
22   A.  Hyung Lee was the cohead of fixed
23   income, and then within the different asset
24   classes, Jim Seery or Fred Orlan would have been a
25   high yield or leveraged loan person. Charlie

TSG Reporting - Worldwide  (877) 702-9580

## Page 85

1    FELDER - HIGHLY CONFIDENTIAL
2    would have been a mortgage person.
3    Q.  Charlie?
4    A.  Charlie Spero.
5        Kaushik would have been rates,
6    commodities and FX. John Coughlin would have been
7    repo or anything short term, and Mike Gelband and
8    Alex would have been the other two.
9    Q.  What about corporates? Who would
10   have --
11   A.  Anything for corporates, for
12   corporates, it would have been me.
13   Q.  So pricing for any corporate
14   obligations would have been something that you
15   would have been most familiar with as opposed to
16   the people you just mentioned?
17   A.  Yes. If they asked for a price on an
18   investment grade corporate bond that -- they would
19   have come to me or someone below me.
20   Q.  What was happening in -- let's take it
21   a step at a time. If you go back to, I think it
22   was Exhibit 2, just as a frame of reference, this
23   summary of asset classes, is it possible for you
24   to assist me as to what was going on in the market
25   in a general respect from, say, the end of the

TSG Reporting - Worldwide  (877) 702-9580

Page 86

**FELDER - HIGHLY CONFIDENTIAL**

1 week of September 15 for each of these asset
2 classes?
3     A.    I could really only talk to the credit
4 side.
5     Q.    OK, give me that.
6     A.    Spreads were widening significantly on
7 the back of the Lehman bankruptcy, specifically
8 within financials.
9         We weren't -- we weren't trading so I
10 could -- because we were bankrupt, so there
11 weren't -- you could only just watch your
12 Bloomberg screen, so obviously the equity markets
13 were going down a lot.  There was a lot of
14 volatility, and in general, spreads were
15 significantly wider.
16     Q.    No way for you to quantify that in any
17 general respect or -- did it change through the
18 week?  Did it spike, did it flatten, did it --
19     A.    No.  I -- I don't remember the exact
20 numbers on things, but there were some things that
21 were north of a hundred basis points wider over
22 the course of that week.
23     Q.    You said Coughlin was responsible for
24 repos?  I think that's what you said in passing.

TSG Reporting - Worldwide  (877) 702-9580

Page 87

**FELDER - HIGHLY CONFIDENTIAL**

1     A.    He ran financing for fixed income.
2     Q.    Let's go back to Tuesday.  We were
3 talking about Tuesday, September 16, and what you
4 were doing that day.
5         If you had come into the office, I
6 would like you to tell me as best you can, just
7 try to walk through the week as to what else you
8 were doing on that Tuesday and the Wednesday and
9 Thursday as well.
10     A.    On the Tuesday, there was the meeting
11 with, I believe it was Tuesday, with Jerry and --
12     Q.    That's where we left you, we left you
13 with Mr. Diamond and Mr. Del Missier.
14     A.    Right.
15         I recall that most of the rest of the
16 week was trying to keep the team together and
17 talking to all the individual people within the
18 credit business who were out interviewing and
19 getting job offers to try to keep the team
20 together.
21     Q.    Were you meeting with Barclays during
22 that time period on what I'll characterize as, you
23 know, the asset classes for which you had
24 responsibility or anything else?  Other than your

TSG Reporting - Worldwide  (877) 702-9580

Page 88

**FELDER - HIGHLY CONFIDENTIAL**

1 compensation.
2     A.    Yeah.  I had coffee with Eric
3 Bommensath, I don't remember which day it was, it
4 was either -- I believe it was Tuesday or
5 Wednesday, who was going to be my boss.  And we
6 started -- he wanted the names of what I deemed to
7 be the top people within the credit space.  So we
8 spent time going through that and just talking
9 about the business overall.
10         Away from that, I don't recall any
11 specific meetings with Barclays.
12     Q.    Did you meet with any lawyers that
13 week?  Going on from Tuesday or the Tuesday
14 meeting with Mr. Diamond, after that --
15     A.    Right.
16     Q.    -- did you meet with any lawyers?
17     A.    No.
18     Q.    Did you ever meet privately with
19 Mr. McDade?
20     A.    I don't recall meeting with him
21 privately.
22     Q.    Did you ever have a private meeting
23 with Mr. Kirk concerning the transaction and, you
24 know, what had been agreed upon by the parties?

TSG Reporting - Worldwide  (877) 702-9580

Page 89

**FELDER - HIGHLY CONFIDENTIAL**

1     A.    No.
2     Q.    What about Mr. Kelly?  Did you have
3 any conversation with Mr. Kelly that week?  Martin
4 Kelly?
5     A.    Martin -- no.
6     Q.    Do you even know Martin Kelly?
7     A.    I know the name.
8     Q.    Who do you know him to be?
9     A.    I knew him to be sort of a -- I don't
10 know what his exact function is, but I knew him to
11 be sort of a right-hand person to the CFO, to Ian.
12 But I couldn't tell you exactly what his function
13 is.
14     Q.    Did you ever tell or write to anybody
15 that Barclays was cherry-picking assets?
16     A.    I don't recall doing that.
17     Q.    Do you recall ever having written
18 anybody to the effect that Barclays was choosing
19 the assets which they wanted to purchase?
20     A.    I did think that Barclays was choosing
21 and pricing assets.  That was just the
22 impression -- that was the impression.
23     Q.    What was that impression based on?
24     A.    I guess I remember Mike Keegan at --

TSG Reporting - Worldwide  (877) 702-9580

1    FELDER - HIGHLY CONFIDENTIAL
2    in one of the meetings, I think it was, I guess
3    that Monday.
4        Q.   Monday, the 15th?
5        A.   I believe. Just the way he asked
6    about -- on the corporate side, I remember him
7    asking about auction rate securities and saying
8    like what -- like are you comfortable with these,
9    and I remember saying, yes, we were comfortable
10   with them.
11       Q.   Anything else?
12       A.   No, that's what I -- I remember that.
13       Q.   It may be my confusion, I apologize if
14   it is, but I thought I understood you to say that
15   you thought that Barclays was buying the entire
16   broker dealer. How does that square with the fact
17   that they are selecting assets to purchase?  I
18   don't understand how those things are consistent.
19   Maybe they are, but I don't understand.
20       MR. STERN:  Objection to the form.
21       A.   I don't know that -- I just know what
22   I had heard about what the transaction was, that
23   they were looking at buying the broker dealer. I
24   don't know the specifics of how a transaction like
25   this would occur.

1    FELDER - HIGHLY CONFIDENTIAL
2        Q.   But you also knew during that week,
3    did you not, that Barclays was picking the assets
4    they wanted to purchase?
5        A.   I knew they were looking at the -- at
6    all the different assets and forming opinions on
7    them.
8        (Exhibit 10, e-mail dated September
9    17, 2008 at 12:34 p.m. marked for
10   identification, as of this date.)
11       Q.   Mr. Felder, I show you what has been
12   marked as Exhibit 10. Midway on the first page,
13   there is an e-mail from you to a collection of
14   people where you are stating that the Barclays
15   folks picked the assets and recall them saying
16   they didn't want the auctions carries, but I
17   wasn't in the meeting.
18       Do you see that?
19       A.   Um-hm.
20       Q.   You mentioned about the auction rates
21   in your conversation.
22       A.   Because I remember -- yes.
23       Q.   Does this document refresh your
24   recollection to any extent that Barclays was
25   interested in only purchasing certain assets of

1    FELDER - HIGHLY CONFIDENTIAL
2    Lehman Brothers as opposed to the entire broker
3    dealer?
4        MR. STERN:  I think you should take a
5    chance to read the document.
6        THE WITNESS: OK.
7        A.   What was the question?
8        (Record read)
9        A.   I just remember them asking opinions
10   on things which led me to believe that a decision
11   process was being made.
12       Q.   OK. Do you remember them asking you
13   about anything or speaking about anything other
14   than auction rates?
15       A.   That was all I recall being asked.
16       Q.   Did you ever have a conversation with
17   anybody at Barclays about the valuations of any of
18   the positions or asset classes in the area of your
19   responsibility?
20       A.   What do you mean by value -- by
21   valuation?
22       Q.   Marks.
23       A.   Like where are things marked? Around
24   the auctions, based on the -- where the prices
25   were, I remember them -- I remember Mike Keegan

1    FELDER - HIGHLY CONFIDENTIAL
2    asking, you know, what do you think of these
3    securities at these prices?
4        Q.   OK.
5        A.   And I recall saying to him that I
6    think you're going to get -- ultimately people
7    would get their money back on these securities
8    from -- because they were at a discount. They
9    weren't marked at par anymore, given what went on
10   in that market. But that over time, those assets
11   would -- you would ultimately get your money back.
12       Q.   Were the auction rates within your
13   area of responsibility, within fixed income?
14       A.   Yes.
15       Q.   And you know they didn't move to
16   Barclays, right?
17       MR. STERN:  Objection, objection to
18   form.
19       A.   I don't know that they didn't move to
20   Barclays.
21       Q.   The conversation that you had with
22   Mr. Keegan on Monday about -- you think it was
23   Monday -- about the auction rates, was this a
24   face-to-face meeting that you had with him?
25       A.   Yes. It was in that -- it was up on

FELDER - HIGHLY CONFIDENTIAL

1   32.
2   Q.   In that room where you were escorting
3   some people in and occasionally staying yourself?
4   A.   Correct.
5   Q.   Do you recall having spoken about any
6   other asset classes or any other types of assets
7   other than auction rates in that room to Barclays
8   people with regard to marks?
9   A.   No.
10  Q.   Were you aware during the week that
11  there was a real interest or focus on the marks
12  that were being placed on the asset classes, or
13  the positions rather, in your area of
14  responsibility?
15  A.   Well, based on -- based on, for
16  example, that mortgage e-mail, there was focus --
17  the -- I don't want there to be a disconnect
18  between my technical area of responsibility, given
19  the job that I had gotten four days before, and
20  what I -- what I really had a knowledge of, which
21  was the credit piece. So I -- I did have the
22  sense that there was focus on the marks of
23  positions, but they weren't my areas of expertise.
24  Q.   Did you ever instruct any traders

FELDER - HIGHLY CONFIDENTIAL

1   within any area of fixed income during the week of
2   September 15 to provide you marks on any
3   positions?
4   A.   I don't recall specifically asking for
5   marks from people.
6   Q.   Did you ever instruct any traders
7   within your area of responsibility to mark down
8   any assets within the fixed income area?
9   A.   I don't recall instructing anyone to
10  mark.
11  Q.   Can you tell me who would have had the
12  conversation with the trader concerning the
13  mortgages that you have seen previously in terms
14  of providing marks for those?
15  A.   It would have gone through Charlie
16  Spero.
17  Q.   OK. Did you ever have a conversation
18  with anyone at Lehman Brothers, Mr. Felder, about
19  a discount being provided to Barclays on its
20  purchase of Lehman assets?
21  A.   I don't recall any specific
22  conversations.
23  Q.   Did you ever hear generally that
24  Barclays had been provided a discount in its

FELDER - HIGHLY CONFIDENTIAL

1   purchase of Lehman assets?
2   A.   Well, that mortgage e-mail, for
3   example, would give that indication, so that would
4   be an example of something that --
5   Q.   OK, thank you for that. Other than
6   the indication and the specific instance
7   concerning the mortgages, did you ever hear of
8   any, I'll call it global discount given to
9   Barclays for -- in purchase of the Lehman assets?
10  A.   No, I don't recall hearing about that.
11  Q.   Did you ever read anywhere or hear
12  from anyone that Barclays had purchased certain
13  valuation or value of Lehman assets for a
14  discount?
15  A.   No, not specifically.
16  Q.   Were you aware that on Tuesday
17  morning, Mr. Diamond and I think others at
18  Barclays had an analyst conversation, telephone
19  conversation?
20  A.   Analysts?
21  Q.   Yeah. They had a telephone
22  conversation with various people?
23  A.   No.
24  Q.   You weren't on it, in any event?

FELDER - HIGHLY CONFIDENTIAL

1   A.   No. What do you mean by analyst?
2   Q.   Not analysts, they were investors. It
3   was an investor call and a collection -- I don't
4   know who got access to the call. All I've seen is
5   a transcript, there was an investor call --
6   A.   No.
7   Q.   -- of some kind, and my question is,
8   were you on that call?
9   A.   No.
10  MR. STERN: Just so the record is
11  clear, I think in one of the previous
12  answers Mr. Felder referred to "that
13  mortgage e-mail," and I believe he was
14  referring to Exhibit 6, just to avoid any
15  confusion.
16  MR. CARDEN: Let's mark this
17  Exhibit 11.
18  (Exhibit 11, document Bates stamped
19  10284073 marked for identification, as of
20  this date.)
21  Q.   Have you seen Exhibit 11 before,
22  Mr. Felder?
23  A.   I believe Dan was the one who was
24  sending out the updates. He was a lawyer, so he

Page 98

FELDER - HIGHLY CONFIDENTIAL

1    was sending out updates on the court process.
2    Q.    Who was Mr. Schellbach?
3    A.    Pete ran the distressed trading
4    business.
5    Q.    Do you remember having gotten this
6    e-mail?
7    A.    Not specifically, but I -- you know,
8    now that I see it, I'm remembering asking him for
9    updates that Friday night.
10    Q.    Do you remember any other
11    conversations concerning what Barclays was
12    actually purchasing and at what values? Does this
13    cause you to have a recollection as to that?
14    A.    No.
15    (Exhibit 12, three-page letter dated
16    September 18, 2008 marked for identification
17    as of this date.)
18    Q.    You mentioned earlier, Mr. Felder,
19    that you had gotten by e-mail a draft offer letter
20    from Barclays. Is that that document? Is this
21    that document?
22    A.    This looks like it, yes.
23    Q.    This still reflects you are going to
24    get the ▓▓▓▓ in February, but that
25    TSG Reporting - Worldwide  (877) 702-9580

Page 99

FELDER - HIGHLY CONFIDENTIAL

1    ultimately was adjusted is your recollection,
2    correct?
3    A.    Yes.
4    Q.    Do you think you got this on
5    September 18?
6    A.    I don't recall.
7    Q.    You got it at your office e-mail,
8    though?
9    A.    Yes. I believe I got it in my office
10    e-mail.
11    (Exhibit 13, Letter dated September
12    21, 2008 marked for identification as of
13    this date.)
14    Q.    Mr. Felder, I show you what has been
15    marked as Exhibit 13. This is your offer letter,
16    isn't it, sir, dated September 21? I am sorry,
17    yeah, your offer letter which you signed.
18    A.    Yes.
19    Q.    That is your signature on page 3,
20    correct?
21    A.    Yes.
22    Q.    And I take it that when you got your
23    offer letter, it did not have the fourth page?
24    A.    No.
25    TSG Reporting - Worldwide  (877) 702-9580

Page 100

FELDER - HIGHLY CONFIDENTIAL

1    Q.    Why don't you hand that one back.
2    That was a mistake somewhere along the lines. I
3    figured that it was. We will substitute a fresh
4    copy when that comes.
5    Now, it mentions that you -- in
6    addition to the ▓▓▓▓, you had a special cash
7    payment of ▓▓▓▓ correct?
8    A.    Correct.
9    Q.    Maybe I misheard. Was that something
10    that you talked about with Mr. Diamond on Tuesday
11    morning?
12    A.    That was the retention payment, that
13    was the 25 percent --
14    Q.    Of --
15    A.    -- of the '08 number split half one
16    year after you were still employed at Barclays and
17    then the other half two years after.
18    Q.    Maybe it was my confusion. I thought
19    I heard you say 25 percent. That didn't look like
20    25 percent of ▓▓▓▓ to me, so what am I
21    missing here?
22    A.    Essentially it ends up being
23    100 percent of your '08 compensation, correct,
24    split into two pieces?
25    TSG Reporting - Worldwide  (877) 702-9580

Page 101

FELDER - HIGHLY CONFIDENTIAL

1    A.    No, no. Each piece was 25 percent, so
2    25 percent of ▓▓▓▓ would be ▓▓▓▓
3
4    Q.    Right.
5    A.    And the way this is set up, you
6    receive a special cash award of ▓▓▓▓
7    half payable on your first --
8    Q.    I got you.
9    A.    -- starting date. That would be ▓▓▓▓
10    ▓▓▓▓
11    Q.    I understand that.
12    MR. CARDEN:  We now have the exhibit,
13    so we will mark it. Let's take a break here
14    for just a moment and see where we are.
15    (Recess)
16    (Exhibit 14, document Bates stamped
17    10292661 marked for identification, as of
18    this date.)
19    Q.    Mr. Felder, I am going to show you
20    what has been marked as Exhibit 14, Mr. Felder,
21    which is one of these e-mail chains. I want to
22    draw your attention to the one at the bottom here
23    from Mr. Lowitt to you and Mr. Gelband and
24    Mr. Kirk on Wednesday, the 17th, at around 10 in
25    TSG Reporting - Worldwide  (877) 702-9580

Page 102

FELDER - HIGHLY CONFIDENTIAL

1    the evening, or 5 rather. No, 10.
2
3        Do you recall having gotten this?
4        MR. STERN: Let's read it first.
5        A.   I don't recall it specifically.
6        Q.   Well, do you recall generally there
7    being any conversation about the need to shrink
8    the matched book?
9        A.   I don't recall that. I recall the --
10   I recall instructions from Ian to make sure that
11   the traders weren't doing things that sent cash
12   out of the firm. I remember that as a broad
13   instruction that he gave.
14       Q.   Do you have an understanding of what
15   is meant by shrinking the matched book in this
16   e-mail from Mr. Lowitt?
17       A.   A matched book is a repo book where it
18   is matched, so there are two sides to it. So if
19   you shrunk a matched book, you would eliminate
20   both sides and then the aggregate size would be
21   smaller.
22       Q.   Do you have any memory at all as to
23   why there was a need in his mind to shrink the
24   matched book?
25       A.   No.

TSG Reporting - Worldwide  (877) 702-9580

Page 103

FELDER - HIGHLY CONFIDENTIAL

1
2        Q.   Did you have any conversations with
3    anybody about needing to shrink the matched book
4    during the week of September 15?
5        A.   Not that I recall.
6        Q.   What did you mean when you wrote here,
7    "What about the line from BACR," that's Barclays
8    credit? Is that what that is supposed to mean?
9        A.   I would assume that's Barclays.
10       Q.   What did you mean by that?
11       A.   I had -- I -- guess I was asking
12   whether there was -- whether Barclays was going to
13   finance Lehman, whether that was --
14       Q.   Were you aware at or about this time
15   that the Fed had done a repo with Lehman?
16       A.   No.
17       Q.   So I take it you're not aware of
18   whether Barclays was going to take over the Fed's
19   position in connection with that repo?
20       A.   No, not aware of that.
21       MR. CARDEN: I'm done.
22
23       _ _ _ _
24
25

TSG Reporting - Worldwide  (877) 702-9580

Page 104

1        FELDER - HIGHLY CONFIDENTIAL
2    EXAMINATION BY
3    MS. TAGGART:
4        Q.   My name is Erica Taggart. I represent
5    the creditors committee.
6        I have some question, mostly directed
7    to finding out who might have some of the
8    information you didn't know.
9        Did you work at all -- I believe
10   Mr. Carden asked you that you weren't involved in
11   any repurchase agreement with the Federal Reserve,
12   right?
13       A.   Correct.
14       Q.   Do you know anyone who was involved
15   from Lehman in dealing with the Federal Reserve in
16   connection with the primary dealer credit
17   facility?
18       A.   I can only make an assumption as to
19   who it would be.
20       Q.   OK. Who do you know that that might
21   fall under their responsibilities at Lehman?
22       A.   I would think it would fall within the
23   Treasury function. So either Ian Lowitt or Paolo
24   Tonucci, who would be the treasurer. Those would
25   be the two people.

TSG Reporting - Worldwide  (877) 702-9580

Page 105

1        FELDER - HIGHLY CONFIDENTIAL
2        Q.   Did you speak with Mr. Lowitt or
3    Mr. Tonucci about anything related to the Federal
4    Reserve at this time?
5        A.   No. Not that I recall.
6        Q.   Did you speak to anyone related to the
7    repurchase agreement related to the Federal
8    Reserve?
9        A.   No.
10       Q.   Now, I understand that you didn't
11   prepare any witnesses for the sale hearing; is
12   that correct?
13       A.   I am sorry, prepare any?
14       Q.   Witnesses for the sale hearing that
15   happened on September 19.
16       A.   No.
17       Q.   Do you know anyone at Lehman who did
18   prepare anyone for the sale hearing?
19       A.   No.
20       Q.   Did you ever have any interaction with
21   JP Morgan during the week of September 15?
22       A.   No.
23       Q.   Do you know who at Lehman did have any
24   interaction with JP Morgan at this time?
25       A.   I would only be assuming again. I can

TSG Reporting - Worldwide  (877) 702-9580

Page 106

FELDER - HIGHLY CONFIDENTIAL
1  give you a list of people who it might be, but I
2  don't know.
3       Q.   Who are the people at Lehman that it
4  was your understanding within their
5  responsibilities would be working with JP Morgan
6  prior to the sale transaction?
7       A.   I would think it would be Ian and
8  Paolo, again.
9       Q.   Besides the people that you mentioned
10  earlier today, do you know anyone else at Lehman
11  who was involved in valuing any assets or
12  securities that became part of the sales
13  transaction?
14       A.   Not specifically.
15       Q.   Is there anybody else besides those
16  that you have mentioned today who it was within
17  their area of responsibility to do valuations of
18  securities or assets at Lehman?
19       A.   Can you repeat the question.
20            (Record read)
21       A.   What do you mean by -- obviously
22  traders mark --
23       Q.   Right.  Besides the traders, I think
24  you said that the traders then give their

TSG Reporting - Worldwide  (877) 702-9580

Page 107

FELDER - HIGHLY CONFIDENTIAL
1  information to the different department heads.
2  You deal with the credit and fixed income.  Is
3  there anyone else that you know of who during this
4  time was collecting information from traders about
5  valuation of assets that might go to Barclays?
6       A.   The -- oh, specifically -- no, not
7  specifically.
8       Q.   And it is my understanding you weren't
9  involved in the negotiation of any of the
10  contracts that related to the sale of assets to
11  Barclays, correct?
12       A.   Correct.
13       Q.   Who do you know at Lehman who was
14  involved in that negotiation?
15       A.   I could only -- I could only make an
16  assumption.  I don't know specifically.
17       Q.   Who were the people that you believe
18  might have been involved in negotiations with
19  Barclays over the sale?
20       A.   Bart McDade, Alex Kirk, Mike Gelband.
21  These are just -- this is just -- would be my
22  assumption.
23            Potentially Skip McGee, ran investment
24  banking.  Mark Schaefer.

TSG Reporting - Worldwide  (877) 702-9580

Page 108

FELDER - HIGHLY CONFIDENTIAL
1       Q.   What was Mark Schaefer's role?
2       A.   He -- I think he was head of M&A.
3       Q.   Did you ever speak to anybody about
4  any terms or conditions about the sale
5  transaction?
6       A.   No.
7       Q.   Did you ever have any involvement with
8  the DTC, Depository Trust and Clearing
9  Corporation?
10       A.   No.
11       Q.   Do you know who at Lehman was
12  interacting with the DTC at this time?
13       A.   I don't.
14       Q.   Were you involved at all in the
15  decision about what amount, if any, of the
16  residential mortgage backed securities would be
17  part of that transaction?
18       A.   No.
19       Q.   Do you know who was involved in those
20  decisions?
21       A.   I don't.
22       Q.   The weekend between -- the weekend of
23  September 20 and 21, were you involved in any
24  meetings with Barclays during that time?

TSG Reporting - Worldwide  (877) 702-9580

Page 109

FELDER - HIGHLY CONFIDENTIAL
1       A.   Weekend of the 20th and 21st?  I
2  was -- that weekend I was working with Eric
3  Bommensath around coming up with contracts for the
4  people that would be on the team in credit.
5       Q.   Any other meetings with anyone from
6  Barclays?
7       A.   No.
8       Q.   Were you involved at all in the
9  assessment of the value of the goodwill of LBI
10  that was purchased by Barclays?
11       A.   No.
12       Q.   Do you know who was involved in that
13  valuation?
14       A.   No.
15       Q.   Were you involved in any valuation of
16  real estate?
17       A.   No.
18       Q.   Do you know who would be involved in
19  that valuation?
20       A.   Mark Walsh ran our real estate group,
21  but I don't know who was involved in valuing it.
22            (Exhibit 15, document Bates stamped
23       BCI-EX30865 with attachment marked for
24       identification, as of this date.)

TSG Reporting - Worldwide  (877) 702-9580

## Page 110

FELDER - HIGHLY CONFIDENTIAL

2  **Q.  Exhibit 15 goes from the numbers**
3  **BCI-EX30865 -- actually that's the cover e-mail,**
4  **and then there is a number of documents of a**
5  **spreadsheet that are attached to it, and it was an**
6  **e-mail from Stephen King dated September 17, 2008.**
7  **Have you ever seen Exhibit 15?**
8  A.  No, I don't recall seeing it.
9  **Q.  Who is Stephen King?**
10  A.  Steven works at Barclays. He -- and
11  at least now he is in -- he was in that PMTG
12  group.
13  **Q.  And it is to C. Spero. Is it your**
14  **understanding that's Charles Spero?**
15  A.  Yeah, that's what it looks like.
16  **Q.  Who is Jasen Yang?**
17  A.  I don't know.
18  **Q.  You will see in the middle of this**
19  **e-mail, it says, "I am going to have to do the**
20  **same on the rest of the portfolio. I guess that**
21  **is Felder, right?"  Do you see that?**
22  A.  Yes.
23  **Q.  Is it your understanding that's**
24  **referring to you?**
25  A.  It looks that way, yes.

TSG Reporting - Worldwide  (877) 702-9580

## Page 111

FELDER - HIGHLY CONFIDENTIAL

2  **Q.  Did any of these people, Stephen King,**
3  **Charles Spero or Jasen Yang ever contact you about**
4  **doing any work with the portfolio that is**
5  **described here?**
6  A.  No. Not that I recall.
7  **Q.  Do you have an understanding under "BB**
8  **takes" what's being described here?**
9  A.  "BB takes." BB -- well, it says takes
10  and leaves, so I assume it is securities being
11  taken and securities being left.
12  **Q.  Were you involved in putting together**
13  **these numbers that are on Exhibit 15?**
14  A.  No.
15  (Exhibit 16, e-mail dated September
16  18, 2008 at 12:23 p.m. marked for
17  identification, as of this date.)
18  **Q.  The next exhibit, 16, is an e-mail**
19  **from Gilles Aublin dated September 18, 2008, to**
20  **Fred Orlan and others, I believe you are on the cc**
21  **line, with the subject "Asset Transfer Update."**
22  **Do you remember receiving this e-mail?**
23  A.  I don't recall specifically.
24  **Q.  Is that your e-mail address on the cc**
25  **line?**

TSG Reporting - Worldwide  (877) 702-9580

## Page 112

FELDER - HIGHLY CONFIDENTIAL

2  A.  Yes.
3  **Q.  And who is Gilles Aublin?**
4  A.  He was in product control for credit.
5  **Q.  You will see that in the first of the**
6  **bullet points, it says, "You will be provided**
7  **later today the updated final list of assets that**
8  **will be carried over to the new entity."**
9  **Do you see that?**
10  A.  Yes.
11  **Q.  Were you provided with an updated**
12  **final list of assets that would be carried over to**
13  **the new entity?**
14  A.  I don't recall.
15  **Q.  Do you know what this is referring to?**
16  A.  Only just what it says in the e-mail.
17  **Q.  Did you receive any list from**
18  **Mr. Aublin or his team that reflected assets that**
19  **were carried over to the new entity?**
20  A.  I don't recall specifically getting
21  one.
22  **Q.  Then you see in the third bullet point**
23  **it says, "Today it is critical that all positions**
24  **are marked carefully, as this mark will be the**
25  **basis of the transfer."  Do you see that?**

TSG Reporting - Worldwide  (877) 702-9580

## Page 113

FELDER - HIGHLY CONFIDENTIAL

2  A.  Yes.
3  **Q.  Were you involved at all in marking**
4  **the assets on or about September 18?**
5  A.  No.
6  **Q.  And did you speak to Mr. Aublin at all**
7  **about the issues of valuation of the asset**
8  **transfer?**
9  A.  No.
10  **Q.  You testified earlier today that you**
11  **returned the ████████ back to Lehman.**
12  A.  Correct.
13  **Q.  Why did you do that?**
14  A.  I thought it was the right thing to
15  do. Given what had happened, I felt it was the
16  proper, proper thing to do.
17  **Q.  When had you received that amount?**
18  A.  I received part in June of '08 and
19  part in September.
20  **Q.  In addition to the ████████ from**
21  **Lehman, had you been receiving an ongoing salary?**
22  A.  I had my normal salary, yes.
23  **Q.  And did you return any of the normal**
24  **salary?**
25  A.  No.

TSG Reporting - Worldwide  (877) 702-9580

## Page 114

FELDER - HIGHLY CONFIDENTIAL

1     FELDER - HIGHLY CONFIDENTIAL
2    Q.  In the presentations that you were
3 making to the room of people on Monday, the 15th,
4 regarding the credit positions, did you present
5 any documents at that meeting?
6    MR. STERN: Objection to the form.
7    A.  On Monday.  There were some risk
8 reports there, I believe.
9    Q.  And you -- did you present those risk
10 reports to the people in the group?
11    A.  I gave -- I gave them to the Barclays
12 folks.
13    Q.  Did they have a -- the document have a
14 title on them?
15    A.  I don't recall a specific title.
16    Q.  About how long were the documents that
17 you presented?
18    A.  I don't remember specifically.
19    Q.  Was there further discussion about
20 your presentation?
21    A.  It wasn't a -- it wasn't a
22 presentation.  It was -- we -- I remember handing
23 over risk reports, and then any questions that got
24 asked, we would try to answer.  Because I remember
25 the specific auction rate question, for example.

TSG Reporting - Worldwide  (877) 702-9580

## Page 115

FELDER - HIGHLY CONFIDENTIAL

1     FELDER - HIGHLY CONFIDENTIAL
2    Q.  What was the specific auction rate
3 question that you remember?
4    A.  What, what is your opinion of the --
5 of these securities?
6    Q.  What was your answer?
7    A.  I believe it was that I was -- based
8 on the prices that they were at over time and the
9 credit quality, that we would expect that we would
10 get par back, that you could expect that you would
11 get par back on the securities.
12    Q.  At the time of September 15, had you
13 been valuing them at par?
14    A.  I don't remember all the individual
15 levels, but in general, they were not at par.
16    Q.  In general, is it correct that the
17 auction rate securities that you were presenting
18 were valued at that time at a discount?
19    A.  Yes, at a discount to par.
20    Q.  Approximately how much of the discount
21 to par at that time?
22    A.  I don't recall specifically, because
23 there were different types.  I don't recall the
24 exact numbers.
25    Q.  What were the different types?

TSG Reporting - Worldwide  (877) 702-9580

## Page 116

FELDER - HIGHLY CONFIDENTIAL

1     FELDER - HIGHLY CONFIDENTIAL
2    A.  There were XXX securities.  There were
3 contingent capital securities.  There were DPC
4 securities.
5    Q.  I am sorry?
6    A.  DPC.  There were -- then I guess there
7 were munis and taxable munis.
8    Q.  What was the approximate value that
9 you were presenting for that total group of
10 auction rate securities?
11    A.  I didn't present any values.
12    Q.  Why had you discounted those
13 securities?
14    MR. STERN: Objection to the form.
15    A.  I didn't discount securities.  These
16 were the marks from the traders that were on the
17 risk report.
18    Q.  What was your basis for saying that
19 you believed that Barclays could eventually get
20 par back from those securities?
21    A.  It was based on my opinion of the
22 credit quality of the underlying securities from
23 the work that had been done by the -- our hybrid
24 capital team that was responsible for those
25 securities.

