# BCI EXHIBIT

# 67

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re: )
) Chapter 11
LEHMAN BROTHERS ) Case No. 08-13555(JMP)
)
HOLDINGS, INC., et al., )
)
Debtors. )
--------------------------)

HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF
JAMES FOGARTY
New York, New York
Friday, January 15, 2010

Reported by:
KRISTIN KOCH, RPR, RMR, CRR, CLR
JOB NO. 27091

January 15, 2010
9:36 a.m.

Highly Confidential Videotaped Deposition of JAMES FOGARTY, held at the offices of Boies, Schiller & Flexner, LLP, 575 Lexington Avenue, New York, New York, before Kristin Koch, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Livenote Reporter and Notary Public of the State of New York.

APPEARANCES:

JONES DAY, LLP
Attorneys for Lehman Brothers, Inc.
222 East 41st Street
New York, New York 10017-6702
BY: JAY W. TAMBE, ESQ.
JENNIFER DelMEDICO, ESQ.

BOIES, SCHILLER & FLEXNER, LLP
Attorneys for Barclays
401 East Las Olas Boulevard - Suite 1200
Fort Lauderdale, Florida 33301
BY: W. TODD THOMAS, ESQ.

QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
Attorneys for Creditors Committee
51 Madison Avenue - 22nd floor
New York, New York 10010
BY: JAMES C. TECCE, ESQ.

APPEARANCES: (Continued)

HUGHES HUBBARD & REED LLP
Attorneys for SIPA Trustee
One Battery Park Plaza
New York, New York 10004-1482
BY: CARL W. MILLS, ESQ.

ALSO PRESENT:

JOSH LIPSON, Legal Video Specialist

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- oOo -

Page 6

THE VIDEOGRAPHER: This is the start of tape number 1 of the videotaped deposition of James Fogarty in the matter in re Lehman.

Today's date is January 15th, 2010 at approximately 9:36 a.m.

Will the court reporter please swear in the witness.

JAMES FOGARTY,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. THOMAS:

Q. Good morning, Mr. Fogarty.

A. Good morning.

Q. Would you please state your full name and address for the record, please.

A. James Fogarty, and I am at 14 Old Roaring Brook Road, Mount Kisco, New York, 10549.

Q. And can you please -- have you been deposed before?

A. Once.

Page 7

Fogarty - Highly Confidential

Q. So you are familiar with how this process works?

A. Very, very pleasant experience.

Q. Okay. If at any point you are not sure what I am asking, please ask me to rephrase the question. I will be happy to try.

Could you please briefly describe your employment history.

A. I was with Alvarez and -- I am with Charming Shoppes now. I am the CEO at Charming Shoppes. I started there April of this year. And prior to that I was with Alvarez & Marsal for over 15 years, and prior to that I was with KPMG Peat Marwick for six years, five years, something like that.

Q. And can you please describe your educational background.

A. Bachelor of arts, Williams College, and MBA from Stern School and a master's in accounting from The Stern School.

Q. What did you do for Alvarez?

A. I was, the back half of my career there, mostly an interim manager in distress situations.

Page 8

Fogarty - Highly Confidential

Q. And can you describe in a little more detail what duties and responsibilities you had in that position.

A. So I was -- I was really on sort of a handful of cases over that period of time. I was the CFO of Warnaco Group for about two and a half years. I was the CFO then at Levi Strauss for about two and a half years. And then I was the CEO of American Italian Pasta Company, again, about two years, give or take, something like that. And then after that I was at Lehman Brothers as the chief operating officer post filing.

Q. So Alvarez & Marsal would come in to distressed companies and you would then essentially function as the company's management?

A. That's correct.

Q. And when was the first time you had any involvement or connection with the Lehman/Barclays sale transaction that occurred in September of 2008?

MR. TAMBE: Objection to the form of the question.

Page 9

Fogarty - Highly Confidential

You can answer.

THE WITNESS: Say that again. I missed --

MR. TAMBE: I just object to the form of the question. You can answer the question.

THE WITNESS: I can answer. Okay.

A. I was -- well, it's probably easier -- I guess the 15th of September was the date that Lehman filed and our firm became involved, basically, that day or we got a call the night before, Brian Marsal got a call, and we started that day over at the offices and there was -- you know, the sort of first I had heard of Barclays and Lehman was probably that day, that there was continuing work on trying to put a transaction together.

Q. And can you describe your first involvement in the working in connection with Lehman during that assignment?

I mean, did you start working on the 15th or the 16th? Can you just describe a little what you did that week of the 15th.

A. So the first week it was myself with

a few others; Brian Marsal, John Suckow, David Coles, myself and a couple others, and we spent a lot of the first week -- we had some connection with the management team, but, frankly, the management team was connected in working on the transaction, so there wasn't as much connection, frankly, as we are used to in the first week, but we had a number of conversations with management over that first week. Really our main goal in the first week was understanding the liquidity of the business and understanding -- trying to get our arms around the business.

Q. And can you describe in a little more detail what you mean by the liquidity of the business?

A. Well, the company had, of course, just filed and we needed to, you know, understand the basics of how the business was going to operate in Chapter 11 and whether there was going to be, you know, liquidity to run the business during that time frame.

Q. On starting with that Monday, September 15th, did you physically go over to

Lehman's offices?

A. Yes.

Q. So on that Monday can you describe what you did when you went over to their offices?

A. We went to the office, went to connect with Brian Marsal, and went in a conference room.

Q. What did you do in the conference room?

A. We then had a meeting with -- I think the first meeting we had we met with Tom Russo, we met with Steve Berkenfeld. We had a -- I can't remember all of the -- we had a couple of connection meetings initially on those first couple of days.

MR. THOMAS: Let me go ahead and show you a document we will mark as 561-B.

(Exhibit 561-B, e-mail dated September 19, 2008, marked for identification.)

MR. TAMBE: Just before you get started --

MR. THOMAS: We are looking for a

production copy. If I have it, we can introduce that also.

MR. TAMBE: Yes, or just read it into the record later on just what the Bates number is, but there appears to be a Bates number that is cut off.

MR. THOMAS: Sure.

Q. This is an e-mail which you are in the e-mail chain. It's -- the initial e-mail is an e-mail from David Coles to Kristie Wong at Lehman dated September 18th.

Do you see that?

A. I do.

Q. Do you recognize this document?

A. I recall it.

Q. In the e-mail -- and who is David Coles?

A. David Coles is my partner, another -- well, former partner, another managing director at Alvarez & Marsal. He is one of the fellows I mentioned earlier.

Q. What was his role with respect to Lehman Brothers at this time?

A. David became the chief financial

officer and his role was to understand the finances of the company and particularly, you know, focus on liquidity measures and so forth, and my focus was more of the operating side, to make sure that we could function in the back end of the business and have people in place and so forth over time. I mean, initially we are all working things together, but that was how the duties delineated over time.

Q. In the e-mail from David to Kristie Wong at Lehman, it says: "Some colleagues and I met with Martin Kelly on Tuesday."

Do you recall meeting with Martin Kelly on Tuesday of that week, it would be September 16th?

A. I do not.

Q. Do you know if you were a part of that meeting?

A. I don't recall. I know David was spending time with Martin Kelly. I may have met Martin once in the hallway, but I don't believe I was ever spending quality time with Martin.

Q. The e-mail goes on to say that they

discussed the consolidated balance sheet and the likely post Barcap sale BS.

Do you see that?

A. I see that.

Q. What do you understand the post Barcap sale BS to refer to?

MR. TAMBE: Objection to the form of the question.

You can answer.

MR. THOMAS: Some of these objections he will state an objection just to preserve something about the question and but then you can go ahead and answer unless he instructs you not to.

THE WITNESS: Okay.

A. Post Barcap sale BS presumably means post Barcap -- post sale to Barclays capital balance sheet.

Q. Was that something you guys were trying to work up, Alvarez & Marsal, at this time?

A. I was not spending time on it. David was.

Q. And do you know why Alvarez folks

were trying to work up this post Barcap sale balance sheet?

A. Well, we were trying to understand what assets will be our responsibility, in other words, what assets will be left behind, and start to think about what we need to do to manage that process of optimizing the answer for our creditors.

Q. Let me go ahead and show you a document which has been previously marked as Exhibit 485.

(Document review.)

Q. Do you recognize this as an e-mail from you to quite a few people at Alvarez --

A. Yes.

Q. -- dated September 20th, 2008 concerning the deal status?

A. Yes.

Q. And which deal is that referring to?

A. Well, let me -- let me read it here.

(Document review.)

A. Okay. I read it. Sorry. I missed the question.

Q. Sure. Is the deal being referred to

here the sale transaction between Lehman and Barclays?

A. Yes.

Q. In the first line you write: "Bill Gordon is point on the TSA negotiation. The deal is not 'paper closed' and the TSA has not been agreed to yet."

When you are referring to the deal that is not paper closed, are you referring to the Barclays sale transaction?

A. Correct.

Q. And what did you mean by it is not paper closed?

A. Not closed. In other words, it's a period of time between -- well, it hasn't closed yet. I can't remember exactly where it's between.

Q. By saying it hasn't paper closed --

A. It's not closed.

Q. Is it your understanding that agreement has been reached, but they haven't finalized the documents and executed them?

MR. TAMBE: Object to the form of the question.

A. It's just not closed, so, you know, when a deal is not yet closed, it's still -- it's still --

Q. Right. I am asking you, you use the term "hasn't paper closed," which is it fair to draw from that that there is an agreement, but it just -- they haven't finalized the papers?

MR. TAMBE: Object to the form of the question.

A. There was an evolving agreement, because there were -- again, I was not -- my job was not to understand what was going on. I wasn't part of that negotiating process. My job was to understand for the estate how we were going to get services for the estate after it closed. So what I am referring to, the TSA is the Transition Service Agreement where my focus was.

Q. I understand. But when you refer to paper closed, does that reflect your understanding that by this point in time, Saturday morning, September 20th, essentially agreement had been reached, but it hadn't been reduced to writing and the documents hadn't

Fogarty - Highly Confidential

been executed yet?

MR. TAMBE: Object to the form of the question. Asked and answered a number of times now.

A. It hadn't closed as of this time, so there were still things being worked on.

Q. So when you wrote --

A. In other words, the TSA was a critical part of the process as well.

Q. And so when you wrote "paper closed," you really just meant closed?

A. I mean closed.

Q. Not paper closed. Okay.

What did you do to prepare for today's deposition?

A. I didn't prepare.

Q. Did you meet with anyone in connection with it?

A. I met with counsel.

Q. And who is your counsel?

A. Well, the -- I met with Jones Day.

Q. Is Jones Day representing you here today?

A. Correct.

Fogarty - Highly Confidential

Q. Did you meet with anyone else concerning the deposition?

A. No.

Q. Did you discuss the deposition with anyone?

A. No.

Q. Is it fair to say --

A. Can I -- I -- in addition to Jones Day, I was called about the deposition by Phil Kruse, my partner at Alvarez & Marsal, basically to just tell me to expect a call from Jones Day.

Q. Okay. There was no substantive discussion --

A. No.

Q. -- about any issues involved in this case or the deal?

A. Other than at a generic level that the dispute was continuing. Other than sort of at a generic level. We didn't get into any details.

Q. And how did he describe the dispute to you?

A. Just from a public standpoint in

Fogarty - Highly Confidential

terms of -- I forget the phrase -- the words he would have used, but from a public standpoint that XYZ motions had been filed back and forth. That's about all I can recall.

Q. And did he describe the substance of those motions?

A. No.

Q. Have you ever reviewed those motions?

A. I have not.

Q. Is it fair to say that you were at least following the deal the week of September 15th?

MR. TAMBE: Object to the form of the question.

A. Yes. And you can see following it even in the press, because...

Q. And about midway down it says: "Interesting details from this and other reports."

Can you describe where you were getting your information about the deal?

And if I say "deal," I am referring to the Lehman/Barclays sale transaction.

Fogarty - Highly Confidential

A. We were having a very difficult time following what was going on and we were working very hard to understand it, again, from a perspective of understanding how to have a control process around what was going to be left in the estate and how to manage what was going to be left in the estate. So we were trying to get ahead of it and it was very difficult to understand what was going on.

Q. And but you were trying to?

A. Our firm was -- yes, we were trying to for purposes of understanding -- we were not asked to be involved other than for purposes of understanding what was left for our creditors and how we would prepare for managing those assets.

Q. You wanted to understand what assets and liabilities were going over to Barclays and what were staying with Lehman; correct?

A. We wanted to understand the latter and part of understanding the latter is understanding the former.

Q. Can I take that as a yes?

A. Yes.

Q. Okay. And that would be important in developing the post Barclays balance sheet as well; correct?

A. I wasn't thinking about it from a development of a post Barclays balance sheet. I was thinking about it from the standpoint of what as assets were we going to have to manage.

Q. When you refer here to this and other reports that you seem to be drawing information from, can you describe what reports those are? For example, were you speaking with someone, were you reading materials, attending hearings?

A. I think the other report I'm refer -- or this report I'm referring to is this -- I can't recall, but I think it's this link here that's on the second page from my colleague, Robert Hershan.

Q. The Bloomberg summary?

A. I believe, but, again, I can't recall exactly what I was thinking about at the time.

Q. So you were reading about the deal in the press, for instance?

A. Right.

Q. Were you also getting -- speaking with anyone directly involved in the deal?

A. September 20th. No. Other -- well, let me -- Steve Berkenfeld around just how, you know, sort of how is the deal going kind of a thing as opposed to -- again, I wasn't intimate to any of the details of what was transpiring and I was more interested in understanding whether it was still happening and timing so that we could, again, be prepared for the assets that we would need to manage for the estate.

Q. Well, you are reporting a number of details to your colleagues; correct?

MR. TAMBE: Object to the form of the question.

A. I'm recapping a number of details that were -- that were referenced in the press.

Q. At the bottom of this page, the last bullet point, you write: "Well said - Daniel Golden of Akin Gump," quoting him to say "we believe this was a flawed sale process. It benefits Barclays and the federal government,

but not the creditors of this estate." Do you see that?

A. I see that.

Q. Were you expecting an opinion that this was a flawed sale process?

A. Say that again. Was I expecting --

Q. Were you expressing the opinion to your colleagues that this was a flawed sales process?

A. I think it meant it was an interesting comment, my phrase, "well said," interesting comment about the process -- the accelerated process of the sale transaction.

Q. Did you believe it was a flawed sales process?

MR. TAMBE: Object to the form of the question.

A. I didn't know enough about the details.

Q. Did you -- were you aware after the sale hearing on Friday night that the parties continued to work on finalizing the sale documents over the weekend?

A. Yes.

Q. Did you keep yourself apprised of those final document efforts?

MR. TAMBE: Object to the form of the question.

A. I was staying apprised of the Transition Service Agreement negotiation through my team. Bill Gordon in particular was working on that piece for me.

Q. And how were you staying apprised of --

A. E-mails, telephone.

Q. With whom?

A. Bill Gordon.

Q. Do you know how he was staying apprised of the deal?

A. He was, again, physically on site, working on the transition -- there was a team working on the Transition Services Agreement and they were physically on site working on it. I can't remember what law firm.

Q. Was he at Weil Gotshal the weekend, that Saturday and Sunday, when the deal papers were being finalized?

A. I believe -- I believe they were at

Fogarty - Highly Confidential
Weil. I believe so.
Q. Was anyone else from Alvarez over at Weil?
A. I don't think so. I don't recall, but I don't think so.
Q. Let me go ahead and show you a document previously marked as 487.
(Document review.)
Q. Do you recognize this as an e-mail from yourself dated September 22nd, 2008?
A. Are you asking me about both of these things? Just so I understand what I am referring to.
Q. Let me see that.
A. (Handing.)
Q. No.
A. Okay.
MR. TAMBE: Put 488 away? Are you going to ask about -- there is a 488 attached.
MR. THOMAS: Just go ahead and take that. It must have just got stapled in the production process.
A. So yes, I am familiar with this.

Fogarty - Highly Confidential
Q. Let me just start over again.
On document 487 do you recognize that as an e-mail from yourself dated September 22nd, 2008?
A. Yes.
Q. And there is a couple of back and forth e-mails here involving you.
John Suckow, can you tell me what his role was?
A. I am trying -- I don't recall John's title, but, again, John, David Coles and I were working for Brian on the matter, on Lehman, the Lehman matter.
Q. And were you trying to keep some of your colleagues up to date about the final discussions over the weekend at Weil concerning the transaction?
A. Yes.
Q. And at the bottom it says: "The M&A deal was that Barclays was getting about 47 billion in trading assets." Do you see that?
A. Yes.
Q. Do you know where you got that information from?

Fogarty - Highly Confidential
A. This was all secondhand information coming through Bill Gordon's understanding in Weil's offices, which was secondhand from others in the Weil offices.
Q. And the last sentence beginning on this page and continuing over to the other, it says: "Barclays does not have that kind of capital, so playing it out, this has the potential to not only tank our deal but tank Barclays."
Is it your understanding that Barclays was undertaking a lot of risk in doing this transaction?
MR. TAMBE: Object to the form of the question.
A. I don't know.
Q. Let me go ahead and ask you to look at 488 now.
(Document review.)
A. Okay.
Q. Do you recognize this as an e-mail to a number of your colleagues dated September 22nd, 2008?
A. Yes.

Fogarty - Highly Confidential
Q. And was this part of your continuing effort to keep your colleagues up to date concerning the final deal negotiations and documenting process?
A. Yes. I am keeping, yes, Brian and others updated.
Q. Okay. And why were you keeping them updated about the deal at 4:16 in the morning Greenwich mean time?
MR. TAMBE: Objection.
Q. Strike that.
Is that Greenwich mean time there?
Strike that.
Why were you trying to keep your colleagues up to date in a timely fashion concerning the final deal negotiations over the weekend at Weil?
A. We are very concerned about the -- making sure that the TSA goes as well as it can so that we can have -- the TSA meaning the Transition Services Agreement, so that we can, you know, have an effective process to manage the remaining assets, and we are concerned about timing of communication of the

Fogarty - Highly Confidential

transaction should it close.

Q. The last sentence you write: "Robert, let's continue to hold back communication until we get the TSA closure."

What did you mean by "continue to hold back communication"?

A. I can't recall specifically what the -- but there was an intent to communicate to the employees of the estate or Lehman in conjunction with this transaction.

Q. Is that an actual recollection that you have that that's what you meant by this, "let's continue to hold back communication" was hold back communication with the employees of Lehman?

A. Absolutely, yes.

Q. That's your recollection, you are not speculating, you recall that's what you meant?

A. Yes, because Robert Hershan, his responsibility for me was human resources and communication, so that -- well -- I don't have -- let me say I don't have a direct recollection of the writing of the e-mail, but

Fogarty - Highly Confidential

that is my -- yeah, that's my interpretation of it based on the fact that Robert was working for me on communication, employee communication.

MR. THOMAS: Let me show you a document that we will mark as 562-B.

(Exhibit 562-B, e-mail dated 9/27/2008, Bates stamped WGM-LEHMAN-E 00000812 through WGM-LEHMAN-E 00000815, marked for identification.)

Q. If you would like, please go ahead and take a moment to read through this e-mail chain.

(Document review.)

A. Okay.

Q. Do you recognize this as an e-mail chain that you were involved with on September 27th, 2008?

A. Yes.

Q. And if you look at I guess the second oldest in time e-mail, the earliest e-mail appears to be an e-mail from Weil to yourself on Friday, September 26th. Do you see that?

Fogarty - Highly Confidential

A. Yes.

Q. And then the next earliest in time is an e-mail from yourself to quite a number of people at both Alvarez and -- well, strike that.

The folks you are e-mailing on Friday, September 26, are those all Alvarez people?

A. Yes. Well, let me just double-check. Yes.

Q. Towards the bottom of your e-mail where you write "a few thoughts," you write: "After you guys spend a little time with these things we should probably arrange a call with the Barclays guys (aka former Lehman - the guys at the table early Monday morning were apparently Paolo and Alex Kirk) and Weil to make sure we all understand these details and make sure these are disseminated appropriately through Barclays - so there is no confusion about "what stuff be ours", and to ensure appropriate security controls (which the TSA requires they keep)."

Was this part of your effort to make

Fogarty - Highly Confidential

sure you understood what assets and liabilities went over with the transaction and what assets and liabilities stayed with Lehman?

A. This was more -- this was focused on what assets were remaining with us, this comment here.

Q. And is that a function of understanding what assets went over to Barclays?

A. Correct.

Q. And did you try to do this?

A. Yes.

Q. Then the next e-mail chain -- next e-mail response in this chain is from Brian Marsal to yourself.

Can you identify Mr. Marsal's position?

A. Where is the e-mail from Brian?

Q. I believe it's the very bottom -- next -- it's the response.

A. Oh, I see. It's cut over on the other page.

Q. It's the response to your e-mail.

(Document review.)

Fogarty - Highly Confidential

A. Yes, I recall.

Q. Okay. And can you -- what was Mr. Marsal's position at this time?

A. Chief restructuring officer.

Q. For Lehman?

A. Correct.

Q. He writes: "Jim, I think that your team needs to be the fail safe on both the Barclays and Bain transaction to outline what was sold and what was kept per the agreement and confirm that that is actually what happened. Can you take responsibility and develop a plan to complete the above."

Did you, in fact, undertake that responsibility?

A. I undertook -- I undertook it initially and elements of it then would transfer to David Coles and his team.

Q. So part of the assignment was to first understand what was sold and kept per the agreement, and the other part was to make sure that that's what actually happened, both parts of that?

A. Correct.

Fogarty - Highly Confidential

Q. And turning to the previous page where you are writing back to Harvey Miller, do you see that?

A. Yes.

Q. You write: "I spent some time on this with David Murgio of your shop last night. We plan to get a group together for a walk-through of the final deal and detailed schedules early next week, including a number of people from Weil, Lehman, Alvarez."

Did you go ahead and do that?

A. We did. At least with some parts of this group. I can't recall all of the folks.

Q. Let me show you a document previously marked as Exhibit 464-A.

(Document review.)

Q. Do you recognize this as an e-mail chain that you were involved with?

A. Yes.

Q. And do you recognize the attachments to the e-mail?

A. Yes.

Q. And the initial e-mail appears to be from Glenn West to a number of people at

Fogarty - Highly Confidential

Alvarez dated September 27th?

MR. TAMBE: Objection. I'm not sure you are reading that right.

Q. Okay. Let me start over again. Well, there is an initial forwarding.

Do you recall receiving this e-mail that begins on the bottom of the first page, which is 2287, from Weil Gotshal?

A. I don't recall it.

Q. But you recall the attachments and you recall getting the attached from Weil Gotshal in this time frame?

A. I recall this attempt to recap assets and liability of the transaction.

Q. And you don't have any reason to believe you didn't receive this --

A. No.

Q. -- document at the time indicated on the face of the e-mail?

A. No.

Q. And looking at the attachment, if you would look at Bates page AM 2289 down at the bottom right-hand corner.

A. I don't have that.

Fogarty - Highly Confidential

MR. TAMBE: I don't either.

MR. MILLS: It looks like 89 through 92.

MR. THOMAS: Okay, in this document apparently there is two. It's out of order. This is --

Q. Exhibit 464-A has two attachments to it and they may be in reversed order at least in terms of the Bates stamping.

A. Okay.

Q. So looking at Exhibit 464-A and the attachment at A&M Bates stamp 2289, do you see the bottom bullet point that says: "During the period of 60 days following the closing Barclays has the right to assume or reject contracts that are related to the assets that it has purchased from the Lehman entities"?

A. Yes.

Q. Is that consistent with your understanding of the deal at the time?

MR. TAMBE: Objection to the form of the question. Lack of foundation.

A. I recall -- I can't recall 60 days or not. I recall there were -- there wasn't

Fogarty - Highly Confidential

perfect clarity on contracts -- wasn't perfect clarity on these contracts as to who was going to need what contracts to run the respective businesses and this was the way that the agreement had -- my understanding that Barclays had the 6- -- this some day period, I don't recall 60 days, but had some days to make some determinations on these contracts.

Q. So any liability assumed by Barclays with respect to contracts would be based upon Barclays' discretion in choosing what contracts to accept; correct?

MR. TAMBE: Object to the form of the question and lack of foundation.

A. I don't know the -- I didn't study the exact legal issues involved in the right to -- on these contract rights personally.

Q. Was that your understanding, though?

A. I had a fellow on my team, Bill Gordon, who was running a process to work in -- to work on the contracts and what I am thinking is contracts around things like printers and copier machines and this kind of thing. That's what I recall on this.

Fogarty - Highly Confidential

Q. So was Bill Gordon trying to figure out which contracts were going to be assumed by Barclays and which were not to understand which contracts Lehman would still be responsible for?

A. Correct.

Q. And if you would turn the page, please, to Bates stamp 2290, do you remember receiving this chart from Weil?

A. I don't recall this chart.

Q. Do you know if this chart was sent to Alvarez to help Alvarez understand consistent with the assignment of understanding what assets went over pursuant to the agreement and which didn't?

MR. TAMBE: Objection to the form of the question.

A. I don't recall this being something we focused on, that I -- I didn't focus on this table.

Q. You don't recall why Weil Gotshal was sending to you on September 27th a chart listing the assets that were included as purchased assets and those that were excluded

Fogarty - Highly Confidential

as assets?

A. I recall this document. I don't recall this table.

Q. Do you recall why Weil Gotshal was sending you this information concerning the deal?

A. I recall --

MR. TAMBE: Object to form.
Go ahead.

A. I recall a -- I recall the attempt to -- the very difficult attempt to figure out what the estate had left in to manage.

Q. What does that mean, what the estate had left to match?

A. Manage.

Q. To manage. Okay.
Couldn't you just pick up the contract and read it and see what went over and what didn't?

A. I tried that too.

Q. Did you need help -- why didn't that work?

A. It was -- it wasn't all in the contract. It was schedules and conversations

Fogarty - Highly Confidential

that I wasn't part of and understanding how it all came together was incredibly difficult.

Q. Were there any assets that you recall that were transferred as part of the sale agreement that weren't identified in the sale documents?

A. Restate.

Q. Were you aware of any assets that were transferred as part of the agreement that you didn't believe were reflected in the sale agreement?

A. There was, I recall, people working on things like stadium tickets, all sorts of things, and trying to figure out what was transferred and what was not and I remember people working on that process.

Q. Let me ask you to look at another part of the attachment here, which is AM 2293. It's a document entitled Lehman Bothers Barclays Transaction, Division of Assets and Liabilities. Do you recognize this document?

(Document review.)

A. I recall this document being prepared by Weil. I can't say I recall the --

Fogarty - Highly Confidential

I recall all of this detail or this detail.

Q. Do you recall seeing this document?

A. Yes, I recall this document.

Q. And under -- did you understand this to be describing which assets were included in the sale transaction?

MR. TAMBE: Object to the form of the question.

A. Did I -- I'm sorry, rephrase. Did I --

Q. Did you understand this document to be describing the assets that were included in the sale transaction with Barclays?

A. Yes.

Q. And on 2293 under Purchased Assets and under Security and Trading Operations do you see the first bullet point that says: "The securities set forth on Schedule A to the Clarification Letter, i.e., the securities subject to the Barclays repurchase agreement"?

A. I see that.

Q. Did you understand at this time that Barclays was acquiring all of the collateral associated with the Fed repo loan?

Fogarty - Highly Confidential

A. No.

Q. Well, did you understand that after you got this document and read it?

A. I understood that there were a lot of documents trying to pull together -- that tried to -- clarification letters and documents and schedules and we had a process to try to understand numerically, you know, what that left us with, what exactly did we have left, I mean, sort of detail trying to understand exactly what securities we had left.

Q. In roughly this time period of September 27th, you understood that as part of the sale transaction Barclays was getting all the collateral associated with the repo; correct?

MR. TAMBE: Objection. Asked and answered.

A. I did not understand -- I did not understand the transaction completely.

Q. Not my question.

The question is you understood that as part of the sale transaction all of the collateral associated with what was the Fed

Fogarty - Highly Confidential

repo -- do you know what I am referring to when I say the Fed repo?

A. I do.

Q. And you know there was collateral associated with that repo?

A. Yes.

Q. And you understood that all of that collateral was supposed to be conveyed to Barclays as part of the sale transaction; correct?

A. I don't know about all. I know that collateral was associated with that Fed repo and that was supposed to be -- that was supposed to be part of this transaction.

Q. Did you ever have a belief that some portion of the repo was supposed to not be transferred to Barclays?

A. No.

Q. Okay. And you understood that what Weil is telling you here is confirming that all of the repo collateral was included as a purchased asset; right?

MR. TAMBE: Objection to the form of the question.

Fogarty - Highly Confidential

A. I believe that was the case.

Q. Okay. And you -- in this rough time frame you would have reviewed the Clarification Letter?

A. Made an attempt to understand it, yes.

Q. Okay. So you read it and you saw in there that it transferred the Fed repo collateral to Barclays; correct?

MR. TAMBE: Objection to the form of the question.

A. I recall the Fed repo. I don't recall whether it was in the Clarification Letter or not.

Q. Let me go ahead and show you a document marked 25, and we will come back to the current document so you can just leave it there. This is a copy.

Do you recognize Exhibit 25?

(Document review.)

A. I do not.

(Document review.)

MR. TAMBE: Do you want him to read it?

Page 46

Fogarty - Highly Confidential
MR. THOMAS: No, but what he is doing is good, flipping through it.
MR. TAMBE: So you want him to flip through it?
MR. THOMAS: Yes.
(Document review.)
A. Okay.
Q. Having had a chance to now flip through the document, do you recognize it as what is referred to as the Clarification Letter?
A. I do.
Q. And do you see under Purchased Assets section 1(a)(ii) towards the bottom of the first page there, and then capital A that it includes the securities owned by LBI and transferred to purchaser or its affiliate under the Barclays repurchase agreement?
A. I see those words.
Q. Okay. And if you turn to paragraph 13 of page 5 entitled Barclays Purchase Agreement, it says: "Effective at closing all securities and other assets held by purchaser under the September 18th, 2008 repurchase

Page 47

Fogarty - Highly Confidential
agreement among purchaser and/or its affiliate and LBI and/or its affiliates and the Bank of New York as collateral agent (the Barclays repurchase agreement) shall be deemed to constitute part of the purchased assets in accordance with paragraph 1(a)(ii) above." Do you see that?
A. I see those words.
Q. Okay. And when it says "all securities and others assets," do you understand that to be conveying all of the repo collateral to Barclays as part of the sale transaction?
MR. TAMBE: Objection to the form of the question.
A. I do.
Q. Does this refresh your recollection that, in fact, all of the repo collateral was being conveyed to Barclays as part of the sale transaction?
A. That is my understanding.
Q. And was that your understanding at the time?
A. I haven't looked at any of this

Page 48

Fogarty - Highly Confidential
since April, prior to April of this year, so I just don't recall all the details.
Q. I appreciate that, but at any time did you have some belief that not all the collateral was going over to Barclays?
A. Because I didn't fully understand the transaction, we were -- I was never sure of anything in that transaction.
Q. Would you agree that --
A. I was never sure.
Q. Do you agree that that language is pretty clear, that means that all the repo collateral was going over to Barclays?
MR. TAMBE: Objection to the form of the question.
A. I can see those – the words that say that, yes.
Q. Okay. Going back to 2293, the second bullet point, the last bullet point on the page, says: "The securities and other assets held in LBI's clearance boxes as of the time of closing." Do you see that?
A. Yes.
Q. Is that consistent with your

Page 49

Fogarty - Highly Confidential
understanding of the Barclays sale transaction?
A. Yes.
Q. Turning the page, the first bullet point says: "All exchange-traded derivatives and any property that may be held to security obligations under such derivative," is that also consistent with your understanding of the transaction, that that was going over to Barclays as part of the sale transaction?
A. Rephrase "understanding of the" -- say that again.
Q. Is that consistent with your understanding of the sales transaction, that all exchange-traded derivative and any property that may be held to security obligations under such derivative was part of the purchased assets and was being transferred to Barclays as part of the sale transaction?
A. That -- yes.
Q. And the parenthetical there where it refers to "and any property that may be held to security obligations under such derivative," do you understand that to be referring to collateral associated with the exchange-traded

Fogarty - Highly Confidential

derivatives?

MR. TAMBE: Object to the form of the question.

A. I don't understand this piece.

Q. Do you recall asking Weil at any point to clarify it?

A. I don't.

Q. Do you know if you had an understanding of that at the time?

A. I don't recall focusing on the exchange-traded derivatives.

Q. And just to be clear, it's your testimony that you are not sure if the parenthetical, "and any property that may be held to security obligations under such derivative," is referring to collateral or not?

A. I don't --

MR. TAMBE: Object to the form of the question.

You can answer.

A. I don't understand what that means.

Q. Do you believe it to be referring to collateral?

A. Property -- I read it to -- it reads

Fogarty - Highly Confidential

as property.

Q. It reads as any property that may be held to security obligations under such derivative.

My question to you is do you believe that that's referring to collateral?

MR. TAMBE: Objection.

A. Property held for security obligations and collateral presumably are the same thing.

Q. And when it says "any property," assuming it's referring to collateral, that would include both securities and cash; correct?

MR. TAMBE: Objection to the form of the question.

A. I don't know.

Q. How do you read that, assuming that's referring to collateral when it says "any property," would you interpret "any property" to include things like security and cash?

MR. TAMBE: Object to the form of the question.

Fogarty - Highly Confidential

A. Yes.

Q. When you received this from Weil on September 27th, do you recall going back to Weil with any follow-up questions concerning the document they sent you?

A. I recall attempting to summarize the transaction -- not the transaction. To summarize what was -- what was -- well, summarize the transaction and to summarize what was left for the estate to manage as the outgrowth of all of this effort.

Q. Was Weil cooperative with Alvarez in providing information to Alvarez?

A. Yes.

Q. If you would look at 2295, please. The top of the page -- well, strike that.

Let's go ahead and go to 2296, please. And do you see where it says at the top of the page: "Purchaser shall receive" and then the second point says: "To the extent permitted by applicable law and as soon as practicable after the closing 769 million of securities as held by or on behalf of LBI on the date hereof pursuant to Rule 15C3-3 of the

Fogarty - Highly Confidential

Securities and Exchange Act of 1934 as amended or securities of substantially the same nature and value," do you see that written there?

A. I see that.

Q. Is that also consistent with your understanding of the deal, that the securities, that value, was going over to Barclays as part of the sale transaction?

MR. TAMBE: Object to the form of the question.

A. I don't recall this particular piece of the -- this particular 769 piece of the transaction.

Q. Okay. You don't recall one way or the other?

A. I don't.

Q. Did you subsequently come to learn at some point in time -- strike that.

Do you recall learning at some point in time that this was listed as a purchased asset in the sale transaction documents?

A. I recall something we termed the -- that was being termed the unencumbered box and I can't recall if this relates to that or not.

Q. Do you have an understanding that the unencumbered box referred to the clearance boxes?
A. Yes.
Q. Does that help you recall that the clearance box is something separate than the 15C3 assets?
MR. TAMBE: Object to the form of the question.
A. The way we were, again, attempting to understand the transaction, there were those two pieces.
MR. THOMAS: Let me show you a document that we will mark as 563-B.
(Exhibit 563-B, handwritten notes, Bates stamped AM 004887 through AM 4892, marked for identification.)
(Document review.)
Q. Do you recognize this document?
A. No.
Q. Do you recall there being discussion in the other e-mails that we looked at about you getting together a meeting or discussion with Alex Kirk, Paolo Tonucci, Rod Miller at

Weil among potentially others?
A. I do.
Q. And do you see this at the top says "9/29 MTG" for meeting?
A. I see that.
Q. And do you see Alex, Rod Miller, Paolo?
A. I do.
Q. Do you know whose handwriting this is?
A. I do not. I don't know.
Q. It's not yours?
A. It's not my handwriting, no.
Q. Do you recall having a meeting with Alex Kirk, Paolo Tonucci and Rod Miller at about this time?
A. I recall meeting with Alex Kirk and Paolo. I can't recall -- I can't recall Rod -- whether Rod was there or not, and I recall a bigger -- others in the room as well. I can't recall.
Q. And who else do you recall being there?
A. Bill Gordon. I believe David Coles.

And I can't recall beyond -- there are others that might have been there, but I can't recall.
Q. And anyone else from Weil? Was Bob Messineo there?
A. I don't recall Bob.
Q. How about Lori Fife?
A. I don't recall her being there either.
Q. And who kind of ran that meeting from the Alvarez perspective?
A. I think we -- I don't know that there was sort of a runner of -- it would have been a combination of myself and Bill and David Coles and others. I can't remember there being a specific runner of the meeting.
MR. THOMAS: And, counsel, this was produced to us a couple days ago. Do you know whose notes these are?
MR. TAMBE: I don't.
MS. DelMEDICO: We are providing you with metadata today that will be produced electronically.
MR. THOMAS: Today. Okay. Can you tell me whose notes they are?

MS. DelMEDICO: I can't. I can try to find out for you.
MR. THOMAS: Okay.
Q. Do you remember that meeting? Where was that meeting held?
A. I think the Lehman offices, the old Lehman offices, but it could be -- we were in this -- I think it was the old Lehman offices in a conference room, or it could have been the new Lehman offices. I can't recall. All the conference rooms were the same, but there were two offices across the street from one another and I can't recall which place we were in at the time.
Q. And was the purpose of that meeting to understand the final deal both in terms of what was in the agreement and what actually occurred?
A. Yes.
Q. And did Mr. Kirk and Mr. Tonucci, were they cooperative and answered your questions?
A. They were rushed, they each had only a little bit of time to give us, so we did not

accomplish the task.
Q. In what sense did you not accomplish the task?
A. We left the room somewhat more befuddled than when we entered the room.
Q. And what befuddled you?
A. We still didn't understand the transaction clearly at that time.
Q. Did there come a point in time when you understood the transaction clearly?
A. No.
Q. Still even today you don't understand the transaction?
A. I haven't tried to in a long time.
Q. When did you leave Alvarez?
A. Beginning of April, late March.
Q. And at that time you still didn't understand the transaction?
A. Correct.
Q. What do you mean when you say you didn't understand the transaction?
A. I didn't -- there were lots of moving parts and I don't -- I never could put them all together, because things kept changing

along the way. My understanding of things kept changing along the way.
Q. Did you feel there was some ambiguity in the language of the purchase agreement which you reviewed?
A. I didn't study it from that standpoint. There was ambiguity in my understanding of what happened. I could never quite -- and I am pretty -- usually pretty good at this stuff. I could never quite put it all together as to what -- because I wasn't there and that's where it was.
Q. What aspect of the deal could you not put together?
A. The interrelations of all the different -- just the actual math -- the ultimate mathematics of the transaction I couldn't put together ultimately.
Q. Did you ever identify any term of the purchase agreement that you thought was vague or unclear?
MR. TAMBE: Objection. Asked and answered. Objection to the form of the question.

A. I couldn't ever understand exactly how the transaction ultimately came together and closed.
Q. Well, I am asking a little bit different question, I think.
Could you understand the transaction as spelled out in the purchase agreement in terms of what assets were supposed to be included in the purchased assets and which weren't?
A. I would come to a I will call it a draft understanding of the transaction and find something out different and it continued to evolve and I couldn't -- the tasks that Brian asked me to pursue, I could never get enough cooperation from the other side through my teams, and this wasn't all just me trying to -- through my teams to really understand the transaction.
Q. Has there been any asset or bucket of assets or type of assets that you had difficulty understanding were conveyed or not conveyed as part of the transaction?
A. There was a -- there was -- you

mentioned the two pieces of the transaction. Put the unencumbered asset piece. The other piece, and I am recalling there being a haircut that was taken against -- again, I'm not a valuation person. I am trying to just follow what happened in terms of control -- asset control, and there was a haircut taken in the transaction that I never quite understood and there was liabilities that others on the team, David Coles' team, were trying to understand that were being assumed by Barclays that we could never get good detail and understand.
Q. Anything else you can think of not having clarity on?
A. Then there were other things like the stadium tickets and the who got to sell Lehman's, you know, caps and bags. Just this kind of stuff. There was lots of this kind of stuff that we never had great clarity on.
Q. Anything that you would consider material?
MR. TAMBE: Objection to the form of the question.
A. The initial two things I mentioned

were more material than the latter piece that I mentioned.

Q. Did you consider the stadium seats or anything else material to the transaction?

A. No.

MR. TAMBE: Now is a good time for a break, Tom.

MR. THOMAS: Okay. Let me finish up with the current document.

MR. TAMBE: That's fine.

Q. Are you okay to finish up with this document?

A. Sure.

Q. Let me ask you to turn to page 4889 of Exhibit 563-B, and I understand these are not your notes and obviously we are going to depose whoever it is who wrote the notes as soon as we are told that information, but this is notes of a meeting that you were at and participated in; correct?

MR. TAMBE: Objection to the form of the question. I don't think you have ever established that.

A. I do -- I was at a meeting with the

people I mentioned earlier. I can't tell you for sure that this is that same meeting.

Q. Is there any doubt in your mind that you were at this meeting that the notes are referring to?

MR. TAMBE: Object to the form of the question.

A. There actually is some doubt, because there may have been other meetings that I wasn't at with either Paolo or Alex, so I can't for sure know that this is the same one, the same meeting.

Q. Okay.

A. I assume it is, but I don't know for sure.

Q. You assume so because it's obviously a detailed discussion of the deal on September 29th shortly after you were tasked to meet with these people and find out all you can about the actual final deal; correct?

MR. TAMBE: Object to the form.

A. I assume so, because it's in the same week that I probably had that same meeting.

Q. Do you think there might have been other people at Alvarez secretly meeting with Paolo and Alex discussing the deals that you didn't know about?

A. I don't know for sure. I know that -- well, there were others on the Alvarez team that were trying to help understand this, including Bill Gordon and Al Lakhani and some of the folks that were referenced, and they were having meetings that I wasn't at together. I don't know -- I just don't know exactly whether they got any time with Alex or Paolo in addition to the time that I was in a meeting with them. I just don't know.

Q. So in addition to the description of the deal that you got from Alex and Paolo, your colleagues at Alvarez & Marsal may have also gotten additional descriptions of the deal from them?

A. I don't know.

Q. Would you take a few minutes to flip through these notes. Perhaps that will refresh your recollection whether these notes are from a meeting that you attended.

(Document review.)

A. I can't -- I can't read all the handwriting, but...

(Document review.)

A. Okay.

Q. And having looked at the substance of what the notes are referring to, does this appear to be the subject matter discussed in the meeting that you attended on or about 9-29 with Mr. Tonucci and Mr. Kirk?

A. Parts of this would have been the subject matter that we discussed and I can't be absolutely sure on all of the pieces, but the parts of this are subject matter for what we would have discussed in the meeting with those two.

Q. And having reviewed the notes of this meeting, do you believe that this is a meeting that you attended?

A. I -- I don't -- I think so, but I can't tell you for sure. I don't know that there wasn't another meeting.

Q. If you would turn, please, to page 4889. Do you recall in your meeting with

Fogarty - Highly Confidential

Mr. Tonucci and Mr. Kirk whether they gave you a description of what happened with the we will refer to it as the $7 billion that did not go to Barclays that was supposed to?

MR. TAMBE: Objection to the form of the question.

A. I recall trying to piece the transaction together. That's what I recall.

Q. Do you recall there being an issue with Barclays having sent over $45 million in cash and having not gotten all the assets in return that it was supposed to get?

A. I recall there was an issue between JPMorgan, Barclays and Lehman.

Q. And you recall it generally involving the fact that Barclays had put out $45 billion in cash and not gotten all the securities that it was supposed to have gotten?

A. Yes.

Q. And do you recall Mr. Kirk or Mr. Tonucci explaining to you in this meeting what happened?

A. Yes.

Q. Okay. Do you see a chart at the top

Fogarty - Highly Confidential

of 4889?

A. Yes.

Q. Do you have an understanding of what that chart is showing?

MR. TAMBE: Object to the form of the question.

A. In a general sense, yes.

Q. Can you explain what it's showing in a general sense, please.

A. I understand it to be generally trying to follow the transaction.

Q. And do you see the box where it says kept 8.6 something cash, 8.6 billion cash?

A. Uh-huh.

Q. Do you know what that's referring to?

A. I do not, other than it says "held back from Fed" next to it.

Q. Turning down a couple of lines it says "Sunday Barclays talked to JPM, resolve $7 billion cash." Do you see that?

A. I see that.

Q. The next line it says "8.4 billion securities worth half amount." Do you see

Fogarty - Highly Confidential

that?

A. I see that.

Q. Do you recall in this meeting you attended a discussion about the securities being only worth half of what they were marked at?

MR. TAMBE: Objection to the form of the question.

A. I do not.

Q. Do you recall generally in this part of this discussion that some of the securities that were associated with the repo collateral were not, in fact, worth what they were marked at?

A. I recall the $45 billion number having been thought to be $50 billion worth of value and there was a description of a -- I don't recall if it was in this meeting. A description of a fight about whether it was worth 50 billion or 45 billion.

Q. There was a question discussed as to whether it was really worth the amount that it was nominally marked at; is that right?

MR. TAMBE: Object to the form of

Fogarty - Highly Confidential

the question.

A. There was a dispute on what that was -- on what the 50 billion was worth, yes. I recall that.

Q. And you understood that Barclays did not believe it was worth 50 billion, but believed it was worth roughly in the neighborhood of about $5 billion less than that?

MR. TAMBE: Objection to the form of the question.

A. I do not know what Barclays believed it was worth. I don't know.

Q. Do you know -- then what was the disagreement about in terms of -- was there any disagreement in terms of the valuation of those securities?

A. I wasn't there, so I don't know specifically, but I know it was described as there was a fight about -- there was a fight where the management team was -- believed the securities -- that the management team was -- I don't know what people believed, but there was a $50 billion number and a $45 billion number

Page 70

Fogarty - Highly Confidential

and Barclays was at 45 and the Lehman folks, Alex and Paolo, were at -- they were at 50 and there was a fight about it. That's what I recall.

Q. Are you sure Alex and Paolo were at 50 or was it the case that those were the marks?

MR. TAMBE: Object to the form of the question.

A. I don't recall where Alex and Paolo would have been at. I don't know where they were -- what they -- I remember there being a $50 billion number, though.

THE VIDEOGRAPHER: The time is 11:06. We are going off the record.

(Recess was taken from 11:06 to 11:06.)

THE VIDEOGRAPHER: The time is 11:06. We are back on the record.

BY MR. THOMAS:

Q. Do you recall anyone from Lehman ever expressing a belief as to what they believe the actual value of those securities was?

Page 71

Fogarty - Highly Confidential

MR. TAMBE: Objection to the form of the question.

A. No.

Q. If you would turn the page to 4890. About three-quarters of the way down there appears to be a reference to "paid 38" I am going to say billion "in cash to buy 42.9B Lehman asset" and it says "different" -- appears to say "different valuation." Is that how you read that?

MR. TAMBE: Object to the form of the question.

Q. Then underneath it says "5.1"?

A. I see that. "Different" -- yeah, I don't know what that word is, but it could be valuation.

Q. The last word is "valuation"; right? "5.1."

MR. TAMBE: Object to the form.

Q. Does that sound like the difference in valuation that you were discussing allowing for the fact that there were $7 billion that didn't get transferred?

MR. TAMBE: Objection to the form of

Page 72

Fogarty - Highly Confidential

the question.

A. I see two numbers. I see 42.9 and I see 38, which are different to the tune of 4.9, and I don't know what the 5.1 is.

Q. And if you take the 48 -- take the 38 cash and add 7, you get the 45 billion that Barclays paid in cash; right?

MR. TAMBE: Object to the form of the question. Does 38 plus 7 equal 45? The math?

MR. THOMAS: It's a speaking objection. I've got the objection.

MR. TAMBE: These are not his notes.

MR. THOMAS: You kind of yelled the objection, so I don't know if it was like -- you know, what's going on here.

MR. TAMBE: I will tell you what's going on. What's going on here is --

MR. THOMAS: The federal rules require you to not make these kind of speaking objections in the middle of a question and I will just ask you -- you have stated your objection. You have preserved it.

Page 73

Fogarty - Highly Confidential

MR. TAMBE: Well, what the rules also require is that you have a fair examination. He has already told you this is not his handwriting. You are asking him to do math based on numbers you are reading on a piece of paper.

MR. THOMAS: You are arguing to give the witness coaching.

MR. TAMBE: It's an improper question.

MR. THOMAS: Improper objection.

A. What's the question?

Q. Do you understand if you add the 38 billion -- at this meeting where this was discussed that you intended as part of your assignment to figure out what the deal was --

MR. TAMBE: Objection. Lack of foundation.

MR. THOMAS: I haven't even asked the question yet.

Q. When you add the 38 billion and the 7 billion that didn't get transferred, that adds up to the 45 billion that Barclays paid in cash; correct?

Fogarty - Highly Confidential

MR. TAMBE: Object to the form of the question. Lack of foundation.

A. 38 and 7 is 45, correct.

Q. Okay. Is there any doubt in your mind that when it says here "paid 38 billion in cash" that that's referring to the 45 billion that Barclays paid minus the 7 billion that went missing?

A. I do not know.

MR. TAMBE: Objection to the form of the question.

Q. You don't know? You have no idea?

A. I didn't write this.

Q. I understand, but that's not my question.

Is it your understanding that the 38 billion is 38 billion there in paid cash because it's taking out from the 45 billion in cash that Barclays paid the 7 billion which ended up not going across in the transaction and ended up being the subject of an extensive settlement agreement in which you were involved?

MR. TAMBE: Object to the form of

Fogarty - Highly Confidential

the question. Lack of foundation. Asked and answered.

A. I'm sorry. Is there a question?

Q. Yes. Do you understand the reference to the 38 billion there paid in cash to be simply the 45 billion that Barclays paid in cash minus the 7 billion over which there was a dispute because Barclays didn't get the assets that it was supposed to get?

MR. TAMBE: Object to the form of the question. Lack of foundation. Asked and answered.

A. I don't know what this means.

Q. So it's your testimony that you have no idea what that "paid 38 billion in cash" is referring to?

A. What I recall is -- the numbers I recall is a $50 billion number and a $45 billion number. That's what I recall from this meeting.

Q. And you recall there being a dispute about $7 billion for which Barclays did not receive the securities that it was supposed to receive on the night of that Thursday and that

Fogarty - Highly Confidential

subsequently it was supposed to receive $7 billion back in cash and then ultimately was the subject of a settlement agreement in December of 2008?

MR. TAMBE: Objection to the form of the question. Asked and answered.

A. I don't know. I don't know. I don't know the settlement that you -- I don't know the settlement you mentioned.

Q. Do you recall that there was a $7 billion issue with Barclays not getting securities it was supposed to get in return for that $7 billion?

A. I recall that there was some sort of settlement, yes, between JPMorgan and Barclays and LBI and I can't remember the details.

Q. Do you recall when you were following the deal over the weekend and your references in your e-mails to JPM being at Weil, do you recall those e-mails?

A. I do.

Q. Do you recall at some point over the weekend it being agreed that Barclays was just going to get paid back the $7 billion?

Fogarty - Highly Confidential

A. I don't recall that over that weekend, no.

Q. Do you recall the $7 billion figure being an issue?

A. I recall there being an issue with JPMorgan in the transaction.

Q. And do you recall the $7 billion figure?

A. I recall -- I recall the $7 billion figure, yes.

Q. Is there any doubt in your mind that paid 38 billion here in cash is simply referring to the $45 billion paid by Barclays minus the $7 billion?

MR. TAMBE: Objection, asked and answered. Objection, lack of foundation. Objection, form.

A. I do not know.

Q. No idea how they -- what that $38 billion is referring to?

A. I didn't write it, so I don't know.

Q. Do you recall in the meeting a $38 billion figure being discussed?

A. No. I recall discussing 50 and 45.

Fogarty - Highly Confidential

That's what I recall.

Q. Now, when you say 50, do you recall there being a nominal valuation of 49.9 or 49.7?

A. I don't recall that number.

Q. In any event, you do recall this approximately $5 billion difference in valuations being discussed in the meeting with Kirk and Tonucci?

MR. TAMBE: Objection to the form of the question.

A. I recall them describing -- fighting about the difference between 50 and 45.

Q. And you understood that to be a difference in valuation --

MR. TAMBE: Objection to form.

Q. -- of what -- question of what securities were actually worth versus what they were nominally marked at?

MR. TAMBE: Object to the form of the question.

A. I recall, yes, there being two different numbers relative to the transaction.

Q. And if you would turn the page,

Fogarty - Highly Confidential

please, to 4891.

At the top of the page does this appear to you to be an effort at some type of balance sheet?

A. Yes.

Q. And if you recall the 45 and the 50 billion numbers, do you have any explanation for why we are dealing with the 38 and 43 numbers?

MR. TAMBE: Objection to the form of the question. Lack of foundation.

A. I don't recall.

Q. Do you see under Assets at the top of that page it says "repo" and then to the right it says "38," then it says "5" and then it says "43.1B"?

A. I see that.

Q. Do you understand that to be referring to, again, this $5 billion valuation issue?

MR. TAMBE: Objection to the form of the question. Lack of foundation.

A. I do not know what they are referring to.

Fogarty - Highly Confidential

Q. And in the right-hand column there is a reference to where it says "deal hits, 3.45." Do you see that?

A. I see that.

Q. Do you remember there being -- first of all, do you have -- just from reading this, do you have an understanding what that's referring to?

MR. TAMBE: Objection to the form of the question. Lack of foundation.

A. Sorry. Restate the question.

Q. Sure. From reading this do you have an understanding of what "deal hits" is referring to there, the 3.45?

MR. TAMBE: Same objection.

A. I don't know what they meant by that phrase.

Q. Do you have any understanding of it?

MR. TAMBE: Same objections.

A. I don't know.

Q. What do you think it means?

MR. TAMBE: What those words mean?

Q. What do you think he means by these words, "deal hits"?

Fogarty - Highly Confidential

MR. TAMBE: Same objection. Lack of foundation.

A. Should I answer as to what I think?

Q. Yes.

MR. TAMBE: You can answer what those words mean to you, yes.

A. It looks like an accountant trying to have the two sides add up to the same number, 47.34, 47.34, and that being a number they need to get to add it up.

Q. And specifically the reference to "deal hits," do you understand that to be a loss on the deal?

MR. TAMBE: Objection to the form. Lack of foundation.

A. No.

Q. What do you understand it to be?

A. I just understand it to be an accountant trying to make the two sides add up and calling the remaining number something there. They called it deal hits.

Q. Do you recall any discussion about deal hits or loss on the deal at this meeting?

A. I recall the $5 billion discussion

at the meeting, the difference between 50 and 45 that I mentioned before, that's what I recall.

Q. Right. Do you recall any discussion about a loss on the deal or deal hits?

A. No.

Q. And having looked at this, you have no understanding of whose handwriting this is?

A. I don't know.

MR. TAMBE: Objection. Asked and answered.

Q. Did you take notes at that meeting?

A. No.

Q. Do you know who was taking notes?

A. I don't know.

Q. Let me go ahead and show you a document we will mark as --

MR. TAMBE: Can we take a break before you show him the next document?

MR. THOMAS: Sure, yes, go ahead.

THE VIDEOGRAPHER: The time is 11:20. We are going off the record.

(Recess was taken from 11:20 to 11:31.)

THE VIDEOGRAPHER: The time is 11:31. We are back on the record.

BY MR. THOMAS:

Q. Mr. Fogarty, do you know a Mary Korycki at Alvarez & Marsal?

A. Yes.

Q. And was she at this meeting that you attended with Mr. Tonucci and Mr. Kirk?

A. She probably was, but I don't recall specifically.

MR. THOMAS: Let me go ahead and show you a document we will mark as Exhibit 564-B.

(Exhibit 564-B, Lehman Brothers/Barclays APA Lead Sheet, Bates stamped AM 004893 through AM 004896, marked for identification.)

MR. TAMBE: Just before you ask about the document, I just want to be clear that we did tell you at the break whose handwritten notes those were.

MR. THOMAS: Right.

MR. TAMBE: I just want to be clear on the record that you were given that

information.

MR. THOMAS: Okay.

Q. Does that refresh your recollection at all about who was at the meeting, the fact that Miss Korycki was there?

MR. TAMBE: Object to the form of the question.

A. No.

Q. Do you now have a recollection that Mrs. Korycki was at the meeting?

MR. TAMBE: Asked and answered.

A. I -- she worked for me, she was on my team, so she was at a lot of the meetings that Bill Gordon or I would be at. I just -- I can't -- I can't sort of visualize and sort of see her there, if you will. I don't recall. I don't doubt that she would have been there.

Q. Did you say she worked for you?

A. Yeah. Well, she was with Alvarez & Marsal. She was a senior associate on my team.

Q. So she reported up to you?

A. She did, through Bill Gordon, but she reported -- she worked for me on certain things as well.

Q. Assuming these are her notes, does that make it more likely that this was, in fact, a meeting you were at?

A. Yes, more likely.

Q. Let me show you a document marked Exhibit 564-B.

(Document review.)

Q. Do you recognize this document?

(Document review.)

A. I recognize the footnotes. I don't recognize the document with the handwritten -- the handwritten stuff. So no, I don't recognize this document.

Q. When you say "the footnotes," do you mean the printed materials or just literally the footnotes? Well, strike that.

Do you recognize the chart on 4893 minus the handwriting?

A. I don't know if I -- I recognize the chart. I don't know if I recognize the numbers on this particular version of this chart.

Q. Do you know who prepared this chart?

A. The -- this is likely Mary Korycki that prepared this chart.

Fogarty - Highly Confidential
Q. Under your direction?
A. Correct.
Q. And what was the purpose of preparing this chart?
A. To understand what securities had transferred under the agreement so that the asset teams -- our asset teams at Lehman would know what was transferred.
Q. Do you know if you ever saw this document before with the handwriting?
A. Definitely not.
Q. You definitely have not seen it before?
A. No. I don't recall it anyway. I don't recall this.
Q. Let me go ahead and show you a document that's been previously marked as 493.
(Document review.)
Q. Do you recognize this as an e-mail from yourself dated September 29th, 2008?
A. 29th or 28?
Q. Well, at the top it appears to say from James Fogarty, Monday, September 29th.
A. I thought you said 28th. 29th, yes,

Fogarty - Highly Confidential
this one at the top, yes.
Q. Do you recognize this as an e-mail that you sent on or about this time?
A. Let me read it here.
(Document review.)
A. Okay. Yes, I recognize this.
Q. And can you describe what the attachment is?
A. This was certain securities that were -- my recollection is certain securities that were to move as part of the transaction.
Q. Are these the clearing box securities?
MR. TAMBE: Object to the form of the question.
A. The -- what I recall is the unencumbered box was the way I recall it and that was -- that this was part of that process.
Q. And why were you obtaining this information? Was that part of your effort to make sure you understood what assets went over as part of the transaction and which didn't?
A. We were obtaining this to make sure that we understood what was really ultimately

Fogarty - Highly Confidential
going to be -- that we had control over what was going over and what was -- that we understood what was going over and what was then left behind.
MR. THOMAS: Let me show you a document we will mark as Exhibit 565-B.
(Exhibit 565-B, e-mail dated 9/29/2008, Bates stamped WGM-LEHMAN-E 00000868 through WGM-LEHMAN-E 00001147, marked for identification.)
Q. Do you recognize this as an e-mail from Mary Korycki to yourself dated September 29th, 2008?
A. I do.
Q. And is this also part of the effort and process to gather information to make sure you understood what assets and liabilities were being transferred as part of the sale transaction and which weren't?
A. Yes.
Q. Was there ever a point in time that -- during this period of time, the last week of September when you were undertaking these efforts that we have been looking at in

Fogarty - Highly Confidential
the e-mails, was there ever any point in time where anyone at Lehman or Weil or anywhere else refused to give you information that you thought was important to understanding what assets and liabilities were transferred and what weren't?
A. Yes.
Q. What was that time?
A. During this time we had a very difficult time getting an understanding. We would get documents, but getting an understanding was very difficult and that was not my -- that was through my team. Our team had a difficult time getting an understanding of the transaction.
Q. Let me ask a more specific question again. Was there any point in time when anyone refused to provide you any specific information or specific documents?
MR. TAMBE: Objection to the form of the question.
A. I don't recall specifically, but I know folks that were working on the project had a difficult time getting time with people to

Fogarty - Highly Confidential

understand the transaction, yes.

Q. Is that because it was a very busy time, tumultuous time?

A. I don't -- I don't know why that there wasn't more time -- the estate took a back seat to the interests of Barclays in general.

Q. What's your basis for that statement?

A. We had these attempts under way and then we had attempts under way to get services under the transition services agreement, which I was responsible for with Bill Gordon, and we had a difficult time getting Barclays to provide support in that -- under that agreement, and we had a difficult time getting Barclays to help us understand -- understand the estate and what we were managing.

Q. Putting aside the Transition Services Agreement, the TSA, just with respect to your efforts to understand the sale transaction and what assets and liabilities were conveyed and what weren't, was there any -- were there any documents or pieces of

Fogarty - Highly Confidential

information that you asked for but didn't get?

A. Personally?

Q. You personally, yes.

A. No.

Q. To your knowledge, anyone else on the Alvarez team?

A. Yes. The team had a difficult time getting things that they asked for along the way, yes.

Q. Well, we are going to have to be more specific. Can you identify any particular documents or specific information that someone on your team asked for but did not get?

A. I can recall a number of various things that Al Lakhani's team was trying to obtain from Barclays along the way and we were having Al Lakhani, Phil Kruse and others trying to understand this transaction over time and we had a difficult time getting the things that we were asking for.

Q. Can you identify something specifically?

A. No.

Q. I mean, you had CUSIP lists of the

Fogarty - Highly Confidential

securities that went over as part of the deal; correct?

A. Well, we had lists, yes, and there -- let's see. We had lists by security, yes.

Q. Was there -- so did you at least feel like you fully understood the assets that went over, putting aside this kind of general understanding of hows and whys about the deal, did you understand what assets went over and what assets didn't?

MR. TAMBE: Objection to the form of the question.

A. Completely, no.

Q. What asset did you not know went over but you at some later point in time found out did go over?

A. I don't recall any.

Q. Do you recall ever asking anyone for any additional information about the securities that went over that you didn't receive?

A. I wasn't making the requests directly myself.

Q. Do you recall anyone on your team

Fogarty - Highly Confidential

asking for something like the list of securities that we are looking at here and that we looked at in previous documents but they didn't receive?

A. I don't recall any specific item, no.

Q. So is it fair to say, putting aside information about the difference in the valuation, the approximately $5 billion difference in valuation, putting aside that, you understood in September what assets were actually conveyed as part of the transaction?

MR. TAMBE: Objection to the form of the question.

A. We had lists of securities that we understood -- we understood those lists of securities were the things that had moved across, yes.

Q. You had lists of securities, you had briefings from Weil, you had a detailed description that we looked at from Weil identifying the purchased assets that were sold as part of the sale transaction; correct?

A. We had a lot of lists, yes.

Fogarty - Highly Confidential

Q. Okay. And at some later point in time after September did you learn that some asset was conveyed that you didn't know about back in September?

A. There were things that came up and I can't recall the specifics.

Q. Do you believe --

A. Whether it was in the private equity book or -- I just can't recall the specifics. There were various things that would come up over time that we didn't completely understand had moved or not moved in the transaction.

Q. Can you identify any of those?

A. I can't.

Q. Were any of those items what you would consider material?

MR. TAMBE: Objection to the form of the question.

A. There were material things that -- yes.

Q. Can you identify those?

A. I can't recall the specifics where I -- there were things that we were understanding about the transaction over time

Fogarty - Highly Confidential

that we didn't understand initially.

Q. But you can't identify any?

A. No. It's been a while. I can't recall.

Q. But in any event you had lists of the securities that went over in connection with the repo and that went over in connection with the clearing box, correct, the unencumbered box?

A. Yes.

Q. Let me go ahead and show you a document that's been previously marked as 463-B.

(Document review.)

Q. This is an e-mail from Conor Tully. Do you know who Conor Tully is?

A. He was on the FTI team.

Q. And what was FTI's role?

A. Working for the creditors.

Q. And what were they doing for the Creditors Committee?

A. Advisory services to the Creditors Committee for the case.

Q. In terms of financial advice?

Fogarty - Highly Confidential

A. They had -- yeah, they basically had Houlihan Lokey and FTI and FTI was the accounting advisory part of the exercise, accounting, you know, reorganization kind of advisory.

Q. What was your understanding of FTI's specific role at this point in time, early October?

A. It was a pretty broad role in advisory of the committee.

Q. And they were looking at, among other things, the Barclays sales transaction; correct?

MR. TECCE: Objection to form.

A. I honestly don't recall -- I don't recall them looking at the -- FTI looking at the -- I don't recall Conor Tully in particular looking at this part of the transaction. I just don't recall it.

Q. When you say "this part of the transaction," what do you mean?

A. This part of the case I meant to say. I misspoke.

Q. You don't recall FTI looking at,

Fogarty - Highly Confidential

examining the Barclays sale transaction?

MR. TECCE: Objection to form.

A. I don't recall.

Q. Who is William Fox?

A. William Fox is one of the other managing directors on the Alvarez team.

Q. What was his role in this?

A. Bill was working on the finance end and he would ultimately take over for David Coles as the CFO of the estate.

Q. And why were there communications between FTI and Alvarez & Marsal at this time?

MR. TAMBE: Objection to form. Lack of foundation.

A. I do not know.

Q. Are you surprised to see this?

A. No, I'm not surprised. I just -- I don't know what this particular -- I don't know.

Q. Did you ever speak with anyone from FTI?

A. No.

Q. Did you ever attend a meeting --

A. Oh, I'm sorry, speak to them, of

Fogarty - Highly Confidential

course. I was connecting it to this. I, of course, spoke to the people from FTI.

Q. And what did you speak with people at FTI about?

A. We actually spent most of our connection -- most of my connection with FTI was through the HR process when we were -- we had to build a workforce to manage the Lehman estate assets.

Q. Let me ask you to turn to the attachment. Let me ask, have you ever seen this document before, the e-mail from Conor Tully?

A. I have not.

Q. Looking at the attachment, at the bottom it says "Alvarez & Marsal."

Let me ask do you recognize the attachment?

A. I do not. I recognize these footnotes. I don't recognize this exact document.

Q. What are the footnotes? Can you describe what the footnotes are?

A. The A and the B. The assets

Fogarty - Highly Confidential

transferred under the repo and the unencumbered box.

Q. The sheet that has the assets and liabilities, the first page of the attachment, do you see that?

A. I see that.

Q. Have you ever seen this sheet before?

A. There were so many versions of this. I can't -- I've seen stuff like this. I can't recall that this -- that this version -- I can't recall this version.

Q. Do you know who put together this version or this document?

A. Mary Korycki was also working with the finance guys and this is an accounting kind of an approach to understanding things, and working with the finance guys on some of this over time, which would have been Bill Fox, so that's what I presume.

Q. And, I'm sorry, Bill Fox worked with your group or separately?

A. We would all work together on things over time, but Bill Fox was -- yeah, we were

Fogarty - Highly Confidential

all on the same Alvarez & Marsal team.

Q. Was he on your particular team within Alvarez & Marsal or was it separate?

A. No, he and David Coles were working the finance specific pieces of the case, accounting/finance pieces.

Q. You think it may have been Bill Fox that would have put together this document?

A. Perhaps.

Q. Was either Bill Fox or David Coles with you at the September 29th meeting with Tonucci and Kirk?

MR. TAMBE: Objection to form.

A. I'm fairly certain David Coles was there and I can't recall if Bill Fox was there.

Q. And, again, looking at the first sheet of the attachment, do you see where it says "38 billion repo assets negotiated a haircut and the assets transferred under repo" slash and then parentheses "stale marks"?

A. I see that.

Q. Do you understand this to be referring to that same approximately $5 billion valuation issue that was discussed in your 9-29

Fogarty - Highly Confidential

meeting between the 38 and the 43?

MR. TAMBE: Objection to the form of the question. Lack of foundation.

A. The 5 billion is, again, unless it's serendipity here, this is the 5 billion that I had in my head from the meeting and I had in my head a difference between 50 and 45.

Q. And do you recall there being a $7 billion box loan?

MR. TAMBE: Objection to the form of the question.

A. I don't know what that phrase means.

Q. Box loan?

A. I don't know what that phrase means.

Q. Do you see in the -- well, strike that.

Do you see where it says "net book loss, 3.27"?

A. I do.

Q. What is your understanding of what "net book loss" means?

MR. TAMBE: Objection to form. Lack of foundation.

A. My understanding is it's an

Fogarty - Highly Confidential

accountant's approach to have the two sides equal one another, to have the 47.31 and the 47.31 equate, and that is the then plug to make the two add up.

Q. Would that reflect the loss on the deal from the Lehman perspective?

MR. TAMBE: Objection to the form. Lack of foundation.

A. This is not how -- again, I'm not a valuation person. This is an attempt to do accounting as -- my understanding of what it is, it's an attempt to do the accounting.

Q. So you don't understand "net book loss" to be referring to a loss on the transaction --

A. No, because --

MR. TAMBE: Objection to form. Lack of foundation.

A. I understand -- accounting and value are not the same, and so book means book values as opposed to value.

Q. So there might be a difference between the book value of assets and their actual market value?

Fogarty - Highly Confidential

A. Correct.

Q. And do you know why FTI would have an Alvarez & Marsal sheet like that attached to Exhibit 463-B?

MR. TECCE: Objection to form.

A. It's fairly common that in our business we work very closely with the advisors to the committees and try to -- and share our understanding, because we are ultimately working for the creditors who they advise.

Q. And is that what happened in this case?

MR. TECCE: Objection.

A. I do not know.

Q. Well, with respect to the Barclays sale transaction, did you work with and cooperate with the committee's advisors?

MR. TAMBE: Objection to the form of the question.

A. I did not work with the FTI folks in any understanding of this transaction personally.

Q. Do you know if Alvarez & Marsal did?

A. I actually did not know -- I did not

Fogarty - Highly Confidential

have an understanding of that until I saw Bill Fox's name on this, so I didn't know what they were doing.

Q. Let me show you a document previously marked as 494.

(Document review.)

A. Okay.

Q. Do you recognize this document?

A. I do not. I recognize that I'm listed on it, but I -- or am I listed on it? Hold on a minute. No, I'm not listed on it, I don't think. No, I don't -- the -- some of the footnotes in the thing I recognize, but I don't recognize the document.

Q. And which footnotes do you recognize?

A. The -- page 3, 4 -- I actually don't recognize 5. I recognize 3, 4 and 6 as, at least in form, the kinds of schedules that I recall.

Q. And is this the Mary Korycki that worked with your group and reported up to you?

A. It is.

Q. It refers -- do you see this is an

Fogarty - Highly Confidential

e-mail from her dated October 6th, 2008?

A. I do.

Q. Do you see that it refers to materials for a 6 p.m. meeting?

A. I do.

Q. Do you have any understanding what -- and then in the subject line it says "materials for 6 p.m. meeting with Paolo Tonucci re JPM $7 billion." Do you see that?

A. I see that.

Q. Do you know if you were a participant in that meeting?

A. I do not believe so.

Q. Did you know that that meeting was going on?

A. I knew we had that overall effort under way to continue to try to understand the transactions and so forth.

Q. If you would look at the attachment at -- titled A Recap of Week Ended 9-19, page AM 3877.

A. Yes.

Q. Do you know if you have seen this page before?

Page 106

Fogarty - Highly Confidential

A. I don't recall this page.

Q. If you would -- do you see under Wednesday -- well, strike that.

Do you see under Thursday a description concerning the Fed repo transaction?

A. I see Thursday 9/18 and I see words there.

Q. Okay. Do you see the third bullet point says: "JPM repaid the Fed 38 billion out of the Barclays 45 plus an additional 7 billion by selling or lending against other Lehman securities previously held by JPM, the remaining 7 billion from the Barclays 45 billion," then it says, parentheses, "45 billion minus 38 billion" --

A. Uh-huh.

Q. -- "was held by JPM in a separate account for the benefit of Barclays," do you see that?

A. I see that.

Q. Does this refresh your recollection that the $38 billion number that was being discussed in the meeting you attended and

Page 107

Fogarty - Highly Confidential

reflected in the meeting notes was, in fact, the 45 billion paid by Barclays minus the 7 billion?

MR. TAMBE: Objection to form and lack of foundation.

A. I don't know this page. I don't know what -- I mean, it's -- the numbers are similar numbers from the other pages. I just don't -- I don't know this page.

Q. The question is does the information on this page refresh your recollection that the 38 billion paid by Barclays was simply the 45 billion minus the 7 billion over which there was a dispute involving JPM?

MR. TAMBE: Objection to the form of the question.

A. I remember there was -- yes, there was a $50 billion number and a $45 billion number and the differential was 5 and there was a piece of it that related to JPMorgan that was part of that settlement we referred to earlier and I don't recall the 38 and the 7 specifically.

Q. But the 38 and the 43 that we

Page 108

Fogarty - Highly Confidential

discussed earlier reflected in the meeting notes is simply the 45 and the 50 minus the 7 billion on each side; right?

MR. TAMBE: Objection to the form and lack of foundation.

A. I don't know.

Q. Is that what you assume it to be?

MR. TAMBE: Objection. Calls for speculation.

A. I assume that -- at my level what I understood and focused on was there was a $50 billion number and there was a conversation about 45 versus 50 and it was different by 5, and I also understood that there was a piece of it relative to JPMorgan and I can't remember the specific details of that piece of it.

Q. And when you heard about the difference in the meeting, 38 billion versus 43 billion, did you --

MR. TAMBE: Objection.

A. I don't recall those numbers. I don't recall 43 billion.

Q. The 42.9 that we looked at in the meeting notes, you don't recall that number?

Page 109

Fogarty - Highly Confidential

A. I don't recall that number.

Q. Do you have any other explanation for the difference being discussed in the meeting between the 38 billion and the 43 billion other than the fact that it's simply the 45 billion versus the 50 billion but backing out the 7 billion on each side?

MR. TAMBE: Objection to form. Lack of foundation. Calls for speculation.

A. No.

MR. TAMBE: Asked and answered.

Q. At the bottom here, the last footnote on page AM 3877, it says: "The Fed loaned 45 billion via JPM in exchange for approximately 48 billion of collateral. When the Fed returned the collateral, JPM held the balance of collateral, approximately 8.6 billion, revalued marked at approximately 7 billion."

Are you knowledgeable about the basis for that remarking?

A. No.

Q. Let me ask you to turn the page. On AM 3878 under Consideration do you see in the

Fogarty - Highly Confidential
box where it says "loss on sale, 3.1 billion"?
A. I see that.
Q. Do you understand that to be indicating that Lehman had a loss on the sale transaction of about 3.1 billion?
MR. TAMBE: Objection to the form. Lack of foundation.
A. I understand that to be another form of an accountant trying to have a plug to add up the two columns so that they equal, and you see very precisely the 47666.89 on both sides.
Q. And so that could be just an accounting loss as opposed to an actual value loss?
A. Correct.
Q. And if it was the case that the assets -- some assets were -- had a higher book value than an actual market value, that would be one basis for explaining why it would be an accounting loss; correct?
MR. TAMBE: Objection to the form of the question. Lack of foundation.
A. An accounting loss has to do with the difference between GAAP carrying value and

Fogarty - Highly Confidential
proceeds by transaction.
Q. Let me show you a document previously marked as 461-A.
Do you recognize this document?
A. Yes.
Q. Would you describe what it is, please.
A. It's a report to the Creditors Committee. We would report on an ongoing basis to the Creditors Committee.
Q. And have you seen this document recently?
THE WITNESS: Will I answer that?
MR. TAMBE: You can answer that.
THE WITNESS: Okay.
A. I saw this document recently in my meeting with counsel.
Q. How much time did you spend with Jones Day preparing for this deposition?
A. Too much. Seriously, was it an hour and a half? Just discussing the upcoming day and then I threw them out and went back to the daily business.
MR. TAMBE: He did throw us out.

Fogarty - Highly Confidential
Q. And what is the purpose for making this report to the Creditors Committee?
A. Again, they are the key constituent in the bankruptcy case and we are -- this is -- this would be a normal practice of the management team of the bankruptcy estate making sure they keep the creditor group well informed of what we are trying to accomplish.
Q. And the section entitled Significant Transactions, is that a section of this document that you helped prepare?
A. Yes.
Q. And more specifically, did you prepare the page that has the Bates stamp number AM 4531?
A. I wouldn't have typed it, but I would have been absolutely aware of the page. My name, of course, is at the top of the page.
Q. And did you make this part of the presentation to the Creditors Committee?
A. I did.
Q. Were members of Weil Gotshal at this presentation also?
A. I believe Harvey and Lori Fife would

Fogarty - Highly Confidential
have been there, the two I would recall, from Weil Gotshal.
Q. And under Assets --
A. At least one or the other of them. They weren't always both there. I just can't remember exactly. One or the other of them would have been there, sure. Maybe both.
Q. Under Assets Purchased, the "43.1 billion repo assets, book value per Lehman stale marks, negotiated a $5 billion reduction," do you see that?
A. I do.
Q. Is that the same $5 billion valuation difference that we have discussed previously in this deposition?
A. It is.
Q. And what was the basis for your understanding that Lehman's marks were stale?
MR. TAMBE: Objection to the form of the question.
A. I specifically put the word "stale" in quotes because that was how -- there was some conversation around the marks not having been -- from that meeting we referred to

Fogarty - Highly Confidential

earlier with Paolo, some conversation around the marks not having been trued up in a couple of days or something like that.

Q. Was it a couple days or was it since Friday, September 12th, the last business day before the bankruptcy filing?

MR. TAMBE: Objection to the form.

A. I don't recall the exact time frame that was referred to.

Q. And who was that discussion with?

MR. TAMBE: Objection. Asked and answered.

A. I believe that was with Alex Kirk.

Q. Was this part of that same meeting with Mr. Kirk and Mr. Tonucci?

A. Yes.

Q. And independent of that did you also understand that Lehman's marks –

A. Can I just clarify?

Q. Sure.

A. I don't know that they were both there for that meeting at the same time.

Q. Okay. Independent of that discussion, were you aware that -- the week of

Fogarty - Highly Confidential

September 15th that Lehman was not fully updating its marks on a daily basis?

MR. TAMBE: Objection. Lack of foundation. Objection to form.

A. I did not know specifically other than I knew via the Transition Services Agreement we were not getting updated marks on a timely basis subsequent to, you know, the filing date.

Q. When you say "we were not getting" --

A. Sorry, subsequent to -- actually, I had no -- subsequent to the transaction -- after the transaction closing and pursuant to the Transition Services Agreement we were not getting updated marks during that time.

Q. The week of September 15th did you see any updated marks during that week?

A. No.

MR. TAMBE: Objection to the form. Lack of foundation.

Q. Were you aware of whether Lehman's marks were being updated daily the week of September 15th?

Fogarty - Highly Confidential

A. Not aware.

Q. As you sit here today, do you have any knowledge about whether Lehman's marks were being updated the week of September 15th on a daily basis?

A. Any knowledge -- I have knowledge -- not -- I recall the conversation with Alex Kirk in that meeting that there was some, again, number of days where the marks hadn't been updated.

Q. Had not been updated?

A. Had not been updated prior to the closing some number of days, and I can't recall what was referenced.

Q. Okay. Did you ever have any reason to doubt the accuracy of that?

A. No.

Q. When you made this presentation, were you trying to be as accurate as possible to the committee?

A. I was trying to be -- yes.

Q. And did anyone in response to your presentation, your description of this $5 billion difference between the 45 and 50 or the

Fogarty - Highly Confidential

38 and 43, did anyone raise any questions concerning that?

A. Yes. I recall -- I can't recall the specifics, but I recall -- I recall framing in my presentation, you know, a general concern for not understanding the $5 billion reduction and I recall either in that meeting that day or the day before, the day after, somewhere around that period of time, a conversation with Mike Fazio of Houlihan Lokey where they were concerned about that $5 billion reduction on behalf of their committee.

Q. And did they express the nature of their concern?

MR. TECCE: Objection to form.

A. Did they express the nature -- yes. Mike had a lot of -- Mike expressed concern that it -- that there wasn't a fair reduction in the value.

Q. And did he explain why --

MR. TECCE: Objection to form.

Q. -- he thought it wasn't a fair reduction in the value?

A. He had been doing some work on it

Fogarty - Highly Confidential

and believed that it wasn't a fair -- that it wasn't a fair answer, but was struggling to have complete understanding of what transpired.

Q. Do you have any knowledge of the work he was doing on it?

MR. TECCE: Objection to form.

A. I don't have any specific knowledge of the work.

Q. Do you have any general knowledge of the work he was doing?

A. Just that he was doing work. I don't know anything specific to the work he was doing.

Q. Did you understand that to be attempting to value -- do an independent valuation of those assets?

MR. TECCE: Objection to form.

A. I -- you know, I don't know the nature -- the detailed nature of what he was doing other than he was concerned about it and trying to understand it.

Q. Do you recall anything else he said?

A. No, nothing -- nothing in particular, no.

Fogarty - Highly Confidential

Q. In general, any other general sense of the conversation from him?

A. Just very annoyed. Very annoyed by it all.

Q. By the sale process or by the difference in valuation?

A. The difference.

MR. TECCE: Objection to form.

Q. Do you recall him saying anything else --

A. No.

Q. -- in that conversation?

A. No.

Q. Now, you said in your presentation you framed it as not having a full understanding of the $5 billion difference; is that right?

A. Correct.

Q. Do you recall what you said?

A. Not verbatim.

Q. Would you please tell me as best you recall what you said.

A. I probably -- well, I recall generally talking about there being a dispute

Fogarty - Highly Confidential

at the closing table about the value of the repo assets being conveyed in the transaction and that there was a $5 billion reduction in the -- what do you call it -- the -- against that 50 billion -- again, I keep having this $50 billion number in my head, but obviously I see the 43 here, but that there was a $5 billion reduction in the asset value and there was a lot of fighting about it at the closing table and that we didn't have an understanding -- a complete understanding of what transpired.

Q. A lot of fighting about it between whom?

A. Between management and the -- Lehman management and the Barclays representatives.

Q. Do you know if you used the word -- any synonyms for "reduction" in your presentation?

MR. TAMBE: Object to the form of the question.

A. I don't recall.

Q. Do you know if you recall -- you used the word "haircut" or "discount"?

Fogarty - Highly Confidential

MR. TECCE: Objection to form.

A. That's possible. I can't recall. Haircut is possible. That would be a word I might have used. I can't recall the specific word I used.

Q. And approximately how many people were at this presentation, just roughly?

A. I don't know. Thirty people, maybe. Something like that.

Q. From the Creditors Committee, from Alvarez, from Weil Gotshal, from any other entities represented there?

A. Creditors Committee, Houlihan, FTI, Alvarez, Weil.

Q. Anyone from the trustee or their representative, Deloitte?

A. No. That wouldn't have been typical. No.

Q. Where was this presentation held?

A. We -- it was either at the Weil offices or Milbank's offices. I didn't mention, of course, Milbank would there be too.

Q. Other than Mike Fazio, did anyone else have any questions about this $5 billion

Fogarty - Highly Confidential

difference?

MR. TECCE: Objection to form.

MR. TAMBE: Object to the form.

A. Possible. I can't recall specifically who might have -- at least possible some of the creditor -- I can't recall exactly who might have had questions there. I don't...

Q. Do you know what, if anything, Mike Fazio did after this point in time to follow up on his concern?

MR. TECCE: Objection to form.

MR. TAMBE: Lack of foundation.

A. In general there was pressing for more information over time, but I don't know what Mike specifically did after -- with his process. I don't know.

Q. Do you recall anyone asking you or Alvarez for additional information about this issue?

A. No. No. Other than a recognition that we were working on -- continuing to work on trying to understand -- understand.

Q. I'm sorry, I didn't understand the

Fogarty - Highly Confidential

last part. You are speculating that they understood that you were continuing to try to understand?

A. Well, because that's --

MR. TECCE: Objection.

MR. TAMBE: Object to the form.

A. That's what we would have said at the -- when we were talking about it with the Creditors Committee, that we were continuing to try to understand the transaction.

Q. Do you recall saying that about this point?

A. Yes.

Q. And did you -- what did you do to further try to understand?

A. It's the same process I referred to earlier, that -- and the process moved over towards the finance team under Dave Coles to continue the effort with Bill Fox to try to continue to understand this transaction.

Q. The 43 billion or 50 billion, you had a CUSIP list, so you knew which assets were at issue; correct?

MR. TAMBE: Objection to the form of

Fogarty - Highly Confidential

the question.

A. Correct, we had a CUSIP list.

Q. Did you make any efforts to independently value those at the time?

A. No.

Q. Why not?

A. Not my skill set. I'm not a valuation person.

Q. Do you know if someone else at Alvarez did?

A. No. Not our -- it wouldn't typically -- we didn't have that skill set in our direct team at Alvarez, the team that was on the Lehman case, we didn't have that skill set.

Q. So when repo collateral goes over to Barclays, or at least part of it goes over to Barclays that Thursday, Friday, Barclays looks at it and says "we don't think it's worth this, we think it's worth less," and ultimately the Lehman executives agree that it's valued less, is that your understanding?

MR. TAMBE: Objection to the form of the question. Lack of foundation.

Fogarty - Highly Confidential

A. Rephrase that one. Ultimately --

Q. Ultimately the -- a negotiated valuation of a lower amount was reached?

MR. TAMBE: Objection.

A. That's my understanding.

MR. TAMBE: Objection to the form of the question.

Q. And if there was a question about whether the updated valuation reached by the two sides was reasonable or not and you had a list of securities, "you" being Alvarez & Marsal, why not just independently value them and see if they are worth that amount?

MR. TAMBE: Objection to the form of the question. Argumentative. Lack of foundation.

A. We continued to through the teams ask questions of Barclays and there came a point in time where we weren't -- the response -- they were not being responsive, I think, is what really happened in that process.

Q. Not being responsive. I mean, did you make any independent effort to value those securities?

MR. TAMBE: Objection to the form of the question.

A. No.

MR. TAMBE: Lack of foundation.

Q. Who was being not responsive? Is there some particular information that was asked of an individual at Barclays that the information wasn't provided concerning the valuation of these assets?

A. Yes. There was a number of requests to spend time with Barclays understanding the transaction and understanding what transpired and we were not receiving information.

Q. Can you identify a specific request to a specific individual?

MR. TAMBE: Objection. Asked and answered.

A. I can't.

Q. But you had the list of securities, you had the CUSIPs, and you didn't make any effort to value those independently?

MR. TAMBE: Objection, asked and answered. Objection, lack of foundation.

A. Sorry.

MR. TAMBE: Isn't that like four times you have asked that question now? He has answered it.

A. Give me that question one more time.

Q. Sure. You had a list of securities, you had the CUSIPs, and you didn't make any effort to value those assets independently; correct?

MR. TAMBE: Objection. Asked and answered. Lack of foundation.

A. No.

Q. Is that correct?

MR. TAMBE: Objection.

Q. When you say "no," are you saying no, you didn't make that effort, or you --

MR. TAMBE: Objection.

A. I did not personally make that effort.

MR. TAMBE: Objection, form. Objection, foundation.

Q. Did anyone at Alvarez?

A. I don't recall that anyone did.

THE VIDEOGRAPHER: The time is 12:36. We are going off the record.

(Recess was taken from 12:36 to 12:52.)

THE VIDEOGRAPHER: The time is 12:52. We are back on the record.

BY MR. THOMAS:

Q. Mr. Fogarty, did you ever study the value of the derivatives or related collateral of those transfers as part of the transaction?

MR. TAMBE: Objection to the form of the question.

A. No.

Q. Have you ever reviewed the original APA?

A. Have I -- parts of it I have flipped through. I can't say I have read the whole APA.

Q. Have you ever made any effort to analyze what assets were included as purchased assets as part of the original APA?

A. Yes.

Q. What was the purpose of that exercise?

A. To -- really to understand for the asset teams what we have -- what we have left

to manage. That was the purpose of it.

Q. And when I say "original APA," let me go ahead and show you what I am referring to. It's previously marked as Exhibit 1 dated September 16th.

(Document review.)

Q. Do you have a general understanding that this is the initial agreement between Lehman and Barclays but that it had to be modified during the course of the week because of a bunch of changes in Lehman's business and assets?

A. I generally understand -- yes.

Q. And so this, if I refer to the original APA, will you understand that I am referring to just this document dated September 16th and not the purchase agreement which includes the revisions and the Clarification Letter that were eventually executed and closed?

A. I can't say I understand that there were those multiple versions. I can't say I --

Q. Sure. And I'm not trying to trick you up on contract stuff. I just want to

Fogarty - Highly Confidential

understand when you went back and looked at assets that were conveyed, were you looking at this original document or this document as modified by the Clarification Letter that we looked at earlier which made revisions to this document including changing the definition of purchased assets?

A. I actually recall doing work with -- trying to have an understanding of the assets purchased and excluded in this document or in a document like this and actually not understanding initially that there was a clarification agreement, and then I don't recall going back to sort of this in concert with that Clarification Letter. I don't recall doing that step.

Q. Did you ever have an opinion as to whether -- or understanding as to whether the unencumbered assets were part of the purchased assets identified in Exhibit 1?

A. I'm sorry?

Q. Did you ever have an opinion or understanding as to whether the unencumbered clearance box assets we discussed previously

Fogarty - Highly Confidential

were part of the purchased assets contained in Exhibit 1?

MR. TAMBE: Object to the form.

Q. And you are welcome to flip to --

A. I had understood not based on reading the document, but based on conversations with the lawyers that the unencumbered assets were part of the transaction.

Q. When you say "part of the transaction," they also were a part of the original purchase agreement before it was modified by the later letter agreement?

MR. TAMBE: Objection to the form of the question.

A. I can't recall that I cared whether it was in the original or in the clarifi- -- I can't recall caring about that.

Q. Okay. Same question for the 15C3 assets. Do you recall if you ever had an opinion or understanding as to whether those assets were not only included in the ultimate purchase transaction, but in the original APA?

A. I can't recall understanding whether

Fogarty - Highly Confidential

they were -- if 15C3 is one in the same as those repo assets, I can't remember all the codes here, I can't recall whether they were -- whether it was in the original or in the clarifi- -- I can't remember sort of worrying about that or thinking that through.

Q. And if the 15C3 is the 769 million, does that --

A. Oh, then that's not -- I don't know -- I don't know the specificity of that 769 number.

Q. And did you ever make any effort to go back and see if the derivatives and associated collateral were a purchased asset as part of the original APA?

A. I don't recall deriv- -- I don't recall thinking about derivatives in conjunction with an understanding of this transaction.

Q. One way or the other?

A. Right.

Q. Did you attend any of the court hearings? Let me clarify. In September.

A. Oh, in September?

Fogarty - Highly Confidential

Q. Related to the sale transaction.

A. Not this sale transaction.

Q. So not the September 16th, 17th or 19th sale hearings?

A. No.

Q. Did you ever read the transcripts of any of those hearings?

A. No.

Q. Have you spoken with anyone other than your lawyers about this case?

A. When?

Q. In the say last two months.

A. No.

Q. When did you --

A. I'm sorry, other than the Phil Kruse conversation I mentioned.

Q. When did you leave Alvarez?

A. I left Alvarez in late March, early April. I can't remember specifically.

Q. Do you still have any contractual relationship with them at all?

A. I do.

Q. What is the nature of that relationship?

Fogarty - Highly Confidential

MR. THOMAS: He can designate it confidential.

THE WITNESS: Okay.

MR. TAMBE: If you don't want to go into the numbers, you don't have to go into the numbers. You can just describe generally the relationship and take it one question at a time.

THE WITNESS: Okay.

A. I have a note that they need to pay me out on over time.

Q. When did that note arise?

A. December.

Q. What was the reason for this arrangement?

A. I was a shareholder of Alvarez & Marsal prior to that.

Q. So they are still paying you out quarterly or monthly on this note?

A. Annually.

Q. Do you have any other contractual relationship with them other than the fact that they are paying you money?

A. Not sitting here today. Well,

Fogarty - Highly Confidential

not -- other than that note and that agreement, whatever that has in it.

MR. THOMAS: Let me take a short break. I may be done.

THE VIDEOGRAPHER: The time is 1:02. We are going off the record.

(Recess was taken from 1:02 to 1:03.)

THE VIDEOGRAPHER: The time is 1:03. We are back on the record.

BY MR. THOMAS:

Q. Did you ever do any analysis of or effort to understand how certain potential exposures, potential liabilities, relating to contracts that Barclays might assume, how those estimates of potential exposure were calculated?

MR. TAMBE: I will only caution the witness to the extent he did any work in that regard at the direction of in-house counsel or other outside counsel, that's work product and you should not be testifying about that.

MR. THOMAS: You can identify that

Fogarty - Highly Confidential

you did it. Then we won't go into any of the substance.

THE WITNESS: Okay.

A. We did -- we did work -- my team did -- Phil Gordon had counsel working with him to work on those printer, you know, leases and all these various things that were in that process where Barclays would either take those obligations, and if they didn't, then we had to figure out whether on behalf of the estate we would assume or reject those various contracts, so there was a process under way under Bill and that team to review that.

Q. Did you know that the week of the sale hearing there were certain estimates made as to the potential exposure, meaning potential amount of liability that could be assumed under those contracts if Barclays elected to assume all the contracts?

MR. TAMBE: Objection to form.

A. I was aware that there was numbers bandied around regarding accruals for severance and bonus and other -- really those two pieces. Those are the pieces I was aware of numbers

Fogarty - Highly Confidential

being bandied around.

Q. The number for severance and bonus, do you have any knowledge as to how those estimates were calculated prior to closing?

A. I had no knowledge of how that was calculated.

Q. Okay. You are just aware that there was some estimate of potential liability for severance and bonus, but you are not aware of how -- who calculated it or how?

A. Correct.

MR. TAMBE: Objection to form.

Q. And do you have any knowledge as to --

MR. THOMAS: Let me go ahead and mark one more document. We will mark this as Exhibit 566-B. This doesn't have Bates stamps, but I will try to find the production copy.

(Exhibit 566-B (subsequently withdrawn), e-mail dated September 19, 2008, marked for identification.)

Q. This is an e-mail from Martin Kelly on which you are copied. Do you recognize the

Fogarty - Highly Confidential

document?

A. I recognize the document generally, yes.

Q. Okay. And do you recall receiving this document at or about the time of September 19th, 2008, or September 18th?

MR. TAMBE: I think you have asked him about this document.

MR. THOMAS: I think you are right.

MR. TAMBE: I just didn't know if there was a deeper plan here, but probably not.

MR. THOMAS: This has all been a test. Let me just -- what I am going to do, I do have another follow-up question about this document, but I am going to go back to the exhibit.

MR. TAMBE: 561-B.

MR. THOMAS: This is why -- so we are striking 566-B, because that's been previously marked as 561-B.

Q. Mr. Fogarty, do you recognize Exhibit 561-B that we discussed previously?

A. Yes.

Fogarty - Highly Confidential

Q. And I believe you indicated you recognize the attachment to the e-mail?

A. Yes, the general form of the thing I recognize.

Q. Okay. And can you describe generally what the attachment is?

A. My partner, David Coles, was just keeping me copied on his attempt to track the accounting of what we had, you know, pro forma for the transaction.

Q. And how would you describe the attachment itself?

A. I'll be honest, I never studied the attachment. Well, I'm supposed to be honest all day, but it's a figure of speech.

Q. That wasn't the first time.

A. Right, that wasn't the first time, yes.

Q. And this is a document you would have -- the attachment you would have received on September 18th of 2008; is that right?

A. Say that again. This was a --

Q. This is a document, the attachment that you received on September 18th, 2008?

Fogarty - Highly Confidential

A. I'm sure I did.

Q. And if you would look at the first page of the attachment, do you see the line about a third of the way down that says "payables"?

A. I'm on the assets page. You are on the --

Q. Under Liabilities.

A. What line am I on?

Q. You are looking for payables under Liabilities.

A. Oh, there. Okay.

Q. Okay. And do you see a line entitled Bonus Payable and a line entitled Cure Payments, Accounts Payable?

A. I do.

Q. Okay. And do you see -- reading across, do you see the column Transaction Adjustments?

A. I do.

Q. Do you see that there was a transaction adjustment to both the bonus payable and the cure amount accounts payable?

A. I do.

Fogarty - Highly Confidential

Q. Were you aware that week that there was a transaction adjustment?

MR. TAMBE: Objection to the form of the question.

A. No.

Q. Do you know if your colleagues who received this document were aware of that?

A. I do not know.

Q. Do you recall any discussions about the transaction adjustment?

A. No.

Q. Do you have any understanding for why that transaction adjustment was made for either one of those two lines?

MR. TAMBE: Objection to the form of the question.

A. No.

Q. What is your understanding of what a transaction adjustment is?

A. An adjustment made in a transaction.

Q. Do you have a more specific understanding than that, the purpose of a transaction adjustment?

A. It could be many different purposes,

Page 142

Fogarty - Highly Confidential
I suppose.
Q. Do you know if -- do you know if Alvarez -- anyone at Alvarez discussed or investigated why these transaction adjustments were made?
MR. TAMBE: Objection to form.
A. No.
Q. You don't know one way or another whether somebody else at Alvarez was following up and asking questions about the transaction adjustment?
MR. TAMBE: When?
MR. THOMAS: At any time.
MR. TAMBE: Objection to the form, and I caution him not to disclose any privilege or work product that he may be aware of.
A. Give me your question again.
Q. Sure. Do you know if anyone else at Alvarez investigated or looked into why there was a transaction adjustment being made to these two items?
MR. TAMBE: Objection to form. Same instruction as before.

Page 143

Fogarty - Highly Confidential
You can answer.
A. I'm not aware of people specifically trying to understand transaction adjustments.
Q. So they may or may not have, but you are not aware either way?
A. I am aware of people trying to understand 2 billion and 2 billion 250, but I am not aware of people trying to understand transaction adjustments.
Q. Okay. Well, those numbers come from a transaction adjustment; correct?
MR. TAMBE: Objection to the form of the question.
A. I don't know. I see the thing that says "transaction adjustments" like you do, but I don't know anything about that.
Q. So when you got this document, you don't recall following up on the nature of this transaction adjustment?
A. I did not study this document, no.
Q. Was someone -- was this someone -- was this issue and document more in Mr. Coles' bailiwick?
A. Yes.

Page 144

Fogarty - Highly Confidential
Q. Okay. Did you have a general understanding that if Barclays elected at its discretion not to assume any of the contracts, that the liability for cure would be zero?
MR. TAMBE: Objection to the form of the question. Lack of foundation.
A. I'm sorry, one more time.
Q. Did you have an understanding that it was Barclays' discretion as to what contracts that it elected to assume or reject?
A. I actually thought about that in the context of copier leases and those kinds of things. I don't know that I was ever thinking about it in the context of severance and bonuses.
MR. THOMAS: Okay, thank you. I have nothing further.
MR. TECCE: I have one question, actually.
EXAMINATION BY
MR. TECCE:
Q. Mr. Fogarty, my name is James Tecce. I am an attorney at Quinn Emanuel. We represent the Creditors Committee.

Page 145

Fogarty - Highly Confidential
Just going back, you mentioned a conversation with Michael Fazio of Houlihan. Correct? Do you remember when that conversation took place?
A. I remember it was -- I don't recall. It was around that time frame of that presentation to the Creditors Committee. I just can't remember --
Q. The October 2008 presentation?
A. Correct.
(Continued on next page to include jurat.)

Fogarty - Highly Confidential

Q. Do you remember if it was after that presentation?

A. I don't remember specifically.

MR. TECCE: I have no further questions.

THE WITNESS: Okay, thanks.

THE VIDEOGRAPHER: The time is 1:17. We are going off the record.

(Time noted: 1:17 p.m.)

--------------------

JAMES FOGARTY

Subscribed and sworn to before me this day of 2010.

--------------------------------------

CERTIFICATE

STATE OF NEW YORK )
) ss.:
COUNTY OF NASSAU )

I, KRISTIN KOCH, a Notary Public within and for the State of New York, do hereby certify:

That JAMES FOGARTY, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of January, 2010.

------------------------

KRISTIN KOCH, RPR, RMR, CRR, CLR

-----------------I N D E X-----------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| JAMES FOGARTY | MR. THOMAS | 6 |
| | MR. TECCE | 144 |

-----------------EXHIBITS-----------------

| NUMBER | PAGE | LINE |
|---|---|---|
| Exhibit 561-B E-mail dated September 19, 2008...... | 11 | 20 |
| Exhibit 562-B E-mail dated 9/27/2008, Bates stamped WGM-LEHMAN-E 00000812 through WGM-LEHMAN-E 00000815........ | 31 | 8 |
| Exhibit 563-B Handwritten notes, Bates stamped AM 004887 through AM 4892............... | 54 | 16 |
| Exhibit 564-B Lehman Brothers/Barclays APA Lead Sheet, Bates stamped AM 004893 through AM 004896.................... | 83 | 15 |
| Exhibit 565-B E-mail dated 9/29/2008, Bates stamped WGM-LEHMAN-E 00000868 through WGM-LEHMAN-E 00001147........ | 88 | 8 |

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: In re: Lehman Brothers

Dep. Date: January 15, 2010

Deponent: James Fogarty

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ |

____________________
Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME THIS____DAY OF___________, 2010.

____________________

(Notary Public) MY COMMISSION EXPIRES:________

# BCI EXHIBIT

# 68

HIGHLY CONFIDENTIAL - J. HRASKA

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------x

In Re:

Chapter 11

LEHMAN BROTHERS HOLDINGS, INC., et al.,

Case No. 08-13555(JMP)

(Jointly Administered)

Debtors.

----------------------x

* * *HIGHLY CONFIDENTIAL* * *

DEPOSITION OF JAMES HRASKA

New York, New York

August 14, 2009

Reported by:

KATHY S. KLEPFER, RMR, RPR, CRR, CLR

JOB NO. 24039

HIGHLY CONFIDENTIAL - J. HRASKA
August 14, 2009
9:25 a.m.

HIGHLY CONFIDENTIAL deposition of JAMES HRASKA, held at Jones Day LLP, 222 East 41st Street, LLP, New York, New York, before Kathy S. Klepfer, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Livenote Reporter, and Notary Public of the State of New York.

HIGHLY CONFIDENTIAL - J. HRASKA

APPEARANCES:

JONES DAY, LLP
Attorneys for Lehman Brothers, Inc.
222 East 41st Street
New York, New York 10017-6702
BY: WILLIAM J. HINE, ESQ.
GEORGE E. SPENCER, ESQ.

BOIES, SCHILLER & FLEXNER, LLP
Attorneys for Barclays and the Witness
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
BY: JONATHAN M. SHAW, ESQ.

QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
Attorneys for the Creditors Committee
51 Madison Avenue
22nd Floor
New York, New York 10010
BY: ERIC M. KAY, ESQ.

HIGHLY CONFIDENTIAL - J. HRASKA

APPEARANCES: (Cont'd.)

JENNER & BLOCK, LLP
Attorneys for the Examiner
330 N. Wabash Avenue
Chicago, Illinois 60611-7603
BY: DAVID C. LAYDEN, ESQ.

HUGHES, HUBBARD & REED, LLP
Attorneys for the SIPA Trustee
One Battery Park Plaza
New York, New York 10004
BY: NEIL J. OXFORD, ESQ.
AMINA HASSAN, ESQ.

Also Present:
RAJESH ANKALKOTI, Alvarez & Marsal

HIGHLY CONFIDENTIAL - J. HRASKA

JAMES HRASKA, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. HINE:

**Q. Good morning, Mr. Hraska.**
A. Good morning.
**Q. We met just briefly before the deposition. My name is Bill Hine. I'm from the firm of Jones Day and we are special counsel to Lehman Brothers Holdings, Inc., in connection with the pending bankruptcy proceeding. And so your deposition is being taken today pursuant to that discovery that we're taking in that case.**
**There's several other counsel around the table who will introduce themselves as they get up to take turns questioning.**
**Have you ever had a deposition taken before?**
A. I have not.
**Q. So, just by way of a little ground rules, I'm going to ask you a bunch of questions. You're under oath. You're going to**

Exhibits 67 - 69 Pg 43 of 167

Page 6

HIGHLY CONFIDENTIAL - J. HRASKA

answer the questions.

On occasion, your counsel will state an objection or, you know, make some kind of objection for the record. That doesn't relieve you of the obligation to answer the question. It's just him trying to either correct a portion of my question or preserve an objection.

In that regard, throughout the day, I am undoubtedly going to a misuse a word or some kind of acronym or some technical term that you folks use every day in your line of business which I'm not as familiar with as you are, obviously, so please correct me if I misuse a word or I ask a question that's misleading in any way or you just don't understand the question because I would like to ask a clear question so you can answer it.

Is that okay?

A. That's fine. Thank you.

MR. SHAW: Just before we begin, again, I want to put on the record our understanding that we will designate the entire transcript highly confidential and then we'll go back and redesignate.

Page 7

HIGHLY CONFIDENTIAL - J. HRASKA

MR. HINE: Yes. That's true. That's fine.

Q. One other thing before we get started, Mr. Hraska. I imagine you're aware that you've been designated as what's called a 30(b)(6) witness by your employer, by Barclays, as to particular topics, and they relate to Schedules A and B which we'll discuss later. So when we get to that portion of the deposition, I'll let you know and we'll treat that portion as a 30(b)(6) deposition, but I'll let you know as we get there.

MR. SHAW: Just so we're, again, clear, Bill, as I think you know, he is one of several witnesses who's been designated as partially responsive to those particular topics.

MR. HINE: I understand.

Q. So, unless you have any questions, we can get started.

A. No, I'm fine.

Q. Okay. Can we just review briefly your employment history with Lehman? What was the last position you held at Lehman? I'm talking

Page 8

HIGHLY CONFIDENTIAL - J. HRASKA

about in the period of September 2008.

A. I was senior vice president from a corporate title perspective and I managed the Secured Financing Operations Group.

Q. And can you just describe for me what that means? What were your responsibilities and duties in that position?

A. The Financing Operations, also known as a financing middle office, is a group that sits between a bunch of groups, but primarily trading and sales individuals and clearance and settlements folks, and we do tasks such as, you know, monitoring positions, reconciling differences, dealing with, you know, customer, you know, concerns, bringing the attention of customers' concerns to either sales staff or trading staff.

We also deal with legal and compliance and regulatory on certain matters. If there are, you know, questions or queries as to the nature of the transactions, if somebody needs some technical expertise on, we usually provide that expertise as to the structure of the transactions and things like that.

Page 9

HIGHLY CONFIDENTIAL - J. HRASKA

Q. And who did you report to in that position?

A. At Lehman Brothers at the time, I was reporting to Monty Forrest.

Q. Did you report directly to anyone else?

A. No, under that structure I was a direct report of Monty Forrest.

Q. And who were your direct reports?

A. My direct reports now or at the time?

Q. At the time in September of 2008.

A. Okay, my direct reports in the U.S. were Nancy Denig, D-E-N-I-G, and Paul Lindner.

Q. Prior to this position -- or, let me ask you another question. How long were you in this senior vice president position?

A. Approximately five to six years. I don't remember the exact date, actually. I don't remember the exact date when I got my senior vice presidentship.

Q. Okay. How long had you been in the position of managing the secured financing?

A. It began in 2001, but it began in a much smaller scale. I only managed a portion of

3 (Pages 6 to 9)

Page 10

HIGHLY CONFIDENTIAL - J. HRASKA

it and over time it grew into a larger and larger responsibility. At the point of September, I was managing both equity and fixed income. I was managing that globally as well.

**Q. Okay. When did you join Lehman?**

A. August of '93.

**Q. So you held this management position since 2001, you said?**

A. That particular one related to Financing Operations since 2001, yes.

**Q. What did you do before that at Lehman?**

A. I did a host of different roles, all in derivatives-based. I worked in Derivative Settlements, I worked in Derivatives Middle Office, and I also worked in a Structured Products and Reinsurance Middle Office as well.

**Q. Okay:**

A. And over the period of time I also held management positions in those roles as well.

**Q. When you say middle office, could you just tell me what that means?**

A. Middle office is similar to the way I described it before for financing, only it was

Page 11

HIGHLY CONFIDENTIAL - J. HRASKA

for derivative-related products. So same types of trader inquiries, sales inquiries, customer resolutions to problems, things like that.

**Q. Did there come a point when you left Lehman and moved to Barclays?**

A. Yeah, I mean after the -- after the declaration of bankruptcy, Barclays extended an offer of employment to me, which I accepted.

**Q. Okay. And when did you start working for Barclays, do you recall the date?**

A. I don't know, I can't for certain be given the official date. When I started, I was extended an employment contract, which I signed, and I believe I signed that sometime in October, but I don't know what the specific date that Barclays considers me an official employee versus when I stopped my Lehman employment.

Like I was never out of work for a period of time. I mean, I continued to show up every day. I'm just not sure what point in time they considered me officially a Barclays employee.

**Q. I understand. When did you consider yourself to be working for Barclays?**

Page 12

HIGHLY CONFIDENTIAL - J. HRASKA

A. I mean, I guess I considered myself to be working for Barclays in the week after the declaration of bankruptcy.

**Q. Okay. We're going to be talking about these weeks for the whole deposition, so the week of September 15 is tbe week you're referring to as the week where tbey declared bankruptcy; is that right?**

A. The week is when -- September 15 is when Lehman declared bankruptcy. I wasn't completely confident that I was a Barclays employee until I guess the week of the 22nd, because I was still working, you know, with LBI in the U.S. broker-dealer, so I wasn't actually sure of my status at that point, to be completely honest.

**Q. I understand. Okay. So tbat September 22 was a Monday, correct?**

A. I believe so, yeah.

**Q. Had you had any discussions with folks at Barclays prior to September 22 about the possibility of you going to work for Barclays?**

A. No.

**Q. When do you recall first speaking to**

Page 13

HIGHLY CONFIDENTIAL - J. HRASKA

**anyone at Barclays about you becoming a Barclays employee?**

A. I would say it was in that week of the 22nd.

**Q. Okay. Had you spoken to any folks at Lehman prior to September 22 about the possibility of you moving over and becoming a Barclays employee?**

A. Well, wait. Could I just go back to that previous question?

**Q. Sure.**

A. When I spoke on that week of September 22, like I had never had any employment conversations with a legacy Barclays employee. All my conversations were with legacy Lehman employees, so either my manager, which was Monty Forrest, or Alastair Blackwell.

So like nobody from like Barclays HR had approached me or had offered me any conversations prior to my conversations with my legacy Lehman managers. I don't know if that's important or not.

**Q. No, I just want to make sure we're all on the same page here.**

4 (Pages 10 to 13)

Page 14

HIGHLY CONFIDENTIAL - J. HRASKA

**So when you say legacy Lehman managers, you're talking about people who were previously employed with Lehman who may now be employed with Barclays?**
A. Yes.
**Q. Okay. So am I correct to say that, prior to September 22, you had had no conversations with anyone who was -- who had always been a Barclays employee as to your possibility of you going over working for Barclays; is that right?**
A. That's correct.
**Q. So had you had conversations with legacy Lehman employees or people who were employed with Lehman at the time prior to September 22 about the possibility of you going to work for Barclays?**
A. No.
**Q. Okay. Do you recall any conversations with Mr. Forrest or anyone in your chain of command about the possibility of you going to work for Barclays?**
MR. SHAW: Asked and answered.
A. No.

Page 15

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Okay. Before I forget, what is your current position at Barclays?**
A. I am in a very similar role. Corporate title-wise I'm a director, which is equivalent to SVP. I manage, again, Secured Financing Operations for both equities globally and fixed income in North America.
**Q. Is it fair to say your role is -- your duties and responsibilities are relatively the same as you had when you were at Lehman?**
A. Responsibilities are reasonably the same, not quite as extensive as they were at Lehman from a global perspective.
**Q. Who do you report directly to now?**
A. I have a dual reporting line. From a product perspective, I still report to Monty Forrest. And Barclays is structured a little bit different, so from a regional perspective, I report to Alastair Blackwell.
**Q. And who are your direct reports?**
A. My direct reports now are still Nancy Denig, Paul Lindner, and a gentleman by the name of Henry Duarte, D-U-A-R-T-E.
**Q. Okay. Anyone else?**

Page 16

HIGHLY CONFIDENTIAL - J. HRASKA

A. No. Not direct reports, no.
(Exhibit 136B, a document bearing Bates Nos. BCI-EX-00077317 through 77319, marked for identification, as of this date.)
**Q. Mr. Hraska, I apologize, I'm not trying to be intrusive here, but I need to ask you some questions about your compensation.**
A. That's fine.
**Q. So I'm handing you a copy of Exhibit 136B, which appears to be an agreement between yourself and Barclays dated September 22, 2008, and my question to you is, have you ever seen this document before?**
MR. SHAW: Take a minute to look at as much of it as you need to.
A. Yes, I've seen this before.
**Q. What is this document?**
A. This was the document offering me employment at Barclays.
**Q. Okay. And is this your current employment contract with Barclays?**
A. It is, yes.
**Q. Okay. Did you sign it on September 22?**

Page 17

HIGHLY CONFIDENTIAL - J. HRASKA

A. I don't believe so.
No, on October 2, when it's dated.
**Q. Okay. Any understanding of why it's dated September 22, but you didn't sign it until October 2?**
MR. SHAW: Foundation.
A. I have no idea. I mean, I'm -- I signed it September 22nd because that's when I decided to agree to the terms.
**Q. Okay. Was there any negotiations between you and Barclays as to the compensation part of your employment?**
A. No.
**Q. Okay. How did it take place? Did they just give you a copy of this letter and ask you to sign it?**
A. The letter was sent to me via interoffice mail.
**Q. Uh-huh.**
A. It was preceded by a phone call which said, you know, you're a key employee that we would like to retain, we're going to be sending you a letter for, you know, an offer to join Barclays. We would like you to review it and,

5 (Pages 14 to 17)

HIGHLY CONFIDENTIAL - J. HRASKA

you know, if you would like to come work for us, you know, accept it, which is, at the time, I was happy to be offered a job, so -- with what was going on in the market, so I took it.

**Q. Who was that phone call from?**

A. Ian Lowitt.

**Q. Could you look on the first page of this document. It says "Compensation," you see that line?**

A. Yes.

**Q. It talks about a base salary of [redacted] per year?**

A. Uh-huh.

**Q. Is that your current base salary?**

A. It is, yes.

**Q. How does that compare with the base salary you were previously paid at Lehman?**

A. It was the same.

**Q. Same? You'll see the next section down, it talks about 2008 guaranteed cash bonus. Do you see that?**

A. Yes.

**Q. And you see the figure of approximately [redacted] and it says to be paid**

HIGHLY CONFIDENTIAL - J. HRASKA

**in February 2009, you see that?**

A. Yes.

**Q. Were you in fact paid that cash bonus in February 2009?**

A. Yes.

**Q. How does that compare to the cash bonuses you had been receiving previously from Lehman?**

A. It was slightly higher, but I don't remember the exact amount, but it was -- it was -- it was slightly higher, but it wasn't tremendously higher. Some small percentage higher.

**Q. Okay. Further down on that page, you will see something that's titled "2008 EPP Recommendation." Do you see that?**

A. I do, yeah.

**Q. And that paragraph discusses a share award in the amount of approximately [redacted] and it says "to be provisionally awarded no later than March 15, 2009." Do you see that?**

A. Yeah, I do.

**Q. Were you paid a share award of that amount?**

HIGHLY CONFIDENTIAL - J. HRASKA

A. I was, yes.

**Q. Were you paid that amount at or about March 15, 2009?**

A. I was, yes.

**Q. And that was, I take it, that's paid in the form of shares?**

A. Yes, that's correct.

**Q. Okay. And how does that compare with any type of stock or share awards that you were being paid by Lehman previously?**

A. It was approximately equivalent. It was slightly less.

**Q. If we go further down, you'll see "Special Cash Award," and it describes a special cash award in the amount of approximately [redacted]. Do you see that?**

A. I have, yes.

**Q. I take it you haven't received that payment yet, correct?**

A. I have not, no.

**Q. And do you know what that payment is for?**

MR. SHAW: Objection. Foundation.

A. I don't, no.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Do you consider that to be some kind of retention compensation?**

A. To be perfectly frank, it was offered to me, and not only was I happy to get a job, I wasn't going to question that. I signed it and took it.

**Q. Do you expect to be paid that on the first and second anniversaries of your starting date?**

A. As per the terms of the contract, yes.

**Q. Okay. Stepping aside from your own personal compensation now, throughout the period of September -- the week of September 15 to the 22, did you have any understanding of the compensation-related provisions embodied in the transaction that was taking place between Barclays and Lehman at the time?**

A. No, I did not.

**Q. Let me just take a step back and I would like to get a little sense of your involvement in that transaction during that week, if you don't mind. I'd like to just kind of go day-by-day for a minute here just to understand what you were involved in during that**

Page 22

HIGHLY CONFIDENTIAL - J. HRASKA

**week.**

**On September 15, 2008, when Lehman Brothers Holdings declared bankruptcy, did you have any involvement in the preparation of the filing or the preparation of any kind of bankruptcy proceedings?**

A. No.

**Q. Did you know that they were going to file bankruptcy before that Monday?**

A. No.

**Q. Did it come as a surprise to you?**

A. It was a -- it was a surprise to me, yeah. The right answer is yes.

**Q. The weekend prior to the bankruptcy filing -- and I'm talking about September 13th and 14th or so?**

A. Uh-huh.

**Q. I understand there was some discussions between Barclays and Lehman, and my question is, did you have any involvement in those discussions?**

A. No.

**Q. Did you have any knowledge that such discussions were taking place?**

Page 23

HIGHLY CONFIDENTIAL - J. HRASKA

A. Yes.

**Q. What had you heard about them?**

A. That there were discussions taking place and they were at the levels of Bart McDade, Dick Fuld, those types of individuals.

**Q. Fair to say you were not involved in those negotiations?**

A. Yes.

**Q. Were you called at any time during that weekend to provide information to the people who were involved in the negotiations?**

A. Could I ask you to clarify? Regarding information regarding the negotiations or information about other topics?

**Q. Well, I'm not talking about run-in-the-mill information that you would normally be dealing with, but did anyone contact you seeking information that you perceived to be involved in the negotiations?**

A. No.

**Q. Did you have any conversations with Mr. McDade or senior officers during that weekend?**

A. No.

Page 24

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Okay. Because you asked for the clarification, I just want to know, did you have some communications that your -- well, let me scratch that.**

**Did you provide information to anyone during that weekend as to the value of securities in Lehman's books?**

A. So let me clarify that. I provided information as to the location and availability of securities, not the value of securities.

**Q. Okay. What information did you provide?**

A. I provided lists of securities that would be eligible to place into financing transactions.

**Q. And who did you provide that to?**

A. Well, I was asked for it by my manager, which is Monty Forrest, but I believe that information was disseminated to multiple people after I provided it, so ...

**Q. You don't really know where it went after you gave it to Monty?**

A. I know that it was sent to Alastair. I know that it was sent to Paolo Tonucci. I

Page 25

HIGHLY CONFIDENTIAL - J. HRASKA

don't know beyond that where it was subsequently forwarded to.

**Q. And just so I understand what type of information, this is information about the types of securities that would be eligible to be pledged as collateral for a financing; is that right?**

A. Yes, that's correct.

**Q. Okay. And do you know what purpose that financing was to serve?**

A. Could you clarify what you mean by that?

**Q. Do you know what type of financing they were talking about?**

A. They were talking about like secured financing transactions, which are normal course for what I support, so ...

**Q. I guess my question is, you're aware that during the following week the Fed provided some financing to Lehman, correct?**

A. Right.

**Q. Were the lists that you were providing to be used towards that type of financing, do you think?**

7 (Pages 22 to 25)

Page 26

HIGHLY CONFIDENTIAL - J. HRASKA

MR. SHAW: If you know.

A. It was used -- it was to be used for anybody who would provide us secured financing. In the end, it ended up being the Fed, but --

**Q. Did you have any understanding during that weekend that there were discussions between Lehman and the Fed about providing financing?**

A. No, not specifically.

**Q. Okay. Let's just continue through the week briefly and then we'll come back to different topics.**

**On the Monday of the 15th, were you involved in any negotiations between Barclays concerning the sale transaction that ultimately took place between Barclays and Lehman?**

A. No.

**Q. Were you asked to provide any information to those who were involved in those negotiations?**

A. No.

**Q. Were you involved in negotiations with the Fed about the Fed financing that was provided during that week?**

A. No.

Page 27

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Were you asked to provide information in support of that financing?**

A. No.

**Q. Okay. What did you do ultimately on that Monday, if you recall?**

A. A year ago?

**Q. Well, it's a big day. It's an eventful day in Lehman's history, correct?**

A. It is.

**Q. What do you recall doing the Monday when Lehman Holdings filed for bankruptcy?**

A. Well, I mean, I guess the first thing to do was, you know, talk to my manager and ask him, you know, kind of what our next steps were. Do we carry on as normal, do we do something different, or do we wait for further instructions or, you know, basically what do we do.

**Q. Okay.**

A. He advised me that we were going to carry on as normal. We were, at the time, we were still trying to preserve the liquidity and functioning of the broker-dealer, and as far as financing transactions, just to clarify, you

Page 28

HIGHLY CONFIDENTIAL - J. HRASKA

know, our involvement was to find collateral and those -- that financing by the Fed that you referred to was -- those programs are open to every broker-dealer, and every broker-dealer at the time -- the market was in a very, you know, as you know, very turbulent situation -- every broker-dealer was taking advantage of those programs so it was normal course for us to figure out what assets we could finance with the Fed that potentially wouldn't be financeable with other counterparties.

And that was our focus that week, was to try to locate all the collateral that we had available to finance that the Fed would deem acceptable in their programs.

**Q. Okay. And so were you involved in the selection of the securities that were ultimately pledged to the Fed?**

A. I wasn't involved in the selection of what was pledged to the Fed. I was involved in identifying assets which were not encumbered and could be used as collateral to be pledged to the Fed.

**Q. Okay. And who actually selects which**

Page 29

HIGHLY CONFIDENTIAL - J. HRASKA

**collateral was pledged to the Fed?**

A. The Fed programs are, at least the ones we used for financing, were tri-party transactions.

**Q. Right.**

A. And the actual selection criteria itself was done by the tri-party agent.

**Q. Who was that?**

A. JPChase. JPMorgan.

**Q. And can you describe for me your role, if any, in supporting the financing that was provided by the Fed?**

A. My role was to communicate between the -- between the trading desks and the tri-party operations groups and just coordinate, you know, the availability of collateral and the booking of the transactions which would ultimately represent that financing.

**Q. Okay.**

A. So the trading desk basically books the transaction onto a system. My group's role is to ensure that that booking makes it all the way through the front-end booking system all the way through to the system that is the books and

8 (Pages 26 to 29)

Page 30

HIGHLY CONFIDENTIAL - J. HRASKA

records and what transmits that transaction to our tri-party agent and that there's no discrepancies, everything matches with what the traders know to have raised from a financing perspective.

And then we coordinate with the tri-party operations folks to make sure that there were no mechanical difficulties in the allocation that's performed by the tri-party agent, that there wasn't any shortfalls of collateral and things of that nature, and then report back to the trading desk.

**Q. Do you have any involvement in how that collateral is valued?**

A. No.

**Q. Who does that?**

A. The tri-party agent.

**Q. And that would be Chase?**

A. JPChase, yes.

**Q. Does Lehman --**

A. Going forward, should we just refer to it as Chase? Because I'm not sure JPMorgan Chase, JPChase.

**Q. That's fine. We'll use Chase as a**

Page 31

HIGHLY CONFIDENTIAL - J. HRASKA

**shorthand.**

A. That's fine.

**Q. So, to your knowledge, with respect to that Fed financing of the week of September 15, Chase placed a value on the collateral that was used?**

A. That's correct.

**Q. Did Lehman place its own value on that collateral?**

MR. SHAW: Objection. Vague.

A. I don't know that -- Lehman, as a normal broker-dealer would have their own marks for collateral on their books and records.

**Q. Right.**

A. The final determinant of that collateral with respect to the financing transaction would be the responsibility of the tri-party agent.

**Q. Okay. And do you know if there's any -- were there any differences in the valuations that Lehman would -- placed on that collateral versus what Chase placed on that collateral during that week?**

A. I don't know.

Page 32

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Okay. Would you be involved in that normally?**

A. No.

**Q. Okay. Before we go further on in that week, do you have any understanding of the actual sale transaction, the terms of the sale transaction between Lehman and Barclays?**

A. No, I don't.

**Q. Did you ever have a chance to look at what's known as the Asset Purchase Agreement?**

A. No, I didn't.

**Q. Did you ever have any understanding about the terms of the transaction whereby Lehman assets were going to be transferred to Chase -- I mean to Barclays?**

MR. SHAW: Objection to form.

A. At what point in time are you referring to?

**Q. Okay. Let's break it down. Early in the week, Monday, Tuesday?**

A. Of the week of the 15th?

**Q. Of the week of the 15th.**

**Did you have any understanding of the terms of the deal between Lehman and Barclays?**

Page 33

HIGHLY CONFIDENTIAL - J. HRASKA

A. I did not.

**Q. Did you have any understanding that the Asset Purchase Agreement called for the sale of $70 billion in long positions to Barclays?**

A. I did not.

**Q. Had you ever heard that phrase used?**

A. No. That number is a completely new number to anything I've had heard.

**Q. You never heard that number during that week?**

A. During -- to this day.

**Q. Okay. I'm just trying to get a sense of what you were involved in.**

A. That's fine.

**Q. Had you ever heard during that week that the transaction involved the transfer of $69 billion in short positions to Barclays?**

A. No.

**Q. Okay. Going further on in the week, did there come a time when you learned some of the terms of the transaction between Lehman and Barclays?**

A. During that week, no.

**Q. After moving to Barclays, have you**

9 (Pages 30 to 33)

Page 34

HIGHLY CONFIDENTIAL - J. HRASKA

**learned some of the terms of the transaction between Lehman and Barclays?**

A. At a much later time, yes.

**Q. What have you learned about it?**

A. I learned that Barclays has purchased the unencumbered assets -- the way I understand it is they purchased the unencumbered assets of Lehman Brothers' clearance boxes.

**Q. Anything else that Barclays purchased?**

A. The building at 745.

**Q. Anything else?**

A. No.

**Q. When you say "unencumbered assets," what do you mean by that?**

A. An unencumbered asset, from my perspective, as an operations professional, is an asset which does not have a lien on it by any other party, primarily customers.

**Q. And when you say "in the clearance boxes," what are you referring to?**

A. Clearance boxes are -- it's a loose term that can be defined in two ways: A clearance box can be a location at a depository institution, such as DTC, or it can be a

Page 35

HIGHLY CONFIDENTIAL - J. HRASKA

clearance or -- a location at a clearing bank, such as a JPChase or Bank of New York, or it can refer to the record of your having those accounts on your stock records. So basically your stock record represents your position of those locations at those outside agents. So it's used intermittently, depending upon the use or the person using it.

**Q. And what is your understanding of the amount or the value of the assets that were transferred from Lehman to Barclays?**

MR. SHAW: Objection. Just for clarification, do you mean as unencumbered assets or overall?

MR. HINE: Whatever assets he thinks.

**Q. Let me clarify that. Let's take out the real estate.**

A. Okay.

**Q. What is your understanding of the value of the assets other than the real estate that were transferred from Lehman to Barclays?**

A. At what point in time?

**Q. Now.**

A. As of today?

Page 36

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Yes.**

A. As of today, my understanding is that the value of unencumbered collateral that was transferred was approximately 1.4 billion.

**Q. Have you heard the term "Schedule B"?**

A. I have, yes.

**Q. And what is your understanding of what that is?**

A. Schedule B, to my understanding, is the schedule of assets which were part of the transaction between Barclays and Lehman Brothers.

**Q. And is the 1.4 billion that you just mentioned, is that the approximate amount of the assets on Schedule B?**

A. The 1.4 -- the short answer is I don't know.

**Q. Okay.**

A. You had asked me what had been transferred to date. So what had been transferred is approximately 1.4.

**Q. Okay. Are you drawing a distinction between transferred and some other -- other --**

A. Originally, yes, because you

Page 37

HIGHLY CONFIDENTIAL - J. HRASKA

originally asked what had been transferred.

**Q. Right.**

A. And based on, you know, transactions, 1.4 or so billion had been transferred.

**Q. Right.**

A. There may have been a different total value on Schedule B. I can't be certain what that value is. There's been people who have talked about a number.

**Q. Okay.**

A. So I have a general sense, but I wouldn't testify that I knew a hundred percent what that value of Schedule B was.

**Q. Do you have any knowledge of what has been called Schedule A with respect to that transaction?**

A. Schedule A, as I understood it, was related to a transaction prior to that transaction which was the financing between Lehman Brothers and Barclays.

**Q. Okay. And do you have any --**

A. I'm not sure, is it all part of the same transaction? I don't know that it's part. I view those as distinctly different

10 (Pages 34 to 37)

Page 38

HIGHLY CONFIDENTIAL - J. HRASKA

transactions, Schedule A and what became Schedule B, but...

**Q. Okay. Well, I just want to understand what your understanding is.**

A. Okay.

**Q. So let me just try to understand. You mentioned a separate transaction between Barclays and Lehman that eventually led to a collection of securities that has been known as Schedule A; is that right?**

A. That's correct.

**Q. Okay. And what was the transaction that you understood took place that led to Schedule A?**

A. There was a secured financing transaction, a repo transaction -- from Lehman's perspective, it was a repo transaction with Barclays which took place on the 18th of September, and the assets related to that transaction became Schedule A.

**Q. Okay. And is it all right -- was that a tri-party repo?**

A. That transaction was a -- was a repo. There were -- it was sort of a unique

Page 39

HIGHLY CONFIDENTIAL - J. HRASKA

transaction. It was one that took on elements of tri-party as well as a bilateral contract, but it was governed under the documents of a tri-party repo, yes.

**Q. And who is the agent with respect to that transaction?**

A. There was -- well, that's what made it unique. There were two tri-party agents involved. There was Chase, who was a tri-party agent, who held our collateral with the Fed that we had pledged to the Federal Reserve, and then, in effecting the transaction, according to the tri-party terms, there was Bank of New York, who was the agent for Barclays.

**Q. I see reference in some of the documents to the BONY tri-party?**

A. Uh-huh.

**Q. Is that the tri-party we're -- is that the transaction we're talking about?**

A. Yes, that's correct. We moved the assets from JPChase, who was our tri-party agent, to Bank of New York, who was, as I mentioned, Barclays' agent.

**Q. Just so I understand the sequence,**

Page 40

HIGHLY CONFIDENTIAL - J. HRASKA

**tell me if I'm wrong here. There was a financing with the Fed in which there was a certain amount of collateral posted by Lehman, correct?**

A. That's correct.

**Q. At some point in time, that collateral gets transferred to Chase? Withdrawn. Let me start again.**

**At some point in time that collateral gets transferred to Bank of New York in connection with this transaction you have just described?**

A. That's correct.

**Q. Okay. And were you involved in that transfer of collateral from the Fed program to Bank of New York?**

A. I was, yes.

**Q. You were, okay. And did all the collateral make it from the Fed program to the Bank of New York?**

A. It did not.

**Q. And do you know -- do you recall how much made it and how much didn't?**

A. I can't give you the figure of exactly

Page 41

HIGHLY CONFIDENTIAL - J. HRASKA

how much that was in the Fed program made it to Barclays of the original collateral because there were difficulties in the collateral all moving over to Barclays.

I can tell you how much collateral, approximately, made it to Barclays, but it wouldn't necessarily be all of the same collateral that was with the Fed.

**Q. Okay. Did you mean to say Bank of New York or Barclays?**

A. Well, it was to Barclays -- I'm sorry, to the Bank of New York for the benefit of Barclays.

**Q. Okay. So how much made it to the Bank of New York in connection with that transfer from the Fed program?**

A. On the night of the 18th, approximately $42 billion worth of collateral.

**Q. And that figure is based on a valuation of the collateral provided by who?**

A. By Bank of New York.

**Q. So $42 billion is how Bank of New York valued the amount of money -- the amount of collateral that was transferred from the Fed**

11 (Pages 38 to 41)

Page 42

HIGHLY CONFIDENTIAL - J. HRASKA

**program to it on the 18th?**

A. From the Fed -- that was the way that they valued the collateral that was transferred to them, not necessarily just from the Fed, because as I mentioned earlier, not all from the Fed program, because there was collateral which was not part of the Fed program which was transferred to Barclays as well.

**Q. Okay. Can you explain to me generally -- I think I understand what you said, but where did the rest of the collateral come from that made it to Bank of New York?**

A. It was other unencumbered collateral in Lehman's clearance boxes.

**Q. Okay. Are you referring to what I've seen referred to as an O74 box?**

A. It was -- that was one of the sources of collateral, yes.

**Q. Where else did it come from?**

A. It came from another DTC location, which was 636, and it also came from our government clearance location. Chase was also a government clearance custodian, so from our government clearance box.

Page 43

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Does that have a number?**

A. It does, but it has an acronym number that I'm not familiar with off the top of my head.

**Q. Okay. So were you involved -- let me just -- I want to get a sense of your involvement now. You were involved in the transfer of collateral from the Fed program to Bank of New York, and were you then involved in the efforts to unwind that September 18 repo arrangement?**

A. Unwind from the perspective of a deal negotiation or unwind from the perspective of the mechanics of --

**Q. I'm trying to get a sense of what your involvement was. What did you do, after the collateral made it to Bank of New York, what was your role in connection with getting that collateral eventually to Barclays?**

A. We didn't have any more involvement with getting that collateral to Barclays. Once Bank of New York took possession of it --

**Q. Uh-huh.**

A. -- Bank of New York got the collateral

Page 44

HIGHLY CONFIDENTIAL - J. HRASKA

to Barclays.

**Q. Okay. Did you have any role in preparing what has been called Schedule A with respect to that collateral?**

A. I did not prepare Schedule A. What I -- what I did provide is I provided information which reflected the assets that Lehman knew to have transferred to Barclays in respect to that transaction, or to Bank of New York for the benefit of Barclays.

**Q. Okay. Well, from September 18 through that weekend, I think I've seen in some documents some efforts to find additional assets that were eventually going to be transferred to Barclays; is that correct?**

A. That is correct.

**Q. And were you involved in that effort to locate additional assets that were going to be transferred to Barclays?**

A. I was, yes.

**Q. What did you do in connection with that?**

A. I pretty much performed the same role. I looked across the stock record for assets that

Page 45

HIGHLY CONFIDENTIAL - J. HRASKA

didn't have liens on them by customers, primarily.

**Q. Okay. How many assets were located in that effort?**

A. I don't know a specific number. I know there were -- there were significant number of individual securities which were located.

**Q. Okay. Was that securities that came out of the O74 box and 636 box?**

A. Those were securities that, yes, out of O74 and 636, yes.

**Q. Previously you had said there were $42 billion transferred to Bank of New York. Did that include assets from the O74 and 636 box?**

A. On the night of the 18th?

**Q. Yes.**

A. Yes, those assets were sourced from those two boxes as well, yes.

**Q. Okay. And then were there -- is it correct to say there were additional assets found over the weekend in those two boxes that were also later sent to Barclays?**

A. At a later date, yes, there were assets from those two boxes that were sent.

12 (Pages 42 to 45)

Page 46

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. So when you add up all these assets that were eventually made their way to Barclays, do you have a number that would reflect the value of those assets?**

A. I don't know what the value of those assets are today. I know that there was a value assigned to the assets on the night of the 18th for what made it, which were -- what was $42 billion. My approximate evaluation of what was subsequently transferred was about 1.4 billion of physically moving from Lehman to Barclays.

So those are the two figures that I'm reasonably comfortable with. And the market valuation of those things has been changing over time, being that it's a year later and things like that.

**Q. I just want to get a -- just so I understand your perspective on this, from your perspective, there was $42 billion moved to Bank of New York which eventually makes its way to Barclays, correct?**

A. That's correct.

**Q. And there's a separate amount of 1.4 billion which is gathered sometime late in the**

Page 47

HIGHLY CONFIDENTIAL - J. HRASKA

**week and that eventually makes it to Barclays as well, correct?**

A. That's correct.

**Q. And is the 1.4 billion what's called Schedule B?**

A. The 1.4 --

MR. SHAW: Objection. Asked and answered. Mischaracterizes prior testimony.

MR. HINE: I didn't say anything about his prior testimony.

**Q. I'm just trying to figure out, do you consider the 1.4 billion the assets that are on Schedule B?**

A. I have subsequently learned that the 1.4 billion are assets that are on Schedule B, yes.

**Q. And were you involved in preparing Schedule B?**

A. I was not involved in preparing the official Schedule B. I provided assets which were used as the securities that would be later selected and placed on Schedule B, but I didn't prepare the official Schedule B.

**Q. Who selected the assets ultimately**

Page 48

HIGHLY CONFIDENTIAL - J. HRASKA

**that would become part of Schedule B?**

A. I provided that information through my manager at the time. I don't recall whether I had sent it to Monty or to Alastair, but nonetheless, they forwarded it to Paolo Tonucci and I believe Paolo sort of crystallized the official Schedule B.

**Q. Is it fair to say over that weekend your role was to just find unencumbered assets that they could possibly decide what to do with?**

A. That's correct.

**Q. Okay. Did you have an understanding of why you were doing that?**

A. No.

**Q. Did anyone tell you that there was any kind of shortfalls in what Barclays was expecting to receive at the end of that week?**

A. My understanding at the time was that I was still trying to complete the repo transaction, and part of that repo transaction was we had placed cash as well as an asset to Barclays, and, you know, my understanding at the time was that I was looking to, in addition to -- I was looking for assets that would be

Page 49

HIGHLY CONFIDENTIAL - J. HRASKA

able to be sent to Barclays for the purposes of also substituting that cash.

**Q. When you say the repo transaction, are you talking about the September 18 transaction that we previously discussed?**

A. Involving the Federal Reserve, yes.

**Q. I think I just misunderstood you. The September 18 transaction was between Barclays, Lehman and BONY, right?**

A. It was Barclays, Lehman and BONY, but it was -- well, yes, it was Lehman. It was basically like I guess a transaction where I guess the collateral that Lehman had on finance with the Fed was being -- instead now being financed with Barclays and Barclays was then I guess going to finance that transaction with the Fed. So that's why I referenced the Fed.

**Q. Okay. When you said you were concerned with the repo at that time, what were you doing with respect to the repo? Again, I'm talking Friday of that week.**

A. Friday of that week, I -- it was my understanding that we were looking to substitute the cash that we had placed on deposit for the

13 (Pages 46 to 49)

Page 50

HIGHLY CONFIDENTIAL - J. HRASKA

benefit of Barclays with assets as opposed to leaving cash, because it's not efficient from a lending transaction to collateralize a cash loan with cash. So we were looking to find available assets which were suitable under the repo agreement to substitute.

**Q. How much cash are we talking about?**

A. On the night of the 18th, Lehman Brothers placed $7 billion on deposit for the benefit of Barclays.

**Q. Just so I understand it, in layman's terms -- well, before I ask that, let me -- was that cash part of the $42 billion that you mentioned?**

A. It was not. 42 billion was the value of the assets, physical securities, that had made it to Bank of New York for the benefit of Barclays.

**Q. And so there was $7 billion in cash on top of that?**

A. Yes.

**Q. And so am I correct to say you were trying to locate other assets that could be transferred to Barclays so Lehman could keep the**

Page 51

HIGHLY CONFIDENTIAL - J. HRASKA

**cash portion?**

A. So, yes, Lehman could get a return of the cash in lieu of assets. So a substitution of one asset for another.

**Q. And were you able to come up with any assets to do that?**

A. Yes, I was. On Friday.

**Q. How much?**

A. Approximately a billion, just a little over a billion. Something like a billion-34, -35, something along those lines.

**Q. Okay. And did those assets in fact get substituted in and make their way to Barclays?**

A. Well, they made their way into Barclays. My expectation of a return of the cash never occurred.

**Q. Why is that?**

A. Well, with the mechanics and everything that happened with the relationship with Chase that day, Chase didn't return any of the cash at that point.

**Q. Can you explain to me the problems you had with the relationship with Chase that day?**

Page 52

HIGHLY CONFIDENTIAL - J. HRASKA

A. The morning of the 19th, Chase had effectively shut down our clearing accounts and stopped having communication with anything other than I think some very senior folks in Lehman Brothers.

**Q. And why did they do that?**

MR. SHAW: Objection. Foundation.

A. I don't know particularly why they do that. I mean, there was, you know, there was some speculation as to why they did that because of the status of our situation from a credit perspective and things like that, but I don't know if there was a particular trigger that caused them to do that.

**Q. Did you have any conversation with folks at Chase about this?**

A. On the morning of the 19th, no.

**Q. At any time?**

A. I mean, I had conversations with folks at Chase all through the night on the 18th, actually, technically, I guess into the morning of the 19th while we were trying to finalize the transaction. And after the morning of the 19th, I guess the very early morning, like in the 1, 2

Page 53

HIGHLY CONFIDENTIAL - J. HRASKA

o'clock range, that was the last conversation I had with anybody at Chase.

**Q. What was that about?**

A. That was primarily about --

The last conversation or the last series of conversations?

**Q. Last series of conversations?**

A. The last series of conversations were in relation to securing a loan to create the $7 billion which we placed on deposit with Barclays.

**Q. I see something referred to in the documents as a box loan. Is that the loan you're talking about?**

A. The 7 billion was a box loan, yeah. Lehman took a box loan from Chase and let -- as a result, Chase puts a lien on the assets for that $7 billion in cash, yes.

**Q. What assets was that lien on?**

A. There were assets which were unencumbered assets sitting in Lehman's clearance boxes at Chase.

**Q. Is that an identifiable set of assets that now has a lien on them from Chase?**

14 (Pages 50 to 53)

Page 54

HIGHLY CONFIDENTIAL - J. HRASKA

MR. SHAW: When you say "now," you mean as we sit here?

**Q. As a result of that box loan, is there now a lien on a particular set of assets, identifiable set of assets in Lehman's box?**

MR. SHAW: Objection to form.

A. Chase, in extending the loan to us, selected the assets that they thought suitable for collateralization on that loan.

**Q. Did Lehman have any say in the selection of those assets?**

A. No.

**Q. Let me go back. I think I have a general sense of what you were working on at the time. I just want to go back with a couple of particular questions.**

**I wanted to go back to the Fed financing for a minute. Do you know what the repo rate was for that financing?**

A. I don't know.

**Q. What is a repo rate?**

A. A repo rate is the rate of interest that you pay for the extension of the cash loan.

**Q. Have you ever seen any schedules of repo rates with respect to the Fed financing?**

Page 55

HIGHLY CONFIDENTIAL - J. HRASKA

A. Schedules of rates, no.

**Q. So you don't -- I think you just said you don't know the repo rate for that Fed financing program?**

A. Well, to be clear, there was more than one program.

**Q. Right.**

A. And I didn't know the rates on any of the programs.

**Q. What was the repo rate on the September 18 transaction we've been talking about?**

A. I don't recall.

**Q. What is a repurchase price with respect to a repo?**

MR. SHAW: Objection. Calls for a legal conclusion, but you can answer.

THE WITNESS: Okay.

A. A repurchase price -- a repo transaction is a collateralized loan. It's based on an initial sale of collateral and a repurchase of collateral. The price of that collateral on both, what are called both legs, which is the on leg, or start leg, or the off leg, or maturity leg, are the same thing. So the repurchase price would have been the price that was assigned to that collateral on the start of the transaction. There's no difference between the repurchase price and the initial price.

Page 56

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. What was the, just -- what was the initial price on the September 18 repo we've been talking about?**

A. Well --

MR. SHAW: Objection. Foundation.

A. There were, if you're asking me about prices, prices of securities, there were prices on something along the lines of 10,000 securities. So...

**Q. No, I'm asking the aggregate price on the September 18 repo. Am I correct to say that --**

A. Well, it --

**Q. -- Barclays, through bank of New York on behalf of Barclays, received collateral valued at $42 billion, correct?**

A. Right.

Page 57

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. And they also received $7 billion in cash pursuant to the box loan, right?**

A. That's correct.

**Q. What did Barclays give to Lehman?**

A. Barclays gave to Lehman $45 billion of cash.

**Q. And is that the price that you were just referring to when you talked about the on --**

A. No.

**Q. Okay.**

A. That's the -- that's what's known as the repo principal or the loan amount.

**Q. Okay. And so how is that different from the prices you were just talking about?**

A. Prices are the prices of the underlying collateral that securitized that loan.

**Q. And how are they different from the principal of the loan?**

A. The principal of the loan is the extension of the dollar amount or what the value -- what the value of cash that's being extended is. That's the loan principal.

15 (Pages 54 to 57)

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Right.**

A. The price, the prices, are the prices of the individual collateral that make up that loan, and in order for a loan to be effective, the value of the price times the par amount of the collateral should exceed the principal extended.

**Q. Okay. Is that what's known as the haircut, the amount by which it exceeds?**

A. The amount by which it would exceed the loan is known as the haircut, that's correct.

**Q. And so what was the haircut associated with the September 18 repo?**

A. There wasn't a -- there wasn't a specific stated haircut. There was a total loan amount, which was this $45 billion, and the total collateral value that we were trying to transfer over to Barclays or what we were directed to transfer over to Barclays was approximately $50 billion.

**Q. And that $50 billion was comprised of the approximately $42 billion in securities that you mentioned earlier plus the cash?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. It turned out that that was the case. It was initially intended to be all collateral, but the market value of what we were to transfer initially was $50 billion.

**Q. Okay. And Barclays was, after the -- after they received the proceeds of the loan and the collateral, was Barclays satisfied that it had received the entire amount of collateral that it was expecting with respect to that repo?**

MR. SHAW: Objection. Foundation.

A. Yeah, I don't know whether they were satisfied or not. I mean, we completed the securities transfers until the point that we couldn't make any transfers because the system had been shut down, and we were requested at that point to deliver an additional 7 billion in cash, which we did.

**Q. Okay. When was that transferred, approximately?**

A. The 7 billion in cash?

**Q. Yes.**

A. Somewhere between 2 and 3 o'clock in the morning on the 19th.

**Q. Friday?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. Well, it was -- it was -- we worked through the night of the 18th. So I guess it was very, very early in the 19th. So it was the morning of the 19th at like maybe 2 o'clock in the morning or something like that.

**Q. So, back to the notion of a haircut, the haircut for that transaction is the difference between the approximate $50 billion in collateral and cash that was transferred to Bank of New York and the 45 billion that Barclays transferred to Lehman, correct?**

A. Could you repeat that one more time? I'm sorry.

**Q. I'm just trying to figure out what the haircut is for that transaction. I thought you said that approximately 50 billion was transferred to Bank of New York or Barclays?**

A. That's correct.

**Q. In the form of either collateral or cash?**

A. Uh-huh.

**Q. And that Barclays gave Lehman 45 billion in cash?**

A. Right, that's correct.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. So that makes the haircut approximately $5 billion?**

A. That would be correct.

**Q. Do you know what the haircut was for the Fed program earlier in that week?**

A. I don't. Again, the haircut, each security class had its own individual haircut, so there would have been a, I guess what's called a synthetic haircut, which, you know, would equate to something similar to what you did there, you know, so -- and I believe it was similar because the transaction was described to me as we were going to take the extension of financing that the Fed had offered to Lehman and we were going to help effect the transfer of that to Barclays so that Barclays could then step back into that transaction. So I believe it was similar. I don't know exactly what the haircut was.

**Q. Okay. And who described the transaction to you like that?**

A. John Rodefeld, who was held of North American Operations at the time, had contacted Alastair and myself to talk about the

Page 62

HIGHLY CONFIDENTIAL - J. HRASKA

transaction.

**Q. And what did he say about it?**

A. He basically told us that Barclays had been contacted by the Fed and Barclays was asked to provide a credit, a counterparty credit upgrade to the Fed, in essence. They were fine with financing the collateral basket that they were financing, but they would prefer not to have Lehman as a counterparty on the other side of that.

They asked Barclays to basically intermediate a transaction where Barclays offered Lehman the same financing that they had been -- that the Fed had been financing with them throughout that week, and then that Barclays would take that collateral and place it back on deposit with the Fed to make them whole on the cash transaction.

**Q. I think I understand what you just said.**

**What else did Mr. Rodefeld say on that call?**

A. Well, that call was on the 17th, and they initially were looking to actually effect

Page 63

HIGHLY CONFIDENTIAL - J. HRASKA

that transaction the same day on the 17th. And then, you know, with some subsequent conversations, it just became -- it basically became an impossibility not just for Lehman Brothers, but for Bank of New York, JPChase, Barclays to do a transaction of that magnitude in the course of a day.

So from the 17th through the -- basically the whole 17th into the night of the 17th and even morning of the early 18th, we discussed the mechanics on how we would effect that transfer in the most efficient manner.

**Q. So do you recall anything else about what Mr. Rodefeld told you on that call?**

A. Not other than what I just described to you.

**Q. So am I correct to say that the initial intent was to have this transaction take place on the Wednesday of that week?**

A. From the first phone call, yes, it was intended to take place on Wednesday, but...

**Q. And just why mechanically was that not possible?**

A. There were numerous reasons from each

Page 64

HIGHLY CONFIDENTIAL - J. HRASKA

of the parties. Purely from the size of the transaction, it was an extremely large transaction, and the number of securities involved were in the multiple thousand range, you know, I would say in the double-digit thousand range. So that was one of the issues.

So not just from a transactional perspective, but also from a static perspective on the Bank of New York's side, they didn't have a lot of these securities set up on their systems. It was going to take them time to set the securities up to be able to set up receipts for these securities and things along that nature.

**Q. So how was it possible to do it on Thursday as opposed to Wednesday?**

A. People were working 24 hours a day to get it done and bunches of people were brought in to help set things up and there were technologists brought in on all different sides to help do away from ordinary type transactions and things like that to get the securities transferred.

**Q. So am I correct to say that you**

Page 65

HIGHLY CONFIDENTIAL - J. HRASKA

**learned of the possibility of this transaction sometime on Wednesday, late Wednesday, and then people worked through Wednesday night and then all the way through Thursday night to get it done?**

A. That's correct.

**Q. Okay. Did the nature of that transfer change at all? In other words -- let me rephrase that.**

**You just described what Mr. Rodefeld told you about the transaction. Did that transaction change at all over the course of that Wednesday into Thursday?**

MR. SHAW: Objection. Foundation.

A. The nature of the transaction itself, the spirit of the transaction, nothing changed, no.

**Q. Okay. That makes sense.**

A. Could I -- I apologize.

(Discussion off the record.)

(Recess; Time Noted: 10:31 A.M.)

(Time Noted: 10:38 A.M.

BY MR. HINE:

**Q. Mr. Hraska, I just want to take a**

17 (Pages 62 to 65)

Page 66

HIGHLY CONFIDENTIAL - J. HRASKA

**second to just talk again about your understanding of the transaction between Barclays and Lehman.**

**Did you ever have any understanding that there was supposed to be a discount associated with that transaction?**

A. Which transaction? The repo transaction?

**Q. No. No, the sale transaction between Barclays and Lehman.**

A. I didn't have any knowledge as to what the terms of that transaction were.

**Q. Did you ever hear the phrase "block discount" used in connection with either that transaction or the repo that we have been talking about?**

A. No.

**Q. Did you ever have any understanding that Barclays was going to be paying less than full value for the assets that it was buying from Lehman?**

A. No.

**Q. Did you ever hear any discussion about the possibility of defaulting on the repo that**

Page 67

HIGHLY CONFIDENTIAL - J. HRASKA

**we have been discussing?**

A. There was discussions related to that topic on the week of the 22nd.

**Q. Tell me what you recall about that, those discussions.**

A. Well, there was -- it was news that obviously LBI had filed for I guess SIPC protection. So the margin folks had contacted me on the morning of -- I don't know which morning, I believe it was on the 22nd, but if not, on the 23rd, to ask me if that transaction was being considered a default by Barclays. And at the time, I didn't know, but there was -- I then had conversations about whether that was going to be treated as default with my manager, and at the time, you know, we didn't actually know when it was or if it was going to be treated as in default.

**Q. When we talk about "it," we're talking about the September 18 repo?**

A. Repo itself, yes.

**Q. And LBI filed for bankruptcy on Friday, the 19th?**

A. That's my understanding.

Page 68

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. And so you had conversations the following Monday about this?**

A. Yes.

**Q. And who were the conversations with?**

A. I don't recall specifically. Somebody from the Margin Group. I don't recall specifically who it was from the Margin Group that I had a conversation with. And I also had a conversation with Monty Forrest, which is my manager.

**Q. The Margin Group at Barclays?**

A. The Margin Group at legacy Lehman Brothers.

**Q. Do you recall the names of the individuals that you spoke to?**

A. No, I just said I didn't recall it.

**Q. To your understanding, was the September 18 repo unwound in some way?**

A. To my understanding, it was defaulted and the collateral that was put up to securitize that loan was seized by Bank of New York for the benefit of Barclays.

**Q. Okay. And did Bank of New York also seize the cash that had been posted?**

Page 69

HIGHLY CONFIDENTIAL - J. HRASKA

MR. SHAW: Objection. Foundation.

A. The cash itself was not in an account that or in a position for Bank of New York to seize. The cash itself was being held for the benefit of Barclays at JPChase.

**Q. Okay. And what happened to that cash?**

MR. SHAW: Foundation.

A. Barclays, because the cash was put into the account of their benefit, they -- later I understood, and it would make sense, that they claimed ownership of that cash. What happened to the cash after that, I sort of was removed from the transaction after they laid ownership claim to that cash.

**Q. Okay. I guess do you understand that there was an ensuing dispute between Chase and Barclays as to the ownership of that cash, among other things?**

A. I did, yes.

**Q. And were you involved in that resolution of that dispute?**

A. My only -- not in the resolution, no.

**Q. What was your involvement in connection with that dispute?**

18 (Pages 66 to 69)

Page 70

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. To do some fact-finding to describe how that cash --

MR. SHAW: Actually, let me just stop you here. If this was any work you did for counsel, I don't want you to get into the details of it.

THE WITNESS: Okay.

A. It was purely to describe how that cash got there, why was there cash in a repo transaction.

**Q. And who were you describing that for?**

A. My initial conversation on that was with -- was with the Treasury folks, and that was more so just to -- was more so just to review sort of what happened on that evening and --

**Q. When you say "the Treasury folks," are you talking about Mr. Tonucci?**

A. Mr. Tonucci and his organization, yeah.

**Q. Okay. And so am I understanding you correctly that you explained to them the genesis of the box loan that we just previously discussed and how the cash came to be involved**

Page 71

**HIGHLY CONFIDENTIAL - J. HRASKA**

**in that transaction?**

A. Yes.

**Q. And did you have any other involvement in the dispute between Barclays and Chase over that cash?**

A. No.

**Q. Okay. I would like to revisit some of the things we talked about earlier.**

**There was a pool of collateral that was used to secure the Fed financing early in the week, correct?**

A. That's correct.

**Q. And I think you told me you weren't aware of the value of that pool; is that right?**

A. That's correct.

**Q. At some point that pool was supposed to be transferred to Bank of New York for the benefit of Barclays, but not all of it makes it, right?**

A. That's correct.

**Q. And now do you know why it didn't make it, that portion of it didn't make it?**

A. There were multiple reasons why not all the collateral made it.

Page 72

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Can you tell me what they are?**

A. I can tell you the ones that I'm aware of. I may not tell you every reason, but ...

The first reason was that some of the collateral that was pledged to the Bank of New York -- I'm sorry, that was pledged to the Fed was obtained through a program called GCF, which stands for General Collateral Financing.

**Q. Uh-huh.**

A. As a result of this program, you obtain collateral. It's basically it's a dealer-to-dealer tri-party program. So you obtain collateral, which is credited on a book-entry-only basis to your clearing bank, and that clearing bank -- you can use that collateral to -- you can basically rehypothecate that collateral. You can use it as collateral for an ongoing transaction.

The transference of that collateral is purely governed by the Fixed Income Clearing Corporation, or FICC, in conjunction with the two clearing banks, Bank of New York and JPChase. So when a transaction is agreed and it's put on and when it's unwound, what happens

Page 73

HIGHLY CONFIDENTIAL - J. HRASKA

is is that the transference of that collateral is purely governed, as I mentioned, by FICC.

And so we had previously purchased collateral under that program and we were using some of that collateral purchased under that program, and when the morning of the 18th hit, some of those programs had matured, and as a result of that maturity, that collateral was taken out of our clearance boxes on an automated fashion away from us having any involvement in or being able to even stop that. Because just as part of the program, collateral comes in and goes out.

So what was previously sourced from that program and listed as a rehypothecated asset to the Fed on the morning of the 18th was no longer available for us to actually transfer to Bank of New York.

**Q. And do you know the value of the collateral that was -- falls into that category?**

A. I don't know the value of specifically the GCF collateral. I know that there was -- it was a significant value. There was a value of -- GCF collateral is typically Fed-eligible

19 (Pages 70 to 73)

Page 74

HIGHLY CONFIDENTIAL - J. HRASKA

collateral. We had a discrepancy of approximately 8 billion in Fed-eligible collateral, but I don't know whether that discrepancy -- I can't say for certain whether that discrepancy was purely related to GCF or not.

**Q. When you say 8 billion, is that the amount that didn't make it from the Fed program to the Bank of New York?**

A. That was the amount at the time when we tried to effect the transfer of the Cusips that were out there that we were unable to transfer on the 18th.

**Q. And so am I correct to say there was approximately $8 billion in collateral that was not able to transfer on the 18th from the Fed program to Bank of New York; is that right?**

A. Yeah, initially, yes.

**Q. Okay. And a portion of that 8 billion wasn't able to transfer due to this --**

A. GCF.

**Q. -- GCF issue that you just described?**

A. Yes.

**Q. Do you know what portion of it falls**

Page 75

**HIGHLY CONFIDENTIAL - J. HRASKA**

**into that category?**

A. I don't, unfortunately.

**Q. Do you know if it's most of it or only a small portion?**

A. I don't think it's most of it, but it's somewhere between most and small. It's probably somewhere in midrange. I don't honestly know.

**Q. I'm not trying to get you --**

A. It's not insignificant, but I don't think it's most of it.

**Q. So that leaves another portion of the 8 billion that didn't make it. Why did the rest of it not make it?**

A. All right. So there were other things that were happening on that day. Collateral over securities that were moving were securities that were also traded by our inventory traders, proprietary traders at Lehman. They were also securities that, you know, customers maybe were asking to move out of their accounts and move to other broker-dealers.

When all these transactions take place, there are a queue of deliveries that get

Page 76

HIGHLY CONFIDENTIAL - J. HRASKA

built out of the delivery boxes, and when there becomes availability, there's no way without manually intervening in every single delivery to say, okay, wait a minute, this Security A goes to Customer A and Security A goes to Customer B or C.

So what was happening, unfortunately, is many of the securities that were going -- that had deliveries onward to Bank of New York for the benefit of Barclays also had onward delivery instructions for other people as well. So when the availability -- when the securities became available, some of those securities were first delivered to other onward obligations.

**Q. Do you know approximately how the amount of securities that fall into that category?**

A. I don't. I actually have no idea on that because that was -- that was a non-stop request of, you know, customer transfers, new trades and, you know, inventory traders were trying to sell assets to raise cash. So it was just an enormous amount of transactions in a particular time period.

Page 77

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Did those securities, I think I understood what you said, they got used for other purposes, basically, and is that -- does that relate to the winding down of the matched book that was managed by the Finance Department, the Financial Department within Lehman?**

A. I wouldn't attribute it to a winding down of the matched book. All I can say is that there were -- there were trades booked in the system that were, you know, outward-going deliveries. They could have multiple sources.

So, as the securities came in, they just made on those deliveries and they could have multiple reasons why they were pending for delivery.

**Q. I think you were describing reasons that some of the collateral didn't make it to BONY. Are there any other reasons?**

A. There is one other reason in my mind that was a reason of the initial -- there was an initial shortfall, right? And that was because we were initially going to do the transfer in increments of $5 billion, and Barclays had forwarded the first $5 billion and our tri-party

20 (Pages 74 to 77)

HIGHLY CONFIDENTIAL - J. HRASKA

agent was then, upon receipt of that $5 billion, supposed to released $5 billion worth of collateral that was previously held in the Fed program.

They had sent in a request to Lehman Brothers, "they" being JPChase sent in a request to Lehman Brothers as to which securities -- or did we have a preference as to which securities were released first. The response back was there was no particular order that needs to be released first. However, just release the securities that are in the program.

Unfortunately, there was a miscommunication and JPChase understood that to be any $5 billion, and it released also some securities that were not in the program.

**Q. When you say "the program," you're talking about --**

A. "The program," meaning that were being financed by the Fed the previous evening.

**Q. And so I interrupted your story, but continue.**

A. So, as a result of that release, those securities had some onward obligations as well

HIGHLY CONFIDENTIAL - J. HRASKA

because they were subject to other transactions, as we described earlier, and those securities as well had gone out away from Bank of New York, and as a result of all these different things taking place, the first delivery of collateral only accomplished somewhere in the neighborhood of around probably 2 billion or less.

**Q. Can you explain that? I mean Chase thinks they're releasing 5 billion?**

A. Uh-huh.

**Q. And only 2 billion or less makes it to BONY?**

A. Right.

**Q. And how does the rest get diverted? Just automatic?**

A. Well, per the process we just talked about, those assets get released to our availability, and because there were pending deliveries in our clearance locations at both DTC, 636, O74, the Fed box, when those securities became available, they were immediately delivered on other obligations and they weren't available any more to be delivered to Bank of New York.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. So, just to continue the story, Chase thinks it's delivering 5 billion, but they get diverted to other purposes and only a little less than 2 billion makes it to BONY out of that first delivery?**

A. Chase releases their lien on 5 billion, and as a result, yes, Lehman, through it's clearance relationships, only delivered 2 billion. I think it was under 2 billion, but I just don't -- somewhere under 2 billion I think is the figure.

**Q. So what happens next?**

A. At that point in time we were contacted by John Rodefeld, who was representing operations at Barclays. He said we were going to suspend -- we were going to suspend the next increment of $5 billion in cash being wired because Barclays didn't feel comfortable in wiring another 5 billion when they hadn't fully received the assets on the first 5 billion, and he asked us to hold off until we heard back from him with further instructions.

**Q. And did you eventually get further instructions?**

HIGHLY CONFIDENTIAL - J. HRASKA

A. We did very late in the day, I would say somewhere in the neighborhood of between 4 and 5 o'clock. He said that it was decided that Barclays was going to extend the remainder of the loan balance in a single transaction, which would have been the $40 billion, and at that point in time, you know, expect to have, you know, Chase release the availability of the remaining 40 billion, I think, or of 40 billion that they had, and we were asked to coordinate with the clearance folks, to the best that they could, to try to monitor assets going and give priority of the assets to Barclays.

And that was -- it was a difficult task, but they, you know, they brought in extra people and tried to watch deliveries and that kind of thing. It was all on a manual basis so it was very difficult to do that, but they did the best they could with, you know, being that it was manual in nature.

**Q. Why, if Chase was -- I mean, if -- excuse me. If Barclays was concerned about not sending the next 5 billion, why did they decide to go ahead and send 40 billion instead?**

Exhibits 67 - 69 Pg 62 of 167

Page 82

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. I honestly don't know.

**Q. And so were you eventually successful in releasing the remainder of the collateral that Barclays was expecting?**

A. Well, as we discussed a little bit earlier, the -- we did manage to get over a total of 42 billion out of the 50 billion in collateral that we were expecting to send over.

**Q. Okay. Am I correct to say that 42 billion -- they had 2 billion from the initial release from Chase and then so there was an additional 40 transferred over?**

A. Rough approximation, that's correct.

**Q. So now you're continuing to tell me the reasons that not all the Fed collateral made it to BONY. Are there any other reasons that you know of?**

A. No, those are the primary items.

**Q. Okay.**

A. At least the ones that I was aware of. There might have been something else that I'm not aware of.

**Q. I believe you said that approximately 8 billion did not make it from the Fed program**

Page 83

**HIGHLY CONFIDENTIAL - J. HRASKA**

**to Bank of New York, correct?**

A. There was, yes, that's correct.

**Q. And so I know you don't know the exact numbers, but is 3 billion of that 8 billion the result of this initial shortfall problem that you just described?**

A. I wouldn't have any way to determine that.

**Q. I thought you said the initial release from Chase was supposed to be 5 billion and only about 2 billion made it to BONY out of that release; is that right?**

A. That's correct.

**Q. So --**

A. But I don't know if what you're asking me is the -- is the 3 billion shortfall comprised of, you know, these GCF and whatever assets. I don't know what percentage of that was GCF or other deliveries or other transactions. That's, unfortunately, I have no way of knowing that.

**Q. Okay. Was any of the 8 billion shortfall later transferred to BONY?**

A. Well, what was transferred was a total

Page 84

HIGHLY CONFIDENTIAL - J. HRASKA

of 42 billion. I mean, there was 8 billion of the Fed program, and those were Fed -- we probably need to make a distinction between the Fed program securities and what are deemed Fed wirable or Fed securities, right?

So there was, you know, what was held in the program, which were DTC-eligible securities, Fed wirable securities and that kind of thing. So the 8 billion shortfall, it was not only a shortfall of what was in the Fed program, it was basically a shortfall of Fed wirable security types.

So we found substitutes of a good portion of that 8 billion. I couldn't tell you the exact quantities, but that's why we were able to, you know, to manage to get, you know, a good portion of the collateral over to Bank of New York.

**Q. I think I understood what you just said, but let me see if I can see if I got that right.**

**$8 billion does not make it for any number of reasons to the BONY in the course of this transfer over Thursday night, and are you**

Page 85

**HIGHLY CONFIDENTIAL - J. HRASKA**

**saying --**

A. Well, let me clarify that. 8 billion that was initially intended to be transferred --

**Q. Right.**

A. -- was not going to be eligible to be transferred for various reasons.

**Q. Okay. Then you relayed that 42 billion in securities ultimately did make it to BONY, right?**

A. Uh-huh. Yes, that's correct.

**Q. Now, was some of that 42 substitute securities for the 8 billion?**

A. Yes, it was.

**Q. Do you know how much?**

A. I don't. I mean, we managed to make up as much as we could. I don't know the percentages of what was substituted from the original 8. I mean, at that point we knew 8 and there were other things that were causing problems. And then the goal became you need to get the $50 billion worth of collateral over and make sure you get every collateral that doesn't have lien on it or unencumbered collateral that's eligible for the Barclays transaction

22 (Pages 82 to 85)

Exhibits 67 - 69 Pg 63 of 167

Page 86

HIGHLY CONFIDENTIAL - J. HRASKA

over there.

So, you know, it stopped being about this pool or that pool or this type of collateral or that type of collateral. You know, there were specific, you know, buckets and things, but at a certain point in time, we were instructed by John Rodefeld to deliver all eligible collateral that fit the criteria to Barclays in as most efficient, quick manner as possible.

**Q. I had one question. I know we're talking round numbers here, but if you were supposed to deliver 50 and you delivered 42, how does the 7 billion box loan make up the entire difference? Was there -- seems to be another billion dollars missing.**

A. Again, it was 42 and change that made it and there was I think it might have been just under 50. It was 49 and some mid to high change.

**Q. So the --**

A. You know, what's a half a billion between friends?

**Q. So I just want to make sure I wasn't**

Page 87

HIGHLY CONFIDENTIAL - J. HRASKA

**missing a billion here or there.**

A. No. No.

**Q. It's really the 50 billion that was supposed to make it, made it in the form of approximately 42 and change --**

A. Yeah.

**Q. -- in securities, and the balance was the box loan?**

A. Yes, that's correct.

**Q. What securities were used to secure the box loan?**

A. I don't know the specific securities. I'm sure that could be provided by --

**Q. Well --**

A. I mean, if you're asking me like -- I think we talked a little bit about this before. There were securities which were unencumbered still at our clearance box at Chase. So Chase looked at the securities that were available and said, you know, you have market value that, you know, far exceed 7 billion.

So we requested a loan. They, you know -- we basically booked the transaction for a 7 billion loan on our books and Chase went

Page 88

HIGHLY CONFIDENTIAL - J. HRASKA

ahead and allocated securities that they deemed appropriate that were being held in their clearance box.

**Q. Am I correct to say that the assets used to secure that box loan had nothing to do with the assets you have just described that were supposed to go from the Fed program to BONY?**

A. I wouldn't know specifically whether there were any circumstances where there might have been a Cusip that was or a security that was the same that were on the initial intended list. It's possible. I wouldn't know for sure.

**Q. Okay. I see reference in some of the documents to something called fails on around Thursday. What is that term meant to entail, in your understanding?**

A. The general term "fails" or --

**Q. Well, I see it in the Thursday night e-mail traffic, and I just wondered how that term is used in connection with what we're just talking about, if at all.**

A. Okay. Well, a fail is an interesting term, actually. It, for most operations

Page 89

HIGHLY CONFIDENTIAL - J. HRASKA

professionals, a security transaction is booked, and until the point of delivery, it's considered a fail.

So that may mean if I book a transaction let's call it last night, 8 o'clock in the morning I haven't delivered it yet, it's still failing. You know, I may make delivery by the end of the day, and at that point, you know, it becomes cleaned up.

Other people in the industry refer to fails as, you know, after settlement date, but from an operations perspective, which is probably a good part of the mail you see, fails are related to undelivered securities at a particular point in time.

So on that day we had a enormous amount, as we talked about those, sort of those trades that were queued up before that I referenced, those were all pending deliveries or fails. So over the course of time, as availability -- as securities became available, those fails were getting cleaned up. So there were --

**Q. Okay.**

23 (Pages 86 to 89)

Page 90

HIGHLY CONFIDENTIAL - J. HRASKA

(Exhibit 137B, a document bearing Bates Nos. 10294679 with attached spreadsheets, marked for identification, as of this date.)

Q. Mr. Hraska, I'm handing you a copy of a document marked as Exhibit 137B, which is an e-mail chain from September 18, 2008, on which you are a CC recipient, and attached to it is a spreadsheet and sheet of some sort.

Please take a minute to look at it and I have a question or two about the spreadsheet.

A. Okay.

(Document review.)

A. Okay.

Q. Have you had a chance to look at the document?

A. Uh-huh.

Q. I know we were talking about fails previously, so I just wanted to get a sense of what this type of report is.

Could you tell me what this document is? I'm talking about the report that's attached to it.

A. I mean, I'm not sure of the generation

Page 91

HIGHLY CONFIDENTIAL - J. HRASKA

of this report. This is a listing of trades that are currently in fail status. So I don't know whether this was -- what system it was taken out of, but it is, looking at the data itself, is it is fail information.

Q. So am I correct to say that, during the course of this Thursday when you are trying to transfer all these securities, people would periodically get reports of what had failed and then they would try to clean them up?

A. My group, along with the Clearance Group, was monitoring the status of failed trades or not in trying to, yes, effect those transfers and clean up the fails, yeah.

Q. And the 8 billion that you described earlier that didn't make it to BONY, those would all show up as fails that eventually could not be cleared up?

MR. SHAW: Just so we're clear, you mean on this list or --

MR. HINE: No, I'm not talking about the list now.

A. They would have initially been booked as transactions which would have showed as a

Page 92

HIGHLY CONFIDENTIAL - J. HRASKA

fail status.

Q. Okay.

A. And then prior -- or, as a result of them not be being available, then, yes, they would have had to have been cleaned up.

Q. Okay. Thanks. That's all I have for that document.

(Exhibit 138B, an e-mail chain, the first one in time bearing a date of September 18, 2008, at 5:40 P.M., marked for identification, as of this date.)

Q. Ready to continue?

A. Sure.

Q. Mr. Hraska, I've handed you a copy of a document marked Exhibit 138B, which appears to be an e-mail chain dated September 18, 2008 in which you are a participant.

Could you just take a moment and just review this real quick and then I have a few questions.

(Document review.)

Q. Have you had a chance to look at the document?

A. Yes, I have.

Page 93

HIGHLY CONFIDENTIAL - J. HRASKA

Q. Mr. Hraska, I was wondering if you can just explain to me generally what the issue is that's being discussed in this series of e-mails with respect to fails, if you recall.

MR. SHAW: Objection to form.

A. Yeah, I don't recall the issue being discussed. This -- it's a long time ago, but I believe this was forwarded to me just because I was involved in a transfer of collateral of some assets, and I think anybody that had any involvement with asset transfers for fails or anything, you know, were being kept apprized of all types transactions going on.

So, like I said earlier, I didn't really sort of know what was going on in some of these other negotiations. My role in this, not to dumb it down, was kind of like more to do with the mechanics of the financing, right? So kind of move assets from one place to another and talk to the trading desk. So I'm not a hundred percent sure as to what was going on here with this stuff.

Q. Okay. My question was were you involved in any discussions with Barclays about

24 (Pages 90 to 93)

HIGHLY CONFIDENTIAL - J. HRASKA

**whether they were going to assume liabilities associated with fails?**

A. No, unfortunately not.

**Q. Did you hear anything about that or recall hearing anything about that at the time?**

A. I remember this mail. I don't remember any other -- like I wasn't participating in any conversations about it or anything like that.

**Q. Okay. Before I forget, I wanted to ask you, were you -- do you have any involvement in -- during the week of September 15th, 2008, did you have any involvement in any amendments to the Master Repurchase Agreement that were being made?**

A. Which one? There's -- let me -- let me clarify my response. Master Repurchase Agreement is usually between two counterparties, the repo buyer and repo seller. So there were -- we have thousands, so I mean --

**Q. Well, I see there's a Master Repurchase Agreement between Barclays and Lehman during that week, correct?**

A. There is, that's correct.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Do you recall any discussions or did you have any involvement in any efforts to amend that agreement --**

A. No.

**Q. -- during that week?**

**Do you have any understanding of why an amendment might have to be made to that agreement during that week?**

A. There was an amendment made to the agreement. There were amendments made. I'm not sure of the specifics of the amendments, but there were amendments because Barclays was providing some financing to Lehman on a tri-party basis, but ...

Q. So was --

A. Not related to the transaction on the 18th. There was -- Barclays was providing financing prior to the 18th to Lehman as a liquidity provider, no different than Fidelity or Merrill Lynch.

**Q. Okay. So did you have any role in that financing?**

A. The role I would have had there is no different than the role I would have had with

HIGHLY CONFIDENTIAL - J. HRASKA

any other liquidity provider. Once the agreement was signed and the, you know, the appropriate schedules were put in place with JPMorgan Chase, then, you know, my team would have been involved again in helping the desk find appropriate collateral that would have fit that schedule and things like that.

**Q. Okay. So that is separate and distinct from the September 18th repo that we've been talking about, right?**

A. That's correct.

**Q. And what was that financing known as among you folks during that week?**

A. It was just a tri-party repo transaction with Barclays. That was probably -- I mean, that's best classified as a generic tri-party repo transaction. It was as true to form as they come. It was a transaction with a schedule, collateral. JPChase handled the allocations of the collateral.

**Q. The collateral used to support that financing was separate and distinct from the collateral used to support the September 18th repo, right?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. The collateral that was used to support that transaction was available collateral in the clearance boxes during the course of that week. Each day that transaction was an overnight transaction that went on and came off.

I wouldn't say that the collateral was separate and distinct. It was just collateral that was available in the boxes.

**Q. But the collateral could not support both -- same piece of collateral could not support both financings, right?**

A. Well, that's correct, but at what point in time are we talking? This transaction, the transaction I'm discussing now was in place earlier on in the week prior to the 18th. So prior to the 18th, it -- any piece of collateral in the box would have been available.

Now, on the 18th, that transaction ceased to exist. So, you know, so there was no time -- there was no point in time when those transactions were both on at the same time.

**Q. Thank you. So why did that transaction cease to exist on the 18th?**

Page 98

HIGHLY CONFIDENTIAL - J. HRASKA

MR. SHAW: Objection. Foundation.

A. I don't know. I mean, that's a trading decision as between I guess Barclays and Lehman's trading desk as to whether or not they were going to roll that transaction to the 18th.

**Q. Did you ever hear any discussions about why that transaction was not rolled into the following day?**

A. I don't know why it wasn't rolled. I know that it was not rolled, but I don't know why it wasn't rolled, no.

**Q. Did the failure of it to roll affect in any way the September 18th repo that we've been talking about?**

MR. SHAW: Objection. Foundation.

A. It did not affect the repo itself. The repo of September 18 had been completed on, you know, whatever that last transaction was, a deposit of cash, at 2, 3 o'clock in the morning point.

It was at that point that that was the main focus. Everybody at the firm was collateralizing that repo and, you know, Lehman believed at the time that that other transaction

Page 99

HIGHLY CONFIDENTIAL - J. HRASKA

was also rolling and we were going to just finish that up after completing the other -- the large transaction, $50 billion transaction.

But as it turns out, you know, at that late hour, we found out that Barclays hadn't in fact -- because in order to roll that transaction, they would have had to deposit 14 or 15 billion dollars in cash. So JPChase had informed us that, you know, as of that time, that cash had not yet come back in.

And at that point it was when we realized that, you know -- we didn't know what was Barclays' intention. We still assumed Barclays' intention was to roll it and that there was an operational problem or something with not sending those funds in. You know, we reached out and tried to contact some Barclays folks at the time, but we were unable to, so ...

**Q. And how was this issue ever resolved? Do you know?**

A. The issue on that evening, JPMorgan asked us what Barclays' intention was and, you know, we didn't know. We can only tell them what our intention was, and our intention was is

Page 100

HIGHLY CONFIDENTIAL - J. HRASKA

that we were -- we were rolling the transaction for an additional day.

They suggested that we, you know, that we book a "held in custody" transaction, in which case, you know, JPChase would be looking to collect 15 billion that should have been, you know, delivered in if they were going to roll the transaction. JPChase would, you know, put a lien against the assets for the benefit of Barclays until the next morning.

**Q. Are we talking Thursday night into Friday morning now?**

A. Thursday night, yeah. This was done very late Thursday night or somewhere in the 2 to 3 o'clock hour of Friday morning, and the expectation was is that, you know -- or, Chase's expectation was is that we and/or them would contact Barclays and have them send in the payment with a back valuation adjustment for the 18th.

**Q. Did that ever happen?**

A. No.

**Q. Did you ever find out later why they didn't roll that loan?**

Page 101

HIGHLY CONFIDENTIAL - J. HRASKA

A. Not specifically. Just found out that it was not their intent to roll that loan for that date.

**Q. Have any general understanding of why?**

A. No, not specifically. I mean ...

**Q. So am I correct to say that, because they didn't roll that loan, Lehman was forced to take this HIC loan from Chase?**

A. Well, Chase forced Lehman into that position. What happened is, you know, Chase said, you know, we are, in essence, liening on those assets now until you come up with the 14 and change, 15 billion, I guess for round numbers, cash. And they basically seized the assets and put themselves on as the counterparty. Very similar to the -- it would have looked from a transactional perspective very similar to the box loan that was put on for the 7 billion.

**Q. So, in the end, there is a HIC loan effected over that night, correct?**

A. Over that night, there was a HIC loan that was booked with Barclays as a beneficiary. That beneficiary was changed by JPMorgan Chase

26 (Pages 98 to 101)

Exhibits 67 - 69 Pg 67 of 167

Page 102

HIGHLY CONFIDENTIAL - J. HRASKA

on the morning of the 19th, somewhere in before noon. I don't know exactly when it was.

**Q. Changed to who?**

A. Changed to Chase being the beneficiary.

**Q. Can we discuss for a couple minutes the -- what happens to the September 18 repo after it's now been collateralized and the box loan has been granted? So there's a bunch of collateral supporting that loan. What happens on Friday with respect to that loan?**

MR. SHAW: Foundation.

A. With respect to the overall loan, in other words, the whole repo transaction, or the loan to support the 7 billion in cash?

**Q. The whole repo transaction.**

A. The whole repo transaction, okay. So as a result of the fact that we deposited the 7 billion in cash, you know, normal course is for my group to work with tri-party operations to try to maximize the efficiency of our collateral.

So it's typical -- it's not typical to leave cash on deposit as collateral. I mean,

Page 103

HIGHLY CONFIDENTIAL - J. HRASKA

it's done on tri-party transactions in, you know, somewhat normal course, but, you know, ideally you try to substitute collateral.

So I had worked with the trading desk and the Tri-Party Ops folks and we started looking for collateral to substitute for that 7 billion. So that's I think we referenced a little bit earlier the billion-35 that we had come up with.

**Q. Okay.**

A. And again, the intent was to deliver the billion-35 in and to receive a portion of the cash -- equivalent market value of cash back.

**Q. And what ended up happening?**

MR. SHAW: Objection. Foundation.

A. Yeah, I mean what ended up happening was we lived up to our part, we delivered the collateral in, and then there was some, you know, some dispute about the cash and, you know, some other things, and at the end of the day, you know, we never got returned the cash by Chase.

**Q. Okay. On Friday of that week, LBI**

Page 104

**HIGHLY CONFIDENTIAL - J. HRASKA**

**files for bankruptcy, correct?**

A. That's correct.

**Q. And do you recall any discussions about whether that would cause a default of the September 18 repo?**

A. I think we talked about that a little bit. I mean, you know, I started thinking about it over the weekend, but I didn't have any real conversations about it until I got a call from the margin folks and until I sat down with Monty and we talked about whether that was going to trigger a default or not. Our assumption was that it was going to.

**Q. At some point over that weekend, you work on transferring the collateral that was used to support the September 18 repo to Barclays, correct?**

A. Not over the weekend, but --

**Q. When --**

A. The collateral was all transferred on the night of the 18th, and then there was that additional piece that we just talked about, which was transferred on the 19th.

**Q. Right.**

Page 105

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. On the weekend we worked to try to locate additional collateral that would be eligible for a transfer.

**Q. And that's the 1.4 billion we talked about earlier?**

A. That's the 1.4 billion, yeah.

**Q. I had a question about that. Is that 1.4 billion as of that weekend; that's the value of that collateral over that weekend?**

A. That was --

MR. SHAW: Objection. Foundation.

A. Again, that was -- the 1.4 billion is the assets that were actually transferred over a period of time, ending I believe on the 29th of September, and it was based off of values that were -- I actually don't know what the value, what they were based off of.

I think they were based off of some initial list, but they wouldn't have been based off of the date of transfer. Like nobody was -- I wasn't involved in any repricing of assets or anything like that, so I believe they were based off of initial pricing.

**Q. You say you identified a pool of**

27 (Pages 102 to 105)

Page 106

HIGHLY CONFIDENTIAL - J. HRASKA

**assets that were approximately worth 1.4 billion. Was that -- did Barclays end up getting all those assets?**

A. Let me just --

MR. SHAW: Mischaracterizes prior testimony.

**Q. Go ahead, Mr. Hraska.**

A. I identified the list that I think was probably greater than 1.4 billion. The 1.4 billion was only the securities that truly made the transfer over. So, you know, we identified the list of everything that we thought was unencumbered and available for transfer. What was physically able to be transferred equaled approximately the 1.4 billion.

**Q. And what happened to the rest of the assets that you identified? Were they ever transferred to Barclays?**

A. They were hot.

**Q. Does Barclays thinks it's entitled to those assets?**

MR. SHAW: Objection. Foundation.

A. I honestly don't know.

**Q. Since you've been working at Barclays,**

Page 107

HIGHLY CONFIDENTIAL - J. HRASKA

**have you heard any discussions about whether they should be getting those assets?**

A. I was instructed to continue to search for available collateral that was to be transferred to Barclays as part of the larger transaction between Barclays and Lehman, which I continue to do in my capacity in working with the Treasury folks and things like that, but I don't know specifically whether it was those same assets.

At that point in time, again, things had changed a little bit. You know, we stopped focusing on the repo because that had sort of been taking care of already and it was a matter of looking -- helping to continue to look for unencumbered assets.

**Q. So, just so I understand, you identified a list of unencumbered assets that was, to your mind, worth more than 1.4, but only 1.4 made it to Barclays; is that right?**

A. That's correct, yes.

**Q. Do you know how much more than 1.4 the assets were that you identified?**

MR. SHAW: Objection. Asked and

Page 108

HIGHLY CONFIDENTIAL - J. HRASKA

answered.

A. I -- I know that it was probably in the neighborhood of around 2 billion, but I don't know how much more than that.

**Q. Okay.**

A. We had a lot of discussions about the assets that, you know, and I can't recall whether it was what is -- what ended up being the list was assets that are only in the DTC boxes or, you know, we were looking across international boxes and all that stuff. So there was just so much going and I know it was north 1.4. I want to say it was 2 billion, but I can't be sure.

**Q. Were you involved, since you've been at Barclays, have you been involved in any efforts to prepare an opening balance sheet that would relate to the Lehman/Barclays transaction?**

A. No.

**Q. Did you have any role in connection with their declaration -- or, let me withdraw that. Do you have any knowledge of or understanding of how Barclays was able to declare a $4.2 billion gain on acquisition as a**

Page 109

HIGHLY CONFIDENTIAL - J. HRASKA

**result of this transaction?**

A. No.

**Q. Do you have any current role in the preparation of Barclays' balance sheets?**

A. No, the typically balance sheet and things like that are performed by the Finance folks and Product Control folks, which is completely aware from Operations.

**Q. Do you give them any input during the course of their preparation of the balance sheets?**

A. If they have questions as to the nature of transaction -- are we talking related to the transaction between LBI and --

**Q. Yes.**

A. Okay. I have provided information as to that transaction on the 18th and what assets were transferred over, and I provided some information around 1.4 billion as to what those assets were that made it to Barclays, but as far as determination of balance sheet or if those assets were eligible for balance sheet, I don't have any knowledge of that.

**Q. Okay. When you say -- who did you**

28 (Pages 106 to 109)

Page 110

HIGHLY CONFIDENTIAL - J. HRASKA

**provide that information to? The Treasury Department?**

A. That would have been, yeah, Paolo and his team.

**Q. How did you come to be involved in what we have called Schedule A and Schedule B?**

A. Well, I guess I provided the assets that ultimately became -- I provided lists of assets that ultimately became Schedule A and Schedule B. I was asked to provide schedules of the assets that made it to Bank of New York, which we did, and then as well as, you know -- you know, and over a period of dates, right?

So, to be very simple, I basically provided a spreadsheet with tabs that said on this date we moved these assets, on this date we moved these assets, and those subsequently became categorized as either Schedule A or Schedule B, depending on I guess the timing of the transfer.

**Q. Do you have any knowledge of what has been called a clarification letter in connection with this transaction?**

A. I've had -- I've heard the term, but

Page 111

HIGHLY CONFIDENTIAL - J. HRASKA

honestly I don't know what it means.

**Q. Have you ever read anything called a clarification letter?**

A. No.

**Q. You have to say verbally say no?**

A. I'm sorry. No.

**Q. Did you have any understanding when you were preparing these schedules that that would become Schedules A and B to a clarification letter?**

A. No.

**Q. Did you have any understanding of the purpose of this clarification letter?**

A. No.

**Q. I want to spend a little time going through these schedules. Do you want to take a break before we do that?**

MR. SHAW: Why don't we take a short break before we do that.

THE WITNESS: Thank you.

(Recess; Time Noted: 11:33 A.M.)

(Time Noted: 11:40 A.M.)

BY MR. HINE:

**Q. Mr. Hraska, I now want to talk about**

Page 112

HIGHLY CONFIDENTIAL - J. HRASKA

**Schedules A and B, so this is going to be the 30(b)(6) portion of your deposition because that's the two topics that you have been designated in part to cover.**

**So what I'd like to do is walk through some of the different schedules that I have seen and discuss them in connection with Schedules A and B.**

A. Okay.

(Exhibit 139B, Printout of Schedules, marked for identification, as of this date.)

**Q. Mr. Hraska, I'm handing you a document which I've marked as Exhibit 139B.**

A. Okay.

**Q. Which is a voluminous printout of schedules of some sort. It is marked with the Bates stamps BCI-EX-00009798 through 10368.**

MR. SHAW: I'm not suggesting you read this cover to cover, but take whatever time you need to review.

**Q. I'm not going to ask you questions about detailed entries in here, but I'm going to ask you questions primarily about the first two pages, but take whatever time you need just to**

Page 113

HIGHLY CONFIDENTIAL - J. HRASKA

**familiarize yourself with the document.**

A. Thank you.

(Document review.)

A. Okay.

**Q. Have you had a chance to review it briefly?**

A. I have, yes.

**Q. Have you ever seen this document before?**

A. Yes, I have. I created it.

**Q. And is this a -- or, well, let's start this way. What is this document?**

A. This is an e-mail to John Rodefeld, who was Barclays, as we mentioned, Operations, and Kevin Caffrey, who is the managing director at Bank of New York in charge of like clearing, custody, tri-party, things like that.

And what I was looking to do here was to confirm what Lehman believed that, you know, they transferred as a result of the repo transaction on the 18th. We wanted to reconcile -- we wanted to do a three-way reconciliation. Basically, we wanted Lehman's books to tie out with both Barclays and with

29 (Pages 110 to 113)

HIGHLY CONFIDENTIAL - J. HRASKA

Bank of New York so that we could confirm the secured identifiers, the par amounts, and things like that of the transaction.

And so the spreadsheet itself attached was my department's collaboration of what we believed we transferred on the 18th, and then the last point here is me reaching out to Kevin to talk about, you know, clearance relationships going forward for the broker-dealer, LBI.

**Q. That's point number 4 on the e-mail you're talking about?**

A. That's point number 4 on the e-mail, yes.

**Q. Can you turn to the second page of this document?**

MR. SHAW: That's the one with the Bates number ending in 9799?

MR. HINE: Correct.

**Q. That's a very small chart with columns A and B, do you see that?**

A. Uh-huh.

**Q. Now, I think I understand what this is, but could you explain to me what you understand this chart to be capturing?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. This chart was my group's attempt to summarize the market value on the collateral in these appropriate buckets just to give people an understanding of the composition of the collateral and market value that we associated with that.

So the Fed collateral would be -- the Fed wirable type collateral, as I defined earlier, and then 74 and 636 would have been the positions that came out of the Depository Trust Company.

And then what's referred to as TP cash is the 7 billion pure cash that we talked about as well.

**Q. Okay. The TP cash is the proceeds from the box loan that we talked when earlier?**

A. Yes, that's correct.

**Q. And when you say "Fed wirable," that is the -- that is securities that were successfully transferred from the Fed program to BONY on Thursday; is that right?**

A. No, let me clarify that. Those are the securities that were transferred that were Fed wirable security types because the

HIGHLY CONFIDENTIAL - J. HRASKA

securities that were transferred were this entire list other than TP cash.

**Q. Okay.**

A. Because these other two are included in the Fed program. So this was Fed program securities that were Fed wire eligible. That's what that first line is.

**Q. What does "Fed wire eligible" mean?**

A. Well, Fed wire eligible is a type of security that's transferred on the Federal Reserve's book entry transfer system. So examples are U.S. Treasuries, Fannie Maes, Ginne Maes, collateral types of those classes.

Other types of collateral are typically transferred through DTC, which is represented by the participant IDs here, DTC participant IDs.

**Q. Just to harken back to our prior discussion, this reflects the approximately 42 billion in securities plus the 7 billion in cash that was ultimately transferred under the September 18th repo, correct?**

A. That's correct.

**Q. Now, how were these market values**

**HIGHLY CONFIDENTIAL - J. HRASKA**

**determined?**

A. I don't know how they were determined. They were provided from what Lehman had in their systems at the time.

**Q. So these are Lehman's values?**

A. I know those to be Lehman's values.

**Q. And I think we might have touched on this before, but Bank of New York ascribed its own values to those securities?**

A. They did, yes.

**Q. So am I correct to say that this chart and spreadsheet would not include Bank of New York valuations, but only included the Lehman valuations?**

A. That would be correct, yes.

**Q. Okay. Now, did you get -- your covering e-mail asks I presume Mr. Rodefeld and Mr. Caffrey to verify the positions. Did they in fact try to do that?**

A. Yes, we did that. They sent us back files and we reconciled all the positions.

**Q. Okay. Let me show you another chart. I think it'll relate to the story, but I'm not sure.**

Page 118

HIGHLY CONFIDENTIAL - J. HRASKA

**Mr. Hraska, I hand you an exhibit that's previously been marked as Exhibit 83B, which is an e-mail dated Sunday, September 21st.**

MR. SHAW: Do you have a copy which is not cut off on the side?

MR. HINE: We'll try to locate one.

MR. SHAW: He needs one that's complete rather than ...

(Document handed.)

A. Okay.

**Q. Mr. Hraska, have you had a chance to look at the document?**

A. I have.

**Q. Have you ever seen this document before?**

A. No.

**Q. To your knowledge, are the people listed in the "to" and "from" portions of the e-mail Barclays employees, generally?**

A. Primarily, yes.

**Q. You'll see in the first -- the first bullet point in the text that says, "We should book all positions from the Lehman financing facility to BCI (approximately 45 billion)**

Page 119

HIGHLY CONFIDENTIAL - J. HRASKA

**securities. See attached files." Do you see that?**

A. I do see that, yes.

**Q. When you had this effort to reconcile your position with Barclays and BONY, did you ever hear the figure of approximately 45 billion used as the value for the securities that were in the September 18 repo?**

A. No, not specifically 45 billion.

**Q. Do you have any knowledge of where this figure might have come from?**

A. Unfortunately, no. I don't think I'm CC'd on here. I didn't see myself and I don't recognize it.

**Q. No, you're not CC'd. I'm just wondering, in your discussions between at or about, you know, Saturday, Sunday that weekend, if you heard any use of a number of about 45 billion in connection with the securities that were listed in your prior exhibit?**

MR. SHAW: Objection. Asked and answered.

A. I hadn't heard any discussions related to 45 billion securities. People mistakenly,

Page 120

HIGHLY CONFIDENTIAL - J. HRASKA

like we were talking terms earlier, referred to the $45 billion in cash. So it's possible that somebody was referring to the cash and not securities here, but I'm speculating on that. I don't really know.

**Q. Can you describe for me the reconciliation process that took place with respect to these securities? Was there a debate as to the value assigned to the securities?**

MR. SHAW: Objection to form.

A. There was --

MR. SHAW: And foundation.

A. There was -- from an operations perspective, our primary objective was to make sure that the quantities and the Cusips all matched. You know, as we talked about the market values that we knew were based off of Lehman's systems, there was some discussion about the value of the securities.

I wasn't privy to the actual discussions. I knew there was going to be a value -- a discussion about value of securities because Bank of New York informed me that they didn't agree with some of the pricing that we

Page 121

HIGHLY CONFIDENTIAL - J. HRASKA

had attached to some of these securities.

**Q. And what did they tell you about that?**

A. Very generically, they basically said that we're going to have to review these prices, we don't necessarily agree with these, and at that point it kind of went out of my camp, because, again, I don't really deal with the pricing side of it. I just have to make sure the securities make it, the right quantities make it, there's no stock record breaks and all that kind of stuff.

**Q. Who deals with the pricing part of it?**

A. The pricing part at both Barclays and at Lehman would be handled by the Financial Control folks. So I would say like, you know, in the current organization, I guess Marty Klein and those folks, and at Lehman it would have been Gerry Reilly's organization.

**Q. Okay. Is there any, in this reconciliation effort that you talked about, is there a reconciliation as to price or is it just the identifying Cusips and the particular securities that were transferred?**

A. My reconciliation was purely to

31 (Pages 118 to 121)

Page 122

HIGHLY CONFIDENTIAL - J. HRASKA

securities quantities, that kind of thing. And like I said, I know that the finance teams were going back and forth on the pricing issue, but, unfortunately, I didn't really partake in those discussions.

**Q. Do you know how -- what price they arrived at at the end?**

A. I don't, unfortunately.

**Q. It appears in some documents that the BONY pricing was higher than the prices ascribed to the securities on your -- on the prior exhibit. Do you have any idea why that would be the case?**

MR. SHAW: Objection to form.

A. I don't. It's actually very surprising to me as well, because the initial conversation that I just referenced a few minutes ago was from Bank of New York that we had over-valued a few securities and, therefore, they were concerned about the total market value that we had sent them. So, you know...

**Q. Do you recall any discussions about writing down the value of securities during this period?**

Page 123

**HIGHLY CONFIDENTIAL - J. HRASKA**

MR. SHAW: Objection to form.

A. During -- could I ask a clarification? During which period? During the period at any point in time after the transaction, or during like a period of the week, or what point in time?

**Q. Let's break it down. Let's talk about this -- during this reconciliation period that you mentioned, which I take it is from Friday, the 19th, through the weekend, correct?**

A. Okay.

**Q. So were there any discussions during that period about writing down the value of securities?**

MR. SHAW: Just so we're clear, because this is a 30(b)(6), are there discussions that he participated in?

MR. HINE: That he's aware of.

A. I'm aware there were discussions about the values of the securities. As to writing up or down, I wasn't made privy to that.

**Q. At any time during this week were you privy to any discussions where the possibility of writing down the value of securities was**

Page 124

**HIGHLY CONFIDENTIAL - J. HRASKA**

**discussed?**

A. No.

**Q. So, back to Exhibit 83B, based on your experience, is it fair to assume that this is probably a document generated by Barclays in connection with that reconciliation effort that you were discussing?**

A. I would assume that's the case, yes.

**Q. Okay. But you have no specific knowledge about how this document was prepared or --**

A. I don't, unfortunately, no.

**Q. Mr. Hraska, I'm handing you a copy of a document marked as Exhibit 84B. If you wouldn't mind taking a moment to review it. Just for the record, the document is Bates-stamped BCI-008149 through 8670.**

**(Document review.)**

A. Presentation of these is definitely not user-friendly.

**Q. Forced to print them out for purposes of a deposition.**

A. I understand that.

(Document review.)

Page 125

HIGHLY CONFIDENTIAL - J. HRASKA

A. Okay.

**Q. Have you had a chance to look at the document?**

A. I have.

**Q. Have you ever seen this document before?**

A. No. Well, actually, I have seen this in the preparation to my -- this portion of the deposition.

**Q. Okay.**

A. I actually reviewed some files, and I believe this is one of the ones on that list. I'm not a hundred percent sure, but I think it is.

**Q. Okay. Other than your preparation for this deposition, do you recall seeing this document at all?**

A. No.

**Q. I noticed they misspelled your name on the front. Is that a possible reason why you might have not received this document?**

A. Yeah, because it wouldn't have gone to my e-mail, if that's the case.

**Q. Would it be fair to say you have no**

32 (Pages 122 to 125)

Page 126

HIGHLY CONFIDENTIAL - J. HRASKA

**familiarity with how this document was prepared?**

A. That's true.

**Q. Okay. And the covering e-mail says -- it's an e-mail from Mr. Yang, which says, "I've attached a schedule produced by Barclays' Ops of the collateral currently held at BONY under the repo financing provided to Lehman." It continues to say that -- it says "a total BONY market value of approximately 45 billion." You see that?**

A. I do, yes.

**Q. Is it probably safe to assume that this was prepared in connection with your reconciliation effort between Lehman and Bank of New York and Barclays as to the securities that were involved in the September 18 repo?**

MR. SHAW: Objection. Foundation. Calls for speculation.

A. Yeah, I guess it's fair to assume then.

**Q. Again, do you see the number of 45 billion?**

A. Uh-huh.

**Q. Does this refresh your recollection at**

Page 127

HIGHLY CONFIDENTIAL - J. HRASKA

**all or does this remind you of anything in connection with how Bank of New York valued this pool of securities?**

MR. SHAW: Objection to form.

A. Unfortunately, not. I mean, I -- the only 45 billion that I was aware of was the actual principal value, and I don't remember assets being referred to as 45 billion in any of the conversations that I had.

**Q. Okay. And when you say the principal value, you're talking about the amount of --**

A. Cash extended on the transaction.

**Q. Okay. So is it correct to say that in this reconciliation process that you discussed you don't recall anyone ever mentioning a value of this pool of securities being about $45 billion?**

MR. SHAW: Asked and answered.

A. That's correct.

**Q. So, just to complete the record, you have no way of explaining how this value in this document would differ with the $42.9 billion number in Exhibit -- in the prior exhibit that you looked at; is that right?**

Page 128

HIGHLY CONFIDENTIAL - J. HRASKA

MR. SHAW: Prior exhibit, are you referring to 139B?

**Q. 139B. Let me rephrase the question.**

A. Okay.

**Q. In Exhibit 139B --**

A. Right, that's my document.

**Q. -- which is the document you prepared, has a value of 42.9 billion, approximately?**

A. Right.

**Q. This one seems to ascribe a value of 45 billion.**

A. Okay.

**Q. Do you have any way to -- any explanation for why they would come to different values?**

MR. SHAW: Objection. Calls for speculation.

A. My opinion is that the Lehman pricing was different than the Bank of New York pricing.

**Q. In what way?**

A. Well, in the tune of $3 billion. I mean -- I mean, I'm not trying to be sarcastic. I mean, you know, to the extent that they're valuing a pool of collateral at 45 and we're

Page 129

HIGHLY CONFIDENTIAL - J. HRASKA

valuing it at 42, the average price on a basket basis would mean that they valued the basket higher. I'm sure there were multiple assets where there were pricing differentials, but as an aggregate, it appears that they gave higher values to most securities.

**Q. Let me ask you this. In this reconciliation -- well, scratch that. The difference could arise, could it not, either from how you value individual securities or whether you have the same pool of securities that you're looking at, correct?**

A. That's correct. I thought the -- yes, okay.

**Q. Well, my question is, in this reconciliation process, did it end up that there was a vast difference in the pool of securities that were being considered?**

A. That's a different question.

**Q. Between the Barclays folks and your list?**

A. From a security delivery perspective, we tied out completely to the number of securities and the security identifiers that we

33 (Pages 126 to 129)

Page 130

HIGHLY CONFIDENTIAL - J. HRASKA

delivered versus what Bank of New York and Barclays knew.

**Q. When you say "tied out"?**

A. "Tied out," meaning we reconciled that there were no discrepancies.

**Q. So the difference in any values would have to be in the method of pricing, then, correct?**

A. Yes, the one thing, we tied out -- the tieout process took a few days, so I don't know whether on September 22 we were completely tied out, but the initial tieout itself, though, there were minimal, minimal discrepancies. I would say, you know, probably less than a hundred.

**Q. So would you agree with me, then, that if there is a difference in pricing, it would probably be the result of how you price individual securities instead of --**

A. And not so much --

**Q. -- the composition of the pool?**

MR. SHAW: Objection to form. You need to let him finish his question and then let me object so we have a clean record.

Page 131

HIGHLY CONFIDENTIAL - J. HRASKA

A. So then could you repeat the question?

(Record read.)

MR. SHAW: Objection to form.

A. Yes.

**Q. Okay.**

**(Exhibit 140B, a document bearing Bates Nos. BCI-CG00052538 through 53173, marked for identification, as of this date.)**

**Q. Mr. Hraska, I'm handing you a document that's been marked as Exhibit 140B.**

A. Okay.

**Q. Again, another voluminous schedule with Bates Nos. BCI-CG-00052538 through 53173. And again, it's a voluminous schedule, but take your time to review it.**

A. Uh-huh.

**Q. I was really going to ask you about the, primarily, the first and last page.**

A. Okay.

(Document review.)

A. Okay.

**Q. Mr. Hraska, have you had a chance to look at it briefly?**

A. I have, yes.

Page 132

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. You'll see the -- first of all, have you ever seen this document before?**

A. In preparation for the deposition, yes, but other than that, no.

**Q. Okay. You'll see on the cover page that this is dated Friday, September 26?**

A. Uh-huh.

**Q. And at the bottom of the covering e-mail it mentions Schedule A, you see that?**

A. Okay.

**Q. It says here, "Our guys are still running the reconciliation to confirm that there are no errors in the Barclays list." Do you see that?**

A. Uh-huh.

**Q. And then if you turn to the last tab in the document, it's a lengthy schedule which concludes with a number, a figure on the last page --**

A. The last page?

**Q. -- of 44, of approximately $44.1 billion, do you see that?**

A. I do, yes.

**Q. And so my question is, do you have any**

Page 133

HIGHLY CONFIDENTIAL - J. HRASKA

**understanding of why the value of this schedule of the securities embodied in the schedule is now at this point in time at $44.1 billion as opposed to the 42.9 that we saw earlier?**

A. No is the short answer. We talked earlier about pricing differentials. So, to me, I don't know whether this is a Lehman-produced or Barclays produced it. It doesn't appear to me to be a Lehman-produced, so ...

**Q. When you say it doesn't appear to be a Lehman-produced document, are you referring to the last tab, which is purportedly Schedule A?**

A. Well, this is an e-mail I wasn't included on.

**Q. Right.**

A. So it doesn't look like the format of any of the files that I produced, so that's why I'm assuming -- well, me being Lehman at the time, Lehman-produced.

**Q. Okay. Do you recall the figure $44.1 billion ever being used in connection with the value of the securities on Schedule A?**

A. No.

**Q. And I think you said earlier, but I**

34 (Pages 130 to 133)

Page 134

HIGHLY CONFIDENTIAL - J. HRASKA

**just want to get a clarification, that other folks, if there was a reconciliation as to value, it was being done by other people other than yourself?**

A. The two finance organizations.

**Q. And I think you gave me names, but I forgot them. Is that Mr. Reilly?**

A. Mr. Reilly's organization, right, and then I know it's Marty Klein now. I'm not sure who was head -- if it was Marty. I think Marty Klein was legacy Lehman, so I'm not sure who was in the finance organization at the time. I think you had Jason Yang or some of those guys. Yeah, Jason Yang was involved.

**Q. So am I correct in assuming that you really don't have any knowledge as to the -- how this $44.1 billion figure was arrived at?**

A. That's correct.

**Q. Okay.**

**(Exhibit 141B, a document bearing Bates Nos. BCI-CG00055192 through 55629, marked for identification, as of this date.)**

**Q. Mr. Hraska, I'm handing you a copy of a document marked as Exhibit 142B.**

Page 135

HIGHLY CONFIDENTIAL - J. HRASKA

A. Mine is marked 141. Do I have the wrong one?

**Q. 141B, I apologize. It's Bates-stamped BCI-CG-0055192 through 55629. Please take a minute to review it. If it helps in your review, my questions are going to involve the cover page and the page marked 55519, which is a little more than halfway through the document.**

**(Document review.)**

A. Could you please repeat the middle page you said you wanted me to read?

**Q. The page ending in 55519.**

MR. SHAW: You mean 55319?

MR. HINE: No, 55519.

A. Okay.

**Q. So CG55519.**

A. Okay.

**Q. Have you had a chance to look at the document briefly?**

A. I have, yes.

**Q. Have you ever seen this document before?**

A. Again, not before the preparation for this deposition.

Page 136

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Okay. Does this look like a schedule that was prepared by Lehman or Barclays?**

A. It does not look like it's a schedule that I prepared, so ...

**Q. Okay. You'll see on the cover page it mentions the fact that this includes two attachments, one of which is Schedule A and one a Schedule B, do you see that?**

A. I do.

MR. SHAW: Objection. Mischaracterizes the document.

**Q. Okay.**

MR. SHAW: Schedule B, Part 1.

MR. HINE: Okay.

**Q. Mr. Hraska, what is Schedule B, Part 1?**

A. I honestly don't know.

**Q. Have you ever seen Schedule B broken into Parts 1 or 2?**

A. No.

**Q. If you could turn to the page we had been discussing, which is the one ending in Bates stamp 55519, you'll see this comes to a $42.9 billion figure, correct?**

Page 137

HIGHLY CONFIDENTIAL - J. HRASKA

A. That's correct.

**Q. Now, my question is along the lines of the prior questions: Do you have any explanation of how, after a few weeks of discussion, the figure appears to have gotten back to $42.9 billion after there were previous iterations where the numbers of 45 and 44 billion bandied about?**

A. Well, what I can tell you is that 42.9 is the number that I recognize, which is I believe we confirmed in the previous documents. So this number to me is familiar, and I would agree that that was what I knew the value to be.

I don't know how it got back to that. I don't know -- this is just -- because it's a large document. It could be that somewhere else it's referenced still 44. I haven't gone through every page. But I can tell you that this number is the number that I recognized and I maintain to recognize as the value of what we transferred.

**Q. So in your -- again, I'm not trying to trick you.**

A. No. No.

35 (Pages 134 to 137)

Page 138

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. I know you're not -- you didn't recognize some of the other numbers we just talked about. So, in your mind, approximately 42.9 billion is the value of the securities on Schedule A, correct?**

MR. SHAW: Objection. Mischaracterizes. You can --

A. It was the value that I knew at the time of transfer, and whether or not that value changed or was subsequently discussed, I don't know, but it was the value that I knew at the time of transfer.

**Q. Okay. And you weren't involved in any discussions about other values with respect to tbat schedule, correct?**

A. No.

**Q. And do you think tbat's the value in your mind of the final version of Schedule A?**

MR. SHAW: Objection to form.

A. Again, I don't know if it was the final version. I know it was the value when I transferred it.

**Q. Maybe that was a bad question. Did Schedule A change in composition, to your**

Page 139

HIGHLY CONFIDENTIAL - J. HRASKA

**knowledge, from the original chart that we looked at?**

A. In composition of securities? The number of securities and things like that? The schedule did not change. The pricing may have changed.

**Q. Okay. But you don't have any knowledge of whether the pricing changed?**

A. Other than the knowledge of looking at these documents here, there's obviously a discrepancy, but no upfront knowledge that it changed.

**Q. And you don't have any knowledge of the value of any securities on Schedule A being written down in connection with this reconciliation process?**

A. No. You asked that earlier, right? No.

**Q. Do you recall what the par value was for the security listed on Schedule A?**

A. I don't, no.

**Q. Okay. That's all I have with that document.**

**Mr. Hraska, you were involved in**

Page 140

HIGHLY CONFIDENTIAL - J. HRASKA

**preparing Schedule B, correct?**

A. I was involved in giving a list of unencumbered collateral, which I understand some of which became Schedule B.

**Q. But you're not familiar with the terms Part 1 and Part 2 of Schedule B; is that right?**

A. No.

**Q. Are you familiar with any kind of discussions about the valuation of the securities that are on Schedule B?**

A. Well, there was the valuation that I knew to have transferred, which is 1.4 billion. I don't know what the ultimate valuation of that or the -- I don't know what the final version of that list was or the market value associated with that, so ...

**Q. Do you recall any discussions about any discrepancies in the valuation of the securities that comprised Schedule B?**

A. I remember there being discussions in valuation of those securities, discrepancies in general. I don't know whether they were specifically Schedule B or if they were just purely related to the repo we were discussing

Page 141

HIGHLY CONFIDENTIAL - J. HRASKA

earlier, so ...

**Q. Well, I guess I'm just trying to -- was there a reconciliation process that went on with respect to the securities in Schedule B?**

A. There was a -- there was a reconciliation process from the standpoint of we were asked what securities were delivered, which we provided to the Finance folks, and the Finance folks did a spreadsheet compared to what they knew to be Schedule B and at one point told us something along the lines of -- I don't remember whether it was 800 Cusips or 800 million in value, but there was a number of 800, which whatever was the discrepancy on that. I believe it was Cusips.

**Q. 800 Cusips?**

A. 800 Cusips or security identifiers which weren't delivered.

**Q. And was that reconciled in some way?**

MR. SHAW: Objection to form.

A. The Cusips in question were looked at by the Clearance folks and my teams as to whether they were delivered or whether they could be delivered, and we verified that in fact

36 (Pages 138 to 141)

Page 142

HIGHLY CONFIDENTIAL - J. HRASKA

they were not delivered.

**Q. And was there any effort to then deliver them later?**

A. There was an effort to see if they were available for delivery, and in most instances, they were actually not available for delivery.

**Q. So was any further action taken on that?**

A. For that -- for the particular securities on that list, no.

**Q. Were substitute securities delivered instead?**

A. Substitute securities were not delivered.

Let me just think about that. Yeah, no, there was no substitute securities delivered after that, no.

**Q. Was that possibility considered?**

MR. SHAW: Objection to form, foundation.

A. That possibility was considered. There was conversations that I had with the Treasury folks, who were prior legacy Lehman,

Page 143

HIGHLY CONFIDENTIAL - J. HRASKA

but now, as a result of the timing, were now employed by Barclays, so Robert Azerad and those folks, as to whether or not there were other securities which were unencumbered that could be substituted for the securities that could not be delivered on the original Schedule B.

**Q. And what was the result of that discussion?**

A. The result of that discussion was is that we went through yet again another identification process to try to locate unencumbered securities that were available or that could be made available to transfer. At that point in time, by then, we no longer had capability to just go ahead and make a transfer. It would have been subject to approval by Deloitte and a few other folks before anything could be done.

**Q. So where does that effort now stand?**

A. The effort basically concluded with a subsequent set of lists that, you know, we feel are securities that are eligible to be transferred to Barclays.

**Q. And why have they not been**

Page 144

HIGHLY CONFIDENTIAL - J. HRASKA

**transferred?**

MR. SHAW: Objection to form and foundation.

A. The clearance boxes in which they reside are presently under administration. So, as Barclays employees, we wouldn't have the ability to go and make those transfers without the administration's approval.

**Q. So does Barclays thinks it's entitled to these securities?**

A. I'm not a hundred percent sure what Barclays thinks. I was asked to go find something that was unencumbered in the Lehman boxes, which I did. I would speculate that Barclays would think they're entitled if they asked me to do that exercise.

**Q. Who would know at Barclays whether they think they're entitled to those securities?**

MR. SHAW: Objection to form, foundation.

A. I would start with the Treasury team and possibly the Legal team.

**Q. And who is the Treasury team to which you are referring?**

Page 145

HIGHLY CONFIDENTIAL - J. HRASKA

A. Robert Azerad would be the point person that I would use, or Alan Kaplan in Legal.

**Q. Can you tell me an approximate value for those securities that are -- that you identified that were not able to be transferred?**

A. I would say 6 to 7 hundred million.

**Q. And that's based on Lehman valuations?**

A. Based on Lehman valuations at a particular point in time, which was November 17 of 2008.

**Q. Just so I have a little clarity, this effort to identify these additional securities took place after you transferred over to Barclays?**

A. That's correct.

**Q. Did it start during the weekend of September 20th at all?**

A. This particular exercise, no. It started I would say early October.

**Q. Okay. We had -- in discussing Schedule A, I think you said there was a reconciliation effort, but to the extent there was an effort to reconcile the values, that's**

37 (Pages 142 to 145)

HIGHLY CONFIDENTIAL - J. HRASKA

**really not something that fell under your purview; is that right?**

A. That's correct.

**Q. Now, is that the same case for reconciliation efforts related to Schedule B?**

A. With regards to the valuation?

**Q. Yes.**

A. Yes.

**Q. So who would I ask about that if I wanted to learn about efforts to reconcile values related to Schedule B?**

A. Robert Azerad would be your best source.

**Q. Am I correct to say that you were, to the extent you were involved in reconciling anything with respect to Schedule B, it would be related to locating securities and Cusips numbers and identifying what would comprise the pool of Schedule B; is that right?**

A. Yes, we reconciled what was given to -- well, we were given an exception list of what was, you know, what we believe was delivered versus what was on the original Schedule B, and we were asked to verify that

HIGHLY CONFIDENTIAL - J. HRASKA

those securities were in fact delivered.

**Q. And were they?**

A. They were not. Well, securities that were delivered were delivered, but the securities that were given as an exception were not delivered.

**Q. And that's the 800 Cusips you mentioned?**

A. That's approximately 800, somewhere in that number.

MR. SHAW: Does it make sense to take a lunch break sometime soon?

MR. HINE: Let me just finish up on this.

**Q. Other than those 800 Cusips that you mentioned, were there any other discrepancies that you came across in your efforts to reconcile the transfer of securities under Schedule B?**

A. Under Schedule B, no.

**Q. So am I correct to say -- I think previously you used the phrase "tie-in." Did your -- Lehman's records of the transfers for Schedule B securities tie in with the Barclays**

HIGHLY CONFIDENTIAL - J. HRASKA

**records other than this 800 Cusips that you mentioned?**

A. Yes.

MR. HINE: Why don't we break for lunch.

THE WITNESS: Okay. That would be great. Thanks.

(Recess; Time noted: 12:34 P.M.)

HIGHLY CONFIDENTIAL - J. HRASKA

AFTERNOON SESSION

(Time Noted: 1:19 P.M.)

JAMES HRASKA, resumed and testified further as follows:

EXAMINATION BY (Cont'd.)

MR. HINE:

**Q. Good afternoon, Mr. Hraska.**

A. Good afternoon.

**Q. I just had a couple of follow-up questions with some of the schedules we talked about. Just look briefly at 84B. That's the one where your name is misspelled on the front page. You see that?**

A. Okay. That's correct.

**Q. I think I see some e-mails that suggest you did eventually get this document; is that right?**

A. I may have. I, honestly, I don't know.

**Q. You don't recall?**

A. No.

**Q. Okay. That's fine. That's all I had on this one. I just wanted to clarify that one issue.**

Exhibits 67 - 69 Pg 79 of 167

Page 150

HIGHLY CONFIDENTIAL - J. HRASKA

**If we look at Exhibit 141B, Mr. Tonucci's name at the top. You see that?**

A. Yes.

**Q. I think you testified that you didn't recognize the format of some of the schedules we were talking about, but I just wanted to ask you a question. If you look at the front of the e-mail on the first page, it has attachments with titles, look likes there's titles of attachments. You see that?**

A. It says -- are you referring to Friday transfers, BONY records agreed?

**Q. Yes.**

A. Okay.

**Q. Are those titles, do those look like titles that would be prepared by Lehman?**

A. They weren't titles that would have been prepared by me. I don't know if they were prepared by anybody else at Lehman.

**Q. Well, do you know if Mr. Tonucci's crew or anyone else at Lehman was preparing schedules in this reconciliation effort that we discussed earlier?**

MR. SHAW: Objection to form.

Page 151

HIGHLY CONFIDENTIAL - J. HRASKA

A. No. No, I don't know.

**Q. You don't know one way or the other?**

A. Yeah.

**Q. Okay. So do those titles -- for example, it says, "Corrected Thursday transfers to Barclays. BONY agreed." Is that a file that you're familiar with?**

A. It's not, no.

**Q. How about the first title, "Friday Transfers. BONY records agreed," do you have any recollection being familiar with that title?**

A. No.

**Q. Okay. If you look at Exhibit 140B, same question: If you look in the attachments it has some titles to various attachments, and my question is are you familiar with any of those attachments or the titles to those attachments?**

A. I recognize terms in the title, but I don't recall if those were particular titles specifically that I was familiar with.

**Q. Did you prepare any other schedules other than the one that we first looked at?**

MR. SPENCER: 139B.

Page 152

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Other than the schedules that's in 139B, did you prepare any other schedules with respect to this reconciliation effort that we talked about?**

A. Schedules, no. I mean, we worked on the differences, but there were no other like schedules. This is what we knew to have taken place or transferred on the night of the 18th.

**Q. Did you prepare any schedules relating to what we've been calling the Schedule B assets?**

MR. SHAW: Objection. Asked and answered.

A. Yeah, I -- I provided information to Schedule B. I didn't prepare Schedule B.

**Q. Okay. So, referring back to the cover page of 140B, Exhibit 140B, do you know one way or the other whether the schedules that are referenced by title on that page were prepared by Lehman or Barclays?**

A. Definitively, no.

**Q. Generally?**

A. Generally, these participant IDs are Lehman participant IDs. So it would make sense

Page 153

HIGHLY CONFIDENTIAL - J. HRASKA

someone from Lehman had prepared them.

**Q. Okay.**

A. But I don't know who.

**Q. Okay. Not you, I take it?**

A. It was not me.

**Q. Do you think that people in Mr. Tonucci's shop would have been preparing some kind of schedules in connection with this reconciliation effort?**

MR. SHAW: Objection. Calls for speculation.

A. It would seem reasonable, but I don't know --

**Q. Okay.**

A. -- specifically.

**Q. Back to the schedule that you did in fact produce.**

A. 139, something?

**Q. 139B. The values that are contained in that schedule, can you describe for me where you got them from within the Lehman system?**

A. They were taken from a system called GFS.

**Q. And how do you find them within the**

39 (Pages 150 to 153)

**HIGHLY CONFIDENTIAL - J. HRASKA**

**GFS system?**

A. They were extracted out of GFS. They were existing prices that were -- that were I guess downloaded into a spreadsheet.

**Q. And where were they downloaded from?**

A. From GFS.

**Q. Okay. But where does GFS get them, do you know? I mean, I'm trying to find out what's the origin of those prices. I understand you downloaded them from the GFS system.**

A. Right.

**Q. Where does the GFS system get those prices?**

A. I can tell you generically it gets pricing -- it gets its pricing from various vendor sources and there's a hierarchy of vendor selection.

**Q. Uh-huh.**

A. And to the extent there's no price, typically the Product Control organization would talk to traders to get traders' marks.

**Q. Okay. So where there's no market information, the traders themselves can do -- do they use a model of some sort?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. How they would determine the marks I don't know, unfortunately.

**Q. Okay. Any other sources of data that would go into that pricing?**

A. From my prospective, no.

**Q. When you actually prepared that spreadsheet, how did you instruct the GFS system to give you those prices?**

A. Well, I -- actually, the spreadsheet itself was created by somebody who works for me, which is Nancy Denig.

**Q. Okay.**

A. And I know the methodology in how she got the prices, but if you're asking me specifically how did I mechanically pull the prices, I don't know, because unfortunately --

**Q. She would know?**

A. Yeah.

**Q. I guess I'm trying to understand, if I wanted to recreate those prices, how would I go about doing it if I had access to the GFS system, do you know?**

A. You would look to the data from that specific date and you would want to download the

HIGHLY CONFIDENTIAL - J. HRASKA

pricing from that date, if it was available.

**Q. But Nancy Denig is the one who actually did that downloading to prepare this spreadsheet?**

A. She obtained the prices. I don't know whether it was her that downloaded it or a technologist that provided it or -- but she obtained the pricing for it.

**Q. Did any of those values come from any source other than the GFS system, do you know?**

A. That I wouldn't know. I mean, what I know is that we got it from GFS. Other than the methodology of how GFS got them other than what I have described, I mean, I don't really know.

**Q. Okay. Very good.**

**Mr. Hraska, you were talking about the 800 Cusips that you identified but never made it to Barclays?**

A. Uh-huh.

**Q. Remember that testimony?**

A. Uh-huh.

MR. SHAW: You need to say yes or no.

A. I'm sorry. Yes.

**Q. Where were those Cusips residing**

**HIGHLY CONFIDENTIAL - J. HRASKA**

**before you identified them?**

A. Could you be more specific?

**Q. Well, when did you identify the 800 Cusips?**

MR. SHAW: Objection to form.

A. The 800 Cusips were not actually identified by me. They were identified by the Finance organization as Cusips which were on Schedule B but were not on the list of securities that we had transferred over to Barclays.

**Q. So where are those Cusips now?**

A. From a location perspective or a --

**Q. Well, where are those securities now?**

A. The securities themselves? They would be still in Lehman clearance boxes.

**Q. Okay. Do you know which boxes or --**

A. Well, various boxes.

**Q. Okay. You don't know specific -- well, let me ask you this way: Is there a list somewhere of these 800 Cusips?**

A. Well, the list of the 800 Cusips is the list. I'm sorry, I'm not --

**Q. Is there a file in Barclays that has a**

Exhibits 67 - 69 Pg 81 of 167

Page 158

HIGHLY CONFIDENTIAL - J. HRASKA

**list of these 800 Cusips?**

A. Yeah, that would have been the file that the Finance organization had sent to me that they asked me to look at these 800.

**Q. So if I find an e-mail -- I would find an e-mail, presumably, with an attachment of 800 Cusips addressed to you?**

A. Yeah, that's reasonable. If not to me, it would have been to somebody either in my organization or to my manager, who subsequently forwarded it to me.

**Q. And how do I find out what boxes those 800 Cusips are in now?**

A. I honestly don't know.

**Q. Were you involved at all since your time at Barclays in any efforts to sell any of the securities that came over to Barclays as part of Schedules A or B?**

A. No.

**Q. Do you have any knowledge about any efforts to sell those securities?**

A. No.

**Q. Do you have any understanding about whether they were sold or not?**

Page 159

HIGHLY CONFIDENTIAL - J. HRASKA

A. No.

**Q. Do you have any understanding about whether they were sold at prices differing from the ones that are on your sheet?**

A. No.

**Q. Who would I ask those types of questions to? Who would know that at Barclays?**

MR. SHAW: Objection. Foundation. Answer if you know.

A. Trading desk at Barclays.

**Q. Who's in charge of the trading desk at Barclays?**

A. Fixed Income would be Harry Harrison.

**Q. Okay. Is it fair to say that you have no involvement in the sale of those securities since you've been at Barclays?**

A. That's true.

**Q. Do you have any involvement in -- and I think I might have asked this previously, but I just want to close this loop -- do you have any involvement in how Barclays accounts for the assets that came over on Schedules A and B?**

A. The accounting treatment of the assets?

Page 160

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Yes.**

A. No.

**Q. Do you have any involvement in how Barclays translated the values of those securities to its balance sheet?**

A. No.

**Q. Okay. I think we'll conclude the 30(b)(6) portion of the deposition, but I still have a few more questions to ask you, unfortunately.**

A. That's okay.

**Q. Mr. Hraska, I'm handing you a copy of an exhibit that's previously been marked as number 25. It's what we have been referring to as the clarification letter. And I know you testified earlier that you had no real familiarity with this, but I wanted to see if you'd just take a minute to review it so I can confirm that.**

A. Okay.

(Document review.)

A. I can confirm this is not familiar to me. I haven't seen this document.

**Q. Let me just ask it for the record.**

Page 161

HIGHLY CONFIDENTIAL - J. HRASKA

**Have you ever seen this document before?**

A. No.

**Q. If I recall correctly, is it correct to say you have no understanding of why this clarification letter was prepared in connection with the Barclays/Lehman transaction?**

A. That's correct.

**Q. If you look on page -- the paragraph that ends at the bottom of page 1 and continues on to page 2?**

A. Okay.

**Q. You'll see references to Schedule A and a Schedule B. You see where I'm referring to?**

A. The A and B in parentheses -- oh, no, further down. "As specified in Schedule A," okay.

**Q. I know we've been talking about those schedules, but did you have any understanding when you were working on those schedules that they would somehow comprise purchased assets under the agreement between Barclays and Lehman?**

A. No.

**Q. Okay. If we turn to the next --**

41 (Pages 158 to 161)

continuation of that paragraph in item C, you'll see references to exchange-traded derivatives and collateralized short-term agreements, do you see that?

A. Yeah.

Q. Did you do any work over the week of September 15th on through the weekend in connection with exchange-traded derivatives and collateralized short-term agreements?

A. No.

Q. Do you recall any efforts to identify assets of this type that were to make its way to Barclays?

A. I know there were conversations being had about it, but I wasn't involved with any of them.

Q. That was not something that was assigned to you to work on; is that right?

A. That's correct.

Q. What do you recall about the conversations?

A. I recall that I was supposed to attend the conference that got delayed because there was a conference going on about exchanged-traded

derivatives. That's the only thing I really recall about that.

Q. Okay. Did you do any work during that week, or even since you've gone to Barclays, with respect to OCC, the OCC or any assets at OCC that are supposed to go to Barclays?

A. No.

Q. If you continue on this document to page 3, item D, you'll see a reference to a First Amendment. Do you see that?

A. Yes.

Q. Do you have any understanding of what -- of anything about the First Amendment to the Asset Purchase Agreement between Barclays and Lehman?

A. No.

Q. Did you know there was such a First Amendment?

A. I didn't.

Q. If you read further into that paragraph, you'll see the mention of a purchaser paying $250 million in cash to the DTC, you see that?

A. Yeah. Yes.

Q. You see that? Do you recall any discussions during the week of September 15 or thereafter about Barclays paying $250 million to the DTC?

A. No.

Q. About paying any amount of cash to the DTC?

A. No.

Q. About Lehman paying any amount of cash to the DTC?

A. No.

Q. Do you recall any discussion of a $250 million figure in connection with a dispute involving the DTC?

A. No.

Q. Did you ever have any understanding about a dispute concerning the DTC during that week?

A. No. No.

Q. If you continue on to page 4 of this agreement, if you look at paragraph 9, it mentions the deletion of a purchase price adjustment provision. Do you see that?

A. I do.

Q. Do you have any understanding of what that's referring to?

A. No.

Q. Do you recall any discussions during that week about deleting a purchase price adjustment clause?

A. No.

Q. As it related to the Barclays/Lehman transaction?

A. No.

Q. Continue on to the next page. You see item 13 days Barclays Repurchase Agreement?

A. Okay.

Q. And it refers to a repo agreement on September 18, do you see that?

A. I do.

Q. Is this the first time you've seen this paragraph?

A. It is.

Q. Do you recall any discussions about terminating that September 18th repo?

A. None that I was a part of. Not terminating it, no.

Q. How about defaulting under it?

Page 166

HIGHLY CONFIDENTIAL - J. HRASKA

MR. SHAW: Objection. Asked and answered.

A. Yeah, we -- we discussed that it would -- that we were curious as to whether it would be declared in default in the early part of the week of September 22.

**Q. Okay. Prior to that, any discussions about whether Lehman would be a default under that agreement?**

A. No.

**Q. You ever hear any discussions about whether -- what would happen if Lehman were to be in default under that agreement?**

A. No.

**Q. Under the normal circumstance, what happens when a party that has provided collateral in a repo defaults?**

MR. SHAW: Can you read that one back?

(Record read.)

A. Normally, the receiver of the collateral retains the collateral in lieu of the repayment of their cash that they had previously extended.

**Q. Does he get to retain all of the**

Page 167

HIGHLY CONFIDENTIAL - J. HRASKA

**collateral?**

A. Yes. To the best of my knowledge, yes.

**Q. So would that include the haircut portion of the collateral?**

A. The entire basket of collateral which was placed, so, yes.

**Q. And that's, based on your experience, that's the normal course of business if the provider of the collateral defaults?**

A. If the provider of the collateral defaults, yes.

**Q. And does that change in bankruptcy in any way, do you know?**

A. I wouldn't know.

MR. SHAW: Objection. Calls for legal conclusion.

**Q. Do you recall any discussions during this week of the 15th and on through the following weekend about that issue?**

A. No. As I said earlier, the first time we started discussing that was in the week of the 22nd.

**Q. Did you ever have any understanding**

Page 168

HIGHLY CONFIDENTIAL - J. HRASKA

**during that week about whether Barclays would be entitled to keep the collateral if Lehman were in default on the September 18 repo?**

MR. SHAW: Objection to form. Which week are we talking about, the 15th or 22nd?

MR. HINE: 15th.

A. The week of the 15th?

**Q. Yes.**

A. No.

**Q. Did you have any discussions the following week about that issue?**

A. Yes.

**Q. And what do you recall about those discussions?**

A. Well, there was primarily two discussions. The first discussion is the one I referenced as to whether there would be declared a fall. The second was when the Clearance Team had let us know that Bank of New York had seized the assets that were pledged under the repo. So, at that point, the only time that they can actually take that action is if there's an event of default declared.

So, once an event of default is

Page 169

HIGHLY CONFIDENTIAL - J. HRASKA

declared, the clearance bank can actually seize the assets which were pledged under the terms of a normal repo.

**Q. I just want to understand the context of these discussions. You had two discussions and this is the week of September 22, correct?**

A. That's correct.

**Q. And the first discussion, just remind me again, was about --**

A. Was about whether or not the repo was going to be declared in default.

**Q. And is that on Monday, the 22nd?**

A. I don't recall the date. I believe it's Monday.

**Q. And is that in connection with the closing of the sale transaction between Lehman and Barclays?**

A. No. At that point, I really wasn't privy to the -- to that transaction. I was, again, my responsibilities are around the repo, so I was focused on the repo itself.

**Q. Who did you have these discussions with?**

MR. SHAW: Asked and answered.

43 (Pages 166 to 169)

Page 170

HIGHLY CONFIDENTIAL - J. HRASKA

A. My manager, Monty Forrest.

**Q. Anyone else?**

A. We had a conversation, as I mentioned earlier, with someone from the Margin Team, but I just can't recall who that person was, and Alastair Blackwell.

**Q. Did this discussion involve how Barclays was going to get the collateral that had been posted to the repo?**

A. No, this -- the first discussion was just whether or not an event of default would occur. Lehman didn't need to discuss how Barclays was going to get the collateral because all the collateral except for the 7 billion in cash was in Bank of New York's control.

So, once it legally became a default or the property of Barclays, that was between Barclays and Bank of New York to work out how Barclays took possession.

**Q. And the event of default would be as a result of LBI's declaring bankruptcy?**

MR. SHAW: Objection. Calls for speculation. Foundation. Legal conclusion.

A. I don't know.

Page 171

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Well, in connection with your discussions, what event of default were you folks talking about?**

A. Yeah, we were -- based on the fact that LBI had declared, that was what we were speculating on, whether or not it would be -- it would call the repo transaction to be in default or not.

**Q. Okay. And did they ever do that?**

A. Well, based --

MR. SHAW: Objection. Foundation.

A. I mean, based on the fact that Bank of New York seized the collateral and they moved out of our clearance locations, I concluded that they did, but I didn't see an official document declaring they did.

**Q. I understand. What else do you recall about that conversation you had on that Monday?**

A. The only other thing was is that we weren't to take any further action until we were advised to do so.

**Q. Further action in respect of what?**

A. In anything at that point. We -- typically, there's maintenance events with repo

Page 172

HIGHLY CONFIDENTIAL - J. HRASKA

transactions, and we talked earlier about substitutions and things like that. Sometimes, you know, there's -- well, maintenance events, in general, would happen to the repo. So at that point we were told to not take any further action on that trade until we knew the status of that trade.

**Q. And were you ultimately told that BONY had seized that collateral?**

A. Yes.

**Q. And so does that conclude the repo? Is the repo terminated as a result of that?**

MR. SHAW: Objection. Calls for legal conclusion.

You can answer if you know.

A. In my opinion, I concluded that as a result of the assets being taken by BONY.

**Q. And so you did no other -- is it correct to say that you did no further work as to with respect to that repo after that?**

A. With regards to the pledge to Barclays or the transfer of assets, that's correct.

**Q. Okay.**

A. The only other thing that we did is my

Page 173

HIGHLY CONFIDENTIAL - J. HRASKA

group helped facilitate the reclassification on the books, because once the repo had terminated, the inventory had to be adjusted to reflect the fact that the repo was no longer on and, instead, the collateral was seized by Barclays.

So there was a series of bookkeeping entries that took place to reflect that the repo was now over and that the assets had been seized subsequently by Barclays.

**Q. Are you talking about LBI's books?**

A. LBI's books, yes.

**Q. And so your team helped LBI close its books with respect to that repo?**

A. Yes, that's correct.

**Q. Okay. And so just continue about your conversations. You had a second conversation I think you related, and please remind me what that was about. You were talking about conversations you had concerning --**

A. So the first conversation was about whether we -- this would be declared defaulted or not, and the second conversation was with the Clearance Team, who had advised me that assets were being currently seized from the Lehman

44 (Pages 170 to 173)

Page 174

HIGHLY CONFIDENTIAL - J. HRASKA

clearance boxes, which led them to believe, and myself as well, that the repo was now considered in default.

**Q. And when was this conversation?**

A. I honestly don't recall a specific date. It was during that week. I don't know which of the days.

**Q. Okay. And who was that conversation with?**

A. It was with the Clearance Department. I don't remember specifically which person. I mean, I was on the phone with all of them multiple times throughout all these days.

**Q. The Clearance Department is LBI's Clearance Department or Barclays Clearance Department?**

A. LBI's Clearance Department.

**Q. So this is in a period of time where you said you weren't sure whether you were a Barclays employee yet? You were still assisting LBI in some of its efforts; is that right?**

A. Yes, that's true.

**Q. Okay. Anything else you recall about that conversation?**

Page 175

HIGHLY CONFIDENTIAL - J. HRASKA

A. No.

**Q. Okay. Other than the work you've just described, did you do any more work on the September 18 repo after those two conversations?**

A. No.

**Q. Do you recall any discussions or do you have any understanding about the issuance of a Notice of Termination as to the September 18 repo?**

A. No.

**Q. Let me direct your attention back to paragraph 13. You'll see a --**

A. What page?

**Q. Page 5.**

A. Okay.

**Q. You'll see on page 5, three little I, under paragraph 13 talks about the Repurchase Agreement terminating, and then if you continue to read, it says the Notice of Termination relating to that Repurchase Agreement is hereby rescinded, do you see that?**

A. Yes, I see that.

**Q. Do you have any knowledge or understanding about a Notice of Termination that**

Page 176

HIGHLY CONFIDENTIAL - J. HRASKA

**was issued in connection with that Repurchase Agreement?**

A. I don't, no.

**Q. Did you ever hear any rumors to that effect or have any understanding as to a Notice of Termination with respect to that agreement?**

A. I made a conclusion that one would have been issued; otherwise, Bank of New York wouldn't have been able or shouldn't have taken the action they did. But as to when it was done and how it was done, I didn't have any knowledge of that.

**Q. Okay. Would you normally get like a report or something sent to you if a notice of termination had been sent?**

A. Myself normally, no. Typically, that would go through the legal teams.

**Q. Okay. Mr. Hraska, I'm handing you a copy of a document marked as Exhibit 27, which is Bates-marked BCI-EX-00109164 through 165.**

**This is a document I understand to be the Notice of Termination I was just talking about. So I just wanted to ask you if you have ever seen this before.**

Page 177

HIGHLY CONFIDENTIAL - J. HRASKA

A. Can I have a minute to --

**Q. Sure.**

**(Document review.)**

**Q. Ever seen that document before?**

A. No.

**Q. This doesn't remind you of anything about -- seeing it now doesn't refresh your recollection at all about a Notice of Termination issued at or about that time?**

A. Well, as I mentioned earlier, it wouldn't be common practice for me to get a Notice of Termination, or at least not during the course of the transaction.

**Q. Okay. So you had no knowledge at the time that such a notice had been issued, correct?**

A. No.

**Q. Okay. I have to walk you through a couple e-mails that happened during this week just to see if I could ask a couple questions about select issues. You have given me a lot of testimony here, but I just wanted to touch base on a couple of issues.**

A. Okay.

45 (Pages 174 to 177)

HIGHLY CONFIDENTIAL - J. HRASKA

(Exhibit 142B, a document bearing Bates Nos. 465401 and 466143, marked for identification, as of this date.)

**Q. Mr. Hraska, I'm handing you a copy of a document marked Exhibit 142B. It's an e-mail dated September 16 in which you are a recipient, and attached to it is a document on page 3, titled Schedule A. That's the document I will be asking you about, so if you take a minute and just review this.**

A. Okay.

MR. SHAW: For the record, did you say September 15 or 16?

MR. HINE: I said 16th.

MR. SHAW: Okay. Well, just for the record, he was a recipient on an e-mail on the 15th and it was forwarded to other people, but he's not on the forwarded e-mail on the 16th.

MR. HINE: Fair enough.

(Document review.)

A. Is there a possibility of stapling error? It looks like the last two pages are duplicated. Or are they different? They appear

HIGHLY CONFIDENTIAL - J. HRASKA

to be the same, but I just --

**Q. It could be a stapling error, but I believe --**

A. Can you confirm how many pages it's supposed to be? I don't want to have to see if there's a difference between the two.

**Q. Why don't we ignore the last two pages. We'll just treat it as a four-page document.**

MR. SHAW: The fax cover page seems to indicate a five-page fax.

MR. HINE: I don't know, but I don't think my questions are going to trip you up on that score. Let's ignore the last two pages.

A. Okay.

**Q. Have you had a chance to look at it?**

A. I have, yes.

**Q. My question has to do with Schedule A, which is the third page of the document. Have you ever seen this Schedule A before?**

A. I have, yes.

**Q. In what context?**

A. I was a recipient of that e-mail at

HIGHLY CONFIDENTIAL - J. HRASKA

the time, so I had reviewed what the Schedule was.

**Q. Okay. What is this schedule for?**

A. This schedule is the schedule of the acceptable collateral types in the margins that Barclays was willing to accept on a tri-party transaction, the tri-party transaction that we spoke about earlier in the beginning of the week of the 15th.

**Q. I just want to clarify which transaction we're talking about. That is not the September 18th transaction, correct?**

A. This schedule is the schedule that was provided by Barclays for the transaction which was done earlier in the week, the week of the 15th, so it was not the 18th, yes, that's correct.

**Q. Does this schedule also govern the transaction that was entered into on the 18th?**

MR. SHAW: Objection. Calls for legal conclusion, foundation, calls for speculation, but if you know, you can answer.

A. I don't know.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. I think you said earlier, but I just want to ask you, we had talked about Master Repurchase Agreements, do you recall that?**

A. Yes.

**Q. And I thought you said, and I'm asking you to correct me if I'm wrong, that in early in the week when Barclays wanted to -- or, somehow they decided to effect this tri-party financing that was to start on Monday and go through most of the week, that in order to do that, they have to amend the MRA; is that right?**

A. The MRA is -- is a document governing a repo transaction.

**Q. Right.**

A. It's not specific to a tri-party transaction. With a tri-party transaction, there's a separate agreement called a tri-party agreement.

**Q. Right.**

A. That's between, well, as the name suggests, three parties, the seller, which is the dealer, the tri-party agent, and the liquidity provider. That was a document that we were -- or, that I was referring to needed to be

Page 182

HIGHLY CONFIDENTIAL - J. HRASKA

amended at that time.

**Q. And is a Schedule A like this typically used to confirm which types of collateral could be posted towards that agreement?**

A. Towards a tri-party agreement. Schedule A is typically a firm -- is a form that's used in a tri-party relationship on a tri-party document.

**Q. Okay. And when I see this schedule, you see the column that says "Margin Percentage"?**

A. Yes.

**Q. Is that the haircut that can be applied to these different classes of securities?**

A. Yes.

**Q. Okay. Do you know if in fact that was the haircut that was applied to these securities with respect to the financing that Barclays provided the week of the 19 -- the week of the 15th?**

MR. SHAW: Objection. Are we talking about the one on the 18th or the one before

Page 183

HIGHLY CONFIDENTIAL - J. HRASKA

that?

**Q. Let me clarify. I think we had previously distinguished between two different transactions, one being the repo on the -- on September 18th, right? And the other being a tri-party arrangement between Barclays, Lehman and Chase that started on the 15th and went for a couple days?**

A. That's correct.

**Q. And eventually was not rolled over, correct?**

A. That's correct.

**Q. And am I correct to understand your testimony that this Schedule A applied to the latter of the two, meaning the one that -- the tri-party that provided overnight financing for three or four days?**

A. That's correct.

**Q. My question then is, are these the margins that were in fact applied to that agreement?**

A. The responsible party for applying the margin would have been the tri-party agent in that particular deal. These are the terms that

Page 184

HIGHLY CONFIDENTIAL - J. HRASKA

were agreed, but the tri-party agent would have actually carried out the application of the margin.

**Q. Now, do these haircut percentages, did they also apply to the September 18 repo?**

MR. SHAW: Objection, foundation. Calls for legal conclusion.

A. I don't know definitively.

**Q. Do you know if there's -- would I expect to find a separate Schedule A with respect to that agreement?**

MR. SHAW: Objection. Form.

A. I wouldn't expect it, but -- but I don't know because I wasn't part of the documentation on that second agreement.

**Q. Okay. You wouldn't expect it why?**

A. It was a tri-party-type program and we delivered the assets to BONY under tri-party premises, even though it was a little bit of a hybrid because of the mechanics. So, based on the fact that it -- and it was documented as tri-party, I would expect from an operations perspective that the same schedule would apply, but whether or not there were any exceptions

Page 185

HIGHLY CONFIDENTIAL - J. HRASKA

made because, again, it was a unique transaction, I don't know.

**Q. And do you know in fact what haircut was applied to the September 18 repo?**

A. Only based on the numbers that we discussed earlier. I know that there was approximately a 5 billion, there was 45 billion in cash extended, and about just under 50 billion of assets.

**Q. Okay.**

A. That ties out to some of the schedules we had looked at as well.

**Q. I understand. You haven't seen any document, have you, that would break that $5 billion haircut into different asset classes, have you?**

A. No.

**Q. Okay. I want to skip --**

A. On this document still or --

**Q. All done.**

**I want to skip ahead a little bit to your efforts to transfer collateral from the Fed to the Bank of New York in connection with the September 18 transaction. You remember you**

47 (Pages 182 to 185)

HIGHLY CONFIDENTIAL - J. HRASKA

**testified about that earlier?**

A. Yes.

MR. SHAW: Object. Just so we're clear, I don't think he testified there was a transfer from the Fed to the Bank of New York, unless I misunderstood it.

**Q. I think you testified there was a movement of collateral from the Fed financing to the Bank of New York financing?**

MR. SHAW: Right. The question is whether Chase was --

**Q. I understand. I'm not trying to mischaracterize your testimony. I just want to bring you to that period of time where you were working on the transfer of collateral that had previously supported the Fed to now supporting the September 18 repo; do you recall your testimony on that?**

A. Yes.

**Q. Okay. Were there any assets that were supposed to be excluded from that?**

MR. SHAW: Objection. Foundation. Calls for speculation. Calls for legal conclusion.

HIGHLY CONFIDENTIAL - J. HRASKA

A. There were -- there was a list of eligible collateral types and there was one particular Cusip that was very specifically supposed to be excluded.

**Q. Which was what?**

A. It was called a Racer Note.

**Q. Okay. Who wanted it excluded?**

A. Barclays.

**Q. Okay. So am I correct to say Barclays would not accept that as a form of collateral for the September 18 repo?**

A. Yes, that's correct.

**Q. Did they have any other restrictions on the types of collateral that could be posted toward the September 18 repo?**

MR. SHAW: Objection to form.

A. They -- there was a list that was provided, and I believe we referenced the list as we were -- as we were searching for available collateral.

**Q. What types of collateral were excluded?**

A. Honestly, we didn't look at the collateral type so much as we focused on the

HIGHLY CONFIDENTIAL - J. HRASKA

body of Cusips, and we kept doing look-ups against that body of Cusips to make sure that we were not including those Cusips.

**Q. Why did Barclays not want the racer securities --**

MR. SHAW: Objection. Foundation.

**Q. -- posted as collateral?**

MR. SHAW: Calls for speculation.

A. In my opinion, racer note is something that is backed partially by the credit of Lehman. So if you're extending credit to somebody, you wouldn't want to take collateral of the same credit.

**Q. Okay. Is that the only reason?**

A. That's my opinion.

MR. SHAW: Same objection.

A. I don't -- I assume Barclays made the same conclusion, but I don't know.

**Q. Okay. Was Barclays unwilling to accept as collateral securities that were tied to mortgages?**

MR. SHAW: Objection to form.

A. There, back to what I said earlier, there may have been mortgages or mortgage-type

HIGHLY CONFIDENTIAL - J. HRASKA

collateral on that Cusip exclusion list.

**Q. Do you know one way or the other whether there was?**

A. Definitively, no.

**Q. When we talk about mortgages, I see the phrase "resis," R-E-S-I-S. Is that a term you are familiar with?**

A. Well, mortgage collateral is a pretty wide array. A resi, a residential mortgage, is a type of mortgage security, yes.

**Q. Okay. And did Barclays exclude residential mortgages from the list of acceptable collateral?**

MR. SHAW: Objection to form.

A. I don't know whether they excluded it as a complete asset class or not.

**Q. Do you recall any discussions about whether residential mortgages, mortgage-backed securities could be transferred to Barclays during that week?**

A. I remember there was a discussion of it. I don't remember the outcome of it.

**Q. Okay. Do you have any recollection at all about it?**

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. The only recollection I have is that the person who ran the middle office at the time was -- was involved with looking at the residential portfolio, but other than that, I don't -- I don't know what the outcome of that was.

(Exhibit 143B, an e-mail chain, the first in time dated September 17, 2008, at 2:42, with attachment, marked for identification, as of this date.)

**Q. Mr. Hraska, I'm handing you a document marked as Exhibit 143B, which is an e-mail stream dated September 18, 2008, and an attachment. Will you please take a moment to review the document?**

A. Sure.

(Document review.)

A. Okay.

**Q. Have you had a chance to look at the document?**

A. I did.

**Q. Have you ever seen this document before?**

A. Yes, I have.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. What is this?**

A. This was an e-mail string that was sent to me and then I forwarded it on to one of the financing traders on the trading desk.

**Q. That's Mr. Webb?**

A. That's Mr. Webb.

**Q. And what's the attachment to this document?**

A. The attachment to this doc was a file that was a file of assets that Barclays did not want, included on the pledge of the repo.

**Q. Is this the list you had previously mentioned about excluded assets?**

A. Yes.

**Q. And this was a list provided by Barclays to Lehman?**

A. Well, it was provided to me from Lehman. I think the person who originated this is David Petrie. Yes, Dave Petrie was Barclays. So the answer to that would be yes.

**Q. So, as I understand it, this was a list prepared by Barclays of the items of securities that they would not want -- would not accept as collateral in support of the September**

**HIGHLY CONFIDENTIAL - J. HRASKA**

**18 repo?**

MR. SHAW: Objection to form.

A. That's my understanding of what it was.

**Q. And is this the list you then used to review the collateral that you were posting to make sure it wasn't on this list?**

A. We used the list that looked like this. I don't know if this was the final list, but a list that looked like this, yes, was used.

**Q. At the subject line of your e-mail, it says, "Excluded mortgage asset files." You see that?**

A. Uh-huh.

**Q. Are these Cusips on this list primarily mortgaged -- mortgage-related securities?**

A. They were primarily mortgage and asset-backed-related securities on this list.

**Q. So why were they to be excluded as collateral?**

MR. SHAW: Objection to form.

A. I don't know. I was given a list to use in the selection criteria and was told to

HIGHLY CONFIDENTIAL - J. HRASKA

exclude them, so I don't know.

**Q. Do you have any understanding of why they might be excluded?**

A. No.

**Q. Now, when these are excluded, is it correct to say that these securities had been posted as collateral to the Fed but were not allowed to be posted as collateral to the September 18 repo?**

A. I never cross-referenced the two, so I don't know for certain.

**Q. Do you know if the Fed in its financing excluded mortgage-backed assets like this as being eligible collateral?**

A. The Fed excluded certain classes and ratings of mortgages, but in general, the Fed would accept mortgage collateral.

**Q. Okay. So is it correct to say that this list, this list reflects a change in the type of collateral that Barclays would accept in connection with the September 18 repo from the collateral that had been posted to the Fed financing?**

A. Well, without knowing whether these

specific assets were pledged to the Fed or not, I wouldn't know that, whether it represented a change.

**Q. Okay. What do you think?**

MR. SHAW: Objection. Calls for speculation.

A. I don't know, honestly.

**Q. Okay. Do you recall any discussions -- is it possible that these mortgage-related securities were just considered too risky by Barclays to be accepted as collateral?**

MR. SHAW: Objection. Calls for speculation.

A. It would be a logical conclusion. I don't know why, but it would be a logical conclusion.

**Q. Okay. Do you recall any other discussions during the week of September 15th about what types of collateral Barclays would not accept in support of the September 18 repo?**

A. I don't know.

**Q. Do you have any understanding about whether there were any differences in the types**

**of collateral that could be posted to the Fed financing as opposed to the collateral that could be used to support the September 18 repo?**

A. No.

**Q. Do you have any understanding about whether the collateral that was posted to support the Fed repo was in any way riskier or less risky than the collateral that was posted toward the September 18 repo?**

A. Well, I don't typically determine risk, so I wouldn't really necessarily be able to determine whether one set of assets is riskier than another, to tell you the truth, so...

**Q. Okay.**

**(Exhibit 144B, a document bearing Bates Nos. 10297377 through 10300510, marked for identification, as of this date.)**

**Q. Mr. Hraska, I'm handing you a copy of a document marked as Exhibit 144B. I have very few questions about the document, but essentially it involves just getting an understanding of what this database includes.**

**So if you might take a minute to**

**review it, I'll ask you a question or two.**

A. Sure.

(Document review.)

**Q. Have you had a chance to look at it?**

A. I have.

**Q. You'll see, Mr. Hraska, on the front there's an attachment with the title "BAR-PDCF-074.XLS." Does that -- well, can you explain to me the convention for titling databases like this? What is that meant to encompass, if you know?**

MR. SHAW: Objection. Assumes facts not in evidence. Calls for speculation.

**Q. Let me withdraw that question. Let's start again.**

**Have you ever seen this document before?**

A. I have, yes.

**Q. And what is this?**

A. This is an e-mail that I had -- that I had forwarded on to Peter Hadingham, who was on the trading desk, the financing trading desk.

**Q. And what is this attachment?**

A. This is a file of collateral that was

sourced from clearance box O74 and had been -- I believe it had been previously deposited to the Fed under the PDCF program.

**Q. Okay. And was this collateral eventually transferred or posted as collateral for the September 18 repo?**

A. This was collateral that we had -- that we had contemplated posting. I can't verify that all of this collateral was posted, but the intention was to take this collateral and post it to Barclays.

**Q. Okay. If you look on page 2 of the document, you'll see three headings under columns E, F and G. I just wanted to get your understanding of what they mean.**

**The first one is entitled "Market Price Factored." Can you explain to me what that means?**

A. I don't specifically know what it means on this file. I know what "price factoring" means, but it doesn't seem, from the data in this file, doesn't seem to mean what price factoring is.

**Q. What is it typically?**

Page 198

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. Typically a price factoring is on a mortgage asset, which is a paydown percentage, and you take par and price and multiple it times the factor to get the market value.

In this case, what appears to be happening is that these prices are in -- they're in bond conventions, and to the extent there's an equity Cusip here, the price has been moved over by two decimal places.

So what this is basically I think trying to do is to get you to the same pricing convention so when you multiply times the quantity, you come up with a true market value.

**Q. Okay. And the two columns entitled "Market Price Clean" and "Market Price Dirty," do you know what those two are meant to signify?**

MR. SHAW: Objection. Mischaracterizes the document. You misread the second column.

MR. HINE: I apologize.

**Q. The column F is "Market Price Clean." Column G says "Market Value Dirty." Do you see that?**

A. I do, yes.

Page 199

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Can you explain to me what those columns are meant to signify?**

A. Yes, I can. A clean price is a price not taking into account a accrued interest. A dirty price is one that takes into account accrued interest. Column G is the value with accrued interest being taken into effect.

**Q. I gotcha. Thank you very much.**

A. You're welcome.

**Q. Mr. Hraska, I'm going to hand you a document that's previously been marked as Exhibit 60B. If you wouldn't mind taking a moment to look at it.**

A. Sure.

**Q. In particular, I'm going to ask you about the second page.**

**(Document review.)**

**Q. Have you had a chance to look at it?**

A. Yes.

**Q. Have you ever seen this document before?**

A. Yes, I have.

**Q. Could you tell me what it is?**

A. Sure. This was an e-mail forwarded

Page 200

HIGHLY CONFIDENTIAL - J. HRASKA

from Ray Stancil at JPMorgan. It was the anticipated list of collateral that was going to be transferred from Lehman Brothers to Barclays with connection to the September 18 repo that we discussed earlier.

**Q. Okay. And this is on Wednesday of that week?**

A. This one's actually I believe it was on the -- well, the 18th I think was Thursday morning, I think, was when he sent this. We discussed it on Wednesday, but I'm pretty sure the final version of this was sent on Thursday morning.

**Q. Okay. Just could you explain, I want to -- along the left-hand side of this chart, I'm looking at the chart on page 2.**

A. Okay.

**Q. It has the abbreviations TSLF, PDCF and OMO, do you see that?**

A. Yes.

**Q. And those are the various Fed programs that this financing was provided under, correct?**

A. Yes.

**Q. Along the top you see a bunch of**

Page 201

**HIGHLY CONFIDENTIAL - J. HRASKA**

**columns, the first being "Par Amount" and the second one is "Market Column," do you see that?**

A. Yes.

**Q. What does that reflect?**

MR. SHAW: Objection. Compound.

A. The market value is the, as we were talking about earlier, the dirty market value, which is the securities value including accrued interest.

**Q. So am I correct to say that's the market value of the collateral that had been posted to the Fed programs, correct?**

A. As calculated by Chase, yes.

**Q. Okay. And that total calculation is approximately $49.7 billion, correct?**

A. That's correct.

**Q. Okay. Now, if you look at the next column, it talks about "paydown amount," you see that?**

A. Yes.

**Q. What is that column meant to signify?**

MR. SHAW: Objection to form.

A. I'm familiar with the term "paydown." The way this data is displayed, it wouldn't be

51 (Pages 198 to 201)

Page 202

HIGHLY CONFIDENTIAL - J. HRASKA

the way I define "paydown," but you can see that it's a lesser value. So, you know, my impression of what this was was the -- was the -- was the cash that was being extended on this as a result of the program from the night before, but I can't be sure.

**Q. I'm not sure I understood what you meant. Are you talking about the program from the night before meaning the Fed program that had rolled over another night?**

A. The Fed program that was on for the night of the 17th.

**Q. That is Wednesday night?**

A. That's Wednesday night, yes.

**Q. Okay. So I'm not sure I understood your explanation. What is paydown amount?**

A. Paydown amount would be the -- paydown amount would be the proceeds that would be -- I guess, simply put, it would be the value that was given to the securities after haircut, probably the simplest way to put it. So this amount would -- in other words, this amount of securities, 49 million, would support a loan in the value of 43,457,000.

Page 203

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Okay. And then if you see the next column, it talks about "Anticipated Prefunding Dollar Amount." Do you see that?**

A. Yes.

**Q. And now -- and that totals to 44.2 billion, you see that?**

A. Yes.

**Q. What does that column signify?**

MR. SHAW: Objection to form.

A. I don't know. Actually, I questioned that at the time. My impression was that was the amount that was going to be wired to Chase to release the collateral, but it turned out not to be the case and I was never explained as to why that was not the case. Because, as you know, it turned out to be 45 billion, so I don't know.

**Q. So you, just so I understand what you are saying, you, at the time, you thought 44.2 billion would be the amount that had to be wired to Chase to release the Fed collateral that was then going to be transferred to the September 18th repo?**

A. Being that this was provided by Chase,

Page 204

HIGHLY CONFIDENTIAL - J. HRASKA

and these were their requirements to release the collateral, the way I read this was that that was the case, and having discussions with Chase, I found out that, no, that was not the case, that they were expecting an amount of 45 billion.

**Q. And did they ever explain to you why the difference?**

A. No.

**Q. Did they ever explain to you what this column was to signify in their view?**

A. No.

**Q. Okay.**

MR. SHAW: We've been going over an hour, Bill, if we could take a short break.

MR. HINE: Sure.

(Recess; Time Noted: 2:28 P.M.)

(Time Noted: 2:39 P.M.)

BY MR. HINE:

**Q. Mr. Hraska, could you pull out the exhibit we were talking about before we broke, which I think was Exhibit 18.**

MR. SHAW: 60B?

**Q. I'm sorry, 60B.**

Page 205

**HIGHLY CONFIDENTIAL - J. HRASKA**

**Because you might want to refer to that when I hand you the next exhibit. So I don't have any questions on that specifically, but let me hand you another document that's been marked as Exhibit 125. If you could take a moment to review that before I ask you a question, I would appreciate it.**

**(Document review.)**

A. Okay.

**Q. Have you had a moment to look at it?**

A. Yes.

**Q. Mr. Hraska, turning to Exhibit 125, have you ever seen in document before?**

A. Yes.

**Q. What is this document?**

A. This is a document that was prepared by Nancy, who works for me. It was how we had broken up the -- how we had broken up what we called the tri-party shells or how we had assembled the baskets of collateral that we were going to be pledging over to Barclays.

**Q. Can you explain to me what you mean by that, tri-party shells?**

A. In a tri-party transaction, you are --

52 (Pages 202 to 205)

Page 206

HIGHLY CONFIDENTIAL - J. HRASKA

you're lending securities based off of, as we talked about, the schedules and typically according to asset classes and requirements. So you typically book the money amount that's going to be associated with a generic bucket of securities that will fit these criterias, and that loan amount or that dollar amount is -- what you book is called typically a shell. By some firms, it's known as a loan amount.

So it's sort of the dollar value that you're going to associate a various basket of securities to.

**Q. Okay. And is that what's called the booking amount?**

A. These -- the booking amounts would be the dollar value of the loan, yes.

**Q. And the baskets of securities, are those listed on the left-hand column coming from various Fed programs; is that right?**

A. That's correct, yes.

**Q. And could you just walk me through the different columns on this chart and explain to me what each column signifies? We can start with the column that totals down to $47.5**

Page 207

HIGHLY CONFIDENTIAL - J. HRASKA

**billion. Do you see that column?**

A. Yes.

**Q. Do you know what that column is supposed to represent?**

A. The total market value of the securities.

**Q. And these are the securities that have been posted to the Fed financing programs?**

A. These were the securities that we had that we were anticipating pledging over to the Barclays transaction for the 18th.

**Q. So this document that we had previously talked about how $8 billion never made it, we had long discussions about that, but this chart is prepared prior to that?**

A. This was prepared prior to that.

**Q. So this is what you are anticipating being able to take from the Fed programs over to BONY; is that right?**

A. Actually, looking at the date of this, this -- this was prepared later that evening. So this must have been where we were at a particular point in time, or where we -- what we had booked at a particular point in time, not

Page 208

HIGHLY CONFIDENTIAL - J. HRASKA

necessarily what was delivered yet at that particular point in time.

**Q. I guess, could you explain that to me in terms of the different columns?**

A. These columns represent items that were actually booked on our systems. That trade, as we talked about, there were different collateral classes and substitutions that happened all day based on deliveries, available in the box, that kind of thing.

So we were using this spreadsheet to try to capture all of the collateral that we were looking and the market value that we were booking, so these were the amounts that were being booked. From the time stamp, I can see it was 7 o'clock, so it was -- we weren't done until much later in the evening, so it was a -- this is an interim file, basically. It's not the beginning file. And it's not at the end of the day. It's not the ending file either. It was an interim step around 7 o'clock.

**Q. So if I found a file entitled BarCapSummary.xls, later than this, I would eventually get to a final file?**

Page 209

HIGHLY CONFIDENTIAL - J. HRASKA

MR. SHAW: Objection to form.

A. There is a final file, yes.

**Q. Okay. And it would have the same title as this file?**

MR. SHAW: Objection to form.

A. I don't know whether it would have the same title.

**Q. Okay. Would Ms. Denig probably know that?**

MR. SHAW: Objection to form.

A. She would know whether she prepared a file. Again, whether it was the final file she may not necessarily know.

**Q. Was she charged with monitoring this process?**

A. Yes.

**Q. Okay. So is she the originator of this chart?**

A. She is the originator of, yes, this format.

**Q. This chart is a snapshot at some point during that day of this transfer?**

A. Yes, that's correct.

**Q. Okay. Now, just so I understand the**

53 (Pages 206 to 209)

Page 210

HIGHLY CONFIDENTIAL - J. HRASKA

**different columns, the first column that totals to $47.5 billion, approximately, is the market value of the securities that had been posted to the Fed programs?**

A. That's what I believe that to be, yes.

**Q. Okay. What is the next column, which starts with $7.1 billion, what is that column?**

A. To be honest, I actually don't recall what that specific amount is. I can venture a guess, but I would rather not.

**Q. Venture a guess, if you don't mind.**

MR. SHAW: Calls for speculation.

A. My guess is it's the par amount of the -- of the securities.

**Q. And then the next column totals to $44.2 billion, you see that?**

A. Yes.

**Q. And do you know what tbat column represents?**

A. That would have represented the principal proceeds of the repo or the amount after haircut.

**Q. Okay. And what does the last column represent, do you know?**

Page 211

HIGHLY CONFIDENTIAL - J. HRASKA

A. No, unfortunately, I actually don't know what the next column is.

**Q. The $44.2 billion that you just testified about, does that relate in any way to the $44.2 billion on the previous exhibit?**

MR. SHAW: Objection to form.

A. It was what we believed we need to fund over to Chase as per the column of this previous spreadsheet. So in our initial bookings that's where we were trying to get collateral that ultimately totaled the amount equal to that amount.

**Q. And later you learned that it had to be 45 billion?**

A. That's correct.

**Q. Mr. Hraska, in the interest of trying to save you looking through another chart, I see one spreadsheet that's entitled Depot Analysis. Do you recall what that is?**

A. No, not off the top of my head.

**Q. Let me show it to you then.**

**(Exhibit 145B, a document bearing Bates Nos. 10328099 through 10319396, marked for identification, as of this date.)**

Page 212

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Mr. Hraska, I'm handing you a documents marked as Exhibit 145B.**

A. Okay.

**Q. And as promised, it's -- it has the attachment entitled Depot Analysis. Do you see that?**

A. I do, yes.

**Q. If you wouldn't mind taking a moment to take a look at this document.**

**Just for the record, it's an e-mail dated September 21, 2008, from Mr. Hraska to Monty Forrest and Mark Lee.**

**(Document review.)**

A. Okay.

**Q. Have you had a chance to look at it?**

A. I have, yes.

**Q. Have you ever seen this document before?**

A. Yes.

**Q. Will you tell me what it is?**

A. This is a document that -- the e-mail's a document that I created with an attachment that I worked on with Nancy Denig and Bill Parrinello over the weekend of the 20th and

Page 213

HIGHLY CONFIDENTIAL - J. HRASKA

21st. It was -- it was our analysis of available unencumbered assets that we had referenced earlier in the testimony.

**Q. Okay. Is this -- okay. You testified I think earlier about an effort to locate unencumbered assets, and this is an analysis you did in that regard?**

A. Yes.

**Q. Is this the list of unencumbered assets that you came up with?**

A. This is a list. On the course of that weekend, there was I would say over a dozen lists that were as we went through it and we revised it and things like that. I mean, it was -- this list was created or sent at 7:36 in the morning. I'm not sure that this is the final list, but this was a later version of the list, yes.

**Q. Why is it called Depot Analysis?**

A. A depot is another name for a clearance box, depository, depot. It's just an industry slang term. The 9/19 date was referencing the fact that this was the close of business 9/19.

54 (Pages 210 to 213)

**Q. When I see the title, it says "9/19/2008.5." Does this suggest that it's a version 5 of this analysis?**

A. I would say yes.

**Q. And would it be your expectation that if I looked through the files, I should find later versions of this analysis?**

A. I don't know for certain. I know that we worked all through Sunday, so it's a -- there's a good chance there may be a different file later, but ...

**Q. Okay. Does this analysis ultimately identify the $1.4 billion worth of securities that we talked about earlier that were transferred to Barclays?**

A. No.

**Q. Okay. What is the end product of this analysis? I'm trying to understand how this analysis fits into the testimony you gave earlier about the 1.4 billion and the 800 Cusips. So I'm just trying to understand what is the end product of this analysis?**

A. The end product of this analysis is that this was sent over as available collateral

to be transferred. I can't confirm a hundred percent that the assets that are in the 1.4 list are all on this list.

**Q. Okay. I think you testified earlier that you sent a list over of unencumbered assets. Am I correct to say that $1.4 billion worth of those assets on that list eventually did make it to Barclays, right?**

A. I sent over a list of unencumbered assets and 1.4 billion of assets made it to Barclays. I can't be sure that it's the same 1.4 that was on the final list that I sent over.

**Q. Okay. And is the list that you sent over entitled Depot Analysis or was that a separate list?**

A. I don't recall what the final name was.

**Q. Okay. What is the analysis part of it?**

A. The analysis was trying to determine whether the securities were available or unencumbered.

**Q. Did the analysis entail valuing those securities at all?**

A. No.

**Q. If you look on page 2 of this document?**

A. Uh-huh.

**Q. I just wonder if you can explain to me the last two columns -- I'm sorry.**

A. Page 2 or a different page?

**Q. The first page of the chart.**

A. This is what I've got. Summary, that page? Or the spreadsheet first page?

MR. SHAW: Use the Bates numbers.

**Q. Let me see if I'm referring to the correct document. I have a misprint in my document.**

**Page 3 of the chart.**

A. Okay.

**Q. You see column F says "Firm DTC MV"?**

A. Yes.

**Q. What does that column represent?**

A. That represents a market value which was held in GFS, which is the system we referenced earlier.

**Q. Okay.**

A. So that would have been the market

value that GFS had assigned to that position.

**Q. Why does it say "DTC"?**

A. GFS was a database storage of multiple pricing sources, and in addition to Lehman's marks, in some instances we -- GFS also took in how the depository knew the value of the collateral to be.

**Q. Okay. And the previous column says "Firm DTC POS," you see that?**

A. Yes.

**Q. What does that column represent?**

A. Those represent the firm positions.

**Q. "Positions" meaning numbers of securities or dollar value?**

A. Numbers of securities.

**Q. Okay. Now, if you turn to the second page of the chart, you'll see a chart which totals $1.19 billion, you see that?**

A. The second page of the document, not of the chart?

**Q. Yes, I'm sorry. You're right.**

**Is 1.19 billion the value of the list of unencumbered assets that you sent over to Barclays?**

HIGHLY CONFIDENTIAL - J. HRASKA

A. It was the market value that GFS assigned at the time of the creation of this particular file.

**Q. Okay. But you don't know if this is the final list, correct?**

A. I don't know.

**Q. At this particular time, GFS assigned that value to this list of securities; is that right?**

A. That's correct.

**Q. Mr. Hraska, I'm handing you a copy of a document previously marked as Exhibit 75B, which is an e-mail stream dated September 20.**

**Please take a moment to take a look at it.**

**(Document review.)**

A. Okay.

**Q. Have you had a chance to look at it?**

A. I have.

**Q. Have you ever seen this document before?**

A. Yes, I have.

**Q. What is this?**

A. This is an e-mail that I was a

HIGHLY CONFIDENTIAL - J. HRASKA

recipient on. It was one of the -- one of the status updates when we were trying to identify unencumbered collateral in various sources.

**Q. If you look -- so am I correct this is in connection with your efforts to identify unencumbered assets that could be transferred to Barclays?**

A. Yes.

**Q. If you look at the bottom of the first page, it says, "Goal is 1.9 billion in unencumbered." You see that?**

A. I do.

**Q. Was that the goal you folks were shooting for at the time?**

A. That was the goal as it was described to me, yes.

**Q. Who described it to you like that?**

A. Monty Forrest.

**Q. Okay. And where did that goal come from?**

A. I don't know.

**Q. I thought I heard you say previously that the effort was simply to find as many unencumbered assets as possible; is that right?**

HIGHLY CONFIDENTIAL - J. HRASKA

A. Yes, that's correct.

**Q. How does the $1.9 billion goal fit in with that? It seems like a very specific target to be shooting for.**

A. I don't know where specifically that number came from. In my mind, I was looking for as many unencumbered collateral pieces that I could because I still was unsure of the status of that repo transaction that we talked about, the September 18 repo, where we pledged the 7 billion in cash.

So in my mind I needed to come up with assets that would continue to be able to substitute that collateral versus cash, and at that point, I was still unsure whether or not anything further was going to happen on that transaction or not. So I was looking for an unencumbered collateral. You know, they gave us this goal of 1.9 billion, but, you know, in my line of work, it's, you know, to the extent that you are given a task to find an unencumbered collateral, it's usually best to find the entire population. And to the extent somebody gives you 1.9, you say, great, I've done it. If it

HIGHLY CONFIDENTIAL - J. HRASKA

turns to 2.9, you have to do it again.

**Q. So was the search for unencumbered collateral an effort to find replacement collateral for the cash?**

MR. SHAW: Objection to form.

A. I was looking to find unencumbered collateral. You know, the firm may have had its own specific goal of the 1.9, in which I was trying to ascertain at least 1.9, because that's what they were looking for. But I was specifically not tied to 1.9 as, you know, the only thing that I was going to find. I was looking to find as many unencumbered collateral as I could.

**Q. I guess I want to understand what -- I thought you had previously said that you found $1 billion in unencumbered collateral that was then posted towards the $7 billion in cash and you had hoped to receive the $7 billion or some of that cash back, right?**

A. That's correct.

**Q. Now, was that effort to find unencumbered collateral different from this goal of 1.9 billion?**

Page 222

HIGHLY CONFIDENTIAL - J. HRASKA

A. I've subsequently learned that this 1.9 was different than the effort to search for unencumbered collateral on this weekend. At the time of that weekend, you know, I was again searching for unencumbered collateral in its entirety. So, in my mind, you know, we still needed to do a substitution on that cash event.

**Q. Okay.**

A. And until I was told otherwise, I was going to try to find collateral that potentially fit the bill for that.

**Q. Okay. What did you learn subsequently that was different than what you understood at the time?**

A. Well, you know, subsequently, I was made aware of, you know, Schedule B, which had some, you know, 1.9 to 2 billion dollars worth of, you know, collateral on it. But at the time, I wasn't aware of that.

**Q. Okay. So now it's your understanding that the $1.9 billion goal was in connection with preparing the Schedule B?**

MR. SHAW: Objection. Mischaracterizes prior testimony.

Page 223

HIGHLY CONFIDENTIAL - J. HRASKA

A. I'm sorry, could you repeat the question?

**Q. Is it now your understanding, notwithstanding what you understood at the time, is it now your understanding that the $1.9 billion goal was, with respect to the search for unencumbered collateral, was to prepare securities that would go to Barclays under Schedule B?**

MR. SHAW: Objection to form.

A. Could you read back to me --

(Record read.)

A. Yes.

**Q. Okay. Now, further up on this e-mail we see a report apparently by Mr. Forrest of the latest status, or some form of status report. Can we just go through those items and tell me what you recall about those items?**

**It says 800 million at BONY. Do you see that?**

A. Yes.

**Q. And what's that referring to?**

A. Honestly, I don't recall what that 800 million was.

Page 224

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Okay. And did that 800 million eventually make its way to Barclays?**

MR. SHAW: Objection. Foundation.

A. Stating that it's at BONY would have indicated that fact, because we didn't have -- Lehman didn't have a relationship with BONY, so...

**Q. Okay. Then further down, number 2, you see it references 746 million in O74, see that?**

A. Yes.

**Q. And what does that reflect?**

A. That's referring to, at the time of this, it was believed that there was 746 million in market value in securities unencumbered in O74.

**Q. And did that collateral make its way to Barclays?**

MR. SHAW: Objection to form.

A. I don't know whether that 746 reference here made it to Barclays or not.

**Q. Do you know whether the collateral in the O74 account was -- made its way to Barclays?**

A. Some collateral in O74 made it to

Page 225

HIGHLY CONFIDENTIAL - J. HRASKA

Barclays, yes.

**Q. Some did not?**

A. That's correct.

**Q. How much did not?**

MR. SHAW: Asked and answered.

A. There's a portion in O74 that's still outstanding, hasn't made it to Barclays.

**Q. Do you know how much?**

MR. SHAW: Asked and answered.

A. I believe that amount to be somewhere in the neighborhood of 6 to 7 hundred million.

**Q. Is that the 800 Cusips that you mentioned earlier?**

A. No, as I had mentioned earlier, there was the original list which had the discrepancy of 800 Cusips, and there was a separate analysis which produced different collateral that was available, potentially, to be transferred.

**Q. Okay. And that's the 6 or 7 hundred million that you're discussing that you just mentioned did not make it to Barclays?**

A. That's correct.

**Q. Then we see in item number 3 a reference to 435 million in Canada, do you see**

57 (Pages 222 to 225)

Exhibits 67 - 69 Pg 98 of 167

Page 226

HIGHLY CONFIDENTIAL - J. HRASKA

that?
A. Yes.
Q. What is that referencing?
A. Unencumbered market value in our Canadian depository.
Q. And did those securities make it to Barclays?
A. No.
Q. Where are they now? Still in that same depository?
A. I don't know for certain, but it would be my assumption, yes.
Q. Does Barclays think they're entitled to that collateral?
MR. SHAW: Objection to form. Calls for speculation.
A. I don't know.
Q. And you see the next item, number 4, 300 million in mortgages in 636. Do you see that?
A. Yes.
Q. What is that referring to?
A. Market value of securities held in our depository at DTC Number 636.

Page 227

HIGHLY CONFIDENTIAL - J. HRASKA

Q. And did that collateral make it to Barclays?
A. I don't know how much of that or if any of that collateral made it to Barclays.
Q. Okay. Then the next line says a total -- this totals to 2.18 billion. You see that?
A. I do, yes.
Q. Does that mean you made your goal of 1.9 billion?
A. That would indicate that we had enough collateral to satisfy the collateral requirement, yes.
Q. Do you recall any discussions about whether you made the goal of 1.9 billion?
A. No.
Q. Did you think at the time that you had achieved the goal of 1.9 billion?
A. Based on this mail, I thought that I achieved what was asked from me by Monty, yes.
Q. Did anyone call you up and say, congratulations, you made the goal of 1.9 billion?
A. No.

Page 228

HIGHLY CONFIDENTIAL - J. HRASKA

Q. So how did it end? Did you think you had to continue searching?
A. This was pretty early on in the weekend. It was only Saturday at 8:30 P.M. So, you know, this continued to go on because there were -- I don't remember what the nature of the circumstances are, but I remember we continued to search for collateral for pretty much the whole rest of the weekend.
Q. So the 1.9 billion goal was put aside and just kept searching?
A. I don't believe that the 1.9 billion goal was set aside. It was just a matter of there might have been some either additional problems in the collateral that we identified or we were doing verification exercises like looking at securities in depositories and accounts on our stock record to make sure that everything tied out. And so throughout some of those additional reconciliations, some of the previous things that had been identified had to be revised.
Q. Okay. I wanted to ask you one follow-up question about I think we previously

Page 229

HIGHLY CONFIDENTIAL - J. HRASKA

were discussing the list of excluded assets. Do you recall that testimony?
A. Yes.
Q. That was a list of assets that Barclays would not accept as collateral for the September 18th repo, right?
A. Yes.
Q. And one of the assets that they would not accept are the racer notes that you mentioned, right?
A. That's correct.
Q. Do you know the value of those racer notes at the time?
A. Approximately 5 billion.
Q. 5 billion?
A. Yes.
Q. Okay. Do you know the value of the pool of excluded assets that had been posted to the Fed financing but Barclays would not accept in the September 18 repo?
A. No.
Q. Did you make an effort to look through the collateral that had been posted to the Fed and exclude out those items that Barclays would

58 (Pages 226 to 229)

HIGHLY CONFIDENTIAL - J. HRASKA

**not accept as collateral for the 9/18 repo?**

A. Yes, we did look-ups on the securities we were going to pledge to make sure that they were not on that excluded list.

**Q. Okay. And did you have any sense of the value of the ones that were excluded because of that review?**

A. No. Once they were excluded, we didn't keep track of what was excluded. It was, in our mind, there was no need to because we weren't going to pledge it.

**Q. Do you recall if it was a substantial amount of securities?**

A. Well, we didn't do it as one exercise. As we went and found baskets of securities in groups, we might have found exceptions in that exercise with multiple iterations. So I don't honestly recall how many were on that list.

(Exhibit 146B, a document bearing Bates Nos. BCI-EX-(S)-00014389 through 14393 with attachment, marked for identification, as of this date.)

**Q. Mr. Hraska, I've handed you a copy of a document marked as Exhibit 146B. It is**

HIGHLY CONFIDENTIAL - J. HRASKA

**Bates-stamped BCI-EX-(S)00014389 through 14393, and then there are a series of attachments which don't have Bates stamps.**

A. Okay.

**Q. Have you had a chance to take a look at the document?**

A. Sure.

(Document review.)

A. Okay.

**Q. Have you had a chance to look at it?**

A. I have, yes.

**Q. Have you ever seen this document before?**

A. Yes, I have.

**Q. Can you tell me what it is?**

A. This was an e-mail sent by Robert Azerad who's on Paolo Tonucci's team in the Treasury Department. He had been given a file that Barclays had worked on comparing it to -- comparing what they believed to be what Lehman knew to deliver versus what Barclays had known was delivered, and there were a few discrepancies in the Fed items versus a few hundred discrepancies in the DTC bucket of

HIGHLY CONFIDENTIAL - J. HRASKA

collateral. So he asked us to look into it and try to reconcile through why there was these particular discrepancies.

**Q. And were you able to do that?**

A. We were, yes.

**Q. Why were there such discrepancies?**

A. I'm not sure why there were discrepancies with the information provided. We -- we verified that the information that we had originally provided was correct, so I don't know the sourcing of the file that -- or of the information that they relied on when they created this.

**Q. Now, is this -- I take it this e-mail is sent in connection with your reconciliation effort that you talked about earlier?**

A. We had -- we had done a reconciliation -- well, there were, to be clear, there were multiple reconciliation efforts that were done after this transaction, but my group had performed a reconciliation effort with -- with the Bank of New York and the Operations folks at Barclays, you know, prior to receiving this and we were -- we were reconciled with

HIGHLY CONFIDENTIAL - J. HRASKA

respect to the number of securities and the Cusip identifiers, as we had talked a little bit earlier about.

**Q. And you said that your records tied in with Barclays records on that score, right?**

A. That's correct, yes.

**Q. And so why did this come up later?**

A. I honestly don't know.

**Q. Are these from a different set of records?**

A. My presumption is that, yes, and they were, in my opinion, incomplete records because they were missing securities.

**Q. So the Barclays records which appear to show a thousand-some-odd Cusips missing were incomplete?**

A. I don't think there was a thousand missing.

MR. SHAW: Objection. Mischaracterizes the document.

**Q. Let's read through this e-mail here for a second. It says you'll see in the larger -- largest paragraph on the first page it says, "For DTC settled securities, there are**

Page 234

HIGHLY CONFIDENTIAL - J. HRASKA

**1,165 Cusips that are in the Barclays file hut not in the Lehman file, and 1,563 Cusips that are in the Lehman file hut not in the Barclays file." Do you see that?**

A. That's correct. Okay. So when I read that earlier, I took the difference between the two, not looking that they were different in totals between the two.

**Q. But so you looked into that issue, right?**

A. Yes.

**Q. And you concluded that Lehman's records were correct and Barclays had incomplete files; is that right?**

A. I concluded that the records that Lehman had that we compared to the records that Barclays Operations folks had were in line. I don't know the source of the file for this comparison, but I found this comparison to be faulty.

**Q. Okay. So you were still satisfied that the initial reconciliation that you did with the Operations folks at Barclays is correct?**

Page 235

HIGHLY CONFIDENTIAL - J. HRASKA

A. Yes.

**Q. Okay. And did you report that hack to Mr. Azerad?**

A. I did, yes.

**Q. And any further action on this score?**

A. No.

**Q. Have you heard about this issue again?**

A. No.

**Q. Okay. So is it your understanding that it's heen resolved?**

A. I never heard about it again, so from my perspective, it's resolved.

**Q. Okay. What explains the five Cusip difference in the Fed settled securities that are referenced in the first paragraph?**

A. I don't recall specifically what those differences were or even if there were differences just as there really weren't, in my opinion, differences here on the DTC securities.

**Q. Okay. If you turn to the first attachment, which is a one-page attachment after the first blue sheet in the document.**

A. Okay.

**Q. Can you explain to me what this chart**

Page 236

HIGHLY CONFIDENTIAL - J. HRASKA

**is showing?**

A. What this chart is showing is the substantiation of the records that are listed on the first page in this paragraph that you just referenced.

The left side are the Fed settled securities on the top, and to the left are what Barclays, according to this analysis, knew and here what Lehman knew. And similarly, further on to the right, for DTC settled assets, the same thing.

**Q. So am I correct in reading this that, with respect to the Fed settled Cusips, the amount in dispute was 186, approximately $186 million?**

A. Market value, according to this analysis, that's what this document would indicate, yes.

**Q. And the amount of the value of the Cusips in dispute on the DTC settled side was 20-some-odd million dollars?**

A. According to this document, yes.

**Q. Do you have any knowledge one way or the other whether that's correct or not?**

Page 237

HIGHLY CONFIDENTIAL - J. HRASKA

A. I just testified that I didn't think the value of this analysis was worth anything. So, in my opinion, it's not valid.

**Q. Okay. Do you know if any adjustments were made in the valuations of securities as a result of your reconciliation of this issue?**

A. I don't know.

**Q. Okay. Could you just identify for me the next two items behind the next two blue sheets, the first --**

A. So this is the first blue sheet?

**Q. The first blue sheet which says -- up in the upper left-hand column which says, Source: Barclays," you see that?**

A. Yes.

**Q. What is this spreadsheet?**

A. This --

**Q. Let me ask it a different way maybe.**

A. Okay.

**Q. Is this one of the spreadsheets that are referenced on the first page of the first e-mail?**

A. Yes, this appears to be the supporting documentation that supports the summary totals

60 (Pages 234 to 237)

Page 238

HIGHLY CONFIDENTIAL - J. HRASKA

that we just discussed.

**Q. Okay. If I look on the front page of the e-mail, the first e-mail, it references looks like a file entitled "Barclays Financing Collateral Lists, BARC Ops," is that this database?**

A. I don't know.

**Q. Okay. How about the last database behind the final blue sheet, do you know what that document is?**

A. Again, I'd have to speculate that it's the supporting documentation to the other summary totals.

**Q. Okay. Do you know which one -- I see on the opening e-mail there's a document entitled "Corrected Thursday Transfers to Barclays. BONY Agreed." You see that?**

A. I do, yes.

**Q. Is that one of these two lengthy databases at the end, do you know?**

A. I don't know.

MR. HINE: Okay. I think, Mr. Hraska, I have no further questions for you. Thank you very much for your time. I think some

Page 239

HIGHLY CONFIDENTIAL - J. HRASKA

of my colleagues might.

(Discussion off the record.)

(Recess; Time Noted: 3:26 P.M.)

(Time Noted: 3:31 P.M.)

EXAMINATION BY

MR. OXFORD:

**Q. Mr. Hraska, we met off the record, but let me introduce myself on the record. I'm Neil Oxford and I'm with Hughes, Hubbard & Reed. We represent the SIPA Trustee.**

A. Okay.

**Q. You testified that sometime after the closing of the transaction you learned that Barclays purchased the unencumbered assets of LBI's clearance boxes, correct?**

A. Can you specify, when you say "the closing of the transaction," which transaction you're referring to?

**Q. I mean the closing of the sale of LBI's assets to Barclays on the 22nd of September?**

A. Okay. So I'm sorry, can I ask you to repeat the whole question based on that?

(Record read.)

Page 240

HIGHLY CONFIDENTIAL - J. HRASKA

A. That's correct.

**Q. From whom did you learn that?**

A. Paolo Tonucci.

**Q. When did Mr. Tonucci advise you of this?**

A. I don't recall a specific date.

**Q. Do you recall whether it was shortly after the closing on the 22nd of September?**

MR. SHAW: What do you mean by "shortly after"?

**Q. Well, was it within a week, within a month of that closing?**

A. It was within a month, yes.

**Q. Can you tell me anything else you remember about that conversation with Mr. Tonucci?**

A. I remember that he had said that, as a result of this transaction, we were to search for all of the assets that were considered unencumbered in the Lehman boxes.

**Q. From whom did you get your instructions over the weekend of the 20th and 21st to search for unencumbered assets? Was that Mr. Forrest?**

Page 241

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. My direct instructions came from Mr. Forrest as my supervisor, yes.

**Q. Did you talk to anybody else about what your instructions were tbat weekend with respect to identifying unencumbered assets in LBI's clearance boxes?**

A. With respect to identifying the assets and instructions, no, those all came from Mr. Forrest.

**Q. The 1.4 billion, approximately, in assets that you believe were transferred from LBI's clearance boxes, do you believe that they include the assets that were transferred on the 18th of September?**

A. No.

**Q. Why do you say that?**

A. Because, from my previous testimony, all the assets that were transferred on the 18th were reconciled through, and the assets that we delivered from the 18th onward -- like I have a record of all the assets that were transferred beyond the 18th, and so when I surmise that it was 1.4 billion, it was based off of the assets that were transferred subsequent to the 18th

61 (Pages 238 to 241)

Page 242

HIGHLY CONFIDENTIAL - J. HRASKA

from my records.

**Q. Does the 1.4 billion figure you bave testified about include assets that were transferred on the 19th of September?**

A. Yes, it does.

**Q. And what's the approximate value, to your knowledge, of the assets that were transferred on the 19th?**

A. A little bit over a billion. I believe it's like 1.034 or 35 billion.

**Q. You said tbat you looked across stock records tbe weekend of the 20th and 21st for assets over whicb tbere was no lien; is that correct?**

A. That's correct.

**Q. Is it fair to conclude that the results of your search for unencumbered assets or assets with no lien was the results were imperfect?**

A. That's fair to say, yes.

**Q. And it's fair to say because of tbe 800 or so Cusips that you testified earlier were identified to you as actually encumbered or other than unencumbered, correct?**

Page 243

HIGHLY CONFIDENTIAL - J. HRASKA

A. That's correct, yes.

**Q. Can you tell me how you went about identifying --**

A. Can I just clarify something?

**Q. Of course.**

A. They were identified as -- on the system as not movable or encumbered, but we needed to do some more investigation because we didn't know whether they truly needed to remain encumbered or whether they were erroneously encumbered.

**Q. And did you do that investigation?**

A. I didn't personally do that investigation. There was -- there was a reconciliation effort that took place that reconciles stock record breaks which then later helped unencumber some of that collateral.

**Q. So, as I understand this, you were given a list that you called an exception list; is that correct?**

A. That's correct, yes.

**Q. Who gave you tbat exception list?**

A. I don't recall the person. I remember it came from Finance.

Page 244

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. And Finance is?**

A. Finance is like product control. Finance -- those are the names of the organization, Product Control Finance. I believe it's managed now by Martin Kelly and his team here at Barclays.

**Q. And can you tell me what an exception list is, please?**

A. The exception list as defined by what we're discussing was the Schedule B list versus -- the official Schedule B list versus the actual collateral delivered to Barclays subsequent to the 18th.

**Q. And at some point did you get a list of 800 Cusips that had not been delivered? Are we talking about the same list?**

A. That's the same list, yes.

**Q. And a reconciliation effort was then undertaken; is that correct?**

A. There was a reconciliation effort -- well, there was two things that were done. There was a verification to see whether or not those, in fact, those 800 were or were not delivered. We verified that those 800 were not

Page 245

HIGHLY CONFIDENTIAL - J. HRASKA

delivered, and then there was a reconciliation just in general to resolve stock breaks at the firm which was done.

**Q. Of the 800 Cusips that you have verified or your team had verified were not delivered, did you determine whether or not any of those securities were in fact unencumbered?**

A. I didn't determine that, no.

**Q. Do you know if such a determination was made?**

A. I don't, no.

**Q. When were you given this exception list?**

A. I don't recall, honestly.

**Q. Can you give me any idea as the whether it was 2008 or 2009?**

A. Honestly, no.

**Q. Was it around the same time, Mr. Hraska, that you were asked to go and find additional unencumbered assets in Lehman's clearance boxes?**

A. Yes, but I was asked that multiple times at multiple stages. We talked about it over the weekend and then there was times where

62 (Pages 242 to 245)

Exhibits 67 - 69 Pg 103 of 167

Page 246

HIGHLY CONFIDENTIAL - J. HRASKA

much further beyond that. So when you're referring to -- at what period of time were you referring to?

**Q. The period of time that you can't remember where you were given the exception list.**

A. Yes, so around that time, yes.

**Q. Do you recall who asked you, at around the time you were given the exception list, who asked you to go and find additional unencumbered assets in Lehman's clearance boxes?**

A. At that time, it would have been Robert Azerad.

**Q. Did Mr. Azerad tell you why he wanted you to go and find these additional unencumbered assets?**

A. It was in connection with the -- with the Asset Purchase Agreement between Barclays and Lehman.

**Q. Did he give you any more detail than that?**

A. No.

**Q. I think you testified that you went on to identify an additional amount of unencumbered**

Page 247

HIGHLY CONFIDENTIAL - J. HRASKA

**assets in response to Mr. Azerad's request; is that correct?**

A. Yes, that's correct.

**Q. And the figure I have written down is approximately 6 to 7 hundred million dollars of unencumbered assets that you previously had not identified; is that correct?**

A. That's correct.

**Q. Can you tell me how you went about, over the weekend of the 20th and 21st of September, identifying unencumbered assets?**

A. Sure. We -- we relied primarily on GFS, which we talked about a little bit earlier, which is a system that was a database aggregator that took information from multiple mainframes which represented the books and records of Lehman Brothers.

We then took that data and we looked for primarily assets which were held in firm trading accounts, and we compared the firm asset side versus the balances which were held in the depositories to make sure that there was enough assets in the depositories to support that inventory balance, and if there was enough, we

Page 248

HIGHLY CONFIDENTIAL - J. HRASKA

deemed that be to be unencumbered assets.

**Q. Did you take any steps to determine whether or not the assets you identified could have been owned by Lehman's customers?**

A. The accounts we searched in were firm trading accounts and stock loan borrow accounts, and in either of these accounts it would have been deemed as inventory because it as in a firm inventory trading ledger, or if it was in a stock loan account, it would have been as a result of having rehypothecation rights. We would have been allowed to borrow it so we would have used that as a source for collateral.

**Q. Is it possible that, taking the hypothetical example of 100 shares of IBM stock that's sitting in the DTC box at O74, is it possible that there could be a claim on that, those 100 shares by both a Lehman customer and by Lehman?**

MR. SHAW: Objection, form.

**Q. Do you understand my question?**

A. Could you repeat it, please?

**Q. Yes. If there are -- if there's a particular Cusip or set of Cusips sitting in**

Page 249

HIGHLY CONFIDENTIAL - J. HRASKA

**Lehman's DTC box O74 --**

A. Okay.

**Q. -- is it possible that there could be a claim on those Cusips by both Lehman as a firm and by Lehman's customers?**

MR. SHAW: Objection to form.

A. In your first question, you specified a quantity and you specified whether each of those could have lay to the same claim for that quantity.

Is that still your question, or is your question now in general could -- could customers and firm have claim to the same Cusip number, meaning the identifier, not the actual number of shares?

**Q. The actual number of shares. I meant to reask my first question.**

A. Okay. So if the stock record is reconciled, you would not have situation where you would have both the firm and customer having a claim to the same number of shares at the depository.

**Q. Were Lehman stock records reconciled fully over the weekend of September 20 and 21?**

63 (Pages 246 to 249)

Page 250

HIGHLY CONFIDENTIAL - J. HRASKA

A. No, which is what led to the inconsistencies you referenced on my set of files that I first produced.

**Q. Those are those 800 Cusips that were not delivered, many of which were in fact determined ultimately to be encumbered, not unencumbered securities, correct?**

A. Yes.

**Q. Why were Lehman's stock records not fully reconciled over that weekend?**

A. Well, as I'm sure you're aware, the financial markets were going through down -- quite of a meltdown in that period and, more specifically, Lehman Brothers. There was an inordinate amount of activity going through our clearance boxes, through our front ends and back ends processing systems.

In addition to that, there were relationship troubles with JPMorgan Chase, and as a result of that, there was information that was typically received, like file transfers that represent statement balances and things like that, that we would normally expect to receive from your custodians which were not sent to

Page 251

HIGHLY CONFIDENTIAL - J. HRASKA

Lehman Brothers on either the night of the 19th or during bat cycles on the 20th. So it was very difficult to do a reconciliation without a complete set of data.

**Q. Did you ever get to have a complete set of data such that you could make that reconciliation?**

A. The firm received additional data. I personally wasn't in charge of those reconciliations. So, as to the nature of its completeness, I couldn't testify to that.

**Q. Who was in charge of any subsequent reconciliations of the firm's stock records? And my question is with respect to Schedule B or subsequent iterations of Schedule B, as far as you're aware, sir.**

A. Well, that's two questions. So there's a group that's responsible for the stock record reconciliations, which is the firm Balancing Department, which I don't remember who was in charge of it at the time, but it would have been the firm Balancing Department that's responsible for that in conjunction with the Clearance folks.

Page 252

HIGHLY CONFIDENTIAL - J. HRASKA

They focused on putting the stock record back in balance, but I don't know whether there was any reconciliation once the stock record was back in balance to the original Schedule B.

**Q. The securities that were transferred from Lehman to Barclays on the 19th?**

A. Yes.

**Q. Was it your idea to transfer those or was that the idea of someone you reported to?**

A. It wasn't that it was a unique idea of my own. What it was, it was a normal course transaction, which we had previously deposited cash as a result of the problems we had the night before.

And in a repo transaction, I think I mentioned earlier, you typically wouldn't deposit cash to get cash. So it's, you know, it's a normal course transaction and it was a situation where you're not using your collateral efficiently to try to find substitute collateral. Especially in a tri-party arrangement, you have full rights to go ahead and do that, and that type of transaction is

Page 253

HIGHLY CONFIDENTIAL - J. HRASKA

typically affected by Operations personnel, not Trading personnel.

So, you know, I discussed with the folks at Barclays the previous night and, you know, and at Lehman that we were going to, you know, the next morning we were going to look to do exactly that and replace the cash with, you know, substitute collateral.

**Q. Can you be more specific about the names of the people you discussed this with?**

A. At Barclays I spoke to John Rodefeld about it, and at Lehman I would have spoke to Monty Forrest and Alastair Blackwell about it.

**Q. And did Mr. Forrest and Mr. Blackwell approve of this transaction?**

A. Yes, they understood it to be a normal course function that I would have done at any other point in time.

**Q. So I'm clear, it was something that -- this transfer of approximately $1.1 billion was done on your initiative, correct?**

A. That's correct, yes.

**Q. But what you say is this is something that was --**

64 (Pages 250 to 253)

HIGHLY CONFIDENTIAL - J. HRASKA

A. Commonplace.

Q. -- commonplace in this commercial situation?

A. Yes.

Q. And the underlying commercial contract that governed this transaction was the tri-party repo that you've testified about today?

A. Yes.

Q. And just so the record is clear, no cash was ever returned to Lehman in return for this transfer of $1.1 billion in additional unencumbered collateral to Bank of New York on the 19th of September, correct?

A. To my knowledge, that's correct.

Q. I have a few documents to show you.

(Exhibit 147B, an e-mail sent from Mr. Hraska to Paolo Tonucci, copying others, on Friday, the 19th of September, 2008, marked for identification, as of this date.)

Q. Showing you, Mr. Hraska, what I've marked as Tab 147B. Let me know when you've had a chance to look at that document.

(Document review.)

A. Okay.

HIGHLY CONFIDENTIAL - J. HRASKA

Q. I'll identify this for the record as an e-mail sent from Mr. Hraska to Paolo Tonucci, copying others, on Friday, 19th of September, and at this time written here 2:28 P.M. is in GMT. So in Eastern Standard Time, that's about 10:30 in the morning.

A. Uh-huh.

Q. Do you recognize this document, sir?

A. I do.

Q. The subject is pledges. It says, "Paolo," and you write to Mr. Tonucci, "We managed to pledge over about 800 MM in MV to BarCap." What does that mean?

A. "MM" is a term that means millions, and "MV" is market value. So the assets that we had pledged over up to that point were, in our estimation, from the, you know, our systems, the way we had them marked, was worth about 800 million in value.

Q. So the 800 in MV is Lehman's marks?

A. Those are Lehman's marks, yes.

Q. And was this a transfer that you had instructed on Friday morning, the 19th?

A. That was part of it. Being that it's

HIGHLY CONFIDENTIAL - J. HRASKA

only 800 million, I don't believe it was all of it that ultimately ended up getting transferred over.

Q. Is this 800 million part of the 1.1 million we have just been discussing that was transferred that same day, the 19th?

A. It would have been, yes.

Q. You go on to say, "We may have identified another 500 million, but I wanted to check with you first before pledging it to them."

A. Yes.

Q. Do you recall whether Mr. Tonucci replied to you?

A. I don't recall.

Q. That's all I have for that document.

(Exhibit 148B, an e-mail chain, the first in time dated September 19, 2008, at 3:43 P.M., marked for identification, as of this date.)

Q. I've handed you a document I have marked as Exhibit 148B. Tell me when you've had a chance to look through it.

(Document review.)

HIGHLY CONFIDENTIAL - J. HRASKA

Q. Of course, you are welcome to look at the whole document. It's really the original e-mail at 3:43 P.M. that I'm going to focus my questioning on. It's a two-page document. It's double-sided.

A. I didn't realize it was double-sided. I'm sorry.

(Document review.)

A. Okay.

Q. At 3:43 P.M. on Friday, 19th, you write to Mr. Feraca, Mr. Aronow, and others, on the subject of an urgent tri unwind. You say, "We pledged only 800 million of new collats to BarCap. All is frozen."

A. Are we talking about the same document?

(Indicating.)

A. Oh, on the very last sentence. I'm sorry. Okay. I'm sorry. Go ahead.

Q. Do you see where it says, "We pledge only 800 million of new collat to BarCap. All is frozen"?

A. I do, yes.

Q. Does that refresh your recollection

HIGHLY CONFIDENTIAL - J. HRASKA

**about the amount of collateral you posted with Barclays on the 19th of September?**

A. It may have been the market value at that particular point in time. We are still able to pledge through -- at 3:43 it would have been a time that we still technically would have been able to pledge assets from DTC to Barclays if we determined there was availability.

So at the time, I'm comfortable that that's what it was, but as it determined later, we moved more than 800 million worth of securities.

**Q. What do you mean "all is frozen"?**

A. I don't know. Looking at it now, I don't really recall the context of what I was referring to with "frozen." I apologize.

**Q. Does it perhaps refer to your earlier testimony and to Chase freezing the movement of any further cash?**

A. To be honest, I don't know.

**Q. Okay.**

MR. SHAW: Are you done with this one?

MR. OXFORD: Yes.

(Exhibit 149B, an e-mail from Gene

HIGHLY CONFIDENTIAL - J. HRASKA

Lempert, to Mr. Hraska, Sunday, September 21, at 3:38 A.M. GMT, or 11:38 P.M. EST, marked for identification, as of this date.)

**Q. Did you have an understanding, Mr. Hraska, that the 800 million of collateral we have just been discussing was of particular importance to the deal?**

A. Can you specify the deal you're referring to?

**Q. The transaction between Lehman and Barclays, the purchase transaction.**

A. At that point in time, the significance of that transaction to me was that we were trying to do a substitution for part of the 7 billion that we had pledged over the previous night in cash.

**Q. And what was the purpose of the substitution of this collateral for cash?**

A. The purpose was purely efficiency of collateral usage. If you're going to obtain financing on a secured loan, you typically get cash, right? You pledge an asset. It wouldn't make sense to get cash and pledge cash right back again, so that's why we were looking to

HIGHLY CONFIDENTIAL - J. HRASKA

substitute securities as opposed to cash on that repo transaction.

**Q. Was Lehman trading that day, the 19th?**

A. Lehman was -- was trading, yes.

**Q. And was the cash needed for any particular activity?**

A. I don't know that I could effectively comment on that. I mean, they were trading. They would have had cash requirements. So but as to whether it was for a particular activity, I don't know.

**Q. No one articulated a particular need or purpose behind this cash?**

A. No.

**Q. If you look at what I have marked as Exhibit 149B, please.**

A. Sure.

**Q. And let me know when you've had a chance to look at it.**

**(Document review.)**

MR. OXFORD: For the record, I'll identify this as an e-mail from Gene Lempert, to Mr. Hraska, Sunday, September 21, at 3:38 A.M. GMT, or 11:38 P.M. EST.

HIGHLY CONFIDENTIAL - J. HRASKA

MR. SHAW: The previous night.

MR. OXFORD: Yes, previous night. Thank you.

A. Okay.

**Q. Do you recall this document, sir?**

A. I do, yes.

**Q. It appears from the document that some technical staff were trying to restore a database; is that correct?**

A. Yes, that's correct.

**Q. And that's the database called Magics?**

A. That's correct.

**Q. What is the particular file that the technical people are trying to restore, if you know?**

A. This was the file of the assets transferred on the 19th which made up the 1.0345 million.

**Q. Do you have an understanding of why there was an attempt made to restore this file?**

A. At some point in time, I don't recall who it was, but somebody had asked that we made sure we were able to retain records of everything that we had transferred over or were

Page 262

HIGHLY CONFIDENTIAL - J. HRASKA

we sure that all the records that we had were going to be able to prove out what we transferred over.

For the assets that were held in the O74, the mechanism that we used to transfer was the front end system Magics connected to our O74 DTC depo, and because we were delivering them to the Bank of New York, which was not anyplace that we had delivered prior to the 18th, we weren't 100 percent sure that these records would have been stored in the database. So I was double-checking to make sure the database hadn't been overwritten because it was a brand-new process.

I testified a little bit earlier we had no connectivity to the Bank of New York prior to the 18th, so that was me confirming that we in fact would have had the records available to us.

**Q. If I understand your testimony correctly, it was your idea to have the file restored; is that correct?**

A. Yes, that's correct.

**Q. Do you see on the front page of the**

Page 263

**HIGHLY CONFIDENTIAL - J. HRASKA**

**document I have marked as the exhibit that you write to Mr. Lempert at 11:17 P.M. on Saturday, do you see that?**

A. Yes.

**Q. It says you're working through the night, as I imagine a number of other people were. The second paragraph says, "The BarCap purchase of us hinges on us having enough collateral to cover shortfall."**

**What did you mean by that?**

A. Honestly, I don't know. I assume it was based off of a comment that somebody had made to me, but I just don't remember the particular context of that. I'm sorry.

**Q. Do you know what "shortfall" means in this context?**

A. I don't. I mean, prior to seeing this, I didn't remember making that comment, so I don't.

**Q. If I understand your testimony correctly, your having restored a file that relates to the transfer of a billion dollars of collateral that's already gone to BarCap?**

A. That's true, yes.

Page 264

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. I guess your comment doesn't make any sense to me in that context. Why would the restore of a file for a transfer of a billion dollars of data that's already -- I'm sorry, a billion dollars of collateral that's already been transferred relate to the question of whether or not you have enough collateral to cover a shortfall?**

MR. SHAW: Objection to form.

A. I honestly don't know. If I could remember the context of why I wrote the sentence, I would be able to answer you, but I just don't remember why I put this in here.

**Q. Maybe if you hadn't been up all night, you would remember.**

**The next sentence says, "This 800 million is critical to the deal." Do you recall writing that?**

A. I don't recall writing it. Obviously I did write it, but I don't recall writing it, no.

**Q. Sitting here today, do you know what you meant when you told Mr. Lempert that this 800 million is critical to the deal?**

Page 265

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. No. Quite honestly, I'm confused on the number of 800 because it doesn't tie into any of the other things we were talking about in this. I know that on that day we transferred -- on the 19th, we transferred a billion-35. So I honestly don't know where that 800 number ties in.

(Exhibit 150B, Mr. Lempert to J. Hraska and others, Sunday, 9/21, at 1:34 A.M. GMT, marked for identification, as of this date.)

**Q. I'm handing you what I have marked as Exhibit 150B, which is an e-mail from Mr. Lempert to you and others, Sunday, 9/21, at 1:34 A.M. GMT, which is 9:34 P.M. Eastern, on Saturday. Let me know when you've had a chance to look through that document.**

**(Document review.)**

A. Okay.

**Q. This is an e-mail that I think relates to the same topic as Exhibit 149. On the second page there's an entry in the string at 8:19 P.M. There's an e-mail from you to Mr. Lempert and others. It says, "Mike, I urgently need to get**

67 (Pages 262 to 265)

Page 266

HIGHLY CONFIDENTIAL - J. HRASKA

a hold of a file that shows all the items we pledged to BONY 885 on Friday. Pete says it was around about 800 million MV. Need this for Paolo. Please send to Nancy and I."

Q. Is this your original request for the restore to Mr. Lempert?

A. It is, yes.

Q. What's BONY 885?

A. This is the Bank of New York pledge location at DTC.

Q. You say, "Need this for Paolo."

A. I believe --

MR. SHAW: There's no question pending.

Q. What do you believe? Was this something that Mr. Tonucci had asked you for?

A. I believe that Paolo had requested that we make sure we had complete records of everything that we transferred on the deal, which is why I needed it for Paolo.

Q. You'll see there's a file attached to this document and the file is named Tri49192008.XLS, you see that?

A. I'm sorry.

Page 267

HIGHLY CONFIDENTIAL - J. HRASKA

Q. It's the attachment on --

A. Right. Okay. And this file behind it -- that's it, right.

Q. Is it that file?

Do you believe that this is the restored file of the unencumbered collateral that you had transferred to the Bank of New York for the benefit of Barclays on September 19, 2008?

A. Yes.

Q. That's all I had for that document.

(Exhibit 151B, an e-mail from Monty Forrest to Mr. Lowitt, Mr. Blackwell, Mr. Ullman and J. Hraska, copying Mr. Tonucci and others, sent on Sunday, 9/21, at 9:16 A.M. GMT, marked for identification, as of this date.)

Q. Mr. Hraska, I've handed you a document marked Exhibit 151B, which I'll identify for the record as an e-mail from Monty Forrest to Mr. Lowitt, Mr. Blackwell, Mr. Ullman and you, copying Mr. Tonucci and others, sent on Sunday, 9/21, at 9:16 A.M., GMT, or 5:16 A.M. eastern. Let me know when you've had a chance to review

Page 268

HIGHLY CONFIDENTIAL - J. HRASKA

that.

(Document review.)

A. Okay.

Q. Do you recall this document?

A. I do.

Q. First of all, if I can direct your attention to the e-mail that begins at the bottom of page 1, the top of page 2, from Mr. Lowitt that is sent to you, Monty Forrest, Alastair Blackwell and Neal Ullman.

Do you recall receiving that e-mail from Mr. Lowitt?

A. I remember this string. I don't particularly remember this particular blurb.

Q. Did you attend the 7 A.M. meeting?

A. I did not, no.

Q. Mr. Lowitt says, "Good luck getting additional collateral, but to get accurate presentation of the collateral is also critical as we will append to the agreement," do you see that?

A. I do, yes.

Q. Do you recall reading that at the time?

Page 269

HIGHLY CONFIDENTIAL - J. HRASKA

A. No.

Q. Did you have any understanding at the time you received this e-mail or at any time over the weekend that the work you did to identify additional collateral would be appended to any type of agreement?

A. No, unfortunately. The weekend, as we discussed previously, I mean, I can't even tell you how many hundreds of e-mails I got. So it's conceivable that I didn't see everything in every e-mail, so... I just don't recall this passage.

Q. Monty Forrest replies to the chain and he says, "We have analyzed any unencumbered assets in all boxes that were not picked up by financing systems." Do you know what that means?

MR. SHAW: Objection to form.

A. I don't know what he means by that phrase. It wouldn't have been the way I would have phrased it, but ...

Q. How would you know how to phrase it if you don't know what he means?

A. Well, he provides a market value of

68 (Pages 266 to 269)

Exhibits 67 - 69 Pg 109 of 167

Page 270

HIGHLY CONFIDENTIAL - J. HRASKA

the collateral, and those market values came from the work that me and my team did. So I don't know why he's referencing finance systems here. These were collateral pieces that were based in the mainframe which was picked up by GFS. I'm just not sure what he's referring to by "financing systems."

**Q. So you see there's a total there, Mr. Hraska, of close to $2.3 billion?**

A. Yes.

**Q. Does that represent the unencumbered assets that, at least as of the date of this e-mail, you and your team had been able to identify?**

MR. SHAW: Objection to form.

A. I can't be certain. I can't be a hundred percent certain. I don't know.

**Q. Did you look for unencumbered assets in any location other than those listed in the e-mail from Mr. Forrest here?**

A. We looked for all unencumbered assets in the stock records. These were the ones that we thought that had the highest probability of having unencumbered assets in them. They were

Page 271

HIGHLY CONFIDENTIAL - J. HRASKA

our primary clearance boxes.

**Q. Were you looking for physical securities as well, Mr. Hraska, that weekend?**

A. We had, yes, we had looked through some of the clearance locations for physical securities, but based on the analysis, we, over the course of that weekend, weren't confident enough that we could determine whether those assets were unencumbered or not so we left them off of this analysis.

**Q. Did you leave physical securities off not just this analysis, but any analysis of unencumbered assets you provided to Mr. Forrest?**

MR. SHAW: Objection. Vague as to time.

**Q. My question is specifically with respect to this weekend of the 20th and 21st of September.**

A. We did an analysis of this weekend. Based on that analysis, we didn't forward any value of unencumbered securities which were physical.

**Q. You see the paragraph immediately following the 2.3 billion number?**

Page 272

HIGHLY CONFIDENTIAL - J. HRASKA

A. Uh-huh.

**Q. Relates to BONY Tri Pledge line item?**

A. Yes.

**Q. Does that refresh your recollection about any of your prior testimony about the reason the file was restored?**

A. Well, it was restored because we wanted to maintain records, but according to this, it appears that complete restore maybe wasn't possible. But I wouldn't change my reason to have requested the restore on the file.

**Q. After reading this e-mail, is it still your testimony that the transfer of approximately $1.1 billion from Lehman to BONY pledged to Barclays on the 19th of September settled?**

A. Yes.

**Q. That's all I have with that exhibit.**

**I'm handing you, Mr. Hraska, a one-page document that's previously been marked Exhibit 93B. If you can take a look at that and let me know when you've reviewed it, please.**

**I'm sorry, it's a two-page document.**

Page 273

HIGHLY CONFIDENTIAL - J. HRASKA

**(Document review.)**

**Q. I'll direct your attention to item 1 in the box, and if you would just identify for the record. This document is entitled "Management of Unencumbered Asset Gap."**

**Actually, let me first direct your attention to the first line that says, "Objective: Delivery to BCI of 1.95 billion of unencumbered collateral by COB Friday, September 19." Do you see that?**

A. I do, yes.

**Q. Were you aware of any objective to deliver 1.95 billion of unencumbered collateral to Barclays by the close of business on Friday, the 19th?**

A. No.

**Q. Item 1 in the box that's headed "Current Status Summary" is "Actual Delivery EOD Friday." Do you see that?**

A. I do.

**Q. Do you believe that refers to the approximately $1.1 billion of collateral that we've been discussing that was transferred from Lehman to Bank of New York on Friday, 19th?**

69 (Pages 270 to 273)

Page 274

HIGHLY CONFIDENTIAL - J. HRASKA

A. Yes.
Q. It says, "Outstanding Actions: Validation of settled versus unsettled of tri-party at BONY."
Do you know what that means?
A. It means that I was expected to validate whether or not those securities actually made it to Bank of New York.
Q. And consistent with your previous testimony, you did actually at some point confirm that transactions settled and those securities made it to Bank of New York, correct?
A. Yes, that's correct.
Q. Okay. That's all I have for that document.
(Exhibit 152B, an e-mail from Alastair Blackwell to Monty Forrest and to J. Hraska, copying Mr. Tonucci dated Monday, 22nd of September, 10:35 A.M. GMT, marked for identification, as of this date.)
Q. Handing you, Mr. Hraska, a one-page document marked Exhibit 152B, which I'll identify for the record as an e-mail from Alastair Blackwell to Monty Forrest and to you,

Page 275

HIGHLY CONFIDENTIAL - J. HRASKA

copying Mr. Tonucci dated Monday, 22nd of September, 10:35 A.M., GMT, 6:35 A.M. Eastern.
A. Okay.
Q. Do you see that Mr. Tonucci originally writes to you at approximately 4 A.M. on Monday, 22nd of September, on the subject of DTC box?
A. Yes.
Q. He says, "You should plan on moving all the unencumbered collateral in the DTC box first thing. Should correspond as closely as possible to list agreed with Barclays over the weekend." And you reply, "Understood." Withdrawn. Mr. Blackwell replies.
Do you know what the reference is to the list that was agreed with Barclays over the weekend?
A. I don't really know what was agreed to Barclays over that weekend. I know that there was a list, and I took this to be move everything that we identified on our list to Barclays. Again, I don't know what was agreed from that list to Barclays or not because I wasn't involved in those discussions.
Q. Did you give your list of unencumbered

Page 276

HIGHLY CONFIDENTIAL - J. HRASKA

collateral that you had identified to anybody other than Mr. Forrest?
A. I gave it to Mr. Forrest. We would have to see who was CC'd on there, if there was anybody on that list. I'm sure Mr. Forrest had passed it on at some point, but I don't recall giving it directly to anybody else besides Mr. Forrest.
Q. And you weren't involved in any discussions with anybody at Barclays about the content of that list over the weekend?
A. No.
Q. That's all I have for that.
(Exhibit 153B, a document bearing Bates Nos. BCI-EX-00003796, marked for identification, as of this date.)
Q. I'm handing you, Mr. Hraska, what I have marked as Exhibit 153B. It's a document produced by Barclays with a Bates range BCI-EX-00003796, and it has an attachment that I believe was produced in native form which is one of the attachments that I have marked that doesn't have any Bates numbers.
Do you recall this document, sir?

Page 277

HIGHLY CONFIDENTIAL - J. HRASKA

A. May I have a minute just to review it?
Q. Of course. Take your time.
(Document review.)
A. Okay.
Q. Do you recall this document, sir?
A. Yes, I do. Well, I recall the e-mail. The document I'm unable to tell that it's the attachment, but I'm assuming that it's been printed from this e-mail, so ...
Q. The e-mail at the bottom of the chain is from you to Mr. Rodefeld at Barclays, correct?
A. That's correct, yes.
Q. It's also to Mr. John Haley?
A. Yes.
Q. Who is Mr. John Haley?
A. Mr. Haley used to work for Mr. Rodefeld. Rodefeld ran Operations in North America at Barclays at the time and John Haley ran the Fixed Income side of the Operations for him at the time.
Q. Do you know where Mr. Haley is employed today?
A. He's still employed at Barclays. I

70 (Pages 274 to 277)

Exhibits 67 - 69 Pg 111 of 167

Page 278

HIGHLY CONFIDENTIAL - J. HRASKA

believe he's in the Wealth Division.

**Q. Do you know who Mr. Jim Beckenhaupt --**

A. Beckenhaupt.

**Q. Is he still employed at Barclays?**

A. He is.

**Q. And you copy Mr. Monty Forrest. The subject is Friday pledge. The e-mail reads, "John, as per your request, here's a list of the assets pledged Friday."**

A. Yes.

**Q. And again, it's got another attachment TRI09192008.**

A. Yes, so that's referring to the file we've been discussing that got pledged, you know, on the 91th.

**Q. And then you write again to John Rodefeld, saying, "John, here is a list of what was scheduled to come today. We're seeing that the collateral from O74 is shorter than we expected by 400 million."**

**Do you know why the collateral from O74 was shorter than you expected by 400 million?**

A. I remember there being a problem in

Page 279

HIGHLY CONFIDENTIAL - J. HRASKA

the morning of the 22nd with DTC, with the settlements folks, but as to why it was 400 million, I don't recall.

**Q. What was the problem with the settlement folks at DTC?**

A. The problem was is that they had indicated to me that there were a bunch of stock record breaks and there were a bunch of problems with their records in O74, so our initial look at the list that we had provided showed based on that that we didn't have availability of approximately 400 million.

**Q. Do you know whether that 400 million relates in any way to the 800 Cusips that were on the exception list you testified about earlier?**

A. I don't know specifically whether these -- because I never really reconciled this out to see whether or not they were related. Honestly, I don't know.

**Q. Okay. That's all I have for that document. Thanks.**

**(Exhibit 154B, a document bearing Bates Nos. BCI-EX-00007930 through 7931,**

Page 280

HIGHLY CONFIDENTIAL - J. HRASKA

**marked for identification, as of this date.)**

**Q. Handing you a document, Mr. Hraska, marked Exhibit 154B.**

A. Okay.

**Q. Which is an e-mail from you to Mr. Rodefeld, Mr. Haley, Mr. Beckenhaupt, Monday, 22nd of September, 7:34 P.M., produced to me by Barclays, BCI-EX-00007930 through 7931. Nothing interesting on the second page.**

**This appears to be a reply to the e-mail we just looked at, which was 153B. Mr. Rodefeld replies, "Jim, Hi. Thanks for this. Do we have the schedule for the securities quantities that were teed up to go today via DTC but were subsequently blocked."**

**Do you recall this e-mail?**

A. I do recall the e-mail, yes.

**Q. He goes on to say, "The schedule from Friday indicates that we moved approximately 1.1 billion in collateral. Is that accurate and is the part that you still need to deliver (assuming the pipes open up) worth approximately 900 million?"**

**Mr. Rodefeld asked two questions to**

Page 281

HIGHLY CONFIDENTIAL - J. HRASKA

**you there. Do you know what the answers to those two questions are?**

A. The answer to the first question is yes. The answer to the second question I don't know.

**Q. Okay. You say, "We would" -- withdrawn. "We most likely would need to do some substituting once DTC takes us out of the box."**

**What did you mean when you wrote that?**

A. Which part particularly are you referring to?

**Q. The part that I just read, "We most likely would need to do some substituting once DTC takes us out of the box"?**

A. Well, we had talked about the situation before where we had identified assets that we were going to try to move, and partially because the stock record, we couldn't move those, but also DTC at some point in the day had frozen our account. So for a period of time, and I don't recall whether it was for the whole day or not or a temporary situation, but at the time of this mail, we weren't able to do any

71 (Pages 278 to 281)

Exhibits 67 - 69 Pg 112 of 167

Page 282

HIGHLY CONFIDENTIAL - J. HRASKA

transfers.

**Q. That's all I have for that document.**

**Could you pick out Exhibit 140B and maybe 141B while you're at it.**

A. Would these have been much earlier or were these exhibits marked earlier on?

**Q. These would have been exhibits marked by Mr. Hine.**

A. What was the number?

**Q. 140B and 1401B.**

A. You said 140B and 141B?

**Q. 140 and 141.**

A. Okay.

**Q. Let's do 140B first.**

A. Okay. Did you have any involvement in preparing any of the schedules that are attached to this document?

MR. SHAW: Asked and answered.

**Q. And the answer was no?**

A. The answer is no.

**Q. Are you able to identify what the first spreadsheet attached here is, either by reference to the spreadsheet itself or by reference to the e-mail? And if it helps, the**

Page 283

HIGHLY CONFIDENTIAL - J. HRASKA

**fourth paragraph of the e-mail says, "The attached document entitled DTC O74 and 636 available. Call," is the second part of Schedule B.**

A. No, these file names don't appear familiar to me. By looking at this file, this doesn't look like a file that I produced.

**Q. If you look at Bates range ending 52704?**

A. 52704?

**Q. Which is just before the second blue piece of paper.**

A. Okay.

**Q. Do you see that?**

A. 52704? Yes.

**Q. Do you see at the bottom of the column headed "Lehman Market Value" there's a figure approximately $269 million?**

A. Yes, right.

**Q. Does that refresh your recollection about what this spreadsheet refers to?**

A. 269 million was approximately one of the market values from one of the DTC boxes. I don't recall which, but that's what that would

Page 284

HIGHLY CONFIDENTIAL - J. HRASKA

have -- that's what that would have referred to.

**Q. I take it since you were not involved in the preparation of this document you are not able to tell me whether or not these records included the 800 Cusips that were on the exception list we've previously discussed?**

A. No.

**Q. Okay. That's all I have for that document.**

**Can you have 141 in front of you, please? Sorry, 141B. Same question. I just wanted to make sure I understood your testimony.**

**So you were not involved in the preparation of these attachments?**

A. I was not involved in the preparation of these.

**Q. And from a review of the e-mail on the attachments themselves quickly, are you able to tell me what they are?**

A. Based off the e-mail, they appear to be Schedule A and B, but I --

**Q. But beyond that, you have no independent knowledge?**

A. No. Sorry.

Page 285

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Thanks. That's all I have for that.**

**I'm handing you a document that's previously been marked as Exhibit 85B. If you could take a moment to look at the e-mail, and in particular to the first page behind the blue sheet, which is entitled "Lehman Brothers/Barclays APA Lead Sheet."**

**And let me know when you've had a chance to do that, please. The Bates range of 85B is BCI-EX-S-00004396 through 4675.**

**(Document review.)**

A. Okay.

**Q. Do you recognize this document, sir?**

A. Only from the preparation I did for my deposition of my 30(b)(6).

**Q. Other than in preparation for your deposition, have you ever seen this before?**

A. No.

**Q. Do you know who the people are who are identified on this e-mail chain from Mary Korycki sent September 29 at 8:19 P.M.?**

MR. SHAW: Are you going to go through each person and say who they are?

MR. OXFORD: Uh-huh.

72 (Pages 282 to 285)

HIGHLY CONFIDENTIAL - J. HRASKA

A. Fogerty I do not know. Will Gordon I do not know. Jeffrey Donaldson I don't know. Al Lakhani I do not know. William Fox I do not know. Mary Korycki I don't know, but I see from her title she's from A & M, but I don't know her. Paolo Tonucci I know. Alex Kirk I know. Lori Fife I do not know. Robert Messino I do not know. Rob Miller I do not know.

**Q. How about Danielle Pitts?**

A. I'm sorry, I missed that. I do not know Danielle.

**Q. I take it you were not involved in an APA schedules meeting on the 30th of September?**

A. No, sir.

**Q. Do you know who was involved in compiling these --**

A. No.

**Q. -- these documents?**

A. Unfortunately, I don't.

**Q. Given the hour, it may be fortunate.**

**Can I ask you to turn your attention to the lead sheet?**

MR. SHAW: That's the page beyond the blue sheet.

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Bates range is Bates number is 4398.**

A. 4398?

**Q. Do you see that?**

A. Yes, sir.

**Q. And I'm interested in the section beginning "Unencumbered box as of Sunday, 9/21/08." Do you have any understanding of the data that's on this schedule beginning with the legend "Unencumbered Box"?**

A. Are you asking me as to whether I would understand the terms and how they would relate to what these things mean, or am I -- are you asking whether would validate these numbers if they're accurate?

I've never seen the document. If you want me to opine as to what something says here as a generic term, I can do that. I don't -- like I didn't help create any of these numbers or these categories, but I can --

**Q. Have you done any independent work to determine whether or not these figures are accurate?**

A. I have not, no.

**Q. Have you spoken to anybody to**

**HIGHLY CONFIDENTIAL - J. HRASKA**

**determine whether or not these figures are accurate?**

A. No.

**Q. What does "positions not with no memo seg mean"?**

A. That means somebody made a typo. I'm not trying to be sarcastic, but it's a double negative. If I had -- I'm assuming positions without memo seg or with no memo seg is what they were referring to, meaning positions that would be unencumbered positions with memo seg.

Memo seg is a -- a "seg" refers to -- it's a short for "segregation," which would mean -- "memo seg" is a shortened abbreviation of segregation, which would mean that it's encumbered.

**Q. Okay. You see there's a figure of 269,921 --**

A. Yes.

**Q. -- 343?**

A. Uh-huh.

**Q. Does that appear to be the same 269 million figure that we looked at that was the total of one of the spreadsheets attached to**

**HIGHLY CONFIDENTIAL - J. HRASKA**

**Exhibit 140B?**

MR. SHAW: Objection to form.

A. Can you redirect me to where in 140B you asked me that question before?

**Q. Yes. It's 5274.**

A. Yes, it's the same figure.

**Q. Okay. Does that help you identify in any way what that entry of 269 million refers to?**

A. The legend on the left refers to 636, which is a DTC depository.

**Q. You'll see at the left-hand side there's an entry that reads, "Friday 9/26 Transfers." You see that?**

A. Yes.

**Q. And it appears to be a total of a little over $1 billion, 1.035 billion?**

A. Yes, that's correct.

**Q. Do you know what that figure represents?**

A. I recognize the amount. It's the amount we've referenced earlier in the testimony, but I believe, again, you have another typo, because to the best of my

Page 290

HIGHLY CONFIDENTIAL - J. HRASKA

knowledge, there were no transfers on 9/26. I believe that's the market value of the positions that were transferred on 9/19.

**Q. If there were transfers from the DTC box of Lehman to Barclays on 9/26, would you know about it?**

MR. SHAW: Objection to form.

A. I don't know.

**Q. Would you expect to know about it?**

MR. SHAW: Objection to form. Incomplete hypothetical.

A. I would hope to know about them.

**Q. The next set of entries relates to Monday transfers. Do you see those?**

A. Yes.

**Q. Are you aware of any transfers from Lehman to Barclays of unencumbered securities on Monday, September 29?**

A. Yes, I am.

**Q. Are those transfers the transfers that are reflected in this lead sheet totaling approximately 333 million?**

A. I recognize the 269. I can't confirm the 63.

Page 291

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. How is it you recognize the 269?**

A. I recognize the 269 as positions that we had in 636.

**Q. I notice that the figure that you say you recognize of a Monday transfer of $269,921,368 is similar to the figure above?**

A. Yes.

**Q. At 36 -- sorry, 636?**

A. Right.

**Q. But not identical?**

A. Yes, that's true.

**Q. Do you believe the relationship between these figures is anything other than coincidental?**

A. I'm sorry, could you repeat that one more time?

**Q. Do you believe there's any relationship between those two figures of 269 million as they appear on this page?**

MR. SHAW: Objection to form.

A. I believe they are the same block of securities, meaning that this is what was deemed to be available and this was when it was actually transferred.

Page 292

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. And you believe those to be unencumbered securities that were in Lehman's 636 box at DTC as of Monday, September 29, 2008, correct?**

A. As of Monday, I'm sorry, which date?

**Q. As of Monday, September 29.**

A. Yes, that's correct.

**Q. Do you have any information about the figure that appears below the 269, the second 269 million figure we've been looking at, $63,569,597?**

A. No, that figure is not familiar to me.

**Q. If you wanted to find out what that figure referred to, who would you ask?**

A. Well, in relation to this document, I would ask one of the people CC'd on this e-mail.

**Q. There's a reference in Footnote 1 to chilled securities, do you see that?**

A. Yes.

**Q. Do you know what that chilled securities are?**

A. Yes, I know what chilled securities are.

**Q. What are they?**

Page 293

**HIGHLY CONFIDENTIAL - J. HRASKA**

A. They are securities which have their movement between DTC locations restricted for one reason or another.

**Q. That's all I have for this document.**

**(Exhibit 155B, a document bearing Bates Nos. BCI-EX-S-00017385 and 7386, marked for identification, as of this date.)**

**Q. I'm handing you, Mr. Hraska, what I have marked as Exhibit 155B, a document marked BCI-EX-S-00017385 and 7386. The attachment was produced to me in native form, which is why it doesn't have a Bates range.**

MR. SHAW: So that's also why a number of columns are truncated.

**Q. If you could let me know when you've had a chance to review that, Mr. Hraska, I've got a couple questions.**

**(Document review.)**

A. Okay.

**Q. Do you recognize this document?**

A. I do, yes.

**Q. It appears to be a document e-mailed by Mr. Forrest to Alastair Blackwell and Mr. Tonucci, copying you, on the subject of**

74 (Pages 290 to 293)

HIGHLY CONFIDENTIAL - J. HRASKA

**"additional collateral moved to BarCap." Is that right?**

A. That's correct, yes.

**Q. There's an attachment to this document. Were you involved in creating it?**

A. My team provided the data to create it, but we didn't actually create it.

**Q. When you say "your team," who do you mean by "your team"?**

A. Meaning myself, and this particular data was provided by myself and Nancy Denig.

**Q. Do you have a recollection of providing this data specifically to Mr. Forrest on or around September 30, 2008?**

A. Yes.

**Q. Do you know the purpose for which you were providing this data to Mr. Forrest?**

A. He had asked me for a summary of collateral that we had transferred to Barclays from the 19th to present day that we actually physically were able to move from the Lehman depositories over to Barclays.

**Q. Where did you find the information to provide to Mr. Forrest?**

HIGHLY CONFIDENTIAL - J. HRASKA

A. They were from spreadsheet records that I had kept in my group. The same spreadsheet records which we referenced earlier had been reconciled with both the Barclays Operations folks and Bank of New York.

**Q. Are these spreadsheets you took with you when you moved to Barclays?**

A. The spreadsheets are saved in a common drive somewhere. I don't know that I still have access to them or not.

**Q. "Mr. Hraska, here is a summary of the what has been moved in order to satisfy the additional collateral move of 1.95 billion to BarCap. I had also shown the outstanding amount due. We will continue to identify available unencumbered collateral as the stock record breaks clean up."**

**Do you see that?**

A. Yes.

**Q. Do you know what Mr. Forrest meant when he said, "We will continue to identify available unencumbered collateral as the stock record breaks clean up"?**

A. Yes. When we had spoke a little

HIGHLY CONFIDENTIAL - J. HRASKA

earlier about the inconsistencies with the stock record and the initial collateral availability lists that were provided not being accurate, so after we had moved over some of the collateral, and as the stock record breaks cleared up, we kept looking for -- looking at the stock record and trying to find additional available collateral that was now unencumbered as a result of resolution of the breaks.

**Q. Do you recall for how long you were engaged in that effort to find additional unencumbered collateral?**

A. During which timeframe?

**Q. At any time post the closing of the transaction between Lehman and Barclays on the 22nd of September, 2008?**

A. I was involved in an effort up until probably approximately a month ago.

**Q. Who else was involved in that effort?**

A. Robert Azerad's team.

**Q. Who is on Mr. Azerad's team with respect to this effort?**

A. Well, he's no longer on the team anymore. It would have been a gentleman by the

HIGHLY CONFIDENTIAL - J. HRASKA

name of Colin Telmer, T-E-L-M-E-R. He's still employed at Barclays. He's just not working with Mr. Azerad anymore.

**Q. Anybody else?**

A. There was another gentleman initially involved, but he subsequently left the firm, and as well Mr. Telmer took over his work and continued -- his name was John Virgil Del Dios, I believe. I'm not exactly a hundred percent sure of the spelling of that. I believe it's D-E-L D-I-O-S, but best I can do.

**Q. Do you understand that this effort to identify additional collateral to move from Lehman to Barclays is still ongoing within Barclays, or do you believe that it's complete?**

A. From my perspective, I believe it's complete. I haven't been asked to do anything else in probably at least a month or so's time.

**Q. Who asked you to identify this additional collateral?**

A. Robert Azerad.

**Q. These requests at any time from September 30th or thereabouts, 2008, until about a month ago all came from Mr. Azerad?**

Page 298

HIGHLY CONFIDENTIAL - J. HRASKA

A. Yes.

**Q. Did you have any conversations with anybody other than Mr. Azerad, Mr. Telmer, and Mr. Del Dios about your ongoing efforts to identify additional unencumbered assets to be moved from Lehman's clearance boxes to Barclays?**

A. I had conversations just to keep them informed of my activities with both Messieurs Forrest and Blackwell.

**Q. Could you take a look at the last page of the spreadsheet that I have marked as Exhibit 155B.**

A. Uh-huh.

**Q. This spreadsheet includes data that you provided to Mr. Forrest?**

A. Yes, that's correct.

**Q. Do you believe that data is accurate?**

A. Yes. The one thing that -- the one thing that I'm not sure is accurate is the market value of the BONY, the BONY pledge. I knew that value to be a little bit less, so I'm not sure why that's not a billion-035 that we've been discussing.

**Q. And the second entry is the $269**

Page 299

HIGHLY CONFIDENTIAL - J. HRASKA

**million transfer from Box 636 on the 29th of September that we discussed previously, yes?**

A. Yes, that's correct.

**Q. There's another entry under Summary of Collateral Moved from O74?**

A. Yes.

**Q. A transfer on 9/30/09, do you see that?**

A. Yes.

**Q. That transfers, as reflected here, is of $161,482,771, do you see that?**

A. Yes.

**Q. Do you know anything about that transfer?**

A. That was the value of the assets that were transferred on the 30th from O74 to Barclays.

**Q. And were you involved in that transfer?**

A. Yes.

**Q. What was your involvement in that transfer?**

A. My involvement was can you help identify the assets and coordinate with the

Page 300

HIGHLY CONFIDENTIAL - J. HRASKA

settlement teams to get that transferred.

**Q. Did you or anyone on your team do any due diligence to satisfy yourself that those assets were not encumbered?**

A. Yes.

**Q. Can you tell me briefly what that was?**

A. Myself and the Settlements Team headed by Neal Ullman verified that those were in fact unencumbered and those transfers both for 636 and O74 were verified by Deloitte.

**Q. Who at Deloitte verified them?**

A. Ultimately, Margo -- I forgot her last name.

**Q. Marlo.**

A. Marlo Karp.

**Q. And it's your testimony that Marlo Karp verified them as transfers of Lehman's proprietary assets that were to be transferred from Lehman to Barclays under the purchase agreement?**

A. I know that Marlo was involved in the approval. I don't know if she was specifically the one that did the verification. I know that she was aware of it and someone from her team

Page 301

HIGHLY CONFIDENTIAL - J. HRASKA

did the verification.

**Q. Do you have an understanding as to when this verification that you say happened by Deloitte, do you understand when it happened?**

A. It would have happened a few days prior to the transfer dates.

**Q. If you were to learn that Deloitte was not engaged by the trustee as of the date of this supposed transfer, would that change your testimony?**

A. No.

**Q. You still think even though they weren't engaged they still did the verification?**

A. I know for a fact that they approved these transfers.

**Q. How is it you can be so certain? Did you talk to someone about it?**

A. Well, I had conversations with Neal Ullman, who said that that transfer was approved, and I believe I have e-mails stating that fact. But I'm not a hundred percent certain, but I believe I do.

**Q. So the basis of your -- because you just testified that you were certain Deloitte**

76 (Pages 298 to 301)

HIGHLY CONFIDENTIAL - J. HRASKA

approved these transfers a few days prior to the 29th and 30th. That was your testimony, correct?

A. Yes, it was.

Q. And the basis of your sworn testimony is that Mr. Ullman told you this?

A. Yes.

Q. And you're sure that Mr. Ullman told you Deloitte approved them?

A. I'm -- I thought, unless it was the trustee approved them. They were definitely approved, according to him, so -- it's my recollection that it was Deloitte, but I -- it's possible that it was the trustee itself and not -- not Deloitte.

Q. And any information you have about the approval of these transfers, whether by Deloitte or the trustee or the trustee's staff, comes from which sources, Mr. Ullman?

A. Mr. Ullman, yes.

Q. Any other source?

A. No. I didn't see, if you're asking for approval, I didn't see an approval document from Deloitte or the trustee themselves.

HIGHLY CONFIDENTIAL - J. HRASKA

Q. Have you seen any correspondence reflecting that Deloitte or the trustee approved this transfer?

A. I can't be certain about that.

Q. By this transfer, that was a bad question, but I meant both the transfers on the 29th and the 30th that are reflected in this document?

A. Yes.

Q. So, apart from this conversation with Mr. Ullman, you have no independent basis to testify that Deloitte or the trustee approved these transfers on these dates, correct?

A. That would be correct.

Q. Do you remember when the conversation with Mr. Ullman took place?

A. It should have taken place on the -- prior to the transfers. Period of a few days prior to the transfers. I can give you a range. I don't know specifically what date.

Q. That's fine. Thank you.

Is it possible that those transfers relate to the repo transaction? And "those transfers," again, I'm referring to the

HIGHLY CONFIDENTIAL - J. HRASKA

transfers on the 29th and 30th of September from the 636 and O74 boxes at DCT that are reflected on the spreadsheet attached to Exhibit 155B.

A. So you're referring to the 29th and 30th, these transfers?

Q. Yes.

MR. SHAW: Objection to form.

A. I'm sorry, could you read back the question?

(Record read.)

A. No.

Q. How is it you can be sure of that?

A. Because the repo had a maturity date of September 25th, and prior to the maturity date, the repo had been declared in default.

Q. Just moving down that summary page, sir, it reads, "Amount identified to be moved to BarCap, $1.95 billion." Was that a figure that you provided to Mr. Forrest?

A. No.

Q. So this -- the math here about the delta between the 1.95 billion and the total of the amount of unencumbered security transferred of 1.587 billion, that's Mr. Forrest's math?

HIGHLY CONFIDENTIAL - J. HRASKA

A. Yes.

Q. Do you believe that that figure of total pledged/transferred that appears in this spreadsheet we're looking at is an accurate reflection of the collateral moved from Lehman's unencumbered box to Barclays between the 19th and 30th of September, 2008?

MR. SHAW: Objection. Asked and answered.

A. Yes, with the exception of the discrepancy on market value, that I believe the market value to be a billion-035.

Q. Right. I appreciate that clarification. You did say that.

You testified in response to one of Mr. Hine's questions that you believed that there was an additional amount of somewhere between 6 and 7 hundred million dollars of unencumbered securities --

A. Uh-huh.

Q. -- that you understand was due from Lehman to Barclays?

A. Yes, that's correct.

Q. That's obviously a different number to

HIGHLY CONFIDENTIAL - J. HRASKA

**this delta figure of 362 million here?**

A. Yes, that's correct.

**Q. Do you have any understanding of the reason for the difference?**

A. Well, this is purely a delta of the two figures that Mr. Forrest provided. The 600 to 700 million that I was referring to were based off an analysis of unencumbered securities in the Lehman boxes at a later date and time. So I think that's where there's a discrepancy because of the timing.

**Q. Are you able to estimate a total of the unencumbered securities in the various Lehman clearance boxes that you reviewed, either over the weekend of the 20th and 21st of September or subsequently, are you able to give me a total of the unencumbered securities that you believe you identified?**

A. On that weekend? Or, when you say "subsequently"?

**Q. At any time subsequently. Obviously you identified a figure that fluctuated, as we saw in the documents that we looked at and you looked at with Mr. Hine of approximately 1.9 to**

HIGHLY CONFIDENTIAL - J. HRASKA

**2 billion dollars?**

A. Yes.

**Q. And you've subsequently identified additional collateral you say of at least a few hundred million?**

A. That's correct.

**Q. Correct. Are you able to give me, just in broad terms, an estimate of the total amount of unencumbered collateral that you believe you have identified?**

A. That would be available let's say as of today if nothing had happened in the clearance box?

**Q. Yes. That's a much better question than I would have been able to articulate. Thank you.**

A. Yes, that's the 6 to 7 hundred million dollar figure.

**Q. And the total would be the 6 to 7 hundred million dollar figure plus this $1.587 billion figure that has already been transferred subject, of course, to your caveat that you believe the BONY Tri Pledge number may be off by a factor of 10 percent or so, is that correct?**

HIGHLY CONFIDENTIAL - J. HRASKA

A. That's correct, yes.

**Q. Last document.**

**(Exhibit 156B, a letter from Cleary Gottlieb Stein & Hamilton is James Kobak at Hughes Hubbard dated October 6, 2009, marked for identification, as of this date.)**

**(Discussion off the record.**

**(Recess; Time Noted: 5:24 P.M.)**

**(Time Noted: 5:30 P.M.)**

BY MR. OXFORD:

**Q. You testified in response to a question from Mr. Hine that you had been involved, Mr. Hraska, in efforts to refine Schedule B, do you remember saying that?**

A. Yes.

**Q. Can you tell me briefly about those efforts to refine Schedule B?**

A. I don't know that I testified that I was involved in an effort to refine Schedule B but, rather, to identify additional assets that perhaps were not on the original Schedule B that were unencumbered.

**Q. And you were also involved, I think you testified, in ascertaining that certain**

HIGHLY CONFIDENTIAL - J. HRASKA

**assets that were on the exception list were in fact encumbered and unavailable for delivery; is that correct?**

A. I'm sorry, could you repeat that question or just read it back to me?

(Record read.)

A. That they were unavailable for delivery. I can't be certain that they were unencumbered; just they were unavailable for delivery.

**Q. Why would they be unavailable for delivery other than the fact that they are encumbered?**

A. It's possible that at a point in time a particular asset wouldn't have been in the actual box itself. So, in other words, there might have been an inventory position versus a break account instead of versus the actual repository.

**Q. Can you take a look at what I've marked as 156B?**

A. Sure.

**Q. Which is a letter from Cleary Gottlieb Stein & Hamilton is James Kobak at Hughes**

Page 310

HIGHLY CONFIDENTIAL - J. HRASKA

**Hubbard dated October 6, 2009.**

**Do you see that there are certain attachments to that letter? There are two spreadsheets attached to that letter at the back.**

**If you could take a moment to review the spreadsheets and let me know, first of all, if you need a magnifying glass and, second of all, if you had any involvement in preparing these spreadsheets.**

**(Document review.)**

A. The spreadsheets are not titled like the content of the spreadsheet.

**Q. There's the description on the last paragraph of page 2 going into page 3.**

A. Okay. Last paragraph of page 2, you're saying, right?

**Q. Yes. The second line reads, "The revised spreadsheet attached hereto as Exhibit A lists undelivered clearance box assets having Cusip numbers in which no LBI customers had long positions on September 20, 2008."**

MR. SHAW: Why don't you take a minute to read that paragraph of the letter.

Page 311

HIGHLY CONFIDENTIAL - J. HRASKA

Were you serious about the offer of a magnifying glass? Because I could use one.

MR. OXFORD: I actually think I have larger copies, which I don't intend to mark.

A. I can't tell where Schedule A and B are cut off.

**Q. Exhibits A and B?**

A. I'm sorry, Exhibits A and B.

(Document handed.)

MR. SHAW: What is this you have handed us? Is this A, B, or --

MR. OXFORD: These are blown up versions of Exhibits A and B to the Cleary letter dated March 6. I don't think Cleary marked them as either Exhibits A or B.

**Q. Mr. Hraska, I don't mean to cut short your time to review these documents, but maybe we can short-circuit it a little bit this way.**

**Do you recall being involved in the preparation of these documents or any analysis to determine lists of undelivered clearance box assets having Cusip numbers in which no LBI customers had long positions as of September 22, 2008?**

Page 312

HIGHLY CONFIDENTIAL - J. HRASKA

A. Yes.

**Q. Tell me about your involvement in that process.**

A. Sometime in October, we had changed the sourcing of our search from unencumbered collaterals from GFS to the pure stock record of ADP, and the reason we did that is that we felt that to be a more accurate source at that time because, by that time, a lot of the stock record breaks had been resolved and we were going to go -- and the other mainframe, the MTS mainframe, we felt was exhausted so there was no need to use GFS to try to aggregate all that data together at that point.

Also, GFS became a system that was purchased or became part of the property that was purchased by Barclays, so we thought it was better just to refer to the pure mainframe, which was considered books and records. And the methodology used was that we took a download of the data from the technology folks of everything on the stock record, and the logic that was employed was that the first query was to return us all the situations where there was a firm

Page 313

HIGHLY CONFIDENTIAL - J. HRASKA

inventory long offset by a depo short, which would be the depository, you know, off side of that position, and where the Cusip had no other position reflected on the stock record. So, therefore, no customer positions or anything of that nature.

So, in our mind, we felt that that was very clearly firm inventory only, there was no chance that there was customer collateral in that mix, and as long as there was a depo short which offset to the asset long, we felt confident that that would be considered a firm unencumbered asset.

The next query was, there were Cusips where there were a mix of firm inventory ledgers long and customer account longs. Those positions would have been offset by, again, a position in depo. Every long has a short in an amount in the stock record. And the -- to be as conservative as possible on the second list -- so the first list became known as List A in our terms, right? The second list became known as B and we had to subdivide it. So it became -- there is a B1 and a B2.

79 (Pages 310 to 313)

Page 314

HIGHLY CONFIDENTIAL - J. HRASKA

B1 was the situation where we compared the total amount of customer positions into the total amount in the depo, and we reduced the amount of the depo balance by the customer long position, and to the extent that anything was left after reducing that balance down by what the customer was long, we took that to be firm unencumbered assets.

So just to -- because there's a lot just to recoup that. So there was positions where we had inventory in customer longs that were mixed. To be conservative, we secured the customer positions regardless of them having debit balances or not. We said, to be the most conservative, just reserve the amount of customer long position, take it out of the position in the depo, and whatever was left in the depo would be considered List B1.

The B2 list was, looking at that same population, we said, as a lender of cash or an extension of credit to clients, you're entitled to rehypothecate up to 140 percent of the debit balance. So what we did then is we looked at situations where clients had long positions but

Page 315

HIGHLY CONFIDENTIAL - J. HRASKA

they were running a debit balance, and to the extent that they ran a debit balance, we claimed that we had entitlement to a hundred percent of the debit balance of the securities that were long in those customers' accounts, and that became B2.

And the last sample population was scenarios where the only positions on the stock record were customer long versus the depo position, and those scenarios, using the same rules I just described about the margin debit balances, we looked at customer margin debit balances, and to the extent that they had margin debit balances, we took 100 percent of the market value, or we took market value equal to 100 percent of the debit balance. That became list C.

**Q. That's B3. That's the --**

A. Well, the way I classified them is the way I knew them. So there was A, there was B1 and B2, and C. There was some discussions about, because of the margin debit balance calculation, there was some discussion about combining B2 and C into one list by Robert

Page 316

HIGHLY CONFIDENTIAL - J. HRASKA

Azerad's team. I don't know if they ever combined those lists or not. That may have become, as you reference, either B3 or a C list, I don't know.

**Q. In the analysis that you have just described for me, did you make any distinction between customers whose accounts were transferred to Barclays and customers whose accounts were not transferred to Barclays?**

A. In the analysis that we did, we used the stock record of Lehman Brothers, Inc. prior to those customers being put on the stock record. The -- well, wait. Let me clarify that.

The stock record we used was a solely Lehman Brothers stock record. The stock record that Barclays now owns as a result of the technology that it had purchased in the Lehman acquisition is a different stock record. So it's the same -- it's the same mainframe and it's the same vendor provider, but it's a completely different set of records from Lehman Brothers.

**Q. Are you able to summarize for me how**

Page 317

**HIGHLY CONFIDENTIAL - J. HRASKA**

**it's different?**

A. The Lehman Brothers stock record only has the Lehman Brothers entity and the -- and all the Lehman Brothers stock record data, whereas the new stock record is purely the activity that's in the new Barclays Wealth Entity and the Barclays activity that resides on ADP Company 224.

The legal entities on ADP are known as these company codes. So 224 is a BCI company code on ADP, and that stock record is related to the BCI entity on ADP. The company code for LBI was 012, and it was, again, held on a different version of ADP.

So the vendor basically copied the functionality that he provided us under Lehman Brothers and provided a new instance of the package and the software and everything else, but it was a completely different entity and it was a different software.

**Q. Who else was involved with you in this effort to create lists A, B and C?**

A. Robert Azerad, Colin Telmer. There was some -- there was some Barclays Finance

80 (Pages 314 to 317)

Exhibits 67 - 69 Pg 121 of 167

Page 318

HIGHLY CONFIDENTIAL - J. HRASKA

folks who were also reviewing some of the spreadsheets that we had produced over that period. I don't recall who was on the Barclays finance side, but I'm sure Robert would.

And to the extent we had questions about a particular status of a clearance box or anything like that, Neal Ullman would have been consulted.

**Q. Do you believe, Mr. Hraska, that the work you, along with Mr. Azerad and others, did to create lists A, B and C are ultimately reflected in the spreadsheets that are attached to the Cleary letter of March 6?**

A. These are versions of the spreadsheets it looks like in form that we used. I'm not a hundred percent certain that these are the final spreadsheets that Colin and I agreed that came up to the total in assets.

List A appears to have all 931 accounts on it, and the 931 range that -- the prefix of this account, are all firm inventory ledgers. So it appears to be the list that's first described in that letter. However, I can't be a hundred percent certain since I

Page 319

HIGHLY CONFIDENTIAL - J. HRASKA

didn't actually provide it.

**Q. Are you able to draw any similar conclusions about the second spreadsheet that is attached to the Cleary letter and any work that you and your team did in preparing the data that may have gone into it?**

A. This was one of the initial data spreadsheets that was used to analyze the B1, B2 relationship, but there was a summary document which was prepared based on the findings which, you know, broke out what we felt was B1 and which I, being conservative, reserving customer assets versus there was a separate schedule which then broke out what we thought, based off of margin debit balances, what the entitlements would be for that B2 and C. That doesn't appear to be included in these documents, at least the way I understood them to be.

**Q. Was there any other documentation provided or created by you and your team as a result of the effort to identify lists A, B and C as you've testified?**

A. Nothing more than what I just described to you, no.

Page 320

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. That's all I have on those.**

**I'm hoping -- I think we're all hoping the answer to this is no. Did you have any involvement in the calculation or recalculation of Lehman's 15c3-3 requirements over the weekend of September 20th and 21st?**

A. No.

(Continued on the next page to include the jurat.)

Page 321

HIGHLY CONFIDENTIAL - J. HRASKA

**Q. Did you have any discussions with anybody about the recalculation of Lehman's 15c3-3 requirement?**

A. No.

MR. OXFORD: I've got nothing further for you, Mr. Hraska. Thank you.

THE WITNESS: You're welcome.

MR. KAY: No questions.

MR. HINE: I think we're done, unless you have any, John.

MR. SHAW: Tempting though it is, I will declare this deposition closed.

MR. OXFORD: Thank you very much.

THE WITNESS: Thank you.

(Time Noted: 5:53 P.M.)

____________________

JAMES HRASKA

Subscribed and sworn to before me this day of 2009.

____________________

81 (Pages 318 to 321)

HIGHLY CONFIDENTIAL - J. HRASKA

CERTIFICATE

STATE OF NEW YORK )
: ss
COUNTY OF NEW YORK)

I, Kathy S. Klepfer, a Registered Merit Reporter and Notary Public within and for the State of New York, do hereby certify:

That JAMES HRASKA, the witness whose deposition is herein before set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

I further certify that neither the deponent nor a party requested a review of the transcript pursuant to Federal Rule of Civil Procedure 30(e) before the deposition was completed.

In witness whereof, I have hereunto set my hand this 14th day of August, 2009.

-------------------------------

KATHY S. KLEPFER, RPR, RMR, CRR, CLR

HIGHLY CONFIDENTIAL - J. HRASKA

INDEX

| WITNESS: | EXAMINATION BY | PAGE |
|---|---|---|
| J. HRASKA | Mr. Hine | 5 |
| | Mr. Oxford | 239 |

| EXHIBITS: | PAGE |
|---|---|
| Exhibit 136B, a document bearing Bates Nos. BCI-EX-00077317 through 77319 | 16 |
| Exhibit 137B, a document bearing Bates Nos. 10294679 with attached spreadsheets | 90 |
| Exhibit 138B, an e-mail chain, the first one in time bearing a date of September 18, 2008, at 5:40 P.M. | 92 |
| Exhibit 139B, Printout of Schedules | 112 |
| Exhibit 140B, a document bearing Bates Nos. BCI-CG00052538 through 53173 | 131 |
| Exhibit 141B, a document bearing Bates Nos. BCI-CG00055192 through 55629 | 134 |
| Exhibit 142B, a document bearing Bates Nos. 465401 and 466143 | 178 |
| Exhibit 143B, an e-mail chain, the first in time dated September 17, 2008, at 2:42, with attachment | 190 |
| Exhibit 144B, a document bearing Bates Nos. 10297377 through 10300510 | 195 |

HIGHLY CONFIDENTIAL - J. HRASKA

INDEX

| EXHIBITS: | PAGE |
|---|---|
| Exhibit 145B, a document bearing Bates Nos. 10328099 through 10319396 | 211 |
| Exhibit 146B, a document bearing Bates Nos. BCI-EX-(S)-00014389 through 14393 with attachment | 230 |
| Exhibit 147B, an e-mail sent from Mr. Hraska to Paolo Tonucci, copying others, on Friday, the 19th of September, 2008 | 254 |
| Exhibit 148B, an e-mail chain, the first in time dated September 19, 2008, at 3:43 P.M. | 256 |
| Exhibit 149B, an e-mail from Gene Lempert, to Mr. Hraska, Sunday, September 21, at 3:38 A.M. GMT, or 11:38 P.M. EST | 259 |
| Exhibit 150B, Mr. Lempert to J. Hraska and others, Sunday, 9/21, at 1:34 A.M. GMT | 265 |
| Exhibit 151B, an e-mail from Monty Forrest to Mr. Lowitt, Mr. Blackwell, Mr. Ullman and J. Hraska, copying Mr. Tonucci and others, sent on Sunday, 9/21, at 9:16 A.M. GMT | 267 |

HIGHLY CONFIDENTIAL - J. HRASKA

INDEX

| EXHIBITS: | PAGE |
|---|---|
| Exhibit 152B, an e-mail from Alastair Blackwell to Monty Forrest and to J. Hraska, copying Mr. Tonucci dated Monday, 22nd of September, 10:35 A.M. GMT | 274 |
| Exhibit 153B, a document bearing Bates Nos. BCI-EX-00003796 | 276 |
| Exhibit 154B, a document bearing Bates Nos. BCI-EX-00007930 through 7931 | 279 |
| Exhibit 155B, a document bearing Bates Nos. BCI-EX-S-00017385 and 7386 | 293 |
| Exhibit 156B, a letter from Cleary Gottlieb Stein & Hamilton is James Kobak at Hughes Hubbard dated October 6, 2009 | 308 |

HIGHLY CONFIDENTIAL - J. HRASKA

NAME OF CASE: In re Lehman Brothers
DATE OF DEPOSITION: August 14, 2009
NAME OF WITNESS: James Hraska
Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

____________________
JAMES HRASKA

# BCI EXHIBIT

# 69

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: )
)
LEHMAN BROTHERS HOLDINGS, INC.,)
et al., ) Chapter 11
) 08-13555(JMP)
Debtors. ) (Jointly
) Administered)
)
-------------------------------)

DEPOSITION OF JIM HRASKA
New York, New York
Friday, January 15, 2010

Reported by:
Philip Rizzuti
JOB NO. 27206

January 15, 2010
10:00 a.m.

Deposition of JIM HRASKA, held at the offices of Hughes, Hubbard & Reed, LLP, 1 Battery Park Plaza, New York, New York, before Philip Rizzuti, a Notary Public of the State of New York

APPEARANCES:

JONES DAY, LLP
Attorneys for Lehman Brothers
222 East 41st Street
New York, New York 10017
BY: WILLIAM J. HINE, ESQ.

BOIES, SCHILLER & FLEXNER, LLP
Attorneys for Barclays Capital
5301 Wisconsin Avenue NW
Washington, DC 20015
BY: JONATHAN SHAW, ESQ.

QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
Attorneys for Creditors Committee
51 Madison Avenue
New York, New York 10010
BY: SCOTT C. SHELLEY, ESQ.

APPEARANCES:

HUGHES, HUBBARD & REED, LLP
Attorneys for SIPA Trustee
One Battery Plaza
New York, New York 10004
BY: NEIL J. OXFORD, ESQ.
AMINA HASSAN, ESQ.

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

Hraska

MR. OXFORD: Would you mark this document as Exhibit 561-D, spreadsheets.

(Exhibit 561-D, spreadsheets, marked for identification, as of this date.)

MR. OXFORD: Would you mark as Exhibit 562-D, document headed Jim Hraska 30(b)(6) deposition notes.

(Exhibit 562-D, document headed Jim Hraska 30(b)(6) deposition notes, marked for identification, as of this date.)

JIM HRASKA, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. OXFORD:

Q. **Good morning, Mr. Hraska.**

A. Good moming.

Q. **As you know, we met before, I am Neil Oxford from Hughes Hubbard & Reed, we represent the SIPA trustee in this litigation. I also know you have been through this**

Hraska

**deposition process before. You know the ground rules, but if there is anything unclear about any of my questions ask me and I will clarify it.**

**If you answer any of my questions without asking me to clarify it I will assume that you have understood it. Is that fair?**

A. Fair.

Q. **Can you tell me how you define the term clearance box, Mr. Hraska?**

A. Sure. To me a clearance box is an account at either a depository or a custodial bank into which securities can be moved into or out of.

Q. **Does your definition include a vault or depository that holds physical securities?**

A. Yes. That would be an account at a custodial bank.

Q. **Does it include settlement accounts?**

A. What I have just described is also -- can be termed a settlement account.

Q. **Does your definition of clearance**

Hraska

**box also include safekeeping accounts?**

A. A safekeeping account would be a further clarification of a clearance account. So basically the clearance account is the most broad definition. And if an account is to be a safe custody account it would be a further distinction which earmarks it as a safekeeping account I guess.

Q. **If I understand your testimony you are saying that a safekeeping account is a sub set of the clearing boxes?**

A. Well that depends on -- it depends on the clearing relationship. In some instances a safekeeping account is a completely distinct and separate account. In some instances it is a sub set of an existing clearance account.

Q. **Is that definition of clearance box one that you applied in your involvement in the creation of Schedule B to the clarification letter?**

A. That definition would have been something that I would have applied, yes, to Schedule B.

Hraska

Q. **Is that the definition to your understanding that Lehman applied in its role in creating Schedule B?**

A. Yes. I would assume that is the -- my understanding that that would be the same definition, yes.

Q. **Mr. Hraska, can you have in front of you Exhibit 156-B?**

MR. SHAW: 156-B, yes?

A. Yes. Okay.

Q. **Mr. Hraska, do you recognize Exhibit 156-B?**

A. There is actually two documents as part of this exhibit, right; are you asking if I recognize both documents?

Q. **Actually three documents. The first is a letter from Cleary Gottlieb dated March 6, March 6, 2009 and there are two attachments to that, Exhibit A and Exhibit B?**

A. Yes, I recognize all the attachments and the letter.

Q. **Could you turn to the start of Exhibit A, please?**

A. Yes.

Hraska

Q. Just to make sure we are on the same page here, the first CUSIP number I have appears to be 23321PUA4?

A. Yes. That is correct.

Q. I would like to ask you a few questions about the particular depots that are listed in column 6, do you see that, do you see the depot listing?

A. Yes.

Q. First of all the IMD conversion omni account which appears on line 2, do you see that reference?

A. I do, yes.

Q. Do you know what that depot is a reference to?

A. I have a general idea of what that specific account is for. But I don't -- that particular account is not an account where -- that wouldn't be an account as described earlier. That is an account that securities are held at a -- well, I want to clarify this.

This is a temporary location, so it is basically a transit location for securities.

Hraska

Q. If I understand your testimony, it is not within your definition of clarification letter that you gave me a few moments ago; is that correct?

MR. SHAW: Objection to the form. You said clarification letter, I think you may have meant clearance.

Q. Let me ask that again.

If I understand your testimony, Mr. Hraska, the depot that appears in line 2 of the first page of Exhibit A in Exhibit 156-B, the IMD conversion omni, is that included within the definition of clearance box you gave me at the start of the deposition, or is it not included within that definition.

A. Yes, I think it is included in it. It is just a way to further segregate a security in a particular transitory state.

Q. Do you know what the reference is, Mr. Hraska, to the conversion omni?

A. I am not a hundred percent sure what this particular omni is used for. A conversion omni is typically a transitory type

Hraska

of location. I am not sure what the IMD depot is specifically used for.

Q. Do you know whether or not this is a PAM conversion account?

A. Not with a hundred percent certainty that it is, but...

Q. Do you have any understanding?

A. I think it may be, but I am not a hundred percent certain.

Q. If it is a PAM conversion account do you think it should be on the schedule?

A. I am not sure that I can answer whether it should be on the schedule. I am saying I know that it could be on the schedule based off of the fact that the mechanics in which assets are transferred in and out of customer accounts would set it up to potentially be on that schedule. But as to whether that particular one belongs on there or not I don't know.

I mean it is basically a transitory location, so while a customer is instructing to move assets out, those assets are temporarily moved into a transitory

Hraska

location. Those assets, you know, may or may not have been originally in different location, and they also may be in fail status.

But as to whether or not -- I am not a hundred percent sure. I would say that while they are still in transitory status to me it makes sense that they are there.

Q. Assuming for the purposes of the next series of questions that it is in fact the PAM conversion account, can you tell me what your understanding is of the PAM conversion account?

MR. SHAW: Objection to the form.

A. My understanding of the PAM conversion account is to the extent that securities are being moved out of the normally held custodial depot to an external depot or to another depot, whether it be to either another depo internally or to be made the delivery to an external custodian away from a particular institution, those securities will end up temporarily in that account.

Q. Do you know what the designation PAM, P-A-M, means in the context of a PAM

Hraska

**conversion account?**

A. I don't know.

**Q. You don't have any understanding that PAM was a particular type of customer that Lehman had?**

A. Yes, the PAM, I don't remember what the acronym stood for, they were primarily I believe the wealth customers.

**Q. Those wealth customers were not moved to Barclays as of the closing of this transaction on the 22nd of September; is that correct?**

A. That is correct.

**Q. Those PAM customers were in fact moved to Neuberger Berman; is that correct?**

A. Yes.

**Q. So can you think of any reason why an asset that is in a PAM conversion account would appear on a list of securities that Barclays is claiming from Lehman?**

MR. SHAW: Objection to the form.

A. It could have been a processing error, it could have been it was instructed at a particular time and it showed up in the

Hraska

account, it had not been settled, or it couldn't be settled because of securities not being in a location accordingly. It could have also been a clerical error in a clearance process. Once a trade is cleared if it is cleared incorrectly or it is cleared to an incorrect location it could actually show up in that particular box or in that particular account without truly being there. So without actually looking at the account and knowing I wouldn't really know.

**Q. Scrolling down the first page about three inches below the entry we just looked at you see there is a depot described as 097-00074-15?**

A. Yes.

**Q. Can you tell me, Mr. Hraska, what that is a reference to?**

A. I don't know.

**Q. Do you know whether or not that is a reference to physical securities held at 70 Hudson Street?**

A. I don't know. I mean just for purposes of clarity we were -- in doing our

Hraska

exercise we were given a list of eligible clearance accounts by the clearance folks which we used as a criteria. So, you know, my involvement in creating some of these lists, I mean we used that criteria. So, you know, some of these don't have descriptions on it.

**Q. What do you mean by your reference in that last answer to eligible clearance accounts?**

A. To the extent that they are an account where we would have been looking at securities which were without encumbrances I guess.

**Q. Who provided to you this list of eligible securities as you defined it?**

A. Eligible securities or eligible accounts; did I say securities?

**Q. You said securities. Either way?**

A. It was accounts, not securities.

**Q. Either way who provided you, Mr. Hraska, with a list of eligible accounts?**

A. The clearance department.

**Q. Whose clearance department?**

A. At the time it was managed by Neil

Hraska

Ullman.

**Q. This is Lehman's clearance department?**

A. Yes.

**Q. When you say at the time, what time are you referencing?**

A. It was the time when we were -- let's see, when was this. I honestly don't recall the time. I know we had asked for it, but I don't recall when it was provided.

**Q. Do you know whether it was before or after the closing of the transaction?**

A. It would have been after the closing.

**Q. Do you know if it was 2008 or 2009?**

A. I don't know. I don't know specifically. It was either the end of 2008 or early 2009, probably 2009. I know it is a year gap.

**Q. Again I think we got it covered, but can you tell me again if you know what criteria Mr. Ullman used in providing you a list of, quote unquote, eligible accounts?**

Hraska

A. I don't know what criteria he used. We asked for the list of accounts, he provided them. So I can speculate what he would have done.

MR. SHAW: Don't speculate.

**Q. I am not asking for your speculation, only asking for your knowledge. Can you tell me, Mr. Hraska, exactly what it is that you asked Mr. Ullman for?**

A. If I remember correctly when you say specifically, what I recall asking for is accounts which would not have been safe custody accounts or segregated accounts.

**Q. Can you explain what you mean by each of those terms; first of all safe custody; secondly segregated account?**

A. Yes. A safe custody account is, and a segregated account is basically one in the same. I mean a safe custody account is used to segregate positions for a particular purpose. The purposes for segregation are when the customer is fully paid for an asset, those assets need be protected away from firm assets. So they are typically put into either

Hraska

A, a separate account as we talked about earlier, or in a segregated location of a clearance location depending on whether, you know, the relationship of the account.

**Q. So it is correct to say that Mr. Ullman provided you to the best of your knowledge the list of accounts that included every account of Lehman other than safe custody or segregated accounts; is that correct?**

A. Yes.

**Q. That list was the basis on which you and Barclays created Exhibits A and B to the Cleary letter of March 6th; is that right?**

A. That is correct.

**Q. Scrolling down the depot column again do you see about two thirds of the way there is an entry to depot 097-00104-19?**

A. I do.

**Q. Do you know what that code is a reference to?**

A. No.

**Q. Do you know whether or not it is a reference to a location in the United Kingdom?**

Hraska

A. I don't know.

**Q. Three lines below that entry, sir, it reads LBI alternative physical security department, or sec dep?**

A. Yes.

**Q. Do you understand what that is a reference to?**

A. Again it would be another description of a type of depository fund. The description written here would be a physical depository.

**Q. Do you know where that physical depository is located, sir?**

A. That specific one I couldn't say with certainty.

**Q. Do you know whether it is a DTC or not?**

A. I don't know.

**Q. At the bottom of page there are three entries for a depot LBIE clearance and custody?**

A. Yes.

**Q. Do you see that, sir?**

A. Yes.

Hraska

**Q. Do you know what that is a reference to?**

A. It would have been a depository that LBI was holding that would have used in transactions that it did with one of its affiliates which was LBIE, that is the affiliate, but it is listed.

**Q. So if I understand your testimony correctly LBI maintained a clearance box at LBIE?**

MR. SHAW: No. Objection. Mischaracterizes the prior testimony.

A. I am sorry, could you repeat the question.

**Q. Could you explain to me again because I clearly misunderstood your last answer, how it is that the LBI clearance and custody depot first of all relates to Lehman's business prior to close?**

A. This --

MR. SHAW: Objection to the form. Just so we are clear when you say Lehman, it introduces an element --

**Q. I am sorry, LBI?**

Hraska

A. Repeat the question.

**Q. Can you tell me what the LBI clearance and custody depot is in the context of its appearance on this list?**

A. Well this is LBIE, so there is a distinction there. So this is the -- the way this appears on this list, this would have been an account that LBI maintained related to transactions that it was -- that it had done for its -- or with its affiliate LBIE, which is Lehman Brothers International Europe.

**Q. Would the account be held with LBI, sir, or LBIE?**

A. The account would be held with LBI and it would have been an account called LBI for the customer LBIE.

**Q. Coming back up the page five or six lines up from the LBIE reference, 097-00093-12?**

A. Yes.

**Q. Do you know what that is a reference to?**

A. I don't know.

**Q. Do you know whether or not that is**

Hraska

**a reference to a Euroclear account?**

A. I don't. Is there a distinction between the two questions, like if you asked me and I say I don't know, then you ask me pretty much the same thing. I am not sure that I understand what the difference between the two questions is.

So if you ask me if I know what the account is and I say no and then you ask me if the zero clears, so if I say know the first time what is the distinction between the two questions. I am not trying to be sarcastic, I am trying to understand the difference between the two, maybe it is a legal distinction.

MR. SHAW: He is trying to see if he can refresh your recollection by suggesting what the answer might be.

**Q. There is no finer legal point.**

A. I will just keep answering no, but I am not trying to be difficult if I say no twice.

**Q. I understand. We are all trying to get through it. I am trying to probe your**

Hraska

**recollection as your counsel suggests?**

A. Fine.

**Q. I realize I skipped over an entry, do you see two thirds of the way down the reference that we discussed to LBI alternative securities?**

A. Yes.

**Q. Three lines up from that is an entry 097 -- I did ask you about that, let's move on.**

A. Okay.

**Q. Flipping over the page do you see the entry --**

MR. SHAW: Second page of Exhibit A to the Exhibit 156-B?

MR. OXFORD: Correct.

**Q. You see the entry to restricted physical box at the top of the page?**

A. Yes.

**Q. Then there is a depot reference 097-00033-15?**

A. Yes.

**Q. Do you know what that relates to?**

A. It would have related to a

Hraska

physical location that had legally restricted securities in there.

**Q. Can you explain what you mean by legally restricted securities?**

A. Securities that would have had -- I will say this as accurate as possible.

They would have needed additional legal documentation which is outside the normal scope of standard physical securities that are not restricted. So for instance a standard physical security just needs a bond power. A restricted security may need additional documentation in order to make it eligible for the delivery.

**Q. When you asked Mr. Ullman to provide you with a list of eligible accounts, Mr. Hraska, did you intend to include in your request that he provide you with the list of such restricted accounts that you just told me about?**

A. Well my intention was to not get any accounts that were safe kept. A restricted, although the term is restricted, doesn't necessarily mean that the firm doesn't

Hraska

have access to use it. It just means that there is a restriction beyond the normal method for delivering a physical security which again is related to the legal requirements on attaching to that security before making a delivery.

Q. **So you didn't mean to exclude those types of accounts from your request to Mr. Ullman?**

A. I didn't consider excluding them or including them. I just meant to exclude fully paid for.

Q. **Understand. The entry immediately below that.**

A. Yes.

Q. **097-00122-17?**

A. Yes.

Q. **Do you see that?**

A. I do.

Q. **Do you know what that is a reference to?**

A. I am sorry, I don't.

Q. **Three lines down from that, sir, 097-00123-16, do you see that entry, sir?**

**Hraska**

A. Yes.

Q. **Do you know what that is?**

A. I don't.

Q. **Do you know whether that is a reference to a settlement account at Royal Bank of Canada?**

A. I don't.

Q. **If you wanted to find out the answer to the questions that I am asking you about what these codes relate to how would you go about doing that?**

A. There is two ways. Partially we would have gotten an account list back, and I would have to go back and see where that account list is from the settlements team and compare the accounts. The thing that I don't recall is whether or not that list that we had actually had descriptions on it or not. So to the extent that it didn't we would have to go back and find an original account list of LBI clearance accounts and then cross reference them. I am sure something like that exist, I just don't have it.

Q. **A few lines down, sir, again on**

**Hraska**

**page 2 of Exhibit A to the letter of March 2009 there is a reference to PIM conversion omnibus?**

A. Right.

Q. **Can you tell me what that relates to, sir?**

A. It would have been a conversion account and it related to the PIM business as opposed to the PAM business. I honestly don't know the distinction between the two businesses. I assume that they were somewhat similar, but I don't know the distinction between the two.

Q. **You do know, sir, that Barclays assumed responsibility for only one of these businesses, don't you?**

A. I don't. I know that they did not assume responsibility of PAM. I don't know if they assumed responsibility for PIM or not.

Q. **Is there anything about the appearance on this list of the PIM conversion omnibus that suggests to you that it may contain customer securities?**

MR. SHAW: Objection to the form.

Hraska

A. It may, it may not. I just -- without doing further research I wouldn't know.

Q. **If you could turn to the ninth page of Exhibit A, sir?**

A. Yes.

Q. **I have the first account number as 097-00027-13?**

A. For a quantity of 15,776 to the right, next column over?

Q. **No, I have a different quantity.**

A. For a quantity of 426,183?

Q. **Yes.**

MR. SHAW: What is the name of the first security in the second column on the page you are looking at?

MR. OXFORD: Ermis Maritime Holdings, E-R-M-I-S.

Q. **You see Mr. Hraska a few lines down, ten lines down there is a reference Euroclear?**

A. Yes.

Q. **The account is 097-00092-13?**

A. Okay.

Hraska

**Q. Do you know what that is a reference to?**

A. Yes, that would have been the LBI Euroclear clearance account.

**Q. Just so we are clear, that is not a DTC account?**

A. It is not a DTC account.

**Q. Anything with the designation Euroclear relates to a LBI account at Euroclear as it appears in the depot column here, is that a fair assumption?**

A. Yes.

**Q. Three below Euroclear, sir, there is a reference to an account 097-00097-18?**

A. Okay.

**Q. Do you know what that is a reference to?**

A. I don't know.

**Q. Do you know whether or not it is a reference to a settlement account at Paribas in Germany?**

A. I do not.

**Q. Six lines down from that there is a reference to a depot number 097-00105-18?**

**Hraska**

A. Yes.

**Q. Do you see that?**

A. Yes.

**Q. Do you know what that is a reference to?**

A. No.

**Q. Do you know whether or not that is a reference to a UK settlement account?**

A. I do not.

**Q. Further five lines down there is a reference to 097-00167-13, do you see that, sir?**

A. Yes.

**Q. Do you know what that is a reference to?**

A. I do not.

**Q. You don't know whether or not that is a reference to a Citibank account in Peru?**

A. I do not.

MR. OXFORD: Off the record for a second.

(Recess taken.)

**Q. Sticking on the same page we were discussing, Mr. Hraska, page 9?**

**Hraska**

A. Yes.

**Q. Third of the way down there is a reference to BNP Paribas France?**

A. Yes.

**Q. Do you know what that is a reference to?**

A. A clearance account held at BNP Paribas.

**Q. That is again not an account held at DTC?**

A. That is not an account held at DTC.

**Q. Six lines down, sir, do you see there is a reference to physical escrow receipts held?**

A. Yes.

**Q. Can you explain to me what that is a reference to?**

A. It is a physical location, again a depot for physical securities of the escrow type.

**Q. Do you know the location of that depository?**

A. I don't.

Hraska

**Q. Finally if you could turn three more pages, sir, Exhibit A, takes us to page 12. So we have a clear record I have the first CUSIP name in column 2 at the top of my page is Solution Net International?**

A. Yes.

**Q. Do you have that page?**

A. Yes.

**Q. About a third of the way down there is a reference to a Lehman Brothers account which starts 097-0093-12, Lehman Brothers, do you see that?**

A. Yes.

**Q. Do you know what that is a reference to?**

A. I don't know.

**Q. Do you know whether or not that is a reference to a location where collateral that had been seized by Bank of New York was located?**

A. I don't know.

**Q. Is that account in DTC, sir?**

A. I don't know.

**Q. That is all the questions I have**

Hraska

on this exhibit. Did you want to take a short break?

A. Yes. That would be great, thanks.

MR. OXFORD: Off the record.

(Recess taken.)

Q. Are you ready, everybody ready to go back on?

A. Sure.

Q. Mr. Hraska, I have placed in front of you what I have marked as Exhibit 561-D, which I will identify for the record as the native file of a document that was produced to us last night by Boise Schiller, which I understand to be another version of Exhibits A and B to the Cleary letter with some additional analysis.

Jonathan, does that comport with your understanding of what this purports to be?

MR. SHAW: Are you asking whether it is list A and list B1; that was one of the things that we sent you last night, but looking at the spreadsheet I couldn't tell you which it was.

Hraska

Q. Looking at the covering E-mail from last night it appears to be a version of list A and B1 that was produced to us last night.

A. Okay.

Q. Mr. Hraska, could you turn to the section of the document that appears after the last blue sheet?

MR. SHAW: The last blue sheet?

MR. OXFORD: Yes.

A. There are multiple blue sheets.

Q. I have two.

A. Got to find it. There we go, yes.

Q. Just so we are sure we are on the same page, the first CUSIP that appears in the description of the page that I am looking at is New York NY City Transitional, are we on the same page?

A. Yes.

Q. First of all do you know the document I have marked as Exhibit 561-D, do you know what it is?

A. Yes, I do.

Q. Can you tell me what it is,

Hraska

please, sir?

MR. SHAW: Are you talking about the entire document or just that piece?

Q. Generally do you know what the document is?

A. Yes.

Q. Can you tell me what it is, please, sir?

A. Yes. It would have been what was -- what has been referred to as list A and B1. I am sorry, you are asking me overall or just this particular section. Overall you asked me?

Q. Yes. Overall?

A. Yes. So overall it would have been both of those.

Q. It appears on my copy that there are three sections to this each divided by a blue sheet. If you could look at the first page and tell me what that is, please, sir?

A. Yes.

Q. There is a reference to sheet A at the top left-hand corner?

A. So now we are at --

Hraska

MR. SHAW: No, here (indicating). Very first page of 561-D.

A. Okay. So what was the question?

Q. Were you involved in creating this page, sir?

A. No, I was not.

Q. Do you know who was?

A. I do not.

Q. Have you seen it before?

A. I have seen it before, but I was not involved in creating it.

Q. In what context did you see it, sir?

A. I saw it in preparation for this deposition.

Q. Can you explain to me what the first page of 561-D represents?

A. No, I cannot.

Q. Do you know who did create this?

A. Specific person; I don't know.

Q. Do you have an understanding of the process by which it was created?

A. No.

MR. SHAW: Again with those last

Hraska

questions were only focussed on the first page?

MR. OXFORD: Correct.

**Q. If you could turn to the second attachment to that first page, sir, after the second blue sheet, the page we first looked at it has the description in the first CUSIP column, or row rather, of New York City NY Transition?**

A. Yes.

**Q. Are you at that page?**

A. Yes.

**Q. I am going to ask you a series of questions about the depot locations that appear across the top of the page.**

A. Okay.

**Q. Do you see there is a column entitled Schedule B Quantities?**

A. Yes.

**Q. About a third of the way along?**

A. Yes.

**Q. Is it accurate to say that the list of numbers that follow as you read along the page left to right are depot numbers?**

**Hraska**

A. From left to right across the top of the page?

**Q. Yes.**

A. Yes. Those would be depot numbers, yes.

**Q. Taking each of these in turn can you tell me what they relate to; can you tell me what the first depot 0007-03, do you know what that relates to?**

A. I do not.

**Q. Do you know what the next one relates to, the one that ends in 7-11?**

A. That would have been DTC.

**Q. Skipping across to the fourth entry after that, 097-0033-15, do you know what that is?**

A. I do not.

**Q. Same question for the next entry, 097-00074-15?**

A. I do not.

**Q. Do you know whether the next two entries that end in 13 and 12 are Euroclear accounts?**

A. I do not.

Hraska

**Q. 097-00099-16, do you see that, sir?**

A. I do.

**Q. You don't know what that is a reference to?**

A. I do not.

**Q. Then the next four entries, sir, to the right of the one ending 16 that I just asked you about, do you know what those are a reference to?**

A. Sorry, I do not.

**Q. If you could read along then to the second to last entry in the list of numbers across the top of the page, 097-00183-13, do you know what that is a reference to?**

A. I do not.

**Q. Were you involved in preparing the spreadsheet that appears after the second blue page here, the one that we have just been talking about, sir?**

MR. SHAW: You mean preparing the physical spreadsheet or --

**Q. Start with that.**

**Hraska**

A. Let me ask you. I was not involved in preparing this specific version you see before you here, but I was involved in preparing data that became this spreadsheet that you see in front of you as the exhibit.

**Q. Do you know who prepared this particular spreadsheet?**

A. Specific person; no.

**Q. Do you know the group of individuals who were involved in preparing this spreadsheet?**

A. This particular version; it would have been Barclays finance group.

**Q. Is there a particular person you can identify in Barclays finance group that was involved in or responsible for the creation of this document?**

A. I think there were multiple people involved. I would be speculating as to who specifically created this spreadsheet themselves.

**Q. You said there were multiple people involved --**

A. There were people, a lot of people

Hraska

reviewing the data in finance. So I don't know who ultimately created this version that you are looking at today.

**Q. Can you list for me the people in finance who were involved in reviewing the data?**

A. One of the people that I dealt with was Sean Teague.

**Q. Any others?**

A. That was my primary contact. Then there were others, I just don't recall the names.

**Q. What was your involvement, sir, in preparing the data that is reflected in the spreadsheet that we have just been looking at?**

A. My involvement was gathering the original source data and creating rules that would have selected securities that were deemed to be not fully paid for assets, and working with some folks in treasury to create a spreadsheet which applied those rules and gave back a data set which we then distributed to the treasury group.

**Q. Generally speaking, sir, is that**

**Hraska**

**process that you have told me about in your last answer, is that the same process that is reflected in the notes to your 30(b)(6) deposition?**

A. Yes. So if in this particular case this is B1. If we wanted to go to the section on B1 we could talk through that process if you want.

**Q. Okay. We will get to that in a second, but that is a useful orientation. The spreadsheet, the last spreadsheet that appears as part of Exhibit 561-D, you just described that as list B1; is that correct?**

A. I believe this to be B1. I think it was entered into, into the records as A and B1.

**Q. Which records are you referring to, sir?**

A. This document, right, is A and B1 in its entirety; right?

**Q. It is not my document, sir, so I can't really tell you that.**

A. Yes. This is A and B1.

**Q. I was hoping you could.**

Hraska

A. I am sorry, I thought we said that already.

**Q. So we have a clear record, is it your testimony, sir, that the second section of the document that appears after the first blue page is list A?**

A. Second document would be list B1.

MR. SHAW: No, no. You are getting confused. After the first blue page?

A. Okay. The first blue page would be list A.

**Q. After the second blue page appears list B1?**

A. That is correct.

**Q. Those descriptions of list A and list B1 are referenced in -- withdrawn.**

**When you reference in your deposition notes, 562-D, list A and list B1, the lists that I have marked as Exhibit 561-D, those are the lists that we are discussing?**

A. Yes, correct.

**Q. Just a couple more questions. But list B1, do you see, sir, looking at the top**

**Hraska**

**of the page a column description I believe it is the eighth column along that reads Sched B Quantities?**

A. Yes, I do.

**Q. Can you tell me what that is a reference to, please?**

A. That is a reference to quantities of securities that were part of what is known as Schedule B.

**Q. When you reference Schedule B in that context, sir, can you be specific about what you are talking about?**

A. Schedule B would have been the schedule which was part of the purchase agreement.

**Q. Is it a reference to the version of Schedule B that was used at the closing of the transaction on September 22, 2008?**

A. Yes.

MR. SHAW: Objection. Foundation.

**Q. What is the basis for the last answer you just gave me, sir?**

A. I only know there to be one Schedule B.

Hraska

**Q. To your knowledge, sir, was the version of Schedule B ever filed with the Bankruptcy Court in this case?**

A. Schedule B filed with the Bankruptcy Court?

**Q. Yes.**

A. Yes, I believe it was.

**Q. And is that the same Schedule B to your knowledge that is referenced in list B1?**

A. To my knowledge yes.

**Q. Was there any analysis underlying the data that appears under the column Schedule B Quantities?**

A. By analysis can you be more specific?

**Q. Maybe I could ask it this way.**

A. Is this 32-C in the question, is that --

**Q. No, I have a more general question first.**

A. Okay.

**Q. Can you explain to me why there is a column entitled Schedule B Quantities in list B1?**

Hraska

A. Yes. The finance group wanted to compare the assets that were retrieved by this exercise versus assets that would have appeared on the original Schedule B.

**Q. How did you come to learn, Mr. Hraska, that the finance group wanted to compare the assets that were retrieved by the exercise that you described to the assets that appeared on the original Schedule B?**

A. I basically when I had seen a -- I had seen a copy of this at one point and I had actually questioned what that reference was there. That is what I was told.

**Q. Who did you ask about that reference?**

A. I don't recall. It would have been a meeting with the finance folks.

**Q. Can you tell me the names of the finance folks who would have been at that meeting?**

A. Again my primary contact for most of this stuff from the finance perspective would have been Sean Teague.

**Q. You referenced a meeting that you**

Hraska

**would have had with the finance folks. On the finance side who else would have been at that meeting or those meetings with Sean Teague?**

A. I don't recall. Probably sometime ago now.

**Q. Did anybody explain to you why the finance group wanted to compare the assets that were retrieved or identified by the exercise culminating in List B1 and stay with the assets that were on the original Schedule B?**

A. Yes. We were trying to identify all assets which were not fully paid for in the clearance boxes and we wanted to see if there were assets -- these exercises were to see if there were additional assets which had not been previously identified.

**Q. You gained that understanding, sir, from your conversation with a person in finance who may have been Sean Teague?**

A. May have been Sean Teague, yes.

**Q. Can you explain to me then, sir, what it means when there is an entry on either List A or List B1 under the heading Schedule B**

Hraska

**Quantities?**

A. This would have been the quantity that appeared on Schedule B as filed with the court that you referenced earlier.

**Q. The Schedule B you are referencing is to your knowledge the version of Schedule B that was filed with the Bankruptcy Court?**

A. Yes.

**Q. If there is no entry or a dash in Lists A and B1 under the heading Schedule B Quantities what does that indicate to you?**

A. That indicates to me that that particular security when this exercise, this comparison exercise was done it was not found on Schedule B.

**Q. Do you know who performed the comparison exercise between the securities on Lists A and B1 with the securities on Schedule B?**

A. I do not.

**Q. If you had to find out the answer to that question who would you ask?**

A. I would start with Sean Teague.

**Q. Do you have any reason to believe**

Hraska

**this analysis of the securities on Lists A and B1, and the securities on the original Schedule B filed with the Bankruptcy Court is inaccurate?**

A. The data is as accurate as it can be based off of what data set we had available and we applied the rules to it. As to its accuracy I couldn't say.

**Q. Could you have in front of you, please, what I have marked as Deposition Exhibit 562-D?**

A. Yes.

**Q. Could you tell me what those are?**

A. These are my notes that I made in preparation for this deposition.

**Q. What did you do to prepare for this deposition other than write these notes?**

A. I reviewed the questions. I went back through historical E-mails. I looked at some of the spreadsheets that were created. I looked at the spreadsheets that -- the final spreadsheets that operations and treasury worked on together and that had submitted forwarded. I wanted to refresh myself with

Hraska

some of the pivot tables and macros and some of the spreadsheet methodology that kind of contained the rules that we held, and how we wrote those rules into the look ups and macros.

To do that I met with a gentleman by the name of Colin Telmer, T-E-L-M-E-R. And we just reviewed kind of the methodology and reviewed how the spreadsheets worked. Then I met with counsel as well to --

MR. SHAW: Don't talk about anything involving your meetings with us.

**Q. Was counsel present when you were meeting with Mr. Telmer?**

A. No.

**Q. Can you tell me as precisely as possible what it is that you reviewed with Mr. Telmer?**

A. We reviewed the data set and the rules that we applied, and how the pivots and look ups in the spreadsheet itself worked.

**Q. Which data set are you referring to, sir?**

A. Our original data set for this was

Hraska

the TMS stock record, and it would have been as of November 17th date, and --

**Q. That is November 17, 2008?**

A. Yes.

**Q. TMS stands for Trade Management System?**

A. Yes.

**Q. The rules that you reviewed with Mr. Telmer, are those the rules that are generally described in your deposition notes, 562-D?**

A. No. The -- well we reviewed these rules, but my focus with Mr. Telmer was more so how the spreadsheet applied these rules to the data set. So he is more of the spreadsheet expert with pivots and look ups and things, those are spreadsheet functions.

**Q. When you say the spreadsheet, sir, what are you referring to?**

A. There were spreadsheets which analyzed the data that we took from the TMS stock record. So the spreadsheets I am referring to are the original spreadsheets that we used as having the raw data and the

Hraska

application of the rules that I described here in the notes.

**Q. Why is it you met with Mr. Telmer in particular, why him?**

A. Because based on the questions themselves I was -- I wanted to be as knowledgeable as I could about -- if I was looking at the spreadsheet itself, you know, how in particular number 1 how it was organized and also how it appeared and why the data appeared that way on the spreadsheet.

**Q. Again you are referring to a particular spreadsheet or a set of spreadsheets generally?**

A. There were spreadsheets that Mr. Telmer and I worked on which were the basis of what we concluded the positions were, and those spreadsheets were sent to finance and to treasury, and data from those spreadsheets in various forms have been, you know, cut, paste. I referenced earlier that the spreadsheet that we saw there was work that came from work that Mr. Telmer and I had done, but that particular version was not the spreadsheet specifically

Hraska

that we created.

**Q. When you say the spreadsheet in that answer, you are referring to the one that I marked as 561-D?**

A. Yes, correct.

**Q. Do you know if Mr. Telmer created the spreadsheet that was marked as 561-D?**

A. This particular version, no. He would have created the original spreadsheet that fed into that.

**Q. Sitting here today, sir, are you able to tell me whether there are any differences between the original spreadsheet that Mr. Telmer created and Exhibit 561-D?**

A. No, not with certainty, I couldn't tell you if there is any differences between the two.

**Q. You referenced a few minutes ago that you had reviewed historical E-mail?**

A. Yes.

**Q. Can you tell me how you went about that review of your historical E-mail?**

A. I have mail filed in a folder referencing LBI. I just took all my

Hraska

historical E-mail at one point and dumped it into that folder. So I went into that folder and just looked for anything where there were E-mails where we were talking about the creations of the lists and things like that.

**Q. Did the review of that E-mail refresh your recollection about the events at the time?**

MR. SHAW: Objection to the form. Compound.

A. I was primarily looking for one of the versions of the spreadsheets that was attached in an E-mail, but subsequently was able to find it via different means. It was actually saved to my hard drive. So that was the main purpose for going through the E-mails was to look for the spreadsheets.

**Q. That particular spreadsheet that was the main purpose of your E-mail review, did that result in you locating that spreadsheet?**

A. Yes. There was a reference to the names of the files, and then by the name of the file -- the mail itself -- I didn't find

Hraska

the mail with the spreadsheet attached, but the name of the file allowed me to go and find the spreadsheet basically saved on my hard drive.

**Q. Do you remember what the name of the file was?**

A. I don't remember. I mean it would have -- I don't remember specifically. It would have had the B1, B2 references in it, and it would have had a C reference in it as well.

**Q. Why specifically were you looking for this attachment?**

A. I was looking for anything related to the lists which were relevant to this deposition. So those would have been lists that we created which were as outlined, A, B1, B2 and C. So I was looking for anything that had those names in it so I could refresh myself with it.

**Q. Did you in fact find the particular spreadsheet that you were looking for?**

A. I did, yes.

Hraska

**Q. Did it refresh your recollection about the events at the time?**

A. Yes.

**Q. Did you review any other documents that you can recall sitting here today that refreshed your recollection as to the events at the time that the documents were prepared?**

A. No.

RQ MR. OXFORD: Jonathan, I don't know whether that has been produced or not.

MR. SHAW: That makes it unanimous, I don't know whether it was produced either.

MR. OXFORD: If you can take that as my request for the production of the document, we can take it up at the end of the deposition.

MR. SHAW: I will take it under advisement.

**Q. Do you have Exhibit 562 in front of you, Mr. Hraska?**

A. Yes.

**Q. I would like to go through this**

Hraska

topic by topic?

A. Okay.

Q. Topic 32, Schedule B to the clarification letter including A, the origin of Schedule B, including who compiled it.

Do you see that section, sir?

A. Yes.

DI Q. Did you prepare these notes by the way?

MR. SHAW: The notes were prepared through a process that involves privileged communication and we are not going to go into it.

Q. Are these notes accurate to the best of your knowledge, sir?

A. Yes.

Q. Under topic A it says, in your notes, Schedule B was referenced in the clarification letter and represented the party's best effort, based on the information available at the time, to list the quote, clearance box, quote, securities that Barclays was entitled to receive.

It goes on to say because there

Hraska

was imperfect information when Schedule B was filed with the court the parties agreed that Barclays retain its right to amend or supplement that list.

Do you see that?

A. Yes, I do.

Q. Can you tell me please as Barclays 30(b)(6) witness on this topic which individuals on behalf of Lehman agreed that Barclays retained its right to amend or supplement that list?

MR. SHAW: A joint motion filed with the court.

A. I wouldn't --

MR. OXFORD: Are you testifying?

MR. SHAW: I am letting you know that, you know --

A. I don't know who on Lehman's behalf agreed to retain the rights.

Q. Do you know who agreed on Barclays' behalf?

A. I don't know.

Q. Do you know whether there was any such agreement at the time of the closing on

Hraska

September 22nd?

A. It has been referenced there was an agreement. I wasn't part of the closing on September 22nd, I didn't witness that agreement.

Q. But, sir, you are Barclays' 30(b)(6) witness and your 30(b)(6) deposition notes --

A. It is my understanding there was an agreement.

Q. But you are not able to tell me who in particular was a party to that agreement, sir?

A. No.

Q. Do you know whether there is any such agreement reflected in the clarification letter, sir?

A. I don't know, but I would have to review the clarification.

Q. I believe you have in your document set Exhibit 25?

A. Okay.

Q. You have seen this document before, sir, correct?

Hraska

A. I have, yes.

Q. Are you familiar, sir, with the section in this document that references the Schedule B that is the topic of your 30(b)(6) deposition?

A. Could you repeat the question.

Q. The section of the clarification letter that deals with Schedule B that is the topic of your 30(b)(6) deposition today?

A. Yes, I would want to review it again.

Q. Please do so as you need and let me know when you have done it.

MR. SHAW: You want to tell him which parts of the letter you want to look at?

MR. OXFORD: Yes.

Q. I believe the only section of this letter that references Schedule B is clause 1-A (ii) under purchased assets on page 1 which spills over to the first few lines of page 2.

A. All right.

Q. Have you had a chance to conduct a

Hraska

**sufficient review of Exhibit 25, sir?**

A. Yes, I have.

DI Q. Can you tell me, sir, as Barclays' 30(b)(6) witness whether there is any -- anywhere reflected in the clarification letter any agreement between the parties that Barclays retained any right to amend or supplement Schedule B?

MR. SHAW: Objection. Beyond the scope of the 30(b)(6) testimony. He is not here to testify about the content or meaning of the clarification letter. As I already indicated to you the agreement in question was contained in a joint motion filed with the court and not the clarification letter.

**Q. Do you have the question in front of you, sir?**

A. Could you read it back.

(Record read.)

MR. SHAW: I continue to object. Beyond the scope of the 30(b)(6) designation and I am going to instruct him not to answer this question as

Hraska

Barclays witness. If you want to ask him that question in his personal capacity you are welcome to do so.

**Q. Well, we can disagree or agree on the scope of the notice, but I will ask it in the witness' personal capacity.**

**Do you have the question in front of you, sir?**

A. Read it back.

(Record read.)

A. From the review of this document it does not appear there to be any agreement in that section.

**Q. Or any other section that you can see today, sir?**

A. Well I only reviewed that section.

**Q. Moving further down your notes, sir, again under topic 32-A, you say that Schedule B was compiled by many people including -- and then you List A number of names here?**

A. Yes.

**Q. Can you tell me, please, for each of them in turn who they were employed by**

Hraska

**prior to the closing of the deal on September 22nd and what their role was in compiling Schedule B?**

A. Sure. Anthony Crispino employed by Lehman Brothers was a clearance representative. William -- let me go back to Anthony Crispino. He provided data as to the depot accounts along with -- depot accounts is enough.

William Parrinello was a technologist whose specialty was in the GFS system. Myself also employed by Lehman Brothers who worked interpreting the data once retrieved. Nancy Denig who also worked at Lehman Brothers who works in my organization also to do interpretation work and spreadsheet work.

Paolo Tonucci also at Lehman Brothers was the recipient of the data from the treasury group. Robert Azerad at Lehman Brothers, worked for Robert Azerad at treasury, also a recipient of data, as well as reviewing the data and providing the spreadsheets. And the legal, the gentleman

Hraska

from Weil, Gotshal, I am not sure what their role was.

**Q. You write that Schedule B was compiled by many people including the list of people that you named here. Do you know whether there were any other people involved in the compilation of Schedule B?**

A. How broad are you defining involved; the primary people for its genesis are listed. There may have been other people who worked in the organizations for these people who either reviewed a portion or made suggestions or something like that. But beyond the scope of the list of people listed here I wouldn't know who these people might have instructed somebody else to look at.

**Q. That is understood.**

A. Yes.

**Q. Can you give me more information on the interpretation work that Nancy Denig did in the compilation of Schedule B?**

A. She was primarily my spreadsheet mechanic. She is -- I am an average spreadsheet user, she is a much better

Hraska

spreadsheet user with results around pivoting and macro'ing, and sorting and filtering.

**Q. That doesn't sound like interpretation work to me. I asked you about the interpretation work that Nancy Denig did?**

A. So then I would say that that is -- that was an incorrect description then. She would have taken the spreadsheet, I would have asked her for specifics -- series of data and she would have filtered it out and provided that.

**Q. Yes.**

A. She was also familiar with -- she was very familiar with the GFS system and we were using that as a primary search tool. So William Parrinello, Nancy and myself were working to create the rules to pull data using the GFS system.

**Q. I think you testified that Mr. Tonucci and Mr. Azerad were recipients of did data, do you remember that testimony?**

A. Yes, I do.

**Q. In your notes you list both of those individuals as people who were involved**

Hraska

**in compiling Schedule B. Can you tell me what the role was of Mr. Tonucci in compiling Schedule B?**

A. He had primarily instruction to look for clearance box assets came from Mr. Tonucci. So it was at his direction that we were doing it. So I interpreted that to be that he was involved in compilation work.

**Q. Is it accurate to say that Mr. Tonucci wasn't involved in the gathering or analysis of data to your knowledge?**

A. I would say he was not involved in the gathering of data. I believe he was heavily involved in the analysis of data.

**Q. Tell me what you recall or rather tell me what you know about Mr. Tonucci's instruction to look for clearance box assets?**

A. He had requested us to look for assets which were not segregated or fully paid for which could be -- which could be delivered to Barclays if requested as part of the purchase agreement.

**Q. When did Mr. Tonucci issue that request to you?**

Hraska

A. He didn't issue it directly to me. He would have issued it to Alister Blackwell. I would have been on call subsequent to that where he would have been describing what his request was. But that would have been -- I am not certain the time it would have been I believe on that Saturday. I believe that is the 20th of September.

**Q. Did Mr. Tonucci issue a -- or request Mr. Blackwell gather a specific amount of non-segregated or non-fully paid for assets that could be delivered to Barclays?**

A. I believe we were looking for a target of approximately 1.9 billion.

**Q. Who was that target set by, sir?**

A. From my perspective Mr. Tonucci. I don't know who agreed or who set it.

**Q. It is from your perspective Mr. Tonucci, how do you know that?**

A. Because we were asked to find the clearance box assets and we were asked to find at least 1.9 billion of them.

**Q. Was it Mr. Blackwell who asked you to find at least 1.9 billion of assets that**

Hraska

**could be delivered to Barclays?**

A. I mean Mr. Blackwell would have sent a communication down to me. I don't know whether it would have been to join a meeting to discuss it or he directly told either myself or Mr. Forest who I worked for to send that message down to us. At the end of the day I mean the instruction came from Mr. Tonucci. So specifically who gave it to me I don't recall.

**Q. You don't list any Barclays personnel as involved in the compilation of Schedule B; is that correct?**

A. That is correct.

MR. SHAW: A point of clarification, you mean --

MR. OXFORD: Is it correct --

MR. SHAW: You mean preclosing Barclays employees or --

MR. OXFORD: We are going to get there.

A. Could you repeat the question again.

**Q. Focusing on the timeframe prior to**

Hraska

closing?

A. Prior to closing, okay.

**Q. Were any employees of Barclays or representatives of Barclays involved in the compilation of Schedule B?**

A. In the compilation of Schedule B, I would -- not to my knowledge.

**Q. Focusing on the timeframe between the closing on the 22nd of September and September 30, 2008 do you know whether any employee of Barclays, including legacy Lehman employees who transferred to Barclays, worked on the compilation of Schedule B?**

A. Yes.

**Q. Are those Barclays employees the former Lehman employees that are listed in paragraph 2 of your notes?**

A. Yes.

**Q. Are there any others?**

A. Not that I am aware of, no.

**Q. Does Barclays have any knowledge, sir, about the role if any of the Weil, Gotshal firm in the compilation of Schedule B at any time?**

Hraska

A. I would say yes.

**Q. What is that knowledge, sir?**

A. I don't know what that knowledge is, but as a matter that Barclays is entitled to and has possibly reviewed previous E-mails, you know, regarding any of these testimonies, I would have to think that that firm's name or references to Schedule B would have come up.

**Q. Your 30(b)(6) deposition notice includes the topic the origin of Schedule B and who compiled it; correct?**

A. Right, and the reason -- okay, yes.

**Q. Your notes reflect the involvement of the Weil, Gotshal firm including David Murgio, M-U-R-G-I-O?**

A. Yes.

**Q. You have testified on behalf of Barclays, Barclays believes that the Weil, Gotshal firm is involved in the compilation of Schedule B; is that correct?**

A. Yes.

**Q. Can you tell me, please, as Barclays representative what the involvement**

Hraska

**is Barclays says Weil, Gotshal had in the compilation of Schedule B?**

A. In my review for this I saw that there was an E-mail that Weil, Gotshal was -- on which discussed some of the components of Schedule B, which is why I included them on this.

**Q. What is the date of that E-mail?**

A. I don't recall.

**Q. Can you give me an approximate date?**

A. Can I give you a range?

**Q. Yes, a range would be a good start?**

A. The 22nd to the 30th of September.

**Q. The E-mail was from whom and to whom?**

MR. SHAW: If you recall?

A. I honestly don't recall. I reviewed -- I honestly don't recall.

**Q. Was either the sender or the recipient an employee of the Weil, Gotshal law firm?**

A. Yes. It would have been David

Hraska

Murgio who is listed probably.

**Q. The basis for your testimony about Weil, Gotshal's involvement, is it just this one E-mail or are there any other documents?**

A. The basis of my testimony was based on that E-mail.

**Q. Are you aware of any other documents as Barclays representative that form the basis of Barclays's belief that the Weil, Gotshal law firm was involved in the compilation of Schedule B?**

A. I am not aware from the documents, no.

**Q. What can you tell me, sir, about the content of the E-mail that is the basis for your testimony for Barclays that Weil, Gotshal was involved in the compilation of Schedule B?**

A. If I recall it was a discussion of -- it was a discussion of the assets and I remember there was a discussion about the assets, there was a distinction as to different assets and potentially their locations. But beyond that I don't remember

Hraska

the details.

**Q. Turning to topic 32-B, sir?**

A. Yes.

**Q. Was it your intention in compiling Schedule B to exclude any fully paid customer or affiliate securities?**

A. Yes.

**Q. Do you believe that was the intention of all of the individuals who you have testified were involved in compiling Schedule B?**

A. Yes.

**Q. Did someone issue to you a direction to exclude any fully paid customer or affiliate securities from Schedule B?**

A. Yes, that would have been Paolo.

**Q. Do you agree with me, sir, that if any fully paid customer or affiliates were accidentally included on Schedule B, they should be removed from that list?**

MR. SHAW: Objection. Calls for a legal conclusion. Beyond the scope of the 30(b)(6).

**Q. Was it the intention, sir, in**

Hraska

**compiling Schedule B that only unencumbered assets in Lehman's clearing box be included?**

A. Yes.

**Q. Can you tell me please what you mean by the term or understand by the term unencumbered assets?**

A. Assets which would have been fully paid for by a -- I am sorry, assets which were not fully paid for by a customer.

**Q. If assets had been pledged by Lehman for example as part of a bank loan, would those assets be eligible to your understanding for the inclusion in Schedule B?**

A. It would have depended on whether the pledge itself was carried out in a manner which would have reflected on the stock record that it was a segregated account versus a non-segregated account. Had it been placed in a segregated account they would have been excluded from Schedule B.

**Q. If it was pledged but not placed in a segregated account it would have been included in Schedule B?**

A. If the securities would have been

Hraska

in an account which would have appeared on the stock record as unsegregated, then it would have appeared on Schedule B.

**Q. Did you understand the direction from Mr. Tonucci to identify approximately 1.9 billion of assets in the Lehman clearing boxes to include a direction to search for assets that Lehman had pledged but not segregated?**

A. Could you be more specific on pledged?

**Q. I am not sure I can. Can you be more -- can you answer my question like that?**

A. Well Schedule B as referenced here was the composition of two components. One which were securities which were pledged to the Bank of New York for the benefit of Barclays. Those assets were skill in Lehman's clearance boxes, but were pledged for the benefit of Bank of New York. And then the second component of that would have been the work that was done around the review of the stock record using GFS which would have yielded securities in accounts which were in non-segregated locations.

Hraska

**Q. Was it your intention, sir, to include both of those categories of assets in Schedule B, or only one?**

MR. SHAW: Asked and answered.

**Q. Was it your intention, sir, to include on Schedule B the assets that Lehman pledged on Friday the 19th of September?**

A. The original exercise was to look for assets which were purely on the Lehman stock record as unencumbered. We were later instructed by Mr. Tonucci to also include these assets which were pledged on the 19th as well as part of Schedule B.

**Q. When did that instruction to include the pledged assets from September 19th come from Mr. Tonucci?**

A. I don't have a specific time, but it would have been in the latter part of that weekend.

**Q. So before the closing of the transaction?**

A. Yes, correct.

**Q. If a security was pledged by Lehman as part of a bank loan but not placed**

Hraska

**in the segregated account did you understand Mr. Tonucci's direction to you, you or Mr. Blackwell, to include such a security on Schedule B or exclude it from Schedule B?**

MR. SHAW: Objection to the form.

A. His direction was never specific about securities which were pledged on bank loan or not. The first part of the direction was to include assets as I testified which were not fully paid for. Later the direction was to add to the list that we had already created the securities which were pledged on the 19th. As to why I don't remember.

**Q. When you were creating the Schedule B prior to closing or were involved in the process that led to the creation of Schedule B prior to closing, did you include assets that Lehman had pledged as part of a bank loan but had not placed in a segregated account?**

MR. SHAW: You mean other than as stated in the sentence you are focusing on, or just that?

**Q. My question was without reference**

Hraska

**to any sentence?**

A. To the best of my knowledge it would have not included that. It would not have included securities that were pledged to bank loans by the definition of the rules applied to the search.

**Q. Can you be more specific about that?**

A. To specify that, if something was pledged for the purposes of a specific bank loan, typically a transaction like that would be in an account that was fully segregated. So by our rules of not including fully segregated accounts we wouldn't have anticipated to pick up any assets that were part of a bank loan transaction.

**Q. If for some reason there were in the accounts that you were looking at under the rules you just testified to securities that were pledged for a bank loan, do you have an understanding of whether or not those securities should be included on Schedule B or excluded from Schedule B?**

MR. SHAW: Objection. Calls for a

Hraska

legal conclusion. Incomplete hypothetical.

A. So do I answer?

MR. SHAW: If you can answer it.

THE WITNESS: Could you repeat the question.

(Record read.)

A. I don't have an understanding as to whether they would be -- should be included or not because it would have been dependent on the terms of the bank loan.

**Q. Why would it have been dependent on the terms of the bank loan, sir?**

A. Some agreements require a full segregation of assets and some do not.

**Q. You see in your notes at 562-D, page 1, the second paragraph under topic 32-B, the methodology for compiling it. Do you see that you write: After the closing those same individuals and others attempted to verify that the assets on the list had either been transfers (on the 19th, 29th or 30th), or showed on Lehman's stock record as available to be transferred.**

Hraska

A. Yes.

**Q. Who were the others that you were referencing in that sentence?**

A. It would have been individuals who worked for the people listed above. So -- and not necessarily that there were folks who worked for every single person listed above, but there may have been individuals who worked for particular people who were involved. For example in clearance.

**Q. You go on to say in that same paragraph: There was also an attempt to identify any additional assets in Lehman's clearance boxes that were not customer or affiliate assets that had been fully paid for.**

A. Yes. Right.

**Q. Schedule B was a result of those processes.**

**Do you see that?**

A. I do, yes.

**Q. Is that for those processes that you described in that paragraph, did they take place between the closing of the deal on September 22nd and September 30, 2008?**

Hraska

A. Yes.

Q. I think I have your prior testimony on this, but you as Barclays 30(b)(6) representative on Schedule B are not aware of any differences between the Schedule B that was available at the closing of the transaction and the Schedule B that was ultimately filed with the Bankruptcy Court; is that correct?

MR. SHAW: Objection to the form.

A. I don't know of any differences between the schedules. There is a possibility after I had submitted the work that we did on that weekend that it might have been an asset or two which was, or maybe more, which were added or deleted. But I was not -- I didn't do a comparison of those two to see if there were differentials.

Q. Again as Barclays 30(b)(6) representative on topic number 2 you don't have any information about any differences between the Schedule B version that was available at the closing on the 22nd and the version of Schedule B that was ultimately

Hraska

filed with the Bankruptcy Court; is that correct?

MR. SHAW: Objection to the form. Goes beyond the scope of his 30(b)(6) testimony. You can answer though.

A. That is correct.

Q. Turning to topic C, Barclays has analyzed Schedule B, you write: Barclays is not aware of any non-privileged analysis of schedule.

Do you see that?

A. Yes.

Q. When we were looking at Exhibit 561-D you testified about a column entitled Schedule B Quantities. Do you remember that testimony?

A. I do, yes.

Q. You testified about what you understood to be the analysis that underlay the data in that column?

A. Yes.

Q. Do you not consider that to be an analysis of Schedule B?

A. I took analysis to be more so

Hraska

related to assets, asset types, you know, that kind of thing, sort of the nature of the assets, and not necessarily analysis of what was on one schedule versus another or delivered or not, and that kind of thing. It could possibly be just my interpretation.

MR. OXFORD: Off the record for a second.

(Luncheon recess: 12:32 p.m.)

Hraska

AFTERNOON SESSION

(Time noted: 12:55 p.m.)

JIM HRASKA, resumed and testified as follows:

EXAMINATION BY (Cont'd.)

MR. OXFORD:

Q. Mr. Hraska, could you have in front of you again your notes for the 30(b)(6) deposition, Exhibit 562-D, please?

A. Yes.

Q. I would like to turn now to topic 33 and your notes on that subject?

A. Yes.

Q. Topic 33 is Exhibits A and B to the Granfield letter, including A, who prepared each exhibit and the methodology used to prepare each exhibit?

A. Yes.

Q. You list individuals primarily involved in the creation of what you described as Lists A, B1, B2 and C, we will get into the detail of that momentarily, but if you could just generally describe for me what you understand to be meant by Lists A, B1, B2 and

Hraska

**C in turn?**

A. In the aggregate or individually?

**Q. Individually if you could just give me a top line understanding of List A and the other lists that you reference there, please?**

A. List A would have been securities which were firm inventory only positions. So there would have been no other entries to the stock record other than firm inventory accounts and depot accounts for those particular securities.

List B1 was the subset of data where securities had positions on a stock record where -- I want to clarify this so it is not confusing.

List B1 were securities that we believed were firm securities, however they were securities on a stock record which included positions in a depot that had both firm inventory as well as non-firm inventory.

List C would have been securities where there were only customer securities on the stock record and the depot securities.

Hraska

**Q. Thank you.**

A. Your welcome.

**Q. You List A number of individuals primarily involved in the creation of those lists?**

A. Yes.

**Q. There are two names I don't believe you testified about before today. The first name that is new to me is John Vergel, V-E-R-G-E-L, de Dios?**

A. Yes.

**Q. Can you tell me what his involvement was in the creation of Lists A through C?**

A. His involvement was he did some spreadsheet work along with Colin Telmer. So he worked in treasury for Robert Azerad, and both he and Colin did some spreadsheet work around the analysis of the results. John had primarily focussed on the spreadsheet work on the earlier -- sort of the earlier phases, and then I don't know if John left the firm or if he was no longer in treasury, but Colin took over the spreadsheet work for Robert at a

Hraska

later point in time.

**Q. The next name new to me is Josie Ocreto?**

A. Yes. She was a technologist from the TMS system.

**Q. Below those names you explain that Exhibit A reports the results of List A?**

A. Yes.

**Q. And Exhibit B reports to results of List B, do you see that?**

A. Yes.

MR. SHAW: List B1.

A. Yes.

**Q. Are those Exhibit A and Exhibit B that you reference in that section of your notes the same Exhibits A and B to the Cleary Gottlieb letter from March of 2009 that I marked as Exhibit 156-B?**

A. Yes.

**Q. You go on to write: Exhibit C reports the results of a subset of Lists B2/C, sometimes referred to as B2 and C?**

A. Yes.

**Q. Exhibit C is an exhibit to what**

Hraska

**document if you know, sir?**

A. I don't recall.

**Q. When was Exhibit C created?**

A. Exhibit C would have been created in late June of 2009. I believe late June. Well the data that went into -- I should clarify that the data that went into the Exhibit C as you see it was done in late June. I am not a hundred percent certain when C was created as you see it after that. I would assume very shortly thereafter.

**Q. The underlying data analysis that is reflected in Exhibit C was performed in June of 2009?**

A. Yes, that is correct.

**Q. Do you have any information, sir, about when if at all Exhibit C has been provided to the SIPA trustee?**

A. I believe it has, yes.

**Q. Tell me what you know about that, please?**

A. From a conversation I had with --

MR. SHAW: I don't want you to get into any privileged conversations.

Hraska

THE WITNESS: So then somebody who is Barclays legal is considered a privileged conversation?

MR. SHAW: That is right. In-house lawyers are lawyers too.

If you can't answer the question on the basis of non-privileged information just say so. Let me step outside for a moment. Off the record.

(Recess taken.)

A. I have no non-privileged information on the topic.

**Q. It appears at the bottom of page 2 and on through page 3 Mr. Hraska your notes describe the process by which in the first instance List A was compiled; is that correct?**

A. That is correct.

**Q. Can you tell me if in the process of compiling List A Barclays provided for any exceptions in the depot ranges?**

MR. SHAW: Objection to the form. Vague.

A. No. There was no exception in the depot ranges.

Hraska

**Q. Can you tell me why that was, please?**

A. I cannot, no.

**Q. Did Barclays perform any testing of the results that were generated in the process described on page 2 and page 3 of your notes in generating List A?**

MR. SHAW: Objection to the form. Vague.

A. I am not aware of any testing that was done, or that any would have been possible. The data that we had was the stock record and we applied these selection criteria to it.

**Q. On the basis of these, the application of these selection criteria is Barclays confident that every CUSIP listed on Exhibits A and B actually existed in Lehman's clearance boxes as at the closing of the transaction on September 22nd?**

MR. SHAW: Objection to the form.

A. These criteria were applied from a data set that was taken as of November 17th, not September 22nd. So that it would not have

Hraska

necessarily reflected what was on September 22nd.

**Q. Do you have any basis to believe that any of the CUSIP's on Exhibits A and B were added to Lehman's clearance boxes after the closing of the transaction on September 22, 2008?**

A. Could you repeat the question.

(Record read.)

A. Well all I can say is that we took the position off of the stock record which was the in-house books and records. So as it appeared to the books and records, whatever was there as of that date would have been what we reported on.

As to whether physically anything was moved in or out of the clearance box in that time period, I wouldn't have any knowledge of that.

**Q. You said you took the position off of the stock record as of which date, November 17th or September 22nd?**

A. November 17th.

**Q. Did Barclays in conducting its**

Hraska

**analysis assume that all securities that were in the stock record on November 17, 2008 were also in the stock record as of September 22, 2008?**

A. The period of September 22nd or the time around September 22nd the stock record had a lot of what we would define as breaks which were inconsistencies due to what was going on in the market at that time. You know, data providers not sending in data, things along that nature. It took some time to work through some of these discrepancies to create accurate records, and it was not until November that we felt that these breaks and differences had been reconciled through to the point that we felt confident with the stock record data. So that is why we took the data in November.

**Q. And did the data that you worked from in November after the reconciliation process you just testified to that you used to create Exhibits A and B, did that reflect the securities that were in Lehman's clearance boxes at the time of closing on September**

Hraska

**22nd, or securities that were in Lehman's clearance boxes at some later date such as November 2008?**

A. It would have been what was on the stock record as a reflection of what was in the clearance box, not necessarily what was in the actual clearance box being held either at the custodian or DTC. We only have the stock record information available to us to analyze. And because of the breaks that needed to be resolved as well as there should not have been any other new activity other than break resolution going on, we felt confident that the positions once reconciled through in November should have reflected reasonably what would have been expected to have been there on the 22nd as well.

**Q. If I understand your testimony correctly, Mr. Hraska, you used in November 2008 in compiling the data that came in Exhibits A and B, two sources of data. Firstly Lehman's stock record, and secondarily information from the custodians including DTC; is that correct?**

Hraska

MR. SHAW: Objection. Mischaracterizes the testimony.

A. No. We used the data from the stock record and we did not use specific data for that analysis from the custodian's directly.

**Q. What was the date of the data -- withdrawn.**

**The data from the stock record that you used in November of 2008 to compile what became Exhibits A and B reflected the position in Lehman's clearing boxes as of which date, sir?**

A. As reflected on the stock record it would have been the positions that were there on the 17th of November.

**Q. Turning to your notes at the bottom of page 3?**

A. Yes.

**Q. On topic B1, do you see those notes?**

A. Yes.

**Q. I think I understand it, but I wanted to ask you a question by way of a**

Hraska

**hypothetical example so I can put some numbers in this and make sure that I am not missing something.**

**If for example the stock record showed that there were 300 CUSIP's, 200 of which belonged to the customer, and there were only 90 remaining at the depot, did the rules result in only 90 CUSIP's being added to B1?**

A. I think you might have -- or maybe I didn't describe it clear enough.

These rules were not to the number of CUSIP's, but rather for each CUSIP how the quantity was determined. So to use an example, if there were -- if there was one CUSIP that had a hundred shares in the depository or in the depot account, and there was a customer position of 50, we would have subtracted out the customer position to reserve those shares of -- those 50 shares for the customer, and we would have reflected the remaining 50 shares on B1.

We would have done that for every CUSIP, which is why the lists yielded what they did. Some securities only had customer

Hraska

positions and some only had firm, and some had a mixture of both, which is why we had to split B into B1 and B2.

**Q. Sir in your example if the stock record showed that there were 110 shares of that CUSIP in the depot and the customer position of 50, but there were only a hundred shares in the depot record, how many shares would be added to B1?**

A. I am not sure that your question makes sense. Could you repeat it -- based on the terms you used.

**Q. Can you read it back.**

**(Record read.)**

A. We only had a view of the depot record. So in that case we would have only seen that there was a hundred in the depot.

**Q. So there was no analysis of the stock record in your steps to compile B1?**

A. I think it is too broad of a question. There was an analysis, the analysis was based off of these criteria. We did that analysis based off of the depot positions as reflected on the stock record at a point in

Hraska

time where the depots on the stock record should have been reasonably reconciled to the actual custodians where they would resolve numerous breaks up to that point. So at that point we felt confident to purely use the stock record.

**Q. You see in the list of report rules, you see item 3, it says: From the remaining depot balances after customer positions have been taken away, take the lesser of the summary of the inventory positions (931 range) for remaining depot balance.**

**That is what prompted my questions?**

A. So the reason that rule was put into place was that if there were still breaks which had not fully been resolved, as I testified there was a large number had been resolved, but to the extent there were not stock records have to be balanced. Long being the asset side, short being depository.

So in the example of if there was a hundred shares in the stock record as being

Hraska

in the depot, 50 of it belonging to a customer, perhaps 40 of it belonging to an inventory trader, and 10 sitting in a break account because it was unresolved, we would have taken the lesser of the quantity and not taken the full depot position at that point in time.

**Q. I understand. That explanation was helpful, thank you.**

**If you can turn the page to number 4, page 4, topic, customer only list, List C?**

A. Yes.

**Q. Can you tell me when this, the effort behind the List C was begun; is that the same process that was begun in June of 2009 that you testified about earlier?**

A. Yes. For List C that is correct.

**Q. And from whom did you -- withdrawn.**

**Who asked you to get involved in the process that generated List C?**

A. List C, not Exhibit C, List C as listed on this page 4; right?

**Q. Yes.**

**Hraska**

A. List C would have been ultimately still at the direction of treasury along with Lists A, B1 and B2. That exercise was all done at the same time, and the reason we separated it was to understand the nature of the ownership of those securities. So it was one data set that was broken out to subsets according to ownership.

**Q. Who asked you personally to get involved in the data analysis that resulted in List C?**

A. Robert Azerad.

**Q. When did he first ask you to get involved in the List C creation process?**

MR. SHAW: When you say the List C creation process, you mean A, B1, B2 and C process?

**Q. No, the List C creation process?**

A. As previously testified they are one in the same. So that would have been -- that specific process would have -- the discussions to do the analysis would have been in early November, and then subsequently we pulled the data in mid November, I believe

Hraska

November 17th, and worked on it from there.

**Q. So it is your testimony that from November 17th forward Barclays was working on the analysis of the data that is contained in List C?**

A. Yes.

**Q. That is November 17, 2008?**

A. 2008, yes, correct.

**Q. Again focusing on List C, can you tell me with as much specificity as you can the direction that Mr. Azerad gave you in connection with your role in analyzing the List C data?**

MR. SHAW: Objection. Mischaracterizes prior testimony. Assumes facts not in evidence.

A. Mr. Azerad had directed us to make sure that we could separate securities off of the analysis that we did, which were purely customer where there was no inventory or any other positions on the stock record not related to customers. We had told him as part of the analysis we did which created A, B1 and B2, that C was the portion of that list --

Hraska

that C was the result of the securities which were purely belonging to customers. Again List C as specified on page 4.

**Q. What is the distinction between List C and Exhibit C; is it that Exhibit C includes data from List B2 and C?**

A. There are a few distinctions. One, Exhibit C does in fact include data from List B2. Another is that Exhibit C is the result of analyzing customer debit balances versus the present marked value of securities in the system, and then creating an entitlement amount which would have equated to up to a hundred percent of the debit balance in the customer's account.

One more distinction is that the customers that were in question on Exhibit C were the 732 range customers, which is a range defined for prime broker customers.

**Q. I see that you have explained in your notes the court rules on definition of criteria used in the creation of List C?**

A. Again this is back to page 4, middle of the page.

Hraska

**Q. Yes, over on to 5?**

A. Okay.

**Q. Can you give me a hypothetical example that would help me understand the application of those rules?**

A. Well for List C it would have been securities where the only positions in the stock record would have been a position which was on one side of the stock record belonging to a customer. On the location side of the stock record, the other side of the stock record being in a depot.

So to the extent that there were a hundred shares in the depot, that hundred shares would have been owned by one or more customers only and not by any other entity or inventory trader or anything like that.

**Q. Anything else for List C?**

A. For List C, no.

**Q. Are those the selection criteria that appear in the immediately below customer lists -- sorry, customer only (List C)?**

A. The selection criteria goes through the end of page 4 up to but not

Hraska

including the sentence customer based firm entitlements. So List C goes from the point you said up to, but not including that sentence.

**Q. The report rules that you included in your note appear in item 2, select only PB range; is that accurate?**

MR. SHAW: Where?

**Q. Page 4, about two thirds of the way down, report rules, point 2?**

A. Yes.

**Q. Are those rules that apply to the creation of List C, sir?**

A. Yes.

**Q. So we should add them into your earlier answer?**

MR. SHAW: Well, no, because your earlier question was about selection criteria, not report rules.

**Q. Then can you give me a hypothetical example that will help me understand in addition to the selection criteria also the report rules that you used in connection with List C?**

**Hraska**

A. Hypothetical example meaning, so if we had to the extent that we used an example before, that hundred shares that was in the depot was in a 732 range, we would have put it on lists C from the selection criteria above for this particular section. If it was not included we would not have included it.

**Q. Can you explain what is meant by your notes under that, what appears to be the heading customer based firm entitlements, List B2 and C in parens?**

A. Yes. So we had segregated out from the previous exercises what securities belonged to PB customers, the two exercises that denoted customer securities were in List B2 and as we just talked about in C. But that was just the position itself that was on the stock record as a position which would have been sitting in a PB defined account.

**Q. PB just so we have a clear record stands for prime broker?**

A. Yes. However to determine the entitlements we needed to understand whether or not the customer maintained a debit balance

Hraska

in the account. So we got the debit balances from the stock record as well in each of the customer accounts in those two lists. And then we filtered out and looked at only customers that had debit balances.

And then we compared the marked value of the securities to the debit balance. And then we claimed entitlement to all of the securities that -- all of the securities that had a marked value of up to the value of the debit balance.

So to clarify that, we would have not -- we would have not claimed entitlement to any more securities that in sum would have equalled any more than the debit balance.

**Q. I understand, that is a very helpful explanation, I appreciate that.**

A. Okay.

**Q. You mentioned in that answer that the steps that you just described were to determine entitlement. What did you mean by the term entitlement; whose entitlement?**

A. Well entitlement from the sense of whether the customer still had entitlement, or

Hraska

whether the firm would have had entitlement based off of the rehypothecation rights which would have been afforded based on the debit balance.

**Q. Did you consider in your analysis, sir, whether the securities in these prime broker customer accounts had in fact been rehypothecated by Lehman?**

A. If there were -- if there were debit balances in the account they were rehypothecated.

**Q. If I understand your answer, you are trying to tell me that all securities that are in this analysis you just testified to would automatically have been rehypothecated; is that correct?**

A. Yes, that is correct.

**Q. Just so we can bring this down to a level that a layman such as me can understand. The rehypothecation would involve a transaction such as Lehman pledging that security to a bank for a bank loan, correct; would that be an example of such a rehypothecation that Lehman would have done in**

Hraska

**the circumstances that you just described?**

A. As just described the rehypothecation process would have been the rights of Lehman to have had access to that security because it was providing financing to the customer. It would have been a separate transaction where Lehman might have used those securities to raise financing to replenish the financing that it had given to the customer, but that would have been a separate transaction.

**Q. Did Barclays in creating List C include in that analysis any data relating to whether or not Lehman had in fact rehypothecated the securities in question?**

MR. SHAW: Objection to the form.

A. Can you define what you are defining as rehypothecated, because to me it means if Lehman has access to the security it has been rehypothecated. Are you asking me whether we did any analysis as to whether those same securities were used as part of a financing transaction?

**Q. Yes.**

Hraska

A. It would have been those securities then in that particular case we would have deemed that, that once the first leg of the rehypothecation was done, which means that we took entitlement from the customer, that those securities at that point were -- would have been Lehman's to do what they had chose to do with them regarding financing.

So at that point if they were in another financing transaction, whoever was on the other side of that financing transaction would have been on the stock record as well. So in that case those wouldn't have been in a depot, but rather as an obligation to another financing counterparty.

So in that case we would have -- we would have had a long customer versus a loan of those securities to another financing counterparty. Those would have not come up on our search because that other side of that equation would not have shown up as a depot where the securities were available.

**Q. So if Lehman did once the**

Hraska

**securities that were in the prime broker accounts and had been rehypothecated to Lehman then pledged them as part of a bank loan to replenish the finance that it used to purchase the securities in the first place. Securities that were the subject of such refinancing by Lehman would be excluded from your analysis in List C; is that your testimony?**

A. I am trying to think from a stock record perspective. From a stock record perspective it all depends on the nature of the bank loan. You would have to be very specific about bank loan for me to answer that. I am sorry, I am not trying to be difficult.

**Q. I understand, I think you are trying to be very helpful.**

**Why would it depend on the nature of the bank loan, sir?**

A. If it was a bank loan type transaction, if you are referring to a tri-party transaction, then in that case the securities would have been in an account where that would have been in a clearance account

Hraska

where it would have fallen in the range of a depot where we would have said even though we are arranging financing, the positions were still sitting in a clearance box that would have belonged to Lehman and we would have made a claim against them.

Whether or not we would have gotten them as a result of anything, as a result of the bank loan might have been a different story. But they would have been in an account which would have been defined as one that we would lay claim to. If they were done on a non-tri-party or a deliverable type bank loan transaction where the securities would have been delivered out of our clearance box to a recipient's clearance box, in that case we wouldn't have showed them on the stock record in a location that was defined as a depot, so we wouldn't have been on the List C in that case.

**Q. In the first example, the tri-party example that you just gave me you mentioned that Barclays would lay claim to a security even though it may not be available.**

Hraska

**Can you explain that a little further?**

A. It would have been available in the normal course because it would have been in our clearance box. But had we pledged it to the financing counterparty who would have as a result of the events that took place seized the asset, it wouldn't have been available as I described.

From a stock record position perspective it would have appeared as though we had entitlement, but physically we might not have been able to take possession of the asset.

**Q. Because in a bankruptcy situation the counterparty would have seized the securities that had been pledged as a result for that?**

A. Yes.

**Q. Correct?**

A. Yes.

**Q. In the analysis that results in I believe Exhibit C and in the processes that are described on pages 4 and 5 of your notes to create Exhibit C, was there any account**

Hraska

**taken of the obligation on the part of Lehman under the financing transaction when Lehman rehypothecated the security to a party such as a bank to provide additional finance?**

MR. SHAW: Objection to the form.

A. There was an analysis that was -- are you asking me if there was an analysis done by Lehman or Barclays?

**Q. Barclays?**

A. Barclays, no.

**Q. Was there an analysis done by Lehman?**

MR. SHAW: Objection. Foundation.

A. There were conversations that I was asked to be a part of which very early stages people were asking questions about the scenario that we just described from the trustee's perspective. And so from that I assume there was a Lehman analysis done, but I was not part of it.

**Q. With whom did you have this early conversation?**

A. From the Lehman side it would have been David Aronow at the time, he was

Hraska

primarily running the point on that with the trustee.

**Q. Who is David Aronow?**

A. David Aronow used to work in the prime brokerage front office, but he had done previous jobs at Lehman such as running clearance and a few other things. So he was asked to be a point person on that particular topic.

**Q. If I understand your testimony correctly, he was an employee of the trustee's office?**

A. No, he was an employee of Lehman Brothers and he was liaising with somebody from the trustee's office, but I don't remember who.

**Q. Can you give me an estimation as to the date of this conversation; was it pre or post closing?**

A. Honestly I don't know. There was a lot of things going on during that time period.

**Q. Maybe I can approach it this way. If I can represent to you for the purposes of**

Hraska

**the rest of this examination that the SIPA trustee was not appointed until the afternoon of Friday the 19th of September, which was a couple of days before the closing on the 22nd, did that help you answer my question when did this early conversation about the trustee's perspective on --**

A. The closing being defined as the 22nd, right?

**Q. Yes. Does it help you answer my question and give me a more specific timeframe about this conversation that involved David Aronow and prime brokers?**

A. That would have taken place I believe the week of the 22nd.

**Q. Were you involved in this conversation?**

A. I was involved in an initial conversation to understand how rehypothecation works with respect to our stock record.

**Q. In this conversation it was you, David Aronow, and who else?**

A. I don't recall who it was from the trustee who was involved in that conversation.

Hraska

There may have been somebody from clearance, but I don't recall.

**Q. Can you tell me everything that you remember about that conversation?**

A. The initial conversation was purely to understand what mechanics there were around rehypothecation, how the systems worked, that kind of thing.

**Q. Was the predicate for the conversation that someone from the trustee's office was trying to understand rehypothecation, is that what you are saying?**

A. Was trying to understand rehypothecation with respect to how did it function internally within our internal mechanisms.

**Q. The week of the 22nd, sir, 22nd of September 2008 you were employed by Barclays at this time?**

A. As of September 22nd I was employed by Barclays.

**Q. Does the same apply to Mr. Aronow?**

A. Yes.

**Q. Do you remember any other**

Hraska

**conversations with anyone from the trustee's office on this same topic, rehypothecation and prime broker accounts?**

A. No.

**Q. The data set that is used in the analysis that underlies Exhibit C, sir, is that the same November 17, 2008 data set?**

A. Yes.

**Q. It is correct to say that Barclays did not assume responsibility for Lehman's prime broker accounts after the closing?**

MR. SHAW: Objection. Foundation. Beyond the scope of the 30(b)(6). If you know you can answer. Calls for a legal conclusion as well.

A. Barclays did not assume responsibilities to the best of my knowledge of the Lehman prime broker accounts.

**Q. At what date did Barclays -- withdrawn.**

**What date did Barclays use to value the CUSIP's on Exhibit C in calculating what they say is their entitlement?**

MR. SHAW: Objection to the form,

Hraska

foundation, including beyond the scope of the 30(b)(6). If you know you can try to answer it.

A. The analysis that we performed was based off of November 17th debit balances as well as November 17th prices which would have been in the TMS stock record.

MR. OXFORD: Off the record for a second.

(Recess taken.)

MR. OXFORD: Would you mark Exhibit 563-D, one-page document headed Exhibit.C-Additional Clearance Box Securities.

(Exhibit 563-D, one-page document headed Exhibit C-Additional Clearance Box Securities, marked for identification, as of this date.)

MR. OXFORD: Would you mark as Exhibit 564-D, document headed 732 Accounts With Securities That May Be Potential Firm Claims If Firm Financed.

(Exhibit 564-D, document headed 732 Accounts With Securities That May Be

Hraska

Potential Firm Claims If Firm Financed, marked for identification, as of this date.)

**Q. Mr. Hraska, I have placed in front of you two additional exhibits marked 563-D and 564-D. Looking at 563-D first, can you tell me if you know what that document is?**

A. I don't know.

**Q. It bears a legend, Exhibit C additional clearance box securities. Do you see that?**

A. Yes, I do. Nothing that I have been involved with the creation of.

**Q. If I can direct your attention back to 562-D, which are your notes?**

A. Yes.

**Q. Your deposition notes on page 2?**

A. Yes.

**Q. Topic 33?**

A. Yes.

**Q. Just below the list of names, second sentence reads: Exhibit C reports the results of a subset of Lists B2/C, sometimes referred to as the List B2 and C?**

**Hraska**

A. Right.

**Q. Are those your notes, sir?**

A. They are my notes, yes.

**Q. Do those notes help you answer my question what is Exhibit 563-D?**

A. No, because Exhibit C is as it was previously marked and shown, and that Exhibit C is a subset of B2 and C. But this is neither of those.

**Q. When you say it was previously -- Exhibit C was previously marked and shown, where and shown to who?**

MR. SHAW: I think he is confused.

MR. OXFORD: Off the record for a second.

(Recess taken.)

MR. OXFORD: While we were off the record we sorted out the confusion. I marked a different document as 563-D.

**Q. Do you see the newly marked 563-D in front of you?**

A. Yes.

**Q. Do you recognize that document?**

A. Yes.

Hraska

**Q. What is it, please?**

A. Exhibit C.

**Q. That is the Exhibit C that you referenced in your testimony prior today?**

A. Yes.

**Q. That is the Exhibit C that you have referenced in your deposition notes marked as 562-D?**

A. Yes.

MR. SHAW: He has one point to make about something on Exhibit C, a clarification about something.

MR. OXFORD: Okay.

**Q. Okay.**

A. So in preparing for the deposition I looked at Exhibit C versus -- which came from a spreadsheet that I had prepared which was the B2/C list, and I noticed that the last two quantities on Exhibit C are incorrect.

On the work that we had done where we had described B2/C in comparing the debit balances, in every security except the last two the marked value of the securities in their entirety were less than the debit

Hraska

balance, therefore we claimed a hundred percent of the quantity as an entitlement.

For the last two securities we were only able to claim a pro rata portion of these quantities, and the pro rata portion that we would claim is not listed here. So it is a lesser quantity obviously being pro rata.

**Q. If I understand your testimony correctly what you are saying is for the last two entries in Exhibit C that we marked as Exhibit 563-D, Met Life Inc. and Net Gear Inc., what is stated in the quantity column is 100 percent of the value of the CUSIP's, and Barclays claim in fact is to less than 100 percent of the value of the CUSIP's?**

A. Yes. For the last two Barclays would not claim a hundred percent value.

**Q. Do you know off the top of your head what percentage Barclays is claiming?**

A. The quantity?

**Q. Yes.**

A. Off the top of my head no, but the electronic form of this --

MR. SHAW: Leave a gap in the

Hraska

record, we can fill that in.

MR. OXFORD: Yes, that is a good idea.

TO BE FURNISHED:____________________

**Q. Do I understand correctly, Mr. Hraska, that Barclays claim is not for these securities that are listed on Exhibit C, but for the value of those securities?**

A. No. It would be for these specific securities.

**Q. Is it your testimony, sir, that all of these securities were held in the accounts of prime brokers?**

A. Yes.

**Q. Do you know what the prefix 931 means in connection with Lehman securities accounts?**

A. Yes, they are firm inventory accounts.

Can I just back up to your question prior to that question?

Q. Sure.

A. If you wouldn't mind please read

Hraska

that back.

(Record read.)

A. Could I make a clarification to that?

**Q. Please do.**

A. Exhibit C as stated here is a subset of B2 and C. In B2 was a list where there were securities on the stock record that could have been both the prime broker accounts -- wait a minute, I'm sorry. I am sorry, never mind, my answer is still yes. I am confused.

MR. SHAW: That is okay. No problem.

**Q. Do you have an understanding, sir, of what the prefix 950 means in connection with Lehman securities accounts?**

A. They would have been an affiliate type range, 950.

**Q. In the processes that resulted in the creation of Exhibit C, sir, did Barclays do any checking or due diligence to determine whether or not the securities listed on Exhibit C were also contained in firm**

**Hraska**

**inventory accounts rather than prime broker accounts or affiliate accounts -- withdrawn.**

**In the processes to create Exhibit C, sir, were any accounts other than prime brokerage accounts taken into consideration?**

A. For Exhibit C; no, there should not have been any other accounts that were prime broker -- other than prime brokerage accounts.

**Q. So you wouldn't expect there to be on Exhibit C securities that are also contained in Lehman affiliated accounts; is that correct?**

A. I just need a minute, I apologize, because something is bottoming me that I hesitated before on. So can I just take a minute to think through.

**Q. Sure. Go off the record for a second.**

**(Recess taken.)**

A. Back on the record.

So I can answer this question and then -- so to answer this question, it is possible that CUSIP's or security numbers that

Hraska

end up on Exhibit C would have been in firm or affiliated accounts as well. I can explain why based on a clarification on that earlier testimony that I had sort of referred back to.

**Q. Okay, please explain?**

A. List B1 and B2 were basically broken out for securities where there were positions in that CUSIP which were a mix of firm inventory as well as customer. In order to separate out the lists as to what were considered for customer purposes and what were considered for firm purposes we went through that process where we -- where I testified earlier where we took the customer portion, we reserved that portion of the depot, and then the other portion based on the lesser quantity was the firm's security which became List B1.

So Exhibit C is a combination of List B2 which was from that pool of securities that may have been in both places. So as a result of it -- if there was a security number that came from the derivation List B2, there is a possibility that that security has a quantity that is partially for the benefit of

Hraska

customer, which is why it would be on this list.

And there would be partially -- there could be an instance where there was a quantity which would have been for the firm which would have been on the B1 list.

**Q. Does that answer explain why --**

A. That answer explains your last question to me and why.

**Q. My question was not just related to firm inventory accounts, my question related to affiliate inventory accounts as well. Does the answer that you just put on the record after the break explain why there would be on Exhibit C CUSIP's that also appear in Lehman's affiliate inventory accounts?**

A. I don't believe you should find affiliate securities on the list.

**Q. Could you take a look, sir, at Exhibit 564-D, please?**

A. Yes.

**Q. Just take a minute to flip through that and tell me if you have seen it before?**

A. Yes.

Hraska

**Q. Tell me what it is, please?**

A. It is the B2/C list.

**Q. That is the B2/C list that you referred to in your deposition notes, Exhibit 562-D, and in your testimony here today?**

A. Yes.

**Q. Did you create this list, sir?**

A. I created it, yes. I created this.

**Q. There are a number of tabs to this spreadsheet that are separated by blue pieces of paper. Did you create every single one of the tabs?**

A. No.

**Q. Can you identify for me please which ones you did create?**

A. I created the first page -- the first tab -- the blues I assume delineate the tabs in the spreadsheet?

**Q. That is my understanding, yes.**

A. I created the second tab. The third tab, fourth tab, and the fifth tab I don't recall -- this is raw data that we used, I don't recall if we created this tab the way

Hraska

you see it, or whether it was provided to us in the format that you see it. But some of the raw data.

**Q. Thank you Mr. Hraska.**

**Do you see at the top left-hand side of page 1 of Exhibit 564-D?**

A. Yes.

**Q. The first spreadsheet?**

A. Yes.

**Q. That you created it. It says 732 accounts with securities that may be potential claims if firm financed.**

A. Yes.

**Q. Do you see that?**

A. Yes.

**Q. When you created the spreadsheet what did you mean by that sentence that I just read?**

A. Meaning if there was a debit balance against these firm accounts we would have financed -- had been considering to have lend the customers in essence cash for the purchase of these. So those would have been firm financed.

Page 130

Hraska

**Q. You used the words may be potential firm claims, do you see that?**

A. Because in the initial analysis we didn't -- not all accounts had debit balances. So I think this tab at one point was initially larger until we got to the point of filtering out the ones that had debit balances versus the ones that didn't.

**Q. So by filtering out the accounts that had debit balances you go from an earlier version of 564-D, page 1, to Exhibit C, Exhibit 563-D to the deposition; is that right?**

A. No. The number on the first tab here of securities should be the same as what is on Exhibit C. I think when we first got the lists of B2 and C, which included more accounts than you see here on the summary tab, all those accounts were initially included, but then once we applied the rules then it got down to this number of accounts and securities.

I think -- not I think, you look at the CUSIP list here versus the CUSIP list

Page 131

Hraska

on the summary, it is one in the same. It is just that this list doesn't include information around the market values and a few other columns that you see on the spreadsheet.

**Q. There is a column as you averted to a second ago in the summary spreadsheet that is page 1 of 564-D?**

A. Yes.

**Q. That is market value?**

A. Yes.

**Q. Do you see that it is the fifth column from the right?**

A. Yes.

**Q. What is the data source for the numbers that appear below market value?**

A. The TMS stock record.

**Q. With --**

A. With, sorry?

**Q. With which date?**

A. It would have been November 17th date.

**Q. November 17, 2008?**

A. Yes. We requested that it come with the same data set from technology that

Page 132

Hraska

the original data pull was from.

**Q. Does that same data set carry over into the last column that is headed entitlement market value?**

A. Yes. By virtue of formula this market value was directly from TMS. The market price in order for us to figure out the entitlement market value we just applied a formula to the number of shares and market value.

**Q. Exhibit C you testified contains only the securities that were held in the accounts or shown in the stock record as being the accounts of prime brokers at Lehman as of closing; correct?**

A. As of November 17th.

**Q. Did Barclays perform any analysis to determine whether these same CUSIP's were in the prime broker accounts as of the close?**

A. There was no further analysis, but we were confident that the securities were there as a result of the stock record as well as the resolution of the breaks and discrepancies that we had talked about in the

Page 133

Hraska

previous round of testimony.

**Q. How is it that the resolution of the breaks gave Barclays confidence that the securities listed here using the November 17th date were in the prime broker accounts at Lehman as of close?**

A. There should not have been any other activity to the stock record other than resolution of breaks. There should not have been any unauthorized transfers, movements, anything like that. So we were going under the assumption that the stock record was accurate, and once the breaks were resolved it gave us a much better picture as to what would have been in those, I will call it the stock record and the clearance box as of the 22nd.

**Q. You say what would have been, I will call it the stock record and clearance box as of the 22nd?**

A. So what would have been the reflective stock record on the 22nd.

**Q. Had those records --**

A. Had those records been done properly under the normal course of business

Hraska

on that date.

Q. But you are unable to testify as to whether or not those records -- withdrawn. You are unable to testify as to whether or not as a matter of fact the records that you used that had the November 17, 2008 data accurately reflect the actual status of Lehman's books and records including its clearance box accounts as of the close; is that correct?

MR. SHAW: Objection, mischaracterizes prior testimony and vague. You can answer if you can.

A. Could you read it back one more time.

(Record read.)

A. As a matter of fact it represents the best availability of data that Lehman has as to its position at the time of the close. But there is no other record as to that time with regards to Lehman's books and records as of the 22nd.

Q. The stock records that you described as the best available records, sir,

Hraska

did they show the securities that are listed on Exhibit C as being for the account of prime brokers?

A. The list on Exhibit C, each one of these accounts is a prime broker account, so yes.

Q. It is accurate, is it not, Mr. Hraska, that prime brokers were not the only type of customer Lehman had prior to the closing who did not fully pay for their securities; is that correct?

A. That is true.

Q. For example customers known as PIM customers had securities with Lehman that they didn't fully pay for; is that correct?

A. Yes.

Q. The same is true for the PAM customers?

A. Yes.

Q. Was there a reason that the PIM and PAM customers for example were not included in the analysis that led to the creation of Exhibit C?

A. Mr. Azerad instructed us to take

Hraska

the most conservative approach and to only include prime brokerage customers in our analysis.

Q. Why was that the most conservative approach, sir?

A. I don't know, that was his opinion.

Q. Do you have any understanding of what Mr. Azerad meant when he said we should take the most conservative approach and only include prime broker customers in your analysis?

A. Just one more time read it back, please.

(Record read.)

A. I don't know the specific reasons or why he thought that. I do remember him thinking that it was more conservative to do so. So based on that we acted on his instruction.

Q. Did you have any discussion with him about why this was the conservative approach?

A. I know that there were some

Hraska

discussions that were taking place about PIM and PAM customers away from my organization. So that may have had something to do with it, but I would have to speculate whether it did or didn't. So he instructed me -- as a matter of fact I believe I might have run that past Alister Blackwell and I think he agreed to use that as a filter criteria and that is where it was from my role.

Q. In the situations where Lehman rehypothecated the partly paid security that is listed on, or any of the partly paid securities that are listed on Exhibit C, Mr. Hraska, is Barclays in connection with its claim to the trustee for the securities listed here assuming any liabilities to repay the loan that is secured by these CUSIP's?

MR. SHAW: Objection to the form. Calls for a legal conclusion.

A. Repay the loan; they would have extended the loan to the customer which is why they claimed entitlement. They wouldn't have taken a loan.

Q. In the circumstances where they

Hraska

**pledged, Lehman --**

A. Took loans to replace the cash?

**Q. That was used to purchase the CUSIP's that was partly paid for by the prime broker customer, you understand that Lehman has an obligation to pay that too?**

A. I didn't realize that that is what you were referring to. So based on that could you please repeat the question to me.

(Record read.)

MR. SHAW: I object. Beyond the scope of the 30(b)(6) testimony. It lacks foundation. Calls for legal conclusion.

THE WITNESS: Can I answer?

MR. SHAW: If you know the answer you can answer.

A. Based on the previous testimony these positions should have been in a stock record location that we would have shown the assets still being held in one of our clearance boxes. If they were being financed and the securities were no longer in our possession we wouldn't have made any attempt

Hraska

to try to repay the loan in a scenario like that, because under those scenarios as we discussed earlier the person that we gave the securities to would have kept them under the default of the financing.

**Q. Just back to the original creation of Schedule B for a second. The instruction came --**

A. Schedule B, back to 32 then?

**Q. Yes. Did the instruction from Mr. Tonucci to identify unencumbered assets, was that instruction limited to any particular depository locations?**

A. The initial request was not. So we were to look at all clearance locations available on the stock record which were not fully paid for customers.

**Q. Did you do so?**

A. We did, yes.

**Q. And the fruits of that initial instruction and your labor consequent to that instruction are reflected on Exhibit B; is that correct?**

A. That is correct. That was what we

Hraska

produced on that weekend which subsequently became Schedule B. The one place we had some difficulty on that weekend was we knew we had a lot of physical securities in physical locations and we were unable to confidently determine what were firm physical securities and what were not until later on. So that further analysis that was done after the 22nd yielded some physical securities that we felt then confident later that we would be entitled to.

So I think I would like to clarify, I think I testified earlier that there were no changes to the security list initially put forth versus what was filed on the 30th. I would like to amend that by saying that the physical securities were added to the list that was finally submitted on the 30th.

**Q. To your knowledge were there any other changes to the version of Schedule B that was available at the closing of the transaction on the 22nd and the finally submitted Schedule B that was filed with the**

Hraska

**Bankruptcy Court on the 30th of September other than this addition of physical securities that you just testified to?**

A. I believe there may have been some discrepancies on some of the CUSIP's, but I don't know what the materiality of those discrepancies are. I think primarily they are essentially the same.

**Q. Did you personally add the physical securities to the list, Schedule B?**

A. I don't believe I personally added the physical securities, no, I created the initial list. I think Robert Azerad's team did.

**Q. Mr. Hraska, included on Schedule B are a number of securities that are in accounts other than the DTC; right?**

A. Yes.

**Q. That reflects your initial instruction coming down from Mr. Tonucci that you and the rest of the team involved in gathering and identifying the securities should look everywhere for available inventory; is that accurate?**

Hraska

A. Yes, that is accurate.

**Q. That search for additional inventory, sir, that you and your team conducted subsequent to September 30th that led to the creation of Exhibits B and C that you testified to today also included search for inventory outside of the DTC boxes; is that correct?**

A. Yes, that is correct.

**Q. Do you know, Mr. Hraska, whether there were any residential mortgage securities that were identified as a separate category of assets that were to be purchased by Barclays under the original asset purchase agreement?**

MR. SHAW: Objection. Beyond the scope of the 30(b)(6). You already had your shot with him as an individual witness.

**Q. Do you know, sir?**

A. Just repeat the question.

MR. OXFORD: If you want to go off for a second I can explain why I am asking the question. Off the record.

(Recess taken.)

Hraska

**Q. Mr. Hraska, I am asking this question in your individual capacity, not as a 30(b)(6) witness of Barclays. Do you know whether or not there were any residential mortgage backed securities that were identified as a separate category of assets that were to be transferred to Barclays under the original asset purchase agreement?**

MR. SHAW: Objection. Foundation.

A. Read it back, please.

(Record read.)

A. I believe that there was, but they would have been included in the assets that were available to be transferred in the overall list. So there was a discussion about residential mortgages, but those resided in the same clearance boxes and locations as the other securities that were in question.

**Q. Do you know whether those residential mortgage securities ended up on Schedule B?**

MR. SHAW: Objection.

**Q. Do you know whether any of those residential mortgage securities that were**

Hraska

**identified as a separate category in the original APA ended up being included on Schedule B to the clarification letter?**

MR. SHAW: Objection. Foundation.

A. I am sorry, can you read that back again.

(Record read.)

A. I don't know for a fact, but it is plausible that some of them might have ended up on Schedule B based off of the criteria that was used to create Schedule B.

**Q. If I asked you the same question with respect to Exhibits A and B would you have the same answer?**

A. Exhibits A and B?

**Q. Yes.**

A. Its possible that Exhibits A and B would have contained that asset class, but it is less likely.

**Q. Why is it less likely, sir?**

A. Because those asset classes were held in a different system.

**Q. Which two systems are you talking about in your testimony here?**

Hraska

A. The residential mortgages would have been held in the system called MTS, and would have been held in a clearance box DTC participant ID 636.

**Q. I take it that these two locations for the residential mortgage securities were not sources that you were looking at for the compilation of the data that led to Exhibits A and B; is that correct?**

A. That is correct, yes.

**Q. You mentioned that there were some conversations about residential mortgage securities. What were you referencing?**

A. Trying to recall, it was a long time ago. I honestly don't recall the specifics. I remember us talking about residential mortgages. I remember us talking about where were they located. Would they be physically able to be moved as part of the asset purchase agreement to Barclays. What type of assets were they, were they DTC or physical, that type of stuff. Beyond that I don't remember much more.

**Q. Who is the "us" that you are**

Hraska

**talking about?**

A. It would have been some of the same folks mentioned earlier. It would have been myself, Neil Ullman, Robert Azerad, Paolo Tonucci primarily.

**Q. Do you know whether any of those residential mortgage backed securities were transferred back to Barclays as part of the Fed settlement securities?**

A. Is that part --

MR. SHAW: No, it is not part of the 30(b)(6).

**Q. The whole line of questioning relates to your individual.**

A. Okay. I didn't know if we were still -- it is very possible that some of the residential mortgages ended up in the transaction from the 18th, which was the repo transaction.

**Q. Why do you say that it is very possible?**

A. They were an asset class which was available in the DTC location 636. So we were pledging assets from that location. So it is

Hraska

possible that some assets classified as residential mortgages made their way to Barclays on the night of the 18th.

**Q. If you wanted to determine whether that possibility was in fact actuality, how would you go about finding that out?**

A. Well there is a list of what -- a CUSIP list of what was sent over to Barclays as a result of the transaction that took place on that night.

**Q. Uh-hum.**

A. Which confirmed the deliveries by both parties of being delivered and received, and you could look up the CUSIP's and their asset classes and determine whether any of those were residential mortgages or not.

**Q. Do you have a list of the residential mortgage securities that were originally identified in the asset purchase agreement that you could compare to the list of CUSIP's that were delivered to Barclays on the 18th?**

A. I don't personally have a list, but I am sure a list -- well, I am not sure.

Hraska

A list may exist somewhere. If provided a list we could do it.

**Q. Do you have any personal knowledge as to whether such a list exist?**

A. I know there was talk of a list about residential securities. I don't know whether -- at one point there was a list of securities, but I honestly don't -- I don't recall much more than that. I know there was talk of putting a list together.

**Q. With whom was there talk?**

A. The talk I had would have been with the same people mentioned before about determining whether or not we could move those assets over to Barclays or not. Where they were residing and whether they were physical form or book entry form.

**Q. Would that conversation have taken place prior to closing, sir?**

A. That conversation would have taken place prior to closing, yes.

**Q. And the people you identified before, can you just, so we have a clear record, the people you think were involved in**

Hraska

**this conversation you testified to moments ago were whom; did they include Mr. Azerad?**

A. It would have been Azerad, Tonucci, myself, Ullman. I am not sure whether Blackwell or not, but most likely Blackwell also.

**Q. I just have one clarified question suggested by your counsel here. If you can have in front of you Exhibits 563-D and 564-D, if you look at the last two lines of Exhibit 564-D, do those help you fill in the blank that we left in the transcript earlier?**

A. Yes.

**Q. Which was to amend downwards the quantity of CUSIP's that Barclays is claiming for the last two CUSIP's -- sorry, the last two lines in Exhibit C, Met Life and Net Gear?**

A. Yes. If you go from the far right column and go in two columns there is a column called entitlement position. If you go down to the last two rows the quantities listed in entitlement position would be what Barclays would claim.

**Q. So in exhibit --**

Hraska

A. 5,017 for Met Life, and 476 for Net Gear.

MR. OXFORD: Thank you, Mr. Hraska. I don't have any further questions for you at this time, I think Mr. Hine has a couple of questions.

EXAMINATION BY
MR. HINE:

**Q. I just want to take a couple of minutes of your time, I know you have to leave. Just to be clear these are questions that I am asking of you in your capacity as a 30(b)(6) witness.**

A. Yes.

**Q. Do you recall in response to some of Mr. Oxford's questions he talked about the $1.9 billion target that you folks at Lehman were shooting for when you were assembling the assets that would later become Schedule B. Do you remember that testimony?**

A. Yes.

**Q. I just want to drill down a little on that target. I believe you testified that that number, that target was communicated to**

Hraska

**you by Mr. Tonucci; is that correct?**

A. Yes.

**Q. Do you know where that target originated from?**

MR. SHAW: Objection. Foundation.

A. I believe as a 30(b)(6) it was in the conversations he was having regarding the purchase agreement. But he didn't specify that.

**Q. Mr. Tonucci wasn't acting alone in coming up with the target; right?**

MR. SHAW: Objection. Foundation.

A. I don't believe he did, no.

MR. SHAW: We are way beyond the scope of 30(b)(6).

MR. HINE: We are talking about the origin of Schedule B.

**Q. Can you tell me whether that $1.9 billion target originated from the Barclays side of the transaction or the Lehman side of the transaction; if you know?**

MR. SHAW: Continuing objection. Beyond the scope of the 30(b)(6), but you can answer if you know.

Hraska

A. I believe it originated from the Lehman side of the transaction.

**Q. And on what do you base that belief?**

MR. SHAW: Same objection.

A. I believe Mr. Tonucci was getting those numbers from assets that he considered unencumbered which were -- which were on a report out of that GFS system that we talked about called non-actionable, meaning financed with the firm's capital.

**Q. Why do you believe he was getting them from that; I guess I didn't understand that answer.**

MR. SHAW: Same objections.

**Q. Do you know why those types of assets -- scratch that.**

**Why were non-actionable assets used to develop the $1.9 billion target?**

MR. SHAW: Objection. Beyond the scope of the 30(b)(6).

A. I believe the reason he went to actionable versus non-actionable were, the non-actionable security was typically one that

Hraska

was classified as something that the front end financing systems might not have been able to typically use in a financing transaction -- secured financing transaction. Something that customers possibly are going to provide liquidity wouldn't necessarily take. However it didn't mean that they didn't necessarily have value, it just wouldn't be an asset class or anything that potentially a liquidity provider would give.

The repo transaction would have used tools because it was a repo, which was secured financing. That transaction would have used very similar type criteria as to what were asset classes that would typically be more actionable as opposed to non-actionable. So because on the night of the 18th Lehman ended up being short collateral to deliver to Barclays and have to take a cash loan, I think Mr. Tonucci felt that there may have been other securities which had value but wouldn't have normally have been available or eligible to pledge on a secured financing transaction.

Hraska

So therefore he wanted to look at those securities and their locations and determine whether they were physically able to be moved to Barclays as a result of the transaction.

**Q. I think I understand.**

**So during that effort to locate these additional assets to be transferred to Barclays was there some consequence associated with not meeting this $1.9 billion target?**

MR. SHAW: Objection. Beyond the scope of the 30(b)(6). Foundation.

A. Can you define consequence?

**Q. Was Barclays not going to close if you didn't meet the $1.9 billion?**

MR. SHAW: This is so far beyond the scope of the 30(b)(6).

MR. HINE: This is the origin of Schedule B. This is the --

MR. SHAW: No. The origin of Schedule B is a far more discreet topic. I mean under your theory the fact that Lehman went bankrupt would be something that you would be entitled to because

Hraska

absent the bankruptcy we wouldn't have had a deal and so forth. At some point we have to draw a line between the origin of Schedule B and everything that led up to the transaction.

MR. HINE: That entire weekend is assembling the assets that eventually become Schedule B. I am just asking --

MR. SHAW: I continue to object. Way beyond the scope of the 30(b)(6). I will let him answer if he knows anything about this. But it is not something that he has been put forth as a 30(b)(6) witness on and he is not prepared on this.

A. Repeat the question, please.

(Record read.)

MR. SHAW: Same objections.

**Q. If you know?**

A. As a 30(b)(6) witness I can't answer that question.

**Q. In your individual capacity do you know; I am asking you --**

A. I guess my question is, we have

Hraska

done it a couple of times, but if this 30(b)(6) subpoena, I am going to keep flipping back and forth, I am happy to answer --

MR. SHAW: Off the record for a second.

(Recess taken.)

**Q. Back on the record.**

A. So I apologize, could you repeat the question to me.

(Record read.)

MR. SHAW: Objection. Foundation. This is an individual question, not 30(b)(6).

MR. HINE: I asked it in a 30(b)(6), I note your objection, and he is not answering the 30(b)(6), so I would like his answer as an individual.

A. As an individual, as a Lehman employee at that time I had no knowledge as to whether Barclays would close or not.

**Q. Did your team assembling these assets that would eventually become Schedule B in fact meet that target?**

A. The target of raising assets which

Hraska

had a value of --

**Q. The $1.9 billion target that Mr. Tonucci communicated to you?**

A. Yes, we did.

**Q. Did you exceed that target?**

A. Yes, we did.

**Q. By how much?**

A. Without having my spreadsheets, to approximate I would say 300ish million.

**Q. Why didn't you stop when you met the target?**

A. We didn't stop because I was asked from my perspective from an operational perspective did we feel that -- what was the probability of us being able -- what were the mechanical probabilities of us being able to actually deliver assets to Barclays that were located in the various locations that we found.

Some of the locations were locations which were held by custodial banks outside the U.S., and as a result of the holding situation some of those accounts, our access had been frozen. So even though the

Hraska

securities showed as unencumbered, the probability of us being able to action or move any of those securities was very likely not going to happen.

So based on that we tried to assemble as much unencumbered collateral as we could in locations where we still felt we had the capability to action that collateral and deliver it to Barclays.

**Q. So when you assembled this additional 300 million in assets that you testified about --**

A. Can I stop you there?

**Q. Yes.**

A. There was never an assemblage of an additional 300, there was an assemblage of approximately 2 point something billion of which we felt that 300 of it was not going to be very easy to transfer.

**Q. So once you assembled that 2 point something billion you stopped in your search for additional assets; is that correct?**

A. At that time that is what the entire exercise yielded. It is not that we

Hraska

stopped, it was what the total result was.

**Q. When did you get to this 2 point something billion figure?**

A. Specific time?

**Q. Like over the weekend?**

A. Very late Sunday, I don't remember -- potentially into the hours of Monday morning. We pretty much -- I didn't sleep that whole weekend, so I don't know what point.

**Q. Can you turn for a minute to your Exhibit 562-D which is your notes we talked about today?**

A. Yes.

**Q. In the first sentence of the section under topic 32-A I would like to refer you to that sentence which reads: Schedule B was referenced in the clarification letter representing the parties best effort based on the information available at the time to list the clearance box securities that Barclays was entitled to receive.**

**Do you see that?**

A. I do.

Hraska

**Q. What do you mean by the phrase entitled to receive in that context?**

A. Entitled to receive as a result of the purchase agreement.

**Q. And how does that relate, the concept of what they are entitled to receive relate to the $1.9 billion target that we were talking about?**

MR. SHAW: Objection to the form.

A. They were entitled to receive clearance box securities as per the selection criteria. What was returned were clearance box securities for which customers had not fully paid for them.

**Q. I guess my question is were they entitled to receive all clearance box securities for which customers had not paid, or did you think they were entitled to receive $1.9 billion of such securities?**

MR. SHAW: Objection. Foundation. Beyond the scope. Calls for a legal conclusion. Speaks for itself.

A. I think they were entitled to receive all clearance box securities that were

Hraska

not fully paid for.

**Q. Then I guess I don't understand why you had a $1.9 billion target?**

A. I didn't -- I was given that target. So I testified as to where I think that target came from. As to why I had that target I honestly don't know.

**Q. I understand. I guess my question is was the $1.9 billion target a quantification of what the parties thought Barclays was entitled to receive, or did it come from some other basis?**

MR. SHAW: Objection. Calls for legal conclusion. Beyond the scope of the 30(b)(6). Lack of foundation.

If you know you can try to answer this in your individual capacity.

**Q. If you know?**

A. Can you repeat the question again.

(Record read.)

MR. SHAW: I would add the further objection that it is vague as to time.

**Q. During that weekend?**

MR. SHAW: It is still vague as to

Hraska

time because it matters very much whether you are talking before or after the agreement that is reflected in the clarification letter that was written.

**Q. You can answer the question?**

MR. SHAW: With all of my objections.

A. I believe it was Mr. Tonucci's impression of what Barclays was entitled to receive based off of the analysis that he did prior to that instruction.

**Q. Analysis of what?**

A. Analysis of the unencumbered list -- not the unencumbered list, the non-actionable list. His feeling was that there had to be off of his analysis at least $1.9 billion of assets which were not being used for secured financing transactions which is evidenced by the fact that they were not used the previous night.

Therefore he asked us to look for all unencumbered clearance box assets, and his opinion was that there should be at least $1.9 billion because that is what he deemed to show

Hraska

up on this non-actionable list. That should add some clarity to it. So the search yielded more than the $1.9 billion which was great because we were able to capture the securities that potentially Mr. Tonucci felt would have been eligible for transfer.

But on the further analysis as previously testified we didn't deem that all those securities would be probable to deliver, therefore we removed them from the initial result.

MR. HINE: That is all I have, thank you.

MR. SHELLEY: No questions.

MR. OXFORD: Nothing further. Thank you.

MR. SHAW: No questions.

(Time noted 3:34 p.m.)

____________________

JIM HRASKA

Subscribed and sworn to before me this ___ day of __________, 2010

______________________________

CERTIFICATE

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, Philip Rizzuti, a Notary Public within and for the State of New York, do hereby certify:

That JIM HRASKA, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of January, 2010.

____________________

PHILIP RIZZUTI

---------------- I N D E X ----------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| JIM HRASKA | Mr. Oxford | 6 |
| | Mr. Hine | 150 |

------------ INFORMATION REQUESTS ----------

DIRECTIONS: 58, 62
RULINGS: None
TO BE FURNISHED: 123
REQUESTS: 57
MOTIONS: None

---------------- EXHIBITS ----------------

Exhibit 561-D, spreadsheets, 6
Exhibit 562-D, document headed 6 Jim Hraska 30(b)(6) deposition notes,
Exhibit 563-D, one-page document 118 headed Exhibit C-Additional Clearance Box Securities,
Exhibit 564-D, document headed 118 732 Accounts With Securities That May Be Potential Firm Claims If Firm Financed,

*** ERRATA SHEET ***

NAME OF CASE: IN RE: LEHMAN BROTHERS
DATE OF DEPOSITION: January 15, 2010
NAME OF WITNESS: JIM HRASKA

| PAGE | LINE | FROM | TO |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

____________________
JIM HRASKA

Subscribed and sworn to before me
this ____ day of ____________, 2009.

__________________ ____________________
(Notary Public) My Commission Expires: