# BCI EXHIBIT

# 70

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4     ------------------------x

5     In Re:

6                           Chapter 11

7     LEHMAN BROTHERS        Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al,    (Jointly Administered)

9                Debtors.

10    ------------------------x

11

12            DEPOSITION OF JONATHAN HUGHES

13              New York, New York

14              January 15, 2010

15

16    Reported by:

17    MARY F. BOWMAN, RPR, CRR

18    JOB NO. 27056

19

20

21

22

23

24

25

Page 2

```
1
2
3
4                    January 15, 2010
5                    10:15 a.m.
6
7
8        Deposition of JONATHAN HUGHES, held at
9   the offices of Hughes, Hubbard & Reed, LLP, One
10  Battery Park Plaza, New York, New York, before
11  Mary F. Bowman, a Registered Professional
12  Reporter, Certified Realtime Reporter, and
13  Notary Public of the State of New York and New
14  Jersey.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2                    APPEARANCES:
3
4   JONES DAY, LLP
5   Attorneys for Lehman Brothers, Inc.
6       222 East 41st Street
7       New York, New York   10017-6702
8   BY:  ROBERT W. GAFFEY, ESQ.
9        BRIDGET CRAWFORD, ESQ.
10
11
12  BOIES, SCHILLER & FLEXNER, LLP
13  Attorneys for Barclays and The Witness
14      575 Lexington Avenue
15      New York, New York   10022
16  BY: JACK STERN, ESQ.
17
18
19  QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
20  Attorneys for the Creditors Committee
21      51 Madison Avenue - 22nd Floor
22      New York, New York   10010
23  BY:  ERIC KAY, ESQ.
24
25
```

Page 4

```
1
2                    APPEARANCES:
3
4   HUGHES, HUBBARD & REED, LLP
5   Attorneys for the SIPA Trustee
6       One Battery Park Plaza
7       New York, New York   10004-1482
8   BY:  WILLIAM R. MAGUIRE, ESQ.
9        FARA TABATABAI, ESQ.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1
2
3
4
5        IT IS HEREBY STIPULATED AND AGREED, by
6   and between the attorneys for the respective
7   parties herein, that filing and sealing be
8   and the same are hereby waived.
9        IT IS FURTHER STIPULATED AND AGREED
10  that all objections, except as to the form
11  of the question, shall be reserved to the
12  time of the trial.
13
14
15        IT IS FURTHER STIPULATED AND AGREED
16  that the within deposition may be sworn to
17  and signed before any officer authorized to
18  administer an oath, with the same force and
19  effect as if signed and sworn to before the
20  Court.
21
22
23
24
25
```

Page 6

J. HUGHES
1
2    MR. STERN: Before we begin, let me
3    just state for the record a point that we
4    have discussed off the record. Mr. Hughes
5    is obviously a senior legal advisor to
6    Barclays. By designating Mr. Hughes as a
7    30(b)(6) representative to address certain
8    topics, we do not intend to have Mr. Hughes
9    testify to privileged communications.
10    He will testify to facts that he
11    learned from various sources, including in
12    some instances from counsel. And that
13    testimony concerning facts, even if facts
14    learned from counsel, does not constitute a
15    waiver of the attorney/client privilege.
16    And if we can have an agreement on that
17    premise, we can proceed.
18    MR. MAGUIRE: I have no problem with
19    that.
20    MR. GAFFEY: That's fine with us.
21    MR. KAY: Us as well.
22    - - - -
23
24
25

Page 7

J. HUGHES
1
2    JONATHAN HUGHES,
3    called as a witness by the Parties,
4    having been duly sworn, testified as follows:
5    EXAMINATION BY
    MR. MAGUIRE:
6
7    Q.    Mr. Hughes, good morning. As you
8    know, I am Bill Maguire. I am going to be
9    asking you some questions today. If any
10    question is unclear, that may happen, let me
11    know and we will try to clear it up.
12    If you answer, we can assume that you
13    understand the question?
14    A.    Absolutely.
15    Q.    If you need to take a break at any
16    time, just let us know and we will find a
17    convenient stopping point.
18    A.    Thank you.
19    Q.    I would like to start by asking you
20    about the sale hearing, and that's the hearing
21    that was held next door in the bankruptcy court
22    on September 19, 2008. Did you attend that
23    hearing?
24    A.    I did not.
25    Q.    Can you tell me who attended that

Page 8

J. HUGHES
1
2    hearing on behalf of Barclays?
3    A.    I think it included a number of
4    Barclays employees and advisors. Those that I
5    recall would include Michael Klein, who I think
6    you know is an external advisor to Barclays; I
7    think Archie Cox; Jason White, who is a member
8    of the legal department at Barclays Capital.
9    I think Alan Kaplan was there, too,
10    another member of the legal department at
11    Barclays Capital, and several representatives
12    from Cleary Gottlieb, who were the principal
13    legal advisors to Barclays Capital at the time,
14    so including Lindsee Granfield and probably Vic
15    Lewkow, L-E-W-K-O-W.
16    There may have been more. I can't
17    bring them to mind. I don't think there were
18    any other Barclays employees there.
19    Q.    Any other advisors or representatives?
20    A.    I'm struggling to remember any more.
21    There may have been.
22    Q.    In preparation for this deposition,
23    did you take any steps to refresh or to gather
24    any information as to who was present at the
25    sale hearing?

Page 9

J. HUGHES
1
2    A.    I did, yes.
3    Q.    What did you do?
4    A.    I spoke to a number of people,
5    including those that I have mentioned, including
6    other employees of Barclays, to try to establish
7    whether, in fact, they were there.
8    Q.    And is there anyone else that you
9    learned was present?
10    A.    I can't now recall any additional
11    names.
12    MR. STERN: Can we go off the record
13    for just a second.
14    MR. MAGUIRE: Certainly.
15    (Discussion held off the record)
16    MR. MAGUIRE: So counsel is just going
17    to give us a list.
18    MR. STERN: Yes. Mr. Hughes'
19    recollection is correct, and in addition, in
20    preparing for this deposition, we learned
21    that for Barclays, Gerard LaRocca was
22    present at the very beginning of the
23    hearing, but he left early in anticipation
24    of the possibility of needing to prepare for
25    a closing.

Page 10

J. HUGHES

1
2      The individuals from Cleary were
3   Victor Lewkow, Lindsee Granfield, Lisa
4   Schweitzer, Joel Moss, Seth Kleinman.
5      In addition, there were attorneys from
6   Sullivan & Cromwell present, Rob Lacy, Jay
7   Clayton, Hydee Feldstein, Elizabeth Summers,
8   Ken Myers.
9      And I believe that's the complete
10  list.
11     Q.  Sir, what was Mr. Klein's role in
12  attending the sale hearing?
13     A.  I'm not sure he had a specific role
14  with respect to the hearing, but he had been,
15  throughout the course of that week and in the
16  period following the hearing, both an advisor to
17  Barclays and also one of the principal
18  negotiators of the transaction from the
19  Barclays' perspective.
20     Q.  And what about Mr. Cox's role?
21     A.  Mr. Cox was also one of the principal
22  negotiators of the transaction.  So again, would
23  have had an actual interest to be there.
24     Q.  And what about Mr. White?
25     A.  Mr. White was one of my colleagues in

Page 11

J. HUGHES

1
2   the legal function who was one of the legal
3   advisors to Barclays on the transaction.
4      Q.  And is the same true of Mr. Kaplan?
5      A.  Correct.
6      Q.  Can you tell me what you have learned
7   in terms of what explanations were made at the
8   sale hearing off the record about the
9   transaction?
10     A.  Are you asking me if I recall or if I
11  have learned that there were some off-the-record
12  descriptions of the transaction at the sale
13  hearing?
14     Q.  Yeah.  If I understood your earlier
15  answers correctly, you weren't personally
16  present.
17     A.  Correct.
18     Q.  The question is, what information does
19  Barclays have as to what was said off the record
20  at the sale hearing?
21     A.  Right.  My understanding is that there
22  was at one point in the proceedings an
23  off-the-record description, as you say, provided
24  to the assembled mass.  Whether it was aimed at
25  the entirety of the assembled mass of

Page 12

J. HUGHES

1
2   population, I don't know.
3      I believe it did include a
4   presentation, so to speak, of Weil Gotshal's
5   meaningful thoughts about certain aspects of the
6   transaction, and that that presentation -- or
7   the presentation included representatives of
8   Lehman, Weil Gotshal, the creditors committee,
9   the trustee, and possibly others who were also
10  in attendance.
11     Q.  And who gave that presentation?
12     A.  I believe it was Lori Fife who was a
13  partner or is a partner at Weil Gotshal, I
14  believe.
15     Q.  Anyone in addition to Ms. Fife?
16     A.  I don't think that I have ascertained
17  with any certainty that anybody else made any
18  representations.  It's possible that there were
19  other partners of Weil Gotshal that also
20  participated in it.  But the recollections are
21  not all abundantly clear.
22     Q.  But the efforts that you have gone to
23  as Barclays' designated 30(b)(6) representative
24  are that Barclays is not aware of anyone else
25  who spoke other than Ms. Fife in this

Page 13

J. HUGHES

1
2   off-the-record presentation?
3      A.  There are some recollections that
4   Michael Klein may have also discussed certain
5   aspects of the transaction with similar
6   groupings.  Whether it was part of that same
7   presentation or whether it was different, I
8   haven't been able to establish.
9      Q.  Anyone other than Ms. Fife and
10  Mr. Klein?
11     A.  Not that I'm aware of.
12     Q.  Did you speak with Mr. Klein about any
13  off-the-record discussion?
14     A.  I have spoken to Mr. Klein about that,
15  yes.
16     Q.  And what did he tell you?
17     A.  I think it's fair to say his
18  recollection was not precise, which is why a
19  moment ago I mentioned that not all
20  recollections were clear.
21     Q.  Can you tell me what is the best
22  recollection that you were able to get as to
23  what Mr. Klein had said?
24     A.  It is hard, it is hard to be clear
25  about it, because I would be repeating what were

Page 14

J. HUGHES

1  answers from Mr. Klein that weren't sufficiently
2  certain for me to be able to represent exactly
3  what it is that he had said.
4      Q.   If you could tell me what you were
5  told. I understand there may be some
6  uncertainties, but just tell me what it is that
7  you were told about what he said, whether he
8  told you or anybody else remembers him saying
9  it.
10     A.   The best that I could say is that
11  while Mr. Klein didn't have a strong
12  recollection of the events, that the -- there
13  was a recollection that he had referred to
14  certain changes to some aspects of the
15  negotiations that had happened earlier in the
16  week, and that Mr. Klein had described some of
17  those to people at court at that time, during
18  that after -- late afternoon, early evening.
19     Q.   Who had that recollection?
20         MR. STERN:  Hold on for a second.
21     I don't want you to intrude on the
22  conversations that Mr. Hughes had in
23  preparing for this deposition.  You can ask
24  him about the facts that he learned, but I

Page 15

J. HUGHES

1  don't think you're entitled to know who told
2  him precisely what.
3      So I'll allow you to testify to facts
4  that you learned, as best you can recall
5  them, but not to the conversations that you
6  had in preparation for the deposition.
7         MR. MAGUIRE:  Well, I think it is a
8  fact as to who has a recollection, so I
9  think if the witness -- that's a factual
10  thing.  That's not a legal advice or
11  opinion.  So I think I am entitled to know
12  who had the recollection.
13         MR. STERN:  So what is the question?
14     Q.   So the question is, when you testified
15  about the recollection that somebody had, who
16  was the person who had that recollection?
17         MR. STERN:  I'll allow you to answer
18  that, if you remember.
19     A.   My best recollection is that Lindsee
20  Granfield and Jason White recalled some form of
21  discussion.  That's about as much as I can
22  remember from the various discussions that I
23  have had on the topic.
24     And as I say, those recollections were

Page 16

J. HUGHES

1  uncertain, and as you can observe, my own
2  recollections are uncertain.
3      Q.   I just wanted to get the extent of
4  what information you were able to get in that
5  regard.
6      A.   I understand.
7      Q.   Did anyone recall what changes
8  Mr. Klein referred to?
9      A.   Again, with the same proviso as to
10  certainty, there were references to, principally
11  references to agreements made earlier that
12  Friday between Lehman Brothers and Barclays with
13  respect to what was subsequently termed
14  clearance box assets, as a very convenient
15  summary label, and another convenient summary
16  label, some 15c3 assets, each of which had been
17  the topic of discussions throughout the course
18  of the day.
19     Q.   And when you say with the same proviso
20  as to certainty of recollection, what do you
21  mean?
22     A.   I mean that because they were -- each
23  of those items were thought to be part of what
24  Mr. Klein may have described to people at court,

Page 17

J. HUGHES

1  and that those -- that very description was not
2  certainly recollected that they are -- by
3  definition, the content of the description was
4  not certainly recollected.
5      Q.   Is what you gathered that certain
6  people thought those two subjects are what
7  Mr. Klein may have spoken about, or do they
8  actually recall that he had spoken about each of
9  those subjects?
10     A.   The latter.
11     Q.   And what did people recall him saying
12  about clearance boxes?
13     A.   That there had been a discussion and
14  an agreement about the clearance box assets, and
15  most importantly, I think, that Lehman Brothers
16  had represented to Barclays that there were
17  assets in what were termed the clearance boxes,
18  which assets were unencumbered assets of Lehman
19  Brothers, which were earlier in the day
20  identified as being capable of being delivered
21  in the transaction to Barclays.
22     Q.   And who recalled Mr. Klein saying all
23  that?
24     A.   The people that I have mentioned, so I

Page 18

J. HUGHES

1  think Lindsee Granfield and Jason White.
2     Q.    And did Lindsee Granfield and Jason
3  White make clear to you that was a recollection,
4  a clear recollection that they had?
5     A.    Again, as I said earlier, I wouldn't
6  describe their recollections as certain
7  recollections, but that was my impression.
8     Q.    I'm sorry. Your impression was --
9     A.    That they recalled, first of all, a
10  description of some facets of the transaction by
11  Mr. Klein, but -- and that that included
12  reference to the clearance box assets.
13     Q.    Did they tell you who was present when
14  Mr. Klein made his, I'll call it presentation?
15     A.    No. Save that they thought it took
16  place at court.
17     Q.    Did anyone tell you that Mr. Klein
18  referred to any other changes in the
19  transaction?
20     A.    As I mentioned a moment ago, I think
21  it included the 15c3 assets. I don't recall
22  that it included anything else. So that's
23  possible that it did, but I don't recall
24  anything else.

Page 19

J. HUGHES

1     Q.    Did anyone tell you that they recalled
2  Mr. Klein saying anything about margin?
3     A.    No.
4     Q.    Did anyone tell you that they recalled
5  Mr. Klein saying anything about clearing fund?
6     A.    No.
7     Q.    Is there anything else that anyone
8  told you they recalled Mr. Klein saying at the
9  sale hearing?
10     A.    Not that I recall.
11     Q.    Is there anything else that was --
12  leaving aside Lori Fife's presentation for right
13  now, is there anything else that you understand
14  was said off the record in court other than what
15  you have told us about Mr. Klein?
16     A.    No.
17     Q.    Can you tell us, please, what you
18  understand Lori Fife said off the record?
19     A.    The best I've been able to establish
20  is that Ms. Fife referred to some of her earlier
21  descriptions with respect to the transaction, by
22  which I mean descriptions made at the hearing
23  which preceded the sale hearing, namely on the
24  17th of September, and that she, both off the

Page 20

J. HUGHES

1  record and then subsequently on the record, made
2  references to what were hers or Weil Gotshal's
3  impressions relating to certain changes to the
4  descriptions that had been made earlier at the
5  September 17 hearing.
6     Q.    With respect to the descriptions at
7  the earlier 17th hearing, that's with respect to
8  the -- that included the description of the
9  assets that Barclays was acquiring and the
10  liabilities that it was assuming; is that
11  correct?
12     A.    There was a description on the 17th, I
13  believe, with respect to the transaction as a
14  whole, and that description included
15  reference to certain assets and certain
16  liabilities, yes.
17     Q.    And you understand that at the sale
18  hearing on the 19th, Ms. Fife referred back to
19  that?
20     A.    Yes. In part, yes.
21     Q.    Let's just focus on the part where she
22  is referring back to the September 17 hearing.
23  You understand that the -- Ms. Fife had earlier
24  described the transaction as an acquisition, as

Page 21

J. HUGHES

1  including an acquisition by Barclays of
2  70 billion dollars of long positions and the
3  assumption of liabilities that had a book value
4  that was described to the court on the 17th?
5     A.    I understand the description to have
6  been first and foremost a description of the
7  asset purchase agreement between Lehman Brothers
8  and Barclays, which at its heart was an
9  agreement pursuant to which Barclays was to
10  acquire the whole of the North American business
11  of Lehman Brothers, and any of the assets used
12  in connection with that business.
13     That rather broadly based transaction
14  was qualified in a couple of respects, one of
15  which was to recognize that certain assets were
16  to be excluded and equally certain liabilities
17  were to be excluded.
18     Ms. Fife, I believe, did refer to and
19  gave valuation numbers with respect to certain
20  assets and certain liabilities.
21     Q.    I'm going to just focus on that part
22  of your answer where the court was advised on
23  the 17th about the book value of certain assets
24  and certain liabilities. OK?

---

**Page 22**

J. HUGHES

1
2     A.    Um-hm.
3     Q.    Do you understand that Ms. Fife in her
4  off-the-record presentation on the 19th referred
5  back to the earlier disclosures to the court
6  about the book values of the assets and the
7  liabilities that were the subject of the
8  acquisition?
9     A.    I believe she did that both off the
10 record and on the record, yes.
11    Q.    And did her off-the-record discussion
12 include a description that the values had
13 changed from a book value that had been
14 described to the court on the 17th to a book
15 value on the 19th of 47.4 billion dollars?
16    A.    I do believe that she made reference
17 to the 70 billion dollars of long positions, and
18 that she also made a reference to a reduction in
19 that number. It's not certain in my mind or I
20 believe in Barclays' mind how she arrived at
21 that different number, but I do believe she did
22 present a different number, both in the
23 off-the-record and in the on-the-record
24 description.
25    Q.    In the off-the-record description, she

---

**Page 23**

J. HUGHES

1
2  also referred to a change in the book value of
3  the liabilities that Barclays was assuming?
4     A.    Again, I think it is more accurate to
5  state it that she referred to liabilities and
6  gave a number with respect to those liabilities
7  of I believe 45.5 billion, and that that was a
8  different number from the number mentioned on
9  the 17th.
10       Again, what Ms. Fife -- the basis upon
11 which Ms. Fife made those parts of her
12 presentation, I couldn't -- I couldn't
13 establish.
14    Q.    I am only asking you what she --
15 whether she used that number and whether she
16 was, in using that number, describing that it
17 was a change in what had earlier been described
18 as the book value of the liabilities that
19 Barclays was assuming.
20    A.    I don't think it is apparent to
21 Barclays either from the recollection of the
22 people that were there or from my own review of
23 the transcript that necessarily there was a
24 direct correlation between or a direct match
25 between the liabilities and the number described

---

**Page 24**

J. HUGHES

1
2  and given on the 19th on the one hand and the
3  liabilities and the number given and described
4  on the 17th.
5     Q.    But in the off-the-record discussion,
6  Ms. Fife did give values both for the book value
7  of the assets and the liabilities, and they were
8  consistent with what she later said then in open
9  court on the record?
10    A.    I believe so, yes.
11    Q.    Is there anything else that you can
12 tell us about what Ms. Fife said in the
13 off-the-record discussion?
14    A.    I think there were certainly one or
15 two additional points that I believe she made.
16 First of all, I think she, and possibly others,
17 by which I mean other representatives of Lehman
18 Brothers in the form of Weil Gotshal partners,
19 did remind the court both on and off the record
20 that there was substantial uncertainty around
21 the values and numbers that were being referred
22 to, principally for two reasons.
23       One, the difficulty throughout the
24 course of the week that Lehman Brothers had had
25 in establishing accuracy around such numbers and

---

**Page 25**

J. HUGHES

1
2  values, and as importantly, the presentation, as
3  I think we all now know, took place at a time of
4  remarkable uncertainty and difficulty with
5  respect to the markets as a whole.
6        The numbers that Ms. Fife referred to
7  with respect to the long positions, I believe
8  she also mentioned to the court that among the
9  major reasons for the reduction in values with
10 respect to those positions was the tremendous
11 market events in the intervening period, by
12 which I mean substantial amounts of those assets
13 were no longer available to Lehman, and I think,
14 in addition, the values of those assets had
15 depleted materially.
16    Q.    In your last answer, was that based on
17 the part of the proceeding at the sale hearing
18 that was on the record and before the judge, or
19 was it exclusively based on the off-the-record
20 discussion?
21    A.    It's a reference to both discussions,
22 but actually at least as much a reference to
23 what she said on the record as off the record.
24    Q.    Is there anything you recall her
25 saying off the record that she did not repeat on

Page 26

J. HUGHES

1 the record?
2
3        MR. STERN: I'll just object to the
4 form because it is not his specific
5 recollection. He is testifying to
6 information he has learned. He wasn't
7 present.
8        MR. MAGUIRE: Absolutely. Frankly --
9        MR. STERN: With that objection, you
10 can answer.
11        Q.   So the record is clear, and we are all
12 on the same page, I'm asking you about something
13 where you weren't even present, so all of my
14 questions and I'm assuming all of your answers
15 today are going to be not just from your
16 personal knowledge but also informed by whatever
17 information Barclays has. Is that your
18 understanding?
19        A.   Yes.
20        I don't recall any other aspect of the
21 presentation off the record that was not relayed
22 to the court on the record. And I'm not -- I
23 don't recall having been told by others of
24 anything that was described off the record that
25 was not also described on the record.

Page 27

J. HUGHES

1
2        Q.   And when you say you don't recall any
3 other aspect of the presentation, are you saying
4 in addition to what you understand Mr. Klein may
5 have said?
6        A.   I'm referring to the presentations
7 that Lori Fife made.
8        Q.   Yeah. What I wanted to find out,
9 frankly, is what Ms. Fife said off the record
10 that was not said to the court on the record.
11 Is there anything that you can point to that you
12 understand, that Barclays understands Ms. Fife
13 disclosed to everybody in court off the record
14 and then failed to disclose to the court on the
15 record?
16        A.   I believe that Ms. Fife did not say
17 anything off the record that she did not also
18 say on the record.
19        Q.   Thank you.
20        Are you aware of any description of
21 what happened in court that was prepared by
22 Barclays or relayed to other people within the
23 Barclays organization by any of those who
24 attended the hearing?
25        A.   Sorry, could you repeat that.

Page 28

J. HUGHES

1
2        Q.   You had quite a crew present at the
3 sale hearing. Are you aware of any
4 explanation -- let me take it first, any written
5 summary or explanation of what happened in court
6 that was transmitted to those who were not
7 present?
8        A.   By a Barclays representative?
9        Q.   Yeah.
10        A.   No, I'm not aware of any such
11 description.
12        Q.   Let me ask you about the
13 representations that were made to the court at
14 the sale hearing. Did you understand that the
15 representations that were made to the court
16 accurately described the deal?
17        A.   I believe the descriptions were
18 accurate. I believe that most importantly,
19 representatives of Weil Gotshal described what
20 was the essence of the transaction, namely, the
21 acquisition by Barclays of the North American
22 business of Lehman Brothers.
23        I believe also that to the extent that
24 there was reference to any aspects of that
25 transaction, that it was essentially a fair and

Page 29

J. HUGHES

1
2 accurate description of what had been agreed.
3        Q.   You understand that in the course of
4 the hearing, the court was advised that no cash
5 was being conveyed to Barclays?
6        A.   That's not my understanding of what
7 was said at court. My understanding of what was
8 said at court with respect to cash -- and I
9 should just say as an aside that I assume we are
10 still talking about the hearing on the 19th?
11        Q.   Absolutely.
12        A.   There had at the hearing on the 17th
13 been reference to what I believe was described
14 as retained cash, and because in the intervening
15 period between the 17th and the 19th there had
16 been a change in this respect with respect to
17 the agreement, that the court was told that
18 there had been that change with respect to cash,
19 and that retained cash was no longer in the
20 deal.
21        So I believe that the amounts
22 previously discussed were firstly 1.3 billion of
23 cash, which subsequently was reduced to
24 700 million, but that that cash was no longer in
25 the deal.

Page 30

J. HUGHES
2 Q. So is it your understanding that,
3 other than the retained cash, cash was being
4 conveyed to Barclays?
5 MR. STERN: Objection to the form.
6 You can answer if you understand it.
7 A. I -- I'm not aware of any other
8 discussions specifically with reference -- that
9 referenced cash prior to discussions with
10 respect to the 15c3 asset that I otherwise --
11 that I mentioned earlier.
12 Q. Again, limiting everything just to the
13 sale hearing, is it Barclays' understanding that
14 what was said to the court concerning cash at
15 the sale hearing was accurate?
16 A. I believe it was accurate, because it
17 was a reference to discussions and changes with
18 respect to an earlier agreement relating to what
19 I have said was referred to as retained cash. I
20 do believe that the court heard a fair and
21 accurate description of how that part of the
22 negotiation between Lehman and Barclays had
23 changed.
24 Q. You know that in the course of the
25 hearing, Ms. Fife described how Barclays was

Page 31

J. HUGHES
2 acquiring 47.4 billion dollars of assets. Is
3 Barclays' understanding that that was an
4 accurate representation?
5 MR. STERN: Objection to the form.
6 A. As you have put the question, I
7 understand you to be asking me whether a -- let
8 me start again.
9 Your question, if I may say, raises
10 two points. One, was Ms. Fife's use of the
11 47.4 number accurate, and two, was it -- if it
12 was, was it an accurate description of the
13 assets that were to be acquired in the
14 transaction.
15 My belief -- and I think -- and
16 Barclays' belief is that the reference to 47.4
17 was a reference by Ms. Fife to assets which had
18 previously been described as long positions in
19 the 17th hearing. It is also possible that it
20 included other assets.
21 Nobody at Barclays had any discussions
22 with Ms. Fife about the composition of that 47.4
23 number. But it is clear and always was clear to
24 Barclays, and I believe also to Lehman Brothers
25 and Ms. Fife, that there were significant assets

Page 32

J. HUGHES
2 in addition that were also part of the agreement
3 and indeed part of the business of Lehman
4 Brothers, which, as I have said, was really the
5 heart of the transaction.
6 So I believe there were, and I believe
7 the court was otherwise informed, both on the
8 17th and on the 19th, that Barclays was
9 acquiring all of the assets of the Lehman
10 Brothers businesses, and that included any
11 assets used in connection with those businesses.
12 The 47.4, as I said, I believe, was a
13 reference to the earlier described long
14 positions that you asked me about a few moments
15 ago. But I believe it was both in detail and in
16 broad terms a fair and accurate description to
17 the court of what the transaction was all about.
18 Q. What are the significant assets in
19 addition to what Ms. Fife described as the 47.4
20 billion? What are the significant assets in
21 addition that you referred to in your last
22 answer?
23 A. I'm not sure I can recount every one.
24 I think there were, in the asset purchase
25 agreement, roughly 18 or maybe 19 categories of

Page 33

J. HUGHES
2 assets. Included among them were buildings,
3 people, the as yet to be defined or valued other
4 assets in the business, and there was an
5 enormous amount of uncertainty about those
6 values.
7 It included all of the exchange-traded
8 derivatives business, all of the capital markets
9 business, and other aspects of the Lehman
10 business in the Americas, which I think were set
11 out in the asset purchase agreement.
12 I'm not sure that's an exhaustive
13 answer, but it certainly included each of those
14 items that I have mentioned.
15 Q. What about the 15c3 asset?
16 A. It certainly included the 15c3 assets.
17 It included the clearance box assets. Not least
18 because they were also all assets in -- held by
19 Lehman Brothers in -- and used in connection
20 with Lehman Brothers' bid in North America.
21 Q. When we talk about the significant
22 assets in addition to what Ms. Fife described as
23 the 47.4 billion, you say there are 18 or 19
24 categories, starting with buildings, personnel,
25 exchange-traded derivatives business and

Page 34

J. HUGHES

1  including the 15c3 asset and the clearance box?
2      A.    Yeah, I don't view any of them as
3  additional assets. I view them as identified
4  assets in the business. I think there is a
5  difference, or at least I view it as a
6  difference.
7      Q.    When you say identified assets, what
8  do you mean?
9      A.    I mean that the agreement in the APA
10  was to -- was for Barclays to acquire all of the
11  assets used in connection with Lehman Brothers'
12  business. So it was from certainly the 15th --
13  no later than the 15th of September onwards, an
14  agreement to acquire the business of Lehman
15  Brothers.
16      It was deliberately not ever
17  described, approached or otherwise discussed as
18  a balance sheet deal, referring to the
19  acquisition of specific assets. There was,
20  during the course of the week of the 15th to the
21  22nd, a lot of discussion about particular
22  assets within the business and how those might
23  be best identified.
24      So when I use the term "identified"

Page 35

J. HUGHES

1  rather than "additional," it's because I think
2  it is important to understand that the deal was
3  about the business as a whole, with some
4  limitations, as I mentioned a while ago, with
5  respect to excluded assets. And that's why the
6  asset purchase agreement described purchased
7  assets in the way that it did.
8      So there was, from time to time,
9  during the course of that week, specific
10  reference to particular assets that had been
11  identified in the discussion and in the
12  negotiations. So for example, the clearance box
13  assets and the 15c3 assets were not identified
14  by Lehman Brothers as assets in the business
15  available to be transferred until, you know,
16  probably sometime on Friday, which was the 19th.
17      So to refer to each of these different
18  assets as additional assets, I think is
19  something of an inaccuracy. I think Barclays
20  viewed them as identified, and there were
21  certainly discussions about the particularities
22  of the transaction in that way.
23      Q.    It was Barclays' understanding that
24  the clearance box and 15c3 assets were always

Page 36

J. HUGHES

1  part of the deal because they were part of the
2  business; is that right?
3      A.    I think by definition, they were part
4  of the business of Lehman Brothers and were --
5  while they had not been discussed or
6  specifically identified before Friday, I think
7  they were by definition purchased assets.
8      Q.    So -- I understand. So they were all
9  covered by the original APA?
10      A.    Correct.
11      Q.    All the assets we have been
12  discussing, I understand it is Barclays'
13  understanding that they were all part of the
14  business and part of the original APA; is that
15  right?
16      A.    I think that's right, yes.
17      Q.    Now, let me just ask you to break it
18  up into two parts. One is, which of those
19  various assets did you understand were part of
20  the 47.4 billion and which did you understand
21  were not part of the 47.4?
22      A.    I think I said earlier that I do not
23  know how Ms. Fife arrived at that 47.4 number.
24  So I'm not in a position to tell you what that

Page 37

J. HUGHES

1  number comprised.
2      Q.    And is Barclays in a position to
3  provide any understanding as to what it believed
4  comprised the 47.4 billion dollars that was
5  represented to the court at the sale hearing?
6      MR. STERN: Objection to the form.
7  Are you talking about speculation or --
8      MR. MAGUIRE: No. I'm asking him did
9  Barclays have an understanding at the sale
10  hearing.
11      MR. STERN: I thought he has already
12  answered that, but go ahead.
13      A.    My understanding was that Ms. Fife was
14  describing or explaining to the court changes in
15  the valuations of long positions which she
16  previously described. Whether that was a
17  description by Ms. Fife that was limited to
18  that, I don't know.
19      Q.    And your preparation for this
20  deposition has not shed any additional light on
21  that from the people you have spoken to at
22  Barclays?
23      A.    From the people I have spoken to at
24  Barclays, their recollections are consistent

Page 38

J. HUGHES

1 with what I have just said. I have not had the
2 opportunity to speak to Ms. Fife or Mr. Miller,
3 so I can't say with certainty what was in her
4 mind when she presented the number.
5     Q.  I'm only asking for Barclays'
6 understanding.
7     MR. STERN:  Should we take a short
8 break for five minutes?  Do you want to
9 finish a line of questions?
10    MR. MAGUIRE:  That's fine, we can take
11 a break now.  Now is fine.
12    (Recess)
13 BY MR. MAGUIRE:
14    Q.  Sir, is Barclays aware of any
15 disclosure to the court of any profit or gain
16 that Barclays anticipated it would make from the
17 sale transaction?
18    MR. STERN:  Are you talking about
19 September 19?
20    MR. MAGUIRE:  Yes.
21    A.  On September the 19th, I'm not aware
22 of anybody identifying to the court a gain, nor
23 am I aware that anybody who made any
24 representations to the court was in a position

Page 39

J. HUGHES

1 to know one way or another whether Barclays
2 would have had a gain.
3     I do think there were objections at
4 that hearing based on the notion that Barclays
5 would make a windfall profit from the
6 transaction.  There were some meaningful
7 complaints, for want of a better word, made on
8 behalf of creditors, I believe, that identified
9 to the court a strong likelihood that Barclays
10 would make what in their description was a
11 windfall profit, and I believe that the judge
12 heard those complaints and dismissed them as
13 being insignificant in light of the importance
14 of the transaction and the importance of
15 approving the transaction, among other things,
16 for the benefit of the estate, creditors,
17 customers.
18    And I believe also that the court felt
19 that it was not relevant whether or not that
20 windfall profit did or did not exist.  Even if
21 it did, I think that the judge explained that
22 there was a greater need in light of the turmoil
23 in the markets at that point in time.  But as I
24 mentioned, in particular for the benefit of the

Page 40

J. HUGHES

1 estate and the creditors.
2     Q.  At the time of the sale hearing, did
3 Barclays expect to make a gain on the closing of
4 the transaction?
5     A.  Sorry, could you just repeat, at which
6 point in time?
7     Q.  At the sale hearing.
8     A.  At the sale hearing, yes, I believe
9 so.  I believe in fact we had even made the
10 public announcement that we would make a -- that
11 we expected to make a meaningful accounting gain
12 on the transaction.
13    Q.  And when you say the public
14 announcement, you are referring to the
15 announcement and analyst call on the 17th?
16    A.  Yes.
17    Q.  In the course of that analyst call,
18 Mr. Varley described the deal as having been
19 derisked.  Do you recall that?
20    A.  I don't recall that specific term, no.
21    Q.  Did Barclays understand the sale to
22 have been derisked?
23    A.  I'm not sure I understand what you
24 mean by derisked.

Page 41

J. HUGHES

1     Q.  Did you participate in the analyst
2 call?
3     A.  No, no, I did not.
4     Q.  I'll represent to you that on the
5 call, Mr. Varley said, and I quote, "What we
6 have taken is a portfolio of trading assets and
7 liabilities that are first of all derisked, and
8 secondly, those that need to support the ongoing
9 parts of the business that we have acquired."
10    Is it Barclays' understanding that
11 that was a true and correct statement?
12    MR. STERN:  I am going to object.  I
13 think you can ask your questions however you
14 want, Bill, but I think in fairness to the
15 witness, if you are going to quote from
16 something, he should be allowed to review
17 it.
18    But subject to that, if you can
19 answer.
20    A.  I've no reason to believe that what
21 Mr. Varley may have said was inaccurate.  I
22 haven't spoken to Mr. Varley about that or
23 indeed any portion of his involvement in order
24 to prepare for this deposition.

Page 42

1    J. HUGHES
2        From the extract -- I assume it is an
3    extract, what you have just read to me, it would
4    appear that that was one or a series of comments
5    with respect to parts of a greater whole, namely
6    a larger transaction.
7        Q.    Did you understand that the
8    transaction had been derisked?
9        MR. STERN: Objection to the form.
10       A.    The trans- -- if by the transaction
11   you mean the acquisition of the businesses, the
12   North American businesses of Lehman Brothers,
13   and that -- using the term "derisked," you mean
14   there was no risk in the transaction, no, I did
15   not understand it to mean that.
16       Q.    In what sense did Barclays not derisk
17   the transaction?
18       A.    The assets and liabilities in the
19   transaction and substantial portions of the
20   business of Lehman Brothers were incredibly
21   uncertain, both in terms of definition and
22   value. So there was, I think, enormous risk in
23   the transaction throughout its negotiation and
24   indeed following the closing of the transaction.
25       There was enormous risk to Barclays in

Page 43

1    J. HUGHES
2    my view. There were enormous risks that the
3    people, for example, who we hoped would come
4    along with that business may or may not have
5    come along, either on day one or stayed on day
6    two.
7        There was incredible uncertainty
8    around the valuation of all of the assets, which
9    is one of the reasons why there were no specific
10   numbers represented or warranted in the
11   transaction to be the actual numbers. I believe
12   that's part of the reason also why there was no
13   explanation to the court at any time that there
14   was any certainty with respect to any of those
15   numbers.
16       And indeed, there was clearly during
17   the course of that week almost unending
18   possibility to establish that there was risk in
19   any valuation of any asset or any liability.
20       So I think that there was always,
21   during the course of that week of negotiations
22   and in the period following, significant risk to
23   Barclays.
24       Q.    With respect to the liabilities, what
25   was the greatest risk that Barclays understood?

Page 44

1    J. HUGHES
2        MR. STERN: Objection to the form.
3        A.    I don't think we ever have assessed
4    the liabilities in the sense of valuing one
5    specifically as compared to another. There are
6    certainly -- there has certainly been work done
7    by -- principally by our finance department to
8    establish assets, assets and liability
9    valuations, both during the course of the week
10   and thereafter.
11       So I don't think we have got to the
12   point of identifying the top ten liabilities and
13   what they may actually look like. There were
14   clearly substantial liabilities of varying
15   types.
16       Q.    Did Barclays ever identify any
17   particular -- any specific single exposure that
18   it felt was the greatest from among the various
19   liabilities that it was assuming in this
20   transaction?
21       MR. STERN: You're talking about
22   before the closing or --
23       Q.    Yeah, anytime before the closing, did
24   Barclays say, this particular liability could
25   blow us up?

Page 45

1    J. HUGHES
2        MR. STERN: Objection, objection to
3    the form.
4        But you can answer.
5        A.    I think Barclays was extremely
6    concerned about the -- about a number of
7    liabilities, included among which were the
8    assets in the repo transaction, the unknown or
9    unidentified size of liabilities with respect to
10   the exchange-traded derivatives business. There
11   were concerns about the liabilities that we took
12   on with respect to employees, with respect to
13   the buildings.
14       So I think it is fair to say that all
15   of the liabilities that were identified were
16   items of concern because, first and foremost,
17   there had been -- there was no ability to
18   establish whether representations made by Lehman
19   Brothers with respect to each and every one of
20   those liabilities was accurate or not, and as I
21   think I mentioned, it was a period in which
22   valuations, prices were changing, essentially
23   all the time. And there was -- the degree of
24   volatility during that period was so extreme,
25   that I think it would have been surprising to

Page 46

J. HUGHES

1
2 anybody if anybody at that point had been sure
3 about the liabilities that were being taken on.
4      So I think Barclays was at all times
5 very concerned about the size or impact of each
6 of the key categories of liabilities in the
7 transaction.
8      Q.   I would like to focus on just one of
9 those, and that's the, what you describe as the
10 unknown and unidentified size of the liabilities
11 in the exchange-traded derivatives business. So
12 my next questions will just focus on that.
13      A.   Yup.
14      Q.   What did Barclays understand was its
15 total exposure in taking on the exchange-traded
16 derivatives business?
17      A.   I think at the time, we agreed with
18 Lehman Brothers that we would acquire all of the
19 exchange-traded derivatives business. First of
20 all, it was right at the beginning of the
21 discussion, by which I mean very early in the
22 week of September 15th, and I think at that
23 point in time, and indeed for an appreciable
24 period following the closing, not only was
25 Lehman Brothers unable to represent to us what

Page 47

J. HUGHES

1
2 the extent of the assets and liabilities were,
3 Barclays was also not in the position to
4 establish for itself what the extent of those
5 assets and liabilities were.
6      Q.   What was the worst, what was Barclays'
7 worst case in terms of what it was facing as its
8 total exposure on the exchange-traded
9 derivatives business?
10      A.   Again, at that point in time we were
11 not in a position to establish the extent of
12 such an exposure. It was partly for that reason
13 that it was made clear that we had to take all
14 of the assets together with all of the
15 liabilities, which included any property or
16 any -- of any sort or description that was being
17 held to secure or to support or was being used
18 in the business of managing that exchange-traded
19 derivatives exposure.
20      Q.   Did anyone at Barclays get a handle on
21 whether the total maximum exposure in taking on
22 that business was a particular figure?  1
23 billion, 10 billion, 100 billion?
24      MR. STERN: Objection, asked and
25 answered.

Page 48

J. HUGHES

1
2      A.   At what point in time?
3      Q.   Prior to the closing.
4      A.   I don't think that prior to the
5 closing Barclays had any ability to conclude any
6 work on that point.
7      Q.   And did the negotiators for Barclays
8 have authority to enter into the deal and close
9 the transaction without getting a handle on what
10 the total maximum exposure was on the
11 exchange-traded derivatives business?
12      A.   Can you define what you mean by get a
13 handle on?
14      Q.   Limit the -- get an understanding as
15 to what the maximum exposure to the company was
16 by taking on this business. Whatever that
17 number was, at least say it can be no worse than
18 this?
19      A.   I think your question was, were
20 representatives of Barclays authorized to
21 conclude the transaction, without getting a
22 handle on.
23      I don't think that the authority
24 either expressly or impliedly delegated to the
25 Barclays representatives at any point would have

Page 49

J. HUGHES

1
2 or did refer to that particular assessment.  I
3 believe that the Barclays representatives at the
4 time were authorized to agree to acquire the
5 whole of the exchange-traded derivatives
6 business of Lehman Brothers, and that it was
7 reasonable in so doing for those representatives
8 to determine as best they could that if we were
9 to acquire all of the assets of the
10 exchange-traded derivatives business, that we
11 would also include in that any property which
12 was in part designed to limit exposures with
13 respect to those businesses.
14      So for example, if there were open
15 exchange-traded derivatives positions on any
16 futures or options exchange, there would
17 necessarily have been assets held in connection
18 with those open positions to secure and to
19 support the exposure either in those particular
20 positions or with respect to other aspects of
21 that business.
22      So I believe that because all of the
23 assets of any description and of any type were
24 to -- were part of what was identified to be
25 transferred in the transaction, that it was a

Page 50

J. HUGHES

1  reasonable assessment on the part of the
2  Barclays representatives to take -- to reach
3  that agreement with Lehman Brothers or that part
4  of the agreement with Lehman Brothers.
5
6       There was, in any event, I guess,
7  residual risk in that assessment.
8       Q.   Did anyone tell the Barclays board
9  that it's people had been unable to quantify the
10 maximum exposure to Barclays in taking on the
11 exchange-traded derivatives business?
12      MR. STERN: One second. I'm just not
13 sure what topic this relates to. I'm also
14 concerned that this may call for privileged
15 communications.
16      MR. MAGUIRE: I am only looking for
17 the facts of the disclosure, and we are
18 clearly talking about the gain. I
19 understand that in disclosing the gain, any
20 contingency would be an issue there. So it
21 is simply a factual question. I'm not
22 looking for any legal advice.
23      MR. STERN: I am trying to figure out
24 what topic this.
25      MR. MAGUIRE: Actually, it's on a

Page 51

J. HUGHES

1  number of topics, but right now I think it
2  is --
3
4       MR. STERN: I am going to allow it. I
5  am not going to be overly strict about that,
6  but -- OK.
7       Q.   Again, I'm not interested in any legal
8  advice. I am just asking whether there was a
9  disclosure to the Barclays board as to the fact
10 that it was unable to quantify the maximum
11 exposure involved in taking on the derivatives
12 business?
13      A.   I am not aware of specific comments
14 made to the board with respect to an inability
15 to assess the exposures you referred to. I am
16 aware that there were, on a number of different
17 topics, and I believe with respect to the
18 transaction as a whole, comments, as I say, and
19 descriptions to the board, among others, of how
20 uncertain all of the valuations were in this
21 transaction and there could at no point be any
22 absolute certainty about estimated values.
23      None of the -- most if -- most of the
24 valuations with respect to particular assets, to
25 the extent that we had them, were received from

Page 52

J. HUGHES

1  Lehman Brothers in the bizarre market
2  circumstances that I have already described, and
3  so it was very clear to the board of Barclays
4  and indeed I believe to the board of Lehman
5  Brothers and anybody involved in the transaction
6  at all that there was no certainty with respect
7  to estimations of valuations, and therefore,
8  with respect to the estimations of what the
9  exposure to Barclays may be.
10      I believe that the representatives of
11 Barclays who were involved in the discussions
12 with respect to particular assets, be they
13 exchange-traded derivatives or otherwise, made
14 their best effort at the time to estimate what
15 those exposures might be, and made those
16 estimations recognizing that it was certainly
17 fundamental to Barclays to insure that there was
18 sufficient comfort that we would gain more value
19 than ultimately we would liabilities, primarily
20 because it was important to the bank to insure
21 that in capital terms, this was not a negative
22 transaction for the bank and its shareholders.
23      Q.   My last question was specific to the
24 liabilities involved in the exchange-traded

Page 53

J. HUGHES

1  derivatives. I am going to ask you a slightly
2  broader question now that is specific to all of
3  the liabilities.
4       Are you aware of whether the board was
5  told that Barclays was unable to quantify the
6  maximum exposure to the company from the
7  liabilities it was assuming in this transaction?
8       A.   I'm not aware of a communication in
9  those terms. I believe that the board was given
10 some estimated values with respect to
11 liabilities of one form or another, and again, I
12 believe the board was told that there was no
13 certainty with respect to those valuations.
14      Q.   Did the board -- is it your position
15 that the board understood that Barclays could
16 not quantify the maximum exposure of the
17 liabilities it was assuming in this deal?
18      MR. STERN: Objection to the form.
19      A.   Could you repeat the question.
20      Q.   Yeah. The question is, while somebody
21 may not have said specifically that --
22 specifically told the board that the company
23 couldn't quantify the maximum exposure of the
24 liabilities it was assuming, is it your

Page 54

J. HUGHES

1  understanding that the board understood that
2  without having to be told that specific fact?
3      MR. STERN: Objection to the form.
4      A.   I'm not sure I could say what the
5  board understood. I believe that the board was
6  told that the representatives of Barclays
7  responsible for negotiating the transaction had
8  done their best to estimate what the assets and
9  liabilities within the transaction were worth or
10 what their proper values were. But that that
11 was, as I say, an estimation.
12     So I believe that it was clear to the
13 board at the time from the representations made
14 by Barclays employees that in the time available
15 and in the circumstances again that I have
16 mentioned, Barclays had tried to estimate what
17 those values were, but couldn't be absolutely
18 sure.
19     Q.   I've been asking you about disclosures
20 that were made to the board, and I'll broaden
21 that a little bit now to senior management. Are
22 you aware of any disclosures to members of
23 senior management that Barclays was unable to
24 quantify the maximum exposure of assuming the

Page 55

J. HUGHES

1  liabilities in this transaction?
2      A.   When you say senior management, are
3  you excluding the board? Because the board is
4  not management.
5      Q.   Yeah, I am excluding the board.
6      A.   Right.
7      Again, I'm not aware of a disclosure
8  in the specific terms that you describe. It was
9  made clear on several occasions to senior
10 management that it was very difficult for
11 Barclays to conclude with certainty values with
12 respect to both assets and liabilities in the
13 transaction.
14     But I think senior management was
15 given enough inputs that it was reasonable for
16 it to conclude that it was acquiring or it was
17 concluding a transaction which ultimately would
18 be positive for the bank.
19     Q.   And how was management able to make
20 that conclusion without quantifying what the
21 risk was of taking on the exchange-traded
22 derivatives business?
23     A.   I think it was able to do it by
24 estimating and making judgments about the risk

Page 56

J. HUGHES

1  associated with those estimations, which is
2  different from an absolute quantification.
3      Q.   And how did it do that?
4      A.   I -- how did it, "it" meaning --
5      Q.   How did management make that
6  assessment?
7      A.   Fundamentally by taking
8  representations of value from Lehman Brothers
9  and where we were -- where Barclays was able to
10 make its own judgments as to those valuations
11 and reach conclusions off the back of that
12 analysis.
13     You mentioned exchange-traded
14 derivatives. I don't think that prior to
15 closing we had been given -- I may be wrong
16 about this -- it is possible there had been some
17 numbers discussed, but I don't think that there
18 was -- that it was clear at the time of closing
19 what the quantification of the assets and
20 liabilities may have been with respect to the
21 exchange-traded derivatives business itself.
22     Q.   So with respect to that business, how
23 was it reasonable for management to make the
24 conclusion that it was in Barclays' interest to

Page 57

J. HUGHES

1  take on that business?
2      A.   Primarily because it was acquiring all
3  of -- any type of asset of whatever form that
4  was held in connection with that business. And
5  I think there both were and are sufficient
6  numbers of expert people in the Barclays
7  organization to make an assessment about the way
8  the futures and options business is conducted,
9  such that if all of the assets that were held in
10 connection with that business were going to be a
11 part of the deal and come to Barclays, that
12 there would be a reasonable risk and a
13 reasonable estimation of risk to reach the
14 conclusion we did.
15     Q.   And that's the piece I'm missing. How
16 was management able to come to that conclusion
17 that the assets would basically cover the
18 liabilities if they weren't able to quantify
19 what the liabilities were?
20     MR. STERN: Let me hear that again.
21     (Record read)
22     MR. STERN: I may be missing it in the
23 topics, but I'm just not sure where that
24 fits.

Page 58

J. HUGHES

1
2    MR. MAGUIRE: I think we are well into
3  a discussion, and we are simply following up
4  on the witness' answer.
5    MR. STERN: No, no, no.
6    MR. MAGUIRE: If you want to make an
7  objection or you want to direct the witness
8  not to answer, Jack, that's fine. I'm
9  not -- just so you know, I am not going to
10  spend the day referring you back and forth
11  to topics in the notice.
12    So I leave it to you. If you think
13  there is something inappropriate and you
14  want to take a position, then by all means,
15  but the proper way to do that is to direct
16  the witness not to --
17    MR. STERN: No, no. I am not trying
18  to be difficult, Bill. All I'm trying to do
19  is to clarify if you are asking Mr. Hughes
20  to testify to something he is prepared on
21  for this deposition or if you are asking
22  about his own personal knowledge aside from
23  his preparation. But I'm not trying to be
24  difficult.
25    I'll allow you to answer this. I'm

Page 59

J. HUGHES

1
2  just not sure that this is a 30(b)(6) topic
3  here.
4    So if you could repeat the question.
5    (Record read)
6    MR. STERN: I'll object and I think it
7  is asked and answered as well.
8    But go ahead. You can answer.
9    A.   Management I think fairly relied upon
10  employees at Barclays who both understood the
11  nature and conduct of the exchange-traded
12  derivatives business and who were able to make
13  assessments with respect to that business at the
14  material time.
15    I believe that those assessments would
16  have included -- though I have not spoken
17  specifically to anybody about this exact
18  point -- but my belief is it would have included
19  recognition that by definition, exchange-traded
20  business in derivatives has to be conducted in
21  accordance with exchange-trading rules, and
22  included within those rules are requirements
23  that assets are always held in connection with
24  such business to, among other things, limit
25  exposures with respect to that business.

Page 60

J. HUGHES

1
2    So that people at Barclays able to
3  recognize those important issues were able to
4  form the view that to agree to acquire all of
5  the exchange-traded business was a reasonable
6  judgment to make at the time.
7    Q.   The business that was being acquired
8  was exclusively exchange traded; is that right?
9    A.   No. The only specific reference to
10  exchange traded was to exchange-traded
11  derivatives. As I said earlier, the business
12  that was being acquired was the whole of the
13  businesses in North America of Lehman Brothers.
14  So the exchange-traded derivatives business was
15  the -- was just one identified aspect of that
16  business.
17    Q.   And were there off-exchange
18  derivatives that were also acquired by Barclays?
19    A.   I wouldn't use the term "off
20  exchange." I would use the term "OTC
21  derivatives." OTC derivatives were excluded
22  from the transaction.
23    Q.   So the assets that Barclays was
24  acquiring was exclusively exchange-traded
25  derivatives; is that right?

Page 61

J. HUGHES

1
2    A.   No.
3    MR. STERN: Objection to the form.
4    Q.   When you say no, within the
5  exchange-traded derivatives -- was Barclays
6  acquiring any derivatives other than
7  exchange-traded derivatives?
8    A.   It depends how you define a
9  derivative. If by that you mean Barclays agreed
10  to acquire the exchange-traded derivatives
11  business but by contrast did not agree to
12  acquire the OTC derivatives business, then I
13  would agree with you.
14    Q.   Do I understand from your previous
15  answer that the business people -- at least it
16  is your belief that the business people
17  understood that the exchanges require customers
18  to keep assets that offset any liabilities on
19  the exchange?
20    A.   Could you repeat the question.
21    Q.   Let me strike that.
22    Have you spoken to any of the business
23  people who made the assessment as to whether it
24  was reasonable for Barclays to acquire the
25  exchange-traded derivatives business?

Page 62

J. HUGHES

1
2    MR. STERN: You mean in preparation
3    for the deposition or generally?
4    Q.   In preparation.
5    A.   I have not spoken to anybody in
6    preparation for today about the question you
7    pose with respect to the judgment made.
8    Q.   Other than in preparation for today,
9    have you spoken to the people who made the
10   assessment that Barclays should acquire the
11   exchange-traded derivatives business?
12   A.   I've spoken to at least two people who
13   were knowledgeable at the time about that
14   portion of the transaction.
15   Q.   Who is that?
16   A.   It would include Stephen King and Rich
17   Ricci. It's possible that I have spoken to
18   others over time, but I couldn't recall right
19   now specifically whether there were more or not.
20   Q.   What have you spoken to Stephen King
21   about specifically with respect to how he became
22   comfortable that it was appropriate for Barclays
23   to acquire the exchange-traded derivatives
24   business? -
25   MR. STERN: Excuse me, I'm concerned

Page 63

J. HUGHES

1
2    that this might call for a privileged
3    communication. I mean it is one thing if
4    you ask the witness as a 30(b)(6) witness
5    what facts he has learned concerning the
6    subject. But it is a different matter when
7    you're asking him about conversations.
8    So I would rather stick with the facts
9    that Mr. Hughes learned.
10   MR. MAGUIRE: Well, I'm only looking
11   for facts. I certainly don't want any legal
12   advice.
13   Q.   All I am looking for is how Mr. King
14   made the assessment that whatever the
15   liabilities were in the exchange-traded
16   derivatives, it was nonetheless -- even without
17   quantifying them, it was nonetheless reasonable
18   for Barclays to acquire that business.
19   MR. STERN: If you know those facts,
20   you can testify to those facts, without
21   describing your conversation.
22   A.   I don't think I can say that from my
23   specific discussions with Mr. King that we
24   addressed those facts as you describe them. I
25   would expect that in any discussion that I might

Page 64

J. HUGHES

1
2    have with a representative of Barclays who is
3    knowledgeable about the futures and options
4    business -- by using "options" in that sense, I
5    mean exchange-traded options -- that it would be
6    implicit in such a discussion that the
7    representative of Barclays would understand that
8    any exchange-traded derivatives position would
9    have associated with it assets at least in part
10   held to limit exposures with respect to those
11   positions.
12   So I can't recall any specific
13   discussion on the topic, but going back to your
14   earlier question, which I understood to be
15   related to assessments of exposures, I believe
16   that Barclays was in a position at least to
17   estimate that there were assets held in
18   connection with those exposures, albeit that it
19   was not at that point in time to establish
20   precisely either the actual exposures or the
21   value of the assets held in connection with
22   them.
23   Q.   And without knowing the specific
24   amount of the assets or the -- or being able to
25   quantify what the liabilities were, how do you

Page 65

J. HUGHES

1
2    understand Barclays' decision makers were able
3    to make the decision that it was reasonable to
4    acquire the exchange-traded derivatives
5    business?
6    MR. STERN: Objection, asked and
7    answered.
8    A.   Again, I don't -- I don't think I
9    have -- let me start again.
10   I haven't had a discussion with
11   anybody of that particular type. It's my belief
12   that knowledge of the conduct of that business
13   allows a reasonable person to conclude, with
14   respect to exchange-traded derivatives business,
15   that exposures by definition are limited. They
16   are not at any point in time absolutely
17   quantified.
18   Indeed, outside of the context of this
19   transaction, I think it would be hard for
20   somebody ever to tell you that with respect to a
21   futures or options exchange-traded position,
22   that there was an absolute quantification of the
23   exposure. That may be feasible with respect to
24   some futures and options positions, but I don't
25   think it's fair to say it's feasible with

Page 66

J. HUGHES

1  respect to all.
2        By definition, there is risk in an
3  open exchange-traded futures or -- not
4  exchange-traded futures, but exchange-traded
5  options or futures position.
6     Q.   When you say the risk is limited by
7  the conduct of the business, are you including
8  in that the rules of the exchanges?
9     A.   The rules of the exchanges and the
10  clearing houses that are associated with them,
11  and primarily what I am referring to there is
12  any form of collateral which is held in
13  connection with those exchange-traded positions.
14     Q.   The need for collateral and the fact
15  that if you don't have collateral, the exchange
16  will liquidate the position?
17     A.   Correct, in part. I guess it is more
18  accurate to say the exchange and/or the clearing
19  house has the right to do that. Whether it
20  chooses to do so or not is a matter for that
21  clearing house or exchange.
22     Q.   We talked about Mr. King. Have you
23  had a discussion with Mr. Ricci specifically
24  about how it was reasonable to acquire this
25

Page 67

J. HUGHES

1  business?
2     A.   I have discussed with Mr. Ricci
3  whether or not it was clear to Barclays that
4  Barclays had intended to and had acquired those
5  businesses.
6        MR. STERN: I want to caution
7     Mr. Hughes not to disclose any privileged
8     communications with Mr. Ricci, and I'm sorry
9     for interrupting.
10     A.   I think I was saying that I have --
11  have discussed with Mr. Ricci Barclays'
12  intention to and agreement to acquire those
13  businesses or that part of the business. I do
14  not recall speaking specifically with Mr. Ricci
15  about judgments of the type we have been
16  discussing in the last few minutes.
17     Q.   OK. Did the Barclays negotiators have
18  authority from the board to close this
19  transaction if it did not produce an immediate
20  gain to Barclays?
21     A.   The short answer to that is I don't
22  know. I do believe that there was authority to
23  conclude the transaction that was concluded,
24  first of all. I do believe there was authority
25

Page 68

J. HUGHES

1  to conclude a transaction that yielded an
2  accounting gain. I believe there was authority
3  to conclude a transaction that was, from a
4  capital perspective, positive for Barclays.
5        I'm not aware of any discussion that
6  referred to an immediate gain. It's possible
7  that there was a discussion with respect to the
8  immediacy of a gain, but I think most
9  importantly the intention of Barclays and the
10  hope was that we would be able to conclude a
11  transaction that was positive in accounting and
12  capital terms and would have yielded an
13  accounting gain.
14     Q.   Is it your understanding that based on
15  all of the work that the Barclays due diligence
16  teams did, that Mr. Diamond was properly in a
17  position to be highly confident in telling the
18  board that this transaction was capital
19  accretive?
20     A.   I believe that was Mr. Diamond's view,
21  and I believe that it was supported by
22  sufficient information, albeit that that
23  information was qualified with respect to
24  certainty around values.
25

Page 69

J. HUGHES

1        But I think he was in a position to be
2  highly confident that it would be positive from
3  the bank's perspective.
4     Q.   So none of the various uncertainties
5  that existed precluded Mr. Diamond from
6  accurately representing to the board that he was
7  highly confident this was capital accretive?
8     A.   I think that's correct.
9     Q.   When did Barclays first raise with the
10  SIPA trustee its demand for all of the assets in
11  the DTC clearance box?
12     A.   Did you say the SIPA trustee?
13     Q.   Yes.
14     A.   Sorry, I thought you said SIVA.
15     Q.   Maybe I did, but I meant to say SIPA
16  trustee.
17     A.   I apologize. Could you repeat the
18  question.
19        MR. STERN: I take it this is
20     topic 10, communications between Barclays
21     and the trustee that occurred between
22     September 22 and December 23?
23        MR. MAGUIRE: Yes.
24     Q.   I'm shifting gears, just so you know
25

Page 70

J. HUGHES

1  where we are.
2      A.   I appreciate your shifting gears.
3      Q.   And what I am now asking is
4  communications -- you have had a number of
5  communications with the trustee over the last
6  long time, and they have involved from time to
7  time Barclays' demand for the securities or
8  assets that are in the DTC clearance box, right?
9      A.   That's correct.
10     Q.   And my question is, when did you first
11  raise that issue with the trustee?
12     A.   The subject of assets in the clearance
13  boxes of Lehman Brothers was first raised
14  between Lehman Brothers and Barclays on Friday,
15  the 19th. At some point from the morning of
16  Friday, the 19th -- let me say it again.
17         At various points, starting, I would
18  think not before the morning of the 19th but
19  during the period of the 19th to the 22nd --
20  when I say the 22nd, I mean by closing on the
21  22nd -- there were discussions relating to the
22  assets in the clearance boxes that both Barclays
23  representatives, be they internal or external,
24  and I believe the trustee and/or the trustee's
25

Page 71

J. HUGHES

1  representatives participated in.
2         So if by your question you mean when
3  were the assets in the clearance boxes first
4  discussed among the trustee and its
5  representatives and Barclays, I would say at
6  some point during that period.
7         If your question refers to Barclays'
8  desire that the trustee transfer those assets,
9  then that first communication requesting a
10  transfer I think necessarily happened at some
11  point after, but close in time to the closing on
12  the morning of the 22nd.
13     Q.   And after the 22nd, when was the next
14  time that Barclays demanded all of the assets
15  from the DTC clearance box from the trustee?
16     A.   I don't recall the first specific
17  time. I do both recall and think there were
18  several occasions upon which Barclays made that
19  request and/or demand, and it was repeated on
20  many occasions both directly and indirectly
21  either to the trustee or to the trustee's
22  representatives.
23     Q.   Do you recall participating in any of
24  those?
25

Page 72

J. HUGHES

1      A.   Yes.
2      Q.   And what's the first one that you
3  recall participating in?
4      A.   I don't recall exactly when -- I don't
5  recall -- I don't have a personal recollection
6  of exactly when.
7      Q.   You couldn't pin it down to the month?
8      A.   Again, without being able to pinpoint
9  the moment, the place or the time, I think
10  either I or people working with me made plain,
11  certainly during September, and my belief is
12  that consistently and persistently since the
13  closing, we have made it plain that we demand
14  from the trustee all of the assets you
15  described.
16         I also believe that from my personal
17  interactions with the trustee and the trustee's
18  representatives, that it was clear both during
19  the period of 19th to 22nd of September and at
20  all times since then, firstly, that Barclays
21  believes that the trustee agreed to transfer all
22  of those assets, and that it has always been
23  abundantly clear to the trustee that Barclays
24  has an outstanding demand for those assets, and

Page 73

J. HUGHES

1  at no point in my many discussions that I have
2  had with the trustee's representatives has
3  anything different emerged with respect to that
4  understanding.
5      Q.   Let me shift gears and direct your
6  attention to the clarification letter for the
7  next series of questions.
8      A.   OK.
9      Q.   I believe you mentioned earlier that
10  Mr. LaRocca left the sale hearing early?
11         MR. STERN: I said that.
12         MR. MAGUIRE: Is that right?
13         MR. STERN: Yes.
14     Q.   Do you have an understanding as to why
15  he left early?
16     A.   No.
17         MR. STERN: I think what I said was
18  that he was there originally and he left
19  early because he thought there was a
20  possibility that he would have to make
21  arrangements for a closing.
22         MR. MAGUIRE: OK.
23     Q.   Was it Barclays' understanding that
24  the closing would follow right after the sale

Page 74

1    J. HUGHES
2  hearing?
3    A.  I think it was Barclays' understanding
4  that we would seek to close as soon after the
5  sale hearing as we could.
6    Q.  And did you understand that a
7  clarifying letter was being prepared?
8    A.  Yes, I believe a clarification letter
9  as it has subsequently become known was expected
10  to be completed.  Indeed, I believe the drafting
11  of it had commenced prior to the sale hearing.
12  And ultimately it was concluded at or just
13  before the closing on the morning of the 22nd.
14    Q.  Did Barclays understand that the
15  clarifying or clarification letter was intended
16  to change the economics of the transaction that
17  had been disclosed to the court?
18    A.  No.  I believe it was intended to
19  clarify some of the aspects of the transaction
20  for the benefit of the court, but also for the
21  benefit of all of the parties interested in the
22  transaction.
23    Q.  And is it Barclays' understanding that
24  the clarification letter does in any way change
25  the economics of the transaction from what was

Page 75

1    J. HUGHES
2  disclosed to the court?
3    A.  I think in large part the economics
4  are not meaningfully different, because, as I
5  have said a few times, the economics of the
6  transaction were most appropriately assessed in
7  the context of the asset purchase agreement as a
8  whole, by which I mean the sale of the business
9  of Lehman Brothers as a whole.
10    To the extent there was any ultimate
11  economic difference, it's possible that after
12  the conclusion of the clarification letter and
13  the negotiations that surrounded it, that there
14  may have been a diminution in some of the assets
15  that Barclays received, but -- so for example,
16  there had been some discussions with respect to
17  some residential mortgages, just as an example,
18  and those discussions had taken place earlier in
19  the week.  By the time the clarification letter
20  was concluded, those residential mortgages were
21  I believe unavailable, but in any event were not
22  part of the different categories of assets that
23  Barclays ultimately received or agreed would be
24  received.
25    Q.  Did anyone at Barclays ever perform a

Page 76

1    J. HUGHES
2  valuation of what you refer to as the RESIs?
3    A.  I believe that during -- while the
4  RESIs were being discussed as a possible portion
5  of the transfer of assets, there were some
6  attempts to value them.  I'm not aware of any
7  particular -- sorry, let me start again.
8    I'm not aware of any conclusion to any
9  analysis that Barclays was able to conduct.  I
10  believe that I can't now recall the full value,
11  but there were estimations of the values
12  presented by Lehman Brothers.
13    Q.  And do you know whether Barclays ever
14  attributed any value to any of those RESIs?
15    A.  I don't know whether we specifically
16  attributed any value.  I think there were -- that
17  the RESIs were included with the received values
18  applied to them by Lehman Brothers in certain
19  more detailed analyses around different
20  categories of assets and liabilities.  They were
21  probably included in particular renditions of
22  what some of those different categories of
23  assets and valuations may have looked like.
24    So I think that Barclays used some of
25  those received values and presented them

Page 77

1    J. HUGHES
2  together with other received values, among other
3  things, while trying to calculate what different
4  categories of assets and liabilities may
5  ultimately have been worth.
6    But I don't recall Barclays ever
7  coming to its own view about actually what those
8  RESIs were worth, if that's what you're really
9  after.
10    Q.  That's what I really wanted to
11  understand, whether Barclays itself attributed
12  any value to the RESIs.
13    A.  I don't think we reached a conclusion,
14  because in common with all of the numbers that
15  Lehman gave us, we were very conscious that they
16  were both presented as estimations and were
17  inherently uncertain.  That's not true just of
18  the RESIs, but it was particularly true of the
19  RESIs, I think, because the valuation of
20  residential mortgages, leaving aside all other
21  asset classes, at that particular time was a
22  very difficult thing.
23    MR. STERN:  Let me just consult with
24  the witness for a moment.
25    (Pause)

Page 78

```
 1              J. HUGHES
 2      Q.   Do you want to clarify your answer?
 3      A.   Yes, in the following way, just to
 4  establish that my answers to your questions are
 5  given in the belief that you're referring to a
 6  particular category of RESIs as you described
 7  them which had formed an identified asset within
 8  the negotiation, as distinct from residential
 9  mortgages as a whole.
10      Q.   We are just talking about a specific
11  category that was identified in the APA,
12  residential mortgage-backed securities.
13      A.   Yes.  Identified in the APA prior to
14  Friday, the 19th?
15      Q.   Yeah.
16      A.   Yes.
17      Q.   And it is your understanding that none
18  of those were included in any of the assets that
19  were acquired by Barclays?
20      A.   That's not my understanding.  I don't
21  know with certainty whether there were any of
22  the components of the class we have thus far
23  been describing as the RESIs that ultimately
24  were delivered to Barclays.
25          I do believe that Barclays received
```

Page 79

```
 1              J. HUGHES
 2  some assets that you would describe as
 3  residential mortgage assets in transfers of
 4  assets from Lehman Brothers, be that assets
 5  received in the repo transaction, or it's
 6  possible the clearance boxes included them,
 7  though I think that's less likely.  I don't
 8  particularly recall.  But --
 9      Q.   And what about the fed settlement
10  transfers from JPMorgan Chase?  Do you know
11  whether the RESIs were included in that
12  transfer?
13      A.   The RESIs, as you previously described
14  them, I think were not intended to be included
15  in that JP Morgan settlement.  Again, I couldn't
16  tell you whether -- what ultimately the makeup
17  was of each of those different categories of
18  assets, the repo, the JP Morgan settlement, the
19  clearance boxes.
20          I believe that others are able to
21  describe accurately, if they haven't already,
22  what those -- what the makeup of each of those
23  different pools was.  Or is.
24      Q.   With respect to the securities that
25  were delivered as part of the fed settlement in
```

Page 80

```
 1              J. HUGHES
 2  December of 2008, you know what I am referring
 3  to?
 4      A.   I assume -- I think I do, but I
 5  typically refer to it as the JP Morgan
 6  settlement.
 7      Q.   That makes more sense, the JP Morgan
 8  settlement.  Who would be the person who would
 9  know whether any of the RESIs were included in
10  that?
11      A.   I would think Stephen King would know
12  the answer to that.  I would think that it's
13  possible that -- it's possible that Jim Hraska,
14  Alastair Blackwell and other people working in
15  the operations function at Barclays would be
16  able to establish that.
17      Q.   You described earlier how you believe
18  that --
19      A.   Sorry to interrupt you.  Can I -- I'm
20  not sure whether I made it clear earlier, but
21  the RESIs as a defined term were not intended to
22  be included, and so I believe it's fair to say
23  that they were not.
24          There may, as I say, have been
25  residential mortgages that were ultimately
```

Page 81

```
 1              J. HUGHES
 2  delivered in one or more parts of the total
 3  transfer.
 4      Q.   Did you understand that the court at
 5  the sale hearing had expressed a view that it
 6  would regard any changes in the transaction
 7  of -- certainly in the amount of 500 million
 8  dollars or more as being material?
 9          MR. STERN:  Objection to the form.
10      A.   From my review of the transcript of
11  the sale hearing -- and I must just note that
12  for the -- for this particular purpose, I have
13  not read that portion of the transcript, but my
14  recollection of the transcript is that the judge
15  was made aware that there were -- that the
16  clarification letter was being finalized, that
17  discussions were continuing with respect to some
18  of the detailed terms, but the clarification
19  letter was hoped to be concluded promptly, and
20  that the judge wanted to insure that there were
21  no material changes to the transaction or that
22  if there had been or if there were to be
23  material changes in the transaction, that there
24  were -- there would be an opportunity for those
25  interested to return to court to discuss any
```

Page 82

J. HUGHES
such material changes with him.
Q. And Barclays understood that?
A. Yes, I believe we did understand that.
I believe we also had reached, prior to the sale
hearing, an agreement with Lehman Brothers with
respect to all of the terms of the transaction.
I believe the clarification letter did clarify
some aspects of that discussion and agreement,
but that there were, in fact, no material
changes to the transaction from the 19th through
to the 22nd of September.
Q. Was it Barclays' view then that the
clarification letter did not cause any material
change to the transaction from what had been
described to the court?
A. Correct.
Q. And there was no need then to return
to the court to advise the court of the
provisions or the economic deal as reflected in
the clarification letter?
A. I believe that Barclays did conclude
there was no need to return to the court to
describe anything to the court. I believe that
that was also the understanding of Lehman

Page 83

J. HUGHES
Brothers and its representatives at the time. I
believe that representatives of Lehman Brothers
considered whether that was necessary on the --
prior to closing and concluded that it was not
necessary. And all of that was, is consistent
with Barclays' understanding.
The court had already heard, as I said
at the outset, that this was a transaction that
was intended to deliver the whole of the
business of Lehman Brothers in North America and
not specific pieces of that business. The court
understood that any valuations that had been
given or described were no more than estimates
of value.
I believe the court understood and all
the interested parties understood that the --
that those valuations were uncertain and that
therefore, there would be no representations or
warranties about any aspect, any valuation
aspects of the deal.
I believe that Barclays and Lehman
Brothers and its respective representatives
understood that all the interested parties, be
they the estate, the trustee, the creditors

Page 84

J. HUGHES
committee, had all participated in all the
relevant discussions associated with the
transaction, and most particularly with respect
to all aspects of the clarification letter, and
that everybody who had an interest had an
opportunity to review those terms, to review --
to participate in discussions and to reach
agreements about them.
I also believe that the fact that for
a considerable period of time, nobody who was
either a participant or interested in the
proceedings did, in fact, go back to the court
to ask the court to review that clarification
letter suggests to me that that was everybody's
belief at the time.
Q. Did Barclays consider going back to
the court to present the clarification letter?
A. No, we did not, and Weil Gotshal I
believe did file the clarification letter with
the court on the 22nd, I believe.
Q. Did Barclays consider going back to
the court to disclose the amount of the clearing
fund and margin that it was acquiring in the
transaction?

Page 85

J. HUGHES
A. Barclays --
MR. STERN: I am going to object to
the form. Just to be clear, when you talk
about consider, you're not calling for
attorney/client communications.
Q. Just the business.
A. Can you describe what you mean by the
clearing fund?
Q. Just whatever Barclays is claiming by
way of collateral held to secure exchange-traded
derivatives, I'm including that and margin
together.
A. Well, I wouldn't use the term
"clearing fund" for that purpose.
I think your question is, did we
consider going back to the court with respect to
those sorts of property, and the answer is no.
Q. And why wouldn't you include clearing
fund in that?
A. I just -- I just wouldn't use the term
"clearing fund" because it is -- it is not clear
to me exactly what you mean by it, but also, it
would, it would likely be just one portion of a
greater whole, namely, any property of any

Page 86

J. HUGHES
1
2  description that was relevant to the
3  exchange-traded futures and options business.
4       But there was no need to go back to
5  the court for -- on any portion of that, because
6  the agreement was already clear to the court.
7       Q.   Can you tell me in -- how it was clear
8  to the court that Barclays would be acquiring
9  margin?
10      A.   It was clear to the court because
11  margin is necessarily part of the
12  exchange-traded business of Lehman Brothers.
13      Q.   And was there any disclosure to the
14  court of the amount of the margin that Barclays
15  was acquiring?
16      A.   I don't believe there was a figure
17  given with respect to it.
18      Q.   What about with respect to the 15c3
19  asset? Are you aware of any disclosure to the
20  court that Barclays was acquiring the 15c3
21  asset?
22      A.   I believe the court was told that
23  there was to be -- I can't be certain about
24  this, but I believe the court was told that
25  there was to be transfer of a 15c3 asset, as you

Page 87

J. HUGHES
1
2  describe. I can't remember whether there was
3  any quantification of that.
4       Q.   And when you say the court --
5       A.   Specifically.
6       Q.   -- the court was told, you are saying
7  in the on-the-record session on the 19th?
8       A.   I believe so. But I could be wrong
9  about that.
10      Q.   Can you tell me how it was clear to
11  the court that Barclays was obtaining as part of
12  this sale the assets in the clearance boxes?
13      A.   The assets in the clearance boxes were
14  unencumbered assets of the business of Lehman
15  Brothers and were purchased assets as defined --
16  purchased assets had been defined in the asset
17  purchase agreement which was disclosed to the
18  court, and so I think from all of that, if
19  nothing else, it was clear to the court.
20       Might I just refer back to one of your
21  earlier questions, because as I think further on
22  the topic of margin, I believe that in the sale
23  order, there is reference to margin, and I
24  think -- I don't always remember paragraph
25  numbers or letters clearly, but I think there is

Page 88

J. HUGHES
1
2  paragraph N in the sale order which makes
3  particular reference to margin, and I think
4  again, from that, I did -- I think it is clear
5  that the court understood that the margin and
6  collateral held with respect to the
7  exchange-traded derivatives business was also --
8  was included within the transaction and included
9  within the assets to be transferred to Barclays.
10       I might just add furthermore that I
11  think it would have been very surprising to
12  Barclays, indeed to most onlookers, that -- if
13  margin or collateral held with respect to that
14  exchange-traded business was not included.
15  Indeed, I think it would be shocking if it had
16  not been included.
17       MR. STERN: Let me ask you a question
18  in terms of timing. Are you planning to
19  break for lunch around 1 o'clock or earlier?
20  If we are going to break around 1:00, I
21  would like to take a five-minute break now.
22  If we are going to stop around 12:30, then
23  we might as well keep going.
24       MR. MAGUIRE: Why don't we take a
25  break and I'll check on lunch.

Page 89

J. HUGHES
1
2       MR. STERN: OK, just five minutes.
3       MR. MAGUIRE: Yeah.
4           (Recess)
5  BY MR. MAGUIRE:
6       Q.   The witness wishes to add something to
7  a previous answer?
8       A.   Yeah. Just, you asked me more than
9  one question about what was clear to the court
10  and why. I think it is just worth noting that
11  all of the relevant commentary or description to
12  the court was presented by Harvey Miller and
13  other representatives of Lehman at Weil Gotshal.
14  Indeed, I think there was an actual agreement
15  that Barclays would not be allowed to make any
16  representations to the court without some prior
17  agreement. He may even not have included that
18  proviso.
19       But fundamentally all the
20  representations to the court and all of the
21  determinations or judgments made about what was
22  appropriate to be described to the court were
23  made I think essentially by Harvey Miller and
24  Weil Gotshal on behalf of Lehman Brothers.
25       I don't know whether that's helpful,

Page 90

J. HUGHES

1  but I think it was as a factual matter the way
2  it was done, and therefore what was made clear
3  to the court, to use your terms, was made clear
4  largely by Harvey Miller, sometimes by Lori
5  Fife. By agreement, Barclays didn't really have
6  the opportunity to make those determinations or
7  judgments.
8          ,Now, I believe that in fact Harvey
9  Miller and others gave a very fair and accurate
10  rendition of the transaction. And indeed they
11  didn't change beyond -- after those descriptions
12  had been given.
13          In any event, I thought that would be
14  useful to add.
15      Q.   What's the agreement that you referred
16  to?
17      A.   I can't remember exactly where it
18  appears, but I believe there was a provision in
19  one of the transaction documents in which it was
20  agreed that the transaction would be described
21  to the court only by Weil Gotshal. I can't
22  remember its precise terms, but that was the --
23  that was the effect of it.
24      Q.   Did Barclays believe that it was

Page 91

J. HUGHES

1  constrained and unable to say anything to the
2  court that it felt appropriate concerning the
3  transaction?
4      A.   I don't know whether people at court
5  at the time felt that, but I think that that
6  provision did exist.  I don't think that
7  Barclays felt that it hurt anything or that it
8  was either unfair or inaccurate.  And nor do I
9  think that anybody who was present felt there
10  was any need on Barclays' part to say anything.
11          So I don't raise the point to suggest
12  that there might have been such a need on
13  Barclays' part, but just to make plain that to
14  the extent there were comments made at court by
15  anybody, they were, they were in large part, if
16  not in fact in totality, made by Harvey Miller
17  and other representatives at Weil Gotshal.
18      Q.   You think you could find that
19  provision that you're thinking of and tell us
20  what it is?
21          MR. STERN:  I can find it.  In the
22  APA, I believe it's Section 7.2.
23          MR. MAGUIRE:  That's appreciated.
24  Thanks.

Page 92

J. HUGHES

1          MR. STERN:  Which states, "Purchaser
2  shall not, without the prior written consent
3  of seller, file, join in or otherwise
4  support in any manner whatsoever any motion
5  or other pleading relating to the sale of
6  the purchased assets."
7      Q.   And did you understand there was any
8  need for you to get any such consent?
9      A.   I think there was a need to get
10  consent if we felt the need to say anything or
11  make any representation or make any filing with
12  respect to the sale up until that point, but I
13  don't think anything happened or anything was
14  said that led anybody at Barclays who was
15  present to think that there was any need for
16  anybody at Barclays to say anything.
17      Q.   Right.
18          Now, did you understand that the
19  purpose of the sale hearing was for the court to
20  determine whether or not to approve the sale?
21      A.   Yes.
22      Q.   And did Barclays understand that it
23  was important for the court to understand the
24  economics of the transaction in making that

Page 93

J. HUGHES

1  determination?
2          MR. STERN:  Objection to the form.
3  Vague.
4          You can answer.
5      A.   I think the court had to take a gander
6  at a whole variety of issues with respect to the
7  transaction in order to determine whether to
8  approve it or not.  I think it is clear from the
9  transcript that there were, there were many
10  issues to be taken account of, most notable
11  among which I believe were the extreme
12  circumstances of that period in financial
13  markets, and the pressing need in time -- not
14  least in terms of timing, to preserve as much
15  value as possible in the estate, for the estate,
16  the business, for the benefit of the estate, the
17  creditors, and a whole variety of additional
18  people associated with Lehman Brothers, and
19  indeed for the benefit of the economy as a
20  whole.
21          And I think that those driving forces
22  behind the transaction and the need to act
23  quickly to preserve that value in the business
24  and in the estate for all of those parties comes

Page 94

J. HUGHES

1 across quite firmly as, not the only factors,
2 but certainly among the most important.
3 So economics is part of that
4 certainly, but it is not of itself the single
5 issue.
6 Q. So one thing but by no means the only
7 thing that the court needed to have an
8 understanding of was the economics of the
9 transaction; is that correct?
10 MR. STERN: Objection to the form.
11 A. I think the court had to understand
12 the transaction, yes.
13 Q. And did Barclays believe that the
14 court had an understanding of the economics of
15 the transaction?
16 MR. STERN: Objection to the form.
17 A. I'm not sure I know exactly what you
18 mean by economics. I believe the court
19 understood that the transaction was proposed and
20 indeed did transfer to Barclays the business of
21 Lehman Brothers in North America, and I believe
22 it gained a clear understanding of those
23 detailed aspects of that transaction that Harvey
24 Miller and Weil Gotshal determined were

Page 95

J. HUGHES

1 appropriate to display to the court, be it on
2 the 17th or the 19th or in a clarification
3 letter that was filed on the morning of the
4 22nd.
5 So I believe that the court had a very
6 clear understanding of the transaction.
7 Q. Does Barclays believe that the court
8 had a clear understanding of the total value of
9 the assets that Barclays was acquiring?
10 MR. STERN: Objection to the form.
11 A. I believe the court understood that
12 it -- that the transaction included assets and
13 liabilities that people had made a good faith
14 effort to value, but whether or not the court
15 felt that it had an exact valuation for each and
16 every asset or liability, I doubt. But I don't
17 think that any part of the transaction or an
18 understanding of it required that degree of
19 exactitude or certainty.
20 Q. I'm not asking you about specific
21 parts. I'm asking you whether Barclays believed
22 that the court understood the total value of the
23 assets that Barclays was acquiring.
24 MR. STERN: Objection to the form.

Page 96

J. HUGHES

1 You have already asked that question. Are
2 you asking again?
3 MR. MAGUIRE: No, no. I asked that
4 question, you're right. The witness
5 answered with respect to the specific
6 components of the total value. That's not
7 what I want.
8 Q. What I want is whether Barclays
9 understood that the court had an understanding
10 of the total value of all of the assets that
11 Barclays was acquiring.
12 MR. STERN: Objection to the form.
13 A. I believe the court understood certain
14 estimations of value, most importantly
15 understood that those valuations were estimates,
16 but that more importantly, to understand the
17 transaction, the court understood everything it
18 needed to, to be able to approve the
19 transaction.
20 Q. So I am still waiting for you to
21 explain to me whether Barclays believed the
22 court was told what the total value was of the
23 assets that Barclays was acquiring.
24 MR. STERN: Objection to the form.

Page 97

J. HUGHES

1 A. I believe the court was given an
2 estimation of that total value.
3 Q. And what was that estimation?
4 A. I don't know what the total number
5 was. I don't think a total number was actually
6 given.
7 Q. So you're saying there were a couple
8 of numbers that were given to the court, and if
9 you were to add those numbers up, you would get
10 the total value of the assets that Barclays is
11 acquiring; is that what you are saying?
12 MR. STERN: Objection to the form.
13 A. No, I am not saying that. I am saying
14 in the APA and through the various
15 representations of Harvey Miller, Lori Fife and
16 so on, that some numbers were given. The court
17 understood that those were estimations. The
18 court understood from the various
19 categorizations of assets what the total assets
20 were that were included and described in the
21 transaction.
22 I'm not aware that a total number was
23 ever given for that. And again, I don't think
24 the court either expected at the sale hearing or

Page 98

J. HUGHES

1  needed at the sale hearing a total number, an
2  exact number for the total amount of assets or
3  liabilities, because that wasn't the deal. The
4  deal was Lehman agreed to sell and Barclays
5  agreed to buy the North American businesses of
6  Lehman Brothers.
7       The court understood, it was very
8  clear in the asset purchase agreement, it was
9  not possible at that particular point in time to
10  give an absolute amount for the total assets or
11  liabilities, and that's why nobody ever
12  represented or warranted anything about those
13  total values.
14      So to come back to your question, I
15  don't think the court heard a specific number
16  for the total value of assets and liabilities,
17  but I believe that that was not necessary. It
18  was not contemplated as part of the transaction.
19  Had it been a different type of transaction,
20  often referred to as a balance sheet
21  transaction, it might have been different. But
22  that was not the deal.
23      Q.  At the time that the court approved
24  the sale then, did the court know what the total

Page 99

J. HUGHES

1  value of the assets was that Barclays was
2  acquiring?
3       MR. STERN: Objection to the form.
4  You can answer.
5       A.  I'm pausing because I'm trying to
6  think of a different way of answering the same
7  question.
8       I think the court had been given
9  estimations of values. I think the court
10  understood that they were estimations. I'm not
11  aware of a total number that was presented to
12  the court as a precise number for those total --
13  for those total values.
14      I believe it's clear from the
15  transcript that the court understood
16  sufficiently the value of assets and
17  liabilities, and understood that in approving
18  the transaction, there was an opportunity to
19  preserve those values, and not to do so would
20  likely not only destroy those values but destroy
21  lots of other value too.
22      I'm not sure I can say it in any other
23  way.
24      Q.  Did the court -- let me put it

Page 100

J. HUGHES

1  differently then. Did the court have the
2  ability based on what was presented at the sale
3  hearing to figure out roughly, not precisely or
4  with certainty, but roughly what the total value
5  was of the assets that Barclays was acquiring?
6       MR. STERN: Objection to the form.
7       A.  I think the court had the opportunity
8  to understand the values of the categories of
9  assets that were to be delivered. I'm not aware
10  that at any point every single one of those
11  categories was given a valuation during the sale
12  hearing.
13      But I don't think that it was
14  necessary for the court to hear specific values
15  with respect to each and every category of
16  assets in order to make a judgment as to whether
17  it made sense or was the right thing to approve
18  the transaction.
19      Q.  In each of your answers, you have
20  referred to specific categories, and for my next
21  series of questions, I don't want to address
22  specific categories. What I want to address is
23  the overall economic result and specifically the
24  total value of all of the assets that were

Page 101

J. HUGHES

1  included in the sale.
2       Did Barclays understand that the court
3  would be interested in knowing what the total
4  value of the assets that Barclays was acquiring
5  was?
6       MR. STERN: Objection. Before you
7  answer that, I'll object to the form, and
8  you can try to answer that again.
9       Did Barclays understand that the court
10  would be interested in knowing. You can
11  answer that if you understand it.
12      A.  I don't know what Judge Peck was
13  interested in knowing about the total value of
14  assets. I do believe that the court was
15  interested in understanding the transaction and
16  its salient elements in order to determine
17  whether it was the right thing to approve the
18  sale.
19      I think the court heard fair and
20  accurate descriptions of some assets and their
21  estimated values, and again, that that was
22  sufficient for the court to make a judgment.
23  The ability to calculate total values with
24  respect to all of the assets was probably not --

Page 102

J. HUGHES

1  let me say that again. The ability to
2  accurately value the total amounts was dependent
3  on a whole variety of additional factors that
4  were hard to describe at that point in time.
5       So I think the court made its
6  assessment recognizing that. To take one
7  example, a number of the securities that
8  Barclays received in the transaction were not
9  capable of being accurately valued by Barclays
10  specifically at that point in time. Indeed, I
11  think you have heard from other Barclays
12  witnesses that an enormous amount of effort was
13  required to come to specific valuations with
14  respect to particular assets.
15      And that was one of the difficulties
16  of the week and one of the risks that Barclays
17  took in agreeing to acquire certain types of
18  assets in the transaction.
19      Q. Did Barclays believe that the court
20  could approve a sale without knowing what the,
21  at least on an estimated basis, what the total
22  value of the assets were that Barclays was
23  acquiring?
24      MR. STERN: Let me just think about

Page 103

J. HUGHES

1  this, because I'm concerned that this
2  question now intrudes on the attorney/client
3  privilege, and the advice that --
4       A. I think I agree with that actually.
5       MR. STERN: I don't know if there was
6  any advice on this subject, but if there
7  was, it would be privileged.
8       I think I'll instruct you not to
9  answer this, and you can formulate a
10  different question.
11      Q. And I take it you will follow the
12  advice of your counsel?
13      A. As always.
14      Q. Did Barclays consider disclosing to
15  the court the values -- let me strike that.
16      Was the court told of the total
17  liabilities that Barclays was acquiring in the
18  transaction?
19      MR. STERN: That you can answer. If
20  you remember.
21      A. I think the answer to that is no. I
22  won't repeat all of the attendant descriptions
23  that I gave you with respect to the assets, but
24  the same commentary applies to liabilities as it

Page 104

J. HUGHES

1  does to assets.
2       Q. Can you tell me what were the most
3  significant liabilities that were not disclosed
4  to the court?
5       MR. STERN: Objection to the form.
6       A. I don't think any meaningful liability
7  was not disclosed to the court.
8       Q. And then can you tell me in what
9  respect there not a full disclosure to the
10  court with respect to the liabilities that
11  Barclays was assuming? --
12      MR. STERN: Objection to form.
13      A. I didn't say that.
14      Q. Let me ask you that question. Was
15  there a full disclosure to the court of all of
16  the liabilities that Barclays was assuming?
17      A. Yes.
18      Q. Was there a full disclosure to the
19  court of all of the assets that Barclays was
20  acquiring?
21      A. I believe so, yes.
22      Q. With respect to the liabilities, was
23  there a full disclosure with respect to the
24  value of those liabilities?

Page 105

J. HUGHES

1       MR. STERN: Objection to the form.
2       A. If by full disclosure you mean
3  disclosure of what the court needed to know with
4  respect to those assets and liabilities, my
5  answer is yes.
6       Q. Did that full disclosure include what
7  the overall estimated value of the assets were?
8       MR. STERN: Objection to the form.
9       A. I think as I said a moment ago, and I
10  really was trying not to repeat the lengthy
11  answers I gave you with respect to assets, that
12  the court heard estimations of value with
13  respect to some liabilities. Those estimations
14  were given by representatives of Lehman
15  Brothers, and I think they were a fair and -- a
16  fair description, given with the best intentions
17  and by people who had tried under very difficult
18  circumstances to come up with real, accurate,
19  precise numbers for all of those liabilities and
20  indeed the assets.
21      But they were estimations, and
22  everybody understood them to be that.
23      Q. At the time that the liabilities were
24  estimated to the court, did Barclays believe

Page 106

J. HUGHES

1 that those estimates were appropriate?
2          MR. STERN: Objection to the form.
3     A.    There were estimations of liabilities
4 that Barclays received from Lehman Brothers both
5 during the week.  Some of them were described on
6 the 17th.  Some of them were described on the
7 19th.
8          Barclays was -- there was no reason
9 that I can recall or that anybody has realized
10 to me to believe that there wasn't a good faith
11 effort made by the Lehman Brothers
12 representatives to come up with those
13 valuations.  There was certainly disagreements
14 with respect to valuations during the course of
15 the week, with respect to some of the assets.
16 Whether we made a judgment specifically with
17 respect to all of them and were able to conclude
18 that they were all accurate, I don't think we
19 had that ability at that time.
20          Some of the information was
21 necessarily information of the type not only
22 that Barclays could not have had in its
23 possession other than by receiving it from
24 Lehman Brothers, some of it was information

Page 107

J. HUGHES

1 which we had no ability to test.
2     Q.    Did you have any reason to disagree
3 with the numbers that were presented by Weil
4 with respect to liabilities?
5     A.    Represented by Weil when?
6     Q.    At the sale hearing?
7     A.    At the sale hearing?  There was
8 nothing that Weil said at the sale hearing that
9 to the people present seemed to be wildly
10 inaccurate or in any way misleading to anybody
11 with respect to values.
12          As I said more than once, they were
13 not -- by "they," I mean the people at Barclays
14 present, were not privy to the basis upon which
15 those numbers were arrived at.  But there was
16 nothing that any of them heard at the time, and
17 there is nothing that, on reviewing the
18 transcript, that suggests to me that there was
19 either any confusion or any meaningful
20 inaccuracies, albeit bearing in mind the proviso
21 neither I nor the Barclays representatives sat
22 with Harvey Miller or anybody else to figure out
23 what the numbers should look like.
24     Q.    There were certain assets -- you

Page 108

J. HUGHES

1 described earlier how there were certain long
2 positions that were identified as 47.4 billion
3 dollars.  You recall that?
4          MR. STERN: Objection to the form.
5     A.    Again, I don't think I did say that.
6 I think you said that.
7     Q.    OK.  What did Barclays understand was
8 included within the 47.4 billion dollars that
9 Ms. Fife represented to the court?
10          MR. STERN: I will object.
11          But I will let you answer, but this
12 has been asked and answered.
13     A.    I believe I did answer that question
14 earlier.  I believe what I said, what I now
15 believe is that the number you are referring to
16 was a number given by Lori Fife to describe
17 changes, as best I can tell from the transcript,
18 with respect to numbers that had previously been
19 given and previously described as long
20 positions.
21          I do not know, nor have I been able to
22 find anybody that does know, exactly what Lori
23 Fife intended to say by that number.  I can tell
24 very clearly from the transcript that her

Page 109

J. HUGHES

1 primary aim was to describe from that part of
2 her presentation what -- a change in what she
3 viewed as the valuation of some assets that were
4 previously agreed to be transferred in the sale.
5          As it happens, or as things turned
6 out, it was largely a meaningless, in my view,
7 description -- "meaningless" is the wrong word.
8 It was -- it was not a full description of some
9 additional points which were then later dealt
10 with, by which I mean the long positions as
11 previously described related to a part of the
12 negotiation, which by the sale hearing had
13 changed, and by the sale hearing the securities
14 that had previously formed that 70 billion long
15 position were no longer either in character or
16 by type the same securities that were going to
17 be acquired, because by the sale hearing, there
18 had been the intervention of a repo transaction
19 which changed the meaning of that 70 billion in
20 any event.
21     Q.    Now, did Barclays understand whether
22 the 47.4 that Ms. Fife represented to the court,
23 whether that included the repo securities?
24          MR. STERN: Objection to the form.

Page 110

J. HUGHES

1  J. HUGHES
2  Asked and answered.
3      A.   Again, I don't know what Lori Fife
4  included. I think my best reading of the
5  transcript is that she intended to include
6  securities that were -- that formed -- that were
7  part of the repo. I can't say whether she had
8  included all of those or whether she had
9  included additional securities. But again, they
10  were all estimations, whether they referred to
11  the repo securities or some of the repo
12  securities or whether it referred to other
13  assets.
14      Q.   Did Barclays understand the
15  47.4 billion number to include the 15c3 asset?
16      MR. STERN: Objection to the form.
17      Asked and answered.
18      A.   I don't think she was referring to the
19  15c3 asset at that point in time. But again, I
20  don't know, for the reasons I've already
21  described.
22      Q.   Did you understand that Ms. Fife's
23  47.4 billion included the clearance box assets?
24      MR. STERN: Objection to the form.
25      Asked and answered.

Page 111

1  J. HUGHES
2      A.   I don't know the constituent parts of
3  the 47.4. As I said earlier, the clearance box
4  assets were clearly within the definition of
5  purchased assets. And so whether or not they
6  were, I think was not a matter of significance
7  at the time.
8      MR. STERN: I think it is after
9  1 o'clock. Are we going to take a lunch
10  break?
11      MR. MAGUIRE: Yeah. We will go
12  another five or ten minutes, and then we
13  will take a break.
14      Q.   Did you understand the margin to be
15  included in the 47.4? Did Barclays understand
16  that?
17      MR. STERN: Objection to the form.
18      A.   I'm not -- I don't think that the
19  people who were present at the time were
20  considering specific assets, specific valuations
21  and whether they were at that point in time
22  included in the number.
23      And again, I think the reason for that
24  is that the margin and other specific assets
25  that were clearly purchased assets were already

Page 112

1  J. HUGHES
2  attended to. But I don't recall anybody at
3  Barclays break -- attempting to break down that
4  47.4 number at the time, because I don't think
5  anybody thought it was necessary or worthwhile
6  to do so.
7      Q.   Did Barclays understand that the
8  47.4 billion did not include a number of
9  additional assets that were part of the sale?
10      MR. STERN: Objection to the form.
11      A.   It --
12      MR. STERN: Let me hear the question
13  again.
14      MR. MAGUIRE: Well, let me put it
15  slightly differently.
16      Q.   I take it from your earlier testimony
17  that Barclays' view at the time of the sale
18  hearing was, when Ms. Fife said, mentioned the
19  .47.4 billion dollar number, Barclays understood
20  that did not -- that referred to some but by no
21  means all of the assets that Barclays was
22  acquiring?
23      MR. STERN: Objection to the form.
24      You can answer.
25      A.   I think it by definition did not

Page 113

1  J. HUGHES
2  include all of the assets, because all of the
3  assets had been described already in the APA.
4  So she didn't need to refer to that part of the
5  APA, because it was clear to all that that was
6  the better description of the transaction and
7  the better description of the assets.
8      Why she used that particular number, I
9  haven't been able to establish.
10      Q.   Did Barclays understand that the
11  additional assets that were not included,
12  whatever they were, that were not included in
13  the 47.4, that the court would want or need to
14  know what the value of those assets was in order
15  to understand the economics of the deal?
16      MR. STERN: Objection to the form.
17      A.   Well, first of all, as I said earlier,
18  I don't view any of the assets that you are
19  referring to as additional assets, first and
20  foremost.
21      And I'm not meaning to be pedantic.
22  It is just by definition impossible that if --
23  that an identified asset that is already part of
24  the business that we were acquiring would be an
25  additional asset.

Page 114

J. HUGHES

1  I think the court, as I have said
2  again earlier, heard descriptions of some of the
3  assets and heard sufficient descriptions of
4  assets and liabilities to enable it to take
5  those estimations, add that to the additional
6  factors that were important, to determine
7  whether to approve the transaction or not, and
8  it came to an appropriate conclusion.
9    Q.   Did the court know the total value of
10  the assets that Barclays was acquiring at the
11  time that it approved the deal?
12    MR. STERN: I think at this point this
13  question has now been asked three or four
14  times. I'm really -- I think at this point
15  we should take a break for lunch and maybe
16  you should review your outline.
17    MR. MAGUIRE: Why don't we get this
18  answer, and then maybe you are right.
19    MR. STERN: I am actually going to
20  instruct him not to answer, because I think
21  this is now getting past the point. So if
22  you have another question, you can ask that.
23    MR. MAGUIRE: All right. We will take
24  our break at this point and reserve our

Page 115

J. HUGHES

1  rights.
2    MR. STERN: Good.
3    (Luncheon recess)
4  BY MR. MAGUIRE:
5    Q.   When did margin become part of the
6  sale transaction?
7    A.   When did margin become part of the
8  sale transaction? At the beginning.
9    Q.   In the original APA?
10    A.   It was agreed orally before it ever
11  got reduced to writing in the APA, but it was
12  subsequently included in the APA.
13    Q.   When you say it was agreed orally, who
14  from Barclays agreed to that?
15    A.   I haven't asked that specific question
16  of anybody, so I can't tell you a specific
17  answer. The people negotiating on behalf of
18  Barclays at that time, and indeed throughout,
19  included the names we mentioned before, Michael
20  Klein, Archie Cox.
21    There were also a number of people in
22  the early part of the week of the 15th
23  discussing certain types of assets, and it is
24  probable, though I haven't yet checked, that

Page 116

J. HUGHES

1  there was a discussion among some of those
2  people with respect to the exchange-traded
3  derivatives.
4    Q.   Let me be clear, because you referred
5  in your answer to exchange-traded derivatives.
6  I'm going to address my questions specifically
7  to margin as opposed to exchange-traded
8  derivatives.
9    Do you know whether there was a
10  discussion between Barclays and anyone at Lehman
11  concerning margin, specifically using that word
12  "margin" as opposed to some general reference to
13  exchange-traded derivatives?
14    MR. STERN: I am going to object to
15  the form.
16    You can answer if you understand the
17  term.
18    A.   I was going to ask you, what do you
19  mean by "margin"?
20    Q.   You have referred to, earlier, to
21  collateral that was at exchanges where Lehman
22  was a member.
23    A.   Yeah.
24    Q.   I take that as meaning margin.

Page 117

J. HUGHES

1    Are you aware of any discussions
2  between Barclays and Lehman concerning the
3  collateral that Lehman had deposited with the
4  exchanges where it traded derivatives?
5    A.   I believe there were discussions
6  between representatives of Barclays and
7  representatives of Lehman and indeed involving
8  representatives of the trustee, possibly also
9  the creditors committee, between Friday, the
10  19th, and the 22nd, which related to margin as
11  you have just described it.
12    I'm not aware that there was any
13  specific reference to margin prior to the 19th.
14  Nor does that surprise me.
15    Q.   And it doesn't surprise you because
16  you understand margin to be included in the
17  transfer of exchange-traded derivatives?
18    A.   It would be shocking to me if anybody
19  thought it was otherwise.
20    Q.   Are you aware of any decision on the
21  part of Barclays to acquire any part of Lehman's
22  futures business independently of whether this
23  sale transaction closed?
24    A.   I'm not sure I understand. I'm not

Page 118

J. HUGHES

1  sure I understand the question.
2  Q.   Are you aware -- did Barclays have any
3  discussions with anyone from Lehman or the
4  Chicago Mercantile Exchange concerning taking on
5  any part of Lehman's futures business?
6  MR. STERN: Objection, to the form.
7  A.   When?
8  Q.   In the week or so prior to the sale.
9  A.   When you say the week or so prior to
10  the sale, do you mean the week preceding the
11  19th or the week preceding the 15th?
12  Q.   Any of that two-week period up to the
13  19th.
14  A.   There were -- there was an agreement
15  reached during the week of the 15th, and indeed
16  an agreement -- that agreement was recorded in
17  the APA, certainly by the 17th, when it was
18  filed with the court, for Barclays to acquire,
19  among other things, the FCM business of Lehman
20  Brothers. In other words, the futures
21  commission merchant business of Lehman Brothers,
22  which included the exchange-traded derivatives
23  business.
24  And that being the agreement, it was

Page 119

J. HUGHES

1  clear to the parties that margin, as you
2  previously described it, among other things, was
3  included in that part of the agreement.
4  Q.   And you say it was clear because --
5  can you explain why it was clear?
6  A.   Because the -- because it was clear
7  that the agreement was to transfer the assets
8  and all the assets and liabilities of that
9  business. So that necessarily would include
10  collateral, margin held in connection with that
11  business.
12  Q.   Did Barclays provide any guarantee to
13  the Chicago Mercantile Exchange of any -- of
14  Lehman's settlement obligations at any time
15  prior to September 22?
16  A.   Any guarantee to the CME prior to the
17  September -- prior to September 22?
18  Q.   Yes.
19  A.   Not that I am aware of.
20  Q.   Did Barclays consider providing such a
21  guarantee to the CME at any time prior to
22  September 22?
23  A.   I'm not aware of any such
24  consideration. I think it unlikely that

Page 120

J. HUGHES

1  Barclays would have given a guarantee with
2  respect to aspects of the sale transaction
3  before closing. Or at least before it was clear
4  what the closing terms were going to be.
5  Q.   I am going to ask you about your
6  testimony concerning margin and the APA, so I
7  will show you a copy of the final APA. It is
8  without all the schedules, but it has all the
9  provisions.
10  Can you point me, sir, to where the
11  APA undertook to convey margin to Barclays.
12  A.   I think the first reference comes in
13  the definition of "business." And I should just
14  add that I have not reviewed the asset purchase
15  agreement with that specific question in mind.
16  So for me to be able to pick out quickly each
17  and every part of the APA which is relevant to
18  assessing whether the margin associated with the
19  futures commission merchant business, for
20  example, was included, would obviously take me a
21  while. There are several aspects of it.
22  But it certainly starts with an --
23  with the definition of business, which as you
24  will see on page 2 includes the words "business

Page 121

J. HUGHES

1  as a futures commission merchant." In my view,
2  that includes, particularly if one adds other --
3  I think there are additional facets of the
4  agreement that are relevant for this purpose,
5  but I would have to look through it to be
6  absolutely sure, but I think that the
7  acquisition of the futures commission merchant
8  business includes margin, collateral held in
9  connection with that business.
10  Q.   So is it Barclays' understanding that
11  this definition picks up any margin that Lehman
12  had at any exchanges?
13  MR. STERN: The only concern I have
14  about this is whether you're calling for
15  privileged information. If you are asking
16  Mr. Hughes to interpret the contract, my
17  concern is that is -- his interpretation of
18  the contract is privileged.
19  MR. MAGUIRE: If you want to direct
20  him not to answer, we can move along.
21  All I'm looking for is Barclays' --
22  Barclays has an understanding, it has a
23  claim. I'm simply asking where in the
24  contract is the source of that claim.

Page 122

J. HUGHES

1
2       MR. STERN: You are asking about a
3   contract interpretation. Let me just
4   confer.
5       Let's just step out for a second and
6   confer about that.
7       MR. MAGUIRE: The record will reflect
8   that the witness has stepped out of the room
9   with his counsel.
10      (Pause)
11      (Mr. Stern and the witness return to
12  the room)
13      MR. STERN: I have just conferred with
14  the witness off the record, and I am going
15  to instruct the witness not to answer
16  questions that call for interpretation of
17  the contract, because that does invade the
18  privilege.
19      MR. MAGUIRE: Just so we are clear,
20  you are directing the witness not to answer
21  the last question?
22      MR. STERN: Correct.
23      MR. MAGUIRE: And any other questions
24  asking for Barclays' understanding of
25  provisions of the contract?

Page 123

J. HUGHES

1
2       MR. STERN: Correct. Anything calling
3   for interpretation, correct.
4       Q. Did you understand that Barclays
5   undertook any additional liabilities or assumed
6   any additional liabilities over the weekend of
7   the clarification letter? By additional, I mean
8   any liabilities that it had not already agreed
9   to under the APA.
10      A. I don't think so. no. That I can now
11  recall.
12      Q. You're familiar with the transfer and
13  assumption agreement?
14      A. I think so, yes.
15      Q. Did that in any way change the
16  economics or the fundamentals of the APA?
17      A. Again, I have been instructed by my
18  counsel not to interpret contracts. My answer
19  is not an interpretation of the contract.
20      My -- Barclays' understanding of the
21  transfer and assumption agreement in essence is
22  that it was a document designed to achieve a
23  couple of things. One, to assure the OCC that
24  certain liabilities at Lehman Brothers and
25  certain assets of Lehman Brothers were to be

Page 124

J. HUGHES

1
2   transferred in a particular way.
3       And secondly, it was a more detailed
4   description of what would happen to certain
5   portions of the exchange-traded derivatives
6   business as a result of the sale.
7       My understanding further is that the
8   TAA was the subject of discussions among the
9   OCC, the trustee, Barclays, possibly also
10  including the estate and ultimately the LBHI
11  estate and the creditors committee. But most
12  notably among -- an understanding among the OCC,
13  the trustee and Barclays with respect to the
14  transfer of OCC margin.
15      And I believe that the agreement, when
16  ultimately signed, was the culmination of quite
17  a lot of communications among those parties.
18  Again, designed primarily to assure the OCC what
19  would happen to margin. And included in those
20  communications, as I understood them, was some
21  urgency on the part of OCC to have the trustee
22  agree that all forms of margin, whatever their
23  description, should -- needed to be agreed to be
24  delivered -- needed to be delivered to Barclays
25  in order to assure the proper transfer of all of

Page 125

J. HUGHES

1
2   that collateral.
3       I believe there were many, many
4   communications from the OCC and indeed back from
5   the trustee that record that understanding among
6   those parties, that all of that collateral, in
7   whatever form, was to go to Barclays. I believe
8   that what was ultimately signed -- sorry, the
9   terms ultimately signed and encapsulated in the
10  transfer and assumption agreement not only did
11  establish the agreement for the transfer of all
12  of that margin, but was consistent with the
13  broader agreement that had already been reached
14  among the parties and which everybody at that
15  point plainly was aware of.
16      So the TAA, as you described it, was
17  at a slightly greater level of detail than had
18  been mentioned in the APA, but was entirely
19  consistent with it, and I think was, as it
20  related to the OCC, the effective document that
21  it needed to properly transfer collateral that
22  was previously with LBI in connection with
23  its -- held by LBI in connection with its
24  business as an FCM to Barclays.
25      Q. Did the TAA add any assets that

Page 126

1           J. HUGHES
2    were -- to the sale that Barclays was taking?
3         MR. STERN: I am going to instruct the
4    witness not to answer this, because again,
5    you're calling for an interpretation of the
6    TAA. Your 30(b)(6) topic calls for
7    information concerning the negotiation and
8    drafting of the TAA. I don't believe it
9    calls for interpretation of the TAA.
10        So I'll instruct you not to answer.
11        If you want to ask him questions about
12   the course of the negotiation and drafting
13   of that document, that's fine.
14        Q.   In entering into the TAA, did Barclays
15   intend to obtain any assets that it was not
16   already obtaining under the APA?
17        A.   I think in discussing through its
18   representatives the terms of the APA, Barclays'
19   intention was to insure that there was nothing
20   in that agreement inconsistent with the
21   acquisition of the business that it had already
22   agreed to acquire. And I think that best
23   describes Barclays' intention at the time.
24        Q.   So I guess I'm still trying to
25   understand, when entering into it, did Barclays

Page 127

1           J. HUGHES
2    intend that there were any assets that it would
3    get at the OCC that Lehman had at the OCC that
4    Barclays was not already acquiring under the
5    APA?
6         MR. STERN: I think again this calls
7    for an interpretation of both the APA and
8    the TAA. So I am going instruct the witness
9    not to answer.
10        If you ask him questions about
11   communications and negotiations concerning
12   the TAA, that I think is consistent with
13   your 30(b)(6) topic number 20.
14        Q.   And I take it you're following your
15   counsel's advice?
16        A.   Yes.
17        Q.   Is Barclays aware of any disclosure
18   that Barclays made to the creditors committee
19   concerning the amount of margin that was being
20   transferred to Barclays as a result of the sale?
21        A.   I'm not aware of actual disclosures by
22   Barclays to the creditors committee to that
23   effect. It is possible, though I don't know
24   with any certainty, that representatives of the
25   creditors committee were involved in or part of,

Page 128

1           J. HUGHES
2    participated in or were present at discussions
3    during the closing weekend relating to margin or
4    collateral held in connection with the
5    derivatives business.
6         But I am not aware of any specific
7    communication, as I said, of the type you
8    described. Nor indeed have I asked that
9    question in preparing for today.
10        Q.   Are you aware of any such disclosure
11   to the trustee?
12        A.   When you say such disclosure, will you
13   do me the favor of repeating how you define
14   disclosure?
15        Q.   Any disclosure by Barclays of the
16   amount of margin that was being conveyed to
17   Barclays under the sale?
18        A.   And to what time period are you
19   referring?
20        Q.   This is anytime prior to the closing.
21        A.   It's possible that there were
22   communications referring to valuations, but I'm
23   not aware that Barclays made any representation
24   to anybody about how much margin there may have
25   been or in what form it may have -- or what form

Page 129

1           J. HUGHES
2    it may have taken, because I don't think at that
3    point Barclays was able to establish precisely
4    either the total or the form.
5         I should also say, that given what I
6    have already said about what would be
7    surprising, indeed shocking, about the transfer
8    of the business that did not include all of the
9    margin in whatever form, that it wouldn't then I
10   think have appeared as a likely important part
11   of the discussion.
12        But it is possible that there were
13   estimations of related values that had been
14   provided by Lehman during the course of the
15   week. It's possible that there had been, you
16   know, discussion with respect to those values,
17   possible that the trustee was involved in or
18   had -- had sight of some of those estimations of
19   value.
20        But again, I think in common with all
21   other valuations, not only were they, as I have
22   said I think a number of times, extremely
23   uncertain, they were also, again as I have said
24   many times, provided by Lehman, and they weren't
25   Barclays' numbers and Barclays' estimations.

**Page 130**

J. HUGHES

1
2    Q.    I'll show you a document previously
3  marked as Exhibit 19.  So you will see on both
4  the assets and the liability side the term
5  "derivatives" appears.
6    A.    Yes.
7    Q.    In each case, the same number applies,
8  which is 4 and a half billion dollars.
9    A.    Yes.
10    Q.    Did that number include, either
11  column, any margin?
12    A.    I don't know.
13    Q.    Have you done anything to check
14  whether that was the case?
15    A.    No.
16    Q.    If you wanted to determine whether
17  this 4 and a half billion dollar number includes
18  margin, who would you turn to?
19    A.    I'm tempted to make a joke, but I
20  won't.
21          I really don't know, because I don't
22  know who -- I don't know who composed this
23  document.  I believe it is a document that was
24  produced, put together and produced at some
25  point by somebody at Lehman Brothers, but I

**Page 131**

J. HUGHES

1
2  don't know who in fact entered the -- either the
3  words "derivatives" or the numbers 4.5.
4    Q.    And you don't know whether anyone at
5  Barclays has any such information?
6    A.    I think there are people at Barclays
7  who are familiar with this document and -- but I
8  don't know, nor have I asked if we know -- if
9  anybody at Barclays specifically knows its
10  actual -- who the scrivener was of this
11  document.  It may be that it has been asked in
12  the past, but I certainly don't recall it now.
13    Q.    I'm not so much interested in the
14  scrivener as much as the person who can tell us
15  whether the 4 and a half billion dollar number
16  includes margin.
17    A.    It would have to be somebody at Lehman
18  Brothers, I would think, to be sure.  Because as
19  I say, I believe it to be produced by somebody
20  at Lehman Brothers.  So I would have thought
21  that would be the best place to ask.
22    Q.    And you haven't checked with anybody
23  at Barclays today who participated in the
24  transaction either on the Barclays side or then
25  as a legacy Lehman person, with respect to the

**Page 132**

J. HUGHES

1
2  specific question whether the 4 and a half
3  billion dollars includes margin?
4    A.    I have not asked that specific
5  question.
6          I should perhaps add that the -- my
7  belief is that this document refers to a stage
8  in the transaction negotiation which became a
9  stage in the transaction, and to a form of part
10  of the transaction, which soon, soon hereafter
11  changed.
12    Q.    I'm going to ask you -- maybe it will
13  be easier if I showed you.
14          MR. MAGUIRE:  We will mark as
15  Exhibit 561C document Bates stamped WGM
16  Lehman E00013236 through 46.
17          (Exhibit 561C, document Bates stamped
18  WGM Lehman E00013236 through 46 marked for
19  identification, as of this date.)
20    Q.    Are you familiar with this document,
21  sir?
22          MR. STERN:  I guess the first question
23  is whether he has ever seen it before.
24    A.    I'm not sure that I have seen this
25  document before.

**Page 133**

J. HUGHES

1
2    Q.    You see that it bears September 20,
3  the Saturday date at the top.  Do you see that,
4  sir?
5    A.    I see where it says "WGM final,
6  September 20, 2008 a.m."
7    Q.    And do you see that there is
8  highlighted text in the middle of "Purchased
9  Assets" on the first page which refers to
10  purchased assets that have a book value of
11  approximately 45.5 billion dollars?  Do you see
12  that?
13    A.    I do see that language there, yes.
14    Q.    And this refers to what had previously
15  in the APA had a book value of approximately
16  70 billion dollars.  Do you see that?
17          MR. STERN:  Objection to the form.
18    A.    The language says, "It being
19  understood that the long positions referred to
20  in Clause D of purchased assets do not have a
21  book value of approximately 70 billion, but
22  rather have a book value of approximately
23  45.5 billion."
24          Am I referring to the right piece?
25    Q.    Yes, we are together, looking at the

Page 134

J. HUGHES

1  same thing.
2
3         MR. STERN: I think if you are going
4  to ask Mr. Hughes about this paragraph, I
5  think you should have a chance to read the
6  entire paragraph. I don't know if you have
7  done that yet.
8     A.  I haven't yet because I don't know if
9  I need to.
10    Q.  I don't think you need to. Do
11  whatever you want to do. Let me give you the
12  question, and you can decide whether you --
13    -   MR. STERN: Fair enough.
14    Q.  Did Barclays understand by Saturday,
15  September 20, that the Lehman book value of the
16  repo assets was approximately 45.5 billion
17  dollars?
18        MR. STERN: If you know that fact, you
19  can answer.
20        I will object to the form because I
21  think the question is a little bit
22  confusing.
23    A.  Could you repeat the question.
24    Q.  -Sure.
25        Did Barclays understand by Saturday,

Page 135

J. HUGHES

1
2  September 20, that the Lehman book value of the
3  repo assets was approximately 45.5 billion
4  dollars?
5         MR. STERN: Objection to the form.
6     A.  Can I just be clear about which assets
7  you are referring to.
8     Q.  Let me try it differently then. You
9  understood that under the APA there was
10  70 billion dollars of assets that it was agreed
11  would be transferred to Barclays?
12        MR. STERN: Objection to the form.
13    A.  I -- that's incorrect. By --
14  certainly by September, the 20th --
15    Q.  No, no. I'm just talking --
16    A.  -- that was not part of -- that was
17  not the understanding.
18    Q.  Right, right. I am simply talking
19  about the original terms of the APA as it was
20  originally executed, it called for the transfer
21  of assets that had -- this is the long
22  positions -- that had a value of approximately
23  70 billion dollars?
24        MR. STERN: Objection to the form.
25    A.  I think I've answered that question

Page 136

J. HUGHES

1
2  earlier by saying that there was an estimation
3  earlier in the week that the long positions as
4  you have described them were valued at
5  approximately 70 billion dollars.
6     Q.  Right, right. And did Barclays
7  understand that as events that transpired and the
8  deal had changed, by Saturday, the book value of
9  the long positions that were being transferred
10  on Lehman's books was not 70 billion but in fact
11  was going to be approximately 45.5 billion?
12        MR. STERN: Objection to the form.
13    A.  No, Barclays did not understand that.
14    Q.  What did Barclays understand the book
15  value, Lehman book value was of the assets that
16  were being transferred that had previously been
17  described as long positions?
18    A.  I don't think Barclays had an
19  understanding at the time you mention of what
20  Lehman's book values were. I don't think we had
21  knowledge of what Lehman's book values were
22  attributed to those same assets.
23    Q.  Did Barclays have an understanding --
24    A.  Can I just be clear. You're referring
25  to a particular categorized 70 billion dollars

Page 137

J. HUGHES

1
2  of assets which had previously been described as
3  long positions. My answer is that on -- at the
4  time you're asking the question, that at that
5  time, Barclays, as far as I'm aware, had no
6  knowledge of the book values that Lehman
7  Brothers associated with that categorized set of
8  assets.
9         MR. STERN: In other words, as of
10  September 20.
11    A.  As of September 20.
12    Q.  And what about with respect to the
13  clearance box assets? Did Barclays have an
14  understanding as to what the Lehman book value
15  was of the clearance box assets?
16        MR. STERN: Objection. I think, you
17  know, the use of the phrase "book value"
18  here is ambiguous.
19        But if you can answer, go ahead.
20    A.  I'm not aware that Lehman Brothers
21  ever referred to values of clearance box
22  securities in terms of book value. I believe
23  that that category of assets which became known
24  as the clearance box assets was first
25  identified -- it was identified by Lehman

Page 138

J. HUGHES
1 Brothers as being worth in their view
2 approximately, I think 1.9 billion dollars. I
3 think that was the first -- roughly that number
4 was the first estimation.
5
6     But there was no use of the term "book
7 value" at that point in time. Nor am I actually
8 aware of any reference to clearance box assets
9 by the use of the term "book value."
10     Q.   Have you asked, in preparation for
11 this or otherwise, any of the Barclays
12 representatives who were at the sale hearing
13 whether they understood the 47.4 billion dollar
14 number that Ms. Fife represented to the court to
15 include 1.9 billion dollars in book assets -- I
16 am sorry -- in clearance box assets, in the 45
17 and a half billion dollars of other assets?
18     MR. STERN:  Objection, this has been
19 asked and answered multiple times.
20     You can answer again.
21     A.   Without repeating our prior relevant
22 answers to your questions, but if I may be
23 lawyerly for a second, incorporating them into
24 this answer, I don't know how Lori Fife came to
25 that number.  I don't know whether it did or did

Page 139

J. HUGHES
1
2 not include, nor does anybody who was present
3 for Barclays at the time, in my belief, know
4 whether or not the clearance box assets were
5 included in that number.
6     Q.   Did you ask the people who attended
7 specifically whether they considered the 47.4 to
8 have been made up of the clearance box assets,
9 plus an additional 45 and a billion dollars of
10 assets?
11     MR. STERN:  I am going to instruct you
12 not to answer to your conversations with
13 people, but you can testify to the facts
14 that you learned.  But I think you have
15 already answered that, so I am just going to
16 instruct you not to answer.
17     Q.   Sir, I am going to show you a document
18 we have previously marked as Exhibit 49.  Have
19 you reviewed this in preparation?
20     A.   I don't know whether I have seen this
21 document before or not, either in preparation
22 for this deposition or otherwise.  On the face
23 of the cover, it is described as a revised
24 clarification letter.  I have discussed the
25 topic of revised -- of revisions to and the

Page 140

J. HUGHES
1
2 negotiations surrounding the clarification
3 letter, and I am aware that there were several
4 drafts of what ultimately was agreed to as the
5 final clarification letter.
6     I'm also aware that, from my
7 participation in the transaction and the events
8 in question, that there was, at the time these
9 revisions were being made and the negotiations
10 were ongoing, a number of efforts by or -- yes,
11 by the lawyers representing Barclays and the
12 lawyers representing Lehman to, unsurprisingly I
13 guess, put on paper what the negotiations
14 delivered in terms of an agreement at any point
15 in time.
16     I think it is worth just noting that,
17 as you may have heard from others, this was a
18 particularly frantic period. There were
19 enormous numbers of lawyers present, trying very
20 hard to keep up with the flow of negotiation and
21 the progression of negotiation, and it's clear
22 to me from discussions I have had about the
23 facts and circumstances associated with this
24 effort to conclude the clarification letter.
25 But there were many points in time at which,

Page 141

J. HUGHES
1
2 unfortunately, lawyers for Lehman, lawyers for
3 Barclays, and others in attendance may or may
4 not have been fully knowledgeable about where
5 the discussions had actually got to.
6     So I have gone through the topic as I
7 mentioned of drafts of clarification letters,
8 revisions to clarification letters, and I think
9 it is important to recognize the conditions in
10 which those revisions and negotiations took
11 place.
12     Q.   If you turn to page 2 of the document,
13 you will see at the bottom of the page, there is
14 a term D that talks about excluded assets, and
15 that excludes cash. Do you see that?
16     A.   I don't. I see paragraph D. Can I
17 read it?
18     MR. STERN:  What page are we on in
19 terms of Bates numbers?
20     MR. MAGUIRE:  The one ending in 65.
21     MR. STERN:  I think we are on a
22 different page than you are. You are
23 looking at the redline?
24     A.   Mine, page 2 of mine finishes at --
25     MR. STERN:  I think it is easier if we

36

Page 142

J. HUGHES

1
2 refer to Bates numbers, and you should read
3 as much of this as you need to answer the
4 question.
5    Q.   It is page BCI-CG 00024965.
6    A.   OK, I have that page. Is this the
7 same document as the one you -- that precedes it
8 in the exhibit? Or is it not?
9    Q.   I think the document that precedes it
10 looks like the cover e-mail.
11       MR. STERN: Well, we have a clean
12 version and we have a redline version. And
13 I think what Mr. Hughes is asking is whether
14 the clean corresponds to the redline. But
15 you're not testifying. So I --
16       MR. MAGUIRE: I'm not the witness.
17       MR. STERN: Just so you know, Bill, we
18 have a document here that has clean and then
19 it has a redline. But you're pointing us to
20 the redline.
21       MR. MAGUIRE: Exactly, yeah.
22    A.   Can I read the paragraph?
23    Q.   Sure.
24    A.   OK, I've read it.
25    Q.   I would like you to focus right after

Page 143

J. HUGHES

1
2 the quote, "Excluded Assets." You'll see where
3 the excluded assets includes cash, and then
4 there is a carve-out that excluded assets shall
5 not include. Do you see that?
6    A.   Yes.
7    Q.   One of the things in the carve-out is
8 margin guarantee fund deposit. Do you see that
9 language?
10    A.   Do you mean in the subclause which has
11 a capital A?
12    Q.   Yes.
13    A.   So you mean, you are referring to the
14 words "whether as margin, guarantee fund deposit
15 or in any other form." Is that what you are
16 referring to?
17    Q.   Exactly.
18    A.   I see the language there, yeah.
19    Q.   Now, was it Barclays' intentions in
20 inserting this language to add anything to the
21 transaction, or was it Barclays' understanding
22 that the margin and guarantee fund was already
23 part of the transaction?
24       MR. STERN: I believe that calls for
25 privileged information, and I'll instruct

Page 144

J. HUGHES

1
2 you not to answer.
3       You can ask about communications
4 concerning this clause and if the witness is
5 familiar with them.
6    Q.   Who proposed this addition?
7    A.   I have no idea.
8    Q.   Have you done anything in preparation
9 to determine who proposed this insertion?
10    A.   As I said, I have spoken with
11 representatives of Barclays, and both internal
12 and external, to review the topic of drafts and
13 revisions to the clarification letter. I have
14 not asked the specific question that you just
15 posed to me.
16    Q.   If you'll turn to the previous page.
17    A.   Can I just add that part of the reason
18 for that is that I didn't think it -- I didn't
19 think it was important.
20    Q.   OK. Do you understand that the
21 references to margin and guarantee fund deposit
22 were deleted from the clarification letter?
23       MR. STERN: Objection to the form.
24 Actually I'm going to instruct you not to
25 answer, because again here, we are getting

Page 145

J. HUGHES

1
2 into the area of contract interpretation.
3       If you want to show him a subsequent
4 draft and how the subsequent draft changed
5 and get his testimony on what he knows
6 concerning how that occurred, that's fine.
7    Q.   I take it if you are going to follow your
8 counsel's instruction?
9    A.   I will.
10    Q.   Sir, I'll --
11    A.   But let me add the following. I'm not
12 aware of any point during the negotiation of the
13 clarification letter at which Barclays changed
14 its views about -- or that it heard anything
15 different from Lehman Brothers with respect to
16 margin, guarantee funds or anything that one
17 might describe as collateral or margin relating
18 to the exchange-traded derivatives businesses.
19       So it is possible that there were
20 drafts that referred to some of those issues,
21 and you pointed at least to what appears to be
22 one draft which does. Why it is there, I can't
23 tell you.
24    Q.   And in preparation I take it you have
25 not gone through the specific drafts to see what

Page 146

J. HUGHES

1 happened and see how the clarification letter
2 evolved?
3     A.    I have been shown different drafts and
4 I have had highlighted to me different language
5 used in different drafts. I think that's --
6 that's about as much as I can say about what I
7 have done with respect to the language in the
8 drafts.
9     Q.    And you also mentioned that you had
10 discussions with people about the drafting
11 process?
12     A.    Yeah, that's with my external lawyers.
13     Q.    And who were those?
14     A.    Representatives of Boies Schiller,
15 Cleary Gottlieb and Sullivan & Cromwell.
16     Q.    What was the purpose of your
17 discussions with those counsel?
18     MR. STERN: Well, part of the
19 discussions were preparation for deposition,
20 and other parts of the discussion were
21 privileged communications. Well, they are
22 all privileged, but part of the discussions
23 related to getting information so that
24 Mr. Hughes could testify.

Page 147

J. HUGHES

1     So if you want to ask him the facts
2 that he learned concerning the chronology of
3 the drafting process and if he remembers, or
4 the people he spoke to remember, you can
5 cover that.
6     Q.    Who did you talk to about the drafting
7 history?
8     A.    Again, representatives of Boies
9 Schiller, Cleary, and Sullivan & Cromwell.
10     Q.    And whom from Cleary?
11     A.    People involved in that discussion
12 included Vic Lewkow, Bob Davis, Lindsee
13 Granfield, Ed Rosen. There is more. Boaz
14 Morag, B-O-A-Z, M-O-R-A-G. I think. Mike
15 Mazzuchi, and I can't spell Mazzuchi. Did I say
16 Duane McLaughiln? Duane McLaughiln.
17     I think there may have been more, but
18 I think that should cover it.
19     Q.    It sounds pretty comprehensive.
20     Was the purpose of your discussing --
21 your discussions with them to at least in part
22 determine what discussions they had had in the
23 course of negotiating the clarification letter?
24     MR. STERN: I guess I am going to

Page 148

J. HUGHES

1 instruct you not to answer. I don't want to
2 intrude on what was discussed between you
3 and Cleary and Boies Schiller and Sullivan &
4 Cromwell.
5     But if you want to ask what facts he
6 knows concerning the course of those
7 negotiations, that's fine.
8     Q.    Sir, what communications occurred
9 between -- what discussions occurred between
10 Cleary and their counterparts after the
11 reference to margin and guarantee funds deposit
12 was deleted from the draft clarification letter?
13     MR. STERN: Objection to the form.
14     You can answer if you know.
15     A.    I don't know the answer to the
16 question. Nor do I actually fully understand
17 the question, given that -- I don't know who
18 specifically conducted negotiations of the type
19 we are referring to or if indeed they actually
20 occurred. So I can't help you with that.
21     Q.    Can you tell us about any discussions
22 that anyone at Cleary had with any of their
23 opposite numbers concerning margin?
24     A.    I do believe there were discussions,

Page 149

J. HUGHES

1 as I mentioned earlier, during the period 19th
2 to 22nd involving representatives of Cleary, the
3 trustee, the OCC, I believe representatives of
4 Lehman and LBHI -- sorry, Lehman, and possibly
5 the creditors committee were party to some of
6 those discussions.
7     And if I may, I would refer you back
8 to the earlier comments I made about the
9 transfer and assumption agreement and the many
10 communications among those people that I just
11 identified relating to margin and associated
12 issues.
13     MR. STERN: Bill, just so your Cleary
14 list is complete, I may not have heard this,
15 but I don't believe you listed Ed Rosen.
16     MR. MAGUIRE: I believe he did. But
17 we have certainly got him now.
18     MR. STERN: So it's complete.
19     Q.    You referred to discussions concerning
20 the transfer and assumption agreement. Leaving
21 aside any discussions about the transfer and
22 assumption agreement, are you aware of any
23 discussions that Cleary had concerning the
24 subject of margin?

Page 150

J. HUGHES

1    · J. HUGHES
2    MR. STERN: Objection.
3    A.   I'm hesitating because I'm not sure it
4    is a good representation of the discussions that
5    I have learned about, that if one leaves aside,
6    like you just said, discussions about the
7    transfer and assumption agreement, my belief is
8    that representatives of Barclays and their
9    opposite numbers, as you mentioned or described
10   them, had discussions about collateral related
11   to the exchange-traded derivatives business.
12   Those discussions were relevant to the transfer
13   and assumption agreement, but they were also
14   relevant necessarily to the actual sale of the
15   business of Lehman Brothers. So it is hard to
16   divorce the two.
17       On the one hand, I think the
18   discussions are primarily about margin and
19   establishing, again as I mentioned earlier, that
20   all of the margin in whatever form had to be
21   transferred to Barclays and had to be done
22   quickly, and the OCC urgently wanted an
23   agreement, wanted to conclude the agreement to
24   that effect.
25       And I think it is just somewhat

Page 151

J. HUGHES

1    J. HUGHES
2    unrealistic to break up the discussion and then
3    apply it to a particular agreement at any
4    particular point in time, other than of course
5    to the actual final documentation of the terms.
6        Q.   And what are the discussions that
7    Cleary had concerning margin, whether it was
8    with respect to the transfer and assumption
9    agreement or otherwise?
10       A.   In effect, as I described earlier,
11   that the margin in whatever form, any property
12   that was held in connection with the
13   exchange-traded derivatives business, including
14   the OCC margin, however described, was
15   understood to be and should be transferred to
16   Barclays in the sale in accordance with what
17   was, I believe, not only the agreement of the
18   parties but the expectation of all of the
19   participants in the discussion that I had
20   earlier identified.
21       Q.   And who at Cleary said that?
22       A.   I don't know whether there is one
23   person. The principal negotiator of -- or the
24   principal participant in those discussions from
25   Barclays' perspective was Ed Rosen at Cleary

Page 152

J. HUGHES

1    · J. HUGHES
2    Gottlieb.
3        Q.   And with whom did Ed Rosen have those
4    discussions?
5        A.   Representatives of the OCC, the
6    trustee, representatives of Weil Gotshal, I
7    believe. I'm less certain about the
8    participation, though I believe they
9    participated. Representatives of the estate,
10   LBHI estate, and the creditors committee. I
11   believe that they participated in, or if not
12   participated, were made aware during the course
13   of that time, of the substance of the
14   discussions.
15       Precise names of people acting on
16   behalf of the trustee or the OCC, I couldn't now
17   recall.
18       Q.   And what's the basis for your belief
19   that Weil was party to those discussions with
20   Cleary?
21       A.   I'm not certain, but I believe that
22   those were the recollections of representatives
23   of Cleary who participated. I believe, though
24   again I wouldn't be certain, that the many
25   communications that I again referred to earlier,

Page 153

J. HUGHES

1    J. HUGHES
2    a good proportion of which were by e-mail, may
3    also have included representatives of Weil. I
4    could be wrong about that, but that's my
5    recollection.
6        Q.   When you say that's your recollection,
7    do you recall a specific e-mail that went to
8    Weil?
9        A.   I don't recall a specific one here and
10   now. I was shown some e-mails that relate to
11   these discussions that we are focusing on right
12   now, and I thought that they included some
13   e-mails which were sent to people at Weil, but
14   again, I could be wrong.
15       Q.   And leaving aside e-mails, do you know
16   one way or another whether Weil was party to the
17   conversations with Mr. Rosen concerning margin?
18       A.   I believe so. I also believe that
19   Harvey Miller and possibly other representatives
20   of Weil understood each and every meaningful
21   portion of the agreement. But also, understood
22   at the time that all of the margin was included
23   in the assets that had to be transferred to
24   Barclays pursuant to the agreement.
25       Q.   And what's the basis for that belief?

Page 154

J. HUGHES

A. The --

MR. STERN: Let me just -- wait a second. I'm not sure -- I'm not sure what belief you're referring to in your question, because the answer referred to two different beliefs.

Q. Well, we will take them one at a time.

MR. STERN: One is a belief that Harvey Miller, et cetera --

Q. Why don't we start with that one. With respect to Mr. Miller, what's the basis for your belief?

A. Can I ask one question of Mr. Stern before I answer that question?

Q. Go ahead.

MR. STERN: Let's step out.

MR. MAGUIRE: The witness is excused for a moment.

(Recess)

Q. Sir?

A. Thank you. The belief that you asked me about comes from discussions that I had in reports of -- by the people I had discussions with, mostly Cleary, relating to negotiations

Page 155

J. HUGHES

relating to margin during that week, closing weekend.

I have also, in preparation for today, reviewed some of the transcript of Harvey Miller's deposition from which I conclude that Mr. Miller was, among other things, knowledgeable about and fully understood all the meaningful terms of this transaction and I believe that he understood that the @@exchange-traded derivatives business and assets held in connection with it were transferred and should be transferred to Barclays.

Q. When you referred to the Cleary people, who were you referring to?

A. Certainly Ed Rosen, but also the recollections of the other Cleary individuals that I mentioned.

I hesitate around that only because it is hard for me to pinpoint exactly who may have said something specific at a particular point in time given that a lot of the discussions I have had recently with Cleary Gottlieb have included a variety of issues and, therefore, there has

Page 156

J. HUGHES

been present on a number of occasions many people from Cleary.

Q. What did the Cleary people tell you about their communications concerning margin with Harvey Miller?

WITNESS' ATTORNEY: @@Don't testify to what Cleary told you. You can testify what you learned, what facts you know concerning Cleary's communications with Harvey Miller on this subject.

Did I simplify it or complicate it?

THE WITNESS: You simplified it.

A. I don't know any facts that are borne of Ed Rosen telling me that he spoke to Harvey Miller specifically and spoke to Harvey Miller specifically about this topic. So I'm not seeking to attribute specific words from those discussions either to Harry Miller or Ed Rose.

Q. Let's leave those two individuals aside. What did Barclays -- what did Cleary communicate to Weil concerning margin?

A. I believe that included in the many communications that I have again referred to a few times were the expectation and belief and

Page 157

J. HUGHES

understanding that all of the collateral, any form of collateral held in connection with that exchange-traded derivatives business was to be acquired by Barclays.

It is hard in reviewing e-mails to recall exactly which was the first e-mail in a chain, but during the course of those communications and during the course of the discussions in the closing weekend, I believe it was clear, made clear by Cleary, among others, but certainly by Cleary to representatives of Weil that the collateral margin of whatever form was to be conveyed as I have described.

Q. I will leave aside e-mails now and just ask you about specific verbal conversation. Is that OK?

A. Sure.

Q. And can you point me to any specific conversations that occurred between Cleary and Weil concerning margin?

A. I think as I said before, there is clarity of recollection regarding the participation of the trustee or its -- or his representatives and the OCC.

Page 158

J. HUGHES

1    There is less clarity about the
2    actual participation of Weil in conversations
3    during that closing weekend. It is my belief
4    that they were party to such discussions, but as
5    I think I acknowledged earlier, I can't -- I
6    couldn't be certain about that. That being the
7    case, I don't think I can recall the
8    specific discussions between those parties that
9    definitively included Weil. I think they were,
10   as I said, again included in part or all of the
11   relevant e-mail chain of communications.
12        MR. MAGUIRE: We will mark as Exhibit
13   562C document Bates stamped WGM-Lehman-E
14   0006263 through 6270.
15        (Exhibit 562C, document Bates stamped
16   WGM-Lehman-E 0006263 through 6270 marked for
17   identification, as of this date.)
18        Q.   Sir, I'm going to invite you please to
19   turn to the page, three pages in, Bates stamped
20   WGM-Lehman-E 00006265.
21        A.   Yup.
22        Q.   Are you with me?
23        A.   Yup.
24        Q.   If you would look, sir, at the bottom

Page 159

J. HUGHES

1    of the page, few lines, starts with, "Maintained
2    by or on behalf of LBI," goes down to the
3    bottom, it is highlighted and deleted. Do you
4    see that?
5        WITNESS' ATTORNEY: This I have to say
6    is very hard to read.
7        A.   I was about to say. Your use of the
8    term "highlighted" is perhaps not the best, but
9    I see what you are referring to.
10       Q.   You can could read the text albeit
11   with a little struggle.
12       A.   I can with a struggle.
13       Q.   By all means take as much time as you
14   need to read it. My question is whether you can
15   point me to any discussions that Cleary had with
16   anyone concerning that deletion?
17       WITNESS' ATTORNEY: So the question is
18   whether Mr. Hughes recalls whether any of
19   the Cleary people recall a discussion about
20   that deletion?
21       Q.   No, the question is whether Barclays
22   can point me to any discussions that Cleary had
23   with anyone concerning that deletion.
24       WITNESS' ATTORNEY: I don't know how

Page 160

J. HUGHES

1    that's different from what I said, but if
2    you can recall.
3        A.   I don't recall any discussions of the
4    type you just described.
5        Q.   Sir, I will show you a document that
6    previously has been marked as Exhibit 50. While
7    we are getting that actually, let me just ask
8    you a couple more questions about Cleary
9    conversations.
10       Can you point me to any specific
11   discussions that anyone at Cleary had over the
12   weekend of the clarification letter with anyone
13   concerning guarantee fund?
14       A.   What do you mean by guarantee fund?
15       Q.   Using those words.
16       A.   I wouldn't know with that degree of
17   particularity whether the discussions during
18   that weekend included that phrase. I wouldn't
19   know.
20       Q.   Would you know whether there were any
21   discussions involving the term "clearing fund"?
22       A.   I wouldn't know whether there was a
23   specific discussion that included that phrase.
24   I -- yeah, I think I can limit it at that

Page 161

J. HUGHES

1    because I'm not sure of the specific term or
2    not.
3        WITNESS' ATTORNEY: Let me state for
4    the record while Mr. Hughes is here as a
5    30(b)(6) witness, there should be no
6    implication from his lack of recollection
7    that such conversations did not occur. The
8    fact that Mr. Hughes may not recall does not
9    mean necessarily that such conversations did
10   not occur.
11       MR. MAGUIRE: Well, Barclays can
12   certainly reserve its rights in that regard,
13   Jack.
14       WITNESS' ATTORNEY: That's what I am
15   doing, I am reserving my rights. I don't
16   want there to be any implication as we sit
17   here today and Mr. Hughes tries in good
18   faith to answer your questions, that if he
19   doesn't recall something, that that
20   necessarily implies that the conversation
21   didn't occur. So I am reserving my rights
22   to make it clear on the record.
23       MR. MAGUIRE: Well, reserving your
24   rights --

Page 162

J. HUGHES

1 J. HUGHES
2 WITNESS' ATTORNEY: I am more than
3 reserving my rights, I am making it clear on
4 the record.
5 MR. MAGUIRE: Well, you understand
6 that certainly there is no agreement to that
7 effect on our side of the table. Everybody
8 can reserve their rights, that's fine.
9 WITNESS' ATTORNEY: Well, I don't
10 think it is a matter of agreement. I think
11 it is just a matter of basic common sense
12 that if a witness is trying in good faith --
13 MR. MAGUIRE: Sir --
14 WITNESS' ATTORNEY: Let me finish my
15 statement.
16 If a witness is trying in good faith
17 to answer questions and cannot recall, even
18 if the witness is a 30(b)(6) witness, that
19 that does not imply the complete absence of
20 those events. And we have had 30(b)(6)
21 witnesses for the moving parties who had no
22 recollection of certain facts. So I just
23 want to make that clear on the record.
24 MR. MAGUIRE: That's fine, you can
25 make your statement. We are not going to

Page 163

J. HUGHES

1 J. HUGHES
2 argue and we will continue with the
3 deposition.
4 A. Can I make a comment?
5 Q. If you really want to.
6 A. I do. You asked me a question about
7 the use of specific terms is or specific
8 phrases, I should say, and I answered your
9 question literally in the sense that I have no
10 recollection of the use of those specific terms
11 or phrases.
12 But I offer that without the benefit
13 of what you mean by those terms.
14 Q. Sir, let me show you what we have
15 marked as Exhibit 25 which is the clarification
16 letter?
17 A. When you say the clarification letter,
18 do you mean the one that was ultimately agreed
19 between the parties and signed?
20 Q. I believe so, you're familiar with
21 that, right?
22 A. Yes.
23 Q. Sir, if you turn to the top of page 2,
24 you will see that four lines down from the top,
25 there is a parenthetical that says, "And any

Page 164

J. HUGHES

1 J. HUGHES
2 property that may be held to secure obligations
3 under such derivatives."
4 Do you see that?
5 A. I do.
6 Q. And who proposed that language?
7 A. I'm not sure I know who -- I don't
8 think I know who first proposed that language.
9 It's -- it could have come from a number of
10 sources.
11 Q. Do you know when that language was
12 proposed?
13 A. Apart from obviously at some point
14 during the course of that weekend, the closing,
15 I don't know exactly when it was first proposed
16 or by whom. It could have been proposed by the
17 OCC, could have been proposed by Weil. It could
18 have been proposed by a number of people.
19 Q. Can you tell me whether this was
20 originally featured in any red line draft or
21 markup of the clarification letter?
22 A. I don't know the answer to that
23 question.
24 Q. Can you point me to any discussions by
25 anyone representing Cleary concerning the

Page 165

J. HUGHES

1 J. HUGHES
2 addition of this parenthetical?
3 A. When you say point you to discussions,
4 I'm not sure I understand.
5 Q. Can you tell me what discussions
6 Barclays or any of its representatives had about
7 the addition of this parenthetical to the
8 clarification letter?
9 A. I believe that the best recollections
10 of people at Cleary that I have spoken to is
11 that the language was included in the final
12 clarification letter partly as a reflection of
13 the discussions that had happened during the
14 course of the weekend, again, which I referred
15 to on several occasions, relating to assets held
16 in connection with the exchange-traded
17 derivatives business and I believe that it
18 appears here in the final letter, agreed letter,
19 following those discussions.
20 Whether it appeared or was proposed
21 prior to that, whether the language had been
22 discussed prior to that or by whom it may have
23 been initially proposed and when, I can't tell
24 you.
25 Q. Do you know whether anyone at Cleary

Page 166

J. HUGHES

1  had any discussion with anyone about adding this
2  parenthetical to the clarification letter?
3      A.   I don't know specifically whether
4  there were discussions about adding the
5  parenthetical as as you describe.
6      I do know that it was Barclays'
7  understanding at the time that this document was
8  signed, was reviewed and signed, that there was
9  no part of what had been agreed in Barclays'
10 mind that was different from the APA or the
11 negotiated terms with Lehman Brothers regarding
12 exchange-traded derivatives.
13     I believe that Barclays intended for
14 this part of the agreement to accurately
15 describe the arrangements that had also been
16 discussed with the trustee and with the OCC.
17         WITNESS' ATTORNEY:  Shall we take a
18 short break?
19         MR. MAGUIRE:  Yes, that's fine.
20         (Recess)
21     Q.   Before the break, we were talking
22 about a parenthetical on page 2 of the
23 clarification agreement.  You are with me?
24     A.   Yes.

Page 167

J. HUGHES

1      Q.   What cash and securities has Barclays
2  received to date pursuant that parenthetical?
3      A.   I'm not sure of the actual numbers to
4  date.  I think there was -- I believe there is
5  an amount of slightly more than -- I think it is
6  a billion, but I'm not sure that it was cash or
7  Treasuries.  I think it may have been
8  Treasuries, and a smaller amount of securities,
9  I believe in the -- either in the range of
10 20-odd million or 40-odd million.  I can't
11 remember the precise number of securities other
12 than Treasuries.
13     Whether any specific cash in the form
14 of hard currencies had been received, I don't
15 know the answer to that.  I think not yet.  But
16 I'm not certain.
17     Q.   Do you know whether Barclays has
18 received 1.375 billion dollars in cash at the
19 OCC?
20     A.   I'm feeling like I should know the
21 answer to that question but I don't.
22     Q.   Let me ask you, would Mr. Romain be
23 maybe the better person to ask that question?
24     A.   Mr. Romain would know much better than

Page 168

J. HUGHES

1  I specifically the numbers and values to be
2  associated with particular assets, be they cash
3  or securities.  There may also be
4  representatives of Barclays in the operations
5  function that might know.
6      Q.   Can you tell me what cash and
7  securities Barclays believes it remains entitled
8  to receive pursuant to the parenthetical we have
9  been talking about?
10     A.   Again, the exact numbers, I can't give
11 you.  I think there is, however, with that
12 proviso, some north of 900 million.  I think it
13 is roughly 925 million, last time I saw, that's
14 due from I believe assets held at the OCC.  I
15 think strictly they are held by JP Morgan, but
16 they relate to the OCC.
17     Q.   Did -- sorry.
18     A.   There may be additional margin or
19 collateral held at other futures exchanges or
20 other clearing houses.  I don't think we have
21 been able to finally establish, despite many
22 attempts to do so with the trustee, what the
23 exact numbers are.  So -- but I do believe that
24 the single largest portion is that 920-odd

Page 169

J. HUGHES

1  million number that I just gave to you.
2      Q.   And when you say other exchanges, does
3  that include foreign exchanges?
4      A.   Absolutely.  It includes any exchange
5  and includes any transaction or any position or
6  any collateral or any property associated with
7  it that was part of the Lehman Brothers
8  exchange-traded derivatives business.
9      Q.   And does it also include the Chicago
10 Mercantile Exchange?
11         WITNESS' ATTORNEY:  Objection to the
12 form of the question.  "And does it also
13 include the Chicago Mercantile Exchange?"
14 All right, go ahead and answer if you can.
15     A.   By that did you mean does it include
16 assets which are held by the CME?
17     Q.   Yes.
18     A.   I'm not sure whether strictly -- well,
19 first of all, whether strictly that would be the
20 right way to refer to it.  I'm not sure whether
21 the relevant assets would be held by the CME as
22 the exchange or whether it would be the
23 clearing -- the relevant clearing corporation,
24 assuming you're not making any distinction

Page 170

J. HUGHES

1  between the two.
2
3      I don't -- I'm not aware of assets
4  that are still outstanding and held there. I am
5  aware that prior to the 19th, the CME did close
6  out a substantial amount of positions that were
7  then held by Lehman Brothers.
8      So to the extent any assets were held
9  with respect to those positions, I wouldn't
10  expect that we would be awaiting those. But I
11  couldn't tell you definitively whether either
12  the CME or another particular exchange is not
13  holding assets that may come within the assets
14  to be transferred under the sale agreement.
15      Q.   Did Barclays obtain any assets that
16  Lehman held at the CME?
17      WITNESS' ATTORNEY: Objection to the
18  form.
19      A.   Not that I am aware of.
20      Q.   Did Barclays undertake any credit
21  analysis prior to entering into the transfer and
22  assumption agreement?
23      A.   What do you mean by credit analysis?
24      Q.   The term is used in the transfer and
25  assumption agreement. We can show it to you if

Page 171

J. HUGHES

1  that helps.
2
3      A.   Yeah, please.
4      Q.   I show you what has previously been
5  marked as Exhibit 51. And if you turn, sir, to
6  page 2, if you look at 2C, section 2C, and
7  within that to (i), "Barclays represents and
8  warrants that it has received such documents and
9  other information as it has deemed appropriate
10  to make its own credit analysis."
11      Do you see that?
12      A.   Yup.
13      Q.   What credit analysis did Barclays
14  perform?
15      A.   I don't know, but I think the
16  representation or warranty is that not that --
17  well, I'm not going to -- I'm not aware of one
18  way or another whether any credit analysis was
19  conducted prior to the signature of this
20  agreement.
21      Q.   Can you tell me what documents and
22  other information --
23      A.   Could I interrupt you briefly.
24      Q.   Of course.
25      A.   I would like to ask one quick

Page 172

J. HUGHES

1  question. I don't need to go out.
2
3      MR. MAGUIRE: Fine.
4      (Discussion held off the record)
5      MR. MAGUIRE: The record will reflect
6  the witness is consulting with his counsel.
7      A.   Thanks.
8      Q.   Can you tell me, sir, first, do you
9  want to change any prior answer?
10      A.   No, thanks.
11      Q.   Can you tell me what documents and
12  information Barclays obtained prior to making
13  the decision to enter into the TAA?
14      A.   Do you mean what documents Barclays
15  received with respect to the TAA? Or do you
16  mean any type of document before entering into
17  the TAA?
18      Q.   I guess I'm looking for whatever
19  documents informed Barclays' decision to enter
20  into that agreement. Can you tell me what were
21  the universe of documents that Barclays
22  considered in making that decision?
23      A.   I'm not sure I could describe
24  necessarily every document that may have been
25  relevant, but I would say that they included the

Page 173

J. HUGHES

1  APA, they included all of the e-mail
2  communications relating to the TAA that I have
3  described.
4      It's possible that there was a prior
5  agreement or a draft of a prior agreement
6  between the OCC and the trustee and there may
7  have been -- and I believe there were additional
8  communications between the OCC and the trustee
9  that Barclays had sight of or was aware of that
10  also may have informed the decision.
11      That last category of additional
12  documents may not, in fact, have been
13  additional. It's possible they were included in
14  my early description of the e-mail chain among
15  Barclays, the OCC, the trustee, copy to Weil and
16  so forth. It's possible there were additional
17  ones. It's possible there were additional
18  discussions between Ed Rosen with respect to
19  this particular document, between Ed Rosen and
20  the OCC and the trustee. They may also have
21  been part of what I earlier described as the
22  communications during the course of a weekend.
23  So that if they weren't included in the earlier
24  description of the communication flow during the

Page 174

J. HUGHES

1  course of that weekend, then I would include
2  them here.
3      Whether that's the entirety of the
4  documentation flow, I couldn't be certain. But
5  I would have thought it includes at least those
6  items that I referred to.
7      Q.  Did Barclays, over the weekend with
8  the clarification letter, understand or have
9  information concerning the amount of collateral
10  that Lehman's customers had posted with Lehman
11  to secure their derivatives positions?
12      A.  I've -- I don't think Barclays had any
13  information as to the specifics of customer
14  positions of the type you described. It's
15  possible that there had been some information
16  passed between respective representatives of
17  Lehman and Barclays who were connected with the
18  futures and options businesses. But I don't
19  think that they were a portion of the
20  negotiations that I referred to and I'm not
21  aware that there was ever any information
22  available regarding the customer positions and I
23  think probably there was not, but I could be
24  wrong about it.
25

Page 175

J. HUGHES

1      Q.  I'm not going to ask you any questions
2  about customer positions. I'm going to ask you
3  about the collateral that Lehman held for
4  customers to secure their positions. So
5  specifically I'm asking you about the money
6  market funds and the other collateral that
7  customers had posted with Lehman. Do you
8  understand what I am talking about?
9      A.  Well -- no, I'm not sure I do
10  understand what you are talking about actually.
11      Q.  Let me show you a document that has
12  previously been marked as Exhibit 404A. You
13  will see that this -- this contains some
14  handwriting from your colleague and Mr. Romain.
15  Basically, this says, lists the money market
16  funds and other assets and you will see there is
17  a little addition, Mr. Romain, on the left-hand
18  side, where he calculates the collateral and the
19  number he has here is 2.192 billion dollars.
20      A.  It actually says 2,192 dollars.
21      Q.  I'll represent to you that he has
22  testified that's thousands of millions, whatever
23  it is to get it to 2.192 billion.
24      A.  OK.
25

Page 176

J. HUGHES

1      Q.  Did Barclays have this information
2  prior to closing?
3      A.  I have no idea. I have never seen the
4  document before and I haven't spoken to Gary
5  Romain about it either.
6      Q.  Did Barclays know the total amount of
7  collateral that Lehman's customers had posted in
8  respect of their derivatives positions?
9      WITNESS' ATTORNEY: Where are we in
10  the 30(b)(6) topics here?
11      MR. MAGUIRE: I think we are still on
12  20.
13      WITNESS' ATTORNEY: We are on 20.
14      Q.  Do you know, sir?
15      WITNESS' ATTORNEY: I don't think that
16  really is covered by 20, but I'll let you
17  answer it to the best of your ability.
18      A.  I couldn't be certain, but I don't
19  think, I don't think so. But I couldn't be
20  certain.
21      Q.  Have you done any investigation prior
22  to this deposition to determine whether or not
23  Barclays knew the amount of collateral that
24  Lehman held for customers of the derivatives

Page 177

J. HUGHES

1  business?
2      WITNESS' ATTORNEY: I am going to
3  object. I don't think that's within the
4  scope of this deposition.
5      You can answer.
6      A.  I have not spoken to anybody at
7  Barclays about customer collateral held by
8  Lehman Brothers in order to answer questions at
9  this deposition.
10      Q.  Are you aware of any information that
11  Barclays had when it made the decision to enter
12  into the transfer and assumption agreement other
13  than what you have told us?
14      A.  I am sorry, repeat that.
15      Q.  We have been talking about information
16  that Barclays had prior to making the decision
17  to enter into the transfer and assumption
18  agreement. And you have listed a number of
19  documents. Are you aware of any other documents
20  or other information that you haven't told us?
21      A.  I'm not aware of other documents, but
22  I think there is other information that I've
23  alluded -- that I have referred to earlier in
24  our discussions, meaning earlier in the

Page 178

J. HUGHES

1  deposition. And I'd summarize that as
2  information that people at Barclays had relating
3  to the conduct of futures and options business.
4  And by options, I mean the exchange-traded
5  options business and the detailed knowledge that
6  Barclays had about the conduct of such business,
7  inclusive of the manner in which collateral is
8  held to support that business and including the
9  different forms of collateral that are used in
10 that business.
11         All of that and indeed additional
12 information with respect to those businesses and
13 how that they are conducted, which would be way
14 too detailed to go into now, although I can if
15 you wish, all of that knowledge clearly informed
16 Barclays' assessments about whether it was a
17 good thing, A, to acquire the exchange-traded
18 businesses that we have described, inclusive of
19 assets and liabilities, and also whether it was
20 appropriate to reach the agreements that we did
21 reach with the OCC and the trustee.
22        So that description doesn't refer to
23 documentation, but I think it is important
24 knowledge that Barclays had. I believe also

Page 179

J. HUGHES

1  Lehman had it, or representatives of Lehman had
2  it, at the time too. So I think that is all
3  important to understand in assessing the
4  judgments that Barclays has made at the time.
5      Q.   When you say the information that
6  Barclays had concerning the businesses and how
7  they were conducted, are you including in that
8  the OCC's requirement that all derivatives
9  positions be covered by collateral?
10     A.   Yes. And I should just say that I'm
11 not referring to Lehman's businesses in that
12 description. I'm referring to the futures and
13 options industry so to speak, and the manner in
14 which exchange-traded businesses is conducted
15 inclusive of the use of clearing houses and the
16 OCC.
17     Q.   I understand. And specifically with
18 respect to the OCC, did you understand, Barclays
19 understood that it marked to market positions on
20 at least a daily basis?
21     A.   It would have been the understanding
22 that the OCC and other clearing corporations
23 would mark margin and would value margin and
24 related positions throughout the business day.

Page 180

J. HUGHES

1      Q.   And where a position, where a member
2  fails to post the required margin, the OCC
3  liquidates the position?
4      A.   Sometimes, yes, it has the right to do
5  that.
6      Q.   Who made the decision to enter into
7  the transfer and assumption agreement?
8      A.   I think ultimately Gerard Larocca was
9  the signatory of it.
10     Q.   Was he the decision maker?
11     A.   I think the decision was made in a
12 combination or through a combination of myself,
13 Gerard Larocca and Rich Ricci.
14     Q.   And who was the ultimate decision
15 maker?
16     A.   The ultimate decision maker? I'm not
17 sure I -- I'm not sure what you mean by the
18 ultimate decision maker.
19        I think that tracing the delegation
20 and -- of authorities from a corporate
21 perspective factually, I believe I may have been
22 specifically an authorized signatory. But I
23 think ultimately Gerard Larocca was definitively
24 an authorized signatory of the signing entity.

Page 181

J. HUGHES

1  So I believe he -- I believe that he -- that
2  Gerard Larocca would be the answer to your
3  question.
4         Ultimately because it was connected
5  with the negotiation of the transactions, I
6  guess ultimately was, by extension, approved by
7  the Barclays board. Though nobody, as I recall,
8  actually picked up the phone to a member of the
9  board to say is it OK if I sign this document
10 right now.
11     Q.   When was the decision made to enter
12 into the TAA?
13     A.   I think it was in the early hours of
14 Monday morning, but I could be wrong about that.
15     Q.   Sir, let's switch gears. I would like
16 to ask you some questions about the clearance
17 box assets.
18     A.   Sure.
19     Q.   Those are assets specifically at DTC,
20 Deposit Trust Corporation. Can I ask you first
21 why Barclays did not enter into an agreement
22 with the DTC similar to the agreement that it
23 entered into with the OCC?
24     A.   Well --

Page 182

J. HUGHES

1  WITNESS' ATTORNEY: Does this call for
2  privileged information?
3  A.   I was going to ask a question first.
4  Are you asking me about the clearance
5  box assets or are you asking me the DTC?
6  Q.   Specifically about the arrangements
7  that Barclays entered into with the OCC compared
8  with the arrangements that it entered into with
9  the DTC.
10  I mean to put it -- all I'm trying to
11  find out is, I understand that Barclays agreed
12  to be responsible for the settlement obligations
13  of Lehman with respect to the OCC. And that
14  Barclays declined to take on that same
15  obligation with respect to the DTC.
16  WITNESS' ATTORNEY: So I think this is
17  where the confusion comes in. You have a
18  topic here, "Barclays decision not to the
19  assume LBI's liabilities at DTC," et cetera,
20  and you ask for discussions with LBI, et
21  cetera. We think those would be the
22  appropriate questions to ask. So -- I don't
23  know if there is a pending question, but --
24  is there a pending question? I don't know

Page 183

J. HUGHES

1  if there is, is there a pending question.
2  Q.   Let me put it, why did Barclays not
3  agree to be responsible for the Lehman
4  settlement obligations to DTC?
5  WITNESS' ATTORNEY: You can answer,
6  but don't reveal any privileged
7  communications, if you can answer it without
8  revealing privileged communications.
9  A.   I think that the determinations with
10  respect to OCC obligations on the one hand and
11  the determination with respect to DTC settlement
12  obligations on another were never associated at
13  any point in time.
14  The determination with respect to DTC
15  obligations at the time was that Barclays had
16  never contemplated taking on that category of
17  liabilities of Lehman Brothers. Lehman Brothers
18  never asked Barclays, as far as I'm aware, to
19  take on those liabilities. Barclays did have
20  discussions with DTC about them. But at no
21  point, as far as I'm aware, did Barclays
22  indicate to DTC that it would take on those
23  obligations.
24  Q.   I understand that some transfers were

Page 184

J. HUGHES

1  made from the DTC clearance box to Barclays on
2  September 18 and September 19 of 2008. Can you
3  tell me what was the reason that those transfers
4  occurred?
5  A.   I'm not sure I know exactly what
6  you're referring to there by clearance boxes or
7  which assets you are referring to.
8  Q.   I believe that you wrote to the
9  trustee concerning certain transfers that had
10  occurred on Friday, September 19 from DTC. Do
11  you recall that?
12  A.   On the 19th?
13  Q.   That's the Friday of the sale hearing.
14  A.   Earlier you mentioned the 18th and the
15  19th. You are referring just to the 19th.
16  Q.   I am going to start with the 19th and
17  see if we can get there. Do you know why those
18  assets were transferred?
19  A.   Can I be clear which assets you are
20  referring to, either by reading the list you are
21  referring to or perhaps by you describing what
22  exactly you are referring to?
23  Q.   Yeah, I believe in the letter you say
24  Barclays identifies the following transfers of

Page 185

J. HUGHES

1  clearance box securities and the first one you
2  mention is 1.035 billion dollars from DTCC on
3  September 19.
4  A.   Um-hm.
5  Q.   Why was that transfer made?
6  A.   I believe it was part of an exercise
7  pursuant to which or "part of" is the wrong
8  word.
9  I believe the securities were
10  transferred by either Jim Hraska, who was then
11  an employee of Lehman Brothers or one of his
12  colleagues, I think Jim Hraska, who I believe at
13  the time thought that he was transferring those
14  securities as part of a repo transaction, but
15  that he was mistaken about that.
16  There had been, at or about the same
17  time if not before that transfer -- I believe it
18  may have been before -- an agreement reached
19  between representatives of Lehman Brothers and
20  Barclays that identified the clearance box
21  assets as being a category of assets
22  transferrable under the -- pursuant to the sale.
23  So I think that's -- I believe that's
24  how it happened.

Page 186

J. HUGHES

1
2    Q.   And I take it that all of the assets
3    that were transferred to Barclays that came from
4    the clearance box, Barclays is claiming them
5    under the clarification letter as clearance box
6    assets and not as a part of the repo?
7         WITNESS' ATTORNEY:  Objection to the
8    form.
9    A.   Well, I think first and foremost, any
10   assets we claim not pursuant to the
11   clarification letter, we claim the assets
12   pursuant to the asset purchase agreement as
13   clarified by the clarification letter, strictly.
14        Do we believe -- did we believe then
15   and do we believe now that some of the assets
16   were identified as clearance box assets and some
17   were identified as repo assets?  Yes.  There
18   were attempts, good faith attempts between both
19   Barclays and Lehmans to identify each of those
20   categories of assets.  I believe the assets that
21   you referred to that I had earlier referred to
22   in my letter were transferred from what were
23   termed the clearance boxes.
24        And so the identified category of
25   clearance box assets represented by Lehman

Page 187

J. HUGHES

1
2    Brothers, I think on the Friday morning as
3    transferrable included the 1.035 billion.
4         Whether any of the -- I can't now recall exactly
5    which accounts the repo assets were transferred
6    from and whether they were, in fact, separate
7    accounts or whether some of the assets under the
8    repo may have also come from the clearance
9    boxes.
10        I can't recall now specifically
11   whether the actual accounts from which the
12   transfers took place were at all times exclusive
13   or different if one looks at one category of
14   assets as compared to the other.
15        Q.   Yeah, my question is simply the
16   billion dollars of assets that were transferred
17   on the Friday the 19th.  I just want to
18   understand, Barclays is claiming that it is
19   entitled to those assets under the sale
20   agreement.
21        A.   Correct.
22        Q.   Does Barclays have any other
23   entitlement to those assets other than under the
24   sale agreement?
25        WITNESS' ATTORNEY:  Objection,

Page 188

J. HUGHES

1
2    objection to the form.
3    A.   Other than under the sale agreement?
4         WITNESS' ATTORNEY:  You can answer if
5    you understand the question.
6    A.   If by your question you mean was
7    Barclays entitled to receive those assets from
8    the clearance boxes pursuant to the terms --
9    pursuant to the asset purchase agreement, yes, I
10   believe Barclays was so entitled.
11        The parties had agreed on the Friday
12   morning that unencumbered assets that were
13.  then -- that Lehman Brothers was at that point
14   able to identify and termed the clearance box
15   assets were clearly assets owned in the business
16   and therefore, they were due to Barclays.
17        Q.   The basis for Barclays claim to those
18   assets is the APA?
19        A.   The APA --
20        Q.   As clarified?
21        A.   As clarified, yes.
22        Q.   We have been talking about the DTC
23   clearance box.  Is it Barclays' understanding
24   that it is entitled to securities and other
25   assets from depositories and clearance boxes

Page 189

J. HUGHES

1
2    other than those at DTC?
3    A.   I think if there are other assets that
4    were used in connection with the businesses of
5    Lehman Brothers in North America, that were --
6    that are unencumbered, in the sense used to
7    describe the clearance boxes, whether they are
8    at DTC or anywhere else, they would be due to
9    Barclays.
10        Q.   And that includes EuroClear?
11        A.   If such assets fit the description
12   I've just given, yes.
13        Q.   Do you know whether Barclays has, in
14   fact, obtained securities or other assets from
15   EuroClear?
16        A.   I don't know the answer to that
17   question.
18        Q.   Do you know whether Barclays has
19   obtained securities or other assets from
20   clearance boxes in other -- from other clearance
21   boxes other than EuroClear and DTC?
22        A.   I'm not aware that that's happened,
23   no.  I'm not saying it hasn't, but I'm not aware
24   that it has.  And to be clear, I'm not aware
25   that it has with respect to EuroClear.  It may

Page 190

J. HUGHES

1  have, but I don't know.
2      Q.    What did you understand was Lehman's
3  exposure to DTC?
4      A.    When you say exposure, what do you
5  mean?
6      Q.    Risk of loss?
7      A.    To DTC?
8      Q.    Maybe I should -- maybe it is easier
9  the other way around.  What was DTC's exposure
10  to Lehman?
11      A.    I don't know.
12      Q.    Did Barclays make any effort to
13  determine, quantify what was DTC's exposure to
14  Lehman?
15      A.    No.  I think it would be more accurate
16  to say that DT -- that Barclays urged DTC to
17  make a realistic determination of what that
18  exposure would be.  There were initial requests
19  from DTC to Barclays to cover the -- cover
20  Lehman liabilities associated with transactions
21  that are cleared through DTC, and during those
22  discussions, Barclays urged -- well, first of
23  all, rejected those requests.  Secondly,
24  encouraged DTC to make a proper assessment of

Page 191

J. HUGHES

1  the nature and extent of those exposures and
2  instead of pleading or claiming a need for an
3  open-ended guarantee or indemnity, to use its
4  own records to be able to estimate more
5  realistically what that potential exposure could
6  be.
7      And ultimately DTC, I believe, did
8  conduct such an exercise.  I wasn't party to
9  such an exercise, nor am I aware that anybody at
10  Barclays specifically was a party to the
11  exercise.  But DTC did ultimately return to the
12  discussion and DTC and Barclays ultimately
13  agreed that Barclays would provide the sum of
14  250 million dollars as a -- I think it was 250
15  million dollars as a limited recourse indemnity,
16  so to speak, for potential losses that DTC might
17  face if -- or after the markets open for
18  business on the morning of the 22nd of
19  September.
20      Q.    Did Barclays assess the impact on the
21  business it was acquiring if DTC were to issue a
22  cease to act notice with respect to Lehman?
23      A.    I'm not sure that Barclays made an
24  assessment of the type as you describe it.  I do

Page 192

J. HUGHES

1  believe that Barclays was very concerned that if
2  transactions that are clearable through -- that
3  were clearable through DTC were not able to
4  clear on -- when markets opened after the
5  closing, that that would be hugely problematic
6  for the -- for not just Lehman but also for
7  Barclays.
8      Q.    Did --
9      A.    And therefore, it was potentially --
10  it was potentially -- it would potentially stand
11  in the way of Barclays being able to conclude
12  the transaction.
13      Q.    Did Barclays consider whether it could
14  conclude the transaction if DTC refused to act
15  for Lehman?
16      A.    I don't know whether there was that
17  specific consideration.  I do know that there
18  were discussions relating to the -- to the risks
19  associated with DTC blocking transactions that
20  needed to clear.  That discussion was not just a
21  DTC discussion, but it also related to other
22  custodians and other organizations or
23  institutions that cleared Lehman-related
24  business.  It was important for the flow of

Page 193

J. HUGHES

1  those settlements to be allowed to happen in
2  order that securities transactions could
3  properly clear and assets and liabilities flow
4  accordingly.
5      Q.    Was there any discussion among the
6  principals at Barclays as to whether it could
7  close the deal without DTC support?
8      A.    When you say DTC support, I don't
9  think there was any discussion about DTC
10  support.
11      Q.    But that I simply mean without DTC
12  continuing to act for Lehman?
13      WITNESS' ATTORNEY:  You can answer if
14  you can answer without revealing privileged
15  communications.
16      A.    I don't think -- I'm not aware of
17  discussions that would be -- discussions other
18  than privileged discussions on that topic.
19      Q.    Did Barclays have any discussions with
20  any regulators concerning the need for DTC to
21  continue to act for Lehman?
22      A.    I think there may have been
23  discussions between external legal advisors of
24  Barclays and certain regulators on that topic,

Page 194

J. HUGHES

1    but I don't know the content of those
2    discussions.
3        Q.   Who was involved in those discussions?
4        A.   I can only answer that by saying that
5    I am aware that Ed Rosen from Cleary Gottlieb
6    had some discussions with some regulators and I
7    believe that Roger Cohen and Jay Clayton at
8    Sullivan & Cromwell had discussions with some
9    regulators. Whether those discussions included
10   reference to this topic, I don't know.
11       I should add there were other
12   discussions with regulators involving other
13   people, but again, I'm not aware that they
14   involved this topic.
15       Can I be clear, I assume you do not
16   include the DTC in the definition of a
17   regulator.
18       Q.   That's right. All I am looking for is
19   what communications were made by Barclays to
20   regulators concerning the need for the DTC to
21   continue to act for Lehman. Are there any
22   communications that you are aware of?
23           WITNESS' ATTORNEY:  Other than what
24   you already answered?

Page 195

J. HUGHES

1        A.   I don't think I can say anything more
2    than what I have already said on the topic.  But
3    I would repeat that DTC was not acting for
4    Lehman Brothers.
5        Q.   By acting for Lehman Brothers, I
6    simply mean clearing, continue to clear Lehman
7    trades?
8        A.   Yes.
9        Q.   You understood that --
10       A.   That I understand, yeah.
11       Q.   I show you a document previously
12   marked Exhibit 156B.
13           WITNESS' ATTORNEY:  This is a lending
14   letter before --
15       Q.   To make it easier to you, sir --
16           WITNESS' ATTORNEY:  You are going to
17   point --
18       Q.   Just going to point to the second
19   page, first full paragraph, "It should be quite
20   clear in context, however"?
21       A.   Yup.
22           WITNESS' ATTORNEY:  Why don't you read
23   that paragraph and read whatever else you
24   think you need to to put it in context.

Page 196

J. HUGHES

1        Q.   Just let me know, sir, when you have
2    done that.
3        A.   OK, I've read it.
4        Q.   I want to invite your attention, sir,
5    specifically with respect to the distinction
6    that is being drawn here between certain
7    accounts maintained at DTCC and the securities
8    contained in those accounts. Do you see that?
9        A.   I do.
10       Q.   Can you tell me what is the basis for
11   that distinction?
12           WITNESS' ATTORNEY:  If you can answer
13   that without revealing privileged
14   information, you can answer. If you are
15   concerned you would reveal privileged
16   information, let me know.
17       A.   I believe the basis is that the
18   agreement between Lehman Brothers and Barclays
19   referred to, in this context, particular
20   securities that had been identified by Lehman
21   Brothers initially in a -- it had been a large
22   list or lengthy list of securities. And that
23   was the agreement between the parties with
24   respect to that identified class of securities

Page 197

J. HUGHES

1    which were assets held in connection with
2    Lehman's businesses which I said, as I have
3    said, was the core of the transaction.
4        I believe the basis also is that at no
5    point did Barclays ever agree in this context
6    with Lehman Brothers to acquire liabilities in
7    any accounts of Lehman Brothers at DTC, and
8    further, I think the basis is that this
9    paragraph is in part at least a reference to the
10   nature of the agreement between Barclays and DTC
11   as distinct from the nature of the agreement
12   between Barclays and Lehman Brothers.
13       Q.   Was this distinction ever discussed
14   with anyone at DTC?
15       A.   Which distinction?
16       Q.   The distinction between the accounts
17   maintained at the DTC and the securities
18   contained in those accounts?
19       A.   At which point in time are you
20   referring to?
21       Q.   At any point in time.
22       A.   At any point in time. I believe
23   Barclays made it clear to DTC that it was not
24   acquiring any liabilities of Lehman relating to

Page 198

J. HUGHES

1          J. HUGHES
2 DTC, that Barclays was not acquiring the Lehman
3 accounts at DTC, and I believe made it clear
4 that there were securities of Lehman Brothers
5 that typically clear through DTC which were to
6 be acquired by Barclays.
7        I believe all of those points were
8 made clear prior to the closing and prior to the
9 signing of the DTC agreement and I can't be
10 certain about what I am about to say, but I
11 believe that representatives of Barclays at
12 Cleary have on more than one occasion reiterated
13 some or all of those points to DTC.
14    Q.   Who at Cleary had those discussions
15 with DTC?
16    A.   I don't know whether those discussions
17 included more -- people in addition to Ed Rosen,
18 but I do believe it did include Ed Rosen.
19    Q.   When did Mr. Rosen have those
20 discussions?
21    A.   I'm not certain as to the exact
22 timing. I do think there were -- I do recall
23 that there were discussions during the closing
24 weekend. Precisely when, I'm not absolutely
25 sure, and I believe there were discussions that

Page 199

J. HUGHES

1          J. HUGHES
2 post-dated the closing and the signing of the
3 DTC agreement. Though again, I'm less certain
4 about the fact of those additional discussions
5 and, therefore, necessarily the content of them.
6    Q.   When did the post-closing discussions
7 between Mr. Rosen and DTC occur?
8    A.   I'm really not sure.
9    Q.   Can you give me a month?
10    A.   No.
11    Q.   Can you give me a year?
12    A.   I believe there may have been
13 discussions in the fourth quarter of 2008 and I
14 believe there may have been discussions in
15 2009. Again, I wouldn't be able to say with
16 certainty, and while I have had discussions with
17 Ed Rosen about a whole variety of different
18 issues, I don't recall -- I certainly can't
19 recall now whether we identified when those
20 discussions might have occurred.
21    Q.   With respect to the 2009 discussions,
22 can you give me a quarter in 2009 that those
23 discussions occurred?
24    A.   Really wouldn't be sure at this point.
25 It's possible there were discussions in each

Page 200

J. HUGHES

1          J. HUGHES
2 quarter, but I really, I really couldn't say.
3    Q.   With whom at DTC did Mr. Rosen have
4 these discussions?
5    A.   I think one or more of Don Thompson --
6 sorry, Larry Thompson, I think, and one other
7 individual who I believe is the chief executive
8 of DTC whose name is eluding me. If anybody can
9 help me with that, I would be able to tell you
10 whether it is right or wrong.
11    Q.   When you saw one or more --
12    A.   I think he had discussions with Larry
13 and also with chief executive of DTC, but I'm
14 not absolutely sure about that.
15    Q.   And specifically, can you tell me what
16 was said in those discussions about the
17 distinction between the accounts at DTC and the
18 securities contained in those accounts?
19    A.   Yeah, I can't tell you specifically.
20 As I said earlier, the serial distinctions or
21 the serial comments that I made in answer to
22 your question earlier, I believe were covered or
23 some of them may have been covered, but I
24 couldn't say with any degree of certainty.
25    Q.   Let me ask you with respect to the

Page 201

J. HUGHES

1          J. HUGHES
2 discussions prior to the closing. Did anyone
3 other than Mr. Rosen have discussions concerning
4 this distinction with the DTC?
5    A.   As I have earlier defined this
6 distinction, yes.
7    Q.   Who other than Mr. Rosen?
8    A.   There were discussions involving, at
9 one point, I believe Larry Thompson, if I am
10 getting his name correct. But I have a greater
11 recollection of representatives of DTC, I think
12 in the form of their lawyers, who I believe were
13 Proskauer at the time. I can't remember the
14 specific names of individuals, but I do recall
15 specific discussions between representatives of
16 Barclays and such representatives prior to the
17 signing of the DTC letter and prior -- and
18 therefore, by definition, prior to the closing.
19    Q.   And you have mentioned Mr. Thompson
20 and Proskauer. Anyone else?
21    A.   On the other side? I wouldn't be able
22 to say. My sense was there were other people on
23 the phone, but they were telephone
24 conversations, so I couldn't say with certainty
25 who else was present on the other side of the

Page 202

```
1              J. HUGHES
2    phone.
3         Q.   Other than -- did you participate in
4    these conversations?
5         A.   I did.  Well, I participated in some
6    or part of those conversations.  But not
7    necessarily -- I didn't participate in all of
8    them.
9         Q.   And other than you and Mr. Rosen who
10   on the Barclays side, who else participated in
11   these discussions?
12        A.   The only other person I can recall
13   specifically being there when I was there was
14   Alan Kaplan who is, as I have said, a member of
15   my department.
16        Q.   When did these conversations happen,
17   the preclosing discussions?
18        A.   Again, it is hard to say with
19   certainty given how much was happening at that
20   time, how frenetic the whole thing was and how
21   little sleep everybody had had.
22        My best recollection of the discussion
23   that I was involved with or the discussions that
24   I was involved with, they were probably on the
25   Thursday night, but it's possible they were on
```

Page 203

```
1              J. HUGHES
2    Friday night.  I don't think they were after the
3    Friday night.
4         And the reason I say that is that I
5    recall the discussions taking place at whatever
6    time in Alan Kaplan's office at 200 Park Avenue
7    and the reason that that's relevant is that as
8    of Saturday morning, I was constantly at the
9    offices of Weil Gotshal right up until and
10   through the closing.  Exactly what time I
11   arrived at the offices of Weil Gotshal on
12   Saturday morning, I couldn't now remember, but I
13   am pretty certain that the discussions did not
14   take place after 6 or 7 o'clock in the morning
15   on Saturday of what I guess would be the 20th.
16        And again, I do have a recollection of
17   a quite lengthy discussion involving the DTC.
18   It also was a discussion relating to DTC's
19   concern with respect to its own potential loss
20   and included the points I made several moments
21   ago now with respect to our urging DTC to come
22   up with what we thought was a realistic
23   proposition around its potential loss because
24   the urging was done by me.
25        Q.   What did DTC say about its concerns
```

Page 204

```
1              J. HUGHES
2    about its exposures to Lehman?
3         A.   I don't recall particular words.  It
4    was clear at the beginning of the discussion
5    that they contended a much broader potential --
6    or much greater potential loss than I thought
7    was rational and I conveyed my thoughts about
8    their irrationality at the time and, as I have
9    said, urged them to come to what I thought was a
10   realistic view which again, as I have said, they
11   ultimately did.
12        Q.   Can you tell me whether anyone from
13   Barclays or representing Barclays had any
14   discussions with anyone at DTC after the Friday
15   night?
16        A.   Anyone at Barclays after the Friday
17   night?  I don't know the answer to that
18   question.  It's possible that -- it's possible
19   that Alan Kaplan had additional conversations
20   with DTC.  It's possible that Gerard Larocca had
21   discussions with DTC.  It's possible that other
22   members of the operations function at Barclays
23   had discussions with DTC.  I couldn't tell you.
24        Q.   You are not aware of any discussions
25   after the Friday night?
```

Page 205

```
1              J. HUGHES
2         A.   Well, I'm not aware of any discussions
3    on this particular topic.  I think there is a
4    decent chance, although I wouldn't know with any
5    certainty, that there were other discussions
6    with DTC.
7         Q.   I'm just asking if your from your
8    knowledge --
9         A.   I'm not aware of others.
10        Q.   Who at the Cleary was responsible for
11   negotiating the clarification letter?
12        A.   I think it was a combination of Cleary
13   lawyers that I have previously referred to.  The
14   responsibility I would say was shared among Vic
15   Lewkow, Bob Davis, Ed Rosen, Duane McLaughlin,
16   Lindsee Granfield and others.  There were a lot
17   of people.  No specific individual was delegated
18   with the actual comprehensive responsibility.
19        Many of those lawyers were having
20   discussions throughout the period of the 17th
21   through the 22nd with many different people.
22   From time to time, naturally, they would have
23   communicated either with me or other member of
24   my department about aspects of that negotiation
25   about aspects of the discussions they had with
```

Page 206

1        J. HUGHES
2   those many other people at Weil or representing
3   the trustee or the creditors committee or indeed
4   anybody else. So I think there were lots of
5   people who were responsible for it.
6       Q.   You have that Exhibit 156B still in
7   front of you?
8       A.   Yup.
9       Q.   If you would turn to the third page,
10  page 3 of Ms. Granfield's letter. If you look
11  at the top and you will see the second full
12  sentence reads, "Nothing in this letter or in
13  Exhibit B should be construed to suggest that a
14  portion of the securities in the LBI clearance
15  boxes at the time of closing equal to the
16  quantity of long customer positions in such
17  securities were not sold to Barclays pursuant to
18  the asset purchase agreement as clarified by the
19  clarification letter."
20       Do you see that, sir?
21       A.   I do.
22       Q.   Now, Ms. Granfield here is referring
23  to a portion of security. Do you see that?
24       A.   Can I read the whole sentence?
25       Q.   Absolutely.

Page 207

1        J. HUGHES
2       A.   OK, I see it.
3       Q.   Do you understand that she is
4   referring to a particular portion of securities
5   there?
6       A.   She certainly uses the --
7       Q.   Maybe I will try it a different
8   question. Do you understand what she is saying
9   there?
10      A.   No.
11      WITNESS' ATTORNEY:  Would this be a
12  good time to take a little break, just two
13  minutes.
14      MR. MAGUIRE:  Sure, sure.  That's OK,
15  we can take a break.
16      (Recess)
17      (Exhibit 563C, letter dated May 13,
18  2009 marked for identification, as of this
19  date.)
20      Q.   Sir, I have shown you a document we
21  have marked as Exhibit 563C.  It is a letter
22  dated May 13 at 2009 from you to Mr. Giddens, is
23  that correct?
24      A.   Yes.
25      Q.   If you turn it, sir, to page 4 of your

Page 208

1        J. HUGHES
2   letter and see the first full paragraph begins,
3   "By Sunday night, September 21," and it
4   continues.
5       A.   Yup.
6       Q.   Can you tell me, sir, what's the basis
7   for that sentence?
8       WITNESS' ATTORNEY:  Why don't you
9   review the sentence in context.
10      Q.   Take as much time as you need, sir.
11      A.   I believe the basis for the statement
12  is that by that point in time, it had become
13  clear from DTC that the 250 million dollar
14  limited recourse guarantee that's also referred
15  to in this paragraph would be sufficient to
16  cover DTC's exposure.
17      As I said earlier, there had been a
18  discussion with DTC on the topic and I assume
19  that in this -- in the beginning of this
20  paragraph, I'm making a reference to the final
21  agreement from which it was fair to conclude
22  that DTC had concluded that its exposure was, in
23  fact, less than it originally feared and that
24  was my understanding at the time.
25      Q.   And that DTC did not need any

Page 209

1        J. HUGHES
2   protection beyond the 250 million dollars that
3   Barclays had agreed to deposit?
4       A.   Whether, in fact, they needed to or
5   not, I believe that that was what we had agreed
6   by that point in time.
7       Q.   Any other basis for that sentence by
8   Sunday night?
9       A.   I think the tenor of the discussion
10  that I had, that I had -- that I have earlier
11  referred to suggested to me that DTC would
12  reassess its concerns associated with that --
13  with those exposures. I didn't know at the
14  conclusion of that discussion that they would,
15  in fact, agree that they really didn't need the
16  kind of indemnity that they had first proposed
17  and that they needed something considerably
18  less.
19      But because I felt at the time that it
20  was an objectively sustainable notion, I
21  certainly hoped that they would, as I then
22  viewed it, see reason. The point being that DTC
23  was in possession of all the necessary
24  information to understand the long and short
25  positions that were relevant to LBI in the DTC

Page 210

J. HUGHES

1  system and ought to have been able, therefore,
2  to determine not exactly by any means, but with
3  a reasonable degree of accuracy what that net
4  exposure might actually look like.
5      Q.   Let me ask you about the --
6      A.   But I should just say, Barclays was
7  clearly not in such a position to make that
8  estimation.
9      Q.   Let me ask you about the assets that
10 were in the DTC clearance box.  What due
11 diligence did Barclays perform on those assets?
12     A.   What do you mean by "due diligence"?
13     Q.   What investigation did Barclays do
14 concerning those assets?
15     A.   Can you be a bit more specific about
16 what you mean by investigation?
17     Q.   Anybody go to DTC?
18     A.   Not that I'm aware of.
19     Q.   Did anybody get a schedule of those
20 assets?
21     A.   I believe a schedule of assets was
22 provided or whether it was described as a
23 schedule or not initially, I don't think it was.
24 But a listing, as I mentioned earlier, of what

Page 211

J. HUGHES

1  were represented as the clearance box assets was
2  provided on the morning of Friday the 19th by
3  Lehman Brothers to Barclays.
4      I believe that listing changed over
5  time, on more than one occasion, but that there
6  was an attempt to identify the actual
7  securities, CUSIP-by-CUSIP.  I believe it was
8  ultimately referred to as schedule B, but I
9  could be wrong, I've often confused schedules,
10 A, B, Exhibits A and B and other such
11 appendages.
12     Q.   Did Barclays send any of its
13 operations people to DTC's offices at any time
14 prior to the closing?
15     A.   At any time prior to the closing, I
16 don't know the answer to that question.  It's
17 possible that Gerard Larocca asked members of
18 the operations function to do that, but I don't
19 recall.
20     Q.   Did Barclays ask any of its employees
21 to determine whether there were any liabilities
22 associated with any of the assets in the DTC
23 boxes?
24     WITNESS' ATTORNEY:  Objection to the

Page 212

J. HUGHES

1  form.
2      Do you understand the question?
3      A.   I'm not sure.  Could you just repeat
4  the question.
5      Q.   Let me try a different way.  Did
6  anyone at Barclays use the term "cats and dogs"
7  with respect to the assets in the clearance box?
8      A.   I don't know whether anybody used that
9  particular term, but I believe that when the
10 assets were first shown or -- to Barclays or
11 soon thereafter, Mike Keegan and/or Stephen King
12 on behalf of Barclays reviewed that listing of
13 assets and I believe concluded two things:  One,
14 it was impossible in the time available to
15 assess whether or not those assets had the
16 values that the Lehman Brothers representatives
17 had ascribed to them, and, two, I believe Mike
18 Keegan felt that there was a good possibility
19 that there was a substantial difference between
20 the represented values and the likely actual
21 realizable values.
22     Q.   Did anyone at Barclays use the term
23 "nails and hammers" with respect to the
24 clearance box assets?

Page 213

J. HUGHES

1      A.   Again, I've heard both that term and
2  the earlier term you used.  But I don't recall
3  ever being present when such a description was
4  given.
5      If those two terms mean to you
6  anything of the type that I have just described,
7  then maybe they were said.  I don't know.
8      Q.   Was there a discussion among the
9  Barclays operations people in which it was
10 advised that Barclays should not take the assets
11 without the ability to cherry-pick and to leave
12 behind and not take certain assets in the DTC
13 clearance box?
14     A.   I'm not aware of any such discussion
15 involving Barclays' operations people.
16     Q.   Now, what about with -- involving Mike
17 Keegan or Stephen King?
18     A.   I'm not aware of discussions involving
19 either Mike Keegan or Stephen King that relate
20 to cherry-picking of assets as you describe it.
21     Q.   Was it Barclays' intention in taking
22 on the clearance boxes to --
23     A.   Can I just -- Barclays did not take on
24 the clearance boxes.  Barclays agreed that it

Page 214

J. HUGHES

1 would acquire a, as part of the purchase,
2 unencumbered securities which by definition, I
3 believe, and certainly Barclays understood to be
4 assets free and clear to be delivered. They
5 were defined or referred to as, at the time, as
6 unencumbered assets in Lehman's clearance boxes.
7    Q.   Right.  In the -- in entering into the
8 clarification letter, did Barclays intend to
9 retain the discretion and the right to be able
10 to return any clearance box assets to Lehman?
11    A.   I don't believe there was a discussion
12 of the type you describe.  I believe at the
13 time, Barclays had received a representation
14 from Lehman that this was one identified
15 category of assets that could be transferred.
16 And because they were unencumbered, naturally,
17 Barclays would have the right, all of the rights
18 with respect to an unencumbered asset that you
19 would expect them to have with respect to an
20 unencumbered asset.
21    Q.   If you could turn to the clarification
22 letter that's Exhibit 25, I believe, before you.
23 And I would invite to you look at the very
24 bottom of the first page and all see a

Page 215

J. HUGHES

1 parenthetical that begins "provided however."
2    A.   Is this the actual signed
3 clarification letter again?
4    Q.   Exhibit 25, yes.
5    A.   I see the beginning of the
6 parenthetical.
7    Q.   If you could read that full
8 parenthetical and anything else that you need to
9 in that sentence just so you understand the
10 context.
11    A.   Yup.
12    Q.   What was Barclays' intention in
13 retaining this right to give certain assets from
14 the box back to Lehman within 60 days?
15        WITNESS' ATTORNEY:  You can answer
16 that provided you can do so without
17 revealing privileged information.
18        I guess to some extent, this is asking
19 for an interpretation of the agreement.
20        MR. MAGUIRE:  No, I'm asking why
21 Barclays wanted this provision?
22        WITNESS' ATTORNEY:  Why this was
23 inserted?
24        MR. MAGUIRE:  Yes.

Page 216

J. HUGHES

1        WITNESS' ATTORNEY:  Can you answer
2 that without disclosing privileged
3 information or do you --
4        MR. MAGUIRE:  I'm not looking for
5 legal advice.  I want to know why Barclays
6 wanted the right to give assets back.
7        WITNESS' ATTORNEY:  You can answer
8 that if you know why Barclays wanted the
9 right to give assets back.
10    A.   I don't know the answer.  I don't know
11 the answer.
12    Q.   Did Barclays have a concern that
13 certain of these assets may be more in the
14 nature of liabilities or may have associated
15 liabilities which would make them more trouble
16 than they were worth?
17    A.   I don't know whether at the time such
18 a determination was reached.  I do know that
19 Barclays was concerned at the time, A, with
20 respect to the value of the securities in
21 question and, B, that it had no opportunity to
22 conduct any real analysis with respect to those
23 securities to, again, the judgments of the type you
24 have questioned me about.

Page 217

J. HUGHES

1        So I do know there was concern about
2 identity of assets.  There was concern about
3 value of those assets, all compounded by the
4 lack of time in which to conduct any real
5 inquiry.
6        I should add that the Lehman
7 representations did describe the assets as
8 unencumbered.  But as I say, we had no ability
9 really to ascertain fully what it was that we
10 were going to be delivered.
11    Q.   So you did not know at the time and
12 prior to closing whether any of the assets
13 within the DTC box, clearance box, were, in
14 fact, net liabilities?
15        WITNESS' ATTORNEY:  Objection to the
16 form.
17    A.   I don't know that.  I think the right
18 people to ask that -- to ask that question of
19 would be Mike Keegan or Stephen King and I have
20 not spoken to either of the two of them
21 specifically to prepare for this deposition.  I
22 have spoken to each of them over the course of
23 time, but not on this particular point.
24        But I would expect that if anybody at

Page 218

J. HUGHES

1 Barclays knows the answer to your question with
2 respect to specific securities, it would be
3 either one of those two. And possibly one or
4 two other people on Stephen King's team as it
5 then was. Jasen Yang I believe is someone you
6 have also had an opportunity to speak with. It
7 is conceivable that Jasen may have had some
8 appreciation of the type that you're referring
9 to.
10      Those are the guys we relied upon to
11 identify the assets and to try at least to form
12 any conclusions about them.
13      Q.  Mr. Keegan and Mr. King, what were
14 their respective roles?
15      A.  When you say respective roles, you
16 mean as employees of Barclays or with respect to
17 the transaction?
18      Q.  Specifically with respect to the
19 transaction.
20      A.  Well, I think they had a -- I think
21 they had a number of roles associated with --
22      Q.  Let me make it even narrower, let me
23 just make it respect to the clearance boxes.
24      A.  I would say they had roles, but

Page 219

J. HUGHES

1 certainly Barclays turned to both of Mike Keegan
2 and Stephen King to consider the nature and
3 value of a number of different assets, but
4 included in those would be the nature and value
5 of the assets that had been listed as included
6 in the clearance boxes.
7      As I said, they had a very limited
8 opportunity in which to do that, but those are
9 the people whom Barclays relied to make such
10 determinations or judgments about them as we
11 could.
12      Q.  Let me switch gears on you and ask you
13 about the C3 asset. You remember that the
14 clarification letter which is in front of you
15 refers to a number of 769 million dollars in
16 that regard.
17      A.  I think it should.
18      WITNESS' ATTORNEY:  I don't know if it
19 is 8.
20      A.  It is 8, right?
21      Yes.
22      Q.  How was that number negotiated?
23      A.  Overnight. Overnight on Thursday, the
24 18th of September, rolling into the morning of

Page 220

J. HUGHES

1 the 19th of September, Lehman Brothers conducted
2 an exercise to try to identify particular assets
3 and their values that could be conveyed as part
4 of the sale transaction.
5      And one of the assets that on the
6 morning of the 19th, there was described or
7 represented by Lehman as being capable of being
8 transferred was what they described as the
9 excess in the 15c33 reserve account.
10      I believe that at that time, the
11 Lehman Brothers representatives thought and
12 indeed mentioned to Barclays that there was
13 roughly, I think, one-half or 1.7 billion
14 dollars of such an excess. And that that would
15 be capable of being identified and transferred
16 as part of the transaction.
17      Subsequently, during the course of the
18 closing weekend, that number of 1.7 billion,
19 roughly, was reduced to 769 million dollars of
20 securities and that was ultimately the agreed
21 identified value within this category that
22 Lehman agreed to convey.
23      Partly, I believe, if not wholly,
24 Barclays' understanding at the time, partly

Page 221

J. HUGHES

1 because of what I believe to have been a
2 mistaken impression on the part of Harvey Miller
3 at Weil Gotshal that there might need to be some
4 regulatory approval to transfer those
5 securities, it was agreed that Lehman Brothers
6 would transfer those securities or other
7 securities that were equivalent. In other
8 words, either those securities actually
9 identified or another 769 million dollars of
10 securities.
11      Q.  How was the number 769 chosen?
12      A.  I believe it came from a combination
13 of discussions and initially a reference to an
14 e-mail which I believe was later seen by some,
15 though by whom I'm not sure, and the discussions
16 in the e-mail I believe referred to
17 representatives of Lehman Brothers having had
18 discussions with the SEC in which the SEC had
19 agreed that a certain amount of that excess was
20 available to be transferred and I think in that
21 set of communications, I think including the
22 e-mail, there was a specific reference to 769
23 million dollars of securities. At least I think
24 that's where the 769 came from originally.

Page 222

J. HUGHES

1  Q.  Did the 769 result from -- did that
2  represent the total amount of noncash assets in
3  the C3 account?
4  A.  I did not know what was in the C3
5  account, I did not know nor do I know what was
6  in the C3 account.
7  I believe that 769 was represented as
8  the total amount of securities in the excess in
9  the C3 account.
10  Q.  Was there any discussion about any
11  cash excess?
12  A.  I believe that there was cash included
13  in the excess and I believe there was cash
14  referred to in those communications and the
15  e-mail that I had referred to. But I don't
16  recall any discussion -- there certainly was not
17  any discussion on the Friday morning when the
18  topic first was raised about the constituent
19  parts of the C3 account or the reserve.
20  Q.  Was there any discussion by anyone at
21  Barclays about whether it could get cash from
22  the C3 account?
23  A.  Whether it could get cash from the C3
24  account. Again, I didn't think there was any

Page 223

J. HUGHES

1  discussion about anything relating to the C3
2  account other than the excess in the C3 account.
3  Q.  Right, was there any discussion by
4  Barclays about getting any cash excess from the
5  C3 account?
6  A.  I don't know whether there was any
7  discussions involving anybody from Barclays or
8  its representatives relating to cash
9  specifically. I believe there was a discussion
10  on, at some point during Sunday afternoon,
11  the closing weekend in which, as I mentioned
12  earlier, Harvey Miller, I believe, raised his
13  mistaken belief that there was a need to have
14  some kind of SEC approval.
15  And it's possible that in that
16  discussion, there was a reference — there was
17  reference to cash. I believe that at some
18  point, Michael Klein was involved in that
19  discussion, though I did speak with him about
20  that and his recollection about it was not very
21  strong or clear. So I couldn't say with
22  certainty that there were any discussions
23  involving Barclays or its representatives
24  relating to cash in this context.

Page 224

J. HUGHES

1  Q.  Right. Now, you said Mr. Miller had a
2  mistaken belief that regulatory approval was
3  required for any part of the C3 asset to be
4  conveyed to Barclays, is that correct?
5  A.  I think I did say that. Yes. That, I
6  should say, is my belief, that his was a
7  mistaken belief.
8  Q.  Have you discussed that issue with
9  anyone at the SEC?
10  A.  No.
11  Q.  Is it your understanding that
12  Barclays' entitlement to, anything from the C3
13  account is subject or is not subject to SEC
14  approval?
15  A.  It's my understanding that both now
16  and at the time that any excess in the C3
17  account was the property of Lehman Brothers,
18  that that property was part of the Lehman
19  Brothers North American business and it was
20  therefore capable of being transferred as part
21  of the purchase without SEC approval or indeed
22  anybody else's approval.
23  Because a question had been raised on
24  the Sunday afternoon, albeit I believe that

Page 225

J. HUGHES

1  Barclays drew no conclusion at that point in
2  time about that concern or question, that
3  Barclays nevertheless felt it was appropriate at
4  that point to cover that question by agreeing
5  with Lehman Brothers that the delivery would be
6  of the 769 within the excess or another 769
7  million dollars worth of securities and I
8  believe that that's -- that also would not have
9  required any SEC or anybody else's approval.
10  Q.  So if I understand this, the sequence
11  right, Mr. Miller expressed a belief that you
12  think was mistaken and that's about getting the
13  need to get SEC approval?
14  A.  That I believe -- I was not a party to
15  that discussion. I believe -- that discussion
16  was reported to me subsequently, I can't recall
17  precisely when it was first reported to me. I
18  now believe that to be a mistaken belief. But I
19  think that was the provenance of the additional
20  part of the agreement; that in any event, Lehman
21  committed to delivering 769 million dollars of
22  securities.
23  Q.  And so when did this discussion with
24  Mr. Miller happen about -- that concerned his

Page 226

J. HUGHES

1  J. HUGHES
2  belief that SEC approval was required?
3      A.   I believe it was sometime on the
4  Sunday afternoon.
5      Q.   With whom did that discussion -- who
6  were the participants pants in that discussion?
7      A.   The person who recalls it best is Vic
8  Lewkow at Cleary Gottlieb.  As I mentioned
9  earlier, he, Vic, recalled that Harvey Miller
10 was there, that at some -- for some portion of
11 the discussion, Michael Klein was there.  I
12 don't recall whether anybody else was present, I
13 couldn't say.
14     Q.   And while Barclays felt that belief
15 was mistaken, it nonetheless agreed that any
16 transfer of the excess would be subject to SEC
17 approval, is that correct?
18     A.   I don't know whether at the time
19 either Vic Lewkow or Michael Klein knew whether
20 that belief was mistaken or not.  But I do
21 believe that it was agreed at that point -- it's
22 possible it was agreed both before and after,
23 but that in any event, 769 million dollars of
24 securities would be transferred.
25     Q.   And based on this belief of Mr. Miller

Page 227

J. HUGHES

1  J. HUGHES
2  which Lehman decided to agree with --
3      A.   Sorry to interrupt you, can I just
4  add, I think I mentioned -- and if I didn't, I
5  would like to mention that it had by that stage,
6  I believe, been mentioned that the SEC had
7  agreed that the excess could be transferred.
8  Now, I could be wrong about the actual
9  chronology of events there, it is hard to recall
10 precisely, but as I mentioned earlier, there
11 were communications and there was, I believe, an
12 e-mail referring to, among other things, the 769
13 and the apparent approval of the SEC.
14         Now, I don't know whether that came up
15 before the discussion on the Sunday afternoon or
16 after it, but I just mention it it is possible
17 it came up before as well, I don't know.
18     Q.   If we leave a space in the transcript,
19 you can refer us to the e-mail that you are
20 referring to.
21     A.   Yeah, I think I can.
22         WITNESS' ATTORNEY:  Yes, we can do
23 that.
24 (Insert:_____)
25     Q.   If you look at Exhibit 25, if you have

Page 228

J. HUGHES

1  J. HUGHES
2  it in front of you, section 8, this is part ii,
3  why did Barclays agree to the language "to the
4  extent permitted by applicable law"?
5      A.   I don't think I have a nonprivileged
6  answer to that question.
7      Q.   Did anyone ever -- did anyone ever
8  agree with Barclays that the transfer of this
9  769 million dollars would be unconditional?
10         WITNESS' ATTORNEY:  Are you asking for
11 him to interpret the words in the
12 clarification letter?
13     Q.   No.  Did at any time over the
14 weekend --
15         WITNESS' ATTORNEY:  Are you talking
16 about oral?
17     Q.   Was there any discussion in which
18 anyone said to Barclays, 769 million, you will
19 get, unconditionally.  Did that discussion ever
20 happen?
21     A.   I believe that the understanding
22 between Lehman Brothers and Barclays was clear
23 that the excess in the C3 reserve account was
24 both available and could be transferred.  I
25 believe that there was an agreement

Page 229

J. HUGHES

1  J. HUGHES
2  unconditionally to transfer 769 million dollars
3  worth of securities.  I believe that was
4  Barclays' understanding of the agreement between
5  Barclays and Lehman Brothers.  I also believe it
6  was Lehman Brothers' understanding of the
7  agreement with Barclays.
8      Q.   Did anyone at Lehman say that Barclays
9  would get 769 million pursuant to this term
10 unconditionally?
11     A.   I'm not aware of the use of the word
12 "unconditionally."  But I believe that Lehman
13 Brothers and Barclays both understood at the
14 time that 769 million dollars of securities
15 would be included in the assets to be
16 transferred to Barclays no later than a point
17 promptly after the closing of the transaction.
18     Q.   Did anyone tell --
19     A.   And I don't believe that Lehman
20 Brothers ever felt then or subsequently that
21 they had any right to withhold 769 million
22 dollars of securities.
23     Q.   Did anyone from Lehman tell anyone at
24 Barclays that Barclays would get 769 million
25 dollars without SEC approval?

Page 230

```
1           J. HUGHES
2      WITNESS' ATTORNEY: Objection to the
3  form.
4      A.  I am -- I am not aware of any such
5  expression, but I believe that such an
6  expression was unnecessary given the
7  representations previously made and the
8  agreement that was ultimately reached as it is
9  described in part in paragraph 8.
10     Q.  You see towards the end of the
11 sentence we have been talking about, there is
12 the words, "are securities of substantially the
13 same nature and value." Do you see that?
14     A.  I do see that.
15     Q.  Who proposed that language?
16     A.  I don't know.
17     Q.  Why was it proposed?
18     WITNESS' ATTORNEY: Can you answer
19 that without disclosing privileged
20 communications?
21     A.  I don't think I can answer that in any
22 nonprivileged way.
23     Q.  What discussions were there between
24 Barclays and anyone else concerning those words?
25     A.  Again, I don't think I can answer that
```

Page 231

```
1           J. HUGHES
2  question without implicating privileged
3  discussions.
4      Q.  I'm not asking for internal Barclays
5  discussions. I am only asking for discussion
6  between Barclays and anyone representing
7  Barclays and Lehman or anyone else outside of
8  the Barclays family?
9      A.  But you're asking me with respect to
10 this specific language.
11     Q.  Yeah, what discussions did anyone at
12 Barclays or anyone representing Barclays have
13 with the trustee, with Weil, with the creditors
14 committee, anyone else concerning the words, "or
15 securities of substantially the same nature and
16 value"?
17     WITNESS' ATTORNEY: Let's discuss this
18 because you have a privilege concern.
19     MR. MAGUIRE: I think actually --
20     WITNESS' ATTORNEY: No, we are
21 entitled to confer on privileged concerns.
22 I'm not sure what his concern is. So let me
23 discuss it.
24     MR. MAGUIRE: Let me -- before you
25 take the break --
```

Page 232

```
1           J. HUGHES
2      WITNESS' ATTORNEY: No, no, no. We
3  are going to just talk for two seconds out
4  here.
5      MR. MAGUIRE: Very well. The record
6  will reflect the witness has again left the
7  room.
8      (Recess)
9      WITNESS' ATTORNEY: I think the
10 witness can answer this question because it
11 calls for communications between Barclays
12 and Lehman, I believe.
13     Q.  Do you remember the question, sir?
14     A.  I do. I do remember the question
15 though I am -- I cannot recall any conversations
16 of the type you referred to as hard as I might
17 try.
18     Q.  And that includes whatever you have
19 learned in preparation for this deposition?
20     A.  Yes.
21     (Pause)
22     Q.  Sir, I show you what we will mark as
23 564C, your notice of deposition.
24     (Exhibit 564C, Notice of Deposition
25 marked for identification, as of this date.)
```

Page 233

```
1           J. HUGHES
2      Q.  If you will turn, sir, to page 13, you
3  will see a topic number 23.
4      A.  Page 13, topic --
5      Q.  The very stop, I am sorry, topic 13,
6  whatever page it is on, 23. It is on page 7, I
7  am sorry, I misspoke.
8      A.  Page 7. Topic --
9      Q.  23?
10     A.  Topic 23.
11     Q.  Can you tell me what did you do to
12 prepare yourself to address that topic?
13     A.  I spoke with people internally at
14 Barclays and at Barclays and with external
15 lawyers who had acted on behalf of Barclays
16 about OCC margin and some of those discussions
17 were discussions had quite recently. But I also
18 carried with me coming into today the
19 recollections of some discussions that I have
20 had over the course of many months relating to
21 the OCC margin.
22     Q.  Are you in a position as you sit here,
23 sir, to give me a complete list of all of the
24 documents that Barclays created or prepared
25 prior to September 22 of documents prepared or
```

Page 234

J. HUGHES

1
2  concerning or reflecting its proposed purchase
3  of the OCC margin?
4       WITNESS' ATTORNEY: I am going object
5  because the topic itself is ambiguous, but
6  you can try to answer it. In other words,
7  as you know, we objected to many of these
8  topics as being unclear and this is a
9  perfect example.
10      But go ahead.
11      Q.   The reason I ask, sir, is I don't want
12 to waste your time here, if you have a specific
13 list that you can give me, that's helpful. If
14 it would be easier to get it from your counsel,
15 I'm perfectly happy to do it that way as well.
16      A.   I don't have a list of the type you
17 describe. And I'm not aware of Barclays'
18 creation of, preparation of documents of the
19 type described in question 23.
20      Q.   If you were to ask -- if you needed to
21 pull together a complete list of all the
22 documents that Barclays created or prepared that
23 in any way reflected its acquisition of the OCC
24 margin, who would be the person who would pull
25 that together for you?

Page 235

J. HUGHES

1
2       WITNESS' ATTORNEY: I am going to
3  object. It is an ambiguous request. It is
4  not at all clear what you are talking about.
5  You can try to answer.
6       A.   I think my answer is the same as the
7  one I just gave you; namely, I'm not aware of
8  any documents that fit this description. There
9  may be some, I'm not aware of any.
10      MR. MAGUIRE: OK. I have no further
11 questions for you at this time, sir. Can we
12 go off the record.
13      (Discussion held off the record)
14      MR. STERN: Back on the record. We
15 have had a long day and I understand that
16 the debtors' counsel has questions that may
17 take hours and that creditors committee may
18 have questions.
19      So given the hour of the day, we have
20 agreed to continue this deposition. The
21 date we have agreed on is February 1 and we
22      (Continued on next page for jurat.)

Page 236

J. HUGHES

1
2  will talk about location and starting time.
3  But we will continue that.
4       Thanks, everybody.
5
6
7
8       JONATHAN HUGHES
9
10 Subscribed and sworn to
11 before me this      day
12 of January, 2010.
13
14 _____

Page 237

J. HUGHES
INDEX:

1
2
3  WITNESS        EXAM BY:          PAGE:
4  J. Hughes      Mr. Maguire        6
5
6           EXHIBITS
7  Exhibit No.                Marked
8  Exhibit 561C Document Bates stamped WGM      132
9     Lehman E00013236 through 46
10 Exhibit 562C Document Bates stamped          158
11    WGM-Lehman-E 0006263 through
12    6270
13 Exhibit 563C Letter dated May 13, 2009      207
14 Exhibit 564C Notice of Deposition           232

Page  238

```
 1              J. HUGHES
 2
 3
 4          CERTIFICATE
 5    STATE OF NEW YORK )
 6              )ss:
 7    COUNTY OF NEW YORK)
 8        I, MARY F. BOWMAN, a Registered
 9    Professional Reporter, Certified Realtime
10    Reporter, and Notary Public within and for
11    the State of New York, do hereby certify:
12        That JONATHAN HUGHES, the witness
13    whose deposition is hereinbefore set forth,
14    was duly sworn by me and that such
15    deposition is a true record of the testimony
16    given by such witness.
17        I further certify that I am not
18    related to any of the parties to this action
19    by blood or marriage and that I am in no way
20    interested in the outcome of this matter.
21        In witness whereof, I have hereunto
22    set my hand this 15th day of January, 2010.
23
24    _____
25        MARY F. BOWMAN, RPR, CRR
```

Page  239

```
 1              J. HUGHES
 2            * * *ERRATA SHEET* * *
 3    NAME OF CASE:  In Re:  Lehman Brothers
 4    DATE OF DEPOSITION:  1/15/10
 5    NAME OF WITNESS:  Jonathan Hughes
 6    Reason codes:
 7        1. To clarify the record.
          2. To conform to the facts.
 8        3. To correct transcription errors.
 9    Page ____ Line ____ Reason____
      From _____to_____
10
11    Page ____ Line ____ Reason____
      From _____to_____
12
13    Page ____ Line ____ Reason____
      From _____to_____
14
15    Page ____ Line ____ Reason____
      From _____to_____
16
17    Page ____ Line ____ Reason____
      From _____to_____
18
19    Page ____ Line ____ Reason____
      From _____to_____
20
21    Page ____ Line ____ Reason____
      From _____to_____
22
23
24    _____
25        JONATHAN HUGHES
```

# BCI EXHIBIT

# 71

Page 1

1

2                 UNITED STATES BANKRUPTCY COURT

3                 SOUTHERN DISTRICT OF NEW YORK

4        ------------------------x

5        In Re:

6                                  Chapter 11

7        LEHMAN BROTHERS          Case No. 08-13555(JMP)

8        HOLDINGS, INC., et al,     (Jointly Administered)

9                      Debtors.

10       ------------------------x

11

12                DEPOSITION OF ELIZABETH JAMES

13                     New York, New York

14                     January 14, 2010

15

16       Reported by:

17       MARY F. BOWMAN, RPR, CRR

18       JOB NO. 27055

19

20

21

22

23

24

25

Page 2

1
2
3
4
5        January 14, 2010
6        10:15 a.m.
7
8        Deposition of ELIZABETH JAMES, held at
9    the offices of Hughes, Hubbard & Reed, LLP, One
10   Battery Park Plaza, New York, New York, before
11   Mary F. Bowman, a Registered Professional
12   Reporter, Certified Realtime Reporter, and
13   Notary Public of the State of New York and New
14   Jersey.
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 3

1
2                        APPEARANCES:
3
4    JONES DAY, LLP
5    Attorneys for Lehman Brothers, Inc.
6        222 East 41st Street
7        New York, New York   10017-6702
8    BY:  KELLY CARRERO, ESQ.
9
10   BOIES, SCHILLER & FLEXNER, LLP
11   Attorneys for Barclays and The Witness
12       10 North Pearl Street
13       Albany, New York   12207
14   BY:  TRICIA J. BLOOMER, ESQ.
15
16
17   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
18   Attorneys for the Creditors Committee
19       51 Madison Avenue - 22nd Floor
20       New York, New York   10010
21   BY:  ROBERT K. DAKIS, ESQ.
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 4

1
2                    APPEARANCES:
3
4    HUGHES, HUBBARD & REED, LLP
5    Attorneys for the SIPA Trustee
6        One Battery Park Plaza
7        New York, New York   10004-1482
8    BY:  NEIL OXFORD, ESQ.
9        SAM McCOUBREY, ESQ.
10       AMINA HASSAN, ESQ. (a.m. session)
11       WILLIAM MAGUIRE, ESQ. (a.m. session)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 5

1
2
3
4
5        IT IS HEREBY STIPULATED AND AGREED, by
6    and between the attorneys for the respective
7    parties herein, that filing and sealing be
8    and the same are hereby waived.
9        IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14        IT IS FURTHER STIPULATED AND AGREED
15   that the within deposition may be sworn to
16   and signed before any officer authorized to
17   administer an oath, with the same force and
18   effect as if signed and sworn to before the
19   Court.
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

2  (Pages 2 to 5)

Page 6

JAMES

1
2    (Exhibit 552, typewritten notes
3    consisting of four pages marked for
4    identification, as of this date.)
5    ELIZABETH JAMES,
6    called as a witness by the parties,
7    having been duly sworn, testified as follows:
8    EXAMINATION BY
9    MR. OXFORD:
10       Q.   Good morning, Ms. James. We met off
11   the record. As you know, my name is Neil Oxford
12   with the law firm of Hughes, Hubbard and Reed,
13   and we represent James Giddens, the SIPA trustee
14   in this litigation.
15       Have you ever had your deposition
16   taken before?
17       A.   No.
18       Q.   Just some basic ground rules, and I am
19   going to ask you a series of questions. It has
20   happened before and may happen again that those
21   questions could be perceived as unclear, and if
22   they are unclear, I would ask you to clarify --
23   ask me to clarify them. I will be happy to do
24   so.
25       But if you just answer my question,

TSG Reporting - Worldwide    877-702-9580

Page 7

JAMES

1
2    I'll assume that you understand my question. Is
3    that fair?
4       A.   That's fine.
5       Q.   And this is not -- it may seem like it
6    at some point, but it is not intended to be a
7    marathon session, so if you need a break at any
8    time, just let me know.
9       Can you tell me, please, Ms. James,
10   what you did to prepare for this deposition?
11      A.   I went and reread my e-mails, put my
12   notes together and had some conversations with
13   people from Barclays.
14      Q.   When you say you reread your e-mails,
15   can you give me a little more detail on that?
16      A.   I just picked up my e-mails and my
17   declaration, based on putting the declaration
18   together, just to confirm it was all fresh in my
19   head.
20      Q.   And what notes did you look at to
21   prepare for this deposition?
22      A.   My declaration and the other people's
23   declarations that I'm looking on behalf of --
24   talking on behalf of, I should say.
25      Q.   Separate and apart from those

TSG Reporting - Worldwide    877-702-9580

Page 8

JAMES

1
2    declarations, did you prepare any notes for this
3    deposition?
4       A.   Yup, yup, which you have.
5       MR. OXFORD: Let the record reflect
6    the witness is indicating the notes for a
7    deposition, which I have marked as 552.
8       Q.   You said in answer to my last question
9    that you were talking on behalf of some people.
10   Can you explain that a little further?
11      A.   Because I am talking on behalf of
12   Barclays, yup, and I am not an OCC expert, which
13   I am not, I will admit, so what I did was
14   actually spoke to the people in Barclays that
15   look after the OCC option, just to make sure I
16   understood what they did and what their
17   declaration said.
18      Q.   I understand. Who were those people
19   you talked to?
20      A.   Dan Dziemian, and don't ask me to
21   spell his last name, and Craig Jones.
22      Q.   Are those individuals both former
23   Lehman employees?
24      A.   Yes, they are.
25      Q.   Can you tell me what their positions

TSG Reporting - Worldwide    877-702-9580

Page 9

JAMES

1
2    are just now?
3       A.   Dan Dziemian is an operations person
4    for the OCC business, and Craig Jones works in
5    the Treasury world in Barclays, both operations.
6       Q.   When did you speak to Mr. Dziemian?
7       A.   Yesterday.
8       Q.   Was that the first time you spoke with
9    Mr. Dziemian?
10      A.   No.
11      Q.   When did you first speak to
12   Mr. Dziemian in connection with this litigation?
13      A.   Probably about a week ago. Yeah,
14   probably a week, if my memory serves correct. I
15   talk to Dan actually fairly often because of the
16   work we do together, but in regards to this is a
17   week.
18      Q.   And how is it you came to speak to
19   Mr. Dziemian?
20      A.   Due to his declaration, I wanted to
21   make sure I was happy with what he put in there,
22   and the questions that I am responding to talk
23   very specifically about OCC options.
24      Q.   Did you review Mr. Dziemian's
25   declaration before it was finalized?

TSG Reporting - Worldwide    877-702-9580

Page 10

JAMES

1
2  A.  No.
3  Q.  Can you tell me what you and
4  Mr. Dziemian discussed about a week ago?
5  A.  What was -- you know, what was in his
6  declaration, what the numbers were, what
7  happened, how the process worked.
8  Q.  Approximately how long did that
9  conversation last?
10  A.  15, 20 minutes.
11  Q.  Did you take any notes of that
12  conversation?
13  A.  No.
14  Q.  Was anyone else on the call apart from
15  you and Mr. Dziemian?
16  A.  No.
17  Q.  OK. Mr. Jones, Craig Jones?
18  A.  Yes.
19  Q.  Can you tell me when you first spoke
20  with him in connection with this litigation?
21  A.  That was actually yesterday when I had
22  both of them on the call, Dan and Craig.
23  Q.  You spoke to Mr. Dziemian twice?
24  A.  Yes.
25  Q.  And I think we have covered your

TSG Reporting - Worldwide    877-702-9580

Page 11

JAMES

1
2  recollection of the first conversation with
3  Mr. Dziemian about a week ago. Can you tell me
4  about your conversation with Mr. Jones and
5  Mr. Dziemian yesterday, please?
6  A.  It was just purely to confirm that
7  there wasn't anything that I missed and
8  reconfirm that I understood what I was talking
9  to.
10  Q.  Was anybody else on the telephone
11  call?
12  A.  My legal counsel.
13  Q.  Did you take any notes of that call?
14  A.  Nope.
15  Q.  Did you ever -- withdrawn.
16  Did you talk to Mr. Romain as part of
17  your preparation for your deposition?
18  A.  No. I spoke to him after, but I
19  didn't speak to him prior.
20  Q.  After or prior to what?
21  A.  My declaration. Sorry.
22  MS. BLOOMER:  Just to clarify the
23  record, I think he was asking whether you
24  spoke to Gary in preparation for this
25  deposition.

TSG Reporting - Worldwide    877-702-9580

Page 12

JAMES

1
2  A.  Oh, for the deposition or my
3  declaration? Apologies.
4  Q.  Deposition.
5  THE WITNESS:  Thanks, Trish.
6  A.  Yes. To the deposition, yes. The
7  declaration, no.
8  Q.  All right. My previous series of
9  questions were about preparation for the
10  deposition.
11  A.  Sorry.
12  Q.  When you were answering them, were you
13  answering them understanding my questions to be
14  relating to the declaration?
15  A.  Yes -- no, to the deposition. You're
16  fine. Apologies.
17  Q.  OK. So you did or did not speak to
18  Mr. Romain --
19  A.  Yes, I did.
20  Q.  And you spoke to Mr. Romain in
21  connection with your preparation for your
22  deposition; is that correct?
23  A.  It was more actually about his than it
24  was about mine, to be honest.
25  Q.  When did you first speak to Romain in

TSG Reporting - Worldwide    877-702-9580

Page 13

JAMES

1
2  connection with this litigation?
3  A.  This week.
4  Q.  Can you tell me how that call came to
5  happen.
6  MS. BLOOMER:  I am going to object.
7  To the extent it calls for discussions or
8  information that you received during your
9  discussions with your counsel, I am
10  instructing you not to answer. But
11  otherwise, you can answer.
12  A.  Then I won't answer.
13  Q.  Just Trish's objection is very fair.
14  In this question and in all of my questions, I'm
15  not seeking to discover information from you
16  that you only know from your counsel. So if the
17  answer is I only know that information because
18  of my counsel, then I don't want to know that
19  answer.
20  But if you know how, independent of
21  your conversation with Trish or any other
22  counsel, how it was that your conversation with
23  Mr. Romain was set up, you can answer that
24  question.
25  A.  The call was set up by Gary with

TSG Reporting - Worldwide    877-702-9580

Page 14

JAMES

1
2  counsel.
3      Q.  You said it was approximately one week
4  ago?
5      A.  No, no, no.  It was this week.
6      Q.  Which day this week?
7      A.  What's today?  Today is Thursday?
8  Tuesday.
9      Q.  Approximately how long did this call
10  take?
11      A.  It was five or ten minutes.  He just
12  wanted to clarify something.
13      Q.  What did he want to clarify?
14      A.  I think it was one of the numbers, to
15  be honest.  I honestly don't remember.
16      Q.  When you say one of the numbers, can
17  you be a little more specific?
18      A.  Numbers that are in my declaration.
19      Q.  You don't remember which number he
20  wanted to clarify?
21      A.  No.  Sorry.
22      Q.  Was anybody else other than your
23  counsel on this call?
24      A.  No.
25      Q.  Do you have any notes of that call?

TSG Reporting - Worldwide    877-702-9580

Page 15

JAMES

1
2      A.  Nope.
3      Q.  Have you spoken to anybody in
4  connection with this litigation who you know to
5  be an expert for Barclays?
6      A.  No, because I'm not sure who the
7  experts are, to be honest.  Sorry.
8      Q.  That's a fair clarification.  Have you
9  spoken to a gentleman by the name of
10  Mr. Leitner?
11          MS. BLOOMER:  You probably want to
12      give the first name.  That may help her.
13      A.  Yeah.  Sorry.
14          MS. BLOOMER:  Tony Leitner.
15      Q.  Anthony, Tony Leitner.
16      A.  Actually, I think he might have
17  been -- yes, I think he may have been on a call
18  once, but I'm actually not 100 percent sure.  I
19  think he may have been.
20          MS. BLOOMER:  Just testify to the best
21      of your recollection.  That's fine.
22      A.  Sorry.
23      Q.  Can you give me the best recollection
24  of the discussion that took place on the call
25  that you think Mr. Leitner may have been on?

TSG Reporting - Worldwide    877-702-9580

Page 16

JAMES

1
2      A.  I think it was --
3          MS. BLOOMER:  I am going to object to
4      the extent it requires the disclosure of
5      communications with your counsel.  Other
6      than underlying facts, obviously.
7      A.  Yeah, I have never spoken to him
8  otherwise.
9      Q.  Do you remember, other than
10  conversations with your counsel, that your
11  counsel participated in, was there any other
12  underlying factual discussion that you had on
13  this call that you believe Mr. Leitner
14  participated in?
15      A.  No.
16      Q.  When did this call take place?
17      A.  I actually don't remember.  A couple
18  of weeks ago.  I can't be specific.  Sorry.
19      Q.  Have you ever met or spoken to a
20  gentleman called Pfleiderer?
21      A.  No.
22      Q.  When did you first come to learn that
23  you would be giving a declaration in this case?
24      A.  A declaration or deposition?  Sorry.
25      Q.  Declaration.

TSG Reporting - Worldwide    877-702-9580

Page 17

JAMES

1
2      A.  The original declaration, I believe
3  was at the end of the summer.
4      Q.  When you say the original declaration,
5  what do you mean?
6      A.  When I was originally asked -- I was
7  originally told --
8          MS. BLOOMER:  I am going to object to
9      the form of the question to the extent it
10      requires disclosure of discussions with
11      counsel.
12      Q.  You mentioned in the answer to my last
13  question, Ms. James, an original declaration.
14  Can you explain without revealing the content of
15  discussions with counsel what that original
16  declaration was?
17          MS. BLOOMER:  I am going to object.
18      We are really bordering on work product
19      here, so I just want to make sure that the
20      record is clear that we are objecting and
21      that she shouldn't be discussing the work
22      that she was doing at the direction of
23      counsel or the communication she was having
24      with counsel.
25          MR. OXFORD:  That's fine.  I think

TSG Reporting - Worldwide    877-702-9580

Page 18

JAMES

1  that's carved out in my question.
2      So can you read my question back,
3  please.
4      (Record read)
5      A.   It is the same as my current
6  declaration.
7      Q.   Word for word it is the same as your
8  current declaration?
9      A.   I can't guarantee that without going
10 back and --
11     MS. BLOOMER: Objection.
12     Q.   In sum and substance, is it the same
13 as the declaration that you have in front of
14 you?
15     A.   Yes.
16     Q.   And that was originally prepared
17 approximately what time frame?
18     MS. BLOOMER: I am going to object
19 again. There was a process by which her
20 declaration was completed, and the process
21 is beyond the scope of what's fair game
22 under the privilege rules.
23     MR. OXFORD: I think the time is fair.
24     MS. BLOOMER: Sure.

TSG Reporting - Worldwide   877-702-9580

Page 19

JAMES

1      A.   Time as in -- sorry.
2      Q.   When did you prepare this original
3  declaration?
4      A.   I would have to go back and check. I
5  honestly don't remember. It was the end of the
6  summer. That's as much as I can tell you.
7      Q.   That's fair. Thanks.
8      A.   I think.
9      Q.   Ms. James, did you have any role in
10 performing due diligence in the sale transaction
11 between Barclays and Lehman?
12     A.   There was no due diligence, as far as
13 I'm aware.
14     Q.   Can you explain that answer a little
15 further?
16     A.   I am the futures expert for Barclays,
17 and I was never at any time asked to look at any
18 records. We were never given any records.
19     Now...
20     Q.   Now?
21     A.   Were we in discussions with Lehman
22 separate from the acquisition to buy the futures
23 business? Yes, we were. Well, actually not to
24 buy. I would correct that. To actually take

TSG Reporting - Worldwide   877-702-9580

Page 20

JAMES

1  over their customer business. But there was no
2  due diligence that was followed.
3      Q.   When you say "we," I presume "we"
4  refers to Barclays?
5      A.   Yes.
6      Q.   In discussions to take over Lehman's
7  customer business; is that correct?
8      A.   Yes.
9      Q.   Can you tell me everything you know
10 about those discussions, please.
11     MS. BLOOMER: Objection, form.
12     Q.   You can answer.
13     A.   We were approached -- I suppose that's
14 the best way, we were approached by the CME as
15 if we would have discussions with Lehman to
16 acquire -- to take over. We didn't buy it. We
17 weren't buying it, but to take over their
18 customer business so that their customers could
19 continue trading, and we agreed to do that.
20     Q.   The CME is a reference to the Chicago
21 Mercantile Exchange?
22     A.   Correct.
23     Q.   And how is it you know that Barclays
24 was approached by CME to take over Lehman's

TSG Reporting - Worldwide   877-702-9580

Page 21

JAMES

1  customer futures business?
2      MS. BLOOMER: I am going to object to
3  the question and instruct the witness not to
4  answer to the extent it requires a
5  disclosure of communications that she had
6  with her counsel.
7      Q.   OK, you can answer.
8      THE WITNESS: OK, now I'm confused,
9  because you say don't answer.
10     MS. BLOOMER: What I am telling you is
11 you can answer to the extent that it doesn't
12 require you to disclose communications that
13 you had with your lawyers.
14     THE WITNESS: OK.
15     Q.   Maybe I could give you --
16     MS. BLOOMER: She has never been
17 deposed before.
18     A.   Sorry.
19     MS. BLOOMER: Fair enough.
20     Q.   That's fine. Maybe I could -- I tried
21 this before, let me try it again. I'm not
22 seeking in any of my questions for you to
23 testify as to matters about which you know only
24 because of conversations with counsel.

TSG Reporting - Worldwide   877-702-9580

Page 22

JAMES

1
2    A.    Right.
3    Q.    So if you only know it, for example,
4    because you spoke to anyone at Boies Schiller or
5    anyone —
6    A.    No, no. I was on the phone with the
7    CME when Jeff Jennings, who ran the Lehman
8    futures business, asked if we as Barclays would
9    be prepared to take over their customer
10    business.
11    Q.    How did you come to be on that
12    telephone call?
13    A.    The CME called me and my boss.
14    Q.    Who is your boss?
15    A.    Tim Stack.
16    Q.    When did they call you and Mr. Stack?
17    A.    Sunday, the 14th of September.
18    Q.    Approximately what time?
19    A.    Midnight.
20    Q.    Midnight? So midnight, Sunday 14th,
21    early Monday morning?
22    A.    Yes.
23    Q.    And where were you when this call came
24    in?
25    A.    My house.

TSG Reporting - Worldwide    877-702-9580

Page 23

JAMES

1
2    Q.    And where was Mr. Stack?
3    A.    In my house. He -- well, actually,
4    the call originally came in while we were
5    actually in the cab on the way home. He was
6    dropping me and then going home, so we actually
7    got out of the cab, went into my house and made
8    the call.
9    Q.    The call came in from whom?
10    A.    The CME.
11    Q.    To Mr. Stack?
12    A.    Yeah.
13    Q.    Do you know who from the CME called
14    Mr. Stack?
15    A.    Kim Taylor.
16    Q.    Who is Kim Taylor?
17    A.    I am actually not sure of her official
18    title at the CME, but she is one of the senior
19    people at the CME.
20    Q.    If I understood your prior testimony
21    correctly, you and Mr. Stack were leaving the
22    office?
23    A.    Yes.
24    Q.    And that's Barclays' office?
25    A.    Yes, 200 Park.

TSG Reporting - Worldwide    877-702-9580

Page 24

JAMES

1
2    Q.    On Sunday evening around midnight?
3    A.    Um-hm. Yes.
4    Q.    What were you and -- withdrawn.
5    What were you working on that Sunday,
6    the 14th?
7    MS. BLOOMER: Objection, vague.
8    Q.    You can answer.
9    A.    We were looking at -- we were looking
10    at the markets and the volatilities based on
11    rumors of what was happening in the markets.
12    Q.    Did those rumors relate in any way to
13    Lehman?
14    A.    It was multiple entities.
15    Q.    I take it from your prior testimony
16    that you were not involved prior to the call
17    with the CME and Mr. Stack in the transfer of
18    any Lehman business to Barclays?
19    A.    No.
20    Q.    This was the first discussion you had
21    with anybody —
22    A.    Yup, yes.
23    Q.    -- in connection with the transfer of
24    futures or any other business from Lehman to
25    Barclays?

TSG Reporting - Worldwide    877-702-9580

Page 25

JAMES

1
2    A.    Yes, correct.
3    Q.    OK. Can you tell me — sorry.
4    Is Kim Taylor, is that a man or woman?
5    A.    Woman.
6    Q.    What did Ms. Taylor say to you and
7    Mr. Stack?
8    A.    She just asked would we be prepared to
9    have a conversation with Jeff Jennings from
10    Lehman about taking over their futures customers
11    business, and we said yes.
12    Q.    Do you know what Mr. Jennings' role
13    was at Lehman?
14    A.    He was the global head of the futures
15    business.
16    Q.    Do you know if he is employed by
17    Barclays today?
18    A.    He no longer is.
19    Q.    Did he at one point take a position
20    with Barclays?
21    A.    Yup.
22    Q.    Do you know when he left Barclays'
23    employment?
24    A.    It was at the beginning of the year.
25    March, April time. I'm actually not -- yeah.

TSG Reporting - Worldwide    877-702-9580

Page 26

JAMES

1
2  Q.  Beginning of 2009?
3  A.  Yes.
4  Q.  Do you know where he is employed
5  today?
6  A.  I believe he is at Credit Suisse.  But
7  I'm not 100 percent sure.
8  Q.  Approximately how long did the
9  conversation with Ms. Taylor last on Sunday
10 evening?
11 A.  It was literally a five-minute
12 conversation.  She -- it was an, "Are you
13 prepared to talk to Jeff Jennings," and the
14 response was, "Yes, we are," and she then put
15 Jeff on the phone, so -- I suppose like a
16 go-between.
17     And then she put Jeff on the phone and
18 we made arrangements to actually go into the
19 Lehman offices on Monday morning.
20 Q.  Did Ms. Taylor remain on the phone
21 while Mr. Jennings was on the phone with you and
22 Mr. Stack?
23 A.  I'm actually not sure, to be honest.
24 Q.  And approximately how long did the
25 whole conversation take?

TSG Reporting - Worldwide    877-702-9580

Page 27

JAMES

1
2  A.  It was literally -- she introduced, we
3  said yes, and we arranged then with Jeff to go
4  into the offices on Monday morning.  That was
5  it.  That was the whole of the conversation.
6  Q.  That affirmative yes was a decision by
7  Mr. Stack or you?
8  A.  Mr. Stack.
9  Q.  Did you then proceed to have that
10 meeting at Lehman on Monday morning?
11 A.  Yes, we did.
12 Q.  What time did that take place?
13 A.  I think it was 9 a.m.
14 Q.  And that's Lehman's offices at 745 7th
15 Avenue?
16 A.  Right, correct.
17 Q.  Who was present for that meeting?
18 A.  There was Tim Stack, myself, Sean
19 Byrne, B-Y-R-N-E, Alexandra Guest, who are all
20 Barclays employees.  There was Ken Raisler, who
21 is our counsel.
22 Q.  Sullivan & Cromwell; is that right?
23 A.  Yeah.
24     And then from the Lehman side, there
25 was Jeff Jennings, Donna Moran, Adam Cohen,

TSG Reporting - Worldwide    877-702-9580

Page 28

JAMES

1
2  Michael Macchiavernia, and Ron Filler.  And Mike
3  Nielsen was on the phone.
4  Q.  Just starting with the Barclays
5  employees, Tim Stack's position at the time was?
6  A.  Global head of futures for Barclays.
7  Q.  Is that his position today?
8  A.  Yes.
9  Q.  And you're currently employed as
10 director in the futures sales department for
11 Barclays?
12 A.  Correct, yeah.
13 Q.  Was that your title at the time?
14 A.  Yes.
15 Q.  And Sean Byrne, what was his title?
16 A.  Sean was the U.S. futures head at that
17 time.
18 Q.  Is he currently employed by Barclays?
19 A.  He is.
20 Q.  What's his role today?
21 A.  He runs sales and trading for futures.
22 Q.  Alexandra Guest, what was her --
23 A.  Is our compliance officer.
24 Q.  And was she your compliance officer at
25 the time of the meeting?

TSG Reporting - Worldwide    877-702-9580

Page 29

JAMES

1
2  A.  Yeah.
3  Q.  So we have four Barclays employees
4  there?
5  A.  Yes.
6  Q.  If you indicate affirmatively, it is
7  easier for Mary to take down.
8  A.  Sorry.
9  Q.  So on the Lehman side, we have
10 discussed Jeff Jennings already.  The second
11 person you identified was Donna?
12 A.  Donna Moran, and she was sales.
13 Q.  Is she employed by Barclays today?
14 A.  No.
15 Q.  Did she ever take a position at
16 Barclays?
17 A.  Yes, she did.
18 Q.  Do you know when she left?
19 A.  It was the end of the summer.
20 Q.  Do you know where she is employed
21 today?
22 A.  I don't believe she is.
23 Q.  You don't believe she is employed by
24 anyone?
25 A.  No.

TSG Reporting - Worldwide    877-702-9580

Page 30

JAMES

1
2      Q.   Do you know what Adam Cohen's position
3    was at Lehman at the time?
4      A.   A relationship manager.
5      Q.   Did he take a position with Barclays?
6      A.   Yes.
7      Q.   What was that position?
8      A.   It is the same position, relationship
9    manager.
10     Q.   Is he still employed by Barclays
11   today?
12     A.   Yes, he is.
13     Q.   In that same position?
14     A.   Yes, he is.
15     Q.   I am going to murder the next one.
16   Michael Macchiavernia?
17     A.   Macchiavernia. I have the same
18   problem.
19         He was the front office IT liaison, I
20   suppose.
21     Q.   Did he take a job with Barclays?
22     A.   Yes, he did.
23     Q.   What position did he take in Barclays?
24     A.   He now works in the product
25   department.

TSG Reporting - Worldwide    877-702-9580

Page 31

JAMES

1
2      Q.   I take it from your answer that he is
3    currently employed by Barclays?
4      A.   Yes, he is.
5      Q.   I think you said that a gentleman by
6    the name of Ron Filler was on the phone?
7      A.   No. Ron Filler was in the room. Mike
8    Nielsen was on the phone.
9      Q.   I'm sorry.
10     A.   That's OK.
11     Q.   Ron Filler's position at the time was?
12     A.   From what I understand, he was there
13   as a consultant because he was their legal
14   counsel.
15     Q.   You believe he was in-house counsel
16   for Lehman?
17     A.   But I don't --
18         MS. BLOOMER:  Objection to form.
19     Q.   You can answer.
20     A.   OK. I believe he was actually no
21   longer employed. I think he was there as a
22   consultant.
23     Q.   I understand. And Mike Nielsen was on
24   the phone?
25     A.   Yup.

TSG Reporting - Worldwide    877-702-9580

Page 32

JAMES

1
2      Q.   Who is Mike Nielsen?
3      A.   He is their -- he was their global
4    operations manager, for futures.
5      Q.   Did he take a position with Barclays?
6      A.   No.
7      Q.   Do you know where he is employed
8    today?
9      A.   He went to work for a charity. I have
10   no idea which one.
11     Q.   Approximately how long did this
12   meeting last on Monday, the 15th?
13     A.   I think around an hour and a half from
14   memory, but that's from memory.
15     Q.   Did you take any notes of this
16   meeting?
17     A.   No.
18     Q.   Do you know if any of the Barclays
19   employees took notes at the meeting?
20     A.   No, I don't think we did.
21     Q.   Do you know if any of the Lehman
22   attendees took notes at the meeting?
23     A.   I don't know.
24     Q.   You don't remember, sitting here
25   today, whether anyone was taking notes?

TSG Reporting - Worldwide    877-702-9580

Page 33

JAMES

1
2      A.   No.
3      Q.   Can you tell me as best you can recall
4    what was discussed during those one and a half
5    hours?
6      A.   It was a very high-level discussion on
7    the exchanges where the customers were trading,
8    what types of customers they had, and what we
9    thought would be the best way for transitioning
10   the business from Lehman to Barclays.
11     Q.   Was there any discussion of a
12   consideration being paid?
13     A.   No, none whatsoever.
14     Q.   Do you know why that was?
15     A.   No. I'm assuming because -- my
16   assumption, nothing more -- because they
17   approached us. It wasn't us approaching them.
18     Q.   Do you have an understanding of why
19   Lehman approached Barclays to transfer their
20   futures business?
21     A.   From my understanding, they actually
22   approached a couple of brokers. We were not the
23   only people.
24     Q.   Who else do you understand they
25   approached?

TSG Reporting - Worldwide    877-702-9580

Page 34

JAMES

2  A.  I don't know.
3  Q.  Was the discussion at that meeting on
4  the 15th about the transfer of only Lehman --
5  only Lehman's futures business as relates to
6  customers?
7  A.  Correct.
8  Q.  Was there any discussion of
9  transferring Lehman's business as it relates to
10  proprietary trading?
11  A.  No.
12  Q.  Was there any discussion of transfer
13  of Lehman's business as it relates to trading
14  that they conducted on behalf of Lehman
15  affiliates?
16  A.  No, because Lehman affiliates, to us
17  it gets classed as proprietary business. So it
18  was purely customer.
19  Q.  Was there any discussion that you
20  recall during that meeting on the 15th of any
21  risks that Barclays would run in assuming
22  Lehman's customer futures business?
23  A.  It depends on what you mean by risk.
24  Can we just --
25  Q.  Sure. Let's define risk as broadly as

Page 35

JAMES

2  possible.
3  MS. BLOOMER: Can you just read the
4  question again.
5  THE WITNESS: Yeah. Terminology.
6  (Record read)
7  A.  When you are taking over a futures
8  business, the risks are going to be associated
9  with how that company runs their business. So
10  are there risks? Yes. Can you clarify them at
11  that time of discussion? No. You are only
12  going to know the risks once you actually get
13  into the details, and there was no details.
14  Q.  What details would you need to
15  understand the risks that you have just
16  described?
17  A.  You would need to know how they
18  operate their books and records, whether their
19  books and records were clean, whether they were
20  reconciled, how they looked after their money,
21  where they had their money segregated and
22  secured. Basically how they transacted their
23  operations.
24  Q.  It is your understanding, Ms. James,
25  that at some point Barclays did assume

Page 36

JAMES

2  responsibility for Lehman's futures customer
3  business, correct?
4  MS. BLOOMER: Objection to form.
5  Q.  Is that correct?
6  A.  Yes.
7  Q.  Do you have an understanding of the
8  date at which Barclays assumed responsibility
9  for the customer futures operation from Lehman?
10  A.  When the acquisition was finalized.
11  Q.  That was September 22, 2008?
12  A.  Yes.
13  Q.  Prior to September 22, 2008, which
14  I'll also refer to as the closing of the deal --
15  A.  OK.
16  Q.  -- did Barclays perform any due
17  diligence on the details that you have just
18  testified to?
19  A.  No.
20  Q.  Can you tell me why that was?
21  A.  Because without -- one of the issues
22  is that Lehman's were not in a clean state to
23  actually provide any information. Plus until
24  you acquire the business, trying to ask for some
25  of that information of course is confidential,

Page 37

JAMES

2  so -- that you can talk in a high-level
3  discussion about the kinds of accounts and the
4  kinds of business. You can't really get into
5  the detail of what's there.
6  So all of the discussions were high
7  level about taking over the business, rather
8  than actually digging into what was there.
9  Q.  Do you have any knowledge of the
10  requests for information that Barclays did make
11  of Lehman prior to September 22, 2008, in
12  connection with the potential takeover of the
13  Lehman futures customers business?
14  A.  Only -- hang on. Can we just clarify
15  that. Are you meaning in regards to the deal
16  that was being done by the broker dealer or in
17  regards to the conversations we are having for
18  just the futures business?
19  Q.  It is a good distinction you make.
20  Let's take the futures business first.
21  A.  So the futures business, yes. Because
22  it was the meeting on the Monday that I was at,
23  which were all high-level conversations, but we
24  never requested any information, if that
25  makes -- it was general conversation, not

Page 38

JAMES

1    JAMES
2    detailed information.
3    Q.    So in connection with the discussions
4    separate and apart from the larger transaction
5    that was finalized and closed on the 22nd of
6    September --
7    A.    Yeah.
8    Q.    -- did you ask for any information or
9    did Barclays ask for any information about
10    Lehman's futures customer business --
11    A.    Not that I am aware.
12    Q.    -- other than that meeting?
13    A.    Not that I am aware.
14       MS. BLOOMER:  I am going to note for
15    the record, this is somewhat in my view
16    beyond the scope of the 30(b)(6).  So to the
17    extent that she is not aware, that shouldn't
18    be taken as the fact that Barclays isn't
19    aware.
20       MR. OXFORD:  That's understood.
21    Q.    Have we exhausted your testimony,
22    Ms. James, on the topic of Barclays assuming the
23    Lehman customer business outside of a larger
24    transaction?
25       MS. BLOOMER:  I am going to object to

TSG Reporting - Worldwide    877-702-9580

Page 39

1    JAMES
2    the form of the question.
3    Q.    Do you understand my question?
4    A.    I think so.  Yeah, I think that's
5    everything.
6    Q.    Turning now to the other topic that
7    you have introduced, the -- the transaction that
8    closed on September 22, between Barclays and
9    Lehman, can you tell me, please, what your role
10    was, if any, in connection with that
11    transaction?
12    A.    Prior to the September 22, I had no
13    involvement in the negotiations of the deal.
14    Q.    Do you know who was involved in the
15    negotiations of the deal?  And directing my
16    question specifically to the futures and
17    derivatives business.
18    A.    I believe the deal team was run by
19    Stephen King.
20    Q.    Do you know who else was on the deal
21    team?
22    A.    No.
23    Q.    Safe to say that you were not part of
24    that deal team?
25    A.    Correct.

TSG Reporting - Worldwide    877-702-9580

Page 40

1    JAMES
2    Q.    Do you recall having any conversations
3    with Mr. King in connection with the activities
4    of the deal team prior to the closing of the
5    transaction?
6    A.    There were conversations on Sunday,
7    21st, which are actually in regards to some
8    information that was sent to Mr. King and
9    Mr. Stack, which is actually covering in the
10    questions which they asked me to look at and
11    translate.
12    Q.    We will get to those specifics in a
13    minute, but just speaking generally just now,
14    can you tell me what you recall about those
15    conversations with Mr. King and Mr. Stack on
16    Sunday, the 21st?
17       MS. BLOOMER:  I just want to be clear
18    that I'm going to object to the extent that
19    you were involved in discussions with any
20    lawyers at the time and to not disclose the
21    contents of any of those communications.
22    A.    OK.  It's purely what's in my
23    questions here that we have been -- that we are
24    looking at, in the fact that Mr. Stack and
25    Mr. King received e-mails from Lehman, which are

TSG Reporting - Worldwide    877-702-9580

Page 41

1    JAMES
2    referred to in my -- you know, and could I
3    translate, could I explain what those reports
4    actually meant.
5       MR. OXFORD:  Just for the record, so
6    we are clear, the witness is indicating that
7    she is looking at Exhibit --
8    A.    It's my notes.  Sorry.
9       MR. OXFORD:  -- 552.
10       MS. BLOOMER:  Whenever you're ready, I
11    think we are getting close to a time for a
12    brief break.
13       MR. OXFORD:  Now is a good time, if
14    you want to take a brief break.
15       MS. BLOOMER:  Thank you, I appreciate
16    that.
17       (Recess)
18    BY MR. OXFORD:
19    Q.    Do you recall, Ms. James, that the --
20    whether the conversations you just testified to
21    before the break with Mr. King and Mr. Stack
22    related to options or futures positions?
23    A.    The conversations were based on a
24    report that was sent to Mr. Stack to -- asking
25    me to explain the details of the report.  So

TSG Reporting - Worldwide    877-702-9580

Page 42

JAMES

1  Mr. Stack, Mr. King did not know how to read
2  what the numbers -- what it meant.
3      Q.   And did this report relate to futures
4  or --
5      A.   It was --
6      Q.   Or options?
7      A.   It was the report from the OCC, which
8  actually covers both.
9      Q.   And we will get to the detail of it
10 shortly. This is the OCC report that you
11 reference in page 1 of your notes --
12     A.   Yes.
13     Q.   -- marked as Exhibit 552?
14     A.   Correct.
15         MS. BLOOMER: I'm just going to object
16 to the form. There are a couple of
17 different reports noted, so I just want to
18 be clear.
19     Q.   What was Mr. King's position at
20 Barclays?
21     A.   I don't know because I never met him
22 before.
23     Q.   When was the first --
24     A.   Sunday, the 21st.

TSG Reporting - Worldwide    877-702-9580

---

Page 43

JAMES

1      Q.   Where did you meet Mr. King?
2      A.   In the offices in 200 Park.
3      Q.   Do you recall approximately what time
4  of day?
5      A.   No.
6      Q.   What were you doing in the office on
7  Sunday, the 21st?
8      A.   We were in the office on the Sunday,
9  trying to just make sure we were good due to
10 volatile -- it was a crazy week, from a market
11 perspective, and actually looking to make sure
12 that we had the letters in place for taking over
13 the futures business on the Monday morning, and
14 making sure that the clearing houses knew that
15 we would be taking over and we would be
16 responsible for the positions, and creating a
17 list of what we would require from the Lehman
18 operation guys once we took over.
19     Q.   You referenced letters in your prior
20 answer. Can you explain a little more what you
21 mean?
22     A.   Due to Barclays buying Lehman or
23 acquiring Lehman, however we want to term it,
24 the clearing houses were not comfortable that

TSG Reporting - Worldwide    877-702-9580

---

Page 44

JAMES

1  the margin calls that would have been made on
2  Monday morning would be satisfied by Lehman.
3  They thought there was a risk.
4      So we as Barclays agreed to guarantee
5  that payment on the Monday morning. We
6  assumed -- you know, we guaranteed from the
7  clearing house perspective, we would make the
8  margin call for the customer accounts. If not,
9  then all the customer accounts would have been
10 in default, which had been a major issue.
11 That's a major risk.
12     Q.   Did Barclays agree to guarantee just
13 customer accounts at these clearing houses?
14     A.   Yes, correct.
15     Q.   Did Barclays ever agree to guarantee
16 proprietary accounts?
17     A.   I don't believe so.
18     Q.   Do you have any understanding of why
19 that -- why there was a difference in Barclays'
20 approach between customers and proprietary
21 trades?
22     A.   On the futures side of the business,
23 which I was involved with, there was no house
24 positions we were made to be understand.

TSG Reporting - Worldwide    877-702-9580

---

Page 45

JAMES

1          MS. BLOOMER: I am sorry, I didn't
2  hear that.
3      A.   I am sorry. There was no -- on the
4  futures side of the business, we were made to be
5  understand that there was no house positions.
6          MS. BLOOMER: OK.
7      A.   Yet on the OCC side, I believe there
8  was. I know, I now know there was, but I don't
9  know whether Barclays guaranteed it to the
10 exchange or not. I don't know. They may have
11 done.
12     Q.   And by the OCC side, you're referring
13 to options generally?
14     A.   Yes.
15         MS. BLOOMER: Objection to form.
16     Q.   Did Lehman clear options through any
17 organization other than OCC?
18     A.   I don't know, to be honest.
19     Q.   And the operations for which Barclays
20 assumed responsibility, did you ever come to
21 learn that Lehman cleared trades through any
22 organization other than the OCC?
23         MS. BLOOMER: Objection to form. You
24 said trades this time, not options, just to

TSG Reporting - Worldwide    877-702-9580

Page 46

JAMES

1    clear the record.
2        A.    Sorry, do we mean just equity options
3    or any options? Just, I just need to clarify
4    which ones.
5        Q.    Let's start with equity options.
6        A.    I actually don't know that because I'm
7    not in the OCC world. So -- I'm not in the
8    equity option world. I stand corrected on this.
9    But were there options on other exchanges? Yes.
10   Which is --
11       Q.    And did those exchanges clear through
12   OCC?
13       A.    No. Not for the equity options. Or
14   not for other options, no. Sorry, can we
15   just --
16       Q.    Did you ever come to learn that Lehman
17   had house positions on futures?
18       A.    There -- I came to learn after the
19   fact, so after the 22nd, that there were
20   positions for their affiliates that were trading
21   that were sitting in the house accounts for
22   futures, and for their equity options, I had
23   found out that they had house equity options,
24   and then they had affiliates trading, and their
25

TSG Reporting - Worldwide    877-702-9580

Page 47

JAMES

1    positions were actually in customer and house.
2    But that was after -- that was after the 22nd.
3    I didn't know prior.
4        Q.    When you say in customer and house,
5    can you be a little bit more specific.
6        A.    Normal practice is your affiliate
7    business gets carried as house positions. It
8    gets carried as proprietary. Lehman had
9    commingled some of their proprietary trades in
10   with their customer business.
11       Q.    Other than the OCC reports that you
12   reference on page 1 of your notes, Exhibit 552,
13   did Mr. King or Mr. Stack ask you to review any
14   other data from Lehman in connection with either
15   futures or options?
16       A.    No, no.
17       Q.    My question --
18           MS. BLOOMER: Objection to form.
19       Q.    My question is, prior to the closing?
20       A.    Oh, no.
21       Q.    You described yourself early in this
22   deposition as Barclays' expert on futures?
23       A.    Correct.
24       Q.    Is there anybody else in Barclays with
25

TSG Reporting - Worldwide    877-702-9580

Page 48

JAMES

1    the level of expertise on futures that you have?
2        A.    No.
3        Q.    So you have no reason to believe that
4    there is someone else within Barclays who was
5    looking at information on Lehman's futures prior
6    to the closing?
7            MS. BLOOMER: Objection to the form.
8    Mischaracterizes her testimony.
9            MR. OXFORD: Can you read the question
10   back, please, Mary?
11           (Record read)
12       A.    I don't know somebody else was
13   looking. They may have been. Would they have
14   had as much futures knowledge as me? No.
15       Q.    Do you know why it is that Mr. Stack
16   was not asked to read the OCC reports that you
17   were asked to interpret?
18           MS. BLOOMER: Objection, foundation.
19       A.    I'm assuming because he has never seen
20   one before. That is an assumption.
21       Q.    I am going to turn to your declaration
22   shortly, but just before we do that, I wanted to
23   see if we could agree on some terms to make the
24   deposition go a little smoother.
25

TSG Reporting - Worldwide    877-702-9580

Page 49

JAMES

1        Do you have an understanding, in
2    connection with your experience in the futures
3    and options industry, of what the term "initial
4    margin" means?
5        A.    Yes. I understand what initial margin
6    is.
7        Q.    Can you tell me what that is, please?
8        A.    Initial margin is the money that is
9    required by the clearing house as security
10   against the position you are trading.
11       Q.    Is that a term that's used both within
12   the options industry and the futures industry?
13       A.    Yes.
14       Q.    And the definition is --
15       A.    The same.
16       Q.    -- applicable to both industries?
17       A.    Yes.
18       Q.    Same set of questions for maintenance
19   margin.
20       A.    Maintenance margin is exactly the same
21   as initial margin. It is the requirement that
22   you put up with the exchange to cover the
23   position you're trading. Maintenance margin is
24   used against a member of an exchange because it
25

TSG Reporting - Worldwide    877-702-9580

13 (Pages 46 to 49)

Page 50

JAMES

1  is normally a lower rate than initial margin.
2      Q.   So to make sure I understand the
3  distinction, is it correct to say that a
4  customer would be — a customer of Lehman's, for
5  example, would be required to post initial
6  margin in connection with a position on an
7  exchange?
8      A.   Yes.
9          MS. BLOOMER: Objection to the form.
10     Q.   And if this were to be a proprietary
11 position placed by Lehman, would that be
12 described as maintenance margin?
13         MS. BLOOMER: Objection to the form of
14 the question. Are you asking hypothetical
15 or are you -- can you just clarify the
16 question?
17         MR. OXFORD: Yeah. I'm seeking to
18 understand the difference between initial
19 margin and maintenance margin. The witness
20 explained that maintenance margin was
21 something that was posted by a member of the
22 exchange.
23     Q.   Is that the only difference between
24 initial and maintenance margin?

TSG Reporting - Worldwide    877-702-9580

Page 51

JAMES

1
2      A.   Yes.
3      Q.   Same questions for exchange minimum
4  margin.
5          MS. BLOOMER: Objection to the form of
6  the question. Please ask her a question.
7      Q.   Do you have familiarity in your
8  experience in the industry with the term
9  "exchange minimum margin"?
10     A.   Exchange minimum margin is maintenance
11 margin. It is the same thing.
12     Q.   Mr. Romain used in his deposition
13 yesterday a term called "open trade value." Do
14 you have an understanding of what that phrase
15 means in the context of a futures and options
16 industry?
17         MS. BLOOMER: Objection, foundation.
18     A.   Can I clarify? Did he use "open trade
19 value" or "open trade equity"?
20     Q.   Value.
21     A.   Then I can't guarantee that I know
22 what he means. If he said "open trade equity,"
23 yes. Open trade value, no.
24     Q.   What does open trade equity mean to
25 you?

TSG Reporting - Worldwide    877-702-9580

Page 52

JAMES

1
2      A.   Open trade equity is the value of an
3  open positions on a customer's account. It is
4  the current market value.
5      Q.   And does that include both assets and
6  liabilities within that account?
7          MS. BLOOMER: Objection to the form of
8  the question.
9      A.   What do you mean by assets and
10 liabilities?
11     Q.   Let me ask it this way. Could that --
12 if the open trade equity on a customer's
13 account -- withdrawn.
14         Could the open trade equity on a
15 customer's account be positive as well as
16 negative?
17     A.   Yes.
18     Q.   If I were to use the phrase "net open
19 trade equity," would you understand what I
20 meant?
21         MS. BLOOMER: Objection to the form
22 and foundation.
23     A.   No. Because I would need you to
24 elaborate some more. Sorry.
25     Q.   The phrase "open trade equity" in

TSG Reporting - Worldwide    877-702-9580

Page 53

JAMES

1
2  connection with a customer's account, does that
3  refer in your understanding to the net of all
4  the customer's positions?
5          MS. BLOOMER: Objection to the form.
6      A.   It depends on how you are asking the
7  question, which is why I am -- because you can
8  ask what is the open trade equity per product or
9  you can ask what is the open trade -- the total
10 open trade equity. So --
11     Q.   Right. I see. I think -- I hope we
12 are no longer talking past each other.
13         There is -- for each customer account,
14 there is open trade equity on each position?
15     A.   Correct.
16     Q.   And when the net of those positions is
17 added together, one gets to the total open trade
18 equity?
19     A.   Correct.
20     Q.   Do you have an understanding of what
21 the phrase "mark to market" means in the context
22 of the options and futures business?
23         MS. BLOOMER: Objection to the form.
24     A.   Mark to market actually has two
25 meanings. And unfortunately, it depends on --

TSG Reporting - Worldwide    877-702-9580

14 (Pages 50 to 53)

Page 54

JAMES

1  so mark to market either is exactly the same as
2  open trade equity, or some people say mark to
3  market is the difference between yesterday's
4  closing price and today's closing price, so...
5      Q.  How is the term "mark to market" used
6  in the context of the OCC reports that you have
7  testified about that are reflected on page 1 of
8  your notes?
9          MS. BLOOMER:  Objection, foundation.
10     A.  I don't believe we actually talk about
11 mark to market on our report.
12     Q.  I don't think it is specifically
13 referenced in your notes.  We can look at a
14 document later.  I'm just trying to do this
15 efficiently.
16         If OCC marks a position to market, do
17 you have an understanding of what that means?
18     A.  If -- it is normally yesterday's
19 closing price to today's closing price.
20     Q.  And that means at the end of trading,
21 for example, on September 19, the OCC would mark
22 the value of those positions as at the close of
23 September 19 on the OCC's books?
24         MS. BLOOMER:  Objection.

TSG Reporting - Worldwide    877-702-9580

Page 55

JAMES

1     Q.  Is that your understanding?
2     A.  Yes.
3     Q.  And do you also have an understanding
4  of whether that mark to market that we have just
5  discussed is the basis on which an exchange such
6  as the OCC calculates the margin requirement?
7          MS. BLOOMER:  Objection.
8     A.  Which margin requirement?  The initial
9  margin or the open trade equity?  It is --
10    Q.  Either.
11         MS. BLOOMER:  Objection to the form.
12    A.  Can we go back over that.
13         (Record read)
14    A.  I think we need to clarify margin,
15 because the exchange will calculate two numbers.
16 They will calculate the initial margin and they
17 will calculate your open trade equity, your mark
18 to market, your unrealized, whichever
19 terminology you want, which is also classed as
20 margin.  So we need to be specific.
21    Q.  Is the initial margin the margin that
22 is required by the exchange when the position is
23 first opened?
24    A.  Yes.

TSG Reporting - Worldwide    877-702-9580

Page 56

JAMES

1     Q.  And does the exchange from time to
2  time, depending on the movement of the markets,
3  does that exchange sometimes request additional
4  margin?
5     A.  Yes.
6          MS. BLOOMER:  I am going to object to
7      the form of the question, and just for the
8      sake of clarity, there are obviously
9      differences in the way that futures and
10     options work.  I mean you're talking about
11     the OCC, you're talking about both.
12         So I just caution you that the record
13     can get very confused if you are not
14     specific.
15    Q.  OK.  And what is the term that you
16 would use to describe that additional margin
17 required by the OCC?
18    A.  It is still initial margin.
19    Q.  I am sorry, can you explain to me
20 again the open trade value and how that fits
21 into the mark to market?
22         MS. BLOOMER:  Objection to form.  Did
23     you mean open trade value or equity?
24    Q.  Open trade equity.  Sorry.

TSG Reporting - Worldwide    877-702-9580

Page 57

JAMES

1     A.  Open -- hang on.  Can we go back and
2  say that again.  Sorry.
3          (Record read)
4     A.  They are the same, so mark to market
5  is the difference between last night's closing
6  price and tonight's closing price.  Open trade
7  equity is the difference between last night's
8  closing price and tonight's closing price, or it
9  can be the difference between original trade
10 price and last night's closing price.
11    Q.  I think we have covered this, but we
12 have a pretty messy record, so let me try this
13 one more time.
14         Is it your understanding that the
15 exchanges such as the OCC mark positions to
16 market each evening?
17    A.  They actually mark twice.
18    Q.  When do they mark?
19    A.  They mark in intraday and they mark
20 end of day.  And that's to cover the futures and
21 the options.  Yeah.
22    Q.  Does intraday marking happen in both
23 the futures market and the options market?
24         MS. BLOOMER:  Objection to the

TSG Reporting - Worldwide    877-702-9580

Page 58

JAMES

```
 1    JAMES
 2    foundation.
 3        A.   I'm not sure with the options.  It
 4    does in the futures.  We would need to confirm
 5    with the options.
 6        Q.   And that mark to market process, do
 7    you understand that to be the basis on which
 8    exchanges such as the OCC calculate the margin
 9    requirement of its exchange members?
10        A.   Just to be specific, the margin
11    requirement, we are talking about the initial
12    margin and the open trade equity, the mark to
13    market?
14        Q.   Yes.
15        A.   Yes.
16        Q.   I hope that was helpful.  I don't know
17    whether it will be or not.  We will find out.
18            Could you have Exhibit 535-A in front
19    of you.  It is your declaration.
20        A.   Yeah.
21        Q.   If you could turn your attention first
22    of all to paragraph 2.
23            Can you tell me what your position was
24    with Barclays prior to March 1, 2006?
25        A.   I was an associate director.  Still
```

TSG Reporting - Worldwide    877-702-9580

Page 59

JAMES

```
 1    within the futures department.
 2        Q.   And was that your position from when
 3    you joined Barclays in 2001 through 2006?
 4        A.   Yes.
 5        Q.   Paragraph 3, you say, "On
 6    September 22, 2008, defined as the closing,
 7    Barclays acquired, among other things, LBI's
 8    exchange traded derivatives and LBI's then
 9    existing business as a futures commission
10    merchant."
11            MS. BLOOMER:  Is there a question?
12            MR. OXFORD:  Yes.
13        Q.   Do you see that?
14        A.   Yup.
15        Q.   What's the basis for your knowledge
16    about that?  There --
17            MS. BLOOMER:  I am going to object to
18    the form of the question.  The witness is
19    instructed not to answer the question to the
20    extent it requires her to disclose
21    communications that she had with counsel.
22            MR. OXFORD:  Sure.  And I will just
23    point out before the witness answers this
24    question, there is a declaration in
25
```

TSG Reporting - Worldwide    877-702-9580

Page 60

JAMES

```
 1    JAMES
 2    paragraph 1 that this is all based on
 3    personal knowledge.
 4        Q.   So that's what I am looking for.  I'm
 5    not interested in your conversation with
 6    counsel, as we have discussed before.  I would
 7    like to know what the basis is for your
 8    statement in paragraph 3.
 9            MS. BLOOMER:  Again, instruct you not
10    to answer to disclose privileged
11    information.
12        A.   Can you clarify for me what you're
13    after?  Sorry.
14        Q.   I'm probably complicating it
15    unnecessarily.
16            How is it that you know Barclays
17    acquired LBI's exchange traded derivatives and
18    Barclays then existing business as a futures
19    commission merchant?
20        A.   Now, I can't answer that because I was
21    told by legal counsel.
22            MS. BLOOMER:  You can answer the
23    question to the extent your personal
24    knowledge tells you that the acquisition
25    occurred.
```

TSG Reporting - Worldwide    877-702-9580

Page 61

JAMES

```
 1    JAMES
 2        A.   That's exactly what happened.  I was
 3    told by legal counsel.
 4        Q.   Independent of legal counsel, you
 5    can't answer that -- withdrawn.
 6            Independent of your discussion with
 7    legal counsel, you don't have any basis for
 8    knowing what Barclays acquired and didn't
 9    acquire?
10            MS. BLOOMER:  I am going to object to
11    the question.
12            I want the record to be clear, you can
13    explain your personal experience to the
14    extent it tells you anything about whether
15    an acquisition took place of these
16    particular businesses or not.
17            THE WITNESS:  OK.
18            MS. BLOOMER:  You just can't explain
19    communications that you had that led to that
20    understanding.  OK?
21            THE WITNESS:  OK.
22            MR. OXFORD:  I think objection to form
23    is the proper objection there, Trish.
24            MS. BLOOMER:  I just want to be sure
25    that the witness understands the distinction
```

TSG Reporting - Worldwide    877-702-9580

Page 62

JAMES

1 between what she can and cannot discuss.
2 MR. OXFORD: I think that's clear.
3 Q. Turning to paragraph 4, you say, "As
4 of the closing, LBI held open futures including
5 futures and options on futures that were traded
6 on both domestic and foreign exchanges."
7  Do you see that?
8 A. Yes.
9 Q. You make a distinction between futures
10 and options on futures. Can you explain to me
11 the difference between the two?
12 A. The reason there is a distinction is
13 because people have the habit of when you say
14 options, thinking you mean equity options, which
15 are the OCC options. And in this instance, we
16 are talking about the options that are traded on
17 the futures exchanges and cleared in a futures
18 account.
19 Q. You say "this instance." What do you
20 mean by "this instance"?
21 A. Well, what I mean by "this instance,"
22 I am -- where I am saying held -- they -- if I
23 just said they held open futures, yeah, in my
24 declaration, it wouldn't have covered the fact
25

TSG Reporting - Worldwide 877-702-9580

Page 63

JAMES

1 that there was options as well on the futures,
2 which is why we clarified. But if we said
3 options in my declaration, people assume I mean
4 equity options.
5 Q. I understand.
6 A. Yeah.
7 Q. Got you. Thank you.
8 A. Sorry.
9 Q. No, no.
10 Can you give me to the best of your
11 ability the list of domestic and foreign
12 exchanges on which LBI held these open futures?
13 A. Yes. Is it listed? No, we didn't.
14 Sorry, I thought we actually had the list of
15 them, but we don't.
16 And you want the exchanges? Can I
17 just clarify, you want the exchanges, not the
18 clearing houses, yeah?
19 Q. Yes. We will get to clearing houses,
20 but I'm just trying to -- this is a little
21 painful, but I need to go through your
22 declaration to make sure I understand what you
23 are talking about.
24 A. So the exchanges were Chicago
25

TSG Reporting - Worldwide 877-702-9580

Page 64

JAMES

1 Mercantile Exchange; NYMEX, New York Mercantile
2 Exchange; COMEX, which is the Commodity Options
3 Mercantile Exchange; the CBOT, which is the
4 Chicago Board of Trade.
5 The ISE U.S. Exchange; the CCFE, which
6 is the Chicago Climate Futures Exchange; the
7 CFE, which is the Chicago Futures Exchange; the
8 Kansas City Board of Trade.
9 The London International Financial
10 Futures Exchange; the Eurex Exchange; the SIMEX
11 Exchange, which is Singapore International
12 Monetary Fund; TSE, which is the Tokyo Stock
13 Exchange; TIFFE, which is the Tokyo
14 International Financial Futures Exchange.
15 There is the Korean and I can't think
16 of the name of the exchange. Sorry. And the
17 Malaysian Ringgit. And Montreal, Canada. And
18 Australia, which is the SFE.
19 I think that's all of them.
20 Q. OK.
21 A. Forgive me if I have missed.
22 Q. You're forgiven. If you remember any
23 others as you go through, just feel free to
24 supplement the record.
25

TSG Reporting - Worldwide 877-702-9580

Page 65

JAMES

1 Taking the list of domestic exchanges
2 first, can you tell me where those futures are
3 cleared?
4 A. So the clearing house that they use?
5 Q. Yes.
6 A. CME, NYNEX, COMEX and CBOT all clear
7 through the CME clearing house.
8 ISE U.S. clears through ISE U.S., so
9 it clears through itself.
10 CFE clears through the OCC.
11 CCFE clears through the Clearing
12 Corporation.
13 Q. Kansas City Board of Trade?
14 A. Kansas City Board of Trade clears
15 through the Clearing Corporation.
16 Q. I presume from your answers that the
17 OCC is the Options Clearing Corporation?
18 A. Correct.
19 Q. And that's distinct from the Clearing
20 Corporation?
21 A. Correct.
22 Q. Where is the Clearing Corporation
23 based?
24 A. Chicago.
25

TSG Reporting - Worldwide 877-702-9580

Page 66

JAMES

1
2      Q.   Turning quickly to the international
3  exchanges, can you tell me where they are
4  cleared, if you know?
5      A.   LIFFE is cleared at the LCH, which is
6  the London Clearing House.
7      Eurex is Eurex, which is Germany.
8      Q.   That's self-clearing?
9      A.   It is self-clearing, yeah.
10      And all of the others are actually
11  independent clearing houses based with the
12  exchanges.
13      Q.   OK. Can you read the next sentence
14  just to yourself, the second sentence of
15  paragraph 4, and let me know when you're done.
16      A.   Yup.
17      Q.   You have a reference there to
18  "non-affiliated clearing broker accounts,"
19  Ms. James. Can you explain what you mean?
20      A.   Correct. The reason we say
21  non-affiliated is because Lehman had what we
22  would term broker accounts with their affiliate
23  counterparts for certain exchanges, but then
24  they also had relationships for broker accounts
25  with entities that were not affiliated to them,

TSG Reporting - Worldwide    877-702-9580

Page 67

JAMES

1
2  i.e., for example, Macquarie or Kenanga.
3      Q.   And the accounts with the number of
4  U.S. clearing corporations, they are the
5  clearing corporations that you testified to a
6  minute ago?
7      A.   Yes, they are.
8      Q.   The next sentence, you referred to
9  foreign futures being maintained in accounts
10  with a number of foreign affiliates, and
11  non-affiliated brokers and foreign clearing
12  corporations. Do you see that?
13      A.   Yup, correct.
14      Q.   Can you tell me which were the foreign
15  affiliates you referenced?
16      A.   The foreign affiliates, Lehman Japan,
17  Lehman Korea, Lehman Singapore, and LBIE.
18  Lehman Brokers International Europe, I believe
19  is their full name.
20      Q.   I see you're looking at your
21  declaration. Which exhibit?
22      A.   Yes. Sorry. I looked at Exhibit 1,
23  because I don't necessarily remember their
24  names.
25      Q.   Do you remember the list of

TSG Reporting - Worldwide    877-702-9580

Page 68

JAMES

1
2  non-affiliated brokers and foreign clearing
3  corporations?
4      A.   They are actually on my Exhibit 1 and
5  2 as well. So they are actually Bank of
6  Montreal, Kenanga, Macquarie, MF Global,
7  Newedge. That's it. Oh, Samsung. And Polaris.
8  I missed one. Apologies.
9      Q.   Can you turn the page on your
10  declaration and look at paragraph 6, please.
11  You say, "As of closing, LBI held open LBI
12  proprietary futures in nine different accounts."
13      Do you see that?
14      A.   Yup.
15      Q.   Which were those nine accounts?
16      A.   Their proprietary trades were held
17  in -- they are actually the ones that are listed
18  on Exhibit 1.
19      Q.   To your declaration?
20      A.   Yes. The only one that's not on there
21  is the CFE, which is the VIX, but apologies,
22  because I'm not sure if you said brokers or
23  clearing houses, so I don't -- so I'm just
24  clarifying.
25      Q.   What I said was -- I asked you --

TSG Reporting - Worldwide    877-702-9580

Page 69

JAMES

1
2      A.   I believe it just says nine different
3  accounts. Apologies. So the one that is
4  missing is CFE.
5      MS. BLOOMER: To be clear, it says --
6  you're looking at which paragraph?
7      MR. OXFORD: Six.
8      MS. BLOOMER: Six, OK. This is
9  talking about held open LBI proprietary
10  futures.
11      THE WITNESS: Yeah.
12      MS. BLOOMER: Open proprietary
13  futures.
14      MR. OXFORD: I think that's enough
15  coaching. Thank you.
16      MS. BLOOMER: Look, there is no
17  secrets here. We are just trying to get the
18  record right. That is all.
19      Q.   So which proprietary futures account
20  is missing from Exhibit 1?
21      A.   Actually, can we just -- my six is
22  proprietary only. The CFE, apologies, is the
23  affiliates, just to make confirmation I've got
24  that right.
25      It's me, I am confusing myself.

TSG Reporting - Worldwide    877-702-9580

Page 70

JAMES

1   JAMES
2   Apologies.
3       Q.   OK.  So I think our record is a little
4   muddled now.
5           My question is, which are the nine
6   different accounts that you reference in
7   paragraph 6 of your declaration?
8       A.   They are the ones in Exhibit 1 of my
9   declaration.
10      Q.   And there is nothing else?
11      A.   No.
12      Q.   You say in paragraph 7, "As of the
13  closing, LBI maintained positive collateral
14  balances in each of the LBI proprietary future
15  accounts."
16          Do you see that?
17      A.   Yup.
18      Q.   What do you mean by positive
19  collateral balances?
20      A.   They weren't -- the accounts weren't
21  in negative.  They weren't overdrawn.
22      Q.   Is that collateral a reference to
23  margin?
24      A.   The collateral is in reference to
25  money that is held in the account or collateral

TSG Reporting - Worldwide    877-702-9580

Page 71

JAMES

1   JAMES
2   that's -- securities that are in the account,
3   cash that's in the account, that's collateral.
4   So, i.e., the account is not overdrawn, they
5   weren't in deficit.
6       Q.   And that collateral may or may not be
7   used as margin on the particular exchange at any
8   given time?
9       A.   Correct.
10          MS. BLOOMER:  Objection, ambiguous.
11      Q.   Now, how is it that you prepared
12  Exhibit 1?  Withdrawn.  Let me lay a foundation.
13          Did you prepare Exhibit 1?
14      A.   Yes.
15      Q.   How is it that you prepared that?
16      A.   We jumped --
17          MS. BLOOMER:  This is Exhibit 1 to her
18  declaration, as opposed to E-1 that she was
19  called here to testify about?  Just to be
20  sure.  I don't want her to be confused.
21  There is two different Exhibit 1's.
22          MR. OXFORD:  How many Exhibit 1's does
23  she have in front of her?
24          MS. BLOOMER:  I'm not in front of her,
25  so I don't see.  I just want a clear record.

TSG Reporting - Worldwide    877-702-9580

Page 72

JAMES

1   JAMES
2   She was called here to talk about an
3   Exhibit E-1, and I don't want her to be
4   confused as to which exhibit you are asking
5   about.
6       A.   Exhibit 1 was prepared by me.
7       Q.   That's Exhibit 1 to your declaration?
8       A.   Yes.
9       Q.   How did you prepare it?
10      A.   I took the broker statements from each
11  of these brokers and took the balances from the
12  accounts and put them on a spreadsheet.
13      Q.   Exhibit 1 at the top has the legend
14  "Undelivered Margin from Proprietary Futures
15  Accounts Valued as of Closeout."  Do you see
16  that?
17      A.   Correct.
18      Q.   What do you mean valued as of account
19  closeout?
20      A.   So this is the value on the account
21  after the positions had been closed.
22      Q.   And is it fair to say that the
23  positions were closed in different exchanges at
24  different times?
25      A.   Correct.

TSG Reporting - Worldwide    877-702-9580

Page 73

JAMES

1   JAMES
2       Q.   Do you have the underlying support for
3   Exhibit 1 in your -- not in your possession
4   today, but do you have it in your office?
5       A.   Yes.
6       Q.   Where did you get it from?
7       A.   I got it from the operations staff.
8       Q.   And the operations staff of whom?
9       A.   Barclays.  That were prior Lehman.
10      Q.   When did you get it?
11      A.   At the time of putting this together.
12  So the beginning of the year, January, last
13  year.
14      Q.   So January of this year, or the end of
15  last year?
16      A.   January '09.
17      Q.   Do you know when Barclays received
18  those underlying exchange statements?
19      A.   No.  Sorry.
20      Q.   Do you know who would know the answer
21  to that question?
22      A.   I'm assuming somebody in operations
23  that they were sent to.
24      Q.   Who in operations did you get them
25  from?

TSG Reporting - Worldwide    877-702-9580

Page 74

JAMES

A.    I reached out to George Paragham.

Q.    How do you spell Paragham?

A.    P-A-R-A-G-H-A-M.

Q.    And do those underlying account statements that you used to create Exhibit 1, are those all once the exchange has closed out all of Lehman's proprietary future positions?

A.    Let me just clarify something. Not all of the positions were closed by the exchange. Our Barclays traders had to close some of those positions.

Q.    Understood.

A.    Yeah.

Q.    With that clarification in mind, do the account statements that underlie this exhibit all reflect the positions that Lehman held at these brokers or custodians once the accounts had been closed out?

MS. BLOOMER: Objection to the vague use of the words "positions" and "accounts."

A.    Yes.

Q.    Did those reports include any information about what of this collateral was held as margin?

TSG Reporting - Worldwide    877-702-9580

Page 75

JAMES

MS. BLOOMER: Objection to the form.

A.    I'm not sure what you --

Q.    I'll ask a better question. I'll try to at least.

You described this as undelivered margin, correct?

A.    Yes.

Q.    This 457 million dollars that you have in Exhibit 1 you described as undelivered margin.

A.    It's -- it's--

Q.    Why do you describe it as margin?

A.    It is the money that's sitting in the account at the brokers that has not come back.

Q.    And do you know how much of it was used at margin — as margin at the time of closing?

A.    It would all be margin. That's what it is in the account.

Q.    Do you know how much of the margin was excess to the minimum required by each exchange?

MS. BLOOMER: Objection to the form.

A.    You need to clarify what you mean by "excess."

TSG Reporting - Worldwide    877-702-9580

Page 76

JAMES

Q.    I am sorry, I thought I did.

Each exchange requires a certain minimum number, amount of margin for each position, correct?

A.    Yes.

Q.    And from time to time, Lehman would have margin that exceeds those requirements, correct?

A.    Yes.

Q.    Do the reports that you base this report on explain what the exchange minimum margin was and whether there was any excess margin beyond that?

A.    No. But it -- we need to clarify -- no. And the -- when you -- margin and -- when you have money in an account, that is your margin account. OK? That can be more than the requirement for the initial margin for your current position, because a lot of these exchanges, you have to prefund your trading. So unless you have money in the account, you can't trade.

So margin is -- it is -- it is one of those clarifications between margin and excess.

TSG Reporting - Worldwide    877-702-9580

Page 77

JAMES

I'm just trying to — I want to make sure that we are not --

Q.    Are you able to tell me whether at the time of closing, these accounts contained margin that was in excess of the minimum required by each exchange? And I'm referring to the account and the broker custodian accounts referenced on Exhibit 1 to your declaration.

MS. BLOOMER: Objection to the form. You are asking whether she can tell you that now or whether she knew that then?

MR. OXFORD: I am asking whether she can tell me now.

A.    I would have to go and look.

Q.    Do you know whether or not Barclays knew at the time of closing what -- sorry, whether these accounts included excess margin?

A.    We had no idea.

Q.    Why did you have no idea?

A.    Because Lehman didn't either. Sorry.

Q.    Can you explain that a little further?

A.    When Barclays took over on September 22, we actually asked the Lehman operations people for a list of their positions

TSG Reporting - Worldwide    877-702-9580

Page 78

JAMES

1    JAMES
2    and their brokers and their accounts, and they
3    were not capable of giving it to us. And in
4    fact, it took a fair number of days for us to
5    get all the information that was required,
6    because their books and records were in such a
7    mess.
8        And in fact, the proprietary trades
9    that were in these accounts we didn't even know
10    were there for a couple of days, because they
11    couldn't actually tell us that they were there.
12    Q.    Do you know whether or not Barclays
13    asked Lehman prior to the closing for
14    information about its proprietary future trades?
15    A.    I don't know.
16    Q.    When did Barclays first learn about
17    the margin that is reflected in Exhibit I, the
18    457 million dollars?
19    A.    When we first knew it was actually
20    in -- the amount of money that was in the
21    accounts or the amount of money that was in the
22    accounts after the positions had been closed?
23    Q.    Sorry. That's a good distinction.
24        When did -- I am sorry, withdrawn.
25        When did Barclays first learn that

TSG Reporting - Worldwide    877-702-9580

Page 79

JAMES

1    JAMES
2    Lehman had proprietary future accounts?
3    A.    In the week following the 22nd.
4    Q.    Do you know whether or not Barclays
5    asked Lehman whether there were proprietary
6    future accounts prior to closing?
7    A.    I don't believe so. I don't know.
8    Q.    And can you be more specific in terms
9    of when Barclays first learned about these
10    proprietary future accounts?
11    A.    On September 22, once we had taken
12    over, we requested information on all of the
13    accounts. So the customers' accounts, the
14    broker relationships, and what the positions
15    were.
16        And between the 22nd and the -- which
17    was the Monday, and the Thursday or the Friday,
18    the operations guys actually kept coming up with
19    new house positions that they didn't actually
20    tell us on day one.
21        So on the 22nd, we were informed of --
22    and even though -- the VIX positions, which are
23    not on this exhibit because they were for the
24    affiliates. It slowly came to light that they
25    had positions sitting in house accounts, over

TSG Reporting - Worldwide    877-702-9580

Page 80

JAMES

1    JAMES
2    the course of that week.
3    Q.    Who were the operations guys that you
4    were getting this information from?
5    A.    Mike Nielsen, who ran global
6    operations for Lehman.
7    Q.    Is he employed --
8    A.    And people that work for him. And no,
9    he is not still with...
10    Q.    He is the same Mike Nielsen who was at
11    the meeting on the 15th?
12    A.    Correct.
13    Q.    Do you know where he works today?
14    A.    As I said earlier, I think he works
15    for a charity.
16    Q.    Sorry.
17    A.    That's OK.
18    Q.    Do you know which of these accounts
19    were closed out by Barclays and which were
20    closed out by the exchanges?
21    A.    Not off the top of my head, no,
22    because it was not something I personally did.
23    Q.    Have you seen account statements from
24    the brokers or custodians that reflect the
25    margin requirements as of closing?

TSG Reporting - Worldwide    877-702-9580

Page 81

JAMES

1    JAMES
2    A.    I have seen them, yes.
3    Q.    How is it you came to see them?
4    A.    In E -- the E-1 document -- the other,
5    the one that was referred to in -- those
6    statements were as of the time of the open
7    positions. So would they have the numbers on?
8    Yes. Did I look at them? No.
9    Q.    Do you know whether or not those
10    account statements were available to Lehman at
11    the time of the closing?
12    A.    I would hope so.
13    Q.    Do those account statements, to your
14    knowledge, break down the margin between the
15    various forms in which margin might be held,
16    such as cash or securities?
17    A.    They should do, yes.
18        MR. OXFORD: And Trish, do you know if
19    these have been produced to us?
20        MS. BLOOMER: Broker statements? I'll
21    have to confirm that. I assume that they
22    were produced, but I can't be sure, so I'll
23    confirm and let you know.
24        MR. OXFORD: Thank you.
25        MS. BLOOMER: And you're talking about

TSG Reporting - Worldwide    877-702-9580

---

Page 82

JAMES

1    the ones that were used -- the source
2    documents that were used for the information
3    on Exhibit E-2, and E-1. E1 or -- E1, I
4    guess.
5        THE WITNESS: E-1.
6        MS. BLOOMER: Yeah.
7    A.    Can we just actually check that?
8    Exhibit 1 or E-1?
9    Q.    I wasn't asking about any particular
10    exhibit. I was asking about the --
11        MS. BLOOMER: Materials that showed
12    the open positions on the 19th. I have got
13    it. I will take care of that.
14        MR. OXFORD: Thank you.
15        THE WITNESS: Sorry.
16    Q.    Were you involved in the closing out
17    of these open positions, Ms. James?
18    A.    No.
19    Q.    Who was?
20    A.    It was Sean Byrne and Sean McKenna.
21        MS. BLOOMER: I am sorry to interrupt.
22    On the issue of these exhibits, just to
23    clarify, these are pre-closing Lehman
24    documents. So we are not producing
25    TSG Reporting - Worldwide    877-702-9580

---

Page 83

JAMES

1    pre-closing Lehman documents. They are
2    already available. That's my understanding.
3        So I'm happy to refer them -- refer
4    you to them, if I can. But just for the
5    record, that's not among the documents we
6    are producing.
7        MR. OXFORD: Well, we can have a
8    discussion at a break, Trish, but to the
9    extent these were in Barclays' possession, I
10    think we have a good reason to request them.
11        MS. BLOOMER: They were not in
12    Barclays' possession at the time zone that
13    you were asking for documents.
14        MR. OXFORD: OK.
15    Q.    Ms. James, you will see on the last
16    sentence of paragraph 8, it says, "On completion
17    of the closeout process, the value of the
18    remaining LBI proprietary futures collateral,
19    according to broker statements reflecting the
20    value in these accounts after all positions were
21    closed out, was approximately 457,205" -- sorry,
22    "$457,205,950."
23    A.    Yes.
24    Q.    That's the total that you reflect on
25    TSG Reporting - Worldwide    877-702-9580

---

Page 84

JAMES

1    Exhibit 1 there?
2    A.    Correct.
3    Q.    Now, were you involved in making that
4    calculation? Did you -- withdrawn.
5        Do you know what the cost was of
6    closing out those positions?
7    A.    What do you mean by cost? Can we
8    just --
9    Q.    Well, the account statements as of
10    September 19 for the accounts reflected in
11    Exhibit 1 presumably have a number higher than
12    457 million; is that correct?
13    A.    I don't know. I would have to look.
14    Q.    Do you know whether or not there were
15    open positions within those accounts?
16    A.    These accounts are the ones that had
17    open positions. So they all had open positions
18    as of the time we took over on September 22.
19    Q.    Have you had any involvement in
20    calculating the value of those open positions?
21    And let's go back to our original definitions of
22    open trade equity.
23        MS. BLOOMER: Can you repeat the
24    question. I am sorry.
25    TSG Reporting - Worldwide    877-702-9580

---

Page 85

JAMES

1        MR. OXFORD: Sure.
2    Q.    Did you have any involvement in
3    calculating the open trade equity value of the
4    positions in the accounts reflected on
5    Exhibit 1?
6        MS. BLOOMER: Objection to form.
7    A.    I'm not -- I'm not sure --
8    Exhibit 1 -- and this is just why I need some
9    clarification, please. Exhibit 1 is after the
10    trades have been closed. So there is no open
11    trade equity.
12    Q.    Right, I understand that. But I don't
13    have an Exhibit 1 that is pre-closing.
14    A.    No. I wouldn't have calculated the
15    numbers. The numbers would come from the broker
16    statements and Lehman's books and records.
17        MR. MAGUIRE: Can we take a short
18    break?
19        MR. OXFORD: Sure.
20        (Recess)
21    BY MR. OXFORD:
22    Q.    Ms. James, could you have in front of
23    you Exhibit 534, please.
24        MS. BLOOMER: 534-A?
25    TSG Reporting - Worldwide    877-702-9580

Page 86

JAMES

1
2    MR. OXFORD: 534-A. Yes, thank you.
3    Q.    And can you turn to -- unfortunately
4    the pages are not numbered, but to the eighth
5    page of that document, please.
6        And just for the record, the last line
7    says, "For the basis of Barclays' claims to the
8    positions."
9    A.    What is this one?
10    Q.    It says, "For the basis of Barclays'
11    claims to the positions," at the bottom.
12        MS. BLOOMER: I don't see that.
13        THE WITNESS: This one.
14        MS. BLOOMER: Just for clarification,
15    whose handwritten notes are on these?
16        MR. OXFORD: I'll identify this for
17    the record. These are not -- they're not
18    handwritten notes. They're typewritten
19    notes of Gary Romain that were marked at his
20    deposition yesterday.
21        THE WITNESS: Oh, OK.
22        MS. BLOOMER: Whose notes are on it?
23    There are handwritten notes on it.
24        MR. OXFORD: There are?
25        MS. BLOOMER: On this there are.

TSG Reporting - Worldwide    877-702-9580

Page 87

JAMES

1
2    MR. OXFORD: That looks like
3    Mr. Maguire's handwriting, but I'll confirm.
4        MS. BLOOMER: There are a couple of
5    notes throughout.
6        MR. OXFORD: I would think that is
7    Mr. Romain's actually, but let me clarify
8    when we go off the record.
9        MS. BLOOMER: You won't be asking any
10    questions about that?
11        MR. OXFORD: I am not asking questions
12    about those.
13        MS. BLOOMER: OK.
14    Q.    Have you seen this document before,
15    Ms. James?
16    A.    No, sorry.
17    Q.    If you could take a moment to look at
18    the last paragraph on page 8 that begins, "The
19    open traded value." Do you see that paragraph?
20    A.    Yup.
21    Q.    If you could read that to yourself and
22    let me know when you're done.
23    A.    OK.
24    Q.    You will see that Mr. Romain's notes
25    in the first sentence there talk about the open

TSG Reporting - Worldwide    877-702-9580

Page 88

JAMES

1
2    trade value of the proprietary positions on
3    foreign exchanges and certain non-OCC cleared
4    domestic exchanges as of closing being
5    approximately negative 13 million.
6        Did you have any involvement in
7    calculating that figure?
8    A.    No.
9    Q.    Do you know who did?
10    A.    I would assume Gary.
11    Q.    You might be surprised.
12        If you wanted to go about calculating
13    the open trade, the net or the total open trade
14    equity of proprietary positions in the accounts
15    listed on Exhibit 1 to your declaration, how
16    would you go about doing that?
17        MS. BLOOMER: Objection. You're
18    asking her how she would value the open
19    trade equity?
20        MR. OXFORD: Yeah.
21        MS. BLOOMER: From a finance
22    perspective?
23        MR. OXFORD: I am asking her how she
24    would value it.
25        MS. BLOOMER: Thank you.

TSG Reporting - Worldwide    877-702-9580

Page 89

JAMES

1
2    A.    Can I ask, it would depend on the --
3    what is still open? So if the position was
4    open?
5    Q.    Yeah.
6    A.    I would look at the price of the trade
7    versus the closing price of the day that you're
8    choosing to value it against, because the whole
9    time the trade is open, it is going to move
10    every day based on the closing price.
11    Q.    Where would you get that information
12    from?
13    A.    I would either -- depending on -- if
14    we are talking specifically to these positions,
15    I would either ask Lehman operations for their
16    positions or I would look at the broker
17    statements. One or the other.
18        So either Lehman books and records or
19    the broker statements, depending on what you
20    could get.
21    Q.    Would you be able to tell from --
22    let's take the broker's statement -- what was
23    the net open trade equity of positions in a
24    particular account fairly easily?
25        MS. BLOOMER: I am going to object to

TSG Reporting - Worldwide    877-702-9580

Page 90

JAMES

1    the form of the question and the foundation.
2    I think you had asked her whether she had
3    any involvement in this and she said she
4    didn't, so I want to be clear about the
5    foundation of this question.
6        MR. OXFORD: I think it is clear. I'm
7    asking her -- I have asked that question,
8    and that's been answered, and now I am
9    asking a different question.
10        Q.    Which is, if you wanted to calculate
11    the net or total open traded value on a
12    particular account or set of accounts, how would
13    you go about doing that?
14        A.    The open trade equity? Yeah, just --
15    I would most likely look at the Lehman books and
16    records to see their original trade price and
17    the closing price of the day that we are trying
18    to get the open trade equity value to, because
19    it moves every day.
20        Q.    Would that be a difficult calculation
21    for you to perform?
22        A.    It depends on the amount of open
23    positions and the products.
24        Q.    Why does it depend on those two
25

TSG Reporting - Worldwide    877-702-9580

Page 91

JAMES

1    variables?
2        A.    Every futures product has a different
3    value associated and a different tick size
4    associated with it, so you have got to know each
5    product specifically to actually do that
6    calculation.
7        Q.    Is the information that you need to do
8    that calculation typically contained within the
9    broker's report?
10        A.    No.
11        Q.    Where is that information typically
12    contained?
13        A.    On the exchange's website, will give
14    you the core specifications of the product.
15        Q.    How would you go about determining the
16    total value in Lehman proprietary futures
17    accounts that are reflected on Exhibit 1 to your
18    declaration?
19        MS. BLOOMER: Objection to form.
20        A.    What -- what we did, which I said
21    earlier, is I took the broker's statements and
22    took the balances after all the positions had
23    been closed, and that's the number on Exhibit 1.
24        Q.    And if you wanted to do that at the
25

TSG Reporting - Worldwide    877-702-9580

Page 92

JAMES

1    end of the day on September 19, 2008, how would
2    you have gone about that?
3        MS. BLOOMER: Objection to form.
4        A.    It would be the same process. I
5    wouldn't be doing a calculation. That's --
6    that's why I am getting confused. Sorry.
7        Q.    So all you would need would be the
8    broker's statement that would tell you the net
9    value of the open positions, correct?
10        MS. BLOOMER: Objection to form.
11        A.    You mean the total equity? Yes. But
12    does that necessarily tie back to Lehman's books
13    and records? No.
14        Q.    I understand. Independent of Lehman's
15    books and records, if you wanted to know on
16    September 19, 2008, what the total equity value
17    of the open trades were on a particular account,
18    you would look simply to the broker's statement.
19        MS. BLOOMER: Objection to the form.
20        A.    Yes.
21        Q.    Would that broker's statement also
22    explain to you how much collateral was posted to
23    that particular account?
24        MS. BLOOMER: Objection to the form.
25

TSG Reporting - Worldwide    877-702-9580

Page 93

JAMES

1    Are you talking about broker's statements
2    that they didn't have at the time? Is that
3    what you are asking her about?
4        MR. OXFORD: I am asking how -- I
5    think my question is very clear.
6        MS. BLOOMER: How she would do it on
7    the 19th, when she didn't have the
8    statements? Is that your question?
9        MR. OXFORD: I don't whether she had
10    the statements or not.
11        MS. BLOOMER: Maybe you should ask her
12    that to set a foundation.
13    BY MR. OXFORD:
14        Q.    I think it is pretty clear, my
15    question, but let's back up.
16        If you wanted on September 19, 2008,
17    to calculate the total value or equity in the
18    proprietary futures accounts reflected on
19    Exhibit 1, how would you go about doing that?
20        A.    As of September 19, we weren't
21    entitled to, so -- but I would have had to
22    request the broker statements, and I would look
23    at the information in the broker's statements.
24        Q.    If you looked at the information in
25

TSG Reporting - Worldwide    877-702-9580

Page 94

JAMES

1  the broker statements, would you be able to
2  answer that question about the total value or
3  net equity of the open positions in that
4  account?
5      MS. BLOOMER: Objection to the form.
6      A.   Yes. I could point out the open trade
7  equity number on those statements, yes.
8      Q.   And I think you testified before, but
9  I just want to be clear, you could also identify
10  from those statements how much collateral or
11  margin was posted against those open trades?
12  Correct?
13      MS. BLOOMER: Objection to the form.
14  Mischaracterizes.
15      A.   Can we just clarify, you'd want to
16  know what the actual requirement from the broker
17  was for those positions?
18      Q.   That's my next question.
19      A.   Oh. Then I don't understand the first
20  one, sorry.
21      Q.   You have told me that in order to
22  calculate the total open trade equity of a set
23  of positions in a particular account, and we are
24  discussing this in the context of the

TSG Reporting - Worldwide    877-702-9580

Page 95

JAMES

1  proprietary futures accounts that are reflected
2  on Exhibit 1 to your declaration, you would look
3  at the broker's statement and that would tell
4  you the answer to that question, correct?
5      A.   Correct.
6      Q.   Would that same broker's statement
7  also tell you how much margin was required by
8  the broker or the exchange to be posted as
9  against those positions?
10      A.   It should do. And I -- that's why I
11  am saying it should.
12      Q.   And would those broker statements that
13  you have just testified about typically reflect
14  whether or not there was excess margin or
15  collateral posted over and above the minimum
16  requirements by that exchange or clearing house?
17      A.   Can we just clarify what you mean by
18  excess here? Because I have a problem with the
19  word "excess," I'll be very honest. Because
20  "excess" kind of gives the impression that it
21  is, you know, free money, and it is really not.
22  Let's be honest about this.
23      So that's why I want to clarify when
24  you use "excess," "excess" in the futures world

TSG Reporting - Worldwide    877-702-9580

Page 96

JAMES

1  is a very different word to what's used in the
2  rest of the world. So I want to clarify, what
3  do you mean by "excess"?
4      Q.   I mean more than -- well, withdrawn.
5      Would the broker reports that you
6  would look to, to calculate or to show you what
7  the total open equity positions were, would
8  those same broker reports show you the margin
9  required by that exchange?
10      A.   They should do, and the reason I am
11  saying they should is because certain of the
12  brokers that they used, it does not, which is
13  why I am...
14      Q.   And would those same statements
15  typically show the amount of collateral that was
16  posted in addition to the amount of collateral
17  that was required by that exchange?
18      MS. BLOOMER: Objection to the form.
19      At the time -- at the snapshot of the
20  broker's statement or -- I mean, I don't
21  think the question is clear about what time
22  you're talking about a requirement.
23      Q.   I'm talking about at any given date,
24  but particularly September 19, 2008.

TSG Reporting - Worldwide    877-702-9580

Page 97

JAMES

1      A.   But I can't talk to September 19.
2  That's -- that's my problem.
3      Q.   I understand. I'm not asking you --
4  Ms. James, I'm not asking you what you did. I
5  understand your testimony that you were not
6  involved in any such due diligence.
7      A.   Right.
8      Q.   I am asking you if you had to answer
9  this question, how would you go about doing it?
10  Does that help you answer the question?
11      A.   OK. And this is why I want to clarify
12  "excess," because the problem is, people have
13  the habit of using the word "excess" as though
14  it is something that shouldn't be there. OK.
15  Which is not the case in the futures world.
16      What you need to understand with the
17  way the futures account works, the money that's
18  held on your futures account is there to secure
19  your trading in that environment. Yup. So you
20  will have your open trade equity value that
21  moves every single day. You will have cash on
22  the account that you have put up to cover that
23  open trade equity, OK. You will have an initial
24  margin requirement that has been calculated

TSG Reporting - Worldwide    877-702-9580

Page 98

JAMES

1  based on the position you have open at that
2  time.
3         And then there may or may not be --
4  and then you'll get what we call your excess
5  deficit. OK? Which is known in the futures
6  world as period, this is the money that is above
7  and beyond what is required for this particular
8  day's trading. OK?
9         That money can also be used or is also
10  used to fund your intraday margin calls, which
11  of course you don't know what they are at the
12  time, and also on certain exchanges your
13  prefunding. So in most of the Asian exchanges,
14  you have to prefund. So if you want to trade,
15  unless you have got money or collateral
16  securities in the account, you cannot trade.
17         Which is why the word "excess" is a
18  bit -- that's why I have a problem with it,
19  sorry, because people assume "excess" is
20  something that somebody could have taken away,
21  and that's actually not the case.
22     Q.   I appreciate that answer. That clears
23  up a lot for me. Thank you.
24     A.   So yes, if somebody said to me -- yes,

TSG Reporting - Worldwide    877-702-9580

Page 99

JAMES

1  I would look at the broker's statements and
2  hopefully get all the information that's
3  required.
4     Q.   And if in this example, Lehman were to
5  have closed out at the end of the day on the
6  19th of September their proprietary futures
7  positions, would you be -- by looking at those
8  statements, be able to tell how much equity or
9  value would be returned to Lehman?
10         MS. BLOOMER: Objection to form. And
11  foundation.
12     A.   I just want to double check. If I
13  looked at a broker statement that Lehman had,
14  they have closed the positions, what the value
15  was? No.
16     Q.   Why is that?
17     A.   Because all I can tell you is the
18  balance in the account.
19     Q.   And why are you not able to tell me
20  the value that would return to Lehman if those
21  positions were closed out?
22     A.   Well, can we just clarify what you
23  mean by "value"? Because perhaps -- to me, with
24  all the conversations we have had earlier,

TSG Reporting - Worldwide    877-702-9580

Page 100

JAMES

1  value, we have been talking about the open trade
2  equity to the value of the open positions.
3  There is no open positions, there is no value.
4     Q.   Right. Maybe I can --
5     A.   Sorry.
6     Q.   Let's go back. Let's go back to
7  Exhibit 1, because I think we are getting close
8  here.
9         In the accounts reflected in
10  Exhibit 1, there were open positions that Lehman
11  held as of the 19th of September, 2008, correct?
12     A.   Yes.
13     Q.   And there was also margin?
14     A.   Yup.
15     Q.   And you have told me that you think
16  you would be able to tell me by looking at the
17  broker statements, with some exceptions, what
18  the value of those open positions was at the
19  close of a particular date.
20         MS. BLOOMER: Objection to form.
21     Q.   How then would you calculate --
22  withdrawn.
23         You have also told me those broker
24  statements would include how much margin or

TSG Reporting - Worldwide    877-702-9580

Page 101

JAMES

1  collateral was posted against those positions,
2  right?
3     A.   It should do, yes.
4     Q.   And also how much margin was required
5  against those positions on -- by the exchange.
6         MS. BLOOMER: Objection to the form.
7  Mischaracterizes the testimony.
8     Q.   Correct?
9     A.   It should do. Yes.
10     Q.   And then if Lehman were on Monday
11  morning, when the exchange is opened, to
12  liquidate those trades, does the broker
13  statement that you have been talking about tell
14  you how much value would return to Lehman?
15         MS. BLOOMER: After the liquidation?
16         MR. OXFORD: Yes.
17     A.   It would give you the total amount in
18  the account that they could remove. Exactly the
19  same as my Exhibit 1.
20     Q.   I see.
21         MR. OXFORD: Now might be a good time
22  for a lunch break.
23         MS. BLOOMER: OK.
24         (Luncheon recess; 12:25 p.m.)

TSG Reporting - Worldwide    877-702-9580

Page 102

1    JAMES
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 103

1                JAMES
2            AFTERNOON SESSION
3                1:21 p.m.
4        THE WITNESS: I wanted to go back and
5    clarify something. When we were talking
6    before the break about the closeouts and
7    looking at the statement and the value, and
8    I had to go back and read the question,
9    sorry, I've muddled the two together, yeah,
10   because the question was, can you tell from
11   the statement the value of the positions,
12   which is correct, you can.
13        But can you tell the value of those
14   positions prior to them being liquidated?
15   No, you can't, which is what I just want to
16   clarify.
17        So can you look at a statement and
18   tell what its value is going to be? No.
19   BY MR. OXFORD:
20        Q.  What would you have to look at to
21   determine the -- what the value of those
22   positions are going to be?
23        A.  Well, you can't. I don't have a
24   crystal ball. Because the problem is, you don't
25   know what price you are going to close out at.

TSG Reporting - Worldwide    877-702-9580

Page 104

1                JAMES
2    And that's why I wanted to go back and double
3    check what was said again, because you said can
4    you tell from the broker's statement, and then
5    they close them, and I thought it was the other
6    way around.
7        So I thought we said can you tell from
8    a broker's statement after you have closed them,
9    yes. Can you tell before they have closed them,
10   no. All you can tell is the value of as of last
11   night. But you can't tell what the value of
12   that closeout is until you physically close it
13   in the market.
14       Q.  Because the market will move?
15       A.  The positions are going to move. It
16   is a volatile -- which it was at that time. It
17   is moving around all over the place. So you
18   can't -- and I thought we meant -- yes, you can
19   look at the statement after they have been
20   closed. You can't look at the statement before
21   they have been closed. Does that --
22       Q.  I think I --
23       A.  Sorry.
24       Q.  I think I understand your
25   clarification.

TSG Reporting - Worldwide    877-702-9580

Page 105

1                JAMES
2        If you were to look at the broker's
3    statements that you testified to just before
4    lunch --
5        A.  Yeah.
6        MS. BLOOMER: These are the statements
7    on the 19th.
8        Q.  The statements on the 19th. You would
9    be able to tell the total open equity positions
10   in that account, correct?
11       A.  Yes. As of close of business of the
12   19th.
13       Q.  And you would also know the exchange
14   minimum margin that the exchange requires as
15   against those positions, correct?
16       A.  As of close of business on the 19th,
17   correct.
18       Q.  And you would also know the total
19   collateral posted against those exchange minimum
20   margin requirements, correct?
21       A.  Yes.
22       Q.  So you would know whether there was
23   more or less collateral than the exchange
24   minimum margin with, in fact, the close of
25   business on the 19th?

TSG Reporting - Worldwide    877-702-9580

Page 106

JAMES

1
2    A.  Yes.
3        MS. BLOOMER:  This is a hypothetical
4    question.
5        MR. OXFORD:  Right.
6    Q.   What's the purpose, to your
7    understanding, of the exchange minimum margin?
8        MS. BLOOMER:  Object to the form.
9    Foundation.
10    A.   What do you mean, purpose?  What --
11    Q.   Why does an exchange require you to
12    post exchange minimum margin?
13        MS. BLOOMER:  Objection, foundation.
14    A.   Just to make sure I have got this
15    right, you want to know why the exchanges have
16    initial margin requirements, right?
17    Q.   Correct.
18    A.   Just to make sure we are on the same
19    page.  The exchanges set initial margin
20    requirements to actually protect themselves.  So
21    they have an initial margin requirement which
22    they will call from you, OK, at the end of day.
23        They then do the intraday, which is
24    the middle of the day call that they do, which
25    is based on the same.  It is the way the

TSG Reporting - Worldwide    877-702-9580

---

Page 107

JAMES

1
2    exchange protects themselves to make sure that
3    they have always got enough money to pay the
4    opposite side of the trade.
5        The issue is, if the market moves --
6    sorry, just to give you -- if the market moves,
7    yeah, and it moves outside of that range of what
8    you have got, you are no longer protected, and
9    neither is the exchange.
10    Q.   And in that situation, Ms. James, the
11    exchange would typically require additional
12    margin to be posted, correct?
13    A.   Correct, yes.
14    Q.   Going back to our example that we were
15    discussing before lunch of where you would be
16    looking at exchange statements as of close of
17    business on the 19th.
18        MS. BLOOMER:  Objection, "would be."
19    I just -- object to the form of the
20    question.
21    Q.   When would the exchange typically
22    calculate the margin after the markets close on
23    the Friday, the 19th?
24        MS. BLOOMER:  Objection, foundation.
25    Q.   Let's use the OCC as an example.

TSG Reporting - Worldwide    877-702-9580

---

Page 108

JAMES

1
2    A.   OK.  Sorry.  A little different.
3        MS. BLOOMER:  Objection, foundation.
4    A.   It is normally done at the end of
5    trading.  Trading will close, they will then
6    pull in closing prices and the volatility of the
7    day, and then they would generate what they use
8    for calculating the initial margin requirement.
9    Then they would generate the initial margin
10    requirement, and depending -- and if it is the
11    OCC, that's available at around, I think it's
12    about 1 or 2 o'clock the following morning.
13    Q.   So for a Friday market close, the
14    calculation by the exchange, in this case the
15    OCC, is typically done after the close based on
16    that day's closing prices, and the initial
17    margin is calculated in the OCC's case and
18    communicated to the member sometime 1 a.m.,
19    2 a.m., Saturday morning?
20    A.   Yes.
21        MS. BLOOMER:  Objection to the form,
22    and to the vagueness of the time period.
23    Q.   So by Saturday morning, Lehman would
24    know what the initial margin requirement was for
25    its positions firm and customer at the OCC,

TSG Reporting - Worldwide    877-702-9580

---

Page 109

JAMES

1
2    correct?
3        MS. BLOOMER:  Objection, foundation.
4    A.   I will answer that, but I'm actually
5    going to give you -- it is something that we
6    have actually got in response to the questions,
7    OK.  The exchange will put out what their number
8    is, OK.  Lehman should also have calculated
9    their own number, yeah.  So you have to do that
10    reconciliation between what the exchange says
11    and what your own books and records say.
12        So should they know?  Yes, they
13    should.  Did they know?  I don't know.
14    Q.   I understand.
15    A.   Because from their books and records,
16    I would have had a tough time.
17    Q.   Would you have been able to tell the
18    OCC margin requirements on, say, Saturday, the
19    20th of September, by looking at a report dated
20    Sunday, the 21st of September, from the OCC?
21        MS. BLOOMER:  Objection.
22    A.   Hang on, I just -- the exchange only
23    puts out one set of reports, unless it is an
24    option expiring weekend, and I know that wasn't
25    your question, but -- so the reports would be

TSG Reporting - Worldwide    877-702-9580

Page 110

JAMES

1    for the 19th trading. It would be the same
2    reports on the Saturday and the Sunday.
3        Q.   I see. So if you on Sunday looked at
4    a report that has Friday's close prices, that
5    would be delivered sometime in the wee hours
6    Friday night, Saturday morning, you would be
7    able to tell what the, in this case the OCC's
8    margin requirements were, correct?
9        MS. BLOOMER: Objection to form.
10       A.   You can tell what the OCC states the
11   number to be.
12       Q.   Right. I understand an individual
13   participant may have a different view and may be
14   able to negotiate that with the OCC.
15       A.   Well --
16       Q.   May have a different view than the OCC
17   on that margin requirement.
18       MS. BLOOMER: Objection. Is that a
19   question you understand?
20       Q.   Is that correct?
21       A.   Hang on, wait a minute.
22       Q.   Withdrawn. It is not -- it is not
23   material.
24       Just to round out this set of
25

TSG Reporting - Worldwide    877-702-9580

Page 111

JAMES

1    questions, Ms. James, you told me a few minutes
2    ago that the purpose of the margin was to make
3    sure that the exchange had enough money to pay
4    the opposite side of the trade.
5        MS. BLOOMER: Objection.
6    Mischaracterizes the testimony.
7        Q.   Is that what you said?
8        A.   At --
9        Q.   Is that a -- is that a fair
10   characterization of what you said, if not word
11   for word?
12       A.   Can we go back and check, that's
13   exactly what I said?
14       MS. BLOOMER: Do you want her to
15   confirm that it is word for word what she
16   said?
17       MR. OXFORD: I'm just trying to lay
18   the foundation.
19       MS. BLOOMER: Fair enough.
20       You can answer the question to the
21   best that you can.
22       A.   I think that's -- I would have to go
23   back and check exactly what I said. I don't
24   remember word for word, I'll be honest.
25

TSG Reporting - Worldwide    877-702-9580

Page 112

JAMES

1        Q.   So in our example, on Monday morning,
2    before the markets open, the OCC would have set
3    the margin so that they would have enough money
4    to pay the opposite side of the trade in what
5    eventuality?
6        MS. BLOOMER: Objection to form.
7        A.   In -- what do you mean, in --
8        Q.   Why does the exchange need to have
9    margin so that they know they have enough money
10   to pay the other side of the trade?
11       MS. BLOOMER: Objection to form.
12       Q.   Is it in case of default by the
13   member?
14       A.   It is default by the member, but it's
15   also the volatility of the trading that's going
16   to occur that day. So the initial margin is
17   there. OK. And the initial margin is normally
18   based on a certain amount of movement in the
19   market during the trading day. OK. So -- and
20   this may be more detail than you need.
21       They have what they call limit up and
22   limit down, and based on how much the market
23   moves up or the market moves down, it is never
24   more than the range of that initial margin. If
25

TSG Reporting - Worldwide    877-702-9580

Page 113

JAMES

1    it is, they end up halting trading and calling
2    more initial margin.
3        Now, because of the volatility at that
4    time in the markets in the two, three weeks
5    before and the three, four weeks after, let's be
6    honest about this, it was a constant move on
7    that initial margin requirement and what was
8    being called.
9        So yes, on the morning, there would
10   have been initial margin requirement, and I'm
11   pretty sure there was another call at intraday,
12   another call in the afternoon. There was a
13   constant moving target.
14       Q.   Do you know whether or not when
15   Barclays started trading Lehman's positions,
16   customer and firm, for options and futures on
17   September 22 of 2008, do you know whether there
18   in fact was an additional margin call made by
19   any exchange?
20       A.   You said traded customers' positions.
21   You don't trade -- that's what you --
22       Q.   Sorry.
23       A.   Sorry. I just -- customers trade for
24   themselves.
25

TSG Reporting - Worldwide    877-702-9580

Page 114

JAMES

1
2  Q.  Right.
3  A.  I don't know. I would have to go back
4  and check.
5  Q.  Looking at the OCC statements, for
6  example, to continue that example, that reflect
7  Friday night's close, the 19th.
8      MS. BLOOMER: Which statement in your
9  question reflects Friday night's close?
10  What statement are you talking about in your
11  question?
12      MR. OXFORD: We can look at a specific
13  statement this afternoon, but I'm trying to
14  understand the subject generally.
15      MS. BLOOMER: OK. I just want to be
16  sure that she understands the question.
17  Q.  It is your testimony, if I am
18  understanding you properly, you would be able to
19  tell on Monday morning what the open equity
20  positions were in any particular account,
21  correct?
22  A.  As of close of business of the 19th,
23  yes.
24  Q.  Correct.
25      So when the markets open at 8 a.m. or

TSG Reporting - Worldwide    877-702-9580

Page 115

JAMES

1
2  at least, say, one minute before the markets
3  open, 7:59 a.m., would you know what the open
4  equity positions were, correct?
5  A.  Yes.
6  Q.  And you would know this just by
7  looking at the OCC statement?
8  A.  You know the net, yes.
9  Q.  Right. You —
10  A.  You don't know an individual
11  customer's position.
12  Q.  It is not a spreadsheet of thousands
13  and thousands of pages, correct?
14  A.  No. It is the net number the OCC is
15  calling that member.
16  Q.  And again, just so we are clear,
17  looking at that report, you would know the
18  exchange minimum margin that the OCC has
19  requested or requires?
20  A.  Yes.
21      MS. BLOOMER: Objection to form.
22  Q.  Correct?
23  A.  Yes.
24  Q.  And you would know whether or not
25  there was collateral posted that was greater

TSG Reporting - Worldwide    877-702-9580

Page 116

JAMES

1
2  than that minimum requirement, correct?
3  A.  Yes.
4  Q.  Would you use that report, Ms. James,
5  to assess the risk inherent in holding those
6  positions?
7  A.  No.
8      MS. BLOOMER: Objection to form.
9  Would she or did she?
10  Q.  I think it is would.
11  A.  No.
12  Q.  Why not?
13  A.  Because it doesn't give you the
14  details of the trade. Without the details of
15  the trades, you have got no idea.
16  Q.  Looking at the OCC's statement before
17  the markets open on September 22, would you be
18  able to assess the risk in assuming those
19  positions — withdrawn.
20      Looking at the OCC statement on the
21  morning of September 22, before the markets
22  opened, that reflects the Friday night prices
23  and the Friday night margin based on those
24  prices, would you be able to assess the risk
25  inherent in taking on those positions if the

TSG Reporting - Worldwide    877-702-9580

Page 117

JAMES

1
2  intention was to liquidate those positions
3  immediately?
4  A.  No.
5  Q.  Why not?
6  A.  Because the OCC reports don't give you
7  the detail of the transactions.
8  Q.  If you liquidated all the positions
9  held at the OCC on Monday morning, as soon as
10  the markets opened, what would happen? Would
11  the margin be applied to those positions?
12  A.  Yes. But we need to -- the issue is,
13  if you were going to close those positions on
14  the Monday morning, OK, you have to know what
15  those positions are. You have to know
16  exactly -- and I'm assuming we are talking more
17  about the OCC options here, rather than the
18  futures.
19      You have got to know those positions,
20  you have got to know the history and the
21  volatility of that product, and you have got to
22  look at where it stands and what's the
23  volatility behind it and whether you're looking
24  at a balanced portfolio or a nonbalanced
25  portfolio.

TSG Reporting - Worldwide    877-702-9580

Page 118

JAMES

1
2    So to just say I'm going to close out
3    all these positions on a Monday morning would
4    not be the smartest move to do, let's be honest
5    about this. And plus, you don't know what price
6    you're going to get if you went into the market
7    and closed them out.
8        The OCC position that Lehman had was a
9    fairly large substantial position, as I've now
10    seen it, OK. If you had gone into the market on
11    Monday morning and closed all of those positions
12    out, there would have been absolute havoc in the
13    market.
14    Q.    Why would there have been havoc in the
15    market?
16    A.    Because of the size of the positions
17    that you're attempting to close out. Yeah. So
18    the volume of the positions, the risk
19    associated. You would have moved the market
20    price substantially if you had attempted to
21    close all of those positions in one go. The
22    risk associated with that is just -- I wouldn't
23    even want to go there.
24        Would there have been enough margin to
25    cover? Yeah, I'm not convinced there would have

TSG Reporting - Worldwide    877-702-9580

Page 119

JAMES

1
2    been.
3    Q.    Why not?
4    A.    Due to the size of their positions
5    they had on. And, you know, actually in the
6    deposition of, I think it was Craig Jones --
7        MS. BLOOMER: Declaration?
8    A.    Declaration, I'm sorry. I muddle the
9    two together.
10        The Craig Jones who is the Treasury
11    guy for the OCC, it actually states, the OCC
12    actually would not allow Lehman to take back
13    money on the Friday. They gave them -- they
14    gave them an extra call, margin call on Friday
15    due to the positions they had on and the
16    volatility in the market.
17    Q.    When did Barclays first learn that?
18    A.    When did we learn --
19    Q.    About the additional margin call that
20    you were just talking about.
21    A.    I don't know when Barclays learned
22    about it. I only learned about it from actually
23    Craig's declaration. Because that would have
24    been proprietary information to Lehman.
25    Q.    In your experience, Ms. James, is that

TSG Reporting - Worldwide    877-702-9580

Page 120

JAMES

1
2    a typical way for -- withdrawn.
3        How typically are margin calls made in
4    or at the OCC?
5        MS. BLOOMER: Objection, foundation.
6    A.    Daily.
7    Q.    How are they communicated to the
8    member?
9    A.    It depends on how the member wishes to
10    have them. The OCC has an online system that
11    you can actually go on and look the number up.
12    They will sometimes call you and sometimes they
13    will do it by e-mail.
14        I don't know Lehman's process.
15    Q.    In terms of the OCC, if the OCC makes
16    an additional margin call intraday, do you have
17    any understanding as to whether or not that is
18    reflected in the OCC's books and records?
19    A.    I'm actually not sure, I'll be honest.
20    I don't know.
21    Q.    So you don't know -- if you got a
22    margin call during the day, you don't know
23    whether or not by the end of the day Lehman -- I
24    am sorry, the OCC's books and records will be
25    updated to reflect that?

TSG Reporting - Worldwide    877-702-9580

Page 121

JAMES

1
2    A.    They will be updated to reflect the
3    money if you had to wire more money in or if you
4    had to put in more securities. But if it was
5    money that was already there that they are not
6    allowing you to take out, then it hasn't
7    changed. So it depends on --
8    Q.    Well, I'm not sure I quite understand
9    that. I thought you said there was an
10    additional margin call made to Lehman on Friday,
11    the 19th of September?
12    A.    Right. And if you read Craig's
13    declaration, what he says is, they went to
14    withdraw money on Friday from the OCC, which was
15    a requirement above and beyond the initial
16    requirement they had there, so they chose to
17    pull it back into their normal, regular bank
18    account, I'm assuming to satisfy other
19    requirements.
20        When they called that money back, the
21    OCC said no, and the OCC said no, we are keeping
22    that money as an additional requirement.
23    Q.    And would you expect the OCC to update
24    their books and records to reflect that?
25        MS. BLOOMER: Objection, foundation.

TSG Reporting - Worldwide    877-702-9580

## Page 122

JAMES

A.   No. No, because they haven't changed anything. There is nothing for the OCC to reflect.

Q.   I understand that you are not an OCC expert. It is -- futures is your area of expertise, not the OCC.

Have you ever heard of a margin call being made in the manner that you have just described?

A.   Yes.

Q.   Under what circumstances?

A.   Normally very extreme, volatile markets.

Q.   That's happened to you in your tenure at Barclays?

A.   No. Previous company.

Q.   Where did it happen?

A.   ABN AMRO.

Q.   And that's prior to your employment with Barclays that began in 2001?

A.   Yup.

Q.   Can you give me a year of when this call happened?

A.   Year 2000.

TSG Reporting - Worldwide   877-702-9580

## Page 123

JAMES

Q.   Could we return to your declaration, which is 535-A.

A.   Yup.

Q.   Could you turn to page or paragraph 9.

MS. BLOOMER: Can we just pause for one minute so I can run back and get my copies of this exhibit.

MR. OXFORD: Yeah, sure.

MS. BLOOMER: Thanks.

(Recess)

Q.   Ms. James, you have your declaration in front of you?

A.   I do, yeah.

Q.   Looking at paragraph 9, you see that it says as of closing, LBI held in open -- LBI held open LBI futures in account number 084F at the OCC. Do you see that?

A.   Yes.

Q.   And do you know, sitting here today, what the total open equity was in that account?

A.   No.

Q.   Have you ever known that answer?

A.   No, I don't think I have.

Q.   If you were to calculate the total

TSG Reporting - Worldwide   877-702-9580

## Page 124

JAMES

open equity in that account, can you tell me how you would go about that?

MS. BLOOMER: Objection, vague as to time frame.

A.   Are we talking as of the day we took over? So September 22?

Q.   My question is not particularly bounded by time, but you can pick that day if you like if that's helpful.

A.   So we would have taken the positions in the account, identified what the positions were, the prices that they were originally traded at and marked them versus the closing price on the day that we are looking to mark them to and that would give you the current value for that day.

Q.   And if you wanted to figure out the total open equity as of Monday morning before the markets close on the 22nd of September, how would you do that? Would that change your answer?

MS. BLOOMER: Objection.

A.   Yeah.

Q.   OK, can you tell me under that

TSG Reporting - Worldwide   877-702-9580

## Page 125

JAMES

scenario you would go about determining that?

A.   Well, what you would have to do is take the trades that you have on. You are then going to have to go look at a screen, a trading screen to see where is the current value which of course is constantly moving and try and price.

Q.   I don't mean to interrupt. My question was before the markets open on Monday morning.

A.   Sorry, then it would be -- you can only value it based on the closing price of the previous night.

Q.   That closing price, if I understand your previous testimony correctly, would be available in a summary OCC report?

A.   Yes.

MS. BLOOMER: Objection to form.

Q.   Is that correct?

A.   Yes.

Q.   If you could have in front of you just briefly Mr. Romain's notes again.

A.   These?

Q.   These are marked as Exhibit 534A. We

TSG Reporting - Worldwide   877-702-9580

Page 126

JAMES
1
2  looked at this page a little earlier, page 8,
3  the last paragraph.
4     A.  Yup.
5     Q.  If you looked at the first sentence,
6  if you could just direct your attention to the
7  second sentence, please.  It says, "The open
8  traded value of the customer positions traded on
9  foreign exchanges and certain nonOCC cleared
10  domestic exchanges as of the closing was
11  approximately negative 154 million."
12     A.  OK.
13     Q.  Do you see that?
14     A.  Yup.
15     Q.  Did you have any involvement in that
16  calculation, Ms. James?
17     A.  No.
18     Q.  Other than it appearing on
19  Mr. Romain's notes from his deposition, do you
20  have any idea who was?
21     A.  No.
22     Q.  Do you know which affiliates positions
23  were held in that account number, 084F?
24     A.  At what time?
25     Q.  Just before the markets opened on the

TSG Reporting - Worldwide    877-702-9580

Page 127

JAMES
1
2  22nd of September, 2008?
3     A.  OK, can I -- I didn't actually know
4  there was positions prior to the opening on the
5  22nd.  So, no.
6        Did I eventually find out afterwards
7  who the positions belonged to?  Yes.  But it was
8  probably four to five weeks before I knew that
9  there was actually more than one affiliate in
10  that account.
11     Q.  If you could tell me what the state of
12  your knowledge as it is today which affiliates
13  were in that account?
14     A.  It is LBSF and LBSA, I think are the
15  acronyms.  Don't ask me what they stand for
16  because I don't know.
17     Q.  Paragraph 10, you go on to say, "As of
18  the open of business on September 22, 2008, LBI
19  maintained a positive collateral balance in the
20  OCC affiliate futures account of 46,406,000."
21        Do you see that?
22     A.  Yup.
23     Q.  Was that a figure, 46 million, that
24  you calculated?
25     A.  No, it was taken from the OCC report.

TSG Reporting - Worldwide    877-702-9580

Page 128

JAMES
1
2     Q.  You go on to say, "The positions in
3  this account have since been moved to the 084C
4  customer account and were then closed out at a
5  net cost of 35,753,250 dollars."
6     A.  Yes.
7     Q.  Do you see that?
8        The 084C customer account is a
9  Barclays account, is that correct?
10     A.  No.
11     Q.  You already said --
12     A.  Well -- I'll correct that, not at the
13  morning of the 22nd, no.  It was renamed --
14  because it was Lehman.  It was renamed to
15  Barclays after the time of the acquisition.  It
16  has since been closed.
17     Q.  When were those affiliate positions
18  moved?
19     A.  It was the week following the 22nd,
20  but I cannot remember which day.
21     Q.  And where were they moved from,
22  account 074C?
23     A.  No.  08 -- they were moved from 084F
24  to 084C.
25     Q.  I understand.  You then say they were

TSG Reporting - Worldwide    877-702-9580

Page 129

JAMES
1
2  closed out at a net cost of 35,700,000?
3     A.  Yeah.
4     Q.  What is the source of information for
5  your declaration there?  Did you calculate the
6  35,000 -- 35 million, rather?
7     A.  No.  It was actually calculated by the
8  operations staff.
9     Q.  Who were the operations staff?
10     A.  It, I believe it was Tom Giosanda.
11     Q.  Do you know how he calculated that?
12     A.  No.
13        MS. BLOOMER:  Objection to form.
14     Q.  Do you know why he calculated that?
15        MS. BLOOMER:  Objection, foundation.
16     A.  Yes, but I'm not sure if that's
17  privileged.
18        MS. BLOOMER:  Anything that you
19  learned from counsel, any discussions you
20  have had with counsel, you should not be
21  talking about today.
22     Q.  Did Mr. Giosanda provide you with a
23  report that contained that figure?  How did he
24  communicate that to you?
25     A.  That's where I have got the issue

TSG Reporting - Worldwide    877-702-9580

33 (Pages 126 to 129)

## Page 130

JAMES

1  where I don't know if it is privileged. Can we
2  just step -- can I double --
3      Q.   Do you want to go off the record for
4  one minute?
5      A.   Sorry.
6          MS. BLOOMER: Sure.
7      A.   I get confused on what's privileged
8  and what's not. I apologize.
9      Q.   We all do.
10         (Recess)
11     A.   Do you want to repeat the question?
12     Q.   The question pending is did
13 Mr. Giosanda provide you with a report that
14 contained that figure? And that figure is the
15 35 million, the figure referenced in paragraph
16 10 of your declaration?
17     A.   Yes, he did. And his name is spelled
18 G-I-A-S-O-N-D-A.
19         MR. OXFORD: Trish, we should probably
20 circle back once we are finished today on
21 all the requests, but I don't believe that
22 report has been produced to us. If you
23 could take this as our request for the
24 production of that report as soon as

TSG Reporting - Worldwide    877-702-9580

## Page 131

JAMES

1  possible.
2          MS. BLOOMER: Sure, we can recap this
3  afterwards off the record.
4          MR. OXFORD: That's fine, I appreciate
5  that.
6      Q.   You used the phrase in paragraph 10,
7  net cost to refer to the 35 million. Do you see
8  that?
9      A.   Yup.
10     Q.   What do you understand by that phrase,
11 net cost?
12     A.   In this instance, what the net cost
13 means is the realized loss that was generated on
14 the close-outs of the trades. So that's
15 original trade provides to the price we
16 physically closed the trades out at, plus the
17 exchange fees that were generated from closing
18 out those trades.
19     Q.   And a net cost is approximately 11
20 million less than the positive collateral
21 balance do you see that?
22     A.   Yes.
23     Q.   What happened to that, the delta
24 between those two figures?

TSG Reporting - Worldwide    877-702-9580

## Page 132

JAMES

1          MS. BLOOMER: Objection, foundation
2  and beyond the scope of the 30(b)(6).
3      A.   I actually don't know.
4      Q.   You don't know if it was returned to
5  the affiliated or credited somehow?
6      A.   I don't know.
7      Q.   Did the -- withdrawn. Did Barclays --
8          MS. BLOOMER: I am sorry, objection to
9  the form of your last add on to your
10 question. It implies returning it to the
11 affiliate implies it was the affiliates to
12 begin with. That's a fact not in evidence.
13         MR. OXFORD: Yeah, that's actually a
14 good objection, Trish.
15     Q.   Do you know if affiliates typically
16 provided collateral to Lehman to cover the
17 margin that Lehman would have to post with
18 exchanges?
19     A.   I don't know.
20     Q.   Do you know the date that the
21 close-out of the Lehman affiliate positions, the
22 OCC futures we have been discussing?
23     A.   It was at some point that week of the
24 22nd, the week after the 22nd. I'm not sure

TSG Reporting - Worldwide    877-702-9580

## Page 133

JAMES

1  which date.
2      Q.   Do you know who took the decision to
3  close those out?
4          MS. BLOOMER: Objection, beyond the
5  scope of the 30(b)(6).
6      A.   It was done in consultation with legal
7  counsel.
8          MS. BLOOMER: Objection. --
9      A.   Yeah, I can't --
10         MS. BLOOMER: I instruct you not to
11 answer.
12     Q.   Paragraph 11 covers a topic you
13 adverted to in your testimony this morning about
14 the commingling of funds. Do you see that?
15     A.   Yup.
16         MS. BLOOMER: Objection to the
17 characterization of the document.
18     Q.   Can you explain to me how it is that
19 you learned that collateral posted for LBI
20 affiliate futures was commingled with
21 proprietary futures collateral?
22         MS. BLOOMER: Objection to the form
23 and characterization of what she says in her
24 declaration.

TSG Reporting - Worldwide    877-702-9580

Page 134

JAMES

2  A.  Sorry, can we just -- what was the
3  question?
4     Q.  Maybe I can ask it a different way.
5  Can you explain what you mean by paragraph 11?
6     A.  OK -- I have got to -- LB -- Lehman
7  put their affiliate futures in their
8  proprietary -- in the house bucket at all of the
9  exchanges. There was instances on the OCC
10  options where it was in customer for some
11  reason. But in regards to the futures, it was
12  commingled with house. So there was no way to
13  distinguish between what money came from the
14  affiliate, if any, and what money came from LBI
15  house.
16    Q.  When did you learn this Ms. James?
17       MS. BLOOMER: Objection to form of the
18  question.
19    A.  Three, four weeks after the 22nd.
20    Q.  How did you come to learn this fact?
21    A.  When we were putting the claim
22  together for the affiliates, we were trying to
23  identify if and what they had paid, that's when
24  it became apparent.
25    Q.  And when you say they paid, you are

TSG Reporting - Worldwide    877-702-9580

Page 135

JAMES

2  referring to the Lehman affiliates?
3     A.  I'm in -- yeah, the Lehman affiliate,
4  yes.
5     Q.  So as part of the process of filing
6  Barclays' formal claim to the LBI estate in this
7  matter, you embarked upon a process to try to
8  determine what margin, if any, or what
9  collateral, if any, was provided to LBI by
10  Lehman affiliates, is that correct?
11       MS. BLOOMER: Objection to the
12  characterization.
13    A.  Say that again.
14    Q.  I don't think I could.
15       MR. OXFORD: Could you read it back.
16       (record read)
17    A.  Yeah, but it wasn't, it wasn't the
18  claim to the LBI estate. It was the claim to
19  the affiliates.
20    Q.  OK, thank you for that clarification.
21  Were you ultimately successful in determining
22  the question of whether or not the affiliates
23  had posted collateral with --
24    A.  No.
25       MS. BLOOMER: With who?

TSG Reporting - Worldwide    877-702-9580

Page 136

JAMES

2     Q.  With LBI for the purposes of options
3  or futures trading?
4     A.  No. It may have been done since, I
5  don't know. I certainly did not.
6     Q.  That's fine.
7        This commingling of funds you just
8  testified about for the last few minutes, is
9  this something that is the subject of regulatory
10  control?
11    A.  In this instance, no. In the instance
12  where it was commingled in London, yes.
13    Q.  Can you tell me, first of all, why it
14  was not a regulatory matter for the commingling
15  in this instance that you talk about?
16    A.  In this instance, the affiliates'
17  positions were commingled with proprietary
18  positions. Affiliates get classed as
19  proprietary, it's not an issue. In London, they
20  commingled affiliate customer and prop which is
21  an issue.
22    Q.  And who is the "they" in that
23  sentence?
24    A.  LBIE.
25    Q.  And whose funds were commingled? Do

TSG Reporting - Worldwide    877-702-9580

Page 137

JAMES

2  you know?
3     A.  The --
4        MS. BLOOMER: Objection to the form of
5  the question.
6     Q.  Sorry, that was a bad question. I'll
7  try it again.
8        You said that LBI commingled affiliate
9  and proprietary funds?
10    A.  LBIE.
11       MS. BLOOMER: Objection to the
12  characterization of the testimony.
13    Q.  Yes.?
14       MS. BLOOMER: You are saying
15  affiliates' money was commingled with LBI's
16  money? That's her testimony.
17       MR. OXFORD: I am asking her to
18  clarify if that is her testimony?
19    A.  OK, for -- in the U.S., LBI affiliate
20  funds were commingled with proprietary. In
21  London, LBIE, they commingled proprietary
22  customer and affiliate.
23    Q.  OK. I have it.
24       Paragraph 12 of your declaration, you
25  say, "Approximately six weeks after the closing,

TSG Reporting - Worldwide    877-702-9580

Page 138

JAMES

1  JAMES
2  I learned of the existence of the positions in
3  the non-OCC affiliate futures accounts which by
4  that time had been closed out by Barclays."
5     Do you see that?
6  A.  Yes.
7  Q.  Do you know, sitting here today, what
8  the total open equity was in those non-OCC
9  affiliate futures accounts?
10 A.  No.
11 Q.  Did you know at any time?
12 A.  No.
13 Q.  Do you know whether Barclays has
14 performed that calculation?
15 A.  No, I don't know.
16    MS. BLOOMER:  Objection, beyond the
17    scope of the 30(b)(6).
18 Q.  Do you know who at Barclays closed out
19 the positions you describe in paragraph 12?
20 A.  They were closed out by Sean Byrne and
21 Sean McKenna.
22 Q.  Do you know why?
23    MS. BLOOMER:  Objection, I instruct
24    the witness not to answer to the extent she
25    has to reveal privileged communications.

TSG Reporting - Worldwide    877-702-9580

Page 139

JAMES

1  JAMES
2  Q.  With that instruction in mind, do you
3  have anything other than privileged information
4  to share?
5  A.  Yeah, I don't -- can I just clarify
6  something with you outside?
7  Q.  Yeah.
8  A.  Sorry, is that OK?  Sorry?
9     (Recess)
10 A.  I needed clarification.  The
11 affiliates were put into default and that's why
12 I didn't know if it was classed as privileged or
13 not.  The accounts were put into default for not
14 paying their margin requirements.  So it means
15 once you go into default, we then have the right
16 to close you out which is what happened.
17 Q.  You are going to say, "I understand
18 that the close-out of those positions came at a
19 net cost of $17,000."  Do you see that?
20 A.  Yeah.
21 Q.  Can you tell me the basis of your
22 understanding?  How did you learn that?
23 A.  It was on the same calculation that
24 was done for number 10 in my declaration, it was
25 the same for 12, it was done by the operations

TSG Reporting - Worldwide    877-702-9580

Page 140

JAMES

1  JAMES
2  staff.
3  Q.  And again, do you have any
4  understanding of the way that calculation was
5  done?
6  A.  The same calculation as the one in 10,
7  it would have been original trade price plus it
8  was closed out at minus the costs of doing the
9  trade, the exchange fees.
10 Q.  Leaving the topic of a Lehman
11 affiliate and moving on to nonaffiliate
12 customers, can you take a look at paragraph 14
13 of your declaration and let me know when you
14 have done so, please.
15 A.  Yup.
16 Q.  You say, "Futures customers had
17 deposited collateral, including initial margin,
18 with LBI prior to the closing to secure their
19 futures trading activity."
20    Do you see that?
21 A.  Yup.
22 Q.  What collateral other than initial
23 margin would be deposited with LBI by futures
24 customers?
25 A.  It's -- as in physical securities that

TSG Reporting - Worldwide    877-702-9580

Page 141

JAMES

1  JAMES
2  would be used to secure their trading going
3  forward and any money that they chose to put in
4  the account.  So I -- collateral as a whole.
5  Q.  Do you know why the futures customers
6  deposited this collateral with LBI?
7  A.  Futures customers, in most cases, have
8  the habit of leaving money with the FCM to cover
9  their trading and because it is protected under
10 the CFTC rules and regulations.
11 Q.  And just so the record is clear, can
12 you explain what an FCM is?
13 A.  Futures commission merchant.
14 Q.  Are there any regulatory requirements
15 that mandate that futures customers deposit
16 collateral with the broker/dealer?
17    MS. BLOOMER:  Objection to the scope
18    as being beyond the 30(b)(6) and instruct
19    the witness not to answer to the extent that
20    she would have to reveal knowledge that she
21    learned from attorneys.
22 A.  Say the question again.  Sorry.
23    (Record read)
24 A.  They have to put it with the FCM.
25 That's the requirement.

TSG Reporting - Worldwide    877-702-9580

Page 142

JAMES

1  Q.    And in this instance, the FCM is
2  Lehman? Sorry I used broker/dealer?
3      A.    Yes. They had to put it with the FCM.
4      Q.    What are those regulations?
5      A.    It is the CFTC's regulations.
6      Q.    And just speaking generally, can you
7  tell me what those regulations require in terms
8  of the amount of collateral required to be
9  deposited by the futures customers with the FCM?
10      MS. BLOOMER: Objection, beyond the
11  scope of the 30(b)(6).
12      A.    One of the rules of the CFTC, and
13  there are multiple, states that a customer has
14  to pay the initial margin requirement designated
15  by the exchange, at least a minimum of.
16      Q.    OK. So if I understand your testimony
17  correctly, in certain situations, the futures
18  customer is mandated under the CFTC regs to give
19  the FCM the minimum margin.
20      A.    Yeah.
21      Q.    Is that correct?
22      A.    Yeah.
23      Q.    And that actually happened with
24  Lehman, correct?
25
TSG Reporting - Worldwide    877-702-9580

Page 143

JAMES

1      A.    Yes.
2      Q.    Lehman, in fact, had substantial
3  amounts of collateral deposited by futures
4  customers under this CFTC rules, right?
5      MS. BLOOMER: Objection to form.
6      A.    Yeah.
7      MS. BLOOMER: Please just give me a
8  moment after he finishes his question so I
9  can get an objection.
10      THE WITNESS: Sorry.
11      MS. BLOOMER: That's OK.
12      Q.    In the second sentence of paragraph
13  14, you say, "LBI maintained this collateral
14  along with additional collateral that
15  constituted LBI's own property."
16      A.    Yup.
17      Q.    Does that in your eyes create a
18  regulatory issue?
19      MS. BLOOMER: Objection, beyond the
20  scope of the 30(b)(6).
21      Q.    Are you suggesting that there is
22  something improper in that, in the way LBI
23  maintained those two sets of collateral?
24      A.    No. It's -- now you have lost me.
25
TSG Reporting - Worldwide    877-702-9580

Page 144

JAMES

1      Q.    You are not suggesting in paragraph 14
2  that there was any improper commingling of funds
3  by LBI, are you?
4      A.    No.
5      Q.    OK. Thanks, I just wanted to clarify
6  that last issue.
7      OK, paragraph 15. You say, "Barclays
8  took over LBI's liabilities to the futures
9  customers in the amount of any collateral those
10  customers had posted prior to the closing to
11  secure their future, futures trading activity
12  and has since complied with its obligations to
13  the LBI futures customers in this regard."
14      Do you see that?
15      A.    Yes.
16      Q.    You go on to say, "Although to my
17  knowledge, Barclays was not aware of the total
18  amount of these liabilities at closing, I
19  understand that Barclays has since determined
20  that the total amount of such liabilities as of
21  that time was approximately 2 billion dollars."
22      A.    Yes.
23      Q.    And that time, we are talking about
24  the closing of the transaction on September 22,
25
TSG Reporting - Worldwide    877-702-9580

Page 145

JAMES

1  correct?
2      A.    Yes.
3      Q.    Now, what's the basis of your
4  understanding about Barclays determination of
5  the total amount of liabilities to LBI futures
6  customers?
7      MS. BLOOMER: Objection, vague as to
8  time frame.
9      A.    I'm not sure I --
10      Q.    Let me ask it a different way. How is
11  it that you know what you write in that last
12  sentence of paragraph 15?
13      A.    Because a balance sheet was put
14  together by finance who confirmed the total
15  amount of money that was there for customers.
16      Q.    And that balance sheet was provided to
17  you?
18      A.    I was given the number. I haven't
19  seen the full balance sheet.
20      Q.    Have you seen any part of the balance
21  sheet?
22      A.    No. I asked the question, what was
23  the total amount of money of customer money that
24  we were acquiring -- that was acquired and I was
25
TSG Reporting - Worldwide    877-702-9580

Page 146

JAMES

1  told roughly 2 billion.
2  Q.  Who told you that?
3  A.  That was Lee Bowell who works for Gary
4  Romain.
5  Q.  Just skipping ahead for a moment
6  paragraph 17, the second sentence, you say,
7  "Barclays has received customers' futures
8  collateral totalling 2.2 billion dollars." Do
9  you see that?
10  A.  Yeah.
11  Q.  Would you agree that, looking at your
12  declaration, Barclays has received customers'
13  futures collateral in excess of the estimate of
14  total liabilities of 2 billion dollars?
15  MS. BLOOMER:  Objection to the form of
16  the question.
17  A.  This is where I am going to have a
18  problem with your word of "excess." This is
19  where we need to clarify how futures works. OK?
20  At the time of us taking over on the 22nd,
21  Lehman's would not give us the total assets they
22  were holding for their customers and where it
23  was being held and even what their full
24  positions were. They had no idea.

TSG Reporting - Worldwide    877-702-9580

Page 147

JAMES

1  So they couldn't tell us this is the
2  total amount of money that we owe to customers,
3  this is the total amount of money we have with
4  the broker, this is the total amount of the
5  money we have with the exchange. Which is
6  extremely scary.
7  These numbers that have been put
8  together were put together by the finance guys
9  months afterwards.
10  It took about two months for us to
11  clean up the books and records that were given
12  to us by Lehman and the reason being is because
13  they had commingled their FX trading and their
14  futures trading into the same accounts, into the
15  same books and records. They had converted all
16  of the customers' currency into U.S. dollars.
17  So when we paid the customers back, we
18  had to go and do FX transactions to acquire all
19  that currency which cost us 60 million dollars
20  to actually get back the currency.
21  There was also an issue where trades
22  that should have been booked prior to us taking
23  over in the books and records were not booked.
24  They were booked after. We then identified that

TSG Reporting - Worldwide    877-702-9580

Page 148

JAMES

1  they commingled trades in London, and in one
2  particular instance, a customer's positions were
3  actually sold off because the OCH was under the
4  impression they were house positions and they
5  were not. It cost the customer 20 million
6  pounds, so 40 million dollars, which we then
7  reimbursed the customer and we have a claim
8  against that.
9  So -- and we still have Korean
10  outstanding for customers that we don't have
11  back and we are going to have do an FX deal
12  against that.
13  So when you pick up and move a futures
14  business, you take every account that is
15  designated seg. and secured to insure you can
16  pay back your customers.
17  Could Lehman tell us what was in those
18  accounts? No, not in any way, shape or form.
19  Q.  Just again looking at your
20  declaration, it looks, comparing paragraph 17
21  and 15, it appears that Barclays has received
22  customers' futures collateral of 2.2 billion,
23  correct?
24  A.  Yup.

TSG Reporting - Worldwide    877-702-9580

Page 149

JAMES

1  Q.  And the total liabilities to customers
2  in connection with that same category of
3  asset --
4  A.  Yup, yup.
5  Q.  -- was approximately 2 billion?
6  A.  Right.
7  MS. BLOOMER:  Objection to the time
8  frame. Vagueness.
9  Q.  Is there a reason that it is not
10  appropriate to conclude that Barclays has
11  received more customer futures collateral than
12  it has liabilities to customers in connection
13  with that collateral?
14  A.  Well, now I think I would have to
15  object to that and the reason being is because
16  Barclays acquired Lehman's futures business as
17  and to continue to keep it running. To keep a
18  business running, you have to insure you have
19  money in those accounts and you're safe and
20  secured to pay back every single customer and
21  never at any time be under-segregated.
22  So do you have to have your own money
23  in a designated seg. and secured account? Yes,
24  you do. Is that a cost of doing business? Yes,

TSG Reporting - Worldwide    877-702-9580

Page 150

JAMES

1  it is.
2  Q.    Either I didn't understand that answer
3  or you didn't understand my question.  Either
4  way, let's try again.
5  Your declaration sets out in paragraph
6  17 that Barclays has to date received customer
7  future collateral totalling 2.2 billion dollars,
8  correct?
9  A.    Yup.
10  Q.    Your declaration also says that
11  Barclays' liabilities assumed in connection with customer future collateral is
12  approximately 2 billion dollars?  Correct?
13  MS. BLOOMER:  Objection to the
14  vagueness of the time frame.
15  A.    Yeah, that's what's in my declaration,
16  yes.
17  Q.    Is it a reasonable conclusion from
18  that that Barclays has received more collateral,
19  the 2.2 billion dollars for Barclays futures
20  collateral, than it has liabilities to
21  customers, 2 billion in paragraph 15?
22  A.    Yes, but that's not factor in the FX
23  exposure and it does not factor in the loss of

TSG Reporting - Worldwide    877-702-9580

Page 151

JAMES

1  the LIFFE trading, European trades.
2  Q.    Leaving aside the LIFFE trades and the
3  FX exposure, can you tell me why it is Barclays
4  has received more customers' future collateral
5  than it owes to customers?
6  A.    Because Barclays took over the seg.
7  and secured accounts, the designated seg. and
8  secured accounts.  When you take over those
9  designated accounts, you take everything that is
10  in it.
11  Q.    I think I understand.  So that if in
12  those designated accounts, there is more
13  collateral than is owed to customers, then
14  Barclays claims that as part of the business
15  that it acquired?
16  A.    Yes.
17  Q.    Can you turn to Exhibit 2 of your
18  declaration, please.
19  A.    OK.
20  MS. BLOOMER:  If you are ready for a
21  break at any time, you can say so, OK?
22  MR. OXFORD:  Do you want to take five
23  minutes?
24  THE WITNESS:  Yeah.

TSG Reporting - Worldwide    877-702-9580

Page 152

JAMES

1  (Recess)
2  Q.    Ready to go back on?
3  A.    Yes.
4  Q.    Ms. James, are you able to testify as
5  to the open equity -- sorry, the value of the
6  open equity of the customer or future positions
7  that were held by the futures customers as of
8  the opening of business September 22, 2008?
9  A.    No.
10  Q.    And you are not able because you
11  haven't done that calculation?
12  A.    Not able due to the books and records
13  that we got from Lehman.  Due to the books and
14  records that we got from Lehman.  They weren't
15  in a state to be able to tell us because there
16  were some adjustments and issues and problems
17  that they had not booked and the customers
18  continued to trade.  It's impossible to actually
19  tell.
20  Q.    Was there any way to tell open equity
21  positions for futures customers once Barclays
22  acquired the business?
23  A.    I believe, and I'm not sure, I believe
24  the finance guys may have looked at it, but I

TSG Reporting - Worldwide    877-702-9580

Page 153

JAMES

1  don't know, and the value of the customers'
2  positions is -- it is their money and it is
3  their risk and their values, so it is not -- it
4  is not Barclays, so it doesn't -- it is not a
5  value for us.  Does that make sense?
6  Q.    I think it does.  I think if I
7  understand your testimony correctly, you're
8  saying that Barclays makes a profit by having
9  customers and charging them fees, but the gain
10  or loss on those positions is borne by the
11  customers, not Barclays, correct?
12  A.    Correct, yeah.
13  Q.    Focusing on Exhibit 2 for a moment,
14  Ms. James, Exhibit 2 to your declaration --
15  A.    Yup.
16  Q.    -- it is entitled, "Customer
17  collateral delivered to date valued as of
18  September 19, 2008."  Do you see that?
19  A.    Yes.
20  Q.    Did you create Exhibit 2?
21  A.    Yes, and I have to say the date is
22  wrong.
23  Q.    What should the date be?
24  A.    This, this was -- wait a minute.  This

TSG Reporting - Worldwide    877-702-9580

Page 154

JAMES

1 I believe may have been October of -- it was
2 October sometime, I think. I apologize.
3    Q.   Do you know what the correct value is
4 as of September --
5    A.   Sorry, no, it's not, it has the money
6 markets. It would have been January. So sorry.
7    Q.   January 2009?
8    A.   Yes.
9    Q.   Do you know when in January, 2009?
10       MS. BLOOMER:  You can use your notes
11 to refresh your memory.  I would suggest
12 that you do.
13       THE WITNESS:  That's why I thought I
14 had it on here.
15       Oh, yes, I do.  January '09.  I
16 thought I did.
17       MS. BLOOMER:  This is Exhibit 2.
18    A.   Right.
19    Q.   Can you tell me, Ms. James, which
20 portion of your notes you are looking at, in
21 that Exhibit 552?
22    A.   I thought I had it in these notes,
23 which I don't.
24       MS. BLOOMER:  If you allow me to point

TSG Reporting - Worldwide    877-702-9580

Page 155

JAMES

1 her to what she is looking for, I think I
2 know what she is looking for.
3       MR. OXFORD:  Please.
4       MS. BLOOMER:  You talked about Exhibit
5 2 to your declaration at the very end and
6 you say that -- so what is it -- you
7 interpret it any way you want, but I think
8 you were noting to yourself something.
9    A.   Yeah, and that's -- no, it was, it was
10 January because we had, we had received some of
11 the money market funds, so it was January.
12       MS. BLOOMER:  January that you
13 prepared it or January the value that's
14 reflected there?
15    A.   Why didn't I put this in my notes.  I
16 know I needed to change it.  I'm actually not
17 sure now.  I confused myself.  Sorry.
18    Q.   Ms. James --
19       MS. BLOOMER:  Why don't we take a
20 short break.
21       MR. OXFORD:  Can I just ask --
22       MS. BLOOMER:  Absolutely, yes.
23       MR. OXFORD:  A couple of questions.
24       MS. BLOOMER:  I'm not trying to impose

TSG Reporting - Worldwide    877-702-9580

Page 156

JAMES

1 at all here.
2    Q.   So Ms. James, which portion of your
3 notes did your lawyer direct you to?  Was that
4 the fourth page of your notes?
5    A.   It is the ones, questions 21 and 22.
6 But of course that's E1 and E2, which is not
7 Exhibit 1, 2 and 3.
8    Q.   Right.  Just so we have a clear
9 record, my questions are directed toward Exhibit
10 2 to your declaration that was dated January of
11 2010?
12    A.   Yes.
13    Q.   Not to Exhibit E2 to the SIPA claim?
14    A.   Correct.  And I thought I had put in
15 my notes that I needed to amend Exhibit 2, and I
16 thought I put the date on here.  But actually, I
17 obviously didn't.
18    Q.   Did you create Exhibit 2?
19    A.   Yes.
20    Q.   And how did you go about doing that?
21    A.   This was created from information that
22 was being gathered by operations of money that
23 we had received from the market, money -- from
24 the money market funds with approval of the

TSG Reporting - Worldwide    877-702-9580

Page 157

JAMES

1 trustees and money that had been received from
2 the foreign brokers with approval of the
3 trustees and money that was received from the
4 bank accounts with approval of the SIPC
5 trustees.  It is SIPC, isn't it?  The trust --
6    Q.   We will take that.
7    A.   I get confused.
8    Q.   Do you personally, Ms. James, have any
9 information about the approval of the SIPA
10 trustee for the transfer of the funds reflected
11 on Exhibit 2 to your declaration?
12    A.   Yes, because I requested more.
13    Q.   Looking first at money market funds,
14 can you tell me approximately when the money
15 market funds reflected on Exhibit 2 to your
16 declaration were received?
17    A.   January, end of December, beginning of
18 January, '08, '09.
19    Q.   And the cash, when was that received?
20    A.   It's the cash that was received.  The
21 first amount came in September 23rd or 4th, and
22 the last one was probably the middle to end of
23 October.
24    Q.   And you also have a third category of

TSG Reporting - Worldwide    877-702-9580

Page 158

JAMES

1
2  assets called foreign brokers. Do you see that?
3      A.   Yup.
4      Q.   That appears to total about 265, 266
5  million dollars, right?
6      A.   Yup.
7      Q.   When were those amounts received by
8  Barclays?
9      A.   Between the middle of November and the
10  beginning of January.
11      Q.   November '08, January '09?
12      A.   Yeah, sorry.
13      Q.   It is always hard, the start of the
14  new year. Everyone is dating their check.
15      A.   Exactly.
16      Q.   And to Trish's question to you a few
17  minutes ago, the title is customer collateral
18  delivered to date, valued as of September 2008?
19  You said that date should be amended to January
20  2009?
21      A.   Yes.
22      Q.   And does that reflect amounts received
23  by January 2009?
24      A.   Correct, it does.
25      Q.   And what is the valuation date? Is it

TSG Reporting - Worldwide    877-702-9580

Page 159

JAMES

1
2  January 2009 or is it September 19, 2008?
3      A.   It is January 2009. So it is amounts
4  that were received up until January of 2009 and
5  valued 2009 because the value wouldn't have
6  changed.
7      Q.   The value of none of these —
8  withdrawn.
9          If I understand your last answer,
10  you're saying that the value of these assets on
11  January 2009 would have been the same as
12  September 19 of 2008, is that correct?
13      A.   Yes.
14          MS. BLOOMER: Object to the question.
15      A.   Well, plus or minus the FX rate.
16      Q.   I think that is all I have for that
17  exhibit right now. If you could turn to Exhibit
18  3, please. This is Exhibit 3 to your
19  deposition. It is entitled, "Customers futures
20  collateral undelivered to date values as of
21  September 19, 2008."
22      A.   Yes.
23      Q.   Did you create Exhibit 3, Ms. James?
24      A.   Yes.
25      Q.   How did you go about creating

TSG Reporting - Worldwide    877-702-9580

Page 160

JAMES

1
2  Exhibit 3?
3      A.   We took -- the same information that I
4  took from operations on what were the money
5  market funds we had not received, what's the
6  foreign broker's money that was still sitting in
7  the broker's statements we had not received, and
8  what was the money on the Lehman entity broker
9  statements that we had not received for the
10  customer designated accounts.
11      Q.   I don't think I have asked you this,
12  but if I did I apologize: Where did you get the
13  foreign broker's statements that you used to
14  compile this information?
15      A.   From the operations team.
16          MS. BLOOMER: If I could ask a
17  clarifying question, is the title correct on
18  this?
19          THE WITNESS: No. It's January as
20  well. Sorry because they, Exhibit 2 and
21  Exhibit 3 were done at the same time.
22      Q.   Then I have — thanks for that Trish,
23  the same set of questions that I just went
24  through with Exhibit 2.
25          Do the values that are reflected on

TSG Reporting - Worldwide    877-702-9580

Page 161

JAMES

1
2  Exhibit 3 of 488 million or so, would they
3  change if you were to recalculate this with the
4  valuation as of September 19, 2008?
5      A.   Yes.
6      Q.   Would it be up or down?
7      A.   I don't know.
8          MR. OXFORD: Trish, we can again
9  circle back at the end of the deposition,
10  but I don't think I have seen the broker
11  statements that are the basis for this
12  calculation.
13          MS. BLOOMER: Sure. What date were
14  the broker statements you were looking at?
15          THE WITNESS: January.
16          MR. OXFORD: January broker
17  statements.
18          THE WITNESS: Yes. For that -- for
19  this, for Exhibit 3, it is January broker
20  statements.
21      Q.   Do you also have for the same brokers,
22  do you have in your possession -- not today, but
23  in your role at Barclays -- statements for the
24  same brokers reflecting the positions and margin
25  as at September 19, 2008?

TSG Reporting - Worldwide    877-702-9580

Page 162

JAMES

1  A.   I assume somebody does, yes.
2  Q.   Would those statements reflect the
3  total open equity of the positions held at those
4  brokers?
5     MS. BLOOMER: Objection, no
6  foundation.
7  A.   Which date?
8  Q.   Well, let's work backwards from
9  January. The January statements that you used
10 as the basis for compiling Exhibit 3, do those
11 show the total open equity of the positions as
12 at the date that's borne on the report?
13 A.   There were no open positions in
14 January. They had all been closed.
15    MS. BLOOMER: I have an objection to
16 the form of the question. It is ambiguous.
17 Q.   Do you have any reason to believe that
18 the statements for these same brokers, that you
19 believe someone in Barclays will have, dated
20 September 19, 2008, do you have any reason to
21 believe that those reports don't show the total
22 open equity of the positions at those brokers?
23 A.   No, I would assume they show them.
24 Q.   Similar to the brokers statements we

TSG Reporting - Worldwide    877-702-9580

Page 163

JAMES

1  talked about before, would you also assume that
2  those statements reflect the minimum exchange
3  margin requirement?
4     MS. BLOOMER: Objection.
5  A.   I would assume so. Don't know for
6  definite.
7  Q.   Similarly, would you assume that those
8  same broker statements would reflect the amount
9  of margin or collateral that is posted against
10 those same requirements?
11    MS. BLOOMER: Objection to the form of
12 the question.
13 A.   Yes, but you do have to remember,
14 these are the customer accounts. It is customer
15 designated money.
16    So if there is a bigger requirement in
17 those accounts than what they are trading, it's
18 because it is designated as a customer account
19 and they are holding that currency.
20 Q.   Can you explain that to me, please.?
21    MS. BLOOMER: Objection to the form of
22 the question.
23 Q.   When -- I need more information.
24    When you're trading in Asia, a lot of

TSG Reporting - Worldwide    877-702-9580

Page 164

JAMES

1  the currency is restricted, if you notice a lot
2  of this outstanding. So you have to trade and
3  keep the currency in -- you have to stay in your
4  restricted currency.
5     So would there occasionally be more
6  money in the account than is needed to be there
7  to fund the current trading? Yes. But it still
8  customer-designated money. A customer may have
9  chosen to keep it there. If that makes sense.
10    MR. OXFORD: Did you want to take a
11 break for a couple of minutes Trish, you
12 asked for a break a couple minutes ago.
13    MS. BLOOMER: No, we took the break.
14    MR. OXFORD: Maybe we did it off the
15 record.
16 Q.   Ms. James, is there a relationship
17 between the amount of money that is posted by
18 customers with the FCM that you describe here as
19 customers' futures collateral and the collateral
20 that has to be posted by the FCM with the
21 relevant exchange?
22    MS. BLOOMER: Objection to form.
23 A.   What do you mean by "relationship"?
24 Q.   Well, as a general matter -- and I

TSG Reporting - Worldwide    877-702-9580

Page 165

JAMES

1  understand that things may differ slightly from
2  exchange to exchange -- but if I am a customer
3  and I am required under the CFTC rules to
4  provide collateral to my FCM, do those rules
5  require then the FCM to post the same margin
6  with the exchange?
7  A.   Normal practice, yes.
8  Q.   So normally, if my -- if I am a
9  customer and my position requires 100 dollars of
10 margin, the normal practice is that I am
11 required under the rules to provide that
12 collateral to my FCM?
13 A.   Yes.
14 Q.   And when Barclays assumed
15 responsibility for what you have described as
16 the Lehman futures business, did it also
17 assume -- it assumed the customer futures
18 collateral that we have been talking about, it
19 also assumed the liabilities to customers that
20 you have said are approximately 2 billion
21 dollars, did Barclays also assume the margin or
22 collateral that was posted by Lehman on behalf
23 of these futures customers at the various
24 exchanges?

TSG Reporting - Worldwide    877-702-9580

42 (Pages 162 to 165)

Page 166

JAMES

1
2       MS. BLOOMER: Objection as vague.
3       A.    That's a -- the way it works is when
4   you pick up the futures business, you're picking
5   up the complete customer seg. and secured
6   accounts. A customer, a broker is designated as
7   being a seg. and secured.
8       So Lehman having their own money in
9   there to stop you going under seg.'d, you can't
10  say the dollar at this broker is a dollar from
11  this customer or a dollar from Lehman. You
12  can't. So when you pick up and move the
13  business, you're taking and moving everything.
14  I'm not sure that --
15      Q.    I'm not sure it answers my question,
16  but I understand what you are saying. Cash is
17  fungible, correct?
18      A.    Yes.
19      Q.    My question was a little different or
20  at least was intended to be.
21      A.    It may be I misinterpreted.
22      Q.    To the best of your understanding, it
23  is Barclays' position that when it assumed
24  responsibility for the customers' futures
25  business of Lehman, as you describe, that it
TSG Reporting - Worldwide    877-702-9580

Page 167

JAMES

1
2   assumed certain obligations to customers, the 2
3   billion dollars that you have testified about,
4   and gained an entitlement to the futures
5   customer collateral, 2.2 billion that has
6   already been received, correct?
7       A.    Yup.
8       Q.    And the 488 billion that's reflected
9   on Exhibit 3 --
10      A.    Yup.
11      Q.    -- that Barclays says has not been
12  received, but claims entitlement to, correct?
13      A.    Yup, yup.
14      Q.    Did Barclays also acquire the
15  collateral that was posted at the futures
16  exchange by Lehman to cover those positions of
17  the same futures customers?
18      MS. BLOOMER: Object as beyond the
19  scope of the 30(b)(6).
20      A.    The problem is that's not a question I
21  can answer because I don't know if it was
22  Lehman's collateral at the exchange or the
23  customers's collateral at the exchange. That's
24  the issue I'm having.
25      Q.    I understand. Let's try it this way.
TSG Reporting - Worldwide    877-702-9580

Page 168

JAMES

1
2   Under what circumstances, generally speaking,
3   does a customer post collateral at the exchange
4   as opposed to when an FCM posts collateral at
5   the exchange?
6       MS. BLOOMER: Objection, lacks
7   foundation, and is vague.
8       A.    When a customer gives you collateral,
9   collateral has to go to the exchange and the
10  broker where they are trading. It passes
11  through.
12      Under the CFTC requirements, you keep
13  excess collateral in your seg. and secured
14  accounts to stop you going under-funded. Can I
15  tell you that the money or collateral -- the
16  terminology, collateral at the exchange belonged
17  to the customer or to Lehman? No, I can't.
18  Does that --
19      Q.    I think that is helpful. If the
20  customer posts collateral directly to the
21  exchange --
22      A.    They can't do that.
23      Q.    OK, then I misunderstood your last
24  answer.
25      How is it that customer collateral
TSG Reporting - Worldwide    877-702-9580

Page 169

JAMES

1
2   gets posted to the exchange?
3       MS. BLOOMER: Objection to the form of
4   the question.
5       A.    Via the FCM.
6       Q.    So the customer posts this
7   hypothetical hundred dollars of margin that is
8   required with the FCM, the FCM then posts that
9   same hundred dollars --
10      MS. BLOOMER: Objection,
11  mischaracterizes the testimony.
12      Q.    -- to the exchange, is that correct?
13      A.    Yeah, it was flow-through, yes.
14      Q.    And under those situations, is the FCM
15  also required to keep a hundred dollars or
16  perhaps hundred dollars plus some additional
17  cushion in a segregated account?
18      A.    Yes.
19      Q.    So whether the collateral is posted by
20  the customer or by the FCM with the exchange,
21  there is essentially two pots of margin here.
22  There is one set of margin that is posted with
23  the exchange and that same amount of money is
24  held perhaps with an additional cushion in a
25  customer-segregated account, is that correct?
TSG Reporting - Worldwide    877-702-9580

## Page 170

JAMES

MS. BLOOMER: Objection, misconstrues
the testimony.

A. No, I don't -- no, I don't agree with
that.

Q. OK, can you, hold on a minute.
(Pause)

Q. Is the customer-segregated account
kept at the FCM or is it kept at the exchange?

A. Both.

Q. Can you explain to me how that works?

A. You have designated accounts, that is
classed as seg. or secured, that are held with
an exchange, a broker, a trust account, a bank
account and a money market. They are all
designated as being seg. And you can hold the
money or collateral securities in governments
and stuff in any of those. They are all
designated as being seg.

MR. OXFORD: Can we take a two-minute
break and then I think I can finish this
line of questioning and we can move on a
little bit.

MS. BLOOMER: Sure.
(Recess)

TSG Reporting - Worldwide    877-702-9580

## Page 171

JAMES

Q. Ms. James, let me try and clarify my
understanding of your testimony. If a futures
customer places or would like to place a
position on a futures exchange, then the FCM can
place the margin on behalf of that customer,
correct?

A. Yes.

Q. In the situation --

A. Well -- they have to have got the
money from the customer first.

Q. OK, that's where I was going with my
next question.

A. Sorry.

Q. So just keep it in baby steps so I can
keep up with my own questions, where a customer
places a position with an exchange, it does so
via the FCM, correct?

A. Yes.

Q. And where the FCM posts the margin on
behalf of that customer's position, the CFTC
requires the customer to give that same margin
in most circumstances to the FCM, correct?

A. Yes.

Q. And the FCM is required, under

TSG Reporting - Worldwide    877-702-9580

## Page 172

JAMES

regulations, to keep that margin or collateral
that is provided by the customer to the FCM in a
segregated account, is that correct?

A. Yes. Or secured.

Q. And the margin that is posted by the
FCM to the exchange is held in the name of the
FCM, correct?

A. Yes. Designated as a customer seg. or
a customer-secured account.

Q. But with that qualification, it would
be running in Lehman's name or Barclays' name,
as it were, at the relevant exchange, correct?

A. Yes.

Q. And when Barclays took over what you
have described as the Lehman futures business on
the 22nd of September, 2008, did it assume
responsibility, in your understanding, for both
the margin posted at the exchange and the
collateral that has been posted by the customer
with Lehman to secure the placing of that
margin?

MS. BLOOMER: Objection to the form of
the question and beyond the scope of the
30(b)(6).

TSG Reporting - Worldwide    877-702-9580

## Page 173

JAMES

Q. Do you need that read back?

A. Yeah.

(Record read)

MS. BLOOMER: I object, again, to the
form of the question as vague and ambiguous.

A. Yeah, I'm not sure that makes sense to
me.

MS. BLOOMER: I think the witness has
said she doesn't understand your question.
Do you have another question?

MR. OXFORD: I am waiting for the
witness to finish rereading it.

A. Do you want to reword that question?
Sorry, I'm a bit --

Q. Well, maybe I can break it up.
The 2 billion dollars -- withdrawn.
Let me start again.
The 2.2 billion dollars that are
referenced in Exhibit 2 to your declaration,
those were -- that's collateral placed by
customers with Lehman, correct?

MS. BLOOMER: Objection,
mischaracterizes the declaration and the
exhibit.

TSG Reporting - Worldwide    877-702-9580

Page 174

JAMES

1
2   Q.   Is that correct?
3   A.   It's money -- well, it's collateral or
4   money, as it says, that we have received back
5   from the customer seg. and secured account.
6   That's what the 2.2 is.
7   Q.   I think I see the distinction you're
8   making. It is not necessarily money received
9   from customers, but it was monies held by Lehman
10  in the seg. account and secured accounts as is
11  required under the CFTC?
12  A.   Designated as customer seg. and
13  secured money, yes.
14  Q.   OK. In addition to those monies, did
15  Barclays, to your understanding, obtain any
16  margin or other collateral posted at the
17  exchange in designated customer accounts that
18  had previously been posted by Lehman?
19      MS. BLOOMER:  If I could interject, I
20  realize the reason why we are all talking
21  past each other, why you two are talking
22  past each other. So allow me to explain if
23  it would assist the report.
24      MR. OXFORD:  Yeah can we go off the
25  record for a second.

TSG Reporting - Worldwide    877-702-9580

Page 175

JAMES

1
2   (Pause)
3   Q.   If you could have 552 in front of you
4   please, Ms. James.
5   A.   My notes?
6   Q.   Your notes.?
7      MS. BLOOMER:  I have a copy that's not
8   labeled.
9   Q.   If I could direct your attention to
10  question 16A, is one of the 30(b)(6) topics on
11  which you have been designated and the topic is
12  Barclays knowledge and the source of that
13  knowledge about the value of LBI's open
14  positions at the OCC and any other foreign or
15  domestic exchange on September 19, 20 and 21,
16  2008. Do you see that?
17  A.   Yup.
18  Q.   We have covered in — mostly in
19  connection with futures and a little about with
20  the OCC. So I just want to circle back.
21      What knowledge do you have concerning
22  the value of LBI's open positions at the OCC as
23  of closing?
24      MS. BLOOMER:  Objection as vague as to
25  the time frame.

TSG Reporting - Worldwide    877-702-9580

Page 176

JAMES

1
2   A.   At the time of closing, I had no
3   knowledge.
4   Q.   OK, sitting here today.
5   A.   Sitting here today, I am aware that
6   the finance guys, I believe, actually took the
7   equity option positions and valued them and I
8   believe it took them a couple of months to
9   actually figure out what the positions were and
10  to actually value them through the risk systems.
11      Barclays was not an equity option
12  house really prior to the acquisition. So it
13  didn't have risk systems and equity options
14  systems in place for valuing these. So when
15  we -- when Barclays got the positions, Lehman
16  actually couldn't give them a lot of that
17  information. So it took months for the finance
18  guys to actually figure out what was the value.
19      The other issue was that the positions
20  for the affiliates, some of the positions for
21  the affiliates are in with the prop, some of the
22  positions for the affiliates were in with the
23  customer. But what I do understand is that all
24  the margin money at the OCC that was posted in
25  the prop account was actually LBI's money.

TSG Reporting - Worldwide    877-702-9580

Page 177

JAMES

1
2   Apparently none of it belongs to the affiliates.
3   That is what I have learned since.
4   Q.   And have you learned, since the
5   closing, Ms. James, what were the value of LBI's
6   open positions at the OCC as of the time of
7   closing?
8   A.   I actually don't think anybody has
9   given me a number, no. Is it in -- I don't
10  remember if it was in --
11      MS. BLOOMER:  I would object as being
12  beyond the scope of the 30(b)(6).
13      MR. OXFORD:  I think it is actually
14  directly within the scope of the 30(b)(6).
15      MS. BLOOMER:  The 30(b)(6) topics
16  about the value of the position, Barclays'
17  knowledge of the value of the positions on
18  September 19, 20 and 21st. Not the
19  knowledge now of the value of the positions
20  on those dates.
21      So it is beyond the scope of the
22  question.
23      MR. OXFORD:  We can agree or disagree.
24  I think it is clearly within the scope. It
25  seems like the witness doesn't know the

TSG Reporting - Worldwide    877-702-9580

Page 178

JAMES

1  answer.
2      MS. BLOOMER: The witness didn't
3  prepare herself for the answer because it is
4  beyond the scope of the 30(b)(6).
5
6      MS. BLOOMER: For the record, I do
7  believe that some of the topics that Gary
8  Romain was designated to cover yesterday
9  went to the issue of the valuation of the
10  positions as the valuation was learned after
11  the fact. So I do believe that topic was
12  designated to him, not to her.
13      MR. OXFORD: Can we mark this as the
14  next.
15      (Exhibit 553, multipage spreadsheet
16  marked for identification, as of this date.)
17      Q. Ms. James, I have put in front of you
18  what I have marked as Deposition Exhibit 553.
19  You will see that it was a multipage
20  spreadsheet, about half an inch thick. Can you
21  take a moment to flip through and tell me
22  whether you have ever seen this before.
23      A. No.
24      Q. Were you involved in the process,

Page 179

JAMES

1  Ms. James, of valuing the LBI open positions at
2  the OCC at any point after the closing?
3      A. No.
4      Q. Do you know who at Barclays was
5  that -- you testified I believe about some
6  finance people who were?
7      A. I believe it was finance, yes.
8      Q. Do you know who in finance was
9  responsible for that?
10      MS. BLOOMER: Objection, beyond the
11  scope of the 30(b)(6).
12      A. I'm afraid I don't.
13      Q. And I presume you don't know the
14  methodology either that they employed, correct?
15      A. No, I don't.
16      Q. How would you go about valuing the LBI
17  open positions at the OCC as of the time of
18  closing?
19      MS. BLOOMER: Objection. Far beyond
20  the scope of the 30(b)(6).
21      A. I'm assuming we are talking for the
22  equity options?
23      Q. Yes.
24      A. The same way I would value the futures

Page 180

JAMES

1  trade. Original trade price, current closing
2  price in the market and do the calculation.
3      Q. And can you tell me, if you know, why
4  it took, as you note on the first page under
5  options, that it took months to figure out the
6  values before closing after closing?
7      A. The reason it took as long as it did,
8  as I said, Barclays was not an equities house,
9  so it didn't have equities systems. And Lehman
10  did not have a decent list of the transactions,
11  the open positions that they had on.
12      So we had no risk system in Barclays.
13  There was no correct information coming out of
14  Lehman. So by the time they gathered the
15  information, and then go back and actually get
16  al the prices to try to value it back at these
17  dates -- which of course with the volatility in
18  the market and moving, your positions have moved
19  on, I believe that's why it took as long as it
20  did.
21      Q. Is it fair to say that the main reason
22  the valuation of the options positions would
23  take longer for Barclays than the futures
24  positions valuations is that Barclays had

Page 181

JAMES

1  experts such as you in the futures market, but
2  it didn't have similar experts in the OCC area?
3      MS. BLOOMER: Objection, no
4  foundation, and beyond the scope of the
5  30(b)(6).
6      A. I would assume, yes.
7      Q. If I can direct your attention to your
8  notes. I don't have any other questions about
9  Exhibit 553.
10      Do you see under options, the second
11  line says, "Option reports to Stephen King on
12  9/19 as of 9/18. Call on, no lots, no clear
13  value, no client, no house."
14      Do you see that?
15      A. Yes.
16      Q. Can you explain what you mean by that,
17  please?
18      A. I -- there was a report sent from a
19  person in Lehman, an e-mail that was sent from
20  Lehman to Stephen King and Tim Stack. I can't
21  remember which way around it was. I believe it
22  went straight to Stephen giving supposedly the
23  OCC equity options positions, but it didn't show
24  all of the positions. It didn't show the number

Page 182

JAMES

1 of lots. There was a number on it, but there
2 was no designation if that was actually a value
3 or not. And there was no separation between it
4 being client, house, or affiliate.
5     So was something sent to Barclays,
6 yes. Could Barclays actually take from that
7 what they were getting? No.
8     (Exhibit 554, e-mail dated 9/19/2008
9     with attachment marked for identification,
10    as of this date.)
11    Q.  Ms. James, I have handed you what I
12 have marked as Exhibit 554 which I will identify
13 for the record as an unBates-stamped e-mail from
14 Christopher Mincak, M-I-N-C-A-K, to Stephen King
15 and others at Barclays on Friday, 19th of
16 September, 2008 at 4:445 p.m.?
17    MS. BLOOMER: Note for the record that
18    I believe we did provide you the Bates
19    numbers for this even though it doesn't
20    appear on this, in an e-mail last night.
21    Q.  OK. Can you take a moment to look at
22 Exhibit 554 and can you tell me if that is the
23 report to which you refer in your notes that you
24 just testified about.?

TSG Reporting - Worldwide    877-702-9580

Page 183

JAMES

1    MS. BLOOMER: Objection, vague. I
2 believe she refers to more than one report.
3    A.  Yes, but I certainly didn't see all of
4 this.
5    Q.  When you say you never saw all of it,
6 can you explain?
7    A.  I think, I think the report I was
8 originally shown, there was like 25 pages.
9 Not -- not a brick.
10    Q.  And who showed you the report, the 25
11 page version of the report, Ms. James? Was that
12 Mr. King?
13    A.  Yeah.
14    Q.  So is it your testimony that you have
15 seen 25 pages of this --
16    A.  Yes.
17    Q.  -- e-mail and the attachment?
18    A.  Yes.
19    Q.  But you haven't seen the whole thing?
20    A.  Correct.
21    Q.  It is your testimony that Mr. King did
22 not show you that at the time?
23    A.  Correct.
24    Q.  Without taking the requisite hours to

TSG Reporting - Worldwide    877-702-9580

Page 184

JAMES

1 go through line by line, could you tell me
2 whether the full report that I have placed in
3 front of you and marked as Exhibit 554 contains
4 more information and specifically more useful
5 information in determining the value of LBI's
6 open positions at the OCC than the report that
7 Mr. King showed you on Sunday the 21st of
8 September.
9    A.  No, it doesn't.
10    Q.  Why is that?
11    A.  There is no lots. There is no
12 designation of house and customer. Or firm or
13 affiliate. There is no designation. It doesn't
14 tell you who these positions belong to. It
15 doesn't give you the number of lots.
16    Q.  OK, do you know whether Barclays asked
17 for the information about lots, clear value,
18 client and house positions that you say is
19 missing from this report?
20    A.  I don't know.
21    Q.  And you don't know because you weren't
22 part of the deal team?
23    A.  Correct.
24    Q.  And you have never learned that fact

TSG Reporting - Worldwide    877-702-9580

Page 185

JAMES

1 subsequently?
2    A.  No.
3    Q.  Did Barclays have any in-house options
4 experts at the time of the closing?
5    A.  I don't know to be honest.
6    (Exhibit 555, document Bates stamped
7     BCI-EX-(S) 188225 through 270 marked for
8     identification, as of this date.)
9    Q.  Thank you, Ms. James. I have handed
10 you a document that is marked as Exhibit 555. I
11 believe it has actually been marked as 394B.
12 But I'm not 100 percent, so I marked it again.
13 I will identify this for the record as -- sorry,
14 this has not been previously marked as 394B.
15    I will identify it for the record as
16 an e-mail bearing the Bates range BCI-EX-(S)
17 00188225 and it is from Frank Pearn to Tim Stack
18 and others. September 21, 2008. Have you seen
19 this document before?
20    A.  Yes.
21    Q.  Tell me the circumstances in which you
22 have seen it, please.?
23    MS. BLOOMER: Objection to the extent
24    you can answer without revealing privileged

TSG Reporting - Worldwide    877-702-9580

Page 186

JAMES

1
2    information.
3    A.    I saw it on Sunday, September 21st.
4    Q.    Tell me the circumstances under which
5    you first saw this e-mail sent September 21.
6    A.    This was given to me and asked if I
7    could explain how to read the report.
8    Q.    Given to you by Mr. King?
9    A.    By Mr. Stack.
10   Q.    What did you tell Mr. Stack when he
11   asked you if you could read the report?
12   A.    I said yes. And I told him how to
13   read it.
14   Q.    And how is it that you were able to
15   read this report? Have you seen reports like
16   this before?
17   A.    Yes.
18   Q.    Under what circumstances had you seen
19   reports like this before?
20   A.    This is a report from the OCC. It is
21   the same report they use for their futures as
22   well as for their equity options. It is a
23   standard format. You read it in the same way.
24   Q.    If you could direct your attention to
25   your notes, page 1 for a moment. You reference

TSG Reporting - Worldwide    877-702-9580

Page 187

JAMES

1
2    in 9/21, 4:07 p.m. e-mail saying e-mail to Tim
3    with OCC reports reflecting 9/19 and 9/22
4    reports?
5    A.    That's this.
6    Q.    In case there is any confusion in the
7    record, the time stamp on the document marked as
8    555 is in Greenwich mean time. It says 8:07
9    p.m. as opposed to the 4:07 p.m. in your notes?
10   A.    Yeah, that's probably right.
11   Q.    And is it fair to say, Ms. James, that
12   the information that appears in bullet point
13   form below the line we have just read, first of
14   all, report reflecting 9/19 date showed a total
15   of 2,148 -- I am sorry, 2,148,180,547.47. That
16   figure is drawn from your analysis of this
17   report, correct?
18   A.    Correct.
19   Q.    And it is a total of what, Ms. James?
20   A.    If you actually --
21         MS. BLOOMER: You're asking about the
22   9/19 entry on her notes?
23         MR. OXFORD: Yes, the one that I just
24   read.
25   BY MS. BLOOMER:

TSG Reporting - Worldwide    877-702-9580

Page 188

JAMES

1
2    Q.    Can you tell me where on the report
3    that that 2.1 billion dollars comes from?
4    A.    OK, so if you go past the second blue
5    divider and the very first page --
6    Q.    Do you have a Bates number, that's the
7    number that appears at the --
8    A.    Yes, so BCI-EX-(S) 00188255.
9    Q.    And what you have done to get that 2.1
10   billion dollars is total the three entries that
11   appear under the column "face value"?
12   A.    That's correct.
13   Q.    What does that 2.1 billion dollars
14   represent, Ms. James?
15   A.    As per the breakdown, it is a letter
16   of credit, it's cash, and it's government
17   securities that Lehman had with the OCC for
18   their trading.
19   Q.    Posted as margin by the -- by Lehman
20   with the OCC?
21         MS. BLOOMER: Objection to form.
22   A.    Yes.
23   Q.    Is part of that also clearing fund to
24   your knowledge?
25   A.    I actually don't know. It doesn't

TSG Reporting - Worldwide    877-702-9580

Page 189

JAMES

1
2    say. So I wouldn't actually know.
3    Q.    And for whose options, has Lehman, in
4    this report, posted this collateral?
5    A.    It doesn't tell you.
6    Q.    Is that information available anywhere
7    in this report?
8    A.    No.
9    Q.    Is it -- does this report break down
10   the collateral that's posted in categories,
11   whether they are posted for customer positions,
12   firm positions, et cetera?
13   A.    For the report, this report dated
14   9/19, no, it does not.
15   Q.    So I take from your answer, you have
16   seen another report that does break it down like
17   that? Is that correct?
18   A.    (Indicating). The next day.
19   Q.    Can you indicate by Bates range?
20   A.    So it is BCI-EX-(S) 00188233 through
21   to BCI-EX-(S) 00188254.
22   Q.    Which exhibit number are you looking
23   at?
24   A.    555.
25   Q.    I see, it is attached to the same

TSG Reporting - Worldwide    877-702-9580

Page 190

JAMES

1  e-mail?
2      A.   Yes.
3          MS. BLOOMER:  Whenever you reach a
4  good time for a break, we would like to take
5  a break.
6          MR. OXFORD:  We can take a break just
7  now.
8          (Recess)
9      Q.   Directing your attention to Bates
10 number 18233 of Exhibit 255.  It is the page I
11 think we were looking at just before the break.
12 And it appears to reflect that in the OCC
13 account 074C, collateral of a total of 507
14 million and change was posted by Lehman, is that
15 correct?
16     A.   Correct.
17     Q.   You read the report the same way as I
18 do?
19     A.   Yes.
20     Q.   In fact, that number is reflected at
21 the bottom of your chart at the bottom of page I
22 of your notes, isn't it?
23     A.   Correct. Yes.
24     Q.   And I think I have this, but I just

TSG Reporting - Worldwide    877-702-9580

Page 191

JAMES

1  want to make sure that I understand it, Lehman
2  posted that collateral with the OCC to secure
3  options placed on behalf of customers, correct?
4      A.   Correct.
5      Q.   And do you know whether or not
6  Lehman's customers also -- to secure Lehman's
7  obligation to the exchange or the posting of
8  this collateral -- also provided Lehman with
9  collateral?
10         MS. BLOOMER:  Objection beyond the
11 scope of the 30(b)(6).
12         (Record read)
13     A.   I don't, but I'm actually going to do
14 a but, and say in Craig Jones' declaration, he
15 actually states that the money posted at the OCC
16 for all of the business was Lehman's money.
17     Q.   Right, I understand that.  I
18 appreciate that clarification.  Your testimony
19 is the same as Mr. Jones' testimony, right?
20     A.   Yes.
21     Q.   You don't disagree that the 2.1
22 billion dollars that you have identified as
23 being reflected as posted by Lehman at the OCC
24 in this report Exhibit 555 -- you don't dispute

TSG Reporting - Worldwide    877-702-9580

Page 192

JAMES

1  that that's Lehman's money?
2      A.   No.
3      Q.   That Lehman, at least insofar as this
4  account 074C, posted to secure the obligations
5  that relate to Lehman's customers options,
6  correct?
7      A.   Correct.
8      Q.   My question is a little different.  To
9  secure or in return for the posting of this
10 margin, this 507 million dollars in account
11 074C, do you know whether Lehman obtained
12 collateral from customers?
13         MS. BLOOMER:  I object to the form of
14 the question.  I would also object that this
15 is beyond the scope of this witness'
16 testimony today.
17     A.   And I am going to have to say I don't
18 know, because I honestly don't.
19     Q.   Who would you ask if you wanted to
20 know the answer to that question?
21     A.   This is equity options.  I would ask
22 somebody in the Lehman -- probably be their PB
23 world, prime brokerage world.
24     Q.   Do you believe Mr. Jones would know

TSG Reporting - Worldwide    877-702-9580

Page 193

JAMES

1  the answer?
2      A.   He may do.  I don't know.
3      Q.   What about Mr. Dziemian?
4      A.   I'm not sure.
5      Q.   If I could direct your attention to
6  the second page of your notes, Ms. James.  There
7  is a reference again 9/21, 4:07 p.m.  Do you see
8  that, a little more than halfway down?
9      A.   Yes.
10     Q.   Tim receives an OCC group board
11 activity date 9/22/08?  Do you see that?
12     A.   Yes.
13     Q.   And that reports excess across all
14 accounts of 689 million dollars, correct?
15     A.   Yes.
16     Q.   When was the first time that you saw
17 the report that you are referencing?
18     A.   Sunday, Sunday the 21st of September.
19     Q.   Did Mr. Stack give you that?
20     A.   Yes, he did.
21     Q.   Go off for one second.
22         (Pause)
23     Q.   Is that activity the report, the OCC
24 report?

TSG Reporting - Worldwide    877-702-9580

Page 194

JAMES

1
2        MS. BLOOMER: Objection, foundation.
3     Q.   Is the OCC report that you have
4  referred to Mr. Stack receiving at 4:07 p.m. on
5  the 21st, is that Exhibit 555?
6     A.   Yes.
7     Q.   It is?
8     A.   Yes.
9     Q.   And you note below that this exhibit
10 shows EXC across all accounts of 689 million
11 dollars, correct?
12    A.   Yes.
13    Q.   Can you explain to me what that means?
14    A.   From the exchange reports, there is
15 actually a line here that gives you a number
16 with EXC.
17    Q.   And EXC refers to excess?
18    A.   Yes.
19       MS. BLOOMER: Objection, foundation.
20    Q.   And what do you understand excess to
21 mean in this context?
22    A.   In this particular context?
23    Q.   Yes, the context of this report?
24    A.   Right. And in this particular side of
25 the report, because you have to be very

TSG Reporting - Worldwide    877-702-9580

Page 195

JAMES

1
2  specific, yeah, that means that is money that
3  was placed -- actually money, collateral or LCs
4  that were at the OCC to cover the initial margin
5  requirement. And that's above and beyond the
6  requirement required by the exchange.
7     Q.   OK. What do you explain to --
8  withdrawn.
9       Did Mr. Stack ask you to interpret
10 this report?
11    A.   Yes.
12    Q.   And what did you tell him in response
13 to that request?
14    A.   I explained what the numbers were.
15    Q.   And those are the numbers that you
16 have in your 30(b)(6) notes breakdown by type
17 Exhibit 552?
18    A.   Yes.
19       MS. BLOOMER: Objection to the form of
20 the question. Are you asking whether she
21 can recall now that these are the precise
22 numbers that she explained to him then? Or
23 are you asking her whether these numbers are
24 the same numbers on the page?
25       MR. OXFORD: I think my question was

TSG Reporting - Worldwide    877-702-9580

Page 196

JAMES

1
2  clear. I'm asking her what she told
3  Mr. Stack.
4     A.   This is what I told Mr. Stack.
5     Q.   The numbers that are on the page?
6     A.   Yes.
7     Q.   Thank you.
8       MS. BLOOMER: The numbers that are on
9  which page? I just want to be clear. I'm
10 not clear.
11    Q.   The numbers on the page --
12       MS. BLOOMER: The numbers on the page,
13 this page of this report, page Bates
14 numbered 233?
15       THE WITNESS: Yes.
16       MS. BLOOMER: So these particular
17 numbers you told him?
18       THE WITNESS: Yes.
19       MS. BLOOMER: OK. Sorry.
20    Q.   That section of the report that starts
21 at 233, do you see that?
22    A.   Yes.
23    Q.   Do you see that that report goes on
24 for a number of pages through Bates range 254?
25    A.   Yup.

TSG Reporting - Worldwide    877-702-9580

Page 197

JAMES

1
2     Q.   And did you discuss with Mr. Stack all
3  of the numbers on this page?
4     A.   Yes.
5     Q.   These pages between the two Bates
6  ranges?
7       MS. BLOOMER: Please specify which
8  page you are talking about when you asking
9  the questions.
10    Q.   Between Bates range 188233 and 188254.
11    A.   Yes.
12    Q.   And those numbers are which are excess
13 margin and various accounts at the OCC are also
14 reflected under breakdown by type on page 2 of
15 your notes, Exhibit 552, correct?
16    A.   That's correct.
17    Q.   Do you remember anything else about
18 the discussion with Mr. Stack on the 21st?
19    A.   No.
20    Q.   What did he say when you gave him this
21 information?
22    A.   He said OK. Knowing Tim.
23    Q.   Do you know -- you will see, directing
24 your attention to 188233, do you see the report
25 has an activity date at the top? Do you see

TSG Reporting - Worldwide    877-702-9580

Page 198

JAMES

1  that?
2  
3     A.   Yes.
4     Q.   That's 9/22/2008.
5     A.   Yes.
6     Q.   Do you have any understanding of why
7  the activity date on this report was 9/22?
8     A.   It was because it was an option
9  weekend, expiry weekend.
10    Q.   Can you explain that a little further?
11    A.   The third Friday of every month, and
12 especially on the quarter months, is a main
13 option expiry weekend. So the options go off
14 over that weekend. They actually are either
15 exercised or assigned. The weekend of 19th, 21,
16 20 was an option expiry weekend.
17         So the OCC puts out reports on the
18 morning of the Saturday morning which are the
19 regular calls, and then they would do the option
20 exercises and reassignments and issue you a new
21 set of numbers.
22    Q.   Does this report fall into the latter
23 category, the new set of numbers that you are
24 talking about?
25         MS. BLOOMER: Objection, no

TSG Reporting - Worldwide    877-702-9580

Page 199

JAMES

1  foundation.
2  
3     A.   Yes, it does.
4     Q.   And the system date that you see just
5  below the activity date, do you see that?
6     A.   Um-hm.
7     Q.   That system date is 9/20/2008?
8     A.   Yes.
9     Q.   Do you have an understanding of why
10 the system date is different from the activity
11 date?
12         MS. BLOOMER: Objection, no
13 foundation.
14    A.   I believe, it's how the OCC dates
15 their reports.
16    Q.   OK. I think this is clear from your
17 prior testimony, but just to be sure, is it your
18 understanding, Ms. James, that this report
19 reflects the Friday mark-to-market close prices
20 in the OCC system?
21         MS. BLOOMER: Objection,
22 mischaracterizes her testimony.
23    A.   No.
24    Q.   Why not?
25    A.   What I don't know is once they have

TSG Reporting - Worldwide    877-702-9580

Page 200

JAMES

1  done the option exercises and assignments, is
2  whether they revalue. That, I don't know.
3     Q.   Can you explain a little further what
4  do you mean about the option exercises and
5  assignments?
6     A.   When you book off an option exercise
7  or assignment, you are taking it out of being a
8  position. So it is no longer an open position.
9  You are actually taking it off the books and
10 there is a value that goes with that.
11         What I don't know is if they use the
12 closing prices of Friday night or if they use
13 the closing prices that have been determined for
14 the exercise and assignment process.
15    Q.   Do you have an understanding of how
16 they -- they being the OCC -- determine the
17 closing prices for the exercise and assignment
18 process?
19         MS. BLOOMER: Objection, no
20 foundation.
21    A.   No, I don't.
22    Q.   So you told Mr. Stack, when he asked
23 you to interpret this report, that this showed
24 that Lehman, as of the date of this report, had

TSG Reporting - Worldwide    877-702-9580

Page 201

JAMES

1  an excess of collateral at the OCC of close to
2  700 million dollars, correct?
3         MS. BLOOMER: Objection to the form of
4  the question. I don't think she has ever
5  said that she told Mr. Stack that number in
6  particular.
7     A.   Yeah. I told him these are the
8  numbers on the report and how to read them.
9     Q.   Did you add it up for Mr. Stack?
10    A.   I don't remember, to be honest.
11    Q.   You don't remember giving him a total?
12    A.   I may have done.
13    Q.   I think we covered this earlier.
14 Below the list of numbers, you write,
15 "subsequent knowledge, 9/19/OCC late margin
16 call"?
17    A.   Yes.
18    Q.   As a 30(b)(6) witness for Barclays,
19 are you able to tell me when Barclays first
20 learned about the late margin call that you have
21 testified about earlier?
22    A.   I think within the first two to three
23 weeks after September 22.
24    Q.   But that Barclays did not know to your

TSG Reporting - Worldwide    877-702-9580

Page 202

JAMES

1   knowledge, and as the 30(b)(6) witness, about
2   that late margin call until after closing,
3   correct?
4   A. Correct.
5   Q. Again, as the 30(b)(6) witness for
6   Barclays, what was Barclays' knowledge of the
7   excess in margin posted at the OCC by Lehman as
8   of the closing of the deal?
9   MS. BLOOMER: Objection to the use of
10   the term "excess."
11   A. Can we just clarify what do you mean?
12   Q. Right. Sure. And I do want to be
13   very clear on this. Your notes reflect, and I
14   think your testimony reflects, that Exhibit 555
15   which you reviewed with Mr. Stack --
16   A. Yup.
17   Q. -- the Sunday before the deal
18   closed --
19   A. Yes.
20   Q. -- shows an excess across all Lehman
21   accounts at OCC --
22   A. Yes.
23   Q. -- of over 689 million dollars?
24   A. Yup, that's the -- yes.

TSG Reporting - Worldwide    877-702-9580

Page 203

JAMES

1   Q. As Barclays 30(b)(6) witness, what was
2   Barclays' knowledge of the excess --
3   A. The knowledge was --
4   Q. Let me finish that.
5   A. Sorry.
6   Q. -- of the excess collateral that
7   Lehman had posted at the OCC over and above the
8   margin requirements of the OCC as at the closing
9   of the deal before the markets opened on
10   September 22, 2008?
11   A. So I -- on the Sunday 21st, when we
12   received this report.
13   Q. Or 7:59 a.m. before the markets
14   opened?
15   A. The only information we had is these
16   were the numbers at the OCC that had been
17   provided. We did not know at that time whether
18   the customers had paid the funds, who the
19   collateral and the excess belonged to.
20   Subsequent to that, based on Craig Jones'
21   testimony, we had found out it was all LBI
22   money. But at that time on Sunday 21st, we did
23   not know.
24   We did not know what the positions

TSG Reporting - Worldwide    877-702-9580

Page 204

JAMES

1   were. We didn't know the breakdown, we didn't
2   know the volatility of any of those positions
3   that were on the Sunday.
4   Q. You didn't know the breakdown of what?
5   A. The positions.
6   Q. The underlying option positions that
7   might be long and short Barclays had no
8   information?
9   A. Correct.
10   Q. Did Barclays ask for information about
11   that prior to closing?
12   A. I don't know.
13   MS. BLOOMER: Objection, beyond the
14   scope of the 30(b)(6).
15   Q. We may have covered this earlier. If
16   so, I apologize. Do you know whether or not
17   Barclays posted additional margin in the OCC
18   accounts that it assumed from Lehman in the week
19   following the closing?
20   MS. BLOOMER: Objection, beyond the
21   scope of the 30(b)(6.
22   A. I would certainly assume yes due to
23   the volatility. I think the weeks following, we
24   lost roughly 700 million dollars based on the

TSG Reporting - Worldwide    877-702-9580

Page 205

JAMES

1   positions that were there. So yes, they
2   definitely would have posted.
3   Q. You lost 700 million dollars based on
4   which positions?
5   A. The positions that were in the OCC
6   account.
7   Q. Which OCC account? The proprietary
8   ones or all of the them?
9   A. All of them. I mean, the volatility
10   that week was horrendous.
11   Q. Well, I'm confused because I thought
12   you told me earlier that the customers accept
13   the gains and losses for any -- when an option
14   is closed out and there is a gain or loss, that
15   is not something that Barclays assumes
16   responsibilities for; it is the customer's
17   option, correct?
18   A. Correct. These weren't just customer
19   though, these were house as well.
20   Q. I understand that. Maybe we are just
21   talking past each other again. I thought you
22   said Barclays lost 730 million dollars post
23   closing on all of the OCC accounts.?
24   MS. BLOOMER: You can look at the

TSG Reporting - Worldwide    877-702-9580

Page 206

JAMES

1  declaration to confirm what was said in
2  that. She is --
3  Q.  Do you know whether Barclays hedged
4  the risk of assuming the positions that Barclays
5  supposedly lost 730 million dollars on?
6  A.  I don't think so, because we didn't
7  know what the positions were. So you can't
8  hedge what you don't know.
9  Q.  If you wanted to know for sure whether
10  or not Barclays did hedge this risk of assuming
11  Lehman's positions at the OCC, who would you
12  ask?
13  A.  I most likely would go back to Stephen
14  King on the deal team and ask.
15  Q.  Ms. James, I am handing you a document
16  that was marked yesterday at Mr. Romain's
17  deposition, Exhibit 546A. Could you take a
18  second, just look at that and let me know if you
19  have seen it before.
20  A.  Yes, I have.
21  Q.  Can you tell me, please, in which
22  context you have seen?
23  A.  I believe it was clarifying some
24  numbers.

TSG Reporting - Worldwide    877-702-9580

Page 207

JAMES

1  Q.  Can you be a little bit more specific?
2  MS. BLOOMER: Objection to the form of
3  the question.
4  Q.  Did someone give it to you?
5  A.  Yeah.
6  Q.  Who gave it to you.
7  A.  I'm not sure if this is the one that
8  came from Lee. I believe Lee forwarded this to
9  me, Lee Bowell.
10  Q.  Lee Bowell who is the finance person
11  from Barclays?
12  A.  Yes.
13  Q.  Do you remember when he forwarded that
14  to you?
15  A.  This week, I think.
16  Q.  Which numbers did Mr. Bowell seek to
17  clarify with you?
18  A.  It was the cash number.
19  Q.  What in particular was Mr. Bowell
20  seeking to clarify about that cash number if you
21  remember?
22  A.  In conjunction with my declaration,
23  Exhibit 2, where I have a cash figure of 871, I
24  was asked to confirm if -- they have 811, they

TSG Reporting - Worldwide    877-702-9580

Page 208

JAMES

1  wanted to know what the difference was and, of
2  course, the difference is they are different
3  value dates. This is as of the 19th. This is
4  as of what we physically received.
5  Q.  I remember that testimony.
6  Do you see on the left-hand side of
7  the spreadsheet that's attached to Exhibit if --
8  first part of Exhibit 546A, there is a reference
9  to domestic exchanges -- sorry, this is a
10  spreadsheet that Mr. Bowell sent to you, the one
11  you have in your hand?
12  A.  Sorry.
13  Q.  On the left-hand side, there is an
14  entry for domestic exchanges. Do you see that?
15  A.  Yes.
16  Q.  Did you discuss that with Mr. Bowell?
17  A.  I was asked what it is and it is the
18  CME, it would be the CME exchange. And I said I
19  assume it was, but they put he's -- they put
20  these numbers together. Finance created this.
21  Q.  Were you involved IN discussions with
22  finance to help them create this?
23  A.  No.
24  Q.  And how was it you were able to answer

TSG Reporting - Worldwide    877-702-9580

Page 209

JAMES

1  Mr. Bowell's question about domestic exchanges?
2  A.  Because I was asked what the domestic
3  exchange were.
4  Q.  By process of elimination --
5  A.  Yeah.
6  Q.  -- you arrived at the CME?
7  A.  Correct.
8  Q.  Do you have any knowledge of any
9  assets at the CME that were formerly held at
10  Lehman or ran in Lehman's name that were assumed
11  by Barclays in connection with the CME
12  transaction?
13  A.  No.
14  Q.  You have no information as to why
15  there would be an entry in this spreadsheet --
16  A.  Well, well, this is the customer money
17  at the CME.
18  Q.  How is it that you know that's the
19  customer money at the CME?
20  A.  Because it is domestic exchanges and
21  it is customer. Domestic exchanges, the
22  customers were trading were the CME clearing
23  house.
24  Q.  Did Lehman have any proprietary

TSG Reporting - Worldwide    877-702-9580

Page 210

JAMES

1   positions at the CME?
2   A.   No.
3   Q.   Did Lehman trade for affiliates or
4   place positions at the CME for affiliates?
5   A.   At the time we took over on
6   September 22, there was no positions for
7   proprietary or affiliates.
8   Q.   So again, by process of elimination,
9   you concluded that these are customer assets?
10   A.   Yes.
11   Q.   Do you have any understanding as to
12   why there is an entry for assets and an entry
13   for liabilities there?  You see that there is a
14   -- there is a debit of 538 million and a credit
15   of a little over 134 million.  Do you see that?
16   MS. BLOOMER:  Objection to her
17   qualifications to talk about the meaning of
18   these numbers.
19   MR. OXFORD:  I'm just trying to lay a
20   foundation.
21   A.   I don't know.  I don't know.  I would
22   be guessing.
23   Q.   We don't need to you guess.
24   A.   Nope.

TSG Reporting - Worldwide    877-702-9580

Page 211

JAMES

1   Q.   Thank you.
2   (Exhibit 556, document Bates stamped
3   BCI-EX-(S) 187355, with attachment marked
4   for identification, as of this date.)
5   Q.   Ms. James, you have in front of you
6   what I have marked as Exhibit 556 which I will
7   identify for the record as a Barclays-produced
8   briefing memo dated September 15, 2008, which
9   has the Bates range BCI-EX-(S) 0018255 to 257.
10   Have you seen this memorandum before, Ms. James?
11   A.   No, I have not.
12   MS. BLOOMER:  I would ask if you are
13   going to ask questions about this that you
14   give the witness ample time to review the
15   document carefully.
16   
17   MS. BLOOMER:  Take the time to read
18   it.
19   MR. OXFORD:  Sure, take all the time
20   you need.
21   MS. BLOOMER:  I would like to take a
22   moment if I could to ask the witness a few
23   questions about who is on this e-mail so I
24   can evaluate any potential privilege.  I

TSG Reporting - Worldwide    877-702-9580

Page 212

JAMES

1   just am not familiar with the names.  So if
2   I could have --
3   MR. DAKIS:  If you want to go off the
4   record to do a privilege analysis with your
5   client, that's fine.  But I don't want to
6   waste time on the record.  You will have
7   time after the initial questioning by the
8   other parties is done to ask any follow up
9   questions you have.
10   MS. BLOOMER:  I am going to need a
11   moment before we ask questions to be sure
12   this isn't privileged.  If we can go off the
13   record.  Thank you.
14   MR. DAKIS:  Let's go off the record.
15   (Recess)
16   Q.   Ms. James, you have in front of you
17   Exhibit 556?
18   A.   Yes.
19   Q.   You have had a chance to review this
20   document?
21   A.   Yup.
22   Q.   And your testimony is the same, you
23   don't remember ever seeing this document?
24   A.   Nope.

TSG Reporting - Worldwide    877-702-9580

Page 213

JAMES

1   Q.   Who is Alasdair Hodge, please?
2   A.   Alasdair, at the time of this -- at
3   this date, was the head of prime services in
4   Barclays.
5   Q.   Is he still with Barclays today?
6   A.   Yes, he is.
7   Q.   What's his position today if you know?
8   A.   He has a COO title, but I'm not -- I
9   think it is COO of fixed income and prime?
10   Q.   Not of great moment.  As head of prime
11   services for Barclays, did Mr. Hodge have
12   responsibility for Lehman -- for, rather,
13   Barclays' futures business?
14   A.   Yes, he did.
15   Q.   Did he also have any responsibility
16   for Barclays' options business?
17   MS. BLOOMER:  Objection, no
18   foundation.
19   A.   Yes, equity options in Barclays went
20   into prime.
21   Q.   Do you know who the other individuals
22   are on the distribution and cc list?  Obviously,
23   we have covered Mr. Stack, we know who he is.
24   If you could take me through each in turn.

TSG Reporting - Worldwide    877-702-9580

Page 214

JAMES

A. Carole Machell was the global head of operations. Paul Chapman was the London head of operations, Philip Freeborn was the global head of IT. Christoph Schwarz was the global head of futures IT. I'm not sure of Sarvjeet, Sarvjeet's title, but he was in the Treasury area. I'm just not sure what level he was or is. The same with Harriet Sterling. They are both in Treasury in London.

Stephen Morse is their global head of compliance. And Sharon Whitehouse is a senior HR person in London. And Joe Logozzo, at this time, was COO for futures.

Q. Has he changed his position then?

A. Joe is now -- I'm actually not sure. Sorry.

Q. To your knowledge, are all of these people still employed by Barclays today?

A. I'm not sure about Christoph Schwarz.

Q. The document reads, "As you may have heard we are evaluating potential acquisition of the Lehman's futures business." Do you see that?

A. Yes.

TSG Reporting - Worldwide    877-702-9580

Page 215

JAMES

Q. Do you believe that's a reference to the same topic that was discussed on your meeting on the 15th?

A. Yes.

Q. "We need to quickly assess and make a decision later today. Attached is a document including situational review benefits, risks, key transactional requirements and key next steps." Do you see that?

A. Yes.

Q. "Please review and reply with your thoughts and your area's relevant assessments as soon as possible."

Now, it then goes on to say, "Please, work with Joe Logozzo and Tim Stack if you have any questions/concerns." Do you see that?

A. Yup.

Q. This e-mail is sent by Mr. Hodge, 7:42 Greenwich mean time, in the morning of Tuesday the 16th. So that would be 3:42 in the morning eastern time, correct?

A. Yes.

Q. Now, does this does this refresh your recollection about any further discussions you

TSG Reporting - Worldwide    877-702-9580

Page 216

JAMES

may have had with Tim Stack or anybody about the acquisition of Lehman's futures business on Monday or Tuesday September 15 or 16th, 2008?

A. When I first came in, we had a conversation about the meeting on the Sunday which is here.

Q. The meeting, that's a meeting on a Monday?

A. Right. But this actually talks about the conversation on Sunday night that Tim and I had with Jeff Jennings and then talks about the meeting from the Monday and I'm assuming, I don't know, that this document was put together by Tim based on the meeting on the Monday.

Q. Based on your review of this document, does this appear to reflect the discussion that you had with Mr. Jennings on Sunday night along with Mr. Stack and the meeting that you participated in on Monday the 15th?

MS. BLOOMER: Objection to the question, it is compound.

A. This information is what came out of the Monday meeting.

Q. You see under the heading

TSG Reporting - Worldwide    877-702-9580

Page 217

JAMES

"Transactional benefits and risks," first page of the memo, do you see that?

A. Yes.

Q. There is an entry, benefits to Barclays?

A. Yup.

Q. It says, "Taking over the LB business will allow BarCap to double its business by adding annual revenues of approximately 250 million dollars."

A. Yes.

Q. Is that consistent with the discussion that you remember from the meeting on the 15th?

A. Yes.

Q. Down at the bottom of the page, there is an entry, key risk, that's in bold. Do you see that?

A. Yup.

Q. The memo reads, "Loss of key clients due to inability to execute an expedient transaction."

Do you see that?

A. Yup.

Q. Does that reflect the discussion, to

TSG Reporting - Worldwide    877-702-9580

Page 218

```
 1           JAMES
 2    the best of your recollection, of the meeting on
 3    September 15th, 2008?
 4           MS. BLOOMER: Objection to the form of
 5    the question.
 6    A.  Yes.
 7    Q.   Did you participate in any
 8    discussions, whether at this meeting on the 15th
 9    that you have testified about previously and is
10    reflected in Exhibit 556 or otherwise, about the
11    risks or potential liabilities for Barclays in
12    taking over or assuming responsibility for
13    Lehman's futures business?
14    A.   There was a lot of meetings the
15    week -- and there is no way I could recall them
16    all.
17    Q.   And I understand that.  There was a
18    lot going on this week.
19    A.   There was.
20    Q.   But focusing on my specific question,
21    which is I need to know your recollection, to
22    the extent you have it sitting here today, of
23    any discussions you had with anyone, whether in
24    this meeting that we have talked about before or
25    in any other meeting with anybody about the
```

TSG Reporting - Worldwide    877-702-9580

Page 219

```
 1           JAMES
 2    risks to Barclays of taking over Lehman's
 3    futures business.
 4    A.   I can't remember.  I'd have to go back
 5    and check my e-mails and communications.
 6    Q.   My question was specific to Barclays'
 7    acquisition of the futures business.
 8    A.   Yes.
 9    Q.   If I asked the same question with
10    respect to Lehman's options business --
11    A.   Was not involved.  That wasn't
12    discussed.
13    Q.   You have a very clear recollection, it
14    seems, that you don't -- you were not involved
15    in any discussions with anybody about the risks
16    or liabilities that Barclays would run in
17    acquiring Lehman's options business, is that
18    correct?
19           MS. BLOOMER: Objection to the form.
20    A.   Sorry.
21    Q.   That's a bad question.  Let me ask it
22    again.  It is correct to say you have a firm
23    recollection that you were not involved in any
24    discussion with anybody prior to the closing of
25    the deal on September 22 about the risks or
```

TSG Reporting - Worldwide    877-702-9580

Page 220

```
 1           JAMES
 2    liabilities that Barclays might run in assuming
 3    Lehman's options businesses, correct?
 4           MS. BLOOMER: Objection to the form of
 5    the question.
 6    A.   No.
 7    Q.   No, you have no recollection of any
 8    such conversations?
 9    A.   I don't have any recollection of those
10    conversations.
11           MS. BLOOMER: Was the question does
12    she have a recollection or does she have a
13    firm recollection that she did not have any
14    discussions?
15           MR. OXFORD: I'd take either.
16           MS. BLOOMER: Pardon.
17           MR. OXFORD: I'd take either.
18           MS. BLOOMER: Well, I think we need to
19    be clear about which is the question because
20    they are very different questions.
21           MR. OXFORD: The question is clear on
22    the record.
23           MS. BLOOMER: And your follow-up
24    response in this dialog about the question
25    is very unclear.
```

TSG Reporting - Worldwide    877-702-9580

Page 221

```
 1           JAMES
 2           MR. DAKIS: If you need to clarify a
 3    question he has asked, you can do so at your
 4    time at the end to ask follow-up questions.
 5    This is wasting time on the record.
 6           If the witness doesn't understand the
 7    question, the witness can say so.  You can
 8    object to form.  But the speaking objections
 9    have gone on all day and it is getting
10    tiresome.
11           MS. BLOOMER: I will make an objection
12    when I need to make an objection.  Thank
13    you.
14           MR. DAKIS: The Federal rules say you
15    can make objections to form, but no speaking
16    objections.  I ask that you follow the
17    rules.
18           MS. BLOOMER: I believe I am following
19    the rules.
20    Q.   OK.  You testified earlier in the
21    deposition, Ms. James, about Barclays' decision
22    to guarantee the obligations of Lehman's
23    customers under the acquisition of the futures
24    business.  Do you remember that testimony?
25    A.   Yes.
```

TSG Reporting - Worldwide    877-702-9580

56 (Pages 218 to 221)

Page 222

JAMES

1
2    Q.   Do you remember when Barclays made
3    that decision to offer that guarantee?
4    A.   To the clearinghouse over the
5    weekend -- actually, it might have been the
6    Friday, the 19th.
7    Q.   How is it you came to learn that
8    Barclays made that decision?
9    A.   It was in a meeting in Barclays'
10   offices.
11   Q.   Who was in attendance at that meeting?
12   A.   I believe, if memory serves correct,
13   it was Tim Stack, Alexandra Guest, I think
14   Joseph Logozzo may have been there and possibly
15   Sean Byrne and myself.
16   Q.   Do you remember what time of day the
17   meeting happened?
18   A.   No.
19   Q.   Do you remember whether it was a
20   business day or a weekend?  It seems like there
21   may have been a little distinction.
22   A.   There was no distinction at that time.
23   I believe it was the Friday which was the
24   business day.  So the 19th.  Yeah, 19th.
25   Q.   I think you told me earlier Alex Guest

TSG Reporting - Worldwide    877-702-9580

Page 223

JAMES

1
2    was the compliance officer for Barclays?
3    A.   That's correct.
4    Q.   Who made the decision for Barclays to
5    offer written guarantees to the exchanges for
6    all future obligations for customers?
7    MS. BLOOMER:  I am going to object to
8    the form of the question.  I am going to let
9    you -- I am going to instruct you not to
10   answer any questions here -- which I know he
11   is not asking for -- to the extent it
12   requires you to expose communications that
13   you had with lawyers or discussions
14   internally at Barclays concerning the legal
15   advice that you received from Barclays'
16   attorneys.
17   A.   OK, sorry, can we --
18   Q.   Sure, I think you have identified four
19   people in the room with you, none of whom has a
20   lawyer, and then I had asked the question if you
21   knew who made the decision on behalf of Barclays
22   to offer written guarantees to the exchanges for
23   Lehman's customer business.
24   
25   A.   In that meeting, it would have been

TSG Reporting - Worldwide    877-702-9580

Page 224

JAMES

1
2    Tim Stack.  What I don't know is if he then went
3    higher up the chain for approval.
4    Q.   What is your recollection about -- of
5    the discussion in that meeting about the topic
6    of whether or not Barclays should issue the
7    guarantee you have just testified to.?
8    MS. BLOOMER:  Again, to the extent it
9    would require you to disclose information
10   that was received in form of attorney
11   advice, I am going to instruct you not to
12   answer.
13   A.   Sorry, can we go with the question.
14   Q.   Can we read back the back.
15   (Record read)
16   A.   I think the conversation, if I am --
17   this is from memory and we are talking 18 months
18   ago here, whether we would give a bank account
19   number to the clearinghouse for them to be able
20   to take the margin call on the Monday morning
21   due to the filing on the Friday.
22   Q.   You said the clearinghouse.
23   A.   Oh, sorry, the CME.
24   Q.   Was there discussion, in this meeting,
25   about providing guarantees of Lehman's futures

TSG Reporting - Worldwide    877-702-9580

Page 225

JAMES

1
2    customers' obligations at any other
3    clearinghouse?
4    A.   No, I think the main topic was the CME
5    because that was the largest.
6    Q.   Do you know whether or not Barclays
7    did, in fact, offer guarantees to any other
8    exchanges or clearinghouses in connection with
9    Barclays' assumption of Lehman's futures
10   business?
11   A.   I don't know.
12   Q.   Can you tell me what you remember
13   about the discussion in that meeting about
14   Barclays' decision whether or not to offer an
15   unlimited guarantee to CME for Lehman's futures
16   customers?
17   MS. BLOOMER:  I am going to repeat the
18   same objections I made last time.  She
19   shouldn't disclose any discussion about
20   legal advice that anyone in the room
21   received from attorneys.
22   A.   It wasn't an unlimited guarantee.
23   Q.   In what way was it limited?
24   A.   It was limited to we only guaranteed
25   the payment for the Monday morning.

TSG Reporting - Worldwide    877-702-9580

Page 226

JAMES

Q. What do you remember about the considerations that factored into that decision as they were discussed at that meeting?

A. I think that the decision was being driven around the filing of LBI and the concern the clearing house would have if the filing had not been completed, where would they get the money from, and of course, the clearing house would have the right to put the customers into default.

Q. Was there any discussion in that meeting about the liabilities that Barclays would be exposed to by issuing this guarantee to CME?

A. No.

Q. Do you recall any discussion outside of this meeting about the liabilities that Barclays would be exposed to by issuing a guarantee to the CME for Lehman's futures obligations for its customer on the Monday, the 22nd of September?

A. Not that I recall.

Q. To your recollection, Ms. James, that decision was made within that meeting to offer

TSG Reporting - Worldwide   877-702-9580

Page 227

JAMES

the CME this guarantee?

A. Yes.

Q. Do you know whether or not Mr. Stack would have required authority from someone in a superior position to him to offer that guarantee?

A. I would say yes, but I don't know for definite.

Q. And why would you say yes?

A. Because to tie Barclays to that kind of guarantee, I — you have to have somebody fairly senior agree to do that.

Q. And why do you say that, because of the potential exposure to be significant?

A. Yes. Especially due to the volatility of the markets. And we also had no idea what we were getting.

Q. Is that a reference to your prior testimony that Barclays hadn't done any due diligence on the futures?

A. Correct.

Q. On the futures business that it was considering buying from Lehman?

MS. BLOOMER: Objection to the use of

TSG Reporting - Worldwide   877-702-9580

Page 228

JAMES

the word "buying" which mischaracterizes her testimony.

A. Yeah, because it is acquiring, not buying.

Q. Do you know whether or not Barclays offered a guarantee of customer obligations at any equity options exchanges or clearinghouses?

A. I don't know.

Q. If I wanted to know the answer to that question, do you know who I would ask?

A. I would assume somebody in the equities option world or maybe Alexander Guest in compliance. Honestly, I don't know.

Q. Who in the equity options role would you ask?

A. I don't know who was running it to be honest.

Q. If I wanted to know whether or not Barclays offered a guarantee to any other futures clearinghouses or exchanges, other than CME, as they did to CME for the customer obligations, who would I ask?

MS. BLOOMER: Objection, time frame, vague.

TSG Reporting - Worldwide   877-702-9580

Page 229

JAMES

Q. Again, my question is directed towards the assumption by Barclays of Lehman's customers futures business in September of 2008.

A. That would be a question for our legal counsel.

MR. OXFORD: Off the record.

(Recess)

(Exhibit 557, document Bates stamped BCI-EX-(S)187751 with attachment marked for identification, as of this date.)

Q. Have you had an opportunity, Ms. James, have you had an opportunity to review Exhibit 557?

A. Yes.

Q. For the record, I'll identify it as e-mail from Sean Byrne to you and others at Barclays entitled "Barclays LBI plan sent on Friday, 19th, at 10:50 in the morning eastern."

A. Yes.

Q. Our 2:50 in the afternoon, GMT. Do you recall reviewing this document?

A. I built it.

Q. And can you tell me the context in which you built it?

TSG Reporting - Worldwide   877-702-9580

58 (Pages 226 to 229)

JAMES

2    A.   This was put together for the content
3  of insuring -- taking, acquiring and moving all
4  the futures positions over for customers -- that
5  we didn't miss anything.
6    Q.   At whose direction did you create this
7  spreadsheet?
8    A.   Who ordered me to do it?
9    Q.   Yes.
10   A.   Tim Stack.
11   Q.   Best you can recall, can you ask me --
12 can you tell me, rather, what Tim Stack asked
13 you to do?
14   A.   To put together a plan of all the
15 things that we needed to make sure we didn't
16 miss before taking over on Monday morning.
17   Q.   And this document is sent around
18 internally in Barclays by Sean Byrne rather than
19 by you.
20   A.   Yes.
21   Q.   Can you tell me why that is?
22   A.   Because I had so much else going on,
23 Sean was my go-for.  Is that a nice word to say
24 about your boss?  Sorry.
25   Q.   I misunderstood.  I thought you

JAMES

2  reported to Tim Stack.  Did you also report to
3  Sean Byrne?
4    A.   Sure, I had dual reporting lines.
5  Sean ran the U.S. futures, which I think we
6  determined earlier, and Tim was the global head
7  of futures.  So I, depending on what I was
8  doing, I had dual reporting lines.
9    Q.   I think you did tell me that.  Sorry,
10 it has been a long day.
11   A.   It's OK.
12   Q.   So who actually created this plan
13 that's attached to Exhibit 557 or is part of
14 557?
15   A.   I did.
16   Q.   Would you do it and Sean Byrne's role
17 was, as your go-for, was simply to e-mail it
18 around?
19   A.   Yes.
20   Q.   I don't see any unfamiliar names
21 except possibly Richard Cantor.  Forgive me if I
22 have asked you this, before Richard Cantor's
23 role?
24   A.   Richard Cantor, at this time, was a
25 relationship manager in prime brokerage in

JAMES

2  Barclays.  And was assigned to help us.
3    Q.   It doesn't appear from the
4  distribution of this e-mail that there were any
5  risk management people at Barclays involved in
6  this process.
7    A.   No, there wasn't, not at this time,
8  no.
9    Q.   At what time did risk management
10 people from Barclays become involved in the
11 process, being the acquisition of Lehman's
12 futures business?
13   A.   I --
14        MS. BLOOMER: Objection to the
15   foundation and scope of the 30(b)(6).
16   A.   Can we just clarify that again, when
17   it came --
18   Q.   Sure, maybe I could ask the question a
19 different way.
20        At any time, to your knowledge, did
21 risk management personnel from Barclays become
22 involved in discussions about Barclays'
23 acquisition of Lehman's futures business?
24        MS. BLOOMER: Objection, foundation
25   and beyond the scope of the 30(b)(6).

JAMES

2    A.   I don't remember.
3    Q.   If they had been involved, do you know
4  which risk management personnel would have been?
5        MS. BLOOMER: Objection to the form of
6    the question.
7    A.   No, no.
8    Q.   I am going to jump through options for
9  a second and then go back, just warning to you.
10 Do you know whether or not there were any
11 discussions with Barclays or within Barclays'
12 risk management personnel about Barclays'
13 acquisition of Lehman's options business?
14   A.   I don't know.
15   Q.   And you don't know simply because you
16 weren't involved in that side of the business?
17   A.   Correct.
18   Q.   And you wouldn't presumably then be
19 able to tell me if there was such a risk
20 management person who that would be, is that
21 correct?
22   A.   Yeah, I would have no idea.
23   Q.   Thank you.  That simplifies the next
24 set of questions.
25        Is there anything to, looking through

Page 234

JAMES

1  Exhibit 557, that reflects the management of
2  risks that Barclays was running in acquiring
3  Lehman's futures business?
4      MS. BLOOMER: I will object to the
5  form of the question.
6      A.   No, no, there isn't.
7      Q.   To your knowledge, Ms. James, were any
8  risk management personnel at Barclays involved
9  in the acquisition of Lehman's options business
10 prior to the closing?
11     A.   I don't know.
12     Q.   If you could look at the attachment to
13 the e-mail at 557, the sixth page?
14 Unfortunately, we don't have Bates numbers for
15 this. You see your name appears in the middle
16 of the page?
17     A.   Yup.
18     Q.   You may, either by memory or being
19 able to track it back, are you able to tell me
20 what you had assigned yourself responsibility
21 for doing in connection with this project?
22     MS. BLOOMER: I am going to have to
23 object to asking the witness to attempt to
24 discern this from the way the spreadsheet is

TSG Reporting - Worldwide    877-702-9580

Page 235

JAMES

1  formatted, but she can do her best.
2      MR. OXFORD: That is all we can ask of
3  anybody.
4      A.   From reading the way the pages line
5  up, and I can't confirm that 100 percent, it
6  looks like to actually open the account.
7      Q.   Just going back to the e-mail,
8  Mr. Byrne says, "This is an outline of what was
9  discussed yesterday with Lehman." Do you know
10 what that is a reference to?
11     A.   I'm assuming a meeting on Thursday.
12     Q.   Sitting here today, do you have any
13 recollection of a meeting with Lehman on
14 Thursday, September 18?
15     A.   There were meetings. Could I tell you
16 which days? No.
17     Q.   You said earlier that there were many
18 discussions during the course of the week from
19 the time you got a call on Sunday the 14th
20 through closing about the acquisition of
21 Lehman's options business, correct?
22     A.   No.
23     MS. BLOOMER: Objection.
24     Q.   Futures business, sorry, my mistake?

TSG Reporting - Worldwide    877-702-9580

Page 236

JAMES

1      A.   Yes.
2      Q.   And I understand that you don't
3  remember any or many specific conversations
4  about that. Did you have conversations with
5  your counterparts at Lehman?
6      A.   Yes. The people on the original
7  meeting were the people we spoke to. It was on
8  the Monday. And you have the list. They are
9  the same people we spoke to during the week.
10     Q.   OK, that's helpful. Thank you. The
11 memo that is dated the 15th of September, that
12 identifies -- Exhibit 556 identifies a key risk.
13 Do you see that in the bottom of the memo?
14     A.   Yes.
15     Q.   Does loss of key clients due to
16 inability to execute an expedient transaction,
17 we talked about that earlier?
18     A.   Yes.
19     Q.   Do you remember any discussions with
20 anybody, either at Barclays or Lehman, prior to
21 the closing as to the risks to Barclays in
22 acquiring Lehman's futures business?
23     A.   High level risks, yes. Specific
24 risks, no.

TSG Reporting - Worldwide    877-702-9580

Page 237

JAMES

1      Q.   Can you tell me what those high level
2  risks were?
3      A.   The high level risks are the positions
4  that you are taking over, the money that you're
5  taking over, the volatility, whether there is
6  customers in deficit, whether those customers
7  haven't paid money, whether Lehman was fully
8  seg.'d and secured, did we actually have enough
9  money, did they have enough money to actually
10 fund all the customer positions.
11     So the risks are we had no details of
12 their business apart from high level
13 discussions.
14     Q.   Taking each of those high level risks
15 in turn, Ms. James, you identified the first
16 risk as the money you were taking over. Can you
17 be a little more specific about what you mean
18 when you say there was a high level risk about
19 the money Barclays was taking over?
20     A.   When I'm talking money, I'm talking
21 insuring that what should be in the seg. is in
22 seg. and that you're actually going to take all
23 the bank account, you are going to get all the
24 bank accounts that -- what the customers are

TSG Reporting - Worldwide    877-702-9580

Page 238

JAMES

1 saying are their balances are actually in fact
2 there. So it is money as well as collateral,
3 securities. That's what I mean by money.
4 Physical cash.
5   Q.   Was Barclays able to quantify this
6 risk?
7   A.   No.
8   Q.   Why was Barclays not able to quantify
9 the risks?
10   A.   Because we got none of the details
11 prior to the acquisition and only half of them
12 after.
13   Q.   Do you know if Barclays asked for the
14 information that would help them quantify these
15 risks?
16   A.   We asked for information that we
17 believed to be in the bounds of not breaking any
18 NDAs they had with customers, but we never
19 actually received anything as far as I remember.
20   Q.   NDA, nondisclosure agreement?
21   A.   Yes. Sorry.
22   Q.   You mentioned the second high level
23 risk was volatility. Can you explain a little
24 more what you meant by the high level risk of
TSG Reporting - Worldwide   877-702-9580

Page 239

JAMES

1 volatility in acquiring Lehman's futures
2 business?
3   A.   Due to the volatility in the markets
4 at that time, the volatility of the market move
5 between Friday when Lehman closed and Barclays
6 took over on Monday morning; that positions
7 could have moved enough that we didn't have
8 enough money and we had no relationships with
9 the customers to actually get that money. So
10 you're taking the risk of taking over a business
11 where the customers decide they are not going to
12 pay you, or there was a customer account in
13 deficit and went further into deficit.
14   Q.   Was Lehman -- withdrawn.
15        Was Barclays able to quantify the risk
16 associated with volatility?
17   A.   No.
18   Q.   Did you have any discussions about the
19 risk of volatility with anyone that you recall?
20   A.   Not that I recall.
21   Q.   Same question for the first risk you
22 identified, the financial risk in taking over
23 positions when Lehman might not be fully seg.'d
24 and secured?
TSG Reporting - Worldwide   877-702-9580

Page 240

JAMES

1   A.   No.
2   Q.   Sitting here today, you have no
3 specific recollection of discussing that with
4 anyone?
5   A.   No, I don't.
6   Q.   I believe the third risk you
7 identified was a risk of customer deficits?
8   A.   Yes.
9        MS. BLOOMER: I didn't have the
10 wherewithal to write everything down.
11   Q.   Can you explain what you meant by the
12 high level risk of customer deficits in
13 connection with Barclays' acquisition of
14 Lehman's futures business?
15   A.   The risk is that we could have been
16 taken over. We did take over accounts where the
17 customer had not actually paid their margin
18 calls. So when Barclays got the account, the
19 account was actually running in a negative
20 balance. They were in deficit. They owed
21 money.
22   Q.   Was Barclays able to quantify that
23 risk prior to closing?
24   A.   No.
TSG Reporting - Worldwide   877-702-9580

Page 241

JAMES

1   Q.   Did Barclays ask for information about
2 that risk before closing?
3        MS. BLOOMER: Objection, beyond the
4 scope of the 30(b)(6).
5   A.   That would actually probably break
6 most of the NDAs.
7   Q.   Does that mean you don't believe so?
8   A.   No.
9   Q.   I think I asked a bad question. Let's
10 clean this up a little bit.
11        To your knowledge, did Barclays ask
12 for information that would allow them to
13 quantify the risk of customer deficits as you
14 described them?
15   A.   No.
16        MS. BLOOMER: I will object as beyond
17 the scope of the 30(b)(6).
18   Q.   The last risk that I noted that you
19 identified as a high level risk for Barclays in
20 taking over Lehman's futures business was
21 whether there would be enough money to fund
22 customer positions. Can you explain what you
23 meant by that?
24   A.   I.e. that in Lehmans did not have
TSG Reporting - Worldwide   877-702-9580

Page 242

JAMES

1  enough money in the seg. and secured bank
2  accounts to fund their customer positions.
3      Q.    Did Barclays ask for information that
4  would allow them to quantify this list? — this
5  risk?
6      MS. BLOOMER: Objection, beyond the
7  scope of the 30(b)(6).
8      A.    I don't remember.
9      Q.    Who would you have asked if you asked
10 for this information?
11     A.    Jeff Jennings.
12     Q.    Do you recall receiving information
13 that would have allowed Barclays to quantify the
14 risk of whether or not there was enough money to
15 fund customer positions?
16     A.    I don't believe we did.
17     Q.    Do you know, Ms. James, whether any
18 documents were created in connection with the
19 issue of risk associated with Barclays'
20 acquisition of the Lehman's futures business?
21     A.    Don't know.
22     Q.    Do you know what information was
23 provided to upper management in connection with
24 Barclays' decision to acquire Lehman's futures

TSG Reporting - Worldwide    877-702-9580

Page 243

JAMES

1  business?
2      MS. BLOOMER: Objection to the
3  foundation and beyond the 30(b)(6).
4      A.    No.
5      Q.    Who at Barclays, in your
6  understanding, would be the person most
7  knowledgeable about Barclays' assessment of the
8  risks and liabilities to Barclays in taking over
9  their Lehman futures business and whether that
10 was an appropriate risk to take or not?
11     MS. BLOOMER: Objection, beyond the
12 scope of the 30(b)(6).
13     A.    Can we just clarify which risks and
14 liabilities do you mean?
15     Q.    I meant the high level risks and
16 liabilities you have just listed for me. I
17 think you listed four.
18     A.    Yup.
19     MS. BLOOMER: For the record, I again
20 object to the scope of the 30(b)(6).
21     A.    I would say it would be multiple
22 people.
23     Q.    Can you give me the names of the group
24 of people?

TSG Reporting - Worldwide    877-702-9580

Page 244

JAMES

1      A.    Off the top of my head, Tim Stack,
2  Alasdair Hodge and whoever Alasdair Hodge goes
3  into.
4      Q.    His supervisor, you mean?
5      A.    Yeah.
6      (Exhibit 558, document Bates stamped
7  BCI-EX-(S) 153941 through 942 with
8  attachment marked for identification, as of
9  this date.)
10     Q.    Ms. James, I have handed you an
11 exhibit marked 558 which is an e-mail from Mark
12 Cox to Kathy Fudali with a copy to you regarding
13 the subject of Barclays bulk transfer. If you
14 would take a moment to look at the e-mail and
15 the attachment to it.
16     My question is going to relate
17 principally to the e-mail, but you are, of
18 course, welcome to take whatever time you need
19 to look at the attachment.
20     A.    Yup.
21     Q.    Do you have a recollection of this
22 document, Ms. James?
23     A.    I don't remember, but I do know what
24 it is.

TSG Reporting - Worldwide    877-702-9580

Page 245

JAMES

1      Q.    Can you tell me what it is?
2      A.    The CME, because Lehman proprietary
3  business defaulted and did not pay their
4  margins, the CME actually put Lehman into the
5  default and sold off their positions. It is a
6  standard policy that the CME uses and they put
7  out to auction all of the house positions that
8  Lehman held.
9      Barclays, in this instance, which is
10 what this is in reference to, the commodity area
11 within Barclays Bank PLC were offered to bid on
12 the portfolio, along with three or four other
13 companies, and that's what this is, Barclays
14 then won that bid.
15     Q.    Were you involved in that bidding
16 process?
17     A.    No.
18     Q.    Why then was this e-mail sent to you
19 about Barclays' bulk transfers?
20     A.    The reason being Barclays Bank PLC is
21 the proprietary trader for commodities in
22 Barclays.
23     BCI, which is who I work for, is the
24 FCM. So Barclays Bank PLC doesn't talk directly

TSG Reporting - Worldwide    877-702-9580

Page 246

JAMES

1  with the CME. They talk via the BCI. And for
2  the bidding, BCI has to submit the bid on behalf
3  of BB PLC and transfer the positions.
4     Q.   Were you involved in the transfer of
5  that bid?
6     A.   Yes.
7        MS. BLOOMER: Transfer of the what?
8     A.   The bid.
9     Q.   Did you have any other involvement
10  than simply transferring documents from Barclays
11  PLC --
12     A.   No.
13     Q.   -- to the CME?
14     A.   No.
15     Q.   Do you have any understanding of what
16  assets and liabilities Barclays PLC purchased?
17     A.   No.
18     Q.   Who at Barclays PLC did you deal with
19  in connection with this bulk transfer?
20     A.   Kathy Fudali. She is commodities
21  operations.
22     Q.   OK. That is all for that document
23  please.
24        (Exhibit 559, document Bates stamped

TSG Reporting - Worldwide    877-702-9580

---

Page 247

JAMES

1  BCI-EX-(S) 154190 marked for identification,
2  as of this date.)
3     Q.   Ms. James, I have handed you a
4  document which have marked as Exhibit 559 which
5  is an e-mail from Tim Stack to one of your
6  colleagues with a copy to you, Saturday,
7  September 20, at 7:48 in the evening Greenwich
8  mean time, middle of the afternoon eastern.
9     A.   Yup.
10     Q.   Do you remember receiving this
11  document?
12     A.   Nope.
13     Q.   Do you see the subject line is Lehman
14  at NDs for 1 p.m. meeting. Do you see that?
15     A.   Yup.
16     Q.   Do you recall attending a meeting, the
17  original e-mail is on Thursday, September 18
18  with Lehman?
19     A.   That was a phone call, I believe.
20     Q.   And were the Lehman attendees the
21  people on the -- withdrawn.
22        What was the subject that have
23  meeting?
24     A.   The high level conversations

TSG Reporting - Worldwide    877-702-9580

---

Page 248

JAMES

1  continuing from the Monday meeting.
2     Q.   Can you be a little more specific in
3  that answer about the high level conversations?
4        MS. BLOOMER: Objection to the form of
5  the question.
6     A.   If you go back to 557, there is a lot
7  of detail in here about exchanges and most of
8  the conversations would have been about what
9  exchanges that we need to look at. And that's
10  what this is.
11     Q.   And that's your recollection about the
12  call with Lehman, between Lehman and Barclays
13  that's referenced in this e-mail?
14     A.   Yup. I believe so.
15     Q.   You will see above the first e-mail,
16  the next one in the chain is from Tim Stack.?
17        MS. BLOOMER: I'm not sure I see the
18  second one to Tim Stack, second one looks
19  like Mike Maechiavernia. Looking from front
20  to back or back to front?
21        MR. OXFORD: I am starting at the
22  bottom and gone up?
23        MS. BLOOMER: Thank you.
24     Q.   3:14 p.m. Mr. Stack writes, "Mike can

TSG Reporting - Worldwide    877-702-9580

---

Page 249

JAMES

1  you confirm with Mike Nielsen that all other
2  house accounts are flat, in parens, (besides the
3  OC-VIX position and CCE/CCFE positions." Do you
4  see that?
5     A.   Yup.
6     Q.   Do you have any understanding of the
7  question Mr. Stack was asking there?
8     A.   He is asking were there positions in
9  the house account or have they been closed out.
10     Q.   That relates to futures?
11     A.   Yes.
12     Q.   And what was the answer that question?
13        MS. BLOOMER: Objection, beyond the
14  scope of the 30(b)(6).
15     A.   Mike's response is above. The house
16  was instructed ongoing through their report to
17  see if that leaves them flat.
18     Q.   Maybe I am missing something.
19  Instruct, is that a technical term within the
20  industry?
21     A.   Yes.
22     Q.   And if you could translate that for
23  me, that means what?
24     A.   Instruct --

TSG Reporting - Worldwide    877-702-9580

63 (Pages 246 to 249)

Page 250

JAMES

1
2    MS. BLOOMER: Objection, foundation.
3    A.   Instruct, instruct means you have to
4    go in and physically close buys versus sells.
5    They don't close automatically.
6    Q.   I think we covered this before, but
7    just to tie the loose ends on it, Barclays --
8    sorry, Lehman's house futures business was or
9    was not flat by the time Barclays took it over?
10   A.   From what I know now -- not from
11   reading this e-mail -- no, they weren't. That's
12   where we have the fixed positions, CCFA, and as
13   I now know, it was affiliate. Not proprietary
14   positions.
15   Q.   Did Barclays have an understanding
16   prior to the closing that Lehman's house futures
17   positions had been closed out?
18   MS. BLOOMER: Objection, beyond the
19   scope of the 30(b)(6).
20   A.   No, which I think is why we are
21   asking. But that's an assumption. Sorry.
22   Q.   OK. That is all I have for that
23   document.
24   Ms. James, I'm handing you two
25   documents that have previously been marked in

TSG Reporting - Worldwide    877-702-9580

Page 251

JAMES

1
2    these depositions as Exhibit 404A and 405A.
3    They are single-page printouts of spreadsheets.
4    If you could take a second to look at them and
5    tell me if you have seen them before please?
6    A.   Yes, I have.
7    Q.   In what context have you seen them?
8    A.   Sorry, what do you mean by what
9    context?
10   Q.   When did you see them?
11   A.   Some time last year.
12   Q.   Did someone send them to you?
13   A.   Yes.
14   Q.   Do you remember who?
15   A.   The 405A would have been Sean Byrne or
16   Sean McKenna. And 404A, I don't remember.
17   Q.   Why would Sean Byrne or Sean McKenna
18   have sent you 405A?
19   A.   Because they were responsible for
20   putting together the list of proprietary
21   positions as of the close.
22   Q.   You see in the top right-hand corner
23   of 405A, there is a handwritten notation. Can
24   you tell -- are you able to read what that
25   notation is?

TSG Reporting - Worldwide    877-702-9580

Page 252

JAMES

1
2    MS. BLOOMER: Objection.
3    A.   I have not claimed the collateral for
4    accounts when no live trades?
5    Q.   OK. I think that is what it says. I
6    was actually a little further up and little
7    further to the right.
8    A.   Oh.
9    Q.   Is that your name there?
10   A.   CFO -- yes.
11   Q.   Do you recognize this handwriting?
12   A.   No.
13   Q.   Do you have any reason to -- do you
14   have any understanding of why your name appears
15   in the top right-hand corner?
16   A.   Nope.
17   Q.   Did Barclays have the information that
18   is contained in these spreadsheets, 404A and
19   405A, at the time of closing?
20   A.   No.
21   Q.   And that's same for 404A?
22   A.   Yes.
23   Q.   And 405A?
24   A.   Yes.
25   (Exhibit 560, document entitled

TSG Reporting - Worldwide    877-702-9580

Page 253

JAMES

1
2    "Customer Claim Form" marked for
3    identification, as of this date.)
4    Q.   Ms. James, I am handing you what has
5    been marked as Exhibit 560, which I will
6    identify -- withdrawn.
7    Can you take a moment to review the
8    document and tell me if you're able to identify
9    it please.
10   A.   No.
11   Q.   Can I turn your attention to Exhibits
12   E1 and E2.?
13   MS. BLOOMER: Is there a Bates stamped
14   version of this?
15   MR. OXFORD: It has not been produced.
16   It is Barclays SIPC claim.
17   MS. BLOOMER: This is January of '09,
18   I think.
19   MR. OXFORD: This is the topics you
20   have all been waiting for.
21   MS. BLOOMER: January 9, OK.
22   BY MR. OXFORD:
23   Q.   Now that I have directed your
24   attention to Exhibits E1 and E2.
25   A.   Yup.

TSG Reporting - Worldwide    877-702-9580

Page 254

1    JAMES
2        Q.   Can you tell me what those are,
3    please.
4        A.   E1 is the proprietary futures
5    collateral positions as of that acquisition,
6    9/22. And E2 is the foreign broker and money
7    market funds that have not been received in
8    January that we filed the claim for. They are
9    both the claim.
10       Q.   Were you involved, Ms. James, in
11   preparing Exhibit E1 and E2?
12       A.   Yes.
13       Q.   I should identify for the record that
14   Exhibit 560 is Barclays SIPA claim 900005752.
15   Showing you Exhibit E1, can you tell me what
16   your involvement was in preparing this?
17       A.   So E1 was prepared in late January and
18   it was prepared by taking 405A and removing the
19   lines that had "N" on them.
20       Q.   And you are referring to the last
21   column?
22       A.   Yes.
23       Q.   Entitled 922 positions, is that
24   correct?
25       A.   Correct.
TSG Reporting - Worldwide    877-702-9580

Page 255

1    JAMES
2        Q.   What was the reason that entries with
3    the line N in that column were removed from
4    Exhibit E1 in Exhibit 560?
5        MS. BLOOMER: I am going to state an
6    objection for the record and you can answer,
7    but you are not to reveal the substance of
8    your discussions with your counsel.
9        A.   It was to file the SIPC claim to just
10   request the money from the brokers where we had
11   positions. The "N" was there were no positions,
12   we didn't claim it, as of September 22.
13       Q.   Do you know whether -- withdrawn.
14       Do you mean that if Barclays did not
15   have an appropriate position, then -- at the
16   relevant exchange or custodian, then Barclays
17   was not in the SIPC claim including any
18   collateral associated with that custodian or
19   account?
20       A.   For the proprietary business, yes. We
21   didn't assume the risk.
22       Q.   You said you didn't assume the risk.
23   Can you explain what you mean by that?
24       A.   So on 9/22, when we took over the
25   accounts, the accounts had positions in them
TSG Reporting - Worldwide    877-702-9580

Page 256

1    JAMES
2    that we ended up getting the risk of that we had
3    to then go close the positions out. This is all
4    relating to the same information that's in my
5    Exhibit E1 that we had spoken about in my
6    declaration.
7        Q.   And it is your understanding that
8    because there was no positions in these three,
9    four -- sorry, four custodian accounts, there
10   was no risk associated with them that Barclays
11   was assuming; therefore, Barclays is not
12   claiming the collateral associated with those
13   accounts?
14       A.   Correct.
15       Q.   What's the basis for your
16   understanding, Ms. James?
17       MS. BLOOMER: I object to the question
18   and instruct you not to reveal the content
19   of your discussions with counsel.
20       A.   I can't answer.
21       Q.   Turning your attention to Exhibit E2,
22   and that's E2 which is attached to the SIPC
23   claim in Exhibit 560?
24       A.   Yup.
25       Q.   It is correct that you prepared this
TSG Reporting - Worldwide    877-702-9580

Page 257

1    JAMES
2    document, right?
3        A.   Yes.
4        Q.   Can you tell me how you prepared it?
5        A.   I took the custodian and broker
6    statements in January and put the numbers on
7    this sheet, on the spreadsheet.
8        Q.   And were these the same custodian
9    broker statements that you used to prepare any
10   of the exhibits to your declaration?
11       A.   Exhibit 3. It is actually my note, I
12   cross-referenced them.
13       Q.   Your notes make a reference to Exhibit
14   3 being based on December statements.
15       A.   Correct.
16       Q.   Does that reflect the fact that the
17   information contained in both Exhibit 3 to your
18   declaration and Exhibit E2 to the SIPC claim
19   were based on broker statements of the positions
20   and collateral with each of those brokers with
21   effect from some time in December 2008?
22       A.   Correct.
23       MR. OXFORD: Can we go off the record
24   for a second.
25       (Recess)
TSG Reporting - Worldwide    877-702-9580

Page 258

JAMES

1    MR. OXFORD: Ms. James, you will be
2  pleased to know that I have no further
3  questions for you at this time. Thank you
4  for your patience. I don't believe any of
5  the other parties have questions.
6    MS. CARRERO: No questions for us.
7    MR. DAKIS: No questions from the
8  committee.
9    MS. BLOOMER: I would like to ask a
10  couple of clarifying questions if I could.
11  I will be brief.
12
13    - - - -

Page 259

JAMES

1  EXAMINATION BY
2  MS. BLOOMER:
3    Q.  There were a couple of times — for
4  the record, Trish Bloomer, Boies Schiller
5  representing Barclays.
6    There were a couple of times today
7  when you used the term "commingling of funds."
8  I believe, but correct me if I am wrong, but one
9  of those references came when you were
10  discussing customer and house and another
11  reference came when you were discussing
12  affiliate and house. And I would ask you to
13  explain what you mean by commingling of funds in
14  each of those two contexts.
15    MR. DAKIS: Objection to form,
16  compound.
17    Q.  You can start with the first. When
18  you say commingling of funds customer house or
19  however — please characterize it in your own
20  way, can you describe what you were talking
21  about?
22    A.  And I misspoke. If I say funds, it
23  should actually be positions.
24    So in LBIE, in London, had commingled

Page 260

JAMES

1  customer positions with house positions which
2  is, as we spoke earlier in the testimony, they
3  got closed out by the LCH and generated a loss
4  of 20 million pounds.
5    Q.  And in the second context, if you can
6  recall, having to do with affiliates, when you
7  used the term?
8    A.  And in regards to affiliates, it would
9  be, it was the OCC positions, the equity options
10  and it was positions, not cash. So the OC --
11  commingled OCC equity options for the affiliates
12  with, in customer and with house, but it was the
13  positions, not funds.
14    MS. BLOOMER: OK, thank you, I have no
15  further questions.
16    MR. DAKIS: No follow up.
17    MR. OXFORD: No questions.
18    (Time Noted: 6:36 p.m.)
19
20
21    _____
22    ELIZABETH JAMES
23  Subscribed and sworn to
24  before me this   day
25  of January, 2010.

    _____

Page 261

JAMES
INDEX:

| WITNESS | EXAM BY: | PAGE: |
|---|---|---|
| E. James | Mr. Oxford | 6 |
|  | Ms. Bloomer | 260 |

EXHIBITS

| Exhibit No. | Marked |
|---|---|
| Exhibit 552 typewritten notes consisting of four pages | 6 |
| Exhibit 553 multipage spreadsheet | 179 |
| Exhibit 554 e-mail dated 9/19/2008 with attachment | 182 |
| Exhibit 555 document Bates stamped BCI-EX-(S) 188225 through 270 | 185 |
| Exhibit 556 document Bates stamped BCI-EX-(S) 187355, with attachment | 211 |
| Exhibit 557 document Bates stamped BCI-EX-(S)187751 with attachment | 229 |
| Exhibit 558 document Bates stamped BCI-EX-(S) 153941 through 942 with attachment | 244 |

66 (Pages 258 to 261)

Page 262

```
 1              JAMES
 2            EXHIBITS
 3   Exhibit No.              Marked
 4   Exhibit 559 document Bates stamped      247
 5      BCI-EX-(S) 154190
 6   Exhibit 560 document entitled "Customer  253
 7      Claim Form"
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 263

```
 1              JAMES
 2
 3
 4          CERTIFICATE
 5   STATE OF NEW YORK )
 6              )ss:
 7   COUNTY OF NEW YORK)
 8        I, MARY F. BOWMAN, a Registered
 9   Professional Reporter, Certified Realtime
10   Reporter, and Notary Public within and for
11   the State of New York, do hereby certify:
12        That ELIZABETH JAMES, the witness
13   whose deposition is hereinbefore set forth,
14   was duly sworn by me and that such
15   deposition is a true record of the testimony
16   given by such witness.
17        I further certify that I am not
18   related to any of the parties to this action
19   by blood or marriage and that I am in no way
20   interested in the outcome of this matter.
21        In witness whereof, I have hereunto
22   set my hand this 14th day of January, 2010.
23
24
25            _____
                MARY F. BOWMAN, RPR, CRR
```

TSG Reporting - Worldwide    877-702-9580

Page 264

```
 1              JAMES
 2         * * *ERRATA SHEET* * *
 3   NAME OF CASE: In Re: Lehman Bros.
 4   DATE OF DEPOSITION: 1/14/10
 5   NAME OF WITNESS: ELIZABETH JAMES
 6   Reason codes:
 7      1. To clarify the record.
        2. To conform to the facts.
 8      3. To correct transcription errors.
 9   Page ____ Line ____ Reason____
     From _____ to _____
10
11   Page ____ Line ____ Reason____
     From _____ to _____
12
13   Page ____ Line ____ Reason____
     From _____ to _____
14
15   Page ____ Line ____ Reason____
     From _____ to _____
16
17   Page ____ Line ____ Reason____
     From _____ to _____
18
19   Page ____ Line ____ Reason____
     From _____ to _____
20
21   Page ____ Line ____ Reason____
     From _____ to _____
22
23
24            _____
                 ELIZABETH JAMES
25
```

TSG Reporting - Worldwide    877-702-9580

# BCI EXHIBIT

# 72

Page 1

1

2                UNITED STATES BANKRUPTCY COURT

3                SOUTHERN DISTRICT OF NEW YORK

4      ------------------------x

5      In Re:

6                                    Chapter 11

7      LEHMAN BROTHERS          Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al,    (Jointly Administered)

9                 Debtors.

10     ------------------------x

11

12              DEPOSITION OF MARLO KARP

13                 New York, New York

14                 January 20, 2010

15

16     Reported by:

17     MARY F. BOWMAN, RPR, CRR

18     JOB NO. 27306

19

20

21

22

23

24

25

Page 2

```
 1
 2
 3
 4
 5                January 20, 2010
 6                9:45 a.m.
 7
 8        Deposition of MARLO KARP, held at the
 9   offices of Boies, Schiller & Flexner, LLP, 575
10   Lexington Avenue, New York, New York, before
11   Mary F. Bowman, a Registered Professional
12   Reporter, Certified Realtime Reporter, and
13   Notary Public of the State of New York and New
14   Jersey.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2              APPEARANCES:
 3
 4   JONES DAY, LLP
 5   Attorneys for Lehman Brothers, Inc.
 6       222 East 41st Street
 7       New York, New York  10017-6702
 8   BY:  WILLIAM HINE, ESQ.
 9
10   BOIES, SCHILLER & FLEXNER, LLP
11   Attorneys for Barclays
12       401 East Las Olas Blvd.
13       Fort Lauderdale, Florida 33301
14   BY:  W. TODD THOMAS, ESQ.
15
16   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
17   Attorneys for the Creditors Committee
18       51 Madison Avenue, 22nd Floor
19       New York, New York  10010
20   BY:  JAMES C. TECCE, ESQ.
21               .
22
23
24
25
```

Page 4

```
 1
 2              APPEARANCES:
 3
 4   HUGHES, HUBBARD & REED, LLP
 5   Attorneys for the SIPA Trustee and the Witness
 6       One Battery Park Plaza
 7       New York, New York  10004-1482
 8   BY:  SETH ROTHMAN, ESQ.
 9        FARA TABATABAI, ESQ.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2
 3
 4
 5        IT IS HEREBY STIPULATED AND AGREED, by
 6   and between the attorneys for the respective
 7   parties herein, that filing and sealing be
 8   and the same are hereby waived.
 9        IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15        IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25
```

2  (Pages 2 to 5)

Page 6

KARP

1
2      THE VIDEOGRAPHER: This is the start
3  of tape number one of the videotape
4  deposition of Marlo Karp in the matter In Re
5  Lehman. Today's date is January 20, 2010,
6  at approximately 9:45 a.m.
7      Will the court reporter please swear
8  in the witness.
9  MARLO KARP,
10  called as a witness by the parties,
11  having been duly sworn, testified as follows:
12  EXAMINATION BY
13  MR. THOMAS:
14      Q.   Good morning, Mrs. Karp. Would you
15  please state your full name and address for the
16  record?
17      A.   Marlo L. Karp, 2 Ashley Place, Towaco,
18  New Jersey, 07082.
19      Q.   Have you been deposed before?
20      A.   No.
21      Q.   Do you have an understanding of how
22  this process works in terms of, I'll be asking
23  questions and the court reporter will be taking
24  down your answers, and your attorney may from
25  time to time have an objection to the form of

Page 7

KARP

1
2  the question, after which he makes the
3  objection, you can go ahead and answer the
4  question, unless he instructs you not to, and if
5  at any point in time you're not clear what I am
6  asking you, please ask me to go ahead and
7  rephrase.
8      A.   OK.
9      Q.   Would you please briefly describe your
10  professional background?
11      A.   Sure. I have been with Deloitte since
12  1990, right out of college. I started out in
13  the audit practice for banking and securities
14  and continued in that role until 1995, in the
15  summer, where I joined the regulatory consulting
16  practice and focused more on projects where
17  there were issues where firms had -- brokerage
18  firms had with regulators, and helping them deal
19  with those issues with the regulators.
20      I have also done SIPA liquidations
21  during that time, as well as fraud
22  investigations.
23      Q.   And your current position?
24      A.   I'm a partner.
25      Q.   Can you please briefly describe your

Page 8

KARP

1
2  educational background?
3      A.   I have a BS/BA from Washington
4  University in St. Louis, and I have a master's
5  from Columbia University.
6      Q.   And what is the master's in?
7      A.   Finance.
8      Q.   So are you an accountant?
9      A.   Yes, I am.
10      Q.   When did you first have any
11  involvement with the Lehman/Barclays
12  transaction?
13      MR. ROTHMAN: Are you asking her
14  personally or Deloitte?
15      Q.   That's a good distinction. They may
16  conflate.
17      When did Deloitte first have any
18  involvement with the Barclays/Lehman
19  transaction?
20      A.   We received a call from SIPC, either
21  the 15th or 16th of September, asking whether or
22  not Deloitte might be -- have the time and be
23  able to help if Lehman Brothers, Inc. went into
24  liquidation.
25      Q.   And was it a -- what was your

Page 9

KARP

1
2  understanding of what the role would be for
3  Deloitte?
4      A.   They spoke to John Manley about it,
5  and it was to be the advisors to the trustee and
6  provide bookkeeping services, help with claims.
7  It was typically the role that we play.
8  Sometimes it would involve some forensic
9  analysis, as well.
10      But they weren't clear as to what the
11  role would be, just at that point they just
12  wanted us to know whether or not we would be
13  able to do -- work on the liquidation if it came
14  to fruition.
15      Q.   You understand you have been
16  designated as a witness here to give testimony
17  on behalf of Deloitte on various topics?
18      A.   Um-hm, yes.
19      Q.   And did you personally become involved
20  in any way in the Barclays/Lehman transaction
21  that week of, let's say September 15th to the
22  22nd?
23      A.   The transaction itself?
24      Q.   Well, in the transaction, and I mean
25  that loosely. I don't mean actually sitting

3 (Pages 6 to 9)

Page 10

```
1              KARP
2    down and typing it up, but in -- were you aware
3    it was going on, the negotiations?
4       A.  We had received a couple phone calls
5    from SIPC as things progressed.  As it got
6    closer they wanted to know whether or not we had
7    cleared conflicts in case the liquidation did
8    come to fruition, and about the 18th, some of my
9    partners had had discussions with Jim Giddens,
10   who hadn't yet been appointed trustee, about
11   what the potential role might be and whether or
12   not it was getting close to fruition.
13          He also shared a draft copy of the
14   APA, which I received as well, just to read
15   through.  They had asked whether or not we had
16   any specific questions.
17      Q.  Did you have any questions or comments
18   regarding the APA?
19      A.  I didn't.  I believe a couple of my
20   partners responded back with one or two
21   questions, but for the most part they really
22   didn't have many questions, as our role wasn't
23   really defined except to say was anything
24   unclear to us.
25      Q.  If there was something unclear in the
```

Page 11

```
1              KARP
2    contract, you may have raised that?
3       A.  It was purely unclear as if we
4    understood -- if we had any specific questions
5    as to -- that might affect our role, and we
6    didn't have any specific questions regarding our
7    role.  That was all we looked at it from.
8       Q.  At any point did anyone from Deloitte
9    provide an analysis of the APA or the purchase
10   agreement?
11      A.  No.  We were not asked to do so.
12      Q.  Let me go ahead and show you a
13   document that without the cover has been
14   previously marked, but we will go ahead and mark
15   this as 566.
16          (Exhibit 566, document Bates stamped
17   DT 303 to 356 marked for identification, as
18   of this date.)
19          MR. ROTHMAN:  Go ahead, look through
20   it.
21      Q.  Does that appear to be the document
22   you referred to as the APA and that Deloitte
23   received on approximately September 18, 2008?
24      A.  The draft that we received had a bunch
25   of markups on it, handwritten notes.  So it
```

Page 12

```
1              KARP
2    doesn't appear to be the same.
3       Q.  OK.  Does it -- allowing -- and we
4    will try to grab the version with the
5    handwritten notes, but does it otherwise appear
6    to be the same document, allowing for the fact
7    that you may have seen a draft that was
8    initially attached to the motion for the sale
9    order which had handwriting on it?
10      A.  I mean they both said "asset purchase
11   agreement" on them.  I don't know if all the --
12   if everything stayed the same within it.
13      Q.  Did you ever get a different copy or
14   did Deloitte ever receive a different copy of
15   the APA other than that one originally provided
16   on September 18?
17      A.  Yeah.  Later on sometime in October, I
18   think we got a final version of the APA with the
19   signed pages.
20          MR. THOMAS:  Counsel, do you know what
21   the -- I am going to go ahead and mark this
22   now even though it has been marked before.
23          (Exhibit 567, letter dated 9/20/2008
24   marked for identification, as of this date.)
25      Q.  Showing you a document we have marked
```

Page 13

```
1              KARP
2    as Exhibit 567, do you recognize this document?
3       A.  Yes.
4       Q.  Can you describe what it is, please.
5       A.  I believe it is referred to as the
6    clarification letter.
7       Q.  And did you understand it to revise
8    and amend the original asset purchase agreement?
9          MR. ROTHMAN:  Objection to the form.
10      A.  I understood that it was in addition
11   to the asset purchase agreement.  I don't know
12   that it -- I know it was afterwards that may
13   have changed some of the terms.
14      Q.  And is it your understanding that this
15   is part of the deal that the parties consummated
16   on September 22, 2008?
17      A.  That's how it has -- sorry.
18          MR. ROTHMAN:  Go ahead.
19      A.  That's how it has been described to
20   me.
21      Q.  When was the first time you received
22   that document, the clarification letter?
23      A.  It would have been the same time I
24   received the final version of the APA, so early
25   October.
```

4 (Pages 10 to 13)

Page 14

KARP

2  Q.  And what was the -- why was Deloitte
3  sent a version of the final APA and the
4  clarification letter?
5      MR. ROTHMAN:  Let me just caution you
6      not to reveal any conversations or things
7      that you might have learned from counsel
8      concerning that question.
9  A.  We generally request documents for our
10 engagements for our file so we understand what's
11 going on. These would be typical documents we
12 would have requested versions of to understand.
13 Q.  Was anyone from Deloitte at any of the
14 bankruptcy court hearings related to the
15 Lehman/Barclays transaction in September of
16 2008?
17 A.  No.
18 Q.  Was Deloitte following those hearings
19 in any way?
20 A.  Following, no.  I believe we received
21 a phone call at that weekend letting us know
22 that the hearing, that the hearing had gone
23 through, the sale was going to go through, but
24 we were asked not to do anything else at that
25 time.

Page 15

KARP

2  Q.  Is that a phone call you received
3  personally?
4  A.  No.
5  Q.  Was -- was Deloitte aware that the
6  clarification letter was being finalized over
7  that weekend of the 20th and 21st over at Weil
8  Gotshal?
9  A.  I don't know when we knew about the
10 clarification letter.
11 Q.  Was anyone from Deloitte ever over at
12 Weil or Lehman prior to September 22?
13 A.  No.
14 Q.  So you were, Deloitte was relying on
15 reports from others in terms of what was going
16 on with the negotiation of the deal, the
17 finalization of the deal?
18 A.  Yes.
19 Q.  And what was the -- what work did
20 Deloitte do in that month of September?
21 A.  We attended a meeting on the 22nd at
22 75 -- the 745 building, the building with the
23 trustee, his counsel, Weil Gotshal, a lot of
24 attorneys, a lot of former Lehman personnel
25 there as well, where we started getting some

Page 16

KARP

1  information about where we could sit, how we
2  would get documents, how we would get books and
3  records.
4      Basically sat there -- it was an
5  organizational meeting at that point, and that
6  is all we were asked to do for pretty much that
7  first week, was just try to get organized, start
8  getting teams organized, people, because we were
9  asked to not do anything while the customer
10 transfers were going on.
11 Q.  What was the goal of the getting
12 organized?  Getting organized to do what?
13 A.  To proceed with the SIPA liquidation
14 process, so how would we do claims, how would we
15 marshal the assets of the firm, just build on --
16 what teams would work on what which
17 attorneys from Hughes Hubbard, and that was --
18 and where would we sit, because it would be a
19 large group of people.
20 Q.  When was the first time Deloitte had
21 conversations with someone other than Hughes
22 Hubbard or the trustee concerning the
23 transaction?
24 A.  We received a phone call from SIPC

Page 17

KARP

1  back on the 15th or 16th about the potential for
2  it, and John Manley had subsequent conversations
3  with SIPC once or twice during that week as it
4  became clear it might actually go into
5  liquidation, to find out if there were
6  conflicts.
7  Q.  Did Deloitte ever meet with Weil
8  Gotshal to discuss the deal?
9  A.  No.
10 Q.  Do you know if they met with Houlihan?
11 A.  No.
12 Q.  No, you don't know or --
13 A.  No, they did not.
14 Q.  Did it ever become important to
15 Deloitte's work to understand what assets and
16 liabilities had been transferred as part of the
17 Lehman Barclays sale transaction and what
18 hadn't?
19 A.  Not in that context.  It became
20 important to understand what assets were under
21 the trustee's control in order to begin the
22 customer claim process, which is where our focus
23 was.
24 Q.  To understand what assets were still

5 (Pages 14 to 17)

Page 18

KARP

1
2  under the trustee's control, was it important to
3  understand which of LBI's assets had been
4  transferred over to Barclays?
5      A.  It was part of the -- it was part of
6  the understanding, but our first priority was to
7  get a handle on what assets were -- what cash
8  securities and other assets were under the
9  trustee's control or we needed to get under the
10  trustee's control. That was our primary
11  responsibility.
12      Q.  So you were -- the goal was more in
13  terms of establishing what the trustee still
14  controlled, but one part of achieving that goal
15  was understanding what had been transferred in
16  the purchase agreement and what had been
17  retained, correct?
18      MR. ROTHMAN:  Objection to the form.
19      You can answer the question.
20      A.  That became the next step of the
21  process, but we didn't have access to the books
22  and records to validate a lot of that
23  information, so it became more important for us
24  to make sure that we could get all the assets
25  that were -- that we thought belonged to LBI

Page 19

KARP

1
2  under the trustee's control first, and as we got
3  access we would then proceed to see what was
4  left, what was still owed to customers.
5      Q.  When Deloitte received the
6  clarification letter in early October, did it
7  review the clarification letter?
8      A.  I know I read through parts of it. I
9  would -- I don't know about the others.
10      Q.  Let me ask you to look at 567 and ask
11  about a few sections that are -- on the first
12  page, see where it says "purchased assets,
13  excluded assets"?
14      A.  Yes.
15      Q.  And then subparagraph 2 there,
16  capital A, it says, "The securities owned by LBI
17  and transferred to purchaser or its affiliates
18  under the Barclays repurchase agreement as
19  defined below, as specified on Schedule A,
20  previously delivered by seller and accepted by
21  purchaser." Do you see that?
22      A.  Yes.
23      Q.  And if you flip to page 5,
24  paragraph 13, where it's entitled "Barclays
25  Repurchase Agreement," it says, "Effective at

Page 20

KARP

1
2  closing, all securities and other assets held by
3  purchaser under the September 18, 2008
4  repurchase agreement, among purchaser and/or its
5  affiliates and LBI and/or its affiliates and the
6  Bank of New York as collateral agent (the
7  Barclays repurchase agreement), shall be deemed
8  to constitute part of the purchased assets in
9  accordance with paragraph 1A2 above."
10      Do you see that language?
11      A.  Yes.
12      Q.  Was it your understanding that as part
13  of the Barclays sale transaction, Barclays was
14  acquiring all of the collateral associated with
15  what was the Fed repo?
16      MR. ROTHMAN:  Objection to form.
17      I don't know if you laid enough of a
18  foundation here, but she has testified she
19  had nothing to do with the negotiation or
20  the drafting of this agreement, so if all
21  you're asking her -- I guess I am not clear
22  whether you are asking her independent of
23  the agreement or what she understood as she
24  read it in October. I don't think you're
25  entitled to her interpretation of it in

Page 21

KARP

1
2  October.
3      MR. THOMAS:  The objection I guess is
4  to foundation.
5      I am asking based upon her receiving
6  it and having read it and the plain language
7  of it. And if she had some different
8  understanding, that's fine. But this
9  relates to what assets went over and what
10  assets didn't, what assets were under the
11  control of the LBI. So that's the basis for
12  it.
13      MR. ROTHMAN:  I will give you a little
14  leeway on this, but she is not an expert,
15  and she had no personal involvement with
16  drafting or creating this document. So it
17  is not really fair to ask her to just
18  interpret for you her view.
19      MR. THOMAS:  We are getting into kind
20  of a long speaking, coaching objection, and
21  I understand the objection is to foundation.
22  I think there is some foundation if you read
23  the plain language of the letter.
24      Q.  So again, the question is, did you
25  understand that as part of the sale transaction,

6  (Pages 18 to 21)

Page 22

KARP

1
2  Barclays was acquiring all of the collateral
3  associated with the Fed repo?
4      A.  I didn't understand that as part of
5  this clarification letter. It had been told to
6  me through counsel, the trustee's counsel.
7          MR. ROTHMAN: Please don't reveal
8  things that have been told to you by the
9  lawyers.
10         THE WITNESS: OK.
11     Q.  Reading this language, is that how you
12 understand these terms, that Barclays is to
13 receive the collateral associated with what was
14 the Fed repo?
15         MR. ROTHMAN: Objection to the form.
16     A.  I'm not an attorney, but reading this,
17 I mean it says purchased assets include the
18 collateral. And it defines the collateral here.
19 So --
20     Q.  So it is pretty clear that they get
21 that collateral?
22         MR. ROTHMAN: Objection to the form.
23 It is not a proper question to ask her. It
24 really isn't.
25         MR. THOMAS: Counsel, we can't have

Page 23

KARP

1
2  these long speaking objections in violation
3  of the federal rules. OK. Just a clear
4  statement. I understand "objection to form
5  based on lack of foundation."
6          MR. ROTHMAN: You need to ask proper
7  questions of the witness.
8          MR. THOMAS: Those are proper
9  questions.
10         MR. ROTHMAN: They are not.
11         MR. THOMAS: We can argue that later.
12 What is not proper is for you to try to
13 coach the witness into answering a certain
14 way while I am asking the question.
15         MR. ROTHMAN: I am not doing that.
16         MR. THOMAS: We can argue about
17 foundation later, but the rules are very
18 clear. Objections are to be limited.
19     Q.  Let me ask you to turn back to page 1,
20 subsection 2, part capital B, where it says,
21 "Such securities and other assets in LBI's
22 clearance boxes as of the time of the closing
23 which at the close of business on September 21,
24 2008 were specified -- were as specified on
25 Schedule B."

Page 24

KARP

1
2      Do you see that language?
3      A.  Um-hm, yes.
4      Q.  Did you understand as part of the
5  sales transaction, Barclays was acquiring
6  clearance box assets?
7          MR. ROTHMAN: Objection to the form.
8  Again, I caution you not to reveal
9  information that you received from the
10 lawyers.
11     A.  Then I can't really talk about it.
12     Q.  Just reading this document, not based
13 on what lawyers may have said, is that how you
14 would interpret capital B of subsection 2, that
15 Barclays was acquiring clearance box assets?
16         MR. ROTHMAN: Objection to the form.
17 Again, if you can't answer that
18 question because of the things that lawyers
19 have already told you, then please don't
20 answer the question.
21     A.  All my discussions were with attorneys
22 on this.
23     Q.  Did you read that when you received
24 the clarification letter in early October?
25     A.  I may have. I honestly don't

Page 25

KARP

1
2  remember.
3      Q.  So independent, do you have an
4  understanding -- can you read that language and
5  tell me independently how you interpret it?
6          MR. ROTHMAN: Sitting here today?
7          MR. THOMAS: Yeah, independent of --
8          MR. ROTHMAN: I'm not going to let her
9  do that. She has already talked to
10 attorneys about it. It has already infected
11 whatever she is going to think about it as
12 she reads it now.
13     It's not -- we are not here to have
14 her sit here and read documents as of today.
15         MR. THOMAS: Well --
16         MR. ROTHMAN: That's not -- you are
17 here to elicit facts from her.
18         MR. THOMAS: You are really
19 obstructing the deposition. You are really
20 doing a lot of coaching and speaking. I
21 really prefer you just do it the way the
22 rules provide.
23     If you are going to instruct the
24 witness not to answer a question, that's
25 fine. We'll just build it into the motion.

7 (Pages 22 to 25)

KARP

1  
2    Q.   If you would turn to the page -- the
3    second page and subpart capital C.
4    "Exchange-traded derivatives." Do you see where
5    it says, "Exchange-traded derivatives and any
6    property that may be held to secure obligations
7    under such derivatives"?
8        A.   Yes.
9        Q.   Do you recall if when you received
10   this document back in October and reviewed it,
11   that you understood that exchange-traded
12   derivatives and any property that may be held to
13   secure obligations under such derivatives were
14   part of the assets being transferred to
15   Barclays?
16       MR. ROTHMAN: Objection to the form.
17       A.   I don't remember reading it and
18   understanding. What I would have understood
19   came from attorneys.
20       Q.   Have you ever had -- have you ever
21   believed that the exchange-traded derivatives
22   were not transferred as far as this sale
23   transaction?
24       MR. ROTHMAN: Objection to the form.
25       Again, please don't reveal anything

KARP

1  
2    you learned solely from attorneys.
3        A.   Were not transferred as in not
4    physically transferred or --
5        Q.   Were not transferred pursuant to the
6    agreement.
7        A.   Could you define exchange-traded
8    derivatives for me, as to what that includes?
9        Q.   OK. Well, are you familiar with that
10   term?
11       A.   I am, but I've heard it used different
12   ways, and so I'm -- I just want to make sure
13   that I'm talking about the right --
14       Q.   How do you use the term
15   "exchange-traded derivatives"?
16       A.   I would -- my interpretation is
17   futures and options on futures.
18       Q.   Using that definition, has there ever
19   been any question in your mind that those
20   exchange-traded derivatives as you just defined
21   them were transferred to Barclays as part of the
22   sale transaction?
23       A.   My understanding from a meeting where
24   the CFTC participated was that futures, the
25   futures business related to customers was

KARP

1  
2    transferred to Barclays.
3        Q.   And what was your understanding with
4    respect to the options business from that
5    meeting?
6        A.   The options --
7        MR. ROTHMAN: Objection to form.
8        A.   The options, you mean the OCC options
9    or the options on futures?
10       Q.   OCC options.
11       A.   My understanding from the -- for the
12   options was that options were being transferred
13   in total to Barclays.
14       Q.   Turning back to the first exhibit we
15   looked at, 566, if you turn to the section
16   "Definition of Purchased Assets," page 6 of the
17   document, Bates stamped DT 313, do you see it
18   has a list of purchased assets?
19       A.   Yes.
20       Q.   Did Deloitte at any time attempt to
21   value any of the assets listed under "purchased
22   assets"?
23       A.   The only time we attempted to value --
24   sorry, we did not attempt to value anything
25   related to this listing.

KARP

1  
2    Q.   Can I ask what -- it seems like you
3    were clarifying your language. Was there
4    something you were going to say before that?
5        A.   We have been in the process of
6    creating a draft balance sheet, but Deloitte
7    hasn't been doing the valuations.
8        Q.   Who has been doing the valuations for
9    the draft balance sheet?
10       A.   The valuations have been coming from
11   third-party sources and Barclays.
12       Q.   What were the third-party sources?
13       A.   They are publicly available sources.
14   The two that I remember are Bloomberg and IDSI.
15       Q.   Is that work still going on?
16       A.   Yes.
17       Q.   When did Deloitte first work on in any
18   way a balance sheet for BLI?
19       A.   It started in late '08. We did not
20   have access to the books and records until
21   around that time to be able to get the details
22   to start creating a balance sheet.
23       Q.   What was the purpose of creating a
24   balance sheet?
25       A.   To determine what the assets and

Page 30

KARP

1
2    liabilities existed as of 9/19/08, the date of
3    liquidation.
4    Q.    And Deloitte is still working on that
5    balance sheet today?
6    A.    Yes.
7    Q.    After you got the books and so forth,
8    records, why is it taking so long to do the
9    balance sheet?
10    MR. ROTHMAN: Objection to the form.
11    A.    There is a lot of reconciliation work
12    that had to be done in order to create the
13    balance sheet.
14    Q.    And just explain in a little more
15    detail the type of reconciliation work.
16    A.    Yes. There were over 200,000 failed
17    transactions between LBI and LBIE that need to
18    be reconciled.
19    There were, I believe, 10, 11 thousand
20    cash breaks related to the bank accounts.
21    We had difficulties in obtaining
22    statements from depositories where securities
23    were being held. All that took time to get the
24    statements and the information and to begin
25    reconciling the data.

Page 31

KARP

1
2    And in addition, our ability to access
3    the data came in spurts, as we worked through
4    different issues with Barclays on access.
5    Q.    Was it difficult to value some of
6    LBI's assets?
7    MR. ROTHMAN: Objection to the form.
8    Objection -- go ahead.
9    A.    We didn't value the assets.
10    Q.    Was it difficult to obtain valuations
11    of the assets that you believed, that Deloitte
12    believed were reliable valuations?
13    MR. ROTHMAN: Objection to form.
14    A.    We didn't say one way or the other
15    whether or not the valuations were reliable.
16    That determination was not made by Deloitte.
17    Q.    Who made that determination?
18    A.    That -- Barclays provided services by
19    which their price verification group looked at
20    the valuations that were provided and questioned
21    whether or not, whether or not -- they did their
22    questioning methodologies to determine whether
23    or not the valuation methods were appropriate.
24    Q.    Did Deloitte agree or disagree with
25    Barclays' determinations?

Page 32

KARP

1
2    MR. ROTHMAN: Objection to the form.
3    A.    We didn't -- we didn't agree or
4    disagree. That was -- the agreement was to rely
5    upon Barclays' pricing.
6    Q.    Let me ask more specifically about a
7    couple of these items. First, do you know as of
8    September 16 or thereabouts the amount of
9    retained cash that LBI had?
10    A.    No.
11    Q.    And when I say "you," I mean Deloitte,
12    not just yourself.
13    A.    No, we didn't.
14    Q.    Just so I understand, Deloitte has
15    never attempted to identify or figure out the
16    value of these items listed under the purchased
17    assets?
18    A.    No.
19    Q.    And that would include efforts even
20    using some other third parties to help with
21    valuation? Deloitte has never made that effort
22    to try to identify the value of these items?
23    MR. ROTHMAN: Objection to the form.
24    A.    Not these specific -- not -- we -- the
25    only effort we made from putting together

Page 33

KARP

1
2    information was for a balance sheet. We did not
3    work off this document for these items.
4    Q.    OK. Did Deloitte, either itself or --
5    when I ask if Deloitte values something, I am
6    going to include efforts where Deloitte might
7    rely on some third party to help establish that
8    value. Understood?
9    A.    Yes.
10    Q.    Did Deloitte ever attempt to value the
11    assets in subpart B of the purchased assets, the
12    deposits referred there? As of -- value them as
13    of September 16, 2008, or anytime that week?
14    A.    No.
15    Q.    Same question for subpart C, the
16    transferred real property leases.
17    A.    No.
18    Q.    Now, subpart D refers to a list of
19    securities and other assets. Do you see that?
20    A.    Yes.
21    Q.    Has Deloitte ever attempted to value
22    as of September 16 or anytime that week the
23    assets in subpart D?
24    A.    To the extent that those assets would
25    be there on 9/19, they would have been part of

9 (Pages 30 to 33)

Page 34

KARP

1    KARP
2    the value, the balance sheet that was prepared
3    for -- in that inventory section.
4        Q.    Does Deloitte know what precise assets
5    are being referred to in subpart D?
6        A.    No.
7        Q.    Is there any list of CUSIPs, to
8    Deloitte's knowledge, that identifies what
9    assets -- list of CUSIPs or other list or
10    document that identifies exactly what are the
11    assets in subpart D?
12        A.    Not that total to 70 billion -- that
13    total to 70 billion, we don't have that list.
14        Q.    What other list do you have that might
15    relate to subpart D?
16        A.    We have a list of firm inventory off
17    the stock record as of 9/19.
18        Q.    But Deloitte doesn't have an
19    understanding of how that list relates to the
20    category of items in subpart D?
21        A.    No.
22        Q.    To your knowledge, does anyone have a
23    list of the securities and other assets being
24    described in subpart D?
25        A.    Not to my knowledge.

Page 35

KARP

1    KARP
2        Q.    Does Deloitte have any idea of whether
3    the assets referenced in subpart D are, or were
4    worth 70 billion dollars or more or less as of
5    September 16?
6        A.    No.
7        Q.    Has Deloitte attempted to figure that
8    out?
9        A.    No.
10        Q.    In subpart E, it refers to 50 percent
11    of each position in the residential real estate
12    mortgage security.  Do you see that?
13        A.    Yes.
14        Q.    Has Deloitte ever attempted to value
15    those positions?  I am going to say ever, at any
16    time?
17        A.    No.
18        Q.    Is Deloitte aware of what assets
19    exactly are being referred to here?
20        A.    We believe it refers to the TBA
21    mortgages.
22        Q.    Is there a list of those mortgages?
23        A.    Yes.
24        Q.    Is that a list that Deloitte has?
25        A.    Yes.

Page 36

KARP

1    KARP
2        Q.    Has the value of those items on the
3    list been updated at any point since
4    September 16, if you know?
5        MR. ROTHMAN:  Objection to the form.
6        A.    The items don't exist.
7        Q.    What happened to the items?
8        A.    DTC's FICC division stepped in and
9    liquidated the securities.  Or closed them out.
10        Q.    And when did that happen?
11        A.    My understanding is that they stepped
12    in that week right after bankruptcy, and I'm not
13    sure how long the process continued.  We are
14    still waiting for information from DTC on all
15    the closeouts.
16        Q.    And if I went through the rest of
17    these lists, would Deloitte have any idea as to
18    the value of these items as of September 16,
19    2008, or thereabouts?
20        A.    No.
21        Q.    Do you know if the trustee has any
22    further knowledge about the value of these items
23    listed under "Purchased Assets"?
24        MR. ROTHMAN:  Again, let me just
25    caution you not to reveal information you

Page 37

KARP

1    KARP
2    may have learned solely from lawyers.
3        Q.    You can give a yes or no to begin
4    with.
5        A.    I don't know.
6        Q.    Now, you referenced an effort by
7    Deloitte to establish some valuations as of
8    September 19, 2008.  Is that correct?
9        MR. ROTHMAN:  Objection,
10    mischaracterizes her testimony.
11        A.    We prepared a balance sheet, but we
12    did not do the valuations.
13        Q.    But you attempted to gather
14    valuations, correct?
15        A.    Yes.
16        Q.    And can you describe the items that
17    you attempted to get valuations for?
18        A.    It would have been market value of
19    assets and liabilities on the balance sheet to
20    the extent that these required outside market
21    values.
22        Q.    What did Deloitte do to first
23    establish what assets were still -- still
24    belonged to LBI after the Barclays transaction?
25        MR. ROTHMAN:  Objection to form.

10 (Pages 34 to 37)

Page 38

KARP

1  A.  We prepared a balance sheet as of
2  9/19, irrespective of any transaction, and
3  obtained bank statements and depository
4  statements to reconcile to 9/19.
5     Q.  Did that include obtaining a list of
6  securities that were posted earlier in the week
7  with the Fed as part of the Fed repo?
8     A.  Not for the 9/19 balance sheet, it did
9  not.  It was only what existed at that date.
10     Q.  So you're familiar with the collateral
11  that was supposed to go to Barclays, that was
12  part of the repo that was supposed to go to
13  Barclays in return for Barclays putting up
14  45 billion dollars?
15     A.  I understand that there was a Barclays
16  repo transaction.
17     Q.  And the securities, for the purposes
18  of your 9/19 balance sheet, how were the repo
19  securities treated as still belonging to LBI or
20  not belonging to LBI?
21        MR. ROTHMAN:  Objection to the form.
22     A.  We would show a repo transaction.  So
23  it would be in a liability.
24     Q.  And the liability at that point, the

Page 39

KARP

1  liability would still be -- so the securities,
2  the assets would still be on LBI's books but
3  they would owe the 45 billion dollars; is that
4  right?
5     A.  Yeah.  A repo transaction would be
6  mark to market, so it wouldn't show 45 billion,
7  but yes, in effect.
8     Q.  How does it -- what does that mean,
9  mark to market?
10     A.  The securities are shown at the market
11  value of the collateral versus the cash.
12     Q.  OK.  And what -- how did you determine
13  what the market value was of those securities?
14        MR. ROTHMAN:  Objection to the form.
15     A.  The market value would have come --
16  excuse me -- would have come from the -- from
17  Barclays.
18     Q.  And do you recall the figure, the
19  market value they identified for those
20  securities?
21     A.  I believe it was -- it was in the --
22  around 42, 43 billion was the market value of
23  the securities delivered, plus there was some
24  cash.

Page 40

KARP

1     Q.  Do you know if that was, Barclays was
2  identifying actual market value, or that was
3  just the nominal -- the marks that had been on
4  those securities placed by others?
5     A.  I don't know.
6     Q.  Are you aware of Barclays raising
7  questions that week as to the actual realizable
8  value of some of those securities of LBI's?
9     A.  Which week?
10     Q.  That week of September 16th.
11     A.  I wasn't involved that week.
12     Q.  But I mean, by the 18th, you had
13  reviewed the asset purchase agreement, Deloitte
14  was at least doing something in -- so during --
15  putting aside whether you were involved at the
16  time, are you aware that during that week,
17  Barclays raised an issue concerning the actual
18  market values of the securities of LBI, that LBI
19  had put up for the repo?
20        MR. ROTHMAN:  Objection to the form.
21     A.  I would have learned any of that from
22  counsel.  Any discussion would have been with
23  counsel.
24     Q.  Let me show you a document we will

Page 41

KARP

1  mark as 568.  Do you recognize this as an e-mail
2  from Vikram Ramani to you and others dated
3  November 12, 2008?
4     A.  Yes.
5        (Exhibit 568, document Bates stamped
6  DT 495 marked for identification, as of this
7  date.)
8     Q.  And who is Vikram Ramani?
9     A.  He is a member of my team.
10     Q.  And do you see where it says, "Can you
11  send me the list of securities that make up the
12  42.3 billion collateral that was delivered to
13  Barclays via Lehman"?
14     A.  Yes.
15     Q.  What was the purpose of this work that
16  Deloitte was doing at this time?
17     A.  This work was in preparation for the
18  December settlement that was eventually filed.
19     Q.  What was Deloitte's role with respect
20  to the December settlement?
21     A.  Our role was to create a time line of
22  the repo transaction for how securities moved,
23  and to document it.
24     Q.  Was it to make a recommendation with

11 (Pages 38 to 41)

Page 42

KARP

1  respect to the settlement?
2        MR. ROTHMAN: Objection to form.
3        That's a yes or no question.
4     Q.   Yes.
5     A.   No.
6     Q.   Do you know if you received this list
7  that is being requested here, the list of
8  securities that made up the 42.3?
9     A.   Yes.
10    Q.   So you did receive it?
11    A.   Yes.
12    Q.   And after receiving it, what did
13 Deloitte do with it?
14    A.   We compared it to the books and
15 records of LBI.
16    Q.   For what purpose?
17    A.   To see if we could see that that had
18 been recorded.
19    Q.   I'm sorry, what does that mean, been
20 recorded?
21    A.   That the records reflected that these
22 securities had been moved as part of a repo
23 transaction with Barclays.
24    Q.   So Deloitte was just confirming that

Page 43

KARP

1  those securities had actually moved to Barclays?
2     A.   That the records reflected that that
3  movement had occurred.
4     Q.   Was there any other purpose in looking
5  at the securities that had already moved in
6  connection with the settlement agreement?
7     A.   We also compared it to the list of the
8  original securities pledged under the repo that
9  LBI had with the Federal Reserve, to see if they
10 were the same securities.
11    Q.   And what did you find out?
12    A.   We found out that there were
13 differences, that there were -- it was not the
14 same pool of securities.
15    Q.   And did you obtain an understanding as
16 to why it was a different pool?
17    A.   We had discussions with JPMorgan Chase
18 where part of the original 50 billion could not
19 move because it was part of a GCS program, which
20 restricted its ability to leave JP Morgan. So a
21 substitution had to occur from that.
22        We also understand that there were
23 operational inefficiencies that occurred during
24 the movement of the rest of the securities,

Page 44

KARP

1  which resulted in other substitutions.
2     Q.   Do you know that rough total volume of
3  substitutions that occurred?
4     A.   Our rough estimate was approximately
5  about 9 billion out of the 42.3 billion, but at
6  the time we did it, the records weren't fully up
7  to date and we didn't rerun that since.
8     Q.   Was it your understanding that the
9  collateral that was supposed to be transferred
10 to Barclays on that Thursday or Friday had
11 nominal marks placed on it by someone, in the
12 value -- in the range of roughly 49.7 billion?
13        MR. ROTHMAN: Objection to the form.
14    A.   I'm sorry, for what was transferred?
15    Q.   To what was supposed to be transferred
16 to Barclays? Do you recall that -- strike that.
17        Do you recall that there was kind of a
18 missing 7 billion dollars?
19    A.   In my meetings with Barclays and with
20 JP Morgan, we had been told by both parties that
21 there was a gap of 7 billion that was expected
22 to be delivered.
23    Q.   And what was your understanding of how
24 that gap occurred?

Page 45

KARP

1     A.   My understanding from the JP Morgan
2  perspective was that they had released -- that
3  they had released approximately 42.3 billion.
4  There was a hard stop at DTC at 11 p.m., so no
5  more collateral could transfer, and that they
6  were requested by LBI to provide 7 billion
7  dollar cash financing to Barclays to cover the
8  difference.
9        And when I had conversations with
10 Barclays personnel, they explained that they --
11 there was a shortfall of approximately 7 billion
12 dollars in collateral that they had expected to
13 receive.
14    Q.   Let me show you a document we will
15 mark as 569.
16        (Exhibit 569, document Bates stamped
17        DT 280 through 285 marked for
18        identification, as of this date.)
19    Q.   Do you recognize this document?
20    A.   Yes.
21    Q.   Can you describe what it is, please?
22    A.   This is a time line analysis, based
23 upon our discussions with JP Morgan on the
24 movement of the securities related to the repo

12 (Pages 42 to 45)

Page 46

KARP

1
2  transaction, and some other information
3  regarding LBI's -- what LBI owed to JP Morgan.
4          And then after the time line is a
5  summary bullet discussion of -- discussions that
6  we had with Barclays senior management and some
7  former LBI employees.
8          Q.  And who prepared this analysis?
9          A.  Myself, Vikram Ramani and Chris
10  Acosta.
11          Q.  And looking at Bates stamp page
12  DT 281, under the 7:30 p.m. column, or row, do
13  you see in the second box where it says
14  "Conclusion, LBI sent wrong files to JPM"?
15          A.  Yes.
16          Q.  Is that Deloitte's conclusion?
17          A.  No.  That was JP Morgan's -- how they
18  relayed it to us.
19          Q.  And what is -- can you just elaborate
20  what that refers to, LBI sending the wrong files
21  to JPM?
22          A.  JP Morgan explained that securities
23  that they released to be transferred back to
24  Lehman, which would then move on to Barclays'
25  account at Bank of New York, were being returned

Page 47

KARP

1
2  or rejected by Bank of New York, and when that
3  happened, the securities ended up coming back
4  into the pledge -- into a pledged account at
5  JP Morgan, LBI's pledge account at JP Morgan.
6          There was -- JP Morgan explained that
7  they had a conference call with LBI to find out
8  why this was occurring, and they said LBI came
9  back and said, "We sent you the wrong file for
10  the releases, and we are going to send a new
11  one."
12          Q.  And how did the wrong, sending the
13  wrong file play into this?  Is that what caused
14  Bank of New York to reject some of them?
15          A.  My understanding from JP Morgan was
16  that Bank of New York was not expecting these
17  specific securities, which is why they rejected
18  them.
19          Q.  Bank of New York, is it your
20  understanding that Bank of New York was
21  expecting securities that were posted as part of
22  the Fed repo?
23          A.  I don't know what Bank of New York was
24  expecting.
25          Q.  OK.  JPM didn't explain why --

Page 48

KARP

1
2          A.  They didn't, they didn't know, they
3  didn't have a listing of what Bank of New York
4  was expecting.
5          Q.  Did anyone from LBI or anyone else
6  contradict the fact that LBI had sent wrong
7  files to JPM?
8          A.  No.
9          Q.  OK.  Can you pick up the story from
10  there?  Did they send the right files?  Next
11  line is, "LBI sends new files," and --
12          A.  That's my understanding, is that LBI
13  sent new files, and securities started to move
14  again from JP Morgan.
15          Q.  The next box down says, "JPM
16  understands that Barclays is not getting the
17  securities it was expecting and Lehman's DKs
18  those securities."
19          Can you explain what DK'ing means?
20          A.  DK is a term "don't know" and where
21  they reject the securities, so they go back to
22  where they started.
23          Q.  And it says, "LBI continues to look
24  for collateral to meet obligation to Barclays."
25          Why were they doing that?  Can you

Page 49

KARP

1
2  elaborate a little bit more on that?
3          A.  My understanding from JP Morgan was
4  that they, LBI had told them that they were
5  looking for additional collateral to send to
6  Barclays.
7          Q.  And why did they need to do that?
8          A.  JP Morgan, when we had the discussion
9  with them, said that there was -- that they
10  hadn't released enough collateral for the repo
11  transaction.  So LBI was looking for more
12  collateral.
13          Q.  And how much collateral was -- were
14  they supposed to release in total?  Do you
15  recall?
16          A.  It was approximately 49 billion of
17  collateral, was the -- was what we had been told
18  by JP Morgan.
19          Q.  Is that -- in the bottom box there, it
20  says, "Total of 42.3 billion in collateral has
21  been sent to Lehman, comprised of 49.7 billion
22  of deliveries and net 7 billion of DKs."
23          Can you explain what is being said
24  there?
25          A.  JP Morgan had told us that a total

13 (Pages 46 to 49)

Page 50

KARP

1
2  amount released from JP Morgan Chase to Lehman
3  was 49.7 billion, and there were some returns of
4  approximately 7 billion, which in their records
5  gave -- in their records showed a total release
6  market value of 42.3 billion.
7      Q.   And your subsequent studies showed
8  that of the 42.3 billion collateral that did go
9  over to Barclays, approximately 9 billion of
10 that was collateral that was not part of the Fed
11 repo collateral, that was different collateral,
12 correct?
13     A.   As I said before, that was based upon
14 the stock record as it exists at that time,
15 which was not fully updated.  But yes, that was
16 the estimate when we did the analysis.
17     Q.   So from the Barclays perspective, A,
18 they were short 7 billion in collateral, and B,
19 approximately 9 billion of the collateral they
20 got was different than what they were expecting?
21     MR. ROTHMAN:  Objection to the form.
22     MR. TECCE:  Join in the objection.
23     A.   I don't know what Barclays was
24 expecting.
25     Q.   What they got was 7 billion dollars

Page 51

KARP

1
2  less of collateral, plus of the collateral they
3  got, approximately 9 billion of it was different
4  than the Fed collateral, correct?
5      MR. HINE:  Objection.
6      MR. ROTHMAN:  Objection to the form.
7      MR. TECCE:  Join in the objection.
8      Q.   You can answer.  They don't like me
9  summing up your testimony, but --
10     A.   My understanding is they didn't
11 receive 7 billion worth of collateral, and our
12 estimate was that 9 billion was not part of the
13 Fed repo, but I do not know what Barclays was
14 expecting to receive as part of the collateral.
15     Q.   Turning the page -- sorry, let me go
16 back.
17     The numbers that are being used here,
18 49.7 billion, 42.3 billion, do you know where
19 those numbers come from?
20     A.   The numbers on this page would have
21 come from JP Morgan and their reports that they
22 shared.
23     Q.   Do you know -- and did JP Morgan
24 caution Deloitte that these collateral figures
25 really weren't reliable in terms of identifying

Page 52

KARP

1
2  what the actual realizable market value is?
3      MR. ROTHMAN:  Objection to the form.
4      A.   No.
5      Q.   At no time did JP Morgan caution
6  Deloitte about assuming that collateral value
7  equated with actual realizable market value?
8      A.   Are you talking in context of this
9  repo transaction?
10     Q.   In context of -- any context.
11     A.   In context with the repo transaction,
12 they did not -- they gave us reports with market
13 value and did not say don't rely on this.
14     In context with other collateral that
15 they were holding for LBI, they did raise
16 questions about value, but that was their
17 question.
18     Q.   Let me go ahead and show you a
19 document we will mark as Exhibit 570.
20     (Exhibit 570, document Bates stamped
21     DT 276 through 278 with attachment marked
22     for identification, as of this date.)
23     Q.   Do you recognize this e-mail as being
24 from JP Morgan's counsel to a number of people,
25 including yourself?

Page 53

KARP

1
2      A.   Yes.
3      MR. ROTHMAN:  You are referring to the
4  top e-mail?
5      MR. THOMAS:  Yes.
6      A.   Yes.
7      Q.   And have you had a chance to review
8  this document recently?
9      A.   I read the top part of the e-mail.
10     Q.   The e-mail says, "I have attached this
11 spreadsheet with collateral values as of
12 September 17, which was the last evening on
13 which the Fed provided financing.  I understand
14 that these collateral values were furnished
15 principally by third-party pricing sources, and
16 we caution against using those values as
17 reliable indicators of realizable value."
18     Do you see that?
19     A.   Yes.
20     Q.   Now, the collateral values that are
21 being referred to are referring to securities
22 that were once a part of the Fed repo, correct?
23     A.   Yes.  According to what this says,
24 yes.
25     Q.   So this is JP Morgan cautioning that

14 (Pages 50 to 53)

Page 54

KARP

1
2  the collateral value that were furnished by
3  third-party pricing sources may not be reliable
4  indicators of realizable value, correct?
5      A.  Yes, for Annex A.
6      Q.  Right.  And can you describe what
7  Annex A is?
8      A.  Annex A is the list of securities that
9  were going to be used for the settlement
10  agreement to -- for the 7 billion dollar
11  shortfall that was in dispute.
12      Q.  Right.
13          And did Deloitte contest -- or did
14  Deloitte believe that the collateral values
15  associated with the securities in Annex A really
16  were reliable as indicators of realizable value?
17      A.  Deloitte didn't give an opinion on
18  that.
19      Q.  So just to understand what the
20  securities are in Annex A, these are some of the
21  securities that were part of the Fed repo that
22  were supposed to go over to Barclays but didn't
23  make it over there.  Is that your understanding?
24      A.  I don't know specifically what list
25  Barclays may or may not have received of what

Page 55

KARP

1
2  they were supposed to get.  My understanding was
3  that these were securities that were going to be
4  used to make, to make -- do the settlement.
5      Q.  I think earlier you indicated that
6  these securities were in fact securities that
7  were once part of the Fed repo, pledged as part
8  of the Fed repo, correct?
9      A.  That's what the e-mail says, yes.
10      Q.  And do you have any reason to believe
11  that -- strike that.
12          So a good portion of what Barclays
13  actually received in the 42.3 billion were part
14  of securities pledged as part of the Fed repo,
15  correct?
16      A.  Yes.
17      Q.  Do you have any reason to believe that
18  the collateral value numbers for the securities
19  attached to this exhibit as Annex A are any more
20  or less reliable than the collateral value
21  figures attached to the other Fed securities
22  that Barclays actually did receive back in
23  September?
24          MR. ROTHMAN:  Objection to the form.
25      A.  I didn't receive any indication from

Page 56

KARP

1
2  JP Morgan to question the value of the
3  securities.
4      Q.  That's because those securities
5  weren't at issue as far as the settlement,
6  correct?
7      A.  I have no idea why they did or didn't.
8      Q.  Did Deloitte -- obviously JP Morgan
9  thinks it is relevant to the settlement as to
10  what the actual values of the securities are
11  that are going to be part of the settlement,
12  correct?
13          MR. ROTHMAN:  Objection to the form.
14      A.  That's their attorney's
15  interpretation.
16      Q.  Did you ever -- did Deloitte ever have
17  occasion to ask JP Morgan or anyone else whether
18  the collateral values associated with the
19  42.3 billion marked, sent to Barclays, was any
20  more reliable than the collateral values in
21  Annex A to this document?
22      A.  We didn't ask.
23      Q.  Do you have any basis -- does Deloitte
24  have any basis for saying that the 42 point --
25  the securities that make up the 42.3 billion,

Page 57

KARP

1
2  their collateral values are more reliable than
3  the collateral values identified by JP Morgan in
4  this document as being unreliable?
5          MR. ROTHMAN:  Objection to the form.
6      A.  I'm not sure I understand the
7  question.
8      Q.  Sure, let me try again.
9          JP Morgan is pointing out that the
10  collateral values of the securities in
11  Appendix A are not reliable, right?
12      A.  I -- it doesn't say that they -- it
13  says they caution against using them as reliable
14  indicators.  I don't know that they are saying
15  they are unreliable.
16      Q.  OK.  JPM cautions against using them
17  as reliable indicators.
18      A.  Um-hm.
19      Q.  Does Deloitte have any reason to
20  believe that collateral value numbers associated
21  with the securities that make up the
22  42.3 billion are any more reliable than any
23  collateral value numbers that are associated
24  with the securities in Appendix A of this
25  exhibit?

15 (Pages 54 to 57)

Page 58

KARP

1
2         MR. ROTHMAN: Objection to the form.
3    A.    We didn't receive any note of caution
4    on the 42.3 billion.
5    Q.    But you didn't receive any note from
6    JP Morgan about the values one way or another on
7    the 42.3 billion, correct?
8    A.    Correct.
9    Q.    But that wasn't part of the settlement
10   consideration that was being considered,
11   correct?
12        MR. ROTHMAN: Objection to the form.
13   A.    I think the entire transaction was
14   part of the settlement consideration in order to
15   know what the settlement should be.
16   Q.    Was there any occasion for Deloitte
17   and JPM to have a discussion about the
18   collateral values of the 42.3 billion the way
19   they are having here in this exhibit?
20   A.    I don't remember such a discussion.
21   Q.    In any event, Deloitte has never
22   looked at or assessed or reached any conclusions
23   about the reliability or accuracy of that
24   42.3 billion collateral value number; is that
25   correct?

Page 59

KARP

1
2    A.    That's correct.
3         THE WITNESS: Could we take just a
4    five-minute break.
5         MR. THOMAS: Oh, sure, sure. Anytime
6    you want to take a break.
7         THE VIDEOGRAPHER: Time is 10:58. We
8    are going off the record.
9         (Recess)
10        THE VIDEOGRAPHER: The time is 11:09.
11   We are back on the record.
12   BY MR. THOMAS:
13   Q.    Let me ask you to turn back to the
14   analysis that you did of the JP Morgan tri-party
15   agreement. And what exhibit number is that?
16        MR. ROTHMAN: 569.
17   Q.    569. Turning back to Exhibit 569, on
18   the second page, which is DT 282, there is an
19   entry in the second column, first row, that says
20   "Lehman requests that cash collateral for
21   7 billion in two tripartite shells, 1.7 billion
22   and 5.3 billion."
23        Can you explain what all that means?
24   A.    My understanding from JP Morgan was
25   that although Lehman was requesting a total of

Page 60

KARP

1
2    7 billion, they wanted 1.7 billion to go
3    directly to BONY and 5.3 billion to go into -- I
4    am sorry, 1.7 to go directly to BONY in an
5    account for the benefit of Barclays, and
6    5.3 billion would be in an account for the
7    benefit of Barclays that would be held at
8    JP Morgan.
9    Q.    And then down below that, Lehman sets
10   aside collateral to cure the repo. What did you
11   mean by curing the repo?
12   A.    This was JP Morgan's explanation that
13   Lehman said to cure the repo, that they had
14   identified additional collateral that had come
15   in to offset the balance of funds that they owe
16   them.
17        But this was JP Morgan's explanation,
18   to the extent that specifically means I'm not
19   really -- they never really explained it in full
20   detail.
21   Q.    Was it your understanding of what
22   JP Morgan was saying, that Lehman was looking
23   for, trying to identify additional collateral to
24   make up for the securities that were supposed to
25   go over but didn't go over?

Page 61

KARP

1
2    A.    More for the loan that it received,
3    the cash loan it received, which would be in
4    anticipation of settling with Barclays.
5    Q.    OK. On the couple columns over to the
6    right, it says, "LBI ends up with a deficit of
7    23.2 billion," paren, "15.8 billion in unfunded
8    Barclays tri-party and 7.4," parentheses, "8.6B
9    collateral value, broker loan." Do you see
10   that?
11   A.    Yes.
12   Q.    Can you explain the difference between
13   the 7.4 billion and 8.6 billion dollar numbers
14   there?
15   A.    There was an overdraft balance in
16   LBI's main cash account with JP Morgan, which
17   was due to 7.4 billion related to settlements of
18   transactions that had a -- which had collateral
19   pledged against it of 8.6 billion.
20   Q.    The 7.4 would be -- seemed to be the
21   exact difference between 42.3 and 49.7. Can you
22   explain the relationship there?
23        MR. HINE: Object to the form.
24   A.    This was their analysis of what was
25   owed to JP Morgan at the end of the day on the

16 (Pages 58 to 61)

Page 62

KARP

1
2  19th. So there was a 23.2 billion dollar
3  overdraft overall in the operating account, and
4  those numbers in the parentheses is how that
5  23.2 billion got there.
6          So it is not just the Barclays repo --
7  it is not just the loan for the 7 billion, it is
8  other activities as well.
9      Q.   And for those who aren't accounting
10  experts, can you explain how the loan, this
11  7 billion worked, or what exactly the
12  7.4 billion number was there?
13     A.   There were settlement activities that
14  day. Besides borrowing the 7 billion dollars
15  for the tri-party, there was other settlement of
16  transactions with counterparties where JP Morgan
17  was the clearing bank, and that resulted in a
18  net 7.4 billion dollar broker loan, as JP Morgan
19  describes it, for those types of activities.
20     Q.   Does the 7.4 billion have any
21  connection with the repo transaction and the
22  securities that were supposed to go to Barclays?
23     A.   My understanding from JP Morgan is
24  that it is all included in here, that that's all
25  the rest of the activity of the day. But we are

Page 63

KARP

1
2  still working through that reconciliation with
3  JP Morgan on the details, so I can't
4  specifically give you any breakout.
5      Q.   So was Lehman like borrowing
6  7.4 billion from JP Morgan against collateral of
7  8.6 billion?
8      A.   The way they explained it, they were
9  actually borrowing 23.2 billion versus
10  collateral that was in excess of that, including
11  this 8.6 billion piece.
12     Q.   Down at the bottom row, second column,
13  it says, "JPM has discussions with Barclays to
14  deliver rest of the collateral or deliver the
15  collateral for 7.4 billion, 8.6 billion
16  collateral value, 9/18 bank loan."
17         Can you elaborate a little bit on what
18  you're saying there?
19     A.   Our understanding from JP Morgan was
20  they had discussions with Barclays about
21  collateral that did not move as part of the repo
22  transaction, and there was questions as to
23  whether what collateral was going to move, and
24  what had happened to the overnight loan funding,
25  and that was part of that discussion.

Page 64

KARP

1
2          Whether or not the collateral value
3  that had to move was 7.4 billion, we did not
4  validate that number, nor know how they got to
5  that number. That was just what they related in
6  their discussion with Barclays.
7      Q.   The -- on the prior page, there is
8  that reference to the 49.7 billion. Do you
9  understand that to be the nominal marks on the
10  collateral that was supposed to go to Barclays
11  as part of the repo?
12         MR. ROTHMAN: Objection to the form.
13     A.   Well, we were told by JP Morgan that
14  was the market value that they assigned to the
15  securities that they released for delivery to
16  Barclays.
17     Q.   Well, they keep on -- we see numerous
18  references to "collateral value" and then you
19  use "market value." Do you recall specifically
20  that they described this as market value?
21     A.   Without seeing the reports, I can't --
22  I'm not positive.
23     Q.   So you have 49.7 billion there, and
24  then there is indications that Barclays received
25  securities with some kind of mark of

Page 65

KARP

1
2  42.3 billion, which is exactly a 7.4 billion
3  difference.
4          So I wanted to make sure I understood,
5  if the 7.4 simply becomes -- comes from the --
6  at least in nominal mark terms, the missing
7  securities that didn't go over?
8          MR. HINE: Object to form.
9          MR. ROTHMAN: Objection to the form.
10         MR. TECCE: Join in the objection.
11     A.   My understanding was that 7.4 billion
12  on the second page is related to the activities
13  of the day, which includes the repo transaction.
14  I don't know whether or not that is solely the
15  repo -- it is supposed to be all the activities
16  for the day.
17     Q.   So you think it may just be
18  coincidence?.
19     A.   I don't know. I don't know. As I
20  said, we are still working through that
21  reconciliation with JP Morgan.
22     Q.   And the reference to the 9/18 bank
23  loan, you're still working through that
24  reconciliation even now, Deloitte is?
25     A.   Yes.

17 (Pages 62 to 65)

Page 66

KARP

1
2    Q.    Why is it taking so long?
3    A.    There were several very large
4    entries -- it took a long time for JP Morgan to
5    provide data, and then it has taken a very long
6    time to piece apart the data. They had some
7    issues providing details on a lot of the
8    information that they provided in summary
9    format.
10    And then it was very difficult for us
11    to compare that information back to LBI's
12    records. So we continue to work with them.
13    Q.    We will take a look at it in a minute,
14    but at some point you got a list of CUSIPs of
15    the securities that went over to Barclays,
16    correct?
17    A.    Yes.
18    Q.    And did you -- you may have answered
19    this, but did you try to value those securities,
20    did Deloitte independently try to value those
21    securities?
22    A.    We had sent a sample of those
23    securities to our -- to our Deloitte's pricing
24    center to use just publicly available pricing
25    services like Bloomberg to see what type of

Page 67

KARP

1
2    prices we might be able to get. We had a very
3    low hit rate on getting prices, so we stopped.
4    Q.    So you, to get a sense -- what was the
5    reason to get a sense of whether the pricing --
6    how the pricing would compare to -- what was the
7    reason for that effort?
8    MR. ROTHMAN: Let me caution the
9    witness not to reveal any attorney/client
10    communications.
11    But it -- I'll give you some leeway
12    here, but can we have an agreement this
13    won't be a waiver of any kind of privilege
14    or protection?
15    MR. THOMAS: Yes, yes.
16    MR. ROTHMAN: OK. And we are talking
17    about this line of questioning here?
18    MR. THOMAS: Yes. Nothing else comes
19    to mind, but just let me do this.
20    Q.    Let me ask it this way, just so I
21    understand what was done. The CUSIPs for the
22    securities -- you got a list of CUSIPs of
23    securities that made up what was referred to as
24    42.3 billion, right? That was transferred to
25    Barclays?

Page 68

KARP

1
2    A.    Yes.
3    Q.    And you took a sample of those and
4    tried to price them independently, but it proved
5    too difficult to price and so you gave up on
6    that effort? Is that correct?
7    A.    We received a file from Barclays of
8    what was transferred to them under the repo
9    transaction. That file showed a different
10    market value than what JP Morgan showed on their
11    file.
12    We were asked by the trustee to see
13    if -- which -- whether or not the -- which
14    prices were more accurate. So we did a sample
15    and sent it out for just publicly available
16    pricing services. We did that, we got very --
17    we got a low hit rate on those prices, so a
18    number of them came back as not being available
19    through publicly available sources, and at that
20    point, we were told not to move further into
21    that.
22    Q.    And you did no other further work in
23    attempting to value the 42.3 billion or the
24    securities that were marked by JP Morgan as
25    42.3 billion and marked as something else by

Page 69

KARP

1
2    Barclays -- strike that.
3    You did nothing else to try to
4    determine which valuations were more accurate in
5    terms of market value?
6    A.    The only other analysis that we
7    performed was looking at the Barclays file,
8    because we noted that the same CUSIP showed up
9    more than once in the file sometimes and had two
10    different prices. So we had notated that and
11    asked Barclays the reasoning behind the two
12    different prices.
13    That's the only other analysis that we
14    did from a pricing perspective.
15    Q.    Did they explain the reasoning behind
16    it?
17    A.    It was an error.
18    Q.    Was it a significant portion of the --
19    I mean just a couple CUSIPs here and there or
20    was it a significant --
21    A.    It was more than a couple of CUSIPs.
22    The total market value was, I believe, several
23    hundred million on the total, 43 billion,
24    43.9 billion.
25    Q.    Do you know if Barclays corrected it

18 (Pages 66 to 69)

Page 70

KARP

1
2  after?
3      A.    We did not receive a new file from
4  them.
5      Q.    I think you said Barclays had a
6  different market value than JPM Morgan, but I
7  think again, as we established earlier, you're
8  not sure whether that 42.3 was something that
9  JP Morgan actually considered a market value or
10  whether it was something they considered a
11  collateral value, hence they used that term in
12  some of the documents we looked at?
13      A.    My understanding from discussions with
14  them, it was market value.  I'm not sure of the
15  difference in term when they refer to it as
16  collateral value, that it is different than
17  market value.
18      Q.    Well, you recall that warning, caution
19  not to assume that the collateral values
20  associated with some of the Fed securities was
21  really indicative of realizable value.  Do you
22  recall that?
23      MR. TECCE:  Objection to form.
24      MR. HINE:  Objection.
25      MR. ROTHMAN:  Objection to form.

Page 71

KARP

1
2      A.    Yes, but that was for the Annex A
3  securities for the settlement that was being
4  done in December.
5      Q.    That was part of the Fed repo
6  securities, and you have no reason -- I think as
7  we established, there is no reason for you to
8  believe that collateral values were any more
9  reliable as market value indicators for that set
10  of Fed repo securities than they were for the
11  other set of Fed repo securities that were
12  actually transferred to Barclays?
13      MR. TECCE:  Objection to the form of
14  the question.
15      MR. ROTHMAN:  Objection to form.
16      A.    As a tri-party custodian, it is
17  JP Morgan's responsibility to make sure that the
18  value is appropriate for the collateral it is
19  receiving under a tri-party arrangement.  So at
20  the time when I did the analysis, I would not
21  have a reason to expect that the 42.3 billion
22  value was incorrect, and they not indicate that
23  there was such an issue with the valuation of
24  those securities.
25      Q.    But it wasn't discussed one way or the

Page 72

KARP

1
2  other?
3      A.    I don't recall it being discussed one
4  way or the other.  I don't recall them saying
5  anything that I had to worry about the value of
6  those securities when I was doing this analysis.
7      Q.    Well, when you did this analysis, did
8  you have other e-mails back and forth with JPM
9  Morgan or their counsel concerning their
10  analysis, or did you just speak with them about
11  this and then do the analysis?
12      A.    We met with them several times about
13  the analysis and showed it to them before we
14  discussed it with the trustee.
15      Q.    Do you have any idea where JP Morgan
16  got their marks from, whether it was just on the
17  books or in the records?
18      A.    We didn't ask them.
19      Q.    You have no idea how they came up with
20  the 42.3 billion?
21      A.    No.
22      Q.    Do you have any knowledge as to
23  whether Lehman was updating their books after
24  they filed -- strike that.
25      Do you have any knowledge as to

Page 73

KARP

1
2  whether Lehman was updating their marks after
3  September 12, 2008?
4      A.    The books and records that we have
5  seen show market values on a daily basis.
6      Q.    From what date?
7      A.    From their -- we have seen reports,
8  not full reports, we have seen some reports that
9  you can pull off their historical system that
10  show market values.  I don't know all the dates
11  that we have looked at.  But there were -- we
12  have, in the reconciliation related to LBIE, we
13  have been rolling forward from September 12, and
14  the reports that we have seen there for some of
15  those positions and the breaks we have been
16  reconciling have market values on them.
17      Q.    Do you know if they are being updated
18  daily?  Have you checked that?
19      A.    I wouldn't know if they are being
20  updated daily.  My understanding from
21  conversations with former LBI personnel is the
22  records were running that week as normal and
23  that they were able to prepare a customer
24  reserve formula computation on the 19th, which
25  would have required market values.

19 (Pages 70 to 73)

Page 74

1           KARP
2      Q.   Who told you that?
3      A.   We spoke to a number of people about
4  books and records.  Do you want me to list them?
5      Q.   Yes, please.
6      A.   Alastair Blackwell, Neil Ullman, Alex
7  Rupo, Anthony Stucchio, Bill Burke.  Jim Hraska
8  was in conversation -- in the conversations, as
9  well as Ricky Pollack and Bill Gallagher.
10     Q.   And when did these conversations take
11 place?
12     A.   We have had many conversations with
13 them.  They were assigned to work with Deloitte
14 and the trustee and his staff through a
15 transition services agreement to help maintain
16 and run the books and records of LBI for the
17 trustee.
18          So we had many conversations with them
19 from the time we started at the end of
20 September.
21     Q.   Do they still work for LBI?
22     A.   They work for Barclays, except Anthony
23 Stucchio is no longer with Barclays.  The rest I
24 believe still work for Barclays.
25     Q.   Are you aware there has been testimony

Page 75

1           KARP
2  in this case that the accounting system was down
3  at Lehman after the bankruptcy filing, that
4  week, and marks weren't being updated?
5          MR. ROTHMAN:  Objection to the form.
6          MR. TECCE:  Objection to the form of
7      the question.
8          MR. HINE:  Objection.
9      A.   Which accounting system?
10     Q.   The accounting systems, plural.
11     A.   My understanding is that the back
12 office systems, where the stock records are,
13 which were used to prepare the 15c3-3
14 computation, were being updated.
15     Q.   Let's talk about the securities, the
16 value of the securities that were conveyed to
17 Barclays.  What system or systems would those
18 values be recorded in?
19     A.   ADP or -- which is also sometimes
20 referred to as TMS and MTS.
21     Q.   Who would be responsible for updating
22 those values?
23     A.   Well, ADP is a third-party vendor.
24 But there would have been operational people
25 that were responsible for recording the

Page 76

1           KARP
2  movements and doing the reconciliation with
3  JP Morgan and DTC.  So it would have been the
4  operational people that would have -- typically
5  a file would come through from JP Morgan and DTC
6  that would show the securities' movements from
7  the day before.
8          Those files would be loaded overnight,
9  and the next day a report would come out and
10 tell them if there is differences between the
11 records and what actually occurred, and then
12 they would, you know, reconcile it and determine
13 what the appropriate action is.
14     Q.   And can you describe the TMS system,
15 please?
16     A.   TMS ADP system is primarily an equity
17 corporate bond system, back office operational
18 system that records the transactions for cash
19 and securities movements and holds customer and
20 firm accounts.
21     Q.   Is that something operated by LBI?
22     A.   Yes.
23     Q.   Is that something that LBI currently
24 has --
25          MR. ROTHMAN:  Can we just get a time

Page 77

1           KARP
2  frame on that.
3      Q.   I mean now, today.
4      A.   Still today?
5      Q.   Who controls TMS, LBI or Barclays?
6      A.   A combination.
7      Q.   So LBI still has access to it?
8      A.   Yes.
9      Q.   And is it various traders who would be
10 responsible for inputting change in value of
11 securities?
12     A.   I'm not sure how LBI was structured to
13 make changes on prices.
14     Q.   Well, after the bankruptcy filing on
15 that Monday, for example, how -- who is it --
16 Monday, September 15, 2008, who at LBI would be
17 responsible for updating value of the securities
18 that would eventually be transferred to Barclays
19 as part of the sale transaction?
20          MR. HINE:  Object to form.
21     A.   My understanding is, from former LBI
22 employees, is that there were pricing feeds from
23 various pricing services that they utilized that
24 would have fed prices to these back office
25 systems.

Page 78

KARP

1
2    Q.   You thought it was an automated
3    process that didn't involve employees doing
4    anything?
5    A.   There were some securities, my
6    understanding, that were priced by the trading
7    desks, but I don't know to the extent that that
8    occurred or whether or not they did or did not
9    do that.
10    The majority of the prices, my
11    understanding, came through pricing feeds
12    directly into their systems.
13    Q.   Do you have knowledge of whether those
14    systems were up and running the week of
15    September 15?
16    A.   My understanding from the LBI
17    employees is yes, they were.
18    Q.   When you say LBI employees, you
19    mean --
20    A.   Former LBI employees.
21    Q.   Former LBI employees who are currently
22    at Barclays?
23    A.   Some are at Barclays and some have
24    left.
25    Q.   And which ones have left Barclays, to

Page 79

KARP

1
2    your knowledge?
3    A.   As I mentioned before, Anthony
4    Stucchio has left. Kendall McLaughlin, who I
5    didn't mention before related to that question,
6    is somebody that we had spoken to who has also
7    left.
8    And there have been some operational
9    people who have left. I don't, I don't remember
10    all their names. The main people were really,
11    that we dealt with, Neil Ullman, Alastair
12    Blackwell and Alex Rupo, were the three main
13    operational people that we dealt with.
14    Q.   And are they at Barclays still?
15    A.   Yes.
16    Q.   Do you still deal with them?
17    A.   Yes.
18    Q.   Do you have any sense of the order of
19    magnitude, what percentage of securities were
20    not automated -- updated through some automated
21    system but had to be updated based upon traders'
22    information and so forth?
23    MR. ROTHMAN: Objection to the form.
24    A.   No.
25    Q.   Have you gone -- have you looked in

Page 80

KARP

1
2    the TMS system to see whether, in fact,
3    securities' values were being updated? The
4    marks were being updated?
5    A.   Yes.
6    Q.   You have done that for September --
7    A.   19th.
8    Q.   -- 15th versus the 12th?
9    A.   I am sorry. We have done it for the
10    19th.
11    Q.   Versus what?
12    A.   Not versus anything. Looked for
13    market values as of the 19th.
14    Q.   I see. So you have gone in, looked on
15    the 19th, and there are market values in the
16    system on the 19th?
17    A.   Yes.
18    Q.   Now, you haven't gone and looked and
19    seen if those are the same market values that
20    were there on the 12th, have you?
21    MR. HINE: Object to the form.
22    A.   We haven't -- I don't believe we have
23    compared the 19th to the 12th. But we have
24    reports that came out of those systems that show
25    different values, the 19th versus the 12th,

Page 81

KARP

1
2    versus the 17th, which support the different
3    customer reserve formula computations that were
4    prepared that week.
5    Q.   So are you talking about different
6    aggregate values, or have you looked at
7    different marks for a particular security on the
8    19th versus earlier days?
9    A.   I don't know to the extent that we
10    looked at particular marks on different days. I
11    know some analysis was done related to claims
12    that may have looked at marks on different days
13    in order to track the securities that are being
14    claimed, but I don't know for sure that somebody
15    compared the different dates to say are these
16    the same or different.
17    Q.   So the reserve formula computations
18    that you referred to, are those -- are you
19    talking about aggregates? I mean are those
20    aggregate numbers where the number of assets,
21    the value is totaled up, and you see the totals
22    being different one day from the other?
23    A.   There are detailed reports supporting
24    each one that we have access to that would
25    summarize the stock record totals, but also

21 (Pages 78 to 81)

Page 82

KARP

1  provide CUSIP detailed information behind that
2  as well.
3      Q.   What was your reason for looking at
4  the 19th versus any other day?  Or did you look
5  at the 19th versus any other day?
6          MR. ROTHMAN:  Again, let me caution
7      you not to reveal any work you did on behalf
8      of or at the request of attorneys.
9      A.   We did the work at the request of
10 attorneys.  So, yeah.
11     Q.   OK.  Other than for the work done at
12 the request of attorneys, did you do any
13 analysis or assessment of whether the marks were
14 being updated daily after September 12th through
15 September 19th?
16         MR. ROTHMAN:  Can we have the same
17     agreement, this is not a waiver?
18         MR. THOMAS:  Sure, sure.  Just the
19     agreement is, any answer will not be
20     construed as a broader waiver.
21         MR. ROTHMAN:  Right.
22     A.   We have done a lot of reconciliation
23 work on the activities that occurred the week of
24 the 15th, such as unwinding of repo

Page 83

KARP

1  transactions, stock loan transactions, which
2  have required us to look at the various records,
3  which would include marks, because they would be
4  as of -- they would be the market values as of
5  those days.
6          I don't believe that anybody has
7  compared day-to-day to say have those marks
8  changed, and I don't remember anybody saying
9  that the values have or have not changed
10 day-to-day.
11     Q.   Is it fair to say that you don't know
12 whether the marks were being updated daily from
13 September 12 to September 19?
14     A.   Since the reserve formula calculations
15 numbers changed, that means market values had to
16 change.  I don't know whether or not all market
17 values changed.
18     Q.   Do you have any other basis for
19 believing that the marks were kept up to date
20 other than the fact that the reserve formula
21 numbers were changing?
22     A.   In discussions with counterparties on
23 stock loan and repo transactions that were
24 outstanding at those dates, when comparing the

Page 84

KARP

1  information they provide, the values are
2  similar.  We did not find major differences in
3  the values on the records of LBI at those dates
4  versus the values that they were putting forth.
5          I don't know if that's --
6      Q.   Can you give me an example?
7      A.   For example, if Merrill Lynch had repo
8  transactions with LBI, we received in many cases
9  termination notices of those repo transactions.
10 And they may have terminated the repo
11 transaction as of the 17th or the 18th.  Let's
12 say the 17th.  We would look at the records of
13 LBI on the 17th to see what the outstanding
14 transactions were as of that date and compare it
15 to what Merrill Lynch was saying they had, and
16 that would include values because they would
17 mark to market daily to request margin.
18     Q.   This was an extremely tumultuous time
19 in the markets, correct?
20     A.   Yes.
21     Q.   Can you think of any example -- there
22 wouldn't be any examples involving the
23 securities that went to Barclays, correct?
24 Because they were pledged to the Fed and then

Page 85

KARP

1  pledged to Barclays, right?
2          MR. HINE:  Objection to form.
3          MR. ROTHMAN:  Objection to form.
4          MR. TECCE:  Objection to form.
5      A.   I guess I'm not sure -- there wouldn't
6  be a question as to what?
7      Q.   I mean you're -- in terms of any other
8  valuation of those securities, you referred to
9  some transactions that involved Merrill Lynch.
10     A.   Um-hm.
11     Q.   Do you remember what the assets were
12 that were at issue in that one?
13     A.   That was just an example of a
14 counterparty that may have had open
15 transactions.  A repo transaction can cover -- I
16 mean it is similar to the Barclays' repo.  It
17 could be a whole variety of securities that are
18 within that type of repo transaction.
19     Q.   So you have been working at --
20 Deloitte has been on board for over a year and a
21 half, right?
22     A.   Um-hm, yes.
23         MR. ROTHMAN:  You have to answer out
24     loud.

22 (Pages 82 to 85)

Page 86

KARP

2  A.  Yes.
3  Q.  You're aware that Barclays placed some
4  valuations on the securities -- you're aware
5  that Barclays placed valuations on the
6  securities that it received as part of the
7  transaction, correct?
8      MR. ROTHMAN:  Objection to the form.
9      And let me caution you, again, not to
10  reveal information that you learned from
11  attorneys only.
12  A.  I have a file from Barclays which
13  shows a market value of securities received
14  under the repo transaction.
15  Q.  Do you have any basis for disputing
16  that value that they have put on it?
17      MR. ROTHMAN:  Objection to the form.
18  A.  We haven't done any work that would
19  indicate -- we didn't value the securities.  We
20  attempted but we didn't -- we weren't able to
21  value the securities.  So I would not know
22  whether or not the valuation is correct or not.
23  Q.  And any efforts to actually look at
24  the TMS system to see whether the marks were
25  being updated after the bankruptcy filing until

Page 87

KARP

2  September 20 -- 19th was done at the direction
3  of counsel?
4  A.  Whose bankruptcy filing?
5  Q.  LBHI's.  In any event, September 12 --
6  any work you have done, Deloitte has done, to
7  actually determine whether securities that
8  either were associated with the original asset
9  purchase agreement or the later purchase
10  agreement as revised by the clarification
11  letter --
12      MR. TECCE:  Objection to form.
13      MR. HINE:  Same here.
14      MR. THOMAS:  I'm not done with my
15  question.
16      MR. TECCE:  Sorry.
17  Q.  Any work that has been done by
18  Deloitte to determine whether the marks for
19  LBI's securities were actually being updated on
20  a daily basis between September 12th and
21  September 19th has been done at the direction of
22  counsel; is that correct?
23      MR. ROTHMAN:  Objection to the form.
24  A.  I wouldn't say that we have done any
25  work to verify that marks were being updated on

Page 88

KARP

2  a daily basis.  We saw some update in certain
3  other work we were doing, but we did not
4  specifically look to see if marks were being
5  updated daily.
6  Q.  Is it fair to say that sitting here
7  today, that you don't know whether marks were
8  being updated daily, the LBI marks, between
9  September 12th and September 19th?
10  A.  We -- I don't know for sure.
11  Q.  Let me ask you to turn back to the
12  e-mail from JPM with the Appendix A attached to
13  it, Exhibit 570.
14      In the attachment, there is a -- at
15  the top, the different columns, on the
16  right-hand column it, says, "Collateral Value."
17  A.  Um-hm.
18  Q.  And as I understand it, you don't --
19  do you have an understanding of what collateral
20  value is vis-a-vis market value?
21  A.  In this sense, it is supposed to mean
22  market value, according to our discussions with
23  JP Morgan.
24  Q.  OK.  If you turn back to the e-mail,
25  in the second sentence, it says, "I understand

Page 89

KARP

2  that these collateral values were furnished
3  principally by third-party pricing sources, and
4  we caution against using those values as
5  reliable indicators of realizable value."
6      Don't you understand realizable value
7  to be a reference to market value?
8      MR. ROTHMAN:  Objection to the form.
9  A.  My understanding of realizable value,
10  based upon my experience, is if I sold it today,
11  is that the value I would get.  That's not
12  necessarily the last market price the securities
13  sold in the marketplace, which was my
14  understanding of these prices, was the market
15  price as of the 17th of September, based upon
16  this e-mail.
17  Q.  Do you understand that a lot of the
18  securities that were conveyed to Barclays were
19  not very liquid?
20  A.  I understand that people have said
21  that.
22  Q.  Do you understand that it may not --
23  some of those securities may not have actually
24  sold in a long time?
25  A.  I don't know that for sure.

Page 90

1              KARP
2       Q.   Do you believe that to be the case?
3            MR. ROTHMAN: Objection to the form.
4       A.   I don't know.
5       Q.   The -- so you don't consider market
6    value to be what you would actually get for the
7    security if you tried to sell it?
8       A.   Market value, to me, is what the last
9    price was that it was sold as of a date. If I
10   tried to sell it the next day or the same day, I
11   may not get that same price. So my realizable
12   value may be different.
13      Q.   So for you, market value just means
14   the value that it was sold at the last time it
15   was sold?
16      A.   In my experience in dealing with
17   market value, when giving somebody a market
18   value, it is the end-of-day price in the
19   marketplace for that day.
20      Q.   And if an asset last sold a year ago
21   for $100 and then you have the greatest
22   financial crisis in 50 years occur and the
23   markets are down, and everyone agrees that you
24   are lucky to get a dollar for that item, you
25   would still consider it to have a market value

Page 91

1              KARP
2    of 100?
3            MR. HINE: Objection.
4            MR. ROTHMAN: Objection to the form.
5       A.   It depends upon what day you're asking
6    me to value it as of.
7       Q.   OK. Let's take, let's take
8    September 1st, before Lehman's financial crisis
9    hit. Let's say the market value was -- as of
10   the last time it traded, it was $100. And you
11   are asked where is the market value of this
12   thing on September 19th.
13           And if everyone assumed that you
14   wouldn't get more than $10 for it on the 19th,
15   but the last time it was traded, the actual
16   price was $100, what would you consider the
17   market value?
18           MR. ROTHMAN: Objection to the form.
19           MR. TECCE: Objection to the form.
20      A.   I would -- in that instance, I would
21   need to -- in that instance, I would normally
22   ask for quotes from other brokers to see what
23   price I would get.
24      Q.   Is that ultimately what you would want
25   to know, the price that you would get?

Page 92

1              KARP
2       A.   If there was no end-of-day market
3    price for that day that I was looking to value
4    it as of, then that is an alternative that some
5    people use.
6       Q.   And isn't that what you understood JPM
7    to be referring to when it referred to
8    realizable value, meaning what you are really
9    going to get for it in the market?
10      A.   I don't know if they were talking
11   about realizable value for the day that they
12   provided it, or on the 17th itself. Which seems
13   to be the date that they were giving the market
14   value for.
15      Q.   It says, "We caution against using
16   those collateral values as reliable indicators
17   of realizable value."
18           Isn't the plain meaning of that,
19   aren't they drawing a distinction between what
20   may be written down as collateral value and the
21   notion of market value in terms of what you
22   would really get for the product?
23           MR. ROTHMAN: Objection to the form.
24      A.   As I said, I don't know if they mean
25   what my realizable value is today, October 31st,

Page 93

1              KARP
2    when I gave you this, versus the 17th, or
3    whether or not you would have gotten that value
4    on the 17th that has been assigned to it.
5       Q.   Well, it doesn't say what -- comparing
6    it to what today's collateral value is, does it?
7            MR. ROTHMAN: Objection to the form.
8       A.   But I don't know what context he is
9    trying to make that statement.
10      Q.   At any point in time, did JPM tell you
11   that when they put collateral values in quotes,
12   that they really meant market value, that they
13   equated collateral values with market value?
14      A.   I didn't have a discussion with them
15   on what they meant by that.
16      Q.   In their chart, there is a column
17   referring to "remaining par." Do you see that?
18      A.   Yes.
19      Q.   Do you understand what that is
20   referring to?
21      A.   It's the -- my understanding, it is
22   the par value of the security.
23      Q.   And what is that? How is that
24   different from collateral value?
25      A.   The par value is not the market value.

                                    24 (Pages 90 to 93)

Page 94

KARP

1
2    It's the underlying denomination of the
3    security.
4    Q.    So there can be wide variations
5    between par value and market value?
6    A.    Yes.
7    Q.    The price source -- do you see that
8    column?
9    A.    Yes.
10    Q.    Do you know what DY refers to?
11    A.    No.
12    Q.    Do you know what VI refers to?
13    A.    No.
14    Q.    Do you have an understanding of how
15    these securities are price sourced?
16    A.    My only understanding was they were
17    provided by JP Morgan.
18    Q.    Do you know if JP Morgan was relying
19    on stale Lehman marks to come up with its
20    pricing?
21        MR. ROTHMAN:  Objection to the form.
22        MR. HINE:  Same objection.
23    A.    I don't know.
24    Q.    If you turn back to your analysis
25    again, Exhibit 569, please.  Page 2 -- DT 282.

Page 95

KARP

1
2    The bottom row, third column: "JP Morgan shows
3    CUSIP making up the bank loans and the remaining
4    securities to be delivered.  Barclays rejects
5    pool of collateral, as it was not what was
6    anticipated."
7        Do you recall JPM indicating to you
8    that that's what happened, Barclays rejected the
9    pool of collateral because it was not what was
10    anticipated?
11    A.    This is what JP Morgan told us, this
12    is what we documented.
13    Q.    Who at JP Morgan told you this?
14    A.    I don't know which specific person.
15    There was a group of people in the meeting to
16    discuss this.
17    Q.    Can you think of any of the names?
18    A.    Yes.  Scott Sandler, Margaret
19    Sullivan, Theresa Campanaro, and Mark O'Donnell.
20    Q.    Turning a couple of pages to the
21    summary of discussions with Barclays and former
22    LBI employees, just so I understand, the chart
23    above, the three-page analysis with the boxes
24    above this, are principally based on what
25    JP Morgan told you in your discussions with

Page 96

KARP

1
2    them?
3    A.    Yes.
4    Q.    On DT 284, where it says, "The Federal
5    Reserve reached out to Barclays on 9/16 to take
6    the Fed out of the transaction it had with LBI,"
7    is that your understanding, that that was
8    something that the Fed asked Barclays to do?
9    A.    That's what Barclays told me.
10    Q.    Do you have any -- do you believe that
11    to be the case?  Do you have any reason not to
12    believe that to be the case?
13    A.    I've participated in a meeting with
14    the Fed where this was -- where we discussed
15    this document, and they didn't say it wasn't
16    true.
17    Q.    Who did you meet with at the Fed?
18    A.    Shari Leventhal and her direct boss,
19    and I do not remember his name.
20    Q.    And did they have -- did you give them
21    a copy of this document?
22    A.    They did see a copy.  I don't know if
23    they retained it.
24    Q.    And would it be both parts of the
25    attachment to this e-mail, 569?

Page 97

KARP

1
2    A.    Yes.
3    Q.    Do you recall them disagreeing with
4    any part of the document?
5    A.    No.
6    Q.    When did you first have any
7    understanding of the repo transaction?
8    A.    Can you define what you mean by
9    "understanding"?
10    Q.    Sure.  When did you know that there
11    was a repo agreement involving Barclays and
12    Lehman?
13    A.    I believe it was -- it would have been
14    after September 26.  September 26, I believe,
15    was the day I met with Anthony Stucchio to gain
16    an understanding of some of the regulatory work,
17    and I believe that's where I first heard about a
18    Barclays repo transaction.
19    Q.    Who does Anthony Stucchio work with?
20    A.    He is now at Deutsche Bank.  He was an
21    LBI employee.
22        MR. THOMAS:  This might be a good
23    natural breaking point if you want to take a
24    break.
25        THE VIDEOGRAPHER:  The time is 12:01.

25 (Pages 94 to 97)

Page 98

KARP

1
2      We are going off the record.
3          (Recess)
4          THE VIDEOGRAPHER: The time is 12:16.
5      We are back on the record.
6  BY MR. THOMAS:
7      Q.  Let me show you a document we will
8  mark as 571.
9          (Exhibit 571, document Bates stamped
10     DT 506 with attachment marked for
11     identification, as of this date.)
12     Q.  Let me first ask you if you recognize
13  that document.
14     A.  Yes.
15     Q.  It is an e-mail you received from JP
16  Morgan on November 3, 2008?
17     A.  Yes.
18     Q.  And let me note that the attachment
19  there may be truncated, meaning there is some
20  additional sheets that were produced in the
21  native format. I would just note that if it
22  becomes relevant, let me know and we will go
23  ahead and mark the entire file and put it in.
24         Can you explain to me what the
25  attachment is, please?

Page 99

KARP

1
2      A.  It appears to be a listing from
3  JP Morgan of collateral value of the securities
4  that would be part of the settlement with
5  Barclays.
6      Q.  And looking at the e-mail, it says,
7  "In accordance with your request, attached is a
8  spreadsheet showing, A, the collateral value,"
9  in quotes, "as of September 17th of the
10  settlement consideration, Fed portfolio
11  securities, which are the securities to be
12  delivered to Bar Cap under the proposed
13  settlement agreement, and B, JP Morgan's
14  estimate of market value as of November 3rd."
15         Does this refresh your recollection
16  that JP Morgan used different terms for when
17  they are describing collateral value versus
18  market value?
19         MR. ROTHMAN: Objection to the form.
20     A.  I see it here.
21     Q.  They are putting -- did you understand
22  them to be drawing a distinction between what
23  they put in quotes as collateral value and what
24  they would describe as market value?
25         MR. HINE: Object to form.

Page 100

KARP

1
2      A.  I wouldn't know.
3      Q.  If you look at the attachment, and the
4  first page of the attachment, it says, "Project
5  Tassimo." Do you see where there is one column
6  that has "CD remaining" under "Mark by JPM"?
7      A.  Yes.
8      Q.  And what do you understand that column
9  to be reflecting?
10     A.  Well, underneath the box it says, "CV
11  equals collateral value," so I'm assuming it is
12  the collateral value."
13     Q.  And that totals up to 5.4 billion?
14     A.  That's what it says.
15     Q.  And there is another column that JPM
16  has, the 11/3 JPM value. Do you understand that
17  to be their estimate of market value for the
18  assets?
19     A.  Based upon the e-mail.
20     Q.  And that's 2.8 million?
21     A.  2.8 billion.
22     Q.  Billion, excuse me. 2.8 billion.
23     A.  That's what it says.
24     Q.  And is it your understanding that --
25  let's go back to the e-mail. It says, "You will

Page 101

KARP

1
2  note that there are a number of securities for
3  which JPM Morgan did not provide such an
4  estimate because there is insufficient
5  information on which it can base an estimate."
6         Were some of the securities pledged as
7  part of the Fed repo difficult to value?
8      A.  I don't know.
9      Q.  JPM apparently is having difficulty
10  valuing them, and didn't Deloitte have
11  difficulty in valuing them too?
12         MR. ROTHMAN: Objection to the form.
13         MR. HINE: Objection to form.
14     A.  We did a sample. I don't know that
15  all are difficult to value.
16     Q.  At least some are difficult to value?
17     A.  I don't know to what extent JP Morgan
18  tried to value, so I don't know whether it was
19  difficult or not.
20     Q.  I mean if it were easy, you could have
21  just -- Deloitte could have a year and a half
22  ago looked up the values, right?
23         MR. ROTHMAN: Objection to form.
24         MR. TECCE: Objection to form.
25     A.  Deloitte just used publicly available

26 (Pages 98 to 101)

Page 102

KARP

1  sources. If there were other avenues to
2  explore, we did not do that.
3      I don't know what avenues JP Morgan
4  took to try to value anything.
5      Q.  Well, you did try to explore. You
6  took a sample and tried to value them and
7  decided it was --
8      A.  Only publicly available pricing
9  services.
10      Q.  So you're saying you didn't dig
11  deeper, trying to value them using nonpublicly
12  available sources?
13      A.  Correct.
14      Q.  Do you disagree with JPM's assessment
15  that some are difficult to value?
16      MR. ROTHMAN:  Objection to the form.
17      A.  I don't know whether or not they are
18  difficult to value. We only did a sample on a
19  limited view.
20      Q.  Do you see in the second paragraph, it
21  says, "Please note the collateral value was
22  obtained from third-party pricing sources, and
23  JPM Morgan cautions that collateral value may
24  not be a reliable indicator of realizable

Page 103

KARP

1  value"? Do you see that language?
2      A.  Yes.
3      Q.  So JPM is again cautioning against
4  using the collateral value as a reliable
5  indicator of realizable value, correct?
6      A.  That's what it says.
7      Q.  I am going to go ahead and mark a
8  document as Exhibit 572.
9      (Exhibit 572, subpoena marked for
10  identification, as of this date.)
11      Q.  Let me ask you, have you seen this
12  document before?
13      A.  Yes.
14      Q.  And what is it?
15      A.  It's a request, it is a subpoena
16  request for a deposition.
17      Q.  And on page 9, you see a list of
18  examination topics?
19      Do you see that list?
20      A.  Yes.
21      Q.  And you understand you are the witness
22  on these topics for Deloitte?
23      A.  Yes.
24      Q.  And can you describe briefly what you

Page 104

KARP

1  did to prepare for your deposition today?
2      A.  I met several times with Hughes
3  Hubbard.
4      Q.  Anything other than that?
5      A.  I read through some documents that
6  they had showed me.
7      Q.  Did you speak with anyone else other
8  than Hughes Hubbard?
9      A.  I spoke to some of my partners that
10  would have made -- that may have had answers to
11  some of these comments -- some of these topics.
12      Q.  And who were those people that you
13  spoke to?
14      A.  Felicia Sokalski, John Manley and
15  Chris Harris.
16      Q.  And did they provide you with any
17  useful information on these topics?
18      A.  They, John and Felicia were the people
19  that were in -- on the ground in the beginning,
20  so for topic 11, they had the most information.
21      Q.  And what is your understanding,
22  Deloitte's understanding of when a SIPC
23  liquidation of LBI was first considered,
24  anticipated or planned?

Page 105

KARP

1      A.  On September 15th or 16th, John
2  received a call from -- John Manley received a
3  call from SIPC saying that there was a
4  possibility that Lehman Brothers, Inc. was going
5  into liquidation. And they wanted to know
6  whether or not Deloitte would be able to clear
7  conflicts and had the people available to assist
8  if necessary.
9      Q.  Looking at topic 2, and -- which is
10  your analysis, reconciliation, evaluation of
11  each of the acquired financial assets, and those
12  assets are defined in the document to include a
13  number of items. I just want to ask you about
14  some of them.
15      The -- I think we have discussed
16  the -- any efforts to value the repo collateral,
17  correct?
18      A.  Yes.
19      Q.  Is there -- was there any efforts to
20  value the repo collateral that we haven't
21  already discussed?
22      A.  No.
23      Q.  In terms of the clearance box assets,
24  has -- do you know what I am referring to when I

27 (Pages 102 to 105)

Page 106

KARP

1
2  say clearance box assets?
3      A.   My understanding is that that's the
4  boxes at -- the box at DTC.
5      Q.   And is it your understanding those
6  assets were being conveyed to Barclays?
7          MR. ROTHMAN:  Objection to the form,
8      and I caution you not to reveal any
9      information that you have learned solely
10     from counsel.
11     A.   My understanding from some of the
12 Barclays personnel is that these -- that they
13 believe these assets should be transferred to
14 them.
15     Q.   And have you attempted, has Deloitte
16 done any valuations of those assets?
17         MR. ROTHMAN:  You can answer that one
18     yes or no, but --
19     A.   Deloitte has not done -- no.
20     Q.   Has Deloitte assisted in the
21 evaluation of those assets?
22         MR. ROTHMAN:  Objection to the form.
23     A.   No.
24     Q.   I'm hearing long pauses, so I just --
25 let me ask you, what is it that you are thinking

Page 107

KARP

1
2  about, you are distinguishing?
3      A.   Well, those assets would have been
4  part of the balance sheet.
5      Q.   OK.
6      A.   So they would have been valued for the
7  balance sheet of 9/19.  It would have included
8  that pool.
9      Q.   Is the balance sheet -- when do you
10 expect to complete the balance sheet for 9/19?
11     A.   I'm not sure.
12     Q.   Is it complete with respect to items
13 such as the clearance box assets?
14     A.   It's being reviewed at this time by
15 the trustee and his counsel --
16         MR. ROTHMAN:  No, don't talk about
17     things that the lawyers are doing, please.
18     Q.   It is OK to just indicate that it is
19 not in your bailiwick.  It is being reviewed I
20 think is OK to say.  Otherwise, it is hard to
21 figure out the story of why.
22         OK, just let me talk about any
23 valuations you have placed on the clearance box
24 assets.  Has Deloitte placed, assigned a value
25 to the clearance box assets?

Page 108

KARP

1
2      A.   Deloitte has not done valuation.
3      Q.   The valuation that's on the draft
4  balance sheet, do you know how it was obtained?
5      A.   They would have been through
6  third-party pricing sources and Barclays.
7      Q.   The third-party pricing sources, did
8  Deloitte go out and make use of third-party
9  pricing sources?
10     A.   No.  Those sources would have come
11 through Barclays and existing Lehman Brothers
12 relationships that continued past bankruptcy.
13     Q.   Can you be a little bit more specific
14 on the last part?
15     A.   We still have a relationship with
16 Bloomberg to obtain some pricing information.
17     Q.   "We" being LBI, the trustee?
18     A.   LBI, the estate.
19     Q.   Do you know the amounts that are on
20 the draft balance sheet for clearance box
21 assets?
22         MR. ROTHMAN:  Objection to the form.
23     A.   There is no specific amount for
24 clearance box assets.  It's listed as firm
25 inventory.

Page 109

KARP

1
2      Q.   And do you know what that adds up to?
3      A.   There are still open questions on
4  those numbers, as we are still waiting for
5  information from JP Morgan and DTC.  So those
6  numbers are not finalized.
7      Q.   What information are you waiting for
8  from JP Morgan and DTC?
9      A.   JP Morgan, there are some open
10 questions on the unwinding of some transactions
11 that happened that week, the 18th and 19th.
12 Some journal -- some entries that hit the bank
13 accounts that affect security settlements that
14 we are waiting for details on.
15         And for DTC, we are still waiting for
16 the -- some information on some of the
17 securities' movements and settlements that they
18 did through their various clearing
19 organizations.
20     Q.   Accepting that there is maybe some
21 margin of error here because of those unknown
22 elements, do you know the rough range of order
23 of magnitude of the clearance box assets?
24         MR. ROTHMAN:  Objection to the form.
25     Calls for speculation.

28  (Pages 106 to 109)

Page 110

KARP

1
2       A.   I don't remember. And I'm not sure
3   what -- whether clearance box means firm
4   inventory.
5       Q.   Same questions for the 15c3-3 assets.
6   Has Deloitte tried to determine the value of
7   assets in that category?
8       A.   That category includes cash and
9   securities, and we did not value them, the
10  securities.
11      Q.   Is Deloitte aware of any effort to
12  value those securities?
13      A.   The securities would have been priced
14  by Barclays as part of the balance sheet
15  efforts.
16      Q.   For your purposes, are you just using
17  those prices provided by Barclays?
18      A.   We also received information from
19  JP Morgan with a market value of those
20  securities, because they were holding the
21  securities.
22      Q.   And which value are you using, or some
23  third value?
24      A.   I'm not sure which value was used. I
25  don't know that there was a difference between

Page 111

KARP

1   the two.
2       Q.   In terms of the opening balance sheet,
3   do you have a number yet for -- strike that.
4       Do you -- have you made any efforts to
5   value the exchange-traded derivatives that were
6   a part of the sale transaction?
7       MR. ROTHMAN: Objection to the form.
8       A.   The exchange-traded derivatives for
9   the futures business were -- customers would not
10  be on a balance sheet.
11      Q.   Right. I divorced it from the balance
12  sheet.
13      A.   Sorry.
14      Q.   So not -- have you made any efforts to
15  value those assets?
16      A.   No.
17      Q.   Do you know what the values of those
18  assets are?
19      A.   I do not.
20      Q.   Do you know what the value of the
21  margin associated with the exchange-traded
22  derivatives is?
23      A.   No. We are still missing that
24  information on some of that.
25

Page 112

KARP

1
2       Q.   What information are you missing?
3       A.   We do not have all the statements from
4   all the exchanges around the world that indicate
5   what the margin was up at those exchanges.
6       Q.   Has -- in connection with the --
7   either the Lehman's/Barclays sales transaction
8   or your efforts to generate an opening
9   balance -- a balance sheet for LBI, what parties
10  other than Houlihan and -- excuse me, Hughes and
11  the trustee have you spoken with?
12      A.   I'm sorry.
13      Q.   So you mentioned you spoke at one
14  point with the Fed, SIPC. Have you had
15  conversations with any other third parties --
16  let's limit it to issues involving the
17  Barclays/Lehman sales transaction?
18      A.   I have participated in meetings with
19  the creditors committee.
20      MR. ROTHMAN: Just don't say what was
21  said yet.
22      THE WITNESS: OK.
23      MR. ROTHMAN: Go ahead and answer the
24  question. Give him a list of people.
25      A.   Creditors committee, LBHI, the ad hoc

Page 113

KARP

1
2   creditors committee, the SEC, and FINRA.
3       Q.   Any other parties or organizations
4   that you can think of?
5       A.   Not that I can remember.
6       Q.   When did you first meet with the
7   creditors committee?
8       A.   I don't remember. We have met with
9   them periodically throughout this entire
10  process.
11      Q.   Were you aware of an October 8, 2008
12  presentation by Alvarez & Marsal/LBHI to the
13  creditors committee and others concerning the
14  deal?
15      MR. TECCE: Objection, form.
16      A.   I don't remember.
17      Q.   Are you aware that there was a -- when
18  some of the repo collateral was transferred to
19  Barclays, that week of September 15, are you
20  aware there was a discussion about updating the
21  valuation for that collateral?
22      MR. ROTHMAN: Objection to the form.
23  And I'll caution the witness not to reveal
24  information learned solely from the lawyers.
25      MR. TECCE: Objection to form.

29 (Pages 110 to 113)

Page 114

KARP

1    MR. THOMAS: Well, if it is a fact, I
2    don't think the fact that it may have come
3    from a lawyer makes it privileged. It's
4    just a fact. I mean if I ask her if it was
5    raining yesterday, and she says, it is
6    because the lawyer told her it was raining,
7    she can still say it is raining.
8        MR. ROTHMAN: If she can answer
9    independently, that's fine. But I'm not
10   going to let her get into discussions she
11   has had with Hughes Hubbard lawyers or with
12   the trustee concerning issues that are at
13   issue in this litigation and dispute.
14   Q.    I'm not asking for the substance of
15   the communications with lawyers. I am just
16   asking you about facts you know as you sit here
17   today. Did you know --
18   A.    Could you repeat it.
19   Q.    Sure.
20        Did you know roughly September 18th,
21   19th time frame that there was a discussion
22   involving people from Barclays and people from
23   Lehman about how much the repo collateral was
24   really worth?

Page 115

KARP

1    A.    No.
2    Q.    Are you aware that Barclays raised
3    questions that week about the values attributed
4    to some of the LBI securities?
5        MR. ROTHMAN: Same caution.
6    A.    I believe JP Morgan, our discussions
7    which I -- I could check, but I believe we
8    documented in the JP Morgan that there was a
9    question about collateral value or the pool of
10   collateral, but I was not part of any
11   discussions.
12   Q.    Are you familiar with a 47.4 billion
13   dollar figure being referenced as part of the
14   bankruptcy court hearings?
15        MR. ROTHMAN: Same objection.
16   A.    I believe that's the number in Shari
17   Leventhal's affidavit. I think that's the only
18   time I know that number.
19   Q.    You have no knowledge of it beyond
20   just reading it somewhere, you believe?
21   A.    It is the only time I remember hearing
22   it. Or reading it.
23   Q.    When was the first time that Deloitte
24   started doing any work in anticipation of any

Page 116

KARP

1    type of legal claim against Barclays? And just
2    the date.
3        MR. ROTHMAN: Objection to the form.
4    I don't know that she is -- she is not a
5    lawyer. I don't know if she is going to be
6    able to answer that question.
7    A.    I don't, I don't know.
8    Q.    Have you ever seen a -- strike that.
9        Have you ever done any -- has Deloitte
10   done any analysis of derivatives owned by LBI
11   the week of September 15th?
12   A.    Can you define what you mean by
13   derivatives?
14   Q.    Is that a term you're familiar with?
15   A.    Yes.
16   Q.    How do you understand derivatives?
17   What do you understand derivatives to refer to?
18   A.    There are a lot of things that are
19   considered derivatives, from my experience,
20   options, futures, swaps, FX. Lots of things
21   that are considered derivatives.
22   Q.    Let's talk about options and futures.
23   Have you done any analysis of the derivatives
24   that were contained in the Barclays sale

Page 117

KARP

1    transaction?
2        MR. ROTHMAN: Objection to the form.
3    Q.    Strike that, let me rephrase.
4        Have you done any analysis to
5    determine which derivative assets -- strike
6    that.
7        Do you know the value of Lehman's
8    exchange-traded derivatives as of September 16?
9    A.    No.
10   Q.    For any other day that week?
11   A.    No.
12   Q.    Did Deloitte make any effort to try to
13   figure out the value of those exchange-traded
14   derivatives during that week?
15   A.    No.
16   Q.    Have they done that as part of the
17   balance sheet work?
18   A.    Only the portion that would be
19   included on the balance sheet.
20   Q.    And what portion is that?
21   A.    The firm proprietary.
22   Q.    And how much is that that's included
23   on the balance sheet as of now?
24   A.    I don't remember.

30 (Pages 114 to 117)

Page 118

KARP

1
2    Q.    Order of magnitude?
3        MR. ROTHMAN: Objection to the form.
4    A.    I don't remember -- the -- for the
5    options, I -- my best recollection is around 500
6    to 700 million in market value, but I'm not
7    positive.
8        For the futures, we are still waiting
9    for information from LBIE on the futures side,
10    because the futures markets closed out the
11    positions, and that data has not come back to
12    us.
13        We are also still working through data
14    from the CME for the domestic side, so that
15    information is still in flux.
16    Q.    And I am looking at examination topic
17    7A now.  The reference to the 4.5 billion dollar
18    figure referenced in relation to derivatives in
19    Exhibit 19, does Deloitte have any knowledge
20    about where that figure came from or how it was
21    derived?
22    A.    No.
23    Q.    Has Deloitte ever attempted to figure
24    out where that number came from or how it was
25    derived?

Page 119

KARP

1
2    A.    No.
3    Q.    And subpart C of 7, it says, "the
4    portion of the value referenced in B that was
5    attributable to exchange-traded derivatives held
6    on behalf of LBI customers." Any knowledge
7    about that?
8        MR. ROTHMAN: Objection to the form.
9    A.    No.
10    Q.    Subpart D, the value of the margin at
11    the OCC on any of those dates listed there, does
12    Deloitte have any knowledge of that?
13    A.    We have statements from the OCC as of
14    the 19th that shows total margin at the OCC of
15    approximately 2.2 billion.
16    Q.    Anything else?
17    A.    No.
18    Q.    The total margin, is there breakdown
19    types of margin there?  It is all -- is that
20    cash?
21    A.    There is cash, there is Treasury
22    securities, and letters of credit.
23    Q.    Can you give me the rough breakdown?
24    A.    I think it is 1.2 billion of cash,
25    900 million of Treasury securities, and the rest

Page 120

KARP

1
2    would be letters of credit.
3    Q.    Do you have any valuation other than
4    that provided by the OCC?
5    A.    I'm not sure what you mean.
6    Q.    So you refer to the statements from
7    the OCC on the 19th. Other than the statements
8    from the OCC, do you have any basis for
9    understanding the value of those items at any
10    point for these days referenced in the exhibit?
11        MR. ROTHMAN: Objection to the form.
12    A.    Well, the cash -- we looked at LBI's
13    books and records and compared the cash balance
14    on that statement versus the cash in the books
15    as attributed to OCC, and we compared the
16    CUSIPs.
17        I don't know that we got -- we would
18    have gotten pricing from Barclays for the
19    balance sheet purposes. I don't know that there
20    was a difference between the two.
21    Q.    Subpart E, the value of margin at any
22    other domestic or foreign exchange or clearing
23    corporation on those dates, any knowledge of
24    that?
25    A.    We have requested and received some

Page 121

KARP

1
2    statements from the various exchanges and
3    clearing corps on margin. We were also provided
4    a list by Barclays of what they thought the
5    margin was that they expected -- that they asked
6    to be turned over to them.
7    Q.    And can you characterize the values in
8    any way from the information you received?
9    A.    I believe the information from
10    Barclays was a little over a billion dollars of
11    margin, but in subsequent conversations with
12    them, they have said that they believe that
13    number will be less, because they know the
14    exchanges closed out positions and utilized that
15    margin for the closeouts.
16        But I don't know what the exact total
17    will be at the end.
18    Q.    And the statements that you received
19    from various exchanges, what information does
20    that provide in terms of the value?
21    A.    Each one would have its own listed. I
22    don't know the individual numbers and amounts.
23    Q.    Subpart F, the amount of margin at the
24    OCC or any other foreign or domestic exchange or
25    clearing corporation that constituted customer

31 (Pages 118 to 121)

Page 122

KARP

1
2   collateral on those dates, any knowledge of
3   those amounts?
4       A.   The OCC breaks out a customer
5   designation, which I believe -- I don't remember
6   what the margin requirement was.  I believe
7   500 million was what was deposited for that
8   customer account designation per the OCC.
9       Q.   Subpart G, the margin requirements
10  imposed on LBI by the OCC and any other domestic
11  or foreign exchange as of those dates, any
12  knowledge of that?
13      A.   All I know is the margin requirement
14  for -- I don't remember what the exact margin
15  requirement was for OCC.  It was just less than
16  the margin actually deposited as of the 19th,
17  according to this statement.
18          There was an excess, and I don't
19  remember the exact number of what the excess
20  was.
21      Q.   Do you remember roughly what the
22  excess was?
23      A.   I know it was in the hundreds of
24  millions.  I don't -- I don't remember the -- I
25  don't remember where the number landed.

Page 123

KARP

1
2       MR. THOMAS:  This is probably a good
3   time to take our lunch break.
4       MR. ROTHMAN:  OK.
5       THE VIDEOGRAPHER:  The time is 12:53.
6   We are going off the record.
7       (Luncheon recess)
8       (Continued on next page)

Page 124

KARP

1
2       THE VIDEOGRAPHER:  The time is 1:48,
3   we are back on the record.
4   BY MR. THOMAS:
5       Q.   You mentioned earlier some other repo
6   agreements that you have come across in your
7   work with respect to LBI.  Can you think of any
8   of the names of any of the counterparties to
9   those agreements?
10      A.   Well, there are some with Barclays,
11  Bank Paribas, Societe Generale, a bunch of
12  foreign banks, I don't remember all the
13  different names of all the different
14  counterparties, but there were, I don't know,
15  anywhere between 40 to 50 counterparties that
16  Barclays -- Lehman Brothers dealt with with repo
17  contracts.
18      Q.   These were all within that period of
19  time, September 15, that week?
20      A.   They all had them as of the 19th, this
21  was outstanding contracts.  That's the date that
22  we are using.
23      Q.   Do you know, can you describe roughly
24  the amounts of those repo agreements?
25      A.   They were in the billions on each

Page 125

KARP

1
2   side, repo and reverse repo.
3       Q.   Do you know the type of collateral
4   that was involved in those?
5       A.   There was all types of collateral and
6   there was no consistency.
7       Q.   Do you know, do you remember if it was
8   like level 1, 2 and 3 types of collateral?
9       A.   No.
10      Q.   Were these ordinary commercial repo
11  agreements?
12      A.   My understanding is that they were
13  traditional repo under master repo agreements.
14      Q.   When did Deloitte first learn that
15  cash margin at the OCC was transferred to
16  Barclays?
17      MR. ROTHMAN:  Objection to the form.
18      A.   October, early October.
19      Q.   Did Deloitte have any role in
20  approving that transfer?
21      A.   No.
22      Q.   Do you know if the trustee did?
23      A.   I don't know.
24      Q.   Do you understand the trustee did
25  approve that release?

32 (Pages 122 to 125)

Page 126

KARP

1           KARP
2     MR. ROTHMAN: Objection to the form.
3    A.   I don't know who approved it.
4    Q.   Do you understand whether it required
5 approval?
6    A.   No.
7    Q.   So you just don't know any of the
8 facts -- you knew it was transferred but you
9 don't know any of the facts surrounding who
10 approved it and so forth?
11    A.   Who -- no.
12    Q.   When did Deloitte first learn that
13 proceeds of certain government securities held
14 by JPM as margin in its OCC accounts were
15 released to Barclays?
16    A.   They were not released to Barclays.
17    Q.   And why do you say that?
18    A.   Because they are still held in an
19 account at JP Morgan.
20    Q.   So you're not aware of any proceeds of
21 any government securities held at one point by
22 JPM as margin for the OCC accounts being
23 released to Barclays?
24    A.   Could you explain what you mean by
25 "proceeds"?

Page 127

KARP

1           KARP
2    Q.   Well, money.
3    A.   There was -- if I remember correctly,
4 there was a -- one of the securities matured and
5 I believe that cash may have been transferred to
6 Barclays. I believe -- I believe that's
7 what happened.
8    Q.   Do you understand roughly when that
9 happened?
10    A.   I think it happened around the same
11 time that the cash moved, but I don't -- I'm not
12 sure when it actually happened.
13    Q.   Would you have been aware roughly at
14 the time it happened?
15    A.   I don't believe so. I wasn't really
16 involved in cash at that point, you know, in the
17 early days of the -- of our role.
18    Q.   Do you know when Deloitte was aware of
19 that release?
20    A.   We would have known -- we would have
21 known a couple days later for the people that
22 were reconciling cash because it would have
23 shown up as a cash movement. But otherwise, I
24 don't know the exact date.
25    Q.   Do you know if Deloitte had any

Page 128

KARP

1           KARP
2 involvement in the release of those funds, those
3 proceedings?
4    A.   No.
5    Q.   Is Deloitte aware that LBI had
6 collateral and accounts with other domestic and
7 foreign exchange brokers of clearing houses to
8 support its business as a futures commission
9 merchant?
10     MR. ROTHMAN: Objection to the form.
11    A.   Yes.
12    Q.   Are you aware of any discussions with
13 Barclays prior to the closing concerning how the
14 transfer of this business was to be implemented?
15    A.   No.
16    Q.   Even today, you're not aware of any
17 such discussions?
18    A.   No.
19    Q.   Is Deloitte aware that collateral held
20 in these accounts had been transferred to
21 Barclays, either by transferring the accounts or
22 by transferring the collateral?
23     MR. ROTHMAN: Objection to the form,
24 and again, let me caution you not to reveal
25 things that you have learned solely from the

Page 129

KARP

1           KARP
2 lawyers.
3    A.   From some of the statements we have
4 received from the exchanges, we understand from
5 those documents that some collateral has moved
6 to Barclays.
7    Q.   When did you understand that?
8    A.   I'm not sure when we first started
9 getting statements. It look a long time to get
10 information from the CME. I believe it was
11 sometime in '09, not before then.
12    Q.   Can you estimate a month?
13    A.   I really -- I really don't remember.
14    Q.   It would have been statements from the
15 CME -- what statements would have alerted you to
16 that?
17    A.   We asked for statements from the CME
18 showing the positions and any margin so that on
19 those statements, we would have seen if any
20 funds had been transferred out.
21    Q.   If there comes a point that I am
22 asking you a fact that you think only came from
23 your lawyer and you're not sure, if you would
24 let us know so we can discuss whether that's --
25 so you can discuss that first with your

33 (Pages 126 to 129)

Page 130

KARP

1  attorney.
2  A. OK.
3  Q. But if I ask if you know something,
4  and you say you don't know, I'm going to assume
5  that you don't know, not that you know it but it
6  just came from your lawyer, if that makes sense.
7  A. OK.
8  Q. Was there any other source of
9  information about that other than the CME
10  statements?
11  A. We have been working with some people
12  from Barclays who were former LBI employees who
13  were responsible for reconciling and
14  understanding that business. And we had heard
15  from them that certain collateral had made its
16  way to Barclays.
17  Q. Roughly when did you hear that?
18  A. I'm not sure when we heard it.
19  Q. '08, '09?
20  A. It probably was in '08 that we heard
21  it, but we wouldn't have seen documentation
22  until '09 when we received the statements.
23  Q. When you heard it, did that cause you
24  to react in any way or follow up with any

Page 131

KARP

1  questions?
2  MR. ROTHMAN: Objection to the form.
3  Excluding discussions that might be
4  had with counsel.
5  Q. Well, if you discussed with counsel,
6  you can say discussed with counsel.
7  A. That's what I was about to say, any
8  discussions would have been had with counsel.
9  Q. And did you -- on this general subject
10  matter, without going into the content of the
11  discussion with counsel, did you have
12  discussions with counsel in '08 on this general
13  subject matter?
14  A. Yes.
15  Q. Did Deloitte have any role other than
16  discussions with counsel in the release of that
17  collateral?
18  A. No.
19  Q. Do you know when the trustee approved
20  the release of that collateral?
21  MR. ROTHMAN: Objection to the form,
22  mischaracterizes her testimony.
23  A. No.
24  Q. Do you know if the trustee -- do you

Page 132

KARP

1  know the circumstances in which the collateral
2  was released?
3  A. No.
4  Q. When was the first time, to your
5  knowledge, that the trustee took the position
6  that Barclays was not entitled to some or all of
7  the margin or collateral held in any of the
8  LBI's exchange-traded derivative accounts?
9  MR. ROTHMAN: I am going to direct her
10  not to answer that one.
11  MR. THOMAS: I'm just looking for a
12  date. If it is privileged, if -- it is
13  privileged, it would be on a privilege log.
14  MR. ROTHMAN: I don't think it is
15  proper for you to inquire into the work they
16  were doing.
17  MR. THOMAS: You can ask --
18  MR. ROTHMAN: There is a work product
19  protection as well as a privilege.
20  MR. THOMAS: I understand. Even for
21  example document, you would put on the log
22  the date of the document and general subject
23  matter. It is just asking when did you go
24  see a lawyer. You can ask a client when

Page 133

KARP

1  they went and visited a lawyer, not the
2  subject matter. But the date isn't
3  privileged. I'm not going to get into the
4  communications.
5  MR. ROTHMAN: I don't think there is a
6  way for her to get into this area without
7  revealing privileged communications and work
8  product.
9  MR. THOMAS: What if I just agree to
10  stop at a date?
11  MR. ROTHMAN: It is -- it is not the
12  date I'm -- I am going to instruct her not
13  to answer. It's not the date I'm worried
14  about. You are asking her to confirm what
15  the trustee might or might not have said to
16  her.
17  Q. Are you aware of any communications
18  involving the trustee's position with respect to
19  whether Barclays was entitled to some or all of
20  the margin or collateral held at LBI's
21  exchange-traded derivative accounts with any
22  parties other than Hughes Hubbard or the
23  trustee?
24  MR. ROTHMAN: Objection to the form.

34 (Pages 130 to 133)

Page 134

KARP

1
2      Q.   This would include discussions, for
3  example, with somebody at Barclays or some other
4  party about whether Barclays was entitled to
5  that collateral or margin?
6      MR. ROTHMAN:  These are communications
7  that Deloitte had?
8      Q.   Well, it's whether -- it is aware of
9  any such communications. These are with, you
10 know, it is with Barclays or another party, it
11 is not privileged, I think you can answer. She
12 is looking to you.
13     MR. ROTHMAN:  Are you asking her
14 whether Deloitte had communications with
15 other parties?
16     MR. THOMAS:  Let's start more broadly,
17 I don't want to technically -- if she sat in
18 the conference room when the trustee and
19 talked about Barclays, I don't want to know
20 about that.
21     Are you aware of any communication,
22 outside of internal communications with
23 Hughes Hubbard and the trustee and Deloitte,
24 communications involving any other party
25 such as Barclays or any other third party

Page 135

KARP

1
2  about whether Barclays was entitled to some
3  or all of the margin and collateral?
4      MR. ROTHMAN:  If it is Barclays,
5  that's OK, but we have a common interest
6  privilege with the other parties sitting at
7  this table.
8      Q.   Let's do yes or no first.
9      A.   I'm not sure I know how to answer
10 this. I think I need to talk to you.
11     MR. ROTHMAN:  All right, we will take
12 a little -- unless you want to try a
13 different question.
14     MR. THOMAS:  No, if there are
15 communications, I just want to identify who
16 they are with, the date, general subject
17 matter, and then if there is a privilege
18 issue, we can take that up later. I just
19 want to frame it before we take it up.
20     THE VIDEOGRAPHER:  The time is 2:03,
21 we are going off the record.
22     (Recess)
23     THE VIDEOGRAPHER:  The time is 2:06 we
24 are back on the record.
25     (Record read)

Page 136

KARP

1
2      A.   Yes.
3      Q.   Can you please identify those
4  communications?
5      A.   There were verbal and written
6  communications from Barclays, as well as verbal
7  communications with the SEC.
8      Q.   Any other parties that you can think
9  of?
10     A.   Not that I can remember.
11     Q.   When were the first verbal and written
12 communications with Barclays?
13     A.   I'm not sure of the exact date. The
14 OCC question came up first. And that was
15 probably in '08. I'm not sure about the rest of
16 the exchanges, exchange-traded derivatives as to
17 when that exactly started with the
18 communications.
19     Q.   How about the communications with the
20 SEC?
21     A.   I'm not really sure. We have met with
22 the SEC every two to three weeks in the
23 beginning and then monthly, so I'm not really
24 sure when the first conversation was had about
25 this particular subject.

Page 137

KARP

1
2      Q.   Why were you having conversations with
3  the SEC about this particular subject?
4      A.   The SEC was interested in the progress
5  of the liquidation and the -- any open issues
6  that might exist between LBI, the trustee and
7  any parties.
8      Q.   Was this identified as an open issue?
9      A.   It was identified as an open subject
10 for which Barclays was demanding certain assets
11 and the trustee was still discussing them with
12 Barclays at that time.
13     Q.   Was there any resolution to those
14 discussions?
15     MR. ROTHMAN:  Objection to the form.
16     Q.   Resolution --
17     MR. ROTHMAN:  Resolution between
18 trustee and Barclays?
19     Q.   Strike that.
20     How did the SEC respond?
21     A.   The SEC didn't take a position. They
22 were interested in knowing the facts.
23     Q.   Did you communicate those facts to
24 them in writing at any point?
25     A.   I don't believe I ever did. I don't

35 (Pages 134 to 137)

Page 138

KARP

1                 KARP
2   know if anybody else did.
3     Q.   Who were you dealing with at the SEC?
4     A.   We generally meet with Mike
5   Macchiaroli and sometimes he brings one of his
6   staff with him.  Randall Roy has been there and
7   Ray Doherty.
8     Q.   Do you think the first discussions
9   with the SEC may have started in about '08?
10     MR. ROTHMAN:  Objection to the form.
11     A.   We definitely started meeting with the
12   SEC in '08 on other matters.  I don't know when
13   we started discussing this particular subject.
14     Q.   Now, is it your understanding that
15   Barclays acquired LBI's PIM, private investment
16   management business?
17     A.   Yes.
18     Q.   In connection with that, Barclays
19   acquired LBI's PIM customer accounts including
20   assets held on their behalf and liabilities to
21   those customers?
22     A.   My understanding is they acquired the
23   PIM customer accounts.
24     Q.   By virtue of their acquiring the PIM
25   customer accounts, did they also acquire assets

Page 139

KARP

1                 KARP
2   held on the customers' behalf and liabilities to
3   those customers?
4     A.   I'm not sure what you mean by that.
5     Q.   Well, to the extent there were assets
6   and liabilities associated with the account, did
7   they go over to Barclays?
8     A.   My understanding was whatever was
9   contained in each customer's account went over
10   to Barclays, with some exceptions.
11     Q.   What are the exceptions you are
12   referring to?
13     A.   Barclays did not take the FX business
14   and certain PIM customers had open FX contracts
15   which therefore stayed behind.  I believe that
16   was the -- it is the extent of the exceptions
17   that I can remember.
18     Q.   And what's the FX business?
19     A.   Foreign exchange transactions.
20     Q.   Did Barclays also not take over
21   affiliate and nonaffiliate options customers'
22   accounts?
23     MR. ROTHMAN:
24     MR. ROTHMAN:  To the form.
25     A.   My understanding was that Barclays

Page 140

KARP

1   was -- took over responsibility for the entire
2   OCC relationship irrespective of who owned the
3   options.
4     Q.   What was the basis of that
5   understanding?
6     A.   My discussions with Barclays personnel
7   who were responsible for that options business.
8     Q.   Who was that?
9     A.   Dan Dziemian, as well as discussions
10   with Ken Raisler and Alan Kaplan.
11     Q.   Did you ever review the purchase
12   agreement?
13     MR. ROTHMAN:  Objection to form, asked
14   and answered.
15     Q.   For this purchase?
16     A.   The asset purchase agreement?
17     Q.   Well, as revised, the purchase
18   agreement?
19     MR. ROTHMAN:  Same objection.
20     A.   Related to this issue?  No.
21     Q.   Did you review any other documents to
22   see if this issue was addressed in the sale
23   agreement?
24     A.   No.

Page 141

KARP

1                 KARP
2     MR. ROTHMAN:  Objection to the form.
3     Q.   Didn't Barclays use a bridge account
4   to administer the affiliate and nonaffiliate
5   options customers?
6     A.   Yes.
7     Q.   Now, they wouldn't need that if they
8   had taken over the accounts, would they?
9     MR. ROTHMAN:  Objection to the form.
10     A.   It was explained to me by Dan Dziemian
11   that they set up these accounts, these bridge
12   accounts because they felt that -- they did not
13   take the responsibility for the final payment
14   related to these options.  But that is not
15   something that has been agreed to in any way by
16   LBI.
17     Q.   So it was Barclays -- what the
18   Barclays folks said to you was that they didn't
19   fully take over the accounts, those accounts?
20     MR. ROTHMAN:
21     MR. ROTHMAN:  To the form.
22     A.   The way it was explained to me was
23   that they took over the entire relationship with
24   OCC and -- but they felt that they took over the
25   clearance and settlement obligation related to

36 (Pages 138 to 141)

Page 142

KARP

1 those accounts at the OCC and they were not
2 responsible for the affiliates and certain other
3 positions and, therefore, were setting up these
4 bridge accounts to in effect charge back the LBI
5 estate for any costs and credit the LBI estate
6 for any profits on those transactions.
7        But that, as I said, that was their
8 doing and their undertaking. It is not
9 something that has been agreed to or accepted.
10    Q.   Did Deloitte ever express to Barclays
11 any kind of disagreement with what they were
12 doing or the position they were taking?
13    A.   We discussed it with Barclays to
14 understand what it was about and why they were
15 doing it. And just obtain facts.
16    Q.   And then after obtaining that
17 information, did you go back to Barclays or take
18 any other course of action?
19    A.   Anything else was done with counsel.
20    Q.   And when did that occur?
21    A.   In early October, I began having a lot
22 of discussions with Dan Dziemian related to
23 certain activities that had been happening at
24 OCC. So it would have been at about that time

Page 143

KARP

1 that we started our discussions.
2    Q.   Early October 2008?
3    A.   2008. Yes.
4    Q.   Can you remember anything else
5 relevant that anyone from Barclays said on this
6 issue?
7        MR. ROTHMAN: Objection to the form.
8    A.   No.
9    Q.   Would you agree that -- or is it your
10 understanding that Barclays acquired LBI's
11 business as a futures commission merchant?
12        MR. ROTHMAN: Objection to the form.
13    A.   My understanding is that they acquired
14 the customer business.
15    Q.   What's the distinction you're drawing?
16    A.   That LBI had its own proprietary
17 positions that were not, would not be part of
18 the customer business.
19    Q.   And in connection with that, with
20 respect to the customers, did Barclays acquire
21 LBI's futures customers accounts?
22    A.   That's my understanding.
23    Q.   Who is Jeff Margolin?
24    A.   He is an attorney at Hughes Hubbard

Page 144

KARP

1    Q.   And John Manley?
2        MR. ROTHMAN: Objection, asked and
3 answered.
4        MR. THOMAS: I asked that?
5        MR. ROTHMAN: About three times
6 already.
7    Q.   Who is John Manley?
8    A.   He is a -- he was a partner at
9 Deloitte. He is now retired.
10    Q.   Veronica Lawry?
11    A.   She is a member of our team.
12    Q.   At Deloitte?
13    A.   At Deloitte.
14        MR. THOMAS: Let me go ahead and show
15 you a document we will mark as 573.
16        (Exhibit 573, privilege log marked for
17 identification, as of this date.)
18    Q.   Have you seen this document before?
19    A.   No.
20        MR. ROTHMAN: This is a privilege log
21 that I believe was prepared by Hughes
22 Hubbard.
23        MR. THOMAS: Right.
24        MR. ROTHMAN: So if you have questions

Page 145

KARP

1 about it, you should direct it to Hughes
2 Hubbard, not a witness.
3        MR. THOMAS: I am going use it to ask
4 some questions. If you want to instruct not
5 to answer based on privilege, you can. But
6 I'm really just using it as a prop because
7 it has dates, it does have some pertinent
8 information on it.
9    Q.   There is a reference in the
10 description to the item 10, "Analysis of asset
11 purchase agreement." Do you see that?
12    A.   Yes.
13    Q.   Did Deloitte ever prepare analysis of
14 the asset purchase agreement?
15        MR. ROTHMAN: No, I am sorry, I
16 object. I'm not going to let her answer
17 questions about the -- try to delve into the
18 privilege log.
19        MR. THOMAS: I'm not delving into what
20 the document is.
21        MR. ROTHMAN: First of all, you have
22 already asked her if she read the APA,
23 Deloitte has read the APA. We have been
24 through this already. Now you are trying to

37 (Pages 142 to 145)

Page 146

KARP

1
2  do it in a way that I think is improper.
3       MR. THOMAS: It is simply asking --
4  the question was, did Deloitte ever prepare
5  an analysis of the asset purchase agreement.
6  That can't possibly be privileged. It is
7  certainly a legitimate question.
8       MR. ROTHMAN: You can go ahead and
9  answer.
10      A.  No.
11      MR. TECCE: Mr. Thomas, I don't mean
12  to interrupt you. There is a page attached
13  to the back of this that you may want.
14      MR. THOMAS: Let me go ahead and get
15  that back.
16      MR. ROTHMAN: We can rip that out.
17      Q.  There is an entry number 12, there is
18  a reference, again, Marlo Karp is you, who works
19  for Deloitte?
20      A.  Yes.
21      Q.  And Felicia Sokalski also works for
22  Deloitte?
23      A.  Yes.
24      Q.  There is a reference in the
25  description to Lehman balance sheet, e-mail and

Page 147

KARP

1
2  attachment regarding Lehman balance sheet.
3       A.  Yes.
4       Q.  Does this refresh your recollection as
5  to whether Deloitte had begun working on a
6  Lehman balance sheet as of or about
7  September 19, 2008?
8       MR. ROTHMAN: Objection to the form.
9       A.  We didn't do any work on the balance
10  sheet.
11      Q.  Deloitte never did work on the balance
12  sheet?
13      A.  Not -- we received a balance sheet as
14  part of this e-mail. We did not do any work on
15  it.
16      Q.  I am going to, correct me if I am
17  wrong, I assume the attached balance sheet would
18  not be privileged, so I am going to ask if you
19  recall what balance sheet that was?
20      MR. ROTHMAN: You can answer.
21      A.  It is a balance sheet that was
22  provided, I believe, by Weil Gotshal that showed
23  about 185 billion in assets.
24      Q.  So was this a balance sheet for LBHI
25  or LBI?

Page 148

KARP

1
2       A.  It was a balance sheet --
3       MR. ROTHMAN: Objection to the form.
4       A.  It was a balance sheet for LBI which
5  if I remember correctly basically was trying to
6  show what the result of the sale would do to the
7  financial position, the balance sheet of LBI.
8       Q.  Was that relevant to your work at this
9  time in any way?
10      MR. ROTHMAN: Objection to the form.
11      A.  No. We were asked to not perform any
12  work at that time until the customer account
13  transfers had been completed.
14      Q.  So when did you actually first start
15  doing work?
16      A.  Not until after September 26, 2008.
17      Q.  And again, I may have asked this
18  already, but your primary focus after
19  September 26, 2008, was what?
20      A.  Was to get the information on the
21  assets that were under the trustee's control.
22      Q.  Who is Todd Scarpino?
23      A.  He is a member of the Deloitte team.
24      Q.  I was going to ask you about one more
25  of these here. Item 22, dated September 25,

Page 149

KARP

1
2  that's an e-mail regarding trustee requests
3  relating to LBI positions and assets. Is that
4  the work that you are referring to when you say
5  you started your first -- your work was largely
6  focused on -- was related to LBI's assets and
7  positions?
8       MR. ROTHMAN: I am going to instruct
9  her not to answer on the grounds that it can
10  disclose the requests that were being made.
11      Q.  All right, you can put that document
12  aside. To come back to your earlier answer,
13  when you said, referred to working on LBI's
14  assets, the assets under the trustee's control,
15  would that include analysis of LBI positions at
16  the time?
17      A.  It would include every asset.
18      Q.  Let me go ahead and show you the
19  document we will mark as Exhibit 574.
20      (Exhibit 574, document Bates stamped
21  DT 264 through 266 marked for
22  identification, as of this date.)
23      Q.  Have you had a chance to review the
24  document?
25      A.  Yes.

38  (Pages 146 to 149)

Page 150

KARP

1
2     Q.   Do you recognize that as an e-mail you
3   received on October 9, 2008?
4     A.   Yes.
5     Q.   Can you describe the general subject
6   matter of the e-mail?
7     A.   Yes, we had had a meeting with DTC to
8   discuss the settlements that occurred the
9   Monday, Tuesday, Wednesday after bankruptcy. So
10  that's 22nd, 23rd and 24th. And there was a
11  number of 376 million in settlements and we had
12  asked for the details about those settlements
13  and this was in response to that.
14    Q.   Does this relate to any assets that
15  went over to Barclays?
16    A.   There were some of these assets that
17  went over to Barclays, yes.
18    Q.   And can you describe what kind of
19  bucket those assets fall into? Are any of these
20  clearing box assets?
21        MR. ROTHMAN: Objection to the form.
22    A.   I don't remember specifically what
23  these assets related to.
24    Q.   Was this part of your work to try to
25  make sure you understood what assets LBI still

Page 151

KARP

1
2   had?
3     A.   Yes.
4     Q.   Let me show you a document we will
5   mark as 575.
6         (Exhibit 575, document Bates stamped
7   DT 402 through 404 marked for
8   identification, as of this date.)
9     A.   OK.
10    Q.   Have you seen this document before?
11    A.   I don't think so.
12    Q.   This is an e-mail chain involving
13  Alvarez & Marsal and Deloitte, and Felicia, and
14  on the second page, there is a discussion
15  collateral and cash transfers on or about 9/19.
16  Do you see that?
17    A.   Yes.
18    Q.   Is this part of the same work effort
19  that you described previously or is this
20  something different? Do you know?
21    A.   I need to read it. I mean, this looks
22  like an agenda from Alvarez & Marsal as to what
23  they wanted to discuss. I don't know that --
24  what the result of that discussion was. I don't
25  know if I attended this meeting.

Page 152

KARP

1
2     Q.   Was there cooperation and coordination
3   in this time period, November of 2008, between
4   Alvarez & Marsal and Deloitte and/or the trustee
5   to your knowledge?
6         MR. ROTHMAN: Objection to the form.
7     A.   At that time, at that time, we
8   continued to work on our own efforts, we did not
9   continue to work with Alvarez & Marsal.
10    Q.   There is at least some exchange of
11  information?
12        MR. TECCE: Object to form.
13        MR. ROTHMAN: Same objection.
14    A.   I don't believe that we gave
15  information to Alvarez & Marsal. There was a
16  confidentiality agreement with JP Morgan Chase
17  that we had signed and I don't believe that we
18  could have given them the JP Morgan information.
19    Q.   In the Alvarez e-mail on the second
20  page, next to balance sheet, it says, "We wish
21  to review the carve-out balance sheet assumed by
22  Barclays and the remainder balance sheet of LBI
23  as of 9/19."
24        Do you see that?
25    A.   Yes.

Page 153

KARP

1
2     Q.   Do you understand it to be asking to
3   see the 9/19 LBI balance sheet that Deloitte has
4   been working on?
5         MR. ROTHMAN: Objection to form.
6     A.   Given the date, there would have been
7   no such balance sheet at that time that we would
8   have been working on or having been close to
9   completed if we had just started it.
10    Q.   Do you have any understanding what
11  have is being referred to here then?
12    A.   It could be the balance sheets
13  provided by Weil which showed the position as
14  of -- I don't remember if it was the 19th or the
15  18th and what the transaction was going to leave
16  it with.
17    Q.   Did you ever see that balance sheet?
18    A.   Yes.
19    Q.   And how did you -- when did you
20  receive that?
21    A.   I believe on the 19th of September of
22  '08.
23    Q.   And can you describe what it looked
24  like?
25    A.   I believe it showed total assets of

39  (Pages 150 to 153)

Page 154

KARP

1
2  185 billion total liabilities and capital of 185
3  billion and then it had a column of for what
4  was -- what had been sold to Barclays and then
5  what would be remaining.
6      Q.   What was the purpose of Deloitte being
7  provided with that on the 19th of September,
8  provided by LBHI?
9          MR. ROTHMAN:  I'm not sure the
10 testimony is that they got it directly from
11 LBHI.
12     Q.   Well, --
13         MR. ROTHMAN:  Why don't you clarify
14 that first.
15         MR. THOMAS:  Sure.
16     Q.   How did you -- do you know how you got
17 the Weil balance sheet?
18     A.   The document referred to on the log, I
19 got it from Felicia.
20     Q.   Do you know how Felicia got it?
21     A.   I believe she got it from counsel,
22 trustee's counsel, but I don't know for sure.
23     Q.   Let me show you a document we will
24 mark as 576.
25         (Exhibit 576, document Bates stamped

Page 155

KARP

1
2  DT 396 through 398 marked for
3  identification, as of this date.)
4      Q.   Before I do that, just putting aside
5  how you got it, do you have any understanding
6  why it was provided to Deloitte on -- in
7  September?
8          MR. ROTHMAN:  It is a yes or no
9  question.
10     A.   State it again.
11     Q.   Do you have any understanding of why
12 that document was provided to Deloitte in
13 September?
14     A.   Yes.
15     Q.   Why?
16         MR. ROTHMAN:  To the extent that the
17 answer to that one would reveal
18 attorney/client communications, I am going
19 to instruct you not to answer.
20     A.   I can't answer.
21     Q.   This is Exhibit 576.  This is an
22 e-mail chain dated December 3, 2008 involving
23 some individuals from Barclays and Lehman and
24 Hughes Hubbard and Deloitte.  And I don't see
25 your name on it, but I want to ask you about a

Page 156

KARP

1
2  sentence in the middle of the page where it says
3  we certainly understand and respect Barclays'
4  rights to certain 3-3 funds under the APA."
5          Do you see that sentence?
6      A.   Yes.
7      Q.   Do you have an understanding of what
8  certain 3-3 funds is referring to?
9          MR. ROTHMAN:  Objection to the form.
10     A.   Based upon the subject line, my
11 conclusion would be that it's the customer
12 reserve formula funds that were deposited.
13     Q.   Is that the same as the 15c3-3?
14     A.   Yes.
15     Q.   Did you understand Barclays, as part
16 of the sales transaction was entitled to certain
17 15c3-3 funds or equivalent securities?
18     A.   I understood that Barclays was
19 claiming it, not that they were necessarily
20 entitled to it.
21     Q.   Here it says, "We certainly understand
22 and respect Barclays' rights to certain 3-3
23 funds under the APA."  Is that consistent with
24 your understanding, this is written from
25 somebody from Hughes Hubbard.  Is it consistent

Page 157

KARP

1
2  with your understanding that Barclays was
3  entitled to certain 3-3 funds?
4          MR. ROTHMAN:  First of all, objection
5  to the form.  Second of all, the person
6  writing this e-mail is actually not from
7  Hughes Hubbard, although I recognize it is a
8  Hughes Hubbard e-mail address.
9          MR. THOMAS:  Let me follow up on that.
10         MR. ROTHMAN:  Marshal was part of the
11 trustee staff, but he is not a Hughes
12 Hubbard lawyer.
13     Q.   Did you have that understanding that
14 Barclays was entitled to certain C3-3 funds?
15         MR. ROTHMAN:  Objection to the form,
16 asked and answered.  And again I'll caution
17 you not to reveal discussions you may have
18 had with counsel about this.
19     A.   I don't know which question I'm
20 supposed to answer.
21         MR. ROTHMAN:  The one that Mr. Thomas
22 asked.
23     A.   I don't remember at this point.
24     Q.   Was it your understanding that
25 Barclays was entitled to certain 3-3 funds?

40  (Pages 154 to 157)

Page 158

KARP

1
2     MR. ROTHMAN: Same objection, same
3  caution to the witness.
4     A.  I understand that Barclays was
5  requesting it, not necessarily that they were
6  entitled to it.
7     Q.  Did you have any understanding as to
8  whether they were entitled to it?
9     A.  No.
10     Q.  Do you recall seeing the provision
11  relating to 15c3-3 in the clarification letter?
12     A.  I believe so.
13     MR. THOMAS: I am going to show you a
14  document we will mark as 577.
15     (Exhibit 577, document Bates stamped
16  DT 517 marked for identification, as of this
17  date.)
18     Q.  Do you recognize this as an e-mail
19  chain on which you were included on
20  December 18th and 19th of 2008?
21     A.  Yes.
22     Q.  And does this relate to the settlement
23  agreement that was ultimately reached involving
24  Barclays, JPM and other parties in December of
25  2008?

Page 159

KARP

1
2     A.  No.
3     Q.  What settlement agreement does this
4  refer to?
5     A.  I don't see where it refers to --
6     Q.  The re: line?
7     A.  Oh, sorry. It refers to JP Morgan's
8  claim against the LBI estate.
9     Q.  Was that claim eventually settled?
10     A.  No.
11     Q.  It is still going on now?
12     A.  Yes.
13     Q.  This may be a dumb question, has that
14  been filed?
15     A.  Has what been filed?
16     Q.  The claim?
17     A.  Yes.
18     Q.  Down below, it says, "Set forth below
19  is Marlo's summary of where we stand on the
20  close of business 9/19 data."
21        Do you see that?
22     A.  Yes.
23     Q.  And then again over to the next page,
24  is that your summary that's referred to on the
25  first page?

Page 160

KARP

1
2     A.  Yes.
3     Q.  You write, "We have some follow-ups
4  related to the Chase information that we have
5  received. It appears we have clear cash
6  balances as of 9/19. The one question that has
7  arisen based on the information provided is
8  related to the DDA account for 15c3-3."
9        Do you -- can you describe what the
10  issue is you're addressing here with respect to
11  15c3-3?
12     A.  JP Morgan had provided a listing of
13  the various bank account balances that LBI held
14  at JP Morgan. The account that they listed and
15  showed as 15c3-3 account showed a negative
16  balance and we had a question as to why that
17  was.
18     Q.  Did you get that resolved?
19     A.  We did, it had to do with journal
20  entries that had been posted incorrectly.
21     Q.  What was the correct balance?
22     MR. ROTHMAN:
23     MR. ROTHMAN: We go off the record
24  here?
25     MR. THOMAS: Sure.

Page 161

KARP

1
2     MR. ROTHMAN: My concern is this has
3  nothing to do with the Barclays issues and
4  has to do with a certain thing -- we might
5  have produced it by mistake.
6     THE VIDEOGRAPHER: The time is 2:46,
7  we are going off the record.
8     (Recess)
9     THE VIDEOGRAPHER: The time is 3:01,
10  we are back on the record.
11     Q.  Ms. Karp, I understand the document we
12  were reviewing is not related to the Lehman
13  Barclays sale transaction, is that correct?
14     A.  Yes.
15     MR. THOMAS: Let me go ahead and show
16  you a document we will mark as 578.
17     (Exhibit 578, document Bates stamped
18  DT 502 marked for identification, as of this
19  date.)
20     Q.  Do you recognize this as an e-mail to
21  you dated December 19, 2008?
22     A.  Yes.
23     Q.  And Vincent Tarantino is someone who
24  works for Deloitte?
25     A.  Yes.

41 (Pages 158 to 161)

Page 162

KARP

1
2    Q.   Does he work in your group?
3    A.   He was working for me on the project.
4    Q.   What project was that?
5    A.   The Lehman SIPC liquidation.
6    Q.   And when you complete the 9/19 balance
7    sheet, how will you use that document and for
8    what purposes?
9    A.   Which?  The clean file?
10   Q.   No, the balance sheet that's --
11   Deloitte has been working on?
12   A.   I don't know.  You would have to ask
13   the trustee.
14   Q.   OK.  You are preparing it for the
15   trustee?
16   A.   Yes.
17   Q.   Deloitte has been working on it for
18   over a year without any understanding of how it
19   is going to be used?
20        MR. ROTHMAN:  Objection to the form.
21   A.   Anything that we would know would have
22   been discussions between counsel.
23   Q.   This e-mail, it says, "During the past
24   hour, I have been attempting to conduct the
25   exercise we discussed during our 1:30 call."

Page 163

KARP

1
2        Do you see that?
3    A.   Yes.
4    Q.   Do you recall what exercise is being
5    referred to there?
6    A.   Yes, he is trying to compare the file
7    of securities that moved under the repo
8    agreement with Barclays to another file that JP
9    Morgan had given us.
10   Q.   What is the other file?  What
11   securities are in the other file?
12   A.   It is a file of all positions that LBI
13   held per JP Morgan's records.
14   Q.   What is the purpose of the comparison?
15   A.   If I remember correctly, there are two
16   different dates, but the purpose was to
17   understand which accounts at JP Morgan the
18   securities had been in, because there were many
19   different box -- different accounts, what they
20   call box locations for where the securities
21   could be at JP Morgan and it was a way for us to
22   understand where the -- each of the positions
23   that actually moved fit into those records.
24   Q.   When you say the securities that had
25   moved from JP Morgan to Barclays, are you

Page 164

KARP

1
2    referring to those moved as part of the
3    settlement agreement or back in September?
4    A.   Back in September as part of the repo
5    transaction.
6    Q.   And I'm sorry, I just didn't follow
7    the answer.  The reason for looking at the list
8    of securities that moved back in September was
9    what again?
10   A.   We were comparing it to what he refers
11   to as the POS-ALL, P-O-S-A-L-L, file which that
12   is attached which is a listing of all securities
13   that JP Morgan held on behalf of LBI with the
14   box or account designation of where and he was
15   comparing that to the securities that moved so
16   we could update and reconcile the books and
17   records of LBI.
18   Q.   OK.
19        MR. ROTHMAN:  Just so the record is
20   clear, the file is not actually attached to
21   the exhibit.
22        MR. THOMAS:  Let me go ahead and mark
23   this separately and ask you if it is the
24   attachment to the prior document.
25        MR. ROTHMAN:  Off the record.

Page 165

KARP

1
2        (Discussion held off the record.)
3    Q.   Let's go lack on the record.  So as
4    part of this exercise, it was an attempt just to
5    clarify what securities had gone over to
6    Barclays or confirm that as opposed to any
7    attempt to evaluate those securities?
8    A.   It was an attempt to understand where
9    those securities were located for JP Morgan's
10   books and make sure that the same corresponds
11   entry was done on the books of LBI for those
12   same locations.  It was more the reconciliation
13   between what happened at JP Morgan versus what
14   happened on LBI's records.
15        And as you can see, it is transcribed
16   from a text file.  It was not a file that was
17   usable for us to do comparisons and he has
18   questions on, when he converted the file, he was
19   having issues in trying to use that data.
20        MR. THOMAS:  Well, thank you, I don't
21   think I have any further questions?
22        MR. ROTHMAN:  I don't have any
23   questions.
24        MR. HINE:  No questions here.
25        MR. TECCE:  No questions.

42 (Pages 162 to 165)

Page 166

KARP

1
2      THE VIDEOGRAPHER: The time is 3:10,
3    we are going off the record.
4
5
_____
MARLO KARP
6
7    Subscribed and sworn to
8    before me this    day
9    of January, 2010.
10
11
_____
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 167

KARP
INDEX:

1
2
3    WITNESS       EXAM BY:        PAGE:
4    M. Karp       Mr. Thomas        6
5
6               EXHIBITS
7    Exhibit No.                Marked
8    Exhibit 566 document Bates stamped DT 303    11
9      to 356
10   Exhibit 567 letter dated 9/20/2008        12
11   Exhibit 568 document Bates stamped DT 495    41
12   Exhibit 569 document Bates stamped DT 280    45
13     through 285
14   Exhibit 570 document Bates stamped DT 276    52
15     through 278 with attachment
16   Exhibit 571 document Bates stamped DT 506    98
17     with attachment
18   Exhibit 572 subpoena              103
19   Exhibit 573 privilege log           144
20   Exhibit 574 document Bates stamped DT 264    149
21     through 266
22   Exhibit 575 document Bates stamped DT 402    151
23     through 404
24
25

Page 168

KARP
EXHIBITS

1
2
3    Exhibit No.                Marked
4    Exhibit 576 document Bates stamped DT 396    155
5      through 398
6    Exhibit 577 document Bates stamped DT 517    158
7    Exhibit 578 document Bates stamped  DT 502   161
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 169

KARP

1
2
3               CERTIFICATE
4    STATE OF NEW YORK )
5                )ss:
6    COUNTY OF NEW YORK)
7        I, MARY F. BOWMAN, a Registered
8    Professional Reporter, Certified Realtime
9    Reporter, and Notary Public within and for
10   the State of New York, do hereby certify:
11       That MARLO KARP, the witness whose
12   deposition is hereinbefore set forth, was
13   duly sworn by me and that such deposition is
14   a true record of the testimony given by such
15   witness.
16       I further certify that I am not
17   related to any of the parties to this action
18   by blood or marriage and that I am in no way
19   interested in the outcome of this matter.
20       In witness whereof, I have hereunto
21   set my hand this 20th day of January, 2010.
22
23
_____
MARY F. BOWMAN, RPR, CRR
24
25

43 (Pages 166 to 169)

```
                                      Page 170
 1              KARP
 2          * * *ERRATA SHEET* * *
 3   NAME OF CASE:  In Re:  Lehman Brothers
 4   DATE OF DEPOSITION: 1/20/10
 5   NAME OF WITNESS:  Marlo Karp
 6   Reason codes:
 7      1. To clarify the record.
        2. To conform to the facts.
 8      3. To correct transcription errors.
 9   Page ____ Line ____ Reason____
     From _____ to_____
10
11   Page ____ Line ____ Reason____
     From _____ to_____
12
13   Page ____ Line ____ Reason____
     From _____ to_____
14
15   Page ____ Line ____ Reason____
     From _____ to_____
16
17   Page ____ Line ____ Reason____
     From _____ to_____
18
19   Page ____ Line ____ Reason____
     From _____ to_____
20
21   Page ____ Line ____ Reason____
     From _____ to_____
22
23
24      _____
            MARLO KARP
25
```

44 (Page 170)

# BCI EXHIBIT

# 73

Page 1

1

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4     ------------------------------x
      In Re:                    Chapter 11
5     LEHMAN BROTHERS           Case No. 08-13555 (JMP)
      HOLDINGS, INC., et al.,   (Jointly Administered)
6     ------------------------------)

7

8        * * * HIGHLY CONFIDENTIAL * * *

9         DEPOSITION OF MIKE KEEGAN

10          New York, New York

11         Friday, August 28, 2009

12

13

14

15

16

17

18

19

20    Reported by:

      FRANCIS X. FREDERICK, CSR, RPR, RMR
21    JOB NO. 24379

22

23

24

25

Page 2

```
 1
 2
 3
 4                August 28, 2009
 5                8:46 a.m.
 6
 7
 8
 9        HIGHLY CONFIDENTIAL deposition of
10   MIKE KEEGAN, held at the offices of
11   Jones Day, 222 East 41st Street, New
12   York, New York, pursuant to Notice,
13   before Francis X. Frederick, a Certified
14   Shorthand Reporter, Registered Merit
15   Reporter and Notary Public of the States
16   of New York and New Jersey.
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S :
 3
 4   JONES DAY, LLP
 5   Attorneys for Lehman Brothers, Inc.
 6       222 East 41st Street
 7       New York, New York  10017-6702
 8   BY:  JAYANT W. TAMBE, ESQ.
 9        TERRY McMAHON, ESQ.
10
11   BOIES SCHILLER & FLEXNER, LLP
12   Attorneys for Barclays Capital
13       575 Lexington Avenue - 7th Floor
14       New York, New York  10022
15   BY:  JACK G. STERN, ESQ.
16
17   HUGHES, HUBBARD & REED, LLP
18   Attorneys for the SIPA Trustee
19       1175 I Street, N.W.
20       Washington, D.C.  20006-2401
21   BY:  JOHN F. WOOD, ESQ.
22        FARA TABATABAI, ESQ.
23
24
25
```

Page 4

```
 1
 2   A P P E A R A N C E S :  (Cont'd.)
 3   JENNER & BLOCK, LLC
 4   Attorneys for the Examiner
 5       330 N. Wabash Avenue
 6       Chicago, Illinois  60611-7603
 7   BY:  DAVID C. LAYDEN, ESQ.
 8
 9   QUINN, EMANUEL, URQUHART, OLIVER &
10   HEDGES, LLP
11   Attorneys for the Creditors Committee
12       51 Madison Avenue - 22nd Floor
13       New York, New York  10010
14   BY:  ROBERT K. DAKIS, ESQ.
15
16
17   ALSO PRESENT:
18       RAJESH ANKALKOTI, Alvarez & Marsal
19
20
21
22
23
24
25
```

Page 5

```
 1        M. KEEGAN - HIGHLY CONFIDENTIAL
 2   M I K E   K E E G A N,  called as a witness,
 3      having been duly sworn by a Notary
 4      Public, was examined and testified as
 5      follows:
 6   EXAMINATION BY
 7   MR. TAMBE:
 8      Q.  Good morning, Mr. Keegan.  We've
 9   met a few minutes ago.  My name is Jay Tambe
10   and I'm one of the lawyers at Jones Day.  We
11   are counsel -- special counsel to the Lehman
12   Brothers Holdings estate.  With me is my
13   colleague, Terry McMahon.  I'll have the other
14   lawyers who are sitting at the table introduce
15   themselves.
16      MR. WOOD:  I'm John Wood from
17   Hughes Hubbard & Reed and we represent
18   the SIPA Trustee.
19      MS. TABATABAI:  Fara Tabatabai
20   also with Hughes Hubbard & Reed.
21      THE WITNESS:  Excuse me.  I didn't
22   hear that.
23      MS. TABATABAI:  Fara Tabatabai
24   from Hughes Hubbard & Reed.
25      MR. DAKIS:  Robert Dakis from
```

Page 6

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2     Quinn, Emanuel, Urquhart, Oliver &
3     Hedges for the Official Committee of
4     Unsecured Committee.
5         MR. LAYDEN:  Good morning.  David
6     Layden from Jenner & Block for the
7     Examiner.
8     BY MR. TAMBE:
9     Q.   Mr. Keegan, by whom are you
10    employed currently?
11    A.    Barclays Bank, PLC.
12    Q.   And how long have you been
13    employed by Barclays Bank, PLC?
14    A.    I've been an employee of Barclays
15    since July of 1996.  But during that time
16    period, because of overseas assignments and
17    things like that, I've been employed by a
18    number of various entities within Barclays.
19    Q.   Starting in July of 1996 to the
20    present, if you could just give us a broad
21    overview of what your positions have been and
22    what your duties have been at Barclays.
23    A.    Sure.  In July of '96 I actually
24    joined BZW which was the investment bank
25    subsidiary of Barclays Bank located in London.

Page 7

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2     I joined in London as a chief operating
3     officer of the markets division of BZW
4     reporting to Bob Diamond.
5         I did that job for two years until
6     the formation of Barclays Capital in January
7     of 1997 -- sorry.  January of 1999.  And I was
8     the C -- sorry.  It was January of '97.  Sorry
9     about that.  So it was 18 months as COO.  Then
10    I was -- became the first CFO of Barclays
11    Capital when Barclays Capital was formed.  I
12    did that job until November of 1999 and then I
13    returned to New York at that point in time as
14    the chief administrative officer for the
15    Barclays Capital operations in the US.  I did
16    that until 2001 when I became the chief
17    operating officer for Barclays Capital's
18    credit trading and investment banking
19    businesses.  And that was the position I had
20    until I guess November '07.  And at that point
21    became head of principal credit trading which
22    is the job I currently have.
23    Q.   Just focusing on your current job
24    and your prior job, so starting in 2001
25    through the present, starting sometime in 2001

Page 8

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2     it sounds like you were head of credit
3     trading?
4     A.    No.  Chief operating officer which
5     in Barclays Capital it's different things to
6     different people.  All right?  So I worked for
7     an individual named Grant Kavalheim.
8     Q.   How do you spell that last name?
9     A.    It's K-A-V-A-H -- let me write it
10    out.
11        MR. STERN:  We can look it up.
12    Q.   Grant was the first name?
13    A.    Yeah.  Grant.
14    Q.   All right.
15    A.    K-A-V-A-L-H-E-I-M.
16    Q.   Okay.
17    A.    So Grant was head of trading and
18    investment banking.  I was his COO and as his
19    COO, yeah, I had a bunch of different duties
20    in charge of planning, budgeting, execution of
21    any strategic plans that we wanted to
22    implement.  I took on responsibility for
23    managing a number of businesses for him which
24    included our -- initially a business called
25    risk finance which was a credit arbitrage

Page 9

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2     trading business.  Then I took on
3     responsibilities for managing our loan
4     portfolio which is the portions of the loans
5     that we would make to clients that we would
6     retain on our balance sheet, managing that.
7     Took on responsibility for our distressed
8     proprietary trading business.  And, finally,
9     more recently, our real estate business.
10    Q.   And if I understand the change in
11    the nature of your duties starting in November
12    2007, you specified that date as the date at
13    which you became head of prime credit trading?
14    A.    No.  Principle credit trading.
15    Q.   Principle.
16    A.    So Grant departed the firm.  All
17    of the trading businesses rolled up to Jerry
18    del Missier.  Jerry del Missier had another
19    individual by the name of Justin Bull who was
20    his chief operating officer.  So basically my
21    chief operating officer duties for credit went
22    away and I was left with what was my trading
23    and risk management supervisory
24    responsibilities.
25    Q.   Okay.

Page 10

M. KEEGAN - HIGHLY CONFIDENTIAL
1
2    A.    And l was renamed as head of
3  principle credit trading.
4    Q.    So starting with November 2007
5  through to the present if you could describe
6  who you directly reported to.
7    A.    November 2000?
8    Q.    Seven.
9    A.    Seven?
10    Q.    Yeah.
11    A.    As of November 2007 until today l
12  directly report to Jerry del Missier.
13    Q.    And who are the folks who directly
14  report to you, if any?
15    A.    Today it's Fred Orlan. It is an
16  individual named Rene Canezen. It's an
17  individual named Matt Barrett. An individual
18  named Haejin Baek. And I'm pretty sure
19  that's -- I'm trying to think. That's it
20  right now the way we're organized.
21    Q.    Okay. When we were earlier
22  talking about some of the work you did when
23  you were working with Grant you'd mentioned
24  managing loan portfolios, distressed
25  proprietary trading, et cetera.

Page 11

M. KEEGAN - HIGHLY CONFIDENTIAL
1
2    Do you still do all those --
3  manage all those types of trading?
4    A.    Yes.
5    Q.    So that's included within
6  principle credit trading.
7    A.    Yeah. What principle credit is is
8  any risk that we are taking as a firm in the
9  credit space in a non-market-making capacity
10  is supposed to roll up into principle credit.
11  It doesn't but...
12    Q.    Other than the duties you have
13  with respect to the principle credit trading
14  business in the past twelve months have you
15  been involved in any strategic initiatives
16  by -- taken on behalf of Barclays?
17    A.    I was involved in the Lehman
18  acquisition, yes.
19    Q.    And other than the Lehman
20  acquisition, have you been involved in any
21  other strategic initiatives, acquisitions,
22  dispositions, things of that nature?
23    A.    Nothing major.
24    Q.    Broad terms, if you could just
25  describe your involvement in the Lehman

Page 12

M. KEEGAN - HIGHLY CONFIDENTIAL
1
2  transaction.
3    MR. STERN: Jay, if it helps, I
4  have a September 2008 monthly calendar,
5  you know, just to keep the days of the
6  week in mind. I just put that up here
7  in front of Mr. Keegan.
8    MR. TAMBE: That's perfectly fine.
9    A.    So my role I guess began Friday
10  the 12th. And was one of the people who was
11  brought in to examine portions of Lehman's
12  balance sheet and operations in preparation
13  for a bid to buy Lehman Brothers from what
14  looked like it was going to be the -- in fact,
15  the government at that point in time.
16    Q.    And over the course of that next
17  week, starting on the 12th going forward say
18  ten days until the 22nd of September, if you
19  could give us a little bit more detail in
20  terms of what tasks you were doing in
21  connection with the Lehman transaction.
22    A.    Sure. I had responsibility
23  specifically for looking at the commercial
24  real estate portfolio, their loan portfolios,
25  their private equity investments, and their

Page 13

M. KEEGAN - HIGHLY CONFIDENTIAL
1
2  corporate credit/debt positions.
3    And, you know, that process took
4  basically, you know, the weekend through -- I
5  don't know -- 3:00 or 4:00 on Sunday when it
6  was determined that the trade wasn't going to
7  happen.
8    Q.    After that Sunday -- the Sunday
9  you're referring to is the 14th of September,
10  correct?
11    A.    I believe it was, yes.
12    Q.    After Sunday, the 14th, did you
13  have any further involvement?
14    A.    Yes, I did.
15    Q.    Okay.
16    A.    On Monday, the 15th, somewhere
17  around 10, 10:30, 11:00 I got a phone call to
18  show up to the conference room at Lehman
19  Brothers' offices on the 32nd floor and to
20  await instruction.
21    Q.    And did some instructions arrive?
22    A.    They did. I believe it was -- I'm
23  not sure if it was actually but I believe it
24  was Richard came in and told us that we had an
25  opportunity to buy the US operations of Lehman

Page 14

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2  Brothers I guess prior to bankruptcy
3  because -- at least with respect to the
4  broker/dealer. The broker/dealer was not
5  filed on that Monday morning.
6      Q.   And so after you were told about
7  that opportunity what involvement did you have
8  in those efforts to purchase Lehman's
9  operations?
10     A.   So I was asked to take a look at,
11 you know, the potential assets that we were
12 buying within the categories that I explained
13 to you before. And it did not include any
14 commercial real estate because our board told
15 us we weren't eligible to take over any
16 commercial real estate. It did not include
17 any private equity investments because during
18 the work we did over the weekend we determined
19 that the private equity investments were not
20 something that we wanted to take.
21     It did not include any of the loan
22 portfolios, should not have included any of
23 the loan portfolios, because that was another
24 asset category we determined we did not want
25 to take.

Page 15

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2      So it basically came down to,
3  within my world, what I looked at, was the
4  corporate debt securities that were on the
5  books of the broker/dealer for the most part.
6      Q.   And just to be clear on what you
7  mean by corporate debt securities, what do you
8  mean by that?
9      A.   Commercial paper, bonds, credit
10 link notes. Any other, you know, security
11 instruments that they might have housed in
12 broker/dealer that, you know, involved
13 corporate credit risk.
14     Q.   And for this asset class,
15 corporate debt securities, would you typically
16 be provided with a list of CUSIP numbers,
17 identifiers for the securities that were held
18 by the broker/dealer?
19     MR. STERN: I'm just going to
20     object to the form. Are you asking him
21     if he was? It says would you typically
22     have been.
23     Q.   That's fine. I could restate the
24 question. Are you provided with CUSIP numbers
25 out of the debt securities held by the

Page 16

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2  broker/dealer?
3      A.   Over the weekend we were. And
4  then on Monday I'm not sure that we were given
5  a complete list again but we were shown -- it
6  was indicated what was on the books of the
7  broker/dealer and I guess we had a list
8  because I had determined whether we looked at
9  it or not -- or didn't look at it over the
10 weekend. That was the first step. You know,
11 had we seen it before. We should have.
12     And then for particular areas
13 where we identified over the weekend as being
14 problematic with respect to value or other
15 concerns, yes, we were given a CUSIP -- we
16 asked for and were given a CUSIP list.
17     So Lehman obviously hadn't planned
18 on going bankrupt and they were totally
19 unprepared for the whole process on Monday so
20 it was a struggle to get any information quite
21 frankly.
22     Q.   And throughout that week, the week
23 of the 15th of September, was the focus of
24 your efforts limited to analyzing the
25 corporate debt securities aspect of the

Page 17

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2  portfolio or did you do other things as well?
3      A.   It was primarily that. I also was
4  more or less coordinating the communication
5  internally between other individuals that had
6  responsibility for various parts of the
7  portfolio -- of Lehman's portfolio and
8  analyzing it. And our team just -- and
9  that's -- no one said, Mike, you're -- you
10 know, you're in charge. Just that I'm more
11 senior than the other guys. So I know -- I
12 know Rich. I know Archie Cox. People like
13 that.
14     I worked on the -- securing -- we
15 were going to make a DIP loan to Lehman for
16 the week and looking at the collateral
17 associated with the DIP loan and how much --
18 what collateral might be available for the DIP
19 loan and how much we might be willing to
20 provide. That was principally it.
21     Q.   And the loan that you're referring
22 to as the DIP loan was that, in fact, extended
23 by Barclays to Lehman?
24     A.   It was.
25     Q.   And in what amount?

Page 18

M. KEEGAN - HIGHLY CONFIDENTIAL

1       A.   I think it was $500 million. I'm
2  not positive what credit finance determined.
3  The collateral was Newburger Berman property.
4       Q.   And just to be clear, this DIP
5  loan is different than the tri-party repo or
6  any other repo --
7       A.   Absolutely, yeah.
8       Q.   You said you were -- you played a
9  coordinating role to some extent during that
10  week. You mentioned two names. I believe you
11  mentioned Rich Ricci. I think you mentioned
12  Rich but that was Rich Ricci?
13      A.   That's Rich Ricci, yes.
14      Q.   And Archie Cox, right?
15      A.   Yes.
16      Q.   Who else were you coordinating
17  with during that week?
18      A.   Jonathan Hughes, our legal
19  counsel. A few conversations with Patrick
20  Clackson.
21      Q.   And who is Mr. Clackson?
22      A.   He's the chief financial officer
23  of Barclays.
24      Q.   Were you involved at all in

Page 19

M. KEEGAN - HIGHLY CONFIDENTIAL

1  negotiating --
2       MR. STERN:  Excuse me. Excuse
3  me. I don't know if you -- if you
4  completed your answer.
5       King.
6       THE WITNESS:  Oh, the guys I was
7  coordinating with. Sorry. I thought
8  you were looking upward, not downward.
9       MR. STERN:  It's a gen -- just to
10  clarify, it's a general question about
11  all the people he was coordinating with.
12  Not just the more senior people.
13      MR. TAMBE:  That's fine.
14      Q.   Let's go through the list of
15  everyone you were coordinating with. You got
16  to Mr. Clackson. Mr. King.
17      A.   Right. So Stephen King was
18  responsible for looking at all of the ABS and
19  mortgage -- residential mortgage assets with
20  Lehman Brothers. Similar role to what I had
21  on the credit side. John Mahon took that
22  responsibility for, I guess you would call
23  them the rates, assets, government bonds
24  principally. Anything that they might have

Page 20

M. KEEGAN - HIGHLY CONFIDENTIAL

1  done with repo would have rolled up to him.
2  The exposures, if any, on derivative
3  contracts.
4       Q.   Anyone else in this coordination
5  circle that you --
6       A.   That was pretty much it. There
7  was other people that -- like I said, I was
8  not in the coordination but I was working with
9  our guys in credit on the DIP loan. A guy
10  named Mark Manski and Ian Prior on that. I
11  had conversations with James Walker. James
12  was controller of the US. Another lawyer
13  named Jason White. Jason was working on the
14  DIP loan. And Gerard LaRocco I guess as well.
15  And Gerard was working on putting a repo
16  facility in place.
17      Q.   Anyone else?
18      A.   Not that I -- not that I remember.
19  I'm not saying there wasn't. I just don't
20  remember.
21      Q.   Were you part of the group of
22  people from Barclays that was negotiating the
23  terms of the transaction with the folks from
24  Lehman?

Page 21

M. KEEGAN - HIGHLY CONFIDENTIAL

1       A.   I wouldn't say I was negotiating
2  the terms of the transaction but I was
3  involved in -- you know, I was also involved
4  on Thursday.
5       Q.   And you say you were also involved
6  on Thursday. What do you mean by that?
7       A.   So we struck a deal on Monday in
8  effect as to what we were going to buy. And
9  then -- you know, so I worked from, you know,
10  at Lehman from whatever time, 10:30 in the
11  morning, 10:00 to roughly 2:30, 3:00 in the
12  morning, Tuesday morning. Went and got some
13  sleep. Tuesday was more worried about other
14  things in our world than I was worried about
15  anything in Lehman's world whose world was
16  melting down. And more focused on that
17  Tuesday and Wednesday.
18      And then Thursday afternoon I got
19  called in around 4:00 to come over again to
20  Lehman by Rich to start taking a look at the
21  inventories that were coming in related to,
22  you know, an effective settlement of the asset
23  purchase to make sure we were getting, you
24  know, what we bought and everything we bought.

Page 22

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    And Stephen was there as well and
3    John was back in UK at that point in time.
4        Q.   And the Stephen you're referring
5    to is Stephen King.
6        A.   Yes.
7        Q.   And the John you were referring to
8    is who?
9        A.   John Mahon.
10       Q.   Have you ever seen a copy of the
11   Asset Purchase Agreement between Lehman and
12   Barclays?
13       A.   Only in preparation for this.
14   Prior to that, no.
15       Q.   So it's fair to say the first time
16   you ever laid eyes on the Asset Purchase
17   Agreement was sometime in the past couple
18   weeks.
19       A.   Yeah. I saw a version of the
20   agreement early on. I was asked a specific
21   question which escapes me now why I was given
22   the agreement. But it was very -- it was
23   specific to, you know, is this worded
24   properly, yes or no. And I just don't
25   remember what it was.

Page 23

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2        Q.   And you say it was early on.
3    Would you put it during that week of the 15th?
4        A.   Yeah. During the week prior to
5    Thursday, I believe.
6        Q.   And the provision you were shown,
7    were you shown that provision in the signed
8    APA or an APA that was being drafted?
9        A.   I think it was a draft.
10       Q.   And who showed you that provision?
11       A.   I think it was the legal
12   department. It may have been the finance
13   department. I don't remember.
14       Q.   You don't down remember the
15   substance of the discussion.
16       A.   The substance was --
17           MR. STERN: If it was a discussion
18       with legal, don't talk about the
19       substance.
20           THE WITNESS: I don't remember who
21       it was with.
22       Q.   Okay. So what was the substance
23   of the discussion?
24           MR. TAMBE: He doesn't know if it
25       was with a lawyer.

Page 24

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2           MR. STERN: Well, since it may
3       have been with a lawyer I think I'll
4       instruct you not to answer because it
5       may have been a privileged conversation.
6           THE WITNESS: Okay.
7        A.   I don't know then.
8           MR. STERN: If you remember what
9       provision you discussed I think that's
10      fine.
11       A.   No, I don't. If you put some
12   documents in front of me I might remember but
13   right now I don't remember.
14       Q.   There's a document that's been
15   referred to as the clarification letter. Does
16   that term have any meaning to you?
17       A.   I'm not sure what that is.
18       Q.   Okay. Did you have any
19   understanding that there were features of the
20   transaction that changed over the course of
21   that week, the week of the 15th?
22       A.   Oh, yeah. Yes, I did.
23       Q.   And what's your understanding of
24   the features of the deal that changed over the
25   course of that week?

Page 25

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2        A.   All right. So Monday night when I
3    left we had come to a conclusion as to what we
4    would buy and what we wouldn't buy. There
5    were assets -- you know, we did have problems
6    with the valuations with a number of the
7    assets that Lehman had on the books. And
8    overall our conclusion from the weekend was
9    that Lehman was aggressive with the rest of
10   the valuations. And, you know, we went back
11   to them on Monday and told them that, you
12   know, we didn't agree with certain prices. We
13   also went back to them with the knowledge that
14   the market was melting down and that that deal
15   wasn't closing until the end of the week,
16   saying that, you know, we need to put a
17   haircut on these assets because the volume of
18   the assets plus the timing -- you know, we're
19   trying to predict what the assets of are going
20   to be worth on Thursday, Friday when the deal
21   closes. We know Lehman's employees have all
22   lost their jobs in effect as of right now and
23   they're not too focused on marketing the
24   inventory, et cetera.
25       So we had proposed some haircuts

Page 26

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    to them. It was assets that we thought were
3    materially -- you know, relative to those
4    assets themselves, materially mismarked and we
5    went back to Lehman on those and told them
6    where we thought the valuation of those assets
7    were. Some of those we agreed. Some of those
8    weren't agreed. And we told them to keep the
9    assets.
10           I've lost my focus on the
11   question. Could you just repeat the question?
12       Q.   The question was about what the
13   features of the deal that changed over the
14   course of the week.
15       A.   Okay. So that was the deal. So
16   we basically came to a definitive list of what
17   we said we would purchase in effect.
18       Q.   I just want to drill down a little
19   bit on a couple of things you said.
20           MR. STERN:  Just for
21   clarification, we've talked about the
22   status as of Monday and then you're
23   going to clarify that and then you'll go
24   to the changes.
25           MR. TAMBE:  Yeah.

Page 27

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2           MR. STERN:  Okay. That's fine.
3       Q.   You had some concerns about the
4    valuations of the assets on Monday, correct?
5    Lehman's valuations.
6       A.   Yeah.
7       Q.   And you went back to them and
8    proposed haircuts on these assets.
9       A.   Well, we proposed valuation
10   adjustments and haircuts, yes.
11       Q.   Do I gather from your answer that
12   on some of the haircuts or valuation
13   adjustments you proposed you reached agreement
14   with Lehman?
15       A.   On some of them, yeah.
16       Q.   And others you didn't?
17       A.   No. Other's they just thought we
18   were nuts.
19       Q.   On the ones where you reached an
20   agreement with Lehman as to the haircut or the
21   valuation adjustment, were those included then
22   in the list of assets that Barclays would be
23   purchasing?
24       A.   Yes.
25       Q.   And the ones that you did not

Page 28

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    reach an agreement with Lehman on on valuation
3    were those excluded from the list of assets?
4       A.   That's correct.
5           MR. STERN:  Let me just pause.
6    I'm sorry. For the reporter. There's a
7    question "And others you didn't." What
8    do you have as the answer?
9           (Discussion held off the record.)
10   BY MR. TAMBE:
11       Q.   In round numbers, for the
12   valuation adjustments or haircuts where you
13   did reach an agreement --
14       A.   I don't know.
15       Q.   $5 billion?
16       A.   No idea.
17       Q.   Have you ever heard about a
18   $5 billion adjustment or mark-down in the book
19   value of Lehman's assets around that period of
20   time?
21       A.   No. Again, only in preparation
22   for this deposition. But not otherwise.
23       Q.   When you said you proposed
24   haircuts or valuation adjustments to Lehman on
25   Monday, was there a document that had

Page 29

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    asset-by-asset proposed mark-downs?
3       A.   Yeah. There was a period -- there
4    was an asset -- there was asset-by-asset where
5    we thought we had problems with valuations.
6    But then there was also a summary where we
7    just said that, you know, we're talking so
8    much -- you know, we're taking on so much
9    inventory, the market is melting down, you
10   aren't getting your hands on it till Thursday.
11   You know, what do you need to protect yourself
12   between now and Thursday or Friday. So we can
13   manage the assets if the deal closes, right?
14           So that was the Monday night
15   process. And I have no idea what the number
16   actually added up to. We weren't targeting a
17   number or anything like that. We were just
18   saying based on this type of asset, based on
19   what's going on in the market, how much
20   protection do you think you need between then.
21       Q.   Just to get a better understanding
22   of your proposal that Barclays made, was it by
23   asset category or was it even more granular,
24   particular asset by asset?
25           MR. STERN:  Objection to the form.

Page 30

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2      Q.  Do you understand my question?
3      A.  Ask it again.  Or repeat it.
4      Q.  The question I'm asking --
5          MR. STERN:  I'm objecting to the
6      proposal term.
7          MR. TAMBE:  That's fine.
8      Q.  You proposed some haircuts or
9      valuation adjustments, right?
10     A.  Yeah.  By category we said we
11     think we need --
12     Q.  When I use the word proposal
13     that's what I'm talking about, okay?
14     A.  Okay.
15     Q.  That proposal.  Was it by asset
16     category or by specific asset?
17     A.  If we had a valuation adjustment
18     it was by asset.  And if we had a haircut it
19     was by category.
20     Q.  Do you recall any of the category
21     type haircuts that you proposed?
22     A.  The actual amount?
23     Q.  Yeah.
24     A.  No, I don't.  Off the top of my
25     head I don't know.  I'd have to look at the

Page 31

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2      documents.
3      Q.  But you believe there's a document
4      or documents from Monday which would contain
5      that information.
6      A.  There was a Monday -- there was a
7      document that contained that information on
8      the Monday, okay?  That deal didn't happen so
9      I have no idea if that still exists or doesn't
10     exist.
11     Q.  All right.  We got down this
12     discussion talking about how the deal changed
13     or how features of the deal changed during
14     that week.  That deal that was being discussed
15     on Monday, did that deal get done?
16     A.  So the deal on Monday, okay, in
17     the context of the bigger deal, I guess yes,
18     it got down.  But in the context of what I was
19     looking at, which was the purchase of the
20     inventory, that aspect of the deal didn't get
21     done, okay?
22         When I showed up on Thursday night
23     there was a -- I got there around 4:00.
24     Somewhere around there.  And I expected to
25     take a look at, you know, the settlement list

Page 32

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2      of what inventory we got and then just do a
3      simple comparison back to what we bought
4      Monday and say, Yeah, it's the same list.  It
5      wasn't the same list.  And, in fact, there was
6      a huge delay in us getting anything back, you
7      know.  We had wired out through JPMorgan money
8      and they were supposed to deliver us
9      securities and were having difficulties
10     delivering us securities for some reason.  So
11     there was a long delay.  Several hours.
12         And my recollection is around 8:00
13     at night, you know, we started getting stuff
14     in and looking at it.  We might have started
15     getting it a little bit earlier, around 7, but
16     we started looking at it.
17         But about 8:00 at night on
18     Thursday night we noticed that this wasn't the
19     inventory that we had agreed to purchase on
20     Monday.  It was different.  And it included a
21     lot of the inventory that we thought was
22     overvalued.  At least the initial deliveries
23     were a lot of what we thought was overvalued
24     in the mortgages area, mortgage agencies, that
25     we said we couldn't come to an agreement with

Page 33

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2      Lehman on valuation and we were leaving
3      behind.
4          So it was at that point I learned
5      for the first time that the agreement had
6      changed and apparently sometime on Tuesday the
7      Federal Reserve came in to us and said -- you
8      know, it's been relayed to me by third
9      parties, I have no idea what they actually
10     said -- but, in effect, what I've been told,
11     if you guys want the deal to go through you
12     need to take us out of our repo.  And so the
13     construct of the deal changed from a purchase
14     of inventory to taking an assignment of repo.
15     Q.  And who described that change in
16     the nature of the deal to you?
17     A.  Could have been Ian Lowitt from
18     the Lehman side.  It could have been Rich.  It
19     could have been Jonathan Hughes.  It could
20     have been -- I don't know.  I mean, I was kind
21     of stunned when I heard it.  But I don't
22     remember exactly who told me that.
23         I do know what I did after that is
24     I had a conversation with Ian Lowitt, and
25     said, "Ian, we're getting stuff we didn't

Page 34

M. KEEGAN - HIGHLY CONFIDENTIAL
1      want. You need to take it back and give us
2      the stuff we bought."
3          And he explained that he couldn't
4      do that because even though they hadn't filed
5      bankruptcy, the counterparties to the repo for
6      the securities company were grabbing
7      collateral and liquidating it on them. And
8      they didn't have the inventory we bought
9      anymore. They only had what was in repo at
10     the Fed.
11     Q.   Did you have any discussions with
12     Ian Lowitt or others about finding additional
13     inventory beyond the inventory that had been
14     identified on Monday?
15     A.   Yeah. Because we had value -- we
16     were getting, for instance, these mortgage
17     securities, agency mortgage securities. I
18     think the number, and I don't recall, Stephen
19     would know the exact number, but I think we
20     thought the adjustment should be as much as a
21     billion eight of new securities. And Lehman
22     did not agree with us. So those securities
23     were to be left behind. And then all of a
24     sudden they show up in our box. Our

Page 35

M. KEEGAN - HIGHLY CONFIDENTIAL
1      inventory. And so we knew they were marked
2      wrong. Or we believed they were marked wrong.
3          And, therefore, we were, you know,
4      short cushion or haircut, if you will, on the
5      repo. And, you know, that was a concern to us
6      because we had -- on Monday in effect
7      negotiated, you know, what we thought was a
8      cushion to protect us, and -- similar to a
9      haircut on repo. And on Thursday night we
10     were finding out that the actual repo haircuts
11     were in effect getting absorbed by the mismark
12     of Lehman securities.
13         So, yeah, we needed additional
14     collateral to protect us.
15     Q.   And did you have in mind a number
16     or target amount of that additional
17     collateral?
18     A.   I did not. I just -- I didn't --
19     I didn't -- you know, we didn't -- we knew,
20     for instance, the billion eight, but we didn't
21     know what else we got. And we were struggling
22     all night long to find out what we were
23     actually getting in terms of inventory,
24     because it came in dribs and drabs through the

Page 36

M. KEEGAN - HIGHLY CONFIDENTIAL
1      evening because of what we believed was
2      operational errors that JPMorgan made.
3          MR. STERN: Let me just pause for
4      one minute.
5          (Discussion held off the record.)
6      BY MR. TAMBE:
7      Q.   Did you discuss with anyone a
8      target number for the additional collateral
9      that Barclays was looking for after the
10     Thursday night transfer?
11     A.   No. I did not discuss a specific
12     number.
13     Q.   Did you discuss a range?
14     A.   No. What we were asked was -- the
15     question we were asked was how much your
16     haircut -- so -- we gave a number -- you know,
17     an amount of money to the Fed, in essence,
18     which was I think gross somewhere in the $45
19     million area. Okay? The Fed delivered the
20     securities that went through JPMorgan. I have
21     no idea if what we got was what came out of
22     the Fed and went to JPMorgan or how JPMorgan
23     determined what we got. All right? But we
24     got stuff from JPMorgan.

Page 37

M. KEEGAN - HIGHLY CONFIDENTIAL
1          We were trying to find out all
2      Thursday night, all Friday morning, what
3      securities we got, were getting, were likely
4      to get, what Lehman thought the value of those
5      securities were. Right? So we could know, we
6      could understand what the magnitude of the
7      repo haircut that we received was.
8          And Lehman wasn't able to provide
9      us that information. JPMorgan wasn't able to
10     provide us that information. And, you know,
11     we had some general idea but not specific idea
12     of what the haircut cushion was. And the
13     question we were being asked was I guess the
14     way the deal was structured initially there
15     was some liabilities we're assuming as well,
16     is there enough cushion to pay for those
17     liabilities. And we couldn't answer that
18     question.
19     Q.   Was it a feature of the
20     transaction as you understood it that the
21     cushion you had negotiated on Monday would be
22     sufficient to pay for the liabilities you were
23     assuming?
24     A.   No. Not on Monday night, no. I

Page 38

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2  had nothing to do -- I had no idea that there
3  were liabilities that we were assuming.
4    Q.   On Thursday was there a discussion
5  about ensuring that there would be enough of a
6  cushion to cover the liabilities that Barclays
7  was assuming?
8    MR. STERN: Objection to the form.
9    A.   Read the question.
10    (Record read.)
11    A.   No, there was not a specific
12  discussion that there was enough cushion for
13  the liabilities that we were assuming.
14    Q.   Was there a discussion of the size
15  of the cushion versus the amount of the
16  liabilities on Thursday night?
17    A.   Not versus the liability. I had
18  no idea what the liabilities were, okay? So I
19  did not have a view of that side of the
20  transaction.
21    MR. STERN: When you're asking was
22    there a discussion, Jay, are you asking
23    a discussion that he participated in or
24    are you asking about if he knows about
25    other discussions?

Page 39

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    MR. TAMBE: Either way.
3    MR. STERN: Because it's
4  misleading the way you're asking it.
5    MR. TAMBE: So you have an
6  objection to form?
7    MR. STERN: I'm just trying to
8  clarify what you mean when you asked was
9  there a discussion.
10  BY MR. TAMBE:
11    Q.   Were you involved in any such
12  discussions, sir?
13    A.   I was told at one point in time
14  that the problem we had because of the deal
15  changing with respect to other aspects outside
16  the inventory, okay, was that Lehman had no
17  way to pay for certain liabilities that we
18  were absorbing. I'm assuming -- and this is
19  an assumption because of the issue what
20  happened with the close-out of the repos by
21  their counterparties -- that somehow that
22  would -- those liabilities were being paid for
23  in the overall structure of the deal and now
24  there was a hole in the deal.
25    And so how you plug that hole was

Page 40

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2  the question. And what we were asked was how
3  much do we think we have in haircut that could
4  plug that hole. And the difficulty that we
5  had is we didn't know how much we had in
6  haircut because we didn't have reliable
7  valuations on what we were getting. We did
8  know we were getting inventory that we had
9  valuation problems with and we had -- on those
10  items we had a relative understanding of how
11  much that was and how much shortfall you had
12  and therefore how much "haircut" would be
13  being absorbed by just valuation errors on
14  Lehman's part.
15    And then how much -- you know,
16  what do you think is kind of left over and
17  that's the question we were trying to answer
18  all day. All night.
19    Q.   Okay. And this effort of trying
20  to identify that question -- trying to answer
21  that question, did that effort continue into
22  the next day, the Friday?
23    A.   Yeah. It continued into Friday.
24    Q.   And did it continue after Friday?
25    A.   I'm not aware that it continued

Page 41

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2  after Friday. But what did continue after
3  Friday was the process of understanding
4  exactly what we did get and marking it
5  appropriately.
6    Q.   Now, for the collateral that was
7  transferred over on Thursday you did at some
8  point receive a valuation report from Bank of
9  New York for that collateral, correct?
10    MR. STERN: Objection to the form.
11    A.   We received an indication what
12  they thought the value might be.
13    Q.   And when did you receive that
14  indication?
15    A.   My recollection is that was Friday
16  morning because we still hadn't been able to
17  get the information out of JPMorgan and we
18  still hadn't been able to get the information
19  from Lehman Brothers. And we were pretty
20  desperate to try to understand where we were
21  at that point in time.
22    Q.   And do you recall the value that
23  Bank of New York but on the collateral?
24    A.   There was several different runs.
25  There was one that was above 50. There was

Page 42

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2    one that was 47. There was -- there were
3    several different runs.
4            You know, the Bank of America
5    numbers --
6      Q.   You mean the Bank of York numbers.
7      A.   Bank of New York. Sorry. Bank of
8    New York, correct.
9            You can't put that much reliance
10   on them or we couldn't put that much reliance
11   on them because they're not the agent for
12   Lehman. They don't have Lehman's marks. They
13   wouldn't know securities necessarily that
14   don't trade and aren't actively quoted. They
15   wouldn't have reliable, accurate marks on
16   those.
17     Q.   If they're not the agent for
18   Lehman whose agent were they?
19     A.   They're our agent. They were
20   seeing this stuff for the first time.
21     Q.   Did you ever make it down to the
22   courthouse for any of hearings about this
23   matter?
24     A.   No.
25     Q.   Did you ever talk to anyone who

Page 43

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2    was down at the courthouse about the
3    courthouse hearings?
4      A.   Yeah, I did.
5      Q.   Who did you speak with?
6      A.   I spoke with Michael Klein at one
7    point asking him how it went. I think I spoke
8    with -- I'm drawing a blank on the guy's name.
9    It was our restructuring guy. Dan Shapiro.
10         MR. STERN: Mark Shapiro?
11         THE WITNESS: Mark Shapiro. I'm
12   sorry.
13     Q.   Do you recall anything that Mr.
14   Klein and Mr. Shapiro told you about the
15   courtroom proceedings?
16     A.   I was -- after the fact I was
17   interested in knowing, you know, what
18   happened. And, you know, is the judge going
19   to approve the deal or not approve the deal.
20   How did it go. And it was more along those
21   lines.
22         I guess during the -- while they
23   were in the courtroom I got asked the question
24   pretty late at night from Mark -- I think he
25   sent an e-mail out that he was trying to get a

Page 44

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2    question answered. I answered that question.
3      Q.   Do you recall what the question
4    was?
5      A.   The question as I read it were did
6    we take any assets from JPMorgan out of the
7    tri-party repo. And, you know, I don't know
8    if you know what the tri-party repo was or not
9    but --
10     Q.   When you refer to the tri-party
11   repo what are you referring to?
12     A.   So, again, on the Monday night one
13   of the things that was going on in addition to
14   the asset purchase is JPMorgan came back to us
15   and said, Listen, you guys are buying these
16   guys. If you're buying some of the inventory
17   can you help us out, all right, and take some
18   of the repo of the securities you're buying
19   and provide -- take some of the load off of
20   them because everybody was strapped for cash
21   after this -- strapped for cash after the
22   bankruptcy.
23         And so they wanted to know if we
24   could provide any repo for what we were
25   buying. And so we agreed to buy -- to provide

Page 45

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2    5 billion of repo of the inventory that we
3    agreed to buy on Monday night.
4            For some reason unknown to me
5    again that proved to be about 15 billion by
6    Thursday. And it contained securities that we
7    did not purchase or agree to purchase on
8    Monday night.
9            So the first thing I was asked
10   when I got to Lehman on Monday -- on Thursday
11   night, sorry, not Monday -- Thursday night,
12   was for -- Jerry del Missier called me up and
13   said take a look at the repo with JPMorgan and
14   tell me whether we should roll this or not.
15         And I got the list of collateral
16   that was in repo and there was a $5 billion
17   security. I have no idea what it was but I
18   know we didn't purchase any $5 billion
19   notional amount of security. So I advised
20   Jerry this is not what we agreed on Monday
21   night. It was not what we purchased. And,
22   you know, my recommendation would be not to
23   roll a repo with JPMorgan.
24         So Archie sent an e-mail out. I
25   guess he was trying to get a question

Page 46

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2  answered. I forget who he said he contacted
3  but he tried to get several people who didn't
4  respond who might have better information than
5  I had.
6        But I read the question as did we
7  take any of that -- did we buy any of the
8  inventory from JPMorgan's tri-party repo and
9  we did not. The only inventory that I knew
10  that we bought from a repo was the Fed repo.
11      Q.   The $5 billion security you just
12  referred to, was tbat the Racers --
13      A.   Yeah. Ultimately later we found
14  out it was the Racers, yes.
15      Q.   And your testimony is that
16  $5 billion security was part of the 15 billion
17  tri-party repo.
18      A.   It was.
19      Q.   And because you did not choose to
20  roll tbat repo you ended up not buying tbe
21  securities that were securing that repo; is
22  that correct?
23        MR. STERN:  Objection to the form.
24        Can you re-read the question,
25  please?

Page 47

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2        (Record read.)
3      A.   That repo wasn't secured by
4  securities, first of all. That security was
5  not secured by securities, right?
6      Q.   I'm trying to understand the
7  connection between the $5 billion Racers and
8  the tri-party repo.
9      A.   It was in the tri-party repo. So
10  they posted collateral to us that was
11  ineligible collateral, okay?
12      Q.   Was any of the otber collateral
13  tbat was posted with respect to tbe
14  $15.8 billion tri-party repo purchased by
15  Barclays?
16      A.   Not to my knowledge, but I have no
17  idea.
18        MR. STERN:  At some point can we
19  take a short break when you're ready?
20        MR. TAMBE:  That's fine.  We can
21  break now.
22        MR. STERN:  All right.  A short
23  break.
24        (Recess taken.)
25        (Deposition Exhibit 294A, document

Page 48

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2  bearing production number
3  BCI-EX-(S)-00035155, marked for
4  identification as of this date.)
5  BY MR. TAMBE:
6      Q.   Sir, I've placed before you a
7  document marked Exhibit 294A. Take a moment
8  the look at it. Let me know when you're done.
9        (Document review.)
10      A.   Okay.
11      Q.   At the bottom of the first page,
12  the Exhibit 294A, you see an e-mail there from
13  Mike Mazzei to you.
14        Do you see that?
15      A.   Correct.
16      Q.   Who was the Mike Mazzei?
17      A.   He was co-head of the commercial
18  real estate -- the US commercial real estate
19  business.
20      Q.   And you'll see there's an e-mail
21  dated September 8th?
22      A.   Correct.
23      Q.   There's a reference in his e-mail
24  to you about Lehman and 10:00 a.m. tomorrow
25  morning.

Page 49

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2        Do you see that?
3      A.   Yes.
4      Q.   Do you recall having meetings
5  about Lehman or with Lehman during the week of
6  September 8th?
7      A.   No, during the week of September
8  8th I was actually in London the first part of
9  that week. I don't remember exactly if I went
10  Monday or if I went Monday night. But I
11  believe this meeting was about Archstone.
12  Lehman, Barclays, and BofA were the
13  co-financiers of Archstone.
14      Q.   And what is or was Archstone?
15      A.   Archstone was the -- was a REIT,
16  residential real estate REIT, that was
17  purchased by Tishman and Lehman and financed
18  on a bridge loan at this point in time by
19  Barclays, BofA, and Lehman.
20        (Deposition Exhibit 295A, document
21  bearing production number
22  BCI-EX-(S)-00035143, marked for
23  identification as of this date.)
24  BY MR. TAMBE:
25      Q.   Sir, I've placed before you a

Page 50

M. KEEGAN - HIGHLY CONFIDENTIAL

1   one-page document marked Exhibit 295A. Take a
2   moment to look at that and let me know when
3   you're done.
4       (Document review.)
5     A.  Okay.
6     Q.  This is an exchange of it would
7   seem to me between yourself and Mike Mazzei
8   and the subject lines reads ASN/Lehman.
9       Do you see that?
10    A.  Yes.
11    Q.  And is ASN a reference to
12  Archstone?
13    A.  Yeah.  Archstone Smith is the full
14  name of the --
15    Q.  And what does the N stand for?
16    A.  I don't know.  You got me.
17    Q.  How big of a transaction -- how
18  large of a transaction was Archstone Smith?
19    A.  It was big.  $16 billion I think.
20    Q.  What happened to that transaction?
21    A.  The first mortgages on the
22  properties were sold to Fannie Mae and Freddie
23  Mac.  Eight and a half billion dollars in
24  financing.  And there's permanent mortgages on

Page 51

M. KEEGAN - HIGHLY CONFIDENTIAL

1  it now.  And the balance of the financing was
2  provided by 500 million of equity provided by
3  Tishman and Lehman Brothers.  Bridge equity of
4  another 3 and a half billion I believe
5  provided by Lehman Brothers, BofA, and
6  Barclays.  And another 4 to 5 billion in debt
7  financing provided by Lehman, Barclays and
8  BofA.
9       The debt financing and the bridge
10  loans are -- remain on our balance sheets with
11  respect to banks I believe.  And in the estate
12  of Lehman Brothers.  Lehman's estate, whatever
13  you want to call it, owns 50 percent of the
14  debt, 50 percent of the bridge loan.  And BofA
15  and Barclays own 25 percent each.
16       What this meeting was about, by
17  the way, just to put it in context for you,
18  Tishman was trying to take Lehman's financial
19  conditions and were trying to get some
20  amendments to the financing that were
21  favorable to the equity.  And BofA kind of
22  wanted to play ball.  Lehman wanted to take
23  the hard line and say, you know, screw that,
24  right?  And that's what my question was to

Page 52

M. KEEGAN - HIGHLY CONFIDENTIAL

1  Mike.  Where's BofA at this point in time.
2  Are they still willing to provide amounts.
3       (Deposition Exhibit 296A, document
4  bearing production number
5  BCI-EX-(S)-00035440, marked for
6  identification as of this date.)
7  BY MR. TAMBE:
8    Q.  Sir, I've handed you a one-page
9  document marked Exhibit 296A. Take a moment
10  to review that and let me know when you're
11  done.
12       (Document review.)
13    A.  Okay.
14    Q.  This is an e-mail exchange between
15  yourself and Rick Van --
16    A.  Van Zijl.
17    Q.  Van Zijl?
18    A.  Yes.
19    Q.  Who is Rick Van Zijl?
20    A.  Rick Van Zijl ran the leveraged
21  finance business for Barclays Capital in the
22  US.  He was co-head.
23    Q.  And you recognize this as an
24  e-mail in connection with the work you did

Page 53

M. KEEGAN - HIGHLY CONFIDENTIAL

1  that weekend, the weekend of the 13th and
2  14th.
3    A.  Yeah.  His guys were actually
4  looking at the valuation of the leverage loans
5  that were on Lehman's books.
6    Q.  In your e-mail to Rick at the top
7  of the page you state that "Our strategy is
8  going to be that we will leave behind all
9  commercial RE, and all the private equity
10  investments other than the investments in the
11  Lehman fund investments."
12       Do you see that?
13    A.  Yep.
14    Q.  Was it the case that at that point
15  on Saturday, the 13th of September, the
16  decision had already been made not to purchase
17  the commercial real estate and private equity
18  investment assets?
19    A.  Yeah.  Well, we were told by our
20  board that the only way that we could proceed
21  with the bid was under the condition that we
22  wouldn't take any of the commercial real
23  estate.
24       And with respect to the private

Page 54

M. KEEGAN - HIGHLY CONFIDENTIAL
1
2 equity investments Lehman just had a
3 phenomenal -- you know, for a broker/dealer,
4 phenomenal amount of this stuff on their
5 balance sheet. And we had no -- you know,
6 their capital -- we're on a different capital
7 regime than they are. So for us private
8 equity investments and capital reduction, I
9 don't know how -- I don't know where they
10 housed them or how they got around it on their
11 end.
12       But, you know, we couldn't -- we
13 couldn't have -- we didn't have the capital to
14 take these into our balance sheet so we
15 couldn't take them. It didn't matter what the
16 values were.
17       And the same with the loans.
18 That's what Rick is inquiring -- he's asking
19 about the loans and basically it was the same
20 thing. We just made the decision we didn't
21 want to take the loans because they were
22 capital consumptive as well.
23       Q.    And the loans that you're
24 referring to are --
25       A.    The leverage loans.

Page 55

M. KEEGAN - HIGHLY CONFIDENTIAL
1
2       Q.    Okay.
3            (Deposition Exhibit 297A, document
4       bearing production numbers
5       BCI-EX-(S)-00035441 through
6       BCI-EX-(S)-00035442, marked for
7       identification as of this date.)
8 BY MR. TAMBE:
9       Q.    Sir, I've handed you a two-page
10 document marked 297A. Take a moment to review
11 that document and let me know when you're
12 done.
13            (Document review.)
14       A.    Okay.
15       Q.    Do you see Exhibit 297A is an
16 e-mail exchange starting with the bottom
17 e-mail on page 1 that goes over on to page 2.
18 It's from someone called Jason Moynihan.
19       Do you see that?
20       A.    Yep.
21       Q.    Who is Jason Moynihan?
22       A.    Jason was our loan trader who
23 worked for Rich Van Zijl.
24       Q.    And there appears in this e-mail
25 from Jason to be some sort of analysis of

Page 56

M. KEEGAN - HIGHLY CONFIDENTIAL
1
2 Lehman's leveraged loan portfolio, correct?
3       A.    Correct.
4       Q.    If Barclays was not going to be
5 purchasing the leveraged loan portfolio, for
6 what purpose was this analysis being done?
7       A.    We didn't conclude that we weren't
8 buying the loans right away. And we didn't
9 know what the Fed would let us do and wouldn't
10 let us do. So we looked at everything. We
11 looked at the private equity investments. We
12 looked at the real estate, even though we were
13 told we couldn't take it by our board because
14 we didn't know the context of any deal that
15 might be out there what it would take at the
16 time.
17            (Deposition Exhibit 298A, document
18       bearing production number
19       BCI-EX-(S)-00035491 with attachment,
20       marked for identification as of this
21       date.)
22            (Document review.)
23       A.    Okay.
24       Q.    Is Exhibit 298A an analysis that
25 was done off Lehman's private equity

Page 57

M. KEEGAN - HIGHLY CONFIDENTIAL
1
2 positions?
3       A.    Of a portion of the private equity
4 positions, yes.
5       Q.    And by looking at this document,
6 can you tell what portion of the private
7 equity positions were being valued here?
8       A.    I would need everything to know.
9 I would need everything to know. I don't -- I
10 don't really know.
11       Q.    How do you know it's just a
12 portion of Lehman's private equity positions?
13       A.    Because they had a bunch of other
14 investments in other businesses outside of
15 this. They had a number of things they call
16 private equity which weren't private equity.
17 They were failed deals that they cut. Failed
18 syndications, failed -- you make a loan,
19 you're supposed to sell it. You take down the
20 bond, you're supposed to sell it. They didn't
21 sell it. Mispriced. Or misgauged the
22 appetite in the marketplace for it.
23       In order to get their balance
24 sheet down what they did is they took it, cut
25 it into an A note and a B note, sold off the A

Page 58

M. KEEGAN - HIGHLY CONFIDENTIAL

1  note, took the B note and put it on the books,
2  typically put it on close to par and didn't
3  mark it. And called it private equity. It
4  wasn't.
5      Q.   The subject line of the cover
6  e-mail refers to something called Hercules
7  Templates For Principal Investments.
8      Do you see that?
9      A.   Yeah. I didn't pay much attention
10 to that. I don't know what that means.
11     Q.   Is there a particular model or a
12 spreadsheet within Barclays that's referred to
13 as the Hercules template?
14     A.   I don't know. I didn't pay
15 attention to the title.
16     Q.   The form of the spreadsheet, is
17 that a form of spreadsheet that was used by
18 your group in valuing the Lehman positions?
19     A.   I would imagine it was. At least
20 the first page.
21     Q.   At the top of the left-hand corner
22 of the first page of the spreadsheet, so it's
23 the second page of the exhibit, it says at the
24 top there Project Hercules, top left.

Page 59

M. KEEGAN - HIGHLY CONFIDENTIAL

1      A.   Yeah.
2      Q.   Was that the reference to the
3  Lehman transaction?
4      A.   I didn't know it by that name but
5  it may have been that name. I didn't focus on
6  that.
7      Q.   Was there any project name that
8  you knew the Lehman transaction by?
9      A.   No, because I didn't get involved
10 until that weekend. That Friday night. I
11 mean, it was already in the press that Lehman
12 wasn't going to make it through the weekend.
13 And the likely bidders were BofA and Barclays.
14     Q.   Did you know if the Lehman
15 transaction was Project Long Island at any
16 point?
17     A.   It might have been. I have no
18 idea. I said I'm not concerned with project
19 names.
20     Q.   If you turn to the third page of
21 the exhibit, the second page of the
22 spreadsheet.
23     A.   (Witness complies.)
24     Q.   And just drawing your attention to

Page 60

M. KEEGAN - HIGHLY CONFIDENTIAL

1  the two right-hand side columns. One titled
2  BarCap Valuation and the other titled ADJ
3  Value.
4      Do you see those?
5      A.   Adjusted value, yeah.
6      Q.   And at least on that third page of
7  the exhibit in the BarCap valuation there's 10
8  percent number that appears down the entire
9  column.
10     A.   Yep.
11     Q.   Is this page of the spreadsheet an
12 example of the type of category-wide
13 adjustment that was proposed by Barclays that
14 you testified about before?
15     A.   Yeah, I don't think so.
16     Q.   What is this?
17     A.   Again, this is private equity
18 investments which we didn't take and we didn't
19 come anywhere near close to completing our
20 analysis over the weekend of the private
21 equity investments. And we started looking at
22 them and a guy named Brent Humphries was
23 responsible for it. He had a team of people
24 working for him. But every one of these on

Page 61

M. KEEGAN - HIGHLY CONFIDENTIAL

1  this page is a company. Some that you
2  recognize like TXU. A big company. Everybody
3  knows who TXU is. Some of these like SkyPower
4  I haven't the slightest idea who they are.
5      And so in order to value these
6  things you had to go through and do a
7  fundamental analysis of the company to find
8  out what these may or may not be worth. I
9  really don't know what the 10 percent stood
10 for at the time because 10 percent for each of
11 these names doesn't make a whole lot of sense,
12 right?
13     Like, for instance, TXU, you know,
14 when we looked at it in detail, you see 316
15 million of notional. Lehman wrote that up to
16 411. All right? The bonds that were senior
17 to this were trading at a discount in the
18 market at that point in time. Like 70. So
19 how do you write something up that's private
20 equity and the bonds are junior?
21     So a 10 percent haircut for this
22 would not have been sufficient so the first
23 thing you had to do on that was wipe out that
24 markup. Bawag says plug. That's what it was.

Page 62

M. KEEGAN - HIGHLY CONFIDENTIAL
1 It was a plug journal history. Debit cash --
2 or sorry. Debit investment in Bawag. Credit
3 income. I had a conversation with Jerry
4 Reilly, the controller. "Jerry, what's the
5 support for this entry?"
6      And I was told it came down from
7 upstairs. So, you know, no further
8 explanation. He wasn't able to provide any
9 further explanation.
10      So what this did tell us is that
11 when I told -- when I said earlier that Lehman
12 was very aggressive with their marks, you
13 know, this put us on notice that we had to be
14 careful.
15      Q.   And with respect to this asset
16 class, the private equity asset class, you
17 just left that off the table entirely.
18      A.   We left it off the table entirely.
19 Well -- yeah, we left it off the table. Yeah,
20 we left it off the table entirely. Initially
21 on the Saturday/Sunday deal it was -- we were
22 leaving behind this. We were leaving behind
23 the commercial paper -- sorry, the commercial
24 real estate. And that was going to have to be

Page 63

M. KEEGAN - HIGHLY CONFIDENTIAL
1 financed by the Fed and -- you know, if any
2 deal was going to go ahead from our point of
3 view. And the Fed was trying to put together
4 a syndicate of banks to finance this stuff.
5      Q.   And that effort never got off the
6 ground; is that right?
7      A.   Well, it didn't got -- I don't
8 know if it got off the ground. I think it did
9 get off the ground actually but it didn't come
10 to pass so...
11      Q.   What do you mean by it didn't come
12 to pass?
13      A.   Well, in the end, the deal didn't
14 happen.
15      (Deposition Exhibit 299A, document
16 bearing production numbers
17 BCI-EX-(S)-00035619 through
18 BCI-EX-(S)-00035620, marked for
19 identification as of this date.)
20 BY MR. TAMBE:
21      Q.   Sir, I've handed you a two-page
22 document marked Exhibit 299A. Take a minute
23 to review it and let me know when you're done.
24      (Document review.)

Page 64

M. KEEGAN - HIGHLY CONFIDENTIAL
1      A.   Okay.
2      Q.   In this two-page document,
3 Exhibit 299A, it's an exchange of e-mail
4 between yourself, Mike Mazzei, and Haejin
5 Baek.
6      Do you see that?
7      A.   Yes.
8      Q.   And there's references to KeepCo
9 in some of these e-mails. What's that a
10 reference to?
11      A.   Yeah. That's Mike's term for the
12 assets we're leaving behind.
13      Q.   So -- and this is over the weekend
14 of the 13th and 14th, correct?
15      A.   Yes.
16      Q.   And so is what you are
17 contemplating or discussing a good bank/bad
18 bank setup?
19      A.   In effect, yeah. The stuff that
20 we would not -- that Barclays, if we had done
21 this purchase from the government, stuff we
22 would leave behind and not take.
23      Q.   If you go all the way to the back
24 of this e-mail chain, so page 2 --

Page 65

M. KEEGAN - HIGHLY CONFIDENTIAL
1      A.   That's the beginning actually.
2      Q.   That's the beginning. Right.
3      This is the Mike Mazzei e-mail to
4 you where he states the letter U, HJ and I --
5      A.   Should be on the board of the
6 legacy --
7      Q.   -- should be on the board of the
8 legacy Lehman as we will be all common.
9      Do you see that?
10      A.   Yeah.
11      Q.   And what did you understand that
12 to mean?
13      A.   So the structure for KeepCo, all
14 right, and financing these assets that came up
15 with was we would contribute value first loss
16 of an amount, 3 billion, okay? The Fed was
17 going to come in then I think -- sorry.
18 Correct me. The preferred was going to be
19 used -- the preferred was going to be used
20 to -- so everything below the preferred debt
21 that Lehman had on their books, preferred
22 down, would be -- stay behind, okay?
23      Then we were the next 3 billion.
24 Barclays money. And the Fed was going to come

Page 66

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2    in I think for 8 up to I think a total of at
3    that point like 21 billion, round numbers. 20
4    billion, 21 billion.
5          And then the Fed was trying to get
6    ten firms to put in an equal amount including
7    us and senior financing for these assets to
8    come up to the total of $64 billion which was
9    the total of the book value of the assets,
10   Lehman's book value of the assets we said we
11   were leaving behind.
12         And that -- but when the Fed went
13   out and talked to the other firms, they only
14   got to a total of 55. So we were 9 short. So
15   then I was asked to go back and see, okay, go
16   through the private equity investments, is
17   there any of the private equity investments
18   that we would take to close that gap.
19         And all Mike is saying our 3
20   billion was actually common so we should be on
21   the board, how these things get managed,
22   because we're at risk.
23   **Q.   The 3 billion that Barclays --**
24   **under this proposal the 3 billion that**
25   **Barclays was putting in, is that the price**

Page 67

1    **M. KEEGAN - HIGHLY CONFIDENTIAL**
2    **that Barclays was paying to purchase the**
3    **assets that it did want to purchase out of**
4    **Lehman?**
5    **A.   No.  Over the weekend there was --**
6    no, it wasn't what we were purchasing, but if
7    you were purchasing the entire company, right,
8    the accounting you get is different than when
9    you're buying assets.
10        So Lehman had so much book value
11   and if you weren't, you know, using it all up
12   in markdowns and write-downs and losses but we
13   weren't paying book value, theoretically there
14   was a gain there, right?  And you attribute
15   that gain which this 3 billion was to -- as --
16   you know, to this deal.  And that's what that
17   was referring to.
18   **Q.   So the $3 billion was -- I mean,**
19   **if I understand your answer, the accounting**
20   **gain from the sale of the assets that Barclays**
21   **would purchase, that would be contributed to**
22   **the legacy KeepCo.**
23   **A.   When you were buying the stock of**
24   Lehman, the entire stock, and you took the
25   assets and marked them to fair value and the

Page 68

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2    liabilities and marked them to fair value, how
3    much equity was left over in that number.  And
4    then how much were you actually going to pay
5    for that equity which wasn't a big number.  I
6    don't know what it was.  It was a dollar
7    probably.
8          So to the extent if we were paying
9    the government a dollar and when you valued
10   the left side and the right sided there was
11   still something left, that would be an
12   accounting gain that we were going to book as
13   goodwill.
14         So then we could take -- if we had
15   a gain, we could take 3 billion of actual
16   cash, put into it KeepCo, and it's real cash
17   but it -- and it's real loss to us
18   theoretically, but it would be offset by the
19   gain on the -- it would have been offset by
20   the gain on the acquisition of Lehman as a
21   whole company.
22         (Deposition Exhibit 300A, document
23   bearing production number
24   BCI-EX-(S)-00036005, marked for
25   identification as of this date.)

Page 69

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2    BY MR. TAMBE:
3    **Q.   Sir I've handed you a one-page**
4    **document marked 300A.  Take a moment to review**
5    **it and let me know when you're ready.**
6          (Document review.)
7    A.   Okay.
8    **Q.   Now, Exhibit 300A is an e-mail**
9    **from Mike Mazzei to you written late Sunday**
10   **night, early Monday morning, September**
11   **14th/15th, correct?**
12   A.   Um-hum.
13   **Q.   Yes?**
14   A.   Yes.  Well, GMT so it's not that
15   late.  This is Greenwich meantime.  It's 8:30
16   in the morning writing this.
17   **Q.   Okay.  I'm not so sure on the time**
18   **conversion, but it's roughly that time period.**
19   A.   Yeah.  It's like 8:30 in the
20   morning.
21        Sorry.  It's not --
22        MR. STERN:  In other words, five
23   hours earlier in New York.
24   **Q.   It's actually earlier.  It goes**
25   **the other way.  Not adding on five hours.**

## Page 70

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    Subtracting five hours from GMT, right?
3        A.   No, no.
4            Three in the morning. So, yeah.
5    Sorry. Yeah. I don't know why his e-mail is
6    in GMT. I have no idea. But, yeah, he's --
7    yeah, that would have added five hours. So
8    it's 10:00 -- you're right. It's 10:00 on
9    Sunday night. 10:30 on Sunday night.
10       Q.   In his e-mail he makes reference
11   to I guess Lehman people walking out of the
12   Lehman building. It's being carried on the TV
13   coverage.
14           Do you see that?
15       A.   Yeah.
16       Q.   At this point, late Sunday night,
17   early Monday morning, the transaction that you
18   were contemplating and working on on the 13th
19   and 14th, that transaction was not going to go
20   forward, correct?
21       A.   That's correct.
22       Q.   Was there ever a contemplation
23   that you would hire the former Lehman
24   employees without buying any of the assets of
25   Lehman?

## Page 71

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2        A.   I did suggest that actually. So
3    on Monday -- it wasn't over the weekend that
4    we did that, right? So over the weekend, no,
5    the answer to your question. But on Monday,
6    right, when I was going through the assets
7    that were in Lehman's broker/dealer and what
8    other entities we might be buying or assets we
9    might be buying, one of the people I talked to
10   was Eric Felder. I was specifically talking
11   to him about -- one of the things was that I
12   recall talking to him about was auction rate
13   securities and there was a bunch of Lehman
14   commercial paper and notes that were in his
15   inventory as well which I talked to him about
16   which obviously weren't -- you know, weren't
17   marked correctly at that point in time after
18   the bankruptcy.
19           There were some credit link notes
20   that Lehman was the payor on that they
21   obviously wouldn't be able to pay going
22   forward. So those were the kind of topics I
23   was talking to him about. And, you know, how
24   should we look at the value of these things,
25   right? Because it's like Lehman is bankrupt

## Page 72

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    now and Lehman is the payor on these things
3    and, you know, they can't possibly be worth
4    what you paid for them which is what they're
5    marked at.
6            And in the context of that
7    discussion we got onto the auction rate
8    securities and the auction rate securities I
9    suggested that we didn't want to take them
10   because of all the noise around auction rate
11   securities and the whole remarketing and how
12   we would do that if we were to take them, et
13   cetera.
14           And he said to me something to the
15   effect, Well, I didn't realize that you
16   couldn't take them, that we could leave stuff
17   behind. I said, Yeah, this is going to be an
18   asset purchase. It's not going to be the
19   purchase of a company. So we can leave
20   whatever we want behind.
21           And he suggested then you should
22   leave it all behind. You shouldn't take
23   anything. And I was kind of curious. He
24   said, Do you realize what's going on out
25   there, and then actually that Monday morning I

## Page 73

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    didn't because we went over it -- you know,
3    Sunday night the transaction and, you know, we
4    ended it pretty depressed. Monday I came
5    in -- what I was really focused on Monday was
6    what's our exposure to Lehman. You know, what
7    swaps are going away. You know, that's what I
8    was focused open. I wasn't focused on what
9    was happening in the market.
10           So he said, "Do you realize what's
11   happening in the market?"
12           And I said, "No, I've been locked
13   up in your office all day. I don't have
14   access to anything. I have no idea what's
15   going on."
16           He said, "The whole world is
17   melting down out there."
18           He said, "So you guys are nuts if
19   you take anything. If you could leave it all
20   behind you should leave it all behind."
21           And actually when you sat back and
22   thought about it that seemed like a brilliant
23   idea.
24           So our first proposal to our
25   management when they said, Okay, you know,

## Page 74

M. KEEGAN - HIGHLY CONFIDENTIAL

what are you guys comfortable buying, was --
we said nothing. Just leave it all here.
Just take the people.

And that didn't happen though,
obviously. We were told to go back and try
again. Actually, we were instructed to take
everything that we could take because the
concern over whether -- you know, what you'd
be leaving Lehman with without people to
manage the inventory and leaving all of that
inventory on their balance sheet in markets
that were, you know, falling apart.

Q.   Was there also discussion that
some of Lehman's inventory was worth
purchasing at the right price?

A.   I don't recall if there was or
not. I mean, that wasn't the instruction.
The instruction was in effect if you want the
deal to go through you got to try to take
everything you can because if you leave too
much behind and you leave -- and you leave --
and no people to manage it, that will never
get approved.

Q.   And who did you have that

## Page 75

M. KEEGAN - HIGHLY CONFIDENTIAL

discussion with about whether all should be
left behind or none should be left behind?

MR. STERN:   Let me just pause here
because I think we're blurring over into
privileged conversations but I think you
can answer. You can answer that
question and then we'll take it a
question at a time.

A.   It was our bankruptcy counsel
basically.

Q.   Your in-house bankruptcy counsel?

A.   No, no. Our outside advisors plus
Archie Cox.

Q.   Who was your external bankruptcy
counsel at that time?

MR. STERN:   You can answer that if
you remember.

A.   I think it's Cleary but I could be
wrong.

Q.   You were in discussions with
Cleary?

A.   They were in the room when I --
when we came in and suggested that we take
nothing.

## Page 76

M. KEEGAN - HIGHLY CONFIDENTIAL

Q.   Who else was in the room when you
came in and suggested --

A.   Archie Cox.

Q.   And who else from Barclays?

A.   That was it.

Q.   So it was you, Archie Cox, and
someone from Cleary?

A.   Two people from Cleary, yeah.

Q.   Do you remember who the people
were from Cleary?

A.   Well, actually, Michael Klein
might have been in the room. I can't say for
certain, but he might have been in the room.
I can't say -- no, I can't say for certain.
You know, I don't know. It was a woman and a
guy.

Q.   Lindsay Grandfield?

A.   I don't remember the name.

Q.   And do you recall when that
meeting was?

A.   It was about 6:30, 7:00 on Monday
night.

(Deposition Exhibit 301A, document
bearing production numbers

## Page 77

M. KEEGAN - HIGHLY CONFIDENTIAL

BCI-EX-(S)-00082251, marked for
identification as of this date.)

BY MR. TAMBE:

Q.   Sir, I've handed you a one-page
document marked 301A. Take a moment to look
at it and let me know when you're done.

(Document review.)

A.   Okay.

Q.   When you'll see this is an
exchange of e-mails between Rich Ricci, Robert
LeBlanc, and Patrick Clackson.

Do you see that?

A.   Yep.

Q.   Who is Robert LeBlanc?

A.   Rob LeBlanc is head of group risk
at Barclays PLC.

Q.   And you see there's a reference in
the first e-mail at the bottom of the chain to
the assets that would be included.

Do you see that?

A.   Yeah. "Please could you let me
know who I can speak to later today to broadly
understand the assets that would be included.
Thanks."

Page 78

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2      Q.   And then at the top of the
3  document, Rich Ricci's e-mail states, "Looks
4  like roughly $50 billion."
5      Do you see that?
6      A.   Yep.
7      Q.   Was it your understanding that the
8  assets that would be included in the purchase
9  as of Monday, September 15th, were roughly
10 $50 billion?
11     A.   We were paying -- I don't know how
12 he knows that necessarily, right?  We were
13 paying 45 billion for assets that were under
14 repo at the Fed, right?  So, you know, repo
15 lending basically is secured lending.  And a
16 percentage of the value of the assets is
17 typically advanced, not a hundred cents on the
18 dollar but a percentage.
19     That difference between the
20 advance amount and the asset market value --
21 or mark is probably a better term -- is the
22 haircut or cushion that the financier requires
23 in order to protect themselves in the event
24 they need to liquidate the inventory.
25     MR. STERN: Can you reread the

Page 79

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2  question, please, Francis.
3      (Record read.)
4      A.   I didn't know what they were.  So
5  that's a better answer.  I didn't know what
6  they were necessarily.
7      Q.   Did you understand the reference
8  in Rich Ricci's e-mail of 50 billion to be the
9  value of the assets to be included in the
10 purchase?
11     A.   No.  What I was actually trying to
12 explain to you was if we were paying 40 -- I
13 don't know what they were exactly, but if we
14 were paying 45 billion to take the Fed out of
15 its repo, plus some haircut on top of that to
16 get to 50 billion, I'm not surprised.  But I
17 don't know for a fact one way or the other
18 what they were.  That's the information we
19 were trying to get from Lehman and couldn't
20 get.
21     (Deposition Exhibit 302A, document
22 bearing production number
23 BCI-EX-00054270 with attached
24 spreadsheet, marked for identification
25 as of this date.)

Page 80

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2      A.   I just noticed that this is
3  actually a Monday e-mail.  So it's 4:03
4  Monday.
5      Q.   Yeah.
6      A.   So this was the first deal, right?
7  And everything I said to you was -- on the
8  repo had to do with Thursday's deal, not
9  Monday's deal.  So that was an error on my
10 part giving you that answer.  I thought this
11 was Thursday's deal.  Okay?  So --
12     MR. STERN: The "this" you're
13 referring to is Exhibit 301A?
14     THE WITNESS: Yes.  301A.
15     Q.   So let's go back to now you're
16 focused on the fact that it's Monday's deal.
17 What's the 50 billion that Rich Ricci is
18 talking about?
19     A.   I don't know.  At that point in
20 time I don't know.  Because at that point in
21 time we were still going through -- I mean, we
22 were still going through the assets, and I
23 probably didn't have my conversation with
24 Felder until about 3:00 on Monday.  And as I
25 said earlier, Lehman -- one thing they weren't

Page 81

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2  prepared for certainly was bankruptcy.  So
3  that whole exercise on Monday getting us
4  information, they had a very difficult time.
5  So I have no idea where he got his information
6  of 50 billion from.  But he did know the
7  process we were going to go through at that
8  point in time which was we were going to go
9  through and sift through the inventory and
10 take what we wanted.  It was going to be an
11 asset purchase and so we would take what we
12 wanted and not take what we didn't want.
13     Q.   And in his e-mail, Rich Ricci's
14 e-mail at the top of Exhibit 301, he makes a
15 reference to you and Mahon.
16     Do you see that?
17     A.   Yes.
18     Q.   And he makes a reference to "all
19 good and clean."
20     Do you see that?
21     A.   Yes.
22     Q.   That's a reference that you'd been
23 separating out excluded assets from the assets
24 that you wished to have included; is that
25 right?

Page 82

M. KEEGAN - HIGHLY CONFIDENTIAL
1    A.   You got to ask Rich.
2    Q.   Well, you were looking to identify
3  the good and clean assets, right?
4    A.   We were looking to identify assets
5  that we'd be comfortable purchasing, yes.
6    Q.   And those would be the good and
7  the clean ones.
8        MR. STERN: Objection to the form.
9    A.   You got to ask Rich.
10   Q.   Well, were you identifying assets
11 that were, you know, of questionable value?
12   A.   My assumption was we were going to
13 take all the assets initially, okay, and that
14 we were supposed to come up with a value that
15 we would take them at, that we felt
16 comfortable taking them at, right?
17       And we knew from the weekend that
18 Lehman's assets weren't -- you know, weren't
19 marked tightly, that they were marked very
20 much on the aggressive side, which isn't
21 surprising since they were struggling
22 financially and potentially going out of
23 business, that they marked things, you know,
24 less than conservatively, right?

Page 83

M. KEEGAN - HIGHLY CONFIDENTIAL
1        So we knew that going in that we
2  had to -- we had to get a good mark on them,
3  or a good reasonable mark on them.
4        Now, the time frame in which
5  you're doing this in everything is done kind
6  of, you know, rough numbers. It's not -- you
7  know, we didn't have time to take every CUSIP
8  and validate a price for each security. In
9  fact, none of that was done on Monday. I
10 mean, we took the information that we had
11 developed over the weekend which, you know, on
12 certain inventory that's what we did, we
13 took -- we did the CUSIP pretty much and came
14 up with what we thought the value was and how
15 much we thought we were off.
16       We took that information and kind
17 of overlaid it on what we were actually being
18 asked to take on Monday.
19   Q.   Did you ever give Rich Ricci a
20 list of good and clean assets on Monday, the
21 15th of September?
22   A.   Certainly not by 4:03 p.m., no.
23   Q.   At some point on Monday?
24   A.   Not a list that we called good and

Page 84

M. KEEGAN - HIGHLY CONFIDENTIAL
1  clean. We gave him a list of things we
2  thought they could buy and at a suggested
3  price.
4        MR. TAMBE: Let's just take a
5  short break.
6        (Recess taken.)
7  BY MR. TAMBE:
8    Q.   So, sir, I've placed before you a
9  document marked Exhibit 302A which is a cover
10 e-mail with a large set of spreadsheets behind
11 it. I'm not going to quiz you in detail about
12 the spreadsheets but if you could review the
13 cover e-mail and flip through the spreadsheets
14 and I'll ask you some questions.
15       (Document review.)
16   A.   Okay.
17   Q.   Looking at the cover e-mail and
18 the attached schedules, is this part of the
19 effort relating to the transaction we talked
20 about, the Monday transaction, as opposed to
21 the Thursday transaction?
22   A.   Looks like it, yeah.
23   Q.   And it's an e-mail -- the cover
24 e-mail is an e-mail from Stephen King to

Page 85

M. KEEGAN - HIGHLY CONFIDENTIAL
1  Archie Cox and you're shown as a c.c.
2    Q.   Do you see that?
3    A.   Yep.
4    Q.   And what role did Archie Cox play
5  in this transaction?
6    A.   I don't really know actually. He
7  was a senior guy. I mean, he was chairman of
8  the US. So -- but did he have a line
9  responsibility in this transaction, you know,
10 I'm not so sure. I mean, he --
11   Q.   When you think of the group of
12 Barclays business people who were leading the
13 Lehman/Barclays transaction in its various
14 forms who are the people that come to your
15 mind?
16   A.   Rich Ricci. John Hughes in legal.
17 I guess myself with respect to the inventory.
18 Stephen King. Jerry. And Bob Diamond and
19 Archie. I mean, Archie -- and also Michael
20 Klein.
21   Q.   And of this grouping of people,
22 the folks who were actually negotiating the
23 terms of the transaction, would it be a subset
24 of this group?

Page 86

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2        A.   Yeah.  I would say the terms of
3    the transaction were negotiated by, you know,
4    Rich and Jonathan Hughes.  And our counsel.
5        Q.   And what role did Michael Klein
6    play in all this?
7        A.   He was an advisor to Barclays over
8    the weekend principally.
9        Q.   At any time during the September
10   12th on period, did you have any conversations
11   with Michael Klein about the assets to be
12   purchased?
13       A.   From what time period are you
14   talking about?
15       Q.   Starting on the 12th of September
16   onwards.
17       A.   Yeah.  Periodically I had
18   conversations.  You'd have to be more specific
19   with your question what you're asking me.
20       Q.   Do you recall specifically
21   conversations that you had with Mr. Klein
22   about the assets that Barclays was going to
23   purchase from Lehman?
24       A.   The only conversation -- specific
25   conversation that -- substantive conversation

Page 87

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    that I know -- that I know I had with him was
3    with respect to -- it was on the Friday
4    morning with respect to -- Friday morning, the
5    19th -- with respect to the -- I don't know
6    what you want to call them.  They were called
7    unpledged assets, which was the list of assets
8    that were sitting in Lehman's -- purportedly
9    sitting in Lehman's box that were not pledged
10   against financing principally because they
11   were, you know, some sort of unique security
12   or private security that may be in some cases
13   physical securities that weren't easy to put
14   into repo.  That weren't easy to finance.
15       Q.   And what was your discussion with
16   Mr. Klein about those unpledged securities?
17       A.   This is on Friday morning and it
18   was again we were asked -- Lehman was trying
19   to come up with additional value to close the
20   gap on the liabilities and to -- and also on
21   the -- to a certain extent on the excluded
22   inventory that we had been delivered that we
23   felt was marked incorrectly.
24            And one -- there was several items
25   that were proposed as potentially having value

Page 88

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    for Barclays to close that gap and one of them
3    was this list.  And I was asked to look
4    through the list to see if we thought the
5    securities were worth what they were putting
6    on the piece of paper to be worth.  And
7    actually could do very little with respect to
8    the list because it wasn't a book quite this
9    thick (indicating) but it was thick.  Most of
10   it was a lot of zero valued securities which
11   was principally the residuals and junior
12   pieces of their -- of Lehman's asset backed
13   securitization deals they had done through the
14   years that they had held onto or didn't sell.
15            The bulk of the value -- and I
16   forget what the value of this list was -- but
17   the bulk of the value was made up by a handful
18   of municipal securities which we were able to
19   get some comfort on the pricing that was
20   reasonable based on going to Bloomberg.
21            There was another security,
22   Navigator, which was a restructured private
23   equity security that I talked to a guy named
24   Bob Mallard about.  He ran -- he was the
25   person at Lehman that ran -- I had no idea

Page 89

1        M. KEEGAN - HIGHLY CONFIDENTIAL
2    what Navigator was.  I knew it was a
3    hundred -- if I remember correctly it was 144
4    million, so it was a reasonable amount of what
5    the value in this account was.  And, you know,
6    is it worth 144 million, I have no idea.  So
7    they put me in touch with Bob Mallard and I
8    talked to him about it.  And he explained to
9    me what Navigator was.  It didn't give me a
10   whole lot of comfort on the value but at least
11   I knew what it was.  It was a real operating
12   company.
13       Q.   What's your understanding of the
14   value of the unpledged assets?
15       A.   You know, off the top of my head I
16   honestly don't remember.
17       Q.   There's $1.9 million that's
18   referenced in some of the e-mails.  Does that
19   refresh your recollection?
20       A.   Could be.  I don't remember.
21       Q.   You said there were several items
22   proposed to plug the gap.  The unpledged
23   assets was one of those items.  What other
24   items were proposed?
25       A.   There was an FX clearing account

Page 90

M. KEEGAN - HIGHLY CONFIDENTIAL
1   M. KEEGAN - HIGHLY CONFIDENTIAL
2   which it was purportedly up to a billion
3   dollars of good faith deposits in which turned
4   out not to be real. It may have been real at
5   one point in time but C Corp was the
6   settlement agent for Lehman for FX. And I
7   know Gerard LaRocco called Citicorp to find
8   out what they thought about the value of that
9   account. They kind of laughed at him. They
10  said, Of course that's gone. They closed out
11  all their accounts and used up -- closing out
12  their contracts.
13          There was some exchange traded
14  futures that I had nothing to do with and
15  don't understand.
16          There was a couple other dead-ends
17  which I don't remember what they are off the
18  top of my head.
19      Q.   Was one of the items 15(c)(3)
20  cash?
21      A.   Might have been. I don't
22  remember.
23      Q.   Is that a term you're familiar
24  with?
25      A.   Restricted cash? Yeah, sure.

Page 91

1   M. KEEGAN - HIGHLY CONFIDENTIAL
2   Customer cash?
3       Q.   Right. Customer cash.
4       A.   Yeah.
5       Q.   And are you familiar with the
6   notion of customer cash being one of the items
7   that was proposed to plug the gap here?
8       A.   Not really. I mean, I don't know
9   how you would plug it with customer cash
10  unless they had deposits -- that Lehman had
11  deposits within the 15 -- their own 15(c)(3)
12  deposits, right? Which that might be their
13  money.
14      Q.   The exchange traded futures that
15  you referenced, was that -- were those OCC
16  transactions?
17      A.   I believe they were exchange
18  traded futures.
19      Q.   On what exchange?
20      A.   I wasn't involved. I just know
21  there was a list of five or six items that
22  they proposed. You know, can you get us some
23  additional value to cover the cost for some
24  liability that we were taking on so...
25      Q.   And you told us the FX clearing

Page 92

1   M. KEEGAN - HIGHLY CONFIDENTIAL
2   account, that was an item that in your opinion
3   went nowhere. There was no value there; is
4   that right?
5       A.   I was actually in Gerard's office
6   when Gerard was on the phone with Citicorp,
7   the clearing agent at Citicorp, and the
8   clearing agent at Citicorp assured him that
9   through the process of liquidating the open FX
10  contracts that Lehman Brothers' various
11  entities had open with Citicorp, that that
12  deposit was fully consumed in that process and
13  that there was no value.
14      Q.   Do you know whether there was any
15  value on the exchange traded futures?
16      A.   I don't know if there was.
17      Q.   And you don't know one way or the
18  other whether there was any additional value
19  or accessible value in the 15(c)(3) accounts?
20      A.   Nope.
21      Q.   At that time have you heard of any
22  excess margin, excess OCC margin that was
23  transferred from Lehman to Barclays?
24      A.   No. I mean, I just wasn't
25  involved with that aspect of it, right? I

Page 93

1   M. KEEGAN - HIGHLY CONFIDENTIAL
2   don't know anything about futures and exchange
3   traded contracts and clearing and settlement.
4   It wasn't what I was asked to do.
5       Q.   Over the week -- the following
6   weekend, the weekend of the 20th-21st, did you
7   remain involved in aspects of the transaction?
8       A.   Well, I went home Friday so I
9   basically worked Thursday night till 4 in the
10  morning. Went to the Four Seasons slept
11  from 4 to 6. Came back at 6. And then Rich
12  been to bed at -- you know, 6 to -- he was
13  back by 9 I think. And then I worked that
14  morning until probably again 2:30, 3:00. Went
15  home. Checked in on Saturday morning to try
16  to find out what happened at the court
17  hearing. Asked if I was needed and was told I
18  wasn't needed. So I stayed home. And then I
19  ended up having to get on the phone and spent
20  really pretty much most of the weekend on the
21  phone talking to various Lehman employees that
22  we had hoped were coming to join us but were
23  talking to other firms about not coming and so
24  I talked them out of doing that and coming
25  with us instead. So that's that I spent the

Page 94

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2  weekend doing mostly.
3      Q.   With respect to movement of
4  collateral or valuation of collateral did you
5  have any involvement in that?
6      A.   I didn't do anything in that.
7      Q.   How about the following week, the
8  week of the 22nd, were you involved in any
9  movement of collateral or valuation of
10  collateral that week?
11      A.   No.  Not really.  That was --
12  once -- once the -- you know, we closed on the
13  trade, got possession of what we got
14  possession of, that was -- Stephen was the
15  point person for that.  He was the point
16  person for coordinating with all the other
17  desks and putting the proper value on it and,
18  you know, distributing it out to the desks and
19  hedging it, et cetera.  That was his job.  He
20  kept me informed of what he was doing in the
21  big picture, but I wasn't involved day to day.
22      Q.   Do you have any knowledge of a
23  settlement that was entered into between
24  JPMorgan, Barclays, LBI, Lehman Brothers,
25  Inc., the broker/dealer, in December of 2008?

Page 95

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2      A.   I don't know what the terms of the
3  settlement were if you're asking me that.
4      Q.   I'm asking you if you were aware
5  of the fact of the settlement.
6      A.   Yeah.  I believe there was a
7  settlement.  I know that after -- so Lehman --
8  so JPMorgan and -- I believe because they had
9  operational problems were unable to deliver
10  securities to us timely on that night.  Were
11  unable to deliver everything that was in
12  the -- the we thought was in the repo to us.
13  So they delivered -- and they delivered us
14  securities late.  Our clearing agent stayed
15  open as late as they could which was well past
16  what they normally would do.  You know, say, 2
17  in the morning.  And we hadn't received -- we
18  put 45 billion of value out, but by JPMorgan's
19  measurements they hadn't given us 45 billion
20  yet.  And so they posted another 7 billion in
21  cash is what I know.  We got 7 billion in
22  cash.
23           And that -- we did have cash.  And
24  then we went to move the cash later apparently
25  and JPMorgan said you don't have cash.  And

Page 96

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2  obviously there was a dispute about that.
3      Q.   And your understanding is that the
4  settlement was to settle up that dispute.
5      A.   Yeah.
6           MR. STERN:  You marked 302A.  Are
7      we going to use that?
8           MR. TAMBE:  We used it a little
9      bit.  We'll go back and use it some
10      more.
11           MR. STERN:  Okay.  I just want to
12      note for the record that 302A may be a
13      privileged document at least in part.
14      I'm not sure.  I would have to talk to
15      some people about that.  But I just want
16      to reserve my position on that.
17  BY MR. TAMBE:
18      Q.   So I've put before you, sir, a
19  document marked Exhibit 144A.  Take a moment
20  to look at that document and let me know when
21  you're done.
22           (Document review.)
23      A.   Okay.
24      Q.   And you'll see the bottom of the
25  document there's an e-mail from Marty Malloy

Page 97

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2  to J. LaRocco and others.
3           Do you see that?
4      A.   Um-hum.
5      Q.   Yes?
6      A.   Yes.
7      Q.   And there's a totalling up of
8  values and cash amounts.
9           Do you see that?
10      A.   Yeah.
11      Q.   There's a line item in that e-mail
12  that says Excess Collateral, 7.19.
13           Do you see that?
14      A.   7.19.  Yeah.  I see that.  Okay.
15  I see it.
16      Q.   You don't know what that means?
17      A.   No, I don't know what it means off
18  the top of my head.
19      Q.   And further up there there's a
20  line that says Repo Cash Settlement 7.00.
21           Do you see that?
22      A.   Sorry.  I may be looking at the
23  wrong line on your last question because the
24  1.7 was on the same line as the repo cash of 7
25  billion.  So is that correct?  Is that the 1.7

Page 98

M. KEEGAN - HIGHLY CONFIDENTIAL

1   you were referring to?
2   Q.   No.  I was asking you to look at
3   the line that says Excess Collateral.
4   A.   Oh, sorry.  Sorry, sorry, sorry,
5   sorry, sorry.  Okay.  I answered the
6   question -- I did answer the question
7   incorrectly because I was looking at the 1.7
8   trying to figure out what that is.
9   Q.   So let's go to the line that says
10  Excess Collateral, 7.19.
11  A.   Sorry.  I didn't understand your
12  question properly.
13  Q.   Do you have any understanding of
14  what that means?
15  A.   Yeah.  I do have an understanding
16  of what that means.  This BoNY -- I think I
17  testified earlier that we were trying to find
18  out how much value we received from the repo
19  from Lehman Brothers, JPMorgan, and they
20  couldn't tell us.  Okay?  BoNY, because it
21  passed through their clearance systems, has a
22  rough estimate of what they believe that
23  number is to be, okay?  And gave -- and that's
24  their -- the total securities in cash received

Page 99

M. KEEGAN - HIGHLY CONFIDENTIAL

1   is the sum of their rough estimates, right?
2   Plus the 7 billion in cash that's posted in
3   the repo plus another small DTC cash item to
4   come to I guess $52.19 billion of value.
5   And then I assume the 45 billion
6   is a repo cash that -- the cash we sent out to
7   JPMorgan.  And so what is referred to as
8   excess collateral is the -- probably a better
9   term.  And that is the haircut differential if
10  you believe BoNY's values.
11  Q.   Who's Marty Malloy?
12  A.   Marty was a prime brokerage
13  employee.  A security borrow lending.  I'm not
14  sure -- because it was repo I guess he was
15  involved.
16  Q.   After his name on that e-mail
17  address Marty Malloy it says CFG MGMT.  Does
18  that phrase have any management to you?
19  A.   CFG management.  Collateral
20  something -- yeah.  Collateral from the
21  finance group.  I have no idea.  I don't know
22  what it means.  I don't know definitively.
23  Q.   Okay.  If you go back to
24  Exhibit 302A there are a series of numbered

Page 100

M. KEEGAN - HIGHLY CONFIDENTIAL

1   items.
2   Do you see that?
3   A.   Yep.
4   Q.   And the first numbered item ends
5   with a question.  "Can securities be sold by
6   LBI without approval at a discount to current
7   mark?"
8   Do you see that?
9   A.   Um-hum.
10  Q.   Yes?
11  A.   Yeah, I see it.
12  Q.   Do you know what that means?
13  A.   Not definitively, no.
14  Q.   Was it your understanding that LBI
15  was selling securities to Barclays at a
16  discount to the current mark?
17  A.   This is Wednesday so this was the
18  Monday night transaction.  We did go through
19  and identify haircuts is the term I would use
20  as opposed to discounts.  But we applied to
21  the various security line items to account for
22  the fact that we were buying inventory in
23  bulk, to account for the fact that we were not
24  being able to close on the inventory until

Page 101

M. KEEGAN - HIGHLY CONFIDENTIAL

1   Friday at the earliest, to account for the
2   fact that the markets were melting down, and
3   that we didn't have certainty of the valuation
4   that Lehman -- we knew that Lehman had been
5   aggressive with their valuations and we didn't
6   have, you know, clear certainty with respect
7   to what the value of all the securities were.
8   So there were, you know, haircuts applied to
9   the inventory.
10  Q.   Sir, I'm showing you a document
11  that's previously been marked as Exhibit 19.
12  Have you seen this document before today?
13  A.   Again, only in prep for this
14  deposition.
15  Q.   Okay.  Is it fair to say that
16  you -- well, do you understand the information
17  that's contained in this document?
18  MR. STERN:  Objection to the form.
19  A.   I understand what I've been told I
20  guess.
21  Q.   By counsel?
22  A.   By counsel, yeah.
23  Q.   Okay.  And putting aside anything
24  you were told by counsel, do you have any

Page 102

1      M. KEEGAN - HIGHLY CONFIDENTIAL
2 other understanding about this document?
3     A.   The first time I saw it was in
4 preparation for the deposition so the answer
5 to that would be no if I put aside what I was
6 told.
7     Q.   Putting aside anything you were
8 told by counsel in preparation, did you have
9 an understanding back in the week of September
10 15th that Lehman was preparing a balance sheet
11 that would be used for purposes of the
12 transaction?
13     MR. STERN: Objection to the form.
14     A.   Never thought about it.
15     Q.   All right. Put it aside.
16     (Deposition Exhibit 303A, document
17 bearing production number
18 BCI-EX-00077814, marked for
19 identification as of this date.)
20 BY MR. TAMBE:
21     Q.   Sir, I've placed before you a
22 document marked Exhibit 303A. Take a moment
23 to review it and let me know when you're done.
24     (Document review.)
25     A.   Okay.

Page 103

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2     Q.   And, sir, can you confirm this is
3 the e-mail exchange that you had with Mr. Cox
4 and others on that Friday, the 19th, about the
5 JPM assets that you testified about before?
6     A.   Yeah. Yeah. This is the e-mail I
7 was referring to.
8     Q.   If you look at the time stamp on
9 these e-mails, the ones at the bottom of the
10 page seem to be around almost 10:00 at night.
11     Do you see that?
12     A.   Yeah.
13     Q.   And your understanding was that
14 the hearing before the bankruptcy judge was
15 under way at that time, correct?
16     A.   That's correct.
17     Q.   Did anyone who was attending that
18 hearing on Friday, the 19th, describe for you
19 any statements that were made to the judge off
20 the record about the transaction?
21     A.   Say that again.
22     Q.   Did anyone who attended that court
23 hearing on Friday the 19th describe to you any
24 statements that were made to the judge off the
25 record?

Page 104

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2     A.   I don't remember -- I don't
3 remember if they did or they didn't or why
4 they would. I didn't have all that con -- you
5 know, that much detailed conversations about,
6 you know, what happened. I was interested in
7 knowing the next day whether the transaction
8 got approved or didn't get approved. But
9 beyond that I didn't get into the specifics
10 that much that I know of or recall.
11     (Pause on the record.)
12     (Deposition Exhibit 304A, document
13 bearing production number
14 BCI-EX-00080560, marked for
15 identification as of this date.)
16 BY MR. TAMBE:
17     Q.   Sir, I've placed before you a
18 one-page document marked Exhibit 304A. Take a
19 moment to look at it and let me know when
20 you're done.
21     (Document review.)
22     A.   Okay.
23     Q.   You testified earlier about some
24 difficulties in getting JPM to follow through
25 on the transfer of collateral or cash, right?

Page 105

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2     A.   Yep.
3     Q.   And does this e-mail refer to
4 that?
5     A.   Yeah. Some point of it, yes.
6     Q.   Okay. At the top of the page of
7 Exhibit 304A there's an e-mail from you to
8 Rich Ricci.
9     Do you see that?
10     A.   Yep.
11     Q.   And you end your e-mail with an
12 all-caps sentence that references a lawsuit.
13     Do you see that?
14     A.   Yep.
15     Q.   What lawsuit were you referencing?
16     A.   Barclays filed suit against Bear
17 Stearns related to the much publicized aspect
18 funds that blew up. It was about a
19 $400 million claim we had against them. In
20 order to talk to us about giving us our money
21 back, several billion, JPM demanded that we
22 drop that lawsuit. And our lawyers agreed to
23 do that. And the reason that we agreed to do
24 that apparently was we didn't want the 7
25 billion -- the fact that we were short 7

Page 106

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    billion of cash out in the market because
3    markets were so skitterish and so concerned
4    about, you know, banks failing that we felt
5    that people might -- if they found that we had
6    a 7 billion hole, a potential hole in our
7    balance sheet, people might pull their
8    financial support. I believe that was the
9    reason.
10          So to get the settlement we agreed
11   to forgive the lawsuit. Drop the lawsuit.
12   Q.   When did Barclays first now it had
13   a $7 billion hole?
14   A.   I have no idea. It was -- I mean,
15   we didn't we had a hole at all because the
16   cash was put in the account but when they went
17   to remove it which was, you know, days later
18   JPMorgan said the cash isn't there so...
19   Q.   In some of your prior testimony
20   you stated that some of the collateral that
21   was delivered --
22   A.   I'm sorry. I missed the beginning
23   of your question.
24   Q.   Yeah. In some of your prior
25   testimony you had stated that some of the

Page 107

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    collateral that was delivered on Thursday
3    night included securities that Barclays did
4    not wish to purchase, correct?
5    A.   Um-hum. Yes.
6    Q.   Did Barclays return that
7    collateral?
8    A.   No, we didn't return the
9    collateral. I testified that I went to Ian
10   Lowitt and said, "Ian, you got to take this
11   back and swap us into the collateral we
12   bought."
13          And he said, "That's impossible."
14          I should say the collateral we
15   agreed to buy on Monday night. So collateral
16   not on the excluded list.
17          And he said, "That's impossible
18   because our counterparties had been grabbing
19   -- our repo counterparties have been grabbing
20   collateral and liquidating it and buying us
21   in" is the term "on our repo and we don't have
22   it anymore. So this is what you got."
23   Q.   So Barclays kept the collateral
24   that had been transferred over Thursday night
25   and you had additional collateral then

Page 108

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    transferred to you on Friday, the items that
3    we were talking about to fill the gap.
4    MR. STERN: Objection to the form.
5    A.   We had the repo collateral from
6    the Fed that JPMorgan delivered to us. We had
7    the deposit from JPMorgan. And, to my
8    knowledge, we had the additional thing that I
9    knew at the time that we had was the -- or
10   should have had was the unpledged box. That's
11   what I knew we were supposed to have.
12          The only thing I'd say is that
13   that may not be the only thing that we were
14   supposed to have. There were pieces of the
15   transaction that I -- you referred to them
16   earlier, the 15(c)(3). I have no idea whether
17   they were supposed to have it or didn't have
18   it. I don't know. And the exchange traded
19   derivative contracts were one of the things
20   that were proposed by Lehman for us to have.
21   But I wasn't looking at it. And I didn't
22   follow up with it. That was decided for us to
23   have it or not have it. I don't know.
24          (Deposition Exhibit 305A, document
25   bearing production number

Page 109

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    BCI-EX-(S)-00036496, marked for
3    identification as of this date.)
4    BY MR. TAMBE:
5    Q.   Sir, I've handed you a one-page
6    document marked 305A. Would you take a moment
7    and look at it and let me know when you're
8    done.
9          (Document review.)
10   A.   Okay. I read it. I don't quite
11   understand it right now.
12   Q.   You're anticipating my question.
13   A.   No, I'm not anticipating your
14   question. I just don't -- I'm anticipating
15   you're going to ask me what it means and I'm
16   struggling to remember at the time.
17   Q.   But you see this is an e-mail
18   exchange between Jasen Yang, Stephen King, and
19   yourself.
20   A.   Yeah.
21   Q.   And it has to do with valuation of
22   Fed collateral.
23          Do you see that?
24   A.   Yeah.
25   Q.   Having read this e-mail can you

## Page 110

M. KEEGAN - HIGHLY CONFIDENTIAL

explain what this -- the issue that's being
discussed in this e-mail?

    A.   Well, my interpretation of it, and
I don't know whether it's an accurate
interpretation, 18.6 billion of lost Fed
collateral, right, so that's collateral that
we expected to get from the Fed that was
supposedly in the Fed box that JPMorgan was
supposed to deliver and didn't deliver, right?

    He's saying it was about --
1.1 billion wasn't able to get prices for.
They're mainly structured notes, large
potential discount, Yankee bonds, unlikely to
have a large discount. When I couldn't get
the Barclays price I used the custodian price.

    So I guess reading that again I
don't know what he means by lost Fed
collateral. Whether it's 18.6 of collateral
that we got that we didn't anticipate getting
or whether it was 18.6 that we were supposed
to get and didn't get. I just don't recall
right now.

    Q.   Going to your e-mail at the top of
the page you say if I read this right, "There

## Page 111

M. KEEGAN - HIGHLY CONFIDENTIAL

is a $1.9 billion difference."

    A.   Yeah, that's what I'm trying to
figure --

    Q.   Any idea what that means?

    A.   I don't know what -- I'm trying --
I'm trying to figure that out right now. I'm
trying to remember what that means. What that
was referring to. I just don't remember right
now off the top of my head.

    Q.   And in the next line you have a
reference to 20 -- a swing of 28 billion gross
inventory differences. What does that mean?

    A.   (Reading document.)

    Q.   What does that mean?

    A.   That's the one I'm trying to --
I'm stumped on. I know it's my own e-mail.
I'm stumped right now.

    Q.   Did you play any role -- you can
put the document aside, yeah. We're done with
the document.

    A.   Sorry.

    Q.   Did you play any role in the fall
of 2008 or early 2009 in helping Barclays'
auditors account for the acquisition of the

## Page 112

M. KEEGAN - HIGHLY CONFIDENTIAL

Lehman assets?

    A.   No.

    Q.   All right. Let's just take a
short break.

    A.   The auditor -- by the way, the
auditor you're referring to is PriceWaterhouse
I assume?

    Q.   I assume it's PriceWaterhouse. I
don't know who all the auditors might be for
Barclays.

    MR. STERN: I'm sure it's
PriceWaterhouse.

    A.   Okay. But you're -- the external
auditors.

    Q.   The external auditors.

    A.   No. The answer to that is no.

    Q.   Let me ask the follow-up question.
Have you worked with any internal auditors at
Barclays?

    A.   None. Zero. But I was just
curious.

    (Recess taken.)

BY MR. TAMBE:

    Q.   Mr. Keegan, are you aware of any

## Page 113

M. KEEGAN - HIGHLY CONFIDENTIAL

sales of assets that were purchased by
Barclays from Lehman?

    A.   You mean liquidation of the
inventory?

    Q.   Liquidation of the, yeah,
collateral that was transferred over.

    A.   I know we did liquidate a lot of
it, yeah. Not all of it but...

    Q.   And do you know generally the
values at which you liquidated it?

    A.   No. I don't know.

    Q.   And was any of the collateral
liquidated by you or was this just something
you heard about it?

    A.   No. I didn't liquidate any of the
collateral.

    Q.   And how do you know that you did
liquidate a lot of it?

    A.   Because that was -- you know, that
was the goal. The goal was that we weren't --
owning assets during this time period was not
a good thing. So you're trying to hedge it
and get your risk down.

    Q.   Are you generally familiar with

Page 114

M. KEEGAN - HIGHLY CONFIDENTIAL

the gain on the acquisition that was reported
by Barclays?

A.    I'm familiar that we reported a
gain in our financial statements, yeah.

Q.    And are you familiar with the
reasons for the gain?

A.    Only, again, in preparation for
the deposition. So generally no.

Q.    All right. I --

A.    I don't believe any of it came
from securities.

Q.    You don't believe any of it came
from securities?

A.    I have no knowledge where it came
from but I don't know why it would come
from -- I don't know why. Under the
circumstances of what happened -- what was
happening and what happened subsequently in
market values, that we would have been booking
gains from the liquidation of the inventory if
that's what you're asking.

You know, I mean, I know there's
one bond, for instance, that we got that was
on the excluded list that we don't want --

Page 115

M. KEEGAN - HIGHLY CONFIDENTIAL

didn't want. We got it. It was Pine. It was
one of the structured transactions that Lehman
did that took their revolve -- it was for the
financing of their revolvers for their
commitments that they gave out to corporate
companies.

They securitized them so they
could finance them with the Fed. And it was
like the Racers which you referred to earlier.
It was a billion dollar security. It had a
billion dollar mark on it. We valued it at
like $600 million in our valuation over the
weekend. We ended up with that. And, you
know, we backed it up with all the loans which
we didn't want.

So the estate's been trying to buy
it from us ever since and they're offering us
like 650 for it or 600. I think that's going
to be the best offer is the 600. Now, we got
that at a billion minus, maybe, you know, a
regular corporate haircut of 5 percent.

So that was -- you know, that was
one example of a security that we still
haven't liquidated that we still hold onto

Page 116

M. KEEGAN - HIGHLY CONFIDENTIAL

that was on the excluded list initially. And
unfortunately under the circumstances we ended
up with it. And they're kind of validating
our price. And your estate is kind of
validating our price -- your client is
validating our price by offering us 650 for
it.

Q.    Putting aside Pine are you aware
of the circumstances of any other securities
that were transferred over? Whether it was
sold or whether they're being held.

MR. STERN: Objection to the form.
I'm not sure what the question is.

Q.    Do you understand the question?

A.    No, I don't. I really don't. I
don't know what you're after.

Q.    You described in detail the
details of Pine and the valuation of Pine.
Putting Pine aside, are you aware of the
circumstances, the specifics of any other
securities that were transferred over, whether
they're being held, whether they're being
liquidated, whether there have been offers for
the purchase of those securities?

Page 117

M. KEEGAN - HIGHLY CONFIDENTIAL

A.    So the process was securities
which were liquid, okay, were -- well, all
securities were hedged, you know, to the
extent we could hedge them immediately. And
then the hedges and the securities for stuff
that was liquid, and we liquidated the market,
were passed back to the various trading desks
to be liquidated, to be sold, as ordinary
course of business.

The stuff that was unusual or
illiquid and all of the ABS securities stayed
with Stephen and Stephen liquidated them over
time. But that's just ordinary business. I'm
not aware -- you know, I'm not aware of any
extraordinary gains or necessarily met
extraordinary losses that we had coming into
that so...

MR. TAMBE: No further questions.
Thanks.

MR. STERN: Okay. So the
trustee's lawyer will move over here and
ask his questions.

THE WITNESS: Okay.
* * *

Page 118

1       M. KEEGAN - HIGHLY CONFIDENTIAL
2  EXAMINATION BY
3  MR. WOOD:
4       Q.   Mr. Keegan, again, I'm John Wood
5  from Hughes Hubbard & Reed.  We represent the
6  SIPA trustee.  My first question is a
7  follow-up question on something you testified
8  about early in your testimony when you were
9  asked about people you coordinated with and
10 you mentioned the name John Mahon.
11      A.   Yes.
12      Q.   And I believe one of the things
13 you mentioned that he was looking into was
14 exposures under written contracts.
15      Do you recall that?
16      A.   What do you mean exposures under
17 written contracts?
18      Q.   Well -- or maybe you just said
19 exposure under contracts.
20      A.   Swap contracts.  Derivative
21 contracts.  So counterparty exposures.  I ask
22 you to swap with you, right?  It's -- at that
23 point in time the actual exposure should be
24 zero.  The market moves either for me or
25 against me.  I now either owe you money or you

Page 119

1       M. KEEGAN - HIGHLY CONFIDENTIAL
2  owe me money, right?
3       So those are assets and -- or
4  potential liabilities.  And in the transaction
5  over the Monday night and the weekend he was
6  looking at that aspect of it, right?
7  Ultimately when the bankruptcy was filed
8  people liquidated those contracts.
9       (Deposition Exhibit 306A, e-mail
10      dated Sunday, 9/21/2008 9:15:16 p.m.,
11      marked for identification as of this
12      date.)
13 BY MR. WOOD:
14      Q.   Handing you what's been marked as
15 Exhibit 306A, it's a two-page e-mail string.
16 The one at the top is an e-mail from you on
17 September 21st.  Take a moment to look it
18 over.
19      A.   Okay.
20      (Document review.)
21      A.   Okay.
22      Q.   At the bottom of the page there
23 there's an e-mail from Ian Lowitt on September
24 20th.
25      A.   Right.

Page 120

1       M. KEEGAN - HIGHLY CONFIDENTIAL
2       Q.   And you are not on that e-mail but
3  were later included on the e-mail chain.  And
4  Mr. Lowitt writes in the middle of that first
5  sentence, "Have an idea regarding a structured
6  Lehman paper that Chase was left funding."
7       Do you recall what that refers to?
8       A.   Yeah.  That would be -- the
9  structured Lehman paper would be things like
10 Pine, Varo, the Racers.  A couple other
11 transactions they had.  Five or six
12 securitizations they put together.  And we
13 ended up with the senior piece of Pine.  But
14 there's a B note for Pine that has all the
15 rights and control features that's sitting
16 with JPMorgan.  So perhaps you'd like to buy
17 that.  In and of itself it's not worth a lot
18 of money, right?  If I've got a security that
19 they say has a billion dollar face which is
20 what they say it has a billion dollar face and
21 it has a billion dollar value, and I go
22 through it and say, Listen, this is loaded
23 with these other things, we only think it's
24 worth about 600 million.
25      Okay?  The B note its worth about

Page 121

1       M. KEEGAN - HIGHLY CONFIDENTIAL
2  that much (indicating), right?  As a value of
3  a security.
4       MR. STERN:  You're signalling
5  what?
6       THE WITNESS:  Zero.
7       A.   Okay?  So how much do I want to --
8  but it would allow -- but it does give us back
9  some control rights with respect to the 600
10 million of exposure that we do have in value.
11 We do have.  It gives us some moves to make.
12 So what would I be willing to pay for that.
13 Not a whole lot, but maybe something.
14      Q.   And then as you look higher up in
15 the e-mail so later chronologically Mr. Lowitt
16 writes to you, "On reflection, it's LBHI not
17 BarCap that is the natural buyer."
18      So my question is what was the
19 outcome on this issue?
20      A.   Nothing.  We didn't buy them.  And
21 JPMorgan for one didn't want to sell them.
22      We thought -- just to be clear, we
23 thought the inventory would come out.  And we
24 thought JPMorgan would liquidate its holdings,
25 its remaining holdings of the Lehman repo, et

Page 122

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2  cetera, right? Because they had a huge -- I
3  don't know what was reported, 25 billion or
4  something like that, secured exposure to
5  Lehman. That they would ultimately liquidate
6  that exposure and you'd see those securities
7  in the marketplace and then we might be a
8  natural buyer for something like the B note
9  for Pine since we owned the A note already.
10  But we never saw the paper come out.
11     Q.   I'm sorry. What was the last --
12     A.   We never saw the paper come out
13  so...
14        (Deposition Exhibit 307A, document
15     bearing production numbers
16     BCI-EX-00053873 through BCI-EX-00054261,
17     marked for identification as of this
18     date.)
19  BY MR. WOOD:
20     Q.   I've handed you what's been marked
21  as Exhibit 307A. As you'll see it's an e-mail
22  chain with a pretty hefty attachment. Feel
23  free to look at the attachment if you'd like
24  but I'm really just going to ask you some
25  questions about the e-mails themselves.

Page 123

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2     A.   Okay.
3        MR. STERN: So, Mike, you may want
4  to read through the e-mails and then
5  just glance at the attachments.
6        THE WITNESS: Yeah, no. That's
7  fine. I just want to see what this is
8  to see if I understand it.
9        MR. WOOD: And just so the record
10  is, clear this, is an e-mail and the
11  first page is BCI Exhibit 00053873.
12        MR. STERN: Well, it's Bates
13  number BCI-EX-0053873 through -- the
14  numbers appear to be cut off on this
15  copy. So, Mike, just let us know after
16  you've had time to review this.
17        THE WITNESS: Okay. The problem
18  is there's two bids floating around.
19  I'm trying to figure out which one this
20  is.
21        (Document review.)
22     A.   Okay.
23     Q.   If you look on page 2 of the
24  e-mail, so the earliest e-mail
25  chronologically, it's an e-mail from Jasen

Page 124

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2  Yang, Monday, September 22nd. The subject is
3  Financing Facilitate Schedule. He writes,
4  "Robert, James, I've attached the schedule
5  produced by Barclays ops of the collateral
6  currently held at BoNY under the repo
7  financing provided to Lehman (with a total
8  BoNY market value of approximately 45
9  million). It appears to differ substantially
10  from the file received from Lehman on Friday
11  evening. We're looking at the differences
12  now."
13        Just one first point of
14  clarification. That 45 million, do you think
15  that's accurate or is that supposed to be 45
16  billion?
17        MR. STERN: Objection to the form.
18     A.   Total BoNY market value 45
19  billion. I would -- I'm speculating but I
20  think it's probably billion he's probably
21  referring to. I said there were several
22  different versions of BoNY collateral value
23  list put in front of us. There was a 45 list,
24  there was a 45 list, there was a 52 list.
25     Q.   And when you're referring to --

Page 125

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2  I'm sorry.
3     A.   There was another e-mail I was
4  presented earlier which is Exhibit --
5        MR. STERN: 144A.
6     A.   144A, right?
7        So it says Total securities and
8  cash received 52.19, right? That
9  theoretically is BoNY's valuation in effect of
10  the cumulative assets of what we got. It's
11  one of many evaluations they had. They had a
12  45 one. There was a 47 one floating around.
13  So, you know, at the end of the day what I was
14  trying to get a handle on was how much value
15  did we actually receive to do the repo. The
16  Fed repo. And we couldn't get it from Lehman.
17  And we couldn't get it from JPMorgan. We
18  tried to get it from BoNY but BoNY just kept
19  giving us different numbers. So I think
20  that's what he's referring to.
21     Q.   And then if you look at the first
22  page of the e-mail string, the second e-mail
23  down from Robert Azerad dated Monday,
24  September 22nd and, again, it looks like you
25  are not on this but it was forwarded to you.

Page 126

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    And Mr. Azerad writes, "Here is the file with
3    the $1.9 billion of additional collateral that
4    Paolo Tonucci asked me to e-mail you."
5        A.    Um-hum.
6        Q.    Do you know where that number
7    $1.9 billion came from?
8        A.    Well, I know what I asked Jason
9    for, okay?
10       Q.    Which is what?
11       A.    So what I asked Jason for was the
12   list of unpledged securities. I asked him
13   for -- to get me that list. And I asked him
14   for that reason -- specific reason that I
15   talked about earlier. A company called
16   Navigator was on that list, an equity
17   position, restricted equity, that Lehman owned
18   44 percent of the company is the number that
19   rings in my head but may not be the right
20   number. And it's a real company. An
21   operating company. That Lehman had -- several
22   of the members of the board of directors were
23   Lehman Brother employees. And another board
24   member had understood from some source, I
25   don't know what source he understood it from,

Page 127

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    that Barclays was now the owner of the shares
3    through this -- through the purchase
4    transaction. And this person knows Archie
5    Cox. He called Archie Cox, explained to
6    Archie, you know, that we needed to name two
7    new board members to replace the two Lehman
8    employees because the company couldn't operate
9    effectively without getting those guys
10   replaced.
11       So I called Stephen to find out,
12   you know, where the Navigator stock was. And
13   he told me we hadn't gotten it yet. And then
14   there was some subsequent discussion about,
15   you know, where it was and, you know, I asked
16   for the list of -- because it was on the list
17   I reviewed of the -- of the unpledged
18   securities we were supposed to get that it was
19   on that list. So I asked Jason for that list
20   because I had to go back -- I think I was
21   going back to Jonathan Hughes to say here it
22   is Jonathan. You know, go get it from -- go
23   get it from JPMorgan. Because we understood
24   it to be in a box at JPMorgan for safekeeping.
25       Q.    Going back to my earlier question

Page 128

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    now, do you know what this $1.9 of additional
3    collateral referred to by Mr. Azerad is?
4        A.    I just told you what I believe it
5    is.
6        Q.    Do you know how they came --
7        A.    Do I know definitively, the e-mail
8    is not to me. I'm not involved in the
9    conversation so I don't know definitively but
10   I'm telling you what I believe it is.
11       Q.    Do you know whether any assets
12   were transferred from Lehman's clearance box
13   at DTC over to Barclays on Friday, September
14   19th?
15       A.    I don't know. I have no idea of
16   the actual box mechanics.
17       Q.    Sorry. What was that?
18       A.    The actual mechanics of the box
19   movements, I have no idea what -- when and if
20   they happened. I do know -- you know, I
21   believe that what happened on JPMorgan's side
22   on the Thursday night was they took the
23   tri-party repo as their securities came back
24   from the Fed and went into Lehman's tri-party
25   account, instead of sending them directly to

Page 129

1    M. KEEGAN - HIGHLY CONFIDENTIAL
2    us, JPMorgan made the error of pushing them
3    into the Lehman box. And then what I believe
4    happened was all the standing orders that were
5    in there prior to the bankruptcy that they
6    hadn't performed on when the securities hit
7    got delivered across the street and that's why
8    they weren't able to deliver us the collateral
9    timely. But that's JPMorgan's problem.
10       (Deposition Exhibit 308A, document
11   bearing production numbers
12   BCI-EX-(S)-00036396, marked for
13   identification as of this date.)
14   BY MR. WOOD:
15       Q.    Mr. Keegan, I've handed you what's
16   been marked as Exhibit 308A. Feel free to
17   take a moment to look it over.
18       A.    Okay.
19       Q.    And it's an e-mail from Haejin
20   Baek -- and I may not be pronouncing that
21   incorrectly but -- to you on September 23rd.
22       A.    Yeah.
23       Q.    The subject is SAS senior.
24       First of all, what does SAS stand
25   for?

Page 130

M. KEEGAN - HIGHLY CONFIDENTIAL

1       A.   Off the top of my head I don't
2  remember specifically. I do know -- I think I
3  know what she's talking about. But I don't
4  know what the security actually is. But it's
5  another one of the -- it's another one of the
6  Lehman structured finance trades where they
7  basically were taking their loan books,
8  turning it into AAA securities so they could
9  post it with the Fed and get the funding.
10      Q.   And so is that what you understand
11 the $1.1 with JPM to refer to at the beginning
12 of the e-mail?
13      A.   That JPM is holding 1.1 billion of
14 SAS and we got 80 million of it delivered to
15 us.
16      Q.   Okay. I don't have anything
17 further on that document.
18      Mr. Keegan, were you involved in
19 any way in the creation of any schedules --
20 actually, strike that.
21      Were you involved in any
22 discussions with Lehman Brothers employees
23 regarding any schedules of unencumbered
24 clearing box assets at DTC?

Page 131

M. KEEGAN - HIGHLY CONFIDENTIAL

1       A.   Yeah. I referred to it several
2  times as the unpledged asset schedule. Yeah.
3       Q.   And what was your involvement in
4  that?
5       A.   Friday morning, the 19th, I was
6  called into Rich's office --
7       Q.   And that's Rich Ricci?
8       A.   Rich Ricci. Who was working out
9  of the Lehman office.
10      And I was presented this schedule.
11 I think it was Paolo Tonucci may have provided
12 it to Rich and Paolo may have been in the room
13 at the time. It was Paolo or anybody else.
14 It was definitely a Lehman employee. And they
15 said that this was the schedule of
16 unencumbered assets that they could provide
17 us, they could get -- you know, incorporate in
18 the deal and give to us if we wanted it for
19 the values that were indicated.
20      So I was asked by Rich to take a
21 quick look at the values and try to
22 substantiate the values and determine whether
23 we thought this was something we thought had
24 value or not and whether we would be willing

Page 132

M. KEEGAN - HIGHLY CONFIDENTIAL

1  to take it as part of the deal, payment as
2  part of the deal.
3       Q.   And what did you conclude?
4       A.   That it did have value and we
5  should take it.
6       Q.   And just to be clear, unencumbered
7  box -- I'm sorry. The unencumbered assets you
8  were referring to were at DTC?
9       A.   I don't remember if they D -- I
10 don't remember if they were DTC or whose
11 assets they were. I couldn't tell you they
12 were all DTC because I believe some of them
13 were at JPMorgan, in fact.
14      I mean, I've been led to believe
15 that the Navigator stock which to my knowledge
16 to this day we still haven't gotten is sitting
17 in safekeeping at JPMorgan. I have no idea if
18 that's a fact or not.
19      Q.   Do you recall whether you came up
20 with a number for the valuation of these
21 unencumbered assets?
22      A.   No. It was kind of take it for
23 what's on the piece of paper or don't take it.
24 Because most of the value was in like five or

Page 133

M. KEEGAN - HIGHLY CONFIDENTIAL

1  six, maybe eight max, muni securities. I
2  believe these were munies. And then
3  Navigator. And on the muni securities we were
4  able to go to Bloomberg and actually get a
5  price but that for all -- you know, for all
6  intents and purposes that was Lehman's price.
7  So I have no idea if that was a good price or
8  not.
9       But we weren't able to do much
10 more than that with that list. And we had
11 Navigator and, you know, the bottom line I
12 guess is you weren't getting anything else.
13 There wasn't anything else to give us. So we
14 could take it or not take it.
15      Q.   Do you recall any other assets
16 besides the munies and the Navigator?
17      A.   What was on that list, the list
18 was yea thick (indicating). This might be the
19 list for all I know.
20      MR. STERN: Yea thick is how
21 thick?
22      THE WITNESS: An inch. Inch and a
23 half.
24      A.   Most of that list was comprised of

---

Page 134

M. KEEGAN - HIGHLY CONFIDENTIAL
1     the residuals from securitization transactions
2     which had zero values on them. But I also
3     wanted to make sure that by taking that list,
4     because they were residual transactions which
5     were subprime securitizations, Alt A
6     securitizations, everything that was in the
7     news, that we weren't taking on any
8     liabilities we wouldn't want to own by taking
9     this list. And that was kind of, you know,
10    one of the other things I was focused on
11    trying to get an answer to.
12        Q.   And the Navigator securities were
13    at JPMorgan Chase; is that right?
14            MR. STERN: Objection to the form.
15        A.   I've been told that's where they
16    are.
17        Q.   And do you know where the munies
18    were?
19        A.   I don't know where they are. I
20    have no idea. I don't even know -- to be
21    honest, I don't know anything about munies. I
22    don't know if they're DTC eligible or not.
23            MR. WOOD: I don't have any
24    further questions.

Page 135

M. KEEGAN - HIGHLY CONFIDENTIAL
1            MR. DAKIS: I have a couple.
2     * * *
3     EXAMINATION BY
4     MR. DAKIS:
5        Q.   Mr. Keegan, I'm Robert Dakis from
6     the law firm of Quinn, Emanuel, Urquhart,
7     Oliver & Hedges. We represent the Official
8     Committee of Unsecured Creditors.
9            I'm just going to ask you a couple
10    follow-up questions about some matters that
11    you discussed earlier with one of my
12    colleagues. You testified earlier that during
13    the weekend of September 20th, 2009 you spoke
14    with Lehman Brothers employees that Barclays
15    was hoping to retain.
16            MR. STERN: Objection to the form.
17        A.   On the 20th, yeah. 20th and 21st,
18    yeah.
19        Q.   Who did you speak with?
20        A.   It was principally Rene Canezen.
21    Eric Felder about Rene. I don't remember the
22    rest. They were Rene's guys so...
23        Q.   What generally did you discuss
24    with Rene?

Page 136

M. KEEGAN - HIGHLY CONFIDENTIAL
1        A.   Why would you go to Deutsche Bank.
2     Why wouldn't you come here and keep the team
3     together.
4        Q.   Did you discuss the sale
5     transaction with Rene at all?
6        A.   No.
7        Q.   Did you discuss the closing of the
8     transaction with Rene at all?
9        A.   No. No, it was about his
10    employment. He had an offer to go be the head
11    of credit trading at Deutsche Bank. And we
12    were -- I spent the weekend talking about it
13    with him.
14        Q.   And during the course of the
15    weekend you didn't discussion the sale
16    transaction with Rene at all?
17        A.   No. Why would I do that? He
18    cares about how much he's getting paid.
19    That's what he cares about. To the extent
20    that we were going to meet that need then we'd
21    be in the game. But then I had to convince
22    him why Barclays was a better platform than
23    Deutsche Bank.
24        Q.   How did you do?

Page 137

M. KEEGAN - HIGHLY CONFIDENTIAL
1            MR. STERN: Objection to the form.
2        A.   Well --
3        Q.   Did Rene come over?
4        A.   Yeah, he came over.
5            MR. DAKIS: Could you please put
6     Exhibit 144A back in front of the
7     witness?
8            MR. STERN: Well, I don't have a
9     copy. These are all jumbled.
10       Q.   You can use mine. I should be
11    able to manage.
12            On Exhibit 144A towards the bottom
13    of the page, do you see the line that states
14    the total securities and cash received is
15    $52.19 billion?
16       A.   Um-hum.
17       Q.   And I believe you testified
18    earlier that the $52.19 billion was the Bank
19    of New York's valuation of the assets?
20            MR. STERN: Objection to the form.
21       A.   Well, the term valuation is kind
22    of a broad term, right? That's -- when they
23    take information from their inventory records,
24    information that they might have access to the

Page 138

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2 in the marketplace, and they do that
3 mathematical extension, that is one of the
4 several numbers that they came up with. Okay?
5 They came up with a 45 billion number.
6 There's another e-mail that talks about they
7 came up with a $47 billion number. Another
8 e-mail talks about -- this is all in the
9 course of like, you know, six hours.
10     So, you know, I wouldn't say it's
11 a -- we didn't put a whole lot of stock in it,
12 right? So...
13     Q.   And earlier you testified that if
14 **you could believe Bank of New York's value.**
15 **Is that what you meant by if you could believe**
16 **their value?**
17     A.   Yeah.  If you could believe their
18 value we would have 50 -- we would have 7
19 billion of haircut.
20     **Q.   And aside from what you just**
21 **testified about the values shifting up and**
22 **down, did you have any other reason not to**
23 **believe Bank of New York's value?**
24     A.   Yeah.  Absolutely.
25     MR. STERN:  Objection.  Wait,

Page 139

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2 wait, wait, wait.  Objection to the
3 form.
4     Can you repeat the question,
5 please, Francis?
6     (Record read.)
7     A.   The only reason that -- the only
8 thing that they would be -- would competently
9 value, okay, were things like exchange traded
10 equities that were very liquid.  Liquid
11 corporate debt.  Treasuries.  They'd probably
12 put a pretty good price on that stuff.
13     Any kind of structured paper,
14 asset-backed paper, all that stuff, they've
15 never seen it before.  They haven't been
16 provided prices.  They'd have no clue what
17 that really -- what that paper should really
18 be valued at.  Lehman didn't have it valued
19 right.
20     **Q.   Where would you go to get values**
21 **for that paper?**
22     MR. STERN:  Objection to the form.
23 Can I hear that again?
24     (Record read.)
25     A.   You would go to Bloomberg and

Page 140

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2 you'd find out what it was.  If you didn't
3 what the security was you'd get the
4 prospectus, you'd take a look at it.  You'd
5 see what the security was.  You'd get the cash
6 remittance reports if it's an ABS security.
7 You'd look at what -- at how the security's
8 actually performing.  You'd put a projection
9 of what you think cash flow is going to be out
10 of the securities and you'd value that from
11 those cash flows.  That's how you come up with
12 a value.
13     **Q.   Did you personally value any of**
14 **the securities transferred in the sale**
15 **transaction?**
16     A.   No.  I didn't value any of the
17 securities.
18     **Q.   Anyone from your team do the**
19 **valuations?**
20     A.   Stephen King.  When you talk to
21 him about that information if you talk to him
22 he would have much -- give you much better
23 information on that than I could give you on
24 that.
25     MR. DAKIS:  Nothing further.

Page 141

1     M. KEEGAN - HIGHLY CONFIDENTIAL
2     MR. STERN:  We'll just take a
3 break.  I may have some questions.
4 Let's go off the record.
5     (Recess taken.)
6 EXAMINATION BY
7 MR. STERN:
8     **Q.   Let's go back on the record.**
9     **Mr. Keegan, from your perspective**
10 **what was the purpose of the haircut in the**
11 **reverse repo that was the basis of the Fed**
12 **replacement transaction?**
13     MR. TAMBE:  Objection to the form.
14 Lack of foundation.
15     **Q.   Go ahead.**
16     A.   So the repo -- the Fed was
17 providing financing to Lehman Brothers.  It
18 was ordinary course repo.  And they provided
19 haircuts that -- a repo provider takes
20 haircuts because I'm giving you cash and I'm
21 getting back a security.  That security is
22 subject to market movements.  It's subject to
23 liquidity risk.  And if you have to liquidate
24 it it will take a while to liquidate it.  And
25 that haircut is supposed to be the cushion

Page 142

M. KEEGAN - HIGHLY CONFIDENTIAL

1  that's provided to the financier so that he
2  has a reasonable probability to recover the
3  amount of his loan from the security if the
4  counterparty defaults and can't pay it back.
5      Q.   And is that the way it's supposed
6  to work in a normal market?
7      A.   Well, yeah.  That's the way in the
8  normal market it works.  But the Fed couldn't
9  have anticipated Lehman's bankruptcy either.
10  I doubt they anticipated Lehman's bankruptcy,
11  you know, weeks ahead of time.  So the
12  haircuts that they were using were traditional
13  haircuts that would be in the normal market
14  and a market that is deteriorating rapidly as
15  the market did after Lehman Brothers'
16  bankruptcy, you know, those haircuts wouldn't
17  necessarily be sufficient to protect you
18  against market movements during the period of
19  time it would take you from the time you took
20  the possession of the collateral to liquidate
21  it.
22      Q.   Now, let's turn to the period you
23  testified to from late on Thursday, September
24  18th going into Friday, September 19th.

Page 143

M. KEEGAN - HIGHLY CONFIDENTIAL

1      Do you have that time frame in
2  mind?
3      A.   Okay.
4      Q.   In that time frame why from your
5  perspective did Barclays need an additional
6  value cushion beyond the repo haircut?
7      A.   I mean, the first reason why we
8  were being delivered securities that, based on
9  the prior work that we did over the weekend,
10  the prior weekend, based on the fact that we
11  didn't come to an agreement with Lehman on --
12  on adjusting the value of the securities and
13  we were getting those securities, that the
14  haircut that we were getting -- that those
15  securities that we were getting were
16  overvalued and therefore they were in effect
17  being used -- they were burning up the
18  haircut, they were using it up, and that
19  needed to be replaced.
20      Q.   Did anybody ask you if there was
21  any excess available through the repo?
22      A.   Yeah, we were asked --
23      MR. TAMBE:  Objection to the form
24  of the question.

Page 144

M. KEEGAN - HIGHLY CONFIDENTIAL

1      A.   Yeah, I was asked by I believe
2  Rich Ricci how much did we think we might have
3  in terms of "excess value" to pay for certain
4  liabilities that Barclays was absorbing in the
5  transaction.  And, you know, I thought the
6  question was -- the question was naive under
7  the circumstances.
8      And, you know, again, we couldn't
9  tell exactly what we had and hadn't have at
10  that point in time.  And we knew that what we
11  did have, while it was done on haircuts that
12  were -- you know, if it were a normal market
13  and they were done at haircuts that assumed
14  the securities were valued properly.  I mean,
15  if they weren't valued properly, and some of
16  them were weren't valued properly, then they
17  were overvalued.  And, therefore, the haircut
18  wasn't adequate to protect us against the risk
19  that was inherent in Lehman Brothers were
20  taking itself, never mind to have excess to
21  pay for liabilities.
22      Q.   Turning back to Exhibit 144A and
23  looking at the figures that are listed on this
24  document, from your perspective were any of

Page 145

M. KEEGAN - HIGHLY CONFIDENTIAL

1  the figures listed here reliable?
2      MR. TAMBE:  Objection to the form
3  of the question.
4      A.   The repo cash amount was the cash
5  that we sent out to JPMorgan so that's a good
6  number.
7      Q.   And what is that number?
8      A.   45 billion.
9      We thought the repo cash amount on
10  the deposit that was at JPMorgan, the 7
11  billion was a good number as well, but that
12  was ultimately taken back by JPMorgan.
13      Q.   What about the rest of the
14  figures?
15      A.   There'd be aspects of BoNY's
16  valuations that would be okay, but there would
17  be significant portions of it that weren't
18  which kind of takes the whole -- you know,
19  renders the whole number not reliable so...
20      Q.   Going back to the Monday,
21  September 15th, discussions between you and
22  people at Lehman concerning haircuts and
23  valuation adjustments on certain securities,
24  were there any disagreements between you and

Page 146

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2    the people at Lehman?
3        A.    This is Monday.
4        Q.    This is on Monday the 15th.
5        A.    Yeah. There was -- there was a
6    number of disagreements, right? That's in
7    part the context of the exclude list. We
8    couldn't come to an agreement on -- we
9    disagreed with their values. We couldn't come
10   to an agreement on their values. So we just
11   said, Fine, you know, you own it, you know,
12   keep it. We won't take it so...
13           MR. STERN: I have no further
14   questions.
15           MR. TAMBE: Just a couple of
16   follow-up questions.
17                * * *
18   EXAMINATION BY
19   MR. TAMBE:
20   DI  Q.    When you took the break before
21   your own lawyer began questioning you did you
22   discuss the content of your testimony with
23   your lawyer?
24           MR. STERN: I'm going to object
25   and I'm going to instruct you not to

Page 147

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2    answer.
3    DI  Q.    Did you discuss the questions that
4    Mr. Stern was going to ask when you came back
5    from the break?
6           MR. STERN: I'm going to instruct
7    you not to answer.
8    DI  Q.    And did you discuss with Mr. Stern
9    the answers that you were going to give in
10   response to those questions?
11           MR. STERN: Again, I'll instruct
12   you not to answer.
13       Q.    On the Fed repo that you testified
14   about in response to Mr. Stern's questions, do
15   you know what the size of the Fed financing to
16   Lehman was the week prior to the week in
17   question? So the week that began on the 8th
18   of September?
19       A.    No, I don't.
20       Q.    And do you know what the haircut
21   schedule was that was charged by the Fed
22   during that week?
23       A.    Precisely, no, I don't. If you're
24   asking about the adjustment that week, I don't
25   know.

Page 148

1          M. KEEGAN - HIGHLY CONFIDENTIAL
2        Q.    Do you know of any adjustments in
3    the haircut schedule proposed by the Fed
4    either on Friday, September 12th, or Monday,
5    September 15th?
6        A.    No.
7           MR. TAMBE: No further questions.
8           MR. STERN: I think we're done.
9    Off the record.
10           (Time Noted:    12:39 p.m.)
11
12
13
14
15
16
17
18
19
20       _____
         MIKE KEEGAN
21
22   Subscribed and sworn to before me
23   this ___ day of _____, 2009.
24
25

Page 149

1
2        C E R T I F I C A T E
3    STATE OF NEW YORK    )
4                         : ss.
5    COUNTY OF NEW YORK   )
6           I, FRANCIS X. FREDERICK, a Notary
7    Public within and for the State of New
8    York, do hereby certify:
9           That MIKE KEEGAN, the witness
10   whose deposition is hereinbefore set
11   forth, was duly sworn by me and that
12   such deposition is a true record of the
13   testimony given by the witness.
14           I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage, and that I
17   am in no way interested in the outcome
18   of this matter.
19           IN WITNESS WHEREOF, I have
20   hereunto set my hand this 28th day of
21   August, 2009.
22
23       _____
24       FRANCIS X. FREDERICK
25

Page 150

```
 1
 2    ---------------- I N D E X ----------------
 3    WITNESS        EXAMINATION BY      PAGE
 4    MIKE KEEGAN       MR. TAMBE       5, 146
 5               MR. WOOD       119
 6               MR. DAKIS      135
 7               MR. STERN      141
 8
 9
10
11    ---------- INFORMATION REQUESTS ------------
12    DIRECTIONS: 146, 147, 147
13    RULINGS: NONE
14    TO BE FURNISHED: NONE
15    REQUESTS: NONE
16    MOTIONS: NONE
17
18
19
20
21
22
23
24
25
```

Page 151

```
 1
 2    ---------------- EXHIBITS -----------------
 3    EXHIBIT                    FOR ID.
 4    Exhibit 294A
 5    document bearing production
 6    number BC1-EX-(S)-00035155............. 47
 7    Exhibit 295A
 8    document bearing production
 9    number BC1-EX-(S)-00035143............. 49
10    Exhibit 296A
11    document bearing production
12    number BC1-EX-(S)-00035440............ 52
13    Exhibit 297A
14    document bearing production
15    numbers BC1-EX-(S)-00035441
16    through BC1-EX-(S)-00035442............. 55
17    EXHIBIT 298A
18    Document bearing production
19    number BC1-EX-(S)-00035491...............56
20    Exhibit 299A
21    document bearing production
22    numbers BC1-EX-(S)-00035619
23    through BC1-EX-(S)-00035620............. 63
24    Exhibit 300A
25    document bearing production
      number BC1-EX-(S)-00036005............... 68
```

Page 152

```
 1
 2    ---------------- EXHIBITS -----------------
 3    EXHIBIT                    FOR ID.
 4    Exhibit 301A
 5    document bearing production
 6    numbers BCI-EX-(S)-00082251............. 76
 7    Exhibit 302A
 8    document bearing production
 9    number BCI-EX-00054270................... 79
10    Exhibit 303A
11    document bearing production
12    number BCI-EX-00077814................... 102
13    Exhibit 304A
14    document bearing production
15    number BCI-EX-00080560................... 104
16    Exhibit 305A
17    document bearing production
18    number BCI-EX-(S)-00036496............... 109
19    Exhibit 306A
20    e-mail dated Sunday,
21    9/21/2008 9:15:16 p.m.................... 119
22    Exhibit 307A
23    document bearing production
24    numbers BCI-EX-00053873
25    through BCI-EX-00054261................... 122
```

Page 153

```
 1
 2    ---------------- EXHIBITS -----------------
 3    EXHIBIT                    FOR ID.
 4    Exhibit 308A
 5    document bearing production
 6    numbers BCI-EX-(S)-00036396............. 129
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 154

1
2      NAME OF CASE:  IN RE:  LEHMAN BROTHERS
3      DATE OF DEPOSITION: AUGUST 28, 2009
4      NAME OF WITNESS:  MIKE KEEGAN
5      Reason codes:
          1. To clarify the record.
6          2. To conform to the facts.
          3. To correct transcription errors.
7      Page _____ Line _____ Reason _____
       From _____ to _____
8
       Page _____ Line _____ Reason _____
9      From _____ to _____
10     Page _____ Line _____ Reason _____
       From _____ to _____
11
       Page _____ Line _____ Reason _____
12     From _____ to _____
13     Page _____ Line _____ Reason _____
       From _____ to _____
14
       Page _____ Line _____ Reason _____
15     From _____ to _____
16     Page _____ Line _____ Reason _____
       From _____ to _____
17
       Page _____ Line _____ Reason _____
18     From _____ to _____
19     Page _____ Line _____ Reason _____
       From _____ to _____
20
       Page _____ Line _____ Reason _____
21     From _____ to _____
22     Page _____ Line _____ Reason _____
       From _____ to _____
23
          _____
24
          MIKE KEEGAN
25