# BCI EXHIBIT

# 74

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   ------------------------------x

    In Re:                    Chapter 11

5   LEHMAN BROTHERS            Case No. 08-13555 (JMP)

    HOLDINGS, INC., et al.,    (Jointly Administered)

6   ------------------------------)

7

8        * * * HIGHLY CONFIDENTIAL * * *

9     VIDEOTAPED DEPOSITION OF ANDREW KELLER

10           New York, New York

11         Friday, January 8, 2010

12

13

14

15

16

17

18

19

20   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

21   JOB NO. 27031

22

23

24

25

Page 2

```
 1
 2
 3
 4
 5            January 8, 2010
 6            9:47 a.m.
 7
 8
 9            HIGHLY CONFIDENTIAL videotaped
10    deposition of ANDREW KELLER, held at the
11    offices of Simpson Thacher & Bartlett,
12    425 Lexington Avenue, New York, New
13    York, pursuant to Federal Rule of Civil
14    Procedure 30(b)(6), before Francis X.
15    Frederick, a Certified Shorthand
16    Reporter, Registered Merit Reporter and
17    Notary Public of the States of New York
18    and New Jersey.
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
 1
 2    A P P E A R A N C E S :
 3        JONES DAY, LLP
 4        Attorneys for Lehman Brothers, Inc.
 5            222 East 41st Street
 6            New York, New York 10017-6702
 7        BY:   WILLIAM J. HINE, ESQ.
 8
 9        BOISE SCHILLER & FLEXNER, LLP
10        Attorneys for Barclays Capital
11            401 East Las Olas Boulevard, Suite 1200
12            Fort Lauderdale, Florida 33301-2211
13        BY:  W. TODD THOMAS, ESQ.
14            - and -
15        BOISE SCHILLER & FLEXNER, LLP
16            575 Lexington Avenue - 7th Floor
17            New York, New York 10022
18        BY:  SHAUNA BLUGH, ESQ.
19
20        QUINN, EMANUEL, URQUHART, OLIVER &
21        HEDGES, LLP
22        Attorneys for the Creditors Committee
23            51 Madison Avenue
24            New York, New York 10010
25        BY:  ERIC M. KAY, ESQ.
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
 1
 2    A P P E A R A N C E S :  (Cont'd.)
 3
 4    HUGHES, HUBBARD & REED, LLP
 5    Attorneys for the SIPA Trustee
 6        One Battery Park Plaza
 7        New York, New York 10004-1482
 8    BY:  SETH ROTHMAN, ESQ.
 9
10    SIMPSON THACHER & BARTLETT
11    Attorneys for the Witness
12        425 Lexington Avenue
13        New York, New York
14    BY:  ANDREW S. AMER, ESQ.
15        LAURA MURPHY, ESQ.
16        SHINZONG LEE (admitting admission)
17    ALSO PRESENT:
18        JORDAN MUMMERT, Videographer
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
 1    PROCEEDINGS - HIGHLY CONFIDENTIAL
 2        THE VIDEOGRAPHER:  This is the
 3    start of the tape labeled number one of
 4    the videotaped deposition of Andy Keller
 5    in re. Lehman Brothers.  This deposition
 6    is being held at 425 Lexington Avenue,
 7    New York, New York, on January 8th, 2010
 8    at approximately 9:47 a.m.
 9        My name is Jordan Mummert from TSG
10    Reporting, Inc.  I'm the legal video
11    specialist.  The court reporter is
12    Francis Frederick in association with
13    TSG Reporting.
14        Will counsel please introduce
15    yourself.
16        MR. THOMAS:  Todd Thomas from
17    Boies Schiller on behalf of Barclays.
18        MR. AMER:  Andy Amer, Simpson
19    Thacher, for the witness.
20        MR. MURPHY:  Laura Murphy, Simpson
21    Thacher, also for the witness.
22        MR. HINE:  William Hine from Jones
23    Day on behalf of the Estate of Lehman
24    Brothers, Inc.
25        MR. KAY:  Eric Kay from Quinn
```

TSG Reporting - Worldwide    877-702-9580

Page 6

A. KELLER - HIGHLY CONFIDENTIAL
1  A. KELLER - HIGHLY CONFIDENTIAL
2  Emmanuel on behalf of the Official
3  Creditors Committee.
4      MS. LEE: Shinzong Lee, Simpson
5  Thacher.
6      MR. ROTHMAN: Seth Rothman from
7  Hughes Hubbard & Reed for the SIPA
8  Trustee.
9      THE VIDEOGRAPHER: Will the court
10 reporter please swear in the witness.
11          * * *
12 A N D R E W   K E L L E R, called as a
13    witness, having been duly sworn by a
14    Notary Public, was examined and
15    testified as follows:
16 EXAMINATION BY
17 MR. THOMAS:
18     Q.  Good morning, Mr. Keller.  Could
19 you please state your full name.
20     A.  Andrew Keller.
21     Q.  And have you been deposed before?
22     A.  No.
23     Q.  Are you familiar with how this
24 process works generally in terms of I'll be
25 asking questions and the court reporter will

TSG Reporting - Worldwide   877-702-9580

Page 7

1  A. KELLER - HIGHLY CONFIDENTIAL
2  be taking down the questions and the answers
3  and so forth?
4      A.  Yes.
5      Q.  And if at any time you're not sure
6  of the question or what I'm trying to ask,
7  please feel free to ask me to rephrase it.
8  I'll be happy to try to do that.
9      A.  Sure.
10     Q.  Thanks.  Can you tell me how long
11 you've been with Simpson Thacher?
12     A.  I started in 1983.
13     Q.  And what is your area of practice?
14     A.  Corporate finance.
15     Q.  And within corporate finance do
16 you have any particular specialty or area of
17 practice?
18     A.  I do a combination of advising
19 clients such as Lehman in their disclosure
20 documentation.  And then also do a number of
21 securities offerings and had done a number of
22 securities offerings as underwriter's counsel
23 for Lehman and various others of our investing
24 banking clients.
25     Q.  Have you been involved in any

TSG Reporting - Worldwide   877-702-9580

Page 8

1  A. KELLER - HIGHLY CONFIDENTIAL
2  mergers and acquisitions?
3      A.  Only tangentially.  M&A is not my
4  area of practice.
5      Q.  And when there's mergers and
6  acquisitions and you tangentially become
7  involved, why do you get involved with those?
8      A.  Actually, I could only, within at
9  least the recent past, remember this
10 particular transaction to the extent that we
11 classify it as M&A as something that I got
12 involved in.  Otherwise, it would just be
13 diligencing an M&A transaction in connection
14 with a securities offering.  Or if you did a
15 securities offering that was financing for an
16 acquisition.  Just to understand the
17 transaction.
18     Q.  And can you describe just
19 generally Simpson's kind of history with
20 working with or for Lehman Brothers?
21     A.  I don't know exactly when it
22 started but it's been a long relationship with
23 the investment bank.
24     Q.  Going back many years?
25     A.  Yes.  Long before -- it started

TSG Reporting - Worldwide   877-702-9580

Page 9

1  A. KELLER - HIGHLY CONFIDENTIAL
2  long before I started at the firm.  And,
3  again, typically as underwriter's counsel for
4  Lehman offerings and corporate counsel for the
5  company.
6      Q.  So Simpson has done a lot of work
7  for Lehman over the years.
8      A.  Yes.
9      Q.  When did you first become involved
10 in any way in a possible transaction between
11 Lehman and Barclays?
12     A.  That probably would have been the
13 Thursday before what unfortunately turned out
14 to be the bankruptcy filing when we got the
15 call to help with the potential sale of the
16 company.
17     Q.  September 11th, 2008?
18     A.  Yes.
19     Q.  And what was your individual
20 personal involvement -- role with that
21 process?
22     A.  I think Lehman called us to -- at
23 that point Lehman called and said that they
24 were talking to two potential buyers, Bank of
25 America and Barclays.  And Sullivan & Cromwell

TSG Reporting - Worldwide   877-702-9580

Page 10

A. KELLER - HIGHLY CONFIDENTIAL

1  had been helping Lehman over the past couple
2  of months also. And the way Lehman was going
3  to split the work was that although everybody
4  would be involved in helping -- in helping
5  Lehman, Sullivan & Cromwell would take the
6  principal responsibility for the BofA --
7  potential BofA transaction and we would do the
8  documentation for the potential sale to
9  Barclays.
10      Q. And when you say documentation you
11  also mean the legal advice concerning the
12  transaction, too, right?
13      A. Yes.
14      Q. And did that — how did Simpson's
15  role change at all after the bankruptcy filing
16  by Lehman?
17      A. Well, we were drafting a merger
18  agreement with Barclays over that weekend, and
19  then got the call roughly sometime mid-day
20  Sunday that the deal had died for whatever
21  reason, and essentially went home at that
22  point. Sometime during the day late morning
23  that Monday I think we got a call from Lehman
24  to come over to their offices, that there was

TSG Reporting - Worldwide    877-702-9580

Page 11

A. KELLER - HIGHLY CONFIDENTIAL

1  now another potential deal with Barclays. And
2  we showed up there and at that point already
3  there were -- at Lehman's conference room
4  floor Weil Gotshal was there representing
5  Lehman, and Sullivan & Cromwell and Clearly
6  Gottlieb representing Barclays, and many
7  people from Lehman and Barclays in many
8  conference rooms on that floor.
9      So we were called over to help
10  given our knowledge of the company and just
11  help review the documents that were being
12  drafted.
13      Q. And we'll pick up there in just a
14  minute.
15      A. Sure.
16      Q. But is it your understanding that
17  you've been designated to be Simpson's
18  30(b)(6) witness on certain topics today?
19      A. I don't even know what a 30(b)(6)
20  witness is.
21      Q. Do you understand that you've been
22  designated to give testimony on behalf of
23  Simpson on certain issues today?
24      A. Of the -- on behalf of the firm.

TSG Reporting - Worldwide    877-702-9580

Page 12

A. KELLER - HIGHLY CONFIDENTIAL

1      Q. Yes.
2      A. Yes.
3      Q. Okay. And can I just ask what you
4  did do to prepare to give testimony today?
5      A. Just looked at a few e-mails.
6  Went over the contracts again to try to
7  refresh my memory.
8      Q. So I assume you met with your
9  counsel.
10      A. Yes.
11      Q. Did you meet with anyone other
12  than counsel or speak with anyone other than
13  counsel —
14      A. No.
15      Q. — with respect to the deposition?
16      And -- okay. So picking up where
17  we left off, did you personally go over there
18  Monday?
19      A. Yes.
20      Q. And what did you do that first
21  day, Monday?
22      A. That Monday and Monday night we
23  essentially would -- the process would be that
24  the -- for the most part the lawyers would be

TSG Reporting - Worldwide    877-702-9580

Page 13

A. KELLER - HIGHLY CONFIDENTIAL

1  in a room going over the contract. Lawyers
2  from both sides. Giving comments. Then the
3  contract would be turned. And we would wait
4  and then review the contract and more comments
5  back and forth. So it was just a technical
6  negotiation, drafting process.
7      Q. And Simpson was involved in that
8  drafting process of that original contract,
9  correct?
10      A. Yes.
11      Q. Let me go ahead and show you a
12  document we'll mark as -- that's been
13  previously marked as Exhibit 1.
14      (Document review.)
15      Q. Is this the ultimately executed
16  version of the contract that you were
17  referring to?
18      A. Yes. Looks like it.
19      Q. And if you don't mind for purposes
20  of the day I'll refer to this as the original
21  APA.
22      A. (Witness nods.)
23      Q. If I do so you'll understand I'm
24  referring to this document?

TSG Reporting - Worldwide    877-702-9580

Page 14

A. KELLER - HIGHLY CONFIDENTIAL
1
2    A.   Right.
3    Q.   I'm going to give you another
4  document. This is -- let me give a document
5  marked -- previously marked as 440.
6       (Document review.)
7    Q.   Do you recognize Exhibit 440?
8    A.   This is --
9       MR. AMER: Are you talking about
10  the whole document, because it's
11  multiple --
12      MR. THOMAS: The whole document.
13  I'm going to ask him about one of the
14  attachments, too, but just the whole
15  document.
16    A.   Yeah. As I recall, this is the
17  version that was submitted to the bankruptcy
18  court.
19    Q.   When you say this is the version,
20  you're referring to the second exhibit which
21  is a version of the original Asset Purchase
22  Agreement that has a number of hand-marked
23  interlineations on it?
24    A.   Which I assume then matches this
25  one.
       TSG Reporting - Worldwide    877-702-9580

Page 15

A. KELLER - HIGHLY CONFIDENTIAL
1
2    Q.   And are you familiar with -- have
3  you ever seen the motion that the exhibit's
4  attached to? The sale order motion.
5    A.   Not until yesterday.
6    Q.   Okay. Let me ask you then about
7  Exhibit -- the version of the original Asset
8  Purchase Agreement attached. Do you know
9  whose handwriting that is showing the marks on
10  that version of the agreement?
11    A.   Yes. That's Elizabeth Cooper's,
12  an associate of this firm.
13    Q.   Okay. And can you just describe
14  the process by which this particular document
15  was created, the handwritten marks?
16    A.   That, as I understand it -- I'm
17  not even sure that it was there at the time
18  because it would have been on the Tuesday that
19  we were there. And I went home to get some
20  sleep because it was at the point where we
21  were essentially done with the negotiations
22  and what was left was to put together the
23  filing for the bankruptcy court. And that was
24  essentially the last round of comments. And
25  people were -- it was urgent to get the filing
       TSG Reporting - Worldwide    877-702-9580

Page 16

A. KELLER - HIGHLY CONFIDENTIAL
1
2  with the court as soon as possible and another
3  turn through the word processing was going to
4  take too long. We were on Lehman's conference
5  call and didn't quite have the word processing
6  facilities that we were typically used to or
7  that a law firm would have. So in order to
8  shorten the time to get it filed, what was
9  agreed by all the law firms was something that
10  Elizabeth just wrote in by hand in order to
11  get the filing done.
12    Q.   Let me ask you to turn back to
13  Exhibit 1 which is the executed copy of the
14  original APA. And let me ask you to turn to
15  page 6 and the definition of purchased assets.
16    A.   Yeah.
17    Q.   And this is a document you're
18  familiar with, right, this contract?
19    A.   Yes.
20    Q.   Okay. The first purchased asset
21  there where it says the retained cash, do you
22  know the value of that asset as of the time
23  this document was executed?
24      Or strike that.
25      As of roughly September 16th or
       TSG Reporting - Worldwide    877-702-9580

Page 17

A. KELLER - HIGHLY CONFIDENTIAL
1
2  September 17th.
3    A.   I don't recall. I would look at
4  the definition and see whether it's spelled
5  out there.
6       (Document review.)
7    A.   Now I can't find it but -- but I
8  don't recall what the value was.
9    Q.   Okay. Do you recall whether there
10  was any value given or not in the contract?
11    A.   I don't. I'd have to look through
12  it again.
13    Q.   Okay. The second asset there
14  referring to deposits, do you know what the
15  rough value of the assets identified in
16  category B were?
17    A.   No.
18    Q.   Do you know the value of the
19  assets identified in category C?
20    A.   No.
21    Q.   How about E?
22    A.   No.
23    Q.   Why was -- do you know why there
24  was no values put on these various assets or
25  any total valuation placed on the assets?
       TSG Reporting - Worldwide    877-702-9580

Page 18

1       A. KELLER - HIGHLY CONFIDENTIAL
2       A.   No.
3       Q.   Do you know if that was an
4  important -- I mean, was that an element of
5  the deal, that certain assets be worth certain
6  amounts?
7       A.   Well, I wasn't part of the
8  discussions between the principals as to
9  exactly how the deal was cut and so I can't
10  say what elements of the deal were important
11  to them.
12       Q.   But since Simpson was involved in
13  the drafting up of this contract, can you
14  explain why it wasn't necessary to try to
15  total up the value of the assets and the value
16  of the liabilities?
17       A.   In my experience in the M&A world
18  which is, as I said, a little limited, it does
19  not strike me as unusual that at least the
20  values of these listed assets weren't broken
21  down; that the principals would agree to
22  essentially how you define the business and in
23  an Asset Purchase Agreement lay out the
24  assets, describe the assets that are being
25  purchased, and describe the liabilities that
     TSG Reporting - Worldwide    877-702-9580

Page 19

1       A. KELLER - HIGHLY CONFIDENTIAL
2  are being assumed, and that essentially is
3  what it was. But to break down each -- the
4  value of each item by item is not -- the fact
5  that it was not broken down is not unusual.
6       Q.   Is it not necessary to do that
7  because the deal wasn't predicated on assets
8  having certain values or liabilities having
9  certain values?
10       A.   I don't know what -- again, I just
11  don't know how the buyer and seller approached
12  the overall valuation of the business or how
13  they got to what they got. By the time we got
14  the call and were brought in that seemed to
15  have already taken place.
16       Q.   And based upon the contract the
17  conclusion of that would have been that it
18  didn't matter -- the deal wasn't predicated on
19  assets having certain values or liabilities
20  having certain values, but rather that
21  Barclays was essentially buying the business?
22       MR. AMER: Objection to the form
23  of that question.
24       MR. KAY: Objection to form.
25       Q.   You can answer it.
     TSG Reporting - Worldwide    877-702-9580

Page 20

1       A. KELLER - HIGHLY CONFIDENTIAL
2       MR. AMER: If you understand what
3  the question is.
4       A.   Well, to my understanding of your
5  question, you're asking how the buyer and
6  seller -- the principals approached the deal.
7       I mean, again, I just wasn't part
8  of those conversations. And so I don't know
9  to what extent value of particular assets was
10  important or factored into the decision or
11  what discussions they had among themselves.
12       Q.   Well --
13       A.   At this point it was just -- from
14  my perspective just running through what
15  the -- lawyers would go back to their clients,
16  principally Weil and Clearly Gottlieb, and say
17  do we have the description of the assets that
18  are being transferred and the liabilities that
19  are being assumed correct.
20       Q.   You're not aware of any reason to
21  believe that there was a disconnect between
22  Simpson and the other attorneys drafting this
23  contract and what the principals wanted, are
24  you?
25       A.   Not that I know of.
     TSG Reporting - Worldwide    877-702-9580

Page 21

1       A. KELLER - HIGHLY CONFIDENTIAL
2       Q.   Okay. So based on how the
3  contract was drafted, at least, in terms of
4  the contract it was a deal that was not
5  predicated on assets having a certain value or
6  liabilities having a certain value; is that
7  right?
8       MR. HINE: Objection.
9       MR. KAY: Objection.
10       MR. ROTHMAN: Objection to the
11  form.
12       MR. AMER: Objection to form.
13       A.   Again, I don't know on what basis
14  the principals had put this together.
15       Q.   I understand. But looking at the
16  contract and the fact that there's no values
17  put on -- no values put on many of the
18  purchased assets and no values put on all the
19  liabilities, doesn't that mean to you that the
20  deal wasn't predicated on assets having a
21  certain value or liabilities having a certain
22  value?
23       MR. HINE: Object to the form.
24       MR. KAY: Join.
25       MR. ROTHMAN: Same.
     TSG Reporting - Worldwide    877-702-9580

Page 22

A. KELLER - HIGHLY CONFIDENTIAL
1   A. KELLER - HIGHLY CONFIDENTIAL
2      Q.   You can answer.
3      A.   Again, not necessarily because if
4   they had -- and this is just speculating here
5   because I wasn't part of the conversation --
6   but if they had put together a deal based on
7   the values and then told the lawyers these are
8   the types of assets and liabilities we're
9   assuming, describe them, it could have been.
10     Q.   Is there any provision in the
11  contract that Simpson helped prepare that
12  requires the assets, the value of the assets
13  to value of the assumed liabilities?
14        MR. HINE: Object to the form.
15     A.   I'm trying to think of how --
16     Q.   Sure. You're welcome to look
17  through the contract. If you want to take a
18  few minutes to look through it you're welcome
19  to.
20     A.   Yeah.
21        (Document review.)
22     A.   I'd have to spend a fair amount of
23  time looking through the whole contract. I
24  mean, just quickly the contract does go into
25  the value of the long positions and the short

TSG Reporting - Worldwide    877-702-9580

Page 23

1   A. KELLER - HIGHLY CONFIDENTIAL
2   positions. But there are other assets and
3   liabilities included in the deal as a whole.
4      Q.   So is there anything from your --
5   from your review, from your knowledge of the
6   contract, from your preparation for your
7   testimony today, do you have anything that you
8   can identify in the contract that requires the
9   asset -- the value of the assets to end up
10  equalling the value of the liabilities assumed
11  or consideration paid?
12     A.   Just on the face of the contract I
13  can't as of this moment. I'd have to go
14  through it. I don't recall any provision that
15  said that.
16     Q.   And you're not aware of -- was
17  this contract drafted in a fairly normal
18  drafting process as far as you can tell?
19     A.   Yes. Other than the fact that we
20  had a very short period of time to do it. The
21  normal process would have taken at least a
22  week or maybe several weeks. But we had about
23  a day.
24     Q.   And each party had one or more
25  large law firms working on the contract?

TSG Reporting - Worldwide    877-702-9580

Page 24

1   A. KELLER - HIGHLY CONFIDENTIAL
2      A.   Yes.
3      Q.   And from everything you know did
4   it appear to be a good faith arm's-length
5   negotiating process?
6      A.   Yes.
7      Q.   You have no reason to believe
8   there was a disconnect between what the
9   principals may have agreed to and what's
10  reflected in the contract, do you?
11        MR. HINE: Object to form.
12     A.   I have no reason believe -- sorry.
13     Q.   Go ahead and answer. Do you want
14  to complete that answer? "I have no reason to
15  believe" is what you said.
16     A.   Yes. I have no reason to believe.
17     Q.   Let me ask you to turn back to the
18  version with handwriting on it. Exhibit 440.
19  The version of the APA -- original APA with
20  handwriting on it. And let me ask you to look
21  at page 11, please.
22     A.   (Witness complies.)
23     Q.   Strike that.
24        Let me ask you to turn back to
25  page 7 first. There's a section that begins

TSG Reporting - Worldwide    877-702-9580

Page 25

1   A. KELLER - HIGHLY CONFIDENTIAL
2   on Purchased Assets on page 6 and then it
3   carries over to page 7.
4      A.   Right.
5      Q.   Do you see that?
6        And at the top of page 7 you'll
7   see there's a Section D that says Government
8   securities, commercial paper -- and this is
9   before the changes were made.
10        It says government securities,
11  commercial paper, mortgage loans, corporate
12  debt, corporate equity, exchange traded
13  derivatives, and collateralized short-term
14  agreements.
15        Do you see that?
16     A.   Yes.
17     Q.   And then there's some handwritten
18  changes made including at the end there is a
19  phrase added "...with a book value as of the
20  date hereof of approximately $70 billion."
21        Do you see that?
22     A.   Yes.
23     Q.   Do you know why that was added?
24     A.   No.
25     Q.   Do you know who added it?

TSG Reporting - Worldwide    877-702-9580

**Page 26**

A. KELLER - HIGHLY CONFIDENTIAL

1    A. KELLER - HIGHLY CONFIDENTIAL
2    A.   Well, again, the language -- the
3  words were actually written by Elizabeth
4  Cooper but this was a part of the negotiations
5  between the two sides and agreed to.
6    Q.   And have you spoken with Ms.
7  Cooper about this edit?
8    A.   No.
9    Q.   Do you know if anyone at Simpson
10  has spoken with her about —
11    A.   That particular edit?
12    Q.   Yes.
13    A.   Not to my knowledge.
14    Q.   Do you know why — do you know who
15  directed her to make that edit?
16    A.   Well, it would have been a markup
17  that both sides had agreed to. And
18  essentially instead of giving it to the word
19  processor to type in somebody handed it to
20  Elizabeth to just do by hand.
21    Q.   Do you know who --
22    A.   She volunteered to do it.
23    Q.   Do you know, was she at a meeting?
24  Where physically was she when —
25    A.   She was there at the conference --

TSG Reporting - Worldwide    877-702-9580

**Page 27**

1    A. KELLER - HIGHLY CONFIDENTIAL
2  at the conference room floors where everybody
3  was negotiating the agreement.
4    Q.   At 745?
5    A.   Yes.
6    Q.   And do you know who else from
7  Simpson was there?
8    A.   I was until I left that morning.
9  John Finley was there. And Alvin Brown may or
10  may not -- was at least there for part of the
11  time.
12    Q.   And do you know which side or who,
13  what person, suggested this inclusion?
14    A.   I don't know where it originated
15  from.
16    Q.   Do you understand the inclusion to
17  be describing some subset of assets listed in
18  Section D?
19    A.   I would read that to lend
20  description to what assets were covered by D.
21    Q.   And is it fair to say that at
22  least one earlier version of the contract did
23  not have that language in it, that
24  description?
25    A.   That's what it looks like, yes.

TSG Reporting - Worldwide    877-702-9580

**Page 28**

1    A. KELLER - HIGHLY CONFIDENTIAL
2    Q.   Do you have any knowledge of where
3  that $70 billion figure came from?
4    A.   No.
5    Q.   Do you have any knowledge of what
6  it represents?
7    A.   Well, other than reading the
8  words. Represents -- just simply that it
9  represents the book value of those long
10  positions as defined.
11    Q.   Do you know -- is there a — are
12  you aware of any defined term "book value" as
13  part of the contract?
14    A.   No.
15    Q.   Does book value mean one precise
16  thing or could it mean different things to
17  different people?
18    MR. HINE: Object to the form.
19    MR. AMER: I'll object to the form
20  as well.
21    Q.   You can answer. They object.
22  They preserve their objection.
23    A.   Right. It means one thing to me.
24  And I would assume it means the same thing to
25  others but can't speak for others.

TSG Reporting - Worldwide    877-702-9580

**Page 29**

1    A. KELLER - HIGHLY CONFIDENTIAL
2    Q.   Okay. Do you know if Lehman,
3  after the bankruptcy filing, the week of
4  September 15th, whether they were continuing
5  to update their marks on securities?
6    A.   I do not know for a fact.
7    Q.   Well, do you have any information
8  as to whether that was occurring?
9    A.   Well, I would not be surprised if
10  it were. I do know from reviewing, for
11  instance, the -- some of the statements that
12  were made to the bankruptcy court that the
13  assets were in the 45, $49 billion range. So
14  presumably people did follow the values of the
15  assets.
16    Q.   Are you just speculating or do you
17  know?
18    A.   I am just speculating.
19    Q.   Do you know how those other later
20  numbers were calculated?
21    A.   No.
22    Q.   Okay. Do you have any personal
23  knowledge of any valuations of marks going on
24  that week?
25    A.   No personal knowledge.

TSG Reporting - Worldwide    877-702-9580

Page 30

1    A. KELLER - HIGHLY CONFIDENTIAL
2    Q.   Let me strike the personal
3    knowledge.
4    A.   Right.
5    Q.   Do you have any knowledge of
6    valuations going on that week of Lehman
7    securities?
8    A.   It was my impression that people
9    were discussing valuations. And that that
10   week things were changing incessantly.
11   Q.   Were the value of Lehman's
12   securities and other assets going down that
13   week?
14   A.   I would assume they were as were
15   everybody's.
16   Q.   Are you aware of, on that Monday
17   when you were over at Lehman, efforts by
18   people from Barclays and people from Lehman to
19   try to update valuations of the Lehman assets?
20   A.   On that Monday?
21   Q.   Yes.
22   A.   I was not aware.
23   Q.   At any other time during that week
24   are you aware of people from Barclays and
25   Lehman sitting down and trying to get together

TSG Reporting - Worldwide    877-702-9580

Page 31

1    A. KELLER - HIGHLY CONFIDENTIAL
2    and come up with updated values of Lehman
3    assets?
4    A.   Again, I assume that that may have
5    been going on but, you know, as we progressed
6    and started talking about that clarification
7    agreement. That process. As the week
8    progressed.
9    Q.   So are you just assuming it or are
10   you aware of it going on?
11   A.   There was a lot going on at that
12   point in Weil's offices and certainly
13   principals of Lehman and Barclays were
14   meeting. At this point it's a little hard for
15   me to recall exactly what the discussions were
16   but it would not surprise me if this were part
17   of that.
18   Q.   I'm sorry. I don't mean to
19   belabor this but it wouldn't surprise you if
20   you were part of it, but were you actually --
21   was Simpson actually aware that those
22   discussions between Barclays and Lehman were
23   going on to try to update the falling values
24   of Lehman assets?
25   A.   I at this point don't know whether

TSG Reporting - Worldwide    877-702-9580

Page 32

1    A. KELLER - HIGHLY CONFIDENTIAL
2    I can recall it as a fact but would assume --
3    my impression was that those conversations
4    were going on.
5    Q.   And you would have been aware of
6    that at the time.
7    A.   Just from milling around the
8    hallways and seeing the people.
9    Q.   Let me ask you to turn in the
10   executed copy of the original APA to Section
11   2.5, please. Take a moment to review that
12   section, please.
13   (Document review.)
14   A.   Okay.
15   Q.   And do you see the section
16   entitled cure amounts obligates the purchaser
17   to pay a couple different types -- or assume a
18   couple different types of liability, one being
19   cure amounts or past amounts owed on contracts
20   that they elect to assume and the other being
21   certain ordinary course amounts?
22   A.   Yes.
23   Q.   Why was there no value placed on
24   the liability that's being assumed here by the
25   purchaser?

TSG Reporting - Worldwide    877-702-9580

Page 33

1    A. KELLER - HIGHLY CONFIDENTIAL
2    MR. HINE: Object to the form.
3    A.   I would think that the -- my
4    understanding was that this is typical in a
5    bankruptcy situation and as you can -- as
6    reading this paragraph as of the day of this
7    contract I could not tell you what the
8    ultimate obligation was going to be. Because
9    it's forward looking.
10   Q.   So it's impossible to know the
11   amount of the liability that would be assumed
12   by the purchaser?
13   MR. HINE: Object to the form.
14   A.   Impossible is a tough standard
15   but -- I would -- I do not know -- I mean, to
16   put an exact dollar amount on it, probably
17   not. Could somebody knowing -- having a good
18   knowledge of the business make a reasonable
19   estimate, that I don't know.
20   Q.   Well, if it's up to the discretion
21   of the purchaser which contracts it elects to
22   assume --
23   A.   Yes.
24   Q.   -- and -- couldn't the purchaser
25   elect to assume zero contracts and assume

TSG Reporting - Worldwide    877-702-9580

Page 34

A. KELLER - HIGHLY CONFIDENTIAL

1    zero?
2    A. As I understand it, yes.
3    MR. HINE: Object to the form.
4    Q. So the actual amount of the
5    liability here could be zero.
6    MR. HINE: Same objection.
7    A. It is possible, yes.
8    Q. Well, are you aware of any efforts
9    to try to require Barclays to accept certain
10   contracts or determine which -- a fortiori
11   which contracts it's going to assume?
12   A. No, I am not.
13   Q. Were you -- did you attend any of
14   the court hearings?
15   A. No.
16   Q. Did anyone from Simpson attend any
17   of the court hearings?
18   A. Not to my knowledge.
19   Q. And you made reference to
20   statements made to the court. Is that because
21   you reviewed the transcripts of those
22   hearings?
23   A. Just a couple of pages that were
24   referenced by Lori Fife to those dollar
25

TSG Reporting - Worldwide    877-702-9580

Page 35

A. KELLER - HIGHLY CONFIDENTIAL

1    amounts items.
2    Q. When did you review those?
3    A. Within the past week. The past
4    two weeks.
5    MR. AMER: Just to be clear, those
6    were the pages that were referenced in
7    your 30(b)(6) notice.
8    MR. THOMAS: Sure.
9    A. So I, having read that, just asked
10   what those were.
11   Q. Were you getting -- how did
12   Simpson have an understanding of what was
13   going on in court? Was somebody reporting
14   back to Simpson?
15   MR. AMER: I'll object to the form
16   of the question.
17   A. It's not something that was being
18   formally done. We heard high-level summaries.
19   Obviously everybody was interested in what was
20   going on in court but...
21   Q. Let me ask you to turn to Section
22   8.5, please.
23   A. (Witness complies.)
24   Q. Subsection A says, "Each of seller
25

TSG Reporting - Worldwide    877-702-9580

Page 36

A. KELLER - HIGHLY CONFIDENTIAL

1    and purchaser shall use its commercially
2    reasonable efforts to take all actions
3    necessary or appropriate to consummate the
4    transactions contemplated by this agreement."
5    Do you see that language?
6    A. Yes.
7    Q. Would that include obtaining court
8    approvals to the extent they're necessary?
9    A. Yes.
10   Q. Do you believe that Lehman
11   obtained all necessary court approvals for the
12   sale transaction that was consummated on
13   September 22nd, 2008?
14   A. Yes.
15   Q. If you would -- are you familiar
16   with a schedule drafted by Steve Berkenfeld of
17   Lehman that was referred to in this contract?
18   MR. HINE: Object to the form.
19   A. I -- yes. I was trying to think
20   of whether it was referred to in this contract
21   but I believe it was.
22   Q. But it was not an exhibit to the
23   contract, correct?
24   MR. HINE: Object to the form.
25

TSG Reporting - Worldwide    877-702-9580

Page 37

A. KELLER - HIGHLY CONFIDENTIAL

1    A. Yeah. I don't believe that it
2    was.
3    Q. Were -- and I think we're going to
4    have another witness on compensation issues,
5    but were you involved in calculating any
6    potential compensation liabilities being
7    assumed by purchaser?
8    A. No.
9    Q. Mr. Brown would be more
10   knowledgeable about that?
11   A. He may be.
12   Q. Did you attend any LBI or LBHI
13   board meetings during this week?
14   A. The only one I attended was the
15   morning -- I think it was the morning we
16   signed this contract or were about to sign the
17   contract.
18   Q. By the way, if at any time you
19   want to take a break just speak up.
20   A. Sure.
21   Q. Let me go ahead and show you a
22   document that's been previously marked as 489.
23   Please take a moment to review that.
24   (Document review.)
25

TSG Reporting - Worldwide    877-702-9580

Page 38

A. KELLER - HIGHLY CONFIDENTIAL

1
2  A.   Okay.
3  Q.   Is this the board meeting you
4  attended?
5  A.   Yes.
6  Q.   The notes from the board meeting
7  you attended.
8       If you would turn to page 3,
9  please.
10  A.   (Witness complies.)
11  Q.   At the second paragraph it reads,
12  "Mr. Roberts resumed by describing that it is
13  a condition to the transaction that eight
14  specific firm employees enter into employment
15  agreements with Barclays.  He stated that Mr.
16  McGee was one of those employees so interested
17  firm employees were involved in the
18  transaction negotiations on behalf of the
19  firm."
20       Do you see that?
21  A.   Yes.
22  Q.   Were you aware at this time that
23  certain employees were negotiating employment
24  contracts -- certain Lehman employees that
25  were also involved in the transaction

TSG Reporting - Worldwide    877-702-9580

Page 39

A. KELLER - HIGHLY CONFIDENTIAL

1
2  negotiations were also negotiating employment
3  transactions with Barclays?
4  A.   Yes.
5  Q.   Did that strike you as odd or
6  inappropriate or problematic in any way?
7  A.   As Mr. Roberts pointed out it was
8  something to point out to people as a
9  potential conflict.  But seemed given the
10  circumstances unavoidable.
11  Q.   And were part of the circumstances
12  the need for Barclays, if they were going to
13  buy the business, to try to retain the
14  employees that made up the business they were
15  buying from Lehman those that they thought
16  were particularly valuable and important to
17  it?
18  A.   At least those that they deemed
19  valuable.
20  Q.   So given the circumstances was
21  there any way to avoid that situation?
22       MR. HINE:  Object to the form.
23  A.   Not that I know of.
24  Q.   So the board and Weil and Simpson
25  were aware of the situation with respect to

TSG Reporting - Worldwide    877-702-9580

Page 40

A. KELLER - HIGHLY CONFIDENTIAL

1
2  what is referred to as interested firm
3  employees --
4  A.   Yes.
5  Q.   -- negotiating the transaction at
6  the same time they were also negotiating
7  employment and bonus agreements with Barclays.
8  A.   Yes.
9       (Pause on the record.)
10  Q.   Any time I pause I'm skipping over
11  documents so we're actually gaining time.
12  A.   That's good.
13       MR. AMER:  Pause away.
14  A.   Pause away, yeah.
15  Q.   Let me show you a document we'll
16  mark as 519.
17       (Deposition Exhibit 519, document
18       bearing production number STB 09637,
19       marked for identification as of this
20       date.)
21  BY MR. THOMAS:
22  Q.   Do you recognize this document as
23  a --
24  A.   I don't recall it.  But...
25  Q.   It's a document produced by

TSG Reporting - Worldwide    877-702-9580

Page 41

A. KELLER - HIGHLY CONFIDENTIAL

1
2  Simpson Thacher.  You can tell by the Bates
3  stamps down below.  And it appears to be an
4  e-mail from you to James Killerlane and Edgar
5  Lewandowski, dated September 17th, 2008.
6  A.   Yes.
7  Q.   And you don't have any reason to
8  doubt that this is one of -- an e-mail from
9  you, do you?
10  A.   No.
11  Q.   Your message says, "LBHI guarantee
12  is still full and unconditional and LBI is now
13  in bankruptcy or soon will be."
14       Can you explain what you're
15  referring to?
16  A.   I can explain at least part of it.
17  I would have to think a little bit more about
18  the second part.  The -- Jim's question -- I
19  assume he was just at that point looking at
20  what ongoing filings LBHI and LBI might have
21  to make with the SEC.  There was LBI debt
22  issued, that had been issued publicly.  So
23  your starting point is that that company then
24  has to make public filings with the SEC,
25  10-Ks, 10-Qs, et cetera.

TSG Reporting - Worldwide    877-702-9580

Page 42

A. KELLER - HIGHLY CONFIDENTIAL

1    But in the case of a wholly-owned
2 subsidiary such as LBI if that debt is
3 guaranteed by the parent and the parent is
4 itself a public reporting company then you
5 don't need to do that. It gives some small
6 amount of disclosure in the financial
7 statement footnotes of LBHI and that's what
8 the case was here.
9    I assume Jim's question was
10 because we don't have to file full financial
11 statements -- because we didn't historically
12 have to file full financial statements for LBI
13 because of the LBHI guarantee, as that changed
14 when LBHI goes bankrupt.
15    Q. And so LBHI was guaranteeing fully
16 and unconditionally LBI's debts and
17 obligations?
18    A. Yes. Or at least the public debt.
19 I wouldn't say all of LBI's debts and
20 obligations.
21    Q. What effect would LBI going under
22 have on LBHI because of those guarantees?
23    A. Well, then, it just would then
24 become more likely that somebody would look to
25

TSG Reporting - Worldwide    877-702-9580

Page 43

A. KELLER - HIGHLY CONFIDENTIAL

1 LBHI under the guarantee but for the fact that
2 it was in bankruptcy. But you would look to
3 either -- either one of the two to be paid.
4    Q. So --
5    A. Or both.
6    Q. So people owed money from LBI
7 could look to -- even within a bankruptcy
8 could look to LBHI, correct? Through the
9 bankruptcy process.
10    A. Yes.
11    Q. And you put a limitation on the
12 full and unconditional guarantee. Is there
13 some -- can you describe in a little more
14 detail what you meant by what was being
15 guaranteed and what wasn't? Or how much --
16    A. I don't view that as a limitation,
17 actually. Just the LBHI guarantee is still --
18 was before and is now still full and
19 unconditional. In my view for purposes of the
20 disclosure obligation.
21    Q. And what is -- I guess I should
22 ask, what is LBI public debt? How did you
23 interpret that?
24    A. That it was issued under the
25

TSG Reporting - Worldwide    877-702-9580

Page 44

A. KELLER - HIGHLY CONFIDENTIAL

1 registration statement. So publicly offered
2 and not debt that was placed with -- privately
3 with institutional investors or banks or --
4 but issued as bonds to the -- under the
5 registration statement.
6    Q. We'll look at some more -- a
7 couple more e-mails but you were giving advice
8 to LBH at this time concerning potential
9 impact of LBI going under?
10    A. Well, only -- at least in this
11 context, and I don't remember off the top of
12 my head other situations. Only insofar as
13 continuing SEC reporting obligations.
14    Q. Um-hum. I'm going to go ahead and
15 show you another document we'll mark as 520.
16    (Deposition Exhibit 520, document
17    bearing production number STB 09680,
18    marked for identification as of this
19    date.)
20 BY MR. THOMAS:
21    Q. Do you recognize this as an e-mail
22 from you to Brad Whitman and John Finley on
23 September 17th, 2008?
24    A. Yes.
25

TSG Reporting - Worldwide    877-702-9580

Page 45

A. KELLER - HIGHLY CONFIDENTIAL

1    Q. And who is Brad Whitman?
2    A. Brad was a fairly senior
3 investment banker in the Financial
4 Institutions Group at Lehman who was part of
5 the team that was working with Lehman on --
6 you know, for the couple of months leading up
7 to September 15th and working with Lehman on
8 the potential sale and ultimate -- and then
9 this transaction.
10    Q. And you refer to this -- are you
11 referring to the sale transaction with
12 Barclays as a Lazarus transaction?
13    A. Yes. From the perspective of the
14 employees.
15    Q. And why do you refer to it that
16 way?
17    A. Because Monday morning they were
18 out on the street with no jobs and Tuesday
19 they had jobs.
20    Q. Were you aware of any -- do you
21 think there was any alternative transaction
22 that LBI could have done that would have saved
23 those jobs?
24    MR. HINE: Object to the form.
25

TSG Reporting - Worldwide    877-702-9580

Page 46

A. KELLER - HIGHLY CONFIDENTIAL
1
2    A.    Not that -- at the time not that I
3    was aware of.
4    Q.    Are you aware of now?
5    A.    No.
6    Q.    Down below Mr. Whitman writes,
7    referring to the transaction, that it
8    literally saved the firm. Did you agree with
9    that?
10    A.    At least from the perspective of
11    the employees.
12    Q.    And do you have any sense of the
13    magnitude of impact on LBHI if LBI couldn't
14    have done this transaction or the Barclays
15    transaction couldn't have gone through and
16    they would have -- LBI would have had to
17    liquidate?
18    MR. AMER: Objection to the form
19    of the question.
20    MR. HINE: Objection.
21    MR. KAY: Objection.
22    MR. ROTHMAN: Objection.
23    A.    I don't.
24    Q.    Do you have any sense of the
25    magnitude of -- the size or value of the

TSG Reporting - Worldwide    877-702-9580

Page 47

A. KELLER - HIGHLY CONFIDENTIAL
1
2    guarantees that you referred to in
3    Exhibit 519?
4    A.    No, I don't recall what those
5    amounts were. But it would have been -- at
6    least those particular guarantees would have
7    just been adding up to the amount of
8    outstanding LBI debt.
9    Q.    Rough order of magnitude of that?
10    A.    Honestly I can't recall.
11    Q.    Do you know if it was in the many
12    billions?
13    A.    It would not surprise me if it
14    were several billion. It was a big company.
15    Q.    Okay. Let me go ahead and show
16    you a document we'll mark as 521.
17    (Deposition Exhibit 521, document
18    bearing production production
19    numbers STB 13350
20    through STB 13353, marked for
21    identification as of this date.)
22    BY MR. THOMAS:
23    Q.    And do you know who John Ericson
24    is?
25    A.    Yeah. He's another partner at
Simpson Thacher.

TSG Reporting - Worldwide    877-702-9580

Page 48

A. KELLER - HIGHLY CONFIDENTIAL
1
2    Q.    And Andrew Young?
3    A.    Andrew Young was an in-house
4    corporate attorney.
5    Q.    At Lehman?
6    A.    At Lehman, yes.
7    Q.    And Scott Willoughby?
8    A.    Scott Willoughby also. I believe.
9    Q.    This e-mail attaches an outline
10    concerning the default cascade if LBI were to
11    default.
12    Do you recall this work being done
13    by Simpson?
14    A.    I know that John Ericson was
15    involved in helping and in reviewing obviously
16    these matters, too. I don't recall this
17    particular -- seeing this particular backup
18    contingency plan. Although I may very well
19    have been copied on an e-mail at some point
20    that had it but...
21    Q.    The last line of this e-mail says,
22    "Essentially is (sic) BD goes down the whole
23    house comes down."
24    Do you have an understanding what
25    he was saying there?

TSG Reporting - Worldwide    877-702-9580

Page 49

A. KELLER - HIGHLY CONFIDENTIAL
1
2    A.    I would imagine what he means is
3    if LBI goes under then the holding company
4    will -- may very well also. Because LBI is
5    such a big part of the consolidated company.
6    Q.    And in part because of the full
7    and unconditional guarantees that LBHI had
8    given for LBI's debt?
9    A.    In part.
10    Q.    Do you disagree with that
11    assessment in any way?
12    A.    It does not surprise me to hear
13    the assessment but it wouldn't have done the
14    work.
15    Q.    Would you like to take a short
16    break or would you like to slog on?
17    A.    No, I'm all right. Continue.
18    Q.    Okay. Let me show you a document
19    we'll mark as 522.
20    (Deposition Exhibit 522, document
21    bearing production number STB 02989,
22    marked for identification as of this
23    date.)
24    BY MR. THOMAS:
25    Q.    A two-page e-mail chain. Please

TSG Reporting - Worldwide    877-702-9580

13 (Pages 46 to 49)

Page 50

1       A. KELLER - HIGHLY CONFIDENTIAL
2   take a moment and read the whole thing.
3       A.   I have one.
4       Q.   You only have one page?
5       A.   Yeah.
6       MR. AMER: That's all I have.
7       (Pause on the record.)
8       Q.   There may or may not be a second
9   page. It's very difficult to tell. The next
10  Bates stamp number is actually a separate
11  e-mail or not, but with that caveat we'll
12  proceed with this.
13      A.   Okay.
14      Q.   Do you recognize Exhibit --
15      MR. ROTHMAN: Well, hold on. Hold
16  on. Does the witness have a two-page
17  document or a one-page document?
18      MR. THOMAS: No, the witness has a
19  one-page document.
20      MR. ROTHMAN: Does he have the
21  page that we all have?
22      MR. AMER: Why don't we just
23  clarify for the record. What you've
24  marked as Exhibit 522 is a single page
25  which has Bates number STB 02989. So if
        TSG Reporting - Worldwide    877-702-9580

Page 51

1       A. KELLER - HIGHLY CONFIDENTIAL
2   you want to ask him about that that's...
3       MR. THOMAS: Right.
4       Q.   And the next document in your
5   production I'm just noting is an e-mail on a
6   related matter which may be a separate e-mail
7   so we're not attaching it for the moment. But
8   just note that I'm not trying to be tricky in
9   case there's a page 2.
10      So Exhibit 522 is Bates stamp
11  number STB 2989. And have you had a chance to
12  review that?
13      A.   Yes.
14      Q.   Do you recognize this as an e-mail
15  from John Finley to you and a number of other
16  folks dated September 19th at 1:48 a.m.?
17      A.   Well, that's certainly -- that's
18  what it looks like to me. I don't recall this
19  particular e-mail but...
20      Q.   Do you recall generally that after
21  the original APA was executed that there had
22  to be major changes to that agreement because
23  of the change in Lehman assets and the ability
24  to deliver all the assets?
25      MR. HINE: Object to the form.
        TSG Reporting - Worldwide    877-702-9580

Page 52

1       A. KELLER - HIGHLY CONFIDENTIAL
2       A.   I don't know exactly what reason
3   or reasons prompted it but it didn't surprise
4   me that given the fact that we had such a
5   short period of time to negotiate the original
6   APA that when people looked back at things
7   they might have thought things could have been
8   set forth more clearly. Whether or not that
9   was also driven or -- by changes in the
10  markets, that I don't know.
11      Q.   So you don't recall whether
12  radical changes going on in the market in part
13  required some of those changes?
14      A.   It wouldn't surprise me if that
15  were the reason but I don't know that that's
16  what -- I can't say as a fact what prompted
17  it.
18      Q.   And the changes made came to be
19  reflected in the first amendment to the APA
20  and then a letter agreement, sometimes
21  referred to as a clarification letter. Do you
22  recall that?
23      A.   I'm sorry. Repeat the question.
24      Q.   In the changes that were agreed
25  between the parties —
        TSG Reporting - Worldwide    877-702-9580

Page 53

1       A. KELLER - HIGHLY CONFIDENTIAL
2       A.   Yes.
3       Q.   -- were -- came to be reflected in
4   a document called the first amendment and then
5   also a letter agreement sometimes referred to
6   as the clarification letter?
7       A.   Yes.
8       Q.   And Simpson continued to be
9   involved in the drafting and negotiation
10  process throughout that week including with
11  respect to the -- we'll call it the
12  clarification letter?
13      A.   Yes.
14      Q.   Do you know the issue that's being
15  referred to here when Mr. Finley says "We gave
16  comments to Weil which our client was on and I
17  think they were preceding based on that
18  discussion"?
19      A.   I don't know what you mean by "the
20  issue."
21      Q.   The subject matter of those
22  discussions.
23      A.   Of the discussion that we had had
24  with Weil.
25      Q.   That's being referred to in this
        TSG Reporting - Worldwide    877-702-9580

Page 54

A. KELLER - HIGHLY CONFIDENTIAL
1  A. KELLER - HIGHLY CONFIDENTIAL
2  e-mail change -- chain.
3      A.   Mr. Lewkew sent an e-mail asking
4  about the -- I assume what the exact nature of
5  the assets and the liability in the contract
6  are.
7      Q.   Were there difficulties that week
8  in identifying Lehman assets, what they
9  actually had and didn't have?
10     A.   As I -- as I understand it now,
11  and I can't remember how much of this I was
12  aware of at the time or, you know, from having
13  read things subsequently, but with everything
14  going on for the Lehman bankruptcy and the
15  markets generally, that lots of their
16  customers were backing out of contracts,
17  grabbing assets, all sorts of things. So --
18  so if there were difficulties, again that
19  wouldn't surprise me.
20     Q.   Let me go ahead and show you a
21  document we'll mark as 523.
22          (Deposition Exhibit 523, document
23      bearing production number WGM-LEHMAN-E
24      00020028, marked for identification as
25      of this date.)

TSG Reporting - Worldwide    877-702-9580

Page 55

1  A. KELLER - HIGHLY CONFIDENTIAL
2  BY MR. THOMAS:
3      Q.   Whoop.  Excuse me.  Let me take
4  that back.  I marked...
5          (Pause on the record.)
6      Q.   Let me show you a document marked
7  as 523.
8          (Document review.)
9      Q.   Do you recognize this as an e-mail
10  from John Finley in which you're copied dated
11  September 18th, 2008?
12     A.   Yes.
13     Q.   And the lower e-mail, earlier in
14  time e-mail from Weil attaches a draft
15  clarification letter for discussion.  And then
16  Mr. Finley writes back, "Consider at what
17  point the changes would be significant enough
18  that you would want to run through the board."
19          Do you see that?
20     A.   Yes.
21     Q.   Were there any further board
22  meetings of LBHI or LBI after the one you
23  attended?
24     A.   I don't know.
25     Q.   To your knowledge were there?  Not

TSG Reporting - Worldwide    877-702-9580

Page 56

1  A. KELLER - HIGHLY CONFIDENTIAL
2  that you're aware of.
3      A.   To my knowledge, no.
4      Q.   Is it fair to say that Simpson was
5  giving consideration to the issue of whether
6  any changes were significant enough to have to
7  bring them back to the board? -
8          MR. HINE:  Object to the form.
9      A.   From -- certainly from this e-mail
10  one could see that since changes were made --
11  were being made to the agreement that it is
12  something that people should consider.  But as
13  John stated here, Weil is closer to what
14  discussions had been had with the board and
15  the agreement.  He's in a better position to
16  make that judgment.  At least in our view.
17     Q.   Although, Simpson did attend the
18  board meeting on the sale transaction.
19     A.   Yes.  But presumably there were
20  discussions with the board before that that we
21  were not part of.
22     Q.   Well, are you aware of any
23  determination by anyone at Simpson or Weil
24  that any of the changes being made to the sale
25  transaction were significant enough to require

TSG Reporting - Worldwide    877-702-9580

Page 57

1  A. KELLER - HIGHLY CONFIDENTIAL
2  going back to either the LBHI or LBI board?
3          MR. HINE:  Can we just hold on
4  second?  Can we get a time frame here?
5  You're talking about before -- because
6  we do have a privilege waiver issue
7  here.  You're asking him at the time,
8  right?  In other words, there was -- you
9  appear to be bordering on what could be
10  privileged issues if it's after
11  September 30th.
12          MR. THOMAS:  I think I understand
13  your question -- your point.
14          MR. HINE:  And just before you
15  correct it, the witness, I just want to
16  warn you, there's a limited waiver of
17  privilege here but it extends up to
18  September 30th only.  So to the extent
19  you're learning things after that that
20  are privileged you're not authorized to
21  waive the privilege.  But I think you
22  understand my point, Todd.
23          MR. ROTHMAN:  Please note my
24  objection to the question.
25  BY MR. THOMAS:

TSG Reporting - Worldwide    877-702-9580

Page 58

1      A. KELLER - HIGHLY CONFIDENTIAL
2      Q.  Are you aware of any determination
3  by anyone at Simpson or Weil Gotshal prior to
4  September 30th that any of the changes that
5  were being made to the sale transaction after
6  September 16th were significant enough to
7  require going back to either the LBHI or LBI
8  boards?
9      A.  No.
10     Q.  Let me going ahead and show you a
11 document we'll mark as -- strike that.
12         Let me show you a document we'll
13 mark as 524.
14         (Deposition Exhibit 524, document
15         bearing production numbers WGM-LEHMAN-E
16         00014009 through WGM-LEHMAN-E 00014029,
17         marked for identification as of this
18         date.)
19         MR. THOMAS:  And let me also show
20 you a document we'll mark as 525.
21         (Deposition Exhibit 525, document
22         bearing production numbers WGM-LEHMAN-E
23         00006149 through WGM-LEHMAN-E 00006168,
24         marked for identification as of this
25         date.)
       TSG Reporting - Worldwide    877-702-9580

Page 59

1      A. KELLER - HIGHLY CONFIDENTIAL
2              (Document review.)
3  BY MR. THOMAS:
4      Q.  Let me start with 525 which is an
5  e-mail from -- Robert Messineo?
6      A.  Messineo.
7      Q.  Messineo.  Is he at Weil Gotshal?
8      A.  Yes.
9      Q.  And it's to a number of folks
10 including yourself dated September 20th, 2008,
11 2:38 p.m.
12         Do you see that?
13     A.  Yes.  That was Saturday.
14     Q.  Okay.  That was Saturday.
15         And then looking at 424 -- strike
16 that.
17         On 525 it's sending you the latest
18 version of the clarification letter.
19     A.  Um-hum.
20     Q.  And then Exhibit 524 you're being
21 sent another more updated version of the
22 clarification letter showing changes being
23 made; is that right?
24     A.  Yes.
25     Q.  Is this consistent with your prior
       TSG Reporting - Worldwide    877-702-9580

- Page 60

1      A. KELLER - HIGHLY CONFIDENTIAL
2  testimony that you remained involved in the
3  sale transaction, negotiation, drafting
4  process throughout that weekend?
5      A.  Yes.
6      Q.  Let me show you a document we'll
7  mark as 526.
8         (Deposition Exhibit 526, document
9         bearing production numbers WGM-LEHMAN-E
10        00002784 through WGM-LEHMAN-E 00002786,
11        marked for identification as of this
12        date.)
13 BY MR. THOMAS:
14     Q.  This is an e-mail from Steve
15 Berkenfeld to yourself copying -- and other
16 people at -- excuse me.  This is an e-mail
17 from Steve Berkenfeld to yourself and two
18 attorneys at Weil dated September 20th, 2008,
19 2:50 p.m.
20         Do you recognize it as such?
21     A.  Yes.
22     Q.  And do you see an e-mail in the
23 chain from you to Mr. Berkenfeld asking the
24 question whether certain changes to the
25 clarification letter would require the
       TSG Reporting - Worldwide    877-702-9580

Page 61

1      A. KELLER - HIGHLY CONFIDENTIAL
2  Trustee's approval?
3      A.  Yes.
4      Q.  Was it your understanding that the
5  Trustee or representatives of the Trustee were
6  also involved in the drafting and negotiation
7  of the clarification letter?
8         MR. ROTHMAN:  Objection to form.
9      A.  It was my understanding that they
10 were there but it depends what you mean by
11 involved in the drafting.  They were not
12 involved in the drafting to it.
13     Q.  Were they involved in the
14 discussions about it?
15         Strike that.
16         When you say "there" do you mean
17 physically at Weil Gotshal's office where --
18     A.  Physically at Weil.
19     Q.  And that's where the clarification
20 letter was being finalized.
21     A.  Yes.  But I was not aware of any
22 direct conversations with the Trustee.
23     Q.  Is it your recollection that the
24 parties had agreed to the terms of the changes
25 to the APA just prior to the Friday night sale
       TSG Reporting - Worldwide    877-702-9580

16  (Pages 58 to 61)

Page 62

1    A. KELLER - HIGHLY CONFIDENTIAL
2  hearing but that the documentation had not
3  been finalized?
4        MR. HINE: Object to the form.
5    Q.    And that process continued?
6        MR. ROTHMAN: Join in the
7  objection.
8    A.    Sorry. Could you repeat the
9  question?
10    Q.    Sure. Do you recall generally
11  that the parties had reached agreement on
12  Friday about changes to the deal prior to the
13  court hearing but that then the actual
14  drafting and finalization of the document
15  continued over the weekend?
16        MR. HINE: Object to the form.
17        MR. KAY: Object.
18        MR. ROTHMAN: Objection.
19    A.    Again, our role was more -- more
20  of a back seat. I was not aware of the direct
21  conversations between the principals. And
22  then the letter would come first to Weil and
23  to Cleary and then through them to us. But --
24  so to what extent people had agreed to the
25  deal as of a particular point in time is very

TSG Reporting - Worldwide    877-702-9580

Page 63

1    A. KELLER - HIGHLY CONFIDENTIAL
2  difficult for me to say.
3    Q.    So Simpson -- part of Simpson's
4  role was once it heard or was informed about
5  the terms, to make sure that the contract
6  document -- documents reflected the agreement
7  of the principals, correct?
8        MR. HINE: Object to the form.
9    A.    At least to the extent we
10  understood what that was, yes. Or raise
11  questions or at least assist where we could.
12    Q.    And here where you raised a
13  question concerning the Trustee's approval, is
14  it fair to say Simpson was conscious of making
15  sure that everyone who needed to agree agreed
16  to the deal?
17        MR. HINE: Object to the form.
18        MR. ROTHMAN: Objection.
19    A.    I'm sorry. Repeat the question
20  again.
21    Q.    Is it fair to say that Simpson was
22  conscious of making sure that any approvals or
23  agreements necessary for the deal were
24  obtained?
25        MR. HINE: Same objection.

TSG Reporting - Worldwide    877-702-9580

Page 64

1    A. KELLER - HIGHLY CONFIDENTIAL
2    A.    At least where we could think of
3  what approvals might be necessary or ask if
4  approvals were necessary.
5    Q.    Was there ever a time when you
6  concluded that a necessary approval was not
7  obtained?
8    A.    No.
9    Q.    And were you over at Weil that
10  weekend, Saturday, Sunday?
11    A.    Yes. Both days.
12    Q.    Was anyone from the Trustee there?
13    A.    My understanding was that somebody
14  from -- a representative of the Trustee was
15  there but...
16    Q.    That someone from Houlihan? Or
17  excuse me.
18        MR. KAY: Hughes Hubbard.
19        MR. THOMAS: Hughes Hubbard.
20    A.    That I don't recall.
21    Q.    And was anyone from the Creditors
22  Committee there or any representatives of the
23  Creditors Committee?
24    A.    I believe that they were, yes.
25    Q.    So you were there and the best of

TSG Reporting - Worldwide    877-702-9580

Page 65

1    A. KELLER - HIGHLY CONFIDENTIAL
2  your recollection is that the Trustee and the
3  Creditors Committee were also represented by
4  someone there.
5    A.    Yes.
6    Q.    And were the Creditors Committee
7  and Trustee representatives participating in
8  discussions with other parties?
9        MR. ROTHMAN: Objection to the
10  form.
11        MR. KAY: Same objection.
12    A.    Not -- well, I had no direct
13  knowledge, but since they were there -- but at
14  least for the meetings that we were a part of,
15  that was just among the law firms, Cleary,
16  Weil, going over the agreements. They were
17  not in the room with us.
18    Q.    Were any -- so there was a
19  separate room where attorneys were having
20  discussions?
21    A.    Yes. There were many separate
22  conference rooms. And the attorneys would
23  often meet in one.
24    Q.    And do you know whether one of the
25  attorneys there was from Hughes Hubbard?

TSG Reporting - Worldwide    877-702-9580

Page 66

A. KELLER - HIGHLY CONFIDENTIAL
1    A.    I do not -- I don't recall.
2    Q.    Do you know whether one of the
3    attorneys there was from Milbank?
4    A.    I don't recall.
5    Q.    But in the -- there were also
6    broader meetings where the participants --
7    where the principals were involved in or
8    non-lawyers were involved in?
9    A.    To my knowledge, there were but we
10   were not in those rooms.
11        MR. ROTHMAN: Can I ask you to
12   keep your voice up a little bit?
13        THE WITNESS: Sure.
14   Q.    Did you have any sense that the
15   representatives from the Trustee or the
16   Committee were in any way excluded from the
17   discussions going on that weekend at Weil?
18        MR. KAY: Object to the form.
19        MR. ROTHMAN: Same objection.
20   A.    I don't know what you mean by "in
21   any way." To the extent they were not in the
22   conference rooms -- I mean, certainly they
23   couldn't be in all places at one time and
24   there were many conversations going on so --

TSG Reporting - Worldwide    877-702-9580

Page 67

A. KELLER - HIGHLY CONFIDENTIAL
1    with the lawyers, among principals, and
2    whoever the various parties were.
3    Q.    And when you say not in a
4    conference room, you're referring to the fact
5    there was going to be a breakout of lawyers
6    and you're not sure --
7    A.    There were many breakouts.
8    Q.    And you're not sure whether those
9    breakouts included lawyer representatives of
10   the Trustee or the Creditors Committee.
11   A.    Yes.
12   Q.    But you knew that representatives
13   of the Trustee and Creditors Committee were at
14   Weil and generally participating in this
15   negotiating drafting process.
16        MR. KAY: Object to the form.
17        MR. ROTHMAN: Objection.
18        MR. AMER: Objection to form. You
19   can answer.
20   A.    I mean, I knew that they were --
21   or at least I believed that they were there,
22   that representatives were there. But to what
23   extent they participated I don't know.
24   Q.    And did they review drafts of

TSG Reporting - Worldwide    877-702-9580

Page 68

A. KELLER - HIGHLY CONFIDENTIAL
1    the -- did they have access to drafts of
2    the clarification letter that were being
3    finalized over the weekend?
4        MR. AMER: I'll object. I think
5    it's pretty clear he doesn't have a
6    basis to know what they did.
7        MR. KAY: I'll make the same
8    objection.
9        MR. ROTHMAN: Objection.
10        MR. THOMAS: He clearly could be
11   aware that they had access to drafts or
12   they were given drafts.
13        MR. AMER: Well, he can answer.
14   A.    Yeah, I was not directly aware. I
15   knew that -- or at least believed that there
16   were representatives present. But the extent
17   of their involvement I don't know.
18   Q.    Do you believe they were reviewing
19   drafts of the clarification agreement?
20        MR. HINE: What deposition topic
21   are we on now?
22        MR. KAY: Object to the form.
23        MR. ROTHMAN: Objection.
24        MR. THOMAS: The drafting of the

TSG Reporting - Worldwide    877-702-9580

Page 69

A. KELLER - HIGHLY CONFIDENTIAL
1    clarification letter.
2    A.    Just again I don't know to what
3    extent they were given documents or what
4    discussions they had, with whom.
5    Q.    Was the principal activity going
6    on the finalization of the clarification
7    letter there?
8    A.    Yes.
9    Q.    And they were there.
10   A.    Yes.
11   Q.    And you're not aware of them being
12   denied access to the clarification letter.
13   A.    No.
14        MR. ROTHMAN: Objection to form.
15        MR. KAY: Just note my objection,
16   please.
17   Q.    At any point in that process did
18   any of them -- any representative of the
19   Trustee or the Creditors Committee object to
20   the -- any terms of the clarification letter
21   or its execution?
22   A.    I don't know.
23   Q.    To your knowledge, did they?
24   A.    No.

TSG Reporting - Worldwide    877-702-9580

Page 70

A. KELLER - HIGHLY CONFIDENTIAL
1
2       MR. THOMAS:  We have to change
3  tapes so why don't we go ahead and take
4  a break.
5       MR. AMER:  Okay.
6       THE VIDEOGRAPHER:  The time is
7  11:17.  We're going off the record.
8       (Recess taken.)
9       THE VIDEOGRAPHER:  The time is
10  11:27.  We're on the record.
11 BY MR. THOMAS:
12      Q.  Let me go ahead and show you a
13 document that's previously been marked
14 Exhibit 25.
15          Actually, can I see that document
16 for a moment?
17      A.  Sure. (Handing.)
18      Q.  Do you recognize that as the
19 letter agreement or clarification letter that
20 the parties were finalizing over the weekend
21 of September 20th and September 21st?
22      A.  Yes.
23      Q.  And you received a -- in addition
24 to the revisions going on over the weekend,
25 you also received a copy of the final version

TSG Reporting - Worldwide    877-702-9580

Page 71

1       A. KELLER - HIGHLY CONFIDENTIAL
2  of this at the time, correct?
3       A.  Yes.
4       Q.  Let me show you a document
5  previously marked as Exhibit 464A.
6          (Document review.)
7       Q.  I'm going to ask you a number of
8  questions about the document but using the
9  document as more of a prop for the questions
10 than anything else, it's an e-mail from
11 someone at Alvarez & Marsal.  What was Alvarez
12 & Marsal's role during this week at Lehman?
13      A.  During which week?
14      Q.  The week of September 15th.  Do
15 you recall generally?
16      A.  I don't recall them in the
17 process.
18      Q.  Okay.  Do you recall Mr. Marsal
19 being appointed chief restructuring officer
20 shortly after the bankruptcy filing?
21      A.  Yes.  But I don't remember exactly
22 when I knew that.
23      Q.  This is an e-mail chain that's
24 entitled, "Here's all we have at the moment
25 that makes an effort to describe what Barclays

TSG Reporting - Worldwide    877-702-9580

Page 72

1       A. KELLER - HIGHLY CONFIDENTIAL
2  got, didn't get."
3          And let me ask you to turn to page
4  3, please.
5       A.  The first page of --
6       Q.  The third page which is 2293.
7       A.  Yes.
8       Q.  Under Purchased Assets it reads,
9  "At the closing Barclays acquired all
10 purchased assets..." and then it goes on to
11 list various assets.  Under Securities and
12 Trading Operations it says "The securities set
13 forth on Schedule A to the clarification
14 letter i.e., the securities subject to the
15 Barclays repurchase agreement."
16      A.  Um-hum.
17      Q.  Was that consistent with your
18 understanding that as part of the final deal
19 Barclays was getting all of the repo
20 collateral?
21      MR. HINE:  Object to the form.
22      MR. ROTHMAN:  Same objection.
23      A.  Yes.
24      Q.  And that's something that you and
25 Simpson were aware of prior to the closing of

TSG Reporting - Worldwide    877-702-9580

Page 73

1       A. KELLER - HIGHLY CONFIDENTIAL
2  the deal, correct?
3       MR. HINE:  Object to the form.
4       A.  To the extent that the letter
5  talks about the Barclay repo, yes.  We were
6  not aware of the process by which that came
7  about, that happened outside of our
8  involvement.
9       Q.  But you're aware as part of the
10 clarification letter all of the repo
11 collateral was being transferred to Barclays
12 as part of the sale transaction, correct?
13      MR. HINE:  Object to the form.
14      MR. ROTHMAN:  Objection.
15      A.  Or that it had -- had it stepped
16 into that repo transaction in doing that,
17 would get these assets.
18      Q.  So as part of the sales
19 transaction all of the repo collateral would
20 be transferred to Barclays, correct?
21      MR. HINE:  Same objection.
22      MR. ROTHMAN:  Objection.
23      MR. AMER:  I'll object to the form
24 of the question.
25      Q.  And you're welcome to refer back

TSG Reporting - Worldwide    877-702-9580

Page 74

1     A. KELLER - HIGHLY CONFIDENTIAL
2   to the clarification letter.
3        MR. HINE: What examination topic
4   are were on again?
5        MR. THOMAS: The clarification
6   letter negotiation of the repo
7   collateral.
8        A.   Yes. I mean, it's set forth in
9   paragraph 13.
10       Q.   And going back to Bates page 2293,
11   under the list of purchased assets conveyed as
12   part of the transaction --
13       A.   Um-hum.
14       Q.   -- the second bullet point says,
15   "The securities and other assets held in LBI's
16   clearance boxes as of the time of closing."
17       Do you see that?
18       A.   Yes.
19       Q.   Is it consistent -- that also
20   consistent with your understanding that those
21   assets held in LBI's clearance boxes would
22   also mean transferred to Barclays as part of
23   the sales transaction?
24       MR. ROTHMAN: Objection.
25       A.   Consistent with my understanding

TSG Reporting - Worldwide    877-702-9580

Page 75

1      A. KELLER - HIGHLY CONFIDENTIAL
2   of the clarification letter.
3        Q.   And --
4        A.   That that had been agreed.
5        Q.   You have that understanding
6   because that's what it says in the
7   clarification letter; is that what you're
8   saying?
9        A.   Yes.
10       Q.   And if you would turn the page to
11   2294, the top bullet point there says, "All
12   exchange traded derivatives and any property
13   that may be held as security obligations under
14   such derivative."
15       Do you see that?
16       A.   Yes.
17       Q.   Is it also consistent with your
18   understanding that those assets, all exchange
19   traded derivatives and any property that may
20   be held as security obligations under such
21   derivatives were being transferred to Barclays
22   as part of the sale transaction?
23       MR. ROTHMAN: Objection to form.
24       A.   What was my understanding of the
25   deal was what's reflected in this agreement.

TSG Reporting - Worldwide    877-702-9580

Page 76

1      A. KELLER - HIGHLY CONFIDENTIAL
2   I don't know -- I just stumble on "all"
3   because I'm not sure -- I would have
4   thought -- and I don't know how this memo was
5   put together but that it would track the
6   language.
7        MR. AMER: Just so we're clear on
8   the record when you say "in this
9   agreement" you're referring to the
10   clarification letter?
11       THE WITNESS: Yes.
12       Q.   And if you'd take a moment to just
13   review any portion of the clarification letter
14   you'd like just to clarify whether that's
15   consistent with your understanding of the sale
16   transaction, that all exchange traded
17   derivatives and any property that may be held
18   as security obligations under such derivatives
19   were, in fact, being conveyed to Barclays.
20       A.   I thought -- and I'd have to look
21   at this again. I thought in connection with
22   exchange traded derivatives there was some
23   discussion of certain types that were not part
24   of the assets. But I at this point can't
25   recall whether that fell away or -- that's why

TSG Reporting - Worldwide    877-702-9580

Page 77

1      A. KELLER - HIGHLY CONFIDENTIAL
2   I stop at "all."
3        Or it could have been that what
4   I'm recalling is derivatives more broadly and
5   then exchange traded derivatives were part
6   of -- part of the assets that were going over
7   but I can't remember at this point. I would
8   have to look over the agreements again.
9        Q.   Okay. And what would you look at,
10   what agreements precisely would you look at?
11       A.   The clarification letter.
12       Q.   Could you take a moment just to
13   review Purchased Assets and Excluded Assets
14   under the clarification letter and see if
15   that --
16       A.   It says Purchased assets shall
17   include...and in (ii)(c), exchange traded
18   derivatives.
19       Q.   And does that refresh your
20   recollection that they were included?
21       A.   Certainly that exchange -- some
22   exchange traded derivatives were included.
23   Right now I just pause on what the intent was
24   as far as all or whether there were any that
25   may not have been.

TSG Reporting - Worldwide    877-702-9580

Page 78

A. KELLER - HIGHLY CONFIDENTIAL

1     Q.  You don't -- you don't
2 specifically recall any limitation on the
3 exchange traded derivatives?
4     A.  I do not recall.
5     Q.  And you don't see any limitation
6 in the clarification —
7     A.  Not any express limitation.
8     Q.  Do you see any implied limitation?
9     A.  Well, only to the extent that the
10 word "all" is used.
11     Q.  The parenthetical that says -- the
12 parenthetical that's in the clarification
13 letter, (ii), part C --
14     A.  Um-hum.
15     Q.  -- and any property that may be
16 held to secure obligations under such
17 derivatives, do you understand that to be
18 referring to collateral associated with the
19 exchange traded derivatives?
20     MR. ROTHMAN: Objection to the
21 form.
22     A.  Yes.
23     Q.  And that would be referring to all
24 collateral, whether it were securities or cash

TSG Reporting - Worldwide    877-702-9580

---

Page 79

A. KELLER - HIGHLY CONFIDENTIAL

1 or some other type of collateral?
2     MR. HINE: Object to the form.
3     MR. ROTHMAN: Objection.
4     A.  I would read the words "any
5 property" referring back to such derivatives,
6 yes. Collateral for such derivatives.
7     Q.  Which would include securities and
8 cash and any other type of property?
9     MR. ROTHMAN: Same objection.
10     A.  Any property.
11     Q.  I'm sorry. Was that yes?
12     A.  I would read property to include
13 cash.
14     Q.  And is that consistent with your
15 reading of it at the time?
16     A.  Yes.
17     Q.  Let me turn back to Exhibit 464A
18 and the eighth page, AM 2296.
19     A.  Yes.
20     Q.  And -- we're actually still --
21 there's a number of pages that are still under
22 the subheading on 2293 that says Purchased
23 Assets. And we're under the sub-subheading of
24 customer accounts which is the bottom of 2295.

TSG Reporting - Worldwide    877-702-9580

---

Page 80

A. KELLER - HIGHLY CONFIDENTIAL

1     Do you see the bullet point at the
2 top of the page that says Purchaser shall
3 receive...and then the second subpart there
4 says "...to the extent permitted by applicable
5 law and as soon as practicable after closing,
6 769 million of securities as held by or on
7 behalf of LBI on the date hereof pursuant to
8 Rule 15(c)3-3 of the Securities Exchange Act
9 of 1934 as amended or securities of
10 substantially the same nature and value"?
11     Do you see that?
12     A.  Yes.
13     Q.  Do you understand that to mean
14 that to the extent permitted by law there's
15 769 million of 15(c)3 securities would be
16 transferred to Barclays as part of this
17 transaction, or if not permitted by law then
18 securities of substantially the same nature
19 and value would be transferred?
20     MR. HINE: Objection to the form.
21     MR. KAY: Objection.
22     MR. ROTHMAN: Objection to the
23 form.
24     MR. HINE: Also caution the

TSG Reporting - Worldwide    877-702-9580

---

Page 81

A. KELLER - HIGHLY CONFIDENTIAL

1 witness that if he's -- in answering
2 that question you have to rely on any
3 kind of privileged information
4 post-dating September 30th, you're not
5 allowed to reveal it.
6     A.  I had not focused on that question
7 and reading it now the language is ambiguous
8 to me. I could read it either way.
9     Q.  What is the other way?
10     A.  The other way being you have to
11 transfer value to the extent you can by
12 applicable law of 769 million of securities
13 held pursuant to 15(c)3-3 or other securities
14 of substantially the same nature and value.
15     So that hypothetically if you
16 could only transfer 500 million you transfer
17 either 500 million held pursuant to 15(c)3-3
18 or 500 million of securities of substantially
19 the same nature or value is the other way I
20 could read that.
21     Q.  What would be -- in that reading
22 what would be the meaning of the second
23 clause? Because obviously no seller is going
24 to gratuitously —

TSG Reporting - Worldwide    877-702-9580

Page 82

1    A. KELLER - HIGHLY CONFIDENTIAL
2         MR. ROTHMAN: Objection to form.
3         MR. HINE: Objection to form.
4         MR. AMER: I'm going to object
5    because I think you can only get at what
6    his understanding was at the time.
7         MR. THOMAS: Okay.
8         Q.   What -- was it your understanding
9    at the time as part of the sale transaction
10   15(c)3 assets were being transferred to
11   Barclays?
12        A.   I do not know exactly what
13   15(c)3-3 assets are. It's not an area of the
14   business that I'm familiar with. My
15   understanding on this particular clause as a
16   general matter was to the extent that LBI held
17   customer assets and the business moved over to
18   Barclays, those customer assets had to move
19   over in order to keep doing business with the
20   customers. They weren't really anyone's
21   assets since they were the customers' assets
22   but the people and the business running it
23   were moving over to Barclays.
24        Q.   Let me go ahead and show you a
25   document we'll mark as 527.
         TSG Reporting - Worldwide    877-702-9580

Page 83

1    A. KELLER - HIGHLY CONFIDENTIAL
2         (Deposition Exhibit 527, Lehman
3    Brothers Holdings, Inc. Form 8-K, marked
4    for identification as of this date.)
5    BY MR. THOMAS:
6         Q.   Before I do that, let me ask you
7    one other question.
8         A.   On the same page?
9         Q.   Let's go back to 2293. The
10   clearance box assets.
11        A.   Um-hum.
12        Q.   Do you know -- or do you have an
13   understanding -- did you have an understanding
14   of whether those assets identified there would
15   have been transferred to Barclays as part of
16   the original APA agreement?
17        MR. ROTHMAN: Objection to form.
18        Q.   You're welcome to refer back to
19   the agreement.
20        MR. HINE: Objection to form.
21        A.   That might take a while.
22        (Document review.)
23        A.   I don't recall the clearance boxes
24   being referred to in the APA. That said,
25   again, this is an area that -- of the business
         TSG Reporting - Worldwide    877-702-9580

Page 84

1    A. KELLER - HIGHLY CONFIDENTIAL
2    that I wasn't as familiar with. The part of
3    the normal trading operations which is
4    something we didn't typically get involved
5    with. So if someone else were to read the
6    contract to include them, in my mind this was
7    one of those things I would have expected to
8    see as a clarification because this was
9    drafted in one day.
10        Q.   This being the original APA?
11        A.   Yes.
12        Q.   Let me show you a document we'll
13   mark as 527.
14        (Document review.)
15        Q.   Do you recognize this document?
16        A.   Yes.
17        Q.   Would you describe what it is,
18   please?
19        A.   I'm sorry?
20        Q.   Would you describe what it is,
21   please?
22        A.   It's an 8-K that Lehman Brothers
23   Holding as a public reporting company had to
24   file under the 8-K given the entry into the
25   Asset Purchase Agreement as a material
         TSG Reporting - Worldwide    877-702-9580

Page 85

1    A. KELLER - HIGHLY CONFIDENTIAL
2    contract.
3         Q.   And let me show you a document
4    we'll mark as 528 in connection with this.
5         (Deposition Exhibit 528, document
6    bearing production numbers STB 07579
7    through STP 07582, marked for
8    identification as of this date.)
9    BY MR. THOMAS:
10        Q.   528 is an e-mail chain dated
11   September 22nd e-mail chain. It includes
12   e-mails to and from yourself.
13        A.   Um-hum.
14        Q.   Do you recognize it as such?
15        A.   Yes.
16        Q.   And in your e-mail you're asking
17   about "Has the agreement with Alvarez & Marsal
18   been approved by the bankruptcy court, or is
19   it still subject to that approval (as we say
20   in this draft 8-K)?"
21        Do you see that?
22        A.   Yes.
23        Q.   You were involved in the drafting
24   of the 8-K?
25        A.   Yes. Reviewing it.
         TSG Reporting - Worldwide    877-702-9580

Page 86

1    A. KELLER - HIGHLY CONFIDENTIAL
2    Q.    And did you offer -- did Simpson
3    review and revise the document before it was
4    issued?
5    A.    They certainly reviewed and
6    commented. I don't recall who was actually
7    the draftsman.
8    Q.    But Simpson would have reviewed
9    it --
10    A.    Yes.
11    Q.    -- to make sure it was accurate
12    and appropriate?
13    A.    Yeah.
14    Q.    And if you would turn back to the
15    actual 8-K itself.
16    A.    (Witness complies.)
17    Q.    There's a description -- looking
18    at the first two paragraphs, it says Asset
19    Purchase Agreement with Barclays, Inc. And
20    about half way down the first paragraph it
21    says, "In addition, Lehman and Barclays
22    entered into a letter agreement dated as of
23    September 20th, 2008 (the letter agreement and
24    together with the original agreement in the
25    first amendment the Asset Purchase

TSG Reporting - Worldwide    877-702-9580

Page 87

1    A. KELLER - HIGHLY CONFIDENTIAL
2    Agreement)."
3    Do you see that language?
4    A.    Yes.
5    Q.    And was that in fact an accurate
6    description of the documents that constituted
7    the transaction?
8    A.    Yes.
9    Q.    And in the second paragraph at the
10    end it notes that the bankruptcy court granted
11    the sale on September 20th, 2008.
12    Do you see that?
13    A.    Yes.
14    Q.    And was it your view that the sale
15    that was granted was the sale divined by the
16    agreements identified in the prior paragraph?
17    MR. HINE: Objection to form.
18    MR. ROTHMAN: Same objection.
19    A.    That is my understanding, although
20    I wasn't involved, as I said, with the
21    bankruptcy court proceeding so I don't know
22    what was described and actually approved.
23    Q.    You had no reason to believe that
24    the sale -- strike that.
25    You knew that the bankruptcy

TSG Reporting - Worldwide    877-702-9580

Page 88

1    A. KELLER - HIGHLY CONFIDENTIAL
2    court's approval of the transaction came late
3    on the night of Friday, September 19th, or
4    early in the morning of --
5    A.    It would have been early morning
6    of the 20th, yes.
7    Q.    Okay. You knew that.
8    And you knew at that time the
9    clarification letter had not been finalized,
10    at least in writing, correct?
11    A.    Correct.
12    Q.    And you knew that there was --
13    that the clarification eventually was --
14    letter was finalized on the morning of
15    September 22nd, correct?
16    A.    Yes.
17    Q.    And --
18    MR. HINE: Object to the form.
19    Q.    -- you knew there was no further
20    approval of the sale documents including the
21    clarification letter after September -- the
22    early morning hours of September 20th,
23    correct?
24    A.    I did not know of any others.
25    Q.    You didn't believe there was any

TSG Reporting - Worldwide    877-702-9580

Page 89

1    A. KELLER - HIGHLY CONFIDENTIAL
2    other court hearing or approval process?
3    A.    Was not aware.
4    MR. KAY: Object to the form.
5    Q.    Did anyone -- did Simpson or
6    anyone else, any other party, to your
7    knowledge, express any belief that any further
8    court approval of the clarification letter or
9    sale transaction was necessary?
10    A.    I don't know of anyone at Simpson
11    that did but I can't speak for others but
12    that's something I would have assumed Weil was
13    responsible for.
14    Q.    But you were at Weil during the
15    negotiations of the clarification letter and
16    to your knowledge no one took the position
17    that any further court approval was needed for
18    the clarification letter, correct?
19    A.    I don't recall anyone taking that
20    position.
21    Q.    And in the subsequent week after
22    the closing of the deal, do you recall anyone
23    at Simpson or otherwise expressing that point
24    of view that further court approval was
25    necessary?

TSG Reporting - Worldwide    877-702-9580

Page 90

1    A. KELLER - HIGHLY CONFIDENTIAL
2    A.    No.
3    Q.    Let me ask you to turn the page to
4    page 3 of the 8-K.
5        MR. HINE: You said the 8-K or the
6    APA?
7        MR. THOMAS: 8-K.
8        MR. HINE: Okay.
9    Q.    And under Key Assets Sold By
10   Lehman, do you see that section?
11   A.    Yes.
12   Q.    It says, "Lehman's United States
13   and Canadian investment banking and capital
14   markets business."
15       Do you see that?
16   A.    Yes.
17   Q.    Is that consistent with your view
18   of this transaction that it was essentially a
19   sale of a business?
20   A.    Yes. In the broadest -- in the
21   broad sense.
22   Q.    And that same bullet point at the
23   end it says Barclays also acquired certain
24   securities of LBI as part of its trading
25   operations.

TSG Reporting - Worldwide    877-702-9580

Page 91

1    A. KELLER - HIGHLY CONFIDENTIAL
2    A.    It says that, yes.
3    Q.    Now, why were there no dollar
4    amounts given with respect to assets acquired
5    or liabilities assumed?
6        MR. AMER: In the 8-K?
7        MR. THOMAS: In the 8-K.
8        THE WITNESS: Right.
9        MR. THOMAS: Or the sale
10   transaction or anything else. The 8-K.
11   A.    For purposes of 8-K dislocation we
12   wanted to describe the transaction in all
13   material respects but that means more
14   generally. So it wouldn't necessarily have
15   needed to get into specific dollar values. We
16   talk about the sale of the businesses.
17   Q.    The specific dollar values or
18   estimates would not have been a material
19   disclosure for this purpose.
20       MR. HINE: Object to the form.
21       MR. AMER: Object to the form of
22   the question.
23   A.    Not in our view.
24   Q.    Do you know if it would have been
25   possible the week of September 15th to have

TSG Reporting - Worldwide    877-702-9580

Page 92

1    A. KELLER - HIGHLY CONFIDENTIAL
2    come up with an accurate valuation of Lehman's
3    assets?
4    A.    I do not.
5    Q.    At any point were you ever told or
6    otherwise informed that either of the parties
7    intended for the value of assets to end up
8    being exactly equal to the value of assumed
9    liabilities?
10       MR. AMER: Can we just put a limit
11   on that, up through September 30?
12       MR. THOMAS: Sure.
13   A.    I'm not quite sure in what context
14   you're asking the question. For the overall
15   transaction or -- I mean, there is certainly
16   the --
17   Q.    The overall transaction.
18   A.    Yeah. The overall transaction,
19   no. You know, if -- I mean, just very
20   theoretically if assets equals liabilities --
21   well, again, it depends how you look -- for
22   the overall transaction, no.
23   Q.    And would that have been possible
24   without knowing what the value of the assets
25   were or would be at closing or the value of

TSG Reporting - Worldwide    877-702-9580

Page 93

1    A. KELLER - HIGHLY CONFIDENTIAL
2    the assumed liabilities since some of them
3    would be assumed in the future or conditioned
4    on Barclays' election?
5        MR. HINE: Object to the form.
6        MR. AMER: Objection to the form
7    of the question.
8    A.    I don't know what you mean by
9    would it have been possible. If somebody
10   wanted to do the deal that way and certain
11   assets or liabilities had to be estimated then
12   they would come up with their best estimate.
13   Q.    But in terms of -- in a situation
14   like this where the value of certain Lehman
15   assets couldn't be estimated and value of
16   certain liabilities wasn't known, in your view
17   would it have been possible to structure this
18   in a way that required that the value of
19   assets have to equal value of liabilities as
20   of a particular closing?
21       MR. HINE: Objection to form.
22       MR. KAY: Same objection.
23       MR. AMER: Objection to the form
24   of the question.
25       MR. ROTHMAN: Join the objection.

TSG Reporting - Worldwide    877-702-9580

Page 94

A. KELLER - HIGHLY CONFIDENTIAL
1    A.    I suppose that could be said.
2  It's a matter of degree. Depending on the
3  business. But for any business that you sell,
4  people may have different views on assets and
5  liabilities.
6    Q.    At any point did Simpson consider
7  putting a true-up provision into the agreement
8  as a way of after the fact trying to balance
9  out value of assets and value of liabilities?
10    MR. HINE: Object to the form.
11    A.    No not to my knowledge.
12    Q.    So just to be clear, at no point
13  were you told that the deal was supposed to
14  be -- it was supposed to somehow be predicated
15  upon or involve the value of assets ultimately
16  equalling the value of liabilities?
17    MR. HINE: Object to the form.
18    A.    I'm unclear as to the exact
19  meaning of the question. There's certainly a
20  portion of the business that was sold that's
21  referred to as the matched book. But that was
22  part of the assets and liabilities. That was
23  sort of viewed generally my understanding was
24  as assets equals liabilities. But that was
25
TSG Reporting - Worldwide    877-702-9580

Page 95

A. KELLER - HIGHLY CONFIDENTIAL
1  part of the overall transaction.
2    Q.    So there was no requirement --
3    A.    So that's why I ask what do you
4  mean by the transaction. With the overall
5  transaction there were other aspects to it
6  that could -- could affect that answer.
7    Q.    And did the matched book values
8  change drastically throughout that week?
9    MR. HINE: Object to the form.
10    A.    They could have given what was
11  going on in the market.
12    MR. AMER: Can you just read back
13  the question.
14    (Record read.)
15    MR. AMER: The question is whether
16  you have knowledge about whether that
17  changed.
18    A.    I don't have direct knowledge of
19  it.
20    Q.    Was there any reference in the
21  final agreement to any -- to matched book?
22    MR. HINE: Object to the form.
23    A.    Not those words, no.
24    Q.    Conceptually was it?
25
TSG Reporting - Worldwide    877-702-9580

Page 96

A. KELLER - HIGHLY CONFIDENTIAL
1    MR. HINE: Objection.
2    Q.    I mean, you say not those words.
3  Were they referred -- other words referred to
4  some type of matched book?
5    A.    I had viewed in the initial draft
6  of the APA the long positions and short
7  positions as reflecting the two sides of that
8  matched book.
9    Q.    The 70 billion versus the 69
10  billion?
11    A.    Right.
12    Q.    Do you know how that 70 billion
13  was calculated?
14    A.    No.
15    Q.    Do you know if there was a list of
16  CUSIPs for that -- making up that 70 billion?
17    A.    At the time that 70 billion was
18  that schedule that we referred to earlier.
19  And I don't know of a list of CUSIPs at that
20  time. Because that was, as I'd said, the
21  first day we came to Lehman's offices was my
22  understanding had been already agreed to by
23  the principals.
24    Q.    Was it your understanding that was
25
TSG Reporting - Worldwide    877-702-9580

Page 97

A. KELLER - HIGHLY CONFIDENTIAL
1  an updated valuation of certain Lehman
2  securities?
3    MR. HINE: Object to the form.
4    A.    I'm not sure what you mean by
5  updated or how updated but it would have been
6  the value of the -- it was my understanding
7  that that was the value of the assets in the
8  matched book.
9    Q.    That that was -- do you understand
10  what the value of the -- those assets were on
11  Friday, September 12th?
12    A.    I don't know as of exactly when.
13    Q.    Do you know -- were you aware of
14  values placed on the amount of the repo
15  collateral that transferred to Barclays?
16    MR. HINE: Object to the form.
17    A.    The repo collateral being the
18  collateral in the Barclays repo.
19    Q.    Yes.
20    A.    Yeah. I was not directly aware of
21  values. Those values.
22    Q.    Were you indirectly aware?
23    A.    Well, my impression is that it was
24  at least part of if not the values that we
25
TSG Reporting - Worldwide    877-702-9580

Page 98

1    A. KELLER - HIGHLY CONFIDENTIAL
2    referenced earlier that Lori Fife referred to
3    that was in your request.
4        Q.   Were you aware that the repo
5    assets had a nominal value placed on them by
6    custodian banks like JPM or Bank of New York
7    that were in the neighborhood of $49 billion?
8        A.   I was not aware of what values any
9    of those parties had placed on the assets.
10       Q.   Were you aware of there -- an
11   issue coming up with respect to whether those
12   marks for the repo collateral were stale or
13   otherwise inaccurate?
14       MR. HINE: Object to the form of
15   the question.
16       A.   Yeah. I don't recall.
17       Q.   Do you recall the parties getting
18   together later in the week, Wednesday,
19   Thursday and/or Friday, in efforts to try to
20   update the value of those securities held in
21   the repo?
22       A.   I was not aware of those meetings.
23       Q.   Were you aware that the process
24   was going on generally or are you just --
25       A.   No, as I said, the first I had
         TSG Reporting - Worldwide    877-702-9580

Page 99

1    A. KELLER - HIGHLY CONFIDENTIAL
2    heard of the Barclays repo was when it was --
3    showed up in the draft clarification letter at
4    some point.
5        Q.   Let me show you a document we'll
6    mark as 529.
7        (Deposition Exhibit 529, document
8        bearing production numbers STB 06214
9        through STP 06215, marked for
10       identification as of this date.)
11   BY MR. THOMAS:
12       Q.   So before we leave the topic of
13   the valuation of the repo collateral,
14   Simpson -- you don't have any knowledge of
15   what that collateral was really worth.
16       A.   No.
17       (Document review.)
18       Q.   This is an e-mail from John
19   Ericson. Who is that?
20       A.   Again, he's another partner at
21   this firm who was also involved.
22       Q.   Involved in the sale transaction
23   to Barclays?
24       A.   Yes.
25       Q.   And you're copied on this e-mail.
         TSG Reporting - Worldwide    877-702-9580

Page 100

1    A. KELLER - HIGHLY CONFIDENTIAL
2    Who is James Killerlane?
3        A.   He was an in-house lawyer who was
4    helping with the transaction but specifically
5    here involved in drafting that 8-K that we
6    spoke about earlier.
7        Q.   The last e-mail here -- and do you
8    see that e-mail discussing issues with the
9    8-K?
10       A.   Yes.
11       Q.   The last e-mail says "Rod noted
12   that some of the officers who negotiated the
13   sale for LBHI were hired by Barclays with
14   other employees as part of the deal and
15   suggested we mention this in the 8-K. If a
16   material relationship is reported the rules
17   require a registrant to disclose the formula
18   or a principle followed in determining the
19   amount of the consideration for the
20   transaction. This is sensitive disclosure, of
21   course, and we've been thinking internally in
22   speaking to Rod about how to word this."
23       Do you recall this issue coming up
24   for consideration?
25       A.   I don't recall it, no.
         TSG Reporting - Worldwide    877-702-9580

Page 101

1    A. KELLER - HIGHLY CONFIDENTIAL
2        Q.   Was it determined that this was
3    not a material issue and therefore not
4    included in the 8-K?
5        A.   That I don't recall either. I'd
6    have to go back and read the 8-K to see what
7    might have addressed the point.
8        Q.   Would you mind turning back to the
9    8-K quickly.
10       (Document review.)
11       A.   Yeah. I don't see mention of
12   discussion of the employee agreements.
13       Q.   Does that mean it was determined
14   not to require disclosure?
15       A.   I would assume so.
16       Q.   You don't remember why or the
17   substance of it?
18       A.   No. No.
19       MR. THOMAS: Why don't we go off
20   the record. I'm close to being done but
21   I have a few more questions.
22       THE WITNESS: Okay.
23       THE VIDEOGRAPHER: The time is
24   12:13. We're off the record.
25       (Recess taken.)
         TSG Reporting - Worldwide    877-702-9580

Page 102

A. KELLER - HIGHLY CONFIDENTIAL

1  
2        THE VIDEOGRAPHER:  The time is
3  12:21.  We're on the record.
4  BY MR. THOMAS:
5        Q.    The clarification letter involved
6  changes to the assets and liabilities being
7  conveyed as part of the sale transaction,
8  correct?
9        A.    Yes.  Changes to the language.
10        Q.    And changes to the assets and
11  liabilities also.
12        A.    It could be.  It was difficult for
13  me to understand to the -- to what extent the
14  language was just further description of the
15  intent of the original agreement or a change.
16        Q.    Because the intent of the original
17  agreement was to sell a business, not to sell
18  some particular value of assets or
19  liabilities.
20        MR. HINE:  Objection to form.
21        MR. ROTHMAN:  Objection to form.
22        A.    No.  Not necessarily.  Because the
23  language used in the definition of purchased
24  assets, again, my sense was I was not
25  surprised to see a clarification letter

TSG Reporting - Worldwide    877-702-9580

Page 103

A. KELLER - HIGHLY CONFIDENTIAL

1  
2  putting a finer line on what may have been
3  intended in that definition of purchased
4  assets or liabilities.  More a description as
5  to what particular assets, broader terms might
6  have covered.  In part.  If there were actual
7  changes to the agreement that again was
8  something that was between -- discussions
9  between the principals that we weren't a part
10  of.
11        Q.    I'm not sure I understand.  The
12  clarification letter changed the assets that
13  were being conveyed --
14        A.    I'm saying it could have been a
15  combination of two things.  It was changes in
16  language that could have changed assets, or
17  added more detailed explanation of the
18  original assets that were intended to be
19  covered as to exactly what that encompassed in
20  further detail.  And between the two I'm
21  not -- having not been part -- part of those
22  discussions don't know how much of one or the
23  other it was.
24        Q.    Did you make -- did Simpson make
25  any effort to add up the total value of the

TSG Reporting - Worldwide    877-702-9580

Page 104

A. KELLER - HIGHLY CONFIDENTIAL

1  
2  assets being conveyed after the revisions made
3  in the clarification letter to the original
4  APA?
5        A.    No.
6        Q.    Are you aware of anyone else
7  trying to sit down and add up assets and
8  liabilities at that point?
9        A.    I am not aware of it but, again,
10  those conversations were in other rooms.
11        Q.    You didn't consider it important
12  to --
13        A.    No, what I considered important
14  was making sure that the language that the
15  lawyers put together reflected the
16  understanding between the -- between the
17  principals.  And just making sure that people
18  did go back to the principals and have them
19  look at the language, say, is this the deal.
20        Q.    And as you sit here today do you
21  think that you did that successfully?
22        MR. HINE:  Object to the form.
23        A.    I would hope so.
24        Q.    At any point did you ever hear or
25  understand there to be any type of cap or

TSG Reporting - Worldwide    877-702-9580

Page 105

A. KELLER - HIGHLY CONFIDENTIAL

1  
2  limit placed on the value of assets being
3  transferred?
4        MR. AMER:  I think we have to
5  limit that up to September 30th.
6        THE WITNESS:  Yes.
7        MR. AMER:  Otherwise we're going
8  to run into the privilege issue.
9        MR. THOMAS:  Okay.
10  BY MR. THOMAS:
11        Q.    Other than from your lawyers, or
12  lawyers for any of the movants after September
13  30th, did you ever hear that there was -- did
14  you ever hear or understand that there was
15  some type of cap or ceiling placed on the
16  assets to be transferred?
17        A.    No.  Other than depending on
18  specific types of -- referring to a matched
19  book if that's what you mean by a cap.  But a
20  specific dollar amount, no.
21        Q.    Well, putting aside a specific
22  dollar amount, did you ever hear that the deal
23  that was struck between the parties
24  involved -- did you ever hear or understand
25  that the deal between the parties involved any

TSG Reporting - Worldwide    877-702-9580

Page 106

A. KELLER - HIGHLY CONFIDENTIAL

2 type of agreement that there was a cap on
3 assets such that assets over some dollar
4 figure couldn't be transferred?
5     A.   No.
6     Q.   Let me ask you to go ahead and
7 look at document what's been previously marked
8 as Exhibit 442.
9         MR. AMER:  I assume you've got a
10 specific page.
11        MR. THOMAS:  No.  Just go ahead
12 and read it.
13        THE WITNESS:  I'll tell you when
14 I'm done.
15     Q.   And before we dig into this, one
16 of the deposition topics was the 47.4 billion
17 and 45.5 billion mentioned at one point in the
18 257-page hearing transcript by Ms. Fife.
19        Does Simpson have any
20 understanding of how that was calculated or
21 what it comprises?
22     A.   No.
23     Q.   Does Simpson have any
24 understanding of what the 45.5 figure was
25 calculated or comprised of?

TSG Reporting - Worldwide    877-702-9580

Page 107

A. KELLER - HIGHLY CONFIDENTIAL

2     MR. AMER:  Isn't that what just
3 asked him?
4     MR. THOMAS:  Did I ask both?
5 Okay.  Fine.  I'll withdraw it.  I'm
6 covered.
7     Q.   Simpson doesn't have any
8 understanding as to how either of those
9 figures, the 47.4 or 45.5 --
10    A.   Were calculated.
11    Q.   -- were calculated or what they
12 comprise.
13    A.   Or what?
14    Q.   Or what they comprise.
15    A.   That's right.
16    Q.   And you don't recall hearing any
17 of those numbers mentioned over the weekend at
18 Weil when the agreement was being finalized.
19    A.   No, I do not.
20    Q.   Okay.  If you would turn to page
21 47, please.  This is the hearing transcript,
22 September 19th sale hearing.  The third
23 paragraph there says, "Barclays is still
24 agreeing to pay the cure amounts on any leases
25 that it assumes or that we assume and assign

TSG Reporting - Worldwide    877-702-9580

Page 108

A. KELLER - HIGHLY CONFIDENTIAL

2 to it."
3         Do you see that?
4     A.   Yes.
5     Q.   Is that consistent with your
6 understanding of the contract term that we
7 looked at earlier with respect to Barclays
8 assuming certain cure and other payments on
9 contracts that it elects to keep?
10    A.   Generally, yes.  Although, I
11 focused less on the real estate piece of it
12 because there was a separate Weil team that
13 was working on that.  So to the extent the
14 leases were involved, I know there were a lot
15 of negotiations and discussions about that
16 which I did not focus on since there were
17 experts in those areas who were doing that.
18    Q.   Okay.  But the notion that
19 Barclays would only incur liability on leases
20 or other contracts that it assumes was
21 consistent with your understanding of the
22 actual sale documents, correct?
23        MR. HINE:  Object to the form.
24    A.   Assumes or that it would have --
25 assumed either as part of this cure amount

TSG Reporting - Worldwide    877-702-9580

Page 109

A. KELLER - HIGHLY CONFIDENTIAL

2 process or assumed under the contract.
3     Q.   And you recall there was — strike
4 that.
5         Let me ask you to turn to page
6 100, please.
7     A.   (Witness complies.)
8     Q.   It says "Barclays is also assuming
9 the cure amounts relating to contracts and
10 leases that will be assumed pursuant to the
11 Asset Purchase Agreement and that has a
12 potential exposure, Your Honor, of $1.5
13 million that he would testify to."
14        When it's referenced as potential
15 exposure do you understand that to be an
16 estimate of a potential maximum amount of
17 exposure if Barclays assumed all the
18 contracts?
19        MR. HINE:  Object to the form.
20        MR. AMER:  Yeah, I'm going to
21 object.  Can we just establish if he was
22 aware of this at the time and then you
23 can ask him.
24        MR. THOMAS:  No, I assume --
25        MR. HINE:  Or if he was at the

TSG Reporting - Worldwide    877-702-9580

Page 110

A. KELLER - HIGHLY CONFIDENTIAL

1    hearing.
2
3        MR. AMER: Well, we know he wasn't
4    at the hearing. That's already been
5    established.
6        A.    I just -- I have no basis to
7    address what -- other than just reading the
8    words on the page and telling you what I think
9    now.
10       MR. AMER: Well, I don't want you
11   to tell him what you think now because
12   it's not important.
13       A.    No. My point is I just wasn't
14   involved in that at that time. I don't know
15   where that number would come from or what was
16   intended by those words.
17       Q.    So you have no knowledge of how
18   the -- how any estimate of potential exposure
19   under -- with respect to the cure amounts
20   section of the APA was calculated.
21       A.    That's right.
22       MR. THOMAS: Well, thank you. I
23   have no further questions.
24       THE WITNESS: Okay.
25       MR. HINE: I have a couple

Page 111

A. KELLER - HIGHLY CONFIDENTIAL

1    clarifying questions unless you have
2    any, Andy.
3        MR. AMER: I have no questions.
4        MR. HINE: I'll be brief.
5        THE WITNESS: Please.
6    EXAMINATION BY
7    MR. HINE:
8        Q.    Mr. Keller, could you just -- for
9    one point of clarification, could you just
10   turn back to Exhibit 464A. Do you recall
11   being asked questions about this document?
12       A.    Earlier, yes.
13       Q.    Yes. And if we turn to -- this
14   document appears to be an e-mail from Alvarez
15   & Marsal with an attachment entitled Lehman
16   Brothers/Barclays Transaction Division of
17   Assets and Liabilities. And my question is
18   were you involved in any way in preparing this
19   attachment?
20       A.    No. This is --
21       Q.    Was Simpson involved in any way in
22   preparing this attachment?
23       A.    No not that I know of.
24       Q.    Do you have any knowledge about

Page 112

A. KELLER - HIGHLY CONFIDENTIAL

1    how it was prepared or on what basis it was
2    prepared?
3        A.    No.
4        Q.    Is it fair to say this is the
5    first time you've seen this document?
6        A.    Yes.
7        Q.    Okay. You can put that aside.
8        And my second set of questions has
9    to do with the matched book concept that you
10   discussed several times today.
11       A.    Um-hum.
12       Q.    Was it your understanding that
13   that concept was part of the sales transaction
14   between Lehman and Barclays?
15       MR. THOMAS: Objection to form.
16       Q.    The concept of matched book that
17   you described earlier.
18       MR. THOMAS: Objection to form.
19       A.    It was my understanding that that
20   was a part of it.
21       Q.    Okay.
22       MR. HINE: I just want to mark one
23   document as Exhibit 530 if you could put
24   a stamp on that for me.

Page 113

A. KELLER - HIGHLY CONFIDENTIAL

1        (Deposition Exhibit 530, document
2    bearing production numbers WGM-LEHMAN-E
3    00009125 through WGM-LEHMAN-E 00009127,
4    marked for identification as of this
5    date.)
6    BY MR. HINE:
7        Q.    Mr. Keller, I'm handing you a copy
8    of a document I'm marking as Exhibit 530 which
9    is Bates stamped WGM-LEHMAN-E 0009125 through
10   -9127. If you can just take a minute and take
11   a look at that and tell me if you recognize
12   that document.
13       (Document review.)
14       A.    I don't recall this but I
15   certainly recognize it as an e-mail from me.
16       Q.    Do you have any reason to doubt
17   that it was an e-mail chain that you were a
18   party of --
19       A.    No.
20       Q.    -- on that Friday?
21       A.    (Witness shakes head.)
22       Q.    You'll see towards the top of that
23   page there's an e-mail from yourself to Mr.
24   Finley and others where you say, "According to

Page 114

A. KELLER - HIGHLY CONFIDENTIAL

1        A. KELLER - HIGHLY CONFIDENTIAL
2  Steve, the 'matched book/balance sheet' is
3  still being discussed."
4       Do you see that?
5    A.  Yes.
6    Q.  And that's an e-mail you sent on
7  Friday at approximately 12 p.m.?
8    A.  Yes.
9    Q.  Is the Steve in that e-mail Steve
10  Berkenfeld?
11    A.  Yes.
12    Q.  And is the matched book reference
13  here the same concept that you were testifying
14  about earlier?
15      MR. THOMAS:  Objection to form.
16    A.  I can't recall but would think so.
17    Q.  Okay.  Looking at this today, do
18  you know what you meant by the term matched
19  book/balance sheet in this context?
20      MR. THOMAS:  Objection to form.
21    A.  Again, I'm having trouble
22  recalling but I assume at a minimum Steve had
23  told me that that concept was still being
24  discussed.
25    Q.  Okay.  And do you know if those

TSG Reporting - Worldwide   877-702-9580

Page 115

1        A. KELLER - HIGHLY CONFIDENTIAL
2  discussions took place through the weekend?
3    A.  I don't know how much -- how long
4  they may have occurred.
5    Q.  Okay.  Fair to say that you were
6  not a party to the discussion between the
7  principals on that concept?
8    A.  Yes.
9      MR. THOMAS:  Objection to form.
10      MR. HINE:  Okay.  I have no
11  further questions.  Thank you.
12      MR. KAY:  I have no questions.
13      MR. ROTHMAN:  No questions.
14    (Continued on next page to include
15  jurat.)

TSG Reporting - Worldwide    877-702-9580

Page 116

1        A. KELLER - HIGHLY CONFIDENTIAL
2      MR. THOMAS:  Let me take a minute.
3    (Pause on the record.)
4      MR. THOMAS:  No further questions.
5      THE VIDEOGRAPHER:  The time is
6  12:39.  We're off the record.
7    (Time Noted:    12:38 p.m.)

20        ANDREW KELLER

22  Subscribed and sworn to before me
23  this ___ day of _____, 2010.

TSG Reporting - Worldwide    877-702-9580

Page 117

1
2      C E R T I F I C A T E
3  STATE OF NEW YORK   )
4         : ss.
5  COUNTY OF NEW YORK   )
6    I, FRANCIS X. FREDERICK, a Notary
7  Public within and for the State of New
8  York, do hereby certify:
9    That ANDREW KELLER, the witness
10  whose deposition is hereinbefore set
11  forth, was duly sworn by me and that
12  such deposition is a true record of the
13  testimony given by the witness.
14    I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage, and that I
17  am in no way interested in the outcome
18  of this matter.
19    IN WITNESS WHEREOF, I have
20  hereunto set my hand this 8th day of
21  January, 2010.

24       FRANCIS X. FREDERICK

TSG Reporting - Worldwide    877-702-9580

Page 118

1
2   ---------------- I N D E X ----------------
3   WITNESS    EXAMINATION BY    PAGE
4   ANDREW KELLER    MR. THOMAS    6
5           MR. HINE    111
6
7
8
9
10  ---------- INFORMATION REQUESTS ------------
11  DIRECTIONS: NONE
12  RULINGS: NONE
13  TO BE FURNISHED: NONE
14  REQUESTS: NONE
15  MOTIONS: NONE
16
17
18
19
20  ---------------- EXHIBITS ----------------
21  EXHIBIT          FOR ID.
22  Exhibit 519
23  document bearing production
24  number STB 09637...................... 40
25

TSG Reporting - Worldwide    877-702-9580

Page 119

1
2   ---------------- EXHIBITS ----------------
3   EXHIBIT          FOR ID.
4   Exhibit 520
5   document bearing production
6   number STB 09680...................... 44
7   Exhibit 521
8   document bearing production
9   numbers STB 13350
10  through STB 13353...................... 47
11  Exhibit 522
12  document bearing production
13  number STB 02989...................... 49
14  Exhibit 523
15  document bearing production
16  number WGM-LEHMAN-E 00020028........... 54
17  Exhibit 524
18  document bearing production
19  numbers WGM-LEHMAN-E 00014009
20  through WGM-LEHMAN-E 00014029.......... 58
21  Exhibit 525
22  document bearing production
23  numbers WGM-LEHMAN-E 00006149
24  through WGM-LEHMAN-E 00006168.......... 58
25

TSG Reporting - Worldwide    877-702-9580

Page 120

1
2   ---------------- EXHIBITS ----------------
3   EXHIBIT          FOR ID.
4   Exhibit 526
5   document bearing production
6   numbers WGM-LEHMAN-E 00002784
7   through WGM-LEHMAN-E 00002786.......... 60
8   Exhibit 527
9   Lehman Brothers Holdings, Inc.
10  Form 8-K................................ 83
11  Exhibit 528
12  document bearing production
13  numbers STB 07579
14  through STP 07582...................... 85
15  Exhibit 529
16  document bearing production
17  numbers STB 06214
18  through STP 06215...................... 99
19  Exhibit 530
20  document bearing production
21  numbers WGM-LEHMAN-E 00009125
22  through WGM-LEHMAN-E 00009127.......... 113
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 121

1
2   NAME OF CASE: IN RE: LEHMAN BROTHERS
3   DATE OF DEPOSITION: JANUARY 8, 2010
4   NAME OF WITNESS: ANDREW KELLER
5   Reason codes:
        1. To clarify the record.
6       2. To conform to the facts.
        3. To correct transcription errors.
7   Page _____ Line _____ Reason _____
    From _____ to _____
8
9   Page _____ Line _____ Reason _____
10  From _____ to _____
    Page _____ Line _____ Reason _____
11  From _____ to _____

12  Page _____ Line _____ Reason _____
13  From _____ to _____
    Page _____ Line _____ Reason _____
14  From _____ to _____

15  Page _____ Line _____ Reason _____
16  From _____ to _____
    Page _____ Line _____ Reason _____
17  From _____ to _____

18  Page _____ Line _____ Reason _____
19  From _____ to _____
    Page _____ Line _____ Reason _____
20  From _____ to _____

    Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
    From _____ to _____
23

24          ANDREW KELLER
25
    TSG Reporting - Worldwide    877-702-9580

# BCI EXHIBIT

# 75

Page 1

1          HIGHLY CONFIDENTIAL - M. KELLY

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                          Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,     (Jointly Administered)

9

                Debtors.

10

      ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF MARTIN KELLY

14              New York, New York

15              August 18, 2009

16

17

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 24042

Page 2

```
 1          HIGHLY CONFIDENTIAL - M. KELLY
 2                 August 19, 2009
 3                    9:30 a.m.
 4
 5          HIGHLY CONFIDENTIAL deposition
 6     of MARTIN KELLY, held at Jones
 7     Day, LLP, 222 East 41st Street,
 8     New York, New York, before Kathy S.
 9     Klepfer, a Registered Professional
10     Reporter, Registered Merit Reporter,
11     Certified Realtime Reporter, Certified
12     Livenote Reporter, and Notary Public
13     of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          HIGHLY CONFIDENTIAL - M. KELLY
 2
 3              A P P E A R A N C E S :
 4     JONES DAY, LLP
 5     Attorneys for Lehman Brothers, Inc.
 6          222 East 41st Street
 7          New York, New York  10017-6702
 8     BY:  ROBERT W. GAFFEY, ESQ.
 9          DAVID L. CARDEN, ESQ.
10          BRIDGET CRAWFORD, ESQ.
11
12     WILLKIE, FARR & GALLAGHER, LLP
13     Attorneys for the Witness
14          1875 K Street, NW
15          Washington, D.C. 20006-1238
16     BY:  RICHARD D. BERNSTEIN, ESQ.
17          - AND -
18     WILLKIE, FARR & GALLAGHER, LLP
19          787 Seventh Avenue
20          New York, New York  10019-6099
21     BY:  KELLY M. HNATT, ESQ.
22
23
24
25
```

Page 4

```
 1          HIGHLY CONFIDENTIAL - M. KELLY
 2          A P P E A R A N C E S :  (Cont'd.)
 3     BOIES, SCHILLER & FLEXNER, LLP
 4     Attorneys for Barclays Capital
 5          5301 Wisconsin Avenue, NW
 6          Suite 800
 7          Washington, D.C. 20015
 8     BY:  HAMISH HUME, ESQ.
 9
10     QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
11     Attorneys for the Creditors Committee
12          865 S. Figueroa Street, 10th Floor
13          Los Angeles, California 90017
14     BY:  ERICA P. TAGGART, ESQ.
15
16     JENNER & BLOCK, LLP
17     Attorneys for the Examiner
18          330 N. Wabash Avenue
19          Chicago, Illinois 60611-7603
20     BY:  DAVID C. LAYDEN, ESQ.
21
22
23
24
25
```

Page 5

```
 1          HIGHLY CONFIDENTIAL - M. KELLY
 2          A P P E A R A N C E S :  (Cont'd.)
 3
 4     HUGHES, HUBBARD & REED, LLP
 5     Attorneys for the SIPA Trustee
 6          One Battery Park Plaza
 7          New York, New York  10004-1482
 8     BY:  NEIL J. OXFORD, ESQ.
 9          FARA TABATABAI, ESQ.
10
11     Also Present:
12          RAJESH ANKALKOTI, Alvarez & Marsal
13          THOMAS E. HOMMEL, Lehman Brothers
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

HIGHLY CONFIDENTIAL - M. KELLY
1    HIGHLY CONFIDENTIAL - M. KELLY
2    MARTIN KELLY, called as a
3    witness, having been duly sworn by a Notary
4    Public, was examined and testified as
5    follows:
6    EXAMINATION BY
7    MR. GAFFEY:
8    Q.  Mr. Kelly, good morning. My name is
9    Bob Gaffey. We met briefly before. I'm with
10    Jones Day and we are special counsel to the
11    estate of Lehman Brothers Holdings, Inc., and as
12    you may know, probably know, we're looking into
13    certain matters concerning the transaction that
14    took place between Lehman and Barclays in
15    September of 2008.
16         Let me just start by getting a brief
17    description of your background, sir. Could you
18    tell me what your education is since high
19    school, after high school?
20    A.  Sure. I have a undergraduate degree
21    in commerce with a major in accounting and
22    finance from the University of New South Wales
23    in Sidney, Australia. I have -- I'm an
24    associate of the Securities Institute of
25    Australia. I qualified as a chartered

Page 7

1    HIGHLY CONFIDENTIAL - M. KELLY
2    accountant in Australia, and I became a
3    certified practicing accountant in the United
4    States.
5    Q.  When did you take your degree, your
6    first degree?
7    A.  '88 would have been -- yeah, I
8    completed in '88.
9    Q.  And other than as a chartered
10    accountant in Australia and a CPA in the United
11    States, have you taken any other professional
12    licenses?
13    A.  Yes, I have. I've taken licenses
14    under the FINRA regulations, so Series 7, Series
15    24, Series 27, and I believe Series 63.
16    Q.  And do you keep your license current
17    as a CPA?
18    A.  No.
19    Q.  And --
20    A.  My licenses -- I keep my FINRA
21    licenses current.
22    Q.  Your FINRA licenses are current, your
23    CPA is dormant, and what about the Australia
24    license; is that dormant or current?
25    A.  I'm not sure, actually.

Page 8

1    HIGHLY CONFIDENTIAL - M. KELLY
2    Q.  By whom are you currently employed?
3    A.  By Barclays Capital.
4    Q.  How long have you been employed there?
5    A.  Since late September of '08.
6    Q.  And what's your title at Barclays
7    Capital?
8    A.  I'm a Managing Director and I'm the
9    Chief Financial Officer in the Americas.
10    Q.  And is that the position you have held
11    since you joined Barclays in September of '08?
12    A.  No, it's not. No, my --
13    Q.  Go ahead.
14    A.  My title has remained the same. My
15    position changed in March, and upon going into
16    Barclays from Lehman, I had three different
17    positions. The first was the Financial
18    Controller for Barclays Capital on an interim
19    basis, and that was a London-based position.
20    Second position was the head of Finance for
21    Structured Capital Markets.
22    Q.  Also in London?
23    A.  Also in London. The third position
24    was head of Americas Financial Decision Support.
25    Q.  Financial Decision Support?

Page 9

1    HIGHLY CONFIDENTIAL - M. KELLY
2    A.  Support, yeah.
3    Q.  Was that in London or in the Americas?
4    A.  That was an Americas-based role.
5    Q.  Are you based in New York?
6    A.  I am. I have remained living in New
7    York. I commuted to London for that period of
8    time between September and March.
9    Q.  Okay.
10    A.  I should also say that, in addition to
11    being CFO of the Americas now, I retained the
12    second of those three positions, so I remain
13    head of Finance for Structured Capital Markets
14    today.
15    Q.  And prior to your employment by
16    Barclays Capital, by whom were you employed?
17    A.  By Lehman Brothers.
18    Q.  For approximately what period of time
19    were you employed by Lehman Brothers?
20    A.  I was employed from approximately
21    August 2000 through approximately May 2005, and
22    then from January 2006 until September 2008.
23    Q.  And what did you do during the
24    interval between your two stints at Lehman?
25    A.  I was not employed.

Page 10

HIGHLY CONFIDENTIAL - M. KELLY

1
2    Q.    And why did you leave Lehman the first
3    time in May of '05?
4    A.    I left to consider a move, a
5    relocation back to Australia.
6    Q.    Was the departure from Lehman in May
7    of '05 voluntary?
8    A.    Yes.
9    Q.    And why did you come back in January
10   of '06?
11   A.    My wife and I decided that we wanted
12   to make New York our home permanently and I
13   enjoyed working at Lehman, so...
14   Q.    Briefly, sir, can you tell me what --
15   give me the sequence of the jobs you held at
16   Lehman between January of '06 and September of
17   '08.
18   A.    Sure.  In -- in January of '06, I
19   returned to assume effectively the same role I
20   had had previously prior to leaving.
21   Q.    Which was?
22   A.    And that was a role in Investment
23   Banking in a group called Global Finance
24   Solutions.  During 2007, I moved into the Hedge
25   Fund Coverage Group, also within Investment

Page 11

HIGHLY CONFIDENTIAL - M. KELLY

1
2    Banking, and then effective December 1 of '08 --
3    sorry, of '07, I assumed the role of the firm's
4    Global Financial Control.
5    Q.    And when you refer to the firm --
6    withdrawn.  When you held the job as Global
7    Financial Controller, is that the job you held
8    until your departure in September of '08?
9    A.    Yes.
10   Q.    And when you were Global Financial
11   Controller, were you an employee of Lehman
12   Brothers, Inc. or Lehman Brothers Holdings, Inc.
13   or both?  What was the structure there, do you
14   know?
15   A.    I don't know.
16   Q.    When you say you were the firm's
17   Global Financial Controller, are you referring
18   to the firm, as the term suggests, globally,
19   worldwide?
20   A.    Yes.
21   Q.    And what were your duties as Global
22   Financial Controller?
23   A.    The primary responsibilities were
24   reporting related to financial and regulatory
25   reporting of the firm's results, externally and

Page 12

HIGHLY CONFIDENTIAL - M. KELLY

1
2    internally.
3    Q.    And in September of '08 to whom did
4    you report?
5    A.    Ian Lowitt.
6    Q.    You were a direct report to Lowitt?
7    A.    Yes.
8    Q.    And what was Lowitt's title?
9    A.    Ian was the firm's chief financial
10   officer.
11   Q.    And did you have a series of direct
12   reports below you?
13   A.    Yes, I did.
14   Q.    Approximately how many direct reports?
15   A.    Approximately seven directs.
16   Q.    Can you tell me who they were in
17   September of '08, best you recall?
18   A.    Yeah, Brian Travesari, Marie Stewart,
19   Kristi Wong, Tony Stucchio, Jin Elman on a
20   partial basis, meaning he reported to someone
21   else as well, and then someone in each of London
22   and Tokyo, whose names I can't recall.
23   Q.    Okay.  Can we go off the record for a
24   second?
25   (Discussion off the record.)

Page 13

HIGHLY CONFIDENTIAL - M. KELLY

1
2    Q.    What was Kristi Wong's job?
3    A.    Kristi headed the financial reporting
4    function.  I should -- I should say Legal Entity
5    Reporting I think was the official title.
6    Q.    Legal Entity Reporting?
7    A.    Legal Entity Reporting.
8    Q.    And what was involved in her job as
9    head of Legal Entity Reporting?
10   A.    She was responsible for the process by
11   which the firm's results were compiled for each,
12   each of the individual legal entities in the
13   group.
14   Q.    Now, at the time -- let's focus in
15   September of 2008, just to give it a timeframe.
16   What was your compensation at Lehman during --
17   well, withdrawn.  What was your compensation at
18   Lehman during 2007?
19   A.    My compensation, including all of the
20   components, was approximately ▮▮▮▮▮▮▮▮
21   Q.    And what were the components of that
22   ▮▮▮▮▮▮▮?
23   MR. BERNSTEIN:  By the way, I
24   understand there is an order making the
25   entire deposition highly confidential and

Page 14

HIGHLY CONFIDENTIAL - M. KELLY

then somebody gets a week to decide what
they really want or something like that.
    Is the witness's counsel part of that
process?
    MR. GAFFEY:  Yes, I believe so.
Hamish?
    MR. HUME:  Yes.
    MR. GAFFEY:  I should say it's not,
just for total clarity.  We have a
confidentiality order.  It does not deem all
depositions to be completely highly
confidential, but we made an agreement
amongst counsel that the first deposition of
Eric Felder that we would do that.
    We will treat the entire transcript as
highly confidential and you have, and I
forget what period we agreed to, some period
of time to more precisely designate, but the
order doesn't exactly require that.
    MR. BERNSTEIN:  We would like to
participate in that as his counsel.
    MR. GAFFEY:  We'll follow the Felder
agreement and, yes, I think you're within
that, is that right?

Page 15

HIGHLY CONFIDENTIAL - M. KELLY

    MR. BERNSTEIN:  Yes.  Because we will
certainly, among other things, designate
matters about his compensation as
confidential.
    MR. HUME:  Highly confidential.
    MR. BERNSTEIN:  Highly confidential.
BY MR. GAFFEY:
    Q.  What were the components of the 1.1
million?
    A.  The base salary was ███ the stock
component was approximately ███ and a cash
component was approximately ███
    Q.  You say the cash component, is that a
bonus, year-end bonus?
    A.  Correct.
    Q.  I know the year ended for you early at
Lehman in '08, but what was your agreement with
respect to compensation for 2008?
    A.  I did not have a written agreement.  I
had a number of conversations with my manager at
the time I moved into that role, who was Aaron
Callum, around what I should expect in a
substantively different role, and we agreed that
approximately ███

Page 16

HIGHLY CONFIDENTIAL - M. KELLY

    Q.  Did you say approximately ███?
    A.  No, ███
    Q.  ███?
    A.  ███ would be sort of a target or an
estimate, subject to the usual factors.
    Q.  And that ███ would be the same
components of a base, stock and a cash bonus?
    A.  We didn't discuss the components, so
my working assumption was it would be determined
based on the firm's formula.
    Q.  And when were you first offered a job
at Barclays Capital?
    A.  I don't recall exactly when.
    Q.  Was it during September of 2008?
    A.  I believe so.
    Q.  Was it during the beginning or the end
of September 2008?
    MR. BERNSTEIN:  Objection to the form.
Ambiguous.
    Q.  You can answer.
    A.  I need a minute, please.
    MR. BERNSTEIN:  You can answer his
question.  I don't think "the beginning or
the end" is as precise a question as it

Page 17

HIGHLY CONFIDENTIAL - M. KELLY

should be.
    Q.  But you can still answer.
    MR. BERNSTEIN:  But you can answer.
I'll instruct you when, for reasons of
privilege or otherwise, you shouldn't
answer.  Otherwise, I'm just making
objections for the record.
    THE WITNESS:  Okay.
    Q.  Do you have the question in mind?
    A.  Yes.  Repeat the question, please.
    Q.  Beginning or end of September of '08?
    A.  More towards the end than the
beginning.
    Q.  And before you were offered a job at
Barclays, did you have conversations with anyone
at Barclays about going to work there?  I'm
trying get a sense of when discussions began
between you and Barclays about going to work
over there.
    A.  No, I don't believe so.
    Q.  I think we're missing each other.
    Prior to being offered a job?
    A.  Uh-huh.
    Q.  Had you had any discussions with

Page 18

HIGHLY CONFIDENTIAL - M. KELLY

1  anyone at Barclays about going to work at
2  Barclays before you were actually offered a
3  position?
4      A.  Well, what do you mean by "offered a
5  position"?
6      Q.  "Would you like to come and work
7  here?"
8      A.  I don't recall.
9      Q.  Do you have any recollection at all of
10  when you began discussions with anybody at
11  Barclays about going to work at Barclays?
12      A.  Not specifically.
13      Q.  Generally?
14      A.  Generally towards the end of
15  September.
16      Q.  And what is your compensation at
17  Barclays?  What was your compensation at
18  Barclays for the period -- withdrawn.
19          When did you start work at Barclays?
20      A.  I don't recall the specific date.
21      Q.  In between the time that you started,
22  whenever it was, and the end of the year, what
23  was your compensation at Barclays?
24      A.  My compensation for the '08 year was

Page 19

HIGHLY CONFIDENTIAL - M. KELLY

1  outlined in an employment contract.
2      Q.  And did that contract also outline
3  your compensation for '09?
4      A.  No.
5      Q.  What's your compensation for '09 at
6  Barclays?
7      A.  I don't know.  I'm on a base salary of
8  ████████.
9      Q.  Do you have any written agreement
10  covering your employment at Barclays for 2009?
11      A.  No.
12      Q.  Have you had conversations with anyone
13  at Barclays similar to the ones you had with
14  Ms. Callum at Lehman where you've been given to
15  understand what you can expect for the year
16  2009?
17      A.  Yes.
18      Q.  And with whom did you have those
19  conversations?
20      A.  Patrick Clackson.
21      Q.  And what did Mr. Clackson tell you?
22      A.  We didn't discuss a specific number.
23      Q.  Did you discuss a general number?
24      A.  Didn't discuss any number.

Page 20

HIGHLY CONFIDENTIAL - M. KELLY

1      Q.  So --
2      A.  The context of the discussion was
3  that -- and this was on moving into my new role
4  in March, so the conversation was, you're doing
5  a great job, your predecessor was paid more than
6  you are.  That was the extent of the
7  conversation.
8      Q.  Did he tell you how much your
9  predecessor was paid?
10      A.  No.
11      Q.  So, as you sit here today, do you have
12  any -- do you have a base of some kind that you
13  get paid?
14      A.  I'm paid a salary of ████████.
15      Q.  And as you sit here today do you have
16  any idea how much you'll be making in 2009 other
17  than that ████████?
18      A.  No.
19      Q.  At all?
20      A.  No.
21      Q.  Do you expect to learn that fact
22  sometime during 2009?
23      A.  No.
24      Q.  Do you expect that in respect of 2009

Page 21

HIGHLY CONFIDENTIAL - M. KELLY

1  you'll make more than ████████?
2      A.  I would expect so.
3      Q.  And when do you expect to learn how
4  much more than ████████ you'll make in respect
5  of 2009?
6      A.  I would expect to learn on the date
7  that the bonuses are notified, which -- which is
8  not a fixed date, so on or around February of
9  2010.
10          (Exhibit 193, a document bearing Bates
11  Nos. BCI-EX-00077323 through 77325, marked
12  for identification, as of this date.)
13      Q.  Mr. Kelly, I have put in front of you
14  what we have marked as deposition Exhibit 193, a
15  multi-page document bearing Bates No.
16  BCIEX00077323 through 325.
17          Do you recognize the document?
18      A.  Yes.
19      Q.  And what is it?
20      A.  It's my employment contract.
21      Q.  And that's your signature on the last
22  page, is it?
23      A.  Yes.
24      Q.  Now, I note the document is dated

Page 22

HIGHLY CONFIDENTIAL - M. KELLY

1    October 10 and your signature also bears a
2    handwritten date next to it of October 10 of
3    '08. Is October 10 of '08 when you entered on
4    duty, started working at Barclays, or had you
5    been working there for some period before then?
6        A.   I don't recall when I started working
7    at Barclays.
8        Q.   Do you recall a break in between the
9    time you stopped working at Lehman and the time
10   you started working at Barclays?
11       A.   No.
12       Q.   Were you working continuously during
13   the months of September and October for someone?
14       A.   I -- yes, I was. I took a few days
15   off, but that was -- that was vacation in
16   October.
17       Q.   The contract reflects in its first
18   page that your employment "shall commence on or
19   before October 31, 2008." Do you see that?
20       A.   Yes.
21       Q.   Does that refresh your recollection at
22   all as to when you actually started working at
23   Barclays?
24       A.   No.

Page 23

HIGHLY CONFIDENTIAL - M. KELLY

1        Q.   Had you negotiated any terms of this
2    agreement prior to seeing the October 10 version
3    that you signed?
4        A.   Yes.
5        Q.   And with whom did you negotiate those
6    terms?
7        A.   Anna Morfe in Barclays' HR Department.
8        Q.   Could you spell that last name,
9    please?
10       A.   I think it's M-O-R-F-E.
11           (Exhibit 194, a document bearing Bates
12   Nos. BCI-EX-00077326 through 77327, marked
13   for identification, as of this date.)
14       Q.   I should just go back, if you would,
15   to Deposition Exhibit 193 before we move on to
16   194.
17           Does that contract accurately state
18   your compensation agreement with Barclays for
19   the year 2008?
20       A.   Yes.
21       Q.   And if you would, sir, please take a
22   look at the provision for a special cash --
23   withdrawn. Take a look at the provision for
24   2000 guaranteed cash bonus, which is guaranteed

Page 24

HIGHLY CONFIDENTIAL - M. KELLY

1    in the amount of ███████ do you see that?
2        A.   Yes.
3        Q.   Was that a bonus in respect of your
4    services to Lehman during 2008?
5        A.   I don't know.
6        Q.   Okay. And if you would, take a look
7    at the special cash award provision for
8    ███████ half on your first anniversary, half
9    on your second?
10       A.   Uh-huh.
11       Q.   Did you understand that to be -- well,
12   I take it you haven't received either part of
13   that yet, right, given the terms of the
14   contract?
15       A.   That's correct.
16       Q.   If you would take a look at what I
17   also put before you, Mr. Kelly, marked as
18   Deposition Exhibit 194. Tell me if you
19   recognize that document.
20       A.   I do. This is a partial version of an
21   earlier draft.
22       Q.   Okay. And this earlier draft, it's
23   two pages, and it doesn't contain any version of
24   the signature page. It's dated September 25,

Page 25

HIGHLY CONFIDENTIAL - M. KELLY

1    2008?
2        A.   Uh-huh.
3        Q.   These handwritten interlineations in
4    the document, are those in your handwriting?
5        A.   Under the "Termination Other Than for
6    Cause," yes.
7        Q.   Where it says or "upon death or
8    disability," that's your handwriting?
9        A.   Yes.
10       Q.   And what about the notes at the bottom
11   in the section "For Cause"?
12       A.   The word "otherwise" is not my
13   handwriting.
14       Q.   Okay.
15       A.   The words "upon notice and with
16   reasonable opportunity to cure" is my
17   handwriting.
18       Q.   Uh-huh. And the phrase "material
19   provision of," that's your handwriting?
20       A.   That is my handwriting. And I believe
21   the other word "material," I think it says.
22       Q.   Right, the ones crossed out at the
23   top?
24       A.   Looks like it's my handwriting, yeah.

Page 26

HIGHLY CONFIDENTIAL - M. KELLY

1   HIGHLY CONFIDENTIAL - M. KELLY
2   Q.   Does the date on this document,
3   September 25, 2008, give you any sharper
4   recollection, sir, of when you first began to
5   talk to Barclays about going to work there?
6   A.   No.
7   Q.   Was it at some point before September
8   25, 2008, the date that this document bears?
9   A.   I don't recall.
10   Q.   Well, do you recall the process here?
11   Do you recall if there were discussions about
12   your working at Barclays and then you got a
13   proposed written contract, or if it just all
14   began with a written contract?
15   MR. BERNSTEIN:   Objection.  Compound.
16   Q.   You can answer, I think.
17   A.   I can or --
18   Q.   You can, yes.
19   MR. BERNSTEIN:   You can if you
20   understand it.
21   A.   I don't understand the question.
22   MR. GAFFEY:   Please don't do that.
23   You know that's -- that constitutes coaching
24   the witness and I'm going to ask you not to
25   do it again.

Page 27

1   HIGHLY CONFIDENTIAL - M. KELLY
2   MR. BERNSTEIN:   No, it doesn't.
3   Q.   No understanding at all of the
4   question?
5   A.   Could you please repeat the question?
6   (Record read.)
7   A.   I think there are multiple questions
8   in the one.  Could you ask a single question?
9   Q.   Do you recall if your discussions with
10   Barclays began with the arrival of a written
11   contract?
12   A.   I believe I had a brief conversation
13   with Patrick Clackson prior to receiving that
14   contract.
15   Q.   What do you remember about that
16   conversation with Mr. Clackson?  What did he
17   say?  What did you say?
18   A.   It was a brief conversation.  I
19   remember him saying he'd like me to be a member
20   of the team.  There was no discussion about the
21   role.
22   Q.   Was there any discussion of
23   compensation?
24   A.   No.
25   Q.   And when did you have this

Page 28

1   HIGHLY CONFIDENTIAL - M. KELLY
2   conversation with Mr. Clackson?
3   A.   I don't recall.
4   Q.   Just to push this point a little more,
5   forgive me for this, that conversation takes
6   place at some point before you received a draft
7   we marked as 194, dated September 25, correct?
8   A.   I believe so.
9   Q.   Was it in person with Mr. Clackson or
10   over the phone?  How was the conversation held?
11   A.   I believe it was by phone.
12   Q.   I'm going to move on to something else
13   in a second, but did he -- who initiated the
14   conversation?  Did you call him to express
15   interest in a job or did he call you?
16   A.   My recollection is that he called me.
17   Q.   Now, you're aware, sir, that there
18   were -- there was a transaction concluded
19   between Lehman and Barclays in September of 2008
20   under which Barclays purchased certain assets of
21   Lehman; is that correct?
22   A.   Correct.
23   Q.   And did you have any involvement in
24   the negotiation of that agreement?
25   A.   Not in the negotiation.

Page 29

1   HIGHLY CONFIDENTIAL - M. KELLY
2   Q.   Can you describe for me, did you work
3   at all, did you have any involvement in the
4   agreement at all?
5   A.   With the agreement, meaning the legal
6   agreement?
7   Q.   Meaning the sale, sir.  Did you just
8   go about your regular work or were you involved
9   at all in the transaction?
10   MR. BERNSTEIN:   Objection.  Compound.
11   MR. HUME:   I'd also object as vague.
12   A.   Could you clarify the question,
13   please?
14   Q.   When did you first learn there was
15   going to be a transaction between Lehman and
16   Barclays?
17   A.   Well, we had been working with the
18   Barclays team prior to our filing bankruptcy and
19   conducting, as they conducted, due diligence.
20   Those conversations ended prior to our filing
21   for bankruptcy, and my recollection is that the
22   morning -- the morning that we filed, I learned
23   that negotiations were recommencing with
24   Barclays around a possible transaction.
25   Q.   Are you done with your answer?

Page 30

HIGHLY CONFIDENTIAL - M. KELLY

1
2    A.  Yes.
3    Q.  Who's the "we" that you were referring
4    to?  When you said "we were working with
5    Barclays prior to the bankruptcy"?
6    A.  It was a large, relatively large team
7    of people.
8    Q.  What was your role on that relatively
9    large team of people?
10   A.  My role was to assist the Barclays
11   team in coordinating responses to their requests
12   for information as part of their due diligence,
13   with an emphasis on finance-related matters.
14   Q.  Just so we have a time period, we're
15   talking about the period before the filing of
16   the Lehman bankruptcy, correct?
17   A.  Correct.
18   Q.  And can we agree that that filing took
19   place on the early morning of Monday, September
20   15?
21   A.  Yes.
22   Q.  You recall that event?
23   A.  Yes.
24   Q.  And the discussions with Barclays that
25   you're talking about at some point came to an

Page 31

HIGHLY CONFIDENTIAL - M. KELLY

1
2    end before the filing of the bankruptcy,
3    correct?
4    A.  Correct.
5    Q.  When did the discussions with Barclays
6    in that phase come to an end?
7    MR. HUME:  Objection.  Lack of
8    foundation.
9    A.  Could you rephrase the question,
10   please?
11   Q.  Do you not understand the question?
12   MR. BERNSTEIN:  Objection.  Badgering
13   the witness.
14   Q.  You did not understand the question,
15   Mr. Kelly?
16   A.  I need a minute with my lawyers,
17   please.
18   Q.  Sure.
19   MR. BERNSTEIN:  Let's go off the
20   record.
21   (Pause in the proceedings.  Time
22   noted:  10:07 A.M.)
23   (Time Noted:  10:09 A.M.)
24   BY MR. GAFFEY:
25   Q.  Sir, the question, Mr. Kelly, is when

Page 32

HIGHLY CONFIDENTIAL - M. KELLY

1
2    did those discussions in that phase with
3    Barclays come to an end?
4    A.  I'm not aware when the discussions
5    ended.
6    Q.  You know only that they ended sometime
7    prior to the filing of the Lehman bankruptcy,
8    correct?
9    A.  Correct.
10   Q.  And did discussions with Barclays
11   resume after the filing of the Lehman
12   bankruptcy?
13   A.  Yes, they did.
14   Q.  Tell me what you remember about the
15   resumption of the discussions with Barclays
16   after the filing of the Lehman bankruptcy.
17   A.  My recollection is that I learned on
18   the Monday morning after I came back to the
19   office that negotiations had commenced around a
20   sale of a portion of the business or portion of
21   the firm.
22   Q.  And from whom did you learn this?
23   A.  I don't recall.
24   Q.  And did you play any role in the
25   activities that followed once those negotiations

Page 33

HIGHLY CONFIDENTIAL - M. KELLY

1
2    had recommenced between Barclays and Lehman?
3    A.  Yes.
4    Q.  Describe your role.
5    A.  The role was largely related to
6    continuing to assist the Barclays finance team
7    with their due diligence efforts.
8    Q.  Did you do anything else other than
9    assist the Barclays team with their due
10   diligence efforts?
11   A.  There was a lot -- there was a lot
12   going on, so likely, yes.
13   Q.  Tell me as much as you remember what
14   you did in respect of the transaction on that
15   first day, on Monday, the 15th.
16   A.  I don't recall specifically what else
17   I was doing.
18   Q.  Do you have a general recollection?
19   A.  Generally, we were helping to gather
20   information for both ourselves and the Barclays
21   team.
22   Q.  And that's on the Monday, the 15th?
23   A.  Correct.
24   Q.  Did there come a time when you learned
25   that an agreement had been reached between

Page 34

1          HIGHLY CONFIDENTIAL - M. KELLY
2     Barclays and Lehman?
3        A.    There were different points in time
4     throughout that week when I was aware of
5     agreements having been reached.
6          MR. GAFFEY: I'm sorry, can you read
7     that back?
8          (Record read.)
9        Q.    Describe the first point in time when
10    you became aware an agreement had been reached.
11       A.    My recollection is that early on the
12    Tuesday morning an agreement had been reached
13    between Lehman and Barclays.
14       Q.    How did you learn that on the early
15    Tuesday morning an agreement had been reached
16    between Lehman and Barclays?
17       A.    I participated in part of the meeting
18    between the bankers to both Barclays and Lehman
19    early that morning.
20       Q.    What was the nature of your
21    participation in the meeting between the bankers
22    for the Barclays and Lehman early that morning?
23       A.    My participation was related to
24    assembling information that had been used as
25    part of the negotiations.

Page 35

1          HIGHLY CONFIDENTIAL - M. KELLY
2        Q.    What type of information?
3        A.    The information was largely related to
4     assets that would be sold to Barclays.
5        Q.    Who was in attendance at the portion
6     of the meeting between the bankers for Lehman
7     and Barclays in which you participated?
8        A.    I recall Mark Shapiro and Mark Shafir
9     representing Lehman were in attendance. I
10    recall that Michael Klein representing Barclays
11    was in attendance.
12       Q.    Anyone else for Barclays?
13       A.    I recall that Marie Stewart
14    participated in a part of that meeting. There
15    were other people. I don't recall.
16       Q.    You don't remember who they were?
17       A.    Correct.
18       Q.    And Marie Stewart is on the Barclays
19    side of the table?
20       A.    No.  She was one of my direct reports.
21       Q.    What was her role in the meeting?
22       A.    She was assisting me.
23       Q.    And as specifically as you can tell
24    me, Mr. Kelly, could you describe your
25    activities related to the assets that would be

Page 36

1          HIGHLY CONFIDENTIAL - M. KELLY
2     sold to Barclays, determining the assets being
3     sold to Barclays?
4          MR. HUME: Objection. Vague.
5        A.    Could you rephrase the question,
6     please?
7        Q.    Did you not understand the question?
8          MR. BERNSTEIN: Let me make an
9     objection that I think will be helpful.  Do
10    you mean at this meeting? Over the next
11    three weeks?
12         MR. GAFFEY: I'm still at the meeting.
13         MR. BERNSTEIN: Okay. That was not in
14    the question.
15       Q.    With that clarification, can you
16    answer the question?
17       A.    Can you repeat the question?
18         (Record read.)
19       Q.    And that question, sir, as your
20    counsel knows, goes to the meeting we've been
21    talking about, the one on Tuesday morning.
22       A.    My recollection is that I was helping
23    to assemble information around asset classes and
24    values of those assets that had been discussed
25    between -- between a variety of Barclays and

Page 37

1          HIGHLY CONFIDENTIAL - M. KELLY
2     Lehman representatives.
3        Q.    Do you have any broader recollection
4     of that than you have just described of what you
5     did with regard to helping assemble information
6     about asset classes and values of those assets?
7     Do you remember anything else about your
8     activities?
9        A.    No.
10       Q.    That's it? That's all you remember as
11    you sit here today?
12       A.    I don't recall anything else.
13       Q.    Do you have any greater recollection
14    of what it is Marie Stewart was doing in
15    connection with assembling information about
16    asset classes and the value of those assets?
17       A.    No.
18       Q.    In the course of your attendance at
19    that meeting and the -- how early on Tuesday,
20    how early in the morning was the part of the
21    meeting that you attended?
22       A.    I don't recall.
23       Q.    Had you worked all night the night
24    before?
25       A.    Meaning Sunday night?

Page 38

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.    Meaning the Monday night into the
3    Tuesday.
4    A.    Well, we're talking about the same
5    night, so that is -- the discussions continued
6    through that night. I do recall going home --
7    Q.    Okay.
8    A.    -- at some point.
9    Q.    Just so we're on the same page, I want
10   to clarify what nights we're talking about.
11   A.    Yes.
12   Q.    In the early morning hours of Monday,
13   that is, shortly after midnight into Monday, the
14   15th, Lehman files for bankruptcy?
15   A.    Correct.
16   Q.    Discussions take place beginning at
17   some point on the 15th between Lehman and
18   Barclays, correct?
19   A.    That's my understanding.
20   Q.    Okay. Now I want to move into the
21   night of the Monday and over midnight into
22   Tuesday.
23   A.    Correct.
24   Q.    The meetings that you've been telling
25   me about that you had this participation in took

Page 39

HIGHLY CONFIDENTIAL - M. KELLY
1    place in the early hours of Tuesday, the 16th,
2    correct?
3    A.    Correct.
4    Q.    And how early in the early hours of
5    Tuesday, the 16th?
6    A.    I don't recall.
7    Q.    And had you worked overnight from the
8    Monday into the early hours of the Tuesday
9    morning?
10   A.    Yeah. We're still talking about the
11   same night, so yes. Yes, I did go home at some
12   point, but it was close to dawn.
13   Q.    By the time you went home close to
14   dawn on the Tuesday, did you have an
15   understanding as to whether an agreement had
16   been reached between Lehman and Barclays?
17   A.    My understanding was that an agreement
18   had been reached subject to approval by the
19   respective boards.
20   Q.    And at that point what was your
21   understanding of the terms of the agreement that
22   had been reached subject to approval by the
23   respective boards?
24   MR. HUME: Could you read back the
25

Page 40

HIGHLY CONFIDENTIAL - M. KELLY
1
2    question, please?
3    (Record read.)
4    MR. HUME: I'll object as vague to the
5    extent it calls for a legal conclusion.
6    A.    Could you be more specific around what
7    you mean by "terms," please?
8    Q.    Did you have an understanding of what
9    the deal was by the time you left around dawn on
10   Tuesday morning?
11   A.    Not a complete understanding.
12   Q.    Did you have any kind of
13   understanding, complete or incomplete?
14   A.    I had an understanding that certain
15   asset classes or, sorry, certain assets with an
16   attached value would be sold to Barclays,
17   together with an understanding that Barclays
18   would assume certain businesses in what was the
19   Lehman North American franchise.
20   Q.    Done with your answer, sir?
21   A.    Yes.
22   Q.    Did you let anyone else know in the
23   early morning of Tuesday what your understanding
24   was of the terms of the transaction?
25   MR. BERNSTEIN: Objection. Vague.

Page 41

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.    I didn't have a complete understanding
3    of the terms of the transaction.
4    Q.    That's not my question. My question
5    is, did you let anyone else know in the early
6    morning of Tuesday what your understanding was
7    of the terms of the transaction?
8    A.    I -- I advised my manager of my
9    understanding of certain of the terms that I
10   understood at that point in time.
11   Q.    Who is the manager to whom you are
12   referring?
13   A.    Ian Lowitt.
14   Q.    And by what means did you advise
15   Mr. Lowitt of your understanding of certain of
16   the terms? Talk to him? Send him an e-mail?
17   A.    By e-mail.
18   Q.    Apart from the e-mail to Mr. Lowitt,
19   did you advise anyone else of what your
20   understanding was of certain of the terms of the
21   deal in the early morning hours of Tuesday, the
22   16th?
23   A.    No. I wasn't representing the firm in
24   the negotiations.
25   Q.    That wasn't my question, I think. We

| Page 42 | Page 43 |
|---|---|

**Page 42**

```
 1        HIGHLY CONFIDENTIAL - M. KELLY
 2   may be missing each other here.
 3        Did you advise anyone other than
 4   Mr. Lowitt of what your understanding was of the
 5   terms?
 6     A.   No.
 7     Q.   While we look for the exhibit,
 8   Mr. Kelly, before this overnight -- before this
 9   deal was reached in the early morning hours of
10   Tuesday, in that time period prior to that had
11   you done any work to try and figure out what the
12   total bonus accrual was for LBI or Lehman
13   Brothers Holdings, Inc.?
14        Withdraw that. Let me ask a more
15   general question. Had you had been involved at
16   all in trying to figure out information
17   concerning compensation of Lehman employees?
18   And again, I'm in that period prior to the early
19   morning hours of Tuesday when you learned the
20   deal has been reached.
21        MR. BERNSTEIN: Objection. Vague and
22   ambiguous.
23     A.   I was aware of compensation accruals
24   generally.
25     Q.   Were compensation accruals generally
```

**Page 43**

```
 1        HIGHLY CONFIDENTIAL - M. KELLY
 2   within your area of responsibility?
 3     A.   Partly.
 4     Q.   Mr. Kelly, I'm showing you what has
 5   been marked at a prior deposition as Exhibit
 6   136A. It's a one-page document. Tell me if you
 7   recognize it, sir.
 8        (Document review.)
 9     A.   Yes, I do.
10     Q.   What is the document?
11     A.   It's the e-mail I was referring to in
12   the answer to my prior question.
13     Q.   And this is the e-mail -- well, take a
14   look, if you would, at the bottom in the chain
15   where you're writing. It's from Martin Kelly to
16   Ian Lowitt, but there's a CC as well to Paolo
17   Tonucci.
18        Does that refresh your recollection as
19   to whether you informed anyone other than
20   Mr. Lowitt?
21     A.   Yeah, I don't recall that, but
22   evidently I did.
23     Q.   Okay. And as you sit here today, can
24   you think of any reason you would be informing
25   Mr. Tonucci as well as Mr. Lowitt?
```

| Page 44 | Page 45 |
|---|---|

**Page 44**

```
 1        HIGHLY CONFIDENTIAL - M. KELLY
 2     A.   Paolo was as involved -- well, Paolo
 3   was very involved in the transaction.
 4     Q.   In the e-mail, Mr. Kelly, you say in
 5   the first sentence, "Well it took all night and
 6   lots of back and forth, but the deal is done and
 7   ready for the board." You see that sentence?
 8     A.   Yes.
 9     Q.   And had you been involved all night?
10   I know you said you went home for -- after dawn,
11   so I'm trying to figure out were you there, you
12   know, were you involved all night?
13     A.   I was there until this point in time.
14     Q.   I didn't hear that.
15     A.   Sorry. I was there until this point
16   in time.
17     Q.   And this e-mail is sent at
18   approximately 5:10 A.M. on the morning of the
19   16th, and you had been there continually all
20   night until you sent the e-mail?
21     A.   I'd been in the office continually,
22   yes.
23     Q.   And you say there that there had been
24   lots of back and forth. What did you mean when
25   you wrote to Mr. Lowitt and Mr. Tonucci that
```

**Page 45**

```
 1        HIGHLY CONFIDENTIAL - M. KELLY
 2   there was lots of back and forth?
 3     A.   I recall a series of discussions
 4   negotiating the values of the assets to be sold
 5   and -- including the real estate assets.
 6     Q.   In addition to the real estate assets,
 7   what, generally speaking, what type of assets?
 8     A.   Generally speaking, the inventory of
 9   securities that was being sold to Barclays.
10     Q.   And you go on in your e-mail to write,
11   "Final price did not change meaningfully -
12   approx. a 5B," 5 billion, "all in economic loss
13   versus our marks and 3.6B of resi assets left
14   behind." Do you see that sentence?
15     A.   Yes.
16     Q.   Okay. When you refer to the final
17   price not changing meaningfully, can you explain
18   to me what you meant when you wrote that to
19   Mr. Kelly and Mr. Lowitt?
20     A.   To Mr. Tonucci and Mr. Lowitt.
21     Q.   I beg your pardon, to Mr. Tonucci and
22   Mr. Lowitt.
23     A.   I don't recall.
24     Q.   Do you recall having knowledge of some
25   back and forth about what the final price would
```

HIGHLY CONFIDENTIAL - M. KELLY

1 be?

2     A.   There were conversations throughout
3 the night on prices of different components of
4 the transaction.

5     Q.   When you say "different components of
6 the transaction," are you talking about the real
7 estate and, generally speaking, the inventory of
8 securities?

9     A.   Correct.

10    Q.   When you wrote, "Approx. a 5 billion
11 all in economic loss versus our marks," what did
12 you mean by that?

13    A.   I recall that the 5 billion represents
14 the difference between the negotiated price and
15 the values of those assets on Lehman's books.

16    Q.   So was the agreement, as you
17 understood it, to give Barclays a $5 billion
18 discount off the values of those assets as shown
19 on Lehman's books?

20        MR. HUME:  Objection, vague.

21        MR. BERNSTEIN:  Objection.

22    A.   No.

23    Q.   Please describe for me what you meant
24 when you said there would be a 5 billion

HIGHLY CONFIDENTIAL - M. KELLY

1 economic loss versus the marks?

2        MR. BERNSTEIN:  Objection.  Asked and
3 answered.

4     A.   The 5 billion represents or
5 represented the difference between the
6 negotiated sales price and the value of the
7 assets on Lehman's books prior to the sale.

8     Q.   Forgive me for being a little slow,
9 but the Lehman -- the assets are carried on
10 Lehman's books at a total of X, correct?  And
11 the agreement was to sell them to Barclays for 5
12 billion less than X, is that what you mean?

13    A.   Well, the 5 billion represents a sum
14 of Xs and a sum of Ys negotiated
15 portfolio-by-portfolio.

16    Q.   On a sort of sum-total level?  The sum
17 total is the securities are carried at X and the
18 deal is to sell them for 5 billion less than the
19 total of X, correct?

20    A.   Well, the 5 billion was a consequence
21 of a series of discussions conducted at a
22 portfolio level.

23    Q.   Describe those discussions as best you
24 can.  Tell me everything you remember about

HIGHLY CONFIDENTIAL - M. KELLY

1 those discussions conducted at portfolio level.

2     A.   I did not participate in those
3 discussions.  Those discussions were occurring
4 throughout the course of the night.  My
5 recollection is that a Lehman representative and
6 a Barclays representative being experts in those
7 particular asset classes were discussing the
8 contents of the portfolio and negotiating an
9 appropriate value for the assets to be sold.

10    Q.   Who were the Lehman representatives or
11 representatives and the Barclays representative
12 or representatives you just referred to?

13    A.   There were a series of discussions
14 occurring simultaneously, so I don't -- I don't
15 know all of the representatives.  I do recall
16 Eric Felder and Stephen King representing Lehman
17 and Barclays respectively.  I'm not aware of who
18 was negotiating other asset classes.

19    Q.   There were people negotiating other
20 asset classes, you just don't remember who they
21 were?

22    A.   That's my understanding, yes.

23    Q.   And what asset class or classes, to
24 your knowledge, were Mr. Felder and Mr. King

HIGHLY CONFIDENTIAL - M. KELLY

1 talking about?

2     A.   My understanding is they were
3 discussing the credit assets.  They may have
4 been discussing other asset classes.

5     Q.   Do you remember anything else about
6 these discussions between Lehman representatives
7 and Barclays representatives who were experts
8 about these asset classes?

9     A.   Sorry, could you repeat the question?

10    Q.   Withdrawn.  You mentioned before that
11 there were discussions between Lehman
12 representatives and Barclays representatives
13 with respect to different asset classes, and you
14 described them as experts in the asset classes?

15    A.   Uh-huh.

16    Q.   And you told me about Felder and King
17 and you don't remember who else may have been
18 discussing other asset classes, that's I think
19 where we are right now.

20        What else, if anything, do you
21 remember about those discussions?  Where did
22 they take place?  How long did they take?  Did
23 you learn about their outcome?

24        MR. BERNSTEIN:  Just to be clear, this

Page 50

HIGHLY CONFIDENTIAL - M. KELLY

1    is all on this evening/morning of the 16th?
2         MR. GAFFEY: I'm up to 5:10 A.M. on
3    the morning of Tuesday when you wrote this
4    e-mail. Thank you.
5         A.   Sure. So for the period of time up
6    until then?
7         Q.   Yes.
8         A.   I believe they were occurring on the
9    32nd floor of the Lehman office. My
10   understanding is that Bart was involved, Bart
11   McDade was involved in some portion of those
12   discussions.
13        Q.   Do you remember anything else?
14        A.   I do recall that Gerry Donini was
15   involved in those discussions.
16        Q.   Anything else?
17        A.   No.
18        Q.   And what's the basis of your
19   understanding that Mr. McDade was involved in
20   those discussions?
21        A.   My understanding is that Bart was
22   responsible for negotiating the transaction
23   representing Lehman.
24        Q.   What's the basis of that

Page 51

HIGHLY CONFIDENTIAL - M. KELLY

1    understanding? Did you see him negotiating?
2    Did somebody tell you? Did you sit next to him
3    while he was doing it? How did you know that?
4         A.   I did not see him negotiate. I did
5    not participate in the negotiations.
6         Q.   How do you know Mr. McDade was
7    involved in that part of the negotiations?
8         A.   I don't know.
9         Q.   When you wrote this e-mail that's been
10   marked as Exhibit 136A, did it, in full, did
11   it -- withdrawn. When you wrote this e-mail
12   that's marked as Exhibit 136A, did it fairly and
13   accurately characterize your understanding of
14   the deal that had been reached?
15        A.   It fairly characterized the components
16   of the deal that I was aware of.
17        Q.   Did you then, or at any time after
18   that, develop an understanding, Mr. Kelly, of
19   how this 5 billion all in economic loss versus
20   Lehman marks was going to be implemented?
21        A.   Can you describe what you mean by
22   "implemented"?
23        Q.   Well, the books are at X, right? They
24   globally show X as the value of those, total

Page 52

HIGHLY CONFIDENTIAL - M. KELLY

1    value of those asset classes, correct? We
2    talked about this a minute ago, right?
3         A.   Correct.
4         Q.   And the $5 billion all in loss is the
5    difference between X and the price that Barclays
6    was going to pay, right? Is that right?
7         A.   Correct.
8         Q.   Well, were the books going to be
9    marked down to reflect that $5 billion
10   difference?
11        A.   I don't know.
12        Q.   Did you ever get an understanding of
13   whether or not there was going to be a markdown
14   on the books to reflect that difference?
15        A.   Yeah, at some point subsequent to
16   then, yes.
17        Q.   Tell me when you got that
18   understanding and what your understanding was?
19        A.   I don't recall when I got that
20   understanding. As part of the process to
21   reflect the transaction in Lehman's books and
22   records, the assets would have been marked to
23   the negotiated sale price.
24        Q.   And who was in charge of the process

Page 53

HIGHLY CONFIDENTIAL - M. KELLY

1    that you just described?
2         A.   Can you describe specifically the
3    process, what you mean by "the process"?
4         Q.   Yes, the process to reflect the
5    transaction in Lehman's books and records that
6    the assets would be marked down to reflect the
7    negotiated sale price.
8         A.   It was unclear who was responsible for
9    that.
10        Q.   Were you in any part responsible for
11   that process?
12        A.   Not for reflecting the markdowns in
13   the assets.
14        Q.   Did you have any role in connection
15   with that process? Withdrawn.
16             I think I understand from your last
17   answer you're telling me you weren't actually
18   involved in marking down the asset classes, is
19   that correct?
20        A.   Correct.
21        Q.   Okay. Did you have to do any work
22   consequent to the marking down of the asset
23   classes?
24        A.   Some work around what specifically?

Page 54

HIGHLY CONFIDENTIAL - M. KELLY

1    Q.   Well, did you prepare balance sheets,
2    for example, that reflected the markdown of the
3    asset classes?  You or anyone under your
4    supervision?
5    A.   We commenced a process to reflect the
6    transaction -- to prepare a closing balance
7    sheet which reflected the transaction.
8    Q.   Okay.  And describe for me what you --
9    who is the "we" you're talking about there?
10   A.   It was a broad group of people.
11   Q.   Were you the head of that group of
12   people?
13   A.   No, I wouldn't say I was head of that
14   group.
15   Q.   Who was the head of that group?
16   A.   I think I would say Ian, Ian Lowitt,
17   was responsible overall.
18   Q.   And what was it that group of people
19   did in connection with the --
20   A.   Well, the process --
21        MR. BERNSTEIN:  Objection.  Vague and
22   ambiguous.
23   Q.   You can finish your answer.
24   A.   A process commenced to determine

Page 55

HIGHLY CONFIDENTIAL - M. KELLY

1    Lehman's balance sheet immediately prior to the
2    sale of assets to Barclays and then to reflect
3    the sale of those assets.
4    Q.   My interest is a little more specific.
5    I'm back at the "$5 billion all in economic loss
6    versus our marks."  Can you describe for me what
7    process was in place that you understood to
8    reflect the $5 billion all in economic loss
9    versus our marks on Lehman's books?
10        MR. BERNSTEIN:  Objection.  Lacks
11   foundation.
12   A.   I'm not aware of the process.
13   Q.   Any understanding of it at all,
14   directly or indirectly?
15        MR. BERNSTEIN:  Objection.  Vague and
16   ambiguous.
17   A.   No.
18   Q.   Talk to anybody about it at the time?
19   A.   Responsibility for reflecting the
20   marks resided under the Product Control
21   function.
22   Q.   Did you talk to anybody about it at
23   the time?
24   A.   I don't recall conversations.

Page 56

HIGHLY CONFIDENTIAL - M. KELLY

1    Q.   Who in Products Control were you
2    referring to a moment ago?
3    A.   Ultimately Gerry Reilly was
4    responsible for Product Control globally.
5    Q.   Did you have any conversations with
6    Mr. Reilly about it?
7    A.   I don't recall.
8    Q.   Did you have any e-mail communications
9    with Mr. Reilly about it?
10   A.   I don't recall.
11   Q.   Further into the e-mail, you write,
12   "Also, an extra 1 billion of comp beyond our
13   accrual and assumption of all trade payables in
14   LBI and LBHI," do you see that?
15   A.   Yes.
16   Q.   What did you mean when you wrote "an
17   extra 1 billion of comp beyond our accrual"?
18   A.   I believe that means that the
19   liability that Barclays would recognize for all
20   forms of compensation would be a billion dollars
21   more than what Lehman had reflected on its books
22   for certain components of compensation.
23   Q.   You referred to the liability for all
24   forms of compensation, but when you talk about

Page 57

HIGHLY CONFIDENTIAL - M. KELLY

1    Barclays, you said certain components of that
2    compensation.  Is there a difference between
3    those two formulations?
4        MR. BERNSTEIN:  Objection.
5    Mischaracterizes his testimony.
6    A.   Can you repeat the question, please?
7        (Record read.)
8    Q.   With the read-back, sir, can you
9    answer that last question?
10        MR. BERNSTEIN:  Same objection.
11   A.   No, I can't, actually.
12   Q.   What did you mean when you said
13   "certain components of compensation"?
14   A.   I think your question has referred to
15   certain components of compensation in a Barclays
16   context, which is not what I said in my answer.
17   Q.   I may be just confused here, but
18   that's what I thought I heard you say.
19        (Record read.)
20   Q.   Okay.  You've heard your answer read
21   back there.
22   A.   Uh-huh.
23   Q.   You see what I mean, you referred to
24   the liability that Barclays would recognize for

Page 58

```
1          HIGHLY CONFIDENTIAL - M. KELLY
2    all forms of compensation, but when you spoke
3    about Lehman you said certain components of
4    compensation.
5          What I'm trying to find out,
6    Mr. Kelly, is the difference between those two,
7    if there is any?
8       A.   I just want to clarify the prior
9    question you asked, because I think you used
10   "certain components of compensation," referring
11   to Barclays, and I think that's --
12      Q.   Okay. I'll take the blame for this
13   one, too. I'm just trying to -- there was an
14   accrual on the LBI books for compensation,
15   correct, that you're referring to in your
16   e-mail, 1 billion of comp beyond our accrual,
17   yes?
18      A.   There was accrual on Lehman's, the
19   firm's books for compensation.
20      Q.   Difference between Lehman and the
21   firm?
22      A.   Lehman, the firm, by "the firm," I
23   mean the group, the group of companies globally.
24      Q.   That's everything?
25      A.   Yes.
```

Page 59

```
1          HIGHLY CONFIDENTIAL - M. KELLY
2       Q.   Within Lehman?
3       A.   And LBI, meaning the broker-dealer
4    specifically.
5       Q.   The accrual, "the 1 billion of comp
6    beyond our accrual," the accrual you referred to
7    there, were you talking about the accrual for
8    the firm globally?
9       A.   Correct. Well, sorry, no. Can you
10   repeat the question, please?
11      Q.   The "1 billion of comp beyond our
12   accrual" that you are referring to in this
13   Exhibit 136A, were you referring to the accrual
14   of the firm globally?
15      A.   No.
16      Q.   You were referring to the accrual for
17   which entity within the firm?
18      A.   I believe what I was referring to was
19   an estimate of an accrual for or related to
20   those individuals that would become employees of
21   Barclays.
22      Q.   Did you have an understanding of why
23   that would be increased $1 billion beyond the
24   Lehman accrual?
25          MR. BERNSTEIN: Objection to the form.
```

Page 60

```
1          HIGHLY CONFIDENTIAL - M. KELLY
2    No foundation.
3       A.   I wasn't party to those negotiations.
4       Q.   You described this in your e-mail to
5    your supervisor, Mr. Lowitt, and also to
6    Mr. Tonucci. Did you have an understanding of
7    the phrase, you know, what you meant when you
8    said "an extra 1 billion of comp beyond our
9    accrual"?
10      A.   I meant that, or I recall that I meant
11   that the compensation liability to be assumed by
12   Barclays would exceed an estimate of what we had
13   recognized on Lehman's books by a billion
14   dollars.
15      Q.   When you wrote this e-mail to
16   Mr. Lowitt, did you have an understanding of why
17   the compensation liability would be assumed by
18   Barclays would exceed an estimate that Lehman
19   had on its books by about a billion dollars?
20      A.   No.
21      Q.   None at all?
22      A.   I wasn't party to those negotiations.
23      Q.   That's not my question. My question
24   is did you have any understanding. None at all?
25   You had no other understanding?
```

Page 61

```
1          HIGHLY CONFIDENTIAL - M. KELLY
2       A.   No.
3          MR. BERNSTEIN: Objection. Asked and
4    answered.
5       Q.   Other than the actual words you here
6    wrote on this document, sir, did you have any
7    understanding of the $1 billion comp beyond
8    accrual?
9       A.   I can't recall what I understood at
10   this point in time versus subsequent to this
11   point in time.
12      Q.   Did your understanding change over
13   time?
14      A.   I can't recall.
15      Q.   You don't remember if -- what your
16   understanding was at the time and you don't
17   remember if it's changed over time, is that your
18   testimony?
19      A.   Yes.
20      Q.   And other than the actual words on
21   this piece of paper, do you have any
22   understanding of what $1 billion of comp beyond
23   accrual was?
24          MR. BERNSTEIN: Objection. Asked and
25   answered for the fourth time and the last
```

Page 62

HIGHLY CONFIDENTIAL - M. KELLY

1  time. You can answer it one more time and
2  then we're taking a break.
3      MR. GAFFEY: Okay. You might remind
4  him he's under oath on the break.
5      MR. BERNSTEIN: You know, one more
6  time like that...
7      MR. GAFFEY: And?
8      MR. BERNSTEIN: And I think more
9  highly of your firm than to make remarks
10 like that.
11 Q.   Answer the question, please.
12 A.   Can you repeat the question, please?
13      (Record read.)
14 A.   Can you repeat the question, please?
15 Q.   Read it back.
16      (Record read.)
17 A.   As I previously stated, my
18 understanding was that the compensation
19 liability to be assumed related to a set of
20 employees and represented all forms of
21 compensation or liability for all forms of
22 compensation.
23 Q.   Bonus, salary, is that what you mean
24 when you say "all forms of compensation" to the

Page 63

HIGHLY CONFIDENTIAL - M. KELLY

1  components compensation?
2  A.   All components. All components,
3  meaning salary, cash, stock and any other forms
4  of compensation.
5  Q.   Okay. And the group of people you're
6  talking about are the so-called transferred
7  employees who went from the Lehman entities over
8  to Barclays?
9  A.   The approximately 10,000 people that I
10 understood were moving over to Barclays.
11      MR. GAFFEY: Let's take a break.
12      (Recess; Time Noted: 10:56 A.M.)
13      (Time Noted: 11:09 A.M.)
14 BY MR. GAFFEY:
15 Q.   Mr. Kelly, in the e-mail -- we're
16 still on 136A -- who told you about the lots of
17 back and forth all night that you referred to in
18 there? Who told you there was lots of back and
19 forth?
20 A.   I witnessed the back and forth.
21 Q.   And when you witnessed the back and
22 forth, who were you witnessing having the back
23 and forth? Who were you -- who was in the room
24 at the time?

Page 64

HIGHLY CONFIDENTIAL - M. KELLY

1  A.   It wasn't a single room. It was a
2  series of conversations between different
3  representatives of Lehman and Barclays.
4  Q.   And these are the conversations about
5  the different asset classes that you were
6  telling me about before the break?
7  A.   Yes.
8  Q.   And I take it there were also
9  conversations about other terms of the deal
10 apart from the $5 billion overall loss versus
11 Lehman's marks, right? Comp, for example,
12 compensation?
13 A.   Could you repeat that question,
14 please?
15 Q.   Well, you talked before the break
16 about adjusting the marks on various asset
17 classes and different people being involved in
18 those conversations.
19      Putting that aside for a moment, there
20 were other topics that were the subject of back
21 and forth, right, like compensation terms in the
22 agreement, yes?
23 A.   Well, I think the conversations that I
24 referred to are not centered on adjusting the

Page 65

HIGHLY CONFIDENTIAL - M. KELLY

1  marks, they were centered on what was an
2  appropriate sale price for the assets being
3  sold.
4  Q.   When you say it was an appropriate
5  sale price for the assets being sold, is
6  there -- what was your sense of whether it was
7  appropriate to sell the assets for 5 billion
8  less than Lehman showed them on their books?
9      MR. BERNSTEIN: Objection. No
10 foundation.
11 A.   I wasn't part of those negotiations.
12 Q.   Did you have a view? Did you think
13 Barclays got a pretty good deal?
14      MR. BERNSTEIN: Objection. Compound.
15 A.   I don't have a view.
16 Q.   Did you have a view at the time?
17 A.   No, I didn't.
18 Q.   Did you have any reason at the time to
19 believe that the marks at which Lehman carried
20 those assets were inaccurate?
21 A.   No.
22 Q.   Did you have any understanding as to
23 why those marks would be marked down by $5
24 billion to achieve the sale price to Barclays?

Page 66

1        HIGHLY CONFIDENTIAL - M. KELLY
2        MR. BERNSTEIN: Objection. No
3    foundation.
4        A.   As I previously mentioned, the $5
5    billion was an aggregation across a series of
6    portfolios.
7        Q.   Uh-huh. Did you have an
8    understanding, sir, that the agreement, the
9    pricing of the agreement was that Barclays would
10   pay Lehman 5 billion less than Lehman had
11   thought the assets were worth?
12       A.   My understanding was that the
13   negotiated sales price across all those asset
14   portfolios resulted in a $5 billion,
15   approximately $5 billion loss to Lehman relative
16   to its marks at that time.
17       Q.   And Lehman's marks at that time were,
18   as far as you knew, maintained in a way that
19   they were Lehman's best view of the value of
20   those assets across those classes, correct?
21       MR. BERNSTEIN: Objection. No
22   foundation.
23       A.   The values were determined in
24   accordance with valuation policies and under
25   U.S. GAAP.

Page 67

1        HIGHLY CONFIDENTIAL - M. KELLY
2        Q.   So, to go back to whether you had a
3    view at 5:10 A.M. when you sent this e-mail to
4    Mr. Lowitt and Mr. Tonucci, did you have a view
5    about whether Barclays was getting a good deal
6    paying 5 billion less than Lehman was carrying
7    these assets for on its books?
8        A.   No.
9        Q.   Did you ever express a view to
10   anybody?
11       A.   No.
12       Q.   Did anybody express any view to you?
13       A.   No.
14       Q.   As you sit here now, do you think
15   Barclays got a pretty good deal?
16       MR. BERNSTEIN: Objection. That's not
17   a factual question. That's calling for his
18   opinion, and I don't think he's being
19   compensated as an expert.
20       MR. GAFFEY: I'll take the answer and
21   worry about admissibility later.
22       Q.   You can answer the question.
23       A.   I don't have a view.
24       Q.   Now, in response to your e-mail,
25   Mr. Lowitt responds, "You are a hero. Well

Page 68

1        HIGHLY CONFIDENTIAL - M. KELLY
2    done. Ian." Do you see that?
3        A.   Yes.
4        Q.   Did you have a sense that Ian thought
5    you were in some part responsible for the terms
6    of the transaction that you described in your
7    e-mail?
8        A.   No.
9        Q.   Did you wonder why Ian was describing
10   you as a "hero"?
11       A.   I don't recall thinking about it.
12       Q.   Do you recall asking him about it?
13       A.   No.
14       Q.   And when Ian says, "Well done," did
15   you have a sense that your boss was telling you
16   you had done a good job in coming up with these
17   terms?
18       A.   I don't have a view on that.
19       Q.   Did you have a sense at the time when
20   you got a "well done" from your boss about the
21   terms of a contract you described, that he
22   thought you were responsible for those terms?
23       MR. BERNSTEIN: Objection asked and
24   answered, but --
25       A.   No.

Page 69

1        HIGHLY CONFIDENTIAL - M. KELLY
2        Q.   Did he say anything to you to indicate
3    that he thought you had something to do with
4    reaching these terms with Barclays?
5        A.   No.
6        Q.   And I take it your testimony is you
7    had nothing to do with reaching these terms with
8    Barclays?
9        A.   Not that I can recall.
10       Q.   At the top of the e-mail chain,
11   Mr. Tonucci writes to Mr. Lowitt and to you, in
12   that order, Mr. Lowitt and to you, "Fantastic.
13   Great work."
14       Did you have a sense Mr. Tonucci was
15   congratulating you on great work for reaching
16   this kind of deal with Barclays?
17       A.   No.
18       Q.   What did you understand -- who did you
19   understand Mr. Paolo was complimenting for great
20   work when you received that e-mail?
21       A.   I don't recall what I thought.
22       Q.   Did you have any conversations with
23   Mr. Tonucci about the terms that you describe in
24   your e-mail to him and to Mr. Lowitt?
25       A.   I recall generally discussing those

Page 70

HIGHLY CONFIDENTIAL - M. KELLY
1
2  terms --
3      Q.   Tell me --
4      A.   -- the following day.
5      Q.   With whom did you have the discussion?
6  Mr. Tonucci?
7          I'm sorry, l may not have -- let me
8  rephrase the question. l may not have heard
9  your last answer properly. You had a discussion
10  the next day. With whom?
11      A.   l don't recall specifically.
12      Q.   Do you recall generally?
13      A.   I'm not sure how l can answer
14  generally if you're asking me for specific
15  names.
16      Q.   You recall having a discussion about
17  these terms with someone the next day, someone
18  or some person or persons the next day, correct?
19      A.   Yes.
20      Q.   And as you sit here, do you have any
21  recollection of who that person or those people
22  were?
23      A.   There was a large group of people --
24      Q.   Do you remember --
25      A.   -- working on this transaction.

Page 71

HIGHLY CONFIDENTIAL - M. KELLY
1
2      Q.   Do you remember --
3      A.   So l don't recall specifically who l
4  discussed it with.
5      Q.   But you do recall you had a discussion
6  with someone or some people about the terms that
7  you described in your e-mail to Mr. Lowitt and
8  Mr. Tonucci?
9      A.   Yes.
10      Q.   And when you had those discussions
11  with whoever it was, did you talk about the $5
12  billion all in economic loss versus Lehman's
13  marks?
14      A.   Yes. In all likelihood, yes.
15      Q.   Why do you say "in all likelihood"? l
16  don't want you to speculate or to guess. Why do
17  you say in all likelihood you had a conversation
18  about the $5 billion all in economic loss versus
19  Lehman's marks?
20      A.   There were many conversations taking
21  place over many days and a large group of people
22  who had been working long hours, and it's
23  difficult to pinpoint specifically or precisely
24  with absolute clarity what l recall.
25      Q.   Do you have a general recollection of

Page 72

HIGHLY CONFIDENTIAL - M. KELLY
1
2  conversations with someone the next day about
3  the $5 billion all in economic loss versus
4  Lehman's marks, correct?
5      A.   Can you repeat the question, please?
6      Q.   You have a general recollection of a
7  conversation with someone the next day about the
8  $5 billion all in economic loss versus Lehman's
9  marks; is that correct?
10      A.   Yes, I would say some people, not
11  someone.
12      Q.   And as you sit here, you have no
13  recollection who any of those people were?
14      A.   I don't recall the specifics of the
15  conversation, so I would have to speculate.
16      Q.   I didn't ask you about the content of
17  the conversation. I'm asking you as you sit
18  here today do you have any recollection who any
19  of those people were about a $5 billion loss to
20  the company you had been working for, any
21  recollection at all?
22      A.   Not specifically.
23      Q.   Generally?
24      A.   Generally, yes.
25      Q.   Who?

Page 73

HIGHLY CONFIDENTIAL - M. KELLY
1
2      A.   I can't answer a general question by
3  giving you specific names.
4      Q.   Why don't you give me the candidates.
5  Who's in the room when you're talking about
6  this?
7          MR. BERNSTEIN: Well, objection.
8  Compound. Which question do you want him to
9  answer? Who's in the room when you're
10  talking about this or why don't you give me
11  the candidates? Those are two very
12  different questions.
13      Q.   You got them both in mind, sir?
14      A.   I'm sorry, can you repeat that,
15  please?
16      Q.   You want the long objection repeated
17  or the question?
18      A.   Yes, I do.
19      Q.   Let me withdraw the objection because
20  the objection accomplished its purpose.
21          Do you have any recollection of
22  whether these conversations took place over the
23  phone or in a meeting?
24      A.   It was most likely in meetings.
25      Q.   Do you remember who you were in

Page 74

HIGHLY CONFIDENTIAL - M. KELLY
1
2  meetings with the next day?
3      A.  About what topics?
4      Q.  I'll take any meeting on any topic.
5      A.  I have -- I have difficulty
6  time-stamping conversations, specific
7  conversations at that point in time.
8      Q.  Let me try it in a more general way
9  and then we'll see if we can drill down a little
10 bit.
11     Over the course of the next week
12 between the 16th of September at 5:10 A.M. when
13 you wrote this e-mail and when the deal closed
14 on Monday, the 22nd of September, with whom did
15 you have any discussion at all about the $5
16 billion loss against Lehman's marks at any time?
17     A.  I can't give you specific names with
18 absolute clarity.
19     Q.  I'm not asking for absolute clarity.
20 I'm asking for your best recollection over that
21 whole week.
22     A.  My recollection is that I discussed
23 this with Gerry Reilly, Ian Lowitt, Paolo
24 Tonucci, and likely others.
25     Q.  Did you talk to Mr. McDade about it?

Page 75

HIGHLY CONFIDENTIAL - M. KELLY
1
2      MR. HUME:  Objection.  Vague.
3      A.  I don't recall conversations with
4  Mr. McDade after this point in time on this
5  matter.
6      Q.  Did you talk to Mr. McGee about it,
7  Skip McGee?
8      A.  Not that I can recall.
9      Q.  Did you talk to Mr. Felder about it?
10     A.  Not that I can recall.
11     Q.  Did you talk to Mr. Berkenfeld about
12 it?
13     A.  I don't recall.
14     Q.  Did you talk to Mr. Shapiro about it?
15     A.  After 5:10 A.M. is your question?
16     Q.  Yes.
17     A.  Not that I can recall.
18     Q.  Did you talk to Mr. Shafir about it?
19     A.  Not that I can recall.
20     Q.  Did you talk to anybody who worked for
21 Barclays about it?
22     A.  Not that I can recall.
23     Q.  Did you talk to Marie Stewart about
24 it?
25     A.  I don't recall.

Page 76

HIGHLY CONFIDENTIAL - M. KELLY
1
2      Q.  Did you talk to Kristi Wong about it?
3      A.  I don't recall.
4      Q.  Did you talk to Robert Azerad about
5  it?
6      A.  I don't recall.
7      Q.  As we've gone through these names,
8  does this refresh your recollection as to anyone
9  you talked to about it beyond Mr. Reilly,
10 Mr. Lowitt and Mr. Tonucci?
11     A.  No.
12     Q.  Can you think of a reason, sir, you
13 would have spoken only to Mr. Reilly, Mr. Lowitt
14 and Mr. Tonucci about it?
15     A.  I'm sorry, what's the question?
16     Q.  Can you think of a reason you would
17 have spoken only to Mr. Reilly, Mr. Lowitt and
18 Mr. Tonucci about it?
19     A.  No.
20     Q.  Did it come to your attention during
21 the week beginning on the 15th of September that
22 there were several hearings before the
23 bankruptcy court in connection with the
24 agreement with Barclays?
25     A.  I remember becoming aware of the court

Page 77

HIGHLY CONFIDENTIAL - M. KELLY
1
2  hearing on the Friday at some point prior to
3  that hearing.
4      Q.  And how did you become aware of that,
5  Mr. Kelly?
6      A.  I don't recall.
7      Q.  Did you attend that hearing?
8      A.  No.
9      Q.  Do you know if at that hearing anybody
10 told the judge about a $5 billion all in
11 economic loss versus Lehman's marks in the deal?
12     A.  I was not at the hearing.
13     Q.  Did you ever follow up to see if
14 anyone did tell the court about a $5 billion all
15 in economic loss versus Lehman marks in the
16 deal?
17     A.  No.
18     Q.  Do you know if the agreement with
19 Barclays was ever reduced to writing, written
20 agreement?
21     A.  Yes, I became aware that there were --
22 there was a written agreement between Lehman and
23 Barclays.
24     Q.  And how did you become aware of that?
25     A.  I was provided a copy of it at some

Page 78

HIGHLY CONFIDENTIAL - M. KELLY
1
2  point.
3      Q.   I want to focus on the point at which
4  you saw the agreement. Did you see the
5  agreement at or around the time you wrote this
6  e-mail? Within the next day or so?
7      I'm asking that to sort of
8  differentiate from you saw it last week or you
9  saw it a month ago. Did you see it at or around
10  the times we're talking about, September of
11  2008?
12      MR. BERNSTEIN: Objection. Compound,
13  vague and ambiguous.
14      A.   I can't recall specifically when I saw
15  it.
16      Q.   Do you have a general recollection of
17  when you first saw it?
18      A.   I generally recall I saw it sometime
19  during that week.
20      Q.   And when you saw it sometime during
21  that week, did you look to see whether it
22  reflected the $5 billion all in economic loss
23  versus Lehman's marks that you had written about
24  in your e-mail to Mr. Tonucci and Mr. Lowitt?
25      A.   I don't know. I don't. But that was

Page 79

HIGHLY CONFIDENTIAL - M. KELLY
1
2  not a term that would be of relevance to
3  Barclays.
4      Q.   What do you mean when you say -- I
5  don't understand. What do you mean it's a term
6  that would not be of relevance to Barclays?
7      A.   The value that the assets were
8  recorded on Lehman's books at was not a relevant
9  matter for Barclays. What was relevant was the
10  agreement, was the sales price that was agreed.
11      Q.   Which Barclays was going to be
12  concerned about what it was paying, yes?
13      MR. HUME: I don't think he finished
14  his answer.
15      MR. BERNSTEIN: I agree.
16      Q.   I beg your pardon. Was Barclays -- is
17  there anything you wanted to add to your last
18  answer?
19      A.   Can you repeat my last answer, please?
20      MR. BERNSTEIN: And the question,
21  please.
22      (Record read.)
23      Q.   I may have interrupted you.
24      A.   Between Barclays and Lehman.
25      Q.   During the due diligence we talked

Page 80

HIGHLY CONFIDENTIAL - M. KELLY
1
2  about at the beginning of the day with Barclays,
3  do you know if Barclays had access to Lehman's
4  books so it could see the marks at which Lehman
5  carried these assets?
6      A.   I don't know.
7      Q.   Do you have any reason to know one way
8  or the other, sir, whether Barclays knew that
9  the sale price reflected at $5 billion all in
10  economic loss versus Lehman's marks, do you know
11  that one way or the other?
12      A.   No.
13      Q.   Did you ever talk to Barclays, anybody
14  from Barclays about the $5 billion loss against
15  Lehman's marks in the deal?
16      A.   Not that I can recall.
17      Q.   Now, you say in the e-mail, and again,
18  I'm on Exhibit 136A, "Bart reviewed all of it
19  before final agreement."
20      Did you see Bart review it all before
21  final agreement?
22      A.   I don't recall. I surmise that he did
23  based on my e-mail.
24      Q.   Were you surmising at the time that
25  you wrote the e-mail?

Page 81

HIGHLY CONFIDENTIAL - M. KELLY
1
2      A.   No, I'm surmising now.
3      Q.   Were you surmising at the time you
4  wrote the e-mail?
5      A.   I don't believe so.
6      Q.   Did you have a basis for personal
7  knowledge as to whether Bart reviewed all of it
8  before final agreement when you wrote it in your
9  e-mail to Mr. Lowitt and Mr. Tonucci?
10      A.   There were a series of conversations
11  with Bart throughout the course of that night.
12      Q.   Were those conversations in which you
13  took part?
14      A.   Several of those discussions, yes.
15      Q.   What discussions did you have with
16  Mr. McDade?
17      MR. BERNSTEIN: On that night?
18      MR. GAFFEY: Yes.
19      A.   I remember discussing generally the
20  assets being sold and the differences between
21  the agreed sales price and the Lehman book
22  values. I also remember being advised by Bart
23  of the negotiated compensation amount.
24      Q.   Tell me everything you can remember
25  about discussing with Mr. McDade generally the

Page 82

HIGHLY CONFIDENTIAL - M. KELLY
1
2  assets being sold and the difference between the
3  agreement sales price and the Lehman book value.
4      A.  I'm sorry, was that a question?
5      Q.  Yes.
6      A.  Sorry, can you repeat the question?
7      (Record read.)
8      A.  I don't have specific recollection of
9  those discussions.
10      Q.  Any general recollection?
11      A.  Not beyond what I just told you.
12      Q.  So, as you sit here today, the only
13  thing you remember is the fact that you had a
14  discussion with him about that topic, but you
15  remember nothing about the content of the
16  conversation, is that your testimony?
17      A.  Yes.
18      Q.  You said you were advised by Bart of
19  the negotiated terms regarding compensation.
20  What do you remember about conversations with
21  Bart about negotiations concerning compensation?
22      A.  I remember being advised by Bart that
23  the compensation accrual that had been
24  negotiated related to the transferring employees
25  would be $2 billion.

Page 83

HIGHLY CONFIDENTIAL - M. KELLY
1
2      Q.  When he told you that it would be $2
3  billion, did Mr. McDade allow as how that was a
4  billion dollars of comp beyond accrual or is
5  that something you inferred at the time you
6  wrote your e-mail marked as Exhibit 136A?
7      A.  I don't recall.
8      Q.  Any general recollection at all?
9      A.  No.
10      Q.  The accruals for compensation that
11  existed at the time that you wrote your e-mail,
12  would that be a number you would have known?
13      A.  For the firm as a whole, and
14  approximately, yes.
15      Q.  Did you ask Mr. McDade why Barclays
16  had agreed to pay $2 billion, that is, 1 billion
17  more than the accrual for the firm as a whole?
18      A.  No.
19      Q.  Other than the fact that the
20  negotiated amount was, for that component, was
21  $2 billion, did Mr. McDade give you any
22  information at all about that component of the
23  transaction?
24      A.  Not that I can recall.
25      Q.  You have no recollection at all as you

Page 84

HIGHLY CONFIDENTIAL - M. KELLY
1
2  sit here; that's your testimony?
3      A.  Yes.
4      (Exhibit 195, a document bearing Bates
5  Nos. 10252949, marked for identification, as
6  of this date.)
7      Q.  Mr. Kelly, I have put before you a
8  one-page exhibit which we have marked as
9  Deposition Exhibit 195. Can you tell me what
10  that document is?
11      MR. BERNSTEIN:  Can I just object?
12      MR. GAFFEY:  Sure.
13      MR. BERNSTEIN:  Are you asking him
14  about including the two lines at the top?
15      MR. GAFFEY:  No, actually, that's a
16  good point.
17      Q.  I should say that at the top where it
18  says "unknown" and "sent March 25," those are
19  lines that were put on by our document vendor
20  when they print this out. That's a good point.
21  Thank you.
22      Just take from "from" through at the
23  bottom where it says "edmond.cuko@Lehman.com."
24      A.  Can you repeat the question, please?
25      Q.  Do you recognize the document?

Page 85

HIGHLY CONFIDENTIAL - M. KELLY
1
2      A.  No.
3      Q.  Do you recall having an e-mail
4  exchange with Mr. -- do you know who Edmond Cuko
5  is?
6      A.  No.
7      Q.  Is the name familiar to you at all?
8      A.  No.
9      Q.  Any idea why you would be exchanging
10  e-mails with an Edmond Cuko about LBI comp
11  expense on or about September 15, 2008?
12      A.  I can only infer.
13      Q.  Okay. Tell me what your inference is
14  and I'll try, understanding that that's what it
15  is, tell me what your inference is and maybe
16  I'll follow up on that.
17      A.  Well, based on the signature of Edmond
18  Cuko, and being a part of the Corporate Strategy
19  Group, my inference is that he works for Tim
20  Lyons, who was also involved as part of the
21  process.
22      Q.  Mr. Cuko writes to you on September 15
23  at 3:56 P.M., I'm in the bottom e-mail in the
24  chain: "Martin, who was the source of the comp
25  expense estimates we used for LBI last night?"

Page 86

HIGHLY CONFIDENTIAL - M. KELLY
1  HIGHLY CONFIDENTIAL - M. KELLY
2      Do you see that?
3      A.   Yes.
4      Q.   Looking at that, does that refresh
5  your recollection as to whether you and Edmond
6  Cuko were involved in comp expense estimates for
7  LBI the night before?
8      A.   No.
9      Q.   Were you involved in comp expense
10 estimates on or around say the 14th or 15th of
11 September?
12     A.   I don't recall.
13     Q.   Do you recall -- and again, I'm
14 alluding to what Mr. Cuko writes here -- do you
15 recall getting a bonus number -- well, he says,
16 "We're getting a bonus number of 1.4 billion
17 associated with the headcount at LBI and wanted
18 to make sure we're being consistent."
19     As you see that line, does it trigger
20 any memory at all, sir, what it is Mr. Cuko,
21 whoever he is, may be talking about to you?
22     A.   No.
23     Q.   In the e-mail above that which is from
24 you to Edmond Cuko, subject, "LBI comp expense,"
25 you say, "Go back to Anthony Collerton. This

Page 87

1  HIGHLY CONFIDENTIAL - M. KELLY
2  number does not seem right.  Cash bonus for
3  entire firm is 1.9 billion."  Do you see that?
4      A.   Yes.
5      Q.   Who's Anthony Collerton?
6      A.   Anthony was a senior guy in HR and was
7  responsible for the firm's compensation.
8      Q.   And around this time had you been in
9  any discussions with Mr. Collerton about
10 assessing what the accrued bonus was for the
11 headcount in LBI?
12     A.   I don't recall.
13     Q.   And seeing this direction that you
14 apparently give to this man Mr. Cuko to go back
15 to Anthony Collerton doesn't trigger any memory
16 at all, sir?
17     A.   No.
18     Q.   Do you know if the cash bonus for the
19 entire firm was around 1.9 billion at the time
20 you wrote this?  As you sit here now, do you
21 know?
22     A.   As I sit here now?
23     Q.   Yes.
24     A.   I don't think I know anything more now
25 than I did at the time.

Page 88

1  HIGHLY CONFIDENTIAL - M. KELLY
2      Q.   Is that a number you would have known,
3  you would have known at the time in the course
4  of your duties?
5      A.   Approximately, yes.
6      Q.   What I'm asking about is what's within
7  the scope of your responsibility, not whether
8  the number is right.
9      A.   I understand.
10     Q.   That's something that would be within
11 your area of responsibility, to know or able to
12 discern that number, yeah?
13     A.   Yes.
14     Q.   And with that in mind, does that
15 refresh your recollection as to whether you were
16 having an e-mail conversation with some man
17 named Edmond Cuko about the total bonus estimate
18 for the firm?
19     A.   No.
20     Q.   If you go back to Exhibit 136, please,
21 Mr. Kelly, that's your e-mail to Mr. Lowitt and
22 Mr. Tonucci, you refer in there to 3.6 billion
23 of resi, R-E-S-I, assets left behind, end quote.
24 Do you see that portion of your e-mail?
25     A.   Yes.

Page 89

1  HIGHLY CONFIDENTIAL - M. KELLY
2      Q.   What were you referring to when you
3  wrote that in your e-mail to Mr. Lowitt and
4  Mr. Tonucci?
5      A.   My recollection is that there were
6  some residential mortgage assets that Barclays
7  was not acquiring from Lehman.
8      Q.   Do you recall if it was taking some
9  residential mortgage assets?
10     A.   No.
11     Q.   Probably a bad question on my part.
12     No, you don't remember if they were
13 taking some or, no, they weren't taking any?
14     A.   The first.  I don't recall if they
15 were taking some.
16     Q.   Now, in the days that followed the --
17 in the time that followed the point at 5:10 A.M.
18 on the 16th of September when you wrote this
19 e-mail, did -- were any of your activities in
20 the following days directed toward the $5
21 billion all in economic loss versus Lehman's
22 marks that you referred to in your e-mail?
23     MR. BERNSTEIN: Objection. Vague and
24 ambiguous.
25     A.   I'm not sure what you mean by

Page 90

HIGHLY CONFIDENTIAL - M. KELLY
1    HIGHLY CONFIDENTIAL - M. KELLY
2    "activities directed to."
3        Q.   Well, did you prepare balance sheets
4    that reflected the difference between where
5    things were carried on Lehman's marks and the
6    purchase price?  Did you consult with people who
7    were marking down the asset value on the books?
8    Did you do anything in connection with a $5
9    billion economic loss to Lehman against its
10   marks?
11       MR. BERNSTEIN:  Objection.  Compound.
12   Vague and ambiguous.
13       Q.   But still you can answer it.
14       A.   I'd like you to rephrase the question
15   and break it down, please.
16       Q.   Do you not understand it as I've asked
17   it?
18       A.   There's multiple parts to the
19   question.
20       Q.   That's not my question.  Do you not
21   understand the question, sir, is that what
22   you're telling me?
23       MR. BERNSTEIN:  Objection.  Badgering.
24       A.   I'm not sure I understand the
25   question.

Page 91

1    HIGHLY CONFIDENTIAL - M. KELLY
2        Q.   Okay.  There's a surprise.
3        (Exhibit 196, a document bearing Bates
4    Nos. 464234 and 466133, marked for
5    identification, as of this date.)
6        Q.   Okay.  Mr. Kelly, I have put before
7    you what we have marked as Deposition Exhibit
8    196.  Tell me when you've had a chance to look
9    through the document and, when you have, whether
10   you recognize it.
11       (Document review.)
12       A.   I recognize the second page.
13       Q.   So the cover e-mail you don't, but
14   the --
15       A.   I don't.
16       Q.   But the financial schedule that's
17   attached you do?
18       A.   Yes.
19       Q.   Okay.  Just if you can go back to the
20   cover sheet.  The e-mail that is the cover sheet
21   appears to come from James Walker at Barclays
22   Capital, do you see that?
23       A.   Yes.
24       Q.   And there's a CC to Chris Weidler,
25   W-E-I-D-L-E-R, at Barclays Capital, see that?

Page 92

1    HIGHLY CONFIDENTIAL - M. KELLY
2        A.   Yes.
3        Q.   Do you know either Mr. Walker or
4    Mr. Weidler?
5        A.   Yes, I know them both.
6        Q.   And what's Mr. Walker's role at
7    Barclays Capital?
8        A.   Mr. Walker's left the firm.  He was
9    the CFO in the Americas at the time of the
10   transaction.
11       Q.   The job you have now is the job Walker
12   had then?
13       A.   I have two roles now.
14       Q.   Uh-huh.
15       A.   Yeah, one of those roles is the job
16   that James held at the time of the transaction.
17       Q.   Okay.  And do you know where
18   Mr. Walker works today, by the way?
19       A.   I believe he went to Credit Suisse.
20       Q.   Here in New York?
21       A.   Yes.
22       Q.   And Mr. Weidler, do you know
23   Mr. Weidler?
24       A.   Yes, I do.
25       Q.   And does Mr. Weidler work for

Page 93

1    HIGHLY CONFIDENTIAL - M. KELLY
2    Barclays?
3        A.   Yes.
4        Q.   What does Mr. Weidler do?
5        A.   Chris runs the Financial Reporting
6    Team in London and reported to me for a period
7    of time.
8        Q.   Reported -- this is in your Barclays
9    team?
10       A.   In my Barclays role.  In one of those
11   three roles that I held for a period of time, he
12   reported to me in one of those capacities.
13       Q.   I just want to be clear.  We're back
14   in September of '08.  He's not reporting to you
15   then?
16       A.   Correct, he's a Barclays employee.
17       Q.   Now, in the e-mail Mr. Walker refers
18   to the balance sheet that I'll ask you about in
19   a moment, but he described it as "used by the
20   LEH side in the overnight discussions of
21   Monday."  Do you see that?
22       A.   Yes.
23       Q.   And he also says, "I believe Chris
24   Weidler spoke to you earlier.  Team are looking
25   for backup details, including position level

Page 94

HIGHLY CONFIDENTIAL - M. KELLY

1  info to tie into the attached."
2      Q.   You see that portion of the e-mail?
3      A.   Yes.
4      Q.   Had you spoken to Weidler about
5  getting backup details, position level info to
6  tie into the attached, that is, this financial
7  schedule?
8      A.   I don't recall.
9      Q.   Any recollection at all of talking to
10  Mr. Weidler about this financial schedule?
11      A.   No.
12      Q.   Do you recall a summary balance sheet
13  being used by the LEH side in the overnight
14  discussions of Monday?
15      A.   I recall an initial estimate of
16  certain of the assets and liabilities to be sold
17  or assumed to or from -- to or by Barclays.
18      Q.   Okay. Take a look, if you would, at
19  the second page of the document, which you said
20  you did recognize. Tell me what that is,
21  please.
22      A.   That's the schedule that I'm referring
23  to. It's -- I should clarify. That is a
24  version of the schedule that I'm referring to.

Page 95

HIGHLY CONFIDENTIAL - M. KELLY

1  I'm not sure it was in typewritten form on
2  Monday night.
3      Q.   Do you know if the schedule you're
4  looking at within Exhibit 196 was the final
5  schedule that was used in connection with the
6  transaction on Tuesday?
7      MR. HUME: Objection. Vague.
8      Q.   You said there were other versions.
9  Do you know if that one was the final, the one
10  you're looking at now?
11      MR. HUME: Same objection.
12      A.   What do you mean by "the transaction"?
13      Q.   The sale of the assets of Lehman
14  Brothers to Barclays that we've been talking
15  about today, that transaction.
16      A.   Can you repeat the question, please?
17  (Record read.)
18      A.   No.
19      Q.   Did you or anyone under your
20  supervision prepare the schedule that is within
21  Exhibit 196?
22      A.   I don't recall specifically who
23  prepared this schedule.
24      Q.   Do you have any general recollection

Page 96

HIGHLY CONFIDENTIAL - M. KELLY

1  about the preparation of this schedule?
2      A.   There were a number of people from
3  Lehman who participated in preparing the
4  schedule.
5      Q.   Who were they?
6      A.   My recollection is that Ian Lowitt,
7  Gerry Reilly, Paolo Tonucci, Marie Stewart had
8  some involvement in preparing this schedule.
9      Q.   Marie Stewart reported to you?
10      A.   Correct.
11      Q.   That would be a person under your
12  supervision?
13      A.   Yes.
14      Q.   So did you have any participation in
15  preparing this schedule, you yourself?
16      A.   Yes.
17      Q.   Describe your participation in the
18  preparation of this schedule. What did you do?
19      A.   I don't recall my participation,
20  specifically.
21      Q.   Do you have any general recollection
22  of it?
23      A.   As a general matter, all of the people
24  I mentioned, including myself, participated in

Page 97

HIGHLY CONFIDENTIAL - M. KELLY

1  preparing this schedule.
2      Q.   That's a different question. This
3  question is, what did you do? What steps, if
4  any, did you take yourself, Martin Kelly, toward
5  the preparation of this schedule attached as an
6  exhibit -- attached as page 2 of Exhibit 196?
7      A.   I think you asked me a general
8  question. Can you repeat the question, please?
9      Q.   Withdraw. I'll ask another question.
10      You did participate in some fashion,
11  sir, in the preparation of this schedule,
12  correct?
13      A.   Correct.
14      Q.   Describe for me what you did in terms
15  of your participation in the preparation of this
16  schedule.
17      A.   I don't recall specifically.
18      Q.   Describe for me generally what you did
19  in terms of the preparation of this schedule.
20      A.   As a general matter, I was involved in
21  assembling onto this schedule components of the
22  transaction that I was aware of.
23      Q.   Any particular components of this
24  schedule that you were responsible for

Page 98

1    HIGHLY CONFIDENTIAL - M. KELLY
2  assembling?
3    A.   Specifically, no.
4    Q.   Generally?
5    A.   As a general matter, the group of
6  people I mentioned were responsible.
7    Q.   That's not the question. The question
8  is, as a general matter, do you remember which
9  components you were responsible for?
10   A.   No.
11   Q.   So as you sit here today you have no
12 specific recollection of what you did to
13 participate in the preparation of this schedule
14 and no general recollection; you only remember
15 you did participate, is that your testimony?
16   A.   Yes.
17     MR. GAFFEY:  Let's take a ten-minute
18 break.
19     (Recess; Time Noted:  11:59 A.M.)
20     (Time Noted:  12:11 P.M.)
21 BY MR. GAFFEY:
22   Q.   The schedule, Mr. Kelly, which is the
23 second page of Exhibit 196, does that schedule
24 reflect the $5 billion all in economic loss
25 versus Lehman's marks that you wrote about in

Page 99

1    HIGHLY CONFIDENTIAL - M. KELLY
2  your e-mail to Mr. Lowitt and Mr. Tonucci?
3    A.   Sorry, can you repeat the question?
4     (Record read.)
5    A.   The $5 billion economic loss
6  represents the difference between the agreed
7  sales price for the assets and the book values
8  of those assets on Lehman's books. So --
9     I'll stop there.
10   Q.   Well, do you know what the price was
11 in the deal?  As of this time we're talking
12 about, this -- let's call it as of September 16,
13 the Tuesday.  Do you know what the price was?
14     MR. HUME:  Objection.  Vague.
15   A.   What do you mean by "price"?
16   Q.   How much was Barclays going to pay for
17 the assets shown on this schedule.
18   A.   I don't recall.
19   Q.   Did you know at the time?
20   A.   I don't recall.
21   Q.   You know, just generally with respect
22 to, and I'm back again at Exhibit 136A, your
23 e-mail, but had you spoken to Mr. Shapiro about
24 the final deal before you wrote this e-mail?
25   A.   Can you clarify what you mean by

Page 100

1    HIGHLY CONFIDENTIAL - M. KELLY
2  "final deal"?
3    Q.   Sure.  It would be, by "final deal," I
4  mean when the deal is done and ready for the
5  board, okay?  It had a final price, that is what
6  you're referring to in your e-mail.  That's what
7  I mean by "final deal."
8     Did you talk to Mr. Shapiro before
9  about the deal before you wrote this e-mail?
10     MR. HUME:  Objection.  Vague.
11   A.   I'm not sure specifically what you're
12 asking.
13   Q.   Whether you spoke to Mr. Shapiro about
14 the terms of the deal before you wrote this
15 e-mail at 5:10 A.M. on September 16, 2008.
16   A.   I participated in a meeting with
17 Mr. Shapiro where certain aspects of the
18 transaction were discussed.
19   Q.   Who told you that the price included a
20 $5 billion all in economic loss versus Lehman's
21 marks?
22   A.   I don't recall.
23   Q.   Any recollection at all?
24   A.   I don't recall.
25   Q.   Any general recollection?

Page 101

1    HIGHLY CONFIDENTIAL - M. KELLY
2    A.   No.
3    Q.   Any idea who the candidates might be
4  for who would have told you about a $5 billion
5  all in economic loss against Lehman's marks?
6     MR. BERNSTEIN:  Objection.  Calls for
7  speculation.
8    A.   I would have to speculate.
9    Q.   I'm sorry, did you both say calls for
10 speculation?
11   A.   I would have to speculate.
12   Q.   Okay.  Go ahead.  Speculate for me.
13 Tell me who it is you think might have told you
14 there was a $5 billion all in economic loss
15 versus the marks.
16     MR. BERNSTEIN:  Objection.
17   A.   I'm not prepared to speculate.
18   Q.   I don't think that's your option.
19 It's not a basis not to answer the question.
20     Give me your best guess as to who told
21 you that.
22   A.   Well, my speculation is that it could
23 have been some or all of Bart McDade, Ian
24 Lowitt, or other Lehman individuals negotiating
25 part of the transaction that night.

Page 102

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.   So it could have been McDade, could
3    have been Lowitt, or it could have been others.
4         Now, if it had been Lowitt, why would
5    you be telling Lowitt what the terms were when
6    you wrote this e-mail at 5:10 A.M., September
7    16?
8    A.   I can only infer.
9    Q.   I'll take that.
10    A.   I can't recall.
11    Q.   Well, does that help refresh your
12    recollection as to whether it was Mr. Lowitt who
13    told you there was a $5 billion all in economic
14    loss versus Lehman's marks, the fact that you
15    were writing to Mr. Lowitt and telling him at
16    5:10 A.M.?
17    A.   It doesn't refresh my recollection as
18    to whether he told me.
19    Q.   So does the language that you used in
20    your e-mail, sir, where you say, "Well, it took
21    all night and lots of back and forth, but the
22    deal is done and ready for the board. Final
23    price did not change meaningfully.
24    Approximately a $5 billion all in economic loss
25    versus our marks and 3.6 billion of resi assets

Page 103

HIGHLY CONFIDENTIAL - M. KELLY
1
2    left behind."
3         That does not refresh your
4    recollection as to whether you were repeating
5    back to Mr. Lowitt something he had already told
6    you?
7    A.   No.
8    Q.   Can you think of a reason why you
9    would be writing to Mr. Lowitt to tell him what
10    he had already told you?
11         MR. HUME: Objection.
12    Mischaracterizes testimony.
13    A.   Can you repeat the question, please?
14    Q.   Read it back, please.
15         (Record read.)
16    A.   No.
17    Q.   Do you know if -- who told you about
18    the back and forth that you refer to in your
19    e-mail?
20         MR. HUME: Objection. Asked and
21    answered.
22         MR. BERNSTEIN: Objection. Ditto.
23    A.   I previously stated that I observed
24    discussions throughout the course of the night.
25    Q.   And did the discussions that you

Page 104

HIGHLY CONFIDENTIAL - M. KELLY
1
2    observed address specifically the topic of the
3    economic loss versus its marks that Lehman was
4    willing to take in the purchase price? Did you
5    witness any of those discussions?
6    A.   I, as I previously stated, I observed
7    discussions between different representatives
8    for Lehman and Barclays negotiating the sales
9    price of individual portfolios of assets.
10    Q.   And do you have any knowledge as to
11    how those individual suggestions regarding
12    particular classes of assets added up to exactly
13    $5 billion?
14         MR. HUME: Objection.
15    Mischaracterizes the document.
16         MR. BERNSTEIN: Objection.
17    A.   I referred to approximately $5 billion
18    in my e-mail.
19    Q.   Do you know the process by which it
20    was added up so that you understood it was an
21    approximate total of $5 billion?
22    A.   My recollection is that it was an
23    aggregation.
24    Q.   And in the parts of these various
25    discussions that you did see, did anybody have a

Page 105

HIGHLY CONFIDENTIAL - M. KELLY
1
2    schedule of particular assets, lists of Cusips
3    or lists of particular securities?
4    A.   I don't recall seeing this.
5    Q.   Did you see anyone going through
6    particular lists of particular securities and
7    negotiating over what any particular security
8    was worth?
9    A.   No.
10    Q.   So were the agreement about the
11    difference between what was carried on Lehman's
12    marks and what wound up in the purchase price,
13    was that as a general matter for each class, you
14    know, what are we going to do with corporate
15    equities, what are we going to do with mortgage
16    backs, that kind of thing?
17    A.   Can you repeat the question, please.
18         MR. BERNSTEIN: Objection to the form.
19    Compound and vague.
20         (Record read.)
21    A.   Can you repeat the question again,
22    please?
23         (Record read.)
24    A.   I don't recall.
25    Q.   Do you recall if writedowns were done

## Page 106

HIGHLY CONFIDENTIAL - M. KELLY

1    with regard to whole classes of securities as
2    opposed to the particular securities within that
3    class?
4        MR. BERNSTEIN: Objection. Vague and
5    ambiguous.
6        A.    My recollection is that sales prices
7    were negotiated for individual classes of
8    assets.
9        Q.    By class, not by the individual
10   components of that class, yes?
11       A.    By class, yes.
12       Q.    And if you can go back to the schedule
13   that's attached to Exhibit 196 on the asset side
14   of the schedule, government and agencies,
15   commercial paper, mortgages, do you see where I
16   am?
17       A.    Yes.
18       Q.    Are those the asset classes that were
19   being discussed?
20       A.    They were. I'm not sure there was a
21   separate discussion for each line item, but they
22   were the asset classes in aggregate that were
23   being discussed.
24       Q.    Okay. You're not sure there was a

## Page 107

HIGHLY CONFIDENTIAL - M. KELLY

1    separate negotiation with respect to each of the
2    six classes of securities that are described
3    here? I'm excluding cash.
4        A.    I'm not sure if it was six separate
5    meetings or some lesser number.
6        Q.    And did the asset values ascribed to
7    these classes of securities reflect the
8    aggregate $5 billion all in economic loss versus
9    Lehman's marks?
10       MR. BERNSTEIN: Objection. Vague and
11   ambiguous.
12       A.    Can you repeat the question, please?
13       (Record read.)
14       A.    Can you repeat the question again,
15   please?
16       (Record read.)
17       A.    The $5 billion economic loss was a
18   consequence of the negotiated sales price for
19   each of these classes of assets.
20       Q.    Could you answer the question I asked
21   you? Is it reflected in this financial
22   schedule? Is that $5 billion loss shown in this
23   schedule?
24       A.    What's the question, please?

## Page 108

HIGHLY CONFIDENTIAL - M. KELLY

1        Q.    Is the $5 billion loss shown on the
2    schedule you're holding in your hands?
3        MR. HUME: Objection. Vague.
4        A.    I'm not sure I understand the question
5    when you say "reflected."
6        Q.    As far as you know, sir, for these
7    asset classes, exclusive of cash, were they
8    shown on Lehman books at an amount higher than
9    $62 billion at or about the time this schedule
10   was prepared?
11       A.    My understanding is yes, they were, in
12   aggregate.
13       Q.    Were they $5 billion higher; is that
14   your understanding?
15       A.    Approximately $5 billion higher.
16       MR. GAFFEY: It would be a good time
17   to take a lunch break. I'm starting to move
18   on to another topic.
19       (Luncheon Recess; Time Noted: 12:27
20   P.M.)

## Page 109

HIGHLY CONFIDENTIAL - M. KELLY
AFTERNOON SESSION

1        (Time Noted:  1:38 P.M.)
2    MARTIN KELLY, resumed and
3        testified further as follows:
4    EXAMINATION BY (Cont'd.)
5    MR. GAFFEY:
6        Q.    Mr. Kelly, I have a couple more
7    questions about Exhibit 136A. That's your
8    e-mail that we talked about a bit this morning.
9        This morning you mentioned that you
10   were -- you saw different sets of people dealing
11   with different asset classes. My question to
12   you is who added it up to $5 billion for you to
13   put in that e-mail?
14       A.    I don't recall.
15       Q.    Did you?
16       A.    I don't recall myself doing it.
17       Q.    Do you have any recollection of who it
18   was who conveyed to you the fact that it was $5
19   billion in total?
20       A.    No.
21       Q.    Do you have any recollection of who
22   conveyed to you that it was an extra 1 billion
23   of comp beyond Lehman's accrual?

Page 110

HIGHLY CONFIDENTIAL - M. KELLY
1  A. The conversation with comp was with
2  Bart McDade and that conversation referred to
3  compensation being agreed at $2 billion.
4  Q. And in reflecting on the fact that it
5  was Bart McDade who told you that it was a $2
6  billion agreement with respect to comp, does
7  that refresh your recollection as to whether
8  perhaps it was Mr. McDade who told you the $5
9  billion total for the economic loss?
10  A. No.
11  Q. Do you have a recollection as to
12  whether it was one or more than one person who
13  conveyed to you the information that you
14  collected in this e-mail that you sent out to
15  Mr. Lowitt and Mr. Tonucci?
16  A. No, I don't.
17  Q. I asked you a bit this morning about a
18  conversation with Mr. Shapiro and this is a
19  loose end or two I need to follow up on, but did
20  you talk to Mr. Shapiro about what the deal was
21  before you sent this e-mail out?
22  A. Well, there were many aspects of the
23  transaction, and as I mentioned, I participated
24  in a meeting where certain aspects of the

Page 111

HIGHLY CONFIDENTIAL - M. KELLY
1  transaction were discussed with Mr. Shapiro in
2  the same meeting and there may have been other
3  discussions.
4  Q. The meeting that you're talking about
5  that you had with Mr. Shapiro, that was, just so
6  we're on timing on the same page, is before you
7  send out this e-mail?
8  A. Correct.
9  Q. And do you recall, as best you recall,
10  who else was in that meeting with Mr. Shapiro
11  that you were in before you sent out this
12  e-mail?
13  A. It's the individuals I referred to
14  earlier.
15  Q. McDade?
16  A. No, not McDade. It was Mark Shapiro
17  and Mark Shafir, Michael Klein and Marie Stewart
18  and others whose names I can't recall.
19  Q. And as you reflect on the fact that
20  you were in a meeting with Shapiro, Shafir,
21  Klein and Marie Stewart, do you recall if it was
22  that group of people or some subset of that
23  group of people who conveyed to you the terms of
24  the deal that was reached before you sent out

Page 112

HIGHLY CONFIDENTIAL - M. KELLY
1  this e-mail?
2  A. No.
3  Q. Did anyone ask you to put this
4  information together in your e-mail and send it
5  out?
6  A. I don't believe so.
7  Q. Did anyone comment to you one way --
8  about the fact that you had sent the e-mail
9  after you sent the e-mail out?
10  A. I don't recall that being the case.
11  Q. Whoever it was, whether it was one
12  person or a group of people who talked to you
13  about what ultimately wound up in your e-mail,
14  did they describe a negotiating process where
15  there was back and forth about the price?
16  MR. HUME: Objection. Lacks
17  foundation.
18  A. Could you repeat the question, please?
19  (Record read.)
20  A. I don't recall anyone telling me that.
21  Q. One of the reasons I asked that is the
22  phrase you have in your mail about there being
23  lots of back and forth, do you see that? Who is
24  it -- how is it you learned that there was lots

Page 113

HIGHLY CONFIDENTIAL - M. KELLY
1  of back and forth before you sent out your
2  e-mail?
3  A. That was my observation of a variety
4  of conversations that occurred throughout the
5  course of that night.
6  Q. And in your observations throughout
7  the course of that night, did you see anybody at
8  Lehman pushing back with respect to the price
9  that he paid for these various asset classes?
10  A. I didn't participate directly in
11  negotiations on any one asset class.
12  Q. Okay.
13  A. I did observe conversations taking
14  place.
15  Q. So, as the witness to the
16  conversations, as you observed them, you heard
17  them, did you hear any negotiation back and
18  forth about what the price would be?
19  MR. BERNSTEIN: Objection. Lack of
20  foundation.
21  A. Let me just finish what I was saying.
22  I observed discussions around the
23  prices of individual asset portfolios and I
24  observed a conversation in the meeting that

Page 114

1     HIGHLY CONFIDENTIAL - M. KELLY
2  included Mark Shapiro and Mark Shafir and
3  Michael Klein whereby the value of the real
4  estate assets was debated, as was the commission
5  for -- oh, as was a reasonable commission that
6  would relate to such a sale.
7     Q.  The commission relating to the real
8  estate aspect of the sale, yes?
9     A.  Correct.
10    Q.  Okay.  My questions go to the other
11 assets, to the securities, the various classes
12 of securities we've been discussing.
13        Did you see a similar debate take
14 place about the overall economic loss Lehman
15 would bear against its marks?
16    A.  No.
17    Q.  As you sit here today, do you have any
18 knowledge at all, sir, about the negotiating
19 process that went into what turned out to be an
20 aggregate $5 billion all in economic loss versus
21 Lehman's marks?
22    A.  Nothing beyond what I've already
23 described today.
24    Q.  Was there a point where you did know
25 more?  I'm trying to figure out how much of it

Page 115

1     HIGHLY CONFIDENTIAL - M. KELLY
2  may be lapsed memory and how much you knew at
3  the time.
4        Was there a time when you did know
5  more about a negotiating process concerning the
6  overall economic loss against Lehman's marks?
7     A.  1 -- 1 don't believe so.
8     Q.  Okay.  If you wanted an answer to who
9  would know about a haggling or a negotiating
10 process concerning the overall loss to Lehman's
11 marks, who would you ask?
12    A.  Sorry, can you repeat the question,
13 please?
14        (Record read.)
15    A.  1 would start with Bart McDade as the
16 person who 1 understood to be leading the
17 negotiations for Lehman.
18    Q.  And who else would you ask?  You would
19 start with Mr. McDade.  Who else would you ask?
20    A.  1 would ask the two individuals, the
21 two bankers to the transaction, Mark Shapiro and
22 Mark Shafir.
23    Q.  Can we go back to the balance sheet
24 that was attached to the financial schedule
25 that's attached to Exhibit 196, and directing

Page 116

1     HIGHLY CONFIDENTIAL - M. KELLY
2  your attention to the liability side of that
3  financial schedule, and in particular,
4  Mr. Kelly, down to the lower right-hand corner
5  where it refers to cure payment and comp, do you
6  see that?
7     A.  Yes.
8     Q.  What was the source of the 2.25 number
9  for cure payment?
10    A.  I don't recall.
11    Q.  Did you ever know?  Was there a time
12 when you did know what the source of the 2.25
13 for cure payment was?
14    A.  I don't know.
15    Q.  Do you have any idea as you sit here
16 today what the -- how the assessment cure
17 payment came to 2.25?
18    A.  No.
19    Q.  Is it your understanding that the
20 entries on the liability side of this schedule
21 for cure payment for comp represent liabilities
22 that Barclays was going to assume in the
23 transaction?
24        MR. HUME:  Objection.  Vague.
25    A.  Can you repeat the question, please?

Page 117

1     HIGHLY CONFIDENTIAL - M. KELLY
2        (Record read.)
3     A.  My recollection is that these amounts
4  were initial estimates of liabilities that
5  Barclays was to assume.
6     Q.  Well, the comp number of 2 billion was
7  an agreed number, correct?
8     A.  Yes, that was my understanding.
9     Q.  And it was your understanding that the
10 2 billion comp number that was agreed was a
11 billion dollars over the accrual that Lehman
12 carried on its books for comp, correct?
13    A.  It was approximately a billion dollars
14 over the cash component of the accrual.
15    Q.  And do you know how anybody went about
16 estimating the amount for cure payment?  How did
17 that number come to be on this schedule?
18    A.  No.
19    Q.  Do you know if the 2.25 billion that's
20 estimated for cure payment on there bore any
21 relation to the actual potential liability for
22 trade payables that Lehman had at the time?
23    A.  Sorry.  Can you repeat the question,
24 please?
25        (Record read.)

Page 118

HIGHLY CONFIDENTIAL - M. KELLY

1
2    A.    At what point in time?
3    Q.    At the time that this was prepared.
4  It's dated September 16, 2008, 11:18 A.M.
5    A.    No.
6    Q.    No, you don't know or, no, it didn't?
7         Sorry, the question might have got
8  lost in there.
9    A.    Can you ask the question again,
10  please?
11    Q.    I'll put another question.
12         Do you know if the 2.25 billion number
13  for cure payment reflected on the liability side
14  of this schedule dated September 16, 2008 bore
15  any relation to the actual potential liability
16  for trade payables that Lehman had on its books
17  at the time?
18    MR. BERNSTEIN: Objection. Asked and
19  answered.
20    A.    I'm sorry, I need the question again.
21         (Record read.)
22    A.    No.
23    Q.    You don't know or it didn't bear a
24  relation to the amount accrued?
25    A.    I think the question was "do you

Page 119

HIGHLY CONFIDENTIAL - M. KELLY

1
2  know."
3    Q.    You're telling me you don't know, is
4  that right?
5    A.    Correct.
6    Q.    Okay. What, if any, connection was
7  there, sir, between the figures on this
8  financial schedule and the pricing of the
9  transaction as it was agreed by the 16th of
10  September?
11    A.    This schedule was intended to reflect
12  an initial estimate of the assets to be acquired
13  and the liabilities to be assumed, and my
14  understanding is that the agreed price was
15  negotiated based on an agreement as to the price
16  of each of these individual items.
17    Q.    And the agreed price was based on the
18  estimates, on the estimates in this schedule?
19    A.    I don't know.
20    Q.    Were you asked to put this schedule
21  together?
22    A.    I don't recall.
23    Q.    Were you involved in putting this
24  schedule together?
25    A.    Yes.

Page 120

HIGHLY CONFIDENTIAL - M. KELLY

1
2    Q.    Do you know why you were involved? Do
3  you know why this schedule was put together?
4    MR. BERNSTEIN: Objection. Compound.
5    Q.    Withdrawn. Do you know why this
6  schedule was put together?
7    A.    The purpose of the schedule, as I
8  understand it, was to reflect the agreed asset
9  value that had been negotiated for assets to be
10  sold to Barclays and an estimate of the value of
11  liabilities to be assumed by Barclays.
12    Q.    The agreed asset value is the asset
13  value including the $5 billion element we talked
14  about this morning, correct?
15         Withdrawn. This is a timing issue
16  that I'm trying to sort out. This schedule is
17  dated and timed on the 16th of September, 2008
18  at 11:18 A.M., correct? You see that?
19    A.    I see that.
20    Q.    So, by that time -- and I'm indicating
21  your e-mail of 5:10 A.M., by -- of that day --
22  by the time this schedule is prepared, the deal
23  is done and ready for the board, correct?
24    A.    Well, not correct, as it turned out.
25  That was my understanding at the time I wrote

Page 121

HIGHLY CONFIDENTIAL - M. KELLY

1
2  this e-mail.
3    Q.    What was incorrect about it? What did
4  you learn was incorrect about it?
5    A.    I recall being woken up at home
6  sometime around 7 and being advised that the
7  deal had changed and that I needed to come back
8  into the office.
9    Q.    That's 7 on the morning of the 16th?
10    A.    Or thereabouts, approximately.
11    Q.    Who advised you of that?
12    A.    Ian Lowitt called me.
13    Q.    Tell me what Mr. Lowitt said to you
14  and what you said to him in that call?
15    A.    I don't recall the -- I don't recall
16  the contents of that conversation.
17    Q.    Did Mr. Lowitt say to you anything
18  other than the deal had changed and you had to
19  come back into the office?
20    A.    I don't believe so.
21    Q.    Did Mr. Lowitt at any point explain to
22  you how the deal had changed?
23    A.    I don't recall.
24    Q.    Do you remember how the deal had
25  changed?

Page 122

HIGHLY CONFIDENTIAL - M. KELLY
1
2      A.   No.
3      Q.   Did you talk to anyone other than
4  Mr. Lowitt about the deal changing?
5      A.   I don't recall.
6      Q.   Did you come into the office?
7      A.   Yes.
8      Q.   What did you do when you got to the
9  office?
10      A.   I went immediately to the 32nd floor.
11      Q.   Okay.   And what happened then?   Did
12  you talk to anybody?
13      A.   I looked for Ian Lowitt and found him.
14      Q.   You found him, okay.   And when you
15  found him, was he by himself or was he with
16  other people?
17      A.   I don't recall.
18      Q.   Did you speak to Mr. Lowitt when you
19  found him?
20      A.   My recollection is that I did.
21      Q.   What's your recollection of what you
22  said to him and what he said to you?
23      A.   I don't recall.
24      Q.   Do you have any recollection at all of
25  the content of that conversation?

Page 123

HIGHLY CONFIDENTIAL - M. KELLY
1
2      A.   No.
3      Q.   Do you have any recollection at all
4  about how the deal changed?
5      A.   No.
6      Q.   As you sit here today do you know if
7  it changed at any point, the manner in which it
8  changed at any point after you wrote your
9  e-mail?
10      A.   Can you repeat the question, please?
11      Q.   Let me withdraw the question.   You get
12  a call from Mr. Lowitt saying the deal's
13  changed, you have to come into the office.   You
14  get that call about 7 o'clock that morning, yes?
15      A.   Correct.
16      Q.   And you come into the office and you
17  see Mr. Lowitt, yes?
18      A.   Correct.
19      Q.   And you understand generally that the
20  deal has changed, correct?
21      A.   Correct.
22      Q.   And there came a point I take it where
23  you learned the manner -- the nature in which
24  the deal had changed?
25      A.   I don't recall.

Page 124

HIGHLY CONFIDENTIAL - M. KELLY
1
2      Q.   You don't recall if you learned at
3  that time how the deal had changed?   You knew
4  only that it had changed; is that your
5  testimony?
6      A.   That's correct.
7      Q.   And did there come a point after that
8  initial meeting with Mr. Lowitt where you
9  learned how the deal had changed?
10      A.   The deal changed multiple times
11  throughout the course of the week, so I can't
12  recall what the specific change at this point in
13  time was.
14      Q.   Do you have any recollection,
15  generally, specific, or otherwise, about the
16  nature of the change in the deal that Mr. Lowitt
17  told you about on the morning of the 16th?
18           MR. BERNSTEIN:   Objection.   Asked and
19  answered.
20      A.   No.
21      Q.   Do you recall talking to anybody else
22  about the fact that the deal had changed on the
23  morning of the 16th other than Mr. Lowitt?
24      A.   No.
25      Q.   Did you talk to Mr. McDade about the

Page 125

HIGHLY CONFIDENTIAL - M. KELLY
1
2  fact that the deal had changed on the 16th?
3      A.   I don't recall that I did.
4      Q.   Did you have a sense of whether the
5  deal had changed in a major or an insignificant
6  way?
7      A.   I don't recall.
8      Q.   You have no recollection at all?
9      A.   That's correct.
10      Q.   Okay.   Just to press on this a little
11  bit, the company you're working for has filed an
12  incredibly high-profile bankruptcy.   Barclays
13  shows up and is going to buy the assets and it
14  may save 10,000 jobs, including yours.
15           It's your testimony you have no
16  recollection of how that deal changed on the
17  16th of September, 2008?
18           MR. BERNSTEIN:   Objection.   Asked and
19  answered and argumentative.
20      Q.   You can answer it.
21      A.   Can you repeat the question, please?
22           (Record read.)
23      A.   I don't recall how the deal changed
24  specifically related to the conversation with
25  Ian around about 7 o'clock that morning.

Page 126

HIGHLY CONFIDENTIAL - M. KELLY

1
2    Q.   Tell me as best you recall generally
3  how the deal changed over the week.  What
4  changes were made, when were they made between
5  your writing of this e-mail, marked as 136A, and
6  the closing of the deal on the 22nd of
7  September.  Give me as much detail about that as
8  you can, sir.
9    A.   My general recollection is that both
10  the types of assets and the amounts of assets
11  changed throughout the course of the week, and I
12  generally recall that there were issues in
13  obtaining or confirming title and/or possession
14  to the assets and, therefore, the ability for
15  Lehman to sell the assets in the amounts that
16  had been agreed to early on the Tuesday.
17    Q.   You need a verb there.  What about the
18  ability for Lehman to sell the assets?  Lehman
19  was not able to convey title to the assets, is
20  that what you mean?
21    A.   I think it's just the word "of" for
22  the word "for."  "The ability of Lehman to sell
23  the assets."
24    Q.   So what steps were taken to account
25  for this event, these events that Lehman was --

Page 127

HIGHLY CONFIDENTIAL - M. KELLY

1
2  that there were issues in obtaining or
3  confirming title or possession to the assets?
4    A.   There were a series of conversations
5  and meetings throughout the course of the week
6  involving a large number of people to validate
7  securities available to be sold.
8    Q.   And this series of conversations
9  concerning a lot of people throughout the week
10  to validate the securities available to be sold,
11  did that result in a reduction of the amount of
12  securities that were available to be sold?
13    A.   It resulted in an absolute reduction
14  and also changes to the components.
15    Q.   What was the absolute reduction?
16    A.   I don't recall.
17    Q.   Do you have any recollection of its
18  range, the range of the absolute reduction?
19    A.   No.
20    Q.   What were the changes to the
21  components?
22    A.   I don't recall specifically.
23    Q.   Do you have any general recollection
24  of the changes to the components?
25    A.   Not beyond what I've already provided.

Page 128

HIGHLY CONFIDENTIAL - M. KELLY

1
2    Q.   Well, all you've told me so far, sir,
3  is there were changes to the components.  Do you
4  have anything to add to that?  Do you have any
5  knowledge other than that there were changes to
6  the components?
7    A.   There were changes in both the amounts
8  by component and of the components themselves.
9    Q.   What do you mean when you say there
10  were changes "of the components themselves"?
11  Changes to what?
12    A.   To the types of assets that had
13  initially been agreed.  I'm sorry, I should say
14  to the types of asset classes that had initially
15  been agreed.
16    Q.   Anything else other than changes in
17  the types of asset classes that originally had
18  been agreed?
19    A.   At what point in time?
20    Q.   Over the week.
21    A.   Until?  Until what point in time?
22    Q.   Closing.
23    A.   There was an effort to identify other
24  assets that could be sold to Barclays.
25    Q.   Those were other assets over and above

Page 129

HIGHLY CONFIDENTIAL - M. KELLY

1
2  the ones identified on the financial schedule?
3    MR. HUME:  Objection.  Vague and
4  mischaracterizes the testimony.
5    A.   No.
6    Q.   What do you mean when you say there
7  was an effort to identify other assets?  What
8  other assets are you talking about?
9    A.   My recollection is that there was an
10  effort to identify whether there was a surplus
11  in funds segregated under the 15c3 requirement.
12    Q.   Apart from the effort to find a
13  surplus in funds, the segregated funds under
14  15c3, were there other types of assets that were
15  being searched for to transfer to Barclays?
16    A.   My recollection is there was a general
17  effort to identify unencumbered and pledgeable
18  assets.
19    Q.   Were you involved in that general
20  effort?
21    A.   No.
22    Q.   Who was?  I know there were a lot of
23  people.  Who was in charge of that general
24  effort?
25    A.   My understanding was that Ian Lowitt

Page 130

HIGHLY CONFIDENTIAL - M. KELLY

1    was leading that effort.
2    Q.   And that's the Ian Lowitt you reported
3    to, right? Did he engage you in that effort at
4    all?
5    A.   Not that I can recall.
6    Q.   And were there any other classes, any
7    other types of assets, apart from 15c3 funds,
8    that were being identified in the course of that
9    project?
10   A.   I'm not aware of any others.
11   Q.   Are you aware of any effort to find
12   excess funds in connection with what's called
13   OCC?
14   A.   No.
15   Q.   By "unencumbered assets," do you mean
16   unencumbered assets other than surplus in the
17   15c3 area?
18   A.   Potentially.
19   Q.   And where were people looking for
20   unencumbered assets in addition to the 15c3 type
21   of assets?
22   MR. HUME:   Objection. Lacks
23   foundation.
24   A.   I don't know.

Page 131

HIGHLY CONFIDENTIAL - M. KELLY

1    Q.   Did you know at the time? I'm trying
2    to find out, do you not remember or did you not
3    know?
4    A.   Did I know what at the time?
5    Q.   Did you know at the time of other
6    types of unencumbered assets apart from 15c3
7    that people were looking for?
8    A.   I don't recall.
9    Q.   Do you know if Barclays paid any
10   additional consideration for these additional
11   types of assets, 15c3 or the other unencumbered
12   assets that were identified?
13   MR. HUME:   Objection. Vague.
14   A.   Can you repeat the question, please?
15   (Record read.)
16   A.   I wouldn't -- wouldn't characterize
17   them as additional assets.
18   Q.   How would you characterize them?
19   A.   I would characterize them as partial
20   replacement for other assets that were not
21   available.
22   Q.   When did this effort to identify
23   additional replacement assets begin?
24   A.   I don't recall specifically.

Page 132

HIGHLY CONFIDENTIAL - M. KELLY

1    Q.   Do you recall generally?
2    A.   Sometime during that week.
3    Q.   Beginning or the end of the week?
4    A.   I don't recall.
5    Q.   No recollection at all?
6    A.   No.
7    Q.   Could it have been -- it wasn't right
8    after you wrote your e-mail at 5:10, right?
9    A.   I don't recall.
10   Q.   Was there a target quantity of such
11   assets that needed to be identified?
12   A.   Not that I was aware of.
13   Q.   Were you aware at the time whether
14   there was a target people were trying to reach
15   of such assets?
16   A.   Not that I was aware of.
17   Q.   Do you have a sense of what the -- my
18   term -- the shortfall was between the amount of
19   assets that needed to be made up?
20   A.   No.
21   Q.   Did you have a sense of that at the
22   time?
23   A.   I don't recall.
24   Q.   Did the -- again, I'm back at the

Page 133

HIGHLY CONFIDENTIAL - M. KELLY

1    financial schedule -- did the assumption of
2    liabilities for comp and cure change at any
3    point over that week?
4    MR. HUME:   Objection. Vague.
5    A.   I don't recall that the accrual for
6    comp changed throughout the course of that week.
7    Q.   It stayed at 2 billion?
8    A.   That's my recollection.
9    Q.   What about the accrual for cure, did
10   that change during the week, over the course of
11   the week?
12   A.   My recollection is that the estimate
13   for the cure payment did change.
14   Q.   How did it change?
15   A.   Can you rephrase the question?
16   Q.   Did it go up? Did it go down?
17   A.   The estimate went down.
18   Q.   By how much did it go down?
19   A.   My recollection is that the estimate
20   reduced to approximately a billion dollars.
21   Q.   To a billion dollars or by a billion
22   dollars?
23   A.   To approximately $1 billion.
24   Q.   And who calculated -- who made the

Page 134

1      HIGHLY CONFIDENTIAL - M. KELLY
2    necessary calculations to reduce that estimate
3    from 2 and a quarter to $1 billion?
4       A.   I don't recall.
5       Q.   Why was it reduced from 2 and a
6    quarter to $1 billion?
7       A.   It was reduced after a review of the
8    schedule that Ian, Ian Lowitt, and I undertook
9    at some point during that week whereby we
10   observed that the estimated liability appeared
11   to be high relative to the expense run rate of
12   the firm.
13      Q.   And was it you and Mr. Lowitt who made
14   that determination that it was high relative to
15   the expense run rate?
16      A.   My recollection is that it was Ian and
17   I that made that observation.
18      Q.   And at what point in the week did you
19   and Mr. Lowitt make that observation?  Early in
20   the week?  Late in the week?
21      A.   I can't recall.
22      Q.   Was it before Friday of the week?
23      A.   I believe it was before Friday, but
24   I'm not certain.
25      Q.   And when you made that determination,

Page 135

1      HIGHLY CONFIDENTIAL - M. KELLY
2    did you or Mr. Lowitt communicate it to anyone?
3       A.   Yes.  Ian and I spoke with Bart.
4       Q.   Tell me the circumstances under which
5    you spoke to Bart and everything that you can
6    remember about the conversation.
7          MR. BERNSTEIN:  Objection.  Compound.
8       A.   Can you ask one question at a time,
9    please?
10      Q.   When did you speak to Bart?
11      A.   I don't recall the date, the day
12   specifically, but it was shortly after observing
13   that the accrual appeared high.
14      Q.   Where were you when you spoke to Bart?
15      A.   I recall that we met in Bart's office.
16      Q.   Bart was in the office, too?
17      A.   We met with Bart.
18      Q.   In his office?
19      A.   Correct.
20      Q.   And Ian Lowitt was in the office with
21   you and Bart, correct?
22      A.   That's my recollection.
23      Q.   Was anyone else present in the office
24   with you and Bart and Ian Lowitt?
25      A.   I don't believe so.

Page 136

1      HIGHLY CONFIDENTIAL - M. KELLY
2       Q.   Tell me what you said, what Mr. Lowitt
3    said, and what Mr. McDade said in that meeting.
4       A.   My recollection is that I explained
5    the observation that we had, meaning that the
6    liability estimate appeared high relative to the
7    run rate.  I don't recall what Ian said in that
8    meeting.  And I recall Bart's reaction to that
9    as being:  We just left a billion dollars on the
10   table.
11      Q.   Are those the words that Mr. McDade
12   used?
13      A.   Words to that effect.  I can't -- I
14   can't say that they were specifically the words.
15      Q.   As best you can -- we'll work from
16   there, but as best you can, tell me the words
17   that he used, as best you remember.
18      A.   They are the words as best I can.
19      Q.   And what did you say in response to
20   him saying that?
21      A.   I don't recall if there was a
22   succeeding conversation.
23      Q.   When you had this conversation with
24   Bart, did you show him any analysis or documents
25   of any kind reflecting your view that the

Page 137

1      HIGHLY CONFIDENTIAL - M. KELLY
2    liability for cure was high -- withdrawn.
3          Did you show him any documents to
4    explain your point at that meeting?
5       A.   I don't think so.
6       Q.   Had you prepared any documents that
7    led to you coming to that conclusion?
8       A.   I don't recall.
9       Q.   Did you prepare any documents that
10   reflected that conclusion?
11      A.   I don't recall.
12      Q.   Did you ever cause a financial
13   schedule similar to the one in front of you to
14   be prepared that reflected that change?
15      A.   I believe it was reflected on a -- on
16   a later version of this schedule.
17      Q.   Do you know what the schedule -- if
18   that schedule or one like it was used at the
19   closing of the transaction on September 22?
20          MR. BERNSTEIN:  Objection.  Vague and
21   ambiguous.
22      A.   I wasn't at the closing, so no.  No, I
23   don't know, to answer the question.
24      Q.   Did you ever ask anyone if an amended
25   schedule was used when the transaction was

Page 138

1    HIGHLY CONFIDENTIAL - M. KELLY
2  closed?
3      A.   I don't recall.
4      Q.   I'm showing you, sir, what was marked
5  at a previous deposition as Exhibit 19, and if
6  you compare that to the schedule that's attached
7  to Exhibit 196, sir, you'll see that it's the
8  same except for an annotation at the top
9  right-hand corner. Take a moment to satisfy
10 yourself that that's so, would you, please?
11     (Document review.)
12     A.   I agree with that.
13     Q.   Okay, you agree with that. Have you
14 ever seen this version that was previously
15 marked as Exhibit 19, the one with the
16 handwritten annotation in the upper right-hand
17 corner?
18     A.   At what point in time?
19     Q.   Ever before today.
20     A.   I need a minute with my lawyers,
21 please.
22     Q.   I prefer you answer the question,
23 unless there's a privilege issue.
24     Can you answer the question?
25     MR. BERNSTEIN:  Maybe if we can modify

Page 139

1    HIGHLY CONFIDENTIAL - M. KELLY
2  the question. Are you talking about in
3  your --
4      MR. GAFFEY:  I see the issue.
5      MS. HNATT:  Other than perhaps the
6  preparation for the deposition.
7      Q.   Apart from what you may have reviewed
8  with your lawyers to prepare for your
9  deposition, sir, have you ever seen that piece
10 of paper before today?
11     A.   I don't recall having seen this piece
12 of paper apart from preparation for the
13 deposition.
14     Q.   Do you have any knowledge, sir, of
15 whether the one marked as Exhibit 19 was
16 referred to in the Asset Purchase Agreement?
17     A.   No.
18     MR. HUME:  Objection. Lack of
19 foundation.
20     Q.   Do you have any knowledge, sir,
21 whether anyone ever brought to the court's
22 attention a change in the assumed liability
23 that's shown on the schedule dated September 16,
24 2008, the one in front of you?
25     MR. HUME:  Objection. Lacks

Page 140

1    HIGHLY CONFIDENTIAL - M. KELLY
2  foundation.
3      MR. BERNSTEIN:  Could you modify the
4  question to be other than what you may have
5  learned from your lawyers?
6      Q.   Yes, all my questions are modified by
7  other than what you may have learned with your
8  lawyers, okay?
9      MR. GAFFEY:  Does that satisfy the
10 concern?
11     MR. BERNSTEIN:  At least for this
12 question, sure.
13     A.   No.
14     Q.   So do you know, Mr. Kelly, when the
15 deal was finally done, what was the amount of
16 assumed liabilities that Barclays took on for
17 compensation and for cure?
18     MR. HUME:  Objection, compound. And
19 calls for legal conclusion. I object on
20 that ground as well.
21     MR. GAFFEY:  I think "objection to
22 form" probably suffices and keeps you within
23 the rules, Hamish, but...
24     MR. HUME:  I wanted to give a reason
25 for the objection.

Page 141

1    HIGHLY CONFIDENTIAL - M. KELLY
2      MR. GAFFEY:  I don't --
3      Q.   Do you have my question in mind, sir?
4      A.   I'd like the question again, please.
5      (Record read.)
6      A.   No.
7      Q.   When the schedule was prepared --
8  actually, just so we're not confusing each
9  other. Hand me back 19, please. I want you to
10 focus on the one that was marked as 196.
11     When that schedule was prepared, the
12 one that's the second page of 196, was it your
13 view, sir, that the numbers for assumed
14 liabilities for cure and compensation were --
15 they were real numbers in the sense that they
16 were the best estimates that could be made at
17 the time?
18     A.   At what point in time?
19     Q.   At the time this was prepared on the
20 16th of September, 2008.
21     A.   These numbers reflected estimates at
22 that point in time, yes.
23     Q.   And they were estimates based on
24 actual data; they weren't just picked to make
25 the schedule balanced, correct?

Page 142

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.    To the best of my knowledge, yes.
3    Q.    Did you ever have any discussion with
4    anyone about that topic, about whether those
5    liabilities were calculated at those levels
6    simply to make this schedule balance; whether
7    they were plug numbers?
8    A.    You're specifically referring to the
9    cure and the comp?
10    Q.    Correct, sir.
11    A.    No.
12    Q.    At the time on the 16th of September
13    when you were involved in preparing this
14    schedule and seeing these conversations, was
15    it -- about negotiating and reaching the deal,
16    was it your understanding, sir, that the
17    assumption of liabilities in an amount of $4.25
18    billion was a part of the price of the
19    transaction?
20        MR. HUME:  Objection.  Vague.
21    A.    I wasn't part of the negotiations, so
22    I don't know.
23    Q.    I've heard you, sir, when you say you
24    weren't actually negotiating, but I've also
25    heard you say you were around them a lot, you

Page 143

HIGHLY CONFIDENTIAL - M. KELLY
1
2    were like a witness to the negotiations.
3        So my question goes to whether you
4    heard or saw anything that gave you that view,
5    that the amounts shown here for cure and comp
6    were part of the price that Barclays was paying
7    in the transaction?
8    A.    I don't know how the price was agreed
9    to.
10    Q.    Do you know if the $5 billion overall
11    economic loss against the marks could fairly be
12    described as a bulk discount?
13    A.    Could you repeat the question, please?
14    Q.    Actually, let me rephrase the
15    question.  Was the $5 billion overall loss on
16    the economics marks a fixed discount on the
17    assets?
18        MR. BERNSTEIN:  Objection.  Vague and
19    ambiguous.
20    A.    Can you repeat the question, please?
21        (Record read.)
22    A.    $5 billion, the approximately $5
23    billion, represented the difference between the
24    negotiated price for the assets and their book
25    values on the books of Lehman prior to the

Page 144

HIGHLY CONFIDENTIAL - M. KELLY
1
2    transaction.
3    Q.    And over the course of the week, the
4    amount of securities that could be conveyed
5    reduced to an absolute number, correct?
6    A.    That's my recollection.
7    Q.    Did the difference in price between
8    what was shown on the marks and what was paid as
9    a purchase price stay at $5 billion?
10    A.    I don't know.
11    Q.    Do you know one way or the other?
12    A.    I don't know.
13    Q.    To go back to the question I
14    originally asked you, could it fairly be
15    described as a fixed discount on the assets?
16        MR. BERNSTEIN:  Objection.  Asked and
17    answered.
18    A.    Can you ask the question -- repeat the
19    question, please?
20        (Record read.)
21    A.    I don't believe it was -- my
22    understanding is that the amount was neither
23    fixed nor a discount.
24    Q.    Let me show you what was marked
25    previously as Exhibit 148A at a prior

Page 145

HIGHLY CONFIDENTIAL - M. KELLY
1
2    deposition.  Let me know when you've had a
3    chance to look through the document, sir.
4        (Document review.)
5    A.    Okay.
6    Q.    Have you had a chance to look it
7    through?
8    A.    Yes.
9    Q.    Do you remember this set of e-mails
10    reflected in Exhibit 148A?
11    A.    No.
12    Q.    Directing your attention to the
13    bottom, that is, the earliest e-mail in the
14    chain, it's from a Daniel Flores on September 17.  Who's Daniel
15    Austin Taylor on September 17.  Who's Daniel
16    Flores?
17    A.    I don't know.
18    Q.    Do you have any recollection of that
19    name?
20    A.    No.
21    Q.    How about Austin Taylor, do you
22    remember an Austin Taylor?
23    A.    No, I don't.
24    Q.    No, you don't?
25    A.    No, I don't.

Page 146

HIGHLY CONFIDENTIAL - M. KELLY
1    HIGHLY CONFIDENTIAL - M. KELLY
2    Q.    Any idea why they would be writing to
3    you about diligence items on September 17, 2008?
4        A.    Now or then?
5        Q.    I'll take either.
6        A.    At the time, no.
7        Q.    Do you have a recollection now?
8        A.    I don't have a recollection.
9        Q.    Do you have an understanding now?
10       A.    I don't have an understanding.
11       Q.    In the e-mail to you from Mr. Flores
12   he refers to "items like Lazard has requested
13   that George Mack and I discussed with you
14   yesterday." Who is George Mack?
15       A.    I don't know.
16       Q.    Any recollection of knowing or
17   speaking to a man named George Mack?
18       A.    No.
19       Q.    Mr. Flores refers to two items. One
20   is as follows:  "Price variance report for
21   trading books going with deal to reflect changes
22   between Friday, 9/12 close and Monday, 9/15
23   close."
24       Do you have an understanding of what
25   that means?

Page 147

1    HIGHLY CONFIDENTIAL - M. KELLY
2        A.    The term "price variance report" is
3    not a term I'm familiar with, so no.
4        Q.    Do you have any understanding what
5    that means apart from whether the term "price
6    variance report" is a term of art?
7        A.    I could speculate, but, no.
8        Q.    Can you do that?  Why don't you
9    speculate.
10       A.    My speculation would be that the price
11   variance report is intended to refer to change
12   in the market price of the securities between
13   those two dates.
14       Q.    Now, in your response to Mr. Flores,
15   you write -- well, for completeness, the second
16   item that Mr. Flores wrote to you about, that's
17   at the bottom, "The balance sheet of what's
18   being sold as well as what is remaining behind."
19       Do you see that?
20       A.    Uh-huh.
21       Q.    And then you respond to Mr. Flores.
22   "Number one is Gerry, CC'd.  Number two is me.
23   We are working on that now."
24       Do you understand that to mean you
25   were working on the balance sheet that is the

Page 148

1    HIGHLY CONFIDENTIAL - M. KELLY
2    second item in Mr. Flores' e-mail?
3        A.    We were working on a balance sheet
4    of -- of Lehman subsequent to the transaction.
5        Q.    Okay.  And is your e-mail to
6    Mr. Flores fairly understood to mean that Gerry,
7    it would be Gerry Reilly working on the price
8    variance report item?
9        A.    I think that's reasonable.
10       Q.    And then in the next e-mail in the
11   chain, we have Gerard Reilly --
12       Mr. Reilly has passed away; is that
13   correct?
14       A.    That's correct.
15       Q.    We have Mr. Reilly writing to you and
16   Mr. Flores with a copy to Mr. Taylor and saying,
17   "The first question is very difficult.  My
18   understanding of the deal is that they will
19   purchase our assets that remain in LBI on the
20   closing date, which will not be the same as the
21   assets on the 12th.  That purchase will be a
22   fixed discount on the assets that remain to
23   reflect the bulk size of the purchase."
24       Do you see that sentence?
25       A.    Yes.

Page 149

1    HIGHLY CONFIDENTIAL - M. KELLY
2        Q.    Did you note at the time that
3    Mr. Reilly was describing the purchase is
4    involving a fixed discount on the assets?
5        A.    I'm sorry, what's the question,
6    please?  Can you repeat?
7        Q.    Let me withdraw the question.
8        Is Mr. Reilly's description of the
9    deal to be a "purchase at a fixed discount on
10   the assets that remain to reflect the bulk size
11   of the purchase" an accurate description of the
12   deal as you understood it on the 17th of
13   September?
14       A.    I don't know.
15       Q.    You have no idea one way or the other?
16       A.    Correct.
17       Q.    If I were to tell you today that the
18   deal as it stood on September 17, 2008 was that
19   a fixed discount on the assets that remain at
20   closing, would you agree or disagree with that
21   as a characterization of the deal as you
22   understood it?
23       MR. BERNSTEIN:  Objection.  Vague and
24   ambiguous.
25       MR. HUME:  Objection.  Vague and

Page 150

HIGHLY CONFIDENTIAL - M. KELLY

1  ambiguous.
2  A.  I don't know.
3  Q.  You have no view one way or the other?
4  A.  Correct.
5  Q.  You have no view one way or the other
6  as to whether the deal involved a fixed discount
7  on the assets?
8  MR. BERNSTEIN:  Objection.  Asked and
9  answered.
10  A.  Correct.
11  Q.  And you have no recollection of this
12  e-mail?
13  A.  Correct.
14  Q.  Or who Mr. Flores or Mr. Taylor are?
15  A.  Correct.
16  Q.  You do remember Mr. Reilly, though,
17  right?
18  A.  Yes.
19  Q.  We got that, okay.
20  And did you correspond with Mr. Reilly
21  from time to time about matters relating to the
22  transaction?
23  A.  Yes.
24  Q.  Do you recall ever talking to
25

Page 151

HIGHLY CONFIDENTIAL - M. KELLY

1  Mr. Reilly about his expression of the deal in
2  terms of a fixed discount on the assets?
3  A.  No.
4  Q.  Mr. Reilly continues in his e-mail to
5  you to say, "We can track our PL by assets
6  category, which gives some indication of how
7  much we have moved the marks."  Do you see that?
8  A.  Yes.
9  Q.  What do you understand Mr. Reilly to
10  have been saying to you in this e-mail when he
11  talks about some indication of how much we have
12  moved the marks?
13  A.  It's unclear to me what he's referring
14  to.
15  Q.  Is it a fair reading in your view that
16  he's referring to changing the marks to reflect
17  the price agreed with Barclays for those asset
18  classes we talked about this morning?
19  MR. HUME:  Objection.  Calls for
20  speculation.
21  A.  I don't know.
22  Q.  Do you have any recollection of
23  speaking to or corresponding with Mr. Reilly
24  about that topic apart from the e-mail that's in
25

Page 152

HIGHLY CONFIDENTIAL - M. KELLY

1  front of you, sir, just an independent
2  recollection?
3  A.  I don't recall.
4  Q.  You don't recall one way or the other?
5  A.  Correct.
6  Q.  Given the task that you had to do
7  during the week between the 16th of September
8  and the closing on the 22nd of September, was
9  whether or not the deal was at a fixed discount,
10  would that have been a matter of some concern to
11  you in order to do your job?
12  A.  I think that's most relevant to the
13  negotiation and the terms of the transaction,
14  which I wasn't party to.
15  Q.  In order to do the tasks you needed to
16  do during that week, sir, would you have needed
17  to know whether or not the deal was at a fixed
18  discount?
19  A.  I'm not sure I can describe what my
20  responsibilities and tasks that I was
21  responsible for were during that week.
22  Q.  You're not sure you can describe what
23  your job was that week, sir; is that what you're
24  telling me?
25

Page 153

HIGHLY CONFIDENTIAL - M. KELLY

1  A.  Yes.
2  Q.  You were around for the negotiation,
3  seeing all these negotiations.  You were there
4  all night overnight from Monday to Tuesday, yes?
5  A.  I was not part of the negotiations.
6  Q.  Why were you there?  What were you
7  doing there?
8  MR. BERNSTEIN:  Objection.  Asked and
9  answered and badgering.
10  A.  As I described earlier, my primary
11  responsibility was gathering information to
12  allow the Barclays Finance Team to do their due
13  diligence.
14  Q.  And in order to let the Barclays
15  Finance Team do their due diligence, would you
16  need to know whether the deal involved a fixed
17  discount?
18  A.  I don't know.
19  MR. BERNSTEIN:  I need to take a
20  break.
21  MR. GAFFEY:  Yes.
22  (Recess; Time Noted:  2:39 P.M.)
23  (Time Noted:  2:54 P.M.)
24  BY MR. GAFFEY:
25

Page 154

HIGHLY CONFIDENTIAL - M. KELLY

1  Q.   This difference between the price that
2  Barclays paid and the amount shown on Lehman's
3  marks, was that done in terms of an actual
4  amount or was it done as a percentage?
5      MR. BERNSTEIN: Objection. No
6  foundation.
7  Q.   Let me withdraw the question and let
8  me see if I can put a couple questions and
9  explain while I'm asking that.
10     Over the course of the week, the raw
11 amount, the total amount of assets that could be
12 delivered shrinks, correct?
13 A.   Yes.
14 Q.   And there was an agreement at the
15 beginning of the week to give to Barclays --
16 there was an agreement at the beginning of the
17 week that the difference between the price
18 Barclays paid for those classes of assets and
19 what they were shown at was $5 billion. We
20 talked about that this morning, correct?
21     MR. BERNSTEIN: Objection.
22 Mischaracterizes his testimony.
23 A.   I need to ask you to repeat the
24 question.

Page 155

HIGHLY CONFIDENTIAL - M. KELLY

1  Q.   The 5 billion is the difference
2  between the price Barclays paid for those asset
3  classes and the values shown for those asset
4  classes on Lehman's books, correct?
5      MR. BERNSTEIN: Objection.
6  A.   Can you repeat the question, please?
7      (Record read.)
8  A.   The $5 billion represents the
9  difference between the agreed sales price and
10 the value that they were recognized at on the
11 books of Lehman.
12 Q.   Okay. And on the 16th, given the
13 collection of assets that had been considered at
14 that time, that difference was $5 billion,
15 correct, between the agreed sale price and the
16 value they were recorded -- the value at which
17 they were recorded on Lehman's books?
18 A.   It was approximately $5 billion for
19 the assets agreed to at that point. And I
20 should clarify that was, when you refer to the
21 16th, that's the early morning hours of the
22 16th.
23 Q.   Yeah, I'm back at the now familiar
24 e-mail marked as 136A.

Page 156

HIGHLY CONFIDENTIAL - M. KELLY

1  A.   Yes.
2  Q.   Was that $5 billion the expression of
3  a percentage against the total, or was it an
4  agreed number of $5 billion?
5      MR. BERNSTEIN: Objection. No
6  foundation.
7  A.   I don't believe it was either. I
8  don't believe it was either.
9  Q.   Well, how did it come to be
10 approximately $5 billion?
11     MR. BERNSTEIN: Objection. Asked and
12 answered.
13 A.   The approximately $5 billion amount
14 was determined by aggregating by asset class the
15 difference between the agreed sales price and
16 the value on Lehman's books prior to the
17 transaction.
18 Q.   And later in the week when the total
19 amount of assets that Lehman was able to convey
20 shrunk, did what had been the $5 billion number,
21 did that change to another number?
22 A.   I don't know.
23 Q.   At the beginning of the week when
24 there was that then existing class of assets,

Page 157

HIGHLY CONFIDENTIAL - M. KELLY

1  was the 5 billion, within each asset class, was
2  it expressed as a percentage of the value shown
3  for that asset class on Lehman's books?
4      MR. BERNSTEIN: Objection. Vague and
5  ambiguous.
6  A.   I don't believe so.
7  Q.   It was a raw number as opposed to a
8  percentage?
9      MR. BERNSTEIN: Objection.
10 Mischaracterizes his testimony.
11 A.   It was an aggregation.
12 Q.   And the aggregation of raw number for
13 each asset class, correct?
14 A.   Yes.
15 Q.   And did that aggregated raw number for
16 each asset class change over the course of the
17 week?
18     MR. BERNSTEIN: Objection. Asked and
19 answered.
20 A.   I don't know.
21 Q.   The exercise you described before of
22 looking for additional assets to convey, the
23 15c3 funds, for example, was that to make up the
24 difference in an amount that needed to be

## Page 158

HIGHLY CONFIDENTIAL - M. KELLY

1        HIGHLY CONFIDENTIAL - M. KELLY
2  delivered to Barclays?
3     A.  Can you explain what you mean by
4  "difference"?
5     Q.  Well, the difference, as I'm hearing
6  it, starts out at 5 billion, right, with respect
7  to the assets?
8       Take the real estate. Put it aside
9  for a moment. The difference is 5 billion with
10  respect to those classes of assets, correct?
11       MR. HUME: Objection. Vague. Vague
12  and ambiguous.
13     A.  I'm not sure what you're asking. I'm
14  sorry.
15     Q.  Are people running around looking for
16  assets at the end of the week to still deliver
17  the 5 billion?
18       MR. HUME: Objection.
19     A.  I'm not sure what you mean by
20  delivering 5 billion.
21     Q.  You agree with me Barclays get a $5
22  billion benefit on the deal that was structured
23  at the beginning of the week?
24       MR. HUME: Objection.
25  Mischaracterizes.

## Page 159

1        HIGHLY CONFIDENTIAL - M. KELLY
2     A.  No.
3     Q.  It's paying $5 billion less than the
4  assets aggregated are carried on Lehman's books?
5     A.  No, I don't agree with that.
6     Q.  Why not?
7     A.  The $5 billion represented the
8  difference between the agreed sales price and
9  the book values.
10     Q.  Okay. And the agreed sales price is
11  $5 billion less than the book values, yes?
12     A.  In aggregate, yes.
13     Q.  So, in aggregate, that would present a
14  $5 billion benefit to Barclays, would it not?
15     A.  No, I don't believe so.
16     Q.  Were the book values at which Lehman
17  carried the assets accurate?
18       MR. BERNSTEIN: Objection. Asked and
19  answered.
20     A.  The book values recognized by Lehman
21  were calculated in accordance with valuation
22  policies and calculated under U.S. GAAP.
23     Q.  And Barclays was paying 5 billion less
24  than that amount of those classes of assets in
25  aggregate, correct?

## Page 160

1        HIGHLY CONFIDENTIAL - M. KELLY
2       MR. BERNSTEIN: We're talking now on
3  the 16th?
4       MR. GAFFEY: Yes.
5       MR. BERNSTEIN: So "was paying" is --
6     Q.  That was the deal on the 16th, yes?
7       MR. BERNSTEIN: "Was going to pay."
8  Okay.
9     Q.  Is that right?
10     A.  Barclays was paying $5 billion less
11  than the value that they had been recognized at
12  by Lehman.
13     Q.  At the end of the week when the body
14  of available assets reduced capable of being
15  transferred over to Barclays, was Barclays still
16  paying 5 billion less than the book value of
17  that body of assets?
18       MR. BERNSTEIN: Objection. Asked and
19  answered.
20       Go ahead.
21     A.  I don't know.
22     Q.  Who would I ask if I wanted to know
23  that?
24     A.  The individuals negotiating the
25  transaction.

## Page 161

1        HIGHLY CONFIDENTIAL - M. KELLY
2     Q.  That would be Mr. McDade, among
3  others?
4     A.  My understanding is it would be Bart
5  McDade.
6       (Exhibit 197, a document bearing Bates
7  Nos. 10292661, marked for identification, as
8  of this date.)
9     Q.  Mr. Kelly, I have put before you a
10  one-page document we have marked as Exhibit 197,
11  and I'll ask you, sir, if you have seen that
12  document before.
13       And again, it's with a disclaimer that
14  where it says "unknown and sent Wednesday, May
15  20," just ignore that part. That's put on by
16  our document vendor.
17       (Document review.)
18     A.  Okay.
19     Q.  Have you seen the document before?
20     A.  I don't recall seeing this document.
21     Q.  The first e-mail in the chain, the
22  earlier one, the one at the bottom of the page,
23  is from Ian Lowitt to Michael Gelband, Alex
24  Kirk, Eric Felder, with copies to Paolo Tonucci,
25  Gerard Reilly and Martin Kelly, and it's

Page 162

HIGHLY CONFIDENTIAL - M. KELLY
1    entitled "Funding Tomorrow" and in it Mr. Lowitt
2    writes, "Today was very bad with very large
3    number of surprise and increased requirement of
4    7 or so billion."
5        Do you know as you sit here what
6    Mr. Lowitt would have been referring to when he
7    referred to the "increased requirement of 7 or
8    so billion"?
9    A.    No.
10    Q.    Mr. Lowitt also writes, and this is in
11    the second paragraph of that e-mail, "Also need
12    to shrink matched book, which as of yesterday
13    was much larger than expected. Gerry and Martin
14    have details. Ian." Do you see that?
15    A.    Yes.
16    Q.    Could you explain what's meant by
17    "shrink the matched book"?
18    A.    The matched book is a component of the
19    repo business and I'm not sure what this means,
20    "need to shrink the matched book."
21    Q.    Do you have an understanding of what
22    it means to shrink a matched book?
23    A.    No.
24    Q.    Do you know why Ian would be writing

Page 163

HIGHLY CONFIDENTIAL - M. KELLY
1    that you and Gerry have the details of that?
2    A.    No, I don't.
3    Q.    Would you have had the details of that
4    at the time this was written, September 17,
5    2008?
6    A.    I don't recall.
7    Q.    And do you have any idea at all what
8    Mr. Lowitt was referring to when he talked about
9    "an increased requirement of 7 or so billion"?
10    A.    No.
11    Q.    Now, you mentioned the Repurchase
12    Agreement. Did there come a time during the
13    week of -- beginning September 16th through the
14    22nd when Barclays and Lehman and Bank of New
15    York entered into a tri-party Repurchase
16    Agreement?
17        MR. HUME: Objection. Calls for a
18    legal conclusion.
19    A.    Can you repeat the question, please?
20    Q.    You won't need that document, sir.
21    It's independent of the document.
22        (Record read.)
23    A.    I don't recall.
24    Q.    Do you have any general recollection,

Page 164

HIGHLY CONFIDENTIAL - M. KELLY
1    sir, the Federal Reserve had funded Lehman
2    day-to-day through a Repurchase Agreement and
3    Barclays stepped into the shoes of the Fed at
4    some point during that week?
5    A.    I have a general recollection that the
6    Fed was in some capacity funding Lehman, and I
7    have a general recollection that Barclays
8    assumed part -- part or all of that repurchase
9    facility.
10    Q.    And apart from what you just told me,
11    do you have any other knowledge about Barclays
12    assuming part or all of that repurchase
13    facility?
14    A.    No.
15    Q.    Did you have any involvement in
16    negotiating such a repurchase facility?
17    A.    No.
18    Q.    Did you have any involvement in
19    assessing or valuing assets that were delivered
20    to Barclays pursuant to that repurchase
21    facility?
22    A.    No.
23    Q.    Do you have any knowledge as to
24    whether that repurchase facility played any role

Page 165

HIGHLY CONFIDENTIAL - M. KELLY
1    in the transaction as it finally closed on the
2    22nd of September, 2008?
3        MR. HUME: Objection. Vague and
4    ambiguous.
5    A.    Would you repeat the question, please?
6        (Record read.)
7    A.    I'm aware that there were discussions
8    around how to close the transaction in view of
9    the repo, but I'm not aware of if the
10    transaction was or how the transaction was
11    amended, if it was, to take account of the repo.
12    Q.    Who was involved in discussions about
13    how to close the transaction in view of the
14    repo?
15    A.    I recall Ian and Paolo discussing the
16    repo.
17    Q.    Were you present at those discussions?
18    A.    I don't recall.
19    Q.    Well, what do you recall about Ian and
20    Paolo discussing the repo?
21    A.    I don't recall the specifics of that
22    conversation.
23    Q.    What do you recall about it?
24    A.    I generally recall confusion about

## Page 166

HIGHLY CONFIDENTIAL - M. KELLY

1    which assets were available and where and how
2    they were being financed, and I recall
3    conversations about how to take possession of
4    those securities and to close out the repos.
5        Q.    About how who would take possession of
6    those securities and close out the repo?  Who
7    would take possession?
8        A.    Lehman.
9        Q.    What do you recall about -- how did
10   you come to that understanding, that there
11   was -- people were addressing how Lehman would
12   come into possession and close out the repo?
13       A.    Sorry, can you repeat the question,
14   please?
15       (Record read.)
16       Q.    Withdraw that question.  Let me put a
17   different question.  What do you recall about
18   conversations about how Lehman would take
19   possession of the securities and close out the
20   repo?
21       A.    I don't recall details of that
22   conversation.
23       Q.    Do you recall, have any general
24   recollection of that conversation?

## Page 167

HIGHLY CONFIDENTIAL - M. KELLY

1        A.    I recall conversations about a
2    possible default on a repo, but I'm not aware of
3    who the parties to that repo were.
4        Q.    Who was engaged in the conversations
5    about a possible default on a repo?
6        A.    My recollection is that it was Ian and
7    Paolo.
8        Q.    Were you involved in those
9    conversations about a possible default on a
10   repo?
11       A.    I became aware of the conversations.
12       Q.    How did you become aware of the
13   conversation?
14       A.    Most likely through -- through
15   conversation with Ian or Paolo or both.
16       Q.    What did you come to understand about
17   a possible default on the repo?
18       A.    Not much beyond the -- a default on
19   the repo being a possible means of settling out
20   the contract.
21       Q.    Tell me, if you would, sir, everything
22   you do remember about any discussions regarding
23   a default on the repo as a possible means of
24   settling out the contract.

## Page 168

HIGHLY CONFIDENTIAL - M. KELLY

1        A.    I don't recall anything beyond what
2    I've just stated.
3        Q.    You recall nothing beyond the fact
4    that there was a discussion about a default on
5    the repo as a possible means of settling out the
6    contract?
7        A.    That's my recollection, yes.
8        Q.    Do you know if ultimately there was a
9    default on a repo as a means of settling out the
10   contract?
11       A.    No.
12       Q.    Did you ever learn one way or the
13   other whether there was a default on the repo as
14   a means of settling out the contract as opposed
15   to remembering it today?
16       A.    I don't recall.
17       Q.    Mr. Kelly, I'm showing you what we
18   previously marked as Exhibit 126 at a prior
19   deposition.  The top is an e-mail addressed from
20   Paolo Tonucci to Ian Lowitt, Gerard Reilly,
21   Michael Gelband, with a copy to Martin Kelly.
22       Take a look through the document,
23   please, sir, and tell me if you have any
24   recollection of seeing it before.

## Page 169

HIGHLY CONFIDENTIAL - M. KELLY

1        (Document review.)
2        A.    I have a vague recollection of seeing
3    this before.
4        Q.    When do you recall seeing it before?
5    At or about the time it's dated, September 18?
6        A.    I don't recall.
7        Q.    Do you see at the bottom of the e-mail
8    there's -- at the bottom of the page there's an
9    e-mail from Gerry Reilly to Ian Lowitt, Michael
10   Gelband, copy Paolo Tonucci, Martin Kelly.
11       Directing your attention to that lower
12   e-mail, and in particular to paragraph 3:  "Not
13   clear on the amount of block discount or how we
14   make it happen.  Defaulting on repo could be the
15   best, as discount could be taken from haircut.
16   If not that, then we need to give business an
17   allocation of block discount so they can mark
18   down the books tonight.  Does that create a
19   problem as it could tip the broker early?  Would
20   we rather have that be in the sale price
21   tomorrow?"
22       Do you see that?
23       A.    Yes.
24       Q.    Did you have an understanding when you

Page 170

HIGHLY CONFIDENTIAL - M. KELLY
1  got this e-mail from Mr. Reilly about what he
2  was referring to when he was referring to the
3  block discount?
4     A.   No.
5     Q.   None at all?
6     A.   Not that I recall.
7     Q.   Do you have any understanding as you
8  look at it today what he meant when he wrote to
9  you about the amount of block discount?
10     MR. BERNSTEIN: Objection.  No
11  foundation.
12     A.   Can you repeat the question, please?
13     Q.   Do you know what Mr. Reilly was
14  referring to when he referred to the block
15  discount?
16     A.   No, it's not a term that we -- that
17  I'm familiar with.
18     Q.   When Mr. Reilly wrote to you, among
19  others, "Defaulting on repo could be the best,
20  as discount could be taken from haircut." Did
21  you have an understanding of what he meant
22  there?
23     A.   No.
24     Q.   Do you know what a haircut is when the

Page 171

HIGHLY CONFIDENTIAL - M. KELLY
1  term is used in connection with a repo?
2     A.   As a general matter, yes.
3     Q.   What's your understanding?
4     A.   My understanding of a haircut is that
5  it's the difference between the amount of
6  financing provided under a repo and the market
7  value of the securities pledged under that repo.
8     Q.   And it would be your understanding
9  that a haircut refers to the difference
10  between -- that the amount of the repo financing
11  is less than the amount of collateral pledged,
12  correct?
13     A.   Yes, that's generally
14  over-collateralization, yes.
15     Q.   So the haircut would be the amount by
16  which the repo facility is over-collateralized,
17  correct?
18     A.   Yes.
19     MR. HUME: Objection.
20     Q.   Do you understand Mr. Reilly's e-mail
21  to mean that defaulting on the repo could be a
22  means of delivering to Barclays the difference
23  between the amount financed in a Repurchase
24  Agreement and the amount pledged?

Page 172

HIGHLY CONFIDENTIAL - M. KELLY
1     MR. BERNSTEIN: Objection.  No
2  foundation.
3     A.   Sorry, can you repeat the question,
4  please?
5     (Record read.)
6     A.   I'm not sure what to make of that
7  statement.
8     Q.   When there is a default on a repo,
9  sir, do you have any understanding of who gets
10  the excess collateral?
11     A.   No.
12     Q.   Did you ever have an understanding of
13  what happens on a defaulted repo with regard to
14  who gets the excess collateral?
15     A.   No.
16     Q.   Did you understand Mr. Reilly's e-mail
17  to be a proposal to convey the excess collateral
18  in the repo to Barclays by Lehman defaulting on
19  the repo?
20     MR. HUME: Objection.  Asked and
21  answered.  Lack of foundation.
22     A.   Can you repeat the question, please?
23     (Record read.)
24     A.   I don't recall what I thought or my

Page 173

HIGHLY CONFIDENTIAL - M. KELLY
1  reaction to this e-mail.
2     Q.   My question was a little different.
3  It's what did you understand it to mean, not
4  what you thought or how you reacted.
5     What did you understand it to mean?
6  Did you understand it to mean it was a proposal
7  that Lehman default on a repo and thereby
8  deliver the excess collateral to Barclays?
9     A.   I don't recall.
10     Q.   When Mr. Reilly wrote, "If not that,
11  then we need to give business an allocation of
12  block discount so they can mark down the books
13  tonight." Did you have an understanding of what
14  Mr. Reilly meant when he wrote those words to
15  you on September 18?
16     A.   Not that I can recall.
17     Q.   As you sit here today, you have
18  absolutely no recollection of what that meant to
19  you when you got this e-mail?  That's your
20  testimony?
21     A.   Not that I can recall.
22     Q.   I think just to get --
23     A.   Yes, that's my testimony.
24     Q.   Thank you.

Page 174

HIGHLY CONFIDENTIAL - M. KELLY

1       When Mr. Reilly wrote, "Does that
2   create a problem, as it could tip the broker
3   early," did you understand what he meant there?
4       A.   No.
5       Q.   Did you understand Mr. Reilly to have
6   meant that if Lehman Brothers, Inc., the
7   broker-dealer, defaulted on the repo, it would
8   tip it into bankruptcy earlier than planned?
9       A.   Can you repeat the question, please?
10       (Record read.)
11       A.   I don't recall.
12       Q.   Do you recall if you had an
13   understanding at the time?
14       A.   No, I don't recall.
15       Q.   And when Mr. Reilly wrote, "Would we
16   rather have that be in the sale price tomorrow,"
17   What did you understand the nature of the
18   alternative that Mr. Reilly was proposing to be?
19       A.   I don't know.
20       Q.   Did the date of September 19 have any
21   significance with respect to the transaction
22   that was being conducted between Lehman and
23   Barclays?
24       MR. BERNSTEIN:  Can we just clarify,

Page 175

HIGHLY CONFIDENTIAL - M. KELLY

1   are you asking now if it had significance or
2   if on the 18th --
3       MR. GAFFEY:  That's a good point.
4       Q.   Let's ask on the 18th and then I'm
5   going to ask you now. On the 18th did you have
6   an understanding of whether the date of the 19th
7   was particularly significant in connection with
8   the transaction between Lehman and Barclays?
9       A.   Yeah, I don't know.
10       Q.   Did you know when the sale hearing was
11   planned to take place?
12       A.   I knew at a point in time prior to the
13   sale hearing.
14       Q.   Okay.
15       A.   I don't recall exactly when I became
16   aware of it.
17       Q.   And the sale hearing was on Friday,
18   the 19th. So would that mean that you -- you
19   knew sometime before the 19th that the sale
20   hearing was on the Friday, correct?
21       A.   It may have been that morning, but I
22   knew before the hearing.
23       Q.   Okay. Do you have a recollection of
24   whether you knew on the 18th that the sale price

Page 176

HIGHLY CONFIDENTIAL - M. KELLY

1   was tomorrow, that it was the 19th?
2       A.   My recollection is that at some point
3   on the Thursday night I understood the sale
4   hearing to be the following day.
5       Q.   So when Mr. Reilly wrote to you at
6   6:35 in the morning on the 18th -- I beg your
7   pardon. When he wrote to you at 6:03 A.M. on
8   the 18th, would you have had an understanding
9   that when he referred to the "sale price
10   tomorrow," he was referring to the sale price to
11   be described at the sale hearing before the
12   bankruptcy court?
13       A.   I don't recall.
14       Q.   Do you recall anything else, sir,
15   about discussions revolving around default on a
16   repo as a means of settling the contract between
17   Lehman and Barclays?
18       MR. HUME:  Objection. Asked and
19   answered.
20       A.   No, not beyond my prior statement.
21       Q.   And beyond your prior statement, do
22   you recall anything else about whether or not in
23   fact a default on the repo was used as a means
24   of settling the contract between Lehman and

Page 177

HIGHLY CONFIDENTIAL - M. KELLY

1   Barclays?
2       A.   No.
3       MR. HUME:  Objection.
4       Q.   Did you ever learn whether defaulting
5   on a repo was used as a means of settling the
6   contract between Lehman and Barclays at any
7   time? Did you ever learn that at any time?
8       A.   Until what point in time?
9       Q.   Two seconds ago.  Up till the present.
10   Apart from anything you've learned from your
11   lawyers.
12       A.   I understand that that was the
13   mechanism, defaulting on the repo was the
14   mechanism.
15       Q.   And how did you come to have the
16   understanding that defaulting on the repo was
17   the mechanism?
18       A.   I don't know.
19       Q.   Do you have any recollection at all as
20   to how you came to understand that defaulting on
21   the repo was the mechanism?
22       A.   No.
23       Q.   Did you come to understand that
24   defaulting on the repo was a mechanism for

Page 178

1        HIGHLY CONFIDENTIAL - M. KELLY
2    delivering a block discount, as Mr. Reilly
3    describes in this e-mail?
4        MR. HUME: Objection. Vague and
5    ambiguous.
6        A.    Can you repeat the question?
7        Q.    Let me withdraw the question. Do you
8    know what -- did you learn what was exchanged
9    between Barclays and Lehman as a result of the
10   default on the repo? Who got what? Who kept
11   what?
12       A.    At what point in time?
13       Q.    Did you learn it at any point in time?
14       A.    I'm concerned there may be a privilege
15   issue in responding to that question.
16       Q.    Let me exclude from the question
17   anything you have learned from your lawyers.
18       A.    I'm excluding that.
19       Q.    Okay.
20       A.    I still have a concern.
21       Q.    Okay. I guess if you need to talk
22   about privilege, let's take a break.
23       MR. BERNSTEIN: Yes, let's talk about
24   it for a minute or two and we'll be right
25   back.

Page 179

1        HIGHLY CONFIDENTIAL - M. KELLY
2        MR. GAFFEY: Sure.
3        (Pause in the proceedings. Time
4    Noted: 3:30 P.M.)
5        (Time Noted: 3:34 P.M.)
6        MR. GAFFEY: Do we have a privilege
7    issue we have to deal with?
8        MR. BERNSTEIN: There is a privilege
9    issue in response to the question, yes.
10       MR. GAFFEY: Are you instructing him
11   not to answer? I'll want to inquire into
12   what the privilege is at some point.
13       MR. BERNSTEIN: I think you can ask
14   the question and he'll give you an answer,
15   and if you feel you should ask further
16   questions, you can.
17       MR. GAFFEY: Read the question.
18       (Record read as follows:
19   "Q    Did you learn what was exchanged
20   between Barclays and Lehman as a result of the
21   default on the repo? Who got what? Who kept
22   what?")
23       MR. BERNSTEIN: You can answer that
24   yes or no.
25       THE WITNESS: Yes, I know.

Page 180

1        HIGHLY CONFIDENTIAL - M. KELLY
2        Q.    Did you learn that from anyone other
3    than the lawyers representing you here today?
4        MR. BERNSTEIN: You can answer that
5    yes or no.
6        Q.    Answer that yes or no, please.
7        A.    I'm sorry, let's go back. I'm not
8    sure what my answer was to the prior question.
9        MR. BERNSTEIN: I think your answer
10   is --
11       A.    I said, "Yes, I know" in response to
12   Rich.
13       MR. BERNSTEIN: Oh. I'm sorry.
14       A.    So can we just go back?
15       MR. BERNSTEIN: We got to go all the
16   way back to the question.
17       MR. GAFFEY: I'm thoroughly confused
18   now. Let's re-read the question that was
19   pending when you left the room.
20       MR. BERNSTEIN: Certain of these
21   questions I'm going to instruct you you may
22   answer, but you have to limit your answer to
23   yes or no. That's what I was trying to make
24   clear. So go ahead and re-read the
25   question.

Page 181

1        HIGHLY CONFIDENTIAL - M. KELLY
2        (Record read as follows:
3    "Q    Did you learn what was exchanged
4    between Barclays and Lehman as a result of the
5    default on the repo? Who got what? Who kept
6    what?")
7        MR. BERNSTEIN: You may give a yes or
8    no to that question.
9        A.    Yes, in general terms.
10       Q.    And did you learn that in general
11   terms from any source other than the lawyers who
12   are representing you here today? Exclude
13   anything they may have told you. Did you learn
14   it from any other source?
15       MR. BERNSTEIN: You can answer that
16   yes or no.
17       A.    Yes.
18       Q.    Who?
19       MR. BERNSTEIN: You can give names,
20   but you should limit your answer to the
21   names -- name or names, to the extent you
22   recall.
23       A.    I recall conversations with James
24   Walker and Gary Romain, both of Barclays, in the
25   period subsequent to the closing.

Page 182

HIGHLY CONFIDENTIAL - M. KELLY
1   HIGHLY CONFIDENTIAL - M. KELLY
2       Q.   Tell me what you learned --
3       A.   Sorry.  In my capacity as a Barclays
4   employee.
5       Q.   And tell me what you learned in your
6   conversations with Mr. Walker and Mr. Romain?
7       A.   I learned of a general understanding
8   of the assets acquired as part of the
9   transaction.
10      Q.   Tell me what you learned.  What's your
11  understanding of the assets acquired as part of
12  the transaction?
13          MR. HUME:  Can I just state for the
14      record, to the extent any of these
15      conversations took place in the presence of
16      Barclays' counsel, including in-house
17      counsel, that Barclays would assert the
18      privilege over those conversations.
19          MR. GAFFEY:  And I take it if counsel
20      is not present, you don't have an objection
21      to him answering this question, right?  If
22      it's just, as he said, Mr. Walker and
23      Mr. Romain, he can answer it, is that right,
24      Hamish?  You're not asserting a privilege
25      there, are you, if it's just Mr. Walker and

Page 183

1   HIGHLY CONFIDENTIAL - M. KELLY
2   Mr. Romain, which is what his testimony is?
3           MR. HUME:  I wasn't clear to me that
4       he had finished answering the question.
5           MR. GAFFEY:  It was pretty clear to
6       me.  He said Mr. Walker and Mr. Romain.  If
7       it's just Mr. Walker and Mr. Remain, do you
8       have an objection to him answering the
9       question?
10          MR. HUME:  There's no need to lose
11      your temper.
12          MR. GAFFEY:  You haven't seen me lose
13      my temper.  This isn't even close.
14          MR. BERNSTEIN:  The witness has a
15      limited amount of time.
16          MR. GAFFEY:  If it's Mr. Walker and
17      Mr. Romain, do you have an objection to him
18      answering the question?
19          MR. HUME:  Proceed.
20      Q.   There's no objection asserted, sir.
21  What did Mr. Walker and Mr. Romain tell you?
22      A.   I'd like to go back to the prior
23  question.
24      Q.   I'd like you to answer the question I
25  asked you.  What did Mr. Walker and Mr. Romain

Page 184

1   HIGHLY CONFIDENTIAL - M. KELLY
2   tell you?
3       A.   I need to clarify my response to a
4   prior question.
5       Q.   Sure.
6       A.   There were conversations over an
7   extended period of time with Barclays' counsel.
8       Q.   When you told me before that
9   Mr. Walker and Mr. Romain told you, gave you a
10  general understanding of the assets that were
11  acquired, were you referring to a conversation
12  in which counsel was present?
13      A.   There were conversations with those
14  two individuals both with and without counsel.
15      Q.   Tell me what you learned --
16      A.   So it is difficult to delineate those
17  conversations when counsel was present.
18      Q.   Let's do the best we can.  Tell me
19  what you learned from Mr. Walker and Mr. Romain
20  in conversations where counsel were not present
21  about the assets that were acquired?
22          MR. HUME:  Again, we assert the
23      privilege over any conversation where
24      counsel was present.
25      A.   I find it difficult to delineate those

Page 185

1   HIGHLY CONFIDENTIAL - M. KELLY
2   sets of discussions, and so I'm not certain as
3   to what conversations I had with those two
4   individuals without counsel present.
5       Q.   When is the last time you spoke to
6   Mr. Walker and Mr. Romain about what assets were
7   acquired where counsel were not present?
8       A.   I don't recall.
9       Q.   How many conversations have you had
10  with Mr. Walker and Romain where the topic of
11  what assets were acquired in which counsel were
12  not present?
13      A.   I don't recall.
14      Q.   There were some, though, right?
15      A.   There were some.
16      Q.   And when you had these conversations
17  with Mr. Walker and Mr. Romain without counsel
18  present, was it both Mr. Walker and Mr. Romain,
19  or were they separate conversations with Walker
20  and then separate conversations with Romain?
21      A.   They were both.  Separate
22  conversations and conversations together.
23      Q.   And what was the purpose of the
24  conversations you had with either Walker or
25  Romain or both, without counsel present, where

Page 186

HIGHLY CONFIDENTIAL - M. KELLY

1    HIGHLY CONFIDENTIAL - M. KELLY
2    you discussed what assets were acquired?
3        A.    The broad purpose of those
4    conversations were to reflect the transaction on
5    the books and records of Barclays.
6        Q.    And did you gain an understanding in
7    those conversation as to what Barclays had
8    acquired in the transaction?
9        A.    Yes.
10        Q.    What's that understanding?
11        A.    I obtained a general understanding of
12    the types of securities that were acquired by
13    Barclays. Regarding other assets or possibly
14    including certain securities, I'm not able to
15    identify specific conversations independent of
16    counsel being present.
17        Q.    When counsel were present, were they
18    asked for legal advice or did they give any in
19    these conversations with Romain and Walker where
20    in-house counsel for Barclays were present?
21        MR. HUME: I object to the question.
22    Instruct you not to answer on grounds of
23    privilege.
24        MR. GAFFEY: I just want a yes or no
25    as to the fact of whether legal advice was

Page 187

1    HIGHLY CONFIDENTIAL - M. KELLY
2    solicited or communicated, which I think I'm
3    entitled to inquire about to determine the
4    validity of your assertion of privilege
5    under the local rules.
6        MR. HUME: Under the local rules? You
7    have a rule to tell me?
8        MR. GAFFEY: Under the rules of the
9    Southern District of New York.
10        MR. HUME: There's a specific written
11    rule on that subject?
12        MR. GAFFEY: Yes.
13        MR. HUME: I'd like to see it.
14        MR. GAFFEY: It's the same rule as the
15    privilege logs. In any event, I'm entitled
16    to inquire. You want to instruct him not to
17    answer?
18        MR. HUME: Are you saying in any
19    event? I'm not sure the witness is
20    qualified to identify what the legal advice
21    is. Are you asking whether he was asking
22    for legal advice?
23        MR. GAFFEY: Are you kidding me?
24        Q.    Was any legal advice -- did the
25    lawyers who were in the room act like lawyers or

Page 188

1    HIGHLY CONFIDENTIAL - M. KELLY
2    did they break into song, sir? Did they give
3    you legal advice or did anybody ask them for
4    legal advice? Do you know what legal advice is?
5        Withdraw my questions. Do you know
6    what I mean when I say "legal advice"? Having
7    any problem with that concept?
8        A.    In what context?
9        Q.    In the context where there's lawyers
10    in the room and there's businesspeople in the
11    room and they're talking about a topic. Let's,
12    hypothetically, let's have Mr. Romain in the
13    room, Mr. Walker in the room, and some lawyers
14    in the room. Okay? And we're talking about
15    what assets were acquired in the transaction.
16    The conversations you've been telling me about.
17        In the conversations where the lawyers
18    were there, were they acting like lawyers, did
19    they give legal advice, or were they asked for
20    legal advice? Can you tell me yes or no?
21        MR. BERNSTEIN: I just object. Are we
22    now asking hypothetically or are we
23    asking --
24        MR. GAFFEY: No, I'm back to real
25    life.

Page 189

1    HIGHLY CONFIDENTIAL - M. KELLY
2        Q.    In the meeting with Walker, Romain and
3    the in-house lawyers, did anybody ask for legal
4    advice? Did anybody give legal advice?
5        MR. BERNSTEIN: I'm going to object as
6    compound and vague and ambiguous.
7        Q.    But I think you can answer it yes or
8    no.
9        A.    Can you repeat the question?
10        MR. GAFFEY: Read the question.
11        (Record read.)
12        A.    On what set of assets?
13        Q.    On any issue during the meeting. Did
14    the lawyers give legal advice or were they asked
15    for legal advice?
16        MR. BERNSTEIN: Same objections.
17        A.    If you're asking about any of the
18    assets acquired as part of the transaction by
19    Barclays, then yes, at times the lawyers gave
20    legal advice. At other times, the lawyers
21    explained the mechanics of the transaction.
22        MR. HUME: Which Barclays would assert
23    is legal advice, because explaining the
24    mechanics of the transaction is interpreting
25    a contract, which I am saying to you, as

Page 190

HIGHLY CONFIDENTIAL - M. KELLY

1   Barclays' representative, is legal advice.
2   So we instruct the witness not to answer
3   questions involving such conversations.
4   Q.   Who were the lawyers? What were their
5   names?
6   A.   At various times the lawyers included
7   Jonathan Hughes, as general counsel, and Alan
8   Kaplan, and there may have been others.
9   Q.   May have been other lawyers?
10  A.   Yes.
11  Q.   Okay.
12  A.   Stop for a minute, please.
13  Q.   Sure.
14  A.   Okay.
15  Q.   Now, apart from meetings where Hughes
16  or Kaplan or the other lawyers gave a
17  description of the transaction or rendered legal
18  advice, apart from those meetings, do you have
19  an understanding of what Barclays acquired in
20  the transaction?
21       MR. HUME:  Asked and answered.
22  A.   I have an understanding of what
23  Barclays acquired as a result of a series of
24  meetings, some including, some excluding the

Page 191

HIGHLY CONFIDENTIAL - M. KELLY

1   lawyers.
2   Q.   Okay. And what's your understanding?
3       MR. BERNSTEIN:  Are you objecting as
4   privileged?
5       MR. HUME:  Yes. We are asserting the
6   privilege and instructing the witness not to
7   answer on any conversations involving the
8   lawyers.
9       MR. GAFFEY:  I don't think you can,
10  Hamish. Respectfully, I don't think you can
11  do that, unless -- it's your burden to prove
12  the objection. I don't think you can do
13  that unless you can show it's a result of
14  the legal advice.
15       It's not enough for him to say I had a
16  bunch of meetings, lawyers were at some of
17  them, so therefore, I can't tell you what I
18  know about the topic at all. I just don't
19  think that's a basis for a privilege
20  assertion.
21       MR. HUME:  His answer was I have an
22  understanding of what Barclays acquired as a
23  result of a series of meetings, some
24  including, some excluding the lawyers.

Page 192

HIGHLY CONFIDENTIAL - M. KELLY

1       MR. GAFFEY:  Right. And I don't think
2   it's enough for you to block off his entire
3   knowledge about this because in some of the
4   meetings lawyers may have been there. I
5   just don't think that's a sufficient basis
6   for you to assert the privilege.
7       MR. HUME:  And I don't think I have
8   asserted the privilege in that manner. I
9   have asserted the privilege to the extent
10  that the witness has learned what was
11  covered by the transaction as a result of
12  conversations with lawyers in which they
13  explained what he called the mechanics of
14  the transaction, which is what the contract
15  says, which is legal advice, he should not
16  answer. If he --
17       MR. GAFFEY:  That's not my point. My
18  point is --
19       MR. HUME:  If he has an understanding
20  based upon conversations not involving
21  lawyers, not involving lawyers explaining
22  the mechanics of the transaction, and he can
23  delineate those from his conversations with
24  lawyers, he may answer as to that

Page 193

HIGHLY CONFIDENTIAL - M. KELLY

1   understanding.
2       MR. GAFFEY:  That's where we differ.
3   I don't think you're entitled to say if he
4   can delineate those. I think if he can't
5   say this was in the privileged context, he's
6   got to give it to me. I don't think you've
7   got a basis to say, because some of it might
8   be privileged, none of it can be answered.
9   I just think you're wrong, Hamish. So I
10  would ask you to reconsider.
11       MR. HUME:  So if he cannot delineate,
12  your view is just --
13       MR. GAFFEY:  Then he can't assert a
14  privilege.
15       MR. HUME:  Then he should assert his
16  entire understanding.
17       MR. GAFFEY:  Yeah, I think I can't --
18  I'm not allowed to elicit which part of that
19  did you get from the lawyers, what did the
20  lawyers say to you, I can't have that. But
21  I'm allowed to have his understanding. If
22  he can't delineate it's a product of legal
23  advice, then you can't assert the privilege
24  as to all of it. That's where I think we

Page 194

1  HIGHLY CONFIDENTIAL - M. KELLY
2  have disagreement.
3  MR. HUME: Why don't we go off the
4  record for a minute and allow me to
5  reconsider it.
6  MR. GAFFEY: Go off the record for a
7  minute?
8  MR. HUME: Can we go off the record?
9  MR. GAFFEY: Sure.
10  (Pause in the proceedings. Time
11  Noted: 3:49 P.M.)
12  (Time Noted: 3:58 P.M.)
13  MR. HUME: We will permit the witness
14  to answer your question even though we have
15  this disagreement about the delineation
16  point, but we will do it if you will agree
17  that this is not waiving any privilege on
18  this or any other issue.
19  MR. GAFFEY: Yes, I'll agree to that.
20  MR. BERNSTEIN: Is that waiver on
21  behalf -- is the agreement on non-waiver
22  applicable to the other constituencies?
23  MS. TAGGART: We agree.
24  MR. HUME: Trustee agree?
25  MR. OXFORD: Sure.

Page 195

1  HIGHLY CONFIDENTIAL - M. KELLY
2  MR. HUME: Examiner?
3  MR. LAYDEN: I agree.
4  MR. HUME: Thank you.
5  BY MR. GAFFEY:
6  Q. So what was your understanding of the
7  assets acquired by Barclays?
8  MR. BERNSTEIN: You said what was.
9  You want to give us a point in time?
10  MR. GAFFEY: Good point.
11  Q. What is your understanding of the
12  assets acquired by Barclays as you sit here
13  today?
14  A. My general understanding is that the
15  assets acquired by Barclays included a
16  collection of securities, certain rights to
17  operate the former Lehman businesses represented
18  by intangible assets, including customer lists,
19  and certain hard assets, including the property
20  at 745 Seventh Avenue and certain data centers.
21  Q. What was the value of the securities
22  it acquired?
23  A. I don't recall.
24  Q. Do you have any understanding of the
25  range? Did you estimate the number from any of

Page 196

1  HIGHLY CONFIDENTIAL - M. KELLY
2  the value of the securities that Barclays
3  acquired?
4  A. Sorry. Can you repeat the question?
5  (Record read.)
6  MR. BERNSTEIN: Objection. Compound.
7  Q. Withdrawn. Can you estimate the value
8  of the securities that Barclays acquired?
9  MR. HUME: Objection. Lacks
10  foundation.
11  A. At what point in time?
12  Q. Right now.
13  A. I can't estimate that right now.
14  Q. Are you capable as you sit here today
15  of estimating the value of the assets that
16  Barclays acquired when the transaction closed on
17  the 22nd of September, 2008?
18  A. No.
19  Q. Were you ever in a position to make
20  that calculation? Did you ever know?
21  MR. BERNSTEIN: Objection. Compound.
22  A. I was familiar with an approximate
23  value. However, I don't recall that value.
24  Q. Just forgot it?
25  A. I don't recall it.

Page 197

1  HIGHLY CONFIDENTIAL - M. KELLY
2  Q. Between the time you knew and today,
3  you just forgot it?
4  A. I don't recall the value today.
5  Q. Do you have any recollection of the
6  range of the value that you knew once but you
7  don't recall today? Is it a zillion dollars?
8  Is it one dollar? Can you give me any kind of
9  range?
10  MR. HUME: I'm going to object that
11  that calls for speculation and expert
12  testimony.
13  Q. You can answer the question.
14  A. I don't recall sitting here today.
15  Q. Without telling me the substance of
16  the conversation, when was the most recent
17  meeting you had either with Mr. Walker or
18  Mr. Romain or the Barclays lawyers or some
19  combination of them about this topic? Just give
20  me a date.
21  MR. HUME: This topic?
22  Q. The value of the assets acquired by
23  Barclays in the transaction.
24  A. We discussed the value of certain of
25  the assets --

Page 198

HIGHLY CONFIDENTIAL - M. KELLY

1    HIGHLY CONFIDENTIAL - M. KELLY
2        Q.    I don't want --
3        A.    -- acquired.
4        Q.    I don't want the content. I just want
5    the date. I want to be careful not to tread on
6    what I agree with Mr. Hume is privileged.
7            Just tell me the last time you had a
8    meeting where one of the topics discussed was
9    the value of the assets acquired by Barclays. I
10   want to get a sense whether it was two days ago,
11   a month ago, six months ago, but I just need you
12   to give me a time period.
13       A.    I don't recall a meeting when we
14   discussed the aggregate value of the assets, if
15   that's what you're asking. If that's not, I'll
16   try and answer the question.
17       Q.    I'm not sure why you just added the
18   word "aggregate" in there.
19           Have you had any meetings where you
20   discussed the value of what Barclays acquired
21   from Lehman; and, if so, tell me the last one
22   that you had, date of the last one that you had.
23           MR. BERNSTEIN:  I'm going to object as
24   vague and ambiguous.
25       A.    To answer --

Page 199

1    HIGHLY CONFIDENTIAL - M. KELLY
2            MR. HUME:  Just a minute.  You're
3    asking about a meeting that contains certain
4    content, including with the lawyer, and
5    saying when did you last talk to your lawyer
6    about this content.
7            MR. GAFFEY:  Yeah, I get -- what I'm
8    trying to do is press the complete and utter
9    lack of recollection of any number
10   whatsoever, the biggest deal this man ever
11   did in his life.  So I want to push this
12   point a little bit to see if we can get some
13   sort of testimony where he gets closer to
14   remembering something other than he doesn't
15   remember.
16           So it's really just to refresh his
17   recollection, you know, the date. I don't
18   want the content of the meeting. I just
19   want to see if I can press his complete
20   failure of recollection of the value of the
21   assets that Barclays acquired.
22           I think that's okay, isn't it?
23           MR. HUME:  I think you're being
24   argumentative and badgering the witness, and
25   I think a legitimate objection, if you're

Page 200

1    HIGHLY CONFIDENTIAL - M. KELLY
2    saying you may have talked to your lawyer
3    about X, when was the last time you talked
4    to him about X, that's requiring the witness
5    to reveal a conversation --
6            MR. GAFFEY:  Let me see if I can get
7    around that.
8        Q.    When was the last time you had a
9    meeting of any kind with anyone where the topic
10   of the value acquired by Barclays in the
11   transaction came up before today?
12       A.    On or around about mid July, 2009.
13       Q.    Okay.  And having had that meeting
14   about a month ago, sometime in the last month,
15   is it still your testimony you have absolutely
16   no recollection of even an estimate of the
17   number of the value that Barclays acquired in
18   the transaction?
19           MR. BERNSTEIN:  Hold on. I'm going to
20   object because it mischaracterizes his
21   testimony, and if you'll permit me, I think
22   you're talking past each other and I don't
23   think you're listening to what he's told
24   you.
25           I think what he's -- you keep asking

Page 201

1    HIGHLY CONFIDENTIAL - M. KELLY
2    about the number or a number, but then you
3    ask about a topic.  Does your question
4    include discussing a portion of the value or
5    does your question only include discussing
6    the absolute, total, complete aggregate
7    number? I think if you clarify that, we may
8    get somewhere.
9            MR. GAFFEY:  I'll take any piece of
10   it, Richard.  If I could elicit something
11   that would let me follow up on that, that
12   would be fine.  If he wants to qualify it,
13   that would be fine.  But I have to get an
14   answer first.  If he knows the total, great.
15   If he only knows the subtotal, fine.  But
16   he's got to give me an answer before we can
17   move on.
18           MR. HUME:  But you're tying to get him
19   to say he knows something when he says he
20   doesn't know.  You're just trying to get him
21   to speculate.
22           MR. GAFFEY:  I'm just doing what I'm
23   entitled to do, which is press the
24   credibility of a denial of any recollection
25   at all.

Page 202

HIGHLY CONFIDENTIAL - M. KELLY

1      HIGHLY CONFIDENTIAL - M. KELLY
2          MR. BERNSTEIN: See, I'm trying to be
3      helpful.
4          MR. GAFFEY: I get it. I get the
5      point.
6          MR. BERNSTEIN: Okay. I've made the
7      point.
8          MR. GAFFEY: Okay.
9          MR. BERNSTEIN: You can do what you
10     wish. Please ask your question. See if we
11     can get an answer.
12         THE WITNESS: I need a minute with my
13     lawyers, please.
14         MR. GAFFEY: Sure.
15         (Pause in the proceedings. Time
16     noted: 4:07 P.M.)
17         (Time Noted: 4:17 P.M.)
18         MR. BERNSTEIN: I think it would be
19     best to allow Mr. Kelly to start, because I
20     believe your question did refresh a
21     recollection, and I want to make sure that
22     we don't move on to another subject before
23     getting that refreshed recollection on the
24     record.
25         MR. GAFFEY: Okay.

Page 203

1      HIGHLY CONFIDENTIAL - M. KELLY
2      BY MR. GAFFEY:
3          Q.   Mr. Kelly, anything you want to
4      answer?
5          A.   Yes, please. So your recent questions
6      refreshed in my mind a recollection that the
7      value of assets received by Barclays was
8      approximately $50 billion resulting from the
9      transaction.
10         Q.   So your recollection is that Barclays
11     received about $50 billion resulting from the
12     transaction. Is the transaction that you're
13     referring to the repo we've been talking about?
14         A.   No, the entire transaction.
15         Q.   The entire transaction. And could you
16     break down for me as best you recall what the
17     components of that 50 billion are?
18         A.   I can describe in broad terms the
19     components. I can't estimate the value ascribed
20     to each component or an approximate value
21     ascribed to each component.
22         Q.   Give me the best you can, all right?
23         A.   The components are similar to what I
24     described in an earlier question, so the
25     components include a collection of securities,

Page 204

1      HIGHLY CONFIDENTIAL - M. KELLY
2      the rights to operate the business, comprising
3      intangible assets and certain hard assets,
4      including real estate.
5          Q.   Now, although you told me you can't
6      delineate it by category, when you say 50
7      billion total, does that include the real
8      estate, the value of the real estate conveyed?
9          A.   My approximate $50 billion amount
10     includes all of the assets.
11         Q.   And do you have a sense of what, I
12     think I'm pushing a little bit where you told me
13     you're not able to go, but what the approximate
14     value of the real estate was. I'm trying to get
15     the subtotal of the securities.
16         A.   My recollection is that the real
17     estate comprised approximately $1.5 billion.
18         Q.   Which would leave it to about 48.5 for
19     the value of the securities and the intangible
20     assets, is that about right?
21         A.   Approximately.
22         Q.   And this 48.5 is a value, and I --
23     it's a value as of what time? At the time of
24     closing?
25         MR. HUME: Objection. Lacks

Page 205

1      HIGHLY CONFIDENTIAL - M. KELLY
2      foundation.
3          I've seen this happen with other
4      witnesses where you're trying to get people
5      to talk about these numbers after they told
6      you they didn't know what the numbers were
7      at the time, they weren't the negotiator,
8      and you want to make a record that's going
9      to be completely distorted.
10         MR. GAFFEY: Can you read the question
11     back, please?
12         (Record read.)
13         Q.   Can you answer the question, please?
14         A.   Are you asking is it my recollection
15     at the time of the closing or the value of the
16     assets at the time of the closing?
17         Q.   The value of the assets at the time of
18     the closing.
19         A.   Well, certain of the assets were
20     received after the closing.
21         Q.   That would be --
22         A.   So I believe it reflects more than one
23     date.
24         Q.   What proportion of the assets were
25     received after the closing?

Page 206

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.    I don't recall.
3    Q.    What was the reason those assets were
4    not received until after the closing?
5    A.    I believe they were held by the
6    custodian pending resolution of certain issues.
7    Q.    Was the custodian JPMorgan Chase?
8    A.    I believe so.
9    Q.    Do you recall the amount, roughly?
10   Any range in your head?
11         MR. HUME:  Objection.  Vague and
12   ambiguous.  Calls for speculation and lack
13   of foundation.
14   A.    When you say "amount," what are you
15   referring to?
16   Q.    Quantum.
17   A.    Of what at what date?
18   Q.    There are a certain amount of
19   securities that were not transferred by JPMorgan
20   Chase to Barclays, correct?
21   A.    That's my recollection.
22   Q.    What was the value at the time of the
23   closing of that amount of securities, of those
24   securities?
25         MR. HUME:  Determined at the time of

Page 207

HIGHLY CONFIDENTIAL - M. KELLY
1
2    the closing?  Determined after the closing?
3    Closing of the settlement?  Closing of the
4    transaction?
5         I object.  Vague and ambiguous.
6    Q.    Go with my question.  Do you need it
7    read back?
8    A.    Yes, please.
9         MR. GAFFEY:  Read it back, please.
10        (Record read.)
11        MR. HUME:  Objection.  Vague and
12   ambiguous in numerous respects.
13   A.    I'm not sure if I -- of what you mean
14   by "those securities."
15   Q.    Let's look at your notes.
16        (Exhibit 198, a document bearing Bates
17   Nos. BCI-EX-00115167 through 5173, arked for
18   identification, as of this date.)
19        THE WITNESS:  I would like to request
20   a break in about five or ten minutes.
21        MR. GAFFEY:  Whenever you want.  You
22   want to take it now?
23        THE WITNESS:  Sure.
24        MR. GAFFEY:  You want to take a
25   ten-minute break now before we start this

Page 208

HIGHLY CONFIDENTIAL - M. KELLY
1
2    line of questioning?
3         THE WITNESS:  Sure.
4         MR. GAFFEY:  Okay.
5         (Recess; Time Noted:  4:25 P.M.)
6         (Time Noted:  4:33 P.M.)
7    BY MR. GAFFEY:
8    Q.    I've put before you, Mr. Kelly, what
9    we have marked as Exhibit 198, a set of
10   handwritten notes, bearing Bates Nos.
11   BCI-EX-00115167 through 5173.  Would you look
12   through those and tell me if you recognize the
13   document and if that's your handwriting.
14        (Document review.)
15   A.    I recognize the handwriting.  It's my
16   handwriting on all pages except the second page.
17   Q.    The second page is not your
18   handwriting?
19   A.    The left-hand side of the second page
20   is not my handwriting.
21   Q.    Under where it says, or appears to
22   say, "goes"?
23   A.    "Goes," yeah.  The boxed -- the two
24   number 7s there.
25   Q.    Uh-huh.

Page 209

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.    May be.
3    Q.    Okay.
4    A.    Looks like my number.  The negative 4
5    I don't recognize as my handwriting.
6    Q.    Okay.  Do you recognize the writing on
7    the left-hand side?
8    A.    I think it's Ian's, but I'm not sure.
9    Q.    I'm sorry, I didn't hear that.
10   A.    Ian, Ian Lowitt's.
11   Q.    You know, just before we get into
12   these notes, just to go back to a topic we were
13   talking about before the break, I asked you --
14   we talked for some time about the amount that
15   Barclays, you know, the value that Barclays
16   received in the transaction, regardless of when
17   it received it.
18        How much did Barclays pay in the
19   transaction?
20        MR. HUME:  Objection.  Lacks
21   foundation.
22   A.    Are you asking me today, as my
23   knowledge today, or at the time?
24   Q.    What was your knowledge at the time?
25   And then I'm going to ask you what your

Page 210

HIGHLY CONFIDENTIAL - M. KELLY
1 knowledge is today.
2
3    A.   I don't recall my knowledge at the
4 time --
5    Q.   Okay.
6    A.   -- of the transaction.
7         My understanding today is that
8 Barclays paid $250 million in addition to
9 assuming a variety of liabilities as part of the
10 consideration for the assets.
11    Q.   And what was the value of the
12 liabilities assumed? Can you put a number on
13 that?
14    A.   When are you asking me as of?
15    Q.   Both times. What was your
16 understanding at the time? What's your
17 understanding today?
18    A.   I don't recall what it was at the time
19 of the transaction.
20    Q.   Uh-huh.
21    A.   I could only deduce the value of the
22 liabilities today based on my understanding of
23 the purchase price.
24    Q.   Okay.
25    A.   And the value of the assets, which I

Page 211

HIGHLY CONFIDENTIAL - M. KELLY
1 previously explained.
2
3    Q.   Okay. I'll take that.
4    A.   So, based on that deduction, it would
5 be approximately $50 billion.
6    Q.   So your understanding, there was no
7 gain for Barclays on the acquisition?
8    A.   No, that's not correct.
9    Q.   50 worth of assets goes to Barclays;
10 Barclays gives 50 worth of cash and assumed
11 liabilities?
12    A.   It depends from whose perspective you
13 are valuing the assets and the liabilities.
14    Q.   Can you explain what you mean by that?
15    A.   The assets -- certain of the assets
16 were valued differently by Barclays than they
17 had been by Lehman. Certain of the assets were
18 not recognized by Lehman in that they were not
19 permitted to be recognized under U.S. GAAP, and
20 I'm not familiar with how each party valued the
21 liabilities, excluding the comp and the cure,
22 which we previously discussed.
23    Q.   Which assets did Barclays value
24 differently?
25    A.   Well, Barclays valued or ascribed a

Page 212

HIGHLY CONFIDENTIAL - M. KELLY
1 value to intangible assets that Lehman had
2 ascribed no value to. Barclays ascribed a value
3 to buildings and other real estate that were
4 different from the values Lehman had ascribed to
5 them. And Barclays marked the securities and
6 other inventory using its own valuation
7 policies.
8    Q.   And when Barclays marked the
9 securities using its own valuation policies, was
10 the valuation higher or lower than Lehman had
11 given those securities?
12         MR. HUME: Objection. Lack of
13 foundation.
14    A.   At what point in time?
15    Q.   Well, I guess let's start with at the
16 time of the closing.
17         MR. HUME: The valuation at the time
18 of the closing or the knowledge at the time
19 of the closing?
20    Q.   Do you have my question in mind?
21    A.   Can you repeat your question, please?
22    (Record read.)
23    A.   Well, certain of the securities were
24 not received until after the closing date, and I

Page 213

HIGHLY CONFIDENTIAL - M. KELLY
1 don't know how the ultimate value ascribed by
2 Barclays compared with the Lehman value.
3    Q.   You're aware, sir, that Barclays
4 announced in the early part of 2009 a gain on
5 acquisition of approximately $4 billion?
6    A.   Yes.
7    Q.   Can you give me an explanation for the
8 components of that gain on acquisition that
9 Barclays announced?
10    A.   Not specifically.
11    Q.   Give me the best you can.
12    A.   I can describe it in general terms.
13 The specifics are provided in the annual filing.
14    Q.   Okay. As best you can describe it.
15    A.   The gain of approximately 4 billion
16 represented the difference between the value
17 allocated to the assets and the sum of the value
18 allocated to the liabilities and the
19 consideration paid.
20         A portion of the $4 billion was
21 derived from assets that had no valuation, had
22 no book valuation by Lehman, and the remaining
23 portion of the $4 billion was derived from
24 differences between the asset -- the values of

54

Page 214

HIGHLY CONFIDENTIAL - M. KELLY

1    the assets acquired and the liabilities assumed.
2    Q.    What portion was derived from assets
3    that had no book value ascribed by Lehman?
4    A.    I don't -- I don't recall the specific
5    amount, but it's generally related to intangible
6    assets.
7    Q.    When you testified that the value of
8    the assets received by Barclays was
9    approximately $50 billion as a result of the
10    transaction, was that based on how Lehman valued
11    the assets or on how Barclays valued the assets?
12    A.    Can you repeat the question, please?
13         (Record read.)
14         MR. HUME: I would like to register an
15    objection that that mischaracterizes the
16    witness's testimony.
17    A.    Can you repeat the question again,
18    please?
19         (Record read.)
20    A.    My recollection is that the
21    approximately $50 billion amount refers to the
22    value of the assets recognized by Barclays.
23    Q.    Let's go back to your notes. Do you
24    recall when you made this set of notes we have

Page 215

HIGHLY CONFIDENTIAL - M. KELLY

1    marked as Exhibit 198?
2    A.    I can't specifically because there's
3    no dates on any of these pages.
4    Q.    Were the notes made at or around the
5    time that the financial schedule we marked
6    before was being made?
7         You referred earlier this morning to,
8    when I showed you the financial schedule that
9    was within Exhibit 196 --
10    A.    Uh-huh.
11    Q.    -- you made a reference of some kind,
12    I can't quote you, but you made a reference to
13    when the schedule was typed up and that there
14    had been some handwritten versions ahead of
15    time. At least that's how I understood your
16    answer.
17         I'm wondering if these notes represent
18    notes you made in connection with what became
19    the financial schedule that's within Exhibit
20    196.
21         MR. BERNSTEIN: Is that the question?
22         MR. GAFFEY: Yes.
23    A.    Sorry, what's the question?
24    Q.    Are these, the notes that are in front

Page 216

HIGHLY CONFIDENTIAL - M. KELLY

1    of you, were they made in connection with the
2    financial schedule that's marked within Exhibit
3    196?
4    A.    Well, my recollection is that there
5    were different versions of this schedule as the
6    week progressed which reflected changes in our
7    estimates, so I have difficulty determining or
8    time-stamping the series of handwritten notes
9    relative to that schedule.
10    Q.    Okay. Can you tell me if you look at
11    it what the annotations at the bottom of each of
12    the two columns -- there's two columns at the
13    top of the first page, do you see those?
14    A.    Uh-huh.
15    Q.    Maybe I need a little help with your
16    handwriting first. "Long" is the first row
17    there, yes?
18    A.    Yep.
19    Q.    And what does that say below that?
20    A.    It looks like "reverse."
21    Q.    And what does that mean?
22    A.    That would mean reverse repos.
23    Q.    Okay. And then "shorts," is that what
24    that says?

Page 217

HIGHLY CONFIDENTIAL - M. KELLY

1    A.    I believe so.
2    Q.    And then "repos," is that what that
3    says?
4    A.    Yes.
5    Q.    And then does that say "plus comp"?
6    A.    It looks to, yes.
7    Q.    Yes?
8    A.    I believe so.
9    Q.    Okay. And "plus other," is that what
10    that says?
11    A.    Yes.
12    Q.    All right. Now, can you tell me what
13    this schedule is meant to show?
14    A.    I believe this is -- this schedule's
15    intended to show some version of an estimate of
16    the assets to be sold and the liabilities to be
17    assumed.
18    Q.    Is that the estimate of the values to
19    be sold before the adjustment of the value of
20    the security classes to reflect the $5 billion
21    we talked about this morning?
22    A.    I can't determine that from this.
23    Q.    Do you have an understanding of what
24    the 78 versus the 68 is there, what those two

## Page 218

HIGHLY CONFIDENTIAL - M. KELLY

1    columns are meant to show?
2        A.   It would appear that they're different
3    versions of the same estimates, although I would
4    note that the "Liability" section doesn't add in
5    the second column.
6        Q.   That doesn't add up to 68, is that
7    what you're saying?
8        A.   Correct.
9        Q.   I probably made this clear by now, but
10   I'm a bit innumerate, so can you take me through
11   the first column, the asset side, and get me to
12   78? 65 plus 10? How does this work?
13       A.   I believe what this schedule is
14   showing is an estimate of asset values of 75,
15   comprising long, long assets, long securities of
16   65, a reverse of repo assets of 10, and then on
17   the liability side, a collection of liabilities
18   that also add -- that, sorry, that add to 78.
19   So securities that have been sold short, repo
20   liabilities.
21       Q.   They add to 68, not 78, right? 58
22   plus the 10?
23       A.   Sorry. I'm in the first column.
24       Q.   I beg your pardon. I thought you

## Page 219

HIGHLY CONFIDENTIAL - M. KELLY

1    moved up to the liability side.
2        A.   The first column, that's the first two
3    lines, are assets, and then the next four lines
4    are liabilities.
5        Q.   Okay.
6        A.   And then the second column is another
7    version of assets and liabilities.
8        Q.   Okay. And why are you in these notes
9    putting together two columns of assets, one at
10   78 and one at 68?
11       A.   I don't recall.
12       Q.   Does that in any way reflect the
13   difference in the marks at which Lehman held the
14   assets on its books and the price that Barclays
15   paid?
16       A.   I don't know.
17       Q.   Is there any relation between these
18   two columns and the values that eventually are
19   shown on the asset side of the financial
20   schedule?
21           MR. BERNSTEIN:  Can we just be
22       specific what exhibit you mean by "the
23       financial schedule"?
24       Q.   I'm sorry. Is there any relation

## Page 220

HIGHLY CONFIDENTIAL - M. KELLY

1    between the calculation shown on Exhibit 198 and
2    the assets shown on the financial schedule
3    within Exhibit 196?
4            MR. BERNSTEIN:  Objection. Asked and
5        answered.
6        A.   I don't know.
7        Q.   Take a look at the next page of the
8    notes. You said this at the left-hand side of
9    this is Ian's handwriting. By that you mean Ian
10   Lowitt; is that right?
11       A.   I believe it's Ian Lowitt's
12   handwriting.
13       Q.   Any idea why Ian Lowitt is writing the
14   phrase "no consideration" on these notes?
15       A.   No.
16       Q.   Do you recall a time when Mr. Lowitt
17   was writing on your notebook? Perhaps in a
18   discussion with Mr. Lowitt or in some other
19   context?
20       A.   I don't recall it, but it's possible.
21       Q.   Why do you say it's possible?
22       A.   It's possible because we continued to
23   make revisions to estimates as additional
24   information became known to us.

## Page 221

HIGHLY CONFIDENTIAL - M. KELLY

1        Q.   Turn to the next page, please. Is
2    this all your handwriting on this page?
3        A.   I'm not sure I recognize what appears
4    to be a 61.9 figure at the top of the page, but
5    I believe the rest of it is my handwriting.
6        Q.   Okay. A little bit, about three
7    inches down the page, there's three columns.
8    Can you -- what's this first column? Is that a
9    "BV"?
10       A.   "BV," yes.
11       Q.   What does "BV" stand for?
12       A.   I believe "BV" would stand for book
13   value.
14       Q.   Okay. And the next column, what does
15   that say?
16       A.   "Proceeds."
17       Q.   And what does the next column say
18   after that, "Loss/Gain"?
19       A.   Yes.
20       Q.   What is this calculation meant to
21   show?
22       A.   I believe this is intended to show an
23   estimate of the assets and liabilities being
24   sold to Barclays together with their book values

Page 222

1       HIGHLY CONFIDENTIAL - M. KELLY
2    and the value allocated to them as part of the
3    transaction.
4       Q.   Can you take me through how it shows
5    that? Can you explain each column and where I
6    find the conclusion that it shows.
7       A.   Well, I believe the first column is
8    intended to show what the book value of each of
9    those items was on the books and records of
10   Lehman immediately prior to the transaction.
11      Q.   Okay. So the inventory is carried at
12   65, the reverse repo at 10, yes?
13      A.   Yes.
14      Q.   Shorts at 56, repo at 10; is that what
15   turns out to be collateralized short-term
16   agreements on financial schedules? Is that the
17   same thing?
18      A.   No, repo is a liability. So that
19   would be on the other side of the page.
20      Q.   I got it. And "comp payable," that's
21   the $1 billion number you talked about before
22   that you told Mr. McDade was closer to the
23   actual running rate?
24      A.   I don't recall having any discussion
25   was Mr. McDade about the comp, the comp payable.

Page 223

1       HIGHLY CONFIDENTIAL - M. KELLY
2       Q.   Okay. That was trade payables, you're
3    right.
4          The comp payable, that's the 1 billion
5    before the agreed $2 billion number, right?
6    That's the number actually carried on Lehman's
7    books?
8       A.   Yeah, I believe that that was an
9    estimate of the cash component of the bonus.
10      Q.   Okay.
11      A.   Associated with some estimate of the
12   number of employees moving to Barclays.
13      Q.   Now, take me down the next column,
14   "Proceeds," all right? What accounts for the
15   difference between the 65 shown in inventory in
16   the "Book Value" column and the 58.75 shown in
17   the "Proceeds" column?
18      A.   I believe that the difference -- well,
19   sorry. I believe that the "Proceeds" column
20   refers to the value that was negotiated and
21   agreed between Barclays and Lehman.
22      Q.   And in the right-hand column, then,
23   the 6.25 is the difference between those two
24   numbers, correct?
25         No, it's not. Yeah, it is. That's

Page 224

1       HIGHLY CONFIDENTIAL - M. KELLY
2    the different between 65 and the 58.75, correct?
3       A.   Yes, it would appear that that is the
4    resulting loss or gain.
5       Q.   Okay. And it's a loss to whom?
6       A.   Well, my recollection is this is from
7    Lehman's perspective, so it would be a loss to
8    Lehman.
9       Q.   Now, the reverse repo, let's work
10   across that line, that's shown on -- they are
11   shown on Lehman's books at 10 billion, yes?
12      A.   According to this schedule.
13      Q.   And for the purposes of the
14   transaction there, they're also -- the
15   negotiated value is 10 billion, correct?
16      A.   According to the schedule.
17      Q.   So there's no loss, there's no gain?
18      A.   According to the schedule.
19      Q.   Same with shorts, they both stay at
20   56, correct? Moving from "Book Value" to
21   "Proceeds" to "Loss and Gain," correct?
22      A.   According to the schedule.
23      Q.   And then repo again, 10, stays at 10,
24   resulting in zero in the "Loss/Gain" column,
25   yes?

Page 225

1       HIGHLY CONFIDENTIAL - M. KELLY
2       A.   According to this schedule.
3       Q.   And then when we get to "Comp
4    Payable," the difference is 1 billion between
5    the 1 billion on the book value and the 2
6    billion negotiated number for the transaction,
7    correct?
8       A.   Sorry, can you ask the question again?
9       Q.   I'm on the "Comp Payable" line. It's
10   shown at 1 billion in the "Book Value" column,
11   yes? You see that?
12      A.   Uh-huh. Yes.
13      Q.   And it's shown at 2 billion in the
14   "Proceeds" column, see that?
15      A.   Yes.
16      Q.   Does that difference reflect the
17   agreement to put -- an agreement to put comp
18   payable at 2 billion when it was carried on
19   Lehman's books at 1?
20         MR. HUME: Objection. Vague and
21   ambiguous.
22      A.   I believe that the $1 billion number
23   reflects an estimate of what we believed the
24   cash component of the compensation was.
25      Q.   We're in the "Book Value" column now?

Page 226

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.    Correct.
3    Q.    What does the 2 billion number
4 represent in the "Proceeds" column?
5         MR. HUME: I'm not sure you let the
6 witness finish his answer.
7    Q.    Were you done, sir?
8    A.    Can you repeat, please, the question
9 and answer?
10        (Record read.)
11    A.    Let me continue. I believe that the
12 $2 billion amount represents the compensation
13 liability agreed to between Bart McDade and the
14 Barclays team.
15    Q.    All right. And the payable -- now
16 we're in the "Payables" line. 2.25 billion on
17 book value, yes?
18    A.    Yes.
19    Q.    That's an estimate of the payables as
20 shown on Lehman's books, correct?
21    A.    I believe this is intended to show an
22 estimate of 2.25 billion for payables.
23    Q.    And no change between that column,
24 "Book Value," and the "Proceeds" column,
25 correct? They're both at 2.25?

Page 227

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.    Yeah, that appears that there's no
3 difference between the two.
4    Q.    Hence, a flat result in the "Loss and
5 Gain" column, yes?
6    A.    Yes, as a derivation of that.
7    Q.    All right. Now, can you tell me what
8 the 5.25 at the bottom of the "Loss/Gain" column
9 is meant to show?
10    A.    I believe it was intended to show the
11 loss on sale -- sorry, the estimated loss on
12 sale to Lehman of the transaction.
13    Q.    Now, down at the bottom left-hand
14 corner of these notes, sir, there are a series
15 of debits shown, "Cash," "Comp," "Payables," and
16 "Shorts," do you see that?
17    A.    Yes.
18    Q.    And a credit for a $65 billion long
19 position, you see that?
20    A.    Yes.
21    Q.    And then the last entry there is "DR,"
22 debit less on sale, 5.75?
23    A.    Yes.
24    Q.    You with me?
25    A.    Yes.

Page 228

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.    What is that meant to indicate?
3    A.    Well, I believe it's intended to
4 represent the loss on sale to Lehman of the
5 transaction. However, it doesn't correspond
6 with the 5.25 figure above.
7    Q.    You're kind of at my next question.
8 Can you account the difference -- for the
9 difference between the loss on sale to Lehman of
10 2.25 billion in the "Loss/Gain" column and the
11 loss on sale to Lehman at the bottom of 5.75?
12    A.    No, I can't.
13    Q.    The only thing I can suggest, sir, is
14 there's a debit without a figure in there for
15 cash. Would that somehow account for the
16 difference? You see where I am in DR cash item?
17        MR. BERNSTEIN: Objection. No
18 foundation.
19    A.    I don't know.
20    Q.    Okay. Now, having gone through this
21 page, does this refresh your recollection at all
22 about the setting in which you were making these
23 notes at the time and the circumstances under
24 which you were making them?
25    A.    No, it doesn't.

Page 229

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.    Is it fair to say that the -- now I'm
3 back in the "Loss/Gain" column, the 5.25 loss to
4 Lehman. Did that calculate -- is it fair to say
5 that's primarily a function of the difference
6 between the book value of the inventory and the
7 value negotiated -- and the negotiated value in
8 the contract for the securities?
9         MR. HUME: Objection. Vague and
10 ambiguous.
11    A.    It may. It may. It likely accounts
12 for the difference based on these estimates at
13 this point in time.
14    Q.    Now, would you turn two pages later in
15 these notes. I'm at Bates page 115171.
16        I'm going to need a little more help
17 with your handwriting here. Is that your
18 handwriting on the page?
19    A.    Yes.
20    Q.    Can you tell me what that says in the
21 top center? Looks to me like it says "what
22 locked up"? You see where I am?
23    A.    Yes.
24    Q.    Can you read that top -- that entry at
25 the top center of the page, please?

## Page 230

HIGHLY CONFIDENTIAL - M. KELLY

1
2    A.   It says, "What locked up? How much
3    to" -- I can't make out the next word, and then
4    it looks like it says "rep. to calculation."
5    Q.   I guess we could both struggle that
6    word that you can't read, but let me just
7    suggest, does that say "reserve" or "recover"?
8    A.   I don't think so.
9    Q.   Okay.
10    A.   I think the second to last word is an
11    "S."
12    Q.   Okay.  Let's not both guess at it and
13    we'll both go find our elementary school
14    teachers and they can talk about our
15    handwriting.
16    A.   That's fair.
17    Q.   There's some names on here, including
18    Gary Romain.  See that?
19    A.   Yes.
20    Q.   Having looked at this portion, does
21    this refresh your recollection as to the
22    circumstances under which you took these notes,
23    made these notes?
24    A.   Well, it would appear to be after the
25    Monday night because there's a reference to

## Page 231

HIGHLY CONFIDENTIAL - M. KELLY

1    Alvarez on the top right.
2    Q.   Okay.  And why does that tell you
3    that's after the Monday night?
4    A.   I don't believe we had any
5    conversations about or with Alvarez until after
6    the Monday night.
7    Q.   Okay.  And had you had conversations
8    with Gary Romain before the Monday night?
9    A.   Yes.
10    Q.   Now, below that is an entry that
11    says -- just tell me if I'm reading this
12    correctly -- "Ian, 15c3 lockup calc"; is that
13    right?
14    A.   Yes.
15    Q.   Getting better at your handwriting.
16         What is that a reference to?
17    A.   I believe that's a reference to funds
18    segregated under the 15c3 requirement.
19    Q.   Now, I want to go back generally,
20    without regard to the notes, to this topic we
21    talked about before about looking for available
22    assets to transfer over to Barclays.  15c3 is
23    what sort of triggers that topic.
24         Did you assist in the search for
25

## Page 232

HIGHLY CONFIDENTIAL - M. KELLY

1    additional assets to give to Barclays?
2    A.   No.  Well, let me clarify.  My
3    recollection is that I was asked to determine
4    what the excess funds in the 15c3 requirement
5    were.
6    Q.   And you were asked that by Lowitt, Ian
7    Lowitt?
8    A.   I recall it was Ian, yeah.
9    Q.   And did you get a sense in your
10    conversations with Ian about, you said -- I
11    believe you said this morning that the
12    determination of how much was available in 15c3
13    and the other asset categories was related to
14    was to replace certain assets that Lehman could
15    not deliver to Barclays; is that right?
16         MR. BERNSTEIN:  Objection.  Vague and
17    ambiguous.  Mischaracterizes his testimony.
18    A.   Can you repeat the question, please?
19    Q.   Let me try this again.  You talked
20    this morning about over the course of the week
21    the amount of assets that Lehman had agreed to
22    deliver shrinking, you recall that?
23    A.   Well, I would characterize it as the
24    amount of assets that both sides had agreed was
25

## Page 233

HIGHLY CONFIDENTIAL - M. KELLY

1    shrinking.
2    Q.   And was the search for additional
3    assets related to that reduction in the size of
4    assets that the parties had agreed would be
5    delivered?
6    A.   I don't know.
7    Q.   Was it making up a difference of some
8    kind, search for additional assets?
9    A.   I don't know.
10    Q.   Was there any limit on the additional
11    assets that were being searched for?  How many
12    needed to be found in order to solve whatever
13    problem was being solved?
14    A.   I don't know.
15    Q.   Did Mr. Lowitt give you an idea of why
16    he wanted you to determine the amount of
17    available funds in the 15c3 category that could
18    be transferred to Barclays?
19         MR. BERNSTEIN:  Objection.  Asked and
20    answered.
21    A.   Will you repeat the question, please?
22         (Record read.)
23    A.   My recollection is that the work
24    around the 15c3 requirement was related to
25

Page 234

HIGHLY CONFIDENTIAL - M. KELLY

1    identifying potential sources of value to be --
2    to be provided -- or, to be sold, sorry --
3    potential additional assets, I should say, to be
4    provided to Barclays.
5        Q.   And again, did you have an
6    understanding as to why potential additional
7    assets to be transferred to Barclays were being
8    looked for?
9        MR. BERNSTEIN: Objection. Asked and
10   answered.
11       A.   My recollection is that certain of the
12   assets that had been agreed to be sold may not
13   have been available to be sold based on title or
14   possession issues.
15       Q.   Okay. And do you have a recollection
16   of how much in 15c3 funds was determined could
17   be sent over to Barclays?
18       A.   No, my role was limited to -- limited
19   to calculating what the surplus might be.
20       Q.   I'm not sure I see where the
21   distinction is. Is it, as opposed to what could
22   be sent over, you were just supposed to figure
23   out how much was available; is that what you're
24   saying?

Page 235

HIGHLY CONFIDENTIAL - M. KELLY

1        A.   My role was to determine what the
2    reserve requirement was relative to what was
3    segregated in the account.
4        Q.   To see if there was a surplus, yes?
5        A.   Correct.
6        Q.   Now, I'm going to ask you about the
7    text in the middle of the page in a minute, but
8    there's a calculation down toward -- a little
9    further down that has three lines in it, "Cash,"
10   "Inventory," and something "15c3." Just for
11   purposes of being on the same page, do you see
12   where we are on the page?
13       A.   Yes.
14       Q.   And that first line says Cash, 7 -- 7
15   billion; is that right?
16       A.   7,000, short for 7 billion, yes.
17       Q.   And the second says, Inventory,
18   44,846,000,000?
19       A.   Yes.
20       Q.   And you're going to have to read that
21   third one to me. What does that say below that?
22       A.   The amount is a billion. A thousand.
23   That's short for a billion.
24       Q.   And what are the words?

Page 236

HIGHLY CONFIDENTIAL - M. KELLY

1        A.   Something 15c3.
2        Q.   Okay. Does that represent a billion
3    in 15c3 surplus?
4        MR. HUME: Objection. Lack of
5    foundation.
6        A.   I'm not sure what that represents.
7        Q.   And those numbers add to
8    52,846,000,000, do you see that?
9        A.   Yes. According to the schedule, yes.
10       Q.   Okay. And the math is right, right?
11       A.   Yes.
12       Q.   And what were you adding up there,
13   that 52,846,000,000?
14       A.   The sum of the three captions above
15   it.
16       Q.   Okay. And it was contemplated, apart
17   from assets that -- we talked a bit about this.
18   There were some assets that got tied up and
19   didn't go over until later, right?
20       A.   Uh-huh.
21       Q.   Yes?
22       A.   Correct.
23       Q.   Okay. Without regard to when they
24   went over, does this calculation of 7 billion

Page 237

HIGHLY CONFIDENTIAL - M. KELLY

1    plus 44846 plus a billion represent the value
2    that was supposed to go to Barclays at the time
3    of the transaction?
4        MR. HUME: Objection. Vague and
5    ambiguous.
6        A.   I'm not aware.
7        Q.   Well, do you know where the source of
8    the inventory number there of 44,846,000,000
9    comes from?
10       A.   No, I don't recall the source.
11       Q.   Now, just above that, sir, does that
12   say "went," W-E-N-T?
13       A.   In a circle?
14       Q.   Yes.
15       A.   I don't know.
16       Q.   Okay.
17       A.   I think below it it refers to Wells.
18   I'm not sure if it's the same word.
19       Q.   Well, there were some 15c3 funds that
20   were found in an account at Wells, correct?
21       A.   I don't recall right offhand.
22       Q.   And below that it says "Chase," do you
23   see that?
24       A.   Yes.

Page 238

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.   So for some reason or another that's
3    referring to a couple of banks, but what I want
4    is to know, if you can tell me, what, if that
5    says "sent" or "went" at the top, what that
6    means?
7        MR. BERNSTEIN: Objection.
8        A.   I don't know.
9        Q.   Now, over on the right-hand side, you
10   see where it says "42 b pledged," "2 b"?
11       A.   Yes.
12       Q.   What does that mean?
13       A.   Well, I would expect that "b" refers
14   to Barclays.
15       Q.   Okay. Do you know what "42 billion
16   pledged to Barclays" would mean? Can you put
17   that in some kind of context looking at these
18   notes?
19       A.   I would expect that that means pledged
20   as part of a repo, but I'm not certain.
21       Q.   And below that, "0.8 pledged B." And
22   I just can't read what's below that. What does
23   that say?
24       A.   I think that says "Friday night."
25       Q.   Okay. Now, I guess over the week

Page 239

HIGHLY CONFIDENTIAL - M. KELLY
1
2    we've been talking about, from Tuesday when the
3    agreement is made until Monday when the
4    transaction is closed, from the 16th to the
5    22nd; you with me with that timeframe, okay?
6        A.   We've been talking about that, yes.
7        Q.   There's only one Friday in that
8    sequence, right?
9        A.   I'm not sure about that.
10       Q.   Well, Tuesday, Wednesday, Thursday,
11   Friday, Saturday, Sunday. Only one Friday,
12   right?
13       A.   If that's the timeframe we're looking
14   at. I'm not sure that this refers to that time.
15       Q.   If that's the timeframe we're talking
16   about, does that suggest to you these notes were
17   done over the weekend of the 21st -- of the 20th
18   and the 21st?
19       MR. BERNSTEIN: Objection. By "these
20   notes" you mean a particular page or all of
21   the pages?
22       Q.   The ones that refer to something
23   pledged on Friday night.
24       MR. HUME: Objection.
25       MR. BERNSTEIN: I just want to

Page 240

HIGHLY CONFIDENTIAL - M. KELLY
1
2    clarify. Are you asking him this page or
3    all of the pages in Exhibit 198?
4        Q.   Let's do this page.
5        MR. BERNSTEIN: Thank you.
6        A.   Yeah, regarding this page, I would
7    infer that the use of the past tense in the word
8    "pledged" infers that Friday night was prior to
9    this page having been written.
10       Q.   Okay. Now, with that sort of review
11   of that portion of your notes, can you go back
12   to the 52,846,000,000 and tell me, now that we
13   have contextualized it to that weekend of the
14   20th and the 21st, that refreshes your
15   recollection as to why we see a total of
16   52,846,000,000 calculated in this way?
17       MR. HUME: Objection. Asked and
18   answered.
19       A.   No.
20       Q.   Well, again, sir, the effort to find
21   the 15 -- the surplus 15c3 didn't occur until
22   the 19th of September, right? It was later in
23   the week?
24       A.   The 19th was what date?
25       Q.   That's the Friday.

Page 241

HIGHLY CONFIDENTIAL - M. KELLY
1
2        A.   I can't recall when the effort
3    started. I can't say it went through that
4    weekend.
5        Q.   Does anything on this page give you
6    any ability to suggest or speculate as to why
7    52,846,000,000 is shown on there?
8        MR. BERNSTEIN: Objection to the form.
9    Compound.
10       And you shouldn't speculate unless
11   you're directed to speculate by the
12   questioner.
13       MR. GAFFEY: And I have.
14       MR. BERNSTEIN: You said "suggest or
15   speculate."
16       Q.   I'll take either one. Tell me whether
17   you're suggesting or speculating.
18       A.   Could you repeat the question, please?
19       Q.   Withdrawn.
20       With the discussion we've had about
21   this page of notes, sir, do you have any ability
22   to suggest to me any reason that it says
23   52,846,000,000 there on that page of your notes?
24       A.   I'm sorry, I don't understand the
25   question.

Page 242

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.   Was the value of the assets
3    transferred to Barclays after the weekend of the
4    20th and the 21st somewhere in the range of 52
5    or 53 billion dollars?
6        MR. BERNSTEIN:  Objection.  No
7    foundation.
8    A.   My recollection was that the value was
9    approximately 50 billion.
10   Q.   You had a repo for a principal amount
11   of approximately $45 billion between Lehman and
12   Barclays during that week, correct?  We talked
13   about this before.
14       MR. HUME:  Objection.  Lack of
15   foundation.
16   A.   I don't recall the specific amounts.
17   Q.   You have no recollection of the amount
18   of the repo?
19   A.   Correct.
20       (Exhibit 199, an e-mail and attached
21   balance sheet, marked for identification, as
22   of this date.)
23   Q.   Take a look through what we have
24   marked as Exhibit 199, which is an e-mail and
25   attached balance sheet.  Tell me whether you

Page 243

HIGHLY CONFIDENTIAL - M. KELLY
1
2    recognize the document.
3        (Document review.)
4    A.   I don't recall the document.
5    Q.   Take a look at the attachment, please.
6    You might want to have handy, sir, the financial
7    schedule within Exhibit 196, okay?
8        And just so we have both an asset and
9    a liability column, I'll ask you to turn to the
10   last page of the document, the schedule showing
11   both assets and liabilities in columns A through
12   M, see that?
13   A.   Yes.
14   Q.   Now, in the assets side, let's start
15   there, there are two columns, one that says "Per
16   Contract Estimate" and one that says "9/16
17   Estimate," do you see that?
18   A.   Yes.
19   Q.   And the difference between the totals
20   there is $5.1 billion, do you see that, between
21   the 62.7 and the 57.6?
22   A.   Yes.  Approximately, yes.
23   Q.   And do you know the source of the --
24   do you know what the 9/16 estimate is an
25   estimate of?

Page 244

HIGHLY CONFIDENTIAL - M. KELLY
1
2        MR. BERNSTEIN:  Objection.  No
3    foundation.
4    A.   It appears to be a revision to the
5    amounts listed under the "Contract Estimate"
6    column.
7    Q.   Okay.  And just so we're again on the
8    same page, the contract estimate numbers on the
9    asset side match the asset values shown on the
10   schedule within Exhibit 196, the one dated
11   September 16, right?
12       The 40 and the 1.1, 2.7?
13   A.   I understand.  I'm just looking at the
14   numbers.
15       Yes, so the "Contract Estimate" column
16   appears to match.
17   Q.   Okay.  And again, just having looked
18   at the document a little more, do you have any
19   memory of seeing this before or any knowledge as
20   to why or how it was prepared?
21   A.   No, I don't recall seeing this.
22   Q.   Can you offer any explanation, sir, as
23   to why on the 18th September Mr. Reilly would be
24   sending that balance sheet to you, as the cover
25   e-mail reflects?

Page 245

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.   Well, Gerry was part of the group of
3    people I referenced earlier as being involved in
4    updating the estimates of the balance sheet.
5    Q.   And does anything we discussed about
6    this particular document now refresh your
7    recollection as to the circumstances under which
8    it was sent to you, why it was sent to you, any
9    conversations you may have had with Mr. Reilly
10   about it?
11   A.   No.
12   Q.   Okay.
13       (Exhibit 200, a document bearing Bates
14   Nos. BCI-EX-00115141, marked for
15   identification, as of this date.)
16   Q.   Mr. Kelly, I have put before you what
17   we have marked as Exhibit 200, a one-page
18   document bearing Bates No. BCI-EX-00115141, do
19   you recognize that document?
20   A.   I do recognize this as another version
21   of the estimates of the assets and liabilities.
22   Q.   Do you recognize it as a version that
23   was created before or after the financial
24   schedule that's within Exhibit 196?
25   A.   I'm not sure if this is before or

Page 246

1        HIGHLY CONFIDENTIAL - M. KELLY
2   after the other exhibit.
3        Q.   Take a look, if you would -- I take it
4   the handwriting on this page is yours; is that
5   right?
6        A.   No, I don't believe -- this is not my
7   handwriting.
8        Q.   Do you know whose handwriting that is
9   where it says "mark down" under "Adjusted Total
10  Assets"?
11       A.   I believe this is Ian Lowitt's
12  handwriting.
13       Q.   Just so we're clear about what you
14  mean by this, what about -- let me ask about the
15  rest of the handwriting on the page which
16  consists of numbers. Do you recognize whose
17  handwriting that is?
18       A.   I don't believe any of the handwriting
19  is mine. I think -- I think the handwriting is
20  Ian Lowitt's.
21       Q.   Can you offer any explanation as to
22  why Mr. Lowitt would be writing "mark down"
23  under "Adjusted Total Assets" on this schedule?
24       A.   No.
25       Q.   When the schedule that's within

Page 247

1        HIGHLY CONFIDENTIAL - M. KELLY
2   Exhibit 196 -- that is what I'm going to call
3   the final schedule, sir, okay? -- when that was
4   prepared, was it Mr. Lowitt who communicated to
5   you what amounts should be attributed to
6   particular asset classes as shown on that
7   schedule?
8        MR. BERNSTEIN: Objection. Asked and
9   answered.
10       A.   Can you repeat the question, please?
11       (Record read.)
12       A.   No.
13       Q.   It was not Mr. Lowitt or you don't
14  remember?
15       A.   I should say -- I should correct that.
16  I don't believe so.
17       Q.   Did Mr. Lowitt ever communicate to you
18  any kind of mark down he thought should be
19  attributed to the assets that were being
20  transferred to Barclays?
21       A.   I don't believe so.
22       (Exhibit 201, an e-mail with attached
23       financial schedule, marked for
24       identification, as of this date.)
25       Q.   Mr. Kelly, you have before you a

Page 248

1        HIGHLY CONFIDENTIAL - M. KELLY
2   document we've marked as Exhibit 201. It's a
3   cover e-mail from Brian Yeung, Y-E-U-N-G, to
4   you, containing an attached financial schedule.
5   Have you seen that document before?
6        A.   Which document are you referring to?
7        Q.   Well, either one. I guess it's an
8   e-mail and the attachment that came with it,
9   so...
10       A.   I don't recall the e-mail cover.
11       Q.   Uh-huh.
12       MR. BERNSTEIN: I just note this is
13       not Bates-stamped. Is it your understanding
14       that this is all -- that pages 2 and 3 are
15       in fact the attachment to page 1?
16       MR. GAFFEY: That's my best
17       information, yes.
18       A.   I do recall versions of this. I'll
19  call it a spreadsheet.
20       Q.   Okay.
21       A.   In this format.
22       I don't recall specifically seeing
23  this version.
24       Q.   Okay. You may have seen it, you may
25  not, but you saw them at or around the time in

Page 249

1        HIGHLY CONFIDENTIAL - M. KELLY
2   this format, is that fair? You just don't know
3   if you saw this one in particular?
4        A.   I don't have specific recollection on
5   this.
6        Q.   Okay. There's a column on the
7   spreadsheet for transaction adjustments, do you
8   see that?
9        A.   Yes.
10       Q.   Okay. What is that column meant to
11  designate? While you're looking at that, let me
12  withdraw that and ask you my next question
13  anyway.
14       If you would turn to the last page of
15  the document in the "Liability" section under
16  "Payables" where it says "Compensation Payable,"
17  you with me?
18       A.   Yes.
19       Q.   If you would just read across from
20  left to right -- not out loud, but to
21  yourself -- read across from left to right.
22       What I want to know, sir, is what is
23  represented by that 1 billion entry in the
24  "Transactions" column -- "Adjustments" column,
25  along that line?

## Page 250

1    HIGHLY CONFIDENTIAL - M. KELLY
2        MR. BERNSTEIN: Objection. No
3    foundation.
4        A.   I don't know.
5        Q.   Does it reflect a write-up of some
6    sort of the amount on Lehman's books for
7    compensation payable as of 9/17/08?
8        A.   I'm sorry, could you repeat the
9    question?
10       Q.   Well, let me rephrase it.
11           Compensation payable, it's got two
12   dates columns, 8/31/08 and 9/17/08.  You with me
13   there?
14       A.   Yes.
15       Q.   And in the 9/17/08 column it shows an
16   amount of 520, correct?
17       A.   Yes.
18       Q.   And moving further to the right, it
19   shows an amount to the thousand in the
20   "Transaction Adjustments" column, correct?
21       A.   Yes.
22       Q.   And in "Balance Sheet Transferred,"
23   the next column, it's in the amount of 1,520,
24   correct?
25       A.   Yes.

## Page 251

1    HIGHLY CONFIDENTIAL - M. KELLY
2        Q.   Well, that's -- that's the math, and I
3    have that, but what is -- what transaction
4    adjustment is being made for a balance sheet?
5    What does balance -- withdrawn.
6            What does "Balance Sheet Transferred"
7    mean on this spreadsheet, do you know?
8        A.   I believe it was intended to represent
9    the estimate at this point in time of the assets
10   and liabilities transferred to Barclays.
11       Q.   When we spoke earlier this morning
12   about your e-mail, which is Exhibit 136, which
13   we spent so much time on this morning, and you
14   referred to an extra 1 billion of comp beyond
15   our accrual, do you remember that?
16       A.   Yes.
17       Q.   Is this the extra 1 billion comp above
18   the accrual that you were talking about in that
19   e-mail?
20       MR. BERNSTEIN: Objection.
21       MR. HUME: Objection.
22   Mischaracterizes testimony.
23       MR. BERNSTEIN: And no foundation.
24       A.   I don't know.
25       MR. BERNSTEIN: It's 5:45 and our

## Page 252

1    HIGHLY CONFIDENTIAL - M. KELLY
2    position the deposition is over.
3        MR. GAFFEY: It's not mine, I'm
4    afraid.  I think we're going to need him
5    back.  If you want to stop for the day,
6    that's fine, but we're going to reserve our
7    rights to resume questioning.  I have a lot
8    more to go through with him.  I think we had
9    a lot of time spent today on read-backs and
10   conferences and the like, and I don't think
11   I've got a full and fair seven hours.
12       MR. BERNSTEIN: I prefer not to have
13   long colloquies on the record.
14       MR. GAFFEY: That's fine.  So you know
15   where I am and I know where you are.
16       MR. BERNSTEIN: Although I would like
17   to say something.
18           We went over by 15 minutes as in
19   recognition of the fact that there were some
20   extra conferences with respect to privilege
21   issues.  And I think he's satisfied his
22   obligation to give a deposition, and our
23   position is that the deposition is over.
24           Without waiving anything, do you and
25   the others around the table have an estimate

## Page 253

1    HIGHLY CONFIDENTIAL - M. KELLY
2    of how much additional questioning you have?
3        MR. GAFFEY: I've got a couple more
4    hours.
5        MR. BERNSTEIN: Does anyone else
6    intend to question this witness?
7        MR. OXFORD: Yes.
8        MR. BERNSTEIN: Assuming there is an
9    additional deposition, which, as you know,
10   our position is there should not be --
11       MR. OXFORD: I intend to question the
12   witness for the Trustee.  I expect to be at
13   least an hour.
14       MS. TAGGART: About the same thing for
15   the Committee.
16       MR. BERNSTEIN: Anyone else?
17           Well, our position is it's over, but I
18   don't want to provoke long colloquies.  It's
19   something that we can discuss off the
20   record, phone calls.  We'll see if there's a
21   way to make an accommodation.  I'm not
22   saying there will be.
23       MR. CARDEN: Should we get the elapsed
24   time so far so we're all dealing with the
25   same information base?

Page 254

```
 1        HIGHLY CONFIDENTIAL - M. KELLY
 2           MR. BERNSTEIN:  Right now --
 3           MR. CARDEN:  The court reporter could
 4    tell us how much time we were under
 5    questioning.
 6           MR. BERNSTEIN:  Right now it's 5:47.
 7           MR. CARDEN:  That doesn't answer the
 8    question.
 9        (Discussion off the record.)
10        (Time Noted:  5:49 P.M.)
11                    oOo
12
13
14
15
16
17
18
19            _____
              MARTIN KELLY
20
     Subscribed and sworn to
     before me this     day
21   of       2009.
22
23        _____
24
25
```

Page 255

```
 1        HIGHLY CONFIDENTIAL - M. KELLY
 2               CERTIFICATE
 3    STATE OF NEW YORK )
                        : ss
 4    COUNTY OF NEW YORK)
 5        I, Kathy S. Klepfer, a Registered
 6    Merit Reporter and Notary Public within and
 7    for the State of New York, do hereby
 8    certify:
 9        That MARTIN KELLY, the witness whose
10    deposition is herein before set forth, was
11    duly sworn by me and that such deposition is
12    a true record of the testimony given by such
13    witness.
14        I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage and that I am in no way
17    interested in the outcome of this matter.
18        I further certify that neither the
19    deponent nor a party requested a review of
20    the transcript pursuant to Federal Rule of
21    Civil Procedure 30(e) before the deposition
22    was completed.
23        In witness whereof, I have hereunto
24    set my hand this 18th day of August, 2009.
25    --------------------------------------
```

Page 256

```
 1        HIGHLY CONFIDENTIAL - M. KELLY
 2               INDEX
 3    WITNESS:        EXAMINATION BY        PAGE
 4    M. KELLY        Mr. Gaffey         5
 5    EXHIBITS:                          PAGE
 6    Exhibit 193, a document bearing Bates Nos.   21
 7    BCI-EX-00077323 through 77325
 8    Exhibit 194, a document bearing Bates Nos.   23
 9    BCI-EX-00077326 through 77327
10    Exhibit 195, a document bearing Bates Nos.   84
11    10252949
12    Exhibit 196, a document bearing Bates Nos.   91
13    464234 and 466133
14    Exhibit 197, a document bearing Bates Nos.   161
15    10292661
16    Exhibit 198, a document bearing Bates Nos.   207
17    BCI-EX-00115167 through 5173
18    Exhibit 199, an e-mail and attached     242
19    balance sheet
20    Exhibit 200, a document bearing Bates Nos.   245
21    BCI-EX-00115141
22    Exhibit 201, an e-mail with attached    247
23    financial schedule
24
25
```

Page 257

```
 1        HIGHLY CONFIDENTIAL - M. KELLY
 2    NAME OF CASE:  In re Lehman Brothers
 3    DATE OF DEPOSITION:  August 18, 2009
 4    NAME OF WITNESS:  Martin Kelly
 5    Reason Codes:
 6       1.  To clarify the record.
         2.  To conform to the facts.
 7       3.  To correct transcription errors.
 8    Page _____ Line _____ Reason _____
      From _____ to _____
 9
10    Page _____ Line _____ Reason _____
11    From _____ to _____
      Page _____ Line _____ Reason _____
12    From _____ to _____
13    Page _____ Line _____ Reason _____
14    From _____ to _____
      Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
      Page _____ Line _____ Reason _____
18    From _____ to _____
19    Page _____ Line _____ Reason _____
20    From _____ to _____
      Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    Page _____ Line _____ Reason _____
      From _____ to _____
24
25              MARTIN KELLY
```

# BCI EXHIBIT

# 76

Page 258

1        HIGHLY CONFIDENTIAL – M. KELLY

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                 Debtors.

10

      ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13     CONTINUED DEPOSITION OF MARTIN KELLY

14            New York, New York

15            November 20, 2009

16

17

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 25923

Page 259

HIGHLY CONFIDENTIAL - M. KELLY
November 20, 2009
9:18 A.M.

1. HIGHLY CONFIDENTIAL deposition
2. of MARTIN KELLY, held at Jones Day
3. LLP, 222 East 41st Street, New
4. York, New York, before Kathy S.
5. Klepfer, a Registered Professional
6. Reporter, Registered Merit Reporter,
7. Certified Realtime Reporter, Certified
8. Livenote Reporter, and Notary Public
9. of the State of New York.

TSG Reporting - Worldwide    877-702-9580

Page 260

HIGHLY CONFIDENTIAL - M. KELLY
2  A P P E A R A N C E S :
3  JONES DAY, LLP
4  Attorneys for Lehman Brothers, Inc.
5    222 East 41st Street
6    New York, New York  10017-6702
7  BY:  ROBERT W. GAFFEY, ESQ.
8      BRIDGET CRAWFORD, ESQ.
9
10  WILLKIE, FARR & GALLAGHER, LLP
11  Attorneys for the Witness
12    1875 K Street, NW
13    Washington, D.C.  20006-1238
14  BY:  RICHARD D. BERNSTEIN, ESQ.
15    787 Seventh Avenue
16    New York, New York  10019-6099
17  BY:  KELLY M. HNATT, ESQ.
18
19  BOIES, SCHILLER & FLEXNER, LLP
20  Attorneys for Barclays
21    575 Lexington Avenue - 7th Floor
22    New York, New York  10022
23  BY:  JACK G. STERN, ESQ.
24
25

TSG Reporting - Worldwide    877-702-9580

Page 261

1    HIGHLY CONFIDENTIAL - M. KELLY
2    A P P E A R A N C E S :  (Cont'd.)
3
4  QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
5  Attorneys for the Creditors Committee
6    865 Figueroa Street, 10th Floor
7    Los Angeles, California  90017
8  BY:  ERICA P. TAGGART, ESQ.
9
10  HUGHES, HUBBARD & REED, LLP
11  Attorneys for the SIPA Trustee
12    One Battery Park Plaza
13    New York, New York  10004-1482
14  BY:  NEIL J. OXFORD, ESQ.
15    FARA TABATABAI, ESQ.

TSG Reporting - Worldwide    877-702-9580

Page 262

1    HIGHLY CONFIDENTIAL - M. KELLY
2  MARTIN KELLY, called as a
3    witness, having been duly sworn by a Notary
4    Public, was examined and testified as
5    follows:
6  EXAMINATION BY
7  MR. GAFFEY:
8    Q.  Good morning, Mr. Kelly.  We have met
9  before.  Welcome back.
10    A.  Thank you.
11    Q.  Are you still employed by Barclays,
12  sir?
13    A.  Yes.
14    Q.  And do you still hold the same
15  position that you have held when we last met?
16    A.  I held, yes, two positions, but I hold
17  the same two positions, yes.
18    Q.  And have you, since the conclusion of
19  the last session of your deposition, read the
20  transcript of that session of your deposition?
21    A.  Briefly.  Not every word.
22    Q.  Okay.  When we left off last time,
23  there was a question on the record that we
24  didn't get to an answer, and I would like to see
25  if we could just go back to that.

TSG Reporting - Worldwide    877-702-9580

Page 263

**HIGHLY CONFIDENTIAL - M. KELLY**

1    You'll recall, which I can mark, an
2    excerpt or just show it to Mr. Kelly to refresh
3    his recollection. I just want to contextualize
4    this.
5        This is an excerpt of a couple of
6    pages of your deposition, and I'm giving it to
7    you, Mr. Kelly, just to kind of put that last
8    question in context. And the excerpt we have
9    given you starts at page 247, where I showed you
10   Deposition Exhibit 201.
11       Could you take a minute just to
12   familiarize yourself again with the text from
13   page 247 through the end? We can skip the
14   colloquy at the end, but I want to take you to
15   the question at page 251, lines 17 to 19.
16       MR. BERNSTEIN: Did he have Exhibit
17   201 in front of him?
18       MR. GAFFEY: I'm just about to do
19   that.
20       MR. BERNSTEIN: I think he should also
21   be shown Exhibit 136.
22       MR. GAFFEY: And we have that, too.
23       MR. BERNSTEIN: Thanks.
24   A.   Okay.

TSG Reporting - Worldwide    877-702-9580

---

Page 264

**HIGHLY CONFIDENTIAL - M. KELLY**

1    Q.   Okay. Have you had a chance to look
2    through the transcript? I have also put before
3    you, Mr. Kelly, Exhibits 136 and 201, which we
4    had at your last deposition. Take a minute to
5    familiarize yourself with those, please.
6    A.   Okay.
7    Q.   Okay. You've had a chance to go
8    through the transcript, Exhibit 136, and Exhibit
9    201?
10   A.   Yes.
11   Q.   Now, directing your attention to the
12   third page of Exhibit 201, Mr. Kelly, if you
13   could just turn that to there. That kind of
14   puts us back where we were when we left off last
15   time.
16       I was asking you at the time about the
17   Balance Sheet Transferred column on that
18   spreadsheet, do you see that? You with me?
19   A.   Yes.
20   Q.   Okay. And you told me at your last
21   deposition that you believed that the Balance
22   Sheet Transferred column was intended to
23   represent the estimate at that point in time of
24   the assets and liabilities transferred to

TSG Reporting - Worldwide    877-702-9580

---

Page 265

**HIGHLY CONFIDENTIAL - M. KELLY**

1    Barclays, correct?
2    A.   Yes.
3    Q.   And at your last deposition, there was
4    a reference to Exhibit 136, which is a document
5    we spent a lot of time with, you may recall, and
6    we've had some discussion about the accrual for
7    compensation payable that would be the estimate
8    of the compensation liability assumed by
9    Barclays, do you recall that?
10   A.   Yes.
11   Q.   And looking at the third page of
12   Exhibit 201, which is the second page of the
13   spreadsheet, in the Transactions Adjustment
14   column 4, Compensation Payable, there is an item
15   of 1 billion, do I see that?
16   A.   Yes, I do.
17   Q.   And to the left of that are two
18   columns at the relatively far left of the
19   spreadsheet for 8/31/08 and 9/17/08, you see
20   those?
21   A.   Yes.
22   Q.   I want to work across those columns.
23       What does the 360, without regard to
24   the particular number, but what does the 360

TSG Reporting - Worldwide    877-702-9580

---

Page 266

**HIGHLY CONFIDENTIAL - M. KELLY**

1    represent for 8/31/08 and opposed to 9/17, can
2    you explain those two columns to me, please?
3    A.   I'd have to surmise on both, but I
4    think the 360 would have represented the
5    compensation accrual at the end of August as
6    reflected on the books and records of this
7    particular entity, LBI.
8    Q.   Okay.
9    A.   I can't explain how or why that would
10   have increased to 520 by the 17th of December.
11   I think typically compensation journals were
12   booked monthly, so I don't -- I don't know why
13   that would have increased midmonth.
14   Q.   When you say you don't know why it
15   would have increased midmonth, is it because you
16   think it's unlikely that it would have increased or
17   you just don't know one way or another why it
18   moves from 360 to 520 over that time period?
19   A.   Actually, I think it's probably both.
20   I don't understand why it increased, and I think
21   it's unlikely it would have increased.
22   Q.   Now, moving further to the right of
23   the Transaction Adjustments column, what does
24   that 1, that 1 billion number represent?

TSG Reporting - Worldwide    877-702-9580

**HIGHLY CONFIDENTIAL - M. KELLY**

1    A.   I don't know what that represents.
2    Q.   We spoke at your last deposition
3  about, at some length, about the accrual that
4  was made, the estimate that was made for the
5  compensation liabilities in connection with the
6  sale transaction, and I believe your testimony
7  was to the effect that at some point you thought
8  it was about a billion dollars over the accrual
9  shown on the books of Lehman; is that right?
10    A.   Yeah, I think the --
11    MR. STERN: Objection to the form.
12    A.   My understanding was that the total --
13  the total liability, including all components of
14  it, was about a billion dollars above what
15  Lehman had recognized at that time for only a
16  piece of the bonus.
17    Q.   So, with that in mind, can you -- do
18  you have anything else to offer on the $1
19  billion entry as a transaction adjustment?  Is
20  it --
21    A.   I'd have to speculate.  I don't know.
22    Q.   We'll take it as speculation.  What is
23  your speculation as to why there's a $1 billion
24  transaction adjustment?
25    

**HIGHLY CONFIDENTIAL - M. KELLY**

1    A.   I would speculate that someone --
2  someone included -- somebody included that as
3  representative of the billion dollars that you
4  just spoke about, but I hesitate because the
5  final number itself doesn't make any sense to
6  me, the 1.52 billion.
7    Q.   Why does the final number not make any
8  sense to you?
9    A.   I don't recognize that number, so
10  therefore, I don't understand what the
11  adjustment is to get to that number.
12    Q.   Does it not make any sense to you
13  because it's too high?
14    A.   I just -- I just don't know what it's
15  meant to represent.
16    Q.   Do you know who made this transaction
17  adjustment?
18    A.   No, I don't.
19    Q.   It wasn't you?
20    A.   It might have been, but I don't have
21  recollection of that.
22    Q.   Do you have a recollection as to
23  whether it was someone working under your
24  supervision?
25    

**HIGHLY CONFIDENTIAL - M. KELLY**

1    A.   It might have been.  I think it -- it
2  would most likely have been one of the
3  individuals we discussed last time.
4    Q.   Someone like --
5    A.   But it could have been within my group
6  or the broader group, because we were all
7  working on it together.
8    Q.   So when you say it might have been,
9  it's based on some recollection that you and
10  your group were involved in something like this;
11  it's not pure speculation, is that right?
12    A.   Yeah, I think -- well, just to be
13  clear, I think the group included my team, but
14  also included a team under Paolo and Jerry and
15  others, and it's likely that one of the people
16  working on those teams included this.
17    Q.   Do you have a recollection as to
18  whether you yourself were involved in a process
19  like this, preparing spreadsheets of this type
20  in connection with the sale transaction?
21    A.   Yeah, I recall wanting to establish a
22  process or I should say needing to establish a
23  process by which an estimate of the impact of
24  the transaction would be -- would be reflected
25    

HIGHLY CONFIDENTIAL - M. KELLY

1  on the books of Lehman, and so I remember -- I
2  remember setting up a process where we would
3  start with what we thought we had, we would back
4  out what we thought we had sold, and we would
5  end up with what we thought was left, estimates
6  around everything.
7    So the format and the logic behind the
8  schedule is consistent with -- with an exercise
9  that I was involved in and may have -- may have
10  started.
11    Q.   Do you know if the $1 billion
12  transaction adjustment was drawn from the books
13  and records of Lehman, or was it determined in
14  some other way?
15    A.   I don't know.
16    Q.   Does it strike you as likely that the
17  accrual for compensation would, between 9/17/08,
18  September 17, '08, move from 520 to
19  1,520,000,000 by the 22nd of September when the
20  deal closed?
21    MR. STERN: Objection to the form.
22    A.   No.
23    Q.   And why does it not strike you as
24  likely that it would move from 520 to
25

Page 271

HIGHLY CONFIDENTIAL - M. KELLY

1  1,520,000,000 between the 17th of September and
2  the 22nd of September?
3      A.   For the same reason I think it's --
4  it's illogical to me that -- that the 360 moved
5  to 520 between the end of August and the 17th of
6  September. There wasn't, as far as I was aware,
7  there was not a process to -- to recognize
8  journals or adjustments within the month.
9      Q.   Now, with respect to the Trade
10  Liabilities item, which is below Compensation
11  Payable, I want to work across the same column,
12  if you don't mind, starting with the 423 shown
13  for Trade Liabilities at August 31, '08?
14      A.   Sure.
15      Q.   You with me on the document there?
16      A.   Yes.
17      Q.   And that moves from 423 down to 400
18  by -- in the column marked 9/17/08, do you see
19  that?
20      A.   Yes.
21      Q.   Can you tell me, what's your
22  understanding of what the basis for those
23  numbers are in those two columns, 8/31/08 and
24  9/17/08?

TSG Reporting - Worldwide    877-702-9580

Page 272

HIGHLY CONFIDENTIAL - M. KELLY

1      A.   Well, I would surmise -- I don't think
2  it's more than surmise -- that the 8/31 number
3  reflected an actual estimate of unpaid trade
4  liabilities at that date for this entity, LBI,
5  through a normal process of booking those
6  liabilities. I'm not aware if we had the
7  ability within the month to update that number,
8  so I don't know what the source of the 400 is.
9      Q.   And then further over in the
10  Transaction Adjustments column, the number was
11  383, which brings it in the Balance Sheet
12  Transferred to a total of 783, do you see that?
13      A.   Yes.
14      Q.   And do you have an explanation for the
15  transaction adjustment of 383?
16      A.   No.
17      Q.   Would you take a look at the first
18  page of Exhibit 201. It's an e-mail from Brian
19  Yeung to you. See that?
20      A.   Yes.
21      Q.   And the text of the e-mail states,
22  "Hi, Martin. Attached is the file Rose asked me
23  to send to you"?
24      A.   Yes.

TSG Reporting - Worldwide    877-702-9580

Page 273

HIGHLY CONFIDENTIAL - M. KELLY

1      Q.   You with me there?
2      Q.   Did Brian Yeung work for you? Was he
3  in your group?
4      A.   He may have. I don't recall.
5      Q.   Okay. Do you know who the Rose he's
6  referring to is?
7      A.   Yeah, I do know Rose.
8      Q.   Could you give me her last name,
9  please?
10      A.   Hauzenberg.
11      Q.   Did Rose Hauzenberg work for you?
12      A.   She did. She worked indirectly for me
13  on Kristi Wong's team.
14      Q.   And does looking at this e-mail dated
15  September 18, 2008 from Brian Yeung to you
16  concerning the attached spreadsheet refresh your
17  recollection as to what the nature of your
18  involvement was in the preparation of this
19  spreadsheet?
20      A.   No, not beyond what I've already
21  stated.
22      Q.   Now, after the transaction closed --
23  you can put that aside. I'm done with that
24  document. Thanks.

TSG Reporting - Worldwide    877-702-9580

Page 274

HIGHLY CONFIDENTIAL - M. KELLY

1      After the transaction closed on
2  September 22, again, I can go back to some
3  documents and show you, but for the purpose of
4  my question, I'll just tell you that your
5  employment agreement with Barclays is dated
6  October 15 of 2008.
7      My questions go to the period between
8  the closing and the commencement of your
9  employment by Barclays. Do you have a
10  recollection of for what entity, for whom you
11  worked in the period immediately after the
12  closing?
13      A.   My -- no. I would assume it's the
14  same entity I had been employed by.
15      Q.   Still on the Lehman side as opposed to
16  the Barclays side?
17      A.   I'm not aware of the date that I
18  moved.
19      Q.   Okay.
20      A.   And I'm not aware of which particular
21  Lehman entity employed me.
22      Q.   Now, in those first couple of weeks
23  after the closing -- let's just, to frame it,
24  let's go from September 22 to October 15. Can

TSG Reporting - Worldwide    877-702-9580

Page 275

1    HIGHLY CONFIDENTIAL - M. KELLY
2  you give me a general description of what the
3  nature of your activities and responsibilities
4  were with regard to the sale transaction that
5  had just occurred?
6    A.  Yeah, I guess a couple things. One is
7  there were continuing efforts to try to
8  understand the terms of the sale treatment --
9  sorry, the sales contract and to gather the
10  information necessary to start to reflect that
11  on the books of Lehman.
12    There were continuing conversations
13  with Alvarez & Marsal around a variety of
14  topics, but including the sale.
15    Q.  Were there conversations with persons
16  and entities other than Alvarez & Marsal?
17    A.  Around the sale, specifically?
18    Q.  Yes.
19    A.  There were conversations with Barclays
20  as they continued to identify what they had
21  purchased, and also, they undertook work to
22  understand what the revenue run rate and cost
23  infrastructure of the acquired businesses would
24  be.  There were -- I'm having trouble
25  time-stamping it specifically, but there were
TSG Reporting - Worldwide    877-702-9580

Page 276

1    HIGHLY CONFIDENTIAL - M. KELLY
2  conversations with -- with Weil, although I
3  think in that period of time from the 22nd
4  onwards, I think they were more related to
5  filing obligations of Lehman than -- than they
6  were around the sale.
7    Q.  Did you talk to anybody at Simpson
8  Thacher?
9    A.  No. Actually, I should amend that.
10    Not that I recall.
11    Q.  Okay.  Do you recall if there were any
12  other professional firms that you were dealing
13  with at that time, apart from Alvarez, Weil
14  Gotshal, in connection with the sale?
15    A.  At some point Deloitte was involved
16  acting as -- acting on behalf of the trustee, I
17  believe, to help identify what remained versus
18  what was sold. I'm not sure if it was within
19  that period of time.
20    Q.  And any other professional firms?
21    A.  Not that I recall.
22    Q.  Now, who did you deal with at Alvarez
23  & Marsal?
24    A.  I had several meetings with David
25  Coles. And again, I just want to be careful on
TSG Reporting - Worldwide    877-702-9580

Page 277

1    HIGHLY CONFIDENTIAL - M. KELLY
2  timing, because some of these started the week
3  of the 15th, so...
4    Q.  Does it help if I expand this out a
5  little bit?  Let's move it to through the -- you
6  know, where do you want to put it?  The end of
7  October?  The end of November?
8    A.  No, I'm more uncertain on the front
9  end of that time range than the back end,
10  actually.
11    Q.  All right.
12    A.  There were other Alvarez
13  representatives that I met with. I don't recall
14  their names. I do recall David's. There was a
15  large meeting that Brian Marsal ran, which I
16  attended, and I would estimate I had between
17  three and five meetings with Alvarez over, over
18  that period of time.
19    MR. STERN: I'm a little confused
20  because the reference to the week of the
21  15th, I'm not sure what month that's in.
22    Q.  Your answers go to the time period we
23  framed, just so we can --
24    A.  I --
25    Q.  Let me just put on the record, if you
TSG Reporting - Worldwide    877-702-9580

Page 278

1    HIGHLY CONFIDENTIAL - M. KELLY
2  don't mind, sir, your answers go to the period
3  we've been talking about from the closing on
4  September 22 through the 15th of October; these
5  are post-closing meetings?
6    A.  No.
7    Q.  Okay.
8    A.  No. But my uncertainty is around
9  there were some conversations and meetings the
10  week of the September 15th.
11    Q.  Leading up to the --
12    A.  So I'm more -- I'm more uncertain on
13  the front end of that time range.
14    Q.  Okay.  Do you recall your first meeting with
15  Alvarez & Marsal in the week leading up to the
16  closing, that is, the week of September 15th
17  through the 22nd?
18    A.  Yes.
19    Q.  And the meeting that you talked about
20  with -- the dealings with David Coles, were they
21  during that period?
22    A.  Yes. Yeah, at least -- at least some
23  of them were.
24    Q.  And some may have been after the
25  closing as well?
TSG Reporting - Worldwide    877-702-9580

Page 279

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.    Correct.
3    Q.    The meeting that you attended that Mr.
4    Marsal was at, was that before or after the
5    closing?
6    A.    That was before.
7    Q.    Where did that meeting take place?
8    A.    It was in the, I think it's called the
9    board room at 745 Seventh Avenue on the 31st
10    floor.
11    Q.    Was it a large meeting? Approximately
12    how many people were there?
13    A.    It was a very large meeting, so 40, 50
14    people.
15    Q.    Was there an agenda for the meeting?
16    A.    I think the agenda was for Alvarez to
17    start to understand the key people responsible
18    for each of the main functions and to start to
19    form smaller teams around each of the functions.
20    Q.    Did you --
21    A.    Oh, and there was a -- there was a
22    discussion around controlling cash
23    disbursements.
24    Q.    And apart from Mr. Marsal, do you
25    recall any other Alvarez & Marsal people who
TSG Reporting - Worldwide    877-702-9580

Page 280

HIGHLY CONFIDENTIAL - M. KELLY
1
2    were present at that meeting?
3    A.    There were quite a number, and I
4    recall that Mr. Marsal introduced them by name.
5    Q.    Did you wind up in a working group or
6    a team of some kind as a result of that meeting?
7    A.    I don't recall if I had already met
8    with David Coles before that meeting. I may
9    well have.
10    Q.    Did you emerge from that meeting with
11    a defined set of tasks and responsibilities that
12    were yours to pursue after the meeting?
13    A.    No, and that's why I'm -- I'm hesitant
14    as to whether I actually met with David
15    beforehand. Because I think I probably already
16    had the kick-off meeting with David.
17    Q.    Did you discuss with any of the people
18    at Alvarez & Marsal the terms of the sale
19    contract?
20    A.    I remember David and his team asking
21    for information. I don't recall the specifics
22    of what they asked for.
23    Q.    Do you recall one way or the other
24    whether the information concerned the terms of
25    the -- included that they asked for included the
TSG Reporting - Worldwide    877-702-9580

Page 281

HIGHLY CONFIDENTIAL - M. KELLY
1
2    terms of the sale contract?
3    A.    My speculation -- it's only
4    speculation -- would be that it did based on
5    what I knew at that time.
6    Q.    Do you recall if you were ever in a
7    conversation, you yourself, were ever in a
8    conversation with anyone at Alvarez & Marsal
9    concerning the terms of the sale contract?
10    A.    Well, I think -- I think that the
11    nature of the conversations was related to the
12    other spreadsheet that we looked at, and that's
13    what we start with, what do we sell, what are we
14    left with. So I think, as a general matter, the
15    conversation related to the sale. I don't
16    recall the specifics.
17    Q.    I'll come back to that point in a
18    minute, but I want to go back to the specifics
19    of my question, which is the terms of the sale
20    contract itself. Did you go over the terms of
21    the sale contract with anyone from Alvarez &
22    Marsal?
23          Let me withdraw that. Did you ever
24    see the sales contract?
25    A.    The Asset Purchase Agreement?
TSG Reporting - Worldwide    877-702-9580

Page 282

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.    Yes.
3    A.    I did at some point.
4    Q.    Do you recall when you saw it?
5    A.    No.
6    Q.    Do you recall if you saw it before the
7    closing?
8    A.    The 22nd?
9    Q.    Uh-huh.
10    A.    I may have. I don't recall.
11    Q.    You don't recall one way or the other?
12    A.    No.
13    Q.    And when you referred to the
14    spreadsheet, were you referring to the
15    spreadsheet, or one like it, that's attached to
16    Exhibit 201?
17    A.    Some version of that, with similar
18    logic.
19    Q.    Do you have a recollection of a
20    spreadsheet like that being reviewed with
21    Alvarez & Marsal, or is it a more general
22    recollection that there were spreadsheets
23    involved in the discussions?
24    A.    It's a general recollection.
25    Q.    Do you have any recollection of
TSG Reporting - Worldwide    877-702-9580

Page 283

HIGHLY CONFIDENTIAL - M. KELLY
1   whether you reviewed the spreadsheet marked
2   within Exhibit 201, or some version of that
3   spreadsheet, with Alvarez & Marsal?
4   A.   No.
5   Q.   Do you have a recollection of whether
6   you reviewed the spreadsheet within 201 or any
7   version of that spreadsheet with anyone from
8   Weil Gotshal?
9   A.   My recollection is that there was --
10  there was spreadsheet or spreadsheets sent to
11  Weil, e-mailed to Weil, and discussions around
12  those spreadsheets. I don't recall if it was
13  specifically this form or a more simplified
14  version of it.
15  Q.   And by "this form," just for the
16  record, you're indicating Exhibit 201?
17  A.   Correct.
18  Q.   So let me press a little bit on that.
19  You have a recollection that spreadsheets were
20  reviewed, but you don't know if they were
21  spreadsheets in the form or format of Exhibit
22  201; is that right?
23  A.   Correct.
24  Q.   And did you review spreadsheets in the

TSG Reporting - Worldwide   877-702-9580

Page 284

HIGHLY CONFIDENTIAL - M. KELLY
1   form or format of Exhibit 201 with people from
2   Barclays?
3        And again, I can move us through this
4   topic a little more quickly. Let me withdraw
5   that question and contextualize a little bit.
6        Did you review spreadsheets in the
7   form or format of Exhibit 201 with Barclays as
8   opposed to other spreadsheets that may have
9   crossed people's desks in connection with the
10  deal?
11  A.   Again, it's difficult to pinpoint. I
12  think -- I don't recall discussing a spreadsheet
13  in this format, 201, with representatives from
14  Barclays, but Barclays assumed obligations to
15  perform services for Lehman, and so in that
16  context, as part of the Transition Services
17  Contract, there were conversations.
18  Q.   In connection with the Transition
19  Services Agreement, would those conversations
20  have taken place after the closing on September
21  22 --
22  A.   Yes.
23  Q.   -- or before?
24       After?

TSG Reporting - Worldwide   877-702-9580

Page 285

HIGHLY CONFIDENTIAL - M. KELLY
1   A.   After.
2   Q.   Did you review with anyone from
3   Barclays the transaction adjustments that we
4   were talking about with regard to the
5   spreadsheet within 201 to compensation and trade
6   payables?
7   A.   I don't think so.
8   Q.   Did you ever review those transaction
9   adjustments with folks from Barclays either
10  before or after the transaction?
11  A.   I don't think so.
12  Q.   Do you have any knowledge one way or
13  the other, sir, whether Barclays or anyone who
14  worked for Barclays was aware of the $1 billion
15  transaction adjustment to compensation that's
16  reflected in Exhibit 201?
17  A.   I'm sorry. Can you repeat the
18  question? Am I aware?
19  Q.   Do you have any basis to know whether
20  anyone at Barclays was aware of the $1 billion
21  transaction adjustment shown within Exhibit 201?
22  A.   No.
23  Q.   Do you have any basis to know whether
24  anyone at Weil Gotshal was aware of the

TSG Reporting - Worldwide   877-702-9580

Page 286

HIGHLY CONFIDENTIAL - M. KELLY
1   transaction adjustment, the $1 billion
2   transaction adjustment shown within Exhibit 201?
3   A.   No.
4   Q.   Do you have any basis to know whether
5   anyone at Weil Gotshal was aware of the $1
6   billion transaction adjustment in Exhibit 201?
7   A.   I'm sorry, could you repeat that last
8   question?
9   Q.   Do you have any basis to know whether
10  anyone at Weil Gotshal was aware of the $1
11  billion transaction adjustment shown in Exhibit
12  201?
13  A.   No, I don't, but I should -- I mean, I
14  should say for all these questions I don't know
15  what the transaction adjustment's meant to
16  represent. So, my answer is no.
17       (Exhibit 427, a document bearing Bates
18  Nos. BCI-EX-00115126 through 140, for
19  identification, as of this date.)
20  Q.   Before we go to 427, if you don't
21  mind, I'm putting back before you what we marked
22  as Exhibit 136A, Mr. Kelly. That's your e-mail
23  that we spent a fair amount of time on at your
24  last deposition concerning a $5 billion overall

TSG Reporting - Worldwide   877-702-9580

Page 287

**HIGHLY CONFIDENTIAL - M. KELLY**

1    economic loss versus the marks.
2        Did you ever discuss the contents of
3    that e-mail with anyone from Alvarez & Marsal?
4        MR. STERN: Objection to the form.
5    A.    I may have. I don't recall, though.
6    Q.    When you say you may have, do you have
7    any recollection one way or the other?
8    A.    No.
9    Q.    Did you ever discuss the contents of
10   that e-mail with anybody from Weil Gotshal?
11       MR. STERN: Objection to the form.
12   A.    I don't recall.
13   Q.    And again, you don't recall one way or
14   the other?
15   A.    Correct.
16   Q.    Did you ever discuss the contents of
17   that e-mail with anybody from Barclays?
18   A.    No.
19   Q.    Did you ever discuss the contents of
20   that e-mail with anybody from Simpson Thacher?
21   A.    I don't believe so.
22   Q.    Did you ever discuss the contents of
23   that e-mail with anybody from the Creditors
24   Committee?

Page 288

**HIGHLY CONFIDENTIAL - M. KELLY**

1    A.    No, I don't believe I ever met the
2    Creditors Committee.
3    Q.    And did you ever discuss the contents
4    of that e-mail with anybody from Deloitte?
5    A.    Same answer.
6    Q.    Actually, if you could turn back to
7    Exhibit 427, I'll take 136 back. Thanks.
8        Now, we have put before you what's
9    marked as Deposition Exhibit 427, Mr. Kelly.
10   Would you take a look through the document
11   sufficiently to tell me, please, whether you
12   have seen it before and whether the handwriting
13   that appears on the third page of the document
14   is yours.
15   A.    There's several documents stapled
16   together here, so I need to answer for each of
17   them.
18   Q.    Okay.
19   A.    I don't recall seeing the front
20   spreadsheets before, which is first six pages,
21   but the handwriting is my writing. I do recall
22   seeing the section that's labeled "Consolidating
23   Balance Sheets."
24   Q.    Okay.

Page 289

**HIGHLY CONFIDENTIAL - M. KELLY**

1    A.    I don't recall the last five or six
2    pages labeled "LBI Fails."
3    Q.    Let's go to the first six pages, the
4    ones that contain your handwriting. I want to
5    focus on those for a little while here.
6        You don't recall the document in
7    particular, but you do recognize your
8    handwriting on it?
9    A.    I recognize my handwriting. I
10   recognize the format of the document.
11   Q.    Uh-huh.
12   A.    I've seen this type of format before.
13   I don't recall seeing this version of it, but it
14   is my handwriting.
15   Q.    You would agree with me, would you
16   not, that the format, you've seen this version
17   before --
18   A.    Yes.
19   Q.    -- is the same format as the
20   spreadsheet we saw within Exhibit 201, correct?
21   A.    Yes.
22   Q.    Do you have any recollection of the --
23   actually, let me be clear. Let me put 201 back
24   in front of you.

Page 290

**HIGHLY CONFIDENTIAL - M. KELLY**

1        Those first six pages are in the
2    format of 201, but they're not the same version,
3    if you could compare some of the numbers and see
4    that. For example, take a look at the second
5    page of Exhibit 427 and the same sections we
6    were looking at before, Bonus Payable and Cure
7    Payments, Accounts Payable, you see there's a
8    difference in terminology and there are some
9    different numbers in the columns 8/31, 9/17 and
10   balance sheet; is that right?
11   A.    That's right.
12   Q.    So this is a different version of that
13   form of spreadsheet, correct?
14   A.    Correct.
15   Q.    Do you have a, back on Exhibit 427, do
16   you have a recollection of the setting in which
17   you put your handwritten notes on this document?
18   A.    Sorry, what do you mean by "setting"?
19   Q.    Do you remember where you were, who
20   you were with, why you wrote these handwritten
21   notes?
22   A.    Well, it was -- it was around the
23   overall effort to estimate what remained after
24   the sale. There was a whole number of

Page 291

HIGHLY CONFIDENTIAL - M. KELLY

1  conversations around it in different locations
2  over a course of many days.
3      Q.  There may have been -- and if you have
4  to speculate, tell me -- but there may have been
5  more than one meeting where you found yourself
6  writing handwritten notes on a spreadsheet like
7  this, is that --
8      A.  I expect so, yeah.
9      Q.  And do you have any recollection about
10  these particular -- when you would have put
11  these particular notes on this particular
12  document?
13      A.  No.
14      Q.  Can you tell me whether it was before
15  or after the closing on September 22?
16      A.  It was likely the days before the
17  closing, because my recollection is when that
18  is -- that was then the -- sorry, that was when
19  the activity was concentrated, but it may not
20  have been.
21      Q.  Okay.  At the lower left-hand corner
22  of -- I'm at the page of the document bearing
23  Bates number 115128, it's the third page of the
24  document, the one with all handwritten notes on

TSG Reporting - Worldwide    877-702-9580

Page 292

HIGHLY CONFIDENTIAL - M. KELLY

1  it.  Take a look, if you would, at the lower
2  left-hand corner.  There are three notes each
3  with an arrow.
4      Are you with me in the document?
5      A.  Yes.
6      Q.  It's the third arrow.  I'm having a
7  little trouble with the handwriting.  Could you
8  read that to me, please?
9      A.  I think it says "other" and then under
10  the arrow, "determine how much to LEH estate and
11  how much."
12      Q.  And does it continue in the upper
13  right-hand piece there?
14      A.  Possibly.  Possibly.  "How much in
15  inventory and which is not encumbered by another
16  3P," third party.
17      Q.  And then further, if you -- if I could
18  just steer you through the document a bit here,
19  take a look at the Transaction Adjustments
20  column.
21      A.  Uh-huh.
22      Q.  Now go to the -- there's some
23  handwritten notes toward bottom of that.  Do you
24  see that?

TSG Reporting - Worldwide    877-702-9580

Page 293

HIGHLY CONFIDENTIAL - M. KELLY

1      A.  Yes.
2      Q.  There's one circled, and below that
3  where it says "49 in Barclays box tonight," do
4  you see that?
5      A.  Yes.
6      Q.  I'm having trouble with the
7  handwriting after that.  Could you read that
8  block note into the record, please?
9      A.  I believe that's shorthand for
10  "combination of what is with Fed and repo with
11  Barclays."
12      Q.  Do you have an understanding of what
13  you were referring to with that note on this
14  document?
15      A.  Well, I know that at some point
16  Barclays provided some repo financing, so I
17  would presume it's -- it's related to that.
18      Q.  Other than the fact that you know that
19  at some point Barclays provided some repo
20  financing, do you have any knowledge of any role
21  what that repo financing played in the deal as
22  it ultimately closed?
23      A.  No.
24      Q.  Do you have any knowledge one way or

TSG Reporting - Worldwide    877-702-9580

Page 294

HIGHLY CONFIDENTIAL - M. KELLY

1  the other?
2      A.  No.
3      Q.  Would you turn to the next page of the
4  exhibit, please, bearing Bates number 115129.
5      Is that your handwriting on that page?
6      A.  Yes.
7      Q.  And again, sir, if you take a look at
8  the Trade Liabilities -- I beg your pardon, at
9  the Bonus Payable line in the Payables section.
10  I'm going to read across the line there.  Are we
11  in the same place on the document?
12      A.  Yes.
13      Q.  Okay.  Here the bonus payable for 8/31
14  and 9/17/08 is shown at nil, do you see that?
15      A.  Yes.
16      Q.  And the transaction adjustment shown
17  on the document, as typed, is 1,500,000,000, do
18  you see that?
19      A.  Yes.
20      Q.  And that is in handwriting.  That's
21  crossed out and 2 billion is written above that,
22  do you see that?
23      A.  Yes.
24      Q.  Is that your handwriting there?

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - M. KELLY

1
2    A.    Yes.
3    Q.    Do you know why you increased that
4    number from 1,500,000,000 to 2 billion?
5    A.    I would have to speculate.
6    Q.    Okay, if you could, and then we'll
7    follow up on that.
8    A.    Well, I would speculate that it's
9    representative of the bonus liability that
10   Barclays assumed.  However, reflecting it as an
11   adjustment to Lehman doesn't make sense because
12   it was not a liability of Lehman.
13   Q.    Apart from whether it was or was not a
14   liability of Lehman, my questions, Mr. Kelly, go
15   to the number itself.  Do you know why you
16   increased the number from 1 and a half billion
17   to 2 billion?
18   A.    Not beyond my speculation.
19   Q.    Do you have any knowledge as to the
20   information that may have been available to you
21   when you increased the number from 1 and a half
22   billion to 2 billion?
23   A.    No.
24   Q.    So as you look at this document now,
25   do you have any explanation for why you

HIGHLY CONFIDENTIAL - M. KELLY

1
2    increased the number from 1 and a half billion
3    to 2 billion?
4    A.    Well, 2 billion is consistent with
5    what I think my understanding was back on Monday
6    night around the assumed obligation.
7    Q.    Okay.
8    A.    So I would surmise it's related to
9    that.
10   Q.    We have to always put dates on the
11   Monday night.
12   A.    Sorry.
13   Q.    Is that Monday, the 15th of September?
14   A.    Right.  Monday night/Tuesday morning,
15   the 15th/16th.
16   Q.    Do you know if the books and records
17   of Lehman reflected a liability for 2 billion in
18   bonus payable?
19   A.    No, they did not.
20   Q.    If you turn to the next page of the
21   document, please.  And again, it's a general --
22   as a general matter across the notes, are these
23   notes in your handwriting?
24   A.    Yes.
25   Q.    And in the lower -- actually, there's

HIGHLY CONFIDENTIAL - M. KELLY

1
2    one -- there's a note that's written vertically
3    up the document that I believe says "clarifying
4    amendment, schedules of inventory," do you see
5    that?
6    A.    Yes.
7    Q.    Do you know what you meant when you
8    wrote that on the document.
9    A.    No, I don't recall.
10   Q.    Do you recall discussions with anyone
11   about a clarifying amendment?
12   A.    I became aware at some point that
13   there was a clarifying -- or, I should say a
14   clarification to the original transaction
15   because the terms had changed so much.
16   Q.    How did you become aware that there
17   was a clarification of the agreement because the
18   terms had changed so much?
19   A.    I don't recall.
20   Q.    Do you recall who informed you of that
21   fact?
22   A.    No.
23   Q.    Do you recall ever seeing a copy of
24   that clarification?
25   A.    I don't think I ever saw it.

HIGHLY CONFIDENTIAL - M. KELLY

1
2    Q.    Did you ever discuss that
3    clarification with anyone from Alvarez & Marsal,
4    Weil, Simpson Thacher or Deloitte?
5    A.    Not that I can recall.
6    Q.    Now, in the lower right-hand corner,
7    again, turning the document to Profile, there
8    are notes that say "bonus" and then three other
9    entries below that.  Are you with me on the
10   document?
11   A.    Yes.
12   Q.    Are those notes "bonus" -- does "TFR"
13   stand for "transfer"?
14   A.    Yes.
15   Q.    And what does "SA" stand for below
16   that?
17   A.    I believe that means fixed assets.
18   Q.    Okay.  And the word below that is
19   "cure"; is that right?
20   A.    Correct.
21   Q.    Is that a reference to the trade
22   payables?
23   A.    Not directly, I don't think.  I think
24   it's a broader reference to liabilities that
25   Barclays was assuming.

Page 299

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Q.   And do you recall why you put that
3    cure number at 1645 when you made this note on
4    the document?
5    A.   No, I don't recall.
6    Q.   Would you turn the page of the
7    document, please. And again, in the Liabilities
8    column, I direct your attention to the items
9    Payables and where there's an entry for Bonus
10   Payable and Cure Payments; you with me on the
11   document?
12   A.   Yes.
13   Q.   And again, I want to move from left to
14   right across there into the Transaction
15   Adjustments column.
16       The two numbers that you had written
17   by hand on the previous page for bonus, 2
18   billion, and for cure, 1645, appear on this
19   document as transaction adjustments. Do you see
20   that?
21   A.   Yes.
22   Q.   And when those transaction adjustments
23   are taken into account, the column Balance Sheet
24   Transferred comes to amounts of 2 billion for
25   bonus and 2,250,000,000 for cure; do you see
TSG Reporting - Worldwide    877-702-9580

Page 300

HIGHLY CONFIDENTIAL - M. KELLY
1
2    that?
3    A.   Yes.
4    Q.   Do you know what the basis was for
5    that calculation for bonus and cure?
6        MR. BERNSTEIN:  Do you want to break
7    that into two questions?
8        MR. GAFFEY:  Okay.
9    Q.   Do you know what the basis was for the
10   calculation of 2 billion for bonus in the
11   Balance Sheet Transferred column?
12   A.   I surmise that that's consistent with
13   what I understood to be the bonus obligation
14   that Barclays was assuming. But again, I would
15   note that that's -- that's not necessarily a
16   liability of Lehman.
17   Q.   Okay. With respect to the number --
18   my question is not the issue of whether it is or
19   is not a liability for Lehman. Do you know
20   where the number $2 billion came from?
21   A.   The only source of that number I have
22   is a conversation with Bob McDade on the Monday
23   night of the 15th.
24   Q.   And I won't take your time with that
25   again. We spoke at some length about that at
TSG Reporting - Worldwide    877-702-9580

Page 301

HIGHLY CONFIDENTIAL - M. KELLY
1
2    your prior deposition, but other than that
3    conversation with Mr. McDade, did you have a
4    basis for any understanding of why the bonus
5    number was put at 2 billion?
6    A.   No.
7    Q.   And with respect to the cure payment
8    item, which in the Balance Sheet Transferred
9    column comes to 2,250,000,000, do you have any
10   understanding of the basis for that number?
11   A.   Well, that number's consistent with
12   what I understood the estimate of that component
13   to be on the same Monday night.
14   Q.   And do you know who made that estimate
15   of 2,250,000,000?
16   A.   No.
17   Q.   If you read over, moving left along
18   that line on the spreadsheet, and go to the
19   column 9/17/08, you see the cure payments are
20   put at 605 million; is that correct?
21   A.   Yes.
22   Q.   Do you know why an adjustment was made
23   from 605 million to 2,250,000,000?
24   A.   No, I don't.
25   Q.   Do you understand looking at this
TSG Reporting - Worldwide    877-702-9580

Page 302

HIGHLY CONFIDENTIAL - M. KELLY
1
2    sheet that the $605 million number for cure on
3    9/17/08 was drawn from the books of Lehman?
4    A.   I'm sorry, at what date?
5    Q.   At 9/17/08.
6    A.   No, I don't know that.
7    Q.   Let me ask you the same question with
8    respect to the 8/31/08 column. Do you know
9    where the 701 shown there came from?
10   A.   I would expect that was from the
11   general ledger, and it's supported by the normal
12   process.
13   Q.   So let's focus then on the 701 shown
14   in the month-end number, 8/31/08. Do you have
15   any knowledge as to why that number was the
16   subject of a transaction adjustment in the
17   amount of 1,645,000,000?
18   A.   No, not beyond what I previously
19   stated.
20   Q.   Did you ever discuss these transaction
21   adjustments with anybody from Alvarez & Marsal,
22   Weil, or Simpson Thacher?
23       MR. BERNSTEIN:  Could I ask you to
24   break that down? Did you mean did he ever
25   discuss both of them?
TSG Reporting - Worldwide    877-702-9580

Page 303

HIGHLY CONFIDENTIAL - M. KELLY
1
2      MR. GAFFEY: Let's say either one of
3  them.
4      Q.  Did you ever discuss either one of
5  those transaction adjustments with anybody from
6  Weil, Alvarez & Marsal, or Simpson Thacher?
7      A.  It may have been identified on the
8  spreadsheets that we sent to -- to Alvarez, and
9  possibly Weil, but I don't recall exactly what
10  was sent to them and, therefore, what the
11  conversations were.
12      Q.  So you don't know?
13      A.  No, I don't know.
14      Q.  You don't know one way or the other?
15      A.  I don't know specifically.
16      Q.  You said you don't know specifically.
17  Do you have any general recollection of
18  discussing either of those transaction
19  adjustments with anybody from Alvarez & Marsal
20  or Weil?
21      MR. BERNSTEIN: Can I, just to be
22  clear, are you asking for a discussion or
23  are you asking for any form of
24  communication, for example, sending
25  something over by e-mail in or out of your

TSG Reporting - Worldwide    877-702-9580

Page 304

HIGHLY CONFIDENTIAL - M. KELLY
1  question?
2      MR. GAFFEY: Let me break it down to
3  be clear.
4      Q.  You testified before that some
5  spreadsheets of some kind may have been sent to
6  Alvarez or Weil?
7      A.  Uh-huh.
8      Q.  Do you though if this spreadsheet was
9  sent over to Alvarez or to Weil?
10      A.  This spreadsheet specifically, no.
11      Q.  Do you know if spreadsheets that
12  showed transaction adjustments such as the ones
13  we've been talking about were sent over to
14  Alvarez or to Weil?
15      A.  They may have been, but I don't know
16  for sure.
17      Q.  You don't know one way or the other?
18      A.  Correct.
19      Q.  And did you have discussions with
20  anyone from Alvarez or Weil about the
21  transaction adjustments that are shown in the
22  spreadsheet that's -- in spreadsheets like this?
23      A.  I may have, but I don't know.
24      Q.  Do you know one way or the other?
25

TSG Reporting - Worldwide    877-702-9580

Page 305

HIGHLY CONFIDENTIAL - M. KELLY
1
2      A.  No.
3      (Exhibit 428, a document bearing Bates
4  Nos. BCI-EX-00115142 through 153, marked for
5  identification, as of this date.)
6      Q.  Mr. Kelly, I have put before you what
7  we have marked as Deposition Exhibit 428. Would
8  you look through the document sufficiently to
9  tell me whether you recognize it and whether any
10  of the handwriting on the document is yours.
11      (Document review.)
12      A.  Similar to the last exhibit, there's
13  actually a number of different documents stapled
14  together here. I do recognize the format of
15  each of the documents. I don't recall the
16  specific numbers or seeing this particular
17  version, but the handwriting throughout is my
18  handwriting.
19      Q.  I should say to you, this may come up
20  with a couple of the sets of notes that we show
21  you, Mr. Kelly, I'm stapling them together
22  because our understanding is that they're
23  produced as, you know, a unitary document to us.
24  So there may be some of your notes, sir, however
25  they were filed and copied, but I can't vouch

TSG Reporting - Worldwide    877-702-9580

Page 306

HIGHLY CONFIDENTIAL - M. KELLY
1  for what's stapled together and what's not. I
2  don't have any knowledge of my own, so I can't
3  fix that issue.
4      Even if you don't have a recollection
5  of the particular document, of the particular
6  version of the document, can you tell me what
7  the first two pages of Exhibit 428 are?
8      A.  The first page appears to be a
9  simplified balance sheet of LBI at two different
10  dates and then a comparison of -- of what's
11  labeled the Purchase Agreement with an adjusted,
12  I would think, estimated balance sheet at 9/19.
13      The second page appears to be a
14  similar analysis for the Lehman Group,
15  consolidated, but does not include the Purchase
16  Agreement column.
17      Q.  Do you know where the -- let's just
18  take the asset piece on the first page. Do you
19  know where the -- actually, withdrawn.
20      Do you know where the numbers in the
21  Purchase Agreement column on the first page of
22  the document came from?
23      A.  My recollection is that they're
24  consistent, although I would need to check, that

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - M. KELLY

1  they're consistent with the one-page simplified
2  balance sheet from the same Monday night.
3      Q.  Showing you what was marked at a prior
4  deposition as Exhibit 19. Is that what you were
5  referring to when you were talking about the
6  simplified balance sheet?
7      A.  Yes, it is.
8      Q.  And back on Exhibit 428, directing
9  your attention to the column 9/19/2008 Adjusted,
10  are you with me on the document?
11      A.  Yes.
12      Q.  Do you know what the basis was for the
13  adjustments shown in that column?
14      A.  I don't think they're adjustments. I
15  think that's intended to represent what the
16  adjusted balance sheet was at that date, but the
17  numbers, the numbers I don't recognize.
18      Q.  Going to the bottom of that column,
19  the 9/19/2008 Adjusted column, you'll see an
20  entry for Out of Balance by 1744. You with me
21  on the document?
22      A.  Yes.
23      Q.  Do you know what accounts for the
24  Adjusted column winding up out of balance?

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - M. KELLY

1      A.  Yeah, I think this is consistent with
2  the prior exhibit in that -- in that any balance
3  sheet or any -- any estimate of a balance sheet
4  at 9/19 or another date around about then was
5  simply an estimate derived from multiple sources
6  and not off the firm's general ledger, and that
7  would explain why -- why it doesn't balance. If
8  the source had been the general ledger, it would
9  balance.
10      Q.  Do you know if the entries in the
11  column 9/19/2008 Adjusted have any relation to
12  the sale transaction as it stood on the 19th of
13  September?
14      A.  No.
15      Q.  Do you know if the entries in the
16  Assets portion of the 9/19/2008 Adjusted column
17  reflect in any way the assets that were, as of
18  September 19, to be transferred to Barclays?
19      A.  No.
20      Q.  If you turn to page 115144 of the
21  document, it's a few pages in, and so I know
22  we're in the same place, it's on the typewritten
23  portion of the document that says "Draft -
24  Subject to Change" in the center top. You with

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - M. KELLY

1  me?
2      A.  Yes.
3      Q.  Do you know what this document is?
4      A.  I think this was an earlier version of
5  the spreadsheet from the prior exhibit, again,
6  intended to show an estimate of the balance
7  sheet before and after the transaction.
8      Q.  Is that your handwriting on the
9  document?
10      A.  Yes.
11      Q.  Do you have a recollection of the
12  information you were using to -- when you made
13  these handwritten entries in the column marked
14  Pro Forma Adjustment #2?
15      A.  I'm sorry, did you ask the source of
16  the information?
17      Q.  Let me be a little clearer in my
18  question. Just directing your attention to the
19  third column, it's called Pro Forma Adjustment
20  #2. You with me on the document?
21      A.  Yes.
22      Q.  And below that in your handwriting it
23  says "Inventory Begins 9/19"; is that right?
24      A.  No, I think it says "Inventory" --

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - M. KELLY

1  "Inventory Buy-Ins 9/19."
2      Q.  Oh, okay. Do you know what is -- what
3  do you mean when you write "Inventory Buy-Ins"?
4      A.  No, I don't.
5      Q.  Do you have any knowledge or
6  recollection of the basis for the numbers you
7  put in that column?
8      A.  No.
9      Q.  Do you know what you're trying to
10  reflect in the numbers that you put in that
11  column?
12      A.  I would speculate that it's trying to
13  adjust inventory for known changes throughout
14  the course of that week.
15      Q.  Would you turn to the next page of the
16  document, please, at 115145. Is the handwriting
17  on that page yours?
18      A.  Yes.
19      Q.  Do you recall when you put your
20  handwriting on this document?
21      A.  I don't recall, but I note the date of
22  9/20 on the top right corner.
23      Q.  That's under the word "sent"?
24      A.  It may say "Brett."

TSG Reporting - Worldwide    877-702-9580

Page 311

HIGHLY CONFIDENTIAL - M. KELLY
1
2   Q.   It may say "Brett"?
3   A.   It may say "Brett." It could say
4  "sent."
5   Q.   Do you know anyone named Brett you
6  were working on this transaction?
7   A.   Brett Beldner.
8   Q.   Do you know what the numbers on -- the
9  handwritten numbers at the right-hand side of
10 the document beginning at 9/20 -- let me put you
11 in the right place in the document. Upper
12 right-hand corner it appears to say "at 9/20,"
13 you with me?
14  A.   Yes.
15  Q.   Below that are a series of handwritten
16 entries, correct?
17  A.   Yes.
18  Q.   What do those entries reflect?
19  A.   I would speculate they don't seem to
20 relate to the other numbers on the page. They
21 seem to represent an estimate at that time of
22 what the balance sheet was at that time.
23  Q.   And the balance sheet of what?  Of
24 LBI?
25  A.   It says "LBI" on the top, so I would
TSG Reporting - Worldwide    877-702-9580

Page 312

HIGHLY CONFIDENTIAL - M. KELLY
1
2  surmise that is correct.
3   Q.   Now, by the 20th of September, is it
4  your understanding that the sale transaction had
5  been approved by the Court?
6       The 19th is the Friday.  The 20th is
7  the Saturday.
8   A.   I was aware that there was a court
9  hearing on the 19th.  I think I became aware on
10 the 20th that it had been approved.
11  Q.   Do you know what the number 52.8 --
12 I'm about midway down the column -- what that
13 represents?
14  A.   It's the sum of the numbers above.
15  Q.   And does that reflect the assets that
16 were transferred to Barclays in the sale
17 transaction?
18  A.   I don't know.
19  Q.   Do you have any knowledge one way or
20 the other?
21  A.   No.
22  Q.   Do you recall the setting or
23 circumstances under which you were making these
24 handwritten notes on this document?
25  A.   No.
TSG Reporting - Worldwide    877-702-9580

Page 313

HIGHLY CONFIDENTIAL - M. KELLY
1
2   Q.   Further down the document, below the
3  52.8 number, sir, is a, reading across the line
4  from total capital, it appears to say 3.3; do
5  you see that?
6   A.   Yes.
7   Q.   Do you know what that number
8  represents, 3.3?
9   A.   No.
10  Q.   Do you know if that represents the
11 capital gain to Barclays as a result of the
12 transaction?
13  A.   No.
14  Q.   Have you ever seen a calculation of
15 that being a capital gain for Barclays as a
16 result of the transaction?
17  A.   No.
18  Q.   Have you ever prepared or calculated
19 any capital gain to Barclays as a result of the
20 transaction?
21  A.   I was involved in that process in the
22 months following.
23  Q.   In the months following the closing?
24  A.   Months following.
25  Q.   Just so we're -- when you say the
TSG Reporting - Worldwide    877-702-9580

Page 314

HIGHLY CONFIDENTIAL - M. KELLY
1
2  months following, I want to be clear.  Let me
3  put question.  In the months following the
4  closing, after you had gone over to Barclays?
5   A.   Yeah, in the months following my
6  commencement of employment at Barclays.
7   Q.   And did you ever learn what the
8  capital gain was to Barclays resulting from the
9  transaction?
10  A.   Yes.
11  Q.   What did you learn it to be?
12  A.   It was consistent with what the firm
13 disclosed to the -- to the public.  So it was in
14 the order of $4 billion.
15  Q.   Would you turn, please, to page 115152
16 of Exhibit 428.  There are a few numbered items
17 in the upper right-hand corner of the page next
18 to the phrase "key issues" circled.  Are you
19 with me on the document?
20  A.   Yes.
21  Q.   Is that your handwriting?
22  A.   Yes.
23  Q.   Do you recall making this list of key
24 issues?
25  A.   No.
TSG Reporting - Worldwide    877-702-9580

Page 315

HIGHLY CONFIDENTIAL - M. KELLY

1  Q.  Do you recall writing the phrase
2  "marking book down"?
3  A.  No.
4  Q.  Do you have any explanation for the
5  phrase "marking book down" on this page of the
6  document?
7  A.  Yeah, I think that was to -- to
8  reflect the transaction on the books of Lehman.
9  Q.  What do you mean it was to reflect the
10 transaction on the books at Lehman?
11 A.  To reflect -- to reflect the
12 negotiated sales price.
13 Q.  So to reflect the negotiated sales
14 price that the books of Lehman would have to be
15 marked down; is that what I understand your
16 answer to mean?
17 A.  It actually depends on when. I think
18 on an overall basis at that point in the week,
19 and that's early the week of the 15th, that was
20 my understanding, yes.
21 Q.  Okay. Just to see if we can pinpoint
22 the time, the page we're looking at is a balance
23 sheet as of September 16. That would be the
24 Tuesday.

TSG Reporting - Worldwide    877-702-9580

Page 316

HIGHLY CONFIDENTIAL - M. KELLY

1  Does that help you to pinpoint or to
2  add any information about why you're writing
3  "marking book down"?
4  A.  I'd speculate that this is -- it's yet
5  another version, but probably an earlier
6  version, of a piece of the balance sheet.
7  Q.  To your understanding, is that at or
8  around the 16th, that's the Tuesday, it would be
9  necessary to mark Lehman's books down to reflect
10 the negotiated price in the transaction; is that
11 right?
12 A.  Just to be clear, let me just be my
13 understanding at that time, based on what I
14 understood the transaction to be at that time,
15 was that certain of the assets would have had to
16 have been marked down.
17 Q.  Did you have any discussions with
18 Alvarez & Marsal or Weil Gotshal or Simpson
19 Thacher about marking down the books to reflect
20 the negotiated price in the transaction?
21 MR. STERN:  Objection to the form.
22 A.  Nothing beyond what I said previously
23 this morning.
24 Q.  I just want to make sure we're not

TSG Reporting - Worldwide    877-702-9580

Page 317

HIGHLY CONFIDENTIAL - M. KELLY

1  mixing up questions and answers from this
2  morning. If you don't mind, let me put the
3  question again and ask you to answer it here as
4  opposed to referring to your testimony.
5  A.  Sure.
6  Q.  Did you have any discussions with
7  anyone at Alvarez & Marsal or Weil Gotshal or
8  Simpson Thacher about marking down the books to
9  reflect the negotiated price in the sale
10 transaction?
11 MR. STERN:  Objection to the form.
12 A.  Not specifically.
13 Q.  Did you have any -- when you say "not
14 specifically," do you have a general
15 recollection of such discussions?
16 A.  No.
17 Q.  Do you have any recollection of such
18 discussions?
19 A.  I'd speculate that the conversations
20 occurred, but I don't have a recollection.
21 Q.  When you say you'd speculate, the
22 question is do you have any memory one way or
23 the other about whether you had such
24 conversations?

TSG Reporting - Worldwide    877-702-9580

Page 318

HIGHLY CONFIDENTIAL - M. KELLY

1  A.  No.
2  MR. STERN:  At some point, if we could
3  take a break.
4  MR. GAFFEY:  Now's a good time. I'm
5  going to move to another document.
6  MR. STERN:  A short break.
7  (Recess; Time Noted:  10:37 A.M.)
8  (Time Noted:  10:47 A.M.)
9  (Exhibit 429, a document bearing Bates
10 Nos. BCI-EX-00115167 through 173, marked for
11 identification, as of this date.)
12 BY MR. GAFFEY:
13 Q.  You have before you, Mr. Kelly, what
14 we have marked as Deposition Exhibit 429, a set
15 of handwritten notes. Look through them,
16 please, sufficiently to tell me whether they're
17 your handwritten notes.
18 (Document review.)
19 A.  They are all mine, except page 2 is
20 not.
21 Q.  State that again, please.
22 A.  They are all mine, except page 2 is
23 not mine.
24 Q.  Did you keep a single notebook at

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - M. KELLY
1   around the time of the transaction, or was it
2   your habit to write, as I do, on a pad and just
3   make separate sets of notes?
4       A.   I tended to keep a single one, but I
5   think at this time we were in so many places
6   that it's possible I was writing on more than
7   one.  And I notice the third page and the fourth
8   page are a different format than the rest.
9       Q.   That's actually the reason I asked.
10      Are you able to tell me whether the
11  notes on pages 1 and 2 were taken at the same
12  time as the notes on pages 3 and 4 or whether
13  all four pages were taken in one sitting or they
14  were taken at different times?  Do you have any
15  knowledge of that?
16      A.   No.
17      Q.   Now, on the third page of the notes,
18  that's at page 115171, the Bates number at the
19  bottom.  You with me?
20      A.   The third page, yeah.
21      Q.   There is a note at the top that
22  says -- does that say, "What locked up?"
23      A.   Yes.
24      Q.   Okay.  And the name Gerard, do you see

HIGHLY CONFIDENTIAL - M. KELLY
1   that?
2       A.   Yes.
3       Q.   Do you know who that's a reference to?
4       A.   I think that's referring to Gerard
5   LaRocca.
6       Q.   Do you recall the circumstances under
7   which you took the notes on this page?
8       A.   No.
9       Q.   Do you recall if you took all the
10  notes on this page at the same meeting, do you
11  know?
12      A.   No.
13      Q.   If you would turn to the second -- the
14  next page at 5172.  There's a name Diane, it
15  says "CFO Apollo"?
16      A.   Yes.
17      Q.   Do you know if those notes were taken
18  at the same time as the notes taken on the prior
19  page?
20      A.   No.
21      Q.   Could you turn back to the prior page,
22  please, 5171.  There's a reference here to, does
23  that say Andy?
24      A.   Yeah, it looks like it.

HIGHLY CONFIDENTIAL - M. KELLY
1       Q.   And then there's phone number and it
2   says Alvarez.  Do you know who that is?  Who
3   that refers to?
4       A.   No.
5       Q.   Do you recall meeting with anyone
6   named Andy from Alvarez?
7       A.   No.
8       Q.   Do you know if these notes reflect a
9   meeting with anybody named Andy at Alvarez?
10      A.   No.
11      Q.   And below that is the name Gary
12  Romain, do you see that?
13      A.   Yes.
14      Q.   Do you know Gary Romain from Barclays?
15      A.   Yes.
16      Q.   Do these notes reflect a meeting with
17  Mr. Romain?
18      A.   I don't know.
19      Q.   And below that is the name Ian.  Is
20  that a reference to Ian Lowitt?
21      A.   I would expect so.
22      Q.   Do you know if these notes reflect a
23  meeting with Mr. Lowitt?
24      A.   I don't know.

HIGHLY CONFIDENTIAL - M. KELLY
1       Q.   I take it you wouldn't be able to tell
2   me one way or the other whether the content of
3   the document that follows relates in any way to
4   a meeting with any of those four people named,
5   Ian Lowitt, Gary Romain, Andy and Gerard
6   LaRocca?
7       A.   That's correct.
8       Q.   Do you know if you were with anyone
9   when you took these notes?
10      A.   It's likely I took them in a meeting.
11  I don't know who it was with.
12      Q.   When you say it's likely, do you have
13  a reason for thinking it's likely or are you
14  speculating?
15      A.   I tended to just write notes in
16  meetings.
17      Q.   Did you write notes at other times?
18      A.   Sometimes off phone calls.
19      Q.   Do you know if this was a meeting or
20  off a phone call?
21      A.   No.
22      Q.   Do you know if these were notes you
23  might have taken just sitting doing some
24  calculations yourself?

Page 323

HIGHLY CONFIDENTIAL - M. KELLY

1    A.    No.
2    Q.    Now, in the middle of the page,
3    there's a -- there are three entries that I
4    think say "Cash," "Inventory" and "Rec. 15c3";
5    is that right?  Do you see those?
6    A.    Yes.
7    Q.    Am I reading those correctly?
8    A.    Yes.
9    Q.    All right.  I want to ask you some
10   questions about those entries and the numbers to
11   the right of them.  Do you know, do you know
12   what this calculation is meant to indicate?
13   A.    I would speculate that it's a version
14   of the assets that were due to be sold to
15   Barclays.
16   Q.    And do you know where the entry
17   44.846, what the basis for that entry is with
18   regard to inventory?
19   A.    No.
20   Q.    Do you know what the basis is for the
21   entry 1,000 next to the 15c3 item?
22   A.    That is consistent with an
23   understanding I had at some time around what the
24   value in the 15c3 calculation was.
25   TSG Reporting - Worldwide    877-702-9580

Page 324

HIGHLY CONFIDENTIAL - M. KELLY

1    Q.    Did your understanding change over
2    some period of time that the final value on the
3    15c3 was a bit less than that?
4    A.    Well, it depends at what point in time
5    you're referring to.
6    Q.    At the time of the closing?
7    A.    At the time of the closing, to the
8    best of my recollection, that's -- that's
9    consistent with what I thought the excess was.
10   Q.    Do these notes indicate that at some
11   point it was your understanding that
12   approximately $52.8 billion worth of assets went
13   over to Barclays in the transaction?
14   A.    I'm sorry, could you repeat that,
15   please?
16   Q.    Do these notes indicate to you that at
17   some point it was your understanding that
18   approximately $52.846 billion worth of assets
19   went over to Barclays in the transaction?
20   MR. STERN:  Objection to the form.
21   A.    I'm not sure when I wrote these notes,
22   so, yeah, so --
23   Q.    That's why I qualified the question by
24   saying "at some point."  Was it at some point
25   TSG Reporting - Worldwide    877-702-9580

Page 325

HIGHLY CONFIDENTIAL - M. KELLY

1    your understanding that was the amount that went
2    over to Barclays?
3    A.    Well, I'm just questioning the use of
4    the word "went" because I'm not sure if it was
5    an understanding of what went or what might have
6    gone.
7    Q.    Okay.
8    A.    But I think it's fair to say that at
9    some point it represented an estimate of what I
10   thought may, may have, or may have been about to
11   go.
12   Q.    Okay.  Just slightly up to the right
13   of these numbers is a word in a circle.  Do you
14   see that?
15   A.    The top circle?
16   Q.    We're in the middle of the document
17   next to that calculation, and there's a circled
18   word?
19   A.    Oh, yes.
20   Q.    Do you see that?  What's that word?
21   MR. BERNSTEIN:  Just to be clear,
22   there are two circled words.  Are you asking
23   about the higher or the lower?
24   MR. GAFFEY:  The higher one.
25   TSG Reporting - Worldwide    877-702-9580

Page 326

HIGHLY CONFIDENTIAL - M. KELLY

1    MR. BERNSTEIN:  I was confused.
2    Q.    Does that say "went"?
3    A.    No, I think that's that says "Weil."
4    I think.
5    Q.    Do you know what is indicated by --
6    apart from the fact that it's a law firm, do you
7    know why you wrote the word "Weil" on that page?
8    A.    It may have been referring to a
9    conversation with Weil, but I'm not sure.
10   Q.    Do you know one way or the other?
11   A.    No.
12   Q.    So when you say it may have been,
13   that's speculation on your part?
14   A.    Yes.
15   (Exhibit 430, a document bearing Bates
16   Nos. BCI-EX-00115297 through 313, marked for
17   identification, as of this date.)
18   Q.    I put before you, Mr. Kelly, what we
19   have marked as Deposition Exhibit 430, a series
20   of handwritten notes bearing Bates numbers
21   115297 through 115313, not all handwritten
22   notes, but it's largely handwritten notes.
23   Would you look through the document
24   sufficiently to tell me whether you recognize it
25   TSG Reporting - Worldwide    877-702-9580

Page 327

HIGHLY CONFIDENTIAL - M. KELLY

1    HIGHLY CONFIDENTIAL - M. KELLY
2    and whether it's your handwriting.
3        (Document review.)
4        A.   Yeah, it's all my handwriting, except
5    on the last page, that's not my handwriting.
6        Q.   That's not your handwriting at the
7    bottom of that typewritten sheet that's the last
8    page; is that right?
9        A.   Correct.
10       Q.   Did you prepare the typewritten sheet?
11       A.   No.
12       Q.   Do you know whose handwriting that is?
13       A.   No, I don't.
14       Q.   Okay.  If you would, do you have a
15   sense, sir, of whether -- I'll ask you the same
16   question I asked you about the last document --
17   whether these notes were taken as part of a
18   single pad or notebook or whether it's a
19   collection of disparate notes?
20       A.   It looks to be the same notepad,
21   although the order, the sequence doesn't look
22   right.
23       Q.   Okay.  I don't want to spend a lot of
24   time on this, but is there a particular reason
25   the sequence doesn't look right to you?
TSG Reporting - Worldwide    877-702-9580

Page 328

HIGHLY CONFIDENTIAL - M. KELLY

1    HIGHLY CONFIDENTIAL - M. KELLY
2        A.   Yeah, the second page -- there may be
3    several reasons, but the second page I think is
4    referring to a -- a spin-off transaction of the
5    commercial real estate book that we were looking
6    at, and that certainly preceded anything around
7    the transaction with Barclays.
8        Q.   And if you would go back to the first
9    page of the document where it refers to an
10   orderly liquidation, do you see that?
11       A.   Yes.
12       Q.   That's a concept that came into play
13   in connection with the bankruptcy, right, the
14   orderly liquidation of the broker-dealer?
15       A.   Yeah, I believe so.
16       Q.   That's not a concept that was being
17   discussed in that period prior to what we'll
18   call bankruptcy weekend --
19       A.   Correct.
20       Q.   -- leading up to the week -- okay.
21       Could you turn to page 5299, please,
22   the third page of the document.  Are you able to
23   tell by looking at this page, along the lines
24   we've just been discussing, at what point you
25   would have been taking these notes, making these
TSG Reporting - Worldwide    877-702-9580

Page 329

HIGHLY CONFIDENTIAL - M. KELLY

1    HIGHLY CONFIDENTIAL - M. KELLY
2    notes?
3        A.   Well, they seem to be unrelated to
4    each other.  I don't -- I don't know about the
5    top third of the page.  I'm not sure what the
6    middle section is referring to, "Cash for
7    severance." I don't think that was connected to
8    the -- to the Barclays transaction.
9        Q.   Okay.
10       A.   But the very last line looks like it
11   says, "Fed will give DIP financing at Holdings,"
12   which would tend to imply was the bankruptcy
13   weekend.
14       Q.   Okay.  In the note on the upper
15   right-hand corner that says, "Need 5 billion to
16   cover expenses," do you see that?
17       A.   Hum.
18       Q.   First, is that what it says?  It's
19   your handwriting, not mine, so...
20       A.   Yes, it is.
21       Q.   Do you know what you meant when you
22   made that note, "Need 5 billion to cover
23   expenses"?
24       A.   No.
25       Q.   Was that a reference of some kind to a
TSG Reporting - Worldwide    877-702-9580

Page 330

HIGHLY CONFIDENTIAL - M. KELLY

1    HIGHLY CONFIDENTIAL - M. KELLY
2    cushion that Barclays needed in the deal in
3    order to fund the liabilities it was assuming?
4        A.   I don't know what it refers to.
5        Q.   Would you turn to page 115302, please.
6    Take a look through the two entries on that
7    page, please.  Let me know when you've had a
8    chance to read them to yourself.
9        A.   Okay.
10       Q.   The first entry there -- tell me if
11   I'm reading this correctly -- says "cushion"?
12       A.   I'm sorry, I'm on the wrong page.
13       Q.   Okay.  5302, in the lower right-hand
14   corner.
15       A.   Sorry.  Yeah.
16       Q.   Are you with me?
17       A.   Yes.
18       Q.   And the first line there says
19   "cushion," is that what that says?
20       Actually, let me -- can you read
21   across the first line into the record, please.
22       A.   Yes, I think it says "Cushion.
23   Proceeds $3 billion minus BV," for "book value."
24       Q.   And what did you mean to indicate when
25   you made that note?
TSG Reporting - Worldwide    877-702-9580

Page 331

1    HIGHLY CONFIDENTIAL - M. KELLY
2    A.    I don't know.  I can't put this in
3    context.
4    Q.    Do you recall, in connection with the
5    sale transaction, any discussion about a cushion
6    for Barclays?
7    A.    No.
8    Q.    Do you recall, in connection with the
9    sale transaction, any discussion of a cushion?
10    A.    No.
11    Q.    Are you able to lend any knowledge or
12    information to why the word "cushion" would be
13    used on this page in connection with the sale
14    transaction?
15    A.    No.
16    Q.    That was not a concept in which --
17    that came up in any discussion in which you took
18    part concerning the sale transaction?
19    A.    Not that I recall.
20    Q.    And the line below that that says,
21    "Contingency 3 billion plus additional value,"
22    question mark, do you see that?
23    A.    Yes.
24    Q.    What is that note meant to indicate?
25    A.    I don't know.
    TSG Reporting - Worldwide    877-702-9580

Page 332

1    HIGHLY CONFIDENTIAL - M. KELLY
2    Q.    Any recollection at all?
3    A.    No.
4    Q.    Any recollection of a discussion of a
5    $3 billion contingency in connection with the
6    sale transaction?
7    A.    No.
8    Q.    Can you shed any light on what that
9    note means apart from the words on the page?
10    A.    No, I can't put it any context.
11    (Exhibit 431, a document bearing Bates
12    Nos. BCI-EX-00115394 through 449, marked for
13    identification, as of this date.)
14    Q.    Same question with respect to Exhibit
15    431, sir, that I have now put before you.  Look
16    through it just sufficiently to tell me whether
17    it's -- these are your notes, whether this is
18    your handwriting.
19    And I can, if you don't mind my
20    saying, I can move this a little faster.  If we
21    get to a particular page that's not your
22    handwriting, we'll deal with it.  But is it
23    generally your handwriting in the document?
24    A.    Yes, in general.
25    Q.    Can you tell by skimming through it,
    TSG Reporting - Worldwide    877-702-9580

Page 333

1    HIGHLY CONFIDENTIAL - M. KELLY
2    the same question, sir, whether these notes are
3    part of a single pad or notebook or whether
4    they're a disparate set of notes?
5    A.    Yes, they look to be part of the same
6    notepad, but I'd have to look more closely to
7    determine the sequence.
8    Q.    Are you able to tell from skimming the
9    notes when you made these notes?  In particular,
10    I'm interested in whether you took them before
11    or after the closing.
12    A.    Can you direct me to a specific set of
13    pages or --
14    Q.    Well, yeah, take look at page 115395,
15    second page of the document, and there's a
16    reference, you know, there's a note about, I
17    don't know, a little bit more than halfway down
18    in the notes that says "Transition Plan."
19    A.    Right.  I'm sorry, the question was
20    before or after?
21    Q.    Yeah, I was trying to contextualize,
22    trying to ascertain if you can tell me at what
23    point you're taking this set of notes.  Is it
24    before or after the closing, or I suppose both.
25    I mean, does it run over the period before and
    TSG Reporting - Worldwide    877-702-9580

Page 334

1    HIGHLY CONFIDENTIAL - M. KELLY
2    after the closing?
3    A.    I would -- I would speculate it's
4    before, but I'm not certain.
5    Q.    Okay.  And just the reason you would
6    speculate it's before?
7    A.    Because I recall spending time on
8    filing requirements that week before the
9    closing.
10    Q.    Okay.
11    A.    With Ryan, Ryan Travesari.
12    Q.    Okay.  And that's a reference to the
13    first line on that page, 55395, that refers to
14    "Filing Requirements" and "Ryan"?
15    A.    Correct.
16    Q.    Would you turn to page 115396, please,
17    next page.  And just for some reference, at the
18    top of page it says "LBI Transition," do you see
19    that?
20    A.    Yes.
21    Q.    And the first item there, "Shrink
22    matched book," do you see that?
23    A.    Yes.
24    Q.    Do you know what that's a reference
25    to?
    TSG Reporting - Worldwide    877-702-9580

Page 335

HIGHLY CONFIDENTIAL - M. KELLY

1    A.    No.
2    Q.    A little further down there's a
3 reference says "move 50 percent resi to," and I
4 can't read the rest of that.  I'm just going to
5 ask you to read the rest that.  Do you see where
6 I am?
7    A.    Yes.
8    Q.    Could you read that into the record,
9 please?
10    A.    I think it says, "Move 50 percent resi
11 to diff." I don't know what "diff" stands for.
12 And then two pieces to that, "subaccount."
13    Q.    Okay.  And below that it says "hedge"?
14    A.    "Hedge."
15    Q.    Do you know what that note is meant to
16 indicate, sir?
17    A.    No, I don't.
18    Q.    And in the next note down, again,
19 would you read that block into the record?
20    A.    I think it says "fund," short for
21 "funding," and then three points, "shrink
22 reliance," I think it says "of Fed." "Move repo
23 to BarCap" and then "FX settlements," dash,
24 "keep LBCC going," question.
25    TSG Reporting - Worldwide    877-702-9580

Page 336

HIGHLY CONFIDENTIAL - M. KELLY

1    Q.    Do you know what you meant by the
2 reference "move repo to BarCap"?
3    A.    Beyond becoming aware that Barclays
4 played a role in repo financing that week, no.
5    Q.    A little earlier today I asked you if
6 you had any knowledge or recollection about,
7 other than the fact that there was a repo, if
8 the repo played any role in the transaction as
9 it ultimately closed, do you recall that?
10    A.    Yes.
11    Q.    And these are not your exact words,
12 but in essence, you told me you didn't.  And
13 does this refresh your recollection as to
14 whether you had any analogy to time of any role
15 the repo played in the final transaction as it
16 finally closed?
17    A.    No.
18    Q.    At the bottom of the page, there's an
19 entry that says, "Capital management stream."
20 Am I reading that correctly?  It's the last line
21 on the page.
22    A.    Yeah, that's a guess.  It could say
23 "stream."
24    Q.    I'm going to ask for the name of your
25    TSG Reporting - Worldwide    877-702-9580

Page 337

HIGHLY CONFIDENTIAL - M. KELLY

1 handwriting teacher at some point.
2    It says "1.7 billion" and then
3 "discount"?
4    A.    Yes.
5    Q.    Do you see that?  Can you shed any
6 light on what you intended when you made that
7 note?
8    A.    No, the phrase "capital management
9 stream" doesn't -- doesn't mean anything to me.
10    Q.    Does the number 1.7 billion next to
11 the word "discount" mean anything to you?
12    A.    No.
13    Q.    Does it refresh your recollection in
14 any way about any aspect of the sale
15 transaction?
16    A.    No.
17    Q.    Would you turn, please, to page
18 115401, and so I know we're on the same page
19 together, the top line there says "LBI Transfer
20 Mechanics"?
21    A.    Yes.
22    Q.    Okay.  About two-thirds of the way
23 down the page is what looks to me like it says
24 "hard discount." I say that only so we're in
25    TSG Reporting - Worldwide    877-702-9580

Page 338

HIGHLY CONFIDENTIAL - M. KELLY

1 the same place on the notes.
2    Are you with me?
3    A.    Yes.
4    Q.    Can you read that note into the
5 record, please?
6    A.    I think it says "hard" -- I don't know
7 what that symbol is.  Could be dollars.  I'm not
8 sure.  "Discount 1.7 billion to closing balance
9 sheet value."
10    Q.    Do you know what you meant to indicate
11 when you made that note?
12    A.    No.
13    Q.    I'm putting back before you, Mr.
14 Kelly, what we marked as Exhibit 428, and keep
15 both exhibits there with you, but take a look at
16 the first page of Exhibit 428 at Bates number
17 115142.  Okay?
18    A.    Yes.
19    Q.    And you recall we talked a little bit
20 about the out of balance item there of 1.744
21 billion?
22    A.    Right.
23    Q.    Is there any relation between that out
24 of balance item of 1.744 billion and the note on
25    TSG Reporting - Worldwide    877-702-9580

Page 339

1    HIGHLY CONFIDENTIAL - M. KELLY
2   page 115401 of Exhibit 431, "hard dollar
3   discount 1.7 billion to closing balance sheet
4   value"?
5       A.   I doubt it.
6       Q.   Okay.  Do you know whose closing
7   balance sheet value you're referring to there?
8   You can take the -- take 428 back.
9            Do you know whose balance, closing
10  balance sheet value you're referring to in your
11  note at page 115401?
12      A.   No, I don't know whose and the date
13  that it's referring to -- or the date.  Sorry.
14      Q.   Turn, please, to page 1125408, please.
15  And so I know we're on the same page, the first
16  checkmarked entry there says "FX balances."  Are
17  you with me?
18      A.   Yes.
19      Q.   Do you recall the setting in which you
20  made these notes?  Do you have any recollection
21  of that at all?
22      A.   No, I don't.
23      Q.   We talked a bit at the last session of
24  your deposition about some events that took
25  place on Friday, September 19, when Mr. Tonucci
     TSG Reporting - Worldwide    877-702-9580

Page 340

1    HIGHLY CONFIDENTIAL - M. KELLY
2   and Mr. Lowitt and I was asking you about the
3   nature of what involvement you might have had in
4   looking for additional assets to transfer to
5   Barclays.  Do you recall that, generally?
6       A.   Yes.
7       Q.   With that in mind, do these notes
8   reflect -- are they notes taken in connection
9   with your activities in that regard, to look for
10  additional assets to transfer to Barclays?
11           I say that because there's a reference
12  to things we talked about, 15c3, good faith
13  deposits.  You see that in sort of the center of
14  the notes, right?
15      A.   Yeah, I think the notes related to
16  other assets, but I -- I don't know when these
17  notes were taken.
18      Q.   Okay.  Okay.  And in the upper
19  right-hand corner of this page there's a phrase
20  "haircut on sale," do you see that?
21      A.   Yes.
22      Q.   Can you shed any light on what that
23  note means?
24      A.   No, I can't.
25      Q.   Okay.  Would you turn, please, to page
     TSG Reporting - Worldwide    877-702-9580

Page 341

1    HIGHLY CONFIDENTIAL - M. KELLY
2   115416.
3            Actually, if you don't mind, turn to
4   415, 115415.  And again, just to put us on the
5   same page, the upper right-hand corner there
6   says "Matthew - Hughey at," and then there's an
7   e-mail address.  Who is that?
8       A.   Matthew's since left Barclays, but
9   he -- he ran the Regulatory Reporting Group in
10  the U.S. for Barclays Capital.
11      Q.   Okay.  Now, just below that is an
12  entry that says "Balance Sheet Update 9/21," do
13  you see that?
14      A.   Yes.
15      Q.   Does that indicate to you that these
16  notes are taken on or after Sunday, September
17  21?
18      A.   Yeah, it would seem to.
19      Q.   Okay.  And take a look, please, at the
20  next note down, "42b," and I just can't read the
21  rest.  Could you read that into the record,
22  please?
23      A.   It says "PX," which is my shorthand
24  for price, "at 9/19 Thursday, which the date
25  doesn't correspond with the day, I think, and
     TSG Reporting - Worldwide    877-702-9580

Page 342

1    HIGHLY CONFIDENTIAL - M. KELLY
2   then it says to the right, "Trade date, free
3   deliveries, happen tomorrow."
4       Q.   Okay.  Do you know what you're writing
5   about when you make these notes?
6       A.   I think I was referring to what the
7   asset's value was at -- certainly at that time
8   using pricing as of Thursday.
9       Q.   And do you know what the source of the
10  pricing was?
11      A.   No.
12      Q.   Do you know if it was pricing that
13  Barclays supplied?
14      A.   No, I don't.
15      Q.   Do you know if it was pricing that
16  Bank of New York supplied?
17      A.   No.
18      Q.   Do you know if it was pricing drawn
19  from the books of Lehman?
20      A.   No.
21      Q.   Do you know what the reference to "1.9
22  additional" is below that?
23      A.   It may refer to other assets.
24      Q.   By Sunday, the 21st, had you become
25  aware that not all of the assets that were meant
     TSG Reporting - Worldwide    877-702-9580

Page 343

HIGHLY CONFIDENTIAL - M. KELLY

1 to be transferred in the Repurchase Agreement
2 had made their way over to Barclays?
3    A.   Well, I wasn't aware which of the
4 assets were going through the repo versus not.
5    Q.   Okay. As a more general matter, were
6 you involved in any discussions about a $7
7 billion shortfall in what was supposed to be
8 transferred over to Barclays?
9    A.   Not at that time. I became aware of
10 that later.
11    Q.   When later did you become aware of
12 that?
13    A.   Much later. Like at least a month
14 later, I would estimate.
15    Q.   So you're into October and working for
16 Barclays?
17    A.   I think so, yeah. Yeah.
18    Q.   When you first become aware of an
19 issue involving $7 billion not being transferred
20 over to Barclays?
21    A.   I believe so.
22    Q.   And from whom did you first learn
23 about that issue?
24    A.   It could have been one of a number of
25

TSG Reporting - Worldwide    877-702-9580

Page 344

HIGHLY CONFIDENTIAL - M. KELLY

1 people.
2    Q.   Do you have a --
3    A.   It could have been Patrick Clackson.
4 It could have been James Walker. It could have
5 been Gary Romain.
6    Q.   Do you recall the setting in which you
7 learned about it? Are you in a meeting or in a
8 phone call?
9    A.   No, I don't.
10    Q.   Do you know why you were in that
11 conversation? Were they asking you questions or
12 were you supplying information?
13    A.   Well, the context of those discussions
14 would have been my transition over into Finance
15 at Barclays.
16    Q.   Would you turn to page 115416. It's
17 the next page of the document. Now, about
18 midway down that page you have a note that says,
19 I believe, "How much lifting in tri-party." Am
20 I reading that correctly?
21    A.   Yes.
22    Q.   What do you mean by that, do you know?
23    A.   I don't know.
24    Q.   And below that, three columns,
25

TSG Reporting - Worldwide    877-702-9580

Page 345

HIGHLY CONFIDENTIAL - M. KELLY

1 "Debit," "Credit," and what's the third word
2 there?
3    A.   I believe it says cushion.
4    Q.   Do you know why you're using the word
5 "cushion" in your notes?
6    A.   No.
7    Q.   Again, was the term "cushion" a term
8 used in any regard with respect to the sale
9 transaction, to your knowledge?
10    A.   No.
11    Q.   Can you shed no light at all on why
12 the word "cushion" is in your notes?
13    A.   No, I can't.
14    Q.   Would you turn to the next page,
15 please? Directing your attention to the lower
16 half, below the handwritten line which I think
17 says "Comp 1 billion, Cure," are we in the same
18 place?
19    A.   Yes.
20    Q.   Now, if you would read across for me
21 the first line in that section, "Comp 1
22 billion," and then does that say "plus 1" —
23    A.   Yes.
24    Q.   -- on the right?
25

TSG Reporting - Worldwide    877-702-9580

Page 346

HIGHLY CONFIDENTIAL - M. KELLY

1    And then below that it says "Cure," no
2 entry, and then "plus 1.4"?
3    A.   Yes.
4    Q.   Do these reflects a write-up of the
5 accrued liabilities for comp and cure in
6 connection with the sale transaction?
7    A.   I don't know.
8    Q.   Do you have any knowledge at all, sir,
9 as to why you wrote "plus 1" and "plus 1.4" next
10 to each of those items respectively?
11    A.   I believe they're consistent with
12 numbers from the earlier spreadsheet this
13 morning, but -- but no, apart from that, no.
14    Q.   When you say "consistent with the
15 numbers from the earlier spreadsheet," are you
16 referring to the discussion we had about the
17 transaction adjustments in those spreadsheets?
18    A.   Yes.
19    Q.   And what is the phrase below that, the
20 next one down?
21    A.   It could be one of two things:
22 "Discount assets" or "discretionary assets."
23    Q.   Okay. Do you know why you would be
24 using the phrase "discount assets"?
25

TSG Reporting - Worldwide    877-702-9580

Page 347

**HIGHLY CONFIDENTIAL - M. KELLY**

1
2    A.  No.
3    Q.    And below that is a reference to 15c3
4    and 1 billion and then "other, 2.5 billion," do
5    you see that?
6    A.  Correct. Yes.
7    Q.    What is that a reference to?
8    A.  The 15c3 is consistent with my
9    understanding that there was approximately a
10   billion dollars of value in the calculation. I
11   don't know what the other refers to.
12   Q.    And as a more general matter with
13   regard to that section of your notes, can you
14   shed any light on the circumstances under which
15   you're taking those notes or why you're making
16   theme?
17   A.  Well, it would have to be after the
18   first Monday night because I don't think we were
19   talking about the 15c3 at that point.
20   Q.    I need to pinpoint when the first
21   Monday --
22   A.  Sorry, the 15th.
23   Q.    The 15th, okay.
24   Well, you weren't talking about the
25   15c3 piece until Friday, the 19th; is that

TSG Reporting - Worldwide    877-702-9580

Page 348

**HIGHLY CONFIDENTIAL - M. KELLY**

1
2    right?
3    A.  Yeah, that's my recollection.
4    Q.    So at some point on Friday, the 19th,
5    it seems you're making notes about comp 1
6    billion and plus 1 and cure plus 1.4; is that
7    right?
8    MR. STERN: Objection to the form.
9    A.  I would infer that, but I don't know.
10   Q.    Okay. Would you turn to the next
11   page, please, and here I'm interested in your
12   note at the -- in the top part of the page. And
13   I see "LEH" and "pledge," but I can't read the
14   rest of that. Would you read that first line
15   for us?
16   A.  Yeah, that says, "If LEH pledged
17   collateral from LEH DTC to BONY."
18   Q.    "And bypassed Chase," is that what
19   that says below that?
20   A.  Yes.
21   Q.    And it says below that, "Therefore,
22   not in Chase valuation"?
23   A.  Yes.
24   Q.    And below that it says, "Therefore,
25   Barclays has more than they think"; is that

TSG Reporting - Worldwide    877-702-9580

Page 349

**HIGHLY CONFIDENTIAL - M. KELLY**

1
2    right?
3    A.  Yes.
4    Q.    Okay. What are you indicating with
5    these notes?
6    A.  I don't know.
7    Q.    Did you come to understand at some
8    point that Bank of New York was the collateral
9    agent in the tri-party Repurchase Agreement
10   between Lehman, Barclays and Bank of New York?
11   A.  Sorry. Can you repeat that question,
12   please?
13   Q.    Did you at some point come to
14   understand that Bank of New York was the
15   collateral agent in the Repurchase Agreement
16   between Lehman and Barclays?
17   A.  At some point, but I think it was well
18   after the transaction closed.
19   Q.    And were you at any point, before or
20   after the transaction, ever involved in
21   discussions as to the appropriate source for
22   valuations of the collateral that was in the
23   repo?
24   A.  No.
25   Q.    Do you have anything that you can tell

TSG Reporting - Worldwide    877-702-9580

Page 350

**HIGHLY CONFIDENTIAL - M. KELLY**

1
2    us with regard to the analysis you appear to be
3    doing here that because something's not in the
4    Chase valuation, therefore, Barclays has more
5    than they think?
6    A.  No, I can't.
7    Q.    Do you recall having a discussion
8    about this topic with anyone at Barclays, that
9    because something was not in the Chase
10   valuation, therefore Barclays had more than they
11   think?
12   A.  No.
13   Q.    Did you have a discussion along those
14   lines with anybody employed by Lehman?
15   A.  I think these are notes I'm taking in
16   a conversation with other people at Lehman.
17   Q.    It's possible, then -- and I'm asking
18   you to speculate, I understand -- it's possible
19   you're making notes of what somebody else was
20   saying?
21   A.  I would not have been close enough to
22   know this, so it would most likely have been a
23   conversation with Paolo or Ian or both.
24   Q.    And Paolo is Paolo Tonucci?
25   A.  Yes.

TSG Reporting - Worldwide    877-702-9580

Page 351

HIGHLY CONFIDENTIAL - M. KELLY
1
2   Q.   And Ian is Ian Lowitt?
3   A.   Yes.
4   Q.   Do you recall any discussions with
5   Paolo Tonucci or Ian Lowitt concerning the Bank
6   of New York valuations that applied, or that
7   could have been applied, to the assets in the
8   Repurchase Agreement?
9   A.   No.
10   Q.   Do you recall any conversations with
11   Ian Lowitt or Paolo Tonucci in which they said,
12   in sum or substance, that Barclays has more than
13   they think?
14   A.   No.
15   Q.   And beyond that, can you shed any
16   light on what these notes mean?
17   A.   No, I can't.
18       MR. GAFFEY: If we can take five
19   minutes, I may be able to wrap this up a
20   little sooner because I can eliminate some
21   documents.
22       (Recess; Time Noted:  11:33 A.M.)
23       (Time Noted:  11:42 A.M.)
24   BY MR. GAFFEY:
25   Q.   We're in Exhibit 431, sir.  I just

TSG Reporting - Worldwide    877-702-9580

Page 352

HIGHLY CONFIDENTIAL - M. KELLY
1
2   have a couple more entries there that I want to
3   ask you about.
4       Would you turn, please, to page
5   115442.  No, I beg your pardon, 115420.  Just to
6   put it in context, why don't you take a look at
7   the prior page, 115419, and then we'll start
8   there.
9       So we're sure we're on the same page,
10   now that I have confused things, it says
11   "breaks" at the top.  Are we in the same place?
12   A.   Yes.
13   Q.   And the second item down with an arrow
14   says, "Commitment to release 769 million"?
15   A.   Yes.
16   Q.   Do you understand that to be a
17   reference to the 15c3 aspect of the sale
18   transaction we've been talking about?
19   A.   Yes.
20   Q.   And this follows up on a question I
21   asked before.  When you had the $1 billion item,
22   there came a point where you understood it was
23   somewhat less than that; is that right?
24       MR. STERN: Objection to the form.
25   A.   No.

TSG Reporting - Worldwide    877-702-9580

Page 353

HIGHLY CONFIDENTIAL - M. KELLY
1
2   Q.   No?  Did there come a point --
3   A.   No.
4   Q.   Tell me what you mean when you write
5   that note, "Commitment to release 7.69."  Do you
6   know?
7   A.   Well, I now know.  I have to
8   distinguish what I knew then versus what I know
9   now.  I now know that to be in reference to the
10   15c3, and I understand that to be included as
11   part of the clarification letter.
12       At the time, I -- my recollection is I
13   understood the excess to be about a billion
14   dollars.
15   Q.   And if I recall your testimony from
16   the last session correctly, you did not see the
17   clarification letter until after the closing; is
18   that right?
19   A.   Yes, and I think I only ever saw
20   extracts from it.
21   Q.   Okay.  Now, a little further down the
22   page, I'm four lines from the -- four of your
23   handwritten lines from the bottom where it,
24   "BONY acting as agent for Barclays," do you see
25   that?

TSG Reporting - Worldwide    877-702-9580

Page 354

HIGHLY CONFIDENTIAL - M. KELLY
1
2   A.   Yes.
3   Q.   Again, in the context of the notes, do
4   you have an understanding of what you mean to
5   indicate with that note?
6   A.   No, I don't.
7   Q.   Now, over on the next page, 5420, in
8   the upper left-hand corner it refers to 1.9
9   billion and says "short 400 million"?
10   A.   Yes.
11   Q.   You with me?  Does this indicate to
12   you that these notes are taken at or around the
13   time of that Friday, September 19, when you're
14   involved in the search for additional value?
15       I'm just trying to put it in a timing
16   context.  I'll ask you about the notice in a
17   minute.
18   A.   It could have been then.  It could
19   have been after that point.
20   Q.   In the upper right-hand corner it says
21   "Cash OCC" and "Clear Fails"; is that right?
22   A.   Yes.
23   Q.   What does the reference to OCC mean?
24   A.   Options Clearing Corporation.
25   Q.   And do you know why you are making a

TSG Reporting - Worldwide    877-702-9580

Page 355

HIGHLY CONFIDENTIAL - M. KELLY

1    note with respect to Options Clearing
2    Corporation?
3       A.  At that time, I don't think so.
4       Q.  Did there come a time when you
5    understood that margin deposits at OCC were a
6    feature of the sale transaction?
7       A.  Yes.
8       Q.  When did you get that understanding?
9       A.  My recollection is it was on or around
10   about when I was transitioning into my finance
11   role at Barclays.
12       Q.  So, if I understand your answer
13   correctly, that would have put it at a point
14   after you had gone over to Barclays. Withdrawn.
15   That would put it after the closing?
16       A.  Yes.
17       Q.  Was there any discussion in which you
18   were involved of OCC deposits on Friday, the
19   19th, when you and Mr. Tonucci and Mr. Lowitt
20   were involved in this project to find additional
21   value?
22       A.  Not that I recall.
23       Q.  And if you would turn to page 115442.
24   On that page at the top it says "A&M 10/1/08,"

TSG Reporting - Worldwide    877-702-9580

Page 356

HIGHLY CONFIDENTIAL - M. KELLY

1    and then below that I believe, correct me if I'm
2    wrong, "Ongoing reporting requirements.
3    Formatting being developed."
4       Can I, to put this note in context, do
5    you know the circumstances under which you're
6    taking a note concerning A&M on October 1, '08?
7       A.  I think this refers to the information
8    that Alvarez was -- well, I should say the
9    template that Alvarez was developing to disclose
10   information publicly as an ongoing matter.
11       Q.  Were you involved at all in meetings
12   with Alvarez & Marsal about what I'll describe
13   generally as a project to figure out what had
14   gone to Barclays and what was left behind?
15       A.  My focus was primarily from the
16   Barclays perspective. It's a little unclear,
17   because the Transition Services Team was made up
18   of Barclays employees, but I didn't have
19   responsibility for that team.
20       Q.  Okay. Did you work with the Barclays
21   side of the Transition Services Team?
22       Withdrawn. Did your work involve --
23   did you work with the Transition Services Team
24   at all?

TSG Reporting - Worldwide    877-702-9580

Page 357

HIGHLY CONFIDENTIAL - M. KELLY

1       A.  To a very small extent.
2       Q.  When you refer to a Transition
3    Services Team, did you understand there were
4    people from both sides of the transaction
5    involving -- in discussing transition issues,
6    that is, both from Barclays and the Lehman side
7    of the table?
8       A.  And when you say "from the Lehman
9    side," do you mean who were then Barclays
10   employees or who remained --
11       Q.  No, I mean people who either stayed
12   behind at Lehman or Alvarez & Marsal.
13       A.  Yes, I am aware of that.
14       Q.  And who did you deal with from --
15   amongst the people who stayed at Lehman or were
16   from Alvarez & Marsal in connection with the
17   transition?
18       A.  I recall one or two meetings with
19   David Coles, I think, and probably members of
20   his team.
21       Q.  Okay.
22       A.  But then I -- I moved away from that
23   work.
24       Q.  Okay. Do you recall anyone other than
25   Chris O'Meara, and he, in addition to the other

TSG Reporting - Worldwide    877-702-9580

Page 358

HIGHLY CONFIDENTIAL - M. KELLY

1    David Coles?
2       A.  There were other people from Alvarez,
3    and then there were -- there were people who I
4    think remained Lehman employees, but I -- I
5    think I have difficulty distinguishing sort of
6    Lehman, former Lehman people who stayed Lehman
7    people versus former Lehman people who became
8    Barclays employees.
9       Q.  Just so we can agree on some terms and
10   not have to stumble, can we refer to people who
11   stayed at Lehman as legacy Lehman employees?
12       A.  Sure.
13       Q.  We'll understand each other if I use
14   that term, okay.
15       A.  Yes.
16       Q.  In any meetings or conversations in
17   which you were involved with legacy Lehman
18   employees or Alvarez & Marsal, did you or were
19   you present while someone else talked about the
20   structure of the transaction, what was
21   contemplated by the sale transaction?
22       A.  The one individual I recall who I
23   believe remained a legacy Lehman employee was
24   Chris O'Meara, and he, in addition to the other

TSG Reporting - Worldwide    877-702-9580

1    HIGHLY CONFIDENTIAL - M. KELLY
2  names we have spoken about, would be the one
3  other person I would include in that list.
4      Q.   And my question went to the substance
5  of any conversations you had or were present
6  for.
7          In those transition meetings, after
8  the closing did anyone sit and say this is what
9  just happened in the deal, this is what went,
10  this is the terms of the transaction, et cetera,
11  to your knowledge?
12      A.   With that same group --
13      Q.   Uh-huh.
14      A.   -- which included Chris O'Meara, there
15  were a series of meetings to try to determine
16  what the deal was and how we gathered the
17  information to reflect the deal.
18          In terms of when they occurred, it
19  occurred in what I would characterize as a
20  transition period when, you know, a group of us
21  may or may not have known at that point that we
22  were Barclays employees, but we were working
23  more on Lehman matters. So it's confusing to me
24  as to what capacity we were operating under, but
25  that's the group.
       TSG Reporting - Worldwide    877-702-9580

1    HIGHLY CONFIDENTIAL - M. KELLY
2      Q.   Right. Okay. Now, in this group --
3  and let's, for timing purposes, put this in the
4  period, you know, September 15 through the end
5  of October, okay? Got that six weeks in mind?
6          Did you or, to your knowledge, anyone
7  else, were you present when anyone went through
8  components of the deal that we've discussed in
9  our two sessions of the deposition?
10          Let me give you examples. The basis
11  for the calculation of comp and cure liability,
12  were you present when that was discussed with
13  anyone from Alvarez & Marsal or legacy Lehman
14  employees?
15          MR. STERN: I don't have the question
16  in mind.
17      Q.   Do you, sir?
18      A.   No, I'm actually confused as well.
19      Q.   Were you part of any discussions in
20  which you or anyone else explained to folks who
21  stayed behind at Lehman, Lehman legacy
22  employees, or Alvarez & Marsal employees the
23  basis for the calculation of the assumed
24  compensation liability in the sale transaction?
25      A.   There may have been conversations the
       TSG Reporting - Worldwide    877-702-9580

1    HIGHLY CONFIDENTIAL - M. KELLY
2  week of the 15th, but I can't recall
3  specifically. I don't think there were
4  conversations after that week.
5      Q.   Okay. When you say there may have
6  been conversations during the week, but you
7  don't recall specifically, do you have a
8  recollection one way or the other?
9      A.   No.
10      Q.   Okay. Same question with respect to
11  the calculation of the assumed liabilities for
12  cure payments. Were you part of, or did you
13  hear anybody talk about, how that calculation
14  was done?
15          MR. STERN: With whom?
16      Q.   With Lehman legacy employees or
17  Alvarez & Marsal personnel.
18      A.   I would repeat the answer to the prior
19  question.
20      Q.   There may have been some on the week
21  of the 15th, but you don't know one way or the
22  other?
23      A.   Correct.
24      Q.   And --
25      A.   And I doubt that there were
       TSG Reporting - Worldwide    877-702-9580

1    HIGHLY CONFIDENTIAL - M. KELLY
2  conversations after that week.
3      Q.   And I'll ask you the same question
4  with regard to the -- I'm showing you 136. That
5  is your e-mail that refers to an overall
6  approximately 5 billion all-in economic loss
7  versus our marks, but my question doesn't go to
8  the document itself. It's just to contextualize
9  it. Okay?
10      A.   Sure.
11      Q.   Did you have a discussion about that
12  topic, the overall $5 billion loss versus
13  Lehman's marks, with Lehman legacy employees or
14  Alvarez & Marsal employees?
15      A.   I would repeat the answer to the prior
16  question. And in terms of what happened, I
17  think the answer is a bit more complicated
18  because the deal had changed so much that I
19  think that became a less relevant conversation.
20  I think the focus then was on reflecting the
21  terms of the deal as it had been changed.
22      Q.   Okay. Let me, though, push it back to
23  that point in the early part of the week of the
24  15th. At or around the time that you wrote your
25  e-mail, 136, did you have conversations with
       TSG Reporting - Worldwide    877-702-9580

Page 363

HIGHLY CONFIDENTIAL - M. KELLY

1  anyone from Alvarez & Marsal about that feature
2  of the transaction at that time?
3
4  A.   I would repeat the same -- the answer
5  to the prior question or several questions ago.
6  Q.   Again, now I'm changing the question a
7  little bit. I don't want to mislead you.
8  After the fact, after the closing, did
9  you ever talk about that historical piece of the
10  deal, you know, in the early part of the week
11  there was that feature, that $5 billion overall
12  economic loss versus the marks; did you ever
13  have that conversation with people from Alvarez
14  & Marsal or legacy Lehman employees?
15  A.   I don't think so, because I don't
16  think it was relevant.
17  Q.   And did you ever talk about that
18  aspect of the deal, the 5 billion -- at that
19  time, the $5 billion overall economic loss
20  versus the marks, with anybody from Weil
21  Gotshal?
22  A.   I don't believe so.
23  Q.   Now, do you know if anyone else did?
24  A.   No.
25  Q.   Did you ever sit with anyone from --

TSG Reporting - Worldwide    877-702-9580

Page 364

HIGHLY CONFIDENTIAL - M. KELLY

1  after the closing, did you ever sit with anyone
2  or talk to anyone over the phone from Alvarez &
3  Marsal or legacy Lehman employees about what had
4  been transferred through the repo to Barclays?
5
6  A.   I don't think so.
7  Q.   Would you take a look at page 11544 of
8  Exhibit 431. I'm pretty good on your writing on
9  this page except for the word in the upper
10  left-hand corner. What does that say?
11  A.   I don't know.
12  Q.   And below that it says "42.9 billion
13  sales under repo booked"?
14  A.   Yes.
15  Q.   Checkmark, "Tuesday night"; is that
16  right?
17  A.   Yes.
18  Q.   And then there's a series of notes
19  below that indented, "At Friday night prices,
20  9/19, 32 billion cleaned up."
21  Can you read down that list
22  sufficient -- I'm going to ask you a couple
23  questions about that stuff, so familiarize
24  yourself with that, please.
25  A.   Sure. You want me to read it out loud

TSG Reporting - Worldwide    877-702-9580

Page 365

HIGHLY CONFIDENTIAL - M. KELLY

1  or --
2  Q.   No, that's okay. That's okay.
3  (Document review.)
4  Q.   Have you had a chance to look that
5  through?
6  A.   Yes.
7  Q.   Where it says "42.9 billion sales
8  under repo booked," do you -- does that refresh
9  your recollection as to any conversation about
10  what was transferred in the repo?
11  A.   No.
12  Q.   And below that where it says "32
13  billion cleaned up," does that refresh your
14  recollection as to any conversations you had
15  with anyone about the repo?
16  A.   No.
17  Q.   Does it refresh your recollection as
18  to any conversations you had with anyone about
19  the sale transaction as a whole?
20  A.   No.
21  Q.   Are you able to shed any light on what
22  you meant when you made these notes?
23  A.   I mean, I think the general context of
24  the notes is taking assets out of repo contracts

TSG Reporting - Worldwide    877-702-9580

Page 366

HIGHLY CONFIDENTIAL - M. KELLY

1  or, I guess, unwinding repo contracts to get
2  securities back in, but if your question is
3  specifically on the top two items, then no.
4  Q.   Let me just press a little bit on
5  the -- what you just said about repo contracts.
6  Are you able to tell me one way or the
7  other whether these notes reflect thoughts and
8  facts about the tri-party repo between Barclays,
9  Lehman Brothers, and Bank of New York or other
10  repos?
11  A.   My -- my speculation is it's other
12  repos because there's a reference there to repos
13  out to the street on the fourth line down.
14  Q.   Okay.
15  MR. GAFFEY: I don't have anything
16  further, Mr. Kelly. Thanks for your time.
17  EXAMINATION BY
18  MR. OXFORD:
19  Q.   Mr. Kelly, my name is Neil Oxford.
20  I'm with the law firm of Hughes, Hubbard & Reed.
21  We represent the SIPA Trustee.
22  I want to follow up on some questions
23  that Mr. Gaffey asked you about the 15c3
24  account.

TSG Reporting - Worldwide    877-702-9580

Page 367

HIGHLY CONFIDENTIAL - M. KELLY

1      If I understand your testimony, you
2 believe that, by the time of closing, you had
3 calculated a 1 billion excess in the 15c3
4 reserve; is that right?
5      A.   I would characterize it as it was a
6 long, involved, complex process.
7      Q.   Uh-huh.
8      A.   And which had many components to it,
9 and the estimate at that time was it was
10 approximately a billion dollars of surplus.
11      Q.   Can you tell me a little more about
12 the long and complex process?
13      A.   The formula -- well, I guess there are
14 several systems and/or businesses that conducted
15 activity that -- for which 15c3 funds were
16 required to be locked up. So there were several
17 systems involved in the process, and there were
18 many components to the calculation across each
19 of those three systems.
20      So I think inherently the calculation
21 is complex, and I would add to that sort of
22 the -- the operational stresses on the firm that
23 week meant that getting information was
24 difficult.
25

TSG Reporting - Worldwide    877-702-9580

Page 368

HIGHLY CONFIDENTIAL - M. KELLY

1      Q.   Can you be a little more specific
2 about the information that was difficult to
3 obtain?
4      A.   I don't think it was immediately
5 available from the normal sources.
6      Q.   Were you or your team lacking
7 information that you required to make the
8 reserve calculation at any point over the
9 weekend?
10      A.   I don't know if I would characterize
11 it as lacking, but there were issues or concerns
12 around the quality of the information that we
13 had.
14      Q.   And what were those issues and
15 concerns, sir?
16      A.   They generally related to completeness
17 of information.
18      Q.   Were those issues and concerns about
19 completeness of information resolved over the
20 course of the weekend prior to closing?
21      A.   The team that was undertaking the
22 calculation, to my knowledge, had a reasonably
23 high confidence by some point on that weekend
24 that the billion dollar number that I referred
25

TSG Reporting - Worldwide    877-702-9580

Page 369

HIGHLY CONFIDENTIAL - M. KELLY

1 to was a good representation.
2      Q.   Have you had any conversations with
3 anyone subsequent to the closing, Mr. Kelly,
4 about the accuracy of that 15c3 computation over
5 the weekend prior to closing?
6      A.   I just want to be careful I'm not
7 dealing in privileged issues here.
8      MR. STERN: I'm just jump in, Neil.
9 Obviously there comes a time when, as an
10 executive at Barclays, Mr. Kelly is involved
11 in a process that is led by counsel relating
12 to these issues. So I think Mr. Kelly is
13 concerned that he not reveal communications
14 in connection with that process, if you
15 could just keep that in mind.
16      MR. OXFORD: Sure.
17      Q.   And perhaps I can give you a running
18 clarification that none of my questions, Mr.
19 Kelly, are designed or intended to have you
20 reveal any conversations that are privileged
21 because they take place in the presence of
22 Barclays counsel.
23      MR. STERN: Well, I think it goes
24 beyond that. It's a process that is
25

TSG Reporting - Worldwide    877-702-9580

Page 370

HIGHLY CONFIDENTIAL - M. KELLY

1 directed by counsel in which a number of
2 executives participated, so not all the
3 conversations and not all the information is
4 received from counsel. But I think why
5 don't you ask the questions and we'll see.
6 I may have to just instruct him not to
7 answer.
8      Q.   Okay. Other than work performed or
9 conversations that you had at the direction of
10 counsel, did you at any time after closing, Mr.
11 Kelly, come to learn that the 15c3 calculation
12 that was performed by your team over the weekend
13 of September 19th through the 22nd was
14 inaccurate?
15      A.   I'm having difficulty separating,
16 separating out the work effort that was directed
17 by counsel versus not. So, again, I'm not sure
18 how -- if I can answer that question.
19      Q.   Did your team in making the c3
20 calculation over the weekend prior to closing
21 make any significant assumptions that you're
22 aware of, sir?
23      A.   Not that I'm aware of.
24      (Exhibit 432, and e-mail from Martin
25

TSG Reporting - Worldwide    877-702-9580

Page 371

HIGHLY CONFIDENTIAL - M. KELLY

1    Kelly to James Walker, marked for
2    identification, as of this date.)
3    Q.    Mr. Kelly, I've handed you an exhibit
4    that I have marked 432 which I'll identify for
5    the record as an e-mail from you to James Walker
6    at Barclays Capital, and it says that it's sent
7    on Sunday, 21st of September, at 2:33, but
8    that's a Greenwich Mean Time date stamp, time
9    stamp, so it's 10:33 Eastern.
10       If you could take a moment to review
11   that e-mail and let me know when you've done so,
12   please.
13   A.    Okay.
14   Q.    If you could direct your attention to
15   the original -- sorry, about halfway down the
16   first page, there's an e-mail from you to Mr.
17   Walker and others at 9:08 P.M.; do you see that?
18   A.    Yes.
19   Q.    And the re line is "assets and
20   liabilities acquired." You write, "James/Gary,
21   Right now the BS," which I take to balance
22   sheet, "is still a work in progress. Will
23   probably take overnight to resolve. Will keep
24   you updated. Here's what we know and don't
25

TSG Reporting - Worldwide    877-702-9580

Page 372

HIGHLY CONFIDENTIAL - M. KELLY

1    know." Do you see that?
2    A.    Yes.
3    Q.    Do you recall writing this e-mail,
4    sir?
5    A.    No, I don't recall it. Evidently I
6    did.
7    Q.    Do you know what you meant when you
8    wrote to Mr. Walker and Mr. Romain that the
9    balance sheet was a work in progress?
10   A.    Yeah, it's consistent with my other
11   comments, which is that the transaction was
12   changing, and trying to adjust the initial
13   estimates of the balance sheet remained,
14   remained a work in progress.
15   Q.    So this e-mail is sent at 9:08 P.M. on
16   Saturday, December 20, correct?
17       MR. BERNSTEIN: Does Greenwich Mean
18   Time apply to that?
19       MR. OXFORD: No. Confusingly enough,
20   it only applies to the top e-mail. You can
21   thank our vendors for that.
22   A.    Yes.
23   Q.    And I believe you, and to run to Mr.
24   Gaffey's questions, indicate that you understand
25

TSG Reporting - Worldwide    877-702-9580

Page 373

HIGHLY CONFIDENTIAL - M. KELLY

1    that there was a hearing to approve the sale on
2    Friday, the 19th, correct?
3    A.    Correct. Yeah.
4    Q.    And that that final approval was
5    received sometime early morning on Saturday, the
6    20th, correct?
7    A.    I became aware of that at some point
8    subsequent to it.
9    Q.    When you told me a minute ago that the
10   transaction was still changing at 9:08 P.M. on
11   Saturday, the 20th, what do you mean by that?
12   A.    No, I think I said that the
13   transaction had been changing and that we
14   were -- we were undergoing work to reflect those
15   changes in the balance sheet. So I happen to
16   have written this e-mail at that time. It
17   doesn't mean that the transaction was still
18   changing at the time.
19   Q.    To your knowledge, sir, was the
20   transaction changing over the weekend after the
21   sale hearing and before the closing?
22   A.    No, I don't have knowledge of that.
23   Q.    You see item 3 below the e-mail that
24   we have been discussing says, "15c3 receivable 1
25

TSG Reporting - Worldwide    877-702-9580

Page 374

HIGHLY CONFIDENTIAL - M. KELLY

1    billion. Have many breaks/fails here. Have
2    large team working now and through the night to
3    resolve."
4       Do you see that?
5    A.    Yes.
6    Q.    Can you explain what you mean by
7    "breaks/fails"?
8    A.    Yeah. I think what I was referring to
9    is transactions that either, or both, actually,
10   both Lehman and counterparties, were failing on,
11   so that either securities that were meant to
12   move weren't moving or cash that was meant to
13   move was not moving, and they were accumulating
14   on both sides of the balance sheet.
15   Q.    And how did those breaks and fails
16   affect your 15c3 calculation?
17   A.    My recollection is that they're a
18   component of the calculation, both -- on both
19   sides of the balance sheet.
20   Q.    In the e-mail at the top of the page,
21   you write to Mr. Walker Sunday morning, "I've
22   been working all night trying to clear up 15c3
23   issue. Will be in contact as soon as I can."
24   Do you see that?
25

TSG Reporting - Worldwide    877-702-9580

Page 375

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.    Yes.
3    Q.    Is it your recollection that you did
4    manage to clear up this c3 issue?
5    A.    Is this GMT?
6    Q.    That's GMT, so it's 10:33 A.M.
7    Eastern.
8    A.    Well, I think the resolution of or the
9    final calculation, I should say, of the 15c3
10    took months after this date. We -- I do recall
11    I had a large meeting and conference call that
12    Sunday morning at the office of Weil where we
13    discussed the status of the calculation --
14    Q.    Uh-huh.
15    A.    -- and the confidence that the team
16    had around different components of the
17    calculation.
18    Q.    At the time you wrote this top e-mail
19    Sunday morning, did you have an understanding,
20    Mr. Kelly, of the business terms of the
21    transaction between Lehman and Barclays insofar
22    as it related to this 15c3 issue?
23    A.    I understood that the 15c3 calculation
24    was important to identifying value or
25    unencumbered assets that Lehman might have to be
TSG Reporting - Worldwide    877-702-9580

Page 376

HIGHLY CONFIDENTIAL - M. KELLY
1
2    transferred. Beyond that, no.
3    Q.    Did you have an understanding, Mr.
4    Kelly, that a particular amount of the excess in
5    the c3 reserve would be transferred?
6    A.    No.
7    Q.    Did you have an understanding, sir, of
8    whether or not Barclays would receive any 15c3
9    reserve moneys in the event there was no excess
10    under the c3 reserve?
11    A.    I didn't have an understanding either
12    way at that time.
13    Q.    And just so I have a clear record, did
14    you gain an understanding of whether or not
15    Barclays would receive moneys from the c3
16    reserve whether or not there was an excess at
17    any time prior to the closing of the
18    transaction?
19    A.    No.
20    (Exhibit 433, an e-mail from Martin
21    Kelly to Matthew Hughey, marked for
22    identification, as of this date.)
23    Q.    Mr. Kelly, you have before you what
24    I've marked as Exhibit 433, which at the top is
25    an e-mail from you to Matthew Hughey at Barclays
TSG Reporting - Worldwide    877-702-9580

Page 377

HIGHLY CONFIDENTIAL - M. KELLY
1
2    Capital at 12:55 A.M. on Monday, 22nd of
3    September. Again, that's a GMT, so it's Sunday
4    evening that's sent.
5    A.    Okay.
6    Q.    You see the bottom e-mail in the chain
7    is an e-mail from you to Gary Romain and others
8    sent at 5:33 on Sunday. You say, "Trying to get
9    hold of the S.E.C. to ensure that" -- sorry, "to
10    ensure they are in agreement with our approach."
11    Do you recall, sitting here today,
12    what your approach was that you mentioned in
13    this e-mail?
14    A.    Yeah. My recollection is that the
15    approach was to seek the consent of the S.E.C.
16    to a release of the funds beyond those necessary
17    for customer -- customer balances.
18    Q.    Do you have a recollection of whether
19    the S.E.C. ever gave that consent that you have
20    just referenced?
21    A.    I don't believe they did.
22    Q.    Do you recall, Mr. Kelly, attempting
23    to secure that consent from the S.E.C.?
24    A.    Yeah, I recall the effort. I don't
25    think I had any of the conversations with the
TSG Reporting - Worldwide    877-702-9580

Page 378

HIGHLY CONFIDENTIAL - M. KELLY
1
2    S.E.C. around that.
3    Q.    In the top e-mail in the chain you
4    write to Mr. Hughey at Barclays, "Currently we
5    have cleared out the other balance to approx 2.3
6    billion -- clearly more to go."
7    Can you explain what you mean by that,
8    please?
9    A.    Yeah, I don't know.
10    (Exhibit 434, an e-mail from Martin
11    Kelly to Tony Stucchio, marked for
12    identification, as of this date.)
13    Q.    Mr. Kelly, you have in front of you a
14    short e-mail, Exhibit 434, which is an e-mail
15    from you to Tony Stucchio sent at 6:14 Eastern
16    on Sunday, 21st September. Let me know when
17    you've had a chance to read that, please.
18    (Document review.)
19    A.    Okay.
20    Q.    Do you recall this e-mail, sir?
21    A.    No, I don't.
22    Q.    Reading from the last two sentences,
23    you write to Mr. Stucchio, "My plan with S.E.C.
24    is not to fight the formula but to create a
25    mechanism under which Barclays has first lien to
TSG Reporting - Worldwide    877-702-9580

**HIGHLY CONFIDENTIAL - M. KELLY**

1    first $1 billion as it clears up."  Do you see
2    that?
3        A.   Yes.
4        Q.   What did you mean when you wrote that
5    your plan was not to fight the formula?
6        A.   My recollection is that there were
7    haircuts built into the formula, and I think
8    there had been conversations about internally
9    within Lehman about trying to access that
10   haircut, and I think my surmise here is that I
11   was suggesting that we not take that approach
12   but that we look at the excess of funds above
13   and beyond the haircut.
14       Q.   You go on to say that your plan is to
15   create a mechanism under which Barclays has
16   first lien to first 1 billion as it clears up.
17       Can you explain what you meant there,
18   please?
19       A.   I don't recall what I meant.
20       Q.   Does that suggest to you, sir, that
21   your plan with the S.E.C. was to seek approval
22   only of a conditional transfer of moneys from
23   the 15c3 reserve?
24       A.   Sorry, can you repeat that, please?

**HIGHLY CONFIDENTIAL - M. KELLY**

1    (Record read.)
2        A.   Yeah, I think I would express it as,
3    in our conversations with the S.E.C., my -- my
4    bias wasn't to try to get them to change what
5    was a preexisting formula but to create an
6    understanding that they would release excess
7    funds above and beyond that requirement as they
8    became free.
9        Q.   You mentioned your conversations with
10   the S.E.C. a moment ago.  I thought I understood
11   your testimony that you didn't have any of these
12   conversations with the S.E.C. personally, is
13   that -- let me ask a better question.
14       Having read this e-mail, do you have
15   any recollection of having a conversation with
16   the S.E.C. in connection with the 15c3 issue
17   around this time, this weekend before the
18   closing?
19       A.   No, the only -- I think when I say my
20   plan is referencing how the team and the people
21   talking to the S.E.C. should approach it.  My
22   only recollection of a conversation with
23   S.E.C. around this was several weeks later.
24       Q.   Okay.  Tell me about that conversation

**HIGHLY CONFIDENTIAL - M. KELLY**

1    you had several weeks later with the S.E.C.
2        A.   Paolo Tonucci had been -- my
3    understanding is Paolo had been -- had been
4    leading the conversations with the S.E.C., and
5    I -- I recall that I just happened to walk past
6    a conversation that Paolo was having with Mike
7    Macchiaroli of the S.E.C. at Lehman's offices
8    and joined for a brief period in that
9    conversation.
10       Q.   Do you recall approximately the date
11   of that conversation?
12       A.   I would estimate it was certainly
13   October, maybe early to mid October.
14       Q.   What do you recall about the substance
15   of that conversation, sir?
16       A.   My recollection is that the S.E.C. was
17   not inclined to grant approval to release funds
18   until -- until all information was available and
19   the calculation was fully complete.
20       Q.   Do you recall anything else about that
21   conversation?
22       A.   No.
23       Q.   That's all for that exhibit.
24       (Exhibit 435, an e-mail from Chris

**HIGHLY CONFIDENTIAL - M. KELLY**

1    O'Meara to Bart McDade and Martin Kelly,
2    marked for identification, as of this date.)
3        Q.   Mr. Kelly, you have in front of you
4    Exhibit 435, which is an e-mail on the subject
5    of 15c3-3 from Chris O'Meara to Bart McDade,
6    copied to you, sent -- it appears to be on
7    Monday, 9/22 at 12:59, but it's four hours
8    earlier on Sunday.
9        Can you let me know when you've had a
10   chance to read that, please?
11       (Document review.)
12       A.   Okay.
13       Q.   Okay.  You see about halfway down
14   Chris O'Meara writes, "We spoke with S.E.C. as
15   well to tell them the plan and explain that some
16   amount of the excess 15c3-3 lock-up is part of
17   the purchase price consideration."
18       Do you see that?
19       A.   Yes.
20       Q.   Do you recall this e-mail, sir?
21       A.   I recall a conversation with Chris in
22   his office that night.  I don't recall the
23   e-mail, but I think this succeeded that
24   conversation.

HIGHLY CONFIDENTIAL - M. KELLY

1  
2  Q.   Does this refresh your recollection
3  about whether or not you were on any conference
4  calls or conversations with the S.E.C. on this
5  issue, sir?
6      A.   I don't, no, I don't think I was on
7  any calls with the S.E.C.
8      Q.   Okay.  What do you recall about your
9  conversation with Mr. O'Meara that evening?
10     A.   I remember that we were going through
11 the calculation or the different aspects of the
12 calculation as it stood at that point in time.
13     Q.   Mr. O'Meara writes, "They don't
14 object" -- "they" being the S.E.C. -- "but want
15 to see the info once the reconciliation break
16 has been resolved and want to ensure that all
17 customer balances are moved cleanly before
18 authorizing the release of the cushions."
19         Do you see that?
20     A.   Yes.
21     Q.   Do you have an understanding of what
22 Mr. O'Meara meant by that?
23     A.   No, I don't.
24     Q.   Sitting here today do you understand
25 that the S.E.C.'s view, at least as represented

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - M. KELLY

1  by Mr. O'Meara, was that the S.E.C. would not
2  authorize any release from the c3 reserve until
3  the reconciliation break was resolved?
4      A.   I would characterize it as the S.E.C.
5  would not authorize the release until the
6  calculation was complete.  I don't have a
7  specific recollection of what Chris is referring
8  to as the reconciliation break.
9      Q.   Okay.  In essence, sir, the S.E.C.
10 wanted to be comfortable there was an excess
11 before any excess was released by them?
12         MR. BERNSTEIN:  Is that a question?
13     Q.   Is that accurate?
14     A.   Yeah, that's accurate.
15     Q.   Mr. Kelly, I've handed you what has
16 been previously marked in these depositions as
17 Exhibit 173A.  If you could just take a moment
18 to read that and let me know when you've done
19 so, please.
20         (Document review.)
21     A.   Okay.
22     Q.   This e-mail from you to Tony Stucchio
23 and others sent in the late hours of Sunday
24 evening around 9 P.M., you write, "Guys, S.E.C.

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - M. KELLY

1  told us we need to do a 15c3 calc for each of
2  the accounts that transfer and those which will
3  not before they are comfortable releasing the
4  cushion/surplus to Barclays."
5         You see that?
6      A.   Yes.
7      Q.   Do you recall this e-mail, sir?
8      A.   Vaguely.
9      Q.   What do you recall about it?
10     A.   In terms of the details or --
11     Q.   Yeah.
12     A.   I do recall that in, I guess in
13 addition to the factors that I outlined before,
14 in terms of the complexity of the formula, the
15 S.E.C. did advise us that we needed to run two
16 separate calculations, one for customer accounts
17 that would remain with legacy Lehman and one for
18 customer accounts that would transfer to
19 Barclays Capital, and so I do recall the need to
20 now run two calculations.
21         I don't recall the agreement with Weil
22 and then I don't recall the ADP break, and I do
23 recall the $1 billion reference, consistent with
24 my prior testimony.

TSG Reporting - Worldwide    877-702-9580

HIGHLY CONFIDENTIAL - M. KELLY

1  Q.   I think we probably covered this in
2  prior testimony, but do you recall whether that
3  ADP break was ever resolved prior to the closing
4  of the deal?
5      A.   No.  I don't recall the break so I
6  don't recall the resolution.
7      Q.   That's all I have on that document,
8  sir.
9         I put in front of you Exhibit 432, Mr.
10 Kelly.  Towards the bottom of the page under the
11 items that you have listed "here's what we know
12 and don't know," you have item 6, "Shorts."  Do
13 you see that?
14     A.   Yes.
15     Q.   Can you define what you meant by
16 "shorts" when you wrote this e-mail?
17     A.   I could define what I understand
18 "shorts" to be, not necessarily in the context
19 of this e-mail, but ...
20     Q.   Okay.  Well, we'll start with that.
21     A.   "Shorts" generally represents
22 securities that you don't own and that you've
23 sold, but you don't own the securities.
24     Q.   Would that include short options at

TSG Reporting - Worldwide    877-702-9580

Page 387

HIGHLY CONFIDENTIAL - M. KELLY
1 the OCC?
2
3     A.  Definitionally or as part of the
4 transaction?
5     Q.  As part of the transaction.
6     A.  I don't know.
7     Q.  Mr. Gaffey asked you some questions
8 about the OCC and the margin at OCC.  Do you
9 remember those questions?
10     A.  Yes.
11     Q.  It's fair to say that your list that
12 you sent to Mr. Walker on Saturday evening, the
13 20th, doesn't contain any reference to any OCC
14 positions, is that fair?
15     A.  Yes.
16     Q.  And similarly, it doesn't contain any
17 reference to the OCC margin, is that also
18 correct?
19     A.  Yes.
20     Q.  Does that accurately reflect your
21 understanding of the business transaction
22 between Barclays and Lehman as of the date of
23 this e-mail, September 20th, 19th?
24     A.  I have no reason to believe it didn't.
25 I don't recall specifically.
TSG Reporting - Worldwide    877-702-9580

Page 388

HIGHLY CONFIDENTIAL - M. KELLY
1
2     Q.  Okay.  I think we may have covered
3 this.  I just want to be clear.  I apologize if
4 we're retreading ground.
5         To the best of your recollection, when
6 did you first come to learn, if you did, that
7 any assets at the OCC -- and I'll include in the
8 definition of "assets" margin at the clearing
9 fund -- were to be transferred from Lehman to
10 Barclays?
11     A.  I -- my recollection is I don't
12 remember being aware of that until I was
13 transitioning into my role at Barclays, so I
14 would -- I would estimate the October timeframe.
15         (Exhibit 436, an e-mail from Tony
16     Stucchio to Martin Kelly, marked for
17     identification, as of this date.)
18     Q.  Mr. Kelly, I've handed what I have
19 marked as Exhibit 436.
20         MR. BERNSTEIN:  While we're doing
21     this, I just notice, I haven't been
22     noticing, that there are no Bates numbers.
23     Is any part of that added that was not part
24     of the original document?  And I have in
25     particular in mind importance in categories.
TSG Reporting - Worldwide    877-702-9580

Page 389

HIGHLY CONFIDENTIAL - M. KELLY
1     MR. OXFORD:  Not to my knowledge.
2     MR. BERNSTEIN:  Okay.  Thank you.
3     MR. OXFORD:  For the record, I'll
4 identify as 436 an e-mail from Tony Stucchio
5 to Martin Kelly, with a copy to others,
6 dated Sunday, September 21 at 3:50 P.M.,
7 which is 11:50 A.M. Eastern.
8     Q.  Can you let me know when you've had a
9 chance to review that document, sir.
10         (Document review.)
11     A.  Okay.
12     Q.  Can you direct your attention, Mr.
13 Kelly, to the second e-mail from the top from
14 Frank Pearn to Mr. Stucchio and others at 11:43
15 A.M. on Sunday, the 21st.  Do you see that?
16     A.  Yes.
17     Q.  And the subject is, "Re:  Net loan
18 options - 9/18."  It reads, "Pete, Barclays is
19 looking for the net margin balances at each
20 clearing house as of close of business Friday
21 related to all exchange-traded options and
22 futures.  Do you have the information updated
23 through Friday's activity?  If not, what will it
24 take to get this through Barclays."
TSG Reporting - Worldwide    877-702-9580

Page 390

HIGHLY CONFIDENTIAL - M. KELLY
1     Do you see that?
2     A.  Yes.
3     Q.  The e-mail is then forwarded.  You're
4 not on that chain, but you see that it's
5 forwarded to you in the next round.
6         Do you recall receiving this e-mail,
7 sir?
8     A.  I have a vague recollection of
9 receiving this.
10     Q.  Do you recall learning at some point
11 over the weekend that Barclays was looking for
12 the net margin balances at each clearing house
13 as of close of business Friday related to all
14 exchange-traded options and futures?
15     A.  No.
16     Q.  Tell me everything you do recall about
17 receiving this e-mail.
18     A.  I don't remember much.  I remember an
19 information request coming out.  I remember
20 being in the midst of the 15c3.  I don't recall
21 the context or the need for the information.
22     Q.  As of the time you received this
23 e-mail on the Sunday, late Sunday morning, the
24 21st, am I correct in saying that your
TSG Reporting - Worldwide    877-702-9580

Page 391

HIGHLY CONFIDENTIAL - M. KELLY
1
2  understanding was that the margin balances at
3  the clearing houses were not part of the
4  transaction between Lehman and Barclays?
5      A.   I didn't have an understanding.
6      Q.   Either way?
7      A.   Correct.
8      Q.   But looking at the substance of the
9  balance sheet that we marked as Exhibit 432,
10 there was no reference to any of these assets
11 that are discussed in Exhibit 436 on your
12 discussion of the interim balance sheet, "What
13 we do know and don't know"?
14     MR. BERNSTEIN:  Do you want him to go
15 back and look at Exhibit 432?
16     Q.   Yes, if you could have 432 in front of
17 you.
18     A.   Yeah, I have no recollection either
19 way. I mean, it could be included as part of
20 inventory, but I didn't have a view or an
21 understanding at that time.
22     Q.   Handing you, Mr. Kelly, what has been
23 previously marketed as Exhibit 163A. And you'll
24 see that there's an attachment to it. You're,
25 of course, welcome to review that. My questions
TSG Reporting - Worldwide    877-702-9580

Page 392

HIGHLY CONFIDENTIAL - M. KELLY
1  are going to be directed towards the e-mail.
2      A.   Uh-huh.
3      Q.   Do you know what a VIX Statement is,
4  sir?
5      A.   I know what VIX is. I don't know what
6  a VIX Statement is.
7      Q.   What is VIX, just so we're talking
8  about the same thing?
9      A.   VIX is a -- is a term for volatility
10 in the equity markets.
11     Q.   And in that context, do you know what
12 a VIX Statement is?
13     A.   No.
14     Q.   How about a clearing house run, do you
15 know what a clearing house run is in the context
16 of a VIX Statement?
17     A.   I could guess, but no, I don't know.
18     Q.   Okay. What would your guess be?
19     A.   My guess would be it would be a list
20 of positions with the clearing house.
21     Q.   You'll see that the VIX statements are
22 forwarded to you by Gerry Reilly on September
23 21, which is the Sunday at around 2 P.M., do you
24 see that?
25
TSG Reporting - Worldwide    877-702-9580

Page 393

HIGHLY CONFIDENTIAL - M. KELLY
1
2      A.   Yes.
3      Q.   Mr. Reilly notes, "This looks like 500
4  million recv," which I take to be "receivable"?
5      A.   Don't know.
6      Q.   Do you recall receiving this e-mail,
7  sir?
8      A.   No.
9      Q.   Do you have any understanding at all
10 of what Mr. Reilly meant when he wrote to you,
11 "This looks like 500m receivable"?
12     A.   No, I don't recall receiving it, so I
13 don't have an understanding.
14     Q.   That's all I have for that document,
15 sir.
16     I'm handing you what has been
17 previously marked, Mr. Kelly, as Exhibit 95 in
18 these depositions. Again, my questions are
19 primarily going to go to the e-mail rather than
20 the attachments.
21     A.   Okay.
22     Q.   Are you familiar with the documents
23 that are attached to this e-mail?
24     A.   No.
25     Q.   Are you familiar with the type of
TSG Reporting - Worldwide    877-702-9580

Page 394

HIGHLY CONFIDENTIAL - M. KELLY
1
2  document that's attached to this e-mail?
3      A.   No.
4      Q.   Were Lehman's operations at the OCC
5  part of your responsibility in any way prior to
6  the Barclays transaction?
7      A.   There may have been regulatory filing
8  requirements either to or related to OCC
9  activity, but I don't recall specifically.
10     Q.   Do you recall receiving this e-mail on
11 Sunday afternoon, the 21st of September?
12     A.   No.
13     Q.   You see that Frank Pearn sends it to
14 you and others, including Mr. Lowitt, and again,
15 it's an e-mail entitled "Net Loan Options -
16 9/18."
17     Mr. Pearn writes, "Craig Jones
18 provided the OCC statements as of September 22
19 for the LBI 074 account. The statement
20 shows" -- sorry, "The first statement shows
21 collateral value of 522 million (cash and
22 government securities) in LBI. The second file
23 details approximately 2 billion of collateral
24 (letters of credit, cash and securities). Craig
25 Dan confirmed these balances with the OCC and
TSG Reporting - Worldwide    877-702-9580

Page 395

HIGHLY CONFIDENTIAL - M. KELLY
1  HIGHLY CONFIDENTIAL - M. KELLY
2  can answer any questions you may have."
3      Does that refresh your recollection,
4  sir, about receiving this e-mail?
5      A.  No.
6      Q.  Do you have any understanding of why
7  Mr. Pearn sent this e-mail to you and others on
8  Sunday afternoon?
9      A.  I would speculate that Frank is
10 copying the senior managers -- sorry, senior
11 members of Finance that he thought were
12 associated with the transaction.
13     Q.  Having read this e-mail, sir, is it
14 fair to characterize it as reflecting
15 substantial collateral value that LBI had at the
16 OCC?
17     A.  I don't know.  I don't recall
18 receiving the e-mail and I wasn't close enough
19 to this business to have an understanding of it.
20     Q.  Right, but sitting here today, do you
21 read this e-mail in any other way than a summary
22 of Lehman's positions at the OCC -- sorry,
23 Lehman's collateral at the OCC being worth in
24 the region of $2.5 billion?
25     MR. STERN: Objection to form.

TSG Reporting - Worldwide    877-702-9580

Page 396

1  HIGHLY CONFIDENTIAL - M. KELLY
2      A.  I'd have to speculate.  I have no
3  context for the e-mail.
4      Q.  My question is can you read it any
5  other way, sir?
6      MR. STERN: Objection to the form.
7      A.  I've never seen the files before.  I'm
8  not -- I'm not close to these businesses.
9      Q.  So the answer is you don't know one
10 way or the other?
11     A.  I'd have to know more to have a view
12 on it.
13     (Exhibit 437, an e-mail from Martin
14 Kelly to Gerard Reilly, marked for
15 identification, as of this date.)
16     Q.  Mr. Kelly, I have marked as Exhibit
17 437 and placed in front you an e-mail with the
18 subject "VIX statements" sent to you by Gerard
19 Reilly on Sunday, the 21st of September, at 4
20 P.M. Eastern.
21     If you can just let me know when
22 you've had a chance to review that.
23     (Document review.)
24     A.  Uh-huh.
25     Q.  Okay.  Do you remember receiving this

TSG Reporting - Worldwide    877-702-9580

Page 397

1  HIGHLY CONFIDENTIAL - M. KELLY
2  e-mail, sir?
3      A.  No.
4      Q.  It contains a forward or further
5  discussion of an e-mail we've seen a few minutes
6  ago.  Mr. Reilly writes to you and others at
7  4:10 P.M., "This has been confirmed as a good
8  balance.  We are going to send to BarCap, who is
9  looking for our positions and balances.  507
10 million."  Do you see that?
11     A.  Yes.
12     Q.  And then you reply, it looks like
13 immediately, to Mr. Reilly to ask them question:
14 "Where does this fit on the balance sheet in
15 terms of value we have provided to them?"  Do
16 you see that?
17     A.  Uh-huh.
18     Q.  Do you recall asking that question of
19 Mr. Reilly?
20     A.  No, I don't.
21     Q.  Do you agree that it -- withdrawn.
22 Mr. Reilly then replies to you, "Does not it is
23 an exchange receivable."  Do you see that?
24     A.  Yes.
25     Q.  Is it fair to say that Mr. Reilly is

TSG Reporting - Worldwide    877-702-9580

Page 398

1  HIGHLY CONFIDENTIAL - M. KELLY
2  telling you that this balance of 507 million
3  doesn't fit on a balance sheet that you have
4  previously provided to Barclays?
5      A.  Well, I'm not sure at this point if I
6  provided a balance sheet to Barclays.  I'd have
7  to go back and check, but I'm not sure -- I'm
8  not sure I understand what Gerry is saying, so
9  I'm not sure that I understand the
10 interpretation in your question.
11     Q.  Let's try it this way.  What did you
12 mean when you wrote to Mr. Reilly, "Where does
13 this fit on the balance sheet in terms of value
14 we have provided to them?"
15     A.  Well, I don't recall writing it, as I
16 said, but I think in the context of what I was
17 trying to do, which was to reflect our most
18 recent understanding, our most current
19 understanding of the transaction, I was trying
20 to understand how -- how this amount would be
21 characterized as an asset.  I, sitting here
22 today, I don't understand Gerry's point back to
23 me.
24     Q.  So when you ask Mr. Reilly, in
25 essence, whether it fits or where does it fit on

TSG Reporting - Worldwide    877-702-9580

**HIGHLY CONFIDENTIAL - M. KELLY**

1  the balance sheet that we have provided to them,
2  being Barclays --
3      MR. STERN: Objection to the form.
4  That's not what it says.
5      Q.   And Mr. Kelly -- sorry, Mr. Reilly
6  writes back, "Does not," does that indicate to
7  you, sir, that Mr. Reilly is telling you that
8  this asset of 507 million doesn't fit on the
9  balance sheet that has previously been provided
10  to Barclays?
11      MR. STERN: Objection to form.
12      MR. BERNSTEIN: Objection. Asked and
13  answered.
14      A.   I'm not sure I understand what he's
15  saying.
16      Q.   That's all I have for that document.
17      Can we go back to Exhibit 431, which
18  is a handwritten note. Mr. Gaffey has asked you
19  some questions. I'm going to have some
20  follow-up on the specific pages that he has
21  asked you and some questions about some
22  additional pages.
23      If you could turn to the page with the
24  Bates range 11 -- sorry, the Bates number

**HIGHLY CONFIDENTIAL - M. KELLY**

1  115408. We looked at this before with Mr.
2  Gaffey. The first entry on the left-hand side
3  appears to be "FX balances"?
4      A.   Uh-huh.
5      Q.   Below that it appears to read
6  "segregated cash"?
7      A.   Yes.
8      Q.   Is that what you write there?
9      A.   Yes.
10      Q.   And below that can you read for me
11  what you write underneath that or beside that
12  arrow?
13      A.   "Updated balances."
14      Q.   And then below that?
15      A.   "Agree to transfer all dollar
16  released, including free" -- looks like it says
17  "including free good faith deposits." I'm
18  sorry, no, it may say "including from good faith
19  deposits."
20      Q.   Sitting here today, do you know what
21  that note means?
22      A.   No, I don't.
23      Q.   You appear to have drawn an arrow to
24  the left of that and write in the margin, "Need

**HIGHLY CONFIDENTIAL - M. KELLY**

1  to talk to SIPA," do you see that?
2      A.   Yes.
3      Q.   Do you know what you meant when you
4  wrote "need to talk to SIPA"?
5      A.   I would speculate that, in the context
6  of ensuring we had appropriate approvals prior
7  to releasing any cash, that around this
8  particular item we needed to talk to SIPA.
9      Q.   Do you recall having any conversations
10  with SIPA in that context, sir?
11      A.   No, I don't think I've ever spoken
12  with SIPA.
13      Q.   Are you aware of whether anybody
14  either at Barclays or Lehman in connection with
15  this transfer spoke to SIPA in connection with
16  the c3 transfer prior to the closing?
17      MR. STERN: Objection to the form.
18      A.   No.
19      Q.   I think I have your testimony on this.
20  I think you told Mr. Gaffey that you were not
21  able to testify as to the context in which this
22  particular set of notes was written; is that
23  accurate?
24      A.   Yes, context and/or timing.

HIGHLY CONFIDENTIAL - M. KELLY

1      Q.   And just to the right of "updated
2  balances," there's a series of figures. It
3  appears to say "1.9 15c3"; is that what you
4  write there?
5      A.   It does, but it's revised twice with
6  other indentations there.
7      Q.   Can you read those indentations for
8  me, please?
9      A.   One says "now 1.3." The other one
10  says "1.0 now."
11      Q.   And then there's a line off there?
12      A.   "Tony talk to S.E.C."
13      Q.   It says it appears to have something
14  before "talk." Is that Tom, T-O-M?
15      A.   Tony. I think it's Tony Stucchio.
16      Q.   And then below the "1.9 15c3," can you
17  read the line immediately below that?
18      A.   "1.0 good faith deposit."
19      Q.   And below that?
20      A.   "1.9 futures margin," but it says
21  something to the right. Something "for
22  systems." "Wait for systems," I think it says.
23      Q.   Do you have any idea of why you made
24  that note "1.9 futures margin"?

Page 403

HIGHLY CONFIDENTIAL - M. KELLY
1
2    A.    No.
3    Q.    The next line below, you write what
4    appears to be, "Margin receivable from
5    exchanges"; is that what it says?
6    A.    Yes.
7    Q.    And then there's a dash in that line?
8    A.    It's a name. Tennyson, Pete Tennyson.
9    Q.    Who is Pete Tennyson?
10    A.    He works under Tony Stucchio.
11    Q.    And then you have an arrow underneath
12    that has some language that I can't quite read
13    it. Does it say "tough to assign"?
14    A.    I believe so, yes.
15    Q.    Do you have any idea why you made this
16    notation?
17    A.    No.
18    Q.    Why would margin receivables for
19    exchanges be tough to assign?
20    A.    I don't know.
21    Q.    Do you know which exchanges you're
22    referring to?
23    A.    No.
24    Q.    Below that you have in a box what
25    appears to be, "Paolo may get 1 billion from,"

TSG Reporting - Worldwide    877-702-9580

Page 404

HIGHLY CONFIDENTIAL - M. KELLY
1
2    and there's nothing further after the
3    "from." Do I read your handwriting correctly
4    there?
5    A.    Yes.
6    Q.    Do you know what that's a reference
7    to?
8    A.    I think it says "due from Citi" on the
9    left. I can't put that in context.
10    Q.    And then immediately below "DTC -
11    Unpledged box," does that read "too small"?
12    A.    I think so, yeah. It might. I'm not
13    sure actually.
14    Q.    Do you know what that's a reference
15    to, that line "DTC - Unpledged box"?
16    A.    Then or now?
17    Q.    Let's start with then and go to now.
18    A.    Then, no. Now would I think -- I
19    think it would be covered by the privileged
20    conversation.
21    MR. BERNSTEIN:    Let me just -- I don't
22    mean to interrupt, but we agreed to come
23    back from 9 to 1. Because of some technical
24    difficulties, although we were here and
25    ready, we didn't start until 9:18. So at

TSG Reporting - Worldwide    877-702-9580

Page 405

1    HIGHLY CONFIDENTIAL - M. KELLY
2    1:18 we're going to consider, pursuant to
3    our agreement, the deposition will be over.
4    MS. TAGGART:    I'm going to need five
5    minutes of questioning. I think this is not
6    going to be a problem, although there's some
7    issue about whether the four is on the
8    record or not. But does that sound like
9    it's going to work with your time?
10    MR. OXFORD:    Yeah, I understand that,
11    Rich, you had the conversation with Bob
12    about the testimony today. It's my
13    understanding there was going to be four
14    hours of testimony, not four hours start to
15    finish, not including breaks.
16    MR. BERNSTEIN:    I've got the e-mails
17    that are quite clear.
18    MR. OXFORD:    That said, I think this
19    is my last document. I've got five minutes.
20    MR. BERNSTEIN:    Okay. The witness has
21    stepped out to go to the bathroom, I
22    believe, so we should go off the record
23    until he gets back.
24    (Pause in the proceedings.)
25    BY MR. OXFORD:

TSG Reporting - Worldwide    877-702-9580

Page 406

1    HIGHLY CONFIDENTIAL - M. KELLY
2    Q.    Can you turn, Mr. Kelly, to the page
3    ending Bates number 412. At the top of the page
4    it appears to read, "Margin debits are netted,
5    but netted in aggregate." Do I read your
6    writing correctly?
7    A.    Yes.
8    Q.    Can you tell me what that's a
9    reference to, if you're able?
10    A.    It might refer to the 15c3. It might
11    not, though. I'm not sure.
12    Q.    Turning to page 414, in the middle of
13    the page is written what appears to be
14    "warrants" and then there's a line down?
15    A.    Uh-huh.
16    Q.    Where it appears to read, "Expiry date
17    Friday. Exchange margin. Need to know balance
18    at Friday night"; is that correct?
19    A.    Yes.
20    Q.    Do you know what that's a reference
21    to, sir?
22    A.    No, I don't.
23    Q.    Do you recall any conversations with
24    anyone prior to closing about the topic of
25    expiry dates on exchange margins?

TSG Reporting - Worldwide    877-702-9580

Page 407

HIGHLY CONFIDENTIAL - M. KELLY
1  A.  No.
2
3  Q.  Turning to 419, please. I just want
4  to go back and make sure, Mr. Gaffey asked you
5  about the words after the second arrow,
6  "Commitment to release 769 million"?
7  A.  Yes.
8  Q.  I believe your testimony was that you
9  had no understanding, prior to the closing of
10  the transaction, as to what this line is a
11  reference to; is that accurate?
12  A.  Yes.
13  Q.  So you have no personal knowledge
14  about any commitments made by Lehman to Barclays
15  or anyone else to release 769 million from the
16  c3 account or elsewhere? And again, my question
17  is with respect to the time period prior to the
18  closing.
19  A.  Yes, that's my recollection.
20  Q.  Did you have any conversations with
21  anybody, Mr. Lowitt -- withdrawn -- Mr. Kelly,
22  about any business agreement between Barclays
23  and Lehman that Barclays would receive a
24  particular amount of assets in the event that
25  there was a shortfall in the c3 excess?

TSG Reporting - Worldwide    877-702-9580

Page 408

HIGHLY CONFIDENTIAL - M. KELLY
1
2  MR. BERNSTEIN: This is prior to the
3  closing?
4  MR. OXFORD: Prior to the closing.
5  A.  Not prior to the closing.
6  Q.  422, please. There's a reference at
7  the bottom of the page. It appears to read "DTC
8  800 million Friday, 1100 million DTC"?
9  A.  Uh-huh.
10  Q.  Do you see that?
11  A.  Yes.
12  Q.  Do you know what the reference is,
13  that first line I read, "DTC 800 million on
14  Friday"?
15  A.  No.
16  Q.  Do you have any information about
17  transfers that were made from Lehman to Barclays
18  on September 19 from the DTC?
19  A.  No.
20  MR. OXFORD: Thank you. Mr. Kelly. I
21  have nothing further from you.
22  EXAMINATION BY
23  MS. TAGGART:
24  Q.  Hi, Mr. Kelly. My name is Erica
25  Taggart and I represent the Creditors Committee.

TSG Reporting - Worldwide    877-702-9580

Page 409

HIGHLY CONFIDENTIAL - M. KELLY
1  At any time in 2008 did you have any
2  communications with anyone from the Creditors
3  Committee about the Barclays sale transaction?
4  A.  No, I don't believe so.
5  Q.  Did you have any correspondence with
6  anyone from the law firm of Milbank about the
7  Barclays sale transaction at any time in 2008?
8  A.  I don't believe so.
9  Q.  Same question for Quinn Emanuel, a law
10  firm, Quinn Emanuel?
11  A.  I don't believe so.
12  Q.  What about a financial professional
13  services group of Houlihan Lokey?
14  A.  I don't believe so.
15  MS. TAGGART: That's all my questions.
16  MR. BERNSTEIN: Thank you all.
17  (Time Noted: 1:11 P.M.)
18
19
MARTIN KELLY
20
21  Subscribed and sworn to
before me this   day
22  of    2009.
23

24  _____
25  CERTIFICATE

TSG Reporting - Worldwide    877-702-9580

Page 410

HIGHLY CONFIDENTIAL - M. KELLY
1  STATE OF NEW YORK )
2                : ss
3  COUNTY OF NEW YORK)
4  I, Kathy S. Klepfer, a Registered
5  Merit Reporter and Notary Public within and
6  for the State of New York, do hereby
7  certify:
8  That MARTIN KELLY, the witness whose
9  deposition is herein before set forth, was
10  duly sworn by me and that such deposition is
11  a true record of the testimony given by such
12  witness.
13  I further certify that I am not
14  related to any of the parties to this action
15  by blood or marriage and that I am in no way
16  interested in the outcome of this matter.
17  I further certify that neither the
18  deponent nor a party requested a review of
19  the transcript pursuant to Federal Rule of
20  Civil Procedure 30(e) before the deposition
21  was completed.
22  In witness whereof, I have hereunto
23  set my hand this 20th day of November, 2009.
24  ------------------------
25  KATHY S. KLEPFER, RPR, RMR, CRR, CLR

TSG Reporting - Worldwide    877-702-9580

Page 411

1          HIGHLY CONFIDENTIAL - M. KELLY
2               INDEX
3  TESTIMONY OF M. KELLY:        PAGE

4  Examination by Mr. Gaffey ................  262
5  Examination by Mr. Oxford ................  366
6  Examination by Ms. Taggart................  408
7  EXHIBITS:              PAGE
8  Exhibit 427, a document bearing Bates Nos.   286
9  BCI-EX-00115126 through 140
10  Exhibit 428, a document bearing Bates Nos.   305
11  BCI-EX-00115142 through 153
12  Exhibit 429, a document bearing Bates Nos.   318
13  BCI-EX-00115167 through 173
14  Exhibit 430, a document bearing Bates Nos.   326
15  BCI-EX-00115297 through 313
16  Exhibit 431, a document bearing Bates Nos.   332
17  BCI-EX-00115394 through 449
18  Exhibit 432, and e-mail from Martin Kelly to   370
19  James Walker
20  Exhibit 433, an e-mail from Martin Kelly to   376
21  Matthew Hughey
22  Exhibit 434, an e-mail from Martin Kelly to   378
23  Tony Stucchio
24  Exhibit 435, an e-mail from Chris O'Meara to   381
25  Bart McDade and Martin Kelly

TSG Reporting - Worldwide    877-702-9580

---

Page 412

1          HIGHLY CONFIDENTIAL - M. KELLY
2            INDEX (Cont'd.)
3  EXHIBITS:             PAGE

4  Exhibit 436, an e-mail from Tony Stucchio to   388
5  Martin Kelly
6  Exhibit 437, an e-mail from Martin Kelly to   396
7  Gerard Reilly

TSG Reporting - Worldwide    877-702-9580

---

Page 413

1      HIGHLY CONFIDENTIAL - M. KELLY
2  NAME OF CASE:  In re Lehman Brothers
3  DATE OF DEPOSITION:  November 20, 2009
4  NAME OF WITNESS:  MARTIN KELLY
5  Reason Codes:
6     1. To clarify the record.
      2. To conform to the facts.
7     3. To correct transcription errors.
8  Page _____ Line _____ Reason _____
    From _____ to _____
9
    Page _____ Line _____ Reason _____
10  From _____ to _____
11  Page _____ Line _____ Reason _____
    From _____ to _____
12
    Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
    From _____ to _____
15
16  Page _____ Line _____ Reason _____
    From _____ to _____
17  Page _____ Line _____ Reason _____
    From _____ to _____
18
    Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
    From _____ to _____
21
22  Page _____ Line _____ Reason _____
    From _____ to _____
23  Page _____ Line _____ Reason _____
    From _____ to _____
24
25

TSG Reporting - Worldwide    877-702-9580