# BCI EXHIBIT

# 77

Page 1

1

2                UNITED STATES BANKRUPTCY COURT

3                  SOUTHERN DISTRICT OF NEW YORK

4        ------------------------x

5        In Re:

6                                  Chapter 11

7        LEHMAN BROTHERS        Case No. 08-13555(JMP)

8        HOLDINGS, INC., et al,    (Jointly Administered)

9                        Debtors.

10       ------------------------x

11

12             * * *HIGHLY CONFIDENTIAL* * *

13             DEPOSITION OF STEPHEN KING

14                  New York, New York

15                  September 10, 2009

16

17       Reported by:

18       MARY F. BOWMAN, RPR, CRR

19       JOB NO. 24299

20

21

22

23

24

25

## Page 2

```
 1
 2
 3
 4
 5                    September 10, 2009
 6                    9:35 a.m.
 7
 8
 9          Deposition of STEPHEN KING held at
10    the offices of Jones Day, LLP, 222 East 41st
11    Street, New York, New York, before Mary F.
12    Bowman, a Registered Professional Reporter,
13    Certified Realtime Reporter, and Notary Public
14    of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2                    APPEARANCES:
 3    JONES DAY, LLP
 4    Attorneys for Lehman Brothers, Inc.
 5       222 East 41st Street
 6       New York, New York  10017-6702
 7    BY:  WILLIAM HINE, ESQ.
 8       GEORGE E. SPENCER, ESQ.
 9
10    BOIES, SCHILLER & FLEXNER, LLP
11    Attorneys for Barclays and The Witness
12       575 Lexington Avenue
13       New York, New York  10022
14    BY: JACK STERN, ESQ.
15
16    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
17    Attorneys for the Creditors Committee
18       51 Madison Avenue
19       New York, New York  10010
20    BY:  ROBERT K. DAKIS, ESQ.
21
22
23
24
25
```

## Page 4

```
 1
 2                    APPEARANCES:
 3
 4    JENNER & BLOCK, LLC
 5    Attorneys for the Examiner
 6       330 N. Wabash Avenue
 7       Chicago, Illinois  60611-7603
 8    BY:  DAVID C. LAYDEN, ESQ.
 9
10    HUGHES, HUBBARD & REED, LLP
11    Attorneys for the SIPA Trustee
12       One Battery Park Plaza
13       New York, New York  10004-1482
14    BY:  NEIL J. OXFORD, ESQ.
15       FARA TABATABAI, ESQ.
16
17    Also Present:
18       INGRID M. CHRISTIAN, Alvarez & Marsal
19
20
21
22
23
24
25
```

## Page 5

```
 1
 2
 3
 4
 5          IT IS HEREBY STIPULATED AND AGREED, by
 6    and between the attorneys for the respective
 7    parties herein, that filing and sealing be
 8    and the same are hereby waived.
 9          IT IS FURTHER STIPULATED AND AGREED
10    that all objections, except as to the form
11    of the question, shall be reserved to the
12    time of the trial.
13
14
15          IT IS FURTHER STIPULATED AND AGREED
16    that the within deposition may be sworn to
17    and signed before any officer authorized to
18    administer an oath, with the same force and
19    effect as if signed and sworn to before the
20    Court.
21
22
23
24
25
```

Page 6

1      KING - HIGHLY-CONFIDENTIAL
2    STEPHEN KING,
3        called as a witness by the parties,
4        having been duly sworn, testified as
5        follows:
6    EXAMINATION BY
7    MR. HINE:
8        Q.    Good morning, Mr. King.
9        A.    Good morning.
10       Q.    We met briefly off the record. My
11   name is Bill Hine. I am from Jones Day, which is
12   the law firm representing, or acting as special
13   counsel for Lehman Brothers Holdings, Inc. in
14   connection with the bankruptcy proceeding that's
15   ongoing, and this deposition is related to that
16   proceeding.
17       Have you ever been deposed before?
18       A.    No.
19       MR. STERN: Can we just introduce the
20   other people in the room.
21       MR. HINE: Sure. Myself from Jones
22   Day, and my associate is George Spencer, who
23   will be joining us shortly.
24       Do you want to go around the table?
25       MR. OXFORD: Neil Oxford with the law

Page 7

1      KING - HIGHLY-CONFIDENTIAL
2    firm of Hughes Hubbard & Reed. We represent
3    the SIPA trustee, and my colleague is Fara
4    Tabatabai.
5        MR. DAKIS: I'm Robert Dakis. I'm
6    from the law firm of Quinn, Emanuel,
7    Urquhart, Oliver & Hedges, and we represent
8    the official committee of unsecured
9    creditors.
10       MR. LAYDEN: David Layden from Jenner
11   & Block.
12       MR. HINE: This is Ingrid Christian,
13   who has lost her voice, from Alvarez &
14   Marsal, so I will do the honors of
15   introducing her.
16   BY MR. HINE:
17       Q.    Mr. King, as I'm sure your counsel has
18   explained, I am going to ask you a series of
19   questions. You are going to provide the answers
20   as best you can.
21       I did want to alert you to one
22   procedural rule we have here. From time to time
23   during the deposition, your lawyer will
24   undoubtedly state an objection or make some kind
25   of statement on the record as to the form of my

Page 8

1      KING - HIGHLY-CONFIDENTIAL
2    question.
3        MR. STERN: Very unlikely.
4        Q.    I just want to let you know that does
5    not relieve you of the obligation to answer the
6    question. It is just Jack being Jack. It is Jack
7    doing his job, stating objections to the form of
8    the question.
9        In that regard, I will undoubtedly ask
10   a confusing question or a question that misuses a
11   term that you folks in your profession use all the
12   time. I feel like I am learning a new language
13   here in some sense. So please correct me if I
14   make a mistake with the term or abbreviation or
15   some kind of concept, because I really do want to
16   ask a clear question so you can then give me a
17   clear answer. OK?
18       A.    Um-hm.
19       Q.    And if at any time you need a break,
20   let me know. This is not an endurance test, so
21   just let me know if you need a break.
22       A.    Sure.
23       Q.    Can we start with your title at
24   Barclays? What is your title?
25       A.    I am managing director and head of a

Page 9

1      KING - HIGHLY-CONFIDENTIAL
2    group called PMTG.
3        Q.    And PMTG stands for what?
4        A.    Portfolio mortgage trading group.
5    Principal mortgage trading group. I forgot what
6    the P was. It has been so long since we named it.
7        Q.    How long have you held that title?
8        A.    MD I have had for three, four years, I
9    think, and the PMTG group was formed in late 2007.
10       Q.    Could you describe for me briefly your
11   duties in this position?
12       A.    I run the group. It is ostensibly a
13   trading and risk management group. It is -- once
14   upon a time its primary asset was mortgages and
15   mortgage-related securities and derivatives
16   thereon.
17       We manage a portfolio of assets which
18   the bank owned that were mortgage assets, and we
19   also have a proprietary trading activity.
20       Q.    Who do you report to directly?
21       A.    I report to Eric Bommensath.
22       Q.    And do you know his title?
23       A.    He is global head of -- global head of
24   fixed income, I think, and there are some other
25   bits to it, too.

KING - HIGHLY-CONFIDENTIAL

1
2      Q.    And who reports directly to you?
3      A.    Do I need to list all of them?
4      Q.    No. I'm just interested in the
5    principal folks that report to you directly.
6      A.    The team is -- well, the team is
7    slightly different today than it was a few months
8    ago. It is about 30 or so people. They are --
9    the senior folks are -- a number of them are
10   senior traders who trade a range of securities. I
11   can give you their names if you like, if it is
12   relevant, for those traders, and then there are
13   also operations and risk management personnel as
14   well.
15     Q.    Could you give me the heads of the --
16   let me just ask it this way: Is your group broken
17   into separate divisions or --
18     A.    Separate not divisions but functions.
19   It is one trading operation, but within that, we
20   have different products, different risks.
21   Therefore, the group is organized along those
22   risks. But it is really -- in the terminology of
23   a bank, it is one desk.
24     Q.    OK. Does Mr. Yang report directly to
25   you?

KING - HIGHLY-CONFIDENTIAL

1
2      A.    Yes, yes. Jasen reports directly to
3    me.
4      Q.    Is it fair to say that you held this
5    same position during the week of September 15,
6    2008?
7      A.    Yes.
8      Q.    And --
9            MR. STERN: I am just going to put out
10     the blank September 2008 calendar, just in
11     case Mr. King needs to reference it.
12           MR. HINE: That's a good idea.
13     A.    It is fair to say that this group came
14   into existence or was derived from another group
15   which I ran in 2007 in a response to the crisis in
16   credit markets and mortgage-related assets. So
17   therefore, the group's character has changed in
18   response to those conditions over the two years,
19   or three years. I guess it is going on towards
20   three years now.
21           One of those things that prompted
22   change was the bankruptcy or seize of Lehman
23   itself. So we expanded the group in response to
24   the need to manage the substantial portfolio of
25   risks and assets which the bank had taken on as a

KING - HIGHLY-CONFIDENTIAL

1
2    result of that acquisition. So there is a slight
3    change in character immediately prior to and
4    immediately following the purchase.
5      Q.    When you say that acquisition, you are
6    meaning the acquisition of Lehman assets?
7      A.    The Lehman assets, yes.
8      Q.    As you can probably expect, most of
9    this deposition is going to center around the week
10   of September 15.
11     A.    Right.
12     Q.    Could you give me just a general
13   description of your role in connection with the
14   Lehman acquisition during that week?
15     A.    Yes. My -- we are a -- I forgot P is
16   principal and not portfolio. We are a principal
17   risk taking or risk managing unit, so -- and
18   essentially we were -- we manage or managed
19   illiquid risks, particularly difficult to trade
20   risks, particularly things like mortgages,
21   mortgage-backed securities.
22           So during this week and in the lead up
23   to the week, our job was -- my job was to
24   facilitate in gathering estimates as best as
25   possible in a very short period of time for the --

KING - HIGHLY-CONFIDENTIAL

1
2    for useful marks or valuations or prices for
3    various securities that were part of the various
4    different proposed purchase -- asset purchases,
5    and then the on boarding of this risk and then the
6    risk management of that risk. That was our
7    function.
8      Q.    When you say illiquid risks or
9    illiquid assets, is there a separate unit within
10   Barclays that performs your function with respect
11   to more liquid assets?
12     A.    No. A -- I mean I guess the answer
13   probably is yes, at some point. It may be it
14   would be Treasury or it would be something else in
15   the bank. For the most part, banks don't hold
16   large amounts of liquid risks, that trading
17   functions -- the reason this group was formed was
18   to deal with the fact that these are incredibly
19   difficult assets to dispose of.
20     Q.    I understand.
21     A.    And they trade, many of them trade by
22   appointment, meaning there is no exchange or
23   obvious market that you can easily trade the
24   assets.
25           So we all, we do use liquid

Page 14

KING - HIGHLY-CONFIDENTIAL

1 instruments and liquid assets in the risk
2 management of these illiquid assets, so we trade
3 everything. But that's really the reason for the
4 existence of the business.
5 Q. I understand.
6 Before we get into the week of
7 September 15, is your group separate and distinct
8 from something I see referred to as PCG?
9 A. PCG is a control function. So
10 that's -- we are a trading group as opposed to
11 a -- so we work, I work for Eric Bommensath, who
12 works for Jerry in the business, if you like, as
13 opposed to product control, which is a control
14 function which reports up ultimately into Patrick.
15 Q. Patrick Clackson?
16 A. Yes.
17 Q. So just I'm trying to picture the
18 structure of Barclays. The PCG group reports
19 under his reporting line, not yours, correct?
20 A. PCG is a firm-wide function. It is
21 product control group, so it is a control
22 function. It deals with -- our interaction on a
23 daily basis with product control is to insure that
24 we have mandates to trade, that we are marking our

Page 15

KING - HIGHLY-CONFIDENTIAL

1 books appropriately, that we are reporting
2 appropriately, and that all of the things that we
3 have to do on a normal basis are administered in
4 such a way that they can roll up into the firm's
5 books and records, et cetera, appropriately.
6 Q. Can we talk specifically about the
7 week of September 15, and just to set some
8 parameters in case you are as bad with dates as I
9 am, September 15 is the date that Lehman Brothers
10 Holdings declared bankruptcy.
11 Can I ask you this question first.
12 You are aware there was some discussions between
13 Barclays and Lehman prior to that filing of
14 bankruptcy?
15 A. Yes, yes.
16 Q. Did you have any involvement in those
17 discussions?
18 A. Yes.
19 Q. Could you describe for me generally --
20 and again we are talking about the weekend of,
21 say, the 12th, 13th and 14th of September, right?
22 A. Yes.
23 Q. Could you just describe for me
24 generally your role in those sessions?

Page 16

KING - HIGHLY-CONFIDENTIAL

1 A. The same.
2 Q. Meaning --
3 A. That we were provided a list of
4 securities and assets that were -- at least what
5 we understood were owned or held by -- the 14th is
6 prior to the bankruptcy -- up to the bankruptcy of
7 LBM, so that then we were looking at the assets of
8 Lehman Brothers in its entirety.
9 Q. OK.
10 A. And then -- and there, our function
11 was to look at just the mortgage-related assets of
12 the Lehman Brothers overall group. But the
13 function was then the same, so assess estimates of
14 value or prices for categories of assets, and we
15 never really got to the risk management stage,
16 obviously because no transaction occurred.
17 Q. When you say assess the category or --
18 categories of assets, were you provided a list of
19 all the CUSIPs that Lehman held at the time or --
20 A. We were provided various lists of
21 CUSIPs or other such descriptions of assets that
22 Lehman held. I mean in the lead up to the 14th,
23 it was -- because it was the whole Lehman entity,
24 there were other assets, too, that weren't

Page 17

KING - HIGHLY-CONFIDENTIAL

1 securities. For example, loan portfolios in
2 Europe, so they didn't have CUSIPs. But we would
3 also attempt to assess some kind of price for
4 those based on some simple analysis.
5 Q. Your mandate during that period was
6 beyond just securities, it was any illiquid asset?
7 A. No. Then we were really strictly
8 mortgage or asset-backed type assets. There was
9 an overall coordination of many groups. At that
10 point there were many groups or many trading desks
11 at Barclays in Europe and the U.S. that were
12 attempting to assess the entire Lehman Brothers
13 balance sheet or list of securities and assets.
14 So we were then just one, we were focused on one
15 part of that.
16 Q. And did you come to New York to
17 participate in those discussions?
18 A. We are based in New York.
19 Q. So you participated in meetings with
20 Lehman folks during that weekend?
21 A. I don't know whether we did by that
22 weekend. That was really -- I thought that was --
23 I thought in the lead up to that week, there was a
24 data room that was set up by Lehman. I never went

Page 18

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    to it actually, but one of the people that works
3    for me did.
4        I would have been at Lehman over the
5    weekend, but most of what we did was phone calls
6    to people and -- I mean in reality, there is a --
7    it is a -- there were many, many -- this was a
8    phenomenally complex situation just because of the
9    number of line items. So in many respects, the
10   approach that we took to the analysis was high
11   level down rather than bottom up, meaning to have
12   accurately assessed the value of an individual
13   security by reference to talking to a trader when
14   there were then, say, 10,000 line items was less
15   useful than being able to initially categorize
16   things as residential mortgage-backed securities,
17   credit card securities, et cetera, et cetera,
18   subordinate, senior, and then have broad
19   valuations based on where we know similar markets
20   trade, and then each day we just refined.
21       Q.   OK, I think I understood what you
22   said. When you said bottom up, you mean if you
23   had the luxury of time, you -- one might go CUSIP
24   by CUSIP or security by security and try to assess
25   the value of an individual security?

Page 19

1    KING - HIGHLY-CONFIDENTIAL
2        A.   Right, right.
3        Q.   But you didn't have the luxury of
4    time. Is that what I hear you saying?
5        A.   Luxury of time and even time -- then
6    markets are actually moving, so I would have to
7    be -- if you had infinite resources for a very
8    short period of time, then you might try to go
9    bottom up.
10       As -- once we had a definitive set --
11   it was really -- so the first exercise was -- and
12   this was repeated as we went through the 15th,
13   through the various iterations of the asset
14   population, was one, do we have a complete
15   description of the population, can we categorize
16   the population, can we estimate valuations for the
17   categories within the population, can we refine
18   and improve those estimates, increasingly becoming
19   more granular. Have we engaged the appropriate
20   desks, trading desks within Barclays to -- or
21   existing Lehman desks, to provide us as much input
22   to where markets are or what securities -- what a
23   particular security is.
24       And then the last part was how do we
25   risk -- what is the risk associated with these

Page 20

1    KING - HIGHLY-CONFIDENTIAL
2    categories of securities and how might we either
3    plan to dispose of the assets or in the short term
4    risk manage the assets.
5        Q.   When you say risk manage, you mean
6    hedging?
7        A.   For example, hedging, yeah.
8        Q.   So the process you have described, is
9    it correct to say it started on the weekend of the
10   13th or 14th and then continued in some form
11   throughout the week of the 15th?
12       A.   Yes.
13       Q.   And how did it change -- well, as I
14   understand it, on the 14th, it was concluded that
15   there was no deal between Barclays and Lehman,
16   correct?
17       A.   That's what I understand, yeah.
18       Q.   And how did you learn that the talks
19   were going to start again?
20       A.   I think it was at some point on the
21   15th or 16th, we were once again asked to look at
22   another population of assets that was a subset of
23   the population of assets that we had been looking
24   at the previous week.
25       Q.   That was going to be my question. How

Page 21

1    KING - HIGHLY-CONFIDENTIAL
2    did the population of assets change from the
3    weekend to the 15th?
4        A.   It was now the assets of LBI or what
5    we thought were the assets of LBI as opposed to
6    the assets of, say, LB. Because there we were
7    looking at all assets regardless of whether they
8    were held by LBH or LBIE or -- so, but by that
9    point we knew we were just looking at or what we
10   thought we were looking at was the assets that
11   were included in the balance sheet for LBI.
12       Q.   OK. Now, were you provided additional
13   information on the 15th or did you just use the
14   information you had previously acquired or --
15       A.   No, we -- I'm not sure -- we may have
16   been provided some of that information the
17   previous week. Again, because the scope of the
18   exercise had narrowed from the entire -- you know,
19   us participating in a small part of assessing the
20   overall assets of Lehman Brothers to a larger part
21   of a much -- a subset of that overall population,
22   which was now just the LBI assets.
23       In keeping with the process of
24   improved granularity of analysis as the population
25   shrunk or the -- we were able to look at a more

**Page 22**

1        KING - HIGHLY-CONFIDENTIAL
2    refined list of assets on the 15th and spend more
3    time. But we definitely reused the -- where there
4    was overlap with analysis that we had done the
5    previous week, we definitely reused it.
6        Q.    Let's start with this document. I
7    think -- well, during the -- now we are in the
8    week of the 15th, starting Monday. Ultimately
9    some kind of agreement was concluded between
10   Lehman and Barclays on the 16th, correct?
11       A.    In relation to --
12       Q.    Well, an agreement was signed on the
13   16th. Are you aware of that?
14       MR. STERN:    Objection to the form.
15       A.    I don't --
16       Q.    Did you ever see what has been termed
17   the asset purchase agreement in connection with
18   the Lehman-Barclays transaction?
19       A.    I have seen drafts of it.
20       Q.    Were you involved in the -- I am just
21   trying to get a scope of what your involvement
22   was. Were you involved in the back and forth
23   negotiations as to the terms of the asset purchase
24   agreement?
25       A.    No, no.

**Page 23**

1        KING - HIGHLY-CONFIDENTIAL
2        Q.    In the course of your -- well, let me
3    get back to the 15th. On the 15th and 16th, did
4    you participate in meetings between Barclays and
5    Lehman?
6        A.    I don't think so. I mean we may have
7    done on the 16th, but if it was, it was strictly
8    to do with identifying the -- you know, a trader
9    who may have been able to provide us clarity about
10   what a particular security was. But I think --
11   but there wasn't an awful lot of that that we had
12   to do.
13       And it was very -- you know, we did
14   more of that in the previous week when we were
15   trying to understand what the asset population
16   was. That was really when we needed some
17   assistance with people from Lehman.
18       But on the 16th, around the 15th and
19   16th, the only thing I could think, we probably --
20   there must have been some dialog, have we got a
21   list of securities to look at. So I would think
22   that we were sent lists, so if you wanted to
23   include e-mails sending us lists of securities,
24   I'm sure that yes, there is communication.
25       But communication in the sense of did

**Page 24**

1        KING - HIGHLY-CONFIDENTIAL
2    we sit down and have conversations with people,
3    very, very limited.
4        Q.    Well, I understand the providing of
5    information part of the discussion, but separate
6    from that, was there a back and forth as to the
7    valuation or marking of particular Lehman assets
8    that were the subject of the discussions?
9        A.    I don't think so really. The -- on
10   the 15th and 16th. No. I think for the most part
11   the 15th and 16th was trying to establish have we
12   got -- these exercises are -- they take a lot of
13   effort.
14       Q.    Sure.
15       A.    And the reason why we were involved
16   was because we had some proficiency in dealing
17   with understanding new populations of securities
18   or assets, because that's what we had been doing
19   for the last year and a half.
20       So one thing that we -- one thing that
21   is critical is to insure that you are not spending
22   a tremendous amount of time working on things that
23   were irrelevant. So the first thing we need is to
24   be sure that we have got the correct population.
25   If we are spending time analyzing something that

**Page 25**

1        KING - HIGHLY-CONFIDENTIAL
2    isn't going to be delivered, then we have
3    definitely wasted time. We are coming up with a
4    wrong valuation and we will never manage the
5    correct risk.
6        So I think mostly around the 15th and
7    16th would have been, well, OK, what are we
8    looking at this time? And of course during the
9    course of that week, and that's why -- you know,
10   my -- the only reason why I am vague as to exactly
11   what happened the 15th, 16th and 17th, is that it
12   changed so much so rapidly, that most of what was
13   happening on the 15th and 16th and almost all of
14   what we were looking at became redundant by some
15   time on the 16th, 17th or 18th.
16       MR. STERN:    Let me just to clarify, I
17   take it you are focusing on what Mr. King's
18   role was and what he was involved in, and
19   when he uses the term "we," he is referring
20   to himself and his group as opposed to
21   Barclays as a whole.
22       THE WITNESS:    That's absolutely
23   correct.
24       MR. HINE:    I understand. I
25   understand.

Page 26

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2        Q.    But, Mr. King, you folks didn't accept
3    the -- at face value the valuations or marks that
4    Lehman had put on various asset groups, did you?
5        A.    No.
6        Q.    Did you come to some conclusions about
7    the accuracy of Lehman's marks when you were
8    looking at all these asset groups?
9        A.    It is a peculiar way to describe it,
10    did we come up with some assessment of the
11    accuracy of Lehman's marks.  In some respects I
12    could say I didn't care about Lehman's marks.  I
13    cared about what was a reasonable assessment for
14    the value of the assets and ultimately what was
15    the risk that we were going to have to manage.
16        If you think about the way a -- as a
17    trader would think, we received phone calls from
18    somebody saying I'd like you to buy -- would you
19    be interested in buying the following at a price
20    or 72.  It is fascinating it is 72 they would like
21    to sell it to me at, but mostly I am interested in
22    where we would be interested in buying it, 55.
23        So can I therefore say ex post facto
24    that, you know, well, I have got some -- I didn't
25    think their offer of 72 was particularly accurate,

Page 27

1    that's an inadvertent output of the fact that we
2    wanted to bid it at 50-something.
3        Q.    I think my question exhibited my
4    inexperience in this field, so I will try again.
5        Did you -- when you received the
6    information from Lehman, it had some kind of book
7    value ascribed to it by Lehman, correct?
8        A.    Yes.
9        Q.    Did you understand that by the time
10    Barclays and Lehman signed an agreement, that
11    there was going to be some kind of discount off of
12    that book value for the pool of assets that
13    Barclays was going to be acquiring?
14        A.    The signing of the agreement on the
15    Tuesday that you have told me about?
16        Q.    Yes, yes.
17        A.    -- or later --
18        Q.    Yes.
19        A.    I don't know much -- I don't really
20    know what agreement was reached on the 16th.  All
21    I know is that there was some assets that we were
22    looking at.  I would assume that it wouldn't have
23    been at all a surprise to anybody that a bid, even
24    a reasonable bid or reasonable assessment of a bid

Page 28

1    KING - HIGHLY-CONFIDENTIAL
2    for small size would be at a discount to book
3    value if that's the valuation that you are
4    referring to.  Book value being where it is held
5    in books and records.
6        Q.    Well, I guess I understand your
7    answer, but do you have any recollection of
8    discussions during that period of time -- and
9    again I'm talking the 15th and 16th -- about
10    either discounting or reducing the values that
11    Lehman had ascribed to these pools of assets in
12    order to come to an agreement as to the pool of
13    assets or the marks for the pool of assets that
14    Barclays was going to acquire?
15        MR. STERN:  This is you personally.
16        A.    This is me personally.  I have never
17    had any conversations with anybody at Lehman about
18    discounting Lehman's marks.  It is definitely the
19    case that in the crudest -- if somebody said to
20    me, Stephen, here is a security, you don't know
21    what it is, but, you know, it is -- it has a
22    price -- the last time it traded it had a price of
23    50, let's say, mentally, I would say, well, I know
24    it is not -- I certainly wouldn't be bidding 50.
25    I would be bidding half of that or 20 percent of

Page 29

1    KING - HIGHLY-CONFIDENTIAL
2    that or 80 percent of that or some number.
3        So it is definitely the case that when
4    we were trying to guess what might be a reasonable
5    value, in a very, very distressed market --
6        Q.    Sure.
7        A.    A very, very distressed market for a
8    very, very substantial number of assets that
9    Barclays would want to be selling, and Barclays
10    didn't -- bear in mind, Barclays didn't want these
11    assets.  The assets were -- you wouldn't want to
12    hold on to them.  They consume capital.  They need
13    to be funded.  Funding was expensive, capital was
14    expensive.
15        The assets were part of, you know, a
16    deal, and therefore, they would -- and, you know,
17    the -- I avoided the word "hedging" when you used
18    hedging because hedging doesn't really -- hedging
19    still means there is a left-over risk.  You never
20    really -- especially with assets like this.
21    Hedging is just, well, I have got one thing that
22    I'm short against something I am long.  It is not
23    very well hedged, there is still a risk, and
24    that's why banks and hedge funds have had quite a
25    lot of difficulty in the last few months.

Page 30

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2        So we knew that the objective would be
3    that we need to dispose of this risk. That was
4    the objective. So if I was looking at a portfolio
5    of assets, and you held the assets at 100, let's
6    say, I'd say I don't know -- and I felt
7    comfortable that I understand what the assets are,
8    my bet is I couldn't sell those for more than
9    80 cents of where you have currently ascribed a
10   value to them.
11       So yes, when we -- as a desk, the "we"
12   meaning my group, one of the first things that we
13   did was say, let's just assume that the stuff we
14   don't know is at 50 percent of book value. The
15   stuff that is exchange traded equities is at
16   95 percent of where it is, because that was a --
17   the crudest form of guess.
18       Q.    Is that the type of analysis you were
19   doing on the 15th and 16th when you described -- I
20   think you previously talked about a top-down
21   approach as opposed to bottom up?
22       A.    Yes. Because you do that -- really if
23   you think about it, you repeatedly do that same
24   process at an ever-more granular level. Even if
25   you got down to an individual security, a trader

Page 31

1    KING - HIGHLY-CONFIDENTIAL
2    would say I've projected -- the thing about some
3    of these securities and assets is, unlike -- not
4    all of them but some of them, and certainly the
5    ones that we would have been looking at at this
6    time, they are not -- even though many of them are
7    called fixed income or debt instruments, the
8    amount of cash that they would be expected to
9    ultimately pay is actually uncertain, either
10   because there is a lot of risk associated with the
11   borrower or there is a prepayment risk or there is
12   something that makes the cash flow uncertain.
13       So the way a trader would look at it
14   is to say, I'll make a -- I'll form a view of how
15   much cash that I would want -- that I expect to
16   receive on this security, and then I would want to
17   discount the amount of cash back to some price
18   that I felt that I was earning an appropriate
19   yield on. And then when a trader was then
20   subsequently bidding, they then may provide --
21   say, actually I'll bid 80 percent of that.
22       So whether it is at the portfolio
23   level, when we are looking at a whole balance
24   sheet, or an individual CUSIP, in many respects
25   the process is the same. It is about how

Page 32

1    KING - HIGHLY-CONFIDENTIAL
2    confident you can be that you have assessed
3    everything correctly, because there is so much
4    uncertainty.
5        Q.    I think I understand that.
6        So during this early stage now, the
7    15th and 16th, is it correct to say you're looking
8    at particular asset classes or groups of assets by
9    type and performing this type of analysis on them?
10       A.    Yes, yes.
11       Q.    And so certain groups of assets, you
12   would be willing to pay a higher percent than
13   other groups, right, or --
14       A.    Yeah. Because to reflect the idea
15   that the uncertainty about the price or the cash
16   flows was more or less clear.
17       Q.    So were there particular assets or
18   groups of assets within the Lehman portfolio that
19   was supposed to be sold to Barclays that warranted
20   much deeper discounts than others?
21       A.    Yes.
22       Q.    And which were the most discounted --
23   or which groups would require the most discount
24   from your perspective?
25       A.    The assets that are the typical assets

Page 33

1    KING - HIGHLY-CONFIDENTIAL
2    that my group manages, which is things like
3    mortgage-backed securities, deeply distressed
4    credit securities, things for which there is a
5    very, very limited market and poor visibility on
6    the expected cash flows.
7        Q.    And what kind of discounts would those
8    groups of assets get during this week?
9        A.    To what?
10       Q.    I don't know, did you -- again,
11   talking about the 15th and 16th, did you say --
12   again, I might be showing my ignorance here --
13   here is a pool of mortgage-backed security, a lot
14   of uncertainty here, let's mark their -- let's
15   discount their marks down by, say, 50 percent?
16       A.    Right.
17       Q.    You did.
18       A.    Yes.
19       Q.    OK. And then other, presumably other
20   categories more secure, more visible -- again, I
21   might be displaying my ignorance, but perhaps
22   government securities might warrant a much smaller
23   discount in the mark?
24       A.    Precisely.
25       Q.    Is that right?

Page 34

KING - HIGHLY-CONFIDENTIAL
1
2  A.  Precisely.
3      (Exhibit 388-B, document Bates stamped
4  BCI-EX-S 74256 through 257 marked for
5  identification, as of this date.)
6  Q.  Mr. King, I am handing you a copy of a
7  document marked as 388-B, which is a two-page
8  document with Bates numbers BCI-EX-S 00074256
9  through 257.
10     After you have had a minute to look at
11 it, let me know, and I have a question or two
12 about it.
13 A.  OK.
14 Q.  Have you had a chance to look at the
15 document?
16 A.  Yeah.
17 Q.  Have you ever seen this document
18 before?
19 A.  Yes.
20 Q.  When?
21 A.  I remember -- this actually is, I
22 think this is my handwriting on it, and I also saw
23 it yesterday.
24 Q.  When you say "my handwriting on it,"
25 you are referring to the second page of the

Page 35

1  KING - HIGHLY-CONFIDENTIAL
2  document?
3  A.  Yes, yes.  Sorry, I thought you were
4  suggesting that I look at both pages.
5  Q.  Yes, yes, I was.
6      And is it fair to assume that this
7  document was sent to you on the 17th by Mr. Yang?
8  A.  Well, I would have seen this document
9  before the 17th.  He is sending it to James
10 Walker.  He just happens to be copying me.
11 Q.  Let me distinguish, when you say "this
12 document," the covering e-mail is on the 17th, but
13 the second page, you have seen that before the
14 17th?
15 A.  Yes.
16 Q.  Can you tell me when you first saw
17 that, the second page?
18 A.  I saw -- I think I saw a hard copy of
19 this at some point -- was this -- yeah.  This is
20 an e-mail and this is a hard copy, so I don't
21 quite know how -- whether Jasen had scanned it or
22 how the two became connected, but we had seen --
23 can I ask that?  Is that --
24 Q.  Well, this is how it was produced.  It
25 doesn't really matter about the -- where Mr. Yang

Page 36

1  KING - HIGHLY-CONFIDENTIAL
2  got it, so I'm not going to ask you about that.  I
3  just want to focus on the second page of this
4  document.
5  A.  I'd seen this in hard copy, which is
6  why I had scribbled on it at some point after
7  the -- after the 12th.  It was produced on the
8  12th.
9  Q.  This was produced by Lehman to
10 Barclays on the 12th?
11 A.  That's what it says on the top
12 left-hand corner of the second page, Lehman
13 Brothers balance sheet by GAAP asset type 9/12.
14 So I couldn't have seen it before the 12th, but I
15 must have seen it at some point thereafter, but
16 I'm not exactly sure when.
17 Q.  You believe you saw it over that
18 weekend at some point?
19 A.  I had seen it during the weekend.  I
20 might have seen it during the weekend, but that
21 was in the old -- that was in the first iteration
22 of the potential acquisition.
23     So I don't know when I saw it.  All I
24 know is I definitely saw it before he sent it to
25 James Walker.

Page 37

1  KING - HIGHLY-CONFIDENTIAL
2  Q.  I guess that was my question.  Was
3  this part of your analysis or discussion over the
4  weekend for the first iteration, or did you --
5  A.  I don't remember.
6  Q.  Or did you use it in connection with
7  the second iteration on, say, the 15th and 16th?
8  A.  I can confirm the latter part.  I
9  don't remember the former.  We might have seen it
10 in relation to the first part, but then it is only
11 a subset.  I don't really know why -- in the first
12 iteration of the transaction, where it was buying
13 Lehman, we never really had thought about Lehman
14 as being multiple entities.  So looking at LBI
15 specifically prior to Sunday would have been
16 something I wouldn't have focused on.
17     So I don't think I looked at it at the
18 weekend.  I would think I looked at it on the
19 Monday or Tuesday when we were told here is the
20 next iteration of the transaction.
21 Q.  OK, OK.  And you are referring to the
22 Lehman Brothers, Inc. at the top of this document?
23 A.  Yes.  This is Lehman Brothers, Inc.,
24 as opposed to Lehman Brothers.  But up to the
25 Sunday, we were thinking Lehman Brothers.  So the

Page 38

KING - HIGHLY-CONFIDENTIAL

1  first thing I would have asked if somebody sent me
2  this is, to my point about population, am I
3  looking at everything, because otherwise this is
4  redundant.
5       Whereas on the Monday, if someone said
6  we are now looking at LBI, I can say is it correct
7  that this is the population of what we are
8  supposed to look at, and someone could say yes,
9  and that would make sense. Now we have got
10 something to work on.
11      So I would think I saw this on the --
12 and also, by the way, these things, even though
13 they say 9/12, typically it would take 24 to 48
14 hours at least for somebody to produce this.
15     Q.   OK.
16     A.   So I very much doubt this -- although
17 it is of the 12th, the 12th is close of business
18 on the Friday, which means it almost certainly
19 didn't exist until something like the Sunday, and
20 I would think it was shown to us on the Monday or
21 Tuesday.
22     Q.   OK, fair enough.
23     Do you recall what you were -- I see a
24 lot of handwriting and a lot of numbers. Do these

Page 39

KING - HIGHLY-CONFIDENTIAL

1  refresh your recollection about what you were
2  analyzing?
3     A.   No. These are sort of typical
4  scribble from me. The e-mail is -- the e-mail
5  covering is quite elucidating because it
6  highlights -- the fact that it is a physical --
7  one of the problems we had at that time was this
8  is a physical. There also was -- I remember that
9  there was -- and I don't have this, but there was
10 a paper copy again of securities that -- these
11 numbers are produced by Lehman's systems. So
12 there would have been line items of all the
13 individual securities that fed up into these
14 numbers.
15     What Jasen is highlighting on the
16 front is that we have obviously by the 17th, this
17 definitely would have been the case as well,
18 started to receive files, which would have been
19 Excel files, I would think, and what he is
20 starting to explain is, all right, we have started
21 to try to understand what is the population that
22 leads to this. If this is what we are buying, is
23 the assets that are currently on -- the assets
24 that are currently on LBI's balance sheet, his

Page 40

KING - HIGHLY-CONFIDENTIAL

1  e-mail explains that we have started to get files
2  that should be all of this, but they don't tie
3  out.
4     He actually points out, you know,
5  corporate obligations, corporate stocks do not tie
6  out to the summary. So we have been sent files
7  that purport to be the same but that don't tie
8  out.
9     Q.   So tie out in your understanding means
10 he is trying to compare the files of individual
11 securities with the line item in the -- on this
12 balance sheet and see that they add up to that
13 total?
14     A.   Exactly right. So he would have had
15 something that says total corporate obligations
16 and spot total, let's say. If he would have been
17 sent a file that also purports to be corporate
18 obligations and let's say included then the line
19 items, a notional or a price, so he could
20 calculate a mark, add the marks up, he ought to
21 get back to that number, and his e-mail indicates
22 that they don't.
23     Q.   His e-mail is trying to, as you said,
24 get the proper population of the securities in

Page 41

KING - HIGHLY-CONFIDENTIAL

1  each group?
2     A.   Yeah. And you see, as you say -- my
3  sentence is that I have asked Jasen to send this
4  to James, because I thought I'd seen something
5  that looked similar to it that might help us to be
6  able to find out. Because with this, there is
7  almost -- again there is almost nothing you could
8  do. You would say -- using the percentage
9  approach, you would have to just take very heavy
10 haircuts to these large numbers and say I don't
11 really know what is behind this.
12     Then on his e-mail he is saying, we
13 have got some stuff but it doesn't tie out to
14 those numbers, and furthermore, we don't have
15 listings for derivatives category. We are able to
16 tie out the asset listings we were given on
17 Monday. We were given some asset listings on
18 Monday, so he is showing on Monday there were some
19 files.
20     And then the last sentence is pretty
21 interesting because it highlights the fact that
22 the problem wasn't a static problem. It was a
23 dynamic problem. So he has a list of securities,
24 but he says the government and agencies book is --

Page 42

KING - HIGHLY-CONFIDENTIAL

1      KING - HIGHLY-CONFIDENTIAL
2 although we understand from Clement Bernard that
3 the government and agencies book is shrinking as
4 trades are unwound.
5      The problem here was the
6 counterparties to Lehman were terminating their
7 trades. So we all have now realized that although
8 Lehman was sending us populations, minute by
9 minute, counterparties to Lehman were terminating
10 trades. Therefore, this population is changing.
11    Q.  I understand.
12    A.  And this was only supposedly as of the
13 12th, which is the Friday. So by the 17th, the
14 probability that these securities still were on or
15 available to LBI was low.
16    Q.  OK. Thank you for that.
17      I would like to step back to before
18 the Wednesday, back to the Monday when you're
19 somehow using this document in connection with
20 your assessment of the Lehman assets. Are
21 these -- if you look on the left-hand column, it
22 has "GAAP asset class." Do you see that?
23    A.  Yes.
24    Q.  And then it has six different asset
25 classes listed. Are these the -- are these asset

Page 43

KING - HIGHLY-CONFIDENTIAL

1      KING - HIGHLY-CONFIDENTIAL
2 classes that fell within your purview in the
3 principal mortgage trading group as groups of
4 assets that you were asked to look at?
5    A.  Not on -- not at this time.
6    Q.  Not on the 15th or 16th?
7    A.  No. We were -- the assets that we
8 were looking at were the -- it was starting to be
9 the case around the 15th and 16th that I had -- I,
10 we, my group, had two hats that we were wearing.
11 One was to look specifically to end up as the
12 ultimate risk -- actually that's not true, not to
13 end up as the ultimate risk manager, but to assess
14 the value of specific instruments. Here the line
15 item in here that would say total mortgage or
16 mortgage-backed total, the 6 and a half billion.
17 So that is a category that my group would have
18 expected to -- or be capable of risk managing.
19    Q.  Right.
20    A.  That's one hat.
21      There is a second hat that we were
22 starting to wear, which was to facilitate in the
23 coordination and aggregation of the opinions of
24 other expert desks within Barclays on the other
25 line items. So, for example, total government and

Page 44

KING - HIGHLY-CONFIDENTIAL

1      KING - HIGHLY-CONFIDENTIAL
2 agencies securities, governments and agencies are
3 traded by a -- you know, there is a desk at
4 Barclays that trades governments and agencies.
5    Q.  Is that desk outside your principal
6 mortgage trading group?
7    A.  Yes, yes. It is in Eric's world, but
8 it is a trading desk.
9    Q.  Eric who?
10    A.  Eric Bommensath, my boss. It is a
11 trading desk, a customer trading desk, and we
12 would have no -- my desk would have no advantage
13 in providing a practical assessment of whether --
14 of what the valuation pricing or risk management
15 issues were associated with 39 billion dollars
16 worth of governments and agencies.
17      But with the hat of coordinating, we
18 were starting around the 15th or 16th to
19 facilitate in coordinating and aggregating that
20 information.
21    Q.  So can I just see if I understand what
22 you said.
23      Your group, the principal mortgage
24 trading group would have -- with respect to the
25 assessment, if you will, as to the total mortgage

Page 45

KING - HIGHLY-CONFIDENTIAL

1      KING - HIGHLY-CONFIDENTIAL
2 and total -- and mortgage-backed securities line
3 item, but as to the other five line items here you
4 would have acted as facilitator?
5    A.  Correct.
6    Q.  Assembling the assessments of other
7 groups within Barclays?
8    A.  Correct.
9    Q.  After you assembled those, presumably
10 that enters into the negotiations between Lehman
11 and Barclays in some way?
12    A.  Then I would have provided an
13 assessment to somebody as to where the current
14 estimate for the cumulative value in our view of
15 value was for this portfolio and particular
16 categories.
17    Q.  Who did you provide that to?
18    A.  I don't remember. It might have been
19 a variety of people. It could have been to -- it
20 would have been at various times to Patrick or to
21 Mike or to whoever was asking me for it at that
22 moment, James Walker, whoever. Some various
23 people at various times asked for an assessment of
24 value for different purposes, and we would provide
25 it.

Page 46

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    Q.   Now, are you talking about people
3 within Barclays or are you talking -- in other
4 words, here is my -- my confusion here is this:
5 Are you engaged in any kind of one-on-one
6 conversations between Lehman as to the types of
7 discounts we might apply to these different
8 groups?
9    A.   No.
10    Q.   Or are you just providing it to other
11 people within Barclays?
12    A.   Other people within Barclays.
13    Q.   Do you recall the conclusions you
14 reached on the 15th or 16th about these particular
15 asset types as far as the amount of discount that
16 would be required?
17    A.   Not particularly. I remember that
18 the -- I remember that the mortgage securities,
19 for example, we carried around -- we had just said
20 I would -- I don't think -- I would be -- I think
21 we used something like 50 percent for the mortgage
22 securities, for example.
23    Q.   OK. OK. Do you recall what you used
24 for the other categories, any of the other
25 categories?

Page 47

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    A.   No.
3    Q.   Is it fair to say, as I think we
4 previously discussed for the less risky or more, I
5 think you used the word visible categories, you
6 would use a smaller discount than the 50 percent?
7    A.   Yes. And that's an interesting thing,
8 because I remember actually that one of the
9 categories here, total government and agencies, I
10 remember thinking -- I think you can sort of see
11 in some of the scribble here as well, for example,
12 the 3.2, I could see a number 3.2 here, which I
13 would guess is half of the 6.5 billion or the half
14 that we were saying that -- one of the problems
15 with that category in particular was that we
16 didn't even know what some of the securities were.
17 They were just -- you know, because if you look at
18 a CUSIP, a CUSIP doesn't tell you anything. You
19 have to get a description to go with a CUSIP.
20    Q.   When you say "that category," talking
21 about mortgage backed?
22    A.   Mortgage backed. Unfortunately banks
23 have a tendency of using mortgage and
24 mortgage-backed securities to mean anything that
25 isn't obviously something else. So it isn't just

Page 48

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2 mortgages. It is CDOs, it is manufactured
3 housing, it is franchise loans. It is a lot of
4 stuff. Because you notice it doesn't obviously
5 fit into any of those other categories, so it is
6 stuff.
7    Because it is stuff, some of it you
8 would have no idea from the CUSIP or even the
9 description whether it was a performing or
10 nonperforming security, a senior obligation or a
11 junior obligation. You would actually have to go
12 to Bloomberg, or if in some cases it wasn't listed
13 on Bloomberg, go to a trader and say what is this.
14    Some of these, for example, were what
15 they call whole business securitizations, which
16 are secured lendings against assets of corporates.
17 And there you would have to understand something
18 about the company.
19    Q.   So in the end, because of all these
20 uncertainties, you ascribed a 50 percent discount
21 rate to that line item?
22    A.   If someone said -- yeah. But for a --
23 if I was asked for an initial guess, a guess, I
24 would say, you know, I can't imagine that -- if
25 you turned around and asked somebody for a bid of

Page 49

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2 6 and a half billion dollars -- these securities
3 for example, mortgage and mortgage-backed
4 securities, they trade in -- they have -- many of
5 them have face values, notionals of millions of
6 dollars. Single numbers of millions of dollars.
7 So you can see that 6 and a half billion dollars
8 of assets is thousands of line items.
9    Furthermore, many of them will trade
10 at a few cents on the dollar, 5, 10, 3, 20. So
11 there is a tremendous level of uncertainty and
12 inaccuracy about it. And the 6 and a half billion
13 dollars of assets, to sell 6 and a half billion
14 dollars of assets would take a tremendous amount
15 of time. Actually, it did ultimately take the
16 better part of a year.
17    So therefore, to just guess, I can't
18 believe that if they are marked there, that if you
19 needed to sell them or you wanted to bid them,
20 that you would bid more than 50 cents on the
21 dollar, would have been a guess.
22    Now, remember, subsequently we did
23 some work on it and came up with similar sort of
24 numbers on it, which is why I happen to remember
25 that one.

Page 50

KING - HIGHLY-CONFIDENTIAL
1    
2    Q.    That's the one that is within your
3    group?
4    A.    That's the one within the group.
5    Interesting thing, the government and agencies
6    securities, 39 billion, I remember on -- at around
7    this time on the 15th and 16th, I had a pretty
8    rosy view of the liquidity of government
9    securities and agencies, mostly because I was
10   pretty ignorant of what they were.  Of course
11   because of the collapse of Lehman in the previous
12   two days, there was no liquidity in these either.
13        So these agency securities turned out
14   to be some of the hardest securities to sell
15   subsequently.  There was a -- there wasn't
16   39 billion dollars of them, but there was a
17   significant population of agencies securities that
18   were in the Fed repo facility.
19        They took nine months to sell at a
20   significant discount, much more than I would have
21   ever guessed on that day, because I would have
22   thought they were liquid.  There were no liquid
23   markets at this point.
24        MR. STERN:  Bill, could we take a
25   brief break?

Page 51

KING - HIGHLY-CONFIDENTIAL
1    
2        MR. HINE:  Sure, sure.
3        (Recess)
4    BY MR. HINE:
5    Q.    Mr. King, I would like to continue
6    with the second page of Exhibit 388-B, if you
7    will.  On the right-hand side of the balance sheet
8    it's entitled "Net Short Inventory."  Do you see
9    that?
10   A.    Um-hm.
11   Q.    Was this side of the balance sheet
12   something that you worked on in connection with
13   these transactions, or is that someone else at
14   Barclays?
15   A.    No.  There were -- it was one of the
16   things that -- they weren't really separable
17   because the longs and shorts obviously were
18   supposedly interrelated.  And you can see that --
19   it kind of highlights as well that something like
20   the mortgage or mortgage-backed pool, if you will
21   notice, is -- there are very few in the way of
22   shorts against that because it is not written --
23   it is not a -- something that is hedgeable that
24   you would expect to have two directional markets.
25   People buy stuff, therefore they are long,

Page 52

KING - HIGHLY-CONFIDENTIAL
1    
2    therefore all of the asset -- there is assets and
3    there is no liabilities.
4        Whereas something like government and
5    agencies is an active two-way market, people
6    borrow and sell.  You can borrow securities and
7    you can sell them, so there would be shorts.
8    Likewise, you know, corporate equities and stocks,
9    et cetera.  Again, nonmoney market instruments and
10   CDs, there is no way to short them.
11   Q.    So is it fair to say with respect to
12   the right side of this balance sheet, you
13   performed the same function you previously
14   described, assembling assessments for the first
15   five line items, and supervising your group and
16   providing assessments for the last line item?
17   A.    That's correct.  And as you see, there
18   is really nothing there.  So really it would have
19   been that we would have provided the list of longs
20   and shorts in files and sent them to the
21   respective desks.
22        And as Jasen says, of course, in
23   reality -- therefore, I can't really comment much
24   on those values because there are -- there is
25   almost nothing that's relevant to the work that my

Page 53

KING - HIGHLY-CONFIDENTIAL
1    
2    group was doing for itself for the last line item.
3    As Jasen's e-mail on the front says, the shorts
4    were evaporating as people closed out trades --
5    bad choice of words I suppose.  They were
6    disappearing as people actually closed out trades
7    against Lehman, and within 24 hours of this
8    Wednesday, I think they became irrelevant.  So
9    there is very little work that was done on that
10   right-hand side.
11   Q.    I understand.
12        I think you said earlier that you were
13   not engaged in one-on-one discussions with Lehman
14   about the valuations of these different groups of
15   assets?
16   A.    Correct.
17   Q.    Was there someone at Barclays who was
18   so engaged?
19   A.    I don't know.
20   Q.    You don't know.  OK.
21        Before we leave this sheet, can I ask
22   for a translation on some of your handwriting.
23   The phrase says 3.8 and there's a text.  Do you
24   see that?
25   A.    Yeah.

Page 54

KING - HIGHLY-CONFIDENTIAL

Q. Do you know what that says?

A. It is 3.8 mortgage -- I guess that says mortgage backs 400 million dollars HELOCs, and I don't know what the last thing would be. But I -- I don't know whether -- 3.8 may not even be related to the scribble to the right. That says morg back, mortgage backs, 400 million dollars of HELOCs and -- ah, it's seconds. HELOCs and seconds.

So, for example, the HELOCs and second liens are -- people are much more familiar with the descriptions of various types of mortgage products than they were a few years ago, but HELOCs and second liens are obviously the subordinate consumer credit attached to their real estate.

So those have -- largely are viewed as worthless, so I'm making reference that somewhere in that 6.556 is 400 million dollars of something that is worthless. I don't remember, I have no recollection as to whether the 400 million dollars was a notional or market value, but it may well have been that I was just noting that there was 400 million dollars of market value attributed to

Page 55

KING - HIGHLY-CONFIDENTIAL

second liens and HELOCs, which I would have just written off.

Q. Do you see below that has a calculation? It looks like it says 61.5 minus 57.9 equals, I assume that says 3.6. Do you see that?

A. Yes.

Q. Do you recall what that calculation related to?

A. No, it's -- I am sure that -- I do know what it -- it will have been something to do with what we were discussing about, you know, estimating how bad that 65 billion dollars -- what that 65 billion dollars might be worth. But I don't remember the calculation. It was one of --

Q. No specific recollection?

A. No. It was one of -- it is incomplete, as you can see.

Q. Right.

Mr. King, I am handing you a document that has previously been marked as Exhibit 19. If you might take a minute and take a look at it. My question is going to be do you recognize that document.

Page 56

KING - HIGHLY-CONFIDENTIAL

A. Only because I was shown it yesterday.

Q. OK. Other than your preparation for today's deposition, had you ever seen that document before?

A. I don't think so.

Q. Are you -- again -- let's -- we had previously been talking about a balance sheet from the 12th for LBI. Were there any iterations of a balance sheet presented in your discussions during the 15th and 16th?

A. I don't think so.

Q. Any revisions to what we have previously talked about as Exhibit 388-B?

A. I don't think so.

Q. So if there was, you don't recall seeing them?

A. No. If they -- you know, and as you said, sort of towards the -- sometime between the 16th and 18th, our focus changed totally to the securities that were just in the Fed facility. So it is possible that during that period, something was sent to me that was a revision, but we wouldn't have been paying attention to it.

Q. OK. Back to Exhibit 19. That's the

Page 57

KING - HIGHLY-CONFIDENTIAL

second document. Do you have any understanding of how this balance sheet is related at all to the asset purchase agreement between Lehman and Barclays?

A. Not directly.

Q. Do you have any general understanding?

A. No. It would all be -- you know, it would all be supposition of stuff that I saw subsequently that meant I could work out what this is as opposed to me ever seeing this or seeing how it was included.

Q. Do you have any recollection -- you see the number at the bottom, total assets, 72.65? Do you see that?

A. Yeah.

Q. Do you have any understanding of how Lehman and Barclays came to agree on that number?

MR. STERN: Objection.

Q. As to the asset purchase agreement?

MR. STERN: Objection to the form.

A. No, I don't think so. I mean I can -- I can look at it -- I mean if I look at the -- again, as I say, I would be -- I would be working this out now, but I could recognize that some of

Page 58

KING - HIGHLY-CONFIDENTIAL

1 the numbers that are on the asset side of the -- I
2 mean it was quite interesting actually that what
3 you can see on the asset side of the balance
4 sheet, that there are some numbers that are
5 similar to the numbers on the right hand -- on
6 here. So, for example --
7     Q.    When you say "here," you are pointing
8 to --
9     A.    Sorry.
10     Q.    -- Exhibit 388-B?
11     A.    I don't know how to define it. This
12 page.
13         MR. STERN: I will define it. It is
14 the second page of Exhibit 388-B.
15     Q.    For the purposes of the reporter, when
16 you say "this," we have to identify documents.
17     A.    I understand that. Second page of
18 388-B.
19     Q.    I apologize, I interrupted you.
20     A.    For example, I could see that some
21 numbers would look familiar on the one, which is
22 the commercial paper 1.1 appears to be roughly
23 total CDs and other money market instruments.
24 That would be -- I would think that's the same

Page 59

KING - HIGHLY-CONFIDENTIAL

1 number.
2         MR. STERN: So Mr. King is pointing
3 first to Exhibit 19 and then he is pointing
4 to the second page of Exhibit 388-B.
5     A.    Right. So this -- there are some
6 numbers that are on both pages or approximately on
7 both pages, the 40 billion dollars of government
8 and agencies, the 39.173 on the second page of
9 388-B.
10     Q.    Right.
11     A.    I vaguely remember the 2.7 billion in
12 mortgages, which is the reduced -- the assumed
13 number -- there was some -- there was only a
14 subset of -- at some point, there was an iteration
15 of discussions which -- that there would be some
16 but not all of these assets that were included
17 in -- that we would be receiving, and it was only
18 roughly half or something like that of the
19 mortgage and mortgage-backed securities. And I
20 think that's where that 2.7 number comes from,
21 which is why mortgage is 2.7 versus the 6.56.
22         And again, you can see the 4.5 of
23 derivatives is approximately the 4.83, et cetera.
24 I don't remember the cash number.

Page 60

KING - HIGHLY-CONFIDENTIAL

1         The interesting thing as well on the
2 liability side, I'm assuming this is -- because
3 this is done as a related date, you can see the
4 attrition of the liabilities, that they were
5 closed out. You had 35 billion dollars of
6 liabilities on the 12th, but on this one, which is
7 dated -- is that the date it was produced, 9/16?
8     Q.    That's what I understand.
9     A.    I don't know if that number has
10 declined.
11     Q.    I see the correlation you are drawing
12 between the two documents --
13     A.    But I am doing that now.
14     Q.    That was going to be my question. Did
15 you have any participation or understanding or
16 knowledge about the process on the 15th and 16th
17 by which Exhibit 19 was prepared?
18     A.    No. Other than my giving numbers on
19 request to people at Barclays that must have in
20 some way been used to produce this, but we weren't
21 involved in the production.
22     Q.    OK. And so --
23     A.    Or in the use of it.
24     Q.    So you're providing your assessments

Page 61

KING - HIGHLY-CONFIDENTIAL

1 or your data to someone else at Barclays who's
2 involved in the discussions with Lehman, correct?
3 That's what we talked about earlier?
4     A.    Yes.
5     Q.    Do you see on Exhibit 19, you have the
6 upper part of the asset side of the sheet, which
7 we have just talked about, but below that is
8 something called collateralized STAGR? Do you see
9 that?
10     A.    Yes.
11     Q.    Do you know what that is?
12     A.    Which one? The one on the left or the
13 right?
14     Q.    On the left, it's -- well, there are
15 two entries. On the left there is a
16 collateralized STAGR. Do you see that?
17     A.    Yeah.
18     Q.    And on the right hand, the liability
19 side, it's collateralized ST fund. Do you have an
20 understanding of what that is?
21         MR. STERN: Objection to the form. If
22 you are asking what his general
23 understanding is, fine.
24         MR. HINE: That's what I am asking.

Page 62

KING - HIGHLY-CONFIDENTIAL

1  MR. STERN: OK.
2  A.  No. I would -- I would -- I know the
3  word "collateralized." I would guess ST is short
4  term, but I wouldn't know.
5  Q.  Just to understand your role on the
6  15th and 16th, is it correct to say that you were
7  not involved in providing any kind of assessments
8  relating to something called a collateralized
9  short-term agreement or fund? Is that right?
10  MR. STERN: Objection to the form.
11  You can answer.
12  A.  Yeah, no. This -- it is work on the
13  assets behind --
14  MR. STERN: The second page.
15  A.  The second page of 388-B that we were
16  working on.
17  Q.  I think I just have a glitch in the
18  record here. It is correct to say that you did
19  not have any -- do any work in connection with
20  something called collateralized ST assets, right?
21  A.  No, I don't think so. I don't think
22  so, no.
23  Q.  OK. Now, I have seen in our
24  production several different iterations of

Page 63

KING - HIGHLY-CONFIDENTIAL

1  Exhibit 19. Have you ever seen any earlier
2  versions of that document that you recall?
3  A.  I don't think so, no.
4  Q.  Do you have any understanding -- do
5  you have any knowledge at the time or any
6  understanding of -- I might have asked this
7  already, I apologize, but the 72.65 number at the
8  bottom, do you have any understanding or knowledge
9  back on the 15th or 16th about discussions between
10  Lehman and Barclays concerning that number?
11  A.  No.
12  Q.  How about a 70 billion dollar number?
13  A.  No.
14  Q.  Just to save use of an exhibit here,
15  in the asset purchase agreement, there is an entry
16  of 70 billion dollars relating to long positions.
17  A.  Right.
18  Q.  Do you have any understanding of that
19  or have you ever heard of that before?
20  MR. STERN: Objection to the form.
21  You can answer it.
22  Q.  Let me --
23  A.  No. I mean, as I say, I can -- I know
24  enough about corporate financial structure to know

Page 64

KING - HIGHLY-CONFIDENTIAL

1  what you are talking about and therefore deduce
2  what you mean, but no, our involvement was to try
3  and assess the value of assets that were feeding
4  into presumably the production of this.
5  Q.  I understand. I'm not trying to get
6  your surmise or conjecture. I am trying to
7  understand if you have any recollection of how a
8  70 billion dollar number came to be, appear on the
9  asset purchase agreement in connection with
10  Lehman's long positions.
11  MR. STERN: Is there a question? I
12  don't think there is a question.
13  Q.  Well, what do you -- do you have any
14  recollection of how that came to be?
15  A.  No. As I say, I mean the fact that
16  there are -- whether this number or any other
17  subsequent number or previous number, it doesn't
18  surprise me particularly that there is -- that
19  there are iterations of this, because, as Jasen's
20  e-mail points out, things change, were changing by
21  the minute. But how it was produced and who
22  produced it, that wasn't -- that wasn't for us to
23  provide.
24  In fact, it doesn't look like any

Page 65

KING - HIGHLY-CONFIDENTIAL

1  particular -- if there is any relationship between
2  Exhibit 19 and the assets that are described in
3  page 2 of 388-B, then there doesn't seem to be any
4  particular discount or revaluation in them.
5  So I'm not even sure whether we
6  were -- I don't know whether anything that we were
7  doing was feeding into this page.
8  Q.  The number dropped from 65 billion to
9  62.7, correct?
10  MR. STERN: Objection to the form.
11  A.  Well, I don't know whether the number
12  dropped from 62, but I can see that mortgages is
13  reported on this -- one thing I do know is that
14  there was a discussion that only a subset of the
15  mortgage or mortgage-backed securities portfolio,
16  which as I described wasn't just mortgages and
17  mortgage backed, it was asset backs, that not all
18  of them -- we didn't want all of them.
19  Q.  I understand.
20  A.  And so the reason I can at least see
21  for the 2.7 of mortgages is probably that it
22  doesn't include the entire population. So I can
23  see that one, but I don't know -- but I don't
24  really know the transformation from the 62.7 to

## Page 66

KING - HIGHLY-CONFIDENTIAL

1  the 65.115, whether they are even based on the
2  same date, same populations. But I do remember
3  that fact about the mortgage and mortgage-backed
4  part.
5          MR. STERN: And that's independent of
6      Exhibit 19?
7      A.   Yes. You can't derive that from --
8  you can't see that -- I don't remember that from
9  seeing Exhibit 19 previously, and I'm not deriving
10  it from that.
11          I am deriving it from a combination of
12  memory about discussions around that 6 and a half
13  billion dollars of mortgage and mortgage-backed
14  securities that are on the 388 page 2, and the
15  fact that I can see there is only 2.7 billion on
16  the mortgage line on Exhibit 19.
17      Q.   I understand.
18      A.   But I don't really -- I don't know
19  the -- I haven't seen this before, I haven't seen
20  Exhibit 19 before. At least I don't remember
21  seeing it. Therefore, I don't remember. It
22  wouldn't surprise me that 72 and a half or 70
23  were -- because, as Jason's e-mail says, things
24  changed by that day.

## Page 67

KING - HIGHLY-CONFIDENTIAL

1
2      Q.   Let's talk about the mortgage-backed
3  securities for a second. At some point in time it
4  was agreed that Barclays would only take half of
5  those securities, correct?
6      A.   Yeah.
7      Q.   And was it later agreed that they
8  would take more than that?
9      A.   As I say, as I pointed out earlier on,
10  one of the difficulties here is that all of what
11  we are discussing, as far as I know, as far as we
12  were concerned, became irrelevant within hours or
13  days of the 16th. So the entire discussion about
14  this by the 17th we had put out of our minds. Or
15  the 18th.
16      Q.   "This" meaning the valuation exercise
17  you were talking about earlier?
18      A.   Yes. Because -- and that's very
19  challenging -- and we had to prioritize, because
20  in many respects around this time we were working
21  literally 24 hours a day. And so the only way to
22  manage this was to say that's now redundant, I
23  don't want to discuss it, I don't care about it,
24  we need to focus on what we need to deliver,
25  because someone has asked us something within an

## Page 68

KING - HIGHLY-CONFIDENTIAL

1
2  hour and a half. So now we are going to move to
3  that.
4          So at some point -- so there are --
5  unfortunately you are asking me about things that
6  within a day or so were irrelevant to us.
7      Q.   "Us" meaning --
8      A.   "Us" meaning my group.
9      Q.   OK. Well, tell me then why this all
10  became relevant. I assume you are talking about
11  in the Wednesday-Thursday time frame?
12      A.   Yeah, at the point that we started to
13  be asked to focus on the securities that were
14  collateralizing the Fed repo facility.
15      Q.   And what were you told in that regard?
16      A.   That here is a population of
17  securities that is collateralizing a loan that was
18  provided to LBI by the Fed, and we were being --
19  we, Barclays was being asked to step into the
20  position of the Fed. I don't know -- I wasn't
21  part of the discussions as to why that would be
22  the case or whether it -- or how it had come about
23  or whether we would do it.
24          My group was then asked once again to
25  provide an assessment of the probable value or --

## Page 69

KING - HIGHLY-CONFIDENTIAL

1
2  not just even the value actually. What was in the
3  Fed facility.
4      Q.   And who told you -- who told you all
5  this? Who gave you these instructions?
6      A.   The instructions to start to do that
7  work?
8      Q.   Yeah.
9      A.   I think, I think it was Mike at the
10  time asked us to look at it.
11      Q.   Mike who?
12      A.   Keegan.
13      Q.   And did you -- you understand that
14  there was a repo transaction entered into on
15  September 18 involving Barclays and Lehman,
16  correct?
17      A.   Yes.
18      Q.   That's the Thursday?
19      A.   Yes.
20      Q.   And so was this assessment you were
21  asked to do prior to that repo transaction or
22  was -- were you assessing the securities that had
23  been posted into that repo transaction?
24      A.   Both.
25      Q.   So am I correct -- I assume the

## Page 70

KING - HIGHLY-CONFIDENTIAL

1  securities that were -- supported the Fed repo
2  earlier in the week were somehow supposed to make
3  their way into the September 18 repo involving
4  Barclays and Lehman, correct?
5      A.   Yes.
6      Q.   So you were asked to assess both the
7  Fed pool of securities and then what ultimately
8  made it into the repo?
9      A.   That's correct, yes.
10      Q.   And did you come to any conclusions
11  after that assessment?
12      A.   Yes, the same -- we did the same
13  process that we had done on each of the previous
14  iterations. We were able to reuse some of the
15  information because there was an overlap between
16  the list of securities in the Fed
17  facility, ostensibly, the Fed facility and also on
18  the balance sheet of LBI.
19      We had -- I thought it was on the
20  Wednesday, we were -- I thought it was on the
21  Wednesday, not the Thursday, we were first asked
22  to look at it, which is why I say about the
23  Wednesday we started to put our pens down on what
24  we were doing previously, and I remember that we

## Page 71

KING - HIGHLY-CONFIDENTIAL

1  had literally something like about an hour or hour
2  and a half when we were first asked to look at it
3  to -- and the population was 49 or so billion
4  dollars of assets, and the question was, Stephen,
5  what do you think these are worth?
6      Q.   That was a population in the Fed repo
7  or September 18 repo?
8      A.   In the Fed -- sorry, is there a
9  difference between --
10      MR. STERN:  I think he is asking if
11  you were looking at the Fed portfolio.
12      A.   Well, we thought -- yes, at this point
13  we were on the Wednesday or Thursday prior to the
14  funding the night of the 18th, so there was a list
15  of -- another list that was sent to us. I can't
16  remember where the list came from, whether it was
17  a list from the Fed to operations to us. I don't
18  remember the information flow. But there was a
19  list of securities. We were able to put that list
20  of securities, you know, in a spreadsheet, compare
21  it to various -- do various look-ups to see
22  whether we could find whether we had ever put a
23  price on anything that was in the Fed facility.
24      Recognizing that during the course of

## Page 72

KING - HIGHLY-CONFIDENTIAL

1  this week, Lehman had -- Lehman Holdings had
2  become bankrupt on the 13th. So almost anything
3  that we were saying about valuations was becoming
4  redundant each minute because markets were moving
5  so much.
6      MR. STERN:  You said the 13th. Did
7  you mean the 15th?
8      A.   I am sorry, the 15th. I think -- the
9  deal stopped happening on the 14th. Right. So
10  that week that we are talking about, markets were
11  moving tremendously because there was disarray
12  because of the bankruptcy.
13      Q.   There were other events taking place
14  at the time as well, correct?
15      A.   Yes. Also Merrill, so other things
16  were going on that meant that, you know, literally
17  if you had a portfolio of equities or a portfolio
18  of Treasuries or portfolio of hedges or portfolio
19  of mortgages, I would say during that week, there
20  was no -- I mean the exercise to some extent was
21  academic because we are putting a price on
22  something for which there was no bid on any of it.
23  No bid.
24      Q.   Well, I think you said previously you

## Page 73

KING - HIGHLY-CONFIDENTIAL

1  were asked -- you mentioned a close to 50 billion
2  dollar number.
3      A.   Yeah.
4      Q.   I still don't know that you answered.
5  Is that the Fed pool or is that the collateral
6  that was ultimately posted to the September 18
7  repo?
8      A.   There I am describing what we were
9  doing prior to the settlement, which was to
10  provide -- the question that had been asked to us
11  is, there is a Fed facility, I seem to remember it
12  was 45 billion dollars, and it is backed by
13  securities which have a value -- which I think
14  subsequently or around that time we found was not
15  of course -- it is neither a Barclays assessment
16  of value or Lehman assessment of value, it is a JP
17  as custodian for the securities assessment of
18  value. Not a trader's value, so not a mark, just
19  a -- you know, a price, a matrix price or wherever
20  they got their prices from, assessment of how much
21  collateral was supposedly supporting the Fed
22  facility, and the Fed facility was sized by
23  reference to haircuts to that assumed value.
24      So we were then asked to say, well, do

## Page 74

KING - HIGHLY-CONFIDENTIAL

1  we think that if you had to liquidate this
2  portfolio, that you could recover the amount of
3  the loan that was being made.
4      Q.   And this is Wednesday night you're
5  asked this?
6      A.   This was I think Wednesday. I
7  remember it being in the afternoon. And I would
8  think it was --
9      MR. STERN:   And Wednesday was the
10     17th?
11     A.   I feel -- for some reason in my head I
12 am carrying it around as a Thursday, but I think I
13 have lost a day in there somewhere because I don't
14 think I had a night. So --
15     MR. STERN:   Just to help, I mean I
16     don't think there is any dispute about this,
17     the Fed replacement transaction was executed
18     on the 18th, into the evening of the 18th,
19     which is a Thursday. So if that helps you
20     put things in perspective.
21     A.   Yes. In my mind, the time between
22 when we first were asked to look -- first became
23 aware of the Fed facility transaction and
24 funding of it, was much shorter than a day and a

## Page 75

KING - HIGHLY-CONFIDENTIAL

1  half. So that may just have been because we
2  didn't have a night.
3      Q.   I appreciate that, for all of us who
4  have missed nights as well.
5          So is this -- when you said you had
6  about an hour and a half or two --
7      A.   We had an hour and a half. There was
8  a phone call to say we are being asked to take the
9  Fed out of this. We didn't know the reason why or
10 reason for the transaction or whether it was even
11 necessarily related to it.
12     MR. STERN:   "We" being you?
13     A.   "We" being Barclays at that point.
14 That Barclays was being asked to take the Fed out
15 of its facility, out of this loan, and the
16 question to us as my group was, what do you think
17 about this value of securities?
18     Q.   And what did --
19     A.   And I found that an extraordinary
20 situation, because we had just had the bankruptcy
21 of Lehman and we were being asked whether or not
22 we thought a portfolio of securities, which we
23 barely knew, because we had only really
24 encountered them a handful of days before, it was

## Page 76

KING - HIGHLY-CONFIDENTIAL

1  actually worth 45 billion dollars, and therefore,
2  should we permit Barclays to lend 45 billion
3  dollars against a portfolio of securities, and in
4  any normal circumstances I would never make that
5  statement or assertion.
6      Q.   When you say 45, that's the amount of
7  the Fed facility?
8      A.   That's the amount I remember being the
9  Fed facility.
10     Q.   Secured by -- 45 was the value of the
11 pool in the Fed, to your recollection, or was that
12 the amount that the Fed --
13     A.   That was the loan amount.
14     Q.   And the value or purported value in
15 the pool was about 5 billion more than that?
16     A.   Well, you are using -- you are saying
17 "value" as if that was value.
18     Q.   OK.
19     A.   The numbers that were the JP Morgan
20 marks I think at some date, and I don't remember
21 which date it was, they may have even been from
22 the Monday or Tuesday or Wednesday, I don't
23 remember how current they were. Markets were that
24 volatile, but that they -- those numbers added up

## Page 77

KING - HIGHLY-CONFIDENTIAL

1  to -- I remember it being anything from 48 and a
2  half to 49, to 49.7. There was some -- if you add
3  up those numbers, it would appear that if it were
4  possible, if it were possible to sell into the
5  open market at those JP Morgan marks, then you
6  would get 49 point or 48 point whatever it is for
7  the portfolio.
8          Of course that's not a -- that's not a
9  value.
10     Q.   OK. But -- I understand that. I
11 didn't mean to misuse that word.
12         So what did you conclude as to the --
13 what did you respond to the people who had asked
14 you to make this assessment?
15     A.   We thought it was possible that in a
16 controlled way, we might be able to recover enough
17 to cover the loan.
18     Q.   Meaning the 45 number?
19     A.   Meaning the 45.
20     Q.   Now ultimately, that pool of
21 collateral or a pool of collateral with some
22 overlap to that gets rolled in -- gets used in
23 connection with the September 18 repo, correct?
24     A.   Yeah.

Page 78

KING - HIGHLY-CONFIDENTIAL

1
2  Q.  And were you asked to do anything in
3  connection with that pool of collateral?
4  A.  Yes. So now -- so that exercise of
5  assessing the value of, liquidatable value of the
6  securities that were supporting the facility --
7  the Fed facility was needed to be refined. So we
8  just carried on.
9       Even though we had given that initial
10 assessment, the reason why I think it fills a very
11 compressed amount of time, we just kept refining
12 and refining and refining our views as we analyzed
13 the portfolio.
14 Q.  Right.
15 A.  As we went into the Thursday -- sorry,
16 Thursday night into the Friday, there was
17 another -- there is another very difficult piece
18 that was in the middle of that, which is
19 operationally how do you settle this transaction
20 and then how do you risk manage it once the trade
21 has come in.
22 Q.  Can you specify "this transaction"?
23 A.  The Fed transaction.
24      The peculiarity of this, and we didn't
25 really understand this at the beginning, but it

Page 79

KING - HIGHLY-CONFIDENTIAL

1
2  became clear, is, of course, the normal
3  circumstances, a repo transaction shouldn't mean
4  that the lender on the loan is long the underlying
5  risk of the securities collateralizing the loan.
6  They have a secured lending to a borrower that's
7  collateralized.
8       Here, of course, we knew that we were
9  lending to a borrower that was expected to be
10 bankrupt within a short period of time, and whose
11 parent was bankrupt. Therefore, although it was a
12 loan to a counterparty, at some point we were
13 going to be long the underlying assets.
14      And if we were long the underlying
15 assets, we therefore needed to risk manage them.
16 Because just because we had assessed that as of
17 the Thursday they were worth some amount,
18 hopefully more than 45 billion dollars, by the
19 Monday, they might have been worth 35 billion
20 dollars.
21 Q.  Right.
22 A.  So we better do something about that.
23 So the focus started to move from how do we
24 manage, how do we even see and book -- how do we
25 book securities that are not just going to be

Page 80

KING - HIGHLY-CONFIDENTIAL

1
2  collateral for a repo but are effectively going to
3  need to be shadow booked into risk systems so that
4  we can generate appropriate risk metrics so that
5  we can risk manage them. So we -- our process
6  started to change to that.
7  Q.  And this started even before you
8  booked the September 18 --
9  A.  Yes, yes.
10 Q.  -- repo?
11 A.  Yes. Because we had to say how are we
12 going to manage this transaction? How are we
13 going to manage this risk once Barclays has
14 lent -- once Barclays has lent -- in Barclays'
15 book, it is going to have -- the repo desk seems
16 to have lent 45 billion dollars to a counterparty
17 that is going to default, and that is
18 collateralized with a number of securities.
19      And if it followed its normal process,
20 it would be marking those securities, asking
21 desks, asking price services to -- it wouldn't
22 actually be assuming that it was going to get long
23 the collateral and have to liquidate it.
24      But here we knew that was going to be
25 the case, and it is mostly the case in other

Page 81

KING - HIGHLY-CONFIDENTIAL

1
2  distressed -- it is frequently the case, and we
3  have obviously seen this because of what happened
4  with Bear and Bear's hedge funds that had
5  defaulted on repo-secured lending, that the moment
6  the repo -- the borrower defaults under the repo,
7  you seek to liquidate the collateral, and you
8  invariably don't recover enough to cover the loan.
9  You hope you are going to, but markets are
10 distressed at that moment.
11      Well, this was the mother of all
12 distress. We are in the middle of a bank, a major
13 bank defaulting that many people had thought
14 wouldn't have been left to default, but had
15 defaulted, and we were about to undertake a
16 45 billion dollar lending in which we would be
17 long this risk with very limited ways of risk
18 managing it.
19 Q.  So what did you do to risk manage it?
20 A.  Well, so Thursday we had to assess how
21 are we going to record in our books securities,
22 when we haven't actually booked the securities, we
23 booked a repo facility. So we had to construct
24 shadow books that were going to represent the risk
25 of the securities that were in the repo facility,

Page 82

KING - HIGHLY-CONFIDENTIAL

1  and then we sought to insure that -- our plan was
2  on the Thursday, each of the desks had a list of
3  the securities that they were expecting to
4  receive, and we had informed them that of course
5  repo is -- this was overnight repo. We weren't
6  but -- a week earlier, by the way, we were not
7  experts in repo. So some of what I am able to
8  talk about now about that repo facility, I
9  actually only learned afterwards.
10      But this was overnight repo, which
11  meant that strictly speaking the borrower could
12  switch the collateral within the repo facility
13  each night. So we had advised the respective
14  desks, thinking about, you know, in a similar way
15  we categorized the assets that were in the repo
16  facility in a similar way to the way they are
17  categorized on 388-B, and we passed those out to
18  the relevant desks and said tomorrow, you are
19  going to be -- we need you to help us manage this
20  exposure.
21      And we sent lists to each of the
22  desks. Of course -- but we told them they may
23  marginally change overnight, and until we are
24  certainly long the risk, we can't hedge. We

Page 83

KING - HIGHLY-CONFIDENTIAL

1  couldn't hedge prior because of course if for some
2  reason the transaction hadn't settled, we would be
3  short the market, so there was no way to hedge
4  until we knew that we actually were long the risk.
5      Q.  OK then. There was a lot there, so
6  let me ask a couple of questions.
7      When you say we were certain we were
8  long the risk, that would be when there was a
9  default?
10      A.  No. Once the securities had settled
11  into Barclays.
12      Q.  Oh.
13      A.  Which would have been the Thursday
14  night, Friday morning.
15      MR. STERN:  You might just explain
16  what you mean when you talk about long the
17  risk and so on.
18      A.  On Thursday, there was -- we knew that
19  there was a Fed facility. Barclays had not lent
20  any money to Lehman. The Fed had lent money to
21  Lehman and collateralized that lending with
22  securities.
23      Q.  Right.
24      A.  That night, Barclays would effectively

Page 84

KING - HIGHLY-CONFIDENTIAL

1  replace the Fed, thereby knowing for certain that
2  it had a secured loan out to Lehman, LBI, where
3  LBI was expected to default.
4      So it is not until for certain that
5  Barclays has funded that loan that it could say
6  that it definitely is long the risk of the
7  underlying securities.
8      Q.  OK. So if --
9      A.  So for example -- maybe it is easiest
10  by example. If we took a single security on the
11  Thursday, in normal trading, in a normal trading
12  environment, I might be negotiating with a
13  counterparty to buy something and I might be
14  agreeing the price and we might be trading, but --
15  and I might know that the moment that I want to --
16  moment that I know I am going to be long the
17  security, I will need to hedge, and I have worked
18  out how I am going to hedge, but until the trader
19  tells me done, not just at some point while we are
20  discussing the price, if I decide to hedge before
21  he says done and then he says, you know what,
22  change my mind, now I have put a hedge on against
23  nothing and I have got to take the hedge off.
24      So until we know that this repo

Page 85

KING - HIGHLY-CONFIDENTIAL

1  transaction -- this replacement repo transaction
2  has settled, it would be -- it was a trading
3  decision whether or not we should hedge before it
4  settles or after it settles. And we elected to
5  start hedging after it settled.
6      Q.  So when you say settles, that's on
7  Thursday, the 18th?
8      A.  Thursday night into Friday morning.
9      Q.  So that -- OK, I think I understand
10  that.
11      But aren't you -- I guess I didn't
12  understand the shadow book concept. I thought you
13  weren't long the security until LBI defaults on
14  the Friday.
15      A.  Formally -- exactly right. Until the
16  Friday when there is the default of LBI, then the
17  systems would record a secured lending facility.
18  As I say, some of this, you know, back filling the
19  knowledge because we learned how it really would
20  happen after the fact.
21      Q.  Sure.
22      A.  But that there would be a loan and the
23  repo desk would say, I have got a loan out to LBI
24  and it is collateralized by the following

Page 86

KING - HIGHLY-CONFIDENTIAL

1    securities, but it isn't equipped to hedge or
2    manage those underlying securities because it is
3    not expecting to ever need to. It thinks it has
4    got an overcollateralized loan.
5        Q.   Right.
6        A.   Where it hopes -- where a repo desk
7    risk management ought to be, I've lent you money,
8    I have got some additional margin over and above
9    the amount of money that you have lent, that I
10   have lent you, and if you default, I am going to
11   sell it all as quickly as possible. I am not
12   going to reflect on it and think about whether I
13   would like to -- those are trading decisions for
14   someone else. I am going to sell it.
15       And hence, when you try to sell
16   something in that way, you would invariably,
17   regardless of whether the last trade observed in
18   the market was 95, if you phone up somebody and
19   say I need a bid, you might get a 85, and that's
20   why they need the margin. But that would be their
21   normal repo risk management decision.
22       Here we were going into this lending
23   with the benefit of knowledge that within 24 hours
24   to 48 hours, it would be the case that this

Page 87

KING - HIGHLY-CONFIDENTIAL

1    borrower would default, so that there was no value
2    to the counterparty, and furthermore, we were
3    therefore going to be long a humongous number of
4    securities that we would have no ability to sell.
5        Q.   So for that reason you start risk
6    managing those securities the minute the repo
7    settles?
8        A.   First we say -- many of these
9    securities have -- so the -- maybe again it is
10   worth just touching on this for a second.
11       When I talk about risk, what I mean is
12   that what is the expected change in value of a
13   security with respect to a change in something
14   else. So many of the securities have interest
15   rate sensitivity.
16       Q.   Right.
17       A.   How much would the value of these
18   bonds change if the interest rates went up.
19       Q.   OK.
20       A.   We would also come up with some crude
21   estimates for, say, the equities portfolio, which
22   would be how much of the S&P 500 does this equity
23   portfolio look like. For the RMBS securities we
24   might say how much of a particular mortgage-backed

Page 88

KING - HIGHLY-CONFIDENTIAL

1    index does this portfolio look like.
2        Because we can't know -- we know there
3    is no way we can sell. If we go out and start
4    selling at 8 a.m. on the Friday morning, five days
5    after the bankruptcy of Lehman, we would
6    recover -- I don't know what we would recover.
7        And we already knew that where we had
8    seen some of the bids in the market during that
9    week where other people have been selling -- bear
10   in mind, the market was flooded with collateral
11   from the bankrupt Lehman Brothers Holding and
12   LBIE, so that people were closing out other repo
13   facilities. So the market was full of Barclays --
14   of Lehman's securities that were already being
15   sold. So -- and we were about to get long another
16   45 billion dollars of them.
17       So there would be no way for us to
18   manage that. The only way we could do it was
19   bring the risk on to our systems, assess how
20   volatile it was going to be and what parts of that
21   volatility we would have to hedge with instruments
22   in more liquid markets. For example, S&P. For
23   example, interest rate derivatives.
24       And that's what we started to do on

Page 89

KING - HIGHLY-CONFIDENTIAL

1    the Thursday in anticipation, what systems are we
2    going to need to help manage that and what are we
3    going to do on the Friday. Of course, that was
4    complicated, further complicated by the fact on
5    the Friday morning we woke up to discover we don't
6    own the same portfolio we thought we were going to
7    own a day earlier.
8        Q.   OK. Let me put that issue aside for a
9    minute here. I think I followed you. It is an
10   area that I am not familiar with, so I apologize.
11       So on Thursday, you are risk managing
12   or hedging the volatility that you foresee in that
13   pool of securities as a result of all this market
14   activity that you have seen? The plan was to
15   hedge the portion you needed to hedge and then
16   sell the securities later?
17       A.   Yeah. So I think the answer to your
18   question is actually no, we were not hedging on
19   the Thursday. We were starting to work out
20   that -- the process up to the decision of will
21   Barclays lend against this pool of assets was one
22   that would incorporate both an assessment of
23   Barclays' assessment, not JP's assessment or
24   Lehman's assessment or anybody else, but Barclays'

Page 90

KING - HIGHLY-CONFIDENTIAL

2 traders' assessment of what was the realizable
3 value of the securities and the amount of -- it
4 would need to have some amount of cushion over and
5 above the amount that it would lend, because the
6 moment that it started to sell, Barclays itself
7 would drive the market down.
8    Q.  Right, right.
9    A.  So we needed to do two things on
10 Wednesday and Thursday.  One, an assessment of an
11 estimate of what we thought was a reasonable
12 liquidation value for the portfolio, and then,
13 two, what was a reasonable guess at the risks that
14 we were taking by being long that portfolio.
15 That's what we were doing Thursday.
16    On Friday then --
17    MR. STERN:  "That portfolio" is the
18 Fed portfolio?
19    A.  For the portfolio we thought we were
20 going to take delivery of, or best guess of the
21 portfolio we thought we were going to take
22 delivery of on the Friday.
23    But it wasn't until -- and then we
24 made a decision not to hedge on the Thursday.  And
25 then on the Friday, once we knew the transaction

Page 91

KING - HIGHLY-CONFIDENTIAL

2 had been consummated, so we knew that we were
3 actually long --
4    Q.  That's Thursday night, Friday morning?
5    A.  So some point Thursday night, somebody
6 would have phoned me and said, Stephen, we are
7 long.  So then we knew we had eliminated one risk,
8 which was the execution risk.
9    Q.  Right, right.
10    A.  Because we couldn't -- the reason for
11 not hedging was we could never manage -- never
12 hedge the execution risk.
13    Q.  Right.
14    A.  But on Friday we now know we are long.
15 Let's say that was at 2 o'clock in the morning or
16 something.  No markets are open, so there is no
17 way to start selling or to manage -- actually we
18 couldn't start selling because actually it is just
19 a repo facility, it is not that we are long the
20 assets, so you couldn't sell on the Friday.
21    So therefore, we would have to think
22 up things we could use to hedge the risk.  And
23 that's -- we started that process on Thursday.  By
24 Friday we started to realize there are securities
25 that we thought we were going to take delivery of

Page 92

KING - HIGHLY-CONFIDENTIAL

2 that we haven't, and there were securities that we
3 have never seen before.
4    Q.  What happens when you -- is that early
5 in the morning Friday?
6    A.  We started to be aware of that early
7 in the morning Friday.
8    Q.  So take me through what happens.  I
9 assume you take that to someone's attention?
10    A.  Yes.
11    Q.  What happens in that regard?
12    A.  They say what -- so what do you want
13 to do, Stephen, and we start the process again,
14 which is OK, we have got a list of securities, do
15 we have a complete population -- bear in mind --
16 the reality is, this was -- there was a tremendous
17 number of people that were involved in this,
18 because this was a -- you know, it had to be a
19 very sensibly and carefully risk managed process.
20 We couldn't eliminate the uncertainty associated
21 with prices, but we ought to be eliminating the
22 uncertainty associated with how we managed the
23 process.
24    So a lot of people involved, but the
25 Friday morning therefore we just started to do

Page 93

KING - HIGHLY-CONFIDENTIAL

2 again what we had done the day before, how many of
3 the securities do we know?  Do we have a complete
4 population?  How do we categorize the securities
5 that we haven't seen before, what are they, and
6 actually less what do we think they are worth at
7 that point, because it doesn't matter.  More what
8 matters is what are they and how do we manage
9 them, and that's what we did on the Friday.
10    Q.  Can I ask you a question.  I think --
11 tell me if I am wrong.  I understood that there
12 was some kind of glitch in transferring the Fed
13 pool of securities to the repo to the tune of
14 about 7 billion dollars, and that Lehman, to make
15 up that shortfall, took a loan and put it into the
16 repo.  Is that your understanding?
17    MR. STERN:  Objection to the form.
18    A.  All I know is -- I reiterate the role
19 that we were playing.  The role that we were
20 playing is we are not operations people.  We are
21 traders and risk managers.  Our job was to assess
22 value and then manage the multitude of risks
23 associated with the acquisition of the assets.
24    I know by construction that there were
25 differences between what we thought we were going

Page 94

KING - HIGHLY-CONFIDENTIAL

1  to be risk managing on the Thursday and what we
2  were actually risk managing on the Friday, and I
3  know that that is -- that there was 7 billion
4  dollars of supposed value, and I think they were
5  using -- I don't know what marks they were using,
6  but 7 billion dollars that had been substituted
7  for cash, which therefore cash doesn't -- nice
8  thing about cash, you don't have to risk manage
9  it, or at least we didn't think so.
10      Q.   I would assume so.
11          MR. STERN: Turns out you did.
12      A.   Turns out we did. Cash is supposed to
13  be cash.
14          And then in addition to that -- so
15  there was a -- there were less secure -- rather
16  than -- and I'm using these numbers just to try to
17  indicate population as opposed to the accuracy of
18  the numbers.
19          So that we had anticipated that at JP
20  marks, that there was a population that JP
21  assessed as being worth 49.7 of securities, that
22  actually that was 42.7. Therefore -- and there
23  was 7 billion of cash.
24          In addition, though, within the

Page 95

KING - HIGHLY-CONFIDENTIAL

1  securities, they were not the same population. So
2  it wasn't even that it was just a subset of the
3  original population, the Thursday population, it
4  was a subset of the original population plus about
5  10 billion dollars of stuff that we had never seen
6  before.
7      Q.   That's where I was leading with the
8  question. In other words, the difference that you
9  saw between what you expected and what you
10  received is both in the size of the pool as well
11  as the composition of part of the pool?
12      A.   Correct. There was approximately --
13  again I am using these numbers, using -- by
14  reference to the JP marks, not my assessment of
15  value or what we were ultimately able to sell them
16  for. There was something like 49 -- we thought
17  that there was going to be something like 49, a
18  population that JP would mark at 49.7. There
19  actually was only about 32 billion dollars of that
20  population was delivered.
21          Then there was 7 billion of cash or
22  cash that -- you know, cash was cash, and then
23  there was 10 billion dollars, and now -- for which
24  we didn't have any equivalent JP valuations, but

Page 96

KING - HIGHLY-CONFIDENTIAL

1  that once they arrived at BoNY, which was our
2  custodian, BoNY assessed as having marks in total
3  of about 10 billion dollars, and that portfolio we
4  had not seen before.
5      Q.   What did you do with respect to that
6  portfolio and the BoNY ones?
7      A.   The exact same as we had done with all
8  the preceding lists of securities. We tried to
9  assess had we got the entire population.
10          Bear in mind, the reason we do that,
11  there is no point in risk managing something if it
12  isn't what you actually own. So it has to start
13  with do I really own this. We spent a tremendous
14  amount of time focusing on do I have this, is this
15  a population, categorizing the population, because
16  now all we have got is a list of CUSIPs, so you
17  have to get from CUSIPs to a description of the
18  asset by name, by asset type, then to break it out
19  into asset types, and then to assess what we think
20  its risk is and what its value ought to be.
21      Q.   And so that's a process you started
22  with respect to those 10 billion dollars --
23      A.   On that Friday morning.
24      Q.   -- on that Friday. Did you come to a

Page 97

KING - HIGHLY-CONFIDENTIAL

1  conclusion on that Friday or when?
2      A.   I think one thing that's also worth
3  pointing out, the idea of a conclusion suggests
4  finality. We had -- and I don't think we -- the
5  conclusion probably should be the date on which
6  ultimately it was sold, and stuff took a year to
7  sell.
8          On that Friday, yes, we did start to
9  think that we had a list of all the securities
10  that were delivered. That took time. And we
11  started to estimate our own -- you know, Barclays'
12  trading desk values for them in -- you know, in
13  the environment that we were in, and the risk.
14      Q.   And did you come to any interim
15  assessments on that Friday?
16      A.   Yes, yes.
17      Q.   What did you assess on that Friday?
18      A.   In relation to -- I don't really
19  remember too much on that Friday about the
20  valuations, because we were very focused on the
21  risk.
22      Q.   OK. Would you have the same answer if
23  I said over the weekend?
24      A.   Yeah. I mean over -- no, over the

Page 98

KING - HIGHLY-CONFIDENTIAL

1    weekend, then it started to change. The -- we
2    were, you know, reassess -- we -- between there
3    and the end of the year, end of the financial
4    year, we were constantly reassessing what we
5    thought was the value of the securities.
6        So you're right, over the weekend we
7    started to revert back to what do we think the --
8    what number are we going to use as a -- when
9    management is asking me, well, Stephen, what did
10   we take delivery of, they would like an answer and
11   they would like it now, not a better answer in
12   three weeks' time. So we had to come up with
13   something. But that was a crude response.
14       And in some respects it didn't really
15   matter to what we were doing, "we" being my desk,
16   because what really mattered is, do we have the
17   population and what is the risk of it.
18       I know that obviously some of the
19   valuation work we were doing would then be feeding
20   back into the negotiations that other parties were
21   having about a deal with Lehman, but it actually
22   wasn't very germane to what we ourselves were
23   doing.
24   Q.    I think I understand that.

Page 99

KING - HIGHLY-CONFIDENTIAL

1        You have mentioned two different --
2    this is Friday now. You mentioned two different
3    sets. One is 32 billion dollars worth of
4    securities which had JP marks on them, and the
5    other is this 10 billion dollars of securities
6    that you had never seen before which had BoNY
7    marks on them.
8    A.    BoNY marks on it.
9    Q.    Is this assessment that you are doing
10   over that weekend primarily focused on the 10
11   billion dollar pool?
12   A.    No, everything.
13   Q.    Are you coming to some interim
14   conclusions during that weekend about the marks?
15   A.    Yes.
16   Q.    And what are you finding out that
17   weekend?
18   A.    I don't really -- the one thing that I
19   remember is saying that I felt that the cumulative
20   amount of securities and cash that we had received
21   in an orderly disposal, in not just a fire sale,
22   we couldn't just sell -- we couldn't say let's
23   sell these over the weekend and then we are done
24   by Monday.

Page 100

KING - HIGHLY-CONFIDENTIAL

1        The -- there was -- the loan was
2    adequately collateralized. And that I remember.
3    Q.    And you told that to your supervisors
4    or whoever was asking?
5    A.    Yes, yeah, yeah. And then on the
6    Friday we started to hedge.
7    Q.    You started to hedge both the 32
8    billion pool and the 10 billion?
9    A.    We didn't differentiate. We really
10   didn't start talking too much about what we had
11   received. Much of the discussion about what we
12   had received versus hadn't received really didn't
13   go on until later on.
14       We only really cared about what
15   would -- you know, the cumulative amount of what
16   we had received.
17   Q.    Later on meaning after the weekend?
18   A.    Yeah, weeks later.
19   Q.    So did you have any discussions over
20   that weekend with Lehman or did anyone from
21   Barclays have discussions with Lehman as to, in
22   words or substance, hey, how come we got
23   10 billion dollars of securities we weren't
24   expecting?

Page 101

KING - HIGHLY-CONFIDENTIAL

1    A.    I know there were discussions, both
2    with JP and Lehman. We weren't -- my desk weren't
3    part of those discussions.
4    Q.    All right. Do you have any
5    understanding of what happened in those
6    discussions?
7    A.    In relation to what?
8    Q.    Well, do you have any -- someone from
9    Barclays said words to that effect to Lehman,
10   right?
11   A.    Or to JP. I don't know -- the deck
12   securities had come from JP. So why -- so -- all
13   we cared about, why have we not got the same
14   population that the Fed thought it had the night
15   before?
16   Q.    You are comparing what you got on
17   Thursday night and Friday to the population that
18   you had spreadsheets about what was previously
19   comprised of the Fed pool?
20   A.    Yes.
21   Q.    And there was a difference in about
22   10 billion dollars worth of those securities?
23   A.    17 or so billion, because there is
24   some missing, 7, and then the 10, and using those

## Page 102

1    KING - HIGHLY-CONFIDENTIAL
2    JP or combination of JP and BoNY numbers. But we
3    weren't ever part of the conversations about what
4    had happened and why it had happened.
5    Q.   OK. Just so I am clear, you had a
6    pool of some close to 50 billion dollars of marked
7    securities for the Fed. What you got on Thursday
8    night or Friday is about 7 billion in cash,
9    32 billion with -- that had been in that pool, and
10   about 10 billion of new securities; is that right?
11   Am I understanding the groups now?
12        MR. STERN: Can I hear the question,
13   the question back.
14        MR. HINE: Let me try again. It was a
15   long convoluted question.
16   Q.   You previously had a list or some kind
17   of data that showed about 50 billion dollars worth
18   of assets in the Fed pool, correct?
19        MR. STERN: Objection to the form.
20   A.   Well, the -- we had a population of
21   securities which we were expecting to take
22   delivery of which we understood was supporting a
23   Fed facility.
24   Q.   And that -- I'm just trying to -- I am
25   drawing a Venn diagram in my head. I want to see

## Page 103

1    KING - HIGHLY-CONFIDENTIAL
2    how what you expected to be in the Fed facility
3    compared to what you ultimately received.
4    A.   Right.
5    Q.   As I understand your testimony, tell
6    me if I am wrong, it is about 32 billion dollars
7    of what you ultimately did receive had previously
8    been in the Fed facility, to your understanding;
9    is that right?
10        MR. STERN: Objection to the form.
11   A.   Unfortunately what we are having to do
12   is to use -- because we couldn't -- when we are
13   talking about the population, we can't describe --
14   between you and I, we can't discuss CUSIPs and we
15   can't discuss asset types, so we are ending up
16   using JP Morgan numbers to describe populations.
17        So I'm just being a little bit
18   cautious about the fact when you say 32 billion,
19   that 32 billion dollars is just the sum of the JP
20   Morgan marks at a particular time.
21   Q.   Right, right.
22   A.   That was probably a different time to
23   the time of the 49 billion dollars worth of
24   JP Morgan prices on securities that we thought to
25   take delivery of. So I am just being particular

## Page 104

1    KING - HIGHLY-CONFIDENTIAL
2    about that.
3        Are we saying that they are of a
4    population that JP Morgan at some point had marked
5    at 49.7, I seem to remember, did we take delivery
6    of a subset of that, using your Venn diagram, that
7    JP Morgan had assessed at about the time of the
8    settlement as 32 billion dollars, yes.
9    Q.   And in addition, you took delivery of
10   a pool that BoNY had assessed at about 10 billion
11   dollars of new securities that were not part of
12   the Fed pool?
13   A.   Yes, yeah.
14        MR. STERN: Objection to the form.
15        Can I hear the question again.
16        (Record read)
17        MR. STERN: You can answer that.
18   A.   Yeah, I think that's right. I also
19   don't know -- when I come to think about it, I
20   don't even know whether the 32 -- I think the 32
21   that you are referring to probably was -- we had a
22   list of securities that from a number of days
23   before we had JP Morgan's -- bear in mind, the
24   moment that the securities moved from JP as
25   custodian to BoNY as custodian, they are not

## Page 105

1    KING - HIGHLY-CONFIDENTIAL
2    then -- the availability of the marks by the
3    previous custodian at that moment are not
4    available.
5        So it may be even that the 32 billion
6    dollars is actually BoNY as opposed to the
7    original JP. I think it was the mark -- it was
8    the sum of the marks that JP had put on the
9    portfolio the last time JP had provided it.
10   Q.   OK.
11   A.   Then there was a population of
12   securities which then BoNY provided, because BoNY
13   provided custodial marks. We actually used to
14   call them custodial, although that's a desk
15   colloquial term. The custodial marks provided by
16   BoNY on the population we hadn't seen before was
17   approximately 10 billion dollars.
18        (Exhibit 389-B, document Bates stamped
19        BCI-EX-S 75200 through 201 marked for
20        identification, as of this date.)
21   Q.   Mr. King, handing you a copy of a
22   document marked as Exhibit 389-B, which is Bates
23   stamped BCI-EX-S 00075200 through 201. Please
24   take a minute, and I will have a few questions
25   about this.

Page 106

1      KING - HIGHLY-CONFIDENTIAL
2         Have you had a chance to look at that?
3      A.   Yes.
4      Q.   The title of this e-mail is "Barclays'
5   team/teams on their way over to meet with us on
6   our positions and marks, obviously critical."
7         Do you see that?
8      A.   Yeah.
9      Q.   Was there a meeting that took place on
10  Friday between Lehmans and Barclays about this
11  issue?
12     A.   There were -- not with us.  Not with
13  my group.  Although David Martin was part -- I had
14  actually forgotten that David Martin -- formally
15  at this point I worked for David Martin, who
16  worked with Eric.  David Martin is not with the
17  firm.  David Martin hadn't really been involved in
18  anything to do -- or hadn't been involved in
19  anything to do with this Lehman acquisition.
20        So that's David's involvement.
21        On the Friday, as I recollect, because
22  the repo facility had now settled, that seemed to
23  indicate a consummation of an ultimate transaction
24  whereby there would be something happening between
25  Lehman and Barclays.  And so various desks, the

Page 107

1      KING - HIGHLY-CONFIDENTIAL
2   flow desks, the other trading desks did start to
3   have dialog with their counterparties at Lehman
4   about stuff.  But not with -- not with us.
5         Now, David here -- so that wasn't --
6   the answer is, there were meetings, but I don't
7   know much about the meetings.
8      Q.   Did you participate in any meetings on
9   that Friday?
10     A.   I don't think so.  I don't think so.
11  I mean I have met -- I've met Charlie Spero maybe
12  twice throughout the whole process.  I think I met
13  Eric Felder once before the 12th.  That's
14  literally the extent of the discussions.
15        There were various telephone
16  conversations between Jasen and -- at various
17  times to try to identify what particular
18  securities were, because we had no idea what they
19  were.  They just had a CUSIP, and then it would
20  say fixed income instrument.  So we had to help
21  find out what they were, but it was very limited.
22     Q.   That's Mr. Yang?
23     A.   That's Jasen Yang, yes.
24     Q.   Charlie Spero is your counterpart at
25  the former Lehman?

Page 108

1      KING - HIGHLY-CONFIDENTIAL
2      A.   He wasn't my counterpart.  He was a
3   trader that ran the mortgage desk at Lehman.
4      Q.   So, but you didn't participate in any
5   meetings on this Friday about positions and marks?
6   Is that right?
7      A.   No, I didn't, no.
8      Q.   Do you know -- do you have any
9   understanding about what happened during those
10  meetings?
11     A.   So this is on -- this is 2:58 on the
12  Friday.
13     Q.   That's Greenwich time, right?
14     A.   That's Greenwich, so that makes much
15  more sense.  So 2:58.  So this is midmorning on
16  Friday, when we would be realizing that we haven't
17  got what we thought we were going to take delivery
18  of.
19        And if you read the top sentence,
20  David's response to me, when I say, "I assume you
21  are talking to Kaushik," Kaushik was the -- so
22  David, David Martin, I'd asked David to look at
23  the agency mortgage pool, agency mortgage security
24  pool, because we do trade those.  I asked David to
25  look at those within the population -- that had

Page 109

1      KING - HIGHLY-CONFIDENTIAL
2   ultimately been delivered on the Friday morning.
3         And what this e-mail highlights, and
4   as I say, I think it is one of a variety of things
5   he said, is an effort on the Friday morning, it
6   wasn't altogether coordinated, to determine what
7   we had got.  Because the first sentence says, "I
8   have called the derivative and CNO guys."  By
9   that, he means the agency mortgage and derivative
10  traders.
11        "Derivative guys said a lot of
12  positions did indeed look like repo ones in the
13  file I sent."  So there has been a file that we
14  have created, the securities which we have taken
15  delivery of on Friday that we had never seen
16  before, that I have sent to David, that David has
17  sent over to a counterparty at Lehman.  And the
18  first paragraph highlights that we are just in the
19  process of trying to work out what we have got and
20  has anybody seen them before.
21     Q.   What does he mean in the first
22  paragraph where it says, "told him to mark them
23  consistent with his inventory.  Appeared he got
24  the message from above to remark positions."
25        Do you have any understanding of what

Page 110

1    KING - HIGHLY-CONFIDENTIAL
2    that means?
3    A.   Right.  So I'm not sure where this --
4    this may have actually -- I think -- there were
5    two -- you mentioned that there were -- there
6    was -- there is sort of multiple tracks that may
7    have been going on simultaneously here.  We
8    were -- my desk was focused on what assets do we
9    have, what do we think we can recover from them,
10   in valuation, you know, in liquidation valuation,
11   and how do we risk manage them.
12        There also was a formal process of how
13   do we and how do Barclays and Lehman mark the
14   books and records, the securities.
15        I don't even know whether this was
16   something that was Lehman asking Lehman people to
17   mark their securities or Barclays asking Lehman
18   people to mark their securities or for what
19   purpose it was.
20        Bear in mind, traders were supposed to
21   still be sitting in their seats of a nonbankrupt
22   entity on the Friday marking their books.  They
23   still had a -- they worked for a broker dealer.
24   They have long risk positions.  They have an
25   obligation to mark every day.

Page 111

1    KING - HIGHLY-CONFIDENTIAL
2    Q.   Well, Lehman, LBI declared bankruptcy
3    on that Friday, right?
4    A.   Maybe that was it.  Was it on the
5    Friday?
6        MR. STERN:  The 19th?
7    A.   OK.  I don't know.  Maybe that was on
8    the Thursday -- I don't know the timing of this
9    particularly, but the -- presumably there was -- I
10   could see that they -- the traders had to mark
11   certain things.
12        I think this, David's involvement here
13   is because we would like to have a mark on what we
14   have just taken delivery of, because all we have
15   got is a list of securities, and what was clear,
16   it is not clear from this e-mail, is that some of
17   the securities at the BoNY marks were atrociously
18   mismarked.  So you need a trader.
19        Most price testing functions work
20   extremely hard.  Price testing functions meaning
21   groups.  We have a price testing group within
22   Barclays.  There is a price testing group within
23   Lehman.  BoNY and JP as custodians need to try to
24   come up with prices for thousands and thousands
25   and thousands of securities every day.  So they

Page 112

1    KING - HIGHLY-CONFIDENTIAL
2    have to do it in some kind of batch way.  So they
3    come up with heuristics by which they mark things,
4    because otherwise how could you do it?
5        But that's not the same as where a
6    trader on a minute, who sat in his seat, talks to
7    other traders and says, I would be willing to
8    trade.  It is supposed to be a pretty good guess,
9    but it is never perfect.
10        And in between the bankruptcy of LBH
11   and bankruptcy of LBI, it was -- you know, it
12   is -- the tracking error of that kind of approach
13   is bound to be big.  So as soon as we have taken
14   delivery, it is great -- at least we have got
15   BoNY's assessment of where they thought they would
16   be willing to advance against -- bear in mind, the
17   other thing about the BoNY and JP marks is that
18   the Fed was using -- what the Fed does when it
19   takes those marks is -- I can't remember the
20   advance rates.  I learned them later on.
21        But when the Fed lends, if you looked,
22   went to the Fed's website and looked at the
23   advance rates of the securities, what it does is,
24   it says, we will assess a value of security at
25   some mark that the custodian has provided us, and

Page 113

1    KING - HIGHLY-CONFIDENTIAL
2    then we will advance less than that as the loan.
3        So for example, for mortgage-backed
4    securities that might only be 50 percent of the
5    supposed mark.  So they are not as worried, and in
6    normal market conditions that's supposed to be
7    fine.  They are not actually as worried that they
8    have got the mark perfect, because they are only
9    lending 50 cents on the dollar, or on equities,
10   for example, I think they lend 90 cents on the
11   dollar.  For agencies maybe they lend 80 cents on
12   the dollar.
13        So they are saying, I think I have got
14   this, I know statistically I must have some error
15   on it, but I am only lending 80.  Whereas the
16   trader when he trades, he is trading there, and he
17   is exposed to the first dollar of mispricing, not
18   the dollar after the haircut.  So they have very
19   different tolerances for error.
20        So this, on that Friday morning what I
21   asked David to do, let's see if we can get an
22   assessment as quickly as possible of the -- what
23   the things we haven't seen before are worth, and
24   it may have been, I don't remember, also the
25   stuff, what we long today, worth today, not

Page 114

KING - HIGHLY-CONFIDENTIAL

1      KING - HIGHLY-CONFIDENTIAL
2  yesterday, because that also is different.
3            And what he is highlighting is that
4  there are -- in the first paragraph he highlights
5  that of course the Lehman guys hadn't actually got
6  in their inventory the list of securities that
7  were part of the repo. Because of the
8  intercreditor relationships between the various
9  Lehman Brothers entities, it wasn't necessarily
10  the case that everything that was in the repo
11  facility was also on the Lehman balance sheet,
12  Lehman Brothers, LBI balance sheet.
13            And in the second paragraph it also
14  has -- there must have been a separate
15  conversation going on. There is a typo in there,
16  actually, but it says, "an orderly liquidation
17  mark." Notice the use of the term "orderly
18  liquidation mark," meant liquidation today mark.
19  Because we couldn't -- that would have been
20  50 cents on -- that would have been who knows, but
21  20 billion dollars. There just could be no bid.
22  There was no bid for any of this on this date.
23            And the second is a typo in there. It
24  says "at a bin in comp." That should be "a bid in
25  comp mark." That was presumably supposed to be

Page 115

1      KING - HIGHLY-CONFIDENTIAL
2  more of an assessment of, you know, if you had
3  to -- if you were willing to buy it today, where
4  would you buy it.
5            So they are being asked to provide an
6  assessment of both. But that wasn't for us.
7      Q.   "It wasn't for us" meaning --
8      A.   It wasn't for my group. That might
9  have been for Lehman, it might have been for --
10      Q.   So is your group, this whole -- I
11  understand you to be saying that your group was
12  focused on getting the population that we had been
13  provided, at least an accurate assessment of what
14  we got?
15      A.   Yes, yes.
16      Q.   Was there another group focused on how
17  to mark them price-wise? Or how to book them into
18  Lehman's system -- I mean Barclays' system?
19      A.   No. Not -- not that part, but product
20  control -- and -- I'm trying -- I was trying to
21  explain what I do know about this e-mail and about
22  things that happened on the Friday. So hopefully
23  I have answered that question.
24      Q.   Yeah.
25      A.   This feels like a different question,

Page 116

1      KING - HIGHLY-CONFIDENTIAL
2  which is was there another group that was also
3  marking securities. Is that right?
4            MR. STERN: I think what Bill wants to
5      know is, who was involved in the booking of
6      the securities and ultimately marking them
7      on the Barclays side.
8      A.   As a formal matter, it is always the
9  trader's responsibility to mark a book. As a
10  practical matter then, there are price testing
11  groups that are within that product control group,
12  PCG function, that have a responsibility to assess
13  whether the traders have marked their books
14  correctly, and they can ask them to revisit their
15  marking and remark them.
16      Q.   OK.
17      A.   That's the logic of the trader and the
18  control function.
19      Q.   OK.
20      A.   So that would have been -- that at
21  some point -- I don't know whether it was
22  happening on the Friday. At some point that would
23  have had to have happened.
24            In addition, Barclays would have to
25  construct the balance sheet, an acquisition

Page 117

1      KING - HIGHLY-CONFIDENTIAL
2  balance sheet that represented what it had
3  ultimately purchased by way of this transaction.
4  That again would be a finance -- it is finance's
5  responsibility, not the desk's responsibility, to
6  produce balance sheets.
7            Therefore, finance would have to make
8  a determination of what it thought was the
9  appropriately price tested valuation for the
10  securities that were acquired on the acquisition
11  date.
12      Q.   OK.
13      A.   That didn't really happen. That
14  happened over a very long period of time. So
15  hopefully that answers that second question.
16      Q.   It does.
17            The finance function and the
18  preparation of the balance sheet I take it is in
19  the finance department, not in the PMTG
20  department; is that right?
21      A.   That's right. Under normal
22  circumstances, if everything worked well, traders
23  would mark their books. Those marks would be
24  picked up by systems -- the same for Barclays as
25  any other bank. Those marks would be picked up in

Page 118

KING - HIGHLY-CONFIDENTIAL
2  systems, and they would roll up and actually form
3  the valuations that are used in constructing
4  balance sheets.
5      Q.  Right.
6      A.  There is a control function which is
7  price testing, which is constantly vetting whether
8  or not desks are marking their books
9  appropriately, and so obviously with an
10  acquisition like this, it was -- it would be, as
11  we -- again, some of this is stuff I know after
12  this date, but now know what would have been
13  happening at that time.  Responsibility to produce
14  a balance sheet that represented what Barclays
15  acquired on that date.  That's obviously very
16  related to what the desk is saying it is valuing,
17  but it isn't necessarily the same.
18      Q.  Sure.  I understand.
19          Let's step back for a minute.  You
20  talked about the pool of assets that you, Barclays
21  did receive on the Thursday night, Friday morning
22  period.
23      A.  Right.
24      Q.  Did there come a time over the weekend
25  when Barclays demanded more assets from Lehman in

Page 119

KING - HIGHLY-CONFIDENTIAL
2  connection with the Lehman transaction?
3      MR. STERN:  Objection to form.
4      A.  I don't really know what you mean.
5  Are you talking about the -- there are -- the
6  discussions with Lehman were ongoing and were
7  separate from anything that we were dealing with
8  here.  We were --
9      THE WITNESS:  Can I ask you something
10  about this?
11      MR. STERN:  Sure, sure.
12      MR. HINE:  OK.  Is this a privileged
13  question or is it --
14      Let's go off the record.
15      (Witness and his attorney left
16  deposition room)
17      (Recess)
18      MR. HINE:  Back on the record.
19      Q.  Mr. King, I think I asked a confusing
20  question, so I want to try to clarify it.
21      I am asking about, did there come a
22  time during the weekend of the 20th and 21st where
23  Barclays asked Lehman to provide additional
24  assets, and what I am referring to is the -- what
25  we have been calling unencumbered assets or the

Page 120

KING - HIGHLY-CONFIDENTIAL
2  clearance box type of assets or 15c3 type of
3  assets.  I am trying to get a sense of whether you
4  were involved in that issue.
5      MR. STERN:  Just one objection.  I
6  think we are talking about the 19th, but
7  subject to that objection.
8      Q.  Correct, correct.
9      A.  No, I subsequently became aware that
10  there were unencumbered assets that needed to be
11  valued and risk assessed.  But no, not at that
12  point.
13      It would come as no surprise that
14  there was discussions, because as I pointed out
15  earlier, that the -- you know, we were being asked
16  to fund a -- to take the Fed out of the facility,
17  valuing the portfolio securities that we hadn't
18  seen, you know, before, and it was going to be
19  very difficult to assess their value, and I very
20  much doubt -- I would totally assume that there
21  would be -- that under any normal circumstances,
22  Barclays did not think that the lending of
23  45 billion dollars against this portfolio of
24  securities was a transaction which it would have
25  done absent the Lehman business acquisition.

Page 121

KING - HIGHLY-CONFIDENTIAL
2      Q.  Sure.
3      A.  I mean, you just -- there was not
4  enough -- you know, the approximations and guesses
5  at value that we were attributing to the portfolio
6  and putting normal liquidation, normal orderly
7  liquidation value on assets that are supporting a
8  45 billion dollar loan, which, as I said, if you
9  had to suddenly sell, there would have been
10  tremendous deficiencies on that loan.  You
11  couldn't have recovered it.
12      The fact that somewhere else in the
13  organization there would have been these
14  negotiations about where is there incremental
15  value to cover us for the massive risk that we are
16  taking on this repo facility, I would assume that
17  was the case, and that's why later on, 20th, 21st,
18  or whatever it was, we first start to see the
19  lists of unencumbered assets.
20      It was certainly of no surprise to me
21  that there had to be other places for value to be,
22  given how -- what a substantial transaction that
23  was.
24      Q.  Well, you didn't participate in any
25  discussions between Lehman and Barclays on this

Page 122

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    issue, right?
3        A.    No.  Again, all we saw --
4        Q.    You are just surmising?
5            MR. STERN:  Let him finish.
6        A.    What I am saying, I became aware there
7    were other assets and that we were then asked to
8    do the same process on that we had done with all
9    of the various categories, and it was of no
10   surprise to me at all that there was incremental
11   portfolio assets.
12           In fact, we would be very pleased,
13   because a -- even at -- in that time, even a
14   50 billion -- even if that portfolio really did
15   have a spot price, meaning a price that you really
16   could liquidate on a second, that the last trade,
17   the sum of the last trades observed was 50 billion
18   dollars, and you lent 45 billion dollars, so
19   that's a 10 percent haircut.
20           When we assess risk, we always say now
21   let's assume that every incremental time you
22   trade, you push the price down, and it takes you
23   however many days or weeks or years to be able to
24   sell everything, given a normal size that trades.
25   The likelihood that you would erode a 10 percent

Page 123

1    KING - HIGHLY-CONFIDENTIAL
2    margin, even if that was the correct -- even if
3    that really was the sum of the last trades you
4    observed, would be very high.  The likelihood that
5    you didn't recover the full amount of the loan
6    would be extremely high.
7            So one would have to assume, I would
8    have assumed that there was incremental value in
9    the transaction to Barclays for doing the
10   transaction, just because of the risk of that
11   facility.  Obviously I didn't see the securities
12   until the weekend or so.
13       Q.    And you didn't participate in any
14   discussions between Lehman and Barclays about a
15   search for additional assets over the weekend,
16   starting Friday, Saturday and Sunday?
17       A.    No.
18           MR. STERN:  Objection to the form as
19   to the time frame.
20       Q.    My question then, starting on that
21   Friday, the 19th, through the weekend, you weren't
22   involved in any discussions between -- let me
23   reask it so I have a clear record.
24       A.    Yeah.
25       Q.    I am talking about Friday, Saturday

Page 124

1    KING - HIGHLY-CONFIDENTIAL
2    and Sunday, starting on the 19th, you weren't
3    involved in any discussions between Lehman and
4    Barclays as to additional assets that were
5    supposed to be provided to Barclays over and above
6    the pool that you just previously talked about
7    that you received through the repo?
8        A.    I don't remember the timing of it,
9    whether it was the Friday, Saturday, Sunday,
10   Monday or the Tuesday or anytime thereafter.
11           If I could delineate, discussions
12   about whether or not Barclays should receive
13   additional securities from Lehman, no, absolutely
14   not.  That we were provided with lists of
15   additional securities, then yes, we were.
16       Q.    OK.  But for the purpose of doing the
17   assessment, the type of activities that you have
18   been describing all day?
19       A.    Just to be able to -- yes.  Someone
20   has to -- you know, someone has to provide us with
21   a list for us to be able to do what we are doing.
22   So you provide me a list, we will assess it and we
23   will hand it back to you.
24       Q.    Am I correct to say you don't have any
25   specific knowledge about why you are being

Page 125

1    KING - HIGHLY-CONFIDENTIAL
2    provided the list, you are just taking the list
3    and doing what you do within your group?
4        A.    No, I can -- I understand why it
5    should have been the case that there was
6    incremental assets somewhere to provide collateral
7    for this loan or for this transaction, but I'm
8    surmising that just because of my commercial
9    knowledge.
10           Yes, I did see lists of securities
11   that were provided to us.  I don't really remember
12   them arriving over the weekend, I have to say.
13   Well, I remember they were -- by the end of the
14   weekend we saw what was supposedly a list of
15   unencumbered assets.  Not a complete list but a
16   list of unencumbered assets.  But the negotiations
17   or why or for what this was in lieu of, no.
18       Q.    Did you understand this list of
19   unencumbered assets to be additional securities
20   for the repo loan?
21       A.    No.
22       Q.    You understood it to be separate and
23   apart from the repo transaction; is that right?
24       A.    To me -- you know, there was a repo
25   transaction, but the reason for the repo

Page 126

KING - HIGHLY-CONFIDENTIAL

1   transaction, as I said, was not in isolation of
2   the fact that we were acquiring, you know, other
3   things.
4        So I never really think of them as
5   separate. I thought of it as being Barclays is
6   having to put money out of the door against what I
7   know is a portfolio of assets that have an
8   estimated value that hopefully is more than the
9   loan, but that doesn't look like a very good
10  trade. So therefore, there has to be other stuff
11  that's going on.
12       But that's not part of our
13  responsibility.
14       Q.  I guess this is what I am driving at.
15  You told me before that on that Friday, you
16  received 10 -- assets marked at 10 billion dollars
17  that you hadn't expected?
18       A.  Yes.
19       Q.  Is the additional assets that Lehman
20  provides over that weekend the result of Barclays'
21  dissatisfaction with the securities it had been
22  provided under the repo?
23       A.  I don't know. Not to -- no, I
24  think -- no, not to the best of my knowledge. It

Page 127

KING - HIGHLY-CONFIDENTIAL

1   was -- no, not to the -- I think it was another
2   list -- to us, it was another list of securities
3   that was part of -- I mean, I think by the Friday,
4   it must be the case that I had seen the draft of
5   the asset purchase agreement, so I -- you know, I
6   knew that there was a list of these securities
7   that were in this repo facility, but there were
8   lots of other things that were subject to the
9   purchase agreement as well.
10       So the fact that from time to time
11  somebody would ask us, by the way, also there are
12  these other things that look like things, Stephen,
13  that you would be able to put an estimate of value
14  on, and ultimately you will end up risk managing,
15  that would come to me. Then I would respond to
16  them, and I would assume that this was part of
17  something that was a -- the repo transaction was
18  just a subset of a liability and an asset that
19  makes up the larger transaction.
20       Obviously later on, I saw the
21  acquisition balance sheets and things, so I could
22  see that there were those pieces. So none of that
23  was a surprise to me. But I wasn't part of the
24  conversations.

Page 128

KING - HIGHLY-CONFIDENTIAL

1        Q.  OK, very good.
2        MR. STERN:  Should we take a quick
3   lunch break?
4        MR. HINE:  Sure. Let's go off the
5   record.
6        (Recess)

Page 129

KING - HIGHLY-CONFIDENTIAL

1        AFTERNOON SESSION
2             1:14 p.m.
3   BY MR. HINE:
4        Q.  Good afternoon, Mr. King. I wanted to
5   go over a few documents with you based on some of
6   the things you have already talked about, but I
7   did want to start off with two topics.
8        First is the -- you have described how
9   you received a bunch of assets through Lehman
10  transactions on Friday, and then later on you
11  received additional assets.
12       Eventually, these assets get booked
13  into Barclays' system, and is it correct that
14  Barclays intended to conduct an orderly
15  liquidation of those assets over time?
16       A.  On the -- it wasn't until later that
17  we concluded that that's what we would do or how
18  we would do it.
19       Q.  Do you know how much later? Do you
20  have a time frame in mind?
21       A.  Days and weeks and -- days and weeks.
22       Q.  Is it fair to say probably sometime
23  before the end of September of '08?
24       A.  We had been -- we had already disposed

Page 130

KING - HIGHLY-CONFIDENTIAL

1  KING - HIGHLY-CONFIDENTIAL
2  of some by the end of September. Prior to the
3  19th, it had been -- my expectation and
4  understanding was that we would -- there were
5  going to be a number of teams that were coming in
6  from Lehman that would be integrated with the
7  relevant Barclays team.
8           There was work that was going on -- it
9  was a very fluid environment, very, very fluid
10 environment. There was work that was going on in
11 the front office trading teams to interview and
12 integrate people, and it was our working
13 assumption -- this is only really coming into play
14 in the middle of that week -- that we would
15 facilitate the booking and on boarding of the
16 assets, and then we would be pushing them back
17 into the relevant trading teams.
18          And at various times, the expression,
19 you know, well, these are the guys that are going
20 to be managing the assets, was used to refer to
21 the Lehman people or the Barclays people. They
22 would go to a desk.
23          As it transpired, as we went through
24 the following days and weeks, we started to
25 conclude that markets were much, much more broken

Page 131

KING - HIGHLY-CONFIDENTIAL

1  KING - HIGHLY-CONFIDENTIAL
2  at a very, very fundamental level than we had
3  really anticipated. And "we" being I think -- I'm
4  not even talking about my group or Barclays, but
5  "we" meaning financial markets and the general
6  public at large hadn't quite realized how broken
7  it was.
8           And we, very close to what was
9  happening at Lehman, could see that some things
10 are irreparably damaged here, and the ability to
11 unwind quickly some of these assets is going to be
12 very, very difficult.
13          And at that point I suggested, and
14 this was then subsequently taken up, that rather
15 than just push the assets back into the trading
16 desks, even with segregated books in the trading
17 desks, that we ought to manage them at a more
18 coordinated -- in a more coordinated and central
19 way and liquidate them in a more orderly fashion.
20          But that really was not -- and you may
21 remember I said earlier on that my -- our group,
22 my group PMTG changed at some point around the
23 time. We actually brought additional resources
24 into PMTG to facilitate that and took some
25 responsibility for liquidating of the assets over

Page 132

KING - HIGHLY-CONFIDENTIAL

1  KING - HIGHLY-CONFIDENTIAL
2  and above the assets that we were originally
3  managing.
4           So there was a bit of a change in
5  plan, you know. There wasn't much of a plan, but
6  the understanding changed over those -- over about
7  ten days or so.
8      Q.   So the assets that you received from
9  Lehman in different tranches never were parceled
10 out to the trading desks?
11     A.   They were parceled out -- some of
12 them, they were parceled out so that the trading
13 desks could originally review them. We further
14 refined that to say certain of the assets will be
15 parceled out and managed by the respective trading
16 desk and some of them won't be.
17          So it is a -- it is not as simple and
18 straightforward a division as all assets were
19 handed down to the respective trading desks. Some
20 of them were. Some of them we sold to the
21 respective trading desks so they could go out and
22 sell them as quickly as possible.
23          Otherwise, PMTG retained the risk
24 management responsibility but was facilitated by
25 the respective trading desk in the liquidation,

Page 133

KING - HIGHLY-CONFIDENTIAL

1  KING - HIGHLY-CONFIDENTIAL
2  and others we just kept and managed within our
3  group and brought additional resources in to
4  facilitate the management.
5           So there was three categories.
6      Q.   When you say facilitate the
7  management, meaning your group liquidated --
8      A.   Managed and liquidated it.
9      Q.   So has this orderly liquidation now
10 been completed?
11     A.   No. I think also to suggest --
12 "orderly liquidation" to me tends to convey -- it
13 is a term that's often used when trying to
14 describe how -- what type of valuation you would
15 attribute to a particular asset. I don't think
16 anyone ever used the term "orderly liquidation" to
17 describe particularly what we were doing. It was
18 liquidation.
19     Q.   OK, fair enough. I think I was using
20 it because I saw it in one of the documents here.
21          But you say sometime in September the
22 approach changed. Is the approach still to this
23 day to liquidate all the assets that were acquired
24 by Lehman or just select types of assets or
25 categories?

Page 134

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2       A.  It was, it was never -- it was never
3    described to me that the intention was to retain
4    for longer than was necessary or sensible any of
5    the assets.
6       Q.  So is there a way to assess now,
7    several months later, whether Barclays made money
8    on this pool of assets it received from Lehman?
9       A.  We made -- some assets were sold at or
10   above their marks, and many of them were sold
11   below, and many of them are still there.
12      Q.  Let me ask it differently.  Has
13   Barclays undertaken some kind of after-action
14   assessment or any kind of assessment or review to
15   see if, in fact, they made money on the securities
16   and other assets that they acquired from Lehman?
17      A.  No.
18      Q.  You have never seen any reports to
19   that effect or any kind of spreadsheets to that
20   effect?
21      A.  At various times, at various times,
22   more for management reporting purposes I think
23   than financial reporting purposes, we, my group or
24   Barclays had -- product control has attempted to
25   describe how much money was made or lost over a

Page 135

1    KING - HIGHLY-CONFIDENTIAL
2    period of time on certain aspects -- certain
3    assets.
4       A -- I think it was included, I think
5    it was included in a footnote to the year-end
6    financial statement, is the acquisition balance
7    sheet for Lehman.  I don't remember whether it was
8    actually published or whether I just saw it and it
9    was somehow integrated into it.  I think it was
10   published.
11         You know, that report is a negative
12   goodwill number, is purportedly a profit of the
13   acquisition, but it includes many things that are
14   nothing to do with the assets that we have talked
15   about here because it includes items such as
16   goodwill, real estate, receivables, et cetera.
17         So there was -- there is a statement
18   there about supposedly some number that is
19   attached to the profitability.  But I think of
20   that as an accounting requirement report for
21   financial reporting purposes of the transaction.
22         But that describes the valuation of
23   the securities according to a set of rules that
24   are influenced by accounting guidelines and rules
25   on a particular day.  And I think the date that

Page 136

1    KING - HIGHLY-CONFIDENTIAL
2    was picked was the 22nd.
3         And a very sophisticated set of rules
4    were developed over the subsequent months that
5    would guide PWC and Barclays' product control and
6    finance to be able to be comfortable that it had
7    adequately come up with an asset value for these
8    assets and for other things that were -- so
9    including certain contingent claims that were
10   going to be included on the balance sheet.
11         But it doesn't say anything there
12   about how much profit or loss was made on those
13   assets after that date, and it is an incredibly
14   difficult exercise to actually aggregate all of
15   that because of the three different places that I
16   described to you that the assets ended up.
17         Some assets were sold to traders and
18   then they subsequently sold them.  So there is a
19   P&L item, if you like, that turns up in the
20   negative goodwill balance sheet.  There is a P&L that we experienced
21   negative goodwill balance sheet.  There is a P&L that we experienced
22   between what was the price that PMTG seemed to
23   acquire the assets and where it sold them to the
24   desks, and then there is another item where the
25   desk sold it to the street and there are gains and

Page 137

1    KING - HIGHLY-CONFIDENTIAL
2    losses on the various hedges, and I'm using that
3    word in the way you were using "hedges," the
4    various instruments that were used to try to risk
5    manage while the assets were in situ in the P&L.
6    There is the gains and losses on those.
7         So I have never seen a number which
8    says how much did we make.
9       Q.  I think I understand what you are
10   saying, but the disclosure that was made in the
11   financial statement is a snapshot of the gain on
12   acquisition, right?  It doesn't even purport to
13   cover gains that might have taken place later as
14   to those securities?
15      A.  Or losses, more importantly losses,
16   right.
17      Q.  So my question is, I see the snapshot
18   of the gain on acquisition of about 4.2 billion
19   dollars.  Has Barclays undertaken any efforts
20   after that to assess what we are talking about,
21   the possibility that it gained or lost on all the
22   securities it acquired?
23      A.  Not in an isolated way.  Clearly, all
24   those gains and losses are part of the normal P&L
25   that all of the desks report, but there isn't a

Page 138

KING - HIGHLY-CONFIDENTIAL

1
2  line item --
3    Q.  OK.
4    A.  -- that says P&L related to Lehman
5  securities.
6    Q.  I understand that.  I was just -- as a
7  layman, outside the organization, I would think
8  someone would have said, hey, did we make any
9  money on that pool of securities we bought last
10  year?
11    A.  There is certainly -- people
12  frequently asked, but it is not easy to answer
13  because -- and it is a tremendous amount of work,
14  so no one bothered to answer it.
15    Q.  Just to trace them in all the places
16  they went?
17    A.  Trace them, and there were some
18  aspects of it that had to be done so there was
19  adequate reporting in trading statements and
20  year-end statements and things, but -- and I don't
21  think it is ever, you know, that -- the
22  acquisition gain that you are referring to doesn't
23  ascribe gains or losses on the securities.  It
24  just talks about on everything that was subject
25  to -- was either -- just the difference between

Page 139

KING - HIGHLY-CONFIDENTIAL

1
2  the assumed assets and liabilities of the
3  transaction.
4    Q.  Were you involved in helping provide
5  information that would go into the assessment of
6  that initial gain on acquisition?
7    A.  Yeah, once again we could -- the
8  estimated values for the securities was provided
9  by my desk to finance.
10    Q.  And you mentioned some stringent rules
11  that were applied in that regard?
12    A.  That's somewhat after the fact.  As I
13  described it, you know, it is not exactly a
14  normal -- as much as possible Barclays, given the
15  environment we were in, was attempting to follow
16  as many of the normal rules and procedures that it
17  would do for an acquisition, even though this one
18  was obviously extremely large.
19    So, you know, initial estimates of
20  what that balance sheet would have looked like
21  were on -- in relation to the securities, were
22  derived from my desk's estimates, where they were
23  available, of the values for the securities.
24    With time, obviously the individual
25  desks that were receiving the assets marked the

Page 140

KING - HIGHLY-CONFIDENTIAL

1
2  assets.  I don't think we -- I don't think we ever
3  went back to remark -- we didn't really -- my desk
4  didn't really care very much about what the mark
5  was on the 19th in many respects.  We cared about
6  what it was for a certain date that we took a
7  snapshot, so that we could report day two P&L, or
8  day one P&L, day two P&L, day two P&L being
9  everything after -- all the P&L associated with
10  the assets after they have been booked.
11    So we cared about a particular
12  snapshot, and I think we took a number that was
13  closer to -- a date that was closer to the end of
14  the month for that purpose.  End of September.
15  And then we looked at P&L changes from that date
16  on individual line items.  Not aggregate but just
17  individual line items.
18    Q.  That was your best estimate at the
19  time --
20    A.  At that time, and then that continued
21  to be refined as we found out more about the
22  securities or passed them out to the respective
23  desks or sold them or what have you.
24    Q.  Sure.  But for financial reporting
25  purposes, that was your best estimate at that

Page 141

KING - HIGHLY-CONFIDENTIAL

1
2  time?
3    A.  That was the best estimate.  We
4  provided the best estimate, and then product
5  control started to -- as things started to
6  stabilize, product control took over its normal
7  process about starting to think about how it would
8  prepare its financial statements, and then
9  therefore, obviously our information was an input
10  to that, but it was only an input, and they used
11  multiple sources, I think, to construct the
12  assumed valuations for the 19th.
13    (Exhibit 390-B, document Bates stamped
14  BCI-EX-S 52667 through 68 with attachment
15  marked for identification, as of this date.)
16    Q.  Mr. King, handing you a copy of a
17  document marked as Exhibit 390-B, which has Bates
18  ranges BCI-EX-S 00052667 through 668, and then
19  there is an attachment which is produced in native
20  form which we have attached to the exhibit.
21    It is a Monday, September 22nd e-mail
22  entitled "Long Island Draft Balance Sheet/Goodwill
23  Calc."  Do you see that?
24    A.  Um-hm.
25    Q.  After you have had a moment to review

Page 142

KING - HIGHLY-CONFIDENTIAL

1 it, I would like to ask you a question about it.
2         MR. STERN: Have you read the e-mail?
3         THE WITNESS: Yeah, I will come back
4 to that in one second.
5     A.   Yes.
6     Q.   My question is, do you see the entry
7 on the first covering e-mail -- I understand that
8 you are not a party to that e-mail, but it is
9 discussing the acquisition balance sheet, and the
10 fourth bullet down refers to the "2.83B valuation
11 adjustment is S. King's first cut only." Do you
12 see that?
13     A.   Yes.
14     Q.   And if we refer to the last page of
15 the document, I see an entry for 2.83 billion. Do
16 you know what -- is that the 2.83 adjustment,
17 first-cut adjustment that the e-mail is talking
18 about?
19     A.   Yes.
20     Q.   Do you know what -- can you explain to
21 me what that valuation adjustment is?
22     A.   Yes. It is linked to your previous
23 questions. There has to be -- and this changed
24 over time. There has to be -- this concept, and

Page 143

KING - HIGHLY-CONFIDENTIAL

1 we have touched on it a few times during the --
2 through the course of the conversations, of there
3 being a value, a valuation, seems to imply that
4 there is a single price, but of course that isn't
5 actually the case.
6         When you are referring to orderly
7 liquidation -- for example, I think the e-mail
8 that we had in front of us earlier was that the
9 CMO guys told me he was told to give two months
10 orderly liquidation in the bid in comp. So there
11 he has used -- you can see he is being given an
12 instruction. That is actually a quite formal
13 instruction.
14         An orderly liquidation mark is
15 something that people understand to mean -- that
16 was on Exhibit 389-B. That was something that
17 people sort of understand to mean if there is --
18 sometimes we come into work in the mornings and we
19 get a phone call saying, will you bid on the
20 following. And if we have got enough capital and
21 we feel like doing it, then we may say yes, and
22 the guy may want to sell us the stuff for
23 30 million dollars and we may bid 10. And if he
24 really needs a bid, then he will hit our 10.

Page 144

KING - HIGHLY-CONFIDENTIAL

1         I wouldn't describe that as an orderly
2 liquidation. And in fact, we have seen a lot of
3 that during the course of the last two years, of
4 course, as so many counterparties have defaulted
5 on obligations and their assets have been seized
6 and liquidated.
7         Under normal circumstances it is not a
8 straightforward process. In marking our books, we
9 have to try to assess whether or not we are
10 supposed to use those pricing points in marking
11 assets.
12         They are clearly actually where
13 something just traded. Something was sold from
14 one party to another party at that price.
15 Somebody was willing to trade. But they weren't
16 really willing to trade -- it wasn't particularly
17 by design that they traded there, they had to
18 trade, it was sold. Maybe it was seized and sold
19 or they needed to sell it to create liquidity, but
20 it wasn't exactly orderly.
21         So on that page 389-B, where it says
22 "orderly liquidation mark and bidding comp,"
23 that's kind of -- it's trying to highlight there
24 really is a little bit of a difference between the

Page 145

KING - HIGHLY-CONFIDENTIAL

1 two of these.
2         We mostly mark our positions as if
3 there was an orderly disposal. Not necessarily
4 that that's what we plan on doing with them. We
5 might hold them, might sell them. There is lots
6 of things we try to do, but we try to keep that
7 concept in mind.
8         At this stage, on Monday, the 22nd,
9 this balance sheet, the valuation adjustment was
10 equal to the difference between -- I think it was
11 the 45 point -- Thursday close. The
12 45.18 billion, which is the Thursday -- this is
13 the inventory Thursday close, 45.18. That would
14 have been, if memory serves, the BoNY marks for
15 the portfolio.
16         And -- there is a little bit of P&L in
17 here. I think that is probably carried, and then
18 the valuation adjustment on this day, this isn't
19 necessarily on subsequent balance sheets, but on
20 this day would be equal to the difference between
21 the BoNY -- I think the BoNY marks and our current
22 best guess, based on everything that we have got
23 available to us, of the orderly liquidation mark.
24         So it is trying to get from one number

Page 146

KING - HIGHLY-CONFIDENTIAL

1    to another number. With time, both of those, the
2    definitions of those were clarified, but that was
3    what this was on that date, and that's why Gary
4    refers to it as valuation adjustment, as S. King's
5    first cut only.
6        It is not an upper-case term,
7    valuation adjustment. It was just a term that we
8    started to use to be the difference between where
9    there was some observable marks that could have
10    been the BoNY marks and where we were saying we
11    would probably book things. Again, it was to try
12    to make the difference between the day one and day
13    two P&L.
14    Q.    This is Monday, the 22nd. That's the
15    date on which the financial statement ultimately
16    says, let's report the acquisition as of on that
17    date, right?
18    A.    Yes.
19    Q.    If you look at 5, I don't know if that
20    helps in your answer. I'm not sure you saw that.
21    A.    OK.
22    Q.    So that confirms that the --
23    A.    That's actually -- so we put that --
24    it is in there, initial estimate of the adjustment

Page 147

KING - HIGHLY-CONFIDENTIAL

1    to Barclays' marks, BoNY prices and Barclays'
2    marks. That's precisely that.
3        Q.    The BoNY price of 45 billion is the
4    BoNY marks assessed on what pool of assets?
5        A.    What is -- I don't know if this is
6    clear on this. It is just inventory on this day.
7        Q.    Maybe I could ask a clarifying
8    question while you look at that.
9        Is the 45 -- my question is, is the
10    45.18 the BoNY marks for the assets you received
11    from the repo, or does it also include other
12    assets that you received later?
13        A.    That's what I was just trying to
14    check. There is a version of this where they are
15    separated. But I don't think we were able to do
16    that as early as the 22nd.
17        Q.    That's the Monday following.
18        A.    Yeah. Because I can only see one --
19    45.18 inventory, 15c3, financial assets.
20        Yes, I think it is 45.18. It is just
21    whatever we -- at this point whatever we knew of.
22        Q.    If you read further down on that
23    column, you will see a reference to 15c3 assets,
24    so that's a separate asset that you received over

Page 148

KING - HIGHLY-CONFIDENTIAL

1    that weekend, correct?
2        MR. STERN: Objection to the form.
3    Q.    If you can describe that, that's fine.
4    A.    On the 22nd, I wouldn't even have
5    known what 15c3 meant, and 15c3 asset wasn't -- is
6    not a security or anything that we -- it is just a
7    line item on here. It is not an asset -- it is
8    not a tradable asset.
9        Q.    OK. And the 7 billion in cash, is
10    that the -- in the next, next line item, 7 billion
11    in cash, is that the 7 billion that came over to
12    Barclays as a result of the repo transaction?
13        MR. STERN: Objection to the form.
14        You can answer.
15        A.    The cash, the 7 billion was the cash
16    item on here. Actually, I have seen -- obviously
17    I've seen this before and various subsequent
18    iterations of it. But we didn't prepare this.
19    So --
20        Q.    "We" meaning --
21        A.    My desk. So we didn't have any input
22    to anything that was -- you know, we would provide
23    Gary numbers, and we wouldn't have had any input
24    below inventory, because they are not securities.

Page 149

KING - HIGHLY-CONFIDENTIAL

1        Now, the 7 billion dollars is the
2    cash, but I know that the 7 billion dollars is the
3    cash that we thought we had in relation to the
4    nonsecurity-based collateral for the repo
5    facility.
6        Q.    If I look on here, I don't see --
7    well, could you tell me if there is any entry on
8    here that covers what we have been calling
9    unencumbered assets or the clearance box assets,
10    or have they not yet come over to Barclays?
11        A.    I -- as I say, there must be a hundred
12    of these balance sheets that were, you know, as
13    product control refined them. I don't know how
14    many I have seen, but I've seen a few of them
15    between here and the end of the year. This is an
16    early version of it. And so you will have to
17    forgive me if I can't remember exactly the 45.18.
18        Inventory on the Friday morning, I
19    think from memory, is everything that we thought
20    we received at the -- by the date of -- by some
21    date on which we provided -- I don't know what
22    date -- I don't know what date Gary is producing
23    this, so it might have been this is from the
24    Friday numbers or Saturday numbers or Sunday

Page 150

KING - HIGHLY-CONFIDENTIAL

1 numbers. It is probably not the Monday numbers,
2 because it is produced on Monday. I suppose it is
3 produced late on Monday.
4       But it doesn't separate out the
5 unencumbered assets that we had already received
6 by that point. It doesn't separate it out. So I
7 think that everything that we had received to this
8 point was in that number.
9    Q.   Back to the 2.83 valuation adjustment.
10 How did you come up with that 2.83 number? Is
11 that the top-down analysis we talked about
12 earlier?
13    A.   No. We never came up, so we, my group
14 never came up with 2.83. 2.83 is a difference
15 between a set of marks and our marks. So it is
16 not like I come up with -- it is not that I come
17 up with 2.83. We would come up with on here 42.55
18 as a -- on the spreadsheet or the inventory, and
19 say we've marked all the individual line items,
20 and then product control will tell us at that --
21 based on all your individual marks or your best
22 estimate here -- I think by this date we were
23 still working on spreadsheets -- we estimate that
24 what we had got is worth 42 and a half billion

Page 151

KING - HIGHLY-CONFIDENTIAL

1 dollars.
2       Then they would compare that to the
3 marks for some of the inventory at the BoNY marks,
4 and that's what that last paragraph says. It said
5 the trades are initially booked at BoNY prices, so
6 no one is calculating the 2.83. The 2.83 is the
7 difference between the BoNY marks and the desk
8 marks.
9    Q.   And the desk marks are -- Barclays is
10 going CUSIP by CUSIP and putting a mark in for --
11    A.   Where possible, yes. Where possible.
12 And it is the best guess by the desk, by my desk
13 using input from as many other sources as we
14 possibly can of an orderly liquidation mark, not
15 where we would -- if we were to -- if we had
16 turned around and asked somebody to bid on this
17 day for 42 and a half billion dollars worth of
18 securities, it would have been 30-something
19 billion.
20    Q.   I understand that. I'm just trying to
21 understand the origin of the marks that Barclays
22 put on it. Did Barclays adopt marks that Lehman
23 had put on these assets?
24    A.   No.

Page 152

KING - HIGHLY-CONFIDENTIAL

1    Q.   I have heard testimony in other
2 instances where Lehman valued those assets at
3 42.9. This appears to be very close to the
4 Barclays marks. Did you have any consideration or
5 discussion between Lehman and Barclays as to their
6 own marks?
7    A.   Well, some of the marks were -- we
8 actually used to make the unfunny joke that 42 and
9 a half versus 49, you know, or 50 versus 48 and a
10 half, it is kind of close. It is -- that's half
11 of a billion dollars, so that's a gap. That's
12 500 million dollars of, you know, rounding.
13       And that would have come from more of
14 a -- it just sort of highlights just how much
15 uncertainty there was. You would be very
16 surprised if there was absolutely no relationship
17 between the BoNY marks, the JP marks, the Lehman
18 marks, the Barclays estimates. If they weren't of
19 some similar order of magnitude, you know you have
20 a major failing of a control system somewhere.
21       But still, I don't -- we never really
22 needed to use the Lehman marks, other than -- the
23 only place where we used the Lehman marks was
24 where we had no idea what the security was other

Page 153

KING - HIGHLY-CONFIDENTIAL

1 than a CUSIP, some generic name, and the Lehman
2 mark, then we would have said we will value it at
3 a discount to the Lehman mark because we have
4 nothing else to go on. It could be worth nothing.
5       Many of them were worth nothing. Not
6 because Lehman had -- bear in mind, the Lehman
7 marks were from days -- they were old, they were
8 what we call stale. Many of them were -- I think
9 most of the stuff we were looking at earlier was
10 on the 12th, which was before the bankruptcy of
11 Lehman Brothers Holdings, and even during that
12 previous week, most of the traders were out -- at
13 Lehman were more worried about their own futures
14 than necessarily marking their books, and markets
15 were already very, very distressed.
16       So the idea that those markets were
17 good on -- those marks were good on the 22nd after
18 two bankruptcies and Merrill being acquired by --
19 or being bailed out, is -- there is a
20 tremendous -- you know, the value of them is
21 that -- so there were cases where we said -- and
22 some of them were appropriately marked by Lehman
23 but worthless to Barclays.
24    A good example would be there were

Page 154

KING - HIGHLY-CONFIDENTIAL

1  warrants that were in the repo facility, I
2  remember roughly it was 300 million dollars as a
3  good example. 300 million dollars issued by
4  Lehman referencing other credits.
5         Now, those, as long as Lehman exists,
6  are worth roughly the amount of the reference
7  credit, but the moment that Lehman defaults, they
8  are worthless. So Lehman had them appropriately
9  marked where they would have traded them prior to
10  Lehman's insolvency. They are just called fixed
11  income security on a schedule that we had, and
12  they are actually worthless, and there were
13  instruments like that in the repo facility.
14         Now, we wouldn't have known that until
15  days, many days later.
16     Q.   So this 2.83 adjustment is derived
17  from comparing the BoNY marks to Barclays' own
18  marks?
19     A.   PMTG's current best guess at an
20  orderly liquidation.
21     Q.   At that particular date?
22     A.   On that particular date. It doesn't
23  say if the other bidding -- you know, that's an
24  orderly liquidation as opposed to a bidding comp

Page 155

KING - HIGHLY-CONFIDENTIAL

1  liquidation.
2         MR. STERN: Should we take a short
3  break?
4         THE WITNESS: Sure.
5         (Recess)
6  BY MR. HINE:
7     Q.   Mr. King, I am going to hand you a
8  copy of a document marked as Exhibit 86-B. After
9  you have had a minute to look at it, I would then
10  like to ask you a couple of questions, first
11  regarding whether you have ever seen this document
12  before.
13         MR. STERN: Take your time and look at
14  it, and that's the question: Have you ever
15  seen it before?
16         THE WITNESS: OK.
17     Q.   Have you ever seen this document
18  before, Mr. King?
19     A.   I've never seen the document before.
20  I don't think I have seen the spreadsheet before.
21     Q.   Does it look like anything else you
22  have seen before?
23     A.   Unfortunately, it looks like a
24  tremendous number of things I have seen before,

Page 156

KING - HIGHLY-CONFIDENTIAL

1  but I don't think I have -- I don't know -- I
2  don't really recognize this one.
3     Q.   Do you have any understanding or can
4  you give me your best -- withdrawn.
5         Do you have any understanding of what
6  this document is modeling?
7         MR. STERN: Objection to the form.
8  Calls for speculation.
9     Q.   Attempting to model?
10         MR. STERN: You are asking for him to
11  guess or --
12         MR. HINE: Yeah.
13         MR. STERN: I object to guessing.
14     Q.   You can answer the question.
15     A.   Well, it describes PMTG and it -- and
16  the cumulative amounts are the same as the sheet
17  we looked at before. Slightly different. So it
18  looks like -- it looks like many reports that were
19  produced around this time that are of a population
20  of securities that in some way are linked back to
21  that, but I don't know this -- especially not
22  with -- without any date or anything on it, it is
23  just one of any number of spreadsheets.
24     Q.   Do you know -- can you tell by looking

Page 157

KING - HIGHLY-CONFIDENTIAL

1  at it, the form, who, which department within
2  Barclays might have prepared this?
3     A.   Only by the fact that it talks about
4  PCG values, as well as PMTG, and -- I would think
5  it is a -- well, it is a reconciliation of
6  something with something, and it looks -- it
7  clearly has a similar set of securities as the
8  previous -- as 39-B, I think it is, but what it
9  was trying to achieve or who prepared it -- it
10  could be either our desk or PCG. It would have to
11  be one of the two.
12     Q.   Have you ever heard of anything
13  referred to as PCG liquidity value?
14     A.   Isn't that just --
15     Q.   That's the column heading for column
16  F. Do you see that?
17     A.   Isn't that just D minus E?
18     Q.   It very well could be. I'm curious if
19  you ever heard the term used, "PCG liquidity
20  value."
21     A.   No.
22     Q.   Is that -- do you see the column
23  marked E which says "MV09/22 with bid-offer"? Do
24  you see that column?

Page 158

KING - HIGHLY-CONFIDENTIAL

1
2    A.  Yes.
3    Q.  Did your department undertake any
4  efforts to, on or around 9/22, to solicit bids or
5  offers for these types of securities?
6    A.  No.
7    Q.  Did you have any idea of where that,
8  the entries in that column would have come from?
9        MR. STERN: Objection to the form.
10        You can answer.
11    A.  I -- I would -- I am -- I would be
12  very surprised if column E -- column E, market
13  value 09/22 with bid offer, is a term that we in
14  PMTG -- those could be -- they could have come
15  from PMTG. They might have come from an aggregate
16  of other places.
17        I would think they came from PMTG, and
18  as far as I can see, F is just D minus E.
19    Q.  OK. Do you see on the left-hand
20  column there appears to be a list of various
21  categories of securities? Do you see that?
22    A.  Yeah.
23    Q.  Below that, PMTG and then another
24  entry for PMTG2. Are those -- other than being
25  the initials for your department, would you --

Page 159

KING - HIGHLY-CONFIDENTIAL

1
2  could you -- do you have any idea what securities
3  are being pooled in those entries?
4        MR. STERN: Objection to the form.
5    A.  No. I mean over there -- you say this
6  is on the 22nd?
7    Q.  I don't have a date for it. I see the
8  entry -- well, the title at the top appears to be
9  22 September.
10    A.  Oh.
11        MR. STERN: The question is, do you
12  have any idea what securities are being
13  pooled in those entries. That's the
14  question.
15    A.  1.17 billion. I think. I would just
16  be guessing.
17    Q.  Don't know?
18    A.  No. I mean I would be guessing rather
19  than I know.
20    Q.  OK. Mr. King, I would like to walk
21  through a couple of documents here just to ask you
22  some specific questions of those documents.
23        The first one, I am going to hand you
24  what was previously marked as Exhibit 302-A. It
25  is very thick. I don't want to ask you about the

Page 160

KING - HIGHLY-CONFIDENTIAL

1
2  whole document, I just want to ask you about the
3  cover e-mail. But take your time to review
4  whatever you need to review.
5        It appears. This is dated Wednesday,
6  the 17th. It appears that you are providing
7  comments to the asset purchase agreement; is that
8  correct?
9        MR. STERN: Objection to the form.
10    Q.  Let me rephrase.
11        What is this covering e-mail?
12    A.  It is an e-mail from me to Patrick,
13  Mike and Jonathan. It is called asset purchase
14  agreement comments. And those are comments to the
15  asset purchase agreement that I would have
16  provided to them.
17    Q.  OK. Do you recall providing comments
18  to the asset purchase agreement?
19    A.  I now do. But I would have forgotten
20  about it otherwise.
21    Q.  OK. I guess my first question: The
22  agreement is signed on the 16th, so why are you
23  providing comments the day after it is signed?
24    A.  I don't know. On that, I -- don't
25  forget, to me, I then didn't know -- until you

Page 161

KING - HIGHLY-CONFIDENTIAL

1
2  told me earlier today that there was an agreement
3  signed on the Tuesday, I didn't know that. Or at
4  least I certainly didn't remember it.
5    Q.  Why would you be sending these
6  agreements to Mr. -- these comments to Mr. Cox?
7  Do you recall?
8    A.  No.
9    Q.  Do you see in the first entry it talks
10  about purchase assets, and the third sentence in
11  that entry, entry number one, says, "Can
12  securities be sold to LBI without approval at a
13  discount to current mark?" Do you see that?
14    A.  Yeah.
15    Q.  Do you recall why you were making that
16  comment?
17    A.  No, though reading it in its entirety,
18  it also says, "Are hedges put on by LBI after the
19  agreement is signed included? Any limits or
20  restrictions?"
21        So on the 17th, you know, on the 17th
22  is before we got into the repo. This is the --
23  these are -- these are commenting on something
24  before we actually -- not on the final form of the
25  transaction.

Page 162

KING - HIGHLY-CONFIDENTIAL

1
2  Q.   Sure, it is before the repo.
3  A.   It is before the repo.
4  Q.   Right.
5  A.   So as a structurer of -- being
6  familiar with structured credit transactions, both
7  of those comments read that we were obviously very
8  worried, our desk was very worried that given the
9  distress in the markets at the time, that if
10 things were just sold into the open market, that
11 they would be sold at tremendous discounts to
12 their marks.
13       Even though they are marked in this
14 orderly liquidation, if someone started selling
15 them, then you would crystallize phenomenal loss,
16 and both of these comments seem to suggest that at
17 the time I was worried that we didn't have -- as a
18 risk manager looking at how were we going to
19 control the management of the assets on an ongoing
20 basis.
21 Q.   You ask in number one can they be sold
22 without approval.  Whose approval are you talking
23 about there?
24       MR. STERN: Sold by LBI.
25 A.   Sold by LBI.  If you read 1 and 7 --

Page 163

KING - HIGHLY-CONFIDENTIAL

1
2  well, 7 says, "Are hedges put on by LBI after the
3  agreement is signed included?  Any limits or
4  restrictions?"
5  Q.   Right.
6  A.   So I am saying, both of those seem to
7  infer that -- and this would be a sensible comment
8  for me to be worried about if there is a portfolio
9  of assets and I put a value on them, if somebody
10 sells those assets or manages those assets after I
11 think I am exposed to them, I have no control over
12 whether or not they would do something stupid.  I
13 mean it is LBI.
14 Q.   I understand that, but whose approval
15 are you talking about there in that sentence?
16 A.   I don't remember.  This is -- this
17 e-mail relates to a form of transaction that
18 didn't happen, so there was no ongoing involvement
19 of LBI, where LBI had people in this portfolio.
20       I read that as a sentence that I typed
21 as asking who does LBI have to get approval from
22 if they sell.  .
23 Q.   And has --
24       MR. STERN: In other words, Bill, sell
25 to somebody other than Barclays.

Page 164

KING - HIGHLY-CONFIDENTIAL

1
2       MR. HINE: I understand that.
3       MR. STERN: I think that's what the
4  confusion is.
5       MR. HINE: I understand that.
6  Q.   Let me ask it differently.  Are you
7  referring in any way to court approval?
8  A.   I don't think so.  I wouldn't have
9  known to refer to court approval.
10 Q.   Are you referring in any way to board
11 of directors approval?
12 A.   I really don't think so, because if
13 you read that -- these are pretty prosaic
14 comments.  I would have to see where I was
15 commenting -- you know, I would have to reread the
16 document to see where I was specifically
17 commenting.
18       But if I read, "Are hedges put on by
19 LBI after the agreement is signed included?  Any
20 limits or restrictions?"  So I seem to be
21 inferring what can LBI do to affect this
22 population.
23 Q.   You are wondering about what LBI can
24 do between the signing of the agreement and
25 closing of the agreement?

Page 165

KING - HIGHLY-CONFIDENTIAL

1
2  A.   I can't remember this in particular,
3  as I say, because it didn't happen.  That's what I
4  read, as having put structured transactions
5  together.  I could assess a portfolio of assets
6  that you had and say, I think they are worth X,
7  and then I inadvertently leave you with control to
8  do whatever you want to do with them, and the
9  first thing you do is go and sell them or put
10 pointless hedges on them, or you do something
11 stupid.
12 Q.   That's what you are worried about?
13 A.   I read that to mean that, and I would
14 think that therefore within -- if you think about
15 the scope of what I was responsible for, which is
16 valuation and risk management of a defined
17 population, and I made the point earlier about one
18 of the main things we are worried about is
19 population, I read that sentence -- I am having to
20 do this with a year -- on a transaction that
21 didn't happen with a year of time in between.  I
22 read that to mean can the population be affected
23 without my control.
24 Q.   I understand that.
25 A.   I think.

Page 166

KING - HIGHLY-CONFIDENTIAL

1
2    Q.   Now, when it says discount, do you
3    recall any discussions or having any understanding
4    at the time that Barclays was acquiring assets
5    from Lehman at a discount?
6          MR. STERN: Objection to the form.
7    Asked and answered.
8    A.   I wasn't -- can you repeat that
9    actually.
10         (Record read)
11   A.   As I pointed out before, I wasn't
12   party to any of those discussions.
13         I would have to also question
14   discounts to what. If it is a discount to BoNY's
15   marks or something, then I would say I was
16   assuming that my desk was viewing the assets as
17   not being worth the BoNY marks, but I don't know
18   if that's what you mean by discount.
19   Q.   I'm just trying to exhaust your
20   recollection on discussions you might have heard
21   or understandings you might have heard about the
22   discussions between Barclays and Lehman.
23         MR. STERN: Your question? I don't
24   think there is a question.
25   Q.   So let's reread the question. Do you

Page 167

KING - HIGHLY-CONFIDENTIAL

1
2    recall any discussions or having any understanding
3    at the time that Barclays was acquiring assets
4    from Lehman at a discount?
5    A.   So I wasn't party to the
6    discussions -- to any discussions, but I didn't
7    think that -- if I -- I would have to define
8    discount to what, and then if I -- if you said --
9    if you had asked me the question did I think that
10   the -- we should pay less than where Lehman had
11   marked the securities on the 12th or where BoNY or
12   JP had marked them on the 17th, then I would say
13   yes. But I don't know whether that's what you are
14   asking.
15   Q.   I understand your answer. I was
16   asking if you have any knowledge of the
17   discussions between Lehman and Barclays --
18   A.   No.
19   Q.   -- as to that subject?
20   A.   No.
21   Q.   Can we skip ahead to the repo
22   transaction, which is the September 18 repo.
23   A.   Yeah.
24   Q.   Did Barclays provide a list of assets
25   that it wanted excluded from the repo or would not

Page 168

KING - HIGHLY-CONFIDENTIAL

1
2    accept as collateral in the repo?
3    A.   No. We didn't have any option on
4    the -- going into the -- we weren't -- "we" being
5    PMTG, weren't aware of any flexibility as to what
6    we were going to receive. That was part of the
7    problem, was we are going to take delivery of --
8    remember you asked me the questions earlier about
9    what were you looking at, Steve, and I was
10   provided an inventory of securities on the
11   Wednesday, Thursday, that represented what I would
12   take delivery of.
13         And then it did happen to change by
14   Friday, but that was not what we were expecting to
15   receive, that list of securities.
16   Q.   I am talking about before the Friday.
17   I'm talking about in the Wednesday, Tuesday,
18   whenever you are talking about the repo, were
19   there certain assets that Barclays would not
20   accept as collateral for that repo?
21   A.   No. I -- on the Wednesday -- so the
22   Wednesday or Thursday we are analyzing the repo,
23   we just assumed we were taking delivery of
24   whatever was described to us as being in the repo
25   on the Thursday.

Page 169

KING - HIGHLY-CONFIDENTIAL

1
2    Q.   Described to you by who?
3    A.   In the schedule of securities
4    provided -- you asked me the question earlier as
5    to -- about a list of securities that was in the
6    repo, and I answered that I didn't know where it
7    came from, whether it was from operations or the
8    Fed or whoever, but somebody provided us a list of
9    securities on the Thursday, which is the list we
10   thought we would take delivery of. It wasn't the
11   list that we ultimately took delivery of, but it
12   was the list that we passed out to the various
13   traders.
14         We didn't think that we had any option
15   to pick and choose.
16         MR. STERN: Is that the list that you
17   referred to as having an hour and a half to
18   look at?
19         THE WITNESS: The hour and a half to
20   look at, yes.
21   Q.   This might clarify the question. I am
22   going to hand you a document that was previously
23   marked as 143-B. It is an e-mail stream of which
24   you are not a party to until you get to page 2.
25         MR. STERN: Take a look at the whole

## Page 170

```
1          KING - HIGHLY-CONFIDENTIAL
2     thing.
3     Q.    You can look at the whole thing. I am
4  just directing your attention to an entry on
5  page 2, which is an e-mail from you to David
6  Petrie, and it attaches something called excluded
7  mortgage assets.
8     A.    Right.
9     Q.    So take your time to look at the
10  document, but my questions are going to be
11  primarily about that attachment.
12    A.    OK.
13    Q.    Have you ever seen this document
14  before?
15    A.    Yes.
16    Q.    Can you tell me what the attachment
17  which is titled "Excluded Mortgage Assets 9/17/08"
18  is?
19    A.    Yeah. It is from the 6.5 billion
20  dollars of assets on the -- let me look here.
21    Q.    Is that the exhibit we first used in
22  this --
23    A.    Yeah, I think so.
24    Q.    I think it is --
25    A.    388-B.
```

## Page 171

```
1          KING - HIGHLY-CONFIDENTIAL
2     Q.    The 6.6 billion in mortgage?
3     A.    Yeah. So once upon a time in the
4  first part of the week, we had suggested that we
5  wouldn't -- remember I said that we wouldn't take
6  all of the mortgage and mortgage-backed total. So
7  we divided it into two pools, the included and the
8  excluded.
9          So that e-mail from the 17th, unless I
10  have made a mistake, it is an e-mail about the
11  assets that we wouldn't be taking out of the
12  mortgage and mortgage-backed securities.
13    Q.    So these are mortgages you are not
14  going to take?
15    A.    These would be -- yes, that's the --
16  well, it was -- in the early part of the week it
17  was the list of securities which we were
18  suggesting that we wouldn't take, "we" being my
19  group, suggesting that we would rather not take
20  out of the total mortgage and mortgage-backed
21  total.
22    Q.    It is really nothing to do with the
23  repo. It has to do with the agreement to only
24  take a portion of the mortgage-related securities?
25    A.    That's correct.
```

## Page 172

```
1          KING - HIGHLY-CONFIDENTIAL
2     Q.    And then that agreement eventually
3  changes toward the end of the week?
4          MR. STERN: Objection to the form.
5     A.    As I have said, I only know that what
6  we were looking at at the beginning of the week
7  didn't end up being the transaction. I don't know
8  how the agreement changed.
9     Q.    Let's talk about mortgage, the pool of
10  mortgages-related securities itself. What
11  happened to that? Did Barclays end up getting
12  those securities?
13    A.    Some of them, because some of them
14  were in the repo, but not all of them were in the
15  repo.
16    Q.    And is the part that was in the repo
17  the securities that did not make it to this
18  schedule?
19    A.    I think I described --
20          MR. STERN: Let me hear that question
21  again, please.
22          MR. HINE: Let me try again. That was
23  confusing.
24    Q.    You talked about this schedule, and I
25  am talking about Exhibit --
```

## Page 173

```
1          KING - HIGHLY-CONFIDENTIAL
2          MR. STERN: 143-B.
3     Q.    143 -- all right, 143-B, that's the
4  schedule of mortgage-related securities that --
5     A.    Correct.
6     Q.    -- Barclays did not want included in
7  the transaction, correct?
8     A.    Right.
9     Q.    And that was -- the counterpart to
10  that is the securities that Barclays would allow
11  in the transaction, right?
12          MR. STERN: Objection to the form.
13    A.    I'm not sure what we mean by -- if we
14  mean what we understood at the beginning of the
15  week my group was asked to assess as a portfolio
16  of assets that would end up being part of the
17  purchase agreement, then this pertains to that.
18  What ultimately happened was of course completely
19  different.
20    Q.    Well, that's what I am asking. What
21  ultimately happened to the pool of mortgage-backed
22  securities?
23    A.    Some of them I don't know, because the
24  388-B balance sheet was -- was not completely --
25  you know, it -- what does he have, 65.1 -- it says
```

Page 174

```
1         KING - HIGHLY-CONFIDENTIAL
2    65.16 billion dollars. That's on 388-B again,
3    65.16 billion.
4         So it is bigger than -- that number is
5    bigger than the repo facility which at any one of
6    the various marks that people had put on was less
7    than 50 billion dollars.
8         So not -- using your Venn diagram, not
9    all of these securities are in the repo facility.
10        MR. STERN:  And you're pointing to
11   388-B.
12        THE WITNESS:  I'm pointing to 388-B.
13        Q.   I'm just trying to chase what happens
14   to the pool of mortgage-backed securities that
15   were originally marked as 60 billion on 388-B,
16   what happens to them by the end of the week?
17        A.   I don't know on all of them. All I
18   know is some of them were in the list -- some of
19   them -- some of them were collateral that was
20   pledged to the Fed as far as my desk knew on the
21   Thursday, Wednesday, Thursday.
22        Q.   The Fed?
23        A.   Yeah. Some of them were in the Fed
24   facility. Every single -- a bank -- I mean every
25   single -- a balance sheet is made up of assets and
```

Page 175

```
1         KING - HIGHLY-CONFIDENTIAL
2    liabilities. Some of them -- all assets have to
3    be financed, especially for a broker dealer like
4    Lehman. So, many of these assets were financed by
5    the Fed. Therefore, they would have also been in
6    the Fed facility.
7         Q.   Right.
8         A.   But there is 65 billion of assets
9    here, so they couldn't all fit in the Fed
10   facility, which was only 50 billion.
11        Q.   I understand.
12        A.   Some of them weren't even in what we
13   thought was the Fed facility on the Wednesday,
14   Thursday.
15        Q.   OK.
16        A.   So some of them were just gone.
17        MR. STERN:  But he is asking you about
18   Exhibit -- the list on Exhibit 143-B.
19        THE WITNESS:  Yeah.
20        MR. STERN:  What happened to those.
21        Q.   No, I am asking the pool of securities
22   on 388-B --
23        MR. STERN:  You didn't ask that.
24        MR. HINE:  Yes, I did.
25        Q.   It was originally marked at
```

Page 176

```
1         KING - HIGHLY-CONFIDENTIAL
2    6.5 billion, and you were describing to me that
3    some of that made it into the repo, as I
4    understand it.
5         A.   Some of them were in the -- some of
6    them -- if we looked at a list of securities on
7    388-B, some of those securities, many of those
8    securities were also in -- also being financed by
9    the Fed.
10        Q.   Right.
11        A.   So they were what we thought were in
12   the repo facility that we were going to assume
13   when we reviewed that list of securities on the
14   Wednesday, Thursday. Not all of them, though.
15   Some of them were just not there. And some of
16   them would have therefore been excluded assets and
17   some of them would have been included assets.
18        I seem to -- I remember that there was
19   not many of the excluded assets -- no, actually I
20   can't remember exactly how many of the included
21   or -- since the included and excluded list
22   pertained to the Lehman balance sheet, not to the
23   repo facility, there were both included and
24   excluded assets in the Thursday repo facility.
25        Q.   So in the Thursday -- September 18
```

Page 177

```
1         KING - HIGHLY-CONFIDENTIAL
2    Thursday repo facility --
3         A.   Before it was the Barclays -- the Fed
4    one.
5         Q.   No. I want to know -- I want to keep
6    the story going. The September 18 repo facility,
7    some of those assets eventually make their way to
8    Barclays, and within that pool of assets, there
9    are a certain number of mortgage-related
10   securities; is that right?
11        A.   Yes. There was some -- some of the
12   mortgage-related securities were in the Fed
13   facility. Some other securities as well.
14        Q.   Do you know how many of the securities
15   within -- that came to Barclays constituted
16   mortgage-related securities?
17        A.   There is a difference. Again on the
18   Thursday when we were looking at what we thought
19   we were going to receive from the Fed, there was a
20   certain amount of the securities that were on that
21   list.
22        On the Friday, by the Friday when
23   we -- after the Fed facility has been refinanced
24   by the Barclays repo facility, then there were --
25   out of the 30 or so billion dollars of the
```

## Page 178

KING - HIGHLY-CONFIDENTIAL

securities that were both in the Fed facility that
ended up in the Barclays facility, there were some
of the mortgage assets, but in addition there were
other assets, other mortgage assets, some other of
the mortgage assets which we hadn't looked at on
Thursday, but we had looked at on Tuesday, that
turned up in the extra 10 billion.

Q.    So as you talked about earlier, on
Friday you realize there is two different types --
you assumed two different types of securities,
about 32 billion worth of securities that you
already knew about using the JPM marks?

A.    Correct.

Q.    And 10 billion using the BoNY marks of
securities that you didn't expect to receive?

A.    Correct.

Q.    There were mortgage securities in both
of those groups; is that right?

A.    That's correct. Yes.

Q.    Do you know about how much?

A.    I remember it being about 3, 3 billion
I think. It was about 3 billion, and we thought
they were worth about 1 and a half.

Q.    And those are the types of -- when you

## Page 179

KING - HIGHLY-CONFIDENTIAL

say 3 billion, that's within both of those two
groups?

A.    Yeah. That's what I remember.

Q.    And those are the types of securities
that you have been focusing on because they get
put into your group eventually?

A.    That's correct, yeah.

MR. STERN: Is there a question?

MR. HINE: No. He answered it.

MR. STERN: Just wait for a question.

BY MR. HINE:

Q.    Did you want to elaborate on
something?

A.    No. I was just thinking about that.
That's fine.

Q.    Mr. King, I am going to hand you
another document, that has been previously marked
as 144-A, and my question is whether you have ever
seen that before.

A.    Yes.

Q.    What is this document?

A.    I've seen it before, but I don't
really know.

Q.    Did you receive a copy of this from

## Page 180

KING - HIGHLY-CONFIDENTIAL

Mr. Malloy around -- on Friday, the 19th?

A.    I'm on the e-mail, so yes.

Q.    Do you have any understanding of why
Mr. Malloy prepared this analysis?

A.    Marty was just involved in the
settlement of the repo, so he -- I don't know why
he produced this in particular. It is a pretty --
the original e-mail is a pretty vanilla e-mail
just saying -- I don't know who Jackie Stanley
Jones is, but it is just a description of Fed wire
securities, but I don't know what it is other than
that.

Q.    You don't know why he prepared it?

A.    Marty and others, Gerard and others
needed to know what was being received by
Barclays, so there would have been a lot of
e-mails on Friday morning saying -- starting to
try to get a handle on what had been received.
This looks like one of many of those.

Q.    Did you ever hear any discussions on
Thursday or Friday of that week about the amount
of excess collateral that had been posted towards
the repo?

A.    I've never heard -- I don't think I

## Page 181

KING - HIGHLY-CONFIDENTIAL

have heard the term "excess collateral" per se,
but there was -- we were obviously extremely
worried on the Friday. We were very worried on
Wednesday and Thursday. We had a population of
securities and we were very worried that those
really might not be worth 45 billion dollars.

We were even more worried -- that was
with at least a list that was purportedly going to
be delivered to us.

We were even more worried over
Thursday night and into Friday that now we just
had a list of stuff that we had no idea whether it
was worth what we just lent against it. So there
was lots of discussion of whether there was
adequate collateral or how -- actually, no one
really talked about whether there was adequate
collateral. It was just how much was the
collateral worth.

So there was that discussion, but not
excess collateral per se.

(Exhibit 391-B, document Bates stamped
BCI-EX-S 136198 marked for identification,
as of this date.)

Q.    Mr. King, I am handing you a document

Page 182

KING - HIGHLY-CONFIDENTIAL

1  marked as Exhibit 391-B, which has Bates stamp
2  BCI-EX-S 000136198. If you wouldn't mind taking a
3  moment to look at it.
4      A.    OK.
5      Q.    Have you ever seen this e-mail before?
6      A.    No. Other than I am copied on it. It
7  is to me, so once upon a time presumably, but I
8  don't remember it.
9      Q.    No recollection of this e-mail?
10     A.    I remember the discussions we were
11 having about the time, but I don't remember the
12 e-mail.
13     Q.    Could you describe for me the
14 discussions you were having about the topics in
15 this e-mail?
16     A.    Yeah. I alluded to them earlier
17 actually. You can actually see in this e-mail the
18 evolving plan of how to deal with the assets that
19 were coming on board. And in fact, you could see
20 a number of things here.
21     Eric obviously -- you know, Keegan
22 going back to John, both John and I work for Eric.
23     Q.    John?
24     A.    Mahon. So the e-mail from Mike Keegan

Page 183

KING - HIGHLY-CONFIDENTIAL

1  is to John Mahon, and both John and I work for
2  Eric, so he's -- Mike is correctly pointing out
3  that if we need additional resources, we really
4  need to ask Eric for additional resources.
5      You can see some of the evolving
6  discussions about what we do with the assets, are
7  we passing assets over to the trading books. You
8  see still here on the Friday, you can see the
9  allusion to the idea of the trading books on
10 Monday, as if the flow trading desks will receive
11 the assets on Monday in a normal way, and another
12 group which will liquidate them.
13     So you start to see the evolving plan
14 of how do we manage the assets on an ongoing
15 basis. Do we push them back to the business or do
16 we liquidate them.
17     You can also see Nick Leyhane, who
18 assisted me on the equities, it highlights just
19 how much -- he is saying half a billion dollars of
20 S&P -- I think this is out of -- September, 8
21 a.m. -- is that London time or New York time?
22     Q.    I don't know.
23     A.    The equities, equities amount is
24 before we realized we actually had 8 billion

Page 184

KING - HIGHLY-CONFIDENTIAL

1  dollars worth of equities, not 500 million
2  dollars. So in that delivery there was
3  considerable more equities than we originally
4  thought, and that kind of highlights that we had a
5  very different problem on our hands on Friday than
6  we thought we were going to have on Thursday.
7      Q.    I want to focus on the first two
8  paragraphs, where it looks like if the court says
9  no and if the court says yes. Do you see those?
10     A.    Right.
11     Q.    Do you recall discussions about those
12 two options or possibilities?
13     A.    No.
14     Q.    The second paragraph, where it says,
15 "If the court says yes," it says, "we will split
16 the book into two bits. One group of assets are
17 those that are part of the deal which needs to be
18 passed over to the trading books on Monday, and
19 another group which will liquidate them."
20     Do you recall any discussions about
21 splitting the books in bits, or does that ring a
22 bell with you at all?
23     A.    No. Yeah, I mean we discussed -- as I
24 said earlier, we discussed the idea that some of

Page 185

KING - HIGHLY-CONFIDENTIAL

1  the assets would be managed by the desks, and some
2  of them would be managed by my desk. Even though
3  it was not within our historic mandate, we would
4  staff up the desk to be able to do it.
5      I can't -- I don't really
6  understand -- I don't have any recollection of the
7  court stuff or why that would be of any relevance.
8      Q.    Are we OK? Do we need a break at all?
9      A.    No.
10     Q.    While we are looking for a document,
11 Mr. King, do you recall any discussions during the
12 week of the 15th or I guess toward the end of the
13 week of the 15th about whether Barclays was going
14 to take on Lehman's short positions as opposed to
15 its long positions?
16     A.    At the end of which week?
17     Q.    At the end of the week of the 15th.
18 Not in the early part of the week but towards the
19 end.
20     A.    No.
21     Q.    Did Barclays end up taking on Lehman's
22 short positions or did they not?
23     A.    No.
24     Q.    That's what I thought. But do you

Page 186

KING - HIGHLY-CONFIDENTIAL

1
2 remember any discussions about that possibility or
3 taking on selective short positions?
4     A.   No. I mean early on in the week,
5 early on in the week there was the balance sheet
6 which has longs and shorts on it, but I don't
7 remember that at the end of the week.
8     Q.   Right. OK.
9          And by the end of the week, Barclays
10 was not taking on the short positions; is that
11 right?
12          MR. STERN: Objection, objection to
13     the form.
14     A.   I just don't remember any discussion
15 of the shorts, and I don't -- I didn't end up
16 managing any short positions, so.
17     Q.   OK. Let me hand you a document that
18 has previously been marked as Exhibit 8. Again it
19 is a thick document. I am not going to ask you
20 about most of it, but primarily relating to the
21 second page.
22          You take as much time as you want to
23 review the document.
24     A.   OK.
25     Q.   My question is, if you could turn to,

Page 187

KING - HIGHLY-CONFIDENTIAL

1
2 I think the second page, it has LBI net long
3 inventory, some kind of spreadsheet. Do you see
4 that?
5     A.   Um-hm.
6     Q.   First of all, let me start with have
7 you ever seen this document before?
8     A.   No.
9     Q.   Have you ever seen this spreadsheet
10 before?
11     A.   I don't think so, no.
12     Q.   Do you have any understanding of what
13 its purpose is?
14     A.   No.
15     Q.   Is that a no?
16     A.   Yeah, no.
17     Q.   Can you tell by looking at it who
18 might have prepared it?
19     A.   It could be anybody. Anybody at
20 Lehman who had access to the inventory.
21     Q.   So you think this is a Lehman
22 spreadsheet?
23     A.   LBI -- LBI on the 17th. They would
24 see this money market. It says LBI on the 17th.
25     Q.   So this is --

Page 188

KING - HIGHLY-CONFIDENTIAL

1
2     A.   It would have to be produced by LBI
3 or -- I mean it had to be produced by a Lehman
4 person.
5     Q.   Do you know why Mr. Gerard was
6 forwarding this to you on Friday?
7     A.   He didn't forward it to me. Where is
8 me?
9     Q.   In the middle of the page 1, it
10 says --
11     A.   Oh.
12     Q.   -- Jerry Reilly forwarding it to you.
13 You are a recipient on the e-mail.
14     A.   Me and Jonathan.
15          I am sorry, I don't know what it is.
16          MR. HINE: Can we take a five-minute
17     break, so I can see if I can finish up here.
18          MR. STERN: Yes, yes.
19          (Recess)
20 BY MR. HINE:
21     Q.   Mr. King, just a few questions and
22 then my portion of this day will be done.
23          If you could turn to Exhibit 390-B,
24 which I asked you about previously, in particular
25 the last page of 390-B. This is the acquisition

Page 189

KING - HIGHLY-CONFIDENTIAL

1
2 balance sheet that we talked about earlier.
3          I just had some -- I need some
4 clarification of you on two items. First of all,
5 do you recall talking about the 2.83 number, the
6 valuation adjustment?
7     A.   Correct.
8     Q.   And I thought you had said, and I'm
9 not trying to -- I just want to bring you back to
10 your old testimony. I thought you said that that
11 was the result of a difference between the 45.18
12 number and a number based on the marks that
13 Barclays had put on the securities they had
14 received from Lehman. Is that right?
15     A.   Based on the --
16     Q.   As of that date.
17     A.   -- PMTG, my group's best estimate as
18 of that date from whatever source, we had managed
19 to put forth an orderly liquidation value.
20     Q.   And I guess my question is, where did
21 you get those marks that you put on those -- where
22 did PMTG get those marks?
23     A.   I got them from a combination of
24 the -- remember I said I -- we had chopped up the
25 file and -- file of securities and passed it out

Page 190

KING - HIGHLY-CONFIDENTIAL

1  KING - HIGHLY-CONFIDENTIAL
2  to relevant Barclays desks or we had marked them
3  ourselves, or if we didn't know what it is, we had
4  estimated it in some variety of ways.
5      Q.   Were some of the marks, marks that you
6  had put on these assets earlier in the week, say
7  back in Monday or Tuesday?
8      A.   Yeah.  Unfortunately, the process
9  lagged, you know, because it was always -- it was
10 almost impossible to keep marks -- so for this
11 balance sheet for example, for example, this would
12 have had to have been produced based on data that
13 we had provided to Gary over the weekend that
14 would have been based on marks that we had put on
15 the portfolio or -- marks that we had put into our
16 spreadsheet on the 19th, some of which would have
17 been based on marks that we had come up with at
18 the beginning of the week.
19     Q.   So it is the accumulated marking by
20 Barclays starting in the 15th all the way through
21 that week?
22     A.   Yeah.
23     Q.   Is the set of marks you used?
24     A.   I think it is also -- rather than
25 using Barclays, it is PMTG at that point.  I'm not

Page 191

1  KING - HIGHLY-CONFIDENTIAL
2  sure the firm had espoused our position, so that
3  was -- it was PMTG's latest estimate line by line,
4  and then that was refined over a period of time.
5      Q.   And then so PMTG -- I didn't mean to
6  ascribe a difference between PMTG and Barclays,
7  but PMTG has been trying to put marks on these
8  various securities dating back to the prior
9  Monday, all the way to the 15th?
10     A.   Correct.
11     Q.   This 2.83 is the product of a series
12 of marks created by that process that -- as of the
13 22nd?
14         MR. STERN:  Objection to the form.
15     Q.   Let me rephrase that.  Let me rephrase
16 it.
17         The marks that you used to come up
18 with the 2.83 number were PMTG marks, as of the
19 22nd --
20     A.   No, I don't know whether these are --
21 no.
22     Q.   OK.
23     A.   This e-mail is as of the 22nd.
24     Q.   OK, I understand.
25     A.   I notice it is at the end of the

Page 192

1  KING - HIGHLY-CONFIDENTIAL
2  London day, but it is still as of the 22nd.
3         I don't remember -- we were very, very
4  heavily embroiled in the risk management of the
5  assets that we had acquired by this Monday.
6      Q.   OK.
7      A.   So I don't remember whether this
8  was -- some of the marks that PMTG was using may
9  well have been updated on this Monday.  Some of
10 them may have been latest guess over the weekend.
11        I think probably over the weekend, and
12 then, in other words, they may have come -- some
13 of them would have come from various stages during
14 the course of the previous week.
15     Q.   I guess that was my question.  I
16 didn't mean to -- I am sorry.
17     A.   The 2.83 is -- what we would have done
18 was put the value that we thought was on the
19 portfolio of the 42.55, let's say, and then there
20 was the sum of the BoNY marks, which was the
21 45.18, and the 2.83 just drops out as the
22 difference between the two.
23     Q.   While we are looking at that, what
24 does the "Friday P&L approx." entry mean?
25     A.   There is always carry and yield on a

Page 193

1  KING - HIGHLY-CONFIDENTIAL
2  portfolio.  That would have been that.  But I'm
3  not sure -- that would have been what that is.
4      Q.   So other than that -- I think you have
5  explained to me where you get the 2.83, but the
6  marks that you used for PMTG were accumulated by
7  PMTG from the period of the 15th through that
8  weekend, the following weekend; is that right?
9         MR. STERN:  Objection to the form.
10        You can answer.
11     A.   The -- there was a production line, if
12 you like, of Barclays' desks, my people, me, Gary,
13 that would have resulted in a steady evaluation of
14 the best estimate at the mark, of what we thought
15 would be an orderly liquidation mark or whatever
16 mark we were being asked for at a particular time,
17 to go into -- to go up to product control so that
18 they could produce this.
19     Q.   And that process is what took place
20 for the week of September 15?
21     A.   No.
22         MR. STERN:  Object to the form.
23     A.   No, that -- no.  All that happened
24 during the week of the 15th was that -- we
25 didn't -- I don't remember seeing any acquisition

Page 194

KING - HIGHLY-CONFIDENTIAL

1    balance sheets during the course of the week. All
2    our desk did was try to ascertain the risk and the
3    best guess of both a liquidation valuation and an
4    orderly liquidation valuation during the course of
5    that week.
6         Once the transaction had closed on the
7    Monday, then there was a -- there was both the
8    risk management process, which was my problem, and
9    also a control process, which was product
10   control's, and obviously we had to have an input
11   to product control, which is where the 42.55 would
12   have been the latest -- Gary is using our latest
13   estimate of value -- you can see it hadn't been
14   updated because it still had the cash on it, for
15   example, of the 7 that wasn't received and so on.
16       Q.   I didn't mean to suggest you were
17   doing the acquisition balance sheet during the
18   week. I just wanted to see when the -- the marks
19   that you used were developed during that week; is
20   that right?
21       MR. STERN: Objection to the form.
22   Objection to the form. I don't know what
23   the question is.
24       Q.   You can answer.

Page 195

KING - HIGHLY-CONFIDENTIAL

1    MR. STERN:  The question is, is that
2    right?  What's the question?
3        Q.   You can answer.
4        MR. STERN:  Well, the question is, "I
5    wanted to see when the marks that you used
6    were developed during that week."
7        MR. HINE:  Jack, if you have an
8    objection to the form, just state it. Don't
9    coach him.
10       MR. STERN:  I am asking you what your
11   question is.
12       Q.   When the marks that you used -- let me
13   restate it.
14           I didn't mean to suggest that you were
15   working on the acquisition balance sheet, as I
16   thought I might have confused you with my last
17   question, during that week, the prior week, the
18   15th.
19       A.   Right.
20       Q.   But in developing this 2.83, the marks
21   that PMTG used were the product of its
22   accumulating knowledge about the marks from the
23   15th through the following weekend; is that right?
24       A.   We would have -- depending on the

Page 196

KING - HIGHLY-CONFIDENTIAL

1    product type -- some -- the 8 -- for example, of
2    that 42.55, approximately 8 billion dollars was
3    cash equities. That's incredibly easy to mark
4    from an accounting point of view. There is an
5    exchange, you type in the ticker for the equity
6    and you get a price. Therefore, that process took
7    one of my analysts approximately -- I think he had
8    Nick Leyhane in London do it for him -- 20 minutes
9    to mark 8 billion dollars in assets.
10           As a trading matter, it's useless
11   because the -- but it is necessarily where a firm
12   has to mark cash equities. Because there is an
13   exchange. It says the price is 22 dollars for --
14   you know, Barclays stock is at 3.98. Therefore,
15   you better mark all the Barclays stock at 3.98.
16           If you happen to be long a billion
17   dollars of Barclays stock and you go out and sell
18   it, you are never going to get 3.98, but the
19   process is pretty easy from the point of view of
20   providing an accounting number.
21           What we had to do over and above
22   that -- so that could have been updated and may
23   well have been updated on Saturday or Sunday. We
24   would have actually had the Bloomberg ticker in a

Page 197

KING - HIGHLY-CONFIDENTIAL

1    spreadsheet, so it would have kept updating it.
2           Other things are less easy. Other
3    things are, you have to run a model. You have to
4    take cash in and do all sorts of things to be able
5    to determine what the price is. So there is a
6    full range.
7           8 billion dollars worth of equities
8    doesn't trade at where those marks are. A good
9    example would be, we had cash equities where the
10   amount of the cash equity that we owned
11   represented 400 days of the historical trading
12   volume. That means if we would have traded as
13   much of that stock as trades every day for the
14   last 400 days, we still couldn't get out of our
15   position.
16           But still, the last mark, last penny
17   of stock that traded was where we had to mark that
18   position. It took us a year at that point to get
19   out of those positions, and many of them therefore
20   by construction every time we sold them took a
21   loss every time. 300 million dollars of loss or
22   whatever it was in the end, but every time we sold
23   we were selling at a discount to the published
24   mark. Easy to provide, put the published mark

Page 198

KING - HIGHLY-CONFIDENTIAL

1    into that spreadsheet.
2         The desk estimates were an attempt to
3    then say, we have taken that, you know, where the
4    exchange, such and such, and we assume it is going
5    to cost us an additional 300 million dollars to
6    bid side for us to be able to sell them. So we
7    would have deducted that from that price, and that
8    would have gone into the 42.55.
9         Now, many times we were just wrong,
10   because the market was also deteriorating as we
11   went along. So it was going to end up costing us
12   an awful lot more to actually sell the stuff.
13        Not only did we have that problem,
14   over the subsequent days we realized the 7 billion
15   dollars wasn't going to turn up 7 billion dollars.
16   We were going to get another slew of securities as
17   well, many of which were securities that were on
18   the excluded asset list that we didn't think were
19   worth anything.
20        So the problem was just getting -- but
21   that's the reason why -- some aspects of providing
22   that 42.55 could have been done on an ongoing
23   basis and others -- but would still have been
24   subject to a -- you know, an observable exchange

Page 199

KING - HIGHLY-CONFIDENTIAL

1    traded mark minus an estimate, and then others
2    would have been things that would have really
3    taken models or input from other desks to come up
4    with.
5    Q.   OK. If you see further down on the
6    spreadsheet, it says, "Previously excluded 50
7    percent MBS." Do you see that?
8    A.   Yeah.
9    Q.   That's mortgage-backed securities?
10   A.   Is that a zero?
11       MR. STERN: The question is what MBS
12   means.
13   A.   Is that what --
14   Q.   Yes.
15   A.   MBS means mortgage-backed securities.
16   Q.   If you look at footnote 3 on that
17   line, it says, "September 20 clarification letter
18   indicates we no longer receive these assets." Do
19   you see that?
20   A.   Yes.
21   Q.   Do you have any understanding of what
22   the September 20 clarification letter does?
23       MR. STERN: Objection to form.
24   Q.   With respect to mortgage-backed

Page 200

KING - HIGHLY-CONFIDENTIAL

1    securities?
2    A.   No.
3    Q.   OK. Did, in fact -- I know we have
4    talked about earlier some of the mortgage-backed
5    securities made their way into the 32 point -- 32
6    billion dollar pool we talked about earlier and 10
7    billion dollar pool from the repo. Do you recall
8    that testimony?
9    A.   Can you say that again.
10   Q.   I'm just trying to get you back to the
11   testimony, but we had previously talked about some
12   of the mortgage-backed securities ended up in the
13   pool of assets that Barclays received as a result
14   of the repo, correct?
15   A.   Yes.
16   Q.   And we compared that to the original
17   number of 6.6 billion in mortgage-related
18   securities. Do you recall that?
19   A.   Yes.
20   Q.   How many mortgage -- did Barclays
21   ultimately get the entirety of the 6.6
22   mortgage-backed securities? And I'm not talking
23   about -- I'm not trying to confuse you with the
24   valuation, but I'm just talking about the pool we

Page 201

KING - HIGHLY-CONFIDENTIAL

1    originally were talking about --
2    A.   I understand. No.
3    Q.   Did Barclays get all that?
4    A.   No.
5    Q.   Do you know how much Barclays did get?
6    A.   Eventually -- like by the end of the
7    year? Or by --
8    Q.   Yeah.
9    A.   Because we got -- we got some -- we
10   didn't get all of it. We weren't even supposed to
11   get all of it for this thing. We got some of it
12   in the Fed facility that we -- the 30-odd billion
13   dollars of Fed facility assets that we thought we
14   were going to get.
15   Q.   Right.
16   A.   We got some of it in the 10 billion
17   dollars that we didn't think we were going to get,
18   and got some of it as part of the JP settlement in
19   lieu of the 7 billion dollars, and then some of it
20   we never got.
21   Q.   Have you liquidated those securities
22   yet?
23   A.   Some of them.
24   Q.   Most of them or a small portion of

Page 202

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    them?
3        A.    Of what we are calling the
4    mortgage-backed securities?
5        Q.    Yes, the entire pool of
6    mortgage-backed securities that Barclays received,
7    no matter how you got it, from Lehman.
8        MR. STERN: Objection to --
9        Q.    Can you give me an estimate of the
10   percentage of it that you have liquidated by now?
11       MR. STERN: Objection to the form.
12       A.    We had about 4 point -- we only -- we
13   estimated that the 6.5 billion was only worth at
14   most about 3 point something billion, so -- and in
15   the Lehman -- in the repo that we thought we were
16   going to get, I think we thought that was about
17   1.5, even though JP had it at about 3.3.
18           And since those are very obvious
19   mistakes as well. Because JP doesn't know any
20   more than we do what some of the securities are.
21   Sometimes it says, if I don't know what it is,
22   mark it at par, but it may actually be worth zero,
23   and that's the reason why that number comes out so
24   wrong, because these are so complicated
25   securities.

Page 203

1    KING - HIGHLY-CONFIDENTIAL
2        Q.    OK.
3        A.    So they are worth a tremendous amount
4    less.
5            If you mean of those securities, that
6    value, I think it was about -- we thought it was
7    worth about 2 billion dollars or so. What we
8    eventually ended up with, 2.2 I think, and we must
9    have sold about -- the last time I was involved
10   with it, it would have been about 60 percent, I
11   think, or so.
12       Q.    Do you know if Barclays made money on
13   those securities, the mortgage-backed securities?
14       A.    We lost money.
15       Q.    Do you know how much or --
16       A.    I don't remember.
17       Q.    Do you know if there has been any kind
18   of assessment of how much money Barclays made or
19   lost with respect to the mortgage-backed
20   securities that it received from Lehman?
21       A.    No, never tried.
22       Q.    For the same reasons we talked about
23   before, it would be difficult to do?
24       A.    No. It would actually be easy to do,
25   just not useful. We had our own portfolio of

Page 204

1    KING - HIGHLY-CONFIDENTIAL
2    mortgage-backed securities that were also losing
3    money, so we just put them in with those, and
4    therefore, I didn't track -- even though I could,
5    I didn't track what was a Lehman security versus
6    what was a Barclays security. We just organized
7    them for appropriate liquidation or retention.
8        MR. HINE: OK, Mr. King, that is all
9        the questions I have. I think one of my
10       colleagues has some questions to ask you as
11       well.
12       (Recess)
13   EXAMINATION BY
14   MR. OXFORD:
15       Q.    Good afternoon, Mr. King. I
16   introduced myself earlier on. My name is Neil
17   Oxford. I represent the SIPA trustee for LBI.
18           Following up on the examination by
19   Mr. Hine, initially you testified about the
20   portion of the 6.5 billion of mortgage-backed
21   securities that Barclays ended up purchasing.
22   Do you recall that?
23       A.    Yeah, yeah.
24       MR. STERN: Wait a second.
25       OK, OK.

Page 205

1    KING - HIGHLY-CONFIDENTIAL
2        Q.    I just want to make sure I understand
3    your testimony. So leaving aside for the moment
4    the question of value, are you able to estimate
5    what percentage of that 6.5 billion of
6    mortgage-backed securities that we have been
7    discussing that is represented on Exhibit 388-B,
8    are you able to estimate what percentage of those
9    mortgage-backed securities ended up in the hands
10   of Barclays?
11       MR. STERN: Objection to the form.
12       Get out 388-B. And let's hear the question
13       again.
14       MR. OXFORD: Can you read it back.
15       (Record read)
16       A.    Not accurately, and the reason for
17   that is that we got the ultimate delivery of
18   securities that Barclays received, first the
19   subset of the ones that it expected to receive in
20   the original repo, the ones that it got in the 10
21   billion dollars of repo that it didn't expect to
22   receive and the ones that it got as part of the
23   settlement against the 7 billion dollars of cash.
24   We actually received a lot of securities that we
25   had -- that would have fallen into that category

Page 206

KING - HIGHLY-CONFIDENTIAL

1 that we had never seen before on -- ever.
2     Q.    And just so we have a clear record, by
3 that category, you are pointing to --
4     A.    To the 6.56.
5     Q.    And by that category, you are also, I
6 take it, referring to the total mortgage and
7 mortgage-backed security reference in 388-B?
8     A.    Yes, yes.  So -- and unfortunately, I
9 can't -- I can't remember how many of the
10 securities that we did receive were also part of
11 this original list because there were ones that
12 were in the repo facility that weren't also on the
13 Lehman balance sheet or that were delivered by JP
14 ultimately in lieu of the 7 billion dollars that
15 weren't on this balance sheet and so I can't quite
16 get back to a subset in my head of this, I'm
17 afraid.
18     Q.    Let's try it this way, Mr. King, you
19 said that under the repo, you received what you
20 considered to be a value of approximately 1.5
21 billion dollars worth of mortgage-backed
22 securities, is that an accurate statement?
23         MR. STERN:  Objection to the form.
24     A.    I think that was in the original -- I

Page 207

KING - HIGHLY-CONFIDENTIAL

1 think that was of the original, of the original --
2 the numbers that I can remember are, I always
3 remember that 6.5.  I remember thinking that that
4 6.5 wasn't worth more than about 3.2 and that was
5 both through crude estimate and steadily refined
6 estimates.  I think we ultimately concluded it was
7 worth less.
8         I remember that we, in the repo
9 facility, I think there was 3 billion dollars or
10 thereabouts which was roughly half of this that
11 was in the expected repo -- in the Fed, supposedly
12 in the Fed facility that we are about to receive
13 and I remember thinking that was worth about 1.5
14 billion.
15     Q.    That, just so I am clear, is in the
16 pool of 32 billion?
17     A.    No, that was in what we thought was
18 the pool of 50 that we were going to receive.  I
19 think that's right.  And then what we ended up
20 receiving was some of that and then some of this
21 that we weren't expecting to receive and I seem to
22 remember that being about 4.5 billion, using the
23 same marks that were in here that we thought was
24 worth about 2.2 billion.

Page 208

KING - HIGHLY-CONFIDENTIAL

1     Q.    So the 4.5 billion, using the marks
2 reflected in Exhibit 388-B that you believe is
3 worth approximately 2.2 billion, was received
4 under -- as part of both the 32 billion pool that
5 you told Mr. Hine about?
6     A.    Yes.
7     Q.    Part of also the 10 billion pool?
8     A.    I think that's also right.
9     Q.    Was that also part of the JP Morgan
10 settlement referred to as 7 billion cash?
11     A.    No, the JP settlement was more, we got
12 1.25 -- all we got for that was 1.25 cash and then
13 we got securities, I think we got about 2 billion
14 dollars worth of securities that we had seen
15 before and 2 billion dollars that we had -- that
16 one I have forgotten, actually.
17     Q.    Just so we have a clear record, it is
18 your understanding that Barclays, under the repo
19 transaction that is constituted by the pool of 32
20 billion of assets and the pool of 10 billion of
21 assets, Barclays received -- using the marks in
22 Exhibit 388-B -- approximately 4.5 billion of
23 mortgage-backed securities which you believe is
24 worth approximately half of that, is that

Page 209

KING - HIGHLY-CONFIDENTIAL

1 accurate?
2         MR. STERN:  Objection to the form of
3 the question.
4         Can you repeat it please.  I don't
5 know how that creates a clear record.
6         MR. OXFORD:  Please read it.
7         (Record read)
8         MR. STERN:  Objection to the form.
9     A.    What I believe they are worth -- for
10 one thing, what I believe they are worth now
11 versus what I believed they were worth shortly
12 thereafter may be a different thing and certainly
13 market conditions were deteriorating, not
14 improving.  Most of those markets lost even more
15 value going into the fourth quarter and of course
16 there was no way for us to liquidate positions in
17 advance of that.
18         The 4.5, I just -- I cannot remember,
19 I'm afraid, whether the 4.5 represented what we
20 got in -- it certainly was at least the -- what
21 you're calling, using the same -- we are using the
22 same types of marks, the 4.5 was included in the
23 32 and in the 10, but I can't remember whether it
24 also included what was in the JP settlement.  I

Page 210

KING - HIGHLY-CONFIDENTIAL

1       KING - HIGHLY-CONFIDENTIAL
2   just can't remember.
3       Q.   Separate and apart from any securities
4   that Barclays received under the JP Morgan
5   settlement or either side of the repo, the 32
6   billion or 10 billion, to your knowledge,
7   Mr. King, did Barclays receive any mortgage-backed
8   securities from Lehman as part of the transaction
9   consummated in September of 2008?
10      MR. STERN:  Objection to the form.
11      You can answer.
12      A.   Could you repeat that, read that back
13  to me.
14      (Record read)
15      MR. STERN:  Again, objection to the
16  form.  Either side of the repo.
17      A.   Yeah, what do you mean by either side
18  of the repo.
19      MR. STERN:  Why don't you just ask the
20  repo.  Aside from what you got --
21      Q.   Let me ask the question again.  Aside
22  from the repo transaction and aside from the
23  settlement with JP Morgan, to your knowledge,
24  Mr. King, did Barclays receive any mortgage-backed
25  securities from Lehman?

Page 211

1       KING - HIGHLY-CONFIDENTIAL
2       A.   There was some mortgage-backed
3   securities. Can I clarify, repeat something that
4   I said earlier, of course.
5       Q.   Yeah, sure.
6       A.   Which is, unfortunately, people use
7   mortgage-backed securities to mean more than just
8   mortgage-backed securities. So if I answer that
9   narrowly, I think the answer is approximately no.
10      Using mortgage-backed securities to
11  mean franchise -- franchise loans, manufactured
12  housing, distressed credit cards, small
13  business loans, whole business securitizations,
14  the myriad of other distressed credit -- auto
15  loans, auto receivables, all of that stuff,
16  that's what people use that -- CDOs, CLOs,
17  CSOs, that, unfortunately, that's what people,
18  that line item on B, whichever it was, 388-B,
19  the line item on 388-B and even our own
20  category, broad category of what the principal
21  mortgage trading group trades is all of that.
22      There were securities of that nature
23  that were in the list of unencumbered securities
24  that we were expecting to receive. And some of
25  them we did receive and some of them we haven't

Page 212

1       KING - HIGHLY-CONFIDENTIAL
2   received.
3       Q.   OK, new topic, Mr. King.
4       In your role with Barclays, in
5   September of 2008, did you have responsibility
6   for exchange-traded derivatives?
7       MR. STERN:  Objection to the form.
8       You can answer, you can answer if you
9   understand the question.
10      Q.   Let's try it this way, do you have an
11  understanding of what the term "exchange-traded
12  derivatives" is?
13      A.   Yes.
14      Q.   Can you give me that understanding?
15      A.   Exchange-traded derivatives are
16  derivative contracts that are cleared through a
17  clearing house and have a published closing price
18  listed on an exchange and are traded through the
19  exchange. So it is often easier to define them as
20  they are not OTC derivatives. In other words,
21  they are not over-the-counter derivatives.
22      Q.   Using your definition of
23  exchange-traded derivatives, Mr. King, did you
24  have responsibility for exchange-traded
25  derivatives in your day-to-day role in Barclays in

Page 213

1       KING - HIGHLY-CONFIDENTIAL
2   September of 2008?
3       MR. STERN:  I am going to object to
4       the form. Neil, I think you might find it
5       more productive to ask him what role, if
6       any, he had in connection with
7       exchange-traded derivatives. I think the
8       way you formed the question makes it harder
9       for him to answer.
10      Q.   Let's try the question that I asked.
11      A.   I don't have day-to-day responsibility
12  for exchange-traded derivatives.
13      Q.   Did you have any responsibility for
14  exchange-traded derivatives?
15      MR. STERN:  Objection to the form.
16      A.   As a result -- through the
17  transaction, for the period of the acquisition
18  period, I facilitated in assessing and risk
19  managing the exposure to the exchange-traded
20  derivatives that we had acquired through the
21  purchase agreement. But that was definitely one
22  that as soon as we were capable of pushing that
23  back into the normal equities trading businesses,
24  we did. We were mostly interested in closing out
25  the positions as quickly as possible and actually,

Page 214

1    KING - HIGHLY-CONFIDENTIAL
2    the only piece that I had any involvement in were
3    the noncustomer exchange-traded derivatives
4    positions.
5        Q.   What exchange-traded derivatives do
6    you understand were purchased by Barclays?
7        MR. STERN: Objection to the form.
8        A.   The line item in the purchase
9    agreement said the exchange-traded derivatives
10   businesses and -- if I remember correctly, and it
11   therefore, we took on responsibility for
12   everything -- the risk management after the 22nd,
13   the risk management of all of the open positions
14   that were then outstanding on any of the
15   exchanges, any of the exchanges.
16       Q.   Are you able to give me a list of the
17   exchanges you mean to reference when you say any
18   of the exchanges?
19       A.   I couldn't give a full list to be
20   honest with you. There was a dizzying array of
21   them. I don't remember all of the positions that
22   we -- all of the positions that I remember that we
23   were managing were really equity derivative and
24   equity -- equity vol. and equity cash derivative
25   positions.

Page 215

1    KING - HIGHLY-CONFIDENTIAL
2        I think the exchange prior to the
3    22nd, the commodities exchange had already
4    closed out the -- the commodities exchange had
5    already closed out the commodities position and
6    including the TBAs that were managed by Tom
7    Hamilton. It was really most of that was on --
8    a lot of that was on the clearing house for
9    what was OCC which was the clearing house I
10   think for NASDAQ and a variety of the other
11   U.S. exchanges.
12       MR. STERN:  Equity vol.?
13       THE WITNESS:  Volatility.
14       Q.   Aside from the OCC, do you recall any
15   other exchanges that you were given --
16       A.   The OCC is a clearing house for a
17   number of exchanges, and yes, there were other
18   clearing houses and there were other exchanges but
19   I don't remember all of them. I really don't.
20       Q.   Do you remember any of them?
21       MR. STERN: Objection to the form. He
22   said he doesn't remember.
23       A.   I remember the New York Stock
24   Exchange, for example, would be one, the London
25   Stock Exchange. They were most of the stock

Page 216

1    KING - HIGHLY-CONFIDENTIAL
2    exchanges.
3        Q.   Do you remember any other clearing
4    organizations you were dealing with with respect
5    to exchange-traded derivatives?
6        A.   We weren't really dealing with any of
7    the clearing houses, just to clarify what our role
8    was. In the same way as I described earlier, our
9    job was to value and risk management.
10       What I need -- the only exposure to
11   the clearing houses that we had was in an
12   effort to try to ascertain what were the list
13   of open positions that we had acquired and the
14   reason we had to do that was the Lehman, when
15   Lehman had been -- had -- both Lehman Brothers
16   Holdings and LBI and LBIE had become bankrupt.
17   The derivative -- the risk reporting systems
18   showed a combination of their OTC and
19   exchange-traded derivatives and they couldn't
20   isolate just their exchange-traded derivatives
21   positions.
22       So to estimate the list, we did have
23   to speak to the exchanges to try and understand
24   what the volatility of the margin that they
25   were calling for was in an effort to estimate

Page 217

1    KING - HIGHLY-CONFIDENTIAL
2    the open risk that they had. Quite literally,
3    we looked that the margin went up when the
4    market went down. We used that to estimate
5    that we must have been long.
6        But that was the reason for the dialog
7    with them. There was obviously a separate
8    dialog which was conducted via legal about the
9    moving, the opening of new clearing accounts at
10   the OCC and the others because there was a big
11   discussion for prime brokerage, the client
12   businesses, et cetera. So ours was a very
13   narrow discussion with them as it pertained to
14   identifying risk.
15       Q.   OK. Do you have an understanding,
16   Mr. King, of the business deal between Barclays
17   and Lehman with respect to exchange-traded
18   derivatives?
19       MR. STERN: Objection to the form.
20       A.   All I know is that I was asked to
21   manage the -- and by manage, I largely mean close
22   down as much of the outstanding exposure to the
23   exchange-traded derivatives positions that had
24   been -- that were still there and that we had the
25   benefit of all and needed the collateral that had

Page 218

1        KING - HIGHLY-CONFIDENTIAL
2  been posted to the clearing houses to support
3  those open positions.
4        Q.   Was it your understanding that
5  Barclays had stepped into the shoes of Lehman at
6  the OCC and other clearing houses?
7        MR. STERN:  Objection to the form.
8        A.   I don't really -- I don't really know
9  what -- I'm pretty naive in my understanding of
10 the way -- of probably the way the transaction was
11 executed or described.  My understanding was that
12 we were purchasing assets.  Therefore, I would
13 think of that as there would be specific things we
14 were acquiring as opposed to we were stepping into
15 the shoes of somebody.
16       Q.   I understand the distinction.  Did you
17 understand that Barclays was acquiring both short
18 and long positions at the OCC and elsewhere?
19       MR. STERN:  Objection to the form.
20       A.   I couldn't generalize.  The OCC
21 positions were -- and short and long is an
22 ambiguous term when we are talking about
23 derivatives because by construction, there are --
24 derivative is being long a call and short a put,
25 the same thing.  Therefore, when we first woke up

Page 219

1        KING - HIGHLY-CONFIDENTIAL
2  and realized we had exposure to the
3  exchange-traded derivatives position, we didn't
4  know whether we were long or short with respect to
5  the U.S. equities market, for example.
6        Did I think that we had the benefit of
7  all of the collateral at the OCC and other
8  exchanges in relation to the proprietary trading
9  books, not the customer books, to support the open
10 exchange-traded derivatives positions and were we
11 risk managing the open exchange-traded
12 derivatives?  Yes, that's what I was doing.
13       Q.   From whom did you gain the
14 understanding, Mr. King, that you just testified
15 about, specifically that Barclays had the benefit
16 all of the margin or rather to use your words the
17 collateral at the OCC and other exchanges?
18       MR. STERN:  At this point, you may be
19 intruding on privileged conversations.  So I
20 am going to talk to the witness about this.
21       (Discussion held off the record.)
22       MR. STERN:  Going back on the record,
23 I think that this definitely intrudes on
24 privileged conversations and I am going to
25 instruct the witness not to answer.

Page 220

1        KING - HIGHLY-CONFIDENTIAL
2        MR. OXFORD:  The witness has already
3  answered --
4        MR. STERN:  I have instructed him not
5  to answer.  You can go ahead and ask the
6  next question.
7        MR. OXFORD:  I think that is a waiver,
8  but we can take it up at the appropriate
9  time.
10       MR. STERN:  I don't think there is any
11 waiver here.  You think there is a waiver?
12       MR. OXFORD:  I think there might well
13 be.
14       MR. STERN:  Where is the waiver?
15       MR. OXFORD:  The witness has already
16 testified about his understanding.
17       MR. STERN:  By that you infer there
18 has been a waiver of the attorney/client
19 privilege?
20       MR. OXFORD:  There may well have been.
21       MR. STERN:  That's absolutely wrong.
22 Absolutely wrong.
23       MR. OXFORD:  We can have that
24 discussion at the appropriate time?
25       MR. STERN:  You never asked him about

Page 221

1        KING - HIGHLY-CONFIDENTIAL
2  conversations with counsel.  Now you are
3  trying to ask him about conversations with
4  counsel.
5        MR. OXFORD:  No, I am not.
6        MR. STERN:  If you are trying in an
7  under-handed way to create a waiver through
8  these questions, then I am going to have to
9  instruct the witness not to answer any more
10 questions along these lines.
11       If that's what you are saying, Neil,
12 you think there has been a waiver of the
13 attorney/client privilege, I am going to
14 instruct him not to answer any more
15 questions on this topic.
16       MR. OXFORD:  Jack, I am not trying to
17 do anything under-handed as you well aware.
18 The witness volunteered that he had an
19 understanding that -- please let me --
20 Jack --
21       MR. STERN:  You asked him what his
22 understanding was.  Then you asked him what
23 the source of his understanding was.  I then
24 asked him off the record.  So there has been
25 no waiver.

Page 222

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2        Why don't you ask your next question,
3    instead of engaging in this nonsense.
4        MR. OXFORD:  It was your nonsense that
5    you began, Jack.
6        MR. STERN:  Just ask the next
7    question, Neil.
8        Q.  OK.  Mr. King, do you have any
9    knowledge, other than knowledge gained through
10   conversations with counsel, as to whether Barclays
11   assumed any margin at the OCC or any other
12   exchange?
13       MR. STERN:  I am going to instruct you
14   not to answer.
15       MR. OXFORD:  What's the basis?
16       MR. STERN:  The basis is that you have
17   already said that you think there has been a
18   waiver on this subject.  And by answering
19   this question, you are intruding on the
20   sources of his knowledge and I'm not going
21   to allow him to answer when you're claiming
22   that there has been a waiver.
23       MR. OXFORD:  I am asking him
24   specifically questions --
25       MR. STERN:  This is a game that you

Page 223

1    KING - HIGHLY-CONFIDENTIAL
2    are playing and I am not going allow it.
3        MR. OXFORD:  I am not playing any
4    game, Jack.
5        MR. STERN:  Yes, you are.  First of
6    all, this is a witness who has told you he
7    didn't negotiate the agreement.  He is not a
8    lawyer.  He is not here to interpret the
9    agreement which is written in black and
10   white.  So this is nonsense.
11       MR. OXFORD:  It is not nonsense, I am
12   entitled to --
13       MR. STERN:  It is unproductive for us
14   to engage in this.  Please ask a question.
15       MR. OXFORD:  If you would let me,
16   Jack, I would do exactly that.
17       MR. STERN:  Ask a question.  Do you
18   have a question?
19       MR. OXFORD:  Yeah, I've got lots and
20   lots of them.
21       MR. STERN:  Go ahead.
22       Q.  Did you have any understanding,
23   Mr. King, of the value of the margin at the OCC --
24   let me try that one again.
25       Do you have an understanding of,

Page 224

1    KING - HIGHLY-CONFIDENTIAL
2    Mr. King, of the value of LBI's margin at the OCC
3    as of close of business on the 19th of September?
4        MR. STERN:  I am going to instruct you
5    not to answer.
6        MR. OXFORD:  Off the record.
7        MR. STERN:  You have already told --
8    you have already said by asking a question
9    about his understanding, that gave rise to a
10   waiver.  And if that's your position, I am
11   going to instruct him not to answer.
12       MR. OXFORD:  Can we go off the record?
13       MR. STERN:  I am not going off the
14   record.
15       MR. OXFORD:  I would like to go off
16   the record and see if we can --
17       MR. STERN:  No, I want the next
18   question.
19       MR. OXFORD:  Let's go off the record.
20       MR. STERN:  No, I am not going off the
21   record.
22       MR. OXFORD:  I am going off the
23   record.  Please come out outside and talk to
24   me.
25       MR. STERN:  I am not going to speak to

Page 225

1    KING - HIGHLY-CONFIDENTIAL
2    you off the record.  Let's have the next
3    question.  Let's complete this deposition.
4        MR. OXFORD:  I want to complete the
5    deposition as well, Jack.
6        MR. STERN:  Ask the next question.
7        MR. OXFORD:  Jack, I will be back in
8    two minutes.  If you would like to discuss
9    it off the record, please do so.
10       MR. STERN:  I want your next question
11   or we are leaving.  If you are terminating
12   the deposition, we are leaving.
13       MR. OXFORD:  I am not terminating --
14       MR. STERN:  This is a busy executive.
15   Ask a question.  Let's finish the
16   deposition.
17       MR. OXFORD:  Let's mark this.
18       (Exhibit 392-B, e-mail dated
19   Wednesday, September 17, 2008 at 19:14:24
20   marked for identification, as of this date.)
21       Q.  Mr. King, I have handed you what I
22   have marked as Exhibit 392.  Would you take a
23   moment to review that and let me know when you
24   have had a chance to do so.
25       A.  OK.

## Page 226

KING - HIGHLY-CONFIDENTIAL

1
2  Q.   Do you recall seeing this document
3  before, sir?
4      A.   No.  Again, I'm copied on the -- a
5  party to the e-mail exchange.
6      Q.   Right.  In fact, you wrote some of the
7  e-mail exchange.
8      A.   I wrote some of the e-mail exchange,
9  so it is wrong of me to say that I don't recognize
10 it, but I don't -- I haven't seen this since it
11 was originally typed.
12     Q.   You see in the second chain down, you
13 write to Patrick Clackson and James Walker on 17th
14 of September.  Do you see that, at 10 past 8 in
15 the morning?
16     A.   Yes, yes.
17     Q.   "The contracts are exchange-traded so
18 they would seem to be captured by the definitions
19 within purchased assets.  Think it seems to be
20 about 3 billion gross."  Do you see that?
21     A.   Yeah, yeah.
22     Q.   Can you explain what you meant when
23 you wrote that to Mr. Clackson, please.
24     A.   17th was when?
25     Q.   17th was the Wednesday.

## Page 227

KING - HIGHLY-CONFIDENTIAL

1
2      A.   I don't really -- I don't remember.
3          MR. STERN:  This document doesn't have
4  a Bates stamp on it.  Can you explain why
5  that is, Neil?
6          MR. OXFORD:  I think it is how you
7  produced it to me, Jack.
8          MR. STERN:  Without a Bates stamp?
9          MR. OXFORD:  I believe so.  I think we
10 have had that problem at a few of our
11 depositions.  I'm not quite sure why they
12 are produced like that, but they are.
13     Q.   Mr. King, Mr. Clackson writes back to
14 you, he says, "The only excluded assets are the
15 ones you excluded.  Nothing else.  So no other
16 collateral."  Do you see that?
17     A.   Yeah.
18     Q.   Do you have an understanding of what
19 Mr. Clackson -- withdrawn.
20          Do you have an understanding of what
21 Mr. Clackson meant when he wrote that to you?
22     A.   He -- the only assets that I excluded
23 were the ones that we discussed earlier.  That's
24 the only thing that I could -- so he seems to be
25 reiterating -- that's the only thing that I can --

## Page 228

KING - HIGHLY-CONFIDENTIAL

1
2  if I have to interpret what he was saying because
3  I don't remember this traffic at all.  The only
4  excluded assets as I remember them -- the only
5  construct of excluded assets that I have got is
6  the thing that we talked about earlier which was
7  the 3 billion dollars or so of the RMBS assets.
8      Q.   By that you mean the mortgage-backed
9  securities?
10     A.   Yeah, yeah.  That's the only thing I
11 remember on excluded assets.
12     Q.   Mr. King, is it a fair interpretation
13 of your e-mail to Mr. Clackson that you are
14 attempting to interpret the asset purchase
15 agreement?
16          MR. STERN:  Objection to the form.
17     A.   My original e-mail says -- Patrick's
18 finishing sentence seems to dovetail to mine at
19 the bottom which is, I am asking him, can you
20 think of any securities that would be good
21 collateral to the Fed facility other than the
22 securities that I excluded.  And he says to me,
23 The only excluded assets are the ones that you
24 excluded, and that's referring to assets that
25 might have turned up in the repo facility.  And by

## Page 229

KING - HIGHLY-CONFIDENTIAL

1
2  there, I am using to assets to mean securities.
3          They are on 388-B, there is a line
4  item which is called "Total Derivatives and
5  Other Contracts" on the balance sheet and I
6  remember -- I can't remember piece by piece,
7  but I remember at the time wondering, well,
8  what are derivatives.  And unfortunately, these
9  definitions are -- these descriptions are bad
10 descriptions because they could, you know, they
11 are being used by a business to colloquially
12 describe something there.  It says, "Total
13 derivatives and other contracts, 4.838
14 billion," and I don't remember what I was
15 concluding, but I am pointing out that we are
16 trying to show that we know with the future --
17 I understand we are purchasing them which
18 highlights that I am not -- I don't think I am
19 interpreting.  I think I am asking.
20          From what I understand, they are not
21 in the line item called "derivatives" on the
22 balance sheet and that's the one that I am
23 pointing back to on 390.
24          So you can see, again, I think most of
25 what I am trying to do here is develop a

## Page 230

KING - HIGHLY-CONFIDENTIAL

1  population of risk that we need to value and
2  risk manage. But I -- but I am sorry, that one
3  I don't -- that may have been one of many
4  such -- sort of many dialogs that were going on
5  at that time. I don't really remember the
6  details at this point. Also it was on the
7  17th, again, which I think is an early, it is
8  on Wednesday the 17th, rather than Friday or
9  something, so it is -- I just don't remember
10 it.
11     Q.   Handing you, Mr. King, what has
12 previously been marked as Exhibit I. I am not
13 going to ask you about the whole of the document,
14 but if you could take a flip through it and let me
15 know whether you have seen this before, please.
16     A.   This is an execution copy of the asset
17 purchase agreement, so no, I have not seen this
18 before. I at some point, because you asked me --
19 earlier I was asked about the one that I provided
20 some comments to the purchase agreement, so I did
21 see a draft of some or all of it -- I don't
22 remember -- I'm not sure I ever saw all of it or
23 at least I never paid attention to all of it. I
24 must have seen a draft, but I have never seen

## Page 231

KING - HIGHLY-CONFIDENTIAL

1  execution copies, so I don't think I have them.
2     Q.   You see an execution copy on the front
3  to be dated September 16, 2008, correct?
4     A.   Yes, yes.
5     Q.   If you could have quickly in front of
6  you 302A which is marked by Mr. Hine.
7     A.   That's the e-mail I was alluding to.
8     Q.   Do you see that you are referring to
9  e-mail that is dated 17th of September, correct,
10 sir?
11     A.   Right.
12     Q.   You see that is dated one day after
13 the asset purchase agreement appears to be dated?
14     A.   That's what I said. I don't really
15 understand -- I don't even know whether that was
16 me -- I have no recollection of the -- I have no
17 recollection of the signing of the agreement on
18 the Tuesday. It wasn't really germane to what we
19 were doing. I am not part of the negotiations.
20         I know there were various
21 modifications and revisions to it over time
22 because I was told about them from time to
23 time. So I don't actually know whether on this
24 302A may well have been -- I can't see how I

## Page 232

KING - HIGHLY-CONFIDENTIAL

1  could have gotten hold of an execution copy
2  because it is a signed copy and I may well have
3  happened to have got back on Wednesday the
4  17th, looking at a copy of a draft version of
5  this from prior to here. I just have no
6  recollection -- just the fact that the
7  sequencing is Wednesday the 17th is after the
8  signed copy on the 16th, I don't know that I am
9  copy -- I don't know that I am commenting on
10 this. I might be commenting on a draft from
11 the same day or an earlier day or something.
12     Q.   I understand. Can you turn to page 6,
13 please, of what I have marked as Exhibit I. And
14 you see there is a heading about the middle of the
15 page that begins "Purchased Assets." Do you see
16 that?
17     A.   Yup.
18     Q.   Can you take a moment to read the
19 definition of "Purchased Assets" and I am going to
20 ask you in particular about subsection D.
21     A.   Yeah.
22     Q.   Let me know when you have done that,
23 please.
24     A.   Right.

## Page 233

KING - HIGHLY-CONFIDENTIAL

1     Q.   Is that -- reading that section, sir,
2  does that refresh your recollection as to what you
3  were reviewing when you wrote to Mr. Clackson in
4  the exhibit that I have just marked?
5     A.   Sorry, on this one.
6     Q.   The exhibit I marked is 392-B, sir.
7     A.   Yeah, I understand.
8         Not particularly.
9     Q.   In reading paragraph D under
10 "Purchased Assets," do you see any reference to --
11 do you see any reference to that margin at the OCC
12 or other exchanges?
13         MR. STERN: Objection to the form. So
14 it in D -- specifically does it reference
15 margin, is that --
16     Q.   Yes, is there anything in D that
17 references margin or would be interpreted by you
18 to encompass the margin at OCC or elsewhere?
19         MR. STERN: Objection to the form.
20     A.   The idea -- an exchange-traded
21 derivative -- an exchange -- if an
22 exchange-traded -- if one is an exchange-traded
23 derivative, it is a peculiar concept in the
24 absence of any construction of collateral against

Page 234

KING - HIGHLY-CONFIDENTIAL

1  it, I mean an exchange -- if I acquired an
2  exchange-traded derivative, what have I got? I
3  have just got a contract, but at what?
4        You know, is it -- because it is every
5  day, it is collateralized. So the
6  exchange-traded derivative -- I could easily
7  read exchange-traded derivatives here to mean
8  the exposure of the exchange-traded derivatives
9  and the collateral supporting them.
10       Q.   Do you consider the exchange-traded
11  derivative and the margin to be the same thing,
12  sir, or different?
13       MR. STERN: Objection to the form.
14       A.   Margin is posted -- I don't know. I
15  mean, I never -- you know, the exchange-traded
16  derivatives -- the way the OCC -- if the OCC --
17  the OCC has a number of contracts and it has some
18  collateral accounts that are supporting the
19  exchange-traded derivative positions. It is very
20  difficult to separate them because every day, the
21  contracts go up in value or down in value. Some
22  of the -- if they go down in value, that consumes
23  margin.
24       Q.   Is that true for long positions as

Page 235

KING - HIGHLY-CONFIDENTIAL

1  well as short positions, sir?
2        MR. STERN: Objection to the form.
3        A.   Yes, again, back to a long put
4  position or a long position that goes down in
5  value consumes margin. A short position that --
6  where the underlying goes down in value increases
7  margin. I don't really know how to separate them.
8  And I have to say that I didn't particularly dwell
9  on it afterwards. I just knew if we had open
10  exchange-traded derivative positions and we
11  ignored them, they were at risk of consuming all
12  the margin. And at the some point, the exchange
13  would close us out.
14       (Exhibit 393-B, e-mail dated Friday,
15       19 September 2008 at 00:57:45 marked for
16       identification, as of this date.)
17       Q.   Mr. King, I have put before you a
18  one-page e-mail that I have marked as Exhibit
19  393-B. Could you take a quick look at it and let
20  me know when you have done so, please.
21       A.   Right. Yeah.
22       Q.   Do you recall this document, sir?
23       A.   No.
24       Q.   It appears to be an e-mail exchange

Page 236

KING - HIGHLY-CONFIDENTIAL

1  between you and Mr. Clackson and Mr. Mahon,
2  correct?
3        A.   Yes.
4        Q.   And initially you write to
5  Mr. Clackson on September 18 at around 8:30 in the
6  evening, you say, "Why don't we add the initial
7  margin on the repos," and then a few hours later,
8  you say, "Sorry, I meant exchange and clearing
9  houses."
10       A.   Right.
11       Q.   Can you tell me what you mean when you
12  wrote those words, sir?
13       MR. STERN: Objection to the form.
14       A.   I don't remember the -- is that at
15  1:30 a.m.?
16       Q.   I believe so. The document was
17  produced to me by Barclays. I don't know whether
18  that is a GMT Time or Eastern Standard Time.
19  Perhaps Jack could enlighten us.
20       A.   One is 12:57 GMT on Friday.
21       MR. STERN: What is the question? The
22  question is what he meant when he wrote
23  those two sentences to Mr. Clackson? I
24  think he has answered that. Is there

Page 237

KING - HIGHLY-CONFIDENTIAL

1  another question?
2        Q.   Sure, let's try it again.
3        Do you know what you meant when you
4  wrote those two sentences to Mr. Clackson?
5        A.   Not without a context.
6        Q.   What context would you need to answer
7  this question, sir?
8        MR. STERN: Objection to the form.
9        A.   If I write a sentence like, Why don't
10  we add the original margin on the repos, I don't
11  know what I am talking about adding it to. Both
12  Patrick and Paolo are on the accounting side of
13  the firm. Paolo was at Lehman. So I don't know
14  whether -- without knowing what the starting point
15  of this is, this may have had to do a, you know,
16  an aggregate asset value question or -- I don't
17  know. I actually don't know.
18       Q.   Could you be suggesting to
19  Mr. Clackson that the initial margin at the
20  exchanges and clearing house be added to the
21  transaction between Barclays and Lehman?
22       MR. STERN: Objection to the form.
23       A.   I find that very unlikely since I
24  wasn't part of that discussion. But I don't know.

Page 238

KING - HIGHLY-CONFIDENTIAL

1    KING - HIGHLY-CONFIDENTIAL
2    Q.  Mr. Clackson replies, "Agreed. Paolo
3 is saying the right stuff."  Do you have an
4 understanding of what Mr. Clackson said when he
5 wrote that to you?
6    A.  I assume he is referring to -- I mean,
7 I would only know one Paolo that's even remotely
8 associated with this transaction.  So other than
9 that, I don't know, no.
10    MR. STERN:  I'll note again that my
11 understanding is that we produced documents
12 with Bates numbers except for the Felder
13 documents that we produced at the very
14 beginning.  So again, I don't know why you
15 are marking documents without Bates numbers
16 and I will note that for the record and we
17 will investigate it after the deposition.
18    MR. OXFORD:  Sure, I would appreciate
19 if you would.
20    MR. STERN:  I will investigate it with
21 you because I don't know where you are
22 getting things if they are not Bates
23 numbered.
24    MR. OXFORD:  It is my information that
25 we pulled these directly from your

Page 239

1    KING - HIGHLY-CONFIDENTIAL
2 production, Jack.
3    MR. STERN:  I don't think that's
4 accurate, but we will talk about it after
5 this.
6    (Exhibit 394-B, e-mail dated 9/19/2008
7 at 9:41 p.m. with attachment marked for
8 identification, as of this date.)
9    Q.  Mr. King, you have in front of you
10 what I have marked as Exhibit 394-B.
11    A.  Right.
12    Q.  And I am going to ask you primarily
13 about the e-mail rather than the attachment,
14 though of course you are welcome to take such time
15 as you need to look at the attachment as well.
16    A.  Right.
17    Q.  I note you are directing your
18 attention to Exhibit 393-B.  I don't have any more
19 questions for you at this time, so if you could
20 focus your attention on 394-B, that would probably
21 be most expeditious.
22    A.  Right.
23    Q.  Do you recall this document, sir?
24    A.  No.
25    Q.  No?  You see that Mr. Yang sends to

Page 240

1    KING - HIGHLY-CONFIDENTIAL
2 you and others a spreadsheet that appears to be
3 titled, "Top Derivatives Position By Position" --
4    A.  Right.
5    Q.  "9/18/08."  Do you have an
6 understanding of what that spreadsheet is, sir?
7    A.  I don't remember it, sorry.
8    Q.  I don't need to ask you anything else
9 on that.  If you could put that to one side
10 please.
11    This has previously been marked as
12 Exhibit 95-B.  I'll save you a little time,
13 Mr. King, your name is not actually on this
14 e-mail.  If you could take a look at the e-mail
15 and the attachment and see whether you have
16 seen this document before, please.
17    MR. STERN:  Read through all the
18 e-mails, please.
19    Q.  Yeah, I am sorry, I meant to say you
20 are not on the ultimate e-mail chain, but you do
21 appear earlier down the e-mail chain.  So I have
22 some questions for you about that.
23    MR. STERN:  Read them all, starting
24 from the bottom.
25    THE WITNESS:  It is essentially the

Page 241

1    KING - HIGHLY-CONFIDENTIAL
2 same as the previous one.
3    MR. STERN:  It could be.
4    A.  Yup.
5    Q.  I would like to direct your attention
6 first to the third page of this exhibit, sir.
7 Near the top of the page, at 11:18 a.m. on Sunday,
8 September 21, you write to a group of people
9 regarding "Net Long Options, 9/18" and you address
10 it to somebody who appears to be called Lily
11 McInerney.  Do you see that?
12    A.  Yup.
13    Q.  And you say, "Lily, what I am trying
14 to be sure about is that we have a clear list of
15 exchange-traded positions (options, futures, et
16 cetera) as of Friday close.  Need this today.
17 Very important.  Also, I need to know what the net
18 margin is at the relevant clearing house and
19 whether that reflects the Friday close marks.
20 What is your number.  Either Tim or I will call
21 you."
22    Do you see that?
23    A.  Yes.
24    Q.  Do you recall this document, sir?
25    A.  I don't.  I remember a lot of the

Page 242

1    KING - HIGHLY-CONFIDENTIAL
2  dialog around this time, but I don't remember
3  this. I don't remember the -- this particular
4  exchange.
5    Q.   You do or you don't?
6    A.   I don't remember this particular
7  exchange, but I remember a lot of the things that
8  were going on at this time.
9    Q.   Can you tell me, please, why you are
10 requesting this information from Lily?
11   A.   Yeah, I don't remember who Lily was
12 actually, so I'm not sure why I am requesting it
13 from Lily in particular. If you remember what
14 I -- further down at the bottom, it says, it is
15 from me to Gerard Reilly, "Don't forget, we only
16 want the exchange-traded options positions, not
17 the OTC."
18   I don't -- I actually, for some reason
19 in my head, I don't know if I described this
20 earlier, I thought about the exchange-traded
21 positions as not really starting work on those
22 until after the Monday. But evidently, I
23 started work on them towards the end of that
24 week and so that's just a -- my -- if this
25 helps to clarify that it must have been earlier

Page 243

1    KING - HIGHLY-CONFIDENTIAL
2  on that I started to become aware of it, and so
3  I -- and that may have come out of the earlier
4  comments about the asset purchase agreement
5  when I started to think about the
6  exchange-traded derivatives position.
7    There have been a number of things
8  that have been happening simultaneously. Gary
9  Romain started to put a balance sheet together.
10 My increasing role on managing the overall risk
11 of the transaction -- sorry, overall risk of
12 all of the assets that were coming on to the
13 balance sheet, and Gary started to put the
14 acquisition balance sheet together.
15   And what we had discovered was that we
16 had no way of producing -- I alluded to this
17 earlier -- we had no way of producing risk for
18 just the exchange-traded derivatives positions.
19 In fact, Barclays wasn't capable of booking the
20 exchange-traded derivatives positions. We
21 didn't have the technology systems. One of the
22 things we were acquiring from Lehman was the
23 businesses -- Jerry Dineen's and I think some
24 of these people were Jerry Dineen's people
25 associated with the equities trading business

Page 244

1    KING - HIGHLY-CONFIDENTIAL
2  and this is one of the few occasions where we
3  really had to use a combination of Lehman
4  people and Barclays people to ascertain the
5  risk and the values.
6    Unfortunately, the Lehman people had
7  this amalgam of OTC and exchange-traded
8  derivatives position in their risk system, so
9  they couldn't tell us just the exchange-traded
10 derivatives positions. I remember -- and I
11 think this e-mail may be the start of it, and
12 it probably was over that weekend, that I
13 worked out that I could estimate the risk of
14 the exchange-traded derivatives positions by
15 the change in the margin. What I was saying to
16 you earlier about the fact that it is
17 impossible to separate margin from an
18 exchange-traded derivative position.
19   The change in the margin, which is the
20 cash posted plus the current market value,
21 liquidation value of the, the in-the-moneyness
22 of the contract -- sorry, the mark on the
23 contract -- if you added all of that up for a
24 book, all of that up on the OCC, you would know
25 whether it was moving -- whether your book was

Page 245

1    KING - HIGHLY-CONFIDENTIAL
2  overall long or short with respect to an
3  underlying market. And I think that's what I
4  am starting to do here with this dialog.
5    So it is a combination of, one,
6  looking at Gary Romain's balance sheet and saying,
7  hold on, Gary actually has OCC clearing house
8  money on the balance sheet as an asset that we are
9  acquiring, is that a volatile number.
10   My responsibility is to advise the
11 firm whether it has volatility, whether it has
12 risk, economic risk. So it has the OCC. In
13 fact, I don't know which exhibit it was which
14 had the first draft of the balance sheet, but
15 that was dated the first draft that you showed
16 me that was on the 22nd, wasn't it? I think it
17 was on the 22nd.
18   So around that time, the balance sheet
19 was becoming available that has the clearing
20 house collateral on it. And we were trying to
21 ascertain the risk before Lehman -- before we
22 were able to actually book the trades because
23 Barclays couldn't book the trades. So we had
24 to do it by estimating change in the margin at
25 the OCC.

Page 246

1      KING - HIGHLY-CONFIDENTIAL
2    MR. STERN: He is referring to 390-B.
3    A.  Right. So this has -- does this have
4  the OCC on it? Maybe it doesn't -- derivatives,
5  it says derivatives, exchange-traded options. So
6  that's where -- that's I think what was going on
7  here, that we had to start to try to work out what
8  we got. We didn't know what we had got at this
9  point.
10    Q.  Mr. King, over the weekend of the 20th
11  and 21st of September, did you come to a
12  conclusion as to the risk in the OCC positions?
13    A.  No. We -- not -- again, as I said
14  earlier in response to another question that
15  suggested that I came to a conclusion, a
16  conclusion we managed to come to several days or
17  weeks later. What we were able to determine was
18  that we had a net open position.
19    On the Friday morning, we had -- I
20  mean, add the pieces up on Friday morning --
21  this was an incredible time. On the Friday
22  morning, we wake up to find out that we are
23  long 8 billion dollars of cash equities; that
24  we have just lent money against, among other
25  things, an 8 billion dollar portfolio of cash

Page 247

1      KING - HIGHLY-CONFIDENTIAL
2  equities. Then we realize that, you know, we
3  have open exchange-traded derivatives positions
4  that are live that aren't closed out, as -- I
5  find out Tim Stack used to be in prime
6  brokerage. You start to see we could get the
7  OCC information statements for Friday, this is
8  from Francis Pearn, Francis. We can get the
9  OCC statements for Friday and determine if
10  these contracts are still outstanding. We
11  didn't know whether or not the contracts that
12  we had were outstanding, how substantial they
13  were. Early in that -- and the equity markets
14  are closed. The equity markets are closed.
15    MR. STERN: What do you mean by cash
16  positions?
17    A.  Cash, people refer to cash equities to
18  refer to the -- it, you know, to the individual
19  equity publicly traded equity positions, Barclays
20  stock, IBM stock.
21    MR. STERN: I see.
22    A.  AT&T stock. That's what I mean by
23  cash equities, they are exchange-traded. They are
24  exchange-traded cash instruments.
25    This derivatives position was a

Page 248

1      KING - HIGHLY-CONFIDENTIAL
2  mixture of index derivatives, i.e., referencing
3  S&P, you know, mostly S&P and also individual
4  stock equities, so it was IBM, so it was perfectly
5  reasonable what -- and Lehman had a very active
6  equity derivative business which means they may
7  well be hedging equity derivative positions with
8  cash equities. So it was a perfectly reasonable
9  thing for them to assert that they were -- why on
10  earth did they have this 8 billion dollar long
11  cash equities position. Well, it might be because
12  it is hedging our equity derivative position.
13  That turned out not to be true or at least than the
14  index derivative position was even larger than the
15  single named derivative position, so the net delta
16  on the exchange-traded derivatives position was
17  long about 3 billion dollars.
18    And what we were trying to get here
19  was a handle on what that risk was.
20    Q.  I appreciate that answer. I think it
21  may set a record for longest answer in these
22  depositions.
23    A.  It was a difficult problem.
24    Q.  I'm sure it was.
25    At any time did you come to a

Page 249

1      KING - HIGHLY-CONFIDENTIAL
2  conclusion as to the risk of Lehman --
3  withdrawn.
4    At any time, Mr. King, did you have
5  come to a conclusion as to the risk, if any,
6  that Barclays was assuming by taking on the
7  exchange-traded derivatives positions of
8  Lehman?
9    MR. STERN: Can I hear the question
10  again.
11    (Record read)
12    MR. STERN: Objection, asked and
13  answered.
14    Go ahead, you can answer again.
15    A.  Didn't I just answer that?
16    Q.  No.
17    MR. STERN: I think you did, but you
18  can try again.
19    A.  I can try it again with another very
20  long answer.
21    Q.  Can you try it with a short answer?
22    MR. STERN: No --
23    A.  No, I didn't come to a conclusion. We
24  started to manage it and eventually closed out all
25  the exchange-traded derivatives positions.

## Page 250

KING - HIGHLY-CONFIDENTIAL

1 Q. Did Barclays undertake any analysis,
2 to your knowledge, at any time as to whether
3 Barclays made a net gain or loss on the
4 exchange-traded derivatives positions they assumed
5 from Lehman?
6 MR. STERN: Objection to the form.
7 A. No.
8 MR. STERN: Let me hear it again.
9 (Record read)
10 MR. STERN: Objection to the form.
11 Try to answer that. "At any time."
12 A. Do you -- do you mean over the life of
13 the exposure to the exchange-traded derivatives
14 positions?
15 Q. Yes, at any time from September 19 to
16 date? Or I should say, September 19, 2008.
17 A. I don't think we ever thought we
18 isolated it in that way.
19 Q. You asked Lily in what I have marked
20 and has been marked previously as 95-B what the
21 net margin was at the relevant clearing house. Do
22 you recall ever receiving an answer to that
23 request?
24 A. I don't remember receiving the answer

## Page 251

KING - HIGHLY-CONFIDENTIAL

1 specifically. The reason for wanting to know, as
2 I said, was, one, to go into the -- that it would
3 be relevant to the acquisition balance sheet as a
4 purchased asset. And two, to assess the change in
5 it so we could estimate the risk.
6 Q. When you say net margin, Mr. King,
7 what do you mean by net margin?
8 A. The margin posted at the exchange, at
9 the clearing house.
10 Q. Is it net of something?
11 A. The long/short positions.
12 Q. I am sorry, can you explain that a
13 little further.
14 A. I think --
15 MR. STERN: Objection to the form.
16 A. The OCC referred to net -- I think it
17 was an OCC -- I think originally it was an OCC
18 description which was cash, securities and PV
19 on -- the present value on the derivative
20 positions, that's the net.
21 Q. And the answer you just gave me is
22 what you understand to be the OCC's definition of
23 the term net margin, sir?
24 MR. STERN: Objection to the form.

## Page 252

KING - HIGHLY-CONFIDENTIAL

1 A. No, what I said was that is how I use
2 it and I remember -- I seem to remember it
3 being -- the genesis of it was it was actually an
4 OCC term. Whether it is a defined term or not, I
5 don't know.
6 Q. If you can go to the front page of
7 Exhibit 95-B, sir. You're not on the chain at
8 this stage, but if you could just read the first
9 e-mail that begins, "Craig Jones provided the OCC
10 statements as of September 22 for the LBI 074
11 account."
12 A. Yeah.
13 Q. Do you ever recall learning the
14 information that's contained in that paragraph?
15 A. I -- at various times, I knew the
16 balances of the margin that was in the OCC because
17 it was what we were using, one, to provide to Gary
18 Romain for the balance sheet and, two, to estimate
19 the daily change in risk. I don't remember these
20 numbers specifically, but at various times I came
21 into contact with the amount of margin that was in
22 the OCC was a very important number to us.
23 Q. Do you have an understanding whether
24 the numbers reflected in that paragraph are the

## Page 253

KING - HIGHLY-CONFIDENTIAL

1 net margin numbers that you had asked Lily for?
2 A. I -- I don't think -- did you say I
3 wasn't on the e-mail?
4 Q. Yes, and I understand that, but I am
5 asking you sitting here today, do you have an
6 understanding of whether the numbers referenced on
7 the front page of Exhibit 95 represent the net
8 margin that you had asked Lily for on Sunday, the
9 21st of September?
10 A. It says it is an OCC statement. We
11 did use the OCC statements and I remember some of
12 the sheets at the back, not these ones in
13 particular necessarily, but ones that look very
14 similar to it that were being used.
15 But you know, one thing that I would
16 ask you to bear in mind is that I was running a
17 very substantial risk book with a large number
18 of people that either reported directly to me
19 or were seconded to me. Much of this kind of
20 material was processed before it got to me. I
21 may have been copied on it, but if there is
22 only one number in here that turns out to be
23 relevant, then somebody may have processed that
24 for me into a form that I could consume.

Page 254

KING - HIGHLY-CONFIDENTIAL

1        This was just one of many streams of
2   risk management valuation, operational process
3   risk management that we were undertaking
4   simultaneously.
5        Q.   Do you recall any particular members
6   of your team who would have processed that
7   information for you?
8        A.   A variety of people.
9        Q.   Can you give me the names of that
10  variety of people?
11       A.   For example, Jasen Yang.
12       Q.   Would Tim Stack also have been one of
13  those individuals?
14       A.   Tim Stack actually was -- Tim Stack
15  doesn't work for me, but Tim Stack was -- Tim
16  Stack, not really.  Tim Stack was more -- Tim and
17  I almost had different objectives.
18       Tim's job was at the time really
19  customers and mine was really proprietary.  So
20  whatever Tim wanted in his world, almost by
21  construction wouldn't have been in my world,
22  and vice versa.  So we wanted to separate our
23  two worlds.  Then he could get on with dealing
24  with customers and customer accounts and I

Page 255

KING - HIGHLY-CONFIDENTIAL

1   could get on dealing with the net exposure that
2   the bank had to the -- what were called the
3   proprietary accounts at the clearing house and
4   exchanges.  So 074, for example, was one that I
5   remember and we spent a lot of time on 074.
6        (Exhibit 395-B, document Bates stamped
7        BCI-EX-S 57416 through 417 marked for
8        identification, as of this date.)
9        Q.   Mr. King, I have handed you what I
10  have marked as Exhibit 395-B, which on this
11  occasion I am able to identify for the record as
12  having a Barclays Bates stamp BCI-EX-S 00057416
13  through 417.  Can you let me know when you have
14  had a chance to review that, please.
15       A.   Um-hm.
16       Q.   Could you recall this document, sir?
17       A.   Again, this is just an e-mail
18  exchange.  I remember lots of dialog with --
19       Q.   I am sorry, I didn't mean to cut you
20  off.
21       A.   I remember lots of dialog with Nick.
22  I just don't remember this traffic in particular.
23       Q.   When you say Nick, do you mean to
24  refer to Nick --

Page 256

KING - HIGHLY-CONFIDENTIAL

1        A.   Nick Moreira.
2        Q.   Do you tell me who Nick Moreira was,
3   please?
4        A.   Nick Moreira was a Barclays employee
5   who we -- again, who doesn't work for me but who
6   was made available to me to facilitate the risk
7   management of the exchange-traded derivatives
8   position.
9        Q.   There is a reference at the bottom of
10  the page to a call, you're asking Michael
11  Schmanske to join?
12       A.   Um-hm.
13       Q.   Who is Michael Schmanske?
14       A.   I don't know his position.  If I
15  remember correctly, Mike -- he was a Lehman
16  employee and he worked somewhere in Jerry Dineen's
17  equity world and I think was the sort of middle
18  office or desk operations person who we had been
19  pointed to towards being able to help us
20  understand what the exchange-traded derivative
21  positions were.
22       Q.   OK.  Do you recall in general terms
23  what was discussed on that call?
24       A.   Which one was this?  Monday at 3 in

Page 257

KING - HIGHLY-CONFIDENTIAL

1   the afternoon.  More of the same discussion how do
2   we get a handle on what the net positions are on
3   the exchanges.
4        Q.   There is a reference in your e-mail,
5   you say if there is anyone there who has an
6   overall view, then I suggest they join.
7        A.   Yeah.
8        Q.   Do you remember whether anyone in
9   particular joined that call in response to your
10  suggestion that someone with an overall view join?
11       A.   Not on that call I think, although
12  this was a -- this was a party that grew and grew
13  and grew for a while as we tried to work out how
14  we could get a handle on what the position was and
15  then it shrank back down to a much smaller number
16  of people in the end.
17       Q.   Apart from Nick Moreira and Michael
18  Schmanske, who else was involved in helping you
19  understand the risk associated with Lehman's OCC
20  related exchange-traded derivatives?
21       A.   I mean there is a -- I don't even
22  remember all of the names of them.  I mean, it is
23  many of the people that are copied on this e-mail,
24  like Tim Stack, obviously members of my team,

Page 258

KING - HIGHLY-CONFIDENTIAL

1      KING - HIGHLY-CONFIDENTIAL
2 Jasen and Sean, Nick Moreira, traders in Nick
3 Moreira's group, people in Jerry's team at Lehman,
4 operations people, compliance people.
5      I mean, it was a very substantial
6 number of people that were involved to make
7 sure that we had -- because we had a number of
8 issues. We had to determine -- we had tried to
9 estimate what the economic risk was in a second
10 so that we could manage it. We had to try and
11 work out how we could close out of the
12 positions and insure that we weren't closing
13 out client positions inadvertently. We had to
14 insure that we were operating within compliance
15 guidelines because these are public
16 exchange-traded derivative positions. So it
17 was a cumbersome process.
18    Q. Why were you trying to close out
19 positions at the OCC, Mr. King?
20    A. Because we didn't -- we had no desire
21 to have an open exchange-traded derivatives
22 position. These were naked -- this is naked risk.
23    Q. Can you explain what you mean by
24 "naked risk"?
25    A. It was not a risk that was -- that

Page 259

1      KING - HIGHLY-CONFIDENTIAL
2 served any purpose. It is a -- it turned out it
3 was approximately -- I am only using this as
4 approximate because it was more complicated than
5 this, but it was -- the exposure behaved something
6 like being long three and a half billion dollars
7 of the S&P. That doesn't mean you had 3 and a
8 half billion dollars of value. It meant if there
9 was, say, 500 million dollars of margin against
10 those derivative positions and the index had
11 fallen 10 percent, then we could have run out of
12 margin.
13    Q. Were you, at any stage, Mr. King,
14 trying to transfer positions at the OCC?
15      MR. STERN: Objection to the form.
16    A. No. Other people were involved with
17 transferring customer-related stuff, but no, we
18 weren't involved. We had no -- again, coming back
19 to my role in this overall transaction was
20 valuation and risk management. Here we had
21 identified a risk and our job was to eliminate it.
22 We weren't trying to start a business or run
23 something. We just needed to eliminate it.
24    Q. Those other people you referenced who
25 were trying to transfer positions, was it customer

Page 260

1      KING - HIGHLY-CONFIDENTIAL
2 positions at the OCC they were trying to transfer?
3    A. I -- yeah, there were some -- I
4 know -- I don't know anything about transfers at
5 the OCC or any of the futures exchanges or
6 anything else. All I know is that there was
7 separate discussions about it, but I wasn't party
8 to them.
9      (Exhibit 396-B, document Bates stamped
10     BCI-EX-S S8711 through 114 marked for
11     identification, as of this date.)
12    Q. Mr. King, you have in front of you
13 what I have marked as Exhibit 396-B, which is a
14 document produced by Barclays BCI-EX-S 00087112
15 through 114.
16    A. Yes.
17    Q. Do you recall this document, sir?
18    A. Not this document. Again, I'm -- you
19 know, I'm involved in the exchange, so I loosely
20 remember the exchange.
21    Q. Turning your attention to the third
22 page of the document, the bottom of the e-mail
23 chain appears to be an e-mail from you on
24 September 30 at 1:24 p.m. to Nick Moreira and
25 others. Do you see that?

Page 261

1      KING - HIGHLY-CONFIDENTIAL
2    A. Yes.
3    Q. "Subject: MM, LBI and LBSF options."
4 Do you see that?
5    A. Yes.
6    Q. What does MM stand for?
7    A. I don't remember.
8    Q. LBI is presumably Lehman Brothers
9 Incorporation?
10    A. Yeah.
11    Q. What does LBSF stand for?
12    A. It was another one of the Lehman
13 Brothers entities. I am trying to remember what
14 MM is.
15    Q. And you will see you are asking Nick
16 Moreira and others for the current MV of for
17 each --
18    A. Yeah.
19    Q. -- each of the buckets of options?
20    A. Um-hm.
21    Q. And if you turn to the second page
22 1173, Lucas, Thierry provides the answer to you,
23 do you see that?
24    A. Yes.
25    Q. And you reply, "So I guess this is the

Page 262

KING - HIGHLY-CONFIDENTIAL

1 liability. What's the asset. Must be the margin,
2 how much do we have?" Do you see that?
3     A.   Yup, yup.
4     Q.   Can you explain what you meant by that
5 answer?
6     A.   No, not particularly. I would have to
7 work through what it was. Yeah, Thierry worked
8 for Nick Moreira. Thierry was an equity
9 volatility trader, and he was assisting me in the
10 hedging and identification and estimation of the
11 risk of the exchange-traded derivatives positions.
12     And what is kind of evident in some of
13 these exchanges is that MM was market maker.
14 So MM was market maker. So would effectively
15 have been there for those -- the market maker
16 positions, just outright, net proprietary
17 positions.
18     Q.   OK, so MM would be proprietary
19 positions, correct?
20     A.   Yeah.
21     Q.   LBI is also proprietary positions?
22     A.   Yeah, I think that was again an OCC
23 definition. There weren't customer positions.
24 There were two types of proprietary positions.

Page 263

KING - HIGHLY-CONFIDENTIAL

1 One were the market maker positions, one were
2 proprietary trading positions. The OCC had
3 slightly different classifications for them, but
4 effectively they both behaved as if they were just
5 crude risk positions that would look like
6 proprietary positions from Barclays' point of
7 view.
8     Some of the discussions about these
9 highlight that some of this area,
10 exchange-traded derivatives, was about as far
11 from our normal trading products suite as we
12 could get, and therefore, we are learning the
13 language as we go along and some of that
14 language is even mathematical. Thierry was an
15 options trader and you will notice that all of
16 the numbers that he provides me are negative.
17 The parentheses imply that they are negative.
18     So I guess this is -- the liability is
19 referring to the fact that Thierry has provided me
20 a string of negative numbers. And at various
21 times, that would scare me a great deal because
22 not knowing much about exchange-traded
23 derivatives, did this mean that somebody owed the
24 exchange 1.2 billion dollars.

Page 264

KING - HIGHLY-CONFIDENTIAL

1     So therefore, I say what is the asset,
2 must be the margin, how much do we have. That
3 plays back to the comment that I made about the
4 net margin, the derivatives themselves can be
5 in or out of the money and, therefore, they
6 could have a positive or negative value that
7 needs to be added to the collateral. And I
8 think that's what that sentence is
9 highlighting.
10     Q.   Over the page on the bottom of the
11 first page of the document, you appear to
12 calculate an excess of 426?
13     A.   Yes.
14     Q.   Do you see that?
15     A.   Yes.
16     Q.   Do you know what that's a reference
17 to?
18     A.   So I think that highlights -- this is
19 about three days of my life that I wouldn't mind
20 not remembering because it wasn't straightforward.
21     The 1.14, if we added up the three
22 line items that Thierry had sent me, 1.061,
23 .5,--.045, .034, all measured in billions, that
24 sums to approximately 1.14 billion. And that

Page 265

KING - HIGHLY-CONFIDENTIAL

1 would appear to me to be the contract amount.
2 The 942 and 624 on the page over is provided by
3 Sean, total OC margin for firm book. Firm book
4 was what MM and LBI, I can't remember exactly
5 how it was broken out for 9.2, and then 623 is
6 the MM book. So 623 plus 942 adding up to
7 1.566.
8     So that's then the margin. So the
9 excess margin, the net margin is .426 million.
10 So that would end up being an estimate because
11 we were just getting our heads around it, but
12 it highlights what I was saying. I wouldn't
13 know -- when you asked me would I interpret
14 exchange-traded derivatives to mean margin and
15 contracts, I wouldn't know how to separate
16 these as that calculation shows.
17     Q.   If I understand your answer correctly,
18 you are defining net margin as excess of margin
19 over the contract amount?
20     A.   I think that's right. I think that's
21 right. I'm not sure I intended to define it as
22 such, but I believe if I was doing the same thing
23 as I did then, I would have called those
24 synonomous.

Page 266

KING - HIGHLY-CONFIDENTIAL

1 KING - HIGHLY-CONFIDENTIAL
2     Q.   This net margin that you estimated,
3 426, that's 426 million dollars, sir?
4     A.   Sorry? That would be millions.
5     Q.   This figure is 426 million?
6     A.   Yes, by induction by from the other
7 pages.
8     Q.   What happened to that 426 million,
9 Mr. King?
10     A.   I don't know.
11     Q.   Would it have gone to Barclays?
12     A.   I see the OCC margin as an item on the
13 balance sheet, so that was my understanding.
14     Q.   And it is an item under assets in the
15 balance sheet, correct?
16     A.   It would be an asset, yes.
17     Q.   Was a similar exercise to calculate
18 the net margin at OCC done for other options
19 beyond those three buckets of options described in
20 what I have marked as Exhibit 396-B?
21     A.   There were various others as well.
22     Q.   Who performed that analysis or those
23 analyses?
24     A.   We did, but this I seem to remember
25 was the largest one. For example, I think

Page 267

1 KING - HIGHLY-CONFIDENTIAL
2 somebody alludes to it in here, Thierry alludes to
3 the VIX options. Yeah, I'm working with a futures
4 team, Liz and James. Futures were treated as
5 separately from us just because we didn't -- it
6 wasn't the same risk management issue. Determine
7 net remaining margin on the LBF VIX futures book,
8 OCC 084. That's alluding to go 084. I think this
9 was all dealing with O74, wasn't it? I think it
10 was 074.
11     Q.   Was your team, Mr. King, responsible
12 for calculating the net margin on any options at
13 OCC other than those discussed in this e-mail
14 marked as Exhibit 396B?
15     A.   A bit like I described earlier, that
16 there was some things on the cash assets that were
17 undertaken by my group and others that were --
18 other activities that were coordinated where the
19 relevant trading desk at Barclays undertook
20 responsibility and then we performed an
21 aggregating role.
22         The same is true here. We provided a
23 conduit, in the early days, not in the late
24 days, but in the very early days of
25 facilitating just the process management around

Page 268

1 KING - HIGHLY-CONFIDENTIAL
2 identifying all of the margin that was
3 available in all of the accounts. But later
4 on, you know, as quickly as we possibly could,
5 we pushed those responsibilities back into
6 their respective business units.
7     Q.   OK. Aside from the three buckets of
8 options described in this Exhibit 396-B, and other
9 than the aggregating role that you have just
10 testified to, did your team have responsibility
11 for calculating net margin on any other groups of
12 options at OCC or elsewhere?
13     A.   We didn't ever -- I don't think we
14 ever -- yeah, I'm not sure we ever really
15 calculated net margin for anything like this. I
16 mean, I am doing it very crudely here in this
17 e-mail, but for the most part we would have just
18 been aggregating, as Sean does on the second page,
19 information that was coming from other sources
20 within the bank and us trying to interpret it and
21 then forward that on in a more manageable form to
22 product control before product control was able to
23 take on the process directly themselves.
24     Q.   For what purpose did you do this net
25 margin calculation, sir?

Page 269

1 KING - HIGHLY-CONFIDENTIAL
2     A.   I don't remember why I did it here. I
3 did this calculation or people who work for me,
4 when I say I, did it repeatedly initially to find
5 out whether what the size of the asset was that we
6 would then report on to product control for
7 inclusion on the acquisition balance sheet, and
8 two, to estimate the daily change so that we could
9 estimate our risk.
10     Q.   Do you have a recollection, Mr. King,
11 of the aggregated net margin that was forwarded by
12 your group to product control for inclusion on the
13 acquisition balance sheet or otherwise?
14     A.   It was a very volatile number. I
15 don't remember what it was from day-to-day. I
16 think in a week following -- in the week following
17 the first Lehman bankruptcy there was about a 15
18 percent decline in the equity market and then
19 there was a rally and there was, you know, so the
20 volatility of this number is measured in hundreds
21 of millions of dollars a day, and even that risk
22 number changes actually as the market itself
23 moved. So I don't remember the numbers. In fact,
24 I didn't ever really care about the numbers. All
25 I cared was that the numbers were current and

Page 270

KING - HIGHLY-CONFIDENTIAL

1 KING - HIGHLY-CONFIDENTIAL
2 accurate.
3 MR. STERN: Let's pause here for a
4 second.
5 (Pause)
6 Q. Mr. King, I have handed you what has
7 previously been marked as 377A. If you could take
8 a look at that and I am primarily asking you about
9 pages 2 and 3, although you are, of course,
10 welcome to review the full document.
11 A. OK.
12 Q. Do you recognize that document, sir?
13 A. I haven't seen the document before.
14 I've seen, at various times, I've seen forms of
15 the spreadsheets that are shown on page 2 and 3.
16 Q. If I were to describe page I as the
17 acquisition balance sheet, would that comport with
18 your understanding?
19 A. I actually think of page 2 and 3 as
20 summaries of the acquisition balance sheet, but
21 column D sums to the same as column C on page 2
22 and so the first spreadsheet is a reorganized
23 version of the second and third spreadsheets I
24 think.
25 Q. Do you have any involvement, Mr. King,

Page 271

KING - HIGHLY-CONFIDENTIAL

1 KING - HIGHLY-CONFIDENTIAL
2 in providing any information that was used to
3 compile Exhibit 377A or any subpart of it to your
4 knowledge?
5 A. Do you have a date on these?
6 Q. I don't think there is an embedded
7 date.
8 A. 390-B was dated on the 22nd and is a
9 -- is called the Long Island Acquisition Summary
10 and it -- certainly the second page of 377-A that
11 you have just shown me is just a later form of
12 390-B.
13 Q. And focusing in particular on the
14 references to OCC on pages 2 and 3 of Exhibit 377,
15 sir?
16 A. Right.
17 Q. If you look on the second page in line
18 18?
19 A. Yes.
20 Q. You will see there is a reference OCC
21 customer and clearing margin which in column C
22 appears to be .89 billion. Do you see that?
23 A. Yes.
24 Q. To your knowledge, sir, were you
25 involved in providing any information or

Page 272

KING - HIGHLY-CONFIDENTIAL

1 KING - HIGHLY-CONFIDENTIAL
2 calculating that figure?
3 A. That number and the -- I remember
4 there was an error in -- there was some -- again,
5 there is an even later version of this where some
6 of these were reorganized, but, for example,
7 the -- for example, this one now includes what was
8 called the JP Morgan inventory of 3.92 and
9 settlement of 1.25.
10 So this one starts to show that we
11 didn't receive the 7 billion of cash that was
12 shown on the balance sheet that was as of the
13 22nd that shows how there were iterations of
14 this as things became clearer, including the
15 fact that we weren't going to receive
16 everything that we expected to receive.
17 The 0.98 and the exchange rate options
18 0.21, I remembered again those were later revised
19 because they -- the combination of that, the
20 futures, customer balances and the exchange-rated
21 options numbers weren't being calculated right for
22 some reason. But yes, the calculation you just
23 asked me about, the 457, I don't remember how we
24 got to where we did, but -- where is the 457, was
25 that in Exhibit 396-B was an example of

Page 273

KING - HIGHLY-CONFIDENTIAL

1 KING - HIGHLY-CONFIDENTIAL
2 calculating that 0.98 number and the 0.21 --
3 Q. The calculation, sir, in Exhibit
4 396-B, is it fair to say that that calculation was
5 a constituent part of the compilation of the
6 numbers reflected on pages 2 and 3 of Exhibit 377?
7 A. Because they are not time stamped -- I
8 mean, the one that you are showing me, see the
9 e-mail that you are showing me from Thierry Lucas
10 to me was on the 30th of September, so quite a lot
11 of time has passed between the 22nd. The balance
12 sheet we were first looking at is the 22nd.
13 I can't remember at what time we
14 started to work out where we were going to
15 split up the assets into different entities,
16 but you can see on page 2 of 377-A, that we had
17 started that process or the firm had started
18 the process of telling us where it wanted to
19 put different assets, but I don't know the time
20 stamps. So I don't know whether -- I actually
21 don't remember -- I absolutely don't remember
22 whether this would precede or follow the
23 estimate -- and whether they were even
24 complete, whether this one on the 30th was even
25 a complete number for the same, 0.98 and 0.21

Page 274

KING - HIGHLY-CONFIDENTIAL

1     KING - HIGHLY-CONFIDENTIAL
2 on this or whether they were just different
3 times or whether they were different -- they
4 are related. There is a relationship between
5 them, but I don't know what it is.
6     Q. And Jack will jump if he doesn't like
7 this, I feel sure. It is my understanding that
8 these are the final acquisition balance sheets
9 provided to Barclays accountants.
10     A. These are at the end of the year?
11 These are the December ones?
12     Q. That is my understanding.
13     A. OK.
14     Q. Based on that understanding, does that
15 help you answer my question whether you or your
16 team was involved in providing these numbers that
17 appear on pages 2 and 3 of Exhibit 377-A,
18 specifically the OCC references?
19     A. Not by this time. If this is the year
20 end, then no.
21     Q. Do you understand who would have been
22 involved in providing those numbers?
23     A. By this stage? Product control, the
24 respective businesses, finance, et cetera. Our
25 involvement was providing the estimate at the time

Page 275

1     KING - HIGHLY-CONFIDENTIAL
2 before we had the opportunity to fully integrate
3 the businesses.
4     Q. The OCC entries on pages 2 and 3 have
5 slightly different language. Do you see that?
6     A. Um-hm.
7     Q. Page 2, line 18, it says, "OCC
8 customer and clearing margin." That's the .98
9 billion figure?
10     A. Yup.
11     Q. Do you see that?
12     A. Yup.
13     Q. Line 16 on page 3 says, "OCC margin
14 against exchange-traded options."
15     A. Yeah.
16     Q. Do you have any understanding of the
17 difference, if any, between those two
18 descriptions? Obviously the numbers are
19 different. The first figure on page 2 is .98
20 billion and the figure on page 3 is 1.31 billion.
21 But in terms of the assets described, do you have
22 an understanding of what they are and how they are
23 different?
24     A. I was working through them. This one
25 has all of the -- they both have the unencumbered

Page 276

1     KING - HIGHLY-CONFIDENTIAL
2 assets, valuation adjustment, total inventory --
3 that's -- I wish my eyes were better.
4     The 0.9 -- this is a -- this can't be
5 the final, by the way, because it says "draft"
6 at the top of that. I don't know what -- there
7 is a footnote 2 on page 2. It says, "These are
8 net amounts. The actual bookings are grossed
9 up to reflect the relevant assets, receivables
10 and payables. See net tab."
11     So I would have to do the sums. But
12 on -- on the following page, there are also
13 references on row 42, for example,
14 exchange-traded options derivative mark to
15 market, derivative liabilities 1.1. So there
16 are numbers, there are OCC margin numbers in
17 the top, loans and advances to customers, and
18 then there are also numbers down in the assets
19 below. So I would have to do all of the math,
20 I would have to work out -- I could -- if I had
21 the spreadsheet, I could do it, but I don't
22 so--
23     Q. That's fine. No need to trouble you
24 further on that one.
25     Handing you what we have previously

Page 277

1     KING - HIGHLY-CONFIDENTIAL
2 marked as Exhibit 51.
3     A. In a minute, can I send an e-mail?
4     Q. If you want to take a couple minutes.
5     (Recess)
6     Q. Mr. King, you have in front of you
7 what has previously been marked as Exhibit 51. It
8 is the transfers and assumption agreement between
9 Barclays, the OCC and the SIPA trustee. Can you
10 tell me if you have seen this document before?
11     A. No.
12     Q. Have you ever had any discussions, of
13 course other than with counsel, about this
14 document?
15     A. I don't think I have even had
16 conversations with counsel on it.
17     Q. If you could turn to page 2, please,
18 and look at in particular 2C. Can you see that it
19 says, "Barclays hereby, one, represents and
20 warrants that it has received such documents and
21 other information as it has deemed appropriate to
22 make its own credit analysis and decision to enter
23 into this agreement."
24     Do you see that?
25     A. Um-hm.

Page 278

KING - HIGHLY-CONFIDENTIAL

1  KING - HIGHLY-CONFIDENTIAL
2      Q.   I take it from your prior answers that
3  you have no knowledge about any documents received
4  or any credit analysis performed by Barclays
5  pursuant to this agreement?
6      MR. STERN: Objection to the form.
7      A.   No.
8      Q.   And you don't have any information
9  about who at Barclays would have been involved in
10 that credit analysis?
11     A.   No.
12     Q.   Do you have any information about who
13 at Barclays was involved in the business decision
14 to enter this agreement?
15     A.   No.
16     Q.   OK, that is all I have for that
17 document.
18         (Exhibit 397-B, document Bates stamped
19     BCI EX-81185 marked for identification, as
20     of this date.)
21     Q.   Mr. King, I have handed you what has
22 been marked 397-B with Bates stamp BCI EX-81185.
23 Can do you recognize this document, sir?
24     A.   I wrote it, but I don't remember it.
25 But I remember thinking about this issue, but I

Page 279

1  KING - HIGHLY-CONFIDENTIAL
2  don't remember the document specifically.
3      Q.   It is an e-mail from you to Rich Ricci
4  on September 21 on Sunday morning around 10 a.m.,
5  correct?
6      A.   Yes.
7      Q.   Subject matter is TBS/DTC?
8      A.   Or TBA and DTC or subject is -- right,
9  OK.
10     Q.   Can you tell me what "TBA" means in
11 this context?
12     A.   I don't remember what "TBA" stands
13 for. It means the government agency loan pools,
14 government agency mortgage loan pools.
15     Q.   And DTC in this context?
16     A.   Is the DTC.
17     Q.   That's the Depository Trust and
18 Clearing Corporation?
19     A.   Yes.
20     Q.   You say to Mr. Ricci on Sunday, "Have
21 asked Jon Mahon and Sean McKenna (works with me)
22 to work through issues on TBA and DTC."
23     A.   Yes.
24     Q.   Can you explain to me what you meant
25 when you wrote that to Mr. Ricci?

Page 280

1  KING - HIGHLY-CONFIDENTIAL
2      A.   Yes, I think that we actually
3  subsequently weren't particularly involved in
4  this. Again, this was something that was new to
5  us as a concept at that time. These TBAs are
6  forward contracts on loan pools, as I described
7  them, and they clear through the DTC, and the firm
8  started to realize because Lehman was gone,
9  there were going to be a tremendous number of
10 failed TBA settlements in the market and that was
11 going to be extremely disruptive.
12         No memory why I was particularly
13 sending this one to Ricci or whether there was
14 stuff preceding this or following this that was
15 the reason why I sent it to him, but there was
16 a concern about that.
17     Q.   Did Mr. Mahon and Mr. McKenna, in
18 fact, help you work through the issues involving
19 TBA and TDC?
20     A.   Actually, we ended up not being
21 particularly involved in it. The -- I can't
22 remember how we -- how the firm ended up resolving
23 the issue, wasn't really a firm issue, it was a
24 market issue, but we were trying to keep things
25 functioning, keep markets as well as ourselves

Page 281

1  KING - HIGHLY-CONFIDENTIAL
2  operating as normally as possible and this was
3  related to that.
4      Q.   Can you explain what you mean by you
5  were trying to keep markets -- withdrawn.
6         You said we were trying to keep things
7  functioning and keep markets as well as
8  ourselves operating as normally as possible.
9  What do you mean by that?
10     A.   This is a -- rather that we had not
11 historically been involved in, these TBA contracts
12 settled through the DTC and if -- I can't remember
13 exactly how it worked, but if we -- we needed
14 to -- the firm needed to help as much as possible
15 with allowing or the desire was to help as much as
16 possible to allow trades that would otherwise fail
17 settle. Because failed trades -- I mean, it is a
18 very difficult -- has so many knock-on
19 consequences and this was starting to realize
20 there was a potential issue with failed trades on
21 the Sunday, but I can't remember, you know, pretty
22 much immediately following this, the issue sort of
23 went away.
24     Q.   How did you come to learn that the
25 issue went away, Mr. King?

Page 282

KING - HIGHLY-CONFIDENTIAL

1    A.  It just -- because it went away in the
2    market, the trades -- I cannot remember for the
3    life of me now how they were cleared, but the
4    trades were largely successfully cleared and some
5    failed.
6    Q.  You go on to say, "Can't guarantee
7    failed trades on DTC.  No way to size."
8    A.  No way to size.
9    Q.  Can you explain to me what that means?
10    A.  I was alluding to the fact that there
11    was no way to size the cost associated with trying
12    to insure that all trades would clear through the
13    DTC in relation to these TBA pools.
14    Q.  Did you have any understanding over
15    the weekend of September 20 and 21, sir, that DTC
16    was concerned about its liability in clearing
17    Lehman trades?
18    A.  No, no.  I only about know about it --
19    I remember the trader, Tom Hamilton, for the flow
20    business asked me what are we going to do about
21    all these TBA trades that should be settling on
22    so-and-so date and we started thinking about it
23    and I can't remember how we concluded it, but it
24    was a -- it is a specific issue relating to TBA

Page 283

KING - HIGHLY-CONFIDENTIAL

1    pools and it went on for about four days.  I asked
2    Sean to help Tom with it.  I largely delegated it.
3    They worked out a way to fix it and it was fixed.
4    Q.  Did you ever hear, Mr. King, that DTC
5    asked Barclays to guarantee the Lehman trades at
6    DTC?
7    A.  No, in relation to this TBA, no.
8    Q.  Otherwise?
9    A.  No.
10    MR. OXFORD:  I don't think I have any
11    further questions for you at this time,
12    Mr. King.
13    With reference to what I believe are
14    inappropriate instructions from counsel, I
15    reserve my rights to resume questioning at
16    another time.
17    MR. STERN:  Why don't we get started.
18
19    EXAMINATION BY
20    MR. DAKIS:
21    Q.  We met earlier.  I am Robert Dakis
22    from Quinn, Emanuel, Urquhart, Oliver & Hedges.
23    We represent the committee of unsecured creditors.
24    I have a couple of quick follow-up questions on

Page 284

KING - HIGHLY-CONFIDENTIAL

1    some things we discussed earlier.
2    Throughout your testimony this
3    afternoon and this morning, you mentioned a
4    settlement with JP Morgan Chase and Barclays.
5    Could you let us know what settlement you are
6    referring to?
7    MR. STERN:  You don't know that?  You
8    don't know that?
9    Q.  Let me clarify.  We don't need all the
10    details.  This is a settlement of a dispute in
11    regards to cash or securities that were supposed
12    to be transferred to Barclays as part of a sale
13    transaction that weren't transferred, correct?
14    MR. STERN:  Wait a second.  You know
15    what we are talking about, the December
16    settlement?
17    MR. DAKIS:  That's fine.  You can
18    define it any way you want to.  I want to
19    make sure that the record is clear so my
20    follow-up questions are clear on the record.
21    MR. STERN:  OK, go ahead.
22    Q.  Can you read back that question.
23    (Record read)
24    MR. STERN:  Objection to the form.

Page 285

KING - HIGHLY-CONFIDENTIAL

1    Q.  You can answer the question.
2    A.  I -- colloquially, I refer to the
3    securities and cash that were ultimately delivered
4    to Barclays instead of the 7 billion dollars that
5    we thought we were supposed to have received.
6    Q.  That's fair enough.  Did you have any
7    discussions with JP Morgan Chase about the cash
8    that was supposed to have been delivered but
9    wasn't?
10    A.  No.
11    Q.  Do you have any discussions with JP
12    Morgan Chase over the weekend of September 20, I
13    believe?
14    A.  No.
15    MR. DAKIS:  No further questions.
16    MR. LAYDEN:  I have two.
17    EXAMINATION BY
18    MR. LAYDEN:
19    Q.  Mr. King, I just wanted to -- again,
20    David Layden on behalf of the examiner.
21    This morning, in response to some
22    questions from Mr. Hine, I believe that you
23    testified that the securities that Barclays
24    received from Lehman, some of those securities

Page 286

KING - HIGHLY-CONFIDENTIAL
1  I believe you said were sold to one or more
2  trading desks at Barclays?  Do I correctly
3  recall that generally?
4      A.    Yes.
5      Q.    I just wanted to orient you as to
6  where I am going.  How were the prices determined
7  at which the securities were sold from the PMTG to
8  the trading desk?
9      A.    There was very little of that done
10  because that's not straightforward.  The way we
11  did it -- the way we -- and that was one of the
12  reasons for saying let's not do it.  You know, in
13  general.  We did it with the more liquid products
14  that had more observable prices.  There were only
15  two -- there was a portfolio of Treasuries which
16  were sold to the rates trading desk.  I seem to
17  remember that was about 4 billion or something
18  like that.  I can't remember exactly the number.
19      And the CMOs, the agency-backed
20  mortgage -- agency mortgage-backed securities,
21  I did it in two different ways.  The -- I saw
22  published -- I saw the day before price-tested
23  prices for the levels at which the Treasuries
24  were sold to the Treasuries desk.  And -- so I

Page 287

KING - HIGHLY-CONFIDENTIAL
1  saw those numbers.
2      On the agency mortgage-backed pools,
3  David Martin, who was referenced in one of the
4  earlier e-mail chains and Shujaat Islam,
5  I-S-L-A-M, he works for me, I had him sort of
6  say would we as a proprietary trading desk, do
7  we think their prices are reasonable that the
8  flow desk is going to pay.  He said yes, so I
9  hit the flow trading desk -- it actually took
10  quite a few iterations to get them to a level
11  that we were comfortable to sell them to them.
12      Q.    Why were those, the movement of the
13  securities from PMTG to the trading desk,
14  booked -- or why was it structured as a sale as
15  opposed to some other internal transfer within
16  Barclays?
17      A.    It really was -- actually, it was
18  structured as an internal structure.  We agreed to
19  price and we rewired the books to them at a net
20  P&L.  There was an internal accounting P&L event
21  and the books were moved to them.
22      MR. LAYDEN:  Nothing further.  Thank
23  you.
24      MR. HINE:  Do you have anything?

Page 288

KING - HIGHLY-CONFIDENTIAL
1      MR. STERN:  No.
2      MR. HINE:  I guess we are done.
3      (Time noted:  5:52 p.m.)
4
5
6
7
                _____
                STEPHEN KING
8
9  Subscribed and sworn to
10  before me this    day
11  of September, 2009.
12
13  _____
14
15
16
17
18
19
20
21
22
23
24

Page 289

KING - HIGHLY-CONFIDENTIAL
1                  INDEX:
2
3  WITNESS        EXAM BY:          PAGE:
4  S. King        Mr. Hine          6
5                 Mr. Oxford        204
6                 Mr. Dakis         283
7                 Mr. Layden        285
8
9                  EXHIBITS
10  Exhibit No.              Marked
11  Exhibit 388-B Document Bates stamped      34
12      BCI-EX-S 74256 through 257
13  Exhibit 389-B Document Bates stamped      105
14      BCI-EX-S 75200 through 201
15  Exhibit 390-B Document Bates stamped      141
16      BCI-EX-S 52667 through 68 with
17      attachment
18  Exhibit 391-B Document Bates stamped      181
19      BCI-EX-S 136198
20  Exhibit 392-B E-mail dated Wednesday,     225
21      September 17, 2008 at 19:14:24
22  Exhibit 393-B E-mail dated Friday, 19     235
23      September 2008 at 00:57:45
24  Exhibit 394-B E-mail dated 9/19/2008 at   239
25      9:41 p.m. with attachment

Page 290

KING - HIGHLY-CONFIDENTIAL
EXHIBITS

| Exhibit No. | Marked |
|---|---|
| Exhibit 395-B Document Bates stamped | 255 |
| BCI-EX-S 57416 through 417 | |
| Exhibit 396-B Document Bates stamped | 260 |
| BCI-EX-S S8711 through 114 | |
| Exhibit 397-B Document Bates stamped BCI | 278 |
| EX-81185 | |

Page 291

KING - HIGHLY-CONFIDENTIAL

CERTIFICATE
STATE OF NEW YORK )
                )ss:
COUNTY OF NEW YORK)
     I, MARY F. BOWMAN, a Registered
Professional Reporter, Certified Realtime
Reporter, and Notary Public within and for
the State of New York, do hereby certify:
     That STEPHEN KING, the witness whose
deposition is hereinbefore set forth, was
duly sworn by me and that such deposition is
a true record of the testimony given by such
witness.
     I further certify that I am not
related to any of the parties to this action
by blood or marriage and that I am in no way
interested in the outcome of this matter.
     In witness whereof, I have hereunto
set my hand this 10th day of September,
2009.

Page 292

KING - HIGHLY-CONFIDENTIAL
* * *ERRATA SHEET* * *
NAME OF CASE:  In Re: Lehman
DATE OF DEPOSITION:  September 10, 2009
NAME OF WITNESS:  STEPHEN KING
Reason codes:
     1. To clarify the record.
     2. To conform to the facts.
     3. To correct transcription errors.

Page ____ Line ____ Reason____
From _____ to _____

Page ____ Line ____ Reason____
From _____ to _____

Page ____ Line ____ Reason____
From _____ to _____

Page ____ Line ____ Reason____
From _____ to _____

Page ____ Line ____ Reason____
From _____ to _____

Page ____ Line ____ Reason____
From _____ to _____

Page ____ Line ____ Reason____
From _____ to _____

STEPHEN KING

# BCI EXHIBIT

# 78

Page 1

1              HIGHLY CONFIDENTIAL – A. KIRK

2           UNITED STATES BANKRUPTCY COURT

3           SOUTHERN DISTRICT OF NEW YORK

4      ----------------------x

5      In Re:

6                              Chapter 11

7      LEHMAN BROTHERS      Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al.,    (Jointly Administered)

9

                    Debtors.

10

       ----------------------x

11

12           * * * HIGHLY CONFIDENTIAL * * *

13           DEPOSITION OF ALEX KIRK

14               New York, New York

15               August 31, 2009

16

17

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 24545

## Page 2

HIGHLY CONFIDENTIAL - A. KIRK

August 31, 2009

9:30 a.m.

HIGHLY CONFIDENTIAL deposition of ALEX KIRK, held at Jones Day, LLP, 222 East 41st Street, LLP, New York, New York, before Kathy S. Klepfer, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Livenote Reporter, and Notary Public of the State of New York.

## Page 3

HIGHLY CONFIDENTIAL - A. KIRK

A P P E A R A N C E S :

JONES DAY, LLP
Attorneys for Lehman Brothers, Inc.
    222 East 41st Street
    New York, New York 10017-6702
BY: ROBERT W. GAFFEY, ESQ.
    BRIDGET CRAWFORD, ESQ.
    GEORGE E. SPENCER, ESQ.

BOIES, SCHILLER & FLEXNER, LLP
Attorneys for Barclays Capital
    5301 Wisconsin Avenue, NW - Suite 800
    Washington, DC 20015
BY: HAMISH HUME, ESQ.

CAHILL, GORDON & REINDEL, LLP
Attorneys for the Witness
    80 Pine Street
    New York, New York 10005
BY: DAVID N. KELLEY, ESQ.
    JOHN O. ENRIGHT, ESQ.

## Page 4

HIGHLY CONFIDENTIAL - A. KIRK

A P P E A R A N C E S : (Cont'd.)

QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
Attorneys for the Creditors Committee
    51 Madison Avenue
    22nd Floor
    New York, New York 10010
BY: JAMES C. TECCE, ESQ.

JENNER & BLOCK, LLC
Attorneys for the Examiner
    330 N. Wabash Avenue
    Chicago, Illinois 60611-7603
BY: DAVID C. LAYDEN, ESQ.

HUGHES, HUBBARD & REED, LLP
Attorneys for the SIPA Trustee
    One Battery Park Plaza
    New York, New York 10004-1482
BY: SETH D. ROTHMAN, ESQ.
    SAMUEL C. McCOUBREY, ESQ.

Also Present:
    PHILIP E. KRUSE, Alvarez & Marsal

## Page 5

HIGHLY CONFIDENTIAL - A. KIRK

ALEX KIRK, called as a
    witness, having been duly sworn by a Notary
    Public, was examined and testified as
    follows:
EXAMINATION BY
MR. GAFFEY:
    Q.    Mr. Kirk, good morning. My name is
Bob Gaffey. We met briefly before. I'm with
Jones Day. We are special counsel to the estate
of Lehman Brothers Holdings, Inc., and as I
guess you may know, we are spending some time
looking into the facts surrounding the
transaction in September of 2008 --
    A.    Uh-huh.
    Q.    -- through which Barclays purchased
some assets from Lehman.
    Just a few ground rules. If at any
time you need a break, just say so. If there's
a question pending, I would prefer to get an
answer to it and then we can take break, but
just speak right up if you want to take five or
ten minutes.
    I'm kind of a fast talker, so if I'm
going too fast, tell me and I'll try and slow

Page 6

HIGHLY CONFIDENTIAL - A. KIRK

1  myself down. And I'm going to ask you please to
2  wait until there's a full question asked before
3  you answer so that we can, as best we can, get a
4  clear record.
5     A.  Uh-huh.
6     Q.  Okay?
7        Did you have discussions with anyone
8  other than your counsel, Mr. Kelley, to prepare
9  for your deposition today?
10    A.  Yes.
11    Q.  With whom?
12    A.  I don't remember.
13    Q.  Mr. Kelley or anybody from his firm?
14  Anybody outside of his firm?
15    A.  Outside his firm we met with the
16  Barclays lawyers.
17    Q.  Okay.
18    A.  I don't remember their names.
19    Q.  And by whom are you employed, sir?
20    A.  Currently I'm not employed.
21    Q.  Was there a time when you were
22  employed at Lehman Brothers?
23    A.  Yes.
24    Q.  Can you give me, sir, just a brief

Page 7

HIGHLY CONFIDENTIAL - A. KIRK

1  description of the positions you held?
2        How long were you at Lehman?
3     A.  I was at Lehman two separate stints.
4  I was at Lehman from December of 1994 until
5  January of 2008.
6     Q.  Uh-huh.
7     A.  And I returned to Lehman in July of
8  2008. When I went to Lehman Brothers from
9  basically July of -- or, December of 1994 till
10  December 2001, I ran the distressed debt
11  business for Lehman Brothers. From 2002 until
12  2006, I ran the high-yield and leveraged loan
13  business for Lehman Brothers. From 2006 until
14  October of 2007, I ran the global credit
15  businesses. From October 2007 until January of
16  '08, I was co-chief operating officer of fixed
17  income, and from -- and then I left the firm.
18  When I returned, I was global head of principal
19  businesses for that brief period of time.
20    Q.  And why did you leave the firm in
21  January of '08?
22    A.  The global head of fixed income, Roger
23  Nagioff, had resigned; my partner, Andy Morton,
24  was promoted to head of fixed income; and I

Page 8

HIGHLY CONFIDENTIAL - A. KIRK

1  reached a mutual agreement to leave the firm
2  with senior -- with the president of Lehman
3  Brothers.
4     Q.  And where did you work in between
5  January of '08 and July of '08 when you returned
6  to Lehman?
7     A.  Didn't work.
8     Q.  And what occasioned your return to
9  Lehman in July of '08?
10    A.  They had promoted Bart McDade to be
11  president of the firm, and he requested that I
12  return to the firm within a few days of his
13  elevation.
14    Q.  And I take it you worked at Lehman --
15  well, for how long after July of '08 did you
16  work at Lehman Brothers?
17    A.  Until the end. Until most of the
18  employees were transferred to Barclays, U.S.
19  employees.
20    Q.  And at the end, did you transfer over
21  to Barclays yourself?
22    A.  Yes.
23    Q.  And when did you start work at
24  Barclays?

Page 9

HIGHLY CONFIDENTIAL - A. KIRK

1     A.  I don't remember the transfer date, to
2  be honest with you. I worked there till the
3  first week of November.
4     Q.  First week of November '08?
5     A.  Yes.
6     Q.  What positions did you hold at
7  Barclays?
8     A.  I didn't have a position at Barclays.
9     Q.  Was there -- I know it was sort of
10  tumultuous times. Was there any break in
11  between leaving Lehman and going to Barclays, or
12  did you just sort of start working at Barclays
13  at the end of the Lehman --
14    A.  Whenever the actual HR records
15  transferred.
16    Q.  Okay. Did you have a written
17  employment agreement with Barclays?
18    A.  No.
19    Q.  Was any written employment agreement
20  ever offered to you by Barclays?
21    A.  No.
22    Q.  Would you describe to me your
23  compensation package at Lehman -- withdrawn.
24        What was your compensation arrangement

Page 10

HIGHLY CONFIDENTIAL - A. KIRK

1  for Lehman when you returned in July of '08?
2      A.   I would, when I returned, I would
3  receive salary.
4      Q.   And what was the salary?
5      A.   It was supposed to be ▮▮▮▮ but
6  through an administrative mistake, I got paid
7  ▮▮▮▮
8      Q.   And what was your salary at Barclays?
9      A.   The same.
10      Q.   Did you have any arrangements or
11  agreements for a bonus at Lehman?
12      A.   No.
13      Q.   Did you have any arrangements or
14  agreements for a bonus at Barclays?
15      A.   Yes.
16      Q.   What were those?
17      A.   Let me clarify.
18      Q.   Sure.
19      A.   About two weeks after I arrived at
20  Lehman, I was granted, without a request --
21  maybe two or three weeks, I don't remember the
22  exact time -- equity under a program they had
23  started that spring.  They were granting equity
24  to a lot of the senior executives, and I was

Page 11

HIGHLY CONFIDENTIAL - A. KIRK

1  granted I think it was ▮▮▮▮ shares of Lehman
2  equity.
3      Q.   And what were your bonus arrangements
4  or agreements with Barclays?
5      A.   About the end of October, I reached
6  out to Bart McDade suggesting that perhaps
7  Barclays could pay me a bonus before I left.
8  About a week later, they informed me that they
9  would pay me ▮▮▮▮ in two separate
10  installments.
11      Q.   And were those installments to be paid
12  on the first and second anniversary of your
13  Barclays tenure; was that the arrangement?
14      A.   No, it was November 15th and
15  February -- sometime in February.
16      Q.   Did you receive either of those
17  payments?
18      A.   Yes.
19      Q.   The first one, I take it?
20      A.   Both.
21      Q.   Both, okay.
22         Why did you leave Barclays?
23      A.   I had -- because I wanted to leave the
24  sell side of the business, broadly, and move to

Page 12

HIGHLY CONFIDENTIAL - A. KIRK

1  the buy side of the business.
2      Q.   Could you explain to me what you mean
3  by that?
4      A.   Meaning I wanted to go work as a
5  principal in a hedge fund or a money management
6  firm.
7      Q.   Did you do that?
8      A.   I'm in the process of setting up a
9  firm right now.
10      Q.   Before you went to work at Barclays,
11  before the end of Lehman, had you had any
12  discussions with anyone at Barclays about the
13  prospects of working there after the Lehman sale
14  was concluded?
15      A.   I was approached by Bob Diamond to see
16  if I was interested in a job, broadly, as
17  opposed to a specific job.  I told him I wasn't.
18      Q.   Pardon me?
19      A.   I was not.
20      Q.   And when were you approached by Bob
21  Diamond?
22      A.   At some point within the first week or
23  two that they were -- I would say probably that
24  week that they were negotiating to buy the firm.

Page 13

HIGHLY CONFIDENTIAL - A. KIRK

1  If not that week, the week after.
2      Q.   Okay.  We're going to spend a lot of
3  time today talking about the negotiations on
4  that point, so let me take this point to frame
5  out some dates.
6         I put before you a blank calendar
7  which may help you with days of the week that
8  we'll talk about, but when you talk about the
9  week in which there were negotiations, could you
10  tell me what week or weeks you're talking about?
11      A.   The week of September -- Monday,
12  September 15th through Friday, you know, through
13  Sunday, September 21st.
14      Q.   And at what point during that week did
15  Mr. Diamond talk to you about coming to work for
16  Barclays?
17      A.   I don't remember if it was that week
18  or the following week.
19      Q.   Again, just to give us a time point,
20  the transaction we're talking about closed on
21  September 22.  Do you recall if it was before or
22  after the closing?
23      A.   I don't recall.
24      Q.   Was it just you and Mr. Diamond in the

4  (Pages 10 to 13)

Page 14

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    conversation?
3        A.   Yes.
4        Q.   And apart from this conversation with
5    Mr. Diamond, had you had discussions with anyone
6    about going to work for Barclays?
7        A.   No.
8        Q.   And when you had the discussion with
9    Mr. Diamond, did he talk to you about a
10   compensation package?
11       A.   No.
12       Q.   When did you first talk to anyone at
13   Barclays about a compensation package?
14       A.   First conversation I had with anybody
15   at Barclays was the meeting I sat down with Rich
16   Ricci where he told me what the
17   severance/compensation packet bonus would be,
18   which was in late October.
19       Q.   Had you had any conversations with any
20   of your fellow Lehman employees about the topic
21   of compensation at Barclays?
22       A.   Bart McDade.
23       Q.   Can you describe that conversation
24   with Mr. McDade?
25       A.   Yes. Several of my colleagues were --

Page 15

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    who had signed employment agreements were
3    resigning from the firm and receiving large
4    payouts upon their leaving the firm, and I
5    suggested to Bart that it would be fair if I was
6    treated in a similar way, despite not having a
7    written contract.
8        Q.   And what did Mr. McDade say to you?
9        A.   He said he agreed and he would talk to
10   Barclays about that.  He was on point for those
11   sorts of issues with Barclays.
12       Q.   Do you know if he did talk to anyone
13   at Barclays about you in that regard?
14       A.   I assume he did.
15       Q.   And why do you assume that?
16       A.   Because they approached me with a
17   deal --
18       Q.   Was the conversation --
19       A.   -- a couple weeks later.
20       Q.   I beg your pardon.
21           Was the conversation with Mr. McDade
22   during the week of the negotiations between the
23   15th and the 22nd?
24       A.   No, it was sometime in late October.
25       Q.   Did you have conversations with anyone

Page 16

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    at Lehman during that week, the 15th through the
3    22nd?
4        A.   No.
5        Q.   Let me just put a full question so
6    that we have a clear record, okay?
7        A.   Yeah.
8        Q.   Did you have conversations with anyone
9    during the week of the 15th to the 22nd about
10   compensation that would be paid to you at
11   Barclays after the 22nd?
12       A.   No.
13       Q.   I think you referred a moment ago to
14   people receiving payouts when you left the firm.
15   What firm were you referring to?
16       A.   Barclays.
17       Q.   And who were those people you were
18   referring to?
19       A.   Mike Gelband was one.  I believe
20   Kaushik Amin was another.
21       Q.   Anyone else?
22       A.   Not that I recall directly.
23           I'm sorry.  Yeung Lee was another.
24       Q.   Anyone else?
25       A.   That's all I can recall.  There were

Page 17

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    many people leaving Barclays at that time.
3        Q.   Just as a general matter, when you say
4    there were many people leaving Barclays, are you
5    referring to former Lehman employees --
6        A.   Yes.
7        Q.   -- who transferred?
8        A.   Yes.
9        Q.   And then left Barclays?
10       A.   Yes.
11       Q.   And if you know, sir, why were these
12   people who were leaving Barclays, Gelband, for
13   example, receiving payouts from Barclays on
14   their departure?
15           MR. HUME:  Objection.  Calls for
16   speculation.
17       A.   I don't know.
18       Q.   Why did you get payments in the
19   amounts that you did from Barclays having worked
20   there for such a short period of time?
21           MR. KELLEY:  I'll make the same
22   objection.
23       Q.   You can answer, I think.
24       A.   I don't know.
25       Q.   Did you talk to anybody about that?

Page 18

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.   No.
3    Q.   Were you surprised to receive payments
4    in that amount from Barclays, having worked
5    there for such a short period of time?
6    A.   No.
7    Q.   I may have been a bit confused about
8    the time periods, but when you said you were to
9    be paid ▮▮▮▮▮▮ by -- actually, just remind
10   me, when did you leave Barclays?
11   A.   November, first week.
12   Q.   When we talked about the bonus to be
13   paid to you, the ▮▮▮▮▮▮ in total, I think
14   you had told me it would be paid in November and
15   then in February?
16   A.   Yes. Uh-huh.
17   Q.   You left before the February payment
18   would have come due, correct?
19   A.   Yes.
20   Q.   Do you know why they paid you the
21   second piece?
22   A.   It was agreed that they would pay me.
23   Q.   When was it agreed?  At the time you
24   left or at some time before that?
25   A.   When I was leaving, as long as I

Page 19

HIGHLY CONFIDENTIAL - A. KIRK

1
2    didn't compete with them or solicit their
3    employees for six months, I was paid -- I would
4    be paid those amounts of money.
5    Q.   Was the non-compete/non-solicitation
6    in a written agreement?
7    A.   Yes.
8    Q.   Did you have a written agreement
9    concerning your departure from Barclays?
10   A.   Yes.
11   Q.   That went beyond the non-compete
12   and -- withdraw.  That's a terrible question.
13   When did you sign the written
14   agreement with Barclays?
15   A.   Sometime in November.
16   Q.   Do you have a copy of that agreement?
17   A.   I do.
18   Q.   Did you bring it with you?
19   A.   No.
20   Unless you brought it.
21   MR. ENRIGHT:  No.
22   MR. GAFFEY:  Just for the record, I
23   should say I think it's probably called for
24   by the subpoena.  We don't have to have a
25   colloquy about it now.  I just want to make

Page 20

HIGHLY CONFIDENTIAL - A. KIRK

1
2    my record.
3    I think it was called for by the
4    subpoena.  I also think it would be called
5    for by our document request to Barclays.
6    MR. HUME:  I think it's from November,
7    a different kind of agreement.  That's the
8    only reason.  We'll look for it.
9    MR. GAFFEY:  If you could, and if --
10   Can we go off the record for a minute?
11   (Discussion off the record.)
12   BY MR. GAFFEY:
13   Q.   Now, when you met, Mr. Kirk, with
14   Mr. Hume or people from his firm, did you talk
15   about events during a time period other than the
16   time you were employed by Barclays?
17   MR. KELLEY:  Objection.  Privileged.
18   MR. GAFFEY:  I think I can inquire to
19   find out -- a yes or no will tell me whether
20   or not I can press on the privilege point.
21   Q.   If you just answer yes or no.
22   MR. KELLEY:  No, I'll make the same
23   objection.
24   Q.   When did you meet with the lawyers for
25   Barclays?

Page 21

HIGHLY CONFIDENTIAL - A. KIRK

1
2    A.   Last Thursday.
3    Q.   Who was present?
4    A.   Mr. Hume and -- who was the other?
5    MR. KELLEY:  If you know.
6    A.   I don't remember that guy's name.
7    Q.   And I take it Mr. Kelley or people
8    from his firm were there as well?
9    A.   Yes.
10   Q.   Anyone else other than lawyers from
11   Mr. Kelley's firm or Mr. Hume's firm?
12   A.   No.
13   Q.   Did you review any documents?  Just
14   answer that yes or no, please.
15   A.   Yes.
16   Q.   Did any of those documents have the
17   effect of refreshing your recollection about the
18   events concerning the sale of assets from Lehman
19   to Barclays?
20   A.   Some.
21   Q.   Which ones?
22   A.   I don't remember specifically.
23   Q.   Are there any that you remember
24   specifically that refreshed your recollection
25   about matters?

Page 22

HIGHLY CONFIDENTIAL - A. KIRK
1
2  A.  Not in particular.
3  Q.  In general?
4  A.  Not in -- generally, yes.
5  Q.  Did those documents cover a time
6  period prior to -- on or prior to September 22?
7     MR. KELLEY:  I object to that.
8     MR. GAFFEY:  I'm not sure of the
9  nature of the objection, David.
10  Q.  Can you answer it?
11     MR. KELLEY:  Privileged.
12     MR. HUME:  We would assert the same
13  objection.
14     MR. GAFFEY:  Do you contend you have a
15  privilege with this witness?
16     MR. HUME:  I think the objection -- I
17  assume what you're questioning is to try to
18  attack this privilege.
19     MR. GAFFEY:  I'm not attacking the
20  privilege.  I'm just trying to find out if
21  you have a basis to assert it.
22     Do you contend you have a privilege?
23     MR. HUME:  Yes, I think that your
24  motion suggested that there were fiduciary
25  breach claims that you were considering as

Page 23

HIGHLY CONFIDENTIAL - A. KIRK
1
2  to senior Lehman officers and as part of
3  your investigation of potential claims
4  against Barclays, but the same theory would
5  give rise to claims against the officers and
6  against Barclays.  So, yes, I think we do
7  have a common interest privilege in that we
8  both deny those claims.
9     MR. GAFFEY:  I'll leave that, but I
10  don't want to have a colloquy on the record.
11  I disagree.
12  BY MR. GAFFEY:
13  Q.  Let's talk about that week, the week
14  in September that's brought us here.  Can you
15  tell me, sir, as a general matter, did you play
16  any role in the negotiations of the agreement
17  between Lehman and Barclays that led to the sale
18  of assets to Barclays.
19     (The witness confers with Mr. Kelley.)
20  A.  Is the week you're referring to the
21  15th through the 21st?
22  Q.  Yes.  Well, let me reframe it because
23  you asked that question.  At any point during
24  September of 2008, were you involved in any
25  discussions or negotiations with Barclays?

Page 24

HIGHLY CONFIDENTIAL - A. KIRK
1
2  A.  Yes.
3  Q.  When?
4  A.  I was involved in discussions that
5  went from Friday, the 12th of September, until
6  Sunday, the 14th, of the transaction that
7  ultimately failed, and I was asked to
8  participate in the discussions, facilitate the
9  discussions starting Friday morning, the 19th.
10  Q.  So if I understand your answer
11  correctly, you're not involved in any
12  discussions or negotiations with Barclays in the
13  period from the 15th through the 18th?
14  A.  That is correct.
15  Q.  Okay.  Describe for me, if you would,
16  generally the nature of what you did in
17  connection with the negotiations from the 12th
18  to the 14th, that is, from the Friday to the
19  Sunday?
20  A.  Generally, I helped organize the due
21  diligence of the assets of Lehman Brothers that
22  I was responsible for specifically and helped
23  coordinate with some of the other departments
24  meetings that would take place with Barclays.
25     In addition, I was down at the Federal

Page 25

HIGHLY CONFIDENTIAL - A. KIRK
1
2  Reserve both Saturday and Sunday, so I
3  participated in probably two different
4  discussions with Barclays on Saturday and
5  Sunday.
6  Q.  And what was the -- actually, if you
7  don't mind, just so we have some term we can use
8  and I don't have to keep saying it this way,
9  could you give me, you referred to the assets
10  you were responsible for specifically.  What
11  were those assets called?
12  A.  The global principal business.
13  Q.  What was the nature of the transaction
14  that was being discussed from the Friday and the
15  Saturday and the Sunday, the 12th through the
16  14th?
17  A.  The nature of that transaction was
18  Barclays was going to buy all of Lehman
19  Brothers.
20  Q.  Do you know what the structure of that
21  transaction was?  Was it an asset purchase?
22  Stock purchase?  Did you have any sense of that?
23  A.  It was a -- I'm not an M&A expert, but
24  I believe they were going to assume the debt and
25  other contractual obligations of Lehman

Page 26

1      HIGHLY CONFIDENTIAL - A. KIRK
2    Brothers. They were going to not assume the
3    preferred stock of Lehman Brothers and they were
4    going to pay a nominal, less than a dollar, per
5    share price for part of the equity and they were
6    going to spin off the real estate and private
7    equity positions into a new company which would
8    be capitalized with debt by a consortium of
9    lenders and have as its equity capital the
10   preferred stock of Lehman Brothers and the
11   equity.
12       Q.   And you said that that transaction
13   failed. Why did that transaction fail, do you
14   know?
15       A.   I was told by Bart McDade that the FSA
16   had turned down the application to close that
17   transaction.
18       Q.   When were you told this by Mr. McDade?
19       A.   Sunday around noon.
20       Q.   Now, did you have any role in those
21   negotiations, again I'm on the 12th through the
22   14th, other than as you described, the sense I'm
23   getting is primarily involved with due diligence
24   for the global principal business.
25       A.   Yes, we had -- I spent most of my time

Page 27

1      HIGHLY CONFIDENTIAL - A. KIRK
2    trying to coordinate due diligence with our
3    principals and the rest of the street, meaning
4    Goldman Sachs, Citigroup, First Boston, et
5    cetera, around the value of those assets which
6    they were going to make a loan to the spun-off
7    company.
8        Q.   And were Barclays personnel involved
9    in that process?
10       A.   Not in the due diligence process, no.
11       Q.   Were you in touch with Barclays
12   personnel about this due diligence process?
13       A.   There were some joint meetings that
14   were arranged between Goldman Sachs and
15   Citigroup as point for the street and Barclays
16   and Lehman Brothers together. Barclays
17   personnel were obviously in those meetings.
18       Q.   To your knowledge, at any point in
19   that period from Friday to Sunday were people
20   from Barclays given an opportunity to review
21   Lehman's books for due diligence purposes?
22       A.   Yes, I believe they continued to do
23   due diligence over the weekend.
24       Q.   And did you have any involvement in
25   that project, that process, giving access to

Page 28

1      HIGHLY CONFIDENTIAL - A. KIRK
2    Lehman's books to personnel from Barclays?
3        A.   I don't recall specifically, but
4    probably. We were down at the Federal Reserve
5    in rooms across the hallway.
6        Q.   During the period from Friday, the
7    12th, through Sunday, the 14th, were you dealing
8    with any particular people at Barclays who you
9    could name?
10       A.   Archibald Cox. Bob Diamond. Rich
11   Ricci. Michael Klein, as their agent.
12       Q.   Anyone else?
13       A.   Those are the ones I recall.
14       Q.   And was there a principal -- were
15   there a group of people you would describe as
16   the principal negotiators for Lehman? Again,
17   I'm in the 12th through the 14th.
18       A.   Mark Shafir, who was head of M&A; Bart
19   McDade, who was president; and via telephone,
20   Dick Fuld.
21       Q.   Anyone else you would characterize,
22   that you would describe as Lehman's principal
23   negotiators?
24       A.   I was the advisor. I believe,
25   although I don't know for sure, I don't have any

Page 29

1      HIGHLY CONFIDENTIAL - A. KIRK
2    direct knowledge, but I have secondhand
3    knowledge that Skip McGee was involved.
4        Q.   Anyone else?
5        A.   That's all I know.
6        Q.   What's the basis of your secondhand
7    knowledge that McGee was involved?
8        A.   Mark Shafir would call Skip from the
9    Federal Reserve.
10       Q.   After that transaction failed, did
11   there come a time when you learned that
12   negotiations had begun again between Barclays
13   and Lehman?
14       A.   Late Sunday night sometime between 11
15   and 2 in the morning.
16       Q.   Would you describe that to me? How
17   did you learn it? Where were you when you
18   learned it?
19       A.   I believe I was in Bart McDade's
20   office, and he mentioned that Barclays had --
21   they had had contact with Barclays and Barclays
22   was interested -- "they" meaning Dick himself,
23   Skip and Barclays was interested in pursuing an
24   acquisition of the U.S. businesses of Lehman
25   Brothers.

Page 30

HIGHLY CONFIDENTIAL - A. KIRK

1  HIGHLY CONFIDENTIAL - A. KIRK
2  Q.   Did he tell you anything more than
3  that?  Who called who or anything that was said
4  in the conversation?
5  A.   No, nothing more than that.
6  Q.   Who else was present when you learned
7  this from Mr. McDade on Sunday night?
8  A.   I don't recall specifically, but
9  probably Mike Gelband.
10  Q.   I should tell you, and I should have
11  said this upfront, I don't want you, please, to
12  speculate during the day.
13  A.   Okay.
14  Q.   Once or twice you've answered by
15  saying "probably," and it's common usage, but if
16  you can give me your memory of things, as you
17  have been, tell me when you'd have to speculate,
18  okay --
19  A.   Okay.
20  Q.   -- so the record will be clear.
21  So do you know if Mr. Gelband was in
22  that conversation?
23  A.   I don't recall.
24  Q.   Now, do you know if that conversation
25  took place before or after Lehman filed for

Page 31

1  HIGHLY CONFIDENTIAL - A. KIRK
2  bankruptcy protection?
3  A.   I don't remember exactly when the firm
4  filed, but that's a matter of record, so ...
5  Q.   Well, do you know, do you remember
6  when you learned, first learned the firm was
7  going to file?  Withdrawn.
8  Did you know before the firm filed
9  that it was going to do so?
10  A.   Yes.
11  Q.   When did you learn, first learn that
12  the firm was going to file?
13  A.   After the board meeting on Sunday
14  night, approximately 8 o'clock.
15  Q.   Did you attend that board meeting?
16  A.   No.
17  Q.   From whom did you learn the substance
18  of the board meeting?
19  A.   I don't recall.
20  Q.   And the conversation with Mr. McDade
21  about renewed negotiations with Barclays, did it
22  take place after the board meeting?
23  A.   Yes.
24  Q.   Did Mr. McDade ask you to do anything
25  in connection with these renewed negotiations?

Page 32

1  HIGHLY CONFIDENTIAL - A. KIRK
2  A.   No.
3  Q.   Did anyone ask you to do anything in
4  connection with these new renewed negotiations?
5  A.   No.
6  Q.   Did there come a time when you learned
7  the negotiations --
8  A.   I'm sorry.
9  Q.   Beg your pardon.  Go ahead.
10  A.   No, not that evening.
11  Q.   Not that evening, okay.
12  Did come a time where you were asked
13  to perform some tasks or do something in
14  connection with the negotiations?
15  A.   Yes.
16  Q.   And when did that happen?
17  A.   Late Thursday night, the 18th of
18  September.
19  Q.   I'm coming there.
20  Did there come a time when you learned
21  there was an agreement reached between Lehman
22  and Barclays concerning the sale of Lehman
23  assets to Barclays?
24  A.   Yes.
25  Q.   When did you learn that?

Page 33

1  HIGHLY CONFIDENTIAL - A. KIRK
2  A.   Sometime Tuesday.
3  Q.   From whom did you learn that?
4  A.   I don't recall.
5  Q.   Did you learn whether that agreement
6  was reduced to a writing?
7  A.   No.
8  Q.   Have you ever seen any -- the written
9  agreement, have you ever seen a written
10  agreement between Lehman and Barclays concerning
11  the asset sale?
12  A.   No.
13  Q.   So you learn on maybe the Tuesday that
14  there's a deal between Lehman and Barclays, and
15  then -- and on late Thursday night you're asked
16  to participate in some way.
17  How are you spending your time between
18  the Tuesday and Thursday?
19  A.   I'm spending, between really Sunday
20  night and Thursday, I was spending all my time
21  attempting to help coordinate the risk reduction
22  and risk management of the firm so it could
23  survive for a few days to get to closure.
24  Q.   Now, did those -- now I'm in the
25  period from, that you just described, from the

Page 34

HIGHLY CONFIDENTIAL - A. KIRK
1  Sunday up until Thursday.
2  A.  Uh-huh.
3  Q.  Are you working with any people from
4  Barclays in connection with those activities?
5  A.  I don't recall specifically working
6  with Barclays employees.  Just Lehman employees.
7  Q.  Were you in communications with
8  Barclays employees?
9  A.  Not directly.  I would have
10  communicated to our finance staff and they would
11  have communicated to Barclays.
12  Q.  And who on the finance staff?
13  A.  Ian Lowitt, Paolo Tonucci.
14  Q.  Did you also deal with Martin Kelly?
15  A.  Maybe once, twice.
16  Q.  When you learned about a deal between
17  Lehman and Barclays having been concluded, what
18  was your understanding of the nature of the
19  deal?
20  A.  That I was -- that it was going to be
21  an asset purchase deal and that they were going
22  to purchase some amount of assets and assume the
23  employees of Lehman, some of the limited
24  obligations of Lehman Brothers.

Page 35

HIGHLY CONFIDENTIAL - A. KIRK
1  Q.  Did you have an understanding of the
2  asset components that were going to be
3  purchased?
4  A.  No.
5  Q.  Did you ever learn what asset
6  components were going to be purchased?
7  A.  Are you specifically asking about the
8  deal that was struck on that Tuesday?
9  Q.  Yes.
10  A.  No.
11  No, let me be more specific.
12  Q.  Sure.
13  A.  I got an e-mail that said they were
14  going to purchase the building and a pool of
15  other broadly defined assets.
16  Q.  Who did you get that e-mail from?
17  A.  Ajay Nagpal.
18  Q.  Could you spell that so we have it in
19  the record, please?
20  A.  A-J-A-Y  N-A-G-P-A-L.
21  Q.  What understanding did you have of the
22  constituent parts of the pool of the defined
23  assets apart from the building?
24  A.  None.

Page 36

HIGHLY CONFIDENTIAL - A. KIRK
1  Q.  Did you have an understanding who the
2  principal negotiators for Lehman of that
3  transaction were?
4  A.  I understood it to be Mark Shafir,
5  Skip McGee.
6  Q.  Did Mr. McDade have any role in those
7  negotiations, to your understanding?
8  A.  I believe he did.
9  Q.  But you wouldn't describe him as one
10  of the principal negotiators?
11  A.  He might have been.
12  Q.  Do you have a reason to think he might
13  have been?  Is it that --
14  A.  He was the president of the firm.
15  Q.  But other than his title, do you have
16  a basis for thinking he might have been one of
17  the principal negotiators?
18  A.  No.
19  Q.  Did you talk to Shafir about the
20  negotiations?
21  A.  No.
22  Q.  Did you talk to McGee about the
23  negotiations?
24  A.  No.

Page 37

HIGHLY CONFIDENTIAL - A. KIRK
1  Q.  Did you have an understanding of the
2  nature of the liabilities that Barclays was
3  going to assume under the agreement?
4  A.  Not at the time.
5  Q.  Did there come a time when you did
6  gain an understanding of the liabilities
7  Barclays was going to assume under the
8  agreement?
9  A.  A very cursory understanding on
10  Friday.
11  Q.  That's on Friday, the 19th?
12  A.  Correct.
13  Q.  From whom did you get that
14  understanding?
15  A.  Paolo Tonucci.
16  Q.  What did Mr. Tonucci tell you in that
17  regard?
18  A.  That there were two categories.  One
19  was assumption of certain trade liabilities and
20  the other was the assumption of compensation
21  liabilities, and that they together totaled
22  somewhere over $4 billion.
23  Q.  Did you talk to anyone other than
24  Mr. Tonucci about these assumed liabilities that

Page 38

HIGHLY CONFIDENTIAL - A. KIRK

1   totaled somewhere over $4 billion?
2       A.   During Friday, the amount of those
3   liabilities were referenced several times by
4   Paolo, who was attempting to accurately estimate
5   them, and by Barclays in their description of
6   the deal later in the afternoon.
7       Q.   Let's go back to the earlier part of
8   the week.  I swear I'm getting to Thursday and
9   Friday.
10      A.   That's all right.
11      Q.   Now I'm still sort of in the early
12  part of the week.
13          Were you asked to be involved in any
14  assessment of the value of the pool of
15  securities that was to be sold?
16      A.   No.
17      Q.   Did you ever come to understand that
18  the agreement between Lehman and Barclays
19  included a loss, an overall loss against the
20  amount at which those assets were carried on
21  Lehman's books?
22      A.   No.
23      Q.   Did you ever at any time have an
24  understanding that that agreement involved a

Page 39

HIGHLY CONFIDENTIAL - A. KIRK

1   discount of any kind given to Barclays against
2   the amount shown on Lehman's books of those
3   assets?
4       A.   No.
5       Q.   Apart from your counsel and counsel
6   from Mr. Hume's firm, have you spoken to anybody
7   about that topic?
8       A.   No.
9       Q.   When you learned about the sale of a
10  pool of assets, and again, apart from the real
11  estate on Tuesday, did you have an understanding
12  it was to be sold at book value?
13      A.   I didn't have an understanding one way
14  or the other.
15      Q.   So on the Monday, the Tuesday, the
16  Wednesday and during the day on Thursday, if I
17  understand what we've talked about so far
18  correctly, you're essentially involved in
19  managing risk?
20      A.   Yes.
21      Q.   And the purpose, apart from the
22  inherent reason for doing it —
23      A.   Keep the firm funded.
24      Q.   Did you have an understanding, while

Page 40

HIGHLY CONFIDENTIAL - A. KIRK

1   you were doing that, of how long you needed to
2   do that?  What the timetable was for things?
3       A.   We knew we were -- I believe they were
4   trying to schedule a meeting with the bankruptcy
5   court on Friday evening, Friday afternoon.
6          It was really a day-to-day operation.
7       Q.   And during that day-to-day operation,
8   did any of your activities involve entering into
9   or addressing repurchase agreements, repos?
10      A.   Some of them.
11      Q.   Could you describe that for me?  What
12  was the nature of your activities in connection
13  with repos?
14      A.   The firm had a number, a large number
15  of clients whose assets had been trapped under
16  repurchase agreements in the European
17  subsidiaries, so we spent some time trying to
18  figure out how we were going to help solve those
19  issues.  That was a big piece of it.
20          And then we were also trying to shrink
21  the matched book because it used liquidity at
22  the firm as a way to raise liquidity, so where
23  you would finance client positions with other
24  client's money.

Page 41

HIGHLY CONFIDENTIAL - A. KIRK

1       Q.   Financing of client positions with
2   other client's money; is that what you're
3   talking about when you talk about the matched
4   book?
5       A.   Yes.
6       Q.   And by shrinking the matched book,
7   you're reducing that level of activity of —
8       A.   Yes.
9       Q.   -- using --
10      A.   And you're -- it would -- I was told
11  it would free up liquidity.
12      Q.   And did you have any involvement, sir,
13  in connection with the Repurchase Agreement that
14  Lehman had with the Fed?
15      A.   Only -- my only involvement there was
16  I was at the Fed when they told us Sunday
17  evening that they would lend us money to pay
18  back the tri-party repo lenders the following
19  morning.
20      Q.   And did Lehman enter into a Repurchase
21  Agreement with the Fed for that purpose, do you
22  know?
23      A.   Yes, they did.
24      Q.   Were any of your activities devoted to

Page 42

HIGHLY CONFIDENTIAL - A. KIRK
1  HIGHLY CONFIDENTIAL - A. KIRK
2  the making of that Repurchase Agreement with the
3  Fed?
4     A.  No.
5     Q.  Did there come a time when the Fed
6  made it known it wanted to come out of that
7  Repurchase Agreement, to your knowledge?
8     A.  Yes.
9     Q.  Describe to me how you came to learn
10  that.
11     A.  I don't recall specifically who told
12  me.
13     Q.  As a general matter, tell me what you
14  remember about learning that the Fed wanted to
15  get out of the Repurchase Agreement with Lehman?
16     A.  At some point on Wednesday, the Fed
17  said that they wanted to get paid back, I
18  believe it was Wednesday, and Lehman had to
19  figure out how to arrange alternative financing,
20  and there was only one party that would provide
21  that financing and that was Barclays.
22     Q.  And what did you do in connection with
23  those activities, if anything?
24     A.  I was not a repo expert.  I didn't --
25  I was not -- I'm not a repo expert.  I did not

Page 43

1  HIGHLY CONFIDENTIAL - A. KIRK
2  participate in those.
3     Q.  How did you learn about those
4  activities?  From whom?
5     A.  I don't recall specifically.
6     Q.  Do you have any general recollection?
7     A.  Probably the finance staff.
8     Q.  And that would be Tonucci?
9     A.  Ian Lowitt or Tonucci, one or the
10  other.
11     MR. GAFFEY:  Can we take a five-minute
12  break?
13     THE WITNESS:  Sure.
14     (Recess; Time Noted: 10:21 A.M.)
15     (Time Noted: 10:29 A.M.)
16  BY MR. GAFFEY:
17     Q.  In a question I asked you a little
18  while ago, Mr. Kirk, you clarified by saying,
19  "You mean the agreement made on Tuesday?"  Did
20  there come a point where you learned that the
21  deal had changed?
22     A.  Friday.
23     Q.  Okay.  Here we are.  Tell me about
24  Friday.
25     Actually, let me just back up.  I

Page 44

1  HIGHLY CONFIDENTIAL - A. KIRK
2  think you also told me there was a conversation
3  late on Thursday night that began your Friday
4  activities?
5     A.  Yes.
6     Q.  Okay.  Let's talk about that one
7  first.  Who's the conversation with, where are
8  you, and what's the content of the conversation?
9     A.  I'm at home.  I get a call from Bart
10  McDade.  He informs me that Mark Shafir has left
11  Lehman Brothers and that he needs some help
12  wrapping up the Barclays deal the following day.
13     Q.  Had Shafir left on the Thursday?
14     A.  I believe so.
15     Q.  You described Shafir as one of the
16  principal negotiators.  As of the Thursday, to
17  your knowledge, has he now gone?
18     A.  Yes.
19     Q.  Did McDade have anything to say about
20  that topic?
21     A.  He said he went -- he quit and he went
22  to work at Citigroup.
23     Q.  Other than telling you that Shafir had
24  quit and gone to work at Citigroup, did
25  Mr. McDade have anything to say about

Page 45

1  HIGHLY CONFIDENTIAL - A. KIRK
2  Mr. Shafir's departure --
3     A.  No.
4     Q.  -- on this Thursday?
5     A.  No.
6     Q.  Did Mr. McDade say anything about the
7  departure, Shafir's departure having any impact
8  on the deal?
9     A.  He said that, given his departure, he
10  would need extra help and he asked for my help.
11     Q.  What did he ask you to do?
12     A.  That evening he did not specify what
13  he wanted me to do.
14     Q.  Tell me what Mr. McDade said and what
15  you said in that conversation on Thursday night,
16  as best you remember.
17     A.  He said that Mark Shafir has quit,
18  gone to Citigroup, I need some help wrapping
19  this up tomorrow, can you help me, I said yes.
20     Q.  That's the entire conversation as you
21  remember it?
22     A.  Yes.
23     Q.  Did you ask him what he needed you to
24  do?
25     A.  I think I asked him, Do you want me to

Page 46

HIGHLY CONFIDENTIAL - A. KIRK

1  come in the office tonight?  He said no, he was
2  already home.  I said, What time do you want me
3  to come in the morning?  And he said, you'll get
4  an e-mail about an early morning meeting.
5      Q.    Did you speak to anyone else that
6  Thursday night about the deal after you spoke to
7  Mr. McDade?
8      A.    Not that I recall.
9      Q.    So let's just get through the rest of
10  Thursday night, okay?  After you have the
11  conversation with Mr. McDade, he says he needs
12  your help, there will be an early morning
13  meeting.
14      Did you do anything else with respect
15  to the transaction on the Thursday night?
16      A.    I don't recall specifically or
17  generally.
18      Q.    On the Thursday, sir -- I'll show you
19  a document about this in a second -- do you
20  recall reaching out to others in the firm,
21  including Kaushik Amin and Gerald Donini and
22  Eric Felder, to ask them to put together
23  information to -- that would be necessary to
24  portray a fire sale liquidation of the

Page 47

HIGHLY CONFIDENTIAL - A. KIRK

1  securities?
2      A.    I may have done so by e-mail.
3      Q.    Okay.  I'll show you the e-mail, but
4  first, if you don't mind, what's your
5  independent recollection of that, if you have
6  any?
7      A.    My independent recollection is that I
8  got an e-mail for a scheduled meeting the
9  following day and I got a request, I didn't
10  recall when it was specifically, to help
11  organize a valuation exercise on behalf of Barry
12  Ridings.  I didn't recall whether that was
13  Thursday night or Friday morning.
14      Q.    And who is Barry Ridings?
15      A.    A Lazard restructuring banker hired by
16  the firm to testify in bankruptcy court.
17      Q.    And who made this request of you?
18      A.    I don't recall specifically who asked
19  me to do that.
20      Q.    I'm showing you, Mr. Kirk, what has
21  been marked at a prior deposition as Exhibit 3
22  an e-mail from you to an address
23  4955214@archwireless.net.  Is that your wireless
24  account?

Page 48

HIGHLY CONFIDENTIAL - A. KIRK

1      A.    I believe we've determined that was a
2  wireless account that was used in the late '90s
3  when there were wireless pagers, if you recall
4  those devices.
5      Q.    Okay.  Uh-huh.
6      A.    But had been inoperative but still
7  alive in the system.
8      Q.    Okay.  You're about to solve one of
9  the great mysteries of this case.
10      A.    Yeah, we had --
11      Q.    Did you have that account?  Are you
12  sending it to your home e-mail?
13      A.    I don't -- no, this is auto-forwarded
14  by the computers.
15      Q.    Okay.
16      A.    So like they auto-forward to your
17  BlackBerry, these are things that auto-forward
18  from the --
19      Q.    You would love it right now if I said
20  I have nothing further, but that wasn't the key
21  question, so let me go to the exhibit that I
22  showed you.
23      A.    We had to ask ourselves the same
24  question when we saw this.

Page 49

HIGHLY CONFIDENTIAL - A. KIRK

1      Q.    Okay.  Take a minute to look through
2  what was marked as Exhibit 3, sir.  I have a
3  couple questions for you about it.
4      (Document review.)
5      A.    Okay.
6      Q.    In this, who is Daniel Flores, the man
7  from whom the underlying e-mail is sent?
8      A.    I believe Daniel worked for Mark
9  Shapiro.  It's indicated he worked in the
10  restructuring group that was run by a fellow
11  named Mark Shapiro at Lehman.
12      Q.    And in the e-mail, you see that
13  Mr. Flores recounts, "Alex Kirk suggested we
14  contact each of you to help us understand on a
15  theoretical basis what would happen in a fire
16  sale liquidation of the securities that are
17  being transferred to Barclays as part of the
18  proposed transaction."
19      Did you have a conversation or
20  communication with Mr. Flores about that topic?
21      A.    This indicates I must have.
22      Q.    Apart from seeing it written on this
23  e-mail, do you have any recollection?
24      A.    I don't recall.

Page 50

HIGHLY CONFIDENTIAL - A. KIRK

1       Q.   Does this e-mail refresh your
2   recollection in any way of a communication with
3   Mr. Flores about that topic?
4       A.   Again, I assume that I must have
5   talked to him.
6       Q.   But again, sir, apart from seeing it
7   on the page in front of you, do you have a basis
8   for that assumption?
9       A.   No.
10      Q.   You said that that was -- well, let me
11  continue down into Mr. Flores' e-mail where he
12  talks about, "We will be leaving on your desks a
13  list of the top 100 positions in each of your
14  area's expertise." Did that exercise take
15  place, to your knowledge?
16      A.   Yes, I believe it did.
17      Q.   And what was the result of the
18  exercise? Was there a fire sale liquidation
19  scenario put together?
20      A.   So these positions were delivered to
21  each of the recipients of this e-mail, Kaushik
22  Amin, Charlie Spero, Eric Felder, Gerry Donini,
23  were the various business heads in charge of
24  parts of fixed income or equities, and they

Page 51

HIGHLY CONFIDENTIAL - A. KIRK

1   would have been -- had those delivered early in
2   the morning, and then we were attempting to have
3   an 11 o'clock meeting to go over the findings of
4   their -- their assumptions and analysis about
5   the value of those positions.
6       Q.   And did that meeting take place?
7       A.   Yes, it did.
8       Q.   Were you at it?
9       A.   Yes.
10      Q.   Who was at the meeting?
11      A.   Mike Gelband, Kaushik Amin, Charlie
12  Spero and Gerry Donini, and Daniel Flores was
13  there as well as Gerry Reilly.
14      Q.   Was James Seery there?
15      A.   He might have been. I recall he was
16  there.
17      Q.   You do recall he was there?
18      A.   I recall he was there.
19      Q.   Was a determination made about
20  liquidation value?
21      A.   No. The data had been delivered in --
22  the position data had been delivered in a way
23  that, given the short period of time, a couple
24  hours, the business heads were not able to

Page 52

HIGHLY CONFIDENTIAL - A. KIRK

1   determine in any comprehensive way the values.
2   So we adjourned the meeting with the -- with a
3   plan that Barry Ridings would talk to each of
4   these individuals separately closer to the end
5   of the day when they might have a better sense.
6       Q.   Do you know if Mr. Ridings did that?
7       A.   I don't know that.
8       Q.   Did he speak to you at all?
9       A.   Not about this topic. I saw him later
10  in the day in a meeting.
11      Q.   Let me just back up a little bit. Did
12  Ridings know you were organizing this project?
13      A.   Yes.
14      Q.   Would he have known you're the contact
15  guy on it?
16      A.   Yes. I probably called him and told
17  him call these people directly.
18      Q.   Did you have any conversations that
19  you recall with Mr. Ridings about the need for a
20  liquidation scenario to be analyzed?
21      A.   I assume he clarified the reasoning as
22  a test for the court.
23      Q.   When you say you assume that, what's
24  the basis of that assumption?

Page 53

HIGHLY CONFIDENTIAL - A. KIRK

1       A.   I vaguely recall having a conversation
2   with him.
3       Q.   Let's go to the early morning of
4   Friday, the 19th. You spoke a moment ago about
5   getting a call from Mr. McDade. Shafir's quit.
6   He asked for your help, can you come to meet
7   with him in the morning. Did you do that?
8       A.   Yes.
9       Q.   And where was the meeting?
10      A.   It was a -- I believe it was in my
11  office.
12      Q.   In your office, sir?
13      A.   Yes.
14      Q.   Who was in attendance?
15      A.   Ian Lowitt, Chris O'Meara, Gerry
16  Reilly, Paolo Tonucci. I think that was it.
17      Q.   Was Mr. McDade there?
18      A.   I don't believe, no, I don't believe
19  he was there.
20      Q.   Now, in your conversation with
21  Mr. McDade the night before, he had told you
22  Shafir quit, he told you he needed your help,
23  you offered to come in, he said come in in the
24  morning, if I remember your testimony right, and

Page 54

HIGHLY CONFIDENTIAL - A. KIRK

1  that's not what governs, that's basically the
2  topics you covered with McDade on Thursday
3  night.
4      So here you are in a meeting with
5  Lowitt, O'Meara, Reilly and Tonucci. Do you
6  learn more at the meeting about the nature of
7  the help that you're going to have to give?
8      A.  They broadly outlined the first
9  transaction. That was a quick summary. Then we
10  discussed an issue that had come up earlier that
11  morning around JPMorgan as our clearing bank
12  shutting down Lehman's DTC account and what
13  effect that would have on the transaction as
14  planned.
15     Q.  Now, you referred to -- you said they
16  broadly outlined the first transaction. By the
17  Friday morning, is it your understanding there's
18  a second transaction, a subsequent transaction?
19     A.  By the time we had this meeting --
20     Q.  Uh-huh.
21     A.  -- it was my view, my opinion, that
22  there would have to be a reworking of the
23  transaction because a vast majority of those
24  securities that had been planned for transfer

Page 55

HIGHLY CONFIDENTIAL - A. KIRK

1  were held at JPMorgan. There was a -- and
2  JPMorgan had a dispute of some sort about the
3  transfer of the repo with Barclays, which was
4  described to me by Mike Keegan, and in addition
5  to that, they shut down Lehman's -- they closed
6  down Lehman's DTC account, which led me to
7  believe that JPMorgan would not cooperate and
8  transfer the aforementioned securities to
9  Barclays on that Friday.
10     Q.  When had you spoken to Mike Keegan?
11     A.  I got up and I went to the office
12  about 5 A.M. and I ran into him about 5:30 in
13  the morning.
14     Q.  Had you met Mr. Keegan before?
15     A.  I had met him the week before during
16  the due diligence process.
17     Q.  So you say "they," that's some
18  combination of Lowitt, O'Meara, Reilly and
19  Tonucci, broadly outlined the first transaction
20  to give you a quick summary?
21     A.  Yes.
22     Q.  How did they summarize -- tell me what
23  you remember about their broad outline of the
24  first transaction, the quick summary that they

Page 56

HIGHLY CONFIDENTIAL - A. KIRK

1  gave you.
2      A.  They summarized it as a purchase of
3  the building, purchase of assets, and an
4  assumption of this 4 billion, 4 and a quarter
5  billion dollars in liabilities.
6      That discussion ended very quickly
7  because of my belief that that transaction,
8  given what had just transpired -- what I had
9  learned from Keegan and the action that JPMorgan
10  had taken, that I believe that they would act as
11  a hostile party towards the closing of this
12  transaction and that whatever had taken place
13  before was irrelevant.
14     Q.  Did Mr. Tonucci tell you anything
15  other than there was an assumption of
16  liabilities in an approximate amount of 4 and a
17  quarter billion for compensation of payables?
18     A.  No.
19     Q.  Did you have any knowledge as to how
20  that number came to be determined?
21     A.  No.  I was not concerned with that
22  part of the transaction.
23     Q.  I'm sort of away from the Friday
24  meeting for a moment.

Page 57

HIGHLY CONFIDENTIAL - A. KIRK

1  A.  No.
2      Q.  At any point did you come to an
3  understanding as to how those, those components
4  of assumed liabilities came to be calculated?
5      A.  No. No.
6      Q.  When the transaction, the first
7  transaction was outlined to you by Tonucci,
8  O'Meara, Reilly and Lowitt, or some combination,
9  did you have an understanding as to where the
10  assets would come from to fund those assumed
11  liabilities?
12     A.  I believe there was a schedule,
13  one-page schedule, which I think you have, that
14  broadly gave an asset and liability balance
15  sheet.
16     Q.  Have you ever seen that schedule?
17     A.  Yes.
18     Q.  When did you first see that schedule?
19     A.  I believe it was that morning.  It was
20  that morning.
21     Q.  Apart from the schedule, did you look
22  at any other documents that morning?
23     A.  No.
24     Q.  I'm putting before you what previously

15 (Pages 54 to 57)

Page 58

HIGHLY CONFIDENTIAL - A. KIRK

1   has been marked as Deposition Exhibit 19.
2       A.   Yes, that's the schedule.
3       Q.   And the schedule that you saw that
4   morning was the one with the annotation in the
5   upper right-hand corner "9/16/08, Final SB"?
6       A.   Uh-huh.
7       Q.   Do you remember that?
8       A.   Yes.
9       Q.   Okay.  Who gave you the schedule?
10      A.   One of the gentleman.
11      Q.   Do you recall which one?
12      A.   No.
13      Q.   Did anybody tell you anything about
14  the schedule?
15      A.   They briefly described it as an asset
16  sale that was approximately this size of this
17  characteristics of the category of assets that
18  they were going to buy, category of liabilities
19  that they were going to assume, including
20  financing liabilities and the aforementioned
21  cure payment and comp.
22      Q.   When you refer to the financing
23  liabilities, are you just sort of broadly
24  describing the liabilities opposite the

Page 59

HIGHLY CONFIDENTIAL - A. KIRK

1   particular assets in ST borrowings, government
2   and agencies?
3       A.   Yes.
4       Q.   The ones that add up to 33.9?
5       A.   Well, in addition, there's the 34.5
6   below that.
7       Q.   For collateralized short-term funding,
8   right?
9       A.   Yes.
10      Q.   Now, did you have an understanding
11  when you were shown this schedule of where the
12  values for assets -- from where the values for
13  assets were derived?
14      A.   I don't recall.  We quickly moved on
15  from this.
16      Q.   Did whoever described the schedule to
17  you, did they give you any description of the
18  role that any of that schedule played in the
19  first transaction?
20      A.   They described it as the template for
21  the first transaction.
22      Q.   And do you know who put together the
23  schedule that was the template for the first
24  transaction?  Did they tell you that?

Page 60

HIGHLY CONFIDENTIAL - A. KIRK

1       A.   No.
2       Q.   Did you ask?
3       A.   No.
4       Q.   Now, present at the meeting was
5   Lowitt, O'Meara, Reilly and Tonucci.  Was
6   anybody participating by telephone?
7       A.   I don't recall.
8       Q.   Was there any participation in that
9   Friday morning meeting by anybody from Barclays?
10      A.   No.
11      Q.   So they broadly outlined the first
12  transaction.  They tell you the problem with
13  JPM, one of them or some combination of them.
14  What happens next in that meeting?
15      A.   We break up.  I tell them that I'm
16  going to go try to shepherd the valuation
17  process that I have been asked to follow up on
18  for this 11 o'clock meeting and that I'm going
19  to try to arrange a meeting with the senior
20  executives at Barclays to explain to them what
21  my view was, that this transaction as outlined
22  couldn't be closed on that Friday night, which
23  they agreed with.
24      Oh, I tell them I'm first going to go

Page 61

HIGHLY CONFIDENTIAL - A. KIRK

1   inform senior Lehman executives, Bart and Dick,
2   of this problem.
3       (Mr. Kelley confers with the witness.)
4       A.   I'm sorry, just to clarify, my
5   assumption about this being problem -- this
6   transaction being problematical was agreed to.
7   The basis for that worry was verified by or
8   agreed to by Ian Lowitt and Paolo Tonucci in
9   that meeting.
10      Q.   As I understand it, your primary
11  activities for the week until this Friday
12  morning meeting had been in risk management --
13      A.   Uh-huh.
14      Q.   -- had been in shrinking the matched
15  book, keeping the firm alive so that the Friday
16  hearing had some possibility of succeeding, is
17  that a fair summary?
18      A.   Yes.
19      Q.   And you're called into this meeting on
20  Friday morning and told that the transaction
21  that's been on the table all week can't go
22  forward because of this problem.  This may seem
23  an odd question, sir, but why are you now the
24  guy that has to call Barclays and call senior

Page 62

**HIGHLY CONFIDENTIAL - A. KIRK**

1  management? Did you have an understanding of
2  why you're the lucky winner of that
3  responsibility?
4      A.  Because I volunteered.  Yeah, I --
5      Q.  Did you have --
6      A.  Believe me, I almost had a heart
7  attack just thinking about that.
8      (Mr. Kelley confers with the witness.)
9      A.  That's true.  In addition to Mark
10 Shafir had left the firm, so ...
11     Q.  That's sort of implicit in my
12 question.  Why are you the guy who has to step
13 up to the plate when Shafir leaves?  Why not
14 McGee?  Why not Tonucci?  Why not Lowitt?
15     A.  Because Bart trusted me.
16     Q.  So did you go and inform more senior
17 Lehman executives of the issues of the problem?
18     A.  Yes.
19     Q.  Okay.  Tell me about that.  Who did
20 you contact and what did you tell them, what did
21 they say to you?
22     A.  I contacted Bart, I don't recall who
23 else was in the meeting exactly, but I walked
24 in, and there were others, I don't remember who

Page 63

HIGHLY CONFIDENTIAL - A. KIRK

1  exactly, Fuld, most likely, that the assets and
2  liabilities that had been assumed to be
3  transferred in the first transaction were then
4  held in custody or had to be cleared through
5  JPMorgan, and because JPMorgan had taken this
6  hostile action, there was a dispute, which I
7  didn't understand the exact nature of, with the
8  transfer of collateral between Barclays and --
9  between the Fed through JPMorgan to Barclays.
10     I knew at a very high level there was
11 a dispute between the two firms as to what
12 collateral was accept -- what collateral was
13 transferred and what collateral was left at
14 JPMorgan, and I knew that JPMorgan had shut down
15 Lehman's DTC account and failed all the
16 settlements on that Friday, and a combination of
17 those two pieces of information led me to
18 believe that JPMorgan wouldn't transfer these
19 assets on this schedule and liabilities, both
20 sides, in any normal course.
21     Q.  And when you reported this to McDade,
22 you said -- withdrawn.  You said Fuld was there,
23 most likely.
24     Do you have a recollection of him

Page 64

**HIGHLY CONFIDENTIAL - A. KIRK**

1  being there, or are you assuming again, because
2  of his role, his title, that he might have been?
3      A.  Yes, I'm assuming because of his title
4  he might have been.
5      Q.  But you do recall talking to McDade
6  about it?
7      A.  Yes.
8      Q.  Do you recall anyone else other than
9  McDade to whom you spoke?
10     A.  No.
11     Q.  And what did Mr. McDade say?
12     A.  He said we should have a sit-down with
13 the Barclays senior team and we should explain
14 our point of view on this ASAP.
15     Q.  And what happened next?
16     A.  We had a meeting with Bart, myself,
17 and then it was Michael Klein, Rich Ricci, and
18 Mike Keegan from Barclays.
19     Q.  Where was the meeting?
20     A.  It was in an office on 31 that
21 Barclays was using as temporary space.
22     Q.  And who's there from the Lehman side
23 of the table?
24     A.  Bart and I were there.

Page 65

HIGHLY CONFIDENTIAL - A. KIRK

1      Q.  Anyone else?
2      A.  Ian was there as well, I'm pretty
3  sure.
4      Q.  Was Tonucci there?
5      A.  I don't remember.
6      Q.  Do you recall whether or not with
7  regard to which ones there were, do you recall a
8  bigger meeting than that, or is this the
9  assembly of people that you remember?
10     A.  It was an assembly of no more than ten
11 people total.
12     MR. GAFFEY:  Can we go off the record
13 for a minute?
14     (Discussion off the record.)
15     (Recess; Time Noted:  10:59 A.M.)
16     (Time Noted:  11:09 A.M.)
17 BY MR. GAFFEY:
18     Q.  We were, before the break, we were at
19 this Friday morning meeting, and so I want to go
20 through in as much detail as I can what happened
21 at that meeting and who said what.
22     I have a general sense that the JPM
23 problem has arisen.  Did you have a sense, was
24 there any discussion about the JPM problem being

Page 66

HIGHLY CONFIDENTIAL - A. KIRK

1  HIGHLY CONFIDENTIAL - A. KIRK
2  related in any way to the Repurchase Agreement
3  with Barclays?
4      A.  Yes.
5      Q.  Describe that for me. What was your
6  understanding?
7      A.  So, to be clear, I'm not an expert,
8  was not an expert on repo, so I was learning
9  things for the first time that day that I didn't
10 understand how they actually worked prior to
11 that. So I got what was a cursory as opposed to
12 a detailed explanation of the issue, but as I
13 understood it from the way that Mike Keegan
14 explained it to me was that the Fed had been
15 providing a repo for Lehman Brothers earlier in
16 the week of approximately $50 billion, that the
17 Fed had made it known that they wanted to be
18 repaid on that repo, and that Barclays had
19 agreed to assume that repo obligation from the
20 Fed. Without that financing the firm would have
21 collapsed the next morning.
22     So the way it was explained to me was,
23 during the transfer of those -- that loan and
24 the collateral associated with that loan, there
25 were many pieces of collateral that Barclays

Page 67

1  HIGHLY CONFIDENTIAL - A. KIRK
2  could not value, so they did not accept them in
3  transfer from the Fed. And mechanically, it was
4  explained to me the way that worked was, in a
5  tri-party repo, the Fed transferred all of the
6  positions to JPMorgan and then JPMorgan began
7  transferring those positions upon the receipt of
8  money from Barclays transferred money, and then
9  they would transfer the positions that secured
10 that repo.
11     And at some point during that process,
12 Barclays became very uncertain as to some
13 percentage of that collateral, I don't recall
14 the exact amount, but it was a large number,
15 maybe as much as, you know, 20 percent of the
16 collateral, and when Barclays didn't accept
17 those positions, they, by definition, just got
18 left at JPMorgan.
19     They -- so JPMorgan was left with
20 collateral that they were not comfortable with
21 but Barclays would not accept, so -- and
22 JPMorgan, I guess they attempted to negotiate
23 but couldn't get that negotiation done.
24     Q.  Who was the "they" who attempted to
25 negotiate?

Page 68

1  HIGHLY CONFIDENTIAL - A. KIRK
2      A.  That JPMorgan and Barclays attempted
3  to negotiate, but they couldn't complete a
4  negotiation for a transfer of that collateral.
5      Q.  And when you say Keegan's explanation,
6  I take it you're talking about the conversation
7  you had with Keegan before the meeting?
8      A.  Yes.
9      Q.  Okay.
10     A.  The 5:30 in the morning.
11     Q.  And did Keegan give you any level of
12 detail about why Barclays was uncertain about
13 some percentage of that collateral?
14     A.  It was collateral that they didn't --
15 was either they didn't have the expertise to
16 value or was not transparent, meaning that there
17 were financing vehicles that Lehman set up that
18 went into the repo that you couldn't look
19 through to what was in those financing vehicles.
20     Q.  And did Mr. Keegan give you any
21 information about what that collateral was, what
22 type of securities?
23     A.  He didn't know.
24     Q.  Well --
25     A.  In some cases he didn't know. In

Page 69

1  HIGHLY CONFIDENTIAL - A. KIRK
2  other cases it was, yes, it was illiquid and
3  either high-yield or defaulted or consumer
4  mortgage securities that were the ones he could
5  identify that were very hard to value.
6      Q.  I'm hearing this in two categories,
7  and I want to be sure you and I are on the same
8  page. There's a component of this collateral
9  that's hard to value and there's a component
10 not transparent, which may also make it
11 hard to value --
12     A.  Yes.
13     Q.  -- but some of it's transparent and
14 hard to value?
15     A.  Yes.
16     Q.  Okay. Did he identify any particular
17 categories of hard-to-value securities? I get
18 it, high-yield or mortgage-backed, but did he --
19     A.  Distressed.
20     Q.  Did he use the term "racers" at all?
21     A.  That was the non-transparent category.
22     Q.  Okay. Tell me what Mr. Keegan said to
23 you about racers.
24     A.  "What are they?"
25     Q.  Anything else?

Page 70

HIGHLY CONFIDENTIAL - A. KIRK

1     A.  "And what's in them?" I said, "I
2 don't know." I then went and -- Paolo Tonucci,
3 I directed him to Paolo, who would be able to
4 tell him what was in those various financing
5 vehicles.
6     Q.  Do you know what Paolo Tonucci then
7 spoke to Mr. Keegan about?
8     A.  I don't know.
9     Q.  Did Mr. Keegan say anything else about
10 racers other than he didn't know what they were?
11     A.  He asked how would I find out.
12     Q.  Did Mr. Keegan say anything to you
13 that, in sum or substance, compared the assets
14 that Barclays had agreed to buy in the first
15 transaction, to use your term, and the assets
16 that were in the repo that were the subject of
17 this transfer problem?
18     A.  He summarized it as it was a very
19 different and riskier category of assets.
20     Q.  Was anyone else present when
21 Mr. Keegan and you had this early morning
22 conversation?
23     A.  No.
24     Q.  Did you understand from Mr. Keegan, in

Page 71

HIGHLY CONFIDENTIAL - A. KIRK

1 sum or substance, whether he had spoken to
2 others at Lehman about this problem by the time
3 he had spoke to you?
4     A.  I understood I was the first person he
5 had explained it to, at Lehman that he had
6 explained it to.
7     Q.  When you spoke to him and about this
8 topic, did you let him know that there was a
9 Friday meeting planned with -- that you had been
10 asked to come to an early morning meeting by
11 Mr. McDade?
12     A.  Yes.
13     Q.  And did you tell him you'd get back to
14 him after that meeting to see if there was a
15 solution to this problem?
16     A.  Yes.
17     Q.  So, in the course of that meeting, now
18 we've got the JPM issue, it's been identified,
19 you've had the first transaction outlined to you
20 broadly, the JPM problem --
21     A.  Right.
22     Q.  -- has been also described. What
23 happens next?
24     A.  I'm sorry, so where -- what time of

Page 72

HIGHLY CONFIDENTIAL - A. KIRK

1 day are we now?
2     Q.  I'm sorry. I've got you back at the
3 Friday meeting with -- we're back at the Friday
4 meeting with Bart, yourself, Klein --
5     A.  Okay.
6     Q.  -- Ricci and Keegan.
7     A.  Yeah.
8     Q.  Okay.
9     A.  So at that meeting I walk through -- I
10 summarized the issues, as I understand them, for
11 this dispute with Barclays. I inform Barclays
12 that those executives -- that JPMorgan had shut
13 down Lehman's DTC account, and I made the
14 supposition that that would make it impossible
15 to complete the transaction as contemplated.
16     Q.  And what, if anything, did Mr. McDade
17 have to say about those topics?
18     A.  He said he agreed with me.
19     Q.  Did you speak first in outlining the
20 issues?
21     A.  Yes.
22     Q.  And how did Klein, Ricci and Keegan or
23 any combination of those three men react to that
24 news?

Page 73

HIGHLY CONFIDENTIAL - A. KIRK

1     A.  There was some question as to, well,
2 what do we do now? I suggested that the only
3 reasonable course of action would be to proceed
4 with the transaction substituting the repo
5 assets, the assets that Barclays had lent
6 against, for all the other securities that had
7 been contemplated in the transaction and leave
8 the rest of the transaction as was.
9     Q.  So if I understand this -- I want to
10 make sure I understand this correctly. Your
11 suggestion was to take the assets that were the
12 subject of the first transaction roughly
13 outlined in that schedule?
14     A.  Yeah.
15     Q.  And instead of transferring that body
16 of assets, transfer the body of assets that are
17 in the repo, correct?
18     A.  Yes.
19     Q.  Maybe I'm not understanding. Is the
20 problem here, doesn't it involve the assets that
21 are in the repo? Hasn't Mr. Keegan told you
22 that Barclays is uncertain about some components
23 of the repo collateral?
24     A.  So, again, the issue was that it was

Page 74

HIGHLY CONFIDENTIAL - A. KIRK
1    HIGHLY CONFIDENTIAL - A. KIRK
2    my view that JPMorgan would not transfer one
3    dollar of one asset unless they got whatever
4    they wanted in a negotiation from Barclays or
5    anybody else, and even then they wouldn't -- it
6    didn't appear that they would do anything but be
7    hostile, having shut down our DTC account, which
8    is a, I mean, that's a colossal nightmare. You
9    know, you've got tens of billions of dollars of
10    securities supposed to settle a regular way that
11    you've been transacting with your clients, and
12    every single one of them fails -- both sides,
13    buys and sells.
14    Q.    How is JPM in a position to shut down
15    Lehman's?
16    A.    They're our clearing bank.
17    So it was, again, my supposition,
18    which was confirmed by, you know, the senior
19    finance staff and Bart and then finally the
20    Barclays guys, that, you know, JPMorgan should
21    be viewed as not going to cooperate. And
22    Barclays was attempting to reach JPMorgan and
23    never got a return call, was my understanding.
24    I was told that by probably Gerard LaRocca or
25    Keegan, one of them, and hence, you know, the

Page 75

1    HIGHLY CONFIDENTIAL - A. KIRK
2    only assets that could participate in any way in
3    this transfer were ones that Barclays had held
4    in custody at their clearing bank, Bank of New
5    York, and potentially any assets at Lehman that
6    were unencumbered and were held away from
7    JPMorgan.
8    Q.    So, again, forgive me if I'm thick
9    here, but is the problem with JPMorgan --
10    withdrawn.
11    When you talk about the assets that
12    Barclays had at Bank of New York, those were
13    assets within the repo?
14    A.    Yes.
15    Q.    Within the Barclays repo, yes?
16    A.    Yes.
17    Q.    Do you know the amount, the value of
18    the assets that were at Bank of New York within
19    the Barclays repo?
20    A.    I didn't know that. I didn't know the
21    amount or the value of those assets.
22    Q.    Okay. And again, so we're clear, you
23    didn't know at the time or you don't remember
24    now, or both?
25    A.    I didn't know at the time.

Page 76

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Q.    Okay. And the problem with JPM
3    refusing to transfer assets over, is that away
4    from the repo?
5    A.    Yes.
6    Q.    Okay. So your suggestion is to focus
7    on the repo as the body of assets that can be
8    transferred to Barclays?
9    A.    Right.
10    Q.    Plus unencumbered, other unencumbered
11    assets?
12    A.    That were not held or cleared through
13    JPMorgan.
14    Q.    That are away from JPMorgan?
15    A.    Correct.
16    Q.    Now, did you have an idea then of what
17    the value of that total package could be?
18    A.    No.
19    Q.    So you've made --
20    A.    Because I wasn't clear on what
21    actually got transferred and what didn't get
22    transferred. I knew broadly the size of the Fed
23    repo. I didn't know what the disputed amount
24    was or the assets.
25    Q.    I just need to follow up a bit on the

Page 77

1    HIGHLY CONFIDENTIAL - A. KIRK
2    disputed amount.
3    A.    Yeah.
4    Q.    I'm trying to be as clear as I can --
5    A.    Yeah.
6    Q.    -- as to what's the JPM problem and
7    how much of that is --
8    A.    Right.
9    Q.    -- whether that's -- we've established
10    the JPM problem is away from the repo, right?
11    A.    The JPM problem vis-a-vis Lehman
12    Brothers was away from the repo, that is
13    correct.
14    Q.    But vis-a-vis Barclays, it was not
15    away from the repo?
16    A.    My understanding was there was a
17    dispute about Barclays not accepting all the
18    collateral out of the Fed, only some of it, and
19    that collateral they didn't accept got left
20    behind or, by definition, stays at the clearing
21    bank, which was JPMorgan. JPMorgan clears for
22    the Fed.
23    Q.    And I think you had an -- a rough idea
24    of what percentage of that. It was some
25    percentage. It could have been as much as 20

Page 78

**HIGHLY CONFIDENTIAL - A. KIRK**

1 **HIGHLY CONFIDENTIAL - A. KIRK**
2 **percent that Barclays would not accept, yes?**
3 　A.　Yes.
4 　Q.　**Did you have a sense of a dollar**
5 **amount of what was net of the amount that**
6 **Barclays would not accept?**
7 　A.　It was somewhere in the 40s.
8 　Q.　**And when you're talking about the**
9 **amount of the repo, are you talking about the**
10 **amount that was financed or the total collateral**
11 **as pledged?  Withdrawn.**
12 　　　**You told me you're not an expert in**
13 **repos --**
14 　A.　Yeah.
15 　Q.　**-- and neither am I, but I understand**
16 **there's a haircut.**
17 　A.　Yeah, I think I was talking about the
18 amount financed, but I'm not -- I'm sketchy on
19 that.
20 　Q.　**So you make this proposal.  McDade**
21 **says he thinks you're right.  What's the**
22 **reaction from Klein, Ricci and Keegan?**
23 　A.　Ricci says -- there was some
24 discussion, I don't recall the specifics of it,
25 but Ricci then I recall specifically says, I

Page 79

1 HIGHLY CONFIDENTIAL - A. KIRK
2 believe he's right.  We have to change course.
3 　Q.　**I know it's a long time ago, but just**
4 **given that phrase, is that -- are you quoting**
5 **him?  Are you summarizing him?**
6 　A.　I'm summarizing him.  I was under a
7 tremendous amount of pressure and stress, so my
8 memory is a little fuzzy from that.
9 　Q.　**Sure.**
10 　A.　At one point in this meeting, Mike
11 Klein looked at me and said, "Do you need a
12 doctor?"
13 　Q.　**Really?**
14 　A.　Yeah.
15 　Q.　**Well, you're kind of a last-minute**
16 **volunteer in this thing, you know?**
17 　A.　Yeah.  Story of my life.
18 　Q.　**What did Klein say?**
19 　A.　He said, okay, let's get to it.
20 　Q.　**And did Keegan say anything?**
21 　A.　He said, well, we haven't analyzed
22 this collateral so we don't know what it's
23 worth.  How are we going to figure out what it's
24 worth?  And we said we had started a process
25 with these large positions.

Page 80

1 HIGHLY CONFIDENTIAL - A. KIRK
2 　　　The problem turned out to be not only
3 was the data delivered in a not usable fashion
4 to the heads of the desk, but it was a different
5 set of securities.  So we had to -- it was
6 determined that the finance staff of Lehman
7 Brothers needed to work with the finance staff
8 at Barclays and get a list of everything that
9 was in their repo line, and then take that off
10 the systems and try to put it together in a way
11 that could be delivered to the various trading
12 desks to try to put some value on it.
13 　Q.　**When you referred before to, you know,**
14 **we had started that process, was that a -- were**
15 **you referring --**
16 　A.　From the night of the --
17 　Q.　Yes.
18 　A.　-- Daniel Flores' e-mail.
19 　Q.　**That's the one that refers to trying**
20 **to come up with fire-sale-type prices?**
21 　A.　Yes.
22 　Q.　**What in your mind was the connection**
23 **between the, what I'll call the fire sale**
24 **analysis and the problem you were dealing with**
25 **on Friday?  I'm not sure I'm clear on that.**

Page 81

1 **HIGHLY CONFIDENTIAL - A. KIRK**
2 　A.　Only that we had -- that I could tell
3 the Barclays guys that we were already trying to
4 value some collateral and relative to the marks.
5 The -- Lehman suffered, you know, two issues
6 that week around valuations.  One was the
7 markets were unbelievably volatile and
8 incredibly illiquid, and that we were a less
9 than desirable counterparty for our -- so that
10 we had been, when we had been liquidating
11 collateral, we had been losing a lot of money,
12 and in addition to that, a smaller problem was,
13 you know, since the firm had filed for
14 bankruptcy, not every person was showing up to
15 work.
16 　Q.　**Now, the fire sale liquidation**
17 **analysis, the top 100 positions there, did**
18 **you -- are you saying that some of those might**
19 **have been in the repo?**
20 　A.　Yeah, but we didn't know which ones.
21 　Q.　**You didn't know?**
22 　A.　We had no idea.
23 　Q.　**That's not, so we're clear, the 100**
24 **positions we're talking about there is not with**
25 **direct reference to what was in the repo?**

Page 82

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    A.    No, not at all.  We didn't know we had
3    this problem Thursday night.
4    Q.    What's the tone of the Friday meeting?
5    I know it's tense and Klein says do you need a
6    doctor, but are people angry?  Are they calm?
7    Are they -- what's the temperature in this
8    meeting?
9    A.    Anxious.  It's very, very anxious.
10   How are we going to be able to try to get
11   anything over the goal line by 4 o'clock this
12   afternoon, and if we don't, you we don't believe
13   we can survive the weekend.
14   Q.    And why 4 o'clock that afternoon?  Was
15   that the bankruptcy hearing?
16   A.    Yeah, that was the bankruptcy hearing,
17   the scheduled bankruptcy hearing.
18   Q.    Is there any discussion in this
19   meeting about what, if anything, needs to be
20   said to the bankruptcy court about this event,
21   these events?
22   A.    That it would have to be explained.
23   This transaction was very different than what
24   had been previewed two days before, and it would
25   have to be explained why it came up.

Page 83

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Q.    Who said it would have to be
3    explained?
4    A.    Barry -- in that meeting -- I
5    apologize, some of these meetings are blurs.
6    Q.    Sure.
7    A.    But at some point during the day,
8    Barry Ridings, I was in a meeting with him, I
9    believe it was maybe at the tail-end of this
10   meeting, he came in and, you know, he listened
11   to this explanation again and then he said,
12   okay, we're going to have to be able to explain
13   this.
14   Q.    And did the Barclays folks in the
15   meeting -- and by that, I'm including Klein
16   here, Klein, Ricci, Keegan -- did they have
17   anything to say about whether and when this
18   would have to be explained to the court?
19   A.    No, they were taking Barry's lead.
20   Q.    Now --
21   A.    We all knew that there was a court
22   hearing scheduled at 4 o'clock.
23   Q.    Why do you describe this as a very
24   different agreement?
25   A.    The list of assets is different.

Page 84

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Q.    Was there any discussion about the
3    consideration Barclays was to give in the
4    agreement also changing?
5    A.    Besides the amount, no.
6    Q.    Well --
7    A.    Meaning besides the fact that it
8    wasn't 72 million, you know, the attempt was to
9    get it so that the assets and liabilities would
10   balance.
11   Q.    And the 72 million, you're looking at
12   Exhibit 19, yeah?
13   A.    Yes.
14   Q.    That financial schedule.
15        Was there any discussion of the
16   compensation and cure components of the assumed
17   liabilities changing?
18   A.    Not at that meeting.
19   Q.    Did you at some point hear a
20   discussion about the compensation and cure
21   components changing?
22   A.    At some point late in the day, there
23   was a -- not on the compensation, there was no
24   discussion of compensation.  Ian -- not Ian,
25   Paolo was attempting to figure out a better

Page 85

1    HIGHLY CONFIDENTIAL - A. KIRK
2    estimate.  I think they had always continually
3    worked on it, but they were trying to figure a
4    better estimate.
5        Ian -- I remember Paolo coming into a
6    meeting I was in, I don't remember who it was
7    with, but he came in and said I'm working
8    through the cure payments to try to see if
9    there's some wiggle room there, so to speak, in
10   terms of what is that estimate.  I never got
11   a -- I was -- that was not part of the
12   transaction I was concerning myself with.  I was
13   supposed to try to shepherd along as best as
14   possible in this incredible short timeframe some
15   valuation work that we could get to on the
16   assets.
17   Q.    Wiggle room up or wiggle room down, or
18   both?
19   A.    I don't -- he didn't mention it one
20   way or another.  Some variance I guess is a
21   better way to put it.  I don't remember whether
22   it was higher or lower.
23   Q.    In the Friday meeting with McDade and
24   you and Klein and Ricci and Keegan, was there
25   any discussion about Lehman defaulting on the

Page 86

HIGHLY CONFIDENTIAL - A. KIRK

1  repo?
2  A.  No.
3  Q.  Were you ever involved in any
4  discussion concerning the topic of Lehman
5  defaulting on the repo?
6  A.  Not a discussion.  I received an
7  e-mail that referenced it, but --
8  Q.  From whom did you receive the e-mail?
9  A.  I don't have it in front of me.
10  You've got it, Gerry Reilly.  That was
11  a couple days earlier when I wasn't involved, so
12  I didn't pay attention to it.
13  Q.  Do you recall that as an e-mail where
14  Reilly proposed defaulting on the repo was the
15  best way to deliver the bulk discount to
16  Barclays?
17  A.  I would have to look at it again.
18  Q.  We'll get to that a little later.
19  A.  Fine.
20  Q.  Is there any discussion in the Friday
21  meeting of that, of using the repo as a means of
22  delivering a haircut to Barclays?
23  A.  No.
24  Q.  Was there any discussion in the Friday

Page 87

HIGHLY CONFIDENTIAL - A. KIRK

1  meeting of terminating the repo?
2  A.  I recall a discussion, I don't
3  remember who was in the meeting, but with
4  Barclays that if we couldn't get to closure that
5  day --
6  Q.  That Friday?
7  A.  That Friday.
8  Q.  Okay.
9  A.  -- it was likely they would terminate
10  the repo.
11  Q.  Do you know if at any point Barclays
12  did terminate the repo?
13  A.  I don't know the answer to that.
14  Q.  When the Barclays folks said if they
15  couldn't get to closure on Friday, they would
16  have to terminate the repo, was there any
17  reaction from the Lehman folks to that
18  statement?
19  A.  We understood they had to do what was
20  within their rights and what they felt was
21  appropriate.
22  Q.  Who said that?
23  A.  McDade.
24  Q.  I'm going to show you, Mr. Kirk,

Page 88

HIGHLY CONFIDENTIAL - A. KIRK

1  what's previously been marked as Exhibit 21.
2  Take a moment to look through the document.
3  (Document review.)
4  A.  Okay.
5  Q.  Is that the document, the e-mail you
6  referred to a moment ago?
7  A.  Yes.
8  Q.  At the very bottom of the document,
9  paragraph 3, and this is within the e-mail from
10  Reilly to Lowitt, Gelband, Tonucci and Kelly, is
11  the following, "Not clear on the amount of block
12  discount or how we make it happen.  Defaulting
13  on repo could be the best, as discount could be
14  taken from haircut."  Do you see that?
15  A.  Uh-huh.
16  Q.  You may have said something a moment
17  ago about this, but let me ask you, did you have
18  an understanding when you saw this e-mail of
19  what it was Mr. Reilly was talking about, using
20  the repo?
21  A.  No, this was before I was involved,
22  and I was CC'd on this e-mail because of my work
23  in the auction rate book and the prime brokerage
24  financing at the time.

Page 89

HIGHLY CONFIDENTIAL - A. KIRK

1  Q.  Okay.  So the first paragraph of
2  Mr. Reilly's e-mail refers to the auction rate
3  book?
4  A.  Yeah.
5  Q.  And the question appears to be whether
6  it's staying or going in the transaction, yes?
7  A.  Right.
8  Q.  And was it your understanding that it
9  was that first question that was the reason it
10  was forwarded to you, because you're in the ARS
11  world?
12  A.  I had been in the ARS world in my
13  previous job, and I assumed it was forwarded to
14  me so they could figure out who should answer
15  these questions, who would be most expert to
16  answer them.
17  Q.  All right.  So when you got the whole
18  e-mail, including the other two questions --
19  A.  Yep.
20  Q.  -- am I fairly understanding your
21  testimony that you didn't really focus on 3
22  because it wasn't in your area of
23  responsibility, you didn't understand it to be
24  addressed to you?

Page 90

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    A.   As a matter of fact, my answer
3    indicates what I did was I redirected them to
4    people I thought could be helpful.
5    Q.   Okay.
6    A.   That's what I thought my
7    responsibility would be.
8    Q.   Okay.
9    A.   Try to put point them in a direction.
10   Q.   Beg your pardon.
11        And with respect to the third
12   question, you say, "The third question is
13   definitely for Cogs," C-O-G-S.  Is that a
14   reference to Mr. Coghlan?
15   A.   John Coghlan, yes.
16   Q.   John Coghlan, okay.  And why was it a
17   question for John Coghlan?
18   A.   Because he was head of repo financing
19   at the firm.
20   Q.   Do you know if Mr. Coghlan ever did
21   address the third question?
22   A.   No idea.
23   Q.   Now, when you were in the Friday
24   meeting and the topic of the repo was being
25   discussed — withdrawn.

Page 91

1    HIGHLY CONFIDENTIAL - A. KIRK
2        This is sent, this e-mail comes to you
3    on Thursday?
4    A.   Yes.
5    Q.   At roughly 6:40 in the morning.  Note
6    that that's Greenwich mean time shown there.
7    A.   Yeah.
8    Q.   The next morning you're in a meeting
9    where the repo is being discussed.  Did that
10   trigger any recollection in your mind about, you
11   know, an e-mail discussion the prior day about
12   using the repo as a means of making the block
13   discount happen?
14   A.   No, I, you know, I get 500 e-mails a
15   day, and during this period of time we were
16   getting probably twice that.  So ...
17   Q.   And when you saw a reference --
18   A.   I was answering all of them, so, you
19   know, or as many of them as I could.
20   Q.   And also to the mysterious number that
21   we finally identified.
22   A.   Yes, and then there's the mysterious
23   number.
24   Q.   Now, the --
25   A.   I don't think the company's in

Page 92

1    HIGHLY CONFIDENTIAL - A. KIRK
2    business anymore.
3    Q.   Was there a reference to the -- any
4    discussion in the Friday meeting of a discount?
5    A.   No, not that I recall.
6    Q.   Okay.  So I'll summarize it just to
7    frame my next question so you're not married to
8    how I do this.  But as I understand it, the
9    meetings happened, you identified the JPM
10   problem, the recommendation is made to transfer
11   what's in the repo, and there's some issues
12   about how to value what's in there; is that a
13   fair summary?
14   A.   Yes.
15   Q.   Okay.  And the general sense of the
16   meeting from both sides of the table is, okay,
17   let's go to it and try and figure this out, we
18   have until about 4 o'clock to see if we can
19   solve this, yes?
20   A.   Yes.
21   Q.   And Barclays says if we can't reach a
22   resolution of that by about 4 o'clock, we may
23   have to terminate the repo, correct?
24   A.   Correct.
25   Q.   And McDade has said if that comes to

Page 93

1    HIGHLY CONFIDENTIAL - A. KIRK
2    be, you know, you have to do what you have to
3    do?
4    A.   Those are your rights.
5    Q.   And you don't know if the repo was in
6    fact ever terminated by Barclays?
7    A.   I don't know that.
8    Q.   Okay.  So now what happens?  Does the
9    meeting end or is there further discussion?
10   A.   I recall the meeting ending at that
11   time.
12   Q.   And what did you do next?
13   A.   I went back to my office.  I called
14   the various senior executives I was going to
15   meet with and told them that we should be
16   getting a new schedule at some point of assets
17   that we would have to -- they should ignore that
18   schedule of assets and we would be getting a new
19   schedule of assets at some point to try to put
20   some values on.
21   Q.   When you say "ignore that schedule of
22   assets," again, for clarity of record, are you
23   talking about Exhibit 19, the original financial
24   schedule?
25   A.   I'm sorry, no, I'm talking about the

Page 94

HIGHLY CONFIDENTIAL - A. KIRK
1 list of hundred assets that was delivered to the
2 desk early that morning.
4 Q. Got it. As part of the fire sale
5 liquidation?
6 A. Correct.
7 Q. And you told them they would be
8 getting a new list of assets. Who is it you're
9 having these communications with?
10 A. I certainly called Mike Gelband and I
11 would have called some subset, although I don't
12 recall who I spoke to specifically or who Mike
13 spoke to, but I would have called either
14 Kaushik, Charlie, Eric and Gerry.
15 Q. Eric is Eric Felder?
16 A. Yes.
17 Q. And Gerry is Gerald Donini?
18 A. Yes.
19 Q. And who is Charlie? Is that Charlie
20 Spero?
21 A. Spero, uh-huh.
22 Q. And did do you this on a conference
23 call? Call them separately? In a meeting?
24 A. Probably called them separately.
25 Q. And what happened after that?

Page 95

HIGHLY CONFIDENTIAL - A. KIRK
2 A. We waited for a deliverable schedule
3 from finance.
4 Q. Did you get one?
5 A. Got one at sometime within the hour.
6 Q. And from whom within finance did you
7 receive that?
8 A. I don't remember who it was.
9 Q. Who within finance was in charge of
10 that piece?
11 A. It would have been some combination --
12 well, no, most likely it would have been Paolo,
13 working with accounting.
14 Q. And Paolo or somebody at his direction
15 delivers a schedule. To whom is it delivered?
16 A. I don't recall, but I'm sure it was
17 instructed to be delivered directly to the
18 people on this list that I mentioned before and
19 myself and Mike.
20 Q. And what happened with the list?
21 A. We asked the senior managers to try to
22 value the list given the market conditions that
23 day, and generally the response was the markets
24 are too volatile, there's too many line items,
25 it's not possible to get this done in any

Page 96

HIGHLY CONFIDENTIAL - A. KIRK
2 pinpoint fashion in this timeframe, but we'll
3 try.
4 Q. And at some point was there -- did
5 they solve that problem? Did they produce
6 valuations?
7 A. The only valuations we got was that --
8 I don't know what they communicated to Barry
9 Ridings or the people working on that specific
10 testimony.
11 Q. Uh-huh.
12 A. But I got the word back generally that
13 many of these positions were so illiquid that,
14 you know, that if we were to try to sell them,
15 given our circumstances, you know, the bids
16 might be down 20 percent.
17 Q. Was there any discussion about looking
18 at the valuations that Bank of New York had
19 given to what was in the repo?
20 A. We didn't have access to Bank of New
21 York's valuations, I don't believe.
22 Q. Did you talk to anyone who was
23 familiar with how repurchase -- more familiar
24 than you with how repurchase agreements worked
25 to see if the collateral agent applied

Page 97

HIGHLY CONFIDENTIAL - A. KIRK
2 valuations to what was held as collateral?
3 A. I don't recall having that specific
4 conversation.
5 Q. Do you know if anyone did have that
6 discussion, that conversation with Barclays?
7 A. They might have.
8 Q. Without regard to the particular
9 detail or even the number --
10 A. Yeah.
11 Q. -- you had a sense of whether by, you
12 know, at some point on that Friday a value was
13 put on the collateral within the repo?
14 A. We at Lehman determined that the
15 out -- the volatility of those outcomes we
16 couldn't put a number that was specific on it.
17 It was, given how illiquid many of the assets
18 were, some of the assets you could value, but
19 the markets were tremendously volatile all week.
20 We had had, you know, been getting
21 closed out of -- just the prior day we got
22 closed out of a repo, a futures position on the
23 CME that had excess margin of, you know, $1.6
24 billion.
25 As far as we could tell, the markets

Page 98

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    hadn't moved that much. Many of them were in
3    Treasury and government bond futures, but the
4    CME called us to inform us they had closed us
5    out of the position and we had lost all the
6    money in excess margin. So it was becoming very
7    hard to value even what were deemed to be liquid
8    securities.
9        Q.   Just so we're clear here, the closing
10   out of the position by the Chicago Merc doesn't
11   bear on the collateral that's within the repo;
12   that's a separate event, correct?
13       A.   That is a separate event, but it
14   was -- it was demonstrative of the volatility
15   and the issues we were wrestling with.
16       Q.   And the question that I would like to
17   put is, did Lehman come to some number, did it
18   come to a value, a valuation of the collateral
19   that was within the Barclays Repurchase
20   Agreement?
21       A.   We couldn't come up with a specific
22   value. We didn't have time. We knew we
23   didn't -- we tried, but we couldn't, and we knew
24   the risk was that Barclays would close out of
25   the repo and take all that collateral, so they

Page 99

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    owned it, that we would end up with no excess
3    from that collateral, and that from the very
4    high-level work that the senior risk managers
5    did, which we were relying upon, that we could
6    be well out of the money, it was likely that we
7    could be well -- we would be well out of the
8    money in that below the haircut, which I
9    believe, understood to be somewhere between 5
10   and 10 percent.
11       Q.   When you referred to a moment ago to
12   one of the risks was that we would not end up
13   with -- we would end up with no excess, what did
14   you mean by that?
15       A.   Meaning that if Barclays closed us out
16   of the repo, our experience had been, not just
17   in that period of time but other cases, but
18   certainly in that week, that their liquidation
19   of that collateral would eat through more than
20   the haircut they had and that they would not get
21   back a hundred cents on the dollar. So we,
22   Lehman, would not receive any proceeds back from
23   the liquidation of that collateral.
24       Q.   What was your understanding of what
25   would happen if there was excess collateral?

Page 100

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Who would keep that?
3        A.   If there was excess collateral, Lehman
4    would keep that value.
5        Q.   Was that discussed at the Friday
6    meeting, that if there was excess collateral, it
7    would say with Lehman?
8        A.   There was not a discussion of closing
9    out the repo and the mechanics of it.
10       Q.   So did there come a point on Friday
11   where Lehman communicated to Barclays either --
12   where it communicated a value of the repo or it
13   said it couldn't? What happens next vis-a-vis
14   talking to Barclays.
15       A.   In terms of talking to Barclays, the
16   next meeting was at some point, call it 3
17   o'clock in the afternoon, and they were
18   indicating that the -- their view of the value
19   of the repo securities was far below the stated
20   value and below their loan value and that Lehman
21   should attempt to find other unencumbered
22   assets, should continue to attempt to find other
23   unencumbered assets or the transaction may not
24   take place.
25       Q.   Now, is this response from Barclays

Page 101

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    after the Friday meeting has ended? I want to
3    get a sense of the timeline within Friday of
4    when Barclays does this.
5        A.   This is like 3 o'clock in the
6    afternoon.
7        Q.   Does Barclays tell you, does Barclays
8    tell Lehman how much difference has to be made
9    up?
10       A.   No.
11       Q.   Is your answer that you don't remember
12   or that you remember that they didn't?
13       A.   I remember they didn't.
14       Q.   So what happens now?
15       A.   We said we'll continue to look. And
16   Ian and I had a conversation with McDade
17   offline, just he and I. I said, I don't have
18   any basis or enough information to argue with
19   them about their point of view, about the value
20   of collateral, and that the high-level work
21   we've been doing leads me to believe that they
22   have a reason to be nervous about this.
23       Q.   And what was --
24           (Mr. Kelley confers with the witness.)
25       A.   Barclays.

## Page 102

```
1         HIGHLY CONFIDENTIAL - A. KIRK
2         I'm sorry. Who is "they," he asked
3    me. Barclays has a reason to be nervous.
4         Q.   And did McDade give any instructions
5    or suggestions about what to do next?
6         A.   He said, well, make sure Ian is
7    working on any possible unencumbered assets.
8         Q.   So did McDade give a target of any
9    kind of how much in unencumbered assets needed
10   to be found?
11        A.   At that point, all we could do was
12   figure out what was there, and specifically I
13   don't recall, but I do -- I do recall that the
14   shortfall was described as, you know, billions
15   of dollars.
16        Q.   And by "the shortfall," you're
17   referring to what?
18        A.   The value that Barclays thought those
19   repo assets were worth versus their stated
20   value.
21        Q.   That's the shortfall between what
22   Barclays thought they were actually worth and
23   the amount of the repo?
24        A.   Yeah.
25        Q.   So your recollection is that the
```

## Page 103

```
1         HIGHLY CONFIDENTIAL - A. KIRK
2    shortfall was in the billions of dollars?
3         A.   Yes.
4         Q.   But do you have a recollection of
5    whether it was between 2 billion and a gazillion
6    billion?  Is there some range you were thinking
7    of at the time?
8         A.   Somewhere between 2 and 5.
9         Q.   And I'm trying to get a sense here,
10   that's why I keep pushing at the number --
11        A.   Yeah.
12        Q.   -- I'm trying to get a sense here of
13   what the project is. Is it go find every
14   unencumbered asset we have on the one end of the
15   possibilities, or we have to make up this
16   specific shortfall, go find that amount at the
17   other?
18        A.   I didn't have the conversation. Bart
19   had the conversation with Ian, so I didn't have
20   that conversation specifically with him.
21        Q.   So you don't know one way or the other
22   whether Mr. McDade gave a target of some kind to
23   Mr. Lowitt?
24        A.   No, I don't know that.
25        Q.   Your understanding from your view of
```

## Page 104

```
1         HIGHLY CONFIDENTIAL - A. KIRK
2    things was there was a shortfall?
3         A.   Yes.
4         Q.   It wasn't Barclays was saying it
5    wouldn't be made up out of the repo bucket?
6         A.   Yeah.
7         Q.   Therefore, other assets, unencumbered
8    assets, capable of delivery had to be found?
9         A.   Right.
10        Q.   It was in the billions, but for
11   your -- for the purposes of what you were doing,
12   you didn't really need to know the number, you
13   just needed to know the problem had --
14        A.   Right, I was not the one who was going
15   to solve those specific issues, so that was
16   someone else's job.
17        Q.   Was anyone other than Lowitt involved
18   in the particulars of solving the problem?
19        A.   I don't know the answer to that.
20        Q.   Did you ever learn whether Lowitt
21   enlisted others in the task of finding
22   unencumbered assets?
23        A.   No, I didn't, I didn't find out.
24        Q.   Did there come a time when you learned
25   whether additional value, additional
```

## Page 105

```
1         HIGHLY CONFIDENTIAL - A. KIRK
2    unencumbered assets were located that could be
3    transferred to Barclays?
4         A.   Sometime late in the afternoon between
5    3 and 4, Ian came into a meeting where I was
6    about to start a phone call with Bart, the Weil
7    Gotshal lawyers on the phone, and I was sitting
8    in the room with Mark Shapiro and I think it was
9    Jim Seery and the Barclays, again, Diamond,
10   Ricci, Klein and Keegan, and Ian came in and he
11   said there's a -- there's a schedule of assets
12   that we have that are unencumbered. I believe
13   the number was $1.9 billion of marked value.
14        In addition, he said there might be
15   value in our 15c3 margin, which at the time I
16   remember that specifically because I was like,
17   "Gee, what's that? I've never heard of that."
18   So he said there might be value there, I don't
19   know yet, and there might be others.
20        So we said to Ian, well, get us a
21   schedule of what's in the 1.9 billion in the --
22   I think he referred to it as being in the box
23   unencumbered of these unencumbered assets, i.e.,
24   they were being financed by Lehman's unsecured
25   debt, I believe at the time, or equity, and he
```

Page 106

HIGHLY CONFIDENTIAL - A. KIRK
1    came back with that list, showed it to myself
2    and to Keegan and some others.
3         Keegan looked at it and said, you
4    know, this is the -- these assets are even
5    harder to value than what we already have. I
6    don't even know what these are. I specifically
7    remember there being residential mortgage
8    residual interests and things like IOs and some
9    very illiquid aged positions in high-yield and
10   distressed debt. I don't specifically recall
11   what else it was, but I do recall the list was
12   a -- there was a reason why there was nobody
13   financing those assets and it was because they
14   were the most illiquid and hardest to value
15   securities that Lehman Brothers owned on its
16   balance sheet.
17   Q.   So when Keegan said these are even
18   harder to value than --
19   A.   Yeah.
20   Q.   -- than the other stuff, was he
21   comparing this new schedule with the
22   hard-to-value stuff in the repo?
23   A.   Yes.
24   Q.   And apart from saying it was hard to

Page 107

HIGHLY CONFIDENTIAL - A. KIRK
1    value, did Keegan have anything to say about
2    that?
3    A.   He said I don't know how I'm going to
4    put a value on this of any positive number.
5    Q.   Describe for me as best you can the
6    conversation about that topic and who said what.
7    A.   Ian came in. He delivered this -- he
8    said -- we started the conversation with Ian
9    delivering the list of assets, and he handed it
10   to Keegan -- he handed out probably five copies.
11   Most people were just staring at it saying
12   nothing.
13        Mike looked at it and said, you know,
14   I -- what's this asset? What's that asset? I
15   think Ian may have answered specifically if he
16   knew what the nature of those assets were,
17   because in like residential mortgages you have
18   names for deals that unless you knew that that
19   was a residential mortgage deal, you wouldn't
20   know what it was, you know, Sasco or things of
21   that nature.
22        And Ian had some familiarity with
23   the -- with what the assets were because he had
24   been responsible for financing those sorts of

Page 108

HIGHLY CONFIDENTIAL - A. KIRK
1    assets or, in this case, having the equity
2    finance the assets. And so there was some back
3    and forth around that, and Keegan made the
4    conclusion that he was not going to warrant any
5    positive value on these assets from his seat,
6    and he made that -- he sort of said that to Rich
7    Ricci and Bob Diamond: "I can't value these. I
8    would be very nervous about putting a positive
9    value on them."
10   Q.   So, just to kind of cut to the end of
11   the sequence here, does Barclays agree to take
12   these additional buckets of value, you know, the
13   15c3 and the assets, the unencumbered assets in
14   the box?
15   A.   Yes.
16   Q.   And when they make that agreement, are
17   you present? Was that at this meeting?
18   A.   Yes.
19   Q.   And tell me what was said in that
20   regard.
21   A.   That, all right, we don't know what
22   they're worth. They might be worth something,
23   so we want them. And Bart was on the phone, he
24   agreed -- he agreed to that, and I think that

Page 109

HIGHLY CONFIDENTIAL - A. KIRK
1    was the sum and the substance as to what was
2    said about those assets.
3    Q.   Was any number put on now the total
4    value of the deal, combining the assets that
5    were in the repo plus the 15c3 and the
6    unencumbered assets in the box?
7    A.   I don't recall a specific number being
8    put on the -- on the deal.
9    Q.   Whether you recall today what the
10   number was, I'm going to press on this a little
11   bit, do you recall if a number was put out
12   there?
13   A.   I'm sorry, I don't recall what --
14   whether -- I don't recall whether there was a
15   number specifically put out there.
16   Q.   Okay. And did you have a sense after
17   this conversation, Mr. Lowitt reports on the
18   15c3 assets and the unencumbered assets and
19   Keegan says, I can't value those and then the
20   agreement's made, well, we'll take them because
21   there may be some value, whether after that
22   point there were additional searches for value?
23   Do you know one way or the other?
24   A.   I don't recall one way or another. I

Page 110

HIGHLY CONFIDENTIAL - A. KIRK
1 don't recall what the whole -- I recall 15c3. I
2 recall this 1.9 billion because I was sitting
3 there with the list and I said, "Gee, what is
4 15c3?" So I recall those two. I don't recall
5 if there were other categories discussed during
6 that meeting.
7    Q. You said a moment ago that Lowitt,
8 when he reported on the 15c3 piece, he put that
9 at about 1.9 billion?
10    A. That was the marked value.
11    Q. Of marked value. And that there was
12 some value, but -- of what was in the box, but
13 he didn't know what it was?
14    A. It was some value in 15c3, but he
15 didn't know how much there would be.
16    Q. So when that meeting ended, did you
17 have, whether you remember the number or not
18 today, did you have a sense of what the total
19 additional value was between the 15c3 and the
20 contents of the box?
21    A. No.
22    Q. Was there any plan made to calculate
23 that number?
24    A. I think Ian was putting together a

Page 111

HIGHLY CONFIDENTIAL - A. KIRK
1 schedule that he would communicate to Bart
2 with -- there was a, first of all, in that
3 discussion there was a wrap-up of this is what
4 the deal looks like. It's got the 45 billion,
5 it's got the, on the asset side, it's got this
6 1.9, it's got 15c3, it may have had, you know,
7 other components to it.
8    Bart agreed, Ian and Bart agreed that
9 these were the components on the assets side.
10 It had the assumed liabilities. They agreed
11 that those were the assumed liabilities that
12 were going to agree, I don't remember the exact
13 numbers, and they said, okay, do we have an
14 agreement? Barclays said yes. Ian was going to
15 go codify that, I believe, and talk to Bart.
16    Bart was in a car with Weil lawyers on
17 his way to bankruptcy court. That's why he
18 wasn't in the room.
19    Q. When you say Ian was going to go away
20 and codify that, you mean put the schedules
21 together?
22    A. I think so, yes, that's what I mean.
23    Q. Did Mr. Klein say anything about this
24 process adding additional value for Barclays?

Page 112

HIGHLY CONFIDENTIAL - A. KIRK
1    A. No, not adding additional value. He
2 didn't comment on that.
3    Q. Did Klein make any recommendation in
4 your hearing as to whether Barclays should or
5 should not accept this deal?
6    A. Klein recommended that they accept the
7 deal if -- when they got the additional, all the
8 additional collateral.
9    Q. I don't mean this to be sarcastic. I
10 just can't come up with another way of phrasing
11 it.
12    We're looking around for all this
13 additional value and your memory is not clear on
14 whether there was a target or not?
15    A. Yeah.
16    Q. Framed that way, what was the project
17 here? Was it to go find everything else and
18 turn it over, or was it to find some, some
19 identifiable bucket of value until Barclays
20 said, yeah, that's enough? Do you see the
21 distinction I'm making?
22    A. Yes, it's -- the project was the
23 second, not the first.
24    Q. Okay. So the idea was there would be

Page 113

HIGHLY CONFIDENTIAL - A. KIRK
1 some value left in Lehman; it was just a
2 question of finding enough additional value to
3 make Barclays still close?
4    A. Yeah. And that project was Ian's
5 project, not mine. I wasn't -- I was an
6 observer to this part of the process.
7    Q. What was Ian's manner in this meeting?
8 I mean, it's a tough week for everybody, but
9 what's his demeanor?
10    A. He hadn't slept in a week, so he was a
11 little harried.
12    Q. Did Ian identify other potential
13 sources of additional value that he had looked
14 at apart from the box and 15c3?
15    A. He --
16    MR. HUME: Objection. Asked and
17 answered.
18    Q. You can answer.
19    A. No, he, as I said, he may have, but I
20 didn't -- I don't remember.
21    Q. You don't remember, then, any
22 particular other sources that he might have
23 discussed?
24    A. No, I don't.

Page 114

HIGHLY CONFIDENTIAL - A. KIRK

1        HIGHLY CONFIDENTIAL - A. KIRK
2        (Discussion off the record.)
3   BY MR. GAFFEY:
4        Q.    While we're pulling a couple of
5   documents out, Mr. Kirk, let me see if I can get
6   the rest of, you know, the blocks of your day.
7             This meeting ends. Lowitt is given
8   the task of codifying -- your word -- you know,
9   getting a list together?
10       A.    Yes.
11       Q.    What do you do next?
12       A.    I just go back to my office. Sit
13  there silently, stunned.
14       Q.    Maybe try to get some sleep?
15       A.    Yeah.
16       Q.    Do you have any role or involvement in
17  this asset collection process we've been talking
18  about after this point?
19       A.    No.
20       Q.    Did you go to the hearing?
21       A.    No.
22       Q.    Did anyone render reports to you from
23  the hearing --
24       A.    Yes.
25       Q.    -- as to what was going on?

Page 115

1        HIGHLY CONFIDENTIAL - A. KIRK
2        Okay. Who did that?
3        A.    I got a couple e-mails from Jim Seery
4   and I had a conversation with Jean-Francois
5   Astier.
6        Q.    And what were the, in sum and
7   substance, what were you hearing in the reports
8   from -- we don't have to go through this chapter
9   and verse, but what were the nature of the
10  reports you were getting back from the --
11       A.    There was, first of all, they were --
12  JF and Jim were trying to understand what the
13  new deal was, so I had a conversation with JF
14  trying to explain to him what I knew, and
15  because they were, I believe, going to
16  participate in a meeting with the creditors
17  explaining this, what the deal was.
18            And then I got -- so there was some
19  back and forth to just try to reach me on that
20  front, and then there was -- they sent me a
21  couple updates of, you know, Bart's proffers
22  being read and there's cross-examination, and
23  then ultimately the deal was done with some
24  quotes from Judge Peck later that night.
25       Q.    Did anyone --

Page 116

1        HIGHLY CONFIDENTIAL - A. KIRK
2        A.    And then somebody called me when it
3   was done.
4        Q.    Somebody called to say the judge has
5   approved the deal?
6        A.    Yeah.
7        Q.    Did you get reports from anyone that
8   told you whether or not anyone had told the
9   judge that this was a new transaction, different
10  transaction?
11       A.    I didn't get presented -- one early
12  conversation I had with JF, I didn't talk to
13  anybody directly by phone, and I just got a few
14  cursory e-mails.
15       Q.    And --
16       A.    But at one point there was, you know,
17  my understanding was there was -- and early,
18  there was discussions before they went, you
19  know, to court to wrap it up with various
20  constituents. And certainly there were
21  constituents there, Bart, Michael Klein and
22  others, that had the details.
23       Q.    Now, did you stay in your office until
24  you heard about the --
25       A.    No. No. I went home and I went to

Page 117

1        HIGHLY CONFIDENTIAL - A. KIRK
2   bed sometime late that evening.
3        Q.    Sometime after you heard that the deal
4   had been approved?
5        A.    No. No. I went to bed before that.
6   Somebody woke me up out of bed.
7        Q.    Did you continue to do any work or did
8   you perform any tasks in connection with the
9   transaction --
10       A.    No.
11       Q.    -- over the weekend?
12       A.    Saturday I had no involvement. On
13  Sunday, Bart asked me to come in and try to
14  participate in the closing of the transaction at
15  Weil Gotshal.
16       Q.    Did you do that?
17       A.    Yes.
18       Q.    Just so I can plan a little bit for
19  what I want to ask you after lunch break, give
20  me an outline of what you did on the Sunday.
21       A.    So we went over to Weil. We, Bart and
22  I, were put in a room. You know, we were there
23  as a resource as people were trying to put
24  schedules together, et cetera.
25            An issue came up early in the morning

Page 118

HIGHLY CONFIDENTIAL - A. KIRK
1  around the settlement of trades on Monday and
2  how they were going to be handled, Lehman
3  trades, customer trades with Lehman. We tried
4  to help work that issue out, and then we
5  effectively became observers of this dispute
6  between JPMorgan and Barclays, as there were
7  many meetings held into the evening that
8  JPMorgan came to Weil about 6 o'clock Sunday
9  night and at the urging of the Federal Reserve
10  and they walked through, described in very large
11  group meetings the issues they had.
12      We sort of hung around and eventually
13  were told that Barclays and JPMorgan had
14  resolved their dispute and that the deal could
15  go to closure.
16      Q. When you say "we," are you talking
17  about yourself and Mr. McDade?
18      A. And there were others at Lehman as
19  well.
20      Q. Who else?
21      A. Jim Seery was there. I called him
22  late in the afternoon. Ian Lowitt was there.
23  Paolo was there. A guy name Alastair Blackwell
24  was there. Steve Berkenfeld was there. That's

Page 119

HIGHLY CONFIDENTIAL - A. KIRK
1  everybody I recall.
2      Q. Did you learn how the dispute between
3  JPM and Barclays had been resolved, what the
4  terms of that resolution were?
5      A. They didn't tell us.
6      Q. So did anybody ask, anybody say how
7  did this issue get resolved?
8      A. Yeah, and they said it's between us
9  and -- Barclays representatives told us -- well,
10  I don't remember if it was the lawyer or who
11  specifically, but a representative from Barclays
12  said that's between Barclays and JPMorgan.
13      Q. So the closing did not take place on
14  the Sunday, correct?
15      A. It eventually I think closed Monday
16  morning, but it was one continuous -- I left at
17  2 A.M., and then they worked towards closing at
18  some point in the morning prior to the markets
19  opening.
20      Q. Did you go back for the closing?
21      A. No.
22      Q. Do you know if any additional
23  documentation was done to reflect the new
24  agreement that had been reached on Friday?

Page 120

HIGHLY CONFIDENTIAL - A. KIRK
1      A. Oh, I'm sure there was lots of
2  documentation, but I'm not a lawyer so I wasn't
3  reviewing it.
4      Q. Do you know, apart from whether you
5  read it or reviewed it, my question is do you
6  know if a new -- a new contract or an amendment
7  or anything else was written up that would
8  reflect the fact that the deal had changed on
9  Friday?
10      A. I assume so. I don't -- I never saw
11  actual evidence of it, but ...
12      Q. I've asked you a couple of times when
13  you said you've assumed. What's the basis of
14  the assumption? The fact that it --
15      A. That you couldn't proceed with a
16  commercial transaction without it.
17      Q. Do you have any factual basis to think
18  that it was? Did you talk to anybody about it?
19  Did you see any documents?
20      A. I didn't see any documents. Certainly
21  we were advised by Weil that the documents were
22  in good order.
23      (Exhibit 316, an e-mail chain with
24  attached balance sheet, marked for

Page 121

HIGHLY CONFIDENTIAL - A. KIRK
1  identification, as of this date.)
2      Q. I have put before you, Mr. Kirk, a
3  three-page document. I'll ask you to take a
4  look through it sufficiently to tell me whether
5  you've seen it before.
6      A. Yes, I've seen it.
7      Q. Did you see it at or around the time
8  that it's -- of September 19 at 6:16 A.M.?
9  That's the date at the top.
10      A. Yes.
11      Q. And was this sent to you -- was it
12  your understanding this was sent to you to
13  prepare for that Friday meeting we've been
14  talking about?
15      A. It was one, one of the documents that
16  I assumed we would review.
17      Q. Okay. And do you recall --
18      MR. HUME: Are you marking it as an
19  exhibit?
20      MR. GAFFEY: Yes, I did, Hamish. It's
21  316.
22      MR. HUME: I'm sorry.
23      Q. Do you recall reviewing it at the
24  Friday meeting?

31 (Pages 118 to 121)

| Page 122 |
| --- |

**HIGHLY CONFIDENTIAL - A. KIRK**

1    **HIGHLY CONFIDENTIAL - A. KIRK**
2      A.    No, I actually don't recall reviewing
3    this.
4      Q.    Let me just direct your attention,
5    sir, to the third page -- well, to the second
6    page. You'll see that that's a balance sheet
7    that's attached to the e-mail and then referred
8    to in the second e-mail.
9      A.    Yes.
10     Q.    Do you know who prepared this balance
11   sheet?
12     A.    I don't know specifically who prepared
13   it, but it would have been prepared by
14   accounting.
15     Q.    Okay. And --
16     A.    Well, the e-mail seems to indicate
17   Martin -- somebody who worked for Martin Kelly
18   had prepared it.
19     Q.    And within the balance sheet, sir, the
20   fifth column that's entitled Transaction
21   Adjustments, do you see that?
22     A.    Yes.
23     Q.    Do you know what that column
24   represents, what the entries in that column are
25   meant to represent?

| Page 123 |
| --- |

1    **HIGHLY CONFIDENTIAL - A. KIRK**
2      A.    Only from reading it.
3      Q.    I don't want you just to guess from
4    the face of the document.
5      A.    No.
6      Q.    Do you recall any discussion of
7    transaction adjustments?
8      A.    No.
9      Q.    And in particular, if you could take a
10   look at the last page of the document, I would
11   ask you to take a look at the Transaction
12   Adjustments column where it says 2 billion and
13   1.645 billion, are you with me?
14     A.    Uh-huh.
15     Q.    And you'll see that those relate to,
16   if you read across to the left, items Bonus
17   Payable and Cure Payments?
18     A.    Uh-huh.
19     Q.    And if you read across with me on the
20   Cure Payments line, you'll see, as of 8/31/08,
21   the number 701 is there, you with me?
22     A.    Uh-huh.
23     Q.    And then as of 9/17/08, 605?
24     A.    Uh-huh.
25     Q.    And then there's a transaction

| Page 124 |
| --- |

1    **HIGHLY CONFIDENTIAL - A. KIRK**
2    adjustment of 1,645,000,000?
3      A.    Uh-huh.
4      Q.    Resulting in a balance sheet transfer
5    total of 2.25 billion, do you see that?
6      A.    Uh-huh. Uh-huh.
7      Q.    2.25 is the amount that you recall
8    Mr. Tonucci telling you was the assumed
9    liability for cure that was Barclays'
10   consideration in the deal?
11     A.    Yes.
12     Q.    Do you have any knowledge or have you
13   been involved in any discussion where a
14   transaction adjustment of 1.645 billion was made
15   against Lehman's books? Do you know if that
16   number was written up?
17     A.    If it was written up, meaning?
18     Q.    Do you know if the amount for cure
19   payments shown on Lehman's books was written up
20   by 1.645 billion?
21     A.    Oh, I have no idea.
22     Q.    Did you ever have a discussion with
23   Mr. Tonucci or Mr. Kelly or Mr. Lowitt about
24   that topic?
25     A.    No.

| Page 125 |
| --- |

1    HIGHLY CONFIDENTIAL - A. KIRK
2      Q.    And I'll ask you the same question,
3    sir, with respect to the line for bonus payable.
4    Do you see a transaction adjustment of 2
5    billion, and the 2 billion is contained in the
6    Balance Sheet Transferred column?
7      A.    Yes.
8      Q.    Any conversations with Lowitt, Kelly
9    or Tonucci about that topic?
10     A.    No, no conversations.
11     Q.    Any conversations with anyone else
12   about that topic?
13     A.    No.
14     Q.    Was that topic addressed at the Friday
15   meeting we've been talking about, to your
16   recollection?
17     A.    Only to the extent that there was a
18   liability that was 2 billion and 2 and a quarter
19   billion that's reflected in this balance sheet
20   that had been agreed to prior.
21     Q.    Do you know if those liabilities of 2
22   billion and 2 and a quarter billion were based
23   on Lehman's accruals on its books, or were they
24   agreed numbers?
25     A.    I don't know.

Page 126

HIGHLY CONFIDENTIAL - A. KIRK
1
2      Q.    Mr. Kirk, I'm showing you what was
3  previously marked as Exhibit 8 at a prior
4  deposition.  Take a look through it, sir,
5  sufficiently to tell me whether you've seen it
6  before.
7      A.    Yes.
8      Q.    Okay.  And what is the document, sir?
9      A.    This is a list of assets that Lehman
10  Brothers owned.
11      Q.    Was this document -- and again, just
12  for clarity, there's a time on the cover e-mail
13  of Mr. Reilly's e-mail to you of 10:51 A.M.,
14  GMT, which would put it at 6:51 New York time,
15  okay?
16          Do you recall receiving this in the
17  early morning of Friday?
18      A.    Yes.
19      Q.    Is this one of the schedules that
20  was -- was this schedule sent to you for use at
21  the Friday meeting?
22      A.    Yes.
23      Q.    Okay.  And what was its purpose?  What
24  is this supposed to tell you that's of use to
25  you at the Friday meeting?

Page 127

HIGHLY CONFIDENTIAL - A. KIRK
1
2      A.    I don't recall specifically what this
3  was used to describe to me, except that it was
4  a -- this I assume is a, just a comprehensive
5  list of the assets that were going -- were
6  planned to be transferred to Barclays.
7      Q.    Now, if you would take look, Mr. Kirk,
8  at the third page of the document.  It's a --
9          MR. KELLEY:  Sorry, Bob, you said the
10  third page?
11          MR. GAFFEY:  Yes, the third page.
12      A.    The Woodbum?
13      Q.    No, just before that.
14      A.    That's my second page.
15      Q.    My fault.  The second page of the
16  document.  What do you understand that to be,
17  sir?
18      A.    I don't recall what this was
19  particularly.  I can read it for the face of it,
20  but ...
21      Q.    Well, if you could read it with the
22  Friday meeting in mind and tell me if it
23  refreshes your recollection as to what role this
24  summary would have played in your activities at
25  that meeting, that would be helpful.

Page 128

HIGHLY CONFIDENTIAL - A. KIRK
1
2      A.    I don't recall this being discussed
3  because we quickly got to, as I described
4  before, that whatever schedules had been
5  produced earlier in that week were no longer
6  operative.
7      Q.    Do you know if the schedule that's
8  attached to Exhibit 8 bears any relation to the
9  schedule that was summarized in Exhibit 19, that
10  is, that --
11      A.    I don't remember.  I can't tell.
12      Q.    Okay.  Just back on that page,
13  Mr. Kirk, do you know what the column Excluded
14  is for?  Do you know what it means?
15      A.    No, I don't know what that means.
16      Q.    I take it, then, you wouldn't be able
17  to tell me what "Available for Transfer" means
18  either?
19      A.    No, I don't remember what that is.
20      Q.    Do you recall anyone discussing this?
21  Whether you recall the contents of the
22  discussion, do you recall anybody discussing
23  this at the meeting?
24      A.    I don't recall discussing this
25  particular sheet.

Page 129

HIGHLY CONFIDENTIAL - A. KIRK
1
2          MR. GAFFEY:  Why don't we take a lunch
3  break now.
4          (Luncheon Recess; Time Noted: 12:29
5  P.M.)

Page 130

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2            AFTERNOON SESSION
 3         (Time Noted: 1:16 P.M.)
 4    ALEX KIRK, resumed and
 5       testified further as follows:
 6    EXAMINATION BY (Cont'd.)
 7    MR. GAFFEY:
 8      Q.   We talked a little bit this morning,
 9    Mr. Kirk, about Mr. Shafir leaving on Thursday?
10      A.   Yes.
11      Q.   Did he just leave? I mean, was it
12    sudden?
13      A.   I just got a call after the fact. I
14    don't know what the back and forth was.
15      Q.   Did Mr. McDade or did anyone say to
16    you anything to the effect of this would be a
17    problem for Lehman in the deal since Shafir had
18    played a major role in the negotiations, in sum
19    or substance? Did you pick up that sense from
20    anybody?
21        MR. HUME: Objection to the form of
22      the question.
23      A.   I don't remember if he described it as
24    a problem, but certainly, you know, there was
25    lots to do that needed to be done.
```

Page 131

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2      Q.   Uh-huh.
 3      A.   It was not viewed as a happy
 4    circumstance.
 5      Q.   Sure. Were there parts, to your
 6    knowledge, were there parts of the deal, of the
 7    negotiations in which Shafir would be the only
 8    source of knowledge?
 9      A.   I don't know the answer to that. I
10    wasn't around the negotiations at all earlier in
11    the week, so I don't know who did what.
12      Q.   Okay. From your time around there
13    during the week, I mean, I understand your
14    involvement in the deal becomes more intense, as
15    it were, on the Friday, but do you pick up any
16    idea during the week of how involved McDade is
17    in the negotiations?
18      A.   I think he was very involved.
19      Q.   Is he negotiating particular issues or
20    the deal as a whole?
21      A.   Again, I don't have any specifics.
22    They were, all these -- my understanding all
23    these negotiations were taking place on the 32nd
24    floor, which I never went up to the 32nd floor
25    during that period of time except maybe to find
```

Page 132

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2    somebody, so ...
 3      Q.   In the initial conversations with Bart
 4    McDade on the Thursday night and with Lehman
 5    folks on the Friday morning, does anyone comment
 6    on the departure of Shafir and its impact on the
 7    deal?
 8        MR. HUME: Objection. Asked and
 9      answered.
10        MR. KELLEY: Objection as to form.
11      A.   Can I answer that question?
12      Q.   Yes, I think you can.
13      A.   No, with the exception of it's
14    unfortunate that he's left at this moment in
15    time.
16        (Exhibit 317, a document bearing Bates
17      Nos. 10310050, marked for identification, as
18      of this date.)
19      Q.   Mr. Kirk, I'll ask you just take a
20    look through that document sufficiently to tell
21    me whether you can remember seeing it before?
22      A.   Yes.
23      Q.   Did you see it at or around the time
24    that it's dated, September 19?
25      A.   Yes.
```

Page 133

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2      Q.   Reading up the e-mail chain from
 3    bottom to top, you appear to get added in the
 4    message from Paul Houston to O'Meara, Tonucci,
 5    Kirk, Walsh, dated 18th September at 23:12, do
 6    you see that?
 7      A.   Uh-huh.
 8        MR. KELLEY: I think you meant
 9      Houston.
10      Q.   I beg your pardon. I do mean Houston,
11    yes.
12      A.   Yes.
13      Q.   Do you have an understanding of why
14    you are added into this e-mail conversation at
15    this point? What's the issue?
16      A.   The issue appears to be, or I recall
17    it to be the racers trust was a piece of
18    collateral that Barclays had received in the
19    repo. Inside the racers trust -- by the way,
20    there are many racers trusts, so I think racers
21    trust was something that indicated a whole
22    series of financing trusts. It wasn't one
23    particular financing trust.
24        But in one of them there might have
25    been a -- some commercial real estate
```

## Page 134

HIGHLY CONFIDENTIAL - A. KIRK

1 collateral, Archstone, in particular, and Mike
2 Mazzei, who is -- ran commercial real estate at
3 Barclays, is pinging the number to the guy in
4 commercial real estate, Paul Houston at Lehman,
5 to try to understand the nature of that of --
6 well, he's trying to understand something about
7 Archstone relative to that.
8    Q.  What is Archstone?
9    A.  Archstone is a very large commercial
10 real estate financing that both Lehman and
11 Barclays participated in in the fall of '07.
12    Q.  Now, in the e-mail in which you're
13 joined in the communication, Houston writes to
14 O'Meara, Tonucci, Kirk and Walsh, "What should I
15 tell him? That the assets are not going to
16 Barclays?" Do you see that?
17    A.  Uh-huh.
18    Q.  What do you understand Mr. Houston to
19 mean when he writes to you that the assets --
20 "What should I tell them? That the assets
21 aren't going to Barclays?"
22    A.  Barclays had specifically told
23 representatives of Lehman Brothers that they
24 didn't want commercial real estate exposure.

## Page 135

HIGHLY CONFIDENTIAL - A. KIRK

1    Q.  So, fairly understood, the issue here
2 is that Barclays does not want the racers, yes?
3    A.  Doesn't want commercial real estate.
4 Racers might have a whole variety of collateral
5 inside them.
6    Q.  Do you know if the racers remained in
7 the assets that were ultimately transferred to
8 Barclays?
9    A.  No idea.
10    Q.  Do you know if there was any
11 discussion with Barclays about whether or not
12 the racers should remain in the value that
13 ultimately was transferred to Barclays?
14    A.  If they were in the repo, I believe
15 they were transferred to Barclays because
16 Barclays had possession of them. If they were
17 not in the repo, I believe they were not in.
18    Q.  Do you know if --
19    A.  And again, this was a series of
20 financings, so there was more than one Racers
21 Trust.
22    Q.  Do you know if at any point the racers
23 were taken out of the repo and other collateral
24 was substituted for that?

## Page 136

HIGHLY CONFIDENTIAL - A. KIRK

1    A.  I don't know the answer to that.
2    Q.  Did you ever hear a discussion about
3 whether the racers could be taken out of the
4 repo and other collateral substituted for them?
5    A.  No.
6    This, by the way, seems to indicate
7 that the racers with the Archstone pieces
8 were -- had custody at Chase, JPMorgan Chase.
9    Q.  I'm about to move on to Tonucci where
10 he says, "They are with Chase now." What does
11 that mean in context? How does it address the
12 problem that's being discussed in the e-mail?
13    A.  There was an assumption by Paul
14 Houston that Mike Mazzei was just fishing for
15 information about Archstone which may be
16 proprietary to Lehman Brothers that he would
17 like for purposes other than the deal. So he
18 was looking for a reason not to answer any
19 questions about Archstone and because it
20 wouldn't have been proper if their assets
21 weren't being transferred, and Paolo is
22 confirming that the assets would not be
23 transferred because they're at Chase.
24    Q.  Okay. So, with that answer in mind,

## Page 137

HIGHLY CONFIDENTIAL - A. KIRK

1 does this e-mail chain in your mind address any
2 issue concerning whether the racers would stay
3 in or not stay in the repo?
4    A.  No.
5    (Exhibit 318, a document bearing Bates
6 Nos. 10325943 with attachment, marked for
7 identification, as of this date.)
8    Q.  Mr. Kirk, I have put before you two
9 documents, one which we have marked as Exhibit
10 318, a one-page document bearing numbers
11 10325943. Withdrawn.
12    MR. KELLEY: On our copy the comment
13 at the far left is, on some pages, partially
14 blocked out.
15    MR. GAFFEY: I don't have a copy of it
16 yet. I see that.
17    MR. KELLEY: That's not a good 318.
18    MR. GAFFEY: Let me more clearly
19 describe it for the record. Exhibit 318 is
20 actually a multi-page document bearing
21 number 10325943, annexed to which is a
22 schedule which I agree, David, is miscopied
23 so that some of the numbers down the
24 left-hand side don't appear and there may

Page 138

1    HIGHLY CONFIDENTIAL - A. KIRK
2    actually be some numbers cut off at the
3    bottom, but I'm not going to ask any
4    questions about the specific numbers.
5    BY MR. GAFFEY:
6    Q.   Have you seen Exhibit 318 before,
7    Mr. Kirk?
8    A.   Yes.
9    Q.   And what is the document?
10   A.   This is a schedule of residential
11   mortgage positions available for sale.
12   Q.   Is this one of the schedules that we
13   spoke about before the break that were prepared
14   for the -- in connection with the Friday, the
15   Friday project to see what assets could be
16   transferred to Barclays?
17   MR. HUME: Objection. Vague and
18   ambiguous.
19   A.   I don't know if this was in particular
20   for that, but it appears to be so.
21   Q.   Okay. Do you have a recollection of
22   seeing this document on that Friday, on the
23   19th, in connection with the work you were doing
24   that day?
25   A.   I took a cursory review of it, as I

Page 139

1    HIGHLY CONFIDENTIAL - A. KIRK
2    recall.
3    Q.   Would you take a look at what's
4    previously been marked as Exhibit 9, which is
5    also before you. Same question: Have you seen
6    the document before?
7    A.   Yes.
8    Q.   And what is the document?
9    A.   This is a schedule of CDs and
10   short-term money market instruments that were
11   available for sale.
12   Q.   And again, the same question: Did you
13   have this document, did you use this document in
14   connection with the work you were doing on
15   Friday, the 19th?
16   A.   Yes.
17   Q.   And for what purpose did you use it?
18   A.   The same -- to be particular, I don't
19   know if this is the document that was produced
20   that was part of the 45 billion or it was a
21   schedule that related to the 70 billion or it
22   was something in between. I just don't know.
23   Q.   Okay.
24   A.   But all the documents that were
25   produced were an attempt to get to the

Page 140

1    HIGHLY CONFIDENTIAL - A. KIRK
2    equivalent of what actually could be sold to
3    Barclays, this would have been one of them, and
4    to be able to deliver to the experts to value
5    them.
6    Q.   Okay. I may be retreading a little
7    bit a topic we addressed before the lunch break,
8    and forgive me for that, but I want to make sure
9    I have a clear understanding of your memory of
10   this.
11   In this work on Friday to find
12   additional assets, the 15c3 and the unencumbered
13   assets, I asked you that question about the
14   broad spectrum, you know, just go find
15   everything or go find a defined amount.
16   Was the formula that was used there,
17   in essence, keep finding assets until Barclays
18   says that's enough?
19   MR. HUME: Objection. Vague and
20   ambiguous.
21   A.   Again, I didn't -- I wasn't party to
22   the discussion between Bart and Ian as to what
23   the specifics of that was.
24   (Exhibit 319, an e-mail chain, marked
25   for identification, as of this date.)

Page 141

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Q.   You have before you, Mr. Kirk, a
3    two-page document that we have marked as Exhibit
4    319. Take a look through it. Let me know
5    whether you've seen the document before, please.
6    (Document review.)
7    A.   Yes.
8    Q.   And what's the document? Well, it
9    appears to be a set of e-mails sent to and fro
10   on the 19th of September. Do you recall seeing
11   this e-mail chain at or around the time that
12   these e-mails are dated?
13   A.   Yes.
14   Q.   And tell me what you remember about
15   the circumstances under which this is of
16   interest to you -- withdrawn.
17   Why is this chain of e-mails of
18   interest to you in the work you're doing on the
19   19th?
20   A.   Well, this is 5:30 in the afternoon.
21   Everybody's left for court. Jim Seery asks me
22   if I'm coming down to the courthouse. That's
23   the first e-mail. I'm not planning on it. Do I
24   have to, i.e., do they need to be down there?
25   He replies no. We will be drinking later.

Page 142

HIGHLY CONFIDENTIAL - A. KIRK
1
2    I reply, "I'm here. I'm close to the
3    building. How long will you guys be down
4    there?" "Give you an idea after we start."
5    "Sounds like hours." "What is the value of
6    collateral Barclays posted to the DTC today?" I
7    answered, "I believe it's 45 and a half."
8    Billion would be the number, would be the big
9    number. "I don't know the marked value,"
10   meaning I don't know what the change in the
11   value might have been between the marks on
12   Thursday night that they accepted and what --
13   what had been attempted to agree to on Friday.
14       Q.   Okay.  The 45.5, let me see if I can
15   put a little context to this.  When you get this
16   last e-mail from Mr. Seery in this sequence, the
17   one with the time of 5:51 on the Friday?
18       A.   Uh-huh.
19       Q.   Is it your understanding Mr. Seery is
20   down in court still?
21       A.   Yes.
22       Q.   And Seery is writing to you to ask
23   what the value of the collateral was that
24   Barclays posted to the DTC.  What do you
25   understand Seery to mean when he's describing it

Page 143

HIGHLY CONFIDENTIAL - A. KIRK
1
2    as the collateral that Barclays posted to the
3    DTC?
4        A.   The collateral that they would have
5    held in the DTC account at Bank of New York,
6    bank, you know, that they had taken over from
7    the Fed, the repo.
8        Q.   Is that the collateral in the repo?
9        A.   Yes.
10       Q.   And you put the value in your response
11   at 45.5 billion, correct?
12       A.   Yes.
13       Q.   And you're distinguishing in your
14   response the difference between the marked value
15   and what kind of value?  The actual value?  The
16   fair value?
17       A.   Whatever the stated value of the
18   transfer was, which Barclays had indicated all
19   day that they weren't sure what the actual value
20   of the collateral was, so that 45 was the stated
21   value versus, as I said, I didn't know what the
22   marked value or the market value was.
23       Q.   Okay.  Now --
24       A.   And it's probably meant to read
25   "market."  I probably just mistyped it.

Page 144

HIGHLY CONFIDENTIAL - A. KIRK
1
2        Q.   Now, the --
3        I'm sorry, "marked," M-A-R-K-E-D, was
4    supposed to read "market," Is that what you --
5        A.   Probably.
6        Q.   So the value of 45.5 that you referred
7    to here may go to a question I asked you before
8    the break, which was whether or not you became
9    aware of the value that was put on the repo
10   collateral by Bank of New York?
11       A.   I don't know if this is a number that
12   was quoted to me by Barclays and it was a number
13   they had at -- by Bank of New York or not.  I
14   just don't recall.
15       Q.   Do you have any recollection of what
16   your source was for the $45 and a half billion
17   number in your e-mail?
18       MR. HUME:  Objection.  Asked and
19   answered.
20       A.   I don't remember.
21       Q.   Did you ever learn why it was that
22   Seery was asking you this question from the
23   courthouse?
24       MR. KELLEY:  Objection.  Speculation.
25       MR. HUME:  Calls for speculation.

Page 145

HIGHLY CONFIDENTIAL - A. KIRK
1
2    Objection.
3        Q.   You can answer.
4        A.   I assume there was a good reason he
5    needed it.  I don't know what it was.
6        Q.   Yeah, my question is a little
7    different.  Did there come a time when you ever
8    knew, either at the time or later, why Seery
9    wanted to know this information from you?
10       A.   No, because it was impossible to
11   communicate directly with him that evening.
12   There was -- I didn't have a phone.  I didn't
13   have a conversation with him to have it
14   explained to me.
15       Q.   He's in the courthouse so he can't use
16   his phone.
17       It doesn't matter.  You can't speak to
18   him by telephone?
19       A.   It's chaos.
20       Q.   Now, did you ever learn, sir, what
21   value was described to the court of the deal as
22   it stood on Friday?
23       A.   No.
24       (Exhibit 320, a document bearing Bates
25   Nos. 10293820, marked for identification, as

Page 146

HIGHLY CONFIDENTIAL - A. KIRK
1 of this date.)
2
3     Q.   Mr. Kirk, you have before you what I
4 have marked as Exhibit 320, a two-page chain of
5 e-mails. Have you seen this document before?
6     A.   I don't remember seeing this document,
7 no.
8     Q.   Do you recall learning that -- have
9 you had a chance to look through the document?
10 Sorry.
11     A.   I don't recall this.
12     Q.   Okay. Do you recall any
13 conversation -- take a look at the chain of
14 e-mails. You see it ends, it discusses Barclays
15 closing out the repo with Lehman and taking all
16 of the assets collateral, asking, further up,
17 Jean-Francois Astier asks, "Is that part of the
18 plan?" You respond, "Call my cell."
19     Do you see that?
20     A.   Right, uh-huh.
21     Q.   Do you recall a conversation with him
22 about that topic?
23     A.   I don't recall speaking to JF about
24 this specific topic.
25     Q.   And JF is Mr. Astier?

Page 147

HIGHLY CONFIDENTIAL - A. KIRK
1
2     A.   Jean-Francois Astier.
3     Q.   And do you recall the topic coming up,
4 whether you remember speaking to JF about it or
5 not, the topic being Barclays taking all the
6 collateral in the repo?
7     A.   Without being refreshed by this
8 e-mail, I didn't recall it.
9     Q.   Does this e-mail refresh your
10 recollection as to whether or not the topic came
11 up?
12     A.   Somewhat.
13     Q.   What do you remember about it?
14     A.   I think I remember knowing nothing
15 about this being part of the plan or discussed
16 prior to us going down to the courthouse.
17     Q.   And when you say you remember nothing
18 about it being part of the plan, do you mean you
19 didn't know one way or the other, or you thought
20 it wasn't part of the plan? Or you thought it
21 wasn't part of the plan?
22     A.   It was never discussed one way or
23 another.
24     Q.   So your understanding was at the time
25 that Barclays was taking, correct me if I'm

Page 148

HIGHLY CONFIDENTIAL - A. KIRK
1
2 wrong, your understanding was at the time that
3 Barclays is taking both the collateral
4 reflecting the financing amount of the repo and
5 the haircut; is that correct?
6     A.   I don't remember understanding what it
7 was exactly that they had done.
8     Q.   Now, after writing back to JF, "Call
9 my cell," he writes back to you, "I don't
10 understand it either. Seery says it is okay.
11 He is walking out to call you." Do you see
12 that?
13     A.   Yes.
14     Q.   Now, I take it at 11:18 P.M. --
15 actually, 7:18 P.M., with the adjustment for
16 Greenwich mean time, on the 19th of February,
17 Mr. Seery is still down in the courthouse,
18 correct?
19     A.   Yeah, they're all down there. JF is
20 down there as well.
21     Q.   And Seery can't use his phone to call
22 you from the courthouse, we've talked about
23 that, and he says, "Seery is walking out to call
24 you." Do you recall getting a phone call from
25 Mr. Seery that evening?

Page 149

HIGHLY CONFIDENTIAL - A. KIRK
1
2     A.   Yes, but I don't recall what
3 specifically the discussion was.
4     Q.   Do you recall anything about the
5 discussion?
6     A.   No.
7     Q.   But you do recall receiving a
8 telephone call from Mr. Seery?
9     A.   Yes, vaguely. This is refreshing my
10 memory. He must have called me if he says he's
11 going to.
12     Q.   Does it refresh your memory, as you
13 look further at the document, that you got a
14 call and somehow the topic was the repo?
15     A.   If it was, it wouldn't have been more
16 beyond Jim just saying it's not a big deal,
17 don't worry about it.
18     Q.   Jim saying it's -- that the issue,
19 that the issue's not a big deal, or the fact
20 that Barclays' taking the collateral is not a
21 big deal?
22     A.   I think the issue, whatever that --
23 which is Barclays taking collateral, so it's one
24 and the same.
25     Q.   And after around that time, around

Page 150

1    **HIGHLY CONFIDENTIAL - A. KIRK**
2    7:18 P.M. on that Friday, did you have a
3    discussion with anyone else about Barclays
4    taking the collateral that was in the repo at
5    any point?
6        A.  No.
7        Q.  Did you talk to anybody about that
8    over the weekend?
9        A.  No.
10       Q.  Was there any conversation about that
11   when you and Mr. McDade were at Weil in
12   connection with preparing for the closing?
13       A.  Not that I recall.
14       Q.  Do you know if the issue of Barclays
15   taking the collateral in the repo was addressed
16   at the closing in any way?
17       A.  I assume not, because if the
18   transaction was that they were -- well, I don't
19   remember is the better answer.  I don't remember
20   that being discussed.
21       Q.  And as you sit here today, you have no
22   recollection of you yourself engaging in a
23   conversation with anyone about Barclays taking
24   the collateral that was in the repo?
25       A.  Except for a vague recollection that

Page 151

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Jim would have called me about it.
3        Q.  And just so I'm clear on that, because
4    you're gesturing at the document saying "Jim
5    would have," do you have a recollection --
6        A.  Yeah.
7        Q.  -- or are you just inferring that from
8    the document?
9        A.  It's vague.  I don't recall the
10   specific conversation.
11       Q.  Okay.
12       A.  But if it had been an issue, I'm sure
13   I would remember it.
14       Q.  Okay.
15       A.  Since it wasn't.
16       Q.  And from the discussions on Friday, it
17   was your understanding that if Barclays got --
18   if this value collection effort gave Barclays
19   enough value to support the financing in the
20   repo, that Lehman would get the excess back,
21   right?
22           MR. HUME:  Objection.
23   Mischaracterizes the testimony.
24       A.  I don't --
25           MR. KELLEY:  Do you want the question

Page 152

1    HIGHLY CONFIDENTIAL - A. KIRK
2    read back?
3        THE WITNESS:  Yeah, why don't you read
4    the question back, please.  I'm not quite
5    sure exactly...
6        (Record read.)
7        MR. HUME:  Same objection.
8        A.  No, that discussion never took place.
9    There was too much uncertainty about the values.
10       Q.  Was there, in connection with this
11   value of additional profit we talked about on
12   Friday, was there any discussion about what it
13   would take to get Barclays up to the value of
14   the financing in the repo?
15       A.  Not that I was present at.  I don't
16   know if there were any away from me.
17       Q.  This sort of goes to a few other
18   questions I have asked you about, whether there
19   was a goal or a cap on how much had to be
20   collected on Friday.
21       Without regard to what the number may
22   or may not have been, was the goal to find
23   enough assets to replace the loss in value
24   within the repo?
25       MR. HUME:  Objection.  Vague and

Page 153

1    HIGHLY CONFIDENTIAL - A. KIRK
2    ambiguous and lack of foundation.
3        A.  In the end, I was the witness to an
4    agreement that was agreed to between Bart and
5    Ian and the Barclays team, but I wasn't part of
6    any discussions as to the basis for that
7    agreement.
8        Q.  And the agreement that you were a
9    witness to is the one you described to me before
10   where they said, do we have a deal?
11       A.  Yes.
12       Q.  And the agreement was we have a deal.
13       (Exhibit 321, a document bearing Bates
14   Nos. AK-LB-BANKR00002 through 27, marked for
15   identification, as of this date.)
16       Q.  Mr. Kirk, I have put before you a
17   document bearing Bates number AK-LB-BANKR000002
18   through 27.  Do you recognize the document?
19       A.  Yes.
20       Q.  What is it?
21       A.  It's a notebook.
22       Q.  Is it your notebook?
23       A.  Yes, my notebook.
24       Q.  Is it in your handwriting?
25       A.  Yes.

Page 154

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Q.   During the course of your work in
3    connection with the Barclays matter, did you
4    carry the same notebook from place to place?
5    What was your habit with respect to taking
6    notes?
7        MR. KELLEY: Objection. Do you
8    understand the "Barclays matter."
9        THE WITNESS: What?
10    Q.   Withdrawn. Did you take these notes
11    during the week of the 15th to the 22nd that
12    we've been talking about today?
13    A.   From the 11th or -- 10th or 11th to
14    the -- yeah.
15    Q.   Okay. Some of these notes may go back
16    to the period before the weekend?
17    A.   Yes.
18    Q.   Is that what you're telling me?
19    A.   Yes.
20        MR. HUME: May I ask a question? Were
21    these notes produced to Barclays by anyone.
22        MR. GAFFEY: I have no idea. They
23    were produced by the witness pursuant to the
24    subpoena.
25    Q.   Are you able to tell me from looking

Page 155

1    HIGHLY CONFIDENTIAL - A. KIRK
2    at your notes, Mr. Kirk, when you took these
3    notes?
4    A.   Some of them, yes.
5    Q.   Let's just take a minute. I don't
6    want you to go through every page, but tell me
7    how you're dating it because there's no dates on
8    any of the pages?
9    A.   This looks like it would have been
10    Friday, the 12th, first page.
11    Q.   Okay. And you're making that
12    inference from the kind of notes you have here
13    that's what was being discussed then?
14    A.   That's correct.
15    Q.   Could you go, if you don't mind, maybe
16    we can save you some time, if you would go
17    through the notes and tell me at what point they
18    pick up, if at all, on the events that begin on
19    the Sunday night, the 15th. I meant Sunday, the
20    14th, I'm told.
21        (Document review.)
22    A.   Page 14.
23    Q.   Okay. And just so I can put it in
24    some kind of context, what is it about page 14
25    that tells you this picks up on the night of

Page 156

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Sunday, the 14th?
3    A.   Because this is dealing with issues
4    that we might have -- hold on one second. Hold
5    on. I apologize. I'm wrong. Sorry. Hold on.
6        14 I'm not sure about. That may
7    actually still have to do with the morning of
8    attempting to get the Barclays deal done and how
9    we would deal with that with Spinco. This
10    reference to Shafron is what makes me think that
11    it is because Steve was the point on Treasury
12    with us. He works for Treasury.
13    Q.   So once I see Steve Shafir's name at
14    page --
15    A.   Shafron.
16    Q.   Shafron, I see.
17    A.   Right. That indicates I'm still
18    trapped at the Fed. Okay? There's notes here
19    with the reference to tri-party repo labeled
20    number 1 on page 16 is during our discussions
21    with the Fed, and the following pages prior to
22    filing but when they were encouraging us to
23    file.
24    Q.   Now, if you would turn to page --
25    A.   So that's during that period of time.

Page 157

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Hold on. That goes through the 18. Yeah, I
3    think that's through 18. Those are all notes
4    from the meeting with the Fed and the Treasury
5    representatives between 4 and 7 o'clock Sunday.
6    Q.   Okay. Now, are the notes sequential
7    after that? Can I -- I'm trying to get a course
8    of dealing here. Can I kind of work on the
9    assumption that we're at Sunday or after as I go
10    through the rest of these notes?
11        I note that it's a spiral notebook,
12    and that's one of the reasons I'm asking that
13    question. Are you writing as you go?
14    A.   I don't know that these are all in the
15    same order, but let me just look. Sometimes you
16    end up inadvertently skipping a page.
17        Yeah, these are -- these next through
18    23 are --
19    Q.   Okay.
20    A.   -- sequential.
21    Q.   Can we go to 23, please?
22    A.   Yes.
23    Q.   There's a list of what appear to be
24    names on there, Chambers, Orlan, Assi, Seery, do
25    you see that?

## Page 158

HIGHLY CONFIDENTIAL - A. KIRK

1    A.   Yes.

2    Q.   Anything to add?  Any knowledge as to
3    why you're listing those eight names there?

4    A.   I don't recall specifically.  Some of
5    these people I'm responsible for, some of them
6    I'm not, so I don't recall exactly what this
7    list was -- why it's there.  This would have
8    been during the week, early in the week of the
9    15th.

10    Q.   And if you would turn to starting at
11    page 24, it's the following four pages are --
12    following three pages are a typewritten balance
13    sheet of some kind.

14         Are we in the same place?

15    A.   Yes.

16    Q.   And it's entitled Funding 2008 Q3
17    Balance Sheet?

18    A.   This was a schedule which was faxed to
19    Bart Saturday morning at the Fed that he and I
20    used to prepare for a meeting with John Mack,
21    Vickram Pandit, John Thayne and their associates
22    to discuss the possible iterations of Lehman
23    Brothers going forward.  This was those -- that
24    was the first -- well, that's the first pages of

## Page 159

HIGHLY CONFIDENTIAL - A. KIRK

1    funding.

2         This second page is a -- is an
3    analysis that B of A did marking down our assets
4    earlier in the week, which we also discussed at
5    that meeting.  B of A's valuation of Lehman
6    Brothers' assets.

7    Q.   You can put that aside.  I'm done with
8    that document.

9    A.   Okay.

10         (Exhibit 322, a document bearing Bates
11    Nos. AK-LB-BANKR000028, marked for
12    identification, as of this date.)

13    Q.   Before you, Mr. Kirk, is Exhibit 322,
14    a one-page set of notes bearing Bates number
15    AK-LB-BANKR000028.  Is that your handwriting?

16    A.   Yes.

17    Q.   Do you have any recollection of making
18    these notes?

19    A.   Yeah, this was somebody trying to
20    explain to me in broad terms what 15c3-3 was.

21    Q.   Okay.  I take it you're looking at the
22    reference to customer accounts segregated in
23    margin in the box in the upper left-hand corner.

24    A.   I'm looking at the whole page, yes.

## Page 160

HIGHLY CONFIDENTIAL - A. KIRK

1    Q.   Do you know, these numbers on the
2    right-hand side, 1B and 1.7B, what do they
3    represent?

4    A.   I don't recall what they represent.

5         (Exhibit 323, a document bearing Bates
6    Nos. AK-LB-BANKR000030, marked for
7    identification, as of this date.)

8    Q.   You have before you, Mr. Kirk, what we
9    have marked as Exhibit 323, bearing Bates number
10    AK-LB-BANKR000030.  Are these notes in your
11    handwriting?

12    A.   Yes.

13    Q.   Can you, as you look at them, do you
14    remember the circumstances under which you took
15    the notes?

16    A.   I think these were notes on Sunday
17    during the closing.

18    Q.   And why is it you think they're notes
19    on Sunday during the closing?

20    A.   Because I see a reference to Alastair,
21    which would be Alastair Blackwell, who I didn't
22    deal with prior to Sunday, and Tom Hamilton, who
23    was head of mortgage trading at Barclays, who
24    was trying to deal with this issue of the

## Page 161

HIGHLY CONFIDENTIAL - A. KIRK

1    settlements.

2         The dispute that arose on Sunday was
3    who was going to guarantee the settlements of
4    the trades that were supposed to settlement on
5    Lehman Brothers' account starting Monday
6    morning.

7    Q.   And that dispute, broadly speaking,
8    involved DTC needing some comfort as to who was
9    going to guarantee those settlements?

10    A.   Yes.

11    Q.   Now, on the notes themselves there is,
12    amidst the names and above the name Tom Hamilton
13    and Harry Harnson -- I'm just giving you that
14    for placement on the document.

15    A.   Uh-huh.

16    Q.   -- is what appears to be an Assets and
17    Liabilities column; is that right?

18    A.   Yes.

19    Q.   Okay.  Can you explain to me what that
20    represents?

21    A.   To the extent that I understand it, it
22    represents some assets of 45 and a half billion,
23    goodwill would be the next line of 250 million,
24    and then it had a loan from BarCap that says 45

Page 162

1          HIGHLY CONFIDENTIAL - A. KIRK
2    and a half, and then payables or trade payables,
3    or whatever they are, cure payments and comp of
4    2 and a quarter and 2 billion on it.
5        Q.   Is that your understanding of the
6    balance sheet of the deal that was agreed on
7    Friday?
8            MR. HUME: Objection. Lacks
9    foundation.
10       A.   I don't remember if this was -- this
11   was probably more a broad generalization than a
12   specific.
13       Q.   I recognize it's some handwritten
14   notes and it's got scratches all over it, sir.
15   I'm not giving it any greater dignity than that,
16   but my question is, really goes to the 45.5 on
17   the asset side and the 45.5 on the liability
18   side.
19       A.   I don't remember for this specific
20   document and why I was scratching this out that
21   way.
22       Q.   You do see on the liability side the
23   amount for payables at 2.25 billion, correct?
24       A.   Yes.
25       Q.   And the amount for comp at 2 billion,

Page 163

1          HIGHLY CONFIDENTIAL - A. KIRK
2    correct?
3        A.   Yes.
4        Q.   And those were the assumed liabilities
5    that had stayed in the deal from the first time
6    you saw it, right?
7        A.   This would have been -- yes, but I
8    don't know, I don't recall anybody warranting to
9    me what all these numbers were or if I was just
10   scratching them down from a press release or...
11       Q.   Actually, I should ask you that. Do
12   you recall the source? Is this something you're
13   reading? Something somebody is saying?
14       A.   I don't recall whether this was
15   something somebody was saying or if I was
16   reading a press release or a, you know, a
17   newspaper account or something.
18       Q.   Do you have any understanding with the
19   repo in mind of whether the agreement made on
20   Friday was that Barclays would get 45.5 out of
21   the repo --
22           MR. HUME: Objection.
23           MR. GAFFEY: You got to wait until I'm
24   done, Hamish.
25           MR. HUME: I thought you were.

Page 164

1          HIGHLY CONFIDENTIAL - A. KIRK
2        Q.   Do you have any understanding with the
3    repo in mind of whether the agreement made on
4    Friday was that Barclays would get 45.5 out of
5    the repo in return for 45.5 in funding?
6            MR. HUME: Objection. Lack of
7    foundation.
8        A.   I'm not sure, actually. They had
9    funded the firm for that amount on Thursday, so
10   I --
11       Q.   I see the problem. Let me rephrase
12   the question. You understood that Barclays had
13   funded the firm for 45.5 the prior Thursday,
14   correct?
15       A.   Thursday or Friday, right.
16       Q.   Okay. And on the Friday, you
17   understood that the deal had changed so that the
18   collateral in the repo was what would be
19   transferred to Barclays, correct?
20       A.   Correct.
21       Q.   Did these notes reflect your
22   understanding that what would be transferred to
23   Barclays was the amount in the repo sufficient
24   to cover the amount they had funded?
25           MR. HUME: Objection.

Page 165

1          HIGHLY CONFIDENTIAL - A. KIRK
2        Q.   They were supposed to balance?
3            MR. HUME: Objection. Vague and
4    ambiguous as to what the values they had
5    funded.
6        Q.   Do you have the question in mind? Do
7    you want it read?
8        A.   No. No, I understand the question.
9    I'm just saying there were lots of moving parts,
10   so I don't know that those were exactly supposed
11   to balance in that.
12       Q.   Was it your understanding they were
13   roughly supposed to balance?
14           MR. HUME: Objection. Vague and
15   ambiguous.
16       A.   Again, I don't -- I didn't have an
17   understanding of that. I didn't know how much
18   would be made up from the shortfall of other
19   assets versus the repo. Once they went to
20   court, I wasn't dealing with valuation issues,
21   so ...
22       Q.   Apart from the source of assets to be
23   given to Barclays, was it your understanding
24   that what was to be given to Barclays was to be
25   equal to the amount that Barclays had funded?

Page 166

1    HIGHLY CONFIDENTIAL - A. KIRK
2        MR. HUME: Objection.
3        MR. KELLEY: Objection. Speculation.
4    Misstates prior answers.
5        MR. HUME: Vague and ambiguous as to
6    valuation.
7    A.  I didn't have that understanding.
8    Q.  Did you have --
9    A.  Nowhere did anybody say they should be
10   equal.
11   Q.  Okay. Did you have an understanding
12   that Barclays was going to get more than it had
13   funded?
14   A.  In terms of assets?
15   Q.  Yes.
16   A.  Yeah, they were going to get assets
17   that were unencumbered.
18   Q.  And when you added the unencumbered to
19   the amount in the repo, was it your
20   understanding that Barclays was going to take
21   more out than it had funded into the repo?
22   A.  Well, they were also assuming other
23   liabilities away from the repo.
24   Q.  I understand that.
25       Did you understand they were going to

Page 167

1    HIGHLY CONFIDENTIAL - A. KIRK
2    take out more than they had funded into the
3    repo?
4        MR. KELLEY: Objection. That's based
5    on speculation. Calls for speculation, I
6    should say.
7        THE WITNESS: So I --
8    Q.  You can answer that question.
9        MR. KELLEY: It just asks him to
10   identify the source of his knowledge.
11       MR. GAFFEY: No, I'm going to ask him
12   to answer the question I asked.
13       Will you read it back?
14       (Record read.)
15   A.  I don't understand the nature of, when
16   you say "take out more," what does that mean?
17   Q.  Barclays funds the repo to the tune of
18   $45.5 billion, you understand that, right?
19   A.  Right.
20   Q.  In the asset transfer agreement that's
21   at issue for the bankruptcy court, Barclays is
22   going to take a certain amount of assets out of
23   Lehman, correct?
24   A.  Yes.
25   Q.  Was it your understanding that that

Page 168

1    HIGHLY CONFIDENTIAL - A. KIRK
2    latter bucket of assets was to equal or to
3    exceed the amount that Barclays had paid into
4    the repo for funding?
5        MR. HUME: Again, objection. Vague
6    and ambiguous as to the valuations posed in
7    your question.
8    A.  My understanding was the totality of
9    the assets should attempt to get somewhere close
10   to covering all the liabilities.
11   Q.  The liabilities, you mean the
12   liabilities in the repo plus the assumed
13   liabilities?
14   A.  Yes.
15   Q.  Is that what you mean?
16       MR. HUME: Objection to the phrase
17   "assumed liabilities."
18   A.  Yes.
19   Q.  And the assumed liabilities you're
20   referring to are the assumed liabilities for
21   payable and comp in the amount of 4.25 billion,
22   correct?
23   A.  Correct, and then ultimately the
24   assumed liabilities in guaranteeing the trading
25   obligations which they were agreed to do come

Page 169

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Sunday.
3    Q.  Okay. And do you know what the
4    resolution was of the issue of guaranteeing --
5    the dollar resolution was of the guarantee of
6    the trading liabilities?
7    A.  I don't recall specifically, but they
8    agreed to I think fund into DTC some amount of
9    cash to make good on the liabilities. I don't
10   remember what the number was.
11   Q.  Do you recall that the number was
12   about $250 million?
13   A.  Sounds reasonable.
14   Q.  Okay. So Barclays is to take out of
15   the deal an amount roughly in balance to the
16   amount in the repo, the assumed liability for
17   comp, the assumed liability for payables, and
18   the guarantee to the DTC; is that your
19   understanding?
20       MR. HUME: Object to the form of the
21   question.
22   A.  And the goodwill.
23   Q.  And the goodwill. And the goodwill is
24   about 250 million, correct?
25   A.  Right, so that -- well, they were

Page 170

HIGHLY CONFIDENTIAL - A. KIRK
1  buying the business of Lehman Brothers and they
2  were buying a whole bunch of assets which had,
3  in my opinion, quite uncertain value so that
4  they could lose many billions of dollars or make
5  many billions of dollars on those assets given
6  the volatility of the markets, and in addition
7  to that, they would obviously get the ongoing
8  operations of Lehman Brothers.
9      Q.   Was it your understanding that --
10     A.   So that it was --
11     Q.   Sorry.
12     A.   What I would say is that, in my
13  opinion, there was, at least from my seat, no
14  way to know what the actual value of those
15  assets would end up being for Barclays, you
16  know, over -- because I had no idea what
17  strategies they were going to pursue about those
18  assets, whether they were going to hedge them,
19  you know, all the variety of things that they
20  might end up choosing to do to execute a large,
21  huge block of -- the size of a transfer of this
22  size of assets is, you know, enormous and at the
23  time maybe even unprecedented.
24     Q.   Was it your understanding that the

Page 171

HIGHLY CONFIDENTIAL - A. KIRK
1  transaction was supposed to give Barclays a gain
2  on day one?
3      A.   No.
4      Q.   I hear what you're saying about longer
5  term they may operate the business and make
6  money out of it.  The question about day one, I
7  want to be sure we're —
8      A.   Yeah.
9      Q.   -- hearing each other here.  Was it
10  your understanding that there was any immediate
11  gain embedded for Barclays in the deal that was
12  made on Friday?
13         MR. HUME:  Objection.  Lacks
14  foundation.
15     A.   No, there was no understanding on my
16  part that there was a gain.
17         (Recess; Time Noted:  2:10 P.M.)
18         (Time Noted:  3:15 P.M.)
19         (Exhibit 324, a document bearing Bates
20  Nos. AK-LB-BANKR0000987 through 119, marked
21  for identification, as of this date.)
22  BY MR. GAFFEY:
23     Q.   Mr. Kirk, you have before you what we
24  have marked as Exhibit 324, a document bearing

Page 172

HIGHLY CONFIDENTIAL - A. KIRK
1  Bates number AK-LB-BANKR000097 through 119.  Do
2  you recognize the document?
3      A.   Yes.
4      Q.   What is the document?
5      A.   This is a document that describes the
6  deal that was cut early in the week between
7  Lehman and Barclays.
8      Q.   Is that your handwriting on the
9  document?
10     A.   No.
11     Q.   Do you know whose handwriting it is on
12  the document?
13     A.   No.
14     Q.   I would note that the document was
15  produced to us by you.  Do you know how you came
16  into possession of this document with somebody
17  else's handwriting on it?  Any memory?
18     A.   No, I don't know what this is.
19     Q.   Do you have any knowledge of what the
20  annotations mean on the asset side where
21  somebody has written "ACT" and "HC"?
22     A.   No.
23     Q.   Would you understand the phrase "HC"
24  to mean haircut?

Page 173

HIGHLY CONFIDENTIAL - A. KIRK
1      A.   That could be.
2      Q.   Would you understand the phrase "ACT"
3  to mean actual?
4      A.   That's not usually a vernacular, but
5  maybe.
6      Q.   I asked you —
7      A.   It could be "account."
8      Q.   Could be.  I don't know what your --
9      A.   Yeah.  Yeah.
10     Q.   I asked you earlier this morning if
11  you had any knowledge of a discount or a haircut
12  being given to Barclays on the book value of the
13  assets being traded for in the early part of the
14  week.  Does this refresh your recollection as to
15  whether there was an agreement on the deal as it
16  originally was made on Monday and Tuesday to
17  give Barclays a discount from book value?
18     A.   No.
19     Q.   Could you put before you Exhibit 19?
20  It's within the pile.
21     A.   What does it look like?
22     Q.   It's the other copy of that financial
23  statement, the one-pager.
24     A.   Yeah.

Page 174

HIGHLY CONFIDENTIAL - A. KIRK

1  Q.  I'm just going to take a fly around
2  this just because I wonder if you know.
3  This document, if you compare it to
4  Exhibit 19, that is, Exhibit 324 is identical to
5  Exhibit 19, except for two things: One is the
6  handwritten note in the upper right-hand corner
7  in 19 and the other is the time stamp in the
8  lower right-hand corner.
9  You see one is generated 11:18 and one
10 is generated at 11:19?
11 A.  Okay.
12 Q.  Do you have any knowledge of how this
13 schedule was being generated or who was
14 generating it?
15 A.  No, I don't even know why I had this
16 document.  Whatever documents I had I gave to
17 David, he gave to you.
18 Q.  Okay.  I have nothing further at this
19 time.
20 Oh, sorry, I lied.  I have one more.
21 (Exhibit 325, a document bearing Bates
22 Nos. AK-LB-BANKR000188, marked for
23 identification, as of this date.)
24 A.  Okay.

Page 175

HIGHLY CONFIDENTIAL - A. KIRK

1  Q.  Before you, Mr. Kirk, is a one-page
2  document from amongst the documents that you
3  produced, and its number is AK-LB-BANKR0000188.
4  A.  Uh-huh.
5  Q.  Do you recognize the document?
6  A.  Yes.
7  Q.  And the first e-mail in the series,
8  the earlier one, is from you saying, "Today is
9  my last day at BarCap/Lehman.  I want to thank
10 everyone for all their help over the years," and
11 you give your contact information, do you see
12 that?
13 A.  Uh-huh.
14 Q.  And the next e-mail up is a response
15 from Mr. McGee to you, do you see that?
16 A.  Uh-huh.
17 Q.  Where he says, "You are a talent and a
18 good guy.  You were amazing through the final
19 months.  I am sorry we didn't pull it off.  Best
20 of luck."  Do you see that?
21 A.  Uh-huh.
22 Q.  Do you know what Mr. McGee was
23 referring to when he said, "I'm sorry we didn't
24 pull it off"?

Page 176

HIGHLY CONFIDENTIAL - A. KIRK

1  A.  Meaning that Lehman didn't survive and
2  thrive as an independent entity.
3  MR. GAFFEY:  Okay.  Now I have nothing
4  further.  Thanks.
5  I have to pass you down to my friends.
6  EXAMINATION BY
7  MR. ROTHMAN:
8  Q.  Good afternoon.  My name is Seth
9  Rothman.  We met earlier.  I represent the
10 trustee who's been appointed under the SIPA
11 statute to liquidate LBI.
12 A.  Okay.
13 Q.  If you would dig out of the pile of
14 exhibits in front of you number 322.  These are
15 your handwritten notes, correct?
16 A.  Yes.
17 Q.  In the upper left-hand corner at the
18 top of the page, there's a box that's divided in
19 two.  It says "Customer Account Seg" in the top?
20 A.  Uh-huh.
21 Q.  Correct?  And then underneath it says
22 "Margin."  Can you tell me what that represents?
23 A.  Okay.  My recollection was somebody
24 was trying to explain to me how the 15c3 margin

Page 177

HIGHLY CONFIDENTIAL - A. KIRK

1  worked, and it was, my recollection from
2  reviewing this document, it was different than
3  between high-net worth individuals and Neuberger
4  Berman, so that's why there's four boxes instead
5  of two.
6  I don't remember the distinct
7  difference, but the customer accounts, the
8  individual customer accounts in the
9  high-net-worth business were held in individual
10 accounts.  In each of them there was some margin
11 that Lehman had to support those accounts.  It
12 was regulatory -- required by regulation.
13 Q.  Are you familiar with the concept of a
14 margin deposit to cover short positions?
15 A.  I'm familiar with that concept.
16 Q.  Is that what you were referring to
17 here when you write margin?
18 A.  I don't know if it was that or if
19 there were other margin requirements that were
20 required by the regulators.  I don't know if it
21 was specifically that or if it was overall
22 margin or if the margin is not required on
23 others.
24 Q.  Over on the right it looks like you

Page 178

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    wrote 500, is that million?
3    A.    It looks like that, yeah.
4    Q.    Do you know if that relates to the
5    margin box on the left?
6    A.    It appears to, but none of these
7    numbers add up in those columns over there, so
8    I'm not sure what it refers to exactly.
9    Q.    Do you recall any discussions
10    concerning the margin deposit that LBI had with
11    the OCC?
12    A.    With the?
13    Q.    OCC.
14    A.    Who's that? What's that? The office
15    of --
16    Q.    The Options Clearing --
17    A.    Oh, no.
18    Q.    -- Corp.
19    A.    Those typically would have been equity
20    options positions. I assume would have been
21    mostly equity, so it was not my bailiwick. I
22    was not involved in that.
23    Q.    In your work on the transaction, did
24    you hear any discussions about whether margin
25    deposits would be transferred to Barclays?

Page 179

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    A.    I don't recall.
3    Q.    You can put that aside.
4    A.    Okay.
5    Q.    And you mentioned that there was a
6    dispute involving the DTC. Do you recall that?
7    A.    Yes.
8    Q.    That arose on Sunday while you were up
9    at Weil?
10    A.    Yes.
11    Q.    When did you become aware of that
12    dispute? At what point during the day?
13    A.    It would have been somewhere, sometime
14    between 10 and 2, 10 A.M. and 2 P.M.
15    Q.    And how did you become aware of that?
16    A.    I don't recall who told us it was an
17    issue, but someone informed Bart and I in the
18    room that there was an issue with the
19    settlements and those obligations going forward.
20    Q.    So you yourself weren't involved or
21    participating directly in any of those
22    discussions?
23    A.    We were informed there was an issue.
24    We were informed that it -- a big piece of the
25    issue had to do with TBAs, mortgage trades, and

Page 180

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    government securities in terms of what was
3    settling.
4         So I was involved only to the extent
5    that I tracked down through Kaushik Amin and
6    Jeff Michaels, who ran agency and government
7    bond trading, to get him in touch with the
8    mortgage people at Barclays to explain to them
9    how what the market risk in those positions and
10    settlement risk in those positions would be.
11        So I set up a call. I reached Jeff
12    Michaels on the phone, I tracked him down, and
13    then I got him to speak to the Barclays
14    representatives by phone. I didn't participate
15    in those conversations.
16    Q.    Who is Jeff Michaels?
17    A.    Head of government agency trading at
18    Lehman Brothers in the U.S. -- globally, I
19    think.
20    Q.    You also mentioned in response to
21    Mr. Gaffey's questions a guarantee relating to
22    this issue.
23    A.    We were informed that the issue had
24    been settled later in the day along with there
25    was a, what I referred to as a global settlement

Page 181

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    between JPMorgan and Barclays. We were not
3    given details, but I do recall one detail we
4    were given was that they had agreed to guarantee
5    the trades. They had gotten enough information
6    and the DTC was comfortable to settle trades the
7    next day. We couldn't open for business with
8    this cash deposit.
9    Q.    When you say they had agreed to
10    guarantee the trade?
11    A.    Barclays.
12    Q.    And did you understand the guarantee
13    to be $250 million or --
14    A.    I don't know if -- I remember the
15    amount, that amount being discussed as being put
16    as a deposit. I don't remember if there were
17    additional parts of the guarantee that were
18    described beyond that. There might have been.
19    Q.    Did you hear that there was a concern,
20    any concern on the part of the DTC that it might
21    be exposed if the trades didn't settle?
22    A.    I remember that being discussed at
23    some point in the day as the reason as to why
24    all the DTC trades had failed on Friday, and DTC
25    was concerned that if they reopened, they would

Page 182

HIGHLY CONFIDENTIAL - A. KIRK
1    be assuming all kinds of risks from failed
2    trades on Friday and in addition to the trades
3    going forward on Monday, and that they wanted
4    some -- they needed a margin safety to be able
5    to do that. So they were concerned that they
6    were exposed.
7        Q.    And did you hear anything about the
8    extent of that exposure?
9        A.    No.
10        Q.    Do you know if the deposit or the
11    guarantee was meant to cover the entire
12    potential exposure?
13        A.    I don't know the answer to that.
14    Those discussions happened directly, that is, my
15    understanding those discussions happened
16    directly between DTC and Barclays.
17        Q.    Do you know if there was a written
18    agreement?
19        A.    I don't know that.
20        Q.    You never saw a written agreement
21    resolving this dispute with the DTC?
22        A.    No. No.
23        Q.    Did you hear anything about what would
24    happen to the guarantee if it turned out not to

Page 183

HIGHLY CONFIDENTIAL - A. KIRK
1    be used?
2        A.    No.
3        Q.    Changing the subject. You mentioned
4    back on September 14 that Mr. McDade told you
5    that the first transaction that was being
6    discussed with Barclays wasn't going to go
7    forward. Do you remember that?
8        A.    Yes.
9        Q.    And I think you said he told you that
10    the FSA had turned down the application to close
11    that transaction?
12        A.    Yes.
13        Q.    Did he tell you why?
14        A.    Yes, that Barclays needed a waiver to
15    guarantee the trading obligations -- I'm sorry,
16    Barclays -- for Lehman to -- for them to close
17    the transaction, they would have to get a
18    shareholder vote, which would take some period
19    of time, I forget if it was 30 or 45 days, but
20    some reasonable period of time, and that it was
21    the view of all the participants, including
22    Treasury and the Fed and everybody, that Lehman
23    would not make it for 30 days without somebody
24    else guaranteeing the trading obligations for

Page 184

HIGHLY CONFIDENTIAL - A. KIRK
1    that period of time.
2        The only person who would do that was
3    Barclays. Barclays apparently needed a waiver
4    of shareholder approval to make that guarantee,
5    which the FSA deemed they would not give.
6        Q.    Okay. Let me now switch topics again
7    and take you back to the Friday meeting that you
8    testified that I think you said started around 3
9    o'clock on Friday afternoon?
10        A.    Uh-huh.
11        Q.    This is the meeting that you had with,
12    among others, Mr. Klein, Mr. Diamond and
13    Mr. Keegan from Barclays?
14        A.    Uh-huh.
15        Q.    You have to give me an out-loud
16    answer --
17        A.    Yes.
18        Q.    -- for the court reporter. Thanks.
19        Was Mr. McDade physically present in
20    that meeting or is he on the phone?
21        A.    He's on the phone.
22        Q.    And were there any discussions about
23    that during that meeting about having to go back
24    and explain the deal to the Barclays board?

Page 185

HIGHLY CONFIDENTIAL - A. KIRK
1        A.    No, not in that meeting.
2        Q.    Did you hear that at another meeting?
3        A.    No, I didn't hear it in any meeting.
4        Q.    When you say no, you don't think it
5    happened or you don't remember?
6        A.    No, I didn't hear it. Didn't
7    happen -- that was not discussed in front of me.
8        This was what day again? This was the
9    19th?
10        Q.    On Friday, the 19th.
11        A.    Friday, yes, no.
12        Q.    You had a meeting --
13        A.    Yeah.
14        Q.    -- late in the afternoon where -- this
15    is late in the afternoon where I think you said
16    this is when Barclays came back and said they
17    thought the value of the securities didn't match
18    the value of the loan and so they were looking
19    for additional unencumbered assets?
20        A.    Uh-huh.
21        Q.    Is that right?
22        A.    Yes.
23        Q.    And Mr. Gaffey asked you a couple of
24    times about whether they gave a target or a

Page 186

HIGHLY CONFIDENTIAL - A. KIRK
1
2 number for how much more they would need?
3     A.    Yes.
4     Q.    Right?
5         As best you can recall, they didn't
6 give you such a number, correct; is that right?
7     A.    That's correct.
8     Q.    And nobody -- Mr. Klein didn't say
9 anything about having to have a certain number
10 to go back to the Barclays board?
11     A.    No.
12     Q.    I'm going to mark as my only exhibit
13 as 326 an e-mail from you to Mr. McDade.
14         (Exhibit 326, an e-mail chain, marked
15     for identification, as of this date.)
16     A.    Right.
17     Q.    Do you recall sending this e-mail to
18 Mr. McDade?
19     A.    I do recall that.
20     Q.    So the bottom e-mail on the page is
21 from you to Mr. McDade. It's sent on that
22 Friday at 3:39.
23     A.    Uh-huh.
24     Q.    Do you see that?
25     A.    Yes.

Page 187

HIGHLY CONFIDENTIAL - A. KIRK
1
2     Q.    You write to Mr. McDade, "Rich Ricci
3 just told me he won't blow up this trade by
4 being a pig."
5         Do you recall the context for that?
6     A.    Well, the Barclays team had left.
7 Bart was on the road and he was having
8 discussions with Ian about whatever additional
9 assets there were. You know, I implored to
10 these guys that they shouldn't blow this deal
11 up, 10,000 jobs were at stake, you know, there
12 was a tremendous amount of pressure on all of
13 us, and Rich said to me something to this
14 effect: I won't blow the deal up by being too
15 piggish.
16         I wanted to make sure Bart knew that
17 because they were wrapping up with he and Ian
18 whatever issues there were, so that's why I sent
19 the e-mail.
20     Q.    Was there a concern on the Lehman said
21 that the Barclays people were being too piggish?
22     A.    I was concerned that we were going to
23 go into bankruptcy court, which there's always
24 uncertainty, and try to describe a deal that
25 didn't look like the deal that they had heard

Page 188

HIGHLY CONFIDENTIAL - A. KIRK
1
2 about two days before.
3         So my primary concern at that point
4 was that there be as much flexibility, so to
5 speak, at least give the -- enough operating
6 room that we wouldn't go into court, have the
7 transaction denied, and have to put the padlocks
8 on the building Saturday morning.
9         So -- and I've been around many, many
10 bankruptcy cases over two decades. Wildly
11 uncertain things happen in these courts in
12 circumstances.
13     Q.    Sorry. Is that what you meant by
14 "blow up the trade"?
15     A.    Yes.
16     Q.    That the bankruptcy court wouldn't
17 approve the deal?
18     A.    That's correct.
19     Q.    And you were, just so I understand
20 your testimony, you were concerned that that
21 might happen if Barclays was too piggish?
22     A.    Yeah, I think there were a myriad of
23 risks that could have done, you know, I mean,
24 the -- the stress of that not happening that
25 evening and you only had one shot at it, you

Page 189

HIGHLY CONFIDENTIAL - A. KIRK
1
2 know, it was -- certainly everybody was very
3 concerned that this was sort of a do-or-die
4 situation, literally.
5     Q.    Was the comment about being a pig
6 related to the effort to find unencumbered
7 assets?
8     A.    Yes.
9     Q.    And you didn't -- so you don't have,
10 since that's in Mr. Lowitt's bailiwick, you
11 don't have a specific number or value that
12 would --
13     A.    No, this comment had been made to me.
14 I just wanted to pass it along.
15     Q.    And then Mr. McDade asks you back,
16 "Are the shorts all gone?" What was that a
17 reference to? Did you have an understanding as
18 to what he meant?
19     A.    I don't recall specifically why he
20 asked that, but that was a problem we were
21 dealing with all week at Lehman, that we were
22 naturally getting longer every day because our
23 hedges were either derivatives that had been
24 wiped out by the terms of their contracts or
25 short positions that were being bought in on the

Page 190

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2  other side.
 3        So, you know, asset prices were
 4  imploding and we were naturally getting longer
 5  every day.  So his question was how long is the
 6  firm, so to speak, at this moment in time.  I
 7  believe -- I don't -- so that's what I -- I
 8  guess I tracked that down.
 9        Q.   And that's what your answer to
10  Mr. McDade says?
11        A.   Yeah.  Yeah.
12        MR. ROTHMAN:  That's all the questions
13  I have.  Thank you.
14        THE WITNESS:  You're welcome.
15  EXAMINATION BY
16  MR. TECCE:
17        Q.   Mr. Kirk, my name is James Tecce.  I'm
18  an attorney at Quinn Emanuel.  We are special
19  counsel to the Creditors Committee.  I just
20  wanted to ask you a couple of follow-up
21  questions.
22        Going back to Friday, September 19th,
23  I believe it is, I think that you had said that
24  it was your belief on that day that JPMorgan
25  Chase would be "hostile," I believe was the word
```

Page 191

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2  that you used, with respect to the transaction.
 3        What was the basis for that belief?
 4        A.   The fact that they had shut our DTC
 5  account down was one issue.  The other issue was
 6  that Barclays had described to me they were
 7  having a dispute with JPMorgan about the
 8  transfer of collateral.  In addition to that,
 9  JPMorgan had been, my -- my understanding, it
10  had been described to me by Ian that JPMorgan
11  over time prior to the bankruptcy had been
12  squeezing a lot of additional collateral out of
13  Lehman Brothers along the way.
14        Q.   Do you have an understanding as to
15  when JPMorgan froze the DTC account?
16        A.   You know, it was either Thursday or
17  Friday.  I don't remember.  I think it was --
18  I'm pretty sure it was Friday, but it may have
19  been Thursday.
20        Q.   And when were you told about the
21  dispute between Chase and Barclays that you
22  described?
23        A.   Friday morning.
24        Q.   Going forward --
25        A.   And that's when I learned about the
```

Page 192

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2  DTC account.  So I don't remember whether they
 3  had closed -- I learned about it all on Friday.
 4  I just don't remember if it was for that day or
 5  it was for the previous day.
 6        Q.   Do you know what the basis -- do you
 7  have an understanding of the basis of
 8  Mr. Lowitt's statements that Chase had been
 9  taking collateral?
10        A.   Well, he was dealing with them
11  directly, so they were -- my understanding was
12  that they were threatening to not clear our
13  transactions without additional collateral prior
14  to the bankruptcy.
15        Q.   Did he provide any examples of that to
16  you?
17        A.   The one example that he provided was
18  that they requested Thursday night, the 11th --
19  is that right?  Yeah, the 11th, that Lehman
20  deliver another $5 billion to them prior to the
21  opening on Friday.
22        Q.   Going forward to the 21st, I believe
23  Sunday, the day of the closing, September 21,
24  you had just spoken briefly about the dispute
25  regarding the guarantee of trades with the DTC.
```

Page 193

```
 1        HIGHLY CONFIDENTIAL - A. KIRK
 2        Were you aware of any other disputes
 3  besides that issue between Chase and Barclays at
 4  that time?
 5        A.   They were still arguing about the
 6  transfer of collateral, your clients were there
 7  for some of those arguments, in a, what I would
 8  refer to as a giant conference room with 50
 9  people in it and a lot of yelling.
10        Q.   Right.  And do you remember the
11  substance of those disputes regarding the
12  collateral?
13        A.   JPMorgan felt as if Barclays should
14  pay them and take additional collateral to
15  complete the repo transfer from the Fed, and in
16  addition to that, they actually asked for
17  Barclays to buy additional collateral even
18  beyond that that they had gotten from Lehman
19  Brothers earlier.
20        Q.   And do you have an understanding as to
21  what the resolution of that dispute was?
22        A.   No, they wouldn't tell us.
23        Q.   Do you have an understanding of anyone
24  at Lehman who does know the resolution of that
25  dispute?
```

Page 194

HIGHLY CONFIDENTIAL - A. KIRK

1    HIGHLY CONFIDENTIAL - A. KIRK
2    A.   I don't know if anybody at Lehman does
3    know that.
4    Q.   Do you know if Mr. McDade knows the
5    answer?
6    A.   I don't know that. I was in the room
7    when they told us they wouldn't tell us. I
8    don't know if there were conversations after
9    that.
10    Q.   Do you have an understanding if
11    Mr. Klein knows the resolution of the dispute?
12    A.   I don't know that he knows it. He
13    probably does.
14    Q.   Do you have an understanding as to
15    whether or not the resolution of that dispute
16    resulted in any additional assets being
17    transferred or liabilities being assumed by
18    Barclays in connection with the transaction?
19    A.   I don't know the answer to that. This
20    was a delivered to us as a fait accompli and,
21    you know, at 2 I went home. There may have been
22    somebody dealing with transfers of assets and
23    have some insight into that. Ian might have
24    insight into it, you know, what happened past
25    that in terms of the closing, but he may not

Page 195

1    HIGHLY CONFIDENTIAL - A. KIRK
2    have because, you know, there may not be -- I
3    don't think they would necessarily have had to
4    have involved Lehman in any transfer of assets
5    between JPMorgan and Barclays. They may have.
6    They may not have. I don't know.
7    (Exhibit 327, an e-mail chain dated
8    September 21, 2008, marked for
9    identification, as of this date.)
10    Q.   I'm handing the witness an Exhibit
11    327, an e-mail dated 9/21/2008.
12    A.   Uh-huh.
13    Q.   Have you ever seen this document
14    before?
15    A.   Yes.
16    Q.   What is it?
17    A.   This is a series of e-mails between
18    myself and Jeff Michaels, who I described
19    earlier was global head of government and agency
20    trading, and who I was -- reached to deal with
21    directly with the -- his counterparties at
22    Barclays to describe what the settlement issues
23    going forward were in his business so they could
24    get some sense of what the risk of those
25    settlement issues were.

Page 196

1    HIGHLY CONFIDENTIAL - A. KIRK
2    Q.   And this, again, correct me if I'm
3    wrong, this is the issue of the settling of the
4    trades involving the DTC?
5    A.   Yes.
6    Q.   And just going up to the e-mail Sunday
7    September 21, 18:13:18, do you see that? I
8    believe it's the second e-mail down from the top
9    of the page.
10    A.   Uh-huh.
11    Q.   And Mr. Michaels asks you, I believe,
12    "Okay, here is where we are." He says, "We had
13    a problem with Chase on Friday re about 8B of
14    collateral. They are the ones holding up this
15    transaction. Chase holds the cards and Alastair
16    and Beth are involved."
17    What's your understanding of what
18    Mr. Michaels is saying in that e-mail?
19    A.   He's certainly saying that JPMorgan
20    Chase is acting as a hostile party. They're
21    holding up the transaction. There's a dispute
22    on Friday. I don't know what exact dispute he's
23    referring to because there were lots of disputes
24    with JPMorgan at this point in time. They had
25    shut our DTC account down. They had taken the

Page 197

1    HIGHLY CONFIDENTIAL - A. KIRK
2    DTC deposit from us. They were having a dispute
3    with Barclays at the same time. And you know,
4    Alastair, Alastair Blackwell, as head of
5    operations, and Beth I think it's Rudofker who
6    he's referring to, I assume who is a lawyer,
7    are, you know, involved in trying to settle this
8    position.
9    Why I asked him how many treasuries
10    was he short in his position I don't recall.
11    Q.   What are treasuries?
12    A.   Government bonds.
13    Q.   And let's actually just go back to
14    his -- to Mr. Michaels e-mail. He says about 8
15    billion of collateral. Do you know whether --
16    do you have an understanding as to whether or
17    not that was Fed repo collateral or other
18    collateral?
19    A.   I don't recall what collateral that
20    was. There were a couple disputes with
21    JPMorgan, so ...
22    Q.   And the treasuries, what portion of
23    the assets transferred were the treasuries, what
24    basket of the assets transferred would the
25    treasuries have fallen into? Would they have

Page 198

HIGHLY CONFIDENTIAL - A. KIRK
1  been part of the Fed repo or would they have
2  been part of the, quote/unquote, unencumbered?
3      A.    The issues that I'm discussing with
4  him here are settlements. So these are going
5  forward -- they're not actually positions.
6  They're going-forward settlements between Lehman
7  and other counterparties that Lehman's standing
8  in the middle buying and selling all kind of
9  securities. So that the positions were
10 reflected.
11          This would have reflected what risk
12 there would be in settlements not settling in a
13 normal way. So that -- but to answer your
14 question, I don't -- I don't remember what the
15 percentage of treasuries were in this. I wasn't
16 dealing with him on any -- on that issue.
17          MR. TECCE: Those are the only
18 questions I have. Thank you for your time.
19          MR. HUME: I have just a few
20 questions.
21 EXAMINATION BY
22 BY MR. HUME:
23     Q.    Mr. Kirk, my name is Hamish Hume. We
24 met before. I represent Barclays.

Page 199

HIGHLY CONFIDENTIAL - A. KIRK
1      Mr. Kirk, during the week of September
2  15 to September 22, 2008 that you've been
3  questioned about, did you believe there was any
4  other viable purchaser of Lehman Brothers other
5  than Barclays?
6      A.    No.
7      Q.    Did you believe there was any other
8  alternative for Lehman Brothers other than the
9  Barclays acquisition?
10     A.    Liquidation.
11     Q.    Did you believe the Barclays
12 acquisition was the best outcome for the Lehman
13 estate for all stakeholders?
14     A.    Yes.
15     Q.    During the questioning earlier in the
16 deposition, you were asked -- you testified
17 about discussions with Mike Keegan about
18 valuation of assets, do you recall that,
19 generally?
20     A.    Yes.
21     Q.    And I think at one point you were
22 explaining that Mr. Keegan complained about
23 certain asset values and that you at some point
24 huddled with Ian Lowitt and Bart McDade to

Page 200

HIGHLY CONFIDENTIAL - A. KIRK
1  discuss whether there was any good basis for
2  disagreeing with Mr. Keegan's concerns. Do you
3  recall describing that?
4      A.    Yes.
5      Q.    I believe you testified that the three
6  of you concluded there wasn't really a strong
7  basis for disagreeing with Mr. Keegan. Do you
8  recall that?
9      A.    Yes.
10     Q.    During those discussions, were you
11 attempting to negotiate the best deal you could
12 for Lehman Brothers?
13     A.    Yes.
14     Q.    Do you believe you participated in
15 arm's length negotiations or that you witnessed
16 arm's length negotiations?
17     A.    I'll be clear about that. I wasn't
18 actually negotiating and I wasn't -- I had no
19 authority to negotiate. I believe we were
20 participating in arm's length negotiations,
21 Lehman was, with Barclays.
22     Q.    You testified earlier in the
23 deposition that you did not have an
24 understanding regarding whether there would be a

Page 201

HIGHLY CONFIDENTIAL - A. KIRK
1  gain at Barclays on day one; do you recall that
2  line of questioning?
3      A.    Yes.
4      Q.    Did you have any knowledge about how
5  Barclays would account for this transaction on
6  its balance sheet?
7      A.    No.
8      Q.    Did you give any thought or analysis
9  to how Barclays would account for the
10 transaction on its balance sheet during the
11 negotiations?
12     A.    No.
13     Q.    Did you have any knowledge of whether
14 Barclays would be required to record an
15 intangible asset in excess of a billion dollars
16 on its balance sheet?
17     A.    No.
18     Q.    Did I understand your testimony
19 earlier that you believed many of the assets
20 being transferred to Barclays were of uncertain
21 value?
22     A.    Yes.
23     Q.    And were many of those assets going to
24 take some time to value?

Page 202

HIGHLY CONFIDENTIAL - A. KIRK

1
2  A.  Yes.
3  Q.  Did you understand the liabilities for
4  cure payments and compensation to be estimated
5  liabilities?
6  A.  Yes.
7  Q.  Did you understand that Barclays was
8  stepping into the shoes of Lehman with respect
9  to its exchange-traded derivative accounts?
10  A.  I was not aware of any agreements
11  around the derivatives.
12  Q.  You weren't involved one way or the
13  other with derivatives?
14  A.  I wasn't involved one way or the
15  other.  Did you generally understand that both
16  Q.  Did you generally understand that both
17  the assets and the liabilities Barclays was
18  taking over were uncertain and difficult to
19  value as of the time of the transaction?
20  A.  Yes.
21  Q.  Therefore, as of the time of the
22  transaction, was it in your mind possible that
23  after Barclays had taken the time to value the
24  assets and the liabilities in accordance with
25  its own methodology and accounted for the

Page 203

HIGHLY CONFIDENTIAL - A. KIRK

1
2  transaction under its own accounting
3  methodologies, that it would be possible that it
4  record either a gain or a loss on the
5  transaction --
6  MR. GAFFEY:  Objection.
7  Q.  -- as of day one?
8  MR. GAFFEY:  Object to the form.
9  Q.  Do you understand the question?
10  MR. GAFFEY:  You can ignore me.
11  THE WITNESS:  Okay.
12  MR. GAFFEY:  He can't, but you can.
13  THE WITNESS:  Okay.  I never know with
14  these objections if I'm supposed to ignore
15  them or not.
16  I think it was completely a matter
17  of -- I had no idea what their accounting
18  issues were on any of those fronts, so I was
19  not aware of that, and whether they would
20  end up recording a gain or loss over time
21  would depend upon market conditions, hedging
22  strategies, you know, disposition
23  strategies, et cetera, that I had no insight
24  into how they were going to execute them.
25  Q.  I understand that.  I think you said

Page 204

HIGHLY CONFIDENTIAL - A. KIRK

1
2  that earlier.  I'm saying, wholly apart from
3  what would happen over time, after Barclays took
4  the time to actually value the assets and
5  liabilities as they were valued on day one,
6  given the uncertainties in both the assets and
7  values that Barclays took on and the limitations
8  on what you knew about derivatives and other
9  assets, was it in your mind at least possible
10  that Barclays would record either a gain or a
11  loss on day one, as of day one of the
12  transaction?
13  MR. GAFFEY:  Objection to form.
14  MR. ROTHMAN:  Objection to form.
15  A.  Yes, it was possible.
16  Q.  Mr. Kirk, you testified a little bit
17  about the transfer of collateral when Barclays
18  replaced the Federal Reserve's lending position
19  on the repo transaction, do you recall that,
20  generally?
21  A.  Yes.
22  Q.  Were you aware of that when Barclays
23  advanced its $45 billion in cash to replace the
24  Federal Reserve, Barclays did not receive the
25  same collateral that had been pledged by Lehman

Page 205

HIGHLY CONFIDENTIAL - A. KIRK

1
2  to the Federal Reserve in its repo?
3  A.  I was not aware of that.
4  Q.  Were you aware of the operational
5  difficulties that arose when the Fed collateral
6  was released into the Lehman clearing account so
7  that some of that collateral disappeared or was
8  tucked into other transactions and, therefore,
9  could not be transferred to Barclays?
10  A.  I was not aware of any specifics of
11  those issues.  I was aware there was a -- some
12  dispute.
13  Q.  I'd like to refer you very quickly to
14  Exhibit 321.
15  A.  Okay.
16  Q.  The third-to-last page with the Bates
17  number, number in the bottom corner, number 25.
18  A.  Okay.
19  Q.  Which I believe you testified
20  reflected write-downs that were being discussed
21  or considered by Bank of America in the
22  potential Bank of America transaction; is that
23  correct?
24  A.  That is correct.
25  Q.  Was this done during that weekend

Page 206

HIGHLY CONFIDENTIAL - A. KIRK

1  HIGHLY CONFIDENTIAL - A. KIRK
2  before the bankruptcy when you were at the Fed?
3      A.   This was done I believe the Friday,
4  December -- September 12th.
5      Q.   And I don't know if you testified or
6  not, but whose handwriting is this on this page?
7      A.   I don't know whose handwriting this
8  is. It's not mine.
9      Q.   Was the general idea that Bank of
10 America wanted haircuts or discounts from the
11 marked to market book values that Lehman had for
12 these assets?
13     A.   Yes.
14     Q.   And was that information shared with
15 the Federal Reserve during discussions?
16     A.   Yes.
17     Q.   And did the Federal Reserve express
18 any surprise or disagreement with that concept?
19     A.   I wasn't there when they shared it,
20 this information.
21     Q.   How do you know it was shared with the
22 Federal Reserve?
23     A.   Because we got this delivered to us at
24 the Federal Reserve. We shared it with -- I
25 think Bart gave a copy to Shafron and we shared

Page 207

1  HIGHLY CONFIDENTIAL - A. KIRK
2  it with John Mack, Vickram Pandit and John
3  Thayne and their teams.
4      Q.   You testified earlier about the
5  unencumbered collateral in the clearance boxes
6  that Ian Lowitt identified as assets to be
7  transferred, do you recall that?
8      A.   Yes.
9      Q.   And you testified that there was an
10 agreement that those assets would be transferred
11 made on the Friday, September 19?
12     A.   Yes.
13     Q.   Is that right?
14     A.   Correct.
15     Q.   You also testified that you were aware
16 of an issue over the weekend relating to the
17 DTC's desire for some support for settlement
18 obligations on the Monday, correct?
19     A.   Correct.
20     Q.   And your general understanding was
21 Barclays agreed to deposit $250 million to
22 address those settlement obligations?
23     A.   Yes.
24     Q.   Did anyone at any time ever tell you
25 or lead you to believe -- let me withdraw that

Page 208

1  HIGHLY CONFIDENTIAL - A. KIRK
2  and say it differently.
3      Did you at any time form an
4  understanding at any time that weekend or that
5  Monday, the 22nd, did you ever form an
6  understanding that the unencumbered collateral
7  in the clearance boxes that Ian Lowitt had
8  identified to be transferred in the transaction
9  were not going to be transferred in the
10 transaction because of the way in which Barclays
11 was dealing with the DTC settlement issue?
12     MR. ROTHMAN: Objection to the form.
13     MR. GAFFEY: Join.
14     MR. TECCE: Join.
15     A.   No.
16     Q.   That was never your understanding?
17     A.   No.
18     MR. HUME: No further questions.
19 EXAMINATION BY
20 MR. GAFFEY:
21     Q.   Just one or two. Your view that there
22 was no other viable purchaser, would that view
23 have changed if there were a $5 billion
24 immediate gain embedded in the transaction?
25 Would you have had the view there might be

Page 209

1  HIGHLY CONFIDENTIAL - A. KIRK
2  viable purchasers then?
3      MR. HUME: Object to the form. Calls
4  for speculation.
5      A.   I think the -- there were -- we were
6  open to a transaction with anybody, so if
7  somebody was willing to take that kind of risk,
8  I assume they would have showed up.
9      Q.   Do you think they would have shown up
10 if they were not told there was a $5 billion
11 haircut embedded in the transaction?
12     MR. KELLEY: Objection. Calls for
13 speculation.
14     A.   There was no certainty what that
15 number was.
16     Q.   If, in addition to whatever else was
17 said about the deal publicly, it was also said
18 that there was a $5 billion haircut embedded in
19 the transaction, do you think there would have
20 been other viable purchasers, do you know?
21     MR. KELLEY: Objection. Calls for
22 speculation.
23     A.   I don't know.
24     Q.   Are you able to say one way or the
25 other?

Page 210

HIGHLY CONFIDENTIAL - A. KIRK

1    A.  Not really.
2    Q.  Okay.  Do you know the basis of the
3  estimated liabilities?  You told Mr. Hume that
4  you knew that the liabilities for comp and cure
5  were estimated in some way.  Do you know the
6  basis for the estimation?
7    A.  I assume that the basis was -- I don't
8  know the estimation.  I knew it came from our
9  Finance Department.
10    Q.  And your understanding at the time on
11  the Friday when you were looking at this was
12  that those were estimates based upon Lehman's
13  books, correct?
14    A.  Upon the work that Lehman had done.
15  Certain, you know, liabilities only
16  come up in the nature a transaction like this,
17  right?  So you cancel contracts you have
18  liabilities.  So they would be contingent and
19  necessarily not necessarily on your books prior
20  to doing an acquisition like that.
21    So the -- it's -- it's not -- it's not
22  completely -- it wouldn't be completely just
23  what was actually recorded on the books.  There
24  would also be other liabilities that could be
25

Page 211

HIGHLY CONFIDENTIAL - A. KIRK

1  triggered by the transaction itself.
2    Q.  And back to this issue of a viable
3  purchaser, if it had been announced in addition
4  to the other components of the deal that --
5  withdrawn.
6    You understood the assumed liabilities
7  component of the deal to be a cost that Barclays
8  would have in the transaction, correct?
9    A.  Correct.
10    Q.  If it had been publicly announced that
11  the $2 billion cost for compensation had been
12  deliberately inflated by a billion dollars, that
13  in your view would lower the actual cost for
14  Barclays, correct?
15    MR. KELLEY:  Same objection.
16    A.  If --
17    Q.  If it --
18    A.  If the answer is if it was inflated,
19  it would lower the cost, the answer is yes,
20  that's factual, I think.
21    Q.  If it had been announced in addition
22  to other components of the deal that the assumed
23  liability for compensation was deliberately
24  inflated by a billion dollars, do you have a
25

Page 212

HIGHLY CONFIDENTIAL - A. KIRK

1  view as to whether that might have attracted
2  other viable purchasers?
3    A.  The market was so uncertain and there
4  was so much financial stress in the list of
5  potential purchasers that I'm not sure there was
6  anybody who could have executed it no matter
7  what they thought the gain was because the
8  market would have viewed it as too risky, so to
9  speak, and too strategically risky in many ways
10  and too risky from a financial standpoint to
11  approve them for any board to approve it.
12    Q.  In your view --
13    A.  No matter what the gain was.
14    Q.  Sure.  And in your view, was there at
15  any point where additional value in the deal
16  might have attracted other viable purchasers?
17    MR. HUME:  Objection.  Asked and
18  answered.
19    A.  None with the time to actually execute
20  it.
21    Q.  And what was your role in determining
22  whether or not there were other actual viable
23  purchasers?
24    A.  I didn't have a role in that.
25

Page 213

HIGHLY CONFIDENTIAL - A. KIRK

1    Q.  Did you have any role at all in that?
2    A.  No, that was the role of the FIG, the
3  FIG bankers, Financial Institutions Group.
4    MR. GAFFEY:  Thanks.  Nothing further.
5    THE WITNESS:  Okay.
6    MR. ROTHMAN:  One question.
7  EXAMINATION BY
8  MR. ROTHMAN:
9    Q.  Fair to say that you don't know how
10  the dispute -- the terms of the resolution of
11  the dispute with the DTC on that Sunday night?
12    MR. HUME:  Objection.  Vague and
13  ambiguous.
14    MR. KELLEY:  Asked and answered, too.
15    A.  I don't know.  Did you say is it fair
16  to say I don't know the terms?
17    Q.  You don't know, yes.
18    A.  I only know it was described that
19  there was 250 million put into the DTC account.
20  I don't know the full terms.  As I said, there
21  may have been other terms that I was not aware
22  of.
23    Q.  You don't know, beyond that 250
24  million that we discussed, you don't know one
25

Page 214

HIGHLY CONFIDENTIAL - A. KIRK
1  way or the other what was supposed to happen to
2  the unencumbered assets that had been in that
3  DTC box, correct?
4      A.   No, I don't know that.
5      MR. ROTHMAN: Thank you.
6      MR. HUME: Let me have follow up on
7  that.
8  EXAMINATION BY
9  MR. HUME:
10     Q.   When you say you don't know the
11  unencumbered assets in the DTC box, to the
12  extent that they were identified by Mr. Lowitt
13  as transferable assets, was it your
14  understanding they were going to be transferred
15  as part of the deal?
16     (Continued on the next page to include
17  the jurat.)

Page 215

HIGHLY CONFIDENTIAL - A. KIRK
1      MR. ROTHMAN: Objection to the form.
2  A.   Yes.
3      MR. HUME: No further questions.
4      THE WITNESS: I may have misunderstood
5  the earlier question.
6      MR. GAFFEY: I'm going to have mercy.
7  I have no follow-up questions.
8      (Time Noted: 3:06 P.M.)
9          oOo

_____

ALEX KIRK

Subscribed and sworn to
before me this    day
of      2009.

_____

Page 216

HIGHLY CONFIDENTIAL - A. KIRK
1              CERTIFICATE
2  STATE OF NEW YORK )
3                   : ss
4  COUNTY OF NEW YORK)
5      I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9      That ALEX KIRK, the witness whose
10  deposition is herein before set forth, was
11  duly sworn by me and that such deposition is
12  a true record of the testimony given by such
13  witness.
14      I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18      I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23      In witness whereof, I have hereunto
24  set my hand this 31st day of August, 2009.
25  -------------------------------------
    KATHY S. KLEPFER, RPR, RMR, CRR, CLR

Page 217

HIGHLY CONFIDENTIAL - A. KIRK
1                 INDEX
2  WITNESS:       EXAMINATION BY       PAGE
3  A. KIRK      Mr. Gaffey       5, 208
4              Mr. Rothman      176, 213
5              Mr. Tecce        190
6              Mr. Hume         213, 214
7  EXHIBITS:              PAGE
8  Exhibit 316, an e-mail chain with ......... 121
9  attached balance sheet
10  Exhibit 317, a document bearing Bates ...... 132
11  Nos. 10310050
12  Exhibit 318, a document bearing Bates ...... 137
13  Nos. 10325943 with attachment
14  Exhibit 319, an e-mail chain .............. 140
15  Exhibit 320, a document bearing Bates ...... 145
16  Nos. 10293820
17  Exhibit 321, a document bearing Bates ...... 153
18  Nos. AK-LB-BANKR00002 through 27
19  Exhibit 323, a document bearing Bates ...... 160
20  Nos. AK-LB-BANKR000030
21  Exhibit 324, a document bearing Bates ...... 171
22  Nos. AK-LB-BANKR0000987 through 119
23  Exhibit 325, a document bearing Bates ...... 174
24  Nos. AK-LB-BANKR000188

Page 218

HIGHLY CONFIDENTIAL - A. KIRK
INDEX (Cont'd.)

1
2
3    EXHIBITS:                                          PAGE
4    Exhibit 326, an e-mail chain ............. 186
5    Exhibit 327, an e-mail chain dated ........ 195
6    September 21, 2008
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 219

HIGHLY CONFIDENTIAL - A. KIRK

1
2    NAME OF CASE: In re Lehman Brothers
3    DATE OF DEPOSITION: August 31, 2009
4    NAME OF WITNESS: Alex Kirk
5    Reason Codes:
6        1. To clarify the record.
         2. To conform to the facts.
7        3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
9    From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
     Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
     Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
     Page _____ Line _____ Reason _____
24   From _____ to _____
25                    ALEX KIRK