# BCI EXHIBIT

# 79

Page 1

1        HIGHLY CONFIDENTIAL – M. KLEIN

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                            Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

            Debtors.

10

     ----------------------x

11

12        * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF MICHAEL KLEIN

14          New York, New York

15          September 12, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24546

Page 2

1    HIGHLY CONFIDENTIAL - M. KLEIN
2         September 12, 2009
3            10:40 a.m.
4
5         HIGHLY CONFIDENTIAL deposition
6    of MICHAEL KLEIN, held at Jones Day
7    LLP, 222 East 41st Street, New
8    York, New York, before Kathy S.
9    Klepfer, a Registered Professional
10   Reporter, Registered Merit Reporter,
11   Certified Realtime Reporter, Certified
12   Livenote Reporter, and Notary Public
13   of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    HIGHLY CONFIDENTIAL - M. KLEIN
2
3    A P P E A R A N C E S :
4
5    JONES DAY, LLP
6    Attorneys for Lehman Brothers, Inc.
7        222 East 41st Street
8        New York, New York  10017-6702
9    BY:  ROBERT W. GAFFEY, ESQ.
10       BRIDGET CRAWFORD, ESQ.
11
12   BOIES, SCHILLER & FLEXNER, LLP
13   Attorneys for Barclays
14       575 Lexington Avenue - 7th Floor
15       New York, New York  10022
16   BY:  JACK G. STERN, ESQ.
17
18   KIRKLAND & ELLIS, LLP
19   Attorneys for the Witness
20       Citigroup Center
21       153 East 53rd Street
22       New York, New York  10022-4611
23   BY:  DAVID BERNICK, ESQ.
24       JOHN P. DEL MONACO, ESQ.
25

Page 4

1        HIGHLY CONFIDENTIAL - M. KLEIN
2        A P P E A R A N C E S :  (Cont'd.)
3
4    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
5    Attorneys for the Creditors Committee
6        51 Madison Avenue
7        22nd Floor
8        New York, New York  10010
9    BY:  JAMES C. TECCE, ESQ.
10
11   JENNER & BLOCK, LLP
12   Attorneys for the Examiner
13       330 N. Wabash Avenue
14       Chicago, Illinois  60611-7603
15   BY:  JACOB P. ZIPFEL, ESQ.
16
17   HUGHES, HUBBARD & REED, LLP
18   Attorneys for the SIPA Trustee
19       One Battery Park Plaza
20       New York, New York  10004-1482
21   BY:  NEIL J. OXFORD, ESQ.
22       AMINA HASSAN, ESQ.
23
24   Also Present:
25       PHILIP E. KRUSE, Alvarez & Marsal

Page 5

1        HIGHLY CONFIDENTIAL - M. KLEIN
2        MICHAEL KLEIN, called as a
3    witness, having been duly sworn by a Notary
4    Public, was examined and testified as
5    follows:
6    EXAMINATION BY
7    MR. GAFFEY:
8        Q.  Good morning, Mr. Klein.  We met
9    briefly before.  My name is Bob Gaffey.  I'm at
10   Jones Day, and Jones Day is special counsel to
11   the Estate of Lehman Brothers Holdings, Inc.  We
12   are looking into, as I hope you know, facts
13   surrounding the transaction that occurred in
14   September of 2008 between Lehman and Barclays.
15       Just a couple of quick ground rules:
16   If you need a break at any time, just say so,
17   and obviously we'll take it.  If there's a
18   question pending at the time, I would ask that
19   you answer the question before we take the break
20   just so the record is clean.
21       I tend to be a fast talker, and I try
22   and slow that down for the sake of Kathy, the
23   court reporter here.  What I would ask so that
24   we get the best record we can is if I start to
25   talk too fast, tell me; and also, if you could

Page 6

1  HIGHLY CONFIDENTIAL - M. KLEIN
2  wait until I complete a question before you
3  answer it, we'll get a cleaner transcript.
4      A.  Okay.
5      Q.  Okay?
6      A.  Thank you.
7      MR. GAFFEY:  As to confidentiality, we
8  have a Confidentiality Stipulation and Order
9  which has been so ordered by Judge Peck.
10  Our agreement has been that all depositions,
11  including depositions of non-parties, as it
12  were, which includes Mr. Klein, are covered
13  by that, and you will have the same rights
14  that the party has under the confidentiality
15  agreement.  If you don't have a copy of it
16  we'll get it.
17      MR. BERNICK:  That's agreeable and we
18  appreciate that.
19      MR. GAFFEY:  I should add, too, we
20  have had a convention over and above that
21  confidentiality stip which has worked well
22  for us up till now, which is that the entire
23  deposition transcript is deemed to be --
24      Is it highly confidential?
25      MR. STERN:  Highly confidential.

Page 7

1  HIGHLY CONFIDENTIAL - M. KLEIN
2      MR. GAFFEY:  -- for some period of
3  time, seven or ten days or so, and we'll
4  sort that out, to give you time to sort of
5  undesignate.
6      MR. BERNICK:  Great.  Terrific.
7  BY MR. GAFFEY:
8      Q.  Mr. Klein, by whom are you employed,
9  sir?
10      A.  I'm not employed.
11      Q.  Okay.  Was there a time when you
12  worked at Citibank?
13      A.  Yes.  To be correct, I have an ongoing
14  consulting relationship with one company, so --
15  but I'm not employed.
16      Q.  Okay.  And with what company do you
17  have an ongoing consulting relationship?
18      A.  With the Dow Chemical Company.
19      Q.  And was there a time when you were
20  employed at Citibank?
21      A.  Yes.
22      Q.  Could you just give me the time
23  periods?  How long were you there?
24      A.  I was at Citi or the predecessors that
25  amalgamated into Citi from 1985 until 2008.

Page 8

1  HIGHLY CONFIDENTIAL - M. KLEIN
2      Q.  And what was the last position that
3  you held at Citi?
4      A.  My final position was a position that
5  had the title of Chairman of Institutional
6  Clients Group, and in that regard, I had a
7  series of responsibilities and relationships
8  with clients, amongst them governments,
9  corporations, et cetera.
10      Q.  And when did you leave Citi?  What
11  month of '08?
12      A.  I think my last official date was July
13  21st.  The third week in July.
14      Q.  Did there come a time during 2008
15  where you were asked to become involved in any
16  way in negotiations between Lehman and Barclays?
17      A.  Yes.
18      Q.  When did that occur?
19      A.  Approximately the Thursday before the
20  weekend of the Lehman bankruptcy filing.
21      Q.  We have in front of you a blank
22  calendar which you might want to refer to
23  through the day, because in this case we have
24  sort of shorthanded it to the Tuesday or the
25  Wednesday, and that will help you pick

Page 9

1  HIGHLY CONFIDENTIAL - M. KLEIN
2  particular dates.
3      Taking a look at that calendar, if you
4  don't mind, you were referring to the Thursday?
5      A.  Before the Lehman bankruptcy.
6      Q.  Okay.  So that would be Thursday, the
7  11th?
8      A.  I believe that's so.
9      Q.  Would you describe for me, please, how
10  you came to be involved, who asked you to be
11  involved, and what you were asked to do?
12      A.  I was called by a gentleman named
13  Hans-Jörg Rudloff at Barclays who asked me just
14  in general where I was, what I was doing.  It
15  was a non-specific conversation.  It was
16  followed up by a call from Bob Diamond.  Bob
17  asked me if I could be available, given all that
18  was going on with Lehman Brothers, to be of
19  assistance to Barclays.  And that was his
20  request.
21      Q.  Now, at the time I understand you had
22  some sort of restrictive covenant or a
23  non-compete or a garden leave with regard to
24  your departure from Citi; is that correct?
25      A.  That's right.

Page 10

HIGHLY CONFIDENTIAL - M. KLEIN

1. Q. Did you need to get relief from that
provision in order to assist Barclays?
2. A. Yeah. I explained to Bob in my first
meeting with him that I could not do this
without a clear agreement from Citi that this
was appropriate and that they had signed off in
fact to do so.
3. Q. And I take it that sign-off in one
form or another was obtained?
4. A. That's right.
5. Q. Now, when you spoke to Mr. Diamond,
did he describe for you the nature of the
services he would want from you?
6. A. I don't recall the specifics except to
say that he needed assistance in the
transaction.
7. Q. On the Thursday before the bankruptcy,
was there a transaction at play? Was there a
transaction on the table or, alternatively, was
the idea that Barclays might want to propose a
transaction?
8. A. It's not entirely clear to me how much
had been done preceding. I didn't know really
any of those people nor had I had the

Page 11

HIGHLY CONFIDENTIAL - M. KLEIN

background.

As of that Thursday, there were
clearly discussions ongoing, and the question
was what to do next, inclusive of what could be
achieved structurally for Barclays in that
acquisition of Lehman.

Q. The discussions that were ongoing, are
you referring to discussions between Barclays
and Lehman or discussions internally at
Barclays?

A. There clearly were discussions
internally at Barclays. It's not clear to me
how much discussions had taken place with
Lehman, although I understood that there had
been some communication with Lehman.

Q. And did you have any agreement with
Barclays as to how you would be compensated for
your services?

A. Not at that time, no.

Q. Did there come a time when you made an
agreement with them about compensation for your
services?

A. Yes.

Q. Could you describe that agreement to

Page 12

HIGHLY CONFIDENTIAL - M. KLEIN

me?

MR. BERNICK: Well, I'm prepared to
have the witness describe the agreement in
general terms, but the specific financial,
the dollars I don't think is necessary.

So, Michael, you ought to feel free to
talk about the agreement, but I'm telling
you that I don't think you need to answer
questions concerning the details of the
dollar amounts.

MR. GAFFEY: We may have to agree to
disagree about that, but I don't think it's
a basis for instructing him not to answer
and we have a confidentiality provision.

MR. BERNICK: It may well be, but
that's my view at the present time. We'll
have a further discussion about it.

MR. GAFFEY: We will, as they say,
reserve all rights.

Q. Anyway, can you describe the agreement
for me, sir?

A. It was a very general financial
consulting agreement that the construct of where
the transaction was going to be completed at

Page 13

HIGHLY CONFIDENTIAL - M. KLEIN

that time had a degree of uncertainty, so the
agreement and the request was a broad financial
consulting arrangement.

Q. Was it in writing?

A. Yes.

Q. Do you have a copy of the agreement?

A. Yes.

Q. Can.

(Exhibit 424, Subpoena for Rule 2004
Examination, marked for identification, as
of this date.)

A. I don't have a copy with me.

Q. No, I'm about to go there.

Mr. Klein, I have put before you what
we have marked as Deposition Exhibit 424, the
subpoena pursuant to which you are appearing
today, which calls for the production of
documents.

Do you have any other documents that
concern the transaction between Lehman Brothers
and Barclays Capital?

A. I do not.

MR. GAFFEY: I don't want to take a
lot of time, David. We would reserve our

Page 14

HIGHLY CONFIDENTIAL - M. KLEIN

1       rights to ask for the written agreement as
2       well.
3           MR. BERNICK: We would probably be
4       willing to give you the written agreement,
5       but we might want to have -- we'll have a
6       discussion about perhaps redacting the
7       dollar amounts or whatever.
8           MR. GAFFEY: Okay.
9           MR. BERNICK: We're not averse to
10      providing you with a agreement.
11          MR. GAFFEY: Is there a copy of it
12      here?
13          MR. BERNICK: No, I don't have a copy
14      here with me today. We might be able to get
15      you a copy before the deposition ends. We
16      can have a conversation about this before
17      the deposition ends.
18          MR. GAFFEY: Okay. Let's deal with it
19      on a break.
20          MR. BERNICK: Yeah.
21      Q.  Who signed the agreement on behalf of
22      Barclays?
23      A.  Rich Ricci.
24      Q.  And approximately when was the

Page 15

HIGHLY CONFIDENTIAL - M. KLEIN

1       agreement signed?
2       A.  I'm not aware of the exact time, but
3       it would have been prior to the final bankruptcy
4       hearing.
5       Q.  So that would be sometime between the
6       Thursday, the 11th, when you first spoke to Mr.
7       Diamond and Friday, the 19th, when the sale
8       hearing took place?
9       A.  That's right, so before that Friday
10      hearing.
11      Q.  Did the agreement provide for any sort
12      of success fee for you, any -- was any part of
13      your compensation based on the contingency of
14      the agreement being approved?
15          MR. BERNICK: Which agreement?
16          MR. GAFFEY: The agreement between
17      Lehman and Barclays.
18      A.  Well, the arrangement that I made was
19      that they would pay me what they saw fit from
20      the beginning. There was a transaction that had
21      been announced on the Tuesday already that was
22      agreed to. The signing of the letter was
23      subsequent to that, so there already was a
24      transaction, part and parcel of it.

Page 16

HIGHLY CONFIDENTIAL - M. KLEIN

1       Q.  The agreement that was announced on
2       Tuesday, September 16, was subject to the
3       bankruptcy court's approval; you understood that
4       at the time?
5       A.  I understood that.
6       Q.  Was any part of your compensation from
7       Barclays contingent on the agreement being
8       approved by the court and closed?
9       A.  I don't -- I'm not aware that there
10      was any discussion of a bankruptcy court issue
11      in the engagement agreement.
12      Q.  In the engagement agreement was there
13      any contingency, was any part of your
14      compensation based on a contingency that the
15      transaction had to actually close?
16      A.  I would have to go back and check, but
17      I believe that I -- it was a good faith
18      understanding agreement, and I believe there
19      would not be, if there were not a transaction, a
20      fee paid.
21      Q.  Any fee at all?
22      A.  I don't think I had any other fee
23      element in it, no.
24      Q.  I take your counsel's point, and we'll

Page 17

HIGHLY CONFIDENTIAL - M. KLEIN

1       deal with it in the longer term, but could you
2       just answer this yes or no: Did the engagement
3       letter actually have a number in it, or did it
4       provide they would pay you what they thought was
5       appropriate?
6       A.  It had a number in it and there was an
7       understanding that they would pay me what they
8       felt comfortable. It was a short engagement and
9       an unusual one.
10      Q.  Had you rendered any sort of advisory
11      services to Barclays before this time?
12      A.  No, not on a personal level.
13      Q.  And by "on a personal level," you mean
14      not in connection, for example, with your work
15      at Citi?
16      A.  I don't -- I was not a service
17      provider to them while at Citi as an individual.
18      Q.  Now, let's go back to the Thursday on
19      the 11th when you speak to Mr. Diamond. Can
20      you, as best you recall, tell me what Mr.
21      Diamond described to you, what he said to you
22      and what you said to him by way of what type of
23      transaction was being considered?
24      A.  I don't recall specifically what he

Page 18

HIGHLY CONFIDENTIAL - M. KLEIN

1  said to me or what I said other than that I was
2  not able to provide the role unless I was
3  cleared by Citi. That clearance then took
4  several hours. Subsequent to that, the, if you
5  will, work began.
6    Q.  When the work began, did you garner an
7  understanding of the nature of the transaction
8  that was under consideration?
9    A.  I did.
10    Q.  From whom did you gain the
11  understanding and what was the understanding?
12    A.  There were people that I was meeting
13  for the first time as that sort of
14  afternoon/evening went onward, so I can't
15  specifically say who told me what pieces, but it
16  was very clear that the Barclays organization
17  hoped to be an acquirer of Lehman if that was an
18  achievable event. However, they were extremely
19  mindful from the beginning that there was an
20  enormous amount of asset problems within the
21  Lehman balance sheet, that that grouping of
22  assets would not be party to anything that they
23  could purchase.
24    Secondly, they were incredibly mindful

Page 19

HIGHLY CONFIDENTIAL - M. KLEIN

1  that they would be risking what they had built
2  over the past decade, both reputationally and
3  businesswise and that this kind of a transaction
4  with this kind of integration they hadn't done
5  before.
6    So they were both mindful of the, for
7  lack of a better word, toxic asset risk
8  embedded; secondly, the timing issues; third,
9  the just sheer complexity of putting their own
10  business at risk vis-a-vis this integration.
11    Q.  What was the timing issue?
12    A.  That the general understanding was
13  that all things regarding Lehman were going to
14  be resolved this weekend or there would be no
15  Lehman Brothers, as I recall. Now, obviously
16  there's been so much data since the event and
17  it's a year ago that there may be facts and
18  pieces that I picked up over the period, but as
19  I recall ...
20    Q.  Sure. Now was there any discussion,
21  in these initial conversations with the folks
22  with Barclays, was there any discussion about
23  what their price parameters were, what they were
24  willing to offer, what it was they needed to

Page 20

HIGHLY CONFIDENTIAL - M. KLEIN

1  achieve in order to reach an agreement on price?
2    A.  Not in the original conversations.
3  This transaction was, as best as I can say, in a
4  very hypothetical set of discussions because it
5  was not clear that Barclays was given active
6  consideration at this early stage from all
7  parties involved.
8    Secondly, the principal element was
9  how to create a structure that would allow for
10  Barclays to own the businesses that were Lehman
11  Brothers, if you will, traditional investment
12  banking businesses but not the various different
13  toxic assets.
14    Q.  Did Mr. Diamond, in any of these early
15  conversations, did Mr. Diamond say to you in sum
16  or substance that it was a condition of going
17  forward that, whatever deal was done with
18  Lehman, it be capital-accretive?
19    MR. BERNICK:  What point in time are
20  we talking?
21    Q.  I'm in those sort of early days. I'm
22  on Thursday/Friday.
23    A.  In the Thursday/Friday discussions,
24  the entire focus, as the best that I can

Page 21

HIGHLY CONFIDENTIAL - M. KLEIN

1  recollect, was on creating a structure that
2  isolated the bad assets or the inappropriate
3  assets. Beyond that, which became the work of
4  essentially Friday into Saturday, that was the
5  principal role or involvement I had, was this
6  particular structural creation.
7    Q.  What did you do? What steps did you
8  take to fulfill that role in terms of looking at
9  structure and isolating the toxic assets?
10    A.  As I recall, there was a team of
11  lawyers from Cleary Gottlieb and there was an
12  elongated overnight conversation to determine if
13  we could essentially invert what had been
14  Lehman's initial proposal. Their announcement,
15  as I recall, to the street was that they were
16  going to create this Spinco and spin off these
17  assets.
18    One of the clear risks embedded in
19  that is that you could not achieve that Spinco.
20  So the idea that we were proffering and working
21  through with the lawyers was effectively
22  acquiring the other assets and leaving what
23  would have been Spinco as the public entity so
24  that you reversed, essentially, what had been

Page 22

HIGHLY CONFIDENTIAL - M. KLEIN

1  proposed, you acquired the businesses that
2  weren't those mezzanine, real estate, private
3  equity, that basket, and that that basket was
4  left behind in the public entity and public
5  vehicle.
6      That was the work that was the bulk of
7  that Thursday into Friday, was to try to
8  determine if that actually could occur, how
9  would that occur, how could that be then
10 achieved and accomplished, and that was the
11 principal efforts leading into the meetings that
12 then became, if you will, the Fed meeting.
13     Q.  When you refer to the Fed meetings,
14 what are you referring to?
15     A.  There was a weekend of activity at the
16 Federal Reserve, and at a certain point in time,
17 and I don't specifically remember when, Barclays
18 and its representatives were invited to come
19 down to the Fed. It was not in -- not as part
20 of a larger group, but invited to be there in
21 case discussions could ensue for Barclays to be
22 a buyer, and those discussions ensued on
23 Saturday evening, effectively, I think. Some
24 discussions ensued Saturday evening with regard

Page 23

HIGHLY CONFIDENTIAL - M. KLEIN

1  to that transaction structure.
2      Q.  The discussions on Saturday evening
3  were between whom and whom?
4      A.  Well --
5          MR. BERNICK:  I think Mr. Gaffey will
6      agree with this:  Michael, he wants to know
7      what you're aware of personally.  You don't
8      have to speculate about discussions.  You
9      should talk about what it is you know.
10     A.  I know that on Saturday there was a
11 group of people at the Fed, which I don't recall
12 all the participants, but they had their Cleary
13 team and the Barclays team.  At selected points
14 in time, government officials, who I hadn't
15 known before, would come in and out, and then on
16 Saturday evening there was a dialogue that
17 included some of the banks that were
18 participating in other parts of -- they were
19 doing what they were doing as part of that
20 weekend, and we were asked to sit with
21 representatives of those banks to describe this
22 particular reverse structure.
23     Q.  Now, over this same period, and I'm,
24 right now, I'm from Thursday, the 11th, through

Page 24

HIGHLY CONFIDENTIAL - M. KLEIN

1  these weekend meetings with the Fed, were there
2  also discussions taking place between Barclays
3  and Lehman about a potential transaction?
4      A.  Some.  There were -- I'm obviously not
5  aware of everybody's whereabouts, but there were
6  attempts to have meetings and have discussions
7  and diligence.  There were not that much, or at
8  least historically, in my experience, there was
9  not that much coordination in terms of having
10 significant dialogues between the Lehman parties
11 and the Barclays parties that I was involved in.
12     Q.  Did you have, you yourself have
13 discussions with any of the Lehman personnel
14 about a proposed transaction during this same
15 period, Thursday and over the weekend?
16     A.  I believe I did.  I believe there
17 were, as part of drafting these or creating
18 these structures, there was also an attempt to
19 try to bring some of the Lehman people and the
20 Barclays people together to have discussion, and
21 I believe that I would have met some of the
22 Lehman people, although not extensively, during
23 that time period.
24     Q.  What Lehman people did you meet during

Page 25

HIGHLY CONFIDENTIAL - M. KLEIN

1  that time period?
2      A.  I couldn't tell you specifically.  I
3  think that the one person that was tasked to
4  interact with us during that time period, and I
5  think Lehman had multiple things going on, as I
6  understand it, but the person tasked to
7  coordinate with us was Mark Shafir, their M&A
8  professional.
9      Q.  Did you have an understanding at the
10 time, and again, I'm in the Thursday/Friday and
11 over that first weekend, the 13th and 14th, that
12 Lehman was also engaged in some fashion with
13 Bank of America?
14     A.  I'm not certain what we knew at that
15 point in time.  It has subsequently become clear
16 that that took place.  I think we assumed that
17 they were busy on other things because they
18 weren't busy working with us.
19     Q.  Did there come a point over the
20 weekend where the degree of engagement between
21 Lehman and Barclays increased?
22     A.  I don't -- I don't recall that it
23 increased dramatically because -- and for me,
24 from my own individual exposure, I recall more

Page 26

HIGHLY CONFIDENTIAL - M. KLEIN

1    of that Saturday being spent around the
2    structural issues to create the structure and
3    then work through how that in fact could be
4    achieved.
5        Q.   Did you talk to Shafir about these
6    structural issues?
7        A.   I don't recall if I specifically did,
8    although I believe we made clear, or the attempt
9    was to make clear that there was a structure
10   that could be achieved that should be given
11   focus. There was -- prior to that Saturday
12   evening meeting where we were asked to put the
13   structure in front of others, I don't believe
14   that there were a lot of people, at least to my
15   knowledge, I wasn't exposed to a lot of people
16   working on our structure.
17       Q.   Was what was under consideration at
18   the time between the Thursday, the 11th, and
19   Sunday, the 13th, in substance a proposal to
20   purchase Lehman globally?
21       A.   The concept was to be an acquirer of
22   Lehman to add that to the Barclays franchise.
23   Barclays is a global business that had done
24   quite well and had some areas that they could
25

Page 27

HIGHLY CONFIDENTIAL - M. KLEIN

1    add, obviously North America and then some
2    products and services.
3        So the proposal was to buy, other than
4    the toxic and inefficient, if you will, and
5    assets that they didn't want to own, was to buy
6    Lehman Brothers, and the structure that was put
7    forward reflected that separation of really only
8    those, as I understood it, really only those
9    assets that were effectively a part of Spinco.
10       Q.   My question goes in a slightly
11   different direction. Let me, to try to be
12   efficient here --
13       A.   I apologize.
14       Q.   No, it's my fault. I'm not being
15   clear.
16       Do you agree with me, sir, that the
17   deal that ultimately was done concerned a
18   purchase, whatever the structure, a purchase of
19   the North American broker-dealer operation of
20   Lehman, yes, in the following week, the one that
21   was taken to the bankruptcy court and ultimately
22   closed?
23       A.   With some other pieces, but yes, I
24   understand.
25

Page 28

HIGHLY CONFIDENTIAL - M. KLEIN

1        Q.   My question goes to whether in those
2    early days, Thursday, Friday, Saturday, Sunday,
3    the 11th through the 14th, whether what was
4    being discussed was a purchase that addressed
5    Lehman's global assets as opposed to merely the
6    North American broker-dealer?
7        A.   Let me try to be as --
8        Q.   The structure aside. I understand
9    what you're talking about.
10       A.   Yeah, let me try to be as clear as I
11   can.
12       Q.   Sure.
13       A.   First of all, this was an intensely
14   short time period, this pre-bankruptcy.
15   Secondly, I was -- I didn't know most of the
16   people involved, so I can't comment on
17   discussions that were going on amongst people
18   that I were not -- (A) I wasn't in rooms or (B)
19   I just don't -- didn't know the people. So I
20   can only reflect what I'm aware of, and what I'm
21   aware of was a view that Barclays had that there
22   were businesses and an overall business within
23   Lehman that could be attractive and the task
24   that I specifically had was to create a

Page 29

HIGHLY CONFIDENTIAL - M. KLEIN

1    structure that might be achievable.
2        So I think there was a very broad
3    understanding that this was an incredibly risky
4    period and that this was also an incredibly
5    complicated period, and directionally where this
6    would go, at least from my understanding, was
7    not clear, but the structure that I was working
8    on was the structure I have described.
9        Q.   Do you know, to your personal
10   knowledge, do you know whether, apart from the
11   discussions you were having, away from those
12   discussions, Barclays was having discussions
13   with Lehman about a proposal for a transaction
14   over Thursday, Friday, Saturday and Sunday, the
15   11th through the 14th?
16       MR. BERNICK:  I'm sorry.
17       Q.   Let me rephrase that. I just killed
18   that question.
19       In the period between --
20       MR. BERNICK:  It's dead.
21       Q.   Thursday, the 11th, and Sunday, the
22   14th, do you know, sir, one way or the other
23   whether there were meetings away from you that
24   you were not involved in between Barclays and

Page 30

HIGHLY CONFIDENTIAL - M. KLEIN

1   Lehman about a transaction?
2       A.   Oh, I'm not aware of any of that.
3       Q.   One way or the other?
4       A.   I'm not -- I can't be aware of what
5   I'm not aware of. The focus from the Barclays
6   team, and it was getting attention of the senior
7   Barclays team, was to determine a path with the
8   Fed, and the senior professionals at Barclays
9   were included in that discussion. And the
10  magnitude of the event in front of them I think
11  was well understood, that this was saving Lehman
12  and this was an opportunity for them, but that
13  this was the whole of an organization that was
14  in great trauma.
15      But I, away from what I physically saw
16  of the senior participants' total engagement, I
17  can't comment.
18      Q.   Who were the senior Barclays
19  participants?
20      A.   I was brought in in that initial
21  period by Bob Diamond and became involved
22  working with Rich Ricci and Archie Cox as the
23  sort of principal participants. In fairness,
24  there were, because I didn't know people, there

Page 31

HIGHLY CONFIDENTIAL - M. KLEIN

1   were people that came in and out of rooms that I
2   just -- some I don't even know now, but I sure
3   didn't know then.
4       Q.   Do you know within the period between
5   September 11th and September 14th Barclays was
6   given an opportunity to conduct any due
7   diligence toward a proposed transaction?
8       A.   I'm not aware of specifics, although
9   there were references of discussions that had
10  taken place to have understanding, but I
11  wasn't -- none that were brought to me or none
12  that I was engaged in.
13      Q.   As a general matter, the discussions
14  between September 11th and September -- Sunday
15  night, September 14th, did they result in a
16  transaction that -- did those discussions come
17  to fruition in a deal?
18      A.   Not that closed.
19      Q.   There came a point on Sunday, the
20  14th, where the effort to arrive at a structure
21  and a transaction came to an end; is that
22  correct?
23      A.   Well, to be precise, in my
24  understanding, the structure that had been

Page 32

HIGHLY CONFIDENTIAL - M. KLEIN

1   proposed by Barclays was deemed on that Saturday
2   evening to be one that was attractive and
3   potentially achievable, albeit with some issues.
4       One, of course, issue that had arisen
5   was that in the -- the banks had to facilitate,
6   if you will, the ongoing nature of Lehman
7   Brothers and, separately, there needed to be an
8   ongoing ability to have the business clear and
9   trade after Monday morning, which was one of the
10  grave risks as occurs just in general in these
11  kinds of situations.
12      Those were attempted to be being
13  solved. As of Sunday morning, we were informed,
14  the collective team working on Barclays,
15  sometime mid Sunday morning that the transaction
16  was deemed to be unworkable and, as a result,
17  the transaction was not being considered.
18      Q.   Who informed the Barclays team that
19  the transaction was deemed to be unworkable?
20      A.   I don't know specifically. I know
21  that there were a wide range of conversations
22  that were being undertaken on that Sunday.
23  There had been a hope that we, collectively, as
24  the transaction team, would be invited back down

Page 33

HIGHLY CONFIDENTIAL - M. KLEIN

1   to the Fed on Sunday to finalize those issues,
2   and we were informed not to come down, that it
3   would not go forward.
4       Q.   Even if you don't remember the name or
5   didn't know the name at the time, my question
6   goes to from what constituency? Was it the Fed
7   that said the deal was unworkable? Was it
8   Lehman? Was it someone else?
9       MR. BERNICK:  If you know.
10      A.   It was a pretty frantic period and I
11  don't know specifically. I was informed by the
12  Barclays team that we were not invited down and
13  that there had been a meeting amongst the banks
14  and, broadly speaking, the government where the
15  government had told the banks that the Barclays
16  transaction was no longer on the table.
17      Q.   Who from Barclays gave you that
18  information?
19      A.   I don't know specifically. It was --
20  I don't know specifically.
21      Q.   Apart from the specifics of from whose
22  mouth it came, was there some meeting or
23  conversation between you and a group of Barclays
24  folks where you learned this?

Page 34

HIGHLY CONFIDENTIAL - M. KLEIN

1    A.    There had been -- it's hard to
2 reconstruct the --
3    Q.    Sure.
4    A.    -- whereabouts a year prior, but there
5 had -- a year since, but on that Friday into
6 Saturday into Sunday, it was, generally
7 speaking, a fluid, consistent period and there
8 was a core group of people working with the
9 lawyers and so forth.
10        Who amongst that core group
11 specifically informed me I just don't know, but
12 I came in very early Sunday with the plan of
13 trying to keep moving things forward and was
14 informed that that wasn't the case.
15    Q.    So, in sum, there comes a point where
16 you know, your understanding is you don't need
17 to be there anymore, the deal is done?
18    A.    No, it becomes a point where we're
19 informed that we were told that the Barclays
20 transaction was not workable. There was a
21 period of disbelief, if you will, and/or lack of
22 willingness to accept that it was simply not an
23 acceptable alternative, and there was discussion
24 as to can it be altered, revised, was there a

Page 35

HIGHLY CONFIDENTIAL - M. KLEIN

1 misunderstanding of some kind, and subsequent to
2 that reflection, there was a period that of
3 recognition that everyone had moved on and our
4 role was not, collectively, the Barclays role,
5 was not part of the solution.
6    Q.    So what did you do then when you were
7 informed that Barclays' role was not part of the
8 solution?
9    A.    I'm sorry, I don't understand the --
10    Q.    Well, you had been there from Thursday
11 through Sunday morning. You're informed that
12 Barclays won't be part of the solution, it's not
13 workable. There's a period of disbelief and
14 further discussion about is there some
15 misunderstanding. You're given to understand,
16 no, there's no misunderstanding, it's not
17 workable?
18        MR. BERNICK:    What did you do with the
19 rest of your day?
20        MR. GAFFEY:    Exactly.    Yeah.
21    Q.    Did you go home? Was the deal dead in
22 your mind at that time?
23    A.    Obviously I think everybody was
24 generally fairly tired. There was a set of

Page 36

HIGHLY CONFIDENTIAL - M. KLEIN

1 phone calls to try to determine (A) how dead is
2 dead and (B) what else could be achieved, if
3 anything.
4    Q.    Sure.
5    A.    And I think collectively the parties
6 that were involved were attempting to figure out
7 what next, what could be done next, and I took
8 part in calls to determine if that were in fact
9 the case, and it really wasn't very clear
10 largely because migrating into the concept of
11 what would happen next to Lehman was just
12 massively uncertain.
13        There's not a lot of analogies -- I
14 could only really think of one -- of a
15 broker-dealer bankruptcy and of that magnitude
16 and the concept of what would be left, and
17 obviously we all watched on T.V. that
18 afternoon/evening, the boxes and people and
19 everyone leaving and the sense that the business
20 just wouldn't exist the next day.
21        So the question was, is there
22 something that could be achieved, what could be
23 achieved, what was it, and that was the time
24 spent prior to going to sleep.

Page 37

HIGHLY CONFIDENTIAL - M. KLEIN

1    Q.    There came a point where discussions
2 resumed, where the possibility of a deal
3 reemerged, yes?
4    A.    Yes, that's right. The next morning.
5    Q.    Describe for me how you learned that.
6    A.    There was a series of calls, and I
7 don't remember who specifically I spoke to when,
8 but I had been informed by -- I don't know
9 whether it was Rich Ricci or by the other side
10 negotiating specifically or Roger Cohen or
11 others who were deeply involved, because there
12 were a lot of lawyers, but I was advised that
13 there had been a reach-out and I then reached
14 out to Bob Diamond to say should I do anything
15 on this, and he said, "Can you come to my office
16 first thing in the morning?"
17    Q.    And so we stay straight on the
18 calendar, we're talking about Monday morning?
19    A.    Monday morning.
20    Q.    Did you do that? Is that when you
21 came back, Monday morning?
22    A.    Yes.
23    Q.    Who did you meet with on Monday
24 morning?

Page 38

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    A.    I know Bob was there, but I don't know
3    who -- I don't know who else was.
4    Q.    And was some sort of, you know, plan
5    of proceeding put together on the Monday
6    morning?
7    A.    There was a call that took place where
8    the Lehman folks reached out to Bob to suggest
9    that they felt that there were alternatives,
10   which was not inconsistent with, as we were
11   attempting to figure out Sunday night what could
12   occur, what kind of alternatives could in fact
13   be there, the clear understanding on Sunday was
14   that the -- there was a fairly -- well, put it
15   differently -- an enormous change, obviously, in
16   the facts and circumstances of Lehman. So what
17   was left was likely to be people and what was
18   left was likely to be a business that was in
19   runoff, so what you could do. And Lehman called
20   and said, you know, we think we've got some
21   ideas of what you could in fact do, and that was
22   the substance of that call, which was early I
23   think on Monday morning.
24   Q.    Who from Lehman called?
25   A.    I don't know who all was on the call.

Page 39

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    I know that -- I believe that Mark Shafir was on
3    the phone because he had been at that stage the
4    sort of principal coordinator, but beyond that,
5    I don't want to speculate. And it was a
6    conference call, so there could have been, you
7    know, people on speakerphone that I --
8    Q.    Sure.
9    A.    -- that I just don't know.
10   Q.    Whose on the Barclays side of the
11   call?
12   A.    I know Bob was there. I don't know
13   who -- it was in Bob's Park Avenue office, so
14   there were others that also shared that office
15   suite with him, but I don't recall who
16   specifically was there.
17   Q.    And what was the proposal that Lehman
18   made about how a deal might still be possible?
19   A.    It wasn't a particularly clear
20   proposal. It was a view that, by the end of the
21   day, the business would be gone because the
22   people would be leaving because the asset books
23   were running off incredibly quickly and the
24   counterparty issues were -- there was a, just a
25   general sense that this business was not going

Page 40

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    to be there by the close of business and that if
3    anyone was going to save, quote, save the firm,
4    it would have to be Barclays because they were
5    the last people standing, and the concept was,
6    could you come over and discuss, you know, what
7    parts of the business made sense for you as part
8    of your franchise.
9          And that was the generalities of the
10   call. There hadn't been on, our side at least,
11   collectively, that I had been briefed on any
12   knowledge of what one could do post-bankruptcy,
13   what kind of transaction could be achievable
14   except that, because you're walking into a
15   falling knife, you really can't look at it as a
16   going concern, you have to look at it as what
17   are you getting, what are the people, what are
18   the rights to do business, if you will.
19   Q.    So, as a general matter, what happened
20   to the rest of the day on Monday? What were
21   your activities on Monday?
22   A.    Again, it's --
23   Q.    And it's long time ago and it's all
24   hectic. I understand that. I just want your
25   best recollection.

Page 41

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    A.    As best as I can recall, the next few
3    hours were trying to decipher what actually
4    could occur, and there were conversations as to
5    who to get in their room.
6          You know, at some point, and I don't
7    remember specifically when, the Sullivan &
8    Cromwell team became part of the team, I don't
9    remember, but there were a lot of questions that
10   were emerging as to what could be achieved, if
11   anything.
12         Secondly was should Barclays go near
13   this, meaning this is -- it was a great
14   opportunity to round out their overall business
15   prior if you were willing to take the risk prior
16   to the weekend, but now that the world had blown
17   up and they were in bankruptcy, attaching
18   yourself to that name was a really very big
19   risk, and putting all of those people into your
20   system, it was very, very, very big business
21   risk to Barclays.
22         So there was a question that said, do
23   you want to -- do you want to touch this? And
24   given that there had been already enough issues
25   that had been raised over the prior weekend

Page 42

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  between the discussions that Barclays had to
3  have with all of their own regulators to get
4  sign-off to do anything, walking into this
5  situation, should it be something that should be
6  done.
7      And then, third, and I'm sure there
8  were other things as well, but how do you
9  protect yourself from all of the risks that
10 could emerge. It's one thing to try to make a
11 transaction and fail. It's another thing to
12 make a transaction and fail. And obviously
13 Barclays had a very big global franchise that
14 they would be putting at risk. So that was the,
15 if you will, morning.
16     We then went over to Lehman's
17 building, the Seventh Avenue building, sometime
18 in that afternoon and began to understand what
19 potentially could be achievable. I think the --
20 because there was no understanding of what a,
21 quote, transaction was, it was fairly clear
22 that, when we walked over, we were hoping to be
23 able to effectively see if there was a way to do
24 business with the Lehman people and do business
25 as Lehman.

Page 43

HIGHLY CONFIDENTIAL - M. KLEIN
1
2      That was the hope behind it, beyond
3  which there was very limited knowledge. There
4  was a substantial amount of noise in the
5  marketplace because the markets had dropped
6  dramatically and there was a view that assets --
7  that Lehman was just hemorrhaging assets so that
8  no one knew what would be left, if you will,
9  when we got over there, and then we went over to
10 the meetings at Lehman.
11     Q.  And before you went over to the
12 meetings at Lehman, what, if any, parameters did
13 Barclays come up with to answer the question of
14 how it would protect itself?
15     MR. BERNICK: Again, I know that Mr.
16 Gaffey will concur with this. He's really
17 asking these questions of you for what you
18 know. So you're not here representing
19 Barclays. You're here just being Michael
20 Klein. Subject to that, what he's asking
21 you about is what you know of about that
22 question.
23     Q.  Just I'll restate the question just so
24 we can be efficient today.
25     MR. BERNICK: Okay.

Page 44

HIGHLY CONFIDENTIAL - M. KLEIN
1
2      Q.  At no point today do I want you to
3  give me anything other than your personal
4  knowledge, and I agree with Mr. Bernick: You're
5  not here as a representative of Barclays. I'm
6  not asking for the history, the global history
7  of the transaction. I'm asking for what you
8  know, what you saw, what you remember.
9      MR. BERNICK: And the only reason I
10 kicked off into that is because you asked
11 him how did Barclays come up or what
12 parameters did Barclays come up with, and it
13 sounded like it was a bit broader.
14     Q.  Let's assume, sir, so I don't have to
15 say it ever time, that all my questions begin
16 with "to your knowledge."
17     So, to your knowledge, what parameters
18 did Barclays come up to address the question of
19 how it would protect itself?
20     A.  Again, it's not very easy for me to
21 reconstruct what at any moment in time even to
22 my own knowledge existed. I do know that the
23 concept of walking into the bankruptcy was one
24 that there was a lot of trepidation and there
25 was a sense that this was a -- if there was an

Page 45

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  opportunity to have some of the right to do
3  business in the areas that the -- that Lehman,
4  old traditional Lehman, could offer, that would
5  be great, but there was no appetite to take risk
6  on things that could, if you will, come out of
7  the woodwork or things that could bite. There
8  just wasn't an ability to do that. That window,
9  if you will, of being the whole owner of a, if
10 you will, a business and a big balance sheet,
11 the whole element, that was the weekend and had
12 passed.
13     Q.  Did Mr. Diamond express to you a view
14 at that time that Barclays would not be willing
15 to pay a premium or market price -- I beg your
16 pardon. Did he express -- let me restate that
17 question.
18     Did Mr. Diamond express to you a view
19 that Barclays would not be willing to pay a
20 premium or book value as opposed to a distressed
21 price for Lehman's assets?
22     A.  I don't recall, but I don't think
23 there was an asset -- it wasn't an asset
24 discussion. We were going over to discuss how
25 to do a business transaction along with the

Page 46

1    HIGHLY CONFIDENTIAL - M. KLEIN
2  ability to do business at Lehman. I don't know
3  of any parameters other than that there was no
4  sense as to whether there was going to be any
5  assets. I mean, it wasn't a -- that wasn't the
6  driver of certainly the -- either the roles or
7  the conversations that I was party to.
8    Q.  So you go over to Lehman. Tell me
9  what happens there. Who meets with who?
10    A.  Lehman was -- there were quite a lot
11  of people at Lehman at the time, and again, in a
12  similar vernacular, I didn't know many of them,
13  if any of them.
14    There were a series of meetings, and I
15  can't tell you who was in which meeting. The
16  Cleary lawyers were there and the Weil lawyers
17  were there. The Lehman professionals were
18  there. The Barclays team were there. And for
19  the better part of -- the early part was a
20  question as to does this make any sense because
21  the clock is running out. The message had been
22  if you can't get something done and have the
23  market believe something was going to be done,
24  your people, your counterparties, your
25  everything would be gone. So that was sort of

Page 47

1    HIGHLY CONFIDENTIAL - M. KLEIN
2  one piece, as I recall.
3    The second piece is, with that in
4  mind, what in fact can you do that is rapid
5  enough to sustain anything of any value, because
6  the view was that if you couldn't do something
7  quickly, there was not only no value in Lehman
8  as an entity on an ongoing basis, but there was
9  going to be negative value because there's
10  always going to be liabilities, but there was
11  not going to be anything left for the business
12  itself.
13    So the early part was just discussing
14  was in fact there something that could be
15  achieved. At some point in that day, and I --
16  I'm not by any stretch a bankruptcy expert --
17  let me be clearer, I'm not a bankruptcy expert
18  all in terms of my knowledge.
19    So there were definitions and
20  description amongst the lawyers of what
21  potential paths could be taken, and there was
22  then a discussion of, if we were going to be
23  doing business as Lehman and step into the
24  operational business, if you will, of that North
25  American, how could you do that, how could you

Page 48

1    HIGHLY CONFIDENTIAL - M. KLEIN
2  structure that, and then there was the purchase
3  discussion, the purchase price negotiation on
4  the purchase price. So that was the sort of
5  path, if you will, of what took place.
6    Q.  Was there a point on the Monday where,
7  to your knowledge, was there a point on Monday
8  where Barclays was given an opportunity to
9  review books and records and otherwise do due
10  diligence?
11    A.  In the rooms I was in --
12    Q.  Uh-huh.
13    A.  -- there was not. That wasn't
14  ongoing, and I -- there were multiple rooms, of
15  course, that were taking place, but in the rooms
16  that I and in my own role, my responsibility was
17  to attempt to determine was there some kind of a
18  transaction that could take place.
19    Q.  So due diligence is not, or the fruits
20  of it, is not within your portfolio?
21    A.  I wasn't within my portfolio.
22    Q.  You referred to purchase price
23  negotiations. Were you involved in those?
24    A.  I was involved in the discussions on
25  the elements of the building and the elements of

Page 49

1    HIGHLY CONFIDENTIAL - M. KLEIN
2  the cash paid for the rights to operate the
3  business.
4    Q.  Can you explain to me what you mean
5  when you say "cash paid for the rights to
6  operate the business"?
7    A.  As best as I can.
8    Q.  Sure.
9    A.  The view was that the business didn't
10  have any value as an ongoing business; that if
11  you were going to step in and take on 10,000
12  employees and whatever liabilities to operate
13  that business, when you had no idea of what
14  revenues would be because there's no -- (A) you
15  just have no knowledge, (B) you have no
16  knowledge of what clients or customers think or
17  feel of you at that point in time, you don't
18  know who's going to stay and who's not going to
19  stay, whether that's clients, customers
20  counterparties, you don't know what had taken
21  place in the week prior to that, it was a
22  very -- there was a lot of reasons to believe
23  that this was not an ongoing business.
24    So the view at the outset was there's
25  no value for the ongoing business, so the

Page 50

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    discussion as to what then cash was paid for,
3    quote, the rights to do this business, which
4    really was the transaction, is how do you end up
5    stepping into those, if you will, operations of
6    the brokerage business, as it turned out, the
7    North American brokerage business. That's what
8    I'm referring to, which became the $250 million
9    number.
10    Q.    That sort of anticipates my next
11    question. If the deal was ultimately done,
12    that's the price paid for such things as the
13    right to use the name and license --
14    A.    Well --
15    MR. BERNICK:  Hang on. Let's let him
16    finish the question.
17    A.    I'm sorry.
18    Q.    -- licenses, that sort of thing, not
19    the price paid for particular assets that were
20    purchased?
21    A.    No, that's right.
22    Q.    Were purchase price negotiations for
23    particular assets that were purchased within
24    your portfolio?
25    A.    No.

Page 51

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    Q.    Were they ever within your portfolio
3    in the time period from Monday, September 15th,
4    through closing on September 22nd?
5    A.    At the end of that week -- let me
6    answer it very specifically because you said, I
7    think, "pricing of specific assets," and at no
8    point was pricing of specific assets in my
9    domain.
10    The concept of how the transaction
11    changed in the later part of the week and, in
12    addition to those changes, the then resulting
13    shifts of assets and the, what I'll call the
14    weekend of the JPMorgan-related issues I was
15    brought into.
16    Q.    I'm going to come back to each of
17    those pieces through the day today, but just so
18    I can clarify this piece for the record, when
19    you talk about the weekend of the
20    JPMorgan-related issues were on the weekend of
21    the 20th and the 21st after the approval
22    hearing, correct?
23    A.    That's right.
24    MR. GAFFEY:  Can we take a ten-minute
25    break?

Page 52

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    MR. BERNICK:  Sure.
3    (Recess; Time Noted: 11:37 A.M.)
4    (Time Noted: 11:49 A.M.)
5    BY MR. GAFFEY:
6    Q.    Before the break, Mr. Klein, we were
7    talking briefly about negotiations concerning
8    purchase price of assets. To your knowledge,
9    was there a team at Barclays who on the Monday
10    was negotiating with Lehman about the purchase
11    price for particular assets?
12    MR. BERNICK:  Your question assumed
13    that there was a separate purchase price.
14    MR. GAFFEY:  Yes, it does. Apart from
15    what turned out to be the $250 million,
16    apart from the price for the right to do
17    business.
18    MR. BERNICK:  Well, that also is an
19    assumption that the 250 was just for the
20    right to do business.
21    MR. GAFFEY:  Okay.
22    MR. BERNICK:  I don't know what's
23    happened in all the other depositions, but
24    that's not a predicate that exists because
25    of what Mr. Klein has testified to this

Page 53

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    morning.
3    Q.    You can answer the question, sir.
4    A.    I can only give you the specifics as
5    to what I'm aware to, which we've discussed, but
6    the discussion was the purchase of the rights to
7    operate the business as the business existed,
8    and there were the two principal components,
9    which were the 250 million and then the
10    buildings which Lehman specifically asked
11    Barclays to buy for which the valuation was then
12    set by Lehman on an as-occupied basis.
13    The business was defined as the rights
14    to do business and any assets and associated, if
15    you will, directly associated, liabilities tied
16    to that business that were necessary to operate
17    the business. I'm not aware of separate
18    specific negotiations.
19    Q.    Does there come a point on Monday or
20    into the morning of Tuesday when an agreement is
21    reached between Lehman and Barclays?
22    A.    I don't know the specific timing. An
23    agreement was reached, yes.
24    Q.    Describe for me your understanding of
25    the components of the agreement that was

Page 54

HIGHLY CONFIDENTIAL - M. KLEIN
1 reached.
2    A.   As I understood it, and just, again,
3 to be clear, there were multiple rooms, and at
4 one point there was an entire room of lawyers
5 drafting documents that I was not party to in
6 any respect, the drafting, so to speak.
7       The transaction was the agreement to
8 purchase selected businesses within Lehman,
9 those businesses being broadly defined as the
10 North American old Lehman businesses, the rights
11 to do those business and the associated,
12 directly associated, assets and liabilities.
13 For that, Barclays spent the $250 million cash
14 payment plus the payment that would be later
15 confirmed by valuation opinions for two
16 buildings, one being a data center and one being
17 the Seventh Avenue building, those being
18 approximately a billion, 3 billion, 4, the
19 numbers being based upon the desire for Lehman
20 to sell the buildings and a valuation that had
21 been agreed to as an occupied valuation.
22    Q.   Did you have any conversations with
23 the room full of lawyers drafting?
24    A.   I'm sure that at various points in

Page 55

HIGHLY CONFIDENTIAL - M. KLEIN
1 time I had conversations with people who walked
2 in and out. Because there were people walking
3 in and out. But there were -- people had
4 different responsibilities, of course, and to go
5 from midday with the view that you have to try
6 to preserve the business by the end of the day
7 meant that people were in different rooms doing
8 different things, and I had a specific task,
9 which was to assist in this, quote, business
10 transaction. But I'm sure that at various
11 points in time there was wandering in and
12 wandering out of each of the rooms.
13    Q.   Let me ask a better question. Did you
14 have a conversation with the lawyers about what
15 it was the drafts -- the documents they were
16 drafting should say or contain?
17       MR. STERN: Let me just say that at
18 the time, of course, Mr. Klein was an agent
19 of Barclays, and our position is that his
20 conversations with Barclays' lawyers in
21 isolation were privileged. If you're asking
22 about conversations with the lawyers from
23 both Barclays and Lehman collectively, I
24 don't have a problem with that.

Page 56

HIGHLY CONFIDENTIAL - M. KLEIN
1       MR. GAFFEY: That's a good point,
2 Jack.
3    Q.   And I'll take it as modified by Mr.
4 Stern down there. When you say there was a room
5 full of lawyers drafting, I'm assuming, maybe
6 wrongly, that there was lawyers for both sides
7 in there?
8    A.   Oh, I think there were lawyers from --
9 yeah, I'm assuming both sides. They were both
10 there.
11    Q.   Did you ever have conversations with
12 that group of lawyers, both for Barclays and
13 Lehman, as opposed to isolated conversations
14 with Barclays' lawyers, about what the agreement
15 should contain?
16    A.   I don't, I don't recall who I spoke to
17 about which parts. I -- it's not possible for
18 me to differentiate what you've just stipulated
19 to.
20    Q.   Okay. Was the final terms as written
21 in the document to deal with something that was
22 within your portfolio?
23    A.   The final?
24    Q.   The terms of an agreement as written,

Page 57

HIGHLY CONFIDENTIAL - M. KLEIN
1 was that within your portfolio?
2       MR. BERNICK: I think he's really
3 asking whether you were involved in the
4 document itself.
5       Is that fair?
6       MR. GAFFEY: Yes.
7    A.   I don't -- I didn't view the document
8 as being my document or in my, if you will,
9 portfolio. My, in that time period in
10 particular, my specific -- my roles were as
11 described.
12    Q.   I have put before you, Mr. Klein, what
13 we have marked in a previous deposition as
14 Exhibit 1. Can you tell me if you've seen that
15 document before?
16    A.   I have seen a document that was an
17 Asset Purchase Agreement. This one in
18 particular I can't tell you for sure.
19    Q.   You understand that an Asset Purchase
20 Agreement was executed between Lehman Brothers
21 Holdings, Inc., Lehman Brothers, Inc., LB 745,
22 LLC and Barclays Capital, correct?
23    A.   Yes.
24    Q.   At the time that agreement was

Page 58

HIGHLY CONFIDENTIAL - M. KLEIN

1  finalized -- and you understood that there was
2  one that was actually signed by the parties,
3  correct?
4      A.   I understood that there was an
5  agreement between the parties, yes.
6      Q.   Without regard to the particular
7  exhibit in front of you, did you see that
8  agreement at or around the time it was signed?
9      A.   I did not review this agreement at or
10 around the time it was -- or, I don't recall
11 reviewing this agreement at or around the time
12 it was signed.
13     Q.   Did there come a time when you did
14 review the agreement that had been signed
15 between the parties?
16     A.   I don't recall that I have ever
17 reviewed this agreement.
18     Q.   Could you turn to page 6 of Exhibit 1,
19 please, and in particular, sir, take the time
20 you need to scan the document, but my questions
21 to you are going to be about the definition of
22 "purchased assets" about midway down the page
23 and, in particular, subsection D of that clause.
24     Can you take a minute to read that

Page 59

HIGHLY CONFIDENTIAL - M. KLEIN

1  through to yourself?
2      A.   Okay.
3      Q.   Okay.  The subsection D includes
4  within the definition of "purchased assets" the
5  following:  "government securities, commercial
6  paper, corporate debt, corporate equity,
7  exchange-traded derivatives and collateralized
8  short-term agreements with a book value as of
9  the date hereof approximately $70 billion
10 (collectively, long positions)."
11     Do you have any personal knowledge,
12 sir, as to whether that's an accurate
13 description of that portion of assets sold to
14 Barclays as part of the transaction?
15     Let me withdraw the question.
16     Do you have personal knowledge, sir,
17 as to whether on the 16th of September, 2008, it
18 was agreed that Barclays would purchase the
19 property described in subsection D for the book
20 value as of the date of the agreement of
21 approximately $70 billion?
22     MR. STERN:  Objection to the form.
23     MR. BERNICK:  Can I just make a
24 suggestion?  Why not just ask him what his

Page 60

HIGHLY CONFIDENTIAL - M. KLEIN

1  knowledge of that is?
2      Q.   Okay.  Do you have any knowledge about
3  that?
4      A.   My knowledge of the transaction, as
5  I've described, was Barclays was buying the
6  business, the right to do business and the
7  associated, directly associated, assets and
8  liabilities to that business.  That is my
9  knowledge.  To be -- yeah, that's ...
10     Q.   Would the long position, the
11 securities owned by the broker-dealer, be, in
12 your mind, included within the assets directly
13 associated with the operation of the business?
14     A.   If they were directly associated with
15 the business, then the answer would be yes, the
16 assumption -- well, let me back up.  My
17 understanding was the acquisition of the
18 business, the right to do business and the
19 directly associated assets and liabilities.  The
20 agreements, because of the complexity of legal
21 entities, I can't particularly comment on.  I
22 can only comment on what I've described.
23     Q.   Was it your understanding on the
24 Tuesday, the 16th, that one of the things

Page 61

HIGHLY CONFIDENTIAL - M. KLEIN

1  Barclays was buying was an inventory of
2  securities?
3      A.   First of all, I don't have a great
4  sense of what data I learned on which day, and
5  it's very hard for me to say to you on Tuesday,
6  the 16th, exactly what I believed or knew at
7  that moment.  I'm sorry, I just don't have that.
8      Q.   Okay, that's fine.
9      A.   My understanding was the transaction
10 was a purchase of a business and the business
11 had certain assets and certain liabilities that
12 allowed it to operate.  That's how I understood
13 the transaction and that's the transaction that
14 was undertaken.
15     Q.   Did you have an understanding one way
16 or the other as to whether, within that
17 definition of "assets," some of them were
18 separately priced?
19     A.   I don't have a --
20     MR. BERNICK:  You're talking about the
21 financial assets as opposed to the building?
22     MR. GAFFEY:  Correct.
23     A.   Again, my focus was on the discussions
24 around that 250 and the building, which I've

Page 62

HIGHLY CONFIDENTIAL - M. KLEIN

1    described already.
2    Q.    Let me show you what's previously been
3    marked, Mr. Klein, as Deposition Exhibit 19.
4         Have you ever seen that document
5    before?
6    A.    Yes, I have.
7    Q.    When did you first see that document?
8    A.    I'm not certain when I first saw it.
9    I've seen it recently, but I'm not sure when I
10   first saw it.
11   Q.    Apart from reviewing it maybe to
12   prepare for your deposition, I'm more interested
13   in at the time that we're talking about.
14        Did you see it during the week of the
15   15th, which is when Lehman filed, and the
16   closing of the deal on the 22nd?
17   A.    I know I've seen it prior to the
18   meeting I had in preparation, but I don't know
19   specifically when I saw it.
20   Q.    Do you recall if you had any
21   discussions with people from Barclays about this
22   document, Exhibit 19?
23        MR. BERNICK:  At any time?
24        MR. GAFFEY:  During the week.

Page 63

HIGHLY CONFIDENTIAL - M. KLEIN

1        MR. BERNICK:  During that week.
2    Q.    Between the 15th and the 22nd.
3    A.    I don't recall specific discussions
4    about the document itself.  I don't recall
5    specific discussions.
6    Q.    Did you ever attend any meetings that
7    were attended by people from Lehman and Barclays
8    at which this document was the subject of
9    discussion?
10   A.    Not that I can specifically recall;
11   the document itself, not that I can specifically
12   recall.
13   Q.    Do you have any knowledge of what
14   role, if any, this document played in the
15   reaching of an agreement on the 16th of
16   September, the Tuesday?
17   A.    I don't, with the exception of saying
18   that there's -- there was very little data that
19   was (A) forthcoming to Barclays.  The situation,
20   as you know, was exceedingly fluid.  (B) the
21   data that was coming was, if it was dated by
22   more than a few seconds, it was, given the
23   market activity, it was changing, and given the,
24   if you will, the melting iceberg that was

Page 64

HIGHLY CONFIDENTIAL - M. KLEIN

1    ongoing at Lehman, it was outdated.
2         So there was a general sense that
3    there wasn't really any data except the
4    construct of what we were trying to achieve,
5    which is buy the business as it was operating.
6    But I don't know specifically -- I don't know
7    who created this nor what they specifically used
8    it for, put differently, I don't recall who
9    specifically created it or what it was
10   specifically used for.
11   Q.    You can put that document aside.
12   Thanks.
13        To your knowledge, sir, do you know if
14   part of the agreement that was reached between
15   Lehman and Barclays included a negotiated
16   discount of $5 billion?
17        MR. BERNICK:  Off what?
18        MR. GAFFEY:  Off the value of the
19   assets transferred.
20        MR. BERNICK:  You can answer.
21   Q.    Actually, withdraw that.  Do you know,
22   sir, if the agreement reached between Lehman and
23   Barclays included a negotiated discount of $5
24   billion against the marks that Lehman had for

Page 65

HIGHLY CONFIDENTIAL - M. KLEIN

1    particular securities?
2    A.    I'm sorry, can you ask that for me one
3    more time.
4         (Record read.)
5    A.    Just so I'm clear, because you've used
6    a couple of words here, there were, by the way,
7    a lot of agreements reached at various different
8    points in time, so are you referring to
9    something in specific?
10   Q.    I'm still on the agreement that was
11   first reached on Tuesday, the 16th, the day it
12   was announced.
13   A.    I was, to my knowledge, never apprized
14   of any $5 billion discount at all.
15   Q.    At any point during that week, from
16   the 15th of September, the Monday when Lehman
17   filed, through the 22nd, when the transaction
18   closed, were you ever apprized of the discount?
19        MR. BERNICK:  Again, the $5 billion
20   discount?
21        MR. GAFFEY:  Any discount.
22        MR. BERNICK:  I think that's pretty
23   unclear.  Are you talking about financial
24   assets?

Page 66

1    HIGHLY CONFIDENTIAL - M. KLEIN
2        MR. GAFFEY: I think objection to form
3    will suffice.
4    Q.   Can I have an answer to the question?
5        MR. BERNICK: I'm trying to be --
6        MR. GAFFEY: I appreciate it.
7        MR. BERNICK: -- have you be fair with
8    the witness. I don't really have an
9    objection. It doesn't make a difference to
10   me or my client. What I'm trying to do is
11   to help make sure that things are clear to
12   Mr. Klein.
13       MR. GAFFEY: Okay.
14   Q.   Can you answer the question, sir? Do
15   you need it read back?
16   A.   Yes, please.
17       (Record read.)
18   A.   I don't really recognize the term
19   "discount" in the way you're describing it.
20   Q.   During the course of the week, from
21   the 15th of September to the 22nd of September,
22   did you have any conversations with John Varley
23   of Barclays about the pricing of the
24   transaction?
25   A.   I don't, I don't recall. I don't

Page 67

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    recall that -- I don't recall that I was
3    involved in conversations with John Varley.
4    Q.   In the course of your conversations
5    with anyone from Barclays during the week from
6    the 15th of September through the 22nd of
7    December, did anyone from Barclays ever tell you
8    in sum or substance that Barclays was going to
9    pay a discount in price for the securities it
10   was purchasing from Lehman as part of the
11   transaction?
12       MR. STERN: Objection to the form.
13       MR. BERNICK: I think you did
14   misspeak. You said December.
15       MR. GAFFEY: Did I?
16       You're absolutely right.
17   Q.   In the course of your conversations
18   with anyone from Barclays during the week from
19   the 15th of September through the 22nd of
20   September, did anyone from Barclays ever tell
21   you in sum or substance that Barclays was going
22   to pay a discount in price for the securities it
23   was purchasing from Lehman as part of the
24   transaction?
25       MR. STERN: Objection to the form.

Page 68

1    HIGHLY CONFIDENTIAL - M. KLEIN
2        MR. BERNICK: Answer if you can.
3    A.   Your specific comment on the discount,
4    no one -- I don't understand the concept of what
5    you're saying by "discount."
6    Q.   Part of what Barclays purchased from
7    Lehman was a body of securities; is that
8    correct?
9    A.   Barclays -- at which point in time are
10   we discussing?
11   Q.   Let's go to the closing and work
12   backwards. Part of what Barclays ultimately
13   purchased from Lehman was a body of securities;
14   is that correct?
15   A.   The final transaction, as I understand
16   it, was the purchase of a business, and then
17   what had been the erasing, if you will, or the
18   exchanging of a loan against collateral that
19   that loan existed, and that exchange of the loan
20   against the collateral is, in a sense, a
21   purchase of long securities.
22       So, yes, at that end transaction there
23   was a purchase of a business and then the
24   exchange of a loan against assets.
25   Q.   Now, let's wind back to when a deal is

Page 69

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    first reached. We're on Tuesday, September
3    16th. Was there a component of that deal that
4    provided for the purchase of long securities?
5    A.   As I understand the transaction, other
6    than the building, which is effectively the long
7    purchase, the remaining assets as described to
8    me was the net business attached to the
9    businesses purchased. I hope that answers the
10   question.
11   Q.   It does. Thank you.
12       On Monday, the 15th, and Tuesday, the
13   16th -- I'm at the day of the filing and the day
14   the deal is announced -- were you involved in
15   any way in separate price negotiations about the
16   long position of securities that would be
17   included in the transaction?
18   A.   I really don't recall that I
19   participated in -- I really don't recall that.
20   Q.   In that same period, that Monday, the
21   15th, and Tuesday, the 16th, did you have
22   discussions with anyone from Barclays about --
23   withdrawn.
24       On Monday, the 15th, and Tuesday, the
25   16th, did you have any discussions with Barclays

Page 70

HIGHLY CONFIDENTIAL - M. KLEIN

1 about the fact that one of its conditions for
2 going forward was that the deal had to be
3 capital-accretive to Barclays?
4     A.  I'm sorry, could you ask that again?
5 Can I read it or do you want to ask it again?
6     Q.  You can read it or we can have it read
7 back.
8         MR. BERNICK:  Just have it read back.
9 This is not really an official transcript.
10 I think it's accurate, but you should
11 formally just let her read it back.
12     (Record read.)
13     A.  That specific term I'm not -- I don't
14 have a recollection of that term being used.
15     Q.  You have no recollection of Mr.
16 Diamond ever using that term?
17         MR. BERNICK:  At any time?
18         MR. GAFFEY:  At any time with respect
19 to this transaction.
20     A.  That particular term, but you're
21 giving me a very specific term, but no, I don't.
22     Q.  Now, when a deal was reached on
23 Tuesday and announced, did you have an
24 understanding of what the structure of the

Page 71

HIGHLY CONFIDENTIAL - M. KLEIN

1 documented deal was?
2     Let me ask you to take look at
3 Deposition Exhibit 1, which you will see is
4 entitled "Asset Purchase Agreement."
5     A.  Yes.
6     Q.  And let me put another question
7 instead.
8         Did you have an understanding on
9 Tuesday, September 16th, that the structure of
10 the deal was described as an Asset Purchase
11 Agreement?
12         MR. BERNICK:  I think the question is,
13 did you have an understanding that the
14 transaction that had been agreed was an
15 Asset Purchase Agreement, or styled that
16 way, separate and apart from what he's
17 looking at now as Exhibit 1.
18         MR. GAFFEY:  Correct.
19         MR. BERNICK:  Do you understand that,
20 Michael?
21     A.  I think, generally speaking, I
22 understood that the estate could sell assets and
23 that that was the form of the transaction.
24     Q.  Now, your portfolio, as I'm

Page 72

HIGHLY CONFIDENTIAL - M. KLEIN

1 understanding it, was essentially to deal with
2 what the structure of the transaction was how
3 this could be achieved?
4     A.  At what point in time?
5     Q.  Well, that's what I'm about to ask.
6 Tuesday there's a deal announced.  Had that, at
7 least at that point, had that goal been reached?
8 There was a structure, there was a proposed
9 transaction that would, if successful, achieve
10 the goal?
11     A.  I'm sorry, you have asked sort of a
12 couple of questions.
13     Q.  I know.
14     A.  I just want to be clear which question
15 you want me to answer.
16     Q.  Well, your task is to determine
17 whether there's a structure that will work to
18 achieve -- to effect a transaction, correct?
19     A.  I ask you again at what time period?
20 Because --
21     Q.  Monday/Tuesday, 15th and 16th.
22     A.  Monday/Tuesday, my role was, as a
23 member of the team, to assist in determining
24 whether a transaction was achievable.  The

Page 73

HIGHLY CONFIDENTIAL - M. KLEIN

1 specific structural reference is more
2 appropriate on that weekend because on that
3 weekend is when the structural complexity of
4 creating a new structure was the most relevant.
5     On the Monday/Tuesday, there was a
6 handful of hours, so I would say all parties
7 were involved in attempting to determine what
8 could be achieved or couldn't be achieved.
9     My specific role was, as I described,
10 on that aspect of discussions on the, quote,
11 business that could be part of the transaction
12 and in the form of that, as I said, 250 and the
13 building purchase, principally.  Again, it's a
14 year ago and there were people running around
15 rooms.  The rooms were designated.  That's the
16 legal room.  That's the -- but there were many
17 people.
18     Q.  Did you have an understanding on
19 Tuesday, the 16th, when the deal was announced
20 that part of it was that Barclays would assume
21 certain liabilities?
22     A.  Yes.  Directly tied to the business,
23 yes.
24     Q.  Could you describe for me what your

Page 74

HIGHLY CONFIDENTIAL - M. KLEIN

1 understanding was of the liabilities that
2 Barclays would assume?
3    A.    As I understood it -- well, as I
4 understand it now, thinking back, and again,
5 it's hard to determine what I understood
6 specifically or not, there was the specific
7 liabilities and then general liabilities.
8        The specific liabilities were defined
9 as the, quote, comp and cure discussions,
10 separately the -- if you called them
11 liabilities, the net short positions against
12 assets because it was a net book. There was a
13 general sense, at least in my recollection, that
14 no matter how much you wanted to make this as
15 clean and clear as to what you were purchasing,
16 the concept and the fluidity of clients and
17 customers and your ability to then go forward
18 and undertake this business would be more costly
19 because you are going to have to have 10,000
20 people, or whatever the people are. They're
21 going to do day-to-day things, they're going to
22 cost money, and there aren't going to be
23 revenues, so those liabilities in terms of an
24 expense base going forward, and then,

Page 75

HIGHLY CONFIDENTIAL - M. KLEIN

1 separately, you would have clients that you
2 would hope to do business with that may have had
3 issues with Lehman that, even though they're not
4 your legal issues, they become commercial issues
5 for you.
6        So the concept of liabilities, as
7 you've asked, you were walking into a situation
8 where conceivably there could have been a lot of
9 liabilities, but clarifying what they were at
10 that point in time was a question of the -- what
11 you could and then, separately and distinctly,
12 how much risk the Barclays team was prepared to
13 take relative to that opportunity.
14    Q.    With respect to the specific
15 liabilities for comp and cure that you
16 mentioned, did you have any involvement in
17 determining what the amounts of those specific
18 liabilities would be?
19    A.    No, I don't believe I had a
20 specific -- certainly the, even the term "cure,"
21 to my knowledge, was a new term for me. I
22 didn't set those numbers.
23    Q.    Do you know who did?
24    A.    To my knowledge, the cure payments

Page 76

HIGHLY CONFIDENTIAL - M. KLEIN

1 were Lehman liabilities, so Lehman created that,
2 if you will. With regard to the comp, I'm not
3 clear who created that. I'm not clear on that.
4    Q.    Just to close out that area, did you
5 yourself engage in any discussions with folks at
6 Lehman about these two specific liabilities for
7 comp and cure?
8    A.    I didn't have conversations that I can
9 recall at all on comp with the Lehman
10 professionals at all. The cure had to be
11 explained to me because, again, I didn't know
12 what it was, and it was explained to me as to
13 what it was regarding the ongoing business
14 expenses of the operation.
15    Q.    Was it someone from Lehman who
16 explained it to you?
17    A.    There was a group of people. I sort
18 of vaguely remember being in a very big room
19 that looked like it was one of the dining rooms,
20 and there was a group of people that -- I don't
21 know how many were Lehman and how many were
22 attorneys -- who were sort of describing that,
23 because I just didn't understand it. It wasn't
24 part of my -- so I don't know who all the

Page 77

HIGHLY CONFIDENTIAL - M. KLEIN

1 specific people were that were explaining it.
2    Q.    In that discussion, in that meeting
3 with all those people in there, did anyone say
4 anything to indicate to you how the quantum was
5 reached for the cure amount as opposed to the
6 purpose for the cure?
7        MR. BERNICK: I'm sorry, the --
8        MR. GAFFEY: The amount.
9        MR. BERNICK: What quantum?
10    Q.    How the quantum of the liability would
11 be assumed for cure?
12    A.    They had a list of ongoing
13 obligations.
14    Q.    Did they have it there?
15    A.    I didn't -- I never was shown a list.
16    Q.    Now, did you have any discussions with
17 the Barclays folks, separate from Lehman folks,
18 about the amounts to be undertaken in these
19 specific liabilities for comp and cure?
20    A.    I don't --
21        MR. BERNICK: Again, your question
22 assumes for this witness -- the problem I
23 have is, what do you mean by "undertaken"?
24 That sounds like a contract. I think you

Page 78

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  don't have a predicate from this witness
3  about what he understood the role of those
4  two issues to be in the transaction that he
5  personally was involved in.
6      MR. GAFFEY: Can we read the question
7  back, please?
8      (Record read.)
9      A.   I don't remember specific
10  conversations, except for one general
11  conversation that was a conversation amongst
12  lawyers to discuss the construct of comp, what
13  "comp" meant. Did it mean comp, bonus? Did it
14  mean payroll? Did it mean severance? I
15  remember a general conversation about that.
16  That's the only conversation that I have a
17  general recollection of.
18      Q.   Did you come away from that
19  conversation with an understanding of what
20  "comp" meant?
21      A.   Well, I, you know, having come from an
22  investment banking background and having a
23  perspective on what sort of total compensation
24  is, I had a perspective just generally that I
25  went into and came away from. I didn't come

Page 79

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  away from with any great new learning from that
3  conversation.
4      Q.   Now, I want to move into the next
5  couple of days of that week after a deal was
6  announced. Has the deal changed during the
7  week?
8      THE WITNESS: Can I take a
9  three-minute break?
10      MR. GAFFEY: Absolutely.
11      (Discussion off the record.)
12      (Luncheon recess; Time Noted:  12:28
13  P.M.)

Page 80

HIGHLY CONFIDENTIAL - M. KLEIN
1
2      AFTERNOON SESSION
3      (Time Noted:  1:20 P.M.)
4  MICHAEL KLEIN, resumed and
5      testified further as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. GAFFEY:
8      Q.   Before the break, Mr. Klein, we
9  were -- I think I asked you a question along the
10  lines of whether the deal changed during the
11  week, so let me ask you that.
12      After the Asset Purchase Agreement
13  that we looked at a moment ago was signed, did
14  the deal change during the ensuing week?
15      A.   Yes, the transaction in certain senses
16  changed. The main transaction, which was the
17  business purchase, didn't change. The concept
18  of buying the business, of operating the Lehman
19  Brothers old Lehman North American brokerage
20  business didn't change.
21      What did change, however, was that
22  during the week events occurred surrounding the
23  various different assets and counterparties that
24  under -- that were underlying the business that
25  caused elements of the transaction to change,

Page 81

HIGHLY CONFIDENTIAL - M. KLEIN
1
2  but the base transaction, save the adjustment on
3  the real estate value to reflect the valuation
4  that came in, the base transaction and the
5  business construct and what was driving that
6  didn't change.
7      Q.   What were the elements of the deal
8  that did change?
9      A.   The principal elements that changed
10  were a recognition that the, effectively, the
11  assets that were directly aligned and related
12  positions directly aligned to the business were
13  changing and that both volatility, valuations in
14  the market, but, more importantly, other
15  counterparties were taking possession of some of
16  those.
17      Separately, Barclays began to finance,
18  if you will, some of what was the ongoing
19  operations of Lehman, and that the change was
20  that the construct of the transaction became the
21  business purchase plus this very specific loan
22  for asset hand-off, if you will, and then some
23  elements of additional assets came into question
24  or came into the transaction as part and parcel
25  of those loan or collateral, if you will, the

Page 82

HIGHLY CONFIDENTIAL - M. KLEIN

1  movement in the asset positions and the Barclays
2  loan.
3     Q.   The assets that Lehman was to deliver
4  that changed because of volatility or valuation
5  or counterparties taking possession, let's take
6  that piece first, did you have -- how did you
7  learn about those?
8     A.   I, somewhere just prior to that
9  Friday, I was apprized, one, that the Barclays
10  had been financing the business, the details of
11  which I became more aware of later as part of
12  the JPMorgan weekend; but, two, that the --
13  there had been meaningful problems in that
14  Lehman in their delivering of what was the
15  business that they intended to deliver had
16  limitations, and the net result of which was
17  what had been committed couldn't be delivered,
18  as I understood it, and the result of which was
19  there needed to be, one, both an understanding
20  of could the business operate, how could the
21  business operate, how would the business
22  operate, and what was actually being
23  transitioned.
24     Q.   Actually, did you first learn about

Page 83

HIGHLY CONFIDENTIAL - M. KLEIN

1  this situation on the Friday?
2     A.   I can't recall specifically.  I know
3  that the issue became an issue post-Tuesday, at
4  least my own focus was shifted to deal with a
5  bigger set of questions that were on I think the
6  minds of senior management:  How do you deal
7  with integration risk and all of the other
8  elements that come with the transaction, and
9  then, separately, what do they do with Europe
10  and Asia?
11     So that was occurring during those
12  couple of days, but sometime before Friday
13  morning, and I don't know when specifically I
14  became aware of it, I became briefed that we had
15  a series of issues that had to be addressed that
16  were very meaningful in terms of the completion
17  of the transaction.
18     Q.   Who gave you that briefing?
19     A.   I don't know specifically.  At this
20  point I was dealing on a -- most of the basis of
21  dealing were with either Archie Cox or Jonathan
22  Hughes or Rich Ricci, but I can't say
23  specifically who gave me the briefing or whether
24  it came from attorneys involved.  I just don't

Page 84

HIGHLY CONFIDENTIAL - M. KLEIN

1  know specifically.
2     Q.   And the loan for asset hand-off you
3  were talking about, the Barclays financing of
4  Lehman, did you have any more specific
5  understanding of the nature of that financing?
6     A.   I later learned, because of the
7  JPMorgan-related matters, quite a lot.  At the
8  time, I wasn't party to those dialogues.  I knew
9  that there was an offer of support and I was
10  then briefed on the quantum of the loan and the
11  issue embedded in the size of capital that they
12  had put up at that stage, but I was -- but that
13  which I learned later about the JPMorgan and
14  other elements of the Fed and so forth I learned
15  subsequent to that.
16     Q.   The financing that you're referring
17  to, did you learn whether it was -- what its
18  form was?  Was it a secured loan? a Repurchase
19  Agreement? anything like that?
20     MR. BERNICK:  Whose financing?
21     MR. GAFFEY:  The Barclays financing of
22  Lehman.
23     A.   I don't, even in hindsight,
24  characterizing it specifically, I couldn't

Page 85

HIGHLY CONFIDENTIAL - M. KLEIN

1  characterize it specifically.
2     Q.   So what, if anything, were you asked
3  to do in connection with this new set of
4  problems?
5     A.   I was asked specifically to -- well,
6  let me back up for a moment.
7     The problems that occurred were of a
8  magnitude that they impaired the going-forward
9  nature of the transaction.  The movements of
10  assets and, of course, data was very hard to
11  come by and very volatile, the markets had of
12  course become even more volatile and even more
13  risky.  The transaction was now public, but by
14  the same token, there was a real question as to
15  what the deliverables, not just the deliverables
16  in terms of pure assets, but could the business
17  continue to operate, operate out of the
18  building, operate with the people, operate with
19  the systems, operate in that way.
20     The question, though, that was put
21  directly on the table was, given that a
22  substantial amount of the, quote, net book that
23  was attached to the business that was the
24  business transaction had gone away and the

Page 86

HIGHLY CONFIDENTIAL - M. KLEIN

1    question put forward was, what do we do?
2        The first -- one of the discussions
3    was, well, maybe we just don't have a
4    transaction that has any assets at all.  I mean,
5    this is a business purpose.  If the assets are
6    getting taken by others in different ways, just
7    do a business deal.  And I think that's how I
8    learned that there had been the loan that had
9    then been provided.
10        The second part I was then asked to do
11    was to make a specific request of the parties at
12    Lehman to find more assets to rectify what had
13    been the substantial movement and substantial
14    reduction in the transaction that had taken
15    place.
16    Q.    Did you make the request of the
17    parties at Lehman?
18    A.    I made the request.  I'm not sure that
19    it was just myself who made it, but I was part
20    of requests that were made.  And I don't know
21    who all was involved in sort of the receipt of
22    those requests, but it resulted in a series of
23    conversations on that Friday morning prior to
24    the court.

Page 87

HIGHLY CONFIDENTIAL - M. KLEIN

1    Q.    Did you have a particular person on
2    the Lehman side who was your point person?
3    A.    Well, originally it was the Mark
4    Shafir connectivity.  That's the beginning.
5    From that point forward, after the Tuesday
6    event, it, first of all, became far more fluid
7    in the sense that there was an agreement out
8    there; secondly, there was no particular
9    counterpart at that point in time, and frankly,
10    there was no need until that event occurred for
11    there to be a specific counterpart for me.  The
12    others may have had, because of executional
13    things that were taking place, other specific
14    counterpoints, but I don't think I had -- I
15    don't think I could define a specific
16    counterpoint at that point.
17    Q.    Did you learn that Shafir left during
18    the week?
19    A.    We did learn that Shafir had left
20    during the week, which obviously made for
21    complexity in just in that dealing.
22    Q.    So describe for me as best you can,
23    please, how, in what circumstances the request
24    was made for more assets?

Page 88

HIGHLY CONFIDENTIAL - M. KLEIN

1    A.    Well, I can only describe what I'm
2    aware of, and what I'm aware of is that the
3    transaction of a net book which had long and
4    shorts could be managed over time had
5    migrated in the two ways I described:  One,
6    substantial of those assets had been removed;
7    secondly, it wasn't clear at that stage what
8    assets had been necessarily moved into which
9    pockets, but perhaps most importantly, because
10    it was now a net asset purchase, it was a -- it
11    was putting all of your capital up against just
12    assets that you're buying in the midst of this
13    market calamity, the $45 billion of capital,
14    which that was never -- that was never the
15    contemplation of the transaction, to my
16    briefing.  To my briefing, we were stepping into
17    the shoes of operating the business.
18        So the request was what do we do, and
19    the first question was, is that -- are those
20    assets sufficient for that loan, and that was
21    the first debate.  And to my knowledge, there
22    was a fairly significant disagreement as to
23    whether even the remaining assets were
24    sufficient against the collateral of that loan.

Page 89

HIGHLY CONFIDENTIAL - M. KLEIN

1    And I wasn't an evaluator of those assets or a
2    participant in those evaluations, but there was
3    that, if you will, debate over can we even get
4    our loan proceeds back, so to speak, and there
5    was a disagreement on that value.  I was at one
6    point in a room where that was communicated
7    between different parties, that this -- there's
8    a disagreement on that.
9        I'm not sure if I'm answering the
10    question that you're --
11    Q.    You were.  Thank you.
12    A.    The net effect of that was, because
13    there was no fundamental agreement and there was
14    both parties taking views, that the agreement
15    was struck that the loan against the assets were
16    essentially going to be equivalent in value, to
17    my understanding.
18        The problem that that then created
19    was, because Barclays was buying an ongoing
20    business and, in buying an ongoing business, had
21    expenses that would be coming and no likely
22    revenues and significant losses during that
23    period, as well as the liabilities that they
24    were assuming that we've discussed previously,

Page 90

```
 1        HIGHLY CONFIDENTIAL - M. KLEIN
 2    they had a problem in the sense that they now
 3    had $45 billion of capital as a purchase, which
 4    was not the original intention, as opposed to
 5    what was a purchase and then net assets that
 6    came with the business.  And they were put in a
 7    position where they would have to go back to
 8    both their board and their regulators with what
 9    was a substantial hit, if you will, not just
10    from the original transaction but to their
11    overall capital base.  They couldn't close the
12    transaction on that basis, as explained to me,
13    and as explained to me, more assets were needed
14    to fill that.  And we delivered the message
15    that, is there anything left that can fill this
16    gap that has been created as a result, and that
17    was the message we delivered.
18        Q.   Who was it who -- let me just back up.
19    Had you had any personal involvement in the
20    decision that led to Barclays financing Lehman?
21        A.   No, not that I'm aware of, no.
22        Q.   Did you have any awareness about the
23    fact that Barclays had decided to finance Lehman
24    in this way at any time before these problems
25    were outlined to you?
```

Page 91

```
 1        HIGHLY CONFIDENTIAL - M. KLEIN
 2        A.   In a general sense, and again, this is
 3    recollection of a short window in a general
 4    sense, they were trying to be supportive because
 5    once they announced the transaction, they were
 6    trying to be supportive to preserve value of the
 7    ongoing business.
 8        The specifics of that, quantums and
 9    the form, as I said, I believe I learned --
10    well, I know I learned a lot over that following
11    weekend, the 20th weekend, but prior to that,
12    no, I was not -- I was not briefed on that.
13        Q.   Now, you said that you were in a room
14    where the disagreement about values was
15    discussed?
16        A.   Right.
17        Q.   Who was present?  Is this one meeting
18    you're describing?
19        A.   I'm only aware of one conversation --
20        Q.   Okay.
21        A.   -- that occurred on Friday that I was
22    sort of in part of, and the only people at this
23    stage that we were seeing or that I was
24    seeing -- "we" is too broad -- from Lehman on a
25    periodic basis was McDade and Alex Kirk, because
```

Page 92

```
 1        HIGHLY CONFIDENTIAL - M. KLEIN
 2    obviously Shafir was gone at that point in time.
 3        There was a -- as part of that
 4    rectification, I think Ian Lowitt came into play
 5    as well.  I can't tell you that they were all in
 6    the room for that discussion, but those would be
 7    the principal participants that we dealt with as
 8    we tried to resolve this.
 9        Q.   In trying to resolve this, did you
10    also deal with either Paolo Tonucci or Martin
11    Kelly?
12        A.   Not that I can recall.  Frankly, I
13    don't -- I don't recall even having heard the
14    name Martin Kelly before, but I don't want to
15    overstep my statement.  I just don't recall.
16        Q.   And this discussion that involved
17    McDade and Kirk, who was there for the Barclays
18    side?
19        A.   Again, I want to be clear.  As I said,
20    McDade and Kirk were the individuals we were
21    principally dealing with.  I don't know who was
22    specifically in the room when the first message
23    was delivered that this was an issue or --
24    because this was very fluid.
25        MR. BERNICK:  I have to tell you, Bob,
```

Page 93

```
 1        HIGHLY CONFIDENTIAL - M. KLEIN
 2    you know, maybe it's clear to everybody
 3    else.  You got into this discussion of
 4    meeting by talking about the discussion
 5    about differences in values, and I'm not
 6    sure that -- I don't know exactly what
 7    meeting the witness is talking about.  He
 8    talked about a meeting where a request was
 9    made.
10        MR. GAFFEY:  Let me see if I can
11    clarify this.
12        Q.   You spoke, Mr. Klein, about the fact
13    that there was a fairly significant disagreement
14    as to whether the collateral was sufficient,
15    yes?
16        A.   I said that there was a disagreement
17    over the value of that collateral versus that
18    loan.
19        Q.   And you had not been involved in the
20    valuation?
21        A.   No.
22        Q.   But that you found yourself in a room
23    where there was some disagreement about whether
24    the collateral was sufficient, and that was
25    discussed?
```

Page 94

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    A.    That's right.
3    Q.    That's the meeting I'm asking about.
4    Is this the meeting on Friday morning?
5    A.    Again, I don't recall which specific.
6    I know that on Friday we had to clean up the
7    issues and or not, I mean, it was that much of a
8    make-or-break event, and the issue as it had
9    been described to me by my client was we have a
10    problem in that this is, given the significant
11    removal of positions and obviously the impact as
12    a result on the, quote, business deal, we need
13    to be very clear that (A) this is a different --
14    putting 45 billion of cash capital now to buy
15    assets and, secondly, we don't have the same
16    value. So I was instructed to go in and express
17    that we needed more assets. So that's the
18    meeting I'm referring to.
19    Q.    And who gave you those directions?
20    A.    At this stage, the principal people I
21    was dealing with were Rich Ricci and Archie Cox,
22    and Jonathan Hughes from a legal perspective was
23    around most of the time during this time period,
24    and the direction would have come from some
25    subset of that team.

Page 95

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    Q.    So did you make that request? Did you
3    come in and say -- did you, in sum or substance,
4    did you make it known to Lehman that you needed
5    more value?
6    A.    Well, I made it known to the parties
7    that were involved that there needed to be more
8    assets, because if there weren't more assets,
9    the transaction couldn't take place.
10    Now, to say "I," it was made known and
11    I was part of discussions that were around what
12    could solve that gap. I don't know that I was
13    the person that specifically stated it or not.
14    Q.    How big a gap had to be made up?
15    A.    The quantification of what I was told
16    was that we had an understanding that the value
17    of the assets, if you will, the loan, the $45
18    billion loan, was -- the collateral base could
19    not be assured that that would solve that; that,
20    secondly, we then needed to go and get more
21    assets. No one gave me an instruction that said
22    you need to get X or Y, but we need to go get
23    more.
24    I wasn't, because I wasn't involved in
25    the, if you will, the -- I may not use the right

Page 96

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    term, but the back end of Barclays in terms of
3    how they were looking at the construct for
4    themselves, I don't know what the accounting
5    was, but I was told you need to go in and get
6    more assets, this won't work.
7    And I think there was a great degree
8    of trepidation. It was already complicated
9    enough because the integration issues. It was
10    already complicated enough because of the market
11    issues. It was now public. It was complicated
12    enough because of the Europe, Asia, everything
13    separating away. It was now already a very
14    complicated event to have what was then this
15    meaningful change and, thus, have a hit to them
16    and that additional incremental risk, and in
17    addition, owning the risk on disposing of what
18    were this 45 billion of securities, there was
19    quite a lot of fear, and at that point there was
20    a sense that this transaction just might not
21    occur.
22    Now, of course, that happened many
23    times over the couple of weeks, the sense that
24    this might not occur, but it was very acute, and
25    I was told you need to -- we need to make it

Page 97

HIGHLY CONFIDENTIAL - M. KLEIN

1
2    very clear if there's not other assets, we can't
3    get this done.
4    Q.    You have to make it very clear that if
5    there are not more assets, this won't get done,
6    how do you do that without being able to tell
7    Lehman this is how much more we need? Does that
8    present an obstacle here?
9    A.    I don't want to hypothesize.
10    Q.    Let me try this another way. Your
11    instructions are to make it clear to Lehman that
12    if there are not more assets to be added, that
13    it's possible the deal won't get done; is that
14    correct?
15    A.    My recollection of both those
16    discussions and at least the instructions that I
17    got were this transaction was going to fail
18    because of what was the diminution in the
19    original plan. Now, that's -- those are the
20    communications that I was part of.
21    Q.    And were you part of the
22    communications to Lehman of the fact that
23    additional assets had to be added?
24    A.    I think I said that I was in a room
25    where that was discussed, and again, I don't

Page 98

HIGHLY CONFIDENTIAL - M. KLEIN

1    know who specifically made which statements, but
2    I was in a room in that and it was made clear
3    you need to find what else there may be because
4    this is a problem.
5        Q.   And in the room where these
6    discussions were had, was anything communicated
7    as to how much more there needed to be added in
8    order for the deal to close?
9        A.   I'm not aware that a specific number
10   was put forward. I'm not -- I'm not clear that
11   a specific number was put forward and I'm not
12   clear that there was a sense that there was any
13   other assets and I think it was a good faith,
14   which is why I raised the point earlier that
15   this question that certainly I had put forward,
16   should we do something without assets, which, as
17   I said, caused me to learn a bit more about what
18   was this loan question. But no, I'm not aware
19   of a specific number that was put forward.
20       Q.   You mentioned the number $45 billion.
21   Was that your understanding of the amount that
22   had been advanced by Barclays to Lehman in this
23   financing?
24       A.   My recollection of the, quote, loan

Page 99

HIGHLY CONFIDENTIAL - M. KLEIN

1    that Barclays had exposure was 45, although for
2    some reason I have in my mind that occasionally
3    it was 45.5, but I may not be getting that
4    exactly correct.
5        Q.   Did you have an understanding one way
6    or another as to whether the loan of 45 or 45.5
7    was collateralized by security in excess of the
8    amount lent?
9        A.   I was only briefed that it was
10   collateralized, that it was a secure -- that it
11   had securities attached to it. I didn't get
12   into the particular details, but I will say that
13   what I was briefed on as part of this was that
14   there was real concern on the Barclays side that
15   the assets that they were going to be buying
16   could not be valued or liquidated at that price,
17   at that value.
18       Q.   Did you gain an understanding what the
19   Lehman side of the story was? What were they
20   saying with respect to the value of the assets?
21       A.   In the rooms I was in -- and again, I
22   can only recollect this being occurring in or
23   around the frenzy, if you will, or the rush --
24   best way for me to say it is I don't remember

Page 100

HIGHLY CONFIDENTIAL - M. KLEIN

1    other than the sort of Friday discussions that
2    we're discussing.
3        There could have been other
4    discussions that I'm not aware of that there was
5    a disagreement as to whether it was -- and the
6    disagreement was a plus or minus the 45. This
7    was a, you know, do you -- are you selling these
8    today? Are you selling these tomorrow? Are you
9    holding them for a week, and if you're holding
10   them for the week, are they worth more than the
11   45?
12       I didn't remember anybody saying this
13   is worth 90 and this is worth zero. I think it
14   was -- and the rationale and the reason why the
15   agreement was reached that it was worth the loan
16   was it was a plus-or-minus discussion point.
17   But I wasn't part of the valuation on either
18   side, so I don't, I mean, I don't know what the
19   underlying background of those statements were.
20       Q.   I understand that you're not -- you
21   don't have the underlying data as to who's right
22   or who's wrong in the discussions, but my
23   question goes to what was the nature of the
24   discussion that you heard.

Page 101

HIGHLY CONFIDENTIAL - M. KLEIN

1        Was there a range of disagreement that
2    you heard between Lehman and Barclays as to the
3    value of the underlying collateral?
4        A.   I only, as I think I said, I think the
5    only thing I can recollect was that they had
6    differences as to whether you sold it today,
7    held it for a period of time, and it was a plus
8    or minus the loan amount. It was not -- people
9    weren't -- this wasn't, to my knowledge, because
10   it certainly didn't involve me, a ten-hour
11   discussion over, you know, multiple different
12   you're here and I'm here. This was there's a
13   difference of opinion, what do we do, and a
14   general understanding that it's not that big of
15   a difference, so let's move forward because we
16   have to move forward. But that's just the part
17   that I was party to.
18       Q.   I need to push for a little more
19   detail on this, the scope of the difference, if
20   I could. The request, the demand, whatever verb
21   you want to use, is made from Barclays to Lehman
22   to add more assets so that the deal can close,
23   correct?
24       A.   The -- not precisely correct. There

Page 102

HIGHLY CONFIDENTIAL - M. KLEIN

1  HIGHLY CONFIDENTIAL - M. KLEIN
2  was a clear understanding that the, quote, net
3  book value transaction could not occur, so what
4  you had was a loan against assets.  There was a
5  message that that loan might not be fully
6  satisfied by those assets and there was a
7  difference of opinion, plus or minus.
8      Secondarily, there was a view that
9  because of all of the risk in liability and the
10 losses that were likely to occur, there needed
11 to be more assets from Barclays' perspective to
12 complete the transaction.  So those messages
13 were messages that were delivered and I was
14 party to at least one conversation on those
15 subjects.
16 Q.  And a while ago you told me one of the
17 issues was that it was probable that Barclays
18 was going to have expenses after the
19 transaction.  Was the request for more assets to
20 cover those expenses?
21     MR. BERNICK:  I think it's unclear
22 what the expenses were that the witness was
23 referring to with his prior answer.
24     MR. GAFFEY:  That's a good point.
25 Q.  What were the nature of the expenses

Page 103

HIGHLY CONFIDENTIAL - M. KLEIN

1  HIGHLY CONFIDENTIAL - M. KLEIN
2  that were at issue?
3  A.  As I understand it, the -- and I
4  wasn't -- there was a whole team of other
5  bankers that were working for Barclays and doing
6  work for board and board presentations and so
7  forth, that wasn't my agreement.  But in looking
8  at this transaction, one had to look at the
9  accounting day one and going forward, and
10 clearly in a world where there's focus on
11 capital and focus from the FSA, potential both
12 day one as well as long-term losses were
13 important.
14     My understanding was that there would
15 be people that were being employed and it's not
16 clear what the revenue streams would have been
17 going forward.  So when I say expenses, there
18 were just operations of the business that --
19 because you wouldn't be up and running.
20     Now, that became more acute even later
21 on June 20th because of the JPMorgan event and
22 the shutdown, but that's what I was referring
23 to.
24 Q.  So this might be a bit simplistic for
25 me to say, but was the idea that now that

Page 104

HIGHLY CONFIDENTIAL - M. KLEIN

1  HIGHLY CONFIDENTIAL - M. KLEIN
2  Barclays needed to have some, at closing, needed
3  to have some equity to support its ongoing
4  expenses once it took over the business?
5      MR. BERNICK:  Answer that question, if
6  you can.  You've got equity, ongoing
7  expense, continuation of business.  I don't
8  want to -- you just answer that if you can.
9  A.  Maybe ask it again because I -- does
10 someone want to --
11 Q.  Was the idea now that Barclays needed
12 to have some, at closing, needed to have equity
13 to support its ongoing expenses once it took
14 over the business?
15 A.  I wouldn't -- I don't think I would
16 characterize it that way.  I wouldn't
17 characterize it that way.  The transaction from
18 Tuesday onward changed meaningfully, and what I
19 was told was that, because of that reduction in
20 the assets and in the asset value, the
21 transaction didn't work for my client and that,
22 as such, I had to work with Lehman to get more
23 assets as part of that.
24     How that all fit into what was the
25 look, if you will, that Barclays had, you'd have

Page 105

HIGHLY CONFIDENTIAL - M. KLEIN

1  HIGHLY CONFIDENTIAL - M. KLEIN
2  to ask the Barclays folks.  The direction I got
3  was that this change was meaningful enough that
4  it had to be fixed.
5  Q.  So your job is go get more?
6  A.  That's right.
7  Q.  And you don't have knowledge as to
8  what Barclays' analysis was of why it needed
9  more?  You understand --
10     MR. BERNICK:  I --
11     MR. STERN:  Objection to the form.
12 Q.  Your instructions from your client are
13 go to Lehman and get more assets, correct?
14 A.  My instructions from the client were
15 this is a very big change, the buying an ongoing
16 business with a net book has now changed,
17 because given what's taken place with
18 counterparties taking assets, given what's
19 taking place, we now don't have that
20 transaction.  It's now become a far greater
21 riskier event for them in that they're putting
22 up this $45 billion of capital and buying long
23 assets and no one wants to buy that much long
24 assets.  This wasn't intended to be an asset
25 transaction.  It was a business that they were

Page 106

HIGHLY CONFIDENTIAL - M. KLEIN

1  stepping into.
2      The concept of buying long assets in
3  that market was great risk, and one had to look
4  at how I value it and how I sell it. That was
5  sort of one comment that was given to me, and
6  the other comment was, given the moving pieces
7  that had taken place with this and given this
8  risk, we need more assets as part of the
9  transaction to replace what had been taken out
10  of the transaction for us to move forward. And
11  that's the task that I embarked upon.
12      Q.   And no one from Barclays tells you how
13  many more assets are needed to replace what had
14  been taken out of the transaction? I'm pushing
15  for a target or a number if you have one here.
16      A.   I don't -- one, let me just say I'm
17  trying to recollect as much as I can recollect.
18      Q.   I understand.
19      A.   Two, I was a part of a team which I
20  had sort of narrow responsibility. Third, I
21  wasn't running any kind of Barclays pro forma
22  model nor was I doing those presentations to the
23  board. So it's not a, you know, it wasn't part
24  of what I was doing.
25

Page 107

HIGHLY CONFIDENTIAL - M. KLEIN

1      The concept of this is a very big
2  problem when your client says this is a very big
3  problem and you're told to help go solve that
4  problem, you go solve that problem. The quantum
5  of that problem, I think as the assets came
6  forward, became clearer as to when I got
7  responses that, "Here's what's available, can
8  this get us over the finish line?" became
9  clearer, but I don't recall someone saying, "I
10  need to get" -- perhaps I'm not recollecting
11  every conversation. I just don't remember
12  somebody saying, "I need to get ..."
13      Q.   Need to get a particular amount?
14      A.   Yeah.
15      Q.   Did anyone on the Lehman side of this
16  dialogue ask how much more does Barclays need?
17      A.   I recall the principal focus that was
18  going on at Lehman was, here's what we have,
19  does this help, and I think it was a real -- it
20  seemed to me in good faith they were trying
21  quite hard to find what was there, and basically
22  the two things they found were the two things
23  they put on the table, which were this so-called
24  bag of hammers, as it was related, and then this
25

Page 108

HIGHLY CONFIDENTIAL - M. KLEIN

1  custodial account balance.
2      Q.   I'm going to ask you to solve one of
3  the great mysteries in the case. Do you know
4  who used the phrase "bag of hammers"?
5      A.   It's -- I had never heard it before.
6  It has to be a trading term, so I'm presuming it
7  came from one of those two, either Bart or Alex.
8  I don't -- I wouldn't want to attribute such
9  a --
10      Q.   It's not a bad phrase. I've just been
11  wondering who was its author.
12      Were more assets added to the deal?
13      A.   Well, let me be specific. Substantial
14  assets were reduced from the transaction, but
15  from the point of the Friday discussion, there
16  were those two asset categories brought into the
17  scope of the transaction.
18      Q.   Okay.
19      A.   So there were certainly not more
20  assets added on an additional basis, but those
21  two categories were brought in to solve the
22  problem at hand.
23      Q.   What was the value in total of those
24  two categories?
25

Page 109

HIGHLY CONFIDENTIAL - M. KLEIN

1      A.   I don't know today nor do I know then
2  what the real value is of those.
3      Q.   Did you have a view at the time as to
4  what the value was that was added on the Friday?
5      A.   I only know what was told to me. I
6  don't know what was the reality of it because I
7  never saw any of the securities or the analysis.
8  I was told that the bag of hammers was 1.9, as I
9  recall, and I was told that there would be more
10  than a million and potentially more than a
11  million and a half in this custodial account.
12      That being said, to be quite precise,
13  there was also an e-mail given that described
14  the specific agreement and willingness, I think
15  by an S.E.C. official, to release a number that
16  was more like 750 of that custodial account. So
17  my understanding of the value that was dealt
18  with as part of that conversation would be those
19  components, and those components then had to be
20  digested as: Do they exist? What do they mean?
21      I didn't have any involvement in the
22  work as to do they exist, what do they mean,
23  what is a bag of hammers, what is that involved
24  in, but in discussions with my client, their
25

Page 110

HIGHLY CONFIDENTIAL - M. KLEIN

1      determination then was that was suitable in
2 order to go forward.
3      So, to your question before, it became
4 then clearer to me what the gap was because
5 those were suitable to solve that in that
6 morning.
7     Q.  The last part of your answer, though,
8 sir, is an inference. Did your client tell you
9 that had been the gap or you inferred --
10     A.  No.
11     Q.  -- from the fact that they said they
12 would go forward that it was?
13     A.  There was an agreement to go forward.
14 That's -- there's -- I don't recall that I saw
15 the accounting before or after or subsequent for
16 it, so I don't know what their internal
17 machinations or gap was, but when I delivered
18 that as part of the discussions with the team
19 and it was discussed, and the lawyers then
20 reviewed what that meant, and I tried to
21 determine if I can figure out exactly what time
22 each of those -- I just can't figure out when
23 each of these things occurred, but certainly
24 before the bankruptcy court that -- those two

Page 111

HIGHLY CONFIDENTIAL - M. KLEIN

1 asset discussions came into play. Barclays was
2 prepared to go forward with the transaction,
3 which was the relevant issue at hand.
4     Q.  Did you attend the bankruptcy hearing?
5     A.  I did attend the Friday bankruptcy
6 hearing.
7     Q.  Correct.
8     A.  That's the only one I would have
9 attended, yes.
10     Q.  And the bankruptcy hearing took place
11 in the late afternoon on Friday? It started in
12 the late afternoon on Friday, correct?
13     A.  I don't know specific time, but yeah.
14     Q.  Was the issue resolved before you left
15 to go to bankruptcy court?
16     A.  Certainly in concept I'm aware that
17 there had been an agreement reached, otherwise
18 there was no business to go to bankruptcy court.
19 Anything that happened between my leaving and
20 going down to court I can't tell you, but there
21 was an agreement reached.
22     Q.  That's a fair comment. I guess
23 there's two pieces to this. One is the
24 agreement reached in concept to add more assets,

Page 112

HIGHLY CONFIDENTIAL - M. KLEIN

1 and then, secondly, there's the point where your
2 client says enough assets have been added, we'll
3 go forward. My question goes to the second
4 part.
5     A.  My recollection of my own sort of
6 whereabouts was I was told that that worked and
7 that we should go down to court to get it done.
8     Q.  Now, just to clarify a little piece of
9 your testimony, you were talking before about
10 the funds that the S.E.C. had to -- the release
11 the S.E.C. had to approve, you were speaking in
12 terms of millions. Did you mean to say you were
13 told there would be a billion to a billion and a
14 half?
15     MR. BERNICK: Wait. You said the
16 release that the S.E.C. had to approve.
17     MR. GAFFEY: Let me put some
18 terminology in the here.
19     Q.  The custodial accounts you were
20 talking about, does the phrase "15c3" ring a
21 bell?
22     A.  It does, because I remember being
23 confused as to that political action committee
24 other thing, which is what -- somebody may know

Page 113

HIGHLY CONFIDENTIAL - M. KLEIN

1 what that is, but I --
2     Q.  You joined everybody else in the room.
3 We've all learned what 15c3 is in the last
4 couple of weeks. But you recall the term "15c3
5 funds" to refer to --
6     A.  I do.
7     Q.  And the amount of 15c3 funds that was
8 at issue was in the billions, not millions?
9     A.  In the billions.
10     Q.  A billion to a billion and a half?
11     A.  A billion to 2 billion at one point,
12 but there was an e-mail, and I only remember it
13 because there were so few pieces of actual data
14 that had been sort of handed in any meeting that
15 I was part of, but I just remember that that
16 e-mail existed and that there was a reference to
17 somebody from the S.E.C. agreeing that a certain
18 amount could be released.
19     And I have a recollection, although I
20 don't have it specifically and I haven't
21 subsequently seen that e-mail, I don't think
22 I've seen that e-mail since that moment, was
23 that it was at least 750, but I don't -- 750
24 million, at least 750 million.

Page 114

1      HIGHLY CONFIDENTIAL - M. KLEIN
2      Q.   And the so-called bag of hammers were
3   also referred to as unencumbered assets,
4   correct?
5      A.   I --
6      Q.   I'm just trying to get some vernacular
7   here so we know which fund we're talking about.
8   I'll go with "bag of hammers," if you like.
9      A.   It was, at various points in time, the
10  only phrases that I specifically remember being
11  used -- I don't want to -- that's too broad a
12  statement. Bag of hammers. Box, there was some
13  reference to box. There were referrals to
14  available assets.
15         The implication to me, not
16  understanding it was that these were assets set
17  aside not on any particular desk that were in
18  some sort of centrally managed code, that were
19  simply available, but I don't -- I don't have
20  any other detail beyond that.
21     Q.   In addition to those two categories
22  that we -- that you talked about, sir, was there
23  any discussion of adding to the deal margin
24  funds held through the Options Clearing
25  Corporation?

Page 115

1      HIGHLY CONFIDENTIAL - M. KLEIN
2      A.   I don't -- that wasn't part of the --
3         MR. BERNICK:  You have to establish --
4   that is a technical term.
5         MR. GAFFEY:  Yeah, that's a good
6   point.
7      Q.   I don't need you to understand what it
8   is. I want to know if that term came up in the
9   discussion, "we'll look for OCC funds as well"?
10     A.   By the later part of the weekend, in
11  that JPMorgan weekend, there were so many
12  different vehicles that -- with acronyms and
13  entities. I can't tell you when which events
14  came up related to those. I wouldn't want to
15  comment.
16     Q.   As a more general matter, in addition
17  to the two categories you described, can you
18  tell me if additional categories of assets were
19  added over the weekend?
20     A.   The, just to be -- to restate, the
21  transaction in terms of buying the business
22  remained the same. The asset that was -- all
23  the assets and concurrent related liabilities
24  directly tied to the business obviously changed
25  to be the loan and the assets.

Page 116

1      HIGHLY CONFIDENTIAL - M. KLEIN
2         The asset categories that I understand
3   were added were relative to that moment. Again,
4   it's a reduction in assets. That was the bag of
5   hammers and this 15c3 question.
6         There was a subsequent reduction in
7   that at a certain point in time the -- Lehman
8   asked if, above and beyond a certain threshold
9   on the 15c3, if there was more, could we have
10  that. That question came up during that time
11  period, and that question was put to Barclays,
12  who said, yes, if it's above that number, and I
13  believe that number was above the 750.
14        Now, I don't know how that -- how they
15  came to that, but that was a request later and
16  that was a reduction in assets. So, subsequent
17  to this Friday, I'm not aware of other assets
18  that came to Barclays, but I am aware that that
19  additional incremental give-back was given back
20  to -- I don't know how to define it, but back
21  to, quote, Lehman.
22        MR. BERNICK:  I think part of the
23  problem is you say "added." It's added to
24  what?
25        MR. GAFFEY:  Is that a question for

Page 117

1      HIGHLY CONFIDENTIAL - M. KLEIN
2   him or me?
3         MR. BERNICK:  No, I mean, really
4   there's an ambiguity. What he said here's
5   what was put. The question was "added," and
6   I think what he said was these were the two
7   things that were added, but it was in
8   reference to an already existing basket that
9   was out there.
10        MR. GAFFEY:  Let me try and be a
11  little clearer.
12     Q.   The bag of hammers is added in
13  whatever amount on Friday, yes?
14     A.   The bag of hammers was a new subject
15  as of Friday, yes.
16     Q.   And the 15c3 funds are added in
17  whatever amount on Friday, yes?
18     A.   It could have been late Thursday night
19  or -- I don't know exactly whether these things
20  took place, but that subject, that was part of
21  the, quote, gap, the 15c3.
22     Q.   And as far as you recall, there was no
23  discussion on the Thursday or Friday of the OCC
24  funds being added?
25     A.   You have asked me that and I've tried

Page 118

1        HIGHLY CONFIDENTIAL - M. KLEIN
2   to be careful, because the term "OCC" and all of
3   the different initials came up at various points
4   in time. I just don't specifically recollect an
5   OCC discussion. I just don't specifically
6   recollect that.
7       Q.  As a general matter, the effort to
8   find additional assets, does it continue on
9   Saturday and Sunday, the 20th and 21st?
10      A.  No, not that I -- I was not --
11      Q.  As far as you know.
12      A.  As far as I know, the only directional
13  asset change, as far as I understand -- well,
14  let me back up. Leaving aside every issue
15  relating to what took place with the JPMorgan
16  and the shutting down of the business, which
17  later became very clear, leaving aside that for
18  a moment, which may be hard to do, but it was
19  not part of my understanding or vernacular
20  leading into the bankruptcy Friday event, so
21  leaving aside that as to the core transaction
22  between the business transaction between
23  Barclays and Lehman, which was the 250 plus the
24  buildings, the related assets attached to it,
25  the changes that were made were the changes that

Page 119

1        HIGHLY CONFIDENTIAL - M. KLEIN
2   occurred Tuesday to Friday.
3       Subsequent to that, there was a -- or,
4   somewhere on the Friday time period late, I
5   think, the appraisals were delivered, so there
6   was a change in value in the real estate as the
7   splitting of the two appraisals took place. The
8   only thing that I can think of right now, and
9   maybe I'm -- but the only thing I can think of
10  right now is the 15c3 give-back.
11      So there was no new assets being
12  searched for. In addition, there was some
13  discussion over, quote, a brokerage fee
14  additional discount on the real estate, and that
15  became a -- that became a contentious point, so
16  Barclays gave up on that, quote, discount.
17  Those are the only elements that I can recall,
18  again, except for the moving pieces relating to
19  solving the JPMorgan-related matter.
20      Q.  In your discussions with your client
21  about the need for additional value to be added
22  on the Thursday or the Friday, what we've been
23  talking about, did Barclays in sum or substance
24  tell you that they needed a buffer of some kind?
25      A.  I don't think -- I don't think the

Page 120

1        HIGHLY CONFIDENTIAL - M. KLEIN
2   term "buffer" -- I don't think I ever recollect
3   the term "buffer" being used.
4       Q.  Is it fair to say that your
5   understanding by Friday is that because of this
6   financing, this loan that you have talked about,
7   that the mechanism of the deal had changed?
8       A.  The basic transaction parameters to
9   buy the business hadn't changed. The purpose
10  from Monday onward was to step into the shoes of
11  operating the Lehman, if you will, North
12  American business, obviously being clear that
13  some of the activities, including customer
14  activities and all those that occurred before
15  Barclays was not going to take part in, but the
16  business, ongoing business, that transaction
17  didn't change.
18      So the sum and substance of the
19  transaction that was the meaningful transaction
20  didn't change. What happened was the related
21  assets that were going to come with those
22  businesses effectively went away, so there then
23  was this incremental additional event that took
24  place, which I have always thought of as then
25  being something different, which was you now

Page 121

1        HIGHLY CONFIDENTIAL - M. KLEIN
2   have a loan that you have to satisfy the loan
3   and you are going long 45 billion of securities
4   in this marketplace. So the main transaction
5   and the substance of that transaction didn't
6   change, it's just that the related assets that
7   would have come with it were no longer the same
8   or comprehensible and a, if you will, distinct
9   event in terms of the loan and the collateral
10  for that loan was undertaken.
11      That's how I understand it. Now, that
12  may just be how I understand it.
13      Q.  To your knowledge, your personal
14  knowledge, were these differences regarding the
15  related assets documented in any way? Was there
16  a written agreement reached?
17      MR. BERNICK: I'm sorry, when you say
18      "related assets," I don't understand what
19      your focus is now.
20      Q.  This addition of value on Friday, were
21  any written agreements, to your knowledge,
22  reached with respect to the addition of these
23  assets?
24      A.  Which assets are you specifically
25  referring to now?

Page 122

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    Q.    Bag of hammers. 15c3.
3    A.    I wasn't party to the drafting of the
4    documents, so I don't want to -- it was -- I
5    certainly understood those two elements to be
6    part and party of the agreement that was
7    reached. I understood it that way.
8    Q.    When you say "the agreement that was
9    reached," you mean the agreement that was
10   reached the prior Tuesday? The original
11   agreement that was reached?
12   A.    I think if you're asking about the bag
13   of hammers, the bag of hammers was, as we
14   discussed, a Friday event.
15   (Discussion off the record.)
16   (Recess; Time Noted: 2:16 P.M.)
17   (Time Noted: 2:21 P.M.)
18   BY MR. GAFFEY:
19   Q.    Mr. Klein, I have placed before you
20   what has been marked at a prior deposition as
21   Exhibit 25. Can you tell me if you've seen that
22   document before?
23   A.    I don't recall seeing it.
24   Q.    Have you ever heard the term
25   "clarification letter" used in connection with

Page 123

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    this transaction?
3    A.    Yes, I have.
4    Q.    With that question and answer, does
5    that refresh your recollection as to whether
6    you've seen this document before?
7    A.    I didn't review the clarification
8    letters when they were drafted, but I'm aware
9    that they existed.
10   Q.    I might be able to save you a little
11   time with my next question. I have a couple of
12   drafts of the clarification letter on which your
13   name appears on the e-mail distribution. Did
14   you read those when you got them?
15   A.    I didn't. I didn't view that given
16   the time that I could read the various different
17   notes that were part of that. I didn't read the
18   clarification letters at all that I can recall.
19   Q.    Were you in New York all that week,
20   the week of the 15th through the 22nd?
21   A.    I apologize. I haven't gone back and
22   checked. I believe I was. I don't -- at one
23   point I was scheduled to go to assist on the
24   European side, but that's when the events
25   transpired, or at least I didn't go.

Page 124

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    (Exhibit 425, a document bearing Bates
3    Nos. BCI-EX-00077378 through 379, marked for
4    identification, as of this date.)
5    Q.    I have put before you, Mr. Klein, what
6    we have marked as Deposition Exhibit 425, a
7    two-page document bearing Bates No.
8    BCI-EX-00077378 through 379. Take a minute,
9    sir, to just scan through that so you're
10   familiar with the text.
11   A.    Okay.
12   Q.    There's a reference in the bottom to
13   you had a plan to fly to Europe, but you were
14   going to stay in New York, and further up it
15   says, "Big issues on balance sheet today versus
16   what we thought we bought." That's an e-mail to
17   you from Rich Ricci. You see that?
18   A.    Yes, I do.
19   Q.    And then you respond, "I am aware," in
20   the subsequent, that is, the e-mail at the top,
21   correct?
22   A.    I see that, yes.
23   Q.    Now, this e-mail is dated Thursday,
24   September 18th, at 8:23 P.M., and by "this" I'm
25   referring to the most recent one, the one at the

Page 125

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    top.
3    Just for a little more precision on
4    this issue of additional assets, let me ask you,
5    does the -- does this chain of e-mails when it
6    talks about issues on the balance sheet refer to
7    the issue we've been discussing, that is, the
8    need for more assets to be added to the deal?
9    A.    I don't know specifically what his
10   comment meant in terms of what he intended this,
11   but it would be consistent with the concept that
12   the, as I described, that the movements in the
13   assets that were attached to the business
14   changed the transaction or changed that element.
15   Q.    Now, in addition to the reduction in
16   the amount of deliverable assets, that is, you
17   know, counterparties had taken assets that
18   otherwise would have been delivered, and the
19   effect of the diminution in market value of the
20   assets, was there also concern on Barclays' part
21   as to the identity of the actual assets in the
22   collateral supporting the loan?
23   A.    Clearly the -- there had been
24   counterparties to various different agreements
25   within Lehman that took assets, moved assets. I

Page 126

HIGHLY CONFIDENTIAL - M. KLEIN

1    don't want to characterize it inappropriately.
2    Clearly the volatility was absolutely moving
3    around.
4         Beyond that, there certainly became
5    questions that I'm aware of as part of the
6    JPMorgan events towards the assets and the asset
7    inclusion. Beyond that, in terms of the sort of
8    specifics, I think that there was, as a general
9    matter, no good schedules provided, if you will,
10   by Lehman as part of this. Things were moving
11   so quickly either by virtue of the unwind of
12   their business or by virtue of the -- just
13   movement.
14        So I wasn't party to the sort of
15   name-by-name asset thing, but as a general
16   measure, there were approximations, if you will,
17   and, you know, the business of trading and so
18   forth was occurring. I don't know if I'm
19   answering your question.
20        I don't know of any specific asset
21   that was -- that I can recollect moving around
22   differently, but I do know that there was not
23   great data coming to, certainly, the teams.
24   Q.   I'll show you, Mr. Klein, a copy of

Page 127

HIGHLY CONFIDENTIAL - M. KLEIN

1    what's previously been marked as Deposition
2    Exhibit 303A and ask you again, just scan
3    through that sufficiently to familiarize
4    yourself with what this is.
5         (Document review.)
6    A.   I see it, yes.
7    Q.   There's a reference in the first
8    e-mail, the earliest e-mail in the chain from
9    you to Archie Cox, Friday, September 19, at
10   21:54, where there's a reference to, quote, the
11   JPM assets?
12   A.   This would be Friday late in the
13   evening. So this would be during the bankruptcy
14   hearing.
15   Q.   Uh-huh.
16   A.   It must be.
17   Q.   What were you referring to there when
18   you are referring to, quote, the JPM assets?
19   A.   I'm not sure if I expressed this
20   before, but the JPM process became much more
21   transparent to me from the hearing in bankruptcy
22   onward. I wasn't party to the various different
23   agreements that were undertaken. I learned
24   about them as part and parcel of this whole

Page 128

HIGHLY CONFIDENTIAL - M. KLEIN

1    JPMorgan problem that took place, but there was
2    a point within the -- there was some odd
3    reference made at the bankruptcy court by one of
4    the JPM attorneys that asked a question about
5    their own viability or their own -- are there
6    any other assets that they had at issue, and
7    there was some discussion within people in the
8    back of the court, what does that mean? I
9    suspect that that's what this is referring to.
10        I had only been aware that JPM, as the
11   broad-based clearing bank, had been the
12   individuals or the bank that had taken a bunch
13   of the assets, or, again, I don't want to
14   misstate this -- "taken" is too strong of a
15   word, but whatever they did to exercise whatever
16   had been their own in terms of their own
17   agreement, that a chunk of the assets that were
18   meant to be attached to the business as part of
19   the business deal had gone away because of
20   actions by JPMorgan separate from the JPMorgan
21   actions that occurred over the weekend.
22        There was an event at court that
23   seemed odd to people in terms of something that
24   the JPMorgan lawyer said, and I think it was an

Page 129

HIGHLY CONFIDENTIAL - M. KLEIN

1    attempt to figure out what that meant. It later
2    became really quite a very, very big problem
3    because neither could the transaction close or
4    business clear or -- and all the moneys that
5    didn't go through.
6         So I'm not sure specifically what I
7    was referring to, but if I was in court, my
8    sense is it had to do with that.
9    Q.   You have alluded several times today
10   to the JPM problem, so why don't we move on to
11   that for a moment. Tell me what you're
12   referring to when you talk about the JPM
13   problem.
14   A.   Well, I think the -- I'm by no means
15   the one that has the best knowledge of this
16   because I got windows, specifics or windows.
17        The first, as I understood it to be,
18   issue that related to JPM was, as we've
19   described, in that middle part of the week when
20   what had been an ongoing business with assets
21   and attached commitments, they started
22   exercising rights to take some of those assets
23   so no longer could there be a, quote, ongoing
24   business and assets attached to each other, as I

Page 130

```
1        HIGHLY CONFIDENTIAL - M. KLEIN
2   understood it. So that was sort of the level
3   one issue.
4        The bigger, the bigger parameter, and
5   this is just my opinion in the scheme of things
6   that became really the problem for the
7   transaction later, it was that between Friday
8   and the Monday when it closed, they took a point
9   of view that, in their position within Lehman,
10  that they were going to stop allowing business
11  to take place within Lehman Brothers.
12       I don't want to explain it a more
13  complicated way because I would likely get it
14  wrong, but the term that was used at various
15  points in time was that the pipes were going to
16  be closed, and that meant that you couldn't open
17  for business Monday, period, and as a result of
18  that, you really -- any concept of having a
19  business that could operate was, you know, you
20  couldn't even answer your phones in that sense.
21       So there then had to be a negotiation
22  which took place over that weekend to determine
23  what the issue was and how to resolve that.
24  Subsequent to all that, I learned that there had
25  been a broader set of agreements that --
```

Page 131

```
1        HIGHLY CONFIDENTIAL - M. KLEIN
2   obviously the Barclays/Fed agreement that took
3   place and the so-called collateral transfer,
4   there was some wiring that occurred that evening
5   that was insufficient, I learned about that
6   later, and then finally, the final event that
7   became, quote, the JPMorgan problem was that,
8   even as late as Monday morning, the assets that
9   they were to deliver that were tied to the loan
10  that Barclays had specifically, as I understood
11  it, made a loan against, they didn't transfer,
12  and there was a conversation at, I don't know,
13  the wee hours, very early in the morning on how
14  do you solve that.
15       And I was in that room. There was a
16  bunch of people, lawyers and otherwise,
17  including representatives of JPMorgan and
18  JPMorgan's lawyers on the phone, in which we
19  said, look, we have, you know, you can give the
20  assets you're supposed to give, you can leave
21  cash in, as you had left cash in, or we can do
22  this transaction in a different way, but just
23  tell us which one, and they said leave cash in
24  and we said, fine, so we moved on in life.
25       The subsequent problem, of course,
```

Page 132

```
1        HIGHLY CONFIDENTIAL - M. KLEIN
2   became that they then took the cash back. Now,
3   I'm giving you a very simplistic version. I'm
4   giving you only my very narrow understanding and
5   others will know much more complexity, and I
6   just want to be clear on that. So that became
7   another parameter of the so-called JPMorgan
8   problem.
9        So when we're clear about JPMorgan in
10  that sense, there was a rolling series of
11  issues, so I just want to be careful when I
12  refer to it that we --
13     Q.  Okay.
14     A.  -- refer that there had been issues.
15       Now, that's -- anyway...
16     Q.  What attention, if any, did you
17  personally devote to these various iterations of
18  the JPM problem?
19     A.  My only -- for me, I got pulled into
20  this JPMorgan discussion in the weekend because
21  it was very clear that the transaction couldn't
22  close, and having made it through the several
23  different issues involved in closing, the
24  question was, okay, what next? And the parties
25  that had been involved in getting through Friday
```

Page 133

```
1        HIGHLY CONFIDENTIAL - M. KLEIN
2   into Saturday were the parties that carried
3   forward to figure out what in fact that problem
4   was.
5        And so my involvement would be as part
6   of that collective team, and that weekend there
7   were a variety of meetings and calls which
8   included I think government officials and the
9   trustees and all kinds of parties to try to find
10  a way to resolve this issue.
11       And then there were direct
12  negotiations JPMorgan, I was in a meeting with
13  them, and then subsequent there was a meeting
14  with the Fed, and I was in a meeting on that.
15       I don't know if that answers your --
16     Q.  It does. And then the resolution, at
17  least as of the Monday morning, was to leave the
18  cash in the deal?
19     A.  As I understood, we gave them three
20  very clear choices, and the -- as I understood,
21  it was very direct, and I think there was a
22  number of people in the room, they very quickly
23  said just leave it the way it is.
24     Q.  Did you go to closing on Monday? Did
25  you attend the closing?
```

Page 134

HIGHLY CONFIDENTIAL - M. KLEIN

1    A.  I don't think I did. I don't --
2       Do you remember where the closing was?
3  Maybe that will help me.
4    Q.  I don't know. I know it was on Monday
5  morning, very early Monday morning.
6    A.  I don't think I was physically there
7  at the closing. I don't recall being there.
8    Q.  And just to sort of close out a couple
9  of areas, I think I heard you say before, but I
10  want to be clear on that, you were not involved
11  in any of the presentations made to the Barclays
12  board about this transaction; is that right?
13    A.  No. No. There had been, early on on
14  the -- at the very beginning of the week on the
15  Thursday I believe there was a board call that I
16  sat in and listened to. Beyond that, I wasn't
17  party to board presentations, and I don't recall
18  seeing the board materials either than were
19  presented beyond that.
20       So the Thursday -- I think it could
21  have been Thursday, it could have been Friday --
22  conversation was on that early structure that we
23  discussed, which related to the Lehman/Spinco
24  separation, the sort of pre-bankruptcy version.

Page 135

HIGHLY CONFIDENTIAL - M. KLEIN

1    Q.  You yourself didn't make any
2  presentation to the Barclays board? You weren't
3  there?
4    A.  There might have been a question put
5  to me. I don't -- I don't believe that I was
6  called upon. I certainly, because I was just a
7  consultant, a person, and because they had a
8  series of other bankers that were giving
9  opinions and doing work and corporate brokers
10  that were doing -- they had other people doing
11  things, I wasn't --
12    Q.  I'm putting before you, Mr. Klein,
13  what previously has been marked as Exhibit 381,
14  an e-mail chain that starts on the second page
15  with an e-mail from you to Rich Ricci dated
16  Friday, September 19, at 21:31 that says, "Rich,
17  three-ring circus. Two overflow rooms."
18       Could you read, sir, up that chain
19  sufficiently to sort of familiarize yourself
20  with that.
21       (Document review.)
22    A.  Okay.
23    Q.  Just in terms of the where and when of
24  this, I'm assuming from the time and the date

Page 136

HIGHLY CONFIDENTIAL - M. KLEIN

1  that you're in the bankruptcy court when this
2  e-mail exchange is taking place; is that right?
3  This will put you on the Friday night.
4    A.  I think it would have to be.
5    Q.  And is it correct, then, that Mr.
6  Ricci was not in the bankruptcy court?
7    A.  I don't believe he was.
8    Q.  And then the next up in the chain is
9  an e-mail from Mr. Ricci to you saying, "Alex
10  tells me they're killing us on 1.9 bucket and
11  not paying anything for it. What gives?"
12       Can you give me any greater detail of
13  what that's a reference to?
14    A.  I think, as you see my next e-mail, I
15  don't follow. I don't -- that wasn't a
16  conversation that I had been in that he was
17  relating to.
18    Q.  You also say, "I don't follow. We are
19  being given 1.9 billion of face." What's the
20  1.9 billion that you're referring to?
21    A.  The only 1.9 that I'm aware is the bag
22  of hammers. The only 1.9 that I'm aware of in
23  the transaction.
24    Q.  And then what follows in the two

Page 137

HIGHLY CONFIDENTIAL - M. KLEIN

1  subsequent e-mails, Ricci to you: "He told
2  me creditors were squawking. Let's get it
3  then." And then you to Ricci: "We are meeting
4  creditors shortly on this."
5       Do you see that interchange?
6    A.  I do, yes.
7    Q.  Can you give me any more detail of
8  what's meant or what you understood to be meant
9  when Mr. Ricci wrote that the creditors were
10  squawking?
11    A.  I don't, because I don't know -- I
12  don't -- I don't know the Alex Kirk
13  conversation. I do know that during the court
14  the Weil team pulled a bunch of folks aside,
15  including creditor folks, to explain the
16  transaction in sort of elongated, elaborate
17  sidebar.
18       So I assume that that's what my
19  comment back is referring to, but I don't -- I
20  wasn't aware of what the Alex conversation was
21  because I wasn't party to that.
22    Q.  Did you participate in the elongated
23  sidebar?
24    A.  No, I was in the -- it was a very -- I

Page 138

HIGHLY CONFIDENTIAL - M. KLEIN

1    hadn't been to bankruptcy court before.  I was
2    in the very, very last row.
3       Q.    I can tell that from your first note
4    here: "Three-ring circus."
5       A.    And there were people calling in as
6    well, which I was -- I had never seen in court
7    before.  But I was in the very last row, and as
8    a result, I didn't have the ability physically
9    to get to the front.
10        So the sidebar conversation that took
11   place, there had been I think a discussion that
12   the lawyer from Weil would brief various parties
13   prior to the event, which they did in that
14   sidebar, but I was not -- I don't think I was
15   physically there because I think I was
16   physically separated, I believe.
17      Q.    Could you hear what was said?
18      A.    I -- no, I was -- I was literally in
19   the last row.
20      Q.    So you know there was a sidebar, but
21   you have no personal knowledge of what was said
22   in that sidebar conversation?
23      A.    I was told that there would be a full
24   debrief that was sort of part of what they had

Page 139

HIGHLY CONFIDENTIAL - M. KLEIN

1    planned.  I mean, I left and went down to the
2    court.  I was told that they would come down to
3    the court, that they would physically debrief,
4    and then there would be a hearing.
5        So I suspect that that's what that's
6    referring to.  My, best as I can recollect, is
7    that's what that's referring to, but I don't --
8    I wasn't party to that.
9       Q.    Was there a point when you arrived at
10   bankruptcy court where you gave a briefing to
11   lawyers for either Lehman or Barclays about the
12   then current status of the agreement?
13      A.    I don't -- I don't think -- I don't
14   believe that I -- I don't know.  I don't know.
15   I don't know who -- I rode down by subway with
16   this chap Gerard LaRocca, who I hadn't known
17   before, who knew the subway system quite well,
18   and then I went in and was pulled to the back
19   and I sat with Archie Cox and everybody else was
20   up in the front.
21       I don't really recall who I spoke to
22   when I walked in.  The only substantive thing
23   that I was briefed on that I know about was
24   the -- this agreement on the splitting the

Page 140

HIGHLY CONFIDENTIAL - M. KLEIN

1    difference on the real estate value because I
2    had to step out and call -- I think I called
3    Rich to tell him and make sure he signed off on
4    that because that was a, sort of an open issue.
5       Q.    You didn't ride down to court in the
6    car with Mr. McDade?
7       A.    No.  I definitely took the subway.
8       Q.    Mr. Klein, I'm putting before you what
9    we previously marked as Deposition Exhibit 382.
10   Take a look through it, please.
11          (Document review.)
12      A.    Okay.
13      Q.    Now, we've moved, just by way of date,
14   we have moved now to Saturday, the 20th, and the
15   earliest e-mail here is on Saturday evening at
16   8:44, where you write to Mr. Ricci and some
17   others: "Team, we need a brief call with Rich,
18   subject to his schedule, to review the language
19   regarding the expense accruals and to ensure
20   that BarCap has appropriate flexibility to run
21   their business as they deem appropriate."
22          What language regarding expense
23   accruals were you referring to in this e-mail?
24      A.    I don't remember specifically the

Page 141

HIGHLY CONFIDENTIAL - M. KLEIN

1    e-mail, but I do recall a conversation I think
2    we talked about earlier today where the lawyers
3    were describing the definition of
4    "compensation."
5        That's the only conversation that I
6    recall that would have had lawyers and
7    otherwise.  I don't remember sending this
8    specific e-mail, but that's the only
9    conversation I can recall that would have been
10   related.
11      Q.    And can you add any more detail beyond
12   the e-mail, sir, to what you would have meant
13   regarding flexibility, "appropriate flexibility
14   for Barclays to run their business"?
15      A.    I can't.  Rich was, at this stage, the
16   principal client and he asked me to arrange a
17   call with people that were involved and I
18   arranged the call, so I can't -- I can't give
19   you anything more.
20      Q.    Beyond arranging the call, Rich Ricci
21   is the principal client, but beyond arranging
22   the call, did you have any involvement of that
23   issue -- involvement in that issue, that is, the
24   expense accruals and BarCap's --

Page 142

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  A.  No. No. No. No. The only subject
3  matter that I'm aware of that was covered was
4  this, you know, definition of "compensation."
5  That's the only thing that I'm aware of at all.
6  Q.  Now, do you know how much value was
7  transferred to Barclays in the deal once the
8  issues were resolved with the addition of the
9  bag of hammers and the 15c3?
10  MR. BERNICK: I think you --
11  A.  I don't understand the question.
12  Q.  I'm looking for a total here.  Do you
13  know how much value was agreed to be transferred
14  to Barclays?
15  MR. BERNICK: Go ahead and answer it
16  if you can. "Value" is a judgmental thing,
17  so if you can give it some factual context,
18  that would be helpful.
19  A.  I don't really view that there was,
20  quote, value transferred.  If you're referring
21  to the Friday events --
22  Q.  Uh-huh.
23  A.  -- where there was the clarification
24  of the issues relating to the assets going away
25  and this 45 billion loan and then the bag of

Page 143

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  hammers and so forth, I don't view that as,
3  quote, value transferred.
4  I view that there was a hole in the
5  transaction and that hole was filled, and the
6  only actions that occurred that would have
7  filled that were the bag of hammers and the
8  15c3.  As I said, I think subsequently there was
9  the change in the real estate midpoint
10  valuation, and then subsequent there was the
11  give-back of the certain 15c3.
12  So the total value that was sort of in
13  those events can be quantified, but your
14  question, which said the total value transferred
15  to Barclays, I don't think there was total value
16  transferred to Barclays.
17  Q.  My question now is -- I'm away from
18  the real estate, okay.  Put the real estate
19  aside for a moment.  In terms of securities
20  transferred, filling the hole, as it were, that
21  you talked about, do you have knowledge of the
22  number, the value of the securities?
23  A.  I don't have --
24  MR. BERNICK: Go back and look at your
25  question, Bob.  It mixes the idea of filling

Page 144

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  the hole, which he's already answered, with
3  value transferred, which may -- or,
4  securities transferred, which may go way
5  beyond filling the hole. So, which one are
6  you asking about?
7  MR. GAFFEY: I'm asking about the
8  value of the securities, including that
9  which was added into the hole, the value of
10  the securities.
11  MR. BERNICK: So you want total value,
12  the total value of the securities that
13  Barclays got in this transaction?
14  MR. GAFFEY: Yes.
15  MR. BERNICK: If you can answer that.
16  You're not being asked to answer that
17  question as an expert, Mr. Klein. This is
18  just purely a question about what you
19  factually know in this deposition.
20  A.  I'm always very sensitive when you use
21  the term "value" because "value" has a --
22  there's a definition that assumes that it has --
23  that is the worth, that is the approximation.  I
24  don't have a view of what the approximation of
25  the, quote, value of that was.

Page 145

HIGHLY CONFIDENTIAL - M. KLEIN

1
2  I have the views that was expressed at
3  that moment as to what the values were of the
4  various different components of the transaction,
5  and I have expressed those I think in prior
6  parts of this, but I don't -- I don't have a,
7  quote, valuation of the assets that were -- I've
8  given you the componentry of what was disclosed
9  as numbers, but I don't -- neither have I done a
10  valuation nor do I have a valuation on them.
11  I don't know if I'm answering your
12  question.
13  Q.  Yeah, I see the issue with value,
14  valuation and it being somewhat judgmental.  Let
15  me ask you this: Did you have a view, did you
16  have a view on the Friday once the bag -- you
17  know, once the additional assets had been added,
18  the 15c3 and the other assets, what the -- did
19  you have a view of what the value was?
20  A.  I have to be as clear as I can.  I had
21  never heard the term "bag of hammers." I never
22  saw a list of securities.  So I had no knowledge
23  nor could I have, frankly, a whole lot of
24  confidence into exactly what that would have
25  resulted.

Page 146

HIGHLY CONFIDENTIAL - M. KLEIN

1    HIGHLY CONFIDENTIAL - M. KLEIN
2        In terms of the other components, the
3    moneys spent by Barclays were clear because they
4    were moneys spent by Barclays, so that
5    components were very clear. The value of the
6    real estate, I had no idea, other than the real
7    estate appraisals.
8        I took issue at various points in time
9    that no one would buy an enormous building on
10   Seventh Avenue, certainly not empty, and the
11   valuation to value them all as fully filled
12   implied that somebody was operating the
13   business, and the only person that was to
14   operate the business was Barclays. So there was
15   a debate as to was that the right valuation to
16   be paid if you were the person causing it to
17   continue to be a fully engaged building.
18       On the other assets that were
19   transferred, I think I've described there was
20   the points of view that that was, by both
21   parties, agreed to be roughly a equivalent to
22   the 45 loan, I don't have an opinion, and at
23   that stage and even today I don't know
24   specifically which assets, because I never
25   reviewed those assets, were in there.

Page 147

1    HIGHLY CONFIDENTIAL - M. KLEIN
2        I hope that answers the best --
3        Q.   Yeah, which moves me to my next
4    question, which is, will you take a look at the
5    last e-mail, second-to-last e-mail of the chain
6    here from Ricci to you on Sunday, September 21,
7    at 2:38: "Pretty convinced resis not in 52
8    after talking to a few people."
9        Do you see that?
10       A.   I do see that.
11       Q.   Do you know what Mr. Ricci is
12   referring to when he refers to 52?
13       A.   I know that the resis, which I think
14   refers to the residential mortgages, there had
15   been some issue, and this was one of the
16   JPMorgan-related issues as to who had pledged
17   what to whom, so that's what I think the resis
18   referred to, but I don't -- I don't know the
19   specifics of the 52.
20       Q.   Do you have a general understanding of
21   what Mr. Ricci meant when he wrote to you about
22   the 52?
23       A.   I would only be guessing. I would
24   only be guessing. I know that the issue on the
25   resis became this issue of who pledged them,

Page 148

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    which then became the later Depository Trust
3    issue, which I had sort of some knowledge of,
4    but not a lot.
5        Q.   Did anyone from Barclays say or
6    suggest to you that Barclays' view of what they
7    received in the bucket of securities was 52
8    billion?
9        A.   Not to me.
10       Q.   Looking at the document we've marked
11   as Exhibit 382, does that refresh your
12   recollection in any way as to whether Mr. Ricci
13   ever expressed to you the view that Barclays had
14   received 52 billion?
15       A.   Mr. Ricci was one of the people that,
16   obviously as my client, instructed me that their
17   work on the value was that their loan was a risk
18   so, quote, the value. No one indicated to me at
19   any point in time that there was 52 billion in
20   value given, nobody.
21       Q.   Do you have any, as you sit here now,
22   do you have any knowledge at all about with
23   regard to what Mr. Ricci is referring to when he
24   refers to the 52 --
25       A.   As I said --

Page 149

1    HIGHLY CONFIDENTIAL - M. KLEIN
2        Q.   -- in this e-mail?
3        A.   I could only speculate. I just don't,
4    I don't -- it's not a number that, in my
5    recollection, the numbers that I have in my mind
6    including the 45 and the 45.5, and the numbers
7    that kick around, 52 is not one of those
8    numbers.
9        (Exhibit 426, a document bearing Bates
10   Nos. BCI-EX-00080661, marked for
11   identification, as of this date.)
12       Q.   I have put before you, Klein, what we
13   have marked as Deposition Exhibit 426, a
14   one-page document bearing Bates No.
15   BCI-EX-00080661. Have you had a chance to look
16   that through?
17       A.   Yes.
18       Q.   Now, the lower in the two of the
19   e-mails in the chain is from you to Rich Ricci
20   Monday, September 22, at 10:04?
21       A.   Monday, September 22nd? Didn't this
22   transaction -- I don't understand the timing.
23       Q.   You know, I'm not going to hold
24   anybody to timing because I think there's an
25   issue that -- I can't answer the issue for you.

## Page 150

HIGHLY CONFIDENTIAL - M. KLEIN

1  I can say that we've had documents produced to
2  us off of servers in the UK, servers in New
3  York, and then further complicated by vendors in
4  New York, so I can never be sure if I'm looking
5  at London or New York time on some of these
6  things.
7      A.   It doesn't seem --
8          MR. BERNICK:  I think --
9      A.   Monday morning was -- Monday morning
10  is the 22nd, is the date of closing, correct?
11  So this would refer to that Sunday evening into
12  the Monday morning.
13      Q.   I suspect --
14          MR. BERNICK:  Well, no, no.  This is
15  probably 10 o'clock --
16          MR. GAFFEY:  I think it's 10 o'clock
17  London time.
18          MR. BERNICK:  -- London time.
19          MR. GAFFEY:  So you're 4 A.M. New
20  York -- or, 5 A.M. New York.
21          MR. BERNICK:  5 A.M. New York time,
22  real early in New York.
23      A.   10 A.M., that's right.  That's 5 A.M.
24  would be consistent.  That's correct.  Then

## Page 151

HIGHLY CONFIDENTIAL - M. KLEIN

1  that's why it says 6 and 6:30.
2      Q.   And then the subsequent one is 5:22
3  A.M. of your --
4      A.   I get it.  I understand.
5      Q.   You mentioned before the choices that
6  were given to JPM.  Does this e-mail relate to
7  that issue?
8      A.   Yes, it does.
9      Q.   And Mr. Ricci --
10          MR. BERNICK:  Actually, you say
11  choices given to JPM.  It says "we have a
12  few choices."
13          MR. GAFFEY:  I'm about to follow up on
14  that.
15      Q.   I just want to know if it relates to
16  the topic that we were referring to, the choices
17  that were given to JPM.
18      A.   The subject matter that's in this
19  e-mail relates to the JPM problem and the list
20  of securities that they gave us in the middle of
21  the night and the path to a resolution which was
22  then resolved in that phone call that we had
23  with their people and their lawyer on the phone.
24  That's what it relates to, to the best of my

## Page 152

HIGHLY CONFIDENTIAL - M. KLEIN

1  knowledge.
2          To be clear, though, so you don't get
3  mistaken, those three choices were not the same
4  three choices that I indicated that were given.
5      Q.   No, I didn't understand your testimony
6  that way.  That may be my fault in the question.
7  I was just sort of pointing to the topic as
8  opposed to the particulars.
9      A.   I understand.
10      Q.   I'm showing you, Mr. Klein, what was
11  previously marked as Deposition Exhibit 149A.
12  Would you take a look through that, please.
13      A.   Yes.
14      Q.   Let me know when you've had a chance
15  to review it.
16      A.   Yes.
17      Q.   Now, in the first e-mail sent here,
18  it's from you to Mr. Diamond and begins, "The
19  court has approved Barclays' acquisition of
20  Lehman Brothers.  Congratulations.  A great leap
21  forward for BarCap."
22          Do you see that?
23      A.   Yes.
24      Q.   Do you recall sending this particular

## Page 153

HIGHLY CONFIDENTIAL - M. KLEIN

1  e-mail to Mr. Diamond?
2      A.   Not this specific, not this specific
3  e-mail.
4      Q.   Further up in the e-mail, Mr. Diamond
5  responds to you, "Yes," exclamation, point,
6  exclamation point, exclamation point, and then
7  you reply, "Bob, great day.  We clawed back 3
8  billion more of value in the transaction and cut
9  the building prices by 160 million tonight."
10          What are you referring to there?
11      A.   This was the Friday morning pain and
12  suffering to get the transaction closed.  Bob at
13  this stage was not intimately involved in the
14  day-to-day, or I certainly wasn't communicating
15  with him, so I didn't see him in part and
16  parcel.  It was Rich who was the day-to-day
17  contact, which was a shift from the sort of Fed
18  weekend, and Rich was sort of intimately
19  involved in the moving pieces.  And the
20  summation up top was meant to sum up all the
21  events that had taken place that got us to get a
22  closing.  It was a hard -- it was a hard day.
23      Q.   Now, the reference to 160 million, is
24  that a reference to the commission issue you

Page 154

1          HIGHLY CONFIDENTIAL - M. KLEIN
2    spoke about before?
3        A.    It was the splitting the difference on
4    the -- I believe, but I don't know this for
5    certainty, that there were two opinions,
6    valuation opinions, both put forward by Lehman.
7    It may well have been that the appraisers had to
8    be agreed to by Barclays. I don't know the
9    specifics, but the two opinions were then split
10   down the middle.
11          Those opinions resulted in a reduction
12   in value of the two buildings of 160 million.
13   In addition, I think there was a waiving of this
14   brokerage commission, but I think this -- I
15   believe that this 160 refers to the splitting of
16   the difference. The above was meant to be of
17   kind of a summation of -- well, just of the
18   challenges of the day to get over the finish
19   line.
20       Q.    And the 3 billion that's referred to
21   in that e-mail to is a reference to the
22   additional assets searched for and found on
23   Friday?
24       A.    I would have to -- again, I don't
25   recall the specific e-mail, but that which we

Page 155

1          HIGHLY CONFIDENTIAL - M. KLEIN
2    found, the bag of hammers, 1.9, the 15c3, is
3    entirely consistent with that.
4        Q.    Does this refresh your recollection as
5    to the amount that was added on?
6        A.    I want to be clear. I don't believe
7    anything was, quote, added on. I have said --
8        Q.    Let me put a clearer question. You
9    made that point before, and that's fair. Let me
10   withdraw the question and rephrase it.
11          Does this refresh your recollection as
12   to the additional value that was put in the deal
13   on Friday?
14          MR. BERNICK:  Go ahead.
15       A.    You've used the term "value" a few
16   times. I don't know what the value of, in
17   particular, the bag of hammers, I don't know
18   what the value of that was, but what I've said,
19   there was the gap. We delivered the need to get
20   more assets. This was a summation of what took
21   place on the Friday.
22       Q.    In your e-mail to Mr. Diamond you used
23   the word "value" and you used it -- you say "3
24   billion more of value." Was that your view of
25   what the value was?

Page 156

1          HIGHLY CONFIDENTIAL - M. KLEIN
2        A.    I couldn't have a view specifically of
3    the value because I don't have the -- I didn't
4    have the analytics of the value and I never saw
5    the 1.9. It was a reference made to us in terms
6    of what the value was. The reference is when
7    someone says you're getting 1.9 billion of
8    securities, that it's 1.9 billion of securities.
9    That's just not something that today or then I
10   could independently verify.
11          (Discussion off the record.)
12          (Recess; Time Noted:  3:07 P.M.)
13          (Time Noted:  3:17 P.M.)
14   EXAMINATION BY
15   MR. TECCE:
16       Q.    Good afternoon, Mr. Klein. My name is
17   James Tecce. I am an attorney at Quinn Emanuel
18   and we are counsel to the Creditors Committee.
19          Going to September 19, the day of the
20   sale hearing, I believe when Mr. Gaffey was
21   asking you questions earlier, you referred to a
22   sidebar that took place during the sale hearing
23   that you did not participate in, correct?
24       A.    There was a reference -- are you
25   referring to the e-mail discussion?

Page 157

1          HIGHLY CONFIDENTIAL - M. KLEIN
2        Q.    No, no, no, I'm referring to the sale
3    hearing -- let me back up for a second. Did you
4    participate in the sale hearing where the
5    transaction was presented to the bankruptcy
6    court for approval on the 19th of September?
7        A.    I sat in and watched, yes.
8        Q.    Okay. And did there come a point in
9    time during the sale hearing where there was a
10   sidebar discussion among Weil attorneys and
11   creditor attorneys, as you understood?
12       A.    I believe so.
13       Q.    Okay.
14       A.    I believe there was a sidebar amongst
15   the Weil attorneys, other attorneys, and
16   interested parties broadly as a -- I don't
17   believe that it was restricted to attorneys. It
18   was interested parties fully being briefed, as I
19   understood it to be the case, but I don't know
20   all the people that were in the room. But it
21   was a fairly broad briefing on what had been the
22   transaction.
23          Again, I don't know, just to respond
24   to your comment about lawyers and lawyers, I
25   think it was far broader than that.

Page 158

HIGHLY CONFIDENTIAL - M. KLEIN

1    Q.   Okay.  And to be clear, you did not
2  participate in that discussion, correct?
3    A.   I don't believe I did.
4    Q.   Okay.  Did there come a point in time
5  during the sale hearing that you participated in
6  any discussions with the advisors to the
7  Creditors Committee, their attorneys, their
8  financial advisors?
9    A.   Not during the sale hearing that I'm
10 aware of.
11   Q.   Okay.
12   A.   Or that I can recall.
13   Q.   Was there a point in time prior to the
14 sale hearing that you participated in
15 discussions with the committee?  And just to be
16 clear, when I say "the committee," I mean the
17 committee or their advisors or their attorneys.
18       MR. BERNICK:  I don't know that you
19   have established that the witness really
20   knows about his knowledge of who is on the
21   committee or who their lawyers are such that
22   he could answer your question.  I mean, if
23   he knows who's on the committee, who the
24   lawyers are, then he can answer the

Page 159

HIGHLY CONFIDENTIAL - M. KLEIN

1  question.
2       MR. TECCE:  I'm not asking who's on
3   the committee.  I'm asking if he ever had a
4   conversation with their advisors.
5       MR. BERNICK:  But if he doesn't know
6   who their advisors are or he doesn't know
7   whose on the committee, he can't answer the
8   question.  I'm not saying -- he may well
9   know.
10      MR. STERN:  James, in other words, he
11  may have spoken to someone at Houlihan, but
12  he may not have known that the person was
13  from Houlihan.
14      MR. BERNICK:  Or that Houlihan was
15  professionals for somebody.
16   Q.   Do you have an understanding of who
17 the attorneys for the Creditors Committee were?
18   A.   I met you today.  I don't -- I don't
19 know who was representing -- I don't know that
20 there was only one creditor committee or if
21 there was more.  I don't know all the background
22 on the Creditors Committee and who was involved.
23   Q.   Okay.  Did you have an understanding
24 that Houlihan Lokey was the financial advisor to

Page 160

HIGHLY CONFIDENTIAL - M. KLEIN

1  the Creditors Committee?
2    A.   I have subsequently learned that
3  official capacity.  I don't know that I knew
4  specifically that they had that role at the
5  time, but I have subsequently learned that.
6    Q.   Okay.  And did you know that Milbank
7  Tweed was counsel to the Creditors Committee?
8    A.   I don't have a recollection of
9  specifically of Milbank Tweed.  I don't.
10   Q.   So, prior to the sale hearing taking
11 place, did you engage in any conversations or
12 discussions with Houlihan Lokey or Milbank Tweed
13 concerning the sale transaction?
14   A.   I can -- to be very precise, there was
15 a series of events at the Weil Gotshal firm
16 where there were a series of meetings in meeting
17 rooms.  I don't recall the specific dates of
18 those meetings or meeting rooms, but there was
19 one evening in which there was a creditors
20 committee of some form meeting.  I don't
21 specifically know what was transpiring.
22       I did get pulled into a side room by a
23 group of people that included some of the Weil
24 lawyers, and again, I don't recall specifically

Page 161

HIGHLY CONFIDENTIAL - M. KLEIN

1  which date in the chronology it was, but it was
2  described to me that could I explain some
3  elements of the transaction, and the creditors
4  were involved.  There was a guy with glasses.  I
5  don't -- I don't know what his specific name
6  was.
7        And I remember specifically that
8  meeting only because I drew on a manila folder
9  such as that with a green marker the components
10 of both this 45 and the assets that were then
11 collateralized against it, separately and
12 distinctly, the other, quote, moving pieces in
13 what I understood to be the fund flows.
14       It was not a very long conversation
15 and I can't tell you who other than I think
16 Harvey Miller was in because I got grabbed in
17 there, but I specifically went through, again,
18 only because I grabbed a manila thing and there
19 was a green pen and I just have that particular
20 recollection of drawing boxes.
21       And I did it because the Weil firm
22 asked me to, and as I understood it, there was
23 some form of ongoing creditor committee meeting
24 that I wasn't a party to.  That's my only

Page 162

HIGHLY CONFIDENTIAL - M. KLEIN

1 recollection.
2   Q.   Okay.  And did this take place before
3 or after the sale hearing?
4   A.   I don't have a recollection of what --
5 I just don't have a recollection of the -- it
6 was at Weil, but I don't know -- I don't have a
7 recollection.
8   Q.   Is there any reason --
9   A.   And by the way, I know which
10 conference room it was at Weil because we had
11 moved from the corner conference room to the one
12 next to it because I was grabbed, and there was
13 the middle conference room near the entryway was
14 where the Creditors Committee was meeting.  So I
15 sort of know -- I have a picture of the
16 whereabouts, I just don't remember the day.
17   Q.   Do you have any reason to believe that
18 it took place prior to the sale hearing Friday
19 hearing?
20   A.   Again, I don't have a recollection of
21 which -- I don't have a recollection of which
22 day it happened.  I know specifically what I
23 drew and that I was asked to have this
24 discussion and that it related to the Creditors

Page 163

HIGHLY CONFIDENTIAL - M. KLEIN

1 Committee and the fact that they were meeting.
2 Beyond those facts, as to which date and who the
3 people were, because I don't -- I don't think
4 they introduced themselves to me, I'm fairly
5 certain they didn't introduce themselves to me,
6 I don't have more of a recollection than that.
7   Q.   Okay.  And so let's just back up for a
8 second.  I believe that you referenced a larger
9 meeting and then you were pulled into a side
10 room; is that correct?
11   A.   That's right.
12   Q.   And so let's start with the larger
13 meeting.  Did you -- what was your understanding
14 of what the larger meeting -- of who was in
15 attendance at the larger meeting?
16   A.   Something to do with the creditors.  I
17 don't have more detail on it than that because I
18 didn't know the people.  There was just a big
19 room that supposedly there was the creditors
20 meeting and a phone call.  I was asked to be
21 pulled into this other side room --
22   Q.   Okay.
23   A.   -- and I acquiesced.
24   Q.   Okay.  The larger meeting, did you

Page 164

HIGHLY CONFIDENTIAL - M. KLEIN

1 speak with anyone or --
2   A.   I wasn't in that larger meeting.
3   Q.   I believe you mentioned Mr. Miller in
4 the side meeting.  Do you remember anyone else
5 who attended that meeting, the names of anyone
6 else?
7   A.   It was -- there were people floating
8 around, you know, from Barclays and from Cleary
9 Gottlieb and people floating around from the
10 Weil firm as well.  I just don't know -- people
11 were coming in and out of some of those rooms,
12 so I just don't know.  I just remember Harvey
13 asked me to explain it, so that's the only
14 reason why I know Harvey was there.
15   Q.   Do you know why he asked you to
16 explain it?  Do you have an understanding of why
17 he asked you to explain it?
18   A.   No, he just asked me to -- no, I
19 don't.  He just asked me to.
20   Q.   Do you remember the sum and
21 substance -- well, actually, how long did this
22 sidebar, side room meeting last, do you
23 remember?
24   A.   I don't.  I don't.  I don't think it

Page 165

HIGHLY CONFIDENTIAL - M. KLEIN

1 was exceptionally long, but it was long enough
2 for me to draw just a box diagram of the flow of
3 funds on a manila folder and answer one or two
4 questions.  I don't want to speculate how long
5 it was.  I don't think it was a enormously long
6 meeting.
7   Q.   Do you remember the substance of what
8 was discussed with respect to, you know, the
9 folder?
10   A.   It was the principal elements were the
11 45 loan, the assets that were roughly viewed as
12 equivalent to that, the, if you will, bag of
13 hammers and -- I'm sorry, let me be more
14 precise.
15   I recall specifically the funds flows
16 being discussed and the critical element of that
17 discussion being the 45.  Beyond that, I don't
18 know specifically which boxes or otherwise I
19 drew, so I don't want to -- I don't want to go
20 through over-detail because I would be then
21 speculating on the remaining details.
22   Q.   Do you recall whether the liabilities
23 that were being assumed by Barclays was
24 discussed during the meeting?

## Page 166

HIGHLY CONFIDENTIAL - M. KLEIN

1
2   MR. BERNICK:  When you talk about the
3   liabilities, other than associated with the
4   $45 billion loan, which I think Mr. Klein's
5   referred to?
6   Q.   Let me rephrase the question.  Do you
7   recall whether the cure and comp liabilities
8   were discussed during the meeting?
9   A.   I don't recall, although, because I
10  was drawing the various different flows -- well,
11  I don't recall specifically.
12  MR. TECCE:  I'd like the record to
13  reflect that I'm handing the witness a
14  document that was previously marked 338,
15  Exhibit 338B.
16  Q.   Mr. Klein, have you ever seen this
17  document?
18  A.   I don't know if it's this specific
19  document that I'm referring to, so I -- I
20  haven't seen it in this form.
21  Q.   Okay.  Is this your handwriting?
22  A.   Looks like it could be.
23  Q.   Do you have any reason to --
24  MR. BERNICK:  Wait.  Are you talking
25  about all of the handwriting?

## Page 167

HIGHLY CONFIDENTIAL - M. KLEIN

1
2   Q.   Well, okay, let's start with the two
3   numbers at the top.  Does that look like your
4   handwriting?
5   A.   It looks like it could be my
6   handwriting.
7   Q.   How about in the two first two boxes?
8   A.   Again, it looks like it could be.
9   Q.   How about the bottom two boxes?
10  A.   Yeah, again, same answer.  It could
11  be.
12  Q.   Okay.  You referred to drawing boxes
13  on a manila envelope.  Do you have any reason to
14  believe that this is not a reproduction of what
15  you drew on the manila envelope during that
16  meeting?
17  A.   I don't have any reason to believe it
18  is or it isn't.  You tell me.  I mean, this is
19  your document.
20  MR. BERNICK:  Who actually produced
21  the document in the case?
22  MR. TECCE:  The document comes from
23  us.
24  MR. BERNICK:  Has it been produced in
25  the case?

## Page 168

HIGHLY CONFIDENTIAL - M. KLEIN

1
2   MR. TECCE:  It hasn't been produced.
3   It was marked as a prior exhibit during
4   another deposition.
5   MR. STERN:  It's never been produced.
6   MR. BERNICK:  What?
7   MR. STERN:  It's never been produced.
8   It was marked at a deposition, but I believe
9   the source is from the Creditors Committee's
10  files.
11  MR. TECCE:  That's correct.  The
12  source is from the Creditors Committee.
13  MR. BERNICK:  But whose file?
14  MR. TECCE:  Houlihan Lokey.
15  MR. BERNICK:  But whose file at
16  Houlihan Loke?  It might refresh the
17  witness's recollection.
18  MR. TECCE:  Well, I don't know whose
19  specific file, but it comes from
20  conversations -- it was produced after
21  conversations with Mr. Burian and Mr. Fazio
22  and Mr. Geer.
23  MR. BERNICK:  Conversations in --
24  MR. TECCE:  Meaning it comes from
25  those three.

## Page 169

HIGHLY CONFIDENTIAL - M. KLEIN

1
2   MR. BERNICK:  Oh.
3   MR. TECCE:  I don't know who
4   specifically was maintaining it of the three
5   of them, but they are the advisors to the
6   Creditors Committee and they provided us
7   with an actual manila envelope and this is a
8   Xerox copy of it.
9   MR. BERNICK:  So what's the date of
10  the document?
11  MR. TECCE:  I don't know what the date
12  of the document is.  As far as -- well, we
13  can have this conversation off the record.
14  I'm not going to sit here and testify to it.
15  Q.   But is there anything about this Xerox
16  copy that refreshes your recollection as to
17  whether or not -- as to the document that you
18  prepared during this sidebar meeting?
19  MR. BERNICK:  Sidebar?
20  MR. TECCE:  This side meeting.
21  MR. BERNICK:  It was a side room
22  meeting.
23  MR. TECCE:  Side room meeting.
24  MR. BERNICK:  The sidebar was in
25  court, I think was what has been referred

Page 170

HIGHLY CONFIDENTIAL - M. KLEIN
1   to.
2   
3   A.    I told you what I recollect from that.
4   I should point out I don't -- some of some this
5   handwriting doesn't seem to match other pieces
6   of the handwriting, just so we're clear. So ...
7   Q.    Which would that be?  Which
8   handwriting would that be?
9   A.    Well, I don't think that that 2535
10  resis doesn't look to be similar to the others,
11  but, anyway.
12  Q.    Do you have an understanding of, just
13  in the first box on the left, it says "Assets
14  Premarked," do you have an understanding what
15  that means?
16  A.    This is the first you're recollecting
17  to me of this.  I've told you what I understand
18  from the green manila, and it was principally
19  focused on the 45 loan and the 45 of, quote,
20  asset collateral value.  I can only speculate
21  what the other pieces are at this point in time
22  because I've given you what the recollection is.
23  Q.    Do you have any reason to believe that
24  this could be a Xerox copy of your manila folder
25  that you referenced previously?

Page 171

HIGHLY CONFIDENTIAL - M. KLEIN
1   
2   MR. BERNICK:  The fact that this is
3   his handwriting or may be his handwriting?
4   A.    I don't -- I don't know what more I
5   can say to this than I've said to this.
6   Q.    Okay.  Other than the 45 loan, do you
7   recall the substance of anything else that was
8   discussed in that meeting?
9   A.    I apologize, I -- I don't know who was
10  in the meeting.
11  Q.    Uh-huh.
12  A.    I was pulled in by Harvey Miller.  I
13  was asked to try to give some explanation, which
14  I attempted to do on a green manila -- on a
15  manila folder with green.  That's the
16  recollections that I have.
17  I know specifically there was a
18  discussion about the 45 loan and, as I think I
19  said earlier in Mr. Gaffey's questioning, on
20  occasion that was referred to as 45.5, and the
21  assets that were against that.  Beyond those
22  statements, I would only be speculating because
23  I don't have a broader recollection of the
24  discussion.
25  Q.    Okay.

Page 172

HIGHLY CONFIDENTIAL - M. KLEIN
1   
2   MR. STERN:  James, do you have the
3   original document?
4   MR. TECCE:  I do.
5   MR. STERN:  With you?
6   MR. TECCE:  No.  But we can discuss
7   the folder offline.
8   MR. BERNICK:  Well, I tell you, the
9   only thing that concerns me a little bit is
10  that there are a lot of questions that were
11  put to my client about the timing of the
12  meeting and he was not able to recollect
13  timing of the meeting, and if in fact this
14  is his handwriting, which it may well be, I
15  don't know, and if in fact it came from the
16  meeting through one of your clients, a
17  member of the committee, then there's
18  information that your committee has and
19  presumably is available to you about when
20  the meeting took place.
21  And it's just a little bit odd that
22  you have a witness who's a third-party
23  witness who's basically been asked questions
24  about the timing of the meeting, he can't
25  recall, then something is given to him from

Page 173

HIGHLY CONFIDENTIAL - M. KLEIN
1   
2   the meeting as to which there may be
3   knowledge by your client about the timing,
4   and the witness is then -- you know, if you
5   know, we ought to know so that you're being
6   fair to the witness.
7   MR. TECCE:  Well, first of all, I'm
8   not being deposed here for starters.  Number
9   two --
10  MR. BERNICK:  That's not the --
11  MR. TECCE:  -- I never said anything
12  about my client producing anything, okay?
13  Our client --
14  MR. BERNICK:  You said Houlihan Lokey.
15  MR. TECCE:  That's not my client.
16  MR. BERNICK:  Excuse me.  Advisors to
17  your client, representatives of your client.
18  I'm not making accusations against you at
19  all.
20  MR. TECCE:  No, I know, but what's the
21  issue?
22  MR. BERNICK:  Well, the issue is that
23  it is a question of being able to refresh a
24  third-party witness's recollection.  He has
25  taken the time, he was subpoenaed, he's come

Page 174

HIGHLY CONFIDENTIAL - M. KLEIN

1      in here to talk, and he has been unable to
2      pinpoint the timing of this meeting, which
3      obviously is important to this case, and you
4      have information or your client has got
5      information that may be material to
6      refreshing his recollection and we don't
7      have it here.
8         MR. TECCE: But, well, first of all, I
9      asked the witness --
10         Well, actually, is there an objection
11      to a question here?
12         MR. BERNICK: No.
13         MR. TECCE: Okay, then let's move on.
14         MR. BERNICK: I have no objections to
15      any question.
16         MR. TECCE: All right, then let's move
17      on.
18      Q. Can we take a look at Exhibit 382
19      again? Okay. This is the e-mail chain -- first
20      of all, it bears Bates range BCI-EX-80984 at the
21      bottom right. This is an e-mail chain -- about
22      the second e-mail down, Mr. Klein, I believe it
23      is, it reads, "Pretty convinced resis not in the
24      52 after talking to a few people," that section

Page 175

HIGHLY CONFIDENTIAL - M. KLEIN

1      of the e-mail.
2         Does "resis" refers to residential
3      real estate mortgage loans?
4      A. It's not my -- it's not my e-mail. I
5      mean, I can, as I said earlier, I can speculate
6      to that, but I don't ...
7      Q. Well, let me rephrase the question. I
8      believe that you had referenced earlier an issue
9      regarding the pledging of residential real
10      estate loans -- residential real estate mortgage
11      loans; is that correct?
12      A. I said that there was assets moving --
13      as I recall I said there were assets moving
14      between, well, frankly, during the entire event
15      post the bankruptcy filing, and that movement of
16      those assets in particular made the Tuesday
17      transaction going into the Friday transaction
18      significantly more complicated. That's what I
19      believe I testified to.
20      Q. Okay. And do you have an
21      understanding as to whether or not any
22      residential real estate loans were pledged to
23      the DTC in connection with the transaction?
24      A. I don't have a great recollection of

Page 176

HIGHLY CONFIDENTIAL - M. KLEIN

1      the DTC conversations. I see it referred to
2      here in this and the inference is made, but I
3      don't have enough references to give you detail
4      on it. I can just make inferences and I don't
5      feel comfortable doing that.
6      Q. Do you have an understanding as to
7      whether there was ever a dispute involving the
8      pledge of the residential mortgage loans to the
9      DTC?
10      A. I know that there was confusion over
11      the DTC and the ability to continue to operate
12      and what would allow the DTC to continue to
13      operate. That I recall that was another one of
14      the issues that had to get solved before the
15      Monday morning. The specifics of that dispute I
16      don't -- I just don't recall.
17      Q. Do you have an understanding as to
18      whether or not there was -- in the e-mail above,
19      your e-mail back to Mr. Ricci says "will do" in
20      response to I believe -- well, can you tell me
21      at the end of Mr. Ricci's e-mail, it says, "Can
22      you touch base with Gerard?" Correct?
23      A. That's what it says, yes.
24      Q. And your response back is "will do";

Page 177

HIGHLY CONFIDENTIAL - M. KLEIN

1      is that correct?
2      A. That's what it says, yes.
3      Q. Okay. And by saying "will do," did
4      that mean that you would get in touch with Mr.
5      LaRocca?
6      A. I could only make an inference. I
7      don't recall the e-mail, so I couldn't -- there
8      seems to be an question there and there seems to
9      be an answer, but I can't make any inference
10      beyond that.
11      Q. Do you recall having a conversation
12      with Mr. LaRocca on Saturday evening?
13      A. I don't recall a specific
14      conversation, but that weekend, as the entire
15      transaction was being impaired because of the
16      events that took place with JPMorgan shutting
17      the pipes, a variety of different players that
18      had to be involved, there was really a lot of
19      conversations to try to find a path to complete
20      the transaction, but I don't -- I don't remember
21      specific conversations with Gerard.
22      Q. Do you have an understanding as to
23      whether or not Barclays received any residential
24      real estate securities in connection with the

Page 178

HIGHLY CONFIDENTIAL - M. KLEIN
1   HIGHLY CONFIDENTIAL - M. KLEIN
2   transaction?
3      A.   I don't.
4      Q.   Did there ever come a time when Mr.
5   Ricci discussed with you again the issue of
6   residential real estate securities, mortgage
7   securities, subsequent to this e-mail?
8      A.   I don't, I don't have any
9   recollection.
10     Q.   In addition to the meeting which we
11  discussed where a manila envelope was drawn upon
12  and you spoke with persons, the committee's
13  advisors, were there any other meetings --
14     A.   I want to be clear, I'm sorry, I don't
15  know who I spoke with.  I know that Harvey
16  Miller asked me to go into a room and I know he
17  asked me to discuss the subject matters.  I
18  don't know who I spoke to.
19     Q.   Did Mr. Miller ever identify the
20  people who were in the room to you?
21     A.   As I said, I don't recall anybody
22  being introduced to me.  I recall a lot of
23  people milling about and I recall the Creditors
24  Committee ongoing at the same time.  I don't
25  know anything beyond that, and so I -- just to

Page 179

1   HIGHLY CONFIDENTIAL - M. KLEIN
2   be clear.
3      Q.   Okay.  Moving away from that, did
4   there ever come a time that you did participate
5   in meetings with the committee or its advisors?
6      A.   I don't, to my recollection, I don't
7   believe I took part in meetings with the
8   committee or the advisors.  The only meeting
9   that I'm aware of that related to that subject
10  matter, Creditors Committees or others, that I
11  can recall -- and there were lots of different
12  moving pieces -- was that meeting.
13         MR. BERNICK:  It's the same -- his
14      testimony is what it is, but it's still
15      subject to that same -- he doesn't know the
16      people, so ...
17     A.   I mean, I have to say that there was,
18  both at Lehman and at Weil, there were hundreds
19  of people walking around and I -- I just don't
20  know who they represented, so ...
21     Q.   Okay.
22         MR. TECCE:  I think that's all I have.
23      Thank you.
24  EXAMINATION BY
25  MR. OXFORD:

Page 180

1   HIGHLY CONFIDENTIAL - M. KLEIN
2      Q.   Mr. Klein, we met earlier.  My name is
3   Neil Oxford, as you know, with Hughes, Hubbard &
4   Reed.  We represent the SIPA Trustee.
5         Just following up on a question you
6   answered from Mr. Gaffey, you testified about a
7   conference call with the Barclays board that you
8   attended.  Do you remember that testimony?
9      A.   I remember that Mr. Gaffey asked me if
10  I presented to the boards of Barclays, and as I
11  responded, I believe to be the case, there was
12  an early call that I sat in on.  I believe that
13  was in the first brief period prior to the
14  bankruptcy filing, not the bankruptcy court.
15         I don't believe that I presented.  I
16  believe that I -- I don't know that I didn't get
17  asked a question, but that's, to my knowledge,
18  the only board meeting that I even, quote,
19  listened in on.  But I -- that's what I
20  responded to Mr. Gaffey.
21     Q.   Sure.  Do you remember, Mr. Klein,
22  whether there was any discussion on that call as
23  to whether the proposed transaction between
24  Lehman and Barclays involved negative goodwill?
25     A.   I don't recall on that call -- I don't

Page 181

1   HIGHLY CONFIDENTIAL - M. KLEIN
2   recall anything specific on that call.
3      Q.   Do you recall from that, the same
4   conference call with the board, any discussion
5   of whether the proposed transaction with Lehman
6   would result in the recognition by Barclays of
7   an immediate gain?
8         MR. BERNICK:  This is still in that
9      period before the bankruptcy filing?
10         MR. OXFORD:  It's that call that he's
11      testified about.
12         MR. BERNICK:  Okay.
13     A.   I certainly don't.
14     Q.   Okay.  Turning to the hearing in the
15  bankruptcy court on the 19th, Mr. Klein, from
16  all the way back where you sat with Mr. Cox,
17  were you able to hear the presentations to the
18  judge?
19     A.   I believe so.  I mean, there was --
20  there was a podium that they were standing in,
21  and I think there was a microphone because there
22  were people on the telephone as well.  I believe
23  so.
24     Q.   Did you have an understanding, and I
25  heard your prior testimony that you're not an

Page 182

HIGHLY CONFIDENTIAL - M. KLEIN

1  expert in bankruptcy, did you have an
2  understanding of the purpose of the bankruptcy
3  court hearing that day?
4     A.  I'm sorry, I don't understand the
5  question.
6     Q.  Did you have an understanding -- let
7  me ask it this way: Did you have an
8  understanding that one of the purposes of the
9  hearing was to describe the transaction to the
10 court and have the transaction approved or
11 otherwise?
12    A.  As I said, I'm not a bankruptcy
13 expert. I understood that this was the hearing
14 to approve the transaction. Beyond which, the
15 process with which it would take, I don't have
16 any particular expertise.
17    Q.  Can you tell me what you recall,
18 please, sir, about the presentations that were
19 made to the court at the hearing in bankruptcy
20 court on the 19th.
21    A.  Its a very general question. I
22 don't -- I don't -- I don't understand the
23 question.
24    Q.  Let me narrow it for you. Do you

Page 183

HIGHLY CONFIDENTIAL - M. KLEIN

1  remember, for example, Harvey Miller making a
2  presentation to the court?
3     A.  Harvey was a party to that, yes.
4     Q.  Do you remember the name of any of the
5  other individuals who presented to the court
6  that day?
7     A.  There was a whole long list of people.
8  I was just surprised how many people stood up in
9  a court like that. I don't -- I don't -- most
10 of them I didn't know nor still don't know.
11    Q.  Is it your understanding, sir, that
12 Mr. Miller and others described the terms of the
13 transaction, or the proposed transaction, to the
14 bankruptcy court that day?
15    A.  As I testified earlier, they made a
16 presentation before the court started to a group
17 of people about events and the transaction.
18 There was then the hearing, and I don't -- I
19 don't know the standard form of these kinds of
20 hearings, but Harvey Miller spoke, various other
21 people spoke.
22    I don't know if I'm answering your
23 question.
24    Q.  Well, perhaps I can help narrow it.

Page 184

HIGHLY CONFIDENTIAL - M. KLEIN

1  I'm not asking about the sidebar discussion that
2  happened in advance of the presentation to the
3  court. You have already told Mr. Gaffey that
4  you did not participate and you don't recall
5  hearing that. So my questions are simply about
6  the presentations that day that were addressed
7  to Judge Peck who was there on the bench.
8     Do you recall anything about the
9  presentations that were made to the judge who
10 was sitting on the bench that day in bankruptcy
11 court?
12    A.  Again, I don't -- it's -- I was there,
13 and if you can be more specific, I can perhaps
14 be more helpful.
15    Q.  I will be more specific. I'm just
16 trying to get your general recollection first.
17 It seems like you don't have much of a general
18 recollection.
19    MR. STERN: Objection to the form.
20    A.  I don't. I apologize. I really don't
21 understand what your line of question means. It
22 was a very large room filled with a lot of
23 people and there were speeches made by a variety
24 of different people and the judge presided. I

Page 185

HIGHLY CONFIDENTIAL - M. KLEIN

1  don't -- I don't know the sum and substance of
2  what might differentiate that from other
3  hearings of their kind as to respond to your
4  specific question.
5     Q.  Did you at any point, Mr. Klein, hear
6  any of the lawyers who were presenting to the
7  court that day explain that cash had been
8  removed from the deal between Barclays and
9  Lehman?
10    MR. BERNICK: I'm sorry. Do you
11 understand? I mean, do you understand
12 question?
13    THE WITNESS: I don't. Please ask the
14 question or explain it again.
15    MR. BERNICK: I don't know what
16 "removed cash from the deal."
17    Q.  There was a representation that the
18 original deal that was reflected in the Asset
19 Purchase Agreement, which Mr. Gaffey marked as
20 Exhibit 1, included a cash component. It's my
21 understanding that there was a representation to
22 the court on the 19th that the cash component of
23 the deal had been removed from the transaction.
24    Do you remember hearing any such

Page 186

HIGHLY CONFIDENTIAL - M. KLEIN
representation?
    A.   I don't recall what you're referring
to with the Mr. Gaffey's representation of cash
in the transaction.  So I don't -- I don't
understand what you're referring to.
    Q.   Let me ask it this way:  Do you have
an understanding, Mr. Klein, that the
transaction that was agreed on the Monday and
Tuesday, the 15th and 16th of September,
included a cash component?
    MR. BERNICK:  Maybe the problem is
"component."
    A.   Barclays was paying cash for --
    I don't understand what you're
referring to.
    MR. OXFORD:  Thank you, David.  I
think I see where the problem is.
    Q.   Did you have an understanding, Mr.
Klein, that in the deal that was agreed on the
15th and 16th of September, Barclays would be
receiving cash from Lehman Brothers?
    A.   I, as I testified to Mr. Gaffey, I
believe, my understanding of the transaction was
the purchase of a business and related assets

Page 187

HIGHLY CONFIDENTIAL - M. KLEIN
and attached specific liabilities that were
directly attached to that business.  What were
in that pile of assets I don't -- I don't know.
I didn't know then and I still don't know, but
it was specifically identified, put differently,
specifically attached assets to run those
particular businesses.  I don't want to
speculate whether there was cash or not cash in
there.
    Q.   And you never heard, Mr. Klein, either
at the bankruptcy court or otherwise in the
context of this transaction, that there was a
business deal between Barclays and Lehman that
no cash would be transferred from Lehman to
Barclays?
    A.   Let me be specific.  The cash issue
that I was aware of, as I think was everybody in
court, was this big question over cash
transferred between the European and the U.S.
affiliate, and that seemed to have been a
subject matter that was of great interest to a
lot of participants, was some cash transferred.
    I don't know anything about that cash
transfer nor was that relevant to our

Page 188

HIGHLY CONFIDENTIAL - M. KLEIN
transaction, and I know for a fact it was made
clear that the team from Barclays was not
anticipating or expecting to get that cash in
any way.
    So the element of at least from the
bankruptcy hearing that I was aware of in terms
of some cash was this thing that people were
focusing on in terms of the Europe/U.S. cash
sweep.  Beyond that, at that particular hearing,
it was not a particular focus certainly of mine
as to the question of cash.
    Q.   Focusing for the moment on the answer
you just gave me and the cash that would be --
withdrawn.  Can you explain a little more about
the issue you were aware of?  You described it
as cash in terms of Europe/U.S. cash sweep.
What do you mean by that?
    A.   I only know what I read in the press,
and what people seemed to be asking questions
about was something to do with some
pre-bankruptcy cash transfer.  I don't know
anything about it at all.  I only read it in the
press, and that, when you ask me my recollection
of the bankruptcy court and the reference to

Page 189

HIGHLY CONFIDENTIAL - M. KLEIN
cash, that's the reference that I recollect.
    Q.   Okay.  Do you have any understanding,
sir, of how that issue was resolved, if it was
resolved?
    A.   It wasn't my issue.  It's not my
issue.  I don't -- I don't know anything about
it other than what I read in the press.
    Q.   And can you tell me what you read in
the press?
    A.   That there was some question about $8
billion of cash.
    Q.   And do you recall hearing anything at
the hearing on the 19th or otherwise about the
resolution to these concerns about $8 billion in
cash?
    A.   I don't.  It really wasn't my issue.
I don't -- I don't -- other than it being a
public issue, I just don't -- I don't have any
knowledge or expertise.
    Q.   Okay.  Thank you.  That's all I have
on those issues.
    Mr. Gaffey asked you some questions
about the OCC.  Do you remember those questions?
Just so we can make sure that we understand each

Page 190

HIGHLY CONFIDENTIAL - M. KLEIN
1  HIGHLY CONFIDENTIAL - M. KLEIN
2  other and are not talking past each other, my
3  understanding is that the OCC stands for the
4  Options Clearing Corporation. Does this accord
5  with your understanding?
6      A.   There is an Options Clearing
7  Corporation. That's fine. Yes.
8      Q.   Do you have an understanding of what
9  the purpose or role of the OCC is?
10     A.   In a very general sense. I'm not an
11  expert on it, no.
12     Q.   Can you give me your very general
13  sense, please, sir?
14     A.   Only what the words would imply. I
15  don't -- it's not a subject that I have
16  particular expertise on. I've never been a
17  particular options specialist.
18     Q.   Did you have an understanding, Mr.
19  Klein, that as part of the business deal between
20  Barclays and Lehman, Barclays would be acquiring
21  certain exchange-traded derivatives from Lehman?
22     A.   My own understanding was that Barclays
23  was buying the businesses, North American Lehman
24  Brothers businesses, and the related assets and
25  attached liabilities attached to that, whatever

Page 191

1  HIGHLY CONFIDENTIAL - M. KLEIN
2  that consisted of.
3      I never reviewed those specific
4  assets, so I don't have a specific -- I never
5  reviewed those specific listing of assets and
6  what was included in it or not.
7      Q.   So you don't have a view one way or
8  the other whether the business of Lehman that
9  traded in exchange-traded derivatives was a
10  business that was assumed by Barclays or
11  purchased by Barclays or otherwise?
12     A.   As I said, I know they were buying
13  that which was the North American ongoing
14  businesses and the related assets and
15  liabilities. The only business that I know for
16  a fact that did not come as part of that was
17  this Eagle Energy business. Other than that,
18  I'm not aware of anything else that was, quote,
19  as a business line excluded from those
20  businesses.
21      But that doesn't answer your question
22  directly. I'm just aware that they bought the
23  ongoing businesses and had the assets and
24  related liabilities that were attached to that
25  come with it. That's what I'm aware of.

Page 192

1  HIGHLY CONFIDENTIAL - M. KLEIN
2      Q.   Okay. Just so we can move on, other
3  than your generalized understanding that
4  Barclays was purchasing Lehman's North American
5  businesses, you have no specific knowledge as to
6  Barclays' purchase or otherwise of Lehman's
7  exchange-traded derivatives business, is that a
8  fair characterization of your testimony?
9      MR. BERNICK:  I think in his prior
10     answer -- why don't you ask him if he
11     focused on exchange-traded derivatives. I
12     think that might be a simple way of finding
13     out whether he knows.
14     Q.   What was the extent, if any, of your
15  dealings with exchange-traded derivatives in the
16  context of the transaction between Lehman and
17  Barclays?
18     A.   It wasn't a part of my -- I wasn't a
19  party to a discussion specifically about
20  exchange-traded derivatives that I can recall.
21     Q.   Would you give me the same answer if I
22  asked you for your responsibility or
23  involvement, if any, with respect to any margin
24  or collateral posted by or on behalf of Lehman
25  to secure those exchange-traded derivatives?

Page 193

1  HIGHLY CONFIDENTIAL - M. KLEIN
2      A.   As I understand "derivatives," that's
3  all one and the same. But I didn't -- I didn't
4  have -- I don't recall being involved in
5  conversations about exchange-traded derivatives,
6  period, but the businesses -- that's a singular,
7  unified business, but leaving that aside, I
8  don't recall being party to those discussions.
9      Q.   I believe Mr. Ricci identified you as
10  someone who negotiated an agreement called the
11  Transfer and Assumption Agreement with the OCC.
12     A.   I --
13     Q.   Does that sound correct, to your
14  knowledge?
15     A.   I don't -- I don't recall. I don't
16  recall the agreement.
17     Q.   Mr. Klein, I'm handing you what has
18  previously been marked as Exhibit 51. I'd ask
19  you just to take a moment to look at that, it's
20  a three-page agreement, and tell me whether
21  you've ever seen this document before, sir.
22     A.   I don't recall seeing it, no. I don't
23  recall seeing it before.
24     Q.   It appears to be an agreement between
25  the SIPA Trustee for LBI, Barclays, and the

Page 194

HIGHLY CONFIDENTIAL - M. KLEIN

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    Options Clearing Corporation. It's signed by
3    Mr. LaRocca. Do you see that?
4       A.  I do, yes.
5       Q.  Did you have any discussions with Mr.
6    LaRocca about this agreement, to your
7    recollection?
8       A.  I don't recall.
9       Q.  Do you have any information, other
10   than seeing Mr. LaRocca's signature on this
11   page, about who at Barclays was responsible for
12   dealing with the Options Clearing Corporation or
13   exchange-traded derivatives, again, in the
14   context of the sale transaction?
15      A.  I'm sorry, I don't. I don't. I'm
16   just not aware or I just don't recall.
17      Q.  That's all I have for that document.
18      Could you have Exhibit 382 in front of
19   you, please, sir? It's one of the documents
20   that both Mr. Tecce and Mr. Gaffey asked you
21   about.
22      A.  E-mail?
23      Q.  Yes.
24      A.  Okay. I have it, yes.
25      Q.  You testified earlier, Mr. Klein, that

Page 195

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    you had some knowledge of the Depository Trust
3    issue. Could you explain to me in a little more
4    detail what you meant by that testimony?
5       A.  There was, from Friday night onward,
6    because of the, I would broadly say the JPMorgan
7    issue that arose, there were a series of -- and
8    again, I'm not attempting to impugn JPMorgan,
9    it's just the collectivity of those issues that
10   were triggered by the ability to operate the
11   business.
12      There was a series of issues that
13   arose regarding the ability to operate the
14   business come Monday morning, and as I recall,
15   and it's a general recollection, the DTC was one
16   of those. Beyond that, and beyond the general
17   sense that it had been an issue going back to
18   the weekend of the bankruptcy, which was that
19   one of the issues that the bankruptcy had was --
20   I'm sorry, that the Saturday/Sunday of the
21   bankruptcy was what was going to clear, Monday,
22   Tuesday, Wednesday, who took all those customer
23   liabilities, and there was no -- Barclays had no
24   willingness or ability to do that.
25      I don't have a real recollection

Page 196

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    except that there were discussions with the DTC
3    at the highest levels to attempt to allow the
4    business to continue to operate, and by
5    Saturday/Sunday, there were large conference
6    calls involving I think your client as well as
7    basically everyone that could have been involved
8    in order to allow the business to continue to
9    operate come Monday morning.
10      One of the elements that was
11   complicated was, because of the agreement with
12   JPMorgan, they said that even though they would
13   keep the pipes open, no new trades could go
14   through them on Monday, starting Monday, which
15   made the deal tremendously more risky for
16   Barclays because they had no -- they had no
17   ability to operate. They had all the people in
18   the buildings and no one could do anything with
19   those people. So it was just, until you
20   converted into Barclays' systems, you had
21   nothing.
22      But I don't -- many of these issues
23   intermixed in my recollection because they
24   weren't my expertise, but they all related to
25   the ability to operate the business come Monday

Page 197

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    morning.
3       Q.  You told Mr. Gaffey in response to a
4    different series of questions that one of the
5    purposes of the deal was to step into the shoes
6    and operate Lehman's businesses, do you remember
7    that testimony?
8       A.  I don't remember the specific wording,
9    but ... is there a question?
10      Q.  I'm asking, I'm just trying to orient
11   you to my next question. Do you remember
12   telling Mr. Gaffey, or independently of what you
13   told Mr. Gaffey, do you remember having a sense
14   that the general understanding or purpose behind
15   the deal was to have Barclays step in and
16   operate Lehman's businesses on Monday?
17      MR. BERNICK:  Sorry. You're talking
18   about the actual agreement?
19      MR. OXFORD:  Yes.
20      MR. BERNICK:  That it was a term of
21   the agreement to step --
22      MR. OXFORD:  Or the business
23   understanding.
24      MR. BERNICK:  It's understanding
25   again. I mean, I think it's ambiguous.

Page 198

1    HIGHLY CONFIDENTIAL - M. KLEIN
2        If you understand the question, answer
3    it, if you can.
4        A.    The purpose of the transaction, for
5    whom are you referring to?
6        Q.    From Barclays' perspective.
7        A.    Barclays' purpose of the transaction
8    was their desire to build an ongoing business,
9    and in doing so, they were striking a business
10   to attempt to, at first, acquire Lehman Brothers
11   as part of growing their business.
12        When that became unachievable and when
13   Lehman filed for bankruptcy, the next purpose
14   was to attempt to find some components of the
15   business that were complementary, and their --
16   so their purpose was to be, if you will, a
17   complementary acquirer.
18        Now, there were multiple purposes in
19   terms of what other people may have had, but
20   that was their purpose, as I understood it.
21        Q.    Let me ask the question a different
22   way.  Did you have an understanding, Mr. Klein,
23   that the DTC organization was concerned about
24   its liability in clearing Lehman's trades, these
25   trades that would be cleared on Monday, Tuesday

Page 199

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    and Wednesday that you just told me about?
3        A.    I don't know what DTC's specific
4    concerns were.  I just know that, come Monday
5    morning, there was an entire set of issues of
6    the ability to open for business that had to be
7    resolved.
8        Q.    And did you have any role, sir, in
9    attempting to resolve those issues?
10        A.    I was there while there was multiple
11   conversations and conference calls, and the
12   biggest conference call was amongst, I don't
13   know, there were dozens of people on the phone
14   that were on and off the line.  So I was part of
15   that, yes.
16        Q.    Can you tell me, sir, what you recall
17   about that conference call?
18        A.    It was principally driven around the
19   JPMorgan issue and the ability to come to an
20   agreement with JPMorgan that satisfied all the
21   parties that the business could operate as of
22   Monday, and there were -- I think there were
23   government officials and I think there were
24   JPMorgan officials that came in and out
25   telephonically or in person.  I think there were

Page 200

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    Barclays officials that were there.  There were
3    many lawyers as well.
4        But the principal issue was triggered
5    by the events that began with JPMorgan and the
6    complexity of ongoing trades, and when that got
7    resolved, that they would keep the, quote, pipes
8    open, as I understood it, even though they would
9    not allow any trades come Monday, that was the
10   big item that I have a recollection of.
11        Q.    And just in the last clause of your
12   answer, sir, you said "they would keep the pipes
13   open."  Who is the "they" you refer to?
14        A.    There was some, and I think there are
15   others that are far more expert on this because
16   this is not my degree of expertise, but as I
17   understood it, JPMorgan, because they were the
18   clearing bank, had the ability to effectively
19   stop the trading or not allow trading to
20   continue to occur come Monday in securities that
21   were just ongoing events, that as a result of
22   Lehman Brothers' professionals, the former
23   Lehman Brothers' professionals, their operating
24   platforms and systems.
25        So when I say "keep the pipes open,"

Page 201

1    HIGHLY CONFIDENTIAL - M. KLEIN
2    JPMorgan agreed to allow that to continue for
3    the next -- I think it was 30 days.  Maybe it
4    became longer, I don't recall specifically, but
5    there was an agreement that there would be no
6    new trades put in.
7        I don't, to be quite honest, know
8    exactly if I'm responding to the question that
9    you're asking.
10        Q.    I think it is helpful in focusing my
11   next question, which is:  Do you recall the DTC,
12   or any representative of DTC, expressing
13   concerns about their liability on this
14   conference call?
15        MR. BERNICK:  I don't know if you have
16   established whether Mr. Klein, in a sense,
17   knew the people who were speaking on the
18   call.  So I guess you can answer it if you
19   can, but I think it's a little bit unclear.
20        A.    I've tried to say I have a general
21   sense that there was a DTC issue amongst a
22   variety of issues.  I don't have a good
23   recollection -- I don't have a recollection of
24   what that specific issue was, so I --
25        Q.    Okay.  Let me ask it in a slightly

Page 202

HIGHLY CONFIDENTIAL - M. KLEIN
1
2    different way. Were you aware that the DTC
3    asked Barclays to step into Lehman's shoes with
4    respect to Lehman's obligations at DTC?
5        A.    Not in the specific what you've just
6    described. As I think I described, and I hope
7    this is responsive, Barclays made it very clear
8    from the beginning that they would not step
9    into, quote, customer liabilities because of the
10   pre-event trading.
11       I don't know if that's helpful as part
12   and parcel, but at least that was my
13   understanding. But in terms of the -- I would
14   only be speculating based upon things like these
15   e-mails that you've shown me. I just don't have
16   a good -- I just don't have a recollection of
17   this answer.
18       Q.    And I'm interested in your
19   recollection rather than your speculation, sir.
20   I appreciate you making that distinction.
21       Just so we can close the loop on this,
22   if you could take a look at Exhibit 382.
23       A.    Yes, sir.
24       Q.    Mr. Ricci writes to you at 2:38, I
25   assume that's Greenwich meantime: "Worried

Page 203

HIGHLY CONFIDENTIAL - M. KLEIN
1
2    about stepping blind into DTCC. Can't do it.
3    Also, TBA's a big client issue." Do you see
4    that?
5        A.    I do. I see that.
6        Q.    Do you have any understanding of what
7    Mr. Ricci intended to communicate to you or what
8    he meant by that when he wrote that e-mail to
9    you?
10       A.    You would have to ask Mr. Ricci. I
11   have --
12       Q.    But sitting here today, you don't have
13   any recollection of what he was trying to
14   communicate to you?
15       A.    The events after the bankruptcy court
16   and to Monday were a tremendous amount of moving
17   pieces in order to keep the pipes open and be
18   able to close this. I don't -- I don't have a
19   specific -- I don't know what was specifically
20   on his mind or in his intention.
21       I do think that everybody on all
22   sides, and I think that's true on all sides,
23   were attempting to get over the finish line and
24   complete a transaction so that it didn't fall
25   apart entirely, as it seemed it might, but I

Page 204

HIGHLY CONFIDENTIAL - M. KLEIN
1
2    don't -- I don't have a specific ...
3        Q.    Did you have any understanding, sir,
4    that the Lehman securities that were held at DTC
5    provided DTC with any sort of security against
6    their potential exposure?
7        A.    I don't, again, I don't have a
8    specific recollection of what the DTC issue was
9    or what the DTC involvement was, so I don't -- I
10   don't have an answer to that.
11       Q.    Did you understand -- withdrawn. I'll
12   start that one again.
13       Did you have any discussion with
14   anyone at either Lehman or Barclays about
15   excluding Lehman's assets at DTC from the assets
16   that would be transferred to Barclays under the
17   sale?
18       A.    I, as I said earlier, I wasn't
19   involved in specific asset listings or specific
20   asset transfers or specific asset discussions,
21   to my knowledge, with any -- I mean, there were
22   lots of things going on and people wandering in
23   and out of rooms, but that wasn't my remit in
24   this at all.
25       Q.    I'm just going to show you one letter

Page 205

HIGHLY CONFIDENTIAL - M. KLEIN
1
2    on this and then I think we can move to a new
3    topic.
4        Mr. Klein, I'm showing you what's
5    previously been marked as Exhibit 52, which is a
6    letter between the Depository Trust & Clearing
7    Corporation and the SIPA Trustee and Barclays.
8    If you could just take a minute to look at that
9    and let me know whether you've ever seen this
10   document before, sir.
11       A.    Again, not that I'm aware of.
12       Q.    Okay. And you don't recall having any
13   discussions with this -- with anybody about any
14   agreement between DTC, Barclays and Lehman?
15       A.    As I've tried to say, and again, I
16   apologize, this is quite some time ago, the
17   condensed period of the number of moving issues,
18   I know there was a DTC issue and I know that
19   there had to be a resolution. In my own mind,
20   I've had a very difficult time separating all of
21   the issues that were triggered by what was
22   learned about the sort of -- and again, I've
23   used it as a generic JPMorgan issue, but all of
24   the related events that occurred, I have a very
25   difficult time separating them.

Page 206

HIGHLY CONFIDENTIAL - M. KLEIN
1    I don't have a specific recollection
2    of DTC. I don't remember seeing this. I don't
3    have a specific recollection. I only recollect
4    that there was an issue that had to get
5    resolved, and as part of that whole big group
6    call, all the issues were resolved and put down
7    and done, save the issue, as I recall, that then
8    emerged that following morning, which was the
9    JPMorgan securities question that --
10   But as I understand it, on that group
11   call, which really was -- I think it involved, I
12   think your client was on, I think
13   representatives from all parties, and I think it
14   was almost an open line conference call where
15   people came in and came out. There was a
16   summary at the end which I think Rich Ricci was
17   party to which summarized that there was a deal
18   that everyone agreed to. That was then done and
19   we moved to close.
20   The open issue that became the issue
21   that I can recollect was then the JPMorgan --
22   this cash question, but this is just my
23   recollection.
24   Q.    I understand. Last topic, sir: You

Page 207

HIGHLY CONFIDENTIAL - M. KLEIN
1    testified in response to questions from Mr.
2    Gaffey about the 15c3 assets. Do you recall
3    that testimony, generally?
4    A.    I recall the question, yeah.
5    Q.    Do you have an understanding, Mr.
6    Klein, of the purpose of Rule 15c3?
7    A.    I don't know that I've ever been
8    briefed on the purpose of it.
9    Q.    Let me ask it this way: When you
10   referred to 15c3 in your earlier testimony, what
11   are you referring to?
12   A.    I referred principally to what I
13   called, I think, custodial but then was
14   redefined as 15c3. It was an e-mail that was
15   delivered and handed to us that said that there
16   was excess collateral and excess assets that
17   could be given to Barclays as part of this last
18   phase of discussion and that those assets could
19   be as much as 2 million, but certainly there was
20   an S.E.C. officer somehow referred to with a
21   number that I think was 750. I don't have a lot
22   greater detail beyond that.
23   Q.    In your last answer I think you said 2
24   million. Did you mean to say 2 billion?

Page 208

HIGHLY CONFIDENTIAL - M. KLEIN
1    A.    I'm sorry. I think that's the second
2    time I've done that. I apologize.
3    Q.    Were you ever briefed, Mr. Klein, on
4    the purpose for which Lehman held these 15c3
5    assets?
6    A.    I think there's -- I don't know
7    whether I was fully briefed or whether someone
8    gave me a general understanding that this was --
9    well, I don't really recall right now what the
10   specific reasons were, so ...
11   Q.    Let me try it this way: Did you have
12   an understanding that the assets held pursuant
13   to 15c3 were held for the benefit of customers?
14   A.    I don't, I don't know it to be that
15   way.
16   Q.    Was it your understanding, sir, that
17   the business agreement between Lehman and
18   Barclays was that the assets that might be
19   available to Barclays were assets over and above
20   that which was required to be held pursuant to
21   this Rule 15c3?
22   A.    It was just a number that was given to
23   us. It was -- again, this was in that last
24   period and there are others that are far more

Page 209

HIGHLY CONFIDENTIAL - M. KLEIN
1    expert on 15c3. It was simply a representation
2    made that Lehman could free up up to 2 billion
3    and the only documentation was this particular
4    e-mail that I have not seen since, but referred
5    to some discussions that they had had with the
6    S.E.C. that they could free up at least 750 of
7    that. And this is a recollection because I
8    haven't seen it since.
9    Beyond that particular event, as I've
10   said, the only thing I recollect about the 15c3
11   was the question Harvey Miller asked, which is,
12   if more comes back, can that go back to Lehman,
13   and that was at the tail-end of all of this
14   process and Archie Cox had to give his
15   authorization that that in fact could. I don't
16   have any -- I don't have any other recollection
17   beyond that.
18   Q.    Okay. Do you remember when this
19   conversation between Harvey Miller and -- let me
20   ask it this way: Was this agreement between Mr.
21   Miller and Mr. Cox that you have just testified
22   to, were you present for a discussion between
23   Mr. Miller and Mr. Cox?
24   A.    I only remember that Mr. Miller asked,

Page 210

HIGHLY CONFIDENTIAL - M. KLEIN

1   HIGHLY CONFIDENTIAL - M. KLEIN
2   and I indicated that I don't have the authority
3   to do anything like that, and then I think
4   Archie Cox was the individual that was there
5   because he was the presiding, if you will,
6   officer.
7        It could well have been that the
8   agreement was other people, because there were
9   other senior people like Jonathan Hughes around.
10  But as I understood it, that was agreed to that
11  above and beyond that, some minimum number, it
12  could in fact go back to the estate. That was
13  very late in the process. I don't remember
14  specifically when, but it was very late in the
15  process.
16      Q.   And do you have a recollection, Mr.
17  Klein, of where you were when this discussion
18  with Mr. Cox and Mr. Miller took place?
19      A.   You know, I want to say again, you
20  have now done this twice to me. I have not said
21  that there was a conversation between Mr. Cox
22  and Mr. Miller.
23      Q.   I'm sorry. I did not mean to
24  represent your prior testimony. I think I must
25  have misunderstood your answer.

Page 211

1   HIGHLY CONFIDENTIAL - M. KLEIN
2       A.   I believe, but I don't know for sure,
3   that the request from Mr. Miller came somewhere
4   at the Weil offices, but I don't -- I don't have
5   a specific recollection, and I just want to be
6   clear that was a request to me that I then
7   passed on to the people at Barclays because it
8   was their decision.
9       Q.   And you say late in the process, so
10  can we at least narrow it down to a date? Was
11  that request of Mr. Miller to you, was that on
12  the Sunday, the 21st?
13      A.   My apologies. I don't know the date.
14  I don't -- I don't know the date.
15      Q.   Was it sometime prior to the closing
16  of the deal on Monday morning?
17      A.   Oh, it certainly was prior to the
18  closing. I don't -- I'm not aware of -- it
19  certainly was prior to the closing.
20      Q.   And just to bookend it, can we agree
21  that that conversation took place sometime
22  between the bankruptcy court hearing on the 19th
23  and the closing on the 22nd, is that fair?
24      A.   I don't, I don't, I really don't. As
25  I think I've said, the -- I don't think the 15c3

Page 212

1   HIGHLY CONFIDENTIAL - M. KLEIN
2   assets came into play until sometime when this
3   issue of the broader set of asset problems after
4   Tuesday occurred, so it's clearly after that,
5   and it's clearly before closing, but I just -- I
6   just don't know the specific date. And I would
7   help you if I could remember, but I don't.
8       Q.   I understand, sir. Forgive me if I'm
9   getting a little repetitive, can you be as
10  precise as possible about the terms of the
11  request from Mr. Miller to you?
12      A.   I've given you what I know. I
13  don't -- I don't have a recollection above and
14  beyond that.
15      Q.   And just so I understand your
16  testimony, sir, Mr. Miller asked you whether
17  Barclays would agree that if there was more than
18  a certain figure, perhaps around $750 million,
19  available under c3, then that would be returned
20  to the LBI estate; is that accurate?
21      A.   You are using very precise terms and I
22  want to be very careful because (A) this was a
23  year ago or more -- a year ago, and there was a
24  lot of moving pieces. I don't specifically know
25  who was involved in the conversation other than

Page 213

1   HIGHLY CONFIDENTIAL - M. KLEIN
2   Harvey Miller.
3        I only know that it was a request
4   that, above and beyond what had been represented
5   as being assets that were certainly going to go,
6   which was this e-mail, if there were more, could
7   those come back to the estate, and I said it's
8   not -- that's not something that can be done.
9        Now, I don't know -- not something I
10  can do. I don't know who else was in the room.
11  It would be -- there was virtually no situation
12  that I can recall, in fact, I can't recall any
13  situation that I was in a room alone with Harvey
14  Miller. So it would have been as part of some
15  other grouping. And then a response was given,
16  to my understanding, from Barclays back that
17  that would be okay. But I don't -- I don't have
18  a recollection beyond what I've just told you.
19      Q.   Did you have an understanding, Mr.
20  Klein, that the transfer of these moneys from
21  Lehman to Barclays, the 15c3 assets, was
22  conditional upon there being an excess beyond
23  the regulatory requirement?
24      MR. BERNICK: Object to the form. I'm
25  not objecting. I think the form of your

Page 214

HIGHLY CONFIDENTIAL - M. KLEIN

1  question, though, is ambiguous.
2     The witness has now been over this
3  like four or five different times, and I'm
4  becoming a little concerned that there's
5  something that's turning on a nuance here
6  that's just not known by the witness.
7     A.  I've testified to what I know.
8  Someone handed an e-mail that said this would be
9  available to you.  It was an important part of
10  the decision process in that last Friday.  It's
11  not a subject I knew a lot about before and it's
12  not a subject I know a lot about now.
13     Q.  And the e-mail was, to your
14  understanding, an e-mail from some individual at
15  the S.E.C.; is that correct?
16     A.  There was an e-mail that referenced
17  that there was an approval to release a certain
18  amount of these funds, and as part of that, the
19  Lehman team said this is an asset for you to
20  solve what was the discussion that Mr. Gaffey
21  and I had about the asset issue, and the
22  reference made, as I've said that I can recall,
23  all I can recall is that it was up to 2 billion,
24  but that this note said it was at least 750 that

Page 215

HIGHLY CONFIDENTIAL - M. KLEIN

1  could be released.
2     I don't recall any more, but I'm
3  assuming that that e-mail -- that was an e-mail,
4  so you all have a lot of documents.
5     Q.  We have many e-mails, Mr. Klein, you
6  are right.
7     Do you know, Mr. Klein, whether the
8  e-mail about which you have testified -- I
9  understand that this was a year ago and your
10  recollection on this issue is one year old and
11  perhaps not any longer precise, do you recall
12  whether that was an e-mail from someone at the
13  S.E.C. or was it an e-mail that simply
14  referenced the S.E.C.'s supposed approval of
15  this element of the deal, or do you not know
16  either way?
17     MR. BERNICK:  You may want to ask him
18  if he ever saw it.  I don't know, but no one
19  has established whether he saw it.
20     MR. OXFORD:  I think he testified that
21  he hadn't seen it subsequently, from which I
22  inferred that he had seen it earlier.
23     A.  There was -- the only reason I recall
24  the e-mail was it was rare that there was

Page 216

HIGHLY CONFIDENTIAL - M. KLEIN

1  specific things shown to me that said here's an
2  asset, and because of that event on Friday,
3  there was this new subject that came up --
4  whether it was Thursday or Friday, I don't know
5  when, but this new subject of this 15c3.
6     I didn't know what it was, it was
7  referred to as an available set of assets, and
8  that was then promptly handed to the lawyers
9  because it was not a subject matter that I
10  could, and then some determination had to be
11  made, is that relevant to then consider it
12  as part of this asset pool, and the decision was
13  yes.  Who the e-mail was from and between I
14  don't -- I don't have a recollection.
15     Q.  I think last question on this, and I
16  hope last question overall:  You described
17  earlier a give-back on the 15c3.  Do you have an
18  understanding of the reasons, if any, for the
19  give-back on 15c3, sir?
20     A.  I don't.  I just recall a request
21  coming in.  I don't know why.
22     MR. OXFORD:  Okay.  Mr. Klein, thank
23  you for your time.  I don't have any further
24  questions for you at this time.

Page 217

HIGHLY CONFIDENTIAL - M. KLEIN

1     MR. GAFFEY:  Just before we close the
2  record, I don't know, Mr. Klein --
3     We can go off the record.
4     (Discussion off the record.)
5     MR. BERNICK:  At the outset of the
6  deposition, there was a dialogue between Mr.
7  Gaffey and I regarding production pursuant
8  to the Subpoena that's been served on Mr.
9  Klein through me of what I will call for
10  short form the engagement letter between Mr.
11  Klein and Barclays relating to this matter,
12  and I undertook at that time to see if we
13  could even get a hold of it during the
14  course of the day, didn't have time to do so
15  because we've been working so hard and
16  intensely with these concise and insightful
17  questions that I didn't get a time to break.
18     So I will in fact get a copy of that.
19  I will make it available in this
20  case pursuant to the subpoena.  However, my
21  current intent on behalf of Mr. Klein is to
22  redact the reference to a dollar amount, and
23  we can have further discussion about that,
24  but I will in fact discharge Mr. Klein's

Page 218

HIGHLY CONFIDENTIAL - M. KLEIN

1 obligation to produce that document pursuant
2 to subpoena.
3     MR. GAFFEY: And I won't burden the
4 record.
5     MR. BERNICK: Sure.
6     MR. GAFFEY: You know where I am on
7 the redaction. We'll deal with it.
8     MR. BERNICK: Right.
9     MR. GAFFEY: My request to Barclays
10 also for that letter remains open. It
11 hasn't been produced by Barclays either.
12     MR. STERN: Right. We have searched
13 for that. We have not located it.
14     MR. GAFFEY: Okay.
15     MR. STERN: We'll search again.
16          oOo
17      _____
18
        MICHAEL KLEIN
19
20 Subscribed and sworn to
   before me this    day
21 of      2009.
22
23 _____
24
25

Page 219

HIGHLY CONFIDENTIAL - M. KLEIN
CERTIFICATE

1
2
3 STATE OF NEW YORK )
          : ss
4 COUNTY OF NEW YORK)
5     I, Kathy S. Klepfer, a Registered
6 Merit Reporter and Notary Public within and
7 for the State of New York, do hereby
8 certify:
9     That MICHAEL KLEIN, the witness whose
10 deposition is herein before set forth, was
11 duly sworn by me and that such deposition is
12 a true record of the testimony given by such
13 witness.
14     I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18     I further certify that neither the
19 deponent nor a party requested a review of
20 the transcript pursuant to Federal Rule of
21 Civil Procedure 30(e) before the deposition
22 was completed.
23     In witness whereof, I have hereunto
24 set my hand this 12th day of Sept., 2009.
25      _____

Page 220

HIGHLY CONFIDENTIAL - M. KLEIN
INDEX

1
2
3 WITNESS:        EXAMINATION BY        PAGE
4 M. KLEIN        Mr. Gaffey        5
5             Mr. Tecce      156
6             Mr. Oxford     180
7
8 EXHIBITS:              PAGE
9 Exhibit 424, Subpoena for Rule 2004      13
10 Examination
11 Exhibit 425, a document bearing Bates Nos.   124
12 BCI-EX-00077378 through 379
13 Exhibit 426, a document bearing Bates Nos.   149
14 BCI-EX-00080661
15
16
17
18
19
20
21
22
23
24
25

Page 221

1     HIGHLY CONFIDENTIAL - M. KLEIN
2 NAME OF CASE: In re Lehman Brothers Holdings, Inc.
3 DATE OF DEPOSITION: September 12, 2009
4 NAME OF WITNESS: Michael Klein
5 Reason Codes:
6    1. To clarify the record.
     2. To conform to the facts.
7    3. To correct transcription errors.
8 Page _____ Line _____ Reason _____
  From _____ to _____
9
  Page _____ Line _____ Reason _____
10 From _____ to _____
11 Page _____ Line _____ Reason _____
  From _____ to _____
12
  Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
  From _____ to _____
15
  Page _____ Line _____ Reason _____
16 From _____ to _____
17 Page _____ Line _____ Reason _____
  From _____ to _____
18
  Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
  From _____ to _____
21
  Page _____ Line _____ Reason _____
22 From _____ to _____
23 Page _____ Line _____ Reason _____
  From _____ to _____
24
25

# BCI EXHIBIT

# 80

Page 1

1                           J. KOBAK

2               UNITED STATES BANKRUPTCY COURT

3               SOUTHERN DISTRICT OF NEW YORK

4        ----------------------x

5    In Re:

6                               Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                 Debtors.

10

     ----------------------x

11

12        * * * PARTIALLY HIGHLY CONFIDENTIAL * * *

13    (Pages 144-145 have been marked Highly Confidential.)

14

15    VIDEOTAPED DEPOSITION OF JAMES B. KOBAK, JR.

16               New York, New York

17               December 7, 2009

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 26430

**Page 2**

1    J. KOBAK
2    December 7, 2009
3
4    PARTIALLY HIGHLY CONFIDENTIAL
5    videotaped deposition of JAMES B. KOBAK,
6    JR., held at the law offices of Boies,
7    Schiller & Flexner, LLP, 575 Lexington
8    Avenue, New York, New York, before Kathy
9    S. Klepfer, a Registered Professional
10   Reporter, Registered Merit Reporter,
11   Certified Realtime Reporter, Certified
12   Livenote Reporter, and Notary Public of
13   the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1    J. KOBAK
2
3    A P P E A R A N C E S:
4    JONES DAY, LLP
5    Attorneys for Lehman Brothers, Inc.
6      222 East 41st Street
7      New York, New York  10017-6702
8    BY:  DAVID L. CARDEN, ESQ.
9         JENNIFER L. DEL MEDICO, ESQ.
10
11   BOIES, SCHILLER & FLEXNER, LLP
12   Attorneys for Barclays
13     5301 Wisconsin Avenue, NW
14     Washington, D.C. 20015
15   BY:  HAMISH HUME, ESQ.
16        LOUIS G. SMITH, ESQ.
17        ANDREW BORCHINI, ESQ.
18
19
20
21
22
23
24
25

**Page 4**

1    J. KOBAK
2    A P P E A R A N C E S: (Cont'd.)
3    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
4    Attorneys for the Creditors Committee
5      51 Madison Avenue
6      22nd Floor
7      New York, New York  10010
8    BY: ROBERT K. DAKIS, ESQ.
9
10   HUGHES, HUBBARD & REED, LLP
11   Attorneys for the SIPA Trustee
12     One Battery Park Plaza
13     New York, New York 10004-1482
14   BY: WILLIAM MAGUIRE, ESQ.
15       SAMUEL McCOUBREY, ESQ.
16
17
18
19
20
21   Also Present:
22     JOSH LIPSON, Legal Video Specialist
23
24
25

**Page 5**

1    J. KOBAK
2    THE VIDEOGRAPHER:  This is the start
3    of Tape Number 1 of the videotaped
4    deposition of James Kobak in the matter In
5    Re: Lehman.  Today's date is December 7,
6    2009 at approximately 8:33 A.M.
7       Will the court reporter please swear
8    in the witness.
9              * * *
10   JAMES B. KOBAK, JR., called as a
11     witness, having been duly sworn by a Notary
12     Public, was examined and testified as
13     follows:
14   EXAMINATION BY
15   MR. HUME:
16     Q.   Good morning, Mr. Kobak.
17     A.   Good morning.
18     Q.   We've met before.
19     A.   Yes.
20     Q.   I'm Hamish Hume from Boies Schiller.
21     A.   Nice to see you again.
22     Q.   Nice to see you.
23          I represent Barclays in the Lehman
24   litigation, as you know.  You're appearing this
25   morning as a 30(b)(6) representative of the SIPC

Page 6

J. KOBAK

1
2  Trustee for LBI; is that correct?
3      A.  That's correct.  I believe I'm
4  appearing both in that capacity and in my
5  personal capacity.
6      Q.   Okay.  And I'm going to have the court
7  reporter mark the 30(b)(6) Notice, and I think
8  we're going to mark it as Exhibit 438 to
9  continue the sequential numbering from the 2004
10  discovery depositions.
11      So please mark this as Exhibit 438.
12      (Exhibit 438, Barclays Capital Inc.'s
13  Rule 30(b)(6) Deposition Notice, marked for
14  identification, as of this date.)
15      Q.   Mr. Kobak, the court reporter has
16  given you the 30(b)(6) Notice.  I assume you
17  have reviewed this before?
18      A.   Yes, I have.
19      Q.   And are you prepared, have you
20  prepared to provide testimony on all the topics
21  in this notice?
22      A.   Yes, I have.
23      Q.   One of those topics, the topic I
24  believe is 15, is the assertions made in your
25  affidavit dated September 15, 2008.  Do you see

Page 7

J. KOBAK

1
2  that?
3      MR. HUME:  While the witness is
4  looking, can you mark this as the next
5  exhibit, please?
6      A.   Yes, I do.
7      (Exhibit 439, Declaration of James B.
8  Kobak, Jr. In Support of The Trustee's
9  Motion for Relief Pursuant to the Sale
10  Orders or, Alternatively, for Certain
11  Limited Relief Under Rule 60(b), marked for
12  identification, as of this date.)
13      Q.   The court reporter has marked as
14  Exhibit 439 your affidavit dated September 15.
15      Do you have that in front of you?
16      A.   I do.
17      Q.   I'm going to ask you some questions
18  about some of the assertions in the affidavit.
19  Starting with paragraph 3, you referenced that
20  on September 19, Judge Lynch entered an order on
21  the application of SIPC to commence liquidation
22  of LBI, do you see that?
23      A.   Yes, I do.
24      Q.   And among other things, you say Judge
25  Lynch's order appointed the trustee and

Page 8

J. KOBAK

1
2  appointed Hughes Hubbard to serve the trustee as
3  counsel?
4      A.   That's correct.
5      Q.   Could you explain to me the sequence
6  of events that led up to the appointment of Jim
7  Giddens as trustee for the SIPC litigation?
8      A.   I was told I think originally that
9  there would be a possibility and then a
10  certainty of the commencement of the SIPA
11  proceeding involving the U.S. brokerage business
12  of Lehman, or LBI.  I believe Mr. Caputo of SIPC
13  came up to our offices a day or two before the
14  actual commencement of the proceeding on Friday,
15  the 19th, and I think he had a set of papers
16  that essentially were forms that SIPC had that
17  we -- he, primarily, edited a little bit to get
18  the right names and so forth for this
19  proceeding, and we participated to some extent
20  in that exercise.
21      There was considerable discussion when
22  the decision was made to do the filing as to
23  when it would be, and I remember we spent
24  considerable time when we were planning on
25  filing on Friday, the Hughes Hubbard view being

Page 9

J. KOBAK

1
2  that we should go into court fairly early to
3  make sure that we could get a duty judge and
4  actually have somebody who would sign the papers
5  before the close of business.  Other people
6  wanted to defer that.  So we had considerable
7  discussion of that topic.
8      Q.   Was Hughes Hubbard hired by SIPC
9  earlier in the week before the trustee was
10  appointed?
11      A.   They asked Mr. Giddens to serve as
12  trustee.  They asked Hughes Hubbard to serve as
13  counsel.  We ran conflicts checks and so forth
14  and decided that we could do it.  I don't know
15  if technically we were retained before we were
16  officially appointed or not.
17      Q.   Do you remember whether you were first
18  contacted before LBHI filed for bankruptcy?
19      A.   Well, I -- my first contact was a call
20  from Jim Giddens.  It was I think on the Sunday
21  before.  I remember because I was -- I believe I
22  was in my car.  I have a summer house or another
23  house up in the Adirondacks and I was on my way
24  down, and I got a call on my BlackBerry or my
25  cell phone and it was Jim Giddens basically

Page 10

J. KOBAK

1
2  saying there might be a SIPC liquidation of
3  Lehman Brothers and I should stand by and we
4  would talk about it first thing Monday morning.
5      Q.   I should maybe have made clear, I
6  think I would like to proceed with the
7  deposition as a 30(b)(6), and when I say "you,"
8  I'm going to be using "you" as the trustee; and
9  if you feel it necessary to distinguish in your
10 answer, please do, or if you need me to clarify
11 the question, please ask me to.
12     MR. MAGUIRE:  I think that's okay.  We
13 may get into issues of privilege, which
14 we'll take as we go, but I take it in asking
15 your questions you're not going to take any
16 position that if the witness answers your
17 question, that there's been some kind of
18 waiver by his answering your question?
19     MR. HUME:  As you know, we already
20 think there's been a waiver and we're
21 fighting about that or disputing that, but
22 I'm not trying to use the questioning
23 technique as a way to strengthen that
24 argument.  I don't think that will be an
25 issue.

Page 11

J. KOBAK

1
2      I just want, in terms of question and
3  answer, to assume it's in 30(b)(6) mode and
4  the "you" should cover the trustee and his
5  representatives generally.
6      Q.   Can you tell me what the trustee's
7  understanding was at the time he was first
8  contacted by SIPC as to whether a SIPC
9  liquidation of LBI was inevitable if LBHI filed
10 bankruptcy?
11     A.   I think that originally we thought it
12 was probable, perhaps not inevitable, and at
13 some point during the week I think it became
14 clear or likely that it would be inevitable.
15     Q.   And were there any discussions that
16 you can -- were there discussions that the
17 trustee was involved in about any way in which a
18 SIPC liquidation could be avoided after LBHI had
19 filed bankruptcy?
20     A.   I don't believe so.
21     Q.   And what was your understanding, the
22 trustee's understanding, of why a SIPC
23 liquidation of LBI becomes inevitable after LBHI
24 files bankruptcy?
25     A.   Well, I think the idea was that

Page 12

J. KOBAK

1
2  something needed to be done with the customers.
3  There needed to be a vehicle to transfer many of
4  the accounts to Barclays, to Neuberger Berman,
5  perhaps to others, as we have done, and that
6  there might be some small number, and it turned
7  out not to be so small, but some number of
8  accounts that might be left behind and therefore
9  would need the protections of SIPA and a SIPA
10 trustee.
11     Q.   Why -- why did the customers need to
12 be moved to other institutions rather than
13 simply stay with LBI?
14     A.   Well, the idea was to protect -- the
15 idea of the transfer was to fully protect the
16 customers as much as possible and also to allow
17 trading to continue in basically an
18 uninterrupted fashion.
19     Q.   Why would the customers not be
20 protected if they simply stayed with LBI in a
21 SIPC liquidation?
22     A.   Well, they would be protected, but
23 they would probably have to go through a claims
24 procedure.  That might mean that they could not
25 have access to their accounts for some time.  It

Page 13

J. KOBAK

1
2  would be very complicated.  If all the customers
3  that were transferred stayed with us, you'd be
4  talking about over a hundred thousand customers.
5      Q.   Was the judgment of the trustee that
6  if the customers had to stay in a SIPC
7  liquidation, that would increase the level of
8  customer panic in the marketplace?
9      A.   I don't know that the trustee made any
10 judgment along those lines.  I think it's
11 inevitable that that might have happened, but I
12 think that others were negotiating a deal which
13 at some point took the form of having a SIPC
14 trustee appointed.
15     Q.   Can you tell me how it is that Jim
16 Giddens came to be the person appointed as
17 trustee?
18     A.   The best of my knowledge is that my
19 firm and myself and Mr. Giddens and others have
20 done a number of SIPA liquidations over the
21 years in the Southern District of New York.
22 We've worked closely with SIPC on those.  We had
23 a couple that we had finished within the last
24 year or two before Lehman began, and I think we
25 had a kind of basic understanding with SIPC that

Page 14

J. KOBAK

1  it would be likely if there were another big
2  brokerage liquidation that went into SIPA, they
3  might think of us for doing that. I don't think
4  any of us had something like Lehman in mind, but
5  I think that was the understanding.
6      Q.   And so is it fair to say that, at the
7  time he was appointed, the trustee had some
8  expertise in how broker-dealers operate?
9      A.   Well, in the mechanics of a SIPC
10  liquidation, particularly.
11      Q.   And at the time he was appointed, did
12  the trustee understand the basics of
13  broker-dealer financing?
14      A.   I would say yes. I don't know, you
15  know, where you draw the line between basics and
16  details.
17      Q.   Fair.
18      A.   And it might be different for
19  different brokerage firms.
20      Q.   Right. At the time of his
21  appointment, would the trustee have had a basic
22  understanding of what a repurchase agreement
23  was?
24      A.   I believe so.

Page 15

J. KOBAK

1      Q.   A repo?
2      A.   I believe so.
3      Q.   And the trustee at the time of his
4  appointment would have understood what a haircut
5  in a repo was?
6      A.   I believe so.
7      Q.   So, at the time of his appointment,
8  the trustee would have understood that when a
9  broker-dealer enters into a repo, it provides
10  collateral that it's supposed to have a value in
11  excess of the value of the repo loan?
12      A.   Somewhat in excess of the value of the
13  repo loan, that's standard, I believe.
14      Q.   He would have understood the concept
15  of a customary haircut in a repo?
16      A.   I believe so, yes.
17      Q.   Can you now recount for me when the
18  trustee first learned about the possibility of a
19  Barclays sale, a sale of assets to Barclays,
20  after LBHI's bankruptcy?
21      A.   Well, I know that we learned about it
22  during the week, early in the week before the
23  hearing on September 17.
24      Q.   Do you remember which day, Monday or

Page 16

J. KOBAK

1  Tuesday?
2      A.   There was probably some discussion of
3  it Monday. I think we had more discussions
4  Tuesday.
5      Q.   Who would -- who -- when you say "we,"
6  you mean Hughes Hubbard, I take it, the Hughes
7  Hubbard team for the trustee?
8      A.   Well, at that time I think it's
9  important to understand that we didn't have a
10  big team. We had the trustee. We had me. Jeff
11  Margolin. We had a few associates that were
12  preparing court papers. Chris Kiplok got
13  involved, but I think originally he -- there was
14  some settlement or something in some other
15  bankruptcy or Chapter 11 that was in its final
16  stages that he was attending to. We had a few
17  corporate people on-call, but we hadn't really
18  had time to assemble any kind of massive team.
19      Q.   And where would you -- where were you
20  getting information from about this potential
21  sale to Barclays?
22      A.   We talked to SIPC. We had some
23  discussions with the attorneys for the holding
24  company, Mr. Miller and others at Weil Gotshal.

Page 17

J. KOBAK

1  I think those were our primary sources of
2  information.
3      Q.   The two primary sources being either
4  SIPC or Weil Gotshal?
5      A.   I believe so.
6      Q.   And who would it have been at SIPC
7  that was giving you information?
8      A.   Well, Mr. Caputo did come up to our
9  offices. Josephine Wang, as the general
10  counsel, she was involved. Steve Harbeck, the
11  president. I don't know if Mr. Carduck or Mr.
12  Fisher or the other people on the accounting
13  side, they may have been involved as well.
14      Q.   And how were they getting information
15  about the Barclays sale?
16      A.   I don't know. I think they had a lot
17  of contact primarily with the regulators.
18      Q.   And at Weil Gotshal you would have
19  been speaking either to Mr. Miller. Do you
20  remember who else besides Harvey Miller you may
21  have been speaking with?
22      A.   Might have spoken once or so to
23  Richard Krasnow, although I think most of the
24  conversations were with -- with him took place

Page 18

J. KOBAK

1
2 afterwards. Rod Miller might have been
3 involved. There may have been a couple of
4 others at various times.
5    Q.   And at that point, you had not yet --
6 you didn't have an official role, so you were
7 simply being kept in the loop because it was
8 understood you might become the SIPC trustee?
9    A.   That's correct.
10    Q.   And during those initial discussions
11 before your appointment, did Hughes Hubbard or
12 the trustee express any skepticism about the
13 sale?
14    A.   No. I'm not sure we knew fully until
15 the hearing on the 17th and maybe after we saw a
16 draft of the agreements what the sale exactly
17 involved. I know we were trying to get some
18 information. Our primary concern was what would
19 be left at the brokerage firm, that there would
20 be enough there to protect any customers who
21 were left, as I think that was our primary
22 focus.
23    Q.   Did you -- did the trustee at any time
24 before his appointment tell Weil Gotshal what
25 the conditions were going to be for the trustee

Page 19

J. KOBAK

1
2 to approve the sale?
3    A.   We wanted some assurances that the
4 records were in reasonable shape and some
5 assurance from the regulators and others that
6 there shouldn't be a problem of defalcations,
7 fraud, missing customer property, that that was
8 our primary concern.
9    Q.   I'm not asking what your primary
10 concern is. I'm asking, before the trustee was
11 appointed, did the trustee or any of his
12 advisors communicate to Weil Gotshal any
13 conditions for the trustee's approval of a sale
14 to Barclays?
15    A.   Other than what I've just described, I
16 don't believe so.
17    Q.   But when -- when did the trustee or
18 any of his advisors communicate what you just
19 described to Weil Gotshal?
20    A.   I think we probably asked questions
21 about that several times. I can't recall any
22 specific discussion, you know, particularly, but
23 I know we were always concerned that the
24 customer positions be in reasonable shape and
25 that there -- and there wasn't apparently any

Page 20

J. KOBAK

1
2 definition -- any evidence, or we were told
3 there wasn't any evidence of real wrongdoing in
4 the sense of people, you know, embezzling assets
5 or taking them out of the firm, particularly out
6 of customer property.
7    Q.   That's what you mean by
8 "defalcations"? The reference to the word
9 "defalcations," your concern was that there not
10 be any embezzlement of any kind, is that what
11 you're saying?
12    A.   Well, we were concerned that there not
13 be a shortfall of customer property.
14    Q.   Did you give any -- was -- did the
15 trustee communicate any specific conditions of
16 approving the sale other than that general
17 concern?
18    A.   I don't believe so. I think there may
19 have been some discussions between SIPC and Weil
20 Gotshal or with the regulators in addition to
21 any discussions that the trustee had, and we
22 weren't necessarily party to all of those.
23    Q.   Now, you understood that there had
24 been an Asset Purchase Agreement agreed to early
25 in the week?

Page 21

J. KOBAK

1
2    A.   Generally, yes.
3    Q.   And the trustee and his advisors were
4 not involved in negotiating that document,
5 correct?
6    A.   That's correct.
7    Q.   And the trustee was appointed
8 officially only on Friday, the 19th, when the
9 SIPC liquidation was filed, correct?
10    A.   That's correct. I think it was Friday
11 afternoon around 1:30 or 2 o'clock.
12    Q.   And as of the time of his appointment,
13 the trustee and his advisors had not been
14 involved in any negotiations regarding the sale?
15    A.   That's correct.
16    Q.   And subsequent to his appointment, the
17 trustee participated in the sale hearing on
18 September 19 --
19    A.   Yes.
20    Q.   -- when the sale was approved?
21    A.   That's correct.
22    Q.   And the sale was approved at the end
23 of that hearing, correct?
24    A.   The sale, as it was approved, as it
25 had been described to the Court, was approved at

Page 22

```
1              J. KOBAK
2    the end of that hearing, yes.
3        Q.   And that sale that was approved was a
4    sale that was negotiated by people other than
5    the trustee and his advisors, correct?
6        A.   That's correct. Because I believe it
7    was a condition of the deal that we at least
8    agree that it was applied to our proceeding.
9        Q.   And then the contractual documentation
10   was finalized over the weekend and executed by
11   the trustee's representative on Monday morning,
12   correct?
13       A.   A clarification letter, what was
14   called a clarification letter was negotiated and
15   drafted over the weekend and signed by us.
16   Whether it documented the deal that was
17   described to the Court I think is a different
18   matter.
19       Q.   My only question is, I think your
20   affidavit and brief says you were not involved
21   in the negotiations, obviously, of the APA
22   because you weren't appointed yet, correct?
23       A.   That's correct.
24       Q.   And you were not -- I think you say
25   you were not actively involved in the
```

Page 23

```
1              J. KOBAK
2    negotiations of the clarification letter,
3    correct?
4        A.   That's correct.
5        Q.   So the trustee's role was to approve
6    the deal as trustee for the LBI SIPC
7    liquidation, correct?
8        A.   Yes.
9        Q.   But the trustee was approving a deal
10   negotiated by the Lehman executives, correct?
11       A.   That's correct.
12       Q.   And the trustee was approving a deal
13   that had been negotiated by Lehman with the
14   advice of its lawyers at Weil Gotshal, correct?
15       A.   That's correct.
16       Q.   The trustee was approving a deal that
17   the trustee did not himself negotiate?
18       A.   That's correct.
19       Q.   And at the time of his approval -- let
20   me refer you back to your affidavit, if I may,
21   paragraph 4. In paragraph 3 you recount your
22   approval by the judge, Judge Lynch, and then you
23   say following that you went to the Bankruptcy
24   Court for the sale hearing. And you say in the
25   second sentence of paragraph 4, "We were
```

Page 24

```
1              J. KOBAK
2    assisted by professionals at my firm and had
3    engaged Deloitte & Touche to act as
4    accountants." Do you see that?
5        A.   Yes.
6        Q.   When was Deloitte & Touche engaged?
7        A.   We talked to them again. I don't know
8    when the engagement letter was signed. It might
9    have been after the liquidation actually began
10   because, again, that I think was approved by
11   SIPC as well as ourselves, but we talked to them
12   shortly before Friday, I don't know if it would
13   have been Wednesday or Thursday. And again,
14   they had a few people involved. Clearly they
15   didn't have time to get a full team together and
16   they really didn't have -- wouldn't have had
17   access to any information anyway.
18       Q.   Can you tell me why Deloitte & Touche
19   was engaged?
20       A.   Well, we knew we would need an
21   accounting firm to assist us. This is a major
22   liquidation. There are a lot of books and
23   records. There's 200,000 computer systems, or
24   something like that. Substantial work needed to
25   be done to reconcile accounts and so forth, so
```

Page 25

```
1              J. KOBAK
2    we would clearly need the assistance of a major
3    accounting firm.
4             It was a very large project, and
5    Deloitte has a lot of experience in this area
6    and didn't seem to have a conflict. So that's
7    why Deloitte was chosen.
8        Q.   Any other reason?
9        A.   No, they had a good reputation for
10   being experienced in this area.
11       Q.   At the time that Deloitte & Touche was
12   retained, and through the time of the sale
13   closing, were you planning to sue Barclays?
14       A.   No.
15       Q.   Did Deloitte & Touche provide any
16   advice to you over that weekend before the
17   closing about the economics of the sale?
18       A.   I don't believe so. I really don't
19   believe. I mostly think they were trying to
20   figure out what they might need to do on Monday
21   morning in terms of what offices to go to, what
22   kind of staff they had to put together, what the
23   size and scope of Lehman might be just as a
24   practical matter.
25            There were a lot of unanswered
```

Page 26

J. KOBAK

1  questions that everybody had just around the
2  logistics of things.
3      I don't think they made any
4  substantial investigation over the weekend. I'm
5  not sure how they could have made any
6  substantial investigation because I don't think
7  they really would have had much access to people
8  or records. Indeed, even when we took over the
9  following week, it was very difficult for us
10  initially to get access to books and information
11  and so forth.
12      Q.   After the closing, did you ask
13  Deloitte to analyze and assess the economics of
14  the sale?
15      A.   Well, the economics of the sale we
16  thought had been described at the hearing, and I
17  can go into that now or later, whatever you'd
18  prefer. So I think we thought we had a handle
19  on the basic economics.
20      Our real concern was getting our hands
21  around exactly what was left, how we were going
22  to staff things, what kind of customer accounts
23  might be left with us, what was needed to be
24  done to move the accounts to Neuberger. What

Page 27

J. KOBAK

1  was needed to be done would be needed to be done
2  to move the accounts to Barclays.
3      Q.   Putting aside what you're saying about
4  the sale hearing, specifically, did you ask
5  Deloitte & Touche to do any work after the
6  closing to analyze the economics of the sale?
7      A.   Certainly not immediately after the
8  sale. I'm not sure what you mean by "analyze
9  the economics of the sale."
10      Q.   Well, let me be more precise then.
11  Did you ever ask Deloitte & Touche, was it part
12  of their responsibility to create a closing
13  balance sheet or an opening balance sheet,
14  whichever you want to call it, for LBI before
15  and after the sale to show on --
16      A.   They had been working on that for some
17  period of time.
18      Q.   They're still working on that?
19      A.   I believe so, yes.
20      Q.   When did they start working on that?
21      A.   I don't recall.
22      Q.   Didn't they start working on that
23  right after the sale closed?
24      A.   I'm not sure it was right after. It

Page 28

J. KOBAK

1  might have been a few weeks after.
2      Q.   But in order to prepare a balance
3  sheet, an opening balance sheet -- so let me
4  make sure the record is clear and my
5  understanding is clear.
6      One of Deloitte & Touche's tasks is to
7  create a balance sheet for LBI as of the start
8  of the SIPC liquidation; is that correct?
9      A.   We asked them to do that at some
10  point.
11      Q.   And they have not yet completed that,
12  correct?
13      A.   That's correct.
14      Q.   And they began work on that shortly
15  after the SIPC liquidation began?
16      A.   I'm not sure it was shortly after. It
17  might have been several weeks after.
18      Q.   Well, wouldn't it be one of their
19  immediate tasks that you would ask the
20  accounting firm to do?
21      A.   I don't see why it would be. You
22  could well do a liquidation without ever having
23  a starting balance sheet, perhaps, and certainly
24  the immediate task would be to get control of

Page 29

J. KOBAK

1  the books and records, figure out what we needed
2  to do, figure out what we needed to do to get
3  customer accounts transferred and reconcile
4  those figures, which involved a lot of
5  coordination with people at Barclays and the
6  staff remaining at LBI, and there were a myriad
7  of other details to attend to. We were getting
8  calls from prime brokers, you know, minute by
9  minute, basically, with all kinds of questions
10  of where property was and where an account was.
11      So I don't, although it would be nice
12  to have a balance sheet, we asked them
13  eventually to prepare one, I do not think it was
14  an initial priority item by any means.
15      Q.   We have asked Deloitte & Touche to
16  produce documents to us and they have refused.
17  Can you explain to me why the trustee won't
18  allow Deloitte & Touche to produce documents to
19  us to show their understanding of the economics
20  of the sale?
21      MR. MAGUIRE:  The trustee has imposed
22  a -- asserted a privilege over the work that
23  Deloitte did.
24      MR. HUME:  I'm asking --

Page 30

```
 1          J. KOBAK
 2          MR. MAGUIRE:  That's not proper.
 3   That's addressed to the trustee's counsel.
 4   We have a whole series of correspondence
 5   with your partner about that.  That's not
 6   appropriate for this deposition.
 7          (Exhibit 440, Debtors' Motion to (A)
 8   Schedule a Sale Hearing; (B) Establish Sales
 9   Procedures; (C) Approve a Break-Up Fee; and
10   (D) Approve the Sale of the Purchased Assets
11   and the Assumption and Assignment of
12   Contracts Relating to the Purchased Assets,
13   marked for identification, as of this date.)
14      Q.   Mr. Kobak, Exhibit 440 is the Debtors'
15   Motion to Schedule a Sale Hearing that I believe
16   was filed early in the morning on September 17
17   and that attaches to it a copy of the Asset
18   Purchase Agreement with handwritten edits on it.
19          Do you see that?
20      A.   Yes, I do.
21      Q.   And are you familiar with this
22   document, the version of the APA with the
23   handwritten edits?
24      A.   I believe, and I think my declaration
25   says that we had seen a copy.  I don't know if
```

Page 31

```
 1          J. KOBAK
 2   we were -- had seen it before we got to court
 3   when we might have been handed a copy of it.
 4      Q.   This would have been -- this was filed
 5   with the court on Wednesday, September 17.  Are
 6   you saying you're not sure whether the trustee
 7   looked at it until September 19?
 8      A.   No.  No.  No.  I think we saw it on
 9   the 17th.  I don't know that we saw it until we
10   got to the courtroom.
11      Q.   Oh.
12      A.   The bankruptcy courtroom.
13      Q.   You attended the hearing.  Paragraph 5
14   of your affidavit says you attended the hearing
15   on September 17, 2008, correct?
16      A.   Yes, that's correct.
17      Q.   And the first sentence of paragraph 5
18   of your affidavit said you had been able to
19   review the proposed sale order and a hand-marked
20   version of the Asset Purchase Agreement,
21   correct?
22      A.   Right.
23      Q.   So you would have reviewed this on the
24   17th?
25      A.   I think we were given a copy on the
```

Page 32

```
 1          J. KOBAK
 2   17th at some point.
 3      Q.   And who at the trustee would have been
 4   responsible for reviewing this to understand the
 5   nature of the deal?
 6      A.   I think at that time it would have
 7   been primarily myself and the trustee.
 8      Q.   And at the time you reviewed this, did
 9   you understand the economics of the deal?
10      A.   We understood primarily the economics
11   of the deal, which originally I think was said
12   to involve some $70 billion of assets against
13   some amount of liabilities, and I think that was
14   the basis for our understanding of the overall
15   economics.  We had some understanding at that
16   time of the items that were to be transferred to
17   Barclays.  Those -- what we were primarily
18   interested in what would remain behind because
19   that would be our job, to liquidate those things
20   and take care of the customers.
21      Q.   And who would you have gotten
22   information from other than Weil Gotshal?
23      A.   I think it was primarily Weil Gotshal.
24   I don't know, they may have had one or two
25   businesspeople who I guess at that time would be
```

Page 33

```
 1          J. KOBAK
 2   Lehman businesspeople.  I can't even remember
 3   who they might have been who might have answered
 4   some questions.
 5      Q.   Can you remember any specific Lehman
 6   executives that the trustee consulted with
 7   before the sale hearing on September 19?
 8      A.   No, I can -- I can speculate, but I
 9   cannot remember who was on the other end of the
10   telephone.
11      Q.   Do you remember that there were
12   conversations with some Lehman executives, but
13   you don't remember their names?
14      A.   That's correct.  And there weren't a
15   lot of conversations, but there may have been a
16   couple.
17      Q.   Were there any conversations with
18   Lehman executives after the Friday, September
19   19, sale hearing and before the closing?
20      A.   Well, we did have people at the
21   hearing -- at the weekend clarification letter
22   drafting Sunday evening and Monday morning, and
23   I know that there were Lehman executives, some
24   of whom subsequently became Barclays executives,
25   who were there.
```

Page 34

J. KOBAK

1
2      I don't know to what extent -- I
3   wasn't there myself. I was on a telephone for
4   many hours, as was the trustee and as were
5   people from SIPC. I don't know if there were
6   substantial -- I don't believe there were
7   substantial communications. There may have been
8   some communications at which our people were
9   present at which Lehman executives may have said
10  something.
11     Q.   Let's go back to this document, if we
12  could. Let me refer you to page 6 of the Asset
13  Purchase Agreement where the purchased assets
14  are defined.
15     A.   Yes.
16     Q.   And you see towards the bottom of 6
17  where purchased assets are defined. It says,
18  "'Purchased Assets' means all of the assets of
19  seller used in connection with the business,
20  excluding the excluded assets." Do you see
21  that?
22     A.   Yes, I do.
23     Q.   And so at the time the trustee
24  received this, did the trustee understand that
25  Barclays was buying all of the assets used in

Page 35

J. KOBAK

1
2   the business as defined in this agreement?
3      A.   Except for that which was -- except
4   for that which was excluded. That was the
5   intention at that time.
6      Q.   And it then lists numerous categories?
7      A.   Yes.
8      Q.   Subsection A through S, and then
9   there's a handwritten T on page 8. Do you see
10  that? I believe it's a total of 19 specific
11  subcategories of purchased assets. Do you see
12  that?
13     A.   I see that it goes through T.
14     Q.   Okay. And do you see that -- do you
15  see that there are no valuations given for any
16  of the assets listed in that definition of
17  "purchased assets" except the assets referenced
18  in subsection D?
19     A.   Yes. In the handwritten delineation,
20  there's a value given for those, a book value.
21     Q.   A book value of 70 billion?
22     A.   Approximately 70 billion, that's
23  correct.
24     Q.   For D. But that's -- there are
25  numerous other subcategories of assets for which

Page 36

J. KOBAK

1
2   no valuation is given?
3      A.   That's correct.
4      Q.   And are you aware of whether there was
5   ever a total valuation given for all of the
6   purchased assets set forth in the Asset Purchase
7   Agreement?
8      A.   No, there might have been some
9   definition of what amount of retained cash was
10  subsequently -- except for $250 million, there
11  really wasn't any retained cash. I'm sorry,
12  this is what Barclays -- I mean, there may have
13  been some, and I don't remember what it was,
14  some estimate of the cash.
15     I think there was some estimate that
16  the residential real estate mortgages were
17  worth -- "worth" probably isn't the right word,
18  but had some kind of value of $6 billion, so 50
19  percent of that would be $3 billion, although I
20  don't think anyone thought that they were
21  actually worth anywhere near that, and I don't
22  think any numbers were associated with any of
23  the other items listed.
24     Q.   So other than the retained cash, the
25  residential mortgages, and the long positions in

Page 37

J. KOBAK

1
2   subsection D, to your knowledge, there was never
3   an appraisal or evaluation put on the other
4   subcategories of purchased assets set forth in
5   the APA; is that correct?
6      A.   That's correct, except for the ones
7   that I've stated, and you know, many of these,
8   like furniture and equipment, purchased
9   intellectual property would be unlikely to have
10  substantial value given the values at stake
11  here, but that's correct.
12     Q.   And let's go back to the retained
13  cash. What was your understanding as of the
14  time of the original Asset Purchase Agreement,
15  as of September 17, of the value of the retained
16  cash? In other words, the cash that Barclays
17  would acquire?
18     A.   Yeah, I don't remember. I think there
19  might have been some discussion of that. I just
20  don't remember what it is.
21     Q.   When you referenced the residential
22  real estate mortgage securities, you recall that
23  a value was represented to the Court of about $6
24  billion. So 50 percent of that would be 3
25  billion, correct?

Page 38

J. KOBAK

1
2     A.    That's correct.
3     Q.    And so the Asset Purchase Agreement
4  would show that if you added the long positions
5  with the residential real estate mortgage
6  securities, you would have assets with an
7  proximate value of 73 billion, plus whatever
8  these other subcategories would add up to?
9         MR. MAGUIRE: Objection. Misstates
10  the record. I think the witness made clear
11  that he didn't think anybody thought that it
12  was actually worth 3 billion.
13     Q.    What does that mean for something to
14  have a value ascribed to it but not really be
15  worth that? What does that mean?
16     A.    I don't know what it means because I
17  don't know what people were basing it on.
18     Q.    Are you saying there were valuations
19  given that week that might not have represented
20  what you could actually sell the assets for in
21  the market, is that what you're saying?
22     A.    Yes.
23     Q.    So there were assets for which
24  numerical valuations were estimated which were
25  higher than the amount you could actually sell

Page 39

J. KOBAK

1
2  those assets for in that market at that time?
3     A.    That might well have been the case in
4  that market at that time. It might well be the
5  case today.
6     Q.    Would you say there were assets
7  included in this transaction, financial assets,
8  that were extremely difficult to value that week
9  because they were illiquid?
10     A.    Yes, I mean, I have been told that
11  about certain securities and other assets, yes.
12     Q.    Were you aware of the fact that the
13  financial markets were in a state of crisis
14  during the week of September 15th, 2008?
15     A.    The newspapers and T.V. and media
16  referred to a financial crisis during that week.
17  It was well-publicized.
18     Q.    Do you think they were just using the
19  word loosely, or do you think there really was a
20  crisis?
21     A.    I don't purport to speak for the
22  press.
23     Q.    Did the trustee understand we were in
24  the middle of a financial crisis?
25     A.    I think it was a severe -- obviously

Page 40

J. KOBAK

1
2  this deal was related to a severe financial
3  crisis. The reason that we were appointed was
4  because there was a concern that customers be
5  protected.
6     Q.    And in that crisis, certain financial
7  assets on the books of Lehman Brothers that were
8  going to be transferred to Barclays were very
9  difficult to sell, weren't they?
10         MR. CARDEN: Objection.
11     A.    I don't know. I'm not in the business
12  of selling assets.
13     Q.    Well, you're in the business of
14  telling me the residential real estate mortgages
15  couldn't be -- had a value that wasn't a real
16  value?
17     A.    I'm telling you that people ascribed a
18  value of $6 billion and I was led to believe,
19  and the trustee was led to believe, that there
20  was no assurance that that value would
21  necessarily be realized.
22     Q.    And I'm asking you, isn't that true of
23  other financial assets that were included in
24  this transaction, that they were difficult to
25  value that week?

Page 41

J. KOBAK

1
2         MR. CARDEN: Objection to form.
3         MR. DAKIS: Objection to form.
4         MR. MAGUIRE: Asked and answered.
5     Q.    Do you agree with that or do you deny
6  that? It's very simple.
7         MR. MAGUIRE: Asked and answered.
8         MR. CARDEN: Same objection.
9     A.    I agree that there was some securities
10  and other positions that I have been told were
11  illiquid and difficult to value in some cases.
12  We've asked Deloitte or others to value them,
13  and we've been told that they were illiquid and
14  difficult to value.
15         MR. HUME: Let's take a short break
16  because the next exhibit is not ready, I'm
17  afraid.
18         THE VIDEOGRAPHER: The time is 9:14.
19  We're going off the record.
20         (Recess.)
21         THE VIDEOGRAPHER: The time is 9:22.
22  We are back on the record.
23  BY MR. HUME:
24     Q.    Mr. Kobak, let's just look a little
25  longer at this version of the APA with the

Page 42

```
1              J. KOBAK
2   handwriting on it. If you go back to page 3,
3   really if you start on page 2 where it talks
4   about excluded assets, do you see that at the
5   bottom of page 2?
6       A.   Yes.
7       Q.   It defines "excluded assets" and it
8   includes in that, in subsection B, all cash,
9   cash equivalents, bank deposits or similar cash
10  items of LBI and its subsidiaries other than
11  $1.3 billion in cash. Do you see that?
12      A.   Cash, cash equivalents, bank deposits,
13  yes.
14      Q.   Yes. So that suggests there's 1.3
15  billion of cash, cash equivalents, bank deposits
16  or similar cash items that, under this version
17  of the agreement, were going to Barclays,
18  correct?
19      A.   Yeah, and that actually refreshes my
20  recollection as to what I and I think we
21  understood the -- roughly the amount of cash and
22  cash equivalents to be.
23      Q.   Okay. So, at the time of this version
24  of the APA, you had long positions estimated to
25  be 70 billion, plus cash, cash equivalents, et
```

Page 43

```
1              J. KOBAK
2   cetera, of roughly 1.3 billion, plus residential
3   real estate mortgage securities for which a
4   value of 3 billion was given, but the
5   liquidation value might be debatable, correct?
6       A.   Well, yes, but book value -- I mean,
7   the 70 billion was said to be book value, not
8   actual -- not actual value.
9       Q.   What do you mean by that? What's the
10  difference between book value and actual value?
11      A.   Book value I think is what it's -- was
12  booked for on the books. I don't know if that
13  means it necessarily marked to market or not. I
14  really don't know either way, but I'm not sure
15  it means present market value.
16      Q.   So at the time you were looking -- the
17  trustee was looking at this agreement, these
18  numbers, the number 70 billion, did the trustee
19  believe that was a number that represented the
20  value of the long positions or just some random
21  number associated with the long positions?
22          MR. CARDEN: Objection to form.
23      A.   I don't think it was a random number.
24  I think it was exactly what it says in the
25  document and we didn't have any more or less
```

Page 44

```
1              J. KOBAK
2   information than that.
3       Q.   Okay. Based on that information, book
4   value of 70 billion for long positions plus 3
5   billion for resis plus the 1.3 billion for the
6   cash and cash equivalents, based upon that
7   information in this document, did the trustee
8   inform anyone that this deal was not acceptable
9   to the trustee?
10      A.   No.
11      Q.   If you flip forward to me -- with me
12  to page 11 of this document, it talks about an
13  assumption of liabilities in Section 2.3. Do
14  you see that? It lists down at the bottom.
15      A.   Yes.
16      Q.   And it lists out the liabilities
17  Barclays would be assuming, correct?
18      A.   Yes.
19      Q.   On the next page, page 12 in
20  subsection I of this provision, 2.3 of the APA,
21  the handwriting -- the handwritten edits list
22  out a definition of short positions with an
23  approximate book value of 69 billion, do you see
24  that?
25      A.   Yes, I do.
```

Page 45

```
1              J. KOBAK
2       Q.   And so under this version of the APA
3   filed with the Court on September 17, Barclays
4   was getting a set of assets, many of which were
5   not valued, but some of which had a value, a
6   book value, of approximately 73.3 billion --
7   sorry, 74.3 billion, and short positions of
8   approximately 69 billion?
9       A.   Valued at 69.
10          MR. CARDEN: Objection to form.
11      Q.   Would you agree with that?
12          MR. CARDEN: Objection to form.
13      A.   That's what the deal says, that's what
14  was described, approximately.
15      Q.   You have assets, many of which were
16  not defined, and liabilities, many of which were
17  not -- sorry. The agreement that was filed with
18  the Court on the 17th had many assets for which
19  values were not given, correct?
20          MR. CARDEN: Objection to form.
21          MR. MAGUIRE: Objection to form.
22      Asked and answered.
23      A.   Yes.
24      Q.   And it had several liabilities for
25  which the contract did not give a value,
```

Page 46

```
1                J. KOBAK
2    correct?
3        A.   That's correct.
4        Q.   But it did have a series of assets
5    that totaled up to book value of approximately
6    74.3 billion, correct?
7            MR. CARDEN: Objection to form.
8        A.   Yes.
9        Q.   And it had one set of short positions
10   in the liabilities that was given a value of, a
11   book value of approximately 69 billion, correct?
12       A.   That's correct.
13       Q.   And the trustee never told anyone that
14   that -- the economics of that transaction was
15   unacceptable?
16       A.   No, we did not. I think our
17   understanding was that the -- there was a rough
18   equivalence probably between the value of the
19   assets and the value of the liabilities. And
20   again, our concern was that with really the
21   entity that was going to remain behind.
22       Q.   When you say you had an understanding
23   there was a rough equivalence, do you mean 69
24   billion and 74.3 billion represent a rough
25   equivalence of book value?
```

Page 47

```
1                J. KOBAK
2            MR. CARDEN: Objection to form.
3        A.   Well, I think there's a rough
4    equivalent of the long positions and the short
5    positions. There are a few other assets. There
6    are also other liabilities. As I've said, I
7    don't think some of the assets probably had the
8    value ascribed to them, and when you put that
9    all together, it seems to me you have a deal
10   where it's fairly -- the assets and the
11   liabilities are fairly equivalent, at least
12   within a fairly narrow range, I would say.
13       Q.   What was the narrow range?
14       A.   Well, you said 74.3 to 69 plus. I've
15   told you I don't think the 74.3 probably was
16   really worth quite 74.3, but you're talking
17   about something where you probably have, if
18   there were any profit ascribed to the deal, a
19   very narrow profit, possibly at the end of the
20   day there would be a net cost to Barclays. And
21   I think that was our understanding of what was
22   involved.
23       Q.   Did the trustee ever communicate to
24   anyone that they would not approve the deal if
25   Barclays recorded a profit on the deal?
```

Page 48

```
1                J. KOBAK
2        A.   No.
3        Q.   Did you -- did the trustee have any
4    basis for knowing whether the 69 billion --
5        A.   You're talking about the Asset
6    Purchase Agreement as described here?
7        Q.   Correct.
8        A.   Yeah. Okay.
9        Q.   But did the trustee at any time before
10   the closing inform anyone that the trustee would
11   not approved the deal if Barclays recorded a
12   profit on the deal?
13       A.   Our understanding was not that there
14   would be a profit on the deal or, if there were
15   a profit, that it would be any kind of
16   substantial profit. Our understanding was that
17   the assets and liabilities as described to the
18   Court were pretty close together, that there
19   were some additional liabilities, like
20   employment and severance and cure costs, of
21   several billion dollars that were being assumed
22   by Barclays, and if you put those things
23   together, it's unlikely that there would be any
24   substantial profit to Barclays, certainly
25   unlikely, in all probability, there might be a
```

Page 49

```
1                J. KOBAK
2    loss to Barclays.
3            And we were also concerned that it was
4    described that we would have at least $20
5    billion of assets left in the broker-dealer, and
6    obviously that number was important to us since
7    our job in life was to liquidate the
8    broker-dealer and make sure the customers were
9    protected.
10       Q.   Mr. Kobak, that was not my question.
11   Just to be clear, at any time before the closing
12   did the trustee communicate to anyone that the
13   trustee would not approve the deal if Barclays
14   was likely to record a profit on the deal?
15       A.   I don't believe that discussion ever
16   came up.
17       Q.   Now, going back to the Asset Purchase
18   Agreement you reviewed on September 17, did the
19   trustee have any greater knowledge about the 69
20   billion and whether that value was accurate than
21   it did about the 70 billion or the 3 billion for
22   resis? Was there the same doubt about whether
23   that number represented an actual, real,
24   definite market value of those positions?
25           MR. CARDEN: Objection to form.
```

Page 50

J. KOBAK

MR. DAKIS: Objection to form.

A.   I think there had been discussions that there was a value of 6 billion in the resis, but they probably weren't worth that much. I don't know if there was -- I don't recall a specific discussion around the 70 billion or the 69 billion, just that those two numbers were roughly in harmony with one another.

Q.   Who did you -- who do you recall having a discussion with about the 6 billion of resis?

A.   I think we might have had a discussion at some point with Mr. Miller.

Q.   And what did he tell you in that discussion?

A.   And I don't remember if it was at this time or, as I recall, DTC wanted the resis because it was concerned about liabilities to it if the accounts continued to transfer and so forth. And I think at that time at some point we were told that some amount of the resis was going to go to them, that they had a book value of 3 billion, 6 billion, but that they really --

Page 51

J. KOBAK

nobody thought they were worth that much, but basically DTC wanted the most assurance it could have that it would be protected.

(Exhibit 441, a document bearing Bates Nos. HHR_00006494 through 95, with attachment, marked for identification, as of this date.)

Q.   Mr. Kobak, Exhibit 441 is an e-mail produced by Hughes Hubbard to us in this case that we believe has the attachment which was given in native format of the balance sheet that is stapled to it. The e-mail is from Richard Krasnow at Weil Gotshal to Jim Giddens as well as to someone at the S.E.C. and Mike Macchiaroli of the S.E.C., copying Brent Beldner at Lehman and Martin Kelly at Lehman, do you see that?

A.   Yes, I do.

Q.   And the e-mail is dated September 18 at 8:30 P.M., do you see that?

A.   Yes, I do.

Q.   The first line of the e-mail from Mr. Krasnow states, "Attached is the draft LBI balance sheet reflecting unaudited estimated numbers both pre and post Barclays

Page 52

J. KOBAK

acquisition -- Barclays transaction." You see that?

A.   That's correct.

Q.   Was this e-mail provided to the trustee to give him some sense of what the economics of the transaction were?

A.   I don't know if it was the economics of the transaction so much as what our entity might look like, to the extent you could tell that from a balance sheet. I remember that we had been asking for this information for a while, not -- "a while" in this context meaning maybe a few hours, and we didn't get it until the evening.

I think I saw a copy of this and discussed it with the trustee. Indeed, I think we had a call with Weil about it, and I think it was in that call where a couple of Lehman people were on the phone to try to answer some questions. And again, I don't recall who those people were at this point.

Q.   Do you remember if Brett Beldner or Martin Kelly were involved in those conversations?

Page 53

J. KOBAK

A.   I don't remember, and this doesn't refresh my recollection in that regard.

Q.   Do you know whether the trustee ever spoke to either of those gentlemen about the transaction?

A.   I don't remember.

Q.   The next sentence of the e-mail says, "The numbers relating to the transaction are still being finalized, so the post-closing amounts are subject to change." Do you see that?

A.   Yes, I do.

Q.   What was the trustee's understanding of that sentence when he received this e-mail?

A.   That this was a pretty rough and ready balance sheet that kind of gave you, at most, a gross approximation of what we might be talking about.

Q.   Did the trustee understand that the valuations being given for the assets in this transaction were generally estimates?

A.   Yes.

Q.   Did he understand that, given the emergency nature -- let me just make sure we

Page 54

J. KOBAK

1   agree on that. Would you agree that this
2   transaction was negotiated and approved under
3   emergency circumstances?
4        MR. CARDEN: Objection to form.
5        A.   I believe the Court described it as
6   extraordinary circumstances, and I would
7   certainly subscribe to that.
8        Q.   Under those extraordinary
9   circumstances, would you agree that there was no
10  time to do a final and formal appraisal of all
11  the assets in the deal?
12       A.   Yes.
13       MR. CARDEN: Objection to form.
14       Q.   And would you agree there was no time
15  to do a formal and final appraisal of all of the
16  financial trading assets in the deal?
17       MR. CARDEN: Same objection.
18       A.   Yes, I don't know what kind of
19  analysis might have been done of those things
20  before, if some of them were marked to market on
21  a daily basis, for instance.
22       Q.   You don't know whether the assets were
23  being marked to market on a daily basis during
24  the week of September 15 through to September

Page 55

J. KOBAK

1   19?
2        A.   I think they probably were or efforts
3   were probably being made to do that. Whether
4   they were all successful, and again, I think
5   there may have been some things that were
6   illiquid and that really couldn't be valued very
7   effectively.
8        Q.   When you say other assets were
9   probably being marked, do you have any basis for
10  knowing one way or the other?
11       A.   No, just general understanding of how
12  a brokerage firm would probably work.
13       Q.   Well, you understand it wasn't
14  operating normally that week --
15       MR. CARDEN: Objection.
16       Q.   -- the brokerage firm?
17       A.   In many respects it was not operating
18  normally, that's correct.
19       Q.   You understand that the president of
20  the firm, Mr. McDade, has testified there was
21  massive human carnage and that the people were
22  not marking the books normally, as far as he
23  knew?
24       MR. MAGUIRE: Objection to form.

Page 56

J. KOBAK

1        MR. CARDEN: Objection to form.
2        Q.   Are you aware of that?
3        A.   I don't recall seeing that. I
4   particularly do not recall the phrase "massive
5   human carnage."
6        Q.   Do you have any basis for knowing
7   whether or not Lehman was marking its books in
8   the ordinary course the way it had in the weeks
9   before the bankruptcy?
10       A.   I do not know. It might have been
11  doing more marked to market since there were
12  assets that were going to be sold. I don't
13  know.
14       Q.   It might have been doing less?
15       A.   It might have been doing less. It
16  might have been doing more.
17       Q.   When the trustee received the balance
18  sheet attached to this e-mail, did the trustee
19  say that there was anything objectionable about
20  this transaction as described in this
21  approximate balance sheet?
22       A.   Well, we were trying to --
23       MR. CARDEN: Objection to form.
24       A.   -- understand it. It -- it refers to

Page 57

J. KOBAK

1   investments in consolidated subs. There had
2   been some discussion that subsequently happened
3   that the subs in fact would be transferred and,
4   as it turned out, we got this Pich note instead.
5   So there were a lot of uncertain items on the
6   balance sheets.
7        We were trying to get a handle on what
8   kind of assets we were talking about that we
9   might be left with, what the approximate
10  magnitude of those would be, and that was
11  essentially what we were interested in.
12       The total capital of 2.4 would show
13  that you had a solvent entity, so to speak. I
14  think we took some of that with a little bit of
15  a grain of salt because you had amounts due from
16  receivables and payables to receivables that we
17  thought would probably have a lot of variability
18  into it, but it did give us comfort that there
19  would probably not be a massive shortfall in
20  what would be needed to satisfy customer claims
21  at least, and again, that was our primary focus.
22       Q.   The numbers in this draft balance
23  sheet are different from the numbers in the APA,
24  correct?

Page 58

J. KOBAK

1
2     A.   I'm not sure how these translate to
3   what's in the APA.
4     Q.   Well, let's look at it. There's an
5   inventory in the draft balance sheet of
6   government and agencies, securities, commercial
7   paper, mortgages, corporate debt, equities and
8   derivatives that, in terms of the Assets Being
9   Sold column, add up to $56.4 billion, do you see
10  that?
11    A.   56.4?
12    Q.   Yeah, look at the second column.
13    A.   Oh, yes, I see it. Okay. The assets
14  being sold, yes.
15    Q.   The inventory adds up to 56.4, and
16  then when you add collateralized short-term
17  agreements, it adds up to 87.2, correct?
18    A.   Yes.
19    Q.   So the numbers are different from what
20  were in the APA?
21        MR. CARDEN: Objection to form.
22    A.   On this balance sheet, yes.
23    Q.   Did the trustee ask anyone why the
24  numbers in this draft balance sheet were
25  different from what was in the APA?

Page 59

J. KOBAK

1
2     A.   No. Again, I don't think we had a
3   real basis -- a real basis for knowing quite
4   what the basis for these -- these numbers were
5   or how it corresponded to the APA.
6     Q.   At this point on September 18, did you
7   think this draft balance sheet or the APA was
8   the better representation of what the
9   transaction was going to be?
10    A.   We were looking primarily --
11        MR. CARDEN: Objection.
12    A.   -- at this balance sheet in terms of
13  what would be left with us.
14    Q.   So is you --
15    A.   That's what we had been asking Weil
16  for.
17    Q.   So you relied on the balance sheet
18  rather than the written contract at this point?
19    A.   No, we looked at the balance sheet to
20  get a sense of what assets and liabilities we
21  would have in our estate.
22    Q.   But the -- okay. But at this point,
23  the balance sheet is different from the
24  contract, correct?
25        MR. CARDEN: Objection.

Page 60

J. KOBAK

1
2     Q.   On the evening of Thursday, September
3   18, the balance sheet sent to the trustee is
4   different from what's in the contract?
5        MR. MAGUIRE: Asked and answered.
6     A.   I mean, the numbers are what the
7   numbers are.
8     Q.   Okay. And just so the record is
9   clear, did the trustee ever ask anyone, the
10  trustee or its representatives ever ask anyone
11  why this draft balance sheet was different from
12  what was in the APA?
13        MR. MAGUIRE: Asked and answered.
14    A.   We primarily asked, as I've said, I
15  think, about what some of the assets and
16  liabilities were that we were going to be left
17  with.
18    Q.   You didn't ask for a specific
19  explanation of why the numbers had changed?
20    A.   No.
21    Q.   Let me go back to your affidavit, if I
22  may. I'm going to continue to refer to that
23  throughout most of the deposition.
24    A.   "That" being my affidavit?
25    Q.   Yes. You may want to keep it handy.

Page 61

J. KOBAK

1
2       In paragraph 6 -- in paragraph 5, you
3   have recounted reviewing the draft sale order
4   and the draft APA -- or, sorry, the executed APA
5   that were submitted to the Court. And then in
6   paragraph 6 you say, "Based on this information,
7   and limited other information that we sought and
8   were provided indirectly through the lawyers for
9   the holding company..."
10       Let me just pause on that. What is
11  the limited other information you reference in
12  paragraph 6?
13    A.   I think it was essentially the balance
14  sheet.
15    Q.   The one that we just looked at?
16    A.   Yeah, in Exhibit 441, and the
17  questions that we asked about it. For instance,
18  we asked questions about what the subsidiaries,
19  that at that point it wasn't clear whether we
20  would retain them or whether they would be
21  transferred to the holding company. We were
22  only told that later, so we asked what those
23  subs were, what business they did, what
24  approximate assets they had, what subsidiaries
25  it was proposed, if any, would be left behind,

Page 62

1            J. KOBAK
2  and a few other questions of that nature.
3       Q.   Can you remember any other specific
4  questions?
5       A.   No, I cannot.
6       Q.   Can you remember any other information
7  that's referenced by the "limited other
8  information" you reference in paragraph 6 of
9  your affidavit?
10      A.   No.  Again, I think we had some
11 discussions with Lehman -- with Weil or Lehman
12 people and with regulators about to the effect
13 that there didn't seem to be any huge problems
14 in terms of missing customer property, in terms
15 of somebody having walked off with accounts or
16 missing accounts not being there or something of
17 that nature.
18      Q.   And in this first sentence you
19 reference that you got information through the
20 lawyers for the holding company.  I assume
21 you're referring to Weil Gotshal?
22      A.   That's correct.
23      Q.   Any other lawyers, or just Weil
24 Gotshal?
25      A.   Just Weil Gotshal, I believe.

Page 63

1            J. KOBAK
2       Q.   And then you say, "...from largely
3  unidentified employees of Lehman entities."
4            Again, when you say "largely
5  identified" in paragraph 6 of your affidavit,
6  can you remember any who were identified?
7       A.   No, I can't, and I didn't mean -- I'm
8  sure that somebody told us their names at the
9  time.  I didn't mean that there were anonymous
10 voices on the phone.  I just cannot recall who
11 they were.
12      Q.   So you say, based on all that
13 information, you say, "The trustee and I
14 believed and discussed with SIPC that the sale
15 would facilitate the transfer of customer
16 accounts to solvent broker-dealers with minimal
17 disruption to the customers' ability to access
18 their accounts."  Do you see that in your
19 affidavit?
20      A.   Yes, I do.
21      Q.   Again, does this just go back to what
22 you said earlier, that the idea here was for
23 customers to have their property moved to a
24 solvent broker-dealer so they could have
25 immediate access and not have to go through a

Page 64

1            J. KOBAK
2  protracted liquidation claims process?
3       A.   To the extent possible, I thought that
4  a purpose of this transaction was to achieve
5  that.  How protracted the claims process would
6  be I don't know, but it certainly would not be
7  likely to give people, even in the best of
8  circumstances, even in a small brokerage house,
9  access to their accounts, you know, immediately
10 on Monday morning, as they might be able to have
11 access if another solvent broker took over the
12 positions and started trading or allowed people
13 to trade in those accounts.
14      Q.   And that goal or purpose, that phrase,
15 "the sale would facilitate the transfer of
16 customer accounts to solvent broker-dealers,
17 with minimal disruption to the customers'
18 ability to access their accounts," that was
19 accomplished through the Barclays sale, correct?
20      A.   Yes, it proved, as I think your client
21 is well aware, a lot more complicated to
22 transfer all the property.  We're still trying
23 to do the final stages of that, as I think you
24 know, but by and large, as I understand it, at
25 least to the customer, most customers I think

Page 65

1            J. KOBAK
2  thought that what had been at Lehman was now at
3  Barclays, in the case of Barclays, or at
4  Neuberger & Berman in the case of Neuberger
5  Berman.
6            There were very few instances that
7  that may not have been the case, but I think in
8  99.99 percent of the cases as far as the
9  customer was concerned, everything went
10 smoothly.  There were some number of accounts,
11 as I've said, that remained with us, so they're
12 being satisfied through the claim process.
13      Q.   That goes to the next -- so at least
14 this first part of it has been accomplished in
15 terms of transferring the customer accounts and
16 providing immediate access?
17      A.   Well, assuming the Court approves our
18 order next Thursday, yes, that whole stage will
19 be completed.
20      Q.   The next sentence says, "We believed,
21 based on the information available to us, that
22 there would be sufficient customer property in
23 the reserve account or otherwise segregated or
24 available at depositories to support the
25 transfer of the great bulk of customer accounts

Page 66

J. KOBAK

1 and satisfy any remaining customer claims."
2 What was the basis for that belief?
3 A. Well, the balance sheet -- first of
4 all, we were told that the S.E.C. thought for
5 the most part that property that should have
6 been in segregation was probably in segregation,
7 that Lehman was basically a pretty well run
8 enterprise while it was a functioning
9 broker-dealer, and that nobody knew about any
10 massive amounts of property that weren't there.
11 We were given a little further
12 assurance by the balance sheet in Exhibit 441,
13 which did seem to show, you know, roughly
14 speaking, a solvent brokerage firm. I think if
15 we had -- if it is -- if even this rough balance
16 sheet had shown a huge negative in total
17 capital, that would have given us a lot of pause
18 that there might well not -- there might well be
19 a big shortfall which would carry over to
20 customer property.
21 Q. Did you ever tell anyone that? Did
22 the trustee or its advisors ever tell anyone
23 that if this transaction resulted in any kind of
24 negative balance at Lehman after the deal, that

Page 67

J. KOBAK

1 you would not approve it?
2 A. I don't know if we said we wouldn't
3 approve it. We certainly had discussions with
4 SIPC. SIPC was certainly not interested. What
5 it would have done, you have to ask them, but
6 they would be very concerned about exposure if
7 there were huge massive shortfalls in customer
8 property to start with in a transaction, and we
9 certainly had discussions with the S.E.C.
10 There was also, frankly, just
11 discussions about getting into something where
12 the records were, you know, a nightmare or
13 something where, you know, you couldn't tell
14 what was in people's accounts, and it did turn
15 out that the records, while there are
16 difficulties in access to the records and
17 reconciling them and there were a lot of
18 transactions in the last week, in fact Lehman as
19 an operating broker had maintained pretty good
20 records so that those kind of concerns really
21 didn't exist to nearly the extent that they
22 could have.
23 Q. Other than in discussions with SIPC
24 and the S.E.C., did the trustee ever communicate
25

Page 68

J. KOBAK

1 to anyone else that it would not approve the
2 deal if the deal would result in a shortfall for
3 remaining customer claims?
4 A. I don't believe we had any direct
5 discussion of that that I can recall.
6 Q. The next sentence of your affidavit in
7 paragraph 6 you say, "Based on the information
8 and assurances we received." What are the
9 assurances you received?
10 A. I think it's what I testified to.
11 Q. There were no assurances from
12 Barclays, were there?
13 A. I think -- I don't know if we were
14 given assurances directly. I think the
15 regulators -- certainly there were assurances
16 that Barclays would cooperate in the account
17 transfer process and was willing to take the --
18 take the accounts. Might not be willing to take
19 the liabilities, but it was willing to take the
20 accounts.
21 Q. You then say, "Based on all of that,
22 the trustee concluded the sale was in the best
23 interests of LBI customers, creditors and the
24 general estate."

Page 69

J. KOBAK

1 When exactly did the trustee decide to
2 support and approve the sale?
3 A. I think we had decided that we would
4 support the transaction certainly by the time of
5 the hearing on the 17th. It was also obviously
6 important to us what people said during that
7 hearing.
8 Q. And after that decision to support the
9 transaction on the 17th, was there ever a time
10 where the trustee -- was there ever a time where
11 the trustee considered changing his support and
12 not supporting a transaction?
13 A. I don't believe so.
14 Q. Do you know whether before the sale
15 closed on Monday, the 22nd, the trustee or his
16 advisors ever reviewed the minutes from the
17 Lehman board meeting that approved the sale?
18 A. We did approve -- we did review the
19 minutes. I don't know if we did it before the
20 closing or at some time after that.
21 Q. You believe you received the minutes
22 at least before the closing?
23 A. I don't believe we received the
24 minutes. I believe my corporate partner Ellen

Page 70

J. KOBAK

1  J. KOBAK
2  Friedenberg had to make several requests of
3  them. I think she went up to Weil's offices or
4  Lehman's offices several times and basically had
5  to find the minutes. I think it was sometime
6  afterward that we first received the minutes,
7  but it may have only been a draft of the
8  minutes.
9      Q.  So there was some effort before the
10  closing to simply review as a matter of
11  diligence what the board approval was?
12      A.  No. No. No. I think we asked for it
13  after the closing.
14      Q.  I see. So before the close, what, if
15  anything, did the trustee or its advisors do to
16  review what the board had meant and approved,
17  what the board had done?
18      A.  I think we were just told that the
19  board had approved the transaction. I don't
20  think we had any reason to question that.
21      Q.  And so, again, just because I
22  misunderstood, just so the record is clear, your
23  testimony is that you don't believe the trustee
24  or his advisors saw any board minutes from the
25  Lehman board meeting that approved the sale

Page 71

J. KOBAK

1  J. KOBAK
2  before the closing?
3      A.  I don't believe. I think we saw them
4  for the first time maybe several weeks after the
5  closing.
6      Q.  Did you understand before the closing
7  that the Lehman board had delegated to Lehman
8  officers the task of finalizing the negotiations
9  for the transaction?
10      A.  Well, I think we had been told that
11  the transaction had been authorized, and you
12  would expect that officers of the company would
13  be the people who would negotiate the deal and
14  implement the deal.
15      Q.  And even though as of Friday afternoon
16  Mr. Giddens is now formally appointed the
17  trustee, he's immediately faced with a
18  transaction that's been negotiated by other
19  people. So is his view -- is it his role at
20  that time simply to approve rather than to try
21  to renegotiate?
22      A.  Well, we ran -- I mean, what happened
23  was we were in the Federal District Court at
24  Pearl Street and we got the order signed, and
25  after it was signed and we made copies and so

Page 72

J. KOBAK

1  J. KOBAK
2  forth, we got in a car and raced down Broadway
3  so we would get to the Bankruptcy Court in time
4  for a 4 o'clock hearing.
5      The time was very tight. After that,
6  we spent from 4 until, you know, whatever time
7  that hearing ended, 1, 2 in the morning in the
8  Bankruptcy Court.
9      Q.  Let's look at paragraph 7 of your
10  affidavit, and we'll look at the sale hearing.
11  We might as well mark it as the next exhibit.
12      (Exhibit 442, Transcript of the Sale
13  Hearing, marked for identification, as of
14  this date.)
15      Q.  You mentioned that shortly after the
16  appointment, you then moved down to the
17  bankruptcy courthouse for the hearing that was
18  to be held to approve the sale on the afternoon
19  of the 19th?
20      A.  That's correct.
21      Q.  And do you arrive just as the hearing
22  is beginning or do you have a chance to meet
23  with people to discuss the transaction before
24  the hearing begins?
25      A.  I can't remember exactly when we got

Page 73

J. KOBAK

1  J. KOBAK
2  there. I remember that Mr. Caputo and I
3  actually had time to go to Chipotle and get
4  something to eat because we hadn't had anything
5  to eat all day, so we had a few minutes to do
6  that. I think we got to the courthouse, the
7  Bankruptcy Court. We wanted to be sure we were
8  there in advance of 4 o'clock, if possible. The
9  place was jammed. There were over -- you know,
10  we wanted to make sure we got a seat at the
11  table, so to speak, if nothing else.
12      And so we were there for some period,
13  not long, but some period of time I think before
14  the proceeding came to order.
15      Q.  Did you have any substantive
16  discussions before the hearing came to order
17  about any changes in the transaction?
18      A.  We had a discussion with Mr. Miller
19  where Mr. Miller said the transaction has
20  changed. The 70, 69 billion is now 4 -- I'm not
21  sure if he used these terms, these exact
22  numbers, but 47.4 versus 45.9, the same kinds of
23  figures that were subsequently described by Ms.
24  Fife to the Court.
25      Q.  So you're not sure what numbers Mr.

Page 74

J. KOBAK

1  Miller gave you, but he told you -- he gave you
2  numbers roughly similar to the ones Ms. Fife
3  gave to the Court?
4      A.   I don't know if he used exactly the
5  same numbers.  He might have said 47, he might
6  have said 47 to 48, but he certainly had a
7  number in that range, and that it was -- there
8  had been changes to what had been -- to the
9  original Asset Purchase Agreement.
10      Q.   And who was it in the meeting in which
11  Mr. Miller said these things?
12      A.   Who?
13      Q.   Who was this -- who was gathered
14  around Mr. Miller when he explained to --
15      A.   Well, there were dozens of people
16  gathered around, but the people he was
17  addressing, I believe, as best I recall, were
18  me -- were Mr. Giddens -- actually, Mr.
19  Harbeck -- I should put them in order of who he
20  was actually talking to -- Harbeck, Giddens, me,
21  Caputo.  I don't know if Mr. Kiplok was there at
22  that time.  So that would have been the group
23  from our side.  I don't remember if anybody else
24  from Weil or elsewhere was with Mr. Miller.  And

Page 75

J. KOBAK

1  it was a very brief conversation, you know, I
2  think a few minutes, actually, before the Court
3  proceeding was called to order.
4      Q.   And this was a meeting separate from
5  the discussion that took place in the recess
6  shortly after the hearing began?  You're talking
7  about a meeting that took place before the
8  hearing even came to order?
9      A.   I believe that's correct.
10      Q.   Do you recall that there was a recess
11  shortly after the sale hearing began?
12      A.   I recall one or maybe even two
13  recesses.  I don't recall the exact timing of
14  them.
15      Q.   Well, when you reference the off -- an
16  off-the-record presentation in paragraph 7 of
17  your affidavit, what are you referring to there?
18      A.   Okay.  Well, I think we had this
19  discussion with Mr. Miller.  At some point I
20  think there was an off-the-record presentation
21  to the assembled masses by Ms. Fife, I believe,
22  also explaining some of the changes in the deal,
23  and then I think we went back on the record and
24  some of that was -- maybe it all was described

Page 76

J. KOBAK

1  to the Court.
2      Q.   Do you remember what Ms. Fife said in
3  the off-the-record presentation during the
4  recess?
5      A.   No.
6      Q.   Were you in attendance during that?
7      A.   Yes.
8      Q.   You don't recall anything she said?
9      A.   No, I have a hard time separating what
10  she said then from what she said later on the
11  record in Court.
12      Q.   Did anyone for the trustee take any
13  notes during the off-the-record recess?
14      A.   Not that I'm aware.
15      Q.   Have you, in preparing for this
16  deposition, did you consult with anyone at the
17  trustee about what they may remember about what
18  Ms. Fife said during that recess?
19      A.   I didn't personally consult with them,
20  no.
21      Q.   I just want the record to be clear.
22  It was -- your testimony is that the trustee and
23  his advisors do not have a recollection of what
24  Ms. Fife said during that recess?

Page 77

J. KOBAK

1      A.   I don't have a recollection.  I don't
2  know if anyone else has a recollection.
3      Q.   I would just like to ask that, since
4  it is part of your affidavit, I think well
5  within the scope of the 30(b)(6), that you make
6  an inquiry as to whether anyone for the trustee
7  or at Hughes Hubbard has a recollection of what
8  Ms. Fife said during that recess.
9          MR. MAGUIRE:  We can leave a space in
10  the transcript and we can take that under
11  advisement.
12          MR. HUME:  Thank you.
13  INFORMATION TO BE PROVIDED: _____
14
15  _____
16
17      Q.   Going back maybe to the meeting you
18  recall with Mr. Miller where he explained that
19  the numbers had changed, I think you said he
20  explained generally that, instead of the 70 and
21  the 69, it was something on the order of the 47
22  to 48 and 45, roughly, is that accurate?
23      A.   Yeah, pretty close to the -- I mean,
24  I'll put it this way:  When -- we weren't really
25  surprised with the numbers that Ms. Fife used

Page 78

```
1              J. KOBAK
2   when she reported to the Court 47.4 versus 45.5.
3   So that was very consistent with whatever Mr.
4   Miller told us.
5      Q.   Okay. And did he explain to you, did
6   Mr. Miller explain to you in the meeting you
7   referenced where he gave you those numbers, why
8   the transaction had changed?
9      A.   No, I don't think specifically. I
10  think he mentioned all the activity at Lehman so
11  that it might be that assets that might have
12  been available and liabilities that might have
13  been associated with them would be smaller in
14  magnitude because of activity that had taken
15  place.
16         It might also have had to do with
17  market conditions generally, valuation. I know
18  that Ms. Fife I think attributed it to decline
19  in securities prices during the ensuing days.
20  I'm not sure that's how Mr. Miller described it,
21  and I think we thought it might be more a
22  diminution in Lehman's remaining assets that
23  were available because there had been activity,
24  people had been trying to get property out of
25  Lehman during that week.
```

Page 79

```
1              J. KOBAK
2      Q.   So part of your understanding was
3   there may have been counterparties who were
4   seizing collateral, for example?
5      A.   Customers getting things out, people
6   closing transactions, perhaps seizing
7   collateral. It could be any number of things.
8      Q.   Just changes to what's available on
9   the balance sheet?
10     A.   I think that, you know -- and again, I
11  don't think Mr. Miller said anything very
12  specific along those lines.
13     Q.   Did you understand, meaning did the
14  trustee or his advisors understand, as of the
15  time that he arrived at the sale hearing on
16  September 19 that Barclays had replaced the
17  Federal Reserve's lending position under its
18  repo to the tune of approximately $45 billion?
19     A.   I think we knew that there was a repo
20  that the Fed was very anxious to get out of,
21  that Barclays may have substituted for that. I
22  don't think we knew or were told the amount of
23  that repo. I don't think we were told
24  definitely what was involved. Really a lot of
25  the basis for our knowledge was the fact that
```

Page 80

```
1              J. KOBAK
2   I've described these discussions about when we
3   should go to court to do the filing, and part of
4   the concern was the Fed's concern that they
5   didn't want the filing to occur too early, and I
6   think we subsequently learned or learned while
7   we were at the courthouse that they wanted to be
8   sure that their transaction had been unwound, so
9   to speak, before the SIPA proceeding commenced.
10  But I don't think beyond that we had any
11  detailed knowledge of what the arrangements
12  were.
13     Q.   Did you learn during the hearing, the
14  September 19 sale hearing, that the -- what the
15  amount of the repo loan was that Barclays had
16  made?
17     A.   I don't recall. I don't recall
18  learning that during the course of the hearing.
19     Q.   Well, let me reference you on page --
20  on Exhibit 442 to page 63 of the sale hearing,
21  and I can refer you -- if you get to page 63,
22  let me know when you're there.
23     A.   I'm here. I'm here.
24     Q.   If you go down to line 16, Mr. Miller
25  says, "Barclays, your Honor, has extended the
```

Page 81

```
1              J. KOBAK
2   sale to enable this extraordinary transaction
3   and hopefully to be consummated. Yesterday, as
4   your Honor has heard, Barclays basically stepped
5   into the shoes of the Federal Reserve in
6   connection with the Primary Dealer Credit
7   Facility as to the $45.5 billion Lehman borrowed
8   last Monday and received the collateral that
9   Lehman had posted in connection therewith."
10         Does that refresh your recollection
11  that during the sale hearing Mr. Miller
12  explained that the repo loan that Barclays had
13  made was approximately $45 billion?
14     A.   It doesn't refresh my recollection
15  specifically, but --
16     Q.   Is it --
17     A.   -- obviously it's what he said.
18     Q.   So did the trustee simply not
19  understand the amount of the repo at the time of
20  the sale hearing?
21     A.   I don't -- I just really don't recall
22  this. I'm not disputing that it was said. I'm
23  not disputing that we would have understood this
24  at the time. I just -- I guess I'm testifying
25  personally now -- just don't recall it having
```

Page 82

J. KOBAK

1   been said at this occasion.
2
3       Q.   Well, did the trustee understand
4   before the closing that the repo loan -- that
5   Barclays had advanced $45 billion of cash?
6       A.   Well, we understood what Mr. Miller
7   was saying.
8       Q.   Okay.  And you understood that there's
9   a haircut in a repo?
10      A.   Yes.
11      Q.   So you understood that the collateral
12  received by Barclays was supposed to be worth
13  more than $45 billion?
14      A.   In all likelihood, it would be worth
15  or at least be valued, potentially valued, at
16  something higher than the face amount of the
17  loan.
18      Q.   And you knew that as part of the final
19  purchase agreement Barclays was to receive all
20  of that collateral in the purchase?
21          MR. CARDEN:  Objection to form.
22      A.   I think that was -- was agreed to,
23  yes, eventually.
24      Q.   When you say "eventually," was it your
25  understanding it was agreed to as of the time

Page 83

J. KOBAK

1
2   the sale hearing on September 19?
3       A.   Well, I thought --
4          MR. CARDEN:  Same objection.
5       A.   I might have my timing out of
6   sequence, but I thought that it was -- it
7   subsequently became the case that Barclays
8   basically kept the collateral that it had, was
9   my understanding, rather than transfer it and
10  have it transferred back and so forth, and that
11  was said to be the $47.4 of assets that were
12  described to the Court.
13      Q.   So was it --
14      A.   Or a part of the 47.4.
15      Q.   That's exactly what I wanted to get
16  to, which was what was the trustee's
17  understanding of what assets comprised the $47.4
18  billion number?
19      A.   I don't think we had a specific
20  understanding as to the exact composition of
21  what the assets were in total.  There was a
22  representation to the Court, and no one
23  disputed, that they were worth $47.4 billion,
24  and there was a corresponding representation
25  that there were liabilities of 45.5 billion.  I

Page 84

J. KOBAK

1
2   don't dispute that that's similar to the figures
3   that were described for the repo.
4          There was also a representation to the
5   Court that the broker would have at least $20
6   billion of assets left behind, and so those were
7   the numbers and it was really the 47.4 that were
8   described as the value of the transaction and
9   the fact that there was a close correspondence
10  between the value of the assets and the value of
11  liabilities and that there were substantial
12  assets being left behind in the brokerage firm.
13  Those were the things that were material to us.
14      Q.   Did the trustee understand that there
15  was also an amendment to the APA relating to the
16  residential mortgage securities as of September
17  19?
18      A.   I believe so, yes.
19      Q.   And did the trustee understand that
20  that amendment transferred 100 percent rather
21  than just 50 percent of the residential mortgage
22  securities to Barclays?
23      A.   Yes, I believe so.
24      Q.   And did the trustee understand that
25  the additional 50 percent that Barclays was

Page 85

J. KOBAK

1
2   going to receive plus the 250 million cash
3   consideration that Barclays was going to pay
4   were going to be used to satisfy settlement
5   obligations at the DTC?
6       A.   They were going to be, as I understood
7   it, available for the DTC -- to the DTC for that
8   purpose.  I understood that DTC -- well, I may
9   be jumping ahead, but I understood that DTC was
10  expressing substantial misgivings about going
11  ahead with processing any transactions unless it
12  was fully satisfied that it had no potential
13  liability.
14          It was looking for anything it could
15  get in that regard, and although this is some
16  things it was looking for, I don't think it was
17  by any means all that it demanded.
18      Q.   Did the trustee understand as of the
19  time the sale was approved that Barclays was
20  still going to retain for its own account 50
21  percent of the residential mortgage securities?
22      A.   I think there was an understanding
23  that, if I recall it, DTC got them, if they
24  turned out not to be necessary, some of the 50
25  percent -- whatever part of the 50 percent was

Page 86

J. KOBAK

1  not necessary, would actually be returned to
2  LBI. That was my understanding.
3     Q.   Of the additional 50 percent that was
4  being given to Barclays?
5     A.   Yes.
6     Q.   But the original 50 percent in the APA
7  would still remain with Barclays, correct?
8     A.   Yeah, I don't think that was changed.
9     Q.   Now, the 47.4 billion that Ms. Fife
10  referenced, maybe you can look with me at page
11  47 where she references it, and you said she
12  says basically the same that Mr. Miller told
13  you, correct, page 47 at the top?
14        MR. DAKIS: Objection to form.
15     Q.   You see at the top where she says
16  "originally"?
17     A.   Yes. No. No. I'm just --
18     Q.   And she references approximately 70
19  billion?
20     A.   Yes.
21     Q.   That's a reference to the long
22  positions in the APA, correct?
23     A.   Yes, that's what we understood.
24     Q.   And in your brief, in your Rule 60

Page 87

J. KOBAK

1  brief, which we can show you, you state that
2  your understanding of the deal was that Barclays
3  would obtain the real estate, the business as
4  defined in the APA, and $47.4 billion of other
5  assets; is that correct?
6        MR. MAGUIRE:  Why don't you show the
7  witness the document.
8        MR. HUME: I'm happy to show him the
9  brief.
10        (Exhibit 443, The Trustee's Motion for
11  Relief Pursuant to the Sale Orders or,
12  Alternatively, For Certain Limited Relief
13  Under Rule 60(b), marked for identification,
14  as of this date.)
15     Q.   Do you have -- does the witness have
16  Exhibit 443?
17     A.   I do.
18     Q.   Okay.  If you turn to paragraph 3 and
19  4, they both say the same thing, I believe.
20  Paragraph 3 of the trustee's Rule 60 motion, are
21  you at paragraph 3?
22     A.   Yes, I am.
23     Q.   It says in the second sentence, "As
24  presented to and approved by the Court, the

Page 88

J. KOBAK

1  revised deal called for Barclays to acquire the
2  business, as defined in the APA, certain real
3  estate properties and $47.4 billion of
4  additional assets in exchange for a payment of
5  $250 million plus the appraised value of the
6  real estate and Barclays' assumption of $45.5
7  billion in liabilities and certain cure costs
8  and employee-related obligations." Do you see
9  that sentence?
10     A.   Yes, I do.
11     Q.   So my question is what assets are
12  included in the business that are not included
13  in the $47.4 billion number according to the
14  trustee's understanding of the deal?
15     A.   I'd have to look at the definition of
16  the business.
17     Q.   Okay.  The APA that I gave you earlier
18  with the handwritten edits is the same as the
19  final APA, just the hand draft writing is typed
20  up, so you can look back at that.
21        "Business" is defined without a
22  paragraph break, so it's difficult to find. On
23  page 2 toward the top of the APA, right after
24  the definition of "breakup fee," you'll see the

Page 89

J. KOBAK

1  definition of "business." See that?
2     A.   Right.
3     Q.   And I'll just read it into the record:
4  "The APA defines 'business' as: 'The U.S. and
5  Canadian investment banking and capital markets
6  businesses of seller, including the fixed income
7  and equities cash trading, brokerage, dealing,
8  trading and advisory businesses, investment
9  banking operations and LBI's business as a
10  future's commission merchant.'"
11        That is the business -- it was the
12  trustee's understanding that that was the
13  business that Barclays was acquiring?
14     A.   Under the APA, that's correct.
15     Q.   Okay.  And so my question for you is
16  from your brief in paragraph 3, and you say the
17  same thing in paragraph 4, seems to be saying
18  that there are -- the $47.4 billion does not
19  include the real estate.  Let's get that clear
20  first.  Would you agree with that?
21     A.   Yes.
22     Q.   So there are some assets in this
23  transaction that are not included in the $47.4
24  billion, correct?  The trustee understood that?

Page 90

J. KOBAK

1
2    A.    Well, yeah, whatever assets might be
3    in the business --
4    Q.    So whatever assets --
5    A.    -- as defined.
6    Q.    Whatever assets might be in the
7    business would be included in the deal and not
8    included in the 47.4 billion?
9          MR. CARDEN: Objection to form.
10   A.    That's what we say. That's what Mr.
11   Maguire says on page 3 here.
12   Q.    Okay. So the three real estate
13   buildings are not included in the 47.4, correct?
14   A.    That's correct.
15   Q.    What other assets are not included?
16   Just any assets in the business?
17   A.    That's what it says here.
18   Q.    Okay. Can you give me any other
19   specific examples of assets that would not be
20   included in the 47.4?
21   A.    Well, I know, I mean, I know there are
22   books and records and things like that. There
23   are things that are important but don't have
24   substantial monetary value. That was certainly
25   would be included.

Page 91

J. KOBAK

1
2    Q.    For example, customer lists, what --
3    and intangible property like customer lists,
4    would that have been included in the 47.4?
5    A.    I think so. I don't know if there
6    were actual customer lists or just accounts that
7    went over.
8    Q.    Is it your understanding --
9    A.    And Barclays was acquiring and paying
10   for a lot of the employees, so most of the
11   brokers would go over with their customers. I
12   don't know that any particular value was
13   ascribed to that.
14   Q.    Well, whatever value might be ascribed
15   to it, was it your understanding that customer
16   lists were or were not included in the $47.4
17   billion?
18   A.    I don't think I had any understanding
19   either way.
20   Q.    Well, you're telling us today, the
21   trustee is telling us today that this
22   transaction had a limit, a valuation cap, is
23   that accurate?
24   A.    There was a value ascribed to the
25   things that Lori Fife was talking about that was

Page 92

J. KOBAK

1
2    very clearly stated as $47.4 billion as against
3    liabilities of 45.9 billion.
4    Q.    But did anyone ever tell you what
5    assets she was talking about or understood she
6    was talking about when she talked about the
7    47.4?
8    A.    She says we're only selling assets
9    that have a value of $47.4 billion.
10   Q.    Right, and she's comparing that to the
11   70 billion, which is in subsection D, the 70
12   billion. So is it -- was it your understanding,
13   the trustee's understanding, that the assets
14   that replaced the long positions from the
15   original deal had a value now of 47.4 billion?
16   A.    Yeah. Basically, I think that was our
17   understanding and of the many types of
18   securities that, as I recall, were described as
19   part of the 70 billion would now be worth 47.4
20   billion.
21   Q.    Right. So what had been the long
22   positions of approximately 70 was now a
23   collection of assets worth approximately 47.4,
24   is that your understanding?
25   A.    A value of 47.4, not approximate

Page 93

J. KOBAK

1
2    anymore.
3    Q.    Not approximate anymore. So you
4    understood that the deal no longer involved an
5    approximate number, it was an absolute number?
6    A.    I don't think it was an absolute. I
7    don't think anyone would have been surprised if
8    things were a few million under or over, but I
9    don't think -- I thought this was supposed to be
10   a good estimate, was presented to the Court and
11   to the creditors and to the regulators as a good
12   estimate by knowledgeable people after a lot of
13   due diligence had been done over the days
14   between the 17th and the 19th.
15         So we thought it was a quite reliable
16   figure. Maybe not down to the penny, but a
17   quite reliable figure. We certainly didn't
18   think there would be a material valuation --
19   variation from that range of figure.
20   Q.    Now, let me move you two pages later.
21   Ms. Fife reports to the Court on the change with
22   respect to the residential real estate mortgages
23   on page 49?
24   A.    Yes.
25   Q.    Second paragraph, she says, there was

Page 94

J. KOBAK

1  a change -- there was a provision in the old
2  agreement pursuant to which the parties were
3  sharing in the residential real estate
4  mortgages, and then she says Barclays is now
5  taking all of those. She says at the end -- she
6  talks about the DTC issue and says, "The
7  collateral will remain with Barclays."
8        This is the first amendment we talked
9  about a few minutes ago, you recall that?
10    A.   Uh-huh. Yes.
11    Q.   Do you know one way or the other
12  whether the estimated value for the 50 percent
13  of residential real estate mortgage value
14  was included or not included in the 47.4 number
15  Ms. Fife gave the Court?
16    A.   No, I don't know, and as I've
17  testified, I don't think that we took -- anyone
18  really took the $3 billion estimate at face
19  value.
20    Q.   Did you ever -- do you know if the
21  trustee ever discussed with anyone what the
22  components of the $47.4 billion number were,
23  what assets comprise that number?
24    A.   At that time, I don't believe so.

Page 95

J. KOBAK

1  (header)
2    Q.   So let me make sure the record is
3  clear on this. Before the closing of this
4  transaction on September 22, did the trustee
5  ever discuss with anyone what assets were
6  included in the $47.4 billion number?
7    A.   Other than the kind of general
8  descriptions that we've been talking about, no.
9    Q.   So, in other words, there was never a
10  discussion of whether that number included both
11  the repo collateral and the clearance box
12  assets?
13    A.   I don't believe so.
14    Q.   Was there --
15    A.   There were separate discussions, as
16  you know, of the clearance box assets.
17    Q.   Was it -- I mean, was the trustee ever
18  given any components of the 47.4?
19    A.   I don't believe so.
20    Q.   Did the trustee understand the 47.4 to
21  be the repo collateral?
22    A.   Not specifically. It was obviously
23  consistent with the numbers that were given for
24  the repo collateral, so I think we assumed that
25  a large part of it at least, a very large part

Page 96

J. KOBAK

1  of it would be the repo collateral, but I don't
2  believe that we necessarily assumed that that
3  was necessarily all of it.
4    Q.   Did the trustee believe that the 15c3
5  asset, which we'll talk more about later, the
6  $769 million in the 15c3 type asset, the trustee
7  believed that that asset was included in the
8  $47.4 billion number?
9    A.   I don't know and I don't know how
10  Barclays -- in our view, that was all was
11  contingent at best as far as -- because the
12  requirements of the Rule 15c3 had to be
13  satisfied, the S.E.C. had to approve it and so
14  forth, so I don't know how Barclays might have
15  considered or not considered that.
16    Q.   That brings me to another question I
17  wanted to ask. The trustee believes that the
18  deal that was approved had a valuation cap for
19  any assets that were not real estate assets and
20  not the business, and that cap was 47.4 billion,
21  correct?
22    A.   Yes.
23    Q.   And was that $47.4 billion cap to be
24  determined according to what the value of the

Page 97

J. KOBAK

1  (header)
2  assets were on the Lehman balance sheet or how
3  they were valued by Barclays or what their fair
4  market value was determined in some other way?
5    A.   I don't think we knew the specific
6  basis for it. I think we thought there was an
7  agreed value of 47.4 billion.
8    Q.   What was the basis for believing it
9  was an agreed value?
10    A.   Ms. Fife said that there was a value
11  of 47.4. That's certainly what LBI must have
12  believed and what must have been described to
13  LB -- to LBHI, I'm sorry, what must have been
14  described to LBHI.
15    Q.   Did anyone at Barclays ever tell the
16  trustee that Barclays agreed that that was the
17  cap on the assets or any subset of the assets in
18  the deal?
19    A.   I don't believe so. They clearly
20  subsequently had taken the position -- is
21  taking -- are taking the position that that's
22  not the cap. On the other hand, these figures
23  were used at the hearing and nobody stood up on
24  Barclays' behalf and said there was some
25  approximate approximation involved, that they

Page 98

J. KOBAK

1
2  valued the figures differently, that this wasn't
3  the extent of what was being acquired or
4  anything to that effect. And this was to a room
5  full of hundreds and hundreds of creditors as
6  well as the Bankruptcy Court and the regulators.
7      Q.   Did the trustee take notes during the
8  hearing in which the $47.4 billion number was
9  written down?
10     A.   Not that I am aware of, I don't
11 believe so.
12     Q.   You understand when I say the trustee,
13 I mean the trustee or his advisors?
14     A.   Those of us who were there is how I'm
15 interpreting the question.
16     Q.   And the answer is the same?
17     A.   I don't believe so.
18     Q.   Do you know when the trustee or his
19 advisors first obtained a transcript from the
20 hearing from the September 19 sale approval
21 hearing?
22     A.   No, I don't specifically recall that.
23     Q.   I assume you did not get one before
24 Monday morning at closing?
25     A.   I doubt it.

Page 99

J. KOBAK

1
2      Q.   What did the trustee do, if anything,
3  to determine how the $47.4 billion number had
4  been formulated after the sale hearing?
5          That was not a well asked question, so
6  let me try again.
7      A.   That's one thing we can agree on.
8      Q.   After the sale hearing, did the
9  trustee do anything to determine how the $47.4
10 billion number was formulated?
11     A.   I don't believe so.
12     Q.   At the time of the closing -- maybe
13 it's better if I ask you these questions with
14 the clarification letter, the final version.
15         This one you don't need to mark. This
16 is Exhibit 25. You'll recognize Exhibit 25, Mr.
17 Kobak, as the final executed version of the
18 clarification letter. Do you recognize it?
19     A.   Yes. Yes, I do.
20     Q.   It lists at the beginning on the first
21 page in Section 1 of the clarification letter,
22 it replaces certain assets that were in the APA
23 with certain other assets. Are you familiar
24 with that?
25     A.   Yes.

Page 100

J. KOBAK

1
2      Q.   And in subparagraph A, Romanette ii,
3  it lists out three categories of assets that
4  were defined as purchased assets to be received
5  by Barclays, correct?
6      A.   That's correct.
7      Q.   The first are securities transferred
8  in the repo under Subsection A. Are you
9  familiar with that?
10     A.   Yes.
11     Q.   Was it your understanding that those
12 assets were to be included -- were included in
13 the $47.4 billion valuation cap?
14     A.   Yes.
15     Q.   Did the trustee make any investigation
16 during the weekend before the closing to
17 determine what the portion of the 47.4 was
18 attributable to those repo securities?
19     A.   No.
20     Q.   Subsection B refers to such securities
21 and other assets held in LBI's clearance boxes.
22 You're familiar with that provision?
23     A.   Yes, I am.
24     Q.   Does the trustee believe that that
25 provision was nullified by the DTC letter

Page 101

J. KOBAK

1
2  under --
3      A.   I'm sorry, I cut off your question.
4      Q.   That's okay. Let me just ask it
5  again. Am I correct that the trustee's position
6  is that there were no securities in LBI's
7  clearance boxes that were to be transferred to
8  Barclays?
9      A.   LBI's clearance boxes at DTC, that's
10 correct, because we had a separate tripartite
11 agreement with Barclays, DTC and the trustee
12 which specifically dealt with those assets.
13     Q.   Does the trustee -- did the trustee
14 make any inquiry in terms of what the value was
15 of any clearance box securities that it believes
16 were to be transferred?
17         MR. MAGUIRE:  Objection to form.
18     A.   At that time, no. At that time, I
19 don't believe so.
20     Q.   Does the trustee believe that the
21 clearance box securities were also supposed to
22 fit within the $47.4 billion valuation cap?
23     A.   I think it's quite possible that they
24 might have. In some ways, since this all came
25 up over the weekend and, in our view, was dealt

Page 102

J. KOBAK

1
2  with differently, it's, you know, perhaps wasn't
3  really relevant or determinative.
4      Q.   Was the trustee ever informed that the
5  estimated value of the clearance box securities
6  was approximately $1.9 billion?
7          Let me make the question more precise,
8  so I withdraw that.
9          Prior to the closing of the sale on
10 Monday, the 22nd, was the trustee ever informed
11 that the estimated value of the LBI clearance
12 box securities referenced in Section 1(A)(ii)(b)
13 was approximately $1.9 billion?
14     A.   I don't know.  I don't recall that
15 specific number.  I can't really recall if we
16 were given any specific number at that time as
17 to what the contents of those boxes -- what the
18 value might be or might be deemed to be.
19     Q.   Subsection C of this provision refers
20 to exchange-traded derivatives.  You're familiar
21 with that provision?
22     A.   Yes, I am.
23     Q.   And is it the trustee's position that
24 all of the exchange-traded derivatives are
25 supposed to fit within the $47.4 billion

Page 103

J. KOBAK

1
2  valuation cap?
3      A.   Again, I'm not sure.  Again, we have a
4  difference of opinion, I guess, as to what the
5  effect of this provision is, which I presume
6  you'll get to later, particularly the
7  parenthetical.
8      Q.   We're going to get to that, but my
9  question is, this -- given what the agreement
10 says, the trustee understood this agreement was
11 subject to a $47.4 billion valuation cap for all
12 assets other than the real estate and the
13 business, correct?
14     A.   Right.
15     Q.   And all I'm trying to understand is
16 what precisely was supposed to fit within the
17 $47.4 billion valuation cap?
18     A.   I wouldn't have expected either B or C
19 to be considered assets ancillary to the
20 businesses.  Therefore, I think we would have
21 assumed that in one way or another those must
22 have been accounted for in the 47.4 billion.
23     Q.   And also in the 45.5 billion on the
24 liability side, to the extent they carried
25 liabilities, correct?

Page 104

J. KOBAK

1
2      MR. MAGUIRE:  I'm sorry, can you
3  repeat that question?
4      Q.   Well, do you understand -- let me make
5  sure the foundation is clear.  Do you understand
6  that when Barclays took over -- forget about the
7  margin issue, okay?  We'll talk about margin
8  later and collateral for exchange-traded
9  derivatives.  You understand that Barclays took
10 over the LBI exchange-traded derivatives
11 accounts in this transaction?
12     MR. MAGUIRE:  Objection to form.
13     A.   Took over, I believe they assumed to
14 some extent LBI's former position at OCC and
15 assumed the liabilities.
16     Q.   All right.
17     A.   That was the purpose of the transfer
18 agreement.
19     Q.   You understand that, in addition, that
20 the -- withdrawn.  Do you understand that LBI's
21 exchange-traded derivatives included positions
22 that would have been both assets on day one and
23 positions that would have been liabilities on
24 day one?
25     A.   Yes, I did.

Page 105

J. KOBAK

1
2      Q.   And your understanding is Barclays
3  took both the assets and the liabilities
4  associated with those positions, I'm not talking
5  about the margin here, but with those
6  exchange-traded derivative positions?
7      A.   As a result of the transfer and
8  assumption agreement, yes.
9      Q.   And as a result of this position,
10 correct?
11     MR. MAGUIRE:  Here you're talking
12 about positions now, or are you talking
13 about --
14     MR. HUME:  Only positions.
15     Q.   I'm only talking about positions.  The
16 actual options and futures, longs and shorts
17 that are exchange-traded derivatives, that's all
18 I'm asking you now.  We're going to talk about
19 margin later.  I just want to understand, I want
20 to make sure we understand each other that
21 exchange-traded derivatives may include options
22 that on a particular day have value?
23     A.   Or --
24     Q.   And they may have options that are
25 short and are negative value, which are a

Page 106

J. KOBAK

1
2  liability on your balance sheet as opposed to an
3  asset. Do you understand that?
4      A.   I do understand that.
5      Q.   And you understand Barclays took both
6  those liability positions that were derivatives
7  and the asset positions that were derivatives?
8      A.   That would be my understanding.
9  Whether it would be Barclays' interpretation if
10  that were all that the agreement said, I'm not
11  so sure, but there certainly was another
12  agreement by which Barclays clearly assumed
13  liabilities associated with positions.
14      Q.   Now, the liability exchange-traded
15  derivative positions, were they supposed to fit
16  within the $45.5 billion cap that Lori Fife gave
17  the Court?
18      A.   I don't know for sure where the 45.5
19  came from. As I've said, I think what was
20  important to us was the rough matching of the
21  assets and the liabilities, which really wasn't
22  so different from the 70 versus the 69 when
23  you're talking about long and short positions
24  and so forth.
25      Q.   I understand that what's important to

Page 107

J. KOBAK

1
2  you is the matching, but I want to understand
3  what you understood these numbers to mean. Lori
4  Fife told the judge 47 -- she gave the judge two
5  numbers: 47.4 and 45.5. I want to know whether
6  the trustee understood that the exchange-traded
7  derivative positions were included in those two
8  numbers?
9      A.   I don't know that we had a view one
10  way or the other. I think we would have assumed
11  that they were.
12      Q.   How could you know -- you knew there
13  was a repo loan, correct? Harvey Miller told
14  the Court the repo loan was --
15      A.   Yeah.
16      Q.   And he told the Court the repo loan
17  was 45.5 billion, correct?
18          MR. MAGUIRE:  Asked and answered.
19      A.   That's what the transcript shows.
20      Q.   So the repo loan is the same number
21  that Lori Fife gave the Court as the liabilities
22  associated with assets?
23          MR. CARDEN:  Objection to form.
24      A.   45.5 is the same number.
25      Q.   So there's no room for any

Page 108

J. KOBAK

1
2  exchange-traded derivative liability
3  positions --
4      A.   I don't know how --
5      Q.   -- in the 45 --
6          Please let me finish the question.
7      A.   I'm sorry.
8      Q.   Based on the trustee's understanding
9  of the numbers given to the Court, there would
10  be no room within the liability number given the
11  Court for any exchange-traded derivative
12  liability positions, correct?
13          MR. MAGUIRE:  Objection to form.
14      Misstates prior testimony where the witness
15      specifically said he assumed a large part of
16      it would be the repo, but not necessarily
17      all.
18      Q.   Harvey Miller -- do you want to go
19  back to the transcript page 63?
20      A.   I answered these questions before.
21      Q.   I don't know --
22      A.   Harvey Miller said there was a repo
23  with the same numbers. Lori Fife used these
24  numbers. Lori Fife did not say how the numbers
25  were derived, and no one from Barclays or anyone

Page 109

J. KOBAK

1
2  else got up and said how they were derived.
3          The Court and the creditors were told
4  this transaction had a value of 47.4 versus 45.5
5  liabilities. Clearly the repo part would be a
6  substantial portion of that. How these
7  valuations were reached was not explained. I
8  think over the weekend changes were made to the
9  deal which we understood were meant to leave
10  people in essentially the same place, and no one
11  got up in court and said the 47.4 versus the
12  45.5 is not in fact the figures, as I would
13  think it would behoove someone to have done.
14          We did not have specific information
15  as to how these numbers were derived or exactly
16  what was included and what was not included in
17  them.
18      Q.   Nor could you at the time of the
19  closing give a coherent explanation of how these
20  assets in the clarification letter fit into
21  those numbers, could you?
22          MR. MAGUIRE:  Objection to form.
23      Q.   You didn't know, is that fair?
24      A.   I think I just answered that question.
25      Q.   Okay. Let me just make sure I

Page 110

J. KOBAK

1  understand the position of the trustee.
2
3        If the exchange-traded derivative
4  liability positions -- is that phrase a clear
5  phrase based on what we talked about earlier?
6  The positions that are liabilities that are
7  derivatives, there would be a liability on the
8  balance sheet net negative value on day one?
9     A.   Uh-huh.
10    Q.   I'm calling those exchange-traded
11 derivative liability positions?
12       MR. MAGUIRE:  I'm sorry, you're saying
13 a net liability?
14       MR. HUME:  They would be a negative.
15 The position itself would be a liability.
16       MR. MAGUIRE:  Are you saying that the
17 short positions exceeded the value of the
18 long positions?
19       MR. HUME:  No, not yet.  I'm not
20 saying that yet.  I'm just saying right
21 now -- I'm talking about the short
22 positions.
23       MR. MAGUIRE:  You're saying if the
24 short and long positions represented
25 separately --

Page 111

J. KOBAK

1
2        MR. HUME:  I'm not saying that.
3        MR. MAGUIRE:  You're talking about a
4  balance sheet.  That's what's confusing
5  everything.
6     Q.   I'm saying if the liability positions
7  from the exchange-traded derivatives plus the
8  repo loan exceeded 45.5.
9     A.   I don't know how the 45.5 or the 47.4
10 were arrived at.  I don't know if somebody
11 looked at this and said the net derivative
12 position is a wash, the net derivative position
13 is a liability, the net derivative position is a
14 plus or we're going to go position by position
15 and add up the assets against the liabilities.
16 I don't know how that was done for purposes of
17 the figures that were given to the Court.
18    Q.   Do you have any basis for believing
19 that it was done?  Do you have any -- let me
20 ask -- make it clear what I'm saying.
21       Do you have any basis for believing
22 that either side to this transaction knew what
23 the value was of the exchange-traded derivative
24 positions at the time this deal was approved or
25 at the time this deal closed?

Page 112

J. KOBAK

1
2     A.   I don't know.  I'm sure they made
3  estimates of that.  I don't know what they were,
4  how they went about it, and in any event, I do
5  not know to what extent -- how these were
6  treated for purposes of the figures that were
7  given to the Court.
8     Q.   If, if the exchange-traded derivative
9  positions cause the assets and the liabilities
10 in this deal to go above 45.5 on the liability
11 side and above 47.4 on the asset side, what's
12 the trustee's position?  Are the derivatives not
13 part of the deal?
14       MR. MAGUIRE:  Objection to form.  I
15 don't think it's -- the witness is not here
16 to give a hypothetical position.
17       MR. HUME:  I need to understand the
18 trustee's position on this, so we're going
19 to have to find a way to ask the question
20 that you will allow me to ask it.
21    Q.   The trustee's position is that there's
22 a valuation cap on all of the assets in the deal
23 that are not -- the business and the real
24 estate, and that cap is 47.4 billion, correct?
25    A.   That's correct.

Page 113

J. KOBAK

1
2     Q.   And the liabilities associated with
3  those assets were supposed to be 45.5 billion,
4  correct?
5     A.   That's correct.  That's what was
6  described to the Court.
7     Q.   And what I'm asking you is, I will
8  represent to you that if those are the caps, the
9  exchange-traded derivative positions on the
10 liability side would cause the liabilities to be
11 higher than 45.5.  Does that mean those
12 liabilities are out of the deal?
13       MR. CARDEN:  Objection to form.
14       MR. MAGUIRE:  Are you also
15 representing that the positive long
16 exchange-traded derivatives were -- had a
17 value that was less than the liabilities?
18       MR. HUME:  I'm not being deposed here.
19    Q.   Let me just take it one step at a
20 time.  I just want to know if the liabilities
21 exceed 45.5, does that allow the asset number to
22 go up?
23       MR. MAGUIRE:  I don't think you can
24 put a hypothetical -- actually, I don't
25 think you can put a hypothetical to the

Page 114

J. KOBAK

1
2  witness at all, but if you're going to put a
3  hypothetical, I think you need to put the
4  whole hypothetical to the witness. In any
5  event, I don't think a hypothetical is
6  appropriate.
7       Q.   In any event, the trustee did not know
8  the value one way or the other, it was not given
9  any information -- the trustee was not given any
10 information about the value of the
11 exchange-traded derivatives before the closing;
12 is that correct?
13      MR. DAKIS: Objection to form.
14      A.   I believe that's correct.
15      Q.   Did the trustee ever ask anyone why
16 there were no valuation estimates provided for
17 any of the assets listed in the clarification
18 letter?
19      Let me restate the question so it's
20 completely accurate. We just went through three
21 purchased assets, the repo collateral, the
22 clearance box assets, and the exchange-traded
23 derivatives, correct?
24      A.   That's correct.
25      Q.   And you would agree with me that there

Page 115

J. KOBAK

1
2  are no valuation estimates provided in the
3  clarification letter for any of those assets,
4  correct?
5       A.   That's correct.
6       Q.   Did the trustee ever ask anyone why
7  the clarification letter did not include
8  valuation estimates?
9       A.   At the time?
10      Q.   Before the closing.
11      A.   I don't believe so.
12      Q.   Did the trustee ever tell anyone that
13 it believed the contract should include $47.4
14 billion valuation cap?
15      A.   I don't think the trustee ever
16 expressed that because it had been expressed to
17 the Court. I think what we understood was
18 happening over the weekend that certain things
19 in the nature of what substitute assets were
20 being substituted for others so that the overall
21 deal would be in the same framework that I've
22 already described and that was described to the
23 Court, and I think our position is that if
24 someone was going to change the deal materially,
25 that should have been disclosed to the Court and

Page 116

J. KOBAK

1
2  the creditors as well as to the parties.
3       Q.   Did the trustee review the sale order
4  before it was issued?
5       A.   Yes.
6       Q.   Did the trustee recognize that the
7  sale order did not include a valuation number
8  for either the assets or liabilities in the
9  deal?
10      A.   There was no valuation number that I
11 recall in that order.
12      Q.   Did the trustee or his advisors ever
13 tell anyone before the sale order was issued
14 that the sale order ought to include the
15 valuation numbers that the trustee understood to
16 be part of the deal?
17      A.   I don't believe -- I don't recall any
18 such discussion.
19      Q.   Did the trustee tell anyone before the
20 closing that the trustee's understanding was
21 that there was a $47.4 billion valuation cap on
22 all non-real estate assets in the deal?
23      A.   I don't believe so.
24      Q.   And just so my question is precise,
25 did the trustee ever tell anyone that it

Page 117

J. KOBAK

1
2  believed there was a $47.4 billion valuation cap
3  on any assets in the deal?
4       MR. MAGUIRE: I'm sorry. Can you
5  repeat that question?
6       Q.   It's the same question. I just want
7  it to be precise. I'm not just -- it's still
8  unclear to me which assets the cap applied to.
9       So my question is, did the trustee
10 ever tell anyone before the closing that the
11 trustee understood there to be a $47.4 billion
12 valuation cap on any assets in the deal?
13      A.   I don't believe there was any such
14 discussion.
15      Q.   Now, you said a earlier you understood
16 that the valuations in the APA were estimates of
17 book value, correct?
18      MR. CARDEN: Objection to form.
19      A.   In the original APA they were said to
20 be approximately, approximately $70 billion at
21 book value, as I recall.
22      Q.   And then in the balance sheet that you
23 were sent on the evening of September 18, you
24 understood that those were estimated numbers,
25 correct?

Page 118

J. KOBAK

1
2    A.    Yes.
3    Q.    And you understood those were also
4    book value numbers?
5    A.    I didn't -- I'm not sure we understood
6    what the numbers were based on.
7    Q.    Okay.  So you had estimated numbers in
8    the APA and estimated numbers in the balance
9    sheet, and it's your testimony that you believed
10   the $47.4 billion number was not an estimate?
11       MR. MAGUIRE:  Asked and answered.
12   A.    I believe it was an estimate, but it
13   certainly was not said to be a kind of gross
14   approximation or anything like that.  It was
15   presented as a number, and again, I don't think
16   anyone would be surprised if it was off a little
17   bit, but I do not think we thought there would
18   be a material variation in that or a material
19   variation between the amount of liability
20   that -- the spread between liabilities and
21   assets, and I believe at one point in the
22   hearing the Court said that a difference of $500
23   million would clearly be material.  I think even
24   a lower standard would be material, but we
25   certainly didn't think there would be a

Page 119

J. KOBAK

1
2    difference of any considerable magnitude.
3        If there had been, then it would seem
4    to me that's something that should have clearly
5    been discussed with the parties and the
6    regulators and should clearly have been
7    disclosed to the Bankruptcy Court when it was
8    asked or so that the deal that the Bankruptcy
9    Court approved had some, you know, was the
10   actual deal that was being done.
11   Q.    If the liabilities had been higher
12   than 45.5, the financial trading liabilities,
13   the short positions in the derivatives had been
14   higher than 45.5 --
15   A.    Assuming those are valued on a
16   position-by-position basis --
17   Q.    Yes.
18   A.    -- and not on some kind of net basis.
19   Q.    Yeah.  Let's -- let me ask you --
20       MR. HUME:  I'm allowed to ask him a
21   hypothetical.
22       MR. MAGUIRE:  No, I don't believe -- I
23   can't imagine how you would be allowed to
24   ask him a hypothetical.
25       MR. HUME:  Are you instructing him not

Page 120

J. KOBAK

1
2    to answer?
3        MR. MAGUIRE:  This is a 30(b)(6)
4    witness, not an expert witness.
5        MR. HUME:  You can instruct him not to
6    answer, but let me ask the question.
7        MR. MAGUIRE:  No.  No.  No.  No.  The
8    witness is here to give the trustee's
9    knowledge, not to answer hypothetical
10   questions.  The witness has no basis to
11   answer hypothetical questions.
12       MR. HUME:  The witness is here as the
13   trustee's 30(b)(6) to tell us what your
14   position is.  I'm going to ask him a
15   question.  If you want to instruct him not
16   to answer, go ahead.
17   Q.    The question is this:  Is it the
18   trustee's position that if the net position on
19   the exchange-traded derivatives was a negative
20   $1.5 billion over and above the $45.5 billion
21   referenced to the Court, and all of the other
22   assets fit within the 47.4, would Barclays have
23   had the right to come back and get that $1.5
24   billion covered?
25       MR. MAGUIRE:  Objection to form.

Page 121

J. KOBAK

1
2    A.    I don't know the answer to that.  That
3    would be up to Barclays to -- to argue whatever
4    it wants to argue at the time.
5        MR. HUME:  Let's take a break.
6        THE VIDEOGRAPHER:  The time is 10:54.
7    We're going off the record.
8        (Recess.)
9        THE VIDEOGRAPHER:  The time is 11:05.
10   We are back on the record.
11   BY MR. HUME:
12   Q.    Mr. Kobak, let me refer you to
13   paragraph 8 of the clarification letter.  You're
14   familiar with the provision in paragraph 8,
15   Romanette ii, that refers to the fact that
16   Barclays shall receive $769 million of
17   securities held in the Rule 15c3 account or
18   securities of substantially the same nature and
19   value; are you familiar with that provision?
20   A.    I'm familiar that there was a
21   provision that said that to the extent permitted
22   by applicable law.
23   Q.    And was it your understanding that
24   that asset was supposed to fall within the $47.4
25   billion valuation cap?

Page 122

J. KOBAK

1
2       MR. CARDEN: Objection to form.
3       A.   I think, as I testified earlier, I'm
4  not sure how I thought Barclays would account
5  for that after the fact, I mean it being added
6  after the fact in relation to the 47.4 figure
7  that had been told to the Court.
8       In our view, this is a contingent
9  liability or a contingent asset, I guess, of
10 Barclays. It's in a part of the agreement that
11 deals with account transfers, which it seems to
12 me it was clearly related to, and we don't
13 believe that the circumstances under which
14 Barclays might be entitled to this $769 million
15 have ever arisen and, in all likelihood, may
16 never arise.
17      Q.   If Barclays had the same view as you
18 do about this provision, which they don't, but
19 if they did, and all the other assets that are
20 not real estate and not the business added up to
21 47.4 billion, would that be what you view to be
22 an acceptable and approved outcome?
23      MR. MAGUIRE: That's a hypothetical.
24      MR. CARDEN: Objection to form.
25      A.   I have no idea. I have no idea how

Page 123

J. KOBAK

1
2  Barclays might or might not have taken this into
3  account with respect to the figures that were
4  used. I understood that the point of the
5  exercise over the weekend was that the deal
6  changed in various ways, but in our
7  understanding, the basic parameters of the deal
8  that I have described never changed or, if they
9  had changed, that should have been disclosed to
10 everyone, including the Court.
11      So I have no idea how Barclays might
12 or might not have accounted for this, and again,
13 I don't think the circumstances under which this
14 amount will ever be received by Barclays have
15 arisen and they may never arise because we may
16 face a very substantial shortfall in being able
17 to pay customers in full.
18      Q.   When you say you don't know how
19 Barclays would account for it, I asked you
20 earlier how this $47.4 billion valuation cap was
21 supposed to be implemented. Does it depend on
22 Barclays accounting?
23      A.   No, no, I didn't -- I'm sorry, I
24 didn't -- I was using "accounting" in a
25 colloquial sense. I meant I don't know what

Page 124

J. KOBAK

1
2  value, if any, Barclays attributed to it for
3  purposes of trying to equate this with the 47.4
4  billion that was disclosed to the account.
5       It seems to me if it was accretive or
6  additive because Barclays was looking for
7  opportunities to get additional assets that
8  hadn't been disclosed, that's something that
9  should have been disclosed to people and it
10 should have been disclosed to the Court.
11      If it thought, on the other hand, that
12 the other things it was getting were worth
13 substantially less than 47.4, then maybe it
14 could have included this to get back to the
15 47.4, and I don't know how Barclays treated it,
16 but --
17      Q.   So the 15c3 assets might be included
18 in the 47.4 and might not, depending --
19      A.   I don't know. And in our view, it's
20 not something that Barclays is likely to obtain
21 anytime soon until there's compliance with Rule
22 15c3 and there's no shortfall in property due
23 customers, and those circumstances have not
24 arisen.
25      Q.   Knowing what the trustee and his

Page 125

J. KOBAK

1
2  advisors know now about the assets referenced in
3  the clarification letter, and in particular, in
4  Section 1(A), Romanette ii of the clarification
5  letter, the repo collateral --
6       A.   Uh-huh.
7       Q.   -- the clearance box assets and the
8  exchange-traded derivatives, knowing what the
9  trustee knows now about those assets, do you
10 think it was possible under the circumstances of
11 this transaction to determine that all of those
12 assets were worth approximately $47.4 billion as
13 of September 19?
14      MR. CARDEN: Objection to form.
15      MR. MAGUIRE: Objection to form. Can
16 you explain -- maybe rephrase that question?
17      Q.   Do you think it was possible to value
18 those assets under the circumstances of that
19 week with that level of precision?
20      MR. CARDEN: Objection to form.
21      MR. MAGUIRE: Same objection.
22      A.   If it wasn't possible to do it, a
23 representation shouldn't have been made in open
24 court as to what the value was, and if it was
25 made and Barclays thought it was too imprecise

Page 126

1           J. KOBAK
2  or did not accurately state the deal, it seems
3  to me it would have behooved Barclays to have
4  their lawyers, very well qualified lawyers, very
5  experienced lawyers, stand up and say so.
6        Q.   You recall -- you recited for me
7  earlier a conversation you had with Harvey
8  Miller before the hearing, and then obviously
9  we've talked about what was said in the hearing.
10           Other than those two things, did
11  anyone ever tell the trustee or his advisors
12  that the transaction was subject to a $47.4
13  billion valuation cap on all assets other than
14  the real estate and what you call the business?
15        A.   I don't believe there was any such
16  discussion. I believe that was our
17  understanding, but I don't believe there was any
18  further specific discussion beyond the
19  representations made in open court.
20        Q.   Can you look back -- do you have your
21  brief, the Rule 60 brief in front of you?
22        A.   Yes, I do.
23        Q.   Could you go to paragraph 1 of the
24  brief.
25        A.   Yes, I have it.

Page 127

1           J. KOBAK
2        Q.   It says in the sentence at the bottom
3  of the first page, "The deal that Barclays wants
4  was supposedly documented over the ensuing
5  weekend of September 20 and 21, 2008 and,
6  according to Barclays, gives it as much as $6.7
7  billion in additional assets from the LBI estate
8  over and above the $47.4 billion in assets that
9  were disclosed to the court." Do you see that?
10        A.   Yes, I do.
11        Q.   If you go over to paragraph 4, the
12  brief lays out what that 6.7 billion consists
13  of?
14        A.   Right.
15        Q.   Clearance box assets -- we'll come
16  back to that -- 15c3 assets, and the OCC margin.
17  See that?
18        A.   Yes.
19        Q.   And 1 billion in other. It leaves out
20  the repo collateral. Is it -- I'm just trying
21  to make sure I understand the trustee's
22  understanding of the numbers. Is it the
23  trustee's understanding that the repo collateral
24  was worth 47.4 billion?
25        MR. MAGUIRE: Objection to form.

Page 128

1           J. KOBAK
2        A.   I think if you look -- maybe I'm not
3  understanding your question, but I think if you
4  look at footnote 1 back on page 2, that also
5  says what we do not include in the $6.7 billion.
6        Q.   That's right.
7        A.   Which would be any additional discount
8  that Barclays obtained.
9        Q.   My question is, I understand --
10        A.   Among other things.
11        Q.   My question is you're saying the 6.7
12  billion is all, all of these things, the
13  clearance box assets, the 15c3 asset, the
14  derivatives margin all are in excess of 47.4?
15        A.   That's what the brief seems to say.
16        Q.   My question is much more simple. Is
17  it the trustee's position that the repo
18  collateral was worth at least $47.4 billion?
19        MR. CARDEN: What day?
20           Objection to form.
21        Q.   That's a good question. What date was
22  this valuation cap supposed to be? Was it
23  September 19 --
24        MR. MAGUIRE: The witness is not here
25  to make an assertion as to valuation, which

Page 129

1           J. KOBAK
2  is clearly not the subject of this
3  deposition. If you're asking him what his
4  understanding was at the time or any factual
5  information, that's entirely different.
6        MR. HUME: The 30(b)(6) is your
7  understanding at all times since September
8  15 regarding the value of all the assets in
9  the deal.
10        MR. MAGUIRE: Right. That's fine. So
11  you can ask him about his understanding.
12  You cannot ask him about a position which is
13  something far beyond his expertise to give.
14  BY MR. HUME:
15        Q.   My question is: Does the trustee
16  currently believe that the value of the repo
17  collateral that Barclays received was $47.4
18  billion or more?
19        MR. DAKIS: Objection to form.
20        A.   The trustee I believe currently
21  understands that the value was at least 47.4 and
22  might have been more than 47.4. There seems to
23  be substantial questions about that.
24        Q.   And what is the basis for that
25  understanding?

Page 130

1        J. KOBAK
2        A.    I mean, I think the basis is set forth
3    in our papers. I think some of the basis comes
4    from what I understand the depositions in the
5    2004 proceeding to have been.
6        Q.    Has the trustee performed a valuation
7    of the collateral that Barclays received in the
8    repo?
9        And let me be clear, when I talk about
10   the repo collateral, my question is meant to
11   include everything received in the JPMorgan
12   settlement in December. Is that consistent with
13   what you understood me to mean?
14       A.    I'm not sure because I thought you
15   were asking your question about an earlier time,
16   but I understand it now.
17       Q.    Well, if I include everything in the
18   JPMorgan settlement, both the cash and the
19   collateral, is it the trustee's position that
20   that settlement allowed Barclays to receive more
21   than $47.4 billion?
22       MR. CARDEN: Objection to form.
23       MR. MAGUIRE: Again, we need to be
24   clear what we're talking about, whether
25   you're asking -- if you're asking him what's

Page 131

1        J. KOBAK
2    in the papers that the trustee has filed
3    based on the 2004, that's one thing. If
4    you're asking him what the trustee's
5    understanding was at a particular time, then
6    you need to be specific about that.
7        Q.    Okay. Let's talk about the trustee's
8    understanding as of the time the trustee asked
9    the court to approve the JPMorgan settlement.
10       A.    The trustee, as I think was made
11   clear, tried to make clear when I was in court
12   that day and we tried to make clear in my
13   application, that we had questions about the
14   transaction, that we thought it was appropriate
15   to give Barclays -- to allow Barclays to get
16   property that had been effectively seized by
17   Chase, but that there were substantial questions
18   about the deal as a whole and the valuation of
19   the deal.
20       I know at that time we instructed
21   Deloitte to try to value the collateral, both
22   the original collateral, I believe, and the 5.2
23   or 5.3 billion that was at issue at the time of
24   the repo to try to get the best valuation they
25   could. I think they reported that that was very

Page 132

1        J. KOBAK
2    difficult to do. There were many illiquid
3    securities and so forth and they couldn't
4    necessarily get prices for things.
5        I believe we discussed that issue with
6    Barclays, with JPMorgan, with the Creditors
7    Committee, with LBHI, who were also
8    investigating the situation, and I don't think
9    we've ever -- I think there's substantial
10   question as to what the value of the collateral
11   in total might have been.
12       Q.    Okay. So let's go through this
13   somewhat methodically so I make sure I
14   understand, and maybe we start back with the
15   clarification letter, if you don't mind.
16       And let me just, before I do that, let
17   me just go back to the sale hearing and the
18   numbers given by Ms. Fife. Both Ms. Fife and
19   Mr. Miller gave the court a number 45.5 billion.
20   Ms. Fife said that was the liabilities
21   associated with the assets of 47.4, correct?
22       MR. MAGUIRE: The transcript reflects
23   what the transcript reflects. I don't think
24   it's appropriate to ask the witness to
25   confirm the accuracy of the transcript.

Page 133

1        J. KOBAK
2    That's an exhibit that's been marked.
3        A.    That's what I remember.
4        Q.    Okay. And then Mr. Miller -- we can
5    go through the transcript, I'm just trying to be
6    efficient, but Mr. Miller said that Barclays had
7    stepped into the shoes of the Fed for a loan of
8    45.5 billion. Do you recall that?
9        A.    Yes.
10       Q.    My first question is, was it the
11   trustee's understanding at that time that the
12   $45.5 billion liability number was a limit on
13   the liabilities Barclays would be assuming in
14   connection with the financial assets it was
15   acquiring?
16       MR. MAGUIRE: Objection to form.
17       A.    We -- I think we were looking at it
18   the other way around, not from Barclays'
19   position so much as from our position, and it
20   may be that it's because the holding company
21   were the ones who made this description, but I
22   think we were looking at it as here's an amount
23   of assets, there's an amount of liabilities
24   associated with that, they basically seem pretty
25   close.

## Page 134

J. KOBAK

1         J. KOBAK
2    In that respect, the deal, even though
3 it's different, isn't so different in kind of
4 overall impact as -- as the deal that had
5 originally been proposed with the 70 versus the
6 69 and so forth.
7    Q.   The trustee then receives the
8 clarification letter and its representative --
9 the trustee's representative signs the
10 clarification letter, correct?
11    A.   Yes, I believe it was early --
12    Q.   Monday morning?
13    A.   -- Monday morning, and there had been
14 a few other drafts at least over the Sunday
15 night and into the wee hours of Monday morning.
16    Q.   And I believe you state, or the brief
17 states that the trustee and his advisors did not
18 actively participate in the negotiation of the
19 drafting of the clarification letter, is that
20 correct?
21    A.   Yeah, that's correct.
22    Q.   And so you relied on Weil Gotshal to
23 represent Lehman in the negotiations of the
24 clarification letter, is that fair?
25    A.   That's correct. The regulators were

## Page 135

J. KOBAK

1         J. KOBAK
2 also there, I believe, so when there were
3 questions about the 15c3, I think they had some
4 role to play in that as well.
5    Q.   After receiving the final version of
6 the clarification letter, did the trustee
7 understand that all of the collateral in the
8 repo was to be a purchased asset acquired by
9 Barclays?
10    A.   Yes, we understood -- yes, that was
11 our understanding.
12    Q.   And was it your understanding that
13 that would include any excess collateral that
14 there might be?
15    A.   Yes.
16    Q.   And did the trustee have an
17 understanding at any point over the weekend
18 before the closing about the $7 billion cash
19 problem with JPMorgan?
20    A.   No, I think we knew that there --
21 because I think there had been some separate
22 negotiations going on between Chase and
23 Barclays, but I don't think we really understood
24 the full effect or implications of that until
25 later at the time or somewhat before the time we

## Page 136

J. KOBAK

1         J. KOBAK
2 asked the Court to approve that transaction in
3 December.
4    Q.   So the trustee's understanding of the
5 $7 billion problem arose after the closing?
6    A.   I believe so, yes.
7    Q.   So before the trustee's understanding
8 about the $7 billion problem, the trustee just
9 assumed it was all the collateral and the repo
10 would be a purchased asset?
11    MR. DAKIS: Objection to form.
12    Q.   All I'm trying to understand is
13 whether -- did the trustee have an
14 understanding -- I believe you've already
15 answered this. Now I just want to be clear. At
16 the time of closing, did the trustee have a
17 view as to the value of all of the repo
18 collateral that was being transferred to
19 Barclays as a purchased asset?
20    A.   I don't think the trustee had
21 independent knowledge. We heard the figures
22 that Harvey Miller used. We heard the 47.4 that
23 Lori Fife used. As I've said, I think we
24 thought that the repo collateral must have been
25 a large part of that 47.4 number. Whether it

## Page 137

J. KOBAK

1         J. KOBAK
2 was the entirety, we don't know. I don't know
3 the exact basis on which the valuations were
4 made.
5    Q.   So, at the time of closing, was it the
6 trustee's understanding the repo collateral may
7 be close to 47.4, or even 47.4, but not more?
8    A.   I don't think we would have thought it
9 was more than 47.4. We probably suspected it
10 might be something less than 47.4.
11    Q.   But you understood there was a haircut
12 and so you understood it might be about $47
13 billion, correct?
14    MR. CARDEN: Objection to form.
15    MR. DAKIS: Objection.
16    MR. MAGUIRE: Objection to form.
17    A.   We thought there would be a stated
18 value of collateral that would be larger by a
19 few percent than the amount of the loan.
20 Whether that reflected the actual value or the
21 way Barclays actually valued it, we didn't know.
22 We didn't have detailed knowledge of what was --
23 of what that collateral was, and as I say, I
24 think some of it might be difficult to value in
25 any circumstance. But we certainly couldn't

Page 138

1            J. KOBAK
2  value it over the course of a few hours on the
3  weekend when we didn't have any access to any
4  records.
5      Q.   Did there come a point in time after
6  the closing when the trustee reached the
7  conclusion, with the help of his advisors, that
8  the entire repo collateral that was supposed to
9  be transferred to Barclays was supposed to be
10 worth more than $47.4 billion?
11           MR. CARDEN: Objection to form.
12           MR. DAKIS: Objection to form.
13           MR. MAGUIRE: Objection to form.
14           (Exhibit 444, Declaration of Shari D.
15     Leventhal in Support of Trustee's Motion for
16     Entry of an Order Approving a Settlement
17     Agreement, marked for identification, as of
18     this date.)
19     Q.   Mr. Kobak, Exhibit 444 is the
20 Declaration of Shari Leventhal, Assistant
21 General Counsel of the New York Fed. You're
22 familiar with this, correct?
23     A.   Yes, I am.
24     Q.   And this document says, as does your
25 motion -- you attach this motion to your

Page 139

1            J. KOBAK
2  request -- sorry. You recall that you attached
3  this declaration to your motion for approval of
4  the settlement with JPMorgan and Barclays in
5  December of last year, correct?
6      A.   Yes, we were -- I thought I was
7  careful in the application to say that we were
8  relying on the facts as stated in the affidavits
9  that were submitted, which were, I believe, two
10 affidavits from people at the Fed and one
11 gentleman from Barclays.
12     Q.   Okay. And in paragraph 12 of this
13 affidavit which you submitted to the court on
14 December I think is 5th, 2008, paragraph 12,
15 Ms. Leventhal says as follows: "Pursuant to the
16 Repurchase Agreement between Barclays and LBI,
17 which was the form selected by Barclays to fund
18 LBI overnight, LBI was to provide Barclays with
19 approximately $49.7 billion in securities in
20 return for the $45 billion in cash funded by
21 Barclays." You see that?
22     A.   Yes, I do.
23     Q.   So at least as of -- this declaration
24 is dated I think -- I think it was submitted to
25 the court on December 5th. In any event, at

Page 140

1            J. KOBAK
2  least as of the date you submitted this
3  declaration to the court, the trustee knew that
4  the value of the repo collateral that Barclays
5  was supposed to receive was supposed to be worth
6  approximately $49.7 billion?
7            MR. CARDEN: Objection to form.
8            MR. DAKIS: Objection to form.
9            MR. MAGUIRE: Same objection.
10     A.   Well, I knew that's what Ms. Leventhal
11 said.
12     Q.   Okay.
13     A.   I don't know who valued the securities
14 or how it corresponded to the 47.4 number.
15     Q.   Do you -- when -- at what point
16 between the closing and receiving this affidavit
17 from Ms. Leventhal did the trustee learn what
18 the value of the collateral was supposed to be?
19           MR. CARDEN: Objection to form.
20           MR. MAGUIRE: Same objection.
21     A.   Well, I think we learned what Ms.
22 Leventhal's view was when she submitted this
23 affidavit to us, which is probably, you know, a
24 day or so before we filed it with the court,
25 basically.

Page 141

1            J. KOBAK
2      Q.   At that time when you received that
3  information from Ms. Leventhal, did you tell
4  anyone that that $49.7 billion number had to be
5  wrong because it exceeded the $47.4 billion
6  valuation cap that you understood existed in the
7  deal?
8            MR. CARDEN: Objection to form.
9            MR. DAKIS: Objection to form.
10           MR. CARDEN: I know you don't mean to
11     be mixing this up, but you are.
12     A.   First of all, I have to back up. I'm
13 sorry, but I realize that we actually had had
14 some discussions with Ms. Leventhal and the Fed.
15 The Fed actually asked us to get involved in
16 doing this in order to dispute -- in order to
17 resolve a dispute between JPMorgan and Barclays
18 because Barclays, as I understood it, wanted us
19 to get involved.
20           So we did have some discussions with
21 her where she went through the background and
22 probably used the 42.7 and then the $7 billion
23 cash figure, or something in that range, to get
24 up with the 49.7.
25           So we had learned of that figure

Page 142

1           J. KOBAK
2  somewhat before this, and that did prompt
3  questions and so we did try to do some work to
4  determine whether this figure corresponded at
5  all with the 47.4 figure that had been used in
6  court.
7      Q.   And you concluded that it did?
8      A.   We concluded, as I think I've said
9  before, that we didn't really know the answer,
10  and I can't recall whether this happened.  I
11  know that we also had some meetings with the
12  Creditors Committee and with Weil.  Everybody
13  had questions about this.
14      I believe we went to all the parties
15  to find out how they valued these securities,
16  both the original securities that had gone to
17  Barclays and then the additional 5.2 or 5.3 that
18  was going to be the subject of this.
19      I think we were told by everybody, and
20  by "everybody" I mean the Fed, Chase and
21  Barclays, that the securities involved were
22  substantially less value than the figures
23  indicated, which I think is also what people
24  told the Court.
25      I think we did receive some figures

Page 143

1           J. KOBAK
2  from JPMorgan showing how they valued some of
3  the illiquid securities that really suggested to
4  us that the real value, if you will, would not
5  have exceeded 47.4, indeed, might be somewhere
6  below 47.4, just looking at the 5 billion plus
7  that was involved in the repo.
8      So that gave the trustee, first of
9  all, a lot of comfort that this was an
10  appropriate thing to do at Barclays' behest on
11  behalf of the estate and that it really didn't
12  alter the fundamentals of the deal as it had
13  been disclosed.  So that's the conclusion that
14  we reached.
15      (Pages 144 & 145 have been designated
16      highly confidential and will continue on the
17      next page.)
18
19
20
21
22
23
24
25

Page 144

1      HIGHLY CONFIDENTIAL - J. Kobak
2      Q.   And so the valuation cap of 47.4
3  billion, based on what you just said, is meant
4  to be a cap that applies to the real value of
5  the assets in the deal, not some mark that
6  doesn't really reflect what you could sell the
7  asset for, is that fair?
8      MR. DAKIS:  Objection to form.
9      MR. CARDEN:  Objection to form.
10      MR. MAGUIRE:  Objection to form.
11      A.   Well, it suggested to us that even at
12  the time the value might have been somewhat
13  lower, and as I say, I think we were also led to
14  believe that the original 42 whatever that
15  Barclays already had that hadn't gotten held up,
16  so to speak, by Chase might be a good deal lower
17  than the face amount.
18      I believe there was a proceeding -- I
19  don't know if I'm allowed to say this because I
20  believe there was a proceeding in chambers
21  that -- where Jonathan Hughes basically
22  testified that at the end of the day, Barclays
23  felt that it had gotten a consideration
24  considerably lower than any of the figures that
25  were used.

Page 145

1      HIGHLY CONFIDENTIAL - J. Kobak
2      Now, again, I'm not sure to what
3  extent this ought to be under seal or whatever,
4  because that was an off-the-record conversation,
5  as I recall, with the Court.
6      MR. MAGUIRE:  We should probably
7  designate that last question and answer as
8  highly confidential.
9      (Continued on the next page in)
10      non-confidential portion.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 146

J. Kobak

1     J. Kobak
2        A.   And I mean to further my answer, if it
3     turned out that in fact Barclays knowingly got
4     collateral that was worth substantially more,
5     that to us would be a violation of the -- of
6     what had been disclosed to the court and, you
7     know, that I think is part of our Rule 60
8     proceedings as it is of the other people who
9     were here.
10       Q.   But that would be based upon actual
11    fair market value, not a mark at the time by a
12    custodian bank, correct?
13           MR. CARDEN: Objection to form.
14           MR. MAGUIRE: Same objection.
15       A.   Well, I think if the evidence -- I
16    mean, I don't want to get into what our legal
17    position is, but my understanding is if the
18    evidence showed that Barclays was knowingly
19    telling the court that it was getting something
20    worth 47.4, and in its own mind told its board
21    of directors it was getting something worth over
22    50, I won't characterize how that might be
23    characterized, but it seems to me that would
24    clearly be a material breach -- or, a material
25    change in the contract that should at least have

Page 147

1     J. Kobak
2     been disclosed to the court.
3        Q.   At the time that you were having
4     discussions with Barclays and JPMorgan regarding
5     the settlement in December of 2008, did you --
6     did the trustee or his advisors tell Barclays
7     that they believed there was a $47.4 billion
8     valuation cap on all the non-real estate assets
9     in the deal?
10       A.   I don't think so. I think we may have
11    had some discussions with Cleary as to the
12    effect that the numbers weren't matching up very
13    well, and that gave us a lot of concern. And I
14    think we made it very clear that in our
15    application we were going to reserve our rights
16    to investigate the transaction and not limit our
17    rights to look into the sale agreement in the
18    future.
19           And I think when the Creditors
20    Committee got involved, they took that position
21    as well and it eventually got embodied not only
22    in my application but in the order itself that
23    the Court signed.
24       Q.   Can I --
25       A.   So we weren't waiving any rights.

Page 148

1     J. Kobak
2        Q.   I understand.
3        A.   There clearly were some potential
4     factual discrepancies that we wanted to
5     investigate further.
6        Q.   My question was simply whether you
7     raised that. When you spoke to the Court to ask
8     for the Court to approve the JPMorgan
9     settlement, including what you may have said in
10    chambers off the record, did the trustee or his
11    advisors ever tell the Court that they believed
12    the entire deal was subject to a $47.4 billion
13    valuation cap on all non-real estate assets?
14       A.   I don't think we put it that way, but
15    I think I did tell the Court that we were
16    reserving -- that we had many questions about
17    the deal, others had questions about the deal,
18    exactly what went on over the weekend, what it
19    did to the economics of the deal, and that we
20    were reserving our rights to seek reformation,
21    to deal with questions of interpretation or
22    otherwise under the agreement.
23       Q.   At the time that you asked the Court
24    to approve the JPMorgan settlement, had the
25    trustee or his advisors reached even an

Page 149

1     J. Kobak
2     approximate valuation of all of the assets in
3     the repo collateral, including everything that
4     was being transferred in the JPMorgan
5     settlement?
6            MR. CARDEN: Objection to form.
7        A.   I don't believe we had reached a final
8     valuation. We took some comfort from these
9     figures that we got primarily from JPMorgan and
10    from the statements of the parties, including
11    Barclays, that the real value of the collateral
12    was substantially less than any of the stated
13    values.
14           But I don't think that we had signed
15    off on that. I think we understood that there
16    was going to be further investigation of that,
17    which the Court I think invited and which
18    eventually led to the 2004 examinations.
19       Q.   The trustee must, at a minimum -- am I
20    correct in saying that the trustee must, at a
21    minimum, in December of 2008 have reached a
22    conclusion that the entire repo collateral
23    transferred to Barclays plus everything it was
24    receiving in the JPMorgan settlement was
25    properly and fairly valued at less than $47.4

Page 150

1              J. Kobak
2  billion?
3          MR. CARDEN: Objection to form.
4          MR. DAKIS: Objection to form.
5          MR. MAGUIRE: Objection to form.
6      A.   No, I don't think that's true at all.
7  We thought there was clearly property that
8  should come over to Barclays. Our position has
9  always been that, to the extent the purchase
10 agreement -- to the extent that the purchase
11 agreement was described to the Court and was
12 described to us and gives Barclays certain
13 rights, Barclays is perfectly entitled to those
14 things.
15         We don't believe that they're entitled
16 to anything more than that, and the purpose of
17 this transaction was to say, look, some of the
18 collateral, whatever its value was, that was
19 supposed to get to Barclays didn't get there.
20 This is a substitute transaction, actually saved
21 the estate money, so it seemed in the best
22 interests of the estate, but we're not waiving
23 our rights to look at the whole transaction.
24         To the extent it makes Barclays whole
25 and they get 47.4 billion as a result of this,

Page 151

1              J. Kobak
2  that's fine, they're entitled to that. To the
3  extent it might give them several billion
4  dollars more, that's a material change that
5  should have been disclosed to the courts and
6  we'll pursue whatever rights we have to that
7  amount, just as we'll pursue our rights on the
8  questions of interpretation where we think
9  Barclays has taken assets or made claims to
10 assets to which we don't believe they're
11 entitled under the Asset Purchase Agreement.
12     Q.   I really need to make sure I
13 understand what you just said, so I'm going to
14 ask a refined version of the question.
15         Are you saying that the time you
16 asked, you, the trustee, asked the Court to
17 approve the JPMorgan settlement, it was an open
18 question in the trustee's mind as to whether the
19 entire repo collateral, including everything
20 received in the settlement, may or may not
21 exceed $47.4 billion?
22     A.   Yes. We took comfort that it might
23 not because of what people had told us, but
24 we -- we wanted to look at the whole
25 transaction, the repo collateral, the positions

Page 152

1              J. Kobak
2  Barclays was taking and everything else, and if
3  we thought that Barclays at the end of the day
4  was getting things, it managed to get things
5  over the weekend that it wasn't entitled to, or
6  that weren't consistent with the deal as it was
7  described to the Court, that that might be
8  actionable and we wanted to not waive our rights
9  in that regard.
10     Q.   And by not waiving your rights, did
11 you understand yourself to be asking the Court
12 to approve a settlement whereby assets would be
13 given to Barclays that you would then claw back
14 if you subsequently determined that the assets
15 exceeded $47.4 billion?
16     A.   I don't know if it would be those
17 assets or other assets. It may be that we had a
18 cause of action.
19     Q.   But you asked the Court to approve a
20 settlement that might have resulted in Barclays
21 receiving assets in excess of the valuation cap
22 at 47.4 billion?
23     A.   It's possible that it could have. We
24 were comfortable at the time that at least the
25 present value didn't appear to do that, but we

Page 153

1              J. Kobak
2  did have questions about it and I thought we
3  made that very clear to Barclays and to the
4  Court.
5      Q.   Well, you entered into a release with
6  Barclays on the repo collateral, correct?
7      A.   On that specific collateral, movement
8  of that specific collateral, yes.
9      Q.   Well, on all claims related to that
10 collateral, correct?
11         MR. MAGUIRE: Objection to form.
12     A.   Yeah.
13         MR. MAGUIRE: Misstating.
14     Q.   If that collateral --
15         MR. MAGUIRE: Wait. If you're going
16 to talk about the release, I think you need
17 to get out the release.
18         MR. HUME: I'll show it to him. I'm
19 happy to do that.
20         MR. MAGUIRE: There is a very broad
21 savings clause in that settlement agreement,
22 as you know.
23         MR. HUME: We'll get to that. We're
24 not going to -- we'll get to it.
25     Q.   Here's the question: Subsequent to

Page 154

1              J. Kobak
2    the settlement that was approved by the Court,
3    has the trustee reached a conclusion that all of
4    the repo collateral, including everything
5    received in the JPMorgan settlement, exceeds
6    $47.4 billion?
7              MR. MAGUIRE: We have --
8        A.   We have not, as far as I'm aware, we
9    have not received -- not reached a conclusion
10   either way on that particular point.
11       Q.   And for these questions about the
12   value of the assets, my questions are the value
13   of the assets on the date they were received,
14   the date of the closing.
15            Would you agree, I mean, I asked -- I
16   think I asked you earlier, but my questions are
17   designed to understand the trustee's position
18   about this valuation cap. Is it the trustee's
19   position that the valuation cap is based upon
20   the value on September 22?
21            MR. CARDEN: Objection to form.
22       Q.   Open of business September 22 at the
23   time of the closing?
24       A.   I think our position -- well, I don't
25   want to speak to what our position was. I think

Page 155

1              J. Kobak
2    our understanding was that was the best value
3    that people placed on the assets at that time as
4    we understood it.
5        Q.   Okay. And has -- you may not have --
6    the trustee may not have reached a final
7    conclusion on the value of all the repo
8    collateral. Has it reached a conclusion that it
9    was worth more than 47.4 at the time the deal
10   was approved?
11            MR. MAGUIRE: Objection to form. If
12   you're asking what -- the trustee has
13   obviously made assertions in its papers and
14   has joined in LBHI's which makes assertions
15   based on documents that have been provided
16   by Barclays.
17            To the extent you're asking about the
18   trustee's position in those papers, that's
19   provided in those papers and is not an
20   appropriate subject of inquiry for this
21   witness.
22            MR. HUME: I want to know what the
23   trustee thinks it's worth.
24            MR. MAGUIRE: If you're asking whether
25   the trustee independently has done his own

Page 156

1              J. Kobak
2    valuation --
3            MR. HUME: Yes.
4            MR. MAGUIRE: -- that's a different
5    question.
6        Q.   That's the question. I want to know
7    if the trustee and his advisors, Deloitte &
8    Touche or whoever else, has done a valuation of
9    the Cusips in the repo collateral, including
10   everything in the JPMorgan settlement, and
11   reached a conclusion that, valued as of whatever
12   you think the operative date is for purposes of
13   your $47.4 billion cap, has that valuation been
14   done for the repo collateral?
15       A.   I think that JPMorgan has done some
16   work. As I testified earlier, I don't think
17   they have reached a conclusion and I don't think
18   we, speaking collectively, have yet reached a
19   conclusion on that question. It's still
20   something that's under investigation.
21       Q.   Did you say JPMorgan? Did you mean
22   Deloitte or is it JPMorgan helping you do this?
23       A.   I'm sorry, Deloitte.
24       Q.   They haven't been able to reach a
25   conclusion. They have had a year. Are the

Page 157

1              J. Kobak
2    assets difficult to value?
3            MR. CARDEN: Objection.
4            MR. DAKIS: Objection.
5        A.   I've been told that some of them are
6    difficult to value.
7        Q.   It must be more -- there must be
8    enough of them that are difficult to value that
9    it makes a material difference?
10           MR. MAGUIRE: Objection to form.
11           MR. DAKIS: Objection to form.
12       Q.   Would you agree with that?
13           MR. DAKIS: Objection to form.
14       Q.   Why don't you just look at the marks?
15           MR. DAKIS: Objection to form.
16           MR. MAGUIRE: I think you need to
17   rephrase that question.
18       Q.   Your complaint is happy to just look
19   at the marks.
20           MR. MAGUIRE: I don't think that's a
21   question.
22           MR. DAKIS: Objection.
23       A.   Our complaint speaks for itself.
24       Q.   Okay. Let me just ask a question.
25   I'll calm down.

Page 158

J. Kobak

1
2      MR. MAGUIRE: That would be good.
3      Q.   I'm trying to understand this baffling
4  situation.
5      A.   I have that effect on everyone.
6      Q.   I assume you would agree with me that
7  a significant portion of the assets transferred
8  in that repo collateral were illiquid at the
9  time they were transferred?
10     MR. CARDEN: Objection to form.
11     MR. MAGUIRE: You're --
12     A.   I know some of them were. I don't
13  know what you mean by "a substantial
14  proportion," and even if you want to do it by
15  value or percentage, I don't think I could give
16  you the answer as I sit here today. I know
17  there was some stuff of more than nominal value
18  that was illiquid and hard to value.
19     Q.   You would agree with me that you
20  cannot simply look at the mark given by either
21  JPMorgan or Bank of New York that night of the
22  transfer, September 18 or the next day, the
23  19th, to determine the value of the assets in
24  the repo, would you agree with that?
25     MR. CARDEN: Objection to form.

Page 159

J. Kobak

1
2      MR. MAGUIRE: Objection to form.
3      MR. DAKIS: Objection to form.
4      MR. MAGUIRE: Again --
5      A.   Somebody did some valuation to come up
6  with a 47.4 figure that was disclosed to the
7  Court, and if in fact they thought they were
8  over the weekend going to be able to get much
9  more than 47.4 or get additional things that
10  were not disclosed to the Court, that seems to
11  me to be something that should have been
12  disclosed to the Court and it goes to the --
13     Q.   That's not my question. I'm sorry.
14     A.   -- enforceability of the contract.
15     Q.   I'm going to interrupt you. You're
16  not asking my question.
17     MR. MAGUIRE: Please. Please. You
18  cannot interrupt the witness.
19     MR. HUME: I can if he doesn't answer
20  my question.
21     MR. MAGUIRE: I'm sorry, we cannot
22  conduct the deposition on that basis. We
23  cannot do a deposition if you're going to do
24  that.
25     Q.   The question is, you've asked Deloitte

Page 160

J. Kobak

1
2  to value the repo collateral. It's now December
3  2009. They still haven't done it. Would you
4  agree with me --
5      A.   They have done work on it.
6      Q.   Now you're interrupting me.
7      MR. MAGUIRE: We'll agree. One goes
8  at a time.
9      Q.   Would you agree with me that to
10  properly value the repo collateral for purposes
11  of the $47.4 billion cap, you cannot simply look
12  at the marks provided at the time of the repo
13  transaction by the custodian banks?
14     MR. CARDEN: Objection to form.
15     MR. DAKIS: Objection to form.
16     MR. MAGUIRE: Objection to form. This
17  witness has no basis to answer that
18  question.
19     A.   I have no basis to -- for once, Mr.
20  Maguire is absolutely right. I don't know what
21  as an accountant or valuation expert or somebody
22  in this business, what somebody would do, what
23  you would consider a good thing, an accurate
24  gauge to look at or an inaccurate gauge.
25     Q.   It is within the scope of the notice.

Page 161

J. Kobak

1
2  What is your understanding of the value? You
3  have asked Deloitte to value it.
4      Do you think for a year have they just
5  been staring at the marks from the custodian
6  banks?
7      MR. DAKIS: Objection to form.
8      Q.   Or are they trying to value it?
9      MR. MAGUIRE: I think you can rephrase
10  that question.
11     Q.   Would you agree that the trustee is
12  asking for a more thorough valuation from
13  Deloitte than simply to look at the marks from
14  the custodian banks?
15     MR. CARDEN: Objection to form.
16     A.   I think Deloitte did some work,
17  concluded that they had trouble valuing the
18  securities. We also asked them to look at the
19  marks or the values that were given us by other
20  parties.
21     Q.   Do you know why the residential
22  mortgage securities came out of the deal?
23     A.   Came out of the deal?
24     Q.   Are you aware of the fact that the
25  clarification letter states that the provision

Page 162

1          J. Kobak
2 in the APA stating that Barclays would receive
3 50 percent of the residential mortgage
4 securities was to be replaced with the assets
5 set forth in the clarification letter?
6          MR. MAGUIRE:  Can you just tell us
7     what provision you're referring to?
8          MR. HUME:  Sure.
9     Q.    If you look at Section 1(A), Romanette
10 i.  If you need to, you can cross-reference your
11 version of the APA to see what I mean.  But if
12 you look at Section 1(A), Romanette i, of the
13 clarification letter, it says, "The items set
14 forth in Clauses B, C and F" -- I'm sorry, this
15 is not -- you need to look at Romanette ii.
16 "With respect to clauses A, D and E of the
17 definition of 'Purchased Assets' in the original
18 agreement, instead of the items referred to in
19 such clauses," and then it lists the assets
20 described by the clarification letter.  Are you
21 familiar with that?
22     A.    Where are you?  What page?
23     Q.    Okay.  I'm sorry.  Let me try to make
24 a respectable record.
25     A.    I'm sorry, I've got a lot of pages in

Page 163

1          J. Kobak
2 front of me.
3     Q.    That's okay.  So you're looking at the
4 clarification letter.  Maybe it would be
5 simplest to get the APA next to it while we do
6 this.
7          Do you have before you the
8 clarification letter on page 1 and the APA on
9 page 6?
10     A.    Yes.
11     Q.    Okay.  Let me refer you back then on
12 the clarification letter to 1(A), Romanette ii.
13 It says, "With respect to Clauses A, D and E of
14 the definition of 'Purchased Assets' in the
15 original agreement," do you see that reference?
16     A.    Uh-huh.
17     Q.    And it says instead of those items,
18 and then it lists three new items:  Clearance
19 for the repo collateral, clearance box
20 securities and the exchange-traded derivatives?
21     A.    Right.
22     Q.    Right?
23     A.    Right.
24     Q.    And so if you look back at the APA, A,
25 D and E are the retained cash?

Page 164

1          J. Kobak
2     A.    Right.
3     Q.    That's A.  D is the long positions, do
4 you see that?
5     A.    Yes.
6     Q.    And E are the 50 percent of each
7 position in the resis, the residential mortgage
8 securities?
9     A.    Right.
10     Q.    So Barclays was originally going to
11 acquire residential real estate mortgage
12 securities estimated to be worth about 3
13 billion, with considerable skepticism as to
14 whether they were really worth that, correct?
15     A.    Right.
16     Q.    And that was true as of the time of
17 the sale hearing on Friday night, correct?
18     A.    Yes.
19     Q.    Here that provision is replaced and
20 taken out of the deal, correct?
21     A.    Right.
22     Q.    And that would be a material change,
23 correct?
24          MR. MAGUIRE:  Objection to form.
25     Q.    Well, if 500 million is the definition

Page 165

1          J. Kobak
2 of "material," would you agree that --
3     A.    That's the minimum definition of
4 "material."
5     Q.    The minimum.  Then whatever the resis
6 were worth, there was some value there and now
7 they're no longer in the deal, correct?
8     A.    Correct.
9     Q.    Do you know why they came -- do you
10 know why Barclays went from receiving those
11 residential securities on the Friday night what
12 the deal was approved to not receiving them at
13 the closing under the clarification letter?
14     A.    I thought I remembered that they went
15 to DTC, and my understanding was, yes, there
16 were things that were coming out of the deal and
17 there were other things that were going into the
18 deal, and the idea was that you would come up
19 with a substitute deal that was relative, you
20 know, equivalent to the deal that had
21 described -- had been described to the Court, or
22 one would think you would go back to the Court
23 and describe that you have a materially
24 different deal.
25     Q.    So, as long as what went into the deal

Page 166

1              J. Kobak
2   was roughly equivalent to what came out of the
3   deal, there should be no need to go back, only if
4   it was different, correct?
5       MR. MAGUIRE: Objection to form.
6       A.   Well, whether one might want to go
7   back is -- maybe that's a question for Barclays,
8   but from our point of view, certainly what would
9   be material would be something that would
10  materially change the economic basis of the
11  deal, meaning the 47.4, its relation to
12  liabilities, the fact that the trustee was going
13  to get a minimum of something like $20 billion
14  in assets at the end of the day.
15      Q.   Would you agree that if Barclays
16  received something for the -- for -- in exchange
17  for giving up the residential real estate
18  securities, Barclays received something of
19  equivalent value or lesser value, then the
20  trustee would not have viewed it as necessary to
21  go back to the Court?
22      MR. DAKIS: Objection to form.
23      A.   Yeah, I don't think we would have a
24  particular problem with that if that were the
25  fact.

Page 167

1              J. Kobak
2       Q.   Do you know --
3       A.   In fact, that's what we thought was
4   happening over that weekend.
5       Q.   Okay. Has the trustee performed or
6   the trustee's advisor performed any valuation of
7   what the residential real estate mortgage
8   securities were worth as of the time the
9   transaction?
10      A.   I don't believe so.
11      Q.   Did the trustee ask anyone before the
12  closing -- I'm sorry, if we covered this before.
13  I just want to be clear. Did the trustee ask
14  anyone before the closing what the estimated
15  value of the clearance box assets were?
16      A.   I think you had asked me a question
17  about 1.9 billion, and I don't recall that
18  figure particularly sticking in my recollection.
19  I really don't recall if we had -- we might have
20  had some general number for the clearance box
21  assets. I really don't recall. In our view,
22  they came out of the deal in any case.
23      Q.   Did the trustee ever ask anyone before
24  the closing what the value of the
25  exchange-traded derivatives were?

Page 168

1              J. Kobak
2       A.   I don't believe so.
3       Q.   And did the trustee ever ask anyone
4   before the closing specifically what the value
5   of the repo collateral was?
6       A.   No, I don't believe so.
7       Q.   I'd like to show you what was
8   previously marked in another deposition as
9   Exhibit 338B. Exhibit 338B was, I believe,
10  produced from the Creditors Committee during the
11  a deposition of Michael Klein, and somebody may
12  have represented that it might have been
13  something written by Michael Klein.
14      In any event, my question to you is,
15  first, are you familiar with this document?
16  Have you seen it before?
17      A.   I don't recall having seen it before.
18      Q.   The question I want to ask is: Was
19  this rough sketch of information shown to any
20  representative of the trustee before the
21  closing?
22      A.   I don't recall having seen anything
23  like this and I'm not aware that anyone else saw
24  it.
25      Q.   I would just ask, I think it's within

Page 169

1              J. Kobak
2   the scope of the 30(b)(6), for the record for
3   you to confirm with your colleagues who were
4   there that weekend whether anyone at Hughes
5   Hubbard saw this. Obviously if you have a copy
6   of it in your files, I assume you would have
7   produced it, but I would ask you to look for
8   that too because it may not be in a e-mail, but
9   either way to confirm with people who were there
10  whether they were shown this or in the room when
11  it was shown.
12      MR. MAGUIRE: We'll leave a space in
13      the transcript and take that request under
14      advisement.
15      MR. HUME: Thank you.
16  INFORMATION TO BE PROVIDED: _____
17  _____
18  _____
19      Q.   Mr. Kobak, let's go back for a few
20  more questions about presentation to the Court
21  at the sale hearing on September 19. We can
22  look at the transcript for some of this, if you
23  wish, but let me just make sure we agree on a
24  few things.
25      The trustee understood that it was an

Page 170

```
 1            J. Kobak
 2 extraordinary hearing to begin with, correct?
 3 Friday night, five days after the largest
 4 bankruptcy in history to sell broker-dealer
 5 operations?
 6    A.   I think the Court viewed to it as
 7 extraordinary, and I don't think we have any
 8 reason to differ with that description.
 9    Q.   Did the trustee understand that the
10 Court was also being told that there were major
11 changes to the transaction?
12    A.   On the 19th?
13    Q.   Yes.
14        MR. CARDEN:  Objection to form.
15    A.   I think the Court was told that there
16 were changes, yes, and, you know, the scope of
17 it had -- I mean, the basic relationship had
18 stayed the same, but the amounts involved had
19 apparently been reduced and so forth.
20    Q.   And there were other changes, like the
21 provision regarding a sharing of any profits on
22 sales for a year was taken out?
23    A.   Yes.
24    Q.   Eagle Energy was taken out?
25    A.   Yes.
```

Page 171

```
 1            J. Kobak
 2    Q.   There were other changes that Ms. Fife
 3 recounted?
 4    A.   Yes, the real estate values had
 5 changed.
 6    Q.   Real estate values.
 7        It was clear, wasn't it, to the
 8 trustee, that the written contract that had been
 9 submitted to the Court had to be amended to
10 reflect those changes, correct?
11    A.   Well, it had to be -- our
12 understanding was there was going to be a
13 clarification letter which was going to -- the
14 deal was described in court, that there was
15 going to be a clarification letter that would
16 clean up some items, would be consistent with
17 the deal as it had been -- and the changes that
18 had been described to the Court.
19        We didn't understand, I don't think
20 anyone understood, that anything more than that
21 would be involved.  Indeed, I have a clear
22 recollection, as I think I say in my
23 declaration, of leaving the hearing, going back
24 to our offices, which is just across the street
25 from the Bankruptcy Court, and basically
```

Page 172

```
 1            J. Kobak
 2 expecting that there would be a call that those
 3 who were doing the clarification letter would be
 4 done with it in 45 minutes or an hour, and then
 5 that proved not to be the case.
 6        So that's what we expected as of the
 7 end of the hearing.
 8    Q.   You expected the contract would be
 9 amended to reflect what the judge was told and
10 that that would happen promptly after the
11 hearing, correct?
12    A.   Amendment isn't even I don't think the
13 right word.  Clarified, yes.
14    Q.   You don't think 20-plus billion
15 dollars of assets is an amendment?
16        MR. MAGUIRE:  Objection to form.
17    A.   Well, whether it was an amendment or
18 not, it was called a clarification letter, and
19 it was going to take the Asset Purchase
20 Agreement, clarify what had been said in court,
21 make a few other minor, you know, language
22 changes, I guess, or I don't know, scrivener
23 changes.
24    Q.   A subsidiary here, a subsidiary was
25 not something --
```

Page 173

```
 1            J. Kobak
 2        MR. MAGUIRE:  Just make sure --
 3    A.   I'm not --
 4        MR. MAGUIRE:  Wait.  Wait.  We can't
 5 have two people speaking at the same time,
 6 so Hamish, this is very exciting stuff, but
 7 you need to make sure that you allow the
 8 witness to conclude his answer before you
 9 start your next question.
10    Q.   Do you agree that the APA had to be
11 amended after the Court issued the sale order?
12    A.   It had to be amended or clarified,
13 whatever word you want to use, yes, it should be
14 embodied in an agreement that was consistent
15 with what was said at court when the deal, as it
16 was changed, was described, would incorporate
17 those changes that were described to the Court,
18 and the overall parameters of the deal as
19 described to the Court.
20    Q.   And you expected that that would be
21 done promptly, as you said, within 45 minutes
22 that evening, you were hoping to see something,
23 correct?
24    A.   I think that's what the Court
25 expected, that people would kind of go out in
```

| Page 174 | Page 175 |
|---|---|

**Page 174**

1       J. Kobak
2   the hallway, you know, the way people do in
3   Bankruptcy Court and hammer things out to the
4   extent there were things to hammer out. I mean,
5   there was an agreement that had a lot of
6   interlineated changes in it and so forth, so
7   some of that amendment process had already
8   begun.
9       Q.   When you didn't see it within 45
10  minutes or an hour or two hours, and you didn't
11  see it -- and you didn't see a draft on Saturday
12  at all, did you?
13      A.   No.
14      Q.   Did that cause the trustee to be
15  concerned that the deal was being changed?
16      A.   We had a -- I recall, and I cannot
17  tell you exactly who made this call or to whom,
18  but I think we called Weil or somebody to ask
19  what had happened, maybe somebody called us, and
20  basically we were told, well, people are tired,
21  they're going to go home tonight, and maybe
22  people will prepare sometime Saturday or Sunday
23  over the weekend to get it done.
24      So certainly then we did not think
25  that people were contemplating major changes

**Page 175**

1       J. Kobak
2   beyond those that had been described.
3       Q.   When you finally did receive a copy of
4   the clarification letter, did the trustee or his
5   advisors review it?
6       A.   Yes, we had people I believe -- I
7   believe we had actually had somebody go to Weil
8   maybe pretty early Saturday, Sunday morning,
9   were basically told nobody else was there yet,
10  and then eventually people came and, you know,
11  the process began.
12      So we did have people there. There
13  were a lot of discussions that went on that we
14  weren't necessarily party to. Again, I don't
15  think we -- we did not have a major role in
16  negotiating the agreement, which, after all, we
17  still understood to be basically clarifying the
18  deal that had already been described and struck.
19      In the afternoon, a number of us got
20  on the phone, and then we did have a couple of
21  people at Weil who were there while some of the
22  negotiations went on and some of the -- some of
23  the drafting was done.
24      Q.   You say in your affidavit in paragraph
25  10 that, "Representatives of my firm were

| Page 176 | Page 177 |
|---|---|

**Page 176**

1       J. Kobak
2   present at the officers of debtors' counsel."
3       That's what you were just describing,
4   correct?
5       A.   Yes, that's correct.
6       Q.   Who was it from Hughes Hubbard who
7   were there?
8       A.   I believe it was Mr. Kiplok, and I've
9   dreaded this because the reporter is going to
10  ask me to spell the last name, but it's Anson
11  Frelinghuysen.
12      Q.   We'll spell it in a break. It's in
13  the --
14      A.   I'm not sure I can.
15      Q.   Well, I think it's written in one of
16  the contracts, so ...
17      A.   But anyway, they were the
18  representatives who were there.
19      Q.   And were they there on both Saturday
20  and Sunday?
21      A.   I think they were there on Sunday.
22  I'm not sure if they were there on Saturday.
23      Q.   And did they communicate back to you
24  or the trustee or other advisors of the trustee?
25      A.   We had some phone calls or e-mails,

**Page 177**

1       J. Kobak
2   and there were a couple of drafts. I think the
3   first one that I saw was in the evening, and
4   then there were a couple more that came in, you
5   know, the early morning hours or really getting
6   close to the beginning of the working day that
7   would have been e-mailed around. So we had some
8   e-mail correspondence.
9       There was a long period of time when I
10  and the trustee and SIPC and others were on the
11  phone, but during most of that time essentially
12  nothing happened. I mean, it was hours and
13  hours of radio silence, basically.
14      Q.   Now, when you saw the clarification
15  letter, the trustee, collectively, his advisors,
16  on Sunday with references to clearance box
17  assets, the 15c3 assets, exchange-traded
18  derivatives, did the trustee or his advisors
19  ever conclude that those specific assets were
20  not specifically described in court and that
21  that was a problem?
22      A.   Well, we had some discussions I think
23  in court with DTC and we knew there were some
24  negotiations with DTC and we -- I think we knew
25  that was going to affect what happened to the

Page 178

1          J. Kobak
2    clearing boxes.
3          I'd been presented with a Transfer and
4    Assumption Agreement by OCC, so we knew that
5    those -- we knew about, to some extent we knew
6    about those aspects of the transaction already.
7       Q.   On the Friday night?
8       A.   Well, I certainly knew either Friday
9    night or it might have gotten into Saturday
10   morning I signed the Transfer and Assumption
11   Agreement.
12      Q.   Shortly after the sale hearing?
13      A.   I think it was during a late break in
14   the sale hearing. And it might have been before
15   midnight. I just can't really remember.
16      Q.   So as of the time of the sale hearing,
17   you knew the exchange-traded derivatives were in
18   the deal; that wasn't a surprise in the
19   clarification letter?
20      A.   Right. I think that had been in the
21   Asset Purchase Agreement.
22      Q.   So --
23      A.   I mean, the question was what --
24   whether Barclays was going to assume the
25   liabilities and what happened to the deposits

Page 179

1          J. Kobak
2    and so forth.
3       Q.   You said -- so, in terms of the
4    derivatives appearing in the clarification
5    letter, that was not a surprise given that you
6    had signed the TAA on Friday night and that it
7    was already in the APA?
8       A.   Well, the final version of the A -- of
9    the clarification letter had a parenthetical
10   that I don't believe was in any other draft
11   which deals with deposits.
12      Q.   I'm going to come to that.
13      A.   So I'm sure we'll come to that.
14      Q.   We will come to that, but the question
15   is the concept that the derivatives were in the
16   deal was not something -- was something you knew
17   about on Friday night at the sale hearing?
18      A.   Yeah, that was not a surprise.
19      Q.   The clearance box assets, you
20   mentioned that you had a discussion Friday night
21   with the DTC about that?
22      A.   I think during a break in the hearing
23   or before the hearing or at some point I had
24   some discussion with the DTC. I certainly was
25   aware that the DTC was -- became unhappy at some

Page 180

1          J. Kobak
2    point that Barclays seemed unwilling to assume
3    liabilities and they were telling people that
4    they were not going to clear anything on Monday
5    when everybody opened for business unless they
6    were fully satisfied that they were secured,
7    protected, whatever word you want to use, and
8    the clearing box -- clearing boxes and where
9    they went became part of that concern in that
10   discussion.
11      Q.   As of the Friday night, then, was it
12   your understanding that clearance box assets
13   were in the deal or not in the deal, or was it
14   not clear?
15      A.   I'm not -- I just am not clear on the
16   sequence completely. I thought that at the
17   beginning of the hearing DTC was assuming that
18   Barclays would step up and assume the
19   liabilities, and I think they reached the
20   conclusion either at the hearing or shortly
21   thereafter that that wasn't the case, wasn't
22   going to be the case, and they became very, very
23   concerned about that.
24      Q.   And then there were negotiations about
25   that over the weekend?

Page 181

1          J. Kobak
2       A.   That's correct, and I -- we weren't
3    really that much part of the negotiations. We
4    just understood that DTC was saying we want
5    everything we can get to make sure that we're
6    protected because we do not know what the scope
7    of liabilities might be, and that includes if
8    Barclays is not going to assume liabilities, we
9    want the clearing boxes to stay with LBI.
10      Q.   The clearing boxes, did anyone at DTC
11   at any time before the closing ever tell you
12   that they needed the clearance box assets, the
13   LBI securities and other assets in the clearance
14   boxes at DTC to remain with DTC?
15      A.   To remain with LBI?
16      Q.   Yes, to remain with LBI.
17      A.   So that DTC could look to them in case
18   there were liabilities or obligations that were
19   otherwise unsatisfied because of the tremendous
20   amount of clearing and transactions they would
21   be processing. I do -- I understood, the
22   trustee understood, I think DTC understood that
23   what we were talking about was the property in
24   the boxes, not empty boxes themselves, which
25   would not satisfy that concern of DTC.

Page 182

J. Kobak

1
2    Q.    Well, I understand what your position
3    is. We're going to talk more about it later,
4    but I just want to know, did anyone at DTC ever
5    communicate to anyone at the trustee about they
6    needed the securities and other assets in the
7    clearance boxes to remain with LBI?
8        MR. MAGUIRE: Objection to form.
9        Asked and answered.
10    A.    That was our understanding that we
11    were talking about the contents of the boxes.
12    Q.    Can you identify any specific
13    communication, oral or written, that occurred
14    from DTC or its representatives before the
15    closing in which they said or communicated that
16    those assets needed to remain with LBI?
17    A.    I had discussions either on the phone
18    or at the hearing with Mary Witkin and possibly
19    Isaac Montal and possibly Shelly Hirshon at
20    Proskauer, who was representing DTC as outside
21    counsel, and that was certainly my understanding
22    and I thought DTC's understanding as a result of
23    those conversations. I can't remember the exact
24    words that were used.
25    Q.    Do you recall them ever saying the

Page 183

J. Kobak

1
2    clearance box assets need to stay with LBI?
3        MR. MAGUIRE: Asked and answered.
4    Q.    Is that what they would tell me if I
5    asked them?
6    A.    You'll have to ask them. I'm sure you
7    will ask them. I believe they will tell you
8    that.
9    Q.    And when did they tell you that those
10    assets had to stay?
11    A.    I don't recall when the specific
12    discussion was or with whom. I know I had some
13    discussions at least with Mary Witkin and Shelly
14    and maybe with Isaac either in court or
15    afterwards.
16    Q.    On late Friday night, early Saturday
17    morning?
18    A.    And at some point over the weekend,
19    maybe early Monday morning. I guess that's not
20    technically over the weekend anymore, but before
21    the closing.
22    Q.    Did they tell you that they thought
23    the clearance box assets had to stay with LBI
24    after learning or agreeing that the residential
25    mortgage securities would not be pledged to help

Page 184

J. Kobak

1
2    satisfy the DTC settlement obligations, or were
3    they saying -- or were they saying that even
4    with all the residential mortgage securities,
5    they needed more?
6        MR. DAKIS: Objection to form.
7    A.    I think they were saying they needed
8    more. My understanding was they wanted anything
9    they could get to feel secure.
10    Q.    Have you spoken to anyone at DTC --
11    have you had any communications with anyone at
12    DTC subsequent to the closing in which they have
13    confirmed that understanding to you? And by
14    "you" I mean the trustee or his advisors?
15    A.    I had a call with Isaac Montal
16    sometime after Barclays started taking the
17    position in writing that they had been taking,
18    and I believe he said he didn't understand
19    Barclays' position. It was a very brief
20    telephone call. I believe my counsel may have
21    had some further communications.
22        MR. MAGUIRE: I'm going to direct
23    you --
24    A.    -- and that, in all probability, is
25    privileged or work product or both.

Page 185

J. Kobak

1
2    Q.    It would not be privileged if there
3    was a written communication from DTC to you on
4    this.
5        MR. HUME: Are you claiming a joint
6    defense or joint interest privilege with
7    them?
8        MR. MAGUIRE: No.
9        MR. HUME: Just a work product
10    privilege on investigation you have done?
11        MR. MAGUIRE: Correct.
12    Q.    Has the trustee received any
13    confirmation from DTC of what their view is as
14    to the meaning of the DTC letter?
15        MR. MAGUIRE: I'm going to direct the
16    witness not to disclose anything that he is
17    aware of by way of his counsel's work
18    product. So he's directed not to answer
19    that question.
20    Q.    Mr. Kobak, let me go back to this
21    47.4, 45.5, these numbers that were given the
22    Court that you say are caps on the deal.
23    A.    Explain the parameters of the deal.
24    Q.    Explain the parameters.
25        There is approximately a $2 billion

Page 186

1          J. Kobak
2  difference between those two numbers, correct?
3        MR. MAGUIRE: I'm sorry, between which
4     numbers?
5     Q.   Okay. Let's look at paragraph 7.
6     A.   1.9 billion, yes.
7     Q.   1.9. Let's be precise. Paragraph 7
8  of your affidavit, you recount these numbers?
9     A.   Uh-huh. Yes.
10    Q.   I just want to ask you one question:
11 You describe -- you use Ms. Fife's words when
12 you describe that there would be $45.5 billion
13 in liabilities in connection with those assets.
14       Can you just explain to me what you
15 meant or understood that phrase to mean, "in
16 connection with those assets"?
17       MR. DAKIS: Object to form.
18    A.   I think it meant liabilities that were
19 related in some way to the non-real estate
20 assets, which could be longs and shorts and I
21 guess it could be other things as well.
22    Q.   And did anyone ever explain to you
23 what the 45.5 billion consisted of?
24    A.   Well, I didn't think it included
25 liabilities such as liabilities -- or,

Page 187

1          J. Kobak
2  obligations that Barclays was undertaking toward
3  employees. I didn't think it included
4  obligations on cure amounts under contracts and
5  so forth. So it was related to the assets that
6  were involved.
7     Q.   Okay. And just so I'm clear, did
8  anyone ever explain to you, anyone from Weil
9  ever explain to you what the $45.5 billion
10 number consisted of?
11    A.   In detail, no.
12    Q.   In any way?
13    A.   No.
14    Q.   Did anyone, other than someone at
15 Weil, ever explain what that number represented,
16 what it consisted of?
17    A.   I don't believe so.
18    Q.   Is your current understanding that
19 it's an approximation of the repo cash advance
20 that Barclays made?
21       MR. MAGUIRE: Objection to form.
22    Asked and answered.
23    A.   Yeah, I mean, we've been over this
24 several times. It is the same number. I assume
25 that's at least a big part of it.

Page 188

1          J. Kobak
2     Q.   Now, the $1.9 billion difference
3  between -- that's given in those numbers between
4  the liabilities and the assets, that $1.9
5  billion spread represents assets that would be
6  going to Barclays under this deal that would not
7  be available to satisfy any remaining customer
8  claims in the estate, correct?
9     A.   That's correct.
10    Q.   And that was acceptable to the
11 trustee?
12    A.   Yes. It was also explained that there
13 would be at least $20 billion left in the
14 brokerage firm.
15    Q.   Who explained that to you?
16    A.   I think Ms. Fife or Harvey Miller said
17 it at the hearing.
18    Q.   Other than what was said at the
19 hearing, did anyone else make any
20 representations to you about the $20 billion
21 that would remain with the estate?
22    A.   Not specifically, no.
23    Q.   And how much money, how much in assets
24 actually did remain with the estate?
25    A.   I think if you look at our interim

Page 189

1          J. Kobak
2  report which we filed not long ago, we have
3  about $18 billion in assets. However, 1.9
4  billion of those assets are the assets to
5  complete the customer transaction -- customer
6  transfer transaction with Barclays, so that
7  would take it down to a little over 16, and then
8  there are several hundred million, I don't have
9  the exact figure, at least that are
10 post-transaction principal and interest
11 payments. So that wouldn't be the 20 billion at
12 the time. So that would take you down to 15.5.
13       If Barclays succeeded in the claims
14 it's making against us under its interpretations
15 of the clarification letter, I think you'd be
16 down to something like, depending on how you
17 value some of those assets and what's involved,
18 something like 12 or 13 billion dollars, which
19 is significantly lower than $20 billion, and
20 could put us at risk of a shortfall to
21 customers.
22    Q.   Why was -- if the trustee was willing
23 to accept the 1.9 billion that would be
24 transferred to Barclays, was there an absolute
25 limit on the amount that the trustee was willing

Page 190

1              J. Kobak
2    to transfer?
3         A.   I think the way we saw it was I think
4    that one reason, and I'm no expert in this, but
5    our understanding was one reason there are
6    haircuts and repos is that you might not, even
7    when stuff was marked to market and stuff, you
8    might not always realize 100 percent on the
9    security values. There are costs associated
10   with that and so forth. So there's always
11   supposed to be a cushion.
12        So I think our understanding was that
13   these could be, to the extent you're talking
14   about repo-type assets, things that were
15   basically in balance with one another. I think
16   if you took the 1.9 even as a figure and set
17   against that some of the obligations, we knew
18   that Barclays was assuming, or was saying it was
19   assuming, like the employee severance, Barclays
20   was either getting the assets for nothing beyond
21   the $250 million or possibly even risking a
22   loss, but certainly wasn't making any windfall
23   profit.
24        And that would leave enough or we
25   thought that would leave enough behind to, you

Page 191

1              J. Kobak
2    know, reasonably comfortably take care of
3    customers.
4         Q.   There was no way you could know that,
5    even if all of the numbers you were given were
6    correct, there was no way you could know that at
7    the time, correct?
8         A.   No.
9              MR. MAGUIRE:  Know what at the time?
10        Q.   There was no way you could know at the
11   time of the sale transaction whether the amount
12   of money left in the LBI estate was going to be
13   enough to satisfy all remaining customer claims?
14             MR. MAGUIRE:  Objection to form.
15        A.   No, but we were led to understand that
16   that would be the case, and we didn't see
17   anything that suggested it wouldn't be the case.
18        Q.   How were you led -- who led you to
19   believe that would be the case?
20        A.   We had some discussions and SIPC
21   particularly had some discussions I believe with
22   the S.E.C. and other regulators about the status
23   of the accounts and what was in segregation and
24   so forth, and basically I believe was led to
25   believe that there probably would not be a

Page 192

1              J. Kobak
2    significant shortfall.
3         I believe there were discussions over
4    the weekend when the 15c3 account was an issue
5    where it was believed, and of course, a lot of
6    this comes from the Barclays and LBI people, but
7    it was believed that there was actually a
8    surplus in that account. I mean, that's why the
9    769 million can even get into the agreement even
10   on a contingent basis. If people thought there
11   were shortfall, I don't think that would have
12   been the case.
13        Q.   You mentioned something about these
14   other liabilities of cure and comp that you
15   understood Barclays was assuming, correct?
16        A.   Yes.
17        Q.   And let me make sure I understand this
18   correctly. The liabilities of cure and comp
19   would be a cost to Barclays?
20        A.   Yes.
21        Q.   Correct? They may be of some
22   benefit -- the cure liability that Barclays
23   assumed would be of some benefit to the estate
24   because there would be that much less in
25   liability claimants, correct?

Page 193

1              J. Kobak
2         A.   That's correct.
3         Q.   But those liability claimants would be
4    general creditors who would come after
5    customers, correct?
6         A.   Well, technically, the way SIPC works
7    is there's customer property and then there's
8    general estate property. A lot of property gets
9    allocated to customer property, and that's used
10   to satisfy customers, and only if there's an
11   excess does that get added to the general
12   estate.
13        It's not really -- I mean,
14   colloquially it's a priority. It's really two
15   different pots of assets.
16        Q.   Okay. My technical formulation may be
17   wrong, but as a practical matter, any
18   outstanding trade payable to a contracting
19   service provider to Lehman would only get paid
20   their claim after all customers had received
21   full amount of their customer prompt?
22        A.   No, there could be a general -- you
23   could have a situation where there's not
24   sufficient assets to pay customers. There's
25   still some money in the general estate and you

Page 194

1           J. Kobak
2  could make some kind of general -- some kind of
3  distribution to general creditors.
4      Q.    You could, but you don't have to?  The
5  trustee has discretion?
6      A.    No, you would have to.  You have a --
7  a trustee has a fiduciary duty to all creditors.
8  There are certain priorities created by the
9  statute that the trustee has to abide by, but
10 even under our allocation motion, the gist of
11 which is that because of shortfalls in the 15c3
12 account and so forth, general estate property
13 ought to be used to satisfy customers, I don't
14 think we would take everything and put it in
15 customer property.  We would probably always
16 leave a billion or two for general creditors,
17 and general creditors might, at the end of the
18 day, at least get some distribution on their
19 claims.
20           There are also some general estate
21 claims that are priority claims, and that might
22 well be true of some of these contracts that --
23 that Barclays would pay the cure costs on.
24      MR. MAGUIRE:  We're getting a little
25 far afield from the topics in the notice.

Page 195

1           J. Kobak
2      MR. HUME:  No, we're not.
3      MR. MAGUIRE:  Okay, well --
4      MR. HUME:  There's a compensation and
5  cure are part of the topics.
6      Q.    The compensation liabilities that
7  are -- were estimated to be assumed by Barclays,
8  those compensation liabilities would not have
9  been something bonuses to employees that would
10 be paid ahead of customers, would you agree with
11 that?
12     A.    Well, again, they would be paid out of
13 a separate pool.
14     Q.    If there had been no transaction, do
15 you think that the Lehman employees would have
16 received the same bonuses they received in the
17 transaction?
18     MR. MAGUIRE:  I don't think that this
19 witness should be asked a series of
20 hypothetical questions about what would have
21 happened.  I think if you want to ask what
22 the knowledge was of the trustee, I think
23 that's fine, but to ask him about what would
24 have happened in a different circumstance is
25 not something that's part of his knowledge.

Page 196

1           J. Kobak
2      Q.    I want to understand the basis of the
3  trustee's approval for the deal which you say is
4  based upon the 47.4, 45.5 construct.
5      A.    And the $20 billion.
6      Q.    The $20 billion that Weil represented
7  would remain?
8      A.    Yes.
9      Q.    And was there a specific numerical
10 threshold in terms of the difference between
11 financial assets and liabilities in connection
12 with those assets that the trustee would approve
13 and beyond which the trustee would not approve?
14     MR. DAKIS:  Objection.  Asked and
15 answered.
16     A.    I don't know because it's a
17 hypothetical that didn't arise.  What we would
18 have done if there had been a $5 billion
19 discrepancy, a $10 billion discrepancy, I don't
20 know, and it would only be the trustee's
21 decision, it would be described in open court
22 and I think you would get a reaction from the
23 creditors and the Creditors Committee.  I don't
24 know if Weil would have agreed to it in the
25 first place, so it's a very hypothetical

Page 197

1           J. Kobak
2  question.
3      Q.    It's not a hypothetical.  The APA had
4  a discrepancy of over 4 billion between the
5  financial assets and financial liabilities and
6  you were willing to support that, correct?
7      MR. MAGUIRE:  Objection to form.  If
8  you want to establish that or ask that, you
9  can do that, but...
10     Q.    Okay.  Let me finish up one or two
11 questions.
12          Did the trustee or his advisors ever
13 instruct his representatives who signed the
14 final clarification letter not to sign it if
15 there was any chance that it transferred more
16 than $47.4 billion in non-real estate assets?
17     MR. DAKIS:  Objection to form.
18     A.    No, and I don't think we understood
19 that it did.
20     Q.    I refer you to paragraph 11 of your
21 affidavit, please.  In the second sentence, you
22 state, "We did not understand and were never
23 advised by anyone, including Barclays, that the
24 clarification letter could be read to convey
25 billions of dollars in additional customer

Page 198

```
1            J. Kobak
2   property."
3        What is the definition of "customer
4   property" that you mean when you made that
5   statement?
6       A.   It's additional customer property and
7   estate assets, so essentially what it means is
8   any assets. Customer property has a definition
9   in SIPA which I won't bore you with and I'm not
10  sure I could recite it from memory anyway, but
11  it also refers to property from any source that
12  would be necessary to make up for shortfalls
13  in -- in what would otherwise be customer
14  property.
15       So, essentially, a lot of estate
16  assets could also be customer property.
17      Q.   So, for example --
18      A.   And to the --
19      Q.   Just so I understand --
20      A.   I'm sorry to cut you off, and I -- in
21  any event, there was property in repos, there
22  might be property that could be customer
23  property, for instance, excess margin and so
24  forth, even though it might not be required to
25  be in segregation, would still be considered
```

Page 199

```
1            J. Kobak
2   customer property.
3       Q.   Sounds like --
4       A.   So that's an example.
5       Q.   So there are two different things,
6   right?  Customer property has a statutory
7   definition which basically means any property
8   that the trustee could use to pay customer
9   claims?
10      A.   Yes.
11      Q.   But there's also a concept before the
12  SIPC liquidation that certain property is
13  segregated, fully paid for customer property,
14  correct?
15      A.   Yes, or otherwise accounted for in
16  good control locations and so forth.
17      Q.   Let's talk about the latter thing
18  first, the latter category of segregated
19  customer property, if I can use that term.
20      A.   Okay.
21      Q.   Would you agree with me that the
22  trustee has the authority to sell segregated
23  customer property in a SIPC liquidation to
24  generate proceeds which can then be distributed
25  to customers?
```

Page 200

```
1            J. Kobak
2       A.   The statute says that, wherever
3   possible, securities should be returned --
4   securities of like kind and series should be
5   returned to customers.  So, generally, to the
6   extent that's possible, that's what a trustee
7   would do.
8        It's possible, theoretically, that you
9   could take securities and sell them and realize
10  cash and do something with that cash, return it
11  to customers, but that's really not what the
12  trustee is ordinarily supposed to do.
13  Ordinarily, the idea is that you try to return
14  in kind, to the extent possible, that property
15  which was in the customer or which the customer
16  thought was in his or her account.
17      Q.   In terms of customer property that is
18  the SIPC liquidation concept of any property
19  that could be used to pay out to customers, that
20  could be simply general estate assets that may
21  be usable to pay customer claims, correct?
22      A.   Well, I think you -- what our
23  allocation motion does, and you can read it for
24  yourself, is to say there were significant
25  shortfalls in the S.E.C. calculations, so under
```

Page 201

```
1            J. Kobak
2   the S.E.C. rules, the broker could have had a
3   duty immediately or in a very short period of
4   time to take property, do whatever the broker
5   needed to do to get in compliance if it wanted
6   to continue to be a broker-dealer.
7        So we say that same concept carries
8   over after the liquidation into SIPA to make --
9   because the SIPA statute is technically to be
10  read as if it were an amendment to the
11  Securities and Exchange Act.  So it's supposed
12  to provide this -- basically the same protection
13  after liquid -- after a filing date that
14  customers are supposed to receive under the
15  S.E.C. rules prior to the filing date.
16      MR. HUME:  Let's take a break for
17  lunch, shall we?
18      MR. MAGUIRE:  Okay.
19      THE VIDEOGRAPHER:  The time is 12:34.
20  We are going off the record.
21      (Luncheon recess.)
22
23
24
25
```

Page 202

```
1              J. Kobak
2         AFTERNOON SESSION
3         THE VIDEOGRAPHER: The time is 1:15.
4    We are back on the record.
5    JAMES B. KOBAK, JR., resumed and
6       testified further as follows:
7    EXAMINATION BY
8    MR. HUME:
9         Q.   Mr. Kobak, I believe you testified
10   earlier this morning that when the $47.4 billion
11   number was told to the trustee and his advisors,
12   you didn't know before the closing how that
13   number precisely was formulated, what the
14   components of it were, correct?
15        A.   That's correct.
16        Q.   I'm not sure I asked, I just want to
17   confirm, after the closing at any time from the
18   closing to present has the trustee learned how
19   the $47.4 billion number was formulated?
20        MR. MAGUIRE: I'm going to direct you
21   to exclude any work product of your counsel
22   or any communications with respect to any of
23   counsel's investigation.  If there was any
24   other separate source of information from
25   which you can answer the question, that's
```

Page 203

```
1              J. Kobak
2    fine.
3         A.   I believe in connection with the repo,
4    as I discussed, we've done some work on the
5    valuation of the collateral.  We certainly have
6    a little more information on some of the assets
7    that Barclays has claimed from us, whether those
8    are included in the 47.4 or not.
9         Other than that, I don't think, other
10   than my counsel has explained, or our counsel
11   has explained, that any investigation we've done
12   has basically been part of this lawsuit.
13        Q.   Yeah, okay.  Just to be clear, I'm not
14   asking about valuation work you've done.  I'm
15   talking about how the number was formulated
16   originally.  The trustee didn't formulate the
17   number, correct?
18        A.   No, right.
19        Q.   Someone --
20        A.   No, I'm saying that we did -- we've
21   done some work on pieces that might be in it.  I
22   don't think we've, other than what we're doing
23   in conjunction with this litigation, I don't
24   think we've put together how all the elements
25   that added up to 47.4 were calculated or added
```

Page 204

```
1              J. Kobak
2    together to get to that number.
3         Q.   Okay.  So, just so I'm clear, in terms
4    of the privilege objection, I'm going to ask,
5    has the trustee or his advisors asked Weil
6    Gotshal how the number was formulated?
7         MR. MAGUIRE: You would again exclude
8    from your answer any information that you
9    have from me or from anyone working on this
10   litigation with respect to any work we've
11   done on this litigation.  If you
12   separately --
13        A.   No, I understand.  I don't recall that
14   we've asked them separately from work,
15   investigative work in conjunction with this
16   dispute.
17        MR. HUME: So let me make sure I have
18   privilege line understood.  A Hughes Hubbard
19   litigator assigned to litigate against
20   Barclays may have asked Weil Gotshal the
21   question, and if they did -- whether they
22   did or not and whether they got an answer or
23   not and what the answer is you're claiming
24   privilege on?
25        MR. MAGUIRE: Yeah, whatever a Hughes
```

Page 205

```
1              J. Kobak
2    Hubbard litigator did in connection with
3    this litigation is privileged.
4         MR. HUME: That's a fairly sweeping
5    statement, but we'll come back to that.
6         Q.   You're agreeing that a Hughes Hubbard
7    lawyer who is not a litigator, if they had asked
8    Weil Gotshal, you would tell me, but you're
9    saying you don't recall whether that ever
10   happened?
11        A.   "Not a litigator" is too broad.
12   Someone who is not working actively with Mr.
13   Maguire and his team on this dispute.
14        Q.   Do you have a Chinese wall in the
15   firm?  Is it clear who's on which side of the
16   line?
17        MR. MAGUIRE: I'm not sure what the --
18   what exactly the question is.  If you're
19   asking --
20        MR. HUME: I just want to understand
21   the privilege, that's all.  Who's --
22        MR. MAGUIRE: It's very clear who is
23   litigating this dispute.  There may be --
24   and if you want to ask whether, separately
25   for the people who are litigating this
```

Page 206

1              J. Kobak
2    dispute, anybody had a separate
3    communication with Weil Gotshal at the time
4    or whatever, that's fine. I'm not asserting
5    privilege as to that.
6           MR. HUME: I want to make sure the
7    record is clear because we don't agree with
8    the privilege. You know, the debtor has
9    waived their privilege through September 30.
10   So I want to know -- and you're claiming a
11   common interest privilege, I take it, with
12   the debtor --
13          MR. MAGUIRE: Uh-huh.
14          MR. HUME: -- for this purpose?
15          MR. MAGUIRE: Right.
16     Q.   In any event, so are you able to tell
17   me today, does the trustee have an understanding
18   from any source of how Weil Gotshal formulated
19   or learned of the components of the $47.4
20   billion number?
21          MR. MAGUIRE: When you say "from any
22   source," you're now getting into the
23   privilege. If we exclude that source and we
24   ask about the non-privileged source, then
25   the witness can answer.

Page 207

1              J. Kobak
2           MR. HUME: I just want --
3           MR. MAGUIRE: Yes.
4           MR. HUME: So you're instructing him
5    not to answer to the extent he's learned it
6    from you or your litigation colleagues.
7           MR. MAGUIRE: Exactly. Exactly.
8     A.   And apart from that, I don't believe
9    so.
10    Q.   Did the trustee, and since I limited
11   my question to Weil Gotshal, I assume is the
12   answer the same if I ask with respect to whether
13   you learned from any other source such as
14   Lazard?
15    A.   Yes, I believe so.
16    Q.   The trustee, other than what he may
17   have learned through privilege, what you are
18   claiming privilege over, the trustee cannot tell
19   me -- you cannot as the trustee's representative
20   tell me how the $47.4 billion number was
21   formulated at the time it was given to the
22   judge?
23    A.   I don't believe we can, no.
24          MR. HUME: We'll state for the record
25   we disagree with the privilege. We think

Page 208

1              J. Kobak
2    you ought to tell us how the number was
3    formulated since you're trying to impose the
4    number as a cap on the entire deal.
5     Q.   Was the trustee aware of the fact that
6    on September 17, two days before the sale
7    approval hearing, Barclays announced to its
8    investors publicly that it was doing the deal
9    and that it expected the deal to generate some
10   positive capital accretion on its balance sheet?
11    A.   Am I aware of that now or was I aware
12   of it then?
13    Q.   Was the trustee aware of that before
14   the closing?
15    A.   I don't -- I wasn't. I don't know
16   about the trustee. That's not something I've,
17   you know, discussed with him in conjunction with
18   this deposition.
19    Q.   I'd ask that you do follow up with
20   that, because I think it's relevant to the
21   topics in the deposition.
22          MR. MAGUIRE: We'll leave a space in
23   the transcript and we'll take that request
24   under advisement.
25   INFORMATION TO BE PROVIDED: _____

Page 209

1              J. Kobak
2    _____
3    _____
4     Q.   When did the trustee first become
5    aware of the fact that, in its view, Barclays
6    may have received assets over the $47.4 billion
7    cap that the trustee believes applies to certain
8    assets in the deal?
9           MR. CARDEN: Objection to form.
10    A.   I, as I testified before, I think when
11   we were doing the repo transaction at Barclays'
12   behest, we did have some questions about the
13   numbers and the valuations. I think we tried to
14   reserve that. As I said earlier, I thought that
15   at the close of the hearing the Creditors
16   Committee and others indicated that they wanted
17   to look at the transaction carefully.
18          The judge seemed favorably disposed to
19   that on the ground that there should be full
20   transparency of what happened during the
21   extraordinary circumstances of that weekend, and
22   there was to be cooperation between the parties.
23          I don't want to get into a "who shot
24   John," but my understanding is Barclays wasn't
25   particularly cooperative with some of the

Page 210

1              J. Kobak
2   questions that were asked and that led to the
3   2004 request, and I think that's basically,
4   that -- those proceedings are basically the
5   answer to the question.
6       Q.   When did the trustee first communicate
7   to Barclays that the trustee believed Barclays
8   may have received assets in the deal in excess
9   of the $47.4 billion cap?
10      MR. CARDEN: Objection to form.
11      A.   I don't know. I don't know if we
12  communicated that during the 2004. I kind of
13  turned that over to a team of litigators who
14  kept me generally apprized of kind of what was
15  happening, but not necessarily on a
16  detail-by-detail basis.
17      Q.   Was the trustee aware that in February
18  2009 Barclays published the acquisition balance
19  sheet for the Lehman acquisition?
20      A.   I remember hearing and maybe seeing
21  the accounting statements that they did that
22  showed a substantial gain on the transaction,
23  which was quite a surprise to us.
24      Q.   Did the acquisition balance sheet --
25  do you recall whether the trustee was aware that

Page 211

1              J. Kobak
2   the acquisition balance sheet showed an
3   acquisition of assets, a total value of assets
4   over $47.4 billions?
5       A.   I don't recall. I recall a footnote
6   that showed a, if I'm thinking of the same
7   financial statement, that showed a profit of
8   something in the area of 2.2 to 2.3 billion
9   British pounds, which would be about $4 billion,
10  I think, U.S., give or take, which seemed quite
11  inconsistent with the kind of deal that had been
12  described and that we understood to be involved.
13      Q.   Did you notify Barclays of that?
14      A.   I don't know, other than that I recall
15  in one meeting with Jonathan Hughes and others,
16  you yourself might have been there, when we were
17  discussing some of Barclays' claims and our
18  reactions to them that I believe somebody on our
19  side, Mr. Maguire or the trustee himself or me
20  or somebody, I believe said that, you know, we
21  did not expect that Barclays would make a huge
22  profit on the transaction and we certainly
23  didn't think that if they made a big huge profit
24  on the transaction, they should also be seeking
25  yet more assets from us.

Page 212

1              J. Kobak
2        So, and I cannot be any more specific
3   than that. I just think that some remark like
4   that was made during such a meeting.
5       Q.   I remember that meeting, and I can
6   tell you I don't remember that statement, but
7   that's fine.
8       A.   Well, it may -- we've had other --
9       Q.   Since you brought the meeting up, I
10  have a question.
11      A.   We've had --
12      Q.   I have a --
13      A.   We've had other meetings with Mr.
14  Hughes and others, and so it may have been in
15  some other meeting or even phone call that
16  occurred.
17      Q.   At the meeting you reference on June
18  12 where we met to discuss Barclays claims, am I
19  correct in saying that no one from the trustee's
20  side of the table said anything about there
21  being a $47.4 valuation cap in the deal?
22      MR. CARDEN: Objection to form.
23      A.   I don't recall that subject coming up.
24      (Exhibit 445, Barclays PLC and
25  Barclays Bank PLC Form 6-K, marked for

Page 213

1              J. Kobak
2   identification, as of this date.)
3       Q.   Mr. Kobak, in front of you is Exhibit
4   445, which is an excerpt from Barclays' Form
5   6-K, S.E.C. filing from February 9, 2009. It
6   lists the acquisition balance sheet in the first
7   column on the second page of the attachment,
8   which is page 38 of the 6-K.
9       A.   Uh-huh.
10      Q.   Do you see that?
11      A.   Yes.
12      Q.   And it is listed in British pounds.
13  Do you understand that? It says "pounds,
14  millions" at the top of that column, do you see
15  that?
16      A.   Uh-huh. Yes, I do.
17      Q.   When this was published, did the
18  trustee review it, or his advisors?
19      A.   We looked at it and the profit that
20  was reported, yes.
21      Q.   And you thought the profit was bigger
22  than you thought -- expected it to be, correct?
23  You mentioned that?
24      A.   We didn't really expect there would be
25  any profit or any profit of any size, yes.

Page 214

```
1              J. Kobak
2       Q.   Did you think the total assets listed
3    were in excess of what you thought was
4    authorized?  Do you recall whether the trustee
5    at that time thought that the assets, the total
6    valuation of the assets was in excess of what
7    was authorized?
8          MR. DAKIS:  Objection to form.
9       A.   I don't know to what extent we looked
10   at that.
11         MR. HUME:  I want to mark quickly as
12   an exhibit the transcript from the Barclays
13   teleconference with investors.
14      Q.   As I understand it, the September 17
15   teleconference Barclays held with its investors,
16   you don't know whether the trustee was aware of
17   that?
18      A.   I don't know if the trustee was aware
19   of it.
20      Q.   Was the trustee aware that certain
21   creditors were complaining at the sale hearing
22   that Barclays was getting a discount and a fire
23   sale deal?
24      A.   I believe people were complaining
25   about a fire sale deal.  I'm not a hundred
```

Page 215

```
1              J. Kobak
2    percent sure that -- I don't recall necessarily
3    discussion of a discount in that connection.
4       Q.   Well, it's in the sale hearing
5    transcript, but we won't belabor it.
6          MR. MAGUIRE:  Would you care to give
7    us a reference?
8          MR. HUME:  Sure.  I'll give it to you
9    off the record and you'll see in it our
10   brief.
11         We'll mark the next exhibit.
12   Actually, we don't need to mark it.  Exhibit
13   24.  It's already been marked.
14         MR. MAGUIRE:  You mentioned the -- the
15   teleconference transcript.  Are you marking
16   that?
17         MR. HUME:  I'm waiting to get it.
18      Q.   Just so we do close the loop on the
19   discount point, if you wish, Mr. Giddens, if you
20   go back to the sale hearing transcript, big
21   document there in front of you.
22         MR. MAGUIRE:  Mr. Kobak.
23      A.   I'm Mr. Kobak.
24      Q.   Sorry, Mr. Kobak.
25         If you look at page 174 of the
```

Page 216

```
1              J. Kobak
2    document.
3       A.   Okay.
4       Q.   There's an objection being registered
5    by a Mr. Daniel Golden, who represented
6    creditors, bondholders, I believe, and at the
7    end of the paragraph on page 174, Mr. Golden
8    says, "Nobody ever suggested maybe there's an
9    alternative here that is something less than
10   selling assets on what we perceived to be a
11   discount value."  Do you see that?
12      A.   Yes.
13         MR. MAGUIRE:  I'm sorry, which line?
14         MR. HUME:  Line 6 through 8.  I'm
15   sorry.  I should have given that.
16      Q.   So does seeing that refresh your
17   recollection that there were complaints about
18   possible discount in the deal?
19         MR. CARDEN:  Objection to form.
20      A.   There were complaints that Barclays
21   was basically getting something for nothing, a
22   very valuable and substantial number of customer
23   accounts, among other things, and substantially
24   paying nothing for that other than a nominal
25   $250 million for goodwill, so that that was the
```

Page 217

```
1              J. Kobak
2    spirit in which I took that comment, not the
3    discount the way we have discussed it earlier.
4       Q.   Not withstanding that, the trustee
5    still believed that the sale should be approved,
6    correct?
7          MR. CARDEN:  Objection to form.
8       A.   Again, the trustee was looking at what
9    would be -- what he thought would be their for
10   customers, the protection for customers, the
11   need to protect customers, the fact that SIPC,
12   the S.E.C., the Federal Reserve, everyone else
13   wanted to protect customers, and that's the role
14   of the SIPA trustee.  So that was our primary
15   concern with the transaction, as I think we
16   explained during the hearing.
17      Q.   And the customers were protected?  The
18   PIM customer were protected, correct?
19      A.   They have been protected.
20      Q.   The PAM customers have been protected
21   by going to Neuberger?
22      A.   Yes, that's correct.  There's some
23   customers that Barclays didn't take.  We're
24   protecting them as well as we can.  There's some
25   prime brokers that I thought in the
```

## Page 218

J. Kobak

1  clarification letter it appeared that Barclays
2  was going to take. There's some 1100 of those.
3  They had very significant, very complicated
4  accounts, and Barclays subsequently changed its
5  mind and didn't take them. So we've done the
6  best that we could to protect them.
7  Q.   Barclays --
8  A.   It's been very expensive to do it.
9  Q.   Barclays did not receive any
10  segregated customer property that belonged to
11  those prime brokerage customers, did they?
12  A.   No, that's correct, they did not.
13  Q.   What other customers besides prime
14  brokerage customers remained with the estate?
15  A.   There are a number that I don't really
16  know how you would categorize them. They were
17  just accounts that it turned out were not
18  included either in the PAM range of accounts or
19  the PIM range of accounts, and so those are the
20  claims that we've received thousands of that
21  we're in the process of trying to analyze and
22  satisfy to the extent we can.
23  Q.   What about affiliate customers, how do
24  you treat those?

## Page 219

J. Kobak

1  A.   We -- we're in the process of
2  examining those claims. I believe some of the
3  affiliates will have customer claims, at least
4  we would be prepared to allow them as customer
5  claims after full reconciliation.
6  .        There are other accounts that have
7  been claimed by the holding company particularly
8  to be customer accounts that we believe were
9  subordinated or otherwise would be ineligible to
10  be customer accounts. But there are some
11  affiliate claims that, in all probability, will
12  be treated as customer claims.
13  Q.   And as of today, the trustee does not
14  know the total value of all customer claims that
15  it will recognize; is that correct?
16  A.   I know the value of those claims that
17  have been filed that have been objected to or
18  not were allowed where the objection has become
19  final, and that number is somewhere in the area
20  of $35 billion.
21  Q.   That have been objected to, that's the
22  amount of the claims --
23  A.   This is amounts of claims that are
24  allowed -- claims that have been filed, allowed,

## Page 220

J. Kobak

1  or objected to when the objection is final. So
2  it's essentially everything that's left.
3  Obviously some of the 35 billion may be objected
4  to, including some of the affiliate claims.
5  Q.   I guess what I'm asking is, at the end
6  of the day, you're going to have a certain
7  amount of claims that for which the
8  objections -- when you say "objected to," you
9  mean objected to by the trustee?
10  A.   Well, I -- let me explain. Our
11  process is customer files a claim. We look at
12  it very carefully, send a determination letter.
13  The termination letter says your claim's allowed
14  in the amount of X, or we deny your claim or we
15  allow it in the amount of X and otherwise deny
16  it.
17        The customer then has 30 days to
18  object to that claim, indicating that he wants
19  to go to court. So we have -- I think we had
20  originally something like $60 billion, $65
21  billion of claims. We processed a lot of those,
22  and quite a lot of customers turned out to be
23  general creditor claimants or, in some cases,
24  not even our -- not even a claimant that didn't

## Page 221

J. Kobak

1  even have a relationship with LBI as opposed to
2  somebody else.
3        So those claims have been allowed. So
4  I'm taking out of the 65 those that did not
5  object within the 30-day periods because, under
6  the court's order, those are now final; they
7  have been decided.
8  Q.   Can you look --
9  A.   35 is what's left.
10  Q.   Can you look at Exhibit 24, please,
11  First Amendment.
12        You've seen this document before, the
13  First Amendment to the Asset Purchase Agreement?
14  A.   Yes, I have.
15  Q.   And you understand, if you look at
16  paragraph 3, that it amended the APA to provide
17  that, instead of 50 percent of the residential
18  mortgage securities being transferred to
19  Barclays, 100 percent would be transferred, do
20  you see that?
21  A.   Yes.
22  Q.   And then in paragraph 4, we can go
23  through it, but it basically says that Barclays
24  would hold back 2 -- the $250 million portion of

Page 222

1                  J. Kobak
2   the cash amount in the APA?
3       A.   Yes.
4       Q.   Do you see that?  As well as this
5   additional 50 percent of residential securities
6   which were going to be called the residential
7   adjustment.  Do you see that?
8       A.   Yes, I do.
9       Q.   And it then goes on to say -- and this
10  is all in an effort to secure, if you look at
11  the fourth line down of paragraph 4, to secure
12  the LBI obligations that the purchaser has been
13  required to guarantee with the Depository Trust
14  Clearing Corporation and its subsidiaries.  Do
15  you see that?
16      A.   Yes.
17      Q.   And those were called the guaranteed
18  obligations?
19      A.   Yes.
20      Q.   These are the settlement obligations
21  at DTCC and its affiliates, do you understand
22  that?
23      A.   Yes.
24      Q.   If you look down to the last two lines
25  on this page of paragraph 4, it says, "All

Page 223

1                  J. Kobak
2   guaranteed obligations shall be charged against
3   the holdback and the residential adjustment."
4   Do you see that?
5       A.   Yes.
6       Q.   So under the First Amendment, the DTC
7   settlement obligations were going to be covered
8   by the holdback amount of 250 million and this
9   excess 50 percent of the residential mortgage
10  securities, correct?  Is that your understanding
11  of the deal as of the time of the First
12  Amendment?
13      A.   Yeah, as of the time of the First
14  Amendment, yes.
15      Q.   And then that then changed, correct?
16  That provision was itself then subsequently
17  amended, do you recall that?
18      A.   Yes.  It would help if I --
19      Q.   Here's Exhibit 52, which is the DTC
20  letter.
21      A.   Okay.
22      Q.   DTC letter Exhibit 52, dated September
23  22, 2008, is an agreement between DTC and the
24  trustee and Barclays, correct?
25      A.   That's correct.

Page 224

1                  J. Kobak
2       Q.   And it provides that Barclays would
3   not be acquiring the LBI accounts at DTCC,
4   correct?
5       A.   Right.
6       Q.   It also provides in paragraph 2 on the
7   second page, it says, "In order to induce DTCC
8   to take the foregoing actions, Barclays hereby
9   agrees to guarantee, indemnify and hold harmless
10  DTCC and each of its clearing agencies'
11  subsidiaries," and it goes on to list other
12  people, "against any losses that would result
13  from the winding down of the accounts."  Do you
14  see that, the guarantee language?
15      A.   Yes, I do.
16      Q.   And it says the guarantee is secured
17  by $250 million, the cash deposit, do you see
18  that?
19      A.   That's correct.
20      Q.   Underneath it then gives wire transfer
21  information of JPMorgan, you see that?
22      A.   Yes.
23      Q.   And underneath that it says, "Recourse
24  with respect to this guarantee shall be solely
25  limited to the cash deposit," which is the $250

Page 225

1                  J. Kobak
2   million, do you see that?
3       A.   Yes, I do.
4       Q.   So the DTC letter now provides that
5   the guarantee is limited solely to the $250
6   million?
7       A.   The Barclays guarantee is limited to
8   $250 million, which will be taken out, if
9   necessary, of the 250 on deposit with DTC, yes.
10      Q.   And any remainder, anything that
11  wasn't needed, would be distributed back to the
12  LBI estate?
13      A.   That's correct.
14      Q.   And by the way, was any amount
15  ultimately distributed back from DTC to LBI?
16      A.   DTC has remitted some funds to us, but
17  it's still holding an amount substantially in
18  excess of $250 million.  So as of today the
19  answer is no.
20      Q.   Your position is that no portion of
21  the 250 million has been remitted back to the
22  LBI estate?
23      A.   That's correct.  They're still holding
24  well over 4 -- well over $250 million.
25      Q.   Where did the excess come from,

Page 226

1            J. Kobak
2   liquidating other securities?
3       A.   They liquidated billions and billions
4   of dollars of securities. Their wind-down
5   process I don't believe is completed yet.
6       Q.   Do you know what the ultimate
7   settlement obligations were that were guaranteed
8   by this DTC letter agreement?
9       A.   In terms of dollar amount or --
10      Q.   Yes.
11      A.   No, not off the -- no, I don't recall.
12      Q.   Do you know if it was more or less
13  than 250 million?
14      A.   I thought it was a very substantial
15  amount. There were many other liabilities that,
16  according to -- and obligations according to DTC
17  that the estate was potentially liable for that
18  they would look to, and that's why it's my
19  understanding they wanted anything that they
20  could get a hold of in addition to this $250
21  million for the Barclays guarantee to make sure
22  that they and their members were protected.
23      Q.   Just so I'm clear, I'm not asking what
24  the potential exposure was. I'm asking what --
25  do you know today what the ultimate actual

Page 227

1            J. Kobak
2   settlement obligations were that the DTCC had to
3   absorb after the Lehman liquidation began that
4   was being secured by this DTC letter?
5       A.   No, I don't. We're in the process of
6   trying to do a full reconciliation of accounts
7   and so forth with DTC.
8       Q.   Now, do you recall that the
9   clarification letter was explicitly amended to
10  reflect the amendment made by the DTC letter to
11  the deal as it was in the First Amendment to the
12  APA?
13          MR. DAKIS: Objection to form.
14          MR. MAGUIRE: Can you repeat that
15  question?
16      Q.   Why don't we do it this way. Can you
17  find and put in front of you yourself the
18  clarification letter, Exhibit 25?
19      A.   I'm having trouble putting my hands on
20  my copy of 25.
21      Q.   I'm sure we have another one.
22      A.   I'm sorry. It was under something.
23  I'm sorry.
24      Q.   If you to turn to page 3 of the
25  clarification letter, you'll see subsection 1(d)

Page 228

1            J. Kobak
2   of the agreement?
3          MR. MAGUIRE: 1(d)?
4       Q.   1(d) toward the top of the page, do
5   you see that provision?
6       A.   Yes.
7       Q.   Says, "Sections 3 and 4 of the First
8   Amendment are hereby deleted in their entirety
9   and shall be of no effect ab initio. LBI hereby
10  instructs purchaser to pay at the closing $250
11  million of the cash amount to the Depository
12  Trust Clearing Corporation for deposit as
13  collateral against LBI's obligations to DTC.
14  Such" -- it then says, "Such collateral account
15  shall be maintained in accordance with the
16  agreement among LBI, Purchaser and DTC entered
17  into in connection with the closing."
18          Do you see that language?
19      A.   Yes.
20      Q.   Would you agree with me that that
21  language in the clarification letter reflects
22  the agreement made in the DTC letter?
23      A.   Well, it refers to that letter. This
24  is only in part what the agreement covered, the
25  agreement, the tri-party agreement between LBI,

Page 229

1            J. Kobak
2   the purchaser and DTC.
3       Q.   I understand that's your position, but
4   what I want to make sure we agree on is that the
5   clarification letter was amended to reflect the
6   agreement reached in the DTC letter agreement?
7       A.   Yes. I mean, it was understood that
8   there would be an agreement with the DTC between
9   the three parties referenced here.
10      Q.   Now, if you turn to the first page of
11  the clarification letter and we go back to the
12  provision we were looking at before, Section
13  1(A), Romanette ii, Subsection (B) of that
14  paragraph provides that purchased assets shall
15  include "such securities and other assets held
16  in LBI's clearance boxes as of the time of the
17  closing." Do you see that language?
18      A.   Yes.
19      Q.   And do you agree with me that that
20  language was not amended to reflect the
21  agreement set forth in the DTC letter agreement?
22          MR. MAGUIRE: Objection to form.
23      A.   I believe there was an earlier draft
24  of the clarification letter that specifically
25  referred to DTC clearing boxes, and the specific

Page 230

J. Kobak

1  reference to DTC clearing boxes or to DTC was
2  removed from the agreement before this language
3  appeared.
4      Q.   We can show you that draft, but are
5  you saying that this provision should have been
6  written the way it's written?  As it's written,
7  it does not -- let me withdraw and ask a clear
8  question.
9         There's nothing in this provision
10 relating to clearance box securities, is there,
11 that carves out or excludes clearance box
12 securities at the DTC account?
13     MR. MAGUIRE:  Objection to form.
14     Q.   Would you agree with that?
15     A.   There's nothing that either
16 specifically includes them or specifically
17 excludes them --
18     Q.   Well --
19     A.   -- in this agreement.
20     Q.   -- there are securities -- there were
21 securities at that time in LBI's clearance boxes
22 at the DTC, correct?
23     A.   I believe so, yes.
24     Q.   And this language does not exclude

Page 231

J. Kobak

1  those securities?
2      A.   Not specifically, no.
3      Q.   Does the trustee think that this
4  should have been written differently to exclude,
5  explicitly exclude, the DTC securities?
6      MR. MAGUIRE:  Objection to form.
7      Q.   The DTC clearance box securities?
8      A.   The trustee feels that there is a
9  clear agreement with DTC and with Barclays which
10 Barclays needed to sign in order to have the
11 account transfers take place which specifies
12 that the clearance boxes remain property of the
13 trustee, as we've previously discussed.
14     Q.   Before the closing, Mr. Kobak, did
15 anyone for the trustee ever tell Barclays that
16 the trustee believed that the DTC letter removed
17 the clearing box assets from the deal?
18     MR. CARDEN:  Objection to form.
19     A.   I don't know if anyone specifically
20 discussed that with Barclays, but it was our
21 clear understanding and I believe the DTC's
22 understanding as well.
23     Q.   But you don't know whether that
24 understanding was ever communicated to Barclays?

Page 232

J. Kobak

1      A.   I don't recall it being communicated
2  one way or the other to Barclays.
3      Q.   And other than -- you told me about a
4  conversation with the DTC earlier before the
5  lunch break.
6         Other than those communications, did
7  the trustee communicate its understanding about
8  the DTC clearing box assets to anyone else
9  before the closing?
10     A.   I don't clearly remember.  I may have
11 discussed it with Mr. Caputo of SIPC.
12     Q.   Other than Mr. Caputo at SIPC, for
13 example, does the trustee have any recollection
14 of telling anyone its understanding about the
15 clearance box securities and the DTC letter at
16 Weil Gotshal before the closing?
17     A.   Before the closing I don't recall any
18 such discussion.  I just don't recall either
19 way.
20     Q.   Is there any recollection of any such
21 discussion with anyone employed by Lehman?
22     A.   No, I don't recall.  Again, I don't
23 recall either way.
24     Q.   Did anyone, during the negotiations

Page 233

J. Kobak

1  and before the closing, did anyone ever
2  explicitly communicate to the trustee that the
3  DTC letter agreement removed the DTC clearance
4  box assets from the sale?
5      MR. MAGUIRE:  Other than in the letter
6  itself?
7      A.   Well, the letter itself clearly says
8  that to me, and I believe that was the substance
9  of my discussions with the representatives of
10 the DTC, that rather than what they would have
11 preferred to have happened, as I understood it,
12 was that Barclays would assume the accounts and
13 the liabilities in their entirety, that the
14 whole 74 box, which I think is what we were
15 talking about, would be transferred to Barclays
16 given whatever the Barclays number is and become
17 the Barclays box, but that since Barclays would
18 not assume liabilities, DTC felt itself exposed
19 and, therefore, it wanted to be sure that the
20 boxes stayed with the trustee.
21        And that was the background for the
22 agreement, as I understood it, and I did have
23 discussions of that with DTC and I believe I
24 also mentioned it briefly to Mr. Caputo at some

Page 234

1           J. Kobak
2    .point, perhaps during the court proceedings or
3    over the weekend.
4       Q.    And the discussions you had with the
5    DTC lawyers and representatives you believe were
6    late Friday and early Saturday morning?
7       MR. MAGUIRE:  Objection to form.
8       A.    I believe we had some discussion in
9    court and further discussion I think maybe very
10   early Monday morning around the time of the
11   execution of the DTC letter, as I recall.
12      Q.    After reviewing the clarification
13   letter, the final clarification letter, did the
14   trustee or any of his advisors bring to anyone's
15   attention that the clearance box provision in
16   the clarification letter does not specifically
17   exclude clearance box assets at the DTC
18   accounts?
19      A.    No, I don't believe we discussed that
20   one way or the other.
21      Q.    So until Barclays raised the issue by
22   demanding delivery of those clearance box
23   assets, you don't know of any time where the
24   trustee raised the issue with anyone else?
25      A.    I don't believe that we reached that

Page 235

1           J. Kobak
2    issue in terms of discussing it.  As I say, we
3    were not very actively involved in the
4    negotiations.  Essentially this is the deal that
5    had been done by the holding company and by Weil
6    that we were asked to approve for purposes of
7    our proceeding, and that was still essentially
8    our role in it.
9       Q.    Can you tell me what meaning the
10   trustee ascribes, if any, to the phrase in
11   paragraph 1(A), two little ii, "Such securities
12   and other assets held in LBI's clearance box as
13   of the time of the closing"?
14      A.    I think the trustee would ascribe the
15   normal English language meaning of those words.
16      Q.    Okay.  You're content to live with the
17   normal English reading of those words?
18      A.    Yeah, but I think you have to
19   interpret this in terms of the context, and the
20   context, if it didn't include then, certainly a
21   short time thereafter did include what's now
22   Exhibit 52, the DTC letter, which is dated as of
23   September 22, actually a date or two after the
24   "as of" date of the clarification letter.
25      Q.    In your letter --

Page 236

1           J. Kobak
2       A.    So, in a sense, whatever the words
3    were, there was a specific agreement between all
4    three of the parties involved very specifically
5    dealing with the clearing boxes at DTC which
6    clearly said, in our view, and I believe in
7    DTC's views, that these are specifically
8    excluded assets from the clarification letter in
9    the Asset Purchase Agreement.
10      Q.    You agree that the clarification
11   letter and the DTC letter were executed
12   simultaneously, correct?
13      A.    I believe roughly simultaneously.
14      Q.    And do you recall making the argument
15   to Barclays in one of your letters that the DTC
16   letter should control the clarification letter
17   because it was executed two days later?
18      A.    I believe I made that point.  I think
19   I also made the point that I've just made that
20   this was a very specific agreement about a very
21   specific subject for a very specific purpose
22   between all three parties that were involved.
23      Q.    Do you agree that the first point
24   about the DTC letter being executed and agreed
25   to later than the clarification letter was

Page 237

1           J. Kobak
2    incorrect?
3       A.    No.
4       MR. MAGUIRE:  You're talking now about
5    executed versus dated?
6       Q.    Executed.  Agreed to, finalized and
7    executed?
8       A.    Can you --
9       Q.    I just want a confirmation on the
10   record.  Your affidavit says the clarification
11   letter was executed in the early morning hours
12   of September 22?
13      A.    Yeah, I've never disputed that.  I
14   think the point I meant to make to Barclays, and
15   I realize you dispute this as a legal matter,
16   and I don't think today is the time to, you
17   know, argue our legal disputes rather than our
18   factual understandings, but I think there's some
19   significance to the fact that dates -- "as of"
20   dates were chosen for this agreement and the
21   more specific agreement which specifically deals
22   with the subject we're talking about is also the
23   one that bears the later date.
24      Q.    Following the closing -- this is a
25   complete filing of something or a filing with

Page 238

J. Kobak

1 one of its attachments that was made in court.
2 It should be clipped together and labeled as the
3 next exhibit, please.
4        (Exhibit 446, Joint Motion of the
5        Debtors and Barclays Capital, Inc. for Entry
6        of an Order Authorizing to File Under Seal
7        Certain Schedules to the Asset Purchase
8        Agreement, marked for identification, as of
9        this date.)
10    Q.   Mr. Kobak, on September 30, eight days
11 after the closing, Weil Gotshal, acting for the
12 Debtor, and Cleary Gottlieb, acting for
13 Barclays, filed a motion, a joint motion, to
14 file two schedules to the clarification letter.
15 That motion has been marked as the next exhibit,
16 which is number 446?
17    A.   I see this. I see it, yes, and I have
18 it in front of me.
19    Q.   And at the time that this was filed, I
20 assume it was served on the trustee, do you
21 recall?
22    A.   We get served with an awful lot of
23 papers. I don't specifically recall.
24    Q.   Were you aware of this filing?

Page 239

J. Kobak

1    A.   I knew there was a filing of certain
2 schedules -- I believe I knew there was a filing
3 of certain schedules to the Asset Purchase
4 Agreement and that Barclays wanted the filing to
5 be made under seal.
6    Q.   Did you get the under-seal exhibit
7 list of the securities that were filed? Did you
8 receive that?
9    A.   I don't know if I ever received it
10 personally, but again, some representative of
11 the trustee did, I'm sure.
12    Q.   And you understood that this was
13 filing Schedules A and B referenced in the
14 clarification letter?
15    A.   Yes, I do.
16    Q.   And you understood Schedule A was the
17 repo collateral?
18    A.   Yes, basically.
19    Q.   And Schedule B were the clearance box
20 assets?
21    A.   Well, that's what -- I believe that's
22 the schedule that's referred to in Exhibit 25,
23 so yes.
24    Q.   Did the trustee -- did the trustee

Page 240

J. Kobak

1 make any effort in response to this filing to
2 determine whether the Schedule B assets were in
3 the DTC clearance boxes?
4    A.   I think at a later time -- I don't
5 think this is what you're really asking me, but
6 it's responsive to your question. I think at a
7 later time during our discussions at Barclays we
8 had Deloitte do an examination of what Barclays
9 was claiming and what was really in the -- in
10 the clearance boxes as compared to the list and
11 so forth. But as the time, the answer is I
12 don't believe so.
13    Q.   Did the trustee object in any way to
14 the fact that there were all these clearance box
15 assets being described as assets transferred
16 under the agreement, many of which were found in
17 the clearance boxes at the DTC?
18    A.   No, because it didn't really alter our
19 understanding or our position, which is that the
20 DTC letter is controlling.
21    Q.   So, just so I understand, at the time
22 this was filed, were you aware of the fact that
23 there was a schedule with clearance box assets
24 that included assets in the DTC clearance boxes?

Page 241

J. Kobak

1    A.   I'm not sure we particularly focused
2 on it, to tell you the truth, because I don't
3 think we thought it was particularly relevant.
4    Q.   You didn't think it was relevant what
5 the schedule of assets were that were being
6 transferred to Barclays, billions of dollars of
7 assets?
8    A.   Schedule A we certainly thought was
9 significant. That doesn't mean that I spent a
10 lot of time, you know, looking at each Cusip
11 number on Schedule A or B, or paying that much
12 attention to it at the time, because I would --
13 it would be meaningless to me in terms of value
14 or whether it actually was in the boxes or
15 anything else. And I think our understanding
16 was that what was in the clearance boxes was
17 ours under the DTC agreement.
18    Q.   Then why would Schedule B even be
19 filed?
20    A.   It was referred to in the agreement
21 and it was Barclays that wanted to file these
22 things and file them under seal. I don't think
23 we paid particular attention to it, to tell you
24 the truth.

Page 242

J. Kobak

1
2    Q.   So you understood Barclays to be
3    filing something that Barclays thought it would
4    receive under the transaction that you didn't
5    think they would receive under the transaction?
6    A.   I don't know --
7        MR. MAGUIRE: Objection to form.
8    Misstates the testimony.
9    Q.   Is that accurate?
10   A.   I don't know what Barclays thought.
11   Q.   Well, wait a minute.  Yes, you do.
12   The agreement itself specifically refers to
13   these assets as assets transferred under the
14   agreement?
15   A.   I know what the agreement -- if you'd
16   let me answer my question.  I don't know how you
17   can know what I thought at the time, even if
18   it's not perhaps what you think I should have
19   thought.
20   Q.   Let me show you -- I didn't mean --
21   A.   Can I finish my answer?
22       I don't know what position Barclays
23   was taking.  There was a lot of suspicion voiced
24   at the time of the hearing about the assets that
25   were involved.  Barclays, as I recall, committed

Page 243

J. Kobak

1
2    to file something.  There was a certain amount
3    of suspicion about why it had to file things
4    under seal, but I think the court understood
5    that there were a lot of securities positions
6    that you might not want to get out in the public
7    eye.
8        And there was a reference to a
9    Schedule B.  I think to complete the filing in
10   good order, Barclays may have decided to file
11   Schedule B as well as Schedule A.  Perhaps it
12   was going to take the position that, after all,
13   they were going to make some claim on these
14   boxes, but we felt very clearly, and we still
15   feel, that they're basically ours under Exhibit
16   52, which we believe is the controlling
17   document.
18   Q.   Mr. Kobak, there's no "perhaps" about
19   it and it wasn't just Barclays.  Let me just
20   refer to you page 3 of the motion.  This was
21   filed by Weil Gotshal with Cleary.  Page 3, the
22   last sentence at the bottom of the page, the
23   last complete sentence says, "As more fully
24   described in the Clarifying Letter, the
25   Schedules contain lists of securities and

Page 244

J. Kobak

1
2    trading positions transferred under the Purchase
3    Agreement."
4        Was it clear to the trustee at the
5    time this was filed that Weil Gotshal,
6    representing the debtor, as well as Barclays,
7    represented by Cleary, understood the Schedule B
8    assets filed in court were to be transferred to
9    Barclays?
10   A.   No.  I mean, I know that's what these
11   pages say, but that -- we didn't have an
12   understanding to that effect at all.
13   Q.   Well, how could you have understood it
14   any other way?
15   A.   We didn't understand that these assets
16   were going to be Barclays' assets.  We did
17   understand that they were still referred to in
18   the clarification letter.
19   Q.   Did you tell anyone at the time this
20   was filed that it was a mistake?
21   A.   No.
22   Q.   Before this was filed, was the trustee
23   consulted in any way about this filing?
24   A.   I believe we understood, and it may
25   have been from things that Lindsee Granfield

Page 245

J. Kobak

1
2    said in court, that there were going to be
3    schedules filed and Barclays, as always, was
4    going to seek to have them filed under seal.
5    Q.   Prior to the September 30 filing of
6    Schedule A and B, did the trustee consult in any
7    way with Weil Gotshal about the filing of those
8    two schedules?
9    A.   Not that I recall.
10   Q.   And prior to the filing on September
11   30, did the trustee consult in any way with
12   Barclays about the filing of those two
13   schedules?
14   A.   Other than that we might have had some
15   discussion that they were going to be filed and
16   Barclays was going to seek to file them under
17   seal, no.
18   Q.   Do you recall whether the trustee
19   communicated to anyone prior to the filing of
20   the September 30 schedule, between the closing
21   and September 30, did the trustee communicate to
22   anyone that it didn't believe the Schedule B
23   securities were included in the deal?
24   A.   In that time period, I don't believe
25   so.

Page 246

J. Kobak

1                J. Kobak
2    Q.   Do you recall that in that time period
3  the trustee was being asked to authorize the
4  transfer of certain securities in the DTC
5  accounts?
6    A.   Yes, and it was our understanding that
7  authorization was for a transfer of customer
8  accounts to Barclays as well as to Neuberger.
9    Q.   What was the basis of that
10  understanding?
11       MR. MAGUIRE:  Can we just make sure
12    that you allow the witness to finish his
13    answer before you start your question.
14    Q.   What was the basis for that
15  understanding?
16    A.   That Barclays would have been
17  entitled -- or, not Barclays, really, but the
18  customers would have been entitled to have their
19  transfer -- their accounts transferred to
20  Barclays because that was the purpose of the
21  transaction.
22       (Exhibit 447, a document bearing Bates
23    Nos. HHR_00009059, marked for
24    identification, as of this date.)
25       (Exhibit 448, a document bearing Bates

Page 247

J. Kobak

1                J. Kobak
2    Nos. HHR_00009050 through 9051, marked for
3    identification, as of this date.)
4    Q.   Mr. Kobak, Exhibit 447 and 448 relate
5  to a request.  If you look at 447 first, there's
6  a request from Laura Vecchio at Lehman to Chris
7  Kiplok, your colleague at Hughes Hubbard, do you
8  see that?
9    A.   I believe her name is pronounced
10  Vecchio.
11    Q.   Vecchio, thank you.
12       She says -- this is on September 26,
13  2008, do you see -- are you on Exhibit 447?
14    A.   Yes.
15    Q.   She says, "Chris, here are the
16  instructions for the Barclays collateral.  We
17  just confirmed with Barclays the following:  We
18  need to deliver the 269 million DTC 636
19  collateral to Barclays corporate DTC box 7256.
20  They have asked us to deliver on DTC Code 30 for
21  free."  Then she says, "Please refer to" a date
22  "DTC 636 on the deliveries.  Any questions,
23  please call."  Do you see that?
24    A.   Yes, I do.
25    Q.   It then says, "Thanks, Jim."  Do you

Page 248

J. Kobak

1                J. Kobak
2  have any idea why it says "Thanks, Jim"?
3    A.   No, I was going to ask you the same
4  thing.
5    Q.   Perhaps it's written by someone other
6  than Laura Vecchio.  It may be written by Jim
7  Hraska from her account.  I don't know.  I don't
8  know the answer.  I'm not representing that.
9       You don't know either?
10    A.   No.  I mean, at this time Laura
11  Vecchio was the person we had to make all
12  requests through.  She was basically a former
13  Lehman person, and I guess -- I can't remember
14  if she was hired by Barclays or the holding
15  company, but she was basically the person that
16  virtually all our information or other kinds of
17  requests had to go through before we could get
18  anything acted on.  It was very frustrating.
19       But anyway, that's who she is.
20    Q.   The next Exhibit, Exhibit 448, is from
21  later the same day, Friday, September 26, from
22  someone named Danielle de la Vega to Chris
23  Kiplok.  Do you see that?
24    A.   Yes, I do.
25    Q.   Do you know who Danielle de la Vega

Page 249

J. Kobak

1                J. Kobak
2  is?
3    A.   No.
4    Q.   This e-mail attaches an authorization
5  signed by Chris Kiplok.  Do you see that?
6    A.   Yes, I do.
7    Q.   And it says, "James W. Giddens, as
8  trustee, authorizes the transfer of collateral
9  referenced in the enclosed spreadsheet in
10  accordance with the wire instructions below on
11  an expedited, priority basis as part of the
12  transfer of customer accounts to Barclays."  Do
13  you see that?
14    A.   Yes, I do.
15    Q.   And is that language the reason that
16  you are saying that the clearance box assets the
17  trustee authorized were transferred, was the
18  theory that they were customer assets?
19    A.   Yes, that was our understanding at the
20  time.
21    Q.   But is that the only basis you have
22  for saying that, that language?
23       MR. MAGUIRE:  I'm sorry, what do you
24    mean?
25    Q.   Well, what is the --

Page 250

1           J. Kobak
2       A.   It was our intent.  It was never our
3   intent to transfer securities other than to --
4   from these boxes other than to -- to Barclays --
5   let me start over.
6           It was never -- it was never our
7   intent to transfer securities from these boxes
8   to Barclays other than for the purpose of
9   satisfying customer accounts as part of the
10  customer account transfer.
11      Q.   Didn't the trustee know which assets
12  were segregated customer assets that were being
13  transferred for customer accounts and which were
14  proprietary assets?
15      A.   I'm not sure at that time that we
16  fully understood it with the small staff we had.
17  I believe later in time we required people to
18  confirm that they were asking for a transfer for
19  the purpose of satisfying customer claims or
20  for -- because it was part of a customer account
21  transfer, to specifically tell us that that was
22  the case.  I think we became concerned that
23  there might have been inadvertent transfers
24  of -- under the belief that we were making a
25  customer transfer that might have been

Page 251

1           J. Kobak
2   considered proprietary assets, and that was of
3   concern to us.
4       Q.   So when you were transferring property
5   you thought was customer property, you would use
6   this language as part of the transfer of
7   customer --
8       A.   I believe, I may be wrong about this,
9   I'm pretty sure we had people do some kind of
10  confirming e-mail or representation to us that
11  they were asking for the transfer because it was
12  a customer account transfer.
13          (Exhibit 449, a document bearing Bates
14      Nos. HHR_0000491 with attachment, marked for
15      identification, as of this date.)
16      Q.   Mr. Kobak, Exhibit 449 is another
17  confirmation for another transfer, this dated
18  September 29, 2008.  In the first paragraph
19  here, it says, "James W. Giddens, trustee in the
20  SIPC liquidation of Lehman, authorizes the
21  transfer of the assets detailed in the attached
22  Excel worksheets pursuant to the Asset Purchase
23  Agreement dated as of September 16, 2008."
24          Wasn't this transfer being made for
25  Barclays' account?

Page 252

1           J. Kobak
2       A.   I'm not sure -- I'm not sure if these
3   accounts are customers' accounts or proprietary
4   accounts, the D -- the DTC accounts that are
5   listed.
6       Q.   Well, the subject heading says
7   "Transfer of Assets Pursuant to the APA."  What
8   basis would you have had for thinking these were
9   customer accounts?
10      A.   Well, if they were going to a DTC,
11  customer DTC participant account or if they were
12  destined for a customer, they would have been
13  transfers to satisfy -- or, for customer account
14  transfers.
15      Q.   Just so I understand it, was there no
16  ability on the part of the trustee to determine
17  whether assets were proprietary assets or
18  customer assets at this time in the September 26
19  through 30?
20      A.   Frankly, it would have been very
21  difficult for our people to do that until we had
22  our full staff up.  Barclays was constantly
23  asking us to transfer things.  We had the
24  understanding we were transferring -- we were
25  basically responding to customer requests.

Page 253

1           J. Kobak
2       Q.   Would you have had that understanding
3   even if Barclays explicitly said in this
4   request, "Please transfer this for us as our
5   assets under the Asset Purchase Agreement"?
6       A.   Would we have had that understanding?
7   Should we have had that understanding?  I don't
8   know.  I think I made it very clear to Jonathan
9   Hughes I think when we had Deloitte up and
10  running and Marlo Karp and her people fully
11  staffed up, I think Marlo on a couple of
12  occasions flagged instances where it appeared
13  that what Barclays was asking for were
14  proprietary assets rather than customer assets
15  and she basically said no.  And if I recall,
16  after it happened a couple of times, she
17  reported that to me.  I believe I sent some
18  e-mails to Jonathan Hughes complaining about
19  that and basically saying if Barclays wanted to
20  make a claim for something, they should make a
21  formal claim in writing through the lawyers and
22  not try to sneak it through relatively low-level
23  staff people without knowledge of the
24  agreements.
25      Q.   Do you remember asking Weil Gotshal

Page 254

J. Kobak

1  whether they agreed with your interpretation
2  about the clearance box provision in the
3  clarification letter?
4      A.   I might have had some discussion with
5  Rod Miller about that.  Other than that, I don't
6  recall.
7      Q.   Did anyone from Weil Gotshal ever
8  confirm your understanding that the DTC
9  clearance box assets were not included in the
10 transaction?
11     A.   I don't recall.  I very vaguely have a
12 recollection of calling Rod Miller, who we were
13 dealing with on some other things at that point,
14 and I think he maybe said it really wasn't my
15 department or I'm not sure or whatever.  And
16 other than that, I don't recall specifically any
17 other conversation.
18         (Exhibit 450, a document bearing Bates
19         Nos. HHR_00009562 through 9566 with
20         attachment, marked for identification, as of
21         this date.)
22     Q.   Mr. Kobak, Exhibit 450 is an e-mail
23 exchange between you and Rod Miller.
24     A.   Uh-huh.

Page 255

J. Kobak

1      Q.   You are forwarding to him a letter you
2  received from Cleary Gottlieb, which is attached
3  to the e-mail.
4      A.   Correct.
5      Q.   You say in your e-mail to Rod Miller,
6  which is dated December 30, 2008, in the middle
7  of the page, you say, "This is the letter which
8  I called -- about which I called earlier."  You
9  then go on to say, "Among other things, we think
10 the agreement with DTCC and Barclays gave us the
11 contents of the accounts back, but we would
12 appreciate Weil's views and recollections."  Do
13 you see that?
14     A.   Yes.
15     Q.   Did you ever get a substantive
16 response from Weil Gotshal to that inquiry?
17     A.   I got the response that you see here,
18 which is, "I will look back -- take a look as
19 soon as possible and get back to you."  I don't
20 believe he did get back to me.  Frankly, it
21 wasn't that unusual, with all deference to their
22 lawyers, that sometimes Weil didn't get back to
23 us because I'm sure they had a million things on
24 their plate.  I think I recall having a

Page 256

J. Kobak

1  discussion with Rod where he basically said he
2  wasn't sure that this was really his department,
3  he wasn't sure who was involved, he didn't -- I
4  thought he said he didn't disagree with our
5  interpretation, but I don't think he had a clear
6  recollection of having been involved one way or
7  the other.
8      Q.   You think you recall that?
9          MR. MAGUIRE:  Objection to form.
10         Is there a question?
11     Q.   The question is you either do or you
12 don't.  I mean, do you have a clear recollection
13 of a conversation?
14     A.   I don't -- I guess what I should have
15 said is I don't have a clear recollection.  I do
16 have a very vague recollection of some follow-up
17 call where Rod Miller disclaimed particularized
18 knowledge of this but, as far as I can see,
19 didn't agree -- disagree with our position;
20 seemed to indicate that he did agree with it.
21     Q.   Can you look back at the Rule 60
22 brief?  Do you have that?
23     A.   This is 443?
24         MR. MAGUIRE:  Yes, Exhibit 443.

Page 257

J. Kobak

1      Q.   Can you look at paragraph 4 again
2  where it references the amount of clearance box
3  assets that you say we received or are claiming?
4  In the first bullet point there under 4, you
5  say, "Approximately $2.4 billion in assets that
6  were in LBI's clearance boxes."  Do you see
7  that?
8      A.   Yes.
9      Q.   "Including approximately 1.6 billion
10 that has been wrongfully transferred to
11 Barclays," do you see that?
12     A.   Yes.
13     Q.   Has the trustee performed a valuation
14 of the clearance box assets referenced in that
15 paragraph?
16     A.   The ones that have been transferred
17 or --
18     Q.   Both.  Either one.
19     A.   Let me start with the 800 that
20 remains.
21     Q.   Uh-huh.
22     A.   I believe we've asked Deloitte to take
23 a look and give us some idea of the value.  I
24 believe, beyond a fairly general range of the

Page 258

J. Kobak

1  type described here, they have, again, said that
2  there are a number of securities that aren't
3  easy to value. There may be some securities in
4  the boxes that are of somewhat questionable
5  value.
6      So we haven't been able to get an
7  exact figure, but I think that was probably
8  about the best estimate that we had at the time
9  of the 800 million.
10     Q.    And so, in order to do that, you had
11 to define what those clearance box assets were,
12 correct?
13     A.    Yeah, what was shown. Well, you'd
14 have to ask Deloitte how they did it. I thought
15 they went to what was --
16     Q.    Did they use Schedule B?
17     A.    I don't know if they used Schedule B
18 or just went to -- took us a long time to get
19 access to DTC, like everything else, but
20 eventually we did, so they may have just gotten
21 the information from what DTC showed and so, you
22 know, on it's whatever line systems are.
23     Q.    Do you know whether an analysis has
24 been done to determine whether the list of

Page 259

J. Kobak

1  securities Barclays sent the trustee that
2  Barclays believes are the remaining undelivered
3  clearance box assets is an accurate list or not?
4      A.    I believe they had some questions
5  about that. I thought we had some
6  correspondence with Jonathan or with Cleary, or
7  I guess Lindsee Grandfield had listed some
8  assets that we didn't think were in the box or
9  might be customer assets. So, to that extent,
10 Deloitte did do some work on what Barclays was
11 claiming might be in the box.
12     Q.    And are you aware that Barclays has
13 valued the clearance box assets that have been
14 delivered at substantially less than $1.6
15 billion?
16     A.    No, I believe that that figure came --
17 I believe there was a letter from Jonathan
18 Hughes, it might have been from Lindsee, I think
19 it was to me, it might have been to the trustee
20 himself, that listed a number of transfers that
21 had been made after the filing date, and I think
22 the 1.6 billion is more or less the sum of those
23 transfers. That included probably a couple of
24 the ones that you showed me, and I believe there

Page 260

J. Kobak

1  was an initial one, according to Jonathan's
2  letter, of over a billion dollars, which was
3  actually made on September 19 before we were
4  even appointed.
5      Q.    That letter listed, I'll represent to
6  you -- we can get it -- a total number of
7  transfers that adds up to 1.4 billion, not 1.6?
8      A.    Oh, okay.
9      Q.    And are you aware of the fact that
10 Barclays has valued it at substantially less
11 than either 1.4 or 1.6 on its balance sheet?
12     A.    No, I'm not aware of that.
13     Q.    And are you aware of the fact that
14 there's testimony in this case that the 1.6
15 stems from an error in an e-mail regarding one
16 of the transfers that makes up what Barclays
17 called 1.4?
18     A.    No, I'm not aware of that.
19         MR. HUME: Why don't we take a short
20 break.
21         THE VIDEOGRAPHER: The time is 2:26.
22 We're going off the record.
23         (Recess.)
24         (Exhibit 451, a document bearing Bates

Page 261

J. Kobak

1  Nos. BCI-CG00033812, marked for
2  identification, as of this date.)
3          THE VIDEOGRAPHER: The time is 2:43.
4  We are back on the record.
5  BY MR. HUME:
6      Q.    Mr. Kobak, the court reporter has
7  marked as Exhibit 451 an e-mail dated September
8  19 from Craig Jones to Paula Tonucci with the
9  subject heading "Final 15c3-3 Lockup as of
10 September 17, 2008." Do you see that?
11     A.    Yes, I do.
12     Q.    And it's forwarding an e-mail from
13 Joel Potenciano to a whole group of people
14 below, do you see that?
15     A.    Yes, I do.
16     Q.    Have you seen this e-mail before?
17     A.    Yes, I believe I've seen it in
18 preparing for the deposition. I don't know if I
19 saw it before this.
20     Q.    Do you understand that this e-mail was
21 shown to Barclays the weekend before the closing
22 to represent to Barclays that there was an
23 excess in the 15c3 reserve account to be
24 transferred to Barclays?

Page 262

J. Kobak

1
2    A.   I -- I don't know.  All I know is that
3    there was an understanding that there might,
4    during the weekend, and particularly I think
5    Sunday night and early Monday morning, that
6    there might be an excess in the 15c3 account.
7    Q.   Do you understand that that was
8    represented to Barclays, that there would be
9    something there that could be transferred?
10   A.   As I said, my understanding was that
11   there was a belief that there might well be an
12   excess in the account.
13   Q.   Have you or has anyone at the trustee
14   made any effort to investigate what was meant or
15   intended by this e-mail when it was sent by Joel
16   Potenciano?
17   A.   I have not seen this e-mail except
18   within the last day or two trying to prepare
19   myself as thoroughly as I could to be a Rule
20   30(b)(6) witness.  So this specific e-mail, no.
21   Q.   Have you ever spoken to Mike
22   Macchiaroli about what was understood at the
23   time of the transaction regarding the 15c3
24   account?
25   A.   Yes, I have.

Page 263

J. Kobak

1
2    Q.   And what has he told you about the
3    status of the 15c3 reserve lockup at the time of
4    the deal?
5    A.   Mr. Macchiaroli told me that he had to
6    rely on LBI personnel, that he generally found
7    those people to be quite reliable, but that the
8    last week was in turmoil, that the S.E.C. was on
9    the premises and looking carefully at the 15c3
10   account, but that there was a lot of turmoil at
11   the time, and it was really not possible for
12   them to do an independent audit, but they
13   basically had to take a lot of things that were
14   told to them at face value in the sense that
15   they couldn't really look and see whether
16   underlying transactions that people believed had
17   taken place had in fact taken place and so
18   forth.
19   Q.   Subsequent to that, you have your own
20   professionals working on analyzing the 15c3
21   reserve requirement and lockup as of the time of
22   the transaction; is that correct?
23   A.   Yes.  And in fact, it's part of our
24   allocation motion that we filed with the court,
25   the -- particularly the expert report or

Page 264

J. Kobak

1
2    affidavit of Mr. McIsaac.
3    Q.   Mr. McIsaac reached a final conclusion
4    as to what the requirement was and the lockup
5    amount was as of the time of the transaction.
6    A.   I don't think beyond what's stated in
7    his affidavit.  There are still some
8    investigations going on.  I think the numbers in
9    the affidavit probably would be a minimum rather
10   than a maximum.
11   Q.   Just so I understand, does the trustee
12   agree that if there was an excess of $769
13   million or more in the 15c3 reserve account,
14   then under the contract, that amount would be
15   transferred to Barclays?
16        MR. DAKIS:  Objection to the form.
17        MR. CARDEN:  Objection.
18   A.   Our understanding is that if the
19   conditions specified in the clarification
20   letter, that is, to the extent permissible by
21   the law, were satisfied, the $769 million of
22   securities referred to would be property to be
23   transferred to Barclays.  I think our
24   understanding of the phrase is that the
25   S.E.C. -- it would have to be clear that there

Page 265

J. Kobak

1
2    would not be a potential violation of 15c3, that
3    the S.E.C. would have to agree and give written
4    approval of that, and I think there would have
5    to be no shortfall in customer property
6    attributable to violations of 15c3 in our
7    proceeding.
8        And if those conditions were
9    satisfied, then I think I would never dispute
10   it.  I've never meant to dispute, I don't think
11   the trustee has ever meant to dispute that if
12   all those conditions were ever satisfied,
13   Barclays would have a claim for these funds.
14   Q.   Are there any other conditions besides
15   those ones, the conditions you lay out in your
16   affidavit?  There has to be an excess,
17   regulatory approval, and customer claims fully
18   satisfied?
19        MR. DAKIS:  Objection to form.
20   A.   There would have to actually be
21   property to satisfy them, and it was still our
22   understanding that this was subject to the
23   overall parameters of the deal.  So if Barclays
24   was already getting somewhere well in excess of
25   $47 billion and was going to add another 769

Page 266

J. Kobak

1  million to it, I think we would have a problem
2  with that. Whether it means they would get this
3  769 million and we would get something else, I
4  don't know how that would get sorted out.
5     Q.   And is that your view of what the
6  contract means or is that just that the contract
7  must be trumped by that?
8     MR. DAKIS: Objection to form.
9     MR. MAGUIRE: Yeah, if you could just
10  explain what you mean.
11    MR. HUME: Forget it. It doesn't
12  matter.
13    Q.   Did the trustee ever communicate to
14  Barclays that, before the closing -- did the
15  trustee ever communicate to Barclays before the
16  closing that Barclays would receive the $769
17  million of securities referenced in paragraph 8
18  of the clarification letter only after all
19  customer claims were fully satisfied in the SIPA
20  liquidation?
21    A.   I don't know. I know there was some
22  discussion of this. There was something that
23  was of particular concern to us. It came up in
24  the clarification letter, as I recall, in

Page 267

J. Kobak

1  connection with paragraph 8, which deals with
2  transfer of customer accounts, not the paragraph
3  that deals with the definition of "purchased
4  assets" and "excluded assets" and so forth, and
5  I think in our view it was always tied in with
6  the question of what accounts were going to be
7  transferred to Barclays, what property might be
8  necessary either to go with those accounts or to
9  stay behind to satisfy the accounts that were
10  left.
11    I think there was discussion that
12  Barclays was actually seeking more than $769
13  million in securities, including maybe a billion
14  dollars in cash, which was inconsistent with
15  representations that were also made that there
16  be no cash going over in the deal, and
17  furthermore, that seemed very unfair to us
18  because it wasn't as if Barclays was getting all
19  the customer accounts that the 15c3 accounts
20  were associated with, it was only getting some
21  of them. Some of them were going to Neuberger
22  Berman. Some of them were staying behind.
23    So, in addition to the cash point, if
24  any number was involved, 769 million was a lot

Page 268

J. Kobak

1  better than a number in excess of a billion
2  dollars.
3     We thought that -- at this time I
4  think we believed that Barclays was also going
5  to be taking the private brokerage accounts, so
6  they might well have a need for this money to
7  satisfy their liabilities to customer accounts
8  that they were taking over. But if not, we
9  wanted to make sure that we would have adequate
10  money in the 15c3 account for whatever was left
11  with us, and we understood that that was the
12  S.E.C.'s intent as well.
13    Q.   I understand your position. You don't
14  have to recite it every time. We've got to get
15  through the deposition. We don't have a lot
16  more time.
17    A.   Well, you asked me the question.
18    Q.   Can I ask you to look at the
19  clarification letter, please?
20    A.   The reporter carefully put them in
21  order for me and I screwed up.
22    Q.   It's right there.
23    A.   I got it.
24    Q.   Can I ask you to turn to paragraph 8.

Page 269

J. Kobak

1     A.   Yes.
2     Q.   And it says that "The purchaser shall
3  receive," and then little Roman ii says, "to the
4  extent permitted by applicable law, and as soon
5  as practicable after deposing, 769 million of
6  securities, as held by or on behalf of LBI, on
7  the date hereof pursuant Rule 15c3 of the
8  Securities and Exchange Act of 1934, as amended,
9  or securities of substantially the same nature
10  and value."
11    Can you tell me what it is that the
12  "or" clause means?
13    A.   The "or securities of substantially
14  the same nature and value"?
15    Q.   Yes.
16    A.   To us that means that there might be
17  a -- a need or desire at some point to
18  substitute other securities for the particular
19  ones that were -- that made up the $769 million.
20    Q.   Did the trustee know why that
21  provision was put in there, the "or" clause?
22    A.   No, but I -- well, our understanding
23  was that we were referring to these specific
24  securities so that cash wasn't involved. There

Page 270

1             J. Kobak
2    might -- you might have securities, I guess,
3    that would come due and be redeemed. There
4    might be all kinds of reasons that you would
5    need to substitute some securities for the
6    particular Cusips that happened to be listed or
7    happened to be in the account at that time.
8        So that was our understanding of what
9    a substitution would be and why it might be
10   necessary.
11       Q.   What is the applicable law that
12   prevents the trustee from transferring
13   securities from outside of the 15c3 account to
14   Barclays?
15           MR. CARDEN: Objection to form.
16           MR. MAGUIRE: Same objection.
17       A.   I don't understand that question, from
18   outside.
19           MR. MAGUIRE: I think your premise --
20           MR. HUME: Yeah, the premise, exactly.
21       Q.   The premise is it says that you can
22   transfer the 769 million from the 15c3 account
23   or securities of the same nature and value.
24       Would you agree that when it says "or
25   securities of substantially the same nature and

Page 271

1             J. Kobak
2    value," it's talking about securities that are
3    not in the 15c3 reserve account?
4        A.   No. My understanding is that those
5    are securities that are not in the 15c3 account
6    at the time this was written, but might be
7    substituted for those accounts. If the whole
8    purpose was to avoid a violation of 15c3 and to
9    avoid a shortfall of customer property, which is
10   what we always believed, and I think the
11   regulators believed the purpose was, it would
12   make no sense to say, well, you can't take this
13   769 but you can say 769 from somewhere else and
14   get a shortfall that way, or put the broker out
15   of compliance, essentially.
16       Q.   Just so I'm very clear, when it says
17   "or securities of substantially the same nature
18   and value," is it your understanding that that
19   is referring to securities that are in the Rule
20   15c3 or are not in the Rule 15c3 account?
21           MR. CARDEN: Objection to form.
22       A.   As I just said, it refers, in our
23   view, to a right to substitute securities when
24   it might make sense to do that so that this
25   provision wouldn't just apply to the particular

Page 272

1             J. Kobak
2    securities that happen to make up the 769
3    million on the account.
4        Q.   So it allows you to substitute
5    securities that are not in the Rule 15c3 reserve
6    account, correct?
7        A.   And you take out the ones that are and
8    you'd end up with 7 -- a maximum of $769
9    million.
10       Q.   So you're saying the "or" clause
11   requires you to put 769 from outside of the
12   account back into the account?
13           MR. MAGUIRE: Objection to form.
14       A.   No, it doesn't require you to do
15   anything. It permits substitution so that --
16   otherwise, this would say the only thing that
17   can be transferred from the 15c3 account is the
18   769 million. If for some reason some of those
19   securities were no longer there because they
20   redeemed and they were now cash or it didn't
21   make sense to hold them, you wouldn't be able to
22   transfer them to Barclays. I don't think that's
23   what Barclays wanted.
24       Q.   Is the trustee's position that no
25   assets, under any provision in the APA or the

Page 273

1             J. Kobak
2    clarification, no assets may be transferred to
3    Barclays if, at the time of the transfer, the
4    trustee believes there may be a shortfall in
5    property available for remaining customer claims
6    that remain with the estate; is that the
7    trustee's position?
8        A.   Well, Barclays takes the position that
9    it's --
10       Q.   I didn't ask you Barclays' position?
11           MR. MAGUIRE: If you can let the
12   witness answer.
13       Q.   But I need an answer to my question.
14       A.   Well, I'm giving you an answer to my
15   question.
16       Barclays is taking the position these
17   are proprietary assets that it has a right to
18   before anyone else. If there's a shortfall and
19   these are proprietary assets that we hold, I
20   believe that they are no longer in the category
21   of being proprietary assets because they would
22   have been necessary for the broker and they
23   would be necessary for us to make up for
24   shortfalls in customer property.
25       And therefore, just because they

Page 274

1              J. Kobak
2  happen to be in a proprietary position
3  temporarily does not mean that you cannot
4  consider them customer property, and I don't see
5  anything in this agreement that says, apart from
6  this one exception for the 769 which was
7  believed to be excess, that Barclays gets
8  customer property other than the property that
9  goes with the accounts that it was actually
10 acquiring.
11     Q.   During the negotiations and prior to
12 the closing, did the trustee have any
13 communications with Weil Gotshal about this
14 provision relating to the 15c3 assets?
15     A.   Yes, we had some discussion with -- I
16 don't know if it was with Weil Gotshal or the
17 Creditors Committee or both about this, about
18 the fact that there was a huge stink, to use the
19 vernacular, I guess, from Harvey Miller, among
20 others, that Barclays was trying to take cash,
21 that cash was absolutely not part of the deal,
22 and I told you that we had our own concerns
23 about the 15c3 account and how much would be
24 taken out of it and what the purpose of it was.
25     Q.   Did you have any communications about

Page 275

1              J. Kobak
2  what would happen if there were no excess in the
3  15c3 account?  Did you have an explicit
4  communication about what would happen under this
5  provision if there were no excess in the 15c3
6  reserve account?
7      A.   I don't know if we had a specific
8  conversation to that extent.  I do know that, as
9  it was reported to me, the discussion was always
10 on the assumption that there was likely to be an
11 excess.
12        I don't believe the regulators would
13 ever have permitted a transaction that -- if
14 there had been a violation of 15c3.  I don't
15 really see how the parties could have agreed to
16 participate in such a transaction.
17     Q.   At the time of the sale hearing, did
18 you understand that all of the margin deposits
19 associated with LBI's accounts at the Options
20 Clearing Corporation would be transferred to
21 Barclays?
22        MR. CARDEN:  Objection to form.
23     A.   I understood during the sale hearing,
24 or during a break in the sale hearing, that a
25 representative of the OCC whose name I believe

Page 276

1              J. Kobak
2  was Alex Rovira -- and I don't know how to spell
3  that, I'm sorry -- came up to me with a draft
4  transfer assumption -- Transfer and Assumption
5  Agreement which he asked me to look at very
6  quickly, said that he needed to have signed,
7  said that the OCC had great concern about their
8  potential liability and the obligations to their
9  members and to themselves, and would not
10 transfer any of the accounts, including the
11 customer accounts, unless such a document was
12 signed.
13     Q.   And so you signed the document?
14     A.   Yeah, I signed the document.
15     Q.   Did you sign two documents?
16     A.   I believe I did, although I have
17 reviewed some of the e-mail traffic and I know
18 that there's one that where only the second
19 document is signed and not the first one.  And
20 then there's another one where the first
21 document -- I really don't remember what I did
22 at the hearing.  I know I signed at least one
23 document.  It was my intention to sign the
24 Transfer and Assumption Agreement.  That's what
25 I was asked to do.

Page 277

1              J. Kobak
2      Q.   And your understanding was that the
3  OCC was insisting upon that because, otherwise,
4  it was going to be exposed to settlement
5  obligations at the open of business on Monday,
6  correct?
7      A.   Yeah, and I think what it was
8  threatening to do was liquidate all the
9  transactions.  Whether that would have been a
10 good thing or bad thing I don't know.  It
11 certainly was inconsistent with the goal as far
12 as customer accounts were concerned of getting
13 the account to the customer so the customer
14 could make its own decision about what to do
15 rather than being closed out.
16        And my understanding was that what was
17 involved was essentially agreeing that if
18 Barclays would assume the accounts and assume
19 the liabilities and obligations associated with
20 those accounts, all the -- the property that was
21 necessary to secure those obligations would go
22 with the accounts.
23        I didn't really understand that the
24 language was asking me to do any more than that.
25 I didn't understand that there was any

Page 278

```
1                J. Kobak
2    substantial amount of funds in the clearing fund
3    or in any of the margin deposits, securities or
4    cash, that would be greatly in excess of that.
5        And I understood at the time that
6    there was substantial question about what the
7    exposure might be under those positions and that
8    it took Barclays a couple of days, I think, to
9    agree that it would assume the liabilities and,
10   therefore, assign -- the agreement was revised,
11   but I don't think in substantially material
12   ways. It took Barclays a couple of days to sign
13   the agreement and agree to assume those
14   liabilities.
15       Q.   You understood that Barclays was
16   concerned about the risk of assuming those
17   liabilities?
18       A.   Yeah, I understood everybody was
19   concerned about the risk. The OCC was concerned
20   about it and Barclays was concerned about it.
21       Q.   And no one knew for sure what those
22   settlement liabilities would be, correct?
23       MR. MAGUIRE: Objection to form.
24       A.   I don't --
25       MR. MAGUIRE: You're asking this
```

Page 279

```
1                J. Kobak
2    witness for his knowledge.
3        Q.   Did you understand that it -- did you
4    understand that there was an unknown potential
5    liability in assuming the settlement obligations
6    of the OCC accounts?
7        MR. MAGUIRE: That he did not know?
8        MR. HUME: No.
9        Q.   Did you understand that it was an
10   unknown potential liability?
11       A.   I -- I -- I didn't know what it was
12   and I realized there was a substantial doubt or
13   uncertainty of how things might transpire and
14   what the potential liability could be.
15       Q.   And Barclays never, to your knowledge,
16   Barclays never agreed to take on that liability
17   without the margin deposit?
18       A.   I didn't have any direct discussion
19   with Barclays. I signed this agreement and was
20   told that Barclays was not committing to sign it
21   and assume the liabilities, even though, in my
22   understanding, the property to secure those
23   liabilities, to the extent it was at OCC, would
24   be transferred along with them.
25       But I did not discuss that directly
```

Page 280

```
1                J. Kobak
2    with anyone at Barclays.
3        Q.   No one, no one at Barclays ever told
4    you that they would be willing to take on any of
5    the derivatives accounts without the margins; is
6    that correct?
7        A.   No one discussed that with me one
8    way -- one way or the other.
9        Q.   Did you understand --
10       A.   I know that there were versions of the
11   agreement that talked about taking the
12   derivatives. It didn't say anything about the
13   margin deposits held for security, and I believe
14   that came in at the very last draft, the
15   execution copy of the clarification letter. I
16   don't recall that being in earlier drafts, I
17   don't recall it being redlined, and I don't
18   recall it being discussed with anyone.
19       Q.   After you saw it after the closing,
20   did you raise any questions about it with
21   Barclays?
22       A.   Well, to me it wasn't that
23   inconsistent -- it really wasn't inconsistent.
24   In fact, it was more limited than the way
25   Barclays reads the Transfer and Assumption
```

Page 281

```
1                J. Kobak
2    Agreement.
3        (Exhibit 452, a collection of document
4    bearing Bates Nos. HHR_00006072 through
5    6081, marked for identification, as of this
6    date.)
7        Q.   You mentioned Alex Rovira as one of
8    the lawyers for the OCC, I believe. This is an
9    e-mail, Exhibit 452, from Mr. Rovira to you. He
10   references -- it's to you and Jeffrey Margolin.
11   He references seeing you at the sale hearing,
12   and he says, "Please find attached some clean-up
13   comments to the transfer documentation." Do you
14   see that?
15       A.   Yes.
16       Q.   And he attaches the Transfer and
17   Assumption Agreement with some word edits to it,
18   do you see that?
19       A.   Yes.
20       Q.   And then behind that he attaches
21   something called the Collateral Agreement?
22       A.   Yes.
23       Q.   And the second version of that has
24   your signature, the very last page of the
25   exhibit, do you see that?
```

Page 282

J. Kobak
2   A.   Well, it's not the last page of my
3   exhibit, but I do see where I sign.
4   Q.   The Collateral Agreement?
5   A.   The Collateral Agreement. It's not
6   the last page of the agreement, at least in my
7   copy.
8   Q.   It's got a Bates number 6078 are the
9   last four digits?
10  A.   Yes.
11  Q.   Okay. The paragraph that begins "in
12  connection with such transfer," do you see that?
13  A.   Yes.
14  Q.   It says, "LBI has assigned to Barclays
15  all rights in securities, cash and other
16  property, defined as collateral, pledged by LBI
17  to the Options Clearing Corporation and held for
18  OCC's benefit at JPMorgan Chase." Did you see
19  that?
20  A.   Yes.
21  Q.   And was it your understanding that
22  that's what the trustee was authorizing when you
23  signed this?
24  A.   Yes, consistent with the overall deal
25  that there be no cash excess that would go to

Page 283

J. Kobak
2   Barclays because that would be inconsistent with
3   the no cash, and that this wouldn't make the
4   deal so rich that it would be way beyond the
5   parameters that we've discussed earlier.
6   Q.   Did you tell anyone, this -- when you
7   say you signed this consistent with the idea
8   that there would be no cash, this says cash;
9   this says cash will be transferred to Barclays?
10  A.   Yeah, but cash would be transferred
11  against the liabilities. What I'm saying is
12  nobody told us there might be in excess of a
13  billion dollars of cash or something like that
14  that would end up at Barclays when the deal was
15  no cash and when there was an economic parameter
16  to the deal.
17  Q.   So, to the extent the cash was simply
18  needed to cover the liabilities, you thought it
19  was possible to be included in the deal; is that
20  correct?
21  A.   Yes.
22  Q.   But to the extent cash exceeded the
23  liabilities, you thought it should not be in the
24  deal?
25  A.   That's correct, and nobody told us,

Page 284

J. Kobak
2   indicated in any way that there was likely to be
3   an excess amount of cash.
4   Q.   Did you ever tell anyone that if there
5   was excess cash in the deal in the margin
6   deposit, then it needed to come back to the
7   estate? I understand that's your position. I
8   just want to know, did you ever communicate that
9   to anyone before the closing?
10  A.   No, I don't think we had any
11  discussion. I don't know -- no one ever told us
12  there was a likelihood there would be
13  substantial excess cash.
14  Q.   Do you remember getting e-mails over
15  the weekend from the OCC trying to confirm the
16  Transfer and Assumption Agreement?
17  A.   I remember some e-mails.
18  Q.   And do you remember e-mails
19  specifically talking about the need to have the
20  Transfer and Assumption Agreement finalized?
21  A.   Yes, I understood the problem was
22  Barclays hadn't signed it.
23       (Exhibit 453, a document bearing Bates
24       Nos. HHR_00006049 through 6051, marked for
25       identification, as of this date.)

Page 285

J. Kobak
2   Q.   And Barclays hadn't signed it because
3   they were worried about the risk of the
4   settlement?
5   A.   I'm not a hundred percent sure, but I
6   think that's what I was told. But generally,
7   Barclays' position, as I understood it, in this
8   entire transaction, was that they didn't want to
9   assume any liabilities.
10  Q.   Next exhibit is marked 453. Let me
11  ask you to look at the bottom of the e-mail.
12       MR. MAGUIRE: Can you share this with
13  us?
14  Q.   This is an e-mail with a Bates number
15  HHR00006049 on the first page, and it has two
16  other pages. At the bottom of the first page is
17  an e-mail from James McDaniel to a group of
18  people, including you and the trustee Jim
19  Giddens and Mr. Margolin at Hughes Hubbard. Do
20  you see that?
21  A.   Yes, I do.
22  Q.   And it's also e-mailed to Mr. Caputo
23  and Mr. Hurt at SIPC?
24  A.   Yes.
25  Q.   And it says, "To the Group," and it

Page 286

J. Kobak

1
2 says the OCC is still seeking to confirm its
3 understanding that the LBI counts and all
4 positions, cash and securities collateral held
5 by OCC in respect of those accounts are intended
6 to be transferred to Barclays and that Barclays
7 is assuming all obligations with respect to
8 those accounts?
9     A.   Yes.
10     Q.   Do you see that?
11     A.   Yes.
12     Q.   It then goes on to provide further
13 description of what's in those accounts. I ask
14 you to continue to read the e-mail and look down
15 to the second paragraph, halfway down the second
16 paragraph where it says the words "in addition."
17         Do you see that sentence?
18     A.   Yes.
19     Q.   It says, "In addition, OCC is holding
20 nearly $1 billion in cash for the accounts of
21 LBI." They say, "It is important that the
22 disposition of these assets is understood and
23 agreed to among all parties and that the
24 documentation addresses it in a consistent way."
25         Do you see that?

Page 287

J. Kobak

1
2     A.   Yes.
3     Q.   Do you have any knowledge of whether,
4 in response to this e-mail, anyone from the
5 trustee or from Hughes Hubbard or from SIPC told
6 the OCC that they did not believe Barclays
7 should receive that cash?
8     A.   No, I didn't understand that it was
9 excess cash. I still understood that this was
10 cash that was going, and the reason for it was
11 that there might be liabilities that have to be
12 settled up, not that there was likely to be that
13 much of an excess.
14     Q.   And you say no one ever told you that
15 there might be an excess. The top e-mail in
16 this chain is a reply to this e-mail from the
17 OCC, a reply sent by Ed Rosen, who is a lawyer
18 at Cleary Gottlieb, representing Barclays?
19     A.   Right.
20     Q.   Correct?
21     A.   Right.
22     Q.   And it says, "Jim, can you tell us
23 more about the $1 billion. Is it excess
24 margin?" Do you see that?
25     A.   Right.

Page 288

J. Kobak

1
2     Q.   In response to that did you make --
3     A.   No, I thought if the answer was --
4     Q.   Can your let me finish my question?
5     A.   I'm sorry.
6     Q.   Did you make any follow-up inquiries,
7 or did anyone from the trustee, as to whether
8 there was any excess margin in the OCC account?
9     A.   No, I think that -- I felt that, given
10 what we knew about the parameters of the deal
11 and what we understood the purpose of this to
12 be, if someone had determined, there obviously
13 was a question whether there would be any
14 substantial excess or any excess at all for what
15 this billion dollars was, if it turned out there
16 was an excess that wouldn't be needed that was
17 accretive to everything else Barclays was
18 getting, it seemed to me it would be in the
19 nature of a windfall and somebody should be
20 coming back and telling us and telling the other
21 parties and telling the Court about it.
22     Q.   Was there a concern at SIPC that these
23 accounts not be liquidated by the OCC?
24     A.   I believe so. I believe our
25 understanding was that it would be desirable at

Page 289

J. Kobak

1
2 all -- if at all possible, to get these accounts
3 transferred along with the other accounts so
4 that customers wouldn't find either that their
5 accounts were frozen or that actions were taken
6 in their accounts that they had no control over.
7         (Exhibit 454, a document bearing Bates
8     Nos. HHR_00007387 through 7397, marked for
9     identification, as of this date.)
10     Q.   Mr. Kobak, Exhibit 454 is a draft of
11 the clarification letter circulated from Weil to
12 Hughes Hubbard Sunday evening of September 21,
13 7:54 P.M. Do you see that?
14     A.   Uh-huh. Yes.
15     Q.   And it -- the e-mail states it
16 attaches the most recent version of the
17 so-called clarification letter. Do you see that
18 in the first line of the e-mail?
19     A.   Yes.
20     Q.   The attachment -- I assume you'll be
21 familiar with this because you referenced it I
22 think in your earlier testimony and your lawyers
23 have referenced it in their briefs. In this
24 draft on the second page there's a provision
25 dealing with excluded assets, subsection D.

Page 290

1                J. Kobak
2    Subsection 1(d) of the agreement, do you see
3    that?
4        A.    Yes.
5        Q.    And it says it defines certain
6    excluded assets, and it says that excluded
7    assets include cash and cash equivalents, you
8    see that?
9        A.    Uh-huh.
10       Q.    And then it says "provided that
11   excluded assets shall not include," so now it's
12   carving out of excluded assets certain assets
13   which were, therefore, going to be purchased
14   assets, correct?  Would that be your
15   understanding of what's happening in this draft?
16       A.    My understanding, at least the first
17   part of it, the immediate sentence you're
18   reading, was that cash that was going to
19   customers as part of the transfer or was in 15c3
20   accounts and so forth at clearing agencies or
21   elsewhere, because it was supporting customer
22   accounts, would be going to Barclays because
23   that was part of the customer transfer.
24       Q.    Let me make sure I understand.  So I
25   want to focus on the language after when it says

Page 291

1                J. Kobak
2    "provided that excluded assets shall not
3    include"?
4        A.    Yes.
5        Q.    I want to focus on what's in the
6    little Romanette i section that follows.
7        A.    Okay.
8        Q.    All right?  So these are assets that
9    are not going to be excluded assets, okay?  Does
10   that make sense?  Is that how you're reading
11   this?
12       A.    Yes.
13       Q.    All right.  So these will be assets,
14   under this version, this draft version of the
15   clarification letter, this is describing assets
16   that would continue to be purchased assets?
17       A.    Yes.
18       Q.    Okay.  And two little ii says, "Cash,
19   cash equivalents, bank deposits or similar cash
20   items maintained by, or on behalf of, LBI
21   pursuant to Rule 15c3 of the Securities Exchange
22   Act or otherwise."
23       A.    Uh-huh.
24       Q.    So at this point the idea that cash or
25   cash equivalents in the 15c3 account would be

Page 292

1                J. Kobak
2    transferred seem to be what somebody was
3    thinking who was drafting this.  Did you -- do
4    you know if the trustee ever told anyone that
5    cash or cash equivalents in the 15c3 account
6    should not be part of the deal?
7        A.    No, we understood there was a very
8    heated discussion of that with Harvey Miller and
9    that that clearly wasn't his understanding
10   whether this was in an earlier draft of the
11   clarification letter or not, and then our focus
12   I think was more on the sheer amount involved
13   and wanting to make sure and being -- and I
14   don't know if we suggested the language or
15   someone else did, but being happy to see that
16   there was the "except as permitted by law"
17   language to make sure that assets that might be
18   needed for customers weren't removed from our
19   possession.
20       Q.    Who told you about that heated
21   exchange with Harvey Miller?
22       A.    Mr. Frelinghuysen and Mr. Kiplok were
23   there at the time.  I think one of them, maybe
24   both of them, told me that there had been this
25   discussion.  I think some of the discussion

Page 293

1                J. Kobak
2    might have taken place outside of their
3    presence, but I believe one or the other or both
4    of them would have told me that.
5        Q.    And the discussion, as you understand
6    it, was about whether cash in the 15c3 account
7    should be in the deal or not?
8        A.    Well, yes, it was about whether cash
9    should be in and also why money was being taken
10   out of the 15c3 account and given to Barclays at
11   all, whether there was an excess, what the
12   amount of that should be.
13       Q.    And did -- did the trustee's advisors
14   participate in that discussion or did they just
15   witness the discussion?
16       A.    I know they witnessed part of the
17   discussion.  Again, I think some of it may have
18   happened in another room, and I think they
19   participated -- I think that's one area where
20   people wanted to be sure the trustee knew about
21   this change to the agreement, and I remember
22   being on the phone with them and I was happy to
23   see that the over $1 billion had become a lesser
24   amount.  I was happy to learn that it was felt
25   that this would be excess and that the S.E.C.

Page 294

```
 1              J. Kobak
 2  would not be concerned about it if it was
 3  excess, and most of all, I was happy about that
 4  "except as permitted by law" language --
 5      Q.   So --
 6           Sorry.
 7      A.   -- which seemed to us to protect our
 8  position about as clearly and fully as one
 9  could.
10      Q.   And during that conversation, there
11  was an understanding that there would be an
12  excess to be transferred?
13      A.   Well, I think the assumption was there
14  would be an excess, and the purport of the
15  language was, if there weren't an excess, if
16  there was shortfall in the account, it wouldn't
17  be permitted by law and, therefore, it wouldn't
18  be allowed.
19      Q.   Did anyone during that conversation or
20  at any other time relay to you what Barclays had
21  told them about this 15c3 issue?
22      A.   Well, I don't know, other than that I
23  know that the over $1 billion cash became the
24  769 million securities and the other changes in
25  the language that we've discussed occurred.
```

Page 295

```
 1              J. Kobak
 2      Q.   The changes occurred, but no one said
 3  Barclays said X or Y or Barclays represented X
 4  or Y?
 5      A.   I don't remember specifically.
 6      Q.   Going on in this provision that we
 7  were looking at, in terms of what is not an
 8  excluded asset, it also says, "Cash, cash
 9  equivalents, bank deposits or similar cash
10  items." First it says in the 15c3 account, and
11  then it says, "or by or on behalf of any
12  clearing agency or clearing organization to
13  collateralize, guarantee, secure," long
14  parenthetical, "whether as margin, guaranteed
15  fund deposit, or in any other form, the
16  obligations of LBI or any other person in an
17  account maintained by, or on behalf of, LBI, and
18  for which purchasers shall become responsible as
19  of the closing." Do you see that language?
20      A.   Uh-huh.
21      Q.   Did anyone from the trustee tell
22  anyone involved in the drafting of the
23  clarification letter or otherwise involved in
24  the negotiations to remove that language?
25      A.   I don't believe so.
```

Page 296

```
 1              J. Kobak
 2      Q.   Do you have any recollection or does
 3  anyone working for the trustee have any
 4  recollection of focusing on that language at the
 5  time it was included in this draft?
 6      A.   I -- I don't recall.
 7      Q.   Was the trustee or the trustee's
 8  advisors aware of this language in any way
 9  before the closing?
10      A.   Well, I'm sure we or somebody would
11  have seen it, certainly. So, in that sense, we
12  were aware of it.
13      Q.   But you're not aware of any
14  communication that the trustee had with anyone
15  about removing or refining or revising this
16  language?
17      A.   Well, we did have specific agreements
18  with DTC, or we were going to have one with DTC,
19  and we had a specific agreement, or the
20  beginning of a specific agreement with the OCC,
21  so I think to -- to the extent we were focusing
22  on this, we were focusing probably largely on
23  those two things.
24      Q.   Those letter agreements?
25      A.   Yes.
```

Page 297

```
 1              J. Kobak
 2      Q.   Let me ask you, were there any changes
 3  to the Transfer and Assumption Agreement that
 4  you recall asking the OCC to make over the
 5  weekend, "you" meaning anyone on behalf of the
 6  trustee?
 7      A.   I don't think we requested any
 8  changes. I think Cleary on behalf of Barclays
 9  had a few language changes.
10      Q.   Let me switch forward. After the
11  closing, am I correct that the trustee agreed --
12  let me withdraw that. After the closing, am I
13  correct that the trustee was aware that all of
14  the margin deposit that LBI had at its OCC
15  accounts were being transferred to Barclays'
16  accounts?
17      A.   Yes.
18      Q.   And after the closing, did the trustee
19  become aware that some portion of the LBI OCC
20  margin was pledged to the OCC in the form of
21  government securities held in an account at
22  JPMorgan?
23      A.   At some point I think we became aware
24  of that, yes, but I can't -- I'm having a hard
25  time filling -- remembering exactly when in the
```

Page 298

```
 1            J. Kobak
 2  sequence of events that was.
 3      Q.   Are you aware that the trustee agreed
 4  to release a portion of those government
 5  securities to Barclays?
 6      A.   I think I became aware of that. I'm
 7  not sure we were aware of it at the time.
 8      Q.   Well, somebody must have been aware of
 9  it for it to happen?
10      A.   Well --
11          MR. MAGUIRE: Let's wait for the
12      question.
13      Q.   Let me just establish a few basics.
14          You understand that there's a
15  portfolio of government securities of
16  approximately $900 million value, or maybe a bit
17  more, that was pledged to the OCC by LBI and
18  held in accounts at JPMorgan?
19      A.   I understand that now. I'm not sure I
20  knew at the time how much was involved.
21      Q.   You understand that a portion of
22  that -- those securities were -- do you
23  understand that in order for those securities to
24  be transferred to Barclays, JPMorgan asked for
25  the trustee's consent?
```

Page 299

```
 1            J. Kobak
 2      A.   Yes, it became -- it came to my
 3  attention after it occurred, I believe, but yes.
 4      Q.   And after that consent was given and
 5  the transfer was made, at some point did the
 6  trustee form the view that it would not consent
 7  to transfer any more of those securities?
 8      A.   Yes.
 9      Q.   And what was the basis for that change
10  in decision?
11      A.   Well, I think first our -- as I
12  recall, there was a problem, and some of this
13  was lack of visibility because we didn't always
14  have great visibility into JPMorgan accounts, to
15  the software that shows what's happening in
16  accounts. I know there was a concern, which I
17  think Deloitte first voiced, that there were
18  customer accounts of customers that might --
19  might or might not even be Barclays' customers,
20  but that nevertheless had positions at OCC and
21  we weren't clear whether Barclays was
22  appropriately standing behind those accounts.
23      Q.   And what do you mean by -- sorry.
24      A.   And then I think in the course of
25  investigating that and learning more about it
```

Page 300

```
 1            J. Kobak
 2  and talking to Barclays about it, among others,
 3  we came to realize that there was potentially --
 4  there appeared to be substantial amounts of what
 5  I'll call excess in these JPMorgan accounts.
 6      Q.   What do you mean by "excess"?
 7      A.   I mean money that was on deposit and
 8  was in excess of the amounts that would be
 9  needed to satisfy any liabilities or
10  obligations. So, in that sense, it's excess
11  margin, let's call it.
12      Q.   So any amount that's over and above
13  the amount needed to satisfy the liabilities on
14  what day? The very first day that Barclays took
15  over the accounts?
16      A.   Whatever -- well, I don't know that we
17  made. I mean, I think our understanding was we
18  found that there was a very substantial amount
19  of money clearly in excess of what would ever be
20  required to satisfy those liabilities, and that
21  to us was not something we had knowingly
22  bargained away or thought should be transferred
23  to Barclays and it seemed, again, to be perhaps
24  a windfall, but something accretive to what
25  Barclays was supposed to obtain in the
```

Page 301

```
 1            J. Kobak
 2  agreements, which had never been explained to or
 3  authorized by the Court.
 4      Q.   Do you have any, any evidence or basis
 5  at all for believing -- let me ask it in two
 6  parts: Do you believe that Barclays knew what
 7  the value was of these margin deposits and how
 8  it compared to the liabilities in the OCC
 9  accounts at the time that Barclays agreed to do
10  the deal?
11          MR. DAKIS: Object to form.
12      A.   I don't know. It might well not have,
13  but I don't know. I don't know whether it made
14  its own estimate or not.
15      Q.   Do you believe it was possible -- I
16  think I've asked that.
17          Did anyone ever tell Barclays that it
18  was going to have a day-one liability of several
19  billion dollars in order to satisfy the margin
20  requirements at all of the exchange-traded
21  derivative accounts that it was taking over?
22      A.   I don't know.
23      Q.   Would it have made sense to tell
24  Barclays that?
25          MR. DAKIS: Objection to form.
```

Page 302

1          J. Kobak
2          MR. MAGUIRE: Objection to form.
3      A.   I mean, is that a question?
4      Q.   Do you believe Barclays -- do you
5  believe Barclays was acquiring all of the margin
6  deposit necessary to satisfy the margin
7  requirements at all the exchange-traded
8  derivative accounts?
9      A.   To the extent there was margin deposit
10  there, it was -- it was acquiring it for that
11  purpose. We didn't understand that there was
12  any real likelihood that there would be a
13  substantial excess at the end of the day that
14  Barclays would get and claim that it was able to
15  keep on top of everything else in the agreement.
16          If Barclays had thought that at the
17  time, it's something that should have been
18  disclosed. If nobody thought it at the time, it
19  seems to me it's in the nature of a mutual
20  mistake and a kind of a windfall, but not --
21  nothing contemplated by the agreement.
22      Q.   The agreement doesn't say anything
23  about not getting an excess, does it?
24          MR. MAGUIRE: Does the agreement
25  require --

Page 303

1          J. Kobak
2      Q.   Does any agreement in this deal say
3  anything about Barclays not acquiring excess
4  margin?
5          MR. MAGUIRE: When you say
6  "agreement," you're referring to the
7  written --
8          MR. HUME: Any. Any of them.
9          MR. MAGUIRE: Are you including the
10  transcript of the sale hearing?
11      Q.   Do you -- Mr. Kobak, do you believe
12  the sale hearing is a contractual document?
13      A.   I believe it goes to the
14  interpretation of the agreement.
15      Q.   Did you and your lawyers understand
16  that the APA had an integration clause?
17      A.   Yes.
18      Q.   Do you understand that if something is
19  going to be a contractual term in a written
20  contract in a multi-billion dollar deal, it's
21  actually supposed to be written in the contract?
22          MR. DAKIS: Objection to form.
23      Q.   Was that understood at the time?
24      A.   Well, I understand, you know, what the
25  rules are. I understand there are exceptions to

Page 304

1          J. Kobak
2  it. I'm also not sure that rule, the common law
3  rule controls to what's said at a Bankruptcy
4  Court when people are asking for approval of a
5  deal that will insulate it against attack for
6  all time.
7      Q.   I just want to make sure I understand
8  what the trustee's position is on excess margin.
9  Is it excess over the day-one liability in the
10  accounts or over the margin requirement imposed
11  by the Custodial Clearing Corporation?
12      A.   Well, the -- if you go to the final
13  draft of the clarification letter, which you
14  haven't shown me on this point, and go to the
15  top of page 2, in the definition of "purchased
16  assets" in paragraph 1(a), double 1, capital C
17  in parenthesis, the exchange-traded derivatives
18  are described.
19          Added there for the first time,
20  without I believe any prior notice to us, but in
21  any event, is "any property that may be held to
22  secure obligations under such derivatives," and
23  in the context of what we understood, what was
24  explained to us, what was explained to the
25  court, at most that could be meant to say

Page 305

1          J. Kobak
2  Barclays got what was necessary to secure the
3  obligations to the extent there was a liability.
4          It didn't -- it doesn't say if there's
5  excess cash in a clearing fund, that Barclays
6  gets that. It doesn't say that if there are
7  substantial margin excesses -- excess, Barclays
8  gets that. So that's the way we see the
9  agreement, and particularly in the context in
10  which these were negotiated and approved by the
11  court.
12          Again, if people thought there was
13  likely to be a substantial excess which would
14  change the value of the deal for everybody,
15  there was no reason that couldn't have been
16  described to people and there's no reason people
17  couldn't have come back to court, if necessary,
18  to explain the changes in the deal to the Court
19  and the creditors as well as the parties.
20      Q.   If the OCC had a margin requirement in
21  excess of the amount of the liabilities, is
22  Barclays allowed to keep the margin for that to
23  meet the requirement, or does it have to give
24  that back, too?
25          MR. MAGUIRE: Objection to form.

Page 306

J. Kobak

1
2    Do you want to rephrase that question?
3    Q.   I want to know what your position is.
4    Is your position that if the margin requirement
5    from the Clearing Corporation is in excess of
6    the day-one liabilities, is it your view
7    Barclays is or is not entitled to keep at least
8    the amount of margin needed to satisfy the OCC's
9    margin requirement?
10        MR. DAKIS: Objection to form.
11        MR. MAGUIRE: I have a difficulty with
12   your asking this witness for a position.
13   That's not his role. His role is to be
14   here --
15        MR. HUME: He's been giving me his
16   position all day.
17   A.   I've been endeavoring to give you my
18   understanding. If you trick me into answering
19   some other way, I apologize. I read the
20   language "any property that may be held to
21   secure obligations under such derivatives," I'm
22   not exactly clear what the word "held" means in
23   that context, but it's my understanding of that
24   would be there was property that would be held,
25   it might be needed to satisfy the obligations

Page 307

J. Kobak

1
2    and that was Barclays', and anything in excess
3    of that is either ours or wasn't dealt with in
4    this contract, but certainly was not a purchased
5    asset.
6        (Exhibit 455, a document bearing Bates
7    Nos. HHR_00014574 through 14575, marked for
8    identification, as of this date.)
9    Q.   Mr. Kobak, Exhibit 455 is a letter
10   that you sent to James McDaniel at Sidley
11   Austin, representing the OCC, on November 14,
12   2008. You copy Ken Raisler, as counsel to
13   Barclays Capital. Do you see that?
14   A.   Yes.
15   Q.   In that letter, and you respond to it
16   a November 9 letter, which we probably have
17   here, in which he asks for clarification of
18   treatment of all the margin deposit.
19        You say in the first paragraph you're
20   aware of the Transfer and Assumption Agreement,
21   which you executed?
22   A.   Yes.
23   Q.   You then say there are certain open
24   issues and concerns surrounding the correlation
25   between the deposited securities and the

Page 308

J. Kobak

1
2    transfer of the options and futures positions
3    they are intended to secure. Do you see that?
4    A.   Yes.
5    Q.   The second or second full paragraph,
6    third paragraph of the letter, you state as
7    follows: "Our position is that this collateral
8    can be transferred to Barclays (and the trustee
9    will gladly consent) if Barclays will live up to
10   its bargain and assume the obligations involved
11   for all customers, not just those in the
12   so-called PIM accounts. We believe that this
13   reflects both the letter and the intent of the
14   Transfer and Assumption Agreement and certainly
15   the trustee's understanding when I signed that
16   agreement. However, this does not appear to be
17   Barclays' understanding."
18        Let me stop there for a moment and ask
19   you, is that still your position as stated here
20   in this letter of November 14, 2008?
21   A.   Well, what I'm really referring here
22   to I think are the customer accounts, the
23   customer OCC accounts, and yes, this is our
24   position. We thought -- and it may be that we
25   have satisfied ourselves by now that Barclays

Page 309

J. Kobak

1
2    was living up to this. I'm not sure they did
3    entirely, but if Barclays was satisfying the
4    customer accounts, agreeing to assume the
5    liabilities, it was appropriate that the
6    collateral necessary to satisfy those
7    obligations would be -- be transferred. Indeed,
8    that would really be part, I would think, of the
9    customer account transfer process.
10   Q.   So you're confirming this is still
11   your position as stated in this letter?
12   A.   To the extent stated in this letter,
13   yes.
14   Q.   And in terms of the customers who are
15   non-PIM customers --
16   A.   Let me rephrase because you have
17   tricked me again.
18        That's my understanding. My
19   understanding of our position or what we think
20   the agreements mean is as -- remains as stated
21   in the November 14 letter with respect to the
22   issues addressed in that letter.
23   Q.   For the customers who had options
24   positions with Lehman, does the trustee know how
25   much margin in total those options customers had

78

Page 310

```
1              J. Kobak
2    deposited with LBI?
3       A.    I don't know. I know that that is
4    something, I believe, that Deloitte has looked
5    into and I -- I know we've discussed it at
6    times. I have no recollection of what the
7    numbers are. I don't know if their work is
8    completely complete in that regard, but I know
9    that is something they have looked into.
10      Q.    Does the trustee understand that the
11   margin that LBI deposited with the OCC is LBI
12   property, not customer property?
13      A.    I think there's LBI property. I think
14   also we believe that Barclays might be looking
15   to its customers to satisfy obligations and then
16   claiming a right to the property -- to the LBI
17   property. That seemed inappropriate to us. I
18   think that's one of the claims we have made
19   against Barclays.
20      Q.    Is the trustee aware that for the
21   positions in the options -- in the OCC customer
22   account, Barclays is recording payables and
23   receivables to those customers through a bridge
24   account at LBI?
25      A.    I'm not -- Deloitte is probably aware
```

Page 311

```
1              J. Kobak
2    of that or maybe our administrative staff. I'm
3    not really aware of the details.
4       Q.    Is the trustee aware that futures
5    customers, as opposed to options customers, did
6    transfer to Barclays?
7          MR. MAGUIRE: You're saying futures
8    customers as opposed to which customers?
9          MR. HUME: Options customers.
10         MR. MAGUIRE: So you're saying options
11   customers did not transfer to Barclays?
12         MR. HUME: I'm saying the question is
13   focused on futures customers.
14      A.    Okay. I believe some futures
15   customers at least transferred to Barclays.
16   It's my understanding that sometimes those
17   futures customers are also securities customers.
18      Q.    Let me ask the question this way: Are
19   you aware that there are a large bulk of futures
20   customers for whom Barclays has fronted
21   collateral because the collateral those futures
22   customers had deposited has not yet been
23   transferred to Barclays?
24      A.    Yes, I realize that's happened in a
25   number of cases, I believe.
```

Page 312

```
1              J. Kobak
2       Q.    And do you contest Barclays' right to
3    receive that collateral, segregated customer
4    collateral for futures customers?
5       A.    No. I think we realize that's a
6    problem really for both of us.
7       Q.    Because it's located in foreign
8    jurisdictions with tied up in other LBI --
9    Lehman administrations?
10      A.    For a variety of reasons, including
11   depositories I think have refused to accept the,
12   you know, jurisdiction of the U.S. court to deal
13   with these things, we haven't been able to get
14   our hands on it. I think we refer to that in
15   the allocation motion, among other things.
16      Q.    Has the trustee or its staff or
17   Deloitte, advisors of Deloitte, made any effort
18   to value the positions at the OCC accounts as of
19   the time Barclays took over those accounts?
20         MR. DAKIS: Objection to form.
21      A.    I think Deloitte has made -- they have
22   certainly made efforts to look at the
23   collateral, whether there's any excess, and that
24   may have involved some analysis of what the
25   accounts are worth, what the liabilities would
```

Page 313

```
1              J. Kobak
2    be and so forth.
3       Q.    Let me ask you, if you could, to go
4    back to the exhibit I showed you with the
5    balance sheet that was sent on September 18 at
6    the beginning of the deposition.
7       A.    Yes.
8       Q.    No, not that balance sheet. The one,
9    the one that the trustee was sent from Weil
10   Gotshal.
11         MR. MAGUIRE: What's the number of
12   that?
13      A.    This is 441? Yes, I have it.
14      Q.    And looking at the balance sheet, the
15   assets being sold, for the derivatives line
16   item, the assets being sold say derivatives on
17   the asset side 3.6 and derivatives in the short
18   inventory saying 1.7. Do you see that?
19      A.    Yes.
20      Q.    So there's almost $2 billion of net
21   value in the derivatives according to this
22   provisional balance sheet on September 18,
23   correct?
24      A.    As of September 17, supposedly.
25      Q.    This was sent to the trustee on the
```

Page 314

1          J. Kobak
2    evening of September 18?
3       A.   But I think the -- the figures are
4    based on September 17th values. It says
5    "Pre-transaction 17 September." I thought those
6    were the most recent figures that were
7    available.
8       Q.   Does the trustee know, have you made
9    any inquiry since that time to the present as to
10   whether the numbers for derivatives on this
11   draft balance sheet included margin deposit?
12      A.   No.  Well, I -- Deloitte may have done
13   some work along those lines, but I don't recall.
14      Q.   Did the trustee ever, between the time
15   of receiving this draft balance sheet and the
16   closing, raise a question with anyone involved
17   in the deal as to whether Barclays was receiving
18   net value by acquiring LBI's exchange-traded
19   derivatives accounts?
20      A.   I don't know if we looked at those
21   accounts particularly.
22      Q.   Did the trustee ever tell anyone at
23   Barclays before the closing --
24      A.   And I also don't know how the
25   derivative values were derived.

Page 315

1          J. Kobak
2       Q.   Uh-huh.  Did the trustee ever tell
3    anyone at Barclays before the closing that the
4    trustee's approval for the sale was dependent
5    upon there being sufficient assets of sufficient
6    value left behind with the estate to cover any
7    remaining customer claims in the estate?
8       A.   Not in so many words.  I don't recall
9    that we had substantial discussion with Barclays
10   because, again, many of those discussions would
11   be had by LBHI rather than ourselves.
12           I think the trustee did say in court
13   that our belief was that there would be
14   sufficient assets to protect customers and that
15   we thought the transfers were in the best
16   interests of customers and so forth.
17      Q.   Did the trustee make any inquiry
18   before the closing as to how Barclays was going
19   to ensure itself that it retained at least 75
20   percent of the top 200 executives in the firm?
21      A.   How Barclays was going to do that?
22   No. No.
23      Q.   You understood -- the trustee and his
24   advisors understood that Barclays was at one
25   point speaking of that as a condition of the

Page 316

1          J. Kobak
2    deal, that it retain at least 75 percent of the
3    top 200 employees?
4       A.   I vaguely remember that there was
5    discussion about a good percentage of what they
6    considered I guess top people staying on and
7    that that was important to them.
8       Q.   And was the trustee aware from any of
9    its discussions with Weil or Simpson Thacher or
10   anyone else that Barclays was making employment
11   and bonus offers to some of the top executives
12   before the closing?
13      A.   I'm not sure we had any discussions
14   with Simpson Thacher.  I don't know that we had
15   any specific discussions.  I think we knew that
16   Barclays must be giving thought to, obviously,
17   who it would hire and what it might take to get
18   those people. But I don't think, beyond that,
19   we had any substantial discussion of that.
20      Q.   Did the trustee ever express any
21   concern to anyone about whether there were bonus
22   offers being made to any of the Lehman
23   executives involved in the negotiation?
24      A.   Again, I don't think at the time we
25   knew what the extent of the bonuses that we

Page 317

1          J. Kobak
2    subsequently came to learn about might be.
3    Maybe we were naïve in that regard given that
4    this is Wall Street and so forth, but no, I
5    don't believe we discussed that, certainly not
6    in any detail.
7       Q.   You knew that there were going to be
8    bonuses offered to all the employees, including
9    the top executives, correct?
10      A.   Well, we knew that one of the
11   obligations that Barclays was undertaking was to
12   pay what was on a schedule as I believe $2
13   billion of bonuses to a large number of
14   employees that they were hoping to retain.
15      Q.   And you understood that that would
16   involve paying market rate bonuses to all the
17   employees of Lehman, Barclays would be obligated
18   to do that?
19           MR. MAGUIRE:  Objection to form.
20      A.   I thought the obligation was that they
21   would pay in a manner that was consistent with
22   their existing practice and past practice.  We
23   didn't know the details of that, what that were.
24           We knew that Wall Street bonuses
25   tended to be pretty generous. I don't think we

Page 318

1             J. Kobak
2  knew how generous some of them might turn out to
3  be.
4      Q.    And you didn't consult with anyone,
5  you weren't told any specific information about
6  the bonus offers or employment offers before the
7  closing?
8      A.    Not that I recall.
9      Q.    There's been -- there have been
10 allegations in this case about -- this is within
11 the 30(b)(6) topic of so-called new evidence
12 that's been raised in the Rule 60 motions.
13          There have been allegations about a
14 discount on the original inventory of long
15 positions referenced in the APA in subsection D,
16 the approximately 70 billion that we looked at;
17 you're familiar with that?
18     A.    Generally.
19     Q.    Has the trustee or any of its advisors
20 examined -- strike that. Let me be more clear.
21          Does the trustee or any of its
22 advisors have a list of the actual Cusips
23 contained in that original inventory of long
24 positions referenced in the APA?
25     A.    The original $70 billion.

Page 319

1             J. Kobak
2      Q.    Right.
3      A.    I don't know, but we may have done it
4  in conjunction with the investigation. I don't
5  recall having seen that.
6      Q.    I think it's within the 30(b)(6) topic
7  of the purchased assets that were either to be
8  purchased or actually purchased in the
9  agreement, so I would ask that we certify this
10 question for follow-up:  Does the trustee or his
11 advisors have access to the list of Cusips that
12 comprise that original inventory of long
13 positions referenced in the APA subsection D?
14          MR. MAGUIRE:  We'll leave a space in
15     the transcript and we'll take the request
16     under advisement.
17 INFORMATION TO BE PROVIDED: _____
18 _____
19 _____
20     Q.    And the following question would be
21 whether the trustee has performed a valuation of
22 that original inventory?
23          MR. MAGUIRE:  Likewise, we will take
24     that under advisement.
25 INFORMATION TO BE PROVIDED: _____

Page 320

1             J. Kobak
2
3      Q.    Did the trustee examine the notices
4  Barclays filed of the contracts it was assuming
5  as purchased contracts under the Asset Purchase
6  Agreement 60 days -- within the 60 days
7  following closing?
8      A.    We had a team, I believe, that looked
9  at the contracts Barclays was assuming and
10 rejecting, and there were quite a lot of them.
11     Q.    By the time the -- you are familiar
12 with the 60-day period I'm talking about? The
13 APA says that for 60 days Barclays can decide
14 which contracts it will assume and which it will
15 not assume?
16     A.    Yes. Yes.
17     Q.    And whichever one it assumes, it has
18 to pay a cure payment for, correct?
19     A.    Yes. Yes.
20     Q.    And it doesn't have to -- you
21 understood that Barclays did not have to pay a
22 cure payment for any contracts it did not
23 assume, correct?
24     A.    That's correct, and a figure was
25 given, I think a billion and a half dollars or

Page 321

1             J. Kobak
2  something like that, as to what was expected. I
3  realize that was an expectation, not an absolute
4  figure. It was said to be an estimate, but we
5  thought probably it was a pretty realistic
6  estimate.
7      Q.    You mean the trustee thought it was a
8  realistic estimate?
9      A.    The trustee thought it was realistic
10 estimate.
11     Q.    Do you have any basis for knowing one
12 way or the other?
13     A.    We knew Barclays had been doing a lot
14 of due diligence for a while, you know, had
15 looked at the whole business and the part it was
16 acquiring. We didn't think there was any
17 certainty, but that figure was given to the
18 court, but it was said to be an estimate.
19     Q.    You understand it was not an estimate
20 from Barclays, it was an estimate from Lehman?
21     A.    I don't know who it was from, but
22 unlike other numbers, it was not said to be an
23 estimate.
24     Q.    It was --
25     A.    I mean, it was said to be an estimate,

Page 322

1              J. Kobak
2   not given as a figure.
3       Q.   By the time Barclays had made its
4   decisions on which contracts to assume or not
5   assume roughly 60 days after the closing, did
6   the trustee at that point understand that the
7   total cure amounts Barclays was going to be
8   paying was substantially less than the $1.5
9   billion number?
10      A.   I'm not sure if we ever -- if at that
11  point we analyzed that number specifically. I
12  do remember that it was quite a lot of contracts
13  and quite a lot of court filings, as I recall,
14  to indicate the contracts were assumed and cure
15  amounts were paid or rejected.
16      Q.   Was the trustee aware of the total
17  cure amounts at the time that it filed its
18  appellate brief defending the sale?
19      A.   I don't know.
20      Q.   Would it have caused the trustee not
21  to support the sale on appeal if the trustee
22  knew that there was only 230 million of cure
23  amounts rather than 1.5 billion?
24          MR. MAGUIRE:  Objection to form.
25      A.   The position we took on appeal was, as

Page 323

1              J. Kobak
2   I recall, and I did look at our briefs on this
3   period, and without getting into privileges, did
4   talk about the position that we wanted to take
5   with the trustee, and we basically made two
6   arguments:
7          One was that the equitable mootness
8   doctrine applied because there hadn't been a
9   request for a stay, which limited the grounds of
10  attack; and, second, that we didn't think there
11  was merit to the allegations that the entire
12  procedure leading up to the sale hearing
13  violated due process in terms of notice and
14  opportunity to be heard given the exigent
15  circumstances.
16         We didn't take a position on any other
17  aspect, I don't believe, of the sale and didn't
18  think it was necessary in connection with the
19  specific types of arguments and allegations that
20  were made by the party challenging the deal.
21      Q.   So do you stand by the positions you
22  took on appeal?
23      A.   Yes.
24      Q.   And after the clarification letter was
25  finalized and executed, did the trustee ever

Page 324

1              J. Kobak
2   consider whether it might be necessary to go
3   back to the court to get additional approval for
4   what was in the clarification letter?
5       A.   Not at the time because, again, we
6   thought that changes that had been made were in
7   the nature of substitutions to get to the kinds
8   of economics that were talked about at the
9   hearing. Subsequent times, and given some of
10  the positions that Barclays started to take in
11  late December and the fall -- spring of last
12  year, we began to at least begin thinking about
13  that. We clearly didn't want to go to court, if
14  that were necessary, until we had explored
15  sufficiently to feel that there was merit to
16  anything we would bring to the court.
17      Q.   I just have one more document to show
18  you before -- I know you need to leave, we can
19  talk about that in a second, but there's one
20  more document I want to show you with one or two
21  questions.
22          (Exhibit 456, a document bearing Bates
23  Nos. HHR_00009337 through 9342, marked for
24  identification, as of this date.)
25      Q.   Mr. Kobak, Exhibit 456 is an exchange

Page 325

1              J. Kobak
2   between you and your colleague Carolyn Lavine or
3   Levine -- I'm not sure.
4       A.   Levine.
5       Q.   -- Levine and some other colleagues
6   and the trustee and Laura Vecchio.
7          This follows a chain of e-mails
8   relating to the transfer of OCC margin, and it
9   attaches -- well, at least an earlier version in
10  the chain attaches the Transfer and Assumption
11  Agreement. I'll represent that to you.
12      A.   Right.
13      Q.   And I think Laura Vecchio sends it to
14  Jim Giddens down below on October 17, saying,
15  "Jim, this is what Alan Kaplan, the Barclays
16  attorney, passed along regarding the OCC
17  agreement." Do you see that?
18      A.   Yes.
19      Q.   And that's forwarded then to Carolyn
20  Levine and you then -- and you then respond
21  saying, "This is what we signed at the hearing
22  because, rightly or wrongly, OCC told us nothing
23  would move otherwise. Barclays had to
24  substitute for LBI." You see that?
25      A.   Yes.

Page 326

J. Kobak

2  Q.  Can you elaborate on what you meant by
3  that?
4  A.  Well, I think the purpose was to show
5  everyone that we had this agreement and make
6  sure they understood what the circumstances
7  were.  In that we had signed this agreement, we
8  had been told that it was necessary, if accounts
9  were to move and so forth, that Barclays would
10  have to substitute for LBI as the party dealing
11  with OCC.
12  Q.  And if "nothing would move otherwise,"
13  that phrase also means that, instead of
14  transferring the accounts to Barclays, the OCC
15  would liquidate the accounts, correct?
16  A.  Yeah, I don't know what OCC would have
17  done.  My focus was on the accounts, and
18  particularly the customer accounts would not
19  have moved -- would not have gotten to the
20  customers so that they could take control of
21  their own trading and make their own decisions.
22  Q.  Has the trustee done any analysis of
23  what its ability to satisfy customer claims
24  would have been if the Barclays sale had not
25  occurred?

Page 327

J. Kobak

2  A.  No.  You're talking about many, many
3  thousands of accounts.
4  We do know how much property has been
5  transferred to Barclays.  We do know how much
6  property, customer property and potential
7  customer property we have left.  So I suppose
8  one could do that calculation, but the customer
9  account transfers aren't necessarily done on the
10  same net equity basis that the customer claims
11  are, so exactly what the claims of Barclays'
12  customers had they all been dated as of
13  September 19 would have been compared to, you
14  know, what they are now, I don't know the
15  details.  I suspect it would have been somewhat
16  the same as the bottom line, but there
17  undoubtedly would have been some difference
18  there.
19  MR. HUME:  You have to leave at 4
20  o'clock, as I recall, you told me at the
21  beginning.
22  THE WITNESS:  Yeah, I do, I have to go
23  to some meetings at the Bar Association
24  which were long scheduled, I'm afraid.
25  MR. HUME:  So I think we should go off

Page 328

J. Kobak

2  the record.  I would like to find how long
3  I've been on the record.  I appreciate your
4  patience.  There are a lot of topics in this
5  30(b)(6), there are a lot of issues in our
6  dispute, and I would like to reserve the
7  right to resume the deposition to pursue
8  those.  You had mentioned that tomorrow
9  might be possible.
10  MR. MAGUIRE:  Yeah, we can be here
11  tomorrow.
12  MR. HUME:  All right.  So let's go off
13  the record to find out the time.
14  THE VIDEOGRAPHER:  The time is 4:04.
15  We are going off the record.
16  (Discussion off the record.)
17  oOo
18
19
20
_____
21  JAMES B. KOBAK, JR.
22  Subscribed and sworn to
   before me this    day
23  of     20 .
24
25  _____

Page 329

J. Kobak
2  CERTIFICATE
3  STATE OF NEW YORK )
   : ss
4  COUNTY OF NEW YORK)
5  I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9  That JAMES B. KOBAK, JR. , the witness
10  whose deposition is herein before set forth,
11  was duly sworn by me and that such
12  deposition is a true record of the testimony
13  given by such witness.
14  I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18  I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23  In witness whereof, I have hereunto
24  set my hand this 7th day of December, 2009.
25  --------------------------------

## Page 330

1        J. Kobak
2        INDEX
3    WITNESS:        EXAMINATION BY        PAGE
4    J. KOBAK        Mr. Hume            5
5
6    EXHIBITS:                    PAGE
7    Exhibit 438, Barclays Capital Inc.'s        6
8    Rule 30(b)(6) Deposition Notice
9    Exhibit 439, Declaration of James B. Kobak,    7
10    Jr. In Support of The Trustee's Motion for
11    Relief Pursuant to the Sale Orders or,
12    Alternatively, for Certain Limited Relief Under
13    Rule 60(b)
14    Exhibit 440, Debtors' Motion to (A) Schedule    30
15    a Sale Hearing; (B) Establish Sales Procedures;
16    (C) Approve a Break-Up Fee; and (D) Approve the
17    Sale of the Purchased Assets and the Assumption
18    and Assignment of Contracts Relating to the
19    Purchased Assets
20    Exhibit 441, a document bearing Bates Nos.    51
21    HHR_00006494 through 95, with attachment
22    Exhibit 442, Transcript of the Sale Hearing    72
23    Exhibit 443, The Trustee's Motion for Relief    87
24    Pursuant to the Sale Orders or, Alternatively,
25    For Certain Limited Relief Under Rule 60(b)

## Page 331

1        J. Kobak
2        INDEX (Cont'd)
3
4    EXHIBITS:                    PAGE
5    Exhibit 444, Declaration of Shari D. Leventhal    138
6    in Support of Trustee's Motion for Entry of an
7    Order Approving a Settlement Agreement
8    Exhibit 445, Barclays PLC and Barclays Bank    212
9    PLC Form 6-K
10    Exhibit 446, Joint Motion of the Debtors and    238
11    Barclays Capital, Inc. for Entry of an Order
12    Authorizing to File Under Seal Certain
13    Schedules to the Asset Purchase Agreement
14    Exhibit 447, a document bearing Bates Nos.    246
15    HHR_00009059
16    Exhibit 448, a document bearing Bates Nos.    246
17    HHR_00009050 through 9051
18    Exhibit 449, a document bearing Bates Nos.    251
19    HHR_0000491 with attachment
20    Exhibit 450, a document bearing Bates Nos.    254
21    HHR_00009562 through 9566 with attachment
22    Exhibit 451, a document bearing Bates Nos.    261
23    BCI-CG00033812
24    Exhibit 452, a collection of document bearing    281
25    Bates Nos. HHR_00006072 through 6081

## Page 332

1        J. Kobak
2        INDEX (Cont'd)
3    EXHIBITS:                    PAGE
4    Exhibit 453, a document bearing Bates Nos.    284
5    HHR_00006049 through 6051
6    Exhibit 455, a document bearing Bates Nos.    307
7    HHR_00014574 through 14575
8    Exhibit 456, a document bearing Bates Nos.    324
9    HHR_00009337 through 9342
10
11    INFORMATION TO BE PROVIDED:
12    Page 77, Line 14
13    Page 169, Line 16
14    Page 208, Line 25
15    Page 319, Line 16
16    Page 319, Line 24
17
18
19
20
21
22
23
24
25

## Page 333

1            J. Kobak
2    NAME OF CASE:  In re: Lehman
3    DATE OF DEPOSITION:  December 7, 2009
4    NAME OF WITNESS:  James B. Kobak, Jr.
5    Reason Codes:
        1. To clarify the record.
        2. To conform to the facts.
7        3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
9    From _____ to _____
    Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
12    From _____ to _____
    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
    From _____ to _____
15    Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
    From _____ to _____
21    Page _____ Line _____ Reason _____
22    From _____ to _____
23    Page _____ Line _____ Reason _____
    From _____ to _____
24
25