# BCI EXHIBIT

# 81

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ------------------------------x

      In Re:                    Chapter 11

5     LEHMAN BROTHERS            Case No. 08-13555 (JMP)

      HOLDINGS, INC., et al.,    (Jointly Administered)

6     ------------------------------)

7

8          * * * HIGHLY CONFIDENTIAL * * *

9          DEPOSITION OF PHILIP E. KRUSE

10            New York, New York

11          Thursday, December 17, 2009

12

13

14

15

16

17

18

19

20     Reported by:

       FRANCIS X. FREDERICK, CSR, RPR, RMR

21     JOB NO. 26533

22

23

24

25

Page 2

```
 1
 2
 3
 4
 5          December 17, 2009
 6          9:32 a.m.
 7
 8
 9          HIGHLY CONFIDENTIAL videotaped
10   deposition of PHILIP E. KRUSE, held at
11   the offices of Boies Schiller & Flexner,
12   LLP, 575 Lexington Avenue, New York, New
13   York, pursuant to Notice, before Francis
14   X. Frederick, a Certified Shorthand
15   Reporter, Registered Merit Reporter and
16   Notary Public of the States of New York
17   and New Jersey.
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3      JONES DAY, LLP
 4      Attorneys for Lehman Brothers, Inc.
 5         222 East 41st Street
 6         New York, New York  10017-6702
 7      BY: JAYANT TAMBE, ESQ.
 8          KELLY CARRERO, ESQ.
 9
10      BOIES SCHILLER & FLEXNER, LLP
11      Attorneys for Barclays Capital
12         401 East Las Olas Boulevard, Suite 1200
13         Fort Lauderdale, Florida  33301
14      BY: W. TODD THOMAS, ESQ.
15         - and -
16      BOIES SCHILLER & FLEXNER, LLP
17         575 Lexington Avenue - 7th Floor
18         New York, New York  10022
19      BY: JONATHAN P. KRISBERGH, ESQ.
20
21
22
23
24
25
```

Page 4

```
 1
 2   A P P E A R A N C E S: (Cont'd.)
 3      QUINN, EMANUEL, URQUHART, OLIVER &
 4      HEDGES, LLP
 5      Attorneys for the Creditors Committee
 6         51 Madison Avenue
 7         New York, New York  10010
 8      BY: ERIC M. KAY, ESQ.
 9
10      HUGHES, HUBBARD & REED, LLP
11      Attorneys for the SIPA Trustee
12         One Battery Park Plaza
13         New York, New York  10004-1482
14      BY: SETH ROTHMAN, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1          P. KRUSE - HIGHLY CONFIDENTIAL
 2          THE VIDEOGRAPHER:  This is the
 3   start of tape number one of the
 4   videotaped deposition of Philip Kruse in
 5   the matter In Re. Lehman.  Today's date
 6   is December 17th, 2009 at approximately
 7   9:32 a.m.  Will the court reporter
 8   please swear in the witness.
 9              * * *
10   P H I L I P   K R U S E,  called as a
11      witness, having been duly sworn by a
12      Notary Public, was examined and
13      testified as follows:
14   EXAMINATION BY
15   MR. THOMAS:
16      Q.   Good morning, Mr. Kruse.
17      A.   Morning.
18      Q.   Would you please state your name.
19      A.   Philip Kruse.
20      Q.   And will you please state who you
21   work for?
22      A.   I'm with Alvarez & Marsal.
23      Q.   And have you been deposed before?
24      A.   Yes, I have.
25      Q.   Okay.  Approximately how many
```

Page 6

P. KRUSE - HIGHLY CONFIDENTIAL
1 times?
3   A.  Twice.
4   Q.  So you understand how this process
5 works.  I'll be asking questions.  If you
6 don't understand any of my questions or want
7 me to clarify them, please do so.  Please ask
8 me to do so and I will.
9   A.  Yes.  Of course.
10   Q.  Okay.  Do you understand you've
11 been designated here today as a corporate
12 representative for both LBHI and Alvarez?
13   A.  Yes.
14   Q.  And can you please describe your
15 career history just at a very high level.
16   A.  Graduated in December of 1982 from
17 the University of Kansas.  Accounting and
18 business administration degree.  Bachelor of
19 science.  Began work in January of '83 with a
20 public accounting firm in Wichita, Kansas.
21 Regier, Carr & Monroe.  I was there for three
22 and a quarter years.  And then began work in
23 Shelby Ruckdashel & Jones in Dallas, Texas.
24 Was with that firm -- that's a public
25 accounting firm.  I was with that firm for

Page 7

P. KRUSE - HIGHLY CONFIDENTIAL
2 about a year.  And then joined Kenneth
3 Leventhal & Company also in Dallas, Texas.  I
4 was with Kenneth Leventhal & Company from the
5 fall -- excuse me -- from the spring of '87
6 through November of '92.  In November of '92 I
7 moved to New York and joined the former
8 Deloitte & Touche.  I was with Deloitte Touche
9 through calendar year 2004 and joined Alvarez
10 & Marsal in January of 2005.
11   Q.  And what is your current position
12 with Alvarez & Marsal?
13   A.  I'm a Managing Director in Our
14 Dispute Analysis and Forensics Services Group.
15   Q.  And what are your duties and
16 responsibilities in that position?
17   A.  Primarily client service.  I
18 oversee forensic accounting engagements of
19 various types.  Litigation consulting
20 engagements.
21   Q.  And when did you first become
22 involved with LBHI or the LBI sale of assets
23 to Barclays?
24   A.  My first involvement was the day
25 the deal closed.  I think I was on site the

Page 8

P. KRUSE - HIGHLY CONFIDENTIAL
2 afternoon of September 22nd.
3   Q.  Do you know when Alvarez's first
4 involvement with that sale transaction was?
5   A.  Well, I know that Brian Marcel was
6 called the evening of September 14th, Sunday
7 evening, by a board member of Lehman.  And at
8 that time was asked to serve as a chief
9 restructuring officer for the entity as it was
10 entering bankruptcy.  So I think we had people
11 on the ground that following day, on the 15th.
12   Q.  Let me go ahead and show you two
13 documents we'll mark as 457A and 458A.
14     (Deposition Exhibit 457A, Barclays
15     Capital Inc.'s Rule 30(b)(6) Deposition
16     Notice to Lehman Brothers Holdings Inc.,
17     marked for identification as of this
18     date.)
19     (Deposition Exhibit 458A, Barclays
20     Capital Inc.'s Rule 30(b)(6) Deposition
21     Notice to Alvarez & Marsal, marked for
22     identification as of this date.)
23 BY MR. THOMAS:
24   Q.  Have you seen these documents
25 before?

Page 9

P. KRUSE - HIGHLY CONFIDENTIAL
2   A.  Yes, I have.
3   Q.  Okay.  And you understand them to
4 be -- to contain the topics which you are
5 going to serve as a representative for here
6 today?
7   A.  Yes.
8     MR. TAMBE:  I would only add that,
9 you know, at least 457A -- well, both
10 457A and 458A have been the subject of
11 certain correspondence between my
12 partner, Bill Hein, and yourself.  And
13 there's a letter dated November 2nd in
14 which we have noted certain objections
15 with respect to 457A as well as 458A.
16 And certainly we're producing this
17 witness subject to those objections.
18     MR. THOMAS:  Sure.  And you
19 received my letter in response.
20     MR. TAMBE:  Yeah, yeah.
21     MR. THOMAS:  So you understand --
22     MR. TAMBE:  We understand your
23 position, yeah.
24     MR. THOMAS:  -- how we're moving
25 forward.

Page 10

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    BY MR. THOMAS:
3        Q.   Since you're kind of wearing two
4    hats here today and at the suggestion of your
5    counsel we've agreed to try to conflate the
6    deposition. We'll have to -- you and I will
7    both have to be careful to distinguish between
8    LBHI and Alvarez when appropriate. Sometimes
9    I'll ask questions framed as LBHI and Alvarez.
10   Obviously, if you need to draw any kind of
11   distinction between the two in your answer,
12   you know, please do so.
13       A.   Yes, of course.
14       Q.   Okay. In terms of your role as an
15   LBHI representative for these topics can you
16   please describe what you did to prepare
17   yourself for answering questions today?
18       A.   My preparation generally entailed
19   rereading and re-reviewing the Rule 60(b)
20   motion that LBHI filed as well as the UCC and
21   the SIPA Trustee and the exhibits to those
22   filings as well. And I also met with counsel
23   for about a -- for two days earlier this week.
24       Q.   Did you discuss the deposition
25   with anyone else?

Page 11

1    P. KRUSE - HIGHLY CONFIDENTIAL
2        A.   I had discussions with other
3    people at Alvarez & Marsal in the course of
4    refreshing my memory about some of this
5    material.
6        Q.   Let's stay on LBHI for just a
7    minute. Did you speak with anyone at LBHI to
8    gain information in order to answer questions
9    today?
10       MR. TAMBE: Objection to the form
11       of the question.
12       A.   Well, you know, the people at LBHI
13   that generally have knowledge on these topics,
14   substantially all of them had moved over to
15   Barclays, and so I wouldn't have had access by
16   and large to virtually all the people who have
17   knowledge on these topics as it relates to
18   LBHI.
19       Q.   Who -- that is who still at LBHI
20   has knowledge on these topics?
21       A.   There are various people who
22   either are with or rejoined the estate -- or
23   joined the estate after the sale that we've
24   had discussions with in the course of our
25   work.

Page 12

1    P. KRUSE - HIGHLY CONFIDENTIAL
2        THE WITNESS: Presumably the
3        identity of those people is not subject
4        to any privilege issues.
5        MR. TAMBE: No. I think if
6        they're the people who fall under the
7        category as you understand the question
8        and you remember the names then you
9        should identify them.
10       A.   The people that I recall as I sit
11   here, and there may be others, Anthony
12   Collerton, Chris O'Meara. There are others
13   whose names escape me but, you know, I can --
14   there are probably at least three or four
15   others that I know we spoke to at various
16   times in the course of our work in order to
17   get the benefit of whatever knowledge they
18   had.
19       Q.   Let me just try to prompt you with
20   a couple names and see if you did speak with
21   them or you otherwise know that they have
22   knowledge concerning these topics or the sale
23   transaction.
24       Christopher Mosher?
25       A.   I don't believe I've spoken to

Page 13

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    him.
3        Q.   Do you know if he has knowledge
4    concerning these topics?
5        A.   I do not know.
6        Q.   Catherine Muller?
7        A.   I know Catherine Muller. I'd
8    spoken to her before. I don't recall that it
9    was specifically about the Barclays deal,
10   itself.
11       Q.   Do you know her involvement with
12   the sale transaction?
13       A.   I don't. She doesn't appear to be
14   a prominent player by virtue of the material
15   that I reviewed.
16       Q.   Bill Olshan?
17       A.   Yes. I know Bill Olshan.
18       Q.   Was he involved in the Barclays
19   transaction?
20       A.   No, he was not. To my knowledge.
21       Q.   Lisa Roitman?
22       A.   I know the name but I don't know
23   Lisa and I don't know that she had any
24   involvement either.
25       Q.   Eric Salzman?

Page 14

P. KRUSE - HIGHLY CONFIDENTIAL

1         P. KRUSE - HIGHLY CONFIDENTIAL
2      A.  I don't know that name.
3      Q.  Have you spoken to Mark Shafir
4  about the sale transaction?
5      A.  Mark Shafir?
6      Q.  Shafir. Excuse me.
7      A.  I want to say he was deposed -- I
8  may have the name mixed up, but I thought Mark
9  was deposed in the course of our 2004
10  discovery.
11     Q.  And have you spoken with him about
12  the sale transaction?
13     A.  Not independently, no.
14     Q.  Martha Solinger?
15     A.  I've spoken to Martha.
16     Q.  And --
17     A.  I don't believe she had any role
18  in the transaction.
19     Q.  Darryl Steinberg?
20     A.  I know the name. I don't recall
21  ever speaking to Darryl.
22     Q.  Do you know if Mr. Steinberg had
23  any involvement in the transaction or
24  knowledge of these topics?
25     A.  Not to my knowledge.

Page 15

1         P. KRUSE - HIGHLY CONFIDENTIAL
2      Q.  Wendy Uvino?
3      A.  I do not know that name.
4      Q.  Okay. Karen Corrigan?
5      A.  I've seen the name but I don't
6  have any recollection of ever talking to her.
7     Q.  Do you know if she was involved in
8  the sale transaction?
9     A.  Not to my knowledge.
10     Q.  Okay. Are the people -- to your
11  knowledge, are all the people that I've listed
12  are they still at Lehman?
13     A.  I know certain of the people you
14  listed are at Lehman. Others I do not know.
15     Q.  How about Daniel Ehrmann?
16     A.  Daniel Ehrmann is an A&M person.
17     Q.  Was Mr. Ehrmann involved in the
18  sale transaction?
19     A.  No, not to my knowledge.
20     Q.  Cliff Feibus, F-E-I-B-U-S?
21     A.  Yes. I know Cliff.
22     Q.  And is he still at the estate?
23     A.  Yes. He is with the estate as I
24  understand it.
25     Q.  Was he involved in the sale

Page 16

1         P. KRUSE - HIGHLY CONFIDENTIAL
2  transaction or does he have knowledge
3  concerning these topics?
4     A.  He was not involved to my
5  knowledge.
6     Q.  Joelle Halperin?
7     A.  I know that name. Don't recall
8  speaking to Joelle. Don't know that she had
9  any role on the transaction.
10     Q.  Is she still at LBHI?
11     A.  I don't know.
12     Q.  Tom Hommel?
13     A.  I do know Tom. I've spoken to
14  Tom. I don't believe he had any role in the
15  transaction.
16     Q.  Henry Klein?
17     A.  I do not know that name.
18     Q.  Gary Mandelblatt?
19     A.  I know the name. I think I've met
20  Gary. In fact, I understand he recently left
21  the estate to join NOMURA if I'm not mistaken.
22  He was a senior person in our derivatives team
23  before he left. I don't know that he had any
24  role in the transaction either.
25     Q.  Did you speak with Chris O'Meara

Page 17

1         P. KRUSE - HIGHLY CONFIDENTIAL
2  at all in preparation for your testimony
3  today?
4     A.  I spoke to Chris before my
5  preparation before but not -- I haven't spoken
6  to him recently on this topic.
7     Q.  Concerning the sale transaction?
8     A.  Yes.
9     Q.  And can you describe what the
10  conversation was about?
11     A.  Well, we met with -- I met with
12  him along with others and representatives from
13  the Jones Day firm --
14        MR. TAMBE: And I think I would
15     just caution the witness not to disclose
16     what would have been a privileged
17     conversation if that's the conversation
18     you're recalling where folks from Jones
19     Day were involved after Jones Day was
20     retained to work on this particular
21     matter. That would be a privileged
22     conversation and I urge you not to
23     testify about that. You can testify
24     about the fact that the conversation
25     occurred but that's it.

Page 18

P. KRUSE - HIGHLY CONFIDENTIAL

1    A.    I don't think I ever spoke to
Chris independently on this subject without
Jones Day present so I'll follow instructions
of counsel and leave it at that.
5    Q.    Okay. Any of the other people
that we've gone through on the list did you
speak with them in preparation for you
testimony today?
9    A.    Well, I speak routinely to the
10   people in the in-house legal team, Bill
Olshan, Tom Hommel, Martha Solinger. I
wouldn't say I spoke to them specifically on
the subject of this deposition. But the other
people -- I did not speak to those people
directly in connection with my preparation.
16   Q.    Okay. For example, Catherine
Muller, did you reach out to her for purposes
of getting ready for the deposition?
19   A.    No, I did not.
20   Q.    Okay. And what did you do for
your preparation with respect to your role as
the Alvarez 30(b)(6) witness today?
23   A.    Again, I reviewed the material
that was filed in connection with our Rule

Page 19

P. KRUSE - HIGHLY CONFIDENTIAL

1    60(b) motion, the other Rule 60(b) motions by
the other interested parties, the exhibits
thereto. I met with counsel. I had
conversations -- a brief conversation with Jim
Fogarty, really to just introduce Jim to the
Jones Day firm, making him aware that Jones
Day would be reaching out to him to schedule
his deposition. We did try to speak to Jim in
the last couple of days but he is currently --
10   he left A&M, as you may know, and is currently
the CEO of Charming Shops. And I understand
he was embroiled in a preparation for and
participation in a board meeting for his
company. And we haven't been able to speak to
him in the last couple of days.
16            I spoken to Brian Marsal recently
in connection with my preparation. I've
spoken to John Suckow in connection with my
preparation.
20   Q.    Anyone else?
21   A.    Not that I recall, as I sit here.
22   Q.    What information did you learn
from Mr. Marsal?
24   A.    I just generally spoke to him

Page 20

P. KRUSE - HIGHLY CONFIDENTIAL

1    about his perspectives on what we as a -- we
as a firm, A&M were focused on. And how they
related to some of the material I saw.
4            And I'm sorry. I should back up.
In connection with my preparation I also
reviewed various e-mail communications that
were produced as I understand it in this
matter that involve communications A&M was
involved in. And I would have spoken to Brian
to get his perspective on some of the material
that I'd seen up to that point in my
preparation.
13   Q.    Okay. And what information did
you learn from Mr. Suckow?
15   A.    Again, it would have been a
similar nature, to try to get a perspective on
some of the material I'd seen in connection
with my preparation.
19   Q.    So from LBHI you reviewed the Rule
60 motions and you met with counsel. That was
pretty much the extent of your getting
prepared to be answer the questions for LBHI;
is that correct?
24   MR. TAMBE: Objection to the form

Page 21

P. KRUSE - HIGHLY CONFIDENTIAL

1    of the question.
2    A.    I would agree with that but would
also just add a point of emphasis that because
of the work that we had been doing up to this
point I was generally aware that the people
that are currently at the estate did not have
substantial knowledge of the transaction. So
I didn't feel an immediate need or utility
that would be served by seeking out some of
these people you named.
11   Q.    Okay. In any event, you didn't
seek them out or talk to them.
13   A.    Not in connection with the
preparation itself, no.
15   Q.    Okay. Let me go ahead and hand
you an exhibit that's already been marked
that's the Asset Purchase Agreement.
18            I might try to start with the most
boring stuff first while we're all still
awake. And basically what I'd like to do is
basically walk through -- and this really
relates to topic number 1 in the deposition
notices and just walk through and ask you
about valuations that were made or not made

Page 22

1           P. KRUSE - HIGHLY CONFIDENTIAL
2   with respect to the assets and then the
3   liabilities.
4       A.   Um-hum.
5       Q.   So at page 6 of the APA -- and
6   this is a document you're familiar with, I
7   presume.
8       A.   Yes. I am.
9       Q.   Okay. Under Purchased Assets --
10  again, I'd like to just walk through and ask
11  pursuant to topic 1 what your understanding --
12  what LBHI's and/or Alvarez's understanding was
13  with respect to the valuations of these
14  various items. And if the answer is they
15  don't know or no valuation performed, so be
16  it. But if there were valuations performed or
17  there was some knowledge I would like to have
18  your information on that.
19          So the first one, the retained
20  cash, do you know how much -- what value the
21  retained cash had as of September 17th?
22      A.   No. A&M had no understanding of
23  this or any of these categories of assets and
24  what their value was at any point prior to the
25  closing.

Page 23

1           P. KRUSE - HIGHLY CONFIDENTIAL
2       Q.   Okay. How about LBHI?
3       A.   I believe LBHI's understanding
4   would have been best represented in the
5   discovery that's been conducted thus far under
6   our Rule 2004 motion. And that's obviously
7   part of the record in this matter.
8   Substantially all the people that were
9   involved, to my knowledge, have moved over to
10  Barclays.
11      Q.   Well, I mean, have you tried to
12  look at any records at LBHI, at the estate, to
13  determine what the amount of retained cash was
14  as of September 17th?
15      A.   Anything I would have been -- have
16  done in connection with the evaluation of
17  these items would have been done in connection
18  with, as I understand it, privileged work
19  under the direction of counsel.
20      Q.   Okay. Well, I'm just -- I don't
21  want to get into, you know, anything
22  privileged but I'm just asking simple fact
23  questions. And I think a fact is not
24  privileged. So do you know how much retained
25  cash was -- there was on September 17th?

Page 24

1           P. KRUSE - HIGHLY CONFIDENTIAL
2       A.   As I sit here, no.
3       Q.   Do you know -- are there records
4   at LBHI that would show that?
5       A.   I believe there would be, yes. To
6   the best of my recollection, I don't believe
7   there was cash, you know, retained. But I
8   don't know the particular details of that as I
9   sit here.
10      Q.   Do you know which documents at
11  LBHI would show that information?
12      A.   The accounting records generally.
13      Q.   Okay. And you did -- you
14  mentioned Alvarez did not know the amount of
15  retained cash prior to closing; is that
16  correct?
17      A.   Correct.
18      Q.   Did Alvarez ever seek to find out
19  what the retained cash was prior to closing?
20      A.   No.
21      Q.   Okay. Did they --
22          MR. TAMBE: Could I just get a
23  clarification on that.
24          Prior to the closing did they make
25  efforts to find other retained cash or

Page 25

1           P. KRUSE - HIGHLY CONFIDENTIAL
2   after closing did they look back and
3   say -- I just want clarification on
4   that.
5           MR. THOMAS: That's a good point.
6   It was the former but I'm going to ask
7   it as to the latter also.
8           MR. TAMBE: Okay.
9       Q.   At any point, did Alvarez try to
10  identify how much retained cash there was as
11  of September 17th or any point up through
12  closing?
13      A.   We had literally no focus on the
14  deal, itself, as of -- prior to closing so I
15  would say no.
16      Q.   Even at a later point in time you
17  didn't go back and look at the value of the
18  retained cash prior to closing?
19      A.   Well, there was an effort post
20  closing to gather the fact base as to what was
21  transferred over in the deal. And I know that
22  our -- the A&M team focused on the treasury
23  function. One of the very first things we do
24  in a matter like this is to try to understand
25  as comprehensively as possible what the cash

Page 26

P. KRUSE - HIGHLY CONFIDENTIAL
1  position is of the entity. So I think there
2  would have been an undertaking to understand
3  what cash was retained by LBHI after the
4  closing and perhaps some of that would have
5  touched upon what cash, if any, was
6  transferred over in connection with the deal.
7      Q.   Okay. Well, do you know the
8  amount of retained cash there was as of the
9  closing?
10      A.   As I sit here, no.
11      Q.   Do you know the amount of the
12  retained cash that was transferred over, if
13  any?
14      MR. TAMBE: Object to the form of
15      the question.
16      A.   Yeah, it seems like a
17  contradiction, retained cash and transferred
18  over.
19      Q.   You're right. I agree. Bad
20  question. I'll withdraw it.
21      And, I mean, obviously LBHI at the
22  time prior to closing would have known how
23  much the retained cash was, correct?
24      MR. TAMBE: Object to the form of

Page 27

P. KRUSE - HIGHLY CONFIDENTIAL
1  the question. You can answer.
2      A.   Yeah, I would presume LBHI
3  personnel understood that, yes.
4      Q.   Did -- what is LBHI's
5  understanding of the value of the deposits
6  indicated in subsection B of the Purchased
7  Assets as of September 17th?
8      A.   LBHI's understanding?
9      Q.   Yes.
10      A.   Again, I think LBHI's
11  understanding would primarily reside with
12  people who are no longer with the estate and
13  have moved over to Barclays.
14      Q.   Would it also be reflected in
15  documents at the estate?
16      A.   I believe it is reflected in
17  documents obtained in discovery in this
18  matter, yes.
19      Q.   Okay. Do you know what those
20  documents indicate in terms of the values of
21  the deposits?
22      A.   Not specifically as I sit here. I
23  have a vague recollection of various documents
24  I've seen on this subject. But --

Page 28

P. KRUSE - HIGHLY CONFIDENTIAL
1      Q.   What are the documents you think
2  show the valuation of the deposits?
3      A.   As I say, I don't have a specific
4  recollection of what the amount is now. I
5  would have to go back and gather the documents
6  that I am vaguely thinking of and undertake to
7  do that. I haven't done it specifically.
8      Q.   Right. I'm just wondering can you
9  describe the documents that you're thinking of
10  that you're referring to when you...
11      A.   Well, there's material that was
12  produced in the course of the 2004 discovery,
13  for example, that speaks to -- and some of
14  this might depend on whether this qualifies
15  under deposits as defined here. I'm not
16  prepared to say that it does because I haven't
17  really discussed that particular correlation.
18  But I know there's material speaking to
19  15(c)(3) deposits, for example, that were
20  transferred over or intended to transfer over.
21      Q.   Is it fair to say for A and B, the
22  retained cash and the deposits, the valuations
23  of those two items would be contained in LBHI
24  documents but that you haven't gone to those

Page 29

P. KRUSE - HIGHLY CONFIDENTIAL
1  documents to go try to determine those values?
2      MR. TAMBE: Objection to the form
3      of the question.
4      A.   I haven't independently separately
5  tried to do that. I know that in the material
6  produced, for example in the 2004 discovery,
7  that there is material that would speak to
8  this issue.
9      Q.   And I think you said there would
10  be obviously documents at LBHI that would have
11  this information, correct?
12      A.   Yeah. And let me just clarify.
13  When we talk about documents at LBHI, we
14  should understand that all the systems were
15  transferred over to Barclays in connection
16  with the sale. So anything that LBHI had was
17  then moved over to Barclays, as I understand
18  it, in connection with the transaction. We've
19  had a process under way for quite some time
20  operating under a Transition Services
21  Agreement with Barclays to retain the data and
22  information that was moved over in connection
23  with that deal. So I just wanted to offer
24  that point of clarification.

P. KRUSE - HIGHLY CONFIDENTIAL
Q. Right. But the estate still has access to those documents and that information, correct?
A. Generally, yes. There were quite a few difficulties early on in the first quarter particularly in getting the information we needed just to run the estate in the manner we deemed necessary.
Q. Moving on to subpart C, the transferred real estate -- excuse me -- the transferred real property leases. At any point did -- strike that.
What was LBHI's or Alvarez's understanding of the value of those leases as of September 17th?
A. As of September 17th Alvarez would have had no knowledge of it. LBHI's understanding would have been as probably more appropriately determined through contact with people who moved over to Barclays.
Q. Would the value of the leases also be reflected in LBHI documents?
A. Yes, they would.
Q. And you haven't tried to identify



P. KRUSE - HIGHLY CONFIDENTIAL
the value from those documents?
MR. TAMBE: Object to the form of the question.
A. Well, there's been an effort to identify the inventory of the items that transferred over. But the work that we've done in that regard has generally been done under the direction of counsel.
Q. Okay. But for purposes of this deposition you haven't gone and found out what the LBHI documents say about the value of the leases in subpart C?
A. Well, I've seen documents that speak to issues like this. I'm not going to be able to quote to you sitting here without anything in front of me what that reflects.
Q. Well, do you have any idea what the value of those leases were as of September 17th?
A. Not specifically. I think it was relatively nominal compared to the overall value of the assets transferred in connection with the deal.
Q. Can you give me some ball park



P. KRUSE - HIGHLY CONFIDENTIAL
figure?
A. No.
Q. And just to be clear when I'm asking about value of these things as of September 17th, it's whether the valuation was known at the time or later on, just to be clear. So if Alvarez did a later study to see how much the leases were worth, you know, two months down the road, that would be, you know, contained in my question also.
So the question is at any time -- or regardless of when they knew the value, did Alvarez make any assessment of the value of these leases in subpart C?
A. As of September 17th, no. Anything that's been done since then as I said was generally done under the direction of counsel.
Q. Okay. Well, did they make an effort to value these leases at any point whether under the direction of counsel or not?
MR. TAMBE: I think that gets into the subject matter of what may have been done at the direction of counsel. I



P. KRUSE - HIGHLY CONFIDENTIAL
think that therefore would invade work product and attorney-client communications.
MR. THOMAS: Just the fact of it?
MR. TAMBE: The subject matter of what it is that they -- what steps they would have taken.
MR. THOMAS: Okay.
BY MR. THOMAS:
Q. Well, let me ask a different question then.
Do you have any idea how much these leases were worth?
A. Not specifically, no.
Q. Generally?
A. They were relatively nominal in relation to the value of all the assets that were transferred.
Q. Okay. Could you tell me what nominal means to you?
A. I believe it was -- I don't know. Actually, as I think about it, I believe Barclays may have ascribed a value to the lease terms, the economic lease terms, versus

Page 34

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  market in connection with their purchase
3  accounting that they ascribed, but I don't
4  recall specifically what the number was. I
5  just know that it wasn't a particularly
6  material item in relation to the overall deal.
7       Q.  Okay. Subsection D is Government
8  Securities, Commercial Paper, Corporate Debt,
9  Corporate Equity, Exchange Traded Derivatives
10 and Collateralized Short-Term Agreements.
11       Do you see that?
12       A.  Yes.
13       Q.  This describes -- references it
14 having approximately $70 billion book value.
15       Do you see that?
16       A.  Yes.
17       Q.  And it's then referred to as the
18 long positions. Has Alvarez ever done -- made
19 any efforts to value these items in subpart D?
20       MR. TAMBE: Objection to the form
21    of the question.
22       A.  Anything we've done in connection
23 with valuing these securities has been done
24 under the direction of counsel. We certainly
25 didn't have any understanding of this at the

Page 35

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  time the deal was done or closed.
3       Q.  Do you know the -- does either
4  Alvarez or LBHI have a list of the actual
5  CUSIPS for these items in subpart D?
6       MR. TAMBE: Objection to the form
7    of the question.
8       A.  Yes.
9       Q.  They do.
10       A.  Yes.
11       Q.  Do you know if that list has been
12 produced?
13       A.  Any list we got I believe would
14 have been part of the production in the Rule
15 2004 discovery if I'm not mistaken.
16       Q.  So without getting into the
17 substance of any efforts to value this at the
18 direction of counsel, when was such efforts
19 made? The date.
20       A.  The work in that respect would
21 have been since Jones Day was retained in
22 March of 2009.
23       Q.  And as you sit here today as both
24 an Alvarez and an LBHI representative do you
25 have any understanding as -- or what do you

Page 36

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  believe the items in subsection D were worth
3  as of September 17th?
4       MR. TAMBE: Objection to the form
5    of the question and to the extent you're
6    asking him to disclose what may have
7    been obtained through work product done
8    at the direction of counsel I'd instruct
9    him not to answer.
10       A.  Anything I could answer with
11 respect to that would be done under direction
12 of counsel. Again, at the time this deal was
13 done Alvarez & Marsal would have had no
14 understanding of the values of these
15 securities beyond what was disclosed or talked
16 about in court hearings.
17       I know that shortly after the deal
18 closed there was an attempt to just gather the
19 fact set from people who were then Barclays
20 personnel and get a CUSIP-by-CUSIP listing of
21 what was transferred over. I believe that
22 listing that we obtained at that time had
23 values ascribed to but we didn't undertake at
24 that point to independently value or verify
25 what was being portrayed in that data.

Page 37

1    P. KRUSE - HIGHLY CONFIDENTIAL
2       Q.  Well, what was transferred over
3  ultimately was not what's in subsection D,
4  correct?
5       A.  Yes. You're correct. Thank you
6  for that correction.
7       Q.  Right. So as I understand it, any
8  knowledge that you have as a representative of
9  LBHI or Alvarez as to the actual value of the
10 products, the securities in subpart D as of
11 September 17th, is being claimed as privileged
12 work product?
13       A.  Yes.
14       MR. TAMBE: Objection to the form
15    of the question. I think I would take
16    issue with any knowledge. We can step
17    outside and we can -- outside the
18    hearing of the witness so I can explain
19    to you what I think the disconnect might
20    be. And you can come back and rephrase
21    the question.
22       I don't want to interrupt your
23    examination but I think you may be
24    talking a little bit past each other.
25    And I could clear that up and I'd rather

Page 38

P. KRUSE - HIGHLY CONFIDENTIAL
1  do that outside the hearing of the
2  witness so --
3       MR. THOMAS: Okay. Sure. Why
4  don't we go off the record and just take
5  a minute.
6       THE VIDEOGRAPHER: The time is
7  10:10. We are going off the record.
8       (Recess taken.)
9       THE VIDEOGRAPHER: The time is
10  10:12. We are back on the record.
11  BY MR. THOMAS:
12       Q.   Mr. Kruse, at the suggestion of
13  your counsel I just wanted to clarify whether
14  you believe there is a list of CUSIPS or any
15  other document that identifies the particular
16  items that are contained in subsection D.
17       A.   There is not, to my knowledge.
18       Q.   So when you were talking about a
19  list of CUSIPS that you had what were you
20  referring to?
21       A.   I was referring to the securities
22  actually transferred as the deal was
23  culminated on the 22nd.
24       Q.   The fed repo collateral?

Page 39

P. KRUSE - HIGHLY CONFIDENTIAL
1       A.   Yes. Among others.
2       Q.   Okay. Turning to subpart E, 50
3  percent of each position in the residential
4  real estate mortgage securities.
5       Do you see that?
6       A.   Yes.
7       Q.   What is LBHI's understanding of
8  the value of those securities as of September
9  17th, 2008?
10       MR. TAMBE: And objection to the
11  form of the question.
12       A.   LBHI's understanding as of that
13  date?
14       Q.   LBHI's understanding at any time
15  as to the value of those securities as of that
16  date.
17       A.   LBHI's understanding would be
18  embodied from the documents that are available
19  at the time this deal was being negotiated.
20  And in terms of what the individual employees
21  of LBHI understood, again, I think those
22  people have generally moved over to Barclays
23  who would have had a specific understanding of
24  this.

Page 40

P. KRUSE - HIGHLY CONFIDENTIAL
1       Q.   When you say generally, which
2  employees still at the estate would have some
3  understanding of this?
4       A.   None that I can think of as I sit
5  here.
6       Q.   Okay. So the value would be in
7  estate documents but that's -- you haven't
8  gone and tried to figure out the value of
9  these securities as of September 7th for
10  purposes of this deposition. As of September
11  17th, excuse me.
12       A.   No. I have not attempted to
13  determine the value of that particular item
14  for purposes of my evaluation.
15       Q.   Has Alvarez ever attempted to
16  value those securities as of September 17th?
17       MR. TAMBE: Again, I'll caution
18  the witness to the extent that Alvarez
19  has been asked or not asked to do
20  particular tasks by counsel, that would
21  be covered by work product privilege.
22       A.   Yeah. Anything we've done on
23  this -- in that respect would have been done
24  under a direction of counsel.

Page 41

P. KRUSE - HIGHLY CONFIDENTIAL
1       Q.   So Alvarez first got the call to
2  get involved on the night of September 14th;
3  is that right?
4       A.   Yes.
5       Q.   And you said they were involved
6  with Lehman starting the next day.
7       A.   We had people on the ground the
8  next day.
9       Q.   And those people would have been,
10  among other things, working to learn about
11  this sales transaction with Barclays?
12       A.   Well, I think Brian Marsal who
13  you're going to be deposing in a few days can
14  speak to this more directly than I but it's my
15  understanding that the Alvarez & Marsal people
16  who were on site were essentially directed not
17  to get involved in the deal, itself, you know,
18  that this was something that was going to be
19  handled independent of our involvement and our
20  role was really to administer the estate
21  separate and apart from the deal that was
22  being negotiated at that point.
23       Q.   What's the basis of that
24  understanding?

Page 42

P. KRUSE - HIGHLY CONFIDENTIAL

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    A.    Discussion with Brian Marsal and
3 various other people who were on site at the
4 time.
5    Q.    Are you saying that somebody at
6 Lehman told Alvarez not to get involved with
7 the sale transaction?
8    A.    In sum and substance. 1 don't
9 know if I'd characterize it exactly that way.
10 But it was well understood on the part of our
11 team, as 1 understand it, that our
12 participation, our involvement in the deal,
13 itself, was not something that anybody wanted
14 or expected.
15    Q.    Can you describe who said what to
16 whom?
17    A.    1 think you're probably better
18 asking Brian Marsal the specifics of that.
19    Q.    Can you describe anyone at Lehman
20 who had that type of discussions with anyone
21 at Alvarez?
22    A.    All 1 can do is guess and 1 don't
23 think you want me to do that.
24    Q.    Well, if you have any basis for
25 guessing I'll take your guess with the caveat

Page 43

P. KRUSE - HIGHLY CONFIDENTIAL

1    P. KRUSE - HIGHLY CONFIDENTIAL
2 that it's a guess.
3    A.    1 would infer that Steven
4 Berkenfeld might have been one of the people
5 that was directing that aspect of our
6 retention.
7    Q.    So is it your testimony prior to
8 closing that Alvarez was not involved in any
9 way in the sales transaction?
10    A.    Yes, it is my testimony.
11    Q.    And it was not reviewing
12 documents?
13    A.    In connection with the sales
14 transaction.
15    Q.    Yes.
16    A.    No. We were not.
17    Q.    When did anyone from Alvarez first
18 review any of the sale documents, to your
19 knowledge?
20    A.    Within a few days after closing
21 I've seen e-mail correspondence speaking to 1
22 think what 1 referred to earlier, an attempt
23 to gather just the factual data of the
24 specific securities and CUSIPS that were
25 transferred over in the deal so that we had

Page 44

P. KRUSE - HIGHLY CONFIDENTIAL

1    P. KRUSE - HIGHLY CONFIDENTIAL
2 that data essentially locked down for purposes
3 of administering the estate, knowing what was
4 ours and what was not ours and what had moved
5 over in the deal.
6    Q.    Turning to subpart F, Furniture
7 and Equipment, what is LBHI's understanding of
8 the value of those items as of September 17th?
9    A.    LBHI's understanding?
10    Q.    Yes.
11    A.    Again, I'm going to have sort of a
12 repetitive comment about LBHI because I think
13 anybody LBHI as I say who would have been
14 focused on these particular things was
15 generally moved over to Barclays. The LBHI
16 documents I think speak for themselves and
17 have been made available in terms of what
18 these things might have been recorded at, et
19 cetera. I'm not aware of any independent
20 valuation done of furniture and equipment, for
21 example. 1 don't even think a value was
22 ascribed in the context of the deal.
23    Q.    Okay. And, again, you haven't
24 reached out to people still at Lehman to see
25 if they know about these values, correct?

Page 45

P. KRUSE - HIGHLY CONFIDENTIAL

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    A.    1 think we went over what 1 had
3 done in preparation for the deposition. I'd
4 spoken to certain of these people. But not
5 directly in connection with my preparation for
6 the deposition.
7    Q.    1 mean, let me ask. Did you ask
8 anyone at Lehman if they knew if there was any
9 valuation of the items under Purchased Assets?
10    A.    1 don't recall asking that
11 question specifically. It's pretty clear from
12 the documentation I've seen that nobody
13 attempted to ascribe a value. It's as if it
14 was thrown into the deal inherently but no one
15 attempted to ascribe furniture and
16 equipment -- ascribe a value.
17    Q.    I'm sorry.
18    A.    No.
19    Q.    Do you have any understanding as
20 to why there was no attempt to ascribe a value
21 for some of these items?
22    A.    1 do not.
23    Q.    Let me just ask you then, maybe to
24 speed things up, if you'd take a minute to
25 just go through all -- briefly review all the

Page 46

1       P. KRUSE - HIGHLY CONFIDENTIAL
2   other subparts under the definition of
3   Purchased Assets. And I'm going to ask you a
4   very similar line of question that covers all
5   of them. So if you want to take a minute to
6   review that, please do.
7       A.   Items G through the end of that
8   section?
9       Q.   Yes. G through S.
10       (Document review.)
11       A.   Okay.
12       Q.   As you sit here today either in
13   your capacity as the LBHI representative or
14   the Alvarez representative, do you have any
15   understanding of the value of any of those
16   items, G through S, as of September 17th,
17   2008?
18       MR. TAMBE: Objection to the form
19   of the question.
20       A.   There -- as far as I know in
21   connection with the deal, itself, there was
22   little, if any, attempt to ascribe a value to
23   the various individual classes of assets that
24   are described here.
25       You know, I think in the context

Page 47

1       P. KRUSE - HIGHLY CONFIDENTIAL
2   of the deal there was a $250 million price for
3   the franchise, if you will, that was ascribed
4   and I would think most people who were
5   involved with the deal would have said that
6   was intended to include items like this.
7       If your question is different than
8   that, is there a separate independent attempt
9   to ascribe a value to any of this on the part
10   of LBHI, I think that question could best be
11   answered by the people who are intimately
12   involved in the deal itself who have since
13   moved over to Barclays.
14       In terms of anything A&M has done
15   in that vein, again, the answer would be any
16   work done in the context of valuation of the
17   deal, itself, would have been done under
18   direction of counsel.
19       MR. THOMAS: And just to be clear,
20   you're instructing him not to answer as
21   to the amount or the valuation of any of
22   these items.
23       MR. TAMBE: What I'm instructing
24   him not to answer is to the extent the
25   valuation work or the valuation

Page 48

1       P. KRUSE - HIGHLY CONFIDENTIAL
2   understanding he has learned is from
3   work directed by counsel, he shouldn't
4   be talking about that. If he has other
5   bases for knowing valuations ascribed by
6   others to those assets you can ask him
7   about that.
8       MR. THOMAS: Okay.
9   BY MR. THOMAS:
10       Q.   Do you have any basis for knowing
11   the values of any of the items listed under
12   Purchased Assets other than from the work done
13   at the direction of counsel?
14       A.   A stand-alone valuation, no. I
15   think I've seen information suggesting book
16   value or accounting some of these -- what some
17   of these items might have been recorded at in
18   the books and records of Lehman at the time.
19       Q.   Do you know -- can you identify
20   what those values were recorded in the books
21   and records of Lehman at the time for any of
22   these?
23       A.   No. Not as I sit here.
24       Q.   Did you understand that to be the
25   information sought in topic 1 of the

Page 49

1       P. KRUSE - HIGHLY CONFIDENTIAL
2   deposition notice?
3       MR. TAMBE: I object to the form
4   of that question. We certainly didn't
5   understand topic 1 to be a memory quiz
6   of various items of valuation for
7   various assets. If you have documents
8   to show him -- he said documents reflect
9   values ascribed by others. If you show
10   him documents he can confirm for you
11   what his views are on those documents.
12       MR. THOMAS: Well, the topic is
13   for the market value of a list of
14   assets. And your 30(b)(6) witness can't
15   identify any values for any of those
16   assets. So maybe he certainly could
17   have -- if it was a memory issue he
18   certainly could have prepared a document
19   or notes to tell him what the values
20   are. But that's what the topic asked
21   for and I just want to confirm --
22       MR. TAMBE: I disagree in terms of
23   what you think the obligations would be
24   to respond to a notice such as that.
25   But it's fine. You can ask your

Page 50

P. KRUSE - HIGHLY CONFIDENTIAL

1    question.
2        A.    I think there was a pending
3    question as to what I did in connection with
4    topic number 1.
5        Q.    No.  It's what you under --
6    whether you understood topic number 1 to be
7    seeking information concerning the market
8    values of the assets listed in the definition
9    of Purchased Assets in the APA.
10       A.    I read this topic to say your
11   understanding as of September 17th, 2008 of
12   the market value of each asset set forth in
13   each subparagraph that mention purchased
14   assets, et cetera.  And how that changed at
15   any time before the closing.
16           I think I've testified that
17   generally speaking Alvarez & Marsal had no
18   knowledge of what these items were worth
19   during that time frame.  No involvement.  No
20   knowledge.  Any knowledge on the part of LBHI,
21   as I've testified already that LBHI's
22   knowledge would be best embodied by people who
23   are now employed by Barclays and in the
24   documents that have been produced in this

Page 51

P. KRUSE - HIGHLY CONFIDENTIAL

1    case.
2        Q.    Okay.  So just to be clear,
3    there's information about the values of these
4    items that are in Lehman documents but you
5    haven't gone and tried to identify those
6    values, correct?
7        A.    No.  Not in a comprehensive way.
8    I'm aware generally of the documents that
9    might refer to it but we're talking about
10   volumes of material here.
11       Q.    And I really don't want to belabor
12   this but are there any assets here that you
13   feel that you can tell us the market value as
14   of September 17th?  And here being items
15   listed under Purchased Assets.
16           MR. TAMBE:  Object to the form of
17       the question.
18       A.    I may have misread what this topic
19   intended.  Your understanding as of September
20   17th, 2008 of the market value.  I've said we
21   had no understanding as of September 17th,
22   2008.  We also had no understanding through
23   the date of the closing as to what the market
24   value was.

Page 52

P. KRUSE - HIGHLY CONFIDENTIAL

1        Q.    Okay.
2            Well, we'll revisit that in later
3    topics.
4            In terms of the liabilities -- let
5    me back up one second.
6            I think you made a comment that
7    maybe some of these -- or some or all of the
8    items would have been covered by the
9    $250 million payment.  Do you recall
10   mentioning that?
11           MR. TAMBE:  Objection to the form
12       of the question.
13       A.    I recall saying something along
14   those lines.
15       Q.    Okay.  What was your basis for
16   that?
17       A.    It's really surmising what we
18   learned in the discovery in the case thus far
19   as to what the $250 million acquisition
20   cost -- element of the acquisition cost was
21   intended to be cover.
22       Q.    Is that just your surmise or is
23   there some information that that's based on?
24       A.    I can't quote specifically every

Page 53

P. KRUSE - HIGHLY CONFIDENTIAL

1    source for that but that's a general surmise
2    from the totality of the evidence I'm aware of
3    in this case.  The deposition testimony.
4    Other e-mails and other documents that I've
5    seen.
6        Q.    And you can't point to anything in
7    particular.
8        A.    Not as I sit here, no.
9        Q.    Is it your belief that the value
10   of all of the items underneath Purchased
11   Assets totaled up would be less than 250
12   million?
13           MR. TAMBE:  That's not what he
14       testified to.  That was the answer to
15       items G through S.
16           MR. THOMAS:  Okay.  Thanks for
17       clarifying that.
18           MR. TAMBE:  Yeah.
19       Q.    Are you just referring to items G
20   through S?  When you say 250 million?
21           Or let me just strike that.
22           To be clear, what items do you
23   think were covered by the 250 million?
24       A.    I think as I testified, it's my

Page 54

1       P. KRUSE - HIGHLY CONFIDENTIAL
2   understanding that the overall value of the
3   franchise, Lehman Brothers, Inc., and the
4   business -- the portion of that business that
5   was being acquired was intended to be acquired
6   for $250 million. That was the -- anything
7   that wasn't otherwise specifically valued
8   would almost by inference have been included
9   in the catch-all of the $250 million
10  acquisition cost, which costs, by the way, I
11  understand never actually went to LBHI. It
12  was used to cover a DTC obligation by the time
13  the deal was ultimately consummated.
14      Q.   Well, the only item under
15  Purchased Assets that has any type of
16  valuation or description is subsection D,
17  correct?
18          MR. TAMBE: Objection to the form
19      of the question.
20      A.   I'm sorry. Could you repeat that?
21      Q.   Sure. I believe in your prior
22  answer you mentioned that unless it had some
23  other valuation that you thought it might
24  be -- you surmised that it might be part of --
25  covered by the $250 million; is that correct?

Page 55

1       P. KRUSE - HIGHLY CONFIDENTIAL
2           MR. TAMBE: Objection to the form
3       of the question. You might want to read
4       back his answer. That's not what he
5       said.
6           MR. THOMAS: Well, okay.
7       Q.   At the suggestion of your counsel
8   I believe what you said was, "Anything that
9   wasn't otherwise specifically valued would
10  almost by inference have been included in a
11  catch-all of the 250 million acquisition
12  cost."
13          And I just wanted to -- looking at
14  the list under Purchased Assets, which items
15  would you say are those that weren't otherwise
16  specifically valued?
17      A.   Which of these items weren't
18  otherwise specifically valued? Or which were
19  specifically valued?
20      Q.   Either way you want to do it.
21      A.   I mean, you pointed to item D.
22  Yeah, there was a separate valuation ascribed
23  in the context of the deal to the securities
24  that were transferred. I mean, I'd be
25  completely fluent sitting here without

Page 56

1       P. KRUSE - HIGHLY CONFIDENTIAL
2   documents in front of me as to all the
3   elements of the deal, but there were not a lot
4   of individual assets wherein a value was
5   ascribed other than the securities as I
6   recall.
7       Q.   I mean, you've kind of thrown out
8   your surmise that maybe these other assets
9   were valued at less than 250 million. I'm
10  just trying to test that and see which assets
11  you're talking about when you surmised that.
12  And would it include E? You think 50 percent
13  of the RESI's?
14      A.   It might help -- because perhaps
15  I've confused the record a little bit. We're
16  talking here about the September 16th Asset
17  Purchase Agreement which I think as we
18  generally understand now was changed in a
19  fairly material fashion before the deal was
20  closed.
21          As of the time this APA was being
22  contemplated in the context of the deal, I can
23  give you my surmise or my understanding of how
24  people were thinking about this at the time
25  that the APA was the focus of the deal. But

Page 57

1       P. KRUSE - HIGHLY CONFIDENTIAL
2   this APA becomes morphed into something
3   different through the amendment to the APA and
4   the clarification letter.
5       Q.   So are you saying that the assets
6   listed here really aren't relevant to the
7   final deal?
8           MR. TAMBE: Object to the form of
9       the question.
10      A.   No. I'm not saying that.
11      Q.   Okay.
12      A.   I'm just saying there's a lot
13  of -- I fear there could be some confusion on
14  the record as I talk about these assets in the
15  context of this APA because the deal
16  ultimately evolves into something different,
17  at least in terms of how the deal was
18  finalized.
19      Q.   Okay. So, I mean, we're trying to
20  just find out what LBHI and Alvarez thinks was
21  the value of these purchased assets as of
22  September 17th and how they may have changed.
23  Just to summarize your answer, you --
24  neither -- the only information you would have
25  about any valuations here are work that

Page 58

1     P. KRUSE - HIGHLY CONFIDENTIAL
2 Alvarez has done at the direction of counsel
3 this year; is that correct?
4        MR. TAMBE: Objection to the form
5 and that's not his testimony.
6     A.  Specific to your topic as I
7 understood in reading this topic, Alvarez &
8 Marsal's understanding as of September 17th,
9 2008 of the market value of each of these
10 classes of assets under Purchased Assets, we
11 had no understanding as of that date or as of
12 the closing date.
13     Q.  And LBHI obviously did. So with
14 respect to LBHI, can you tell me your
15 understanding of any of these values?
16        MR. TAMBE: Again, asked and
17 answered. Go ahead.
18     A.  I think LBHI's understanding can
19 best be gleaned from speaking to employees
20 that have gone over to Barclays.
21     Q.  When did Alvarez become aware
22 that -- strike that.
23     Looking at topic number 2, what is
24 Alvarez's understanding of the $47.4 billion
25 figure that was referenced during the

Page 59

1     P. KRUSE - HIGHLY CONFIDENTIAL
2 September 19th sale hearing?
3     A.  I'm sorry. What is our
4 understanding of that figure?
5     Q.  Yes. And what it is, what it
6 represents.
7     A.  Alvarez -- I don't believe Alvarez
8 has any understanding of how that number
9 derives or how it was determined at that time.
10     Q.  How about LBHI? What is its
11 understanding?
12     A.  I've not seen any discovery speak
13 to how this number was derived in the course
14 of anything I've seen. So while I could give
15 my standard answer as it relates to LBHI and
16 say that that could best be gleaned from
17 speaking to people who have since moved over
18 to Barclays, I haven't seen anything in
19 discovery that would speak to that specific
20 knowledge of that number.
21     Q.  So you have no idea as you sit
22 here today what that number represents?
23        MR. TAMBE: Objection to the form
24 of the question.
25     A.  I don't know if I would say no

Page 60

1     P. KRUSE - HIGHLY CONFIDENTIAL
2 idea. I mean, it's obviously -- you know, you
3 can infer what it was intended to represent.
4 I just haven't seen a correlation how that
5 number was derived and how it was -- how it
6 correlates to the securities that are actually
7 transferred in the deal.
8     Q.  What is your best understanding of
9 what that number represents?
10     A.  My best understanding of what that
11 number represents.
12        MR. TAMBE: Objection to the form
13 of the question.
14     A.  I don't know specifically what it
15 represents. I infer that it was intended to
16 represent the value of the securities that
17 were transferred in the deal.
18     Q.  What's your basis for that answer?
19     A.  I've read the transcript that this
20 is cited from at some point previously. It's
21 been a little while since I've read that
22 specifically but that's what I remember in
23 terms of my impression as I read it.
24     Q.  Have you -- what efforts did you
25 make to be able to describe the $47.4 billion

Page 61

1     P. KRUSE - HIGHLY CONFIDENTIAL
2 figure for purposes of the deposition?
3     A.  I would say there were efforts
4 throughout the Rule 2004 discovery to
5 understand specifically how that number was
6 derived. To my knowledge, there was no
7 evidence that I'm aware of that would suggest
8 specifically how that number was derived.
9     Q.  So for purposes of the deposition
10 in your preparation for the deposition did you
11 take any steps to try to find out how that
12 number was derived or what it represented?
13        MR. TAMBE: Objection to the form
14 of the question. And asked and
15 answered.
16     A.  Specific to the deposition I would
17 have confirmed in my mind through discussions
18 with others that we don't have any basis for
19 understanding how that number was derived. I
20 don't know what else to say. We don't
21 under -- we don't have a specific
22 understanding of how that number was derived.
23     Q.  Okay. Did you pick up the phone
24 and call someone and ask them about that
25 number?

Page 62

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2        A.   I've had conversations throughout
 3   the course of my work on this matter on that
 4   and many other subjects and I have never
 5   gained any understanding that we knew how that
 6   number was derived.
 7        Q.   Same question with respect to the
 8   $45.5 billion figure.  Do you know what that
 9   number represents?
10        MR. TAMBE:  Object to form.
11        A.   Same answer.
12        Q.   Who was providing information
13   about the values of assets being sold to Weil
14   Gotshal during the week the sales transaction
15   was being negotiated?
16        A.   I don't know specifically.  I
17   think that question would be directed toward
18   the Weil Gotshal witnesses.
19        Q.   Would you agree that it was
20   probably someone at Lehman or Alvarez or
21   Lazard or do you know who was interfacing with
22   Weil Gotshal during that week?
23        A.   Could have been any of those.
24   Could have been somebody who was a Barclays
25   employee.  I don't know specifically where
```

Page 63

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2   they got the information.
 3        Q.   Do you have any knowledge of a
 4   Barclays employee talking with Weil Gotshal
 5   about valuations of Lehman products?
 6        A.   No, I don't.
 7        Q.   By the way, at any time you want
 8   to take a break, just speak up.  I'm happy to
 9   do so.
10        MR. TAMBE:  If you're at a natural
11   breaking point if we could take a break.
12        MR. THOMAS:  Sure.
13        THE VIDEOGRAPHER:  The time is
14   10:43.  We are going off the record.
15        (Recess taken.)
16        THE VIDEOGRAPHER:  The time is
17   10:53.  We are back on the record.
18   BY MR. THOMAS:
19        Q.   If I could ask you to turn to page
20   11 of Exhibit 1, please.
21        A.   (Witness complies.)
22        Q.   And look at Section 2.3, the
23   Assumption of Liabilities.  And do you see
24   that there's a number of liabilities listed
25   there?
```

Page 64

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2        A.   Yes.
 3        Q.   Did -- can you tell me LBHI's
 4   understanding of the value of any of those
 5   liabilities as of September 17th?
 6        A.   As of September 17th the people
 7   who I understand at LBHI would have been
 8   knowledgeable of this have generally moved
 9   over to Barclays.
10        Q.   Okay.  And I think I know the
11   answer but you haven't gone to the Lehman
12   documents and tried to identify any values of
13   these liabilities; is that correct?
14        MR. TAMBE:  Object to the form of
15   the question.
16        A.   I've reviewed a substantial amount
17   of the material produced in this case but I
18   haven't tried to line out item by item here
19   what the value of those liabilities was at
20   that time.
21        Q.   So sitting here today you can't
22   tell me LBHI's understanding of these
23   liabilities at any point prior to closing?
24        MR. TAMBE:  Objection to the form
25   of the question.  That's not his
```

Page 65

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2   testimony.
 3        A.   Again, I think LBHI's
 4   understanding would best be gained from
 5   speaking to people who were involved in the
 6   deal and understood the books and records.
 7        Q.   I understand that's your position.
 8   And just to save you from having to repeat
 9   that, putting that aside, based upon what you
10   did do to try to prepare for the deposition in
11   terms of speaking with people still at LBHI,
12   speaking with counsel if they provided you
13   information, speaking with anyone else who
14   provided you information, or on reviewing
15   documents at Lehman that would have
16   information concerning this, based on any of
17   that, can you tell me LBHI's understanding of
18   the value of these liabilities prior to
19   closing?
20        MR. TAMBE:  Objection to the form
21   of the question.
22        A.   I'm not sure I can speak to LBHI's
23   knowledge of the value of these liabilities as
24   of September 17th.  Again, I've seen various
25   documents produced in the course of the
```

Page 66

1      P. KRUSE - HIGHLY CONFIDENTIAL
2  discovery in this matter that may speak to
3  some of this. But that's in the record of
4  this matter as we sit here.
5      Q.   Okay. So -- and you said as of
6  September 17th, and that's true for any time
7  through closing?
8      A.   Yes.
9      Q.   Did Alvarez have any understanding
10 of these liabilities during that period of
11 time?
12     A.   During that period of time, no.
13     Q.   And we'll come back in a later
14 topic to later points in time.
15         All right. Let's -- can you point
16 me to any particular documents that would show
17 what LBHI thought was the value of any of
18 these liabilities the week of September 17th
19 up to closing?
20     A.   I know there have been various
21 balance sheet data produced in the -- in this
22 matter that would speak to the reported book
23 value of those liabilities.
24     Q.   Can you identify any?
25         MR. TAMBE: Objection to form.

Page 67

1      P. KRUSE - HIGHLY CONFIDENTIAL
2      A.   Not beyond the general description
3  of various balance sheet data I've seen in the
4  course of reviewing the material --
5      Q.   Okay.
6      A.   -- in this case.
7      Q.   Do you know how those values were
8  derived?
9      A.   Not specifically. I understand
10 accounting and I understand how liabilities
11 are generally recorded and on what basis.
12     Q.   Let me show you a document that's
13 been previously marked as Exhibit 25. Are you
14 familiar with that document?
15         (Document review.)
16         MR. TAMBE: Just give him a
17 moment.
18     A.   Yes.
19     Q.   Could you describe what you
20 understand it to be, please.
21     A.   It's what's been generally
22 referred to in this matter as the
23 clarification letter.
24     Q.   And when was the first time you
25 saw this document?

Page 68

1      P. KRUSE - HIGHLY CONFIDENTIAL
2      A.   In or about January 2009.
3      Q.   Do you know when the first time
4  anyone at Alvarez reviewed this document?
5      A.   Not specifically. I can say that
6  Alvarez as a whole didn't undertake a
7  comprehensive review of the transaction until
8  January of 2009.
9      Q.   Well, putting aside the qualifier
10 of comprehensive review, do you know when
11 anyone at Alvarez first saw this document?
12     A.   When anyone at Alvarez first saw
13 it.
14     Q.   This document, yes.
15     A.   I don't think I could tell you
16 when anybody at Alvarez first saw this
17 document.
18     Q.   Okay. Is it your understanding
19 that the -- this document, we'll call it the
20 clarification letter, conveys to Barclays all
21 of the collateral associated with the fed
22 repo?
23         MR. TAMBE: Objection.
24     Q.   Let me stop you. Do you know what
25 I mean when I refer to the fed repo?

Page 69

1      P. KRUSE - HIGHLY CONFIDENTIAL
2      A.   The fed repo that was in place on
3  the 17th and then Barclays stepped into that
4  on the 18th?
5      Q.   Correct.
6      A.   Yes.
7      Q.   Okay. If I refer to the fed repo
8  we're on the same page?
9          To your understanding the
10 clarification letter transferred all of the
11 collateral associated with the fed repo to
12 Barclays.
13         MR. TAMBE: Objection to the form
14 of the question.
15     A.   I agree that that was the intent
16 of the letter. Among other items, of course.
17     Q.   And is your qualification because
18 some of the collateral actually didn't get
19 transferred?
20     A.   That's not what I had in mind.
21 I'm disagreeing with your assertion.
22     Q.   Sure. Sure.
23         So as of closing, presumably LBHI
24 would have understood that the fed repo
25 collateral was being transferred to Barclays,

Page 70

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    correct?
3        MR. TAMBE: Objection to the form
4    of the question.
5        A.    LBHI would have understood that,
6    yes.
7        Q.    When did Alvarez first come to
8    understand that?
9        A.    I think that a few days after the
10   closing as we began to gather data again as to
11   the specific securities that were transferred
12   to Barclays in connection with the deal, we
13   became aware that they were transferred
14   pursuant to a repo agreement based on the
15   documents that I've seen. So there was
16   knowledge of the repo deal and its connection
17   to the transfer of the securities in the days
18   after the closing.
19       Q.    Okay. Are you familiar with the
20   term "haircut"?
21       A.    Yes.
22       Q.    In the context of a repo or a
23   repurchase agreement, what do you understand
24   that term to mean?
25       A.    A haircut is a --

Page 71

1        P. KRUSE - HIGHLY CONFIDENTIAL
2        MR. TAMBE: Just objection to the
3    extent it goes beyond the scope of the
4    30(b)(6). You can answer the question.
5        A.    I understand a haircut to be a
6    negotiated item between two parties engaged in
7    a repurchase agreement which is intended to
8    compensate for the risk of default to one of
9    the parties of the deal.
10       Q.    Is it the amount of collateral
11   value in excess of the loan amount?
12       MR. TAMBE: Objection to the form
13   of the question. Is there a specific
14   topic in the 30(b)(6) this question is
15   aimed at?
16       MR. THOMAS: Sure. This is part
17   of the repo. It's something that you
18   described as a haircut in documents so
19   I'm not sure what you're talking about.
20       MR. TAMBE: At least to the extent
21   you're asking him generally about the
22   workings of repo and how repo
23   transactions are supposed to work, I
24   think that's not what this witness is
25   here for. You can ask him about what

Page 72

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    his understanding may be of the repos
3    used in this context or the repo in this
4    transaction. It may go to some of your
5    valuation questions.
6        MR. THOMAS: I think it's within
7    because you've used that term in
8    connection with collateral repo,
9    collateral, and it's hard to examine the
10   witness without having the same
11   understanding of what the term is.
12       MR. TAMBE: With your
13   characterization I'm going to let him
14   answer the question. I do think it's
15   beyond the scope of the 30(b)(6).
16       MR. THOMAS: Okay.
17       MR. TAMBE: If you have the
18   question in mind.
19       THE WITNESS: I do not.
20   BY MR. THOMAS:
21       Q.    Okay. And I'm just asking. Is
22   your understanding of the term haircut that
23   it's the amount by which the value of the
24   collateral exceeds the loan amount?
25       MR. TAMBE: I'll object to the

Page 73

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    form of the question. You can answer.
3        A.    Yes. I would agree with that
4    characterization. Value as ascribed by the
5    repo agent.
6        Q.    And is that a common term in this
7    industry, haircut?
8        A.    Yes. I think it is.
9        Q.    So people generally at Alvarez
10   would understand what that term means?
11       A.    Depending on their particular
12   industry focus I believe people would
13   understand, you know, the nature of the term.
14       Q.    Okay. Let me show you another
15   document we'll mark as 459A.
16       (Deposition Exhibit 459A, document
17   bearing production numbers WGM-LEHMAN-E
18   00005736 through WGM-LEHMAN-E 00005740,
19   marked for identification as of this
20   date.)
21   BY MR. THOMAS:
22       Q.    And I'm not going to ask you about
23   the whole chain but if at any point you feel
24   you need to review it you're certainly welcome
25   to. But I could start by asking you if you

Page 74

1    P. KRUSE - HIGHLY CONFIDENTIAL
2 recall ever seeing this document before.
3    A.    Not that I recall.
4    Q.    Okay.  You'll see it's an e-mail
5 dated September 21st, 2008 from Robert
6 Messineo to Catherine Muller.
7        Do you see that?
8    A.    Yes.
9    Q.    Is Catherine Muller someone who
10 still works at Lehman?
11    A.    She may have been one of the
12 people you asked me about.  If I'm thinking of
13 the same person, I believe she may be with the
14 estate currently, yes.
15    Q.    Okay.  How about Emma Bailey, is
16 she still with the estate?
17    A.    I don't know.
18    Q.    Kevin Genirs?  Do you know if
19 Kevin is still with the estate?
20    A.    I've seen the name.  But I don't
21 recall specifically if he's with the estate or
22 not.
23    Q.    And if you look at -- on the first
24 page the first indented paragraph the second
25 sentence of that says, "Beyond the text of the

Page 75

1    P. KRUSE - HIGHLY CONFIDENTIAL
2 Asset Purchase Agreement no further schedule
3 of the assets to be included as contemplated
4 apart from a listing of traded securities
5 positions.  With regard to traded securities,
6 all the securities that were collateral for
7 the September 18th repurchase agreement with
8 Barclays are expected to be included.  We
9 received from Lehman a listing of many dozens
10 of pages of these securities."
11        Do you see that?
12    A.    Yes.
13    Q.    Is this consistent with your
14 understanding that Lehman was aware that as
15 part of the sale transaction all of the fed
16 repo collateral was being transferred to
17 Barclays?
18    A.    Yes.  I think that's consistent.
19    Q.    Do you have any understanding of
20 Ms. Muller's or Ms. Bailey's or Mr. Genirs'
21 involvement on the sale transaction?
22    A.    Not specifically.  I acknowledge
23 this e-mail has them on it but I don't recall
24 seeing them generally in the material I've
25 reviewed in connection with the matter.

Page 76

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    Q.    And you haven't spoken with any of
3 those individuals for purposes of today's
4 deposition, correct?
5    A.    No, I've not.
6    Q.    Let me go ahead and show you
7 another document we'll mark as Exhibit 460A.
8        (Deposition Exhibit 460A, document
9        bearing production number
10        LAZ-C-00048526, marked for
11        identification as of this date.)
12 BY MR. THOMAS:
13    Q.    Would you please take a moment to
14 review that document.
15        (Document review.)
16    A.    Okay.
17    Q.    Do you recall seeing this document
18 before?
19    A.    I believe that I have, yes.
20    Q.    And can you tell me when you saw
21 it?
22    A.    I think it was fairly recently
23 given that I recall it.  Within the last few
24 days.
25    Q.    Was it in connection with your

Page 77

1    P. KRUSE - HIGHLY CONFIDENTIAL
2 preparation for the deposition?
3        MR. TAMBE:  Object to the form of
4    the question.  And instruct you not to
5    answer to the extent you had discussions
6    with counsel about the document.  You
7    can ask him about the document without
8    getting into his preparation with
9    counsel.
10        MR. THOMAS:  I understand.  I just
11    want to know if it was something other
12    than in preparation for the deposition.
13    Q.    So I'm just asking yes or no was
14 it in connection with preparation for the
15 deposition.  If the answer is no then I'm
16 going to ask you about.
17    A.    My best recollection is that it
18 was in connection with the preparation.
19    Q.    Okay.  Do you know who Arthur
20 Bruhmuller is?
21    A.    I've seen the name.  Obviously
22 he's connected to Lazard according to the
23 e-mail but I don't specifically know him.
24    Q.    Do you have an understanding of
25 Lazard's role at this point, September 17th,

Page 78

1          P. KRUSE - HIGHLY CONFIDENTIAL
2     2008?
3          A.   Yes.
4          Q.   And what was that role?
5          A.   I understand that they were
6     brought on as investment banking advisors in
7     connection with the deal on behalf of the
8     Lehman entities.
9          Q.   They advised Lehman concerning the
10    sales transaction with Barclays?
11         A.   Yes.  That was their role
12    generally, yes.
13         Q.   And do you know who Daniel Flores
14    is?
15         A.   Not specifically, no.
16         Q.   Do you know if they're
17    specifically at Lehman or whether they came
18    over to Barclays?
19         A.   I do not know.
20         Q.   How about Gerard Reilly who's the
21    author of a lower-down e-mail?  Do you know
22    who that is?
23         A.   Yes, I know -- I understand who he
24    was, who he is in the context of our review of
25    the material.

Page 79

1          P. KRUSE - HIGHLY CONFIDENTIAL
2          Q.   Okay.  The top of the e-mail from
3     Lazard reads, "We are trying to get a sense of
4     how marks have evolved since Friday."
5          Do you see that?
6          A.   Yes.
7          Q.   Do you understand that to be
8     referring to Lehman Brothers securities which
9     would at least include the ones referenced as
10    being approximately $70 billion worth in the
11    initial APA?
12         MR. TAMBE:  Objection to the form
13    of the question.
14         A.   I view that as a reasonable
15    inference, yes.
16         Q.   Okay.  Are you aware -- can you
17    describe what efforts were made by LBHI and
18    Lazard prior to the sale -- prior to the
19    closing of the sale transaction to "get a
20    sense for how marks have evolved" since
21    Friday, September 12th?
22         A.   I believe that question would best
23    be directed toward Lazard or its
24    representatives as well as the LBHI employees
25    who moved over to Barclays.

Page 80

1          P. KRUSE - HIGHLY CONFIDENTIAL
2          Q.   I appreciate that but I'm going to
3     go ahead and ask you just to your knowledge as
4     a corporate representative on these topics for
5     LBHI and Alvarez what you know, okay?
6          And based on what you know and
7     what you found out for this deposition, what
8     efforts were made to get a sense for how the
9     marks evolved since Friday, September 12th,
10    2008.
11         A.   The knowledge I have of Lazard
12    beyond just the raw documents that have been
13    produced in this case derive from a
14    conversation that I was involved in with
15    Lazard representatives that included Jones
16    Day.
17         Q.   So your knowledge --
18         MR. THOMAS:  So are you
19    instructing the witness not to describe
20    the discussion and knowledge?
21         MR. TAMBE:  Why don't you phrase
22    the question you're going to want to ask
23    him.  I may want to talk to him about
24    the conversation he has in mind to
25    decide whether or not there will be a

Page 81

1          P. KRUSE - HIGHLY CONFIDENTIAL
2     privilege invocation.
3          Q.   What did you learn about Lazard's
4     efforts or LBHI's efforts to get a better
5     sense for how the marks, Lehman's marks, had
6     evolved since Friday, September 12th from that
7     conversation with Lazard?
8          MR. TAMBE:  Objection to the form
9     of that question.  I'm going to consult
10    with the witness just about the content
11    of that conversation and see if there is
12    a privilege concern here.
13         MR. THOMAS:  Sure.
14         THE VIDEOGRAPHER:  The time is
15    11:16.  We are going off the record.
16         (Conference between counsel and
17    witness.)
18         THE VIDEOGRAPHER:  The time is
19    11:19.  We are back on the record.
20         MR. TAMBE:  We are going to assert
21    privilege over sort of the contents of
22    that meeting but the witness is prepared
23    to tell you his general understanding of
24    Lazard's role on this topic that you're
25    generally asking about which is the

Page 82

1           P. KRUSE - HIGHLY CONFIDENTIAL
2    marks and the valuation.
3    BY MR. THOMAS:
4        Q.   Okay.  What was -- what did Lazard
5    do that week to try to get a better sense of
6    how the marks had evolved from Friday,
7    September 12th, 2008?
8        A.   My general understanding is that
9    Barry Ridings and perhaps others from Lazard
10   were observing the course of the activities as
11   a deal was being negotiated on I believe the
12   30th floor at the 745 building.  And observed
13   various meetings amongst certain of the
14   parties that were involved.  You know, based
15   on the record I've seen, very unclear to me
16   the degree to which they were able to
17   ultimately fully understand and appreciate how
18   Hugh the marks evolved as it's characterized
19   here in this e-mail.
20       Q.   When you say observing the course
21   of the activities, what are you referring to
22   in particular?
23       A.   Observing the conduct of the
24   people talking to each other in the course of
25   the negotiations.  Just being in various

Page 83

1           P. KRUSE - HIGHLY CONFIDENTIAL
2    meetings, various rooms, as multiple aspects
3    of the transaction were being discussed.  I
4    don't have much specifics beyond that.  I
5    really think the question is ultimately best
6    directed of course to Lazard representatives.
7        Q.   Is it your understanding that the
8    long positions referenced in the APA, the
9    original APA, had a total approximate value --
10   or strike that.
11       What is your understanding of what
12   the long positions value was marked as on
13   Lehman's books as of September -- Friday,
14   September 12th, 2008?
15       MR. TAMBE:  Objection to the form
16   of the question.
17       A.   The long positions that are
18   contemplated in the 9/16 APA?
19       Q.   Yes.
20       A.   Stated in the APA at $70 billion,
21   roughly.
22       Q.   Approximately.
23       A.   And you're asking me about my
24   knowledge of the value of those securities on
25   September 12th?

Page 84

1           P. KRUSE - HIGHLY CONFIDENTIAL
2        Q.   Yes.
3        A.   Okay.  I don't think I have a
4    specific understanding as I sit here of that.
5    I think it's perhaps something we've looked
6    into but I don't -- as I sit here I don't
7    think I can tell you a specific relationship.
8        Q.   Have you seen assertions in some
9    of the Rule 60 motions that those marks were
10   valued at closer to 75 billion on Friday,
11   September 12th?
12       A.   The assertions I've seen are not
13   specific to the date.  I generally understood
14   the assertions to be contemporaneous with the
15   day that they were being talked about.
16       Q.   Well, after the Lehman bankruptcy,
17   after -- what knowledge do you have as to
18   whether there was any efforts -- strike that.
19       What efforts are you aware of to
20   mark those long securities, that is to put a
21   value on them, after September 12th, 2008?
22       MR. TAMBE:  Objection to the form
23   of the question.
24       A.   I'm sorry.  Would you please
25   repeat that?

Page 85

1           P. KRUSE - HIGHLY CONFIDENTIAL
2        Q.   Sure.  What efforts are you aware
3    of to value the long positions, Lehman's long
4    positions, after September 12th and prior to
5    closing?
6        MR. TAMBE:  Objection to form.
7        A.   Well, the -- I understand that
8    they were -- Lehman was continuing to operate
9    as close as they could to business as usual,
10   understanding, of course, under the
11   circumstances there were I'm sure a lot of
12   challenges there given that the parent company
13   had filed for bankruptcy on the morning of the
14   15th.  And, you know, the efforts I understand
15   were continuing to value securities in the
16   course of that week.
17       Q.   And who was continuing to value
18   securities during the course of the week?
19       A.   I can't speak specifically.  I've
20   heard -- Ian Lowitt, as you're probably aware,
21   testified in his deposition that he believed
22   the marks were accurate as of the dates that
23   they were stated in Lehman's books during that
24   week.
25       Q.   Other than Ian Lowitt's deposition

Page 86

1           P. KRUSE - HIGHLY CONFIDENTIAL
2    testimony do you have any other basis for
3    knowing whether the marks were accurate or
4    whether they were being kept up to date during
5    that week?
6           MR. TAMBE: Objection to the form
7        of the question.
8        A.    Well, as I stated, I have a
9    general understanding that there were ongoing
10   efforts to run the business as usual. And to
11   me that would entail doing what they typically
12   did as marking their books on a daily basis
13   for the trading assets.
14       Q.    Okay. Other -- what is your basis
15   for that understanding that they were marking
16   their books? Do you have any other basis for
17   that understanding that they were continuing
18   to mark their books after declaring bankruptcy
19   other than Ian Lowitt's deposition testimony?
20       A.    Well, they would have been -- the
21   securities would have been marked
22   independently by Lehman and also by the
23   clearing agent. In this case JPMorgan Chase.
24   They have their own independent way in which
25   they valued securities that didn't necessarily

Page 87

1           P. KRUSE - HIGHLY CONFIDENTIAL
2    equate to Lehman's practices. So there were
3    ongoing -- as I understand it, ongoing efforts
4    to keep contemporaneous marks on these
5    securities.
6        Q.    Let's focus on Lehman's efforts to
7    mark its securities after September 12th,
8    2008. Other than Mr. Lowitt's deposition
9    testimony, do you have any basis for knowing
10   that Lehman did, in fact, continue to try to
11   mark those on a daily basis?
12       A.    As I stated, I have a general
13   understanding that they were continuing to
14   attempt to operate business as usual,
15   recognizing that there were likely challenges
16   in that environment. I'm aware that there
17   were these contemporaneous valuations being
18   done by the clearing agent. And I have a
19   general understanding that those valuations
20   continued to dovetail relatively closely to
21   what Lehman was marking the positions at at
22   that time. Based on that totality of
23   information I surmised that there were
24   continuing attempts to value the securities
25   during that week.

Page 88

1           P. KRUSE - HIGHLY CONFIDENTIAL
2        Q.    Do you have knowledge of what
3    Lehman was marking the securities as of that
4    week? Of long positions?
5           MR. TAMBE: Objection to the form
6        of the question.
7        A.    Not specifically beyond what I've
8    just stated.
9        Q.    Do you have any understanding
10   whether the long positions -- there would be a
11   difference in the market value of the long
12   positions between September 12th and September
13   16th?
14       A.    I'm sorry?
15       Q.    Do you have any understanding of
16   whether there was a difference or would have
17   been a difference between the long positions'
18   value on September 12th, 2008 versus September
19   16th, 2008?
20           MR. TAMBE: Objection to form.
21       A.    Well, there would have been
22   differences just by virtue of any fluctuations
23   in the market, of course. And you also -- I
24   think it's relevant to recognize that the
25   make-up of the securities likely would have

Page 89

1           P. KRUSE - HIGHLY CONFIDENTIAL
2    been different to some degree between those
3    two dates. This is an ongoing operation where
4    securities move in and out, et cetera.
5        Q.    Is it fair to say in those
6    particular days in that market with Lehman
7    declaring bankruptcy that the fluctuations
8    would have been downward as of between
9    September 12th and September 16th?
10           MR. TAMBE: Objection to the form
11       of the question. And objection to the
12       extent it extends beyond the scope of
13       the 30(b)(6). The witness can answer.
14       A.    Probably depends on the nature of
15   the security. Treasuries may have been more
16   highly valued. Very low risk securities or
17   securities perceived to be low risk might
18   have, in fact, increased in value during that
19   week given the flight to safety, so to speak,
20   that was occurring. Securities viewed as
21   being more risky, it's reasonable to assume
22   that they would have been going down in value.
23       Q.    Overall, do you have a sense of
24   whether the values would have gone up or down
25   from September 12th to September 16th?

Page 90

1        P. KRUSE - HIGHLY CONFIDENTIAL
2            MR. TAMBE: Objection.
3        Q.    The total value of the long
4    positions.
5            MR. TAMBE: Object to the form of
6        the question.
7        A.    I don't know if I can speak
8    specifically to it. Although, certainly my
9    general recollection of the material I've seen
10   would suggest that overall the values were
11   going down.
12       Q.    So you would expect the overall
13   value of Lehman's long positions as of
14   Tuesday, September 16th, to be lower than they
15   were on Friday, September 12th; is that fair?
16           MR. ROTHMAN: Objection to the
17       form.
18       A.    Difficult to generalize. And I
19   don't have any specific data in mind. But,
20   again, depending on the nature of the security
21   and the makeup of the portfolio that
22   fluctuation very well may have been down
23   overall.
24       Q.    Now, do you have any information,
25   hard information, has anyone to your knowledge

Page 91

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    studied that issue, comparing the values of
3    the longs from September 12th, 2008 to
4    September 16th, 2008?
5            MR. TAMBE: Objection to the form
6        of the question. And objection to the
7        extent that it asks the witness to
8        disclose what may be work product
9        protected analysis.
10       A.    Any work that A&M has done in
11   connection with the general subject of
12   valuation of securities has been done at
13   direction of counsel.
14       Q.    Okay. So let me just go and ask.
15   Can you tell me what the value of the longs
16   were on September 16th based upon anything
17   Alvarez or LBHI has done?
18           MR. TAMBE: Same objection.
19       A.    The value of the longs at
20   September 16th. I think you -- it might be
21   helpful to reflect on the context here. I'm
22   not even sure anybody, as far as I'm aware,
23   can tell you specifically CUSIP by CUSIP what
24   these securities were. It was a general --
25   there were general attempts to identify the

Page 92

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    available securities that could have gone in a
3    transaction at that date under extraordinarily
4    difficult circumstances. I'm not even aware
5    of a list that would enable anybody to depict
6    this value at that date.
7        Q.    A lot of the assets were illiquid.
8    A lot of the long positions of Lehman's were
9    illiquid; is that fair?
10           MR. TAMBE: Objection to the form
11       of the question.
12       A.    I don't know -- perhaps we would
13   have to agree on what illiquid means in this
14   context.
15       Q.    That's not a term --
16       A.    Obviously any asset is salable
17   under the right circumstances.
18       Q.    Were there any assets -- were any
19   of the LBHI assets what you would consider to
20   be illiquid the assets in the long positions?
21       A.    Were any of the assets in the long
22   positions illiquid?
23           MR. TAMBE: Objection to the form
24       of the question. And beyond the scope
25       of the 30(b)(6).

Page 93

1        P. KRUSE - HIGHLY CONFIDENTIAL
2        Q.    Are you familiar with the term
3    illiquid?
4        A.    Yes.
5        Q.    Okay. Do you contest that some of
6    LBHI's assets were illiquid and therefore
7    difficult to value during this time period of
8    the sale transaction?
9        A.    Perhaps it would help if we
10   agree -- if I understand what your definition
11   of illiquid is. You know, illiquid is a
12   very -- I take it as a term that could have a
13   lot of different meanings to different people.
14       Q.    Well, why don't you give me your
15   definition and we'll go with that.
16       A.    I don't have a definition. I'm
17   not asking the question.
18       Q.    Difficult to sell and therefore
19   difficult to value?
20       A.    No question. There are various
21   types of securities that are easier to sell,
22   have a more active market than others. I
23   accept that premise, yes.
24       Q.    And were LBHI's securities
25   difficult to value?

Page 94

1　　　P. KRUSE - HIGHLY CONFIDENTIAL
2　　　MR. TAMBE: Objection to the form
3　of the question.
4　　Q.　As of September 16th, 2008?
5　　　MR. TAMBE: Same objection.
6　　A.　I don't think I would accept that
7　characterization, no.
8　　Q.　Have you read Mr. McDade's
9　deposition testimony?
10　　A.　Yes, I have.
11　　Q.　Okay. Let me go back to the
12　current document which is 460A. Are you
13　familiar with the Lehman GPS system?
14　　A.　Yes.
15　　Q.　Would you describe what it is,
16　please?
17　　　MR. TAMBE: Object to the form of
18　the question but you can answer.
19　　A.　It's one of the systems -- and I
20　equate in my mind sitting here today as the
21　system that was used to obtain valuations in
22　the context of the ordinary course of
23　business. I don't have full functionality in
24　mind as I sit here although I've known that at
25　other times better than as I sit here.

Page 95

1　　　P. KRUSE - HIGHLY CONFIDENTIAL
2　　Q.　Other than Ian Lowitt who was
3　involved in marking Lehman's securities?
4　　　MR. TAMBE: Objection to the form
5　of the question.
6　　A.　Presumably there were numerous
7　people involved in that.
8　　Q.　Did you speak with anyone from
9　Lazard in preparation for your deposition?
10　　A.　No. Not in preparation for my
11　deposition.
12　　Q.　The e-mail from Mr. Bruhmuller is,
13　"I think the first priority would be to see
14　the inventory of what's being sold, how the
15　marks have evolved, and info on the buyer
16　'discount'."
17　　Do you see that?
18　　A.　Yes.
19　　Q.　Do you have any understanding of
20　what he's referring to by the buyer discount?
21　　　MR. TAMBE: Object to the form of
22　the question.
23　　A.　Not specifically, no.
24　　Q.　Generally?
25　　A.　Well, generally, I'm aware in the

Page 96

1　　　P. KRUSE - HIGHLY CONFIDENTIAL
2　case that there was a characterization by many
3　that there was a bulk sale discount being
4　ascribed in the context of the deal.
5　　Q.　Other than your reading of case
6　materials, do you have any understanding of
7　what that discount referred to?
8　　A.　No.
9　　Q.　LBHI under -- well, strike that.
10　　Could you be more specific in what
11　you understand the buyer discount to refer to?
12　　　MR. TAMBE: Object to the form of
13　the question.
14　　A.　More specific on what the buyer
15　discount refers to?
16　　Q.　Yes.
17　　A.　Not beyond what I've just said. I
18　don't think so.
19　　Q.　It's based on buying in bulk; is
20　that what your understanding was?
21　　　MR. TAMBE: Objection to the form
22　of the question.
23　　　MR. THOMAS: I'm just repeating
24　back his answer.
25　　　MR. TAMBE: It's asked and

Page 97

1　　　P. KRUSE - HIGHLY CONFIDENTIAL
2　answered. But are you asking him what
3　he thinks the author meant by this
4　phrase? Or what those words mean to
5　him?
6　　　MR. THOMAS: No. His
7　understanding.
8　　　MR. TAMBE: Okay.
9　　A.　When I use the term bulk sale
10　discount I'm using a phrase I've heard or
11　paraphrasing a phrase I've heard in the course
12　of the discovery in this matter. I think what
13　people intended that to mean can best be
14　directed toward the people who are using it in
15　this context.
16　　Q.　Are you aware that Barclays'
17　representatives in the sale negotiations took
18　issue with some of the valuations of the
19　Lehman marks?
20　　A.　I'm familiar with the testimony
21　around that subject, yes.
22　　Q.　Let's turn to the valuation not of
23　the original assets but of the collateral
24　associated with the fed repo. Has Alvarez
25　ever attempted to value the fed repo

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    collateral?
3            MR. TAMBE: Objection to the form
4    of the question.
5        A.    At the risk of being repetitive,
6    anything we'd done in the context of valuation
7    of the securities had been done under
8    direction of counsel and I believe would be
9    covered by the privilege.
10       Q.    Okay. So if I ask Alvarez's
11   understanding -- its understanding as to what
12   the value of the fed repo collateral was, I'm
13   going to get an instruction not to answer. So
14   that's the question.
15           MR. TAMBE: Let me be clear. If
16   you're asking if A&M has derived at or
17   explored an independent valuation of
18   that collateral, yes, you would get an
19   objection and instruction not to answer.
20           If you ask questions as to their
21   understanding of what values may have
22   been ascribed by others including
23   Barclays to do that collateral, you can
24   get at it that way.
25           MR. THOMAS: No, no. I just want

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    to confirm that you're not going to let
3    the witness say what Alvarez's or LBHI's
4    understanding of the value of the fed
5    repo collateral is because it's based on
6    work product.
7            MR. TAMBE: No. And that's why I
8    said what I did. That's not what I'm
9    saying. If you're asking the witness to
10   describe or state the basis for A&M's
11   understanding or Lehman's understanding
12   of the valuation of the assets, to the
13   extent there's an understanding based on
14   values ascribed by others including
15   Barclays after the closing of the
16   transaction, there's a basis for that
17   understanding and I'll let the witness
18   testify about what his understanding is
19   about that.
20           To the extent your question is
21   have you independently, has LBHI or A&M
22   independently post-closing done a
23   valuation exercise of that collateral,
24   that I am going to object to and say
25   that is work product.

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    BY MR. THOMAS:
3        Q.    Okay. As you sit here today can
4    you tell me what you believe the value of the
5    fed repo value was as of the closing?
6            MR. TAMBE: And subject to my
7    objection you can answer the question.
8        A.    So I want to be careful to make
9    sure I understand exactly what you're asking.
10   My current understanding of the value of the
11   collateral?
12       Q.    Yes.
13       A.    My current understanding is
14   based -- to the degree I have an
15   understanding -- on work done under the
16   direction of counsel.
17       Q.    Did Alvarez ever have an
18   understanding of the value of the repo
19   collateral prior to its work that's being
20   claimed as work product?
21           MR. TAMBE: Objection to the form
22   of the question for the reasons stated
23   below as to what you mean by
24   understanding.
25       A.    Does Alvarez -- I'm sorry. I

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    just -- I'm trying to be careful as to what
3    you're asking.
4        Q.    Okay. The claim is that your
5    current knowledge of the value of the fed repo
6    collateral is privileged work product.
7            MR. TAMBE: No, that's not the
8    position and that's why we're running
9    into trouble here. You can have an
10   understanding as to --
11           MR. THOMAS: No, I asked him what
12   his current understanding was and he
13   said --
14           MR. TAMBE: And there was an
15   objection to that question.
16           MR. THOMAS: But he said it would
17   have to be biased upon privilege worked.
18           MR. TAMBE: And the reason there
19   was an objection to that question is you
20   seem to be trying to get at is there
21   independent valuation done by LBHI or
22   A&M independent of information. There's
23   lots of information on the record about
24   values ascribed to that collateral. On
25   and before the closing date. That's

Page 102

1     P. KRUSE - HIGHLY CONFIDENTIAL
2  certainly within their understanding as
3  to values ascribed by others. Okay. Go
4  ahead.
5     MR. THOMAS: I'm not trying to --
6  I know there's nominal marks that exist
7  that he might have read in a paper or
8  something else like that. I'm asking if
9  Alvarez, prior to -- independent of what
10  is being claimed as work product made
11  any effort to value that collateral, the
12  fed repo collateral.
13     A.  No, we did not.
14     Q.  Okay. What was Alvarez's
15  understanding as to the value of the fed
16  collateral prior to doing this work product
17  with counsel?
18     A.  Any understanding we had about
19  values ascribed to the collateral would have
20  been gained post closing and in connection
21  with the gathering of data so that we
22  understood the securities that were
23  transferred in connection with the
24  transaction.
25     Q.  And as you sit here today can you

Page 103

1     P. KRUSE - HIGHLY CONFIDENTIAL
2  tell me what that understanding was in terms
3  of the amount of the fed repo collateral?
4     A.  I think it would be more
5  appropriate or perhaps more safe, rather than
6  having me misstate a number, I'm thinking of
7  e-mails that I know some of the A&M people
8  were gathering the data and I think those
9  documents represent what our early
10  understanding was of the ascribed values.
11     Q.  Okay. After the sale closed, what
12  was the purpose of your trying to get an
13  understanding of the value of the assets that
14  had been transferred? Yours being Alvarez's.
15     A.  It was really from the perspective
16  of capturing the data that we thought was
17  going to be necessary for us to administer the
18  estate and understanding what was estate
19  assets, what was not estate assets. I think
20  there was some thought early on that we would
21  try to do a reconciliation of the securities
22  that were transferred, ensure that nothing was
23  transferred that should not have been
24  transferred under the deal.
25     That effort was not really

Page 104

1     P. KRUSE - HIGHLY CONFIDENTIAL
2  feasible based on the information available to
3  us in that first quarter of the administration
4  of the estate.
5     But the context was ensuring we
6  had the data in hand while it was fresh in
7  everybody's mind as to what was transferred in
8  the deal.
9     Q.  Let me show you a document we'll
10  mark as 461A.
11     (Deposition Exhibit 461A, document
12  bearing production numbers AM 004503
13  through AM 004595, marked for
14  identification as of this date.)
15  BY MR. THOMAS:
16     Q.  Is this a document that you've
17  seen before?
18     A.  Yes. I've seen this.
19     Q.  And when did you see it?
20     A.  When did I see it?
21     Q.  Yes.
22     A.  I would have first seen it pretty
23  much contemporaneous with the date of this,
24  October 8th, or the day or two before.
25     Q.  And can you describe what the

Page 105

1     P. KRUSE - HIGHLY CONFIDENTIAL
2  document is, please.
3     A.  It is a Powerpoint dec assembled
4  by Alvarez & Marsal to report to the Unsecured
5  Creditors Committee on this date of October
6  8th. It was sort of a guide for communication
7  to the Unsecured Creditors at that point.
8     Q.  And why was Alvarez & Marsal
9  relaying this information to the Creditors
10  Committee?
11     A.  It was in the context of the
12  Creditors Committee is an important
13  constituent that we serve in the
14  administration of the estate and giving them
15  an early download as to our activities and how
16  we're getting ramped up and getting ready to
17  best serve our role as a chief restructuring
18  officer.
19     Q.  If I could ask you to turn to page
20  28, please.
21     A.  (Witness complies.)
22     MR. ROTHMAN: The Bates number or
23  the page?
24     MR. THOMAS: That's the page
25  number. The Bates number is AM 4531.

Page 106

P. KRUSE - HIGHLY CONFIDENTIAL

1      P. KRUSE - HIGHLY CONFIDENTIAL
2      Q.   And let me just ask, who would
3   have prepared this document?
4      A.   Who physically prepared it?
5      Q.   Yes. Or determined what went into
6   the document.
7          MR. TAMBE:  Object to the form.
8   Go ahead.
9      A.   The document as a whole would have
10  been a joint effort. I had some participation
11  in a slide or two here as well. So, you know,
12  depending on who you see as the leader or the
13  discussion leader on a given subject that's
14  likely the person who directed the
15  preparation. The physical preparation was
16  probably somebody working underneath that
17  particularly person.
18     Q.   Did Alvarez work with anyone at
19  Lehman or Lazard or anyone other than Alvarez
20  to pull this information together?
21     A.   Not to my knowledge.
22     Q.   Do you know who would have
23  prepared the information that appears on page
24  28 of the document?
25     A.   I would presume Jim Fogarty was

Page 107

1      P. KRUSE - HIGHLY CONFIDENTIAL
2   the person most responsible for compiling
3   this.
4      Q.   Now, looking at the first arrow
5   where it says Assets Purchased, and then the
6   first bullet it says 43.1 billion repo assets,
7   book value per Lehman stale marks. Negotiated
8   a $5 billion reduction.
9          Do you see that?
10     A.   Yes.
11     Q.   Do you have an understanding of
12  what's being referred to there?
13     A.   I think the words speak for
14  itself. I'm not sure what your question is.
15     Q.   Well, they may speak for
16  themselves but can you just describe what's
17  being said there?
18     A.   Book value per Lehman "stale
19  marks" negotiated a $5 billion reduction. I
20  think that says that at that point we had
21  gained an understanding that there was a
22  negotiated reduction as compared to the Lehman
23  marks because the previous marks were deemed
24  at that point to be stale by whoever was
25  communicating this information to us.

Page 108

1      P. KRUSE - HIGHLY CONFIDENTIAL
2      Q.   And what is your understanding of
3   the term stale there?
4          MR. TAMBE:  Object to the form of
5   the question.
6      A.   I would infer stale to mean that
7   it was outdated.
8      Q.   Were you part of any oral
9   presentation to the Creditors Committee in
10  connection with this written presentation?
11     A.   I was responsible for
12  communicating a relatively small portion of
13  this. At that point we were so busy we were
14  coming in and out of the room as our sections
15  were approaching. I was not present when this
16  was discussed.
17     Q.   Um-hum. Was the document sent to
18  the Creditors Committee and also discussed
19  with them in a meeting? Or meetings?
20     A.   There was a meeting where this
21  information was covered, yes.
22     Q.   So was this a Powerpoint that was
23  handed out at a meeting and there was a
24  discussion of these -- of the information in
25  this document?

Page 109

1      P. KRUSE - HIGHLY CONFIDENTIAL
2      A.   Yes. There was a discussion of
3   this document in a meeting at Weil Gotshal's
4   offices.
5      Q.   And the representatives of the
6   Creditors Committee were there?
7      A.   Yes.
8      Q.   Do you recall who in particular?
9      A.   Not specifically. I mean, I know
10  and have met the two chairs of the Creditors
11  Committee and they're the only people I could
12  probably name by name and I'm fairly certain
13  they were there.
14     Q.   And who are they?
15     A.   July Becker and Noel Purcell.
16     Q.   Other than people from Weil -- who
17  was there from Weil?
18     A.   I don't recall specifically.
19  Again, I was only here in this meeting for a
20  relatively small slice of it. It was a very
21  large conference room that was quite full. I
22  know there were Weil people there but I can't
23  tell you specifically who was there at the
24  time I was there.
25     Q.   Do you know if any -- anyone from

## Page 110

P. KRUSE - HIGHLY CONFIDENTIAL

1  the trustee was there or from Hughes Hubbard?
2  A.  I don't think so.
3  Q.  Do you know if this was sent to --
4  this document was sent to the trustee at some
5  point?
6  A.  Not to my knowledge.
7  Q.  Are you aware of any communication
8  with the trustee between Alvarez and the
9  trustee concerning the sale transaction?
10  MR. TAMBE:  Object to the form of
11  the question.
12  A.  I'm aware of communications, yes.
13  Q.  With the trustee concerning the
14  sales transaction?
15  A.  Yes.
16  Q.  Can you just generally describe
17  them in terms of time and substance.
18  A.  The one I recall I was in -- I
19  believe it was almost a year ago today, it was
20  December 15th, because I've seen the memo on
21  this in preparation for the deposition.
22  December 15th, 2008 was the meeting I'm
23  remembering.
24  Q.  Okay.  And what was the meeting

## Page 111

P. KRUSE - HIGHLY CONFIDENTIAL

1  about?
2  A.  Generally about the sale
3  transaction and -- you know, the context was
4  helping us to perform some due diligence to
5  determine how we should react to the
6  settlement motion that was pending at that
7  point before the court that I'm sure we're all
8  well aware of.
9  Q.  Do you recall the upshot of that
10  discussion?
11  MR. TAMBE:  Objection to the form
12  of the question.
13  A.  I don't know if I'd characterize
14  that upshot.  I mean, I recall generally what
15  we were talking about but I don't -- I
16  wouldn't characterize anything as a particular
17  upshot.
18  Q.  Turning back to this document and
19  particularly page 28, the 43.1 billion repo
20  assets, do you understand where that number
21  comes from and what it represents?
22  A.  I believe it comes from a data --
23  a collection of data we had received from
24  former Lehman people, current -- at this point

## Page 112

P. KRUSE - HIGHLY CONFIDENTIAL

1  they would have been Barclays employees when
2  we had requested, again as stated before,
3  the -- you know, the data that supported the
4  individual securities transferred in the sale.
5  Q.  Is it your understanding the 43
6  billion repo assets was a valuation of all of
7  the fed repo collateral?
8  A.  To the best of my recollection, it
9  was, yes.
10  Q.  Are you aware that there were --
11  A.  Oh, I'm sorry.  I should back up.
12  All the fed repo collateral I think as we're
13  all probably aware, there was the issue of
14  certain securities not making its way to
15  Barclays immediately upon closing of the sale.
16  And that's roughly a 7 -- it's a $7 billion
17  figure that's referred to throughout the
18  course of the discovery in this matter, but I
19  should caveat my answer to clarify that I know
20  now that that was not included.  I don't know
21  that we appreciated that fully at the time.
22  Q.  Okay.  We'll refer to that as the
23  $7 billion and put aside whether that's the
24  actual value of the securities or nominal

## Page 113

P. KRUSE - HIGHLY CONFIDENTIAL

1  value or anything like that.  Just so we can
2  understand each other.
3  A.  Sure.
4  Q.  So if you add -- would you then
5  add $7 billion to the 43.1 in order to get the
6  stale marks that's referred to there?
7  MR. TAMBE:  Objection to the form
8  of the question.
9  A.  If you're asking me today would I
10  add the 7 billion to determine the full
11  ascribed value of what was transferred today
12  I'd say yes.  I'm not sure we had that
13  understanding at this time.
14  Q.  Okay.  Well, can you think of any
15  other way that 43.1 would have been derived
16  other than taking some stale marks and
17  subtracting out the 7 billion?
18  MR. TAMBE:  Objection to the form
19  of the question.
20  A.  As I think I stated earlier, I
21  believe the 43.1 billion was derived through
22  an individual listing of CUSIP by CUSIP of the
23  assets that were determined to have been
24  transferred at that point.

Page 114

1    P. KRUSE - HIGHLY CONFIDENTIAL
2        Q.   Do you know when those marks were
3    marked? They're being referred as to stale.
4    I just don't know -- do you have knowledge of
5    whether those marks were updated as of since
6    September 12th, 2008?
7        MR. TAMBE: Objection to the form.
8        A.   Since the data was delivered to us
9    through what people are currently Barclays
10   employees, I think they would have the best
11   understanding of what specifically those
12   numbers were and what they were based on.
13       Q.   I understand that. But I'm just
14   asking what you know. We can ask them
15   separately. It says stale marks. I'm just
16   treating to think are the stale marks the ones
17   that are, you know, five days old, three days,
18   old, go back to September 12th? I mean, do
19   you know?
20       A.   I generally -- my current
21   understanding is that the values ascribed at
22   this time, that was the value that the entity
23   as a whole was ascribing to these securities
24   at the time the deal was closed. I don't know
25   that I accept the characterization of them

Page 115

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    being stale marks based on what I know now.
3    At the time we obviously had a belief or an
4    understanding that they were thought to be
5    stale marks.
6        Q.   And have you learned since then
7    that -- I mean, do you know whether those
8    people -- whether those marks were updated
9    through the week of September 15th?
10       MR. TAMBE: Objection to the form
11   question.
12       Q.   And the way you phrased it was it
13   was continued to be the value, understanding
14   that the values ascribed at this time. It's a
15   little more specific. Do you know -- I think
16   you've said you don't know earlier but do you
17   know whether these marks were updated through
18   the week -- by someone at Lehman through the
19   week of September 15th?
20       MR. TAMBE: Objection. Asked and
21   answered.
22       A.   Yeah, I think I'd refer back to
23   what I believe I testified to a few moments
24   which is I had a general understanding that
25   they were attempting to do business as usual

Page 116

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    and keep the marks current. And there was
3    also the ongoing contemporaneous marking
4    process that was done by their clearing bank.
5        Q.   And that's based on Ian Lowitt's
6    deposition testimony?
7        MR. TAMBE: Objection to form.
8        A.   I don't think it's based solely on
9    that. It's based on an aggregation of my
10   understanding.
11       Q.   Is it just the aggregation we
12   talked about earlier in the deposition?
13       A.   It's based on a -- you know, a
14   series of -- the information I've gathered and
15   absorbed in the course of being involved in
16   this matter.
17       Q.   Is there anything else specific --
18   I mean, can you -- you read the deposition
19   testimony. You've read, you know, the motion
20   paper -- the litigation papers.
21       Have you talked to someone who
22   said they were updating their marks that week
23   at Lehman?
24       A.   Again, I'm aware that the clearing
25   banks, JPM was doing contemporaneous marks.

Page 117

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    That's their responsibility as the clearing
3    agent. Bank of New York who was -- these
4    securities were being transferred to was doing
5    their own independent valuation or ascribing
6    their own independent values to it. There
7    were -- you know, there wasn't just one source
8    of value during this week.
9        Q.   I'm asking about Lehman. Other
10   than Lowitt's, Mr. Lowitt's testimony, do you
11   have any knowledge that Lehman was updating
12   these marks during the week?
13       MR. TAMBE: Objection, asked and
14   answered.
15       A.   I believe it was asked and
16   answered. And I believe they were attempting
17   to continue to mark the books on a daily
18   basis.
19       Q.   And that belief is based on what
20   other than Mr. Lowitt's testimony? And they
21   being Lehman. So not BNY or JPM or the
22   clearing or anything else.
23       A.   I can't tell you specifically the
24   single item or the series of items that lead
25   me to believe that that was the case. It's

Page 118

P. KRUSE - HIGHLY CONFIDENTIAL
1 quite possible if I go back and review
2 material I'll be convinced otherwise. But
3 sitting here today it's my general
4 understanding that the marks were being
5 updated by Lehman continuing on a daily basis.
6     Q.  Did you see Mr. McDade's testimony
7 that he didn't believe that they were being
8 updated?
9     A.  I do recall seeing that testimony,
10 yes.
11     Q.  Okay.  So we have Mr. McDade
12 testifying that he believed they weren't being
13 updated.  We have Mr. Lowitt's testimony.  Is
14 there anything else specific that anyone at
15 Lehman has told you or that you'd gone and
16 looked at the documents to confirm that marks
17 were being updated?
18         MR. TAMBE:  Objection.  Asked and
19 answered.
20     A.  Again, general recollection, we
21 may have gotten data even out of the Lehman
22 GFS system since we began our work.  But I
23 have a general understanding that the marks
24 were being updated daily.

Page 119

P. KRUSE - HIGHLY CONFIDENTIAL
1     As to the -- you know, the
2 distinction between Mr. McDade's testimony and
3 Mr. Lowitt's, I'm aware of the contradiction
4 there.  If I were to choose between the CFO
5 who is closer to the marking process on a
6 daily basis than a chief operating officer
7 which I believe was Mr. McDade's title I'd
8 probably take the CFO in that context.
9     Q.  I really want to move on.  I just
10 want to be very specific.  I just need to know
11 if there's some other specific basis you have
12 for believing there were marks being updated
13 by Lehman that week other than Mr. Lowitt's
14 testimony.  Because if there's some other
15 basis I've just got to know.  I'll keep asking
16 it until you answer it.
17     A.  I will refer to my prior
18 testimony.
19         MR. TAMBE:  Objection.  You've
20 asked him this any number of times.
21 He's answered any number of times.
22         MR. THOMAS:  The answer is
23 non-responsive.  The answer is I have a
24 general belief and so forth so --

Page 120

P. KRUSE - HIGHLY CONFIDENTIAL
1         MR. TAMBE:  He's given you his
2 answer.  And he's mentioned the GFS data
3 now.  So what else do you want him to
4 talk about?  He's told you the bases for
5 his understanding.
6         MR. THOMAS:  I want to make sure
7 we close that out.
8 BY MR. THOMAS:
9     Q.  So at this time, the time of this
10 document, at the time you were making your
11 presentation to the Creditors Committee, is it
12 fair to say that Alvarez believed the Lehman
13 marks were stale?
14         MR. TAMBE:  Objection to the form
15 of the question.
16     A.  No.  I don't think that's a fair
17 characterization.  I think this was the
18 recitation of something that was communicated
19 to us.  I don't think we were making a
20 qualitative assessment that it was accurate or
21 inaccurate.  We were simply communicating
22 information to a key constituent of ours.
23     Q.  Do you know who communicated that
24 to Alvarez?

Page 121

P. KRUSE - HIGHLY CONFIDENTIAL
1     A.  I don't know specifically because
2 I didn't get a chance to get a hold of Jim
3 Fogarty in the last couple of days.  He would
4 be the better person to ask.  But I infer from
5 the documents I've seen Ian Lowitt or somebody
6 that worked with Ian Lowitt.
7     Q.  Okay.  You're aware that --
8     A.  I'm sorry.  Did I say Ian Lowitt?
9     Q.  Yes.
10     A.  I believe it was Paolo Tonucci.
11     Q.  You're aware that Barclays did not
12 believe that the marks of the repo collateral
13 were still accurate as of the time of closing,
14 correct?
15     A.  I'm sorry.  Am I aware sitting
16 here today that Barclays doesn't believe those
17 marks were accurate?
18     Q.  Right.
19     A.  I understand that is an assertion,
20 yes.
21     Q.  Okay.  In any event, Alvarez
22 understood and communicated to the Committee
23 that there was a difference in the value of
24 the repo assets ascribed for purposes of the

Page 122

1      P. KRUSE - HIGHLY CONFIDENTIAL
2   sales transaction and -- between that and
3   the -- what's referred to here as the stale
4   marks. The nominal marks on the fed repo
5   collateral.
6           MR. TAMBE: Objection to the form
7      of the question.
8      A.   Sorry. I lost the train of that
9   question. Could you repeat it?
10     Q.   Okay. Alvarez understood and
11  conveyed to the Committee at this time that
12  there was a difference between the Lehman
13  marks and the -- of the repo collateral and
14  the value of the repo collateral ascribed to
15  the repo collateral for purposes of the sale
16  transaction by the parties.
17          MR. TAMBE: Object to the form of
18     that question.
19     A.   I think we've gone over this. You
20  know, I think the words communicate that
21  concept. I'm not necessarily agreeing that we
22  accepted it at the time as being -- you know,
23  I take this as Jim was relaying information
24  that we had come to understand through others
25  at that point. I don't think we were making a

Page 123

1      P. KRUSE - HIGHLY CONFIDENTIAL
2   qualitative judgment at that point that it's
3   right, wrong, or otherwise.
4      Q.   Well, putting aside whether it's
5   correct or not, that's what was being
6   conveyed, though; that there was this
7   difference between the old Lehman marks and
8   the parties' valuation of the repo collateral
9   for purposes of the sale transaction. That's
10  what the reduction is referring to, correct?
11          MR. TAMBE: Object to the form of
12     the question.
13     A.   If I understand that correctly
14  that's probably a fair characterization.
15     Q.   Okay. Let me ask it open ended.
16  What is the reduction that's -- the $5 billion
17  reduction referring to there?
18     A.   What is it referring to?
19     Q.   Yes.
20     A.   Well, it's referring to apparently
21  a negotiated difference between the value
22  which the assets were acquired versus the way
23  they were characterized prior to the
24  transaction.
25     Q.   And Alvarez would have tried to

Page 124

1      P. KRUSE - HIGHLY CONFIDENTIAL
2   make its presentation to the Creditors
3   Committee as accurate as it could, correct?
4      A.   Yeah. We were certainly trying to
5   convey accurate information to the committee.
6      Q.   And Alvarez also understood that
7   the -- if you look at the next bullet point --
8   that the sale transaction conveyed to Barclays
9   the unencumbered box?
10     A.   Yes.
11     Q.   And is the unencumbered box
12  referring to the clearance box assets?
13          MR. TAMBE: Object to the form.
14     Go ahead.
15     A.   Is unencumbered box relating to
16  the -- unencumbered box I think refers to
17  unencumbered collateral that was transferred
18  that wasn't -- that didn't have a lien on it
19  prior to the transaction.
20     Q.   Would you take a look back at the
21  clarification letter, please.
22     A.   (Witness complies.)
23     Q.   And if you would look at
24  Section -- paragraph 1(a)(ii)(B).
25     A.   Yes.

Page 125

1      P. KRUSE - HIGHLY CONFIDENTIAL
2      Q.   Do you understand that to be
3   referring to what's being referred to in the
4   Alvarez presentation as the unencumbered box?
5      A.   Yes. Sitting here today I would
6   make that connection.
7      Q.   Okay. So, I mean, as of the time
8   of the presentation Alvarez's understanding
9   was that the sale transaction, specifically
10  the clarification letter, did convey the
11  unencumbered box to Barclays and that that was
12  worth approximately $1.9 billion?
13          MR. TAMBE: Objection to the form
14     of the question.
15     A.   Our understanding at the time was
16  being conveyed here, yes, that that was
17  transferred.
18     Q.   Okay. Did that understanding ever
19  change in terms of the conveyance of
20  1.9 billion unencumbered box?
21     A.   I'm generally aware that there are
22  disputes perhaps between the SIPA trustee and
23  Barclays on this opinion. I may have this
24  mixed up with other categories of securities
25  or assets that were transferred but accepting

1          P. KRUSE - HIGHLY CONFIDENTIAL
2    that there may be disputes on that as we sit
3    here today I would answer that, you know, that
4    at the time we were communicating that this
5    was an un -- collateral that was sitting in an
6    unencumbered box at the time it was
7    transferred.
8        Q.   So Alvarez's understanding didn't
9    change with respect to that. I understand
10   there may be -- with another party there may
11   be some dispute or whatever, but in terms of
12   Alvarez's understanding of that did that
13   change at any point in time that this was
14   being conveyed?
15       A.   If I'm not mistaken I thought this
16   was depicting what was physically transferred
17   at that point. So I'm not sure that has
18   changed assuming that is the case. If it was
19   physically transferred, it was transferred.
20   If there are items in dispute currently I'm
21   not certain of the details of that as I sit
22   here.
23       Q.   Was it Alvarez's understanding
24   based upon the term of the clarification
25   letter we just read that these -- this

1          P. KRUSE - HIGHLY CONFIDENTIAL
2    1.9 billion was, in fact, being conveyed as
3    part of the sale transaction?
4          MR. ROTHMAN: Objection to form.
5        A.   Well, again, I draw the connection
6    between the words here in this section you
7    drew me to and the unencumbered box. I assume
8    that is correlated here.
9        Q.   The fourth bullet point refers to
10   .8 billion 15(c)(3)-3 securities.
11       Do you see that?
12       A.   Yes.
13       Q.   And Alvarez understood that that
14   also was being conveyed as part of the sale
15   transaction.
16       A.   Yes. That's what we were
17   communicating here in terms of our
18   understanding at that point.
19       Q.   Yeah. And the topic of this is
20   not what's being conveyed. It's asset
21   purchased, correct?
22       A.   Yeah. That's how it's depicted,
23   yes.
24       Q.   So your understanding is you're
25   just briefing the Creditors Committee on the

1          P. KRUSE - HIGHLY CONFIDENTIAL
2    assets that were purchased as part of the
3    sales transaction; is that correct?
4        A.   That's probably a fair
5    characterization.
6        Q.   And then under Liabilities
7    Assumed -- by the way, did anyone -- do you
8    recall anyone at the Creditors Committee
9    raising any questions concerning any of these
10   items in terms of the assets purchased listed
11   here?
12       A.   Well, again, I wasn't in the room
13   at the time this was communicated. So I can't
14   answer that.
15       Q.   Whether you were there personally,
16   are you aware of any Creditors Committee at
17   any point raising questions about whether
18   these assets were purchased or --
19          MR. TAMBE: Objection to the form
20   of the question.
21       A.   Sitting here today, I'm not aware,
22   no.
23       Q.   Okay.
24       A.   I'm not aware one way or the
25   other, just to clarify.

1          P. KRUSE - HIGHLY CONFIDENTIAL
2        Q.   Are you aware of any
3    communications between Alvarez and the trustee
4    concerning the three bullet points we
5    looked -- we just discussed?
6        A.   Between Alvarez and the SIPA
7    Trustee.
8        Q.   Yeah. Alvarez and the SIPA
9    Trustee or the trustee's representatives and
10   the fact that -- and the first, second, and
11   third -- first, second and fourth bullet
12   points under the assets purchased?
13       A.   I'm sorry. Am I aware of any
14   communications between Alvarez & Marsal and
15   the SIPA Trustee on these three bullet points?
16       Q.   Yes. And by bullet points I mean
17   the topics in the bullet points.
18       Let me just rephrase it.
19       Are you aware of any conversations
20   between Alvarez and the SIPA Trustee or the
21   trustee's representatives and the $1.9 billion
22   unencumbered box?
23          MR. TAMBE: Object to the form of
24   the question.
25       A.   No. And I can probably

Page 130

P. KRUSE - HIGHLY CONFIDENTIAL

1  short-circuit this. I'm not familiar as I sit
2  here of any communications between Alvarez and
3  the SIPA Trustee on these issues.
4     Q.  Okay.  Under Liabilities Assumed,
5  do you see the first 38.0 billion extinguished
6  liability to the fed?
7     A.  Yes.
8     Q.  Is it your understanding that
9  that's -- well, what is your understanding of
10 the 38 billion?
11    A.  The 38 billion would be the
12 information we had at that point as to the
13 liabilities associated with these particular
14 assets.  You know, we all know today that
15 there's a $7 billion issue if I could
16 characterize it that way that would make up
17 the difference between a 38 and a 45.
18    Q.  Right.
19    A.  But this is what we understood at
20 that point.
21    Q.  Right.  So what it's saying is the
22 understanding here if you add 7 to the 38 you
23 get 45 in terms of that being the value of the
24 fed repo collateral, correct?

Page 131

P. KRUSE - HIGHLY CONFIDENTIAL

1     MR. TAMBE:  Objection to the form
2  of the question.
3     A.  No.  We're talking here about
4  liabilities.  Not value of the collateral.
5     Q.  Right.
6     A.  This refers to the amount of the
7  liability to the fed.
8     Q.  Well, is it your understanding
9  that Barclays -- okay.  Is your understanding
10 that Barclays just transferred 38 billion or
11 45 billion as part of the -- in connection
12 with the fed repo?
13    A.  My understanding today?
14    Q.  Yes.
15    A.  I understand that they transferred
16 45 billion.
17    Q.  What was your understanding at the
18 time of this document?
19    A.  I'm not sure I had any
20 understanding at the time of this document.  I
21 wasn't focused on this at all.
22    Q.  Let me do one more document and
23 then maybe break for lunch if that makes
24 sense.

Page 132

P. KRUSE - HIGHLY CONFIDENTIAL

1     Let me show you a document that
2  we'll marked as 462A.
3     (Deposition Exhibit 462A, e-mail
4     dated Monday, 06 October 2008, marked
5     for identification as of this date.)
6  BY MR. THOMAS:
7     Q.  Let me just start by asking is
8  this a document that you recognize?
9     A.  Yes.  I recognize this.
10    Q.  And when did you first see this
11 document?
12    A.  As I recall, I saw it in
13 connection with my preparation for the
14 deposition.  If I saw it before that I don't
15 recall seeing it.  But it's possible.
16    Q.  Okay.  Who is Conor Tully?
17    A.  Conor Tully is with FTI.
18    Q.  And what's FTI?
19    A.  FTI is a financial advisory firm
20 serving as financial advisors to the Unsecured
21 Creditors Committee.
22    Q.  In connection with the sale
23 transaction?
24    A.  In connection with the

Page 133

P. KRUSE - HIGHLY CONFIDENTIAL

1  administration of their duties as the UCC.  I
2  don't know what if any role they had in
3  connection with the sale transaction.
4     Q.  Okay.
5     MR. TAMBE:  Could I just ask a
6  question about this document?  I notice
7  it doesn't have any Bates numbers on it.
8  Is this a document that you have
9  produced, we've produced, someone else
10 has produced in this case?
11    MR. THOMAS:  That's a question I
12 can't answer right now.
13    MR. TAMBE:  The only reason I ask
14 is, I mean, all of LBHI's documents are
15 already in the possession of Barclays.
16 So if there's documents that are going
17 to be produced and used at depositions I
18 would have hoped that Barclays would
19 have produced them during the course of
20 this proceeding.  You have all our
21 documents.
22    MR. THOMAS:  Okay.  Yeah, I can't
23 give you the answer but I'll look into
24 it.

Page 134

```
1         P. KRUSE - HIGHLY CONFIDENTIAL
2         MR. TAMBE: If you could find out
3    at the break that would be helpful.
4         MR. THOMAS: Sure.
5         MR. TAMBE: Sorry. Go ahead.
6    BY MR. THOMAS:
7         Q.   Who is William Fox?
8         A.   William Fox is a managing director
9    at Alvarez & Marsal.
10        Q.   And who is Samuel Star?
11        A.   Samuel Star is with FTI.
12        Q.   Ken Green?
13        A.   Ben Kream?
14        Q.   Oh, Ben, yes. Excuse me.
15        A.   I don't know who that is.
16        Q.   How about D. Fleming?
17        A.   That appears to be Dan Fleming.
18        Q.   Is he someone who stills works at
19   Lehman?
20        A.   Yes. He's with Lehman as far as I
21   know.
22        Q.   C. L. Jones?
23        A.   I don't know C. L. Jones. Lehman
24   suffix on the e-mail, of course, so...
25        Q.   And Tamir Shafer?
```

Page 135

```
1         P. KRUSE - HIGHLY CONFIDENTIAL
2         A.   Yes. Tamir is with Lehman. I
3    think I met him or at least heard of him. I
4    think he's in their treasury group or was in
5    their treasury group.
6         Q.   Do you know if he's still there?
7         A.   I don't know specifically.
8         Q.   Can you describe generally what
9    this document is?
10        A.   It's an e-mail.
11        Q.   Okay. If you would look at three
12   pages into the document. And some type of
13   schedule or sheet. Where it says Lehman
14   Holding Barclays Transaction at the top, do
15   you see that?
16        A.   Yes.
17        Q.   Do you see where it says Repo
18   Assets 38.07?
19        A.   Yes.
20        Q.   And it says Negotiated Mark
21   Haircut.
22             Do you see that?
23        A.   Yes.
24        Q.   And the Assets Transferred Under
25   Repo (sale marks).
```

Page 136

```
1         P. KRUSE - HIGHLY CONFIDENTIAL
2             Do you see that?
3         A.   Yes.
4         Q.   Does this appear to be conveying
5    the same points, information, that -- in the
6    document we just looked at, the information to
7    the Creditors Committee?
8         MR. TAMBE: Objection to the form
9    of the question.
10        A.   Yes. It's this and perhaps other
11   communications like this that I was thinking
12   about when I was communicating the state of
13   our knowledge at that point and what the
14   source of it was.
15        Q.   And do you know -- does this
16   refresh your recollection at all about who put
17   together this information?
18        MR. TAMBE: Objection to the form.
19        A.   To the best of my knowledge, this
20   was compiled by Alvarez & Marsal based on
21   information we were gathering from former
22   Lehman people.
23        Q.   Were you also reviewing records
24   and documents of Lehman's as part of that
25   process?
```

Page 137

```
1         P. KRUSE - HIGHLY CONFIDENTIAL
2         A.   We were getting e-mails -- I've
3    seen e-mails where former Lehman people were
4    sending us the data behind, for example, these
5    repo assets. And I can't speak specifically
6    for each and every item here but I think it
7    was information we were getting from former
8    Lehman people.
9         Q.   On the right side there under
10   Liabilities where it says Net Book Loss,
11   what's your understanding of what that line
12   represents?
13        A.   I would infer that to be sort of a
14   plug figure to communicate what the difference
15   between the two columns independent of that
16   item is. And it's communicated as a net book
17   loss. Presumably from the perspective of the
18   Lehman estate, if you accept the stale marks
19   at their gross figure, Lehman lost
20   $3.27 billion on the deal.
21        Q.   And do you have an understanding
22   of the assumed cure figure of 2.25, what that
23   derives from?
24        MR. TAMBE: Objection to the form.
25        A.   I would expect that number came
```

Page 138

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  from Barclays personnel. I don't think we had
3  an independent basis for knowing what that
4  number was.
5    Q.   When you say Barclays -- I'm
6  sorry. When you say Barclays personnel do you
7  mean Lehman's -- former Lehman personnel --
8    A.   Former Lehman personnel.
9        The communications I've seen
10 around this kind of information indicated that
11 we were attempting to meet with people like
12 Paolo Tonucci, Dan Fleming at the time. So
13 I'm presuming that somebody like that would
14 have provided this information.
15   Q.   Would you have -- at this point in
16 time would Alvarez had had a copy of the
17 purchase agreement?
18   A.   I don't know. We weren't
19 attempting at this time to do a comprehensive
20 evaluation of the deal. We were just
21 attempting really to lock down the information
22 as to what got transferred in the deal. This
23 wasn't done for the purpose of a full-blown
24 holistic analysis of the deal and the
25 economics of it. We were focused on many

Page 139

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  other things at that point in time and this
3  was not in any way a priority.
4    Q.   Are you aware that the -- that
5  Barclays was not obligated to actually assume
6  any particular contracts under the sale
7  transaction?
8    MR. TAMBE: Objection to the form
9  of the question.
10   A.   Well, sitting here today, I'm
11 aware of -- they had options as to which
12 contracts they would assume and not assume.
13   THE VIDEOGRAPHER: The time is
14 12:27. We're going off the record.
15   (Videotape changed.)
16   THE VIDEOGRAPHER: The time is
17 12:27. We are back on the record.
18 BY MR. THOMAS:
19   Q.   What's your understanding of what
20 this page represents?
21   A.   I believe it's a summary of data
22 that we were -- had obtained around this time
23 from former Lehman people. And it's depicting
24 the various categories of securities and the
25 amount at which they were deemed to be

Page 140

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  transferred at -- or the value at which -- in
3  the data set that was relayed to us.
4    Q.   And do you know whether these --
5  specifically where these values came from?
6  Was it --
7    A.   Specifically, no.
8    Q.   The last -- near the bottom there
9  it says, "Less Friday 9/19 transfers."
10       And then it has a negative entry
11 of a little over a billion dollars. Do you
12 know what that's referring to?
13   A.   Not specifically. I could make an
14 inference but --
15   Q.   What's your inference?
16   A.   That the amount of the securities
17 that was not -- not transferred by virtue of
18 activity that occurred on Friday, the 19th.
19 They weren't available for transfer for
20 whatever reason and that's how I would infer
21 that item.
22   Q.   Okay.
23   MR. THOMAS: Why don't we go ahead
24 and take our lunch break if that works
25 for everyone.

Page 141

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    MR. TAMBE: 45 minutes, an hour?
3    MR. THOMAS: Why don't we do 45
4  minutes.
5    THE VIDEOGRAPHER: The time is
6  12:29. We're going off the record.
7    (Luncheon recess taken at 12:39
8  p.m.)

| | Page 142 |
|---|---|
| 1 | P. KRUSE - HIGHLY CONFIDENTIAL |
| 2 | A F T E R N O O N   S E S S I O N |
| 3 | (Time noted:      1:27 p.m.) |
| 4 | THE VIDEOGRAPHER: The time is |
| 5 | 1:27. We are back on the record. |
| 6 | * * * |
| 7 | P H I L I P   K R U S E,   resumed and |
| 8 | testified as follows: |
| 9 | EXAMINATION BY (Cont'd.) |
| 10 | MR. THOMAS: |
| 11 | Q.   Mr. Kruse, let me ask you to |
| 12 | please go back to Exhibit 461A which is the |
| 13 | presentation to the Creditors Committee. |
| 14 | A.   (Witness complies.) |
| 15 | Q.   And, again, at page 28 I believe |
| 16 | you indicated that as part of your preparation |
| 17 | for your testimony today, you went back and |
| 18 | reviewed the Rule 60 motions. Would that |
| 19 | include LBHI's Rule 60 motion? |
| 20 | A.   Yes. |
| 21 | Q.   And you recall there being a |
| 22 | discount talked about in that motion. |
| 23 | A.   Yes. |
| 24 | Q.   Is that the same discount that's |
| 25 | referred to on page 28, the $5 billion |

| | Page 143 |
|---|---|
| 1 | P. KRUSE - HIGHLY CONFIDENTIAL |
| 2 | reduction? |
| 3 | MR. TAMBE: Object to the form of |
| 4 | the question. |
| 5 | A.   I believe it applies to the same |
| 6 | pool of securities. |
| 7 | Q.   Is it different in any way? |
| 8 | MR. TAMBE: Objection to the form |
| 9 | of the question. |
| 10 | A.   Well, no. Again, because it |
| 11 | applies to the same group of securities, the |
| 12 | repo collateral, I think it is the same |
| 13 | concept being communicated. |
| 14 | Q.   Okay. And that concept is that |
| 15 | there was agreement to value the securities at |
| 16 | approximately $5 billion less than the Lehman |
| 17 | marks? |
| 18 | A.   Well -- |
| 19 | MR. TAMBE: Objection -- okay. |
| 20 | Objection to the form of the question. |
| 21 | A.   We've spoken about what this |
| 22 | communicates and how I infer what this was |
| 23 | communicating. This talks about stale marks |
| 24 | and negotiated a $5 billion reduction from the |
| 25 | marks that were on Lehman's books. The |

| | Page 144 |
|---|---|
| 1 | P. KRUSE - HIGHLY CONFIDENTIAL |
| 2 | discount, it's characterized probably |
| 3 | differently in the Rule 60 motion and in the |
| 4 | other material we gathered in the course of |
| 5 | discovery. But I think it's the same concept |
| 6 | at play if that's your question. |
| 7 | Q.   Right. It's the same difference |
| 8 | in values at play. |
| 9 | A.   The same $5 billion, yes. |
| 10 | Q.   LBHI understood as of the time of |
| 11 | closing that the purchase agreement was |
| 12 | transferring the exchange-traded derivatives |
| 13 | to Barclays, correct? |
| 14 | A.   You're asking LBHI's |
| 15 | understanding. |
| 16 | Q.   Yeah. |
| 17 | A.   I would presume LBHI understood |
| 18 | that. At the time of the closing, yes. |
| 19 | Q.   Right. And that's your |
| 20 | understanding of what the purchase agreement |
| 21 | says, correct? |
| 22 | A.   The clarification letter, I |
| 23 | believe, is where that comes up. If I'm not |
| 24 | mistaken. |
| 25 | Q.   You understand the purchase |

| | Page 145 |
|---|---|
| 1 | P. KRUSE - HIGHLY CONFIDENTIAL |
| 2 | agreement to include the clarification letter? |
| 3 | MR. TAMBE: Objection to the form |
| 4 | of the question. |
| 5 | A.   Yeah. I'll accept that as a way |
| 6 | to talk about it. |
| 7 | Q.   Did Alvarez ever seek to value the |
| 8 | exchange-traded derivatives that were |
| 9 | transferred to Barclays as part of the deal? |
| 10 | A.   Any work, again, we've done on |
| 11 | the -- in the area of valuation of the assets |
| 12 | transferred is subject to work we've been done |
| 13 | under direction of counsel. |
| 14 | Q.   Okay. Other than work you're |
| 15 | describing as work being done under direction |
| 16 | of counsel for purposes of litigation, did |
| 17 | Alvarez ever seek to put a value on the |
| 18 | exchange-traded collateral -- exchange-traded |
| 19 | derivatives? |
| 20 | MR. TAMBE: Objection to the form |
| 21 | of the question. |
| 22 | A.   No. Alvarez, to my knowledge, |
| 23 | other than in connection with the work with |
| 24 | Jones Day has not. |
| 25 | Q.   Are you aware of whether LBHI has |

Page 146

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2   done so?
 3        A.   LBHI since the closing, I would
 4   say no. Because, you know, we are essentially
 5   LBHI in a way of thinking.
 6        Q.   And other than the work being done
 7   with Jones Day, are you aware of anyone else
 8   attempting to put a value on the derivatives?
 9        A.   Not to my knowledge.
10        Q.   Let me show you a document we'll
11   go ahead and mark as 463A.
12        (Deposition Exhibit 463A, document
13        bearing production numbers WGM-LEHMAN-E
14        00005853 through WGM-LEHMAN-E 00005866,
15        marked for identification as of this
16        date.)
17   BY MR. THOMAS:
18        Q.   Is this a document you've seen
19   before?
20        A.   Yes. I believe I have.
21        Q.   And when is the first time you saw
22   it?
23        A.   The first time that I recall is in
24   connection with my preparation for this
25   deposition.
```

Page 147

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2        Q.   Very recently.
 3        A.   Yes.
 4        Q.   Do you know one way or another if
 5   you saw it earlier?
 6        A.   To my knowledge, I did not.
 7        Q.   You recognize that as an e-mail
 8   from Glenn West at Weil Gotshal dated
 9   September 27th, 2008?
10        A.   Yes.
11        Q.   And it goes to, among others, Jay
12   McCarthy. Who is that?
13        A.   That would probably -- that would
14   be Jack McCarthy.
15        Q.   And he works at Alvarez?
16        A.   Yes.
17        Q.   And D. Ehrmann also with Alvarez?
18        A.   Yes.
19        Q.   And the subject description is,
20   "Here is all we have at the moment that makes
21   an effort to describe what Barclays got and
22   didn't get."
23        Why was Weil sending you this
24   information -- sending Alvarez this
25   information at this time?
```

Page 148

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2        MR. TAMBE: Objection to form.
 3        A.   My presumption would be Jack and
 4   Daniel were heading up specific asset teams
 5   and were trying to get their bearings on what
 6   the estate owned and didn't own and this
 7   presumably would have been sent in the context
 8   of them getting their bearings on that
 9   subject.
10        Q.   And as part of that analysis and
11   work I think you mentioned Alvarez may have
12   spoken with former Lehman people who had gone
13   over in the transaction to Barclays. But I
14   assume that's not all that Alvarez did. They
15   also spoke with Weil, for example, and tried
16   to gather information to make a complete
17   analysis as possible. Is that fair enough?
18        A.   I'm sure that was happening, yes.
19        Q.   If you would turn the page,
20   please.
21        A.   (Witness complies.)
22        Q.   Under Purchased Assets, and the
23   first bullet point under Securities and
24   Trading Operations. And let me just back up
25   under Purchased Assets. It says At closing
```

Page 149

```
 1        P. KRUSE - HIGHLY CONFIDENTIAL
 2   Barclay acquired all purchased assets. And
 3   then down below it says The securities set
 4   forth on Schedule A to the clarification
 5   letter, i.e., the securities subject to the
 6   Barclays repurchase agreement.
 7        Do you understand that as just
 8   listing all the -- or referring to the fed
 9   repo collateral?
10        A.   Yes.
11        Q.   And was that consistent with
12   Alvarez's understanding at the time that as
13   part of the deal Barclays was to receive all
14   the fed repo collateral?
15        A.   I think Alvarez would have been
16   gaining that understanding concurrent with an
17   e-mail like this. I think we were focused on
18   it prior to closing.
19        Q.   Okay. Did Alvarez ever form any
20   inconsistent -- strike that.
21        Looking at the next bullet point
22   where it says, "The securities and other
23   assets held in LBI's clearance boxes as of the
24   time of the closing."
25        Do you see that?
```

Page 150

P. KRUSE - HIGHLY CONFIDENTIAL

1    A.    Yes.
2
3    Q.    And do you understand Schedule B
4  to the clarification letter basically listing
5  the clearance box assets that were being
6  transferred to Barclays as part of the
7  purchase agreement?
8    A.    That's my understanding, yes.
9    Q.    Okay. And turning the page, the
10  next bullet point where it says, "All exchange
11  traded derivatives and any property that might
12  be held to security obligations under such
13  derivative," do you see that point?
14    A.    Yes.
15    Q.    And is that consistent with what I
16  believe was your earlier testimony that you
17  understood that the purchase agreement
18  transferred to Barclays all exchange-traded
19  derivatives?
20    MR. TAMBE:    Objection to the form
21  of the question.
22    A.    Yeah. I think that was part of my
23  earlier testimony.
24    Q.    And that was -- that was Alvarez's
25  understanding of the deal at this time?

Page 151

P. KRUSE - HIGHLY CONFIDENTIAL

1    A.    At this time, yes. Our
2
3  understanding would have been gained through
4  things like this.
5    Q.    Okay. At any point did your
6  understanding of the deal with respect to
7  those three items change? Your being
8  Alvarez's?
9    A.    With respect to those three items
10  I have no knowledge that our understanding
11  changed.
12    Q.    If you would turn a couple more
13  pages to Bates stamp 5857 or page 4 of the
14  document.
15    A.    (Witness complies.)
16    Q.    And if you want to flip back to
17  the prior page you're welcome to. It's --
18  that bullet point at the top of page 4 is
19  under something entitled Customer Accounts.
20    A.    Um-hum.
21    Q.    Okay. And we're still under the
22  big heading of Purchased Assets.
23    And this bullet point at the top
24  of 4 says, "Purchaser shall receive for the
25  account of customer any and all property of

Page 152

P. KRUSE - HIGHLY CONFIDENTIAL

1  any customer including any held by or on
2  behalf of LBI to secure the obligations of any
3  customer whose accounts are being transferred
4  to purchaser as part of the business and to
5  the extent permitted by applicable law and as
6  soon as practicable after the closing, 769
7  million of securities as held by or on behalf
8  of LBI on the date hereof pursuant to rule
9  15(c)(3)-3 of the Securities and Exchange Act
10  of 1934 as amended or securities of
11  substantially the same nature and value."
12    Was Alvarez's understanding that
13  as part of the purchase agreement Barclays was
14  to receive $769 million of the 15(c)(3)
15  securities or if that wasn't allowed by law,
16  other securities of the same nature and value?
17    A.    Well, the document as provided to
18  us by Weil Gotshal I think speaks for itself
19  on that point. I just want to clarify I'm
20  aware now that this is a subject of dispute
21  between LBI and Barclays and I'm not in a
22  position to opine or offer any insight on
23  that.
24    Q.    Right. I guess the question,

Page 153

P. KRUSE - HIGHLY CONFIDENTIAL

1  though, is was that Alvarez's understanding at
2  the time that Barclays was entitled to either
3  the 769 million of the 15(c)(3) securities if
4  permitted by law or if not permitted by law
5  securities of substantially the same nature
6  and value?
7    A.    I'm not even sure I would go that
8  far. In the context of what we were trying to
9  accomplish at this time, you know, the
10  intricacies of customer property and things
11  that were probably under the purview at that
12  time of LBI wouldn't have been a particular
13  focus of ours. Obviously, it's here in the
14  document that was provided to us. The degree
15  to which Alvarez & Marsal focused on this or
16  really thought about it or considered it, I
17  wouldn't presume anything beyond that it's
18  here on the document.
19    Q.    Is it your understanding at least
20  that that's what Weil was telling you was part
21  of the deal?
22    A.    Well, I think the document speaks
23  for itself in terms of where it came from and
24  what it says.

Page 154

P. KRUSE - HIGHLY CONFIDENTIAL
1    Q.   So as part of its -- about how
2  many people at Alvarez were working on this
3  effort to try to assess the transfers, the
4  deal, during this period of time?
5         MR. TAMBE: Objection to the form
6    of the question.
7    A.   Difficult for me to characterize
8  numbers of people.  It was a substantial part
9  of our effort at that point.  I think as it
10 relates to Barclays in particular, our focus
11 was on, you know, bearing in mind, of course,
12 that the business and all of its systems, its
13 records, all of its systems, and substantially
14 all of its employees were being moved over to
15 Barclays.  The TSA, the Transition Services
16 Agreement, was the primary focus of ours as it
17 related to Barclays at the time.  And so the
18 numbers of people -- there's within this
19 October 8th dec I think there's some depiction
20 of the numbers of people that we were gearing
21 up with at that time.  But a substantial
22 portion of those people were involved in this
23 effort across multiple asset classes and
24 multiple teams that I think is probably best

Page 155

P. KRUSE - HIGHLY CONFIDENTIAL
1  portrayed in this document at that time as
2  opposed to me trying to recite that for you.
3    Q.   When Alvarez became aware of the
4  discount that we discussed and was in the
5  presentation to the Creditors Committee, did
6  Alvarez take any action or do anything with
7  respect to the fact that there was a discount
8  or a difference between the agreed value of
9  the repo collateral and certain marks?
10        MR. TAMBE: Objection to the form.
11   A.   No, again, I would characterize,
12 you know, what we were doing at this time
13 relaying information that had been given to us
14 in connection with that transaction to our UCC
15 constituency.  Some aspects of which they may
16 have known more than we did at the time
17 because they had perhaps people involved as
18 the deal was happening that weekend whereas we
19 did not.  Did we take action?  This was not a
20 priority at the time.  We were not -- again,
21 as it relates to Barclays, the TSA was our
22 primary focus.  Getting ourselves in a
23 position where we could run the wind-down of
24 this enormously large operation in a competent

Page 156

P. KRUSE - HIGHLY CONFIDENTIAL
1  way, that was our focus.
2    Q.   Did anyone at the Committee
3  express any surprise that there was a
4  difference between the agreed value of the
5  marks as part of the transaction and some
6  prior Lehman marks?
7         MR. TAMBE: Objection to form.
8    A.   At this meeting?  I think I
9  covered that.
10   Q.   At the meeting -- okay.  Let's try
11 it without the meeting.
12   A.   I was not at the meeting so I
13 can't offer any insight.
14   Q.   You tricked me.
15        Okay.  At any time to your
16 knowledge.
17   A.   Just to clarify, I was not at any
18 part of the meeting so I can't offer any
19 insight.
20   Q.   At any time, to your knowledge.
21   A.   At any time did -- I'm sorry.  I
22 just want to make sure I got your question
23 straight.  I've lost track.
24   Q.   At any time did anyone, to your

Page 157

P. KRUSE - HIGHLY CONFIDENTIAL
1  knowledge, from the Committee express, you
2  know, surprise about the fact that there was a
3  difference in the value of the fed repo
4  collateral agreed to by the parties for
5  purposes of the deal and the -- some nominal
6  prior Lehman marks?
7         MR. TAMBE: Objection to form.
8    A.   You mean people sitting on the
9  Committee?  I didn't have a lot of
10 communication with people sitting on the
11 Committee.
12   Q.   That may be so but are you aware
13 of anyone on the Committee expressing surprise
14 about the fact that there was this delta?
15   A.   Not that I'm aware.  Again, there
16 may have been communications I'm not aware of.
17   Q.   Are you aware of anyone else who
18 expressed surprise or indicated that that was
19 news to them?  Anyone at Alvarez or LBHI or
20 anyone at this period of time?
21        MR. TAMBE: Objection to form.
22   A.   My recollection during the first
23 quarter of our administration of the estate,
24 there was a gentleman from Houlihan, I believe

Page 158

1         P. KRUSE - HIGHLY CONFIDENTIAL
2    Mike Fazio, who I think primarily indirectly
3    through others I understood that he was
4    expressing some concerns about the economics
5    of the deal and whether it was ultimately in
6    the best interest of the estate to have the
7    deal done as it was papered. I -- you know.
8         Q.   Can you think of anything else
9    other than that?
10        A.   Not that I recall.
11        Q.   Was Mr. Fazio's expression of
12   concern more general or particularly with
13   respect to there being a delta between the
14   agreed value of the -- we'll call it the
15   discount as you've used the term.
16        A.   My best recollection is that Mr.
17   Fazio was either -- attended or had heard
18   firsthand about a meeting that I know has been
19   depicted in the prior discovery Sun -- I
20   believe it was Sunday night before the deal
21   was closed Monday morning, where -- and I was
22   in the deposition of Michael Klein who
23   acknowledged that he had a depiction of the --
24   a very high-level depiction of the deal that
25   was written on the back of a manila envelope

Page 159

1         P. KRUSE - HIGHLY CONFIDENTIAL
2    that was shown to Mike and/or others at
3    Houlihan.
4         I remember Mike telling us that
5    they, meaning as advisors to the Unsecured
6    Creditors Committee, had been asked -- had
7    asked Barclays and Lehman people for the
8    details behind the difference between the
9    marked values and what was determined to be
10   the negotiated value as depicted on that
11   envelope. And they were very unhappy with the
12   fact that they had never gotten any details.
13   They were promised the details at the time and
14   they never got them. And I think that was
15   part of what was underlying their concerns
16   about the economics of the deal.
17        Q.   So they were aware of the delta
18   but they wanted to get details about the delta
19   further explained.
20        A.   Sure. If you're a fiduciary for
21   the estate and you're aware of that you'd like
22   to have empirical knowledge, empirical
23   evidence of how it was derived rather than
24   just, you know, somebody saying it was
25   negotiated.

Page 160

1         P. KRUSE - HIGHLY CONFIDENTIAL
2         Q.   The sale transaction didn't
3    require the deal to be a wash, did it?
4         MR. TAMBE:   Objection to form of
5    the question.
6         A.   The sale transaction didn't
7    require the deal to be a wash?
8         Q.   Okay. I'll rephrase that. Are
9    you familiar with the term "wash"?
10        A.   Yes.
11        Q.   What does that term mean to you?
12        A.   Well, in the context I know where
13   you're coming from, it's assets essentially
14   equalled liabilities. And there was little to
15   no exchange of economic value in the deal.
16        Q.   Okay. And little to no exchange
17   of economic value, can you explain to me?
18        A.   Yeah. Wash assets equal
19   liabilities, that's how I'm trying to give my
20   understanding of what that concept means.
21        Q.   It was never your understanding
22   there was something that sale transaction
23   documents required that assets match
24   liabilities; is that correct?
25        A.   I don't think it was ever --

Page 161

1         P. KRUSE - HIGHLY CONFIDENTIAL
2         MR. TAMBE:   Objection to form of
3    the question.
4         A.   I don't have any basis to think it
5    was characterized as -- in that way in the
6    sale documents. Although I would point out
7    that the Asset Purchase Agreement dated
8    October 16th, and I think this is depicted in
9    our Rule 60 papers, it really does -- the end
10   result of that appears to be assets equal
11   liabilities as it relates to the securities
12   and the comp and cure obligations being
13   assumed. And then you've got an additional
14   element of consideration if you want to look
15   at it that way by virtue of, you know, other
16   liabilities being assumed.
17        Q.   Have you done an analysis of the
18   initial Asset Purchase Agreement to determine
19   what the actual liabilities would have been
20   and what the assets would have been?
21        A.   Well, what I'm describing I think
22   is depicted in our Rule 60(b) motion. I can
23   picture it now. There's a little table in the
24   motion that depicts $70 billion of long
25   positions, 69 billion of short positions,

Page 162

P. KRUSE - HIGHLY CONFIDENTIAL
$250 million acquisition price, and a $750
million profit participation, if you will, in
the upside of the securities if they were sold
for more than the negotiated price.

Q.    Do you know whether the 70 billion
long includes residential mortgages valued at
50 percent of which valued at 3 billion?

A.    My best recollection may not be
completely accurate, is that the -- half of
the mortgage securities were excluded assets,
if I'm not mistaken, as depicted in the APA.

Q.    Okay. But the 70 billion didn't
include the 3 billion, 50 percent of the
RESI's, correct?

A.    That's my recollection, yes.

Q.    Were you aware that Barclays had
put out a press release before the deal closed
saying that it was going to be accretive, the
deal was going to be accretive for Barclays?

MR. TAMBE: Objection to the form
of the question.

A.    I first saw that press release in
roughly Oct -- excuse me -- January of this
year.

Page 163

P. KRUSE - HIGHLY CONFIDENTIAL

Q.    So Alvarez now is working on
trying to value some of the assets for
purposes of this litigation. Without getting
into the results of that because your counsel
has said that that's privileged, how long has
Alvarez been doing that work?

MR. TAMBE: Objection to form of
the question, and to your
characterization that Alvarez is now
working on trying to value some of the
assets. What they're doing at the
direction of counsel and how far they've
come along and how much of it they've
done, all of that is within the
privilege.

MR. THOMAS: Okay. But not the
dates.

Q.    I mean, when did Alvarez start
working on the general subject of valuing
assets related to the sale transaction? Just
the date. Rough date.

A.    Sometime after Jones Day was
engaged the best I recall.

Q.    And -- March?

Page 164

P. KRUSE - HIGHLY CONFIDENTIAL

A.    We were engaged in March. I can't
give you a specific date of when that
activity --

Q.    Is it still continuing?

MR. TAMBE: Again, I'd object to
that and instruct you not to answer in
terms of what you are doing, may have
done, whether you're still doing it.

MR. THOMAS: Okay. Yeah, I mean,
I disagree but I don't want to belabor
it. You've got your instruction and I
assume you're going to follow it.

Q.    Can you tell me roughly how much
time Alvarez spent on trying to value assets?

A.    No, I can't.

Q.    Was it -- I mean, just order of
magnitude was it a one-week thing or two-month
thing?

MR. TAMBE: Objection to the form
of the question.

A.    I have no characterization of it.

Q.    So prior to that work -- so prior
to March 2009 Alvarez never made any effort to
go back and value any of the assets or

Page 165

P. KRUSE - HIGHLY CONFIDENTIAL
liabilities that were part of the sales
transaction; is that correct?

MR. TAMBE: Objection to the form
of the question.

A.    I don't know if I -- I don't think
I'd accept that characterization if I
understand it. You mentioned their both
assets and liabilities. Our initial concerns
about the economics of the deal actually were
generated as a result of us closing the books
as of the closing date -- excuse me -- as of
the date of the bankruptcy closing the books
and records on behalf of the LBHI estate and
coming to some realization that the
liabilities that were on the books for comp
and call it cure kind of liabilities appear to
be much lower than the amounts that were
presumed to be the effective liabilities in
the deal. So it was the liability side that
really started our concerns.

Q.    When was that?

A.    Toward the end of December 2008.

Q.    And what did you do as a result of
those concerns?

Page 166

P. KRUSE - HIGHLY CONFIDENTIAL
1
2   A.   Well, what I did is I took
3   direction from Brian Marsal and started a
4   forensic team that was focused on the Barclays
5   sale.
6   Q.   And did you -- what was the result
7   of that forensic team's work?
8   A.   Well, as is probably obvious we
9   recognized we needed legal counsel and engaged
10  Jones Day in or about March of this year. And
11  the end result of our joint effort in this
12  process is evident in the Rule 60(b) motion.
13  Q.   So we'll pick up on that in a
14  minute but prior to March did Alvarez ever
15  make any effort to try to value the assets
16  transferred as part of the sale transaction?
17  A.   There were probably analytical
18  kind of exercises to evaluate the value of the
19  assets. It was a preliminary, you know, sort
20  of attempt to look at it. Obviously, by that
21  time in early February as everybody knows
22  Barclays had its annual earnings announcement
23  which put sort of a spotlight on the idea that
24  there was a very substantial gain on
25  acquisition that gave us concern as to the

Page 167

P. KRUSE - HIGHLY CONFIDENTIAL
1
2   ultimate economics of the deal. So we looked
3   at that gain disclosure. We looked at, you
4   know, tried to make sense out of it. Where
5   was the gain derived, et cetera.
6   Q.   And can you tell me anything about
7   the results of your evaluation work prior to
8   March in terms of what -- the amounts you came
9   up with for any class of asset?
10  MR. TAMBE: By this point in time
11  the work that was being done by Alvarez
12  & Marsal is in anticipation potentially
13  of litigation and claims and we have
14  asserted work product privilege on any
15  of that analysis that was done by A&M.
16  MR. THOMAS: Can you tell me as to
17  what time?
18  MR. TAMBE: I think it would
19  probably go back to the January time
20  frame when they started looking at it
21  from a forensic perspective as opposed
22  to merely collecting assets and
23  identifying assets which is what they
24  were doing in the first quarter of their
25  engagement when this becomes more of an

Page 168

P. KRUSE - HIGHLY CONFIDENTIAL
1
2   anticipation of litigation or an
3   anticipation of bringing claims
4   exercise.
5   BY MR. THOMAS:
6   Q.   And the assets that prompted this
7   exercise on the books were the comp and cure
8   amounts; is that correct?
9   A.   Well, I guess I'd characterize it
10  differently. Comp and cure are liabilities.
11  Q.   I'm sorry. I misspoke.
12  Liabilities.
13  A.   Yes. My best recollection is that
14  the initial concerns that arose on our part,
15  on A&M's part, emanated from the liabilities
16  side, an apparent overstatement of the
17  liabilities. That's my best recollection.
18  Q.   Let me show you another document
19  we'll mark as 464A.
20  (Deposition Exhibit 464A, document
21  bearing production numbers AM 002287
22  through AM 002292, marked for
23  identification as of this date.)
24  BY MR. THOMAS:
25  Q.   Before I ask you about this

Page 169

P. KRUSE - HIGHLY CONFIDENTIAL
1
2   document, in your view would it have been
3   possible to accurately value all of the assets
4   transferred as part of the purchase agreement
5   by the time of closing given the short period
6   of time in the negotiation of the deal?
7   MR. TAMBE: Objection to the form
8   of the question. Beyond the scope of
9   the 30(b)(6).
10  A.   I would almost reply that they
11  were valued. There were values being ascribed
12  at that time that depicted the value, for
13  example, of the repo assets being
14  approximately $49.9 billion.
15  Q.   Well, for example, the RESI's you
16  mentioned were valued at $6 billion. Do you
17  think they were really worth $6 billion?
18  MR. TAMBE: Objection to the form
19  of the question.
20  A.   I don't know which particular
21  securities you're referring to. There's been
22  a lot of confusion in my mind about what
23  constitutes those RESI's. If you're referring
24  to the RESI's that are referenced in the APA.
25  Q.   Right. I mean, do you think those

Page 170

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  could be easily valued during the week of the
3  deal?
4         MR. TAMBE: Objection to the form
5     of the question and beyond the scope of
6     the 30(b)(6).
7     A.   As I mentioned, I have a lot of
8  uncertainty as to what securities are even
9  being referred to there. So it's a
10  difficult -- I can't even answer the question
11  because I don't have a premise from which to
12  answer.
13     Q.   So you weren't even sure which
14  securities were in the deal.
15     A.   It's not clear to me, no. And
16  when I say in the deal, I'm talking about the
17  RESI assets referred to in the APA.
18     Q.   All right. Turning to 464A who is
19  W. Gordon? William Gordon?
20     A.   He's an Alvarez & Marsal employee.
21     Q.   And this appears -- this may just
22  be a further chain that attaches some of the
23  information from Weil but I just wanted to ask
24  you about a couple other names on here. Who
25  is Mary Karitsky?

Page 171

1    P. KRUSE - HIGHLY CONFIDENTIAL
2     A.   Mary Kariky.
3     Q.   Kariky.
4     A.   She's an Alvarez employee as well.
5     Q.   Okay. Were they also working on
6  analyzing the sale transaction in terms of
7  what assets went over?
8     A.   Yes. That was part of their
9  mission, among I'm sure many other things at
10  the time.
11     Q.   We talked a little bit earlier
12  about this wash notion that appears in some of
13  the litigation papers.
14         Can you point to any part of the
15  sales documents that require the deal to be
16  anything like a wash, that place restrictions
17  on what the amount of the assets and
18  liabilities have to be?
19         MR. TAMBE: Objection to the form
20     of the question.
21     A.   I thought we just discussed that.
22  I described the depiction of the long and the
23  shorts as described in the APA and how that
24  balanced out.
25     Q.   Right. And you referred to the

Page 172

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  APA and your belief that maybe there was some
3  balance there between long and short. That,
4  of course, the APA had to get modified because
5  Lehman couldn't deliver those assets. And so
6  in terms of the transaction that actually went
7  through, the purchase agreement that actually
8  -- or the actual deal that was agreed to and
9  closed, is there anything in there that you're
10  aware of that in your mind could be considered
11  to require that after some post-doc analysis
12  that liabilities and assets had to somehow
13  balance out?
14         MR. TAMBE: Objection to the form
15     of the question.
16     A.   It's a very long question and I
17  lost track of some of the characterizations
18  early on and I'm not sure I accept some of the
19  early characterizations that sort of formed
20  the premise of it but...
21     Q.   Okay. You've described your kind
22  of understanding of the term wash, and I'm
23  asking you is there anything that you can
24  point to in the sale agreement, in the
25  purchase agreement that required the deal to

Page 173

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  be a wash?
3         MR. TAMBE: Objection to form.
4     A.   And you don't want me to repeat, I
5  assume, what I've already talked about in
6  terms of the APA having an implied sort of
7  balancing aspect to it? That's the primary
8  thing I would look to.
9     Q.   Well, the terms you referred to in
10  the APA came out of the deal because those
11  assets couldn't be delivered, right?
12     A.   Well, that's one way to
13  characterize it. Another way to think about
14  it is that there wasn't even a specific
15  listing of those assets at the time. That was
16  people's best estimate of what was on the
17  balance sheet of LBI, as I've gleaned from the
18  discovery at this point. The idea that they
19  couldn't be delivered may in my mind go too
20  far.
21         The nature of the assets in a
22  broker/dealer are going to change day-to-day
23  because of the typical machinations in and out
24  of a broker/dealer. But there certainly were
25  less assets available later in the week than

Page 174

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    were there and believed to be there as of the
3    time the APA was negotiated.
4        Q.   Right.  The 70 billion longs
5    weren't there or a lot of them weren't there
6    later in the week; is that right?
7        A.   Some of those assets -- and it's
8    dangerous for me to try to recharacterize
9    what's been in discovery, but I think some of
10   those assets simply weren't available because
11   they were locked up at LBIE, which was under a
12   separate administration at this point, the
13   European broker/dealer.  So there were issues,
14   certainly, that caused a fair amount of
15   confusion as I've seen around the -- which
16   assets could and could not be transferred.
17       Q.   Um-hum.  So other than your sense
18   that there were some rough equivalency
19   associated with some of the initial terms of
20   the APA, is there anything else you can point
21   to that required the deal to be a wash, as you
22   say?
23       MR. TAMBE:  Objection to the form
24   of the question.
25       A.   No, I think ultimately as the deal

Page 175

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    changed, if I can use a -- what may seem like
3    a gratuitous sort of characterization, it
4    seemed like a free for all.  It seemed like
5    the confusion over the delivery of the assets
6    that final night between JPM and Bank of
7    New York caused people to go on a land grab,
8    in a sense get everything they possibly could
9    out of the entity that had any value and
10   wasn't nailed down.  That's -- the deal as it
11   changed seemed to go that direction.
12       Q.   Just -- my question is just
13   whether there's anything that you can point to
14   that you think required the deal to somehow be
15   a wash.
16       MR. TAMBE:  Objection to the form
17   of the question.
18       Q.   Other than what you mentioned
19   about the initial APA.
20       A.   Not specifically in the way the
21   deal was papered, although I do recall that
22   there was a characterization before the court
23   that essentially spoke to that kind of
24   concept.  I don't remember -- I don't recall
25   the exact words but I thought there was some

Page 176

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    communication of a concept that there was
3    generally a wash.  I know it was communicated
4    as a wash kind of transaction to the Lehman
5    board on Tuesday morning according to those
6    minutes.
7        Q.   Okay.  Why don't we go ahead and
8    take a look at some of those minutes.
9        (Pause on the record.)
10       Q.   Do you know who prepared the
11   minutes of the Lehman board?
12       A.   Not specifically.  Jeffrey
13   Welligson I believe served as the secretary.
14       Q.   Was anyone there from Alvarez at
15   the board meeting where this sale was being
16   discussed?
17       A.   No.
18       MR. THOMAS:  Let me mark this
19   document as 465A.
20       (Deposition Exhibit 465A, document
21   bearing production numbers LBHI 017667
22   through LBHI 017673, marked for
23   identification as of this date.)
24   BY MR. THOMAS:
25       Q.   This is a document produced to us

Page 177

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    by LBHI.  Do you recognize the document?
3        A.   Not this specific version of it.
4    I've seen what appeared to me to be a final
5    version of it.  But I haven't seen the track
6    change version that this represents.
7        Q.   Let me ask you to turn to page 5
8    of the document.
9        A.   (Witness complies.)
10       Q.   -- in the second full
11   paragraph at the end there's a bracket that
12   says, "For LBHI, the transaction was described
13   as a wash with Barclays assuming liabilities
14   of 64 billion basically equivalent to the
15   assets, 70 billion, plus assuming some
16   employees and accounts."
17       Do you see that?
18       A.   Yes.
19       Q.   Would you consider 70 billion
20   versus 64 billion a wash?
21       A.   Well, in and of itself, no.  But I
22   would infer that they must be coming to the
23   concept of a wash by presumably the additional
24   obligations being incurred, assuming the
25   employees and accounts.

Page 178

1      P. KRUSE - HIGHLY CONFIDENTIAL
2      Q.   Those additional obligations don't
3   add up to anywhere near $6 billion, though, do
4   they?
5      MR. TAMBE:  Objection to the form
6   of the question.
7      A.   No.  Not if they were depicted in
8   a financial schedule or anything else.  They
9   totalled to 4.25 billion as I recall.
10      Q.   So how close does it have to be,
11   the assets and liabilities, in your view, for
12   you to consider it a wash?
13      MR. GATTO:  Object to the form.
14   Beyond the scope of the 30(b)(6).  He's
15   not here to give you opinions and I
16   instruct him not to answer.
17      MR. THOMAS:  They're valuations --
18      MR. TAMBE:  Yeah.
19      MR. THOMAS:  -- of the assets and
20   liabilities --
21      MR. TAMBE:  He can talk about
22   valuations.
23      MR. THOMAS:  -- which is under
24   the scope of like five topics.
25      MR. TAMBE:  He can talk about

Page 179

1      P. KRUSE - HIGHLY CONFIDENTIAL
2   valuations but he's not going to give
3   you opinions about what is and what
4   isn't a wash.
5      MR. THOMAS:  So you're instructing
6   him not to answer any questions about
7   opinions about a wash?
8      MR. TAMBE:  About opinions, yeah.
9   He can give you -- he's already
10   described to you what he believes a wash
11   to be.  He's given you his understanding
12   of what he believes a wash to be and
13   he's given you his understanding of this
14   document.
15   BY MR. THOMAS:
16      Q.   Do you understand who prepared
17   this document?
18      A.   No.
19      Q.   Do you understand how the
20   $64 billion calculation was made?
21      A.   No.
22      Q.   Let me ask you to turn -- I'm
23   sorry.  I may have asked you -- I don't know
24   if I asked this or not.  Was anyone from
25   Alvarez -- I think I did ask it.  Was anybody

Page 180

1      P. KRUSE - HIGHLY CONFIDENTIAL
2   from Alvarez at the board meeting?
3      A.   No.
4      Q.   Was anyone from Alvarez in any way
5   involved in the preparation for that board
6   meeting?
7      A.   No.  Not to my knowledge.
8      Q.   All right.  If you would turn two
9   pages prior to page 3 of the same document.
10      A.   (Witness complies.)
11      Q.   The second full paragraph states,
12   "Mr. Roberts..." do you know Mr. Roberts to be
13   from Weil Gotshal?
14      A.   I would expect that to be
15   Tom Roberts.  Was he in attendance?  I believe
16   he was.
17      Yes.  I would expect that to be
18   Tom Roberts.
19      Q.   Okay.  "Mr. Roberts resumed by
20   describing that it is a condition to the
21   transaction that eight specific firm employees
22   enter into employment agreements with
23   Barclays.  He stated that Mr. McGee was one of
24   those employees.  So interested firm employees
25   were involved in the transaction negotiations

Page 181

1      P. KRUSE - HIGHLY CONFIDENTIAL
2   on behalf of the firm.  Mr. Roberts reported
3   that Mr. McDade was subsequently advised by
4   Barclay that his agreement of continued
5   employment was a condition of the transaction.
6   Mr. Roberts reported that Weil Gotshal &
7   Manages and Simpson Thacher & Bartlett then
8   told Barclays that after numerous discussions
9   concerning Mr. McDade's employment, all the
10   terms of the firm transaction were completed."
11      LBHI understood that at least some
12   of the executives negotiating the deal with
13   Barclays were also being offered employment by
14   Barclays; is that correct?
15      A.   LBHI -- going back to the
16   characterization I've offered before, during
17   this time certainly LBHI was in the middle of
18   this before the closing.  They were still
19   employees of LBHI and LBI.  So, yes, LBHI
20   would have been aware of this.  Now, just to
21   be clear on how --
22      Q.   That includes the LBHI board, too,
23   right?
24      A.   Well, the LBHI board, to the
25   extent it heard this characterization, would

Page 182

1          P. KRUSE - HIGHLY CONFIDENTIAL
2    have been aware of this.
3          Q.   And Alvarez was aware of this
4    fact, is it fair to say, at some point
5    certainly within a week or two of the closing?
6          MR. TAMBE:  Objection to the form
7    of the question.
8          A.   I think Alvarez's knowledge of an
9    issue like this would have been limited to
10   anything we heard in a court hearing on the
11   19th. I think we had some people there. I
12   don't know that we had any particular
13   knowledge or understanding of who was doing
14   the negotiations and what their terms of
15   employment were or were not --
16         Q.   Um-hum.
17         A.   -- at the time.
18         Q.   Okay. And I'm under topic -- depo
19   topic 8 now concerning Lehman's understanding.
20   Assuming executives were being offered
21   employment by Barclays including offers of
22   bonus payments for 2008, Lehman understood
23   that while during this week the deal was being
24   negotiated, it was -- I mean, Lehman, the
25   board, others at Lehman understood that the

Page 183

1          P. KRUSE - HIGHLY CONFIDENTIAL
2    officers who were negotiating the deal were
3    being offered employment and bonuses by
4    Barclays and indeed employing a lot of these
5    people was a condition of doing the deal for
6    Barclays since they were trying to buy the
7    business?
8          MR. TAMBE:  Objection to the form
9    of the question.
10         A.   All right. I'm going to try to
11   make sure I understand the question there.
12   Again, I lose track when it goes on.
13         The Lehman -- you know, the same
14   thing Lehman versus Alvarez & Marsal. Lehman
15   people were clearly knowledgeable about this.
16   They were the people that were getting some
17   offers to some extent. They were the people
18   who were right in the middle of this. All
19   those people that we're talking about are no
20   longer employed by LBHI. They've gone on to
21   Barclays or they've gone their own way.
22         So the short answer to your
23   question is yes, LBHI was aware of this at the
24   time. They were inherently aware because they
25   were part of it.

Page 184

1          P. KRUSE - HIGHLY CONFIDENTIAL
2          Q.   And in addition to LBHI being
3    aware of this because officers involved in it
4    were aware of it, the LBHI board was aware of
5    that and LBHI's outside counsel was aware of
6    that, too, correct?
7          A.   I would suggest asking members of
8    the board and members of Weil Gotshal
9    specifically what they're aware of. Anybody
10   can read this and accept the characterizations
11   there to the extent this accurately depicts
12   what was talked about in a board meeting.
13   People who were there heard that. I mean,
14   there's no arguing that. I just -- I don't
15   want to characterize anything beyond that
16   because I don't know anything beyond that.
17         Q.   Okay. But you are the
18   representative of LBHI on this topic.
19         MR. TAMBE:  And he's answered with
20   respect to LBHI. He's not here as a
21   representative of Weil Gotshal.
22         MR. THOMAS:  Okay.
23         Q.   Let me go ahead and show you
24   another document we'll mark as 466A.
25         (Deposition Exhibit 466A, document

Page 185

1          P. KRUSE - HIGHLY CONFIDENTIAL
2    bearing production numbers LBHI 017761
3    through LBHI 017764, marked for
4    identification as of this date.)
5    BY MR. THOMAS:
6          Q.   Let me ask you, is this a document
7    that you've seen before?
8          A.   Not that I recall.
9          Q.   Okay. If you would turn to the
10   third page, please. The third full paragraph.
11   70 billion of assets at LBI, 64 billion of
12   liabilities, so paying the BD 94 percent of
13   assets. Do you have an understanding what
14   that's saying, so paying the BD 94 percent of
15   assets?
16         MR. TAMBE:  Objection to form.
17         A.   No, I don't understand. If I
18   reflected on it for a while, perhaps but
19   sitting here right now, no. I'm guessing BD
20   means broker/dealer but I don't know what the
21   94 percent relates to.
22         Q.   The last sentence there says, "If
23   we don't do this deal today, the broker/dealer
24   would have to declare bankruptcy tonight, at
25   which point all employees would leave and

Page 186

1       P. KRUSE - HIGHLY CONFIDENTIAL
2    there will be nothing."
3            Was it Alvarez's understanding
4    that this was a waste -- LBI was a wasting
5    asset and that some kind of deal needed to be
6    done right away?
7            MR. TAMBE: Objection to the form
8    of the question.
9       A.   I don't know -- Alvarez & Marsal
10   wasn't involved in the deal itself. I think
11   anybody recognizes that a broker/dealer with a
12   bankrupt parent can't last long. I don't
13   think any reasonable person would argue with
14   that. Just to -- rather than accepting the
15   characterization that it was a wasting asset,
16   as it relates to the estate itself, now, you
17   look at that and, you know, there was a net
18   give-away of several billion dollars of
19   economic value as a result of this deal.
20           So I wouldn't accept the
21   characterization that it was a wasting asset.
22   I mean, the creditors were ultimately better
23   off if you just let LBI go down with LBHI.
24       Q.   What is the basis for your saying
25   there was a net give-away of several billion

Page 187

1       P. KRUSE - HIGHLY CONFIDENTIAL
2    dollars?
3       A.   The Barclays disclosure in their
4    February 6 financial announcement that they
5    made $4.2 billion on the acquisition of LBI.
6       Q.   Anything else other than that?
7       A.   There was also characterizations
8    by Mr. Clackson in his deposition that
9    acknowledged the ultimate gain -- accounting
10   gain was closer to 4.9 or $5 billion. That
11   accounting gain equates to economic value.
12       Q.   You have a good understanding of
13   what went into that accounting gain?
14       A.   Reasonably so, yes. I consider
15   myself expert on that issue of accounting.
16       Q.   And you've studied that -- the
17   Barclays papers?
18       A.   I've reviewed the Barclays papers
19   there, yes.
20       Q.   And can you explain what you mean
21   when you say an accounting gain?
22       A.   Accounting gain for purposes of
23   acquisition accounting equates to economic
24   gain. The accounting rules are driven off of
25   determining the fair value of the assets and

Page 188

1       P. KRUSE - HIGHLY CONFIDENTIAL
2    liabilities and any excess of assets acquired,
3    fair market value of assets acquired versus
4    liabilities assumed equates to economic gain.
5    So accounting gain equals economic gain in
6    this vein.
7       Q.   Other than what you've
8    identified --
9            MR. TAMBE: Can we just tie this
10   down to some 30(b)(6) topic that you've
11   identified. He's not going to testify
12   on behalf of Barclays. You had your
13   folks to do that.
14           MR. THOMAS: First of all, I'm
15   directly following up on what he just
16   testified.
17           MR. TAMBE: That's fine but you
18   can't exceed the scope of the 30(b)(6)
19   even if you're following up on something
20   he told you.
21           MR. THOMAS: And that's -- sorry.
22   And it does relate to the valuations and
23   due diligence in terms of what the
24   valuations were going forward after the
25   deal. I mean, I can stop and go tie it

Page 189

1       P. KRUSE - HIGHLY CONFIDENTIAL
2    to several topics but --
3            MR. TAMBE: I don't think it does.
4    I think at the end of the day how
5    Barclays accounted for the gain doesn't
6    tie into the valuation from LBHI's
7    perspective.
8            MR. THOMAS: When his answer to
9    clearly a topic question of the
10   valuation goes to Barclays accounting
11   report, then I'm allowed to at least
12   explore the basis of his knowledge.
13           MR. TAMBE: And I'll let you do
14   that but if you start going into the
15   accounting theory now and the accounting
16   theory behind Barclays gain, I think
17   you're going too far afield.
18           MR. THOMAS: Once again, he used a
19   term in his answer. Okay? I didn't go
20   out there. He used the term. I want
21   him to explain what he meant by that.
22           MR. TAMBE: And I allowed him to
23   do that.
24           MR. THOMAS: Okay. Well, I think
25   we've probably exhausted this.

## Page 190

P. KRUSE - HIGHLY CONFIDENTIAL

1    MR. TAMBE: Okay.

3    Q.   Is there anything other than your
4  interpretation of the Barclays work and the
5  thing with Mr. Clackson you cited that you
6  believe indicates that there was a gain for
7  Barclays?

8    A.   Is there anything else beyond
9  Barclays admission in a public filing?

10   Q.   Yeah. I'm not questioning it. I
11 just want to know. Let me ask you differently
12 because -- did Alvarez do any similar type of
13 analysis as to what the actual agenda was?

14   A.   Certainly not at the time that
15 that announcement came out in February.

16   Q.   Okay. Did anyone ask Alvarez to
17 say, hey, we have this notion that assets were
18 supposed to roughly equal liabilities. Could
19 you do an analysis in October, November,
20 December to see whether the assets and
21 liabilities really balanced out?

22   A.   I think we've covered this ground
23 generally but we didn't undertake a true
24 forensic valuation of the deal until January
25 of 2009.

## Page 191

P. KRUSE - HIGHLY CONFIDENTIAL

2    Q.   Um-hum.

3    MR. THOMAS:  Why don't we take a
4  five-minute break now.

5    MR. TAMBE:  Okay.

6    THE VIDEOGRAPHER:  The time is
7  2:27.  We are going off the record.

8    (Recess taken.)

9    THE VIDEOGRAPHER:  The time is
10 2:42.  We are back on the record.

11 BY MR. THOMAS:

12   Q.   Mr. Kruse, let me ask you to turn
13 back to Exhibit 464A, an e-mail from
14 William Gordon from Alvarez.  And the second
15 page is an attachment which is AM 2294, the
16 Bates number, and up at the top where it says
17 "All exchange-traded derivatives (and any
18 property that may be held in security
19 obligations under such derivatives)."

20   Do you understand the
21 parenthetical to be confirming that the sale
22 transaction was transferring the
23 exchange-traded derivatives and any collateral
24 associated with the delivery of the
25 derivative?

## Page 192

P. KRUSE - HIGHLY CONFIDENTIAL

2    MR. TAMBE: Objection to form.

3    A.   Security and collateral to me
4  probably have the same meaning in that context
5  so I would have to say yes.

6    Q.   Did Alvarez ever attempt to value
7  the exchange-traded derivatives and collateral
8  that were transferred to Barclays as part of
9  the sale transaction?

10   A.   I thought we covered this.

11   Q.   Okay. Other than -- prior to
12 March, and we may have, apologies, but did you
13 ever attempt to value the amount of the
14 derivatives in the collateral?

15   MR. TAMBE:  Objection. Asked and
16 answered. Object to form.

17   A.   No. Not that I'm aware of.

18   Q.   You accepted that there would be
19 some amount of value associated with the
20 derivatives and collateral, is that fair?

21   A.   I have no basis to answer that.

22   Q.   Let me show you another document
23 we'll mark as 467A.

24   (Deposition Exhibit 467A, document
25 bearing production numbers HHR 00006469

## Page 193

P. KRUSE - HIGHLY CONFIDENTIAL

2  with attachment, marked for
3  identification as of this date.)

4  BY MR. THOMAS:

5    Q.   This is an e-mail among a number
6  of people, Weil, the trustee, and a couple
7  people at Lehman.  Do you recognize this
8  document?

9    A.   I don't recall having seen it.

10   Q.   Okay. Do you know who Brett
11 Beldner is?

12   A.   No.

13   Q.   You know who Martin Kelly is?

14   A.   Yes.

15   Q.   On the attachment to this e-mail,
16 which is described in the e-mail itself as a
17 draft LBI balance sheet reflecting unaudited
18 estimates pre and post Barclays transaction,
19 and on the attached balance sheet under
20 inventory, do you see derivatives there
21 indicating a value of 3.6?

22   A.   Yes, I see that.

23   Q.   Okay. All right. And does
24 this -- were you ever aware of any kind of
25 valuation of derivatives in that general

Page 194

P. KRUSE - HIGHLY CONFIDENTIAL

1  range?
2      A.   I don't recall.  To me
3  exchange-traded derivatives, they are what
4  they are.  They're exchange traded.  So
5  there's, you know, an active market for them
6  as I infer.
7      Q.   Is your point that because there's
8  an active market for them, their price would
9  be whatever they trade at?
10     A.   Yes.
11     Q.   I mean, I guess you have no basis
12  for denying that the derivatives and
13  collateral transferred to Barclays had
14  significant economic value associated with it?
15     A.   I have no basis for commenting on
16  that.  I know obviously it's part of the deal
17  as it's summarized by Weil in that e-mail.
18     Q.   Let me show you a document that's
19  been previously marked as Exhibit 442.  It's a
20  large document, and I'm going to ask you about
21  something at the top of page 47.  You're
22  welcome to flip a little before and a little
23  after if you want.
24         (Document review.)

Page 195

P. KRUSE - HIGHLY CONFIDENTIAL

1      Q.   And I'd like to ask you, going
2  back to this 47.4 figure -- and as I
3  understand it, neither LBHI or Alvarez are
4  aware of how that 47.4 figure was calculated;
5  is that right?
6      A.   Alvarez is not.  LBHI, again, I
7  think the employees that have gone over to
8  Barclays, to the extent there is knowledge,
9  would be in the best position to address that.
10     Q.   But in terms of the knowledge that
11  LBHI through documents --
12     A.   Yeah, the knowledge currently at
13  resident in the estate, no, there is no
14  knowledge about how that number is derived.
15     Q.   Did you ask anyone at Weil Gotshal
16  how it was derived?
17     A.   I did not directly.  I think Jones
18  Day has had discussions with them.
19     Q.   Do you have any knowledge for us
20  today about the 47.4 as an LBHI designee on
21  this figure?
22         MR. TAMBE:  If you agree that's
23  not going to be deemed a waiver.
24         MR. THOMAS:  Agreed.

Page 196

P. KRUSE - HIGHLY CONFIDENTIAL

1      A.   To my knowledge, Weil Gotshal
2  doesn't remember where they got the number.
3      Q.   Do you have any further knowledge
4  on that?
5      A.   No.
6      Q.   When you look at the number at the
7  top of page 47, it says -- Ms. Fife, Weil
8  Gotshal, speaking to the court, "So originally
9  we were selling assets that had a value of
10  70 -- approximately $70 billion and today,
11  Your Honor, we're only selling assets that
12  have a value of $47.4 billion."
13         The $70 billion, do you understand
14  that to be referring to subsection D of the
15  list of purchased assets in the initial APA?
16         MR. TAMBE:  Objection to form.
17     A.   Just to be clear, I should go back
18  and look at subsection D of the APA.
19         (Document review.)
20     A.   Yes.  The long positions.
21     Q.   Okay.  And from your read of this,
22  would this be saying that the long positions
23  are now down to 47.4?
24         MR. TAMBE:  Objection to the form

Page 197

P. KRUSE - HIGHLY CONFIDENTIAL

1  of the question.
2      A.   It says what it says.  But I don't
3  think it's necessarily appropriate to equate
4  70 billion in value going down to 47.4 billion
5  in value.  The mix of securities is different
6  between the APA number and this number I would
7  assume.
8      Q.   Well, the 70 billion would not be
9  all of the assets that Barclays was going to
10  acquire under the initial Asset Purchase
11  Agreement, correct?
12     A.   The 70 billion --
13     Q.   The 70 billion long, subsection D
14  of the purchased asset list did not constitute
15  all of the assets that Barclays was going to
16  obtain in the initial Asset Purchase
17  Agreement, right?
18     A.   No, of course not.  There's
19  obviously numerous subsections that delineate
20  the purchased assets.
21     Q.   Right.  For example, one of the
22  other subsections was 50 percent of the RESIs,
23  right?
24     A.   Yes.

Page 198

```
1        P. KRUSE - HIGHLY CONFIDENTIAL
2        Q.  And the total RESIs at that time
3   add a Lehman value of $6 billion
4   approximately; is that right?
5           MR. TAMBE:  Objection to the form
6      of the question.
7        A.  I think we've covered this.  And,
8   again, I've got confusion as to what
9   constituted the RESIs.  I've never seen a real
10  separate stand-alone list of what those RESIs
11  were and which CUSIPS made up that number.  I
12  could rattle off what I do recall about it.  I
13  know on the financial schedule attached --
14  that was referred to in the APA, I believe
15  mortgage assets are stated at 2.7 billion but
16  I --
17       Q.  Was that mortgage assets or half
18  of the mortgage assets?
19       A.  My vague recollection is that that
20  is half, but I'm not a hundred percent
21  certain.
22       Q.  Okay.  But, in any event, whether
23  it be 2.7 billion or 3 billion, that was
24  separate from the 70 billion subsection D long
25  positions as listed out in the Asset Purchase
```

Page 199

```
1        P. KRUSE - HIGHLY CONFIDENTIAL
2   Agreement?
3        A.  Yeah, I believe that's the
4   understanding I got actually from the Steven
5   Berkenfeld deposition.
6        Q.  And from looking at the -- that's
7   consistent with your reading of the APA,
8   correct?
9        A.  Yes.
10       Q.  Which is a number of different
11  assets.
12          MR. THOMAS:  Let me go ahead and
13     mark another document.  It will be 468A.
14          (Deposition Exhibit 468A, document
15     bearing production numbers AM 004734
16     through AM 004738, marked for
17     identification as of this date.)
18  BY MR. THOMAS:
19       Q.  This is an e-mail from Jamie
20  Schwarz.  Is that someone who works for
21  Alvarez?
22       A.  I believe so.
23       Q.  And to a number of people that
24  work at Alvarez?
25       A.  Yes, I recognize all these people
```

Page 200

```
1        P. KRUSE - HIGHLY CONFIDENTIAL
2   as being Alvarez people.
3        Q.  And this is dated September 22nd,
4   which is -- 2008, the date of closing.  Can
5   you describe what work this is a part of?
6           MR. TAMBE:  Objection to the form
7      of the question.
8        A.  Well, if I understand what you're
9   asking, I think it would be an attempt early
10  on to categorize and inventory the assets that
11  were transferred to Barclay so that we knew
12  what we were obligated to deal with in the
13  administration of the estate versus what we
14  were not obligated to deal with.
15       Q.  And why was it important for
16  Alvarez to figure that out?
17       A.  It's self-evident to me.  I mean,
18  our mission was to administer the wind-down of
19  the Lehman Brothers estate.  You've got to
20  know what assets are yours in order to begin
21  that process.
22       Q.  If you would turn to the last page
23  of this exhibit.  It says Holdings Barclays
24  Deal up at the top.
25          Do you see that?
```

Page 201

```
1        P. KRUSE - HIGHLY CONFIDENTIAL
2        A.  Yes.
3        Q.  Under the included assets, the
4   fourth bullet point, it says Trading Assets,
5   47 billion long, and then it lists certain
6   securities underneath it.
7        A.  Yes.
8        Q.  Would that be consistent with the
9   notion that the 47 billion number was related
10  to subsection D of the purchased asset list?
11       A.  Yes.  The terminology is
12  consistent.
13       Q.  Does this refresh your
14  recollection as to whether it was Alvarez's
15  understanding that the $47 billion figure was
16  related not to the total of all assets in the
17  deal but to what had become of the $70 billion
18  long position?
19          MR. TAMBE:  Objection to the form
20     of the question.
21       A.  That's a reasonable inference to
22  me, yes.  When I read the testimony, I
23  assumed, because she started talking about
24  70 billion, she was talking about the
25  corollary of that a few days later.  So I
```

Page 202

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    would -- that would be my inference on the
3    face of the court transcript.
4        Q.    Thank you.
5            When was the -- so there was no
6    analysis of the deal by Alvarez prior to
7    closing?
8        A.    No.
9        Q.    Okay. Sorry I'm pausing but I'm
10   actually cutting stuff out. So it's a
11   productive pause.
12           (Pause on the record.)
13       Q.    Let's move to the cure and comp
14   figures, which I believe is one of the depo
15   topics.
16           Can you tell me everything you
17   know either in your capacity as the LBHI or
18   Alvarez witness about how the comp figure
19   referred to in the purchase agreement was
20   derived?
21       A.    At what point in time? I'm
22   just -- I want to make sure -- the topics seem
23   to focus on what we knew at the time the deal
24   was being done, and I think we've established
25   we knew nothing about this deal at the time.

Page 203

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    So at what point in time? You know, there's
3    been a lot of discovery on that topic. I'm
4    just trying to narrow down what you want from
5    me.
6        Q.    Okay. Let's start with -- let's
7    start with what you know now at any time. So
8    your total knowledge of what the comp figures
9    were.
10       A.    Total knowledge of what the comp
11   figures were. Do you mean total knowledge of
12   how it was derived in the context of the deal?
13       Q.    Yes.
14       A.    Well, our current knowledge is
15   embodied in the discovery and Rule 60(b)
16   motion and the exhibits thereto, but if I can
17   try to characterize that as best I can sitting
18   here now, I think there was real confusion in
19   the record thus far as to whether that was
20   derived by Lehman people and given to Barclays
21   or whether it was a negotiated amount. I know
22   I've heard in some ways contradictory
23   testimony from people as to how they derived
24   that number. And I have some lack of clarity
25   sitting here even today as to specifically how

Page 204

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    the number was derived.
3        Q.    Other than just kind of reading
4    testimony and litigation materials, do you
5    have any knowledge as to how that was -- the
6    comp number was derived, such as by speaking
7    with people at Lehman or speaking with people
8    at Alvarez or review of Lehman documents?
9        A.    Well, I'm not familiar and I could
10   be not remembering this correctly, but I don't
11   recall that there was any sort of empirically
12   derived build-up of how the number was put
13   together at that time. I've never seen a
14   schedule that says here's our comp accrual.
15   Here's how we're building this up for purposes
16   of a negotiation about what that number should be. I
17   don't have an understanding of that kind of
18   support for it.
19       Q.    Um-hum. Was it your understanding
20   that the comp figure included severance as
21   well as bonuses?
22           MR. TAMBE: Objection to the form
23   of the question.
24       A.    No. I think severance is in a
25   separate section of the agreement. Severance

Page 205

1        P. KRUSE - HIGHLY CONFIDENTIAL
2    is 9.1(b), if I'm not mistaken. Bonus is
3    discussed in 9.1(c). So I think it's a
4    separate concept, as I understand it.
5        Q.    Let me go ahead and show you a
6    document we'll mark as 469A.
7            (Deposition Exhibit 469A, document
8    bearing production numbers
9    BCI-EX-00115450 through BCI-EX-00115462,
10   marked for identification as of this
11   date.)
12   BY MR. THOMAS:
13       Q.    Do you recognize this document?
14       A.    I believe I've seen this, yes.
15       Q.    And when did you see it?
16       A.    I would have seen this in the
17   course of the Rule 2004 discovery motion as I
18   best recall.
19       Q.    I think I asked you before. Brett
20   Beldner, do you know if he's still at Lehman?
21       A.    I don't know.
22       Q.    Okay. Who is Robert Azaron?
23       A.    He was a Lehman employee. I
24   assume he still is but I don't know that.
25       Q.    And Marie Stewart?

Page 206

P. KRUSE - HIGHLY CONFIDENTIAL

1    A.  I don't know that name.
2    Q.  Paragraph 6 here says the comp
3 accrual and cure payment accruals are just
4 estimates.  And then it says comp for a year
5 should probably not be the full accrual and
6 cure payment should be actual.
7        Do you understand what the
8 parenthetical means?
9    A.  Other than just the English
10 interpretation of what it says, I don't have
11 any particular insight about it, no.
12    Q.  Okay.  On the next page for cure
13 payments it says Placeholder for actual
14 accrual.
15        Do you see that?
16    A.  Where are you?
17    Q.  I'm sorry.  I'm looking at the
18 wrong document.
19        MR. TAMBE:  The Bates number?
20        MR. THOMAS:  Hold on.  I have the
21 wrong -- let me see if I can find it.
22 Well, you may get a pass on this
23 document.
24    Q.  All right.  Can you describe at

Page 207

P. KRUSE - HIGHLY CONFIDENTIAL

1 all the process at Lehman for how the bonus
2 number was calculated other than based on your
3 reading of litigation materials?
4    A.  The process that Lehman employed
5 in the ordinary course?
6    Q.  Yes.
7    A.  Of computing its compensation
8 accrual?
9    Q.  Sure.
10    A.  I know I've been in conversations
11 around this.  The best of my recollection
12 sitting here today, I know that they -- for
13 the cash portion Lehman has had a cash and a
14 stock portion of their bonus that went to
15 their people in any given year.  The cash
16 portion was accrued ratably through the year.
17 As I understand it, the stock portion vested
18 at a given date after the end of the year and
19 therefore wasn't part of the accrual.  I've
20 heard I think Ian Lowitt testified in his
21 deposition on this particular subject and he's
22 in a much better position than I am to get
23 that characterization correct.
24    Q.  Um-hum.  And are you -- now, as

Page 208

P. KRUSE - HIGHLY CONFIDENTIAL

1 part of the forensic analysis you did when you
2 became concerned over these assumed
3 liabilities, did you determine how much
4 Barclays actually spent on compensation in
5 2008 for the Lehman employees that came over?
6    A.  We had no way of knowing what
7 Barclays spent on compensation.
8    Q.  Okay.  Were you aware that
9 Barclays paid a higher percentage of cash
10 compensation as compared to Lehman?
11    A.  I've come to the realization
12 seeing the employment agreements in --
13 produced in discovery.
14    Q.  And so even if there can be total
15 compensation is going to be the same as Lehman
16 Brothers and Barclays, Barclays would have to
17 accrue more because they pay more in cash
18 versus Lehman who is going to pay a higher
19 percentage in Lehman stock; is that fair?
20    A.  Well, I don't know how Barclays
21 accounts for it.  I don't know if they have
22 that same distinction between cash and stock.
23 I think from an accounting standpoint it
24 depends on the terms of the stock grants and

Page 209

P. KRUSE - HIGHLY CONFIDENTIAL

1 how they inure or accrue or vest to the
2 employee.  If it's a cliff vesting, you may
3 not record them until after they're granted.
4 It just depends on the facts and
5 circumstances.  I don't know how Barclays
6 accounts for that.
7    Q.  And with respect to the cure, the
8 assumption of the compensation requirement or
9 liability, what with respect to compensation
10 gave you concern?
11    A.  Well, I think the insight in that
12 is embodied in the letter that I think Brian
13 Marsal sent on February 19th to Jonathan
14 Hughes at Barclays.  And in that letter we --
15 it gives a sense of what we're seeing in the
16 books and records of Lehman at the time as to
17 how -- what was on the books for compensation,
18 and it's not close to $2 billion.  So we're
19 just asking the question to Barclays, help us
20 understand this.
21    Q.  In terms of the cure and
22 transaction payment amounts that assumed the
23 liability, do you know how that was
24 calculated?

## Page 210

P. KRUSE - HIGHLY CONFIDENTIAL

    A.   I'm sorry. The cure?

    Q.   Do you know how they came up with the cure amount?

    A.   In the context of the deal --

    Q.   Yes.

    A.   -- and how it was depicted in the -- for example, the financial schedule?

    Q.   The 1.5 billion that was referenced to the court.

    A.   Yeah. The reference as 1.5 in the court as we know is referenced as 2.25 billion in the financial schedule. Again, a lot of ambiguity in the record as I currently interpret it as to how that number was derived. At a minimum it appears to have been dramatically overstated as to what the actual cost in my view was.

    Q.   You understood that it was on the face of the agreement and, as mentioned to the court, it was a kind of a maximum estimate of a maximum potential exposure.

    MR. TAMBE: Objection to form.

    Q.   I mean, Barclays could have incurred zero cure under the terms of the

## Page 211

P. KRUSE - HIGHLY CONFIDENTIAL

agreement. What was estimated was a maximum potential exposure, correct?

    A.   I don't know if that's how it's cure -- I don't think it's characterized as the maximum potential exposure. It might be. I just don't recall that.

    Q.   Okay. I mean, it certainly wasn't something -- I mean, you don't understand that Barclays had determined at that point in time what contracts it was going to assume, right?

    A.   I understand that process was ongoing after the closing to some extent.

    Q.   But prior to the closing time, I mean, you had no idea which, if any, contracts Barclays was going to assume, correct?

    A.   I've seen indications that appear to me to be coming from preclosing documents that would suggest there were people who knew that that liability was grossly overstated at $1.5 billion.

    Q.   But, again, it wasn't the sort of liability that was going to be taken on. Would you agree it's a potential exposure because Barclays could choose how many and

## Page 212

P. KRUSE - HIGHLY CONFIDENTIAL

which contracts it wanted to assume?

    A.   You probably don't need me to characterize how it's laid out in the agreement. I agree it's not a hard and fast number in the agreement. It's an estimate as characterized.

    Q.   Well, I'm asking you in terms of your understanding, what LBHI's understanding was prior to closing and after closing as to whether that was an estimate of supposedly what was going to be actually incurred or was it simply an estimate of potential exposure?

    A.   I'm not sure I can make that distinction. It was -- you would expect a liability to be estimated to your best efforts. It doesn't appear to me that that was done.

    Q.   How would -- if it wasn't known which contracts would be assumed, how would one go about trying to figure out what would be the actual cure amount?

    MR. TAMBE: Objection to form.

    A.   At a high level you could look at the accounts payable activity and look at --

## Page 213

P. KRUSE - HIGHLY CONFIDENTIAL

get some bearings as to, okay, what are the significant contracts, what do we think we need, they're mission critical to run the business. I've seen indications in some of the documents that are included as exhibits that would suggest -- one of them I recall, if I'm not mistaken, was produced in the Cox deposition and there was notes up to the side that would suggest Cox had an understanding or whoever wrote that note had an understanding that the real liability was really only $200 million. Not 1.5 billion or 2.25 billion.

    Q.   But other than your kind of interpretation of the litigation materials that you referenced as part of this litigation, do you have any knowledge as to how that figure was calculated?

    MR. TAMBE: Objection to the form of the question.

    A.   At the time?

    Q.   Did you at the time?

    A.   Well, certainly not at the time.

    Q.   Do you now have any knowledge other than your reading of litigation

Page 214

P. KRUSE - HIGHLY CONFIDENTIAL

1    materials?
2         MR. TAMBE: Object to form.
3    Q. Or being advised by Jones Day.
4    A. I don't think there's any evidence
5 in the record to suggest that a good faith
6 effort to derive that number prior to closing.
7 Or to support that number prior to closing of
8 the deal.
9    Q. You're characterizing your view of
10 kind of the record. My question is just a
11 little bit different. I just want to make
12 sure I understand whether you have any
13 information other than your characterizing the
14 litigation record about how that was
15 calculated. I mean, have you talked to people
16 that are involved? Did you go back and look
17 at documents and so forth?
18    A. It's hard for me to parse that
19 because my current understanding is based on
20 the litigation record. I don't have an
21 independent understanding apart from, you
22 know, the work I've been doing in support of
23 this matter.
24    Q. Okay. So I just want to make sure

Page 215

P. KRUSE - HIGHLY CONFIDENTIAL

1 for preparation -- for discussion of this
2 topic you didn't go back and talk to people or
3 look at documents other than the litigation
4 materials.
5    A. No. I looked at the documents we
6 discussed this morning. I think that's --
7 we've covered that.
8         (Deposition Exhibit 470A, document
9         bearing production numbers
10         LBHI_SEC07940_927774 through
11         LBHI_SEC07940_927779, marked for
12         identification as of this date.)
13 BY MR. THOMAS:
14    Q. Was Alvarez aware prior to the
15 closing that there were transaction
16 adjustments made to the cure and comp figures?
17         MR. GATTO: Object to the form.
18    A. Was Alvarez aware there were
19 transaction adjustments made to the comp and
20 cure. I think what you're going to show me is
21 a balance sheet that has the transaction
22 adjustment on it that might have been copied
23 to A&M at some point in time. I don't think
24 anybody had an understanding of that or put a

Page 216

P. KRUSE - HIGHLY CONFIDENTIAL

1 focus on that at the time.
2    Q. Well, let me see if this is what
3 you think I was going to show you. It's
4 Exhibit 470A. Have you seen this document
5 before?
6    A. I believe I have.
7    Q. Is this the document that you were
8 referring to?
9    A. What I was fixated on was the
10 balance sheet so I have to look at this and
11 see if it jogs my memory. There were -- it
12 was characterized as transaction adjustments
13 in the document that I was thinking of.
14         (Document review.)
15    A. It's not the exact document but
16 it's probably not dissimilar to the one I was
17 thinking about.
18    Q. Okay. Let me -- this is a
19 document from Martin Kelly at Lehman. And
20 it's sent to, among others, David Coles at
21 Alvarez and John Suckow.
22    A. Suckow.
23    Q. Suckow. And James Fogarty.
24 They're all at Alvarez; is that right?

Page 217

P. KRUSE - HIGHLY CONFIDENTIAL

1    A. Well, Dan Fogarty is no longer at
2 Alvarez. I think you're aware of that.
3    Q. And this is sent very early in the
4 morning it appears, late on September 19th,
5 2008, 1:12 a.m. So it's really more like
6 very, very late on the 18th. And the lower
7 e-mail from David Coles to Kristy Wong at
8 Lehman. It says, "Kristy, some colleagues and
9 I have met on Tuesday and discussed the
10 consolidated balance sheet and the likely post
11 Bar Cap sale -- " it says BS.
12    A. Balance sheet.
13    Q. Oh, balance sheet. Okay. Sorry.
14 Not an accountant.
15         "Martin suggested we could get
16 some information from you. Do you have a
17 current consolidating BS file by entity that
18 you could send or grant us access?"
19         Now, I had thought you had said
20 that Alvarez prior to closing was really not
21 doing any work relating to the sales
22 transaction. Can you describe to me what's
23 going on here?
24    A. Yes. We were trying to understand

55

Page 218

P. KRUSE - HIGHLY CONFIDENTIAL
1  what the entry was going to have post
2  sale. What's the domain of assets and
3  liabilities we need to deal with. I think
4  that's exactly what they're asking about here.
5  They want a balance sheet that depicts the
6  entity and then the deal gets done.
7      Q.   So as part of that they wanted to
8  know what assets and liabilities were being
9  transferred as part of the sale transaction,
10  correct?
11     A.   You could probably say that by
12  inference but I think the focus on our part
13  would have been what are we going to be
14  responsible for managing.
15     Q.   Do you know -- have you seen the
16  spreadsheet that's attached before?
17     A.   I believe I have. Again, I have a
18  recollection of seeing this.
19     Q.   And you see that there's a
20  Transaction Adjustments column on the
21  right-hand side?
22     A.   Yes.
23     Q.   And then if you go a couple more
24  pages to the Bates ending in 778 you'll see

Page 219

P. KRUSE - HIGHLY CONFIDENTIAL
1  under Payables there's transaction adjustments
2  for the bonus payable and a cure payments
3  accounts payable.
4      Do you see that?
5      A.   I'm not there yet. I'm sorry.
6      Q.   The page ending Bates number 778.
7      A.   Yes.
8      Q.   Under Payables.
9      A.   Yes.
10     Q.   Do you see where there's
11  transaction adjustments for the bonus payable
12  and cure payments/accounts payable?
13     A.   Yes.
14     Q.   Do you know if Alvarez was
15  concerned about the fact that there were
16  transaction adjustments to this amount?
17     A.   No. Again, I think our focus was
18  not on the transaction or -- itself. It was
19  on help us understand the assets and
20  liabilities we need to be focused on as we
21  begin to administer the wind-down of this
22  estate.
23     Q.   It's fair to say at least Alvarez
24  was aware of the fact that there was

Page 220

P. KRUSE - HIGHLY CONFIDENTIAL
1  transaction adjustments to these items.
2      MR. TAMBE: Objection to the form.
3      A.   I could not say one way or the
4  other whether anybody focused on that. I
5  don't think -- if I were them at the time and
6  what I would have been thinking about I would
7  not have focused on it.
8      Q.   Did you talk to these people to
9  see if they focused on it? These people being
10  the ones that received this at Alvarez.
11     A.   I've spoken to John Suckow so I
12  know that John would not have been thinking
13  about this at the time. Jim Fogarty you're
14  going to get him in a couple of weeks.
15     Q.   Did you ask Mr. Suckow about comp
16  and cure and --
17     A.   I did not ask him specifically
18  about this document. But I'm reasonably
19  certain given significant interaction with
20  John that he would not have been focused on
21  this at the time.
22     Q.   What was your -- why did you call
23  John?
24     MR. TAMBE: Objection to the form

Page 221

P. KRUSE - HIGHLY CONFIDENTIAL
1  of the question.
2      Q.   For purposes of this deposition?
3  I think you said you called --
4      MR. TAMBE: Object to the form.
5  He interacts with John almost on a daily
6  basis.
7      MR. THOMAS: I think the testimony
8  was he called him for purposes of
9  deposition.
10     MR. TAMBE: I'm not sure that's
11  what he said so why don't you --
12     MR. THOMAS: Yeah.
13     A.   I reached out to John initially in
14  the context of I think what you're asking when
15  I was shown the October 8th, 2008 Unsecured
16  Creditors Committee presentation because I had
17  never focused on the slide that you questioned
18  me about earlier. And, as I said, most of the
19  A&M team was in and out throughout that
20  process. And I wasn't present at the time
21  this was discussed. John was there the entire
22  time. So I asked John, Do you have any
23  recollection of how this was talked about.
24  You know, what concerns might have been there

Page 222

1          P. KRUSE - HIGHLY CONFIDENTIAL
2   at the time. And John didn't even remember
3   the slide. It wasn't -- it just didn't
4   register with him.
5          Q.   Another question. This says cure
6   payments/accounts payable. Do you know if the
7   cure amount was more than just cure but was
8   also trade payments? There seems to be two
9   columns there.
10         MR. TAMBE: Object to the form.
11         A.   I really don't know what was being
12  attempted to be characterized here. If
13  they're trying to draw a distinction between
14  cure and accounts payable. To me cure equals
15  accounts payable you're assuming but I don't
16  know what they meant when they wrote this.
17         Q.   But there are two different
18  entries here, that are added together. I take
19  that back. They may not be --
20         MR. TAMBE: If you go back and
21  look at the column headings --
22         A.   No, there's two different dates.
23  8/31/08 and 9/17/08.
24         Q.   Oh, I see. And do you know why
25  that change was made, the transaction

Page 223

1          P. KRUSE - HIGHLY CONFIDENTIAL
2   adjustment was made?
3          A.   Not specifically, no.
4          Q.   Okay. Let me go back to a
5   question about the value of Lehman's long
6   positions the week of September 15th. If -- I
7   think there's some testimony that, you know,
8   the markets were at about 75 billion give or
9   take on the preceding weekend before the
10  bankruptcy on September 12th. If they were
11  updated at all on Monday, what kind of record
12  does that updating process create? Are there
13  computer records that we could go look at and
14  see if somebody entered new amounts that were
15  different from Friday? Are there paper
16  records generated?
17         A.   I believe you'd likely go to the
18  GSF system and see for a given CUSIP what
19  changed if anything on a day-to-day basis.
20         Q.   So that system would tell you for
21  a given CUSIP if something was changed on
22  Monday and if it was changed on Tuesday and so
23  forth?
24         A.   By inference. It's going to give
25  you the mark at that time I believe, if I

Page 224

1          P. KRUSE - HIGHLY CONFIDENTIAL
2   understand correctly, on a day-to-day basis.
3   CUSIPs are in and out of their portfolio. You
4   can't necessarily be assured that the same
5   CUSIP's going to be there on Friday -- or on
6   Monday that was there the previous Friday.
7   But as a general rule there is probably a
8   process you can go through there.
9          Q.   To your knowledge has anyone done
10  that?
11         A.   I mentioned the GFS system as one
12  of the sources that I had in mind when I was
13  drawing my understanding that the marks were
14  changing day-to-day. That's my best
15  recollection at the time. I would just refer
16  you to my prior testimony on that.
17         Q.   Let me be a little more specific.
18  Did you go sit down at the GF system and look
19  at a whole bunch of CUSIPs and see what the
20  value was on Friday versus Monday versus
21  Tuesday?
22         MR. TAMBE: Objection to form.
23         A.   I believe that members of the team
24  have been involved in that, yes.
25         Q.   Members of what?

Page 225

1          P. KRUSE - HIGHLY CONFIDENTIAL
2          A.   People that are working on the
3   forensic team for Alvarez.
4          Q.   Is that the ongoing litigation
5   work?
6          A.   Yes.
7          Q.   Was it done prior to that
8   litigation work, to your knowledge, by anyone?
9          A.   Not to my knowledge.
10         Q.   And the records are still there?
11  I mean, they still have those -- they have
12  entries for those dates?
13         A.   I believe so, yes.
14         Q.   Does it show -- is there a record
15  of when changes were made? For example, you
16  have a mark of, let's say, a hundred on one
17  day and the next day it's 95 and the next day
18  it's 90. In addition to showing the marks on
19  different days, will it show you when changes
20  were made inputted?
21         A.   I don't know.
22         MR. THOMAS: And I guess you're
23  not going to let me ask about the
24  results of the analysis --
25         MR. TAMBE: No. I mean, I just

Page 226

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  found the question curious because you
3  guys have the GFS system, we don't. We
4  have to ask you for data about GFS
5  system. And we did in discovery.
6  That's how we got it. So you know more
7  about it than we do.
8        MR. THOMAS: I will confess I
9  don't know anything so I'm going to
10  just --
11        MR. TAMBE: I wasn't sure if you
12  knew about it when you were asking the
13  questions anyway but we don't have
14  access --
15        MR. THOMAS: I know it exists but
16  these little technical details maybe
17  we --
18        MR. TAMBE: No, we don't have
19  access to it. So we can't just go into
20  GFS and make queries. We have to ask
21  you, Barclays, to give us data that we
22  can then review so...
23        MR. THOMAS: Yeah.
24  BY MR. THOMAS:
25    Q.   Are there any other records

Page 227

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  generated by the marking process?
3    A.   I don't know. I don't have
4  perhaps extensive understanding of the
5  intricacies of the system that you're looking
6  for. I do think there's much better resources
7  for you to find out under Barclays' roof right
8  now.
9        MR. THOMAS: Why don't we go ahead
10  and take a short break and see how much
11  more I have left.
12        THE VIDEOGRAPHER: The time is
13  3:30. We are going off the record.
14        (Recess taken.)
15        THE VIDEOGRAPHER: The time is
16  3:41. We are back on the record.
17  BY MR. THOMAS:
18    Q.   Mr. Kruse, I'd just like to walk
19  through some of the deposition topics if you
20  want to pull that -- Exhibits 1 and/or 2 out.
21  I think they're pretty identical.
22    A.   I think you mean 457A and 458A.
23    Q.   Oh, yeah. That's true. You're
24  ahead of me. Excuse me.
25        In looking at topic 2 in terms

Page 228

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  of -- excuse me. Topic 3. In terms of when
3  you understood that Barclays acquired -- was
4  acquiring the repo collateral, the clearance
5  box assets, the 15(c)3 assets and the
6  exchange-traded derivatives, and the margin,
7  with respect to you, Alvarez, and we can go
8  back through these exhibits if you want, but
9  certainly as of the e-mail description of the
10  deal by Weil the week after the deal, it's
11  fair to say that Alvarez was aware of these
12  things.
13        MR. ROTHMAN: Objection to form.
14    A.   Well, I can't attest to how much
15  we would have focused on all the details of
16  that Weil attachment. I think -- I tried to
17  describe our focus for what it was. It was
18  really on what's ours and what do we need to
19  be concerned about from an estate
20  administration standpoint.
21    Q.   But putting aside whether that was
22  really your focus at the time, it was
23  information that you had that was provided to
24  you by Weil?
25    A.   Yes.

Page 229

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    Q.   I mean, that was your
3  understanding. The topic is just when Alvarez
4  understood that Barclays acquired the repo
5  collateral, the clearance box assets, the
6  15(c)3 assets, the exchange-traded derivative
7  and the margin. If it wasn't -- it was
8  roughly in that time at least within a week or
9  so after closing. That fair enough?
10        MR. TAMBE: Objection to form.
11        MR. ROTHMAN: Join.
12    Q.   I can give you a date if you want.
13  For example, the September 27th e-mail from
14  Weil to a number of people at Alvarez
15  describing the purchase assets. Roughly in
16  that time period that Alvarez -- certainly by
17  that time period Alvarez would have been aware
18  of -- that Barclays was acquiring those
19  assets, correct?
20        MR. TAMBE: Objection to form.
21    A.   Generally, yes.
22    Q.   And now putting on your LBHI hat,
23  is it your understanding that Weil who drafted
24  the deal documents, was obviously LBHI's
25  counsel, was obviously aware that Barclay was

Page 230

1        P. KRUSE - HIGHLY CONFIDENTIAL
2   acquiring those assets prior to closing?
3        MR. ROTHMAN:  Objection to the
4   form.
5        A.   Yeah.  As I interpret the
6   attachment to the e-mail you're referring to
7   where Weil is summarizing the deal terms, I
8   took that to mean they're summarizing, you
9   know, the documentation to the deal, the APA,
10  the clarification letter, et cetera, and
11  putting their own interpretation on that.
12       Q.   So that reflected -- sorry.  So
13  that reflected Weil's understanding.
14       A.   That would be my inference, yes.
15       Q.   Now, number 4, topic 4 deals with
16  communications to or from interested parties.
17  When's the first time that you're aware of
18  post-closing communications between Lehman or
19  Alvarez and the trustee about the terms of the
20  sale?
21       A.   I think this got covered and I
22  recall talking about the December 15th, 2008
23  meeting we had with Hughes Hubbard and certain
24  other representatives.  Including a person
25  from Deloitte & Touche.  That's the first

Page 231

1        P. KRUSE - HIGHLY CONFIDENTIAL
2   formal communication with the trustee that I'm
3   aware of about the deal.  There may have been
4   others but, you know, that's -- again, we were
5   doing our own diligence on this sale motion
6   order at that point.
7        Q.   Are you aware of any other
8   informal earlier communications?
9        A.   I'm not aware of any, no.
10       Q.   Is it fair to say the
11  information -- any information that you
12  learned about the sale transaction that was
13  news to you after -- let's say after October
14  had to do with the liabilities that you
15  discussed earlier?
16       MR. TAMBE:  Objection to the form
17  of the question.
18       A.   Sorry.  I want to make sure I
19  understand the -- can you repeat it?
20       Q.   Sure.  I mean, just -- is there
21  any material about the sale transaction that
22  you learned after October in your view?  And I
23  think you mentioned earlier some -- you
24  mentioned earlier something about the
25  liabilities.  Is there anything other than the

Page 232

1        P. KRUSE - HIGHLY CONFIDENTIAL
2   liabilities that you mentioned earlier that
3   you view as significant about the sales
4   transaction?
5        MR. TAMBE:  Objection to the form
6   of the question.
7        A.   As I sit here right now, I know
8   some of the work that we were doing in
9   connection with the sale motion order that was
10  approved by the court on I believe December
11  23rd of 2008, we were doing some work to
12  understand all the facts and information laid
13  out in that motion along with the declarations
14  attached.  So we were learning probably new
15  things at that point about the 7 billion.  I
16  think there was a fair amount of confusion on
17  our part what really happened and there's
18  still some confusion, I'm not sure the record
19  is completely clear on how and why JPM kept
20  the 7 billion and what the basis of that was.
21  But we were learning things in that context
22  certainly.
23       Q.   Okay.  About the 7 billion.
24  Anything else stand out to you?
25       MR. TAMBE:  Objection to the form

Page 233

1        P. KRUSE - HIGHLY CONFIDENTIAL
2   of the question.
3        A.   Nothing that we haven't already
4   talked about today.
5        Q.   Okay.  And on the liabilities,
6   just to bear down a little bit on what you
7   learned that was new after October about the
8   liability amounts.
9        A.   We talked about this.  I'm not
10  exactly clear what the distinction, the
11  importance is of October.  But -- because I
12  think I already testified -- I believe it was
13  toward the end of December 2008 when our
14  finance team was finalizing the closing of the
15  filing date books and records.  Issues started
16  to bubble up about the amount of the
17  liabilities for comp and to some extent for
18  cure as well.
19       So that created some questions in
20  our mind at that point.
21       Q.   And can you describe what those
22  issues were precisely?
23       A.   I think the -- they're best
24  characterized in the February 19th letter that
25  Brian Marsal wrote, as I mentioned earlier.  I

59

Page 234

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  think that really -- obviously we're asking
3  the question to Barclays help us understand
4  this. Here's what we see. Help us understand
5  this. I think that speaks for itself.
6      Q.  Okay.  When --
7      MR. TAMBE:  Todd, just before
8  you -- just a point of clarification on
9  that.  You talked about discovering
10  something new.  I assume you're talking
11  about --
12      MR. THOMAS:  I mean, I don't want
13  to --
14      MR. TAMBE:  I'll ask the question.
15  Fine.  We can do it now or I'll ask the
16  question when you're done examining.
17  Although I think there's --
18      MR. THOMAS:  Well, is it really a
19  point of your clarification or are you
20  trying to suggest something?
21      MR. TAMBE:  The point of
22  clarification is I'm assuming you're not
23  including everything that's learned in
24  the 2004 process that's new.  That
25  wasn't known before the 2004 process.

Page 235

1    P. KRUSE - HIGHLY CONFIDENTIAL
2      MR. THOMAS:  No, anything new.
3      MR. TAMBE:  Okay.  Well, then,
4  that wasn't clear.
5      MR. THOMAS:  I think it was.
6      MR. TAMBE:  Okay.
7  BY MR. THOMAS:
8      Q.  You understand by new I didn't
9  mean to put a deadline on something.
10      A.  I wasn't think of that obviously
11  when I answered the question.  There was
12  clearly a lot of information we gained around
13  all these topics in connection the 2004
14  discovery.
15      Q.  Um-hum.  But, I mean, you knew
16  much -- or you knew the assets that had been
17  transferred.  You knew the -- what did you
18  learn that was new other than something about
19  what's in the Marsal letter about the
20  liabilities and about the 7 billion?
21      A.  There was never a comprehensive
22  attempt for us to fully evaluate the totality
23  of the deal and the economics of the deal
24  until we started a forensic focus on it in
25  January 2009.  So the idea that we knew, you

Page 236

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  know, or focused on this issue at some point
3  prior to that, I think that's wrong.  There
4  were a lot of other priorities that we were
5  dealing with and this just wasn't anywhere
6  near the early priorities in that first
7  quarter of the administration of the estate.
8  We were gathering facts early on just to lock
9  it down what went over, what didn't go over.
10  We weren't in any way attempting to
11  comprehensively evaluate the Barclays deal in
12  the first quarter of the administration.
13      Q.  So what was new was further
14  understanding about the economics of the deal
15  based upon your further focus on it?  Or were
16  there any new -- I mean, you knew the
17  assets -- you knew very early on even by
18  before the end of September Weil telling you
19  these are the assets that were transferred
20  over.  And you knew the liabilities assumed.
21  And you had -- obviously, you had the sales
22  documents.  And so what are the -- what
23  material new facts did you learn about the
24  deal after the end of September?
25      A.  You mean other than everything

Page 237

1    P. KRUSE - HIGHLY CONFIDENTIAL
2  that's in the Rule 60(b) motion and the
3  attachments thereto?
4      Q.  Yeah.  I mean facts.
5      A.  There are volumes of facts that we
6  learned in connection with that discovery.
7      Q.  Okay.
8      A.  Volumes of information we
9  gathered.  The idea that we somehow knew that
10  in September is in my mind ridiculous.
11      Q.  Can you identify some particular
12  facts?
13      A.  Yes.  Let's get out the Rule 60(b)
14  motion and read it.
15      Q.  Okay.  But I mean as you sit here,
16  can you -- I mean, are there assets that, you
17  know, went over that you didn't know went
18  over?
19      A.  I've tried to describe that there
20  was not a comprehensive valuation of the deal
21  at that -- in those early stages.  I've tried
22  to characterize as best I can the context of
23  what we were doing and why.  I hope the record
24  is clear on that point but we were not
25  attempting in the first quarter of the

Page 238

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    administration of the estate to do a
3    full-blown valuation of the economics of the
4    deal. There were things that came to our
5    attention toward the end of that quarter that
6    gave us cause for concern and resulted in us
7    putting more focus on it.
8        Q.   Okay. And I understand what
9    you're saying about increased focus and not
10   doing a full-blown economic analysis. I'm
11   just honing in on particular specific facts.
12   There's one thing -- it seems to me you had
13   the facts but you didn't focus on them and do
14   a full-blown economic analysis. Is that a
15   fair summary of what you're saying?
16       MR. TAMBE: Objection to the form.
17       A.   We had certain limited facts as a
18   result of trying to gain an understanding
19   early on of what went over and what didn't go
20   over. We were not attempting to
21   comprehensively evaluate the detail in its
22   totality at that stage of the administration
23   of the estate. It was not a priority. There
24   were a lot of other things we felt were a
25   higher priority at that state.

Page 239

1    P. KRUSE - HIGHLY CONFIDENTIAL
2        Q.   If it had been a priority for you
3    and you had tried to do that analysis earlier
4    at the time end of September, early October,
5    are there any facts about assets and
6    liabilities that you did not have that would
7    have prevented you from doing that analysis?
8        MR. TAMBE: Object to the form.
9        A.   There was a very difficult process
10   we had for getting any information from
11   Barclays. I think I referred earlier in my
12   testimony to extraordinarily difficult
13   circumstances in getting Barclays to execute
14   under the TSA. That big focus that we had as
15   it related to Barclays as an entity was
16   getting performance of the TSA. We were at
17   Barclays' mercy in terms of needing their
18   employees, their systems, their information,
19   their insight. That was the focus, the
20   immediate most important focus for us early on
21   in the administration of the estate. If we
22   didn't get that right a lot of things were
23   going to go wrong. That was the priority. We
24   weren't focusing on the Barclays deal at that
25   stage. It would have been in my mind

Page 240

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    irresponsible to put an emphasis on that
3    versus the higher priority of getting the
4    information in hand that we needed to minister
5    and run the estate.
6        Q.   I appreciate that. And you're
7    stating that very strongly and it's
8    understood. I just want to know if you didn't
9    think there was any facts in terms of the deal
10   in terms of what assets and liabilities were
11   transferred that you didn't have by the end of
12   September.
13       MR. TAMBE: Objection to the form
14   of the question.
15       A.   Yes. There were facts that we
16   didn't have about the deal at the end of
17   September. Certainly there were many facts we
18   didn't have.
19       Q.   What if any facts would have
20   prevented you from doing the economic analysis
21   that you're doing now?
22       A.   I will again try to communicate
23   the issue we were dealing with. We weren't
24   getting information openly from Barclays.
25   Shortly after the time that we got the

Page 241

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    information we've seen in these e-mails today
3    where we got the CUSIP level detail of what
4    came over, there were repeated problems in
5    performance under the TSA. It almost resulted
6    in a lawsuit being filed. I mean, we had
7    it -- we had the lawsuit drafted and it was
8    going to be served if we didn't get
9    cooperation. That's the degree to which the
10   performance or the lack of performance under
11   the TSA was a concern of ours.
12       So if you're talking about facts
13   that we knew or didn't know, there were -- the
14   entire process was breaking down under which
15   we needed to administer to the estate because
16   of what we felt was the failure to perform
17   under the TSA by Barclays. There were
18   significant issues that just administering the
19   estate was becoming -- in an appropriate
20   fashion was becoming an issue.
21       To put an emphasis at that stage
22   on looking back at a deal, again, that was not
23   the focus at the time. It evolved to be a
24   focus. But we weren't focusing on that in the
25   first quarter.

Page 242

P. KRUSE - HIGHLY CONFIDENTIAL

1    Q.    And my question is not about focus
2    or whether you should have focused or
3    shouldn't have focused or anything like that.
4    It's just -- I just want to know if you -- if
5    by the end of September you understood that
6    assets that were transferred and the
7    liabilities assumed and the fact that there
8    was a delta between, you know, Lehman marks,
9    whether they were stale or not, and the kind
10   of agreed value of the assets for purposes of
11   the deal, what's referred to in your documents
12   as the discount, you understood those things,
13   correct?
14       MR. TAMBE:  Objection to the form
15       of the question.
16       A.    Yeah.  I think we've covered the
17   ground earlier but the characterization of a
18   discount, I believe we were relaying
19   information we got from Paolo Tonucci working
20   for him at the time.
21       Now, I'm sorry.  I've lost track
22   of your question in terms of what you
23   specifically wanted.
24       Q.    I just wanted to make sure -- I

Page 243

P. KRUSE - HIGHLY CONFIDENTIAL

1    don't want to get into whether it made sense
2    to focus on this now or later.  I understood
3    your testimony.  I'm just summing up the
4    things we've gone through and it wasn't that
5    you learned new facts -- you -- strike that.
6        You understood that assets that
7    were transferred as part of the deal and the
8    liabilities assumed including the delta
9    between what one document referred to as stale
10   marks and the value put on those securities by
11   the parties, I mean, you understood all that
12   by the end of September, correct?
13       MR. TAMBE:  Objection to the form
14       of the question.
15       A.    We had certain facts that we had
16   gathered at that time.  We had not evaluated
17   those facts in a comprehensive fashion.  So we
18   weren't in a position -- if what you're
19   ultimately trying to get at is were we in a
20   position at the end of September to file a
21   Rule 60(b) motion, no, I don't believe we
22   were.  We wouldn't have done that without
23   appropriate legal counsel and we hadn't gone
24   down that path until the first quarter of

Page 244

P. KRUSE - HIGHLY CONFIDENTIAL

1    2009.
2        Q.    Right.  I just -- I'm just focused
3    on the facts.  You had the information but you
4    felt you weren't in a position to analyze it
5    at that time because you had other focuses.
6        A.    We had other priorities.
7        MR. TAMBE:  Objection to the form
8        of the question.
9        Q.    Turning to topic number 10, when
10   was to your knowledge a civic liquidation of
11   LBI first considered or planned?
12       A.    Well, presumably if you filed the
13   holding company, as I stated earlier, I think
14   most people would recognize that the
15   broker/dealer is not going to survive forever
16   under those circumstances.  So I would have to
17   believe that there is a recognition that a
18   civic liquidation was going to be occurring at
19   some point relatively soon.  I don't know the
20   specifics of that.  I'm just speaking as a
21   general state of knowledge of analyzing the
22   situation.
23       Q.    Okay.  But you're not aware
24   factually when that was, when it was

Page 245

P. KRUSE - HIGHLY CONFIDENTIAL

1    considered and so forth.
2        A.    No.
3        Q.    Was Alvarez involved in any
4    discussions leading up to the presentation to
5    the court on September 19th, 2008?
6        A.    No.
7        Q.    Was Alvarez involved in the
8    presentation to the court concerning the
9    December 2008 JPMC settlement approval motion?
10       MR. TAMBE:  Objection to the form.
11       A.    No.  Alvarez didn't present to the
12   court in that context.  Weil presented to the
13   court on behalf of Lehman Brothers Holdings.
14       Q.    And did the -- LBHI -- did LBHI
15   coordinate with the trustees and the Creditors
16   Committee in connection with that settlement
17   motion?
18       MR. TAMBE:  Objection to the form.
19       Use of the word "coordinate."
20       A.    Any such coordination, to the
21   extent it happened it would probably be best
22   addressed by Weil because I think it was
23   happening at that level to the extent it was
24   happening.

Page 246

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    Q.    With respect to the appellate
3    brief filed by LBHI in the district court in
4    support of the sale agreement, and in
5    opposition to the Bay Harbor appeal dated
6    December 12th, 2008, as part of your
7    preparation for your testimony here today, did
8    you research that at all?
9    A.    Yes. I'm not aware that there was
10    anybody at Alvarez & Marsal that was aware
11    that that was going to happen before it
12    happened.
13    Q.    Who at LBHI coordinated or
14    interacted with Weil about that filing?
15    A.    I don't know specifically. I
16    would presume somebody in the in-house legal
17    team but again I don't know specifically.
18    Q.    And Alvarez -- you say Alvarez
19    was -- was Alvarez aware of the appeal filed
20    by objectors?
21    A.    Not to my knowledge.
22    Q.    What is LBHI's understanding of
23    who drafted the clarification letter?
24    A.    LBHI's current understanding is
25    embodied in the discovery under the Rule 2004

Page 247

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    discovery. And I -- you know, I know I've
3    seen various e-mails with various drafts going
4    back and forth. I think it was a collective
5    process of Cleary Gottlieb, if I'm not
6    mistaken, Weil, all -- you know, Simpson
7    Thacher. All the counsel on behalf of the
8    parties involved at the time.
9    MR. THOMAS: If we could just take
10    a two-minute break I just want to review
11    my notes.
12    THE VIDEOGRAPHER: The time is
13    4:07. We're going off the record.
14    (Recess taken.)
15    (Deposition Exhibit 471A,
16    document, marked for identification as
17    of this date.)
18    THE VIDEOGRAPHER: The time is
19    4:13. We are back on the record.
20    BY MR. THOMAS:
21    Q.    Mr. Kruse, let me show you a
22    document we've marked as 471A.
23    MR. THOMAS: What's the first page?
24    MR. ROTHMAN: Do you want to take
25    off the first page? It's a tab from a

Page 248

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    file.
3    MR. KRISBERGH: That's from the
4    appendix.
5    MR. TAMBE: Okay.
6    MR. THOMAS: And we had looked at
7    some -- is that highlighting? Let me
8    just --
9    MR. TAMBE: It's highlighting on
10    all of them.
11    (Pause on the record.)
12    MR. THOMAS: Well, let me take
13    those back.
14    BY MR. THOMAS:
15    Q.    Let me just ask. Have you ever
16    seen a copy of the final board minutes?
17    A.    Yes.
18    Q.    Okay. And do you recall -- we
19    looked at earlier some language in there from
20    Mr. Roberts informing the board that certain
21    members -- certain executives at Lehman who
22    are negotiating the deal were also negotiating
23    employment contracts and bonuses with Barclays
24    and planned to go over to Barclays. Do you
25    recall looking at that earlier?

Page 249

1    P. KRUSE - HIGHLY CONFIDENTIAL
2    A.    Yes, generally.
3    Q.    And do you recall that general
4    disclosure being also in the final board
5    minutes?
6    A.    Yes. I have a general
7    recollection.
8    MR. THOMAS: Thank you. I have
9    nothing further.
10    THE COURT REPORTER: Are you
11    withdrawing that exhibit?
12    MR. THOMAS: Yes.
13    (Continued on next page to include
14    jurat.)

Page 250

1        P. KRUSE - HIGHLY CONFIDENTIAL
2        (Deposition Exhibit 468A
3    previously marked for identification is
4    withdrawn as of this date.)
5        MR. TAMBE:  We have no questions.
6        MR. KAY:  No questions.
7        MR. ROTHMAN:  No questions.
8        MR. TAMBE:  Thank you very much.
9        THE VIDEOGRAPHER:  The time is
10    4:16.  We're going off the record.
11        (Time Noted:    4:14 p.m.)
12
13
14
15
16
17
18
19    _____
20        PHILIP KRUSE
21
22    Subscribed and sworn to before me
23    this ___ day of _____, 2009.
24
25

Page 251

1
2        C E R T I F I C A T E
3    STATE OF NEW YORK    )
4                         : ss.
5    COUNTY OF NEW YORK    )
6        I, FRANCIS X. FREDERICK, a Notary
7    Public within and for the State of New
8    York, do hereby certify:
9        That PHILIP KRUSE, the witness
10    whose deposition is hereinbefore set
11    forth, was duly sworn by me and that
12    such deposition is a true record of the
13    testimony given by the witness.
14        I further certify that I am not
15    related to any of the parties to this
16    action by blood or marriage, and that I
17    am in no way interested in the outcome
18    of this matter.
19        IN WITNESS WHEREOF, I have
20    hereunto set my hand this 17th day of
21    December, 2009.
22
23
24    _____
25        FRANCIS X. FREDERICK

Page 252

1
2    --------------- I N D E X ----------------
3    WITNESS        EXAMINATION BY        PAGE
4    PHILIP KRUSE        MR. THOMAS        5
5
6
7
8
9    ---------- INFORMATION REQUESTS ------------
10    DIRECTIONS:  NONE
11    RULINGS:  NONE
12    TO BE FURNISHED:  NONE
13    REQUESTS:  NONE
14    MOTIONS:  NONE
15
16
17
18
19    ----------------- EXHIBITS -----------------
20    EXHIBIT                FOR ID.
21    Exhibit 457A
22    Barclays Capital Inc.'s
23    Rule 30(b)(6) Deposition
24    Notice to Lehman Brothers
25    Holdings Inc............................ 8

Page 253

1
2    ----------------- EXHIBITS -----------------
3    EXHIBIT                FOR ID.
4    Exhibit 458A
5    Barclays Capital Inc.'s
6    Rule 30(b)(6) Deposition
7    Notice to Alvarez & Marsal............ 8
8    Exhibit 459A
9    document bearing production
10    numbers WGM-LEHMAN-E 00005736
11    through WGM-LEHMAN-E 00005740......... 73
12    Exhibit 460A
13    document bearing production
14    number LAZ-C-00048526................. 76
15    Exhibit 461A
16    document bearing production
17    numbers AM 004503
18    through AM 004595..................... 104
19    Exhibit 462A
20    e-mail dated Monday, 06 October 2008., 132
21    Exhibit 463A
22    document bearing production
23    numbers WGM-LEHMAN-E 00005853
24    through WGM-LEHMAN-E 00005866......... 146
25

Page 254

```
 1
 2   ----------------- EXHIBITS -----------------
 3   EXHIBIT                    FOR ID.
 4   Exhibit 464A
 5   document bearing production
 6   numbers AM 002287
 7   through AM 002292..................... 168
 8   Exhibit 465A
 9   document bearing production
10   numbers LBHI 017667
11   through LBHI 017673.................. 176
12   Exhibit 466A
13   document bearing production
14   numbers LBHI 017761
15   through LBHI 017764.................. 184
16   Exhibit 467A
17   document bearing production
18   numbers HHR_00006469
19   with attachment...................... 192
20   Exhibit 468A
21   document bearing production
22   numbers AM 004734
23   through AM 004738.................... 199
24
25
```

Page 255

```
 1
 2   ----------------- EXHIBITS -----------------
 3   EXHIBIT                    FOR ID.
 4   Exhibit 469A
 5   document bearing production
 6   numbers BCI-EX-00115450
 7   through BCI-EX-00115462............... 205
 8   Exhibit 470A
 9   document bearing production
10   numbers LBHI_SEC07940_927774
11   through LBHI_SEC07940_927779.......... 215
12   Exhibit 471A (WITHDRAWN)
13   document............................ 247
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 256

```
 1
 2   NAME OF CASE:  IN RE. LEHMAN BROTHERS
 3   DATE OF DEPOSITION:  DECEMBER 17, 2009
 4   NAME OF WITNESS:  PHILIP KRUSE
 5   Reason codes:
         1. To clarify the record.
 6       2. To conform to the facts.
         3. To correct transcription errors.
 7   Page _____ Line _____ Reason _____
     From _____ to _____
 8
     Page _____ Line _____ Reason _____
 9   From _____ to _____
10   Page _____ Line _____ Reason _____
     From _____ to _____
11
     Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
     From _____ to _____
14
     Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
     From _____ to _____
17
     Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
     From _____ to _____
20
     Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
     From _____ to _____
23

24   _____
     PHILIP KRUSE
25
```

# BCI EXHIBIT

# 82

Page 1

1          HIGHLY CONFIDENTIAL - G. LaROCCA

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                   Debtors.

10

      ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF GERARD LaROCCA

14             New York, New York

15             August 19, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24292

## Page 2

HIGHLY CONFIDENTIAL - G. LaROCCA
August 19, 2009
9:30 a.m.

HIGHLY CONFIDENTIAL deposition of GERARD LaROCCA, held at Jones Day, LLP, 222 East 41st Street, LLP, New York, New York, before Kathy S. Klepfer, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Livenote Reporter, and Notary Public of the State of New York.

TSG Reporting - Worldwide (877) 702-9580

## Page 3

HIGHLY CONFIDENTIAL - G. LaROCCA

A P P E A R A N C E S :

JONES DAY, LLP
Attorneys for Lehman Brothers, Inc.
    222 East 41st Street
    New York, New York 10017-6702
BY: ROBERT W. GAFFEY, ESQ.
    BART GREEN, ESQ.

BOIES, SCHILLER & FLEXNER, LLP
Attorneys for Barclays Capital
and the Witness
    575 Lexington Avenue - 7th Floor
    New York, New York 10022
BY: JACK G. STERN, ESQ.

QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
Attorneys for the Creditors Committee
    865 Figueroa Street, 10th Floor
    Los Angeles, California 90017
BY: ERICA P. TAGGART, ESQ.

A P P E A R A N C E S : (Cont'd.)

TSG Reporting - Worldwide (877) 702-9580

## Page 4

HIGHLY CONFIDENTIAL - G. LaROCCA

JENNER & BLOCK, LLP
Attorneys for the Examiner
    330 N. Wabash Avenue
    Chicago, Illinois 60611-7603
BY: ROBERT L. BYMAN, ESQ.

HUGHES, HUBBARD & REED, LLP
Attorneys for the SIPA Trustee
    1775 I Street, N.W.
    Washington, DC 20006-2401
BY: JOHN F. WOOD, ESQ.
    FARA TABATABAI, ESQ.

Also Present:
    PHILIP E. KRUSE, Alvarez & Marsal

TSG Reporting - Worldwide (877) 702-9580

## Page 5

HIGHLY CONFIDENTIAL - G. LaROCCA
GERARD LaROCCA, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:
EXAMINATION BY
MR. GAFFEY:
    Q.  Mr. LaRocca, good morning.  We met briefly before the deposition.  I'm Bob Gaffey. I'm with Jones Day and we are special counsel to the estate of Lehman Brothers Holdings, Inc., and as you know, we have been looking into matters related to the transaction in September of 2008 where Barclays purchased some assets from Lehman and my questions today will be largely about that.  But first let me get some background information.
        Have you been deposed before?
    A.  No, I haven't.
    Q.  Okay.  Could you give me an idea of what your educational background is since high school?
    A.  Undergraduate degree from Wagner College, BS in accounting, '79 graduate.  MBA from Pace University, 1984, concentration in

TSG Reporting - Worldwide (877) 702-9580

Page 6

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    finance.
3        Q.   And do you hold any licenses,
4    professional licenses of any kind?
5        A.   Series 7 and Series 24.
6        Q.   CPA?
7        A.   No.
8        Q.   Did you ever practice as a public
9    accountant?
10       A.   No.
11       Q.   Do you keep your licenses current?
12       A.   Yes.
13       Q.   And give me an idea, if you would, of
14   your employment background.  I know you're
15   currently employed by Barclays, but if you
16   could -- how long have you been with Barclays?
17       A.   I've been with Barclays since November
18   of '98.  Prior to joining Barclays, I spent 16
19   years at Salomon Brothers from -- or, 15-plus
20   years at Salomon Brothers from '83 to '98.
21       The early part of my career from '83
22   to '91 was primarily in the Controller's Group
23   in the Financial Division at Salomon, and after
24   the Treasury auction scandal in August of '91, I
25   moved out of the controller's world and into
        TSG Reporting - Worldwide (877) 702-9580

Page 7

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    Operations and eventually was running Sali's
3    U.S. operations.
4        In '96 I went over to run Salomon's
5    European operations and get the firm ready for
6    the introduction of the euro.
7        '9 -- back end of '97, Salomon got
8    taken over.  I hung around for a year and then
9    joined Barclays in November of '98.  So I've
10   been out of school since '79, been on Wall
11   Street since '79, and primarily on the back, on
12   the infrastructure side, so all in the back
13   office.
14       Q.   You also serve or have served as a
15   director of the Depository Trust Corporation?
16       A.   I am currently on the board of the
17   Depository Trust Company.
18       Q.   How long have you been a DTC board
19   member?
20       A.   I believe this is year three.
21   Certainly more than two.  I'm not sure if it's
22   three or four years now.
23       Q.   Is that a paid position?
24       A.   No, it's not.  DTC is a
25   not-for-profit, industry-owned utility.
        TSG Reporting - Worldwide (877) 702-9580

Page 8

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2        Q.   And if you would, please, Mr. LaRocca,
3    give me a resumé of the positions that you have
4    held at Barclays since you joined in 1998
5    through today?
6        A.   1998, I was hired as the Global Head
7    of Operations and had that position from '98 to
8    2002, 2003.  I'm not exactly sure when that
9    transferred to my responsibilities.
10       In, I believe in 2000, in addition to
11   my operational responsibilities, I was the Chief
12   Financial Officer for Barclays Capital for
13   roughly a couple years, 2000 and 2001.  The CFO
14   had resigned and they had asked me to step into
15   that role.  And those jobs were based in London.
16       In February of 2002, I relocated back
17   to the United States.  At that point in time, I
18   relinquished my chief financial officer role and
19   retained the operations responsibilities
20   probably for another six to twelve months,
21   Global Head of Ops.
22       In addition to running Ops. globally
23   from New York for that period of time, I assumed
24   the role of Chief Administrative Officer for
25   Barclays Capital.
        TSG Reporting - Worldwide (877) 702-9580

Page 9

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2        Q.   That's in about '02?
3        A.   Yes, when I relocated.
4        The chief administrative officer --
5    the way my organization is structured is people
6    have a regional boss and a functional boss, so I
7    had regional oversight of most of the
8    infrastructure groups and the primary oversight
9    initially for Operations, because I was also the
10   functional head, and I have retained those
11   positions -- I'm still the chief administrative
12   officer.  I no longer have primary oversight of
13   Operations, although, like I said, all the
14   infrastructure groups report to me from a
15   regional perspective.
16       Those are kind of what I call my
17   business responsibilities as a result, I am also
18   an officer of many legal entities.
19       Q.   Within the BarCap?
20       A.   Within BarCap family of companies.  So
21   I'm the CEO of its U.S. broker-dealer.  I am the
22   branch manager for Barclays Bank, PLC, the New
23   York branch.  I sit on the board of its Mexican
24   affiliate and am an officer on several of its
25   companies.
        TSG Reporting - Worldwide (877) 702-9580

## Page 10

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    Q.   And, at least from time to time, have
3    to testify?
4    A.   Yeah, this is a first.
5    Q.   Now, at the moment, to whom do you
6    report? Who is your --
7    A.   Rich Ricci.
8    Q.   You're Rich Ricci's direct report?
9    A.   Correct. And have been for some time.
10   Q.   For our purposes, you were reporting
11   directly to Rich Ricci back in September of
12   2008?
13   A.   Correct. Yes.
14   Q.   And how many direct reports do you
15   have? That might be a hard question given these
16   two different regional and functional
17   responsibilities.
18   A.   Excluding administrative, secretarial
19   support, I believe it's four direct reports, and
20   that is -- there's a woman Theresa Fox, who is
21   the branch manager of our Miami office; there's
22   a woman Cristiano Pedote, who runs our Brazil
23   office; there's gentleman Mike Montgomery, who
24   is a BarCap employee who looks after our Homeq
25   and Equifirst.

TSG Reporting - Worldwide (877) 702-9580

## Page 11

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    You know, they have very little to do
3    with the investment banking activities in New
4    York, you know.
5    Q.   Uh-huh.
6    A.   And again, you know, I'm a senior guy
7    and I have regional oversight of all the
8    infrastructure groups, but, you know, I
9    wouldn't, while they report to me locally, you
10   know, I don't do their appraisals, I don't do
11   their comp.
12   Q.   What's sometimes called the dotted
13   line?
14   A.   Dotted line, correct. Although I put
15   input into all of that.
16   Q.   Sure.
17   A.   There's one thing I failed to mention
18   in terms of talking about my background and my
19   role and responsibilities. About a year ago I
20   was put on the board of Barclay Card Delaware.
21   So Barclay Card has a big UK card business and a
22   smaller U.S.-based business, and I've been put
23   on the board of Barclays Card Delaware.
24   Q.   And let me focus you back to September
25   of 2008. You were reporting to Mr. Ricci at

TSG Reporting - Worldwide (877) 702-9580

## Page 12

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    that point. Who were your direct reports in
3    September of 2008? Was it any different from
4    what you have just described?
5    A.   No.
6    Q.   Now, you are familiar, obviously, with
7    the topic that brought us here today, the Asset
8    Purchase Agreement between Lehman and Barclays?
9    A.   Well, I know why you're here, and my
10   familiarity with the Asset Purchase Agreement,
11   you know, I guess we're going to talk about it,
12   because I wasn't part of the deal team, but
13   obviously privy to a lot of information at that
14   time and involved in elements of kind of what
15   went on at that point in time.
16   Q.   Okay. We'll explore that during the
17   day.
18   A.   I'm sure.
19   Q.   If you would, if you could frame it
20   out for me, give me a general description of
21   what your activities or involvement were with
22   respect to the negotiation and conclusion of the
23   deal in that period in call it, you know,
24   September 12 through the closing on the 22nd.
25   You can keep that calendar with you

TSG Reporting - Worldwide (877) 702-9580

## Page 13

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    all day.
3    A.   My first involvement or the first time
4    I became aware of this transaction or a possible
5    acquisition of Lehman Brothers would have been
6    on late afternoon of September 11. I would have
7    gotten a call from Rich Ricci, who indicated
8    that Barclays was thinking about acquiring
9    Lehman Brothers and that he was on his way to
10   New York with Bob.
11   He had given me a phone number of a
12   gentleman named Mark Fisher at Lehman Brothers.
13   MR. STERN: Shafir?
14   THE WITNESS: Mark Shafir. I'm sorry.
15   Mark Shafir.
16   And said, call him up, find out what
17   you can and, you know, he was going to
18   arrive in New York at 3 A.M. and wanted to
19   meet at 3 A.M.
20   Q.   The "he" you're referring to is Bob
21   going to arrive at 3 or Shafir?
22   A.   My conversation was with Rich. I
23   was -- but Rich left me the impression -- I was
24   left with the impression that Bob was with him.
25   Q.   And the Bob you're referring to is Bob

TSG Reporting - Worldwide (877) 702-9580

| Page 14 |
|---|

1　**HIGHLY CONFIDENTIAL - G. LaROCCA**
2　Diamond?
3　　A.　Correct.
4　　**Q.　So what happened next?**
5　　A.　I called -- this was late afternoon,
6　roughly 3 o'clock, and I called Mark Shafir and
7　asked for access to the data room and, believe
8　or not, we didn't get access until much later
9　that night because Mark required us to execute
10　an NDA, non-disclosure agreement, and that took
11　a long -- longer than I thought.
12　　　So around 9, 10 o'clock at night --
13　so, that afternoon of the 11th, gotten a
14　heads-up from Rich, initiated a dialogue with
15　Mark Shafir, and began to mobilize a due
16　diligence team, letting them know that at some
17　point in time in the evening that we were going
18　to have access to a data room and that we needed
19　to be prepared to work through the night
20　because, you know, we were expecting visitors
21　from the UK, Rich and Bob, and needed to be able
22　to have information to share with them at that
23　point in time.
24　　　Now, what I would have done would have
25　mobilized primarily infrastructure people,
　　　TSG Reporting - Worldwide (877) 702-9580

| Page 15 |
|---|

1　　**HIGHLY CONFIDENTIAL - G. LaROCCA**
2　because that's my role as more of a -- more of a
3　back-office oriented than a front office
4　orientation, and would have reached out to the
5　guy that runs our internal real estate and said,
6　you know, you got to look at leases; and would
7　have reached out to our technology person and
8　said that -- he was a former Lehman Brothers --
9　you know, we need to understand their technology
10　infrastructure; would have reached out to
11　someone in HR and said, you know, we want a
12　snapshot of the demographics, compensation, how
13　many of these do they have, what's their
14　geographical, you know, would have -- would have
15　encouraged them to think about what information
16　that they would need to retrieve from the data
17　room in a potential acquisition; would have
18　alerted our internal audit, we're going to want
19　to look at internal audit reports; would have
20　alerted our compliance head.
21　　　You know, it sounds like -- it's
22　probably about ten people in major back office
23　disciplines that I would have alerted that, you
24　know, that they weren't going to go home.
25　　**Q.　Okay. Who was the real estate guy,**
　　　TSG Reporting - Worldwide (877) 702-9580

| Page 16 |
|---|

1　　**HIGHLY CONFIDENTIAL - G. LaROCCA**
2　based on what you remember?
3　　A.　Bill Lista would have been the real
4　estate person.
5　　**Q.　And the IT guy?**
6　　A.　Rich Greenbaum.
7　　**Q.　That's the former Lehman person?**
8　　A.　Correct.
9　　**Q.　And who was HR?**
10　　A.　I think it would have been Mark Kerman
11　or Michael Evans, one of those two individuals.
12　　**Q.　And the internal audit?**
13　　A.　Bob Hart.
14　　**Q.　And compliance?**
15　　A.　Erin Mansfield.
16　　**Q.　Say it again, please?**
17　　A.　Erin, E-R-I-N, Mansfield.
18　　**Q.　And there may have been a couple of**
19　**other categories?**
20　　A.　Yeah, there may have been a couple
21　other categories, you know, may have been
22　additional people.
23　　**Q.　Sure.**
24　　A.　To the best of my recollection, those
25　would typically be people that I would have, you
　　　TSG Reporting - Worldwide (877) 702-9580

| Page 17 |
|---|

1　　HIGHLY CONFIDENTIAL - G. LaROCCA
2　know, would reach out to and engage.
3　　**Q.　So these folks and whatever teams they**
4　**assembled in those area gather in the data room?**
5　　A.　Correct.
6　　**Q.　What happens --**
7　　A.　I'm not sure they gathered in the data
8　room. We had -- the plan was to get access to
9　the data room, right?
10　　**Q.　Uh-huh.**
11　　A.　And that was a -- that was --
12　actually, what they were going to do was give us
13　a window into the data room.
14　　**Q.　Okay.**
15　　A.　And for whatever reason, that was a
16　disaster, right? You know, all our employees
17　had accessing -- had difficulty accessing, you
18　know.
19　　**Q.　Getting onto the site?**
20　　A.　Getting onto the site, accessing data
21　that we believed we needed. You would have --
22　well, I would have thought that a company that
23　was out shopping itself would have been better
24　prepared to share with a possible acquirer a lot
25　of information, and that was anything but the
　　　TSG Reporting - Worldwide (877) 702-9580

Page 18

HIGHLY CONFIDENTIAL - G. LaROCCA

1  case.
2
3        And because, you know, there was an
4  expectation on the part of senior management
5  that we would have information in the morning
6  when the people from the UK arrived, the calvary
7  arrived from the UK, we ended up, a subset of us
8  ended up going over to the law firm's offices
9  that were representing Lehman to try to get
10  access to data in the room.
11        So it was a, you know, what we had was
12  a subset of infrastructure people at Barclays
13  Capital trying to get on the site in an
14  automated way and others who went over and
15  started meeting with Lehman people to try to get
16  data.
17  Q.  Okay.  The law firm was Simpson
18  Thacher?
19  A.  Could have been.  I don't recall.
20  Q.  All right.  So --
21  A.  That was my -- so the nature of my
22  involvement the early part of, you know, the
23  12th and 13th was really a due diligence kind of
24  role and more of a -- more of a coordination, in
25  a coordination capacity.

TSG Reporting - Worldwide (877) 702-9580

Page 19

HIGHLY CONFIDENTIAL - G. LaROCCA

1  I often describe my job as kind of
2  like an air traffic controller, you know, where
3  I'll get a request and then figure out who in
4  our organization are the right resources to, you
5  know, who's got the technical competence and,
6  you know.
7  Q.  Okay.  So there's a point now where
8  Rich Ricci and Bob Diamond arrive, right?
9  A.  Correct.
10  Q.  Describe that to me.
11  A.  They would have arrived early A.M.
12  Friday morning.  I want to say early A.M., could
13  have been 3 or 4 o'clock in the morning.  Didn't
14  have -- you know, I would have spent a little
15  time with Rich, told him what I was doing and
16  would have gotten, yeah, continue what you're
17  doing, we're going to need that data at some
18  point in time.
19        But still very, very early days, we
20  had difficulty in terms of, like I said, getting
21  access to data, right?  And didn't really spend
22  a great deal of time with Rich and/or Bob at
23  that point in time.  I'm not sure if I spent any
24  time with Bob at that time.  My primary

TSG Reporting - Worldwide (877) 702-9580

Page 20

HIGHLY CONFIDENTIAL - G. LaROCCA

1  interface would have been Rich because I think
2  they were focused on, again, they were focused
3  on meeting Lehman people and doing a deal and
4  I'm doing infrastructure due diligence.  And it
5  had, you know, in terms of relative importance
6  to what they were doing, it was kind of a
7  necessary --
8  Q.  Sort of an adjunct?
9  A.  An adjunct, but kind of not high on
10  their priority list, right?  And the -- if I
11  could think about where I spent most of my time,
12  I think about due diligence, right, or, you
13  know, which group did I spend a lot of time
14  with, it would have been with the real estate
15  guys, trying to understand kind of what real
16  estate Lehman Brothers owned, what were the, you
17  know, what their lease arrangements looked like,
18  what they owned, leased, et cetera, and would
19  have -- and would have been Rich's kind of -- I
20  can't think of a better word -- gofer.  He
21  wanted me around if he needed something to, you
22  know, go get Jonathan Hughes, go get --
23  Q.  I'm going to go with the air traffic
24  controller.

TSG Reporting - Worldwide (877) 702-9580

Page 21

HIGHLY CONFIDENTIAL - G. LaROCCA

1  A.  Air traffic controller, okay?
2        And that would have been -- that would
3  have been the nature of my involvement probably
4  from, you know, initial call I got on the 11th
5  through the 14th.
6  Q.  That would take you into the Sunday?
7  A.  That would take me into the Sunday.
8  Q.  Now, there comes a point -- does there
9  come a point in this phase where you are --
10  A.  I don't think I went home at all
11  that -- I'm pretty sure I didn't go home until
12  Sunday night when it looked like the deal wasn't
13  going to happen.
14  Q.  That's sort of the next thing I want
15  to ask about.  How does it come to you that it
16  looks like the deal is not going to happen?
17  A.  I don't -- I'm not sure if it was Rich
18  or Archie Cox or one of the senior members of
19  the BarCap team who indicated that the deal was
20  not going to happen, and the -- I was told, I
21  don't recall by who, but I was made aware of at
22  the time that, you know, we had this issue
23  regarding UK shareholder approval.
24        And so initially Barclays was going to

TSG Reporting - Worldwide (877) 702-9580

Page 22

HIGHLY CONFIDENTIAL - G. LaROCCA

1  acquire all of Lehman Brothers and step into all
2  its trades, right?  But that required
3  shareholder approval and, you know, and because
4  we -- it would take us 30 days to get
5  shareholder approval, it couldn't provide the
6  necessary guarantees, that that was the reason
7  our transaction couldn't proceed.  Because I
8  believe the government was looking for, you
9  know, more formal guarantees at that time.
10     Q.   **The government there is the United**
11  **States Government?**
12     A.   The United States Government.  The
13  U.S. Treasury or the Fed, one of those two
14  agencies, right?
15         So I left late Sunday believing that
16  the transaction had -- the original transaction,
17  where Barclays was going to acquire all of
18  Lehman Brothers, was over and done with.
19     Q.   **Okay.  You referred to Cox as a senior**
20  **member of the Barclays team.  Was there a deal**
21  **team?**
22     A.   I don't know who was on the deal team,
23  right?  I would categorize, from my perspective,
24  and I can't be certain who all the people on the
25
                TSG Reporting - Worldwide (877) 702-9580

Page 23

HIGHLY CONFIDENTIAL - G. LaROCCA

1  deal team, but, you know, it seemed like Rich
2  Ricci was deputized by Bob and Michael Klein
3  was, you know, his advisor.  I'm sure there were
4  other people involved, you know, but Archie
5  being one of them, Tom Kalaris being another one
6  who was I think looking at the wealth business
7  at the time.
8         But, you know, I don't really know
9  exactly what roles they played and what entirely
10  their area of purview was.
11     Q.   **I guess what I should, just so we can**
12  **frame this piece out, you have alluded to it,**
13  **but let me be clear about it on the record, are**
14  **you involved, during this phase from, you know,**
15  **late on the night of the 11th through the**
16  **Sunday, in negotiations of terms with Lehman?**
17     A.   No involvement at all.
18     Q.   **Are you present with anybody is?**
19     A.   Really no involvement at all.  I'm
20  really a due diligence gofer kind of role,
21  right, for Rich.
22     Q.   **Okay.**
23     A.   I'm an extra pair of hands, okay?  And
24  that is through Sunday night, right?
25
                TSG Reporting - Worldwide (877) 702-9580

Page 24

HIGHLY CONFIDENTIAL - G. LaROCCA

1     Q.   **Okay.  Now, you allowed us how the**
2  **deal that was being talked about during that**
3  **period was a global deal, it was for the entire**
4  **firm, right?**
5     A.   Uh-huh.
6     Q.   **How did you learn that?  Let me ask**
7  **you, did you learn that at the time or did you**
8  **learn that sort of after this first project**
9  **ended?**
10     A.   I don't, you know, I don't know how I
11  learned it.  Maybe just being in the
12  environment, you know.  You know, everyone
13  was -- it was a buzz around the place Barclays
14  was going to acquire Lehman Brothers.  I don't
15  know if I was formally -- and I was operating
16  under the impression, maybe rightly, maybe
17  wrongly, that we were going to buy the whole --
18     Q.   **The whole thing?**
19     A.   -- the whole firm, right?  And then
20  advised that that deal had fallen apart.
21     Q.   **Now, in the course of that work --**
22     A.   Right.
23     Q.   **-- you had some access to data.  I**
24  **hear what you say about it wasn't the smoothest**
25
                TSG Reporting - Worldwide (877) 702-9580

Page 25

**HIGHLY CONFIDENTIAL - G. LaROCCA**

1  **access to data, it wasn't as smooth as you would**
2  **have liked it to have been and there was some**
3  **difficulties there, but with that, did you and**
4  **your due diligence team, were you able to**
5  **assemble some data about Lehman and get a better**
6  **understanding of the company?**
7     A.   How do I answer this question?  I
8  actually really wasn't privy to a lot of the
9  data, right?  The -- I was really mobilizing
10  resources, right?  There's a group of people
11  from the UK are traveling, right?  And I was
12  kind of like, you know, Gerard, we need to get a
13  head start in advance, right?  So, you know, so
14  the example I gave was, you know, HR would have
15  been a group that I reached out to, right?
16  The -- I'm certain they got the data that they
17  needed.
18     Q.   **Right.**
19     A.   Did that ever -- did I ever look at
20  that data, see that data, did it ever -- no,
21  right?
22     Q.   **So to use HR as an example, if the**
23  **person in charge of HR --**
24     A.   Mark Kerman.  I would presume he got
25
                TSG Reporting - Worldwide (877) 702-9580

Page 26

HIGHLY CONFIDENTIAL - G. LaROCCA

1  what he needed.
2      Q.   You don't know one way or the other?
3      A.   Don't know one way or the other. The
4  only data that I saw was the real estate data,
5  okay? Because I was involved with our real
6  estate people in terms of looking at the real
7  estate that they owned, where did Lehman have
8  offices, et cetera.
9      Q.   Se, again, to use the HR example, if
10 someone on the HR team had developed a view or
11 some knowledge about --
12     A.   I wouldn't know.
13     Q.   -- global bonus accruals, that's not
14 something you would know?
15     A.   I wouldn't know. Absolutely wouldn't
16 know.
17     Q.   All right. So you haven't slept for a
18 couple of days. It's Sunday. That phase has
19 ended. What happens next?
20     A.   What I don't recall, what I don't
21 remember is whether if I got calls Sunday night
22 or Monday morning, you know. I mean, it was
23 all -- when I tell you I, you know, if I got 90
24 minutes' sleep that week, it was...

TSG Reporting - Worldwide (877) 702-9580

Page 27

HIGHLY CONFIDENTIAL - G. LaROCCA

1      So I got a call either late Sunday
2  night or early A.M. on Monday morning and --
3      Q.   Just so we can have a clear record,
4  when you say Sunday night, you're on Sunday
5  night, the 14th?
6      A.   The 14th or the 15th.
7      Q.   Okay.
8      A.   And that possible that we may buy --
9  I'm trying to -- how I found out. Someone would
10 have called me. I don't recall who it was
11 called, said come back, you know, and was told
12 we may be buying the U.S. broker-dealer, that
13 the LBI hadn't declared bankruptcy.
14     And when I initially found out, I'm
15 thinking we're buying the U.S. broker-dealer. I
16 don't know anything about an Asset Purchase
17 Agreement and, you know, I'm thinking we're
18 buying a U.S. broker-dealer.
19     Now, my role is kind of changed a
20 little bit now. Now I'm no longer in a kind of
21 due diligence coordination role. I get sent
22 over to Lehman Brothers and to sit with the ops.
23 guys and try to be helpful to them, they're
24 dying, they're in -- they're in bad shape

TSG Reporting - Worldwide (877) 702-9580

Page 28

HIGHLY CONFIDENTIAL - G. LaROCCA

1  because, you know, JPMorgan had turned off the
2  pipes, banks were pulling lines, counterparties
3  were closing them out, walking away from trades.
4  And so I was told, you know, to go over to
5  Lehman Brothers and try to be helpful because
6  I'm an experienced ops. guy and would have --
7      You know, so that kind of consumed my
8  Monday, well, that kind of -- I was heavily
9  involved in that the whole week, and then on --
10 that would have been a big part of my Monday.
11 And Monday or late afternoon, I became aware
12 that from -- and I would have become aware from
13 Jonathan Hughes, who told me that the Fed had
14 reached out to him and had asked him to -- and
15 that -- so on Monday late afternoon, I believe,
16 I believe it was Monday, Jonathan had alerted me
17 that the Fed was financing Lehman Brothers and
18 they were looking for Barclays to help in some
19 kind of way.
20     At that point in time, it really
21 didn't resonate with me because, you know, I was
22 fighting a lot of fires and, you know, trying to
23 settle trades and leverage my relationships on
24 Wall Street to try to get, you know, banks to

TSG Reporting - Worldwide (877) 702-9580

Page 29

HIGHLY CONFIDENTIAL - G. LaROCCA

1  assist and cooperate, et cetera.
2      On the 16th, the Tuesday, Jonathan
3  came back to me again and said, you know, the
4  Fed wants to meet with us, they want us to -- I
5  don't remember the exact words -- they want us
6  to step into their trade with Lehman Brothers.
7  It might not have been the words he used, but
8  the tone of what he was very different than the
9  conversation I had with him on Monday. I
10 remember it being very different because it got
11 my attention on the Tuesday a lot more than it
12 got on the Monday.
13     Q.   Can you give me a little more detail
14 on that? How had his tone changed? It was more
15 urgent? It was angry? It's loud?
16     A.   It was more urgent.
17     Q.   Okay.
18     A.   And said we needed to get on the phone
19 with the Fed, okay? And Jonathan used words
20 like if the Fed is going to support this, you
21 know, if we want the Fed to work with us and to
22 support this transaction that we want to try to
23 do, that we're going to have to step into
24 that -- we're going to have to take the Fed out

TSG Reporting - Worldwide (877) 702-9580

Page 30

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2  of my -- of their financing obligation with
3  Lehman Brothers.
4         I participated in a phone call with
5  the Fed on that Tuesday, and -- and you're going
6  to ask me who it was with, and I don't recall,
7  and after my phone call, the urgency was evident
8  to me and I dropped what I was doing and headed
9  down to the Fed and I met with -- now, I'm not
10 sure if I -- I don't know if I went down on the
11 Tuesday night.  I think so, I'm almost, I'm
12 almost positive it was Tuesday night early
13 evening and met with Lucinda Brickler and other
14 colleagues of hers from the Fed.
15        And Lucinda had explained to me that
16 the Fed was financing Lehman Brothers, had
17 provided roughly $45 billion in financing for
18 Lehman Brothers, and that they were using --
19 that Lehman was using three facilities to
20 finance collateral and the Fed had lent them $45
21 billion.
22    Q.  Do you know what the three facilities
23 were?
24    A.  If you say them, I'll -- one was Open
25 Market Operations, one is --
        TSG Reporting - Worldwide (877) 702-9580

Page 31

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2    Q.  OMO?
3    A.  OMO.  There was --
4    Q.  TLSF, yes?
5    A.  Treasury -- TLSF sounds right.  And
6  what's the third one?
7    Q.  PDCF?
8    A.  PDCF.  Those would be the three,
9  right?
10        And they had explained that Lehman had
11 put collateral into those three facilities and
12 the Fed had advanced them $45 billion, right?
13 And they wanted -- they didn't have -- the Fed
14 did not have a problem that if Barclays stepped
15 into that trade, that we could use the
16 facilities because it would take us -- they knew
17 it would take us time to find financing, you
18 know, financing with third parties.  It would
19 take some weeks to find financing.
20        So they left me with the impression
21 they didn't have a problem -- they had a problem
22 with Lehman being the counterparty to the Fed
23 and were more comfortable with Barclays being
24 the counterparty to the Fed, and them seeing a
25 way that Barclays had, over a couple of week
        TSG Reporting - Worldwide (877) 702-9580

Page 32

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2  period, would be able to put that collateral out
3  on the street.
4         So worked with Lucinda that night, and
5  the Fed replacement transaction was kind of
6  developed.  Told her that she was looking --
7  they were anxious, right?  Were hoping that we
8  could execute on Wednesday.  We told them that
9  we wouldn't be prepared.  We didn't have any
10 idea, you know, while we drew this up on the
11 blackboard, you know, I needed to go back and
12 figure out how it was going to work.
13    Q.  Right.
14    A.  And there was just so much uncertainty
15 about data, you know, didn't know the collateral
16 that the Fed was holding and, you know, needed
17 to talk to our ops. people.  And, you know, so
18 Wednesday would have been a day of preparation
19 in anticipation of beginning doing this
20 transaction on that Thursday.
21    Q.  So this Wednesday, the 17th --
22        I'm putting the days in so we have a
23 record by number as well.
24    A.  Yeah.  Yeah.
25    Q.  So you leave the Fed, you told them
        TSG Reporting - Worldwide (877) 702-9580

Page 33

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2  we'll do this, but I can't get it done today?
3    A.  We're going to do it on Thursday,
4  right?  And they seemed to be fine with that.
5  They were just, you know, they were expecting a
6  Friday closing and seemed to be okay that
7  Thursday was the day.
8    Q.  Were you expecting a Friday closing at
9  that point, too?  Was that the timeline people
10 were working on?
11    A.  You know what, I was expecting a
12 Friday closing.  It became -- and I don't know
13 why, I don't know where, you know, again, it
14 could have been chatter in the -- in our
15 facilities.  It became, you know, from my
16 personal experience, it became very evident that
17 if it had to go through another weekend, this is
18 personal experience, they were having a great
19 deal of difficulty, Lehman Brothers, just
20 getting through a day because they were flying
21 blind.
22        They had -- they didn't know the
23 status of their trades.  They hadn't reconciled
24 the bank accounts.  They hadn't reconciled their
25 stock record in several, several days in advance
        TSG Reporting - Worldwide (877) 702-9580

Page 34

HIGHLY CONFIDENTIAL - G. LaROCCA

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2   of when -- even before I got in there. I mean,
3   when was the last time you reconciled your stock
4   record, I would ask, and they would say they
5   hadn't reconciled in weeks because JPMorgan was,
6   you know, shutting the -- not providing any --
7   not only did they not provide any intraday
8   liquidity, they denied them access to the
9   system.
10        So the quality of data was -- was
11  horrible.
12      Q.   Okay.
13      A.   Absolutely horrible.
14      Q.   I interrupted you. Let me put you
15  back where we were, I think, in the timeline.
16  You had this conversation with Lucinda. You
17  told her what you can get done and what you
18  can't get done on the Wednesday?
19      A.   We were going to try to do it on
20  Thursday.
21      Q.   Do you leave the Fed?
22      A.   Leave the Fed.
23      Q.   What happens then?
24      A.   Go back to the office, mobilize the
25  team, you know, tell them that we're going to
         TSG Reporting - Worldwide (877) 702-9580

Page 35

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2   try to --
3      Q.   People must be really sick of seeing
4   you show up now. You're mobilizing teams...
5      A.   Mobilizing teams, right? And it's
6   very -- you know, in theory, it's a very simple
7   transaction, right? So the Fed is going to
8   release collateral to Lehman Brothers, right?
9      Q.   Uh-huh.
10     A.   Barclays is going to wire $45 billion
11  in money to Lehman, and Lehman is supposed to
12  deliver to us the collateral that it had held at
13  the Fed, right? That was supposed to be -- that
14  was the transaction which was agreed.
15     Q.   Okay.
16     A.   Okay?
17     Q.   What next?
18     A.   The Thursday we begin to move money
19  and assets start coming across. We have all
20  kinds of operational difficulties. We had
21  difficulties getting started, difficulties
22  coordinating with JPMorgan, and as you
23  undoubtedly know, that the transaction that
24  started in the middle of the afternoon didn't
25  get completed until -- well, never really got
         TSG Reporting - Worldwide (877) 702-9580

Page 36

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2   completed, but we were moving securities into --
3   the transaction would have started sometime in
4   early afternoon, late morning on Thursday and it
5   didn't get -- we stopped moving securities at
6   Friday, would have been after 12 o'clock, that
7   the Fed had -- DTC had closed the securities
8   wire.
9      Q.   Let me clarify that a little bit
10  because I'm not sure I understand the timing.
11  You're into Friday. When you say 12 o'clock,
12  are you at noon?
13     A.   So noon on Thursday, right? On or
14  around noon on Thursday. Could have been a
15  little before, a little after we moved cash over
16  to JPMorgan and securities started trickling
17  across, right?
18     Q.   The cash is how much? 45 billion?
19     A.   Originally, the -- we moved 5 billion
20  initially, and the securities did not move
21  across quickly, and as a matter of fact, we
22  actually didn't get $5 billion worth of
23  securities for the first $5 billion worth of
24  cash that moved across.
25        At that point in time, I alerted the
         TSG Reporting - Worldwide (877) 702-9580

Page 37

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2   Fed, and I would have called, I'm not sure if it
3   was Lucinda Brickler or Stephanie Heller, that
4   we had agreed a transaction, we were having a
5   great deal of difficulty because JPMorgan was
6   not cooperating, and they had gone onto the --
7   they had gotten -- I was told that they were
8   going to reach out to JPMorgan. I can't tell
9   you what they said.
10        They came back to me, the Fed, and
11  said that JPMorgan wanted to hold the excess
12  collateral in margin for the transactions to
13  satisfy, you know, their potential exposure to
14  Lehman Brothers, and I said that's a
15  non-starter, that's not the transaction that we
16  had agreed on the Wednesday.
17        We had agreed a transaction with the
18  Fed to take the Fed out of the transaction, not
19  for Barclays to satisfy or, you know, JPMorgan's
20  exposures to Lehman Brothers. That was a lively
21  discussion with me and the Fed, and at that
22  point in time, I had escalated to Rich Ricci
23  that JPMorgan was -- I don't know the words I
24  would have used. I don't know that --
25     Q.   Something colorful?
         TSG Reporting - Worldwide (877) 702-9580

Page 38

1    **HIGHLY CONFIDENTIAL - G. LaROCCA**
2        A.    Something colorful, right?  They
3    didn't play nice in the sandbox, okay?
4        And, you know, and several -- now
5    hours have passed, right?  And, you know, we
6    haven't done -- we haven't moved much cash and
7    much securities.
8        Q.    **Right.**
9        A.    I'm not sure of the -- what discussion
10    took place with the Fed, but the Fed came back
11    and said JPMorgan indicated that they were going
12    to cooperate.
13        Q.    **Okay.  When you say you're not sure**
14    **what discussion, the discussion between the Fed**
15    **and JPMorgan?**
16        A.    Fed and JPMorgan.  I'm not privy to
17    that conversation, right?  So, but the Fed came
18    back to me and had indicated that JPMorgan was
19    going to cooperate, right?
20        Q.    **Okay.  So what happened next?**
21        A.    And because of the now the Fed wire
22    and DTC, I mean, now we're past the deadline,
23    right?  And there was -- and we're wondering how
24    we're going about to get this transaction done.
25        Q.    **This transaction being the --**
TSG Reporting - Worldwide (877) 702-9580

Page 39

1    **HIGHLY CONFIDENTIAL - G. LaROCCA**
2        A.    The Fed replacement transaction given
3    the we've already asked for extensions and the 5
4    billion took hours and it was trickling in and
5    the systems weren't working, right?
6        Q.    **Who do you have to ask for extensions?**
7        A.    The Fed, normally, in a normal course
8    of business, okay, the dealer community would
9    ask one of its two clearing banks, it would be
10    Bank of New York or JPMorgan, right, to keep the
11    securities wire open or the money wire open.
12        And it's done through a clearing bank,
13    so the dealers don't talk to the Fed, right?  On
14    occasion, 30 years of experience, when the
15    security wire or money wire is kept open for
16    prolonged periods of time, sometimes the Fed
17    will want to talk to the dealer or the
18    participant who's causing the extension.
19        Q.    **Okay.**
20        A.    In this instance, the Fed was party to
21    the transaction.  They were, you know --
22        Q.    **They're in it?**
23        A.    So I don't know that we asked.  They
24    were going to keep it open to, you know, to help
25    us.
TSG Reporting - Worldwide (877) 702-9580

Page 40

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2        Q.    **Got it.**
3        A.    Right?  And they -- but still
4    concerned about how this, you know, how this was
5    going to happen and get done on time.  We talked
6    about internally at Barclays -- who?  Me, Rich
7    Ricci -- about, you know, moving $40 billion in
8    one go.  And, you know, it's a lot of money and
9    that decision carried kind of great personal
10    risk for me and also tremendous risk for
11    Barclays, and while I was given assurances that
12    from the Fed that JPMorgan was going to play
13    ball or cooperate, my experience that week with
14    them grabbing collateral, them turning the pipes
15    off at Lehman Brothers, caused me great concern
16    and was very concerned that we would be exposed
17    that kind of money.
18        Rich kicked the decision up.  I don't
19    know exactly the conversation that he had with
20    Bob, but what came back to me was that Bob had
21    gotten assurances from Bill, I think it's Bill
22    Winters from JPMorgan, that all the collateral
23    would move across.
24        So we moved 40 billion in one go, I
25    don't recall the time, late afternoon or early
TSG Reporting - Worldwide (877) 702-9580

Page 41

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    evening of Friday, and securities started to
3    come across in glacier-like speed, just -- and
4    I'm not sure why the systems were creaking.  I'm
5    not sure.  Just it took -- you know, there was
6    no rule book for what was happening.  These
7    aren't, you know, this is not, you know, this
8    transaction is not getting processed like a
9    normal transaction, you know, and securities
10    moved till well after midnight.
11        And Barclays is expecting, you know,
12    something greater than $45 billion worth of
13    securities or, you know, and the number we were
14    expecting were in the neighborhood of 49 to 50
15    billion dollars worth of securities, assuming
16    there were normal haircuts assign to the
17    collateral.
18        MR. STERN:  When you said "well after
19    midnight," are you sure of your recollection
20    on that?
21        THE WITNESS:  It was after midnight.
22    On or around midnight.  "Well after" maybe
23    is not the right, Jack --
24        MR. STERN:  I'm sorry, I just wanted
25    to be accurate.
TSG Reporting - Worldwide (877) 702-9580

Page 42

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    Q.    It's a good point, because let's --
3    A.    It was --
4    Q.    And just so I can further clarify
5    this, after midnight on the midnight from
6    Thursday over to Friday?
7    A.    Correct.
8    Q.    Okay.  Okay.  So at some point very,
9    very late on Thursday or early Friday?
10    A.    Right, the Fed and DTC closed the
11    securities wire.
12    Q.    Okay.
13    A.    Because they needed to be open for
14    business the next day.  And we found ourselves
15    short, didn't really know how short we were
16    because, you know, we didn't really have a lot
17    of time to -- we had no time to look at
18    collateral, valuations.  No time, right?  And
19    were relying on information that values that
20    were being assigned by the systems, okay, that
21    suggested that we had approximately $42 billion
22    worth of securities couldn't be absolutely sure,
23    you know, because we didn't -- didn't know what
24    we were -- what was coming across.
25         When it became evident that we were
         TSG Reporting - Worldwide (877) 702-9580

Page 43

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    short, our ops. guy got on the phone with a
3    JPMorgan guy.
4    Q.    Who is your ops. guy?
5    A.    John Rodefeld.
6         And I would have instructed him to get
7    some cash back, and JPMorgan at that point in
8    time wired $7 billion in cash.  So I left Friday
9    morning in the wee hours, you know, sometime
10    between 1 and 3, thinking that, you know, we got
11    roughly 49 to 50 billion in collateral, you
12    know, and thinking that we're going to have to
13    finish this transaction at a later date.
14    Q.    Okay.  You're thinking you got 42 plus
15    7.  What happens next?
16         Actually, can I withdraw that?  I want
17    to go back to something you just said.  You said
18    you looked at the collateral valuation, et
19    cetera, and you were relying on values assigned
20    by the system.  Could you tell me what you meant
21    by that?
22    A.    No.  You're probably better placed
23    talking to an Ops. guy, right?  Because somehow,
24    right, so I'm not -- I'm in 745 or 200 Park.
25    I'm in Manhattan.  Our ops. guys are in New
         TSG Reporting - Worldwide (877) 702-9580

Page 44

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    Jersey and somehow they were able to keep a
3    running total --
4    Q.    Of what's coming across?
5    A.    -- of what's come across, right?  And
6    I don't know how they did that, so I don't
7    know --
8    Q.    Let me just press that a little bit,
9    see if -- did anybody talk to you about the
10    values that were -- did the values you're being
11    informed about come from the Bank of New York
12    valuation, because they're like holding the
13    collateral?
14    A.    I don't really know the specifics.  I
15    would be speculating.  I really --
16    Q.    I don't want you to do that.
17    A.    I really don't know.  Based upon my
18    experience, right, you know, I would think that
19    the Bank of New York would have no difficulty
20    assigning values to wirable securities.
21    Q.    Hold them, right?
22    A.    Treasuries and mortgage-backed,
23    Ginnie, Fannie, Freddie, highly liquid markets
24    because that's what they do.  They're a
25    tri-party bank and they value the securities.  I
         TSG Reporting - Worldwide (877) 702-9580

Page 45

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    would imagine that they would have a great deal
3    of difficulty pricing non-wirable securities.
4    They would have no difficulty with wirable and
5    equities, listed stocks, and it would all be all
6    the non-investment grade, illiquid products that
7    they would have a great deal of --
8    Q.    Like give me some examples.
9         MR. STERN:  Let him finish.  You were
10    saying illiquid products would have a great
11    deal of?
12    A.    Difficulty pricing.  Actually, not
13    only would they have difficulty pricing, right,
14    but the market is in major meltdown mode, right?
15    So I know from our own books, right, you know,
16    there's no markets, prices are moving like -- we
17    didn't know what it was we were going to get.
18    We were hoping we were going to get something
19    more -- we would end up in a position that we
20    had something more than 45 billion in cash that
21    went across, but we couldn't be absolutely
22    certain.
23         We had, you know, thousands and
24    thousands and thousands of Cusips.  We didn't
25    know if we're getting, you know, AAA-rated
         TSG Reporting - Worldwide (877) 702-9580

---

Page 46

```
 1        HIGHLY CONFIDENTIAL - G. LaROCCA
 2   corporates or wallpaper.  You know, so it was a
 3   lot of uncertainty, a lot of risk, and --
 4        Q.   Okay.
 5        A.   -- so there's a running total being
 6   kept.
 7        Q.   Yeah.
 8        A.   Okay.  That running total gets
 9   communicated to me it's 42 billion, right, but
10   these guys aren't, you know, these are ops. guys
11   and they're not traders and they're not making
12   markets in the securities, right?  There are
13   no -- you know, so, you know, we wanted 7
14   billion in cash.
15        They moved 7 billion in cash to our
16   account.  I left, communicated to the Feds, said
17   we didn't do the transaction, all the collateral
18   didn't move across, we got what we think is
19   roughly 42 billion in collateral and 7 billion
20   in cash, and, you know, I'm -- I'm probably not
21   going home.  I'm probably going to a hotel now.
22        Q.   You're at least getting some sleep
23   now, right?
24        A.   I don't know if I was getting -- I
25   didn't get sleep.  I maybe was going for a
```
TSG Reporting - Worldwide (877) 702-9580

Page 47

```
 1        HIGHLY CONFIDENTIAL - G. LaROCCA
 2   shower, because I -- I had a hotel room, but it
 3   wasn't to sleep in.  It was to shower and to --
 4   I really didn't sleep.  It was, you know...
 5        Q.   So what happens next?
 6        MR. STERN:  Where are we in time?
 7        Q.   We are in the wee hours of Friday
 8   morning.  You've been told by the ops. guys that
 9   42 billion plus 7 billion in cash has come
10   across.
11        A.   Right.  Okay.  I'm pausing.  I just
12   want to remember.  The closing is scheduled that
13   afternoon, right?  On Friday, the 19th, right?
14   And I would have explained to Rich and Michael
15   Klein kind of what happened, right?
16        So they had that information, and it
17   becomes -- I'm not sure -- I'm not sure of the
18   timing of it, if someone said anything to me or
19   if it's a function of being in the room or, you
20   know, it's becoming evident to me that the
21   securities that came across in the -- from the
22   Fed are the securities that are going to be in
23   the -- now we're doing an Asset Purchase
24   Agreement, we're not buying the broker-dealer,
25   and the securities that we're going to purchase
```
TSG Reporting - Worldwide (877) 702-9580

Page 48

```
 1        HIGHLY CONFIDENTIAL - G. LaROCCA
 2   are going to be the ones that have come across
 3   from the Fed.  So somehow that lightbulb goes
 4   off on Friday, right?  For me.
 5        I'm trying to recall.  That's very,
 6   very -- I remember going to the closing.
 7        MR. STERN:  You said something about
 8   telling Rich and Klein.
 9        A.   I told Ricci and Michael Klein that we
10   didn't get all our securities, we got cash, we
11   somehow have to complete the transaction, you
12   know, don't know what it is we got in the way of
13   collateral, you know, we need to get traders to
14   look in at it.  I'm not sure that we got
15   collateral that was held by the Fed, I'm not
16   sure we got collateral that was held by
17   JPMorgan, I'm not sure about anything, right?
18   You know, I'm very, very concerned that, you
19   know, about what it was we had moved across.
20        Q.   Okay.
21        A.   Right?  Someone explained to me, and I
22   didn't know this at the time, and I'm in a room
23   with a bunch of lawyers, that when, under repo
24   law, in a bankruptcy, right, the collateral --
25   we're not getting -- that's not a transaction
```
TSG Reporting - Worldwide (877) 702-9580

Page 49

```
 1        HIGHLY CONFIDENTIAL - G. LaROCCA
 2   that, the way we structured it, was a repo,
 3   right, a reverse repo for Barclays, that, you
 4   know, that's not going to unwind, that trade,
 5   you know, the Fed is going to be left with cash
 6   and we're going to be left with collateral and
 7   we didn't know what it was we had.
 8        We didn't know what it was we had, the
 9   markets were tanking, the world was melting
10   down, and there was a great deal of concern
11   about what it was we -- what it was we had come
12   across, and so I would have alerted Michael that
13   we ended up with what we believed to be $42
14   billion, or what the system said, we needed to
15   get traders to look at it, and we got $7 billion
16   in cash.
17        Q.   Michael is Michael Klein?
18        A.   Michael Klein and Rich Ricci, okay?
19        And then I went to the, that
20   afternoon, I went to the bankruptcy proceeding,
21   you know.  I was just fascinated.  I hadn't
22   seen, you know, about what was transpiring in
23   the market, you know, what wasn't, you know,
24   sitting in the gallery and then --
25        Q.   In the main room or up on the other
```
TSG Reporting - Worldwide (877) 702-9580

Page 50

HIGHLY CONFIDENTIAL - G. LaROCCA

1 floor?
2     A.    The main room.
3         And someone indicated to me that -- I
4 don't know who, it would have been -- could have
5 been one of Barclays' lawyers or it could have
6 been one of Barclays' employees, but someone --
7 it became evident to me while I was sitting in
8 the gallery that this transaction could -- they
9 wanted to close on Friday night, so that would
10 require Barclays to move money Friday night.
11         At that point in time, I left because
12 I'm thinking, you know, money wire goes down at
13 6 o'clock and our money is going to move on
14 Monday. I'm just thinking, you know, first
15 thing Monday, we're going to settle this
16 transaction. What I found out being in that
17 room is that the Fed is going to keep the
18 systems open. They want money -- they want this
19 trade to close that night. I got out of there
20 because, again, I had to --
21     Q.    You're going to mobilize another team
22 new, aren't you?
23     A.    I got to mobilize another team to move
24 cash. What accounts, you know, and, you know,

TSG Reporting - Worldwide (877) 702-9580

Page 51

HIGHLY CONFIDENTIAL - G. LaROCCA

1 and so I didn't stay very long.
2     Q.    About what time did you leave? Is it
3 still light out? Dark?
4     A.    It was still light. It was still
5 light.
6         Went back and stood by the phone, and
7 then it became, at some point in time, became
8 evident that it didn't close and, you know, and
9 then there was a discussion -- this is where now
10 I'm really going to get vague. Then there was
11 discussion about how do we complete, you know,
12 what's going to happen on Monday, how do we
13 complete the transaction.
14         I wasn't privy to that. I wasn't part
15 of the deal team. You know, that was
16 negotiations that I presume were done by Rich
17 and Michael and Lehman Brothers and, you know...
18     Q.    So how are you picking up your
19 information about what's -- you're not in those
20 negotiations, right?
21     A.    Not in those negotiations.
22     Q.    How are you picking up your
23 information that Friday evening about what's
24 going the happen next? What's going to gear you

TSG Reporting - Worldwide (877) 702-9580

Page 52

HIGHLY CONFIDENTIAL - G. LaROCCA

1 toward a Monday closing?
2     A.    What I'm told is Monday morning we're
3 going to complete the securities, the Fed
4 replacement transaction.
5     Q.    Who tells you that, do you remember?
6     A.    Could have been Rich or Michael Klein
7 or --
8     Q.    Yeah, I want to be -- I don't want to
9 be unfair about my question because sometimes
10 you say it's picked up in the buzz and sometimes
11 you don't know.
12     A.    I don't know, okay? I don't know.
13     Q.    Okay.
14     A.    That I didn't pick up in the buzz. I
15 don't know who told me.
16     Q.    Okay.
17     A.    But I was definitely told that we're
18 going to complete the transaction, that we were,
19 you know, that JPMorgan was going to sub
20 collateral for that $7 billion in cash.
21     Q.    So then you go home for the weekend
22 and play golf for two days?
23     A.    That's exactly right, yeah.
24     Q.    What happens next?

TSG Reporting - Worldwide (877) 702-9580

Page 53

HIGHLY CONFIDENTIAL - G. LaROCCA

1     A.    I go to the closing.
2         MR. STERN: More seriously, the
3 question on the weekend, what did you do?
4     Q.    What are you doing Saturday? What's
5 going on?
6     A.    I don't remember.
7     Q.    Well, let me see if I can give you
8 sort of a guide point. Does there come a point
9 where you learned that the court approved the
10 sale?
11     A.    Yes.
12     Q.    Okay. Now, about when does that
13 happen?
14     A.    I just don't remember.
15     Q.    Okay. We know, and there's a
16 transcript that we'll -- that would show that
17 the court announces it's going to approve the
18 sale shortly after midnight into the early
19 morning of Saturday, right? Over Friday night,
20 it's like 20 after midnight, and the hearing
21 ends?
22     A.    It had to open -- it had to take place
23 before the opening on Monday, I think is what I
24 was told.

TSG Reporting - Worldwide (877) 702-9580

Page 54

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2      Q.   Okay. That makes some sense. So now
3    we have the judge right after midnight on Friday
4    into Saturday, the hearing ends, right? And
5    then you're aiming at a before-opening close on
6    Monday?
7      A.   Correct.
8      Q.   I'm doing this just so see if I can
9    refresh your recollection about what's happened
10   in these time segments, okay?
11     A.   Don't remember.
12     Q.   Are you busy with the deal in some
13   fashion or other on Saturday or Sunday?
14     A.   I was there that weekend because I
15   didn't go home.
16     Q.   Okay.
17       MR. STERN:  "There" being Weil Gotshal
18   or Barclays?
19       THE WITNESS:  I'm sorry?
20       MR. STERN:  Where is the "there"?
21     Q.   Where were you?
22       MR. STERN:  Where are you?
23     A.   At Barclays, I think at 200 Park.
24     Q.   I'm going to show you in a couple of
25   minutes, because I bet you thought this was over

TSG Reporting - Worldwide (877) 702-9580

Page 55

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2    when you told me everything, but -- I'm kidding.
3      A.   You know, I --
4      Q.   This is very helpful.
5      A.   And then, and Monday morning --
6      Q.   Can I go back to the weekend for a
7    second? I'm going to show you in a couple of
8    minutes a clarification letter that you
9    signed --
10     A.   Okay.
11     Q.   -- that's being -- and maybe you're
12   not the one, but that's being negotiated during
13   that period. Does that refresh your
14   recollection about what topics you were
15   addressing over the weekend?
16     A.   I'm a signator on every legal entity
17   for Barclays. I think I alluded to that in my
18   background, right? So I probably signed, you
19   know, so many documents that weekend, you know.
20     Q.   Are you involved over the weekend on
21   the Friday or the Saturday or the Sunday in any
22   back and forth about what this clarification
23   letter will contain?
24     A.   No.
25     Q.   Okay.

TSG Reporting - Worldwide (877) 702-9580

Page 56

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2      A.   No.
3      Q.   Okay. So tell me what you remember
4    next?
5      A.   Monday turning up at a law office, I
6    don't remember which one, if it was Cleary or
7    Weil Gotshal, I don't know where it was, walking
8    into a room, not unlike this, with about more
9    lawyers than, you know, a lot of lawyers, right?
10       And there was a discussion all of
11   about ten minutes about the $7 billion where we
12   talked about agreeing the collateral that would
13   come across for that $7 billion, right? And
14   there was a -- it was a sheet of paper, to the
15   best of my recollection, put in front of me of
16   kind of collateral that JPMorgan wanted to give
17   us.
18       We said that was unacceptable because
19   we believed the collateral to be worth -- well,
20   I shouldn't say -- we believed the collateral to
21   be less, worth less than the cash and we were
22   expecting something more than $7 billion worth
23   of collateral because of the haircuts.
24       And JPMorgan said, how about you -- I
25   shouldn't say -- the lawyers for JPMorgan said

TSG Reporting - Worldwide (877) 702-9580

Page 57

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2    how about you just keep the cash, and we said
3    okay because we wanted to facilitate the close.
4    I would have said okay. I actually got
5    criticized for that decision because I should
6    have got $7 billion worth of the securities plus
7    the margin, something greater, right?
8       And then the deal team was going to go
9    away and make the amendments to reflect that
10   that Fed, you know, that the transaction had to
11   change or the asset purchase or whatever had to
12   change for now because we weren't going to
13   complete the transaction.
14       I hung around at the law offices and
15   executed documents and then I went home and got
16   much needed sleep.
17     Q.   Okay. Now --
18       MR. STERN:  I think at some point
19   before 11 we should take a little short
20   break, whenever it's a convenient time.
21       MR. GAFFEY:  Two or three questions
22   and that's a very good breaking point.
23     Q.   Now, I just want to go back to the
24   documents you executed. Do you know what you --
25     A.   I don't remember.

TSG Reporting - Worldwide (877) 702-9580

Page 58

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  Q.  Did you know at the time, or is it a
3  lot of papers flying around?
4  A.  I presumed it was the deal closing
5  documents, you know, and --
6  Q.  Okay.
7  MR. GAFFEY: Let's take a break now,
8  okay?
9  MR. STERN: Yes.
10  (Recess; Time Noted: 10:44 A.M.)
11  (Time Noted: 10:53 A.M.)
12  BY MR. GAFFEY:
13  Q.  Mr. LaRocca, I want to go back to --
14  I'm going to go back over quite a bit of what
15  you told me, but I would like to go back for a
16  moment to, you said that on the Friday the
17  decision was there should you take the cash, and
18  you said --
19  A.  No, Monday morning.
20  Q.  I beg your pardon, Monday morning.
21  And you said okay and you were criticized for
22  that.  Who criticized you for that?
23  A.  A colleague of mine, a gentleman Mike
24  Keegan, indicated to me that, you know, you
25  should have got securities plus the margin so,

TSG Reporting - Worldwide (877) 702-9580

Page 59

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  theoretically, we could have gotten some more
3  value.
4  Q.  And what's Keegan's job?
5  A.  He's a trader -- well, he manages a
6  trading unit of -- manages a trading -- manages
7  a trading unit of credit assets, right?  So an
8  illiquid trading book.
9  Q.  Tell me, just so I can frame this,
10  tell me what you remember about the conversation
11  with Keegan.  What did you say, what did he say,
12  as best you remember?
13  A.  I, what seemed like either that day or
14  the next day, that same day, I said, you know,
15  we got cash, right?  Thinking that cash is king
16  and we, you know, and instead of having illiquid
17  assets and given the market volatility.  And
18  Mike said, well, we should have got more than 7
19  billion.  We should have got securities worth 7
20  billion plus the haircut.  I don't know that
21  those were his words, you know, but ...
22  Q.  Did he express any concern about the
23  quality of the securities that came over?
24  A.  No.
25  Q.  No?  Did anybody express concern about

TSG Reporting - Worldwide (877) 702-9580

Page 60

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  the quality of the securities that came over?
3  A.  No one -- no one would have expressed
4  concern to me, but I don't think anyone had time
5  to look, right?  You know.
6  Q.  So how is Keegan in this conversation?
7  I'm trying to get a sense of it.  This sounds
8  like anything that would range from he's --
9  A.  Mike is -- not certain of Mike's role
10  on the deal, right?  My impression of Mike's
11  role on the deal is he would have some
12  responsibility for figuring out what it is we
13  got in the way of collateral, right?  So he's
14  ultimately going to be responsible for managing
15  a subset or a piece of assets that have come
16  across.  So that would be his role.
17  Q.  And did Mike express any view about
18  any of the assets that came over, good assets,
19  bad assets?
20  A.  No.
21  Q.  Do you know if by the Monday anybody
22  had looked to see whether -- to make any
23  determination about the quality of the assets
24  that came over, quality of the securities that
25  came over?

TSG Reporting - Worldwide (877) 702-9580

Page 61

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  A.  I would imagine -- I don't know that
3  definitively.  I would imagine that they had a
4  lot of traders looking at the assets that came
5  over.  I would imagine they were trying to sell
6  and trying to understand what -- I would imagine
7  traders are looking at assets, one, to try to
8  sell the assets and, two, to figure out who
9  would borrow those securities so we could
10  finance those positions.
11  The Fed was going to allow us to put
12  that collateral back to them into those three
13  facilities, but not for a prolonged period of
14  time.  They had an expectation that we would --
15  that they would be able to step out of the
16  trade.  They were able to, instead of finance
17  Lehman Brothers, now they were financing
18  Barclays, and they had an expectation that we
19  would get rid of those assets or finance them
20  through third parties.
21  Q.  So Mike, the view that Mike expressed
22  was you should have gotten the 42?
23  A.  Should have gotten -- the view that
24  Mike expressed was specifically was related to 7
25  billion in cash.

TSG Reporting - Worldwide (877) 702-9580

Page 62

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2    Q.    Okay.
3    A.    Right? Because, theoretically, that 7
4    billion in cash should have attracted something
5    greater than $7 billion in collateral.
6    Q.    So, okay, so you have the 42 --
7    A.    Uh-huh.
8    Q.    -- of securities plus the 7 billion in
9    cash?
10   A.    Correct.
11   Q.    Mike's view is if you got 7 billion,
12   you should have gotten 7 billion more in
13   securities plus a haircut?
14   A.    Securities plus a haircut, correct.
15   Q.    And nothing he says in this
16   conversation expresses any view about the
17   quality of what you did get, the securities that
18   you did get?
19   A.    No. I'm not a trader, so I'm not --
20   Q.    I'm just trying to find out what Mike
21   said.
22       (Exhibit 202, a document bearing Bates
23   Nos. ECI-EX-00000042 through 43, marked for
24   identification, as of this date.)
25   Q.    Mr. LaRocca, I've put before you what

Page 63

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2    we've marked as Deposition Exhibit 202, a
3    two-page document bearing Bates number
4    BCI-EX-00000042 to 43. Take a look through that
5    and let me know whether you've seen the document
6    before, and just let me direct your attention to
7    your name at the very end of that distribution
8    list.
9    A.    I see I'm on the distribution.
10       (Document review.)
11   A.    I don't recall seeing this, right?
12   I've read it, right? And at a high level I
13   understand it, but I suspect this is probably
14   one of hundreds of documents that you'll have my
15   name on.
16   Q.    Okay. Well, having looked through it,
17   and I understand you haven't had time to study
18   it, does it roughly lay out -- we're on
19   Thursday, September 18, shortly after midnight.
20   See the time and date on there up at the top?
21   A.    Yes, I see the time. I'm trying to
22   put that in context.
23       MR. STERN: Take your time to read it.
24   A.    All right. So this is Thursday in the
25   early A.M. before we move the securities, right?

Page 64

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2    Q.    Well, that's what I'm going to ask
3    you.
4    A.    Okay. Okay.
5    Q.    Having looked through it, I don't want
6    to spend a lot of time on this document, does it
7    roughly lay out what the plan was with respect
8    to --
9    A.    Yeah, roughly it does. Right? So
10   like I said, came back from the Fed on Wednesday
11   night, mobilized the team, and they're obviously
12   working through the night figuring out how we're
13   going to do this.
14   Q.    Now I'd like to move in time to --
15   A.    Do you want this back?
16   Q.    Just keep it over there because
17   sometimes we go back to the exhibits.
18       (Exhibit 203, a document bearing Bates
19   Nos. BCI-EX-00000080, marked for
20   identification, as of this date.)
21   Q.    Mr. LaRocca, you have in front of you
22   a one-page e-mail which we have marked as
23   Deposition Exhibit 203, bearing Bates No.
24   BCI-EX-00000080?
25   A.    Yes.

Page 65

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2    Q.    Do you recall receiving this e-mail?
3    A.    Do not recall receiving this e-mail.
4    Q.    Who is Marty Malloy?
5    A.    Marty Malloy is a trader in our stock
6    loan area who would be responsible for trying to
7    finance some of this collateral with third
8    parties after it arrived.
9        MR. GAFFEY: Can we go off the record
10   for one second?
11       (Discussion off the record.)
12   Q.    The e-mail is entitled "Totals for the
13   Fed Facility Collateral," and there's an
14   annotation on here that says, "Total securities
15   and cash received: 52.19." I'm assuming these
16   numbers are in the billions, yes? I can read
17   that as 52.19 billion?
18   A.    I would think so.
19   Q.    Okay. And further up there, there's
20   an entry that says "Repo Cash: 7 billion"?
21   A.    Okay.
22   Q.    I'm trying to get this into a timing
23   context. Does this reflect how much value
24   Barclays received -- well, thought it received
25   as of September 19 at 11?

Page 66

HIGHLY CONFIDENTIAL - G. LaROCCA

1       A.   I have no idea. Right? I just have
2   no idea. I don't know where Marty's getting
3   these numbers from.
4       Q.   Uh-huh.
5       A.   How he's describing, you know, he's,
6   you know, you know, he's reporting me some
7   numbers. I'm on an e-mail where he's reporting
8   some numbers that suggests we got 52 billion.
9   This would have been 11:51 A.M., right?
10      Q.   Uh-huh.
11      A.   I just, I don't know how he -- I don't
12  know where he got the numbers from or how he
13  would have gotten the numbers from.
14      Q.   There's a phrase you used before,
15  "excess collateral," and there's an entry here
16  for excess collateral of 7.19. What do you
17  understand Mr. Malloy to be reporting to you
18  there?
19      A.   I have no -- I just don't know what
20  that number is.
21      Q.   Well, you got the repo cash amount.
22      You know, actually, I'm not sure we've
23  used this term all morning, so let me -- apart
24  from the document for a moment, when you've been

TSG Reporting - Worldwide (877) 702-9580

Page 67

HIGHLY CONFIDENTIAL - G. LaROCCA

1   talking about the Fed facility?
2       A.   Right.
3       Q.   And then the Barclays what you call
4   the replacement transaction?
5       A.   Fed replacement transaction, right.
6       Q.   These are repurchase agreements, yes?
7       A.   I hesitate because I -- I don't, you
8   know, I don't know how the, you know, I don't
9   know if there are documents associated with the
10  transaction and what the documents say, right?
11  From a processing point of view, okay, from a
12  processing point of view at a high level, I
13  think of it as a simple reverse repo where I
14  reverse in collateral and I pay cash.
15      Q.   Uh-huh.
16      A.   Now, the reality of that is, at a high
17  level, but the devil's in the details, right, so
18  the wirable securities are going to get
19  processed one way, equities are going to get
20  processed one way, corporates will get processed
21  a different way, they're going to settle
22  differently, how they're reflected in our
23  systems, whether it be, you know, you know, so
24  at the high level, I think like you think, you

TSG Reporting - Worldwide (877) 702-9580

Page 68

HIGHLY CONFIDENTIAL - G. LaROCCA

1   know, it's a -- it's being -- I think of it as a
2   reverse repo.
3       Q.   Okay.
4       A.   I think of a Fed replacement
5   transaction as a reverse repo.
6       Q.   So the repo cash amount that's listed
7   here on Exhibit 203 --
8       A.   Right.
9       Q.   -- that would be -- that's the 45
10  billion that Barclays sent over, yes?
11      A.   I presume that's what it is, yes.
12      Q.   And the margin which is put at 14
13  percent here, right? Is that what you have
14  referred to as the haircut?
15      MR. STERN: Objection to the form.
16      A.   I just don't know where these numbers
17  are coming from or how Marty's derived it,
18  right?
19      Q.   Okay.
20      A.   My recollection is having 42 and being
21  short 7.
22      Q.   You know, I'm going to go back to
23  that. It's one of the reasons I'm being quite
24  careful about -- as careful as I can be about

TSG Reporting - Worldwide (877) 702-9580

Page 69

HIGHLY CONFIDENTIAL - G. LaROCCA

1   the dates I'm asking about.
2       This is the 19th at 11:14 A.M. We'll
3   talk later about whether the 7 billion arrived
4   and ultimately it did or didn't, but if you
5   could just sort of snapshot this for me at the
6   time that you're seeing that e-mail, that's the
7   frame I want to put around my questions, okay?
8       We have marked as --
9       Go ahead, sure.
10      MR. STERN: Let him ask a question.
11  This is the next exhibit.
12      (Exhibit 204, a document bearing Bates
13  Nos. BCI-EX-00000081, marked for
14  identification, as of this date.)
15      Q.   Before you is Exhibit 204 bearing
16  Bates No. BCI-EX-00000081, a one-page e-mail
17  from you to Mike Keegan?
18      A.   Right.
19      Q.   And this appears to be you forwarding
20  to Keegan Malloy's e-mail to you.
21      A.   Yes.
22      Q.   Why did you send that on to Keegan?
23      A.   He would be Steven King's boss. No
24  other reason than, you know, because Steven King

TSG Reporting - Worldwide (877) 702-9580

Page 70

HIGHLY CONFIDENTIAL - G. LaROCCA

1    worked for Mike Keegan.
2        Q.   Okay.  Why would you send it on
3    instead of King sending it on?  Any reason?
4        A.   Maybe Stephen King did.  Maybe Stephen
5    King did send it on.  I don't know, right?  You
6    know, but Mike, like I said, Mike would be, as I
7    indicated earlier, Mike would have some
8    responsibility of managing a subset of this
9    collateral that comes across.  Stephen King
10   works for Mike, so I'm not managing the
11   collateral coming across.
12       Q.   Yeah.
13       A.   It would have been Marty Malloy who's
14   got to finance it.  Stephen King and Mike Keegan
15   who have to manage the risk.
16       Q.   In my own layman's terms, it sounds to
17   me like your job is to get it in the house and
18   somebody else's job to make money with it?
19       A.   Absolutely.  Absolutely.
20       Q.   All right.
21       A.   So Marty's got to worry about
22   financing the assets.  Mike Keegan and Stephen
23   King have to worry about hedging it, managing
24   the risk.  Right?
TSG Reporting - Worldwide (877) 702-9580

Page 71

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2        Q.   When we talked a moment ago about
3    Keegan being critical about accepting 7 billion
4    in cash?
5        A.   Uh-huh.
6        Q.   One of the reasons I have shown you
7    this document is to ask you whether it was this
8    reference to 7 billion repo cash that --
9        A.   No, would not, because Mike made the
10   comment on the Monday after we -- because, you
11   know, after we had taken the cash.
12       Q.   Okay.  Did you have any response from
13   Mike -- there's sort of a gap in the sequence we
14   talked about before over the weekend, and I just
15   want to see if this refreshes your recollection.
16       A.   No.
17       Q.   Any conversations over the weekend or
18   communications over the weekend with Mike about
19   the 7 billion cash?
20       A.   No.  The, again, the -- my job almost
21   kind of on Friday, it's kind of now with traders
22   who got to figure out how to hedge, manage risk,
23   and I'm not part of that -- it's not what I do.
24       Q.   Okay.  Was part of what you do,
25   though, to, you know, as I said, your job is to
TSG Reporting - Worldwide (877) 702-9580

Page 72

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    get it in the house, other people's job to make
3    money with it.  Is this reporting, this is a
4    useful piece of information to you, yes?  This
5    is what somebody thinks arrived, yes?
6        A.   It's of no utility to me.  It's of
7    little utility to anyone.  Okay?  What's going
8    to be important is the detailed listing of the
9    thousands and thousands and thousands of Cusips,
10   the values that have been ascribed to each
11   Cusip, and then traders could begin to do their
12   work, right?  This is -- this isn't worth the
13   paper it's printed on.  Just, you know, the --
14       Q.   So, as you sit here today looking at
15   it, you don't know one way or the other whether
16   it's an accurate description?
17       A.   Correct.
18       Q.   Okay.  We're done with that for now.
19   Thanks.
20       A.   I don't even know, okay, if the
21   valuations, the running totals that I alluded to
22   earlier, if they're current prices, the day
23   before's close.  You know, securities are coming
24   across.  I alluded to the ops. guys are trying
25   to keep a running total, right?  You know,
TSG Reporting - Worldwide (877) 702-9580

Page 73

HIGHLY CONFIDENTIAL - G. LaROCCA

1    relying on systems.
2        A.   
3    I mean, you got to remember the
4    markets are volatile, right?  And everyone at
5    Barclays is concerned that we're going to be
6    short, you know, and because the markets
7    movement, markets are moving, markets were very
8    volatile during that period of time.
9        Q.   Let's go back now into the chronology
10   we were talking about before.  When last we left
11   it, you went to the closing, some stuff got
12   signed, you went home and got some sleep.
13       You mentioned before Barclays was
14   concerned that it might be short.  Is there any
15   determination made after the closing about that?
16       A.   Again, I'm not privy to -- I'm just
17   not in that circle, right?  I mean...
18       Q.   Well, let me ask you this.  What are
19   your activities with respect to the transaction
20   starting on --
21       A.   On the Monday?
22       Q.   Yeah, after the closing.
23       A.   Starting to work on integration,
24   thinking about integrating -- let me pause.
25   Would have been thinking about integration would
TSG Reporting - Worldwide (877) 702-9580

Page 74

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2  have been an area of focus initially. Shortly
3  after the close, the next day or Tuesday or
4  Wednesday, it became evident that the 7 billion
5  wasn't in our account. It would have been a
6  huge area of focus, would have been on the phone
7  with the Fed.
8       So getting $7 billion back,
9  integration, and Barclays had provided some
10 intraday liquidity to Lehman Brothers earlier in
11 the week. We wanted to get that money back,
12 too.
13     Q.   What was the intraday -- describe the
14 intraday liquidity they provided earlier in the
15 week?
16     A.   Barclays had -- Citigroup was going to
17 resign as Lehman Brothers' CLS clearer, and
18 Citigroup was going to resign as Lehman
19 Brothers' clearing bank for foreign exchange,
20 and Barclays provided some intraday liquidity.
21     Q.   And if you could, this is an area I'm
22 not familiar with, could you take me through the
23 steps that that involves? I need a little more
24 detail there.
25     A.   CLS, the acronym stands for
        TSG Reporting - Worldwide (877) 702-9580

Page 75

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2  "continuous link settlement," is a utility that
3  enables its members to settle its foreign
4  exchange transactions. Its members are often
5  provided intraday liquidity by its clearing
6  bank.
7       Citigroup was Lehman Brothers'
8  clearing bank. They had refused to -- or, they
9  had informed Lehman Brothers of their intent to
10 resign as Lehman Brothers' foreign exchange
11 clearer. That's a public event that gets posted
12 on their Website, and they were going to do that
13 sometime -- they had indicated they were going
14 to do that sometime the week of beginning the
15 15th they had indicated that they were going to
16 resign. That would have made a very, very
17 difficult situation even more difficult, right?
18      So Barclays -- I got on the phone,
19 being a 30-year Wall Street guy, to the people I
20 knew at Citibank and asked them not to do that,
21 and that worked for a day or two, but then they
22 wanted money. And Barclays advanced -- Barclays
23 provided some intraday liquidity to Lehman
24 Brothers. I don't recall the amount. I -- for
25 some reason, 700 million rings a bell.
        TSG Reporting - Worldwide (877) 702-9580

Page 76

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2       So, you know, so after the -- going
3  back to your original question, what was I
4  focused on was, you know, getting our money back
5  from Citibank, getting our $7 billion from
6  JPMorgan, starting to work on integration. You
7  know, I'm not focused on asset valuation.
8  That's the traders and risk and accountants who
9  got to reflect it on our books and records.
10     Q.   Now, the integration you're talking
11 about, I just want to talk in top level terms,
12 you're talking about integrating systems and
13 people?
14     A.   Yeah. Yeah. At the highest level,
15 right.
16     Q.   And does some of that integration
17 process also involve determining what
18 contracts --
19     A.   No.
20     Q.   -- need to be taken over --
21      Let me just put the question so we
22 have a clear record.
23      -- what contracts need to be taken
24 over, assumed by Barclays?
25     A.   No, that wouldn't have been an area
        TSG Reporting - Worldwide (877) 702-9580

Page 77

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2  that would have gotten any significant attention
3  from me.
4       Q.   From you, okay. Who would be the
5  person to pay significant attention to that
6  area?
7       A.   The -- I'm trying I'll tell you what I
8  do remember, okay, is there was -- there is
9  reference to cure payments, right? And I don't
10 know how I became aware of cure payments as that
11 being -- that's an issue, right? We needed to
12 pay Lehman's vendors because there was concern
13 about them "turning off the lights" was the
14 expression was used, right?
15      So, from an integration point of view,
16 you know, I became aware that there were cure
17 payments and there were vendors that needed to
18 be paid and Lehman had been delinquent in terms
19 of paying some third parties.
20      I think it was brought to my attention
21 by Legal, okay? I understand Legal to be
22 negotiating -- you know, there's cure payments
23 component to the deal. So, at the highest
24 level, that was kind of my understanding, and
25 what I did was I assigned a resource to look
        TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  after that. That gentleman's name is Jai
3  Westwood. He's one of my direct reports and,
4  you know, he would have, again, been trying to
5  go figure out what needs to be done and be a
6  central point of contact.
7      Q.   And other than assigning him to it,
8  did you have any involvement in it?
9      A.   No.
10         I want to clarify. There was the --
11 other than assigning him, I had nothing to do
12 with it, with the one exception being, and I'm
13 not sure if it's days or weeks after, there was
14 a debate or a dispute with American Express, and
15 I didn't have much to do with it other than I
16 knew there was some kind of disagreement between
17 Barclays and American Express as to whether, you
18 know, we should honor, step into that
19 commitment.
20         I don't know the details. It was
21 brought to my attention by someone in Legal and
22 Jai Westwood, and I said just reach a
23 settlement. So, other than that, I was not
24 involved -- not involved in that aspect of the
25 integration contracts.

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2      Q.   Let's go back to the area that you
3  said was a huge area of focus. That's the,
4  shortly after the closing, it was realized that
5  7 billion was not in your account?
6      A.   Yes.
7      Q.   Take me through the steps of that.
8  Who realizes it and what follows?
9      A.   After that Monday, after the closing,
10 we had -- we -- I had instructed our ops. guys
11 to move the $7 billion in cash out of our
12 account at JPMorgan into our account at the Bank
13 of New York.
14         Our ops. guys instructed JPMorgan to
15 move the cash. JPMorgan did not act on those
16 instructions. That would have been escalated to
17 me, their failure to act. We would have
18 instructed again movement on Tuesday. Tuesday I
19 believe I was alerted that the cash was no
20 longer in our account.
21         To the best of my recollection, that
22 was the timeline. So Monday we believed the $7
23 billion was in our account. I had seen a bank
24 statement to evidence its existence in our
25 account. We tried to move the money out of our

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2  account into our account at Bank of New York,
3  and I believe it was Tuesday that I was informed
4  that the cash was no longer in our account.
5      Q.   So what happened then?
6      A.   Would have escalated to numerous
7  people.
8      Q.   Presumably Rich Ricci, right?
9      A.   Rich Ricci and Jonathan Hughes would
10 have been certainly two people. Maybe more, but
11 certainly would have alerted our legal group and
12 Rich Ricci and would have also alerted the Fed.
13 It would have been most likely Stephanie Heller
14 at the Fed.
15     Q.   Why would it most likely be Stephanie
16 Heller at the Fed? Was that someone you dealt
17 with?
18     A.   Stephanie would have -- I think during
19 the week I alluded to the fact that when we
20 started the replacement transaction and JPMorgan
21 wasn't moving the securities over in a timely
22 basis, they wanted to hold the margin, right, to
23 satisfy their liens against Lehman Brothers.
24 Stephanie would have been the person that became
25 my interface.

TSG Reporting - Worldwide (877) 702-9580

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2      Q.   Okay.
3      A.   Okay? So Lucinda Brickler was the
4  person that we negotiated how the transaction
5  was going to work, and then regarding the
6  performance of JPMorgan during -- Stephanie
7  somehow emerges as my interface.
8      Q.   Okay. All right. So it's escalated
9  to Ricci, Hughes --
10     A.   And the Fed.
11     Q.   -- and the Fed. What happens after
12 that?
13     A.   Then Jonathan Hughes becomes the
14 primary interface with JPMorgan.
15     Q.   Did you ever learn what happened to
16 the $7 billion? It was in your account?
17     A.   It was in our account.
18     Q.   And now it's not in your account?
19     A.   Now not in our account.
20     Q.   Did you ever learn where it went?
21     A.   No.
22     Q.   Through today you've never learned
23 where the 7 billion went?
24     A.   No.
25     Q.   Do you know if Barclays got it back?

TSG Reporting - Worldwide (877) 702-9580

Page 82

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2     A.    Well, I know we -- I know Barclays
3   reached a settlement with JPMorgan. I was at
4   that settlement at the bankruptcy court and we
5   got something less than $7 billion.
6     Q.    Do you know how much you got?
7     A.    I can't be precise. So if you want a
8   definitive, specific amount, no. I think if you
9   want a range, my recollection might have been in
10   the 4 billion plus change, you know, 4 billion
11   plus -- again, I'm, you know --
12     Q.    Yeah.
13     A.    -- it's not my, you know. If that was
14   my job, I would know the numbers like I would
15   know my phone number, but that wasn't --
16     Q.    What were the components of what you
17   received, cash and securities?
18     A.    Cash component and stock component or
19   cash and securities component. I don't know if
20   the securities were equities, government, I just
21   don't know.
22     Q.    Do you have any recollection of how
23   much the cash component was?
24     A.    No.
25     Q.    And again, I'll ask you about the

TSG Reporting - Worldwide (877) 702-9580

Page 83

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   quality of the securities that Barclays got as
3   part of the JPM settlement. Do you have any
4   knowledge about that?
5     A.    No.
6     Q.    So what I'm pressing on here a bit is
7   what you know or don't know about the basis for
8   saying you got -- that what Barclays got was
9   worth something less than 7 billion. I'm just
10   looking for your personal knowledge about that.
11       Why do you say that?
12     A.    I was at the court proceedings and the
13   judge asked for a value to be ascribed, and
14   people testified that or, you know, that the
15   value was significantly less than the $7
16   billion, so it should be a -- it should be -- it
17   should be a court record. So my knowledge is
18   what I've heard.
19     Q.    Okay.
20       (Exhibit 205, Motion Under 11 U.S.C.
21     Sections 105 and 363 and Fed. R. Bankr. P.
22     9019(a) for Entry of an Order Approving
23     Settlement Agreement, marked for
24     identification, as of this date.)
25     Q.    Mr. LaRocca, I have put before you

TSG Reporting - Worldwide (877) 702-9580

Page 84

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   what we have marked as Exhibit 205, a document
3   entitled Motion Under 11 U.S.C. Sections 105 and
4   363 and Federal Rule of Bankruptcy Procedure
5   9019(a) for Entry of an Order Approving
6   Settlement Agreement.
7       It's a fairly long document. Take a
8   minute, you don't have to read the whole thing,
9   but just enough to familiarize yourself with
10   what's in there.
11     A.    Is this the document that got --
12   that's December that got presented or --
13     Q.    Yeah, I think so.
14     A.    December 22 --
15       MR. STERN: Yes.
16     A.    Okay.
17     Q.    Just so you can put in your own head
18   where we are here, there's an affidavit by you
19   in here, which is the last document. It's like
20   the last ten pages or so.
21     A.    The last ten pages?
22     Q.    Yeah.
23       MR. STERN: Let me just show you.
24   There's a motion, right? It's a legal
25   motion. Then there's a settlement

TSG Reporting - Worldwide (877) 702-9580

Page 85

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2   agreement, and then after the settlement
3   agreement, I think there are a couple of
4   declarations. One is Shari Leventhal and
5   one is yours.
6       THE WITNESS: Uh-huh. Did I sign
7   this?
8       MR. STERN: Your declaration is --
9       THE WITNESS: I know I signed this.
10   Did I sign the settlement agreement? Rich
11   did. Looks like Rich signed it. Okay.
12       MR. STERN: So do you want him to
13   review his declaration.
14     Q.    Yeah, my question -- my first question
15   is have you seen all of this before, but then
16   we're going to ask about your declaration.
17     A.    I clearly have seen my declaration. I
18   think I've seen Shari Leventhal's declaration.
19   I recall seeing Shari's declaration, although I
20   don't remember it and I would have to read it
21   again.
22     Q.    Okay.
23     A.    Regarding this -- the -- I don't
24   recall -- I don't recall receiving this
25   settlement agreement.

TSG Reporting - Worldwide (877) 702-9580

Page 86

HIGHLY CONFIDENTIAL - G. LaROCCA

1  Q.  That's attached in there?
2  A.  That's attached.  May have, because I
3  got a lot of documents, but I don't recall
4  receiving the settlement agreement.
5  Q.  And do you recall seeing before --
6  there's another affidavit in here, Declaration
7  of Jeffrey Moore.  It's the one right in front
8  of yours.
9  A.  No, I don't know who Jeffrey Moore is.
10 Don't recall.
11 Q.  Let me just clean up a little bit of
12 that and then we'll move into your declaration,
13 but take a look at -- could you turn to Jeffrey
14 Moore's declaration?
15 A.  Yeah, you know what?  I'm reading this
16 now.
17 Q.  Yeah.
18 A.  I think I might have seen this now.
19 Q.  That's the Jeffrey Moore declaration?
20 A.  Yeah.
21 Q.  Okay.
22 A.  This is -- yeah, there's comment that
23 the value of securities would be substantially
24 less than the securities that the Fed valued on

TSG Reporting - Worldwide (877) 702-9580

Page 87

HIGHLY CONFIDENTIAL - G. LaROCCA

1  that night was our biggest concern at Barclays.
2  We didn't really know the values that had -- the
3  Fed had ascribed.  I think we were flying, I
4  don't know, blind.
5  Q.  Okay.  Well, when Mr. Moore says in
6  paragraph 6 of his declaration, "In my opinion,
7  the value on the date hereof the 'Settlement
8  Consideration Fed Portfolio Securities'
9  identified in Annex A to the Settlement
10 Agreement that is the subject of the motion is
11 substantially less than $5.743 billion (i.e.,
12 the difference between (x) $7.0 billion and (y)
13 the sum of $1.25 billion and $7.1 million
14 referred to in Sections 1(a) and 1(c)(y) of such
15 Settlement Agreement."
16         Translated, he seems to be saying that
17 the securities component was worth less than
18 5.743 billion.
19 A.  Okay.
20 Q.  Do you know what Mr. Moore's basis was
21 for saying that?
22 A.  No idea.
23 Q.  Okay.  And at the time that these
24 papers were submitted to the bankruptcy court in

TSG Reporting - Worldwide (877) 702-9580

Page 88

HIGHLY CONFIDENTIAL - G. LaROCCA

1  or around December of 2008, did you have any
2  knowledge yourself about the value of the
3  securities component of the settlement?
4  A.  No, none whatsoever.
5  Q.  Okay.
6         (Exhibit 206, a letter from Hamish
7  Hume dated July 31, 2009, marked for
8  identification, as of this date.)
9  Q.  If you could take a look at what we've
10 marked as Exhibit 206, Mr. LaRocca.  I'd ask you
11 whether you have seen it before.  Well, let me
12 ask you, have you seen it before?
13 A.  No, I don't think so.
14 Q.  I'm giving you this just to frame the
15 next document I'm going to show you, and I'm
16 directing your attention to paragraph 1(c) of
17 this letter, which is from Mr. Stern's partner,
18 Hamish Hume, to me, dated July 21, and it's
19 transmitting some documents that were produced
20 in the case.
21         Paragraph 1(c) refers to a spreadsheet
22 from JPMorgan on December 16, 2008 showing
23 securities that were to be delivered as part of
24 the JPM settlement, and it's got a Bates number

TSG Reporting - Worldwide (877) 702-9580

Page 89

HIGHLY CONFIDENTIAL - G. LaROCCA

1  range, okay?
2         (Exhibit 207, a document bearing Bates
3  Nos. BCI-EX-00099493 through 99517, marked
4  for identification, as of this date.)
5  Q.  Mr. LaRocca, I have in front of you
6  what we have marked as Exhibit 207, bearing
7  Bates Nos. 99493 through 99517.  This is the
8  document referred to in the letter that I just
9  showed you.
10 A.  Uh-huh.
11 Q.  That's the same Bates range.  Have you
12 seen this schedule before?
13 A.  No, I don't believe so.
14 Q.  Have you ever seen the schedule
15 showing securities that were to be delivered as
16 part of the JPM settlement, Annex A?
17 A.  No, I don't believe so.  I want to
18 clarify.
19 Q.  Sure.  Sure.
20 A.  Okay.  I have no doubts, right, that
21 there are schedules to -- that I am CC'd on that
22 shows --
23 Q.  Some number?
24 A.  -- listings of securities, of Cusips

TSG Reporting - Worldwide (877) 702-9580

Page 90

HIGHLY CONFIDENTIAL - G. LaROCCA

1 and, you know, that are going between Ops. and
2 salesmen or traders or Bank of New York or
3 JPMorgan. I mean, but, you know, my job is not
4 to reconcile, sort those things, so if I got
5 this, I wouldn't have even opened the
6 attachment.
7    Q.  Okay.
8    A.  And if so, you know, not only -- so I
9 don't recall seeing it, and I just wouldn't have
10 been looking at spreadsheets and --
11    Q.  Okay.
12    A.  I don't have --
13    Q.  As I get it, at best, what your job is
14 is to make sure whoever needs to see that to
15 analyze it does, yes?
16    A.  So if someone sent me a document that
17 this is what JPMorgan, I would have hit forward,
18 you know, John Rodefeld, forward Marty Malloy,
19 and, sssht.
20    Q.  That's back to that air traffic
21 controller role we talked about before?
22    A.  Absolutely. I mean ...
23    Q.  I'm going to give you three documents
24 at once here. Now, I've placed before you,

TSG Reporting - Worldwide (877) 702-9580

Page 91

HIGHLY CONFIDENTIAL - G. LaROCCA

1 Mr. LaRocca, what we have marked at previous
2 depositions as Exhibits 86B, 87B, and 88B, and
3 with respect to all three documents, I'll ask
4 you, have you seen them before?
5    A.  These specific documents, you know,
6 with absolute certainty, I don't recall. I
7 would not be surprised, again, not unlike the
8 comments I made earlier where, you know, I'm
9 CC'd or of every e-mail. These would be reports
10 prepared by our accounting group.
11    Q.  Okay.
12    A.  But I wouldn't do any -- you know,
13 again, very much like, you know, someone giving
14 me an FYI, this is kind of how it's broken out,
15 right?
16    Q.  Well, let me ask you this, and again,
17 with respect to all three, if I were to go
18 through the columns on these documents and ask
19 you what they mean and what this is meant to
20 show?
21    A.  I can speculate, but I couldn't tell
22 you with a hundred percent certainty. Right?
23    Q.  Okay. Do you know, as a general
24 matter, again, without regard to the documents

TSG Reporting - Worldwide (877) 702-9580

Page 92

HIGHLY CONFIDENTIAL - G. LaROCCA

1 in your hand --
2    A.  Yeah.
3    Q.  -- just generally, do you know if any
4 work or any type of project was undertaken
5 within Barclays to value the securities received
6 in connection with the JPM settlement?
7    A.  In connection with?
8    Q.  With the settlement. With the
9 discussion.
10    A.  The $7 billion?
11    Q.  Yes.
12    A.  I can't be certain.
13    Q.  Okay.
14    A.  I know that there was -- I believe, I
15 believe that there was a spreadsheet of
16 securities that would come across as part of the
17 settlement and I would think that our traders
18 put a value to, but I wouldn't have had sight of
19 that or --
20    Q.  Or involvement in it?
21    A.  Yeah, or involvement in it, but I
22 don't think we would agree to a settlement
23 without the -- without getting a look at the
24 collateral that was going to move.

TSG Reporting - Worldwide (877) 702-9580

Page 93

HIGHLY CONFIDENTIAL - G. LaROCCA

1    Q.  Okay. I want to go back to Exhibit
2 205.
3      MR. GAFFEY: That's the motion papers,
4 please, Jack.
5    Q.  And I want to spend a little time,
6 Mr. LaRocca, on your declaration. If you could
7 turn to that.
8    A.  Which is page?
9    Q.  The problem is I don't have page
10 numbers. I believe it's the last six or seven
11 pages. Actually, if you hand me the document,
12 I'm get you right there.
13    A.  I got it.
14    Q.  So we're at the Declaration of Gerard
15 LaRocca in Support of the Trustee's Motion For
16 Entry of Order Approving the Settlement
17 Agreement?
18    A.  Yes.
19      MR. STERN: Have you read this in a
20 while? He may need to read it.
21      THE WITNESS: Not in a while.
22    Q.  Why don't you take a minute and read
23 it through because we're going to spend some
24 time on this.

TSG Reporting - Worldwide (877) 702-9580

24 (Pages 90 to 93)

Page 94

1     **HIGHLY CONFIDENTIAL - G. LaROCCA**
2       (Discussion off the record.)
3       (Document review.)
4     A.  Okay.
5     Q.  Okay?
6     A.  Yep.
7     Q.  As a general matter, at the time that
8  you signed this, you reviewed it and determined
9  that it was true?
10    A.  Uh-huh.  Correct.
11    Q.  And where you say in paragraph 1 of
12  the declaration that you have -- that, "Except
13  where stated otherwise, I have personal
14  knowledge of the facts set forth in this
15  declaration," that statement is true as well,
16  yes?
17    A.  Right.
18    Q.  Now, in your declaration, Mr. LaRocca,
19  you generally describe what you've been
20  referring to here as the replacement
21  transaction?
22    A.  Uh-huh.
23    Q.  That's when Barclays begins to supply
24  financing that the Fed previously had supplied,
25  yes?
       TSG Reporting - Worldwide (877) 702-9580

Page 95

1     **HIGHLY CONFIDENTIAL - G. LaROCCA**
2    A.  Correct.
3    Q.  And you say in paragraph 6 of your
4  declaration -- withdrawn.  Who drafted this
5  declaration for you to sign?
6    A.  Jonathan Hughes.  Now, Jonathan Hughes
7  would have drafted it.
8    Q.  And I don't want to know the substance
9  of your conversations with Mr. Hughes, but I'd
10  like a yes/no answer to this question.  Did it
11  go through more than one draft?
12    A.  Yes.
13    Q.  Did it go through more than one draft
14  so that you could be certain that what you were
15  saying in there was accurate?
16    A.  Correct.
17    Q.  And again, without the substance, just
18  yes or no, please, did you make corrections to
19  drafts that you saw before a final was arrived
20  at, as opposed to others making corrections?
21    A.  Yes.
22    Q.  Okay.  If you could go back to
23  paragraph 6, you describe in there that -- I'm
24  at the second sentence: "Thus, as Barclays and
25  LBI had agreed, Barclays transferred $45 billion
       TSG Reporting - Worldwide (877) 702-9580

Page 96

1     **HIGHLY CONFIDENTIAL - G. LaROCCA**
2  to LBI at a JPMorgan account that afternoon and
3  early evening," right?
4     Neither there nor anywhere else in the
5  declaration is there a reference to the
6  securities that LBI transferred to Barclays as
7  part of this repo.
8    A.  Okay.
9    Q.  Is there a reason for that?
10    MR. STERN:  Objection to the form.
11  You say "reference to the securities."
12  Well --
13    Q.  Actually, let me be a little more
14  precise.
15    MR. STERN:  Paragraph 6 --
16    Q.  In paragraph 5 there's a reference to
17  securities being pledged.  My question is
18  there's no reference to the amount, the value of
19  securities being sent over?
20    A.  There's no reference to the value,
21  correct.
22    Q.  Is there a reason for that?
23    A.  No particular reason at the time.  It
24  wasn't a conscious omission or anything, just,
25  you know, I wouldn't have known the value so I
       TSG Reporting - Worldwide (877) 702-9580

Page 97

1     HIGHLY CONFIDENTIAL - G. LaROCCA
2  couldn't make a declaration, right?
3    Q.  And you describe through paragraphs 6,
4  7, 8 and 9 what we've been talking about a bit
5  today?
6    A.  Uh-huh.
7    Q.  Which are the difficulties in
8  executing fully on the transaction and the story
9  about the 7 billion cash?
10    A.  Uh-huh.
11    Q.  Is that a fair summary?
12    A.  Correct.
13    Q.  In paragraph 9 refers to opening of
14  business on September 19.  You with me there?
15  It's the second sentence.
16    A.  Paragraph 9, yep.
17    Q.  What you're describing there -- let me
18  read the first two sentences: "When the Fed,
19  Barclays and LBI originally agreed to engage in
20  the replacement transaction, the parties
21  intended for all of the Fed portfolio securities
22  to be delivered to Barclays under the
23  replacement transaction.  As that had not
24  happened as contemplated by the opening of
25  business on Friday, September 19, 2008, LBI and
       TSG Reporting - Worldwide (877) 702-9580

Page 98

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2    Barclays discussed during the business day on
3    September 19 and into the weekend of September
4    20, 2008, the transfer to Barclays of the
5    portion of the federal portfolio securities that
6    had not yet been delivered as originally
7    contemplated."
8         I read you that again to put you at a
9    place and a time. We're on the morning of
10   September 19. Did at any time, sir, it come to
11   your attention, cross your screen in any way
12   that there would be an effort by Lehman to find
13   additional value to give to Barclays? By
14   "additional," I mean apart from what was
15   contemplated in the transfer of the Fed
16   portfolio over to Barclays.
17        A.   Not as it relates to the Fed
18   replacement transaction.
19        Q.   Okay. Do you have knowledge of that
20   as it relates to something else?
21        A.   The -- not specific detailed
22   knowledge.
23        Q.   Uh-huh.
24        A.   My -- the context is Barclays is,
25   again, being around, you know, I'm aware that,

Page 99

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2    you know, Barclays is trying to derive value
3    from the transaction because of we're acquiring
4    a firm, assets that we don't know the value of,
5    assets -- you know, so I'm aware that there's
6    discussion on how do we get value out of this
7    transaction, how do we make sure we don't
8    inherit a mess, don't get toxic assets, don't
9    lose money, you know, the view of management or
10   the people is that, you know, this is a very
11   risky transaction to Barclays and we're going to
12   end up with collateral from the repo transaction
13   that we're not sure what it's worth, you know,
14   the market, you know, so I'm -- you know, but
15   not -- I wasn't privy or part of the deal team
16   at all in terms of other elements of the
17   transaction.
18        Q.   You were in court for a part of the
19   hearing on Friday, the 19th, part of the hearing
20   before Judge Peck on the 19th, correct?
21        A.   Correct.
22        Q.   Okay. We talked about that a bit
23   before.
24        A.   Yeah.
25        Q.   At any point during that hearing did

Page 100

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2    you hear anyone tell the judge that the value of
3    the deal had dropped?
4         A.   I don't recall.
5         Q.   Did you have an understanding by
6    Friday, the 19th, that the value of the deal had
7    decreased, had dropped?
8         A.   On Friday, the 19th?
9         Q.   Yes.
10        A.   From what point -- from what
11   perspective?
12        Q.   From the deal that had been
13   contemplated on Tuesday, the 16th, to the
14   situation as it existed on September -- on
15   Friday, the 19th?
16        A.   Not in a detailed way. I knew that
17   the deal had changed in some way, but no
18   specifics.
19        Q.   You mentioned a bit before, I think, I
20   may be wrong about this, I think you said it was
21   on the Thursday you used a phrase like the
22   lightbulb went on and you realized we're not
23   buying a broker-dealer at this point?
24        A.   Yeah.
25        Q.   Now we're buying assets?

Page 101

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2         A.   Yes.
3         Q.   Moving into the Friday morning --
4    actually, anytime during the Friday, did it ever
5    come to your attention that Barclays had
6    demanded from Lehman that additional sources of
7    value be found and turned over to Barclays,
8    other than the assets that were within the repo?
9         A.   Yes, but no specifics, right? And I
10   would have -- so, yes, right? I was aware that
11   Barclays was looking to give value from the
12   transaction other than the repo, right? And my
13   experience with the repo, right, and the core
14   information that Lehman had provided to us
15   relative to kind of what they believed to be
16   held at the Fed, right, forced me to be cautious
17   about all information that we would have gotten
18   from Lehman.
19        So the -- would have alerted Rich,
20   Rich, you know, Lehman hasn't been able to
21   produce a position report, reconcile bank
22   accounts, reconcile stock record for weeks,
23   right, so you need to be very cautious about
24   value that they say exists.
25        I could give you a very specific

## Page 102

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    example.
3    Q.    Okay.
4    A.    There was some foreign exchange. You
5    can settle European currencies, what I call G7,
6    you know, in CLS. It's kind of a riskless
7    settlement process, right? So that's why I was
8    very comfortable for Barclays to provide some
9    intraday liquidity. Settlement is certain,
10    right?
11        Lehman Brothers has foreign exchange
12    transactions that settled in local markets.
13    They settle outside CLS. They believe that they
14    had a bunch of foreign exchange trades that, if
15    settled, right, would result in value to the
16    organization, to Lehman Brothers, right? Their
17    information was two weeks old, right?
18        And I said, you know, Rich, I said,
19    those trades closed out weeks ago. Those
20    counterparties walked away from those trade. So
21    that way kind of the environment, right? So, do
22    I believe Barclays was looking for value? So, I
23    believe Barclays was grasping at straws because
24    there was so much uncertainty, so much risk.
25    Q.    And specifically with reference to the
TSG Reporting - Worldwide (877) 702-9580

## Page 103

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    Friday, the 19th, and looking for value, there's
3    two general --
4    A.    I can't tell --
5        MR. STERN:  Let him ask you a
6    question.
7    Q.    Let me frame it so you know what I'm
8    looking for. We've got the assets that are
9    within the repo, right?
10    A.    Yeah.
11    Q.    And you mentioned before, and we'll
12    talk some more about this, how the deal became
13    moving those assets over to Barclays?
14    A.    Uh-huh.
15    Q.    My question goes to, outside that box,
16    are there other categories of assets that
17    Barclays told Lehman it wanted in order to close
18    the deal?
19        MR. STERN:  Objection. I have to
20    object to the form of that.
21    Q.    You can answer it anyway, sir. I'm
22    not too worried about admissibility. I just
23    want to set a platform here.
24    A.    I can't give you any specifics. I
25    wouldn't have been part of any of that. You
TSG Reporting - Worldwide (877) 702-9580

## Page 104

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    know, I wouldn't have been involved in any
3    detailed way.
4    Q.    Does the phrase "15c3 funds" ring a
5    bell?
6    A.    Yeah, absolutely. Right? Lehman
7    Brothers believed that there was an excess in
8    15c3 based upon a calculation two, two weeks
9    ago. I would have alerted our deal team that,
10    you know, they can't substantiate any of this
11    data.
12    Q.    Do you know if the 15c3 excess was
13    transferred to Barclays as part of the
14    transaction?
15    A.    No idea.
16    Q.    Do you know anything about an effort
17    to find assets, unencumbered assets, in
18    clearance boxes?
19    A.    I don't know. Can you ask the
20    question again?
21    Q.    You know what, I'm going to withdraw
22    that. There's a letter I want to show you and
23    it's got some stuff in it. It's probably more
24    focused if I give it to you that way.
25        Can we go back to your deposition --
TSG Reporting - Worldwide (877) 702-9580

## Page 105

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    I'm sorry, your declaration for a minute? You
3    describe in here, I'm at paragraph 10 --
4        You're going to need to go back into
5    that.
6    A.    Paragraph 10, yes.
7    Q.    We're at paragraph 10, and you're
8    describing how the replacement transaction was
9    structured as a reverse repurchase transaction?
10    A.    Uh-huh, yes.
11    Q.    And you say, "As part of the APA" --
12    that would be the Asset Purchase Agreement?
13    A.    Yeah.
14    Q.    "As part of the APA, however, Barclays
15    would be acquiring (without LBI having any
16    repurchase obligations) the very securities that
17    had been delivered under the Replacement
18    Transaction. Thus, at the closing of the APA
19    transaction on Monday, September 22, 2008, the
20    Clarification Letter to the APA, dated as of
21    September 20, 2008 (the 'Clarification
22    Letter'))," in paren, "simply terminated the
23    repurchase part of the Replacement Transaction
24    with respect to 'all securities and other assets
25    held by' Barclays 'under the September 18, 2008
TSG Reporting - Worldwide (877) 702-9580

## Page 106

HIGHLY CONFIDENTIAL - G. LaROCCA

repurchase arrangement among' Barclays and LBI.
This termination meant that all of the
securities that were actually delivered on
September 18, 2008, and that were by then held
in a Barclays account at the Bank of New York
were 'deemed to constitute part of the Purchased
Assets' under the APA (and thus LBI would have
no further obligation to 'repurchase' those
securities and Barclays would not be obligated
to deliver such securities back to LBI)."
    Now, I want to go through that a bit
and maybe decode it into some layman's terms,
but also, first, did you have -- when you signed
this declaration and it was referring to all the
securities and other assets held by Barclays,
that would be that would go to Barclays when the
replacement transaction was simply terminated,
when the repo was simply terminated, did you
have an idea what the value, what the quantum of
those securities were?
    A.   No.
    Q.   Do you know if they exceeded the $45
billion that Barclays had given Lehman?
    A.   No.

TSG Reporting - Worldwide (877) 702-9580

## Page 107

HIGHLY CONFIDENTIAL - G. LaROCCA

    Q.   You talked a bit before about that --
you've used the term "excess collateral"?
    A.   Uh-huh.
    Q.   And you said you viewed this as,
essentially, a reverse repo?
    A.   Yes.
    Q.   Is it your understanding that in a
reverse repo there was a haircut?
    A.   Correct.
    Q.   There is protection of some kind?
    A.   Yes.
    Q.   So, and that protection is to be found
in the difference between the amount --
    A.   Of cash.
    Q.   -- funded --
    A.   Correct.
    Q.   -- by the purchaser?
    A.   Uh-huh.
    Q.   And the collateral pledged --
    A.   Pledged.
    Q.   -- by the seller --
    A.   Uh-huh.
    Q.   -- in the first leg of the repo,
right?

TSG Reporting - Worldwide (877) 702-9580

## Page 108

HIGHLY CONFIDENTIAL - G. LaROCCA

    A.   Correct.
    Q.   And a repo as it normally is
conducted, the next day or whatever the term of
the repo is, yesterday's purchaser sells it
back?
    A.   Correct.
    Q.   And delivers back the excess
collateral less the implied interest rate,
right?
    A.   Uh-huh.
    Q.   Now, you mentioned a little while ago
that it came to your attention, it was described
to you somehow that in a bankruptcy that might
not be the way things go?
    A.   The unwind would not, right.
    Q.   Can you expand on that a little bit?
What did you learn about the difference between
what happens in the unwind on a bankruptcy and
an unwind in a non-bankruptcy situation?
    A.   Nothing too interesting here.  Very
simple, right?  So when we agreed to step in for
the Fed as providing financing, and we agreed a
reverse repo, I would have talked to our lawyer,
Jonathan Hughes, our general counsel, and said

TSG Reporting - Worldwide (877) 702-9580

## Page 109

HIGHLY CONFIDENTIAL - G. LaROCCA

we can't do the unwind, and Jonathan would have
said, under bankruptcy law, right, the repo,
you, you know, you don't do the unwind, the
assets don't get tied up, in bankruptcy
proceedings you own the collateral.  Nothing
more than that.
    Q.   Any distinction between, in that
analysis, between the -- between the amount
financed and the excess collateral?  Let's use a
45 and 50 billion dollar example.  There's $45
billion advanced by the purchaser --
    A.   Right.
    Q.   -- here Barclays to Lehman, right?
         And there's 50 billion in security
pledged by Lehman to Barclays?
    A.   It's commonplace, right, if you're
going to close out a repo or close out a
counterparty, the margin is -- accrues to the
dealer, the person that's reversing the
collateral, to cover their risk associated with
a fire sale or collateral liquidation, right?
    Q.   Okay.  So I want to deal with your
understanding of a default in a non-bankrupt
circumstance.  You may have just answered that,

TSG Reporting - Worldwide (877) 702-9580

**Page 110**

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    but I want to make my record as clear as I can.
3        Absent bankruptcy, there's no
4    bankruptcy, and there's a default on a
5    repurchase obligation?
6    A.    Right.
7    Q.    Then yesterday's purchaser --
8    A.    Yes.
9    Q.    -- is holding the collateral?
10    A.    Plus margin.
11    Q.    Plus margin, right?
12        What's your understanding of who gets
13    the margin in that circumstance?
14    A.    I believe the person that owns the
15    collateral.
16    Q.    Okay. Gets to keep it all?
17    A.    Gets to keep it all. Don't know that
18    definitively, but that's my understanding.
19    Q.    And in a bankruptcy situation, does
20    that change?
21    A.    I don't know definitively.
22    Q.    Okay. Did you have, at the time of
23    the transaction, did you have an understanding
24    of what you thought happened in a bankruptcy
25    situation?
     TSG Reporting - Worldwide (877) 702-9580

**Page 111**

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    A.    My understanding is that we would be
3    left with the collateral, right? And there was
4    hope that the collateral would be in excess of
5    the cash, right?
6    Q.    And in the bankruptcy, when there's a
7    bankruptcy in the picture, what was your
8    understanding as to who gets to keep the margin?
9    A.    The Barclays would keep the margin.
10    Q.    And you described in paragraph 10 of
11    your declaration that the repurchase was -- and
12    these are the words -- "simply terminated," end
13    paren, and you're referring to the clarification
14    letter.
15    A.    I'm sorry, where does it reference?
16    Q.    I'm in paragraph 10.
17    A.    "Simply" --
18    Q.    It's the third sentence of the
19    paragraph that begins "thus at the closing."
20    A.    Right.
21    Q.    Just read through that sentence in
22    full to yourself.
23    A.    Yes. Okay.
24    Q.    I guess my question is, did you have
25    an understanding as to why in the clarification
     TSG Reporting - Worldwide (877) 702-9580

**Page 112**

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    letter it was agreed to simply terminate the
3    repurchase?
4    A.    I'm sorry, I don't understand your
5    question, right? You know, my --
6    Q.    Let me try and rephrase it, then,
7    because I don't want to be at cross purposes.
8        If it was your understanding that
9    you'd get to keep the margin anyway?
10    A.    Uh-huh.
11    Q.    Why would you have to terminate the
12    repurchase?
13        MR. STERN: Objection to the form.
14    A.    I'm not sure I understand your
15    question. Here, the declaration says the
16    termination of the repo, it facilitates that
17    those transactions become a part of the Asset
18    Purchase Agreement. You know, the --- I'm not
19    trying to be difficult.
20    Q.    No, no, it's a difficult topic, and
21    I'm -- I don't think you're trying to be
22    difficult.
23    A.    Okay.
24    Q.    It's a complicated thing to ask
25    questions about and to get answers on, so we'll
     TSG Reporting - Worldwide (877) 702-9580

**Page 113**

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    just have to work at it a little bit.
3        I'm going to show you what was marked
4    at a prior deposition, sir, as Exhibit 25.
5    That's a copy of the clarification letter that I
6    think you're referring to in paragraph 10.
7        Take a look through that, sir, and
8    tell me if you've seen it before and take note
9    of what appears to be your signature at the end.
10    A.    Actually, I don't recall seeing it
11    before. Is my signature on a page?
12    Q.    Take a look at the --
13    A.    It wouldn't surprise me since I'm an
14    officer of BCI.
15        There it is, okay.
16    Q.    You got it there?
17    A.    Uh-huh.
18    Q.    That's your signature?
19    A.    Yeah, absolutely.
20    Q.    Okay. And if you can --
21    A.    I see this one didn't have it. That's
22    why --
23        MR. STERN: It's different page.
24        THE WITNESS: Is there a different
25    page? There it is, okay.
     TSG Reporting - Worldwide (877) 702-9580

| Page 114 | Page 115 |
|---|---|

**Page 114**

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    Q.    You see where your signature is?
3    A.    Yes.
4    Q.    Now, the signature pages are what are
5    sometimes referred to as counterpart signature
6    pages. When you signed, do you recall if when
7    you signed the document the signature page was
8    attached to it?
9    A.    I don't remember.
10    Q.    Do you have any recollection of just
11    signing signature pages?
12    A.    I wouldn't normally do that. Right?
13    Q.    When you signed an agreement, you
14    would read through it before you signed it?
15    A.    One of two things. I would either
16    read it myself, but I don't always read all the
17    documents, or I would want to know who has --
18    where the document comes from, who signed it,
19    who's authorized it, right? Whether Legal has
20    seen it.
21    Q.    Do you have any recollection of what
22    process you went through with respect to --
23    A.    Don't even -- don't even remember the
24    document.
25    Q.    I need to just put a full question on

**Page 115**

HIGHLY CONFIDENTIAL - G. LaROCCA

1    the record, okay?
2
3    Do you have a recollection of what
4    process you went through with respect to the
5    clarification letter marked as Deposition
6    Exhibit 25?
7    A.    No.
8    Q.    Okay.
9    MR. GAFFEY: Let's go off the record
10    for a second.
11    (Discussion off the record.)
12    (Luncheon Recess; Time Noted: 12:15
13    P.M.)
14
15
16
17
18
19
20
21
22
23
24
25

| Page 116 | Page 117 |
|---|---|

**Page 116**

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    AFTERNOON SESSION
3    (Time Noted: 12:58 P.M.)
4    GERARD LaROCCA, resumed and
5    testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. GAFFEY:
8    Q.    I want to mark another set of
9    documents so we can talk about them as a set.
10    Mr. LaRocca, I'm putting before you
11    what was marked at a previous deposition as
12    Exhibit 1 and Exhibit 24 and Exhibit 51.
13    Now, what I've put before with you,
14    Mr. LaRocca, Exhibit 1 is entitled Asset
15    Purchase Agreement, Exhibit 24 is a First
16    Amendment, Exhibit 51 is entitled Transfer and
17    Assumption Agreement, and then before the break,
18    I put in front of you Exhibit 25, which is the
19    clarification letter.
20    A.    Yes.
21    Q.    All right. So for a while I want to
22    ask you some questions about this collection of
23    documents.
24    First, let me just ask you to take a
25    look at them sufficiently to tell me whether

**Page 117**

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    you've seen each one before and whether each of
3    them bears your signature.
4    A.    They do bear my signature.
5    Q.    Okay.
6    MR. STERN: Read them carefully now.
7    I'm not sure they all do.
8    A.    The Transfer and Assumption Agreement
9    bears my signature.
10    Q.    Okay.
11    A.    And I believe the Asset Purchase
12    Agreement has my signature. Yes.
13    Q.    And I think what Jack may be referring
14    to --
15    A.    The First Amendment does not bear my
16    signature.
17    Q.    Okay. Do you recognize that to be the
18    signature of Archibald Cox?
19    A.    You know what, I'm not familiar with
20    his John Hancock --
21    Q.    All right.
22    A.    -- to definitively opine.
23    Q.    Put the First Amendment aside for the
24    moment. What do you generally recognize these
25    documents to be?

Page 118

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2     A.   I would just categorize them as part
3  of the agreements and documentation associated
4  with the Barclays transaction with Lehman
5  Brothers.
6     Q.   Now, the first of these that I want to
7  ask you about is Exhibit 1, the Asset Purchase
8  Agreement.
9     A.   Uh-huh.
10    Q.   When we spoke before the lunch break,
11 you described your understanding of what was
12 going on in the early part of the week
13 post-bankruptcy. I'm in that week starting the
14 15th, the Monday.
15         As purchasing a broker-dealer --
16    A.   Correct.
17    Q.   -- and later in the week, don't hold
18 me to the particular date, but I think you said
19 on the Thursday, on the 18th, you understood
20 that it was now to be an Asset Purchase
21 Agreement, that a lightbulb went on, and --
22    A.   Uh-huh.
23    Q.   Taking a look at Exhibit 1, which is
24 entitled "Asset Purchase Agreement," I want to
25 revisit that a little bit.

TSG Reporting - Worldwide (877) 702-9580

Page 119

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2     A.   Uh-huh.
3     Q.   Did you understand it to be an Asset
4  Purchase Agreement at the outset?
5     A.   When you say "at the outset," we're
6  buying Lehman Brothers. That transaction falls
7  apart. Come in on Monday, it's kind of, you
8  know, I'm thinking now we're just buying the
9  broker-dealer, the piece that hadn't filed for
10 bankruptcy. And then somewhere over the next
11 day or two or three, I don't recall when, you
12 know, I'm beginning to hear, we're not buying
13 LBI, LBI is going to declare bankruptcy, we're
14 going to take the employees and buy certain
15 assets.
16    Q.   Okay.
17    A.   Okay?
18    Q.   And you're going to buy --
19    A.   And maybe some real estate I think at
20 that time.
21    Q.   So I want to go back to the Monday and
22 the Tuesday. You have said several times you're
23 not part of the deal team?
24    A.   Uh-huh.
25    Q.   Which I take it to mean is you're not

TSG Reporting - Worldwide (877) 702-9580

Page 120

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2  involved in the negotiations of the business
3  terms?
4     A.   Correct.
5     Q.   The Asset Purchase Agreement that we
6  have marked as Exhibit 1 is dated as of --
7     A.   The 16th.
8     Q.   -- the 16th of September. That's the
9  Tuesday.
10         Did you sign the agreement on the
11 Tuesday?
12    A.   I don't recall.
13    Q.   Do you recall anything about the
14 circumstances when you signed the agreement?
15    A.   I don't recall.
16    Q.   Okay. Do you remember if the
17 signature page that you signed was attached to
18 the agreement when you signed it?
19    A.   I would think so because, like as a
20 rule of thumb, I don't sign --
21    Q.   Free-standing signature pages?
22    A.   -- free-standing signature pages.
23    Q.   And before the break I asked you, you
24 know, with regard to the clarification letter if
25 you read it before you signed it, and you told

TSG Reporting - Worldwide (877) 702-9580

Page 121

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2  me your practice is to either read something and
3  understand it before you sign it or, and I'm
4  paraphrasing you, have somebody --
5     A.   Take me through it.
6     Q.   -- take you through it and make you
7  understand what it is you're signing, yes?
8     A.   Correct.
9     Q.   Do you recall which of those two
10 practices you followed with regard to signing
11 the Asset Purchase Agreement dated September 16?
12    A.   I probably would have had -- I can't
13 say with certainty, but, you know what, as it
14 relates to the Asset Purchase Agreement, had I
15 read it, I would remember it. So it probably
16 was a discussion with one of the lawyers on our
17 deal team.
18    Q.   By the Tuesday, the 16th, had anyone
19 described to you the economic terms of the
20 transaction?
21    A.   No.
22    Q.   Did you have an understanding as to
23 whether there was a discount being applied to
24 securities being purchased pursuant to the Asset
25 Purchase Agreement?

TSG Reporting - Worldwide (877) 702-9580

Page 122

**HIGHLY CONFIDENTIAL - G. LaROCCA**

1
2     A.    No.
3     Q.    Did you have an understanding as to
4  the total amount of securities that were being
5  transferred from Lehman to Barclays under the
6  first agreement you have there?
7     A.    No.
8     Q.    That is, Exhibit 1?
9     A.    No.
10     Q.    Did you have any knowledge of what the
11  components of the price to be paid by Barclays
12  were on September 16?
13     A.    No.
14     Q.    Did you ask anyone?
15     A.    No.
16     Q.    Would you take a look at the Transfer
17  and Assumption Agreement.  Now, that is -- it
18  says in its first line was executed on September
19  20, which would be the Saturday, right?  And do
20  you recall if you signed it on September 20?
21     A.    I don't recall when I signed it.
22            Definitely my signature.
23     Q.    Okay.  The last page appears to me as
24  if it may be a fax --
25     A.    It looks like it was.

TSG Reporting - Worldwide (877) 702-9580

Page 123

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2     Q.    -- transmission as opposed to the
3  pages that precede it.  Compare that with the
4  rest of the document.  They don't have that line
5  across the top and across the bottom, you see
6  that?
7     A.    (Witness shrugs.)
8     Q.    Do you recall if you signed a
9  signature page without the rest of the
10  agreement?
11     A.    Just as a rule of thumb, I typically
12  don't sign the signature pages.
13     Q.    If you take a look at the lower
14  left-hand corner of the signature page, it's got
15  a document number on there?
16     A.    Uh-huh.
17     Q.    It says -- the number's a little
18  blurred, but it begins CHI --
19     A.    Uh-huh.
20     Q.    -- 4436673, Version 2, do you see
21  that?
22     A.    Yes.
23     Q.    Take a look at the two pages that
24  precede it and look at the lower left-hand
25  corner.  You see that it says Washington, D.C.

TSG Reporting - Worldwide (877) 702-9580

Page 124

**HIGHLY CONFIDENTIAL - G. LaROCCA**

1     Number 397038, Version 3?
2     A.    Uh-huh.
3     Q.    Does that suggest to you that the
4
5  signature page was prepared on a different word
6  processing system than the two pages that
7  precede it?
8     A.    I don't know what it suggests, you
9  know?
10     Q.    Okay.
11     A.    Would have never even noticed it had
12  you not pointed it out to me.
13     Q.    And does it refresh your recollection
14  one way or the other as to whether you signed --
15     A.    No.
16     Q.    -- a free-standing signature page for
17  the Transfer and Assumption Agreement?
18     A.    No, it doesn't.  It doesn't.
19     Q.    Do you know what the purpose of the
20  Transfer and Assumption Agreement was?
21            MR. STERN:  I don't think he's asking
22  you to read and interpret it today.
23     Q.    It's a yes or no.
24            MR. STERN:  Either you do or you don't
25  from memory.

TSG Reporting - Worldwide (877) 702-9580

Page 125

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2     A.    Yes, vaguely.
3     Q.    Okay.
4     A.    At a high level.
5     Q.    Give me your understanding of what the
6  purpose of the Transfer and Assumption Agreement
7  was.
8     A.    That there were some assets that were
9  going to transfer -- some assets that Lehman
10  held at one of the exchanges that were going to
11  be moved over to Barclays.
12     Q.    And the exchange at issue here was the
13  Options Clearing Corporation, OCC?  Do you see
14  the reference to it in the agreement?
15     A.    Yes, I do.
16     Q.    And the "whereas" clauses of the
17  agreement in the second one says, "Lehman
18  maintains clearing fund and margin deposits with
19  OCC," do you see that?
20     A.    Yes.
21     Q.    Did you have an understanding of what
22  those two items were when you signed this?
23     A.    No.
24     Q.    Do you know if the transfer --
25     A.    I mean, I know what a clearing fund is

TSG Reporting - Worldwide (877) 702-9580

Page 126

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2  and I know what a margin deposit is, but I have
3  no idea what the value was at the time.
4    Q.  Okay.  That's a good point.  Apart
5  from what it's worth, apart from the value, I
6  just want to know if you know its character,
7  what they are?
8    A.  Yes.
9    Q.  And do you know whether either of
10 those, a clearing fund or margin deposits, would
11 contain cash?
12   A.  No idea.
13   Q.  Do you know --
14   A.  I'm sorry, let me answer.  I don't
15 know what was contained in it.
16   Q.  Uh-huh.
17   A.  Most margin deposits or clearing fund
18 deposits could be cash or securities, okay?
19 Most firms use securities.
20   Q.  Do you know -- did you know when you
21 signed this agreement whether the clearing fund
22 or margin deposits that it addresses contained
23 cash or securities?
24   A.  No idea.
25   Q.  If you could turn your attention to
       TSG Reporting - Worldwide (877) 702-9580

Page 127

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2  the clarification letter, which I think is
3  Exhibit 25.  The clarification letter,
4  Mr. LaRocca, is dated as of September 20.  You
5  see that on the face of the document?
6    A.  Yes.
7    Q.  And the closing took place on Monday,
8  September 22?
9    A.  Correct.
10   Q.  Do you remember when you signed the
11 clarification document, the clarification
12 letter?
13   A.  No.
14   Q.  Do you recall signing documents at the
15 actual closing on --
16   A.  Monday morning, yes, I do.
17   Q.  Do you recall approximately how many
18 documents you signed?  I want to know if it was
19 a number greater than one.
20   A.  Yes.
21   Q.  Was it a dozen documents?  One
22 document?  Two documents.  Any recollection?
23   A.  (Witness gestures.)
24   Q.  No, you don't know?  You got to say it
25 out loud for the reporter.
       TSG Reporting - Worldwide (877) 702-9580

Page 128

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    A.  No, no recollection.  It was more than
3  one.
4    Q.  Did you have an understanding when you
5  signed the clarification letter what the purpose
6  of the clarification letter was?
7        MR. STERN:  Objection to the form.
8        Do you want to repeat the question?
9        (Record read.)
10   A.  I understand, you know, what the word
11 "clarification" means, right?  So there
12 obviously had to be -- there was revisions to
13 some earlier agreements.  Do I know the -- did
14 at the time or do I recall what the specific
15 points relative to the, you know, that had to be
16 clarified?  No.
17   Q.  When you say you understood what the
18 word "clarification" means, did you understand
19 the clarification letter to be clarifying terms
20 of the Asset Purchase Agreement?
21       MR. STERN:  Objection to the form.
22   A.  My -- I just -- the answer is I don't
23 know.  I don't know the answer to that, right?
24 So the answer is no, not specifically to the
25 Asset Purchase Agreement.
       TSG Reporting - Worldwide (877) 702-9580

Page 129

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    Q.  Did you understand the clarification
3  letter to be --
4    A.  I wasn't surprised by a clarification
5  letter given that there was ongoing dialogue
6  through the weekend, right?  And specifically as
7  it related to the --
8    Q.  To the repo?
9    A.  -- the repo.
10   Q.  Before you signed the clarification
11 letter, had you seen any drafts of the
12 clarification letter?
13   A.  No.
14   Q.  The first version of the clarification
15 letter that you saw was the one that you signed?
16   A.  To the best of my knowledge, yes.
17   Q.  Did you understand or were you given
18 to understand by someone else that the
19 clarification letter was an amendment as opposed
20 to a clarification?
21       MR. STERN:  Objection to the form.
22   A.  I'm not sure that I could
23 differentiate with your question.
24   Q.  That's good point.  One of the things
25 in front of you, although you didn't sign it, is
       TSG Reporting - Worldwide (877) 702-9580

Page 130

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2 a document entitled First Amendment, you see
3 that?
4    A.   Yes.
5    Q.   First Amendment to Asset Purchase
6 Agreement. And do you have an understanding, in
7 your view, is there a difference between an
8 amendment to an agreement and a clarification
9 letter, a clarification of the agreement?
10    MR. STERN: Objection to the form.
11    Q.   I just want your view.
12    A.   No.
13    Q.   What was your understanding of how the
14 clarification letter addressed the repo?
15    A.   Don't recall. Right? You know, my
16 perception at the time, this was all very fluid
17 and evolving over the week's time, right?
18 People moving at -- things needing to happen
19 very fast because the markets are melting down
20 and -- and everyone wanting to effect a
21 transaction to try to save jobs and a Lehman
22 franchise and value for everybody, including
23 the, you know, the piece that was going to go to
24 the estate, right?
25    Q.   Also including the piece that was

TSG Reporting - Worldwide (877) 702-9580

Page 131

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2 going to go to Barclays, right?
3    A.   Yeah, absolutely.
4    Q.   Did you have an understanding that the
5 clarification letter changed the definition of
6 the assets that were going to be purchased when
7 you signed the clarification letter?
8    A.   Not when I signed the clarification
9 letter. Not at the time, okay? Subsequent, you
10 know, we learned that the transaction as
11 originally envisioned in the beginning of the
12 week has changed a lot by the end of the week,
13 right? Again, I can't give you specifics, but,
14 you know, things you think you're buying that
15 don't exist because the quality of the data or
16 the uncertainty.
17    Q.   But there came a point where you
18 understand that -- where you came to understand
19 that the clarification letter changed what was
20 purchased?
21    A.   Yes.
22    Q.   And that point came after, at some
23 point after you signed the clarification letter?
24    A.   Yes.
25    Q.   Was the fact that the clarification

TSG Reporting - Worldwide (877) 702-9580

Page 132

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2 letter was changing what was going to be
3 purchased explained to you at the time that you
4 signed the clarification letter?
5    Let me withdraw that. Let me ask a
6 more general question. When you signed the
7 clarification letter, did anybody explain to you
8 what its purpose was in the transaction?
9    A.   At a high level that the terms of the
10 transaction had changed.
11    Q.   Was it described to you in any greater
12 detail than at that high level, that the terms
13 of the transaction had changed?
14    A.   No, not that I can recall.
15    Q.   Now, could you turn to paragraph 13 of
16 the -- actually, first, if you don't mind, turn,
17 please, to paragraph 9.
18    A.   Of which agreement?
19    Q.   Of the clarification letter. Page 4.
20    A.   Did you say paragraph 9 or page 9?
21    Q.   It's paragraph 9 located on page 4 of
22 the clarification letter. Take a minute and
23 read through that paragraph 9 to yourself, if
24 you don't mind.
25    A.   It's only one sentence.

TSG Reporting - Worldwide (877) 702-9580

Page 133

HIGHLY CONFIDENTIAL - G. LaROCCA

1
2    Q.   And it's entitled "Deletion of
3 Purchase Price Adjustment Provisions" and it
4 says, "Section 3.3 of the original agreement is
5 hereby deleted in its entirety and shall be of
6 no effect ab initio."
7    A.   No frame of reference at all.
8    Q.   Did you have a frame of reference when
9 you signed the agreement for paragraph 9?
10    A.   No.
11    Q.   And would you take a look at paragraph
12 12, which is on page 5 of the agreement. And
13 I'll read that into the record: It's entitled
14 "Schedule 12.3," underscored, and it says,
15 "Following the closing, the parties shall
16 reasonably agree to an allocation of the
17 purchase price (including the assumed
18 liabilities) among the purchased assets for tax
19 purposes and set forth such allocation on a
20 Schedule 12.3 to be signed by the parties." Do
21 you see that?
22    A.   Yes.
23    Q.   Do you know whether any such schedule
24 has ever been prepared?
25    A.   I have no idea.

TSG Reporting - Worldwide (877) 702-9580

| Page 134 | Page 135 |
|---|---|

**Page 134**

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    Q.    And would you take a look now at the
3    paragraph that follows, paragraph 13. I'm not
4    going to read it into the record because it's
5    too long, but read through it yourself and let
6    me know when you've had a chance to do that.
7        (Document review.)
8    A.    Okay. I've read it.
9    Q.    Now, when you signed the clarification
10   letter, did you have an understanding of the
11   purpose of paragraph 13?
12   A.    Don't recall.
13   Q.    When you signed the clarification
14   letter, had you seen a copy of the Notice of
15   Termination that's referred to in the last
16   sentence of paragraph 13?
17   A.    I don't believe so.
18   Q.    Did you have an understanding that a
19   Notice of Termination relating to the Barclays
20   Repurchase Agreement had been issued?
21   A.    No. I had an understanding that the
22   repo would terminate, but didn't know if the
23   notice -- didn't understand the formal process
24   of how that takes place.
25   Q.    Did you have an understanding as to
     TSG Reporting - Worldwide (877) 702-9580

**Page 135**

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    whether paragraph 13 was meant to address the
3    bankruptcy implications we talked about before
4    when there's a default on a repo and a
5    bankruptcy is involved?
6    A.    No.
7    Q.    No, you did not?
8    A.    No, I did not.
9    Q.    Do you recall if anyone explained to
10   you, even if you don't remember the content of
11   it -- actually, just answer this yes or no: Do
12   you recall whether anyone explained to you the
13   implications under the Bankruptcy Code of
14   paragraph 13?
15   A.    "No" to your question.
16   Q.    Okay. We talked before about getting
17   an explanation of the implications of the
18   Bankruptcy Code for the termination of the repo?
19   A.    Yes.
20   Q.    Yours is a good point. Specifically
21   with respect to paragraph 13, did you get that
22   kind of explanation?
23   A.    No.
24   Q.    I'm putting before you, Mr. LaRocca, a
25   document that was previously marked as Exhibit
     TSG Reporting - Worldwide (877) 702-9580

| Page 136 | Page 137 |
|---|---|

**Page 136**

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    27, and I'll ask you, sir, if you've seen that
3    document -- actually, this is the Notice of
4    Termination referred to and you told me you
5    didn't remember if you saw it.
6        Does this refresh your recollection?
7    A.    No, not at all.
8    Q.    Do you know the Michael Montgomery who
9    signed this?
10   A.    Yes. Yes.
11   Q.    Who is Michael Montgomery?
12   A.    Michael Montgomery is a director with
13   Barclays Capital. He was formerly the CFO of
14   Barclays Capital of the Americas, and because of
15   his previous role, he was on the board of
16   Barclays Capital, Inc., still remains on the
17   board of Barclays Capital, Inc., and is why he's
18   a signator.
19       But at the time of this transaction,
20   Mike's role would have been to be the BarCap
21   person on the ground responsible for overseeing
22   our investments in Homeq and Equifirst.
23   Q.    Did the investments in Homeq or
24   Equifirst have any relation to the --
25   A.    None whatsoever.
     TSG Reporting - Worldwide (877) 702-9580

**Page 137**

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    Q.    Let me put the whole question so we
3    have a clear question and answer.
4        Do the investments in Homeq or
5    Equifirst have any relation to the Repurchase
6    Agreement we have talked about?
7    A.    None whatsoever.
8    Q.    Do you have any knowledge as to why it
9    would be Michael Montgomery signing this other
10   than the fact that he holds that title?
11   A.    No, I presume it's only because they
12   were looking for a signator.
13   Q.    Do you know who's the "they"?
14   A.    Alan Kaplan. It probably would have
15   been Alan Kaplan or someone within Barclays
16   Capital Legal was looking for a BCI signator.
17   Q.    Without regard to the documents, and
18   I'll go back to them in a minute, but without
19   regard to the documents, was there a point in
20   the time sequence from the morning of the 19th
21   through to the closing on the 22nd where the
22   fact that a Notice of Termination of the repo
23   had been sent came to your attention?
24   A.    No.
25   Q.    Was the fact of a Notice of
     TSG Reporting - Worldwide (877) 702-9580

Page 138

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2   Termination being sent a topic of any
3   conversation in which you were involved at any
4   time?
5       A.   No, not that I'm aware of. Not that I
6   recall.
7       Q.   When you signed the agreement, did you
8   have any understanding of why the Notice of
9   Termination needed to be rescinded and void ab
10  initio in all respects?
11      A.   I didn't sign the agreement.
12      Q.   I'm in the clarification letter at
13  paragraph 13 again.
14      A.   No.
15      Q.   Over the weekend of the 20th and the
16  21st and through the closing on the morning of
17  the 22nd, that's the time I'm talking about now,
18  during that period did you have discussions with
19  anyone as to whether the terms of the
20  clarification letter had been approved by the
21  bankruptcy court?
22      A.   No.
23      Q.   With respect to both the Asset
24  Purchase Agreement, the one dated the 16th, the
25  Tuesday, and the clarification letter, dated as
         TSG Reporting - Worldwide (877) 702-9580

Page 139

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2   of the 20th, did you have an understanding, sir,
3   of the amount -- did you have an understanding
4   that Barclays would be assuming certain
5   liabilities as part of its consideration in the
6   deal?
7       MR. STERN: Objection to the form.
8       A.   Could you rephrase the question?
9       Q.   As part of the transaction, did you
10  understand Barclays would be assuming
11  liabilities?
12      A.   Yes.
13      Q.   What liabilities did you understand
14  Barclays would be assuming?
15      A.   I don't have a detailed understanding
16  or I don't recall being privy to, you know, a
17  detailed listing of all the liabilities that
18  Barclays would assume, right? As a result of
19  being in the area, right, you know, there was
20  going to be severance packages that would need
21  to be paid to Lehman employees, there would be
22  compensation that would need to be paid to
23  Lehman employees that we would retain, right?
24  There would be cure payments that would have to
25  go to third parties. You know, that's you
         TSG Reporting - Worldwide (877) 702-9580

Page 140

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2   know, I couldn't tell you the amounts associated
3   with those, but knew that Barclays was going to
4   assume some liabilities.
5       Q.   But beyond knowing the fact of an
6   assumption of liabilities, you did not know the
7   amounts, correct?
8       A.   No, wouldn't have been privy to it,
9   wouldn't have been involved in that aspect of
10  it.
11      Q.   If you could go back to Exhibit 1,
12  sir, the Asset Purchase Agreement, and turn,
13  please, to page 35.
14      A.   Did you say page 35?
15      Q.   Yes, sir. And the paragraph I'm
16  talking about is paragraph 9.1(C), which is at
17  the top of page 35. If you could read through
18  that just sufficiently to tell us whether you've
19  seen or focused on that language before?
20      A.   No.
21      Q.   Do you see that it refers to a --
22  actually, let me read the portion I'm interested
23  in. In paragraph 9.1(C) it refers to a
24  financial schedule delivered to purchaser on
25  September 16, 2008, and initialed by an officer
         TSG Reporting - Worldwide (877) 702-9580

Page 141

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2   of each of Holdings and purchaser. You see
3   that?
4       A.   Yes.
5       Q.   Did you ever see that schedule?
6       A.   No.
7       Q.   Let me show you what's previously been
8   marked as Deposition Exhibit 19 and ask you if
9   you've ever seen that document before?
10      A.   No, I have not.
11      Q.   Down the asset side of that financial
12  schedule are certain classes of collateral and
13  numbers attributed to those assets, correct?
14      A.   Uh-huh.
15      Q.   When you were around -- you and I both
16  have used different phrases to this today. When
17  you were around and picked up the buzz of what
18  was going on or you were nearby to what was
19  going on, did you come to any understanding as
20  to whether those amounts were negotiated with
21  between Barclays and Lehman?
22      A.   No, I -- no idea at all.
23      Q.   Did you ever --
24      A.   Being around, I had a high level. I
25  knew that the size of the transaction had
         TSG Reporting - Worldwide (877) 702-9580

Page 142

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2  shrunk.
3    Q.   Okay.
4    A.   Other than that ...
5    Q.   When you say "the size," you're
6  talking about over the week?
7    A.   Over the week.
8    Q.   From the Tuesday to the Friday, right?
9    A.   Yeah.
10    Q.   Did you have any understanding as to
11  whether the price that Barclays paid for those
12  asset classes constituted a contract price that
13  was different from the amounts shown on Lehman's
14  books for those asset classes?
15    A.   No idea at all.
16    Q.   Did you have any understanding that
17  the $2.0 billion number attributed to comp on
18  the liability side was also a negotiated amount?
19    A.   No, I did not.
20    Q.   Why were you the guy to sign these
21  agreements?
22    A.   I'm the signator for Barclays Capital,
23  Inc.
24    Q.   Is Rich Ricci a signator for Barclays
25  Capital, Inc.?

TSG Reporting - Worldwide (877) 702-9580

Page 143

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    A.   I don't know the answer to that.
3    Q.   What about Bob Diamond, is he a
4  signatory for Barclays Capital, Inc.?
5    A.   I don't believe so. I don't know what
6  his role as chief executive of Barclays Capital.
7  I presume that entitles him to -- maybe, I don't
8  know, I don't know if that entitles him to sign
9  any document in the firm, but he's, you know,
10  he's not an officer of Barclays Capital, Inc.
11  nor on the board of BCI, right, the U.S.
12  broker-dealer.
13    Q.   Okay. You see why I'm asking. Are
14  there other officers around who could have
15  signed instead of you?
16    A.   I'm the chief executive of the U.S.
17  broker-dealer, so I'm the likely -- Mike
18  Montgomery, obviously he's an officer of BCI. I
19  didn't even realize he was in New York that
20  week. Maybe he was, maybe he wasn't.
21    Q.   He might not have been. Washington
22  and Chicago are at the bottom of the document.
23    A.   Okay.
24    (Exhibit 208, a document bearing Bates
25  Nos. BCI 006119 through 6646, marked for

TSG Reporting - Worldwide (877) 702-9580

Page 144

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2  identification, as of this date.)
3    Q.   What I need you to look through on
4  Exhibit 208 -- well, look through the document
5  enough to tell me whether you've seen it before,
6  but in particular, Mr. LaRocca, I'm going to
7  have questions for you about the first couple of
8  pages running from BCI-00619 through 6121.
9    A.   I'm sorry, can you repeat that?
10    Q.   The first few -- Bates Nos. BC1000619,
11  which is the first page of the document, through
12  6121, which is the third page of the document,
13  front and back. And you'll see that the cover
14  is an e-mail from Robert Azerad at Lehman --
15    A.   Yes.
16    Q.   -- to you, entitled "Detailed
17  information about the 1.9 billion of
18  unencumbered collateral."
19      Do you recall receiving this document?
20    A.   No.
21    Q.   We talked a little earlier about what
22  you would do if you got a document with a
23  schedule like this.
24    A.   A lot of the Lehman guys -- I was in
25  Ops. I explained my role in terms of trying to

TSG Reporting - Worldwide (877) 702-9580

Page 145

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2  be helpful. And a lot of the Lehman employees,
3  maybe they presumed I was part of the deal team
4  and trying to give me docs and information and
5  the -- you know, this document, I don't even
6  recall what I would have done with it.
7    Q.   Okay.
8    A.   Actually, if I look below, it looks
9  like it was sent to Rich Ricci below me, right,
10  and then subsequently shared with me. I
11  wouldn't have done a -- I might have filed it
12  under G.
13    Q.   Okay.
14    A.   You know what G stands for?
15    Q.   The e-mail at the bottom is from
16  Azerad to Ricci?
17    A.   Yeah.
18    Q.   And then there's some CCs, Tonucci,
19  Lowitt and Kelly?
20    A.   Those are all Lehman employees.
21    Q.   And then the top is Azerad himself.
22  This isn't being forwarded by Ricci to you.
23  This is from Azerad.
24    A.   I'm saying I would have seen that it
25  was sent to Rich.

TSG Reporting - Worldwide (877) 702-9580

Page 146

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2     Q.   And therefore, you don't have to do
3  anything with it; it's where it needs to be?
4     A.   I don't know why it was being sent to
5  Rich or why it's not being sent to Rich. Rich
6  wouldn't know what to do with a document like
7  this.
8     Q.   Do you have an understanding of what's
9  meant by "1.9 billion of unencumbered
10 collateral"?
11    A.   I understand what the term
12 "unencumbered" means, right? Which means --
13 right?
14    Q.   I'm asking a slightly more specific
15 question. In the context of the deal, was there
16 an issue --
17    A.   No.
18    Q.   -- concerning 1.9 billion of
19 unencumbered collateral that you know about?
20    A.   Not that I knew about.
21         I can tell you --
22    Q.   What did you want to tell me about the
23 document?
24    A.   What I was going to do would be
25 critical of the document in terms of, since
TSG Reporting - Worldwide (877) 702-9580

Page 147

1     HIGHLY CONFIDENTIAL - G. LaROCCA
2  Lehman hadn't been able to settle trades,
3  reconcile its positions in bank accounts for
4  several days, I don't think they would be in a
5  position to definitively know what was in the
6  box, let alone whether it was unencumbered or
7  not.
8     Q.   That's based on your impression going
9  back to even the week before --
10    A.   Absolutely.
11    Q.   -- about the state of the records?
12    A.   The state of recordkeeping was
13 horrific.
14    Q.   Beyond that impression, based on an
15 overall view of the state of their
16 recordkeeping, do you have any knowledge about
17 whether Lehman could accurately describe 1.9
18 billion as unencumbered, about 1.9 billion?
19    A.   I'm sorry, could you just repeat? Do
20 I have an impression?
21    Q.   Let me rephrase the question.
22         MR. STERN: He's asking if you know.
23    Q.   Your answer to me has been based on
24 your overall impression of Lehman's
25 recordkeeping. My question is more specific
TSG Reporting - Worldwide (877) 702-9580

Page 148

1     HIGHLY CONFIDENTIAL - G. LaROCCA
2  now. Do you know one way or the other whether
3  the description of 1.9 billion in unencumbered
4  assets in that exhibit is accurate or not?
5     A.   I do not know.
6     Q.   Could you go back to the clarification
7  letter, please, Exhibit 25, and I would direct
8  your attention to the first page of it,
9  paragraph 1, entitled "Purchased Assets;
10 Excluded Assets," and in particular, paragraph
11 I(A)(ii), which begins "with respect to causes
12 (a), (d) and (e)."
13    A.   I'm sorry.
14    Q.   It's that paragraph there, Roman
15 numeral ii.
16         (Document review.)
17    Q.   Okay. Have you had a chance to read
18 that through?
19    A.   Uh-huh.
20    Q.   Section capital A of that paragraph
21 refers to "the securities owned by LBI and
22 transferred to purchaser or its affiliates under
23 the Barclays Repurchase Agreement (as defined
24 below) as specified on Schedule A previously
25 delivered by seller and accepted by purchaser."
TSG Reporting - Worldwide (877) 702-9580

Page 149

1     HIGHLY CONFIDENTIAL - G. LaROCCA
2  Do you see that piece?
3     A.   Yes.
4     Q.   At the time you signed the
5  clarification letter, had you seen that Schedule
6  A to which that portion refers?
7     A.   I don't recall. I don't recall.
8     Q.   In the next section it refers to,
9  "Such securities and other assets held in LBI's
10 'clearance boxes' as of the time of the Closing,
11 which at the close of business on September 21,
12 2008 were as specified on Schedule B previously
13 delivered by seller and accepted by purchaser."
14    A.   I don't recall receiving that.
15    Q.   Schedule B?
16    A.   Yes.
17    Q.   And if you would turn to page 2 and go
18 to section capital C within that paragraph,
19 which says, "Exchange-traded derivatives (and
20 any property that may be held to secure
21 obligations under such derivatives) and
22 collateralized short-term agreements."
23         Do you have an understanding of what
24 that was describing?
25    A.   No.
TSG Reporting - Worldwide (877) 702-9580

Page 150

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2      Q.   Let me ask you to back up to page 1
3   again.  The reference to clearance boxes and the
4   description, "at the close of business on
5   September 21, 2008, were as specified on
6   Schedule B," does that refresh your recollection
7   as to whether the clarification letter was
8   signed on the Monday?
9      A.   No.
10         (Exhibit 209, a document bearing Bates
11      Nos. BCI-EX-00079307 through 79309, marked
12      for identification, as of this date.)
13      Q.   I have put before you, Mr. LaRocca,
14   what we have marked as Deposition Exhibit 209, a
15   three-page document bearing Bates Nos.
16   BCI-EX-00079307 through 79309.
17         Take a look through it, please,
18   sufficiently to tell me whether you recall
19   seeing this e-mail chain before.
20      A.   I don't recall receiving it.
21      Q.   Okay.  Could you take a minute -- what
22   I recommend is read it from earlier to the more
23   recent.  So if you start at the back and read
24   up, that would be helpful.
25         (Document review.)
       TSG Reporting - Worldwide (877) 702-9580

Page 151

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2      Q.   Okay.  Have you had a chance to read
3   through the e-mail chain?
4      A.   Yes.
5      Q.   And you see generally, sir, this
6   refers -- it's an e-mail entitled "Updated
7   Opening Balance Sheet" and there's a discussion
8   within the various sections of the e-mail about
9   an -- well, withdrawn.  Take that question out
10   and shoot it.  Let me start again.
11         Let's go to the earliest e-mail, which
12   is from Gary Romain to Martin Kelly, copy James
13   Walker and it says, "Martin, a basic question,
14   but want to make sure I'm understanding this
15   summary.  Will the $44,880 correspond to what
16   came across against repo - you mentioned an
17   additional $1.9 billion of assets (separate to
18   the 15c3), which is included/excluded in this
19   number ...?"  Do you see that?
20      A.   Yes.
21      Q.   Do you know what that e-mail exchange
22   is about?
23      A.   No.
24      Q.   Did you know at the time?
25      A.   No.
       TSG Reporting - Worldwide (877) 702-9580

Page 152

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2      Q.   Okay.  Now, through the e-mail there's
3   some back and forth about that issue, and at the
4   very top it's an e-mail from Rich Ricci to
5   Patrick Clackson with a copy to you, and the
6   text of Mr. Ricci's e-mail is, "Gerard, any
7   view?"
8         Do you recall getting an inquiry
9   either by this e-mail or otherwise from
10   Mr. Ricci about the $1.9 billion?
11      A.   No.
12      Q.   Do you know if you ever responded to
13   this?
14      A.   I don't believe I ever responded.  I
15   could tell you how I would respond today.
16      Q.   Okay.
17      A.   All right?  I mean, this is consistent
18   with my comments about the shoddy recordkeeping
19   and not knowing what assets are where.  And you
20   can see the questions.  They don't even know
21   if -- what's in the 44 billion.
22         So had I spoken to Rich about it, I
23   would have said, you know, I'm putting -- you
24   can't rely on any of the information that you
25   have been given, you know?
       TSG Reporting - Worldwide (877) 702-9580

Page 153

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2      Q.   Do you have an understanding of why
3   Mr. Ricci would be asking you, in particular, if
4   you had a view about the issues discussed in
5   this e-mail chain?
6      A.   No.  No.
7         (Exhibit 210, a document bearing Bates
8      Nos. BCI-EX-00082420 through 82422, marked
9      for identification, as of this date.)
10      Q.   What I have put before you marked as
11   Deposition Exhibit 210, Mr. LaRocca, is a
12   three-page document consisting of an e-mail
13   chain and it bears Bates No. BCI-EX-000082420
14   through 422.
15         Same request.  Take a look through it
16   sufficient to tell me whether you've seen it
17   before.
18      (Document review.)
19      MR. STERN:  You'll have to take some
20   time reading this because there's a number
21   of long messages.
22      A.   I recall all of these e-mails, you
23   know, because this is related to the Fed
24   replacement repo.
25      Q.   It contains the names of people that
       TSG Reporting - Worldwide (877) 702-9580

## Page 154

HIGHLY CONFIDENTIAL - G. LaROCCA

1  you have spoken about today, Lucinda Brickler,
2  Stephanie Heller.
3
4       And the top e-mail, the one most
5  recent in time, is from Stephanie Heller to you
6  dated September 25 at 7:59 P.M., copy Hughes,
7  Brickler, Shari Leventhal with the Fed, entitled
8  what I'm sure you agree is probably the wrong
9  title for thing: "One last question," right?
10      In the first paragraph of the e-mail,
11  Ms. Heller -- and I'm paraphrasing this,
12  obviously -- seems to be telling you that there
13  are two $7 billion issues between Barclays and
14  Chase?
15      A.   Right.
16      Q.   Tell me what you understand about
17  there being two 7 billion dollar issues?
18      A.   I recall receiving the e-mail and I
19  was floored. I had no, you know, you know, my
20  response to Stephanie at the time we spoke is
21  this is -- I just pick my words carefully.
22      Q.   Another colorful response?
23      A.   Another colorful response.
24      I don't know what they're talking
25  about. I don't know anything about -- all I

TSG Reporting - Worldwide (877) 702-9580

## Page 155

HIGHLY CONFIDENTIAL - G. LaROCCA

1  know is about the Fed replacement transaction,
2  so I would have gone back to her aggressively,
3  colorfully, you know, and I thought this was the
4  Fed doing a rope-a-dope -- I'm sorry, JPMorgan
5  doing a rope-a-dope with the Fed. I still to
6  this day don't know what confusion related to
7  another transaction.
8      Q.   Did you ever get any more knowledge
9  than this --
10      A.   No, I don't recall.
11      Q.   Let me put a full question so we have
12  a good record.
13      Did you ever gain any more knowledge
14  than is contained in this e-mail about a second
15  $7 billion issue with Chase apart from the
16  replacement transaction?
17      A.   No.
18      MR. GAFFEY: Let's go off the record
19  for a second.
20      (Discussion off the record.)
21      (Exhibit 211, a letter from C. Green
22  to R. Gaffey dated August 18, 2009, marked
23  for identification, as of this date.)
24      MR. GAFFEY: Just to follow up on what

TSG Reporting - Worldwide (877) 702-9580

## Page 156

HIGHLY CONFIDENTIAL - G. LaROCCA

1  we briefly discussed off the record, I'm
2  marking as Exhibit 211 -- and I'll just show
3  it to you, Jack, I'll give you your own copy
4  as well -- a letter dated August 18, 2009,
5  to me from Chris Green at Boies Schiller,
6  and it's the cover letter that came last
7  night with a collection of, I don't know,
8  three or four disks.
9      And Chris tells me that Gerard LaRocca
10  documents are covering the range
11  BCI-EX-(S)-00033492 through 34981, and it's
12  about a thousand pages of document. I tried
13  to take a look at it quickly over the break
14  but haven't been able to sort it out, so for
15  that reason, we're going to -- I have no
16  further questions at this time, but I'm
17  going to reserve the right to bring
18  Mr. LaRocca back if we need to follow up on
19  any documents in there.
20      And I should just say so we have
21  clarity on the record, I know everybody is
22  working very hard in August, I'm not
23  suggesting that there's anything wrong or
24  insidious in getting the disk yesterday. I

TSG Reporting - Worldwide (877) 702-9580

## Page 157

HIGHLY CONFIDENTIAL - G. LaROCCA

1  know everybody's a little bit pressed this
2  month, but it's just a question of not
3  having been able to look through them.
4      MR. WOOD: I think we got them this
5  morning sometime, and obviously since this
6  deposition is not taking place at our
7  office, I have not had a chance to see any
8  of them.
9      MR. GAFFEY: And with that, I don't
10  have anything.
11      (Discussion off the record.)
12      (Recess; Time Noted: 1:56 P.M.)
13      (Time Noted: 2:00 P.M.)
14  EXAMINATION BY
15  MR. WOOD:
16      Q.   Again, Mr. LaRocca, I'm John Wood from
17  Hughes, Hubbard & Reed. We represent the
18  trustee under SIPA.
19      You were saying earlier in response to
20  some of Mr. Gaffey's questions that you were
21  aware on or about the 19th that Barclays was
22  looking to get additional assets beyond the repo
23  securities as part of the deal?
24      A.   Correct.

TSG Reporting - Worldwide (877) 702-9580

Page 158

HIGHLY CONFIDENTIAL - G. LaROCCA

1       HIGHLY CONFIDENTIAL - G. LaROCCA
2       Q.   Is that right?  Do you recall any
3  conversations where particular amounts were
4  discussed?
5       A.   No.
6       Q.   Dollar figures, anything like that?
7       A.   No.
8       Q.   Can you just take another look at
9  Exhibit 209, which we went through earlier.
10       And we went through it earlier.  There
11  are several references in there to 1.9, $1.9
12  billion.  Do you recall any discussions on or
13  about the 19th of Barclays seeking an additional
14  $1.9 billion in assets?
15       A.   I wouldn't have been involved in any
16  discussions.  I'll answer the question the same
17  as Mr. -- I answered Mr. Gaffey.  I was aware of
18  those discussions going on, but I wouldn't have
19  been privy or involved in those discussions.
20       Q.   Then towards the top of the first page
21  there where Mr. Clackson writes to you, "Not
22  looking good for the $1.9 billion," what do you
23  understand that to mean?
24       A.   He wrote Rich Ricci.
25       Q.   I'm sorry, he wrote Rich Ricci, who

TSG Reporting - Worldwide (877) 702-9580

Page 159

1       HIGHLY CONFIDENTIAL - G. LaROCCA
2  then subsequently forwarded it to you.  Thank
3  you for clarifying that.
4       What do you understand Mr. Clackson to
5  refer to there?
6       A.   Just don't have -- I don't know.
7  Don't know.
8       I guess a clarifying question for you,
9  right?  At the time, I didn't know.  Right?
10  Obviously a year later, right, you guys are
11  talking about an unencumbered box.  So I don't
12  know how you differentiate kind of what I knew
13  at the time, which I didn't know anything, or
14  much, related to this, and what I know now or
15  have been able to derive from the question and
16  the information you showed me here at the
17  deposition.
18       Q.   So just to make sure I understand, at
19  the time you would not --
20       A.   So I wouldn't have been able --
21       Q.   -- at the time you not only would not
22  have been involved, you wouldn't have understood
23  what he meant by the 1.9, "Not looking good for
24  the $1.9 billion"?
25       A.   Correct.

TSG Reporting - Worldwide (877) 702-9580

Page 160

1       HIGHLY CONFIDENTIAL - G. LaROCCA
2       Q.   What do you understand that to mean
3  now?
4       MR. STERN:  And I'm going to instruct
5  you not to answer based on conversations
6  you've had with counsel.
7       THE WITNESS:  Okay.
8       MR. STERN:  Which means you can
9  testify to any understanding you got other
10  than through conversations with counsel, if
11  any.
12       A.   Today as I sit before you my
13  understanding is that Barclays, in addition to
14  the assets it came across, the repo was looking
15  for other assets from Lehman Brothers, one of
16  which is some securities held in the box, that
17  certain e-mails suggest has a value or an amount
18  of 1.9.  That's what I know now.
19       But I wouldn't have been involved in
20  the deal or the aspects about the inclusion or
21  exclusion of this element of the assets that
22  were coming across from Lehman Brothers.  My
23  responsibility was limited to the, you know -- I
24  don't want to say "limited" -- primarily focused
25  on the Fed replacement transaction.

TSG Reporting - Worldwide (877) 702-9580

Page 161

1       HIGHLY CONFIDENTIAL - G. LaROCCA
2       MR. STERN:  I guess I just want to
3  make a statement on the record.  I'm
4  concerned about confusion as between
5  information that Mr. LaRocca had at the time
6  of the transaction and what he's testifying
7  to based on what he's read today.
8       So I'm just concerned about that, and
9  in asking your questions, I just ask that
10  you guard against that confusion.  And I've
11  asked the witness to do the same.
12       THE WITNESS:  Yes.  Okay.
13       Q.   Based on what you know today -- you
14  might want to keep that document in front of
15  you, by the way.  Based on what you know today,
16  do you have an understanding of why, as of
17  Monday, September 22, at 5:46 P.M., it was not
18  looking good?
19       A.   No idea.  Not at all.
20       Q.   Turning your attention back to Exhibit
21  25, which we've been referring to as the
22  clarification letter.
23       A.   Uh-huh.
24       Q.   At the bottom of that first page,
25  there's reference to Schedule B that Mr. Gaffey

TSG Reporting - Worldwide (877) 702-9580

Page 162

HIGHLY CONFIDENTIAL - G. LaROCCA

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    asked you about?
3        A.    Uh-huh.
4        Q.    And I think you testified that you
5    never saw Schedule B?
6        A.    I don't recall.
7        Q.    Do you have any idea who at Barclays
8    would have been responsible for preparing
9    Schedule B?
10        MR. STERN:    Barclays?
11        I'm going to object to the form.
12    You're suggesting Barclays prepared Schedule
13    B?
14        MR. WOOD:    I'll clarify that.
15        Q.    Do you know who at Barclays would have
16    been involved in reviewing Schedule B?
17        A.    No idea.
18        MR. STERN:    Objection to the form.
19        Q.    I'm handing you what's already been
20    marked as Exhibit 52, which is a letter dated
21    September 22, 2008.
22        And for the record, at the top on the
23    letterhead it says the Depository Trust &
24    Clearing Corporation.  So I'll probably just
25    refer to this as the DTCC letter.
    TSG Reporting - Worldwide (877) 702-9580

Page 163

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2        MR. STERN:    Well, take a look at it.
3        MR. WOOD:    Yeah, take your time.
4        MR. STERN:    Take time to review it.
5        (Document review.)
6        Q.    Ready?
7        A.    Yes.
8        Q.    If you look at the last page, is that
9    your signature on the document?
10        A.    Yes, it is.
11        Q.    Do you remember signing it?
12        A.    Do I remember signing this document?
No.  No.
14        Q.    It's dated September 22?
15        A.    Yeah.
16        Q.    Do you have any recollection of
17    whether this was among the group of documents
18    that you signed that day?
19        A.    I have a recollection of a payment
20    needing to be made to DTCC as part of the
21    agreement with the, you know, and the $250
22    million wire transfer seems to resonate with me.
23    I remember at the closing there was a payment
24    that had to be made to DTC.  That's my
25    recollection.
    TSG Reporting - Worldwide (877) 702-9580

Page 164

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2        Q.    Do you recall whether you read the
3    document before you signed it?
4        A.    Don't recall if I read the document,
5    but as I indicated, I do recall that, as part of
6    the agreement of the -- as part of our
7    acquisition, there needed to be a payment made
8    to DTC.
9        Q.    Do you remember who told that you?
10        A.    Might have been our in-house counsel,
11    but not certain.
12        Q.    Do you recall whether anybody
13    explained to you the terms of this letter before
14    you signed it?
15        A.    I'm fairly certain our internal legal
16    team would have explained this letter to me.
17        Q.    Do you recall when you first learned
18    of the need to have a DTCC letter, as I'm
19    referring to it?
20        MR. STERN:    Objection to the form.
21        A.    Don't recall specifically when.  I
22    don't recall.
23        Q.    If you'll look at page 2 of this
24    letter, near the top of the page you'll see
25    number 1, "Winding Down of Accounts"?
    TSG Reporting - Worldwide (877) 702-9580

Page 165

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2        A.    Yeah.
3        Q.    And the first sentence there says,
4    "Barclays has indicated and hereby agrees that
5    all of the accounts of LBI maintained at the
6    clearing agency's subsidiaries (the accounts)
7    constitute 'excluded assets' within the meaning
8    of the APA."
9        MR. STERN:    Is there a question?
10        MR. WOOD:    I thought the witness was
11    reading, so I wanted to pause to give him a
12    moment to read it.
13        (Document review.)
14        A.    Yes.
15        Q.    Do you recall that language?
16        A.    No.
17        Q.    As you sit here today what is your
18    understanding of that?
19        MR. STERN:    Objection to the form.
20        A.    I'm not really sure.
21        Q.    Do you recall whether you were on a
22    telephone call with anyone from DTC on Sunday
23    night, September 21st?
24        A.    I don't recall being on a telephone
25    call with DTC on a Sunday.
    TSG Reporting - Worldwide (877) 702-9580

Page 166

HIGHLY CONFIDENTIAL - G. LaROCCA

1  
2  Q.   And just in case this refreshes your  
3  recollection, our understanding is there was a  
4  telephone call involving Isaac Montel of DTC.  
5  Does that ring a bell?  
6      MR. STERN: Objection to the form.  
7  A.   Yes, it actually does ring a bell.  
8  Q.   Just to be clear, the -- you remember  
9  the call or just remember the name of the  
10  individual?  
11  A.   I remember a call with DTCC that  
12  weekend, couldn't tell you if it was Saturday or  
13  Sunday, with seemed like -- I seem to recall  
14  that Isaac Montel was on the call.  
15  Q.   Do you recall participating in the  
16  call? By that I mean speaking?  
17  A.   No. No, I don't think I spoke.  
18  Q.   Do you remember what the purpose of  
19  the call was?  
20  A.   I believe DTC wanted Barclays to step  
21  into Lehman's obligations at the Depository.  
22  Q.   And what do you mean by "step into the  
23  obligations"?  
24  A.   Assume, assume the obligations of  
25  Lehman Brothers.

TSG Reporting - Worldwide (877) 702-9580

Page 167

HIGHLY CONFIDENTIAL - G. LaROCCA

1  
2  Q.   And do you remember whether anyone  
3  from Barclays said whether or not Barclays would  
4  do so?  
5  A.   I think we were all apprehensive about  
6  stepping into Lehman obligations and all the  
7  uncertainty associated with it.  
8  Q.   Do you remember whether anybody from  
9  DTC expressed any apprehensions?  
10      MR. STERN: Objection to the form.  
11  A.   About?  
12  Q.   About the arrangement.  
13      MR. STERN: Objection to the form.  
14  A.   Don't recall.  
15  Q.   Do you recall any discussion about  
16  whether residential mortgage securities would be  
17  included in the assets that would be given to  
18  DTC?  
19  A.   Vaguely.  
20  Q.   I'll ask a different question.  
21  A.   Vaguely. Yes.  
22  Q.   Do you remember whether on that call  
23  that we're discussing, whether anyone from DTC  
24  expressed concern that residential mortgage  
25  securities would not be included among the

TSG Reporting - Worldwide (877) 702-9580

Page 168

HIGHLY CONFIDENTIAL - G. LaROCCA

1  
2  securities they would have access to?  
3  A.   Just don't recall.  
4  Q.   Again, looking at this Exhibit 52,  
5  which is on the letterhead of the Depository  
6  Trust & Clearing Corporation, do you know who  
7  drafted that letter?  
8  A.   No idea. No idea.  
9      (Exhibit 212, an e-mail string, the  
10  first one in time from N. Reyda to ITD War  
11  Room, dated September 19, 2008, marked for  
12  identification, as of this date.)  
13  Q.   Take a moment to read that over.  
14      (Document review.)  
15      (Exhibit 213, an e-mail string, the  
16  first in time from G. LaRocca to A.  
17  Blackwell, dated September 20, 2008, marked  
18  for identification, as of this date.)  
19  Q.   And I'm actually going to ask you  
20  first about number 213. The reason I want to  
21  make sure you had 212 is you'll see at the  
22  bottom of 213 it says "original message  
23  truncated," so 212 gives you some context.  
24  A.   213 is in front of me. I've read it.  
25  Q.   So I'm looking at 213. The second

TSG Reporting - Worldwide (877) 702-9580

Page 169

HIGHLY CONFIDENTIAL - G. LaROCCA

1  
2  message from the top is the one that you wrote  
3  on September 20th at 9:07 P.M.?  
4  A.   Yes, I remember this.  
5  Q.   Subject is "The Conversion," and you  
6  write, "Deal team wants to see Lehman produce  
7  some credible books and records which will  
8  provide valuable information about Lehman's  
9  inventory which remain in the box on Friday and  
10  also the securities/assets that Lehman's  
11  believed to have been seized," and then four  
12  question marks.  
13      MR. STERN: Do you know where he is?  
14      THE WITNESS: I do now. I was  
15  starting below.  
16  Q.   Take a second to read it.  
17  A.   Okay.  
18  Q.   What are the assets Lehman believed to  
19  have been seized?  
20  A.   I don't know the answer to that  
21  question. At this point in time, I remember  
22  these two e-mails very clearly, right? The  
23  Lehman team making representations that there  
24  were assets, right, but producing no credible  
25  evidence, right, you know, and me telling them,

TSG Reporting - Worldwide (877) 702-9580

## Page 170

1  HIGHLY CONFIDENTIAL - G. LaROCCA
2  you know, show me something, don't just tell me
3  that JPMorgan seized assets.
4      So they made references that JPMorgan
5  seized assets, they had an unencumbered box, you
6  know, but they couldn't produce records because
7  they were -- hadn't been able to reconcile books
8  and records and do a close for days, right?
9      Q.   So to --
10      MR. STERN:  Have you finished your
11  answer?
12      Q.   Oh, sorry.
13      A.   Yes.
14      Q.   Moving to the earlier part of that
15  sentence, so setting aside now these seized
16  assets, the reference to "inventory which remain
17  in the box," so as of that Saturday night, did
18  you still feel uncertainness as to what was in
19  the box?
20      A.   To this day I don't know what was in
21  the box.  A year later.  I have no frame of
22  reference.
23      Q.   Did you get any additional
24  information?
25      A.   No, not that I'm aware of.
                TSG Reporting - Worldwide (877) 702-9580

## Page 171

1  HIGHLY CONFIDENTIAL - G. LaROCCA
2      Q.   Between then and the closing?
3      A.   No.
4      Q.   Was somebody tasked with doing that?
5  Sorry.  Let me be more precise.
6      Was somebody tasked with responding to
7  your requests reflected in that e-mail?
8      A.   The -- I mean, the Lehman Ops. Team
9  was tasked with reconciling and all, but weeks
10  went on.  Nothing was produced.  They were
11  unable to reconcile for weeks.  You know, it --
12  you know, because their clearing bank turned off
13  the systems.  They had no idea what was in their
14  box.  The quality of data was poor.
15      (Exhibit 214, an e-mail from T.
16  Hasenpusch to A. Blackwell and others, with
17  attachment, marked for identification, as of
18  this date.)
19      Q.   I've just handed you what has been
20  marked as Exhibit 214, which is a brief e-mail
21  and a one-page attachment.  Feel free to take a
22  moment and look it over.
23      (Document review.)
24      Q.   You'll see at the top there about
25  eight lines down your name is among many listed
                TSG Reporting - Worldwide (877) 702-9580

## Page 172

1  HIGHLY CONFIDENTIAL - G. LaROCCA
2  on the "to" line, and subject is "Important -
3  Lehman/Barclays Capital Integration Update -
4  7:30 A.M. Call."
5      Do you remember whether you were on
6  that call?
7      A.   I don't remember.  I don't believe I
8  was.
9      Q.   If you look at the attachment there --
10      A.   No familiarity at all.
11      Q.   Looking at number 1 where it says,
12  "Reviewing TBA risk in DTC box, do you remember
13  that?
14      A.   Not at all.
15      Q.   Do you know what "TBA" refers to?
16      A.   Yes.
17      Q.   What?
18      A.   "To be announced" is the acronym.
19  It's associated with mortgage pools.
20      Q.   Mr. LaRocca, do you remember whether
21  any assets were transferred from the clearance
22  box on Friday, September 19th?
23      A.   Wouldn't -- don't remember.
24  Wouldn't -- wouldn't know.
25      I'm sorry, when you say September 19,
                TSG Reporting - Worldwide (877) 702-9580

## Page 173

1  HIGHLY CONFIDENTIAL - G. LaROCCA
2  that was the day we effected the repo --
3      Q.   That was the day of the bankruptcy
4  court proceeding that I think you said earlier
5  you went to.
6      A.   That's right.  We did the replacement
7  transaction on Thursday, you're right.
8      Q.   The 18th.
9      A.   I don't know if assets moved across on
10  Friday.  I just don't know.
11      Q.   Actually, let me ask that a little bit
12  differently.
13      Do you remember whether any assets
14  were moved from Lehman's clearance box at DTC to
15  Barclays on September 19?
16      A.   Don't remember.  Don't know.
17      Q.   Have you finished reading it?
18      A.   Yes.
19      Q.   You'll see at the top it lists
20  "objective" and down below this chart it says,
21  "Methodology Employed: Number 1.  Actual
22  delivery EOD Friday (800 million to 1 billion)."
23      Does that refresh your recollection at
24  all?
25      A.   No.
                TSG Reporting - Worldwide (877) 702-9580

Page 174

HIGHLY CONFIDENTIAL - G. LaROCCA
1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    MR. STERN: Objection to the form.
3    A.  No.
4    Q.  You said earlier that -- and this
5  won't be your exact words, so correct me if this
6  is not your recollection -- that Lehman Brothers
7  believed there was an excess of assets beyond
8  the 15c3 requirement; does that sound correct?
9    A.  Lehman believed that the last time
10  they did the 15c3 calculation there was an
11  excess collateral over and above the
12  requirement.
13    Q.  Do you remember how you learned that?
14    A.  Lehman employees would have told me
15  that there was excess collateral in the 15c3
16  account.
17    Q.  Do you recall who told you that?
18    A.  Could have been one of -- one or all
19  of three employees: Maybe Ian Lowitt, Paolo
20  Tonucci and Robert Azerad. And my reaction was:
21  When was the last time you did a calculation?
22  And it hadn't been done in a while because
23  they --
24    Q.  And do you recall --
25    MR. STERN: "Because they"? I don't

TSG Reporting - Worldwide (877) 702-9580

Page 175

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2  think you finished your answer. "Because
3  they"?
4    MR. WOOD: Oh, I'm sorry.
5    A.  Because they didn't have systems.
6  JPMorgan had turned the systems off. They
7  didn't know the status of their trades. They
8  hadn't been able to reconcile bank accounts.
9  They hadn't been able to reconcile the stock
10  record.
11    So I found the information that was
12  conveyed to be not credible. There was a
13  problem with everything that we got from Lehman
14  during that week. The data was not credible.
15    Q.  When you said the calculation hadn't
16  been done in a while, do you recall how long it
17  had been since the calculation had been done?
18    A.  No. At least a week.
19    Q.  Do you recall when you first learned
20  that excess assets beyond the 15c3-3 requirement
21  might be transferred to Barclays?
22    MR. STERN: Objection to the form.
23    A.  Probably after the close. You know,
24  after the closing. I didn't know it was part of
25  the deal at the time.

TSG Reporting - Worldwide (877) 702-9580

Page 176

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    Q.  If you can take a look at Exhibit 212,
3  which is the one I handed you earlier but didn't
4  ask you any questions about, if you look at the
5  second page, your e-mail of September 20th in
6  the evening, you write, "I would pursue
7  calculating a more updated requirement and
8  excess."
9    A.  Uh-huh.
10    Q.  Why did you want to know the excess?
11  Actually, let me ask -- I'm sorry, let me
12  rephrase. Why did you want to know the
13  requirement?
14    A.  Lehman indicated that there were
15  unencumbered assets in their 15c3 and excess.
16  If you go to the below that where they say "do
17  you know" -- they wanted me to call someone at
18  Wells Fargo and ask them to see if I knew
19  someone at Wells Fargo and can I get Wells Fargo
20  to release the money.
21    My response to them was: One is I
22  don't know anyone at Wells Fargo; two, they're
23  not going to release money based upon a phone
24  call. They're going to need demonstrative
25  evidence, right? So that's what I'm asking the

TSG Reporting - Worldwide (877) 702-9580

Page 177

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2  team to produce. Do a calculation. Do a -- do
3  a rec. The deal team will need it. Lawyers
4  will need it.
5    If there are assets that belonged to
6  Lehman that need to be freed up, you need to
7  have demonstrable evidence, and they weren't
8  able to produce it.
9    Q.  Was it your understanding at that
10  time, meaning September 20th, that under the
11  deal that was being negotiated, the excess would
12  go to Barclays?
13    A.  I didn't know. I wasn't part of the,
14  you know, the deal team. What I do recall
15  telling Rich and where the conversations are
16  going on that you need to be very careful
17  because my experience in dealing with the Lehman
18  team at the time was that nothing, no
19  information they gave us was credible.
20    So I do recall that, you know, and
21  aware that, you know, that some of the deals
22  guys are having conversations with the Lehman
23  people working on the deal, and I would just be
24  very careful because the books and records and
25  what Lehman thought they had and what they

TSG Reporting - Worldwide (877) 702-9580

Page 178

1  HIGHLY CONFIDENTIAL - G. LaROCCA
2  actually had, I mean, you couldn't validate
3  anything.
4      We were asking them for reports from
5  JPMorgan and we couldn't get them. There was so
6  much uncertainty regarding what Lehman had, what
7  Lehman didn't have, and that's my recollection.
8      Q.  So did you have doubts about whether
9  there was an excess?
10     MR. STERN: Objection to the form.
11     A.  I didn't know if there was an excess
12 or I didn't know if it was -- I had no opinion
13 at all, you know. You know, what I had -- I had
14 no view at all, you know.
15     Q.  Were you aware that the 15c3 assets
16 included both cash and securities?
17     A.  No. No.
18     Q.  If you take a look again at Exhibit
19 51, which Mr. Gaffey asked you about earlier.
20 It's entitled a "Transfer and Assumption
21 Agreement." Again, this is a document you
22 signed --
23     A.  Yes.
24     Q.  -- correct?
25     And I know Mr. Gaffey asked you these
TSG Reporting - Worldwide (877) 702-9580

Page 179

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2  questions regarding several of the documents,
3  but I'm not sure he did on this one, so I
4  apologize for going through this again, but do
5  you recall whether you read this document before
6  you signed it?
7      A.  I don't recall. I think what I
8  indicated was I wouldn't have signed it blind,
9  so I either read it or got an explanation as to
10 what it was.
11     Q.  But for this particular document, do
12 you recall whether anyone explained it to you?
13     A.  I don't recall.
14     Q.  And I think you said earlier, and I
15 don't recall your language, but something to the
16 effect that the purpose of this agreement was
17 because some Lehman assets were moving to
18 Barclays?
19     MR. STERN: Objection to the form.
20     Was there a question? What is the
21 question?
22     Q.  Is that roughly what you said earlier?
23     MR. STERN: Objection to the form.
24     A.  I don't recall -- I remember talking
25 about it. I don't recall specifically the
TSG Reporting - Worldwide (877) 702-9580

Page 180

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2  question or the -- what it was --
3      Q.  Actually, I'm happy to just drop that.
4  Even though it may mean we cover some ground we
5  covered earlier, do you recall what the purpose
6  of this agreement was?
7      A.  This agreement is to include assets
8  associated with Lehman's option -- activity at
9  the Options Clearing Corp. that would move
10 across to Barclays.
11     Q.  Under this agreement was Barclays
12 assuming any kind of risks?
13     A.  I don't know. I don't know.
14     MR. WOOD: I don't have anything
15 further. Thank you for your time.
16 EXAMINATION BY
17 MS. TAGGART:
18     Q.  Hi, I'm Erica Taggart. I'm a
19 representative from the Committee.
20     You mentioned earlier today, you
21 described a process of moving securities across
22 generally from the Fed to Barclays as part of
23 taking over the Repurchase Agreement. Do you
24 generally recall that?
25     MR. STERN: Objection to the form.
TSG Reporting - Worldwide (877) 702-9580

Page 181

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2      A.  Yes.
3      Q.  I want to find out a little bit more
4  about what that means from an operations point
5  to move securities across.
6      A.  Uh-huh.
7      Q.  First of all, where were the
8  securities that were pledged for the Fed
9  Repurchase Agreement, where were those initially
10 kept?
11     A.  Erica, I want to clarify something you
12 said, right? You said securities moved across
13 from the Fed, right? Some of the securities
14 moved across the Fed wire and some of them moved
15 through DTC.
16     Q.  Okay.
17     A.  Okay?
18     Q.  And maybe you can --
19     Sorry. Please.
20     A.  So Lehman Brothers had a pool of
21 securities that I'm speculating they couldn't
22 finance in the open market because of their
23 fragile state. So the Fed financed -- so those
24 securities were held in Lehman's account at
25 JPMorgan.
TSG Reporting - Worldwide (877) 702-9580

## Page 182

HIGHLY CONFIDENTIAL - G. LaROCCA

1        Lehman Brothers would deliver those
2 securities to the Federal Reserve using three
3 facilities at the Fed, and I presume they were
4 held in a Fed account at JPMorgan and the Fed,
5 in turn, would have moved cash to finance those
6 positions -- move cash into a Lehman account at
7 JPMorgan.
8        When the --
9 **Q.  Keep going.**
10   A.  When the Fed unwound that transaction,
11 they freed up those securities, moving the
12 securities into accounts at JPMorgan.  Lehman
13 returns the cash, so now Lehman is sitting with
14 securities in its accounts at JPMorgan and they
15 were going to move across to Barclays and
16 Barclays was going to move cash.
17       Now, depending upon -- so Barclays
18 wires $45 billion in cash, and depending upon
19 whether they're equities or corporates or U.S.
20 treasuries, the means at which they move across
21 varies.
22  **Q.  Okay.  Good.  That's helpful.**
23      **First of all, when you said that you**
24 **couldn't finance it on the open market, can you**

TSG Reporting - Worldwide (877) 702-9580

## Page 183

**HIGHLY CONFIDENTIAL - G. LaROCCA**

1 **give me a few examples of open market options**
2 **that are sometimes available for financing?**
3      MR. STERN: Objection to the form.
4 You mean Lehman couldn't finance?
5      MS. TAGGART: Yes, but now I'm just
6 saying just generally on the open market,
7 who are other counterparties --
8      MR. STERN: Wait. Wait. I want to
9 hear the question.
10  **Q.  Can you give me some examples of other**
11 **parties that do financing on the open market?**
12      MR. STERN: Objection to the form.
13   A.  Every dealer finances its balance
14 sheet with third parties.
15  **Q.  Can you give me an example?**
16      MR. STERN: Objection to the form.
17  **Q.  Like banks?**
18   A.  Banks.  Hedge funds.
19  **Q.  My question, this is slightly out of**
20 **order, but when you were talking about haircuts**
21 **that happened in financing, do those -- are**
22 **haircuts also taken when you get financing on**
23 **the open market?**
24   A.  Yes.

TSG Reporting - Worldwide (877) 702-9580

## Page 184

HIGHLY CONFIDENTIAL - G. LaROCCA

1 **Q.  You also mentioned the term "a normal**
2 **haircut."  What did you mean by "a normal**
3 **haircut"?**
4      MR. STERN: Objection to the form.
5   A.  There are different haircuts that get
6 ascribed to different assets, and -- so it's the
7 quality of the underlying asset that impacts the
8 haircut. It's also the creditworthiness of the
9 counterparty.  So you have two kind of variables
10 that impact the haircuts.
11  **Q.  Does the amount of haircuts that the**
12 **Fed usually requires, how does that compare to**
13 **the amount of haircut that financing on the open**
14 **market usually requires?**
15   A.  I'm not a market practitioner, but I
16 would expect the Fed to be competitive and
17 comparable.  I think the Fed is probably more
18 selective in terms of the quality of assets that
19 they take than certain borrowers of securities.
20 I mean, you know, there's a risk in a price and
21 everything.
22  **Q.  Have you personally been involved in**
23 **negotiating with the Fed for any Repurchase**
24 **Agreements --**

TSG Reporting - Worldwide (877) 702-9580

## Page 185

**HIGHLY CONFIDENTIAL - G. LaROCCA**

1   A.  No.
2  **Q.  -- for Barclays?**
3   A.  No.
4  **Q.  And are you aware at all of the**
5 **process that the Fed takes in determining the**
6 **amount of a haircut for a given Repurchase**
7 **Agreement?**
8   A.  No.
9  **Q.  What's your understanding of the range**
10 **of a haircut that would be in the normal range?**
11   A.  There was a time when I knew this
12 stuff cold years ago.
13      U.S. treasuries, T Bill at one point
14 in time might have been a 2 percent haircut.
15 Listed equities might have been a 20 percent
16 haircut.  You know, it varies really depending
17 upon the nature of the assets.
18  **Q.  Did you know what amount of haircut**
19 **had been taken in this particular Repurchase**
20 **Agreement --**
21   A.  No idea.
22  **Q.  Sorry.  Let me get it all on the**
23 **record.**
24      **Do you know what was the amount of**

TSG Reporting - Worldwide (877) 702-9580

Page 186

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    haircut that the Fed had required in the
3    Repurchase Agreement with Lehman that Barclays
4    took over that you described today?
5        A.    No idea.
6        Q.    So then also going back to the process
7    of moving securities across, you mentioned that
8    it starts where there are securities that were
9    in Lehman's account in JPMorgan; is that right?
10        A.    Yes.
11        Q.    And then Lehman, as part of the
12    Repurchase Agreement with the Fed, moved those
13    securities to the three facilities that were at
14    the Fed; is that right?
15            MR. STERN:  Can I hear the question
16    again?
17        A.    I'm not sure you got that right.  Can
18    you repeat that?
19            (Record read.)
20        A.    Correct.
21        Q.    And then when they move it to the
22    three facilities, does it go to a Fed account at
23    JPMorgan or did you mention that there was a
24    separate account that the Fed had themselves?
25        A.    I'm not certain.
        TSG Reporting - Worldwide (877) 702-9580

Page 187

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2        Q.    And then when it's time to move
3    securities to get to Barclays, first, do those
4    securities go from wherever the Fed has taken it
5    into an account at JPMorgan?
6        A.    Into Lehman's account at JPMorgan.
7        Q.    Okay.  And then when it goes from
8    Lehman's account at JPMorgan to Barclays, what
9    account at Barclays did it go into?
10        A.    I don't have the specifics of that.
11    You say --
12        Q.    Is it a JPMorgan account?
13        A.    Yes, Barclays has an account at
14    JPMorgan.
15        Q.    And so it was --
16        A.    I'm sorry.  I'm sorry.  Let me clarify
17    that.  It was our accounts at Bank of New York.
18        Q.    Okay.
19        A.    So Barclays clears at Bank of New
20    York.
21        Q.    Okay.  And you also --
22        A.    The cash went to Barclays' account at
23    JPMorgan.
24        Q.    Now, you mentioned that many of the
25    securities that were part of that Repurchase
        TSG Reporting - Worldwide (877) 702-9580

Page 188

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    Agreement did reach Barclays?
3        A.    Uh-huh.
4        Q.    But that there was about 7 billion,
5    approximately, of collateral that did not make
6    it to Barclays?
7        A.    Correct.
8        Q.    Do you remember that?
9            Of the securities that did move to
10    Barclays, were those all securities that had
11    been part of the Fed Repurchase Agreement?
12        A.    Many of them were.
13        Q.    Of the collateral that did make it to
14    Barclays, was any of that collateral not part of
15    what had been pledged to the Fed under the
16    Repurchase Agreement?
17        A.    Yes.
18        Q.    How do you know that?
19        A.    There are detailed reconciliations
20    that were done with Barclays, JPMorgan and the
21    Fed, so our intention was to -- our expectation
22    was that we would receive all the securities
23    that the Fed held in -- on behalf of Lehman
24    Brothers, and because of numerous operational
25    hiccups on the part of Lehman, JPMorgan, et
        TSG Reporting - Worldwide (877) 702-9580

Page 189

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    cetera, the actual portfolio of securities did
3    not move -- that the Fed held did not move in
4    its entirety.  A large subset of those moved,
5    and some things that we should have gotten,
6    didn't get, and we got other things.  And
7    there's been -- that work has been -- that's
8    been reconciled, you know, so...
9        Q.    Before I get into understanding this a
10    little more, first, I just want to know the
11    source of your information.  What input did you
12    have into the process of doing these detailed
13    reconciliations?
14        A.    None.
15        Q.    How did you know that they took place?
16        A.    The Fed required us to reconcile -- to
17    provide them a listing of all the securities we
18    received.
19        Q.    Who did do that?
20        A.    I believe it was the Fed.
21        Q.    And did anybody at Barclays
22    participate in doing that detailed
23    reconciliation of what was received?
24        A.    I don't know.
25        Q.    Did you see documents that did that
        TSG Reporting - Worldwide (877) 702-9580

Page 190

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    reconciliation?
3        A.   I saw summary reports which, if I
4    could -- and the level of reports that I would
5    have looked at, if we were supposed to receive
6    10,000 securities, maybe we got 9,800 of the
7    same Cusips. Of the 9,000 -- the numbers are
8    just illustrative of what I'm describing so you
9    get an idea of the high level summary.
10       So maybe we got an indication that the
11   Fed held 10,000 securities. We maybe got some
12   large percentage of those, and for those that we
13   got that were held by the Fed, we would have
14   been told that the quantities are similar in
15   what the Fed had. If the quantities were
16   different, we were told that. We were told the
17   securities that we got that the Fed didn't, you
18   know, that the Fed didn't have.
19       Q.   When did this take place?
20       A.   Weeks.
21       Q.   Weeks following the closing?
22       A.   Weeks following the closing.
23       Q.   And did you discuss this
24   reconciliation with anyone?
25       A.   It was part of the discussion with
        TSG Reporting - Worldwide (877) 702-9580

Page 191

1       HIGHLY CONFIDENTIAL - G. LaROCCA
2    JPMorgan to resolve the, you know, the $7
3    billion cash that didn't immediately move
4    across.
5        Q.   Who have you personally spoken to
6    about the issue of this reconciliation of what
7    did and didn't make it from the Fed?
8        A.   Personally? Jonathan Hughes.
9        Q.   Anyone else?
10       A.   No.
11       Q.   Did you personally speak to anyone at
12   JPMorgan about it?
13       A.   No.
14       Q.   Did you speak to anyone at the Fed
15   about it?
16       A.   Yes.
17       Q.   Who is that?
18       A.   It would be Stephanie Heller, who was
19   my primary interface.
20       Q.   So, concentrating on now the
21   securities that did get transferred but were not
22   part of what were originally with the Fed for
23   the Repurchase Agreement, first of all, can you
24   give me a sense of what range of all the
25   securities --
        TSG Reporting - Worldwide (877) 702-9580

Page 192

1       HIGHLY CONFIDENTIAL - G. LaROCCA
2        A.   Couldn't tell you.
3        Q.   Do you know who chose -- well, first,
4    where did those other securities come from, if
5    not from the Repurchase Agreement?
6        A.   No idea.
7        Q.   And do you know who chose the
8    securities to put --
9        A.   No.
10       Q.   -- to include?
11       A.   No idea.
12       Q.   Do you know whether it was someone
13   from Barclays?
14       A.   It would have been Lehman Brothers.
15   We didn't, you know ...
16       Q.   Do you know if JPMorgan had any role
17   in choosing?
18       A.   No idea.
19       Q.   Did Barclays keep those securities
20   that -- all the ones that had not been part of
21   the Fed but then did transfer as part of taking
22   over the Repurchase Agreement?
23       A.   To the best of my knowledge, yes.
24       Q.   Did Barclays reject any securities
25   that were given as part of this collateral when
        TSG Reporting - Worldwide (877) 702-9580

Page 193

1       HIGHLY CONFIDENTIAL - G. LaROCCA
2    you took over the Repurchase Agreement?
3        A.   I don't know the answer to that.
4    The --
5        I want to clarify the answer. I don't
6    know the answer to whether there were rejects.
7    What I don't know is when the bulk of those
8    securities moved across. I suspect if there
9    was, they were minimal, okay?
10       Now, there was a discussion that I
11   participated in with regarding the -- on the
12   morning of the close, there was a discussion
13   that I participated in with regard to JPMorgan
14   wanting to give us collateral in lieu of cash,
15   and we rejected the collateral that JPMorgan
16   offered up.
17       Q.   Do you know who selected the
18   collateral that JPMorgan wanted to give?
19       A.   No.
20       Q.   And do you know where that collateral
21   came from?
22       A.   No.
23       (Exhibit 215, a document bearing Bates
24   Nos. BCI-EX-(S)-00034528 through 34529,
25   marked for identification, as of this date.)
        TSG Reporting - Worldwide (877) 702-9580

Page 194

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2    Q.    Sir, I have put before you an exhibit
3  we're marking as 215 that goes from
4  BCI-EX-(S)-00034528 through 29, and I -- why
5  don't you just take a minute to look through
6  this.
7        (Document review.)
8    Q.    Okay.  So let's look at the bottom
9  e-mail from Teri Scott.  Who is Teri Scott?
10    A.    Teri Scott is a senior finance
11  professional.  She works in our accounting
12  group.
13    Q.    Does he sometimes report information
14  to you?
15    A.    Teri's a female.
16    Q.    Excuse me.  Does she sometimes report
17  information to you?
18    A.    Sometimes.  Not normally.  You know,
19  not in the normal course.  Not in the normal
20  course.
21    Q.    Let me focus first, if you go to the
22  last page on the item that's 2, third from the
23  bottom bullet point, there's something that's in
24  bold that says, "A list of Cusips to be excluded
25  has been provided to ensure collateral we are

TSG Reporting - Worldwide (877) 702-9580

Page 195

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2  not purchasing is excluded in this transfer."
3        Do you know what that's referring to?
4    A.    Not specifically, no.
5    Q.    Do you remember ever having a list of
6  Cusips that would be excluded from the
7  collateral?
8    A.    No.  No, not me personally.  Don't
9  recall seeing it.
10    Q.    Why don't you take a longer look at
11  that list on number 2 that describes this $47
12  billion transaction, and putting aside the one
13  that's in bold, do you know if the remaining
14  bullet points are accurate?
15        MR. STERN:  Objection to the form.
16    A.    Well, define "accurate."  So the 47
17  billion was never a number I knew, right?  The
18  number I knew was 45 billion, and I would have
19  heard that firsthand from -- you know, because I
20  would have negotiated the amount with -- well,
21  actually, I don't know that we negotiated the
22  amount.  That was the amount the Fed required us
23  for the collateral that they held.  The number
24  would have been given to us by Lucinda Brickler,
25  so I don't know where the $47 billion number

TSG Reporting - Worldwide (877) 702-9580

Page 196

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2  comes from.
3    Q.    Okay.
4    A.    Nor were we intending to do a one-week
5  term.
6    Q.    Uh-huh.
7    A.    So I would say there's a lot of
8  inaccuracies with that.
9    Q.    Okay.  Were you involved at all in
10  discussions or transactions relating to
11  residential mortgage-backed securities?
12    A.    No.
13    Q.    Do you know one way or another whether
14  Barclays received any residential
15  mortgage-backed securities --
16    A.    Don't know.
17    Q.    -- as part of this transaction?
18    A.    I don't know definitively whether
19  residential mortgages were in the assets that
20  moved across associated with the Fed replacement
21  repo.
22    Q.    Okay.
23    A.    It was a very diverse group of
24  securities, thousands and thousands of Cusips,
25  and I would not be surprised if there were

TSG Reporting - Worldwide (877) 702-9580

Page 197

HIGHLY CONFIDENTIAL - G. LaROCCA
1
2  mortgages in that pool of assets, but I don't
3  know for sure.
4        MS. TAGGART:  Okay.  With the same
5  reservations that my colleagues had about
6  the documents that we had just received and
7  have not reviewed, I don't have any other
8  questions.
9        THE WITNESS:  Okay.
10        MS. TAGGART:  Thank you.
11        MR. GAFFEY:  One quick follow-up.  I
12  can do from down here.
13  EXAMINATION BY
14  MR. GAFFEY:
15    Q.    A couple of the documents referred to
16  the so-called conversion.  Do you know what
17  that's a reference to, Mr. LaRocca?
18    A.    No.  Okay?  I recall seeing it.  You'd
19  have to look at the documents if you want me to
20  see if there's -- it rings a bell, but I don't
21  know what -- I remember seeing "conversion" in
22  the subject field in some of the documents, but
23  doesn't resonate with me or mean anything to me.
24        MR. GAFFEY:  Okay.  I have nothing
25  further.

TSG Reporting - Worldwide (877) 702-9580

Page 198

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2          MR. STERN: Anybody else?
3          MR. WOOD: No.
4          MR. STERN: I have just two quick
5      clarifications.
6      EXAMINATION BY
7      MR. STERN:
8          Q.   Earlier you were asked whether anybody
9      expressed concern to you about the collateral
10     that came over to Barclays in the Fed
11     replacement transaction. Can you clarify for
12     the record what your recollection is in that
13     regard?
14         A.   I'm sorry, the -- that's a
15     clarification of a question I got earlier?
16         Q.   Yeah, I'm asking, earlier you were
17     asked whether anybody expressed concern to you,
18     to you, about the collateral that came over to
19     Barclays in the Fed replacement transaction, and
20     I'm asking if you can clarify what your
21     recollection is in that regard?
22         A.   Can you tell me how I answered it
23     earlier?
24         Q.   Just tell us your best recollection.
25         A.   Well, everyone had concern, right?
            TSG Reporting - Worldwide (877) 702-9580

Page 199

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2      But, you know, wasn't, wasn't -- it wasn't that
3      I could solve their problems, right? So
4      everyone was concerned about the assets that
5      were going to move from Lehman Brothers over to
6      Barclays Capital.
7          That's how I would answer the
8      question. I don't know if that's consistent
9      with how I answered it before.
10         Q.   And did you personally have any role
11     in evaluating the collateral?
12         A.   None.
13         Q.   You were asked questions about a
14     post-closing conversation you had with Mike
15     Keegan. Do you know whether Mr. Keegan was
16     involved in the transaction in the period from
17     Wednesday, September 17, 2008, through the
18     closing on September 22, 2008?
19         A.   I don't know --
20             (Continued on the next page to include
21         the jurat.)
22
23
24
25
            TSG Reporting - Worldwide (877) 702-9580

Page 200

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2          MR. GAFFEY: Objection to the form.
3          THE WITNESS: Excuse me?
4          MR. GAFFEY: You can ignore me.
5          A.   I don't know the answer. I don't know
6      to what extent Mike was involved in the
7      transaction prior to closing.
8
9          MR. STERN: That's all I have.
10             (Time Noted: 3:02 P.M.)
11                 oOo
12
13
14
15
16
17
18
                   _____
                   GERARD LaROCCA
19
20     Subscribed and sworn to
       before me this    day
21     of      2009.
22
23     _____
24
25
            TSG Reporting - Worldwide (877) 702-9580

Page 201

1      HIGHLY CONFIDENTIAL - G. LaROCCA
2          CERTIFICATE
3      STATE OF NEW YORK )
                          : ss
       COUNTY OF NEW YORK )
4
5          I, Kathy S. Klepfer, a Registered
6      Merit Reporter and Notary Public within and
7      for the State of New York, do hereby
8      certify:
9          That GERARD LaROCCA, the witness whose
10     deposition is herein before set forth, was
11     duly sworn by me and that such deposition is
12     a true record of the testimony given by such
13     witness.
14         I further certify that I am not
15     related to any of the parties to this action
16     by blood or marriage and that I am in no way
17     interested in the outcome of this matter.
18         I further certify that neither the
19     deponent nor a party requested a review of
20     the transcript pursuant to Federal Rule of
21     Civil Procedure 30(e) before the deposition
22     was completed.
23         In witness whereof, I have hereunto
24     set my hand this 19th day of August, 2009.
25             ------------------------------------
            TSG Reporting - Worldwide (877) 702-9580

## Page 202

HIGHLY CONFIDENTIAL - G. LaROCCA
INDEX

| WITNESS: | EXAMINATION BY | PAGE |
|---|---|---|
| G. LaROCCA | Mr. Gaffey | 5, 197 |
| | Mr. Wood | 157 |
| | Ms. Taggart | 180 |
| | Mr. Stern | 198 |

EXHIBITS:                                    PAGE

Exhibit 202, a document bearing Bates Nos.    62
ECI-EX-00000042 through 43

Exhibit 203, a document bearing Bates Nos.    64
BCI-EX-00000080

Exhibit 204, a document bearing Bates Nos.    69
BCI-EX-00000081

Exhibit 205, Motion Under 11 U.S.C. Sections   83
105 and 363 and Fed. R. Bankr. P. 9019(a)
for Entry of an Order Approving Settlement
Agreement

Exhibit 206, a letter from Hamish Hume dated   88
July 31, 2009

Exhibit 207, a document bearing Bates Nos.    89
BCI-EX-00099493 through 99517

Exhibit 208, a document bearing Bates Nos.    143
BCI 006119 through 6646

TSG Reporting - Worldwide (877) 702-9580

## Page 203

HIGHLY CONFIDENTIAL - G. LaROCCA
INDEX (Cont'd.)

EXHIBITS:                                    PAGE

Exhibit 209, a document bearing Bates Nos.    150
BCI-EX-00079307 through 79309

Exhibit 210, a document bearing Bates Nos.    153
BCI-EX-00082420 through 82422

Exhibit 211, a letter from C. Green to        155
R. Gaffey dated August 18, 2009

Exhibit 212, an e-mail string, the first one   168
in time from N. Reyda to ITD War Room, dated
September 19, 2008

Exhibit 213, an e-mail string, the first in    168
time from G. LaRocca to A. Blackwell, dated
September 20, 2008

Exhibit 214, an e-mail from T. Hasenpusch to  171
A. Blackwell and others, with attachment

Exhibit 215, a document bearing Bates Nos.    193
BCI-EX-(S)-00034528 through 34529

TSG Reporting - Worldwide (877) 702-9580

## Page 204

1    HIGHLY CONFIDENTIAL - G. LaROCCA
2    NAME OF CASE:  In re Lehman Brothers
3    DATE OF DEPOSITION:  August 19, 2009
4    NAME OF WITNESS:  Gerard LaRocca
5    Reason Codes:
6        1. To clarify the record.
         2. To conform to the facts.
7        3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25        GERARD LaROCCA

TSG Reporting - Worldwide (877) 702-9580

# BCI EXHIBIT

# 83

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3              SOUTHERN DISTRICT OF NEW YORK

4    ------------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS      Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al,    (Jointly Administered)

9                Debtors.

10   ------------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF IAN LOWITT

14             New York, New York

15             August 20, 2009

16

17   Reported by:

18   MARY F. BOWMAN, RPR, CRR

19   JOB NO. 24043

20

21

22

23

24

25

Page 2

```
 1
 2
 3
 4                  August 20, 2009
 5                   9:31 a.m.
 6
 7
 8
 9         Deposition of IAN LOWITT, held at
10   the offices of Jones Day, LLP, 222 East 41st
11   Street, New York, New York, before Mary F.
12   Bowman, a Registered Professional Reporter,
13   Certified Realtime Reporter, and Notary Public
14   of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2                APPEARANCES:
 3   JONES DAY, LLP
 4   Attorneys for Lehman Brothers, Inc.
 5       222 East 41st Street
 6       New York, New York  10017-6702
 7   BY:  ROBERT GAFFEY, ESQ.
 8        BRIDGET CRAWFORD, ESQ.
 9
10   BOIES, SCHILLER & FLEXNER, LLP
11   Attorneys for Barclays and The Witness
12       5301 Wisconsin Avenue, NW - Suite 800
13       Washington, DC 20015
14   BY:  HAMISH HUME, ESQ.
15
16   WILLKIE FARR & GALLAGHER, LLP
17   Attorneys for the Witness
18       1875 K Street NW
19       Washington DC  20006-1238
20   BY:  RICHARD D. BERNSTEIN, ESQ.
21        KELLY M. HNATT, ESQ.
22
23
24
25
```

Page 4

```
 1
 2               APPEARANCES:
 3   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
 4   Attorneys for the Creditors Committee
 5       865 Figueroa Street, 10th Floor
 6       Los Angeles, CA  90017
 7   BY:  ERICA P. TAGGART, ESQ.
 8
 9   JENNER & BLOCK, LLC
10   Attorneys for the Examiner
11       330 N. Wabash Avenue
12       Chicago, Illinois  60611-7603
13   BY:  ROBERT L. BYMAN, ESQ.
14
15   HUGHES, HUBBARD & REED, LLP
16   Attorneys for the SIPA Trustee
17       One Battery Park Plaza
18       New York, New York  10004-1482
19   BY:  NEIL J. OXFORD, ESQ.
20        JOHN F. WOOD, ESQ.
21
22   Also Present:
23       THOMAS E. HOMMEL, ESQ.
24          Lehman Brothers Holdings
25       PHILIP E. KRUSE, Alvarez & Marsal
```

Page 5

```
 1
 2
 3
 4
 5          IT IS HEREBY STIPULATED AND AGREED, by
 6   and between the attorneys for the respective
 7   parties herein, that filing and sealing be
 8   and the same are hereby waived.
 9          IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form
11   of the question, shall be reserved to the
12   time of the trial.
13
14
15          IT IS FURTHER STIPULATED AND AGREED
16   that the within deposition may be sworn to
17   and signed before any officer authorized to
18   administer an oath, with the same force and
19   effect as if signed and sworn to before the
20   Court.
21
22
23
24
25
```

Page 6

1    LOWITT - HIGHLY CONFIDENTIAL
2    IAN LOWITT,
3        called as a witness by the parties,
4        having been duly sworn, testified as
5        follows:
6    EXAMINATION BY
7    MR. GAFFEY:
8        Q.  Good morning, Mr. Lowitt. My name is
9    Bob Gaffey. We met briefly before. I am with
10   Jones Day. We're special counsel to the estate of
11   Lehman Brothers Holdings, Inc., and as you
12   probably know, we are looking into issues arising
13   from the transaction in September of 2008 wherein
14   Barclays purchased certain assets of Lehman.
15       I should say to start, I have had a
16   request from my friends at the bottom of the table
17   who have been with us the last couple of days to
18   keep my voice up so they can hear, and I am going
19   to ask you to do the same thing.
20       Have you had your deposition taken
21   before?
22       A.  I have not.
23       Q.  Just a couple of ground rules. One,
24   try and keep your voice up for everybody. Two,
25   please give me audible answers. The court

Page 7

1    LOWITT - HIGHLY CONFIDENTIAL
2    reporter can't take down a nod or a shake of the
3    head. So for the sake of a clear record, please
4    try to do that.
5        If you need a break at any time, say
6    so. If there is a question pending and there is
7    not an issue about whether there's a privilege
8    applying to that answer, what I would ask is for
9    an answer to that, and then if you need to, you
10   can step out into the hall and we will take a
11   short break.
12       A.  Okay. Thank you.
13       Q.  Can you give me a description,
14   Mr. Lowitt, of your education after secondary
15   school?
16       A.  I attended the University of
17   Witwatersrand in South Africa, in Johannesburg.
18       MR. BYMAN: I cannot hear you at all.
19   Can you speak up.
20       A.  I attended the University of
21   Witwatersrand in Johannesburg, South Africa, did
22   an undergraduate degree in electrical engineering,
23   and then I did a Master's degree in electrical
24   engineering.
25       And then I went to Oxford in England

Page 8

1    LOWITT - HIGHLY CONFIDENTIAL
2    and did a PPE, philosophy, politics and economics,
3    and then I did a graduate degree in economics at
4    Oxford.
5        Q.  What college at Oxford?
6        A.  I was at Merton College.
7        Q.  After you took your second degree at
8    Oxford, is that the end of your education?
9        A.  That is the end of my education.
10       Q.  Do you keep any professional licenses?
11       A.  I do not.
12       Q.  Have you ever? Series 7, series 23,
13   anything like that?
14       A.  No.
15       Q.  Now, you currently are employed as the
16   chief operating officer of Barclays Wealth
17   Americas; is that correct?
18       A.  That is correct.
19       Q.  How long have you held that position?
20       A.  Since April of this year.
21       Q.  And when did you first start work for
22   Barclays?
23       A.  I joined Barclays I guess the Monday
24   that the deal closed.
25       Q.  That would be September 22nd?

Page 9

1    LOWITT - HIGHLY CONFIDENTIAL
2        A.  I believe that's correct.
3        MR. GAFFEY: Off the record for a
4    second.
5        (Off-the-record discussion)
6        Q.  What was your position when you first
7    joined Barclays on September 22nd?
8        A.  I didn't have a position on the day
9    that I joined Barclays on September 22nd, but
10   within a few days, I was appointed as the director
11   of integration for the Lehman businesses.
12       Q.  And what were your duties as director
13   of integration?
14       A.  To work with Barclays on integrating
15   the Lehman businesses into the Barclays
16   infrastructure.
17       Q.  Is that the position you held until
18   April when you took your current position as head
19   of Barclays Wealth?
20       A.  That's correct.
21       Q.  And prior to taking up employment with
22   Barclays, you were employed by Lehman, correct?
23       A.  That is correct.
24       Q.  Do you know which entity within the
25   Lehman family you were employed by?

Page 10

LOWITT - HIGHLY CONFIDENTIAL

A. I don't know with certainty. I
believe it was LBI, but I don't know with
certainty.

Q. As I understand it, you began work at
Lehman in about 1994 as head of corporate
development?

A. That is correct.

Q. Was that head of corporate development
at Lehman Brothers Holdings, Inc.? Do you recall
that?

A. I know that my position was head of
corporate development. I can't be clear on
whether it was the holding company that employed
me or LBI. It is not a distinction that I would
have noted at that time.

Q. And you served as treasurer and global
head of tax from 2000 to 2005, correct?

A. That is correct.

Q. And from July of 2005 until October of
2006, you acted as chief administrative officer of
LBHI Europe; is that correct?

A. I was the chief administrative officer
for the European business. I don't know whether
that was holdings or LBIE, but that was my

Page 11

LOWITT - HIGHLY CONFIDENTIAL
position.

Q. And after you -- did you take on a
position after you acted as chief administrative
officer?

A. Yes, I did.

Q. What position was that?

A. I was the co-global CAO for Lehman.

Q. How long were you the co-global CAO
for Lehman?

A. From when I returned from London,
which I recall as being January 2007, through my
employment with Barclays.

Q. And then in or around June of 2008 --
did you leave Lehman at any time?

A. I did not.

Q. In or around June of 2008, you became
chief financial officer, correct?

A. That is correct.

Q. And what were your duties as chief
financial officer?

A. I needed to run the finance
department, the product control, the financial
control, tax and treasury.

Q. And within those responsibilities were

Page 12

LOWITT - HIGHLY CONFIDENTIAL
you responsible to insure that the books and
records of the corporation were kept accurately?

A. Maintaining the accuracy of the books
and records was the responsibility of the -- a lot
of people in the finance department, and it
included myself.

Q. Well, it included yourself but
ultimately reported up to yourself, correct?

A. Correct.

Q. You were the man in charge of that
operation?

A. I was in charge of that.

Q. Now, there came a time in September of
2008, Mr. Lowitt, did there not, when Lehman
engaged in discussions with Barclays about a
potential acquisition of Lehman by Barclays? Is
that correct?

A. That is correct.

Q. And to your knowledge, when did those
discussions first take place?

A. I believe there were discussions that
began on the Friday before the bankruptcy filing
on the Sunday. I wasn't party to those
discussions, but I believe that there was contact

Page 13

LOWITT - HIGHLY CONFIDENTIAL
between people at Lehman and people at Barclays
from that point.

Q. And although you were not involved in
the discussions in those -- that period before the
bankruptcy, did you play any role or have any
involvement in activities related to those
discussions?

A. There was some due diligence work that
was done on the Friday. I didn't participate in
those meetings but I was aware that it had taken
place.

Q. Was any of the due diligence work
being done under your supervision or were you
responsible for any part of it?

A. There were -- the people who were
meeting with the folks at Barclays were people who
reported to me.

Q. Who were those people who were meeting
with Barclays? Again I am still in the period
before the bankruptcy filing.

A. My recollection is Martin Kelly met
with some of his counterparties at Barclays.

Q. As CFO of Lehman, to whom did you
report?

Page 14

**LOWITT - HIGHLY CONFIDENTIAL**

1   A.   I reported to Bart McDade, who was the
2   president of Lehman Brothers.
3   Q.   Did you have one or more persons who
4   were direct reports to you?
5   A.   I did.
6   Q.   Who were your direct reports?
7   A.   Well, I had direct reports within the
8   finance organization, which included Jerry Reilly,
9   who was the product controller; Martin Kelly, who
10   was the financial controller; Paolo Tonucci, who
11   was the treasurer of the firm; John DeRosa, who
12   was the head of tax, in addition to others.
13   And then I had reports which I
14   maintained through my CAO role which included the
15   other head of IT, which was Bridget O'Connor, and
16   the head of operations, which was Alastair
17   Blackwell. It also included Bob Lieberberg, who
18   ran expense management for us, and others.
19   MR. BYMAN: I hate to be a pest, but
20   your voice does drop. It is difficult to
21   hear you. I don't want to ask the reporter
22   to repeat things which will make double your
23   agony, so --
24   THE WITNESS: I will try. I

Page 15

**LOWITT - HIGHLY CONFIDENTIAL**

1   apologize.
2   BY MR. GAFFEY:
3   Q.   I won't think you're yelling at me if
4   you keep your voice up.
5   Now, the discussions between Lehman
6   and Barclays that were taking place prior to the
7   filing of the bankruptcy, as I understand it, sir,
8   did not result in an agreement between the two
9   entities. Is that your understanding as well?
10   A.   That is my understanding.
11   Q.   And to your knowledge, did discussions
12   at some point resume between Barclays and Lehman?
13   A.   Yes, they did.
14   Q.   And when did that occur?
15   A.   I believe that Bart McDade was in
16   contact with folks at Barclays on the Monday
17   morning after the filing for bankruptcy.
18   Q.   That would be September 15?
19   A.   I -- if that was --
20   Q.   OK.
21   A.   If that was the Monday, September 15.
22   Q.   And tell me what you know about the
23   contact Mr. McDade had with folks at Barclays
24   beginning on Monday the 15th.

Page 16

**LOWITT - HIGHLY CONFIDENTIAL**

1   A.   I understood from Bart that Barclays
2   were interested in potentially transacting an
3   acquisition of some of the assets of LBI and
4   buying the businesses that were in LBI or some
5   subset of those businesses, and that the details
6   would be worked out over the course of the next
7   day.
8   Q.   And how did you gain that
9   understanding? Did you speak to Bart McDade?
10   A.   I did speak with Bart.
11   Q.   Did he tell you anything else that you
12   can remember now about that initial contact with
13   Barclays and Lehman?
14   A.   He also shared with me that there were
15   eight individuals that Barclays deemed as critical
16   to the transaction, and that I was one of those
17   eight individuals.
18   Q.   Who were the other seven?
19   A.   The other seven, to the best of my
20   recollection, was Mike Gelband, Eric Felder, Ajay
21   Nagpal, Tom Humphrey, Hyung Lee, myself.
22   Q.   Is Skip McGee the last one?
23   A.   Skip McGee. And I -- Bart indicated
24   to me that he was not going to be part of that

Page 17

**LOWITT - HIGHLY CONFIDENTIAL**

1   group of eight.
2   Q.   What did Mr. McDade tell you about not
3   being part of the group of eight, best you recall?
4   A.   Nothing beyond that.
5   Q.   Did you understand him to be saying he
6   wasn't going to work at Barclays after the
7   transaction or he wasn't one of the eight that
8   Barclays considered to be critical to the deal?
9   A.   He just indicated that he wasn't part
10   of the eight.
11   Q.   Now, did there come a time when you
12   began to negotiate or -- withdrawn.
13   Did there come a time when you began
14   to discuss with Barclays the terms and conditions
15   upon which you would be employed at Barclays after
16   the transaction?
17   A.   I met with Rich Richie at some point
18   on early Tuesday morning.
19   Q.   And tell me about your meeting with
20   Mr. Richie. What did you say? What did he say?
21   A.   To the best of my recollection, he
22   indicated that they wanted me to be part of the
23   transaction, that having me be part of their
24   organization was important. And he shared with me

Page 18

LOWITT - HIGHLY CONFIDENTIAL

1 the terms that they would be extending to me.
2    **Q.** **What terms did he share with you that**
3 **they would be extending to you?**
4    A. The terms were that a payment in
5 February, 2009, which was equal to 80 percent of
6 my 2007 compensation, and two additional special
7 payments to be paid at one-year anniversaries of
8 the deal closing, which were each equal to
9 25 percent of my 2007 compensation.
10    **Q.** **How much was that in dollar amount,**
11 **the 80 percent of your 2000 comp?**
12    A. $6 million.
13    MR. BERNSTEIN: Again, we as
14 Mr. Lowitt's counsel will want to be part of
15 the process, and I understand from last time
16 we had a right to be part of the process in
17 terms of maintaining the highly confidential
18 designation for this deposition and
19 particularly for any discussion about his
20 compensation.
21    MR. GAFFEY: Richard, if you mean by
22 maintaining the highly confidential
23 designation it is bound by the
24 confidentiality order and our agreement that

Page 19

LOWITT - HIGHLY CONFIDENTIAL

1 everything in the depositions is highly
2 confidential until designations come and
3 some period after that, then I agree.
4    I am not waiving any rights we have
5 under the confidentiality order to go back
6 and say we don't think it is highly
7 confidential and to take it to the Court if
8 we need to.
9    MR. BERNSTEIN: I didn't think you
10 were.
11    MR. GAFFEY: I just wanted to make it
12 clear.
13    **Q.** **And the two special -- I don't know if**
14 **you called it -- the two payments you described,**
15 **one on your first anniversary and one on your**
16 **second, what are the amounts of those, sir?**
17    A. It is 25 percent of the 7.5. I think
18 it is 1.875. but I may have those numbers slightly
19 wrong.
20    **Q.** **Did you at some point enter into a**
21 **written agreement with Barclays concerning the**
22 **terms and conditions of your employment by**
23 **Barclays?**
24    A. I did.

Page 20

LOWITT - HIGHLY CONFIDENTIAL

1    **Q.** **About when did you do that?**
2    A. I think I did that on the Thursday
3 evening.
4    **Q.** **By the Thursday evening, you are**
5 **talking about the Thursday after the bankruptcy**
6 **filing on the 15th?**
7    A. Correct.
8    **Q.** **That would be September 18th?**
9    A. If that's the Thursday.
10    **Q.** **While we are looking for an exhibit**
11 **that I want to mark, Mr. Lowitt, was there any**
12 **back and forth between you and Barclays about the**
13 **financial terms of your employment?**
14    A. No.
15    **Q.** **And when did you -- did they send a**
16 **draft contract at some point?**
17    A. They did.
18    **Q.** **How was that delivered to you?**
19    A. I believe it was delivered to me by
20 Anthony Collerton.
21    **Q.** **And Anthony Collerton was I think head**
22 **of HR at Lehman or in HR at Lehman?**
23    A. He was in HR in Lehman.
24    **Q.** **It was delivered to you by hard copy,**

Page 21

LOWITT - HIGHLY CONFIDENTIAL

1 **not by e-mail, not by electronic means?**
2    A. Correct. To the best of my
3 recollection. It may have been sent to me in
4 addition in soft copy, but I did have a hard copy.
5    **Q.** **Do you know when any of the other**
6 **seven people that you named signed their contracts**
7 **with Barclays?**
8    A. I don't know when anybody else signed.
9 My understanding was that a condition of the
10 transaction proceeding was that the seven sign
11 their contract.
12    **Q.** **It was your understanding that the**
13 **seven had to sign their contracts before the**
14 **transaction closed?**
15    A. That it was a condition of closing,
16 was at least my understanding.
17    **Q.** **And from whom did you obtain that**
18 **understanding?**
19    A. I don't have a specific recollection
20 of where I heard that.
21    **Q.** **Do you have any general recollection**
22 **about that?**
23    A. No, I -- I don't know specific -- I
24 have no recollection of how I got that.

Page 22

LOWITT - HIGHLY CONFIDENTIAL
1
2    Q.   Were you -- in the week between the
3    filing of the bankruptcy on the 15th and the
4    closing of the transaction on the 22nd, did you
5    have any involvement in either negotiating or
6    implementing the terms of the agreement?
7    A.   I didn't have a role in negotiating
8    the transaction. And I guess I'm not sure what
9    you mean by implementing the transaction. I
10   certainly played a role in providing information
11   to those folks who were doing the negotiation.
12   Q.   Were you kept apprised by Mr. McDade
13   of the state of negotiations through the week?
14   And by the week, I mean between the 15th and the
15   22nd.
16   A.   Not in any formal way. There may have
17   been elements that he shared with me, but I
18   don't -- I was -- it wasn't part of -- he wasn't
19   keeping me regularly updated on that.
20   Q.   Was one of your responsibilities
21   during that week to identify assets that would be
22   transferred from Lehman to Barclays?
23   A.   That is an exercise that I was
24   involved with towards the end of that week.
25   Q.   When towards the end of the week?

Page 23

LOWITT - HIGHLY CONFIDENTIAL
1
2    Tell me on what day that began.
3    A.   I can't be more precise. I believe it
4    was on the Friday, the 19th, after the repo
5    transaction had taken place.
6    Q.   And prior to Friday, the 19th, did you
7    have any involvement in the activities surrounding
8    the transaction?
9    MR. BERNSTEIN: Objection, vague and
10   ambiguous.
11   But you can answer.
12   A.   Yeah, I'm -- I'm not sure what you are
13   getting at.
14   Q.   Let me try and rephrase it.
15   As a general matter, and I'll
16   obviously follow up on this, I am trying to get an
17   idea, Mr. Lowitt, of what you were doing during
18   that week. Could you sort of take me through the
19   week and give me a general idea of what your
20   activities were?
21   A.   The focus for me during that week was
22   a combination of dealing with funding issues,
23   which were quite extreme; dealing with personnel
24   issues with a number of people in the
25   organization, very disconcerted with what had

Page 24

LOWITT - HIGHLY CONFIDENTIAL
1
2    happened to Lehman and worried about their
3    futures; and then supporting, you know, specific
4    requests, you know, from Bart and others.
5    Q.   Who were the others in addition to
6    Bart that you just referred to?
7    A.   Well, the other people who were
8    involved with the negotiation were Mark Shapiro,
9    Mark Schaefer. Skip McGee I think was involved in
10   some of the questions and issues, and I think
11   Steve Berkenfeld was providing, you know, legal
12   advice. There may have been others.
13   Q.   What were the nature of the funding
14   issues that you said were a focus of your
15   activities during that week?
16   A.   Well, clearly there was very
17   substantial market disruption following the Lehman
18   bankruptcy filing. Clearly, there was, you know,
19   a great deal of fear in the marketplace with
20   secured funders, and there was concern about, you
21   know, LBI, and so we had people not rolling their
22   secured funding and we needed to find other ways
23   to fund the firm.
24   Initially, we were utilizing the Fed,
25   but on Wednesday became involved, together with

Page 25

LOWITT - HIGHLY CONFIDENTIAL
1
2    folks at Barclays, in arranging for the Fed to be
3    taken out of their repo position with LBI and to
4    have that repo replaced with one with Barclays.
5    Q.   And was what you were doing in
6    connection with -- actually, let me just follow up
7    on a phrasing. When you say rolling the funding,
8    in layman's terms, does that mean not continuing
9    the next day?
10   A.   Correct. People were canceling their
11   repo trades and returning the collateral for cash.
12   Q.   When you were dealing with Barclays
13   with respect to the repurchase transaction, and
14   again that is something we will talk about in more
15   detail today, were you --
16   A.   When you say repurchase transaction --
17   Q.   That's the transaction that I think
18   you were just referring to where Barclays supplied
19   funding for the firm.
20   A.   Right. Where Barclays took the Fed
21   out of their repo position.
22   Q.   OK. And give me a little more detail,
23   if you would, on your activities in connection
24   with the repo transaction. What did you do in
25   connection with the repo transaction?

**LOWITT - HIGHLY CONFIDENTIAL**

A.    Well, I was asked to join people from Barclays in a meeting with the Fed to talk through the logistics and details of how that transaction would take place.  And then on the -- that was on the Wednesday.

And then on the Thursday was, you know, involved in -- together with other folks at Lehman, in insuring that the -- you know, the collateral movements and cash movements were taking place as, you know, expected by the transaction.

Q.    Is it fair to characterize what you were engaged in during those couple of days as negotiations with Barclays over the terms of the repo?

A.    There was no negotiation with regard to the terms of the repo.  The repo was -- the repo with the Fed was governed by the haircuts that the Fed applied to various term -- parts of collateral, and then when the collateral went over to Barclays, it was again being driven by the Schedule A that Barclays had in place.

So there was no negotiation or pricing elements involved in that at all.  It was just the

LOWITT - HIGHLY CONFIDENTIAL

mechanics of moving collateral out of the Fed and getting cash back for that, playing cash to the Fed, and then the reverse on the Barclays side, getting the collateral to Barclays and receiving cash in from Barclays.

MR. BERNSTEIN:  The record says "playing cash to the Fed."  Did you say "playing" or "paying"?

THE WITNESS:  "Paying."

MR. BERNSTEIN:  Thank you.  Go ahead.

BY MR. GAFFEY:

Q.    Were there any discussions with Barclays about what implied interest rate would be applied in the reverse repo?

A.    Not that I was aware of.

Q.    When you referred to the Schedule A a moment ago, is that -- could you describe for me what you meant by Schedule A?

A.    In financing transactions, any counterparty that's extending cash against collateral would specify what are the haircuts that apply to any piece of collateral that they would be willing to lend against to protect them in the event that that collateral needed to be

LOWITT - HIGHLY CONFIDENTIAL

sold out and they would realize their cash as a result of that sale.

So there is standard haircuts that operate across the marketplace, and in certain cases individual institutions would adjust their haircuts relative to the standards that prevailed in the marketplace, and that tends to get characterized on a schedule that is just called the Schedule A.  So I am using shorthand for that.

Q.    When you refer to a haircut, just to try to put this in layman's terms, the haircut is the difference between the value of the security used as collateral and the amount at which the purchaser will pay for it on the first leg of the repo, yes?

A.    It is the difference between the amount of cash that somebody is willing to extend to a given collateral value.  So if there is, you know, $100 worth of government bonds, they would be willing to, just to make the point, extend $99 of cash, because in the event that they -- the repo had to get canceled, they would take the government bonds and they would have to sell those government bonds to recover the 99 of cash that

LOWITT - HIGHLY CONFIDENTIAL

they extended, and there is always uncertainty in what you can sell collateral for in the marketplace, even if it is very liquid collateral, and the haircuts would tend to be larger for less liquid security.

Q.    What was the mechanism by which the collateral underlying the fed repo was valued?

A.    Well, within triparty, the triparty agent, so in the case of the fed repo, JP Morgan Chase maintains as part of their triparty service a pricing mechanism for the collateral that's being funded on behalf of, in our case, Lehman with the various funding counterparties, so that pricing is part of the triparty service, so that that pricing would have been provided by JP Morgan Chase in the example of the Fed repo.

Q.    Do you know if there was any comparison made between the pricing that JP Morgan Chase applied in the triparty and the values ascribed to the particular securities as collateral on Lehman's books?

A.    Well, these would be, you know, liquid securities, so the pricing, one would expect the pricing to be the same or very similar.  I

Page 30

LOWITT - HIGHLY CONFIDENTIAL

1    wouldn't imagine that there would be sources of
2    difference.
3    Q.  Thanks.
4        Was there a comparison made, do you
5    know?
6    A.  I'm not aware of a specific
7    comparison.
8    Q.  Was there anything else that you did
9    in connection with arranging the repurchase -- for
10   Barclays to take over the Fed repo?
11   A.  Nothing that I recall specifically
12   that we haven't talked about already.
13   Q.  Did you consider it part of your
14   duties in the course of doing that work to protect
15   the interest of Lehman?
16       MR. BERNSTEIN:  Objection, vague and
17   ambiguous.
18   A.  I saw myself as having to support
19   Lehman Brothers and do the -- and I was an
20   employee of Lehman Brothers at that point, so yes.
21       (Exhibit 216, document Bates stamped
22       BCI-EX77335 through 37 marked for
23       identification, as of this date.)
24   Q.  Mr. Lowitt, I have put before you what

Page 31

LOWITT - HIGHLY CONFIDENTIAL

1    we have marked as Exhibit 216.  Do you recognize
2    the document?
3    A.  I do.
4    Q.  Is that your employment agreement with
5    Barclays?
6    A.  I don't know if it is an employment
7    agreement.  It is certainly the offer that I got
8    from Barclays that I signed on the 18th that we
9    talked about.  I guess I'm just not sure what
10   employment contract means, but yes, it is the
11   agreement that I signed with Barclays.
12   Q.  Well, in this document, you agree to
13   work with Barclays and they agree to pay you a
14   certain amount of money, correct?
15   A.  Yeah, I did sign the document.
16   Q.  And you understood it to be an
17   agreement by you to work for Barclays, and an
18   agreement by Barclays to pay you a certain amount
19   of money for that, correct?
20       MR. BERNSTEIN:  Objection,
21   misrepresents the document.
22   A.  It is an offer to join Barclays
23   Capital.  It is subject to the transaction
24   closing.  It specifies duties and responsibilities

Page 32

LOWITT - HIGHLY CONFIDENTIAL

1    that are consistent with my present duties with
2    Lehman Brothers.  That was what I understood that
3    I was signing.
4    Q.  OK.  And the date on your signature on
5    the third page, 18 September, is that the date on
6    which you signed this offer?
7    A.  I believe it is.
8    Q.  Did you think there was any conflict
9    between your obligations to protect the interests
10   of Lehman through the rest of the week and the
11   fact that you were under -- you had accepted an
12   offer from Barclays for employment for which you
13   would be paid in excess of $10 million?
14   A.  Well, I -- I don't -- the $10 million,
15   I'm not sure how you are getting to that.  There
16   were a lot of things that needed to happen for me
17   to receive payment, including remaining with
18   Barclays through sort of the time when bonuses
19   were paid, to get initial payment of, what I see
20   here is $4.560 million, and then I would need to
21   remain employed with Barclays through the
22   anniversary dates to get the special cash awards.
23       So those were the numbers of what I
24   was expecting to get paid.  I knew that this was

Page 33

LOWITT - HIGHLY CONFIDENTIAL

1    conditional on the transaction closing.  And until
2    that point, I remained an employee of Lehman
3    Brothers.
4    Q.  My question is -- let me rephrase the
5    question a bit.
6        Did you see any conflict between your
7    obligations during the week between the 15th and
8    the 22nd to protect the interests of Lehman in the
9    fact on the 18th of September you had an agreement
10   signed with Barclays where you stood to be paid up
11   to $10 million over the next two years?
12   A.  I recognize that in that week, I was
13   an employee of Lehman Brothers, I was working
14   to -- in the interests of -- I was working in the
15   interests of Lehman Brothers.  If a transaction
16   did occur, then I had an opportunity to join
17   Barclays and contribute to Barclays and get paid
18   by Barclays.
19   Q.  And if the transaction with Barclays
20   had not closed, what were Lehman's prospects?
21   A.  Oh, I think that Lehman -- I don't
22   know -- it is pure speculation on my part, but it
23   would have been difficult to see how Lehman would
24   have, you know, continued to operate.  I mean post

LOWITT - HIGHLY CONFIDENTIAL

1  the bankruptcy, the objective was to wind down LBI
2  in an orderly fashion. Whether one could in fact
3  have wound it down in an orderly fashion given how
4  much turmoil there was in the market the week
5  after the bankruptcy filing in the absence of the
6  transaction I think has to be seen as quite
7  unlikely.
8      Q.   And you would have lost your job?
9      A.   I would not have been employed by
10  Lehman. I mean possibly, as others, would have,
11  you know, joined the estate in assisting with the
12  wind-down of the remaining positions as other
13  folks did. But --
14      Q.   Was it your view you could make that
15  amount of money working for the estate?
16      A.   I really wasn't focused on how much
17  money I was potentially going to make if I stayed
18  at Barclays (sic) through the course of that week.
19  I was working to see if we could -- we could get a
20  transaction with Barclays which we all believed
21  were in the interests of our employees and all the
22  participants, including the creditors.
23      Q.   Did you discuss with anyone whether
24  the fact that you had a signed offer letter with

LOWITT - HIGHLY CONFIDENTIAL

1  Barclays on September 18 presented a conflict in
2  your duties?
3      A.   There were people within Lehman who
4  obviously knew that I was one of the eight, and
5  given that I wasn't involved in the negotiation, I
6  didn't feel a specific conflict.
7      Q.   Thank you.
8           Let's go back to the negotiations, all
9  right. I want to, just to frame this for a time
10  period point, I want to go back to the Monday,
11  which is when I think you told me you first spoke
12  to Mr. McDade about the fact there were renewed
13  negotiations with Barclays. That was the Monday,
14  correct?
15      A.   That is correct.
16      Q.   What is your understanding of what
17  happened next between the Monday and the Tuesday?
18      A.   Well, in the Monday evening, you know,
19  a number of Barclays folks came to meet with their
20  counterparts at Lehman to understand, you know,
21  what was the inventory and the assets in the firm.
22  And then there were, you know, groups of folks who
23  were also involved that evening in crafting a
24  deal.

LOWITT - HIGHLY CONFIDENTIAL

1      Q.   And can you tell me who were the
2  Barclays folks who came to meet with your
3  counterparts at Lehman to understand what was the
4  inventory and assets in the firm?
5      A.   I don't know the names of all of them.
6  But the -- you know, the head of interest rates
7  would have met with the head of interest rates at
8  Lehman, and the head of credit would have, you
9  know, met with Eric Felder, for example.
10      Q.   Can you give me a roster of who was
11  involved in the Lehman side on this activity?
12      A.   I think the people -- not a complete
13  list, but it would have included Mike Gelband, who
14  was the head of capital markets. It would have
15  included Alex Kirk, and it would have included
16  Eric Felder.
17           There may well have been others, but
18  those three I'm sure were involved.
19      Q.   Did any of them meet with you, any of
20  the Barclays people meet with you at that point?
21  I'm on the Monday into the Tuesday.
22      A.   I mean I met with Rich Richie. I --
23  there were some meetings -- I wouldn't say a
24  meeting, but sort of contact where we were --

LOWITT - HIGHLY CONFIDENTIAL

1  where I was introducing some of the Barclays
2  people to some of the Lehman people.
3           I mean I recall one situation where
4  there was one asset that the Barclays folks
5  weren't sure what it was, and the person who was
6  in a position to explain it was Jim Seery, so I
7  put the Barclays person, whose name I can't
8  recall, in contact with Jim to understand the
9  particular asset.
10      Q.   And did any of the people who worked
11  directly for you, who were your direct reports or
12  people who reported to them, were they involved in
13  these meetings with the Barclays folks to
14  understand the inventory and assets of the firm?
15      A.   I don't know. You know, Jerry Reilly,
16  who was the head of product control, may well have
17  been involved in some of those meetings, given
18  that he was knowledgeable about some of the
19  assets, but I'm not aware specifically of any of
20  my reports meeting specifically with people
21  specifically at Barclays, but they may well have.
22      Q.   When you met with Mr. Richie, you
23  talked about the fact that you were one of the
24  eight and that he wanted you at Barclays. Did you

Page 38

LOWITT - HIGHLY CONFIDENTIAL

1      LOWITT - HIGHLY CONFIDENTIAL
2  talk about anything else?
3      A.  I don't recall talking about other
4  things.
5      Q.  Did there come a time when you learned
6  that an agreement of terms had been reached
7  between Lehman and Barclays?
8      A.  Well, there were, you know, a number
9  of us waiting in the morning of Tuesday to hear
10  that terms had been reached between the two firms,
11  and at some point on the Tuesday morning, I was
12  aware that a deal between the two firms had, in
13  fact, been reached.
14      Q.  How did you become aware of the fact
15  that a deal between the two firms had been
16  reached?
17      A.  I can't recall precisely. I imagine
18  somebody who was in the room negotiating would
19  have come out and shared with, you know, the
20  senior Lehman folks who were waiting on the 32nd
21  floor that had taken place, but I can't be
22  more specific in my recollection.
23      Q.  Who were the senior Lehman folks who
24  were waiting on the 32nd floor to learn whether an
25  agreement had been reached?

Page 39

LOWITT - HIGHLY CONFIDENTIAL

1      LOWITT - HIGHLY CONFIDENTIAL
2      A.  Well, it included -- my recollection
3  is Skip McGee was there, Paul Parker. It would
4  have involved, included some of the finance folks
5  that had been working that evening. So Jerry
6  Reilly, Martin Kelly.
7      Q.  A tumultuous week for everybody. Are
8  you there on the premises all night?
9      A.  Yeah, I was.
10      Q.  What were you doing, other than
11  waiting?
12      A.  I was involved in collecting the input
13  that was being generated by different parties,
14  vis-a-vis the assets that were, you know, going to
15  be part of the transaction.
16      Q.  Tell me what you did in terms of
17  collecting input that was generated by different
18  parties vis-a-vis the assets that were going to be
19  part of the transaction.
20      A.  There were a number of people that
21  were, you know, involved in that. There was
22  obviously input from the various business teams
23  with regard to which assets the Barclays folks
24  were interested in purchasing and which ones they
25  weren't. There was, you know, an effort to match

Page 40

1      LOWITT - HIGHLY CONFIDENTIAL
2  up assets and liabilities, and again a number of
3  folks in Lehman were involved in that effort.
4      Q.  And what were you doing? What were
5  your activities? You described that there were
6  teams looking at assets and teams looking at
7  liabilities. I want to get a sense of what you
8  were doing over the night from Monday to Tuesday,
9  from the 15th to the 16th.
10      A.  Well, part of what I was doing was
11  meeting with some of the -- as I indicated, you
12  know, introducing some of the Barclays folks to
13  Lehman folks, and some part of what I was doing
14  was, let's say maintaining a sense of where those
15  discussions were coming out. And that's mostly
16  what we were doing.
17      Q.  And were those discussions that you
18  refer to, when you say, talk about the discussions
19  and how they were coming out, are those the
20  discussions -- did they include what the value of
21  the assets are that Barclays will purchase from
22  Lehman?
23      A.  Yeah. It included both -- you know,
24  there were certain assets that as the Barclays
25  folks understood them, they decided they would not

Page 41

1      LOWITT - HIGHLY CONFIDENTIAL
2  want to purchase them, and then there were also,
3  as one would expect, if you were buying big blocks
4  of assets, that you would -- that the price that
5  you would offer to purchase those big blocks of
6  assets would be less than what those assets were
7  trading in the marketplace at that point in time.
8      Q.  Did Lehman's books at that time fairly
9  reflect the value of the assets according to how
10  they were trading at the time?
11      A.  Yes, I believe they did.
12      Q.  So it was your understanding on the
13  15th and the 16th of September of 2008, that
14  Lehman's books carried accurate marks for
15  securities that were recorded therein; is that
16  correct?
17      A.  Yeah. The assets that were on
18  Lehman's books were, particularly LBI, were
19  securities, and securities are priced based on,
20  you know, market sources, and our books and
21  records were accurate.
22      Q.  And as CFO, you were comfortable with
23  the fact that Lehman's books and records were
24  accurate; is that right?
25      A.  There is obviously an enormous process

Page 42

LOWITT - HIGHLY CONFIDENTIAL

1      LOWITT - HIGHLY CONFIDENTIAL
2 that finance goes through and business goes
3 through to validate those prices, and I had
4 confidence in that process to establish the
5 pricing.
6     Q.   Do you know if -- when you learned on
7 the Tuesday morning that there was a deal, what is
8 your memory of the terms that you learned?
9     A.   I didn't know all of the -- I wasn't
10 party to all of the terms.  You know, I was aware
11 that the -- that Barclays was going to purchase a
12 substantial block of assets for less than the
13 amount that we had on our books to reflect a sort
14 of bid offer that reflected both the size of the
15 purchase, as well as the inherent volatility in
16 the market, which was significant that week.
17     Q.   So was Barclays agreeing to buy the
18 assets at a fixed discount?
19       MR. HUME:  Objection, vague and
20 ambiguous.
21     A.   Barclays were going to purchase the
22 assets at a price they were willing to pay to
23 purchase a substantial block of assets at a time
24 that was tumultuous in the marketplace.  That
25 amount was less than the amount that those assets

Page 43

1      LOWITT - HIGHLY CONFIDENTIAL
2 were on our books for.
3     Q.   Was it a discount from the amount
4 shown on Lehman's books?
5       MR. HUME:  Same objection.
6     A.   You keep asking whether it was a
7 discount.  It was an amount that was less than the
8 amount that we had it on our books for, which
9 reflected a bid offer that was consistent with the
10 size of the purchase, as well as the volatility in
11 the marketplace.
12     Q.   Is there a reason you are not
13 agreeable to the term "discount" to describe that?
14     A.   I think my explanation of it is more
15 accurate.  The shorthand for it could be discount.
16 I think that it is important to reflect that the
17 marks that we had on our books were accurate,
18 which I believe was the case, as well as the fact
19 that if you are going to sell a very substantial
20 block of assets, you sell it for an amount, or
21 somebody is going to pay you less than the amount
22 that you actually have it on your books for.
23     Q.   If someone is going to pay you less
24 than the amount that you have it on your books
25 for, you would expect that to be recorded in the

Page 44

1      LOWITT - HIGHLY CONFIDENTIAL
2 agreement for that transaction; is that correct?
3       MR. HUME:  Objection, lacks
4 foundation.
5     A.   The -- my understanding of the
6 transaction was that it included that feature, and
7 how it was reflected in any agreement is not
8 something that I know about.
9     Q.   Tell me what you know about the
10 process by which this difference between the
11 amount shown on Lehman's books and the amount
12 Barclays would pay was determined.
13     A.   I think it was a combination of what I
14 term sort of bottom up, as the Barclays folks met
15 with the Lehman folks and looked at the assets
16 specifically, as well as, you know, a top-down
17 view that, you know, emerged from the negotiation
18 between Lehman and Barclays.
19     Q.   This may be an inartful question, but
20 what ultimately governed the decision as to the
21 amount of the difference between the amount shown
22 on Lehman's books and the price paid?  The
23 bottom-up process or the top-down view?
24       MR. HUME:  Objection, lacks
25 foundation.

Page 45

1      LOWITT - HIGHLY CONFIDENTIAL
2     A.   I mean it is hard for me to say.  I
3 wasn't part of the discussion.  But I would say
4 that the bottoms-up view would have informed what
5 was going on inside the negotiating room, but that
6 in the end, it must have been what was agreed to
7 between the parties in their negotiating sessions.
8     Q.   Do you know if what was agreed to
9 between the parties in their negotiating session
10 with regard to this difference between the amount
11 shown on the books and the price paid was an
12 agreement in terms of a percentage of what was
13 shown in the amount of the books or a raw number?
14     A.   My recollection is that it was a
15 number, not a percentage.
16     Q.   What was the number?
17     A.   My recollection is it was $5 billion.
18     Q.   And do you know how that $5 billion
19 number was calculated?  How it was generated?
20       MR. BERNSTEIN:  Objection, asked and
21 answered.
22       But you can answer it again.
23     A.   I don't know how it was derived, but I
24 understand that if you were buying a big block of
25 assets in one go in a very volatile market, you

Page 46

LOWITT - HIGHLY CONFIDENTIAL

1 would expect to have a fairly substantial bid
2 offer spread associated with that purchase.
3    Q.  Again, it is something I will ask you
4 in more detail as we go through the day, but to
5 your understanding, sir, the deal changed in form
6 over the week?
7    A.  Well, the deal that was consummated
8 and approved by the judge was a completely
9 different deal than the deal that was worked
10 through on the Monday night/Tuesday morning.
11    Q.  I want to get up to the point -- when
12 the deal is approved by the judge, it is at the
13 hearing that takes place on Friday, the 19th? Can
14 we agree on that? I am trying to put the date on
15 that.
16    A.  We can agree on that.
17    Q.  That is all I want you to agree on, is
18 the date.
19      In addition to the Tuesday morning
20 when you learn there is a deal and the hearing on
21 the 19th, the repo arises, right? Barclays steps
22 into the shoes of the Fed on the repo?
23    A.  The Fed insists on Barclays taking
24 them out of the repo.
25

Page 47

LOWITT - HIGHLY CONFIDENTIAL

1    Q.  For whatever reason, Barclays takes
2 them out of the repo?
3    A.  Correct.
4    Q.  The repo ultimately plays a role in
5 the transaction, correct?
6      MR. HUME: Objection, vague and
7 ambiguous.
8    Q.  The deal ultimately becomes giving to
9 Barclays the collateral that's in the repo, yes?
10      MR. BERNSTEIN: Objection, vague and
11 ambiguous.
12    A.  The deal was that Barclays would keep
13 the collateral that was in the repo, and those
14 were the assets that Barclays was going to take as
15 part of the transaction.
16    Q.  And the $5 billion number we talked
17 about before, did that number stay in the deal
18 through its various iterations?
19    A.  Well, the repo transaction was just a
20 different thing. As we discussed earlier, you
21 know, the standard repo construct is one where a
22 lender extends less cash than the amount of
23 collateral they receive to protect them in the
24 event that they have to cancel that repo and sell
25

Page 48

LOWITT - HIGHLY CONFIDENTIAL

1 off the collateral in order to get the cash back
2 that they have extended.
3      And so in a -- the repo that we did
4 with Barclays was done in a way that was
5 completely sort of market standard, and it did
6 include the financing haircut that was typical,
7 and so it is accurate that the transaction as it
8 took place did include that Barclays received
9 collateral for cash through the repo transaction.
10    Q.  And that --
11    A.  And there was a difference between the
12 amount of repo and the cash proceeds, but they
13 were different and not really related to the
14 original transaction.
15    Q.  And the difference between the amount
16 of the repo and the cash proceeds was
17 approximately $5 billion, correct?
18      MR. HUME: Objection, lacks
19 foundation.
20    A.  It, it -- I mean it was in that
21 region.
22    Q.  Now, let's go back to the Tuesday
23 morning when you learn about the deal. I may be
24 treading on a few things you already told me.
25

Page 49

LOWITT - HIGHLY CONFIDENTIAL

1      You learn about it from -- I just
2 forget if I asked you this. From whom did you
3 learn about the terms of the deal?
4    A.  As I said earlier, I didn't recall
5 specifically. It was part of a group of us
6 waiting to hear and we heard simultaneously.
7    Q.  And where were you when you heard
8 about the terms of the deal simultaneously?
9    A.  We were on the 32nd floor of 745.
10    Q.  And this was very early in the morning
11 of Tuesday?
12    A.  I don't think it was very early in the
13 morning. Again, I don't have a precise
14 recollection, but I think that this continued
15 through the morning.
16    Q.  Did there come a time when you
17 attended a meeting of the boards of Lehman
18 Brothers Holdings, Inc. and Lehman Brothers, Inc.
19 on the morning of Tuesday, September 16?
20    A.  I don't recall attending a board
21 meeting on the Tuesday.
22    Q.  No recollection of that at all?
23    A.  I don't. I was very tired, so I --
24 it's possible, but I have no recollection of it.
25

Page 50

LOWITT - HIGHLY CONFIDENTIAL

1  LOWITT - HIGHLY CONFIDENTIAL
2  Q.  Do you have any recollection of the
3  deal being described to the board by anybody?
4  A.  I don't have a recollection of being
5  at a meeting of the board, so, no.
6  Q.  Do you ever learn one way or another,
7  whether you attended or not, whether the deal had
8  been described to the board?
9  A.  I mean I would have assumed it would
10  have been presented to the board and approved.
11  But I wasn't aware of anything specific to it, or
12  I don't recall being aware of anything specific to
13  it, but I would have expected that it would have
14  been presented to the board.
15  Q.  Did there come a time when the
16  agreement between Lehman and Barclays was reduced
17  to a written contract?
18  A.  Well, I know there was a contract that
19  was worked on on the Tuesday, and I know that
20  there was, you know, various clarifications that
21  were made to that, but I wasn't involved in the
22  drafting or commenting, you know, of that.
23  Q.  At any point during the week?
24  A.  At any point during the week.
25  Q.  Did you ever see the contract that was

Page 51

1  LOWITT - HIGHLY CONFIDENTIAL
2  first agreed?
3  A.  I don't recall I did.
4  Q.  I am sorry?
5  A.  I don't recall that I did.
6  Q.  I just need to press that a little
7  bit.  You don't recall seeing it or you don't
8  recall whether or not you saw it?
9  A.  I don't recall seeing the contract.
10  Q.  This might be quite an event for you.
11  I am about to show it to you.
12  A.  Can I take a quick break?  Is that OK?
13  Q.  Sure.
14  A.  Thank you.  Very quick.
15  (Recess)
16  BY MR. GAFFEY:
17  Q.  Mr. Lowitt, I have put before you what
18  we have marked as Exhibit 1 at a prior deposition,
19  a document entitled Asset Purchase Agreement among
20  Lehman Brothers Holdings, Inc., Lehman Brothers,
21  Inc., LB745 LLC, and Barclays Capital, Inc., dated
22  as of September 16, 2008.
23  Would you look through the document,
24  sir, sufficiently to tell me whether you have ever
25  seen it before.

Page 52

1  LOWITT - HIGHLY CONFIDENTIAL
2  A.  I have seen it as part of my meetings
3  with my counsel.
4  Q.  Apart from meetings you may have had
5  to prepare for your deposition, have you ever seen
6  the document before?
7  A.  I didn't read it ahead of this, no.
8  Q.  I am asking a different question.
9  Putting aside what documents you may have reviewed
10  with counsel --
11  A.  Right.
12  Q.  -- to prepare for your deposition,
13  independently of that activity, have you ever seen
14  the document marked as Exhibit 1 before?
15  A.  I don't recall having seen the
16  document before that.
17  Q.  You learned that there was a written
18  agreement between Lehman and Barclays, yes?
19  A.  Yes.
20  Q.  Did you ever ask to see it at the
21  time?
22  A.  I was -- I don't recall asking to see
23  it at the time.
24  Q.  Did any of your activities in the
25  ensuing week require you to understand the terms

Page 53

1  LOWITT - HIGHLY CONFIDENTIAL
2  of the agreement?
3  A.  I don't believe they did.
4  Q.  When you learned the terms of the
5  agreement, sir, without regard to the exhibit I
6  gave you, when you learned the terms of the
7  agreement, did you also learn that Barclays would,
8  as part of the deal, assume certain liabilities?
9  A.  I mean my understanding of the
10  transaction was that Barclays was going to assume
11  additional liabilities in addition to the sort of
12  asset liability -- the work around the individual
13  assets and the liabilities associated with those.
14  Q.  Did you come to understand that in the
15  deal there would be an extra $1 billion of
16  compensation beyond Lehman's accrual?
17  A.  I mean I was aware that the
18  compensation liability that Barclays was taking on
19  was $2 billion.
20  Q.  Did you understand that to be
21  $1 billion beyond Lehman's accrual?
22  A.  Well, I understood it to be the total
23  compensation, which as we would have thought about
24  it at Lehman would have included both a cash
25  component and a stock component.

Page 54

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2    Q.   Was it $1 billion above the accrual
3    that Lehman had for those components?
4    A.   We would not have accrued for the
5    stock component of compensation that was granted
6    in -- at the end of that year.  We would have been
7    accruing for that over the five years, three or
8    five years that that stock was vesting.
9    So the accrual would have been for the
10   bonus, and then in addition to that, away from the
11   bonus accrual, we had expensed the cost of the
12   prior equity awards that were continuing to vest
13   through 2008.  So compensation that was included
14   in the 2 billion would have been more than just
15   the bonus piece, it would also have, in my mind,
16   included a component that would have been stock.
17   Q.   Now, putting before you, Mr. Lowitt,
18   what has previously been marked as Exhibit 24 and
19   what has previously been marked as Exhibit 25.
20   And with respect to those two documents, sir, I'll
21   ask you the same question.  Take a look through
22   them sufficiently to tell me whether you have seen
23   them before.
24   A.   I don't believe I've seen either of
25   these documents before.

Page 55

1    LOWITT - HIGHLY CONFIDENTIAL
2    Q.   Now, Exhibit 24 is a First Amendment
3    to the asset purchase agreement, and Exhibit 25 is
4    a letter dated as of September 20, which has come
5    to be called the clarification letter.  Have you
6    heard that term before?
7    A.   I have.
8    Q.   And when did you hear the term
9    "clarification letter" in connection with the
10   transaction between Lehman and Barclays?
11   A.   I would have heard of the
12   clarification letter actually subsequent to the
13   transaction closing, is my recollection.
14   Q.   How long after the transaction closed
15   did you first hear about the clarification letter?
16   A.   My recollection around that is hazy,
17   but it would have been a few weeks, probably
18   within a few weeks of the transaction closing that
19   there was a clarification letter.
20   Q.   Do you remember anything about the
21   circumstances under which you learned a few weeks
22   after the closing about a clarification letter?
23   A.   No.
24   Q.   Did you -- until I have shown it to
25   you today, did you ever know there was a First

Page 56

1    LOWITT - HIGHLY CONFIDENTIAL
2    Amendment to the asset purchase agreement?
3    A.   No.
4    Q.   You knew generally at the time -- and
5    by the time, I mean the week between the 15th and
6    22nd, that there were changes in the deal that
7    were memorialized in some way, correct?
8    A.   Yes.
9    Q.   Did you ever ask to see the writings
10   that memorialized those changes in the deal?
11   A.   I don't recall ever asking to see
12   those.
13   Q.   To conduct the activities you were
14   conducting in connection with the deal, did you
15   think you needed to understand or see the written
16   terms of the deal?
17   MR. BERNSTEIN:  Objection.  Compound.
18   A.   I -- I don't believe I -- I didn't ask
19   to see it, so I felt -- I believe I would have
20   felt competent to fulfill my duties without having
21   read it.
22   Q.   Did you attend any of the hearings
23   before the bankruptcy court concerning the
24   transaction?
25   A.   I did not.

Page 57

1    LOWITT - HIGHLY CONFIDENTIAL
2    Q.   Did you have reports from anyone who
3    did attend the hearings before the bankruptcy
4    court about the transaction, about what was going
5    on at the hearings?
6    A.   I recall having conversations with
7    Steve Berkenfeld on the weekend after the 7th --
8    the Friday evening, about it, but don't have
9    recollection of specific details of that
10   conversation.
11   Q.   Do you have a general recollection of
12   what Mr. Berkenfeld was recounting to you in those
13   conversations about the hearing?
14   MR. BERNSTEIN:  Is Lehman --
15   Mr. Berkenfeld, as I understand it, was a
16   Lehman lawyer.  Is everyone comfortable
17   waiving the privilege?
18   MR. GAFFEY:  Mr. Berkenfeld was not
19   acting as a lawyer at that time, so it is
20   not a waiver of privilege.
21   MR. BERNSTEIN:  No one is going to
22   assert that this witness is violating the
23   privilege by answering this question.  There
24   are lots of constituents around the table.
25   MR. GAFFEY:  I'm not.  I'm not going

Page 58

LOWITT - HIGHLY CONFIDENTIAL

1    LOWITT - HIGHLY CONFIDENTIAL
2    to --
3        MR. BERNSTEIN: If anyone is going to
4    assert that, they need to assert that now.
5        MR. GAFFEY: I am not going to assert
6    that.
7        MR. HUME: Barclays may assert that
8    Berkenfeld was acting as a lawyer and this
9    is waiving the privilege. At least we
10    reserve the right to reserve that.
11        MR. GAFFEY: I would disagree with
12    that.
13    Q.    Could you answer the question, please.
14    A.    Could you --
15    Q.    Do you recall generally what
16    Berkenfeld told you about the hearing when he
17    spoke to you after the -- over the weekend after
18    the hearing had taken place?
19    A.    I think he was recounting the broad
20    narrative of how it had proceeded without giving
21    very specific details of what had actually
22    transpired. But again my recollection of it is
23    low on sort of detail. I just recall having that
24    conversation with him.
25    Q.    Before our break in one of your

Page 59

1    LOWITT - HIGHLY CONFIDENTIAL
2    answers you mentioned that the deal that was
3    approved by the court at the hearing was a
4    different deal than the one that had been reached
5    on the Tuesday. Do you recall that?
6    A.    I do.
7    Q.    How did you learn that the deal that
8    was approved by the court was a different deal
9    than the one that had been reached on Tuesday?
10    A.    Well, there were -- as specific
11    examples, you know, the work that we had done on
12    the Friday to identify additional sources of value
13    for the transaction were clearly elements that
14    were included in the final transaction which were
15    not part of the transaction that was discussed on
16    the Monday and Tuesday.
17    Q.    What were the different sources of
18    value that were identified on the Friday?
19    A.    There was a 15c3 lock-up excess and
20    unencumbered collateral in LBI.
21    Q.    Anything else?
22    A.    I wasn't party to all the elements of
23    what went into the transaction, but I was aware of
24    the work that we did on, you know, those elements.
25    So there may have been others, but certainly I was

Page 60

1    LOWITT - HIGHLY CONFIDENTIAL
2    aware of those.
3    Q.    And what, as best you recall, is the
4    value of those additional elements, dollar value?
5    A.    The dollar value of the unencumbered
6    collateral was in and around $2 billion, and, you
7    know, the 15c3 excess, my understanding of the
8    deal that was reached vis-a-vis the 15c3 excess
9    was around 750 to 800 million dollars.
10    Q.    And why, why was -- why were different
11    sources of values being identified on the Friday
12    to be transferred to Barclays?
13    A.    I mean I was asked to identify
14    potential sources of value by Bart and by Rich. I
15    wasn't part of the discussions of why that was
16    necessary.
17    Q.    By Rich, do you mean Mr. Richie?
18    A.    Rich Richie. I am sorry. Mr. Richie.
19    Q.    What did Mr. Richie say to you about
20    identifying different sources of value?
21    A.    Just that we needed to identify those,
22    we, Lehman, needed to go and identify where there
23    were different sources of value and what those
24    would be.
25    Q.    And do you remember anything else

Page 61

1    LOWITT - HIGHLY CONFIDENTIAL
2    about what Mr. Richie said about identifying
3    additional sources of value?
4    A.    I don't recall additional details of
5    that conversation, no.
6    Q.    Describe the setting in which
7    Mr. Richie told you that Lehman needed to identify
8    additional sources of value. Meeting, phone call?
9    A.    It was a meeting. I had an office on
10    the 31st floor, Rich had an office that he was
11    operating out of on the 31st floor, so we would
12    have -- I can't recall precisely where we met, but
13    we met probably somewhere on the 31st floor.
14    Q.    Was anyone else present when you had
15    this conversation with Mr. Richie?
16    A.    I don't believe anybody else was
17    present.
18    Q.    Did you have the conversation with
19    Mr. Richie before or after you had a conversation
20    with Bart McDade about identifying additional
21    sources of value?
22    A.    I can't be certain, but I believe it
23    was after I spoke with Bart.
24    Q.    So was Bart McDade the first person
25    who discussed with you identifying additional

Page 62

LOWITT - HIGHLY CONFIDENTIAL

1   sources of value?
2       A.   I believe that to be the case.
3       Q.   Was anyone else present when you had
4   this conversation with Bart McDade?
5       A.   I don't recall anybody else being
6   present.
7       Q.   As best you remember, what did
8   Mr. McDade say to you about finding additional
9   sources of value?
10      A.   I don't have a specific recollection
11  of the conversation, but I would -- I would expect
12  that he would have asked me where, if anywhere,
13  were there additional sources of value we could
14  include in a new transaction.
15      Q.   Did Mr. McDade give you a target
16  number for additional sources of value?  How much
17  he needed to find?
18      A.   My recollection is between 3 and 4
19  billion dollars.
20      Q.   Did you ask him why you needed to find
21  3 to 4 billion dollars in additional value on that
22  Friday?
23      A.   I don't recall the details of that
24  conversation, so I can't be clear on whether I did

Page 63

LOWITT - HIGHLY CONFIDENTIAL

1   ask him about that or not.
2       Q.   Without regard to the specific
3   conversation, Mr. Lowitt, after you had these
4   conversations, you spent a considerable amount of
5   time that day looking for 3 to 4 billion dollars
6   in additional value, correct?
7       A.   That is correct.
8       Q.   Who worked with you in that endeavor
9   to find 3 to 4 billion dollars in additional
10  value?
11      A.   The main person I worked with on that
12  was Paolo Tonucci, and we would have also included
13  Jerry Reilly and probably Alastair Blackwell.
14      Q.   Did you have an understanding as to
15  whether finding an additional 3 to 4 billion
16  dollars in additional value was important to the
17  transaction?
18      A.   I mean at some level, it needed to be
19  important to the transaction or we wouldn't have
20  been asked to find it.
21      Q.   I agree with the inference, but it is
22  a different question.
23           My question is, is -- did you have an
24  understanding at the time as to whether it was

Page 64

LOWITT - HIGHLY CONFIDENTIAL

1   important to the transaction?
2       MR. HUME:  Objection, vague and
3   ambiguous.
4       A.   I don't recall how I was thinking
5   about it.  I know that I worked hard on it, you
6   know, on the Friday and into the weekend.  So I
7   would have thought it was important.
8       Q.   Did you express to anyone you were
9   working with in this endeavor to find 3 to 4
10  billion dollars in additional value that it was
11  critical to the deal?
12      A.   I don't recall expressing that to
13  people, but it was obviously, you know, an
14  important exercise, an important element of, you
15  know, the new transaction post the repo.
16      Q.   What was your understanding of why it
17  was an important element of the new transaction
18  post the repo?
19      A.   I don't have specific recollection.  I
20  do know that there was -- it was a pretty
21  tumultuous marketplace, and obviously the
22  discussions between, you know, Barclays and
23  Lehman, Barclays communicated to Lehman that it
24  was important that this additional source of value

Page 65

LOWITT - HIGHLY CONFIDENTIAL

1   was located.
2       Q.   Do you know that as a matter of fact
3   or as a matter of inference that Barclays
4   communicated that to Lehman?
5       A.   I know that as a matter of inference.
6   I wasn't party to those discussions.  Thank you
7   for clarifying.
8       Q.   Did anyone tell you that Barclays had
9   communicated that it was important?
10      A.   I don't recall anybody saying that
11  specifically, but as I say, the fact that I was
12  working on it, it was clear to me it was
13  important.
14      Q.   It can fairly be said that the work
15  that you did on Friday into the weekend to find
16  the additional value was a fairly intense
17  activity, correct?  There was a lot of effort
18  being put into this, correct?
19      MR. BERNSTEIN:  Objection, asked and
20  answered.
21      A.   Yeah, we worked hard on Thursday into
22  the weekend.
23      Q.   Were you curious why you needed to
24  find 3 to 4 billion dollars of additional value

Page 66

LOWITT - HIGHLY CONFIDENTIAL

1 for the transaction post the repo?
2 A.   I mean the transaction had changed.
3 The circumstances in the marketplace were
4 tumultuous. It wasn't a great surprise to me that
5 Barclays was, given the risk they were taking on,
6 looking for additional value.
7 Q.   Now, while you and these other
8 folks -- and Mr. Tonucchi and Mr. Reilly and
9 perhaps Mr. Blackwell and perhaps other folks,
10 were searching for 3 to 4 billion dollars in
11 additional value on that Friday, there was a
12 hearing in the afternoon going on down at the
13 bankruptcy court, correct?
14 A.   That's correct.
15 Q.   And you had no reports from the
16 hearing about what was going on?  That's what you
17 told me, correct?
18 A.   Yeah, I don't believe I was -- I
19 certainly wasn't getting updates of how things
20 were going in the meeting.
21 Q.   Did you ever ask anyone if the judge
22 had addressed and approved the 15c3 issue?
23 A.   I do know as a result of an e-mail
24 that I saw as part of my preparation for this

Page 67

LOWITT - HIGHLY CONFIDENTIAL

1 deposition that I had asked that of Bart.
2 Q.   Did you get an answer from Bart?
3 A.   I don't recall the specific
4 conversation that I had with Bart, but I'm sure I
5 did.
6 Q.   Why were you asking Bart whether the
7 court had approved the 15c3 lock-up point?
8 A.   We needed to sort of operationalize
9 the movement of collateral, if that was part of
10 the approved transaction, and so my interest was
11 in determining what we needed to do to get
12 ourselves ready to close on the transaction.
13 Q.   My question is a bit more specific.
14 A.   It is less than -- 15c3 lock-up would
15 have been something that would have resolved over
16 a period of time as the customer claims were being
17 addressed. It was really around the unencumbered
18 collateral that we would have needed to
19 operationalize ourselves.
20 Q.   The 15c3 lock-up piece, let me be sure
21 I understand what you just said.  As I understand
22 it, the reason it takes place over a period of
23 time is as trades settle and customer activity
24 takes place, you are able to realize how much is

Page 68

LOWITT - HIGHLY CONFIDENTIAL

1 surplus in 15c3, correct?
2 A.   I don't know if it's so much trade
3 settling, but 15c3 lock-up is sort of a regulatory
4 requirement which establishes a set of rules
5 which, based on customer assets and how they are
6 custodied, determines an amount of excess that you
7 need to hold against that.
8 And it is only in sort of the unwind
9 of all of those customer positions that you can
10 determine whether there is excess as calculated
11 per the formula or whether the actual excess is a
12 different number.
13 Q.   When you asked Bart whether the court
14 had approved this 15c3 component, did you think
15 the court needed to approve it before you could
16 operationalize transferring that to Barclays?
17 A.   If -- if those elements were not part
18 of a deal, then obviously there was no requirement
19 to operationalize those.
20 Q.   Was it your understanding that the
21 court needed to approve it for it to be part of
22 the deal?
23 MR. HUME:  Objection, lacks
24 foundation.  Calls for a legal conclusion.

Page 69

LOWITT - HIGHLY CONFIDENTIAL

1 A.   All I wanted to know was whether we
2 needed to get ourselves set up on the Monday to
3 begin moving assets.
4 Q.   So I guess my question is, why didn't
5 you ask Mr. McDade, should I send it, should I
6 operationalize it, as opposed to did the court
7 approve it?
8 A.   I did understand that the court needed
9 to approve the transaction, and if the court had,
10 you know, not approved the transaction, then -- or
11 not approved elements of the transaction, then
12 there would have been no requirement to
13 operationalize it.
14 Q.   And you were asking Mr. McDade in that
15 e-mail about whether the court had approved the
16 15c3 component specifically, correct?
17 MR. HUME:  Objection, lacks
18 foundation.
19 MR. BERNSTEIN:  Why don't we show him
20 the e-mail.
21 MR. GAFFEY:  I want to get his
22 independent recollection first before it is
23 refreshed.
24 MR. BERNSTEIN:  If you want to ask him

## Page 70

LOWITT - HIGHLY CONFIDENTIAL

1 specifically what he did in the e-mail, show
2 him the e-mail.
3
4 **Q. I think you can answer my question.**
5 A. Which is your question?
6 MR. BERNSTEIN: You have the right if
7 you're being asked about what a specific
8 document says to see the document.
9 THE WITNESS: OK.
10 MR. GAFFEY: I'm not sure that's so.
11 But let's not have that fight.
12 **Q. Let me ask you this. Did you review**
13 **documents to prepare for your testimony today?**
14 A. I did.
15 MR. BERNSTEIN: You can answer yes or
16 no.
17 A. Yes.
18 **Q. And can you tell me whether any of the**
19 **documents that you reviewed had the effect of**
20 **refreshing your recollection about the events I am**
21 **asking you about?**
22 MR. BERNSTEIN: You can answer that
23 yes or no.
24 A. I am struggling with it because I'm
25 not quite sure what -- of my ability to sort of

## Page 71

LOWITT - HIGHLY CONFIDENTIAL

1
2 separate out if something refreshed it or not. In
3 some cases it probably did.
4 **Q. Can you tell me which documents had**
5 **that effect of refreshing your recollection of**
6 **events?**
7 A. I can't.
8 **Q. Do you know when the agreement was**
9 **made -- do you know, sir, if the agreement with**
10 **Barclays was changed or amended to include the**
11 **unencumbered collateral -- unencumbered collateral**
12 **and the 15c3 lock-up?**
13 MR. HUME: Objection, vague and
14 ambiguous and calls for a legal conclusion.
15 MR. BERNSTEIN: I would add no
16 foundation.
17 A. I wasn't party to the negotiation of
18 the deal, the writing of the contracts or what was
19 presented to the court, so I'm not in a position
20 to respond to that.
21 **Q. Did you know at the time -- well,**
22 **withdrawn.**
23 **Do you know now whether the court was**
24 **told about the 15c3 lock-up and the unencumbered**
25 **collateral?**

## Page 72

LOWITT - HIGHLY CONFIDENTIAL

1
2 MR. BERNSTEIN: You are asking him
3 whether he knows from sources other than
4 discussions with counsel what the court was
5 told?
6 **Q. Other than discussions with the**
7 **counsel representing you here today.**
8 A. I do not.
9 **Q. Do you know if the $5 billion**
10 **difference between the amount at which assets were**
11 **carried on Lehman's books and the amount Barclays**
12 **agreed to pay, back on Tuesday, was disclosed to**
13 **the court?**
14 MR. BERNSTEIN: Again you are asking
15 for his knowledge other than his discussions
16 with counsel?
17 MR. GAFFEY: Counsel representing him
18 here today.
19 MR. BERNSTEIN: Counsel representing
20 him, period.
21 MR. GAFFEY: No, counsel representing
22 him here today.
23 MR. BERNSTEIN: My instruction is
24 counsel representing him, period. We all
25 have associates, et cetera.

## Page 73

LOWITT - HIGHLY CONFIDENTIAL

1
2 MR. GAFFEY: OK, Willkie Farr or Boies
3 Schiller, I will take all of them.
4 MR. BERNSTEIN: Whoever his counsel
5 is.
6 MR. HUME: Or representing Barclays.
7 MR. GAFFEY: Fine.
8 A. Can you repeat the question.
9 **Q. Apart from talking to your own lawyers**
10 **or lawyers from Barclays, do you know if the**
11 **$5 billion difference between the amount at which**
12 **assets were carried on Lehman's books and the**
13 **amount Barclays agreed to pay, back on Tuesday,**
14 **was disclosed to the court?**
15 A. I don't know what was disclosed to the
16 court, but I also would say that the transaction
17 that was presented to the court was not the
18 transaction that was the one that was agreed to on
19 the Tuesday. It mutated, it was different as a
20 result of sort of the repo and other factors.
21 **Q. Did the deal mutate over the weekend**
22 **of the 21st -- of the 20th and 21st?**
23 A. Again, I'm not really in a position to
24 say what happened because I'm not -- I don't know
25 what was really agreed to on the Friday and what

Page 74

1    LOWITT - HIGHLY CONFIDENTIAL
2  was presented to the court.
3    Q.  Do you know -- whether you know the
4  specific means in which it did, do you know
5  whether the deal mutated over the weekend of the
6  20th and 21st?
7    MR. BERNSTEIN:  Objection, asked and
8  answered.
9    MR. HUME:  Same objection, lacks
10  foundation.
11    A.  Again, I just repeat the previous
12  answer, which was I didn't know what exactly went
13  into the deal on the Friday that was presented to
14  the court, so I'm not in a position to say whether
15  things changed.  I wasn't party to the discussions
16  even over the weekend around what would have or
17  might have changed.
18    Q.  Did you ever get an understanding of
19  the components of the deal as it actually closed
20  on the 22nd?
21    A.  The 22nd is the --
22    Q.  Is the Monday.
23    A.  Is the Monday?
24    MR. HUME:  Excluding conversations
25  with counsel.

Page 75

1    LOWITT - HIGHLY CONFIDENTIAL
2    A.  Well, I knew that there was a fairly
3  detailed schedule which identified unencumbered
4  collateral that was, you know, reviewed by the
5  creditors' committee and was -- again I assumed,
6  not that I knew, included what -- the deal that
7  was agreed to with Barclays.
8    Q.  When you refer there to unencumbered
9  collateral, are you talking about the unencumbered
10  collateral you were looking for on Friday?
11    A.  Correct.
12    Q.  My question is a little broader.  Did
13  you ever have an understanding of the overall
14  terms of the deal that closed on Monday?  What did
15  Barclays get, what did Barclays pay?
16    MR. HUME:  Again objection to the
17  extent it calls for anything you learned
18  from Barclays' lawyers or your own lawyers,
19  I am instructing you on behalf of the
20  company not to answer.  Preserve the
21  attorney/client privilege.
22    MR. GAFFEY:  I -- hold that thought.
23  Let's see if we can save everybody some
24  speechifying.  That will be a standing
25  instruction to the witness.

Page 76

1    LOWITT - HIGHLY CONFIDENTIAL
2  I never want you to disclose to me,
3  unless I specifically ask you for it,
4  anything that was disclosed to you by your
5  counsel from Willkie Farr or counsel
6  representing Barclays.
7    Would that solve the problem so we
8  don't have to solve it every time?
9    MR. BERNSTEIN:  It doesn't solve his
10  problem.  It has to be counsel, period.
11    MR. HUME:  First of all, what about
12  in-house Barclays counsel?  We are entitled
13  to object and to instruct the witness.
14    MR. GAFFEY:  It will take longer.
15  That's fine.  I have all day.
16    Q.  Do you have the question in mind?
17    A.  Can you repeat it for me, please.
18    (Record read)
19    MR. BERNSTEIN:  Again, you can answer
20  the question except with reference to
21  information you have obtained from either
22  Barclays' counsel or your counsel.
23    THE WITNESS:  No, I understand.
24    A.  I had a sense of many but probably not
25  all of the elements of the transaction.

Page 77

1    LOWITT - HIGHLY CONFIDENTIAL
2    Q.  Describe for me what your sense was,
3  what your understanding was.
4    A.  So my sense was that it included the
5  unencumbered collateral, it included the 15c3
6  lock-up excess or a component of 15c3 lock-up
7  excess, that it involved the cancellation of the
8  repo, it involved making offers to -- of
9  employment to legacy Lehman employees of LBI.  It
10  included the exchange -- the exchange derivative
11  business and all the business -- the majority of
12  the businesses of LBI.
13    But again, the details of what was in
14  and what was out, there were details there that I
15  would not have been aware of.
16    Q.  Do you know if in connection with the
17  inclusion of the exchange derivative business any
18  cash was transferred to Barclays?
19    A.  Not aware.
20    Q.  So the unencumbered collateral, if I
21  have your testimony correctly, was approximately
22  2 billion?
23    A.  That's my recollection.
24    Q.  And the 15c3 was approximately
25  1 billion, correct?

Page 78

LOWITT - HIGHLY CONFIDENTIAL

1    A.    I think my recollection was between
2    750 and 800 million dollars.
3    Q.    And the collateral on the repo was
4    approximately 50 billion, correct?
5    MR. HUME:  Objection, lacks
6    foundation, vague and ambiguous.
7    A.    I believe it was in and around
8    $50 billion of collateral.
9    Q.    So at least by my amateur math, my
10    understanding, as I am adding it up, sir, tell me
11    if I'm correct, your understanding is that
12    Barclays got about $52.8 billion in value?
13    MR. BERNSTEIN:  Objection,
14    mischaracterizes his testimony.
15    A.    There was individual components of the
16    deal.  I don't think you could adequately -- you
17    can correctly stand them up as you have just done
18    that.  And you are just mixing different concepts
19    together.
20    Q.    Why don't you tell me what you think
21    Barclays -- let me ask you this.  In your
22    understanding, was the deal structured in a way
23    that Barclays would have an immediate gain on
24    acquisition?

Page 79

LOWITT - HIGHLY CONFIDENTIAL

1    A.    I didn't know how Barclays was going
2    to account for the transaction, but it wouldn't
3    have surprised me that Barclays was going to get
4    some equity out of the transaction, given the
5    risks that they were taking on.
6    Q.    Describe what you mean by that, given
7    the risks that they were taking on?  Why would it
8    not surprise you given the risks that they were
9    taking on?
10    A.    I think they were taking on at least
11    two risks.  One was that as they looked to sell
12    off the collateral on the repo trade, that they
13    couldn't sell it out for -- you know, within the
14    amount of the financing haircut.
15    And then the second risk is obviously,
16    you know, any integration has a fair amount of
17    risk, and they were going to employ, you know, a
18    large number of Lehman people, and it was possible
19    that they wouldn't have been successful in
20    integrating all of those people and that the costs
21    of those folks would have been more than they were
22    generating in revenue.
23    Q.    And at the time that the deal closed,
24    again around the Monday, September 22nd, did you

Page 80

LOWITT - HIGHLY CONFIDENTIAL

1    have an understanding or a view as to whether
2    Barclays would enjoy immediate gain on the
3    acquisition?
4    A.    I had no sense of it.
5    Q.    Mr. Lowitt, showing you what was
6    marked at a prior deposition as Exhibit 19.  Have
7    you seen that document before?
8    A.    I have.
9    Q.    What do you recognize the document to
10    be?
11    A.    Monday night, Tuesday morning, we were
12    tracking elements of the transaction and in
13    particular the sort of net assets, the specific
14    liabilities that we from a Lehman perspective
15    understood that Barclays would be assuming in the
16    transaction as it was conceived on the Monday and
17    Tuesday period.
18    Q.    Did you play any role in the drafting
19    of the document we have marked as Exhibit 19?
20    A.    I mean I can't recall precisely my
21    role in this particular version, but I was
22    certainly involved in the iterative work product
23    that led up to this particular piece of paper.
24    Q.    By iterative work product, are you

Page 81

LOWITT - HIGHLY CONFIDENTIAL

1    talking about prior drafts of this -- withdrawn.
2    What do you mean by iterative work
3    product?
4    A.    I believe there were earlier drafts of
5    this as our understanding of what was going to
6    constitute the transaction as we were getting a
7    better sense of it through the morning of Tuesday.
8    Q.    Now, on the asset side of this --
9    withdrawn.
10    On the asset side of this financial
11    schedule, sir, there are descriptions of various
12    asset classes.  Do you see that?  Government
13    agency, commercial paper, et cetera?
14    A.    I do see that.
15    Q.    Are the amounts attributed to each of
16    those asset classes -- withdrawn.
17    Were the amounts attributed to each of
18    those asset classes the values shown on Lehman's
19    books for each of those asset classes?
20    A.    My understanding of what was reflected
21    in these asset values would be the amount that
22    Barclays would be paying for assets in those asset
23    categories.
24    Q.    So that roughly $5 billion number that

Page 82

LOWITT - HIGHLY CONFIDENTIAL

1  we talked about before is recognized in this
2  document, Exhibit 19, correct?
3        MR. BERNSTEIN: Objection, vague and
4  ambiguous.
5        A.   It is not recognized in this, in the
6  sense that these -- these asset numbers are post
7  that -- reflect what Barclays were willing to pay
8  for $72 billion worth, $72.65 billion worth of
9  assets, which was less for reasons that we talked
10 about earlier than the amount they were on
11 Lehman's books for, and the amount less is
12 probably the 5 billion that you referenced.
13       Q.   Now, you told me a moment ago, sir,
14 there were various drafts of iterative work
15 product that led to this final. Do you recall how
16 many different drafts of it there were before this
17 document was a result?
18       A.   I don't recall how many, but there
19 were many, and that's -- just for clarification,
20 you know, I'm not aware of why this is marked
21 final, but there were a number of, you know, sort
22 of iterations that led to whatever the final
23 version of this thing was.
24       Q.   And when were these iterations being

Page 83

LOWITT - HIGHLY CONFIDENTIAL

1  generated? Is this during Tuesday, the 16th?
2        A.   It would have started -- I can't say
3  when it would have started, but it certainly would
4  have continued through the morning of Tuesday.
5        Q.   May have started as early as --
6        A.   Monday evening.
7        Q.   Monday evening. OK.
8             And who, if you know, was actually
9  generating the document?
10       A.   Again, my recollection is that it was
11 one of the Weil lawyers who had the spreadsheets
12 on his computer, but I don't know the name of that
13 person.
14       Q.   Do you -- can you describe that
15 person?
16       A.   A reasonably young man, but I'm afraid
17 I can't be more specific than that.
18       Q.   That would qualify every man in the
19 room, sir. Can you give a more detailed
20 description?
21       MR. BERNSTEIN: I just want to correct
22       that. It wouldn't describe everyone in the
23       courtroom.
24       Q.   With the possible exception of Neil

Page 84

LOWITT - HIGHLY CONFIDENTIAL

1  Oxford, it would be everyone in the room.
2        Do you have a more detailed
3  description that you can give me, sir, than
4  fungible young associate at Weil Gotshal?
5        A.   I'm afraid I can't.
6        Q.   Did he have it on a laptop? Did he
7  have it on a computer, a PC?
8        A.   I believe it was on a laptop that he
9  had rather than a standing PC, just because he was
10 in one of the dining rooms on the 32nd floor, so
11 there aren't standing computers there. But that's
12 based on my assumption rather than a specific
13 recollection of whether it was a laptop or a
14 computer.
15       Q.   How do you know he worked for Weil
16 Gotshal?
17       A.   I can't be specific about how I knew.
18 He wasn't somebody who was, you know, at Lehman,
19 and he wasn't somebody at Barclays, but -- and my
20 recollection is he was at Weil, but I
21 unfortunately can't be more clear about how I knew
22 he was at Weil.
23       Q.   Is it anything other than process of
24 elimination that makes you think that he worked

Page 85

LOWITT - HIGHLY CONFIDENTIAL

1  for Weil?
2        A.   I have a recollection that he worked
3  for Weil. I can't be more specific as to why I
4  have that recollection.
5        Q.   Is it possible he was a Lehman intern?
6        A.   It's possible.
7        Q.   Were there Lehman interns in and
8  around the premises when this work was being done?
9        MR. BERNSTEIN: Were you finished with
10       your answer, your prior answer?
11       Q.   I am sorry. If I interrupted, I
12 apologize. Is there any --
13       A.   Again, it is not because of
14 recollection, but I would have been very surprised
15 if we would have been using a Lehman intern for
16 this. Again, given that I can't be more precise
17 about who it was, things are possible, but it
18 would surprise me if that was the case.
19       Q.   Were there any junior-level Lehman
20 personnel in and around the premises when this
21 work was being done?
22       A.   Again, I couldn't say with complete
23 certainty, but I would be surprised if there were.
24       Q.   Did you know everybody who was in and

Page 86

LOWITT - HIGHLY CONFIDENTIAL

1    around the premises when this work was being done?
2
3        A.    I obviously didn't know everybody who
4    was involved.
5        Q.    And had you met this young man at any
6    time prior to seeing him when this work was being
7    done?
8        A.    I don't recall meeting him prior to
9    that.
10        Q.    I am going to put before you what has
11    been marked at a previous deposition as
12    Exhibit 200. Mr. Lowitt, I will ask you what I
13    asked you with respect to other documents. Would
14    you take a look through that document sufficiently
15    to tell me whether you have seen it before.
16        A.    I certainly saw it as part of my -- I
17    have seen it before.
18        Q.    Let me ask you this. Have you seen it
19    before, apart from your preparation for the
20    deposition?
21        A.    I don't recall seeing it before that.
22    It is just an interim work product, and when I
23    recall seeing it is as part of my preparation for
24    this deposition.
25        Q.    Is that your handwriting on the

Page 87

LOWITT - HIGHLY CONFIDENTIAL

1    document?
2
3        A.    Part of this looks like my
4    handwriting.
5        Q.    Does that include the part that says
6    "mark down," down below the asset line?
7        A.    I can't be certain of that, but it may
8    well be.
9        Q.    Why do you say it may well be?
10    Because it looks like your handwriting to you?
11        A.    It looks like it could be my
12    handwriting.
13        Q.    And there are other annotations on the
14    document by hand. Do you recognize any of them as
15    your handwriting, the various numbers written on
16    the page?
17        A.    The numbers on the right side of the
18    adjust column look like my handwriting. The ones
19    to the left actually don't.
20        Q.    When you say the adjust column, you
21    are talking about the adjustment column both for
22    assets and liabilities? There are two adjustment
23    columns.
24        A.    To the right of both of those columns.
25        Q.    Under the word "asset," where it says

Page 88

LOWITT - HIGHLY CONFIDENTIAL

1    40.31 and 8.4, that may not be your handwriting;
2    is that right?
3        A.    That is correct.
4        Q.    Do you have any idea whose handwriting
5    that is?
6        A.    I do not.
7        Q.    Do you recall making handwritten
8    notations on the financial schedule as part of
9    this iterative work?
10        A.    I do.
11        Q.    Why are you doing that?
12        A.    We are really trying to keep track of
13    what are the assets that Barclays is willing to
14    purchase and at what price they would be willing
15    to purchase it at that reflects a difference
16    between our book value and what they would be
17    willing to purchase at to reflect the size of the
18    purchase and the market conditions.
19        Q.    Take a look, if you would, sir, at the
20    handwritten entries along the line for government
21    and agencies on the asset side. Do you see that?
22        A.    Yes.
23        Q.    Is that a 42 or a 41 in your
24    handwriting next to the adjustment column?
25

Page 89

LOWITT - HIGHLY CONFIDENTIAL

1        A.    It looks like 41 to me.
2        Q.    Do you recall a point where Barclays
3    offered 41 for government and agencies? I'm
4    wondering why that number is higher than the
5    number shown on the schedule.
6        A.    I can't say. We may have found that
7    the amount of governments and agencies was
8    actually more than was on the schedule rather than
9    a markup of any position.
10        Q.    I asked you earlier before about --
11    that sort of vague question I put about the
12    difference between the bottoms-up review and the
13    top-down look. This sort of -- the question I am
14    about to ask you relates to that.
15        Are the calculations being done on
16    this schedule and whatever other calculations were
17    done like that that day, are they meant to achieve
18    the raw total number or are they meant to develop
19    the components, add them up and see what the raw
20    number will be?
21        A.    I think it is supposed to cover both,
22    which is supposed to say bottoms up, what does it
23    look like, and then top down, what would we need
24    to do to achieve the overall goal.
25

LOWITT - HIGHLY CONFIDENTIAL

1
2    Q.   And the overall goal is the price that
3    Barclays will pay and the difference between that
4    and the value shown on Lehman's books, yes?
5    A.   The difference between what Barclays
6    are willing to pay versus the amount that's on
7    Lehman's books which reflects, you know, the
8    market price of those securities.
9    Q.   When that agreement ultimately was
10   made, whatever that difference was between the
11   amount shown on the books and the amount Barclays
12   would pay, was it expressed as a percentage of the
13   amount shown on the books?
14   A.   My recollection is that it was a
15   dollar amount, not a percentage.
16       MR. GAFFEY: I need to take about ten
17   minutes. Can we do that now? Is that
18   convenient?
19       MR. BERNSTEIN: Sure.
20       (Recess)
21   BY MR. GAFFEY:
22   Q.   Exhibit 200, sir, is before you. We
23   were talking before the break about some of your
24   annotations down the right-hand side of each of
25   the adjustment columns.

LOWITT - HIGHLY CONFIDENTIAL

1
2    I direct your attention now to the
3    words "mark down" at the bottom. Do you have any
4    information, sir, as to why you wrote the words
5    "mark down" on this document? Why you would have
6    written the words "mark down" on this document?
7    A.   I really don't have any recollection
8    of why that would be the case. We were in this
9    exercise both identifying which assets Barclays
10   would be purchasing and the price they were
11   comfortable paying, and that represented a -- you
12   know, obviously a lower price than they were on
13   the books for.
14       So it is possible that it has to do
15   with that, but I don't recall writing this down
16   specifically. So that would just be an
17   interpretation of what I am seeing on the page.
18   Q.   Without regard to that particular
19   document, sir, in this process where the
20   determination is being made as to the amount that
21   this schedule finally will reflect when it is
22   done, do you know if there is any back and forth
23   between Lehman and Barclays as to the price?
24   A.   I mean I know there is back and forth
25   between Lehman and Barclays vis-a-vis what assets

LOWITT - HIGHLY CONFIDENTIAL

1
2    are going to be included. So I recall, for
3    example, that a set of the mortgage assets were
4    ones that Barclays said they weren't in a position
5    to determine value so they would -- they would not
6    include those.
7        And I know that there was ---if you
8    are asking me do I know precisely the nature of
9    that back and forth, I don't.
10   Q.   I'll follow up on the -- the inclusion
11   of assets point that you just told me about. My
12   question goes more toward the number, the number
13   that's finally agreed.
14       Is there a negotiation of that number,
15   Barclays wants it to be a zillion dollars and
16   Lehman wants it to be one, and they negotiate it?
17   Do you know anything about the process that led to
18   it being that number as opposed to any other
19   number?
20   A.   Again, I wasn't in the room where the
21   negotiations were taking place, but what -- you
22   know, what I was seeing was, you know, information
23   that was coming in from the various businesses
24   that indicated how much less Barclays would pay
25   for certain assets than it was on the books of

LOWITT - HIGHLY CONFIDENTIAL

1
2    Lehman for, and that the combination of those
3    things I think were being tracked and became part
4    of the back and forth of the negotiation.
5        But I again wasn't party to those
6    discussions, so I don't know how that was
7    proceeding. But my sense was it was an iterative
8    process between the parties.
9    Q.   Do you have any -- not with respect to
10   the particular document we have marked as
11   Exhibit 200, but if you can use that to refresh
12   your recollection, fine.
13       Do you have any recollection of where
14   you sit in the process? You're writing down
15   numbers on a financial statement. What are you
16   keeping track of here?
17   A.   I don't have a specific recollection,
18   but I would imagine that what I was keeping track
19   of was a combination of which assets Barclays
20   would have or would not be purchasing because they
21   were in a position to say what price they would be
22   willing to purchase it for, so that was part of
23   the screening exercise that we talked about
24   earlier that Barclays was engaging with their
25   counterparts at Lehman about.

Page 94

LOWITT - HIGHLY CONFIDENTIAL

1    And then the difference between what
2    the assets were on Lehman's books for and as a
3    result of the bulk purchase and the volatility of
4    the marketplace, what Barclays would be willing to
5    pay for it.
6    **Q.  Was it your understanding of the**
7    **transaction -- did you have an understanding that**
8    **after the transaction, Barclays planned to sell**
9    **these assets off in bulk?**
10    MR. HUME: Objection, lacks
11    foundation.
12    A.  I had no idea what Barclays were
13    planning to do.
14    **Q.  You knew you were going to go work at**
15    **Barclays. You knew they were taking what**
16    **businesses they were taking. Did you have an**
17    **understanding that what Barclays was planning to**
18    **do was operate the business as Lehman had?**
19    MR. BERNSTEIN: Objection, compound,
20    mischaracterizes his testimony.
21    You may answer.
22    A.  Well, it seems like there were a
23    couple of things you were saying. I didn't know I
24    was going to work at Barclays because I didn't

Page 95

LOWITT - HIGHLY CONFIDENTIAL

1    know that the deal was going to be completed. I
2    would -- I had had no discussions with Barclays
3    vis-a-vis how they were going to operate these
4    various businesses. So I am not in a position to
5    say whether they were anticipating selling off
6    these assets or not.
7    You know, what I would have known was
8    that if Barclays were going to maintain these on
9    their balance sheet, then they needed sort of
10    equity to support those assets and they needed
11    room within their leverage ratios, and I wouldn't
12    have known if they had an ability to absorb that
13    or not.
14    **Q.  Can you go back to Exhibit 19. That's**
15    **the one without the handwritten notes.**
16    Now, Exhibit 19 shows on the liability
17    side entries for cure payment and comp on the
18    lower right-hand side. Do you see that?
19    A.  I do.
20    **Q.  And cure payment is put at**
21    **2.25 billion, and comp is put at 2 billion. Do**
22    **you see that?**
23    A.  Yes. There isn't the dot on my copy,
24    but yes, 2.25 and 2 billion.

Page 96

LOWITT - HIGHLY CONFIDENTIAL

1    **Q.  Do you know the basis upon which those**
2    **numbers were calculated?**
3    MR. BERNSTEIN: Objection, compound.
4    A.  When you say the basis under which
5    they were calculated, I mean those were numbers
6    that -- the $2 billion of comp I think was a
7    negotiated number between the parties.
8    The cure payment number was one that I
9    recall Martin Kelly was working on and that, you
10    know, it represented the best estimate that we had
11    of the -- those payables that would be assumed by
12    Barclays.
13    **Q.  And was it, to your understanding, a**
14    **component of the transaction that the difference**
15    **between the amount Barclays would pay for the**
16    **assets and the amount for which -- and the**
17    **amount -- the value of those assets shown on**
18    **Lehman's books needed to exceed the amount of**
19    **liabilities assumed for cure and comp?**
20    MR. HUME: Objection, lacks
21    foundation.
22    A.  I wasn't party to the discussions that
23    were occurring between sort of Lehman and Barclays
24    with regard to that. Again, you know, we spent a

Page 97

LOWITT - HIGHLY CONFIDENTIAL

1    lot of time on this, the difference between the
2    amount that things were on Lehman's books for and
3    the amount that Barclays were going to pay for,
4    for those assets. How they viewed their ability
5    to capture that difference, I just have no basis
6    to assess.
7    **Q.  My question goes to something slightly**
8    **different, not Barclays' state of mind. It is**
9    **more toward did you hear any conversation, see any**
10    **documents, learn any facts at the time this**
11    **schedule was being prepared about that issue,**
12    **about whether the 5 billion was to cover the cost**
13    **of the assumed liabilities?**
14    A.  I don't recall knowing anything
15    specific to that, and again, that would have been
16    something that would have been discussed between
17    Lehman and Barclays.
18    **Q.  Did you ever have a discussion with**
19    **Mr. Kelly concerning whether the 5 billion was**
20    **needed to cover Barclays' expenses?**
21    A.  I don't recall a conversation with
22    Martin about that.
23    (Exhibit 217, document Bates stamped
24    BCI-EX00115595 through 654 marked for

Page 98

LOWITT - HIGHLY CONFIDENTIAL
1    identification, as of this date.)
2    Q.   Mr. Lowitt, I have put before you what
3    we have marked as Exhibit 217, a document,
4    multipage document bearing Bates number
5    BCI-EX00115595 through 115654.
6        I will ask you if you have any
7    recollection of seeing this document before.
8    A.   I don't recall this document.
9    Q.   I will represent to you, sir, that
10   this exhibit is put together in the manner in
11   which it was produced to us by Barclays. In other
12   words, the metadata put all of these pages
13   together.
14       Can you see any reason why the
15   schedule that is the first page of the document
16   would have been combined with the triparty
17   collateral analysis that's attached to it?
18       MR. BERNSTEIN: Objection, no
19   foundation.
20       MR. HUME: When you say, when you say
21   the metadata -- you said the metadata put
22   the pages together. I don't know what you
23   mean.
24       MR. GAFFEY: It appears from Barclays'

Page 99

LOWITT - HIGHLY CONFIDENTIAL
1    production that this is produced as a
2    singular document.
3        MR. HUME: Was it attached to an
4    e-mail? This whole production came from an
5    e-mail?
6        MR. GAFFEY: No.
7        MR. HUME: It was not attached to an
8    e-mail?
9        MR. GAFFEY: Not the way it was
10   produced. It could well be a clerical
11   issue, but I need to ask him about it.
12       MR. BERNSTEIN: Can I ask a question?
13   Who put the Bates numbers on this?
14       MR. GAFFEY: Barclays.
15   A.   But I think I know what at least
16   elements of this are. These are materials that as
17   I was preparing for the deposition, as I looked
18   through --
19       MR. HUME: Can anyone give me a copy?
20   I don't have a copy.
21   Q.   Go ahead.
22   A.   I was asked the question whether I had
23   any materials that were associated with the period
24   post the bankruptcy, and the first and second

Page 100

LOWITT - HIGHLY CONFIDENTIAL
1    schedules I believe were materials that I made
2    available through my lawyers to Barclays. The
3    subsequent materials, I'm not aware of what those
4    would be.
5    Q.   Let me see if I can get a slightly
6    clearer record on it. The first page is what you
7    are referring to as the first schedule?
8    A.   Yes.
9    Q.   The second page entitled "Triparty
10   Collateral Analysis" is the second.
11   A.   Yes.
12   Q.   But after that, you haven't seen the
13   document before?
14   A.   I don't have a specific recollection
15   of that, but it is possible that this -- I mean I
16   would just be speculating what the long document
17   is.
18   Q.   I don't want you to do that.
19       You have seen the first page marked
20   115595, yes?
21   A.   Yes.
22   Q.   You have seen that before?
23   A.   This page.
24   Q.   Right.

Page 101

LOWITT - HIGHLY CONFIDENTIAL
1    A.   Yes.
2    Q.   And you have seen the second page
3    bearing the number in the lower right-hand corner
4    115596?
5    A.   Correct.
6    Q.   And you don't know if you have seen
7    the pages 115597 through the end of the document?
8    A.   Correct.
9    Q.   What's the second page, marked 115596?
10   A.   I believe that this is the collateral
11   that was with the Fed that was part -- that was --
12   as there was the necessity to unwind the Fed repo,
13   this was the collateral that was returned to
14   Lehman from the Fed.
15   Q.   Can you tell me what it means when it
16   describes collateral value after margin reduction?
17   A.   This is a schedule from the Fed. It
18   says, "Customer Lehman Brothers," top left.
19   Q.   Well, in the column where it says
20   "effective margin," do you understand that to be
21   describing the haircut in some fashion?
22       MR. BERNSTEIN: No foundation.
23   Objection, no foundation.
24   A.   It is not my schedule, so I don't

Page 102

1    LOWITT - HIGHLY CONFIDENTIAL
2    know.
3    Q.   OK. All right, that's fine. Let's
4    put the document aside.
5        I want to go back to the conversation
6    you told me about a while ago that you had with
7    Mr. Richie on the morning of Friday, September 19,
8    about looking for additional sources of value.
9    A.   Right.
10   Q.   Did Mr. Richie say to you in sum or
11   substance that it was critical to the deal closing
12   to find those additional sources of value?
13   A.   I don't recall Rich saying it was
14   critical to the deal closing. But clearly it was
15   important as an input into the discussions that
16   were taking place between Barclays and Lehman.
17   Q.   The conversation that you had with
18   Mr. McDade, the first conversation that you had
19   about -- as between the one with Mr. Richie, that
20   you had about finding additional sources of
21   collateral, was that in the early morning of
22   Friday?
23   A.   My recollection is somewhat hazy, but
24   I believe it was early on Friday morning.
25   Q.   Was there a meeting with Mr. McDade

Page 103

1    LOWITT - HIGHLY CONFIDENTIAL
2    early on Friday morning that you attended along
3    with others?
4    A.   I have no recollection of that
5    meeting, but I believe it is possible that it took
6    place. I think Thursday night was also an
7    all-nighter.
8    Q.   It sounds like most of the week was
9    all-nighters.
10       Was there a sense of urgency in
11   finding the additional sources of value?
12       MR. BERNSTEIN: Objection, asked and
13   answered.
14   A.   It was obviously important for us to
15   do that.
16   Q.   When you spoke to Mr. Richie after you
17   spoke to Mr. McDade, did Mr. Richie relay to you
18   any conversations he had had with McDade about
19   this issue?
20   A.   No. I don't believe he did.
21   Q.   Did you refer to your earlier
22   conversation with Mr. McDade about the issue when
23   you spoke to Mr. Richie?
24   A.   I don't have a recollection of the
25   details of, you know, my conversation with

Page 104

1    LOWITT - HIGHLY CONFIDENTIAL
2    Mr. Richie other than that it was -- other than we
3    needed to look to identify sources of additional
4    value.
5    Q.   Did you speak or otherwise communicate
6    with Mr. McDade about the issue after you spoke to
7    Richie?
8    A.   I can't recall any additional
9    conversations with Bart, but the progress that we
10   were making in identifying sources of value is
11   something that I would have been communicating to
12   Bart through the course of the day.
13   Q.   Now, there came a point during the
14   course of the day where Bart went down to the
15   bankruptcy court, correct?
16   A.   On the Friday, yes.
17   Q.   And approximately when during the day
18   was that, morning or afternoon?
19   A.   I don't know exactly when Bart went
20   down, but I would assume it was in the afternoon.
21   Q.   And the hearing went on until the wee
22   hours of the morning on the 20th. It went past
23   midnight, correct?
24   A.   Don't know with certainty, but if you
25   say that was what happened, I'm sure that's right.

Page 105

1    LOWITT - HIGHLY CONFIDENTIAL
2    Q.   Do you know if Mr. McDade was down
3    there for the entire hearing?
4    A.   Again, I wasn't there so I don't know
5    if Bart was there for the whole time.
6    Q.   Do you know if as part of this project
7    to identify additional sources of collateral, do
8    you know if during the work related to that
9    project anyone sent assets over to Barclays on the
10   Friday?
11       MR. BERNSTEIN: Objection, vague and
12   ambiguous.
13   A.   I don't have a recollection.
14   Q.   Did it ever come to your attention
15   that that happened, that additional sources of
16   value that were found during the Friday project
17   were sent over to Barclays on the Friday?
18       MR. BERNSTEIN: Same objection.
19   A.   I don't have a recollection.
20   Q.   Was part of your -- was one of the
21   goals of that work on the Friday to send assets to
22   Barclays on the Friday, Friday, the 19th?
23       MR. BERNSTEIN: Same objections.
24   A.   I don't have a recollection of that.
25   Q.   Putting before you what was marked at

Page 106

**LOWITT - HIGHLY CONFIDENTIAL**

1    a prior deposition as Exhibit 20. Can you take a
2    look through the document and tell me whether you
3    have seen it before?
4        MR. BERNSTEIN: Just so the record is
5        clear, when you are showing him documents
6        like this, you mean the part after "unknown"
7        and the 2009 date?
8        MR. GAFFEY: Yes.
9        Q.    Do you understand what he is referring
10    to? Up at the top it says "unknown" and then a
11    date. Ignore that. That's imprinted on the
12    document by our vendor. Below that is a copy of
13    the document I want to ask you about.
14        A.    Again, only in the preparation for the
15    deposition.
16        Q.    You note that the document is an
17    e-mail addressed to you and Paolo Tonucci from
18    Martin Kelly. That's the only e-mail on the
19    chain.
20        A.    I can see that, yes.
21        Q.    Do you have a recollection of seeing
22    this e-mail from Mr. Kelly at or about the time it
23    is dated, September 16, 5:10 a.m.?
24        A.    I don't have a recollection of it

Page 107

LOWITT - HIGHLY CONFIDENTIAL

1    specifically.
2        Q.    Do you have any recollection of
3    communicating in any way with Mr. Kelly in the
4    early morning hours of September 16 about the deal
5    terms?
6        A.    I don't have a recollection of
7    speaking with Mr. Kelly about anything
8    specifically, but speculatively, I would imagine
9    that I would have spoken with him about what was
10    our understanding of what was emerging.
11        Q.    And looking at the document in
12    preparation for your testimony today, did that
13    have any -- did that refresh your recollection in
14    any way about communications with Mr. Kelly on the
15    early -- in the early morning of September 16?
16        A.    It did not.
17        Q.    Does looking at that now refresh your
18    recollection?
19        A.    No, it doesn't refresh the
20    recollection.
21        Q.    Take a look, if you would, at the next
22    e-mail up in the chain, which appears to be from
23    you to Martin Kelly, copying Mr. Tonucci. Do you
24    see that?

Page 108

**LOWITT - HIGHLY CONFIDENTIAL**

1        A.    Yes.
2        Q.    And in it, it says, "You are a hero.
3    Well done." Do you see that?
4        A.    Yes.
5        Q.    Do you have any recollection as to why
6    you would respond to Mr. Kelly and describe him as
7    a hero?
8        A.    I think the reason I would imagine
9    that I was doing that, he had worked all night
10    after an extremely tumultuous week around this
11    deal, and that he had -- and it was part of just
12    showing appreciation for that.
13        Q.    Do you have -- he was one of your
14    direct reports, is that right, Martin Kelly?
15        A.    That is correct.
16        Q.    Do you have an understanding of -- can
17    you describe to me what it was that Martin Kelly
18    was doing overnight from Monday to Tuesday? What
19    were his tasks?
20        MR. BERNSTEIN: Objection, no
21        foundation and compound.
22        A.    I know some of the things that Martin
23    was doing. Martin was helping to sort of estimate
24    some of the numbers that were going into the

Page 109

LOWITT - HIGHLY CONFIDENTIAL

1    transaction, like the cure payment, and as the
2    financial controller, he was a key participant in
3    determining what some of the items in the
4    transaction were, and as is clear from the e-mail,
5    he had a good sense of what many of the key
6    elements of the transaction included.
7        Q.    Is that the extent of your
8    recollection about that?
9        A.    That's my recollection of that morning
10    and my interactions with Martin and his role.
11        Q.    You referred before to some
12    mortgage -- some mortgage securities that Barclays
13    did not want.
14        A.    Correct.
15        Q.    Can you describe them in any more
16    detail?
17        A.    Only that they were sort of
18    residential mortgages. But no, I can't be more
19    specific. But as you see in the e-mail, you know,
20    it talks about $3.6 billion of Resi assets left
21    behind. I believe that's the -- those are the
22    same assets I was referring to before.
23        Q.    Did you have an understanding in the
24    early part of the week, the Monday, Tuesday, that

Page 110

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    the agreement that was reached had 50 percent of
3    the Resis going to Barclays and 50 percent going
4    to Lehman, remaining with Lehman?
5        A.   I don't recall what the percentages
6    were, but there were clearly assets that were
7    staying and assets that were going.
8        Q.   I put before you, Mr. Lowitt, what has .
9    been marked at a prior deposition as Exhibit 10.
10   I would ask you to take a look through the
11   document and tell me whether you have a
12   recollection of seeing it before.
13       A.   No, I don't recall seeing this before.
14       Q.   Some of the e-mails reflect on this --
15   well, the e-mail at the top appears to be an
16   e-mail from you to Jerry Reilly and Eric Felder.
17   Do you see that?
18       A.   Yes, I do.
19       Q.   And in that piece of the e-mail chain,
20   it says "that's my understanding, but check with
21   whoever drafted the purchase agreement, Ian," and
22   that's responding to a question about whether
23   certain Resis and auction securities are going to
24   be included, right?
25       A.   That seems to be the sense of the

Page 111

1    LOWITT - HIGHLY CONFIDENTIAL
2    chain of e-mails.
3        Q.   I want you to get the sense of it
4    because my question goes to your apparent
5    direction to Reilly and Felder to check with
6    whoever drafted the purchase agreement.  Do you
7    know who drafted the purchase agreement?
8        A.   It would be -- I don't know.  I would
9    assume it was lawyers from Weil working together
10   with maybe some lawyers from Lehman.
11       Q.   You are assuming it because that's
12   what -- do you have any factual basis for the
13   assumption or it is an assumption?
14       A.   It's an assumption.
15       Q.   And do you have any knowledge, sir, of
16   what facts were given to whoever drafted the
17   purchase agreement about the business terms that
18   had been agreed?
19       Let me make that question simpler.  Do
20   you know what the drafters were told about the
21   terms of the deal?
22       A.   I do not.
23       Q.   And this e-mail appears to indicate
24   that at least on September 17 at 12:34 p.m., which
25   is the time of the e-mail from you to Reilly and

Page 112

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    Felder, you had not seen the purchase agreement;
3    is that correct?
4        MR. BERNSTEIN:  You are asking him if
5    that's what the e-mail indicates or --
6        MR. GAFFEY:  Actually let me ask if it
7    refreshes his recollection as to the first
8    time he saw the asset purchase agreement.
9        A.   I don't believe I had seen the
10   purchase agreement.
11       Q.   Further down in that e-mail chain,
12   there is an e-mail from Eric Felder to a number of
13   people and a cc to a number of people including
14   you.  And Mr. Felder wrote, "I think the Barclays
15   folks picked the assets.  I recall them saying
16   they didn't want the auction securities, but I
17   wasn't in all the meetings."
18       Do you see that?
19       A.   I do.
20       Q.   Was it your understanding that the
21   Barclays folks picked the assets?
22       A.   The Barclays folks determined which
23   assets they were willing to purchase and which
24   assets they didn't want to purchase.  So in that
25   sense, the Barclays folks picked the assets.

Page 113

1    LOWITT - HIGHLY CONFIDENTIAL
2        Q.   Was it your understanding that
3    Barclays picked the assets it was willing to
4    purchase based on the quality of those assets they
5    were --
6        MR. HUME:  Objection, lacks
7    foundation.
8        A.   I couldn't say why they chose to
9    purchase certain assets and not others.
10       Q.   Let me go back to what may have been
11   expressed to you at the time by others.  That's
12   really what I am asking.  Did anybody express to
13   you that Barclays was picking assets based on the
14   quality of the assets?
15       A.   I have no recollection that that was
16   the basis.  It would have been what they -- how
17   they decided which assets they wanted to purchase
18   would have been driven by their own positions and
19   not wanting to get overconcentrated, as well as,
20   you know, their view of how easy it was to assess
21   what was an appropriate mark on those.
22       Q.   Take a look, if you would, sir, at the
23   second page of the exhibit.  The earliest e-mail
24   in this e-mail chain is from -- I'll probably
25   murder this -- Gilles Aublin to Jerry Reilly, cc

Page 114

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    Clement Bernard, dated September 17, 11:53 a.m.
3         And it is asking in the last line
4    whether there are "guidelines to exclude some
5    assets that are deemed to be more toxic (for
6    example, we have 2.8 billion of ARS, in high grade
7    and muni combined)."
8         Do you see that?
9    A.  I do.
10   Q.  Does that refresh your recollection as
11   to whether there were standards or guidelines
12   governing assets Barclays had said it would
13   purchase as opposed to those it said it would not?
14   A.  I wasn't aware of any guidelines.  I
15   know there were meetings that took place between
16   managers at Barclays and managers at Lehman so
17   that Barclays could make an assessment about
18   whether they were willing to purchase certain
19   assets, with an understanding that there were some
20   assets in the portfolio that for reasons that made
21   sense to them they chose not to want to purchase.
22   Q.  Mr. Lowitt, we talked earlier today in
23   somewhat broad terms about the repo, and I would
24   like to return to that topic and that segment of
25   the week, as it were.

Page 115

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    A.  Sure.
3    Q.  Give me as best you can a description
4    of how it came to be that the repo with Barclays
5    was necessary and agreed.  What caused the repo to
6    come into being?
7    A.  I think the context for it was the
8    extreme markets disruption that was being
9    experienced that week, where, as you recall, AIG
10   was -- received assistance on the Tuesday.  There
11   was big increases in credit default swaps of many
12   other firms.
13        The Fed, for reasons of its own,
14   decided that it didn't want to have ongoing
15   exposure to LBI, and although I wasn't party to
16   any of the discussions, you know, communicated to
17   Barclays that they wanted Barclays to take them
18   out of their repo with Lehman Brothers.
19        I was asked to attend the meeting with
20   the Fed, together with people at Barclays, to talk
21   through how that was going to get effected, but it
22   was clear that the Fed was very keen on being
23   taken out of that risk so that they would
24   either -- for reasons that made sense to them.  I
25   can speculate on what those were.

Page 116

1    **LOWITT - HIGHLY CONFIDENTIAL**
2         As a consequence, on the Thursday,
3    there was a huge effort under way to move the
4    collateral back from -- move -- to move the
5    collateral from JP Morgan, who was the triparty
6    agent for Lehman, to BONY, that was the triparty
7    agent for Barclays, with Chase obviously concerned
8    through this whole process about their own
9    exposures to Lehman Brothers.
10        The effect of this was that through
11   the Thursday, this repo was now effected with
12   Barclays rather than with the Fed, so Barclays
13   needed to come up with, in round numbers, about
14   $45 billion of cash to buy the Fed out of their
15   repo position so the Fed no longer had a claim on
16   that collateral and received the cash for that
17   collateral.
18        That then became a new and very
19   different element, because there was no way that
20   LBI could get out of that repo position.  It
21   couldn't generate $45 billion to give to Barclays
22   to get back its collateral.  The repo was now an
23   imposed element on whatever deal was going to get
24   consummated between LBI and Barclays.
25   Q.  Now, when the repo was put into

Page 117

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    place -- was it put into place on the Thursday,
3    the 18th?
4    A.  That's my recollection, that we met
5    with the Fed on the Wednesday and Thursday, and
6    the Thursday evening was when the repo was unwound
7    with the Fed and a new repo was put in place with
8    Barclays.
9    Q.  Is it your understanding, sir, as the
10   deal ultimately came to be implemented, one
11   element of it was that Lehman -- that the repo was
12   extinguished, it was terminated?
13        MR. HUME:  Objection, vague and
14        ambiguous, calls for a legal conclusion.
15   Q.  Can you answer my question.
16   A.  Can you repeat the question.
17        (Record read)
18   A.  I mean what was clear to me was that
19   Barclays kept the collateral and LBI kept the
20   cash.  If that's the equivalent of extinguishing
21   the repo, yes, it extinguished the repo.
22        What really was happening, Barclays
23   accepted the collateral that was in the repo trade
24   and they kept that collateral and LBI kept the
25   cash.

1      LOWITT - HIGHLY CONFIDENTIAL
2      Q.   The collateral included the haircut
3  over and above the cash amount?
4      A.   It included the collateral -- the
5  amount of cash was less than the collateral
6  reflecting the standard financing haircuts on
7  those collateral terms, but yes.
8      Q.   Yes, it kept the difference?
9      A.   It got the collateral that was part of
10 the repo. They retained that. And they didn't
11 get the cash back from LBI. That cash obviously
12 had gone to the Fed to take the Fed out of its
13 repo position.
14     Q.   Do you know when during the week it
15 was determined that that's how the repo would be
16 resolved, that Barclays would keep the collateral
17 and Lehman would keep the cash?
18     A.   It was definitely part of -- I wasn't
19 party to the negotiating sessions, but it was
20 definitely part of the discussions that were
21 occurring on the Friday.
22     Q.   The discussions between whom and whom
23 on the Friday?
24     A.   Well, we were looking to see how the
25 deal -- within finance, there was an effort to

1      LOWITT - HIGHLY CONFIDENTIAL
2  determine what would be delivered to Barclays
3  under the deal, whatever the deal was, and the
4  repo as a new fact in the situation allowed or it
5  enabled or became a basis for the new transaction.
6      Q.   I think we might be at cross purposes
7  here. My question to you, sir, when you referred
8  to some discussions that were occurring on the
9  Friday, I asked you between whom and whom. What
10 people were involved in these discussions?
11     A.   I don't have specific recollections of
12 the discussions. I do know that the people in
13 finance, so that would have included Jerry Reilly,
14 myself, would have been discussing what collateral
15 was going to be delivered to Barclays and how that
16 was going to be effected.
17          Actually, could I take a break,
18 please?
19     Q.   Sure.
20          (Luncheon recess)
21          (Continued on next page)
22
23
24
25

1      LOWITT - HIGHLY CONFIDENTIAL
2           AFTERNOON SESSION
3               1:10 p.m.
4  BY MR. GAFFEY:
5      Q.   Mr. Lowitt, I have put before you what
6  we have previously marked as Deposition Exhibit 5.
7  Take a look at the document and tell me whether
8  you recognize it.
9      A.   I don't recognize the e-mail, but I am
10 obviously aware of the people who are referenced
11 in it.
12     Q.   There is a reference in the e-mail,
13 which is from you to Chris O'Meara, to -- you say
14 as follows: "We worked all night to find what
15 inventory we have available to sell. Meet me in
16 Martin's office. Jerry has the details. Ian."
17          Do you see that?
18     A.   I do.
19     Q.   Do you recall working all night from
20 Thursday to Friday to find inventory to sell?
21     A.   I do.
22     Q.   Is that part of this project we were
23 talking about before the lunch break of looking
24 for additional value for Barclays?
25     A.   No. This was in the construct of the

1      LOWITT - HIGHLY CONFIDENTIAL
2  earlier transaction which was around our ability
3  to insure that the collateral that we were selling
4  to Barclays was collateral that was unencumbered
5  and available.
6      Q.   When you're referring to the
7  collateral that was going to Barclays, is that the
8  collateral in the repo?
9      A.   It was the collateral that was
10 conceptually referenced on the earlier schedules,
11 the assets that would have been described in that
12 schedule. So we were -- it wasn't thinking about
13 the repo specifically. It was, you know, what
14 assets did we have where we knew we had possession
15 of those so that we could make sure that they went
16 to Barclays, some portion of which was the repo,
17 but it could have been in other inventory as well.
18     Q.   And is that because during the week,
19 starting on Tuesday and now we are at Friday, the
20 body of available collateral had shrunk because of
21 issues of possession or title?
22     A.   Yes. And the fact that, you know,
23 some of it was being financed and that the various
24 counterparties wouldn't have returned it, and
25 there was that series of issues, operationalizing

Page 122

LOWITT - HIGHLY CONFIDENTIAL

1  LOWITT - HIGHLY CONFIDENTIAL
2  the delivery of collateral.
3      Q.  And do you have a sense of how much
4  that body of collateral had shrunk from Tuesday to
5  Friday?
6      A.  I don't have a recollection of how
7  much.
8      Q.  Do you remember if on Friday, whether
9  you remember the number today or not, do you
10  remember if on Friday you had a determination of
11  what the value was of what was available to give
12  to Barclays?
13      A.  I know we worked Thursday to develop a
14  point of view of what collateral we did have that
15  we could deliver as part of the transaction.  I
16  can't be more specific about the amount, and I
17  would simply be speculating as to how much it was
18  less than the amount that was available on Monday.
19      Q.  But again without regard to the
20  particular number, and it is a while ago, you do
21  remember that there was a number of some kind, if
22  you can't remember it today?  It was quantified in
23  some way?
24      A.  There were a series of schedules that
25  identified specific pieces of collateral that

Page 123

1  LOWITT - HIGHLY CONFIDENTIAL
2  based on the information that we had, which was
3  hazy because of data issues with Chase and others,
4  that we were confident was collateral we could
5  have delivered into the deal.
6      Q.  And there is a reference in the lower
7  e-mail, that is the earlier e-mail from Chris
8  O'Meara to you at 6:24 in the morning on
9  September 19, "Ian, Bart asked some LEH folks to
10  meet with Alex Kirk about the Barclays deal at
11  7 a.m. today.  We will get him up to speed on
12  where we stand, especially on the matter of
13  inventory being sold.  We will then coordinate
14  with the LEH business heads to ensure they are in
15  agreement, FYIC."
16      Focusing your attention on that
17  language, sir, was there a meeting with Alex Kirk
18  in the early morning of September 19?
19      A.  I don't recall.
20      Q.  Do you know if there was a meeting --
21  well, this suggests that you had a conversation or
22  a communication of some kind with Bart McDade
23  prior to 6:24 on September 19.  Does it refresh
24  your recollection as to --
25      A.  No, I actually don't see that in -- it

Page 124

1  LOWITT - HIGHLY CONFIDENTIAL
2  says Bart asked some Lehman folks to meet with
3  Alex.
4      Q.  I beg your pardon, that's absolutely
5  right, that's absolutely right.
6      Do you know why Bart wanted LEH folks
7  to meet with Alex Kirk about the Barclays deal
8  that morning?
9      A.  I don't know.  Again, the sense of the
10  e-mail is that it is associated with the inventory
11  that was being sold as part of the transaction,
12  and the work that we had done the previous evening
13  was around determining what it was that we had
14  that was available to sell.
15      So it is -- they seem linked to me.
16      Q.  Is that determination with respect to
17  inventory separate from the other issue we were
18  talking about before, the 15c3 and unencumbered
19  collateral?
20      A.  It is separate in the sense that --
21  they are different issues to my mind.  So there
22  was one which was what was the inventory that we
23  had that was available to us that we could include
24  in a transaction.  So that was one thing.
25      And then separately there is a

Page 125

1  LOWITT - HIGHLY CONFIDENTIAL
2  question of sort of unencumbered collateral, which
3  would have overlapped with this but was different
4  from it, and I think the exercise that we
5  undertook on the Thursday evening was to determine
6  what was the inventory that was unencumbered that
7  we would be able to sell to Barclays.
8      Q.  I think -- I always get these two
9  numbers backwards.  We talked before about a
10  $1.9 billion number, an approximately $2 billion
11  number as between the 15c3 and the unencumbered
12  collateral?
13      A.  No, I think we said unencumbered
14  collateral was around $2 billion and the 15c3 was
15  between 700 and 800 million.
16      Q.  Those are the two I mixed up.  Was
17  the -- did the unencumbered collateral overlap the
18  inventory that is being discussed in Exhibit 5?
19      MR. HUME:  Objection, lacks
20  foundation.
21      A.  Really they were just different
22  things.  To the extent that we discovered
23  inventory that was unencumbered and could be
24  delivered into the deal and wasn't part of the
25  repo, then it would be available as unencumbered

Page 126

1      LOWITT - HIGHLY CONFIDENTIAL
2   collateral to deliver into the transaction.
3      **Q.   And was property of that character**
4   **added to the body of assets that were going to be**
5   **traded to Barclays?  Not in the repo but available**
6   **for transfer?**
7      A.   Again, this exercise was associated
8   with trying to satisfy the structure that was
9   existing prior to the repo, even though it was
10  done on the Thursday evening.  I think what
11  emerged through Friday was that the repo itself
12  was going to be the basis of the transaction.
13     **Q.   That brings me back to the search for**
14  **additional value, if the repo itself was going to**
15  **be the basis for the transaction.  The 15c3 and**
16  **the unencumbered collateral were not within the**
17  **repo, correct?**
18     MR. BERNSTEIN:  Objection, form,
19  compound.
20     Go ahead.
21     A.   The transaction clearly included more
22  than just the repo.  It included other elements as
23  well.  It included the repo, it included 15c3 and
24  unencumbered collateral.  It included the
25  exchanged traded derivatives.  It included a

Page 127

1      LOWITT - HIGHLY CONFIDENTIAL
2   variety of other things.
3      So the repo was an element of the
4   transaction, obviously a big part of the
5   transaction, but it wasn't the sole part of the
6   transaction.
7      **Q.   Was there a time, Mr. Lowitt, during**
8   **the week when Barclays' personnel were involved in**
9   **marking Lehman positions?**
10     A.   Marking Lehman positions for the
11  purpose of --
12     **Q.   You would have to tell me.**
13     A.   I mean I think there were Barclays
14  personnel involved in looking at our assets and
15  determining what they would be willing to purchase
16  it for, but they were not marking our positions
17  for the purposes of our books and records.
18     **Q.   I show you what was marked at a prior**
19  **deposition as Exhibit 23.  I ask you to take a**
20  **look at that.**
21     **Do you recall seeing this e-mail chain**
22  **before?**
23     A.   Not before preparing for the
24  deposition.
25     **Q.   Take a look, please, at the earliest**

Page 128

1      **LOWITT - HIGHLY CONFIDENTIAL**
2   of the e-mails, from Ian Lowitt to Gerard Reilly,
3   September 17, 9:29 p.m.  In it you write, the
4   subject is, "Are we set up to do the marking of
5   the positions?  Ian."
6      A.   Yup.
7      **Q.   And then above that is an e-mail from**
8   **you to Gerard Reilly forwarding that e-mail and**
9   **adding, "What I meant was for BarCap to mark the**
10  **positions further?  Ian."  Do you see that?**
11     A.   I do.
12     **Q.   What did you mean when you wrote that**
13  **to Mr. Reilly, asking if we were set up to do the**
14  **marking of positions and with the explanatory note**
15  **about BarCap?**
16     A.   Either -- what I understand as I read
17  it now is that we were determining what was the
18  price that BarCap were willing to pay for the
19  assets of the -- that reflected the discount for
20  the -- to use your word discount -- the delta
21  between what they were on our books for and what
22  they would buy it for, given the size of the
23  purchase, as well as for the volatility of the
24  underlying positions.
25     **Q.   So can you tell me why negotiations**

Page 129

1      **LOWITT - HIGHLY CONFIDENTIAL**
2   were continuing on September 17 about that topic?
3      A.   I don't know whether they were
4   negotiations.  We were trying to determine what
5   was the way in which we would effect the
6   transaction, which was to deliver a series of
7   assets to Barclays at prices that they were
8   comfortable purchasing them at.
9      **Q.   Had the prices not been determined in**
10  **the exercise on Tuesday with the development of**
11  **the financial schedule we looked at before?**
12     A.   They weren't developed at the level
13  of -- I don't know the extent to which they were
14  developed, but we weren't aware of information
15  that was at an asset-by-asset level which would
16  have been necessary to effect the transaction.
17     **Q.   And was that process being conducted**
18  **on an asset-by-asset level on the 17th?  Is that**
19  **what you are referring to here?**
20     A.   On the 17th we were believing what we
21  needed to do was to mark the positions to a level
22  that was consistent with what Barclays were
23  willing to purchase them at.
24     **Q.   Did that happen?**
25     A.   I don't believe that it did.

LOWITT - HIGHLY CONFIDENTIAL
1
2    Q.   Why not?
3    A.   I think the transaction changed when
4 the repo was effected, and because the repo was
5 effected, the transaction itself changed.
6    Q.   Was the process of marking the
7 positions to a level that was consistent with what
8 Barclays were willing to purchase them at referred
9 to as the conversion?
10    A.   I don't believe so. The conversion --
11 can you be more precise about the conversion.
12    Q.   I will show you a document in a little
13 while about that.
14    A.   I would imagine the conversion is
15 about converting the assets from the Fed to
16 Barclays, would be my surmise about what that
17 means.
18         This was not an exercise that we
19 actually undertook.
20    Q.   And --
21    MR. BERNSTEIN: Can we be clear for
22 the record, when you said this was not an
23 exercise, I don't want to suggest an answer
24 to you, but you might want to explain
25 "this," because I'm not sure if you are

LOWITT - HIGHLY CONFIDENTIAL
1
2 talking about the conversion or piece of
3 paper that you are holding in your hand.
4    Q.   My question exactly.
5    A.   I am referring to what is described in
6 this e-mail as having Barclays' traders come to
7 Lehman and engage in a marking process.
8    MR. BERNSTEIN: Just for the record,
9 this e-mail is Exhibit 23, correct?
10    THE WITNESS: That is correct.
11    Q.   Further up in that e-mail chain, there
12 is an e-mail from Mr. Reilly to you, also
13 September 17, at 9:35 p.m., responding to yours,
14 saying "Ian, I told business guys they must get
15 counterparts at BarCap comfortable tomorrow night
16 by our front-end systems. We will not have time
17 to do Friday. We are going to send last night's
18 assets and marks over so they can see mix and
19 marks."
20         What did you understand Mr. Reilly to
21 be conveying to you with that e-mail?
22    A.   That we needed to have the Barclays'
23 traders comfortable with the assets that they were
24 purchasing and marks that they were going to buy
25 them at that reflected a price that they were

LOWITT - HIGHLY CONFIDENTIAL
1
2 willing to pay for those assets.
3    Q.   Now, further up, the next one up,
4 September 17, 9:41 p.m., Mr. Reilly writes to you,
5 "I went through all docs and did not see reference
6 to the price haircut. If we want conservative
7 marks to reflect block nature, we need to know how
8 much and then can allocate to most logical
9 assets."
10         Could you explain that to me?
11    A.   I think what Jerry is describing here
12 is the need to reflect in the assets that we
13 are -- we would be sending to Barclays a mark that
14 reflected what they were willing to pay for the
15 assets and that there needed to be a process of
16 reflecting that not at the level of the gross
17 asset category but at the level of individual
18 assets.
19    Q.   Now, do I understand that to mean that
20 the price haircut would be determined and then the
21 assets would be identified to which it would be
22 applied?
23    MR. BERNSTEIN: Objection to the form.
24    A.   Yeah, I didn't see it in that way. I
25 think it was trying to insure what we were doing

LOWITT - HIGHLY CONFIDENTIAL
1
2 at an asset-by-asset level was consistent with
3 what was in the agreement.
4    Q.   And is that -- when you say in the
5 agreement, is that what you understood Mr. Reilly
6 to be referring to when he referred to the docs?
7    A.   Yeah, the documents describing what
8 the contract was.
9    Q.   You respond to Mr. Reilly by saying,
10 "Since not in contract, hard to see what to" -- it
11 says D-P but I will read that as "do. Ian." Do
12 you see that?
13    A.   I do.
14    Q.   Had you, by September 18, referred
15 the -- now reviewed the contract?
16    A.   I had not.
17    Q.   Well, how would you know, Mr. Lowitt,
18 what was and what was not in the contract?
19    A.   I didn't know what was in and what
20 wasn't in the contract. I had a sense of what the
21 terms were, but I hadn't reviewed it in the
22 contract.
23    Q.   I note that you don't say in your
24 e-mail to Mr. Reilly I don't know what the
25 contract says. You say it's not in the contract.

Page 134

1       **LOWITT - HIGHLY CONFIDENTIAL**
2   **Do you see that?**
3       A.   I do.
4       **Q.   Does that suggest to you that you had**
5   **read the contract and seen no reference to the**
6   **price haircut?**
7           MR. BERNSTEIN: Objection. Asked and
8       answered.
9       A.   I don't read it as such. I said if --
10  it doesn't -- when I say "since not in contract,"
11  it doesn't mean that I knew that independently.
12  It is referencing what Jerry has said about that
13  the documents didn't include it.
14      **Q.   So when you were saying to Mr. Reilly**
15  **that it was hard to see what to do, what were you**
16  **communicating?**
17      A.   It was hard to see how we were going
18  to identify those assets that Barclays were going
19  to purchase and what the pricing on each of those
20  individual assets were going to be.
21      **Q.   And it was hard to see because, at**
22  **least if Mr. Reilly's right that there is no**
23  **reference to the price haircut, it doesn't give**
24  **any guidance?**
25          MR. BERNSTEIN: Objection to form.

Page 135

1       LOWITT - HIGHLY CONFIDENTIAL
2       **Q.   Is that right?**
3       A.   It is hard because, as Jerry says,
4   "went through the docs and do not see reference to
5   price haircut."
6       **Q.   So absent a reference in the**
7   **documents, you don't know how to apply the price**
8   **haircut? Is that what you are saying?**
9       A.   It is hard to determine how we are
10  going to identify the series of assets that are
11  part of the transaction and at what price those
12  are going to be marked at and that Barclays is
13  going to purchase them at.
14      **Q.   Now, did there come a time,**
15  **Mr. Lowitt, where you understood that --**
16  **withdrawn.**
17          **Did there come a time when it was**
18  **suggested to you that the best means of delivering**
19  **the discount to Barclays was by defaulting on the**
20  **repo?**
21      A.   Again, I don't -- I don't agree with
22  the characterization of the best way to deliver
23  the discount. I think what was clear on the
24  Friday, in part because of the difficulties that
25  we have talked about, but also because the repo

Page 136

1       LOWITT - HIGHLY CONFIDENTIAL
2   was now in place, that the repo represented -- was
3   part of what any new transaction was going to be
4   and that what you had in the repo addressed many
5   of the operational questions that we were not sure
6   how to address, which was which of the assets
7   Barclays was going to acquire, because clearly the
8   ones in the repo became the basis of what they
9   were going to acquire, as well as what was the
10  financing haircut associated with that.
11      **Q.   Mr. Lowitt, I am putting before you**
12  **what has previously been marked as Deposition**
13  **Exhibit 127. Have you seen that document before?**
14      A.   Again, I don't recall seeing this
15  before the preparation for the deposition.
16      **Q.   Take a scan through it sufficient to**
17  **familiarize yourself with it and let me know when**
18  **you have done that.**
19      A.   OK.
20      **Q.   I would -- directing your attention to**
21  **the earliest message on the page, the one at the**
22  **bottom, from Gerard Reilly to you, Michael**
23  **Gelband, copy Paolo Tonucci and Martin Kelly,**
24  **September 18th, 2008 at 6:04 a.m.**
25          **And in that e-mail entitled "Open**

Page 137

1       **LOWITT - HIGHLY CONFIDENTIAL**
2   **Issues on Deal," Mr. Reilly writes -- I'm down at**
3   **paragraph 3 -- "Not clear on the amount of block**
4   **discount or how we make it happen. Defaulting on**
5   **repo could be the best, as discount could be taken**
6   **from haircut. If not that, then we need to give**
7   **business an allocation of block discount so they**
8   **can mark down the books tonight. Does that create**
9   **a problem, as it could tip the broker early?**
10  **Would we rather have that be in the sale price**
11  **tomorrow?"**
12          **Do you see that portion?**
13      A.   I do.
14      **Q.   What did you understand Mr. Reilly to**
15  **be suggesting in this e-mail when he said,**
16  **defaulting on repo could be the best as the**
17  **discount could be taken from the haircut?**
18      A.   Again, I don't have a recollection of
19  this on the Thursday, but in reading the e-mail
20  here, you know, what Jerry is suggesting is that
21  the repo transaction is a way in which we could
22  deliver collateral to Barclays and that as a basic
23  concept, the financing haircut is a similar
24  concept to the item that we were talking about
25  earlier, which is Barclays' buying collateral for

Page 138

1        LOWITT - HIGHLY CONFIDENTIAL
2   less than the marks to reflect the size of their
3   purchase and the volatility of the underlying
4   assets.
5        Q.   So to put that at least in my layman's
6   terms, that would be using the haircut on the repo
7   as a replacement for the markdown of the value
8   shown on the books?
9        MR. BERNSTEIN:  Objection,
10       mischaracterizes his testimony.
11       A.   What I would say is not how I would
12  think of it as a replacement.  They were -- they
13  are comparable concepts, but the repo transaction
14  was, again, a way in which we could deliver
15  specific assets to Barclays at a specific price,
16  which is what the original deal intended, but it
17  was a different thing.
18       Q.   Well, if the repo is used to deliver
19  assets to Barclays at a specific price and
20  Barclays gave $45 billion and received 50 billion
21  in collateral, does that mean Barclays bought
22  50 billion in collateral for $45 billion?
23       A.   If the -- if they received all their
24  collateral and that was the cash that came to of
25  firm, then, yes, they received $49 billion of

Page 139

1        LOWITT - HIGHLY CONFIDENTIAL
2   collateral -- $50 billion of collateral for the
3   cash.
4        Q.   Further up in the e-mail, you write to
5   Mr. Reilly, Gelband, with copies to Kelly, Felder
6   and Lee, "Jerry, please set up a meeting first
7   thing this morning to work through these issues
8   with Mike, Eric and Hyung."
9        A.   That's Hyung Lee.
10       Q.   "Probably want Martin as well, and how
11  to approach.  Must be a huge priority for today.
12  Ian."
13       Why was this a huge priority for that
14  day?
15       A.   Well, we needed to determine how we
16  would be able to deliver collateral that was
17  specified and what Barclays would be paying for
18  that collateral.
19       Q.   And the Martin that you are referring
20  to is Martin Kelly?
21       A.   I believe it would be Martin Kelly
22  from the context.
23       Q.   Do you still work with Martin Kelly on
24  a day-to-day basis?
25       A.   I do not.  We speak occasionally,

Page 140

1        LOWITT - HIGHLY CONFIDENTIAL
2   but --
3        Q.   Apart from meeting with your lawyers,
4   did you talk to anyone about the fact that your
5   deposition was being taken today?
6        A.   There are some people in the wealth
7   division that are aware that I am being deposed.
8        Q.   Did you talk to them for any reason
9   other than to explain your absence?  Did you talk
10  to them about the substance of what you would be
11  testifying about?
12       A.   No, no.
13       Q.   Have you spoken to anyone else who has
14  had their deposition taken in this matter?
15       MR. BERNSTEIN:  I presume you mean
16       about the deposition?
17       MR. GAFFEY:  Yeah, sure.
18       MR. BERNSTEIN:  As opposed to at some
19       point in his life about something else.
20       MR. GAFFEY:  Yes.  But "no" would
21       cover both.
22       A.   But I meant about the deposition.
23       Q.   OK.  Now, up at the top of this,
24  Mr. Felder writes to Reilly, Lowitt, Gelband, copy
25  Kelly and Lee, "The Barclays guys chose the

Page 141

1        LOWITT - HIGHLY CONFIDENTIAL
2   assets.  We did not have anything to do with it."
3       In the context of the e-mails below,
4   do you have an understanding of what Mr. Felder is
5   communicating here?
6        A.   He is saying that Barclays' folks, my
7   understanding would be that what the -- that the
8   Barclays folks were the ones who decided which
9   assets they wanted to purchase and ones they
10  didn't, so the selection of which assets would be
11  included was not something driven by the Lehman
12  folks but by the Barclays folks.
13       Q.   I am trying to put it in context of
14  the e-mail.  Let me suggest it might be a response
15  to paragraph 1 in the bottom e-mail, about whether
16  or not auction rates are included.  I don't want
17  you to speculate, but I am wondering if you have
18  any knowledge of what it is Mr. Felder meant when
19  he wrote this.
20       A.   I don't know what Mr. Felder meant
21  when he wrote this.
22       Q.   Mr. Lowitt, you have before you what
23  has previously been marked as Deposition
24  Exhibit 14.  And with the exclusion we talked
25  about before, the top two lines that say "unknown

Page 142

1        **LOWITT - HIGHLY CONFIDENTIAL**
2    **and sent," have you seen the text of this e-mail**
3    **before?**
4        A.    Yeah, I don't have a recollection of
5    it besides in the preparation for the deposition.
6        Q.    **In the bottom e-mail, from you to**
7    **Gelband, Kirk and Beldner, copies to Tonucci,**
8    **Reilly and Kelly, you say, "Today was very bad**
9    **with very large number of surprises, increased**
10   **requirement of 7 or so billion. Cannot get**
11   **through tomorrow if not tighter. Not sure what to**
12   **suggest other than someone makes ensuring great**
13   **discipline the number one priority. Let's huddle**
14   **in the morning to see the best way forward. Also**
15   **need to shrink matchbook, which as of yesterday**
16   **was much larger than expected. Jerry and Martin**
17   **have details. Ian."**
18       **What were you referring to when you**
19   **said increased requirement of 7 or so billion?**
20       A.    You see here the subject says funding
21   tomorrow?
22       Q.    **Yes.**
23       A.    This was referring to the funding
24   position of the firm on the Wednesday evening
25   where per the e-mail, there was a number of

Page 143

1        LOWITT - HIGHLY CONFIDENTIAL
2    surprises vis-a-vis the funding, which I think
3    would have referred to the fact that people we
4    thought were going to roll secured funding didn't,
5    or some of the term repo that we expected to stay
6    on as term had -- wasn't available to us, which
7    increased the funding requirement that we had to 7
8    or so billion dollars. So this was referring to
9    the funding position of the firm.
10       When it says, "cannot get through
11   tomorrow if not tighter," it is saying that our
12   ability to fund the firm on Thursday requires us
13   to be extremely disciplined around financing and
14   funding in one or two, ensuring that the senior
15   people in fixed income were aware of just how
16   important this was and how our funding position
17   was deteriorating.
18       Q.    And what are you referring to when you
19   talk about the need to shrink the matchbook?
20       A.    Well, the matchbook, there is a book
21   which has -- you know, assets and liabilities
22   should be matched. It was consuming some amount
23   of cash. So shrinking the matchbook was one of
24   the ways we wanted to improve the liquidity
25   position of the firm.

Page 144

1        LOWITT - HIGHLY CONFIDENTIAL
2        Q.    **When you say shrink the matchbook,**
3    **what does that mean? I guess you need to explain**
4    **the matchbook term.**
5        A.    It means you could be longer Treasury
6    and shorter Treasury, and shrink it means -- you
7    know, one is a repo, one is a reverse repo, so
8    when you repo the collateral out, so shrinking the
9    matchbook's essentially relating to reducing the
10   number of repos of collateral where you hold the
11   collateral and reducing the number of reverse
12   repos where you reverse the collateral in.
13   Normally -- that's what it would be.
14       Q.    **Could you -- in front of you there**
15   **ought to be Exhibit 127 that we just looked at a**
16   **moment ago. It is the e-mail, not clear about the**
17   **amount of block discount.**
18       A.    Yes, I see that.
19       Q.    **A few more questions about that. Down**
20   **in paragraph 3, when Mr. Reilly writes, "Does that**
21   **create a problem, as it could tip the broker**
22   **early," what did you understand him to mean?**
23       A.    Again, I don't have a recollection of
24   what that means. Again, as I sort of speculate
25   from the context, it is you need broker -- the

Page 145

1        LOWITT - HIGHLY CONFIDENTIAL
2    broker-dealer needs to remain in compliance from a
3    regulatory perspective and regulatory capital
4    perspective, so he may have been talking about the
5    implications of dealer marking the books down
6    would create a problem from a regulatory capital
7    perspective, but again this is pure speculation.
8        Q.    **Is an alternative speculation that**
9    **defaulting on the repo could drive the**
10   **broker-dealer into a bankruptcy earlier than**
11   **planned?**
12       A.    Defaulting on the repo? I don't see
13   why -- I don't read it in that way at all.
14       Q.    **And when Mr. Reilly writes, "Would we**
15   **rather have that be in the sale price tomorrow,"**
16   **do you have an understanding of what he is**
17   **communicating to you there?**
18       A.    I don't have a recollection of it, but
19   I think it is a question of do you mark the books
20   down before the bankruptcy filing or essentially
21   as part of the bankruptcy filing.
22       Q.    **This is written on the 18th and the**
23   **sale hearing is going to be conducted before the**
24   **bankruptcy court on the 19th, LBI, correct?**
25       A.    That is correct.

Page 146

1        LOWITT - HIGHLY CONFIDENTIAL
2        Q.   Do you understand this to mean a
3    reference to the sale price that will be
4    referenced at the bankruptcy hearing the next day?
5        MR. BERNSTEIN:  Objection, no
6    foundation.
7        A.   I can't say what that would be
8    referring to, but -- I can't say what it would be
9    referring to.
10       (Exhibit 218, document Bates stamped
11   42628 marked for identification, as of this
12   date.)
13       Q.   Mr. Lowitt, you have before you what
14   we have marked as Deposition Exhibit 218.  Do you
15   recognize the document?
16       A.   I don't recall it specifically.
17       Q.   Have you seen it before?
18       A.   I don't recall seeing it before.  But
19   I see that it was sent from me to Paolo.
20       Q.   In the e-mail sent from you to Paolo,
21   the subject is "As matter of urgency need to get
22   going on showing THAT the DTCC money is there."
23       What did you mean by the DTCC money?
24       A.   I can't recall what I would have meant
25   by that.

Page 147

1        LOWITT - HIGHLY CONFIDENTIAL
2        Q.   The text of the e-mail refers to
3    the -- well, IT says, "Need proof that lock-up is
4    2 billion.  Also other unencumbered collateral in
5    DTCC we can pledge.  Ian."
6        Does that e-mail relate to the project
7    we were talking about before of identifying
8    additional value?
9        A.   From the context, it suggests that it
10   does.
11       Q.   And having looked at that now, do you
12   have -- can you tell me why finding additional
13   value would require looking for unencumbered
14   collateral in DTCC?
15       A.   I can't say why it would be in DTCC
16   rather than unencumbered collateral in aggregate.
17   Our exercise was around unencumbered collateral
18   whether it was in DTCC or any other depository or
19   location.
20       Q.   Why were you describing this as a
21   matter of urgency on Friday, September 19, at
22   1:36 p.m. eastern time?  Note that the time there
23   is GMT.
24       A.   Well, again, to the discussion we had
25   earlier, finding sources of value was an important

Page 148

1        LOWITT - HIGHLY CONFIDENTIAL
2    exercise for us on the Friday.  You can see here
3    that the estimate of the 15c3 lock-up at that
4    point was 2 billion.  It turned out as a result of
5    the work that was done that the amount of the
6    lock-up was less than that.  But it was obviously
7    an early estimate of it as high as $2 billion.
8        Q.   Were you describing this as a matter
9    of urgency based in any part on your conversation
10   that morning with Mr. Ricci?
11       A.   The whole exercise of identifying
12   additional collateral, which as we talked about
13   was a result of a conversation with Bart as well
14   as with Rich Ricci, was a very important exercise
15   for us on the Friday, which is why I think I would
16   have talked about it in this way.
17       Q.   Did you think you were at some degree
18   of professional risk if that project was
19   unsuccessful?
20       A.   No, I don't recall feeling that.
21       (Exhibit 219, document Bates stamped
22   138017 marked for identification, as of this
23   date.)
24       Q.   You have before you, Mr. Lowitt, what
25   we have marked as Deposition Exhibit 219.  Do you

Page 149

1        LOWITT - HIGHLY CONFIDENTIAL
2    recognize the document?
3        A.   I don't recall the e-mail
4    specifically.
5        Q.   It appears to be an e-mail from you to
6    Mr. McDade.
7        A.   Yes, it does.
8        Q.   And the subject says "CLS money all
9    snarfed up by city.  The 15c3 lock-up looks OK at
10   1.3 billion.  Good faith not.  So we are short
11   1.7 billion.  The TBA and FX settlement don't
12   work.  We did find 5 billion of exchange listed
13   options which we are investigating.  Ian."
14       Can you explain to me what it is you
15   are reporting to Mr. McDade here?
16       A.   Yeah.  There are a series of issues
17   obviously.  Not issues, items.  CLS refers to
18   money that we had pledged to Citi to insure that
19   they would continue to operate as our CLS bank, so
20   that's the bank that performs the FX settlements
21   on behalf of -- that was performing FX settlements
22   on behalf of Lehman Brothers.  So we posted cash
23   to them probably on the Thursday, and this
24   suggests that they had not released it, they had
25   taken it all themselves.

Page 150

LOWITT - HIGHLY CONFIDENTIAL

1  The 15c3 lock-up, so this is now
2  saying what we think the value of the 15c3 lock-up
3  was. So what's the excess in 15c3? Looks like at
4  that point the estimate was 1.3 billion.
5     Good faith was another item of --
6  there was an item called the good faith lock-up,
7  which again as part of the investigation to
8  determine sources of value, it was determined that
9  there was no value that could be included in the
10  transaction from the line that was called good
11  faith lock-up. So that is suggesting that if, you
12  know, your target is 4 billion, that we need
13  $1.7 billion of additional value beyond what's in
14  the 15c3 lock-up.
15     And TBA and FX settlements don't work,
16  I think what that was meaning was there was no
17  additional sources of value in the items of TBA or
18  FX settlement.
19     And then it says we did find 5 billion
20  of exchange listed options which we are
21  investigating.
22     So it was a status update for Bart on
23  a series of things that were going on vis-a-vis
24  our efforts to determine the extra value.

Page 151

LOWITT - HIGHLY CONFIDENTIAL

1     Q.   So you're basically looking in every
2  corner for this extra value, right?
3     A.   We were looking in a number of places
4  to determine -- to find extra value.
5     Q.   And the target was $4 billion?
6     A.   Yeah. My recollection is between 3
7  and 4, and the math here suggests that what we
8  were targeting was $4 billion.
9     Q.   Let me push that a little further.
10  Rather than suggesting it, does it refresh your
11  recollection that the target was $4 billion?
12     A.   My recollection is it was between 3
13  and 4.
14     Q.   Did there come a point where the
15  target was reached? Whether it was 3 or 4 billion
16  dollars or something in between, did there come a
17  point where the target was reached?
18     A.   I think we identified -- we determined
19  that the exchange listed options were already
20  included as part of the business transaction, so
21  there was no additional value there, and the
22  additional place where we found the value was in
23  the unencumbered collateral in the various depots.
24     Q.   As of the writing of Exhibit 219,

Page 152

LOWITT - HIGHLY CONFIDENTIAL

1  where you say, "So we are 1.7 billion short,"
2  that's one time point. My question goes to what
3  follows. Did there come a time when the target
4  was met?
5     A.   I mean there was a time when we had
6  identified unencumbered collateral and 15c3
7  lock-up that we had some degree of confidence
8  represented 3 to 4 billion dollars of value.
9  Didn't know with certainty, but we believed that
10  it did represent value of the amount we were
11  searching for.
12     Q.   Did there come a point where Barclays
13  indicated that enough extra value had been found
14  that it was willing to close?
15     A.   I'm not aware of that, but the
16  transaction went forward, so that seems to
17  indicate it.
18     Q.   When did you stop looking for
19  additional assets?
20     A.   I don't recall specifically when we
21  stopped looking for additional assets.
22     Q.   Do you generally recall that the
23  search continued into the weekend?
24     A.   I do recall that we were continuing to

Page 153

LOWITT - HIGHLY CONFIDENTIAL

1  work through the weekend, and I do recall that we
2  shared a schedule of unencumbered collateral with
3  the creditors' committee on the Sunday.
4     Q.   And who is the "we" who shared the
5  schedule of unencumbered collateral with the
6  creditors' committee on Sunday? Is that a
7  meeting? And if so, who is at it?
8     A.   I think -- my recollection is a
9  schedule was delivered, so there were big thick
10  piles of paper which included all the collateral
11  that was included on that schedule, and that
12  schedule was delivered to a group of people
13  representing the creditors' committee in another
14  room at Weil.
15     Q.   Why was it delivered to the creditors'
16  committee?
17     A.   I can't say specifically. I assume
18  because they wanted to review it.
19     Q.   Did you deliver it to the creditors'
20  committee?
21     A.   I don't recall being the person
22  delivering it.
23     Q.   Did you cause it to be delivered to --
24  did somebody under your supervision deliver it?

Page 154

LOWITT - HIGHLY CONFIDENTIAL

1    A.    My recollection is that either -- I
2  would expect that either Paolo or Robert Azerad
3  would have delivered it, but I can't be precise.
4    Q.    Other than thinking they had a reason
5  they wanted to see it, do you have any
6  recollection of the reason this schedule was given
7  to the creditors' committee?
8         MR. BERNSTEIN:  Objection, asked and
9    answered.
10    A.    I don't have anything additional to
11  say.
12    Q.    Before you, Mr. Lowitt, is what we
13  have marked as Deposition Exhibit 220, a two-page
14  document.  Have you seen the document before?
15        MS. HNATT:  Did you say two-page
16    document?
17        MR. GAFFEY:  I did.
18        MR. BERNSTEIN:  Mine is one.
19        MR. GAFFEY:  You know what?  Let's
20    just -- I'll sort that out during a break
21    and we will come back to the document.
22        MR. BERNSTEIN:  OK.
23        (Exhibit 220 withdrawn)
24        (Exhibit 221, document Bates stamped

Page 155

LOWITT - HIGHLY CONFIDENTIAL

1  137537 marked for identification, as of this
2  date.)
3    Q.    Before you, Mr. Lowitt, is what we
4  have marked as Deposition Exhibit 221, an e-mail
5  from Bart McDade to you at the top.  Have you seen
6  the document before?
7    A.    I don't recall the document
8  specifically, but I have seen it as part of my
9  preparation.
10    Q.    The earliest e-mail in the chain is
11  from you to McDade, September 19 at 7:12 p.m.
12  Subject, "Please send word when you are done.
13  Ian."
14        What were you referring to there?
15    A.    Again, I don't have a specific
16  recollection, but given from the timing of it and
17  the context, it suggests that I would -- I am
18  asking Bart to say when he is completed with the
19  bankruptcy hearing with the judge.
20    Q.    And Mr. McDade responds, "The conclave
21  is over.  We are part of BarCap," exclamation
22  point, "subject to documenting."
23        Do you see that?
24    A.    I do.

Page 156

LOWITT - HIGHLY CONFIDENTIAL

1    Q.    Do you have any knowledge of any
2  documenting going on after this point?
3    A.    I mean, I was aware that there was
4  documentation of the transaction that was
5  occurring over the weekend following the agreement
6  with the bankruptcy court, but I don't have any
7  knowledge specifically of what documentation
8  needed to be completed.
9    Q.    And did you -- I may have asked you
10  this before, but just so it is in this section,
11  were you involved in that documenting over the
12  weekend?
13    A.    I was not.
14    Q.    Did you ever see it?
15    A.    I did not.  I don't remember seeing
16  it.
17    Q.    Further up is a response from you to
18  McDade, Berkenfeld, with a copy to Tonucci, at
19  5:52 a.m. on Saturday, September 20, and it reads,
20  "Did the court accept the 15c3 lock-up and
21  unencumbered box make it through to BarCap?  If
22  so, need to make sure documentation is very tight
23  so we can deliver on it.  Should have Weil lawyers
24  work closely with Paolo on it.  Obviously critical

Page 157

LOWITT - HIGHLY CONFIDENTIAL

1  we get this right.  Congrats again.  Ian."
2        When you refer to the documentation
3  needing to be "very tight," are you referring to
4  documentation about 15c3 lock-up and unencumbered
5  box?
6    A.    The sense of it suggests that.
7    Q.    Did you ever see any documentation
8  concerning the 15c3 lock-up and unencumbered box?
9    A.    I didn't read through the contract,
10  no.
11    Q.    Do you know if Paolo worked with
12  lawyers on putting that documentation together?
13    A.    I don't know with certainty.
14    Q.    Do you have any general recollection
15  of that?
16    A.    My recollection is Paolo talking with
17  some of the folks at Barclays about this, but I
18  don't have a specific recollection about him
19  talking to lawyers.
20    Q.    Do you have any recollection about him
21  being involved in any documentation concerning the
22  15c3 lock-up and the unencumbered box?
23    A.    I mean he was the person who knew a
24  great deal about both of those two items, so I

## Page 158

```
 1          LOWITT - HIGHLY CONFIDENTIAL
 2   would have expected him to be involved, but I
 3   don't have a specific knowledge of whether he was
 4   or he wasn't.
 5       Q.   Now, apart from the search for
 6   additional value that we have been talking about,
 7   give me a general idea of what your activities are
 8   on the Friday and through the weekend before the
 9   deal was closed.
10          MR. BERNSTEIN: Can I just clarify,
11       when you say on the Friday, he has already
12       talked a lot about on the Friday.
13          MR. GAFFEY: That's a good point.
14       Q.   Let's go to the evening of the
15   Friday -- actually after you wrote this e-mail to
16   Mr. McDade, at 1 in the morning on Saturday. What
17   did you do during the weekend?
18       A.   Again, I have a hazy recollection.
19   But I -- again, I was very tired, but I do have
20   remembrances of spending time waiting at the Weil
21   offices to answer specific questions about
22   settlement and other issues which were a subject
23   of discussion in the -- on the Sunday.
24       Q.   What are you referring to when you
25   refer to settlement?
```

## Page 159

```
 1          LOWITT - HIGHLY CONFIDENTIAL
 2       A.   Well, there was a series of questions
 3   about whether Barclays would step into Lehman's
 4   shoes vis-a-vis settlement obligations that
 5   existed in the coming week, and there were
 6   representatives from a number of different
 7   organizations, including DTCC and Chase, that were
 8   discussing these items with folks from Barclays,
 9   and on occasion people would ask questions about
10   elements of that.
11       Q.   And what was the area of knowledge or
12   expertise that you lent to that discussion?
13       A.   You know, it was familiarity with
14   elements of Lehman's operational processes or at
15   least knowing who within Lehman would be better
16   equipped to address those questions.
17       Q.   Now, in the e-mail that we have marked
18   as -- series of e-mails that we have marked as
19   Exhibit 221, the one at the top, Mr. McDade to
20   you, says, "Can you call me at home," and that's
21   at 10:51 p.m. -- 10:51 a.m. on Saturday,
22   September 20, when we convert to GMT time.
23          Did you speak to Mr. McDade at home on
24   Saturday morning.
25       A.   I don't have a specific recollection
```

## Page 160

```
 1          LOWITT - HIGHLY CONFIDENTIAL
 2   of speaking with Bart, but in all likelihood I
 3   would have called him. I wasn't going to not call
 4   the president of the firm.
 5       Q.   Do you have a general recollection of
 6   speaking to him in person or over the phone over
 7   the weekend?
 8       A.   Well, I believe I would have spoken to
 9   him over the phone on Saturday morning, and then I
10   think we were both at the Weil offices on --
11   certainly on the Sunday. .
12       Q.   As you sit here today, looking at
13   Exhibit 221, do you have any knowledge as to
14   whether there was any particular topic Mr. McDade
15   wanted to talk to you about when he wrote this
16   e-mail?
17       A.   Well, I think that again it is -- I
18   don't have a specific recollection, but from the
19   sense of the e-mail, it was to answer the
20   questions that I asked of him.
21       Q.   Did you get an answer to the question
22   you asked of him as to whether the court accepted
23   the 15c3 lock-up and unencumbered box make it
24   through to BarCap?
25       A.   I don't have a recollection of that,
```

## Page 161

```
 1          LOWITT - HIGHLY CONFIDENTIAL
 2   but we did begin working, once the transaction
 3   closed, on both of these items, so I feel
 4   confident, but I don't have a specific
 5   recollection that Bart would have communicated to
 6   me that these were both part of the transaction.
 7       Q.   Just sort of focus where you are and I
 8   will give you the two-page version of that
 9   version.
10          MR. GAFFEY: Can we just substitute --
11       do you mind if we unmark that and mark that
12       as 220?
13          MR. BERNSTEIN: Fine.
14       Would now be a good time for a break?
15       THE WITNESS: Yes.
16       (Exhibit 220, document Bates stamped
17       10298186 marked for identification as of
18       this date.)
19       (Recess)
20   BY MR. GAFFEY:
21       Q.   Mr. Lowitt, could you go back to in
22   the pile in front of you Exhibit 23, please.
23       A.   Yes.
24       Q.   We talked a bit about this a moment
25   ago where I asked you about the language in these
```

Page 162

1    LOWITT - HIGHLY CONFIDENTIAL
2    e-mails that referred to marking of the positions,
3    and what you meant was for BarCap to mark the
4    positions further, and I think you said this was
5    the asset-by-asset assessment that was being done;
6    is that right?
7    A.    Yes, I think that's what we talked
8    about before.
9    Q.    Now, the financial schedule we looked
10    at earlier, one-page financial schedule, reflected
11    the difference between the price Barclays agreed
12    to pay and the amount shown on Lehman's books as
13    of September 16, correct?
14    MR. HUME: Objection, lacks
15    foundation. Which schedule?
16    Q.    Exhibit 19 that's in front of you
17    there.
18    A.    I think that --
19    Q.    Do you have 19 there?
20    A.    I have 19.
21    Q.    That's the schedule I am referring to.
22    That schedule reflects the values for the assets
23    that reflect the difference between the amounts
24    shown on Lehman's books and the amount Barclays
25    was willing to pay, correct?

Page 163

1    LOWITT - HIGHLY CONFIDENTIAL
2    MR. BERNSTEIN: Objection, asked and
3    answered.
4    A.    What this reflects is for the
5    different -- at the broad level of the asset
6    categories, an amount that Barclays was going to
7    pay to Lehman for assets in those asset categories
8    which reflected the combination of those assets
9    they wanted to purchase as well as the price that
10    they were willing to pay, as we discussed, for the
11    large purchases as well as the volatility of the
12    assets.
13    Q.    Taking a look at Exhibit 23, which
14    refers to Barclays and the positions, is there
15    further marking down going on here when it is done
16    on an asset-by-asset basis?
17    A.    It is not additional. I wouldn't read
18    it that way. It is an asset-by-asset buildup that
19    gets us to the purchase. But what you see on
20    Exhibit 19 is the amount after the -- that
21    Barclays is willing to pay. It doesn't reflect
22    what was the amount that was the amount that was
23    on -- that those particular assets were on
24    Lehman's books at.
25    So the combination of things that you

Page 164

1    LOWITT - HIGHLY CONFIDENTIAL
2    have to do in the exercise that I think Jerry is
3    referring to on Exhibit 23 is come up with a set
4    of assets which on a -- which reflects the amount
5    that Barclays is going to pay within that asset
6    category that is consistent with Exhibit 19.
7    MR. BERNSTEIN: Can I just -- can I --
8    this is the problem with having a live
9    transcript. The second sentence on the live
10    transcript begins, "I want read it that
11    way," and what I heard was, "I wouldn't read
12    it that way."
13    Q.    So I asked you a little earlier
14    whether in the exercise that led to the completion
15    of Exhibit 19, the top-down view was to arrive at
16    the broad price then. And to put another
17    question, so the exercise that led to Exhibit 19
18    was the top-down process to determine broadly the
19    difference between the amount on Lehman's books
20    and the amount that Barclays would pay?
21    A.    I don't think that's completely right.
22    I think that's the -- what led to Exhibit 19 was a
23    view on the Lehman side of the combination of what
24    was emerging from the sort of bottoms up with what
25    was happening top down. It wasn't just the

Page 165

1    LOWITT - HIGHLY CONFIDENTIAL
2    top-down view. It was a combination, and it was
3    iterative through the course of the evening.
4    Q.    And now looking again at Exhibit 23,
5    which is written on the 17th of September, this is
6    the security-by-security review you talked about,
7    yes?
8    A.    It is the effort to say, just pick a
9    number. There are $2.7 billion of mortgages on
10    Exhibit 19. What are the specific positions that
11    are going to get transferred over to Barclays that
12    they will be paying 2.7 billion for, that
13    represents the price they are willing to pay which
14    is less than the amount that would have been the
15    book value.
16    Q.    So the question that's being answered
17    on the 17th is which particular securities within
18    the category of mortgages will be priced in a way
19    to add up to the total for mortgages in
20    Exhibit 19?
21    A.    You mean the September 18, but yes.
22    Q.    Yes. But yes is the answer?
23    A.    I believe, if I am understanding you
24    correctly, that it is the asset-by-asset view
25    that's going to -- because in the end, what was

Page 166

1      LOWITT - HIGHLY CONFIDENTIAL
2   necessary to complete the transaction was a
3   specific set of assets were going to be delivered
4   at a specific set of prices. In aggregate by
5   category, we are going to be consistent with 19,
6   if it didn't shift in some way, rather than just
7   something that you saw on 19, on Exhibit 19.
8      Q.   Well, what do you mean if it didn't
9   shift in some way?
10     A.   Again, the values that -- the values
11  of assets may have changed, some assets that --
12  that valuations of those may have changed. I
13  didn't mean anything more than that.
14     Q.   As a result of the asset-by-asset
15  review that was going on, that you are writing
16  about on the 17th, did the delta between the
17  amount shown on Lehman's books and the price
18  Barclays was willing to pay grow larger?
19     A.   I think as we said, we didn't actually
20  do the exercise that we talked about on Exhibit
21  23. It was -- this was a series of correspondence
22  about what we would need to have done, but we
23  didn't sit down with Barclays, we didn't sit down
24  and actually re-mark any of the positions. It
25  was -- it was a reference to what we would have

Page 167

1      LOWITT - HIGHLY CONFIDENTIAL
2   needed to have done if the transaction had
3   proceeded in the earlier form rather than the repo
4   form.
5      Q.   Were the individual positions being
6   marked for the purpose of putting them into the
7   repo?
8      A.   No.
9      Q.   Would you need to do --
10     A.   I don't believe so.
11     Q.   Would you need to -- to put them into
12  repo, would you need a schedule of individual
13  positions?
14     A.   The repo, the advantage of the repo
15  was that there was collateral that was at the Fed,
16  that collateral was delivered to Chase, Chase was
17  supposed to deliver that collateral to Barclays at
18  BoNY, Bank of New York, and as a result, there was
19  no requirement to go into separate schedules and
20  identify specific assets or to mark them in any
21  particular way.
22     Q.   Because they are marked by BoNY when
23  they're received, BoNY in the triparty; is that
24  correct?
25     A.   And by Chase when they return from the

Page 168

1      LOWITT - HIGHLY CONFIDENTIAL
2   Fed.
3      Q.   OK. I am going to show you a new and
4   improved Exhibit 220. I have marked the correct
5   document this time. And just so we don't have a
6   gap in numbering, I have re-marked Exhibit 66B
7   also as Exhibit 220.
8          MR. BERNSTEIN: So this is both 66B
9      and 220.
10         MR. GAFFEY: Yeah. We will call it
11     220 for the purpose of this deposition. I
12     just didn't want a numbering gap.
13         MR. BERNSTEIN: Sure.
14  BY MR. GAFFEY:
15     Q.   Let me know when you have had a chance
16  to look at what we have marked as Exhibit 220,
17  Mr. Lowitt, and tell me whether you recall seeing
18  it before.
19     A.   I don't have a specific recollection
20  of this chain of e-mails.
21     Q.   Do you know who David Aronow is?
22  A-R-O-N-O-W.
23     A.   David was one of the people in
24  operations who worked for Alastair Blackwell.
25     Q.   Would David Aronow have been involved

Page 169

1      LOWITT - HIGHLY CONFIDENTIAL
2   in this security-by-security marking we were
3   talking about before with respect to Exhibit 23?
4      A.   There was no security-by-security
5   marking for Exhibit 23. There was no effort
6   that -- in other words, there was a project that
7   was being identified as a piece of work. It
8   wasn't a piece of work that actually took place.
9      Q.   OK. In his e-mail to Mr. Tonucci,
10  copy to you, Mr. Aronow says, "Paolo, apologies if
11  you already know this. Barclays' operations team
12  has recalculated the value of the collateral that
13  they received from us last night and they are more
14  than fully collateralized, including the haircut
15  applied. Senior management at Barclays I am told
16  are very satisfied with the results of the effort.
17  They are not interested in moving forward with any
18  more collateral movements from us to them today
19  through the process we built and applied
20  yesterday. They have said that we can now stand
21  down with the process we had in place to move
22  collateral."
23         Do you know what Mr. Aronow was
24  referring to when he communicated that the
25  Barclays operation team had recalculated the value

Page 170

LOWITT - HIGHLY CONFIDENTIAL

1 of the collateral they received from Lehman?
2     A.    I mean I can't know precisely what
3 Dave meant by this, but I would assume what
4 Barclays' operations was doing was looking at the
5 collateral that was in their BoNY accounts and
6 assessing the value of that collateral, probably
7 utilizing the BoNY triparty system to assess what
8 they had received and what the value of that was.
9     Q.    When Mr. Aronow writes that Barclays
10 was now "more than fully collateralized, including
11 the haircuts applied," what do you understand that
12 to mean?
13     A.    Again, I don't know what Dave was
14 referring to.
15     Q.    All right. Well, if you had received
16 this in realtime on the 19th of September, give me
17 your best estimate of what you would have
18 understood it to mean or whether you would have
19 had to write back to David to say what do you mean
20 by this.
21     MR. HUME: Objection, calls for
22 speculation.
23     A.    I don't know what David was referring
24 to specifically with that. I could speculate if

Page 171

LOWITT - HIGHLY CONFIDENTIAL

1 you would like.
2     Q.    No, thank you.
3     Did it ever come to your attention
4 that Barclays was more than fully collateralized?
5     A.    Again, I wasn't aware of Barclays
6 being fully collateralized or not. I know that
7 there were a lot of difficulties associated with
8 the collateral movement from Chase to BoNY and
9 that that didn't proceed smoothly.
10     Q.    Do you know what Mr. Aronow was
11 referring to when he refers to "the process we had
12 in place to move collateral"?
13     A.    Again, from the context, I would
14 suggest that it is, or I would understand it to be
15 the collateral that was going to move from Chase
16 to BoNY because, you know, the Fed repo was taken
17 down, and rather than transact through JP Morgan,
18 the new repo was going to get booked through BoNY.
19 That process of moving the collateral was not a
20 standard one, and so a process needed to be
21 developed and then applied.
22     Q.    And at some point apparently Lehman
23 was told it could stand down with the process,
24 yes?

Page 172

LOWITT - HIGHLY CONFIDENTIAL

1     A.    That's what David is saying.
2     Q.    Do you have any independent knowledge
3 of a process -- of Lehman standing down on that
4 process?
5     A.    I mean at some point, we weren't
6 moving additional collateral, but I'm not aware
7 specifically of, you know, a time or a place where
8 people were told no additional work needed to get
9 done.
10     Q.    Do you have -- without regard to the
11 documents, sir, do you have any knowledge of a
12 point during this week where Barclays said we have
13 enough collateral?
14     A.    I am not aware of that, no. I don't
15 recall being aware of that.
16     Q.    Now, did this, the project we have
17 been talking about of looking for additional
18 assets, did that project ultimately succeed? Did
19 you find enough additional assets?
20     A.    I think we identified unencumbered
21 collateral and we understood the excess collateral
22 in the 15c3 lock-up were in the range that we were
23 looking for.
24     MR. GAFFEY: Can we mark that, please.

Page 173

LOWITT - HIGHLY CONFIDENTIAL

1     (Exhibit 222, e-mail dated 9/20/2008
2 at 1:42:32 marked for identification, as of
3 this date.)
4     Q.    We have marked as Exhibit 222,
5 Mr. Lowitt, a one-page chain of e-mails. Take a
6 look through it and tell me whether you have seen
7 it before.
8     A.    I don't recall the e-mail trail
9 specifically.
10     Q.    On the lower e-mail from you to Paolo
11 Tonucci, copy to Steven Berkenfeld, the subject is
12 "Thanks for all your help getting us over the goal
13 line. We did it," with exclamation points.
14     Is "we did it" a reference to we found
15 enough additional value to transfer to Barclays?
16     A.    I think it's -- that the transaction
17 was approved by the court would have been what I
18 think we would have referred to as getting over
19 the goal line. And we participated in that.
20     Q.    And what was Mr. Tonucci's
21 participation in getting you over the goal line --
22 withdrawn. I will get to that in a minute.
23     That being so, there is no reference
24 in here to the bankruptcy court or hearing or

Page 174

1      **LOWITT - HIGHLY CONFIDENTIAL**
2  **decision. It is speaking in terms of 15c3 lock-up**
3  **money and the unencumbered box. By that, were you**
4  **referring to the result in the hearing of the**
5  **bankruptcy court where the sale was approved?**
6        MR. BERNSTEIN: Objection,
7  mischaracterizes the document.
8        MR. HUME: I object to vague and
9  ambiguous, the question.
10     A.   Again, my -- you know, we had just
11 gone through an extremely trying period in
12 aggregate. You know, dealing with the bankruptcy
13 initially and then all the work to get a deal done
14 with Barclays. And this is on the Saturday saying
15 we got the approval or the transaction was
16 approved, but we have to do more work. We have to
17 ensure that the 15c3 lock-up money and the -- you
18 know, we could free that up and transfer it, and
19 we can also transfer the collateral in the
20 unencumbered box to Barclays.
21     Saying that everything that we have
22 had to deal with has proven to be complicated and
23 difficult, we wanted to make sure that we had a
24 team on it to ensure that we are organized to
25 effect that.

Page 175

1      LOWITT - HIGHLY CONFIDENTIAL
2     Q.   And how was it that Mr. Tonucci's
3  activities helped get over the goal line?
4     A.   Well, it was a combination of things.
5  One was the work that he had done in identifying
6  the excess collateral, as well as the 15c3 excess.
7  It was also all the work that was done in
8  effecting the movement of collateral from Chase to
9  BoNY, as well as helping to keep the firm sort of
10 funded over that period.
11     **Q.   And Mr. Tonucci responds in response**
12 **to your direction to coordinate with Berkenfeld**
13 **and the additional work that needs to be done,**
14 **"Agreed. We will use Robert for this. Have**
15 **confidence he knows how to get done."**
16     **Is that a reference to Robert Azerad?**
17     A.   I believe it is.
18     **Q.   Now, I asked you before if in the**
19 **course of the project to find additional assets**
20 **you felt that you were at some degree of**
21 **professional risk if that goal was not achieved.**
22 **Do you recall that?**
23     A.   I do recall you asking that.
24     **Q.   And you told me no?**
25       MR. BERNSTEIN: Mischaracterizes his

Page 176

1      LOWITT - HIGHLY CONFIDENTIAL
2  testimony.
3     **Q.   Well, did you feel some degree of**
4  **professional risk if the goal was not achieved**
5  **with respect to finding additional assets?**
6       MR. BERNSTEIN: Objection, asked and
7  answered.
8       You can answer it again.
9     A.   I think I said I didn't recall
10 specifically.
11     **Q.   Well, you write to Mr. Tonucci on the**
12 **20th of September at 9:33 a.m., "You need to be**
13 **close to it. If we don't succeed, you and I are**
14 **toast despite all our heroics."**
15     **Does that refresh your recollection?**
16     A.   I think that -- what I think was
17 described here is we both worked fantastically
18 hard to get the transaction to a point where we
19 could fund the firm through the Friday where we
20 could meet the requirements of the -- we could
21 support the transaction as it was negotiated, and
22 that we didn't want to sort of fail at the last
23 minute vis-a-vis our ability to move the
24 collateral and to resolve the 15c3 lock-up.
25     **Q.   Is that what you meant when you said**

Page 177

1      **LOWITT - HIGHLY CONFIDENTIAL**
2  **to Mr. Tonucci, "if we don't succeed, you and I**
3  **are toast despite all our heroics"?**
4     A.   That's what I think I could have meant
5  by that.
6     **Q.   Could you also have meant by that if**
7  **the deal didn't close, the offer you accepted for**
8  **approximately $10 million in compensation from**
9  **Barclays would not go into effect?**
10    A.   I don't think that's what I was
11 referring to. I think we were anxious to have a
12 trade succeed because of what it meant for the
13 whole franchise and all the employees of Lehman
14 Brothers, as well as to see the franchise continue
15 in some form, given the amount of work we had put
16 into building it up over the years, as well as
17 having a sort of functioning entity to continue to
18 support the various estates.
19     So I think we were anxious for it to
20 succeed for a range of reasons.
21    **Q.   And when you refer to the benefits of**
22 **this to the whole franchise and the employees and**
23 **functioning entity, is that what you meant when**
24 **you wrote to Mr. Tonucci referring to "you and I**
25 **being toast"?**

Page 178

LOWITT - HIGHLY CONFIDENTIAL

1
2    MR. BERNSTEIN: Objection, asked and
3    answered, and argumentative.
4        You can answer it one more time and
5    then we will move on.
6    A.    I think it means -- I don't see it as
7    referring only to Paolo and myself. I think of it
8    as if we are not successful with this despite all
9    the hard work that everybody has put into this,
10   that it will be -- that it would have been in
11   vain.
12   Q.    Had you and Mr. Tonucci ever had
13   discussions, the two of you, about the effect on
14   your own personal careers if the transaction
15   didn't close?
16   A.    I don't recall us having that
17   conversation, and we were so busy with so many
18   things, I don't believe we would have had that
19   conversation.
20   Q.    Well, do you know if Mr. Tonucci had
21   an offer in hand from Barclays during the week
22   before the closing?
23   A.    He didn't have an offer in the week
24   before the closing. The deal would have included,
25   you know, all the employees of LBI having an offer

Page 179

LOWITT - HIGHLY CONFIDENTIAL

1
2    as part of the transaction.
3    Q.    Had you had any conversations with
4    Mr. Tonucci in the week prior to the transaction
5    about whether he, Paolo Tonucci, was likely to
6    find employment with Barclays after the
7    transaction?
8    A.    I don't recall having that
9    conversation with Paolo.
10   Q.    Did he ever raise that topic with you,
11   is there going to be a job for me at Barclays?
12   A.    I don't recall him ever raising it
13   with me.
14   Q.    Did there ever come a point when you
15   spoke to Mr. Tonucci who reported directly to you
16   about whether there would be a job for him at
17   Barclays?
18   A.    I did speak with Barclays the week
19   after the transaction closed together with a
20   number of other folks who were on a list of --
21   people that Barclays wanted to retain. But that
22   was only the week after the transaction closed.
23   Q.    When did Barclays make it known to you
24   that it wanted to retain Mr. Tonucci?
25   A.    Well, there wasn't a communication

Page 180

LOWITT - HIGHLY CONFIDENTIAL

1
2    around Mr. Tonucci specifically. There were --
3    there was a list that had been generated for a
4    number of people in the corporate area that
5    Barclays was interested in retaining.
6    Q.    Did this list include Mr. Tonucci?
7    A.    It did.
8    Q.    Did it include Mr. Kelly?
9    A.    It did.
10   Q.    Did it include Mr. Reilly?
11   A.    It did.
12   Q.    Did it include -- I didn't get the
13   name -- the person who was in charge of tax who
14   was a direct report to you?
15   A.    Yes, it did.
16   Q.    Did it include Alastair Blackwell?
17   A.    It did.
18   Q.    Did it exclude any of your direct
19   reports?
20   A.    I can't say with certainty. It was a
21   list that was -- that had actually been generated
22   by Lehman prior to the bankruptcy as the list of
23   people that would receive -- that potentially
24   would have received various stock awards that
25   Lehman was contemplating.

Page 181

LOWITT - HIGHLY CONFIDENTIAL

1
2    So it was a lift of a list that had
3    been developed previously.
4    Q.    On the Friday, the 19th, when the
5    project was going on to search for additional
6    assets, during that day, was it matter of any
7    concern to you that you might not have a position
8    at Barclays if that project was not successful?
9        MR. BERNSTEIN: Objection, asked and
10   answered.
11   A.    I did not -- that was not my focus on
12   that day, and it was not a concern of mine, I
13   don't believe.
14   Q.    Was it a focus of yours or matter of
15   concern to you that if the project of finding
16   additional value was not successful, your several
17   direct reports would not have jobs or the
18   possibility of jobs at Barclays?
19   A.    Again, I was -- we were all working
20   very hard to ensure a transaction took place
21   without regard to individual circumstances.
22        (Exhibit 223, document Bates stamped
23   10293506 marked for identification, as of
24   this date.)
25   Q.    Mr. Lowitt, I put before you what we

Page 182

LOWITT - HIGHLY CONFIDENTIAL

1  **LOWITT - HIGHLY CONFIDENTIAL**
2  **have marked as Deposition Exhibit 223. Have you**
3  **seen this document before?**
4      A.  I have not.  Or I don't recall seeing
5  it before.
6      **Q.  The document is a chain of e-mails,**
7  **the earliest of which is 20th September, 2008, at**
8  **1:04 p.m. from you to Alastair Blackwell with a**
9  **copy to Paolo Tonucci. Subject, "Confirming our**
10 **unencumbered box is now the top priority."**
11     **And in it you say to Mr. Blackwell,**
12 **"Please coordinate with Paolo to do everything**
13 **possible to ensure we have the 1.95 billion of**
14 **collateral identified and ready to move and**
15 **address claims from Chase that they have a claim.**
16 **Ian."**
17     **What are you referring to when you**
18 **refer to claims from Chase there?**
19     A.  I am -- again, I don't have a
20 recollection of this specifically, but Chase were
21 seizing collateral, and so what we needed to do
22 was make sure that the collateral that we had
23 identified that was unencumbered was -- in fact,
24 we were in -- we had the ability to deliver to
25 Barclays.

Page 183

1  LOWITT - HIGHLY CONFIDENTIAL
2      So I think that this is again about
3  operationalizing what had been agreed to, which
4  was our ability to deliver the collateral to
5  Barclays to satisfy the terms of the transaction.
6      **Q.  OK.  So on the Saturday, as far as**
7  **this e-mail reflects anyway, on the Saturday, you**
8  **are looking at whether the -- having found the**
9  **additional value, whether it can actually be --**
10 **you are assuring yourself it can be transferred to**
11 **Barclays, correct?**
12     A.  That's the essence of the e-mail, yes.
13     **Q.  Over the course of the weekend, apart**
14 **from that type of activity, what was found on**
15 **Friday can be transferred to Barclays, were there**
16 **efforts to find still more value?**
17     A.  Again, I can't recall whether there
18 were things specifically to add additional value.
19 I think that if there were additional efforts, it
20 was to sort of understand, in the event some of
21 this collateral couldn't be delivered, whether
22 there was other collateral that could have been
23 delivered to satisfy the requirement under
24 whatever the deal was that was agreed.
25     Can I have a quick break, please.

Page 184

1  LOWITT - HIGHLY CONFIDENTIAL
2      **Q.  Sure.**
3      A.  Thank you very much.
4      (Recess)
5      (Exhibit 224, four-page e-mail dated
6      9/20/2008 at 6:12 p.m. marked for
7      identification as of this date.)
8  BY MR. GAFFEY:
9      **Q.  Mr. Lowitt, I am putting before you a**
10 **document we have marked as 224. Take a look at**
11 **that, please, and let me know whether you have**
12 **seen it before.**
13     A.  I don't have a specific recollection
14 of seeing this trail of e-mails.
15     **Q.  OK.  I should -- I am going to ask you**
16 **a couple of questions about it anyway, but I just**
17 **want to note that as far as I can see on my read,**
18 **you are not within the e-mail chain until the very**
19 **top one that seems to be sent to you as a whole.**
20 **I only see your name at the top.**
21     **But you will see that the e-mail chain**
22 **is a series of communications that start with**
23 **Martin Kelly writing to Robert Azerad, Alastair**
24 **Blackwell and Brett Beldner with some ccs about an**
25 **opening balance sheet that has been requested by**

Page 185

1  **LOWITT - HIGHLY CONFIDENTIAL**
2  **Barclays. Do you see that?**
3      A.  I do see that on the last page.
4      **Q.  Do you have any independent**
5  **recollection of work being done to prepare an**
6  **opening balance sheet for Barclays?**
7      A.  I don't have an independent
8  recollection of that, no, not that I recall.
9      **Q.  And in the e-mail that follows, and**
10 **I'm moving up the page here, 20 September 2008 at**
11 **10:27 a.m. from Azerad to Kelly, Blackwell and**
12 **Felder. Do you see that?**
13     A.  I do see that.
14     **Q.  Azerad refers to a "classification of**
15 **the assets by asset class that should be done by**
16 **end of day today, assuming that what was**
17 **transferred was," and then he has got two items.**
18 **One is, "Repo with Barclays as of Thursday night**
19 **(49 billion-42 billion of securities and 7 billion**
20 **of cash)." Do you see that?**
21     A.  I do see that.
22     **Q.  And then two, "Non-actionable box as**
23 **shown to Barclays on Friday afternoon (1.9 billion**
24 **of collateral).  Actual box is slightly bigger**
25 **because it also contains Lehman debt."**

1    LOWITT - HIGHLY CONFIDENTIAL
2        Do you see that?
3        A.   I do.
4        Q.   And do you recognize this to be two of
5    the components of the value that was ultimately
6    transferred to Barclays in the transaction?
7        A.   I see this as two of the elements of
8    the transaction, the repo transaction and the
9    non-actionable box, which I think is shorthand for
10   or just a different term for the unencumbered
11   collateral.
12       Q.   The description of the values there is
13   correct, is it not?  49 billion for the repo and
14   1.9 billion for the unencumbered collateral?
15       MR. HUME:  Objection, lacks
16       foundation, vague and ambiguous.
17       A.   Yeah.  As I said before, unencumbered
18   collateral was about a billion nine, and the total
19   repo was, you know, my recollection, about --
20   between 49 and 50 billion dollars of collateral
21   was what was papered, and the cash movement was
22   about $45 billion, again from my recollection.
23       What I will say, I don't think the
24   7 billion in cash was actually included in the 49.
25       Q.   Well, there was a point where -- there

1    LOWITT - HIGHLY CONFIDENTIAL
2    was 7 billion in cash that was supposed to be
3    included, correct?
4        A.   Again, I believe that that was how the
5    49 was -- or 49, 50 was going to get established,
6    but it didn't move -- I don't believe it all
7    moved.
8        Q.   Do you know why the 7 billion did not
9    move?
10       A.   I don't know why.  I know Chase didn't
11   move it.
12       Q.   And ultimately Chase's failure to move
13   it was resolved in a settlement that came in
14   December, correct?
15       A.   I don't know when it happened.  I know
16   there was an ongoing settlement discussion that
17   Mr. Ricci was involved with.
18       Q.   Were you involved in any of the
19   discussions that led to that settlement in
20   December?
21       A.   I was not.
22       Q.   Do you have any knowledge as to on
23   what terms Chase's failure to move the 7 billion
24   were resolved?
25       A.   I don't know and I wasn't part of the

1    LOWITT - HIGHLY CONFIDENTIAL
2    negotiating team.
3        Q.   The plan was 42 billion plus 7 billion
4    in cash, correct?
5        A.   Again, I can't confirm that for you.
6    That's what it says down on the e-mail.
7        Q.   Apart from the fact that it says that
8    on the e-mail, sir, do you have any knowledge as
9    to whether the amount of the repo, the collateral
10   in the repo was roughly $49 billion?
11       A.   Yeah, my recollection is between 49
12   and 50 billion dollars.
13       Q.   Further up the e-mail, there is an
14   e-mail from Paolo Tonucci to Azerad, Kelly,
15   Blackwell and Beldner.
16       A.   This is the 10:31?
17       Q.   That's right.
18       And in it Mr. Tonucci writes, "We also
19   need to add the 15c3 cash as a receivable."  Do
20   you see that?
21       A.   I do see that.
22       Q.   And if you read further up the e-mail,
23   you will see that's calculated -- well, that a
24   series of cash sources are calculated, and I am
25   going to ask you to read through it and then take

1        LOWITT - HIGHLY CONFIDENTIAL
2    a look at the e-mail from Dan Flemming to Paolo
3    Tonucci, 20 September at 5:01.  Read that through.
4        A.   I have read the E mail.
5        Q.   Do you see the reference in the 20
6    September 5 -- 17:01 e-mail to a summary of
7    securities in lock-up at JPM for 15c3 EBOC, all
8    caps, and PAIB, all caps?
9        A.   I do.
10       Q.   I want to see what your reading is of
11   this, but as I understand the calculations being
12   done here, there is a total of 1.763 billion --
13       A.   Yeah, my --
14       Q.   -- identified here; is that right?
15   Are you seeing it that way?
16       A.   Yeah.  My recollection was that the
17   15c3 excess was about $1.75 billion, so this would
18   be consistent with that recollection.
19       Q.   And at the end of the day, in the
20   event only the security portion of the 15c3 was --
21   well, what was the ultimate amount of 15c3 that
22   went over?
23       A.   Again, I know that in the final
24   contract, the amount was about $560 million.
25       (Exhibit 225, two-page document Bates

## Page 190

1          LOWITT - HIGHLY CONFIDENTIAL
2     stamped 77882 marked for identification, as
3     of this date.)
4         Q.   I put before you Exhibit 225,
5     Mr. Lowitt. Tell me, please, if you recall seeing
6     this document before.
7         A.   I don't recall seeing this document
8     before.
9         Q.   The chain of e-mails here begins on
10    the second page with an e-mail -- well, on the
11    first page it runs over. An e-mail from Paolo
12    Tonucci sent September 18, 4:07 p.m., to you, copy
13    to Alastair Blackwell, subject, "First 5 billion
14    gone."
15           What is that a reference to? Do you
16    know?
17        A.   Again, I would assume this is moving
18    the collateral from Chase to BoNY.
19        Q.   And that's collateral in respect of
20    the September 18 Lehman-Barclays-BoNY triparty
21    repo?
22        A.   Right. The unwind of the Fed and the
23    movement of collateral from JP Morgan to BoNY, so
24    the repo could be booked through BoNY's triparty
25    rather than Chase's triparty.

## Page 191

1          LOWITT - HIGHLY CONFIDENTIAL
2         Q.   The next e-mail up, from you to
3     Blackwell, September 18, 16:35, you write, "Are we
4     still papering the 18 billion repo from Barclays
5     or is that all part of the same transfer? Afraid
6     that is getting lost in the numbers. Ian."
7            Do you see that?
8         A.   I do.
9         Q.   Mr. Blackwell responds in the next
10    e-mail up, "We are not unwinding. It was
11    15.8 billion last night. We will increase it at
12    the end of the process."
13        A.   I see that.
14        Q.   This was just kind of a cry for help
15    for me. What is the $18 billion Barclays repo you
16    are referring to here?
17        A.   So you will recall one of those
18    earlier e-mails that we talked about that the
19    funding position of the firm was deteriorating
20    quite rapidly. So on the Wednesday we talked
21    about the position having deteriorated by
22    $7 billion. Barclays was assisting us in our
23    funding, so Barclays was doing repos with Lehman
24    and helping to make up the lost funding capacity
25    that we were experiencing as people were pulling

## Page 192

1          LOWITT - HIGHLY CONFIDENTIAL
2     away from funding the street and funding Lehman.
3            So in addition to taking on the Fed
4     repo, Barclays were additionally funding Lehman.
5         Q.   In a repo transaction separate and
6     apart from stepping into the Fed repo?
7         A.   Separate and apart.
8         Q.   OK. And that --
9         A.   And that was built up over, I think --
10    again, I can't say with certainty, but I think it
11    was probably being built up on the Tuesday and the
12    Wednesday.
13        Q.   Now, on the Thursday in your e-mail
14    from -- in your e-mail to Blackwell and Tonucci,
15    you seem to be asking whether we are still
16    papering the $18 billion repo with Barclays or is
17    that all part of the same transfer. Is the
18    question you are asking whether they are to be
19    combined, that is the Fed repo and the 18 billion?
20        A.   It is saying -- I don't recall it
21    specifically, but the question would have been,
22    was Barclays going to continue to fund the
23    $18 billion of collateral or cash -- I can't be
24    sure if it was collateral or cash -- in addition
25    to what they were doing with the Fed, or was -- or

## Page 193

1          LOWITT - HIGHLY CONFIDENTIAL
2     were they in effect going to cancel this
3     $18 billion repo that they had outstanding.
4         Q.   And that perhaps explains for me
5     anyway the e-mail you're sending further up,
6     Lowitt to Blackwell, September 18, 16:44. What --
7     "Do you mean increase it at the end of the
8     process? Do you mean that the total repo with
9     BarCap becomes 15.8 plus 48 or so? What is the
10    exact number to take out the Fed so it goes up to
11    63.8?"
12           That's not what happened, right?
13        A.   That's not what happened. One way
14    this could have happened was that Barclays
15    maintained their $18 billion repo, which they were
16    doing through Chase, and in addition to that, they
17    were going to take on the $50 billion or so off
18    the Fed.
19        Q.   Now, did Barclays roll a $15.8 billion
20    repo --
21           MR. BERNSTEIN: In your last answer
22    did you say 15 billion or so off the Fed or
23    50?
24           THE WITNESS: 50. 5-0.
25        Q.   Did Barclays roll the $15.8 billion

Page 194

1     LOWITT - HIGHLY CONFIDENTIAL
2  repo, the one that is referred to here?
3     A.   They did not.
4     Q.   Had it been your expectation that they
5  would?
6     A.   I mean expectation is -- I'm not sure
7  if that's the right word. I certainly wasn't
8  aware that they were not going to, but that was
9  why I was asking the question.
10    Q.   Were you surprised at the time to
11 learn that they weren't rolling the $15.8 billion
12 repo?
13    A.   Again, I don't have a complete
14 recollection, but I do believe that I -- it was
15 not expected that they were not going to roll the
16 15.8 that they had been funding up to that point.
17    Q.   So did that create -- we have enough
18 to deal with there. Does that create another
19 problem that has to be addressed to replace that
20 funding?
21    A.   That's the heart of the issue with
22 Chase, because Chase then had to fund that as a
23 box position. So Chase effectively stood in to
24 fund that position on the Thursday evening.
25    Q.   Did Chase do that, stand in on that

Page 195

1     LOWITT - HIGHLY CONFIDENTIAL
2  funding?
3     A.   They did.
4     Q.   Would you explain to me how they do
5  that? I'm a little, as you put it in your
6  e-mails, lost in the numbers. How does Chase
7  stand in to replace the Barclays repo funding?
8     A.   The collateral is sitting in the Chase
9  accounts, so they have the collateral, and they
10 extend a box loan against that collateral.
11       So the way the triparty would work
12 normally is, if there is any collateral left in
13 the box, because of inefficiencies in funding
14 through the course of the day that weren't
15 anticipated, in certain cases if there is extra
16 collateral in the box, Chase would extend a loan
17 against that collateral.
18       So the collateral here that had been
19 funded by Barclays in the 15.8 remained in the box
20 as collateral, and Chase needed to fund it that
21 night with a very substantial box loan.
22    Q.   And they made the loan?
23    A.   They did make the loan.
24    Q.   And does that roll the next day?
25    A.   Well, it remains in place and the

Page 196

1     LOWITT - HIGHLY CONFIDENTIAL
2  meeting with the bankruptcy judge occurs on the
3  Friday afternoon.
4     Q.   Mr. Lowitt, I put before you what was
5  previously marked as Deposition Exhibit 77B. Have
6  you seen those e-mails before, that chain of
7  e-mails?
8     A.   Yeah, I don't have a specific
9  recollection of this e-mail chain.
10    Q.   The e-mail -- again, I am now starting
11 at the top of the page rather than working
12 chronologically. The e-mail from you to Monty
13 Forrest, Alastair Blackwell, Neal Ullman, Jim
14 Hrasca, copies Tonucci, Azerad and Flemming,
15 entitled "1.9 billion, 9:15 p.m. update."
16       And you say, and it's as follows,
17 "Need a CUSIP level detail of the collateral and
18 where it is for a 7 a.m. meeting with Bart.
19 Monty, you or Alastair need to be at that 7 a.m.
20 meeting to prepare for a final Weil meeting to
21 finalize the agreement. Thanks. Good luck
22 getting additional collateral. But good accurate
23 presentation of the collateral is also critical,
24 as we will append to the agreement. Thanks again
25 for all the hard work. Ian."

Page 197

1     LOWITT - HIGHLY CONFIDENTIAL
2       Now, do you recall -- if you don't --
3  even if you don't recall a particular e-mail, do
4  you recall putting this project on the plate of
5  people that night for a 7 a.m. meeting with Bart
6  McDade?
7     A.   I don't have a recollection of that.
8     Q.   Do you recall meeting with Bart McDade
9  on the Monday morning at 7 a.m.?
10    A.   Is it on the --
11       MR. BERNSTEIN: Yeah.
12    Q.   Let me back up. The e-mail you send
13 is --
14    A.   This is Saturday night for Sunday
15 morning.
16    Q.   You're right. I have screwed up my
17 GMTs here.
18       So the e-mail is late Saturday night
19 at about 10:23 p.m. Saturday night, and refers to
20 a 7 a.m. meeting for Sunday, yeah?
21    A.   I believe that to be the case based on
22 the timing.
23    Q.   OK. All right. And the reference in
24 here to a final Weil meeting to finalize the
25 agreement, what agreement are you referring to in

Page 198

LOWITT - HIGHLY CONFIDENTIAL
1  there?
2      A.    Again, I know that the -- that there
3  were meetings on Saturday and Sunday at Weil which
4  were finalizing the agreement with Barclays, and
5  that there were some set of issues or items that,
6  you know, still needed to get resolved, and that's
7  why, you know, we were meeting at the Weil offices
8  on Sunday.
9      Q.    Did you go to any of those meetings?
10     A.    I mean I was at Weil. A lot of time
11  was spent sitting around. There was some meetings
12  that I was a part of, but the majority of meetings
13  were happening with other people involved in
14  those.
15     Q.    And you were not at any of the
16  meetings where the agreements were finalized; is
17  that right?
18     A.    That's -- I don't remember being at
19  any meetings where things were finalized.
20     Q.    And in this e-mail, you express to the
21  men to whom you are sending it, "Good luck getting
22  additional collateral." What is that a reference
23  to? Are you still looking for collateral as late
24  as Saturday night?

Page 199

LOWITT - HIGHLY CONFIDENTIAL
1      A.    I think we were trying to understand
2  what was the collateral that was unencumbered.
3  The information that was available was
4  extremely -- it was extremely difficult to get
5  clarity on what collateral we had that was really
6  unencumbered, given that we didn't have access to
7  many of our accounts at Chase and we didn't know
8  what collateral Chase had actually taken.
9      So I think that was what this was
10  probably referring to. But I don't have a precise
11  recollection of it. Based on what I know was
12  going on at the time.
13     Q.    Did that get straightened out, what
14  collateral they had actually taken?
15     A.    I think it was -- it wasn't
16  straightened out completely that weekend. I think
17  it remained work that was ongoing, and we didn't
18  have access to many of the -- much of the
19  information systems that we needed to resolve that
20  completely.
21     (Exhibit 226, e-mail dated September
22  21, 2008 at 2:15 p.m. marked for
23  identification, as of this date.)
24     Q.    I put before you, Mr. Lowitt, what we

Page 200

LOWITT - HIGHLY CONFIDENTIAL
1  have marked as Deposition Exhibit 226. Have you
2  seen that before?
3      A.    I have no recollection of seeing this
4  before.
5      Q.    Do you know Gerard Larocca?
6      A.    Gerard is the CAO for BarCap in the
7  Americas.
8      Q.    And this e-mail is dated September 21,
9  2:15 p.m.
10     A.    So that's the Saturday?
11     Q.    Yes. No, that's the Sunday.
12     A.    That's the Sunday.
13     Q.    That's the Sunday.
14     Entitled "Please give me a call to
15  review the schedules on collateral." And the text
16  of the e-mail says, "To emphasize the key point,
17  there is no overlap between the unencumbered
18  collateral and the purchased assets of
19  49.9 billion. Ian."
20     Do you see that?
21     A.    I do.
22     Q.    Do you have a recollection of there
23  being some issue that you needed to resolve or
24  clarify with Mr. Larocca as to whether the

Page 201

LOWITT - HIGHLY CONFIDENTIAL
1  unencumbered collateral overlapped with the repo
2  amount?
3      A.    I don't have a specific recollection,
4  but I'm sure that BarCap would have wanted to make
5  sure that the schedule that was the unencumbered
6  collateral schedule didn't include any assets that
7  were already in the repo transaction and that they
8  were -- given the sort of uncertainty around
9  information, that we were sure that the collateral
10  that was in the unencumbered collateral schedule
11  was not included in the repo transaction that we
12  talked about before.
13     Q.    And apparently you determined that the
14  unencumbered collateral was not included in the
15  repo; is that correct?
16     A.    That was what a lot of the work that
17  Alastair and the others who are referenced in that
18  earlier e-mail were working to insure. Not only
19  that it wasn't in the repo, but also that it was
20  genuinely unencumbered and that if there was --
21  you know, additional work over that period may
22  have identified some collateral that we had
23  previously thought was unencumbered that may have
24  been encumbered as they got better or new

51 (Pages 198 to 201)

Page 202

LOWITT - HIGHLY CONFIDENTIAL

1    information.
2
3        Q.   When you write to Mr. Larocca on
4    Sunday, the 21st, the conclusion that has been
5    reached is it wasn't in the repo and it was
6    unencumbered, correct?
7        A.   That was what the exercise was
8    designed to ensure, and every effort was made to
9    ensure that was the case. Whether it was correct
10   in every case, can't say, but that was the best
11   effort that a lot of people were putting in to
12   determine that was the case, because that was our
13   understanding of what the transaction called for.
14       Q.   I'm not trying to be argumentative
15   here. I think we may be at cross purposes. I
16   think what I am asking you is, this project people
17   were working so hard on, did it conclude that the
18   unencumbered -- that the unencumbered collateral
19   was not included in the repo and it was available
20   for transfer?
21       MR. BERNSTEIN: Objection, asked and
22   answered.
23       A.   The exercise was to identify
24   collateral that was unencumbered and not part of
25   the repo transaction. The people working on it

Page 203

LOWITT - HIGHLY CONFIDENTIAL

1    were confident that that was the case.
2
3        What I can't say with certainty is
4    that that was correct in every single
5    circumstance, but that was the purpose of the
6    exercise that people were undergoing.
7        Q.   OK, thank you.
8        (Exhibit 227, two-page document Bates
9    numbed 70327 marked for identification, as
10   of this date.)
11       Q.   I put before you, Mr. Lowitt, what we
12   have marked as Deposition Exhibit 227. Have you
13   seen this set of e-mails before?
14       A.   Again, I don't recall the specific
15   flow of e-mails.
16       Q.   Looking at the earliest e-mail in the
17   chain, from Tonucci to you September 22,
18   5:24 a.m., re: 15c3 -- you know, I think it's part
19   of --
20       A.   Mine says 4:02 a.m.
21       Q.   I was in the wrong place. Let me
22   start again.
23       The earliest is 4:02 a.m. entitled
24   "15c3." Tonucci writes to O'Meara, Lowitt, Kelly,
25   Azerad and Blackwell, "Final agreement was limited

Page 204

LOWITT - HIGHLY CONFIDENTIAL

1
2    to the 769 million of Treasuries so should be more
3    comfortable to accomplish."
4        Does that reflect an adjustment in the
5    15c3 that no cash would move over?
6        A.   I don't know if it would be that no
7    cash would move over. What I understood this to
8    mean was the amount of excess under the 15c3 that
9    was in the contract was 769 rather than the one
10   billion seven that had been talked about earlier.
11       Q.   What contract are you referring to?
12       A.   The final agreement that was signed by
13   BarCap.
14       Q.   And you have never seen that contract?
15       A.   Which I didn't read.
16       Q.   Well, were you -- did you ever have it
17   in your hand? Were you ever in possession of it?
18       A.   I did not have it in my hand that I
19   recall.
20       Q.   And in your e-mail to Mr. Tonucci, at
21   5:22 on the morning of September 22, you ask, "Is
22   it all signed? Ian." Do you see that?
23       A.   Yes, I do.
24       Q.   What is the "it" that you are
25   referring to?

Page 205

LOWITT - HIGHLY CONFIDENTIAL

1
2        A.   I think I would have been referring to
3    the agreement between Barclays and Lehman being
4    finally signed and completed.
5        Q.   Again, just so we -- this series of
6    questions is complete, that's the agreement you
7    hadn't seen?
8        A.   It was the agreement that was being
9    worked on by a large number of people between
10   Barclays and Lehman. I wasn't involved with that.
11   I wasn't present at the time that those agreements
12   were being worked on.
13       Q.   Now, further up in the e-mail chain,
14   you're told by Mr. Tonucci that there is an issue
15   with RACERS which JPM had on their list of assets
16   to transfer. That is the only open item. Do you
17   see that?
18       A.   I do.
19       Q.   Do you have any recollection of what
20   the issue was concerning RACERS?
21       A.   I don't have a specific recollection,
22   but I can infer from this that JP Morgan wanted
23   the RACERS to be included in the repo trade with
24   Barclays and that Barclays was resisting that, and
25   that was something that I was aware was an issue.

## Page 206

LOWITT - HIGHLY CONFIDENTIAL

1      LOWITT - HIGHLY CONFIDENTIAL
2      Q.  Can you give me a bit more detail
3 about the issues?  Why was it Barclays was
4 resisting that?  Did you have an understanding of
5 that?
6      A.  Well, it was one of those assets that
7 Barclays didn't want to take, and when they
8 thought about the Fed repo that they stepped into,
9 the Fed repo didn't include the RACERS, and so
10 they didn't feel that they should have to take the
11 RACERS position as part of the repo.
12      Q.  Did they wind up taking the RACERS
13 position, as far as you know?
14      A.  I don't know.  That was, I'm sure,
15 part of the discussion between JP Morgan and
16 BarCap that you referenced that was completed in
17 December.
18      Q.  Further up in the e-mail Mr. Tonucci
19 says, "We are not involved, have tried to stay out
20 of it completely."  Do you see that?
21      A.  I do.
22      Q.  What is your understanding of why
23 Tonucci or Lehman would try to stay out of it
24 completely?
25      A.  Look, I -- I don't know what Paolo

## Page 207

1      LOWITT - HIGHLY CONFIDENTIAL
2 means by this specifically, but this would -- I
3 think we would have seen this as an issue between
4 JP Morgan and BarCap to resolve, not something
5 that Lehman could contribute to.
6      Could I take a quick break, please.
7      Q.  Sure.  If it helps, I am almost done.
8 If you want to take a break --
9      A.  Just a short one.  I just need a few
10 minutes.
11      (Recess)
12 BY MR. GAFFEY:
13      Q.  There was some part of your testimony
14 that you wanted to clarify, sir?
15      A.  Yes.
16      MR. BERNSTEIN:  Let me refer you to
17 the end of 176.  You were asked, "What was
18 the ultimate amount of 15c3 that went over?"
19 And your answer:  "Again, I know that in the
20 final contract, the amount was about
21 $560 million."
22      Do you want to make a clarification?
23      A.  The correct number would be
24 $760 million, around $760 million.
25      Q.  Thanks.

## Page 208

1      LOWITT - HIGHLY CONFIDENTIAL
2      Mr. Lowitt, when the -- you will --
3 can you pull out -- I think you have it there --
4 Exhibit 19.
5      A.  Yes.
6      Q.  Everybody spends time with Exhibit 19.
7 Exhibit 19.  When the -- when that schedule was
8 put together and the asset classes -- when that
9 schedule was put together and it was going to
10 reflect the price that Barclays would pay versus
11 the amount shown on Lehman's books for those asset
12 classes, were the RACERS included within the asset
13 classes that are listed?
14      A.  I actually don't know.  I don't know.
15      Q.  We talked a bit just before the last
16 break about an issue that arose over the weekend
17 where Barclays didn't want the RACERS and they
18 were -- I think they were taken out of the
19 collateral supporting the repo.  Is that right?
20      A.  Again, I don't know what ended up
21 being concluded between JP Morgan and Barclays,
22 but I know that it was a point of contention
23 between the two parties.
24      Q.  And whatever discussions they had to
25 solve that point of contention, do you know if the

## Page 209

1      LOWITT - HIGHLY CONFIDENTIAL
2 end result was the RACERS were not transferred
3 over to Barclays?
4      A.  Again, I don't know the details of
5 what the settlement was between JP Morgan and
6 BarCap, so I don't know whether the RACERS went
7 over to Barclays or remained with JP Morgan.
8      Q.  Do you know if the basis of Barclays'
9 concern about the RACERS was the quality of that
10 collateral?
11      A.  I don't know the basis of their
12 concern.  It may well have been their ability to
13 feel comfortable with what they were willing to
14 pay for it, but I don't know why, what the basis
15 of their concern was.
16      Q.  We have talked from time to time today
17 about the delta between the amount Barclays was
18 willing to pay against the amount -- against the
19 value that Lehman ascribed to the collateral.  Was
20 there any discussion over the weekend about
21 adjusting that delta if the RACERS were taken out?
22      A.  Again, I'm not aware of any
23 discussions around that.  I think that the repo
24 that Barclays believed that they were entering
25 into was the one that they were standing in the

Page 210

LOWITT - HIGHLY CONFIDENTIAL

1  shoes of the Fed. The RACERS were not part of the
2  repo with the Fed, so they were not expecting the
3  RACERS to be part of the transaction.
4      Q.   The constituent parts of the
5  collateral that was in the repo at the Fed, the
6  body of collateral that was with the Fed, was that
7  body of collateral amongst the securities that
8  were valued that led to the -- valued and priced,
9  that led to the drafting of Exhibit 19?
10      MR. HUME: Objection, vague and
11      ambiguous.
12      A.   I think the --
13      Q.   You know, I think my friend Hamish
14  might be right. Let me rephrase that.
15      Did the component parts of Lehman's
16  inventory change from the time the exercise that
17  led to Exhibit 19 took place to the time
18  collateral was put into the repo when Barclays
19  stepped in for the Fed?
20      A.   I think there was some small amount of
21  trading activity, but given the state of LBI, it
22  would have been, you know, securities that were
23  maturing or settling but there was very little
24  trading activity. So it wouldn't be identical,

Page 211

LOWITT - HIGHLY CONFIDENTIAL

1  but it would be largely similar but not
2  necessarily identical.
3      Q.   Now, with respect to this, on
4  Exhibit 19, the annotations for assumed
5  liabilities for comp and cure, did you ever have a
6  discussion with Mr. Kelly about the amount that
7  was accrued for cure in that schedule?
8      A.   You said the amount that was accrued
9  for cure?
10      Q.   You see the amount next to "cure"
11  there is 2 and a quarter billion?
12      A.   I do.
13      Q.   Did there come a time after that
14  schedule was prepared where you had a discussion
15  with Martin Kelly about whether that number was
16  too high?
17      A.   Yeah, I have no recollection of
18  discussions with Martin about a cure payment.
19      Q.   Do you have any recollections of any
20  discussions with Mr. McDade where he was informed
21  that that number was too high?
22      A.   I have -- I don't recall a
23  conversation with Bart about that.
24      Q.   Do you generally recall any point

Page 212

LOWITT - HIGHLY CONFIDENTIAL

1  where Mr. McDade allowed as how if that number was
2  too high, Lehman had just left a billion dollars
3  on the table?
4      A.   I don't recall any conversations
5  around the cure payment after the Monday night,
6  Tuesday morning.
7      Q.   Do you recall any conversations at
8  all, without, you know, with regard to Mr. McDade,
9  Mr. Kelly, any conversations at all about whether
10  that accrual for 2 and a quarter billion for cure
11  was a good estimate, whether it was close to what
12  the real liability would be?
13      A.   Again, my focus through the course of
14  that week was around funding, around other
15  aspects, and I don't recall any discussions around
16  the cure payment.
17      Q.   Were you involved in any discussions
18  surrounding the comp accrual shown on that
19  schedule?
20      A.   I don't recall being a part of any
21  discussions around the comp.
22      Q.   Did you ever develop an understanding
23  as to whether the accrual for comp on that
24  schedule bore any relation to the actual accruals

Page 213

LOWITT - HIGHLY CONFIDENTIAL

1  for comp at Lehman?
2      MR. BERNSTEIN: Objection,
3      mischaracterizes the document.
4      Q.   I am sorry, I am getting tired too.
5  Let me rephrase the question.
6      Did you ever develop an understanding
7  as to whether a $2 billion accrual for comp was a
8  good estimate?
9      A.   My understanding of the 2 billion was
10  that it was a negotiated number between Barclays
11  and Lehman, that it included the cash bonus, as
12  well as sort of stock and other forms of
13  compensation.
14      So the fact that it was a $2 billion
15  number which was larger than the sort of accrual
16  for cash bonus didn't surprise me.
17      Q.   Is the effect of that enlargement of
18  the number over the accrual for -- accrual for a
19  cash bonus, to increase the consideration Barclays
20  is shown to pay by assuming liabilities?
21      A.   I don't see it in that way. I see it
22  as an agreement that $2 billion of compensation in
23  the form of cash bonus and stock would be
24  available for Lehman employees.

Page 214

1          LOWITT - HIGHLY CONFIDENTIAL
2      Q.   Was it agreed to that amount,
3   $2 billion, simply so assets and liabilities would
4   balance on Exhibit 19?
5      A.   The comp number at 2 billion was
6   consistent through earlier iterations of this that
7   we have been through, so it wasn't a number that
8   made these balance. It was one of the inputs that
9   had been consistent based on the discussions
10  through the evening and morning.
11     Q.   Were the -- were the numbers for comp
12  and accrual on that balance -- on that, on Exhibit
13  19, just plug numbers?
14     A.   No. The comp number was the number
15  that was the number that was agreed between the
16  parties, and 2 and a quarter was the estimate that
17  Martin generated on that evening for what the cure
18  payment items were going to be.
19     Q.   It was Martin who generated that
20  number?
21     A.   That's my recollection.
22     Q.   Tell me what you remember about Martin
23  generating that number. Martin is Martin Kelly?
24     A.   Martin Kelly.
25          My own specific recollection was

Page 215

1          LOWITT - HIGHLY CONFIDENTIAL
2   talking with Martin on that -- either the Monday
3   night or Tuesday morning about the need to
4   estimate that and the difficulties associated with
5   it, given that we didn't have sort of daily
6   balance sheets associated with LBI, and there was
7   a need to estimate it, and Martin went through
8   some process to estimate it, which I don't recall
9   him taking me through. He would just have
10  provided the estimate.
11     Q.   I am showing you, sir, what has
12  previously been marked as Exhibit 45. Have you
13  seen this document before?
14     A.   I have not.
15     Q.   Do you recall writing to
16  Mr. Berkenfeld, Mr. McDade, Mr. Kirk, Mr. Tonucci
17  and Mr. Seery in the early morning hours of
18  Monday, September 22, and commenting on the fact
19  that the closing had started?
20     A.   I don't recall it specifically.
21     Q.   Do you recall sending e-mails back and
22  forth inquiring as to where things stood on the
23  closing?
24     A.   I mean we have been through
25  Exhibit 227, where I was asking Paolo how the

Page 216

1          LOWITT - HIGHLY CONFIDENTIAL
2   negotiations were proceeding. I obviously was
3   interested in how it was going.
4      Q.   And in the e-mail below yours saying
5   hooray, from Berkenfeld to McDade, Berkenfeld
6   writes, "JP Morgan blinked. They agreed to cancel
7   the 7.4 billion collateral purchase."
8          Do you understand what that is a
9   reference to?
10     A.   I don't know.
11     Q.   Do you know if at the time you did
12  have an understanding, even if you don't remember
13  it today?
14     A.   I don't have any recollection other
15  than I am sure that my hooray with three
16  exclamation points was about we are starting the
17  closing. That was a huge relief, that after all
18  this, the transaction was going to close.
19     Q.   I am going to ask you not to say
20  hooray, but I don't have any further questions.
21  Let's just change some seats so the court reporter
22  can hear.
23          - - - -
24
25

Page 217

1          LOWITT - HIGHLY CONFIDENTIAL
2   EXAMINATION BY
3   MS. TAGGART:
4      Q.   Mr. Lowitt, I am Erica Taggart and I
5   represent the committee.
6      A.   The committee?
7      Q.   The official committee of unsecured
8   creditors. We are special counsel for the
9   committee and we're the law firm of Quinn Emanuel.
10     A.   So the creditors' committee?
11     Q.   Yes.
12          Before the closing did you have any
13  other outstanding offers of employment if you did
14  not move to Barclays?
15     A.   I didn't have outstanding offers, but
16  I had been in conversations with various other
17  institutions.
18     Q.   Do you remember now what those
19  institutions were?
20     A.   I had some conversations with Citadel.
21     Q.   And any others?
22     A.   That was -- that's one that I had
23  probably the most conversations with.
24     Q.   Did you get to the point of discussing
25  any terms of employment with Citadel prior to the

Page 218

LOWITT - HIGHLY CONFIDENTIAL

1    **LOWITT - HIGHLY CONFIDENTIAL**
2    **closing?**
3        A.    I did not.
4        Q.    **Do you know one way or the other**
5    **whether Citadel was prepared to offer you any**
6    **terms that were commensurate with what Barclays**
7    **was offering you?**
8        MR. BERNSTEIN: Objection, vague and
9    ambiguous.
10        A.    The role that I was in discussions
11    with Citadel was a very senior role at a major
12    hedge fund, but we did not discuss terms
13    specifically. It didn't get to that point.
14        Q.    **Now, I want to switch gears for a**
15    **minute and talk about the repo transaction, and I**
16    **understand that the general idea was that Barclays**
17    **was going to step into the shoes of the Fed and**
18    **take the collateral that had been pledged to the**
19    **Fed as part of a repurchase agreement.**
20        **Do you generally recall that subject?**
21        A.    I do.
22        Q.    **Was all of the collateral that was**
23    **pledged to the Fed as part of the repurchase**
24    **agreement ultimately given to Barclays?**
25        A.    Again, I don't know whether some of

Page 219

1    LOWITT - HIGHLY CONFIDENTIAL
2    that collateral was held by Chase or whether all
3    of that collateral was moved to Barclays. That
4    was subject to that settlement that we referred to
5    earlier as occurring in the December time frame
6    between JP Morgan and Barclays.
7        Q.    **Is it your understanding that some of**
8    **the collateral that was pledged to the Fed did not**
9    **make it over to Barclays?**
10        A.    Again, I don't know with certainty
11    whether all the collateral that was in the Fed
12    repo made it over to Barclays. I believe the
13    majority did. I can't say whether all did because
14    I don't have the details of the settlement between
15    JP Morgan and Barclays.
16        Q.    **Do you know if there was collateral**
17    **that went to Barclays as part of the triparty repo**
18    **with Bank of New York, Barclays and Lehman that**
19    **was not part of what was pledged to the Fed?**
20        A.    Again, I don't know all the collateral
21    that made it into BoNY because of the operational
22    difficulties with Chase and Chase's activity
23    moving collateral from Chase to BoNY.
24        Q.    **Do you know who would know that?**
25        A.    Well, the people who would have the

Page 220

1    LOWITT - HIGHLY CONFIDENTIAL
2    best view of that would probably be Paolo Tonucci
3    and Mr. Blackwell.
4        Q.    **Do you know whether it was someone at**
5    **JPMC or someone at Lehman who made the decision**
6    **about what of the securities that were pledged to**
7    **the Fed were going to be transferred to Barclays?**
8        A.    I don't know with certainty. I would
9    imagine that it was -- there were communications
10    going on between Lehman operations and people at
11    Chase to effect the movement of collateral from
12    Chase to BoNY.
13        Q.    **Were you involved at all in**
14    **discussions of whether residential mortgage-backed**
15    **securities would be part of the transaction**
16    **between Lehman and Barclays?**
17        A.    I wasn't part of the negotiations or
18    the determination of which assets would be
19    included. I am assuming you are referring to now
20    the sort of earlier transaction that was discussed
21    on the Monday and Tuesday.
22        Q.    **Well, do you know one way or another**
23    **whether -- have you heard the term "Resi's" in**
24    **connection with this transaction?**
25        A.    There may well have been Resi's that

Page 221

1    LOWITT - HIGHLY CONFIDENTIAL
2    were part of the transaction, I can't say for
3    certainty whether they were or they weren't.
4        Q.    **So just to be clear, do you know one**
5    **way or the other whether any residential**
6    **mortgage-backed securities were transferred to**
7    **Barclays as part of the transaction with Lehman?**
8        A.    I don't know with certainty.
9        Q.    **You also discussed earlier that there**
10    **was a presentation to the creditors committee the**
11    **weekend prior to the closing that showed a**
12    **schedule of unencumbered collateral. Do you**
13    **recall that?**
14        A.    I don't think it was a presentation,
15    but I do recall that a schedule of unencumbered
16    collateral that was going to be included as a
17    component of the deal was shared with the
18    creditors committee.
19        Q.    **How do you know that?**
20        A.    I was at the Weil offices and the
21    creditors were in a -- the creditors committee
22    were in one of the rooms at the Weil offices.
23        Q.    **Were you present during that**
24    **presentation to the committee?**
25        A.    Again, it wasn't a presentation. I

Page 222

1    LOWITT - HIGHLY CONFIDENTIAL
2  think it was a delivery of a schedule.
3      Q.   Were you present when there was a
4  delivery of a schedule?
5      A.   I don't have a precise recollection of
6  that.
7      Q.   Do you know who did the delivery?
8      A.   I don't know precisely. I would --
9  again, I'm speculating, but I think it would have
10  been either Paolo Tonucci or Robert Azerad.
11     Q.   Do you know if any other documents
12  were transmitted to the committee along with that
13  schedule identifying unencumbered collateral?
14     A.   I don't know whether they received
15  additional information. They may well have, I
16  don't know.
17     Q.   Do you know one way or the other
18  whether there was any discussion of the value of
19  that unencumbered collateral in the delivery of
20  that schedule to the committee?
21     A.   Again, I think that the schedule was
22  delivered to the committee. I'm not aware of
23  specific discussions in relation to the valuation.
24     Q.   You also testified this morning about
25  your understanding of the deal as it closed and

Page 223

1    LOWITT - HIGHLY CONFIDENTIAL
2  you described your sense of many of the elements
3  of the transaction. Do you recall that part of
4  your testimony?
5      A.   I do recall that.
6      Q.   And I think you listed some different
7  pieces of the transaction of value that was
8  ultimately received by Barclays generally?
9      A.   My recollection is that I talked about
10  different elements of the transaction.
11     Q.   Do you have a sense of what Barclays
12  gave in the deal to Lehman?
13     A.   I am sorry, can you be more specific
14  about what you mean by what Barclays gave to
15  Lehman.
16     Q.   Sure. So if I understand your
17  testimony from earlier, you listed some different
18  things that Lehman ended up transferring to
19  Barclays in the transaction, including
20  unencumbered collateral and the 15c3 and some
21  securities that were related to the repo. Do you
22  recall that?
23     A.   I do.
24     Q.   What did Lehman receive from the
25  transaction?

Page 224

1    LOWITT - HIGHLY CONFIDENTIAL
2      A.   Again, what Lehman received was
3  negotiated by other parties and I don't know the
4  details of all of those items. I know they got
5  consideration for the building. I know they
6  received some amount of cash and I know there was
7  a TSA agreement that was signed which required
8  Barclays to provide a number of services to
9  support the various estates. And there may be
10  others, I'm not familiar with all of them, all
11  other items.
12     Q.   And in connection with the repurchase
13  agreement, they received 45 billion dollars in
14  cash?
15     A.   Essentially, they received, you know,
16  45 billion dollars of cash which then had to be
17  paid to the Fed to replace the repo that was done
18  by the Fed.
19     Q.   For the securities that Barclays
20  received as part of this repurchase agreement, did
21  it assume any liabilities related to those
22  securities?
23     MR. BERNSTEIN: Objection, calls for a
24  legal conclusion.
25     A.   I'm afraid I don't understand what you

Page 225

1    LOWITT - HIGHLY CONFIDENTIAL
2  mean by accepted liabilities.
3      Q.   Well, maybe we could take a look at
4  Exhibit 19 and that's the schedule -- this is the
5  version that was marked final.
6      A.   Everyone's favorite schedule.
7      Q.   It is everyone's favorite schedule.
8      So putting aside the questions I just
9  asked, focusing on this schedule, did you have
10  an understanding of what was listed under the
11  liability section?
12     A.   Yeah, but the repo that we have just
13  been talking about was what was transacted on the
14  Thursday and it replaced this transaction.
15     Q.   I understand and it is my fault that I
16  switched two gears, but I just for a minute want
17  to now focus on this schedule and the way it
18  reflected the deal that was in place as of
19  September 16 at 11:18 a.m. Did you have an
20  understanding of what these numbers listed under
21  liabilities were meant to reflect?
22     A.   I think these were liabilities that
23  Barclays would take on, whether those were the
24  short positions that LBI held or they would have
25  to step in for -- they would have to assume the

Page 226

1    LOWITT - HIGHLY CONFIDENTIAL
2  liability of some of the short term funding.
3     Q.  Was there a relationship between the
4  categories of assets that were listed, such as
5  government and agriculture, with assets and the
6  liabilities that were listed under that same
7  category in the other column?
8     A.  Those are agencies, so it is
9  government and agencies.
10    Q.  Excuse me?
11    A.  That's OK.  Those would have been
12  short positions in governments and agencies is 21
13  billion, and the 40 would have been the long
14  positions in governments and agencies.
15    Q.  Do you know how the numbers were
16  arrived at that were listed in the liabilities on
17  this schedule?
18    A.  Again, they were the collection of a
19  number of people in finance identifying what were
20  the short positions that were associated with
21  those assets that were going to be acquired by
22  Barclays.
23    Q.  Were the numbers listed in the
24  liabilities on Exhibit 19 subject to negotiation
25  between Barclays and Lehman?

Page 227

1    LOWITT - HIGHLY CONFIDENTIAL
2     A.  Again, I wasn't party to those
3  discussions so I can't answer that question for
4  you.  I am sorry.
5     Q.  Do you know one way or another whether
6  they reflected Lehman's view of what the
7  liabilities would be or an opinion based on what
8  Barclays thought the liabilities would be?
9     A.  I can't say with certainty.  I think
10  these were probably the liabilities as Lehman
11  assessed them with input from folks at BarCap to
12  the extent that they were uncomfortable accepting
13  some of the short positions.
14    Q.  Do you know if in the ultimate
15  agreement, setting this aside, Barclays assumed
16  any liabilities related to short positions?
17    A.  Again, I don't know.  As discussed,
18  you know, I wasn't party to the negotiations.
19    Q.  I think you also testified earlier
20  that you were involved in a -- there was some
21  effort made to match assets and liabilities I
22  think in conjunction with setting up the initial
23  deal on Tuesday the 16th.
24    MR. HUME:  Objection, mischaracterizes
25  prior testimony.

Page 228

1    LOWITT - HIGHLY CONFIDENTIAL
2     A.  No, I don't think I said that.
3     Q.  Was there any -- was there any effort
4  made to match assets and liabilities?
5     MR. BERNSTEIN:  Objection, vague and
6  ambiguous, but you may answer.
7     A.  I mean the, you know, adjusted total
8  assets and the total of liabilities do match, so
9  one would assume from that that there was some
10  effort to match assets and liabilities in this
11  schedule.  Whether this schedule represents the
12  agreement that was agreed to by Barclays again is
13  subject to the negotiators and what the
14  negotiators agreed to.
15    Q.  First let me find out if I can
16  understand what I think you testified to before.
17  I think it was in just -- according to my notes,
18  when you were talking about what you were doing
19  that night, you collected input from parties about
20  the asset part of the transaction, you got input
21  from the business about which assets Barclays
22  would be interested in, and I believe you made
23  some sort of testimony about there was an effort
24  to match assets and liabilities.  I understand
25  that is paraphrasing and not exactly what you

Page 229

1    LOWITT - HIGHLY CONFIDENTIAL
2  said, but do you recall any involvement that you
3  personally did in an effort to match assets and
4  liabilities?
5     MR. BERNSTEIN:  I am going to object
6  to the form of the question.
7     You can answer the last sentence which
8  was the question part.
9     A.  Again, I think that the adjusted total
10  assets equals the total liabilities on this, so
11  some effort was undertaken to match assets and
12  liabilities per the schedule.
13    Q.  Were you personally involved in some
14  activity relating to matching assets and
15  liabilities?
16    A.  Again, I have no precise recollection,
17  but I may well have been involved in that.
18    Q.  But like you testified, you did notice
19  that the final exhibit does have a matching in
20  that the adjusted total assets is the same number
21  as the total liabilities?  You see that?
22    A.  I do see that.
23    Q.  And do you know if that was
24  coincidence or that was something that was
25  purposeful?

Page 230

LOWITT - HIGHLY CONFIDENTIAL

1    MR. HUME: Objection, vague and
2  ambiguous.
3    A.   Yeah, I can't say -- I can't say
4  anything to you other than the totals do equal one
5  another.
6    Q.   If I look, Exhibit 200, which is I
7  believe the earlier -- an earlier version of the
8  schedule that has some annotations by yourself,
9  and here you see there are some -- the numbers
10  that are listed under adjusted total assets is not
11  the same as total liabilities. You see that?
12    A.   I do see that.
13    Q.   Do you know when -- did there come a
14  time that you noticed that the schedule had those
15  matching of assets and liabilities?
16    A.   Again, I don't have a specific --
17  this -- I don't have a specific recollection of
18  that. I do know that through the course of the
19  evening and the morning, these were updated with
20  additional information, and as you point out, the
21  Exhibit 19 does have assets and liabilities equal
22  to one another.
23    Q.   Switching topics again, I also want to
24  take you to the conversation that you had with

Page 231

LOWITT - HIGHLY CONFIDENTIAL

1  Mr. McDade and Mr. Ricci on Friday the 19th about
2  the process of finding additional value. Do you
3  remember that event?
4    A.   I do.
5    Q.   Was there any time given where you
6  needed to find that amount of collateral by a
7  certain time?
8    A.   I don't recall a specific deadline for
9  that.
10    Q.   Did you have a sense for when that
11  would be needed by?
12    A.   I think my sense was the sooner, the
13  better.
14    Q.   You also testified a number of times
15  about -- that the numbers -- let's start with, for
16  example, listed on the assets in Exhibit 19
17  reflected a price that Barclays was willing to pay
18  given the size of their purchase and the
19  volatility of the market. Do you recall that?
20    A.   I do.
21    Q.   What is your basis of your testimony
22  that that price was determined based on the
23  factors of the size of their purchase and the
24  volatility of the market?

Page 232

LOWITT - HIGHLY CONFIDENTIAL

1    A.   I mean, it is not based on specific
2  knowledge of what they were thinking about. It is
3  based on my sense of what would happen in a -- in
4  any circumstance where a securities firm was
5  selling a very large block of assets.
6    They would expect that whoever was
7  purchasing that large block of assets,
8  particularly at a time of great market
9  uncertainty -- which certainly the week after
10  the Lehman bankruptcy was a time of great
11  market uncertainty -- that they would pay less
12  for those assets because they were making such
13  a large purchase and how much less they would
14  pay would also be determined by the amount of
15  volatility in the marketplace and how given
16  that volatility, the asset prices could reduce
17  before they were able to sell out their
18  positions.
19    Q.   Did you communicate with anyone at
20  Barclays about whether the reason for their
21  selection of price had to do with either the size
22  of their purchase or the volatility of the market?
23    A.   I don't recall specific conversation
24  with people at Barclays about their approach to

Page 233

LOWITT - HIGHLY CONFIDENTIAL

1  the valuation of the assets.
2    Q.   What about anyone at Lehman? Did
3  anybody at Lehman say that the price that Barclays
4  was going to pay was based on the size of their
5  purchase and the volatility of the market?
6    A.   Again, I don't have a precise
7  recollection of that. But again, I don't feel
8  that that would have been an unusual view for
9  anyone to have had. If I had spoken with Bart or
10  Alex Kirk about that, I'm sure, I believe they
11  would have agreed that that made sense. But I
12  don't recall a specific conversation.
13    Q.   Putting aside conversations with your
14  lawyers and this discussion today, have you ever
15  spoken to anybody about whether or not the price
16  that Barclays paid was reflective of the size of
17  their purchase and the volatility of the market?
18    MR. BERNSTEIN: Hold on. When you
19  said putting aside conversations with your
20  lawyers, you are including Barclays counsel?
21    MS. TAGGART: Yes.
22    MR. BERNSTEIN: OK, go ahead.
23    A.   The transaction that actually took
24  place was not this transaction. It was the repo

Page 234

1       LOWITT - HIGHLY CONFIDENTIAL
2  transaction and the repo transaction, the
3  difference between the collateral delivered and
4  the cash received was driven by the standard
5  financing haircuts and so the actual transaction
6  that took place was different and there was no
7  requirement to hence operationalize this version
8  of adjusted assets being sold to Barclays.
9       Q.  I understand there is something that
10 happens after about the repo transaction, but I do
11 just want to focus on your testimony today, a
12 number of times, that the pricing that was, at
13 least in the original transaction from the 16th,
14 was based on the size of the purchase and the
15 volatility of the market. Putting aside your
16 conversations with counsel, have you ever
17 discussed that with anybody?
18      A.  I don't have a recollection of
19 discussing that specifically with anybody, but
20 again, I would just reiterate that the notion of
21 one firm buying a large block of assets from
22 another would involve a substantial bid offer
23 spread is one that would be broadly understood by
24 market participants.
25      Q.  What exactly were you told about the

Page 235

1       LOWITT - HIGHLY CONFIDENTIAL
2  reason that these prices were less than what was
3  marked on Lehman's books referring to the prices
4  reflected on Exhibit 19?
5       A.  Again, I don't have a recollection of
6  a specific instruction with regard to that. I was
7  aware that Barclays were willing to purchase a
8  substantial quantity of assets from the Lehman
9  estate and that what they were willing to pay for
10 those assets was less than what those were marked
11 at based on the prevailing market prices.
12      Q.  Is there anything else that you
13 actually learned from somebody, either from
14 Barclays or Lehman, prior to September 22, about
15 the basis for the pricing that Barclays used in
16 the assets that it was willing to pay for these
17 assets?
18      A.  Again, I don't have anything specific
19 with regard to why Barclays were willing to pay
20 those prices for these specific assets. That was
21 their judgment of what they were willing to pay to
22 acquire this large quantity of assets.
23      Q.  You did testify just a bit ago that
24 you believed that some sort of discount based on
25 the size of the purchase or volatility of the

Page 236

1       LOWITT - HIGHLY CONFIDENTIAL
2  market is something that happens when securities
3  firms are selling a large block of assets. Do you
4  recall that?
5       A.  I do.
6       Q.  Have you been in any transactions
7  where securities firms are selling large blocks of
8  asset?
9       A.  Well, in the, you know, in the prior
10 quarter, Lehman had sold substantial quantities of
11 assets in our efforts to manage down our legacy
12 positions. But I wasn't party to those specific
13 negotiations, but I was aware that when
14 counterparties were looking to purchase blocks of
15 assets, they were looking for a big bid/offer
16 spread associated with that.
17      MR. BERNSTEIN: Again, this may just
18 be the transcript, but what's written down
19 "big bid/offer spread."
20      THE WITNESS: A big bid/offer spread.
21      MR. BERNSTEIN: Good, my apologies.
22      Q.  Are you referring to specific
23 transactions?
24      A.  The transaction that I have in mind is
25 a sale of European residential securities to

Page 237

1       LOWITT - HIGHLY CONFIDENTIAL
2  BlackRock.
3       Q.  Were you involved in those
4  negotiations?
5       A.  I was not.
6       Q.  How do you know that BlackRock wanted
7  a bid off the spread in association with the
8  transaction?
9       A.  That would have been reported to me by
10 Tom Humphrey who was engaged in discussions with
11 BlackRock.
12      Q.  Do you know what BlackRock was
13 intending to do with the assets that it purchased?
14      A.  No, I don't.
15      Q.  And do you know what the amount of
16 spread it negotiated for, BlackRock negotiated in
17 this other transaction?
18      A.  I don't recall precisely what the
19 spread was. It actually wasn't a consummated
20 transaction. It was one that was in negotiations
21 over the quarter end and didn't end up being
22 completed.
23      Q.  Is there any other transaction that is
24 informing your testimony that you believe that
25 generally when securities firms are selling large

Page 238

1      **LOWITT - HIGHLY CONFIDENTIAL**
2   blocks of assets, they require some sort of
3   discount?
4      A.   Again, I can't point to specific
5   transactions, but it was my understanding that --
6   it is my understanding that that's how the market
7   operates. And it does seem logical to me.
8      Q.   Do you have any other factual basis
9   besides your belief that that is logical?
10     A.   I can't point to a specific
11  transaction which effects that. I could --
12     Q.   Anything else?
13     A.   No.
14     Q.   But your general belief based on logic
15  that securities firms selling a large block of
16  assets include this sort of discount -- how is
17  your sense of how much that discount is compared
18  to the haircut that financers (sic) often require
19  when they are giving cash for collateral?
20     MR. BERNSTEIN: Objection, vague and
21  ambiguous.
22     A.   I think those are just different
23  things. One is negotiated by two parties, one of
24  whom wants to sell assets in size quickly where
25  the buyer has negotiating power and can extract a

Page 239

1      LOWITT - HIGHLY CONFIDENTIAL
2   large bid/offer spread to transact. You know,
3   financing haircuts are set based on sort of a
4   market standard which establishes what the market
5   believes they have to take possession of the
6   collateral and sell off the collateral to generate
7   cash, they will have to sell the collateral out at
8   in order to realize the cash value that they have
9   extended.
10     Can I take a short break?
11     Q.   Sure.
12     (Recess)
13     Q.   So I also want to ask you some
14  questions about the search for unencumbered
15  assets. As I understand that, there was a long
16  process of trying to find what unencumbered assets
17  Lehman had that could be transferred to Barclays,
18  do you recall that?
19     A.   I do.
20     Q.   Of all the unencumbered assets that
21  Lehman located, did it give all of those to
22  Barclays?
23     A.   I don't know the details of the
24  transaction that was agreed between the parties.
25     Q.   Are you aware of any unencumbered

Page 240

1      **LOWITT - HIGHLY CONFIDENTIAL**
2   assets that were held back from Barclays?
3      A.   Again, I think there was a schedule
4   that was created that represented our best
5   estimate of what the unencumbered collateral was
6   and that was the schedule that was provided to the
7   Lehman management and they then negotiated a deal
8   with Barclays.
9      Q.   But as far as you know, there was no
10  unencumbered assets that you found in your search
11  that were held back from the transfer to Barclays,
12  is that correct?
13     MR. BERNSTEIN: Objection, no
14  foundation. But go ahead.
15     A.   Again, we came up with what we thought
16  was the unencumbered collateral. We realize that
17  had we had imperfect information and it may have
18  been that there was additional collateral. It may
19  have been that some of the collateral on the
20  schedule was, in fact, encumbered and we were
21  unaware of that. So it was a best efforts to come
22  up with a schedule that reflected collateral that
23  was not a part of the repo, as well as was
24  unencumbered and available to be transferred to
25  Barclays if that was what was agreed between the

Page 241

1      LOWITT - HIGHLY CONFIDENTIAL
2   parties.
3      Q.   I just want to focus on what you know.
4   You were part of a search where you searched for
5   any collateral that was unencumbered that could be
6   transferred to Barclays. You were part of that
7   search effort, right?
8      A.   That's correct.
9      Q.   And all of the unencumbered assets
10  that you were able to locate that could be
11  transferred, you communicated that to people at
12  Lehman as assets that could be transferred to
13  Barclays, right?
14     A.   Yeah, that schedule was made available
15  to people, that schedule was made available.
16     Q.   And do you personally know of any of
17  those assets that you found that were held back
18  from the transfer?
19     A.   Again, we had a schedule of assets
20  that we believed was, were unencumbered and those
21  assets were identified and included on a schedule
22  and it summed around a billion, nine of value.
23     Q.   You personally don't know of any
24  assets that were determined to be unencumbered
25  that were held back from the agreement with

Page 242

1     LOWITT - HIGHLY CONFIDENTIAL
2 Barclays, correct?
3     A.  I'm not aware at this point of any
4 collateral that was not included in that schedule
5 that we have talked about.
6     Q.  And that schedule refers to the
7 schedule of unencumbered assets that -- well,
8 maybe I should ask, what schedule are you
9 referring to when you say that all of the
10 unencumbered assets were included on the schedule?
11     A.  That we were aware of at that time
12 were included in the schedule of unencumbered
13 assets, I don't know if it is schedule B that I
14 think we have been referring to.
15     Q.  So is it your understanding that all
16 of the assets that you determined were
17 unencumbered and could be transferred were
18 included on a schedule that became schedule B to a
19 contract with Barclays?
20     A.  Again, I don't know that it became
21 part of the contract, but yes, all the assets that
22 we identified -- but again, I'll come back to make
23 sure there was no confusion, there may well have
24 been unencumbered collateral that we had not
25 identified and determined that it specifically was

Page 243

1     LOWITT - HIGHLY CONFIDENTIAL
2 unencumbered and we knew that there may well have
3 been additional collateral that we were not able
4 to determine at that point was unencumbered but
5 there may have been. But what we had identified
6 to the point that you have been pressing on was
7 included in that schedule.
8     Q.  When you were searching for
9 unencumbered collateral, did you search everywhere
10 you thought that unencumbered collateral might be?
11     A.  Well, I think the search was broad,
12 but I mean in particular, there was -- there is
13 collateral in physical form that we were unsure
14 whether it was unencumbered or whether it had been
15 seized by one of the entities, so that in
16 particular was collateral that we just did not
17 know if it was unencumbered or not.
18     Q.  But in your search that you did prior
19 to the closing, you searched for everywhere that
20 there might be collateral that would be
21 unencumbered that could be transferred to
22 Barclays, right?
23     A.  Again, I keep saying the same thing
24 which is we looked to determine what collateral we
25 could determine was unencumbered.  There may have

Page 244

1     LOWITT - HIGHLY CONFIDENTIAL
2 been collateral that actually was unencumbered but
3 we were unable to determine it, and as a result,
4 we would not have included it in that schedule.
5     The "we" I am talking about here is
6 very loose.  I wasn't actually involved in
7 searching for pieces of collateral.  I am
8 merely referring to the broad effort that was
9 going on involving operations and finance.
10     Q.  The broad effort that involved
11 operations and finance looked everywhere that it
12 thought there might be unencumbered collateral and
13 every collateral that it could determine really
14 was unencumbered, you put on schedule B, right?
15     MR. BERNSTEIN: Two objections; no
16 foundation, asked and answered.  This really
17 ought to be the last time.
18     A.  Again, I -- I have just got to
19 reiterate what I think I have said in the previous
20 answers which is we looked broadly for all sources
21 of unencumbered collateral.  When we -- when
22 people in operations and finance were able to
23 determine to the best of their judgment that it
24 was unencumbered, then it made it on to the
25 schedule.  There was an understanding that there

Page 245

1     LOWITT - HIGHLY CONFIDENTIAL
2 was some collateral which, upon additional work,
3 might have been determined to be unencumbered and
4 people knew and recognized that.
5     Q.  While you have been at Barclays, have
6 you been involved at all in valuing the gain that
7 Barclays had upon acquisition, the gain of what it
8 received from Lehman?
9     A.  I've not been involved in that.
10     Q.  You also testified earlier today that
11 you were not yourself involved in documenting any
12 of the changes to the contract that followed the
13 court hearing, correct?
14     A.  I am sorry, can you be more specific
15 what you mean by changing the contract?
16     Q.  Sure.  I think it was your
17 understanding that following the agreement that
18 was presented to the court, there was some sort of
19 documenting of that agreement?
20     A.  Yeah, there was a -- and we went
21 through it as one of the e-mails, there was a
22 documentation process that needed to take place to
23 reflect the agreement that was discussed.
24     Q.  Do you know who was involved in that
25 process?

## Page 246

LOWITT - HIGHLY CONFIDENTIAL

1  
2    A.   Who was involved in the process of
3 documenting?
4    Q.   Yes.
5    A.   I think the main law firm was Weil.
6 Again, I don't know the specific people that were
7 involved. I could speculate on who I think was
8 involved.
9    Q.   First, do you know anyone at Lehman
10 who was involved in documenting the deal following
11 the court hearing?
12    A.   Yeah, I believe Steve Berkenfeld was
13 involved, but I don't know with certainty because
14 I didn't see him actually documenting things
15 myself, but it would -- I would have expected
16 Steve to have been involved in that effort.
17    Q.   Anybody else?
18    A.   I can't -- there are no specific names
19 that I could give you. Again, I could speculate
20 who I think was involved.
21    Q.   Why don't you go ahead and speculate,
22 but I understand you don't know for sure. But who
23 are the people you personally might ask if you
24 were trying to find out who documented the deal as
25 it changed or documenting anything following the

## Page 247

LOWITT - HIGHLY CONFIDENTIAL

1  
2 court hearing.
3    A.   Well, again, I think the people who
4 negotiated the deal would have been involved. I
5 think Steve, Steve Berkenfeld would have been
6 involved. I think the senior lawyers from Weil
7 would have been involved. I would guess that Alex
8 Kirk may have been involved. But again, I'm
9 basing that not on any specific knowledge, I'm
10 basing that on my understanding of sort of the
11 roles that different people played at Lehman.
12    Q.   On Sunday -- where were you Sunday, at
13 Weil's office, on the Sunday, September 21st, the
14 day before the closing?
15    A.   Yeah, I spent a lot of the day at
16 Weil.
17    Q.   Who else from Lehman was there at the
18 office with you?
19    A.   Paolo Tonucci was there, Robert Azerad
20 was there, Bart McDade was there. I think Alex
21 Kirk was there, that's my recollection, and Steve
22 Berkenfeld was there. I'm sure there were others.
23 Those are the -- the listing includes those.
24    MS. TAGGART:  OK, that is all the
25 questions I have.

## Page 248

LOWITT - HIGHLY CONFIDENTIAL

1  
2 EXAMINATION BY
3 MR. OXFORD:
4    Q.   Good afternoon, Mr. Lowitt. My name
5 is Neil Oxford. I am with the law firm of Hughes,
6 Hubbard & Reed. We represent the SIPA trustee.
7    Could you have in front of you Exhibit
8 219. If you could direct your attention to the
9 part of the subject line in the last sentence
10 where it says, "We did find 5 billion of
11 exchange listed options which we are
12 investigating."
13    I believe you testified that you, when
14 you investigated, you found what that was already
15 included as part of the business transaction.
16    A.   Yes.
17    Q.   Is that correct?
18    A.   That is correct.
19    Q.   Can you explain that a little further,
20 which part of the business transaction was this 5
21 billion dollars a part of?
22    A.   Well, again, I don't have a
23 recollection of the 5 billion specifically, so
24 again, I have no recollection of where that came
25 from. I do know that the exchange-listed sort of

## Page 249

LOWITT - HIGHLY CONFIDENTIAL

1  
2 options business was one that we came to
3 understand was included in the deal, that that
4 business was being taken over by Barclays in its
5 entirety and that was part of what had been agreed
6 to on the, I guess, on the Tuesday.
7    Q.   Did that business deal, to your
8 understanding, sir, change at any point?
9    A.   Again, I wasn't part of the final -- I
10 wasn't aware of how the whole thing was coming
11 together in the final version. But given that it
12 was included -- the business itself was included
13 as part of the earlier transaction, the assumption
14 that we were working with was it would be included
15 in the remaining transaction and so we didn't
16 continue to do any additional work on looking for
17 value in the exchange-listed options.
18    Q.   Just so I am clear, the
19 exchange-listed options you are e-mailing
20 Mr. McDade about in Exhibit 219 don't form any
21 part of the repo that we have been discussing
22 today, correct?
23    A.   That's correct. That would have --
24 the repo would have been the repo and then we were
25 looking for value in items away from that. There

Page 250

LOWITT - HIGHLY CONFIDENTIAL

1  was a long list that was generated, including
2  15c3, the good faith lock-up, the TBA settlement,
3  FX settlement, and there was obviously an item
4  that somebody had identified as a potential source
5  of value which was exchange-listed options and
6  that was dropped from our investigation because
7  our understanding was that it was already included
8  in the transaction as a stand-alone business.
9      Q.   And from whom did you gain that
10 understanding, sir?
11     A.   I don't have a precise recollection of
12 who I would have got that from. I think that -- I
13 mean to the best of my recollection, that was
14 something that Paolo Tonucci had looked into and
15 communicated, but I do know -- I do recall that we
16 didn't continue to investigate exchange-listed
17 options. Our focus was on the 15c3 and
18 unencumbered collateral.
19     Q.   Was it your understanding, sir, that
20 Barclays was to step into the shoes of Lehman
21 insofar as Lehman owned exchange-listed options?
22     A.   Again, I didn't have a sense of what
23 was agreed to between the parties with regard to
24 this. What I do recall was that this was a

Page 251

LOWITT - HIGHLY CONFIDENTIAL

1  business that was included in the transaction and
2  didn't represent a place where we should
3  investigate to determine additional sources of
4  value. How precisely Barclays was going to engage
5  with regard to this business, I wasn't aware of.
6      Q.   Can you give me your definition of
7  what you meant by exchange-listed options in
8  Exhibit 219, please?
9      A.   Again, I --
10     Q.   What kind of assets were covered in
11 exchange-listed options as you used it in this
12 document?
13     A.   Again, I don't recall precisely --
14 there was sort of a list that identified potential
15 sources of value and exchange-listed options had
16 made it to the list and then was removed from the
17 list because it was already included in the deal.
18 So that's what I would say around that.
19     If you are asking me the more general
20 question away from this about what are
21 exchange-listed options, they are, you know,
22 derivative contracts that are listed on an
23 exchange and sort of collateralized with that
24 exchange.

Page 252

LOWITT - HIGHLY CONFIDENTIAL

1      Q.   In the context of the use of that
2  phrase "exchange-listed options" in this document,
3  sir, would that include short options as well as
4  long options?
5      A.   Again, in -- for the purposes of this,
6  we were engaged in an exercise to identify
7  additional sources of value and that, the
8  investigation suggested that we would not look for
9  value in exchange-listed options. So that was --
10 we didn't do any work on exchange-listed options.
11 So what actually made it into the transaction was
12 what was agreed to between the parties and really
13 we were just, we didn't pursue as a source of
14 value which could be included in the transaction
15 potentially.
16     Q.   Again, I think I have got this, but
17 just so I am clear, to the best of your knowledge,
18 the exchange-listed options were never removed
19 from the deal between Barclays and Lehman?
20     A.   I'm not aware but -- I'm not aware
21 that -- I'm not aware either way.
22     Q.   OK. Do you have any knowledge as to
23 whether the 5 billion dollars that's estimated
24 here for exchange-listed options includes margin

Page 253

LOWITT - HIGHLY CONFIDENTIAL

1  and deposits at various exchanges?
2      A.   Again, I -- I have no recollection of
3  where the 5 billion came from or what it reflects.
4  It was something that we looked at to determine if
5  it was a potential source of value, as were
6  others, and determined that it wasn't a place we
7  needed to look because it was already included in
8  the deal, was my recollection of why we didn't.
9  We found, for example, in the TBA and FX
10 settlements that there was no value in those
11 items. So that was the investigation that we were
12 doing on the Friday.
13     Q.   Do you recall having any conversations
14 at any time, sir, in the week from 15th of
15 September until the closing on the 22nd with
16 anybody other than Mr. Tonucci about the inclusion
17 or otherwise of exchange-listed options in the
18 transaction between Lehman and Barclays?
19     A.   Again, I have no recollection of any
20 conversations besides the one with Paolo.
21     Q.   Are you able to testify any further
22 about the details of your conversation with
23 Mr. Tonucci?
24     A.   Again, the only thing that I recall

Page 254

1          LOWITT - HIGHLY CONFIDENTIAL
2   was that this was not an item that we needed to
3   continue to investigate because it was already
4   included in the deal.
5        Q.   OK. I am handing what you has
6   previously been marked in these depositions as
7   Exhibit 95B. If you could take a moment to review
8   that document, I am going to focus primarily on
9   the e-mail, and let me know when you have had a
10  chance to do that.
11       A.   I've read through the e-mail trail.
12       Q.   Do you recognize this document, sir?
13       A.   I don't have a recollection of this.
14       Q.   You see that it is an e-mail that was
15  sent to you by Francis Pearn on Sunday the 21st of
16  September. Do you see that?
17       A.   I do see that, yes.
18       Q.   And the time here is reflected, and
19  GMT, so it was sent to you at 4:03 p.m. eastern?
20  Do you have any understanding of why Mr. Pearn
21  would send this document to you?
22       A.   I mean, I don't know specifically why
23  he would have. I was the CFO of the firm and
24  Frank was in the finance department, so that might
25  be a reason why he would have included me in it.

Page 255

1          LOWITT - HIGHLY CONFIDENTIAL
2        Q.   Are you familiar with the type of
3   report that is attached to this e-mail, sir?
4        A.   I mean, I can't recall ever looking
5   through this report or one like it.
6        Q.   Reading the e-mail that Mr. Pearn
7   sends to you and others, it says "Craig Jones
8   provided the OCC statements as of September 22 for
9   the LBI 074 account. The first statement shows
10  collateral value of 522 million (cash and
11  government securities) in LBI. The second file
12  details approximately 2 billion of collateral,
13  (letters of credit, cash and security). Craig and
14  Dan confirmed these balances with the OCC and can
15  answer questions you may have."
16            Do you see that?
17       A.   I do.
18       Q.   Would you agree with me that this
19  e-mail Mr. Pearn -- withdrawn.
20            Would you agree with me that the
21  e-mail that Mr. Pearn sends to you reflects that
22  there is substantial collateral value held by LBI
23  at the OCC?
24       A.   Well, it suggests there is a lot of
25  collateral at the OCC. My recollection was at

Page 256

1          LOWITT - HIGHLY CONFIDENTIAL
2   some point during the week that because Lehman was
3   no longer posting margin, that the OCC sold out
4   the Lehman position and would have -- would have
5   been satisfied with whatever the obligations it
6   had were and I don't know how that -- how much
7   collateral was left after that.
8        Q.   If you look at the first attachment,
9   sir. Do you see in the middle of the page at the
10  top it says "activity date"?
11       A.   I do.
12       Q.   And that date is 9/22/08, correct?
13       A.   Yes.
14       Q.   And below, there is a system date and
15  that date is 9/20/08?
16       A.   Yes.
17       Q.   Does that refresh your recollection as
18  to the collateral that LBI owned that was posted
19  at OCC as of the date of this e-mail?
20       A.   Again, I -- I don't recall spending
21  any time around the collateral at OCC on the
22  Sunday or on any of the other days. To say we
23  were engaged in, you know, efforts to fund the
24  firm, to effect the repo, and to identify sources
25  of value and really, I didn't focus any attention

Page 257

1          LOWITT - HIGHLY CONFIDENTIAL
2   on this over that time period.
3            MR. OXFORD: OK, that is all I have on
4   that document.
5            (Exhibit 228, e-mail dated 9/21/2008
6   at 8:09:34 p.m. marked for identification,
7   as of this date.)
8        A.   Do you mind if we take a short break?
9        Q.   Sure.
10           (Recess)
11       Q.   Mr. Lowitt, I would like to hand you
12  what I have marked as Exhibit 228.
13       A.   Yes.
14       Q.   Which is an e-mail from Jerry Reilly
15  to you, Mr. Kelly and Mr. O'Meara entitled, "VIX,
16  V-I-X Statements," and on Sunday, the 21st, 4:08
17  eastern in the afternoon. Why don't you take a
18  moment to read through that document. Again, I am
19  going to ask you mostly about the e-mail rather
20  than the attachments. Let me know when you have
21  had a chance to do that?
22       A.   I have.
23       Q.   Do you recognize this document, sir?
24       A.   I don't.
25       Q.   In the chain below where it is

Page 258

LOWITT - HIGHLY CONFIDENTIAL

1  forwarded to you, Mr. Michael Neilson writes to
2  Mr. Francis Pearn and others:  Here are the
3  clearing house runs.  Do you know what the
4  clearing house runs are?
5      A.  No, I don't.
6      Q.  Do you know what the reference to VIX
7  is in the subject line?
8      A.  I mean, I don't know.  The VIX is an
9  instrument that is associated with the volatility
10 of the equity markets.
11     Q.  Mr. Reilly writes to you, "This has
12 been confirmed as a good balance.  We are going to
13 send to BarCap who is looking for our positions
14 and balances, 507 M" -- which I take it to be 507
15 million?  Do you see that?
16     A.  I see that.  I don't know if that is
17 millions or thousands.  But I can see it is 507 M.
18 I'm sure you could show me that it is millions.
19     Q.  I'm sure I could, but I'm not so sure
20 it matters if you don't remember the document.  Do
21 you remember having -- withdrawn.
22     Do you have any understanding of why
23 Mr. Reilly sent you this e-mail?
24     A.  I don't know why he did.  I imagine he

Page 259

LOWITT - HIGHLY CONFIDENTIAL

1  was keeping -- he felt he should include me in a
2  mail because I was the CFO and he was reporting to
3  me and it would be something that he felt I would
4  want to see.
5      Q.  From your review of this e-mail, do
6  you have an understanding of what he was keeping
7  you in the loop on?
8      A.  I mean, that Barclays was looking for
9  information and that this was part of the
10 information and what they were looking for.
11     Q.  Does this refresh your recollection
12 about the inclusion or otherwise in the business
13 deal between Lehman and Barclays of
14 exchange-traded derivatives?
15     A.  Again, exchange-traded derivatives, I
16 was -- I spent no time on it.  It wasn't -- it
17 just wasn't a focus either for me during that
18 period.
19     Q.  You don't recall any conversations
20 with Mr. Kelly about that subject?
21     A.  I don't recall any conversations with
22 Martin about exchange-traded derivatives or about
23 this.
24     Q.  What about Mr. Reilly, same question,

Page 260

LOWITT - HIGHLY CONFIDENTIAL

1  did you have any conversations with him about the
2  inclusion or otherwise in the assets going to
3  Barclays of exchange-traded derivatives or any
4  assets to secure those derivatives?
5      A.  I have no recollection of discussions
6  with either Jerry or Martin or Chris or any of the
7  folks on this e-mail about that.
8      MR. OXFORD:  That is all I have on
9  this document.
10     (Exhibit 229, e-mail dated 9/21/2008
11 at 6:20:35 p.m. marked for identification,
12 as of this date.)
13     MR. BERNSTEIN:  By the way, I
14 actually -- I should do this -- I'm assuming
15 with this and the prior document, which are
16 not Bates stamped, that Counsel has a -- it
17 is Counsel's understanding that these are,
18 in fact, attached documents in the real
19 world?
20     MR. OXFORD:  Yes, that is my
21 information.
22     Q.  Mr. Lowitt, take your time and
23 whenever you're ready, let me know when you have
24 had a chance to review Exhibit 229.

Page 261

LOWITT - HIGHLY CONFIDENTIAL

1      A.  Yeah, I have looked at it.
2      Q.  It looks to me to be an e-mail from
3  Robert Azerad to Gary Romain at Barclays, James
4  Walker at Barclays, T.J. Gavenda, also at
5  Barclays, and you and others at Lehman are copied,
6  is that correct?
7      A.  That's what it suggests on the first
8  page.
9      Q.  It was sent on the Sunday, 21st of
10 September at 2:20 eastern.  The subject is
11 "updated opening balance sheet."  Do you see that?
12     A.  I do.
13     Q.  Do you recognize this document?
14     A.  I don't recognize it.
15     Q.  Did you have any responsibility,
16 direct or otherwise, for the creation of an
17 opening balance sheet for Barclays?
18     A.  I am sorry, could you just repeat, did
19 you have any responsibility --
20     Q.  Did you have any responsibility,
21 direct or otherwise, for the creation of an
22 opening balance sheet for Barclays?
23     MR. BERNSTEIN:  Objection, vague and
24 ambiguous.

Page 262

LOWITT - HIGHLY CONFIDENTIAL

1    You may answer.
2    Q.  Let me ask it this way:  Did you have
3  any responsibility for creating an open balance
4  sheet for Barclays?
5    A.  I don't believe I had responsibility
6  for creating an opening balance sheet for
7  Barclays.  I think we were -- we needed to provide
8  information to Barclays so that they could go
9  through their process and there was pieces of
10  information that they would have looked to from us
11  to provide, but that, you know, establishing an
12  opening balance sheet was going to be their
13  responsibility.
14    Q.  OK, did Mr. Azerad work for you?
15    A.  Robert reported in to Paolo and Paolo
16  reported to me, so Robert was in my chain.
17    Q.  Do you have any understanding that
18  Mr. Azerad created the opening balance sheet that
19  is attached to this e-mail?
20    A.  Again, I'm not in a position to say
21  who created this.  I just have no knowledge of who
22  would have done this.
23    Q.  Safe to say then you did not have any
24  involvement in creating this opening balance

Page 263

LOWITT - HIGHLY CONFIDENTIAL

1  sheet?
2    A.  I can't recall having any involvement
3  in creating this.
4    Q.  You see that it was sent at 2:20 p.m.
5  on Sunday the 21st?
6    A.  I do see that.
7    Q.  If you take a moment to review the
8  balance sheet and then tell me if, to the best of
9  your recollection, it accurately reflects the
10  business deal between Barclays and Lehman as you
11  understood it at the time the e-mail was sent?
12    A.  Again, I -- I didn't know all the
13  items of what went into the business deals, so
14  what I would have been aware of was that there was
15  a repo transaction, that there was the assumption
16  of liabilities for sort of bonuses or cure
17  payment, although again, I didn't know that with
18  any certainty because I didn't know that that made
19  it into the final transaction.  And I know that we
20  had been looking for, you know, additional sources
21  of value but I can't say more than that or how
22  that would have been reflected in a balance sheet
23  or what Barclays would have wanted to show in
24  their opening balance sheet.

Page 264

LOWITT - HIGHLY CONFIDENTIAL

1    Q.  One of those additional sources of
2  value that you have testified about at length is
3  the 15c3 lock-up release, correct?
4    A.  Yes.
5    Q.  And that's shown is there as 1 billion
6  dollars.
7    A.  That's what it is shown here.
8    Q.  You have already testified about a
9  search for other unencumbered assets that you
10  believe were valued at approximately 2 billion
11  dollars, correct?
12    A.  At 1.9 to 2 billion.
13    Q.  1.9 to 2 billion.  Do you see anywhere
14  on this spreadsheet where those unencumbered
15  assets balance at 1.9 to 2 billion dollars are
16  reflected?
17    A.  I don't see it on this schedule.  But
18  again, I don't think that the schedule would
19  necessarily have represented the transaction that
20  was agreed to.  Also -- another example, the 15c3
21  lock-up release we talked about earlier was agreed
22  to at around 760 million dollars.
23    Q.  The 5 billion dollars of
24  exchange-listed options that you included in the

Page 265

LOWITT - HIGHLY CONFIDENTIAL

1  subject line of Exhibit 219, do you see those
2  exchange-listed options listed anywhere in the
3  opening balance sheet marked as Exhibit 229?
4    A.  I don't see it listed.
5    Q.  Do you have any understanding of why
6  it would not be listed?
7    A.  Again, I don't know who pulled this
8  schedule together and I don't know the amount of
9  knowledge they would have had about all the
10  elements of the deal.  And even if they had known
11  about that item, I don't know if they would have
12  had any knowledge of what that was actually worth,
13  again, it wasn't something that I was aware of any
14  work that went on to determine if there was or how
15  much value there was in that and so just wouldn't
16  have known how -- I don't know how anybody would
17  have reflected it on the balance sheet.
18    Q.  Well, they could have used the 5
19  billion dollar figure that you told Mr. McDade
20  that you had found in Exhibit 219, right?
21    A.  We didn't say we had found it.  We
22  said in that exhibit that there was
23  exchange-listed options.  I don't know where the 5
24  billion came from, and I don't know if 5 billion

Page 266

LOWITT - HIGHLY CONFIDENTIAL

1  was right. But you're right, somebody could have
2  put that there. But again, I don't know who put
3  this together and I don't know what they were
4  aware of and I, again, don't know what the real
5  valuation of exchange-listed options business was.
6  And I wasn't aware of any work that was done to
7  determine that.
8      Q.  Could you just briefly have Exhibit 19
9  in front of you, please?
10     A.  Sure, 19. Do see anywhere on Exhibit
11 19 a description or a figure that includes the
12 exchange-listed options that you referenced in
13 your e-mail marked as Exhibit 219?
14     MR. HUME:  Objection, vague and
15 ambiguous.
16     A.  Again, I don't know how
17 exchange-listed options turn up on balance sheets.
18 So I wouldn't know this. There is derivative
19 lines here, it's possible that it is in those
20 lines, but again, I'm just speculating. I don't
21 know where it would have turned up here.
22     Q.  OK. You testified earlier about a
23 conversion, sir. Do you remember that testimony?
24     A.  The conversion.

Page 267

LOWITT - HIGHLY CONFIDENTIAL

1      Q.  You used the word "conversion"?
2      A.  Actually somebody else used the word
3  "conversion," but I did say that I understood it
4  to be the movement of collateral from JP Morgan
5  Chase to BoNY to reflect the replacement of the
6  Fed repo with the Barclays repo.
7      Q.  And the way in which you used that
8  phrase "conversion" has nothing to do with the OCC
9  or exchange-traded derivatives, correct?
10     A.  That is correct.
11     Q.  You mentioned, sir, that the subject
12 of discussion on Sunday the 21st of September was
13 a series of questions about what would happen if
14 Barclays steps into the shoes of Lehman in the
15 coming weeks. Do you remember that testimony?
16     A.  I do, yes.
17     Q.  Focusing on the DTCC for the present,
18 did you tell me what your recollection is of any
19 discussions about Barclays stepping into the shoes
20 of Lehman at DTCC?
21     A.  I was aware that on the Sunday, there
22 were ongoing discussions between the Barclays
23 representatives and representatives from DTCC
24 around how that would be covered, but I was not

Page 268

LOWITT - HIGHLY CONFIDENTIAL

1  party to the resolution of those -- of that.
2      Q.  With whom did you discuss that issue,
3  sir?
4      A.  I don't recall discussing it with
5  anybody. There was a large forum that included
6  participants from a number of different --
7  representing Barclays and JP Morgan and DTCC and
8  creditors and others and my recollection is that
9  at a certain point, the people from Barclays and
10 people from DTCC left that group and went through
11 and talked through that issue themselves.
12     Q.  Did you have any understanding, sir,
13 that Barclays was conducting due diligence into
14 Lehman's positions at DTC during the day on Sunday
15 the 21st?
16     A.  I'm not sure I understand what the
17 word "due diligence" means, but I do know that
18 Barclays were trying to understand what the Lehman
19 obligations were vis-a-vis DTCC and what, if any,
20 were the risks that they would take on if they
21 stepped into LBI's shoes and that those were
22 discussions that they had in my recollection with
23 people in operations like Alastair Blackwell.
24     Q.  Did you ever come to have an

Page 269

LOWITT - HIGHLY CONFIDENTIAL

1  understanding of what Barclays concluded about the
2  risks they would take on if they stepped into
3  Lehman's shoes at DTCC?
4      A.  I was not part of that discussion and
5  I did not know where Barclays came out or what
6  their assessment of those risks were.
7      Q.  You didn't talk to Mr. Blackwell about
8  that?
9      A.  I don't recall having a conversation
10 with Mr. Blackwell about that. I do -- but I
11 don't believe that Mr. Blackwell would have been
12 aware of what Barclays' assessment of those risks
13 would have been. He would have explained the
14 risks as he understood them and it was up to
15 Barclays to make an assessment of those risks
16 themselves.
17     Q.  Do you know who at Barclays was
18 involved in assessing the risks of stepping into
19 Lehman's positions in DTC?
20     A.  Again, I wasn't party to those
21 discussions, but of the people at Barclays that
22 were involved, my recollection is that it included
23 Rich Ricci, Gerard Larocca, probably Jonathan
24 Hughes. There may be others at Barclays that were

## Page 270

1          LOWITT - HIGHLY CONFIDENTIAL
2    involved in those discussions.
3          Q.   Did you ever hear, sir, that Barclays
4    had decided not to take Lehman's positions at DTC
5    because there were concerns about the liabilities
6    associated with those positions?
7          MR. HUME:  Objection, lacks
8          foundation.
9          A.   Yeah, I have no recollection of how
10   that got resolved.
11         Q.   Just a couple of questions on C3, sir.
12   Did you understand that the transfer of any assets
13   from Lehman's 15c3 reserve was conditional upon an
14   approval of the SEC?
15         MR. HUME:  Objection, calls for legal
16         speculation -- legal conclusion.
17         A.   Again, I -- what I was aware of was
18   that the resolution of the 15c3 excess was
19   uncertain because it was a formula and nobody
20   would know precisely how much excess there was
21   when the customer positions were fully unwound.
22   So there was uncertainty about what that was going
23   to -- what that number was going to eventually
24   become.
25         Q.   Was it your understanding, sir, that

## Page 271

1          LOWITT - HIGHLY CONFIDENTIAL
2    the resolution of the 15c3 excess was that any
3    transfer of 15c3 excess would be conditional upon
4    the existence of an excess?
5          MR. HUME:  Objection, lacks
6          foundation, calls for a legal conclusion.
7          A.   I don't know what actually made it
8    into the contract with regard to 15c3.  What I was
9    involved with, as I have spoken about today, is
10   the efforts to identify what our best estimate of
11   what that excess was and to make that available to
12   those who are involved in negotiating to determine
13   how they were going to treat that and I don't know
14   how it was treated specifically in the final
15   resolution between Barclays and Lehman.
16         Q.   Did you understand, sir, that there
17   were certain difficulties negotiated with
18   calculating the 15c3 requirement over the weekend
19   of the 21st and 22nd of September?
20         A.   I was aware that the data that the
21   people needed to -- the data were -- there were a
22   lot of data issues associated with running the 15C
23   lock-up that weekend.
24         Q.   Did you or anybody who reported to you
25   come to the conclusion as to the existence or

## Page 272

1          LOWITT - HIGHLY CONFIDENTIAL
2    otherwise of an excess in the 15c3 reserve over
3    the weekend of the 21st and the 20th of September?
4          A.   Well, again, I -- we didn't -- my
5    recollection was that the estimates of the 15c3
6    excess that had been generated earlier in the week
7    were believed to be accurate reflections and that
8    those were computed without all the dirty data
9    that was associated with all the collateral
10   movements and other issues in LBI, and so the
11   excess that had been estimated earlier was a good
12   reflection of what the excess was likely to be.
13   Because there wasn't a lot of customer activity
14   that had taken place subsequent to when those
15   earlier calculations were made.
16         Q.   What do you mean by "dirty data"?
17         A.   Well, there was a fair amount of chaos
18   in the marketplace towards the end of that week.
19   There was a lot of fails.  There was items that
20   weren't being posted accurately and those were all
21   elements that made the computation of 15c3
22   difficult that weekend.
23         Q.   Did you ever come to have an
24   understanding, Mr. Lowitt, that there was a change
25   in the deal between Lehman and Barclays and that

## Page 273

1          LOWITT - HIGHLY CONFIDENTIAL
2    change was that no cash was to be transferred from
3    Lehman to Barclays?
4          A.   Again, I was not part of the
5    negotiating teams and I wasn't aware of what was
6    agreed to between the two parties.  So I would
7    have no view on whether that was agreed to or not
8    agreed to.
9          Q.   Nobody ever told you that?
10         A.   No, I don't recall.
11         Q.   Even subsequent to the transaction,
12   did anyone ever discuss the inclusion or otherwise
13   of cash in the deal between Lehman and Barclays?
14         MR. HUME:  Obviously excluding any
15         conversations with counsel for Barclays or
16         your own counsel.
17         Q.   I offer the same caveat as Mr. Gaffey,
18   I am not looking for --
19         A.   I have no recollection of anybody
20   indicating that the transfer of cash was not --
21   was excluded from the deal in any way.  It was
22   just no discussion one way or the other with me
23   that I recall.
24         MR. OXFORD:  Can I mark this as my
25         last one.

Page 274

LOWITT - HIGHLY CONFIDENTIAL

1    (Exhibit 230, e-mail dated 9/22/2008
2    at 11:53:18 a.m. marked for identification,
3    as of this date.)
4        Q.    This, I promise, Mr. Lowitt is my last
5    exhibit which I have marked as Exhibit 230.  It is
6    an e-mail from you to Mr. Tonucci at 11:53 a.m.
7    Greenwich Mean Time so 7:53 Eastern on the 22nd.
8    And below, Mr. Tonucci writes to you and
9    Mr. McDade on the subject of closing call saying,
10   "Cash should go in the next five minutes.
11   Congratulations!  Paolo."  And you reply, "What a
12   relief!!  Ian."  Do you see that?
13       A.    I do.
14       Q.    Do you have any understanding of what
15   Mr. Tonucci meant by his reference to cash going
16   in the next five minutes?
17       A.    I don't have a specific recollection.
18   Again, if I was speculating, it would be the cash
19   from Barclays to Lehman to effect the transaction
20   would move and that that was establishing that the
21   transaction was actually closing.  And my response
22   is it is actually done.  Because I think we knew
23   that it needed to happen before 8 o'clock when the
24   markets opened.

Page 275

LOWITT - HIGHLY CONFIDENTIAL

1        Q.    You made it by 7 minutes.
2        A.    It was a stressful time.
3        Q.    I'm sure it was.
4            MR. OXFORD: I have no further
5    questions for you at this time.  Thank you,
6    sir.
7            THE WITNESS: Thank you very much.
8            MR. GAFFEY: Just one or two to follow
9    up, I promise.
10   EXAMINATION BY
11   BY MR. GAFFEY:
12       Q.    Mr. Lowitt, in response to --
13   Ms. Taggart asked you a series of questions about
14   the logic behind the discount behind the idea of a
15   discount applying to a large transaction by a
16   firm.  You said, and I think I have the words
17   here, I am if I am a little off forgive me, if
18   anyone had spoke to Bart or Kirk, they would agree
19   it made sense, but I don't recall a specific
20   conversation.  And that was in the context of
21   talking about these bulk prices.
22           Do you know who on the Lehman side of
23   the table decided that the point was negotiable
24   at all?  Who decided that it was negotiable

Page 276

LOWITT - HIGHLY CONFIDENTIAL

1    whether Lehman would take less than the marks
2    shown on its books for its securities?
3        A.    I don't.  It is a question for you to
4    ask those people who were involved in the
5    negotiations.
6        Q.    The reason I ask you, you made a
7    reference to Bart or Kirk.  I assume Bart is Bart
8    McDade and Kirk is Alex Kirk?
9        A.    Yes.
10       Q.    Is there a reason Alex Kirk is a
11   person who might have some information on that?
12       A.    Well, Alex was running our principal
13   business and was involved in the -- was close to
14   Bart and was engaged in the negotiation as best I
15   understood it.  So that was the reason I included
16   those two names and they would both be very
17   knowledgeable about capital markets and how one
18   disposes of big blocks of assets.
19       Q.    And my question as to who made the
20   decision as to whether it was appropriate to
21   negotiate at all was a very broad one.  It doesn't
22   go to the process that you spoke about before of
23   determining what it was.  Who made the
24   determination, all right, we will talk to Barclays

Page 277

LOWITT - HIGHLY CONFIDENTIAL

1    about selling assets for less than we carry them
2    on our books and you don't know who it was who
3    made that decision?
4        A.    I'm not aware of who would have made
5    that decision.
6        Q.    OK, and Mr. Oxford asked you a
7    question about the conversion which is a topic
8    that I had raised with you earlier and
9    unfortunately for you, it reminded me of a
10   document that I promise you I won't be very long
11   with it.
12           (Exhibit 231, document Bates stamped
13   10254271 (two pages) marked for
14   identification, as of this date.)
15       Q.    Take a look at the document,
16   Mr. Lowitt, sufficiently to determine if you
17   remember seeing it before.
18       A.    Yeah, I have read it.
19       Q.    Have you seen the document before
20   today?
21       A.    I don't recall seeing it before.
22       Q.    I would direct your attention to
23   the -- again, the top two lines which we are
24   disregarding, "administrator" and "sent," below

Page 278

1        LOWITT - HIGHLY CONFIDENTIAL
2    that, the latest e-mail in the chain is from you
3    to Alastair Blackwell, Robert Azerad entitled,
4    "The Conversion," where you say, "Need people to
5    work all night on it. Need to know we can get
6    BarCap their money by Sunday night. We had a list
7    we showed them. Can we not give them that
8    collateral. Robert produced it. Ian." Would you
9    take a look there?
10       A.   Yeah.
11       Q.   And then if you go to the very bottom,
12   the very last e-mail, and that is from a Nancy
13   Reyda to the ITD war room on the previous evening,
14   Friday, September 19, at about 8:08 p.m.
15       A.   I do see that.
16       Q.   And she writes to the war room, "As
17   you all probably know by now, the asset move was
18   orchestrated in such a way that the conversion
19   move was not needed this weekend. We will regroup
20   on Monday to discuss these next steps." Do you
21   see that?
22       A.   I do.
23       Q.   Having seen the two ends of this
24   e-mail conversation where Nancy Reyda is telling
25   the war room that the asset transfer was

Page 279

1        LOWITT - HIGHLY CONFIDENTIAL
2    orchestrated in such a way that we can go home,
3    and you say no, everybody needs to work all night,
4    does that refresh your recollection as to what the
5    conversion was?
6        A.   I think the conversion here is
7    different than the conversion that I have been
8    talking about. So the conversion that I was
9    referring to, without the benefit of this was just
10   the movement of assets from the JP Morgan to BoNY
11   to effect the repo.
12            Again, I don't have a recollection of
13   this, but what I think Nancy is sharing with
14   people is that there is no requirement to move
15   the assets in the way that was envisaged in the
16   original transaction, which was moving large
17   amount of specific assets and at specific
18   prices to Barclays in one way or another. And
19   then the -- my mail at the top, again, I am
20   doing this by just reading through this -- is
21   saying that the reserve formula requires recs.
22   R-E-C-S to be run and processed,
23   reconciliations, and that what I am saying in
24   this is that we actually need to, we need to
25   work on those reconciliations so we can update

Page 280

1        LOWITT - HIGHLY CONFIDENTIAL
2    the reserve formula. The reserve formula would
3    be referring to the 15c3 lock-up and then my
4    mail is really referring to that income
5    collateral. So it seems to be a combination of
6    a number of different things in this chain.
7        Q.   And in the middle of that sequence is
8    an e-mail from Alastair Blackwell to you and
9    Gerard Larocca, September 27, 10 p.m., asking,
10   "FYI, what do you want us to do here, use Thursday
11   night or can it wait until tomorrow?"
12            Do you understand what is meant by use
13   Thursday night?
14       A.   Again, I'm basing that on what goes
15   below that. But usually 15c3 lock-up calculation
16   that was calculated on the Thursday night.
17       Q.   OK.
18       A.   Rather than having to rerun it and
19   then to the questions that we had a little while
20   ago about the need to rerun the 15c3 over the
21   weekend, that was -- that was work that needed to
22   get done in order to run that 15c3.
23            MR. GAFFEY: Thanks, I have nothing
24   else.
25            MR. HUME: I have I am sorry, to do

Page 281

1        LOWITT - HIGHLY CONFIDENTIAL
2    this. I have two things to quickly clean
3    up.
4    EXAMINATION BY
5    MR. HUME:
6        Q.   Mr. Lowitt, if you look at Exhibit 229
7    that Mr. Oxford showed you. Do you have Exhibit
8    229 in front of you?
9        A.   I do.
10       Q.   If you look at the spreadsheet
11   attached or schedule attached, Mr. Oxford asks you
12   first whether you saw the unencumbered collateral
13   that has been talked about today of approximately
14   1.9 billion or 2 billion on this schedule. Do you
15   remember him asking you that?
16       A.   I do.
17       Q.   I think you may have said that you did
18   not see it on there. And I just wanted to ask
19   you, you see that there is a cash number of 7
20   billion represented. Do you see that?
21       A.   I do.
22       Q.   And then you see an inventory
23   of a variety of classes of securities. Do you see
24   that?
25       A.   I do.

Page 282

1    LOWITT - HIGHLY CONFIDENTIAL
2      Q.   And that inventory totaled 44.8
3  billion. Do you see that?
4      A.   I do.
5      Q.   Which if you add the inventory and the
6  cash, you get to 51.8 billion. Do you see that?
7      A.   I do.
8      Q.   And do you recall saying earlier that
9  your general recollection was that the repo
10 collateral had a value at least from Chase of
11 about 49.7, I think, or 49.9 billion, something
12 like that. Do you recall that?
13     A.   I do.
14     Q.   Is it possible -- first let me ask
15 you, do you know -- did you prepare this schedule?
16     A.   I did not prepare this schedule.
17     Q.   Do you know that the unencumbered
18 assets, the approximately 1.9 billion or 2 billion
19 is not included within the inventory?
20     A.   I don't know that and as you show what
21 the sum of the numbers are, at close to 52 billion
22 dollars, it is quite plausible that the 1.9
23 billion dollars of unencumbered collateral is
24 included in inventory for the purpose of this, but
25 again, I didn't prepare it and I don't know with

Page 283

1    LOWITT - HIGHLY CONFIDENTIAL
2  certainty if it is.
3      Q.   Mr. Oxford also asked you if you
4  saw -- and here I just don't know whether the
5  question was clear. He asked you if you saw the 5
6  billion of exchange-listed options which he took
7  as a phrase from another exhibit, Exhibit 219. Do
8  you remember him asking you that?
9      A.   I do remember him asking me that.
10     Q.   And you said you did not see that on
11 this schedule, Exhibit 229. Do you recall giving
12 that answer?
13     A.   I do recall giving that answer.
14     Q.   Now, do you see a listing of 5 billion
15 on the schedule? Let me ask the question this
16 way: Was your answer that you did not see the 5
17 billion for exchange-listed options or that you do
18 not believe it is possible that exchange-traded
19 derivatives of any kind are listed on this
20 schedule?
21     MS. TAGGART: Object to form.
22     A.   I mean, I see under inventory a number
23 that says "derivatives and other contracts."
24     Again, I didn't create this schedule
25 and I probably didn't spend enough time

Page 284

1    LOWITT - HIGHLY CONFIDENTIAL
2  reviewing it. I was saying I didn't see a line
3  that referred explicitly to exchange-traded
4  options and I didn't see a 5 billion dollar
5  number.
6      Again, I don't know how the schedule
7  was created and it is possible that it includes
8  an estimate for what the exchange-traded
9  options are. I can't say one way or the other.
10     MR. HUME: I have no further
11 questions.
12     I do want it state for the record that
13 Exhibit 217, I have been informed -- and we
14 can address this off line -- I just want to
15 state it on line, from our production
16 people, it is not an integrated document.
17 All these sheets marked together as Exhibit
18 217 are not a single document but multiple
19 documents. We will have to address it off
20 the record.
21     MR. GAFFEY: Sounds like a vendor
22 issue.
23         - - - -
24
25

Page 285

1    LOWITT - HIGHLY CONFIDENTIAL
2  EXAMINATION BY
3  MR. OXFORD:
4      Q.   I have one question based on Mr.
5  Hume's question. You just said with respect to
6  Exhibit 229 that it was possible that the
7  spreadsheet attached to the e-mail included a line
8  item for derivatives, is that correct?
9      A.   Again, I see under "inventory
10 derivatives and other contracts."
11     Q.   What's the value of that entry, sir?
12     A.   It looks like 80.
13     Q.   And when you say 80, do you mean 80
14 million dollars, sir?
15     A.   It doesn't say what the unit is, but
16 given the other numbers, it seems that it would be
17 80 million.
18     Q.   Well, you managed to answer my
19 question about a thousand for C3 lock-up release
20 meant 1 billion dollars, right?
21     A.   Right.
22     Q.   And you managed to answer Mr. Hume's
23 question that figure of 7000 for cash is 7
24 billion?
25     A.   Yes.

## Page 286

1     LOWITT - HIGHLY CONFIDENTIAL
2     Q.  So it is fair to assume that the
3  figure of 80 against the line items of derivatives
4  and other contracts is 80 million dollars,
5  correct?
6     MR. BERNSTEIN:  Asked and answered.
7     A.  Yes, I did say it was 80 million
8  dollars.
9     Q.  Do you see anywhere on Exhibit 229 an
10  entry that reflects, separate and apart from the
11  "derivatives and other contracts" line any entry
12  for margin or deposits at the UCC or any other
13  exchange?
14     MR. HUME:  Objection, the document
15  speaks for itself.
16     A.  Again, I didn't develop the schedule.
17  I don't know precisely what makes it into the
18  different lines.  The words "margin" or -- and
19  "OCC," I don't see on the schedule.
20     Q.  And do you see any other entry under
21  the subheading of inventory in which margin or
22  deposits at OCC or elsewhere would naturally fit?
23     A.  I didn't generate the schedule so I
24  don't know where somebody might have done that,
25  but the inventory categories of governments and

## Page 287

1     LOWITT - HIGHLY CONFIDENTIAL
2  equities and mortgages and corporate debt,
3  commercial paper and derivatives and other, you
4  would imagine it would be in the derivatives line
5     (Continued on next page for jurat)

## Page 288

1     LOWITT - HIGHLY CONFIDENTIAL
2  if it was anywhere.
3     MR. OXFORD:  OK.  Thank you, no
4  further questions.
5     MR. BERNSTEIN:  Both Mr. Lowitt and
6  Mr. Kelly reserve the right to read the
7  deposition and provide errata.  Depositions,
8  and provide errata.
9     (Time noted:  5:51 p.m.)
10
11     _____
12     IAN LOWITT
13
14  Subscribed and sworn to
15  before me this     day
16  of August, 2009.
17
18     _____
19
20
21
22
23
24
25

## Page 289

1     LOWITT - HIGHLY CONFIDENTIAL
2     INDEX:
3  WITNESS     EXAM BY:     PAGE:
4  I. Lowitt     Mr. Gaffey     6, 276
5     Ms. Taggart     216
6     Mr. Oxford     248, 285
7     Mr. Hume     281
8
9     EXHIBITS
10  Exhibit No.     Marked
11  Exhibit 216 document Bates stamped     30
     BCI-EX77335 through 37
12  Exhibit 217 document Bates stamped     97
     BCI-EX00115595 through 654
13  Exhibit 218 document Bates stamped 42628     146
  Exhibit 219 document Bates stamped 138017     148
14  Exhibit 221 document Bates stamped 137537     154
  Exhibit 220 document Bates stamped     161
15     10298186
16  Exhibit 222 e-mail dated 9/20/2008 at     173
     1:42:32
17  Exhibit 223 document Bates stamped     181
     10293506
18  Exhibit 224 four-page e-mail dated     184
     9/20/2008 at 6:12 p.m.
19  Exhibit 225 two-page document Bates     189
     stamped 77882
20  Exhibit 226 e-mail dated September 21,     199
     2008 at 2:15 p.m.
21  Exhibit 227 two-page document Bates numbed     203
     70327
22  Exhibit 228 e-mail dated 9/21/2008 at     257
     8:09:34 p.m.
23  Exhibit 229 e-mail dated 9/21/2008 at     260
     6:20:35 p.m.
24  Exhibit 230 e-mail dated 9/22/2008 at     274
     11:53:18 a.m.
25  Exhibit 231 document Bates stamped     277
     10254271 (two pages)

Page 290

LOWITT - HIGHLY CONFIDENTIAL

1
2
3          CERTIFICATE
4    STATE OF NEW YORK )
5              )ss:
6    COUNTY OF NEW YORK)
7        I, MARY F. BOWMAN, a Registered
8    Professional Reporter, Certified Realtime
9    Reporter, and Notary Public within and for
10   the State of New York, do hereby certify:
11       That IAN LOWITT, the witness whose
12   deposition is hereinbefore set forth, was
13   duly sworn by me and that such deposition is
14   a true record of the testimony given by such
15   witness.
16       I further certify that I am not
17   related to any of the parties to this action
18   by blood or marriage and that I am in no way
19   interested in the outcome of this matter.
20       In witness whereof, I have hereunto
21   set my hand this 20th day of August, 2009.
22
23   _____
         MARY F. BOWMAN, RPR, CRR
24
25

Page 291

1        LOWITT - HIGHLY CONFIDENTIAL
2          * * *ERRATA SHEET* * *
3    NAME OF CASE:  In Re:  Lehman Brothers, Inc.
4    DATE OF DEPOSITION:  8/20/09
5    NAME OF WITNESS:  Ian Lowitt
6    Reason codes:
7        1. To clarify the record.
         2. To conform to the facts.
8        3. To correct transcription errors.
9
10   Page ____ Line ____ Reason____
     From _____to_____
11
12   Page ____ Line ____ Reason____
     From _____to_____
13
14   Page ____ Line ____ Reason____
     From _____to_____
15
16   Page ____ Line ____ Reason____
     From _____to_____
17
18   Page ____ Line ____ Reason____
     From _____to_____
19
20   Page ____ Line ____ Reason____
     From _____to_____
21
22   Page ____ Line ____ Reason____
     From _____to_____
23
24   _____
             IAN LOWITT
25