# BCI EXHIBIT

# 84

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------x

     In Re:                      Chapter 11

5    LEHMAN BROTHERS              Case No. 08-13555 (JMP)

     HOLDINGS, INC., et al.,     (Jointly Administered)

6    ------------------------------)

7

8         * * * HIGHLY CONFIDENTIAL * * *

9           DEPOSITION OF BRYAN MARSAL

10             New York, New York

11          Tuesday, December 22, 2009

12

13

14

15

16

17

18

19

20    Reported by:

      FRANCIS X. FREDERICK, CSR, RPR, RMR

21    JOB NO. 26534

22

23

24

25

Page 2

1
2
3
4
5          December 22, 2009
6          10:04 a.m.
7
8
9          HIGHLY CONFIDENTIAL videotaped
10    deposition of BRYAN MARSAL, held at the
11    offices of Boies Schiller & Flexner,
12    LLP, 575 Lexington Avenue, New York, New
13    York, pursuant to Notice, before Francis
14    X. Frederick, a Certified Shorthand
15    Reporter, Registered Merit Reporter and
16    Notary Public of the States of New York
17    and New Jersey.
18
19
20
21
22
23
24
25

Page 3

1
2    APPEARANCES:
3        JONES DAY, LLP
4        Attorneys for Lehman Brothers, Inc.
5            222 East 41st Street
6            New York, New York 10017-6702
7        BY: ROBERT W. GAFFEY, ESQ.
8
9        BOIES SCHILLER & FLEXNER, LLP
10        Attorneys for Barclays Capital
11            401 East Las Olas Boulevard, Suite 1200
12            Fort Lauderdale, Florida 33301-2211
13        BY: W. TODD THOMAS, ESQ.
14            - and -
15        BOIES SCHILLER & FLEXNER, LLP
16            575 Lexington Avenue - 7th Floor
17            New York, New York 10022
18        BY: JONATHAN P. KRISBERGH, ESQ.
19
20        QUINN, EMANUEL, URQUHART, OLIVER &
21        HEDGES, LLP
22        Attorneys for the Creditors Committee
23            51 Madison Avenue
24            New York, New York 10010
25        BY: ERIC M. KAY, ESQ.

Page 4

1
2    APPEARANCES: (Cont'd.)
3
4        HUGHES, HUBBARD & REED, LLP
5        Attorneys for the SIPA Trustee
6            One Battery Park Plaza
7            New York, New York 10004-1482
8        BY: SETH ROTHMAN, ESQ.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1                    PROCEEDINGS
2            THE VIDEOGRAPHER: This is the
3    start of tape number one of the
4    videotaped deposition of Bryan Marsal in
5    the matter In Re. Lehman. Today's date
6    is December 22nd, 2009 at approximately
7    10:04 a.m. Will the court reporter
8    please swear in the witness.
9                      * * *
10    BRYAN MARSAL, called as a
11        witness, having been duly sworn by a
12        Notary Public, was examined and
13        testified as follows:
14    EXAMINATION BY
15    MR. THOMAS:
16        Q.   Good morning, Mr. Marsal.
17        A.   Good morning.
18        Q.   Would you please state your
19    current occupation.
20        A.   I'm currently serving as the chief
21    executive officer of Lehman Brothers Holdings.
22        Q.   Are you also still working with
23    Alvarez & Marsal?
24        A.   I'm the co-chief executive officer
25    of a crisis management firm called Alvarez &

Page 6

```
 1      B. MARSAL - HIGHLY CONFIDENTIAL
 2   Marsal.
 3      Q.   Okay.  And you've been deposed
 4   before?
 5      A.   Yes.
 6      Q.   If at any point you don't
 7   understand any of my questions, please ask me
 8   to rephrase and I will.
 9           When did you or Alvarez & Marsal,
10   to your knowledge, first do any work for
11   Lehman?
12      A.   We started -- received a call
13   September 14th, 2008.  We came to the office
14   September 15th, 2008.
15      Q.   Prior to that engagement had you
16   or, to your knowledge, Alvarez & Marsal worked
17   for any of the Lehman entities previously?
18      A.   Only in a capacity of them being a
19   creditor in various cases that we've had over
20   the last 20 years.  I don't know about those
21   cases but I'm sure there must have been some
22   overlap but not in a direct capacity.
23      Q.   And who did you receive that call
24   from?
25      A.   The call was received from
```

Page 7

```
 1      B. MARSAL - HIGHLY CONFIDENTIAL
 2   Mark Shapiro of Lehman Brothers.
 3      Q.   And can you describe the substance
 4   of that call, basically?
 5      A.   The call was placed on the night
 6   of September 14th around 10:30 p.m.
 7   Mark Shapiro was calling on behalf of the
 8   board of directors of Lehman, Lehman Holdings.
 9   They asked about my availability to lead an
10   assignment at Lehman Brothers the next --
11   beginning as soon as possible.
12      Q.   And can you describe what that
13   assignment was, please.
14      A.   That assignment was to serve as
15   the chief restructuring officer of Lehman
16   Brothers at the outset, probably leading to a
17   chief executive officer responsible for the
18   management of the company during a Chapter 11
19   proceeding.
20      Q.   And --
21      A.   The company being Lehman Brothers
22   and various subsidiaries.
23      Q.   And what are the primary duties
24   and responsibilities of the chief
25   restructuring officer?
```

Page 8

```
 1      B. MARSAL - HIGHLY CONFIDENTIAL
 2      A.   The chief restructuring officer is
 3   really the head of the company during the
 4   period of the crisis.  At the end of the
 5   crisis normally what would happen is the
 6   chief executive officer would replace the CRO.
 7   But during the period of the crisis the CRO is
 8   really the head officer of the company.  The
 9   CRO title would not be appropriate under
10   normal circumstances.  It would be under
11   crisis circumstances.
12      Q.   And so when did you actually
13   become the CRO or chief restructuring officer?
14      A.   Well, the night of the 14th they
15   asked me would I take the position and I said
16   yes.  Then they -- so we agreed that subject
17   to the contract, finalizing a contract of our
18   employment, that I would become the CRO as
19   soon as possible.
20      Q.   And when did that happen?
21      A.   I believe it happened -- we came
22   to work the next day.  So we were -- we came
23   to work to start to be debriefed on what the
24   issues were the morning of September 15th,
25   2008.  I believe we were hired -- the contract
```

Page 9

```
 1      B. MARSAL - HIGHLY CONFIDENTIAL
 2   was focused on on Thursday of that week.  So I
 3   believe we were hired officially on Thursday
 4   of that week.
 5      Q.   If the official hire was Thursday,
 6   when did you actually start acting as the CRO?
 7   Would it have been earlier than that?
 8      A.   I would say Friday when I really
 9   was acting in the capacity of trying to find
10   out what was going on with respect to the
11   other assets of the company.
12      Q.   And as of that Thursday or Friday
13   were you also effectively acting as the CEO of
14   Lehman?
15      A.   I was effectively --
16           MR. GAFFEY:  Object to the form.
17      A.   Yes, I was effectively serving as
18   the CRO in trying to explain to the board of
19   directors and to the CEO what that meant.  And
20   basically that meant that there would be no --
21   there would be no outflow of cash that was not
22   approved by me.  And from there the roles
23   became expanded.  But when you address it that
24   way, it's pretty evident to everybody there
25   will be no cash paid to anyone that's not
```

Page 10

B. MARSAL - HIGHLY CONFIDENTIAL

1    going to receive my blessing and my approval.
2    Q.    Is it fair to say that there would
3    be no significant decisions made by the
4    company without your approval as of that time?
5        MR. GAFFEY: Object to the form.
6    You can answer.
7    A.    There was a carveout of two
8    transactions at the time. There was a
9    carveout of the week of the 15th, the senior
10    management was focusing their efforts on the
11    sale of Lehman to Barclays. Sold certain of
12    the businesses to Barclays. And that specific
13    activity was carved out from our purview. My
14    concern about that transaction, though, was
15    that it did have an implication to -- while it
16    was carved out, there was an implication,
17    namely we needed the supply of the books and
18    the records and the accounting material that
19    would in turn be transferred as part of what
20    we will refer to in the future as the TSA, the
21    Transition Services Agreement, which was
22    really access to information.
23        So the focus was without
24    information, the rest of the estate had

Page 11

B. MARSAL - HIGHLY CONFIDENTIAL

1    troubles. So we needed the books and the
2    records.
3    Q.    And how was your concern resolved,
4    if it was?
5    A.    My concern was resolved because of
6    the TSA, which was -- the TSA -- once the
7    sale -- the terms of sale were negotiated by
8    the management team, the only insertion that
9    Alvarez & Marsal made was to make sure that we
10    had access to the information and we were
11    assured that that information access would be
12    captured in what's called the TSA.
13    Q.    Were you -- during that week of
14    the 15th were you kept up to date about the
15    sale negotiations and efforts?
16    A.    No. No. I was -- toward the end
17    of the week I was briefed on what the sale
18    meant by -- in fact, people did not attend --
19    I mean, I had appointments with various
20    players who were not able to attend those
21    appointments that week because they were tied
22    up in the negotiations with Barclays.
23        And I got a briefing from
24    Steven -- Steven Belden -- I forget Steven's

Page 12

B. MARSAL - HIGHLY CONFIDENTIAL

1    last name now. I'm at a loss. But the chief
2    administrative officer. He gave me a briefing
3    Thursday -- I believe Thursday or Friday of
4    that week on what the transaction looked like.
5    Q.    And -- is it Berkenfeld?
6    A.    Berkenfeld. Excuse me. Yes.
7    Steven Berkenfeld.
8    Q.    And that was on Thursday or Friday
9    of that week?
10    A.    Yeah. Yes.
11    Q.    And did he go through the assets
12    that were being sold and the liabilities being
13    assumed?
14    A.    Really, no. He went through a
15    very -- very much an overview, which was the
16    company was assuming -- Barclays was assuming
17    liabilities consisting of debt that it --
18    secured debt. Unsecured payables and
19    unsecured bonus accrual liability. In
20    exchange for that there was going to be an
21    exchange of an equal amount -- equal value of
22    assets. I think they referred to the
23    transaction as a push. It was the assets
24    would equal the liabilities.

Page 13

B. MARSAL - HIGHLY CONFIDENTIAL

1    Q.    At any point did you review any of
2    the sale contract documents?
3    A.    No.
4    Q.    Are you aware of any requirement
5    in the sale agreement for the deal to somehow
6    be, as you say, a push?
7        MR. GAFFEY: Excuse me one second.
8        (Pause on the record.)
9        MR. GAFFEY: Object to the form.
10    Can you put a time period on that, Todd,
11    so I can know whether I have a privilege
12    I have to assert.
13        MR. THOMAS: Well, I just want to
14    ask it as a factual question.
15        MR. GAFFEY: That's not a time
16    period. I need a -- we have a privilege
17    waiver agreement that goes up to
18    September 30, as you know. If it's
19    anything he learned after that, I'm
20    going to instruct him not to answer on
21    the grounds of privilege. If it's
22    before that, that's within our waiver
23    and I'll let him answer.
24        MR. THOMAS: If it's just a fact

Page 14

B. MARSAL - HIGHLY CONFIDENTIAL

1  B. MARSAL - HIGHLY CONFIDENTIAL
2  of whether he believes there's something
3  in the contract that requires it to be a
4  push, you're not going to let him answer
5  that?
6      MR. GAFFEY: I'm not going to let
7  him answer anything he's learned from
8  conversations with counsel after
9  September 30th. If you put a time
10 period on it before September 30, we
11 don't have any problem here. And then
12 you can follow up and I can make a more
13 focused privilege assertion if I need
14 to.
15     MR. THOMAS: Sure. Well, we'll
16 break it down.
17     MR. GAFFEY: Okay. Thanks.
18 BY MR. THOMAS:
19     Q.  Before September 30th, did you
20 have any knowledge as to whether there was any
21 requirement for a push that was in the sale
22 documents?
23     A.  The only conversation that I can
24 recall was with Steven Berkenfeld. And that
25 discussion was his description of the

Page 15

1  B. MARSAL - HIGHLY CONFIDENTIAL
2  transaction as assets equaling liabilities.
3  And my concern, again, about the whole
4  transaction, since we were excluded from its
5  review, was making sure we had access to
6  the -- you know, to the technology base that
7  was also being transferred. And my focus was
8  5 percent about the transaction and 95 percent
9  about the access to the technology -- I mean,
10 to the information base.
11     Q.  So you specifically recall in that
12 conversation Mr. Berkenfeld saying that the
13 assets were going to equal liabilities?
14     A.  Yes.
15     Q.  Okay. What else do you
16 specifically recall about his description of
17 the deal?
18     A.  It was, like I said, it was very
19 brief. That was not our purview so we were
20 specifically excluded from those negotiations
21 when -- and people who were having those
22 negotiations missed appointments to debrief us
23 on their areas of involvement.
24     Q.  Can you recall anything else
25 specific about the conversation with

Page 16

1  B. MARSAL - HIGHLY CONFIDENTIAL
2  Mr. Berkenfeld other than that assets were
3  supposed to equal liabilities?
4      A.  The assurances that there would be
5  access to the technology and the information
6  through a TSA. And that in order to -- in
7  order to ensure that that access was made, I
8  should assign one of my people to make sure
9  that the TSA was done in such a way as to
10 provide that access.
11     Q.  Um-hum. Did Mr. Berkenfeld
12 provide you with any description of the assets
13 that were being transferred?
14     A.  No.
15     Q.  Wouldn't that be relevant to what
16 you needed to know?
17     MR. GAFFEY: Object to the form.
18 You can answer.
19     A.  Well, again, the -- we were not
20 involved with the negotiation of the
21 transaction. My assumption was that this
22 transaction involved securities because of the
23 cash position of the company, we were told
24 that the cash position of the company was
25 pretty low, pretty desperate.

Page 17

1  B. MARSAL - HIGHLY CONFIDENTIAL
2      So my conclusion was that the
3  value that was being given was not in the form
4  of cash. So the only other alternative would
5  have been securities or property.
6      Q.  You said that there was a carveout
7  for a couple of transactions, one of which was
8  the sale to Barclays in which Alvarez & Marsal
9  was not involved; is that right?
10     A.  Yes.
11     Q.  And can you describe what you mean
12 by --
13     A.  Well, the other carveout was the
14 Newburger Burnham transaction which was being
15 pursued at the time. There was an active
16 auction taking place, and so for us to intrude
17 in that auction was not deemed to be sensible
18 either.
19     Q.  Was that carveout with respect to
20 the Barclays sale in writing somewhere?
21     A.  I don't know if it was in writing.
22 I don't know if it was in writing. We were
23 told that that is -- those two transactions
24 are going forward and that really you need to
25 focus on -- you need to focus on the wind-down

5

Page 18

B. MARSAL - HIGHLY CONFIDENTIAL

1 of the company exclusive of those two
2 transactions because the plan was to go
3 forward with both transactions as soon as
4 possible.
5     Q.    And who told you that?
6     A.    Steve Berkenfeld.
7     Q.    Anyone other than Steve Berkenfeld
8 say anything that you took as a carveout
9 for --
10    A.    Well, the others didn't make the
11 meetings that we had with them. So he was the
12 only one that made the meetings.
13    Q.    Okay. So when you refer to a
14 carveout, you're referring to something that
15 Steve Berkenfeld told you personally?
16    A.    Yes. Steve Berkenfeld said these
17 are two areas that you should not focus your
18 attention on. These are transactions which
19 are going forward. You should focus on the
20 company post these two transactions happening.
21    Q.    Did he ever say it in terms of you
22 must not be involved in those or was it just
23 that shouldn't be your focus?
24    A.    No. Should not be your focus.

Page 19

B. MARSAL - HIGHLY CONFIDENTIAL

1     Q.    Okay. And when did he tell you
2 that?
3     A.    In the -- only -- during the week
4 of -- back to the 15th. During that week the
5 only one we had contact with was Steve
6 Berkenfeld that was on the negotiating team.
7     Q.    Do you know which day of the week
8 that was? Was that part of your Thursday or
9 Friday conversation?
10    A.    I would suspect it was Wednesday
11 or Thursday-ish.
12    Q.    Okay. And what was your reaction
13 to him saying that you don't need to focus on
14 that because those deals are going forward?
15    A.    It was described as a transaction
16 that was happening and that it was well along
17 and that it was not something that we should
18 focus our attention on. Focus on the assets
19 that are remaining.
20    Q.    Did that seem reasonable to you?
21    A.    Yes.
22    Q.    Did he explain why the transaction
23 was going forward or needed to go forward?
24    A.    Well, both transactions were going

Page 20

B. MARSAL - HIGHLY CONFIDENTIAL

1 to be receiving bankruptcy court approval and
2 review. And both transactions were actually
3 being discussed within the court that week
4 before we'd actually been hired. So this was
5 not -- this was not a surprise to anybody.
6     Q.    Did he explain from a business
7 standpoint why the transaction with Barclays
8 needed to go forward?
9     A.    No, he did not.
10    Q.    When you showed up on that -- the
11 first day, Monday, can you just generally
12 describe what you did that Monday for Lehman?
13    A.    Well, the first day on the job
14 was -- there was total chaos taking place at
15 Lehman. The people were actually walking out
16 of the building with boxes. Employees were
17 walking out of the building with personal
18 effects. The TV people were trying to
19 interview anybody going in and out and if you
20 happened to have a suit on, you were a prime
21 target.
22        We got in there and security was
23 obviously pretty heightened. It took us a
24 long time to get through security. And then

Page 21

B. MARSAL - HIGHLY CONFIDENTIAL

1 when we went upstairs, we basically sat in the
2 conference room for five hours pretty much by
3 ourselves.
4        We were given the form of the
5 company's 10-K and told to look at it. So we
6 spent the first day really looking at the 10-K
7 because everybody else was busy. Part of the
8 team was busy working on the transactions,
9 either the Barclays or the Newburger Burnham,
10 and the other part of the team was pretty much
11 paralyzed. They were just in a state of shock
12 that this had happened.
13        And so the first couple of days,
14 you know, there was very little productivity.
15 It was mostly getting up to speed on the
16 businesses and trying to talk to HR and
17 getting an organization chart.
18        But people didn't really have time
19 for us that first week. They were all busy
20 trying to transfer -- HR was trying to
21 transfer people. You know, what will the
22 Barclays transaction look like, how will we
23 transfer those people over to Barclays. So
24 that was their focus. So getting them to give

Page 22

1       B. MARSAL - HIGHLY CONFIDENTIAL
2   us org charts was not possible.
3           The financial team did not make
4   themselves available I think until Thursday or
5   Friday of that week, and that was like -- they
6   were so exhausted that they really couldn't
7   provide us much in the way of support.
8   Everything was we'll do it after the fact.
9   We're just too tired right now to help answer
10  any questions.
11          So the first week was -- Monday
12  through Thursday was pretty much a wash, a
13  wash-out. I mean, there was just not people
14  available.
15      Q.  When you showed up at Lehman that
16  week, at that point in time how did Lehman
17  mark the value of the securities that they
18  held?
19      A.  Didn't have a clue. We didn't
20  have information so we did not have a clue.
21  That was what the technology -- our interest
22  in the technology was. If you knew -- we had
23  to capture the transactions. We had to
24  capture the assets. We had to try and capture
25  the most recent marks. There was no further

Page 23

1       B. MARSAL - HIGHLY CONFIDENTIAL
2   updating of the marks after the filing. So we
3   were pretty much in limbo. That was exactly
4   what we were concerned about.
5       Q.  And when you say no further
6   updating of the marks, were the last values
7   that you had for the securities held by, for
8   example, LBI, would they have been from the
9   week before filing for bankruptcy?
10          MR. GAFFEY: Objection to form.
11      A.  No. The values were mostly -- I
12  mean, some of the transactions are marked
13  every day. So you had some transactions that
14  would eventually be available from the 12th of
15  September, but most of the assets were really
16  as of quarter end. Some of them were June
17  30th, 2008 and some of them were August, and
18  those would have been the -- I mean, they were
19  all over the map.
20          And, again, that's part of the
21  problem. We did not have an updated asset
22  list. We didn't even know what we owned. We
23  didn't know what we owned and we didn't
24  know -- we didn't know what the value was of
25  it and we couldn't find a -- we didn't have an

Page 24

1       B. MARSAL - HIGHLY CONFIDENTIAL
2   information system where we could have access
3   to that, which was the biggest concern. Which
4   is, again, that's really what the concern was
5   as it relates to this transaction.
6       Q.  So, for LBI's assets, some of
7   their assets you may have had -- the most
8   recent marks you would have had or that Lehman
9   would have had would have been as of September
10  12 and some of the most recent -- for other
11  assets the marks would be not as recent as
12  September 12; is that right?
13          MR. GAFFEY: Object to the form.
14      You can answer.
15      A.  Well, again, we're talking about
16  LBHI and the 19 subsidiaries that filed
17  bankruptcy. LBI was in a state of chaos. So
18  I don't have a clue what was going on at LBI
19  but that, as you know, was not even -- that
20  wasn't even our purview. That's the
21  broker/dealer, LBI.
22      Q.  Was it your purview before the
23  receivership, the trusteeship --
24      A.  No.
25      Q.  -- of LBI?

Page 25

1       B. MARSAL - HIGHLY CONFIDENTIAL
2       A.  No. It was always -- the
3   broker/dealer was going to be governed by the
4   SIPA trustee. There was going to be a
5   different receiver for that. And, in essence,
6   we were going to be receiver for everything
7   else other than that.
8           And there was negotiations going
9   on. As you know, assets and subsidiaries
10  moved out of the LBI broker/dealer into the
11  realm of LBHI in conjunction, working together
12  to maximize the recovery value of the assets.
13  That's why that was all going on.
14          So we were fully anticipating that
15  LBI would be seeking bankruptcy at some time
16  in the near future, and that's what the game
17  plan was in terms of Weil Gotshal working with
18  counsel.
19      Q.  And the -- are you familiar --
20  you're aware that part of the Barclays
21  transaction involved the sale of certain long
22  positions, securities, correct?
23      A.  I'm -- like I said, depending on
24  when. I mean, today I understand a lot about
25  the transaction. At the time my knowledge of

Page 26

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  the transaction was really two-fold. It was
3  this transaction assets -- asset values are
4  going to cover liabilities. We will be no
5  worse off, no better off. It's a push. And
6  you will have access to -- even though you're
7  selling the data centers and you're
8  transferring all of the software and all of
9  the access to those systems, you will have a
10 TSA in place which will permit you to take an
11 inventory of your assets, to value your assets
12 on a real-time basis so that you can know what
13 you got.
14      Those were the two focuses of the
15 Barclays transaction. The actual securities
16 wasn't -- that wasn't on my radar screen.
17     Q.  Let me go ahead and show you a
18 document that we'll mark as 482.
19      (Deposition Exhibit 482, January
20      29, 2009 341 Meeting of Creditors
21      transcript, marked for identification as
22      of this date.)
23 BY MR. THOMAS:
24     Q.  And let me ask you to turn to page
25 18, please.

Page 27

1    B. MARSAL - HIGHLY CONFIDENTIAL
2      (Pause on the record.)
3     A.  Eighteen.
4      (Document review.)
5     Q.  And the second full paragraph
6  there it says -- let me just back up.
7      I believe this is you speaking but
8  if you'd like to review the front of the
9  document, it's dated -- it's the January 29th,
10 341 meeting of creditors --
11     A.  Yes.
12     Q.  -- from the transcript here. And
13 the second full paragraph you're stating, "The
14 chaos that we walked into the next morning at
15 9:15, there was a series of issues with many
16 of the, what we call 'melting assets.' Those
17 are assets that are very much time sensitive,
18 very much people related. If those people
19 walk out, the asset values walk out."
20      Do you remember making --
21     A.  Yes.
22     Q.  -- comments along those lines?
23      And is that some of the chaos that
24 you described a few minutes ago?
25     A.  Yes.

Page 28

1    B. MARSAL - HIGHLY CONFIDENTIAL
2     Q.  Would you describe in a little
3  more detail what you mean by melting assets
4  and when the people walk out, the asset values
5  walk out?
6     A.  Well, the melting assets resulted
7  in a series of emergency hearings, and those
8  emergency hearings for the bankruptcy court
9  for Judge Peck to address. So if you wanted a
10 complete list of those melting assets, you
11 just need to dig out the transcripts during
12 this period.
13      But mostly they were a series of
14 investments which if we did not address those
15 assets, then the residual value of our --
16 either put them into safe hands, the residual
17 value would have diminished dramatically. And
18 the melting assets were not -- the melting
19 assets did not include the Barclays
20 transaction, if that would be the question.
21      And it really didn't include the
22 Newburger Burnham matter. This was related to
23 most of the proprietary portfolio investments
24 we had to agency positions that we had as a
25 bank lender where we had to get out of our

Page 29

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  agency position.
3      And really, again, there's a
4  complete list of these in all the emergency
5  hearings which took place in the first 60 to
6  90 days. Of course, this was also a source of
7  a lot of consternation for Judge Peck because
8  of the -- it was like a constant stream of
9  melting asset hearings.
10     Q.  And when you say if the people
11 walk out, the asset values walk out, could you
12 just explain what you meant there?
13     A.  Well, I mean, if -- I mean, what
14 was important was the -- what we needed to
15 have was some institutional knowledge. We
16 needed to have some institutional knowledge of
17 these people and what the assets were that we
18 were looking at. And if you recall, what
19 happened here is that shortly after the
20 transaction occurred, 10,000 employees moved
21 across the street to work at Barclays, in
22 essence, and I was left with a very -- I was
23 left with a squad of legal department, a
24 compliance department and some tax people.
25 And we had to rebuild out of those ashes and

Page 30

B. MARSAL - HIGHLY CONFIDENTIAL

1   what I was trying to do was to -- the people
2   we would be talking about would be the
3   institutional knowledge that various players
4   had. And I mean, as part of the TSA we got an
5   informal understanding that those people would
6   be available on a reasonable basis.
7       Q.   In terms of the people walking
8   out, are those -- are some of those people the
9   people that went over to Barclays?
10      A.   Yeah. But I mean, what happened
11  with Barclays is that the likelihood that we
12  were going to get institutional cooperation --
13  if you're familiar with what happens on
14  Wall Street, the people on Wall Street do not
15  look retrospectively. It is all
16  prospectively. And what was becoming clear is
17  with the passage of time, it was very
18  difficult to get them to come back and focus
19  on issues that they -- I mean, this is
20  institutional knowledge. I mean, today we
21  don't have a shot at getting them to come back
22  and help us on these things.
23      Q.   But in terms of the people you
24  were concerned about losing, it would be a lot

Page 31

B. MARSAL - HIGHLY CONFIDENTIAL

1   of the people that went over to Barclays as
2   part of the 10,000?
3       A.   The people -- the people -- the
4   people who had the institutional knowledge,
5   which would be the people who were at
6   Barclays, yes.
7       I mean, how -- but the concern
8   that I would have here is -- my concern is the
9   passage of time was going to reduce the
10  willingness of those people to cooperate with
11  us to provide institutional knowledge on these
12  assets. So disposing of these assets sooner
13  rather than later was very important before
14  people -- people and information goes to the
15  wind.
16      Q.   And are you -- when you're
17  referring to assets, you're referring to
18  assets that would be assets of both LBI and of
19  LBHI?
20      A.   No. Assets of the estates that I
21  was receiver for.
22      Q.   Okay. So you're drawing a
23  distinction between --
24      A.   The 20 estates.

Page 32

B. MARSAL - HIGHLY CONFIDENTIAL

1       Q.   -- assets of the LBHI estate and
2   LBI's assets?
3       A.   Yes. Yes. I mean, that would be
4   what would be meant by that. The 20 estates
5   under my receivership and those estates which
6   hadn't filed yet, which hadn't filed I should
7   say bankruptcy but were under my receivership
8   or our control.
9       Q.   And the people that went over to
10  Barclays that you were concerned about here,
11  were they the employees of LBHI or LBI?
12          MR. GAFFEY: Object to the form.
13      You can answer.
14      A.   The people that went over to
15  Barclays were by and large I believe most
16  entirely LBI employees. They were on LBI's
17  payroll performing services for LBHI and all
18  the various subsidiaries.
19      Q.   So they were LBI -- they're LBI
20  employees but they were impacting the value of
21  LBHI?
22      A.   They managed the LBHI assets.
23  That's correct.
24      Q.   Okay. And the -- are you familiar

Page 33

B. MARSAL - HIGHLY CONFIDENTIAL

1   with the assets that were -- that was -- that
2   were ultimately sold as part of the Barclays
3   transaction, by and large?
4       A.   After September 30th, yes.
5       Q.   Yes. I'll try to -- if I want to
6   focus on your knowledge back then, I'll try to
7   make that clear. So I'm just asking you now
8   are you familiar with the assets that went
9   over?
10      A.   I'm familiar --
11          MR. GAFFEY: Are you familiar with
12      that, yes or no.
13      A.   Yes.
14      Q.   Okay. And who -- and that would
15  include the long positions that were -- went
16  over as part of the sales transaction?
17      A.   Yes.
18      Q.   Okay. And is it your testimony
19  that when you refer to melting assets, you're
20  not referring to any of the assets that went
21  over as part of the Barclays sale?
22          MR. GAFFEY: Object to the form of
23      the question.
24      A.   That's correct.

Page 34

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    Q.   Okay. The securities that went
3    over as part of the Barclays sale, the long
4    positions, who were responsible for marking
5    the value of those securities prior to the
6    Barclays sale?
7    A.   Various traders and people within
8    the old Lehman organization. Primarily LBI
9    payroll type people.
10    Q.   Okay. And can you describe how
11    that process would work based on your
12    knowledge today in terms of how the securities
13    would get marked?
14    A.   Well, it varied. Are you asking
15    about the securities or assets?
16    Q.   How the securities, long
17    positions.
18    A.   I don't know specifically how they
19    would get marked. I wasn't -- that really
20    wasn't my area but...
21    Q.   Do you know if they would get --
22    at least prior to the bankruptcy filing, would
23    they get marked each day?
24    A.   I was told they were -- it would
25    be -- the trading securities, the trading

Page 35

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    assets would be marked every day or at least
3    weekly.
4    Q.   And would those marks be
5    accounting entries?
6    A.   I do not know. I assume they
7    would be.
8    Q.   You continue on at the bottom of
9    page 18. You say, "We had a complete loss of
10    all accounting systems beginning Monday
11    morning."
12    Do you see that?
13    A.   Yes.
14    Q.   And then the last sentence in that
15    paragraph says, "So the coordination or
16    consolidation of any financials became
17    impossible beginning the morning of the 15th.
18    All accounting entries stopped the morning of
19    the 15th. People were worried about whether
20    or not they should get their possessions and
21    move out of the building as opposed to
22    accounting."
23    Do you believe that was an
24    accurate statement of the situation the week
25    of the 15th?

Page 36

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    A.   Yes.
3    Q.   Okay. And would that situation
4    apply not just to the holding company but also
5    to the subsidiaries like LBI?
6    A.   Yes.
7    Q.   In terms of the long positions
8    that were conveyed as part of the Barclays
9    sale, when -- do you believe there was any
10    effort to update those marks during the week
11    of the 15th?
12    A.   I do not know. I do not know.
13    Q.   Okay. Would that have been
14    possible, to mark those the week of the 15th
15    given the situations you've described here?
16    MR. GAFFEY: Object to the form.
17    A.   Not with these -- not without the
18    accounting systems being up and running. If
19    there was marking done, it might have been
20    done on an individual basis by various
21    managers who are attempting to mark them based
22    on whatever, I don't know. I was not involved
23    with the marking process or my people were not
24    involved with any marking of the assets.
25    Q.   And you're not aware of any

Page 37

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    marking that went on the week of the 15th?
3    A.   I'm not aware of any marking that
4    was done through this -- through accounting
5    entries, if that's the question.
6    Q.   Okay. Are you aware of any other
7    marking that was done?
8    A.   I have heard that there was an --
9    there was valuations that were being attempted
10    by various managers during that week. I don't
11    know -- I don't know beyond that.
12    Q.   Do you know -- can you provide a
13    little more detail with what you heard? Was
14    that in connection with the Barclays sale
15    negotiations?
16    A.   Some type of -- in trying to value
17    a portfolio of securities that were not
18    readily -- that did not have a ready mark
19    value.
20    But, again, this is something
21    after that fact now. This is not during the
22    time period. This was not a focus of my
23    attention during this time period. This
24    transaction was really a focus of my attention
25    in the first quarter of 2009. My focus during

Page 38

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    the first quarter of 2008 -- excuse me -- the
3    fourth quarter of 2008 was the TSA agreement
4    as it relates to Barclays.
5         And, I mean, the support for that,
6    if you look into the logs of Jonathan, the
7    general counsel, and Ricci, and the amount of
8    meetings we had with Barclays and the
9    discussions we had with Barclays, it related
10   exclusively to the TSA, which was the access
11   to technology and fact base and systems.
12       Q.   So your understanding is that
13   there may have been some -- other than --
14   well, strike that.
15       So there may have been some
16   efforts of Barclays and Lehman to do some
17   valuations the week of the 15th for purposes
18   of valuing difficult to value assets, but
19   other than that, you're not aware of any
20   efforts at Lehmans to systematically mark
21   values of assets?
22       A.   No accounting system was up. So
23   unless an accounting system was up and there
24   could be a remarking of the assets, I don't
25   know how it was accomplished.

Page 39

1    B. MARSAL - HIGHLY CONFIDENTIAL
2       Q.   Okay. Are you aware -- okay.
3    Strike that.
4         MR. THOMAS: Let me go ahead and
5    mark a document that's -- well, actually
6    it's been previously marked as
7    Exhibit 1.
8         (Document review.)
9       Q.   Have you seen this document
10   before?
11       A.   No.
12       Q.   Never had a chance to review --
13       A.   No.
14       Q.   Let me go ahead and show you a
15   document that's been marked Exhibit 25.
16       A.   Do you want this one -- continue
17   with this?
18       Q.   No, you can leave that. We're
19   probably going to come back to that at some
20   point. And if at any point you want to refer
21   to that, you're welcome to.
22       A.   Okay.
23       Q.   Have you seen this document
24   before?
25       A.   No.

Page 40

1    B. MARSAL - HIGHLY CONFIDENTIAL
2       Q.   Have you -- so you haven't had
3    occasion to review what's been referred to as
4    the Clarification Letter that's part of the
5    purchase agreement for the Barclays
6    transaction?
7       A.   I haven't reviewed this letter.
8       Q.   Okay.
9       A.   I don't know if -- I don't know --
10   I have -- again, this transaction was not
11   within our purview so I would have no reason
12   to look at that document.
13       Q.   Well, we may -- we'll probably
14   come back to them in a few minutes.
15       A.   Okay.
16         MR. THOMAS: Let me go ahead and
17   mark a document as Exhibit 483.
18         (Deposition Exhibit 483, e-mail
19   dated Monday, September 15, 2008, marked
20   for identification as of this date.)
21   BY MR. THOMAS:
22       Q.   Do you recognize this document?
23       A.   No. I believe it to be a document
24   that would come to my attention.
25       Q.   It appears to be an e-mail from

Page 41

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    Alex Kirk to yourself dated Monday, September
3    15th.
4       A.   Um-hum. Yes.
5       Q.   In the body of the e-mail he says,
6    "Bryan, please come by and see me tomorrow
7    when you can so I can give you a proper
8    download."
9         Do you see that?
10       A.   Yes.
11       Q.   Is Alex Kirk someone you knew
12   prior to this engagement?
13       A.   No.
14       Q.   And I was wondering why he was
15   reaching out to you and telling you to come
16   by. Did you meet him during the day of the
17   15th?
18         MR. GAFFEY: Objection to form.
19       A.   I doubt if it was the 15th. It
20   was the week of the 15th. I don't believe it
21   was the 15th.
22       Q.   Okay.
23       A.   That first day was a complete
24   wash-out.
25       Q.   Okay. But he's -- I mean, he's

Page 42

B. MARSAL - HIGHLY CONFIDENTIAL
1  writing you on the 15th asking you to come by.
2  So I just was -- you presumably had met him at
3  some point prior to this?
4     A.  No. I --
5        MR. GAFFEY: Objection to form.
6  You can answer.
7     A.  No. What I'd asked when I got
8  there on the 15th was can you give me a list
9  of the key officers of the company that I need
10  to talk to and then an e-mail was sent out by
11  Steve Berkenfeld trying to arrange for times
12  with various people, one of which was Alex
13  Kirk.
14     Q.  Did you go by and see him on
15  Tuesday to get --
16     A.  I attempted -- during that week of
17  the 15th I attempted maybe four times to do
18  so. I ultimately hooked up with him.
19     Q.  When did you hook up with him?
20     A.  Toward the end of the week I
21  hooked up with him.
22     Q.  Okay.
23     A.  He was very much -- again, he was
24  very much involved with the negotiating

Page 43

B. MARSAL - HIGHLY CONFIDENTIAL
1  process on the 32nd floor.
2     Q.  And is that the negotiating
3  process with respect to the Barclays sale?
4     A.  Yes.
5     Q.  When you eventually hooked up with
6  him, did he give you a description of the
7  deal?
8     A.  No.
9     Q.  What did you guys talk about?
10     A.  He was also in charge of the
11  proprietary asset portfolio, the private
12  equity portfolio which we own, which we had
13  roughly $14 billion worth of assets. And Alex
14  had suggested that he and a small team might
15  come over and work -- help us with the
16  wind-down of those assets. That was the --
17  that was the thrust of the conversation.
18     Q.  Okay. Let me show you another
19  document, which we'll mark as 484.
20        (Deposition Exhibit 484, e-mail
21     dated Wednesday, September 17, 2008,
22     marked for identification as of this
23     date.)
24        MR. GAFFEY: Can we go off the

Page 44

B. MARSAL - HIGHLY CONFIDENTIAL
1  record a second? Is that okay?
2        MR. THOMAS: Sure.
3        (Discussion held off the record.)
4  BY MR. THOMAS:
5     Q.  Do you recognize this as an e-mail
6  from Alex Kirk to yourself on Wednesday,
7  September 17th, 2008?
8     A.  I recognize it as an e-mail. I
9  don't recall it but I recognize it as an
10  e-mail.
11     Q.  I mean, you have no reason to
12  believe you didn't receive this e-mail?
13     A.  Yeah. I have -- I believe I
14  probably received this, yes.
15     Q.  Okay. Do you -- and the
16  subject -- the entire message really just says
17  "Need you ASAP."
18        Do you see that?
19     A.  (Witness nods.)
20     Q.  Do you know why he needed you?
21     A.  No.
22     Q.  Now, there's a couple e-mails --
23     A.  I shouldn't say that. Alex did
24  have -- there was -- a number of melting

Page 45

B. MARSAL - HIGHLY CONFIDENTIAL
1  assets were in the proprietary portfolio that
2  we were talking about. I mean, his assets,
3  funds that we had to make decisions on whether
4  we continued to fund or not continue to fund.
5  There were conversations with him about that.
6  I do not know whether that was the -- what he
7  was referring to ASAP.
8     Q.  Okay. So there's a couple e-mails
9  we looked at where he's sending out and saying
10  he wants to meet with you, but your
11  recollection is you didn't meet with him until
12  later in the week, Thursday or Friday?
13     A.  You know, I don't know when during
14  the week. I didn't -- my recollection would
15  be I didn't meet with him Monday. Sometime
16  between Monday and Friday I met with him.
17     Q.  Did you personally know any of the
18  individuals at Lehman prior to this
19  engagement?
20     A.  You know, Bart McDade's father and
21  I used to play golf together. We belong to
22  the same golf club. But it was the first time
23  I'd ever met Bart. And then Mark Shapiro, who
24  is -- was head of the restructuring group, the

Page 46

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    stress restructuring group at Lehman, I knew
3    him from business.
4        Q.    How did you know him from
5    business?
6        A.    Alvarez & Marsal does a lot of
7    business with the restructuring group at
8    Lehman. Historically.
9        Q.    Okay. Were you aware during that
10   week that certain Lehman executives were --
11   that were involved in the negotiations of the
12   sale transaction were also discussing
13   employment or negotiating employment with
14   Barclays, to come over to Barclays after the
15   sale?
16       A.    I did not know it but I had heard
17   rumors to that effect.
18       Q.    At the time you had -- and prior
19   to the closing you had heard rumors to that
20   effect?
21       A.    I had rumors to that effect. I
22   don't recall when but I had heard rumors to
23   that effect, yes, that there were employment
24   contracts provided.
25       Q.    And were you present at the Lehman

Page 47

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    board meeting on September 16th?
3        A.    I was present at a board meeting.
4    I don't know if it was the September 16th
5    meeting.
6        Q.    Were you present at the board
7    meeting which discussed this Barclay sale
8    transaction?
9        A.    You know, I do not -- I was not
10   asked for my opinion about this transaction so
11   I don't know what I would have -- whether I
12   attended that session or not. I could very
13   well have attended it.
14       Q.    Okay. Do you recall there being a
15   statement to the board to the effect that some
16   of the employees negotiating the Barclays
17   transaction were also seeking employment with
18   Barclays after it closes?
19           MR. GAFFEY:  Object to the form.
20       A.    I don't recall making the
21   statement.
22           MR. THOMAS:  Let me go ahead and
23       mark a document as 485.
24           (Deposition Exhibit 485, document
25       bearing production numbers AM 003237

Page 48

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    through AM 003238, marked for
3    identification as of this date.)
4    BY MR. THOMAS:
5        Q.    It's just over a page so, please,
6    take a moment to review the whole thing.
7           (Document review.)
8        A.    Okay.
9        Q.    Do you recall this e-mail?
10       A.    I do not recall the e-mail but I
11   believe it to have been sent to me.
12       Q.    Okay. And it's from James
13   Fogarty. He's someone who worked at Alvarez &
14   Marsal at the time?
15       A.    He was a team leader.
16       Q.    What does that mean, to be a team
17   leader?
18       A.    He was responsible for the TSA
19   agreement and the wind-down of the assets. At
20   this point in time he was responsible for the
21   wind-down and for accessing the information,
22   making sure that the technology and the
23   software systems were in place so that we
24   could update the accounting and gain -- and
25   begin to value the asset base.

Page 49

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        Q.    Did he also report back to the
3    Alvarez team on the status of deal discussions
4    with Barclays?
5        A.    He did. In this e-mail he
6    reported on the deal discussions as he was --
7    I don't know how he got the information but I
8    assume that he was -- this was information
9    that he had picked up. I don't know how.
10       Q.    Okay. And he sends it to a fairly
11   large group of people at Alvarez including
12   yourself. Is that the group of people --
13   would you characterize that as a particular
14   team at Alvarez?
15       A.    Each one of these people were team
16   leaders. I'm glad to go through that list, if
17   you would like, and find out what each person
18   did, if you would like.
19           I, at the top, am the chief
20   executive officer. Chief restructuring
21   officer at that time, later the chief
22   executive officer, CRO. John Suckow, he is
23   responsible for all claims management. So all
24   the liabilities of the Lehman receivership is
25   under his review. Steve Cohn is treasurer.

Page 50

B. MARSAL - HIGHLY CONFIDENTIAL

1  He's responsible for the cash, cash
2  management. David Coles was the chief
3  financial officer. His responsibility
4  obviously was financial and accounting
5  systems. Pietroforte, his responsibility was
6  real estate. He was co-head of the real
7  estate team and all real estate assets.
8  Daniel Ehrmann, he was responsible at that
9  time for the international asset portfolio,
10  anything we had offshore. Bill Fox, he was
11  responsible for accounting and accounting
12  systems. Bill Gordon, he was part of the
13  wind-down team, issues like moving a premises,
14  consolidation. Donaldson, he's responsible --
15  Jeff Donaldson, he's responsible for the
16  actual IT migration. Martin Winter, he was
17  responsible for the derivatives team. Peter
18  Briggs, he was responsible for the bank loan
19  team. Bob Hershan, he was HR head, the top.
20      So each of these team heads had a
21  role and what you'll find is these -- is that
22  they were trying to communicate updates on
23  where things were among the team heads.
24      Q.  So these are just the team heads

Page 51

B. MARSAL - HIGHLY CONFIDENTIAL

1  and there would be a number of people working
2  under each of these team heads in those
3  groups?
4      A.  Yes.
5      Q.  Okay.
6      A.  And not at that time because we
7  hadn't been able to recruit a lot of people by
8  September 20th. They were pretty much it at
9  that point in time.
10      Q.  Okay. Sometimes you use titles
11  like the CFO. Would that person be pretty
12  much acting as Lehman's CFO --
13      A.  Yes.
14      Q.  -- at this point in time?
15      A.  Not pretty much. They were.
16      Q.  Okay. And down below, the second
17  half of the e-mail has a description about --
18  do you understand it to be a description about
19  the Barclays transactions and the negotiations
20  going on?
21          MR. GAFFEY:  Where in the
22      document, Todd?
23          MR. THOMAS:  The second half of
24      the first page where it says

Page 52

B. MARSAL - HIGHLY CONFIDENTIAL

1  "Interesting details from this and other
2  reports:" And then it goes on to talk.
3      A.  Yeah. I mean, this is just sort
4  of like interesting but not relevant. The
5  relevant part was the first and the second
6  paragraph of this e-mail. The third was
7  tid-bits of information, gossip that he heard
8  in Akin Gump and pieces of information he got.
9  From where I don't know. You'll have to ask
10  him that question.
11      But the key parts of this e-mail,
12  as I was indicating, is the TSA, is the first
13  paragraph. We got to get the TSA, we got to
14  get the technology services agreement done, we
15  got to get that information. And Bob Hershan
16  saying, Well, what are we going to do with the
17  people. We got to tell the people what their
18  status is when they move over to the new
19  employer.
20      So the first and second was really
21  the thrust. The rest of this is just, Oh, by
22  the way, this is what I've heard.
23      Q.  You referred to it as gossip and
24  just what he heard --

Page 53

B. MARSAL - HIGHLY CONFIDENTIAL

1      A.  Just interesting points.
2      Q.  But do you know what his source of
3  information was and how he got it?
4      A.  I do not know the source of
5  information for these three, no.
6      Q.  Under the first bullet point there
7  where it says $200 million price reduction and
8  then it continues on, lower price reduction
9  rationale now conveying to Barclays
10  47.4 billion of securities and 45.5 billion of
11  liabilities for a net value of 1.9 billion. A
12  change from the earlier 72 billion in
13  securities and 68 billion of liabilities for a
14  net value of 4 billion.
15      Do you see that?
16      A.  Um-hum. Yes.
17      Q.  So that's not consistent with the
18  deal being a push, is it?
19          MR. GAFFEY:  Objection to the
20      form.
21      A.  I don't know what that all means
22  to him. Maybe you can decipher that. To this
23  day I don't know what this means.
24      Q.  Did it cause you any -- did any of

Page 54

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    those numbers cause you any concern about the
3    deal that was being negotiated?
4        A.    No.  No, what caused me concern
5    was the first point, which is the TSA.  To the
6    extent that I have access to the information
7    and the transaction information, I can
8    reinstruct whatever has happened.  That's my
9    focus at this point in the crisis.
10        Q.    The last bullet point on the page,
11    he writes, Mr. Fogarty writes, "Well said.
12    Daniel Golden of Akin Gump.  Clients holding
13    about 9 billion in bonds.  'We believe this
14    was a flawed sales process.  It benefits
15    Barclays and the federal government but not
16    the creditors of this estate'."
17        Did that -- reading that did you
18    have any reaction to that or being concerned
19    about not benefiting the creditors of the
20    estate?
21        A.    Did I have a reaction to Danny
22    Golden's representing a client saying this
23    client doesn't think he's getting paid enough
24    money for something?  Yeah, my reaction is
25    I -- that's pretty typical of what Danny

Page 55

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    Golden would say.
3        Q.    Well, it's also Mr. Fogarty saying
4    well said.  This is Mr. Fogarty's comment on
5    this.
6        A.    Yeah.
7        Q.    Did that cause you to question --
8        A.    You know, my concern was not that
9    this -- this transaction was done for a whole
10    host of reasons and those reasons were done --
11    were obviously in the minds of the people who
12    were negotiating it at the time.  It wasn't
13    for me to question whether Barclays got a good
14    deal or didn't get a good deal.  What was was
15    I wanted to make sure that we would have
16    access to the information, to the technology
17    to reconstruct the transactions surrounding
18    this estate.  The actual transaction with
19    Barclays was really not -- that was not,
20    again, under my purview.  Interesting to know,
21    but not relevant.  The first item is the
22    relevant item to me.
23        Q.    So even if Barclays was getting a
24    good deal, that wouldn't be relevant to you at
25    this time?

Page 56

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        A.    No.  Barclays getting a good deal,
3    I mean, it's all in the eyes of the beholder.
4    I mean, because Danny Golden or Jim Fogarty
5    don't believe it's a good deal, I mean, I'm
6    not negotiating the deal.  I don't know the
7    pros and cons, the pluses and minuses, nor do
8    they.  What I knew is I could not manage this
9    estate unless I had the fact base and the
10    information and the TSA.
11        Q.    You mentioned the deal was done
12    for a host of reasons.  Could you describe
13    what those reasons were?
14        A.    Well, it was described in court.
15    I mean, you had a national emergency, is what
16    was described I think by Harvey Miller when he
17    presented this to the judge, a national
18    economic crisis going on.  You had employee
19    jobs trying to be retained.  You had customer
20    custodial accounts that you were trying to be
21    responsible to those people who would have
22    been locked down had they not been able to get
23    their cash out of this company.
24        Those were the reasons that were
25    given in the court.  I was aware of those

Page 57

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    reasons.
3        Q.    And do you think those are
4    legitimate reasons, good reasons for a sale
5    going forward?
6        MR. GAFFEY:  Objection to the
7    form.  Do you want his opinion?
8        MR. THOMAS:  Yes.
9        MR. GAFFEY:  Objection.  You can
10    answer.
11        A.    I know my opinion of the
12    transaction was I wasn't living it.  I
13    didn't -- I wasn't in the negotiations at the
14    time.  I think that Barry Ridings said it the
15    best.  There were no options set for us at
16    that time.  There was no other sale options
17    for us.  And if we wanted to preserve -- if we
18    wanted to preserve the jobs and the value, we
19    needed to go forward with the transaction,
20    which was involving the assumption of
21    liabilities for an equal amount of assets and
22    live with it.  And I believe Barry Ridings was
23    telling us his view based on his review of the
24    transaction.
25        By the way, he was there before I

Page 58

1     B. MARSAL - HIGHLY CONFIDENTIAL
2     got there. So Barry had -- he had the
3     opportunity to assess the situation. He knew
4     whether there were other buyers out there.
5        Q.   Did you know Barry Ridings before
6     this?
7        A.   Yes.
8        Q.   Did you have --
9        A.   Barry Ridings is very active in
10    the restructuring community. So he would be
11    an investment banker like any number of six --
12    five or six other major investment banks that
13    would be called in to give valuation or
14    fairness opinions on transactions like this.
15       Q.   Do you have a positive
16    professional opinion of Mr. Ridings?
17       A.   Yes, I do.
18       Q.   Do you disagree with any of the
19    points that Mr. Miller made to the court or
20    that Mr. Ridings made concerning the need for
21    the transaction?
22          MR. GAFFEY: Object to the form.
23    At the time?
24       A.   I mean --
25          MR. GAFFEY: Wait, wait. I may

Page 59

1     B. MARSAL - HIGHLY CONFIDENTIAL
2     have a privilege issue.
3          MR. THOMAS: I'm asking his
4     opinion.
5        Q.   Do you currently?
6        A.   Do I currently believe -- I'm
7     sorry. I'm not sure I understand the
8     question.
9        Q.   Do you disagree with any of the
10    points that Mr. Miller made to the court or
11    Mr. Ridings made in terms of why the deal
12    needed to go forward?
13       A.   As to the points that I just -- as
14    to the points that I just outlined? I haven't
15    read their transcript so I'm not sure what
16    else was said.
17          But as to the points, I believe
18    that Harvey believed in his own mind that the
19    jobs -- it was important to try to save those
20    jobs. I believe that we were experiencing a
21    massive economic crisis at the time. I
22    believe that the -- having customer accounts
23    frozen would have had an adverse effect
24    deepening that situation. I believe all of
25    that. I also believe that when Barry Ridings

Page 60

1     B. MARSAL - HIGHLY CONFIDENTIAL
2     said there was no other interested party, I
3     believe that to be true.
4        Q.   And you believe those points that
5     were cited as reasons for going forward with
6     the deal were legitimate, reasonable points for
7     going forward with the deal?
8          MR. GAFFEY: Objection to form.
9        A.   At the time I believed that to be
10    reasonable. Today I don't think I would have
11    done this transaction, no.
12       Q.   And putting aside whether you
13    would have done the transaction, do you
14    believe that those are reasonable
15    considerations.
16       A.   Yes, I believe those are
17    reasonable considerations.
18          MR. GAFFEY: Todd, let me know
19    when you get to a natural breaking
20    point. No hurry.
21          MR. THOMAS: Okay.
22          (Deposition Exhibit 486, document
23    bearing production numbers AM 000864
24    through AM 000869 and AM 000935, marked
25    for identification as of this date.)

Page 61

1     B. MARSAL - HIGHLY CONFIDENTIAL
2     BY MR. THOMAS:
3        Q.   Let me go ahead and show you a
4     document we marked as 486. There you go.
5        A.   Um-hum.
6        Q.   Let me ask you first, do you
7     recognize this document?
8        A.   No.
9        Q.   Okay. And I'm not going to ask
10    you to read the whole thing, but it appears to
11    be an e-mail from someone at Weil Gotshal. Do
12    you understand that to be Lehman's outside
13    counsel for purposes of the Barclays
14    transactions, among other things?
15       A.   Yes.
16       Q.   And it's sent to a number of
17    people at Alvarez & Marsal.
18          Do you see that?
19       A.   Yes.
20       Q.   Dated Sunday, September 21st,
21    2008.
22          And the e-mail message says,
23    "Although this is not what you are ask for..."
24    I assume that's a typo "...what you asked for,
25    it might be helpful if you reviewed the

Page 62

1      B. MARSAL - HIGHLY CONFIDENTIAL
2  definition of purchased assets and excluded
3  assets in the purchase agreement together with
4  the first amendment and the clarification
5  letter, which is still being negotiated and
6  hence the continued confusion."
7          Do you see that?
8      A.  Yes.
9      Q.  Do you know why Weil was providing
10 this information about the negotiations and
11 the sale transaction to Alvarez at this time?
12         MR. GAFFEY:  Objection to form and
13 _  foundation.
14     A.  No.  The people involved here,
15 Jack McCarthy, is head of the private equity
16 team, the private equity proprietary
17 investments team, and Daniel Ehrmann was head
18 of the international assets team.  So if it
19 was directed to those two, I would assume the
20 assets -- it involves those assets.
21     Q.  And who is Mr. -- what was
22 Mr. Cohen doing again?
23     A.  Mr. Cohen works for Jack McCarthy.
24 He's on the -- he's on Cohen's -- Cohen is on
25 McCarthy's team.

Page 63

1      B. MARSAL - HIGHLY CONFIDENTIAL
2      Q.  Okay.  Let me show you a document
3  we'll mark as 487.
4          (Deposition Exhibit 487, document
5      bearing production numbers AM 003240
6      through AM 003241, marked for
7      identification as of this date.)
8  BY MR. THOMAS:
9      Q.  This is an e-mail chain, the top
10 of which is dated Monday, September 22nd.  But
11 down below there's an earlier e-mail, appears
12 to be an earlier e-mail from Jim Fogarty to
13 you and others at Alvarez dated Sunday,
14 September 21st, 2008.
15         Do you see that?
16     A.  Yes.
17     Q.  Do you remember receiving this
18 e-mail?
19     A.  I didn't receive this.  I received
20 the --
21     Q.  The lower one?
22     A.  The lower e-mail, yes.  I
23 remember -- I don't remember the e-mail but I
24 remember the points in the e-mail.
25     Q.  Okay.  And have you seen this

Page 64

1      B. MARSAL - HIGHLY CONFIDENTIAL
2  document recently?
3      A.  No.
4      Q.  Down below there's an -- it
5  appears to be Jim Fogarty reporting on "huge
6  problems encountered in the Barclays deal."
7          Do you see that?
8  -   A.  Yes.
9      Q.  So he -- Mr. Fogarty is updating
10 you and others at Alvarez concerning what's
11 going on with the Barclays transaction,
12 transaction negotiations?
13         MR. GAFFEY:  Objection to form.
14 You can answer.
15     A.  Yes.
16     Q.  His third paragraph in the e-mail
17 to you underneath Bryan, it says "The M&A deal
18 was that Barclays was getting about 47 billion
19 in trading assets and assuming 46 billion in
20 trading liabilities."
21         Do you see that?
22     A.  Yes.
23     Q.  Are you familiar with that -- do
24 you know what was in that 47 billion number?
25     A.  No.

Page 65

1      B. MARSAL - HIGHLY CONFIDENTIAL
2      Q.  Okay.  He goes on to say that
3  "Barclays had a back-stop letter in place on
4  trading obligations.  Barclays does not have
5  that kind of capital.  So playing it out, this
6  has the potential to not only tank our deal
7  but tank Barclays."
8          Do you see that?
9      A.  Yes.
10     Q.  Do you agree that Barclays was
11 taking a lot of risk in doing this transaction
12 at this point in time?
13         MR. GAFFEY:  Objection to the
14     form.  You want his opinion?
15     A.  I don't know what -- I didn't know
16 at that point in time what the risk was.  What
17 I was told was that not all the money -- all
18 the money didn't arrive at Barclays that was
19 supposed to arrive at Barclays.
20         From that -- you know, would I
21 assume that a multi-billion dollar hit would
22 hurt Barclays?  Yes, I would have in that
23 environment.
24     Q.  Um-hum.
25     A.  In the environment we were in at

Page 66

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    that time, yes, I would assume it would hurt
3    Barclays.
4        Q.   And more generally, would you
5    agree that stepping in taking -- taking
6    Lehman's position on a lot of these securities
7    and assets -- doing this transaction at this
8    point in time, this market, also had a lot of
9    risk for Barclays?
10        MR. GAFFEY:  Object to form.
11        A.   You know, I would assume that
12    Barclays is not going to take the assets
13    except if they believe in the market value of
14    the assets.  I assume they wouldn't go forward
15    with it unless they believed in the market
16    value of the assets.
17        Q.   Um-hum.
18        A.   I certainly would not in a
19    bankruptcy ever expect Barclays as well
20    counseled as they are ever to do a transaction
21    unless they had a pretty good handle on the
22    valuation of the assets.
23        MR. GAFFEY:  Could we take a few
24    minute break?
25        MR. THOMAS:  Okay, sure.

Page 67

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        THE VIDEOGRAPHER:  The time is
3    11:11.  We're going off the record.
4        (Recess taken.)
5        THE VIDEOGRAPHER:  The time is
6    11:17.  We are back on the record.
7    BY MR. THOMAS:
8        Q.   Let me go ahead and show you a
9    document we'll mark as 488.
10        (Deposition Exhibit 488, document
11    bearing production number AM 002737,
12    marked for identification as of this
13    date.)
14    BY MR. THOMAS:
15        Q.   It appears to be an e-mail --
16        MR. GAFFEY:  I don't think I have
17    a copy of that, Todd.
18        MR. THOMAS:  Oh, sorry.
19        Q.   This appears to be an e-mail from
20    Jim Fogarty to you and a number of others at
21    Alvarez & Marsal dated September 22nd, 2008.
22    Do you recognize it as such?
23        A.   I recognize it as such.
24        Q.   Okay.  And the first line is,
25    "Bryan, keeping you posted."

Page 68

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        And then it goes on to discuss
3    some discussions over at Weil Gotshal
4    concerning JPM.
5        Do you see that?
6        A.   Yes.
7        Q.   Is it fair to say that -- well,
8    strike that.
9        Does this -- do these documents
10    refresh your recollection that Mr. Fogarty was
11    tasked with informing you and others at
12    Alvarez concerning the status of negotiations
13    of the Barclays deal?
14        MR. GAFFEY:  Object to the form.
15    He hasn't expressed a failure of
16    recollection.
17        A.   No.  What this would tell me is
18    that Mr. Fogarty was -- Mr. Fogarty's task was
19    the TSA resolution.  That was Mr. Fogarty's
20    task.  The fact that he has thrown in other
21    information is interesting but his task was to
22    preserve and to provide a TSA agreement which
23    would support the job that we had been given.
24        Q.   Okay.  Let me go ahead and show
25    you another document.

Page 69

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        (Deposition Exhibit 489, document
3    headed A.39, marked for identification
4    as of this date.)
5    BY MR. THOMAS:
6        Q.   Let me show you another document
7    we'll mark as Exhibit 489.
8        A.   Okay.
9        Q.   This is a document entitled
10    Minutes of the Board of Directors, September
11    16th, 2008.
12        Do you recall whether you attended
13    this meeting of the board?
14        A.   I do not know if I attended this
15    meeting.  If I could read this, maybe I
16    could -- maybe that's what I should do as
17    opposed to --
18        Q.   I'm going to --
19        A.   I was not hired officially by the
20    company -- the reason I'm apprehensive, I
21    wasn't really hired by the company until the
22    contract was signed on Thursday.  So this is
23    dated September 16th.  So I'm not sure what
24    capacity I was in when this meeting took
25    place.  But I had not been retained by the

Page 70

B. MARSAL - HIGHLY CONFIDENTIAL
1
2    company to that point in time.
3        Q.    Okay.  Well, I'm just going to ask
4    you about a section on page 3.
5        A.    Okay.
6        Q.    And just see if this triggers any
7    memories.
8            The second paragraph says,
9    "Mr. Roberts..." who I believe is an attorney
10    at Weil Gotshal "...resumed by describing that
11    it is a condition to the transaction that
12    eight specific firm employees enter into
13    employment agreements with Barclays. He
14    stated that Mr. McGee was one of those
15    employees. So interested firm employees were
16    involved in the transaction negotiations on
17    behalf of the firm."
18        Do you recall whether --
19        A.    I don't know who Mr. McGee is.
20        Q.    Okay.  Skip McGee you don't know?
21        A.    No.  Never met him.  Never worked
22    with him.  I'm not sure what area he had
23    responsibility for.
24        Q.    Right.  And do you know the other
25    eight -- did you know that the transaction

Page 71

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    actually required eight specific firm
3    employees?
4        A.    No, I did not.
5        Q.    -- to enter into employment
6    contracts?
7        A.    I subsequently found out that
8    there were contracts.  I don't know about
9    eight, but I subsequently have found out about
10    it, yes.
11        Q.    Did you know that the board had
12    been apprised of that on the 16th?
13        MR. GAFFEY:  Time period?  Excuse
14        me.  Did he know --
15        MR. THOMAS:  You can't cover
16        facts.  If he knows something, just
17        because he learned it from you doesn't
18        make it privileged.
19        MR. GAFFEY:  You can answer that
20        yes or no.
21        Q.    Did you know the board was
22    apprised of the fact that interested firm
23    employees were involved in a transaction
24    negotiation on behalf of the firm and that the
25    transaction actually required a certain number

Page 72

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    of specific firm employees to enter employment
3    agreements?
4        A.    I suspect I would, but I do not
5    recall.  I do not recall.  I suspect I would
6    if that was, in fact, the case.
7        Q.    Okay.
8        A.    If I attended this meeting.  I
9    don't know if I attended this meeting.  Does
10    it say whether I did or not?
11        Q.    I'm not sure whether you did or
12    not.  I don't believe you're listed.  But I
13    was -- whether you did or not, I was just
14    wondering whether you were aware of that.
15    Because you had mentioned earlier you thought
16    you had heard rumors to that effect during
17    this week, and I was just wondering if this
18    refreshed your recollection about whether you
19    knew that for sure or not.
20        MR. GAFFEY:  Object to the form.
21        He's not expressed a failure of
22        recollection.  You can answer.
23        A.    No.  I'm not really sure -- I'm
24    not really sure what the question is you're
25    asking.  What I told you is -- why don't you

Page 73

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    ask the question again.  Excuse me.
3        Q.    Sure.  Okay.
4            Does this refresh your
5    recollection that you were aware that
6    supposedly interested firm employees were
7    involved in the Barclays sale negotiation?  By
8    interested, meaning employees that were
9    negotiating or entering employment contracts
10    with Barclays.
11        MR. GAFFEY:  Same objection.  You
12        can answer.
13        A.    I eventually became aware of the
14    fact that employees who were negotiating the
15    Barclays transaction, some of those employees
16    I'd been led to believe, but it wasn't -- I
17    haven't got specific knowledge of that, also
18    were offered contracts.  Some of them may have
19    signed those contracts.
20            I know Alex Kirk had indicated to
21    me that something like that was going to be
22    happening and he wasn't going to join.  So on
23    that score I did know that there was some kind
24    of conversations taking place.
25        Q.    And to the best of your

Page 74

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    recollection you were aware of that sometime
3    that week?
4        A.    Sometime -- well, I was aware of
5    what? I was aware of the fact that there were
6    discussions. Who was involved, who was
7    getting contracts, no, I was not aware of
8    that. I was aware that there were contracts
9    going to be offered to senior employees, which
10   would be standard, by the way, which would be
11   fairly typical in most M&A transactions. You
12   wouldn't want to lose your senior management
13   team.
14       Q.    My next question was going to be
15   just that; did that fact cause you any concern
16   to the extent you learned it that week?
17       A.    It did not cause me -- it caused
18   me -- I did not know who was receiving those
19   contracts. My assumption was that there was
20   somebody watching this transaction, that there
21   was somebody who was not conflicted that was
22   reviewing the transaction that was recusing
23   themselves from it.
24       Q.    And at any point did you
25   investigate that issue prior to the sale

Page 75

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    closing?
3        A.    No, no.
4        Q.    Do you believe that Mr. Kirk or
5    the other senior employees at Lehman who were
6    involved in the sale negotiations were
7    breaching their fiduciary duty to Lehman?
8            MR. GAFFEY: Objection to form.
9        Calls for a legal conclusion. Do you
10       want a legal opinion?
11       A.    I had no -- I had no basis to
12   reach any conclusion like that. What I knew
13   was Alex Kirk told me he was not going with
14   the Barclays transaction and thus he was
15   looking for -- was I interested in hiring he
16   and a team to go work the proprietary asset
17   portfolio in the wind-down. That was the
18   conversation with Kirk.
19       Q.    And as you sit here today do you
20   believe Mr. Kirk breached his fiduciary duties
21   to Lehman in any way?
22           MR. GAFFEY: Objection to the
23       form. Calls for a legal conclusion.
24       A.    I don't know what Mr. Kirk did or
25   didn't do. I have no reason to -- I have no

Page 76

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    basis to reach a conclusion today on that
3    score. I would have -- I mean, I -- I mean,
4    Alex Kirk did not go with Barclays.
5        Q.    Do you have any reason to believe
6    that --
7        A.    I don't know. Did Alex Kirk
8    receive any compensation from Barclays?
9        Q.    Do you have any reason to believe
10   that any of the Lehman executives involved in
11   negotiating the Barclays deal breached their
12   fiduciary duty to Lehman?
13           MR. GAFFEY: Objection to the
14       form.
15       A.    I don't have any evidence. I
16   don't have any facts one way or the other.
17       Q.    Let me go ahead and show you the
18   next document which we'll mark as 490.
19           (Deposition Exhibit 490, document
20       bearing production numbers AM 001683
21       through AM 001685, marked for
22       identification as of this date.)
23           (Document review.)
24       A.    Okay.
25       Q.    Do you recognize the document?

Page 77

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        A.    No.
3        Q.    Okay.
4        A.    And I have no reason to believe
5    that it isn't as represented, though.
6        Q.    Okay. An e-mail from Jamie
7    Schwartz to you and a number of others at
8    Alvarez & Marsal concerning the Barclays sale
9    transaction?
10       A.    Yes.
11       Q.    And who is Jamie Schwartz?
12       A.    Jamie Schwartz is an analyst on
13   the wind-down team.
14       Q.    Okay. Now, this is an e-mail with
15   attachments that appear specifically to be
16   addressing the Barclays transaction; is that
17   right?
18       A.    It says Excluded real estate
19   assets of Barclays transaction. And then
20   Holdings Barclays deal Cliff notes
21   exclusion/inclusion of assets and liabilities
22   I assume.
23       Q.    All right. It says "Jim had me
24   prepare the attached Cliff note summary of the
25   Barclays deal capturing excluded assets and

Page 78

1       B. MARSAL - HIGHLY CONFIDENTIAL
2    liabilities, ours, and included assets and
3    assumed liabilities, theirs."
4           Do you see that? On the e-mail?
5       A.   On e-mail?
6       Q.   Yeah.
7       A.   Yes, okay. Yes, I see that.
8       Q.   Okay. So this was an effort by --
9    excuse me -- someone at Alvarez to summarize
10   the Barclays transaction?
11          MR. GAFFEY: Objection to form.
12   You can answer though.
13      A.   To summarize, yes.
14      Q.   And if you would, look, please --
15      A.   Not a very clear summary I might
16   add but a summary.
17      Q.   Okay.
18      A.   Jamie is also -- he's a junior
19   analyst. Not surprising. Did a good job but
20   not what you would normally have from Alvarez
21   & Marsal.
22      Q.   Okay. On the last page of this
23   document --
24      A.   Um-hum.
25      Q.   -- where it's entitled Holding

Page 79

1       B. MARSAL - HIGHLY CONFIDENTIAL
2    Barclays Deal Cliff Notes.
3       A.   Okay.
4       Q.   Do you see where it says "Included
5    assets, trading assets 47 billion long"?
6       A.   Yes. I see that.
7       Q.   Are you aware that the number
8    47.4 billion was referenced by Weil's -- Weil
9    Gotshal in the sale hearing for the Barclays
10   transaction with respect to long assets?
11      A.   I'm not aware of it. I was not
12   aware of it at the time. I'm aware of it
13   today.        -
14      Q.   Okay. When did you first become
15   aware of that figure that was mentioned to the
16   court?
17      A.   Oh, sometime probably -- probably
18   in the briefing of the last couple of weeks in
19   talking about this specific number.
20      Q.   Okay. Do you have an
21   understanding of how that number was
22   derived --
23      A.   No, I do not.
24      Q.   Do you have an idea what it refers
25   to, what class of assets it refers to?

Page 80

1       B. MARSAL - HIGHLY CONFIDENTIAL
2       A.   I do not.
3       Q.   Okay. Down at the last bullet
4    under Included Assets -- actually, under
5    Assumed Liabilities where it says Employee
6    Bonus/Severance Liability.
7           Do you see that?
8       A.   Employee Bonus -- yes, Employee
9    Liabilities.
10      Q.   Yes.
11      A.   Other than the 2.5 billion -- no.
12      Q.   Well, and then over to the right
13   it says Employee/Severance Liability.
14      A.   Right. Yes.
15      Q.   Earlier in your testimony I
16   believe you -- in discussing the liabilities
17   that was going to be assumed you mentioned
18   something -- a liability with respect to
19   compensation.
20          Do you recall that?
21      A.   Yes.
22      Q.   Was it your understanding that
23   that number with respect to compensation was
24   for employee bonus and severance liability?
25      A.   Yes.

Page 81

1       B. MARSAL - HIGHLY CONFIDENTIAL
2       Q.   Let me go ahead and show you a
3    document we'll mark as 491.
4           (Deposition Exhibit 491, document
5        bearing production numbers WGM-LEHMAN-E
6        00011676 through WGM-LEHMAN-E 00011678,
7        marked for identification as of this
8        date.)
9    BY MR. THOMAS:
10      Q.   Please take a moment to review the
11   two-page e-mail.
12          (Document review.)
13      A.   Okay.
14      Q.   Okay. The original in time e-mail
15   from James Fogarty -- well, first of all, do
16   you recognize this document?
17      A.   I do not.
18      Q.   Okay.
19      A.   But again I have reason to believe
20   it would be sent to me.
21      Q.   Okay. The first in time e-mail
22   from James Fogarty on September 26 to --
23   copying yourself to a number of individuals
24   including some at Lehman -- I mean, excuse
25   me -- including some at Alvarez & Marsal

Page 82

1       B. MARSAL - HIGHLY CONFIDENTIAL
2    starts at the bottom of the page and contains
3    a description of the Barclays sales
4    transaction.
5           Do you see that?
6       A.  I'm sorry.  Which one are you
7    referring to?  Which memo are you --
8       Q.  The earliest e-mail in time which
9    begins at the bottom of the first page, that
10   is from Mr. Fogarty dated September 26.
11      A.  Yes.  This wasn't to me.  This was
12   to Jim Fogarty -- or was it -- did he e-mail
13   me?  Yeah, I guess I'm on circulation.
14           Okay.  I'm sorry.  What was your
15   question?
16      Q.  Okay.  I was just pointing your
17   attention.  Do you recognize this as an e-mail
18   to you from Jim Fogarty dated September 26?
19      A.  I do not but I have no reason to
20   believe it is not.
21      Q.  If you turn the page -- have you
22   had a chance to review this e-mail?
23      A.  Yes.  I just read it.
24      Q.  Okay.  And the e-mail is generally
25   describing the Barclays sales transaction; is

Page 83

1       B. MARSAL - HIGHLY CONFIDENTIAL
2    that correct?
3       A.  Yes.  Um-hum.
4       Q.  Okay.  For instance, on the second
5    page, near the top it says Schedule A, a list
6    of securities transferred under the Barclays
7    repo agreement and then it refers 44 billion
8    in collateral.
9           Do you see that?
10      A.  Yes.
11      Q.  And the discussion goes on and two
12   paragraphs down he writes, "Check my thinking
13   but the 44 billion is match booked through the
14   unwind of the repo."
15           Do you see that?
16      A.  Yes.
17      Q.  What is your understanding of what
18   he meant by that?
19      A.  I don't know what that means.
20           MR. GAFFEY:  Objection to the
21    form.  You can answer.
22      A.  I do not know what that means.
23      Q.  Okay.  "And thus we transferred
24   net long value of 2.3 billion plus whatever is
25   to be transferred Monday out of the agreed --

Page 84

1       B. MARSAL - HIGHLY CONFIDENTIAL
2    everything in the unencumbered box."
3           Did you then or do you now have an
4    understanding of what he's referring to?
5       A.  Do not know now and, I mean, I'm
6    hopeful of gaining through the information I'm
7    going to get eventually in this case to be
8    able to answer that question, yes.
9       Q.  And just specifically the
10   reference to net long value of 2.3 billion, do
11   you have an understanding of what he's saying
12   in terms of --
13      A.  No.
14      Q.  Do you recall if you -- when you
15   got this if you didn't understand it would you
16   have asked someone about it?
17      A.  No.  I mean, this was, again, a
18   pretty low priority item from my perspective.
19   I mean, the issues were not -- this is a
20   transaction which we were not -- this was not
21   within our purview.  It was a transaction
22   which would im -- to the extent that there
23   were problems with this transaction, as long
24   as we preserved the data, as long as we
25   understood what was transferred around, if

Page 85

1       B. MARSAL - HIGHLY CONFIDENTIAL
2    there were mistakes at the end of that day
3    that preservation of that data would permit us
4    to come back and to sit down and to talk about
5    this.
6           From my perspective, this was a
7    transaction that was a done deal.  What I
8    needed to focus on was the TSA.  I needed to
9    focus on access to information and once we got
10   that information we could reconstruct anything
11   we needed to reconstruct against any of the
12   clearing banks, against any transaction that
13   took place within the 90-day time period of
14   the bankruptcy filing.
15      Q.  Was that your view, that you could
16   basically just consider these issues up
17   through 90 days and figure out --
18      A.  No, back 90 days from the filing.
19      Q.  Okay.  Sorry.
20           Do you recall any follow-up with
21   Mr. Fogarty or anyone else concerning the
22   substance of what he's conveying to you here?
23      A.  Again, during the first period
24   following the proceeding, the most important
25   issues that we had to deal with was the

Page 86

1      B. MARSAL - HIGHLY CONFIDENTIAL
2    preservation of the data, was getting access
3    to the inventory of assets, dealing with those
4    key melting assets that we had. And as you
5    may or may not recall, I don't know to what
6    extent you got to know the testimony, there
7    was just a slew of creditors who wanted
8    information. Where's the status of my
9    transaction. And the judge insisted upon
10   trying to help these people to the best of our
11   abilities to try and get the information that
12   they were requesting.
13        So we were in a period of -- that
14   period of this was followed by -- and, by the
15   way, during this period, just as an aside, the
16   only discussions we had with Barclays was not
17   about whether this transaction was good or bad
18   or whether they'd given us adequate securities
19   or whatever the issues you've raised earlier.
20   The issue was always in all the meetings we
21   had with Jonathan and others, of Barclays, was
22   relating to the TSA, relating to the
23   technology -- relating to the accounting
24   information.
25        And, in fact, it wasn't until

Page 87

1      B. MARSAL - HIGHLY CONFIDENTIAL
2    mid-November when we -- when Jonathan saw the
3    complaint that we had drafted that we were
4    going to bankruptcy court with it that we
5    caught the attention of senior management.
6    And senior management basically apologized for
7    the fact that there were parts of Barclays
8    which we're trying to protect the integrity of
9    their system but were indifferent to the
10   commitments that had been made by Barclays
11   senior management.
12        And Barclays in mid-November did a
13   complete turn-around. They became very
14   cooperative with us following our threatening
15   to take them before Judge Peck for violation
16   of the TSA. And then really -- until that
17   information started to flow, we didn't have
18   accounting information. We didn't have
19   records. We didn't have -- we didn't have a
20   lot of the information that we later got which
21   was in the -- which was really in the late
22   December, early January time frame which is
23   when we were able to shift gears to another
24   part of this which is to start to ask
25   questions about what had happened, what was

Page 88

1      B. MARSAL - HIGHLY CONFIDENTIAL
2    going on here, because the numbers were not
3    jiving with what -- the numbers that we had
4    been provided.
5    Q.   Mr. Fogarty goes on a little
6    further down under a few thoughts. The first
7    bullet point and about mid way through that
8    bullet point -- well, the full bullet point,
9    "After you guys spend a little time with these
10   things we should probably arrange a call with
11   the Barclays guys, a/k/a former Lehman, the
12   guys at the table early Monday morning were
13   apparently Paolo and Alex Kirk and Weil, to
14   make sure we all understand these details and
15   make sure these are disseminated appropriately
16   through Barclays so there is no confusion
17   about what stuff be ours and to ensure
18   appropriate security controls which the TSA
19   requires they keep."
20        Was it important for you
21   operationally to make sure you understood as
22   soon as possible which assets had been
23   transferred to Barclays and which had stayed
24   with Lehman?
25        MR. GAFFEY: Object to the form.

Page 89

1      B. MARSAL - HIGHLY CONFIDENTIAL
2    A.   It was important for us to get
3    access to the accounting information. And
4    we -- and part of that account information we
5    would capture what assets were transferred or
6    not transferred. It would be essential that
7    we capture that information.
8    Q.   Including the information about
9    what was transferred as part of the
10   transaction and what wasn't.
11   A.   Yes. Yes. Yes.
12   Q.   Okay.
13        (Deposition Exhibit 492, document
14   bearing production numbers
15   BCI-EX-(S)-00021769 through
16   BCI-EX-(S)-00021771, marked for
17   identification as of this date.)
18   BY MR. THOMAS:
19   Q.   Let me show you a document we'll
20   mark as 492.
21   A.   Um-hunh.
22        (Document review.)
23   Q.   This appears to be an e-mail chain
24   dated September 28th, 2008. And appears that
25   you're a recipient at least on the early

Page 90

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  e-mails although not the last most recent one
3  in time.
4        Do you see that?
5    A.  Yes.
6    Q.  And no reason to believe you
7  didn't get this e-mail.
8    A.  Correct.
9    Q.  The earliest in time is an e-mail
10  from Rod Miller to Jim Fogarty, yourself, and
11  a number of other people concerning the 15c3-3
12  account progress LBI funds.
13        Do you see that?
14    A.  Yes.
15    Q.  Mid way through this e-mail he
16  says -- asks, "Were you able to make a headway
17  on the 1 billion of the 15c3-3 cash at Wells
18  Fargo?"
19        Do you see that?
20    A.  Yes.
21    Q.  Do you recall what the issue was
22  there?
23    A.  No.
24    Q.  Do you recall that 15c3-3
25  securities were transferred to Barclays as

Page 91

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  part of the transaction?
3    A.  I didn't -- I have no -- I had no
4  idea at this time what 15c3-3 even meant.
5    Q.  Okay.
6        Do you recall any discussions
7  or -- discussions with Wells Fargo about
8  those --
9    A.  I didn't have any discussions with
10  them and I don't recall having discussions
11  with Wells Fargo with Steve Cohn.  Steve Cohn
12  is the treasurer.
13    Q.  Okay.  Let me show you another
14  document we'll mark as 493.
15        (Deposition Exhibit 493, document
16    bearing production numbers AM 001695
17    through AM 00167 with attachment, marked
18    for identification as of this date.)
19        MR. GAFFEY:  Todd, the first three
20    pages of this are Bates numbered but the
21    remainder are not.  Is there any reason
22    for that?
23        MR. KRISBERGH:  I believe because
24    they were produced in native format they
25    won't be Bates stamped but they are

Page 92

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  attachments.
3        MR. GAFFEY:  That's the attachment
4    to the native format.
5        MR. KRISBERGH:  Yeah.
6        MR. THOMAS:  I'm told those are
7    the attachments.  I think they're the
8    attachments.  I'm not going to ask about
9    the attachments though so...
10        MR. GAFFEY:  Okay.
11  BY MR. THOMAS:
12    Q.  Do you recognize this as a
13  September 29th, 2008 e-mail from Jim Fogarty
14  to a number of people at Alvarez including
15  yourself?
16    A.  I don't recall this document but I
17  believe it to be a document that was sent to
18  me.
19    Q.  Okay.  Mr. Fogarty writes, "I
20  believe this is the final securities
21  collateral file.  We discussed securities to
22  move on Monday.  Looks like another
23  .3 billion.  This is on top of the 2.3 billion
24  in prior files for a total of 2.6 billion in
25  addition to the unwind of the 44 billion repo

Page 93

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  with Barclays."
3        Do you see that?
4    A.  Yes.
5    Q.  Do you remember this issue that's
6  being discussed with respect to these
7  transfers?
8    A.  No.
9    Q.  Do you know why Mr. Fogarty was
10  following these issues?
11    A.  You'd have to ask Jim.  It would
12  be good order to try and gather this
13  information.  I mean, I would say he would try
14  to gather this information.  But this again
15  was not a priority at this point in time.
16        Gathering this information to act
17  upon it at another point in time would be I
18  think common sense but this was not his
19  priority.  His priority at this time was the
20  TSA and shortly thereafter the derivatives
21  booked.
22    Q.  But, again, even for operational
23  purposes it's important to know which assets
24  were transferred over to Barclays and which
25  weren't.

Page 94

B. MARSAL - HIGHLY CONFIDENTIAL

1
2     A.    Well, these were LBI assets. As
3  you undoubtedly know, these were LBI assets
4  and these were not -- the LBI assets were not
5  under our purview. So this was interesting to
6  know but this is for another day so that we
7  could sit back and find out what the heck
8  happened with this transaction. As long as we
9  captured the data and captured the information
10 that was priority number one. Acting upon it
11 was not priority one.
12    Q.    Well, putting aside acting on it,
13 when you try to -- there's a lot of e-mails
14 we've looked at, documents, discussing
15 assessing parts of the Barclays transaction.
16 The fact that it was -- involved LBI assets
17 that still had a big impact on the LBHI
18 estate, correct? The transaction.
19    A.    It had an impact on the estate,
20 yes.
21    Q.    I mean, it was important to the
22 estate.
23    A.    I view LBI as ultimately an asset
24 of the -- any positives would flow up to the
25 holding company level, yes.

Page 95

B. MARSAL - HIGHLY CONFIDENTIAL

1
2     Q.    So even if there were LBI assets
3  that went over, it's still important for LBHI
4  holding company to understand what assets went
5  over?
6     A.    Ultimately -- yeah, ultimately we
7  intend to go through -- the same forensic
8  activity that we went through on LBH we intend
9  to go through on LBI. So the preservation of
10 the data. But the most immediate was -- the
11 most immediate problem was the preservation of
12 the data, not to take action; not to
13 second-guess what was going on on other fronts
14 but to save that data so that we could review
15 what happened on those other fronts.
16    Q.    But it was also to understand the
17 sales transaction and what assets and
18 liabilities went over and which stayed,
19 correct?
20    A.    Yes. Yes.
21    Q.    Let me go ahead and show you the
22 next document which is 494. Maybe.
23        (Pause on the record.)
24        MR. THOMAS: Let's go off the
25 record for a moment, please.

Page 96

B. MARSAL - HIGHLY CONFIDENTIAL

1
2        THE VIDEOGRAPHER: The time is
3  11:51. We are going off the record.
4        THE CHAIRMAN: The time is 11:59.
5  We are back on the record.
6  BY MR. THOMAS:
7     Q.    Let me show you a document that
8  we've previously marked as 464A.
9        (Document review.)
10    Q.    And this is an e-mail chain with
11 attachments from Bill Gordon at Alvarez to a
12 number of other folks at Alvarez dated
13 September 29th, 2008. Does that appear to be
14 accurate to you?
15    A.    Yeah, I -- yes. It wasn't
16 addressed to me, though.
17    Q.    Right. I see that.
18        And would you remind me, what was
19 Bill Gordon working on at this --
20    A.    He was head of the TSA team.
21    Q.    Okay. And the subject line of
22 this e-mail chain is Here is all we have at
23 the moment that makes an effort to describe
24 what Barclays got and didn't get.
25        And looking at this, do you

Page 97

B. MARSAL - HIGHLY CONFIDENTIAL

1
2  understand this -- well, first of all,
3  there's -- the original e-mail appears to be
4  from Glenn West on the second page.
5        Do you see that?
6     A.    Yeah. Right. On the first page
7  it says Glenn West to Weil Gotshal.
8     Q.    Weil Gotshal, right.
9     A.    Right.
10    Q.    And then you have Weil Gotshal --
11 Weil Gotshal sending the information to a
12 number of people at Alvarez & Marsal including
13 J. McCarthy --
14    A.    To Jack McCarthy, head of the
15 proprietary investments team and Daniel
16 Ehrmann, head of the international team.
17    Q.    Um-hum. This is a description of
18 what Barclays got and didn't get as part of
19 the sale transaction provided to Alvarez &
20 Marsal from Weil Gotshal; is that right?
21        MR. GAFFEY: Object to the form.
22 Foundation.
23    A.    Yes.
24    Q.    And if you would turn to the third
25 page, please, with the Bates stamp number

25

Page 98

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    ending in 2289 at the bottom.
3    A.    I don't have such a page.
4    MR. GAFFEY: I don't have the page
5    in mine either.
6    Q.    Okay. So the third page which
7    says General Information Regarding the Lehman
8    Transaction.
9    MR. GAFFEY: There's no 2289 in
10    these copies, Todd.
11    MR. THOMAS: Can I see that,
12    please?
13    THE WITNESS: Sure.
14    MR. GAFFEY: Actually, just 89
15    through 92 are missing in this one.
16    MR. ROTHMAN: Actually, it's in
17    the back. It's out order.
18    MR. THOMAS: Oh, they're out of
19    sequence, yeah. You know, I'm going to
20    go ahead and proceed recognizing that
21    the attachments to the document may be
22    out of order.
23    MR. GAFFEY: You know, let's just
24    take one second and clip it or something
25    and put it in the right order.

Page 99

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    MR. THOMAS: Well, the document
3    was previously marked as an exhibit.
4    MR. GAFFEY: Okay. It doesn't
5    matter.
6    BY MR. THOMAS:
7    Q.    Just understand that the
8    attachments are out of sequence.
9    A.    2289?
10    Q.    Yes.
11    A.    Okay.
12    Q.    And you see at the top it says
13    General Information Regarding the Lehman
14    Transaction.
15    A.    Um-hum, yes.
16    Q.    And then the last bullet it says,
17    "During the period of 60 days following the
18    closing Barclays has the right to assume or
19    reject contracts that are related to the
20    assets that it has purchased from the Lehman
21    entities."
22    Do you see that?
23    A.    Yes.
24    Q.    Did you understand that Barclays
25    was -- did not have an obligation to assume

Page 100

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    any particular contracts and that it was up to
3    them as to whether they assumed the contracts
4    or not?
5    MR. GAFFEY: Wait a second.
6    Object to the form.
7    A.    I don't know.
8    MR. GAFFEY: Foundation. Since he
9    hasn't seen this document before and
10    you're calling for a legal conclusion.
11    You can answer the question.
12    A.    I don't know. I mean, I don't
13    know what this -- what this relates to. I
14    don't know what liabilities -- they were
15    assuming certain liabilities in the contract.
16    I don't know what -- how do these liabilities
17    relate to those, I don't know.
18    Q.    Have you ever reviewed LBHI's Rule
19    60 motion filed with the bankruptcy court?
20    A.    No.
21    Q.    Are you aware generally of the
22    terms of the Barclays sales transaction?
23    A.    As I outlined it earlier, yes.
24    Q.    Okay. Let's turn the page -- I'm
25    going to spend a few minutes on these pages.

Page 101

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    A.    Okay.
3    Q.    On the next page which is 2290.
4    A.    Okay.
5    Q.    At the top it says, "The table
6    below indicates the status of assets,
7    products, agreements, business and
8    infrastructure after the closing." And then
9    there's a chart and column that says Purchased
10    Assets and a column that says Excluded Assets
11    and then a column that Barclays May Assume or
12    Reject.
13    Do you see those columns?
14    A.    Yes.
15    Q.    I just want to ask you about a few
16    of these items. There's the third --
17    MR. GAFFEY: Todd, so as not to
18    get in your way with this line of
19    questioning let me just state a
20    continuing objection to your use of the
21    document on the grounds of no
22    foundation. He said he hasn't seen it
23    before. If you want to use it as a
24    guide it's subject to my objection.
25    MR. THOMAS: Okay. Sure.

Page 102

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    Q.   I'm going to ask you about --
3  these are discussing terms of the deal and if
4  any point you want --
5          MR. GAFFEY: You don't have to
6    explain yourself to him. Just ask him a
7    question. That's just my continuing
8    objection to your using a document he
9    said he hasn't seen before and asking
10   him questions as if he has. But go
11   ahead.
12         MR. THOMAS: I hear you. But as a
13   predicate to my next question I'm
14   explaining that these involve terms of
15   the deal which are reflected in various
16   documents including the --
17         MR. GAFFEY: You know, honestly, I
18   really would prefer you not testify and
19   just ask him questions. That's what
20   he's here for. You don't have to
21   explain why --
22         MR. THOMAS: Well, you just
23   objected to foundation so --
24         MR. GAFFEY: You can't fix the
25   foundation that he hasn't seen the

Page 103

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  document before by explaining why you're
3  asking the question.
4          MR. THOMAS: I can explain the
5    basis for what I'm asking for.
6          MR. GAFFEY: I think you should
7    just put a question to him.
8          MR. THOMAS: Okay.
9  BY MR. THOMAS:
10   Q.   Do you see the third item that
11  says Exchange-Traded Derivatives All
12  Underlyings?
13   A. - Exchange-traded, yes.
14   Q.   Based on your total knowledge of
15  the deal is it your understanding that
16  exchange-traded derivatives including the all
17  underlyings was transferred to Barclays?
18   A.   I don't know what an
19  exchange-traded derivative is.
20   Q.   Okay. Have you ever heard
21  discussion of that item in the context of --
22   A.   No. Not of an exchange-traded
23  derivative.
24   Q. - Okay. How about a few items down
25  it says Securities owned by Lehman Brothers

Page 104

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  and transferred to Barclays under the Barclays
3  repurchase agreement.
4          Do you see that?
5          MR. GAFFEY: Objection. That's
6    not what it says.
7          MR. THOMAS: A few lines down it
8    says --
9          MR. GAFFEY: Lehman Brothers, Inc.
10   are transferred to Barclays under the
11   Barclays repurchase agreement is what it
12   says.
13         MR. THOMAS: Okay.
14   Q.   Do you see that line?
15   A.   Yes.
16   Q.   Is it your understanding that the
17  securities or collateral for the Barclays
18  repurchase agreement or -- conveyed to
19  Barclays as part of the sale transaction?
20         MR. GAFFEY: Object to the form.
21   A.   I would -- I do not know. That's
22  part of the problem. I mean, that's part of
23  the fact base. What we do is that there were
24  securities which were -- which were held at
25  the Federal Reserve and those securities were

Page 105

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  supposed to have gone to Barclays but we to
3  this day do not know what went and what did
4  not go.
5    Q.   And the securities which were held
6  at the Federal Reserve, if I refer to that as
7  the Fed repo, will you understand what I'm
8  talking about?
9    A.   Yes.
10   Q.   Okay.
11   A.   Yes.
12   Q.   And do you know -- before the
13  closing at that time did you know the
14  approximate value of the securities at the
15  Fed?
16   A.   No, no.
17   Q.   Do you know now?
18   A.   After the fact I have -- I've seen
19  reports of what the various valuations that
20  have been put on it by the various players. I
21  haven't seen one set of valuations. They're
22  all over the map.
23   Q.   Do you know if Lehman has tried to
24  value those --
25   A.   Yes.

Page 106

1         B. MARSAL - HIGHLY CONFIDENTIAL
2     Q.    -- securities?
3         MR. GAFFEY: Yes or no. I've got
4     to watch the privilege at this point in
5     time because I think you're moving after
6     the period of our privilege waiver so --
7     A.    I mean, none of this discussion
8     occurred before September 30th.
9     Q.    Okay. But prior to January of
10    this year, was there any effort to value by
11    Lehman's securities held at the Federal
12    Reserve?
13    A.    Not that I'm aware of.
14    Q.    The next line from the one we
15    looked at says Securities and other assets
16    held in Lehman Brother, Inc.'s clearance boxes
17    at the time of closing, and that has an X
18    indicating it went over to Barclays as part of
19    the sale transaction.
20        Is that consistent with your
21    understanding?
22    A.    I don't know what a clearance box
23    is so...
24        Unfortunately, you just got a dumb
25    crisis manager. You don't have a securities

Page 107

1         B. MARSAL - HIGHLY CONFIDENTIAL
2     expert.
3     Q.    I'm only smiling because I had no
4     idea either.
5         Let's go ahead and flip to 2293 in
6     the same document which will be before that.
7     A.    2293. Okay.
8     Q.    At the top it says Lehman
9     Brothers/Barclays Transaction Division of
10    Assets and Liabilities.
11        Do you see that?
12    A.    Yes.
13    Q.    Do you recall ever seeing this
14    document before which is --
15    A.    No.
16    Q.    Do you see under Purchased Assets
17    there's a description of securities and
18    trading operations?
19        Strike that.
20        Do you see about half way down
21    where it says Purchased Assets?
22    A.    Yes.
23    Q.    Okay. And then it goes on to list
24    the Purchased Assets and under Securities and
25    Trading Operations the first bullet point

Page 108

1         B. MARSAL - HIGHLY CONFIDENTIAL
2     says, "The securities set forth on Schedule A
3     to the clarification letter, i.e., the
4     securities subject to the Barclays repurchase
5     agreement."
6         Do you see that?
7     A.    Yes. Um-hum. Yes.
8     Q.    When did you first understand --
9     well, strike that.
10        Are you aware that the securities
11    that went over to Barclays or were to go over
12    to Barclays as part of the transaction were
13    listed in Schedule A to the clarification
14    letter?
15        MR. GAFFEY: Object to the form.
16    A.    No.
17    Q.    Okay. The second bullet point
18    listing purchased assets says The securities
19    and other assets held in LBI's clearance boxes
20    as of the time of closing.
21        Do you see that?
22    A.    Yes.
23    Q.    Do you -- is that consistent with
24    your understanding of what was transferred?
25    A.    I didn't know what a clearance box

Page 109

1         B. MARSAL - HIGHLY CONFIDENTIAL
2     was. I mean, I couldn't answer that.
3     Q.    Okay. Do you have any reason to
4     believe that's incorrect now?
5     A.    I have no idea.
6         MR. GAFFEY: Objection.
7     A.    I'm not trying to be cagey. I
8     don't have any idea.
9     Q.    Okay. I won't do too many more of
10    these but on the next page, the bullet point
11    at the top, it lists All exchange-traded
12    derivatives and any property that may be held
13    to security obligations under such derivative.
14        Do you see that?
15    A.    Yes.
16    Q.    Did you have an understanding one
17    way or the other in terms of whether all
18    exchange-traded derivatives were being traded
19    as part of the sales transaction?
20        MR. GAFFEY: Objection to form.
21    A.    I didn't. Again, I do not know
22    what an exchange-traded derivative is. So at
23    the time -- I mean, even today I don't know
24    what an exchange-traded derivative is.
25    Q.    The reference in the parenthetical

Page 110

B. MARSAL - HIGHLY CONFIDENTIAL
1
2  to property -- any property that may be held
3  to security obligations under such derivative,
4  just by reading that, is it -- do you
5  understand that to be referring to the
6  collateral associated with the exchange traded
7  derivative?
8          MR. GAFFEY: Objection to form.
9      A.   In reading that that's what I
10  would gather was the collateral.
11     Q.   And if you would flip, please, to
12  page 2296 -- or Bates number 2296.
13     A.   (Witness complies.)
14     Q.   The bullet point at the top says
15  Purchaser shall receive, and then (ii) is, to
16  the extent permitted by applicable law and as
17  soon as practicable after the closing 769
18  million of securities as held by or on behalf
19  of LBI on the date hereof pursuant to Rule
20  15c3-3 of the Securities Exchange Act of 1934
21  as amended or securities of substantially the
22  same nature and value.
23          Do you see that language?
24     A.   Yes.
25     Q.   Is that consistent or inconsistent

Page 111

B. MARSAL - HIGHLY CONFIDENTIAL
1
2  with your understanding that as part of the
3  sales transaction Barclays was to receive
4  those assets?
5      A.   No idea.
6          MR. GAFFEY: Objection to form.
7      Q.   No idea.
8      A.   No idea.
9      Q.   Can I ask you to turn to the APA,
10  please. Which is one of the first documents I
11  showed you.
12     A.   (Witness complies.)
13     Q.   And if you would turn to page 6 of
14  that document, please.
15     A.   (Witness complies.)
16     Q.   To the definition of Purchased
17  Assets.
18          Do you see that?
19     A.   Yes.
20     Q.   Do you know or have an opinion as
21  to whether the exchange-traded derivatives --
22  well, strike that.
23          As to whether the 769 million in
24  15c3 securities or securities substantially of
25  that same nature and value were --

Page 112

B. MARSAL - HIGHLY CONFIDENTIAL
1
2      A.   Todd, I have no idea. I didn't
3  see this document and I didn't see the last
4  one. So my -- my ability to answer that
5  question -- I don't know whether this 767 or
6  whatever you're saying it is relates to some
7  other 767.
8      Q.   Okay.
9      A.   This was -- again, this is not a
10  transaction which -- I feel a little like a
11  dope because, you know, what you've got to
12  understand here is this transaction was not
13  something that was in question during this
14  period of time. This was only in -- this only
15  became to light into the early part of 2009.
16          So this whole period 2008, this
17  was not a -- this transaction would be a
18  transaction which one day would see the light
19  of day, one day would be analyzed, and there
20  would be a forensic activity to seeing what
21  happened here.
22          But from my perspective during
23  this critical period this was not a priority.
24  This was was not on my radar screen.
25     Q.   So your approach was to --

Page 113

B. MARSAL - HIGHLY CONFIDENTIAL
1
2          MR. GAFFEY: For the record I
3  object to you're asking him for an
4  opinion which I didn't get to say a
5  moment ago. He's not here as an expert.
6      Q.   So from your perspective
7  addressing issues about which assets were
8  transferred and not transferred and their
9  values and whether it was a good deal or bad
10  deal was something that would be put off for a
11  later period of time to be --
12     A.   Not the subject of a good or bad
13  deal. I didn't think that was my
14  responsibility to determine whether it was a
15  good deal or bad deal. It would be my
16  responsibility to determine whether or not the
17  benefit of the bargain was realized by all
18  parties. That's what I would put off to
19  another day. I would never reopen the
20  transaction because it was a good or bad deal.
21  The court determined that based on a whole
22  host of factors that were reviewed at the
23  time. No, that would not have been my -- that
24  would not have been my approach.
25          But to know what -- I mean,

Page 114

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    clearly, we wanted to know whether or not the
3    cash which was priming the operating pump
4    which was the sale of the headquarters
5    building, the sale of the data centers, that
6    cash was important to us. That cash was
7    important to us as to what assets were
8    transferred. Again, we were told that assets
9    were transferred equal to liabilities that
10   were transferred. And we basically assumed
11   that was correct. There was no issue to be --
12   to be challenged at that point in time. And
13   never did I want to get into a situation where
14   was this a good or bad deal.
15       Q.   In terms of whether the parties
16   received the benefit of the bargain or not,
17   that would be based on the terms of the
18   agreement they entered, correct?
19       A.   The assets equalled the
20   liabilities. That's what I had been
21   represented. The assets were supposed to
22   be -- the asset value -- I shouldn't say
23   assets -- the asset value were supposed to
24   equal the liabilities being assumed. That was
25   the benefit of the bargain that Berkenfeld had

Page 115

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    told me we had struck.
3        Q.   Well, when you say the parties
4    received the benefit of the bargain, shouldn't
5    it be -- shouldn't that benefit be measured
6    based upon the agreement they signed and
7    entered?
8        MR. GAFFEY: Object to the form.
9        A.   Well, I didn't review the
10   agreement. I didn't review the agreements. I
11   mean, what I was told was this was an excluded
12   transaction, not for your purview. The
13   transaction will have an impact, though, on
14   the rest of the estate and we're giving you
15   assurances that there will be a TSA prepared
16   which will provide you with the assurances you
17   need to access.
18       As to the transaction, itself,
19   what I was told was there'll be a -- there
20   will be -- assets will be left with the --
21   with Barclays equal to the liabilities being
22   assumed.
23       Q.   Now, when you say excluded
24   transaction, again you're just referring to
25   Mr. Berkenfeld's comment to you --

Page 116

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        A.   Correct.
3        Q.   -- that other things should be
4    your focus as opposed to --
5        A.   Well, no. Yes, I mean, it was
6    Berkenfeld -- it was Berkenfeld on both of
7    those transactions. He was the only one
8    available. Bart McDade was not available
9    because they were all working on the
10   transaction. My assumption was that
11   Berkenfeld who signed the agreement was
12   speaking for Bart McDade and others.
13       Q.   But did he ever say that?
14       A.   Berkenfeld said what I said, yeah.
15       Q.   But did he ever say that he was
16   speaking for Bart McDade?
17       A.   You know, he said he was speaking
18   for the company. He was speaking for the
19   company as to what the -- for me to be -- I
20   mean, I was being hired to do -- to be
21   focusing on the wind-down of the estate
22   excluding those two transactions which were
23   under way and I was not to be -- I was not to
24   put myself in the middle of those transactions
25   because they were on the verge of closing.

Page 117

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    That's what he said.
3        And, I mean, he said that
4    everything else you should be focusing your
5    attention on the residual estate.
6        Q.   And you actually recall him saying
7    he was speaking on behalf of the company when
8    he said your focus should be elsewhere?
9        A.   No. I don't recall whether he
10   said it was on behalf of the company but the
11   inference was since he was signing the
12   agreement to hire Alvarez & Marsal and myself
13   that he must be speaking for the company.
14       Q.   And no one else from the company
15   like Bart McDade or anyone else --
16       A.   I didn't meet with Bart McDade
17   until after the transaction had occurred.
18       Q.   But, in any event, no one other
19   than Mr. Berkenfeld indicated to you that your
20   focus should be elsewhere.
21       A.   No. That's Berkenfeld. Steve
22   Berkenfeld was the one who indicated.
23       Q.   Okay. Now, in -- do you think the
24   parties should be held to the terms of the
25   agreement that they entered?

30

Page 118

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        MR. GAFFEY: Object to the form.
3        A.    As a matter of -- again, I mean,
4    I'm not being controversial. The deal -- the
5    benefit of the bargain which I was told about
6    is evidently very different than the deal
7    which was ultimately inked.
8        Q.    Well, Mr. Berkenfeld had told you
9    a different description according to your
10   testimony than the deal that was ultimately
11   inked. But I'm asking in terms of the parties
12   being held to the benefit of the bargain,
13   shouldn't that be the contract that they
14   ultimately agreed to enter?
15       MR. GAFFEY: Object to the form.
16   You can answer.
17       A.    I would say -- you know, as a bargain
18   philosophical matter if you strike a bargain
19   you live by it, whatever that bargain was. If
20   that bargain was -- you know, I mean, that's
21   the crux of this argument, though, was what
22   was this bargain.
23       Q.    And so the bargain -- what was
24   struck as the bargain is normally reflected in
25   the terms of the contract the two sides sign,

Page 119

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    correct?
3        MR. GAFFEY: Objection.
4        A.    I would -- I mean, my idea of a
5    bargain is whether there's a contract signed
6    or not. If you and I have a deal, that's what
7    I'm going to live by. It happens to be if
8    you're going to paper it, sure. But, I mean,
9    that was -- you know, in the wild, wild west
10   they might shoot you if you say a bargain is
11   only a bargain if you have it signed up.
12       But my idea was this was -- the
13   idea was that this was a transaction which was
14   supposed to have assets equalling liabilities
15   assumed. That's what I believe and as I
16   recall that's what Berkenfeld told me and
17   that's what my team I think believed.
18       Q.    Okay. In this situation do you
19   think each party should just live with the
20   terms of the agreement that they signed and
21   entered?
22       MR. GAFFEY: Objection.
23       A.    If that agreement was -- if that
24   agreement was as I indicated, yes. Because
25   then I think it would have been -- I would

Page 120

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    like to have known that that wasn't the
3    benefit of the bargain. I would like to have
4    known what this transaction really was. And I
5    think the bankruptcy court and the creditors
6    needed to know what this transaction was if it
7    wasn't as outlined.
8        Q.    If there was -- are you aware that
9    I guess each side has taken months to value
10   certain assets that were transferred as part
11   of the transaction?
12       MR. GAFFEY: Object to the form.
13       A.    Yes.
14       Q.    And that's because some assets in
15   the transaction were extremely hard to value?
16       MR. GAFFEY: Object to the form.
17       A.    I'm not sure.
18       Q.    Okay. And are you aware that
19   certain liabilities wouldn't be set until
20   after the transaction? Wouldn't be known
21   until after the transaction. For example,
22   which contracts Barclays decided to assume.
23       A.    No. What I'm assuming is that the
24   liabilities that were being assumed were the
25   book liabilities. And that the bonus accrual

Page 121

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    and the severance accrual, that was being --
3    that was being assumed. So I assume that that
4    liability was truly an exchange of values so
5    that Barclays would be no worse off.
6        Q.    So in terms of -- you didn't
7    understand in terms of cure liabilities or
8    trade payments being assumed that they would
9    only be assumed to the extent Barclays elected
10   to assume those contracts?
11       MR. GAFFEY: Objection.
12       A.    No. That's correct. But my
13   assumption was that there was going to be
14   value given in exchange for an exact equal
15   amount of liabilities being picked up.
16       Q.    And can you tell me -- and you
17   never read the sale contract, correct? The
18   purchase agreement.
19       A.    That's correct.
20       Q.    Now, you've said a number of times
21   that you thought assets would have to equal
22   liabilities.
23       A.    Value of assets.
24       Q.    Value of assets have to equal
25   value of liabilities.

Page 122

B. MARSAL - HIGHLY CONFIDENTIAL

1 If some of the assets couldn't be
2 valued in real-time and were in flux and
3 changing, how would it even be possible to
4 enter a transaction that required assets to
5 ultimately end up equalling liabilities?
6 MR. GAFFEY: Objection. You can
7 answer.
8 A. I don't know what assets -- I
9 don't know enough about the assets that were
10 not in flux to really know what -- to
11 understand what you're asking. Nor do I know
12 what the value -- I mean, our people are
13 valuing those assets today. I'm not sure why
14 there's all this complication. We didn't
15 have -- we didn't seem to have the same kind
16 of difficulty.
17 Q. Well, at the time the deal was
18 being negotiated, the week of September 15th,
19 as you've testified there was chaos at Lehman.
20 A. Right.
21 Q. I think also you've indicated that
22 some of these assets were difficult to value
23 because they weren't being traded. So if
24 you --

Page 123

B. MARSAL - HIGHLY CONFIDENTIAL

1 A. If an asset wasn't being traded it
2 would be more difficult to value, yes.
3 Q. Right. I mean, you don't contest
4 that during that week it was difficult -- I
5 mean, to even determine what securities Lehman
6 had let alone what is the appropriate market
7 value of those securities.
8 A. That's correct. It was a very
9 difficult period of time for everybody.
10 Q. Okay. And if you couldn't say
11 definitively which securities you had and what
12 their value was, how could you possibly
13 structure a deal which was predicated on
14 assets ultimately equalling liabilities?
15 MR. GAFFEY: Object to the form.
16 A. My assumption is that just as you
17 were -- you know, you would give yourself some
18 kind of a decent cushion when you were looking
19 at those assets you would say what the market
20 value was and -- I mean, I think most of the
21 assets, though, had a pretty good handle on
22 what the market value was. There was a group
23 of illiquid assets maybe in this portfolio.
24 I'm not sure whether -- what those assets

Page 124

B. MARSAL - HIGHLY CONFIDENTIAL

1 were. Maybe the Racer's portfolio. I could
2 see how there would be complications there.
3 But as I understand, those assets since I have
4 them back were not transferred so...
5 Q. Do you think it would be unre --
6 would it be unreasonable for Barclays in a
7 situation where assets were uncertain and
8 difficult to value, to seek a cushion as
9 protection and for LBHI to give them that
10 cushion in that situation?
11 MR. GAFFEY: Object to the form.
12 A. I mean, I can't go redo the deal.
13 I mean, the deal -- what would be appropriate
14 to me would be some kind of a hold-back. And
15 the hold-back -- to the extent the hold-back
16 was needed then it would be utilized. To the
17 extent it wasn't, it would be returned to the
18 company. That would be the way most
19 transactions in the M&A side of the world is
20 dealt with.
21 Q. And by hold-back you mean figuring
22 out what assets and liabilities were some time
23 after the deal and then having some kind of
24 true-up provision?

Page 125

B. MARSAL - HIGHLY CONFIDENTIAL

1 A. Yes.
2 Q. Other than that contractual
3 device, in this situation in which you found
4 yourself the week of September 15th, would
5 there be any other possible way you could
6 think of to somehow make a deal that had to
7 turn out to be a push, as you say?
8 MR. GAFFEY: Objection to the
9 form. And it mischaracterizes much of
10 the testimony today. He didn't find
11 himself in that situation on the 15th.
12 And I'm not sure if that's something you
13 put in the question deliberately, Todd,
14 or it's just the rhythm of the questions
15 you're asking. But I've been pretty
16 patient about this but you're basically
17 engaging in a legal debate.
18 MR. THOMAS: Speaking objection.
19 MR. GAFFEY: Completely improper
20 question. That's why.
21 MR. ROTHMAN: The questions are
22 calling for speculation as well. I
23 would object on that basis.
24 MR. THOMAS: We have your

Page 126

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    objection.
3        A.   Can you ask the question again?
4    I've lost track of what it was.
5        Q.   Sure. Initially I'd asked whether
6    there was any way possible to make this a deal
7    that had to end up assets equalling
8    liabilities if not all the assets were known
9    and their values couldn't be determined. And
10   you came up with the idea of a hold-back which
11   is a contractual device by valuing them later,
12   figuring it all out later, and then you have
13   some kind of true-up provision.
14        Other than that hold-back
15   contractual device which you identified, can
16   you see any way in which this deal could have
17   been structured so that assets equal
18   liabilities?
19        MR. GAFFEY: Object to the form.
20        A.   I mean, I'd have to think about
21   other ways you might do it. I mean, I don't
22   know. I mean, I would say to you that in a --
23   you know, in a secured lending position you
24   would over-advance. In a secured loan where
25   you'd over-advance, you'd liquidate your

Page 127

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    position, and to the extent that you had an
3    over-advance you would apply it to your loan,
4    and to the extent there was excess, well, you
5    would return the excess to the estate or the
6    borrower.
7        But I'm not trying to redo the
8    deal. What I believe -- what I'm saying to
9    you is that I was told that this is -- there
10   were assets going to be equalling liabilities
11   assumed and it wasn't until the first quarter
12   of 2009 when we said we don't think that
13   happened here. We think there's a skunk in
14   the garden party.
15        Q.   We looked at a number of
16   descriptions this morning of assets by Weil
17   Gotshal -- a number of descriptions for the
18   assets that were going over, liabilities going
19   over, and those staying, including by Weil
20   Gotshal and people at Alvarez for whatever
21   purpose.
22        A.   Right.
23        Q.   And would you really haven't seen
24   anything that says that the deal was supposed
25   to be a push with assets somehow equalling

Page 128

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    ultimate liabilities?
3        MR. GAFFEY: Objection.
4        A.   No. I don't say that at all.
5        MR. GAFFEY: Excuse me. Excuse
6    me. Objection. You mean of the
7    documents you've shown him today?
8        MR. THOMAS: Yes. That's what I
9    said.
10        MR. GAFFEY: So, here. Do you
11   want him to look through the documents
12   you've shown him? Come on.
13        MR. THOMAS: I don't really want
14   him. We just have his testimony. You
15   and I both know there's nothing in there
16   like that. So if he can point me to
17   something I just want to know.
18        A.   No. But all I can tell you -- all
19   I can tell you about this transaction which
20   was out of my purview is what I was told this
21   transaction was going to be. All that -- that
22   is what I know. And what you are citing me is
23   documents upon documents which suggests
24   otherwise. Those documents I didn't review.
25   Nor did I participate in this negotiation.

Page 129

1        B. MARSAL - HIGHLY CONFIDENTIAL
2    People who did participate in the negotiation
3    have represented a different side of this.
4        Q.   And I believe you --
5        A.   I don't believe anyone's not
6    telling me the truth. I believe everyone is
7    being honest about what their recollection
8    was. It may be contrary to what the other guy
9    thinks but I believe people are telling me the
10   truth.
11        Q.   Who --
12        A.   There was chaos during this
13   period.
14        Q.   Other than Mr. Berkenfeld, who
15   else indicated to you that the transaction was
16   supposed to be a push with assets --
17        A.   I don't know whether it was before
18   or after the transaction closed but I think
19   Tom Roberts of Weil Gotshal indicated that.
20   Again, I don't know whether it was before or
21   after the transaction closed.
22        Q.   Anyone else?
23        A.   You know, I don't recall. Maybe
24   Dick Fold had indicated it. He's indicated
25   that was his understanding. But, again, I do

Page 130

B. MARSAL - HIGHLY CONFIDENTIAL
1    B. MARSAL - HIGHLY CONFIDENTIAL
2    not know whether it was before or after the
3    transaction. I don't recall -- it would be in
4    the early days but I don't know whether it was
5    before or after the 22nd. Probably would have
6    been after the 22nd for Dick Fold.
7        Q.    Anyone else you can think of?
8        A.    No.
9        Q.    Okay. Can you -- is there
10    anything in any document you ever saw that
11    indicated that? That the transaction was
12    supposed to add up to assets equalling
13    liabilities?
14        A.    Some schedule -- I don't remember
15    what the name of it was but some schedule --
16    it was an attachment that was supposed to --
17    that listed -- an appendix or an attachment to
18    it that was referenced and I don't know -- I
19    don't know what that's called today. But
20    there was a schedule which identified the
21    liabilities being assumed and -- an estimate
22    of the bonuses and the accrual for it.
23        Q.    Did you see that prior to closing?
24        A.    I don't know when I saw it. I saw
25    it. And I don't -- I don't recall when. But

Page 131

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    I saw it within that time frame. Within that
3    time frame.
4        Q.    Okay. So you think you saw the
5    schedule but you didn't see the sale
6    documents.
7        A.    It was not a focus on the
8    securities side of this thing. The focus
9    really was on what were the liabilities that
10    were being assumed. That was where the focus
11    was, are we assuming these liabilities. You
12    know, maybe naively we believed that the loan
13    was going to be rather easy to -- why would
14    anybody -- why would Barclays take out the
15    secured creditor? I mean, I've been doing
16    this for 25 years and I've never seen a
17    situation where a secured lender on the eve of
18    bankruptcy takes out another secured lender
19    unless there's a high degree of confidence
20    that there is no credit exposure. So the only
21    issue in my mind was on the question of the
22    liabilities.
23        Q.    Was your understanding that
24    Barclays -- well, do you think Barclays would
25    have done that if not for the agreement -- the

Page 132

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    purchase agreement?
3        MR. GAFFEY: Objection.
4        A.    I don't know. I don't know why
5    they would have done it. You're asking me
6    what -- I mean, I can't conceive of any
7    sophisticated -- which I believe Barclays
8    is -- smart, savvy secured creditor taking the
9    place of another secured creditor unless they
10    had a pretty good handle on what's in the
11    portfolio of the securities and what the value
12    of those securities are. I mean, I've been
13    doing this for, you know, going on 30 years.
14    I've never seen that happen before. Never on
15    the eve of a bankruptcy.
16        Q.    Well, have you ever seen a
17    situation like this where the Fed was asking
18    Barclays to step in and do it?
19        A.    Well, obviously, there's no two
20    situations like this before. But I'm just
21    telling you, you know, I've never seen in 30
22    years where anyone -- any secured creditor
23    takes out another secured creditor like this
24    on the eve of a bankruptcy. So the only thing
25    you can assume, if you're a sophisticated --

Page 133

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    as Barclays is -- but that wasn't the issue
3    here. The issue was related to the payables.
4        It wasn't until later that I --
5    you know, later on when we started to say wait
6    a minute, this may be more than just payables.
7        Q.    When you say the issue was related
8    to the payables, what do you mean?
9        A.    We want to understand what
10    payables are being assumed and what
11    liabilities are being assumed here. Those
12    must be the liabilities that -- you know,
13    again, what was represented was that there
14    were liabilities having to do with the cure.
15    And there were liabilities having to do with
16    the bonus and the severance. So that must be
17    what was accrued by the company, right?
18        Well, we didn't find out it
19    wasn't -- that wasn't what was accrued by the
20    company. Where did you get these numbers? We
21    find out in January nobody could tell us where
22    they got these numbers from. Well, where did
23    you get these numbers for this agreement?
24    Well, those managers were gone. Where did
25    they get them? Where did the accounting

Page 134

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    department get those numbers?
3        So then we went in January and
4    asked Jonathan, Jonathan, in a letter, we
5    don't get it. Where did you got these
6    numbers? Which we got back from them, It
7    doesn't matter. Read your agreement. Well,
8    wait a minute. We thought that assets were
9    supposed to equal liabilities. If the
10   liabilities were overstated was an honest
11   mistake made in the confusion of all this?
12       If you remember the letter that
13   was -- I assume you got that letter, the
14   letter that was sent to Barclays. And they
15   said, it's irrelevant whether a mistake was
16   made or not. The deal's the deal. Which is
17   when we -- which prompted us -- that response
18   prompted us to go out and say, Whoa, let's go
19   get counsel and find out if that is really the
20   case or not because that's certainly not what
21   was represented to me. And upon telling it to
22   the board the board indicated that wasn't what
23   was represented to them. The board of
24   Holdings. Which prompted us in the first
25   quarter to then go out and identify counsel to

Page 135

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    represent this matter.
3        Q.   And when you said represented to
4    you, you're referring to again to, like,
5    discussion with Berkenfeld?
6        A.   Yeah. Well, a discussion with
7    Berkenfeld. Discussions with Fold after the
8    fact. Discussions with Russo after the fact.
9    Discussions with board members after the fact.
10   They all -- discussion with Tom Roberts after
11   the fact. They all confirmed the same thing.
12   This was a push. Barclays was not to suffer a
13   dollar in doing this transaction. That's what
14   everyone understood, that Barclays was not
15   going to suffer by doing this transaction.
16       Q.   You added Tom Russo? You also
17   had --
18       A.   But not -- but in terms of the
19   timing this would have been well after the --
20   well after the period. This would have been
21   more into the first quarter. I mean, when we
22   got to discussions with the board it wasn't --
23   this wasn't a relevant -- this wasn't on our
24   radar screen until the first quarter of 2009.
25       Q.   I mean, Lehman was a very big,

Page 136

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    very sophisticated company with very
3    sophisticated counsel and advisors, correct?
4        A.   Yes. The best.
5        Q.   And if they enter an agreement
6    that does not require there to be a push, but
7    rather just involves the exchange of certain
8    assets and liabilities, what possible basis
9    would Lehman have for then claiming that the
10   deal had to be a push?
11       MR. GAFFEY: Objection. Calls for
12   a legal conclusion.
13       A.   They were told. I mean, we were
14   told that it was a push. We were told it was
15   a push. The creditors were told it was a
16   push. We think the bankruptcy judge was told
17   it was a push. And all of this, whenever this
18   went forward, the transaction ultimately was
19   approved on a very different basis. I think.
20   If I could ever find out. But I can't find
21   out. I don't have the transparency here,
22   Todd. I don't have that transparency. And
23   that's all we're asking for. And there's
24   not -- there's no -- and that's what we asked
25   for in January. What happened here. And all

Page 137

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    we got was stonewalled which is why we have
3    this litigation.
4        And then it was followed by the
5    fact that in the first quarter along comes
6    some bravado from somebody indicating -- at
7    Barclays that they made a profit on the
8    transaction of umpteen dollars. We said,
9    Well, wait a minute. Nobody talked about a
10   profit, a built-in profit. Where is that
11   built-in profit?
12       But all of this dialogue, none of
13   this happened until the middle of the first
14   quarter. That's the reason -- what do you
15   mean a built-in profit. Nobody -- would you
16   as a creditor who's getting ten cents on the
17   dollar have agreed to a transaction for a
18   built-in profit? Ask yourself that. If that
19   had gone to the bankruptcy court, would you as
20   a creditor of Holdings have agreed to a
21   transaction that which have a built-in profit
22   for the other side buying it? You would
23   rather have this case have been a meltdown.
24       Q.   We're going to get to the
25   alternatives in a minute.

Page 138

B. MARSAL - HIGHLY CONFIDENTIAL
1
2    A.    Yeah.
3    Q.    But in terms of -- if you had a
4    bunch of difficult to value assets being
5    transferred and uncertain liabilities, isn't
6    it the case inherently that you're not going
7    to know how assets match up with liabilities
8    ultimately until sometime after closing?
9        MR. GAFFEY: Object to the form.
10    A.    No, Todd. That's not true. I
11    mean, we know that there were -- in hindsight
12    we know that there were illiquid assets. But
13    I'll defy you to find a repo out there that
14    hasn't gotten market value assets in it. I
15    mean, if there was -- $50 billion --
16    $45 billion in loans, whatever the number was
17    in loans, you would expect that the
18    liquidation of those securities would cover
19    you if you were a banker. If you were
20    Barclays, JPMorgan, Citibank, you would assume
21    that to be the case. Evidently -- I mean, and
22    why wouldn't we assume that to be the case?
23    Because there's no way any -- I've never -- in
24    all the time I've been doing this I've never
25    seen this happen before. I've never seen a

Page 139

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    secured lender on the eve of bankruptcy take
3    out another secured lender with inadequate
4    collateral which is what you're suggesting.
5    Unvalued collateral. Difficult to value
6    collateral. That would be silly in
7    sophisticated banking terms. You wouldn't
8    ever get there.
9    Q.    Have you ever seen a situation
10    where the purchaser was buying assets of the
11    company, and to allow that deal to go forward
12    the Fed insists that the purchaser come in and
13    take it out because it wants it out?
14    A.    Never before. Never before have I
15    seen it. I've never had -- I've never --
16    there's not two situations like this. But I'm
17    just saying common sense would cause one to
18    believe based on the life experience that I
19    have that you would never find a sophisticated
20    lender like yourself or like Barclays and
21    JPMorgan who would ever have a collateral base
22    on the eve of bankruptcy not sufficient to
23    cover their loan exposure. That would be a
24    rarity. I mean, I've never seen it in 30
25    years.

Page 140

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    Q.    In a situation you think it would
3    be unreasonable for Barclays to be willing to
4    take out the Fed repo loan at the Fed's
5    request if it was the only way to go forward
6    with this purchase?
7        MR. GAFFEY: Object to the form.
8    A.    I can't stand in the shoes of
9    that. I'm just telling you in my life of
10    experience in dealing with secured creditors
11    I've never seen that happen. So why would we
12    not -- why would we not believe -- because
13    your assumption is, well, there was a bunch of
14    illiquid securities in the portfolio. Well,
15    would you lend against it if that was the
16    case.
17        So our assumption is it must have
18    all had a market value. It must have all been
19    reasonably liquid. And I also think that
20    Barclays, based on -- again on information
21    we've gotten since then in discovering what
22    this dispute was with JPMorgan, I think that
23    Barclays asked themselves the same question.
24    What is this crap you're trying to give me
25    across the transom. I don't want this

Page 141

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    collateral where he rejected some of the
3    collateral and said this is illiquid. Good.
4    That's exactly what you expect out of a
5    banker. Unfortunately that wasn't the case.
6    So why would I -- I don't -- I didn't know
7    about this disagreement among Barclays and
8    JPMorgan until well into the end of the
9    quarter. And then I still -- I still don't
10    know what this dispute is between these guys.
11    We still can't pierce this onion back because
12    there's a complete lack of transparency
13    between JP -- the Fed and Barclays on this
14    whole thing as to what happened here.
15    Q.    Once Barclays stepped in as the
16    Fed asked them to do and --
17    A.    I don't know that to be the case.
18    Q.    And if it be the case that --
19    A.    I don't know that to be the case.
20    I wasn't involved in any of this so I don't
21    know.
22    Q.    If Barclays stepped into the Fed
23    repo and then found the collateral that it
24    thought was there wasn't there and started to
25    get very concerned about the value of that

Page 142

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    collateral, would it have been unreasonable
3    for Barclays to go, Whoa, we need to make sure
4    we have some more assets here?
5        MR. GAFFEY: Objection.
6    Objection. Calls for an opinion. I
7    don't know any witness who'd be
8    qualified to decide whether it's
9    reasonable for Barclays to go forward.
10    I mean, you want him to opine about what
11    Barclays' state of mind is, Todd? This
12    is getting into an argument.
13        MR. THOMAS: He's giving a lot of
14    opinions. I'm allowed to ask.
15        MR. GAFFEY: No, you're not. He's
16    not offered as an expert. You know he's
17    not offered as an expert. He's a fact
18    witness. You decided you wanted to
19    dispose him. If we wanted to put him up
20    as an expert we would have. You're not
21    entitled to explore opinions. You know
22    that.
23        MR. THOMAS: That's not true.
24        MR. GAFFEY: Well, it's true.
25        MR. THOMAS: You've got your

Page 143

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    objection. Your objection is to
3    foundation.
4        MR. GAFFEY: It goes beyond
5    foundation but you can answer the
6    question if you have it in mind. Do you
7    want it read back?
8    A.    What's the question again?
9    Q.    Do you think if Barclays, stepping
10    into the repo transaction and then discovering
11    concerns about the collateral, that it's not
12    what it thought it was or that it doesn't seem
13    to have the values, that -- the nominal
14    values, that it would be concerned and want to
15    seek more assets to protect itself?
16    A.    Barclays is a sophisticated -- a
17    very sophisticated, very savvy player as is
18    JPMorgan. Do I believe there was ever any
19    issue with the value of that collateral with
20    the securities against secured loan? It never
21    crossed my mind. Because a savvy institution
22    like that, there is no way you would ever do
23    this transaction if that was an issue. You
24    would have gotten the CUSIPS -- you would have
25    gotten all the information you need before

Page 144

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    you're going to lend $45 billion. Are you
3    kidding me? Anything that could have broken
4    the bank are you telling me they did not have
5    a pretty good handle on what was there in the
6    way of value? Inconceivable. That's
7    inconceivable.
8        So the issue in my mind was never
9    the issue of the securities value. I assumed
10    that one would wash against the other. I
11    assume there was real value there. That was
12    the value that they held. My mind was always
13    related to the liabilities. Not to the --
14    because the securities were going to take care
15    of the loan. The securities must have a
16    market value. It must be readily marketable.
17        That was never our focus. It
18    wasn't our focus until almost the second
19    quarter of 2009. The first quarter of 2009
20    this was all about the fact that the cure
21    liabilities and the severance didn't jive with
22    what our records were showing. It didn't
23    jive -- and then the first quarter results
24    came out for Barclays or whatever quarter that
25    was. The quarter results came out and we said

Page 145

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    what is this. That's when Jones Day was hired
3    and that's when we asked for the information
4    and we were stonewalled. That's what's
5    happened here. So you -- you know, and so if
6    it seems like we were kind of "well, why
7    didn't you," we didn't because you wouldn't
8    expect -- any sensible businessman wouldn't be
9    expected to challenge this. It never would
10    happen.
11    Q.    If you thought that the deal was
12    supposed to be a push and that was supposed to
13    be important to you, why wouldn't you have put
14    that into the contract you signed?
15    A.    I wasn't involved in that.
16        MR. GAFFEY: Objection.
17    Q.    Okay.
18    A.    I wasn't involved in that so I
19    don't know. You got to talk to the guys who
20    were.
21    Q.    Okay. Were you aware of the fact
22    that the original provision, the original APA,
23    before it had to be modified because assets
24    listed in there couldn't be delivered,
25    contained a partial true-up provision or

Page 146

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  hold-back provision?
3      A.  No.  I was not involved in that
4  negotiation, Todd.
5          MR. THOMAS: Okay.  Next document.
6          THE VIDEOGRAPHER: Todd, five
7  minutes left on the tape.
8          MR. THOMAS: Can you flip it real
9  quick now?
10          THE VIDEOGRAPHER: Yep.  The time
11  is 12:49.  We're going off the record.
12          (Discussion held off the record.)
13          (Luncheon recess taken at 12:49
14  p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 147

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        A F T E R N O O N   S E S S I O N
3        (Time noted:      1:28 p.m.)
4        THE VIDEOGRAPHER: The time is
5  1:28.  We are back on the record.
6            * * *
7  B R Y A N   M A R S A L,   resumed and
8      testified as follows:
9  EXAMINATION BY (Cont'd.)
10  MR. THOMAS:
11      Q.  I'd like to show you a document
12  that's been previously marked as 344A.  And
13  there's a cover attachment dated September
14  17th and it's attaching a Barclays press
15  release.
16          Do you see that?
17      A.  Yes.
18      Q.  Have you ever seen this press
19  release before?
20      A.  No.
21      Q.  The second paragraph of the press
22  release reads, "Barclays will acquire trading
23  assets with a current estimated value of 72
24  billion and trading liabilities with a current
25  estimated value of 68 billion US for a cash

Page 148

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  consideration of .25 billion US."
3      Do you see that?
4      A.  Yes.
5      Q.  Were you aware that Barclays put
6  out a press release on the 17th while the deal
7  was being negotiated?
8      A.  No.  But it doesn't surprise me.
9  I would expect a publicly-traded company to do
10  so.
11      Q.  Okay.  And it also had quotes from
12  Mr. McDade as well.
13      A.  (Witness nods.)
14      Q.  It's a fairly short release.
15          Is there anything in this document
16  that indicates to you that the deal was
17  supposed to be a push?
18      A.  I haven't read the document.  This
19  is the first time I've seen it.
20      Q.  Okay.  But let's just -- if you
21  take a moment -- let's just look at the press
22  release itself on the second page.
23      A.  Second page?
24          MR. GAFFEY: Of the release or of
25  the document, Todd?

Page 149

1    B. MARSAL - HIGHLY CONFIDENTIAL
2          MR. THOMAS: The second page of
3  the document.
4          MR. GAFFEY: Okay.
5      A.  Um-hum.
6      Q.  There's a press release.
7          (Document review.)
8      A.  Okay.
9      Q.  Would you agree that there's
10  nothing in there that indicates that the deal
11  is supposed to be a push in terms of assets
12  equalling liabilities?
13      A.  I don't know whether --
14          MR. GAFFEY: Object to the form.
15  Sorry.  Go ahead.
16      A.  I don't know what trading
17  liabilities means.  Maybe you can tell me what
18  that means.
19      Q.  Okay.
20      A.  Since you know -- since you're
21  seeing it the first time maybe as I did.
22  Define trading liabilities.
23      Q.  Well, if I define it as being
24  assets as subsection D of the definition of
25  purchased assets of the APA, would that --

Page 150

1    B. MARSAL - HIGHLY CONFIDENTIAL
2       A.   It wouldn't help me at all.  What
3   would trading mean to you?
4       Q.   Well, let me ask you this way.
5   Just from reading the release is there
6   anything in there that you would say refers to
7   some kind of idea that this would be push?
8          MR. GAFFEY:  Objection.  You can
9   answer.
10      A.   I wouldn't get an inference one
11  way or the other unless you're going to define
12  for me what the trading liabilities are.  Did
13  they include the severance, did they not in --
14  did they include the current liabilities.
15         The word "trading" to me means
16  something very different.  Maybe there's a
17  term of art about trading but I don't know
18  what a trading liability is.
19      Q.   Okay.  Are you familiar with the
20  terms of the original APA in terms of ball
21  park figures what was going over and what was
22  not?
23      A.   No, no.  No.
24      Q.   Okay.  Do you have any opinion one
25  way or the other whether if the original APA

Page 151

1    B. MARSAL - HIGHLY CONFIDENTIAL
2   had been closed, whether that would have
3   resulted in a push or not?
4          MR. GAFFEY:  Objection.  You can
5   answer.
6       A.   Again, what I was told -- as far
7   as the APA, what I was told was that the
8   transaction, the transaction was the asset
9   values transferred equal the liabilities being
10  assumed.  And as far as any other discussion
11  that was -- I did not focus on any other
12  discussion.
13      Q.   And you weren't told by -- you
14  weren't told that by anyone by Barclays --
15  strike that.
16         You weren't told that by anyone
17  from Barclays, were you?
18      A.   No.
19      Q.   No.  And when you refer to being
20  told that, it's at the time you're referring
21  to the conversation with Berkenfeld?
22      A.   Berkenfeld and the others that I
23  indicated before.
24      Q.   The other --
25      A.   I don't know the exact timing of

Page 152

1    B. MARSAL - HIGHLY CONFIDENTIAL
2   when they told me, whether it was before or
3   after the transaction.  But various players,
4   including Berkenfeld, Fold, Russo, the board,
5   had the -- you know, that was their
6   understanding of the deal.  Only when -- I
7   certainly know happened before the transaction
8   occurred was Berkenfeld.
9       Q.   Can you remember specifically what
10  any of those individuals said about it?
11      A.   It was a push.  Every one of them
12  said the same thing.
13      Q.   I mean, in terms of --
14      A.   Assets equal liabilities.  If
15  anything, it was a push.  And Tom Roberts.  It
16  was a push.
17      Q.   And was this a -- with Mr. Roberts
18  was this a meeting you had with him?
19      A.   The meeting I sat in on -- I
20  believe I sat in on the meeting and got an
21  explanation.  Again, it was probably after the
22  transaction had taken place.
23      Q.   And do you recall the words Mr.
24  Roberts used?
25      A.   It's in the minutes.  It's in the

Page 153

1    B. MARSAL - HIGHLY CONFIDENTIAL
2   minutes of the board meeting that I believe he
3   said -- where he said this.
4       Q.   Oh, you're referring to a board
5   meeting that occurred after the sale closed?
6       A.   Yes.  I believe so.  I don't
7   recall as to the timing.
8       Q.   Is that where those others --
9   apart from the Berkenfeld conversation, is
10  that where the other conversations you heard
11  about it being a push occurred?
12      A.   I would believe it took place
13  later on in the year, in the first quarter
14  when we got to discussing why we were going to
15  need counsel to talk about the Barclays
16  matter.  And the board's recollection was
17  exactly --
18         MR. GAFFEY:  Excuse me.  I'm going
19  to stop Mr. Marsal there given the
20  predicate that he just described and
21  instruct him not to answer on the ground
22  of privilege.  I'm sorry to do that in
23  the middle of an answer but I'm trying
24  to give you as much leeway as I can.
25         MR. THOMAS:  I understand.

Page 154

B. MARSAL - HIGHLY CONFIDENTIAL
1   MR. GAFFEY: Okay.
2   Q.   So I understand the sum of your
3   testimony on this is that you believe Mr.
4   Berkenfeld indicated it was roughly a push to
5   you prior to closing and that after closing
6   there were comments to that effect at a board
7   meeting from Mr. Rogers and potentially other
8   people at that meeting that would be reflected
9   in the minutes.
10  A.   It may or may not have been at a
11  board meeting. It may have been just in
12  asking people as we tried to reconstruct what
13  happened, asking them for their recollection
14  of what was the deal that you approved.
15  Q.   Do you have any specific
16  recollections of those conversations asking
17  people --
18  A.   Yeah. Specific -- as it relates
19  to -- as it relates to Fold and Berkenfeld
20  that -- I mean, as it relates to Fold and
21  Russo the timing -- I believe it was after --
22  well after the transaction had happened when I
23  asked what was your understanding of this.
24  Q.   That may have been November,

Page 155

B. MARSAL - HIGHLY CONFIDENTIAL
1   December --
2   A.   Then I asked the board. I asked
3   everybody on the board and they gave me the
4   exact same response.
5   Q.   You asked everyone on the board?
6   A.   Everyone who was in attendance at
7   the board meeting which I believe was most
8   everyone on the board.
9   Q.   Okay. Let me show you another
10  document.
11  This has been previously marked as
12  343A.
13  (Document review.)
14  Q.   Have you ever seen this document
15  before?
16  A.   No.
17  Q.   Are you aware that Barclays
18  conducted an analyst call on September 17th or
19  during that week of the sale negotiations?
20  A.   No.
21  Q.   If you would turn to the second
22  page of this document, please. The fifth
23  paragraph reads, "We also mentioned in our
24  announcement today that certain of our

Page 156

B. MARSAL - HIGHLY CONFIDENTIAL
1   shareholders have expressed support for the
2   transaction and an interest in increasing
3   their shareholdings in Barclays. In fact, the
4   transaction is capital ratio accretive with
5   additional equity issuance and the source of
6   that accretion is the negative goodwill from
7   the transaction which amounts to about 2
8   billion US dollars post tax."
9   Do you see that language?
10  A.   Yes.
11  Q.   Do you understand -- do you have
12  an understanding of what is meant by negative
13  goodwill?
14  A.   Yes.
15  Q.   Do you have an understanding of
16  what he's saying there is that Barclays is
17  going to make a gain on the transaction?
18  MR. GAFFEY: Objection. You can
19  answer.
20  A.   Yes.
21  Q.   Were you aware that Barclays was
22  publicly saying that during the week?
23  A.   No.
24  Q.   If Barclays was publicly saying

Page 157

B. MARSAL - HIGHLY CONFIDENTIAL
1   that during that week and there's no
2   requirement in the sale documents for the
3   agreement to be a push, do you think it's
4   reasonable for LBHI to go forward with the
5   sale on the assumption that it would be a
6   push?
7   MR. GAFFEY: Objection, form. And
8   calls for a legal conclusion. You can
9   answer.
10  A.   I don't know what to answer. I
11  mean, I happen to have -- I happen to be
12  pretty strong on the accounting front and what
13  I'd tell you is I don't know what you think
14  this means. But in terms of acquisition
15  accounting this could mean a lot of things.
16  This doesn't necessarily mean anything until
17  you understand what the nature of the $2
18  billion acquisition -- the $2 billion gain is.
19  So I would have drawn a conclusion anxious to
20  see what they got had I looked at this.
21  I had enough other things to worry
22  about at this time.
23  Q.   Let me show you a document that's
24  been previously marked as 462A. It's an

Page 158

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  e-mail from Conor Tully who I believe is with
3  FTI. Do you know Conor Tully?
4    A.  No.
5    Q.  Okay. Do you know FTI's role in
6  the -- with respect to the sale transaction?
7    A.  Yes.
8    Q.  And what was that role?
9    A.  Professional advisor to the
10 Unsecured Creditors Committee.
11   Q.  Okay. And one of the recipients
12 is William Fox. Does he work with Alvarez?
13   A.  Yes. At the time he was -- he was
14 head of accounting -- the accounting team.
15   Q.  Okay. And this e-mail is dated
16 October 6. And if you would look at one of
17 the -- the attachment which is the third page
18 of the document, page number 1. And at the
19 top it says Lehman Holdings/Barclays
20 Transaction.
21     Do you see that?
22   A.  Yes.
23   Q.  And the top left column it says
24 Repo Assets 38.07. And it says Negotiated
25 mark haircut 5 billion. And it says Assets

Page 159

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  transferred under repo (stale marks) 43.07.
3     Do you have an understanding of
4  what that's communicating?
5    A.  No. I haven't seen this before so
6  I don't -- I don't -- I don't know what a
7  stale mark is. What he meant by stale mark.
8  I don't know.
9    Q.  In the right column, where it
10 refers to a net book loss.
11   A.  (Witness nods.)
12   Q.  Do you have an understanding of
13 what that refers to?
14   A.  The value of the assets has gone
15 down by 3.27 million.
16   Q.  Okay. And in the context of the
17 sale transaction to Barclays, do you know what
18 that means -- what's gone down by
19 3.27 million?
20   A.  The value of the repo assets.
21   Q.  Okay. And do you have an
22 understanding of why it went down?
23   A.  No. I don't understand why it
24 went down.
25   Q.  Okay. Let me show you a document

Page 160

1    B. MARSAL - HIGHLY CONFIDENTIAL
2  we'll mark as 494.
3     (Deposition Exhibit 494, document
4     bearing production numbers AM 003874
5     through AM 003882, marked for
6     identification as of this date.)
7  BY MR. THOMAS:
8    Q.  It's an e-mail dated October 6,
9  2008 from Mary Korycki?
10   A.  Korycki.
11   Q.  Korycki?
12   A.  Um-hum.
13   Q.  And she's at Alvarez Marsal. And
14 what did she do at this time for Alvarez?
15   A.  She's an analyst for the -- in the
16 accounting department.
17   Q.  And you see it's sent to number of
18 different people at Alvarez & Marsal.
19     Were you aware that she was
20 working on this type of analysis of the deal
21 at this time?
22   A.  She was working in the accounting
23 department. I was aware she was working on
24 accounting matters. This specific analysis,
25 no.

Page 161

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    Q.  It references the materials being
3  for a 6 p.m. meeting on the front page. Do
4  you happen know what meeting that was?
5    A.  No.
6    Q.  Okay. Turning the page to the
7  second page of the recap -- actually, page 1.
8  It's Bates stamp 3877 at the bottom.
9    A.  Um-hum.
10   Q.  And it shows a recap of the week
11 ended September 19th. And under September
12 17th it says -- the first bullet says "As of
13 Wednesday, 9/17, the Fed had loaned Lehman 45
14 billion in exchange for 48 billion in
15 collateral."
16     Do you see that?
17   A.  Yes.
18   Q.  Was Alvarez -- do you know the
19 basis for that valuation of the collateral
20 being 48 billion?
21   A.  No.
22   Q.  Do you know if people at Alvarez
23 at this time were doing analysis of --
24   A.  They were not valuing the
25 collateral, no.

Page 162

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    Q.   Okay. Has anyone at Alvarez ever
3    tried to value the collateral?
4    A.   Lehman -- Lehman has been
5    attempting to evaluate the collateral well
6    into the summer of 2009. Not before then.
7    Q.   When did they start?
8    A.   I don't know. Sometime after the
9    second quarter. Thereabouts.
10    Q.   Why is it taking so long?
11    MR. GAFFEY: Objection to the
12    form.
13    A.   You could probably answer that
14    better than I could.
15    Q.   I know. I'm not allowed to,
16    though.
17    A.   I think the gathering of
18    information has been very difficult. Trying
19    to understand the value and the basis by which
20    people value things.
21    Q.   All right. Let's move on. Let me
22    show you a document which has been previously
23    marked as 461A.
24    A.   It wasn't that long, by the way.
25    We're moving pretty good.

Page 163

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    Q.   I know.
3    A.   No, but I mean gathering this fact
4    base.
5    Q.   Oh, okay.
6    A.   After one year. This is a pretty
7    good fact base after one year. Enron it took
8    them three years.
9    Q.   I take it they're not assets that
10    you could just look up on a database somewhere
11    and see what they are?
12    A.   Well, you got to have the database
13    first. That's the biggest problem.
14    Q.   Are they -- are some of them
15    illiquid assets?
16    A.   There are liquid assets and
17    illiquid assets. Not among this category.
18    Most of this is liquid stuff. Most of the
19    other category is illiquid assets. Real
20    estate and the like.
21    Q.   This is a Powerpoint approved by
22    Alvarez & Marsal. It's dated October 8th,
23    2008 entitled Report to Unsecured Creditors
24    Committee.
25    A.   Um-hum.

Page 164

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    Q.   Do you recall being involved in a
3    presentation to the Creditors Committee about
4    this time?
5    A.   Yes. I presented it.
6    Q.   And did you present this actual
7    Powerpoint?
8    A.   I presented sections of the
9    Powerpoint. As you see on page 2, the various
10    presenters of the various sections on page 2
11    of the presentation.
12    Q.   Was it -- so where did this
13    meeting take place?
14    A.   I don't recall but it would have
15    been either at Weil Gotshal or Milbank. We
16    alternate meeting locations.
17    Q.   Other than Alvarez/Lehman people
18    and people from the Creditors Committee was
19    anyone else there?
20    A.   Professionals from the Creditors
21    Committee. No one else.
22    Q.   And -- I mean, Creditors
23    Committee, that would be --
24    A.   The Unsecured Creditors Committee.
25    Q.   Houlihan, for example?

Page 165

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    A.   Houlihan and FTI would be there.
3    Q.   Anybody from Weil there?
4    A.   Oh, yes.
5    Q.   Anybody from the trustee?
6    A.   No.
7    Q.   If you would turn to page 4531,
8    please, which is page 28 of the presentation.
9    And you see it's a description of the sale to
10    Barclays and it has a list of assets
11    purchased. Was part of the presentation
12    designed to give -- convey what assets were
13    transferred as part of the sales transaction?
14    A.   Yeah. The purpose of the
15    transaction was just to give a summary
16    overview of what had happened in the course of
17    two and a half weeks.
18    Q.   Um-hum.
19    A.   At which that was one of the
20    items, yeah.
21    Q.   Okay. And under the assets
22    purchased -- and when it says Assets Purchased
23    that's purchased pursuant to Barclays'
24    purchase agreement, correct?
25    A.   I believe so, yes.

Page 166

1       B. MARSAL - HIGHLY CONFIDENTIAL
2       Q.   It has 1.9 billion unencumbered
3   box listed there.
4       A.   Um-hum.
5       Q.   Do you -- do you recall that that
6   was some of the assets that were transferred
7   as part of the deal?
8       A.   No, I do not know.  Jim Fogarty
9   presented this so he would -- he'd be the
10  right party to speak to this.
11      Q.   Okay.  The first bullet point says
12  "43.1 billion repo assets - book value per
13  Lehman stale marks negotiated a $5 billion
14  reduction."
15      Do you see that?
16      A.   Yes.
17      Q.   Okay.  There's -- in your motion,
18  your Rule 60 motion filed in this matter,
19  there's reference to a $5 billion discount.
20      Are you aware of that?
21      A.   Yes.
22      Q.   Okay.  Is this the $5 billion
23  discount that's referred to in your motion?
24      MR. GAFFEY:  Objection to the
25  form.  You can answer.

Page 167

1       B. MARSAL - HIGHLY CONFIDENTIAL
2       A.   I do not know -- I mean, I do not
3   know what the basis of this $5 billion
4   reduction is.  I believe that there are
5   separate...
6       Q.   What do you understand the
7   discount in your motion to be referring to?
8       A.   I'd have to look at the motion
9   again but -- as to what you're speaking about.
10      Q.   Okay.  Let me go ahead and mark
11  this as 495.
12      (Deposition Exhibit 495, Debtor's
13  Rule 60 Motion, marked for
14  identification as of this date.)
15  BY MR. THOMAS:
16      Q.   A copy of LBI's Rule 60 motion in
17  this matter.  And you're welcome to look at as
18  much or as little as you want but I'm going to
19  direct your attention to paragraph 91.
20      A.   91, okay.
21      (Document review.)
22      A.   Okay.  Would you like me to read
23  beyond 91?
24      Q.   Well, again, you're welcome to
25  read more but the sentence in here I want to

Page 168

1       B. MARSAL - HIGHLY CONFIDENTIAL
2   draw your attention to is, "Later that day,
3   pursuant to the repurchase agreement, Barclays
4   forwarded to LBI approximately $45 billion in
5   cash and LBI was to post collateral valued at
6   approximately $50 billion in securities
7   reflecting an approximate $5 billion discount
8   or haircut in the value of LBI's collateral."
9       And then in paragraph 100 there's
10  a reference to "The undisclosed decision to
11  use the repurchase agreement to deliver the
12  discount conveniently solved the problem."
13      Do you see that?
14      A.   Um-hum.
15      Q.   And then again on paragraph 104
16  there's testimony about -- excuse me.  It
17  reads, "Lowett was not the only witness to
18  concede that the repurchase agreement was
19  employed to ensure that Barclays got its extra
20  $5 billion."
21      Do you see that?
22      A.   Yes.
23      Q.   So is the $5 billion that Lehman
24  is concerned about, the discount that they're
25  concerned about in their motion, is that the

Page 169

1       B. MARSAL - HIGHLY CONFIDENTIAL
2   difference between what Lehman now believes to
3   be the correct value of the repo collateral
4   and the amount at which it was valued for
5   purposes of the deal?
6       MR. GAFFEY:  Objection to the
7   form.
8       A.   Well, I mean, again, if you're
9   asking me the question about this presentation
10  that was done in October when the words stale
11  marks -- if you're asking me what I -- the
12  interpretation that I draw from this
13  presentation, the presentation when it said
14  stale marks, that would tell me that the marks
15  were old.  The marks were out of date.  And
16  that the value of the collateral had actually
17  deteriorated $5 million that they were
18  receiving.  That's what I would have
19  interpreted this -- that's what I actually
20  interpreted this as which would have made
21  sense to me given the market conditions that
22  there had been a drop in the value of the
23  securities.
24      Q.   And by stale marks meaning that
25  after September 12th the marks were being

43

Page 170

1     B. MARSAL - HIGHLY CONFIDENTIAL
2     updated throughout that week of chaos and
3     so --
4         A.   Yes.
5         Q.   So the stale marks would refer to
6     the marks that were just on the books from the
7     preceding week before bankruptcy.
8             MR. GAFFEY: Object to the form.
9         You can answer.
10        A.   Yes.
11        Q.   Okay. And your understanding of
12    this was that the parties agreed that those
13    marks were stale and there needed to be some
14    type of updated valuation of those assets?
15            MR. GAFFEY: Object to the form.
16        You can answer.
17        A.   Yes. My understanding was -- is
18    that the parties had negotiated based on an
19    updated assessment, their assessment of the
20    value of the securities, and that that's what
21    this had represented, that there had been a
22    deterioration in the securities during this
23    period of time, during the market chaos.
24        Q.   And the parties had gotten
25    together, both sides, that week and sat down

Page 171

1     B. MARSAL - HIGHLY CONFIDENTIAL
2     and discussed how to value those assets.
3         A.   At this time that's what I
4     believed. Yes. As of October 8th that's what
5     I believed.
6         Q.   Okay. And so isn't it -- what do
7     you believe differently now?
8         A.   I don't believe that's what
9     happened. I believe that there was a built-in
10    gain in this transaction. And I don't believe
11    a built-in gain means a push.
12        Q.   And do you still believe that the
13    marks were stale in the sense that the ones on
14    the books were from the preceding week?
15        A.   Yes. I believe that if -- that
16    you would update the value of the securities.
17    And that in that kind of a market you would
18    have to update the securities and if the last
19    marks you had were based on Friday, the 12th,
20    my assumption would be that now the problem is
21    the market could have deteriorated in some
22    securities and improved in other securities.
23    For example, governments would go up in that
24    period and other securities might go down.
25            So that made sense to me that

Page 172

1     B. MARSAL - HIGHLY CONFIDENTIAL
2     there was a drop in the value of the overall
3     portfolio.
4         Q.   Couldn't some -- some could go up,
5     some could come down but it's likely the
6     overall portfolio value was --
7         A.   Was down by 5 billion. Yes.
8     That's what interpreted by this.
9         Q.   Right. And do you still believe
10    that the parties got together and tried to
11    address the stale mark problem by putting an
12    updated value on the securities that were --
13        A.   Yeah.
14        Q.   You do.
15        A.   I believe that they attempted to
16    do that. That's what's been represented.
17        Q.   And do you believe that was a good
18    faith effort to try to update the value of
19    those securities?
20            MR. GAFFEY: Objection to the
21        form. You can answer.
22        A.   I don't know the definition of
23    good faith effort. They attempted to put a
24    value on these securities. And as I
25    indicated, I mean, what I'd like to do is to

Page 173

1     B. MARSAL - HIGHLY CONFIDENTIAL
2     inspect what was actually done. I'd like to
3     understand the underpinnings of that before
4     anybody gets accused of any impropriety or any
5     breach of fiduciary. I just don't have the
6     facts. That's all I'm looking for. I'm not
7     going to accuse anybody until I get the facts.
8         Q.   Okay. Do you fault in any way the
9     way they went about trying to update those
10    stale marks in that environment of the time?
11    I mean, should they have done something they
12    didn't do?
13        A.   I mean, I would speculate as to
14    the -- I would have done it differently but
15    that's me. I mean, that's my opinion and it's
16    worth nothing in this argument.
17        Q.   How would you have done it
18    differently?
19            MR. GAFFEY: Object to the form.
20        You can answer.
21        A.   I would have attempted to -- I
22    would have attempted to identify what the
23    values were CUSIP by CUSIP that I was placing
24    on it. And I would have attempted to provide
25    myself with some type of a reasonable cushion

Page 174

1     B. MARSAL - HIGHLY CONFIDENTIAL
2   until the transaction closed in which case
3   that cushion would have been released to the
4   company. Had I believed that I was really
5   giving -- here's the liabilities I'm assuming
6   and here are the assets I'm providing.
7        I do not think Barclays for the
8   benefit of their bargain should have been out
9   a dollar. I just don't think Barclays should
10  have made a dollar on this transaction in
11  terms of the actual transaction itself.
12       Q.   When you say provide a cushion,
13  you mean value -- can you explain what you
14  mean by that?
15       A.   Just as I would always provide a
16  modest cushion to loan-to-value relationship
17  I would try to do that and then I would
18  provide that cushion for protection.
19       Q.   So you'd have -- you'd have the --
20       A.   And a true-up at the end of the
21  process.
22       Q.   So you'd have the estimate of
23  assets you were getting being a little higher
24  than the estimate of liabilities you were
25  taking.

Page 175

1     B. MARSAL - HIGHLY CONFIDENTIAL
2        A.   Yes.
3        Q.   Okay. And then you said you'd put
4   into the contract that true-up provision if
5   that was the bargain between the parties.
6        A.   Yes.
7        Q.   Now, having been through all of
8   that, isn't this $5 billion reduction the same
9   thing as the discount that's being described
10  in the motion --
11       A.   No.
12       Q.   -- because it's a difference?
13       A.   No.
14       Q.   How is it different?
15       A.   Because I think this $5 billion
16  reduction was because of the value of the
17  securities -- it was believed that the value
18  of the securities had deteriorated during the
19  chaos of the week of the 15th. What was not
20  contemplated was that there was a built-in
21  gain.
22       Q.   So it's your belief that there was
23  some $5 billion reduction beyond the simple
24  updating of the security of the stale marks?
25            MR. GAFFEY: Object to the form.

Page 176

1     B. MARSAL - HIGHLY CONFIDENTIAL
2   You can answer.
3        A.   I'm sorry. What this -- which
4   question are you asking? With the 60 -- which
5   motion says what? This transaction -- the
6   October presentation is basically saying, hey,
7   the value of the securities has declined.
8   It's been reported that the value of those
9   securities has declined. People associated
10  with those securities have told us that the
11  value declined $5 billion. The inference
12  we're getting. And thus in order to do that
13  we're going to have to provide the
14  securities -- but we're still getting the
15  benefit of the bargain that the assets being
16  exchanged equal the liabilities being assumed.
17       What the 60B motion is suggesting
18  is something very different. There wasn't the
19  assets equalling the liabilities. In fact,
20  the assets did not equal the liabilities. The
21  assets were significantly in excess of the
22  liabilities.
23       Q.   And the $5 billion decline, that
24  was something measured prior to closing
25  between the -- when the two parties are

Page 177

1     B. MARSAL - HIGHLY CONFIDENTIAL
2   getting together and trying to update those
3   values, correct?
4            MR. GAFFEY: Objection to form.
5        A.   The $5 billion reduction?
6        Q.   Yes.
7        A.   You're talking about in the
8   October presentation?
9        Q.   Yes.
10       A.   The $5 billion -- I believe what
11  it was was that Fogarty would have been told
12  by whoever had valued these that the value of
13  the collateral, the value of the collateral
14  had gone down by $5 million -- $5 billion
15  during the chaos of the week.
16       Q.   Right. Okay. I just wanted to
17  confirm that it wasn't this -- this updated --
18  the updated valuing of the stale marks from
19  the pre-bankruptcy close was done between the
20  parties the week of the 15th and not like the
21  date of this presentation.
22       A.   No.
23       Q.   There wasn't some separate thing
24  done.
25       A.   No, no, no. That's correct.

Page 178

1    B. MARSAL - HIGHLY CONFIDENTIAL
2       Q.   I just want to make sure we're
3   talking about the same thing.  Okay.
4           And -- okay.
5       I'll take one more stab at this.
6   But to me that seems like that's the discount
7   that's referred to in the sections I just
8   showed you.  And I wanted to just understand,
9   if you could, why you think that that's any
10  different when the complaint talks about the
11  delta between nominal value and the value put
12  on the assets as part of the process of the
13  parties trying to update those values.
14          MR. GAFFEY:  Object to the form.
15      A.   We go back over the October
16  presentation again.  What I said was the
17  October presentation to me by virtue of this
18  book value, not market value but the words
19  book value, per Lehman's stale marks.  So the
20  book value was the value that had been placed
21  on it as of the last time the accounting
22  system had marked these securities.
23          Stale meant they had to be
24  updated.  Updating it -- after updating the
25  market value was down by $5 million.  Market

Page 179

1   value decline of $5 million has nothing to do
2   with the word discount which is in here.  The
3   world discount in here implies there was a
4   built-in gain in the transaction.
5           This implies -- the October
6   presentation implies that there was a decline
7   in the market value of the securities.  It
8   does not have anything to do with the built-in
9   gain that is implied here.
10      Q.   But aren't those just different
11  words or characterizations referring to the
12  same delta?
13      A.   No, sir.  Very different.  The
14  numbers happen to be the only thing that you
15  have got that's similar.  It's very different.
16  This would be the value of the securities
17  which we all believed was worth -- let's just
18  use a number -- a hundred.  It was really not
19  worth a hundred.  It's really when you got
20  down to it an updated -- when you updated the
21  securities, you found out that it was really
22  only worth 95.  That's what was in the October
23  presentation.  That's why this did not trouble
24  anyone because the benefit of the bargain was

Page 180

1    B. MARSAL - HIGHLY CONFIDENTIAL
2   you get value for value.  You're assuming
3   liabilities.  You get value in exchange for
4   it.  That is what this October presentation
5   assumed.  This is saying something different.
6   This is saying that wasn't the benefit of the
7   bargain.  We made a mistake.  What you're now
8   telling us is that there was a built-in gain
9   in this transaction.  That, in fact, it wasn't
10  a $5 billion -- it was a 105 that you got.
11  You took off 5 and you made a hundred when we
12  thought you were making 95.  That's a -- this
13  relates to the word reduction in market value.
14  This relates to built-in gain.  Too very, very
15  different concepts.
16      Q.   Well, but isn't this referring
17  to --
18      A.   At least you're asking me what I
19  thought.
20      Q.   Right.  The 43 billion and the
21  $5 billion reduction, that's referring to the
22  Fed repo collateral that came to Barclays.
23      A.   Whatever the collateral that came
24  to Barclays; yes.
25      Q.   All right.

Page 181

1    B. MARSAL - HIGHLY CONFIDENTIAL
2       A.   I don't know -- because it went
3   through JPMorgan.  I don't know what the heck
4   ended up coming in to you.
5       Q.   Right.  But isn't that part of --
6   is it part of LBHI's claim that that
7   collateral, which is the subject of this
8   updating of stale marks thing, was really
9   worth its nominal value, whatever it was?
10      A.   Well, I think --
11          MR. GAFFEY:  Objection to the
12      form.  And to the extent -- the 30(b)(6)
13      is over so embedded in that objection is
14      I think it's an inappropriate question
15      for Mr. Marsal but he can answer the
16      question.
17      A.   Well, again, I just think, Todd,
18  that you got two completely different issues.
19  This page is addressing the fact that during
20  the craziness of the week of the 15th, that
21  there was securities which were held by
22  various parties.  And those securities had
23  dropped in value during that week that -- such
24  that at the time of the transaction the value,
25  the actual value being provided was down by

Page 182

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    $5 billion.
3        This is saying something very
4    different. This is saying that, yeah, that
5    happened. And in addition there was built-in
6    gain which is very different than what's being
7    talked about here. Because this concept which
8    didn't alert anybody to anything was saying,
9    hey, the benefit of the bargain was value for
10   value. What this says is value plus 5 versus
11   value. That's very different. These two
12   pieces of paper are -- it's like comparing an
13   apple to an orange. The only thing that's in
14   common is the number.
15       Q.   And the date -- the last date for
16   the stale marks I think you've already said
17   the last date would be September 12th.
18       A.   I think so. I don't know for
19   sure. But it would have been -- it would have
20   been August 30th or the 12th of September.
21       Q.   Okay. Let me go ahead and show
22   you a document that we'll mark as 496.
23       (Deposition Exhibit 496, document
24       bearing production numbers WGM-LEHMAN-E
25       0001363 through WGM-LEHMAN-E 0001368,

Page 183

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        marked for identification as of this
3        date.)
4    BY MR. THOMAS:
5        Q.   It's an e-mail from Harvey Miller
6    to yourself.
7        (Document review.)
8        A.   Yes.
9        Q.   Do you recall this e-mail dated
10   December 5th?
11       A.   I do, yes.
12       Q.   Okay. In the second half of the
13   second paragraph Mr. Miller is saying, "JPM
14   believes that the settlement is an
15   advantageous settlement because the securities
16   which are being released to Barclays which is
17   in addition to the cash of 1 and a quarter
18   billion dollars does not have a value that
19   would equal an aggregate of $7 billion."
20       Do you recall the fact that the
21   securities that were supposed to go over to
22   Barclays that were part of the repo collateral
23   and were supposed to go over to Barclays, not
24   all of those securities, not all of that
25   collateral made it over to Barclays?

Page 184

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        A.   Not at the time of this letter I
3    didn't know.
4        Q.   Do you know that now?
5        A.   I understand it to be the case
6    now.
7        Q.   And do you understand Harvey here
8    to be saying that the assets that we're going
9    to put in -- we're going to give -- as part of
10   the settlement Barclays is going to get some
11   cash and some securities and that JPM believed
12   it was a good settlement for Lehman because
13   the securities really weren't worth their
14   nominal value?
15       MR. GAFFEY: Objection to the
16   form.
17       A.   I don't know about the nominal
18   value.
19       MR. GAFFEY: Wait, wait.
20       Objection to the form and no foundation.
21       You can answer, Bryan.
22       A.   Just state your question again.
23   I'm sorry.
24       Q.   Sure. Do you recall being
25   informed that JPM thought it would be a

Page 185

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    favorable settlement, the one that was entered
3    with Barclays, over the -- we'll call it the
4    missing $7 billion?
5        A.   As represented by Hal Novakoff to
6    Harvey Miller, yes. I didn't have any
7    conversations with him other than this from
8    Harvey.
9        Q.   Okay. Let me step back. I think
10   you mentioned earlier in your testimony about
11   how you may or may not have gone forward with
12   the deal had you known everything you know
13   today. And I just wanted to pick up on that
14   and ask you if you were fully in charge of
15   Lehman as of September 12th, knowing
16   everything you know today, what would you have
17   done differently?
18       MR. GAFFEY: Objection. It's a
19   hypothetical. You can answer.
20       A.   I would have expected the
21   transaction to, in fact, have been a push with
22   a hold-back and an appropriate true-up so that
23   the value that people -- if the decision was
24   made to give that as the purchase price which
25   I believe was the best -- was the best deal

Page 186

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    available under the circumstances, the
3    transaction as proposed between Barclays and
4    Lehman as approved by Lehman's board, I would
5    have handled the transaction very differently.
6    I would have tried to get the market value of
7    the securities. I would have left more
8    securities on the table for Barclays to do
9    that in an orderly fashion. At least
10   comfortable fashion. I would have had
11   Barclays be given the opportunity to decide
12   what liabilities they were going to assume or
13   not assume and to the extent they did not do
14   that I would have returned the proceeds,
15   whatever the net was.
16       Q.   So you would have bargained for --
17   tried to bargain for a push and a hold-back or
18   true-up provision that would allow that to
19   actually take place in an environment where
20   you couldn't really identify in value
21   real-time all of the assets?
22       A.   Until we get --
23           MR. GAFFEY: Same objection. You
24   can answer.
25       A.   As long as what we needed to do is

Page 187

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    we did not have a basis at that time, it seems
3    to me we did not have a basis to confirm what
4    the liabilities were that were being assumed.
5    We assumed it was going to be book value. The
6    book value would have been global book value.
7    Barclays was originally talking about a global
8    acquisition. They didn't make a global
9    acquisition. They only made a North American
10   acquisition. There was an accrual on the
11   bonuses. What we would like to have done is
12   what happened in the first quarter is we
13   concluded that that accrual beared -- there
14   was no relationship to the numbers that were
15   used by the management team in the bonus
16   accrual and in the assumed liabilities. There
17   was no relationship between those and reality.
18   We didn't understand that. That's why the
19   preservation of the data and having the
20   information flow was so important. That
21   information was just not available until the
22   first quarter and that's when the questions
23   came up and nobody wants to address those
24   questions.
25       Q.   Do you have an opinion as to

Page 188

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    whether the estate is better off having done
3    the deal that was actually done versus not
4    doing any deal?
5           MR. GAFFEY: Objection to the
6    extent it calls for an opinion. He's a
7    fact witness.
8       A.   I can't answer that. I can't
9    answer. In hindsight it was a very difficult
10   period. It was a very difficult period.
11       Q.   If Barclays had not been willing
12   to take the Fed out do you have any sense of
13   what would have then happened going forward?
14          MR. GAFFEY: Objection to the
15   form. Calls -- it's a hypothetical.
16       A.   I don't know what would have
17   happened. The jobs would have been
18   jeopardized. The wind-down would have been
19   less smooth. And it probably would have
20   precipitated even a deeper crisis, global
21   crisis, than what was already happening.
22       Q.   Do you know whether the Fed would
23   have insisted on unwinding its repo before
24   LBI's SIPC liquidation?
25          MR. GAFFEY: Objection.

Page 189

1    B. MARSAL - HIGHLY CONFIDENTIAL
2       A.   No idea.
3       Q.   Did the -- did Lehman have any
4    other options for DIP financing?
5           MR. GAFFEY: Objection. You can
6    answer.
7       A.   I didn't participate in the DIP
8    discussions but I would assume yes.
9       Q.   Do you know who was going to offer
10   to provide DIP financing?
11       A.   I don't know who, but we would
12   have provided DIP financing, but it would have
13   just been at a very, very high
14   loan-to-collateral ratio and -- a
15   collateral-to-loan ratio and it would have
16   been very expensive.
17       Q.   But you think someone would have
18   been -- can you name any candidates that might
19   have been able to extend it in that situation
20   where the Fed gets -- unwinds its repo?
21          MR. GAFFEY: Objection.
22       A.   It wouldn't have been the Fed's
23   repo though.
24          MR. GAFFEY: Bryan, give me a
25   minute.

Page 190

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        Objection. You can answer the
3    question.
4        A.    Okay. I mean, the DIP financing
5    was $200 million. The value of the building
6    was $1 billion.
7        Q.    Did you say million or --
8        A.    It was 200 million. 200 million.
9    So the value of the building was $1 billion.
10   The question is would we have been able to
11   find a different DIP lender for $200 million
12   on a 5-to-1 ratio. I think so. Based on
13   being in that business I think so. But it
14   would have probably been at 18 to 19 percent
15   cost of capital.
16       Q.    To what extent did LBHI have
17   guarantees on LBI's obligations?
18       A.    I would have to check with
19   counsel. I mean, it's very confusing. We
20   guarantee a lot of the subsidiaries. Many of
21   the derivative subsidiaries are guaranteed by
22   the parent. Whether there was reliance on
23   those guarantees is probably another issue.
24   But the -- I know on the derivative front. I
25   don't recall what we guarantee of LBI's

Page 191

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    obligations.
3        Q.    You're not aware of how much
4    exposure LBHI would have if LBI had just not
5    been able to do this -- do a deal and continue
6    on? Would have had to just liquidate?
7        A.    I don't know what that exposure
8    would be.
9        Q.    Do you know if --
10       A.    I mean, I'm sure there are people
11   in our organization that would know what that
12   exposure would be.
13       Q.    Do you know if LBI would have been
14   able to open its door for business on
15   September 22nd if the deal had not gone
16   through?
17       A.    Would not have been able to.
18   Definitely would not have been able to do.
19       Q.    And the consequences of that --
20   there would have been consequences obviously
21   to the LBHI estate in terms of LBHI's
22   obligations. But you're not sure of the order
23   of magnitude of those obligations?
24       A.    I don't know what the -- I don't
25   know what the guarantee story as it relates to

Page 192

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    LBHI versus LBI. Hadn't really been a focus.
3    But I know I have people who have focused on
4    that. John Suckow would be the right guy to
5    get that information from.
6        Q.    You're aware that Barclays
7    provided DIP financing during the week of
8    September 15th?
9        A.    Yes.
10       Q.    You don't believe that Barclays
11   would have provided that if it weren't doing
12   the purchase, do you?
13           MR. GAFFEY: Object to the form.
14       A.    I don't know. It was a good
15   transaction for them. They made a significant
16   amount of money for a very short DIP period.
17   I would have.
18       Q.    Absent DIP financing, how would
19   the LBHI and LBI estates have operated, hired
20   employees, managed the assets, and so forth?
21       A.    It would have had to get DIP
22   financing.
23           MR. GAFFEY: Objection.
24       A.    It's just -- let me just finish
25   your answer. It's just not DIP financing. It

Page 193

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    was also asset sale proceeds came in from
3    other unencumbered assets that were out there.
4    We would have had a delay, but there were
5    unencumbered asset sales that took place after
6    the proceeding that started to build cash.
7        Q.    Would LBI have defaulted on the
8    Fed repo if Barclays had not signed the APA
9    and assumed the Fed repo?
10           MR. GAFFEY: Objection.
11       A.    I don't know.
12       Q.    Do you know -- if they had
13   defaulted, do you know if there's any
14   mechanism in place for the Fed to liquidate
15   the collateral beyond the repo agreement
16   itself?
17       A.    The repo agreement.
18       Q.    Yeah, okay.
19           Would LBHI have been on -- have
20   been the guarantor of LBI's repo obligation to
21   the Fed?
22       A.    I do not know but I don't think
23   so.
24       Q.    Could JPMC have asserted claims
25   against LBHI if LBI was not able to repay the

Page 194

B. MARSAL - HIGHLY CONFIDENTIAL

1  $7.4 billion locks loan?
2  MR. GAFFEY: Objection.
3  A.  They would probably try.
4  Q.  Did you ever make a report to the
5  board that the LBHI bankruptcy was premature?
6  A.  Premature?
7  Q.  Yes.
8  A.  Premature. I do not think I'd use
9  the word premature. A bankruptcy isn't an
10  option if you run out of cash. When the
11  liquidity runs out and obligations are due you
12  don't have the option of delaying if it ran
13  out of liquidity.
14  Q.  Did you ever offer any analysis to
15  the board of whether -- of something that
16  should have been done that wasn't done or vice
17  versa?
18  A.  Yes. I explained to the board
19  that there should be an orderly wind-down with
20  liquidity being provided by the Fed. As
21  opposed to a free-fall bankruptcy. And had
22  that been done there would have been --
23  significant value would have been preserved
24  for the creditors.
25

Page 195

B. MARSAL - HIGHLY CONFIDENTIAL

1  Q.  And where did that fail to get
2  done? Was it just something the Fed refused
3  to do?
4  A.  Yeah. The Fed did not provide
5  liquidity.
6  MR. THOMAS: I don't have a whole
7  lot more so why don't we take a short
8  break now and I'll just organize my
9  thoughts. Thanks.
10  THE VIDEOGRAPHER: The time is
11  2:22. We are going off the record.
12  (Recess taken.)
13  THE VIDEOGRAPHER: The time is
14  2:27. We are back on the record.
15  BY MR. THOMAS:
16  Q.  I'll go ahead and show you a
17  document we'll mark as 497.
18  (Deposition Exhibit 497, facsimile
19  transmittal sheet dated 2/19/2009
20  covering letter dated February 19, 2009,
21  marked for identification as of this
22  date.)
23  MR. ROTHMAN: Do we get to see it,
24  too?
25

Page 196

B. MARSAL - HIGHLY CONFIDENTIAL

1  MR. THOMAS: Ah.
2  (Document review.)
3  A.  Yes.
4  Q.  You're familiar with this
5  document?
6  A.  I authored it, yes.
7  Q.  Okay. It's a letter from you to
8  Barclays, February 19th, expressing concerns
9  about the deal?
10  A.  Yes.
11  Q.  And February 19th, this was maybe
12  approximately a week and a half after Barclays
13  had announced a gain on the transaction?
14  A.  I don't recall exactly when it was
15  but it was after the announcement, yes.
16  Q.  Yeah. And you were aware of the
17  announcement when it was made by Barclays?
18  A.  Yes.
19  Q.  Okay. My question is after the
20  announcement by Barclays that this was a gain
21  on the transaction and you're writing a letter
22  to them about the deal, and you ask about --
23  some details about bonus accrual and cure
24  amounts, why didn't you say anything to the
25

Page 197

B. MARSAL - HIGHLY CONFIDENTIAL

1  effect of I thought this deal was supposed to
2  be a push?
3  MR. GAFFEY: Object to the form.
4  A.  In this letter?
5  Q.  Yes.
6  A.  Isn't that implied in this letter?
7  Q.  Is that -- where do you -- where
8  do you refer to your understanding that the
9  deal was supposed to be a push?
10  A.  Because if it wasn't it would be
11  completely irrelevant.
12  Q.  Well --
13  A.  If it wasn't, it would be
14  completely irrelevant which is what I think
15  the response I got from them was. It's
16  irrelevant what these categories of assets are
17  or aren't.
18  Q.  Well, if -- you're talking about
19  separate liabilities in the contract. Let's
20  say if Barclays had a contractual duty to pay
21  a certain amount in comp, even if there's no
22  push it's not necessarily irrelevant, right?
23  You'd say, hey, you know, you were supposed to
24  do this on comp or you were supposed to do
25

Page 198

1      B. MARSAL - HIGHLY CONFIDENTIAL
2    this on cure amounts.
3      A.   Yeah.
4      Q.   It wouldn't be irrelevant just
5    because there's no overarching push
6    requirement to the deal.
7         So why is there no reference to
8    the fact that they were making a gain in this
9    letter?
10      A.   This letter was an attempt --
11    again, our basis -- the basis upon which we
12    thought the transaction was structured was
13    that we were giving fair value for the
14    assumption of liabilities, unsecured
15    liabilities, and the secured debt. There was
16    never -- we were not challenging the
17    securities as we challenged later on. At this
18    stage it was -- the question came up was there
19    a gross mistake made, unwittingly made because
20    of the chaos associated with this transaction.
21    Was there a gross error made in the assumption
22    and thus an overpayment unwittingly made in
23    these two categories. That was what -- that's
24    what this letter results in.
25         We set aside -- at that time there

Page 199

1      B. MARSAL - HIGHLY CONFIDENTIAL
2    was the belief that A equalled -- that the
3    assets set aside equalled the liabilities that
4    were being assumed. There was never a -- we
5    did not at that point in time understand as we
6    did later that there was a further problem
7    with the transaction.
8         The first problem with the
9    transaction was we thought fair value had been
10    exchanged but the liabilities had been
11    unwittingly -- nobody's accusing anyone of
12    anything -- unwittingly overstated. And if it
13    was overstated, you know, this is what we
14    read, that's what we thought was in their
15    first quarter results where they were
16    recognizing a gain from these two categories.
17    Among other things. There was some purchase
18    accounting gains as well in that quarterly
19    report which doesn't relate to this and
20    because of purchase accounting we were not
21    challenging that. We were challenging the
22    fact that this related to the cure
23    liabilities. Did you have gain from that
24    because you didn't pay the money out as we had
25    anticipated. Was there a mistake, a mutual

Page 200

1      B. MARSAL - HIGHLY CONFIDENTIAL
2    mistake made. That was the purpose of this
3    letter.
4      Q.   So breaking that down, you
5    recognize that some of the gain announced by
6    Barclays was the result of purchase
7    accounting.
8      A.   Yes.
9      Q.   Not of a difference between assets
10    and liabilities but purchase accounting.
11      A.   Yes.
12      Q.   Okay. And at any point did you
13    communicate in substance to Barclays, hey, how
14    could you be having a gain on this if this is
15    supposed to be a wash?
16      A.   No, but the issue was -- at this
17    point the issue was not about the wash. The
18    issue was was there a mistake made in the
19    calculation of the liabilities that you were
20    assuming. It was not a question of $100 over
21    here, $100 over there, we did not sense what
22    we later sensed in the 60B motion or whatever
23    that there was a mistake in the calculation of
24    this hundred dollars. We thought this was
25    worth a hundred. We thought this was worth a

Page 201

1      B. MARSAL - HIGHLY CONFIDENTIAL
2    hundred. And that the question was was there
3    a mistake made by the accounting side of the
4    house when they were negotiating this deal to
5    the detriment of billions of dollars. And was
6    there a gross miscalculation -- if this had
7    been a little bit of money there wouldn't have
8    been a call. This was billions of dollars.
9    How could this be? How could you assume that
10    this was the liability when in fact it's
11    turning out to be far, far less than that. So
12    the issue wasn't about the wash. That just
13    continued to be an assumption until later in
14    this situation where we said, wait a minute,
15    you know, what's going on with the next part
16    of this transaction which was the value of the
17    securities.
18         That's the second challenge that
19    occurred. The first challenge was just
20    related to the liabilities.
21      Q.   But -- so the amount of the
22    liabilities that Barclays incurred didn't
23    factor into the wash question.
24      A.   No. The liabilities -- the
25    liabilities that we were assuming, if you've

Page 202

B. MARSAL - HIGHLY CONFIDENTIAL

1    got -- 4 billion was over here was assumed to
2    be liabilities, if the liabilities turned out
3    to be 1, where did you get the 4 from? And it
4    just so happens that the guys who provided you
5    the estimate of 4 are now on your payroll.
6    Shouldn't we find -- shouldn't we discover
7    what exactly from -- without going to court,
8    shouldn't we talk about this and get an
9    explanation. And the reaction we got was read
10   your contract. That's the reaction. Read
11   your contract.
12       So, I mean, the point of it is we
13   weren't challenging the wash. The wash was --
14   that was always the case in our mind. A
15   hundred for a hundred. That was the benefit
16   of the bargain. Weren't not trying to undo
17   the transaction. But where did you get this
18   number for $4 billion.
19       Q.   But was the amount -- the estimate
20   for liabilities that might be assumed or
21   potential exposure liabilities, was that part
22   of your equation for thinking it was a wash?
23   Meaning you're getting -- wouldn't that be
24   part of the equation?

Page 203

B. MARSAL - HIGHLY CONFIDENTIAL

1    A.   The equation was simple. On the
2    left side you have a hundred billion of
3    securities. Let's put the numbers for ease.
4    On the right side 4 billion of payables, 96
5    billion of secured debt. For ease. We said,
6    you know, that's the benefit of the bargain.
7    They got a good bargain. So be it. We live
8    with it.
9        Then we started looking at the --
10   when the financial accounting systems kicked
11   in and we started to be able to look at what
12   happened on the accounting, where did this 4
13   billion come from? We can't reconcile this
14   number which is this letter. How did we get 4
15   billion?
16       Q.   But under your scenario if the 4
17   billion in liabilities was actually -- was
18   less, you have to assume less, that would
19   implicate the wash. It wouldn't be a wash,
20   right?
21       A.   It would be a gain. There would
22   be a gain. How would -- because the intention
23   of the parties was to set aside -- there was a
24   $4 billion real liability and there was a

Page 204

B. MARSAL - HIGHLY CONFIDENTIAL

1    $96 billion real liability. In exchange for
2    that you're going to receive real value, not
3    stale book value, but real value of $100
4    billion. So you're no worse off by doing this
5    transaction. All right?
6        And what I'm saying is the 4 --
7    what this letter is saying, the $4 billion,
8    how did we get 4 billion? We can't come up
9    with this number. And, oh, by the way, the
10   guys who came up with this number are all on
11   your payroll. We don't understand this. Was
12   there a mistake made? An honest mistake.
13   That was the purpose of this letter. Was
14   there a bona fide mistake made. Because we
15   don't get it. We don't get where this
16   liability came from that we were using in this
17   hundred billion here, hundred billion there.
18   The accounting systems did not reflect that as
19   we got -- as we peel this onion back.
20       Q.   But the upshot -- in your view of
21   things, in your scenario you just laid out
22   where you're accounting a certain amount of
23   liabilities against assets, under that view,
24   if the liabilities were to be less, then it

Page 205

B. MARSAL - HIGHLY CONFIDENTIAL

1    would take it out of a push situation.
2        So my question to you is why
3    didn't you reference the fact that it's
4    supposed to be a push in connection with the
5    liabilities being less than you thought they
6    would be?
7        A.   Push was already -- I mean, the
8    underlying assumption was we did a
9    transaction -- we did a transaction involving
10   a hundred on one side, a hundred to fair value
11   on the other side, and the assumption of a
12   hundred billion dollars of liabilities.
13       The issue was not about the push.
14   The issue was about, hey, did we make an
15   honest mistake in what we were estimating.
16   Did that happen. Did we just blow this thing
17   because of the craziness of the times.
18       And that separate and apart of
19   from that came the next question which was was
20   the hundred in assets really a hundred in
21   assets. That's the second part of this thing.
22       I don't know if that's still
23   confusing but it just never came across our
24   mind that that wasn't the transaction. That's

Page 206

B. MARSAL - HIGHLY CONFIDENTIAL

1    what we thought the transaction was.
2        Q.    But you never went and read the
3    transaction documents.
4        A.    Well, no.  Then we proceeded to go
5    and say to Weil Gotshal what happened here.
6    You got to talk to Harvey.  What happened
7    here?  How come this is not reflected -- how
8    come the board say one -- believes one thing,
9    the court believes one thing -- the same
10   thing, the creditors believe one thing and
11   suddenly there's documents that show up
12   something completely different.  We don't get
13   it.  So there must have been an honest mistake
14   made by people here.  And that's what this was
15   about.  And it never got anywhere because
16   instead what we got back was read your
17   documents.  That's at which point we hired
18   Jones Day.
19        We don't want to jump to -- trust
20   me, the last thing we want to do is attack
21   Barclays, the source of all our information.
22   The source of our transaction services
23   agreement.  The last thing we want to do is go
24   after Barclays.

Page 207

B. MARSAL - HIGHLY CONFIDENTIAL

1        Q.    I mean, can you see Barclays'
2    position where they've announced that it was
3    going to be a gain publicly and there's
4    nothing in a document about it being a push
5    and they --
6        A.    But we all know that there's a
7    purchase accounting gain in there.  We all
8    agree with that.  That wasn't -- we weren't
9    attacking the purchase accounting gain.  That
10   wasn't -- that's not -- that wasn't the part
11   of the gain that we questioned.
12       Q.    And what precisely is the part of
13   the gain that you question?
14            MR. GAFFEY:  Object to the form.
15       A.    Well, in this letter --
16            MR. GAFFEY:  You have to give me a
17   chance, Bryan.
18            THE WITNESS:  Excuse me.
19            MR. GAFFEY:  Object to the form.
20   You can answer.
21       A.    In this letter we addressed the
22   two parts of the gain which was the bonus
23   accrual.  Trying to understand did your gain
24   come out of bonus accrual?  Did your gain come

Page 208

B. MARSAL - HIGHLY CONFIDENTIAL

1    out of cure amounts?  Can you give us the
2    information and tell us what you actually
3    spent on these things?
4        And we basically got back, No, I
5    can't give you that information.
6        Q.    And is it your understanding --
7    your sense when you're writing this letter
8    about cure amounts, that under the terms of
9    the agreement that there was some amount of
10   cure that Barclays was obligated to pay?
11       A.    My belief was they had assumed the
12   current liabilities at the time of the
13   closing.  They had assumed the current
14   liabilities which were -- which was this cure
15   liability amount.  That if they didn't assume
16   those, if those liabilities turned out to be
17   inflated, then it was a mistake made by all
18   parties.  It was a windfall.  But you and I
19   didn't bargain for that.
20       Q.    Did you understand that Barclays
21   didn't have an obligation to assume any
22   contracts and that it would only be
23   responsible for cure amounts with respect to
24   contracts that it at its total discretion

Page 209

B. MARSAL - HIGHLY CONFIDENTIAL

1    elected to assume?
2            MR. GAFFEY:  Objection to the
3    form.  You can answer.
4        A.    I'm just telling you what we
5    believed the transaction was was it was 2 plus
6    billion set aside for cure liabilities.  And
7    there was 2 plus billion set aside for
8    severance and bonuses.  And this letter asked
9    what did you spend.  And the response was it's
10   irrelevant.  There's no relevancy to that
11   question.  Because that isn't the transaction.
12       And what I'm telling you is that
13   was the transaction that some of us believed
14   we had done.  The board, the court, Harvey
15   Miller, me.  But yet the management didn't
16   sign that agreement.  But the management are
17   the same management that seems to have gone to
18   Barclays.  So curiously enough we are
19   confused.
20       Q.    And if it's a fact that the
21   contract, the agreements between the parties
22   could provide that Barclays has the discretion
23   to assume contracts and is not liable for cure
24   payments unless it assumes -- decides to

Page 210

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    assume contracts, and that the court was told
3    that this is potential exposure if the
4    contracts are assumed and so forth, would that
5    all be news to you as you sit here today?
6        A.    Yeah, it would be news to me at
7    the time -- not today, but it would have been
8    news to me at the time this transaction was
9    done. Because what I knew about this
10    transaction was just as I told you.
11        Q.    When you wrote this letter did you
12    know that Barclays was not obligated to make
13    any --
14        A.    I disagree. I think Barclays was
15    obligated. I think that what happened -- what
16    the court approved and what the board of
17    directors approved is what -- the transaction
18    that all had approved. I believe that that is
19    the transaction. Now, what happened between
20    the management of Lehman, many of which who
21    were under contract to go to Barclays and what
22    they negotiated following the court hearing
23    and what actually was done was very different
24    than what was presented in front of Judge
25    Peck, what was presented to the Unsecured

Page 211

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    Creditors Committee, what was presented to the
3    board of directors. Very different.
4        Q.    How do you know what was presented
5    to Judge Peck?
6        A.    Well, I was at the hearing. I
7    read the transcript of the hearing.
8        Q.    So you attended --
9        A.    No, I attended -- I didn't attend
10    it all. But I attended part of it. But I
11    didn't -- I listened to -- it went on forever.
12    I had to get -- that was a Friday.
13        Q.    Did you attend the Wednesday
14    hearing?
15        A.    I didn't attend all the hearings,
16    no. I didn't attend. I attended the hearing
17    the night it was -- about half way through the
18    night it was approved.
19        Q.    So the first half of the hearing
20    you listened to.
21        A.    Part of it. I listened to Bart
22    McDade's testimony and to Barry Ridings and
23    then I left after that.
24        Q.    Did you disagree with Mr. Ridings'
25    testimony in any way?

Page 212

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        MR. GAFFEY: Object to the form.
3        A.    That wasn't my job. My job wasn't
4    to do -- his job was to run an auction. He
5    said what he said. I respect Barry Ridings.
6        Q.    So -- and you're listening -- at
7    the hearing, the presentation, were you there
8    when Mr. Miller described that there was going
9    to be major -- had to be major changes to the
10    deal?
11        MR. GAFFEY: Objection. No
12    foundation.
13        A.    I don't remember that part of the
14    meeting, no.
15        Q.    Did you read the whole transcript
16    at some time subsequent?
17        A.    At some point I read the
18    transcript of that day, yeah. At some point.
19    I don't know when I read that transcript, but
20    I eventually read that evening. It wasn't --
21    it wasn't soon after the deal was done or
22    anything like that.
23        Q.    Were you aware that the parties
24    had reached agreement on some of the final
25    terms shortly before the hearing on Friday

Page 213

1    B. MARSAL - HIGHLY CONFIDENTIAL
2    that you attended?
3        A.    Am I -- I know that the parties
4    reached agreement. What the terms were, I
5    don't really know what the terms were.
6        Q.    Okay.
7        A.    Other than what I've outlined to
8    you. Berkenfeld on Thursday told me what the
9    deal was. Wednesday or Thursday.
10        Q.    Okay. And it was your
11    understanding that, in any event, whatever the
12    terms were, the parties had reached agreement
13    as of that Friday hearing.
14        A.    Yeah. And the hearing was a
15    little bit confusing. But the hearing was
16    pretty much consistent with what Berkenfeld
17    told me.
18        Q.    Do you remember the -- do you
19    remember the numbers 47.4 billion and 45
20    billion?
21        A.    I don't remember the exact
22    numbers. No.
23        Q.    Okay.
24        A.    They didn't mean anything to me at
25    that time.

Page 214

1    B. MARSAL - HIGHLY CONFIDENTIAL
2        (Pause on the record.)
3        MR. THOMAS: I think that's it.
4    Thank you very much for your time.
5        THE WITNESS: Thank you, sir.
6    Thank you.
7        MR. GAFFEY: Thanks.
8        THE VIDEOGRAPHER: The time is
9    2:47. We are now off the record.
10        (Time Noted:    2:45 p.m.)
11
12
13
14
15
16
17
18
19        _____
20        BRYAN MARSAL
21
22    Subscribed and sworn to before me
23    this ___ day of _____, 2009.
24
25

Page 215

1
2        C E R T I F I C A T E
3    STATE OF NEW YORK    )
4            : ss.
5    COUNTY OF NEW YORK   )
6        I, FRANCIS X. FREDERICK, a Notary
7    Public within and for the State of New
8    York, do hereby certify:
9        That BRYAN MARSAL, the witness
10    whose deposition is hereinbefore set
11    forth, was duly sworn by me and that
12    such deposition is a true record of the
13    testimony given by the witness.
14        I further certify that I am not
15    related to any of the parties to this
16    action by blood or marriage, and that I
17    am in no way interested in the outcome
18    of this matter.
19        IN WITNESS WHEREOF, I have
20    hereunto set my hand this 22nd day of
21    December, 2009.
22
23        _____
24        FRANCIS X. FREDERICK
25

Page 216

1
2    ---------------- I N D E X -----------------
3    WITNESS        EXAMINATION BY    PAGE
4    BRYAN MARSAL    MR. THOMAS      5
5
6
7
8
9    ----------- INFORMATION REQUESTS -------------
10    DIRECTIONS: NONE
11    RULINGS: NONE
12    TO BE FURNISHED: NONE
13    REQUESTS: NONE
14    MOTIONS: NONE
15
16
17
18    ----------------- EXHIBITS -----------------
19    EXHIBIT            FOR ID.
20    Exhibit 482
21    January 29, 2009 341 Meeting
22    of Creditors transcript............... 26
23    Exhibit 483
24    e-mail dated Monday,
25    September 15, 2008.................... 40

Page 217

1
2    ------------------ EXHIBITS -------------------
3    EXHIBIT            FOR ID.
4    Exhibit 484
5    e-mail dated Wednesday,
6    September 17, 2008.................... 43
7    Exhibit 485
8    document bearing production
9    numbers AM 003237
10    through AM 003238.................... 47
11    Exhibit 486
12    document bearing production
13    numbers AM 000864 through
14    AM 000869 and AM 000935.............. 59
15    Exhibit 487
16    document bearing production
17    numbers AM 003240
18    through AM 003241..................... 62
19    Exhibit 483
20    document bearing production
21    number AM 002737..................... 66
22    Exhibit 489
23    document headed A.39................. 68
24
25

Page 218

```
 1
 2    ---------------- EXHIBITS ----------------
 3    EXHIBIT                    FOR ID.
 4    Exhibit 490
 5    document bearing production
 6    numbers AM 001683
 7    through AM 001685.................... 75
 8    Exhibit 491
 9    document bearing production
10    numbers WGM-LEHMAN-E 00011676
11    through WGM-LEHMAN-E 00011678......... 79
12    Exhibit 492
13    document bearing production
14    numbers BCI-EX-(S)-00021769
15    through BCI-EX-(S)-00021771........... 88
16    Exhibit 493
17    document bearing production
18    numbers AM 001695 through
19    AM 00167 with attachment.............. 90
20    Exhibit 494
21    document bearing production
22    numbers AM 003874
23    through AM 003882.................... 159
24    Exhibit 495
25    Debtor's Rule 60 Motion............... 166
```

Page 219

```
 1
 2    ---------------- EXHIBITS ----------------
 3    EXHIBIT                    FOR ID.
 4    Exhibit 496
 5    document bearing production
 6    numbers WGM-LEHMAN-E 0001363
 7    through WGM-LEHMAN-E 0001368.......... 181
 8    Exhibit 497
 9    facsimile transmittal sheet
10    dated 2/19/2009 covering
11    letter dated February 19, 2009........ 194
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 220

```
 1
 2    NAME OF CASE: IN RE. LEHMAN BROTHERS
 3    DATE OF DEPOSITION: DECEMBER 22, 2009
 4    NAME OF WITNESS: BRYAN MARSAL
 5    Reason codes:
          1. To clarify the record.
 6        2. To conform to the facts.
          3. To correct transcription errors.
 7    Page _____ Line _____ Reason _____
      From _____ to _____
 8
      Page _____ Line _____ Reason _____
 9    From _____ to _____
10    Page _____ Line _____ Reason _____
      From _____ to _____
11
      Page _____ Line _____ Reason _____
12    From _____ to _____
13    Page _____ Line _____ Reason _____
      From _____ to _____
14
      Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
      From _____ to _____
17
      Page _____ Line _____ Reason _____
18    From _____ to _____
19    Page _____ Line _____ Reason _____
      From _____ to _____
20
      Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
      From _____ to _____
23
      _____
24
         BRYAN MARSAL
25
```

# BCI EXHIBIT

# 85

Page 1

1          HIGHLY CONFIDENTIAL – B. McDADE

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                          Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                Debtors.

10

      ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF BART McDADE

14              New York, New York

15              September 2, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24045

Page 2

1    HIGHLY CONFIDENTIAL - B. McDADE
2        September 2, 2009
3            9:57 a.m.
4
5        HIGHLY CONFIDENTIAL deposition
6    of BART McDADE, held at Jones Day, LLP,
7    222 East 41st Street, New York,
8    New York, before Kathy S. Klepfer, a
9    Registered Professional Reporter,
10   Registered Merit Reporter, Certified
11   Realtime Reporter, Certified Livenote
12   Reporter, and Notary Public of the State
13   of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    HIGHLY CONFIDENTIAL - B. McDADE
2
3        A P P E A R A N C E S :
4
5    JONES DAY, LLP
6    Attorneys for Lehman Brothers, Inc.
7        222 East 41st Street
8        New York, New York  10017-6702
9    BY:  ROBERT W. GAFFEY, ESQ.
10       BART GREEN, ESQ.
11
12   BOIES, SCHILLER & FLEXNER, LLP
13   Attorneys for Barclays Capital
14       5301 Wisconsin Avenue, NW
15       Washington, DC  20015
16   BY:  HAMISH HUME, ESQ.
17
18   WILLIAMS & CONNOLLY, LLP
19   Attorneys for the Witness
20       725 12th Street, NW
21       Washington, DC  20005
22   BY:  JOHN J. BUCKLEY, ESQ.
23       JAMES WEINGARTEN, ESQ.
24
25

Page 4

1    HIGHLY CONFIDENTIAL - B. McDADE
2    A P P E A R A N C E S : (Cont'd.)
3
4    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
5    Attorneys for the Creditors Committee
6        865 S. Figueroa Street, 10th Floor
7        Los Angeles, California  90017
8    BY:  ERICA P. TAGGART, ESQ.
9
10   JENNER & BLOCK, LLC
11   Attorneys for the Examiner
12       330 N. Wabash Avenue
13       Chicago, Illinois  60611-7603
14   BY:  ROBERT L. BYMAN, ESQ.
15
16   HUGHES, HUBBARD & REED, LLP
17   Attorneys for the SIPA Trustee
18       One Battery Park Plaza
19       New York, New York  10004-1482
20   BY:  WILLIAM R. MAGUIRE, ESQ.
21       AMINA HASSAN, ESQ.
22
23   Also Present:
24       THOMAS E. HOMMEL
25       RAJESH ANKALKOTI

Page 5

1        HIGHLY CONFIDENTIAL - B. McDADE
2    BART McDADE, called as a
3        witness, having been duly sworn by a Notary
4        Public, was examined and testified as
5        follows:
6    EXAMINATION BY
7    MR. GAFFEY:
8        Q.   Good morning, Mr. McDade.  We met
9    briefly before.  As you know, I'm Bob Gaffey.
10       A.   Good morning.
11       Q.   I'm from Jones Day and we are special
12   counsel to the estate of Lehman Brothers
13   Holdings, Inc. and, as I hope you know, we are
14   charged with looking into some matters relating
15   to the transaction in September of 2008 where
16   assets were transferred from Lehman to Barclays,
17   and that will be the subject of my questions
18   this morning.
19       Just a couple of ground rules, which
20   you either know or have been told, but let me
21   review them.  If you need a break at any time,
22   just say so, and if there's a question pending,
23   I would ask that the question be answered and
24   then take whatever break you want.  Just speak
25   up when that's convenience whenever you think

Page 6

1        HIGHLY CONFIDENTIAL - B. McDADE
2   you need a break.
3        I have a habit of becoming a fast
4   talker. I try and slow it down when I'm going
5   this long, but if I'm speaking too quickly, tell
6   me, and if you don't understand me in any way,
7   tell me and I'll try and rephrase the question
8   so you do. And I'll ask, if you can, try and
9   wait for me to ask a complete question before
10  you answer it for the sake of the court
11  reporter. That will make it easier for Kathy
12  here and make for a cleaner record.
13     A.   Okay, I understand.
14     Q.   Have you had your deposition taken
15  before?
16     A.   No, I have not.
17     Q.   How are you currently employed?
18     A.   I am unemployed.
19     Q.   And prior to being unemployed, what
20  was your last job?
21     A.   My last job was a small stint at
22  Barclays Capital.
23     Q.   When did you work at Barclays Capital?
24     A.   The end of the week of September 22nd
25  through till December 31st of 2008.

Page 7

1        HIGHLY CONFIDENTIAL - B. McDADE
2     Q.   Prior to that you were employed by
3   Lehman Brothers, correct?
4     A.   Correct.
5     Q.   How long were you at Lehman Brothers?
6     A.   I was a summer intern from 1979;
7   full-time employee from 1983.
8     Q.   I'm not going to ask you to go through
9   the whole 1993 --
10    A.   Thank you.
11    Q.   -- but if you can give me an idea of
12  what you were -- maybe just give me a summary of
13  positions you held in the last three years
14  before September of 2008.
15    A.   Sure. The job I held from early 2000
16  until 2005 was the global head of fixed income.
17  From 2005 till June of 2008, I was global head
18  of equities. From 2008 until I left to go to
19  Barclays, I was the president of Lehman
20  Brothers.
21    Q.   Okay. Did you leave the firm at any
22  time during that period or were you continuously
23  employed?
24    A.   No, I did not.
25    Q.   And why did you leave Barclays?

Page 8

1        HIGHLY CONFIDENTIAL - B. McDADE
2     A.   I left Barclays -- I went to Barclays
3   to help the transaction's integration. I left
4   Barclays -- that was the sole purpose of going
5   to Barclays. Therefore, when I thought my
6   responsibilities with that integration were
7   done, I left Barclays.
8     Q.   From the outset, had that been the
9   plan, that you would go there for the
10  integration, stay a short period of time, and
11  then leave?
12    A.   Yes.
13    Q.   If you could, I'll ask you to focus
14  for time period purposes in September of 2008.
15  Did there come a time when Lehman and Barclays
16  began to engage in discussions about a
17  transaction in which Barclays would purchase all
18  or some of Lehman?
19    A.   That's correct.
20    Q.   When did that happen?
21    A.   That was Thursday, September 11.
22    Q.   And were you involved in those initial
23  discussions?
24    A.   I was in due diligence process with
25  the Bank of America discussions between Lehman.

Page 9

1        HIGHLY CONFIDENTIAL - B. McDADE
2     Q.   Okay.
3     A.   So I only engaged with Bob Diamond and
4   his team late in the evening of the 12th of
5   September, 2008.
6     Q.   While you were doing the Bank of
7   America side of things, was there someone who
8   was in charge of dealing with Barclays during
9   that period prior to the weekend?
10    A.   There was a team that had started to
11  engage with Barclays and Bob's team, yes.
12    Q.   Who was that? Who was the Lehman team
13  there?
14    A.   That would have been Michael Gelband,
15  Alex Kirk. I wasn't there so I don't know all
16  of the individuals that were there at the time.
17    Q.   What I'm looking for is who you would
18  say were the primary individuals.
19    A.   Those two individuals would have been
20  the primary.
21    Q.   So they're dealing, before the
22  weekend, the 11th, 12th --
23    A.   Correct.
24    Q.   -- Gelband and Kirk are dealing with
25  the Barclays side of things?

---

Page 10

HIGHLY CONFIDENTIAL - B. McDADE

2   A.  Correct.
3   Q.  And you're dealing with the Bank of
4 America side of things?
5   A.  Correct.
6   Q.  Who is working with you, at the top
7 level, who is working with you on the Bank of
8 America side of things?
9   A.  Well, we had -- we had fully engaged a
10 set of probably 50 individuals at Lehman and a
11 like amount from BankAmerica that were locked in
12 a room in Midtown in different rooms in
13 different teams. So the most senior partner
14 working with me at BankAmerica would have been
15 Skip McGee, who ran investment banking.
16      But it would be unfair to say we were
17 the sole protagonists, if you will, because
18 there are large groups of teams from all the
19 different functional areas of the firm.
20   Q.  Where I am now, and we'll drill down a
21 bit more sort of at a 30,000-foot view, of who
22 you would characterize as sort of running the
23 Bank of America side of things for Lehman, and
24 that would be you and Skip McGee?
25   A.  Yes.

---

Page 11

HIGHLY CONFIDENTIAL - B. McDADE

2   Q.  Now, you came to become involved or
3 start dealing with Bob Diamond and his team on
4 the 12th of September?
5   A.  That's correct.
6   Q.  Describe for me, please, how that came
7 about and what you did initially.
8   A.  The team of individuals that I
9 previously mentioned, Mike and Alex, were
10 encouraged with the dialogue and the other teams
11 were encouraged with the dialogue, so they
12 encouraged me to lead the due diligence process,
13 which was, if you will, well in hand, in terms
14 of it had started on Thursday with BankAmerica,
15 so I went down to the office, actually somewhere
16 around here, I don't remember the exact
17 location, and met Bob Diamond.
18      So my first interaction was an hour
19 meeting or so with Bob Diamond, and then I left
20 Bob and went into a room with the Lehman deal
21 team, if you will, that was there and we built
22 the strategy for how to proceed with dialogue
23 with Barclays in earnest.
24   Q.  And who were the members of the Lehman
25 deal team that you met with to build a strategy?

---

Page 12

HIGHLY CONFIDENTIAL - B. McDADE

2   A.  The two previous mentioned. There
3 were -- it was a large group of folks. So it
4 would have been Mark Shafir -- to be honest, I
5 don't have recollection of the individuals in
6 the room.
7   Q.  But that team included Gelband, Kirk
8 and Shafir?
9   A.  Absolutely.
10   Q.  When you met with Bob Diamond, was
11 anybody else in the meeting? Was it just the
12 two of you?
13   A.  No, the two of us.
14   Q.  What was the nature of your discussion
15 with Mr. Diamond? Just summarize it for me.
16   A.  The nature of the discussion was
17 his -- we had never met, and it was his walking
18 through what his intentions and needs were if he
19 was going to do a deal over the weekend and his
20 trying to get a basic understanding from a
21 senior executive of what the core of the
22 businesses were and how I and he felt an
23 integration would or would not work of the
24 collective set of businesses.
25   Q.  And what did you say to Mr. Diamond

---

Page 13

HIGHLY CONFIDENTIAL - B. McDADE

2 about those topics?
3   A.  Well, I believe, you know, it was --
4 it was very clear that Barclays had -- at this
5 point he was contemplating the purchase of the
6 whole firm, so it was very clear that there
7 would be challenges and certain overlaps between
8 their international capabilities and their lack
9 of, if you will, U.S. capabilities. So we spent
10 time talking about that, and mostly I walked him
11 through the philosophy and the basic approach in
12 terms of how the businesses had been built, the
13 client focus, the research focus, to make sure
14 that we were aligned just at a general
15 philosophical level with where and how money
16 should and could be made over a period of time.
17   Q.  Was there any discussion at that first
18 meeting about price?
19   A.  No, absolutely not. Absolutely not.
20   Q.  Now, as I understand it, that, that --
21 those discussions before the weekend, in sum and
22 substance, were for an acquisition of the entire
23 firm?
24   A.  That is correct. That is correct.
25   Q.  And those discussions contemplated or

Page 14

HIGHLY CONFIDENTIAL - B. McDADE

1      HIGHLY CONFIDENTIAL - B. McDADE
2 addressed an acquisition of the firm globally?
3    A.   That's correct.
4    Q.   And as I also understand it, that deal
5 died; that deal didn't happen?
6    A.   That's correct.
7    Q.   Tell me what you know about the
8 circumstances of that, those negotiations coming
9 to an end? When did they do it and why?
10    A.   The deal -- Barclays had, like all
11 financial institutions, a set of limitations in
12 terms of what they could and couldn't do, and it
13 was very clear by their rhetoric that they were
14 challenged by certain -- acquisition of certain
15 of our balance sheet items, those being private
16 equity and commercial real estate, because their
17 accounting regime apparently, as they
18 communicated to me and to us, charged them a
19 significant amount of capital, if you will,
20 against assets like that.
21     So the deal needed to be formed as we
22 went through the weekend with a construct that
23 those assets would not be included, and that's
24 why we were engaged significantly at the Fed
25 with all of the industry consortium participants

Page 15

1     HIGHLY CONFIDENTIAL - B. McDADE
2 to try to establish an ability to create a
3 separate facility for those assets to be spun
4 out of Lehman, if you will, and a deal that
5 would take place.
6    Q.   Those assets being the private equity
7 and the commercial real estate?
8    A.   Correct. Correct.
9     At the end, that looked to have been
10 accomplished, but then clearly there were
11 regulatory issues which have been -- which I
12 wasn't privy to in terms of being part of the
13 discussions with all the different regulators,
14 including the UK regulators, the Barclays
15 regulators specifically, and the U.S.
16 regulators, but clearly there must have been
17 some sort of discomfort. And it's been
18 communicated to me that the FSA in particular
19 had some discomfort with the structure of the
20 deal as contemplated.
21    Q.   And it was the FSA's, among other
22 things, perhaps, but it was the FSA's discomfort
23 with the structure of the transaction that
24 prevented it from going forward?
25    A.   That is what has been communicated to

Page 16

1     HIGHLY CONFIDENTIAL - B. McDADE
2 me.
3    Q.   And who communicated that to you?
4    A.   Bob Diamond.
5    Q.   And when was that? Was that the
6 Sunday?
7    A.   Sunday morning, correct.
8    Q.   So did there come a time when
9 negotiations with Barclays began again about a
10 subsequent transaction?
11    A.   Absolutely.
12    Q.   And when was that?
13    A.   The genesis of the second set of
14 conversations started to take place early in the
15 evening of September 14th, Sunday, September
16 14th. I made a call to Bob Diamond to express
17 interest in continuing a dialogue, despite the
18 bankruptcy. There was a meeting that took place
19 which specifically kicked off the discussions
20 the next morning by telephone with Bob Diamond,
21 Jerry del Missier, his president, Michael Klein,
22 his advisor, myself, Skip McGee, Mark Shafir to
23 talk about that transaction and the
24 possibilities of that 7 A.M. on Monday morning,
25 the 15th.

Page 17

1     HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   And if you could summarize for me the
3 sum and substance of the conversations that that
4 group had in that phone call on the morning of
5 the 15th.
6    A.   The basic thrust that Barclays and Bob
7 were concerned about was whether or not he would
8 be buying a business, given all the media
9 reports and all that he had seen on T.V. of our
10 employees having left in droves from the
11 building, taking their belongings, et cetera,
12 and so he and they were obviously concerned that
13 they would be entering into a set of
14 negotiations and buying perhaps a set of
15 businesses that were no longer what they used to
16 be.
17     We felt confident that we could, if we
18 did a deal in an efficient time period, bring
19 together a large part of the businesses and keep
20 a large part of the businesses together. And
21 then the second part of the conversation really
22 had to do with, okay, let's go do this, where do
23 we do it, where do we hold the discussions, what
24 do we need to do, practical matters related to
25 starting the dialogue again in earnest.

Page 18

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   The "this" that you're referring to,
3    the "let's go do this," was there any discussion
4    in that first meeting on the Monday morning
5    about the structure of the deal?
6    A.   No.
7    Q.   When did a discussion begin about the
8    structure of the deal?
9    A.   Over the course of by noon of Monday,
10   the 32nd floor at 745 had been taken over as the
11   deal room, it used to be the dining rooms of
12   Lehman, and that's where all the discussions
13   started to take place, the different individuals
14   from both organizations organizing in subgroups
15   to go through it.
16       The main deal negotiating team of
17   individuals, including Lehmanites, BarCap
18   employees and our external advisors started
19   to -- started to shape the form of the deal I
20   would say over the course of the afternoon of
21   the 15th.
22   Q.   Who were the Lehmanites who were again
23   heading up the discussions? I know there were a
24   lot of people involved, but who would you
25   describe as the primary negotiators?

Page 20

1    HIGHLY CONFIDENTIAL - B. McDADE
2    A.   I did, yes.
3    Q.   What did you say to Mr. Diamond or say
4    to the BarCap team?
5    A.   I felt very strongly that the value of
6    the franchise was worth the effort, number one;
7    and, number two, we as a collection of managers
8    felt very strongly that if, again, we did it as
9    I said before, in a time-efficient fashion, we
10   could keep the bulk of the team intact that had
11   created that valuable franchise.
12   Q.   In that 7 A.M. call, I'm going to move
13   ahead in a minute to the afternoon, but in that
14   7 A.M. call was there any discussion of
15   particular individuals who would be critical
16   to --
17   A.   No.
18   Q.   -- the deal?
19   A.   Absolutely not.
20   Q.   Did that discussion come about at some
21   point?
22   A.   Those discussions came about over the
23   course of the day in the afternoon and well into
24   the --
25   Q.   For an orderly record, I'm going to

Page 19

1    HIGHLY CONFIDENTIAL - B. McDADE
2    A.   Bart McDade, Skip McGee, Mark Shafir,
3    clearly Dick Fuld was an informed party but not
4    in the room in terms of those discussions, would
5    be how I would describe the main, the main
6    Lehman principals.
7    Q.   And who were the principals for
8    BarCap?
9    A.   Rich Ricci, Jerry del Missier, and
10   their advisor, Michael Klein. And sorry,
11   Archibald Cox, the CEO of the Americas.
12   Q.   Was Diamond involved?
13   A.   In and out.
14   Q.   In and out physically or in and out by
15   phone?
16   A.   Both. Both. So very much involved,
17   but not able to be there in every step of the
18   conversations.
19   Q.   Just to back up a little bit, in that
20   first conference call, that first phone call,
21   the 7 A.M. first meeting on the 15th when the
22   BarCap folks expressed concerns about whether or
23   not there was really a business that would be
24   left for them to buy, did you or someone else on
25   the Lehman team address those concerns?

Page 21

1    HIGHLY CONFIDENTIAL - B. McDADE
2    get to that in sequence, but was there anything
3    else that was discussed in the 7 A.M. meeting
4    that you recall?
5    A.   No, it was a very short meeting to the
6    point of let's get to work.
7    Q.   I assume after the 7 A.M. meeting
8    there was a lot of phone calls made telling
9    people to gather on the 32nd floor and get to
10   work?
11   A.   Correct.
12   Q.   Describe for me how -- how were the
13   negotiations set up? Were there people
14   responsible for particular issues? Were there
15   rooms devoted to particular topics?
16   A.   So that the actual configuration of
17   the 32nd floor lent itself very well to a deal
18   environment. We used what was commonly referred
19   to as Dick Fuld's dining room upstairs as the
20   main place because it had the largest table for
21   the main significant protagonists to be sitting
22   with each other to set up the process, to be
23   doing some of the negotiations, et cetera. So
24   there was that in the corner of the building was
25   the main room, if you will, the central hub.

6

Page 22

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2        There were probably, I forget how many
3    letters in the alphabet, but there probably 15
4    or so different dining rooms, each of which was
5    occupied by different teams. So there would
6    have been human resource team, there would have
7    been finance team, there would have been
8    different risk teams taking on as the assets
9    started to get valued, different of the
10   components of the risk teams would be in
11   different rooms. We had legal teams, et cetera,
12   across the different -- all the different
13   rooms, including using the lobby and everything
14   else.
15       Q.   We've had a bunch of descriptions of
16   that in a sense fairly vibrant couple hours.
17       A.   It was a beehive.
18       Q.   Who's in the Fuld dining room? Who is
19   in the main room?
20       A.   So those are the Lehmanites mentioned
21   before, including other of our senior partners
22   involved, all the advisors, so the Weil team,
23   Simpson lawyers, the lawyers for Barclays and
24   clearly all the significant Barclays senior team
25   as well.

Page 23

1    HIGHLY CONFIDENTIAL - B. McDADE
2        Q.   So in that room is McDade, McGee,
3    Shafir, and you said some other senior
4    executives. Who were they on the Lehman side?
5        A.   Again, when you say "in the room,"
6    just to clarify, that room would have had many
7    participants, different participants over the
8    course of day. So there wasn't one meeting at 1
9    o'clock that I'm describing. I'm describing a
10   dynamic process over, you know, over a basically
11   a 30-hour period.
12       Q.   Okay.
13       A.   So I wouldn't be able to describe for
14   you who else was in the room because there would
15   be a long list, most of which I can't recall in
16   terms of who was in the room at what point in
17   time. But they would have been in general
18   categories. Folks in and around the process at
19   Lehman would have been the financial
20   institutions banking team as an example of who
21   outside of those protagonists would have been
22   there as part of the process that we had been
23   dealing with over the course of the whole year
24   in terms of trying to find solutions for the
25   overall Lehman platform.

Page 24

1    HIGHLY CONFIDENTIAL - B. McDADE
2        Q.   You referred to, I think you said risk
3    teams. I'm having trouble with my own
4    handwriting, but risk teams who gathered as the
5    assets were being valued. Who from the Lehman
6    side of things were the main protagonists?
7        A.   Mike Gelband ran capital markets. In
8    that responsibility, he would have been in
9    charge all of the risk of the firm, with the
10   exception of the businesses that Alex Kirk ran
11   the principal businesses. So those two ran all
12   the risk of the firm at that point in time.
13       So Michael Gelband would have been
14   chaperoning his different asset experts. So it
15   would have been Charlie Spero for residential
16   mortgages, it would have been Eric Felder for
17   the credit businesses, and it would have been
18   Kaushik Amin for our interest rate and foreign
19   exchange businesses.
20       Q.   And who, again, at the top level was
21   dealing with the HR issues?
22       A.   The head of HR at Lehman was Tracy
23   Binkley. Her deputy was Anthony Collerton.
24       Q.   And who was dealing with HR for
25   Barclays, do you know?

Page 25

1    HIGHLY CONFIDENTIAL - B. McDADE
2        A.   Michael Evans and a gentleman named
3    Mark Kerman, I believe his name is.
4        Q.   Kerman, with a K?
5        A.   Kerman, with a K, I believe.
6        Q.   Now, how involved were you in the side
7    of things where assets were being valued?
8        A.   I was involved from the point of view
9    of being informed. I was involved from helping
10   facilitate and set the process up, and at some
11   point, I could not tell you exactly what moment
12   in time, I believe over the course of the week
13   several times I would have been involved in
14   getting an update from the team in terms of
15   where the different valuation processes were
16   heading, but I certainly wouldn't describe
17   myself as being in the room going asset-by-asset
18   through --
19       Q.   Were people in the room going
20   asset-by-asset?
21       A.   Absolutely.
22       Q.   Who?
23       A.   Those individuals I mentioned. The
24   junior traders who -- or, the senior traders who
25   had been working with them, and the counterparts

Page 26

HIGHLY CONFIDENTIAL - B. McDADE
1    from Barclays, most of which 1 didn't know and
2    don't know their names.
3       Q.    And what was your understanding of
4    what they were doing in these meetings with the
5    traders?
6       A.    So that the -- 1 would describe it as
7    a bottoms-up process, albeit in a very quick
8    time period, of establishing a fair market value
9    for the individual assets and done in a way such
10   that most of the focus would have been on the
11   largest concentrated positions in terms of
12   notional size, if that -- does that make sense
13   to you?
14      Q.    A little bit.
15      A.    If there's a hundred line items in the
16   credit business, and 90 of them -- sorry, 10 of
17   them represent 90 percent of the market value --
18      Q.    Uh-huh.
19      A.    -- the focus of those meetings would
20   have been on the --
21      Q.    On the big pieces?
22      A.    -- on the ten pieces that represent 90
23   percent of the value.
24      Q.    And what was the result of this

Page 27

HIGHLY CONFIDENTIAL - B. McDADE
1    process you've described in terms of valuation
2    of the assets?
3       A.    Well, eventually that's how we agreed
4    on the prices of the assets.
5       Q.    Was there back and forth on the price?
6       A.    Absolutely.
7       Q.    Who was doing the negotiating of that?
8       A.    Again, Michael Gelband would have been
9    the lead.
10      Q.    Who was the lead for Barclays?
11      A.    1 can't answer the question directly.
12   Stephen King was certainly an individual that
13   had a large role on their side, but 1 can't
14   answer the question specifically.  You'd have to
15   ask Barclays.
16      Q.    I'd have to ask Gelband?  Oh, I'd have
17   to ask Barclays?
18      A.    Barclays would be my guess.  Michael
19   might know as well.
20      Q.    And did there come a time when you, as
21   you got these information updates, when you were
22   informed that a price had been agreed?
23      A.    The context of what we were dealing
24   with?

Page 28

HIGHLY CONFIDENTIAL - B. McDADE
1       Q.    Yeah.
2       A.    There were no markets.  They were
3    tumultuous, volatile.  The market had changed
4    from Friday to Saturday to Sunday to Monday,
5    Monday at 9, Monday at 11, et cetera.  So prices
6    agreed at a moment in time, but prices were
7    changing in the world dramatically.
8          So we knew that we didn't have a deal
9    until we had a deal at the end, whenever the
10   bankruptcy process was.  So was there a
11   penultimate moment at a piece in time relative
12   to the first transaction?  Yes, there was an
13   agreement, but we knew it was a dynamic process
14   over the course of the -- it would be a dynamic
15   process over the course of the week.
16      Q.    So in recognizing that it would be a
17   dynamic process over the course of the week, was
18   it -- how was it agreed that the price in the
19   deal for these assets that were being valued
20   would adjust, would change?
21      A.    It would adjust as the market adjusted
22   and as the participants continued to dialogue.
23      Q.    So, from your view, was anything built
24   into the price at the outset to anticipate

Page 29

HIGHLY CONFIDENTIAL - B. McDADE
1    volatile markets over the week, or am 1
2    understanding that the idea was we would reach a
3    price, but we know this price is probably going
4    to change as we go?
5       A.    It's very clear that the price would
6    change given how much volatility was in the
7    market.
8       Q.    So when an original pricing is
9    reached -- moving forward a little bit, on the
10   15th and into the 16th, an agreement is reached?
11      A.    That's correct.
12      Q.    And we'll talk a bit about that
13   sequence, but in that sequence when an agreement
14   is reached, a price of some kind is agreed for
15   these assets?
16      A.    That's correct.
17      Q.    And there's real estate assets, hard
18   real estate assets, right, as well as
19   securities?
20      A.    The --
21      Q.    The buildings?
22      A.    The buildings themselves, yes.  I'm
23   sorry, the commercial real estate business
24   assets were separate.

Page 30

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.    The reason I raised the building is --
3    put them out of the mind. I don't want to talk
4    about them. I want to talk about the securities
5    side of things.
6    A.    I understand.
7    Q.    In this process for over from Monday
8    to Tuesday toward a deal is reached, was a price
9    reached for the securities component?
10    A.    A price wouldn't have been reached for
11    the securities component until Tuesday.
12    Q.    I'm going overnight from Monday to
13    Tuesday.
14    A.    Okay.
15    Q.    So we're early Tuesday morning, and a
16    price is reached for the securities component?
17    A.    Correct.
18    Q.    What was that price based on?
19    A.    That price was based on all of that
20    collaborative work between the Barclays' points
21    of view and the Lehman's points of view.
22    Q.    Did that price contemplate any delta
23    between the book value at which Lehman carried
24    the assets and the price that Barclays would
25    pay?

Page 31

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    A.    You'll have to clarify what you mean
3    by "contemplate." The price was different
4    because Lehman hadn't marked the books since
5    Friday, and the markets were unbelievably
6    different in terms of the nature of the dynamic
7    of what happened in the markets.
8        So, yes, there ultimately was a
9    difference in where Lehman's marks were, but the
10    marks were as of Friday night.
11    Q.    Do you know what the quantum of the
12    different was?
13    A.    No, I don't know specifically.
14    Q.    Did anybody ever talk to you about
15    what the quantum of the difference was between
16    the last time Lehman marked its books and the
17    price that was agreed?
18    A.    In general terms, absolutely.
19    Q.    Okay. Who told you that and what did
20    they tell you?
21    A.    Well, that the deal team would have
22    been, you know, any of the individuals might
23    have communicated that, so the individuals
24    mentioned before, and the approximate value
25    would have been about $5 billion.

Page 32

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.    When you say "the approximate value,"
3    you're talking about the difference between book
4    and the price; you're not talking about the
5    overall value --
6    A.    The difference in the marks from
7    Friday to the contemplated asset purchase price,
8    yes.
9    Q.    And do you recall who it is who
10    communicated to you that the difference was
11    about $5 billion?
12    A.    It would have been a number of people.
13    No, I don't recall specifically.
14    Q.    Who would be the candidates?
15    A.    Ian Lowitt, Michael Gelband, Eric
16    Felder.
17    Q.    About what time on Tuesday was,
18    subject to documentation, perhaps, but about
19    what time on Tuesday was a deal reached?
20    A.    Early afternoon.
21    Q.    On Tuesday?
22    A.    Yes, on Tuesday.
23    Q.    Do you recall a board meeting on
24    Tuesday morning, the meeting of the boards?
25    A.    No, I was not involved in any of the

Page 33

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    board meetings.
3    Q.    I guess I should -- would you describe
4    yourself as the lead negotiator for Lehman?
5    A.    I was the senior officer amongst all
6    of the team, but I would describe myself as one
7    of three lead negotiators with Mark and Skip.
8    Q.    Did Skip McGee devote his attentions
9    to any particular aspect of the negotiations?
10    A.    Well, he was an M&A banker by
11    background, as obviously was Mark, the global
12    head of M&A, so they spent their time working
13    through the specifics of what M&A transactions,
14    and this one charting new territory in terms of
15    its speed, in terms of processing.
16    Q.    Was Mr. McGee particularly focused on
17    employee issues?
18    A.    Well, I think that the key to the
19    transaction, as I stated before, was retaining
20    the bulk of a service organization or its
21    people. So, from that point of view, yes.
22    Q.    I guess my question goes to Mr. McGee
23    in particular as opposed to you and Mr. Shafir
24    or the other senior executives involved.
25        Was McGee's particular focus retention

Page 34

HIGHLY CONFIDENTIAL - B. McDADE

1  HIGHLY CONFIDENTIAL - B. McDADE
2  of employees?
3  A.   No.
4  Q.   Was he dealing with all aspects of the
5  deal?
6  A.   Absolutely.
7  Q.   And what about Shafir, did he have any
8  particular focus, or was he dealing with all
9  aspects of the deal as well?
10  A.   He was dealing with all aspects of the
11  deal.
12  Q.   I haven't been in this setting myself,
13  so this may be an ignorant question, but is
14  there one point guy for Lehman as between say
15  you, Shafir and McGee?
16  A.   Is there one point guy?  No.
17  Q.   Was McGee as involved in these
18  negotiations as you and Shafir were?
19  A.   Absolutely.
20  Q.   And I guess Shafir -- all three of you
21  were equally involved?
22  A.   Absolutely.
23  Q.   Did it ever come to your attention
24  that a deal was presented to the boards of
25  Lehman Brothers Holdings and Lehman Brothers,

Page 35

1  HIGHLY CONFIDENTIAL - B. McDADE
2  Inc. on the morning of September 16?
3  A.   Well, it was very clear that we -- we
4  didn't have permission as the employees.  It
5  would have to be done through the CEO and the
6  chairman Dick and the board.  So we were wrapped
7  up in, again, the processing, but it would have
8  been very clear to us that some board process
9  had to take place, yes.
10  Q.   What do you know about the board
11  process, you know, what meetings took place, who
12  made presentations to the boards?
13  A.   I do not know any of that.
14  Q.   Have you ever learned that there was a
15  board meeting -- there were board meetings of
16  Holdings and Inc. concerning the transaction
17  with Barclays?
18  A.   Have I ever specifically learned and
19  did I ask and confirm?  No.
20  Q.   Do you have any knowledge as to what
21  was described to the boards of Lehman Brothers
22  Holdings, Inc. and Lehman Brothers, Inc. with
23  regard to the Barclays transaction?
24  A.   All of the information that we were
25  using in the processing would have been the

Page 36

1  HIGHLY CONFIDENTIAL - B. McDADE
2  documents used in the description to a board
3  meeting.
4  Q.   Apart from any documents that may have
5  been given to the board, my question is a little
6  more basic.  Do you know what the board was told
7  about the deal?
8  A.   I was specifically not there, so I
9  can't -- no, I do not.
10  Q.   Did anyone ever recount to you what
11  the boards were told about the meeting?
12  A.   No.
13  Q.   Do you know when the boards were told
14  there was a deal?
15  A.   No.
16  Q.   Have you ever talked to any member of
17  the boards about the components of the deal?
18  A.   No, I have not.
19  Q.   So I think you said before the deal
20  was reached in the early afternoon of Tuesday?
21  A.   Correct.
22  Q.   Okay.  I know it's a long time ago,
23  but approximately what time would you say a deal
24  was reached?
25  A.   My guess it would have been about 1

Page 37

1  HIGHLY CONFIDENTIAL - B. McDADE
2  P.M. New York time.
3  Q.   Okay.
4  A.   And then we were in waiting for
5  regulatory approval from the UK regulators.
6  Q.   Now, this point at about 1 P.M. New
7  York time, is this a -- is this when, you know,
8  hands are shaking and there's a deal and it has
9  to be documented, or is there a document by that
10  time?
11  A.   There is a piece of legal paper.
12  There's no document.  Needs to be documented.
13  Q.   By that 1 P.M. or so point when a deal
14  is done, have you seen any documentation, any
15  contract?
16  A.   No, I have not.
17  Q.   Working from that point at 1 P.M. and
18  backwards, I want to get an idea of what the
19  remaining issues were.
20  A deal gets made when all issues are
21  resolved.  What were the last big issues that
22  had to be dealt with before folks were saying we
23  have a deal?
24  A.   You said working backwards from 1
25  P.M.?  You mean earlier?

Page 38

HIGHLY CONFIDENTIAL - B. McDADE

1   HIGHLY CONFIDENTIAL - B. McDADE
2   Q.   Let me just sort of explain the
3   context of my question, if that's okay. I'm
4   hearing about a process that where this
5   negotiation is overnight from Monday to Tuesday.
6   I'm assuming there's a whole bunch of issues
7   that are dealt with. I'm assuming, and I may be
8   wrong, that there's, as you get closer to a deal
9   being made, there are a couple of issues that
10  need to be resolved before everybody knows
11  there's a deal. That's the context of my
12  question.
13      What's your memory of what, what if
14  any, big issues there were that were resolved
15  last in the process?
16      A.   I don't have a recollection of a
17  priority of first to last in terms of what, you
18  know, what was resolved.
19      Q.   When was price decided for the
20  securities assets?
21      A.   I've walked through that process.
22  Price was decided as late as possible because
23  the dynamics of the markets moving. So price
24  would have been decided up unto that point at 1
25  o'clock.

Page 39

1   HIGHLY CONFIDENTIAL - B. McDADE
2      Q.   I'm going to show you, Mr. McDade,
3   what has been marked at a prior deposition as
4   Exhibit 21. Take a moment, please, take a look
5   at the document. That's the wrong one. Hold
6   on.
7      Handing you what was marked as 20 at a
8   prior deposition. When you've had a chance to
9   look it through, my first question to you, sir,
10  will be have you seen this document before?
11     A.   Yes, I have.
12     Q.   When did you first see it?
13     A.   I saw this document in a review with
14  my attorney.
15     Q.   Prior to that point, had you ever seen
16  the document before?
17     A.   No.
18     Q.   Do you know Martin Kelly?
19     A.   Yes, I do.
20     Q.   Who is Martin Kelly?
21     A.   Controller for Lehman.
22     Q.   Was he involved in the negotiations in
23  any way?
24     A.   He was definitely involved in helping
25  the deal.

Page 40

1   HIGHLY CONFIDENTIAL - B. McDADE
2      Q.   Describe for me what his role was?
3      A.   Financial controller. He's in charge
4   of the books and records, if you will, and the
5   assets. So his -- his job would have been
6   twofold: One, organizing his team of
7   individuals who would have had a lot of the
8   necessary information to put assets together to
9   be formed in an asset purchase; and,
10  secondarily, he was running points specifically
11  for Ian around making sure that the information
12  was as accurate as possible.
13     Q.   And we've spoken about Mr. Lowitt. He
14  was the chief financial officer?
15     A.   Chief financial officer, that's
16  correct.
17     Q.   And who's Paolo Tonucci?
18     A.   Paolo Tonucci was our treasurer.
19     Q.   And did both --
20     A.   He ran the funding for the firm.
21     Q.   Tonucci and Kelly both are direct
22  reports to Lowitt; is that right?
23     A.   That's correct.
24     Q.   Was Lowitt your direct report?
25     A.   Lowitt was a direct report of Dick

Page 41

1   HIGHLY CONFIDENTIAL - B. McDADE
2   Fuld, but Lowitt and I lived together as if he
3   was direct report of mine. We sat next to each
4   other and we didn't care about the org.
5   structure. So, in effect, yes.
6      Q.   Have you had a chance to look through
7   the body of the --
8      A.   Yes, I have.
9      Q.   -- of the e-mail?
10     The one I'm talking about is the one
11  at the bottom from Kelly to Lowitt, copy
12  Tonucci, at 5:10 A.M. on the 16th. And in it
13  Mr. Kelly writes, "Well, it took all night and
14  lots of back and forth, but the deal is done and
15  ready for the board."
16     A.   Uh-huh.
17     Q.   "Final price did not change
18  meaningfully. Approximately a 5 billion all in
19  economic loss versus our marks."
20     A.   Uh-huh.
21     Q.   "And 3.6 billion of resi assets left
22  behind." Do you see that?
23     A.   Yes.
24     Q.   Is that an accurate description of
25  deal?

Page 42

HIGHLY CONFIDENTIAL - B. McDADE
1
2    A.    That is.
3    Q.    Is it accurate that that deal was made
4  by 5:10 A.M. on the morning of the 16th?
5    A.    At that point in time, again, process
6  with the risk guys went all the way up unto,
7  because markets changed again overnight
8  dramatically, so we had another repricing in
9  terms of the process after this.  But at that
10  point in time, that would have been accurate,
11  yes.
12    Q.    So it was accurate that by 5:10 A.M.
13  on the 16th there was a 5 billion all in
14  economic loss versus the marks?
15    A.    That's correct.
16    Q.    And it was ready for the board by that
17  time?
18    A.    Yes.
19    Q.    Withdrawn.  I don't -- I heard what
20  you said about not knowing about the board, and
21  that's an unfair question.
22        Do you know one way or the other
23  whether -- when Mr. Kelly says it's ready for
24  the board, does this refresh your recollection
25  about if you knew anything else about when the

Page 43

HIGHLY CONFIDENTIAL - B. McDADE
1
2  board was going to review this deal?
3    A.    Does not.  Does not.
4    Q.    Mr. Kelly writes "final price did not
5  change meaningfully" when he describes the 5
6  billion all in economic loss.  Can you shed any
7  light on what he means there, about the price
8  not changing meaningfully?
9    A.    What I would describe is a process
10  with the risk operators is what he's describing
11  taking place.  In the initial math and the math
12  as it went through the first day, there was one
13  set of market movements.  So one would expect
14  overnight process, with no inputs from any of
15  the markets, for that price not to have changed.
16  With the next day's trading activity, you then
17  would have new inputs in terms of markets
18  potentially changing either way, up or down.
19    Q.    When Mr. Kelly writes that "the final
20  price did not change meaningfully," was there a
21  price, approximate or otherwise, reached early
22  in the process, an overall price?
23    A.    There would have been no overall price
24  reached because the nature of the buyer knew
25  that the assets were dynamic and we had a

Page 44

HIGHLY CONFIDENTIAL - B. McDADE
1
2  responsibility as the seller of the assets'
3  prices being dynamic as well.
4    Q.    Further into the e-mail that we're
5  talking about Mr. Kelly writes, "Also, an extra
6  1 billion of comp beyond our accrual and
7  assumption of all trade payables in LBI and
8  LBHI," do you see that portion?
9    A.    Yes, I do.
10    Q.    Do you have an understanding of what
11  Mr. Kelly is referring to there?
12    A.    Yes, I do.
13    Q.    Could you describe it to me, please?
14    A.    The deal in terms of Barclays
15  purchasing the assets also assumed roughly the
16  employing of 9,000 Lehman employees, so there
17  had been an accrual in Lehman's system for the
18  accounting of our compensation for our Lehman
19  employees.
20        We handed over to Barclays all of the
21  accrual information and all of the 2007
22  compensation information for all of our
23  employees.  They took that information and built
24  an assumption in terms of what it would be
25  necessary to protect the investment that they

Page 45

HIGHLY CONFIDENTIAL - B. McDADE
1
2  made in terms of overall compensation for the
3  year 2008 for all of those 9,000 employees that
4  they would be acquiring.  That's my recollection
5  on the comp.
6    Q.    So --
7        Sorry.  Were you done with your
8  answer?  I may have interrupted you.
9    A.    I think you asked me to answer both,
10  but I'll be happy to stop and answer the trade
11  payables in a second.
12    Q.    Tell me about the trade payables piece
13  and then I'll follow up on both.
14    A.    It clearly was understood on the
15  Barclays side that the vendor contracts that
16  Lehman was responsible for in the course of
17  running its businesses would be necessary items
18  to be dealt with by an acquirer, in this case,
19  Barclays.  So I believe it was contemplated in
20  the first Asset Purchase Agreement that they
21  would have 60 days, and Martin was giving an
22  estimate in terms of what -- he was giving a
23  process in terms of an estimate of what those
24  trade payables would be and giving an update to
25  Barclays.

Page 46

HIGHLY CONFIDENTIAL - B. McDADE
1
2    Q.    And on the compensation piece, I just
3    want to go back to something you said in your
4    answer about the accrual information was turned
5    over to Barclays and they built a model to
6    anticipate what their costs would be?
7    A.    Correct.
8    Q.    Did you ever see --
9    A.    No.
10    Q.    -- any --
11        Let me just finish the question so we
12    have a clear record.
13        Did you ever see that model, see any
14    documentation of the calculations that they did?
15    A.    No, I did not.
16    Q.    Were you involved in any of the
17    discussions that led to whatever their ultimate
18    conclusion was?
19    A.    Brief discussions.
20    Q.    With whom?
21    A.    With Jerry del Missier, with Rich
22    Ricci, and with Michael Evans and Mark Kerman.
23    Q.    And in the --
24    A.    And I don't mean to describe that as
25    one large meeting with all of them.

Page 47

HIGHLY CONFIDENTIAL - B. McDADE
1
2    Q.    Okay.
3    A.    A series of meetings.
4    Q.    Overall and in sum and substance --
5    A.    Right.
6    Q.    -- over these series of meetings, what
7    did you come to understand Barclays was going to
8    do with the compensation accrual?  Increase it?
9    Decrease it?  Take it as it was?
10    A.    With the accrual that had been on the
11    books of Lehman?
12    Q.    Correct.
13    A.    Increase it.
14    Q.    And why were they going to increase
15    it?
16    A.    To protect the investment in terms of
17    the people they were acquiring and to reflect a
18    full year of compensation.  Because the accrual
19    would have been only for that portion of the
20    year which we had gone through.
21    Q.    If the accrual was at that point
22    through August 31?
23    A.    Uh-huh.
24    Q.    Do you have any knowledge one way or
25    the other about whether the difference for the

Page 48

HIGHLY CONFIDENTIAL - B. McDADE
1
2    rest of the year would have been a billion more?
3    A.    All of the pay processes are dynamic
4    so I would have no knowledge in terms of looking
5    into the future what may or may not have
6    happened.
7    Q.    What I'm aiming at here, and this is
8    the state of your knowledge, is whether one
9    billion over the accrual is meant just to
10    annualize it or if it's more than that.
11    A.    It's definitely more than just
12    annualizing.
13    Q.    And who at Barclays was responsible
14    for, if you know, who at Barclays was
15    responsible for doing that modeling?
16    A.    I don't know.
17    Q.    Was there a similar process with
18    respect to calculating the liabilities for trade
19    payables?
20    A.    No.
21    Q.    Describe that process to me.
22    A.    We struggled over the course of the
23    week with getting an accurate depiction of what
24    those trade payables would be to Barclays, but
25    that would have been a specific set of

Page 49

HIGHLY CONFIDENTIAL - B. McDADE
1
2    obligations that Lehman had that Barclays would
3    have received and accepted at face value given
4    they didn't -- they didn't, you know, other than
5    their general knowledge of what payables may be
6    in a general sense, they would have taken that
7    at face value.
8    Q.    And was any exercise undertaken within
9    Lehman to increase the amount shown, the accrued
10    amounts for trade payables as part of the
11    transaction?
12    A.    Our only process was to provide
13    accurate information in terms of what those
14    payables would be.
15    Q.    Who were the people responsible for
16    assessing?
17    A.    Martin Kelly.
18    Q.    Do you know if Mr. Kelly added any
19    transaction adjustments to the accruals for
20    trade payables?
21        MR. HUME:  Objection.  Vague and
22    ambiguous.
23    Q.    You can answer.
24    A.    I'm not sure I understand your
25    question.  Say it again, please.

Page 50

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   To your knowledge, did Mr. Kelly make
3   any transaction adjustments with respect to the
4   accrual for payables?
5    A.   Again, a transaction adjustment?
6    Q.   Did you write them up for the purpose
7   of the deal?
8    A.   Oh, I'm sorry.  Absolutely not, to my
9   knowledge.
10    Q.   Do you know if Mr. Kelly calculated
11   any transaction adjustments for the compensation
12   accrual?  Did he write them up for the purpose
13   of the deal?
14    A.   I do not know.
15      To the best of my knowledge, Martin
16   Kelly would have only seen generic information
17   on comp.  He wouldn't have been -- it would have
18   been an HR process.
19    Q.   Mr. Kelly writes here, "Bart reviewed
20   all of it before final agreement."  Do you see
21   that?
22    A.   Yes, I do.
23    Q.   Okay.  You've said to me the deal
24   isn't final, the deal's not done until the
25   afternoon of the 16th.  Mr. Kelly is writing at

Page 51

1    HIGHLY CONFIDENTIAL - B. McDADE
2   5:10 A.M. on the 16th, "Bart reviewed all of it
3   before final agreement."
4      Had you reviewed all of it before
5   final agreement at that time?  Is Mr. Kelly
6   right or is he wrong here?
7    A.   This is a choice that Mr. Kelly's use
8   of words.  I reviewed all the information I had
9   at that point in time.
10    Q.   Okay.  At that point in time, did
11   you --
12    A.   As I did often during the course of
13   the week.
14    Q.   I'm sure, and I hear what you're
15   telling me about a dynamic process.
16    A.   And there's no final deal until
17   bankruptcy court.
18    Q.   There can be a final agreement before
19   the bankruptcy court, though, right?
20    A.   Yes.
21    Q.   Okay.  And your view is a final
22   agreement was not reached until the afternoon of
23   the 16th?
24    A.   That's correct.
25    Q.   Mr. Kelly appears to be writing that a

Page 52

1    HIGHLY CONFIDENTIAL - B. McDADE
2   final agreement had been reached by 5:10 A.M.,
3   you had reviewed it and it was ready for the
4   board.  Is that in accord with your
5   recollection?
6    A.   My recollection was the process would
7   stay in place and dynamic in terms of the pieces
8   of it all the way up until as late as possible
9   because of the nature of the assets and the
10   movements.
11    Q.   By 5:10 A.M. on the morning of
12   September 16, was there a final deal ready for
13   the board?
14    A.   I don't recall.
15    Q.   By 5:10 A.M. on September 16, had the
16   final process been reached which included a 5
17   billion all in economic loss versus the marks?
18    A.   I would repeat the same answer I used
19   before, which is the markets again changed
20   overnight so there's no way that a final price
21   had been reached at 5:10 A.M. because both the
22   seller and the buyer would have wanted to review
23   the changes in the marketplace again --
24    Q.   Okay.
25    A.   -- before final agreement.

Page 53

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   Mr. McDade, I'm putting before you
3   what we previously marked as Deposition Exhibit
4   19.  Take a moment, please, sufficient to tell
5   me whether you've seen that document before.
6    A.   I have seen this document before.
7    Q.   When did you first see the document?
8    A.   I first saw this document on
9   9/16/2008.
10    Q.   And could you describe for me the
11   circumstances under which you saw the document,
12   meaning meeting, with other people?
13    A.   Correct.
14    Q.   Who you are meeting with when you
15   first see this document?
16    A.   I would have -- this document would
17   have been with our collection of internal Lehman
18   advisors and our external advisors.
19    Q.   And do you know who prepared this
20   document?
21    A.   I do not know the individual who
22   prepared this document, no.
23    Q.   Do you know who delivered the document
24   into that meeting?
25    A.   I do not know who delivered the

Page 54

1      HIGHLY CONFIDENTIAL - B. McDADE
2    document into the meeting, no.
3      Q.   And does this document bear any
4    relation to the transaction that was agreed with
5    Barclays?
6      A.   Bear any relation to the transaction
7    that was ultimately done or the transaction --
8      Q.   Yes.  Actually, that's a good point.
9    Let me clarify the question.
10          Does that bear any relation to the
11   transaction that was agreed as of the 16th of
12   September?
13     A.   Yes.
14     Q.   Okay.  What relation does it bear?
15     A.   Significant relation.
16     Q.   Could you describe that to me?
17     A.   The deal contemplated an assumption of
18   liabilities and the acquiring of assets, and
19   this represents the summation of those two
20   components of the transaction.
21     Q.   And among those components are the
22   assumption of liabilities for cure and
23   compensation that we've been talking about,
24   correct?
25     A.   That's correct.

Page 55

1      HIGHLY CONFIDENTIAL - B. McDADE
2      Q.   And the cure assumption of liabilities
3    was put at 2.25 billion, correct?
4      A.   That's correct.
5      Q.   And the compensation liability was put
6    at 2 billion, correct?
7      A.   Correct.
8      Q.   And this schedule reflects those two
9    assumed liabilities that were part of the price,
10   correct?
11     A.   Yes, it does.
12     Q.   And on the asset side, does the asset
13   side reflect the book value of the securities
14   being sold as of the 16th?
15     A.   No, this represents the bottoms-up
16   work done between the two deal teams.  This
17   reflects the market price or the price agreed to
18   by the individuals, the sellers and the buyer.
19     Q.   It may be, but I'm not sure that's
20   responsive.  We may be missing each other, so I
21   just want to take a look at the -- I guess my
22   question is:  On Lehman's books were the marks
23   for these securities higher than the amount
24   shown on the schedule as of the 16th of
25   September?

Page 56

1      HIGHLY CONFIDENTIAL - B. McDADE
2      A.   On Lehman's books were the marks for
3    the assets?
4      Q.   Correct.
5      A.   They would have been higher, yes.
6      Q.   By about that $5 billion element?
7      A.   That's correct.
8      Q.   So would it be fair to say that, as of
9    the 16th of September, the book value of this
10   position was not approximately $70 billion,
11   72.65?
12     A.   The Lehman books hadn't been marked
13   since Friday evening, the 12th, if that's what
14   you're describing as the book value of the
15   securities.  What we marked to market is the
16   market value of those securities.  The markets
17   changed dramatically between the 12th, the last
18   process for marking, and when this was done in
19   the middle of the evening that early morning of
20   the 16th.
21          So, yes, the long assets purchased
22   would reflect change in the dynamic of the
23   market, particularly given the nature of what a
24   lot of those assets were.
25     Q.   Did Lehman's books on the 16th of

Page 57

1      HIGHLY CONFIDENTIAL - B. McDADE
2    September reflect that dynamic change in the
3    market?
4      A.   We attempted to keep up with the mark
5    to market process, but to the best of my
6    recollection, Lehman's books reflected were --
7    or, last reflected the market on the 12th.
8      Q.   Would you have known on the 16th what
9    book value was attributed to these assets as of
10   the 16th of September?
11     A.   It wouldn't have changed from the 12th
12   was the point I was making.  So, yes.
13     Q.   I want to ask you in a little more
14   detail how this $5 billion number came about,
15   this bottoms-up process that you've described to
16   me.  Is that the sum total of an asset-by-asset
17   valuation or is it -- was it arrived at in any
18   different way?
19     A.   It's a sum total of each of the
20   individual risk heads, business heads working
21   with their individual traders and their
22   counterpart from Barclays in a bottoms-up way as
23   I described earlier.
24     Q.   Do you know if the 5 billion was
25   calculated based on particular securities or by

Page 58

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    asset class or otherwise?
3        A.    I tried to describe the process
4    previously.  It was there's no way in that short
5    a period of time to identify every single line
6    item, but the significant line items in terms of
7    market value as a percentage of the total were
8    valued individually, yes.
9        Q.    Before you saw the financial schedule
10   that's marked as Deposition Exhibit 19, before
11   that point on the 16th -- withdrawn.  If you
12   would, just take note that it's dated 11:18 A.M.
13   on the 16th.  With that as a focus, did you see
14   prior drafts of this?
15       A.    Prior drafts of this exact document?
16   I don't recall.
17       Q.    Did you ever see a version of this
18   document that had different totals on it in the
19   course of this negotiating process we've been
20   talking about today?
21       A.    I'm sure I did, but I don't recall.
22       Q.    If you take a look at the upper
23   right-hand corner of the document, you'll see a
24   handwritten notation.  Do you recognize the
25   writing or do you know who put that notation

Page 59

1    HIGHLY CONFIDENTIAL - B. McDADE
2    there?
3        A.    Steve Berkenfeld.
4        Q.    Do you know why and when and the
5    circumstances under which he put that notation
6    on the document?
7        A.    I don't know why and when.  I wasn't
8    there when he inked it, but he ran our CAD, our
9    compliance and legal areas, and I'm sure he was
10   trying to mark a moment in time for the
11   collection of partners because it had been so
12   dynamic.
13       Q.    When you say you're sure, I just want
14   to --
15       A.    Sorry.
16       Q.    -- get your basis.  Are you making an
17   inference?
18       A.    I'm making an inference.  I apologize.
19       Q.    Just to switch topics for a minute,
20   and I want to come back to the agreement itself,
21   but during this period from the Sunday evening
22   through the Monday and into the Tuesday morning,
23   from the evening of the 14th through the --
24   actually, let me reframe that.
25            From the evening, the Sunday evening

Page 60

1    HIGHLY CONFIDENTIAL - B. McDADE
2    through the point in the early afternoon on
3    Tuesday when an agreement was reached, to your
4    knowledge were there any discussions between
5    Barclays and senior Lehman personnel about
6    personnel, those personnel going to work for
7    Barclays?
8        A.    Yes.
9        Q.    With whom were those -- which Lehman,
10   which senior Lehman personnel were the subject
11   of those discussions or involved in them?
12       A.    There was an established group of
13   eight individuals.  That would have been the
14   group.
15       Q.    And who were they?
16       A.    McGee, Nagpal, Humphrey, Felder,
17   Donini, Gelband, Lee, and I apologize, I forget
18   the last.
19       Q.    So do I.  So I can't suggest an answer
20   to you, but if it comes to you, speak up.
21            Were you one of them?
22       A.    No, I was not.
23       Q.    Did you have any discussions with
24   Barclays about going to work there?
25       A.    No, I did not.

Page 61

1    HIGHLY CONFIDENTIAL - B. McDADE
2        Q.    There came a point where you did go to
3    work at Barclays for the transitional purposes
4    we talked about, correct?
5        A.    Uh-huh.
6        Q.    When did you first have any
7    discussions with Barclays about doing that,
8    about going over for transitional purposes?
9        A.    So the early morning of the 16th, Bob
10   Diamond tried to engage me in conversation about
11   employment at Barclays.  I stopped him
12   immediately, given the responsibility I had at
13   Lehman, and immediately left that meeting, which
14   was in my office, and went and got Tom Roberts
15   from Weil, walked him through what had just
16   happened.  We went and got Bob and his chief
17   legal counsel, made it very clear that in no
18   way, shape or form could any conversation with
19   Bart McDade ever take place about employment or
20   anything to do with employment.
21       Q.    Did you ever have during this time --
22   actually, let me broaden it out a little bit to
23   the week.  In between the 16th and the closing
24   on the 22nd, in that timeframe, was there ever a
25   time where you said to anybody from Barclays, in

Page 62

```
1         HIGHLY CONFIDENTIAL - B. McDADE
2    sum or substance, "I have a handshake deal and
3    that's good enough for me for now," anything
4    like that?
5       A.   No.
6       Q.   Did you ever say that during that
7    week, in sum or substance, to any of the Lehman
8    personnel involved, "A handshake deal is good
9    enough for me right now," or words to that
10   effect?
11      A.   A handshake deal with respect to my --
12      Q.   With respect to you going to work at
13   Barclays, yes.
14      A.   No. No.
15      Q.   When the time came, when you did have
16   discussions -- well, when did you have
17   discussions about going over to Barclays?
18      A.   It became very clear to me as the
19   process post-bankruptcy, which -- post the whole
20   process of getting through, so after the 21st of
21   September, starting on the 22nd as the deal
22   dynamics finished, it became very clear to me
23   that I could be helpful and would be necessary
24   to protect the balance of the investment that
25   all the Lehmanites had made in making this
```

Page 63

```
1         HIGHLY CONFIDENTIAL - B. McDADE
2    change.
3         So I made the decision to sign on in a
4    transition way to sign on to join Barclays with
5    no deal other than continuance of my sal rate to
6    walk through and specifically, as I described
7    before, for the sole purpose of integrating the
8    Lehman employees into the BarCap franchise.
9       Q.   Presumably you had a conversation with
10   someone at Barclays about that.  Was it Diamond?
11      A.   I had a conversation with Diamond
12   about that, yes.
13      Q.   And as best you recall, when did that
14   conversation take place?
15      A.   Sometime early in the week of the
16   22nd.
17      Q.   Okay.  After the closing?
18      A.   Correct.
19      Q.   Do you know if employment contracts
20   were offered to any of the other senior Lehman
21   executives involved in the negotiations in the
22   team period between --
23      A.   Yes.
24      Q.   -- Sunday night, the 14th, and before
25   the closing on the 22nd?
```

Page 64

```
1         HIGHLY CONFIDENTIAL - B. McDADE
2       A.   Yes, I do know they were.
3       Q.   Who?
4       A.   The group of eight.
5       Q.   The group of eight?
6       A.   Yes.
7       Q.   Outside of this group of eight, do you
8    know if job offers were made to senior Lehman
9    executives who were involved at the upper levels
10   of the negotiations?
11      A.   Well, additional group of 200
12   employees were contemplated as part of the
13   transaction, some of which I don't have -- those
14   lists were created by the business heads.  Some
15   of those individuals I'm sure were involved in
16   some aspect of the dynamic on the 32nd floor.
17      Q.   And that's a larger process of what
18   group as a whole is going to move over with the
19   businesses, right?
20      A.   Right.
21      Q.   I'm at a slightly more individual
22   level.  Let me give you an example.  Do you know
23   if Ian Lowitt was offered a job during the week?
24      A.   Ian Lowitt I believe was the last of
25   the group of eight.
```

Page 65

```
1         HIGHLY CONFIDENTIAL - B. McDADE
2       Q.   Okay.  I knew we would fill that in.
3         Do you know if Steve Berkenfeld was
4    offered a job?
5       A.   I don't know.
6       Q.   Do you know if Martin Kelly was
7    offered a job?
8       A.   I do not know.
9       Q.   Do you know if Paolo Tonucci was
10   offered a job?
11      A.   I do not know.
12      Q.   Did you know at the time?  I just want
13   to distinguish between whether you recall or
14   whether you knew contemporaneously.
15      A.   I guess I don't understand your
16   question.  I don't know now.  I didn't know
17   then.
18      Q.   Okay.  I'm going to show you what's
19   previously been marked as Deposition Exhibit 1,
20   Mr. McDade.  Tell me whether you recognize the
21   document.
22      A.   Yes, I do.
23      Q.   What is the document?
24      A.   It's the Asset Purchase Agreement.
25      Q.   And you'll --
```

Page 66

HIGHLY CONFIDENTIAL - B. McDADE
1
2     A.   The original Asset Purchase Agreement.
3     Q.   Just for the record, because I don't
4  want to mislead you, I will tell you that the
5  Asset Purchase Agreement as it was originally
6  signed and filed with the court is actually not
7  this document. We can get it out if you want to
8  see it, but you may recall there was a document
9  with handwritten interlineations on it.
10     A.   Okay. Understood.
11     Q.   I will represent to you, and we have
12  compared it, this is what ultimately was sort of
13  retyped and signed and filed?
14     A.   Okay.
15     Q.   But I don't want your testimony to be
16  misconstrued later.
17     A.   Thank you.
18     Q.   But do you recognize the signature?
19          You see that it's signed on the last
20  page of the document for Lehman Brothers by
21  Mr. Berkenfeld?
22     A.   Yes.
23     Q.   Why didn't you sign it?
24     A.   I can't answer that question. I don't
25  know.

Page 67

HIGHLY CONFIDENTIAL - B. McDADE
1
2     Q.   Okay. Now, if you would turn to
3  page -- you've read this document before?
4  You're roughly familiar with it?
5     A.   Yes, I am.
6     Q.   And did you review it before
7  Mr. Berkenfeld signed it?
8     A.   Yes, I was familiar with this
9  document. Yes, I reviewed it before
10  Mr. Berkenfeld signed it.
11     Q.   And when you reviewed it, did you
12  review it in its final form before
13  Mr. Berkenfeld signed it?
14     A.   There were so many iterations of the
15  document and I can't -- I can't acknowledge that
16  it was in its exact final form, but certainly
17  was in its close to final form, I would certify.
18     Q.   Let me not be shy here. What I'm
19  pushing for is, was there a point where you
20  looked at it to determine whether this was a
21  document suitable for you to sign, whether it
22  was the final, you know, whether it accurately
23  reflected the final agreement?
24     A.   Yes. Yes.
25     Q.   And do you know if you did that review

Page 68

HIGHLY CONFIDENTIAL - B. McDADE
1
2  before Berkenfeld signed it?
3     A.   Yes.
4     Q.   If you could take a look at page --
5  for context, please, just take a look at page 1
6  of the document, Article I, and you'll see that
7  we're in the Definitions section. Okay?
8     A.   Uh-huh.
9     Q.   And further into that Definitions
10  section at page 6, I'm directing your attention
11  to the definition of Purchased Assets.
12     A.   Uh-huh.
13     Q.   And this, does it not, describes the
14  assets that were to be purchased by Barclays in
15  the transaction as contemplated on Tuesday, the
16  16th, correct?
17     A.   That's correct.
18     Q.   And item D in the definition of
19  Purchased Assets, would you take a look at that?
20  You see that?
21     A.   Uh-huh.
22     Q.   And it describes government
23  securities, commercial paper, corporate debt,
24  corporate equity, exchange-traded derivatives
25  and collateralized short-term agreements with a

Page 69

HIGHLY CONFIDENTIAL - B. McDADE
1
2  book value as of the date hereof of
3  approximately 70 billion?
4     A.   Uh-huh.
5     Q.   Collectively the long positions?
6     A.   Uh-huh.
7     Q.   Is that an accurate description?
8     A.   Yes.
9     Q.   Did the long position have a book
10  value of approximately $70 billion as of
11  September 16?
12     A.   Well, it's a book value in terms of
13  this process, yes.
14     Q.   Indicating 19, Exhibit 19?
15     A.   Correct.
16     Q.   So it's your view that Exhibit 19,
17  that schedule, reflected the book value of the
18  assets of Lehman that were to be transferred in
19  the deal?
20          MR. HUME: Objection. Asked and
21  answered.
22     Q.   You can answer it.
23     A.   I can answer?
24          Again, I'd repeat, maybe I don't
25  understand the specifics of your question, the

Page 70

HIGHLY CONFIDENTIAL - B. McDADE
1
2 market -- the securities were last marked on
3 Friday, the 12th, to the best of my knowledge.
4 The process, in terms of the bottoms-up between
5 the two firms to recognize a value of assets to
6 be purchased, was done over the course of the
7 15th and 16th, prices had changed dramatically
8 in the marketplace.
9      So your specific question, using the
10 term "book value," I would agree that the book
11 value, if you're describing what our traders and
12 the Barclays traders came up with, I would agree
13 that that's one and the same, this is the book
14 value.
15     Q.   That Exhibit 19 is the book value?
16     A.   Correct.
17     Q.   What did the books of Lehman reflect
18 as of the 16th?  Did they reflect that number or
19 did they reflect a number $5 billion higher, do
20 you know?
21     A.   I believe they reflected 5 billion
22 higher because we hadn't marked since the 12th.
23     Q.   If you would turn, please, to pages 34
24 and 35 of the document.  Look at 34 so you'll
25 know what section we're in, and then I'm going

Page 71

HIGHLY CONFIDENTIAL - B. McDADE
1
2 to direct your attention to Section 9.1(C) on
3 page 35.  Take a moment to put yourself in that
4 piece of the document, okay.
5      (Document review.)
6     A.   Okay.
7     Q.   My first question with respect to
8 9.1(C) is, is the schedule that's marked as
9 Deposition Exhibit 19, that financial schedule,
10 the schedule that's referred to in Section
11 9.1(C)?
12     A.   Can you point me to the reference to
13 schedule?
14     Q.   Within 9.1(C), you'll see -- let me
15 read you the section I'm thinking about here.
16 "On or after" -- reading along with me in
17 9.1(C), "On or after the closing, purchaser
18 shall, or shall cause its subsidiaries to, pay
19 each transferred employee an annual bonus in
20 respect of the 2008 fiscal year that, in the
21 aggregate, are equal in amount to 100 percent of
22 the bonus pool amounts, accrued in respect of
23 the amounts payable for incentive compensation,
24 but not base salary, and reflected on the
25 financial schedule delivered to purchaser on

Page 72

HIGHLY CONFIDENTIAL - B. McDADE
1
2 September 16, 2008" --
3     A.   Right.
4     Q.   -- "and initialed by an officer."
5      Do you see where I am?
6     A.   Yes.
7     Q.   Is that schedule that's referred to in
8 9.1C, the schedule that's marked as Deposition
9 Exhibit 19?
10     A.   Yes.  Yes, it is.
11     Q.   So is it your understanding that the
12 amount to be paid in bonuses pursuant to 9.1(C)
13 was to equal the amount shown as the
14 compensation accrual on Deposition Exhibit 19?
15      MR. HUME: Objection.  Calls for a
16 legal conclusion.
17     Q.   You can ignore him.  I do.  Sorry.
18      You can answer the question, sir.
19     A.   The accrual was based on a Barclays
20 model, which I don't know how to contemplate and
21 answer the question relative to their ultimate
22 intent.
23     Q.   Let me ask it this way:  Is the 2
24 billion number, do you know one way or the other
25 whether the $2 billion number in the liability

Page 73

HIGHLY CONFIDENTIAL - B. McDADE
1
2 side of Exhibit 19 comes from the Barclays
3 model?
4     A.   Comes from all the data given from
5 Lehman.
6     Q.   Uh-huh.
7     A.   It's very specific data, you know,
8 both top-down and bottoms-up in terms of
9 individuals, and then built in and ultimately
10 processed in terms of what that responsibility
11 would be, you know, by Barclays.  So if --
12      Did I not answer your question?
13     Q.   I'm not sure it did.
14      Who came up with the $2 billion that's
15 shown on Exhibit 19 for comp?
16     A.   Data provided by Lehman, 2 billion in
17 terms of the responsible number by the acquirer,
18 Barclays.
19     Q.   And who came up with the $2.25 billion
20 number for cure that's shown as a liability on
21 Exhibit 19?
22     A.   I believe I've answered that before.
23 That number was specifically given by Martin
24 Kelly from Lehman.
25      MR. GAFFEY: Can we take a five-minute

Page 74

HIGHLY CONFIDENTIAL - B. McDADE
1    break?  Is that okay?
2    (Recess; Time Noted: 11:11 A.M.)
3    (Time Noted: 11:21 A.M.)
4
5    BY MR. GAFFEY:
6    Q.   Mr. McDade, just a couple of questions
7    about some topics we were talking about before
8    the break.  Do you know if Mark Shafir was made
9    any job offer from Barclays during that week
10   between --
11   A.   I do not know.
12   Q.   And was there a reason that you were
13   the one who was, you know, you described this
14   conversation with Diamond and then with Roberts
15   and Hughes and -- Roberts or Barclays counsel
16   where it was fairly emphatic there would not be
17   any negotiations with you.
18   What was the reason for that?
19   A.   The reason for that, in my mind, I had
20   two responsibilities: Responsibility in terms
21   of the role that I had assumed in June and being
22   completely unfettered in terms of being able to
23   assume and have those -- continue with those
24   responsibilities; and, second, I was already on
25   record to the entire Lehman population in the

Page 75

HIGHLY CONFIDENTIAL - B. McDADE
1    summer of 2008 that I was not going to get paid
2    for 2008.
3    Q.   Now, these discussions we were talking
4    about that were taking place, again, from over
5    the Monday night into the Tuesday concerning
6    asset values, were any of McGee, Nagpal,
7    Humphrey, Felder, Donini, Lee or Lowitt involved
8    in that process?  That's the eight we talked
9    about before.  Were any of them involved in
10   that?
11   A.   Yes.
12   Q.   Which ones?
13   A.   If you read the list, I'll tell you
14   yea or nay.
15   Q.   McGee?
16   A.   No.
17   Q.   Nagpal?
18   A.   No.
19   Q.   Humphrey?
20   A.   No.
21   Q.   Felder?
22   A.   Yes.
23   Q.   Donini?
24   A.   Yes.
25

Page 76

HIGHLY CONFIDENTIAL - B. McDADE
1    Q.   Gelband?
2    A.   Yes.
3    Q.   Lee?
4    A.   No.
5    Q.   Lowitt?
6    A.   No.
7    Q.   Was Lowitt, did Lowitt have any
8    functional role in connection with the results
9    of those meetings?  Was he -- the traders are
10   wherever they are.  Finance is wherever they are
11   in this.  What's Lowitt's role in that?
12   A.   Lowitt's role is making sure that his
13   team is providing the accurate information,
14   which was a struggle all week, to the risk
15   teams.
16   Q.   And Lowitt as CFO is responsible for
17   the keeping of the books and records of the
18   broker-dealer, correct?
19   A.   That would be correct.
20   Q.   And to your knowledge, were there
21   regulatory requirements that a broker-dealer
22   marks its books every day?
23   A.   Absolutely.
24   Q.   Had Lehman marked its books on the
25

Page 77

HIGHLY CONFIDENTIAL - B. McDADE
1    15th?
2    A.   I'm sorry?
3    Q.   Had Lehman marked its books on the
4    15th?
5    A.   Not to the best of my knowledge.
6    Q.   You say "to the best of your
7    knowledge."  If you wanted to know who actually
8    knew that, would you ask Lowitt?
9    A.   I would ask Martin Kelly and Lowitt.
10   Q.   So as between you, Martin Kelly and
11   Ian Lowitt, who, to your view, would have the
12   best knowledge of whether the books of Lehman on
13   September -- as of September 16th fairly and
14   accurately represented the market value of the
15   securities?
16   A.   Martin Kelly would always have the
17   best view.
18   Q.   And as between you and Lowitt, who
19   would have the best view?
20   A.   Lowitt would have the best view.
21   Q.   Did you have any degree of concern,
22   sir, that Felder, Donini and Gelband were
23   involved in the negotiation of price at the same
24   time they had job offers from Barclays?
25

Page 78

HIGHLY CONFIDENTIAL - B. McDADE
1      HIGHLY CONFIDENTIAL - B. McDADE
2      A.   No, l did not.
3      Q.   Did you see any potential conflict in
4   that situation?
5      A.   Yes.
6      Q.   Did you do anything to resolve the
7   potential conflict in that situation?
8   Withdrawn.
9          You say you didn't see a problem with
10   it, but you see a potential conflict.  How did
11   you resolve that in your own view?
12      A.   l resolved it in my own view with
13   making sure that, one, l was part of the
14   process; number two, l solved it in my own mind
15   because those individuals collectively, l'm just
16   adding it up, worked with me for about 60 years;
17   and number three, l knew where their hearts
18   were, which is leaving Lehman green blood.
19      Q.   Do you know if any of those eight
20   actually signed their employment contracts with
21   Barclays before the 22nd?
22      A.   l do not know that.
23      Q.   Do you know when any of these eight
24   actually had discussions with Barclays about
25   compensation?

Page 79

HIGHLY CONFIDENTIAL - B. McDADE
1      HIGHLY CONFIDENTIAL - B. McDADE
2      A.   Those meetings took place starting in
3   the evening and early morning hours of the 15th
4   and the 16th.
5      Q.   Okay.  And during that time --
6      A.   The group of eight.
7      Q.   The group of eight.  That's who l'm
8   talking about.
9          During that time from the 15th to the
10   16th, they are, at least Felder, Donini, and
11   Gelband, are at about the same time negotiating
12   price at the same time they're talking about
13   compensation for themselves?
14      A.   The discussions started.  l don't know
15   the specific times that those individuals had
16   meetings with Jerry or Rich Ricci, Jerry del
17   Missier or Rich Ricci.
18      Q.   So you don't know if, for example,
19   while they were negotiating about a particular
20   asset class, they were pulled out of the room to
21   talk about what their compensation would be when
22   they went to Barclays?
23      A.   l do not know that.
24      Q.   Do you know who was having the
25   conversation with them about what their

Page 80

HIGHLY CONFIDENTIAL - B. McDADE
1      HIGHLY CONFIDENTIAL - B. McDADE
2   compensation would be at Barclays?
3      A.   Jerry del Missier and/or Rich Ricci.
4      Q.   Did you have any knowledge as to
5   whether Ricci and del Missier or others at
6   Barclays had kind of divided up who they were
7   going to talk to midst the group of eight.
8      A.   l believe there was a lot of dividing
9   and conquering.  l believe they did that, but l
10   don't know the specifics.
11      Q.   Do you know if Diamond spoke to any of
12   these eight about their compensation when they
13   went to Barclays?
14      A.   l don't know specifically.
15      Q.   Did you have knowledge at the time as
16   to the compensation packages that were being
17   offered to this group of eight?
18      A.   Yes.
19      Q.   l'm not going to ask you to remember
20   in detail now, but do you remember if you knew
21   the exact numbers, you knew what the package
22   was, as opposed to merely its range?
23      A.   l remember it in terms of they
24   reflected percentage of 2007 plus a special
25   award.  l don't recall remembering the specific

Page 81

HIGHLY CONFIDENTIAL - B. McDADE
1      HIGHLY CONFIDENTIAL - B. McDADE
2   numbers.
3      Q.   The $5 billion differential, the
4   overall loss versus Lehman's marks that we
5   talked about before, would it be fair to
6   describe that as a discount from the book value
7   as then shown?
8      A.   l would describe it as a change in the
9   valuation of the assets.
10      Q.   If you could turn back to page 6.
11   When you read the agreement and you saw the
12   definition of Purchased Assets to be describing
13   a book value as of the date hereof --
14          Let me just, so everything is in the
15   question, take a look at the cover of the
16   document.  You see that it's dated as of
17   September 16?  So that's the date we're talking
18   about.
19          In the definition of Purchased Assets
20   in subsection D on page 6, when you reviewed
21   this document to see if it accurately reflected
22   the deal, did you think it should say "market
23   value" instead of "book value"?
24      A.   l didn't reflect -- this is a 50-page
25   document.  l didn't reflect on every word of

21

Page 82

1       HIGHLY CONFIDENTIAL - B. McDADE
2   every paragraph.
3     Q.   Apart from the buildings -- actually,
4   even including the buildings, the $70 billion
5   long position that's being sold here is by far
6   the largest component of the transaction; is
7   that right?
8     A.   That's correct.
9     Q.   So when you looked at that definition
10  of the largest component of the transaction, did
11  you give any thought to whether it should have
12  been described as market value instead of book
13  value?
14    A.   I did not give any thought to that.
15    Q.   I mean, I know it's a long document,
16  but you would agree that that definition of
17  what's being purchased by Barclays is a fairly
18  important piece of it, wouldn't you?
19    A.   I would agree that the $70 billion
20  assets are very important.
21    Q.   When you looked at that provision to
22  determine if it was accurate, did you discuss
23  with Mr. Lowitt, the CFO, whether or not the
24  book value as of the date of this agreement was
25  approximately $70 billion?

Page 83

1       HIGHLY CONFIDENTIAL - B. McDADE
2    A.   I do not recall.
3    Q.   Did you have any discussion with
4  Mr. Lowitt at all about the description of
5  purchased assets in the agreement?
6    A.   In the agreement?  No, I did not.
7    Q.   Did you have any discussion with
8  Mr. Kelly about the definition, this definition
9  of Purchased Assets --
10    A.   No, I did not.
11    Q.   -- in the agreement?
12    A.   No, I did not.
13    Q.   Did you have any discussion with
14  Mr. Kelly about whether describing the $70
15  billion long position as the book value was an
16  accurate description?
17    A.   No, I did not.
18    Q.   Did you have a discussion with anyone
19  else as to whether describing the long position
20  as a book value as of the date hereof
21  approximately $70 billion was accurate?
22    A.   No, I did not.
23    Q.   Let's talk a little bit about
24  Mr. Shafir's role in these negotiations.
25      Did he have any particular area of

Page 84

1       HIGHLY CONFIDENTIAL - B. McDADE
2   responsibility in the negotiations?
3    A.   Mr. Shafir was the global head of M&A
4   at Lehman and he would have been responsible for
5   what I would describe as the deal mechanics in
6   terms of the role that he played.  So he, along
7   with, as described earlier, Mr. McGee and I,
8   shared collective responsibilities.
9      We divided and conquered along the way
10  in terms of what those obligations were and we
11  always came back together with our advisors and
12  tried to reconcile processes that were taking
13  place.
14    Q.   Do you know --
15    A.   He did not have a specific special
16  role with respect to one aspect of the
17  transaction.
18    Q.   Do you know if Mr. Shafir reviewed
19  this document to determine -- the agreement to
20  determine if it was accurate before Berkenfeld
21  signed it?
22    A.   I do not know specifically.
23    Q.   Do you have a general knowledge of
24  that?
25    A.   General knowledge would be yes,

Page 85

1       HIGHLY CONFIDENTIAL - B. McDADE
2   absolutely.
3    Q.   And I'll ask you a question I asked
4  you before:  Is that an inference or do you have
5  a general knowledge that he reviewed it?
6    A.   I have a general knowledge.
7    Q.   Did you talk to Shafir about whether
8  the definition of Purchased Assets was accurate?
9    A.   I did not specifically talk to him
10  about that.
11    Q.   Do you know if McGee reviewed the
12  entire agreement?
13    A.   I do not know.
14    Q.   Did you have any discussions with
15  McGee about whether the definition of Purchased
16  Assets was accurate?
17    A.   No, I did not.
18    Q.   As a general matter, without regard to
19  the agreement itself, was it your understanding
20  that the long position was being conveyed at
21  market value as opposed to book value?
22    A.   Yes.
23    Q.   Did there come a time when you learned
24  that the Asset Purchase Agreement had been filed
25  with the bankruptcy court to seek its approval

Page 86

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2  of the transaction?
3        That's a -- that's a bad question.
4  Let me rephrase that.
5        You understood, sir, that the
6  bankruptcy court would need to approve the
7  transaction, correct?
8     A.   Yes, l did.
9     Q.   Do you know if there were any filings
10  made to seek that bankruptcy court approval?
11     A.   In a general sense, l would know
12  filings would need to be made.  In a specific
13  sense, no, l don't know the specific filings.
14     Q.   So, beyond knowing it needed to be
15  done, did you review any of the filings that
16  were made with the bankruptcy court?
17     A.   No, l did not.
18     Q.   Is the agreement before you marked as
19  Deposition Exhibit 1 the agreement that
20  ultimately was closed on the 22nd?
21     A.   The deal changed.  The market changed.
22  The deal changed over the course of the week.
23  There was a First Amendment and there was
24  ultimately a clarifying amendment -- letter made
25  to the original asset purchase.  l would

Page 87

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2  describe the deal's details to have changed.  I
3  would describe the concept and the approach to
4  be extremely similar in terms of what was
5  ultimately consummated.
6     Q.   The Clarification Letter that you
7  referred to, did you view that as an amendment
8  to this transaction?  "This," l'm pointing
9  Exhibit 1.
10     A.   The First Amendment and the -- l would
11  view as amendments to this original document,
12  yes.
13     Q.   Both the First Amendment and the
14  Clarification Letter?
15     A.   Yes.
16     Q.   Were amendments to this document.
17     A.   Yes.
18     Q.   Now, l'm showing you, Mr. McDade, what
19  previously has been marked as Exhibit 43.  Take
20  a moment to look through the document.
21        (Document review.)
22     Q.   Have you had a chance to do that?
23     A.   Yes.
24     Q.   Now, again, l don't want to mislead
25  you.  Your name is not on here.  l want to

Page 88

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2  direct your attention to the substance at the
3  bottom where it says, "The HR director at
4  Barclays called to try to get a schedule that
5  was supposed to be initialed by the parties and
6  is a financial schedule related to bonuses
7  'accrued FY liability.'  It sounds like his team
8  is concerned about getting that document before
9  closing.  Do you know what he's referring to and
10  where to get his hands on it?"  And the response
11  from Mr. Berkenfeld to Ms. Binkley is, "l don't.
12  Check with Bart and Skip."
13        Did anyone ever check with you to look
14  for a copy of Deposition Exhibit 19, the
15  financial schedule?
16     A.   To look for a copy of Exhibit 19?
17     Q.   Yes.
18     A.   No.
19     Q.   Did it ever come to your attention
20  during the week that Barclays had lost track of
21  that financial schedule?
22     A.   No.
23     Q.   Okay.  Now, you mentioned a moment ago
24  that the deal details changed.  Can you give me
25  sort of a -- l want to go through the week and

Page 89

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2  we'll spend some time on that, but if you could,
3  sir, give me a summary of how the details
4  changed through the week.
5     A.   First of all, the balance sheet
6  changed at Lehman.  The market changed in terms
7  of value of balance sheet items that were still
8  left at Lehman.  Those would be the two most
9  significant changes.
10     Q.   During the week, to your knowledge,
11  did Lehman mark its books -- did the
12  broker-dealer mark its books from day-to-day?
13     A.   As awareness of the potential for the
14  Barclays deal came to the employee base, it
15  became more normal course of business than
16  Monday or Tuesday or the weekend had been.  l
17  don't know specifically the answer, but it would
18  be my -- it would be my guess that, yes, we
19  would be back to marking the books and records.
20     Q.   Do you know one way or the other?
21     A.   l do not know.
22     Q.   Do you know if after the price was
23  agreed, including the $5 billion overall loss
24  against the marks, whether in the following days
25  a process began where people were instructed to

Page 90

1        HIGHLY CONFIDENTIAL - B. McDADE
2    mark the books to reflect the $5 billion
3    agreement?
4        A.   I do not know. I know a process
5    continued until the end of the week to continue
6    to value the assets, because that would have
7    been our responsibility and that would have been
8    Barclays, the purchaser's, desire.
9        Q.   When you say "continued to value the
10   assets," do you know if the books -- when the
11   process began again of marking the books, do you
12   know if they were marked by market values the
13   way they always had been or were they marked to
14   reflect this $5 billion agreement that had been
15   made with Barclays?
16       A.   I don't know the answer.
17       Q.   Who would I ask if I wanted to know
18   the answer to that?
19       A.   Ian Lowitt and Martin Kelly.
20       Q.   To your knowledge, would it be
21   appropriate, if you wanted to reflect the market
22   value, to mark the books to reflect the $5
23   billion agreement as opposed to the way they had
24   always been marked to market?
25       MR. BUCKLEY: Object to your referring

Page 91

1        HIGHLY CONFIDENTIAL - B. McDADE
2    to the $5 billion agreement. That's not
3    what the witness has testified. He's not
4    testified that it's a $5 billion agreement.
5    So I object to the question.
6        Q.   I think you can answer it, sir.
7        A.   The mark to market process on a daily
8    basis was and has always been the same. I would
9    assume the individual traders at the line
10   level who do the individual marking of the
11   aggregate positions that you see here would have
12   taken their same approach to the marking over
13   the course of the week.
14       Q.   So, with respect to the $5 billion
15   overall loss against the marks that we talked
16   about before, do you know if, when the books
17   were marked on the 17th, they were marked to
18   reflect market value as they always had been or
19   if they were marked to reflect the $5 billion
20   overall economic loss that we talked about
21   before?
22       A.   I do not --
23       MR. HUME: Objection to form. Lack of
24   foundation.
25       MR. BUCKLEY: Objection to form. You

Page 92

1        HIGHLY CONFIDENTIAL - B. McDADE
2    can answer.
3        A.   I do not know.
4        Q.   And if you wanted to know, you would
5    ask Mr. Lowitt, correct?
6        A.   Correct.
7        Q.   I take it from your answer to that
8    question that you would not know whether a
9    process of marking the books to reflect the $5
10   billion component we talked about stopped also
11   on the 17th, whether it wasn't completed?
12       A.   I don't know the specific answer to
13   the question about the marking process over the
14   course of the week at the broker-dealer. I do
15   know the specific processes and was involved in
16   the valuation of these assets relative to the
17   transaction.
18       Q.   Okay. In the valuation of the assets
19   relative to the transaction was it a process by
20   which Lehman and Barclays agreed on what they
21   viewed as the market value or did it also
22   involve a haircut that Barclays had wanted as a
23   negotiated price?
24       A.   It was the former: A market value
25   process which reflected all the features of what

Page 93

1        HIGHLY CONFIDENTIAL - B. McDADE
2    was happening in the marketplace at the time.
3        Q.   That was your understanding of what
4    was going on in these asset value discussions?
5        A.   Yes, it was.
6        Q.   Did you have any understanding that
7    what was going on in these asset value
8    discussions also included a haircut to reflect
9    market, future market volatility?
10       A.   No.
11       Q.   If there had been negotiations of a
12   haircut -- an agreement to apply a haircut to
13   reflect future market volatility, would that
14   have been consistent with your understanding of
15   the transaction?
16       MR. HUME: Objection. Vague and
17   ambiguous, the use of the word "haircut."
18       A.   No.
19       Q.   If there had been an agreement to sell
20   the assets to Barclays for $5 billion less than
21   the amount shown on Lehman's books, would that
22   have been consistent with your understanding of
23   the transaction?
24       A.   You'll have to repeat the question,
25   because I believe you're asking me to speculate

Page 94

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    on something that --
3        Could you repeat the question?
4        MR. GAFFEY: Can you read it back,
5    please?
6        (Record read.)
7        MR. BUCKLEY: Objection to form and
8    foundation.
9    A.   Yes.
10    Q.   Did there come a point during the week
11    where you had a discussion with Mr. Kelly where
12    he told you that the evaluation of accrued
13    liabilities for trade payables was overstated?
14    A.   We were, over the course of the week,
15    trying to determine with a great degree of
16    specificity and struggling with what those cure
17    payments, what that figure was, yes.
18    Q.   Did there come a time when Mr. Kelly
19    informed you that in his view the accrual for
20    trade payables was overstated?
21    A.   The numbers moved from a higher level
22    to a lower level over the course of the week,
23    yes.
24    Q.   I think we're missing each other. I'm
25    asking about whether you recall any specific

Page 95

1    HIGHLY CONFIDENTIAL - B. McDADE
2    conversation with Mr. Kelly.
3    A.   I don't recall specific conversation
4    with Mr. Kelly.
5    Q.   Do you recall any conversation with
6    Mr. Kelly where you responded to him, "We just
7    left a billion dollars on the table"?
8    A.   I don't recall a specific conversation
9    with Mr. Kelly where I said we left a billion
10    dollars on the table.
11    Q.   Do you recall any conversation with
12    Mr. Kelly where the topic was the accrued
13    liability for trade payables where you said, in
14    sum or substance, "We left a billion dollars on
15    the table"?
16    A.   I don't recall a specific conversation
17    with respect to Mr. Kelly.
18    Q.   Do you recall any, generally, any
19    conversations with Mr. Kelly along those lines?
20    A.   Generally, Mr. Kelly would have been
21    in a series of meetings with Ian Lowitt and
22    potentially with me during the course of the
23    week trying to inform us as to the specific
24    number with respect to assets and with respect
25    to cure payments. So, yes, in a general sense.

Page 96

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   Do you have any recollection of a
3    conversation with Mr. Kelly where he talked
4    about the cure payment shown on Exhibit 19, the
5    financial schedule, and told you he thought that
6    number was overstated?
7    A.   So I don't recall a specific
8    conversation, no.
9    Q.   Did it ever come to your attention
10    during the week that it was the view within the
11    folks in finance that the accrued liability for
12    cure on the financial schedule was overstated?
13    A.   Yes, the number kept moving. It kept
14    moving down. That would have been a benefit to
15    the Lehman estate.
16    Q.   The accrued liability for cure was
17    part of the compensation that the court was told
18    Barclays would be paying for Lehman's assets,
19    correct?
20    A.   That's correct.
21    Q.   And if the number was going down, I
22    take it then -- or if it started at 2 and a
23    quarter, it winds up at something less than 2
24    and a quarter, right?
25    A.   Correct.

Page 97

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   Do you know how much less than 2 and a
3    quarter it wound up?
4    A.   The number was between 750 and 800
5    million.
6    Q.   And what's your basis for that number?
7    You state it with some degree of certitude. How
8    do you know it came to 750 to 800 million?
9    A.   The clarifying -- I believe the
10    clarifying letter.
11    Q.   You believe the clarifying letter
12    addressed a change in the accrued --
13    A.   Addressed a change in the cures, yes.
14    Q.   Do you know who calculated the reduced
15    liability for trade payables to 700 or 800
16    million?
17    A.   I don't know the individuals. It
18    would have rolled up under Martin Kelly's team.
19    Q.   There would be individuals within
20    Martin Kelly's team?
21    A.   Most definitely.
22    Q.   So, in realtime, if you wanted to know
23    the, you know, if you wanted to know the answer
24    to the question, Kelly's the guy you would have
25    asked?

Page 98

HIGHLY CONFIDENTIAL - B. McDADE
1    HIGHLY CONFIDENTIAL - B. McDADE
2    A.   Yes.
3    Q.   As a result of the number going down
4    from the 2 and a quarter billion shown on the
5    financial schedule to the 7 or 8 hundred million
6    that you told me about, you would agree with me
7    that the component of consideration Barclays was
8    paying in the form of assumed trade payables was
9    also going down, correct?
10   A.   Absolutely.
11   Q.   And do you know if there was any
12   change in the compensation accrual over that
13   period?
14   A.   I don't believe there was any change
15   in compensation.
16   Q.   It always stayed at 2 billion?
17   A.   Yes.
18   Q.   That was an agreed number?
19   A.   That was the number used.  I've
20   answered that before.  That was the number used
21   by Barclays in the process.
22   Q.   Did you know at the time whether the
23   number $2 billion as the liability that Barclays
24   would assume for compensation accurately stated
25   what Barclays would wind up paying?

Page 99

HIGHLY CONFIDENTIAL - B. McDADE
1    HIGHLY CONFIDENTIAL - B. McDADE
2    A.   I would, again, not part of the
3    Barclays process, part of gathering the
4    information and helping to give some context, I
5    would assume that number reflected an accurate
6    assessment, yes.
7    Q.   I want to push that a bit further,
8    sir, than you would assume.  I want to get the
9    basis of what you knew at the time.
10          Did you know one way or the other
11   whether the $2 billion number for compensation
12   accurately stated what Barclays would actually
13   wind up paying?
14   A.   I -- no one could possibly know that
15   number, no, I would not have known that to
16   accurately state what would have actually been
17   paid because they were taking on 9,000
18   employees, 9,000 different iterations of a
19   modeling process.
20   Q.   Do you know if that was a good faith
21   estimate of the amount that Barclays would wind
22   up paying?
23   A.   Absolutely.
24   Q.   And how do you know it was a good
25   faith estimate?

Page 100

HIGHLY CONFIDENTIAL - B. McDADE
1    HIGHLY CONFIDENTIAL - B. McDADE
2    A.   Because the data was rigorously
3    provided by Lehman and rigorously reviewed and
4    modeled by Barclays.
5    Q.   Do you know what Lehman's accrual --
6    do you know the difference between what Lehman
7    had on its books accrued and the $2 billion
8    number?
9    A.   I believe it was a billion dollars.
10   Q.   And the difference of a billion
11   dollars was attributable, if I understand you
12   correctly, to Barclays' modeling?
13   A.   It was a combination of full year.
14   The combination of, to the best of my knowledge,
15   Barclays pays in a different percentage of cash
16   and stock, therefore, a higher cash component
17   of -- therefore, a higher expense accrual in the
18   Barclays system than Lehman's, who paid us a
19   higher percentage of equity.  The combination of
20   those plus an estimate of what it would keep in
21   a competitive environment to keep the bulk of
22   the team in place.
23   Q.   But you didn't see Barclays' model,
24   correct?
25   A.   No, I did not.

Page 101

HIGHLY CONFIDENTIAL - B. McDADE
1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   You didn't know the method that
3    Barclays used to model this number, correct?
4    A.   No, I did not.
5    Q.   You knew only the number that Barclays
6    told you was the result of the modeling,
7    correct?
8    A.   Correct.
9    Q.   What was your basis to know that it
10   was a good faith estimate of what Barclays
11   actually would pay, other than the fact that
12   Barclays told you that?
13   A.   My, my method, my litmus test was the
14   knowledge of what was happening in the
15   marketplace and the knowledge of what
16   historically had been necessary to keep the
17   folks at Lehman who they were hiring in place.
18   So I would have used internal metrics and market
19   metrics that I would have always used in a
20   competitive pay process.
21   Q.   In a competitive pay process, could
22   you have discerned why there was a
23   billion-dollar difference between the accrual on
24   Lehman's books and the amount Barclays said
25   should be the assumed liability amount?  Would

## Page 102

HIGHLY CONFIDENTIAL - B. McDADE

1 you be in a position to know that?

2    A.   I would have been in a reasonable

3 position to understand the pay dynamics, yes.

4    Q.   Take another look, if you would, sir,

5 at page 35 of the Asset Purchase Agreement,

6 Section 9.1(C). And we talked a while before

7 ago, sir, about the financial schedule, Exhibit

8 19, being the schedule that's referred to in

9 paragraph 9.1C of the agreement.

10      When the agreement speaks in terms of

11 "bonus pool amounts accrued," do you see where I

12 am. Just so we're in the same place on the

13 document, just about the fourth line down,

14 referring to "bonus pool amounts accrued," we in

15 the same place?

16    A.   Uh-huh.

17    Q.   Where the agreement refers to a

18 hundred percent of the bonus pool amounts

19 accrued in respect of amounts payable, and then

20 reading on a little bit, "reflected on the

21 financial schedule delivered to purchaser"?

22    A.   Uh-huh.

23    Q.   Would you fairly read that to

24 understand that it was an amount calculated by

## Page 103

HIGHLY CONFIDENTIAL - B. McDADE

1 Barclays as opposed to an amount accrued by

2 Lehman?

3    A.   So if I understand your question,

4 ultimately Barclays is the amount -- is the

5 payer. It accurately reflects --

6    Q.   Well --

7      MR. BUCKLEY: Let him finish the

8 answer.

9      MR. GAFFEY: I beg your pardon.

10      MR. BUCKLEY: Finish your answer.

11    A.   It accurately reflects the

12 combination -- the full cost of employing

13 including all aspects of the 9,000 employees who

14 would and wouldn't stay as a part of the

15 transaction.

16    Q.   Well, looking at the language itself

17 in the agreement, sir, where it talks about

18 "bonus pool amounts accrued"?

19    A.   Uh-huh.

20    Q.   Accrued where?

21    A.   Accrued in the -- we're speaking to

22 the Lehman accrual.

23    Q.   Okay. And the Lehman accrual that

24 we're speaking to, according to the agreement,

## Page 104

HIGHLY CONFIDENTIAL - B. McDADE

1 is reflected on the financial schedule delivered

2 to purchaser, correct? That's what it says?

3    A.   I think you're choosing the words

4 extremely specifically. I read it to -- I read

5 this to specifically be the ultimate

6 responsibility for compensation for bonus pool

7 compensation that Barclays would be responsible

8 for.

9    Q.   I think I agree with you on that as an

10 overall matter, sir, but I'm looking at the

11 description of the financial schedule, and at

12 least as I'm reading this, what it refers to is

13 "bonus pool amounts accrued in respect of

14 amounts payable for incentive compensation, but

15 not base salary, and reflected on the financial

16 schedule delivered to purchaser on September

17 16."

18      Is Lehman's accrual for amounts

19 payable for incentive compensation but not base

20 salary, is Lehman's accrual reflected on that

21 financial schedule marked as Deposition Exhibit

22 19?

23    A.   No, this reflects the estimate of what

24 it would take for a full year to compensate the

## Page 105

HIGHLY CONFIDENTIAL - B. McDADE

1 9,000 employees.

2    Q.   So that $2 billion number reflected on

3 the financial schedule does not reflect Lehman's

4 accrual?

5    A.   It includes Lehman's accrual.

6    Q.   Plus the billion added by Barclays?

7    A.   Correct.

8    Q.   Now, the $4.25 billion in accrued

9 liabilities for comp and cure shown on the

10 financial schedule, do you know if -- withdrawn.

11 The 4.25 billion in accrued liabilities

12 reflected on the financial schedule, were they

13 meant in any way to cover the difference between

14 Lehman's book values and the market value, the

15 $5 billion difference we've been talking about?

16    A.   No, the cure payments are literally a

17 series of, a collection of hundreds of contracts

18 that already exist.

19    Q.   Was it your --

20    A.   And the compensation is again what

21 we've described, so no.

22    Q.   Was it your understanding that the

23 accrued liabilities for compensation and cure

24 were consideration Barclays was giving over and

Page 106

HIGHLY CONFIDENTIAL - B. McDADE

1    above the assumption of short positions against
2    the long position?
3        A.    These were responsibilities and
4    expenses that clearly would have to be paid and
5    honored to run the businesses going forward.
6        Q.    Let me put the question another way.
7    Did you understand the transaction at issue here
8    to be basically a wash from the perspective of
9    LBI, the broker-dealer, an equivalent exchange
10   of assets?
11       MR. HUME:  Objection.  Vague and
12   ambiguous.
13       A.    I understood the transaction to be an
14   assumption of the assets and liabilities.  It's
15   clear Barclays was negotiating, as any purchaser
16   would, in their opinion, in its most efficient
17   fashion, and we were responsible as Lehman to
18   negotiate against their efficient process.
19       Q.    If I understand your last answer, sir,
20   correctly, you're essentially describing to me
21   that a purchaser wants to pay the least amount
22   possible and the seller wants to get the most?
23       A.    Correct.
24       Q.    My question goes to the end result,

Page 107

HIGHLY CONFIDENTIAL - B. McDADE

1    not the goals of the negotiators.
2        Did you understand the end results of
3    this transaction to be, from the perspective of
4    LBI, essentially a wash, an equivalent -- with
5    Barclays assuming liabilities, including
6    employee liabilities and contract cure
7    amounts --
8        A.    Yes.
9        Q.    -- basically equivalent to the assets?
10       A.    Yes.
11       Q.    And did that equivalent exchange
12   include or exclude the $4.25 billion in assumed
13   liabilities shown on that financial schedule?
14       A.    It ultimately included what those
15   figures ultimately ended up being, but did
16   not -- it did not --
17       Are you talking about the final
18   transaction consummated or are you talking
19   about --
20       In concept, yes.
21       Q.    Okay.  When you say "in concept, yes,"
22   you're talking about the deal as it was --
23       A.    Cure payments -- as the final details
24   of cure payments and compensation.

Page 108

HIGHLY CONFIDENTIAL - B. McDADE

1        Q.    Let's do this with time periods, okay?
2    So --
3        A.    Fine.
4        Q.    -- on the 16th, as reflected in the
5    Asset Purchase Agreement dated as of September
6    16th and signed on that day, was it contemplated
7    that this would be an equivalent exchange of
8    assets, a wash?
9        A.    It ended up being an equivalent
10   exchange of assets and liabilities, yes.  Yes.
11       Q.    On the 16th?
12       A.    On the 16th, yes.
13       Q.    And for it to be an equivalent
14   exchange of assets -- withdrawn.
15       And within that equivalent exchange of
16   assets --
17       MR. BUCKLEY:  Assets and liabilities.
18       MR. GAFFEY:  That's sort of where I'm
19   going.
20       Q.    Within that equivalent exchange would
21   be included the $4.25 billion in assumed
22   liabilities, correct?
23       A.    Yes.
24       Q.    And in order for it to be an

Page 109

HIGHLY CONFIDENTIAL - B. McDADE

1    equivalent exchange of assets, the $4.25 billion
2    in assumed liabilities would have to be
3    accurately stated?
4        A.    Correct.
5        Q.    And if the actual assumed liabilities
6    were less than $4.25 billion, it would not be an
7    equivalent exchange of assets, correct?
8        A.    That's correct.
9        Q.    It would be a deal to Barclays'
10   benefit if the assumed liabilities were lower
11   than $4.25 billion, correct?
12       A.    That's correct.
13       Q.    And I think you told me over the week
14   the amount of accrued liabilities for cure
15   dropped from 2 billion to between 7 and 8
16   hundred million dollars?
17       A.    Correct.
18       Q.    Was there any change in the assets
19   that would be delivered to keep it in equivalent
20   exchange?
21       A.    The assets changed over the course of
22   the week dramatically.
23       Q.    Okay.  Was it --
24       A.    So there was a different nature of the

Page 110

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    balance sheet. So the process started all over
3    again at the end of the week.
4        Q.    By, say, Friday --
5        A.    Given the dynamic nature.
6        Q.    I'm sorry to interrupt you.
7            Given the -- let's say by Friday, the
8    19th, was it accurate or inaccurate --
9    withdrawn. By Friday the 19th, would it have
10   been accurate or inaccurate to say that the
11   assumed liabilities of 2 billion for comp and
12   2.25 -- 2 billion for comp was the same as it
13   had been earlier in the week?
14       A.    Yes. Accurate.
15       Q.    And would it have been accurate or
16   inaccurate to say that on Friday, the 19th, that
17   the assumed liabilities for trade payables was
18   the same as it had been earlier in the week?
19       A.    It would be inaccurate to say it's the
20   same.
21       Q.    And that's because the amount of trade
22   payables dropped from the 2.25 shown on the
23   financial schedule to 7 or 8 hundred million?
24       A.    Correct.
25       Q.    Do you know if at any point the amount

Page 111

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    for trade payables was calculated downwards from
3    2.25 to 1.15?
4        A.    It was talked about in the bankruptcy
5    court at 1.5, yes. The number kept moving over
6    the course of the week.
7        Q.    Well, it was talked about in the
8    bankruptcy court at 1.5 on Wednesday, the 17th?
9        A.    Right.
10       Q.    The day after this deal was signed,
11   right?
12       A.    Right.
13       Q.    Do you know what accounted for the
14   drop of 750 million from Tuesday evening when
15   the agreement was signed? Withdrawn.
16           Do you know what accounted for the
17   drop from Tuesday at 11:18 A.M. when that
18   schedule was created to the filing of the papers
19   that described the liability at 1.5 billion?
20       A.    I specifically did not go through that
21   process, so I don't know the answer
22   specifically.
23       Q.    I'm just looking for the math. Do you
24   know, was there an event or a recalculation or
25   what? How could it -- why did it drop from 2

Page 112

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    and a quarter to 1.5 as opposed to the mechanics
3    of filing with the court?
4        A.    I don't know the specific answer.
5    Again, Martin Kelly is the correct individual to
6    talk to for the specifics of the process.
7        Q.    And would he be the correct individual
8    for me to talk to know why it dropped from 1.5
9    on the 17th to between 7 and 8 hundred million
10   near the end of the week?
11       A.    Yes, he would.
12       Q.    It wasn't 1.5 billion by Friday, the
13   19th, correct?
14       A.    That's correct.
15       Q.    Just before I sort of move on to a
16   couple other topics, I want to see if I can set
17   some groundwork with you about how the week
18   went.
19           Can you give me a general idea of how
20   your -- what were your activities after the deal
21   was -- after the contract was actually signed?
22       A.    Most of my activities involved working
23   with the Weil team in and around the bankruptcy
24   process.
25       Q.    And give me a general description of

Page 113

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    what you were doing in working with the Weil
3    team?
4        A.    Well, I ultimately was involved in
5    creditor meetings, as you described it, the
6    pre-bankruptcy hearing on Wednesday, then
7    ultimately the preparation of and the process of
8    being a hundred percent part of and a witness in
9    the actual bankruptcy hearing on Friday.
10       Q.    You testified at the sale hearing?
11       A.    Yes, I did.
12       Q.    Now, also during that Tuesday,
13   Wednesday, Thursday and Friday, were you dealing
14   with the finance guys, Reilly, Kelly, Lowitt and
15   Tonucci?
16       A.    Yes, I was.
17       Q.    Did it come to your attention at some
18   point during that week that the Fed -- announced
19   Fed that it wanted to be relieved of its
20   obligations under a repurchase transaction
21   through which it was financing the broker-dealer
22   and that Barclays needed to take that over?
23       A.    Yes, it did.
24       Q.    Did you have any involvement in the
25   process that followed that announcement by the

Page 114

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Fed?
3        A.    No, I did not.
4        Q.    Who was responsible, to your
5    knowledge, on the Lehman side for dealing with
6    that issue?
7        A.    Paolo Tonucci and Ian Lowitt.
8        Q.    Was Mr. Kelly involved at all?
9        A.    I do not know.
10        Q.    Anyone else other than Tonucci and
11    Lowitt?
12        A.    I do not know.
13        Q.    Do you know if Gerry Reilly was
14    involved in that at all?
15        A.    I do not know.
16        Q.    Describe for me what you do understand
17    about the process of transitioning from a Fed
18    repo to a repo with Barclays.
19        A.    Ultimately the cash that had been lent
20    to Lehman for assets was repaid to the Fed and
21    Barclays became, if you will, the lender, the
22    provider of the cash against the assets.
23        Q.    Do you have an understanding of what
24    the numbers were, what was lent, what was put up
25    as collateral?

Page 115

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2        A.    I don't know the specifics.
3        Q.    Did you know at the time?
4        A.    No, I did not.
5        Q.    Did there come a point during the week
6    where the transaction we've been talking about
7    became centered on the Repurchase Agreement?
8        A.    Yes.
9        Q.    How so?
10        A.    The clearing bank, JPMorgan, where
11    ultimately custodied assets took place,
12    apparently -- again, apparently, because we're
13    removed from the process specifically from the
14    Lehman seat -- did not provide the swift,
15    efficient, clean transfer of all of that repo
16    and ultimately could not get resolution with
17    Barclays for whatever that commercial dispute
18    was and started to cause other, if you will,
19    down-the-chain challenges for Lehman, in
20    particular, threatening to and removing our
21    ability to process transactions that had already
22    taken place with DTC, which is, as you know or
23    may know, the ultimate clearer of most of the
24    securities in the world.
25        Q.    How did that bring the repo to the

Page 116

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    center of the transaction?
3        A.    The ultimate -- the original balance
4    sheet as described were repo counterparties that
5    were customers of the firm. The Fed replaced
6    the customers of the firm on Monday. Barclays
7    replaced the customers -- Barclays replaced the
8    Fed, I believe it took place on Thursday. So it
9    created a very different dynamic in that just
10    the financing of the assets had a different
11    financing partner, in that case, Barclays.
12        The twist that I would describe is the
13    real dynamic around repo had to do with the
14    dispute that occurred between JP and Barclays
15    around the unwind of the Fed repo, and that's
16    where I think it really affected the change in
17    the transaction to the point where over the
18    weekend, this was the weekend now of --
19        Q.    Following the hearing.
20        A.    -- following the hearing, we lived --
21    we, as the Lehman team, lived in sort of a
22    silent cave off to the side at the Weil offices
23    waiting for the regulators and JPMorgan and
24    Barclays to resolve their dispute, and it was
25    not clear that a deal -- that it would be

Page 117

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    resolved.
3        Q.    Ultimately was a resolution reached
4    for that?
5        A.    It was, but we were not made privy.
6    We, as Lehmanites, were not made privy to the
7    specifics of the resolution.
8        Q.    Okay. I can understand from what
9    you've described how this may have presented an
10    operational hurdle to concluding the deal, but
11    I'm still not sure I'm clear on how the repo
12    becomes the center of the deal.
13        A.    Those are your words, not mine.
14        Q.    Okay. Let me ask you that. Did it
15    become the center of the deal?
16        A.    No.
17        Q.    By Friday, was it so that the
18    Repurchase Agreement was -- withdrawn.
19        Was it so, in your view, sir, that by
20    Friday there was a completely new deal?
21        A.    The repo made Barclays the ultimate
22    owner of the assets already in the form of the
23    repo contract if Lehman didn't exist and the
24    financier of those assets. So the deal shifted
25    in that Barclays now was valuing what assets

Page 118

HIGHLY CONFIDENTIAL - B. McDADE

1  were left by the way, because these assets that
2  you're looking at on September 16th are now at a
3  combination of Barclays and JPMorgan, they're
4  not at Lehman anymore, right? So as Barclays
5  assessed its value of the repo, the collateral
6  within it, that collateral represented some of
7  the assets that they would have originally, as
8  we contemplated, had originally not wanted to
9  purchase, as an example, the residential
10  mortgage assets, and there might be other
11  examples.
12      So it made for a fundamental view in
13  their mind of a shortfall in terms of the value
14  of the assets as first contemplated and as
15  contemplated on Friday when the, quote, new
16  balance sheet assessment process, the continuing
17  assessment of the assets was taking place.
18  Q.    Was the idea that there was a
19  shortfall based on Barclays' valuation of the
20  collateral in the repo?
21  A.    It was a combination of Barclays'
22  process around the repo and JPMorgan having
23  taken some of the assets.
24  Q.    I may be a bit confused here myself.

Page 119

HIGHLY CONFIDENTIAL - B. McDADE

1  I understand the piece where JPMorgan is hanging
2  onto some collateral.
3  A.    Right.
4  Q.    That's what you're describing to me,
5  yes?
6  A.    Right.
7  Q.    I'm addressing a different --
8  A.    The Barclays issue.
9  Q.    Yeah, my question goes to who is
10  valuing the collateral that's in the repo,
11  whether Barclays actually got it or not, you
12  know, whose value is it, who is doing the
13  valuation modeling?
14  A.    Same team of individuals, so at
15  Barclays and at Lehman. So I can't speak
16  specifically to who was doing that process on
17  the Barclays side.
18  Q.    Your answer sort of -- I asked you a
19  bad question and you answered it anyway. My
20  question is, was it people on both sides
21  involved in the valuation?
22  A.    Absolutely.
23  Q.    And you don't know who the teams were
24  who were involved in that valuation process?

Page 120

HIGHLY CONFIDENTIAL - B. McDADE

1  A.    On the Lehman side I can answer the
2  question. It's the same group of individuals,
3  in addition to Alex Kirk being part of the
4  process.
5  Q.    When does Kirk first get involved?
6  A.    Kirk gets involved when I ask him to
7  get involved on Thursday evening. He
8  technically gets involved on Friday morning. I
9  asked him on Thursday evening.
10  Q.    You called Kirk on Thursday evening
11  and asked him to get involved, correct?
12  A.    Yes.
13  Q.    Had he had any involvement prior to
14  that other than managing credit risk?
15  A.    No, he had not. He had very specific
16  involvement over the weekend up to Sunday
17  evening.
18  Q.    That's in the deal that didn't get
19  done?
20  A.    Exactly.
21  Q.    My question goes to, in the deal that
22  did get done, he doesn't get involved until
23  Friday, right?
24  A.    Does not get involved until Friday

Page 121

HIGHLY CONFIDENTIAL - B. McDADE

1  morning.
2  Q.    And he gets involved because you call
3  him on Thursday night and ask him to get
4  involved, correct?
5  A.    That's correct.
6  Q.    You asked him to get involved because
7  Mark Shafir had left; is that correct?
8  A.    I asked him to get involved for a
9  couple different reasons. I educated him that
10  Mark Shafir had left, but I asked him to get
11  involved because he was an adult, he was a
12  senior risk operator, it was clear that we still
13  did not have a transaction, and an extra set of
14  hands was extremely valuable.
15  Q.    Okay. Had Mark Shafir actually left?
16  A.    He had left.
17  Q.    On the 18th he announced he was
18  leaving, and he left that day?
19  A.    I don't recall the exact moment in
20  time, so I can't confirm the 18th, but he was
21  there through the processing of the deal and it
22  was either the 17th or the 18th that he made his
23  decision to leave and go to Citi.
24  Q.    Let's try and use a milestone. Is he

31

Page 122

HIGHLY CONFIDENTIAL - B. McDADE

1
2 gone before the bankruptcy hearing at which you
3 testified took place?
4    A.   Yes.
5    Q.   So that would go move it back at least
6 to the 18th?
7    A.   That's correct.
8    Q.   Because Friday is the 19th?
9    A.   That's correct.
10    Q.   And was there any gap in between the
11 time he said he'd be leaving and the time that
12 he actually left?
13    A.   I --
14    Q.   Did you get notice or did he go that
15 day?
16    A.   I don't recall.  He would not have
17 communicated that departure to me.  He would
18 have communicated to Skip McGee, his boss.
19    Q.   Okay.  How did you learn Shafir was
20 leaving?
21    A.   Through Skip McGee.
22    Q.   And what did you learn?  Did you
23 learn --
24    A.   I learned he left.
25    Q.   Did you learn Mark is going to leave

Page 123

HIGHLY CONFIDENTIAL - B. McDADE

1
2 or did you learn Mark's gone?
3    A.   He left.
4    Q.   And Mark was one of the three
5 principal members of the negotiating team along
6 with you and Skip McGee, correct?
7    A.   That's correct.
8    Q.   Did the departure of one of the
9 principal negotiators on such short notice
10 create a problem?
11    A.   It created a continuity problem.  It
12 did not create a substance problem, in my
13 opinion, in terms of the deal.
14    Q.   Did it create a continuity problem in
15 having the same personnel on board who
16 understood the terms of the deal and how they
17 came to be?
18    A.   I would describe it as a human dynamic
19 continuity problem because he had been
20 interacting with Michael Klein, facing off with
21 the advisors of Barclays.  It was more of a
22 human social than it is the dynamic of the
23 actual information, because he was not working
24 in a vacuum.  His M&A team had been very much
25 around it from Paul Parker, his head of M&A in

Page 124

HIGHLY CONFIDENTIAL - B. McDADE

1
2 the U.S., to a lot of financial institutions'
3 bankers.
4    Q.   When you say he had been facing off
5 with Mark Klein?
6    A.   Michael Klein.
7    Q.   Michael Klein, beg your pardon.
8         In what sense was he facing off with
9 Michael Klein?  What were they facing off about?
10    A.   They were the two M&A advisors
11 representing the clients.  So there were many
12 moments, as there is in any deal, of lots of
13 back and forth and pushing and cajoling, et
14 cetera.
15    Q.   Did you have any conversations with
16 Shafir in between the time you learned from
17 McGee that he was leaving and the closing of the
18 deal?
19    A.   I believe he might have come by or
20 phoned and said, "I left, thanks," but I don't
21 have a specific -- I don't have a very good
22 frame of reference for the recall of that.
23    Q.   Why did he --
24    A.   That's it.
25    Q.   Do you know why he left?

Page 125

HIGHLY CONFIDENTIAL - B. McDADE

1
2    A.   I do not know.  I do not know why he
3 left.
4    Q.   Did you ever know?  I mean as opposed
5 to you might not remember now, do you remember
6 if anybody gave you a reason that Mark Shafir
7 left during the middle of the week while the
8 deal was being processed?
9    A.   My understanding is that he had been
10 contemplating leaving for a long period of time
11 and wanted to see through the end of the --
12 whatever happened with Lehman.
13    Q.   To your knowledge, did his decision to
14 depart have anything to do with anything going
15 on in connection with the transaction?
16    A.   No, it did not.
17    Q.   You know that that's not so or you
18 don't know one way or the other?
19    A.   You asked to my knowledge.  I do not
20 know, to my knowledge, that this had anything to
21 do with his departure.
22    Q.   Let's go back to the repurchase
23 agreement.  I want to see if I can get a better
24 understanding of what role it ultimately comes
25 to play in the deal.

Page 126

HIGHLY CONFIDENTIAL - B. McDADE

1      HIGHLY CONFIDENTIAL - B. McDADE
2      I think when we left that topic there
3  are difficulties, for whatever reason, hostile
4  or not, of getting collateral out of JPMorgan.
5      They had the collateral because they
6  were the collateral agent on the tri-party repo
7  with the Fed, correct?
8      A.    They're a clearing bank, exactly.
9      Q.    And JPM had some view that it had a
10  claim to some of the collateral for some reason,
11  correct?
12      A.    Yes, correct.
13      Q.    Okay. I won't take your time with
14  what it was. I think it's enough they thought
15  they should be able to keep it, yes?
16      A.    Correct.
17      Q.    And as a result, collateral that was
18  within the repo did not in fact move over to
19  Bank of New York, which was the collateral agent
20  on the tri-party repo between Barclays and
21  Lehman, correct?
22      A.    That's correct.
23      Q.    For the collateral that did move over
24  to Bank of New York, do you know whether Bank of
25  New York put a value on the collateral that

Page 127

1      HIGHLY CONFIDENTIAL - B. McDADE
2  arrived?
3      A.    Typically, I'm not a repo expert, but
4  typically a repo, the clearing banks have a
5  pricing service in terms of the process, yes.
6      Q.    And normally when the clearing banks
7  give you a pricing service in terms of the
8  process, that pricing governs the value of the
9  collateral in the repo, correct?
10      A.    Normally, it doesn't apply to 2008.
11  Prior to 2008, that would have applied, but
12  anyone doing their work in repo would not have
13  accepted a third party's top-down approach to
14  valuing assets.
15      Q.    Okay. And when you say that, sir, are
16  you talking about some sort of regulatory change
17  in 2008 or just -- or the economic circumstances
18  that obtained in 2008?
19      A.    I'm talking about the economic
20  circumstances. Nothing to do with the
21  regulatory environment. Pure business
22  observation.
23      Q.    Do you know if that change in practice
24  had been applied at any point in 2008 other than
25  with respect to the Barclays Repurchase

Page 128

1      HIGHLY CONFIDENTIAL - B. McDADE
2  Agreement we've been talking about?
3      A.    I know how we operated at Lehman in
4  terms of our repo business.
5      Q.    Do you know what the view was of
6  people whose day-to-day job involved repurchase
7  agreements was with respect to whether or not
8  you could have a negotiation with the collateral
9  agent regarding the valuation?
10      A.    I don't know that specifically.
11      Q.    And you're not a repo expert?
12      A.    That's correct.
13      Q.    Do you know if there was any -- and
14  you referred to the groups that were for
15  Barclays and Lehman talking about asset
16  valuations, sort of continuing that --
17      A.    Uh-huh.
18      Q.    -- at the time of the Repurchase
19  Agreement?
20      A.    Uh-huh.
21      Q.    Using my awkward phrasing.
22      To your knowledge, what exactly were
23  they doing when they were continuing this
24  process with respect to the collateral that was
25  in the repo?

Page 129

1      HIGHLY CONFIDENTIAL - B. McDADE
2      A.    The Barclays -- the Lehman and
3  Barclays participants in this process?
4      Q.    Yeah. So I can frame it, I'm at the
5  point where the repo's happened, Barclays is
6  supposed to have transitioned in for the Fed,
7  JPM hasn't sent over everything, there's some
8  valuation process going on with respect to what
9  has been sent into Bank of New York.
10      A.    Exactly.
11      Q.    Describe for me --
12      A.    The same process. I would describe it
13  as the same process that took place earlier.
14  It's just in a different form in terms of the,
15  you know, the -- it's in a repo form as opposed
16  to Lehman's balance sheet, but it's the
17  identical process, with the inclusion of the
18  experts from the repo side at Barclays and the
19  professionals at the Lehman repo side, so John
20  Coghlan, for example, at Lehman who would have
21  ran the Lehman financing business.
22      Q.    Coghlan is the guy you would think of
23  as the Lehman expert on repos?
24      A.    Coghlan, yes, he ran the business.
25      Q.    So if I want an answer to the question

**Page 130**

HIGHLY CONFIDENTIAL - B. McDADE

1      HIGHLY CONFIDENTIAL - B. McDADE
2  about whether or not you could operate
3  independently of the valuation that the
4  collateral agent applied, Coghlan is the guy I
5  ask?
6      A.   Yes, from the Lehman point of view.
7      Q.   From the Lehman point of view, yes.
8  At the time, from your point of view too, right?
9      A.   Yes.
10      Q.   Do you know if Coghlan's involved in
11  discussions with his counterparts at Barclays
12  about the value of the securities within the
13  repo?
14      A.   I don't know specifically.
15      Q.   Do you know who was involved in
16  discussions with counterparts at Barclays about
17  the valuation of the securities in the repo?
18      A.   I don't know specifically the answer,
19  but again, the same group -- I have a general
20  sense it would have been the same group of
21  individuals that had been involved all week in
22  risk.
23      Q.   Do you have any sense as to whether
24  the Barclays side of the table had actual input
25  into valuing the collateral that was within the

**Page 131**

1      HIGHLY CONFIDENTIAL - B. McDADE
2  repo?
3      A.   I believe in a general sense they had
4  a strong view on the value of the collateral.
5      Q.   Okay.  We can all have views about a
6  lot of things.  The question is whether or not
7  their view had any impact.
8          Do you know if the Barclays view was
9  given any weight or any effect in terms of
10  valuing what was in the repo?
11      A.   I think ultimately the markets, the
12  markets had effect on the valuation process.
13      Q.   All right.  Again, generally, I guess
14  we can understand that, with the markets
15  dropping, the value of a lot of collateral or a
16  lot of securities generally would be dropping;
17  some goes up, but most goes down in a down
18  market, yes?
19      A.   Yes.
20      Q.   So that macro view aside, I'm talking
21  about the process you've described to me where
22  Barclays and Lehman people were talking about
23  valuing the assets in the repo.
24          Is it your view that what they decided
25  between themselves constituted market value?

**Page 132**

1      HIGHLY CONFIDENTIAL - B. McDADE
2      A.   Yes.
3      Q.   Because the two of them were -- the
4  two sides were negotiating a price?
5      A.   The continued process over the course
6  of the week, yes.
7      Q.   And in that continued process of
8  negotiating a price, do you know if any account
9  was taken of extraneous market data with respect
10  to valuing the collateral in the repo?  Is this
11  something other than what Barclays was willing
12  to pay for it?
13      A.   Yes, I'm sure the third-party
14  providers in both cases, JP, as our clearer, and
15  Bank of New York's data was used.
16      Q.   Do you know if it was actually taken
17  into account or merely recognized to exist?
18      A.   I think it would have -- I don't know
19  the answer.
20      MR. GAFFEY:  Let's go off the record
21  for a second.
22          (Luncheon Recess; Time Noted: 12:25
23  P.M.)
24
25

**Page 133**

1      HIGHLY CONFIDENTIAL - B. McDADE
2      AFTERNOON SESSION
3          (Time Noted: 1:15 P.M.)
4  BART McDADE, resumed and
5      testified further as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. GAFFEY:
8      Q.   We were talking before the break,
9  Mr. McDade, about the Repurchase Agreement, and
10  I think you had told me, and correct me if I'm
11  wrong, that you don't know -- you don't remember
12  now, anyway, that the amount that Barclays
13  financed?
14      A.   That's correct.
15      Q.   Would it refresh your recollection if
16  I was to tell you it was $45 billion, does that
17  ring true with you?
18      A.   Approximately.
19      Q.   And do you know if in the Repurchase
20  Agreement with Barclays Lehman pledged more than
21  $45 billion in collateral to support the
22  financing?
23      A.   We would have -- my understanding,
24  again, not being there in terms of effecting the
25  trade with the deal, the team that was doing it,

34

Page 134

HIGHLY CONFIDENTIAL - B. McDADE

1 but we would have pledged collateral in the same
2 terms that would have been pledged from the Fed,
3 the transfer over to Barclays.
4     Q.   And you understood, if not -- with
5 respect to the specific number, as a general
6 matter, there was a haircut in the repo that has
7 collateral over and above the amount of
8 financing?
9     A.   That's commonplace for repo
10 transactions, yes.
11    Q.   Do you know the rough amount of the --
12    A.   No, I do not.
13    Q.   -- of the haircut?
14        I'm going to ask you two questions
15 here and I want to make them both full and
16 clear.  So do you know the amount of the haircut
17 that obtained with respect to the Repurchase
18 Agreement with the Fed?
19    A.   No, I do not.
20    Q.   Do you know the amount of the haircut
21 that obtained with respect to the Repurchase
22 Agreement with Barclays?
23    A.   No, I do not.
24    Q.   Would it refresh your recollection if

Page 135

HIGHLY CONFIDENTIAL - B. McDADE

1 I were to tell you it was in the amount of
2 approximately $5 billion?
3     A.   No.
4     Q.   Do you recall having any discussions
5 in connection with your work regarding the
6 transaction during that week of the amount of
7 the Fed haircut?
8     A.   No.
9     Q.   Do you recall having any discussions
10 in connection with your work regarding the
11 transaction during that week of the amount of
12 the haircut in the Barclays Repurchase
13 Agreement?
14    A.   No.
15    Q.   As a general matter, as I understand
16 it, as I understand what you were telling me
17 before the lunch break, the quantum of
18 securities that could be delivered to Barclays
19 had decreased in between Tuesday when the Asset
20 Purchase Agreement was signed and Thursday,
21 correct?
22    A.   Correct.
23    Q.   And what's your understanding of why
24 that quantum of securities that could be

Page 136

HIGHLY CONFIDENTIAL - B. McDADE

1 delivered decreased?
2     A.   The market changed, so any
3 transactions that may have occurred at Lehman,
4 transactions that were imposed on Lehman, for
5 example, the CME taking us out of a piece of the
6 balance sheet, the cash, for example, wiping us
7 out of all of our futures positions at the CME,
8 and the actual difference of the market value
9 because the markets continued to move, and
10 finally, the difference had to do with different
11 pieces of collateral that Barclays was
12 ultimately valuing as a result of the, however
13 we want to describe it, the dispute with
14 JPMorgan.
15    Q.   Okay.  So I understand it, those three
16 categories, it's there is some of the body of
17 collateral that's unavailable to be delivered
18 anymore for a variety of reasons?
19    A.   That's correct.
20    Q.   Closed out of trades or taken by the
21 Chicago Merc, right?
22    A.   Exactly.
23    Q.   That's one category.  The other
24 category is, as a matter of general market

Page 137

HIGHLY CONFIDENTIAL - B. McDADE

1 forces, the pricing, the value of the available
2 body of collateral has dropped in that time?
3     A.   Right.
4     Q.   Correct?
5        And the third is the body of
6 collateral that was stuck in the problem with
7 JPM?
8     A.   Exactly.  Yes.
9     Q.   And do you know as a general matter
10 what the difference was caused by those three
11 factors between the amount of the long position
12 that was agreed on Tuesday in the Asset Purchase
13 Agreement and what was available to be delivered
14 on Thursday?
15    A.   No, I don't.
16    Q.   Do you have a rough idea?
17    A.   No, I do not.
18    Q.   Do you know if the amount of
19 securities available to be delivered after
20 taking those three factors into account was less
21 or more than the amount that was in the repo,
22 including the haircut?
23    A.   Could you repeat that one more time?
24 Sorry.

Page 138

HIGHLY CONFIDENTIAL - B. McDADE
1       Q.    Let me try and rephrase it.  The
2   quantum of securities available that can
3   delivered to Barclays drops because of those
4   three factors you told me about, correct?
5       A.    Yes.
6       Q.    Do you know if that quantum was more
7   or less than the amount of the financing
8   Barclays supplied in connection with the repo,
9   the 45 billion?
10      A.    I understand.
11            I don't know the answer.
12      Q.    Do you know if the quantum of those
13  securities dropped below the amount in the
14  Barclays repo consisting of the amount financed
15  plus the haircut, the higher number?
16      A.    Yes.
17      Q.    And I take it from your testimony
18  before the break that one of the things that was
19  under discussion was finding assets sufficient
20  to deliver a particular amount to Barclays,
21  correct?
22      A.    That's correct.
23      Q.    What was the amount?
24      A.    Again, the process that we went

Page 139

HIGHLY CONFIDENTIAL - B. McDADE
1   through over the course of the week was to find
2   the market valuation of the assets that were
3   available.
4            In this case, the quantum of assets,
5   using your term, had changed.  We were going
6   through a process again of finding the value of
7   those assets that were available to be purchased
8   by the purchaser, in this case, Barclays.  They
9   still were in the position where the value of
10  the liabilities was reasonably similar.  The
11  form had changed in terms of it being their repo
12  now, but there were still the responsibilities
13  around cure payments and the compensation.
14           So we were looking for, at that point
15  of view, as a result of the current process of
16  valuing assets, for more assets within Lehman
17  that weren't part of the process of the repo,
18  all of the repo.
19      Q.    So you were looking for assets outside
20  the scope of the repo?
21      A.    Correct.
22      Q.    To add to the body of assets that
23  could be transferred to Barclays?
24      A.    Correct.

Page 140

HIGHLY CONFIDENTIAL - B. McDADE
1       Q.    So maybe I'm asking the same question,
2   but what was the total amount of -- total value
3   of assets you were looking for?  You knew you
4   wanted to add to what was in the repo, right?
5   Yes?
6       A.    That's -- that's correct.
7       Q.    How much more did you want to add to
8   what was in the repo?
9       A.    We were still going through the
10  process of valuing.  We knew we had a gap.  I
11  wasn't part of the specific meeting, so I can't
12  answer the question specifically, but there was
13  still a gap.
14      Q.    Okay.  A gap between what and what?
15      A.    The rough assets and liabilities
16  matching.
17      Q.    So, in the search for additional
18  assets to deliver to Barclays, one of the tasks
19  was to find enough assets to match the
20  liabilities that Barclays was undertaking,
21  correct?
22      A.    Our task was to understand all the
23  assets -- within Lehman, our task was to
24  understand all the assets and make sure we had

Page 141

HIGHLY CONFIDENTIAL - B. McDADE
1   proper valuation in terms of understanding the
2   value of those assets and to get the best price
3   for Lehman for those assets.
4       Q.    Okay.
5       A.    It was clear, yes, I have stated I
6   think previously, it was clear Barclays was
7   trying to find a means to provide against the
8   liabilities of cure payments and compensation.
9       Q.    Okay.  So I just want to run down the
10  liability side sort of full by category from the
11  bottom up.  It's the comp liability, correct?
12      A.    Correct.
13      Q.    The cure liability, correct?
14      A.    Correct.
15      Q.    And the liabilities that are incident
16  to the securities themselves, correct?
17      A.    Correct.
18      Q.    The short side of long position, yes?
19      A.    Yes.
20      Q.    Okay.  And included in the mathematics
21  of the total amount of liabilities that Barclays
22  would be undertaking were whatever the amounts
23  were of comp and cure, correct?
24      A.    That's correct.

Page 142

HIGHLY CONFIDENTIAL - B. McDADE
1
2    Q.    Okay.  So as the amount of -- as over
3    the week the amount of liability for cure
4    dropped, you would agree with me then that the
5    price -- that the amount of value that had to be
6    given to Barclays should have dropped in
7    accordance with that, correct?
8    A.    Correct.
9    Q.    So when the value of the cure
10   liability dropped from its original number of
11   2.25 and then to 1.5 and then down to the range
12   of 7 or 8 hundred million, the value of
13   securities attributable to that as it were
14   should have dropped, correct?
15   A.    I want to make a correction to the
16   statement I made earlier.  I was confusing the
17   15c3 7 to 8 hundred figure with cure.  So the
18   last figure that I do recall is the billion and
19   a half in cure.
20   Q.    As the number dropped from 2.25 to --
21   A.    To 1.5.
22   Q.    -- to 1.5?
23   A.    To answer your question, though, yes.
24   Q.    So, to follow up on your clarification
25   a little bit, your memory is not now that it

Page 143

HIGHLY CONFIDENTIAL - B. McDADE
1
2    dropped from 1.5 further during the week?
3    A.    That's correct.
4    Q.    It stayed at 1.5 from --
5    A.    To the best of my recollection, yes.
6    Q.    Let me put the "from" and "to" in
7    there so we have a good record.
8         It stayed at 1.5 from September 17 to
9    the closing on September 22?
10   A.    To the best of my recollection, yes.
11   Q.    Was any work being done between
12   September 17 and September 22 to fine-tune that
13   number?  Was Mr. Kelly continuing to look at it?
14   A.    Yes, he was.
15   Q.    And when Mr. Kelly and his crew
16   continued to look at it, did they ever change
17   that number from $1.5 billion?
18   A.    I don't know.
19   Q.    I'll go back to a question I asked you
20   before the break.  Having now sort of refreshed
21   your recollection about whether or not there was
22   this other drop, do you have a better
23   recollection now of whether or not Mr. Kelly
24   came to you during the week and told you the
25   trade payable number was overstated by about a

Page 144

HIGHLY CONFIDENTIAL - B. McDADE
1
2    billion dollars?
3    A.    I don't have a -- I don't have a
4    better recollection.  I tried to describe my
5    recollection of the week with Mr. Kelly being in
6    and around Ian Lowitt's office and in and around
7    my office several times, some of which we were
8    obviously talking because I was imploring an
9    accurate assessment of what the cure payment
10   number was.
11   Q.    Who were you imploring to give an
12   accurate assessment of what the cure payment
13   was?
14   A.    Ian Lowitt and Martin Kelly.
15   Q.    And you were imploring Lowitt and
16   Martin Kelly to get an accurate assessment of
17   the cure payment number because it related to
18   the amount of value that Lehman had to give to
19   Barclays, correct?
20   A.    Exactly.  And the number was changing.
21   Q.    So as the number dropped -- looking at
22   Exhibit 19, the financial statement upon which
23   the original transaction was based, that number
24   drops from 2.25 for cure.  The assets to be
25   delivered should drop dollar for dollar, right?

Page 145

HIGHLY CONFIDENTIAL - B. McDADE
1
2    A.    That's correct.
3    Q.    Was there a point --
4    A.    Assuming that they were all the same
5    assets and the markets hadn't changed.
6    Q.    We were going to have to take into
7    account this --
8    A.    That would be correct.
9    Q.    -- dynamic, as you call it, that takes
10   place during the week, but as a basic matter in
11   the deal as it was contemplated, as the accrued
12   liabilities dropped, the value to Barclays
13   should also drop, yes?
14   A.    That's correct.
15   Q.    And I guess it's also so that, to the
16   extent the value of any assets went up, the
17   price should change as well, correct?
18   A.    Absolutely.
19   Q.    Barclays should take on more
20   liabilities, yes?  Or pay more cash?
21   A.    Or pay more cash.
22   Q.    And if there's an imbalance at the end
23   of the day between the accrued liability for, to
24   pick one, cure?
25   A.    Uh-huh.

Page 146

HIGHLY CONFIDENTIAL - B. McDADE

1       HIGHLY CONFIDENTIAL - B. McDADE
2     Q. And the total value that Barclays
3 is -- actually, withdrawn.
4     I want to ask you to put one other
5 piece in here before I ask you this question.
6 Part of the transaction contemplated a cash
7 payment from Barclays to Lehman of $250 million,
8 correct?
9     A. Yes, that's correct.
10     Q. And as far as -- apart from the real
11 estate?
12     A. That's correct.
13     Q. That's the only cash that's moving
14 from Barclays to Lehman, right?
15     A. That's correct.
16     Q. Everything else in the form of
17 consideration is in the form of assumed
18 liabilities, correct?
19     A. That's correct.
20     Q. So if an imbalance occurs at the end
21 of the week where the -- when the deal is closed
22 where the amounts of the accrued -- of the
23 assumed liabilities drops, then either you have
24 to give them fewer assets or they have to pay a
25 bigger cash price to make the deal balanced,

Page 147

1       HIGHLY CONFIDENTIAL - B. McDADE
2 correct?
3     A. To make the deal balanced, that's
4 correct.
5     Q. And it was always the view that the
6 deal should balance, correct?
7     A. It was always Barclays' view that the
8 deal should balance. It was always our view to
9 get the market value for the assets and the
10 businesses we were selling at the best price.
11     Q. I beg your pardon. Did you finish
12 your answer?
13     A. I did.
14     Q. You wanted either a balance or better,
15 in Lehman's favor, correct?
16     A. We wanted the best price for Lehman,
17 right.
18     Q. At any point did you think you were
19 selling the assets of Lehman for less than their
20 value?
21     A. No. The context of the marketplace,
22 the illiquidity in the marketplace, the
23 volatility, the tumultuous, cannot begin to
24 describe how illiquid all the markets were over
25 the course of the preceding weeks and especially

Page 148

1       HIGHLY CONFIDENTIAL - B. McDADE
2 that week.
3     Q. And that type of illiquidity would be
4 reflected when a regulator broker-dealer would
5 mark its books in the market, wouldn't it?
6     A. It would be reflected in marking to
7 market on a regular basis, yes, absolutely.
8     Q. And it would be the responsibility of
9 the CFO to make sure that that illiquidity was
10 taken into account when marking to market was
11 done on the books of company, correct?
12     A. That's correct.
13     Q. Whether or not that illiquidity was
14 taken into account in marking the books to
15 market would be a question you would ask of the
16 CFO, Ian Lowitt, correct?
17     A. I would ask that, yes.
18     Q. To go back to the point that you
19 clarified, sir, with regard to your memory of
20 the drop in the amount of assumed liability for
21 cure, we still have a drop here from 2.25 to
22 1.5, correct?
23     A. Correct.
24     Q. Is it still your testimony that was
25 reflected in the Clarification Letter?

Page 149

1       HIGHLY CONFIDENTIAL - B. McDADE
2     A. I believe I read that in the -- I
3 remember that from the actual bankruptcy,
4 Mr. Miller talking to the bankruptcy.
5     Q. And that was when Mr. Miller told the
6 bankruptcy court that the assumption of
7 liabilities --
8     A. Was 1.5.
9     Q. That would be when Mr. Miller on the
10 19th told the bankruptcy court that the
11 assumption of liabilities for cure and comp
12 would be the same as he had described at the
13 prehearing on the 17th, correct?
14     A. Exactly, which is the 1.5 figure.
15     Q. And the 20.0 including Barclays'
16 modeling?
17     A. Correct.
18     Q. To your knowledge, sir, can you tell
19 me anyplace in what was filed or told to the
20 court that the fact that the $2 billion was
21 based on Barclays' modeling was disclosed?
22     A. I don't recall the specifics of
23 whether Barclays modeling was described, no.
24     Q. My question -- I guess my question
25 should be a little more general. Do you recall

Page 150

HIGHLY CONFIDENTIAL - B. McDADE

1    any point where the fact that the 2 billion was
2    a number calculated by Barclays as opposed to
3    Lehman was disclosed?
4        A.    My answer would be I would have
5    thought the court would have assumed the
6    purchaser would have made the calculation --
7        Q.    Of --
8        A.    -- of the 2 billion.
9        Q.    Would you have assumed the court would
10   have thought that the purchaser made the
11   calculation of the trade payable liability as
12   well?
13       A.    I would have thought the purchaser
14   would have thought there was a list of the
15   vendor contracts.
16       Q.    Okay.
17       A.    I would have gotten a list, would have
18   gotten a list, and the court would have assumed
19   that a list had existed from Lehman.
20       Q.    So you would have assumed the court
21   would have thought that the purchaser calculated
22   the assumed liability for comp but that the
23   assumed liability for cure came from a list that
24   Lehman supplied?

Page 151

HIGHLY CONFIDENTIAL - B. McDADE

1        A.    In my mind it's very clear.  The cure
2    payments are a list of contractual obligations.
3    The pay process is a payment of a -- to a group
4    of 9,000 folks in the future in very uncertain
5    times and in, you know, in a very dramatic,
6    large M&A transaction.  So I'm very confident
7    the court understood the distinction between the
8    two.
9        Q.    When you're talking about the
10   liability for the cure payment being subject to
11   these very uncertain times, let's pursue that a
12   little bit.  Presumably there is an objective
13   list of contracts that could be reviewed to get
14   the number, correct, of what the cap, what the
15   ceiling is of potential trade payables, correct?
16       A.    That's correct.
17       Q.    And is it your view that in these
18   tumultuous times you're describing that that
19   number could go up as a result of market forces?
20       A.    No.
21       Q.    It would go down from the cap,
22   correct?
23       A.    Absolutely.
24       Q.    Okay.  So if the amount accrued on

Page 152

HIGHLY CONFIDENTIAL - B. McDADE

1    Lehman's books was X, then this market force --
2    these market force you're talking about would
3    make the number less than X, correct?
4        A.    You're talking about the cure
5    payments, just to clarify?
6        Q.    Correct.  Yes.
7        A.    It's actually papered I believe right
8    from the beginning of the transaction that
9    Barclays had 60 days to walk through all of the
10   vendor contracts, to the best of my
11   recollection, and say which ones they intended
12   they needed to run the businesses and they would
13   honor those.
14           It was very clear in terms of I think
15   the -- from all the operators that this would be
16   the basic course of business in this or any
17   other transaction.
18       Q.    Okay.  I'm not sure that goes to the
19   question I asked.  Let me try and rephrase the
20   question a little bit.  If you took the list of
21   potential -- of contracts subject to that
22   process where Barclays has the option of taking
23   or leaving it?
24       A.    Right.

Page 153

HIGHLY CONFIDENTIAL - B. McDADE

1        Q.    And you add them up, you're going to
2    get a total number, right?
3        A.    Yes.
4        Q.    And the fact that Barclays can take or
5    leave some of them will do nothing but reduce
6    that number; it'll never increase it, right?
7        A.    That's correct.
8        Q.    And the fact that these market forces
9    you're talking about may have an impact on the
10   payables also will reduce the number; it won't
11   increase it, correct?
12       A.    No, I would not describe the market
13   forces have anything to do with it.  These are
14   contracts and these are inventories providing
15   all sorts of different services, hundreds of
16   different services.  I would not describe the
17   market having an impact on that.
18       Q.    The thing that would have the impact
19   on the contract would be the amount Barclays
20   would ultimately undertake?
21       A.    Would need to run its businesses.
22       Q.    With that in mind, sir, can you think
23   of a reason why the accrual for liabilities on
24   the trade payables would be an increased

Page 154

HIGHLY CONFIDENTIAL - B. McDADE

1        HIGHLY CONFIDENTIAL - B. McDADE
2    adjustment for the transaction?
3        A.   Would increase from the moment the
4    transaction was done?
5        Q.   Would increase from the amount accrued
6    on Lehman's books to a higher number for the
7    purpose of the transaction?
8        A.   No, I would just be speculating.  No,
9    I can't think of a reason.
10       Q.   Because, in your view, the number can
11   do nothing but go down from the amount, correct?
12       A.   Correct.
13       Q.   So you can think of no reason, can
14   you, why the number would be written up?
15       A.   No.
16       Q.   Let me suggest a reason:  Could it be
17   written up so that the comp -- the cure assumed
18   liability is a plug number to make sure that
19   balance sheet balances?
20       A.   I don't have a comment on that.
21   That's --
22       Q.   I'm afraid I'm going to have to ask
23   you for one.  Do you know -- was that the reason
24   the number was what it was, to be a plug number
25   on the balance sheet?

Page 155

1        HIGHLY CONFIDENTIAL - B. McDADE
2        A.   That's a different question.
3        No.
4        Q.   Did anybody ever discuss that fact
5    with you?
6        MR. BUCKLEY:  That fact?
7        Q.   Withdrawn.  Did anybody ever discuss
8    with you the possibility of writing up that
9    number to make that balance sheet balance?
10       A.   Absolutely not.
11       Q.   I'll go back to what I asked you about
12   Mr. Kelly.  Do you know if Mr. Kelly wrote that
13   number up?
14       A.   No, I do not.
15       Q.   Do you know if Mr. Lowitt was involved
16   in any writing up of that number?
17       A.   No, I do not.
18       Q.   Did you ever see any work product
19   generated by Mr. Kelly or Mr. Lowitt indicating
20   a write-up of that number by as much as a
21   billion dollars?
22       A.   No, I did not.
23       Q.   If you had seen work product from
24   Mr. Lowitt or Mr. Kelly writing that number up
25   by a billion dollars, that would have been

Page 156

1        HIGHLY CONFIDENTIAL - B. McDADE
2    inconsistent with your view of what this number
3    represented, would it not?
4        MR. BUCKLEY:  Objection.  Would you
5    repeat the question?
6        No foundation.
7        (Record read.)
8        A.   Yes, that's correct.
9        Q.   And by "this number," I'm pointing at
10   the number on Exhibit 19.
11       A.   2.25.
12       Q.   We're in the same place on the
13   document?
14       A.   Yes.
15       Q.   And if the comp accrual was not in
16   fact a good faith estimate of the amount that
17   Barclays would in fact pay for compensation,
18   that would not be consistent with your view of
19   what the financial schedule upon which the deal
20   was based represented; isn't that correct?
21       A.   That's correct.
22       Q.   And you don't know, because it was
23   Barclays model that resulted in that number,
24   whether there was any writing up of that number
25   beyond a good faith estimate of what Barclays

Page 157

1        HIGHLY CONFIDENTIAL - B. McDADE
2    actually would pay; isn't that correct?
3        A.   I don't know.
4        Q.   In the deal as you understood it both
5    on the Tuesday, September 16th, and as it closed
6    on the 22nd, in between those two times, in your
7    view, was there any embedded gain for Barclays
8    contemplated in that deal on day one?
9        A.   No, there was not.
10       Q.   Did you come to learn that Barclays
11   declared earnings that showed a gain on day one
12   in the range of $4 billion?
13       A.   I have come to learn that they
14   reported their interim results that they
15   reported a gain.
16       Q.   Mr. McDade, I have put before you what
17   we previously had marked as Exhibit 22.
18   Barclays Results Announcement Figures 2008,
19   which was published in February of 2009, and I
20   would direct your attention to page 95 of that
21   fairly lengthy document.
22       And in particular, sir, there's a
23   description in note 11 starting on page 95 of
24   the group's material acquisitions and it
25   describes Lehman Brothers North American

Page 158

HIGHLY CONFIDENTIAL - B. McDADE

1    businesses. Take the time you need, sir, to
2    read through it to familiarize yourself with it,
3    but my question, sir, is going to go to the
4    second to last paragraph, which reads, "The
5    excess of the fair value of net assets acquired
6    over consideration paid resulted in
7    $2,262,000,000 of gains on acquisition," and the
8    number there is in sterling.
9    A.   Uh-huh.
10   Q.   Was that type of gain contemplated by
11   the deal you made with Barclays?
12   A.   No, absolutely not. The type of risk
13   that they took on for this transaction
14   associated with the liabilities could have led
15   to a gain or a less given the nature of the
16   markets. Absolutely not contemplated. I have
17   no knowledge of how their accounting works. I
18   have no knowledge of how they hedged and what
19   they did with the risk.
20   Q.   The question actually revolves a bit
21   around the phrase "on acquisition" here. I'm
22   not talking about their sort of ultimate success
23   with the assets.
24         Was it contemplated there would be a

Page 159

HIGHLY CONFIDENTIAL - B. McDADE

1    gain upon acquisition?
2    A.   No, it was not.
3    Q.   Was it contemplated that the price
4    paid by Barclays would be less than the fair
5    value of the net assets acquired?
6    A.   Absolutely not.
7    Q.   And that's because at all points from
8    Tuesday, September 16, through the closing on
9    Monday, September 22, the deal was supposed to
10   be in balance, taking into account the changing
11   amount of securities that could be transferred;
12   is that right?
13   A.   Those are your words.
14   Q.   That's a question. Correct?
15   A.   I'm sorry. No, from Monday all the
16   way through till the closing we, as Lehman, the
17   responsible parties at Lehman, worked to put a
18   transaction together, always valuing the assets
19   with all the current and relevant market
20   information that we had available to us with the
21   relevant experts.
22   Q.   You were in court on Friday, the 19th,
23   for the sale hearing; is that correct?
24   A.   That's correct.

Page 160

HIGHLY CONFIDENTIAL - B. McDADE

1    Q.   Were you there for the entire hearing?
2    A.   Yes, I was.
3    Q.   So you were there from 4 or so when it
4    started till 20 minutes after midnight when it
5    ended?
6    A.   That's correct.
7    Q.   And you heard the deal described to
8    the court by the -- whoever got up and spoke,
9    you know, Mr. Miller, whatever lawyers got up
10   and spoke, you had a sense how the deal was
11   being described to Judge Peck, correct?
12   A.   Yes.
13   Q.   At any point in the description to
14   Judge Peck did you have an understanding that
15   the deal was described as anything other than a
16   wash, an equivalent exchange of assets?
17   A.   The deal was described as a
18   transaction where the assets and liabilities
19   matched.
20   Q.   Now, you mentioned before a
21   Clarification Letter that was put together after
22   the hearing, correct?
23   A.   That's correct.
24   Q.   And did you have any role in

Page 161

HIGHLY CONFIDENTIAL - B. McDADE

1    connection with putting that Clarification
2    Letter together?
3    A.   Role with the actual creation of the
4    document, no.
5    Q.   That's a good --
6    A.   Role with certain aspects of it,
7    clarification of businesses that were
8    contemplated as part of being purchased or not,
9    yes.
10   Q.   The role you have just described, did
11   that include any role in redefining the assets
12   that were to be transferred pursuant to the
13   transaction?
14   A.   Redefining the assets?
15   Q.   Let me make that question a bit
16   clearer.
17   A.   Please.
18   Q.   In the role that you played, did you
19   play any role in any change in the definition of
20   Purchased Assets as stated in the Asset Purchase
21   Agreement that we talked about before?
22   A.   Well, for example, the original Asset
23   Purchase Agreement I'm fairly certain
24   contemplated purchase of Eagle Energy. I would

Page 162

HIGHLY CONFIDENTIAL - B. McDADE

1      HIGHLY CONFIDENTIAL - B. McDADE
2 have been knowledgeable and part of the decision
3 of that clarifying letter that excluded the
4 Eagle commodity business and I think Lehman
5 commodity services excluded as part of it. That
6 would be an example of where I would have been
7 involved.
8     Q.  Let me give you another example. Do
9 you have any recollection of the definition of
10 Purchased Assets changing from the description
11 of a long position worth -- with a book value of
12 approximately $70 billion changing to the assets
13 transferred in the repo plus the 15c3 assets you
14 mentioned plus certain other unencumbered funds?
15     A.  Yes, I do.
16     Q.  When was that change made?
17     A.  The actual change made, the deal that
18 was put together or the actual change for the
19 clarifying letter?
20     Q.  Let's take both.
21     A.  The deal was put together over the
22 course of the day on Friday, so that would be
23 Friday, the 19th, and the letter, I'm not sure
24 all the drafting, but over the course of the
25 20th through the 22nd, I assume. The original

Page 163

HIGHLY CONFIDENTIAL - B. McDADE

1      HIGHLY CONFIDENTIAL - B. McDADE
2 draft I guess started on the 20th.
3     Q.  Now, describe for me, if you would,
4 how those changes came -- in the deal came to be
5 made during the course of the day on Friday.
6 I'll ask you for a general description and who
7 was involved and then obviously I'm going to
8 follow up on that.
9     A.  Sure. So with the changes in what
10 Barclays' view of the assets that, after all the
11 quantum changes, could be acquired, you know,
12 there was a need for one clarification of just
13 making sure they understood what assets could be
14 acquired. After that, plus the valuation
15 process of the teams that we've talked about and
16 described, it became clear that they would
17 insist on more value in terms of the
18 transaction.
19     Ian Lowitt, Alex Kirk, probably
20 others -- I was not involved directly in much of
21 the process -- started working on a couple of
22 ideas that they had come up with in terms of
23 places where there might be other assets that
24 could be available to be contemplated as part of
25 the purchase. So that's when we contemplated

Page 164

HIGHLY CONFIDENTIAL - B. McDADE

1      HIGHLY CONFIDENTIAL - B. McDADE
2 this concept of the 15c3 and that's when we
3 started looking at, the, what's called the
4 clearance boxes for any unencumbered assets that
5 could be made available.
6     The process was a process that I
7 believe included combination of Lehmanites and
8 Barclays in terms of the general notion, and
9 then specifically Ian and Martin and his team
10 working -- and Paolo Tonucci working to find
11 other assets that may be of value in terms of a
12 purchaser.
13     Q.  Now, you said you were not part of
14 the --
15     A.  I was part of it for a brief period of
16 time in the morning.
17     Q.  Okay.
18     A.  Directing traffic to start, and then I
19 left to go prepare for bankruptcy over at Weil
20 Gotshal. So I was part of it for a brief period
21 of time, not actual part of most of those
22 meetings that took place.
23     Q.  Describe for me what you did when you
24 were directing traffic to start.
25     A.  We understood that Barclays was

Page 165

HIGHLY CONFIDENTIAL - B. McDADE

1      HIGHLY CONFIDENTIAL - B. McDADE
2 uncomfortable with the aspect of what they
3 now had in terms of market value that we and
4 they had agreed upon. We had, in order to
5 transact the deal, we had to find more in the
6 way of ideas that would provide value.
7     So we, as the Lehmanites, sat and
8 tried to come up with a couple of different
9 concepts that we had, both of which I've just
10 mentioned to you, that might be of value, and I
11 directed the team to go ascertain whether any of
12 those were actual paths that we could take that
13 could have a positive outcome.
14     Q.  And the team was Kirk, Lowitt --
15     A.  Kirk was really directing traffic.
16 Lowitt was directing traffic in terms of, you
17 know, facilitating the finance team's logistics
18 on it, yes.
19     Q.  Kirk, Lowitt and Tonucci were the
20 three main guys on that?
21     A.  Yes.
22     Q.  Now, to whom did Barclays communicate
23 its lack of comfort about the market value?
24     A.  The team, Michael Klein, Archie Cox,
25 Rich Ricci, I believe Michael Keegan, who was

Page 166

HIGHLY CONFIDENTIAL - B. McDADE
1    HIGHLY CONFIDENTIAL - B. McDADE
2    playing a significant risk role in the process
3    over the course of the week, described the
4    process around the asset valuation discomfort
5    to, I believe -- there were two sets of groups:
6    One, the Alex Kirks of the world and, two, the
7    different risk teams that we've talked about in
8    previous questions.
9    Q.    Did Klein, Cox, Ricci and Keegan
10   describe this discomfort to you?
11   A.    They -- to me, in a collective sense
12   to me, and Ian and Alex Kirk, yes, that's
13   correct.
14   Q.    I'm not sure what you mean by "in a
15   collective sense." Were you present when they
16   communicated this?
17   A.    Early in the morning, yes. Early
18   Friday morning.
19   Q.    And there's a meeting on early Friday
20   morning?
21   A.    We're sitting somewhere in one of
22   offices on the 31st floor.
23   Q.    In this meeting on the 31st floor for
24   Barclays is Klein, Cox, Ricci and Keegan?
25   A.    To the best of my recollection.

Page 167

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.    And the Lehmanites in this meeting are
3    you, Kirk, Lowitt and Tonucci; is that right?
4    A.    To the best of my recollection, it's
5    Lowitt. I don't recall whether Tonucci was
6    there.
7    Q.    Do you recall if Kirk was there?
8    A.    Yes, he was.
9    Q.    Kirk was there because you had asked
10   him to come, right?
11   A.    That's correct.
12   Q.    The night before?
13   A.    That's correct.
14   Q.    As best you can recall, what precisely
15   did the Barclays people say and who said it
16   about the lack of comfort with market value?
17   A.    Well, I think the -- I don't have a
18   recollection of who said what. It was -- you
19   know, I was there for a short period of time. I
20   don't have a specific recollection. They tended
21   to rely a lot on their advisor, Michael Klein,
22   but none of them were shy in terms of the
23   process.
24      So I don't know who spoke. The
25   content I believe of what was spoken to is we

Page 168

1    HIGHLY CONFIDENTIAL - B. McDADE
2    believed that our process -- Mike Keegan spoke
3    and talked about some of the assets that now had
4    become part of the deal, part of the repo/part
5    of the deal, were different assets and he was
6    having a hard time finding the ability to value
7    those assets.
8       We spoke about trying to help get the
9    transparency and the information underlying some
10   of that collateral to them, which we set about a
11   process to do. That would have been Tonucci's
12   job. And then we just talked overall about the
13   other aspect of their view that the markets were
14   continuing to decline and their current view on
15   values as of that Friday morning, which would
16   have been the same process, just a fresh market
17   view from -- that we had been undertaking all
18   week.
19   Q.    Now, the assets that Keegan spoke
20   about, did they include among his concerns that
21   there was now in the repo categories of assets
22   that had been excluded in the earlier part of
23   the week?
24   A.    That's correct.
25   Q.    Did Barclays say they no longer wanted

Page 169

1    HIGHLY CONFIDENTIAL - B. McDADE
2    those previously excluded assets?
3    A.    Keegan's whole line of thinking was I
4    just need to be able to value the assets. There
5    was never any, to my recollection, there was
6    never anything "we don't want any asset," "we
7    moved past the residentials," you know, none of
8    the earlier dynamic that we had in terms of the
9    constituent base of the assets.
10      So he needed information, he was
11   lacking information to be able to value those
12   both from a time point of view and also from a
13   specific information point of view. So he was
14   saying he couldn't have a thorough enough
15   process in his mind with what he was lacking and
16   how could we help him.
17   Q.    Apart from looking for additional
18   assets, was part of the solution that was
19   arrived here that Barclays could substitute
20   collateral? It could take out assets it didn't
21   want and replace it with assets that it did
22   within the repo?
23   A.    No. No. No.
24   Q.    Other than the search for additional
25   value which you directed Lowitt and Kirk to

43

Page 170

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    supervise, were there any other solutions
3    reached to the problem that Barclays had stated,
4    that they were concerned about the overall value
5    of the assets they were getting?
6        A.    Not in the meetings that I was at, no.
7        Q.    How long were you in this meeting?
8        A.    I don't remember, but it could not
9    have been more than half an hour.
10       Q.    And after your attendance at the
11   meeting, did you at any point return to the
12   issue, you know, check in by phone, send a
13   BlackBerry?
14       A.    Very likely, yes, because it was an
15   important aspect of getting a deal done or not.
16       Q.    When you say "very likely," do you
17   have a recollection of doing that or are you
18   inferring from your general management style?
19       A.    I have a recollection -- no, I have a
20   recollection of a combination of both, but I
21   have a specific recollection of driving down to
22   the bankruptcy court still haven't completely
23   resolved the transaction.
24       Q.    Did there come a point where you
25   learned it had been resolved?

Page 171

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2        A.    There came a point where we got more
3    comfort with the process that we had been
4    working on, 15c3, as a value, and there came a
5    point in time where we got more comfort that
6    there were unencumbered assets and that a
7    process was taking place.
8        So, quote, that it had been completely
9    worked out, no, but yes, confidence that there
10   were unencumbered assets that were going to go
11   through the same process we had gone through to
12   value and also that working -- both Barclays and
13   Lehmanites were working with the S.E.C. and I
14   believe other regulators -- I wasn't part of the
15   process -- around the second counts, the 15c3.
16       Q.    The Barclays and the Lehmanites were
17   not working with the S.E.C. and the other
18   regulators with regard to valuation, were they?
19       A.    No.
20       Q.    That was just with regard to whether
21   the 15c3 --
22       A.    Exactly.
23       Q.    -- could be released to be
24   transferred?
25       A.    Exactly.

Page 172

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2        Q.    When you directed Lowitt and Kirk to
3    undertake this project of finding additional
4    value, did you give them a target they had to
5    reach?
6        A.    I think we understood that the -- that
7    there was a differential between Barclays'
8    desired outcome, but I don't remember giving
9    them a specific target. And again, I wasn't
10   there long enough for that specific target to
11   be -- for that part of the process.
12       Q.    Well, sir, a differential between
13   Barclays' desired outcome and what?
14       A.    The -- I don't recall specifically
15   giving a target. It was very clear that
16   Barclays had a view in terms of the market value
17   of the assets, of the new assets in the --
18   valued in the repo, and we had a view on what
19   cure was, we had a view on what comp was and
20   assumed liabilities. It was very clear that
21   Barclays still wanted more value in terms of
22   assets.
23       Q.    So the cure and the comp assumed
24   liabilities were taken into account in measuring
25   this differential between --

Page 173

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2        A.    Yes.
3        Q.    -- Barclays' view and the amount
4    needed?
5        A.    Yes.
6        Q.    I'm still trying to get some clarity
7    on -- this is what I think I hear so far:  Kirk
8    and Lowitt are supposed to go look for
9    additional value with whatever resources they
10   can marshal to do that?
11       A.    Correct.
12       Q.    Barclays is expressing discomfort
13   about the amount of value that it's getting?
14       A.    Correct.
15       Q.    You don't know -- you don't remember
16   giving them, that is, Kirk and Lowitt, a target,
17   go find X amount of additional value.
18       Who was going to decide when enough
19   additional value had been found?
20       A.    It's the same, it's the identical
21   process that we've been going through. So if
22   it's Barclays, the purchaser's, intent to try to
23   end up with a transaction where assets and
24   assumed liabilities, including cure and comp,
25   roughly matched, it's our goal as representing

Page 174

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2  the estate to make sure that the assets are
3  valued fairly in that process.
4        So we continued the process up unto
5  late into the evening of valuing the assets in
6  the repo and continuing that process and also
7  finding other assets. There was not a specific
8  target because that number in terms of the
9  valuation could still have been moving around.
10  That's why I say I don't remember giving a
11  specific target.
12        Who at the end would have made that
13  ultimate valuation? The risk operators who were
14  still responsible for understanding the value of
15  the assets being transferred and ultimately the
16  deal team in terms of, you know, the individuals
17  involved.
18    Q.  This may be my stupidest question of
19  the day, but you've got a team of people looking
20  for assets. They need to have a deal in
21  balance. How were they going to know when to
22  stop? How were they going to know when to stop
23  looking?
24    A.  I think the basic premise that I'm
25  trying to communicate is there was a lot of

Page 175

1    HIGHLY CONFIDENTIAL - B. McDADE
2  challenges in ascertaining perfect information
3  in terms of what were unencumbered assets. So
4  the first real challenge that the team had to go
5  through that I instructed them on was not,
6  here's a target, it was what are the
7  unencumbered assets. Not that all the
8  unencumbered assets are therefore going to go.
9  What are the unencumbered assets so we can
10  define what it is that, if a transaction needed
11  more assets, could be possibly applied. And the
12  same confusion applied to 15c3.
13        So, in fairness, it didn't matter what
14  the target was. If we didn't have unencumbered
15  assets or we didn't have comfort that Barclays
16  or the regulators would be comfortable with
17  15c3, we wouldn't be able to do that.
18    Q.  So assets available for transfer as
19  part of this project --
20    A.  Right.
21    Q.  -- constituted 15c3 and unencumbered
22  assets?
23    A.  Right.
24    Q.  Yes?
25    A.  Yes.

Page 176

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.  Were there any other categories of
3  assets that were included?
4    A.  I don't recall.
5    Q.  Were there any, any assets, 15c3,
6  unencumbered or otherwise, that could have been
7  transferred to Barclays that were not
8  transferred to Barclays?
9    A.  Any assets?
10    Q.  Anything, yes.
11    A.  I gave you an example before of Eagle
12  Energy as an example.
13    Q.  And why did Eagle Energy come out of
14  the deal?
15    A.  I don't know the specifics. I think
16  it -- I don't know the specifics.
17    Q.  It's because Barclays didn't want it,
18  isn't that right?
19    A.  It's a -- I don't know the specifics
20  so I can't answer the question.
21    Q.  You have no --
22    A.  I don't know the specifics.
23    Q.  So the team's looking for additional
24  assets to make up this difference. Apart from
25  Eagle Energy, are there any assets that that

Page 177

1    HIGHLY CONFIDENTIAL - B. McDADE
2  team identifies that don't wind up going over to
3  Barclays? Is there any excess that the estate
4  needs to keep -- that the estate gets to keep?
5    A.  To the best of my knowledge, the other
6  overriding -- we were trying to manage the
7  actual risk of Lehman. To the best of my
8  knowledge, "no" is the answer to your question.
9        That's the reason we were trying to
10  get fair value for all of our assets. Because
11  we were unable to operate in the marketplace at
12  the same time. We were being shut at DTC. All
13  our counterparts wouldn't do business with us.
14  We had employees in and out, et cetera. So it
15  was an impossible struggle to manage any assets.
16        We were motivated from a Lehman point
17  of view to mitigate risk to include assets in
18  the process. So, to the best of my knowledge,
19  the answer is "no" to your question.
20    Q.  Was it communicated to you at some
21  point that the asset value -- that the search
22  for additional value had been successful?
23    A.  The search for other assets had been
24  successful, yes.
25    Q.  Was it communicated to you that the

Page 178

HIGHLY CONFIDENTIAL - B. McDADE

1    amount of additional value that was found had
2    been determined to be sufficient?
3        A.    Yes.
4        Q.    And was it communicated to you who
5    made the determination that the amount of
6    additional value that was found was sufficient?
7        A.    Again, I go back to --
8            Who made those determinations in terms
9    of the process?
10       Q.    Yes.
11       A.    So that would have been Alex Kirk,
12   given I was in bankruptcy court, you know, with
13   my proxy, and his deal teams, along obviously
14   with the folks at BarCap on the other side, on
15   the risk side.
16       Q.    And where were you when you learned
17   that the project had been -- the project to find
18   additional value had been found?
19       A.    Bankruptcy court.
20       Q.    You were in the courthouse?  How was
21   it communicated to you that the project was
22   successful?
23       A.    How was it communicated to me?
24       Q.    By what means?

Page 179

HIGHLY CONFIDENTIAL - B. McDADE

1        A.    By means of word of mouth and once in
2    a while a BlackBerry.
3        Q.    You got a BlackBerry from them?  Do
4    you remember getting an e-mail from them telling
5    you this?
6        A.    No, I don't remember getting an
7    e-mail.  Collective, collective bits of
8    information.  BlackBerries were checked at
9    the -- best of my knowledge, most BlackBerries
10   were checked.
11       Q.    You can't use your phone in the
12   courthouse, though, right?
13       A.    To the best of my understanding, no.
14       Q.    Your means of communication were
15   either you get an e-mail on your BlackBerry or
16   somebody tells you something, right?
17       A.    That's correct.
18       Q.    And you don't recall getting an e-mail
19   reporting to you that the project was
20   successful, correct?
21       A.    I don't recall getting an e-mail.
22       Q.    And you do recall, at least in part,
23   learning by word of mouth that the project had
24   been successful?

Page 180

HIGHLY CONFIDENTIAL - B. McDADE

1        A.    Correct.
2        Q.    I guess my question is, whose mouth
3    and what words?  Who told you this?
4        A.    I don't recall.  Keep in mind that
5    I'm, many parts of the evening, on the witness
6    stand.
7        Q.    Sure.  Can you recall any -- you're
8    paying close attention through the whole
9    hearing?  It's a big deal, right?
10       A.    Yes.
11       Q.    Do you recall any part of the hearing
12   where anybody tells the judge about the search
13   for additional value?
14       A.    I don't recall that process.  I recall
15   a process where we started the bankruptcy -- we
16   started the meeting by going to a recess to
17   educate the masses on what the concept of the
18   deal was and that certain specifics including,
19   for example, leaving the commercial real estate
20   had yet to be, quote, finalized, but over the
21   course of the evening it would be.  That's all I
22   recall.
23       Q.    Were the masses told that the bulk of
24   the assets to be conveyed to Barclays were those

Page 181

HIGHLY CONFIDENTIAL - B. McDADE

1    within the Repurchase Agreement?  Had they told
2    the details of repo and its role in the deal?
3        A.    I don't recall that.
4        Q.    Were they told about the search for
5    15c3 and unencumbered assets to make up the
6    difference between the perceived value of the
7    repo and what Barclays needed to close?
8        A.    No, they were not told that
9    specifically.
10       Q.    Were they told the valuations that
11   Barclays had applied itself to the amount of
12   collateral in the repo?
13       A.    No.
14       Q.    Were they told that the Clarification
15   Letter would have addressed these changes in the
16   purchased assets?
17       A.    There was -- there was clear rhetoric
18   around letter clarifying over the weekend the
19   deal terms.
20       Q.    Were they shown any draft of that
21   letter?
22       A.    I don't know.
23       Q.    Was the judge shown any draft of that
24   letter?

Page 182

HIGHLY CONFIDENTIAL - B. McDADE
1
2    A.    I don't know.
3    Q.    Did you talk to Mr. Ricci, talk or
4    otherwise communicate with Mr. Ricci about this
5    Friday project to find additional value to
6    transfer to Barclays?
7    A.    Did I talk to Mr. Ricci specifically?
8    No, I did not. Other than he would have been
9    present, I believe, in the morning meeting.
10    Q.    Do you recall Mr. Ricci saying to you
11    in substance that he wouldn't let this trade
12    blow up by being piggish?
13    A.    No, Mr. Ricci never said that to me.
14    Q.    You're certain he never said that to
15    you?
16    A.    He never said that to me. I'm
17    certain.
18    Q.    How much additional value was found in
19    15c3 and unencumbered assets?
20    A.    I believe the 15c3 was the figure that
21    I was confusing before, was between 750 and 800
22    million of value, and I believe the unencumbered
23    assets was a billion-9.
24    Q.    So with 2.7 billion in additional
25    value, did the deal now balance, in your view?

Page 183

HIGHLY CONFIDENTIAL - B. McDADE
1
2    A.    Yes.
3    Q.    Did you know whether it balanced with
4    an addition 2.7 billion in additional value?
5    A.    I knew that the deal team had gone
6    through the same process through the course of
7    all the way into the afternoon and evening. I
8    specifically was unable at that moment in time,
9    given where I was sitting and obligated to do.
10    Q.    Uh-huh.
11    A.    But, yes, I felt comfortable given who
12    was in the process and what was process was.
13    Q.    And the balance, this concept of a
14    balance in the transaction at this point still
15    depended on the 1.5 billion in assumed
16    liabilities for trade payables and 2 billion in
17    assumed liabilities for compensation, correct?
18    A.    Yes, that's correct.
19    Q.    And it also depended on an accurate
20    valuation of the collateral actually being
21    transferred, correct?
22    A.    Yes, that's correct.
23    Q.    When those three elements are added
24    up -- I'm sorry, when those elements are
25    compared, your view of the deal was they should

Page 184

HIGHLY CONFIDENTIAL - B. McDADE
1
2    balance and there would be no immediate gain to
3    Barclays, correct?
4    A.    That's correct.
5    Q.    Did Barclays share with you or with
6    anyone on the Lehman team the value that they
7    did determine applied to the collateral in the
8    Repurchase Agreement?
9    A.    No.
10    Q.    Did they ever tell you what the amount
11    of the --
12    A.    To me?
13    Q.    You or, to your knowledge, anyone
14    under your supervision.
15    A.    Of course they would have gone through
16    the process of valuing the collateral, just as
17    they had done, again, all week in terms of the
18    assets.
19    Q.    Yes.
20    A.    So the answer: The deal team, yes.
21    To me, no.
22    Q.    Did you learn from the deal team that
23    Barclays said we're short by X amount?
24    A.    Yes, absolutely. Over the course of
25    time.

Page 185

HIGHLY CONFIDENTIAL - B. McDADE
1
2    Q.    And over the course of time did the
3    deal team let you know what X amount was, what
4    the shortfall was?
5    A.    Ultimately, the shortfall --
6    ultimately, the satisfaction of the process of
7    the deal teams working together got to a point
8    where Barclays would do a transaction.
9    So, again, you're pushing towards this
10    notion of something that we were pushing toward
11    correct valuation of the assets that we had on
12    our books. They were pushing for a deal on the
13    best terms. There was no target given other
14    than continued valuation of these assets and
15    trying to get and extract market valuation for
16    them. In the process, it ultimately consummated
17    with Barclays being comfortable with the
18    transaction which ultimately contemplated in
19    roughly the assets and liabilities matching.
20    Q.    And given what you heard in the
21    bankruptcy hearing on the 19th of September,
22    where you heard the deal described to the judge
23    as essentially a balance --
24    A.    Right.
25    Q.    -- it would have been important in

## Page 186

HIGHLY CONFIDENTIAL - B. McDADE

1 your view, sir, to tell the judge if it was not
2 in fact in balance because that's a different
3 deal, is it not?
4     A.    Most definitely, yes, sir.
5     Q.    Mr. McDade, I'm handing you what has
6 previously been marked as Exhibits 24 and 25.
7 Ask you if you recognize those documents?
8     A.    Yes, I do.
9     Q.    What are they?
10     A.    The First Amendment to the purchase
11 agreement and second is the clarifying -- I
12 believe the clarifying letter.
13     Q.    Now, did you have any involvement with
14 the negotiation of the business terms of the
15 First Amendment?
16     A.    Yes.
17     Q.    Can you briefly describe to me what
18 your involvement was?
19     A.    As I said, the involvement that I had
20 had to do with the excluded assets and purchased
21 assets change with respect to the residential
22 mortgages.
23     Q.    And then the Clarification Letter,
24 sir, dated as of September 20, Exhibit 25, were

## Page 187

HIGHLY CONFIDENTIAL - B. McDADE

1 you involved in the negotiation of the business
2 terms of this letter?
3     A.    I was involved in some of the
4 negotiation terms of some of this, yes.
5     Q.    Which parts?
6     A.    For example, clarification around the
7 IMD business.
8     Q.    That's paragraph 2?
9     A.    Paragraph 2 on page 3. I certainly
10 was understanding and knowledgeable about the
11 cash, the DTC issue, which is paragraph D up
12 above; the clarification of the Lehman name and
13 licensing for two years; the subleases for
14 offices I would have been involved in, page 5,
15 since they inherited certain business
16 obligations.
17         That's it, to the best of my
18 recollection.
19     Q.    Did you have any involvement in the
20 negotiation of the terms reflected in paragraph
21 1, Purchased Assets?
22     A.    Specifically, no. Generally, I was
23 aware of.
24     Q.    Who on the team of businesspeople was

## Page 188

HIGHLY CONFIDENTIAL - B. McDADE

1 involved in negotiating the terms of paragraph
2 1, Purchased Assets?
3     A.    So that would have been -- that would
4 have been our -- that would have been a
5 combination of Kelly, Lowitt, Kirk, McGee,
6 Berkenfeld.
7     Q.    Any others?
8     A.    Our advisors, our advisors from Weil.
9 That's it.
10     Q.    Would you turn to paragraph 13.
11 Actually --
12     A.    Page 13 or paragraph?
13     Q.    Actually, I'm in the wrong place.
14 Hold on one second.
15         Would you turn to page 4, paragraph 9,
16 please. You with me?
17     A.    Uh-huh.
18     Q.    That section concerns the deletion of
19 a purchase price adjustment?
20     A.    Right, the original deal had
21 contemplated a hold-back, if you will, if
22 Barclays earned profits and profits going back
23 to the Lehman estate.
24     Q.    Do you recall, we can show you, but

## Page 189

HIGHLY CONFIDENTIAL - B. McDADE

1 maybe to save a little time, do you recall
2 generally that the terms of that purchase price
3 adjustment were that Lehman would share in the
4 upside of any profit on the long position up to
5 a cap of 750 million?
6     A.    I recall a cap and I recall a
7 construct of -- you know, I don't know all the
8 specifics, but yes.
9     Q.    Why did that come out in the
10 Clarification Letter?
11     A.    Because the original balance sheet
12 changed so dramatically from Tuesday to Friday,
13 and a combination of the changes, the Barclays
14 assumption of the repo and negotiation, to be
15 blunt.
16     Q.    When you say "negotiation, to be
17 blunt," the fact is Barclays just said that's
18 got to come out for us to do the deal; is that
19 right?
20     A.    Well, Barclays was ascribing a value
21 to it like we were, and as part of the process,
22 no, I'm not -- I'm not suggesting Barclays
23 said -- those are your words, no.
24         Over the course of the week, value

Page 190

HIGHLY CONFIDENTIAL - B. McDADE

1     HIGHLY CONFIDENTIAL - B. McDADE
2 ascribed in different ways, value taken away in
3 different ways. We thought that that -- that
4 that feature didn't represent as much value
5 given the change in the mix.
6     Q. And was that, was the value of that
7 feature, the potential upside to Lehman,
8 attributed to any particular securities that
9 were being transferred? I'm trying to find out
10 how that got involved in the valuation, if at
11 all.
12     A. You mean in the original
13 contemplation?
14     Q. No, I'm on the -- we're on the weekend
15 and the potential 750 million upside to Lehman's
16 being taken out of the deal. And if I
17 understand your answer, it's because of the
18 drops in value and the changes in value and the
19 buckets of securities.
20     Was the decision to eliminate a
21 potential upside of 750 million to Lehman
22 attributed to a drop in value of any particular
23 security?
24     A. No. It was our view that the upside
25 had changed dramatically, meaning there was much

Page 191

1     HIGHLY CONFIDENTIAL - B. McDADE
2 less upside because there was a lot less in the
3 way of values. We would have assigned less
4 value to that as part of the process in terms of
5 what that value could be.
6     Q. But it did not derive from any
7 analysis of a particular asset or class of
8 assets?
9     A. It derived from analysis of all the
10 assets. Continued on the bottoms-up process.
11     Q. And would you take a look at paragraph
12 13, please, on page 5. Take a moment to read
13 that to yourself.
14     (Document review.)
15     Q. Have you had a chance to look that
16 through?
17     A. I have.
18     Q. You see, sir, that that, as a general
19 matter -- and it's my description, not the
20 actual words -- is a paragraph that terminates
21 the Repurchase Agreement we've been talking
22 about, correct?
23     A. Yes.
24     Q. And it also -- and now I'm reading in
25 the last sentence, "Additionally, the Notice of

Page 192

1     HIGHLY CONFIDENTIAL - B. McDADE
2 Termination relating to the Barclays Repurchase
3 Agreement dated September 19, 2008, is hereby
4 deemed rescinded and void ab initio in all
5 respects," do you see that?
6     A. Uh-huh.
7     Q. Do you have any understanding of why
8 that provision was put in the Clarification
9 Letter?
10     A. No, I do not.
11     Q. Any understanding at all?
12     A. No, I do not.
13     Q. Did you discuss that provision with
14 anyone at the time of the closing on the 22nd?
15     A. No, I did not.
16     Q. Did you go to the closing?
17     A. Did I go to the closing? No, I did
18 not.
19     Q. Is there a reason you didn't go to the
20 closing other than the fact you were probably
21 very tired by then?
22     A. I don't recall the specific reason why
23 I didn't go to the closing.
24     Q. And I note that Mr. Berkenfeld signed
25 this document as well. Is there a reason he

Page 193

1     HIGHLY CONFIDENTIAL - B. McDADE
2 signed it instead of you?
3     A. You asked me that question before. It
4 was the common practice within Lehman for the
5 lawyers to sign the documents, so that wouldn't
6 have been part of anything. The role was new to
7 me, you know, over a period of time, but that
8 wouldn't have been normal course of business.
9     Q. And when it was the common practice
10 within Lehman for the lawyers to sign the
11 documents, was it also the common practice for
12 the businesspeople to communicate to those
13 lawyers all the terms that they had agreed to so
14 that the documents signed reflected the terms?
15     A. Most definitely. Most definitely.
16 Including our outside legal advisors.
17     Q. Also including Mr. Berkenfeld?
18     A. Absolutely.
19     Q. Now, I asked you before, and I may
20 have misspoke, do you recall anyone
21 communicating to you that Rich Ricci said he
22 wouldn't blow up the trade by being a pig?
23     A. You asked me before if Rich Ricci
24 spoke to me directly.
25     Q. Correct.

Page 194

HIGHLY CONFIDENTIAL - B. McDADE

1        HIGHLY CONFIDENTIAL - B. McDADE
2        A.    He did not speak to me directly.
3        Q.    Was that sentiment communicated to
4    you?
5        A.    That sentiment was communicated to me.
6        Q.    This has previously been marked as
7    Exhibit 36, sir -- 326, and it contains an
8    e-mail from Alex Kirsch to you on Friday,
9    September 19, at 3:39.
10       A.    Uh-huh.
11       Q.    And it says, "Rich Ricci just told me
12   he won't blow up this trade by being a pig."
13       A.    Uh-huh.
14       Q.    And at 3:39 that afternoon, I'm
15   guessing you're in court, or on your way; is
16   that right?
17       A.    Driving.
18       Q.    And what did you understand Mr. Kirk
19   to be communicating to you when you sent -- when
20   he sent this e-mail to you?
21       A.    That if the finishing up of the
22   process of the assets that we were looking for,
23   unencumbered and the 15c3, didn't add up, that
24   Barclays would still do the transaction.  That's
25   what I understood.

Page 195

1        HIGHLY CONFIDENTIAL - B. McDADE
2        Q.    Did you ever get a sense of what
3    Barclays' tolerance was on that point?
4        A.    No.  No.  I had no means to
5    communicate directly with Mr. Kirk at the time.
6        Q.    Well, you responded to him by e-mail,
7    "Are all the shorts gone?"  So that's one means,
8    right?
9        A.    Yeah, but literally I was walking in
10   the door.
11       Q.    And when you were walking in the door,
12   did you --
13       A.    No, I had not.
14       Q.    You didn't write back to Mr. Kirk and
15   ask, "Well, what's their tolerance?  How short
16   can we fall and Barclays will still do the
17   trade?"  Right?
18       A.    No, I did not.
19       Q.    Did you ever ask him that question?
20       A.    No, I did not.
21       Q.    Sir, I'm showing you what previously
22   has been marked as Exhibit 282B at a prior
23   deposition.  Do you recognize this document?
24       A.    No, I do not.
25       Q.    It appears to be a letter to you from

Page 196

1        HIGHLY CONFIDENTIAL - B. McDADE
2    Barclays Capital offering certain terms and
3    conditions of employment, and I note the
4    document is not signed.
5        Have you ever seen this document
6    before?
7        A.    Other than in preparation with my
8    attorney, no.
9        Q.    And the document speaks in terms of a
10   guaranteed -- a base salary of ▉▉▉▉ per
11   annum and then a 2008 cash bonus of ▉▉▉▉
12   an EPP recommendation of stock award of
13   ▉▉▉▉ and a special cash award of ▉
14   ▉▉▉▉
15       In sum or substance, were this
16   compensation in that range ever offered to you
17   by Barclays?
18       A.    No.
19       (Exhibit 335, a document bearing Bates
20   Nos. BCI-EX-(S)-50261, marked for
21   identification, as of this date.)
22       Q.    Mr. McDade, I have put before you a
23   document we've marked as Exhibit 335.
24       A.    Yes.
25       Q.    Have you seen this document before?

Page 197

1        HIGHLY CONFIDENTIAL - B. McDADE
2        A.    This document?
3        Q.    Correct.
4        A.    I believe this is me clicking on the
5    Barclays system to be accepted as a Barclays
6    employee.
7        Q.    Okay.
8        A.    Accepting an offer of employment, I
9    guess.
10       Q.    We talked a little bit this morning
11   about the offer that was made to you of a salary
12   and nothing more, and as I understand it, and
13   again, I'm trying to sort of --
14       A.    No offer was made.  I just continued
15   the Lehman salary that I had.
16       Q.    Okay.  This was to put you on
17   Barclays' payroll and nothing more?
18       A.    Correct.  Correct.
19       Q.    Okay.  Can you think of any reason
20   that Barclays would deem this document to be
21   highly confidential, sir?  Do you think this is
22   a big secret?
23       A.    This document?
24       Q.    Yes.
25       A.    No, it was reported in the press

Page 198

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    and -- no.
3    Q.    Thanks.
4    A.    Every employee had to click the box to
5    accept employment.
6    Q.    This search for additional value that
7    we were talking about before, I know there was a
8    meeting on Friday morning, you mentioned that to
9    me.  Had the search been done at all before
10    that?
11    A.    I believe the clarification of the
12    assets what we had, what was encumbered,
13    unencumbered, et cetera, had been happening all
14    week.
15        To the best of my recollection, the
16    search for me to continue to find assets both
17    for the motivation of we were having a hard time
18    managing any assets because we couldn't manage
19    hedges or anything, from Lehman's motivation,
20    yes, and also from the point of view of we
21    didn't know what the ultimate terms would be and
22    we wanted to make sure that we were availing
23    ourselves of all possible outcomes, yes.
24    Q.    But the particular work that we were
25    talking about where you directed Kirk and Lowitt

Page 199

1    HIGHLY CONFIDENTIAL - B. McDADE
2    to go look for sources, you know, what wound up
3    being the 15c3 and the unencumbered assets, did
4    that begin on the Friday morning?
5    A.    To the best of my knowledge, the
6    unencumbered assets did not begin on the Friday
7    morning.  It began earlier in terms of finding
8    assets that would be part of a transaction.  So
9    that work would have been done earlier.  I --
10    Q.    And when did -- I beg your pardon.  Go
11    ahead.
12    A.    I don't know the specifics, to answer
13    your question, when they might have been.
14    Q.    When did it end?  Did it end on the
15    Friday or did it continue over the weekend?
16    A.    Oh, it continued over the weekend.
17    Q.    On both days of the weekend?
18    A.    We were -- the work continuing over
19    the weekend, most of Sunday would have been
20    related to all of the protagonists were working
21    on the DTC issue.  We were all locked in at
22    Weil.  We at Lehman were sequestered in the
23    corner working on the specific DTC issues and
24    understanding what the ramifications would be.
25        So, no, it wouldn't have -- it

Page 200

1    HIGHLY CONFIDENTIAL - B. McDADE
2    wouldn't have been over all of the weekend.  It
3    would have been Saturday, primary.  Friday
4    evening, Saturday morning, Saturday.
5    Q.    What was the value of the deal?  When
6    the deal was done, what was the value of what
7    Barclays received and what was the value of what
8    Barclays gave?
9    A.    I have never seen a final balance
10    sheet, so I can't give you a specific answer.
11    Q.    Do you have a general idea of the deal
12    that you negotiated, what it was worth and who
13    gave what?
14    A.    The general idea is 1.29 billion for
15    Lehman's 745 headquarters, the two data centers,
16    250 million in goodwill, cure payments,
17    compensation that we have spoken to, and the
18    value of unwinding the repo.
19        That actual number, roughly speaking,
20    was, roughly speaking, the combination of the
21    15c3, the figure you talked before, the 45, and
22    the unencumbered assets.  That's roughly the
23    deal, but I've never seen the final.  I've never
24    seen, never been given the final number.
25    Q.    Again, using those rough numbers, and

Page 201

1    HIGHLY CONFIDENTIAL - B. McDADE
2    I appreciate that's how you're describing them,
3    45 billion for the repo, right?
4    A.    Uh-huh.
5    Q.    Plus approximately 800 million for the
6    15c3?
7    A.    Uh-huh.
8    Q.    Right?
9        And 1.9 --
10    A.    Uh-huh.
11    Q.    -- in unencumbered assets?
12    A.    Uh-huh.
13    Q.    Again, net of the real estate, because
14    we have sort of stayed out of that topic the
15    whole day.
16    A.    Uh-huh.
17    Q.    That's 47.7, right?  That's your
18    estimate of the amount of value that Barclays
19    received, correct?
20        MR. HUME:  Objection.
21        MR. BUCKLEY:  Objection.
22        MR. HUME:  Lacks foundation.
23        MR. BUCKLEY:  Did you include the 250
24    for goodwill?
25        MR. GAFFEY:  I beg your pardon.  I

51

Page 202

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    didn't.
3    Q.    47.950?
4          MR. HUME: Objection. Lacks
5    foundation.
6          MR. BUCKLEY: Objection. Same.
7          MR. GAFFEY: Is my math wrong?
8    A.    It's goodwill is the other way around.
9    They're paying us.
10   Q.    That's what I thought. They wanted me
11   to add it in. Let's take it back out.
12         MR. BUCKLEY: A trick question.
13         MR. GAFFEY: It's a trick objection.
14         MR. BUCKLEY: I have to throw one at
15   you today. Keep you awake.
16         MR. GAFFEY: I'm just kidding.
17   Q.    Barclays gets 45 billion in the repo,
18   yes?
19   A.    Uh-huh.
20   Q.    800 million in 15c3?
21   A.    Uh-huh.
22   Q.    And 1.9 billion in unencumbered
23   assets?
24   A.    Uh-huh.
25   Q.    Which by my math comes to $47.7

Page 203

1    HIGHLY CONFIDENTIAL - B. McDADE
2    billion, we agree on that?
3    A.    Uh-huh.
4    Q.    And Barclays gave 250 million and what
5    else add up the Barclays consideration?
6    A.    The building.
7          Away from the building?
8    Q.    Away from the building.
9    A.    They expunged the loan on the repo,
10   right? So that's 45.
11   Q.    45.
12   A.    Right. And then assumed the cure
13   payments.
14   Q.    At let's call that 1.5?
15   A.    Yes.
16   Q.    As described to the court?
17   A.    Yes.
18   Q.    Okay.
19   A.    And assumed the comp.
20   Q.    And assumed the comp.
21         Which by my calculation comes to 48.7;
22   is that right?
23   A.    Uh-huh. I don't know. I'm not
24   looking at your math. I'm not doing it in my
25   head.

Page 204

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.    I think I've added it up right.
3    48.750.
4          So, first, sir, is there an
5    explanation for the billion-dollar difference
6    between the two?
7          MR. BUCKLEY: Objection. Foundation.
8    Q.    Barclays gives, on these numbers,
9    48.7; gets 47.7?
10         MR. BUCKLEY: Objection. Same.
11   A.    You're excluding the buildings, right?
12   Q.    Yes.
13   A.    I can't read your math and look at it
14   upsidedown, so I have to go through this process
15   myself.
16   Q.    Okay. Can you do that?
17   A.    I would rather not interpret your ...
18         (The witness calculates.)
19   A.    Of what we're adding up, I get 47.7
20   and 48.75.
21   Q.    And the 47.7 is the value that
22   Barclays receives?
23         MR. HUME: Objection. Lack of
24   foundation.
25   A.    Again, 1.9 billion of identified

Page 205

1    HIGHLY CONFIDENTIAL - B. McDADE
2    assets that Lehman finds. Then there's a
3    valuation process to identify what those assets
4    are worth. I'm not part of that process. It's
5    up to the final balance sheet.
6          MR. GAFFEY: I think just for the
7    clarity of the record I would like to mark
8    that as an exhibit.
9          MR. HUME: I would like to state for
10   the record that the document being marked is
11   the witness's handwritten down numbers that
12   Mr. Gaffey gave him.
13         MR. GAFFEY: Okay. We'll read the
14   record and see what they really were, but
15   you can characterize them however you want.
16         (Exhibit 336, handwritten calculation,
17   marked for identification, as of this date.)
18   Q.    You've taken account in there of
19   the -- "in there" being what we have now marked
20   as Exhibit 336 -- the assumed liabilities for
21   comp and cure at a total of 3.5, right?
22   A.    That's correct.
23   Q.    Now, to your knowledge, sir, was there
24   at any point -- you remember we spoke before
25   about the Repurchase Agreement having a haircut,

Page 206

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    the collateral in excess of the amount financed?
3    A.    Yes.
4    Q.    Where did that go?  Who gets the
5    haircut on your math?
6    A.    The repo was essentially expunged,
7    right?
8    Q.    Including the haircut?
9    A.    Including the haircut.
10    Q.    So --
11    A.    It's all in the value of the process.
12    Q.    So your 45 is --
13    A.    The assets themselves, not the repo
14    loan.
15    Q.    Okay.  Just so I'm -- let me put a
16    full question because I want to be sure I'm
17    clear on your testimony here.
18         The 45 that you calculate is the total
19    of the -- of all the assets in the repo?
20    A.    The repo contract is a set of assets
21    and a loan against those assets, haircut
22    typically being somewhat less than those assets,
23    right?  So the haircut, the haircut being the
24    total loan is somewhat less than the total
25    assets.

Page 207

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.    Okay.  And the haircut, just so we're
3    clear on our terms, the haircut is the
4    difference between the total loan and the total
5    assets?
6    A.    That's correct.
7    Q.    It could also be the excess collateral
8    over the amount of the loan, yes?
9    A.    That's correct.
10    Q.    Okay.
11    A.    That's correct.
12         So, yes, it's written in the document
13    we just reviewed, the -- yeah, the repo
14    paragraph.
15    Q.    The Clarification Letter?
16    A.    The Clarification Letter.  So they
17    kept the collateral in terms of the process
18    because of the valuation process that both the
19    teams had been going through.
20    Q.    And when you calculated the 45 here on
21    Exhibit 336 --
22    A.    And I calculated --
23         MR. HUME:  Those were your numbers.
24    A.    I put your numbers in.  I didn't
25    calculate anything.  I used your numbers and

Page 208

1    HIGHLY CONFIDENTIAL - B. McDADE
2    added it up to make sure your math correctly --
3    Q.    Let's do this again, sir, because I
4    need your testimony.  Could you please calculate
5    for me what were the numbers on the deal that
6    you negotiated?
7         MR. HUME:  Objection.
8    Q.    Forget anything I told you.  Could you
9    write down the numbers on the deal that you
10    negotiated, sir?
11         MR. BUCKLEY:  Mr. Gaffey, you've
12    behaved yourself all day.  Please calm down.
13         Mr. McDade has explained he's never
14    seen the final balance sheet from the
15    transaction.  If you have it, why don't you
16    show it to him.
17    Q.    I'll clarify the record.
18         MR. BUCKLEY:  You better back off a
19    little.
20    Q.    Apart from whether you've seen a fully
21    calculated balance sheet, sir, do you have a
22    concept of the deal, the negotiation you led on
23    behalf of Lehman as to what the value was of
24    what was given to Barclays?
25    A.    Do I have a concept?

Page 209

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.    Yeah, do you have a rough idea of what
3    went to Barclays and what it consisted of?
4    A.    Yes, I do.
5    Q.    Could you tell me what the components
6    were that went to Barclays and what they were
7    worth?
8         MR. BUCKLEY:  Objection.  Asked and
9    answered.
10         THE WITNESS:  I'm sorry?
11         MR. BUCKLEY:  You may answer.
12    Q.    You can answer.
13         MR. BUCKLEY:  It's just repetitive of
14    what he said.
15    A.    The assets that were unencumbered, the
16    15c3, what the ultimate valuation was of the
17    Barclays repo, the unwinding of the Barclays
18    repo in terms of the cash, right, in terms of
19    the 45, the cure payments, and the compensation.
20    Q.    What was the ultimate value of the
21    Barclays repo?
22    A.    I did not see the final.  I did not
23    see the final balance sheet.
24    Q.    What's your best estimate as you sit
25    here today, having negotiated the deal, of what

Page 210

1    HIGHLY CONFIDENTIAL - B. McDADE
2    the ultimate value of the Barclays repo was?
3        MR. HUME: Objection. Calls for
4    speculation.
5        MR. BUCKLEY: Objection. Foundation.
6        THE WITNESS: You want me to answer?
7        MR. BUCKLEY: Go ahead.
8    Q.    You can answer.
9    A.    My best guess is 45.
10    Q.    And your best guess of 45, does that
11    include all of the collateral in the repo, yes?
12    A.    Yes.
13    Q.    When you say it includes all of the
14    collateral in the repo, that includes the
15    haircut, correct?
16        MR. BUCKLEY: Objection.
17        MR. HUME: Objection. Vague and
18    ambiguous.
19        MR. BUCKLEY: Misstates the testimony.
20    Q.    With all of that, sir, you may still
21    answer.
22    A.    Yes.
23    Q.    And that, and again, I understand it's
24    your best estimate, but is that best estimate
25    based on the value that Lehman gave to the

Page 211

1    HIGHLY CONFIDENTIAL - B. McDADE
2    collateral in the repo, Barclays gave to the
3    value to the collateral in the repo, or
4    something else?
5    A.    I have described the process and I
6    would answer the same way. Barclays obviously
7    had a view as the purchaser. Lehman has a view
8    as the responsible owner of the assets. It's a
9    mutual agreement of the two.
10    Q.    Okay. I guess that's -- did they come
11    to a common view?
12    A.    Yes.
13    Q.    And what was the level of your
14    involvement in -- your personal involvement in
15    that valuation?
16    A.    I've tried to describe over the course
17    of the different questions. My personal
18    involvement was making sure that the teams were
19    in place and the process was constantly in place
20    through the course of the week. I did not have
21    direct personal involvement in terms of the
22    actual negotiations.
23    Q.    Who on the Lehman team had the
24    responsibility to make that call, to make the
25    agreement with Barclays as to what the

Page 212

1    HIGHLY CONFIDENTIAL - B. McDADE
2    collateral in the repo was worth?
3    A.    Michael Gelband, Alex Kirk, all the
4    different risk operators within the different
5    business units.
6    Q.    Again, it may be my unfamiliarity with
7    this part of the world, but at some point some
8    one person makes the decision, right, after a
9    process? Somebody makes the call?
10    A.    Absolutely.
11    Q.    Who was it?
12    A.    Absolutely.
13    Q.    Who made the call as to what the value
14    was of the collateral in the repo?
15    A.    What the value was in the collateral
16    of the repo, that would have been the head of
17    risk, which would have been Michael Gelband, but
18    in concert with others, coming to me and
19    communicating he's gone through a thorough
20    process and has reached an agreement.
21        (Discussion off the record.)
22        (Recess; Time Noted: 2:40 P.M.)
23        (Time Noted: 2:53 P.M.)
24    BY MR. GAFFEY:
25    Q.    Now, did it ever come to your

Page 213

1    HIGHLY CONFIDENTIAL - B. McDADE
2    attention, sir, that in anticipation of the
3    closing, personnel within Lehman prepared an
4    opening balance sheet to reflect the
5    transaction?
6    A.    I have a vague recollection.
7    Q.    Let me show you -- do you recall it
8    being prepared by Mr. Robert Azerad, working
9    with Kelly and Tonucci?
10    A.    I know who he is. I don't recall in
11    specific who would have prepared it.
12    Q.    Let me show you what's previously been
13    marked as Exhibit 229. Take a look through the
14    document, if you would, sir. Let me know when
15    you've had a chance to look that through.
16    A.    Okay.
17    Q.    Have you seen that opening balance
18    sheet before?
19    A.    I have not.
20    Q.    You'll note, sir, that the balance
21    sheet is annexed to an e-mail from Robert
22    Azerad. You said you know who he is?
23    A.    Yes.
24    Q.    Who is he?
25    A.    He's an old employee of Lehman in the

Page 214

1        HIGHLY CONFIDENTIAL - B. McDADE
2    finance area.
3        Q.    Did he work under Kelly and Lowitt or
4    with Kelly and Lowitt?
5        A.    Yes.  Yes, he did.
6        Q.    Under?
7        A.    Under.
8        Q.    And you recognize the names in the
9    "to" line here, Gary Romain, James Walker, TJ
10   Gavenda?
11       A.    No, sir.
12       Q.    Now, you'll see on the -- e-mail
13   itself reads "Copy of Opening Balance Sheet," do
14   you see that?
15       A.    Uh-huh.
16       Q.    And that balance sheet, sir, covers
17   first cash and cash equivalent and then a
18   variety of inventory and the 15c3 stuff that
19   we've been talking about, do you see that?
20       A.    Uh-huh.
21       Q.    And it also covers the accrued bonuses
22   at 2 billion and the cure payments at the
23   original number of 250, do you see that?
24       A.    Uh-huh.
25       Q.    And it reflects a valuation of the

Page 215

1        HIGHLY CONFIDENTIAL - B. McDADE
2    inventory, and by this point, by the point of
3    this -- by the date this is sent, which is
4    Sunday, September 21, the inventory we're
5    talking about in the transaction is the
6    inventory in the repo, correct?
7        A.    Yes.
8        Q.    Okay.  And this values the inventory
9    of the repo at 44,880,000,000; is that right?
10       A.    That's what this document says.
11       Q.    And it puts the 15c3 amount at a
12   billion, do you see that?
13       A.    Yes, I do.
14       Q.    And when you add in the cash and cash
15   equivalents, it comes out to 52.8 billion, do
16   you see that?
17       A.    Yes, I do.
18       Q.    And below the "Asset" line is the cash
19   received from Barclays, and it recounts the 45
20   billion for the repo.  We talked about that
21   number, right?
22       A.    Yes.
23       Q.    And the $250 million cash payment?
24       A.    Yes.
25       Q.    Totals at 45-billion-250 and then

Page 216

1        HIGHLY CONFIDENTIAL - B. McDADE
2    takes accounts of the accrued bonuses and the
3    cure payments, right?
4        A.    Yes.
5        Q.    And then there's a provision of equity
6    of $3.38 billion.  Now, as I read this, sir,
7    that would be equity to Barclays after the
8    transaction, correct?
9        A.    I have not seen this document.  I
10   don't know what this is in terms of the equity
11   line.
12       Q.    Well, if the equity line is meant to
13   indicate the equity to Barclays in the amount of
14   3.380, given what we've talked about about the
15   deal being in balance --
16       A.    I didn't create the document.  I've
17   never seen the document before.
18       Q.    I understand.
19       A.    I prefer not to interpret it.
20          MR. BUCKLEY:  Let the witness answer.
21       A.    I prefer not to interpret it.  I don't
22   know what it means.
23       Q.    If there were an equity component in
24   the deal on the opening day, sir, of $3.38
25   billion, that deal would not be in balance; is

Page 217

1        HIGHLY CONFIDENTIAL - B. McDADE
2    that right?
3          MR. BUCKLEY:  Objection to form and
4    foundation.
5        A.    That's correct.
6        Q.    And the deal that you made was one to
7    be in balance; is that right?
8          MR. BUCKLEY:  Objection.
9          MR. HUME:  Objection.  Vague and
10   ambiguous.
11       A.    That's correct.
12       Q.    So if the opening day balance sheet
13   for the deal reflected that Barclays had $3.38
14   billion in equity, that's not the deal you made,
15   is it?
16          MR. HUME:  Objection to form and calls
17   for a legal conclusion.
18          MR. BUCKLEY:  Objection.  Foundation.
19       A.    That's correct.
20       Q.    And it wouldn't be consistent with the
21   deal that you made, would it?
22       A.    It would not be consistent, that's
23   correct.
24       Q.    Now, was there ever a time, sir,
25   where -- at around the time of the hearing

Page 218

HIGHLY CONFIDENTIAL - B. McDADE
1    where, to your knowledge --
2    A.    Which hearing?
3    Q.    Good point. The hearing at which you
4    testified on the 19th, the Friday sale hearing.
5    For time periods that's where this question goes
6    to.
7        Before that hearing, sir, do you have
8    any knowledge of a project where Alex Kirk
9    suggested that fire sale liquidation prices be
10   calculated for the -- for a list of the top 100
11   positions in each of the different categories?
12   A.    I don't know -- I don't have knowledge
13   of a fire sale process, no.
14   Q.    Let me show you what's previously been
15   marked as Exhibit 3. Ask you to take a look
16   through that e-mail, and just for purposes of
17   your review, sir, take note that you're at least
18   shown as one of the CCs on this.
19   A.    Uh-huh.
20   Q.    Let me know what you've had a chance
21   to look through the document, sir.
22   A.    I'm good.
23   Q.    Now, the document addressed to Kaushik
24   Amin, Charlie Spero, Eric Felder and Gerald

Page 219

HIGHLY CONFIDENTIAL - B. McDADE
1    Donini recounts that Alex Kirk -- "Alex Kirk
2    suggested we contact each of you to help us
3    understand on a theoretical basis what would
4    happen in a fire sale liquidation of the
5    securities that are being transferred to
6    Barclays as part of the proposed transaction.
7    The question is what these securities could be
8    sold for in such a scenario. We will be leaving
9    on your desks a list of the top 100 positions in
10   each of your areas of expertise. The pages you
11   need to look at will be flagged. We need to get
12   your views on this by no later than 11 A.M.
13   tomorrow. The court hearing is at 4 P.M. and
14   Bart and Lazard need to have their testimony
15   ready several hours prior to that. We will
16   follow up with each of you in the morning." And
17   then, "Please do not hesitate to contact me," et
18   cetera.
19       Having looked through this, was there
20   any discussion that your testimony might address
21   fire sale prices for securities?
22   A.    No.
23   Q.    Any recollection of this at all?
24   A.    My -- my testimony? I'm sorry.

Page 220

HIGHLY CONFIDENTIAL - B. McDADE
1    Q.    My question derives from the document,
2    where there's this instruction appears to be
3    given and the note is made that the court
4    hearing is at 4 P.M. and Bart and Lazard need to
5    have their testimony ready.
6    A.    Right.
7    Q.    Do you have any knowledge, sir, of a
8    connection between the need for fire sale
9    prices?
10   A.    I was obviously CC'd, but I don't know
11   the context of how Daniel spoke to Alex. I
12   don't have any of the specific recollection of
13   this e-mail.
14   Q.    Okay. We've been doing this long
15   enough today I can just do it this way: Is
16   there anything you can add about the topic of
17   this e-mail?
18   A.    There's nothing I would add.
19   Q.    Showing you, sir, what previously has
20   been marked as Exhibit 221, an e-mail from you
21   to Ian Lowitt with a prior e-mail below that.
22   Take look through that, please.
23   A.    Okay.
24   Q.    Do you recall this e-mail?

Page 221

HIGHLY CONFIDENTIAL - B. McDADE
1    A.    Yes.
2    Q.    And in the earliest of them at 1:02
3    A.M. on the 20th of September, you recount to
4    Mr. Lowitt, "The conflate is over. We are part
5    of BarCap subject to documenting"?
6    A.    Uh-huh.
7    Q.    I take it this was sent shortly after
8    the hearing finally had ended in the early
9    morning hours of September 20?
10   A.    That's correct.
11   Q.    And Mr. Lowitt responds by asking in
12   his e-mail to you, Berkenfeld and Tonucci, "Did
13   the court accept the 15c3 lockup and
14   unencumbered box make it through to BarCap? If
15   so, we need to make sure documentation is very
16   tight so we can deliver on it. Should have Weil
17   lawyers work closely with Paolo on it.
18   Obviously critical we get this right. Congrats
19   again. Ian."
20       Did you have an understanding of what
21   Mr. Lowitt was asking you about when he asked if
22   the court accepted the 15c3 lockup and
23   unencumbered box in BarCap?
24   A.    I did not have an understanding of

Page 222

HIGHLY CONFIDENTIAL - B. McDADE

1        HIGHLY CONFIDENTIAL - B. McDADE
2  what he was specifically asking in that.
3     Q.  It's some reference to the project on
4  Friday to find added value, yes?
5     A.  Yes.
6     Q.  And those were the categories in which
7  the added value was found?
8     A.  Correct.
9     Q.  Had you had any discussions with
10  Mr. Lowitt about bringing to the court's
11  attention these particular --
12     A.  No.
13     Q.  -- additional assets?
14     A.  Absolutely not.
15     Q.  Do you know if they were brought to
16  the court's attention?
17     A.  In a particular way they were not
18  brought to the court's attention.
19     Q.  And your final e-mail from you to
20  Lowitt, "Can you call me at home?" Did you have
21  a conversation with Mr. Lowitt that -- I guess
22  in that early morning?
23     A.  So I don't know the times of these. I
24  don't recall a specific conversation with Ian.
25  I spent all day Sunday with him back at Weil.

Page 223

1        HIGHLY CONFIDENTIAL - B. McDADE
2     Q.  You know, I think that my question may
3  have been misleading, and I apologize. I had
4  not noticed this.
5     Take a look at the time and date of
6  the top e-mail and note that it's GMT, so
7  subtract four hours. So we're on -- now we're
8  on Saturday night when you say, "Can you call me
9  at home?"
10     A.  And we lived together all day Sunday.
11     Q.  So that could have been any one of any
12  number of calls between you?
13     A.  Right.
14     Q.  Is there any particular topic you were
15  asking him to call you at home about?
16     A.  I don't recall.
17     Q.  I'd like to just return briefly to
18  Mr. Shafir's departure from the scene on
19  Thursday. Was that a surprise to you, sir?
20     A.  Yes, it was.
21     Q.  Why were you surprised at that?
22     A.  Well, number one, it was new
23  information; number two, competitive instincts,
24  you never like to lose good employees; and,
25  number three, obviously we were in the middle of

Page 224

1        HIGHLY CONFIDENTIAL - B. McDADE
2  a deal.
3     Q.  You were in the middle of a deal and
4  he was playing a fairly critical role in --
5     A.  I have described the role that he was
6  playing.
7     Q.  Would it be fair to describe it as a
8  fairly critical role?
9     A.  He was playing an important role.
10     Q.  Who conveyed to Barclays the news that
11  Mr. Shafir had left?
12     A.  I don't know that answer.
13     Q.  I take it by your answer that means it
14  wasn't you?
15     A.  I don't recall doing that.
16     Q.  Had there been particular people at
17  Barclays for whom Shafir was the contact point?
18     A.  I described earlier I think Shafir and
19  Mike Klein, the advisor to BarCap, were -- were
20  their prospective contact points, but we were
21  all living together, so ...
22     Q.  Okay.
23     A.  It's not like it was a remote set of
24  discussions going on. Everyone was together,
25  so...

Page 225

1        HIGHLY CONFIDENTIAL - B. McDADE
2     Q.  I guess I'm working on the assumption
3  that somebody on the BarCap side of things would
4  have noticed Mr. Shafir was missing. Did
5  anybody ask where did Shafir go?
6     A.  Again, I wasn't there in the process.
7  I was informed, I believe, by Skip McGee, as
8  I've said before. I am sure Mr. Shafir had the
9  professional courtesy, but I don't have specific
10  knowledge of, to speak to the proper
11  counterparts at Barclays. I'm sure as soon as
12  we at Lehman knew the BarCap team you knew.
13     Q.  With Shafir's departure on the
14  Thursday, was there any, you know, was there any
15  learning curve, was there anybody who had to
16  pick up what Shafir had been doing, learn what
17  Shafir knew?
18     A.  No, because while the deal specifics
19  changed in terms of the detail, the general
20  nature of the deal had been accomplished earlier
21  on in the week and there were many, many
22  advisors, internal and external, that had been
23  and had become part of the process over the
24  course of the week.
25     Q.  Okay. There is a continuum, I guess,

Page 226

HIGHLY CONFIDENTIAL - B. McDADE
1 
2 between graveyards that are full of
3 indispensable people and people are
4 indispensable. But Shafir plays an important
5 role in this deal.
6        On Thursday night, you got --
7        MR. BUCKLEY: Is that a question or a
8 statement you're making?
9        MR. GAFFEY: That's a statement I'm
10 making.
11    Q.   On Thursday night, you call Kirk and
12 ask him to come in and help get involved on
13 Friday. Prior to Thursday night, Kirk had been
14 managing credit risk, not involved in the deal.
15        Was Kirk meant to replace Shafir in
16 the primary deal team?
17    A.   No.
18    Q.   Does anybody download to Kirk what it
19 was Shafir was doing or Shafir knew or was
20 responsible for in the deal?
21    A.   Kirk was working on specifics related
22 to accomplishing the finality of determining the
23 value of the assets.
24    Q.   Prior to his departure, had anyone --
25    A.   Prior to whose departure? Shafir?

Page 227

HIGHLY CONFIDENTIAL - B. McDADE
1 
2    Q.   Shafir's departure.
3        Had anyone had a conversation with
4 Shafir about this, about Barclays allowing as to
5 how they weren't getting the value that they
6 thought they were getting, the reason for the
7 Friday project?
8    A.   I don't know the answer. He was no
9 longer an employee, but I don't know the answer.
10    Q.   Did you ever talk to Shafir after he
11 departed on Thursday, September 18?
12    A.   One time he called me.
13    Q.   When did he call you?
14    A.   I don't recall. Soon thereafter.
15    Q.   Soon thereafter.
16        And do you recall what the
17 conversation was between you and Shafir when he
18 called you?
19    A.   He thanked me for our professional
20 relationship.
21    Q.   Were you angry when Shafir left on
22 such short notice in the middle of the deal?
23    A.   It was frustrating, yes. I had
24 different forms of -- of challenges over the
25 course of the couple months, so it was par for

Page 228

HIGHLY CONFIDENTIAL - B. McDADE
1 
2 the course.
3    Q.   Did the departure of Shafir add to
4 the -- to confusion about the deal?
5    A.   No, it did not, not in my opinion, no.
6    Q.   Did the departure of Shafir present
7 additional challenges to completing the deal?
8    A.   I -- I remain with the same set of
9 statements that we were adequately womaned and
10 manned in terms of the right type of personnel
11 to be able to, internal to Lehman and external,
12 to be able to process responsibly and
13 accurately.
14    Q.   After Shafir left, who dealt with
15 Klein?
16    A.   A combination -- a combination of a
17 number of us dealt with Klein. Myself, Kirk,
18 Paul Parker, investment banking, M&A, other
19 financial institutions' bankers. A number of
20 people.
21    Q.   What issues were left to be discussed
22 with Klein after Shafir's departure?
23    A.   Well, after Shafir's departure, the
24 challenge of the change in the mix that we had
25 spoken to in terms of the balance sheet, the

Page 229

HIGHLY CONFIDENTIAL - B. McDADE
1 
2 need in processing of the different assets that
3 we have talked about this morning, those would
4 have been the basic challenges of getting a deal
5 done.
6    Q.   Prior to his departure, had Shafir
7 played any role in this process of valuing the
8 different assets we talked about this morning?
9    A.   Of valuing the assets?
10    Q.   Yes.
11    A.   No.
12    Q.   Prior to his departure, had Shafir
13 played any role in determining the nature of
14 the -- the composition of the assets that were
15 going to go to Barclays?
16    A.   The composition of the assets?
17    Q.   Yes, what Barclays was going to get.
18    A.   He would have been involved in
19 developing a framework and construct in terms of
20 how the deal was coming together, but he didn't
21 grow up in risk management. He wouldn't have
22 known what the assets were worth that could
23 constitute good assets to be purchased. That
24 would not have been his role.
25    Q.   Did you ever have any conversations

Page 230

HIGHLY CONFIDENTIAL - B. McDADE

1    with Mr. Shafir where he indicated that in his
2    view the deal had changed from a -- it was a
3    completely different deal from the one made on
4    Tuesday?
5        A.   I never had those conversations, no.
6        Q.   When you spoke to Shafir shortly after
7    the deal, was that the first time you spoke to
8    him after his -- is that the only time you spoke
9    to him after his departure?
10        A.   Best of my recollection, yes.
11        Q.   Did you ask him why he left in the
12    middle of the deal?
13        A.   I don't recall the actual
14    conversation, so I can't answer that question.
15        Q.   Do you know if anyone on your team at
16    Lehman ever asked Shafir why he left in the
17    middle of the deal?
18        A.   I do not -- I do not know.
19        Q.   Did you ask anyone else on the team if
20    they knew why Shafir left in the middle of the
21    deal?
22        A.   Absolutely.
23        Q.   Who did you ask?
24        A.   Skip McGee.

Page 231

HIGHLY CONFIDENTIAL - B. McDADE

1        Q.   What did Skip McGee say to you?
2        A.   He said he stayed to get the deal
3    done.  He wanted to do this, apparently, for a
4    long time.
5        Q.   Was the deal done on Thursday,
6    September 18?
7        A.   The deal obviously wasn't completely
8    contemplated -- consummated, no.
9        Q.   So when McGee told you that Shafir had
10    said he wanted to get the deal done, did you
11    comment on the fact that Shafir left before that
12    happened?
13        A.   I don't recall the specifics of the
14    conversation other than me asking and McGee
15    giving that answer.
16        Q.   Do you remember McGee saying anything
17    else about why Shafir left before the deal got
18    done?
19        A.   No, I do not.
20        Q.   Other than McGee, did you talk to
21    anyone about the fact that Shafir left before
22    the deal got done?
23        A.   Not that I recall.
24        Q.   Do you recall hearing anybody talk,

Page 232

HIGHLY CONFIDENTIAL - B. McDADE

1    other than your conversation with McGee, about
2    why Shafir left before the deal got done?
3        A.   That we were too focused on the deal.
4    So, no, I do not recall that.
5        MR. GAFFEY:  I don't have anything
6    further.  Thanks.  Thanks for your time.  My
7    friends may have some questions for you,
8    though.
9        THE WITNESS:  Understood.
10    EXAMINATION BY
11    MS. TAGGART:
12        Q.   I have a few.  Can you hear me okay
13    from here?
14        A.   Yes, I can.
15        MR. BUCKLEY:  Who are you?  Who do you
16    represent?
17        Q.   My name is Erica Taggart and I
18    represent the Creditors Committee.
19        First thing, I want to ask you some
20    questions about residential mortgage-backed
21    securities, and to put a little context, if you
22    look at Exhibit 1, which is the Asset Purchase
23    Agreement, page 3, and there's a subsection K, I
24    believe this is the section discussing excluded

Page 233

HIGHLY CONFIDENTIAL - B. McDADE

1    assets, there's a discussion of 50 percent of
2    each position, residential real estate mortgage
3    securities, and also on page 6 of this document
4    under Purchased Assets, subsection E, there's 50
5    percent of each position, the residential real
6    estate mortgage securities.
7        Were you involved in negotiations at
8    all related to any amount of residential
9    mortgage-backed securities going to Barclays as
10    part of the deal?
11        A.   Yes, from a top-down point of view, I
12    was involved.  Originally, Barclays wanted none
13    of the mortgage securities consistent with the
14    weekend before view on certain challenges that
15    they had with their own concentrations and
16    capital, et cetera.  So there was a strong
17    negotiation on our part to continue to push to
18    include those illiquid assets in the deal.
19        But the role I would have had would
20    have been continuing to push the process which
21    ultimately did change in the inclusion of those
22    assets.
23        Q.   Did you speak personally to someone at
24    Barclays about the issue?

Page 234

1        HIGHLY CONFIDENTIAL - B. McDADE
2        A.    I spoke personally to Rich Ricci and
3    to Jerry del Missier and the senior deal team.
4    I did not speak to the senior individuals
5    involved in the mortgage risk and
6    decision-making at the risk level of Barclays.
7        Q.    And what did those individuals at
8    Barclays that you spoke of say why they did not
9    want to include the residential mortgage
10   securities?
11       A.    Right, they didn't want to include
12   residential mortgages, one, because of the
13   illiquid nature of them; two, because of the
14   capital-intensive nature of apparently their
15   need to account for those type of assets; and my
16   estimation as well just that the concentration
17   of that type of asset being looked at unkindly
18   by the marketplace, to say the least.
19       Q.    And how did it come about that some of
20   those, at least some, residential
21   mortgage-backed securities were included let's
22   start in the original agreement, the APA?
23       A.    That was part of the negotiation
24   process of at least Barclays meeting us halfway
25   in terms of our position that mortgages should

Page 235

1        HIGHLY CONFIDENTIAL - B. McDADE
2    be included.
3        Q.    And what was your position about why
4    they should be included?
5        A.    There was -- I had two reasons:
6    Number one, it was, again, very challenging for
7    us to manage any of the assets, especially the
8    most illiquid assets, residential mortgages
9    being more illiquid than some of the other
10   assets on the balance sheet, one; and two, it
11   would, you know, be important in terms of the
12   overall -- so the fundamental thrust was the
13   reduction of the risk to the Lehman estate and
14   from point of view of the mechanics of being
15   able to manage if businesses -- we had a
16   responsibility, if businesses were being assumed
17   by Barclays, those resident experts that we had
18   at Lehman would potentially be going over to
19   Barclays wouldn't be able to manage the risks.
20   So a responsibility around they would be taking
21   the individuals, they had to understand the
22   burden that that would put Lehman under.
23       Q.    If you look at Exhibit 19, which I
24   think is the schedule that was referred to in
25   the APA.

Page 236

1        HIGHLY CONFIDENTIAL - B. McDADE
2        A.    Right.
3        Q.    In this schedule, does it include the
4    mortgage-backed securities that were subject of
5    those negotiations?
6        A.    Mortgages.
7        Q.    And this 2.7, what does that reflect?
8        A.    That reflects the bottoms-up process
9    between the two deal teams in terms of the 50
10   percent, the original 50 percent value of the
11   residential mortgages.
12       Q.    So this 2.7 is, first of all, it's 50
13   percent of the total mortgage-backed securities
14   that Lehman had at the time?
15       A.    To the best of my recollection, yes.
16       Q.    And if you look back at the APA page
17   6, under Purchased Assets, if you look at
18   subsection D, it's describing government
19   securities, commercial paper, corporate debt --
20       A.    Uh-huh.
21       Q.    -- corporate equity and some other
22   things of the approximately $70 billion in
23   value. Do you know if that includes value that
24   was part of residential mortgage-backed
25   securities?

Page 237

1        HIGHLY CONFIDENTIAL - B. McDADE
2        A.    I believe residential mortgages were
3    included in E because of the specific nature of
4    the split.
5        Q.    Okay. So the 70 billion that's the
6    estimate in Purchased Assets, subsection D, does
7    not include the value of the assets that were in
8    these resis; is that right?
9        A.    Which trues up the math to the 72.7,
10   which is the total, exactly.
11       Q.    Could you explain that?
12       A.    So the 70 billion in line D plus the
13   2.7 in mortgages gets to the actual figure you
14   see in Exhibit 19 of 72.65.
15       Q.    Now, subsequent to that, was there a
16   change in the decision about how much of the
17   residential mortgage securities would go to
18   Barclays?
19       A.    Yes.
20       Q.    And how did that change?
21       A.    It was part of the repo that
22   ultimately was -- part of the decision was based
23   on negotiation and part of it was the repo
24   transaction. Barclays actually ended up with
25   more of those assets already assumed in the repo

Page 238

```
1        HIGHLY CONFIDENTIAL - B. McDADE
2    transaction.
3        Q.   First, let's look at on the First
4    Amendment to the Asset Purchase Agreement, and
5    that's Exhibit 24, and in particular, now you
6    see under number 3, Purchased Assets, says,
7    "Cause E of the definition of Purchased Assets
8    in the original agreement is hereby amended to
9    give 50 percent and to insert 100 percent in
10   lieu thereof."
11       A.   Uh-huh.
12       Q.   First of all, were you involved in the
13   negotiation of that change?
14       A.   I was involved again only at a high
15   level, but yes.
16       Q.   Did you speak with anyone at Barclays
17   about that change?
18       A.   It's likely that we ratified that
19   change at our level.
20       Q.   And what was the reason for the change
21   between the time of the APA and the first
22   amendment to change that to be 100 percent of
23   the residential real estate mortgage securities?
24       A.   I think, as I -- I think I previously
25   stated, a combination of our need to find
```

Page 239

```
1        HIGHLY CONFIDENTIAL - B. McDADE
2    responsible risk managers at Lehman, the change
3    in the -- the change in the overall dynamic of
4    the marketplace, the change in the assets, it
5    became clear that it would be a whole lot more
6    efficient ultimately for all parties for all the
7    assets to be included.
8        Q.   At the time of when you decided to
9    give 100 percent of the residential real estate
10   mortgage securities, did you have an estimate at
11   that time of what the value of that hundred
12   percent of those securities were worth?
13       A.   I'm sure we did.  I did not have that
14   specific value.  We didn't give.  We sold.  We
15   agreed to sell the residential mortgage assets.
16       Q.   Do you know if it was more or less
17   than two times the 2.7 billion that's reflected
18   in Exhibit 19?
19       A.   I don't have the specifics.
20       Q.   Do you know if the value had changed
21   of those mortgage securities in the time between
22   the APA and that First Amendment?
23       A.   I am sure the value changed given what
24   was happening in the market, but I don't have
25   the specifics.
```

Page 240

```
1        HIGHLY CONFIDENTIAL - B. McDADE
2        Q.   Now, you say that you didn't give, you
3    agreed to sell.  Was there any specific
4    counterbalance in what -- in the deal to reflect
5    that now Barclays was going to receive all of
6    the mortgages?
7        A.   Any given counterbalance?
8        Q.   What did you sell them for?
9        A.   We sold them for the proceeds.  We
10   sold them for whatever the valuation process of
11   the two deal teams had put together.
12       Q.   I guess regarding this particular
13   change for the -- from 50 percent to 100
14   percent, was there any counterbalancing change
15   that was made to the deal in assumption of
16   liabilities or more that Barclays had to pay?
17       A.   I understand your question in a
18   vacuum, but the deal was changing and the assets
19   were changing, so I can't answer the question
20   specifically because so many moving pieces in
21   terms of the balance sheet was taking place.
22       Q.   But it was your understanding that
23   there was some change that would have been
24   reflected to Barclays in order to keep those in
25   balance so that Barclays would give more or
```

Page 241

```
1        HIGHLY CONFIDENTIAL - B. McDADE
2    receive less to keep it in balance after this
3    change?
4        A.   It's my understanding that Lehman got
5    value for those assets in a properly -- in a
6    proper process, as described.
7        Q.   Do you know who would know what value
8    was attributed to these residential securities
9    in order to make sure that it continued to be
10   balanced?
11       A.   On the Lehman side, that would have
12   been Charlie Spero, who would have spearheaded
13   our efforts.
14       Q.   Did you speak with Charlie Spero about
15   the value of those mortgage securities?
16       A.   I did not speak directly to Charlie.
17   I'm sure Michael Gelband did.
18       Q.   Now, at the time of the First
19   Amendment to the Asset Purchase Agreement, was
20   it already decided that Barclays would enter
21   into the repo with the Fed?
22       A.   The First Amendment I believe is dated
23   the 19th, and I believe the Fed transaction with
24   Barclays took effect late in the evening on the
25   18th.  So, yes.
```

Page 242

HIGHLY CONFIDENTIAL - B. McDADE
1
2    Q.    Let's start with were any real estate
3    mortgage securities included in the collateral
4    that had been pledged to the Fed?
5        MR. HUME: Objection. Lack of
6    foundation.
7    A.    I don't know the specifics of the
8    exact collateral pledged to the Fed.
9    Q.    Do you know if any residential real
10   estate mortgage securities ultimately were
11   transferred to Barclays at the end of the deal?
12   A.    It's my understanding, yes.
13   Q.    What's that understanding based on?
14   A.    My understanding is based -- my
15   understanding is based on our inability to
16   transact much in the way of those assets over
17   that period of week in terms of what market
18   activity. So those balance -- those balances
19   and those assets would have been there and those
20   balances were part of the transaction.
21   Q.    Did you ever have a specific
22   conversation or communication with anyone that
23   confirmed, yes, the real estate mortgage
24   securities have now gone to Barclays?
25   A.    Did I ever have a specific

Page 243

HIGHLY CONFIDENTIAL - B. McDADE
1
2    conversation? No.
3    Q.    And you may have already answered
4    this, but do you have any understanding today
5    about what value Barclays got as a result of
6    these residential real estate mortgage
7    securities?
8    A.    I don't have a specific figure.
9    Q.    I also want to talk about the process
10   about this coming up with a $5 billion price,
11   which I know was described quite a bit this
12   morning and don't need to restate all that now,
13   but one thing that you had mentioned is that
14   there was a back and forth about the price.
15   Barclays probably wanted to pay less and get
16   more and Lehman wanted to get more and not pay
17   as much.
18       Was there ever a time -- well, first
19   of all, did you actually speak with someone at
20   Barclays where the number 5 billion was ever
21   mentioned?
22   A.    No.
23       MR. BUCKLEY: Objection to the
24   question.
25   A.    No, the number 5 billion is not my

Page 244

HIGHLY CONFIDENTIAL - B. McDADE
1
2    number. It's not a number that we used in the
3    process. We went through a process of valuing
4    assets from Monday midday all the way through to
5    the final consummated transaction, and that $5
6    billion figure was simply the different at the
7    end of the day in terms of day for the initial
8    balance sheet from where the marks were on
9    Friday. There was no concept of a discount, and
10   there was -- there was the same process we went
11   through over the course of the week.
12   Q.    Who did you speak with about this
13   difference between the price that they would pay
14   and the marks that it's your understanding where
15   the marks that were on Friday?
16   A.    Who did I --
17       MR. BUCKLEY: Would you specify which
18   Friday we're talking about, if you would?
19   Q.    Okay. Who if anyone did you ever
20   speak about about this $5 billion difference
21   between a price and marks?
22       MR. BUCKLEY: Price on Friday, the
23   12th?
24   Q.    The price that is --
25       MR. BUCKLEY: Or the marks?

Page 245

HIGHLY CONFIDENTIAL - B. McDADE
1
2    Q.    -- discussed on the APA -- that are
3    reflected in the APA.
4    A.    The main individual that I would have
5    spoken to at Lehman with respect to the whole of
6    the risk process and the valuation process from
7    the beginning to the end would have been Michael
8    Gelband, who had collective responsibility for
9    all of the businesses with the exception of the
10   principal businesses, which was Alex Kirk, which
11   were not part of broker-dealer assets. The bulk
12   of his risk responsibilities were not part of
13   the broker-dealer assets. So it would have been
14   Michael Gelband, to answer your question.
15       Did I speak to any of the other risk
16   operators that have been mentioned today, Gerry
17   Donini in equities, and Eric Felder in credit
18   and Charlie Spero, possibly on occasion in terms
19   of making sure I understood their process, if
20   they needed help, et cetera, yes, but my main
21   point of contact would have been Michael
22   Gelband.
23   Q.    And do you actually remember a
24   conversation with Michael Gelband where the
25   number 5 billion came up?

Page 246

HIGHLY CONFIDENTIAL - B. McDADE

1       HIGHLY CONFIDENTIAL - B. McDADE
2       A.   No, I don't remember a conversation
3   with Mike Gelband where the number 5 billion --
4       Q.   Do you remember a conversation with
5   Mike Gelband in particular about the difference
6   between the numbers that were reflected on
7   Exhibit 19 and numbers that were reflected on
8   Lehman's books?
9       A.   Our specific focus was getting the
10  best possible execution. I remember -- I have
11  no recollection of any conversation with respect
12  to the books on Friday and the market prices
13  reflected in the 5 billion figure that you
14  suggest.
15       I recall many conversations with
16  respect to the valuation process, what are we
17  doing, how are we doing it, and how are we
18  making sure that we're getting the best possible
19  execution in terms of those -- valuing those and
20  transacting those assets.
21       Q.   Do you remember speaking with anyone
22  about the topic of whether the marks were marks
23  that were done on Friday and not after that?
24       MR. BUCKLEY: Could we please have
25  clarification what Friday we're talking

Page 247

1       HIGHLY CONFIDENTIAL - B. McDADE
2   about here?
3       MS. TAGGART: Sure, that's Friday the
4   12th.
5       Q.   I guess I should ask you. We talked
6   today about the difference between the prices
7   that are reflected on Exhibit 19 and the marks
8   on Lehman's books. What is your understanding
9   of when the time that the marks had been done
10  that you're using for that comparison?
11       A.   Again, I think I've answered the
12  question today. I think I've answered the
13  question today. I don't have the specific
14  knowledge of when the marks were done. We were
15  going through a process of valuing the assets
16  for the transaction over the course of the week,
17  those assets changed in terms of composition
18  over the course of the week, and that was done
19  in iterative times.
20       Q.   I guess, and I know I'm looking at my
21  notes from this morning, but I have something
22  about that there was a price that was different
23  because there were marks changed from the marks
24  on the books since Friday?
25       A.   Right.

Page 248

1       HIGHLY CONFIDENTIAL - B. McDADE
2       Q.   Did you speak with anyone about that
3   the marks that were used to calculate the
4   difference were marks that were done on Friday,
5   and not after that?
6       A.   I understood the last time that we
7   were able to mark our books was September 12th
8   in the evening.
9       Q.   Where does that understanding -- I'm
10  sorry. Continue.
11       A.   I understood that given that the
12  carnage, human carnage that had taken place in
13  terms of what happened at Lehman and our
14  inability on Monday to really operate and
15  function in any real capacity until life came
16  back to the organization because of the
17  potential of a BarCap deal.
18       So all I understood was we had marked
19  on Friday, it would have been impossible to mark
20  on Monday, and this balance sheet, Exhibit 19,
21  reflected the bottoms-up process between the two
22  collective teams.
23       Q.   Did you actually speak to somebody
24  where the topic that someone said Lehman was
25  unable to mark on Monday, that topic was

Page 249

1       HIGHLY CONFIDENTIAL - B. McDADE
2   discussed?
3       A.   I don't recall the specific
4   conversation about that.
5       Q.   Did you speak to any trader about
6   whether they had marked the books on Monday?
7       A.   I would speak to individual business
8   heads, not individual traders in the normal
9   course of business, and it became clear that
10  that would be -- have been impossible to do.
11       Q.   What did they say and who said in
12  particular something that made you think it was
13  impossible to do?
14       A.   "There's nobody on the interest rate
15  trading desk today."
16       Q.   Who said that?
17       A.   I don't know. I'm using an example of
18  what would be communicated early on on Monday as
19  everyone had left the building. So, therefore,
20  I put two and two together. We did not
21  specifically talk about the mark process, to
22  answer your question specifically.
23       Q.   Okay. And did you ever actually see
24  the document or computer system that showed
25  there hadn't been marks on Monday?

Page 250

HIGHLY CONFIDENTIAL - B. McDADE

1      HIGHLY CONFIDENTIAL - B. McDADE
2      A.   I would never see those documents, no.
3      Q.   Is it your understanding that Barclays
4    had wanted to ascribe even lower value to these
5    assets than is reflected on Exhibit 19?
6      A.   Very much so.
7      Q.   How much lower did they want to go?
8      A.   I wasn't part of the individual
9    conversations where the valuing was taking
10   place, so I can't give you a frame of reference.
11     Q.   Then where does your understanding
12   that very much so Barclays actually was trying
13   to get an even lower attribution of the value of
14   the assets than they were getting?
15     A.   It comes, one, from the, again, the
16   liaison that I had, Michael Gelband, in terms of
17   just general me getting a general update in
18   terms of how that process is going; and, two, it
19   just comes from my set of market experiences
20   knowing all of the markets had shut down.
21          So for an individual organization to
22   take on the risk of a balance sheet of this
23   size, intuitively, they would -- they would be
24   pushing for an efficient, translation, low
25   execution.

Page 251

1      HIGHLY CONFIDENTIAL - B. McDADE
2      Q.   Did Mike Gelband tell you that someone
3    at Barclays had said that they needed a change
4    because of what you just described, because of
5    the market shutdown?
6      A.   No.
7      Q.   Okay.  That was your understanding of
8    what logically might be taking place?
9      A.   Correct.
10     Q.   And you also mentioned that you
11   thought that, at some point I think you said --
12   let me just strike that.
13          Do you believe that Exhibit 19, the
14   values attributed to the assets, were the fair
15   market value of those assets at the time?
16     A.   At that time, yes, I do.
17     Q.   And so is it your belief that the
18   value of these assets had gone down $5 billion
19   from the Friday, September 12th, and September
20   16th?
21     A.   If the 5 billion represents where the
22   marks were, and I believe that we marked fairly
23   on Friday, yes, I believe we -- I believe we
24   marked fairly on -- the process came up with a
25   fair market valuation on Tuesday, and I believe

Page 252

1      HIGHLY CONFIDENTIAL - B. McDADE
2    at the close of business on Friday we had marked
3    our books appropriately into the market.
4      Q.   When you say "we had marked our books
5    appropriately," what are you referring to?
6      A.   You asked me about the $5 billion
7    figure, I think, in your question.
8      Q.   Right.  Yes.
9      A.   I'm just saying that our
10   responsibility was to mark our books to market
11   each evening.
12     Q.   Right.
13     A.   On Friday, September 12, we had done
14   that.  You then pointed out that the price on
15   Exhibit 19 happens to be $5 billion difference.
16   I'm suggesting that we went through a thorough
17   process in terms of getting to the place on
18   September 16th where this reflected the fair
19   market value.  So, therefore, I viewed it to be
20   fair on Friday and fair on Tuesday, and so that
21   would reflect the 5 billion change in terms of
22   the process.
23     Q.   Is there any difference in your
24   understanding of fair market value and the price
25   that these would be marked on that day?

Page 253

1      HIGHLY CONFIDENTIAL - B. McDADE
2      A.   There's a -- again, the ability to
3    value and transact in this type of size did not
4    exist in the marketplace.
5      Q.   So what do you mean when you say "fair
6    market value"?
7      A.   Ability to transact -- the ability to
8    transact securities of a normal lot size in the
9    marketplace is typically what's described as
10   fair market value.
11     Q.   And sorry, maybe I misunderstood your
12   answer, but is that then different between what
13   would be marked if they had marked the books on
14   what -- how they could sell those assets on that
15   day in the market; is that different than what
16   you're describing as fair market value?
17     A.   No financial institution marks its
18   books at the close of the evening, mutual funds,
19   to where they can liquidate that entire
20   portfolio that evening.
21     Q.   Is that what you're describing as fair
22   market value, is the amount to liquidate those
23   assets that evening?
24     A.   No, our transaction reflected the
25   ability to eliminate all of the assets over the

Page 254

1    HIGHLY CONFIDENTIAL - B. McDADE
2    course of this transaction.
3    Q.  Looking in particular at the assets
4    listed on Exhibit 19, did the assets listed
5    there -- first of all, do you believe they all
6    went down in value from Friday, September 12th,
7    until the APA was signed on the 16th?
8    A.  There was -- there was a lot of
9    correlation in terms of the asset prices
10   changing and all heading down. Do I believe
11   they all went down? I would not make that
12   statement.
13   Q.  Do you know if the top one, which I
14   think is government and agencies, had gone down
15   in value?
16   A.  It definitely went down in value.
17   Q.  Do you have any idea of the amount of
18   the $5 billion difference that was attributable
19   to the change in value to the government and
20   agencies?
21   A.  I don't have the specific balance
22   sheet details in front of me. From my
23   recollection, these were not T bills and
24   two-year notes in terms of governments and
25   agencies that's the bulk of the 40 billion

Page 255

1    HIGHLY CONFIDENTIAL - B. McDADE
2    that's described here. So there was a lot of
3    agency securities as a percentage of the total
4    which were definitely being affected by the
5    goings on with Fannie and Freddie all over the
6    market.
7    So I don't have the specifics to be
8    able to answer your question, but I think it's
9    fair to say that the majority of the portfolio
10   was being negatively affected, but not -- I
11   would not answer all.
12   Q.  Do you know how that $5 billion
13   difference was attributed among these different
14   asset classes?
15   A.  Specifically, no. It was -- the
16   process, yes. Specifically, I do not know the
17   answer.
18   Q.  I asked you if Barclays wanted to mark
19   these down even lower. Let me ask the other
20   side. Did Lehman say that these assets should
21   be marked even higher?
22   A.  I'm not sure what you mean by
23   "marked." As it pertains to the deal?
24   Q.  As it pertains to the deal, did Lehman
25   believe that the value attributed to these

Page 256

1    HIGHLY CONFIDENTIAL - B. McDADE
2    assets should be higher than is reflected on
3    Exhibit 19?
4    A.  Clearly we continued to push for what
5    we thought was appropriate valuation for all
6    these assets.
7    Q.  And what were the reasons that you
8    were conveying to Barclays that the asset values
9    reflected on Exhibit 19 were too low?
10   A.  I can only give you the general
11   answer, which is, in most cases, their deal team
12   would have had a small amount of time. We might
13   have had more transparency and more -- we would
14   have had more transparency and more information
15   with respect to details. Many of these
16   securities were illiquid and pretty specific in
17   terms of the characteristics of the securities.
18   So I think it would have been the knowledge of
19   the assets would have been part of what
20   obviously we would have been making arguments
21   about.
22   We would also have argued that in many
23   cases we had significant transparency in terms
24   of transacting of because we had been in the
25   business of selling assets over the course of

Page 257

1    HIGHLY CONFIDENTIAL - B. McDADE
2    2008. In some cases these assets were very
3    familiar to Barclays and their businesses. In
4    some cases, some of these assets were businesses
5    that they were less-market-share significant in,
6    which is one of the reasons why they wanted to
7    buy the U.S. businesses.
8    Q.  Well, of the $5 billion difference
9    that you have described, how much was Lehman
10   saying was the appropriate difference for these
11   assets that are reflected on Exhibit 19?
12   A.  We went through a process, a
13   collective process, you know, between the two
14   organizations and between all the risk
15   operators. So we obviously came to a conclusion
16   at the end of that process in terms of what we
17   viewed to be fair in terms of transacting.
18   I don't have the context. I wasn't
19   sitting in the room for any of the beginning of
20   the dialogue to be able to give you any
21   specifics, where it started, where it ended,
22   none of that, unfortunately, I can't give you.
23   Q.  Well, did you ever discuss with anyone
24   at Lehman that the assets should be valued at
25   the last time they had been marked by Lehman?

Page 258

HIGHLY CONFIDENTIAL - B. McDADE
1
2    A.    I would never make that statement
3  because the markets had dramatically moved from
4  Friday until when we were doing the transaction.
5    Q.    So is it your testimony that nobody at
6  Lehman said that the value attributed to the
7  assets that would be part of the APA should be
8  valued at the amounts that they appeared on
9  Lehman's books?
10    A.    All of the operators involved in the
11  transaction were working on -- we hadn't marked
12  since Friday.  We weren't focused on the mark
13  process.  We were focused on the transacting
14  process and the valuation process and an
15  education process to the buyer to make sure we
16  could effect the best possible sale.  The --
17    Q.    I just want to -- sorry.
18    A.    The individual risk operators were not
19  focused on the Friday mark because the Friday
20  mark didn't reflect any relevance to what had
21  happened in the market or to an actual
22  transaction.
23    Q.    Let me just make sure the record is
24  clear.  You don't have any memory of anyone at
25  Lehman taking the position during negotiations

Page 259

HIGHLY CONFIDENTIAL - B. McDADE
1
2  that the asset value should be, that when we're
3  coming up with a transaction that's in the APA,
4  should be the way they were valued on Lehman's
5  books?
6    A.    No, I -- we take very seriously the
7  marking responsibility as -- we took very
8  seriously as an organization all the way down to
9  the individual operators.  So clearly there was
10  an understanding somewhere within finance and
11  intuitively at the trader level, but not
12  specifically in aggregate, because these were
13  individual traders and senior traders working
14  this process up.
15        So certainly, to answer your question,
16  there would have been responsible understanding
17  of where we were marked to where this
18  transaction was, but all relative to what had
19  happened vis-a-vis the markets between Friday
20  night and Tuesday.
21    Q.    Okay.  Let me switch topics for a
22  minute.  How much did you receive from Barclays
23  total in the entire time that you worked at
24  Barclays?
25    A.    Sorry, how much?

Page 260

HIGHLY CONFIDENTIAL - B. McDADE
1
2    Q.    How much money did you receive?
3    A.    Compensation?
4    Q.    Yes.
5    A.    I assumed a ▓▓▓▓▓ salary rate and I
6  believe I worked from September 24th until
7  December 31st, but I can't tell you what that
8  exact number is.  Whatever those number of weeks
9  pro rated over that ▓▓▓▓▓ salary.
10    Q.    Did you receive any bonus?
11    A.    No, I did not.
12    Q.    Did you receive any other
13  compensation?
14    A.    No, I did not.
15    Q.    Of the people who negotiated this deal
16  was there anyone who did not spend any time in
17  the employment of Barclays?
18    A.    I don't have a specific list of who
19  all was involved with us over the course of the
20  week or who ultimately has gone to Barclays, so
21  I can't answer the specific question.
22    Q.    Sitting here today, do you -- can you
23  remember anyone who was part of what you
24  consider the negotiating deal team who never
25  spent any time at Barclays?

Page 261

HIGHLY CONFIDENTIAL - B. McDADE
1
2    A.    No.
3    Q.    You mentioned earlier today that you
4  had a conversation with Bob Diamond on the
5  morning of the 16th where you talked about
6  employment and you said that you stopped him and
7  you left that meeting and you went to talk to
8  your lawyer.
9        What exactly did Bob Diamond say
10  before you stopped him?
11    A.    He started a process of asking if I
12  would -- if I wanted to be part of Barclays, and
13  I stopped him.
14    Q.    Anything else?
15    A.    No.
16    Q.    Who did make the presentation to the
17  board about this transaction?
18    A.    I don't know.
19    Q.    Does the board involve anyone who was
20  also involved in the negotiations?
21    A.    I don't know the process that went at
22  the board.  Do you mean the constituent of who
23  the board is?
24    Q.    Yes, is there any overlap between the
25  constituents of who the board is and any

Page 262

HIGHLY CONFIDENTIAL - B. McDADE

1      HIGHLY CONFIDENTIAL - B. McDADE
2   negotiators that were part of the deal?
3       A.   An informed person in the process was
4   Dick Fuld, but he was not a negotiator sitting
5   on the 32nd floor in the deal room.
6       Q.   Anybody else?
7       A.   No one else.  He was the only employee
8   of Lehman on the board.
9       Q.   After LBHI declared bankruptcies, so
10  from September 15 on, was this deal shopped to
11  anybody other than Barclays?
12       MR. BUCKLEY:  Objection to the form of
13   the question.
14       A.   The Lehman Brothers platform had been
15   aggressively shopped from the moment I became
16   president in early June up unto this
17   transaction.  So the week of, to answer
18   specifically your question, the week of 15th
19   through 19th, everyone knew the opportunity.  No
20   one came forward.
21       Q.   Do you know of any specific efforts
22   following the morning of September 15 to shop or
23   advertise any sale of any part of Lehman to
24   anyone other than Barclays?
25       A.   I do not.

Page 263

HIGHLY CONFIDENTIAL - B. McDADE

1      HIGHLY CONFIDENTIAL - B. McDADE
2       Q.   Did you ever meet with anyone from the
3   Creditors Committee to discuss this deal?
4       A.   I never met with the Creditors
5   Committee.  Representatives of Lehman, including
6   Jim Seery -- I know for a fact Jim Seery did,
7   but I did not.
8       Q.   Do you know anything about what was
9   communicated to the Creditors Committee about
10   this transaction?
11       A.   No, I'm sorry, I do not.
12       Q.   You also testified earlier today about
13   how JPMorgan had custody of assets that it did
14   not provide and it did not transfer all of the
15   assets that were under the Fed repo.
16           What do you know about why they didn't
17   do that?
18       A.   The commercial dispute was between
19   Barclays and JPMorgan.  I know nothing other
20   than it became a dispute which caused more
21   issues in terms of DTC, et cetera.
22       Q.   Did you ever speak to anyone at
23   JPMorgan about it?
24       A.   I was involved on Sunday at the
25   offices of Weil, in extremely large, dozens and

Page 264

HIGHLY CONFIDENTIAL - B. McDADE

1      HIGHLY CONFIDENTIAL - B. McDADE
2   dozens of folks, of which JPMorgan
3   representatives were there and I was there, to
4   try to begin -- and regulators, Fed, S.E.C.,
5   SIPC, et cetera, et cetera -- to begin the
6   process of trying to create a solution.  But did
7   I speak individually?  No.
8       Q.   At that time, what did JPMorgan say
9   about their position on whether they should be
10   transferring additional assets to Barclays?
11       A.   In the public setting, if you will,
12   where we or I was exposed to, they just had a
13   simple party line that they viewed they had the
14   right to collateral given their collective set
15   of exposures to Lehman as the clearing bank, in
16   particular.
17       Q.   Did you have a position whether
18   that -- whether JPMC had the right to the
19   collateral or not?
20       A.   Lehman had been struggling with JPM
21   over a period of weeks prior to, you know,
22   this -- the bankruptcy and this particular
23   transaction.  So I have seen some of what
24   JPMorgan had been doing specifically to Lehman
25   in terms of trying to secure, you know, its

Page 265

HIGHLY CONFIDENTIAL - B. McDADE

1      HIGHLY CONFIDENTIAL - B. McDADE
2   credit position.
3       Q.   Did you have an opinion about whether
4   JPMC was justified in its actions?
5       A.   That would be a question most
6   specifically better asked to the financing
7   individuals, but the extreme process by which
8   they were claiming and gathering our collateral
9   is I think at this point reasonably
10   well-documented.  It was aggressive would be my
11   opinion.
12       Q.   Do you know anything about assets that
13   are referred to as racers, R-A-C-E-R-S?
14       A.   The trust certificate, yes.
15       Q.   Do you know if any of the racers
16   assets were transferred to Barclays?
17       A.   I don't know specifically, but I
18   believe the answer is yes.
19       Q.   Who did you discuss the issue of the
20   racers in context of this transaction with?
21       A.   I didn't discuss racers with any
22   individual.  I know that racers is a common
23   financing trust vehicle that we had used over a
24   period of time for certain of our asset classes
25   to use to gain much more efficiency in terms of

Page 266

1          HIGHLY CONFIDENTIAL - B. McDADE
2    the repo market.
3        Q.   I'd like to turn your attention to
4    that handwritten page that we talked about right
5    before the break that was some notations about
6    the parts of the deal that you recall, and I
7    think you told Mr. Gaffey that what you thought
8    that Barclays received as part of the repo you
9    attributed to 45, and then you also said that
10   the cash given related to the repo was also 45
11   billion.
12       First of all, did I understand that
13   testimony right?
14       A.   Uh-huh.
15       Q.   So is it your understanding that
16   Barclays received exactly the amount of
17   collateral that it gave in cash, those were
18   exactly equal?
19       A.   What I would describe is if Barclays
20   had unwound the repo with Lehman, so there was
21   actually no repo transaction, the transaction
22   that ultimately happened would have been the
23   same transaction. So we would have received
24   back the haircut, we would have gone through a
25   process of valuing the assets, and those -- that

Page 267

1          HIGHLY CONFIDENTIAL - B. McDADE
2    process would have come with the same outcome in
3    terms of the price.
4        So, to me, the repo is actually
5    secondary to actually what transpired because
6    ultimately we just kept valuing the assets,
7    whether it was the haircut in the original
8    construct, there was no additional haircut taken
9    in terms of the process, and the haircut,
10   whether it was Lehman and Lehman's cash back,
11   would have been valued at par. It was
12   ultimately a process around the assets
13   themselves in terms of how we valued them.
14       Q.   I guess you said normally you would --
15   it was your understanding that Lehman would have
16   received back a haircut.
17       Did Lehman receive back the haircut in
18   collateral?
19       A.   No, we did not receive back a haircut
20   in collateral.
21       Q.   Barclays took the entire amount of or
22   value of collateral that had been pledged to the
23   Fed, right?
24       A.   Because the ultimate package of cash a
25   hundred cents on the dollar, whatever that

Page 268

1          HIGHLY CONFIDENTIAL - B. McDADE
2    haircut was, and I've testified I don't know the
3    specific number, but whatever that haircut was
4    and then the value of the assets is the same
5    number.
6        Q.   I'm sorry, tell me what the two
7    numbers are that you think are the same number.
8        A.   If Lehman had taken back the repo
9    transaction. So we had our securities and we
10   had our cash and Barclays had effected the same
11   transaction with us, they would have valued our
12   cash at par, presumably, and they would have
13   valued the securities the same -- the total of
14   the two would have added up to the same price.
15       So to me it's moot what the haircut
16   was. We would have added back in terms of the
17   total value proposition.
18       Q.   In terms of what actually happened, do
19   you know what the value was of the securities
20   that were transferred as part of the repo?
21       A.   The deal team went through that
22   process. I was not part of that specifically.
23       Q.   Do you know whether the amount of
24   assets and collateral that Barclays received as
25   part of the repo was more or less than $45

Page 269

1          HIGHLY CONFIDENTIAL - B. McDADE
2    billion?
3        A.   I never saw the specific document in
4    terms of the final process, but I am confident
5    that our team went through a process, both the
6    risk and the components of the operational
7    aspect of the repo, I'm confident that that was
8    the outcome.
9        Q.   Do you know -- I guess I have to ask
10   it again. I'm sorry if I misunderstood. Do you
11   know one way or another whether the assets, the
12   value of the assets that Barclays received when
13   they took over the repo was more or less than
14   $45 billion?
15       A.   The value of the assets was the value
16   of the assets that we had determined together in
17   terms of the process. It would not have been
18   more than 45 billion.
19       Q.   Why do you say it would not have been
20   more than 45 billion?
21       A.   Barclays had a different view of the
22   value of the assets.
23       Q.   Do you know whether Lehman had a view
24   that the value of the assets that were given to
25   Barclays was more --

Page 270

HIGHLY CONFIDENTIAL - B. McDADE

1        A.    The ultimate conclusion was the
2   collection of the two views.
3        Q.    What was Lehman's view of the value of
4   the assets that were transferred to Barclays as
5   part of the Barclays taking over the Fed repo?
6        A.    I wasn't part of the specific process
7   in terms of that valuation, so I can't give you
8   that answer.
9        Q.    So you don't know whether Lehman
10  believed that the value of the assets that went
11  to Barclays as part of the Fed repo was more
12  than $45 billion?
13       A.    No, I believe that the deal teams went
14  through the process and concluded that it was
15  $45 billion.
16       Q.    But I thought that process was
17  because Lehman had a view and Barclays had a
18  view and it's your understanding that the view
19  together would have been $45 billion, right?
20       A.    Right.
21       Q.    I want to know if you know what
22  Lehman's view of what the asset value was.
23       A.    I do not know.
24            MS. TAGGART:  That's all my questions.

Page 271

HIGHLY CONFIDENTIAL - B. McDADE

1        Thank you.
2   EXAMINATION BY
3   MR. MAGUIRE:
4        Q.    Sir, my name is Bill Maguire from
5   Hughes, Hubbard & Reed.  Sir, Hughes Hubbard is
6   counsel to the trustee for the Estate of Lehman
7   Brothers, Inc.
8            I'll start by showing you a document
9   that's previously been marked as Exhibit 219.
10           Do you recognize the e-mail, sir?
11       A.    Yes, I do.
12       Q.    You'll see in this e-mail Mr. Lowitt
13  indicates that -- he refers to the 15c3 lockup
14  as 1.3 billion.  You see that?
15       A.    Yes.
16       Q.    And he goes on to say, "So we are
17  short 1.7 billion."  And taking those two
18  numbers, it sounds as though the 15c3 seems to
19  leave him short, or he seems to be suggesting to
20  you that that leaves you short by 1.7 billion,
21  which seems to suggest that he's shooting for an
22  overall target of around 3 billion.
23           Do you understand how Mr. Lowitt got
24  that understanding?

Page 272

HIGHLY CONFIDENTIAL - B. McDADE

1        A.    Again, I have attempted to answer that
2   question.  I don't remember a specific target.
3   Mr. Lowitt would have been with Mr. Kirk at that
4   time.  I believe the time of this would have
5   been when I was in the courtroom.
6            So, specifically, they're work with
7   the live data in terms of the full valuation
8   process, which is how we probably got to that
9   figure.
10       Q.    Do you recall hearing from Barclays
11  any specific number or target that they wanted?
12       A.    A number or target?
13       Q.    Yes.
14       A.    Specifically me, no.
15       Q.    At the time of this, you had gone to
16  court?  You were actually in the hearing?
17       A.    I'm not good on GMT time.  Is this
18  2:30 in the afternoon?
19       Q.    Let me leave the exhibit aside.  I
20  just wanted to really direct your attention to
21  the hearing.
22       A.    Yes.
23       Q.    You mentioned there's a session at the
24  court, there's a period where the masses are

Page 273

HIGHLY CONFIDENTIAL - B. McDADE

1   told about changes to the deal?
2        A.    Uh-huh.
3        Q.    In the course of that discussion, do
4   you recall anything that was told to the masses
5   about the 15c3 assets?
6        A.    No, I was -- it was a large gathering
7   around Mr. Miller in a live setting without
8   microphones, so I wasn't part of the actual
9   conversation.  So the senior lawyers were
10  gathered in the middle of the courtroom.
11       Q.    And when you say you weren't part of
12  the conversation, were you able to hear the
13  conversation?
14       A.    No, that's what I mean.  I was not
15  able to hear the conversation.  There was no
16  microphone.  He was not in a position with a
17  microphone in any public setting.  It was a
18  public setting where, unless you were crowded
19  around the ring, you couldn't hear.
20       Q.    I see.  So there was a meeting where
21  information was given to the masses, but you
22  needed to be specifically within the tight
23  immediate ring in order to actually hear what
24  was being said?

Page 274

HIGHLY CONFIDENTIAL - B. McDADE
2    A.    Correct.
3    Q.    And you did not hear what was said?
4    A.    Yes, sir.
5    Q.    When you say "yes, sir"?
6    A.    Yes, sir, I did not hear.
7    Q.    You had looked a number of times today
8    at the September 16 balance sheet, Exhibit 19,
9    and that includes on each side, the assets and
10    the liabilities, a reference to derivatives.
11    See that, 4 and a half billion on the asset side
12    and 4 and a half billion on the liability side?
13    A.    Uh-huh.
14    Q.    Am I correct that on the asset side
15    that represents long positions?
16    A.    Yes.
17    Q.    And on the liability side that
18    represents short positions?
19    A.    Yes.
20    Q.    And those are positions in derivatives
21    that are -- that LBI had?
22    A.    Yes, exchange-traded.
23    Q.    The exchange-traded, do those include
24    derivatives that were traded on the Options
25    Clearing Corporation, or OCC?

Page 275

HIGHLY CONFIDENTIAL - B. McDADE
2    A.    Yes.
3    Q.    Did you understand that, in addition
4    to the long positions and the short positions
5    that Lehman had at OCC, it also had additional
6    cash and assets that were deposited as margin
7    and also clearing funds deposited at the OCC?
8    A.    Yes, I did, but keep in mind the
9    context that we had had assets like that, for
10    example, at the CME, and they lost those assets
11    over the course of the week.  So we had no
12    confidence that those were potentially our
13    assets given what had been transpiring.
14    Q.    Did anyone tell you that you -- that
15    Lehman had an excess of those assets at OCC?
16    A.    Not specifically, no.
17    Q.    Do you recall whether at any time
18    anyone told you that Lehman had an excess of
19    $1.3 billion of cash deposited at the OCC?
20    A.    No one told me that specifically, no.
21    Q.    Did anyone tell you that Lehman had an
22    excess of $900 million in additional assets
23    beyond the cash deposited at the OCC?
24    A.    No one told me that.
25    Q.    Did you ever have any discussion with

Page 276

HIGHLY CONFIDENTIAL - B. McDADE
2    Barclays about Barclays acquiring the $2.2
3    billion of excess cash and assets margin at OCC?
4        MR. HUME: Objection. Lacks
5        foundation.
6    A.    I specifically did not.
7    Q.    Are you aware whether Barclays ever
8    asked anyone at Lehman to include any of those
9    assets in the sale?
10    A.    I'm not specifically aware of any
11    specific dialogue with respect to those options,
12    the collateral, BarCap and Lehman.
13    Q.    And to your knowledge, was there ever
14    any intent on the part of Lehman to transfer any
15    of those excess cash, that 1.3 billion or any
16    additional assets, that was clearing in margin
17    at OCC to Barclays as part of the sale?
18    A.    My recollection is the original
19    contemplation of those positions would have
20    been, to your point, the actual positions
21    themselves. Collateral would have been a
22    secondary consideration. We were concerned
23    about our collateral positions.
24        However, I think over the course of
25    the week, that became -- that became, to my

Page 277

HIGHLY CONFIDENTIAL - B. McDADE
2    recollection, over the course of time, that
3    became something that ended up, I believe, in
4    the clarifying document.
5    Q.    Did anyone tell you that the, under
6    the clarifying document, there had been some
7    agreement where Barclays to transfer to Barclays
8    an additional $2.2 billion of cash and
9    securities representing margin, excess margin
10    and other assets at OCC?
11    A.    No.
12        MR. HUME: Objection. Vague and
13        ambiguous. Lacks foundation.
14    Q.    To your knowledge, was there ever any
15    intent on the part of Lehman that the clarifying
16    letter would provide Barclays an additional $2.2
17    billion in margin at OCC?
18    A.    No.
19    Q.    What about margin, additional margin
20    that Lehman had at any other clearing
21    corporations, and I want to specifically include
22    any foreign clearing corporations, counterparts
23    to the OCC, were you aware, was there ever any
24    negotiations or intent on the part of Lehman to
25    transfer any such margin, cash or additional

Page 278

HIGHLY CONFIDENTIAL - B. McDADE
1
2  assets, at foreign clearing corporations to
3  Barclays?
4      A.  I'm not aware of those.
5      Q.  Were you involved, sir, with any
6  discussions with the Depository Trust
7  Corporation, DTC?
8      A.  Specifically, no.
9      Q.  Were you aware of any concerns at DTC
10 concerning Lehman's business?
11     A.  Yes, absolutely.
12     Q.  What were the nature of the concerns
13 that you heard about that were experienced by
14 DTC?
15     A.  We obviously had a number of
16 settlements normal course of business, and DTC
17 had become concerned because JPMorgan apparently
18 was backing -- was backing away in terms of its
19 role with us, and DTC essentially told us they
20 were going to shut down our ability to not only
21 transact going forward, but to shut down
22 hundreds of thousands of settlements that were
23 in process.
24     Q.  And how did that threaten the deal
25 with Barclays?

Page 279

HIGHLY CONFIDENTIAL - B. McDADE
1
2      A.  Well, it was the position of -- it was
3  the position of Barclays that they didn't want
4  to assume all of those liabilities, and it was
5  the position of the other protagonists,
6  regulators and others -- again, this is my
7  opinion -- that Barclays should be more
8  forthcoming in terms of assuming some of those
9  responsibilities.  And it was also -- there was
10 also the confusion of the dispute between
11 JPMorgan and Barclays that clearly created --
12 created headache.
13     So how it was going to stop the deal,
14 it would have become an enormous challenge for
15 Barclays to buy a set of businesses where all of
16 the normal course transacting over the course of
17 the last couple weeks of the core constituent
18 clients, it would have been a massive brand and
19 reputational challenge, I believe, for a new
20 buyer, practically speaking, I think.
21     Q.  The uncleared trades were in the many
22 billions of dollars; is that correct?
23     A.  I don't have the exact figure, but I
24 know they were in the hundreds of thousands of
25 individual transactions.

Page 280

HIGHLY CONFIDENTIAL - B. McDADE
1
2      Q.  And DTC's concern was as to its
3  exposure --
4      A.  Exactly.
5      Q.  -- in clearing those trades?
6      A.  Exactly.
7      Q.  And it wanted Barclays to assume
8  responsibility for that exposure?
9      A.  Exactly.  It wanted a letter of credit
10 and it wanted posted collateral, et cetera.
11     Q.  And Barclays did offer some limited
12 guarantee?
13     A.  My understanding is Barclays offered
14 250 million.
15     Q.  And DTC wanted an unlimited guarantee?
16     A.  That's correct.
17     Q.  Were you involved in any discussions
18 concerning the pledging of certain residential
19 mortgage assets to DTC in connection with its
20 concerns?
21     A.  Only at a very -- I have vague
22 recollection of the process, but I was not
23 involved specifically, no.
24     Q.  What do you recall about it?
25     A.  We were trying to find at that point

Page 281

HIGHLY CONFIDENTIAL - B. McDADE
1
2  in time an ability for Lehman to solve some of
3  these issues back to the -- at some point during
4  the week we had an understanding we still might
5  have some -- any asset that we had we were using
6  to try to figure out how to solve individual
7  problems, that being one of them.  That's the
8  extent of my recollection.
9      Q.  Did you learn that DTC had specific
10 concerns about Lehman transferring assets,
11 unencumbered assets at DTC to Barclays as part
12 of the sale, and specifically the concern that
13 that would deprive DTC of collateral that it was
14 looking to as a line of defense against its
15 exposure to Lehman?
16     A.  I was not part of those discussions.
17 I did not learn that, no.
18     Q.  Did you learn that there was an
19 agreement including not only Lehman, but also
20 DTC and Barclays that was worked out over the
21 weekend?
22     A.  It's in the -- I believe it's in the
23 clarifying letter.  In terms of the posting of
24 250 million of posted collateral?
25     Q.  Yes.  Did you understand there was a

71

Page 282

HIGHLY CONFIDENTIAL - B. McDADE

1  separate agreement with DTC?
2      A.    Again, we were -- we -- only after the
3  fact because we were not allowed in the room in
4  terms of the process.
5      Q.    So you did not have an understanding
6  of what the terms of that were, other than
7  obviously there was a $250 million guarantee?
8      A.    Right.  Correct.
9      Q.    We have the clarifying letter marked
10  as an exhibit.  I believe it's Exhibit 25.  If
11  you turn, sir, to page 4, there's a paragraph 8
12  there which concerns transfer of customer
13  accounts.  If you take a moment to look at that.
14  I'm going to ask you about the part that begins
15  little "ii".
16      A.    Uh-huh.
17      Q.    This refers to the 15c3 assets, and
18  you understand the 15c3 was a lockup or
19  protective customer account?
20      A.    Uh-huh.
21      Q.    Did you understand that there were
22  regulatory issues about whether assets could be
23  removed from that account?
24      A.    Most definitely.

Page 283

HIGHLY CONFIDENTIAL - B. McDADE

1      Q.    Did you understand that the promise by
2  Lehman to pay assets, 15c3 assets, required
3  regulatory approval?
4      A.    Yes.
5      Q.    And did Barclays understand that the
6  transfer was conditioned on obtaining that
7  regulatory approval?
8          MR. HUME:  Objection.  Lacks
9  foundation.
10      A.    I was not part of the individual
11  discussions with the regulator, the BarCap and
12  Lehman team together, but I do know that BarCap
13  was very interested in learning whether this
14  could be an asset that could be part of the
15  transaction in order to facilitate a deal being
16  done, and I do know that they spent a lot of
17  time -- their experts spent a lot of time with
18  the team from Lehman and the team from the
19  S.E.C. and I assume other regulators working
20  through the process.
21          I don't know the conclusion in terms
22  of their comfort level with that or the --
23  presumably they got some sense of comfort taking
24  it on as an asset in the transaction, but that's

Page 284

HIGHLY CONFIDENTIAL - B. McDADE

1  all I know.
2      Q.    And your understanding is that Lehman
3  was open and transparent with Barclays in giving
4  them whatever information was available so they
5  could assess, I guess, whatever level of comfort
6  they could as to what the excess in the account
7  was?
8          MR. HUME:  Objection.  Lacks
9  foundation.
10      A.    Yes, Lehman -- this was a brand-new
11  concept for all of us in terms of the notion.  I
12  didn't know what 15c3 was, you know, walking
13  into the week of September 15th, as did -- as
14  probably did some of our other front-end risk
15  operators, but clearly our financing and
16  regulatory folks did.
17          It's my understanding that our
18  communication with Barclays over the course of
19  the week would have led Barclays to a level of
20  uncertainty in whether or not -- how much and
21  whether or not this could be doable, yes,
22  because there were lots of -- there was a lot of
23  dynamics in terms of the fact that Lehman was
24  providing to Barclays because of the unchartered

Page 285

HIGHLY CONFIDENTIAL - B. McDADE

1  nature of what we were contemplating.
2      Q.    Was there ever any discussion between
3  Lehman and Barclays in which Lehman undertook to
4  provide the 700 plus million dollars to Barclays
5  unconditionally, regardless of whether there was
6  regulatory approval or regardless of the extent
7  to which it was permitted by law to remove 760
8  million or anything from a lockup account?
9      A.    No, not to my recollection.
10      Q.    That term never became unconditional
11  as far as you're aware?
12      A.    As far as I'm aware, no.
13          MR. MAGUIRE:  Thank you, sir.  That's
14  all I have.
15          THE WITNESS:  Thank you very much.
16          MR. HUME:  I may have a few questions.
17  I would like a short break to review my
18  notes.
19          (Recess; Time Noted:  4:17 P.M.)
20          (Time Noted:  4:29 P.M.)
21  EXAMINATION BY
22  MR. HUME:
23      Q.    Mr. McDade, thanks.  I'm Hamish Hume.
24  We met earlier today.  I represent Barclays

Page 286

1      HIGHLY CONFIDENTIAL - B. McDADE
2   from Boies, Schiller & Flexner.
3        Just a couple of questions. Earlier
4   in the day you were asked about the estimated
5   liability of $2 billion for compensation, do you
6   remember that?
7      A.  Yes, I do.
8      Q.  And you were asked about its
9   relationship to the Lehman accrual, do you
10  remember that?
11     A.  Yes, I do.
12     Q.  Am I correct that Lehman would
13  accrue -- let me withdraw that. Am I correct
14  that Lehman would pay bonuses to its employees
15  through a mix of cash and equity?
16     A.  Yes, you're correct.
17     Q.  Am I correct that Lehman paid a
18  significant portion of its bonuses in equity?
19     A.  Yes, a very significant proportion.
20     Q.  Above average for Wall Street?
21     A.  Above average for Wall Street, and it
22  had changed in 2007 to a higher percentage of
23  equity.
24     Q.  Am I correct that the accrual on
25  Lehman's books for bonuses reflected only the

Page 287

1      HIGHLY CONFIDENTIAL - B. McDADE
2   cash component of the bonus?
3        MS. TAGGART:  Objection to form.
4        MR. GAFFEY:  Join.
5      A.  That's correct.
6      Q.  And so the accrual at Lehman was a
7   cash accrual -- was for the cash portion of the
8   bonus?
9        MS. TAGGART:  Objection to form.
10       Foundation.
11     A.  The 2008 accrual was the -- for
12  employees pay in 2008 was a cash accrual, and
13  then there was accrual for anything that might
14  have vested for previous awards over a period of
15  time.
16     Q.  If you wanted to compensate -- if
17  Barclays wanted to compensate all of the
18  transferred employees in a manner commensurate
19  with what their 2008 compensation would
20  otherwise have been, would it be appropriate for
21  them to increase, to add some portion to the
22  cash accrual to reflect the equity that they
23  would have received?
24       MR. GAFFEY:  Objection.
25     A.  Yes, it would.

Page 288

1      HIGHLY CONFIDENTIAL - B. McDADE
2      Q.  You were also asked questions about
3   the cure estimate. Do you remember that?
4      A.  Yes, I do.
5      Q.  You referenced, I think, in your
6   testimony an understanding that Barclays had 60
7   days under the agreement to determine which
8   contracts to assume or not?
9      A.  Yes.
10     Q.  Do you recall that?
11     A.  Yes, I do.
12     Q.  And we can look at the provision, but
13  it sounded like you remembered it. Was it clear
14  in your head, in your understanding that it was
15  Barclays' decision, in its sole discretion, as
16  to which contracts to assume and which not to
17  assume?
18     A.  It's intuitive and it was very clear
19  from the outset, yes.
20     Q.  And that process would happen only
21  after the closing, correct?
22     A.  It couldn't happen before the closing,
23  right.
24     Q.  And therefore, it was not possible
25  before the closing to have a definitive number

Page 289

1      HIGHLY CONFIDENTIAL - B. McDADE
2   for the cure payments Barclays would have to
3   pay?
4        MR. GAFFEY:  Objection to form.
5        MS. TAGGART:  Objection.
6      Q.  Is that correct?
7      A.  That is correct.
8      Q.  Was it, therefore, in your mind always
9   just an estimate of what the cure payments might
10  be?
11     A.  From my seat, I could not make a
12  determination what Barclays' management would do
13  with the contracts. The only determination I
14  could make was a list of the obligations that
15  were there. Barclays' management team would
16  make those decisions.
17     Q.  You gave testimony earlier I think
18  during Ms. Taggart's questioning about how no
19  financial institution would mark to market the
20  assets on its books securities at the price at
21  which it could liquidate the entire portfolio.
22  Do you recall that?
23     A.  Yes.
24     Q.  I think you gave the example of a
25  mutual fund, for example, which marks to market,

Page 290

1      HIGHLY CONFIDENTIAL - B. McDADE
2    would not mark to market at the value that it
3    would sell the entire portfolio at once in a
4    bulk sale?
5       A.   Correct.
6       Q.   Would you elaborate upon what you
7    meant by that?
8       A.   I think it's -- the whole notion of
9    marking assets that need to be marked in a
10   broker-dealer context around the world has been
11   challenged by what's happened in the credit
12   crisis, but it was our responsibility to mark on
13   every given night to the best of our abilities
14   and all the market inputs and all the individual
15   operators' ability to transact a significant
16   amount of those assets, but not in aggregate all
17   of those assets.  None of the individual
18   collective balance sheets with the liquidity
19   characteristics of the market particularly in
20   2008 would allow for transactions of that
21   significant a size.
22      Q.   Let me make sure I understand that.
23   If Lehman Brothers were to look at its books,
24   even assuming that everything had been perfectly
25   marked to market as of a minute before they

Page 291

1      HIGHLY CONFIDENTIAL - B. McDADE
2    looked at the books, and Lehman then had to
3    decide that it was going to sell its entire
4    portfolio or some significant portion of the
5    portfolio, tens of billions of dollars, what
6    would the relationship be in your mind between
7    the price Lehman would be able to get for the
8    sale of the entire portfolio versus those marks?
9       MS. TAGGART:  Objection.
10      A.   Obviously depends on the time of the
11   day, the characteristics of the assets, but it
12   would be lower.
13      I would give an even simpler example.
14   If I tried to transact in IBM stock and I can
15   see on any self-directed ticker that the price
16   is 101 to 101 and one cent, if I tried to
17   transact a hundred shares, I'll get an
18   execution.  If I try to transact 10,000 shares
19   of IBM, I won't get a 101 execution.
20      Q.   You will get a lower execution?
21      A.   I'll get a lower execution.  So even
22   in the, quote, most liquid forms of assets.
23      Sorry.
24      Q.   And is that dynamic you just
25   explained, that relationship in the market value

Page 292

1      HIGHLY CONFIDENTIAL - B. McDADE
2    of a sale of a bulk portfolio and the marks,
3    does that -- is that relevant to understanding
4    the negotiations of the price that were
5    occurring between Lehman and Barclays?
6       A.   I think it's very relevant because
7    Barclays was taking a large amount of risk given
8    the size of the transaction relative to the
9    liquidity characteristics of all of the marks.
10   Barclays could easily have lost a significant
11   amount of money purchasing these assets.
12      Q.   And is that because when you buy the
13   long positions in a volatile market in a large
14   bulk, you can't liquidate them immediately --
15      A.   That's correct.
16      Q.   -- at a set price?  Instead, while you
17   hold them, the price may drop?
18      A.   That's correct.
19      Q.   You testified also that there was an
20   ongoing effort through the week to value the
21   assets, the changing potential list of assets
22   that would be in the deal, correct?
23      A.   Yes, that's correct.
24      Q.   And am I correct that there were --
25   that the process of debating the values of the

Page 293

1      HIGHLY CONFIDENTIAL - B. McDADE
2    bulk value of the assets, as you just described,
3    there was back and forth between Barclays and
4    Lehman?
5       A.   Yes, there was.
6       Q.   And was there room for reasonable
7    disagreement about the value of those assets?
8       A.   I was not in the room, but, yes, it's
9    my understanding, yes.
10      Q.   And is it relevant to that discussion
11   of the value of the assets that it was happening
12   in the context of a very difficult financial
13   market?
14      A.   I think the backdrop of the markets is
15   very relevant.
16      Q.   Do you believe there was some level of
17   uncertainty, therefore, in what the absolute
18   final asset values were, some level of
19   uncertainty?
20      A.   I'm not sure I understand the
21   specifics of your question.
22      Q.   Well, let me just ask it this way.
23   You've testified through the day that there was
24   a concept that the assets and liabilities should
25   roughly balance, correct?

Page 294

HIGHLY CONFIDENTIAL - B. McDADE
1
2    A.   Correct.
3    Q.   But would you also agree that some
4  portions of the liabilities were estimated
5  liabilities, such as cure?
6    A.   That's correct.
7    Q.   And that the asset -- the components
8  of assets that were being transferred changed
9  during the week; is that correct?
10   A.   Yes, they did.
11   Q.   And the valuations of those assets
12 changed during the week; is that correct?
13   A.   Yes, they did.
14   Q.   And there were debates over those
15 valuations, yes?
16   A.   Yes, there was.
17   Q.   And so there was a clear deal over
18 what assets were being transferred, correct?
19   A.   Yes.
20   Q.   And there was a clear effort to value
21 those assets?
22   A.   Yes, there was.
23   Q.   But there was also some uncertainty
24 over precisely what the value of those assets
25 would turn out to be?

Page 295

HIGHLY CONFIDENTIAL - B. McDADE
1
2    A.   Absolutely, yes. I understand, yes.
3    Q.   With respect to the exchanged-traded
4  derivatives, was it your understanding that
5  Barclays was taking over Lehman's settlement
6  obligations with respect to all of the
7  exchange-traded derivatives? Did you understand
8  that?
9    A.   I wasn't involved in the specifics of
10 the actual equity derivative trade, so it would
11 be my understanding that the settlements, option
12 positions and settlements are very important
13 aspects of the risk characteristics. So, yes,
14 the settlements, yes.
15   Q.   Is it your testimony that you don't
16 recall one way or the other the specifics of the
17 deal with respect to the exchange-traded
18 derivatives?
19   A.   That's correct.
20   Q.   So you don't have a specific
21 recollection, as I understand it, with respect
22 to whether the collateral was or was not
23 included?
24   A.   That's correct.
25      MR. HUME:  I don't have any more

Page 296

HIGHLY CONFIDENTIAL - B. McDADE
1
2  questions.
3  EXAMINATION BY
4  MR. GAFFEY:
5    Q.   Just one or two. This concept
6  Mr. Hume has asked you about where accounts are
7  taken of financial institutions not maintaining
8  the book value to contemplate a transaction of
9  this size, is there a difference -- is there,
10 when this extra consideration is brought into
11 play of moving in that bulk, that's not the same
12 thing as book value, right?
13      MR. BUCKLEY:  Objection.
14      MR. HUME:  Objection. Vague and
15 ambiguous.
16   A.   The concept of a broker-dealer is
17 market value every single night. So it's a
18 debate about the market value, the criteria used
19 in that process of creating the valuations for
20 market value, and there's a difference between
21 the price of buying seven, you know, seven loads
22 of oil tankers and one, and same thing in
23 securities.
24   Q.   So when the market value is determined
25 every night, that is a market value determined

Page 297

HIGHLY CONFIDENTIAL - B. McDADE
1
2  by moving smaller blocks of the asset, not the
3  whole thing?
4    A.   That's correct.
5    Q.   So the book value would not reflect
6  that block discount?
7    A.   Book value of any financial
8  institution would not reflect moving the entire
9  book that next morning, that's correct.
10   Q.   So if the assets are described as the
11 book value, that's a different concept than the
12 valuation contemplating of a bulk transfer,
13 correct?
14      MR. HUME:  Objection. Vague and
15 ambiguous.
16   A.   Again, I'm not -- I'm not familiar
17 with the term "book value." We used only
18 "market value" at Lehman.
19   Q.   Well, the Asset Purchase Agreement
20 used the term "book value," right?
21   A.   I remember we used the -- the papering
22 of the transaction used the term "book value."
23 I had not focused on that. I'm not sure who
24 wrote this specifics, so I couldn't comment on
25 the use of the term in that paragraph.

Page 298

HIGHLY CONFIDENTIAL - B. McDADE

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   You could comment on whether it's an
3    accurate description of the assets, though,
4    couldn't you?
5    A.   It's an accurate description of the
6    Friday night -- I have gone through it -- the
7    Friday night, September 12, to the market value
8    process that we went through on September 16.
9    Q.   And whether you're looking at it on
10   the 12th or on whatever day the book value was
11   determined, it does not include this additional
12   haircut for a bulk transfer?
13   A.   For any financial institution, that's
14   correct.
15   Q.   Now, you have spoken a bit today about
16   Barclays purchasing the business, although we've
17   been talking about an asset transfer.  The idea
18   was Barclays would take in the franchise, the
19   people, the inventory, and have a running
20   business; is that right?
21   A.   Absolutely.
22   Q.   Okay.  And so, and in that concept,
23   Barclays would on day one, after the
24   transaction, be as close an approximation as it
25   could be of what Lehman had been in terms of

Page 299

1    HIGHLY CONFIDENTIAL - B. McDADE
2    people and inventory and businesses, correct?
3    A.   Correct.  Even more so with the
4    integration of their -- their infrastructure
5    that they had already built up.
6    Q.   Into the Lehman infrastructure they
7    took in?
8    A.   Yes.
9    Q.   And when those infrastructures were
10   combined and Barclays had now a substantial
11   broker-dealer presence in the United States,
12   that's not a transaction that contemplates
13   moving the bulk of inventory out the next day,
14   is it?  It's a -- that's the inventory for the
15   business to be run?
16   A.   I can't comment about how Barclays,
17   you know, was thinking about or working through
18   the assets.  They were buying the assets as part
19   of the combination to buy the businesses.
20   Q.   Okay.  Well, a lot of attention was
21   spent on the eight critical employees, yes?
22   A.   Absolutely.
23   Q.   And the top 200, yes?
24   A.   Yes.
25   Q.   And a percentage of the rest of the

Page 300

1    HIGHLY CONFIDENTIAL - B. McDADE
2    employee population, yes?
3    A.   Yes.
4    Q.   And taking over the buildings, yes?
5    A.   Yes.
6    Q.   And taking over the systems and the
7    hard assets necessary to run the business, yes?
8    A.   Yes, that's correct.
9    Q.   And the inventory of securities that
10   were necessary to operate the business, yes?
11   A.   No, the point that I was trying to
12   make just a minute ago is the goal of
13   Mr. Diamond and BarCap was to buy the
14   businesses.  They understood the responsibility
15   around the assets.  If they had their druthers,
16   I'm sure they would have not wanted to go
17   through the asset part of the process because
18   buying the business would have been far simpler
19   in terms of process given the market conditions
20   at that moment in time.
21   Q.   So they would have bought the business
22   without any inventory would have been their
23   preference, am I understanding that correctly?
24   A.   If you could buy a world-class client
25   franchise with no risk attached to the

Page 301

1    HIGHLY CONFIDENTIAL - B. McDADE
2    transaction, you would prefer to do that
3    transaction.
4    Q.   Did anything anybody from Barclays
5    said to you at all during the week indicate that
6    it was their intention to take the inventory and
7    move it out in a bulk trade shortly after the
8    transaction closed?
9    A.   I have no information in terms of,
10   during that week or anytime after, in terms of
11   what Barclays' intent was with the assets.
12   Q.   My question is a little broader than
13   that.  Did anything anybody said to you during
14   that week indicate to you that that might have
15   been Barclays plan?
16   (Continued on the next page to include
17   the jurat.)
18
19
20
21
22
23
24
25

## Page 302

HIGHLY CONFIDENTIAL - B. McDADE

1
2    A.   Nobody said to that to me.
3         MR. GAFFEY:  Thanks.  I have nothing
4    further.  Thank you for your time again.
5    THE WITNESS:  Thank you.
6         (Time Noted:  4:45 P.M.)
7              oOo
8
9
10
11
12
13
14
15
16
17
18
         _____
             BART McDADE
19
20   Subscribed and sworn to
     before me this    day
21   of       2009.
22
     _____
23
24
25

## Page 303

HIGHLY CONFIDENTIAL - B. McDADE

1
2              CERTIFICATE
3    STATE OF NEW YORK )
                       : ss
     COUNTY OF NEW YORK)
4
5         I, Kathy S. Klepfer, a Registered
6    Merit Reporter and Notary Public within and
7    for the State of New York, do hereby
8    certify:
9         That BART McDADE, the witness whose
10   deposition is herein before set forth, was
11   duly sworn by me and that such deposition is
12   a true record of the testimony given by such
13   witness.
14        I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage and that I am in no way
17   interested in the outcome of this matter.
18        I further certify that neither the
19   deponent nor a party requested a review of
20   the transcript pursuant to Federal Rule of
21   Civil Procedure 30(e) before the deposition
22   was completed.
23        In witness whereof, I have hereunto
24   set my hand this 2nd day of September, 2009.
25   ------------------------------------

## Page 304

HIGHLY CONFIDENTIAL - B. McDADE

1
2              INDEX
3    WITNESS:        EXAMINATION BY        PAGE
4    B. McDADE      Mr. Gaffey        5, 296
5         Ms. Taggart       232
6         Mr. Maguire       271
7         Mr. Hume          285
8
9    EXHIBITS:                    PAGE
10   Exhibit 335, a document bearing Bates    196
11   Nos. BCI-EX-(S)-5026I
12   Exhibit 336, handwritten calculation    205
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 305

HIGHLY CONFIDENTIAL - B. McDADE

1
2    NAME OF CASE: In re Lehman Brothers
3    DATE OF DEPOSITION: September 2, 2009
4    NAME OF WITNESS:  Bart McDade
5    Reason Codes:
6         1. To clarify the record.
          2. To conform to the facts.
7         3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25              BART McDADE

# BCI EXHIBIT

# 86

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     -------------------------------x

      In Re:                    Chapter 11

5     LEHMAN BROTHERS            Case No. 08-13555 (JMP)

      HOLDINGS, INC., et al.,    (Jointly Administered)

6     -------------------------------)

7

8          * * * HIGHLY CONFIDENTIAL * * *

9          DEPOSITION OF HUGH McGEE

10             New York, New York

11          Monday, August 10, 2009

12

13

14

15

16

17

18

19

20    Reported by:

      FRANCIS X. FREDERICK, CSR, RPR, RMR

21    JOB NO. 24038

22

23

24

25

Page 2

```
 1
 2
 3
 4
 5          August 10, 2009
 6          10:00 a.m.
 7
 8
 9          HIGHLY CONFIDENTIAL deposition of
10   HUGH McGEE, held at the offices of Jones
11   Day, 222 East 41st Street, New York, New
12   York, pursuant to Notice, before Francis
13   X. Frederick, a Certified Shorthand
14   Reporter, Registered Merit Reporter and
15   Notary Public of the States of New York
16   and New Jersey.
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide  (877) 702-9580

Page 3

```
 1
 2   A P P E A R A N C E S :
 3
 4   JONES DAY, LLP
 5      Attorneys for Lehman Brothers, Inc.
 6         222 East 41st Street
 7         New York, New York  10017-6702
 8      BY:  ROBERT W. GAFFEY, ESQ.
 9         BRIDGET CRAWFORD, ESQ.
10
11   SIMPSON THACHER & BARTLETT
12      Attorneys for the Witness
13         425 Lexington Avenue
14         New York, New York  10017
15      BY:  MICHAEL CHEPIGA, ESQ.
16         CHRISTOPHER J. LUCHT, ESQ.
17
18   BOISE SCHILLER & FLEXNER, LLP
19      Attorneys for Barclays Capital
20         575 Lexington Avenue - 7th Floor
21         New York, New York  10022
22      BY:  JACK G. STERN, ESQ.
23
24
25
```

TSG Reporting - Worldwide  (877) 702-9580

Page 4

```
 1
 2   A P P E A R A N C E S : (Cont'd.)
 3      QUINN, EMANUEL, URQUHART, OLIVER &
 4   HEDGES, LLP
 5      Attorneys for the Creditors Committee
 6         865 S. Figueroa Street, 10th Floor
 7         Los Angeles, California 90017
 8      BY:  ERICA P. TAGGART, ESQ.
 9
10   HUGHES, HUBBARD & REED, LLP
11      Attorneys for the SIPA Trustee
12         One Battery Park Plaza
13         New York, New York  10004-1482
14      BY:  SETH D. ROTHMAN, ESQ.
15         SAMUEL C. McCOUBREY, ESQ.
16         - and -
17   HUGHES, HUBBARD & REED, LLP
18         1175 I Street, N.W.
19         Washington, D.C. 20006-2401
20      BY:  JOHN F. WOOD, ESQ.
21
22
23
24
25
```

TSG Reporting - Worldwide  (877) 702-9580

Page 5

```
 1
 2   A P P E A R A N C E S : (Cont'd.)
 3      JENNER & BLOCK, LLC
 4      Attorneys for the Examiner
 5         330 N. Wabash Avenue
 6         Chicago, Illinois  60611-7603
 7      BY:  ROBERT L. BYMAN, ESQ.
 8
 9
10   ALSO PRESENT:
11      RAJESH ANKALKOTI, Alvarez & Marsal
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide  (877) 702-9580

**Page 6**

1    PROCEEDINGS - HIGHLY CONFIDENTIAL
2        (Witness sworn.)
3        MR. STERN: I'll just state on the
4    record our standing agreement concerning
5    confidentiality. The transcript will be
6    marked as highly confidential and within
7    a week of receiving the transcript we
8    will make appropriate designations under
9    the confidentiality stipulation.
10        MR. GAFFEY: And that's agreed.
11            * * *
12  H U G H   M c G E E,   called as a witness,
13        having been duly sworn by a Notary
14        Public, was examined and testified as
15        follows:
16  EXAMINATION BY
17  MR. GAFFEY:
18        Q.    Good morning, Mr. McGee. My name
19  is Bob Gaffey. I'm with Jones Day. And we're
20  special counsel to the estate of Lehman
21  Brothers Holdings, Inc. We met briefly before
22  the deposition.
23        Can you give me an idea, Mr.
24  McGee, of your background at -- well, first
25  let me cover your educational background.

TSG Reporting - Worldwide  (877) 702-9580

**Page 7**

1        H. McGEE - HIGHLY CONFIDENTIAL
2        You're a graduate of Princeton; is
3    that correct?
4        A.    That's correct.
5        Q.    What year did you graduate?
6        A.    1981.
7        Q.    And you also graduated law school
8    from the University of Texas?
9        A.    That's correct.
10        Q.    When did you graduate from there?
11        A.    1984.
12        Q.    And do you keep an active license
13  to practice law in any jurisdiction?
14        A.    No.
15        Q.    Could you give briefly a
16  description of your employment after your
17  graduation from law school.
18        A.    Sure. I went to work in Houston,
19  Texas for the law firm Andrews & Kurth as an
20  associate in the corporate and securities
21  department working primarily on corporate
22  finance transactions, some M&A transactions,
23  with a client base that was largely
24  energy-based. Had exposure to a number of
25  investment banks through the course of that

TSG Reporting - Worldwide  (877) 702-9580

**Page 8**

1        H. McGEE - HIGHLY CONFIDENTIAL
2    activity. Was asked by First Boston to
3    consider a career change. After the second
4    time that they asked, which was due to that
5    they had a young person leave, I moved to New
6    York City in late 1986, kind of beginning of
7    '87, and switched careers and became an
8    investment banker for First Boston in their
9    energy M&A department. Stayed there until
10  June of 1989 at which time I left to join
11  Wasserstein Perella which was a split-off from
12  First Boston. Stayed with Wasserstein Perella
13  through early 1993 when at such time the two
14  named partners of that firm were starting to
15  have some disagreements. And I joined Lehman
16  Brothers at that time as a senior vice
17  president heading up their Houston office
18  focused primarily on energy.
19        Over time built up the Houston
20  office, became a managing director, ran the
21  energy group, ran the energy and power group
22  globally, both of those. Then in December of
23  '02 the then head of investment banking had
24  been promoted up within Lehman Brothers and
25  they asked me to assume the job of global head

TSG Reporting - Worldwide  (877) 702-9580

**Page 9**

1        H. McGEE - HIGHLY CONFIDENTIAL
2    of investment banking which I was in that role
3    through the end of Lehman Brothers.
4        Q.    And who did you replace as head of
5    investment banking?
6        A.    A guy by the name of Brad Jack.
7        Q.    Okay. I'd ask you, Mr. McGee,
8    just answer this question yes or no, please.
9    Did you review any documents to prepare for
10  your deposition testimony today?
11        A.    I was shown some documents.
12        Q.    Okay. Did any of the documents
13  you were shown have the effect of refreshing
14  your recollection about the events of the week
15  of September 15th, 2008?
16        A.    To a limited extent, yes.
17        Q.    Could you tell me what those
18  documents were?
19        A.    I was shown some e-mail and I
20  think that's all. I was shown some e-mail
21  documents.
22        Q.    Do you have a better recollection
23  of what the content of the e-mails was rather
24  than just e-mails? What were they about, what
25  were their dates, what can you remember about

TSG Reporting - Worldwide  (877) 702-9580

Page 10

H. McGEE - HIGHLY CONFIDENTIAL

1
2  those?
3      A.   They were generally dated during
4  the period of time that you're referring to.
5      Q.   Okay.
6      A.   But I can't -- I mean, we looked
7  at different e-mails. I can't recall.
8      Q.   Okay.
9      A.   I'd be happy to address any
10 particular ones.
11     Q.   Okay.  We'll be showing you some
12 e-mails as we go through the day.
13     A.   Okay.
14     Q.   Have you -- other than lawyers,
15 have you spoken to anyone to prepare for your
16 deposition today?
17     A.   No.
18     Q.   Have you spoken to anyone whose
19 deposition has been taken in connection with
20 this proceeding?  Mr. Berkenfeld, Shapiro, Mr.
21 Felder?
22     A.   Well, I speak with them in the
23 normal course of business but not about this
24 topic.
25     Q.   Okay.  Now, as you know, Mr.

TSG Reporting - Worldwide  (877) 702-9580

Page 11

H. McGee - HIGHLY CONFIDENTIAL

1
2  McGee, we're here to talk about the
3  transaction through which assets of Lehman
4  Brothers were sold to Barclays.  Give me, if
5  you would, a description of your role in the
6  negotiations of that transaction or other
7  activities connected to that transaction.
8      A.   Sure.  In connection with the
9  transaction that ultimately resulted in
10 Barclays buying the North American business of
11 Lehman Brothers I was involved as head of
12 investment banking in an ongoing effort to
13 explore a number of different transactions
14 throughout the course of the summer leading
15 into the final weekend.  And I was one of the
16 more senior Lehman people involved in the
17 activities that weekend.  I would not
18 characterize myself as the primary negotiator.
19 I would say that I was focused on trying to
20 facilitate the transaction with the particular
21 focus on trying to make sure that we delivered
22 the human capital side of the equation to that
23 franchise that we preserved it, were able to
24 then deliver it as part of the transportation.
25     Q.   Who would you describe as the

TSG Reporting - Worldwide  (877) 702-9580

Page 12

H. McGEE - HIGHLY CONFIDENTIAL

1
2  primary negotiator or negotiators of the
3  transaction that was effected with Barclays?
4      A.   Well, Bart McDade was the
5  president of Lehman Brothers at the time.  He
6  was the senior Lehman executive involved.
7      Q.   And is he what you would describe
8  as the primary negotiator?
9      A.   Well, we had our head of M&A, Mark
10 Shafir, involved.  We had a full team.  We
11 were trying to get a lot done in 48 hours.
12     Q.   Sure.
13     A.   But anything that was a major
14 decision was taken to Bart.
15     Q.   And apart from Mr. McDade and Mr.
16 Shafir who were the other senior Lehman
17 executives you would describe as involved in
18 the negotiations?
19     A.   Alex Kirk was actively involved
20 around some of the balance sheet things I
21 think.
22     Q.   And anyone else?
23     A.   Mark Shapiro from our
24 restructuring team.  But he was more on the
25 basis of expertise as opposed to status as a

TSG Reporting - Worldwide  (877) 702-9580

Page 13

H. McGEE - HIGHLY CONFIDENTIAL

1
2  senior Lehman executive.
3      Q.   Um-hum.  And anyone else?
4      A.   I'm not sure how far down the
5  chain you want to go.
6      Q.   Stay up at the top of the chain if
7  we could for a moment because I know there's a
8  lot of people who do something in connection
9  with it.  I'm looking at the senior activities
10 either at the table or near the table.  Who's
11 involved in getting the transaction done?
12     A.   Well, certainly Mike Gelband was
13 there as well.
14     Q.   Was Paolo Tonucci involved?
15     A.   Yes.
16     Q.   What was his role?
17     A.   Well, Paolo and Ian Lowitt were
18 both involved around some of the balance sheet
19 type items.
20     Q.   And when you say the balance sheet
21 type items, does that include putting a value
22 on the assets that were transferred?
23 Assessing the value?
24     A.   I'm not sure.
25     Q.   Did you have any role or

TSG Reporting - Worldwide  (877) 702-9580

Page 14

1    H. McGEE - HIGHLY CONFIDENTIAL
2    involvement in that process during the week?
3        A.    No.
4        Q.    I should say just for clarity when
5    we're talking about "the week" we're talking
6    about the week of September 15th, right?
7        A.    Correct.
8        Q.    You made a reference before to the
9    weekend and I just want to put some dates on
10   that. You're talking about the week of
11   September 13th and 14th.
12       A.    Correct.
13       Q.    Holdings files its bankruptcy on
14   the 15th and what we're talking about is the
15   week that follows that.
16       A.    Correct.
17       Q.    Before that week, you mentioned
18   before that during the summer you were
19   exploring different options with respect to
20   Lehman. Could you give me a general
21   description of the type of options that were
22   being explored and the negotiations that took
23   place. Before the negotiations that led to
24   the transportation that occurred.
25       A.    Well, going all the way back to

TSG Reporting - Worldwide  (877) 702-9580

Page 15

1    H. McGEE - HIGHLY CONFIDENTIAL
2    the weekend in March when Bear Stearns went
3    down, Lehman Brothers and all financial
4    institutions were facing an increasingly
5    difficult and deteriorating market. We looked
6    at a bunch of different financing
7    alternatives. We looked at transaction
8    alternatives. Some that we could control
9    ourselves. Some that would involve
10   transactions with third parties. Those that
11   we could do ourselves were transactions such
12   as the spin-off of our commercial real estate
13   business, the sale of a partial interest in
14   the investment management division. The
15   transactions involving third parties ranged
16   from, you know, potential combinations to
17   strategic investments. And they involved
18   parties from -- you know, all different parts
19   of the globe.
20       Q.    And in the week preceding the week
21   we've been talking about, were there
22   discussions with Barclays?
23       A.    The discussions with Barclays
24   really took place starting on Friday and then
25   through the course of the weekend.

TSG Reporting - Worldwide  (877) 702-9580

Page 16

1    H. McGEE - HIGHLY CONFIDENTIAL
2        Q.    Before Friday, the 13th -- is that
3    correct? The 13th?
4            MS. CRAWFORD: The 14th -- I mean
5        the 12th.
6            MR. GAFFEY: I have not come armed
7        with my calendar.
8        Q.    Okay. Before Friday the 12th.
9        A.    Okay.
10       Q.    Isn't it so that there were
11   discussions with Barclays and Bank of America
12   about a global purchase of Lehman?
13       A.    Well, I need -- yes and no. So,
14   yes in that there were discussions with Bank
15   of America and Barclays leading into that
16   final weekend. Bank of America had a team
17   that showed up if I -- I may be a day off but
18   I think it was Thursday and I don't think the
19   Barclays team actually showed up until Friday,
20   kind of mid day Friday. And then they went
21   through that night and then through Saturday.
22   BofA efforts were slightly ahead because their
23   team showed up first. But it's an accurate
24   statement to say that discussions at some
25   point were going on contemporaneously with

TSG Reporting - Worldwide  (877) 702-9580

Page 17

1    H. McGEE - HIGHLY CONFIDENTIAL
2    both Bank of America and Barclays.
3        Q.    Did there come a point over the
4    weekend where the discussions with Bank of
5    America came to an end?
6        A.    There was a point on Saturday
7    where it became clear that the additional
8    request for follow-up due diligence evaporated
9    from Bank of America and our speculation was
10   that they were off doing something else. We
11   were never formally told Bank of America is
12   discontinuing discussions.
13       Q.    So essentially the phone stops
14   ringing with Bank of America. What happens
15   with Barclays? Do the discussions with
16   Barclays that took place on the Friday and the
17   Saturday, do they at some point cease prior to
18   the bankruptcy filing?
19       A.    The discussions with Barclays
20   continued straight through to Sunday morning
21   where it appeared at one point in time that
22   there was a handshake deal for the entire
23   company in a structured transaction.
24       Q.    Now, in the interest of your time
25   and everybody's time today we can agree that

TSG Reporting - Worldwide  (877) 702-9580

Page 18

1      H. McGEE - HIGHLY CONFIDENTIAL
2  the structured transaction for the entire
3  company did not take place. What took place
4  was a sale of the assets, right?
5      A.   That is correct.
6      Q.   Okay. If you know, why didn't the
7  structured transaction for the entire company
8  take place?
9      A.   I could give you my understanding.
10     Q.   Sure.
11     A.   I can tell you I was sitting in a
12  conference room at the Simpson Thacher
13  Conference Center with Jerry Del Missier, the
14  president of BarCap, and we were talking about
15  various plans as we consummated the
16  transaction, things that we could do moving
17  forward, et cetera. My cell phone rang and it
18  was from a team that was down at the New York
19  Fed. And they reported to me that in fact the
20  transaction had fallen apart on some
21  regulatory approvals. So everything I would
22  tell you at that point on is second hand.
23     Q.   Let's stay with your first-hand
24  knowledge for the moment. Did you have an
25  understanding of what the regulatory approval
TSG Reporting - Worldwide  (877) 702-9580

Page 19

1      H. McGEE - HIGHLY CONFIDENTIAL
2  issue was?
3      A.   I have an understanding what was
4  told to me.
5      Q.   Okay. Do that.
6      A.   That the FSA had some objections
7  to effectively stepping into the shoes of
8  Lehman on the trading side and an unlimited
9  guarantee without shareholder approval.
10     Q.   Okay. After the FSA issue arose,
11  was there a point, however brief, where the
12  discussions with Barclays came to a halt?
13     A.   Yes.
14     Q.   And did those discussions resume
15  at any point before the filing of Lehman
16  Brothers Holdings for bankruptcy protection?
17     A.   No.
18     Q.   By the way, I should ask you in
19  the description of your employment that you
20  gave me before, were you an officer of
21  Holdings or Lehman Brothers, Inc. or both?
22     A.   That's a good question.
23     Q.   Everybody answers that that way.
24     A.   I assume of Holdings but maybe
25  both. We never thought about the corporate
TSG Reporting - Worldwide  (877) 702-9580

Page 20

1      H. McGEE - HIGHLY CONFIDENTIAL
2  structure.
3      Q.   Sure.
4      A.   Until that Sunday, the honest
5  answer is I don't know. My business card said
6  Lehman Brothers.
7      Q.   So Holdings files for bankruptcy
8  in the early -- very early morning hours of
9  Monday, the 15th. And I'd like to focus your
10  attention on that time period.
11         At what point after that does it
12  come to your attention that there are renewed
13  discussions with Barclays about the
14  transaction?
15     A.   I'd received a phone call from
16  Bart McDade that evening that said we're going
17  to try to see if there's an opportunity to
18  pursue a transaction with Barclays and we're
19  going to meet first thing in the morning.
20         MR. STERN:   You just may want to
21  clarify what "that evening" is.
22     Q.   That was my next question. When
23  you say that evening, are we on the evening of
24  Sunday?
25     A.   Sunday.
TSG Reporting - Worldwide  (877) 702-9580

Page 21

1      H. McGEE - HIGHLY CONFIDENTIAL
2      Q.   Going into Monday.
3      A.   Going into Monday. Sunday
4  evening.
5      Q.   And, best you recall, tell me what
6  Mr. McDade told you about the nature of the
7  transaction that was being contemplated at
8  that time.
9      A.   That we were going to get teams
10  together to see if there was -- still a way to
11  do a transaction.
12     Q.   Okay. What happened next?
13     A.   I communicated with some of my
14  team, including Mr. Shafir, Shapiro, some
15  others, and we had agreed to meet first thing
16  in the morning at Lehman Brothers. I can't
17  remember if that was 7 a.m., 7:30, 6:30. But
18  it was relatively early.
19     Q.   And on the Monday morning -- is
20  there a point on the Monday morning where you
21  catch up with Mr. McDade?
22     A.   Yeah. I think I probably saw him
23  first thing.
24     Q.   And when you saw Mr. McDade first
25  thing what did you say to him, what did he say
TSG Reporting - Worldwide  (877) 702-9580

Page 22

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    **to you about the possibility of renewed**
3    **negotiations with Barclays?**
4         A.    I can't recall specifically what
5    was said.
6         **Q.    All right. And did there come a**
7    **time when an agreement was reached with**
8    **Barclays about a transaction?**
9         A.    Sure. At some point over the next
10   two days, you know, agreement was reached and
11   an agreement was signed. I don't recall
12   exactly what time it was.
13        **Q.    And in the course of those**
14   **negotiations of that agreement, did you have**
15   **any involvement in negotiating with people**
16   **from Barclays?**
17        A.    Yes.
18        **Q.    Describe your role in those**
19   **negotiations.**
20        A.    As I mentioned before I was
21   focused on preserving the franchise. That
22   involved keeping the people and making sure
23   they were treated fairly. So the place where
24   I was most directly involved was the
25   provisions of the agreement dealing with comp

TSG Reporting - Worldwide  (877) 702-9580

Page 23

1    H. McGEE - HIGHLY CONFIDENTIAL
2    and severance.
3         **Q.    Did you have any role at all in**
4    **the negotiation of the terms of the agreement**
5    **regarding the purchase of assets?**
6         A.    No.
7         **Q.    Were you present while any of**
8    **those negotiations took place regarding the**
9    **purchase of assets?**
10        A.    The answer is yes. But I was
11   walking in and out of the room.
12        **Q.    Okay.**
13        A.    So I wasn't directly involved in
14   the -- you know, taking the ball all the way
15   down the field so to speak. I was in and out
16   of the room. I was trying to make sure the
17   overall -- that we were -- that we had an eye
18   on the different pieces of the transaction and
19   that they were all moving along so that we
20   didn't forget something since we had to get
21   the entire thing done in 48 hours.
22        **Q.    When you say you were in and out**
23   **of the room, what room are you referring to?**
24        A.    One of the conference rooms that
25   was the larger ones up on the 32nd floor of

TSG Reporting - Worldwide  (877) 702-9580

Page 24

1         H. McGEE - HIGHLY CONFIDENTIAL
2    Lehman Brothers where everyone was basically
3    situated.
4         **Q.    And was there -- as I understand**
5    **it there's a lot of activity going on on the**
6    **32nd floor that day and that night. Was there**
7    **one room where -- you would characterize as**
8    **the main table where the negotiations were**
9    **going on?**
10        A.    There's a -- one of the larger
11   dining rooms had a large conference table in
12   it and that was a room where there was a lot
13   of meetings to discuss stuff with two sides
14   because there was more seating and there was
15   also kind of an anti-room next to that.
16        **Q.    Is that the room where McDade is**
17   **negotiating?**
18        A.    He was moving around as well is my
19   recollection. But I wasn't keeping track of
20   his specific whereabouts all the time.
21        **Q.    Do you know -- is there anyone you**
22   **would describe as the primary or main**
23   **negotiators for Barclays?**
24        A.    Again, my participation in the
25   direct negotiations was somewhat limited but

TSG Reporting - Worldwide  (877) 702-9580

Page 25

1         H. McGEE - HIGHLY CONFIDENTIAL
2    in the times I was in the room Archie Cox was
3    in there a lot.
4         **Q.    Anyone else from Barclays?**
5         A.    Certainly Rich Richie was on the
6    scene.
7         **Q.    And anyone else?**
8         A.    Not that I saw in the room.
9         **Q.    Do you know a man named Michael**
10   **Klein?**
11        A.    Yes.
12        **Q.    Was Michael Klein involved in the**
13   **negotiations?**
14        A.    Yes. But he was an advisor.
15        **Q.    To whom?**
16        A.    Barclays.
17        **Q.    Do you know where Mr. Klein works**
18   **today?**
19        A.    No.
20        **Q.    Could you tell me what your**
21   **compensation was at Lehman Brothers during the**
22   **year 2007?**
23        MR. STERN:  This is all designated
24   highly confidential.
25        THE WITNESS:  Okay.

TSG Reporting - Worldwide  (877) 702-9580

Page 26

1     H. McGEE - HIGHLY CONFIDENTIAL
2     A.     ███████.
3     Q.    And what were the components of
4   that compensation?
5     A.    ███████ cash, ███████ of
6   stock -- restricted stock.
7     Q.    And of the -- actually, of both
8   components, cash and stock, could you tell me
9   what was in the form of a bonus and what was
10  in the form of a base?
11    A.    Base was ███████. Everything else
12  was bonus.
13    Q.    And although I understand the year
14  came to a -- from the Lehman perspective kind
15  of came to a halt in September, can you
16  describe for me what your compensation was for
17  the year 2008 from Lehman?
18    A.    It would have been the pro rata
19  piece of that salary.
20    Q.    Well, prior to -- let me just put
21  some dates in place so we're clear where we
22  are in the week. The asset purchase agreement
23  was signed on September 16th and the
24  transaction closed on Monday, the 22nd, so
25  with those two dates in mind a lot of my
          TSG Reporting - Worldwide  (877) 702-9580

Page 27

1     H. McGEE - HIGHLY CONFIDENTIAL
2   questions will relate to that time period.
3     Prior to the closing of the
4   transaction on the 22nd of September, were you
5   engaged in any negotiations with Barclays
6   concerning your compensation as a Barclays
7   employee after the transaction?
8     A.    Yes. I had a discussion with Bob
9   Diamond.
10    Q.    Just one discussion?
11    A.    Two discussions.
12    Q.    Okay. Could you describe each of
13  them to me, when they took place and who said
14  what.
15    A.    Both discussions took place that
16  Monday evening. Bob Diamond approached me and
17  told me what he was thinking about for '08
18  compensation. He also indicated that it was
19  important that I joined Barclays and run
20  investment banking for Barclays. And my
21  understanding is that there were a group of
22  people that were important to agree to join
23  and that I was one of those people.
24    Q.    Who else was in the group of
25  people for whom it was important to join?
          TSG Reporting - Worldwide  (877) 702-9580

Page 28

1     H. McGEE - HIGHLY CONFIDENTIAL
2     A.    I assume Bart McDade and others.
3   You know, Jerry Donini. People that ran
4   important businesses that were an important
5   part of delivering the actual franchise as
6   part of the transaction.
7     Q.    In addition to McDade and Donini,
8   do you remember specifically who any of those
9   people were?
10    MR. STERN: Objection to the form.
11  I don't think he said that he
12    remembered. He said he assumed.
13    MR. GAFFEY: Okay. That's fair.
14    Q.    But, do you have an idea, then,
15  sir, of who the other people were in addition
16  to McDade and Donini?
17    MR. STERN: Same objection.
18    A.    Well, I assume -- I did not see --
19  there was discussion of seven. I can
20  speculate who the seven were but no one told
21  me specifically who they were and I'm sure you
22  have that information.
23    Q.    When you were devoting some of
24  your energies to moving capital over to
25  Barclays and keep the franchise intact and all
          TSG Reporting - Worldwide  (877) 702-9580

Page 29

1     H. McGEE - HIGHLY CONFIDENTIAL
2   of that, was there a group of about eight
3   senior executives that were deemed critical to
4   the transaction?
5     A.    I believe that's right.
6     Q.    Were you involved in any way in
7   the determination as to who those eight
8   critical executives were?
9     A.    No.
10    Q.    And was there a group of
11  approximately 200 Lehman personnel who were
12  deemed important and some percentage of them
13  had to go over to Barclays for the deal to
14  close?
15    A.    My understanding is that there was
16  such a designation.
17    Q.    Okay. And were you involved in
18  putting together that group of 200 or so?
19    A.    Yes. Insofar as it involved
20  investment bankers.
21    Q.    Now, you said you spoke to Mr.
22  Diamond on that Monday. Again, for date
23  purposes are we on Monday, the 15th?
24    A.    Correct.
25    Q.    Okay. And when you spoke -- and
          TSG Reporting - Worldwide  (877) 702-9580

Page 30

1  H. McGEE - HIGHLY CONFIDENTIAL
2  that was one of two conversations you had with
3  Mr. Diamond.
4  A.  (Witness nods.)
5  Q.  When was the second one?
6  A.  Later that same evening.  Night.
7  Q.  And describe that conversation for
8  me; what did you say, what did he say?
9  A.  Well, in the first conversation I
10  expressed concern that a significant number of
11  our most highly valued employees already had
12  contracts in hand from competitors at numbers
13  that were flat to '07 and were two-year
14  transactions.  So I expressed concern about
15  making sure that we were able to actually
16  deliver a franchise because the franchise was
17  like a -- you know, an ice cube in the
18  pavement in the middle of the summer.  It was
19  melting quickly.  Very quickly.  Part of the
20  reason for that is that historical Lehman
21  compensation, a senior employee got more than
22  50 percent of their compensation in stock
23  which had a five-year vest.  So the senior
24  employees of Lehman Brothers had always been
25  somewhat untouchable to the street because

TSG Reporting - Worldwide  (877) 702-9580

Page 31

1  H. McGEE - HIGHLY CONFIDENTIAL
2  they were all carrying around five years of
3  deferred restricted stock units that hadn't
4  vested.  Now, all of a sudden, all of these
5  senior employees at a minimum, had they sold
6  all of their stock every time it matured, they
7  had just lost two and a half years of
8  earnings, assuming 50 percent, five years.
9  They had never wanted to leave.
10  They had been very loyal.  So it was open
11  season for the senior employees of Lehman
12  Brothers.
13  So when Bob first came to me and
14  said I'm thinking about this kind of a deal
15  for you and for the Lehman people, and he said
16  one-year transaction at either -- I think
17  maybe he said down 30 percent from '07.
18  I said let me reflect on that and
19  I'll come back to you.  I thought about it for
20  a second -- oh, and I didn't say I'll come
21  back to you.  I said let me think about that.
22  And then I came back to him right there in
23  that sitting.  I said that feels a little bit
24  like relative to what I see as the bid away
25  for our top people.  Because I assumed his

TSG Reporting - Worldwide  (877) 702-9580

Page 32

1  H. McGEE - HIGHLY CONFIDENTIAL
2  discussion with me was a proxy for what was
3  going to happen for the division.
4  And do you want me to go to the
5  second conversation now?
6  Q.  Yes, please.
7  A.  So in the second conversation he
8  came back and said what about a down
9  20 percent one-year deal.  And I said I'm not
10  going to hold this deal up, I'm not going to
11  hold up saving 11,000 jobs, I'm fine, I'll
12  agree.  I'm in.  But I still think we're going
13  to have a harder time landing the plane with
14  the rest of the franchise at that kind of
15  level knowing as I did that I had entire
16  swaths of bankers that already had two-year
17  deals from Citi, from JPMorgan, whatever, and
18  I was going to have to try to keep those
19  people in the boat.
20  Q.  Now, when Mr. Diamond was talking
21  to you about the -- about your joining
22  Barclays after the transaction on that Monday
23  night, did he make you a dollar offer?
24  A.  Well, he described it in terms of
25  down 20 percent.

TSG Reporting - Worldwide  (877) 702-9580

Page 33

1  H. McGEE - HIGHLY CONFIDENTIAL
2  Q.  And can you describe your
3  compensation for me at Barclays for the year
4  2009?
5  I shouldn't restrict it to year.
6  Just tell me what your compensation package
7  was with Barclays when you joined them.
8  A.  It was exactly as he described.
9  It was down the 20 percent.  So it was, you
10  know, 80 percent of the ▮ number which is
11  something like ▮▮▮▮.  I believe the salary
12  is the same.  It's the ▮▮▮.  And the
13  difference is that the Barclays mix is
14  different from Lehman or at least it was for
15  this year, was 75 percent cash, 25 percent
16  equity.
17  Q.  And was that -- to your knowledge,
18  was the fact that Mr. Diamond had made an
19  employment offer to you during the
20  negotiations disclosed to the boards of Lehman
21  Brothers Holdings and Lehman Brothers, Inc.?
22  MR. STERN:  Objection to the form.
23  Q.  Do you know one way or the other?
24  A.  I have no idea.
25  Q.  And do you know if the discussions

TSG Reporting - Worldwide  (877) 702-9580

Page 34

1      H. McGEE - HIGHLY CONFIDENTIAL
2  about employing other senior executives at
3  Lehman apart from yourself that you were
4  talking to Mr. Diamond about, were disclosed
5  to the board of either Lehman Brothers
6  Holdings or Lehman Brothers, Inc.?
7      A.   I have no idea.
8      Q.   Do you know if Mr. McDade was in
9  similar discussions with Barclays during the
10 week leading up to the closing on 22nd of
11 September?
12     A.   I have no idea.
13     Q.   You referred in one of your
14 answers a minute ago to the division. When
15 you say that, are you referring to the
16 investment banking division?
17     A.   Yes. The investment banking
18 division.
19     Q.   Now, there were portions -- and
20 I'll show it to you in a while. We'll come
21 back to some more detail on this so I'm
22 looking for your general recollection at this
23 point. But there were portions of the asset
24 purchase agreement that dealt with the issue
25 of compensation to transferred employees; that
        TSG Reporting - Worldwide  (877) 702-9580

Page 35

1      H. McGEE - HIGHLY CONFIDENTIAL
2  is, employees that went from Lehman to
3  Barclays.
4          Do you have a general
5  understanding that that's so?
6      A.   Yes.
7      Q.   Okay. Did you have any
8  involvement in the negotiation of the terms of
9  those provisions of the asset purchase
10 agreement?
11     A.   Yes, I did.
12     Q.   Okay. And just as a general
13 matter, and again I'll show you the final at
14 some later point today, but did you look at
15 drafts of that provision?
16     A.   Yes.
17     Q.   Those provisions?
18     A.   Yes.
19     Q.   And did you engage in negotiations
20 about the terms of those provisions with
21 personnel from Barclays?
22     A.   Yes.
23     Q.   And with whom at Barclays did you
24 engage in those discussions?
25     A.   There were a number of people in
        TSG Reporting - Worldwide  (877) 702-9580

Page 36

1      H. McGEE - HIGHLY CONFIDENTIAL
2  the room but I recall that Archie Cox was one
3  of the more senior people from Barclays in the
4  room.
5      Q.   And, again, for lack of a better
6  term, would it be fair to describe Archie Cox
7  as the principal negotiator from Barclays on
8  that issue?
9          MR. STERN: Objection to form.
10     A.   Don't know.
11     Q.   Well, were you talking to anybody
12 from Barclays other than Archie Cox about
13 these matters?
14     A.   There were a bunch of people in
15 the room. I didn't know all the people from
16 Barclays so I don't know who else -- who was
17 lawyers, inside lawyers, outside lawyers, who
18 was -- but Archie Cox is a name of a person
19 that I remember was in the room.
20     Q.   And apart from yourself, were
21 there others on the Lehman side of the table
22 engaged in discussions with Barclays about the
23 terms of compensation for transferred
24 employees?
25     A.   Mark Shafir who was head of M&A
        TSG Reporting - Worldwide  (877) 702-9580

Page 37

1      H. McGEE - HIGHLY CONFIDENTIAL
2  was kind of very focused on all aspects of the
3  deal.
4      Q.   Anyone else?
5      A.   No.
6      Q.   What lawyers were involved in
7  drafting the provisions of the APA concerning
8  compensation? For transferred employees.
9      A.   I don't know.
10         (Deposition Exhibit 98, document
11         bearing production number 10282956,
12         marked for identification as of this
13         date.)
14 BY MR. GAFFEY:
15     Q.   Mr. McGee, I've put before you
16 what we've marked as Deposition Exhibit 98, a
17 one-page document bearing number 10282956.
18         Have you seen that document
19 before?
20     A.   I don't recall.
21     Q.   Do you know what it is? You'll
22 see that it appears to be an e-mail from Peter
23 Calistri to you.
24     A.   I see that it's an e-mail from
25 Peter Calistri to me.
        TSG Reporting - Worldwide  (877) 702-9580

Page 38

1          H. McGEE - HIGHLY CONFIDENTIAL
2      Q.   Okay. Who's Peter Calistri?
3      A.   Peter Calistri is the CFO of the
4   investment banking division at Lehman
5   Brothers.
6      Q.   And the e-mail is entitled Exec
7   Comm Comp and Retention and lists the names of
8   six people. Parker, Weiss, Stephenson,
9   Wieseneck, Gatto, Hash.
10         Do you see that?
11     A.   Yes.
12     Q.   Do you know who those people are?
13     A.   Yes. I know who these people are.
14     Q.   Who are they?
15     A.   Those are the names of the
16   investment banking executive committee that
17   are from Lehman Brothers.
18     Q.   Now, when you referred a few
19   moments ago to a group of about eight -- when
20   we were talking a few moments ago about a
21   group of eight senior Lehman executives who
22   were critical to the transaction, are these
23   six people among those eight?
24     A.   No. Not to my knowledge.
25     Q.   And forgive me. I may have
              TSG Reporting - Worldwide  (877) 702-9580

Page 39

1          H. McGEE - HIGHLY CONFIDENTIAL
2   forgotten if I asked you this and you answered
3   it.
4          Do you know who the eight were who
5   were the critical eight?
6      A.   I answered previously that I
7   assumed it was McDade, Jerry Donini, Eric
8   Felder. Some people that ran some major
9   businesses that presumably BarCap would want
10  the business leaders who led the people to
11  come across, but I don't -- no one ever shared
12  that list with me.
13     Q.   Now, these people, Parker, Weiss,
14  Stephenson, Wieseneck, Gatto and Hash, did
15  they all work for you?
16     A.   They all worked for me in
17  investment banking.
18     Q.   And did you spend time during the
19  week leading up to the closing on the 22nd
20  addressing compensation for this group of six
21  people?
22     A.   Yes. We talked about
23  compensation, what it might take to retain
24  some of these people. But this is -- this is
25  just an e-mail somewhere along the way. I
              TSG Reporting - Worldwide  (877) 702-9580

Page 40

1          H. McGEE - HIGHLY CONFIDENTIAL
2   don't think any of these numbers were pinned
3   down at this point.
4      Q.   Did there come a point where
5   numbers were pinned down for people in the
6   investment banking division?
7      A.   Yes. There did come a point when
8   numbers were pinned down for people.
9      Q.   When did that happen?
10     A.   It varied person by person and
11  group by group. It was an iterative process
12  that took quite a while.
13     Q.   Okay. Was it pinned down before
14  the transaction closed?
15     A.   Was what pinned down?
16     Q.   Compensation for the senior
17  executives within the investment banking
18  division.
19     A.   Specific numbers next to specific
20  names?
21     Q.   Yes.
22     A.   No.
23     Q.   When were there specific numbers
24  next to specific names?
25     A.   It would have been weeks and
              TSG Reporting - Worldwide  (877) 702-9580

Page 41

1          H. McGEE - HIGHLY CONFIDENTIAL
2   almost a month later.
3      Q.   By later after the closing.
4      A.   Later after the closing, correct.
5      Q.   Okay. On Exhibit 98 with respect
6   to Mr. Parker and Mr. Gatto, you'll notice
7   that there's a column for 2009.
8          Do you see that?
9      A.   Yes, I do.
10     Q.   As a general matter, without
11  reference to that particular document, as a
12  general matter were some of the investment
13  banking division personnel -- withdrawn.
14         With respect to some of the
15  investment banking division personnel were
16  there discussions about retention payments
17  that would be paid or guaranteed in connection
18  with 2009? As opposed to 2008?
19     A.   The 2009 column next to Parker in
20  this particular e-mail refers to a guarantee
21  of compensation for the year 2009. In other
22  words, a two-year agreement of compensation
23  for '08 and '09.
24         The retention amount was a
25  separate retention program that was being put
              TSG Reporting - Worldwide  (877) 702-9580

Page 42

1       H. McGEE - HIGHLY CONFIDENTIAL
2    in by BarCap that was consistent with trying
3    to hold the franchise together and somewhat
4    make up for the wipe-out on the net worth of
5    all the senior Lehman people to -- the
6    retention program was structured such that it
7    vested over a couple of years.
8       Q.  And have you heard that retention
9    program referred to as a special cash award?
10      A.  No, I have not heard it referred
11   to as that.
12      Q.  Is that a term you've heard before
13   in connection with compensation?
14      A.  No.
15      Q.  Withdrawn.
16      I --
17      (Deposition Exhibit 99, document
18      bearing production number 10265851,
19      marked for identification as of this
20      date.)
21   BY MR. GAFFEY:
22      Q.  Mr. McGee, I've put before you
23   what we've marked as Deposition Exhibit 99 an
24   e-mail from Tim Sullivan sent Saturday,
25   September 20th, 8:27 p.m. Greenwich meantime
TSG Reporting - Worldwide  (877) 702-9580

Page 43

1       H. McGEE - HIGHLY CONFIDENTIAL
2    which would put it at about 4:27 p.m. eastern
3    time to you, a copy to Jennifer Becker.
4    Subject, Exec Comm Deals.
5       Have you seen this before?
6       A.  Yeah.  This is an e-mail to me
7    from Tim Sullivan.
8       Q.  Okay.  Who's Tim Sullivan?
9       A.  Tim Sullivan works for me in my
10   office.
11      Q.  Did he have a particular role or
12   function?  What I want to know is he an HR guy
13   or did he have some kind of line
14   responsibility?
15      A.  He is -- you might think of him as
16   almost a chief of staff for me.
17      Q.  And in that e-mail marked as
18   Deposition Exhibit 99 there are references
19   again to Weiss, Parker, Ros, who I believe
20   would be a reference to Stephenson; is that
21   right?
22      A.  That is correct.
23      Q.  Larry, that would be a reference
24   to Wieseneck; is that correct?
25      A.  That is correct.
TSG Reporting - Worldwide  (877) 702-9580

Page 44

1       H. McGEE - HIGHLY CONFIDENTIAL
2       Q.  Gatto and Hash.  Mr. Sullivan
3    writes to you here, "Barclays has drafted the
4    letters to IBD exec members but we want to
5    confirm the terms hadn't changed.  Below is
6    what we currently have on our sheets.  Any
7    changes we should post Barc on."
8       Were there -- now we're at
9    Saturday the 20th.  We're two days before the
10   closing.  Were you at that stage of the week
11   involved in the negotiations of what the
12   particular numbers would be for these six
13   people?
14      A.  Continuing to have discussions --
15   at that point on Saturday I had -- I had left
16   New York on Wednesday to fly to London to try
17   and see if there was an opportunity to put a
18   transaction together for the European business
19   of Lehman Brothers.  So this was all -- I'm
20   not sure when I received this e-mail, whether
21   I was on a plane, if I was in London at the
22   time or if I was flying back.  But there
23   was -- there were no letters that were signed
24   and I think the final numbers around all these
25   people changed even from these numbers.
TSG Reporting - Worldwide  (877) 702-9580

Page 45

1       H. McGEE - HIGHLY CONFIDENTIAL
2       Q.  Okay.  When you went to London,
3    was that at the request of Mr. Diamond?
4       A.  No.
5       Q.  Did there come a point where Bob
6    asked you to go to London?
7       A.  No.
8       Q.  During that week?
9       A.  No.
10      Q.  Were there discussions about the
11   European business with Barclays or with other
12   entities?
13      A.  I flew to London because I
14   personally felt horrible about the way the
15   transaction had played out for the people in
16   London.  And I was getting bombarded with
17   phone calls and e-mails, what are we to do,
18   are were in the transaction, is there a plan
19   for step 2.
20      So I flew over as much as anything
21   out of a feeling of personal obligation to all
22   those colleagues that I had hired and had
23   worked for me.  Spent time trying to figure
24   out whether there was the potential for a
25   transaction.  Jerry Del Missier also came to
TSG Reporting - Worldwide  (877) 702-9580

Page 46

1       H. McGEE - HIGHLY CONFIDENTIAL
2  London. But given the absolute devastation in
3  the financial markets there was not scope or
4  appetite to put together a significant
5  transaction.
6       Q.   Jerry Del Missier was from
7  Barclays?
8       A.   That is correct.
9       Q.   Did he go with you on the trip?
10      A.   No.  He arrived after I was
11  already there.
12      Q.   And were you in discussions -- was
13  he involved in these discussions about looking
14  for some sort of remedy to the European
15  issues?
16      MR. STERN:  Objection to the form.
17      Q.   I think you can answer it.
18      A.   I'm not sure what you mean by
19  "remedy to the European issues." That's --
20  it's -- depending on who you ask that question
21  to there's a long list of things that need to
22  be remedied.
23      Q.   Yeah, I guess that's right.  Let
24  me try to ask it a different way.
25          You go to London to meet with

TSG Reporting - Worldwide  (877) 702-9580

Page 47

1       H. McGEE - HIGHLY CONFIDENTIAL
2  people who you have hired because you have
3  some concern about what's going to befall them
4  because of the transaction.  You're looking
5  for some sort of transaction on the European
6  side of things.  Is Mr. Del Missier involved
7  with you in that effort?
8       A.   He was in Europe.  We spent some
9  time.  He was focused on I think a lot of
10  things in addition to that given the world was
11  blowing up.
12      Q.   Did you meet with Mr. Diamond when
13  you were in London?
14      A.   No.
15          (Deposition Exhibit 100, document
16  with the first page bearing production
17  number 10287489, marked for
18  identification as of this date.)
19  BY MR. GAFFEY:
20      Q.   Mr. McGee, I've put before you
21  what we've marked as Deposition Exhibit 100, a
22  multi-page document bearing 10287489 with a
23  series of attachments.  Take a minute, please,
24  to look through it sufficiently to tell me
25  whether you recall seeing it before.

TSG Reporting - Worldwide  (877) 702-9580

Page 48

1       H. McGEE - HIGHLY CONFIDENTIAL
2       MR. CHEPIGA:  Bob, I don't know if
3  you care but the document -- these
4  numbers are not sequential after that
5  first number.
6       MR. GAFFEY:  They're not, Mike,
7  because the number system that was used
8  to -- they have not been turned over in
9  discovery so they're not subsequent
10  Bates numbers.
11      MR. CHEPIGA:  But you know that
12  they go together.
13      MR. GAFFEY:  That's how they came
14  out of the box, yeah.  I don't mean the
15  box.  My best knowledge is, yeah, this
16  is a singular document.
17      A.   Can you repeat the question?
18      Q.   Have you seen the document before?
19      MR. CHEPIGA:  In fact, I see there
20  are two pages with the same numbers on
21  two consecutive pages.
22      MR. GAFFEY:  You will because the
23  document is numbered, not the pages
24  same.
25

TSG Reporting - Worldwide  (877) 702-9580

Page 49

1       H. McGEE - HIGHLY CONFIDENTIAL
2  BY MR. GAFFEY:
3       Q.   Have you seen the document before?
4       A.   This appears to be an e-mail
5  addressed to me which has some drafts of
6  potential contracts.
7       Q.   Okay.  Now, the e-mail is dated
8  September 21, 2008, 10:04 p.m. Greenwich
9  meantime which is about 6:04 p.m. eastern
10  time.
11          By that time, by Sunday night,
12  were there final offer letters put together
13  for this group of people including Mr. Gatto,
14  Mr. Weiss, Mr. Wieseneck, and Mr. Hash?
15      A.   No.  I don't believe any of these
16  letters were final.
17      Q.   And there's a c.c. on this e-mail
18  to a Melissa Kastens.  Do you know who Ms.
19  Kastens is?
20      A.   I do not know Melissa Kastens.
21      Q.   Mr. McGee, were you one of the
22  eight critical employees?
23      MR. STERN:  Objection to the form.
24      A.   I assume that I was.  But no one
25  ever -- I never saw the list.  I saw a

TSG Reporting - Worldwide  (877) 702-9580

Page 50

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2   reference to eight.
 3        Q.   Um-hum.
 4        A.   But I -- Bob had mentioned to me
 5   we're not going to do this deal if you're not
 6   going to run investment banking. I assumed
 7   that I was. But -- and that was the context
 8   in which I took his statement that I was one
 9   of that number.
10        Q.   Who would you ask if you wanted to
11   know if you were one of the eight critical
12   people?
13        A.   Who would I have asked?
14        Q.   Who would you ask now? I'd like
15   to put them over there and ask them. So who
16   would you ask now?
17        A.   I would ask the people who put
18   that list together which are the senior BarCap
19   people.
20        Q.   Amongst the former Lehman people
21   who would you ask?
22        A.   Bart McDade.
23        (Deposition Exhibit 101, document
24   with the first page bearing production
25   number 10322002, marked for
```
TSG Reporting - Worldwide  (877) 702-9580

Page 51

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2   identification as of this date.)
 3        MR. STERN:  Could we just go off
 4   the record for a second.
 5        (Discussion held off the record.)
 6   BY MR. GAFFEY:
 7        Q.   Okay. We're back on the record.
 8        Mr. McGee, have you seen the
 9   document that we've marked as Exhibit 101?
10   Have you seen that before?
11        A.   No. This is the first I've seen
12   of this. It's not addressed to me.
13        MR. STERN:  I guess we should just
14   note on the record that which we stated
15   off the record which was a concern about
16   the non-sequential numbering of the
17   attachments to the exhibit and an open
18   question as to whether the attachments
19   are, in fact, attachments to the
20   original e-mail but subject to that
21   objection.
22   BY MR. GAFFEY:
23        Q.   Mr. McDade, would you turn to the
24   sixth page.
25        MR. STERN:  McGee.
```
TSG Reporting - Worldwide  (877) 702-9580

Page 52

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2        Q.   I beg your pardon. There's too
 3   many Mcs in here. I meant that as a reference
 4   to me, folks. I'm sorry.
 5        Mr. McGee, would you please turn
 6   to the sixth page from the back of this
 7   document.
 8        A.   I see it.
 9        Q.   And do you know, Mr. McGee,
10   whether an offer of employment was made to Mr.
11   McDade during the week preceding the closing
12   on September 22nd?
13        A.   I would have no way of knowing
14   that one way or the other.
15        Q.   And if you would now turn to the
16   second page of the exhibit. And I would
17   direct your attention to the three-page
18   unsigned letter that begins there. Appears to
19   be addressed to Hugh E. McGee, III. September
20   18th. Ask you if you've seen those three
21   pages before.
22        A.   This looks like a draft of the
23   agreement that Barclays -- that I signed with
24   Barclays.
25        Q.   Did you see a draft written
```
TSG Reporting - Worldwide  (877) 702-9580

Page 53

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2   employment agreement sometime on or around the
 3   date this document bears, September 18th?
 4        A.   I'm not sure when I was actually
 5   handed a draft of an agreement.
 6        Q.   Do you recall if you saw a draft
 7   of a written agreement at any point prior to
 8   the 22nd?
 9        A.   No. I would not have because
10   draft agreements were not -- they didn't send
11   me an e-mail. It would have been handed to
12   me. And so it would have been after the
13   closing when I would have first seen the draft
14   of my agreement.
15        Q.   I just want to follow up on that a
16   little bit because I think we're talking about
17   two issues and I want to separate them a
18   little bit.
19        When you did see draft agreements
20   they weren't sent to you by e-mail, they were
21   handed to you in hard copy; is that right?
22        A.   Of my contract. This Exhibit 101
23   that you have handed to me, they never would
24   have sent me contract terms for Bart McDade,
25   Eric Felder, Jerry Donini, who were either
```
TSG Reporting - Worldwide  (877) 702-9580

Page 54

1      H. McGEE - HIGHLY CONFIDENTIAL
2    people at my level or above me. I never would
3    have seen this information.
4        Q.   With respect to your contract
5    offer, your contract documents --
6        A.   They would have -- the practice
7    was to hand you a written agreement. I was in
8    Europe. I went to Texas for the weekend.
9    Came back. So this -- my actual contract
10   caught up with me some sometime after the
11   fact.
12       Q.   After the 22nd.
13       A.   Yes.
14       Q.   Okay.
15           (Deposition Exhibit 102, document
16       bearing production number
17       BCI-EX-(S)-00003505, marked for
18       identification as of this date.)
19           (Deposition Exhibit 103, document
20       bearing production numbers
21       BCI-EX-00077338 through BCI-EX-00077340,
22       marked for identification as of this
23       date.)
24           MR. STERN: After you get through
25       these maybe we'll take a short break.

Page 55

1      H. McGEE - HIGHLY CONFIDENTIAL
2           MR. GAFFEY: Yeah. It would be
3       good to take a break.
4    BY MR. GAFFEY:
5        Q.   Mr. McGee, I put two documents
6    before you, one marked Exhibit 102, a one-page
7    e-mail bearing Bates number
8    BCI-EX-(S)-00003505, and the other a
9    three-page document bearing Bates number
10   BCI-EX 000077338 through -340 proving Mr.
11   Stern has a better Bates numbering system than
12   I do.
13           Have you seen either of those
14   documents before?
15       A.   The -- yes. The item 103 is the
16   contract that I ultimately signed.
17       Q.   And that is your signature on the
18   last page?
19       A.   That is my signature on page 3.
20       Q.   And it appears to have been dated
21   on October 7th, 2008. Did you put that date
22   in there when you signed it?
23       A.   Yes, I did.
24       Q.   Okay. That's your handwriting?
25       A.   Yes, it is.

Page 56

1      H. McGEE - HIGHLY CONFIDENTIAL
2        Q.   And does this document accurately
3    state your compensation agreement with
4    Barclays for employment that commenced on
5    September 22nd, 2008? I'm making note of the
6    start date in the document.
7        A.   Yes, it does.
8        Q.   Now, if you would take a look at
9    Exhibit 102, Mr. McGee, that's an e-mail from
10   you to an address called Accept Barclays
11   Offer.
12           Do you recall sending this
13   document?
14       A.   I don't recall specifically but my
15   assumption is that there was a central
16   clearinghouse that you had to send an e-mail
17   into to basically say you're in or not. I
18   didn't have my contract yet. But I thought it
19   was important for me to be shown as in the --
20   you know, in the list of -- I didn't want to
21   continue showing up on the list of people who
22   were not "in." I think that is my
23   recollection.
24       Q.   As I understand it, for the
25   transferred employees there was a sort of

Page 57

1      H. McGEE - HIGHLY CONFIDENTIAL
2    default. If you didn't say yes at a certain
3    point you would be deemed to say no. So you
4    had to say yes to a website of some kind.
5        A.   There was some sort of an e-mail
6    that went into some sort of a central thing
7    and I still didn't have my contract because
8    obviously that wasn't signed until a couple of
9    weeks later. But I had a handshake deal with
10   Bob Diamond. I had no reason to not believe
11   that at some point the -- you know, a contract
12   in line with the handshake deal would come
13   forth.
14       Q.   When did you reach the handshake
15   deal?
16       A.   That night.
17       Q.   Was the handshake deal on the
18   numbers that are shown --
19       A.   The night that -- you know, that I
20   described earlier, the two conversations. It
21   was the Monday night, whatever night that was.
22       Q.   That's Monday, the 15th?
23       A.   That would be Monday, the 15th.
24       Q.   Okay. And were the numbers that
25   are reflected in Exhibit 103, were they agreed

Page 58

1    H. McGEE - HIGHLY CONFIDENTIAL
2  upon as part of the handshake deal?
3      A.   Again, we discussed it in
4  percentage terms down from '07 to '08. And a
5  one-year deal. But, yes.
6      Q.   Okay.
7          MR. GAFFEY: This is a good time
8  for a break.
9          MR. STERN: Yeah. Let's take a
10 short break. Good.
11         (Recess taken.)
12 BY MR. GAFFEY:
13     Q.   Let's go back on the record.
14         Mr. McGee, if you would -- we're
15 still taking a look at Exhibit 103, your
16 signed employment agreement with Barclays. I
17 just want to get some clarity on the numbers.
18 When we spoke earlier about your Lehman
19 compensation you were able to give me full
20 year for '07 of ███████ consisting of █
21 cash and █ restricted stock?
22     A.   That is correct.
23     Q.   And for '08 you told me what I
24 believe you described as a pro rata piece of
25 that year. I may not have been clear in my

Page 59

1    H. McGEE - HIGHLY CONFIDENTIAL
2  questioning. Was your compensation supposed
3  to go up for '08 over '07?
4      A.   For Lehman?
5      Q.   Yes.
6      A.   It had not been determined. I had
7  a base salary.
8      Q.   Okay.
9      A.   And you get paid I think
10 bimonthly -- or twice a month.
11     Q.   Um-hum.
12     A.   Maybe it's monthly.
13     Q.   So when you made the deal with Mr.
14 Diamond to be down 20 percent over one year
15 that was 20 percent of what?
16     A.   '07.
17     Q.   Off of '07. All right. So if you
18 would take a look at Exhibit 103 when you were
19 20 percent down off of '07, is that -- I take
20 it that's not including the item called
21 special cash award for ███████?
22     A.   That's correct.
23     Q.   Okay. So the calculation of 20
24 percent off for '08 would be in the first two
25 parts, guaranteed cash bonus and EPP

Page 60

1    H. McGEE - HIGHLY CONFIDENTIAL
2  recommendation?
3      A.   That is correct.
4      Q.   And the EPP recommendation is
5  Barclays' version of a restricted stock
6  program, correct?
7      A.   Correct.
8      Q.   So what was the special cash award
9  for?
10     A.   The special cash award was a
11 retention program that BarCap put in place for
12 a number of the senior people to basically
13 induce them to stay longer than the term of
14 the contract and it was vested over two years
15 and you had to be there -- like a normal
16 retention award, you had to be there to
17 collect it.
18     Q.   And this has half on your first
19 anniversary and half on your second, right?
20     A.   That is correct.
21     Q.   Okay. So was the special cash
22 award in any way compensation in respect of
23 your services to Lehman during 2008?
24     A.   No. I don't believe so.
25     Q.   Okay.

Page 61

1    H. McGEE - HIGHLY CONFIDENTIAL
2      A.   And the reason is because you had
3  to be here to collect it.
4      Q.   For the first year and then for
5  the second to get the second half, right?
6      A.   Right.
7      Q.   Okay. Now, when you were involved
8  in the negotiations of the asset purchase
9  agreement, we spoke a while before the break
10 about aspects of that agreement that covered
11 compensation to transferred employees.
12         Do you recall that?
13     A.   Yes.
14     Q.   And that was a part of the
15 agreement that you were involved in, correct?
16     A.   Correct.
17     Q.   Okay. And do you recall that
18 there was a pool set aside, an amount of money
19 set aside for Barclays to pay transferred
20 employees in respect of their '08 Lehman --
21         MR. STERN: Objection to the form.
22     Q.   -- compensation?
23         MR. STERN: Can I hear the
24 question again?
25         MR. GAFFEY: I can rephrase it.

## Page 62

H. McGEE - HIGHLY CONFIDENTIAL

1    Never mind. Withdrawn.
2    Q.    As best you recall, sir, what
3    aspects of the asset purchase agreement
4    addressed compensation to be paid by Barclays
5    to Lehman employees? Describe them as best
6    you remember.
7    A.    There was a provision in the
8    contract that dealt with compensation and how
9    continuing employees were to be treated and
10    how employees who were not continuing
11    employees were to be treated.
12    Q.    Do you have any more independent
13    recollection on that?
14    A.    No.
15    Q.    We'll come to the documents, okay.
16    I'd like to switch topics here and
17    in particular switch time periods and go back
18    to the period in the week prior to the
19    bankruptcy filing, okay? If you could...
20    And I think you mentioned to me
21    this morning that you had some involvement
22    going back as far as March but certainly in
23    the week before that looking for transactions
24    with Bank of America, with Barclays, other

TSG Reporting - Worldwide (877) 702-9580

## Page 63

H. McGEE - HIGHLY CONFIDENTIAL

1    potential transaction parties.
2    Q.    Were any investment bankers
3    retained to assist in that during that time
4    period?
5    A.    Retained by Lehman Brothers?
6    Q.    Yes, sir.
7    A.    There was another investment bank
8    that was retained by Lehman Brothers to give
9    an independent point of view to the board.
10    That investment bank was Lazard.
11    MR. GAFFEY: Let's mark this as
12    104.
13    (Deposition Exhibit 104, e-mail
14    dated 9/14/2008 6:15 a.m. with
15    attachments, marked for identification
16    as of this date.)
17    BY MR. GAFFEY:
18    Q.    Take a look, Mr. McGee, through
19    the document we've marked as Exhibit 104. Let
20    me know when you've had a chance to do that
21    sufficient to tell me whether you've seen it
22    before.
23    (Document review.)
24    A.    Okay.

TSG Reporting - Worldwide (877) 702-9580

## Page 64

H. McGEE - HIGHLY CONFIDENTIAL

1    Q.    Have you seen the document before,
2    sir?
3    A.    If I've seen it I don't remember
4    it.
5    Q.    The document appears to be an
6    e-mail from Brad Whitman to you and others if
7    you take a look at the first page. Who's Brad
8    Whitman?
9    A.    Brad Whitman worked for Lehman
10    Brothers. He was an M&A banker focused on
11    FIG. Financial institutions.
12    Q.    Did he report to you, directly or
13    indirectly?
14    A.    Indirectly.
15    Q.    Okay. If you would take a look,
16    please, at the fifth slide in the slide dec
17    that's attached to that e-mail entitled Sales
18    Strategic Investment Process, can I just -- if
19    you don't mind if I come around. I want to
20    make sure we're on the same page here.
21    A.    This one (indicating)?
22    Q.    Yeah. That's the one.
23    Did the term Green come to your
24    attention as a pseudonym for Lehman in

TSG Reporting - Worldwide (877) 702-9580

## Page 65

H. McGEE - HIGHLY CONFIDENTIAL

1    materials that were prepared in connection
2    with potential transactions?
3    A.    I assume that Green was Lazard's
4    code name for Lehman.
5    Q.    Okay. There's a description on
6    this slide of -- well, it says, "Lazard
7    understands Green has contacted approximately
8    30 strategic private equity sovereign wealth
9    institutions over the last three months about
10    a potential investment in or acquisition of
11    Green. Most of the discussions were premised
12    on a separation of Green's commercial real
13    estate assets. Lazard was not asked to
14    solicit interest for Green."
15    And then there are four columns
16    below that denoting particular entities and
17    characterizing them. Active, current
18    discussions, recent inbound inquiries, et
19    cetera.
20    Do you have any independent
21    knowledge, sir, of a program to conduct
22    strategic -- to contact institutions such as
23    those listed on this slide to see if they were
24    interested in a transaction with Lehman?

TSG Reporting - Worldwide (877) 702-9580

Page 66

1       H. McGEE - HIGHLY CONFIDENTIAL
2       A.   Sure.
3       Q.   And you'll note that in the
4    left-hand column Barclays and Bank of America
5    are listed and described as the active current
6    discussions, correct?
7       A.   Correct.
8       Q.   Okay. To the right of that
9    there's a series of other entities, CITIC,
10   Nomura, Korea, Inc., et cetera, et cetera.
11          To your knowledge, sir, were any
12   of these entities contacted about interest in
13   a potential transaction after the asset
14   purchase agreement with Barclays was signed on
15   the 16th?
16      A.   To my knowledge, I don't know. I
17   would think that given the fact that through
18   the course of the summer we had been in
19   contact with almost -- because if you go to
20   the next page -- almost every financial
21   institution on the planet, that if one had
22   interest when one saw the transaction
23   announcement one could have -- we had already
24   contacted a very, very significant number of
25   people who for different reasons had not had
         TSG Reporting - Worldwide  (877) 702-9580

Page 67

1       H. McGEE - HIGHLY CONFIDENTIAL
2    interest. And -- but I don't know
3    specifically if additional outbound calls were
4    made. I did not make any. As I said, I got
5    on a plane to London trying to see if there
6    was a transaction to be done to put the rest
7    of Lehman Brothers back together.
8       Q.   I'm presuming that while you were
9    in London you were in contact with your office
10   by phone and by e-mail, right?
11      A.   Correct.
12      Q.   Were you in a position to know --
13   withdrawn.
14          Did you ever ask during the week
15   after the asset purchase agreement was signed
16   on September 16th whether the deal was being
17   shopped or offered to other parties?
18      A.   I did not specifically ask. I
19   cannot believe that if anybody had any
20   interest why they would not have shown up.
21   And there was no one else there. We had
22   canvassed the world.
23      Q.   When the asset purchase agreement
24   was signed, when it was agreed to, did you
25   have an understanding of the economics of the
         TSG Reporting - Worldwide  (877) 702-9580

Page 68

1       H. McGEE - HIGHLY CONFIDENTIAL
2    transaction that was agreed with Barclays?
3       A.   You'll have to be more specific.
4    What do you mean by economics?
5       Q.   Who paid what for what? What was
6    the price given to Barclays?
7       A.   In general, yes. And I'll
8    describe that for you. Specifically, no.
9          In general my understanding was
10   that Barclays was going to buy the building, a
11   couple of data centers, the people, which is
12   really the assets that had value, and, as I
13   stated previously, were evaporating under our
14   feet.
15          And some amount of balance sheet
16   assets which was determined by a separate
17   working group that I'm not familiar with
18   exactly was included in balance sheet items.
19      Q.   Who was the separate working group
20   that determined the balance sheet items?
21      A.   The balance sheet items were
22   focused on by Alex Kirk, by Bart McDade, by
23   Mike Gelband. Certainly Ian and Paolo would
24   have been involved as well.
25      Q.   By Ian you mean Ian Lowitt?
         TSG Reporting - Worldwide  (877) 702-9580

Page 69

1       H. McGEE - HIGHLY CONFIDENTIAL
2       A.   Even Lowitt.
3       Q.   And Paolo is Paolo Tonucci?
4       A.   Paolo Tonucci, yes.
5       Q.   Did you, during the course of --
6    excuse me -- during the course of the week
7    leading to the closing on the 22nd, did you
8    see any work product or analysis generated by
9    that working group or people under their
10   supervision?
11      A.   Not to my recollection.
12      Q.   Did you have a general
13   understanding or do you have one today about
14   that -- that's two questions. Withdrawn.
15          Did you have a general
16   understanding at the time of the value, the
17   amount of balance sheet assets, that were
18   going to be transferred to Barclays?
19      A.   No.
20      Q.   I may have confused that by
21   interrupting myself.
22          Let me be clear on time period.
23   My question goes to at the time, sir. At the
24   time did you have an understanding what
25   quantum of balance sheet assets was going to
         TSG Reporting - Worldwide  (877) 702-9580

Page 70

1    H. McGEE - HIGHLY CONFIDENTIAL
2  be transferred over to Barclays?
3     A.  No, I did not. My understanding
4  was that the structure of the transaction was
5  an asset purchase and there was still work
6  being done to agree on exactly what the assets
7  were to be purchased.
8     Q.  Do you know, sir, if there was any
9  discount off the book value of the assets
10  transferred, any agreed discount off the book
11  value?
12     A.  I was not involved in that process
13  so I have no idea.
14     Q.  Did you review the asset purchase
15  agreement when it was finalized and signed?
16     A.  No, I did not.
17     Q.  Have you reviewed it since?
18     A.  No, I have not.
19     Q.  Did anyone ask you to review it at
20  the time that it was signed?
21     A.  No.
22        With the exception of the
23  provision relating to compensation and
24  employees.
25     Q.  Okay.
      TSG Reporting - Worldwide  (877) 702-9580

Page 71

1    H. McGEE - HIGHLY CONFIDENTIAL
2        (Pause on the record.)
3     Q.  Now, Mr. McGee, I've put before
4  you what we previously have marked as
5  Deposition Exhibit 1.
6        Do you recognize the document?
7     A.  Actually, I don't recognize it.
8  But I take it for what it's labeled to be.
9     Q.  Okay. And that would be the asset
10  purchase agreement between Lehman Brothers
11  Holdings, Lehman Brothers, Inc., LB 745, LLC
12  and Barclays Capital, dated as of September
13  16th, 2008?
14     A.  That is what it says on the cover.
15  Yes, sir.
16     Q.  Prior to today, have you ever seen
17  this document that we've marked as Exhibit 1?
18     A.  No. Have not.
19     Q.  Would you take a look, please,
20  at --
21     A.  Have not seen in it in its
22  entirety. I have seen a provision
23  (indicating).
24     Q.  Okay. You're pointing to a
25  provision. Which one are you pointing to?
      TSG Reporting - Worldwide  (877) 702-9580

Page 72

1    H. McGEE - HIGHLY CONFIDENTIAL
2  Page 34?
3     A.  Page 34.
4     Q.  Okay.
5     A.  That my counsel has helpfully
6  paged me to.
7     Q.  And page 34 is the beginning of
8  Article 9 entitled Employees and Employee
9  Benefits, correct?
10     A.  Correct.
11     Q.  And if you would take a look, sir,
12  please, through -- you'll note it has three
13  subsections, (a), (b), and (c), right?
14     A.  Yes.
15     Q.  Were you involved in the drafting
16  or the finalizing of the language in
17  Exhibit -- in Section 9.1 of the asset
18  purchase agreement?
19     A.  Yes, I was.
20     Q.  Describe for me as best -- with it
21  in front of you, describe for me as best you
22  remember exactly what your role was in
23  drafting or finalizing that language.
24     A.  Again, as I mentioned earlier, I
25  had very real-time and serious concerns about
      TSG Reporting - Worldwide  (877) 702-9580

Page 73

1    H. McGEE - HIGHLY CONFIDENTIAL
2  the franchise of Lehman Brothers and
3  preserving some value in that franchise.
4  Headhunters were conducting very aggressive
5  campaigns to hire senior employees, groups of
6  employees, entire industry groups. We had
7  very significant numbers of employees,
8  certainly in investment banking that already
9  had contracts in hand from competitors. And I
10  was worried about the value of Lehman Brothers
11  I was about to walk out the front door if this
12  wasn't handled the right way.
13        So I was involved in the
14  discussion of these provisions. Two places
15  where I was the most involved had to do with
16  what would happen with employees who didn't
17  end up having a job, would they be treated
18  fairly and appropriately severed because there
19  was bound to be redundancies and I wanted to
20  make sure that the severance program was
21  consistent with the kind of severance program
22  that Lehman had historically utilized.
23        The second was to make sure that,
24  in fact, there was a bonus pool and bonuses
25  paid for employees because, as I mentioned
      TSG Reporting - Worldwide  (877) 702-9580

Page 74

1     H. McGEE - HIGHLY CONFIDENTIAL
2  previously, if you're a senior employee you
3  work for a salary which is ultimately a
4  fraction of your compensation and it's about
5  the year-end bonus or year-end compensation.
6     And if we didn't have -- if we did
7  not have an adequate answer to this question I
8  worried about our ability to retain the
9  franchise represented by the employees.
10     Q.   Are you finished with your answer,
11 sir?
12     A.   Yes.
13     Q.   Okay. Why were you worried about
14 Barclays' ability to retain employees after
15 the transaction? Why was that a matter of
16 concern to you?
17     A.   Because if we couldn't represent
18 to the employees that there was a program to
19 take care of them they were going to leave.
20 They had offers away.
21     Q.   Okay. And --
22     A.   And without employees the client
23 relationships, the -- there's no value to the
24 business. At least that was my view.
25     Q.   Do you know if any part of the
                TSG Reporting - Worldwide  (877) 702-9580

Page 75

1     H. McGEE - HIGHLY CONFIDENTIAL
2  consideration paid in the asset purchase
3  agreement was consideration paid for the
4  franchise value of Lehman?
5     A.   My understanding was that there
6  was a "goodwill" number that was included in
7  the transaction.
8     Q.   Can you remember what the
9  "goodwill" number was?
10     A.   250 million was what I had heard.
11     Q.   And did you have a view at the
12 time as to whether the Lehman franchise was
13 worth $250 million?
14     MR. STERN: Objection to the form.
15     A.   I would say that that's a very
16 difficult question to answer. What I would
17 say was that that number was very rapidly
18 speeding to zero. And the more employees --
19 the more key employees that left to go to
20 other firms, it was quite certainly going to
21 zero.
22     Q.   Now, when the agreement was being
23 negotiated prior -- the agreement being the
24 asset purchase agreement before it's signed --
25 what's contemplated, as I understand it, is a
                TSG Reporting - Worldwide  (877) 702-9580

Page 76

1     H. McGEE - HIGHLY CONFIDENTIAL
2  sale of assets; the building, the two data
3  centers, the balance sheet assets.
4     Can you describe for me what
5  interest Lehman Brothers Holdings or Lehman
6  Brothers, Inc. would have in the continued
7  viability of the franchise after Barclays
8  bought those assets?
9     THE WITNESS: Could you repeat the
10 question.
11     (Record read.)
12     A.   Well, I can't speculate as to what
13 their interests are or should have been but I
14 would -- I would assume that one would be
15 interested in the franchise staying intact
16 through the transaction so that the purchaser
17 actually carried through with the transaction
18 and actually purchased.
19     If there was no franchise, if
20 there was no people and most of the key
21 employees had left to go do other things and
22 the only employees that were remaining were
23 those that generally couldn't find
24 opportunities elsewhere, I would think that
25 what was there for any potential purchaser was
                TSG Reporting - Worldwide  (877) 702-9580

Page 77

1     H. McGEE - HIGHLY CONFIDENTIAL
2  much less valuable and, therefore, what was
3  then realized in any transaction was much
4  lower.
5     Q.   So when you spoke about the
6  severance program before you said there were
7  two main topics that were of concern to you;
8  one was how severed, terminated employees
9  would be treated because there would be
10 redundancies; and the other was the
11 establishment of a bonus pool.
12     Let's talk about the first piece,
13 the severance piece. Is the agreement
14 regarding severance that was reached the one
15 that's reflected in paragraph 9.1(b) of the
16 asset purchase agreement?
17     A.   I believe that to be true. I
18 looked at drafts of just this article.
19     Q.   Um-hum.
20     A.   And worked on some of the
21 language. I didn't reread the entire document
22 as signed. But my understanding is that it
23 was -- that this is consistent.
24     Q.   You just said something that went
25 back to the question I asked a few moments ago
                TSG Reporting - Worldwide  (877) 702-9580

Page 78

H. McGEE - HIGHLY CONFIDENTIAL

1    which is actually what mechanically you were
2    doing. Were you marking up drafts as they
3    came -- from time to time as they came through
4    of this document?
5       A.   I looked at a draft of this
6    language along the way and got involved in
7    some discussions to change some of provision
8    (b) and some of provision (c).
9       Q.   Do you recall what provisions of
10   subparagraph (b) and subparagraph (c) were the
11   subject of changes?
12      A.   Specifically to say that the
13   severance was going to be no less favorable
14   than they would have been entitled to had they
15   been basically under Lehman's program to put
16   it in common language.
17      Q.   No pool was put together to fund
18   the severance obligations under 9.1(b); is
19   that correct?
20         MR. STERN: Objection to the form.
21      A.   I have no idea. I don't know the
22   answer to that.
23      Q.   When you were speaking before
24   about making sure there was a bonus pool tell

Page 79

H. McGEE - HIGHLY CONFIDENTIAL

1    me what steps, if any, you took to make sure
2    there was a bonus pool.
3       A.   There was a calculation made, and
4    I'm not sure by who, to come up with some
5    amount which was a number to represent the
6    accrued compensation liability for the North
7    American business. That was a complicated
8    calculation because normally Lehman was
9    operated as a global business. Investment
10   banking was global. Equities was global. I
11   never -- people never thought about the comp
12   pool as, you know, sub pieces of it. You also
13   had, you know, comp always -- the "comp line"
14   always has other stuff in there besides pure
15   bonus. There's -- severance probably flows
16   through there. There's other benefits. So
17   it's somewhat unclear.
18         But what was important was that
19   there was a defined number that was calculated
20   by somebody, I'm not sure who, that was based
21   on the historical Lehman accruals which I
22   guess were then pro rated through for the
23   balance of the year and to come up with a
24   number.

Page 80

H. McGEE - HIGHLY CONFIDENTIAL

1       Q.   Did you review any of the work
2    that was done with respect to calculating that
3    pool?
4       A.   No. No.
5       Q.   And, again, I'm sorry if I'm
6    repeating myself or asking you to answer again
7    but do you know who was involved in -- you
8    know, who signed off on a final number for
9    that pool?
10      A.   I don't know. I'm not sure who
11   calculated it.
12      Q.   Would you take a look at paragraph
13   9.1(c). It's at page 35 of Exhibit 1.
14      A.   Um-hum.
15      Q.   Let me know when you've had a
16   chance to read through the language of that
17   section. You don't need to memorize it but I
18   want you to familiarize yourself with it
19   because I'm going to go to different pieces of
20   it.
21         (Document review.)
22      A.   Okay.
23      Q.   Now, there's a reference in
24   9.1(c), sir, to a financial schedule delivered

Page 81

H. McGEE - HIGHLY CONFIDENTIAL

1    to purchaser on September 16th, 2008 and
2    initialed by an officer of each of Holdings
3    and purchaser defined as "The Accrued '08 FY
4    Liability."
5         Do you see that?
6       A.   Yes.
7       Q.   Have you ever seen that schedule?
8       A.   No.
9       Q.   Well, do you know how much was --
10   do you know how much -- what the amount of the
11   accrued '08 FY liability was that was referred
12   in to paragraph 9.1(c)?
13      A.   I heard of number of 2 billion.
14      Q.   And who did you hear that number
15   from?
16      A.   I don't recall.
17      Q.   And did you hear it at or around
18   the time the asset purchase agreement was
19   being finalized and signed or at some
20   subsequent time?
21      A.   I'm not sure. I think I heard it
22   at or -- I may have heard it at or about the
23   time but I'm not positive.
24      Q.   Well, when you were --

Page 82

H. McGEE - HIGHLY CONFIDENTIAL

1
2  A.  And I'm not sure exactly what was
3  in the two.
4  Q.  When you were working on these two
5  pieces, you know, severance and bonus,
6  wouldn't you have -- I mean, once you got the
7  agreement in place to actually pay the
8  bonuses, wouldn't you have been concerned to
9  see that the bonus pool was enough?
10  A.  My understanding was based on how
11  the number was calculated that it took the
12  accrual year-to-date, grossed it up, reflected
13  the subset of the employees that were part of
14  this transaction, that it would be the right
15  number, but I didn't know how exactly what
16  was -- exactly was was included in all this
17  stuff.
18  Q.  And you don't remember who it was
19  that described that formula to you that gave
20  you comfort that it was based on the accrued
21  bonus -- the accrued liability for bonuses on
22  Lehman's books?
23  MR. STERN: Objection to the form.
24  A.  No.  I don't recall.
25  Q.  I'm giving you a copy of a

TSG Reporting - Worldwide  (877) 702-9580

Page 83

H. McGEE - HIGHLY CONFIDENTIAL

1
2  document, Mr. McGee, that was marked as
3  Exhibit 19 at a prior deposition.  Have you
4  ever seen that document before?
5  A.  No.  Not to my recollection.
6  Q.  Would you be able to tell me one
7  way or the other whether this is the financial
8  schedule referred to in paragraph 9.1(c) of
9  the asset purchase agreement?
10  A.  I can't comment one way or the
11  other.
12  Q.  Do you know if in the process of
13  calculating the accrued liability for bonuses
14  on Lehman's books that number was overstated
15  in connection with the asset purchase
16  agreement?
17  A.  I have no way of knowing.
18  Q.  If you wanted an answer to that
19  question who would you ask amongst the former
20  Lehman employees?
21  A.  And the question being again?
22  Q.  Whether the accrual for bonus
23  liability that's referred to in paragraph
24  9.1(c) was inflated.
25  A.  And as reflected on Exhibit 19

TSG Reporting - Worldwide  (877) 702-9580

Page 84

H. McGEE - HIGHLY CONFIDENTIAL

1
2  from the prior deposition?
3  Q.  Actually, no.  Without reference
4  to that because you've told me you'd never
5  seen that before and you can't tell me if it
6  has anything to do with 9.1(c).  So I'm really
7  talking about what's referred to in paragraph
8  9.1(c).
9  Just for clarity, since -- I beg
10  your pardon.  Since you've asked for that
11  clarification, let me ask you both questions
12  again.
13  A.  Okay.
14  Q.  Solely with respect to the
15  language of 9.1(c), do you know if the '08
16  liability referred to in that section was
17  inflated for the purposes of September 16th,
18  2008 asset purchase agreement?
19  A.  When you say inflated, do you mean
20  to -- grossed up to reflect a full year or do
21  you --
22  Q.  No, I'm --
23  A.  Because I -- or do you mean
24  inflated as not reflective of the number that
25  was in the -- supposedly in the books and

TSG Reporting - Worldwide  (877) 702-9580

Page 85

H. McGEE - HIGHLY CONFIDENTIAL

1
2  records of Lehman Brothers?
3  Q.  The latter.
4  A.  I have no knowledge that --
5  Q.  And my second question was who
6  would ask you within the group of former
7  Lehman employees if you wanted an answer to
8  that question?
9  A.  People that were responsible for
10  accruals on the balance sheet starting with
11  Ian Lowitt and Paolo Tonucci.
12  Q.  Do you know Martin Kelly?
13  A.  Yes.
14  Q.  Who is Martin Kelly?
15  A.  He works in the finance and
16  accounting area for Lehman.
17  Q.  To whom did he report at Lehman?
18  A.  I'm not exactly sure.  Maybe Ian.
19  But I'm not positive.
20  (Pause on the record.)
21  Q.  Do you recall, sir, if you knew --
22  after the asset purchase agreement was signed
23  but before the deal was closed on the 22nd, if
24  you knew what the amount of the pool was that
25  we've been talking about established under

TSG Reporting - Worldwide  (877) 702-9580

Page 86

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    Article 8 of the APA?
3        A.   Define the pool for me.
4        Q.   You made reference before to a
5    bonus pool.
6        A.   Correct.
7        Q.   Did you know at the time, even if
8    you don't remember now, what the amount was?
9        A.   There's an accrual that's
10   referenced.  Unclear to me exactly what is
11   included in the accrual.
12       Q.   Um-hum.
13       A.   A portion of the accrual I assume
14   is a year-end bonus pool.  A portion of it is
15   an accrual for remaining salaries.  A portion
16   of it is accrual for other comp and benefits.
17   Probably a portion of it is an accrual for
18   estimated severance.  So unclear when you say
19   the pool, exactly which part of these accruals
20   that you're referring to.
21       MR. GAFFEY: Mark that, please.
22       (Deposition Exhibit 105, document
23       bearing production number 10321888,
24       marked for identification as of this
25       date.)
     TSG Reporting - Worldwide  (877) 702-9580

Page 87

1    H. McGEE - HIGHLY CONFIDENTIAL
2    BY MR. GAFFEY:
3        Q.   We've marked as Deposition
4    Exhibit 105, Mr. McGee, a one-page document.
5    It appears to be an e-mail from you dated
6    September 18th, 2008 8:01 a.m. GMT to Anthony
7    Collerton.  Subject, Confidential.
8        Take a look at this document.
9    Tell me if you recall seeing it before.
10       A.   It's an e-mail that I sent.  That
11   is correct.
12       MR. STERN: Take a look at the
13       e-mails starting at the bottom.
14       (Document review.)
15       Q.   Have you had a chance to look
16   through the document?
17       A.   Um-hum.
18       Q.   And the top e-mail is from you to
19   Anthony Collerton.  Who is Anthony Collerton?
20       A.   He worked in HR for Lehman
21   Brothers.
22       Q.   And in your e-mail to Mr.
23   Collerton you ask this question: "Of the 2
24   billion number, what is share for IBD?"
25       Do you know what $2 billion number
     TSG Reporting - Worldwide  (877) 702-9580

Page 88

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2    you were referring to when you wrote that
3    e-mail to Mr. Collerton on September 18th?
4        A.   I believe that to be the 2 billion
5    number that I had heard to be the accrual
6    number.
7        Q.   Okay.  And you go on in the e-mail
8    to Mr. Collerton to ask, "Is that remaining
9    salary plus year-end bonus?"
10       Do you see that?
11       A.   Yes.
12       Q.   Did you get an answer to that
13   question?
14       A.   No.
15       Q.   Do you know the answer as you sit
16   here today?
17       A.   No.
18       Q.   And then you ask Mr. Collerton,
19   "Does it include the retention or is that
20   separate?"
21       Do you see that?
22       A.   Yep.
23       Q.   Did you get an answer to that
24   question?
25       A.   Nope.
     TSG Reporting - Worldwide  (877) 702-9580

Page 89

1    H. McGEE - HIGHLY CONFIDENTIAL
2        Q.   Do you have an answer to that as
3    you sit here today?
4        A.   No.
5        Q.   Did you ever known the answer to
6    either -- any of those three questions?
7        A.   No.
8        Q.   So looking again at what was
9    marked as Exhibit 19, that's the financial
10   schedule that shows a $2 billion number for
11   comp, you have -- you can't tell us whether
12   that $2 billion is for bonuses only, for
13   bonuses and salary, or for bonuses and
14   severance, can you?
15       A.   Cannot.
16       Q.   Do you have any idea at all?
17       A.   No.
18       (Deposition Exhibit 106, e-mail
19       dated 9/17/2008 2:21 p.m., marked for
20       identification as of this date.)
21   BY MR. GAFFEY:
22       Q.   Mr. McGee, I've marked as
23   Exhibit 106 a one-page e-mail from Ajay Nagpal
24   to Bart McDade, Michael Gelband, Gerald
25   Donini, Thomas Humphrey, yourself, Eric Felder
     TSG Reporting - Worldwide  (877) 702-9580

Page 90

1    H. McGEE - HIGHLY CONFIDENTIAL
2  and Hyung Lee.
3        Have you seen this e-mail before?
4    A.   I see that I'm listed as one of
5  the addressees.  I don't recall it.  I'm
6  reading it now.
7        (Document review.)
8    A.   Okay.  I've read it.
9    Q.   Having read through it does it
10 refresh your recollection as to whether you've
11 seen it prior to today?
12   A.   It appears I received this.  I
13 can't recall receiving this specific e-mail
14 but I get hundreds every day and there's lots
15 of days between now and then.
16   Q.   Okay.  You can put that e-mail
17 aside then.
18       (Pause on the record.)
19   Q.   Could you take from the pile in
20 front of you, please, Mr. McGee, Exhibit 103.
21 It's your signed --
22   A.   Contract.
23   Q.   -- contract.  And you also need in
24 front of you the asset purchase agreement.
25   A.   Okay.

TSG Reporting - Worldwide  (877) 702-9580

Page 91

1    H. McGEE - HIGHLY CONFIDENTIAL
2    Q.   Now, having been involved in the
3  drafting of Article 9 of the asset purchase
4  agreement you would meet the definition, sir,
5  of a transferred employee as it's used in that
6  provision, correct?
7    A.   Correct.
8    Q.   Okay.  And with reference to your
9  employment agreement, could you tell us, sir,
10 of the four components of compensation, that
11 is your base salary, your 2008 guaranteed cash
12 bonus, your 2008 EPP recommendation, and your
13 special cash award, which, if any, of those
14 four elements fall within the provisions of
15 9.1(c)?
16   A.   Well, my understanding would be
17 that certainly the base salary, the guaranteed
18 cash bonus, and the stock piece of that would
19 fall under that.
20       I don't know about the retention.
21   Q.   By the retention you mean the
22 special cash award?
23   A.   That is correct.
24   Q.   You don't know whether the special
25 cash award is within the rubric of the

TSG Reporting - Worldwide  (877) 702-9580

Page 92

1    H. McGEE - HIGHLY CONFIDENTIAL
2  agreement you helped negotiate, 9.1(c)?
3    A.   I don't know.
4    Q.   Now, when the asset purchase
5  agreement was concluded on the 16th -- when it
6  was signed, the one in front of you was signed
7  on the 16th of September 2008 -- and taking
8  into account, sir, you're telling me that you
9  had a general idea of its terms but
10 specifically dealt only with this -- do you
11 have a general sense of whether the pricing of
12 it was such that it was to the net benefit of
13 Lehman, the net benefit of Barclays or a wash?
14   A.   As I've answered previously, I was
15 not involved in the discussions around
16 specific assets so I -- you know, I can't
17 comment.
18   Q.   Did you have a sense of that at
19 the time?  Whether it was a net benefit to
20 Lehman, a net benefit to Barclays, or a wash?
21   A.   No.
22   Q.   There were hearings in the
23 bankruptcy court during the week of the 15th.
24 There was one on the 17th, the Wednesday, and
25 then there was one -- actually, there was one

TSG Reporting - Worldwide  (877) 702-9580

Page 93

1    H. McGEE - HIGHLY CONFIDENTIAL
2  on the 16th, there was one on the 17th, and
3  then there was one on Friday, the 19th.
4        Did you attend any of those?
5    A.   No.
6    Q.   And remind me, when did you leave
7  for London?  Wednesday?
8    A.   Wednesday afternoon for Thursday
9  morning.
10   Q.   Okay.
11       Did you see any of the filings
12 made with the bankruptcy court that described
13 the transaction at any point?
14   A.   No.
15   Q.   During the week of September 15th
16 there came a point -- did you ever learn that
17 during the week of September 5th there came a
18 point where Barclays stepped into the shoes of
19 the Federal Reserve with respect to a certain
20 repurchase agreement concerning Lehman?
21       MR. STERN:  I'm sorry.  The
22 date --
23   Q.   Withdraw the question.
24       During the week before the
25 transaction closed did the existence of a

TSG Reporting - Worldwide  (877) 702-9580

Page 94

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2   repurchase agreement in connection with the
 3   transaction come to your attention?
 4        A.   No.
 5        Q.   In any way whatsoever?
 6        MR. STERN: Objection to the form.
 7        MR. CHEPIGA: I don't know what it
 8   means.
 9        A.   No. I mean, subsequently, I've
10   heard reference to it but at the time, no.
11   And I was out of the country.
12        Q.   Apart from counsel, what
13   references have you heard to it subsequently?
14        A.   Nothing more than that there was a
15   repurchase agreement that Barclays got
16   involved in.
17        Q.   Anything more than that?
18        A.   No.
19        Q.   Anybody ever talk to you about the
20   use of the repurchase agreement as a means of
21   transferring the assets over to Barclays?
22        A.   No.
23        Q.   Do you know if the deal that was
24   made on the 16th of September, the one that
25   was signed on Tuesday, the 16th of September,
```
TSG Reporting - Worldwide  (877) 702-9580

Page 95

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2   was, in fact, the deal that was closed on
 3   Monday, the 22nd of September that the terms
 4   of the deal stayed the same?
 5        A.   I don't know.
 6        Q.   Do you know if the terms of the
 7   deal changed between the 16th and the 22nd?
 8        A.   I don't know.
 9        Q.   Did you attend the closing?
10        A.   No.
11        Q.   Did you ever see any amendments to
12   the asset purchase agreement that's before you
13   marked as Exhibit 1?
14        A.   No.
15        Q.   Did it ever come to your attention
16   that there were any amendments to the asset
17   purchase agreement?
18        A.   Maybe after the fact.
19        Q.   By after the fact you mean after
20   the closing?
21        A.   Yes.
22        Q.   In what manner did that come to
23   your attention?
24        A.   It might have been around this
25   process. I don't recall. But I don't feel
```
TSG Reporting - Worldwide  (877) 702-9580

Page 96

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2   like I can say I never heard that there were
 3   any changes.
 4        Q.   Yeah, and I appreciate that. What
 5   I want to do is focus on from the 22nd of
 6   September and prior.
 7        A.   Okay. I had not. No. I had not.
 8        Q.   Have you ever heard about the
 9   execution of a clarification letter concerning
10   the asset purchase agreement?
11        A.   No.
12        Q.   So I take it you were not involved
13   in the negotiation of any such clarification
14   letter.
15        A.   That is correct.
16        Q.   And had you heard about the
17   existence or the drafting or the negotiation
18   of such a clarification letter in the week
19   prior to the closing on the 22nd?
20        A.   I had not.
21        Q.   Did it ever come to your
22   attention, Mr. McGee, that Barclays announced
23   a certain gain upon the acquisition of the
24   Lehman assets?
25        A.   That Barclays announced --
```
TSG Reporting - Worldwide  (877) 702-9580

Page 97

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2        Q.   A gain on acquisition.
 3        A.   When would such announcement have
 4   been made?
 5        Q.   I'll show you a document.
 6        (Pause on the record.)
 7        Q.   Mr. McGee, I've put in front of
 8   you what was previously marked as Deposition
 9   Exhibit 22 entitled Barclays PLC Results
10   Announcement Figures 2008.
11        Let me ask you first, have you
12   seen this before?
13        A.   I have -- I have seen it but I
14   haven't read all the footnotes.
15        Q.   Okay. Well, let me show you --
16   I'm not going to ask you to read them all but
17   I am going to ask to you take a look at page
18   95.
19        A.   Okay.
20        Q.   There's a section -- there's a
21   note there entitled Acquisitions and in the
22   second-to-last paragraph do you see the phrase
23   "The excess of the fair value..."
24        A.   Yeah.
25        Q.   It says "The excess of the fair
```
TSG Reporting - Worldwide  (877) 702-9580

Page 98

1     H. McGEE - HIGHLY CONFIDENTIAL
2  value of net assets acquired over
3  consideration paid resulted in 2,262,000,000
4  pounds of gains on acquisition."
5        Do you see that?
6     A.   Yes, I do.
7     Q.   Did that announcement of a gain on
8  acquisition of the Lehman assets come to your
9  attention at or around the time Barclays made
10 this announcement?
11    A.   I saw it in the -- I saw it picked
12 up by the press and other places, yes.
13    Q.   And when you saw it picked up by
14 the press and in other places, did you have a
15 view as to whether it was consistent or
16 inconsistent with the terms of the transaction
17 in which you were involved in September of
18 2008?
19    A.   My sense is it was consistent with
20 the environment in which the transaction was
21 consummated; that it was the absolute worst
22 financial crisis anyone had ever seen, the
23 fact that somebody bought assets, any assets
24 at the very bottom, they were probably going
25 to ultimately earn a return on having stepped

TSG Reporting - Worldwide  (877) 702-9580

Page 99

1     H. McGEE - HIGHLY CONFIDENTIAL
2  up.
3     Q.   And when you say ultimately earn a
4  return, do you mean that over the longer term
5  make better use of those assets to return
6  profit?
7     A.   Perhaps ultimately is a bad term.
8  It's not surprising to me that there was a
9  gain if that's what you're asking me.
10    Q.   Would it be surprising to you that
11 there was a gain on acquisition? At the point
12 of acquisition.
13    A.   I'm not so sure that's what this
14 says.
15    Q.   Well, where it says there "on
16 acquisition" that's what I'm talking about.
17 Would it surprise you that there was a gain
18 "on acquisition"?
19    A.   I'm not sure I understand you.
20        MR. STERN:  If you don't
21    understand the question --
22    Q.   Do you understand the question?
23    A.   No, I don't.
24    Q.   Okay. Barclays purchases the
25 assets - as you put it, the franchise - gets

TSG Reporting - Worldwide  (877) 702-9580

Page 100

1     H. McGEE - HIGHLY CONFIDENTIAL
2  the people, gets the assets, on September
3  22nd, 2008.
4     A.   Correct.
5     Q.   As we sit here today Barclays has
6  had some opportunity to operate businesses
7  using those people and those assets and those
8  other facilities that were transferred to it,
9  correct?
10    A.   Right.
11    Q.   Barclays will have had over that
12 period of time as we sit here today some
13 degree of success or lack of success using
14 those assets and people and facilities, right?
15    A.   Correct.
16    Q.   My question has nothing to do with
17 any of that. My question has to do with
18 whether or not Barclays made a gain at the
19 moment it acquired the assets.
20    A.   Are these financial -- I thought
21 these financial estimates were as of December
22 31st.
23    Q.   I'm just asking you, sir, whether
24 it was your understanding that Barclays would
25 make a gain at the moment it acquired the

TSG Reporting - Worldwide  (877) 702-9580

Page 101

1     H. McGEE - HIGHLY CONFIDENTIAL
2  assets.
3     A.   As I said before, I was not
4  involved in the detail around the asset side
5  of the acquisition.
6     Q.   You were involved in the bigger
7  picture of negotiation of the transaction,
8  correct?
9        MR. STERN:  Objection to the form.
10    A.   I think that's a bit too broad. I
11 was involved -- I was involved in trying to
12 facilitate the transaction to try and make
13 sure that we had 48 hours to try to put
14 something together that we didn't forget
15 something. So I'd go around and say, you
16 know, are we buttoned up here, are we going to
17 need this approval, do we have to get these
18 guys. So I was wandering in and out of the
19 rooms. Anything material went to Bart McDade
20 for his sign-off. And anything related to the
21 balance I just wasn't involved in.
22    Q.   We've had more than one witness,
23 sir, prior to today describe you as one of the
24 principal negotiators of the transaction. Is
25 that accurate?

TSG Reporting - Worldwide  (877) 702-9580

Page 102

1    **H. McGEE - HIGHLY CONFIDENTIAL**
2         MR. STERN: Objection to the form.
3    Objection to the form.
4         A.   Of the senior Lehman executives
5    who were there for the entire time frame, you
6    know, two days without sleep, I was one of
7    them. But Bart McDade was my boss and he was
8    there the whole time, too.
9         So -- and in terms of a principal
10   negotiator I've never -- well, this is the
11   wrong document -- but that particular asset
12   purchase -- the only place I really dug in on
13   the language was around the stuff related to
14   the employees because, as I said before, the
15   employee base was -- some of them had one foot
16   out the door already.
17        Q.   Okay.
18        MR. GAFFEY: It would be a good
19   time to take a break now because I'm
20   going to move into a body of documents
21   that will take about an hour. So why
22   don't we take a lunch break now.
23        MR. STERN: Let's go off the
24   record.
25        (Discussion held off the record.)
TSG Reporting - Worldwide  (877) 702-9580

Page 103

1    H. McGEE - HIGHLY CONFIDENTIAL
2         (Luncheon recess taken at 12:22
3    p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
TSG Reporting - Worldwide  (877) 702-9580

Page 104

1    H. McGEE - HIGHLY CONFIDENTIAL
2    A F T E R N O O N   S E S S I O N
3         (Time noted:      1:07 p.m.)
4    H U G H   M c G E E,   resumed and testified
5         as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. GAFFEY:
8         Q.   Let's go back on the record. I
9    know you were in London during the week, Mr.
10   McGee, but did it come to your attention
11   during the week between the 15th and the 22nd
12   at any point that a problem had arisen and
13   that Lehman would not be able to deliver to
14   Barclay the assets promised in the asset
15   purchase agreement?
16        A.   No. It did not.
17        Q.   Did it ever come to your attention
18   that at the sale hearing that took place
19   before Judge Peck on Friday, the 19th of
20   September, the court was told that the value
21   of the assets to be transferred had fallen?
22        A.   I was not aware of that.
23        Q.   Did you have any knowledge of any
24   efforts being undertaken by folks at Lehman to
25   find additional assets to send to Barclays?
TSG Reporting - Worldwide  (877) 702-9580

Page 105

1         **H. McGEE - HIGHLY CONFIDENTIAL**
2    A.   No.
3         Q.   Has that -- have any facts
4    concerning those questions come to your
5    attention since the closing? I mean, since
6    you've been at Barclays.
7         A.   Any facts concerning -- well, I've
8    heard generally about some of that but, you
9    know, I'm not -- was not in the middle of it.
10        Q.   In your time at -- have you been
11   working at Barclays more or less continuously
12   since September 22nd? That was the start date
13   on your employment agreement.
14        A.   Yes.
15        Q.   And in your time at Barclays since
16   September 22nd -- let me back up. I need to
17   ask you this.
18        Did you start before or after the
19   closing? Working for Barclays.
20        A.   Well, I view working -- prior to
21   the closing I was working to preserve the
22   franchise which I viewed as working very much
23   for Lehman Brothers to try and preserve value
24   that could actually be closable against.
25        After the closing -- I mean, I
TSG Reporting - Worldwide  (877) 702-9580

Page 106

1     H. McGEE - HIGHLY CONFIDENTIAL
2  didn't just go away and come back. I mean, I
3  kept working but it was all the -- it was on
4  the same thing, trying to keep -- trying to
5  keep the people -- you know, it was herding
6  cats. I mean, it was --
7     Q.    That's what your activities in
8  the -- at least in the immediate
9  post-transaction days are still devoted to
10  keeping the team together.
11     A.    Correct.
12     Q.    Keeping the personnel to come over
13  and work at Barclays, yes?
14     A.    Right. Right.
15     Q.    In your time at Barclays since
16  September 22nd, 2008, have you had discussions
17  with Barclays personnel, that is people who
18  never worked at Lehman, where they've
19  expressed a view to you about whether the deal
20  was a good one or a bad one for Barclays?
21     A.    Oh, I think everybody who was a
22  historical Barclays employee looks at the
23  franchise that they had and now the franchise
24  that they have today, the capabilities, the
25  skill set, the reach, the product set, and
TSG Reporting - Worldwide  (877) 702-9580

Page 107

1     H. McGEE - HIGHLY CONFIDENTIAL
2  feels that the company is -- and I think the
3  company's own public pronouncements describes
4  the combination as transformational.
5     Q.    I'm more interested in what's
6  being said internally as opposed to the public
7  pronouncements. Are you -- have you had
8  conversations with senior executives at
9  Barclays where they have said to you in
10  substance that they paid less for the assets
11  than they were worth?
12     A.    No.
13     Q.    Have you had conversations with
14  senior Barclays executives where they have
15  told you that they got a good bargain on the
16  assets that were transferred?
17     A.    No.
18     (Deposition Exhibit 107, document
19     bearing production number 10270027,
20     marked for identification as of this
21     date.)
22  BY MR. GAFFEY:
23     Q.    Mr. McGee, I've put in front of
24  you what we've marked as Deposition
25  Exhibit 107, a one-page e-mail dated September
TSG Reporting - Worldwide  (877) 702-9580

Page 108

1     H. McGEE - HIGHLY CONFIDENTIAL
2  18th, 2008 from Tim Sullivan to you entitled
3  "Balance sheet that you and Archie signed."
4     A.    Um-hum.
5     Q.    Was there a balance sheet that you
6  and Archie signed?
7     A.    No. There was not.
8     Q.    Looking at this document, do you
9  recall receiving this document at or around
10  the time it's dated?
11     A.    It's easy to read it and see it
12  was addressed to me from Tim Sullivan. He
13  worked directly for me. This was sent to me
14  no doubt while I was in London. And
15  apparently people were looking around for a
16  document but I never signed any sort of
17  balance sheet.
18     Q.    Do you have any recollection --
19  and, again, I know you're in London at the
20  time but you talked to me before the lunch
21  break a fair bit about your main focus being
22  the compensation side of things, the human
23  capital as you put it, moving over to
24  Barclays.
25     Do you have any recollection of
TSG Reporting - Worldwide  (877) 702-9580

Page 109

1     H. McGEE - HIGHLY CONFIDENTIAL
2  being asked about the location of the $2
3  billion comp liability -- a document that
4  concerned $2 billion in comp liability?
5     A.    No. Just this e-mail.
6     Q.    Do you recall receiving it?
7     A.    I don't recall it but I clearly --
8  I can see that it's addressed to me but I --
9  you know, until you put this in front of me
10  now I can see that I did receive the e-mail.
11     Q.    Apart from the e-mail itself do
12  you have any independent recollection of
13  anybody asking you the whereabouts of a
14  schedule?
15     A.    No.
16     Q.    Do you have any recollection of
17  any conversation with Tim Sullivan along those
18  lines?
19     A.    I can't recall whether I responded
20  to this e-mail or whether I talked to him on
21  the phone but he -- I don't think he ever
22  found the schedule because I never saw one.
23     Q.    I want to separate out what you
24  might be inferring from what you know.
25     A.    Okay. That's fair.
TSG Reporting - Worldwide  (877) 702-9580

Page 110

1    H. McGEE - HIGHLY CONFIDENTIAL
2    Q.   Apart from the e-mail, itself,
3 let's just go through this, you never signed a
4 financial schedule. That much you have an
5 independent recollection of, right?
6    A.   That is true.
7    Q.   As a marginally separate topic do
8 you have any recollection of talking to Tim
9 Sullivan about him thinking you had signed a
10 financial schedule?
11    A.   No.
12    Q.   Do you have a recollection of
13 talking to anyone about them thinking you had
14 signed a financial schedule?
15    A.   No.
16    Q.   Was there ever a setting during
17 the week between the 15th of September and the
18 closing on the 22nd of September where you
19 signed anything in connection with the asset
20 purchase agreement?
21    A.   Not to my knowledge.
22    Q.   Did it ever come to your attention
23 at the time, during that week, did it come to
24 your attention that the schedule -- a schedule
25 that was related to the agreement bad gone
TSG Reporting - Worldwide  (877) 702-9580

Page 111

1    H. McGEE - HIGHLY CONFIDENTIAL
2 missing and people were looking for it?
3    A.   No.
4       (Deposition Exhibit 108, document
5    bearing production numbers 10269417,
6    marked for identification as of this
7    date.)
8 BY MR. GAFFEY:
9    Q.   We've put in front of you, Mr.
10 McGee, what we've marked as Deposition
11 Exhibit 108. It's a three-page e-mail chain
12 beginning with its earliest one that would be
13 on the last page, September 18th, 2008, from
14 Tim Sullivan and Ros Stephenson and others
15 including you.
16       Let me give you a sec -- why don't
17 you take a look through each portion of that
18 e-mail chain as you go up through the most
19 recent and let me know when you've had a
20 chance to do that.
21       MR. STERN: Before he does that is
22    there any particular part you're going
23    to focus on?
24       MR. GAFFEY: Well, we'll see as we
25    go.
TSG Reporting - Worldwide  (877) 702-9580

Page 112

1    H. McGEE - HIGHLY CONFIDENTIAL
2       MR. STERN: Okay.
3       MR. GAFFEY: The chances are each
4    piece of it, so spend enough time
5    reading each segment, please.
6       Was that your question Jack? Was
7    there one part of it?
8       MR. STERN: Yes.
9       (Document review.)
10    Q.   For clarity I should point out to
11 you that starting on the first page of the
12 document you disappear out of the e-mail chain
13 beginning witb tbe From Parker to Sullivan
14 September 18th, 8:54 p.m. near the bottom of
15 the page. So I'm not going to ask you about
16 what's above that, okay?
17    A.   Okay.
18    Q.   And if you turn to the last -- the
19 earliest e-mail in the chain, sir, from Larry
20 Wieseneck to Tim Sullivan, Ros Stephenson, and
21 others, c.c.'d to you entitled "Updates for
22 Skip. Skip, PLEASE READ."
23    A.   Yes.
24    Q.   Do you recall seeing tbat e-mail
25 from Mr. Wieseneck on the 18th -- around the
TSG Reporting - Worldwide  (877) 702-9580

Page 113

1    H. McGEE - HIGHLY CONFIDENTIAL
2 18th of September?
3    A.   Well, now, you've asked me to read
4 it. There were a lot of e-mails during this
5 period with similar discussions. So this
6 specific one I don't recall it specifically
7 but...
8    Q.   I picked this specific one for a
9 couple reasons. One, it's got that, "Skip
10 PLEASE READ."
11       You're in London at this point,
12 right?
13    A.   I'm in London.
14    Q.   And the men involved in this
15 e-mail chain are the group we talked about
16 earlier. You know, it's Wieseneck. And then
17 moving up it's Jeffrey Weiss and then moving
18 up it's Paul Parker.
19    A.   Um-hum.
20    Q.   So I guess my question is given
21 that it's an e-mail amongst these gentlemen
22 who I understand are fairly senior members of
23 IBD --
24    A.   Correct.
25    Q.   -- and it concerns an issue that
TSG Reporting - Worldwide  (877) 702-9580

Page 114

1  H. McGEE - HIGHLY CONFIDENTIAL
2 was of big concern to you, you know, who had
3 bids away and keeping the group together --
4  A. Correct.
5  Q. -- does that help you remember
6 whether or not you saw or focused on this
7 particular e-mail chain?
8  A. I'm sure I saw it.
9  Q. Okay. Apart from seeing it today
10 and being sure you saw it because it's an
11 e-mail, do you have any other independent
12 recollection of it?
13  A. No. Because, as I said, I get a
14 tremendous number of e-mails every day and
15 during that period of time I was getting
16 buried with e-mails just like this because
17 this guy's got a bid away, that guy's got a
18 bid away, this team's got a bid, what are we
19 going to do.
20  Q. Where Mr. Wieseneck writes -- and
21 I'm again at the earliest e-mail at the bottom
22 of the penultimate page, "Basically, the fear
23 is spreading that BARC bought us for nothing
24 and now don't even want to put up the right
25 dollar to pay people. This is the wrong way
  TSG Reporting - Worldwide  (877) 702-9580

Page 115

1  H. McGEE - HIGHLY CONFIDENTIAL
2 for them to start if they want to make money
3 on this asset."
4  Do you recall a sentiment being
5 expressed amongst the people that worked for
6 Barclays had bought Lehman for nothing?
7  A. Well, this is an e-mail to -- I'm
8 c.c.'d. It's to a group from Larry Wieseneck
9 and you have to understand the dynamic here.
10 They're trying to hold their teams together.
11 These guys hadn't yet signed their agreement,
12 and, oh, by the way, they all -- you showed me
13 an e-mail earlier that had, you know, names
14 and those people on my executive committee.
15 Well, they ultimately all held out for
16 two-year deals. And also had retention. And
17 so it was -- I was a little bit man in the
18 middle because these guys were negotiating
19 their packages a little bit with me. They
20 were negotiating them on behalf of their team.
21 They want more and more and I'm trying to hold
22 the line because it just cascades all the way
23 through.
24  And the ultimate -- I mean, the
25 commentary -- you know, the editorial
  TSG Reporting - Worldwide  (877) 702-9580

Page 116

1  H. McGEE - HIGHLY CONFIDENTIAL
2 commentary about the transaction, I mean, the
3 transaction was the transaction. There was no
4 one else there ready to do a transaction. I
5 mean, these people were frustrated that their
6 own teams were disintegrating. I think you
7 can see it through the e-mail chain.
8  Q. Sure. But I guess my question is
9 do you recall a sentiment being expressed by
10 the members of your executive committee that
11 in sum and substance was that Barclays had
12 bought Lehman for nothing?
13  A. Well, whatever the consideration
14 was that traded hands, it was a lot less than
15 what Lehman had been worth, you know, some
16 period before. The stock had gone from $85 to
17 zero. And so, I mean, I can't comment what
18 was in Larry Wieseneck's mind when he wrote
19 this.
20  Q. Can you comment whether you heard
21 that kind of sentiment from people who worked
22 for and you if so whether you responded to it?
23  A. Well, I think there was a
24 frustration that that is a very understandable
25 human reaction which is when the teams are
  TSG Reporting - Worldwide  (877) 702-9580

Page 117

1  H. McGEE - HIGHLY CONFIDENTIAL
2 dissipating and it's a team that's been
3 together for years and years and people have
4 bids here and bids there and we're trying to
5 hold the line on one year and trying to take
6 the overall comp pool down, there was
7 frustration. And they juxtaposed that
8 against, you know, whatever the transaction
9 consideration was. And none of these people
10 were expertized in that in terms of what was
11 the deal. It was a lot less than what Lehman
12 Brothers had been worth three months before,
13 six months before, one year before, you know,
14 whatever.
15  Q. At this point were you expertized
16 in what consideration was given in the deal?
17  A. No.
18  Q. Just to frame it for time
19 reference, Mr. McGee, the questions I'm asking
20 you now go basically to the weekend. The
21 20th, the 21st.
22  A. Okay.
23  Q. And into the 22nd. I want those
24 last couple of days before the deal closes.
25  At that point are you close to
  TSG Reporting - Worldwide  (877) 702-9580

Page 118

1      H. McGEE - HIGHLY CONFIDENTIAL
2   finality with Barclays as to what the
3   compensation will be for the members -- for
4   yourself and for the members of your executive
5   committee and --
6       A.   No.
7       Q.   -- and the other people you're
8   concerned about?  Are you getting close to
9   resolution of that?
10      A.   No.
11      Q.   Is there a point where in the days
12  before the deal closes -- and put it at the
13  Friday, the Saturday, the Sunday, where you
14  begin to get authority from Barclays as to
15  what kind of offers can be made to people?
16      A.   No.  This was still iterating.
17      Q.   Was there a point where you got
18  approval -- prior to the closing of the deal
19  was there a point where you got approval to
20  tell people in investment banking that
21  Barclays would honor all guarantees in your
22  group for a million dollars or more?
23      A.   I think you're going to have to
24  give me some more facts around that question.
25  When you say honor guarantees, are you talking

TSG Reporting - Worldwide  (877) 702-9580

Page 119

1   H. McGEE - HIGHLY CONFIDENTIAL
2   about guarantees that were pre-existing Lehman
3   guarantees?
4       Q.   You know, I don't know the answer
5   to that.  I'll give you a document in a couple
6   minutes.  We'll go back to that topic.  I
7   mean, I'm pulling that from a document.  But I
8   want to be a little more general right now,
9   but we'll --
10      A.   Well, there were no new guarantees
11  yet because no contracts had been signed.
12      Q.   Okay.  That's where I want to go
13  next.  And we'll go back and drill down on
14  that.  I don't want to just leave that
15  hanging.
16      A.   Okay.
17      Q.   But are there documents out there?
18  You've got -- let me frame this.  You've got
19  these two groups, in essence.  You've got the
20  eight critical employees that we've talked
21  about.  I know you don't know who's on that
22  list, that was not shared with you.  But
23  there's that eight.  And then there's the
24  200 -- there's a group of 200, right?
25      A.   Correct.

TSG Reporting - Worldwide  (877) 702-9580

Page 120

1      H. McGEE - HIGHLY CONFIDENTIAL
2       Q.   And you're aware at the time that
3   there's this group of 200 who Barclays wants
4   to come over or ought to want to come over so
5   they can operate the franchise, right?
6            Apart from you was anyone else
7   talking to Barclays about how to compensate
8   that group of 200 and the of eight?
9       A.   I assume that there parallel
10  discussions going on between Jerry Donini and
11  people and Felder and some of his people and
12  that those are being reflected up through
13  chain.
14      Q.   And Donini and Felder are division
15  heads as you are, right?  Different divisions.
16      A.   Correct.
17      Q.   With respect to the people for
18  whom you're responsible, that is the folks in
19  the investment banking division, are you
20  close -- at some point do you get an
21  understanding that you've got X-amount of
22  dollars from Barclays to use to make
23  compensation offers to the people in the
24  investment banking division?
25            And again I'm in the period prior

TSG Reporting - Worldwide  (877) 702-9580

Page 121

1      H. McGEE - HIGHLY CONFIDENTIAL
2   to the closing.
3       A.   Prior to the closing, no.
4       Q.   No, okay.
5            I wasn't going to use this
6   document but I promised you I wouldn't leave
7   you hanging so I just want to put some context
8   to that question I asked you about a moment
9   ago.
10      A.   Okay.  Sure.
11           (Deposition Exhibit 109, document
12      bearing production numbers 01321878,
13      marked for identification as of this
14      date.)
15  BY MR. GAFFEY:
16      Q.   Mr. McGee, I've put in front of
17  you an e-mail that I was referring to before
18  and we've marked it as 109.  I should point
19  out it's neither addressed to nor from you.
20  It appears to be an e-mail from Michael Evans
21  at Barclays Capital to Tracy Binkley at Lehman
22  with a copy to Anthony Collerton at Lehman
23  entitled "How to handle employees with
24  guarantees."
25           First let me ask you, do you know

TSG Reporting - Worldwide  (877) 702-9580

Page 122

```
1        H. McGEE - HIGHLY CONFIDENTIAL
2   who Tracy Binkley is?
3       A.   Tracy Binkley was the head of HR
4   at Lehman Brothers.
5       Q.   And Michael Evans, what's his role
6   at Barclays?
7       A.   He's the head of HR.
8       Q.   I should ask you have you seen
9   this e-mail exchange before?
10      A.   No.
11      Q.   You see in it, though, that
12  there's a reference to -- and I'm at the
13  bottom here. "By the way, my HR person
14  covering investment banking tells me that Skip
15  McGee, head of IBD, was told that Barclays
16  would honor all guarantees of his group for $1
17  million or more. I presume he has begun
18  communicating that but don't know. Got this
19  info second hand."
20            And then further up just to sort
21  of relate these two things it says "As for
22  Skip saying he has that approval, I'm not
23  aware of it."
24            Any of this ringing any bells
25  about an area of confusion or any
```

TSG Reporting - Worldwide  (877) 702-9580

Page 123

```
1        H. McGEE - HIGHLY CONFIDENTIAL
2   conversations you may have had at around this
3   time?
4       A.   No. It's not -- I've never seen
5   this before. There was a concern by some
6   people that had guarantees going into the year
7   2008 with Lehman Brothers as to what was going
8   to be the status of those guarantees.
9       Q.   Once they went over to Barclays.
10      A.   Once they went over to Barclays.
11      Q.   And is that an area that you were
12  addressing that you were having conversations
13  about during the week?
14      A.   It would have been down the list
15  of priorities. Because that was not a
16  significant population of people nor was it
17  the most significant people.
18      Q.   I'll take that back. I just
19  marked that to show you I keep my promises.
20      A.   Okay. Thanks.
21            (Deposition Exhibit 110, document
22            bearing production numbers 10279514,
23            marked for identification as of this
24            date.)
25
```

TSG Reporting - Worldwide  (877) 702-9580

Page 124

```
1        H. McGEE - HIGHLY CONFIDENTIAL
2   BY MR. GAFFEY:
3       Q.   What we've put in front of you,
4   Mr. McGee, is marked Exhibit 110. And on its
5   top it appears to be an e-mail from you to
6   Roger Jenkins at Barclays Capital entitled
7   "Current Numbers." And it's got an e-mail
8   chain within it. And take a look at the
9   e-mail, please, from earliest to latest and
10  let me know when you've had a chance to do
11  that.
12            (Document review.)
13      A.   Okay.
14      Q.   I guess starting at the earliest
15  one, Mr. McGee -- well, do you have any
16  independent recollection of this e-mail chain?
17      A.   Generally, yes.
18      Q.   Okay. Tell me what your best
19  recollection is about the issue that's
20  addressed in it and how it came up and how you
21  dealt with it.
22      A.   Well, this again relates to trying
23  to pin down the various groups or senior
24  individuals within investment banking and
25  trying to do so with some combination of a
```

TSG Reporting - Worldwide  (877) 702-9580

Page 125

```
1        H. McGEE - HIGHLY CONFIDENTIAL
2   await, perhaps retention, and hopefully not
3   '09 but in some instances '09 guarantees.
4            And Roger Jenkins was a member of
5   the BarCap Executive Committee who was
6   nominally watching over the process with
7   respect to investment banking. And my
8   assumption is that there were similar
9   processes going on with other divisions. And
10  this had to do with that process.
11      Q.   Was there a point -- there are
12  references on the e-mail to -- well, let me
13  direct your attention to the second most
14  recent e-mail. It's on the first page from
15  Jenkins to you.
16      A.   Yes.
17      Q.   Saturday, September 20th, 15:40,
18  Re. Current Numbers. It begins, "Skip, we got
19  to talk."
20      A.   Yes.
21      Q.   Okay. Mr. Jenkins writes "Skip,
22  we got to talk. We are over the pool and
23  don't have the money. All comp stuff needs to
24  come through me for my sign-off. We are
25  working to a clearly defined pool."
```

TSG Reporting - Worldwide  (877) 702-9580

Page 126

H. McGEE - HIGHLY CONFIDENTIAL

1       H. McGEE - HIGHLY CONFIDENTIAL
2           Do you know what clearly defined
3   pool Mr. Jenkins was referring to when he
4   wrote to you on September 20th?
5       A.   No, I did not.
6       Q.   Did you know that on September
7   20th there was a clearly defined pool
8   available for compensation of investment
9   banking division personnel?
10      A.   My understanding was that there
11  was some pool. I didn't know exactly what was
12  in it, how much was in investment banking, how
13  much was in equities.
14      Q.   Okay.
15      A.   And you can see that in the e-mail
16  that I was somewhat frustrated as to -- I
17  didn't really know what the pool was and I was
18  trying to manage this on the one hand with the
19  e-mail chain we just went through a minute ago
20  with all my direct reports who were saying,
21  you know, you got to -- you know, we got bids
22  away, people have two years, et cetera, et
23  cetera. So it was -- there was a bit of
24  frustration in this e-mail chain.
25      Q.   And you ask 00 in your response to

TSG Reporting - Worldwide  (877) 702-9580

Page 127

1       H. McGEE - HIGHLY CONFIDENTIAL
2   that e-mail you ask Jenkins, "What is the
3   pool?"
4       Do you see that?
5       A.   Yes, I see that.
6       Q.   Did you get a response as to what
7   the pool was?
8       A.   No.
9       Q.   Now, in the next --
10      A.   Not that I recall. I don't
11  recall.
12      Q.   Are you on your way back from
13  London at this point?
14      A.   I am -- yes.
15      Q.   Let me --
16      A.   I believe so.
17          (Deposition Exhibit 111, document
18      bearing production numbers 01279510,
19      marked for identification as of this
20      date.)
21  BY MR. GAFFEY:
22      Q.   Mr. McGee, I've put before you an
23  e-mail marked Deposition Exhibit 111. It's
24  from you to Roger Jenkins, Saturday, September
25  20th, 2008, at 7:38 p.m. GMT.

TSG Reporting - Worldwide  (877) 702-9580

Page 128

1       H. McGEE - HIGHLY CONFIDENTIAL
2       A.   Um-hum.
3       Q.   And I show this to you -- well,
4   let me ask you the usual question.
5       Do you recall seeing that before?
6       A.   These are e-mails from my e-mail,
7   yes.
8       Q.   You're writing to Mr. Jenkins at
9   7:38 p.m. "Yes. Sorry. Plane door shut.
10  Will call again in 45 minutes."
11          Are you getting on an airplane on
12  Saturday night?
13      A.   That would have been an
14  airplane -- yes, I was getting on an airplane.
15      Q.   Okay. And is that your flight
16  from London back to New York?
17      A.   No. I think that's a flight -- I
18  think I landed in New York and then was flying
19  on to Texas for the week.
20      Q.   Okay. So you're back in the US on
21  Saturday, 7:38 p.m. GMT?
22      A.   I believe so, yes.
23      Q.   Now, if you could go back to
24  Exhibit 110.
25      A.   Okay.

TSG Reporting - Worldwide  (877) 702-9580

Page 129

1       H. McGEE - HIGHLY CONFIDENTIAL
2       Q.   And that e-mail's about a half
3   hour after that.
4       A.   Okay.
5       Q.   And, as you say, there is a degree
6   of frustration in this e-mail. You don't know
7   what the pool is. You're writing back to
8   Jenkins and you say this: "Bob asked me to go
9   to London so I did. I'm sorry this is so
10  disjointed. Further complicated by the fact
11  that our plan keeps changing. I have no idea
12  what authority I have or don't have and what
13  the boundaries are."
14          Do you see that?
15      A.   Um-hum.
16      Q.   Who's the Bob you're referring to
17  there?
18      A.   That would be Bob Diamond.
19      Q.   Had Bob Diamond asked you to go to
20  London?
21      A.   Well, I think you asked me that
22  earlier and maybe I said that he didn't.
23  Maybe he suggested that I go to London when I
24  was talking about the European piece of
25  Lehman. There was no reason to go to London

TSG Reporting - Worldwide  (877) 702-9580

Page 130

1        H. McGEE - HIGHLY CONFIDENTIAL
2   for this transaction because it didn't -- but
3   I went to -- I was concerned about trying to
4   do the European piece of Lehman and then the
5   Asian piece of Lehman.  And Bob had suggested
6   that I head over there.
7        Q.   So that's why I raised this
8   because, you know, I did ask you this
9   morning --
10       A.   Yeah, I didn't recall that
11  accurately.
12       Q.   And is one reason that you went to
13  London to meet with Bob to talk about the
14  compensation for yourself and the people in
15  the investment banking division?
16       A.   No.  I never saw --
17            MR. STERN:  Objection to the form.
18       A.   Well, I never saw Bob when I was
19  in London.  I don't even know if he was in
20  London at the time.
21       Q.   Do you have -- as you see this
22  e-mail now, do you have a recollection of what
23  it was Bob wanted you in London for?
24       A.   I was very focused as we announced
25  the transaction on what were the follow-on
          TSG Reporting - Worldwide  (877) 702-9580

Page 131

1        H. McGEE - HIGHLY CONFIDENTIAL
2   plans to try to put the rest of Lehman
3   Brothers back together that the European piece
4   and the Asian piece had gone into separate
5   receivership.  So in that context I wanted to
6   go to London and Bob said, Yes, you should go
7   and see, you know, what it is we can do there.
8   Jerry Del Missier did show up while I was in
9   London.  We did not travel together nor
10  coordinate our schedules.
11       Q.   So when you wrote -- and, again, I
12  just want to get as pinpoint as I can on your
13  memory of this.  You write in the e-mail "Bob
14  asked me to London" but I think you just told
15  me you suggested to Bob that you go.
16            Which was it?  Did Bob ask you to
17  come to London or did you suggest you go there
18  and he agreed?
19       A.   I'm not so sure I understand that
20  there's a significant difference.
21       Q.   One's the invitor and the other is
22  invitee.  I'm trying to figure out who's who.
23       A.   Well, I wanted to go because I
24  wanted to put the transaction together for the
25  European piece and I had a number of our
          TSG Reporting - Worldwide  (877) 702-9580

Page 132

1        H. McGEE - HIGHLY CONFIDENTIAL
2   European colleagues who were very, very
3   curious as to what did this mean for them.  In
4   the context of responding in an e-mail chain
5   to Roger Jenkins I probably said Bob asked me
6   to go to London.  Whether he invited me to go
7   or said, Yes, you can go and try to do that,
8   it's probably a little bit of interpretation.
9        Q.   There's some frustration in this
10  communication with Jenkins and it's possible
11  you're taking a pop at Jenkins saying here,
12  Look, I'm in London because Bob Diamond asked
13  me to be here?
14       A.   Yeah, a little bit of that.  And
15  no sleep for the previous week and a half.
16  Hadn't seen my family in a month.  You know, I
17  was a little bit frustrated.
18       Q.   So do you have a recollection of
19  whether Bob asked you to go to London as you
20  sit here now?
21       A.   No, no.
22       Q.   While we're getting the document,
23  did you say when you got back from London you
24  went home to Texas?
25       A.   Yes.
          TSG Reporting - Worldwide  (877) 702-9580

Page 133

1        H. McGEE - HIGHLY CONFIDENTIAL
2        Q.   When did you next come back to New
3   York?
4        A.   Sunday night.
5        Q.   And why did you come back on
6   Sunday night?  Did you have a particular
7   meeting you had to be at or place you needed
8   to be?
9        A.   Because I always come back to New
10  York on Sunday night.
11       Q.   I mean, as opposed to generally
12  being back in the area.  Was there any reason
13  to come back Sunday night?
14       A.   No.
15       Q.   Was it part of the plan to go to
16  the closing the next morning?
17       A.   No.
18       Q.   When you got back on Sunday did
19  you touch base with other Lehman executives to
20  see where things stood on the deal?
21       A.   Not to my recollection.
22       Q.   Through that week -- I mean, the
23  sequence I'm getting here -- and, again, this
24  is me making a statement, not asking a
25  question.  I just want to put this in context.
          TSG Reporting - Worldwide  (877) 702-9580

Page 134

1      H. McGEE - HIGHLY CONFIDENTIAL
2          Is that -- your primary focus
3    through the week is what you've called holding
4    the franchise together, dealing with the HR
5    side of things, the human capital side of
6    things.
7          You know the APA is signed -- the
8    asset purchase agreement is signed on the
9    16th. I asked you if you had any knowledge of
10   an amendment or a clarification letter and you
11   don't, right?
12         MR. STERN: Is this a question or
13   statement?
14         MR. GAFFEY: That's a question.
15         MR. STERN: So what is the --
16      A.   I had no knowledge of the
17   amendment or clarification letter. My
18   involvement with the asset purchase
19   transaction effectively ended on Tuesday, you
20   know, when the thing was signed. I was not
21   involved in any of the follow-up hearings or
22   whatever else happened after that.
23      Q.   Okay. That's a cleaner way to get
24   to where I was bumping along to, yes.
25      A.   And so what I was focused on was
          TSG Reporting - Worldwide  (877) 702-9580

Page 135

1      H. McGEE - HIGHLY CONFIDENTIAL
2    that we had employees again that were -- and I
3    know I keep repeating myself -- but that -- in
4    my business in particular people had lost
5    their entire net worth. They had all of a
6    sudden become vulnerable to being hired by
7    other firms. Other firms viewed this -- we're
8    still in the first part of the week so we
9    didn't yet have financial Armageddon when
10   things were still good and they were putting
11   very attractive proposals in front of our
12   people, I was afraid we were going to show up
13   at closing and we weren't going to have any
14   employees and there was going to be no closing
15   and there would be nothing left for the
16   creditors.
17      Q.   During that week -- you know, from
18   the time the asset purchase agreement is
19   signed --
20      A.   Yes.
21      Q.   -- through when the closing
22   actually occurs, what if anything are you
23   doing to stay in touch with McDade or whoever
24   else is involved with the negotiation of the
25   deal and making sure that a closing occurs?
          TSG Reporting - Worldwide  (877) 702-9580

Page 136

1      H. McGEE - HIGHLY CONFIDENTIAL
2      A.   I was not in regular contact. I
3    just assumed that somebody would call me if
4    they needed me for something.
5      Q.   So when you got back to the US on
6    Saturday and went home to Texas, did you check
7    in by phone when you got there with anybody to
8    say How's it looking, did we close, is the
9    deal going to close? Did you check in with
10   anybody along those lines?
11      A.   I'm sure I did but I can't recall
12   specifically.
13      Q.   And did you have a sense when you
14   got back of when the closing was going to
15   occur?
16         Well, withdrawn.
17         When you left for London did you
18   have an idea of when the deal was supposed to
19   close?
20      A.   I had a sense that the time line
21   was that weekend but I don't know specifically
22   when.
23      Q.   So when you got back on that
24   weekend did you ask anybody did the deal
25   close?
          TSG Reporting - Worldwide  (877) 702-9580

Page 137

1      H. McGEE - HIGHLY CONFIDENTIAL
2      A.   I'm sure I did because I remember
3    getting e-mails kind of play-by-play as to
4    what was going on in a hearing. And I can't
5    remember when that was.
6      Q.   And did you find out when you got
7    back whether or not the deal had closed right
8    after the hearing? I don't mean to be --
9      A.   I don't recall.
10      Q.   Let me withdraw the question.
11      A.   I don't recall.
12      Q.   The closing doesn't happen till
13   the Monday. We know that, right?
14      A.   Okay.
15      Q.   Okay. When you get back on the
16   weekend are you surprised to find out it
17   hasn't closed yet?
18      A.   No.
19      Q.   Did you ask anybody when the
20   closing was going to be?
21      A.   I'm sure I did but I can't recall.
22      Q.   Any recollection of who you spoke
23   to?
24      A.   No.
25      Q.   And when you say you're sure you
          TSG Reporting - Worldwide  (877) 702-9580

Page 138

1    H. McGEE - HIGHLY CONFIDENTIAL
2  did is that because you had a sense that it
3  was an important deal in your life at the time
4  and you must have asked or you have a vague
5  recollection of asking someone?
6    A.   The former.  It was important --
7  I'm sure I would have asked but I can't recall
8  who I would have asked.
9       (Deposition Exhibit 112, document
10      with the first page bearing production
11      number 10269342, marked for
12      identification as of this date.)
13 BY MR. GAFFEY:
14   Q.   Mr. McGee, I've put before you an
15 e-mail and attachments which we've annotated
16 Deposition Exhibit 112.  It appears to be an
17 e-mail from Ros Stephenson sent Sunday,
18 September 21st, at 9:15 p.m. to you,
19 Wieseneck, Weiss, Parker, and Gatto, subject
20 BarCap 200 Template.
21      MR. STERN:  I'll just note again
22      that we have the same issue with
23      non-sequential numbers.
24   Q.   Have you seen that document
25 before?

Page 139

1    H. McGEE - HIGHLY CONFIDENTIAL
2    A.   I don't specifically recall.
3    Q.   Do you recall a template, a form
4  of employment agreement, Barclays Capital
5  employment agreement being circulated on this
6  Sunday night?
7    A.   I don't specifically recall on
8  that Sunday night.  But there certainly were
9  drafts of form employment agreements that were
10 being circulated and there was discussion as
11 to some of the specific terms.
12   Q.   Do you know if there was a
13 distribution of offer letters made to a
14 population of people within -- withdrawn.
15      Do you know if there was a
16 distribution of an offer letter in this format
17 made to employees of the investment banking
18 division?
19   A.   When?
20   Q.   That would be my next question.
21 Do you know if one was sent out?
22   A.   Well, there were -- there
23 definitely were offer letters that were given
24 to selected senior employees of the investment
25 banking division.  Whether they were of this

Page 140

1    H. McGEE - HIGHLY CONFIDENTIAL
2  draft, the prior draft if there was one or a
3  later draft, I have no idea.  This thing was
4  modified a number of times along the way and I
5  don't know -- I mean, people signed -- people
6  ultimately signed a final agreement that had a
7  lot of these provisions, but were -- you know,
8  there were some changes along the way.
9    Q.   There's a reference in the e-mail
10 from Mr. Stephenson to you.  It's the last
11 sentence of the first paragraph it says, "We
12 should keep a master list."
13      Do you know if a master list was
14 kept?
15   A.   No.  I don't know.
16      (Pause on the record.)
17      MR. GAFFEY:  I have good news and
18      bad news which is that I'm done with
19      questions but all these people might
20      have a couple so -- but thank you for
21      your time.
22      THE WITNESS:  Okay.  Thank you.
23      MR. ROTHMAN:  Can we take a quick
24      break?
25      MR. STERN:  If you'd like to, yes.

Page 141

1    H. McGEE - HIGHLY CONFIDENTIAL
2      (Recess taken.)
3  EXAMINATION BY
4  MR. ROTHMAN:
5    Q.   Mr. McGee, my name is Seth
6  Rothman.  I'm a lawyer at Hughes Hubbard &
7  Reed.  We represent the trustee who was
8  appointed under the SIPA Act to liquidate the
9  affairs of LBI.
10   A.   Okay.
11   Q.   You described your role in the
12 transaction or what you were doing to Mr.
13 Gaffey a moment ago as herding cats; is that
14 correct?
15      MR. STERN:  Objection to the form.
16   A.   I think I used the term herding
17 cats as descriptive of my effort to round up
18 the various investment bankers who were off
19 negotiating all their separate deals with
20 different companies.  In terms of my role in
21 the transaction I was trying to serve as a
22 facilitator to try and keep an eye on the
23 overall picture to make sure that there were
24 not things that we were forgetting as we sped,
25 you know, around the clock to try and get this

1      H. McGEE - HIGHLY CONFIDENTIAL
2  thing done.
3      Q.  Did Lehman have an office in
4  Houston?
5      A.  Lehman did and still does have an
6  office -- or Barclay does have an office in
7  Houston.
8      Q.  And some of the investment bankers
9  you were in touch with were people in that
10 Houston office?
11     A.  That's correct.
12     Q.  Do you know who Gregory Pipkin is?
13     A.  Yes, I do.
14     Q.  Who was he or what was his role?
15     A.  He's a managing director in the
16 nature resources group.  The nature resources
17 group is one of the stronger groups at Lehman
18 Brothers and there's bankers in Houston and
19 bankers in New York for purposes of this
20 transaction.
21     Q.  And did you speak to Mr. Pipkin
22 about retaining people in the Houston office?
23     A.  Yes.
24     Q.  Did Mr. Pipkin ever tell you that
25 Bob Diamond stole Lehman?

1      H. McGEE - HIGHLY CONFIDENTIAL
2      A.  I can't recall whether he did or
3  he didn't.  I know that he was focused on
4  making sure that the bankers in Houston and
5  the energy bankers were appropriately taken
6  care of.
7      Q.  Do you know how Mr. Pipkin felt
8  about that deal?
9         MR. STERN:  Objection to the form.
10     A.  I know how he felt about his
11 ultimate compensation but I don't know how he
12 felt about the deal.
13     Q.  Do you know if he felt that
14 Barclays was getting a good deal?
15        MR. STERN:  Objection to the form.
16     A.  I'm not -- I'm not sure what I
17 would say about what Mr. Pipkin thought back
18 then.  Other than I know that he was very
19 concerned about making sure that there was
20 some sort of a deal for the energy team as a
21 group and that that entire team had a two-year
22 bid away from another firm.
23        MR. ROTHMAN:  Let's mark as the
24 next exhibit an e-mail chain.  The top
25 e-mail is an e-mail from Mr. Pipkin to

1      H. McGEE - HIGHLY CONFIDENTIAL
2  Lee Jacobe and to you and it's dated
3  September 18, 2008.
4         (Deposition Exhibit 113, e-mail
5      dated Thursday, 9/18/2008, 9:55:41 a.m.,
6      marked for identification as of this
7      date.)
8         (Document review.)
9      A.  Okay.  I've read it.
10     Q.  Have you ever seen this e-mail
11 before?
12     A.  It's addressed to me from Pipkin
13 so, yeah, I assume I received it.
14     Q.  And do you recall the issue that
15 Mr. Pipkin and Mr. Jacobe in earlier e-mails
16 in the chain are discussing?
17     A.  Well, there's a couple of
18 different issues here.  The New York energy
19 team, which was Grant and Carlos, are the
20 senior guys there, had separately been out
21 marketing the entire energy group as a
22 franchise to -- I may have the groups wrong --
23 to JPMorgan and Citi and had bids, and the
24 Houston team which viewed itself as perhaps
25 the stronger component of the energy

1      H. McGEE - HIGHLY CONFIDENTIAL
2  franchise, had separately been marketing
3  itself in a different direction.
4         So the other thing is that all of
5  these people had been at Lehman more than five
6  years so they had just seen at least two and a
7  half years of earnings go puff and, in fact,
8  probably a much greater percentage of their
9  net worth.  And so there's a lot -- there's
10 obviously emotion in all this.  And so those
11 are some of the issues that I think are
12 weaving their way through this e-mail chain
13 that you've asked me to read.
14     Q.  Okay.  In the top e-mail Mr.
15 Pipkin writes to you and Mr. Jacob, "Bob
16 Diamond is a former Morgan Stanley guy.  He
17 has paid for talent many times before.  While
18 he's still at Lehman he has to pay up for the
19 best originating franchise - the Houston
20 upstream and midstream verticals."
21        When you received this e-mail from
22 Mr. Pipkin did you know what that meant?
23        MR. CHEPIGA:  Objection to the
24 form.
25     A.  I think Mr. Pipkin wanted more

Page 146

1    H. McGEE - HIGHLY CONFIDENTIAL
2  money.
3    Q.  Do you know what he meant when he
4  said Bob Diamond stole Lehman?
5    A.  No. I have no idea why he chose
6  that particular phrase.
7    Q.  Was that a sentiment you were
8  hearing from other investment bankers?
9    A.  No.  But I think the concept that
10  the investment bankers had multiple, you know,
11  alternatives in different directions and were
12  ready, willing, and able to walk down the
13  street was a consistent theme in many of the
14  e-mails that Bob had asked me to read.
15    MR. ROTHMAN: Let's mark as
16  Exhibit 112 an e-mail --
17    MR. STERN:  This would be 114.
18    MR. ROTHMAN:  114.  Thank you.
19    -- from you to Mr. Diamond and Mr.
20  Del Missier at Barclays dated 9/20/2008.
21    (Deposition Exhibit 114, e-mail
22    dated Saturday, 9/20/2008, 6:19:26 a.m.,
23    marked for identification as of this
24    date.)
25    (Document review.)

TSG Reporting - Worldwide  (877) 702-9580

Page 147

1    H. McGEE - HIGHLY CONFIDENTIAL
2    A.  Okay.  I've read it.
3    Q.  This is an e-mail you've sent to
4  Mr. Diamond and Mr. Del Missier, correct?
5    A.  Yes.
6    Q.  Do you recall sending this e-mail?
7    A.  It looks like an e-mail I sent,
8  yes.
9    Q.  You're sending this Saturday?
10    A.  Looks like I sent it from London
11  as I was getting ready to get on the plane
12  back to the States.
13    Q.  Okay.  Can we walk -- let's walk
14  through the e-mail.  Maybe you can explain to
15  me what you were telling them.
16    A.  Sure.
17    Q.  So the top line you say "Step 1 is
18  done (USA)."
19    What did that refer to?
20    A.  Well, again, my -- I say again.  I
21  referenced earlier in some responses to the
22  questions from Mr. Gaffey that I had wanted to
23  go Europe to try and see if we could put the
24  deal together for Lehman Brothers Europe.
25    The original transaction between

TSG Reporting - Worldwide  (877) 702-9580

Page 148

1    H. McGEE - HIGHLY CONFIDENTIAL
2  Barclays and Lehman Brothers contemplated all
3  of Lehman Brothers.  That was the deal that
4  did not get approved by the regulators.
5  Lehman Brothers went into bankruptcy and then
6  there was a new construct that people began
7  discussing that Monday morning and then worked
8  through for 48 hours and that got signed up on
9  Tuesday.  Wednesday evening I got on a plane
10  to Europe.  I thought that if BarCap had an
11  interest in all of Lehman Brothers on Sunday
12  what was different on the following Thursday
13  and that we should try and see if we can put
14  the deal together.  I flew over there with
15  that mission in mind and worked with John
16  Winter who was the head of BarCap investment
17  banking for Europe on what I thought was a
18  workable construct to get to a meaningful
19  amount of critical mass in Europe.
20    My thinking then was to run the
21  same play again in Asia.  The reason I say a
22  need for speed on all fronts is because in
23  every region it was an absolute free-for-all
24  in terms of people wanting to go after the
25  ex-Lehman employees.  A need for a global

TSG Reporting - Worldwide  (877) 702-9580

Page 149

1    H. McGEE - HIGHLY CONFIDENTIAL
2  franchise is -- I mean, I can explain it to
3  you but if you're in the M&A business and the
4  equities business you have to be global.  When
5  you're dealing with companies like Pfizer,
6  like AT&T, like Chevron, the discussion
7  doesn't stop at the border.  You have to be
8  global.
9    So the fact that we no longer had
10  the global capability in M&A and equities was
11  of real issue to all the bankers that they
12  were asking me to try and, you know, hold on
13  to in the States and a very important issue to
14  them.
15    So that's why I said I need the
16  global franchise.
17    Q.  So is step 1 the sale of the
18  Lehman assets in the United States or in North
19  America?
20    A.  Yes.
21    Q.  And as far as you're concerned
22  that's now completed because you've signed the
23  APA on Tuesday?
24    MR. STERN:  Objection to the form.
25    A.  Well, yeah.  The -- again, let's

TSG Reporting - Worldwide  (877) 702-9580

Page 150

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2   review what I was doing and what my role was.
 3   Step 1 was the deal was signed. I assumed it
 4   was going to close. I was not involved at
 5   all --
 6        Q.   What did you --
 7             MR. STERN: Please let him finish
 8   his answer.
 9        Q.   Sorry.
10        A.   I assumed that the transaction for
11   the North American business of Lehman Brothers
12   would close. I was very focused on how do we
13   then do a similar transaction for the European
14   business, and then a third transaction for the
15   Asian business. I was very focused on Lehman
16   Brothers had created this franchise over many
17   years which I had spent the last six years
18   building up. I didn't want to see it just go
19   puff in smoke and disappear.
20        Q.   Okay. So what did you mean when
21   you said step 1 was done?
22        A.   What I meant was that there was a
23   deal that was signed and I assumed was going
24   to close. I did not mean in the legal
25   perspective that the deal was closed.
```

TSG Reporting - Worldwide  (877) 702-9580

Page 151

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2        Q.   And if you go back to the e-mail
 3   you go on to say, "This deal will go down in
 4   history as one of the savviest."
 5             What did you mean by that?
 6        A.   By that I meant that the
 7   combination of the BarCap existing platform
 8   with product strength and fixed income,
 9   commodities, FX, a balance sheet that was
10   bigger and more highly ranked than Lehman
11   Brothers, combined with the Lehman Brothers
12   capability in M&A, equities, and also fixed
13   income was going to create a real powerhouse
14   in the investment banking business, and that
15   BarCap had the intestinal fortitude to
16   actually step in and do a transaction when
17   everyone else in the world said no.
18        Q.   And you were congratulating Mr.
19   Diamond and Mr. Del Missier on doing that
20   transaction, correct?
21        A.   Although, as you've already
22   pointed out, the deal had not yet closed, yes.
23   So prematurely I assumed it was going to get
24   to a closing at some point.
25        Q.   Then you say you were excited to
```

TSG Reporting - Worldwide  (877) 702-9580

Page 152

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2   get back on offense. What did you mean by
 3   that?
 4        A.   To think about going back and
 5   actually focusing on business again and client
 6   business and generating revenue. It was more
 7   of a personal comment. That from March of '08
 8   through that weekend I had done nothing but
 9   lurch from crisis to crisis to crisis with
10   Lehman Brothers. And you don't need to hear
11   my tale of woe but it was not a fun period nor
12   was it a financially rewarding period.
13             (Continued on next page to include
14        jurat.)
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide  (877) 702-9580

Page 153

```
 1        H. McGEE - HIGHLY CONFIDENTIAL
 2
 3             So it was going to be -- I was
 4   looking forward to getting back to actually
 5   doing investment banking business, working on
 6   deals, calling on clients, things like that.
 7   So that's what that meant. More of a personal
 8   commentary.
 9             MR. STERN: Anything else?
10             MR. ROTHMAN: I think that's it.
11             MR. STERN: Okay. Thank you very
12   much. We're off the record.
13             (Time Noted:   2:18 p.m.)
14
15
16
17
18
19             _____
20             HUGH E. McGEE, III
21
22   Subscribed and sworn to before me
23   this ____ day of _____, 2009.
24
25             _____
```

TSG Reporting - Worldwide  (877) 702-9580

Page 154

```
 1
 2        C E R T I F I C A T E
 3   STATE OF NEW YORK   )
 4                       : ss.
 5   COUNTY OF NEW YORK  )
 6        I, FRANCIS X. FREDERICK, a Notary
 7   Public within and for the State of New
 8   York, do hereby certify:
 9        That HUGH E. McGEE, III, the
10   witness whose deposition is hereinbefore
11   set forth, was duly sworn by me and that
12   such deposition is a true record of the
13   testimony given by the witness.
14        I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage, and that I
17   am in no way interested in the outcome
18   of this matter.
19        IN WITNESS WHEREOF, I have
20   hereunto set my hand this 10th day of
21   August, 2009.
22
23
24        _____
25            FRANCIS X. FREDERICK
```

TSG Reporting - Worldwide  (877) 702-9580

Page 155

```
 1
 2   ---------------- I N D E X ----------------
 3   WITNESS      EXAMINATION BY     PAGE
 4   HUGH E. McGEE, III  MR. GAFFEY     6
 5             MR. ROTHMAN     141
 6
 7   ---------- INFORMATION REQUESTS ------------
 8   DIRECTIONS: NONE
 9   RULINGS: NONE
10   TO BE FURNISHED: NONE
11   REQUESTS: NONE
12   MOTIONS: NONE
13
14   ---------------- EXHIBITS ----------------
15   EXHIBIT                  FOR ID.
16   Exhibit 98
17   document bearing production
18   number 10282956........................ 37
19   Exhibit 99
20   document bearing production
21   number 10265851........................ 42
22   Exhibit 100
23   document with the first
24   page bearing production
25   number 10287489........................ 47
```

TSG Reporting - Worldwide  (877) 702-9580

Page 156

```
 1
 2   ---------------- EXHIBITS ----------------
 3   EXHIBIT                  FOR ID.
 4   Exhibit 101
 5   document with the first
 6   page bearing production
 7   number 10322002........................ 50
 8   Exhibit 102
 9   document bearing production
10   number BCI-EX-(S)-00003505.............. 54
11   Exhibit 103
12   document bearing production
13   numbers BCI-EX-00077338
14   through BCI-EX-00077340................ 54
15   Exhibit 104
16   e-mail dated 9/14/2008
17   6:15 a.m. with attachments............. 63
18   Exhibit 105
19   document bearing production
20   number 10321888........................ 86
21   Exhibit 106
22   e-mail dated 9/17/2008 2:21 p.m......... 89
23   Exhibit 107
24   document bearing production
25   number 10270027........................ 107
```

TSG Reporting - Worldwide  (877) 702-9580

Page 157

```
 1
 2   ---------------- EXHIBITS ----------------
 3   EXHIBIT                  FOR ID.
 4   Exhibit 108
 5   document bearing production
 6   numbers 10269417........................ 111
 7   Exhibit 109
 8   document bearing production
 9   numbers 01321878........................ 121
10   Exhibit 110
11   document bearing production
12   numbers 10279514........................ 123
13   Exhibit 111
14   document bearing production
15   numbers 01279510........................ 127
16   Exhibit 112
17   document with the first
18   page bearing production
19   number 10269342........................ 138
20   Exhibit 113
21   e-mail dated Thursday,
22   9/18/2008, 9:55:41 a.m.................. 144
23
24
25
```

TSG Reporting - Worldwide  (877) 702-9580

Page 158

```
 1
 2     ---------------- EXHIBITS -----------------
 3     EXHIBIT                          FOR ID.
 4     Exhibit 114
 5     e-mail dated Saturday,
 6     9/20/2008, 6:19:26 a.m................. 146
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide  (877) 702-9580

Page 159

```
 1
 2   NAME OF CASE:  IN RE:  LEHMAN BROTHERS
 3   DATE OF DEPOSITION:  AUGUST 10TH, 2009
 4   NAME OF WITNESS: HUGH E. McGEE, III
 5   Reason codes:
 6        1.  To clarify the record.
          2.  To conform to the facts.
          3.  To correct transcription errors.
 7   Page _____ Line _____ Reason _____
     From _____ to _____
 8
     Page _____ Line _____ Reason _____
 9   From _____ to _____
10   Page _____ Line _____ Reason _____
     From _____ to _____
11
     Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
     From _____ to _____
14
     Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
     From _____ to _____
17
     Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
     From _____ to _____
20
     Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
     From _____ to _____
23
     _____
24
         HUGH E. McGEE, III
25
```

TSG Reporting - Worldwide  (877) 702-9580