TSG Reporting - Worldwide  (877) 702-9580

## Page 117

FELDER - HIGHLY CONFIDENTIAL

1     FELDER - HIGHLY CONFIDENTIAL
2    Q.  Who were you referring to as part of
3 the hybrid capital team that had done work related
4 to these securities?
5    A.  Anthony Bugliari.  Gia Rys, R-Y-S.
6 Those would be the main people.
7    Q.  You testified earlier today that you
8 didn't remember any private meetings with Bart
9 McDade.  Did you meet at all with Bart McDade the
10 week of September 15?
11    A.  I definitely saw him around.  I
12 don't -- I don't recall a specific meeting,
13 though.
14    MS. TAGGART: I don't have any more
15 questions.
16    MR. MAGUIRE: Mr. Felder, I don't have
17 any questions for you.  I would make a
18 request of your Barclays counsel that with
19 respect to Exhibit 11, which I believe you
20 were provided with, that makes a reference
21 to a Barclays lawyer coming in and making an
22 explanation.  I believe that's in the
23 context of the hearing, the proceedings
24 associated with the bankruptcy court hearing
25 on September 19.  I would ask that Barclays

TSG Reporting - Worldwide  (877) 702-9580

Page 118

FELDER - HIGHLY CONFIDENTIAL
2 provide us with the record of that
3 explanation.
4     MR. STERN: Are you suggesting there
5 is something other than the transcript of
6 the hearing?
7     MR. MAGUIRE: If there is nothing
8 other than the transcript, if you could
9 confirm that, that would be fine. If there
10 is anything other than the transcript, if
11 you could provide us with the record.
12     MR. STERN: Sure, we will definitely
13 look into that.
14     MR. MAGUIRE: Thank you.
15 EXAMINATION BY
16 MR. BYMAN:
17     Q.  Mr. Felder, you and I have met before.
18 I am Bob Byman for the examiner.  I just want to
19 follow up on the risk reports that you were
20 talking about that were present on September 15.
21 Could you describe those in a little more detail,
22 who prepared them, what risks were they
23 evaluating, what type of information was conveyed
24 in them?
25     A.  If I recall, they were the broad risk

Page 119

FELDER - HIGHLY CONFIDENTIAL
2 reports for the credit business which would have
3 been produced by Luan Sha La, L-U-A-N, S-H-A, L-A,
4 and Hans Chunk.  They were -- they sat within the
5 risk management function, and they were our -- the
6 standard risk reports that were delivered either
7 on a daily or weekly basis that gave a broad
8 overview as to the credit risk and the credit
9 business.
10     Q.  So these were routine reports that
11 happened to have been generated that you brought
12 with you?
13     A.  Correct.
14     Q.  As opposed to something that you
15 created for the meeting?
16     A.  Correct.
17     Q.  In these routine reports, can you give
18 somebody like me, who is a total layman who
19 doesn't know how you calculate risk or what you do
20 with it, what do these things show?  Do they take
21 the asset and say how much the asset will be
22 downgraded or down-valued?
23     A.  No. It was summarize the current
24 position using metrics within the credit space,
25 such as DVO1, which is dollar value of a basis

Page 120

FELDER - HIGHLY CONFIDENTIAL
2 point, how much a position would move based on the
3 basis point shift in yield.
4     VOD, which stands for value on
5 default, meaning how much you would lose if that
6 position defaulted and recovered. 40 cents is the
7 market standard for recovery within corporates.
8     There would also be a VOD zero column,
9 which would be how much would you lose if there
10 was a default and the security went to zero.
11     And then there would be lists of top,
12 long and short positions based on that DVO1 metric
13 which I mentioned and also that VOD metric which I
14 mentioned.  There would also be portfolio
15 statistics, such as, BAR, that would be shown and
16 those types of general metrics.
17     Q.  Are you familiar with the concept of
18 risk appetite?
19     A.  Yes.
20     Q.  Did these reports quantify the amount
21 of risk appetite usage the businesses that you
22 were responsible for were consuming?
23     A.  There would be some -- I don't know if
24 in those reports risk appetite was on there.
25     Q.  Were there routine reports that your

Page 121

FELDER - HIGHLY CONFIDENTIAL
2 businesses generated that did track the amount of
3 risk appetite usage?
4     A.  Yeah, I would think there would.  It
5 wasn't a metric that was -- it wasn't a metric
6 within credit that the risk management folks
7 focused on, because it didn't give, didn't give
8 a -- it didn't give a real sense as to how the --
9 that portfolio would -- those credit specific risk
10 metrics were the more important risk metrics in
11 managing the credit book.
12     Q.  Focusing just on the credit business,
13 which I take it you have a further understanding
14 of than the business you were only in charge of
15 for four and a half days.
16     A.  Correct.
17     Q.  Were you assigned a certain amount of
18 risk appetite usage at any point in a fiscal year?
19     A.  I would assume that there were limits.
20 I don't recall being given a specific number.
21     Q.  Do you recall ever being told you were
22 over or under or comfortably within whatever your
23 usage was?
24     A.  Not specifically.
25     Q.  Do you recall at any time any concern

Page 122

1    **FELDER - HIGHLY CONFIDENTIAL**
2    in any of the businesses that you bumped into
3    about whether or not the business was within its
4    risk appetite limits?
5        A.    I do recall Alex Kirk saying -- and I
6    couldn't tell you when, this is going back
7    pre-September, I do recall Alex saying that his
8    business had to get risk appetite lower.
9        Q.    And which business would he have been
10    talking about?
11        A.    This was when he was the co-COO of
12    fixed income. So --
13        Q.    So it was the fixed income division
14    that had to get limits lower?
15        A.    I recall him saying that.
16        Q.    Usage lower or limits lower?
17        A.    Risk appetite usage.
18        Q.    OK. Thank you. I don't have any
19    further questions.
20            MR. CARDEN: We have been admirably
21    efficient, but I have a few more questions.
22    Won't take long.
23            _ _ _ _
24
25

TSG Reporting - Worldwide  (877) 702-9580

Page 123

1        FELDER - HIGHLY CONFIDENTIAL
2    EXAMINATION BY
3    MR. CARDEN:
4        Q.    The traders who are responsible for
5    certain aspects of the fixed income portfolio are
6    the ones who do the marks every night, correct?
7        A.    Correct.
8        Q.    How many traders, just roughly
9    speaking, were there within the fixed income area
10    in the days when you were the cohead, who would
11    have prepared such marks?
12        A.    Oh, I don't know how many specific
13    trade -- I know there were about 3,000 people in
14    fixed income. And I think that the split was
15    about a third, a third, a third, sales, trading,
16    research, so I would give an estimate without real
17    knowledge specifically of maybe about a thousand.
18        Q.    A lot of people?
19        A.    A significant number.
20        Q.    And those people, when they did their
21    marks for the portfolios for which they were
22    responsible, did they have a responsibility to
23    provide those marks up to an immediate supervisor
24    every day?
25            Or said another way, how were they

TSG Reporting - Worldwide  (877) 702-9580

Page 124

1        **FELDER - HIGHLY CONFIDENTIAL**
2    input into the system?
3        A.    No, the traders input their own marks.
4        Q.    On the evening of Thursday, I know you
5    don't recognize, or pardon me, don't recall having
6    gone forth to get valuations.
7        A.    Right.
8        Q.    But had you done so and just don't
9    remember, who would you have asked to provide the
10    marks for the portions of the portfolio that were
11    provided to you Thursday evening?
12        A.    I would -- if I had to ask that
13    question, I probably would have asked someone like
14    a Gilles in product control, because product
15    control was responsible for month-end variance
16    testing, so they had -- they could get all of the
17    different marks all together in one spot. Each
18    trader would only have their book. So the only
19    place where you could go to get an aggregate list
20    of marks would be out of product control.
21        Q.    That would only be on a once monthly
22    basis, correct? You had to go back to the end of
23    August, or is that done on a --
24        A.    Product control could get all the
25    marks on any given day.

TSG Reporting - Worldwide  (877) 702-9580

Page 125

1        FELDER - HIGHLY CONFIDENTIAL
2        Q.    So I know you, again, you don't
3    remember, I'm just trying to get what the process
4    would have been.
5            When you're given -- if you were given
6    the sheet that had the hundred largest positions
7    in fixed income on the evening of Thursday or
8    Friday morning, and you had to get fire sale marks
9    for those positions, is it your testimony that you
10    would have gone to Gilles?
11            MR. STERN: Objection to the form.
12        A.    No. If things had already been marked
13    and I was asked to get what are the marks, I would
14    go to Gilles.
15        Q.    Fair enough.
16            If you were asked to get fair sale
17    marks for those same positions on late Thursday
18    night or Friday morning, to whom would you have
19    gone to get those fire sale marks?
20        A.    Within credit?
21        Q.    Yes.
22        A.    The people under me in credit would
23    have been Fred Orlan, who ran the high-yield
24    business. Within the investment grade business,
25    it would have been Jason Quinn and Anthony

TSG Reporting - Worldwide  (877) 702-9580

Page 126

1    FELDER - HIGHLY CONFIDENTIAL
2   Bugliari.
3           Within the CDO business it would have
4   been Peter Hornick. Within the municipal business
5   it would have been Jerry Rizzieri, and within
6   emerging markets it would have been Mohammed
7   Grimeh.
8           Those would have been the heads of
9   those businesses who would then, if they had to do
10  that, go to the traders underneath them or desk
11  heads underneath them to do that kind of a --
12   Q.   Is it possible they could have -- they
13  would have known what the existing marks were
14  already so they wouldn't have needed to go to
15  product control?
16   A.   They wouldn't have needed to go to
17  product control.
18   Q.   As to those aspects of the fixed
19  income division that were not credit related --
20   A.   Right.
21   Q.   -- to whom would you have gone, if you
22  know, to provide fire sale marks on that, those
23  aspects or those assets in the fixed income
24  division?
25   A.   I could just give you the heads of the

Page 127

1    FELDER - HIGHLY CONFIDENTIAL
2   businesses.
3   Q.   OK.
4   A.   So Charlie Spero ran mortgages.
5   Kaushik Amin ran rates, FX and commodities. John
6   Coughlin was anything that was financing or short
7   dated. Jim Murley would have been anything within
8   the syndicate functions, which also included
9   commercial paper.
10          Let's see. FX, commodities --
11  Mohammed Grimeh would have been emerging markets.
12  And I guess Mark Walsh would have been commercial
13  real estate.
14   Q.   Look back at Exhibit 2 for me for just
15  a moment. I think we have already established, or
16  in any event, there is some indication that this
17  is the sheet of the 100 largest positions in fixed
18  income that was discussed in the e-mail traffic on
19  Thursday evening.
20          MR. STERN: Objection to the form. I
21          don't think any such thing has been
22          established. I think the transcript will
23          reflect Mr. Felder's uncertainty concerning
24          this document and the categories within this
25          document.

Page 128

1    FELDER - HIGHLY CONFIDENTIAL
2   But if you have a question, go ahead.
3           MR. CARDEN: I'm --
4           MR. STERN: I just object to the
5           statement and characterization of the
6           testimony.
7           MR. CARDEN: I think it is an accurate
8           characterization, but I will eliminate it
9           from the question so we won't have any
10          problem with it.
11          MR. STERN: Thank you.
12   Q.   Looking at Exhibit 2, Mr. Felder, had
13  you wanted to go forward and you had this document
14  in your possession, to provide fire sale
15  valuations for these positions, to whom would you
16  have gone?
17          MR. STERN: Objection to the form.
18   Q.   Take a look at the positions, because
19  they may or may not all be in the areas you have
20  already previously described.
21   A.   That list of people that I gave you
22  would -- I believe that would incorporate --
23   Q.   The difference between my question
24  is --
25          MR. STERN: Wait, incorporate what? I

Page 129

1    FELDER - HIGHLY CONFIDENTIAL
2   don't hear a complete answer.
3   A.   I think that list of people would have
4   had a responsibility for -- assuming that these
5   are positions from within fixed income at Lehman,
6   that group of people would have had responsibility
7   for the ultimate people that would have marked
8   these securities.
9   Q.   On a fire sale basis?
10          MR. STERN: Objection to the form.
11   A.   They would -- those would be the
12  people that if they were asked to do that, would
13  have the knowledge level of the security to do
14  that.
15   Q.   OK. Let me make certain that we are
16  understanding one another. Had you been given
17  this list on Thursday, September 18, in the
18  evening or early Friday morning on September 19
19  and been asked to provide fire sale prices for
20  those positions which were in fixed income, the
21  people to whom you would have gone would have been
22  those which you previously described as in charge
23  of those specific areas, correct?
24   A.   Correct.
25   Q.   All right. Do you have -- strike

Page 130

FELDER - HIGHLY CONFIDENTIAL

1  that.
2  Would there be any way that you could
3  have avoided going to each and every one of them
4  in order to make the process more efficient? In
5  other words, is there some one person above all of
6  them to whom you might have gone to say get this
7  done and that they in turn would have gone to the
8  collection of people you described? Or is that
9  person you?
10  A.  Can you repeat the question.
11  Q.  Yeah, I am happy to rephrase the
12  question.
13  I know you don't have a recollection
14  of this, I am simply trying to determine what you
15  would have done if it in fact happened.
16  You were asked to give fire sale
17  prices for the securities in Exhibit 2. You have
18  got to find the people who are in a position to do
19  it. You have described to me the people in each
20  of the various asset classes who are in a position
21  to talk to the relevant traders and get those fire
22  sale marks, correct?
23  A.  Correct.
24  MR. STERN: Objection to the form.
25

TSG Reporting - Worldwide  (877) 702-9580

Page 131

FELDER - HIGHLY CONFIDENTIAL

1  Wait. Objection to the form, because the
2  question incorporates all kinds of
3  statements.
4  MR. CARDEN: That's fine. I am happy
5  with the question. You can object to the
6  form.
7  Q.  So the question I have for you now is,
8  is there --
9  MR. STERN: The point is if you are
10  creating a misleading record, I just can't
11  let that stand. So what exactly are you
12  asking?
13  MR. CARDEN: We have done beautifully
14  this far. I am perfectly happy with the
15  answer. I am just trying to identify people
16  who are involved. Let's just move on. I am
17  happy to stand by the question. I have
18  reformulated questions in the past when I
19  thought you were correct. I thought you
20  were mistaken about this. I don't really
21  care about this.
22  Q.  What I really want to know,
23  Mr. Felder, is, if you had chosen to do so and
24  were asked to provide fire sale prices for a wide

TSG Reporting - Worldwide  (877) 702-9580

Page 132

FELDER - HIGHLY CONFIDENTIAL

1  collection of positions in the fixed income area,
2  is there some one person you could have called as
3  opposed to contacting all the people that you have
4  described?
5  A.  I could have gone to one person who
6  would have gone to those people. So Mike Gelband
7  would know all of those people, Alex Kirk would
8  know all of those people.
9  Q.  But at the end of the day, what you
10  are saying to me, in order to provide the fire
11  sale prices, you would have had to have gone back
12  to the people that you have identified to get
13  those prices, correct? Somebody would have had to
14  have gone to them?
15  A.  That would be the process I would go
16  through.
17  Q.  That's what I am asking for. OK.
18  And it is your testimony you have no
19  recollection of having done that on Thursday night
20  or Friday morning?
21  A.  I have no recollection of having done
22  that.
23  Q.  OK, thank you, sir.
24
25

TSG Reporting - Worldwide  (877) 702-9580

Page 133

FELDER - HIGHLY CONFIDENTIAL

1  EXAMINATION BY
2  MS. TAGGART:
3  Q.  I will ask a couple of follow-up
4  questions to this.
5  When you talk about the traders are
6  the ones who put together marks, do they do that
7  on a routine basis?
8  A.  They mark their books every day.
9  Q.  And what's involved in marking the
10  books every day?
11  A.  For what type of a trader?
12  Q.  It varies from trade to trade? Let me
13  ask this: Where do they put the information on a
14  daily basis, or did they at this time?
15  A.  Whatever the front office system of
16  that asset class is would be where the marks would
17  be put in.
18  Q.  When you say a front office system,
19  are you talking about a computerized database?
20  A.  An application. There were different
21  applications for different products, that would
22  all feed into the middle office or the back office
23  of the firm. So depending on what the product
24  was, whatever system that was used would be the --

TSG Reporting - Worldwide  (877) 702-9580

## Page 134

FELDER - HIGHLY CONFIDENTIAL

1 would be -- that is where they would put the
2 prices into.
3     Q.    When you talk about a system, a
4 computerized system?
5     A.    Computerized system.
6     Q.    So every day traders would be entering
7 marks for the securities that they were involved
8 in on some sort of computer system; is that
9 correct?
10     A.    To my knowledge, that -- a computer
11 system was used in the products I knew.
12     Q.    Did you ever personally access on a
13 computer system daily marks?
14     A.    In risk systems, you can see -- you
15 can see the marks of securities.
16     Q.    How do you see them?
17     A.    On the computer screen.
18     Q.    Did the computer screen -- is there a
19 database that you remember, a name of a database
20 where you personally could go and access daily
21 marks?
22     A.    In -- within credit, our main risk
23 system was called ICE, I-C-E. And that
24 consolidated the derivative systems and the cash

TSG Reporting - Worldwide  (877) 702-9580

## Page 135

FELDER - HIGHLY CONFIDENTIAL

1 systems.
2     Q.    Did marks ever change from the close
3 of the market on Friday to the opening of the
4 market on Mondays?
5     A.    From the close on a Friday to the open
6 on a Monday?
7     Q.    Yes.
8     A.    I don't think you could do -- I don't
9 think the system would let you -- you can get an
10 end-of-day mark, and then I don't think you could
11 go in and change -- as far as I know, you couldn't
12 go in and change a mark once it was committed for
13 that day until the mark for the next day.
14     Q.    In particular on the weekend of
15 September 19 -- from the close of the market on
16 September 19 to the opening of the market on
17 September 22, would there be any reason for any of
18 the marks from the credit business to change over
19 that weekend?
20     A.    Not that I would be aware of.
21     Q.    OK, that is all.
22     ____

TSG Reporting - Worldwide  (877) 702-9580

## Page 136

FELDER - HIGHLY CONFIDENTIAL

1 EXAMINATION BY
2 MR. BYMAN:
3     Q.    I apologize. Every time somebody asks
4 a question, somebody else thinks of another
5 question.
6        When the traders do their marks, and I
7 understand, I think, that process, is there any
8 other group such as the product control group that
9 does an independent analysis of where they think
10 certain assets should be valued?
11     A.    That would be done monthly, and there
12 would be variance reports. I only know this
13 specifically within credit because I hadn't gone
14 through that process in the other asset classes.
15 So within credit, we had a monthly variance
16 meeting with product control to go through any
17 positions that they felt -- they got external data
18 from third parties and they compared the marks to
19 that external data, and then the desk heads would
20 sit down with product control, and then ultimately
21 I would sit down to make sure that the business
22 was properly marked from the product control --
23 from a -- essentially a third party's perspective.
24     Q.    So I want to make sure that I

TSG Reporting - Worldwide  (877) 702-9580

## Page 137

FELDER - HIGHLY CONFIDENTIAL

1 understand the process then. So on a daily basis,
2 the traders would mark the assets that they were
3 responsible for. On a monthly basis, product
4 control would do its own evaluation. To the
5 extent there was a variance, it would escalate to
6 you, and you would decide who was right or whether
7 it was someplace in the middle?
8     A.    No. The product controllers
9 ultimately had the -- you couldn't overrule a
10 product controller because they had the
11 third-party data. So if they said this, this is
12 off, then the book just got marked down by where
13 it was.
14        If there was a situation where -- if
15 there was a situation where there was other data
16 in the market that the product controllers didn't
17 have, for example, then --
18     Q.    You would reason with them, but you
19 couldn't overrule them?
20     A.    Right. That was my experience within
21 credit.
22     Q.    And so far as you know, is that the
23 same system that other businesses use within
24 Lehman?

TSG Reporting - Worldwide  (877) 702-9580

## Page 138

1      **FELDER - HIGHLY CONFIDENTIAL**

2      A.  I don't know.

3      Q.  How close to this monthly review by

4  the product controllers would you do your sit down

5  to look at the variance reports?  Would that be

6  done within a day or two?

7      A.  It would usually take them a week or

8  two to put it all together.

9      MR. BYMAN:  OK, thanks.

10     MS. TAGGART:  I do have another.

11 EXAMINATION BY

12 MS. TAGGART:

13     Q.  Just who are the product controllers

14 that were at Lehman doing this process, the

15 monthly evaluation, prior to the sale?  That you

16 know of.

17     A.  I just know Gilles within credit.

18 There is a whole product control function, and

19 they were set up by asset class, so I would assume

20 that there are product controllers for each asset

21 class.

22     Q.  OK.

23     MR. CARDEN:  We have given you the

24 gift of time, Mr. Felder.

25     THE WITNESS:  I sincerely appreciate

## Page 139

1      FELDER - HIGHLY CONFIDENTIAL

2  it.

3      (Time Noted: 1:05 p.m.)

4

5

    _____

    ERIC JONATHAN FELDER

6

7  Subscribed and sworn to

8  before me this     day

9  of July, 2009.

10

11     _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 140

1  FELDER - HIGHLY CONFIDENTIAL

2  INDEX:

3  WITNESS     EXAM BY:     PAGE:

4  E. Felder     Mr. Carden     10, 123

5      Ms. Taggart   104, 133, 138

6      Mr. Byman     118, 136

7      EXHIBITS

8  Exhibit No.     Marked

9  Exhibit 1  asset purchase agreement dated     47
       September 16, 2008

10 Exhibit 2  e-mail with attachment dated     53
       September 18, 2008

11 Exhibit 3  document Bates stamped 1029780     57
   Exhibit 4  e-mail dated September 19,     75

12     2008 at 1:30 p.m.
   Exhibit 5  e-mail dated September 19,     75

13     2008 at 10:34 a.m.
   Exhibit 6  document Bates stamped     76

14     10242982
   Exhibit 7  document Bates stamped     81

15     BCI-EX70957
   Exhibit 8  e-mail September 19, 2008 at     82

16     10:51 a.m. with attachment
   Exhibit 9  e-mail dated September 19,     83

17     2008 at 2:06 p.m. with
       attachment

18 Exhibit 10  e-mail dated September 17,     91
       2008 at 12:34 p.m.

19 Exhibit 11  document Bates stamped     97
       10284073

20 Exhibit 12  three-page letter dated     98
       September 18, 2008

21 Exhibit 13  Letter dated September 21,     99
       2008

22 Exhibit 14  document Bates stamped     101
       10292661

23 Exhibit 15  document Bates stamped     109
       BCI-EX30865 with attachment

24 Exhibit 16  e-mail dated September 18,     111
       2008 at 12:23 p.m.

25

## Page 141

1      FELDER - HIGHLY CONFIDENTIAL

2

3      CERTIFICATE

4  STATE OF NEW YORK )

5      )ss:

6  COUNTY OF NEW YORK )

7      I, MARY F. BOWMAN, a Registered

8  Professional Reporter, Certified Realtime

9  Reporter, and Notary Public within and for

10 the State of New York, do hereby certify:

11     That ERIC JONATHAN FELDER, the witness

12 whose deposition is hereinbefore set forth,

13 was duly sworn by me and that such

14 deposition is a true record of the testimony

15 given by such witness.

16     I further certify that I am not

17 related to any of the parties to this action

18 by blood or marriage and that I am in no way

19 interested in the outcome of this matter.

20     In witness whereof, I have hereunto

21 set my hand this 31st day of July, 2009.

22

23     _____

24     MARY F. BOWMAN, RPR, CRR

25

Page 142

```
 1          FELDER - HIGHLY CONFIDENTIAL
 2          * * *ERRATA SHEET* * *
 3   NAME OF CASE:  In Re:  Lehman Brothers
 4   DATE OF DEPOSITION: 7/31/09
 5   NAME OF WITNESS:  ERIC JONATHAN FELDER
 6   Reason codes:
 7      1. To clarify the record.
        2. To conform to the facts.
 8      3. To correct transcription errors.
 9
10   Page ____ Line ____ Reason____
     From _____ to _____
11
12   Page ____ Line ____ Reason____
     From _____ to _____
13
14   Page ____ Line ____ Reason____
     From _____ to _____
15
16   Page ____ Line ____ Reason____
     From _____ to _____
17
18   Page ____ Line ____ Reason____
     From _____ to _____
19
20   Page ____ Line ____ Reason____
     From _____ to _____
21
22   Page ____ Line ____ Reason____
     From _____ to _____
23
24
              ERIC JONATHAN FELDER
25
```

TSG Reporting - Worldwide  (877) 702-9580

# BCI EXHIBIT

# 66

Confidential

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4

5    In re:                    )
                               ) Chapter 11
6    LEHMAN BROTHERS           ) Case No. 08-13555(JMP)
                               )
7    HOLDINGS, INC., et al.,   )
                               )
8             Debtors.         )
     --------------------------)

9

10

11

12

13

14

15        HIGHLY CONFIDENTIAL DEPOSITION OF

16           DANIEL JOSEPH FLEMING

17            New York, New York

18          Friday, August 28, 2009

19

20

21

22

23   Reported by:

24   KRISTIN KOCH, RPR, RMR, CRR, CLR

25   JOB NO. 24123

Confidential

|  | Page 2 |
|---|---|
| 1 |  |
| 2 |  |
| 3 |  |
| 4 | August 28, 2009 |
| 5 | 9:28 a.m. |
| 6 |  |
| 7 |  |
| 8 | Highly Confidential Deposition of |
| 9 | DANIEL JOSEPH FLEMING, held at the offices |
| 10 | of JONES DAY, LLP, 222 East 41st Street, |
| 11 | New York, New York, before Kristin Koch, a |
| 12 | Registered Professional Reporter, |
| 13 | Registered Merit Reporter, Certified |
| 14 | Realtime Reporter, Certified Livenote |
| 15 | Reporter and Notary Public of the State of |
| 16 | New York. |

**Page 3**

1
2 APPEARANCES:
3
4
5 JONES DAY, LLP
6 Attorneys for Lehman Brothers, Inc.
7   222 East 41st Street
8   New York, New York 10017-6702
9 BY: BART GREEN, ESQ.
10   KELLY A. CARRERO, ESQ.
11
12
13 BOIES, SCHILLER & FLEXNER, LLP
14 Attorneys for Barclays and Daniel Joseph
15 Fleming
16   333 Main Street
17   Armonk, New York 10504
18 BY: CHRISTOPHER M. GREEN, ESQ.
19
20
21 QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
22 Attorneys for Creditors Committee
23   865 South Figueroa Street - 10th floor
24   Los Angeles, California 90017
25 BY: TYLER WHITMER, ESQ. (Via telephone)

**Page 4**

1
2 A P P E A R A N C E S: (Continued)
3
4
5 JENNER & BLOCK LLP
6 Attorneys for Examiner
7   330 North Wabash Avenue
8   Chicago, Illinois 60611-7603
9 BY: VINCENT LAZAR, ESQ.
10
11
12 HUGHES HUBBARD & REED LLP
13 Attorneys for SIPA Trustee
14   One Battery Park Plaza
15   New York, New York 10004-1482
16 BY: SETH D. ROTHMAN, ESQ.
17   AMINA HASSAN, ESQ.
18
19
20 ALSO PRESENT:
21
22   PHIL KRUSE, Alvarez & Marsal
23
24
25

**Page 5**

1
2   IT IS HEREBY STIPULATED AND AGREED
3 by and between the attorneys for the
4 respective parties herein, that filing and
5 sealing be and the same are hereby waived.
6   IT IS FURTHER STIPULATED AND AGREED
7 that all objections, except as to the form
8 of the question, shall be reserved to the
9 time of the trial.
10   IT IS FURTHER STIPULATED AND AGREED
11 that the within deposition may be sworn to
12 and signed before any officer authorized
13 to administer an oath, with the same
14 force and effect as if signed and sworn
15 to before the Court.
16
17
18
19
20   - oOo -
21
22
23
24
25

Confidential

Page 6

1
2    D A N I E L   J O S E P H   F L E M I N G,
3    called as a witness, having been duly sworn
4    by a Notary Public, was examined and
5    testified as follows:
6    EXAMINATION BY
7    MS. CARRERO:
8        Q.    Good morning, Mr. Fleming. My name
9    is Kelly Carrero. I am with Jones Day. We are
10   special counsel to the estate of Lehman
11   Brothers Holding, Inc. With me is my
12   colleague, Bart Green, and I will have everyone
13   else in the room introduce themselves on the
14   record.
15       MR. ROTHMAN: Seth Rothman, Hughes
16   Hubbard & Reed. We represent the SIPA
17   trustee.
18       MS. HASSAN: Amina Hassan, Hughes,
19   Hubbard & Reed.
20       MR. LAZAR: Vince Lazar from
21   Jenner & Block. We represent the Examiner
22   appointed in the Lehman Brothers case.
23       MR. KRUSE: Phil Kruse with
24   Alvarez & Marsal on behalf of LBHI.
25       MR. C. GREEN: Christopher Green

Page 7

1        Fleming - Highly Confidential
2    with Boies, Schiller & Flexner on behalf of
3    Barclays Capital and the witness.
4    BY MS. CARRERO:
5        Q.    Mr. Fleming, have you been deposed
6    before?
7        A.    No.
8        Q.    Then I will go over some background
9    rules, housekeeping. It will go easier and
10   smoother if when I ask a question you let me
11   finish the question before you start your
12   response and if you will give verbal answers
13   rather than any nods of the head so that the
14   court reporter can take down every word that
15   you say.
16       If you need to take a break, if you
17   can wait until we find a reasonable place to
18   stop, just let me know, let your counsel know
19   and we will work with each other.
20       A.    Okay.
21       Q.    So if we could start with some
22   background information in terms of education,
23   work experience. Let's start with your
24   educational experience.
25       A.    Education, I attended the University

Page 8

1        Fleming - Highly Confidential
2    of Hartford and St. John's University for
3    approximately two and a half years. Did not
4    graduate. In terms of work experience, would
5    you like me to start backwards?
6        Q.    Start with your earliest work
7    experience after you finished at University of
8    Hartford and St. John's.
9        A.    First employment was with EF Hutton
10   working in the mortgage-backed security
11   accounting group.
12       I subsequently was hired by Shearson
13   Lehman Hutton, moved into their regulatory
14   group for a short period.
15       I subsequently left and joined, I
16   believe, what was Chemical Bank, again, working
17   in mortgage-backed security accounting.
18       Subsequent to that I left the
19   industry and worked out of industry as a
20   controller for a wholesale distributor out on
21   Long Island.
22       Then I came back into the industry.
23   I worked for a firm named East Bridge Capital
24   and East Bridge Asset Management, which was --
25   East Bridge Capital was a primary dealer owned

Page 9

1        Fleming - Highly Confidential
2    by Nippon Credit Bank. In that space I worked
3    in accounting for both the broker/dealer and
4    for the asset management business.
5        Subsequent to that I worked at DE
6    Shaw for a short while in their operations
7    accounting group.
8        And then I moved over to Lehman
9    Brothers in and around 1998 where I joined the
10   cash and collateral management team in New York
11   reporting in to at the time the U.S. head of
12   cash and collateral management.
13       I subsequently took over the role of
14   U.S. head of cash and collateral management.
15       Subsequent to that I was --
16       Q.    I'm sorry, if I could stop you
17   there. What year are we talking that you
18   became U.S. head of cash and collateral
19   management?
20       A.    2001, 2002, thereabouts.
21       Q.    And when you began at Lehman in 1998
22   in the cash and collateral group, was that part
23   of the treasury group?
24       A.    Yes.
25       Q.    And who did you report to starting

Confidential

Page 10

1      Fleming - Highly Confidential
2  in 1998?
3      A.   I reported in to an individual by
4  the name of Robert Murack.
5      Q.   And was there a time when that
6  changed and you started to report to someone
7  else or did you report --
8      A.   Yes.  Robert left the organization.
9  I was then reporting in to an individual by the
10 name of Kathy Bopp Flynn, who was in charge of
11 cash and collateral management, as well as
12 network management and possibly some other
13 functions.  I don't recall.  She was a direct
14 report to the treasurer at the time who was
15 Daniel Minerva.  Kathy Bopp Flynn moved into a
16 new role at some point after I was reporting in
17 to her.  A new individual by the name of Robert
18 van Zwieten was hired.  Robert was responsible
19 for global cash management as well as some
20 other functions.  Upon Robert --.
21     Q.   Go ahead.  Finish.
22     A.   Upon Robert's departure -- I don't
23 recall exactly when that was, it was probably
24 2005, 2006.  2006.  At that time I was named
25 the global head of cash and collateral

Page 11

1      Fleming - Highly Confidential
2  management reporting in to Ian Lowitt, who at
3  the time was the treasurer.
4      Q.   So if I can just step back to
5  clarify, in 2001, 2002 you became the U.S. head
6  of cash and collateral management and then in
7  2006 you became the global head of cash and
8  collateral management; is that correct?
9      A.   That sounds approximately correct,
10 yes.
11     Q.   And at the time that you were the
12 U.S. head of cash and collateral management,
13 were you reporting to the then global head of
14 cash and collateral management or directly to
15 the treasurer?
16     MR. C. GREEN:  Object to form.
17     You can answer.  Go right ahead.
18     A.   There was a change in organizational
19 structure during my time at Lehman Brothers.
20 When I first joined, there was no global head.
21 Each region ran their own treasury group.  At
22 some point, I don't exactly remember when that
23 was, they created global heads for each
24 function within treasury.
25     Q.   So to clarify, when you were going

Page 12

1      Fleming - Highly Confidential
2  through the people you reported to prior to
3  becoming global head, Kathy Bopp Flynn, at the
4  time that you reported to her, what was her
5  title?
6      A.   She was senior vice president.  That
7  was her official title.
8      Q.   Let's move on.  Let's go back to you
9  became global head of cash and collateral
10 management in 2006.  What were your duties as
11 global head?
12     A.   Most of my time was spent focusing
13 on the U.S. operations of Lehman Brothers.  I
14 did have global responsibility.  In that
15 capacity I was responsible for overseeing
16 strategic direction and objectives of the team,
17 but each of my directs -- I had a direct in
18 Europe and a direct in Asia -- reported in to
19 the treasurer of those respective regions and
20 the day-to-day operations were managed within
21 the region.
22     Q.   And did you have direct reports in
23 the U.S.?
24     A.   Yes, I did.
25     Q.   Could you name those individuals?

Page 13

1      Fleming - Highly Confidential
2      MR. C. GREEN:  I'm sorry, at the
3  time he became global head or throughout
4  the period of time that he was global head?
5      Q.   Why don't we say at the time you
6  became global head, how many direct reports did
7  you have?
8      A.   I don't really recall.  It could
9  have been three.  I don't remember exactly what
10 it was.
11     Q.   Did it change substantially over
12 time?
13     A.   I think towards the end there were
14 two direct reports in the U.S.
15     Q.   And at the end who were those two
16 direct reports?
17     A.   Craig Jones and Mandeep Seekond.
18     Q.   Could you spell the last name?
19     A.   S-E-E-K-O-N-D.
20     Q.   Were you and your two direct
21 reports, Craig Jones and Mandeep Seekond, the
22 only members of the U.S. cash and collateral
23 management team?
24     A.   No.
25     Q.   Who else would have comprised

Confidential

**Page 14**

1      Fleming - Highly Confidential
2  membership in that team in the end, around
3  September 2008?
4      A.   There were approximately thirty
5  people in the U.S.
6      Q.   Could you break down those thirty
7  people in terms of function or sub-groups?
8      A.   Yes. There was one group of
9  individuals that we described their function as
10  cash control.
11      Q.   Could you explain what cash control
12  means?
13      A.   These individuals were responsible
14  for managing what we call the queues, the
15  payment queues, which is the release of payment
16  messages out to banks at certain times during
17  the day. They were responsible for the
18  investigation if there was any delay in the
19  transfer of those messages. They were
20  responsible for viewing and applying incoming
21  money that were received into our bank
22  accounts, and they were responsible for
23  investigations as it relates to payments made
24  in error, funds received in error, those types
25  of things. That's generally what they were

**Page 15**

1      Fleming - Highly Confidential
2  responsible for.
3      Q.   And what would be the next sub-group
4  within the cash and collateral management
5  group?
6      A.   The funding team.
7      Q.   And what did the funding team do?
8      A.   The funding team was responsible for
9  projecting cash and collateral availability at
10  the beginning of the day, providing front
11  office traders with some indication of assets
12  available to be financed, monitoring settlement
13  activity throughout the course of the day, both
14  cash settlements and security settlements,
15  liaising with the trading desk to advise them
16  of events that would occur throughout the
17  course of the day that they may not have
18  complete transparency into. Cash
19  concentration, consolidating cash amongst a
20  wide network of bank accounts for purposes of
21  investment. We did not execute any
22  investments. That was a front office function.
23  You know, and balancing our fund position on a
24  daily basis.
25      Q.   Are there any other sub-groups

**Page 16**

1      Fleming - Highly Confidential
2  within the cash and collateral management
3  group?
4      A.   There was another team that we
5  defined as the MIS and analytics team,
6  production of MIS information related to bank
7  balances, funding activity, collateral
8  position, residual collateral positions at the
9  end of the day.
10      Q.   Could you explain to me what MIS
11  stands for?
12      A.   MIS is an acronym that's widely used
13  in our industry for management information
14  systems is what the acronym stands for, which
15  is reporting basic information.
16      Q.   Is there anything else that the MIS
17  and analytics team did?
18      A.   Post-settlement reconciliation,
19  trying to understand, you know, why certain
20  things happened throughout the course of the
21  day, why we ended up at the end of the day
22  where we did. They would work on special
23  projects, you know, and ad-hoc analysis as
24  required.
25      Q.   Are there any other groups within

**Page 17**

1      Fleming - Highly Confidential
2  the cash and collateral management group?
3      A.   Yes. That was all -- what I
4  described there was Craig Jones'
5  responsibility.
6      Q.   And did you also have responsibility
7  for this group as global head?
8      A.   I don't understand the question.
9      Q.   Did you also have responsibility for
10  the MIS and analytics team as global head or
11  did Craig Jones alone?
12          MR. C. GREEN:  Object to form.
13          MS. CARRERO:  You can answer.
14      A.   It ultimately rolled up to me.
15      Q.   Are there any other sub-groups
16  within the cash and collateral management
17  group?
18      A.   There is the role that Mandeep
19  Seekond performed.
20      Q.   And what was that role?
21      A.   That was -- there were two roles.
22  One was he was responsible for the build and
23  deployment of a global cash management and
24  funding application. Second is he was
25  responsible for the treasury technology budget

Confidential

Page 18

1      Fleming - Highly Confidential
2    and enhancement process.
3      Q.    Is that it?
4      A.    Uh-huh.
5      Q.    Are there any other sub-groups
6    within the cash and collateral management
7    group?
8      A.    No.
9      Q.    And you had ultimate responsibility
10   for all four teams within the cash and
11   collateral management group?
12       MR. C. GREEN:  Object to form.  I'm
13     not sure he has testified they were four
14     teams.
15       MS. CARRERO:  You could answer, but
16     just for the record, I just want to --
17     withdrawn.
18     Q.    Are the four sub-groups or teams
19   within the cash and collateral management group
20   cash control funding team, MIS and analytics
21   team, and Mandeep's two roles, would that
22   accurately sum up the functions of the cash and
23   collateral management group?
24     A.    In the U.S., yes, that would
25   accurately describe the functions that were

Page 19

1      Fleming - Highly Confidential
2    performed.
3      Q.    And you had ultimate responsibility
4    for those functions?
5      A.    Yes.
6      Q.    Were any of the four functions or
7    teams your specialty or your personal
8    responsibility?
9        MR. C. GREEN:  Object to form.
10     A.    I'm not sure I fully understand what
11   you are trying to --
12     Q.    Sure.  Let me rephrase.
13       On a day-to-day basis were any of
14   these four functions or teams where you spent
15   the majority of your time?
16     A.    It would depend on the time or the
17   situation at hand.  There were certainly
18   periods of time where I spent, you know,
19   focused more attention, spent more time with
20   different groups.  So if it was -- if we were,
21   you know, rolling out a technology solution,
22   you know, and there was a cut-over on the
23   weekend that week, you know, I was probably
24   spending more time with Mandeep and his group.
25   If there was some issue, you know, with funding

Page 20

1      Fleming - Highly Confidential
2    that caused, you know, a funding problem, some
3    amount of inefficiency or something, I may be
4    spending more time with the funding team.  If
5    audit is in and they are focusing on, you know,
6    SOX reviews for payment, you know, release, I
7    might be spending more time.  So it really
8    depended on the situation.
9      Q.    Historically or -- scratch that.
10       Prior to becoming global head, was
11   your experience with one of these teams greater
12   than with others or did you have experience
13   with all of them?
14       MR. C. GREEN:  Object to form.
15       MS. CARRERO:  You can answer.
16       MR. C. GREEN:  You can go ahead and
17     answer, if you understand the question.
18     A.    I don't think I had more experience
19   with one over the other.
20     Q.    You had worked at one point or
21   another in all four functions or with all four
22   teams?
23       MR. C. GREEN:  Object to form.
24     A.    If you look at my prior experience,
25   it does -- it is not what I was doing at Lehman

Page 21

1      Fleming - Highly Confidential
2    Brothers.  It was a different type of function.
3    However, I had experience working on
4    technology.  I had experience working with
5    financing traders.  You know, so some of the
6    experience I had was applicable to the role at
7    Lehman, but I did not have extensive and
8    prolonged experience in the field of treasury
9    operations prior to joining Lehman Brothers.
10     Q.    And could you explain to me how the
11   cash and collateral management group fits
12   within the larger treasury group?
13     A.    At what point?
14     Q.    Let's say September of 2008.
15     A.    The global head of cash and
16   collateral management reported in to the global
17   treasurer.
18     Q.    The global treasurer at the time was
19   Paolo Tonucci; is that correct?
20     A.    2008, yes.
21     Q.    In terms of other groups within
22   treasury, what was cash and collateral
23   management's function versus other groups
24   within the treasury department?
25       MR. C. GREEN:  Object to form.

Confidential

| Page 22 | Page 23 |
|---|---|

**Page 22**

1  Fleming - Highly Confidential
2     Do you understand the question?
3     A.   I'm not sure I completely
4  understand.
5     Q.   How many other groups are there
6  within the treasury group?
7        MR. C. GREEN:  This is as of
8  September 2008?
9        MS. CARRERO:  As of September 2008.
10    A.   I will list them for you.  There was
11 the network management team.  There was the
12 asset and liability management team.  There was
13 the interest control team.  There was the FP&A,
14 financial planning and analysis team, and there
15 was, I believe, the treasury funding team, I
16 believe, was a direct report into Paolo as
17 well.
18    Q.   And did the cash and collateral
19 group work with all other groups within
20 treasury?
21       MR. C. GREEN:  Object to form.
22    A.   There was interaction with, you
23 know, each one of those teams at certain
24 points.  Some groups more than others.
25    Q.   For instance, what sort of

**Page 23**

1  Fleming - Highly Confidential
2  interaction would there have been between the
3  cash and collateral group and the treasury
4  funding group within treasury?
5        MR. C. GREEN:  As of September 2008?
6        MS. CARRERO:  Yes, as of September
7  2008.
8     A.   There was a close working
9  relationship on a day-to-day basis between the
10 cash and collateral management group, which
11 is -- let's define it as a back office
12 function, and the treasury funding desk, which
13 was a front office function, both of which were
14 dealing with similar, if not the same,
15 information.
16    Q.   When you say they are dealing with
17 the same information, could you expand upon
18 that?
19    A.   The cash and collateral management
20 funding team supported the treasury funding
21 desk in terms of providing traders with
22 information to allow them to perform their
23 functions.
24    Q.   What sort of information would they
25 provide?

| Page 24 | Page 25 |
|---|---|

**Page 24**

1  Fleming - Highly Confidential
2        MR. C. GREEN:  Object to form.  You
3  mean the cash and collateral team would
4  provide?
5        MS. CARRERO:  Yes.
6     Q.   What information would the cash and
7  collateral group supply to the treasury and
8  funding group?
9     A.   Cash positions, real-time balances
10 and other settlement activity that could
11 ultimately affect the cash position for the
12 treasury funding desk.
13    Q.   Going back to the functions of the
14 cash and collateral group, would that fall
15 within the funding team?
16       MR. C. GREEN:  Object to form.
17    Q.   Would the funding team within the
18 cash and collateral group be the team to supply
19 the treasury funding desk with the information
20 that you listed?
21    A.   Yes.
22    Q.   Would the cash and collateral team
23 also supply similar information to other
24 trading desks within Lehman?
25       MR. C. GREEN:  Object to form.

**Page 25**

1  Fleming - Highly Confidential
2     You can answer, if you understand
3  the question.  If you don't, you should ask
4  her to clarify the question.  I am just
5  objecting for the record.
6     A.   Can you restate, say it again,
7  repeat it.
8     Q.   Let me rephrase that for you.
9     The sort of information that the
10 cash and collateral group is supplying to the
11 treasury funding team, would they supply
12 similar information to any other desks within
13 Lehman?
14    A.   They would provide information to
15 what's described as or labeled as the repo desk
16 which resided in the fixed income business
17 front office at Lehman.  It was not the same
18 information.  It differed than the information
19 provided to the treasury desk.  One could
20 describe it as similar type of information, but
21 it was not the same.
22    Q.   Let's start with how the information
23 differs between the treasury funding desk and
24 the repo desk.
25       MR. C. GREEN:  Is there a question?

Confidential

Page 26

1    Fleming - Highly Confidential
2    Q.   How does the information differ
3    between what's supplied to the treasury funding
4    desk and the repo desk?
5    A.   First, we could start by the legal
6    entity dynamics. The treasury funding desk was
7    managing the cash of the holding company, LBHI,
8    so the information that was communicated to the
9    treasury funding desk was -- had more to do
10   with cash and intercompany activity and, you
11   know, deposits, commercial paper issuance,
12   things of that nature. The information
13   provided to the repo desk was largely related
14   to repo transactions and the underlying assets
15   supporting those repo transactions, which
16   primarily would consist of fixed income assets.
17   Q.   Would the treasury funding desk also
18   transact repos of some sort similar to how the
19   repo desk would?
20       MR. C. GREEN:  Object to form.
21   Q.   Let me state it simpler.  Do both
22   desks, both the treasury funding desk and the
23   repo desk, both perform repos?
24       MR. C. GREEN:  Object to form.
25   A.   I think there is a lot of detail

Page 27

1    Fleming - Highly Confidential
2    behind that question, so I don't think I can
3    give you an answer to that. My understanding
4    is that the repo desk was responsible for
5    trading, repo trading, and that the treasury
6    funding desk was not. Now, there were,
7    however, what I believe was repo transactions
8    between the treasury funding desk and the repo
9    desk as a form or a means of investing holding
10   company cash. Let me clarify that that was an
11   internal transaction and I do not know whether
12   that was legally a repo under, you know, repo
13   guidelines and legal documentation. I know
14   that it was executed as a repo, but I cannot
15   tell you whether it was truly, in fact, a repo
16   transaction.
17   Q.   And in that situation, would that be
18   what's known as a reversed repo where the
19   treasury funding desk would give cash to the
20   repo desk and the repo desk would give
21   securities, pledge securities to the treasury
22   funding desk?
23       MR. C. GREEN:  Object to form.
24   Assumes facts not in evidence.
25   I am just stating an objection for

Page 28

1    Fleming - Highly Confidential
2    the record. You can go ahead and answer
3    the question, if you understand the
4    question. If you don't, you should ask her
5    to rephrase the question.
6    A.   So someone has described to you a
7    transaction between the repo desk and the
8    treasury funding desk. Any repo transaction
9    has both the lender and the borrower. The
10   lender of cash is executing a reverse repo and
11   the borrower of cash is executing a repo
12   transaction. It's the same transaction. It's
13   just two sides of the same transaction. So in
14   the case where LBHI was investing its cash in
15   fixed income assets, it would be doing so in
16   the form of a reverse repo.
17   Q.   And when the securities under that
18   scenario were pledged to the treasury funding
19   desk, what would the treasury funding desk do
20   with them?
21   A.   It is my understanding that the
22   treasury desk was investing their cash and that
23   they were not re-hypothecating or lending those
24   securities back out, that they basically would
25   just hold on to them.

Page 29

1    Fleming - Highly Confidential
2    Q.   Does the treasury group or the
3    treasury funding desk in general only hold cash
4    or does it have an inventory of securities as
5    well?
6        MR. C. GREEN:  Object to form.
7    A.   I don't know the composition of the
8    holding company balance sheet. I can't say.
9    Q.   My question is really, I think, a
10   little simpler than that. I am trying to
11   understand the different sorts of information
12   that are being supplied to the treasury funding
13   desk versus what's being supplied to the repo
14   desk. I believe you had suggested the repo
15   desk information is different because your
16   group is supplying information about the
17   underlying assets of the group.
18       MR. C. GREEN:  Object to form.
19   Q.   Is that correct?
20   A.   The information provided to the
21   treasury funding desk was information on cash,
22   as previously stated. Cash balances, projected
23   cash balances, settlement activity, things of
24   that nature. The information provided to the
25   repo desk, there was an element of cash,

Confidential

Page 30

1    Fleming - Highly Confidential
2    information that was provided, but there was
3    also an emphasis on collateral, what type of
4    collateral, how much collateral and the value
5    of that collateral. The information provided
6    to the repo desk was specific to Lehman
7    Brothers, Inc., the broker/dealer, and the
8    information provided to the treasury funding
9    desk was largely associated with LBHI. I am
10   not saying in totality, but that was the core
11   focus.
12       Q.    What system was used to generate the
13   reports or information provided to the treasury
14   funding and repo desks?
15       A.    There were numerous systems in place
16   that provided different pieces of information.
17   I don't know exactly what, you know, all of
18   those systems are by name.
19       Q.    For example, you mentioned reports
20   dealing with types of collateral and the value
21   of that collateral. What system would generate
22   such a report?
23       A.    There was a -- I'm not sure -- I
24   don't want -- the definition of "system," I am
25   not a hundred percent sure what that is, but

Page 31

1    Fleming - Highly Confidential
2    there was what we described as an application
3    called RTA, which stood for real-time
4    availability, which was the system that the
5    cash and collateral management team used to
6    derive projected cash and collateral positions
7    at the start of day.
8        Q.    And how was the RTA application
9    populated with information?
10       A.    That's a very technical question and
11   I can't answer that question. Now we are
12   talking code and logic, business logic, things
13   of that nature.
14       Q.    More simply stated, how would the
15   values for any piece of collateral within that
16   system come to be?
17           MR. C. GREEN:  Object to form. How
18   would the values come to be?
19       Q.    Do you need me to clarify?
20       A.    Yes, please.
21       Q.    Was there someone who entered values
22   for each piece of collateral into the RTA
23   application?
24       A.    It is my understanding that the
25   positions were marked, meaning there was a

Page 32

1    Fleming - Highly Confidential
2    market, a current market value applied. Where
3    that information was sourced from, I cannot
4    answer that question.
5        Q.    Would it be sourced from different
6    people depending on the type of collateral?
7            MR. C. GREEN:  Object to form. He
8    said he doesn't know the source.
9        A.    I cannot tell you where that
10   information -- where the pricing information
11   was sourced from. What I can tell you is that
12   I am aware that the firm received pricing feeds
13   from vendors. I am also aware that in the
14   normal course traders mark their positions, but
15   I cannot tell you whether it was a vendor price
16   or a trader price that populated this
17   information.
18       Q.    And how does the RTA application
19   differ from the GFS system?
20           MR. C. GREEN:  Object to form.
21       A.    The GFS application -- it's my
22   understanding that the GFS application had many
23   purposes, most of which I am not familiar with,
24   but have a general understanding where it would
25   provide post-settlement information such as

Page 33

1    Fleming - Highly Confidential
2    residual collateral left in depos and I believe
3    there was cash capital information that was
4    provided by GFS.
5        Q.    Did you use the GFS system in the
6    cash and collateral management group?
7        A.    I believe that there was a small
8    piece of information that we extracted from
9    GFS, but it was -- in relation to all the data
10   that we had it was a very small piece.
11       Q.    Could you tell me the names of the
12   individuals on the treasury funding desk?
13           MR. C. GREEN:  In September 2008?
14           MS. CARRERO:  In September 2008.
15       A.    Steven Engel, David Forsyth, and I
16   believe Scott Alvey, although I can't say for
17   certain that he was part of that group at that
18   time.
19       Q.    And could you list for me the names
20   of the individuals on the repo desk?
21           MR. C. GREEN:  In September 2008?
22           MS. CARRERO:  In September 2008.
23       A.    The individual that we communicated
24   with most frequently was Larry Servidio and he
25   had someone who worked with him by the name of

Page 34

1       Fleming - Highly Confidential
2   Joseph Bellingeri. That does not constitute
3   the whole repo desk. There were many other
4   things that the repo desk was doing that we
5   were not liaising with them on, so those two
6   individuals were our primary contacts and those
7   two individuals were the ones that were
8   executing the bulk of Lehman Brothers, Inc.'s
9   secured financing.
10       Q.    And were Servidio and Bellingeri the
11  individuals to whom your group would send
12  reports?
13       MR. C. GREEN:  Object to form.
14       A.    The information that we provided, I
15  believe, went to a broader distribution than
16  just those two individuals.
17       Q.    If you could take me through
18  starting September 12th, 2008, the weekend
19  before Lehman Brothers Holdings, Inc. filed for
20  bankruptcy, what you were doing that weekend
21  before the filing.
22       MR. C. GREEN:  Object to form.
23       A.    The weekend prior to bankruptcy, the
24  holding company bankruptcy?
25       Q.    Yes.

Page 35

1       Fleming - Highly Confidential
2       MR. C. GREEN:  This would be the
3   weekend of the 13th and 14th?
4       MS. CARRERO:  Yes, September 13th
5   and 14th.
6       A.    I don't recall. I don't remember if
7   I was working or not working.
8       Q.    Do you have any recollection of
9   being involved in any sort of negotiations
10  either directly or indirectly for the sale of
11  any part of Lehman that weekend?
12       A.    No.
13       Q.    Were you ever involved in any
14  negotiations for the sale of any part of Lehman
15  or its assets?
16       A.    No.
17       Q.    Do you recall generally what you
18  were doing on September 15th, the date that
19  Lehman Brothers Holding had filed for
20  bankruptcy?
21       A.    That would be Monday?
22       Q.    That would be Monday, September
23  15th.
24       A.    I mean, generally speaking, we were
25  trying to figure out how we were going to

Page 36

1       Fleming - Highly Confidential
2   continue to run LBI.
3       Q.    And what decisions were made in
4   terms of how to continue running LBI?
5       MR. C. GREEN:  Object to form. What
6   decisions were made by him?
7       Q.    Do you have any recollection of what
8   decisions were made in terms of running LBI?
9       MR. C. GREEN:  By whom?
10       Q.    On the 15th what's your
11  recollection -- you had testified that on the
12  15th what was going on was conversations in
13  terms of how to run LBI. Could you expand upon
14  that, please.
15       MR. C. GREEN:  Object to form.
16       A.    Okay. So the thought that -- Lehman
17  Brothers was an integrated organization,
18  meaning that legal entities were not simply
19  stand-alone entities, that it was an integrated
20  organization. Systems were integrated,
21  processes were integrated. The notion that,
22  you know, the 15th of September that we can say
23  that, you know, the holding company is bankrupt
24  and the broker/dealer is not and people just go
25  about their day is just not a reality, so

Page 37

1       Fleming - Highly Confidential
2   trying to shut down the holding company and its
3   subsidiaries, which, quite frankly, at the time
4   there was ambiguity around which legal entities
5   were in bankruptcy and which ones were not, and
6   trying to run LBI required a tremendous amount
7   of coordination and effort between operations,
8   technology, finance, treasury, right, to
9   effectively shut down the pipes and plumbing as
10  we could for that portion of the business that
11  we believed was in bankruptcy while keeping
12  within that same grid the portion that we
13  thought was still a functioning entity open for
14  business and being able to satisfy the
15  obligations that came about on Monday morning.
16  We had issued checks. We had -- there were
17  debit cards clients were using. The banks are
18  coming to us Monday morning saying, you know,
19  how are you going to pay for this, how are you
20  going to do this, how are you going to do that.
21  So that was what I was spending the bulk of my
22  time on, in addition to fielding questions from
23  many, many different people internally and
24  externally as it related to our ability to
25  remit payment or fund for certain types of

Confidential

Page 38

1    Fleming - Highly Confidential
2    activities.
3    Q.    At any point on September 15th did
4    you become aware of negotiations for the sale
5    of certain LBI assets?
6    A.    I was not aware of any negotiations,
7    so the answer to that question is no.
8    Q.    Were you asked for any information
9    either directly or indirectly that you believe
10    was used in the negotiations for the sale?
11    MR. C. GREEN: Object to form.
12    A.    Again, I don't know anything about
13    the negotiations. I wasn't involved in
14    negotiations. I wasn't asked to participate in
15    negotiations. I wasn't asked to review any
16    information related to the negotiations or the
17    agreement, so I can't answer that question.
18    Q.    When did you first become aware of
19    either the negotiations or the sale, the actual
20    deal?
21    MR. C. GREEN: Object to form. And
22    which deal is it you are talking about?
23    MS. CARRERO: The deal between
24    Lehman and Barclays for the sale of certain
25    LBI assets.

Page 39

1    Fleming - Highly Confidential
2    A.    I don't recall exactly. I believe
3    it was, you know -- I came to realize that when
4    it was, you know, announced in the press.
5    Q.    Do you recall on Monday, September
6    15th, being involved with any financing being
7    derived from the Fed?
8    MR. C. GREEN: Object to form.
9    A.    I was located at 1301, I believe, on
10    that Monday and the days leading up to
11    bankruptcy. The rest of my team is located at
12    70 Hudson, so the day-to-day activities, you
13    know, the detailed activities in terms of what
14    financing trades were doing and the like, I was
15    not engaged in at that time, so I was not aware
16    of the Fed trades that were being put on.
17    Q.    Would your group generally be
18    involved in any financing transactions with the
19    Fed?
20    A.    My team would have -- would
21    understand, yes, what trades were being put on
22    with the Fed.
23    Q.    In what capacity would they know
24    what trades were put on?
25    MR. C. GREEN: Object to form.

Page 40

1    Fleming - Highly Confidential
2    Do you understand the question?
3    A.    I will just describe --
4    MR. C. GREEN: All right.
5    A.    The team was responsible for
6    tracking the funding position of the
7    broker/dealer, which includes all of the
8    activity, secured financing activity, and cash
9    flow, so as a matter of course they would know
10    all of the tri-party repo trades that were
11    booked to settle, and it is my understanding
12    that the Fed trades were facilitated through
13    the tri-party repo system.
14    Q.    And do you know if it would have
15    been the treasury funding desk or the repo desk
16    that would have entered into funding
17    transactions with the Fed?
18    MR. C. GREEN: Object to form.
19    A.    I would not know in that specific
20    instance who executed those transactions.
21    (Exhibit 294B, e-mail dated
22    September 15, 2008, Bates stamped 10302690,
23    and Chase Tri-Party Haircut Summary, Bates
24    stamped 10308382, marked for
25    identification.)

Page 41

1    Fleming - Highly Confidential
2    Q.    Mr. Fleming, you have before you
3    what's been marked as Exhibit 294B, if you
4    could take a moment and look it over.
5    MR. C. GREEN: Not to interrupt, but
6    may I ask you, A, where these documents
7    came from, and B, if you believe the
8    attachment or the second page was actually
9    the attachment to the first page when it
10    was transmitted as an e-mail? Because the
11    Bates numbers or identification numbers are
12    unfamiliar to me and not sequential.
13    MS. CARRERO: The documents come
14    from Lehman's system and the system -- the
15    vendor system links the documents, so we do
16    know them to be an e-mail and its
17    attachment and different document numbers
18    are assigned to each.
19    MR. C. GREEN: Okay. So you are
20    representing that this second page was the
21    attachment to the e-mail that is on the
22    first page?
23    MS. CARRERO: Yes, I am.
24    Q.    Mr. Fleming, have you had an
25    opportunity to review the document?

11

Confidential

---

Page 42

1        Fleming - Highly Confidential
2        A.    Yes.
3        Q.    Do you recall receiving this
4    document?
5        A.    I don't specifically recall
6    receiving this, no.
7        Q.    Does it surprise you that you would
8    have received a document like this on the 15th?
9        MR. C. GREEN:  Object to form.
10       A.    When you say "surprise," what do you
11   mean by that?
12       Q.    Do you generally receive documents
13   with haircut amounts?
14       MR. C. GREEN:  Object to form.
15       A.    This document doesn't look familiar
16   to me, so this certainly would not be something
17   that I had received on a frequent basis.
18       Q.    My question, more generally, is
19   whether your group would receive the haircut
20   amounts on any funding transactions.
21       A.    No, I would say generally not.
22       Q.    Is the haircut amount on a security
23   collateralizing a repo generally within the
24   system -- scratch that.
25       Are haircut amounts listed on the

---

Page 43

1        Fleming - Highly Confidential
2    reports that you generate for the treasury
3    funding desk or the repo desk?
4        MR. C. GREEN:  Object to form.
5        Do you have the question in mind?
6        THE WITNESS:  I'm just thinking.
7        A.    I believe there was some form of
8    haircut information that was produced within my
9    team to help us understand why our cash
10   position would change day over day.
11       Q.    And when you say your cash position
12   would change day over day, is that because the
13   higher the haircut, the more expensive any
14   transaction becomes?
15       MR. C. GREEN:  Object to form.
16       Assumes facts not in evidence.
17       Q.    Let me phrase it differently.
18       Could you explain to me why you
19   would care about the haircuts?
20       A.    The higher the haircut, the less
21   cash that you will generate from that asset.
22       Q.    And your group would monitor the
23   amount of cash that could be generated from any
24   asset?
25       MR. C. GREEN:  Object to form.

---

Page 44

1        Fleming - Highly Confidential
2        A.    Our team was interested in
3    understanding all of the dynamics that affected
4    our cash positions, haircuts being one.
5        Q.    Could that be one reason why you
6    received the PDCF haircuts on September 15th?
7        MR. C. GREEN:  Object to form.
8        Calls for speculation.
9        A.    I don't recall receiving this e-mail
10   and I don't know what the intent was.
11       Q.    If you could look at Sindy
12   Aprigliano's e-mail where she writes the
13   estimated impact is approximately 4 billion.
14   Do you see that?
15       A.    Uh-huh, yes.
16       Q.    Is that consistent with your
17   testimony about the cash and collateral group
18   being interested in the effect of haircuts on
19   cash position?
20       MR. C. GREEN:  Object to form.  I
21       think it mischaracterizes his testimony to
22       the extent that he has said he doesn't
23       remember seeing this e-mail, so I'm not
24       certain he can testify whether her
25       statement is consistent with his testimony

---

Page 45

1        Fleming - Highly Confidential
2        about his group's function.  If he can
3        answer the question, he should go ahead.
4        A.    Can you repeat it, question.
5        Q.    I am simply asking if Sindy
6    Aprigliano's statement that the estimated
7    impact is approximately 4 billion is similar to
8    your suggestion that your group was interested
9    in the impact of haircuts on cash position?
10       MR. C. GREEN:  Object to form.
11       A.    Again, this was -- to my knowledge,
12   this was not something that was, you know,
13   normally distributed, this information.  The
14   information that we viewed around haircuts was
15   away from this.  So we had -- you know, in my
16   team we had other information and other data
17   that we used to look at changes in haircuts and
18   assess, you know, the impact on cash positions.
19   If someone was telling us that at some point in
20   the future something was going to happen that
21   was going to affect your cash position, then
22   I'm sure it would have been of interest to us,
23   but again, I don't recall this e-mail and I
24   don't necessarily know what the intent of it
25   was, whether it's accurate, whether it's not

---

Confidential

Page 46

Fleming - Highly Confidential
1 
2 accurate. I just don't know.
3 Q. Do you have any recollection of the
4 PDCF trade on the 15th?
5 A. No.
6 Q. Do you have any recollection of
7 anything else you were doing that week of the
8 15th?
9 MR. C. GREEN: Object to form. Does
10 he have any recollection of anything else
11 he was doing during the week?
12 Q. Day to day the week that LBHI filed
13 for bankruptcy, do you recall coming in to the
14 office every morning and what your functions
15 were during that week?
16 A. I remember chaos is what I remember.
17 There was nothing normal about what was
18 happening that week. There was nothing
19 standard about what was happening that week. I
20 recall fielding many, many questions and
21 dealing with banks, dealing with issues of
22 credit, dealing with issues of funding, dealing
23 with people who I have never spoken with
24 before, very senior people, either within the
25 organization or outside the organization that

Page 47

Fleming - Highly Confidential
1 
2 were concerned about the status of Lehman
3 Brothers, Inc. and the ability to settle some
4 of its obligations.
5 Q. Do you recall the senior people
6 within Lehman that you spoke to that week?
7 MR. C. GREEN: Object to form.
8 A. I don't remember all of them. I'm
9 sure you have had a chance to take a look at my
10 e-mails. Within those e-mails you could either
11 see the e-mails that I received from people or
12 my admin advising me that people were on the
13 phone. She would shoot me e-mails. I think
14 that's probably the best source of that
15 information.
16 Q. At some point in that week of
17 September 15th, 2008 did you become aware of a
18 repo transaction between Lehman and Barclays?
19 A. I became aware of a transfer of
20 assets. I do not know whether that was under a
21 repo agreement or any other form of legal
22 agreement between the two organizations, but I
23 was aware that there was a transfer.
24 Q. And when did you become aware of
25 that transfer?

Page 48

Fleming - Highly Confidential
1 
2 A. I don't recall the specific time.
3 It was either, you know, Wednesday at some
4 point during the day or early Thursday. It was
5 more likely that it was Wednesday.
6 Q. Did you learn about the transfer
7 around the same time you learned about the
8 Lehman/Barclays deal?
9 MR. C. GREEN: Object to form.
10 A. I don't recall the specifics on
11 either one of them, you know, specifically the
12 date or time of either. It probably was in and
13 around the same time, give or take a few days.
14 Q. And do you recall how you learned
15 about the transfer of assets to take place?
16 MR. C. GREEN: Object to form.
17 A. I don't. That transfer was largely
18 done away from myself and from my group.
19 Q. What role, if any, did your group
20 have in the transfer of assets?
21 MR. C. GREEN: This is the transfer
22 from Lehman to Barclays?
23 MS. CARRERO: Yes. The transfer
24 that Mr. Fleming learned about on Wednesday
25 or Thursday of the week of the 15th.

Page 49

Fleming - Highly Confidential
1 
2 A. We had a very limited role. We
3 basically were throughout the course of the day
4 on Thursday trying to figure out what was going
5 on.
6 Q. When you say "trying to figure out
7 what was going on," what do you mean?
8 A. Generally in normal course when you
9 are executing something of this size, you
10 gather the appropriate people, you document
11 what needs to happen. It's very clear the
12 steps that need to be taken, what to expect,
13 how to react to situations. None of that
14 happened as it relates to this transfer. I was
15 not engaged. I was not asked to engage. I do
16 not believe that the people in my team were
17 asked to engage. So we really didn't know what
18 was going on. We were trying to figure out
19 along the way on Thursday what was happening to
20 our cash position, what was happening to our
21 collateral position and what to expect at the
22 end of the day.
23 Q. Would you have expected your group
24 to have been more involved in a transfer of the
25 sort that was taking place on Thursday,

Confidential

Page 50

1          Fleming - Highly Confidential
2     September 18th?
3          MR. C. GREEN:  Object to form.
4          A.    In normal course I would have been
5     actively engaged in a transfer of this size and
6     complexity.
7          Q.    And do you have any understanding of
8     why you weren't engaged in a transfer of this
9     size and complexity?
10         MR. C. GREEN:  Object to form.
11         A.    I do not.
12         Q.    Do you know who was involved in the
13    transfer transaction you have described?
14         A.    I cannot say for certain who was
15    involved or what their involvement was.  I had
16    a general understanding that there were some
17    folks in the operations clearance department,
18    the individuals, you know, responsible for
19    actually moving securities that were involved
20    to some degree, but again, because I didn't
21    have involvement, I can't really comment too
22    much on that.
23         Q.    Mr. Fleming, you have before you
24    what has previously been marked as
25    Exhibit 142B.

Page 51

1          Fleming - Highly Confidential
2          A.    Yes.
3          Q.    I will give you a minute to take a
4     look.
5          (Document review.)
6          MR. C. GREEN:  I'm sorry, I was not
7     at the deposition where this exhibit was
8     previously marked.  Was it the same case
9     with this exhibit that the second through
10    ending pages are attachments to the first
11    page when it was transmitted?
12         MS. CARRERO:  Yes.
13         Q.    Mr. Fleming, do you know what this
14    document is before you, Exhibit 142B?
15         A.    I have never seen this before.  I
16    don't recall.
17         Q.    Have you seen in the past similar
18    types of documents as what is attached to the
19    e-mail of Exhibit 142B?
20         A.    Are you referring to page numbered
21    466143?
22         Q.    Yes.  I am talking about the
23    attachments which are titled Schedule A
24    dated -- I'm not looking for -- scratch that.
25         Have you seen a similar type of

Page 52

1          Fleming - Highly Confidential
2     Schedule A before?
3          A.    My team was not responsible for
4     documentation or in the setup of any of the
5     tri-party arrangements.  However, I am familiar
6     with what a Schedule A is, what it represents,
7     and I have seen examples in the past.
8          Q.    And do you have any understanding as
9     to why you would receive a copy of a Schedule A
10    to Master Purchase Agreement?
11         MR. C. GREEN:  Object to form.
12         A.    I don't know the relevance of this
13    being sent to me.
14         Q.    For instance, would it, as you have
15    testified earlier today, be of interest to your
16    group, the haircut amounts on certain asset
17    classes for purposes of monitoring the cash
18    position?
19         MR. C. GREEN:  Object to form.
20         A.    I don't believe there is anything
21    that my group would have done with this
22    documentation to augment, you know, their
23    procedures or their projections or anything
24    like that.
25         Q.    Prior to the transfer that we spoke

Page 53

1          Fleming - Highly Confidential
2     of earlier between Lehman and Barclays, were
3     you aware of any other Lehman and Barclays
4     repos that were on the week of September 15th?
5          MR. C. GREEN:  Object to form.  Was
6     he aware prior to the transfer of any other
7     or was he aware of any others prior to the
8     transfer?
9          Q.    Let me rephrase.
10         In addition to the transfer that we
11    discussed earlier that took place on September
12    18th, were you aware of any other transactions
13    between Lehman and Barclays, specifically repo
14    transactions?
15         MR. C. GREEN:  Object to form.
16         A.    At what point?
17         Q.    The week of September 15th, are you
18    aware of there having been any repo between
19    Lehman and Barclays?
20         A.    At any point during that week was I
21    made -- did I become aware of any other repo?
22    Is that the question?
23         Q.    Yes.
24         A.    Yes, I did.
25         Q.    And how did you become aware of

Confidential

Page 54

1      Fleming - Highly Confidential
2  another repo?
3      MR. C. GREEN: Object to form to the
4  extent that the question implies that the
5  prior transaction was, in Mr. Fleming's
6  mind, a repo. He testified he didn't know
7  whether it was a repo or not. So when you
8  say "another repo," there is a repo that he
9  said he is aware of.
10     MS. CARRERO: Let me rephrase.
11     Q. When did you become aware of a repo,
12 other than the September 18 transfer we
13 discussed earlier?
14     A. It was sometime either the evening
15 of Thursday -- was Thursday the 18th?
16     MR. C. GREEN: Yes.
17     A. Or the early morning of Friday the
18 19th when I was advised that we had a funding
19 shortfall. That's when I was notified. That's
20 when I became aware.
21     Q. And when you say that you were
22 advised of a funding shortfall, can you
23 explain?
24     MR. C. GREEN: Could he explain
25 what?

Page 55

1      Fleming - Highly Confidential
2      Q. What you mean by a funding
3  shortfall.
4      A. As of close of business on Thursday,
5  the 18th, which actually wound up closing early
6  Friday morning, but on that close of business
7  that day Lehman Brothers, Inc. was short cash
8  and that is what I mean by a funding shortfall.
9      Q. Why did you become short cash on
10 Thursday, September 18th?
11     MR. C. GREEN: Object to form.
12     A. I can't answer the question why. I
13 can describe to you the events as they were
14 explained to me, which is that the asset
15 transfer was executed in a non-traditional
16 fashion which rendered our systems of
17 monitoring cash and collateral positions, it
18 rendered it basically useless. We did not have
19 good visibility into what was happening on an
20 intra-day basis because of the way that the
21 asset transfer was affected. We were
22 so-called, quote unquote, flying blind in terms
23 of where our funding position was. As
24 previously stated, I was advised either late
25 Thursday night, early Friday morning that we

Page 56

1      Fleming - Highly Confidential
2  had a shortfall of cash and that we had a
3  corresponding long collateral position. It was
4  explained to me that there had been a tri-party
5  repo on between LBI and I don't know which
6  legal entity at Barclays, so I will just call
7  it Barclays, for approximately $15 billion and
8  that at some point on Thursday, the 18th, that
9  that trade had matured, termed, rolled off, I
10 don't know the correct terminology to use other
11 than to say that it was not there Thursday
12 night. The individuals in my team did not know
13 that that was happening, so that when we went
14 to balance with the bank at the end of day, it
15 came as a surprise to everyone that we didn't
16 have that $15 billion of tri-party cash. So
17 that is how I became aware of the situation.
18     Q. And what happened as a consequence
19 of the shortfall in cash?
20     A. The consequence of that is that we
21 had to advise JPMorgan Chase as our clearing
22 bank that we were short cash and required a
23 secured box loan.
24     Q. And could you explain what a secured
25 box loan is?

Page 57

1      Fleming - Highly Confidential
2      A. A box loan is a term that's used to
3  describe when a broker/dealer or client of a
4  clearing bank borrows cash from that clearing
5  bank versus collateral or assets that are
6  sitting in that client's clearance account.
7      Q. You had described the asset transfer
8  as being done in a non-traditional manner.
9      Could you explain what you meant by
10 "non-traditional manner"?
11     A. Again, I was not at 70 Hudson with
12 the people performing the day-to-day function,
13 so I am providing you -- this is second-hand
14 information that I am providing to you. I
15 didn't have access to information. But the
16 transfer that was done, I believe, was done
17 between JPMorgan Chase and the Bank of New York
18 as opposed to a transfer between Lehman
19 Brothers and Barclays, and the mechanics of
20 that settlement meant that the information that
21 we normally derive from our clearing bank,
22 JPMorgan, in terms of viewing information on
23 screens and looking at our accounts at JPMorgan
24 Chase which tell us what our cash and
25 collateral position is, that those screens were

Confidential

Page 58

1      Fleming - Highly Confidential
2  not reflecting the activities of the transfer.
3         MR. C. GREEN:  I don't mean to
4  interrupt, but we have been going about an
5  hour and a half and I wonder if we might be
6  able to take a break at a good opportunity.
7         MS. CARRERO:  Sure.  Let's just
8  finish this up and we can break in a couple
9  of minutes.
10     Q.   I'm trying to understand your last
11 answer regarding the transaction or the
12 transfer being between JPMorgan and BONY as
13 opposed to a transfer between Lehman and
14 Barclays.  Could you explain -- withdrawn.
15        In a normal or traditional transfer
16 as opposed to the non-traditional manner you
17 have described, what sort of feeds would
18 normally come through to your system?
19        MR. C. GREEN:  Object to form.
20     A.   In normal course if we delivered out
21 collateral, we would see our collateral
22 position decrease and we would see a cash
23 credit on the account.  We did not -- we could
24 not see that or we did not see that, as
25 described to me from the people who were

Page 59

1      Fleming - Highly Confidential
2  working at 70 Hudson, on the screens that we
3  use or used normally to view this activity.
4         MS. CARRERO:  Why don't we take a
5  break now.
6         MR. C. GREEN:  Okay.
7         (Recess was taken from 11:02 to
8  11:13.)
9  BY MS. CARRERO:
10     Q.   Before the break we were talking
11 about the September 18th asset transfer and you
12 had described it as being done in a
13 non-traditional manner.  Do you recall that?
14     A.   Yes.
15     Q.   Do you recall the terms of the
16 transfer?
17        MR. C. GREEN:  Object to form.
18     A.   No.
19     Q.   Do you know if Lehman as a
20 consequence of the transfer received a certain
21 amount of cash?
22     A.   I don't understand your question.
23 Can you rephrase it?
24     Q.   Was a term of the transfer that
25 Lehman was to receive cash?

Page 60

1      Fleming - Highly Confidential
2         MR. C. GREEN:  Object to form.  I
3  think he has already testified he doesn't
4  know the terms of the transfer or doesn't
5  recall them.
6     Q.   Mr. Fleming, I am putting before you
7  what's been marked previously as Exhibit 60B.
8  Do you see your name in the "to" line?
9     A.   Yes.
10     Q.   And you received this e-mail from
11 Ray Stancil at JPMorgan; is that correct?
12     A.   That's what it appears.
13     Q.   Do you know what this document is?
14        MR. C. GREEN:  Are you referring to
15 the second page of this exhibit?
16        MS. CARRERO:  I am referring to the
17 e-mail attaching an exhibit labeled
18 Lehman - Barcap - BONY Transition - 091808.
19        MR. C. GREEN:  And this BONY
20 Transition Anticipated Prefunding document
21 is the attachment that was recovered with
22 the e-mail from your document system?
23        MS. CARRERO:  Yes.
24        MR. C. GREEN:  Do you have the
25 question in mind?

Page 61

1      Fleming - Highly Confidential
2         Is there a question pending?
3         MS. CARRERO:  Could you repeat it.
4         (Record read.)
5     A.   I don't recall accessing this
6  document.
7     Q.   Is this a document -- is this type
8  of document one that you would receive in the
9  normal course of business?
10        MR. C. GREEN:  When you say
11 "document," you are referring to the
12 attachment; correct?
13        MS. CARRERO:  Yes.
14     A.   No, I would not normally receive a
15 document such as this in the normal course of
16 business.
17     Q.   Do you think this document was
18 created specifically with respect to the
19 September 18th asset transfer?
20        MR. C. GREEN:  Object to the form.
21 Calls for speculation.
22        MS. CARRERO:  Go ahead and
23 speculate.
24     A.   It would appear, as I look at it
25 today, that this document was in relation to

Confidential

## Page 62

1     Fleming - Highly Confidential
2  the transfer.
3     Q.   Was it your understanding that
4  the -- scratch that.
5        Did you have any understanding with
6  respect to the collateral being transferred on
7  September 18th?
8     MR. C. GREEN:  Object to form.
9     A.   Can you repeat that?
10    Q.   Do you have any understanding what
11 collateral was being transferred on September
12 18th?
13    A.   No.
14    Q.   Would your group have normally been
15 aware of the types of collateral being pledged
16 under a funding transaction?
17    MR. C. GREEN:  Object to form.
18    A.   Can you clarify what type of funding
19 transaction you are referring to?
20    Q.   Let's just say a repo, for instance.
21    A.   Can you describe what type of repo?
22    Q.   A repo whereby Lehman would be
23 pledging assets in exchange for cash.
24    A.   Not in all cases.
25    Q.   In what cases would you not be aware

## Page 63

1     Fleming - Highly Confidential
2  of the types of collateral being pledged?
3     A.   In a deliverable repo.
4     Q.   Could you explain what you mean by
5  "deliverable repo"?
6     A.   A deliverable repo is where the repo
7  is settled through the Federal Reserve's
8  Fed Wire system and that is something that we
9  would monitor the cash effect of those repos,
10 but we would not actively monitor the
11 underlying collateral associated with those
12 repos.
13    Q.   Is that because of the -- withdrawn.
14       Is there some sort of automatic
15 allocation system for Fed wirable securities
16 that's the reason why you wouldn't know?
17    MR. C. GREEN:  Object to the form.
18    A.   What's the question?  I'm not
19 sure -- it doesn't make sense.
20    Q.   Let me rephrase.
21       Is there a reason why there is a
22 distinction between Fed Wire and other types of
23 securities with respect to being able to --
24 withdrawn.
25    MS. CARRERO:  Can we mark this as

## Page 64

1     Fleming - Highly Confidential
2  295B.
3     (Exhibit 295B, e-mail dated
4  9-18-2008, marked for identification.)
5     Q.   Mr. Fleming, you have before you
6  what's been marked as Exhibit 295B.  Have you
7  had a chance to review it?
8     A.   I was actually still reading through
9  it.
10    Q.   I will give you a minute.
11    MR. C. GREEN:  You should read
12    the -- unless there is a specific part of
13    the exhibit you want to focus his attention
14    on, I think he should read the entire
15    exhibit thoroughly.
16    MS. CARRERO:  That's fine.
17    (Document review.)
18    A.   Okay.
19    Q.   Mr. Fleming, do you see yourself as
20 a recipient of both the bottom e-mail from
21 David Aranow on September 18th at 12:53 a.m. as
22 well as the top e-mail from Paolo Tonucci on
23 September 18th at 7:07 a.m.?
24    A.   I see that I was -- it was
25 addressed -- the bottom was addressed to me,

## Page 65

1     Fleming - Highly Confidential
2  but I was CC'd on the top section, so it wasn't
3  the top.  Paolo's e-mail was not addressed to
4  me.
5     Q.   Were you a recipient of both?
6     A.   Yes.
7     Q.   Were you involved in any of the
8  logistics with respect to the Barclays
9  collateral move that is the subject of
10 Exhibit 295B?
11    MR. C. GREEN:  Asked and answered.
12    Object to form.
13    A.   No.
14    Q.   Do you recall whether or not you had
15 any conversations with anyone at Barclays or
16 BONY or JP Chase the evening before the
17 transaction?
18    MR. C. GREEN:  Object to form.
19    Which evening are you referring to
20    specifically?
21    MS. CARRERO:  I am referring to in
22    the bottom e-mail that representatives from
23    Barclays, Lehman, BONY and JP Chase met to
24    discuss the Barclays collateral move.
25    MR. C. GREEN:  And you want to know

Confidential

Page 66

1    Fleming - Highly Confidential
2    if Mr. Fleming participated in those
3    meetings?
4        Q.   If you participated in those
5    meetings or if you had any conversations with
6    anyone who participated in those meetings.
7        A.   Not that I recall.
8        Q.   Do you at all recall learning at the
9    time or later how the collateral move was to
10   take place?
11       MR. C. GREEN: Object to form.
12       A.   Sorry. Say that again.
13       MS. CARRERO: Could you.
14       (Record read.)
15       A.   At what time?
16       Q.   Did you then or later learn the
17   logistics of what is dubbed in this e-mail as
18   the Barclays collateral move?
19       MR. C. GREEN: Object to form.
20       A.   I don't recall receiving this.
21       Q.   Do you at all recall learning of any
22   of the logistics that are set forth in this
23   e-mail at any other point or in any other
24   manner?
25       A.   No.

Page 67

1    Fleming - Highly Confidential
2        Q.   Turn your attention to the later
3    e-mail from Paolo Tonucci where he writes: "I
4    would like the RACERs to not be funded by
5    Barclays. We need to work out if that is
6    possible."
7        Do you recall there being an issue
8    with the RACERs in connection with the asset
9    transfer?
10       MR. C. GREEN: Object to form.
11       A.   You said there was an issue -- you
12   said was there an issue? Was that the
13   question?
14       Q.   Yes.
15       MR. C. GREEN: Do you recall if
16   there was an issue with the RACERs?
17       A.   I'm not sure how we would define
18   "issue." I do recall that there was -- and I
19   don't recall when this was, but I do recall
20   learning that there was, as stated here, that
21   the RACER was not to be part of the asset
22   transfer.
23       Q.   Do you know why the RACER was not to
24   be part of the transfer?
25       A.   I do not.

Page 68

1    Fleming - Highly Confidential
2        Q.   Do you know if it had previously
3    been funded by either Barclays or the Fed prior
4    to the asset transfer?
5        MR. C. GREEN: Object to form. You
6    are asking him if the RACER had previously
7    been funded?
8        MS. CARRERO: Yes.
9        A.   With either the Fed or Barclays, I
10   cannot confirm whether it was or not.
11       Q.   Do you know why you would be CC'd on
12   an e-mail saying that the RACER should not be
13   funded by Barclays?
14       MR. C. GREEN: Object to form.
15   Calls for speculation.
16       MS. CARRERO: Go ahead.
17       A.   Paolo CC'd me on anything that -- he
18   CC'd me on many things, so -- there is no
19   action on my part based on this e-mail.
20       Q.   Do you recall receiving any other
21   requests either verbally or in writing
22   regarding assets that should or should not be
23   pledged or transferred to Barclays on the 18th?
24       MR. C. GREEN: Object to form.
25       A.   No.

Page 69

1    Fleming - Highly Confidential
2        Q.   Were you involved in the selection
3    of assets to be transferred to Barclays?
4        MR. C. GREEN: Asked and answered.
5    Object to form.
6        A.   No.
7        (Exhibit 296B, e-mail dated
8    September 18, 2008, Bates stamped 10303223,
9    marked for identification.)
10       Q.   Mr. Fleming, you have before you
11   what's been marked as Exhibit 296B. Take a
12   moment to review, particularly the second
13   e-mail down.
14       MR. C. GREEN: I would caution you
15   to review the entire chain, Mr. Fleming.
16       (Document review.)
17       A.   Okay.
18       Q.   Mr. Fleming, I direct your attention
19   to the second e-mail down on Exhibit 296B.
20   It's an e-mail message from James Hraska.
21       Could you tell me who James Hraska
22   is?
23       A.   James Hraska works in the -- what we
24   describe as the middle office.
25       Q.   And how do the middle office and

Confidential

## Page 70

1      Fleming - Highly Confidential
2  your cash and collateral management group
3  interact?
4      MR. C. GREEN: Object to form.
5      A.   Predominantly for normal, you know,
6  issue resolution.
7      Q.   Issue resolution with any particular
8  types of transactions?
9      A.   Generally for, you know, trade
10 entry, you know, issues.
11     Q.   And do you know why James Hraska is
12 e-mailing you what I'll read into the record as
13 "we are going to be cancelling 8.5 to 10 B of
14 Fed deliverable collateral we lost due to GCF
15 and other factors.  We should be getting 10
16 billion in collateral from GCF."
17     MR. C. GREEN:  Do you want to read
18     the entire e-mail or is your question
19     focused on the first sentence?
20     MS. CARRERO:  Yes, it's focused on
21     the first sentence.
22     MR. C. GREEN:  Okay.  Object to
23     form.  Calls for speculation.
24     You may answer, if you have an
25     answer.

## Page 71

1      Fleming - Highly Confidential
2      A.   I'm not sure what James is
3  communicating in this e-mail.
4      Q.   Does this e-mail chain in general
5  refresh your recollection regarding what assets
6  were being transferred on September 18th?
7      A.   No.
8      Q.   Do you have any recollection that
9  the assets to be transferred were some of or
10 all of the assets that had been pledged to the
11 Fed on the evening of September 17th?
12     MR. C. GREEN:  Object to form.
13     A.   It would appear based on this memo
14 that that is the case.
15     Q.   But that's not your personal
16 recollection right now here today?
17     MR. C. GREEN:  Asked and answered.
18     Object to form.
19     A.   I don't have a recollection of what
20 was transpiring at that time.  Based on this
21 e-mail it would appear that that is the case.
22     Q.   And based on this e-mail does it
23 appear as though 8.5 to 10 billion of the
24 collateral was being cancelled due to GCF and
25 other issues?

## Page 72

1      Fleming - Highly Confidential
2      MR. C. GREEN:  Object to form.
3      A.   As I read this today, I don't
4  understand it.  This doesn't make sense to me.
5      Q.   Who would you expect to have
6  knowledge of what was transferred under the
7  repo?
8      MR. C. GREEN:  I'm sorry, when you
9      say "repo," you mean this transaction
10     between Lehman and Barclays?
11     Q.   I mean the transfer between -- on
12 September 18th.
13     A.   It would be speculation.
14     Q.   Who would you expect, by speculation
15 or otherwise, to have been involved with the
16 selection of assets to be transferred?
17     A.   The CEO, CFO.
18     (Exhibit 297B, e-mail dated
19     9-18-2008, marked for identification.)
20     Q.   Mr. Fleming, you have before you
21 what's been marked as Exhibit 297B.  Do you see
22 yourself as a recipient of this e-mail?
23     A.   Yes.
24     Q.   Do you have any recollection of the
25 substance of this e-mail?

## Page 73

1      Fleming - Highly Confidential
2      MR. C. GREEN:  Object to form.
3      A.   I'm sorry, can you repeat the
4  question.
5      Q.   Have you had an opportunity to read
6  the e-mail?
7      A.   Yes.
8      Q.   After reading this e-mail, do you
9  have any recollection of the substance of what
10 you have read?
11     A.   I don't recall, you know -- I don't
12 recall this particular instance.
13     Q.   So you don't recall that on the
14 evening of September 18th there was collateral
15 left to be funded and a question of whether it
16 was to be moved to Barclays?
17     MR. C. GREEN:  Object to form.  Is
18     that your characterization of this e-mail?
19     Q.   With or without this e-mail, do you
20 have any recollection on September 18th of
21 there being collateral available to be
22 transferred to Barclays that Barclays did not
23 want?
24     A.   That Barclays did not want?  I am
25 aware that some amount of assets did not

Confidential

Page 74

1        Fleming - Highly Confidential
2    transfer over to Barclays.
3        Q.    Do you know why those specific
4    assets were not transferred over to Barclays?
5        A.    I do not.
6            (Exhibit 298B, e-mail dated
7        9-21-2008, marked for identification.)
8        Q.    Mr. Fleming, you have before you
9    what's been marked as Exhibit 298B.
10           (Document review.)
11       Q.    Have you had an opportunity to
12   review the e-mail?
13       A.    I need another minute.
14           (Document review.)
15       A.    Okay.
16       Q.    Do you recall this e-mail exchange
17   with David Aranow?
18       A.    Not specifically.
19       Q.    Do you recall the substance of the
20   questions and answers being had in the e-mail?
21           MR. C. GREEN:  Object to form.
22       A.    I recall the substance.
23       Q.    What do you recall?
24       A.    Trying to understand what happened.
25       Q.    Can you explain that a little bit

Page 75

1        Fleming - Highly Confidential
2    more?
3        A.    As previously described, the nature
4    of the transfer rendered our systems of
5    monitoring activity obsolete.  It is -- we were
6    attempting to recreate what had happened, what
7    had transpired.
8        Q.    And how were you attempting to do
9    that?
10       A.    Trying to understand how much money
11   was paid.
12       Q.    And why was there a question as to
13   how much money was paid?
14           MR. C. GREEN:  Object to form.
15       A.    Why was there a question?  Because
16   we didn't have visibility into the transaction.
17       Q.    In terms of not having visibility,
18   was that only on the cash side or the
19   collateral side as well?
20           MR. C. GREEN:  Object to form.
21       A.    I believe it was both.
22       Q.    And was the lack of visibility a
23   consequence of the transaction not being booked
24   into a certain system?
25           MR. C. GREEN:  Object to form.

Page 76

1        Fleming - Highly Confidential
2    Asked and answered.
3        A.    I don't know the answer to that.
4    Again, I was located at 1301.  The team
5    managing the details behind this are located at
6    70 Hudson.  So I don't know why -- I don't know
7    how the transaction was facilitated and I don't
8    have an answer as to why we couldn't view it.
9        Q.    In the ordinary course for you to
10   view or to have visibility of a transaction,
11   would it have to be booked into a specific
12   system?
13           MR. C. GREEN:  Object to form.
14       A.    Yes.
15       Q.    What system would it need to be
16   booked into?
17       A.    I don't know the answer to that.  It
18   depends on how they affected or facilitated the
19   transfer, but if the transaction settled, then
20   it would have had to have been booked
21   somewhere.  Whether that's by Chase, whether
22   it's by the Fed, I can't -- I don't know the
23   answer to that.
24       Q.    I'm sorry.  Maybe you misunderstood
25   my question.  My question was for your team to

Page 77

1        Fleming - Highly Confidential
2    have visibility of the amount of cash
3    transferred and the collateral being
4    transferred, is there a Lehman internal system
5    in which it would need to be booked?
6        A.    No.
7        Q.    So the visibility your group would
8    get would be through third parties; is that
9    correct?
10           MR. C. GREEN:  Object to the form.
11       A.    Through access to our account
12   activity at our clearing bank.
13       Q.    So it would be Chase as Lehman's
14   clearing bank that would provide the feed
15   enabling your group to have visibility; is that
16   correct?
17           MR. C. GREEN:  Object to the form.
18       A.    Normally that's what would occur.
19       Q.    And normally the visibility you
20   would have, would that -- withdrawn.
21           Did Lehman ever come to have
22   visibility any time after September 18th with
23   respect to the transaction and -- I'm sorry,
24   withdrawn.
25           Did Chase ever provide the feed

Confidential

Page 78

1       Fleming - Highly Confidential
2   necessary to have visibility of the September
3   18th transfer?
4           MR. C. GREEN: Object to form.
5       A.   Not to my knowledge.
6       Q.   And do you know why not?
7       A.   I do not.
8           MR. C. GREEN: Object to the form.
9   Calls for speculation.
10      Q.   In the ordinary course when Chase
11  did provide a feed enabling visibility, would
12  it include market values for the collateral
13  being pledged?
14      A.   I can't answer that question. I
15  didn't manage the day-to-day. I didn't view
16  these screens each day. I wasn't that close to
17  it, so those type of detailed questions I am
18  not going to be able to answer.
19      Q.   Is there any link between the Chase
20  feeds and the application you have described
21  earlier today called the RTA, real-time
22  availability application?
23      A.   Can you repeat the question again.
24      (Record read.)
25      A.   No.

Page 79

1       Fleming - Highly Confidential
2       Q.   Could you explain the difference
3   between the two?
4       A.   One is an internal Lehman
5   application and the other is an access into a
6   clearing system.
7       Q.   Are the numbers in the internal
8   application system not dependent on the figures
9   being ascertained from the -- from accessing
10  the clearing system?
11          MR. C. GREEN: Object to form.
12      A.   I'm not sure I understand what that
13  question means.
14      Q.   I am trying to understand how the
15  two are related, if at all. If the RTA system
16  or application generates reports with cash and
17  collateral positions, I am trying to understand
18  where that information comes from and if it
19  comes from the feeds being obtained from
20  Lehman's clearing bank.
21          MR. C. GREEN: Object to the form.
22      A.   One is a start-of-day projection.
23  One of them is a real-time view into positions.
24      Q.   The start-of-day projection being
25  generated by the RTA application; is that

Page 80

1       Fleming - Highly Confidential
2   correct?
3       A.   Yes.
4       Q.   The end-of-day view from Lehman's
5   custodian, Chase, would not affect the start of
6   day projection in the RTA system?
7           MR. C. GREEN: Object to form.
8       Q.   Is that correct?
9       A.   There was no direct link between the
10  two.
11      Q.   Do you have any recollection of what
12  collateral remained with Lehman and was not
13  transferred to Barclays?
14          MR. C. GREEN: Object to form.
15  Asked and answered.
16      A.   I don't know.
17      Q.   Neither the quantity or the types of
18  classes that might not have transferred?
19          MR. C. GREEN: Same objection.
20      A.   That's correct, I don't know.
21      Q.   Back to Exhibit 298B, is your
22  recollection that Barclays transferred 45
23  billion to Lehman on September 18th?
24      A.   That is what this e-mail indicates.
25      Q.   But as you sit here today, you have

Page 81

1       Fleming - Highly Confidential
2   no recollection as to the amount of cash
3   transferred to Lehman on September 18th in
4   connection with the asset transfer we
5   discussed?
6           MR. C. GREEN: Object to form.
7       A.   I don't know what that amount was.
8   I think it's clear by this e-mail that we
9   didn't know what that amount was even
10  subsequent to the transfer.
11      Q.   Do you have reason to believe that
12  the number was not 45 billion -- withdrawn.
13          Could you tell me who David Aranow
14  is?
15      A.   David Aranow is an employee of
16  Lehman Brothers.
17      Q.   And do you know his function or
18  title at Lehman Brothers?
19      A.   At what point?
20      Q.   In September of 2008.
21      A.   You would need to confirm this with
22  David, but I believe that he was working in the
23  prime services business as a senior vice
24  president.
25      Q.   The prime services division is the

Confidential

## Page 82

1      Fleming - Highly Confidential
2   division in which the repo desk is situated;
3   correct?
4      A.   Yes.
5      Q.   And do you know who Dave Petrie is?
6      A.   Other than him being a Barclays
7   employee, I do not know what his role is or
8   was.
9      Q.   In Exhibit 298 B you write to Monty
10  Forrest and David Aranow asking for Dave
11  Petrie's contact info.  Is that correct?
12     A.   Yes.
13     Q.   Do you know if you ever contacted
14  him subsequent to this e-mail?
15     A.   I do not believe so.
16     Q.   And do you recall why you were
17  looking for his contact information?
18     A.   I don't recall why I requested his
19  contact info on the 21st.
20     Q.   Do you recall if you ever had any
21  conversations with Dave Petrie?
22        MR. C. GREEN:  Object to the form.
23  Asked and answered, I believe.
24        MS. CARRERO:  Go ahead and answer.
25     A.   I do not believe so.

## Page 83

1      Fleming - Highly Confidential
2      Q.   Mr. Fleming, you have before you
3   what's been previously marked as Exhibit 139A.
4   Please take a moment and look it over.  I would
5   like to specifically turn your attention to the
6   e-mail at the top of the e-mail chain.
7        (Document review.)
8      A.   Okay.
9      Q.   Did you receive this message?
10     A.   I don't recall if I read it.  I see
11  that I was CC'd on it.
12     Q.   Do you recall the substance of this
13  message which is a message from James Hraska
14  where he writes:  "Agreed.  In addition, I just
15  want to make sure that everyone is clear that
16  $7 billion that was locked up for Barcap in tri
17  was returned to JP Chase.  If anyone has any
18  questions, please call me."
19     A.   I do recall the issue of the 7
20  billion.  Not specifically as it relates to
21  this e-mail.
22     Q.   What do you recall about the issue
23  of 7 billion?
24     A.   It's my understanding that there was
25  a shortfall in the amount of assets pledged as

## Page 84

1      Fleming - Highly Confidential
2   part of the asset transfer to the tune of 7
3   billion and that the cash that had been
4   transferred for that 7 billion and residing at
5   Chase was -- it was agreed that that cash would
6   be put in a Barclays account at JPMorgan Chase.
7      Q.   And was that cash, in fact, put into
8   an account, a Barclays account, at JPMorgan
9   Chase?
10        MR. C. GREEN:  Object to form.
11     A.   I don't know.
12     Q.   Do you have any recollection of any
13  events that transpired after -- withdrawn.
14        So as you sit here today, you have
15  no knowledge or recollection of whether the 7
16  billion cash was, in fact, transferred to
17  Barclays; is that correct?
18        MR. C. GREEN:  Object to form.  You
19     mean placed in an account on Barclays'
20     behalf?  I think that's what he testified
21     about, it was agreed that the cash would be
22     put in a Barclays account at JPMorgan
23     Chase.
24     Q.   Let me rephrase.
25        As you sit here today, do you have

## Page 85

1      Fleming - Highly Confidential
2   any knowledge or recollection as to whether 7
3   billion in cash was transferred to Barclays?
4        MR. C. GREEN:  Object to form.
5      A.   On this day?  Is that the question?
6      Q.   On this day or after.
7      A.   I do not know whether there was a
8   transfer of cash into a Barclays account on
9   this day, this day being close of business
10  Thursday the 18th.
11     Q.   Do you know if there were any
12  attempted or actual transfers of 7 billion in
13  cash after Thursday, September 18th?
14        MR. C. GREEN:  Object to form.
15     A.   I'm not aware of any transfer of
16  $7 billion of cash from JPMorgan to Barclays.
17     Q.   Is it your group that would be
18  responsible for liaisoning with both Barclays
19  and JPMorgan Chase with respect to a cash
20  transfer like the 7 billion contemplated?
21        MR. C. GREEN:  Object to form.
22     A.   I don't believe so.  I believe that
23  was a transaction between JPMorgan Chase and
24  Barclays.
25     Q.   Could you explain why you describe

Confidential

## Page 86

1    Fleming - Highly Confidential
2  it as a transaction between JPMorgan Chase and
3  Barclays?
4    A.   It is my understanding that Barclays
5  had sent some money to the tune of $7 billion
6  to JPMorgan and did not get assets in return.
7    Q.   Is it your understanding that the 7
8  billion Barclays sent to JPMorgan remained with
9  JPMorgan then?
10    A.   It was my understanding at the time
11  that JPMorgan put that cash into a Barclays
12  account held at JPMorgan.
13    Q.   So when you say there was no
14  transfer of 7 billion on September 18th from
15  JPMorgan into Barclays' account, I am trying to
16  understand how to reconcile that with your
17  later answer that the 7 billion delivered from
18  Barclays to JPMorgan Chase went into a Barclays
19  account at JPMorgan Chase.
20    MR. C. GREEN:  Object to form.  I
21    think you may want to try that question
22    again.
23    Q.   Just to simplify it, I am not quite
24  sure I understand your last answer about 7
25  billion being delivered by Barclays to JPMorgan

## Page 87

1    Fleming - Highly Confidential
2  Chase which subsequently went into a Barclays
3  account at JPMorgan Chase.  Could you explain?
4    A.   It's my understanding that Barclays
5  had paid for something that they didn't
6  receive, so, in effect, JPMorgan had received
7  funds that they weren't entitled to, that they
8  were Barclays' funds, until such time that
9  assets were transferred over to the Barclays
10  account.  Given the timing of the transfer and
11  the fact that this was, you know, probably
12  around midnight and that no more transfers were
13  due to transpire for that Thursday, Barclays --
14  I'm probably not the right person to describe
15  this, because at the time I was not a Barclays
16  employee, but, you know, Barclays, you know,
17  viewed that they were out of pocket $7 billion
18  and requested that JPMorgan take that 7 billion
19  that they had and to put it into an account,
20  into a Barclays account.  So it is almost as
21  though it was, you know, Barclays transferred 7
22  to JPMorgan and then JPMorgan put it into a
23  Barclays account.  So Barclays should have --
24  you know, based on the description should have
25  been, you know, protected, so to speak.  I'm

## Page 88

1    Fleming - Highly Confidential
2  not sure that's the proper word, but...
3    Q.   I am confused about where Lehman
4  fits into the equation with respect to the 7
5  billion.  Could you clarify for me why you
6  describe the $7 billion dispute between
7  JPMorgan Chase and Barclays when it's the
8  Lehman securities that were failed to be
9  delivered?
10    MR. C. GREEN:  Object to the form of
11    the question.
12    A.   I can't, because I wasn't party to
13  the whole asset transfer structuring of how it
14  was mechanically going to work.  From my
15  perspective I viewed this as a transfer of
16  assets between Bank of New York and JPMorgan
17  Chase.
18    Q.   As custodian banks for Lehman and
19  Barclays?
20    MR. C. GREEN:  Object to the form.
21    A.   I don't think that they were
22  stepping in as principal at any point during
23  this transaction, but it was -- if Lehman still
24  had their assets, 7 billion of assets, and
25  Barclays paid money to JPMorgan Chase, then

## Page 89

1    Fleming - Highly Confidential
2  JPMorgan Chase owes that money to Barclays, not
3  Lehman.  It was almost as though you could
4  consider that as funds paid in error that were
5  due to be returned.
6    Q.   And does that mean that 7 billion
7  should be subtracted from the amount of cash
8  Lehman received under the transfer?
9    MR. C. GREEN:  Object to the form of
10    the question.  Calls for speculation.
11    You can answer, if you have an
12    answer.
13    A.   I don't know what should have
14  happened.
15    Q.   But you viewed it as 7 billion
16  transferred in error; is that correct?
17    A.   Lehman did not get credited for that
18  7 billion.
19    (Exhibit 299B, e-mail dated
20    9-19-2008, marked for identification.)
21    Q.   Mr. Fleming, you have before you
22  what's been marked as Exhibit 299B.  It's an
23  e-mail from you to Paolo Tonucci on September
24  19 at 4:42 p.m.
25    You write: "Bob Diamond is speaking

Page 90

1    Fleming - Highly Confidential
2  to JPM about the 7 billion of cash allocated to
3  Barclays in tri-party last night." Do you
4  recall sending this message?
5      A.   I do recall sending this message.
6      Q.   Do you recall the circumstances
7  around which you sent it?
8          MR. C. GREEN: Object to form.
9      A.   I do not know or do not recall how I
10 learned of this. I certainly did not speak to
11 Bob Diamond. It was secondhand at best. It
12 was, you know, an attempt to communicate
13 whatever information was available. I do not
14 know whether this actually happened.
15     Q.   Meaning you do not know if Bob
16 Diamond actually spoke with JPM about the 7
17 billion of cash?
18     A.   I cannot definitively say that that
19 occurred.
20     Q.   Was it your understanding that the 7
21 billion of cash was a reference to the 7
22 billion of cash that had been transferred in
23 error and resulted in a shortfall to Barclays?
24         MR. C. GREEN: Object to form. To
25     Barclays?

Page 91

1    Fleming - Highly Confidential
2        MS. CARRERO:  Let me rephrase that.
3      Q.   Is it your recollection that the 7
4  billion of cash is in reference to the 7
5  billion transferred by Barclays under the
6  September 18 asset transfer in which there was
7  a $7 billion collateral shortfall?
8      A.   Yes, it's my understanding that this
9  is in reference to the same 7 billion, the 7
10 billion that we previously discussed.
11     Q.   And do you recall how you heard that
12 Bob Diamond was speaking to JPM?
13         MR. C. GREEN: Object to form.
14     Asked and answered.
15     A.   I do not recall.
16     Q.   Do you know why there was a
17 collateral shortfall on September 18th in
18 connection with the asset transfer?
19         MR. C. GREEN: Object to form.
20     Asked and answered.
21     A.   I do not know why the assets did not
22 transfer over.
23     Q.   Did you come to learn that the
24 assets that had been transferred on September
25 18th from Lehman to Barclays were part of the

Page 92

1    Fleming - Highly Confidential
2  larger asset sale that had been agreed to
3  earlier that week?
4          MR. C. GREEN: Object to form.
5      Calls for a legal conclusion.
6          You may answer, if you have an
7      answer.
8      A.   I was not, again, subject to the
9  terms of those agreements, so I would not be
10 able to draw any conclusions on the transfer of
11 assets as it relates to whether they were
12 related to any legal agreement that I was not a
13 party to.
14     Q.   I am not asking you for any legal
15 opinion. I am just asking did you -- was it
16 your understanding at some point that week that
17 Barclays was purchasing the assets being
18 transferred on September 18?
19     A.   At some point that became apparent,
20 but I don't recall when that was.
21     Q.   Do you recall how it became apparent
22 to you?
23     A.   I don't.
24     Q.   Do you recall if it became apparent
25 before September 22nd?

Page 93

1    Fleming - Highly Confidential
2        MR. C. GREEN: Object to form. I'm
3      sorry. When you say "it became apparent,"
4      you are referring to what?
5      Q.   The purchase. Do you recall roughly
6  when the purchase became apparent? Was it in
7  sometime the week of September 15th, was it the
8  next week, sometime the week of September 22nd,
9  was it months later?
10         MR. C. GREEN: And just to make sure
11     the record is clear, when you say
12     "purchase," you are referring to the
13     purchase of the assets that were
14     transferred on the 18th --
15     MS. CARRERO: Yes.
16     MR. C. GREEN: -- from JPMorgan to
17 Bank of New York?
18     MS. CARRERO: Or, more specifically,
19     assets that were owned by Lehman and
20     purchased by Barclays.
21     MR. C. GREEN: Do you have the
22     question in mind, Mr. Fleming?
23     A.   I don't recall. I don't recall when
24 that realization occurred.
25     Q.   Were you at any time involved in

Confidential

Page 94

1    Fleming - Highly Confidential
2 putting together a list of the collateral that
3 had been transferred from Lehman to Barclays on
4 September 18th?
5    A.   Not that I recall.
6    Q.   Do you recall ever receiving such
7 lists?
8    A.   I don't have specific recollection
9 of receiving a list.
10    Q.   Do you recall any issues with
11 reconciling the positions that had been
12 transferred on September 18th between Lehman
13 and Barclays and its custodians?
14    MR. C. GREEN: Object to form.
15    A.   Can you repeat that question.
16    Q.   Do you recall there being a process
17 of reconciliation between the collateral list
18 setting forth the positions that had been
19 transferred on September 18th between Lehman,
20 Barclays and their respective custodians,
21 JPMorgan Chase and BONY?
22    MR. C. GREEN: Object to form.
23    A.   I recall there being a significant
24 effort post the 18th to reconcile the books and
25 records.

Page 95

1    Fleming - Highly Confidential
2    Q.   And do you recall what that process
3 of reconciliation entailed?
4    A.   I didn't -- I wasn't responsible for
5 reconciliations at Lehman Brothers, so what it
6 entailed, I couldn't answer that question.
7    Q.   I am putting in front of you what
8 has been previously marked as Exhibit 47.
9    Mr. Fleming, do you recall receiving
10 a collateral schedule similar to the one
11 attached to Exhibit 47 or Exhibit 47 itself?
12    MR. C. GREEN: Mr. Fleming, take a
13    moment to review the e-mail at the front of
14    Exhibit 47. Make sure you have read the
15    entire thing before we proceed, please.
16    (Document review.)
17    MR. C. GREEN: I don't mean the
18    entire exhibit, I mean the entire e-mail,
19    just for the record.
20    MS. CARRERO: I understand. Yes,
21    you may read the four-page e-mail.
22    A.   Okay.
23    Q.   Do you recall receiving this
24 collateral schedule or a collateral schedule
25 similar to this at any point the week of

Page 96

1    Fleming - Highly Confidential
2 September 15th or afterwards?
3    A.   I don't recall receiving anything
4 like this.
5    Q.   Turn your attention to the e-mail
6 dated September 20th at 11:38 a.m. asking if
7 50 percent of residentials were transferred
8 through the repo or if they had to be
9 transferred at closing.
10    Does that accurately summarize
11 Mr. Miller's September 20th e-mail?
12    MR. C. GREEN: Are you asking
13    Mr. Fleming if your characterization
14    accurately summarizes Mr. Miller's e-mail?
15    MS. CARRERO: Withdrawn.
16    Q.   Do you recall whether 50 percent of
17 residential mortgages were transferred on
18 September 18th to Barclays or if they were to
19 be transferred at the closing?
20    MR. C. GREEN: Object to form.
21    Asked and answered, but you may answer it
22    again.
23    A.   No, I don't.
24    Q.   Again, you have no recollection of
25 what collateral was transferred on September

Page 97

1    Fleming - Highly Confidential
2 18th; is that correct?
3    A.   No. There is many e-mails out
4 there, some of which I didn't even read. I
5 certainly didn't --
6    Q.   Do you know why you are being copied
7 on this e-mail and others asking about what
8 collateral is transferred on September 18th?
9    MR. C. GREEN: Object to form.
10    Calls for speculation and assumes facts not
11    in the record.
12    You may answer, if you have an
13    answer.
14    A.   I don't know the answer. Clearly --
15 what would I possibly do with this document?
16    Q.   If you could turn to page Bates
17 numbered BCICG 00035138. This document appears
18 to be a summary of the market value of the
19 positions transferred on September 18th
20 totaling, according to this sheet,
21 49,902,924,897.20.
22    Did you ever have any sort of
23 understanding as to the market value of the
24 positions being transferred on September 18th,
25 if not the specific CUSIPs that were being

Confidential

Page 98

1      Fleming - Highly Confidential
2  transferred on the 18th?
3        MR. C. GREEN: I would suggest,
4  Mr. Fleming, that you answer the question,
5  not the characterization of this document.
6        MS. CARRERO: That's fine.
7        MR. C. GREEN: If you have an answer
8  to the question.
9      A.   I believe that at the time I was
10 given a general indication of the proceeds to
11 be received as a result of the asset transfer.
12 I don't recall at this point what that number
13 was.  And I do vaguely recall that there was
14 some reference to market value.  That was an
15 irrelevant number to me, so I wouldn't have
16 paid attention.
17     Q.   So when you say "proceeds," you mean
18 the cash to be received or the value of the
19 collateral to be pledged?
20       MR. C. GREEN: Object to form.
21     A.   The cash to be received.
22     Q.   And in learning about the cash to be
23 received, it would have been conveyed to you
24 the market value of the assets to be pledged?
25       MR. C. GREEN: Is that a question?

Page 99

1      Fleming - Highly Confidential
2      Q.   To clarify, I am asking if in
3  learning the amount of proceeds to be received
4  if ordinarily you would also be told the market
5  value of the assets to be pledged?
6        MR. C. GREEN: Object to form.
7        You may answer.
8      A.   There was nothing ordinary about
9  what was happening this, so I can't
10 comment on that.  I do believe that at the time
11 I was given an indication of both the cash
12 proceeds and the market value.
13     Q.   And do you recall either of those
14 two numbers?
15     A.   I do not recall those numbers today,
16 no.
17     Q.   And do you recall generally the
18 spread between those two numbers or the
19 haircut?
20       MR. C. GREEN: Object to form.
21       Assumes facts not in evidence, but you may
22 answer.
23     A.   I don't remember what that was.
24     Q.   Would that be information that you
25 would need to know in order to manage the cash

Page 100

1      Fleming - Highly Confidential
2  and collateral position of the firm?
3      A.   We would need to understand the cash
4  amount, the proceeds to be received.  I think
5  by that point in time we had lost control over
6  understanding collateral valuations and
7  collateral availability.
8      Q.   And, again, lost control of
9  collateral valuations and collateral
10 availability, by that you mean you no longer
11 had visibility of those positions and values;
12 is that correct?
13       MR. C. GREEN: Object to form.
14     A.   I would say that's a fair
15 description.  We lost visibility, really didn't
16 understand what was available.
17     Q.   And loss of visibility being only
18 because of the failure to receive feeds from
19 Chase or other reasons?
20       MR. C. GREEN: Object to form.
21     A.   I think it was -- had to do with the
22 very sudden and abrupt change in business
23 activities during that week post the holding
24 company bankruptcy that caused us to --
25 possibly our tools were not sophisticated

Page 101

1      Fleming - Highly Confidential
2  enough to be able to respond as quickly as
3  changes were occurring, which led us to, in
4  some ways, lose control over that information.
5      Q.   Were you involved at all in
6  assessing Lehman's asset -- withdrawn.
7        Were you involved at all in an
8  exercise to determine the availability of the
9  assets on Lehman's balance sheet for purchase?
10     A.   No.
11       MR. C. GREEN: Object to form.
12     Q.   Are you aware of any sort of
13 exercise to determine what positions were
14 available for purchase?
15       MR. C. GREEN: Object to form.  And
16 can you give us a time frame on this
17 question?
18     Q.   Were you aware any time after
19 September 12th of an exercise to create a list
20 of Lehman assets available for purchase?
21     A.   No.  I was not -- I was not informed
22 as to any aspects of a purchase agreement.
23     Q.   Have you ever seen a copy of the
24 Asset Purchase Agreement that was signed on
25 September 16th and closed on September 22nd

Confidential

Page 102

1        Fleming - Highly Confidential
2    between Lehman and Barclays?
3        MR. C. GREEN: Object to form. I'm
4    not certain the characterization is
5    correct.
6        You can answer, if you are able to.
7    A.    Not that I recall.
8    Q.    Have you ever seen the financial
9    schedule attached to the September 16 Asset
10   Purchase Agreement between Lehman and Barclays
11   setting forth assets and liabilities at Lehman?
12   I am trying to save time here. I can get them
13   all out.
14   A.    No, I'm not.
15       MR. C. GREEN: Would it help if we
16   took a short break? We have been going for
17   quite a while.
18       MS. CARRERO: I would say if we
19   could in ten minutes take the break?
20       MR. C. GREEN: Take a break in ten
21   minutes you mean?
22       MS. CARRERO: Yes.
23       MR. C. GREEN: That would be fine.
24   It would be fine with me.
25       Would it be all right with you,

Page 103

1        Fleming - Highly Confidential
2    Mr. Fleming?
3        THE WITNESS: It's fine.
4    Q.    Was it your understanding that when
5    assets were transferred from Lehman to Barclays
6    on Thursday, September 18th, that they would be
7    returned to Lehman?
8        MR. C. GREEN: Object to form.
9    A.    I didn't know the terms of the
10   transfer.
11   Q.    Are you aware of a process on
12   Friday, September 19th, to locate additional
13   assets to transfer to Barclays in addition to
14   those that were transferred September 18th?
15       MR. C. GREEN: Object to form.
16   A.    I was aware of a reconciliation
17   process under way. I was aware that there was
18   some form of shortfall. I don't know what that
19   form was. So that I was aware of.
20   Q.    When you say "some form of
21   shortfall," do you mean under the terms of the
22   asset sale from Lehman to Barclays?
23       MR. C. GREEN: Object to form.
24   Calls for a legal conclusion.
25       You may go ahead.

Page 104

1        Fleming - Highly Confidential
2    A.    As it relates to what I described as
3    the asset transfer.
4    Q.    To clarify, the search for
5    additional assets on Friday, September 19th,
6    what you described as a shortfall you saw
7    to be related to the September 18th transfer;
8    is that correct?
9        MR. C. GREEN: I just want to make
10       sure, he hasn't testified that there was a
11       search for additional assets at this point.
12       I think he just said he was aware of a
13       shortfall. So maybe --
14   A.    I cannot say that it was -- I had a
15   general understanding that there was a
16   shortfall, but I was not advised or informed as
17   to what that shortfall specifically referenced.
18   Q.    And as a consequence of the
19   shortfall, do you know what happened?
20   A.    I'm aware of, you know, a
21   reconciliation process that was launched. I
22   don't know the exact date. I don't know
23   whether it was Friday or it was Saturday, but
24   shortly after the -- probably either Thursday,
25   Thursday or Friday, to reconcile our cash and

Page 105

1        Fleming - Highly Confidential
2    collateral positions.
3    Q.    And by reconcile cash and collateral
4    positions, what do you mean?
5    A.    I'm not sure how to respond.
6    Reconcile, you know, our books and records to
7    bank statements and depository statements.
8    Q.    What was the intended outcome of the
9    reconciliation process?
10       MR. C. GREEN: Object to the form of
11       the question. Calls for speculation.
12       MS. CARRERO: Go ahead. Answer.
13   A.    To determine, you know, what
14   happened and where we ended up.
15   Q.    Was the reconciliation process also
16   to determine if there were additional assets
17   that could be transferred to Barclays?
18       MR. C. GREEN: Object to the form of
19       the question.
20   A.    I believe one of the goals of the
21   reconciliation was to determine what excess was
22   available.
23   Q.    And do you know if the outcome of
24   the reconciliation determined that there was
25   excess available?

Confidential

Page 106

1      Fleming - Highly Confidential
2          MR. C. GREEN: Object to form.
3      A.    I didn't perform the
4  reconciliations, my group wasn't responsible
5  for the reconciliations and I didn't access the
6  reconciliations, so I am really not in a
7  position to comment on the reconciliations
8  themselves.
9      Q.    Do you know if as a consequence of
10 the reconciliations or otherwise excess
11 collateral or cash was discovered that was to
12 be transferred to Barclays?
13         MR. C. GREEN: Object to the form.
14     A.    I'm not aware of -- I can't recall
15 if there were additional transfers made after
16 that Thursday, the 18th.
17         MS. CARRERO: Why don't we break.
18         MR. C. GREEN: Would you like to
19 break for lunch or --
20         MS. CARRERO: I think that makes
21 sense.
22         MR. C. GREEN: Okay.  Off the
23 record.
24         (Lunch recess was taken from 12:54
25 to 1:57.)

Page 107

1      Fleming - Highly Confidential
2  CONTINUED EXAMINATION BY
3  MS. CARRERO:
4      Q.    Good afternoon, Mr. Fleming.
5          Before we broke for lunch we were
6  talking about whether there were additional
7  transfers made from Lehman to Barclays after
8  September 18th.  Do you recall that discussion?
9      A.    Yes.
10     Q.    I am putting before you what has
11 previously been marked as Exhibit 177.  Take a
12 moment and read it, please.
13         (Document review.)
14     A.    Okay.
15     Q.    Starting with the last e-mail or
16 earliest in time on the last page of the
17 exhibit, do you recall a process of preparing
18 an opening balance sheet for Barclays to use on
19 day 1?
20         MR. C. GREEN: Object to the form.
21     A.    No, I was not part of that exercise.
22     Q.    Skipping to, I believe, the first
23 e-mail in the chain that you are CC'd on from
24 Paolo Tonucci to many and CC'ing you dated
25 September 20th at 10:31 a.m., do you recall

Page 108

1      Fleming - Highly Confidential
2  being asked to determine whether there were
3  15C3 assets to be transferred to Barclays?
4      A.    I recall being asked to provide some
5  information as it relates to the assets that
6  were segregated according to 15C3.
7      Q.    Could you explain briefly what 15C3
8  segregated assets are?
9          MR. C. GREEN: Object to the extent
10 it calls for a legal conclusion.
11         You may answer the question.
12     A.    I'm not the regulatory expert when
13 it comes to this, but I can give you a
14 general -- my general understanding of what the
15 segregation requirement pertains to, and that
16 is fully paid for customer assets whereby a
17 broker/dealer needs to on a weekly basis
18 calculate what that amount is as of close of
19 business each Friday and reserve for that
20 amount of assets on the following Tuesday and
21 it's a weekly calculation that's performed.
22     Q.    More generally, what is your role
23 with 15C3 segregated assets?
24     A.    My team, upon instruction from our
25 regulatory group, would perform the calculation

Page 109

1      Fleming - Highly Confidential
2  and advise us what the net change was.  My
3  group was responsible for affecting movements
4  into or out of the reserve accounts for the
5  actual week-over-week net change.
6      Q.    And by reserve account, you mean
7  15C3 reserve accounts; is that correct?
8      A.    There are designated accounts set up
9  for the exclusive benefit of customers that
10 have agreements associated with them whereby
11 the banks have no right or lien against the
12 assets for the customer, so those specific
13 accounts, you have to have the reserve assets
14 in those types of accounts.
15     Q.    In Mr. Tonucci's September 20th
16 e-mail he indicates: "Dan, the collateral that
17 was locked up for 15C3 needs to be transferred
18 over the Barclays." I imagine he meant to
19 Barclays.
20         Do you recall if 15C3 collateral was
21 transferred to Barclays?
22     A.    I think I already answered this
23 question earlier.  This e-mail, I believe, was
24 already distributed as one of the exhibits.  I
25 will respond again.  I am not aware of any

Confidential

## Page 110

1    Fleming - Highly Confidential
2 transfer of 15C3 assets to Barclays.
3    Q.    Are you aware of calculation of 15C3
4 assets available to transfer to Barclays?
5        MR. C. GREEN: You mean other than
6 is discussed in this e-mail?
7    Q.    Other than what is discussed in this
8 e-mail.
9    A.    I recall an exercise to reconcile
10 our books and records post Thursday, the 18th,
11 for purposes of determining excess assets that
12 resided in the broker/dealer. You know, what
13 would be done with those assets was not
14 described to me and certainly was not clear.
15    Q.    15C3 assets being one component of
16 those assets potentially available for
17 transfer; is that accurate?
18        MR. C. GREEN: Object to form.
19        You may answer.
20    A.    I believe that there was a
21 calculation, a recalculation of the reserve
22 formula as of close of business most likely
23 Friday, the 19th, but I'm not sure of the exact
24 date, but I do know that whatever that last
25 date was, they wanted to perform the

## Page 111

1    Fleming - Highly Confidential
2 calculation to determine what the proper amount
3 of segregation was or should be.
4    Q.    Were you ever given a figure you
5 were trying to reach with respect to the
6 reconciliation?
7        MR. C. GREEN: Object to form.
8    A.    I'm not aware of any amount related
9 to the rec. The reconciliation should result
10 in zero breaks. That's what a reconciliation
11 ultimately is.
12    Q.    If the reconciliation ultimately
13 results in a positive number, is that a
14 consequence of more assets being segregated
15 than necessary under the rules?
16        MR. C. GREEN: Object to form.
17        Do you understand the question?
18    A.    The question doesn't make sense to
19 me.
20    Q.    Could you explain for me, is there
21 more than one type of 15C3 reserve account, one
22 for customer -- withdrawn.
23        MS. CARRERO: Give me one moment.
24        All right.
25        (Exhibit 300B, e-mail dated

## Page 112

1    Fleming - Highly Confidential
2 September 23, 2008, Bates stamped
3 BCI-EX-(S)-00019269 and
4 BCI-EX-(S)-00019270, marked for
5 identification.)
6    Q.    Mr. Fleming, you have before you
7 what's been marked Exhibit 300B, if you could
8 take a moment to review it, particularly the
9 first e-mail in the chain.
10        (Document review.)
11    A.    Okay.
12    Q.    In this document marked Exhibit 300B
13 there is a reference to PAIB reserve accounts
14 and customer reserve bank accounts. Could you
15 explain the difference?
16    A.    There is two types of reserves. One
17 is the EBOC reserve, which is for the exclusive
18 benefit of customers. There is a second
19 calculation for PAIB, which is the proprietary
20 accounts of introducing brokers. Again, I'm
21 not an expert in the calculation, but I believe
22 that they are very similar in nature. They are
23 just covering two different types of customers.
24    Q.    And the reconciliation process
25 taking place I believe you said either that

## Page 113

1    Fleming - Highly Confidential
2 Thursday or Friday, September 18th, 19th, was
3 with respect to both the EBOC and the PAIB
4 accounts; is that correct?
5        MR. C. GREEN: Object to the form of
6        the question.
7    A.    The reconciliation that was being
8 performed was not -- to my understanding, was
9 not a reconciliation of the reserve accounts.
10 It was a reconciliation of our operating, our
11 normal operating bank accounts.
12    Q.    Which included the reserve accounts
13 or excluded them entirely?
14        MR. C. GREEN: Object to the form.
15    A.    I believe it would have excluded
16 them.
17    Q.    Was there a separate recalculation
18 process with respect to the EBOC and PAIB
19 accounts?
20    A.    I believe so.
21    Q.    Were you involved in that
22 recalculation process?
23    A.    That was the responsibility of the
24 regulatory group.
25    Q.    Do you know the outcome of the

Confidential

Page 114

1      Fleming - Highly Confidential
2  recalculation of the PAIB and EBOC accounts?
3      A.   I do not recall the outcome of
4  those.
5      Q.   And you do not recall whether any
6  excess in the EBOC and PAIB accounts subject to
7  release were transferred to Barclays; is that
8  correct?
9      MR. C. GREEN:  Object to the form.
10      A.   I do not recall.
11      Q.   Going back to Exhibit 300B, there is
12  a reference to Chase being instructed not to
13  communicate with Lehman.
14      Do you recall if that was, in fact,
15  the case as of September 23rd?
16      A.   Yes.
17      Q.   Do you know the circumstances under
18  which they had been instructed not to
19  communicate with Lehman?
20      MR. C. GREEN:  Object to form.
21      A.   I guess I would say no, I don't. I
22  just knew that they were instructed not to have
23  our phone calls and not to communicate with us.
24      Q.   Is this related to the situation you
25  described on September 18th with respect to

Page 115

1      Fleming - Highly Confidential
2  feeds not going through to your systems and
3  allowing visibility of the September 18th
4  transfer?
5      MR. C. GREEN:  Object to form.
6      A.   This relates to the exercise of
7  reconciling our books and records.
8      Q.   Can you turn back to Exhibit 177.
9  Turn to the second page, the first complete
10  e-mail at the top from you dated September 20th
11  at 5:01 p.m.
12      A.   Uh-huh.
13      Q.   Do you recall sending that message?
14      A.   Now that I look at it, I do. I do
15  recall sending this.
16      Q.   Do you recall why you sent it?
17      A.   I believe that I was requested to
18  provide the balances in the reserve accounts.
19      Q.   And are the balances in the reserve
20  accounts only those that are in excess of what
21  is required under the rules?
22      MR. C. GREEN:  Object to the form of
23      the question.
24      A.   I'm not sure I follow you.
25      Q.   My question is the balances in the

Page 116

1      Fleming - Highly Confidential
2  EBOC and PAIB accounts, are those amounts still
3  required to be segregated or are they available
4  for other uses?
5      MR. C. GREEN:  Object to the form of
6      the question.
7      A.   The calculation is what determines
8  the requirement. This is just collateral to
9  satisfy the requirement. So you need to look
10  at the calculation itself.
11      Q.   My question is are these amounts the
12  excess over the requirements or is it the total
13  amount in the accounts?
14      MR. C. GREEN:  I'm sorry, these
15      amounts you are referencing are on page 2
16      of Exhibit 177?
17      Q.   Exactly. The amounts being for EBOC
18  a total of 1.73 billion, which is comprised of
19  both cash and securities, and then securities
20  totaling 492,707,260.65.
21      MR. C. GREEN:  Object to the form of
22      the question.
23      A.   Without knowing what the requirement
24  was, there is no way to determine whether there
25  was excess or deficit based on this

Page 117

1      Fleming - Highly Confidential
2  information.
3      Q.   Is your e-mail suggesting an attempt
4  to transfer the cash and securities -- I'm
5  sorry. Withdrawn.
6      Is your e-mail suggesting an attempt
7  to transfer the cash then at Wells Fargo to
8  somewhere?
9      MR. C. GREEN:  Object to the form of
10      the question.
11      Q.   Let me rephrase.
12      There is mention in this e-mail to
13  moving the cash. Do you recall where it was to
14  be moved to?
15      A.   I believe that this e-mail is
16  referencing an attempt to release cash from the
17  lock-up at a prior date, not necessarily the
18  transfer of cash somewhere else.
19      Q.   And how about the statement
20  regarding moving the securities at JPM, what is
21  that a reference to?
22      A.   That is in reference to the extent
23  that there was instructions provided to move
24  the securities somewhere, wherever that may be,
25  it was unclear to me how that could be affected

Confidential

Page 118

1          Fleming - Highly Confidential
2     given that JPMorgan had blocked us out of their
3     system and wasn't communicating with us.
4          Q.   I guess I am just not understanding
5     how the e-mail below regarding transferring the
6     15C3 over to Barclays is not related to the
7     movement of cash and securities in your
8     response e-mail. Am I understanding correctly?
9          MR. C. GREEN:  Object to the form of
10     the question.
11          A.   I really can't comment on the prior
12     e-mail from Mr. Tonucci referencing the
13     transfer of the 15C3 over to Barclays.
14          Q.   So you have no recollection if you
15     responded to his message with the EBOC and PAIB
16     balances because there was an intention to move
17     those over to Barclays?
18          MR. C. GREEN:  Object to the form.
19          A.   I was responding to Mr. Tonucci and
20     advising him of what was in the account.
21          Q.   Mr. Tonucci later asks you for a
22     contact at Wells. Do you recall if you
23     provided that contact information?
24          A.   I believe I did.
25          Q.   And after you provided the

Page 119

1          Fleming - Highly Confidential
2     information regarding the accounts, is it your
3     understanding that it was then determined a
4     recalculation was needed?
5          A.   Can you say that one more time,
6     repeat that?
7          Q.   If I understand your testimony
8     correctly, you were providing in your 5:01 p.m.
9     e-mail of September 20th the information you
10     had on the EBOC and the PAIB accounts. Is that
11     correct?
12          A.   Correct.
13          Q.   Mr. Tonucci then asks you for your
14     contact at Wells and you believe you did
15     provide that contact information; is that
16     correct?
17          A.   I believe that to be the case, yes.
18          Q.   And then later on in the chain it
19     appears as though there is a request for a
20     recalculation to be done immediately.  Do you
21     recall there being a recalculation following?
22          MR. C. GREEN:  Following this
23     request by Mr. Blackwell?
24          MS. CARRERO:  Following this request
25     by Mr. Blackwell, yes.

Page 120

1          Fleming - Highly Confidential
2          MR. C. GREEN:  Do you have the
3     question in mind, Mr. Fleming?
4          A.   I do recall that there was a reserve
5     calculation performed, yes.
6          Q.   And turning back to Exhibit 300B, do
7     you recall if the outcome of the recalculation
8     was a determination that there was 769 million
9     of qualified collateral in the customer reserve
10     bank account?
11          A.   I think there is some confusion with
12     regards to the calculation and the assets that
13     are in reserve accounts. The calculation is
14     based on a variety of different things, largely
15     driven by books and records of client balances
16     and that calculation is performed. Part of
17     that calculation involves the reconciliation of
18     our operating accounts, our stock record, our
19     bank accounts, and there is a calculation and a
20     result from that. The collateral that's in the
21     reserve accounts that we are describing --
22     that's being described in these e-mails is the
23     collateral that was there from the prior
24     calculation. So it's the request for
25     information on what is in the account and then

Page 121

1          Fleming - Highly Confidential
2     the -- what I consider to be normal course, to
3     do a re-calc. There is -- I'm not -- I'm
4     getting a little bit confused with what we are
5     trying to get at with the question, I guess.
6          Q.   What was your understanding of why a
7     re-calc was being done? Did it have to do with
8     Mr. Tonucci's request regarding transfer of
9     15C3 over to Barclays?
10          MR. C. GREEN:  Object to the form of
11     the question. May call for speculation.
12          You can answer, if you have an
13     answer.
14          A.   In my opinion, the purpose of the
15     calculations is to determine proper client
16     segregation.
17          Q.   Did you have any understanding of
18     what would be done with any excess cash or
19     collateral no longer needed to be segregated?
20          A.   No.
21          Q.   Were you involved in any sort of
22     process around that same time to locate assets
23     in the non-actionable box that could be
24     transferred over to Barclays?
25          MR. C. GREEN:  Object to the form of

Confidential

Page 122

```
1        Fleming - Highly Confidential
2    the question.
3        Do you understand the question,
4    Mr. Fleming?
5        THE WITNESS: I am thinking.
6        A.   I think I previously stated that I
7    wasn't involved in the -- you know, the
8    location or that reconciliation process to
9    identify unencumbered assets.
10       Q.   Do you know the term Schedule B with
11   respect to the asset sale by Lehman to
12   Barclays?
13       MR. C. GREEN: Object to the form.
14       A.   I've heard it referenced, but that's
15   the extent of it.
16       Q.   Do you know the type of securities
17   that are listed on Schedule B?
18       A.   No.
19       Q.   Do you know of a process to locate
20   unencumbered assets for transfer to Barclays?
21       MR. C. GREEN: During what period of
22   time?
23       MS. CARRERO: During the week of
24   September 15th, specifically after
25   September 18th.
```

Page 123

```
1        Fleming - Highly Confidential
2        A.   I'm aware of an effort to reconcile
3    and identify unencumbered assets.
4        Q.   Did you participate in that process?
5        MR. C. GREEN: Object to the form.
6    Asked and answered.
7        A.   No.
8        Q.   Do you know if unencumbered assets
9    were identified at the end of that
10   reconciliation process for transfer to
11   Barclays?
12       MR. C. GREEN: Objection to form.
13       A.   I don't recall the outcome of those
14   reconciliations.
15       Q.   And do you recall if any
16   unencumbered assets were later transferred to
17   Barclays?
18       A.   I do not recall that.
19       (Exhibit 301B, e-mail dated
20   September 21, 2008, Bates stamped 10307085,
21   marked for identification.)
22       Q.   Mr. Fleming, you have in front of
23   you what's been marked as Exhibit 301B.  Please
24   take a moment to look it over.
25       (Document review.)
```

Page 124

```
1        Fleming - Highly Confidential
2        A.   Okay.
3        Q.   Starting with the last e-mail in the
4    chain or the earliest in time, do you recall
5    there being a call on September 20th, 2008
6    regarding the unencumbered assets?
7        A.   I don't recall this specific call.
8    There were many calls occurring.
9        Q.   Do you recall a series of calls
10   taking place around that time of September 20th
11   regarding a reconciliation process to determine
12   the amount of unencumbered assets that could be
13   transferred over to Barclays?
14       MR. C. GREEN: Object to the form.
15   Kelly, I'm sorry, excuse me, I am
16   wondering, do you have a copy of this
17   e-mail chain that has the entire chain?  It
18   says on the second page of this document
19   that the original message is truncated and
20   it appears to break off in mid sentence. I
21   am just wondering do you have a more
22   complete version?  If you don't, you don't.
23       MS. CARRERO: Five minutes.  I think
24   we can find out.
25       MR. C. GREEN: Off the record for a
```

Page 125

```
1        Fleming - Highly Confidential
2    minute then.
3        (Recess was taken from 2:37 to
4    2:38.)
5    BY MS. CARRERO:
6        Q.   Mr. Fleming, what is your
7    understanding of the types of collateral that
8    would constitute unencumbered assets?
9        A.   My understanding of unencumbered
10   assets are those assets that are free and clear
11   of any lien or segregation and available for
12   use.
13       Q.   And any free and clear assets could
14   be found in a number of different Lehman
15   accounts; is that correct?
16       MR. C. GREEN: Object to the form.
17       A.   There could be unencumbered assets
18   in multiple locations.
19       Q.   And what would those locations be?
20       A.   Depository accounts.
21       Q.   Would depository accounts be the
22   same thing as DTC accounts?
23       A.   Yes.
24       Q.   And would those DTC accounts be
25   designated -- withdrawn.
```

Confidential

---

Page 126

Fleming - Highly Confidential

1       Fleming - Highly Confidential
2       Could you tell me your understanding
3  of what type of assets are in DTC box 074?
4       MR. C. GREEN: As of what point in
5  time?
6       MS. CARRERO: As of the time of the
7  reconciliation searching for unencumbered
8  assets.
9       MR. C. GREEN: That would be this
10  weekend of the 20th and the 21st?
11       MS. CARRERO: Starting September
12  18th through the 22nd of September.
13       A.   I don't know specifically what
14  assets were in that account. It could have
15  been any DTC eligible asset.
16       Q.   And was it your understanding that
17  the unencumbered assets in DTC 074 were being
18  transferred to Barclays?
19       MR. C. GREEN: Object to the form of
20  the question. I think it mischaracterizes
21  his testimony or at least does not take
22  account of his prior testimony. He said he
23  doesn't know specifically what assets were
24  in that account, his prior answer.
25       Q.   Answer, if you can.

---

Page 127

1       Fleming - Highly Confidential
2       A.   Can you repeat it.
3       (Record read.)
4       MR. C. GREEN: Same objection.
5       A.   I'd have to answer the question as
6  no, it was not my understanding. I did not
7  have an understanding of what assets were being
8  transferred.
9       (Exhibit 302B, e-mail dated
10  September 22, 2008, Bates stamped
11  BCI-EX-(S)-00018817, marked for
12  identification.)
13       Q.   Mr. Fleming, you have before you
14  what's been marked Exhibit 302B.
15       Do you recall learning at some point
16  on September 22nd that Barclays would not fund
17  or back DTC box 074?
18       A.   I don't remember this specifically.
19       Q.   In Mr. Blackwell's e-mail to you and
20  Mr. Tonucci on September 22nd at 9:29 a.m. what
21  do you think he meant by saying "how do we fund
22  this"?
23       MR. C. GREEN: Object to the form of
24  the question. Calls for speculation.
25       A.   I would interpret this to mean how

---

Page 128

1       Fleming - Highly Confidential
2  do we satisfy the net settlement obligations
3  for that account.
4       Q.   Do you know whether Barclays
5  ultimately funded or backed settlement
6  obligations in DTC 074?
7       A.   I don't remember. I don't recall.
8       Q.   Were you involved in any
9  communications with DTC regarding funding of
10  any Lehman accounts there?
11       MR. C. GREEN: On or after September
12  22nd or at any time or --
13       MS. CARRERO: Any time from
14  September 18th onward.
15       A.   I'm not sure of the exact date, but
16  I was contacted by DTC. I think it was the
17  chairman of DTC who was trying to get in touch
18  with me about the -- about satisfying the
19  obligations on the account. I don't recall
20  what day it was, but I do recall that they were
21  trying to get in touch with me and I do believe
22  I spoke to him. I believe it was Mr. Donohue.
23       Q.   Were you involved with any
24  negotiations regarding -- withdrawn.
25       Were you involved in negotiations

---

Page 129

1       Fleming - Highly Confidential
2  with either Barclays or DTC regarding
3  settlement of trades at DTC?
4       MR. C. GREEN: Object to the form.
5       A.   No, not that I recall.
6       (Exhibit 303B, e-mail dated
7  September 19, 2008, Bates stamped 465433,
8  marked for identification.)
9       Q.   Mr. Fleming, you have before you
10  what's been marked Exhibit 303B. Take a moment
11  to review it.
12       (Document review.)
13       A.   Okay.
14       Q.   Do you recall a pledge of about 800
15  million in market value to Barcap on Friday,
16  September 19th?
17       A.   I mean, I don't recall it
18  specifically where that was.
19       Q.   Do you know why you would be copied
20  on an e-mail regarding a transfer on Friday,
21  September 19th?
22       MR. C. GREEN: Object to the form of
23  the question to the extent it calls for
24  speculation.
25       A.   I think I was being CC'd on most

Confidential

Page 130

1    Fleming - Highly Confidential
2    cash and collateral transfers.
3        Q.    Going back to Exhibit 301B, the top
4    e-mail references an 800 number asking if it
5    should be included in the reconciliation or
6    unencumbered number that's being generated on
7    September 21st.
8        Do you know if the 800 is a
9    reference to the Friday transfer?
10        MR. C. GREEN:  Object to your
11    characterization of the e-mail.  The e-mail
12    speaks for itself.
13        You may answer.
14        A.    I do not know whether the 800
15    referenced in 301B is the same 800 referenced
16    in 303B.
17        Q.    Do you know if the 800 referenced in
18    301B was, in fact, included in the
19    reconciliation resulting in an unencumbered
20    asset number?
21        MR. C. GREEN:  Object to the form of
22    the question.
23        A.    I do not know.
24        Q.    As one of the functions of the
25    collateral -- cash and collateral management

Page 131

1    Fleming - Highly Confidential
2    group, did the group deal with the margin
3    requirements -- withdrawn.
4        Is the cash and collateral
5    management group responsible for monitoring
6    margin requirements of the exchanges?
7        A.    The cash and collateral management
8    team was responsible for satisfying the
9    requirements at certain exchanges.
10        Q.    And which exchanges are those?
11        A.    I can't say with precision, but I
12    believe the FICC, the NBSCC, the OCC.  That's
13    all I can recall right now.  There may have
14    been -- I don't know whether -- I don't recall
15    whether the futures exchanges were included,
16    like the CME or the CBOT.  I don't recall
17    whether those were included or not.
18        Q.    And could you explain to me the
19    process by which your group would handle margin
20    to those exchanges?
21        MR. C. GREEN:  Object to the form.
22        A.    We would receive the margin
23    statement from the exchange each morning and we
24    would then either withdraw or place additional
25    collateral with the exchange.

Page 132

1    Fleming - Highly Confidential
2        Q.    Do you know if any of the margin
3    posted to the exchanges was transferred over to
4    Barclays?
5        MR. C. GREEN:  Object to the form.
6        A.    I don't know for certain what
7    happened with the exchanges.
8        (Exhibit 304B, e-mail dated
9    September 17, 2008, Bates stamped 10306758,
10    with attached spread sheet, Bates stamped
11    10306405, marked for identification.)
12        Q.    Mr. Fleming, you have before you
13    what has been marked as Exhibit 304B.  Please
14    take a moment to review.
15        (Document review.)
16        Q.    Have you had an opportunity to
17    review?
18        A.    One more minute.
19        (Document review.)
20        A.    Okay.
21        Q.    Is the attachment to Exhibit 304B a
22    spread sheet that is generated in the normal
23    course of business?
24        MR. C. GREEN:  Object to the form.
25        A.    I believe the answer to that is no.

Page 133

1    Fleming - Highly Confidential
2    The cash and collateral management team had a
3    schedule for the exchanges that they were
4    responsible for funding.  The futures team
5    within operations was responsible for funding a
6    whole host of other margin exchanges.  I think
7    primarily international exchanges.  I believe
8    that this report is one that was created in and
9    around that week of the 15th for us to try to
10    get a consolidated view as to what all of our
11    exchange margin was.
12        Q.    If you would turn your attention to
13    the second page of the attachment to
14    Exhibit 304B, lines 58, 59 and 60.
15        A.    Okay.
16        Q.    Regarding OCC accounts, could you
17    tell me the difference between the customer and
18    the house OCC accounts?
19        MR. C. GREEN:  You mean as reflected
20    on this exhibit or --
21        Q.    As reflected on this exhibit or if,
22    in fact, there were two separate accounts, one
23    for a customer account and one house account.
24        A.    It's my understanding that there
25    were two accounts.

Confidential

---

Page 134

Fleming - Highly Confidential

1
2    Q.    And could you explain to me the
3    difference between the two OCC margin accounts?
4    A.    I'm not an expert in the margin. I
5    didn't control the OCC processing. My
6    understanding is that the house represents the
7    proprietary positions and that the customer
8    represents customer positions or the margin
9    associated with each.
10    Q.    And would Lehman funds be used to
11    post margin to the customer margin accounts at
12    OCC?
13    MR. C. GREEN:  Object to the form of
14    the question.
15    Do you have the question in mind?
16    THE WITNESS:  Am I supposed to be
17    answering the question?
18    MR. C. GREEN:  Do you want to read
19    back the question?
20    (Record read.)
21    A.    We would use firm assets to pledge
22    to the customer requirement. There is no
23    correlation between the customer margin and the
24    margin that's actually collected from clients,
25    because the margin treatment that we give

---

Page 135

Fleming - Highly Confidential

1
2    clients, such as New York Stock Exchange
3    portfolio margin treatment, allows for the
4    netting of options and other types of
5    instruments that are housed within the client's
6    account whereby the OCC is only looking at the
7    option position, so there never is a
8    correlation, so you could never locate the
9    client asset applicable to a margin -- I
10    shouldn't say never. We couldn't. We didn't.
11    So it was firm assets that were pledged to the
12    OCC.
13    Q.    And if you would turn your attention
14    to column F, which is entitled IM Excess
15    Deficit, could you explain for me what column F
16    is tracking?
17    A.    IM stands for initial margin, which
18    is determined by the exchange.
19    Q.    If there is an excess under IM
20    excess deficit, is the excess available to be
21    returned to Lehman?
22    A.    I believe so.
23    Q.    If you turn your attention to
24    column H of Exhibit 304B, the column is headed
25    Exchange Margin Available.

---

Page 136

Fleming - Highly Confidential

1
2    Do you have any understanding as to
3    the meaning of the numbers in that column?
4    A.    I don't know.
5    Q.    And do you know if the excess margin
6    in the OCC customer and house accounts, which
7    can be found in lines 58, 59 and 60, were
8    growing on the 16th as opposed to the numbers
9    on the 15th if you turn to the fourth page of
10    the attachment and look at the same lines 58,
11    59 and 60?
12    MR. C. GREEN:  Object to the form of
13    the question.
14    Q.    Because of any particular event?
15    A.    I'm not sure I'm looking at the
16    right thing. So the second --
17    Q.    So page 2 of the attachment, lines
18    58 through 60, and then page 4 of the
19    attachment to Exhibit 304B, lines 58 through
20    60.
21    A.    And which columns?
22    Q.    I'm sorry, column K on page 4.
23    A.    So column F is the equivalent of
24    column K? Is that what --
25    MS. CARRERO:  Off the record.

---

Page 137

Fleming - Highly Confidential

1
2    (Discussion off the record.)
3    MS. CARRERO:  Withdraw the pending
4    question.
5    BY MS. CARRERO:
6    Q.    Mr. Fleming, are you aware of excess
7    margin growing in the margin accounts at OCC
8    over the week of September 15th?
9    MR. C. GREEN:  Object to the form of
10    the question.
11    A.    I would say that I was -- nothing
12    stood out or nothing was brought to my
13    attention as it related to issues with -- let
14    me rephrase that. I was not aware of issues
15    with a growing amount of excess in the
16    accounts, so I think it's fair to say that
17    there was always some amount of excess in the
18    accounts. I also think it's fair to say that
19    there was a tremendous amount happening during
20    that time frame, not only as it relates to, you
21    know, positions that we were trading in or
22    clients were trading in, but the market in
23    general. So the volatility of, you know, the
24    positions, not the positions but the value of
25    those positions, was very, very significant, so

---

Confidential

## Page 138

1     Fleming - Highly Confidential
2 the fact that we had excess there doesn't come
3 as a surprise.
4    Q.  If there is excess in the account,
5 does that suggest any volatility in the market
6 was in Lehman's favor in aggregate?
7     MR. C. GREEN: Object to the form.
8    A.  I wouldn't draw any conclusion like
9 that. All I am saying is there was, you know,
10 unprecedented volatility in the marketplace.
11    Q.  Could you explain to me how the
12 margin accounts at an exchange like OCC work in
13 tandem with the position accounts?
14    MR. C. GREEN: Object to the form.
15    A.  I cannot describe to you the
16 calculation of margin at the exchanges that
17 they perform. I don't know what that
18 calculation consists of.
19    Q.  Could you explain to me how the
20 margin account is related to any account
21 holding exchange-traded derivatives?
22    MR. C. GREEN: Object to the form.
23    A.  There is a margin calculation based
24 on the positions and then there is a designated
25 account whereby qualified assets need to be

## Page 139

1     Fleming - Highly Confidential
2 deposited to satisfy the margin requirement.
3    Q.  So for the customer margin account
4 at OCC there would be a related account holding
5 any exchange-traded derivatives; is that
6 accurate?
7    MR. C. GREEN: Object to the form.
8    A.  There would be customer trades that
9 correspond to the customer margin.
10    (Exhibit 305B, e-mail dated
11 September 23, 2008, Bates stamped
12 BCI-EX-(S)-000191987 through
13 BCI-EX-(S)-000191194, marked for
14 identification.)
15    Q.  Mr. Fleming, you have before you
16 what's been marked Exhibit 305B.
17    A.  Yes.
18    Q.  Do you know what this document is?
19    A.  This appears to be a statement from
20 the OCC.
21    Q.  Do you recall receiving these
22 statements on September 23rd from Susie Chen?
23    A.  Not specifically, but it shows here
24 that -- well, there is a memo here. I don't
25 recall actually reviewing or doing anything

## Page 140

1     Fleming - Highly Confidential
2 with these statements.
3    Q.  Do you recall attending a meeting
4 regarding OCC margin around September 23rd?
5    A.  I don't. There were a lot of
6 meetings happening at the time and I didn't --
7 I wasn't actively managing the day-to-day
8 business, the detail, so it's likely that
9 someone else would have been attending those
10 meetings who was more familiar with the
11 details.
12    Q.  Do you have any idea of who would
13 have been attending those meetings?
14    MR. C. GREEN: Object to the form of
15 the question. When you say "those
16 meetings," you mean this particular meeting
17 you are referring to or --
18    MS. CARRERO: Mr. Fleming said that
19 it was likely that somebody else would have
20 been attending those meetings who was more
21 familiar with the details. I am asking him
22 to clarify who those individuals might have
23 been.
24    MR. C. GREEN: He said there were a
25 lot of meetings.

## Page 141

1     Fleming - Highly Confidential
2    Q.  Particularly with respect to OCC
3 margin, who, if not you, would have attended
4 any meetings taking place on the issue?
5    A.  It's conceivable that Craig Jones
6 may have attended the meeting you are
7 referencing.
8    Q.  And at this point on September 23rd
9 are you employed by Lehman or are you employed
10 by Barclays at this point?
11    MR. C. GREEN: Object to the form.
12    A.  I don't know. I don't know.
13    Q.  Do you recall if at any point during
14 the week of September 15 you received an offer
15 of employment from Barclays?
16    A.  I recall receiving an offer of
17 employment. I don't recall what day it was
18 that that occurred.
19    Q.  Do you recall how you received that
20 offer of employment?
21    A.  I received a phone call from
22 Mr. Lowitt advising me that Barclays would like
23 to hire me.
24    Q.  And do you recall if you received a
25 written offer following Mr. Lowitt's call?

Confidential

Page 142

1          Fleming - Highly Confidential
2      A.   I did.
3      Q.   Do you recall if you received both
4  an e-mail as well as a letter?
5      A.   I do recall that there was e-mails
6  sent out to a number of individuals within my
7  team, some of which received e-mails for
8  employment, others did not. I don't recall
9  when that e-mail was distributed or the date
10 that I received the call from Mr. Lowitt. I'm
11 not sure which one occurred first.
12         (Exhibit 306B, e-mail dated
13     September 22, 2008, Bates stamped 10295071,
14     marked for identification.)
15         (Exhibit 307B, letter dated
16     September 22, 2008, Bates stamped
17     BCI-EX-00077308 through BCI-EX-00077310,
18     marked for identification.)
19     Q.   Mr. Fleming, you have before you
20 what's been marked as Exhibits 306B and 307B.
21 Are these the acceptance and offer of Barclays
22 employment that you recall?
23     A.   This is the contract that I signed.
24         MR. C. GREEN: And you are referring
25     to Exhibit 307B?

Page 143

1          Fleming - Highly Confidential
2      A.   307B.
3      Q.   And turning to the signature page,
4  do you recall if you signed it on September
5  27th, 2008?
6      A.   I believe I received it on a Friday.
7  I don't know whether that was the 27th of
8  September or not.
9      Q.   The letter is dated September 22nd.
10 Do you recall if you received it closer to the
11 22nd or around the time that you signed on the
12 27th?
13         MR. C. GREEN: Object to the form of
14     the question. I believe his answer was he
15     received it on a Friday, he thinks.
16     Q.   Turning your attention to
17 Exhibit 306B, which is dated September 22nd,
18 Eastern Standard Time 8:27 a.m., do you recall
19 having accepted employment at Barclays by means
20 of this e-mail at that time?
21     A.   Monday would have been -- I guess
22 based on this e-mail, yes, I accepted at this
23 time.
24     Q.   And turning back to 307B, your offer
25 letter, does this letter accurately reflect the

Page 144

1          Fleming - Highly Confidential
2  terms of your employment at Barclays?
3      A.   Yes, it appears so.
4      Q.   And were these terms commensurate
5  with your compensation you were receiving from
6  Lehman at the time?
7          MR. C. GREEN: Object to the form of
8      the question.
9      A.   Can you ask that question another
10 way? Could you clarify?
11     Q.   Are the terms of your Barclays
12 employment letter the same as the compensation
13 package you had at the time with Lehman?
14     A.   Similar. Not the same.
15     Q.   How did they differ?
16     A.   I believe that this is a percentage
17 higher than the 2007 year end compensation.
18     Q.   The [redacted] cash bonus that was to
19 be awarded for 2008, was that the amount you
20 were to receive from Lehman as a bonus in 2008?
21         MR. C. GREEN: Object to the form of
22     the question.
23     A.   I don't know the answer to that.
24     Q.   You had not at the time of this
25 offer already received a bonus for 2008 from

Page 145

1          Fleming - Highly Confidential
2  Lehman; is that correct?
3      A.   That is correct.
4      Q.   And the salary which is listed here
5  as [redacted] is that the same as your salary in
6  2008 at Lehman?
7      A.   Yes.
8          MR. C. GREEN: Just for the record,
9      I would like to assure Mr. Fleming that we
10     have an agreement that the entire
11     transcript is to be designated highly
12     confidential under the protective order,
13     including this testimony about
14     compensation, and then the parties will
15     revisit that as necessary within a week.
16         That comports with your
17     understanding, doesn't it, Kelly?
18         MS. CARRERO: Yes.
19     Q.   Going back to what has been marked
20 as Exhibit 305B, does the review of your offer
21 and acceptance of Barclays employment refresh
22 your recollection whether as of September 23rd
23 you were already an employee of Barclays?
24         MR. C. GREEN: Do you understand the
25     question?

Confidential

Page 146

1      Fleming - Highly Confidential
2          THE WITNESS:  No.
3          MR. C. GREEN:  Do the documents you
4      just looked at refresh your recollection
5      that as of the 23rd you were or were not an
6      employee of Barclays?  Do they change your
7      recollection as to that question?
8      A.   Not 305B.
9      Q.   You can answer the question without
10     305B.  My question is as of September 23rd had
11     you begun employment with Barclays?
12     A.   It would appear, yes, that as of the
13     22nd of September is when I accepted the offer
14     of employment from Barclays.
15     Q.   And looking at 305B, can you walk me
16     through some of the information on the OCC
17     account statements starting with the account
18     information in the left-hand corner, the first
19     being OCC 00074 C.
20         MR. C. GREEN:  Is there a question?
21     Q.   Do you know if this is the OCC
22     customer account we had discussed with
23     reference to Exhibit 304B?
24     A.   Again, I'm not -- I didn't deal with
25     these statements on a day-to-day basis.  It

Page 147

1      Fleming - Highly Confidential
2      would appear to me based on my read of this
3      document at this time that the second page to
4      305B is representative of the 074 customer
5      account.
6      Q.   The second page being tier account
7      074 F, as in Frank?
8      A.   That would appear to me to be 074
9      firm, which I will make a leap of faith is
10     equivalent to what is also described as house.
11     Q.   And 074 C, which I have as the first
12     page of the exhibit, of the attachment to the
13     exhibit, would be the customer?
14         MR. C. GREEN:  Object to the form.
15     Q.   Is that correct?
16     A.   That's what it would appear to be at
17     this time, yes.  Again, I was not the
18     individual who was managing this process, nor
19     reviewing these documents on a day-to-day
20     basis.
21         (Exhibit 308B, e-mail dated
22     September 25, 2008, Bates stamped
23     BCI-EX-(S)-00011649 through
24     BCI-EX-(S)-00011651, marked for
25     identification.)

Page 148

1      Fleming - Highly Confidential
2      Q.   Mr. Fleming, you have before you
3      what has been marked as Exhibit 308 B.  Please
4      take a moment to review.
5          (Document review.)
6      A.   Okay.
7      Q.   Mr. Fleming, do you recall learning
8      at some point that all the margin previously
9      posted to the OCC with respect to accounts
10     number 74, 84 and 273 would be transferred to
11     Barclays?
12         MR. C. GREEN:  Object to the form of
13     the question.
14     A.   I recall at the time that there was
15     some ambiguity and uncertainty as to the status
16     of the OCC accounts.  It was something that I,
17     you know, was not actively engaged in.
18     Q.   Do you know who would have been
19     actively engaged in any ambiguity regarding the
20     OCC accounts?
21         MR. C. GREEN:  Object to the form of
22     the question.  I think you mischaracterized
23     his testimony.  I don't think he was
24     stating that people were actively engaged
25     in an ambiguity, but perhaps he was.

Page 149

1      Fleming - Highly Confidential
2          Do you have the question in mind,
3      Mr. Fleming?
4      A.   It is possible that some of the
5      others listed on this e-mail may, in fact, have
6      more information, who could provide more
7      clarity around some of the discussions that
8      were going on at that time.  I do know that
9      there was a significant amount of
10     reconciliation that was going on at that time.
11     I believe that there was an option expiration
12     date on Friday, I believe it was the 19th, and
13     again, you know, our books and records were
14     not -- you know, were not reconciled.  There
15     was a lot of effort to try and figure out,
16     again, what our positions were at close of
17     business the 19th.
18     Q.   Do you recall being asked for any
19     information about the margin amounts in the
20     accounts on the 19th or prior to the 22nd in
21     order to transfer additional value to Barclays?
22         MR. C. GREEN:  Object to the form.
23     A.   I recall there being a lot of
24     questions around the OCC, broadly.
25     Q.   Could you give me examples of the

Confidential

Page 150

1       Fleming - Highly Confidential
2   type of questions being asked about the OCC?
3       A.   There were questions that were being
4   asked as to, you know, what our requirements
5   were, you know, what collateral was posted.
6   The status of the accounts in terms of, you
7   know, were they active, were they not active.
8   Who had ownership of the accounts. Were they a
9   Lehman account, were they a Barclays account.
10  The individuals that I had spoken to were back
11  office people similar to myself who were not
12  party to any discussions around agreements that
13  had been made, so...
14      Q.   Around what time were these
15  questions about the OCC accounts being made?
16      MR. C. GREEN:  Mr. Fleming, I just
17  want to caution you that if there were any
18  inquiries of you from counsel for Barclays,
19  lawyers for Barclays about these issues or
20  any other issues, those inquiries should be
21  left out of your testimony, because they
22  are privileged.
23      MS. CARRERO:  We are talking prior
24  to the 22nd at this point.
25      MR. C. GREEN:  I thought you were

Page 151

1       Fleming - Highly Confidential
2   asking about the week of the 22nd after
3   Mr. --
4       Q.   I am currently asking about when
5   these questions about the OCC accounts arise,
6   which I believe your prior testimony indicates
7   it was around the 19th, but I would like to
8   clarify exactly when these discussions are
9   taking place.
10      MR. C. GREEN:  Let me just make
11  clear for the record then I would like for
12  you to not testify about any discussions
13  you had after you became a Barclays
14  employee with lawyers for Barclays about
15  the OCC or anything else.
16      That said, you can go ahead and
17  answer the question to the extent you are
18  able to do so.
19      So your question is about before the
20  22nd is the question that's pending?
21      Q.   My question pending is regarding
22  questions being asked about the OCC accounts.
23  When do those questions begin to arise?
24      A.   I can't say for certain. I think
25  post -- post the 19th.

Page 152

1       Fleming - Highly Confidential
2       Q.   That weekend prior to the closing of
3   the sale to Barclays?
4       A.   I don't know when the sale closed.
5   I don't know the term --
6       Q.   Prior to your becoming an employee
7   at Barclays?
8       A.   I can't say. I can't say when. I
9   mean, there was many, many questions about many
10  different topics. Certainly in the week
11  leading up to the 19th close of business, you
12  know, we were just trying to get a handle on
13  what the positions were, what was happening and
14  so forth. You know, subsequent to that then
15  after the SIPC bankruptcy there were questions
16  around reconciliation and other things like
17  that.
18      Q.   Going back to Exhibit 305B, if we
19  could go to the third page of the attachment,
20  do you know what the M after account 074 stands
21  for?
22      A.   I believe the M stands for market
23  maker.
24      Q.   And how is the market maker account
25  different from the customer and house accounts?

Page 153

1       Fleming - Highly Confidential
2       A.   I don't know.
3       Q.   Do you know how account 74 differs
4   from account 84 which starts on the next page
5   of the attachment to Exhibit 305B?
6       MR. C. GREEN:  Object to the form.
7       A.   I don't.
8       Q.   Same question with respect to
9   account 273, which begins a couple of pages
10  later in the attachment to 305B?
11      MR. C. GREEN:  I'm sorry, I don't
12  see that in the copy that I have. Oh, 273.
13  I'm sorry. I have it now.
14      Q.   I am referencing the page that's
15  Bates stamped BCI-EX-(S)-00019193 which has
16  account 273.
17      A.   I don't know what 273 C is
18  representative of.
19      Q.   And looking at the information on
20  any of these pages in the attachment, could you
21  explain to me the excess deficit line and the
22  meaning of it?
23      MR. C. GREEN:  Object to the form.
24  The meaning of the line on each of these
25  pages?

Confidential

Page 154

1    Fleming - Highly Confidential
2         MS. CARRERO: Yes.
3         A.   No.  Again, I was not dealing with
4    these statements on a day-to-day basis.  It
5    would be speculation for me to provide an
6    explanation on what that line item actually
7    means.
8         Q.   So it's your testimony that you are
9    unaware of what at the time these statements
10   are sent on September 23 the excess margin in
11   any of the three accounts, 074, 084 and 273,
12   with respect to both customer and firm accounts
13   were at that time?
14        MR. C. GREEN:  Object to the
15   question.  I think it mischaracterizes his
16   testimony.
17        You may answer.
18        A.   I cannot say with certainty what the
19   figures represent.
20        Q.   But my question is a little
21   different.  Are you aware of there having been
22   excess in any of the OCC margin accounts
23   reflected on these statements as of September
24   23rd?
25        MR. C. GREEN:  Object to the form.

Page 155

1    Fleming - Highly Confidential
2         Do you have that question in mind,
3    Mr. Fleming?  That's a different question.
4         A.   I am trying to interpret that.  Can
5    you repeat that one more time?  I'm sorry.
6         MS. CARRERO:  Can you.
7         (Record read.)
8         A.   At the time I don't recall being
9    aware of the fact that there was, you know,
10   excess in the amount of the figures listed in
11   this document.
12        Q.   Did you later become aware that
13   there were excess in the accounts at OCC?
14        A.   I don't recall it being, you know,
15   an issue that was brought to my attention.
16        Q.   We should be wrapping up.  The last
17   questions I wanted to ask you were about your
18   current employment.
19        Are you currently employed by
20   Barclays?
21        A.   Yes.
22        Q.   And what is your position there?
23        A.   I am the U.S. head of treasury
24   operations.
25        Q.   And what are your duties as U.S.

Page 156

1    Fleming - Highly Confidential
2    head of treasury operation?
3         A.   They are similar to that of the
4    function performed at Lehman as described in
5    the early part of this interview.
6         Q.   And who do you report to?
7         A.   I report to Fraser MacKenzie, who is
8    the global head of treasury operations.
9         Q.   And did you receive by the date
10   indicated in your offer letter, which was
11   Exhibit 307B, the compensation enumerated
12   therein that was to be paid in February 2009?
13        A.   The 2008 guaranteed cash bonus, yes.
14        MS. CARRERO:  Give me five minutes.
15        (Recess was taken from 3:57 to
16   4:07.)
17        MS. CARRERO:  Mr. Fleming, I think
18   we are done for the day.  I am going to
19   pass along the deposition to Hughes
20   Hubbard, counsel for the SIPA trustee.
21   EXAMINATION BY
22   MR. ROTHMAN:
23        Q.   Good afternoon.
24        A.   Good afternoon.
25        Q.   My name is Seth Rothman.  We met

Page 157

1    Fleming - Highly Confidential
2    earlier.  I represent the trustee that's been
3    appointed to liquidate LBI under the SIPA
4    statute.
5         I'd like to follow up and ask you a
6    few questions about the transaction between
7    Barclays and Lehman Brothers by which Barclays
8    purchased certain assets of LBI.  Do you know
9    the transaction that I mean?
10        A.   Again, as previously stated, I
11   wasn't party to any of those conversations
12   surrounding the asset purchases.
13        Q.   Understood, but as you sit here
14   today, you are aware that there was in
15   September of 2008 a deal by which Barclays
16   purchased certain assets of Lehman Brothers;
17   right?  I just want to make sure we are on the
18   same page.
19        A.   Yes, I am aware that there was a
20   purchase.
21        Q.   Okay.  And you have told us already
22   that you had no involvement in negotiating that
23   deal; correct?
24        A.   That is correct.
25        Q.   And I think you said that as best

Confidential

Page 158

1      Fleming - Highly Confidential
2  you can recall you learned of that deal when it
3  was announced in the press. Is that true?
4      A.   I believe that to be the case.
5      Q.   And you have never seen a copy of
6  the Asset Purchase Agreement?
7      A.   I don't believe so.
8      Q.   Does the term "Clarification Letter"
9  mean anything to you?
10     A.   I've heard it used, but it doesn't
11 mean anything to me.
12     Q.   Have you ever seen a copy of the
13 Clarification Letter?
14     A.   Not that I'm aware of.
15     Q.   You said that you have seen it used?
16     A.   I've heard it.
17     Q.   While you were at Lehman Brothers?
18     A.   I don't remember when, but it
19 probably was when I was with Barclays. I don't
20 recall the term "Clarification Letter" being
21 used when it was still Lehman.
22     Q.   Do you recall the context in which
23 it came up?
24     A.   I don't.
25     Q.   Do you remember who mentioned it to

Page 159

1      Fleming - Highly Confidential
2  you?
3      A.   I don't.
4          MR. C. GREEN:  Give me a minute to
5  object.
6          THE WITNESS:  Sorry.
7          MR. C. GREEN:  Not that his
8  questions aren't great, but...
9      Q.   While you were still at Lehman did
10 you have any understanding of the economics of
11 the deal?
12     A.   No.
13     Q.   You didn't know what Barclays was
14 going to be paying in the deal?
15     A.   I knew what everyone else knew
16 publicly. The timing of that, whenever that
17 came out in the press.
18     Q.   What did you learn when you saw it
19 in the press?  You say you knew what everybody
20 else new publicly, so tell me what you knew.
21          MR. C. GREEN:  Object to the form.
22     A.   That Barclays had purchased Lehman
23 Brothers' North American investment banking
24 operations.
25     Q.   Did you have any knowledge with

Page 160

1      Fleming - Highly Confidential
2  respect to what they were paying for those
3  operations?
4          MR. C. GREEN:  Object.  Asked and
5  answered.
6      A.   I don't recall the exact amount. I
7  believe it was a billion and three quarters or
8  something to that effect, I think.
9      Q.   Did you have any understanding of
10 what assets Barclays was going to be getting?
11         MR. C. GREEN:  You mean -- excuse
12 me.  Do you mean other than he obtained
13 from the press?
14     Q.   At all.  While you were at Lehman
15 did you have any understanding of what assets
16 Barclays was going to be getting in the deal?
17     A.   While at Lehman?  I don't believe
18 so, no.
19     Q.   Did you have any understanding about
20 what liabilities Barclays might be assuming as
21 part of the deal?
22     A.   While at Lehman Brothers?
23     Q.   While you were at Lehman Brothers.
24     A.   I don't believe so, no.
25     Q.   After you left Lehman Brothers and

Page 161

1      Fleming - Highly Confidential
2  joined Barclays, did you learn any of these
3  things?
4          MR. C. GREEN:  Object to the form.
5      A.   There is certainly rumors and
6  hearsay, but I cannot confirm, because there
7  was not a source that was providing me this
8  information who was close enough to the actual
9  negotiation or details to provide that
10 information.
11     Q.   Do you have anything particular in
12 mind that you were referring to when you say
13 that there were rumors that you heard?
14     A.   The building, 745 Seventh Avenue,
15 was part of the deal, it came along with the
16 operations.  There was the I guess what would
17 be considered furniture, fixtures, technology,
18 that all was part of the deal.
19     Q.   Anything else that you heard?
20     A.   It was rumored that there was
21 liabilities associated with compensation that
22 went along with the purchase agreement.
23     Q.   Anything else?
24     A.   Not that I can recall.
25     Q.   While you were at -- I think I know

41

Confidential

Page 162

1    Fleming - Highly Confidential
2  the answer to this, but while you were at
3  Lehman Brothers l take it you never saw any
4  kind of balance sheet or scorecard showing the
5  assets and the liabilities that would be
6  involved in the deal?
7         MR. C. GREEN: Object to the form.
8     Asked and answered.
9     A.   No.
10    Q.   Did you ever hear there was a court
11 hearing relating to the deal?
12    A.   While an employee at Lehman?
13    Q.   At any time.
14        MR. C. GREEN: Putting aside if you
15    will, please, what you have learned solely
16    from counsel.
17    A.   The question is was l aware that
18 there were --
19    Q.   Did you ever hear anything about a
20 court hearing relating to the deal?
21    A.   l read about that in the paper.
22    Q.   After it happened? It's not a trick
23 question.
24    A.   After it happened they talked about
25 there needing to be follow-up with Judge Peck

Page 163

1    Fleming - Highly Confidential
2  and bankruptcy court, things of that nature.
3     Q.   While you were at Lehman did you
4  have an understanding that the bankruptcy court
5  needed to approve the deal?
6     A.   l was aware of that at some point,
7  but l don't know exactly when that was.
8     Q.   Let's change topics and talk a
9  little bit more about the 15C3 calculation.
10        (Exhibit 309B, e-mail dated
11    9-20-2008, marked for identification.)
12    Q.   I will mark as Exhibit 309B an
13 e-mail string. It's three pages long. The top
14 e-mail is an e-mail from you to Emil Cornejo,
15 among other people, and it's dated Saturday,
16 September 20th, 2008.
17        MR. C. GREEN: Take your time,
18    Mr. Fleming, to read the entire string.
19    Q.   Feel free to read the entire e-mail.
20 l am only going to ask you about the top e-mail
21 on the first page.
22        (Document review.)
23    A.   Okay.
24    Q.   Who is -- first of all, do you
25 recall sending this e-mail to Mr. Cornejo?

Page 164

1    Fleming - Highly Confidential
2     A.   Yes, l do.
3     Q.   And who is Mr. Cornejo?
4     A.   Mr. Cornejo worked in the creditor
5  relations group within the treasury
6  organization at Lehman Brothers.
7     Q.   Do you remember why you e-mailed
8  Mr. Cornejo?
9     A.   We were attempting to get a contact
10 at Wells Fargo.
11    Q.   And this was the $1 billion in cash
12 that was at Wells Fargo?
13        MR. C. GREEN: Object to the form of
14    the question.
15    A.   We were seeking a contact at Wells
16 Fargo in relation to the 1 billion deposit of
17 cash that we had with them for 15C3.
18    Q.   Wells Fargo had a money market
19 account; correct?
20        MR. C. GREEN: Object to the form.
21    A.   l don't recall the form of it. 15C3
22 can take many forms. It's possible that we had
23 a money market fund.
24    Q.   Do you recall there was an MMDA
25 account at Wells Fargo?

Page 165

1    Fleming - Highly Confidential
2     A.   That sounds right. That sounds
3  right.
4     Q.   And you write to Mr. Cornejo: "We
5  have the SEC prepared to support our request."
6  Do you see that?
7     A.   Yes, l do.
8     Q.   Why are you telling that to
9  Mr. Cornejo?
10    A.   l guess because Wells had indicated
11 that they would not release funds.
12    Q.   Do you need the SEC to authorize the
13 release of these funds?
14    A.   The SEC, in particular Mike
15 Macchiaroli, was working alongside of us in the
16 days prior to bankruptcy, so it is not unusual
17 here for me to be referencing the SEC. They
18 were on site. Mr. Macchiaroli was up from
19 Washington. He was in our offices. We were
20 liaising with them on a daily basis. That is
21 not usual. It's very unusual. They had a
22 staff of people in our building.
23    Q.   The 15C3 funds were locked up for
24 the protection of customers; correct?
25    A.   That is correct.

Confidential

Page 166

Fleming - Highly Confidential

1
2      Q.   Do you ordinarily need the
3  permission of the SEC to release funds from
4  those accounts?
5      A.   No.
6      Q.   Did you need permission from the SEC
7  at this point in time, September 20th?
8      A.   I don't recall what the outcome of
9  this was. I do know that Wells Fargo had
10 indicated to us that they would not be able to
11 release funds upon our request.
12     Q.   I think you said you thought that
13 was because of the bankruptcy filing?
14     MR. C. GREEN:  Object to the form.
15 I'm not certain he did say that.
16     MR. ROTHMAN:  That's why I am
17 asking.
18     A.   Can you repeat the question.
19     Q.   Do you have any understanding or
20 knowledge as to why Wells Fargo wasn't
21 releasing those funds?
22     MR. C. GREEN:  Apart from what's
23 indicated in this e-mail?
24     Q.   As you sit here today.  Do you
25 remember why it was that the funds weren't

Page 167

Fleming - Highly Confidential

1
2  released?  Did you ever hear a reason for that?
3      A.   Yes.  I am trying to recall what was
4  said.  I do believe that it was in reference
5  to, you know, SIPC and/or, you know, bankruptcy
6  filing.
7      Q.   Did you hear that from somebody?
8      A.   I believe I heard that from somebody
9  from Wells.
10     Q.   Do you remember who?
11     A.   I do not.
12     Q.   Okay, you can put that document to
13 the side.
14     Let me ask you to dig out of your
15 pile the exhibit that was marked as Exhibit 177
16 at a prior deposition.  The first e-mail is
17 from Alastair Blackwell to a group of people.
18     A.   All right.
19     Q.   If you turn to the top of the second
20 page -- of course, feel free to look back over
21 the entire string, if you need to, but I am
22 only going to ask you about the e-mail at the
23 top.  This is from Paolo Tonucci to you.  He
24 tells you:  "Mike Macchiaroli has agreed to
25 release and there is a letter to provide to

Page 168

Fleming - Highly Confidential

1
2  them."  Do you see that?
3      A.   Yes, I do.
4      Q.   And do you recognize Mike
5  Macchiaroli as the Mike at the SEC?
6      A.   Yes, I do.
7      Q.   Did you ever see a letter from him
8  relating to the release of the funds at Wells
9  Fargo?
10     A.   I don't recall seeing a letter.
11     Q.   Did you follow up with Wells Fargo
12 regarding the release of those funds?
13     A.   I don't believe I did.
14     Q.   Do you know if anybody did?
15     A.   I don't recall.
16     MR. ROTHMAN:  You can put that
17 document to the side.
18     Let me mark as the next exhibit it
19 will be an e-mail from Paolo Tonucci.  It's
20 a string.  The top e-mail is from
21 Mr. Tonucci to you and Anthony Savoca.
22 Just for the record, the Bates stamp on the
23 first page is 19297.
24     (Exhibit 310B, e-mail dated
25 September 23, 2008, Bates stamped

Page 169

Fleming - Highly Confidential

1
2  BCI-EX-(S)-00019297 and
3  BCI-EX-(S)-00019298, marked for
4  identification.)
5      MR. C. GREEN:  Take your time.
6      (Document review.)
7      THE WITNESS:  Okay.
8      Q.   The first e-mail in the string is
9  from Anthony Savoca to -- the e-mail is
10 addressed to Mr. Burke, you, and I assume
11 that's Mr. Stucchio.  Is that correct?
12     A.   That's correct.
13     Q.   And also to Mr. Tonucci?
14     A.   Yes.
15     Q.   Mr. Savoca actually addresses the
16 text of the e-mail to Mr. Burke; correct?
17     A.   That's what it appears.
18     Q.   Who is Bill Burke?
19     A.   Mr. Burke worked in the regulatory
20 team at Lehman Brothers.
21     Q.   That's the same team as
22 Mr. Stucchio?
23     A.   That is correct.
24     Q.   Do you see in the first line of his
25 e-mail Mr. Savoca refers to a conversation that

Confidential

Page 170

1      Fleming - Highly Confidential
2  took place that morning, and my only question
3  to you about that is were you -- did you
4  participate in that conversation?
5      A.   I don't recall participating in that
6  conversation.
7      Q.   Do you recall having any
8  conversations with Mr. Savoca regarding the
9  15C3 customer and PAIB reserve bank accounts?
10     A.   I do not.
11     Q.   Do you see in Mr. Savoca's e-mail to
12 Mr. Burke, which is then -- he then forwards on
13 to you and Mr. Fleming, he writes: "LBI is in
14 SIPC liquidation and based upon that no moneys
15 and/or securities may be removed from the
16 above-stated reserve bank accounts without the
17 approval of Mr. John Gibbons, the SIPC trustee
18 for LBI." Do you see that?
19     A.   Yes, I do.
20     Q.   Was that your understanding at this
21 time?
22         MR. C. GREEN:  The time being
23 September 23rd?
24         MR. ROTHMAN:  Correct.
25     A.   Yes.

Page 171

1      Fleming - Highly Confidential
2      Q.   Even though he writes "Mr. John
3  Gibbons," I will represent to you that the
4  trustee is actually named Jim Giddens.  Did you
5  know that?
6      A.   Yes, I did.
7          MR. ROTHMAN:  You can put that
8  aside, Mr. Fleming.  We will move on.
9          Mark as the next exhibit a
10 multi-page document.  It's an e-mail from
11 Kendall McLaughlin to Alex Crepeau and
12 Alastair Blackwell at the top and there is
13 an attachment.  The Bates number on the
14 first page is 4061.
15     Q.   Mr. Fleming, you can take as much
16 time as you need to look through this.  I am
17 going to mostly ask you about the e-mail, but I
18 will have a couple of questions about the
19 attachment.
20         (Exhibit 311B, e-mail dated
21 September 23, 2008, Bates stamped
22 BCI-EX-(S)-00004061 and
23 BCI-EX-(S)-00004062, with attached Lehman
24 Brothers, Inc. Customer/PAIB Reserve
25 Analysis, marked for identification.)

Page 172

1      Fleming - Highly Confidential
2          (Document review.)
3      A.   Okay.
4      Q.   On the cover page there is an e-mail
5  from Bill Burke to Mr. Stucchio and a number of
6  people who you are a CC; is that correct?
7      A.   Yes.
8      Q.   This is on Monday, September 22nd?
9      A.   That's what it appears, yes.
10     Q.   Do you recall receiving this
11 particular e-mail from Mr. Burke?
12     A.   This doesn't stick out in memory.
13     Q.   You see he starts off by telling
14 everyone that: "The following are the latest
15 results for our customer and PAIB reserve
16 calculations as of September 19th."  Then he
17 gives some figures, and beneath the figures he
18 notes: "The following assumptions or open
19 issues are relevant to the above calculations."
20 Do you see number 1 there?
21     A.   Yes.
22     Q.   Okay.  That talks about an MTS
23 computation is not including 42 billion
24 overdrafts with Chase.
25         Can you tell me what an MTS

Page 173

1      Fleming - Highly Confidential
2  computation is?
3      A.   MTS is a system.
4      Q.   And the information in that system
5  is part of the 15C3 computation?
6      A.   I'm not responsible for the comp,
7  nor are my people responsible for the comp, so
8  I can't answer that definitively.
9      Q.   It says: "The internal records
10 reflect a book credit and those of Chase are
11 inconclusive."  Do you understand what that
12 means?
13     A.   I believe so.
14     Q.   What does that mean to you?
15     A.   It means that the internal records
16 reflect a book credit and the information Chase
17 was providing to us was inconclusive, that they
18 were erratic and unreliable.
19     Q.   The next sentence says: "Dan
20 Fleming and Paolo" -- that's Mr. Tonucci;
21 correct?
22     A.   I would assume so, yes.
23     Q.   "Had represented that these amounts
24 should represent secure financing and are
25 probably not an overdraft with the bank," and

Confidential

## Page 174

1      Fleming - Highly Confidential
2  then this parentheses it says "overdrafts are a
3  formula credit item," close parentheses.
4       As you sit here today, do you have
5  any recollection of making a representation
6  along these lines?
7      A.   I explained to -- and I don't know
8  who it was, it may have been Mr. Stucchio, it
9  may have been Mr. Burke.  I explained to people
10 that we had taken out a $32 billion loan with
11 JPMorgan Chase on Thursday, close of business
12 Thursday, the 18th, which wound up being early
13 morning Friday, and that Friday morning Chase
14 locked us out of their systems and stopped
15 communicating with us.  What happened on Friday
16 at Chase, I could not tell you what happened,
17 because I did not have access to that
18 information, and that was my description of the
19 events.  The 42 number, I told him I don't know
20 how you get to 42.  I know a number of -- I'm
21 sorry, it was 23.  Approximately 23 is what I
22 told him.
23      MR. C. GREEN:  So you are saying
24 instead of 32 it was 23?
25      A.   It wasn't 32, it was 23, that's

## Page 175

1      Fleming - Highly Confidential
2  correct.
3      Q.   So Thursday night, just so we are
4  clear, LBI obtained a $23 billion loan from
5  JPMorgan Chase?
6      A.   That was my understanding,
7  approximately 23 billion.
8      Q.   How do you know that?  Were you
9  involved in obtaining that loan?
10     A.   Yes.
11     Q.   What did you do?
12     A.   I requested a loan from JPMorgan
13 Chase.
14     Q.   Why did you do that?
15     A.   Because we were short cash.
16     Q.   Short for a particular purpose or
17 just in general?
18     A.   I wouldn't describe it as a purpose.
19 I would say that there were some events that
20 led to that, being short cash, long collateral
21 position.
22     Q.   Did somebody ask you to obtain this
23 loan from Chase?
24     A.   Requesting loans from Chase was part
25 of the responsibilities of the cash and

## Page 176

1      Fleming - Highly Confidential
2  collateral management team at the end of the
3  day after we balanced and we figured out what
4  our position was, if there was a shortfall, we
5  would request a loan.  If there was excess,
6  then there were some other options that we had
7  available to us to earn a return on that cash.
8      Q.   Did you have to pledge any
9  collateral in exchange for this approximately
10 $23 billion loan?
11     A.   Yes, there was collateral that was
12 pledged.
13     Q.   Do you recall the value of that
14 collateral or the amount of that collateral?
15     A.   I recall it was right around the
16 amount that we needed, the cash that we needed.
17     Q.   And what was the nature of that
18 collateral?  Securities?
19     A.   Securities.
20     Q.   Were they proprietary securities of
21 LBI?
22     A.   I think that that's a fair
23 description, although without knowing the
24 detail, you know, I couldn't answer that, you
25 know, definitively.

## Page 177

1      Fleming - Highly Confidential
2      MR. C. GREEN:  Mr. Rothman, I'm
3  sorry to interrupt, do you think that we
4  could take a short break?  I don't want
5  to --
6      MR. ROTHMAN:  Absolutely.
7      MR. C. GREEN:  I just want to take a
8  short break to check with the witness about
9  a clarification that I am uncertain of.
10     MR. ROTHMAN:  Okay.
11     MR. C. GREEN:  And then we will be
12 right back.
13     (Recess was taken from 4:45 to
14 4:50.)
15 BY MR. ROTHMAN:
16     Q.   Mr. Fleming, I understand you want
17 to clarify one of your prior answers.  Is that
18 right?
19     A.   Yes.
20     Q.   Go ahead and do that.
21     A.   I had previously stated that I had
22 made a request to JPMorgan Chase for a loan in
23 the amount of 23 billion.  That request was
24 denied.  I was told that we could not have a
25 loan for $23 billion.  I proceeded to explain

Page 178

Fleming - Highly Confidential
1
2 to JPMorgan Chase how we wound up being short
3 $23 billion and long $23 billion of collateral,
4 which was basically two things. One, was that
5 7 billion of assets had not been transferred
6 over to Barclays and subsequently Lehman
7 Brothers had not been paid $7 billion. Second
8 was that there was a $15 billion repo that had
9 been on the prior day that came off that we
10 were unaware of until we balanced in the early
11 morning of Thursday close of business. The
12 combination of those two events caused us to be
13 short cash $23 billion long collateral.
14 JPMorgan decided that they were going to book
15 what's called a held-in-custody repo for
16 $15 billion between Lehman Brothers, Inc. and
17 Barclays Capital, and that they were going to
18 represent that the money due from Barclays
19 failed. Then they would book a $7 billion loan
20 with Lehman. That is how we closed out the
21 night.
22       The next morning when we got on a
23 conference call with everyone, with Barclays,
24 with Lehman, with JPMorgan, the first order of
25 business that JPMorgan wanted to get to was to

Page 179

1       Fleming - Highly Confidential
2 discuss the $15 billion money fail and the
3 held-in-custody repo. Barclays advised that
4 they were not aware of that trade and were not
5 honoring that trade, at which point Chase
6 disabled our access to their systems and
7 stopped communicating with us.
8       It is my understanding, and I don't
9 recall how I obtained this understanding, that
10 JPMorgan Chase subsequently cancelled that HIC
11 repo trade between Lehman Brothers, Inc. and
12 Barclays and booked it as a loan with Lehman
13 getting us to the 23 billion loan. Now --
14    Q.   That's the 15 billion piece?
15    A.   I'm sorry?
16    Q.   The HIC loan is the 15 billion
17 piece?
18    A.   Yes. I cannot confirm to you today
19 that that is what JPMorgan reflects on their
20 books and records as what occurred on the
21 evening of Thursday the 18th, but that is what
22 I believe to be the events of that day.
23    Q.   You mentioned in that answer that
24 $7 billion in assets had not been transferred
25 over to Barclays.

Page 180

1       Fleming - Highly Confidential
2    A.   Yes.
3    Q.   That was on Thursday night, the
4 18th?
5    A.   Yes.
6    Q.   Was the $7 billion in cash meant to
7 be a replacement for those 7 billion assets
8 that did not go on the 18th?
9       MR. C. GREEN: Object to the extent
10    it calls for speculation, but you may
11    answer, if you know.
12    A.   I'm not sure which 7 billion of
13 assets, what the underlying assets were, but
14 it's my understanding that 7 billion of
15 assets -- an additional 7 billion of assets
16 would have moved over and Lehman Brothers, Inc.
17 would have received $7 billion in cash.
18    Q.   If you turn back to Exhibit 311B.
19 We were talking about Mr. Burke's comment about
20 whether the 42 billion, according to him,
21 represented secure financing and probably not
22 an overdraft with the bank, and I think you
23 said you had discussions about this, you
24 couldn't recall whether it was with Mr. Burke,
25 but when you had discussions on this, did you

Page 181

1       Fleming - Highly Confidential
2 represent the significance of whether the money
3 was a secured financing or an overdraft to the
4 C3 calculation?
5       MR. C. GREEN: Object to the form of
6    the question.
7    A.   I explained the events as I knew
8 them. It was not my role to be making a
9 determination of those events as it relates to
10 the computation of the 15C3 reserve
11 requirements.
12    Q.   Did you know at the time you were
13 making -- the time you were giving the
14 explanation that you were giving, did you know
15 that overdrafts are not a formulaed credit
16 item?
17       MR. C. GREEN: Object to the form of
18    the question.
19    Q.   Just basically asking you if that is
20 something that you would have known.
21    A.   They are a formula credit.
22    Q.   And is that something that you --
23    A.   I was aware of that fact, yes.
24    Q.   If you look at the bottom of that
25 e-mail, Mr. Burke writes: "Senior staff at

Confidential

Page 182

Fleming - Highly Confidential
1       Fleming - Highly Confidential
2    both the SEC and FINRA have stated that the
3    firm cannot withdraw any funds or securities
4    from the reserve accounts without their staff
5    reviewing the calculation and their approval."
6    Do you see that?
7        A.   Yes, I do.
8        Q.   Did you have that understanding at
9    or around September 23rd, 2008?
10       A.   I believe so, yes.
11       Q.   If you would take a look at the
12   first page of the attachment, the top left-hand
13   corner of the document notes that it's a draft
14   as of 7:00 p.m.
15           Is this document the type of
16   document or form that you were familiar with?
17       A.   This is not a document that I
18   produced. It is, I believe, a document
19   produced by the regulatory group.
20       Q.   But you received documents that look
21   like this?
22       A.   I may have.
23       Q.   Do you recognize this to be an
24   analysis of the 15C3 reserves?
25       A.   It would appear to be, yes.

Page 183

Fleming - Highly Confidential
1       Fleming - Highly Confidential
2        Q.   And it's divided into the customer
3    portion and the PAIB portion; correct?
4        A.   Yes.
5        Q.   And then across the top it compares
6    the amounts reserved on 9-17-08 in the second
7    column; correct?
8        A.   Yes.
9        Q.   To the amounts that they are
10   calculating for 9-19-08 in the first column?
11       A.   That's what it appears, yes.
12       Q.   So if you go down to the very
13   bottom, the total segregated, they are saying
14   that there is a $1.4 billion variance between
15   9-17 and 9-19. Is that how you understand this
16   document?
17       A.   For PAIB, that's what it appears to
18   be.
19       Q.   I think the last line actually
20   aggregates the PAIB and the customer.
21       A.   Okay.
22       Q.   Now, if you look in the middle of
23   the column under the customer portion and then
24   under ADP, there is an entry for OCC
25   proprietary qualified collateral. Do you see

Page 184

Fleming - Highly Confidential
1       Fleming - Highly Confidential
2    that?
3        A.   Yes, I do.
4        Q.   Do you know what that is?
5        A.   I can't say for certain. I have
6    some general thoughts.
7        Q.   What are those thoughts?
8            MR. C. GREEN: Object to the extent
9        it calls for speculation.
10       A.   This would -- you know, again,
11   Mr. Burke and/or the individuals producing this
12   document are probably best to describe, you
13   know, what each one of these different
14   categories represents. I don't want to
15   speculate.
16       Q.   Do you think this relates to the OCC
17   margin deposit?
18       A.   Again, I'd be speculating if I
19   answered that question.
20       Q.   Do you know if a portion of the OCC
21   margin deposit is able to be counted toward the
22   reserve requirement under 15C3?
23           MR. C. GREEN: Object to the extent
24       it calls for a legal conclusion.
25           You can answer, if you know. Do you

Page 185

Fleming - Highly Confidential
1       Fleming - Highly Confidential
2    have the question in mind?
3            THE WITNESS: I'm sorry, are you
4        waiting for me?
5            MR. C. GREEN: I think there is a
6        question pending.
7        Q.   The question was do you know if a
8    portion of the OCC margin deposit is able to be
9    counted toward the reserve requirement under
10   15C3 and counsel objected to the extent that
11   that called for a legal conclusion. We were
12   waiting for you to give your understanding.
13       A.   I think that in certain cases
14   collateral posted to the OCC would be counted
15   as a debit in the formula.
16       Q.   You testified previously that your
17   group would sometimes withdraw funds from the
18   OCC margin deposits; correct?
19       A.   Correct.
20       Q.   Do you know if you are able to
21   withdraw funds from the OCC margin deposit that
22   are counted towards the C3 requirement?
23           MR. C. GREEN: Object to the extent
24       it calls for a legal conclusion.
25           You may answer, if you know.

Confidential

Page 186

1    Fleming - Highly Confidential
2    A.   The withdrawal or addition of margin
3    to the OCC was done, you know, without any
4    involvement with the reserve formula.
5    Q.   Would the people in your group
6    compare the OCC margin requirements with the
7    amounts that the regulatory department would
8    post with customer margin in the 15C3
9    calculation?
10   A.   No.
11        MR. ROTHMAN: Mark as Exhibit 312B
12   an e-mail from Mr. Tonucci to Mr. Jones.
13   You are a CC on the e-mail and it's got a
14   Bates stamp 21746.
15        (Exhibit 312B, e-mail dated
16   September 27, 2008, Bates stamped
17   BCI-EX-(S)-00021746, with attached OCC
18   Summary, marked for identification.)
19        (Document review.)
20   Q.   Have you had a chance to look over
21   the document?
22   A.   Yes.
23   Q.   So the bottom e-mail on the page
24   Mr. Jones writes to Mr. Tonucci with a copy to
25   you and Richard Golaszewski.

Page 187

1    Fleming - Highly Confidential
2    Can you tell me who Richard
3    Golaszewski is?
4    A.   Richard is an analyst who worked for
5    Craig.
6    Q.   This is Friday, September 26.  Are
7    you now at Barclays or are you still at Lehman?
8    A.   I think based on the -- I think
9    Barclays at that point.
10   Q.   Is Mr. Golaszewski a Barclays
11   employee?
12   A.   Yes, he is.
13   Q.   And did Mr. Jones also move from
14   Lehman to Barclays?
15   A.   Yes, he did.
16   Q.   When you were at Lehman, were you an
17   employee of LBHI, LBI, or both?
18        MR. C. GREEN: Object to the extent
19   it calls for a legal conclusion.
20   Q.   What did you consider yourself; do
21   you know?
22   A.   I don't remember what my pay stub
23   said. I don't remember.
24   Q.   Did you distinguish between the
25   different Lehman entities?

Page 188

1    Fleming - Highly Confidential
2        MR. C. GREEN: You mean as an
3    employee or --
4        MR. ROTHMAN: Yes.
5    A.   For what purpose?
6    Q.   Withdrawn.
7    So Mr. Jones writes to Mr. Tonucci,
8    copying you and Mr. Golaszewski, and attaching
9    a summary of the OCC margin requirements and
10   associated collateral postings, and he writes:
11   "I have a call in to regulatory to reconcile
12   the 500 million they have posted for customer
13   margin in the 15C3 calculation versus the 336
14   million we reflect at the exchange." Do you
15   see that?
16   A.   Uh-huh, yes.
17   Q.   When you got this e-mail, did you
18   know what Mr. Jones was referring to when he
19   wrote that?
20   A.   I don't recall this e-mail
21   specifically.
22   Q.   Are you still doing the 15C3
23   calculation for 9-19 at this point in time?
24        MR. C. GREEN: Object to the form.
25   Q.   By "you" I mean the people at the

Page 189

1    Fleming - Highly Confidential
2    regulatory group that did that.
3    A.   I don't know at this point in time,
4    the 26th of September, where the regulatory
5    group was in terms of their calculations.
6    Q.   Do you know if there was ever a
7    final calculation for 9-19?
8    A.   I don't know for certain. I would
9    assume so.
10   Q.   Did you hear that there were
11   difficulties in doing that calculation?
12        MR. C. GREEN: Object to the form.
13   Do you mean the final calculation that he
14   is uncertain about?
15        MR. ROTHMAN: No, the 9-19
16   calculation that we saw a draft of a few
17   documents ago.
18   A.   It is my understanding that there
19   were difficulties in reconciling everything.
20   There is a lot of information that feeds into
21   the reserve formula, so if there is general
22   reconciliation issues, it's going to impact the
23   reserve calculation.
24   Q.   When you refer to general
25   reconciliation issues, those are the issues you

Confidential

## Page 190

1     Fleming - Highly Confidential
2   have already told us about?
3     A.   Yes.
4     Q.   It was difficult to see certain
5   data, is that one of the problems?
6     A.   Yes, information that in nonnal
7   course would be fed in electronically into our
8   systems, processes would be run and
9   reconciliations would be automatically
10  generated, those files were not sent in. Those
11  automatic reconciliations didn't occur. I'm
12  not even sure whether they are done reconciling
13  9-19 today.
14    Q.   Do you know if the issue that
15  Mr. Jones raises in his e-mail was ever
16  reconciled?
17    A.   I don't.
18    Q.   If you look at the first page of the
19  attachment to Mr. Jones' e-mail, it's an OCC
20  summary. The first page. And under the
21  customer -- the top box is Lehman Brothers
22  positions. Do you see that?
23    A.   Yes.
24    Q.   And in the customer column he has
25  got treasuries and there is a figure of 336.20.

## Page 191

1     Fleming - Highly Confidential
2     A.   Yes.
3     Q.   Do you know if that's the 336
4   million he refers to -- Mr. Jones refers to in
5   his e-mail?
6     A.   I don't know for certain. I don't
7   know that.
8     Q.   Are treasuries qualified securities
9   under 15C3; do you know?
10    A.   I believe so, yes.
11    MR. ROTHMAN:  Let me show you what I
12  am going to mark as Exhibit 313B, an e-mail
13  from Mr. Tonucci to a number of people and
14  you are shown as a carbon copy.
15    Mr. Fleming, feel free to read
16  through the entire e-mail string. I am
17  only going to ask you about the first
18  e-mail in the string, which is from Martin
19  Kelly to Mr. Lowitt and others.
20    For the record, the first page of
21  the exhibit is Bates stamped 3945.
22    We will withdraw that exhibit. Just
23  for the record, we are going to withdraw
24  that exhibit because it had some
25  handwritten annotations on it that our team

## Page 192

1     Fleming - Highly Confidential
2   had -- meaning the Hughes Hubbard team had
3   added to the document. We will move on to
4   the next one.
5     We will mark as Exhibit 313B an
6   e-mail from Mr. Tonucci to Mr. Blackwell,
7   Mr. Fleming and Mr. Ullman and Mr. Dorogoff
8   with a Bates stamp of 4784.
9     (Exhibit 313B, e-mail dated October
10  1, 2008, Bates stamped BCI-EX-(S)-00004784,
11  marked for identification.)
12    Q.   This e-mail is dated October 1 of
13  2008. Do you recall receiving this from
14  Mr. Tonucci?
15    A.   It doesn't stick out as a memorable
16  e-mail.
17    Q.   Do you know what this e-mail relates
18  to?
19    A.   I believe so.
20    Q.   What do you believe it relates to?
21    A.   I believe this relates to a customer
22  who has purchased securities on margin that has
23  requested an account transfer to another
24  broker.
25    Q.   What was the issue with the

## Page 193

1     Fleming - Highly Confidential
2   collateral that had been pledged against the
3   debt?
4     MR. C. GREEN:  Object to the form.
5     A.   I don't know whether there was an
6   issue. I think this was a question.
7     Q.   What was Mr. Tonucci asking? Do you
8   have any understanding of what he was trying to
9   determine?
10    MR. C. GREEN:  Object to the form.
11  Calls for speculation.
12    A.   I believe he was asking whether BCI
13  gets reimbursed for the margin loan when an
14  account is transferred to another broker.
15    Q.   This is the margin loan that BCI
16  would have made to its customer as opposed to
17  the margin deposit that BCI would post at the
18  OCC?
19    A.   I believe this is in reference to
20  Reg T margin.
21    Q.   Do you know what a clearing fund
22  deposit is? Does that phrase have any meaning
23  to you?
24    A.   Yes.
25    Q.   What is that?

Confidential

**Page 194**

1      Fleming - Highly Confidential
2    A.  My understanding is it's an initial
3 deposit that is made to support the clearing
4 activities of the customer.
5    Q.  Who makes the deposit?
6    A.  The firm that holds the account with
7 the clearing org.
8      MR. ROTHMAN: Let's mark as
9   Exhibit 314B an e-mail from Mr. Tonucci to
10   you dated September 21st, 2008.
11     (Exhibit 314B, e-mail dated 9-21-08,
12   marked for identification.)
13    Q.  The second e-mail on the page is
14 from you to Mr. Tonucci, the subject is cash,
15 and you ask: "Can we look to the 1 billion
16 Citi CLS clearing deposit in LBI as a source of
17 funds for Barcap?
18     Do you recall sending this e-mail to
19 Mr. Tonucci?
20    A.  Yes, I do.
21    Q.  Can you tell me why you were asking
22 him this question?
23    A.  I was asking him what the status of
24 this -- what is described in here as a clearing
25 deposit with Citibank.

**Page 195**

1      Fleming - Highly Confidential
2    Q.  Was it a clearing deposit at
3 Citibank?
4    A.  I don't believe that it would fall
5 under the technical definition of a clearing
6 deposit. This was a mandated additional
7 deposit that we had to make in the days leading
8 up to bankruptcy.
9    Q.  Mandated by Citi?
10    A.  That's correct, Citi as our CLS
11 settlement agent.
12    Q.  What does CLS stand for?
13    A.  It stands for continuous linked
14 settlement, which is a foreign exchange netting
15 facility.
16    Q.  And there is 1 billion -- I'm sorry.
17 This additional deposit that you -- withdrawn.
18     This additional deposit was in the
19 amount of a billion dollars; is that right?
20    A.  That's correct.
21    Q.  And is it property that's held to
22 secure obligations under the exchange-traded
23 derivatives?
24     MR. C. GREEN: Object to the extent
25   the question calls for a legal conclusion.

**Page 196**

1      Fleming - Highly Confidential
2     You may answer.
3    A.  It was my understanding that this
4 additional $1 billion of cash was to protect
5 Citibank against the intra-day exposures
6 associated with fails in the foreign exchange
7 market.
8    Q.  You are asking Mr. Tonucci if it
9 could be a source of funds for Barcap. Why are
10 you asking him that particular question?
11    A.  I was aware of the fact that there
12 was a shortfall of some sort as it related to
13 the transfer and, you know, as a result, a
14 reconciliation process was initiated to try to
15 locate unencumbered assets and, in my opinion,
16 if we had settled our obligations with
17 Citibank, this would constitute an unencumbered
18 asset.
19    Q.  By the transfer you mean the
20 transfer that occurred on the Thursday, the
21 20th?
22    A.  Yes.
23    Q.  The transfer of securities to
24 Barclays in exchange for the loan that came
25 back to --

**Page 197**

1      Fleming - Highly Confidential
2     MR. C. GREEN: I object to the form.
3    A.  Well, let me rephrase that. I
4 don't -- I did not know whether it was specific
5 to that transfer. I was aware of a general
6 shortfall, but I was not advised of the details
7 behind it and what it pertained to.
8    Q.  Mr. Tonucci writes back to you: "We
9 have put them on this."
10     Do you know what he meant by that?
11     MR. C. GREEN: Object to the form.
12   Calls for speculation.
13    A.  I'm not sure what that means.
14    Q.  Did LBI get the 1 billion clearing
15 deposit released from Citi?
16     MR. C. GREEN: Object to the extent
17   it mischaracterizes his testimony. I think
18   he said it was not a true clearing deposit.
19     MR. ROTHMAN: But his e-mail calls
20   it a clearing deposit. I don't want to
21   quibble.
22    Q.  Did you get this $1 billion deposit
23 back from Citi?
24    A.  Not to my knowledge.
25    Q.  Do you know what happened to that

Confidential

| Page 198 | Page 199 |
|---|---|

**Page 198**

1    Fleming - Highly Confidential
2    $1 billion deposit?
3        A.   No, I do not.
4        Q.   This is a document that was marked
5    at a prior deposition as Exhibit 182.
6        As always, Mr. Fleming, feel free to
7    look through the whole thing.  I am only going
8    to ask you questions about the bottom-most
9    e-mail on the page.
10        (Document review.)
11        A.   Okay.
12        Q.   The bottom e-mail is from
13    Mr. Tonucci to you and Mr. Azerad dated
14    Saturday, September 20, 2008.
15        Do you recall receiving this e-mail
16    from Mr. Tonucci?
17        A.   I don't recall this.
18        Q.   The subject of the e-mail is the
19    non-actionable box.  I apologize if you have
20    already explained this to us, but could you
21    tell me what that is?
22        MR. C. GREEN:  Object to the form.
23        A.   In the normal course of business the
24    non-actionable box represented assets that
25    could not be financed.

**Page 199**

1    Fleming - Highly Confidential
2        Q.   Does the non-actionable box refer to
3    a specific depository?
4        A.   No.
5        Q.   And so the assets that cannot be
6    financed could be in various places; is that
7    correct?
8        A.   That is correct.
9        Q.   And Mr. Tonucci is saying some may
10    be in the DTC box which may be mixed up with
11    the tri-party pledge on Thursday.  Do you see
12    that?
13        MR. C. GREEN:  Object to the form of
14        the question.
15        A.   I see that.
16        Q.   Do you know what that means or what
17    it means to you?
18        A.   That means that -- my interpretation
19    of this is that we wanted to confirm that
20    JPMorgan Chase didn't seize more assets than
21    they were entitled to as a result of the box
22    loan.
23        Q.   Are you saying that JPMorgan was
24    trying to determine whether JPMorgan seized
25    more assets than they were entitled to from the

| Page 200 | Page 201 |
|---|---|

**Page 200**

1    Fleming - Highly Confidential
2    DTC box?
3        MR. C. GREEN:  Object to the form.
4        A.   The way that this typically works is
5    that your assets at DTC are pledged to JPMorgan
6    for purposes of JPMorgan uploading them into
7    their system to be available as collateral for
8    financing transactions, so it is conceivable
9    that we pledged over more assets than what we
10    had financed and that Chase could have
11    conceivably seized those assets.
12        Q.   I am going to show you what's been
13    marked in a prior deposition as Exhibit 152B.
14        MR. C. GREEN:  Rothman, do you have
15        any idea how much longer you expect to be?
16        MR. ROTHMAN:  I have one left after
17        this.
18        MR. C. GREEN:  One exhibit?
19        MR. ROTHMAN:  Yes.
20        Q.   Have you had a chance to look at
21    Exhibit 152B?
22        A.   Yes.
23        Q.   The e-mail at the bottom is from
24    Mr. Tonucci to Mr. Hraska copying you and
25    Mr. Blackwell.  Do you see that?

**Page 201**

1    Fleming - Highly Confidential
2        A.   Yes, I do.
3        Q.   Mr. Tonucci tells Mr. Hraska:  "You
4    should plan on moving all the unencumbered
5    collateral in the DTC box first thing."
6        Do you have any understanding of
7    what Mr. Tonucci is telling Mr. Hraska to do
8    here?
9        MR. C. GREEN:  Object to the extent
10        it calls for speculation.
11        A.   I do not know the location to which
12    he is referring to in terms of moving the
13    collateral.
14        Q.   Underneath he writes:  "Should
15    correspond as closely as possible to list
16    agreed with Barclays over the weekend."
17        I was going to ask you if you knew
18    what the list is or was.
19        A.   I don't know what the list was.  I
20    can tell you that people were seizing
21    collateral left, right and center.  DTC, Chase,
22    just about everybody.  We were very mindful of
23    that.  Not only our securities, but our cash
24    positions too were being seized by the banks
25    and there was an effort to try to safeguard

Confidential

Page 202

1      Fleming - Highly Confidential
2  some of those assets. I'm not sure whether
3  this was in reference to that, whether they
4  were trying to put it into a location that we
5  knew wouldn't be seized by any of the creditors
6  or any of the banks or anything like that. I
7  just don't -- I don't know -- I don't recall
8  what he is referencing in this.
9      MR. ROTHMAN: Let's mark as
10  Exhibit 315B an e-mail from you to
11  Mr. Tonucci dated September 21, 2008.
12      (Exhibit 315B, e-mail dated
13  9-21-2008, marked for identification.)
14      (Document review.)
15      THE WITNESS: Okay.
16  Q.  The first e-mail in the string you
17  write to Mr. Tonucci: "The statement from the
18  OCC reflects a large excess position in house
19  and customer. House has excess of 444 million
20  and customer 244. I do not know how accessible
21  this is." Do you see that?
22  A.  Yes, I do.
23  Q.  When you wrote "I do not know how
24  accessible this is," what did you mean?
25  A.  I believe what I was referring to

Page 203

1      Fleming - Highly Confidential
2  was that if there was a request to access that
3  excess margin, I don't know whether we would
4  have been able to execute against that request.
5  Q.  Why don't you know that?
6      MR. C. GREEN: Object to the form of
7  the question.
8      THE WITNESS: Answer?
9      MR. C. GREEN: Oh, yes, you can go
10  ahead and answer. I'm sorry.
11  A.  Because of the uncertainty at that
12  point. That was Sunday night after we filed
13  for bankruptcy. There was a tremendous amount
14  of uncertainty in every aspect of what we were
15  doing.
16  Q.  Are you telling me that there was
17  uncertainty as to whether there was, in fact, a
18  large excess position in house and customer?
19  A.  I think there was uncertainty as to
20  why there was excess that much.
21  Q.  Is that unusual for there to be
22  excess of that much?
23  A.  I think in normal course that may be
24  considered a lot of excess in the account. As
25  I had stated earlier, that excess was a normal

Page 204

1      Fleming - Highly Confidential
2  event, but I would say that 600, 700 million of
3  excess was a lot.
4  Q.  Is there an amount of excess in the
5  ordinary course that you try to keep in the
6  account?
7      MR. C. GREEN: Object to the form of
8  the question.
9  A.  There was not a target amount that
10  we kept as excess. We didn't have a target
11  amount.
12  Q.  I think you testified before that
13  there were ambiguities regarding the OCC margin
14  deposit around this time? Do you recall that?
15  A.  Yes, I do.
16  Q.  Was one of the ambiguities over who
17  would own the excess margin amount?
18      MR. C. GREEN: Object to the form of
19  the question.
20  A.  No, that was not something that --
21  that was not a question posed to me. That was
22  not something that I was dealing with.
23  Q.  What did you mean by "ambiguities"?
24  A.  What I meant was there was
25  unreconciled positions. There was an option

Page 205

1      Fleming - Highly Confidential
2  expiration on that Friday. That, again, we
3  were locked out of our systems. Our books and
4  records weren't updated and reflected properly.
5  Not just as it relates to OCC, but across the
6  board in, I would say, every asset class.
7  Q.  I think you testified earlier that
8  there were uncertainty about whether certain
9  accounts were LBI's or Barclays'. Do you
10  recall that?
11  A.  Was this in relation to what, to the
12  OCC?
13  Q.  That's my next question.
14  A.  Okay. I don't remember what that
15  comment --
16  Q.  What the context was for that
17  comment?
18      MR. C. GREEN: I don't remember that
19  comment, not to volunteer information,
20  but...
21  Q.  I mean, I will just ask you. Around
22  this time period that we have been talking
23  about, the weekend of September 20th, 21st,
24  22nd, was there any uncertainty as to any
25  accounts, whether they were owned at that point

Confidential

Page 206

1      Fleming - Highly Confidential
2   by LBI or whether they were going to be owned
3   by Barclays?
4       MR. C. GREEN: You are asking him
5   was he uncertain or was there uncertainty
6   generally?
7       MR. ROTHMAN: Did he hear about any
8   uncertainty.
9    A.  There was uncertainty. Okay. The
10  terms of the agreement had not been
11  communicated, to my knowledge, to anyone in the
12  back office. The status of our DTC accounts,
13  the status of our Chase accounts, the status of
14  our OCC accounts or, for that matter, any other
15  margin exchange was not clear to us.
16   Q.  Did you ever hear that the DTC was
17  concerned about LBI's open positions, who was
18  going to fund the fails?
19   A.  I recall there being some
20  discussions as it related to the DTC.
21   Q.  What do you recall about that?
22   A.  There were concerns, I believe,
23  about the NSCC positions that were due to
24  settle. I don't -- I'm not, you know, an
25  expert in the mechanics of NSCC and the

Page 207

1      Fleming - Highly Confidential
2   relationship between NSCC and DTC, but I
3   believe there were some concerns around that
4   set of activity.
5    Q.  Whose concerns? You are talking
6   about Lehman having concerns or are you talking
7   about the clearing agencies having concerns?
8    A.  I thought it was the DTC themselves.
9    Q.  Do you know what those concerns
10  were?
11   A.  I don't know the specific details of
12  exactly what their concerns were.
13   Q.  Do you know generally what their
14  concerns were?
15   A.  I believe it had to do with NSCC
16  trades that were due to settle post bankruptcy.
17   Q.  Was there a concern about whether
18  those trades actually would settle?
19   A.  Again, that's the general concern
20  that I was aware of, but the detailed specifics
21  behind it either I wasn't made aware of or I
22  can't remember at this point.
23       MR. ROTHMAN: Thank you,
24  Mr. Fleming. That's all the questions I
25  have.

Page 208

1      Fleming - Highly Confidential
2       MR. C. GREEN: Does anyone else have
3   any questions?
4       MS. CARRERO: We are done.
5       MR. C. GREEN: I might have one or
6   two questions. I just need to look at the
7   transcript.
8   EXAMINATION BY
9   MR. C. GREEN:
10   Q.  Mr. Fleming, can you get
11  Exhibit 314B.
12   A.  Yes.
13   Q.  Do you remember Mr. Rothman asking
14  you about the 1 billion Citi CLS clearing
15  deposit that is referenced in that exhibit? Do
16  you remember he asked you some questions about
17  that?
18   A.  Yes.
19   Q.  Do you remember you testified that
20  "it was my understanding that this additional 1
21  billion of cash was to protect Citibank against
22  the intra-day exposures associated with fails
23  in the foreign exchange markets," do you recall
24  that testimony?
25   A.  Yes.

Page 209

1      Fleming - Highly Confidential
2    Q.  Was that amount deposited with
3   Citibank as collateral?
4    A.  That was collateralizing the
5   intra-day exposure that Citibank had as
6   settlement agent for Lehman Brothers, Inc.
7       MR. C. GREEN: I don't have any
8   further questions.
9       MR. ROTHMAN: Nothing further for
10  me.
11       MS. CARRERO: Nothing further.
12       MR. WHITMER: No questions.
13       (Time noted: 5:57 p.m.)
14
15
16      --------------------
17      DANIEL JOSEPH FLEMING
18
19  Subscribed and sworn to before me
20  this      day of          2009.
21
22  ------------------------------------
23
24
25

Confidential

## Page 210

```
 1
 2              C E R T I F I C A T E
 3
 4   STATE OF NEW YORK  )
 5                      ) ss.:
 6   COUNTY OF NASSAU   )
 7
 8        I, KRISTIN KOCH, a Notary Public
 9   within and for the State of New York, do
10   hereby certify:
11        That DANIEL JOSEPH FLEMING, the
12   witness whose deposition is hereinbefore
13   set forth, was duly sworn by me and that
14   such deposition is a true record of the
15   testimony given by such witness.
16        I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that I am
19   in no way interested in the outcome of
20   this matter.
21        IN WITNESS WHEREOF, I have hereunto
22   set my hand this 28th day of August, 2009.
23        ------------------------
24        KRISTIN KOCH, RPR, RMR, CRR, CLR
25
```

## Page 211

```
 1
 2   -------------I N D E X--------------
 3
     WITNESS         EXAMINATION BY      PAGE
 4
     DANIEL JOSEPH FLEMING    MS. CARRERO     6
 5
                     MR. ROTHMAN    156
 6
                     MR. C. GREEN   208
 7
 8   --------------EXHIBITS--------------
 9   NUMBER               PAGE LINE
10
11   Exhibit 294B
     E-mail dated September 15, 2008,
12   Bates stamped 10302690, and Chase
     Tri-Party Haircut Summary Bates
13   stamped 10308382................... 40  21
14   Exhibit 295B
     E-mail dated 9-18-2008............ 64   3
15   Exhibit 296B
     E-mail dated September 18, 2008,
16   Bates stamped 10303223............ 69   7
17   Exhibit 297B
     E-mail dated 9-18-2008............ 72  18
18
     Exhibit 298B
19   E-mail dated 9-21-2008............ 74   6
20   Exhibit 299B
     E-mail dated 9-19-2008............ 89  19
21
     Exhibit 300B
22   E-mail dated September 23, 2008,
     Bates stamped BCI-EX-(S)-00019269
23   and BCI-EX-(S)-00019270......... 111  25
24   Exhibit 301B
     E-mail dated September 21, 2008,
25   Bates stamped 10307085............ 123  19
```

## Page 212

```
 1
 2   -------------EXHIBITS--------------
 3
     NUMBER               PAGE LINE
 4
 5   Exhibit 302B
     E-mail dated September 22, 2008,
 6   Bates stamped BCI-EX-(S)-00018817.... 127  9
 7   Exhibit 303B
     E-mail dated September 19, 2008,
 8   Bates stamped 465433................. 129  6
 9   Exhibit 304B
     E-mail dated September 17, 2008,
10   Bates stamped 10306758, with
     attached spread sheet, Bates
11   stamped 10306405.................... 132  8
12   Exhibit 305B
     E-mail dated September 23, 2008,
13   Bates stamped BCI-EX-(S)-000191987
     through BCI-EX-(S)-000191194........ 139  10
14
     Exhibit 306B
15   E-mail dated September 22, 2008,
     Bates stamped 10295071.............. 142  12
16
     Exhibit 307B
17   Letter dated September 22, 2008,
     Bates stamped BCI-EX-00077308
18   through BCI-EX-00077310............. 142  15
19   Exhibit 308B
     E-mail dated September 25, 2008,
20   Bates stamped BCI-EX-(S)-00011649
     through BCI-EX-(S)-00011651......... 147  21
21
     Exhibit 309B
22   E-mail dated 9-20-2008.............. 163  10
23   Exhibit 310B
     E-mail dated September 23, 2008,
24   Bates stamped BCI-EX-(S)-00019297
     and BCI-EX-(S)-00019298............. 168  24
25
```

## Page 213

```
 1
 2   --------------EXHIBITS---------------
 3
     NUMBER               PAGE LINE
 4
 5   Exhibit 311B
     E-mail dated September 23, 2008,
 6   Bates stamped BCI-EX-(S)-00004061
     and BCI-EX-(S)-00004062, with
 7   attached Lehman Brothers, Inc.
     Customer/PAIB Reserve Analysis....... 171  20
 8
     Exhibit 312B
 9   E-mail dated September 27, 2008,
     Bates stamped BCI-EX-(S)-00021746,
10   with attached OCC summary............ 186  15
11   Exhibit 313B
     E-mail dated October 1, 2008, Bates
12   stamped BCI-EX-(S)-00004784.......... 192  9
13   Exhibit 314B
     E-mail dated 9-21-08................. 194  11
14
     Exhibit 315B
15   E-mail dated 9-21-2008.............. 202  12
16
17
18
19
20
21
22
23
24
25
```

Confidential

Page 214

```
 1
 2        ERRATA SHEET FOR THE TRANSCRIPT OF:
 3   Case Name:    In re: Lehman Brothers
     Dep. Date:    August 28, 2009
 4   Deponent:     Daniel Joseph Fleming
 5        CORRECTIONS:
 6   Pg. Ln. Now Reads    Should Read    Reason
 7   ___ ___ _____    _____    _____
 8   ___ ___ _____    _____    _____
 9   ___ ___ _____    _____    _____
10   ___ ___ _____    _____    _____
11   ___ ___ _____    _____    _____
12   ___ ___ _____    _____    _____
13   ___ ___ _____    _____    _____
14   ___ ___ _____    _____    _____
15   ___ ___ _____    _____    _____
16   ___ ___ _____    _____    _____
17   ___ ___ _____    _____    _____
18
19        _____
20        Signature of Deponent
21   SUBSCRIBED AND SWORN BEFORE ME
22   THIS____DAY OF_____, 2009.
23
24   _____
25   (Notary Public) MY COMMISSION EXPIRES:_____
```

TSG Reporting - Worldwide    800-702-9580