# BCI EXHIBIT

# 87

Page 1

1                    H. MILLER

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

10                   Debtors.

11   ----------------------x

12

13

14      VIDEOTAPED DEPOSITION OF HARVEY R. MILLER

15                New York, New York

16                January 7, 2010

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 26535

Page 2

```
 1              H. MILLER
 2           January 7, 2010
 3
 4       VIDEOTAPED deposition of HARVEY R.
 5   MILLER, held at the law offices of Weil,
 6   Gotshal & Manges, LLP, 767 Fifth
 7   Avenue, New York, New York, before Kathy
 8   S. Klepfer, a Registered Professional
 9   Reporter, Registered Merit Reporter,
10   Certified Realtime Reporter, Certified
11   Livenote Reporter, and Notary Public of
12   the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              H. MILLER
 2          A P P E A R A N C E S:
 3
 4   JONES DAY, LLP
 5   Attorneys for Lehman Brothers, Inc.
 6       222 East 41st Street
 7       New York, New York  10017-6702
 8   BY:  ROBERT W. GAFFEY, ESQ.
 9       DAVID L. CARDEN, ESQ.
10       BRIDGET CRAWFORD, ESQ.
11
12   BOIES, SCHILLER & FLEXNER, LLP
13   Attorneys for Barclays Capital
14       575 Lexington Avenue – 7th Floor
15       New York, New York  10022
16   BY:  DAVID BOIES, ESQ.
17       HAMISH HUME, ESQ.
18       JONATHAN KRISBERGH, ESQ.
19       JONATHAN D. SCHILLER, ESQ.
20       ADDISON HOLLADAY, Paralegal
21
22
23
24
25
```

Page 4

```
 1              H. MILLER
 2       A P P E A R A N C E S: (Cont'd.)
 3   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
 4   Attorneys for the Creditors Committee
 5       51 Madison Avenue
 6       22nd Floor
 7       New York, New York  10010
 8   BY:  JAMES C. TECCE, ESQ.
 9       ERIC M. KAY, ESQ.
10
11   HUGHES, HUBBARD & REED, LLP
12   Attorneys for the SIPA Trustee
13       One Battery Park Plaza
14       New York, New York  10004-1482
15   BY:  wILLIAM MAGUIRE, ESQ.
16       NEIL J. OXFORD, ESQ.
17
18   WEIL GOTSHAL & MANGES, LLP
19   Attorneys for weil Gotshal & Manges, LLP,
20   and the Witness
21       767 Fifth Avenue
22       New York, New York 10153
23   BY:  JONATHAN POLKES, ESQ.
24       RICHARD DAvIS, ESQ.
25       GEORGIA MAGNO, ESQ.
```

Page 5

```
 1              H. MILLER
 2       A P P E A R A N C E S: (Cont'd.)
 3
 4   Also Present:
 5       STEVEN SANPIETRO, Legal Video Specialist
 6       THOMAS E. HOMMEL, Lehman Brothers
 7       JONATHAN HUGHES, Barclays Capital
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1           H. MILLER
2           THE VIDEOGRAPHER: This is the start
3    of the tape labeled number 1 of the
4    videotaped deposition of Harvey R. Miller in
5    the matter of In re: Lehman Brothers, Inc.
6    The date is January 7, 2010. The time is
7    now 9:43 A.M.
8           Will the court reporter please swear
9    in the witness.
10              * * *
11   HARVEY R. MILLER, called as a
12       witness, having been duly sworn by a Notary
13       Public, was examined and testified as
14       follows:
15   EXAMINATION BY
16   MR. BOIES:
17   Q.   Good morning, Mr. Miller.
18   A.   Good morning, Mr. Boies.
19   Q.   I'd like to begin by taking you back
20   to September of 2008, and I'd like you to just
21   summarize briefly what was happening the week of
22   September 16 through September 22. September 16
23   was a Tuesday. September 22 was the following
24   Monday.
25   A.   Yes. Starting with September 16,

Page 7

1           H. MILLER
2    there had been negotiations all of the prior day
3    in connection with the Lehman bankruptcy case
4    which had been filed at about 2 A.M. on the
5    morning of the 15th, and starting on that
6    morning, there were meetings at the Lehman
7    headquarters on Seventh Avenue in connection
8    with a, I guess an offer or a consideration of
9    an offer by Barclays to purchase the North
10   American Capital Markets business of Lehman,
11   which started, my recollection is, probably
12   someplace around 7 A.M. in the morning. And
13   those negotiations continued throughout that day
14   and through most of the night.
15          I think you have to, to put it in the
16   perspective, it was -- the filing of the Lehman
17   Chapter 11 petition was cataclasmic. There
18   was -- there were hundreds of people milling
19   around in the Lehman headquarters as these
20   negotiations were going on, and at some point, I
21   can't tell you exactly, I don't recall, an
22   agreement in principle was reached, an Asset
23   Purchase Agreement was being drafted, and the
24   big issue was how could you consummate the sale.
25   From the standpoint of Barclays, time was of the

Page 8

1           H. MILLER
2    essence.
3           The volatility in the marketplace, the
4    ramifications from the filing were already
5    beginning to set in, and the reaction to the
6    filing was fairly negative. And the big issue
7    was, how could you do this when most of the
8    business was in Lehman Brothers, Inc., which was
9    a registered broker-dealer.
10          So the issue was how could we
11   structure a deal that would accommodate the
12   needs of Barclays as to speed to consummate the
13   transaction without a tremendous erosion in the
14   values of the assets that would be purchased.
15   And the -- the conundrum, if you want to call it
16   that, was that LBI, Lehman Brothers, Inc., as a
17   registered broker-dealer, was not qualified to
18   file a Chapter 11 petition.
19          Its alternatives were either a Chapter
20   7 liquidation proceeding under the Bankruptcy
21   Code or a SIPA proceeding under the Securities
22   Investor Protection Act, and since LBI had
23   customers, public customers, the likelihood,
24   almost mandatory, is it would have to be a SIPA
25   proceeding. That's S-I-P-A.

Page 9

1           H. MILLER
2           And we came up with a structure
3    whereby, if there was an agreement, there would
4    be a Sale Hearing in the Bankruptcy Court as
5    early as possible and we would try to convince
6    the Securities Investor Protection Corporation
7    to file a proceeding under the SIPA statute in
8    the morning or several hours before any hearing
9    on the sale.
10          A SIPA proceeding goes to the United
11   States District Court, and it normally will be
12   referred to a bankruptcy judge, and the concept
13   was that the -- we would ask the district court
14   judge to refer the SIPA proceeding to the same
15   bankruptcy judge who had the Lehman Chapter 11
16   case, and then, in connection with the Sale
17   Hearing, have a joint hearing both in the SIPA
18   proceeding and in the Chapter 11 case; and if
19   the judge approved the sale, there would be an
20   order entered in each proceeding. And it was
21   necessary because, essentially, you were selling
22   the LBI business.
23          So we had to convince the Securities
24   Investor Protection Corporation that this was an
25   appropriate procedure to follow, that it would

3

Page 10

H. MILLER

1 be beneficial and protect the public customers
2 of LBI. We had to convince the Securities and
3 Exchange Commission that this was appropriate.
4 And those discussions took place.
5 They started on the 15th during I think the
6 afternoon. The S.E.C. had some people on-site
7 at Lehman. I can't remember his name, Mike
8 Macchiaroli, or something like that, who was
9 very negative that this could be done, and I
10 called Steve Harbeck, who was the -- who is the
11 president and CEO of Securities Investor
12 Protection Corporation, explained to him what we
13 contemplated doing. He thought it was a good
14 idea, and the suggestion was that SIPC,
15 that's -- SIPC, select the person who would be
16 the SIPC trustee informally so that he could
17 participate in the week's activities.
18 And I don't know whether it was within
19 an hour or so it was clear that it was going to
20 be James Giddens from Hughes Hubbard who had a
21 lot of experience in SIPA proceedings. So
22 that -- this is sort of a seamless timeframe.
23 Not many people got much sleep during -- the
24 15th sort of morphed into the 16th.

Page 11

H. MILLER

1 And there was a substantial discussion
2 about the timing and how fast could we get this
3 done, and I don't remember how it came out, but
4 Friday seemed to be a deadline, from Barclays'
5 standpoint. So what was happening -- you have
6 to remember there were multi-functional things
7 going on. My function was getting ready to go
8 to court. Other groups were negotiating the
9 provisions of the Asset Purchase Agreement, and
10 there were huge discussions going on.
11 And we had to arrange for a hearing in
12 the Bankruptcy Court to approve the sale
13 procedures, so we had to draft a motion to
14 approve the sale and to set the sale procedures
15 and the bidding procedures. And sometime during
16 the 16th, we contacted the Court about having a
17 hearing to approve the sale procedures and to
18 approve a debtor-in-possession financing.
19 At the time, it appeared that Lehman
20 would be totally illiquid. The only access to
21 funds was through LBI and the PDCF window at the
22 Fed, I think that's Primary Dealers Credit
23 Facility, which was a window that was set up by
24 the Fed sometime months before that to assist

Page 12

H. MILLER

1 the investment banking community, which Lehman
2 had never used before, and the Fed, the Federal
3 Reserve Bank of New York, had said the window
4 would be open for LBI for a period I think of
5 four days or five days provided the appropriate
6 collateral was given to the Federal Reserve
7 Bank.
8 So, to get financing for Lehman
9 Brothers Holdings, Inc., a negotiation went on
10 with Barclays to do a debtor-in-possession
11 financing under the Bankruptcy Code, and that
12 was being negotiated concurrently with
13 everything else in this very tumultuous
14 atmosphere.
15 And originally it was supposed to be a
16 $500 million DIP facility. It was ultimately
17 negotiated to be $450 million. $250 million was
18 going to be a term loan and 200 million was
19 going to be a revolving credit. And we needed
20 to get a hearing on that also.
21 And I don't recall, there may have
22 been a procedural hearing in the Bankruptcy
23 Court on Tuesday on some, some matter, but I
24 don't recall. What -- what was finalized was

Page 13

H. MILLER

1 that there would be a hearing in the court in
2 the Bankruptcy Court before Judge Peck, who was
3 the bankruptcy judge assigned to the case, on
4 Wednesday afternoon to consider the motion to
5 approve the sale procedures, the breakup fee and
6 all of the related matters to the sale, and also
7 to consider the approval of the DIP financing on
8 an interim basis.
9 And during most of Tuesday, I was
10 involved in that while other meetings were going
11 on to try and finalize the Asset Purchase
12 Agreement, and that morphed into Wednesday. And
13 this was a -- I think I described it at some
14 point in time as a very fluid situation. Things
15 continued to change.
16 The market reaction, as I said before,
17 was terrible and Wednesday was even worse.
18 Wednesday was, I think, a traumatic day for the
19 market. Commercial paper market seized up.
20 Values were being diminished. The word around
21 was that there were massive fails in the
22 brokerage community. It was a very tumultuous
23 time.
24 We finally finalized the papers for

Page 14

H. MILLER
1  the court. I think the hearing was supposed to
2  be around 2 or 3 o'clock in the afternoon, and a
3  Creditor Committee was appointed on Tuesday, the
4  16th. The U.S. Trustee had accelerated all of
5  the processes for the appointment of a Committee
6  because of the urgency of the situation, and the
7  Committee in the morning of Wednesday, the 17th,
8  hired Milbank Tweed as its counsel.
9       And I first learned that on the way
10 down to the courthouse when I received a phone
11 call from a partner at Milbank, Luc Despins. I
12 think I'm pronouncing his name correctly, who
13 said -- who informed me that Milbank had been
14 engaged and Milbank hadn't had a real
15 opportunity to review everything and was
16 considering asking for an adjournment of the
17 hearing.
18      I told Luc that that was virtually
19 impossible, that time was working against us, if
20 we were going to preserve any value, we had to
21 go forward, and that the hearing insofar as the
22 sale was concerned was essentially a procedural
23 hearing and that there wasn't any substantive
24 relief being requested.

Page 15

H. MILLER
1       And I was about five minutes from the
2  courthouse when I received the call, and I said
3  if you want to, I'll meet you in the courthouse
4  and we can discuss it. And while I was on that
5  mission, other people were still back at 745
6  Seventh Avenue working on a transaction.
7       You want me to continue?
8  Q.  Yes.
9  A.  We got to the courthouse. I'm trying
10 to remember who was with me. I actually don't
11 recall who was with me anymore. In any event, I
12 met Luc, and he said -- he asked if it was all
13 right if we had a chambers conference to discuss
14 the possibility of an adjournment, and I said I
15 had no objection to that, but I would oppose any
16 adjournment and had a very short discussion with
17 him about how urgent the situation is in terms
18 of potential erosion in the value of the assets.
19      Judge Peck agreed to see us not in
20 chambers. There is a conference room adjacent
21 to the courtroom, and he came in and basically
22 said that he did not want to have any chambers
23 conferences in this case, it was such an
24 important case that he wanted everything on the

Page 16

H. MILLER
1  record, and that if the Committee wanted to
2  request an adjournment, it should do it on the
3  record.
4       But he understood the gravity of the
5  situation and he understood the -- that time was
6  of the essence, and as I recall, he said to Luc,
7  "I want you to consider those issues as to how
8  critical this case is."
9       And then we went into the courtroom
10 and I explained to the Court what was being
11 done. I can't recall how long the hearing went
12 on. It went on for a long period of time.
13      There were -- notwithstanding it was
14 only the third day, the courtroom was packed. I
15 think even there was an overflow into another
16 courtroom, and lawyers being lawyers, everybody
17 had to say something. So it went on for hours.
18 And there were a substantial number of
19 objections.
20      Basically, Judge Peck came down and
21 said that he agreed it was essentially a
22 procedural matter that was before the Court,
23 there wasn't any real substantive relief as to
24 the sale, I'm talking about, and he -- he

Page 17

H. MILLER
1  thought we were entitled to a hearing on Friday
2  to consider approval of the sale.
3       And he noted -- I think he noted on
4  the record, I haven't gone back to look at it --
5  that the Creditors Committee was essentially
6  silent at that point. It did not support it and
7  did not object. He then someplace during that
8  four or five hours, we had the hearing on the
9  debtor-in-possession financing, which he
10 approved, and my recollection is Lehman drew
11 down immediately $200 million.
12      And he set a hearing for Friday
13 afternoon to approve the sale transaction, it
14 was either -- I think it was probably for 2
15 o'clock in the afternoon on Friday, and he said
16 that he would allow objections orally and in
17 writing and right up to the time of the
18 commencement of the hearing.
19      And the way it actually worked out,
20 objections continued all during the hearing
21 coming in. So that ended it was -- I think it
22 was about 8, 8 P.M., sometime in the evening,
23 and we returned to 745 Seventh Avenue, reported
24 we had told the Court at that time that it was a

Page 18

H. MILLER

1  very fluid transaction; the values -- I think I
2  used the word "values" -- were changing all the
3  time because of the market. I knew that we were
4  having -- not we, Lehman was having substantial
5  problems with the Chicago Mercantile Exchange.
6  People were closing out Lehman positions. It
7  was a very volatile period, as I said before,
8  tumultuous. So we knew we had the hearing set
9  for Friday afternoon and we started preparing
10  for the hearing.
11          Lehman had engaged Lazard as a
12  financial advisor in connection with the
13  transaction, and we basically had Thursday and a
14  bit of Friday morning to respond to objections
15  and to prepare for the hearing. And as I said
16  before, this was a multi-functional operation.
17  There were lots of things going on. There were
18  sort of, if you were up on, I forget, the 31st
19  or 32nd floor at 745, there were hundreds of
20  people, mostly attorneys and financial advisors,
21  roaming around. At one point I said, "Is there
22  any security up here?" I think The Wall Street
23  Journal might have been on the floor. It was a
24  very tumultuous period.

Page 19

H. MILLER

1          So Thursday was preparing for the
2  hearing, from my perspective; that's what I was
3  doing. Mr. Bart McDade was going to be our
4  primary witness. Things were so hectic over at
5  745 that I either brought or I asked Mr. McDade
6  to come here so we could go over the preparation
7  for the hearing. And he did, and we spent most
8  of Thursday afternoon into the evening with -- I
9  did, with Mr. McDade and with Barry Ridings, who
10  was the officer from Lazard whose testimony was
11  going to be proffered.
12          And that continued through the evening
13  into the late night into the morning. Things
14  were, unfortunately, in terms of the
15  marketplace, deteriorating. There was a lot of
16  issues coming up about the transaction in terms
17  of the value -- I wasn't directly involved in
18  that -- about Lehman's marks, the mark to
19  markets were too aggressive, but I wasn't
20  directly involved in that.
21          We were not ready at 2 o'clock, so we
22  had asked the court to put the hearing off one
23  hour to 3 P.M. And we went down to court.
24  Again, it was an extremely crowded courtroom,

Page 20

H. MILLER

1  with overflows. There was a Clarification
2  Letter which was being worked on, and we were
3  hoping that the Clarification Letter would get
4  to the courthouse sometime at the beginning of
5  the commencement of the hearing or during the
6  hearing.
7          So my partner Lori Fife was at 745
8  Seventh Avenue. She was involved in those
9  discussions, and she got down to the courthouse
10  probably around 3, a little bit after 3. The
11  Clarification Letter was not completed, and what
12  we proposed was that we would orally present to
13  the assemblage the essence of the Clarification
14  Letter. And Judge Peck agreed, and he went into
15  his chambers and Ms. Fife spoke to the
16  assemblage in the courtroom and described what I
17  believe were the essentials of the Clarification
18  Letter. And that went on, I don't know, half
19  hour, 35 minutes, 40 minutes. And my best
20  recollection is the hearing must have started
21  around 4 P.M., and it went from 4 P.M. to about
22  12:01 A.M. on the 20th.
23          I guess that Judge Peck announced his
24  decision just about midnight, and somehow the

Page 21

H. MILLER

1  order of approval got dated September 19th,
2  although I always thought it was two or three
3  minutes after midnight. He heard all the
4  objections. Mr. McDade testified. There were
5  proffers of the direct testimony of Mr. McDade
6  and Mr. Ridings and both of them were subjected
7  to cross-examination.
8          And Judge Peck orally delivered his
9  opinion and approved the sale, and basically he
10  said words to the effect that he did not see any
11  other alternative, this was a way of preserving
12  10,000 jobs, approximately 10,000 jobs, and to
13  realize a value that otherwise would
14  substantially erode.
15          So the closing, once the sale -- I
16  don't think the order was entered till about --
17  well, let me go back. After he issued his
18  order, he got up, he got off the bench, as I
19  recall, and for the first time in my history as
20  a practicing lawyer, I never saw this happen
21  before, the entire audience in the courtroom got
22  up and started applauding.
23          And as I remember, he sort of blushed,
24  but in any event, he said that if we wanted to,

6

Page 22

H. MILLER

1
2 he would stay around for an hour or two and
3 enter the order because there were modifications
4 being made to the order and to accommodate
5 objections that had been made. And that took
6 about an hour, an hour and a half. So,
7 actually, the order wasn't finalized and
8 submitted to chambers until around 1:30 A.M. or
9 something like that.
10         And the arrangements were made to
11 start the closing the following morning --
12 not the following, that morning. I don't know
13 what time it started in the morning. It
14 probably started around 9 A.M. is my guess. I
15 wasn't here Saturday morning or until late in
16 the afternoon.
17         And the hearing was going on. Some of
18 it I think was in this room. This entire floor
19 was devoted to the Lehman closing, and that
20 closing went from starting whatever time they
21 started on Saturday. I have learned in 50 years
22 of practice if you give time to lawyers, they
23 will fill the time, and basically it was to
24 close and consummate before the opening of the
25 market Monday morning.

Page 23

H. MILLER

1
2         And the process was very difficult.
3 There were many people here from Lehman and from
4 Barclays and I think DTCC was represented. We
5 invited the representatives of the Creditors
6 Committee to be at the closing and to
7 participate fully in the closing, and Luc was
8 here and I think other people from Milbank
9 Tweed.
10         The Committee had hired FTI as a
11 financial advisor and Houlihan Lokey as
12 financial advisors, and their representatives
13 were here throughout the weekend.
14         The closing got -- transaction got
15 very difficult on Sunday because of a dispute
16 between Barclays and JPMorgan in connection with
17 the clearing account and transactions between
18 Barclays and JPM, and as a consequence of that,
19 the Federal Reserve Bank got involved, I think
20 the S.E.C. was involved, and I think it had to
21 do with $7 billion, something equal to $7
22 billion.
23         And finally, I think with the help of
24 the Federal Reserve, a delegation from Chase --
25 or, from JPM came to the closing. My

Page 24

H. MILLER

1
2 recollection is it was Steve Cutler, who was
3 general counsel of JPM, a group from the
4 whatever division handled the clearing account,
5 the tri-party loan transactions, Hal Novikoff
6 from Wachtell Lipton. He wasn't here, he was on
7 the phone. Heidi Miller, who I think was the
8 CFO or a very senior officer at JPM was on the
9 phone, and there were people from the Fed.
10         There were a lot of people from
11 Washington that were on the phone. And there
12 was an open conference line, I can't remember,
13 it may have been in this room or it may have
14 been down the hall, to find out what the issue
15 was, what was going to hold up this transaction.
16         It had actually been surfaced either
17 Friday or Wednesday, and during the court
18 hearing when the attorney for JPM said there
19 were outstanding issues with Barclays that
20 hadn't been resolved and would have to be
21 resolved if JPM was going to open up on Monday,
22 the 22nd, for clearing accounts and transfers.
23         So we all congregated in this room
24 with 18 people, I think there were 18 people on
25 the conference line, to try and find out what

Page 25

H. MILLER

1
2 the issue was, and there was a dialogue between
3 Mr. Cutler and I think it was Ricci, Rich Ricci
4 from Barclays, who was on the phone, about what
5 the nature of the dispute was or who was -- who
6 failed to call each other.
7         It went on for a little bit, and
8 finally, my recollection is Steve Cutler said,
9 "We're not going to make any progress the way
10 we're going," and his recommendation was that
11 Barclays and JPM should retire to another
12 conference room and caucus among themselves and
13 see if they could resolve their differences.
14         And they left and they were gone for
15 quite a long period of time. I can't remember
16 what time they came back, it was late in the
17 evening, and meanwhile, the other mechanics of
18 the closing were going forward. There was a
19 room set up where people had huge piles of
20 papers going over securities about the marks.
21         My recollection was that Barclays was
22 of the opinion that the marks were too
23 aggressive, and there was a team of Lehman
24 people and a team of Barclays people going
25 through the securities I think

Page 26

H. MILLER

1  CUSIP-number-by-CUSIP-number, which was a huge
2
3  task.
4      Whenever it was that Steve Cutler and
5  Barclays came back and they announced that they
6  had reached an accommodation, and as I recall,
7  it was that Barclays was -- I'm sorry, JPM was
8  going to release certain securities to Barclays
9  which had a value of $7 billion, and that was a
10  big stumbling block.
11      I remember the person who was from the
12  Fed who had been on his phone for, I don't know
13  how many hours this was, said something to the
14  effect, "Now I can go home." And we thought
15  everything was going well at that point, and
16  people proceeded all night working on finalizing
17  the sale, the closing.
18      And there were people sleeping all the
19  over the place here on the floor, and I think it
20  must have been around 5 or 6 A.M. when Archie
21  Cox, who was I guess the senior officer of
22  Barclays, who had been here the whole weekend,
23  came into one of the conference rooms and said
24  there's no deal, and I think that shocked
25  everybody.

Page 27

H. MILLER

1
2      And when he was pressed why, he said
3  because -- and he had a piece of paper in his
4  hand -- the securities that JPM was going to
5  release to Barclays in his view were simply not
6  worth $7 billion. And he particularly alluded
7  to one security called the Racers, R-A-C-E-R-S,
8  which had an attributed value of $5 billion,
9  which he said wasn't worth anything close to $5
10  billion.
11      And Steve Cutler was -- I don't know
12  whether he had left and come back, but he was
13  here, and there was some dialogue. It went on
14  for relatively short period of time, and Steve
15  Cutler said, "Okay, let's stop. We're not
16  making any progress. I'll tell you what we'll
17  do. Barclays" -- I mean, "JPM will keep the
18  securities and give Barclays $7 billion in
19  cash." And that was like the last major hurdle.
20      The last remaining thing from my
21  perspective was that Barclays did not want to
22  formally close until they got official
23  notification from the title company that the
24  deed to 745 Seventh Avenue had been filed in the
25  appropriate recording office, so we were all

Page 28

H. MILLER

1
2  waiting in the conference room for a phone call
3  from the title company.
4      And that came in I think just before
5  the market opened. And that was the closing.
6  And then people collapsed and the clean-up crews
7  started coming in to clean up because there was
8  another transaction starting right then to sell
9  the Neuberger Berman assets.
10      And I went home and went to sleep.
11      Q.  Thank you. At the time that the
12  Clarification Letter was finally completed --
13  and let me ask, when was that time?
14      A.  Over the weekend.
15      Q.  Over the weekend.
16      A.  I can't say precisely. There was a
17  Clarification Letter that was -- I wouldn't say
18  completed -- drafted that actually got to the
19  courthouse, but my partner Tom Roberts reviewed
20  it and said that it wasn't correct. So it was
21  over the weekend. It was -- it was signed on
22  the 22nd, I think.
23      Q.  The Clarification Letter, when you say
24  it was gotten to the courthouse, you mean gotten
25  to the courthouse on Friday during that hearing,

Page 29

H. MILLER

1
2  during that long hearing?
3      A.  I think a box came down late in the
4  hearing.
5      Q.  Who got copies of the Clarification
6  Letter that weekend?
7      A.  I believe, and I don't have personal
8  knowledge of it, everybody who was at the
9  closing.
10      Q.  And that included members of the
11  Creditors Committee and their representatives?
12      A.  They -- the members -- well, the
13  representatives of the Creditors Committee, let
14  me put it that way. I don't remember if there
15  was an actual member here. Were here throughout
16  the closing till about, I may be off by an hour
17  or so, until about 4, 3 to -- someplace between
18  3 A.M. and 5 A.M.
19      Houlihan Lokey, and I believe it was
20  Sol Burian and Mike Fazio and FTI -- his first
21  name is Michael -- were all here, and at some
22  point between 3 and 5 A.M., they basically said
23  that they were leaving and said, "Everything's
24  fine, and going forward, if it's okay with you,
25  it's okay with us."

Page 30

H. MILLER

1    It was right after a somewhat heated
2  discussion about the 15c3-3 account which took
3  place in the hallway down the -- down, halfway
4  down the floor here.
5    Q.   And what was that discussion?
6    A.   Barclays took the position that the
7  15c3-3 account, which is a collateral account
8  for the benefit of customers that is subject to
9  oversight or supervision by the S.E.C., goes
10  with the customer accounts; that if you're
11  buying all the customer accounts, you get the
12  15c3 account.
13    Our position was that wasn't
14  necessarily true, that wasn't the custom in the
15  industry, and it wasn't entitled to 15c3
16  account, which was collateral for customers and
17  couldn't be moved anyway without S.E.C.
18  approval.
19    And there was a discussion about that.
20  I think Michael Klein, who was advising
21  Barclays, got into that discussion. We were
22  standing out by the reception down the hallway,
23  and Sol Burian, Mike Fazio and I think Michael
24  from FTI was also there, in which we were

Page 31

H. MILLER

1  arguing over this. And this was, you know, this
2  was pretty close to closing time.
3    Q.   On what day?
4    A.   This was the morning of the 2 --
5  Monday morning.
6    Q.   This is -- this is Sunday night/Monday
7  morning, after midnight?
8    A.   Oh, this was I'm saying 3, 4 A.M.
9  Monday morning. I think at that point in time
10  almost everything else had been cleared up and
11  the resolution was -- like all major closings,
12  you have some adjustments -- there was a letter
13  which had been obtained or approved by the
14  S.E.C. in connection with what was thought to be
15  another transaction before the September 12th to
16  release the 15c3-3 account. And I think it was
17  in connection with possibly a sale of all of
18  Lehman without any bankruptcy or anything, and
19  in that letter a list of what was in the
20  account. And in the account was cash, PAIB
21  securities, which I can't -- at the time I knew
22  what the acronym meant, but I don't know what it
23  means now, of some 400 million, odd million
24  dollars, PAIB securities and other securities.

Page 32

H. MILLER

1    And the agreement by that, okay, we
2  will resolve this issue by Lehman -- I'm using
3  "Lehman" broadly -- would retain the cash and
4  the PAIB securities, which was about a billion,
5  a billion-four or something like that, and the
6  other securities would go to Barclays, I think
7  it was 700 odd million dollars, but all subject
8  to S.E.C. approval and that the S.E.C. may
9  never -- well, I shouldn't say that. It was
10  collateral to satisfy customers, and you could
11  not get your hands, so to speak, on those assets
12  without the S.E.C. approval.
13    So there was a question as to if and
14  when that would ever be released, and it
15  certainly would be something that the LBI
16  trustee would have a major interest in.
17    Q.   And was the agreement with respect to
18  the 153c-3 (sic) issue incorporated into the
19  final Clarification Letter?
20    A.   As I understand, it was.
21    Q.   And that final Clarification Letter
22  was not kept secret; it was made available to
23  everybody who was at the closing, correct?
24    A.   That's my understanding.

Page 33

H. MILLER

1    Q.   And was there any discussion as to
2  whether or not it was necessary or desirable to
3  go back to court to have the Court approve the
4  Clarification Letter after it had been
5  finalized?
6    A.   No, there wasn't.
7    Q.   The -- was there any -- was there any
8  discussion Sunday afternoon or evening about the
9  possibility of going back to the court for any
10  further approval?
11    A.   Neither on Sunday or Monday was there
12  any discussion. The transaction that was being
13  pursued was the transaction that we believe we
14  presented to the Court.
15    Q.   So that the transaction that was
16  reflected in the final written Clarification
17  Letter was, in your view, the transaction that
18  you had already received approval from the Court
19  to proceed with?
20    A.   That's correct, with the -- let me
21  just say that, insofar as any of the figures
22  were concerned, we -- all those figures were
23  supplied by Lehman.
24    Q.   And by "figures," you're referring to

Page 34

H. MILLER

1     what?
2     A.    References to the value of the assets,
3     the assumption of liabilities, all the
4     liabilities.
5     Q.    Did you have an understanding one way
6     or the other as to whether there were any
7     reliable estimates of the actual value of the
8     assets or liabilities that were involved here?
9     A.    I don't quite know what you mean by
10    "reliable." As I said, the -- it was fluid.
11    The markets were in terrible shape. There was a
12    persistent theme that -- and this was a theme
13    that predated this transaction -- that Lehman
14    was always aggressive on its marks.
15    So, from my perspective, and I think
16    my team's perspective, Lehman and Barclays were
17    trying to work that out in this room that had
18    this huge computer printouts and stuff that went
19    on for hours and hours and hours.
20    Q.    Were you, and by "you" I mean Weil
21    Gotshal, not you necessarily you personally, but
22    were you, in the context of Weil Gotshal, aware
23    that both Barclays and Lehman had a variety of
24    estimates of values of these assets?

Page 35

H. MILLER

1     A.    Yes.
2     Q.    And that those estimates varied
3     widely?
4     A.    "Widely" is a relative term, but I
5     mean, we -- I think we started Monday or Tuesday
6     with estimates of potentially 70 odd billion
7     dollars in assets and $64 billion in
8     liabilities. By Wednesday evening, or sometime
9     around that time, it had gone down to 45 billion
10    in assets, and I don't remember the figure on
11    the liabilities, but 42, 43, something like
12    that.
13    Q.    In terms of the assets.
14    Now, when you refer to the assets,
15    what assets are you referring to there?
16    A.    I can't -- I really can't itemize
17    them, but those were the figures that I heard.
18    Q.    Were you aware of assets that were
19    referred to as the repo assets?
20    A.    There were the outstanding -- there
21    was an outstanding repo with the Fed.
22    Q.    And that outstanding repo with the
23    Fed, there were certain assets that were the
24    collateral for the loan from the Fed, correct?

Page 36

H. MILLER

1     A.    Well, as I said, when we had the
2     meeting with the Federal Reserve Bank on Sunday,
3     the 14th, in the course of those discussions,
4     when the Fed and the S.E.C. and the Treasury
5     Department insisted -- maybe "insisted" is too
6     strong a word -- that Lehman file a bankruptcy
7     petition and the discussions about the effect
8     that it would have on customers of LBI, which
9     had the biggest presence, the Fed said that they
10    would keep the PDCF window open for four days,
11    about four or five days, provided that LBI
12    complied with the collateral requirements.
13    So there wasn't one repo; there was a
14    repo on Monday and I guess there was a repo on
15    Tuesday. It was like an overnight loan. And I
16    can't recall the figure on Monday, but it was
17    maybe close to $90 billion.
18    Q.    And that Monday, which Monday is that?
19    A.    That's the 15th.
20    Q.    That's the 15th.
21    By the end of that week, there was
22    still a repo outstanding with the Fed, correct?
23    A.    There was a repo outstanding, but the
24    character of it had changed in terms of who was

Page 37

H. MILLER

1     the lender, let me call it. I think starting on
2     Tuesday there was pressure on Barclays to step
3     into the process. If I recall correctly, I
4     think Barclays made a first loan on Tuesday, may
5     have been around $7 billion, then there was a
6     $15.8 billion loan, and then the Fed I think put
7     a lot of pressure on Barclays to take over the
8     Fed's position. And that repo, I think it was
9     45 billion.
10    Q.    And Barclays did take over the Fed's
11    position?
12    A.    My -- my understanding was Barclays
13    stepped into the shoes of the Fed.
14    Q.    And at that point there were certain
15    assets, and you said about $45 billion, that
16    were collateral that was backing up that loan
17    that had first been made by the Fed and then --
18    A.    Should have been more than 45 billion.
19    Generally, you need an excess, some
20    loan-to-value kind of a concept. My own
21    impression is the Fed was getting very nervous
22    about the deterioration in the value of the
23    collateral and certainly did not want to end up
24    as an undersecured creditor.

Page 38

H. MILLER

1
2    Q.   Let me see if I understand what you're
3    saying. The Fed had a repo and had collateral
4    for the loan that started out in excess of value
5    of the loan, correct?
6    A.   That's correct.
7    Q.   But what the Fed was concerned about
8    was because of the deterioration of the value of
9    the assets, the actual value might turn out to
10   be less than the value of the loan and they
11   might be undersecured?
12        MR. MAGUIRE: Objection to form.
13        MR. GAFFEY: Join the objection.
14   Q.   Is that correct?
15   A.   That's my construction of what was
16   happening. I don't have any personal knowledge
17   of anybody at the Fed saying that, but looking
18   at the marketplace and looking at what was
19   happening to the value of securities during that
20   market, and having been told -- may have been
21   hearsay -- that the Fed was pressuring Barclays
22   to take over that position, I would assume that
23   the value of the excess collateral, if you want
24   to call it that, or that the collateral package
25   was eroding, and since Barclays was going to

Page 39

H. MILLER

1
2    acquire the business of LBI, I imagine, okay,
3    that the Fed was saying to Barclays, "Step up to
4    the plate. Put your money where your mouth is."
5    Q.   Uh-huh. And in the sale transaction
6    was it clear that Barclays was, among other
7    things, going to get the entire repo collateral,
8    whatever that was worth?
9    A.   I don't know what you mean by "clear."
10   Barclays assumed the position of the lender. It
11   had certain rights as the lender. If the --
12   let's say -- let me hypothesize that if the LBI
13   failed to pay, Barclays would have had remedial
14   rights to that collateral.
15   Q.   This was at what point in time?
16   A.   Whenever there was a failure to pay.
17   Q.   As of the closing --
18   A.   Yeah.
19   Q.   -- Barclays had actually purchased
20   those assets, correct?
21   A.   As I understand it, what happened was,
22   as between the Lehman reps and Barclays, the
23   process was basically to terminate the repo, and
24   Barclays -- and the collateral would be part of
25   the assets that were acquired. Essentially,

Page 40

H. MILLER

1
2    this was being -- I mean, this was the purchase
3    of really the LBI business.
4    Q.   You said a number of times this was
5    the purchase of the LBI business. Why was it
6    the purchase of the business as opposed to a
7    balance sheet transaction?
8    A.   Well, we never had a, what I would
9    call an accurate balance sheet, and it was never
10   a balance sheet transaction from my perspective.
11   It was always in the -- it was always
12   characterized as the purchase of the North
13   American business, which was basically the LBI
14   business, and the 10,000 employees, I think the
15   estimate was 10 to 12,000 employees who were
16   involved in the transaction, which Barclays
17   wanted, were all LBI -- basically all LBI
18   employees.
19   Q.   In the transaction that was closed,
20   there was an identification of certain purchased
21   assets, correct?
22   A.   Yes.
23   Q.   And a part of those purchased assets
24   were what had been the repo collateral before
25   the repo was terminated, correct?

Page 41

H. MILLER

1
2    A.   I can't recall if there was a specific
3    description of that. The concept was the
4    securities at LBI would be going over to
5    Barclays.
6    Q.   Whatever those securities were?
7    A.   Yes.
8    Q.   Now, in addition to those securities,
9    there were certain assets, sometimes referred to
10   as additional assets, correct?
11   A.   Some characterization of that type.
12   Q.   And those assets included, I think you
13   already identified, the 153c-3 (sic)?
14   A.   15c3-3, yes.
15   Q.   Those assets. And there were
16   additional assets, correct?
17   A.   Well, there was the real estate.
18   Q.   There was the real estate.
19   A.   Which was 745 Seventh Avenue and
20   two -- two properties in New Jersey, I think
21   they were.
22   Q.   Uh-huh.
23   A.   Data centers.
24   Q.   And were there additional assets?
25   A.   I can't specify. They were sort of

Page 42

H. MILLER

1 grouped by characterizations, like the Fixed
2 Income Group and PIM and things like that.
3     Q.  Do you recall a Schedule B to the
4 transaction?
5     A.  Yes.  Schedule B I think was supposed
6 to be the schedule of securities.
7     Q.  And who prepared that Schedule B?
8     A.  I don't have personal knowledge of
9 that.  I think it was prepared by Lehman, and
10 that was reviewed by Barclays.
11     Q.  Let me show you an exhibit that I hope
12 has been premarked.
13     MR. HUME:  It's been premarked.
14     (Exhibit 508, a document bearing Bates
15     Nos. WGM-LEHMAN-E 00015980 through 82 with
16     attachment, marked for identification, as of
17     this date.)
18     Q.  It's been premarked as Exhibit 508,
19 and while copies are being given out -- while
20 copies of that are being given out, are you --
21 do you know about what are referred to as
22 clearance box assets?
23     A.  I've heard the term.  I know there was
24 a lot of discussion about clearance box assets

Page 43

H. MILLER

1 which involved DTCC, who was also here, and
2 there was a point in the closing when there was
3 an issue of the values had eroded to such a
4 point that Lehman was talking about the need to
5 find additional assets.
6     Q.  And those were additional assets that
7 would be transferred to Barclays, correct?
8     A.  Correct.
9     Q.  And was one category of those
10 additional assets the so-called clearance box
11 assets?
12     A.  I can't specifically say that, but I
13 would -- my impression is yes.
14     Q.  Let me ask you to look at Exhibit 508,
15 and this is materials that were sent to Lori
16 Fife.  Do you see that at the top?
17     A.  On which page?
18     Q.  The very top of the page.
19     A.  Oh, yes, from Rod Miller to Lori Fife,
20 yes.
21     Q.  And there's a discussion here of the
22 clearance box assets and the Schedule B,
23 correct?
24     A.  It looks that way, yes.

Page 44

H. MILLER

1     Q.  And do you have any reason to doubt
2 the accuracy of what is set forth here?
3     MR. GAFFEY:  Object to the form.
4     A.  What specifically are you referring
5 to, Mr. Boies?
6     Q.  In terms of what the market value is
7 of the clearance box assets that are referred
8 to.
9     A.  I would have no basis to dispute that.
10 As I said before, all of the figures came from
11 Lehman.
12     Q.  And the -- and the figures that came
13 from Lehman included the valuation of the
14 clearance box assets; is that correct?
15     A.  As Lehman marked it, I assume.
16     Q.  And did Weil Gotshal make any effort,
17 not necessarily by you personally, but did Weil
18 Gotshal make any effort to review the accuracy
19 or procedures by which those marks were arrived
20 at?
21     A.  I don't have any personal knowledge,
22 as you pointed out.  I don't believe that we
23 undertook that at all.
24     Q.  Now, there was Lazard who had been

Page 45

H. MILLER

1 hired --
2     A.  Yes.
3     Q.  -- as an investment banker; is that
4 correct?
5     A.  That's correct.
6     Q.  And who did Lazard represent?
7     A.  Lazard was engaged by Lehman Brothers,
8 Inc. pursuant to a court order.
9     Q.  And do you know if Lazard reviewed the
10 accuracy of the marks that were made or how that
11 was -- how those marks were determined?
12     A.  No, I don't know.
13     Q.  Did you ever -- did you or anyone at
14 Weil Gotshal, since you're a 30(b)(6) witness --
15     A.  Yes.
16     Q.  -- ever have any discussions with
17 Lehman about the marks?
18     A.  With Lehman or with Lazard?
19     Q.  With Lazard.  I'm sorry.
20     A.  I'm not sure.  I don't -- I don't
21 believe so.
22     Q.  Now, you were aware that some of the
23 people at Lehman who were working on these marks
24 were people that would ultimately end up at

Page 46

H. MILLER

1
2  Barclays since Barclays was buying the business,
3  correct?
4      A.   Correct.
5      Q.   So they had at least a potential
6  conflict of interest since they were both doing
7  marks and they were going to end up at the
8  buyer, correct?
9      A.   You could say that, but I'm not sure,
10  I don't know -- well, certainly Mr. McDade was
11  here most of the time, and Mr. McDade had taken
12  the position that he would not agree to being
13  employed by Barclays. In fact, he said to me he
14  was here to -- he was going to be the
15  independent officer in connection with this
16  transaction would not even consider any
17  discussions about employment by Barclays.
18      I don't remember whether Alex Kirk,
19  who was involved in some of this, actually was
20  employed by Barclays at any point in time, but
21  there was that issue, yes.
22      Q.   Did you believe that the information
23  that you were getting from Barclays was
24  information that you could rely on in making
25  representations to the Court?

Page 47

H. MILLER

1
2      A.   Barclays or from Lehman?
3      Q.   I'm sorry.
4      A.   Okay.
5      Q.   Did you believe that the information
6  that you were receiving from Lehman was
7  information that you could rely on in making
8  your representations to the Court?
9      A.   I assumed that the people at Lehman
10  were operating in good faith and I had no reason
11  to doubt them.
12      Q.   Have you ever had any reason to doubt
13  it based on anything that you have come across
14  since September of 2008?
15      A.   No.
16      MR. GAFFEY: Objection to the form.
17      Q.   Have you ever had any reason to doubt
18  the good faith of Mr. McDade?
19      A.   No, I've never had any reason to doubt
20  the good faith of Mr. McDade.
21      Q.   Let me --
22      MR. GAFFEY: Mr. Boies, could I
23  interrupt you? When you get to a convenient
24  point for a break, if we could take ten
25  minutes.

Page 48

H. MILLER

1
2      MR. BOISE: Sure. We can break now.
3  Absolutely.
4      THE VIDEOGRAPHER: The time is now
5  10:42 A.M. We're now off the record.
6      (Recess.)
7      THE VIDEOGRAPHER: This is the start
8  of tape number 2. The time is now 11:03
9  A.M. We're now back on the record.
10  BY MR. BOISE:
11      Q.   Mr. Miller --
12      A.   I remembered Michael's last name.
13  It's Eisenband from FTI.
14      Q.   Thank you.
15      Mr. Miller, I've handed you a copy of
16  Exhibit 25. Is this the Clarification Letter
17  that we had talked about?
18      A.   Yes.
19      Q.   And did this Clarification Letter
20  represent, in substance, the deal that the Court
21  had approved Friday night or early Saturday
22  morning?
23      A.   In my view, yes.
24      Q.   And is that why you and Weil Gotshal
25  concluded that it was not necessary to take this

Page 49

H. MILLER

1
2  specific letter back to the Court for further
3  approval?
4      A.   Yes. I was reminded, as a 30(b)(6)
5  witness, I did not recall that there was
6  actually a discussion about going back to Court
7  in connection with the Clarification Letter.
8  That occurred sometime during either Sunday
9  evening or Monday morning, in which there was a
10  discussion and the conclusion of that discussion
11  was it wasn't necessary.
12      Q.   And the reason it wasn't necessary was
13  what?
14      A.   It did not change the deal that was
15  presented to the Court.
16      Q.   Let me ask you to look at the first
17  page, and at the bottom half it talks about what
18  the purchased assets are. Do you see that?
19      A.   Yes.
20      Q.   And subparagraph 1(A)(ii) lists
21  certain additional purchased assets, correct?
22      A.   Yes.
23      Q.   And (A) is, or are, the securities
24  that we referred to as the so-called repo
25  securities, correct?

Page 50

H. MILLER

1   A.   They would be in that, in that
2   characterization.
3   Q.   And Category (B) are the securities
4   and other assets held in LBI's clearance boxes,
5   correct?
6   A.   That's what it says.
7   Q.   And Category (C) are the
8   exchange-traded derivatives and any property
9   that may be held to secure obligations under
10  such derivatives and collateralized short-term
11  agreements, correct?
12  A.   That's what it says.
13  Q.   And as you understood it, were all of
14  those assets included as purchased assets that
15  Barclays was acquiring?
16  A.   Correct.
17  Q.   Now, in this agreement there are no
18  values specified for any of the assets that are
19  being transferred or the liabilities that are
20  being assumed, correct?
21  A.   I believe that's correct.
22  Q.   Why is that?
23  A.   It was a purchase of the business and
24  the assets that went with that business, to the

Page 51

H. MILLER

1   extent not excluded.
2   Q.   And those -- and those assets that
3   were being purchased were being purchased
4   irrespective of what their value was, correct?
5   A.   Essentially, yes.
6   Q.   Now, let me ask you to look at Exhibit
7   506.
8       MR. POLKES:   Which is 506? I'm sorry.
9       MR. BOISE:   It's coming.
10      (Exhibit 506, a document bearing Bates
11  Nos. WGM-LEHMAN-E 0006125 through 127 with
12  attachment, marked for identification, as of
13  this date.)
14  Q.   Exhibit 506 is an e-mail chain dated
15  September 20, 2008, correct?
16  A.   That's what it says.
17  Q.   And this was an e-mail chain that Weil
18  Gotshal had as of September 20, 2008, correct?
19  A.   It appears, yes. Yes, the answer is
20  yes.
21  Q.   And this represented an estimate of
22  the value of the so-called repo assets, correct;
23  that is, the Barclays collateral that was
24  collateralizing the repo loan?

Page 52

H. MILLER

1       MR. GAFFEY:   Object to form.
2       MR. POLKES:   Are you referring to the
3   first page that's a chart that's attached to
4   the exhibit that says "Market Value" at the
5   top?
6       MR. BOISE:   Yes.
7   A.   That's what it appears to be.
8   Q.   And that shows the market value of the
9   so-called repo assets at $49.9 billion, correct?
10  A.   In round figures, yes.
11  Q.   Now, were you aware of the fact that
12  there were other estimates of the value of the
13  repo assets other than this $49.9 billion
14  estimate?
15  A.   I was aware that the values were
16  fluctuating all the time.
17  Q.   Let me, let me ask you to look at
18  Exhibit 510.
19      (Exhibit 510, a document bearing Bates
20  Nos. WGM-LEHMAN-E 00021381 and 21409, marked
21  for identification, as of this date.)
22  A.   Yes, sir.
23  Q.   Exhibit 510 is, or purports to be, an
24  excerpt from a report to Unsecured Creditors

Page 53

H. MILLER

1   Committee of Lehman Brothers Holdings dated
2   October 8, 2008.
3       Have you ever seen this exhibit
4   before?
5   A.   I don't have a present recollection
6   other than in connection with this deposition.
7   Q.   This was a document that Weil Gotshal
8   had, correct?
9   A.   Yeah.
10  Q.   Now, on the second page of the exhibit
11  when it talks about the assets purchased by
12  Barclays, it refers to the assets, the repo
13  assets, as 4.31 billion and says that there had
14  been a negotiated 5 billion reduction from what
15  are referred to as Lehman "stale" marks, do you
16  see that?
17  A.   I see that.
18  Q.   Were you aware that there was, during
19  the time leading up to the closing of the
20  transaction, a negotiation between Lehman and
21  Barclays as to what the appropriate marks should
22  be?
23  A.   I was aware that there were
24  discussions between Lehman and Barclays as to

Page 54

H. MILLER

1 the marks, which I think I referred to before
2 was a -- an extensive discussion during that
3 weekend, mostly on Sunday and Monday.
4     Q.    And the assets that are purchased that
5 are listed here include the repo assets, include
6 1.9 billion that was referred to as the
7 unencumbered box. Do you know what that refers
8 to?
9     A.    Clearance box, I believe it refers to.
10     Q.    And it refers to a 1.5 billion
11 building and data centers and then it refers to
12 $800 million of 15c3-3 securities?
13     A.    Yes.
14     Q.    And it says any excess will accrue to
15 Lehman Brothers, Inc., do you see that?
16     A.    I see that.
17     Q.    And that is any excess above the $8
18 billion, is that correct -- the .8 billion
19 dollars?
20         MR. MAGUIRE:  Objection to form.
21         MR. GAFFEY:  Join in the objection.
22     Q.    The .8 billion dollars?
23     A.    I don't know what the scrivener of
24 this document meant by "excess."

Page 55

H. MILLER

1     Q.    Okay.
2     A.    As I said before, the securities in
3 the 15c3-3 account, to the extent that the
4 S.E.C. would agree to release them, would go to
5 Lehman -- I mean, would go to Barclays, and that
6 was it.
7     Q.    Is there anything in this Exhibit 510
8 that, in your view, is inconsistent with any of
9 the representations that you made to the Court
10 in connection with the approval of the sale?
11         MR. GAFFEY:  Objection to form.
12         MR. TECCE:  Same objection.
13         MR. MAGUIRE:  Same objection.
14     A.    As I believe I testified, I think this
15 is part of a report that the financial advisors
16 to the Creditors Committee gave to the Creditors
17 Committee at the meeting that was held on
18 October 8, 2008, and generally, the Creditors
19 Committee met in executive session before
20 representatives of the Debtors appeared.
21         And I'm -- I don't recall this
22 presentation. I'm not sure I was at the October
23 8 meeting, but I don't really know what is meant
24 by "book value per Lehman's stale marks

Page 56

H. MILLER

1 negotiated a $5 billion reduction" meant.
2 Otherwise, it's accurate.
3     Q.    Now, you're aware that a Rule 60
4 motion has been filed in this matter?
5     A.    Yes, I am.
6     Q.    And have you reviewed that Rule 60
7 motion?
8     A.    I have read it.
9     Q.    And is there anything in that Rule 60
10 motion that Weil Gotshal was not aware of at the
11 time of the approval of the transaction?
12         MR. POLKES:  Objection to form.
13         Go ahead. You can answer.
14         MR. GAFFEY:  Join.
15         MR. TECCE:  Join in the objection.
16         MR. MAGUIRE:  Objection.
17     Q.    Let me break it down then.
18     A.    Okay.
19         MR. BOISE:  And the objection is it's
20 just too broad?
21         MR. POLKES:  Yes.
22     Q.    You were aware, were you not, at the
23 time that the transaction was approved that
24 there were a number of different estimates to

Page 57

H. MILLER

1 value the assets that were being acquired?
2     A.    As I said before, the values were
3 fluctuating all the time.
4     Q.    And there were no representations or
5 warranties with respect to what the values were
6 in the final documentation, including the
7 Clarification Letter, correct?
8         MR. GAFFEY:  Form objection.
9     A.    That's correct.
10     Q.    And why is that?
11     A.    Because the values were fluctuating.
12 The figures were, I would say, not reliable, and
13 it was a deal to buy the business, not a balance
14 sheet deal, and as a consequence, there were no
15 representations or warranties or any true-up in
16 the Asset Purchase Agreement.
17     Q.    And -- and Weil Gotshal had told the
18 Court on September 19 that the deal had changed
19 and that there was no true-up; is that correct?
20     A.    I don't know if we used those words,
21 but I am sure I used the words that it was a
22 very fluid transaction where values were
23 changing all the time.
24     Q.    Let me give you, just to refresh your

Page 58

H. MILLER

1    recollection, Exhibit 442. This is the hearing
2    transcript.
3       A.   What page?
4       Q.   47. And this is Ms. Fife from Weil
5    Gotshal.
6       A.   Yes.
7       Q.   And she says at lines --
8          MR. GAFFEY: Which day, the 17th or
9    the 19th?
10          MR. BOISE: Page 47 --
11          MR. GAFFEY: Which transcript?
12          MR. BOISE: I'm sorry. It's the 19th.
13       Q.   Exhibit 442 is the transcript of the
14    hearing before the Court on September 19,
15    beginning at 4:36 P.M., correct?
16          MR. POLKES: Harvey, he's just asking
17    if this is in fact the transcript of the
18    19th.
19       A.   I'm sorry. It appears to be so.
20       Q.   And if you go to page 47.
21       A.   Yes.
22       Q.   Ms. Fife, beginning at line 7, says,
23    "There was an upside sharing in the original
24    transaction, there is going to be a true-up 12

Page 59

H. MILLER

1    months later on, and that has been eliminated
2    from this transaction." Do you see that?
3       A.   I see that.
4       Q.   And as you understand it, was that an
5    accurate statement?
6       A.   I believe so.
7       Q.   Let me ask you to look at Exhibit 489.
8    This is a copy of minutes of the board of
9    directors of Lehman Brothers Holdings dated
10    September 16, 2008. My questions to you are in
11    your capacity as a 30(b)(6) witness at Weil
12    Gotshal.
13          Representatives of Weil Gotshal
14    attended this meeting, correct?
15       A.   Correct.
16       Q.   All right. That's all I have on that.
17          Based on everything that you know as
18    of today, do you believe that your presentation
19    to the Court on September 19 was fair and
20    accurate and appropriate?
21       A.   I believe that it was fair, accurate
22    and appropriate based upon the information which
23    we were given and the assumption that everybody
24    at Lehman was operating in good faith.

Page 60

H. MILLER

1       Q.   And have you found anything since then
2    that has led you to believe that the information
3    that you were given was inaccurate or that the
4    people at Lehman were not operating in good
5    faith?
6       A.   No.
7          MR. GAFFEY: Objection to form.
8          MR. TECCE: Join in the objection.
9          MR. MAGUIRE: Same objection.
10          MR. BOISE: May I have just a moment?
11       Q.   Did Weil Gotshal ever tell the Court
12    or represent to the Court, directly or
13    indirectly, that the deal was going to be a
14    wash?
15       A.   I don't believe so. I did not,
16    certainly.
17       Q.   Did you in fact believe that the deal
18    was going to be a wash?
19       A.   I hadn't -- I did not hear the
20    expression "wash" until very recently.
21       Q.   Again, in your capacity as a
22    representative, as a 30(b)(6) representative of
23    Weil Gotshal, Weil Gotshal received information
24    contemporaneous with the negotiations that took

Page 61

H. MILLER

1    place leading up to the closing on September 20
2    that Barclays expected to record a gain as a
3    result of the transaction, correct?
4       A.   Could you pinpoint time?
5       Q.   Sure. Let me -- let me give you first
6    Exhibit 505 and, with it, Exhibit 344A.
7          (Exhibit 505, a document bearing Bates
8    Nos. LAZ-C-00045462 through 463, marked for
9    identification, as of this date.)
10       Q.   First, Exhibit 34A?
11          MR. GAFFEY: I'm sorry to interrupt.
12    We don't have the exhibit yet.
13          MR. BOISE: I'm sorry.
14       Q.   Let me also, just so we have a
15    complete set, give you Exhibit 343A.
16          MR. MAGUIRE: Could I ask that we have
17    a set of the premarked exhibits so we can
18    keep up?
19          MR. BOISE: I think that would be much
20    more efficient.
21          Let me finish with these particular
22    exhibits and then we'll take a short break
23    and we'll get you a copy of all the
24    premarked exhibits.

Page 62

H. MILLER

1
2      MR. MAGUIRE: Thanks.
3      MR. BOISE: I agree that would be a
4  much more efficient way to do it.
5      Do you have the exhibits?
6      (No response.)
7      MR. BOISE: Okay, I'll take that as a
8  yes.
9      Q.   Mr. Miller, let me ask you to look
10  first at Exhibit 344A.
11     A.   Yes.
12     Q.   This is a -- an e-mail that attaches a
13  Barclays press release dated September 17, 2008?
14     A.   Yes.
15     Q.   And without asking you to read the
16  whole thing, if you go to the last sentence of
17  the third paragraph, it says, "The proposed
18  transaction with Lehman Brothers and the
19  additional equity would result in an enhancement
20  of Barclays' earnings and capital ratios." Do
21  you see that?
22     A.   Yes, I do.
23     Q.   And let me ask you to look next at
24  Exhibit 343A.
25     A.   I have it.

Page 63

H. MILLER

1
2      Q.   Which is also -- which is also dated
3  September 17, 2008, correct?
4      A.   Correct.
5      Q.   And this is a transcript of an analyst
6  and investor conference call that Barclays had
7  at that time, correct?
8      A.   It appears to be so.
9      Q.   And if you go to the second page, the
10  fifth paragraph?
11     A.   Yes. I would just note this exhibit
12  is highlighted.
13     Q.   Oh, it is?
14     A.   Yes. On the second page.
15     Q.   They gave you probably my copy. Or
16  maybe they decided that was a good way to do it,
17  I don't know. But we don't generally highlight
18  the witness's copy.
19     (Document handed to the witness.)
20     A.   Okay.
21     Q.   Paragraph 5 of Exhibit 343A says that
22  the transaction with Lehman is "capital ratio
23  accretive without additional equity issuance.
24  And the source of that accretion is the negative
25  goodwill from the transaction, which amounts to

Page 64

H. MILLER

1
2  about 2 billion U.S. dollars post tax." Do you
3  see that?
4      A.   Yes, I do.
5      Q.   And both of these exhibits were
6  exhibits that Weil Gotshal had available to it
7  on or about September 17, 2008, correct?
8      MR. GAFFEY: Objection.
9      A.   As to 344A, I'm certain that that was
10  in the possession of Weil Gotshal, because 505
11  would appear to have been -- there's an
12  attachment of the -- of a press release. It
13  says the "Lehman Press Release." The press
14  release itself is not attached, but it's from --
15  I think it's from -- to Lori Fife. Who is it
16  from? It's from Lazard, and I'm not sure which
17  press release was attached to it because it's
18  not attached, whether it was a Lehman release or
19  it was a Barclays release.
20     Q.   Was there -- or, I guess I should say
21  is there anything that is in these releases that
22  I've just showed you that is in any way
23  inconsistent with your understanding as of
24  September 19?
25     MR. GAFFEY: Object to the form.

Page 65

H. MILLER

1
2      MR. MAGUIRE: Object to the form.
3      MR. TECCE: Form objection.
4      A.   No, I assume that Barclays was not
5  making this acquisition for the purpose of
6  taking a loss.
7      MR. BOISE: Let's take just a brief
8  break, and what we'll do is we'll get all of
9  the exhibits that are premarked out so that
10  we don't have discontinuity that we've had
11  trying to distribute them.
12     THE VIDEOGRAPHER: The time is 11:30
13  A.M. We're now off the record.
14     (Recess.)
15     THE VIDEOGRAPHER: The time is now
16  11:42 A.M. We are now back on the record.
17  BY MR. BOISE:
18     Q.   Mr. Miller, let me give you copies of
19  documents that have been premarked as
20  pre-distributed.
21     MR. MAGUIRE: Just so you are aware,
22  David, they have been remarked, but they
23  have not been pre-distributed.
24     MR. BOISE: You still don't have them?
25     MR. MAGUIRE: We don't have the

Page 66

H. MILLER

1    H. MILLER
2    exhibits, no. I know that was the purpose
3    of the break.
4        MR. BOISE: That was.
5        MR. MAGUIRE: At least I don't have
6    any.
7        MR. BOISE: Let's be sure that
8    everybody over there has copies of the
9    exhibits. I know there are a lot of people,
10   but let's be sure everybody's got copies,
11   particularly the people who are sitting
12   right across from me.
13       MR. GAFFEY: I'm happy to report I
14   have 514.
15       MR. BOISE: Okay. 514 or 513?
16       MR. GAFFEY: 513.
17       MR. MAGUIRE: 514 and 507.
18       MR. GAFFEY: You want to go off for
19   one minute with the promise no one leaves
20   the room?
21       MR. BOISE: Yes. Everybody stay in
22   place.
23       THE VIDEOGRAPHER: The time is 11:43
24   A.M. We're now off the record.
25       (Recess.)

Page 67

1    H. MILLER
2        THE VIDEOGRAPHER: The time is now
3    11:47 A.M. We are now back on the record.
4    BY MR. BOISE:
5        Q.  Now that everybody has Exhibits 513,
6    467B and 477B, Mr. Miller, let me ask you some
7    questions about them.
8        (Exhibit 513, an e-mail dated
9    September 17, 2008 at 13:08, marked for
10   identification, as of this date.)
11       Q.  First, let me start with 513, which is
12   an e-mail dated September 17, 208 -- 2008 at
13   13:08, and it's sent to a number of people.
14       First, this e-mail attempts to
15   summarize the Barclays conference call that we
16   referred to earlier, correct?
17       A.  It appears to be.
18       Q.  And if you look on the second page
19   under "Capital Requirements," do you see the
20   statement, "This transaction, due to $2 billion
21   in after-tax negative goodwill, is accretive to
22   capital ratios immediately." Do you see that?
23       A.  Yes, I do.
24       Q.  Now, I'd like you to look at the
25   people who received this and ask you to identify

Page 68

1    H. MILLER
2    those that you know. There may be a number of
3    people you do not recognize, but those that you
4    can recognize I'd like you to identify who they
5    are.
6        A.  Okay. Bart McDade. That is about it.
7        Q.  The other people are people that
8    you -- whose names you do not recognize?
9        A.  I do not recognize the other names.
10       Q.  Let me ask you to look next at Exhibit
11   467B.
12       A.  Yes, sir.
13       Q.  Which is also dated September 17, 2008
14   at 7:42 P.M., and if you look at the second
15   page, the seventh paragraph says, "The deal
16   would also lift Barclays' capital ratio, even
17   before the bank completes a planned capital
18   injection alongside the deal, because of a
19   negative goodwill adjustment from the deal
20   amounting to about $2 billion after tax." Do
21   you see that?
22       A.  That's what it says.
23       Q.  And this was an e-mail from and to Ann
24   Marie Miller. Can you identify who she is?
25       A.  From the e-mail, I would assume that

Page 69

1    H. MILLER
2    she is an employee of Houlihan Lokey, which was
3    the -- is the financial advisor -- one of the
4    financial advisors for the Creditors Committee.
5        Q.  Let me ask you to look at next Exhibit
6    477B.
7        A.  Yes.
8        Q.  And this is two e-mails, and the last
9    line on the exhibit talks about a Barclays
10   investor call transcript from Wednesday where
11   they described how great the Lehman buy is and
12   that there would be a $2 billion goodwill
13   after-tax benefit. Do you see that?
14       A.  Yes, I do.
15       Q.  And can you identify any of the
16   recipients of this or these e-mails?
17       A.  Only Chris Flowers.
18       Q.  And who is Chris Flowers?
19       A.  Chris Flowers is an investor
20   particularly active in the distressed debt
21   market in the commodities area who has been
22   involved in cases like Refco, and I think at one
23   point in time may have been interested in
24   Lehman, but --
25       Q.  I'm sorry.

Page 70

H. MILLER

1    H. MILLER
2    A.   But specifically in connection with
3    this e-mail, I mean, I just know Chris Flowers.
4    Q.   Was Mr. Flowers involved in the Lehman
5    bankruptcy at all?
6    A.   Not to my knowledge.
7    Q.   Do you know who Edward Gilbert is?
8    A.   No, sir.  No.
9    Q.   Is there anything in the Exhibits 513,
10   467B or 477B that I have referred you to that is
11   in any way inconsistent with any of the
12   representations that you made to the Court?
13   A.   I don't believe so.
14        MR. TECCE:  Objection to form.
15        MR. GAFFEY:  Join in the objection.
16        MR. MAGUIRE:  Objection.
17   A.   I don't believe so.
18        MR. BOISE:  I have no more questions.
19        MR. GAFFEY:  I hate to ask you for a
20   break so quickly, but I think I could
21   shorten significantly if we could take ten
22   or fifteen minutes to throw some stuff out.
23        Is that okay with you?
24        THE WITNESS:  Sure.
25        THE VIDEOGRAPHER:  The time is now

Page 71

H. MILLER

1    H. MILLER
2    11:53 A.M.  We are now off the record.
3        (Recess.)
4        THE VIDEOGRAPHER:  The time is now
5    12:09 P.M.  We are now back on the record.
6    EXAMINATION BY
7    MR. GAFFEY:
8    Q.   Good afternoon, Mr. Miller.  I'm
9    Robert Gaffey from Jones Day, as you know.
10   A.   Good afternoon.
11   Q.   I have put before you three documents,
12   sir, and I have several lines of questioning
13   about each of them, but just for convenience, do
14   you have them there?
15        The first one I would ask you to focus
16   on is Exhibit 517, entitled "Transaction
17   Summary."
18        (Exhibit 517, a document entitled
19   Transaction Summary, marked for
20   identification, as of this date.)
21   A.   Yes, sir.
22   Q.   It's a one-page document bearing a
23   Weil Gotshal Bates number.
24        And I apologize to those assembled
25   that it's cut off.  We'll supply a better copy,

Page 72

H. MILLER

1    H. MILLER
2    if you like, after.
3        Do you recognize the document, sir?
4    A.   I've seen the document in connection
5    with the preparation for this deposition.
6    Q.   Okay.  At the -- at the hearing on
7    September 19, sir, there was some testimony
8    earlier today about a description that Ms. Fife
9    gave with regard to changes in the transaction
10   that had occurred since the Wednesday, do you
11   recall that?
12   A.   Yes.
13   Q.   I can show you the transcript if you
14   like, but there's a portion where you say, "We
15   have a document, but it's better to go orally,"
16   or words to that effect.
17        Do you recall there being a document
18   available to Ms. Fife from which she could
19   deliver the summary of changes?
20   A.   I don't recall the specific document,
21   no.
22   Q.   Okay.  Do you know who prepared
23   document 517?
24   A.   No.  I would assume that it's a Lehman
25   Brothers production because it has the

Page 73

H. MILLER

1    H. MILLER
2    identification of Lehman Brothers.  There was a
3    lot going on in the courtroom, as you might
4    imagine, at that time.
5    Q.   Sure.
6    A.   In speaking with Ms. Fife, somebody
7    may have handed this to her.
8    Q.   I just want to press on that a little
9    bit because of the 30(b)(6) nature of your -- of
10   your deposition, sir.
11        Do you know if anyone at Weil Gotshal
12   knows whether this document that we've marked as
13   517 was the basis for Ms. Fife's presentation at
14   the September 19 hearing regarding changes in
15   the transaction?
16   A.   I don't believe so.
17   Q.   Do you know if she had a document from
18   which she was -- to which she was referring when
19   she gave the oral presentation to the judge
20   about the changes in the deal?
21   A.   My recollection is that it was
22   primarily oral, and she may have had some notes
23   on a yellow -- on a legal pad.
24   Q.   During the portion of the hearing on
25   the 19th, that's the Friday hearing, when the

Page 74

H. MILLER

1  judge was off the bench and the discussion was
2  had with those present --
3      A.  Yes.
4      Q.  -- in this piece of the hearing, sir,
5  who was it who spoke to the assemblage of those
6  present about the changes in the deal?
7      A.  Ms. Fife.
8      Q.  Ms. Fife. And when Ms. Fife spoke to
9  that assembly of people in the courtroom,
10  approximately how many people were there?
11      A.  If you refer back to The Wall Street
12  Journal or one of the papers, it was standing
13  room only.
14      Q.  That's what it sounded like.
15      A.  There were two other courtrooms in
16  which they were either piping in what was going
17  on -- I'm not sure they had television monitors
18  or not.
19      Q.  Was she at the podium?
20      A.  She -- she was at the podium.
21      Q.  And to your knowledge, sir, did she --
22  did she have any kind of document other than the
23  yellow pad you think you may recall having seen
24  when she went through the changes?

Page 75

H. MILLER

1      A.  I don't believe so.
2      Q.  Was anything distributed to the
3  assembly of people during the -- for lack of a
4  better term, sir, I'll call it the
5  off-the-record session when the judge was off
6  the bench -- was anything distributed to the
7  assembled people?
8      A.  No, but it was opened up for a
9  question and answer period.
10      Q.  Were there questions?
11      A.  There were a lot of questions.
12      Q.  Do you know anybody in particular who
13  asked questions?
14      A.  It's -- I may be in error. There were
15  attorneys from Akin Gump. There were attorneys
16  from Kasowitz Bennett. There were attorneys
17  representing the Administrative in the United
18  Kingdom. I think there were some
19  representatives of the Creditors Committee that
20  asked questions. There were quite a few.
21  questions.
22      Q.  And the sum total, as I understand it,
23  of the description of the changes, then, if
24  there's no document distributed, is Ms. Fife's

Page 76

H. MILLER

1  conversation or presentation to the assemblage
2  while the judge was off the bench and then her
3  recitation of the changes once the Court went
4  back on the record and Judge Peck rejoined the
5  assembly, correct?
6      MR. BOISE: Object to the form.
7      A.  Basically, yes.
8      Q.  To your knowledge, was there any
9  difference between what Ms. Fife said in the
10  period -- in the off-the-record session as
11  opposed to the on-the-record session?
12      A.  I don't believe there was any major
13  difference.
14      Q.  Would you take a look at the document
15  before you that has previously been marked as
16  Deposition Exhibit 20, sir.
17      A.  20?
18      Q.  20, yes.
19      A.  Yes. Yes, I have it.
20      Q.  And directing -- well, let me ask you
21  first, sir, have you seen this document before?
22      A.  Only in connection with the
23  preparation for this deposition.
24      Q.  You'll note, sir, the bottom e-mail in

Page 77

H. MILLER

1  the chain on Exhibit 20 is an e-mail from Martin
2  Kelly to Ian Lowitt, copied to Paolo Tonucci,
3  dated September 16 at 5:10 A.M., do you see
4  that, sir?
5      A.  Yes, I do.
6      Q.  Did you have conversations with Mr.
7  Kelly in that period you described to us before
8  the break of the 15th overnight into the 16th
9  while the negotiations were going on?
10      A.  I never met Mr. Kelly.
11      Q.  As a general matter, as I understand
12  your testimony this morning, the negotiation of
13  the economic terms of the deal were done by the
14  businesspeople, not by the lawyers; is that
15  right?
16      A.  That's correct.
17      Q.  And the economic terms that were
18  negotiated by the businesspeople were
19  communicated to the Weil Gotshal lawyers who
20  were responsible for drafting the Asset Purchase
21  Agreement, correct?
22      A.  Essentially, yes.
23      Q.  And the economic terms that the
24  businesspeople negotiated were communicated, as

Page 78

H. MILLER

2  necessary, to you or Ms. Fife as the principal
3  Weil Gotshal lawyer standing up at the hearings
4  on the 17th and the 19th, is that correct?
5      MR. BOISE: Object to the form.
6      A.  I would say it was broader than that.
7  Communicated to the people who were working on
8  the Asset Purchase Agreement and then probably,
9  in turn, to us.
10     Q.  And none of Weil Gotshal's activities
11 on the 15th -- for the week of the 15th through
12 the 19th included any independent assessment of
13 the values being discussed with respect to the
14 assets being transferred; is that correct?
15     MR. BOISE: Objection.
16     A.  That is correct.
17     Q.  Directing your attention back to
18 Exhibit 20, Mr. Miller.
19     A.  Yes.
20     Q.  You see that it -- let me read it,
21 portions of it, into the record: "Well, it took
22 all night and lots of back and forth, but the
23 deal is done and ready for the board.  Final
24 price did not change meaningfully - approx a 5b
25 all in economic loss versus our marks and 3.6

Page 79

H. MILLER

2  billion of resi assets left behind."
3      Do you see that portion of the --
4      A.  I do.
5      Q.  And were you or anyone else at Weil
6  Gotshal privy to any discussions concerning a
7  negotiated -- a negotiation of an overall $5
8  billion loss versus Lehman's marks?
9      A.  I don't believe so.
10     Q.  Were you or anyone else at Weil
11 Gotshal involved in any discussions concerning a
12 negotiated discount that Lehman on the one hand
13 agreed to give to Barclays on the other from
14 Lehman's book values?
15     MR. BOISE: Objection.
16     A.  No, I never heard the expression
17 "discount."  I did sit in a room listening to
18 groups talk about the marks and the different
19 opinions on the marks.
20     Q.  Did it come to your attention in any
21 way, sir, prior to the time that you described
22 the transaction to Judge Peck on the 17th, one
23 way or the other, that there was a negotiated
24 agreement for Lehman to give Barclays a $5
25 billion discount from Lehman's marks as part of

Page 80

H. MILLER

2  this transaction?
3      MR. BOISE: Objection.
4      A.  No.
5      Q.  If you could turn your attention,
6  please, Mr. Miller, to Exhibit 21.
7      A.  Yes.
8      Q.  Actually, I beg your pardon.  Could
9  you go back to 20 for just one second.
10     A.  Sure.
11     Q.  Thank you. Also, in 20, Mr. Miller,
12 there is a -- let me read another sentence from
13 Mr. Kelly's e-mail: "Also, an extra 1 billion
14 of comp beyond our accrual and assumption of all
15 trade payables in LBI and LBHI." Do you see
16 that, sir?
17     A.  I do.
18     Q.  Did you -- was it communicated to you
19 or anyone else at Weil Gotshal, sir, prior to
20 the time you described the transaction to Judge
21 Peck on the 17th, that there had been a write-up
22 of the amounts shown on Lehman's books accrued
23 for compensation for the purposes of the
24 transaction?
25     MR. BOISE: Objection.

Page 81

H. MILLER

2      A.  You're using the expression a
3  "write-up"?
4      Q.  Yes, sir.
5      A.  No, I never heard of anybody talking
6  about a write-up. The figures on comp and also
7  the figure on the assumption of executory
8  contracts was always a very contingent figure.
9  Thus, nobody knew what contracts were going to
10 be assumed and how many employees Barclays would
11 ultimately keep.
12     Q.  The estimates were made in the first
13 instance by Lehman personnel, correct?
14     A.  That's correct.
15     Q.  Do you know who within Lehman made
16 those estimates?
17     A.  No, I do not.
18     Q.  Did you ever speak to Mr. Kelly at or
19 around -- at or before the time you described
20 the transaction to Judge Peck?
21     A.  I don't believe I've ever spoken with
22 Mr. Kelly.
23     Q.  Okay. Did you -- when you -- the
24 estimates that we're talking about for
25 compensation --

Page 82

1            H. MILLER
2     A.   Yes.
3     Q.   -- and for assumption of contracts
4  were part of the -- an answer you gave to Judge
5  Peck in response to a question about the breakup
6  fee, do you recall that?
7     A.   Vaguely.
8     Q.   And they also were referred to in the
9  Sale Motion?
10    A.   Yes.
11    Q.   As part of the terms of the
12  transaction?
13    A.   As part of the transaction.
14    Q.   When they were included in the Sale
15  Motion or when they were discussed with Judge
16  Peck, did anyone from Weil Gotshal have any, any
17  reason to believe that people within Lehman had
18  inflated those numbers?
19        MR. BOISE: Objection.
20    A.   I don't believe so.
21    Q.   Now, if you would, Mr. Miller, would
22  you turn back to Exhibit 21.
23    A.   Yes, sir.
24    Q.   Thank you. If I asked this a moment
25  ago, forgive me, I've confused myself in my

Page 83

1            H. MILLER
2  order here. Have you seen this document before?
3     A.   Only in connection with the
4  preparation for this deposition.
5     Q.   I would direct your attention, Mr.
6  Miller, to paragraph 3 in the bottom of the
7  e-mails, which is an e-mail from Gerard Reilly
8  to Ian Lowitt, Michael Gelband, copy, Paolo
9  Tonucci, Martin Kelly?
10    A.   Yes.
11    Q.   Prior to describing the transaction
12  for the first -- in that first hearing on the
13  17th, had you had any discussions with Mr.
14  Lowitt?
15    A.   About the motion to approve?
16    Q.   About the transaction, yeah.
17    A.   No.
18    Q.   And you had some testimony, we talked
19  a bit this morning about the Repurchase
20  Agreement --
21    A.   Yes.
22    Q.   -- that was, for lack of a better
23  term, part of the events of that week.
24        Weil Gotshal played no role in
25  negotiating that Repurchase Agreement; is that

Page 84

1            H. MILLER
2  correct?
3     A.   That's correct.
4     Q.   And Weil Gotshal played no role in
5  structuring that Repurchase Agreement in any
6  way; is that correct?
7     A.   I don't believe so.
8     Q.   And Weil Gotshal had no role as to
9  determining the value of the collateral that was
10  put in that repo; is that correct?
11        MR. BOISE: Objection.
12    A.   Absolutely not.
13    Q.   I would direct your attention to
14  paragraph 3 in the lower e-mail in Exhibit 21,
15  which says as follows: "Not clear on the amount
16  of block discount or how we make it happen.
17  Defaulting on repo could be the best, as
18  discount could be taken from haircut. If not
19  that, then we need to give business an
20  allocation of block discount so they can mark
21  down the books tonight. Does that create a
22  problem as it could tip the broker early? Would
23  we rather have that be in the sale price
24  tomorrow?"
25        I want to ask you a few questions

Page 85

1            H. MILLER
2  about each of those sentences. Was Weil
3  Gotshal -- and I ask that in the 30(b)(6) sense,
4  Mr. Miller --
5     A.   Yeah.
6     Q.   -- was Weil Gotshal privy to any
7  conversations with anyone at Lehman about using
8  an intentional default on the repo as a means of
9  delivering a pre-agreed block discount to
10  Barclays?
11    A.   I don't believe so.
12    Q.   And there's a reference in Mr.
13  Reilly's e-mail -- rather than a reference, let
14  me reread the sentence: "If not that, then we
15  need to give business an allocation of block
16  discount so they can mark down the books
17  tonight."
18        Was Weil Gotshal privy to any
19  discussions with anyone at Lehman about a plan
20  to mark down the books to reflect an agreed
21  block discount that had been given to Barclays?
22        MR. BOISE: Objection.
23    A.   I do not believe so.
24    Q.   Mr. Miller, I've put before you what
25  we've marked as Exhibit 518, bearing Bates

Page 86

H. MILLER

1  numbers WGM-LEHMAN-E 00000355 through 403.
2  (Exhibit 518, a document bearing Bates
3  Nos. WGM-LEHMAN-E 00000355 through 403,
4  marked for identification, as of this date.)
5  Q.  Have you seen this document before,
6  Mr. Miller?
7  A.  Only in connection with the
8  preparation for this deposition.
9  Q.  Do you recall, Mr. Miller, that when
10  the sale motion was filed, the motion papers
11  regarding approval of sale procedures --
12  A.  Yes.
13  Q.  -- on the 17th, that attached to it
14  was a copy of an Asset Purchase Agreement with
15  handwritten --
16  A.  Yes.
17  Q.  -- annotations on it?
18  A.  Yes.
19  Q.  The evidence, I guess, of the speed
20  with which things were getting done.
21  Do you know whose handwritten
22  annotations they were?
23  A.  No, I do not.
24  Q.  Would you turn within -- would you
25

Page 87

H. MILLER

1  turn within Exhibit 518, Mr. Miller, to page 7.
2  Actually, for context, why don't you
3  take a look first at page 6.  Where we are here
4  is in this -- this version of an Asset Purchase
5  Agreement in the definition of "purchased
6  assets."  You with me?
7  A.  On page 6?
8  Q.  Yes, starting at page 6.
9  A.  Yes.
10  Q.  And within that definition of
11  "purchased assets," overleaf on page 7, in
12  subsection D, the typewritten portion says
13  "government securities, commercial paper,
14  mortgage loans, corporate debt, corporate
15  equity, exchange-traded derivatives and
16  collateralized short-term agreements" and then
17  there are some handwritten annotations to that
18  block.  Do you see that?
19  A.  Yes, I do.
20  Q.  And the handwritten annotation on page
21  7 includes the insertion of the phrase "with a
22  book value as of the date hereof of
23  approximately 70 billion, collectively, long
24  positions"?
25

Page 88

H. MILLER

1  A.  Yes.
2  Q.  You with me in the document?
3  A.  Uh-huh.
4  Q.  Do you or does anyone at Weil Gotshal,
5  sir, know whose requirement that was in the
6  negotiations to put that language into the
7  agreement?
8  MR. BOISE: Objection.
9  A.  I don't know.
10  Q.  Do you recall any discussion -- do you
11  or does anyone else at Weil Gotshal recall any
12  discussions with Weil Gotshal about the use of
13  the term "book value" in this insertion into
14  that draft Asset Purchase Agreement?
15  A.  I know that the figure $70 million was
16  on the 16th -- 15th and 16th was a figure that
17  was thrown around with great frequency.  Other
18  than that, I don't know.
19  Q.  Do you know -- do you know where the
20  $70 billion that was going around with great
21  frequency, what the source of that was, who
22  calculated it?
23  A.  From Lehman.
24  Q.  And do you know if it was taken -- but
25

Page 89

H. MILLER

1  beyond knowing that the $70 billion, the dollar
2  number that was being talked about came from
3  Lehman, do you know who within Lehman?
4  A.  There were so many people involved.
5  There was a room full of people trying to work
6  up figures.  I don't recall whether it was Mr.
7  Berkenfeld.  Probably Paolo Tonucci was
8  involved.
9  Q.  Do you have a recollection of Mr.
10  Berkenfeld coming into a room with a sheet of
11  paper saying "here are the numbers"?
12  A.  No.
13  Q.  And in any event, with respect to this
14  handwritten insertion on page 7, neither you
15  nor, to your knowledge, anyone else at Weil
16  Gotshal knows who -- who's the author, the
17  proposer of this insertion; is that right?
18  MR. BOISE: Objection.
19  A.  That's correct.
20  MR. GAFFEY: I have nothing further.
21  Thank you, Mr. Miller.
22  THE WITNESS: Thank you.
23  THE VIDEOGRAPHER: The time is 12:28
24  P.M.  We are now off the record.
25

Page 90

1           H. MILLER
2       (Pause in the proceedings.)
3       THE VIDEOGRAPHER: The time is 12:28
4    P.M. We are now back on the record.
5    EXAMINATION BY
6    MR. MAGUIRE:
7       Q. Mr. Miller, again, my name is Bill
8    Maguire. I'm from Hughes, Hubbard & Reed, and I
9    represent the SIPA Trustee, James Giddens.
10       Sir, I believe you have one of the
11    exhibits before you that Mr. Boies covered
12    fairly early in your deposition, Exhibit 25,
13    which is the final Clarification Letter.
14       A. Yes, sir.
15       Q. If you turn, sir, to page 4, there's a
16    section there, Section 8, concerning transfer of
17    customer accounts. Do you see that?
18       A. Yes, I do.
19       Q. And if you look at Section 8(ii)?
20       A. Yes.
21       Q. There's a provision that says, "to the
22    extent permitted by applicable law, and as soon
23    as practicable after the Closing, $769 million
24    of securities, as held by or on behalf of LBI on
25    the date hereof pursuant to Rule 15c3-3 of the

Page 91

1           H. MILLER
2    Securities Exchange Act of 1934, as amended, or
3    securities of substantially the same nature and
4    value."
5       You see that provision, sir?
6       A. Yes.
7       Q. Was that the provision that you were
8    referring to in your earlier testimony
9    concerning the need for approval from the
10    regulators, specifically, the S.E.C., for any
11    such transfer to Barclays?
12       A. Generally --
13       MR. BOISE: Objection.
14       A. I'm sorry. Generally, yes.
15       Q. And do you have an understanding, sir,
16    that the securities that are held on a
17    particular date and the reference here "on the
18    date hereof," I believe that's to the date of
19    the Clarification Letter which was as of
20    September 20, 2008; is that correct?
21       A. Yes.
22       Q. Did you understand that the securities
23    in the c3 account had, at least some of them,
24    had maturities?
25       A. Yes.

Page 92

1           H. MILLER
2       Q. And that the composition, therefore,
3    of the account may change from time to time?
4       A. Generally, yes.
5       Q. Can you tell us, sir, what the purpose
6    of the words "or securities of substantially the
7    same nature and value" meant?
8       MR. BOISE: Objection.
9       A. I was not the scrivener of those
10    words, but I assume that there might be
11    exchanged securities, I mean securities that
12    were exchanged for some reason or other. But,
13    essentially, it was the securities that were
14    there at that particular time.
15       Q. And if those securities matured or
16    changed as of the date of September 20, 2008,
17    then assuming there was an excess, and the
18    regulators gave approval for a transfer, LBI
19    would have the option of either taking what
20    securities were in the account as of the closing
21    date, or as of September 20, or they would have
22    had the option of substituting alternative
23    securities?
24       MR. BOISE: Objection.
25       A. You said LBI?

Page 93

1           H. MILLER
2       Q. I'm sorry. The estate.
3       MR. BOISE: Objection.
4       Q. The transfer, the person who's making
5    the transfers?
6       A. These securities -- let me just -- one
7    minute.
8       These securities were to go to
9    Barclays.
10       Q. I'm sorry?
11       A. These securities were to go to
12    Barclays.
13       Q. Right.
14       A. The division was the cash and the PAIB
15    securities were to be retained by Lehman and the
16    769 was to go to Barclays, the securities.
17       Q. And in the event that there was an
18    excess and there was approval from the
19    regulators to transfer up to as much as 769, in
20    the event that that took some time, and by the
21    time that approval was obtained, the securities
22    that were in the account as of September 20 were
23    no longer in the same form --
24       A. Uh-huh.
25       Q. -- let's take a T bill had matured --

Page 94

H. MILLER

1
2     MR. BOISE: I don't know if that's a
3     question, but I object to anything asking
4     him to interpret the contract.
5     Q.   In that event, was it your
6     understanding, and I ask you this now as a Weil
7     30(b)(6) witness.
8     A.   Yes.
9     Q.   Was it your understanding that if the
10    LBI or the estate was no longer in a position of
11    transferring the specific security because it
12    had matured, it would have the ability to
13    transfer an alternative similar security of the
14    same value?
15        MR. BOISE: Objection.
16    A.   I don't think that was contemplated at
17    the time that this was drafted.
18    Q.   Do you know who the scrivener of this
19    particular document was?
20    A.   No.
21    Q.   Do you know whether Mr. Messineo was
22    the person who drafted the words "or securities
23    of substantially the same nature and value"?
24    A.   It --
25        MR. POLKES: It's pronounced Messineo.

Page 95

H. MILLER

1
2     MR. MAGUIRE: Messineo. I apologize.
3         MR. BOISE: Objection.
4     A.   I think he was involved. Whether he
5     actually drafted those words I can't tell you.
6     Q.   At any time in the course of -- any
7     time prior to closing, did you or anyone at Weil
8     agree with anyone at Barclays that, under any
9     circumstances, Barclays would get $769 million
10    unconditionally, and even without the approval
11    of regulators, pursuant to Section 8(ii) of the
12    Clarification Letter?
13        MR. BOISE: Objection.
14    A.   No. It was always the regulatory --
15    the S.E.C. was always -- the question, in fact,
16    the discussion was you may never get authority
17    from the S.E.C. to release these on the premise
18    that this was really collateral for customer
19    accounts.
20    Q.   And when you say that was always the
21    discussion, with whom did you have that
22    discussion?
23    A.   Mr. Klein, in the presence of probably
24    Sol Burian and Mike Fazio and maybe Luc was
25    there, I don't remember. I think Luc was there.

Page 96

H. MILLER

1
2     Q.   And specifically with respect to
3     Barclays, who else participated on behalf of
4     Barclays in the discussions that you had?
5     A.   It was primarily Michael Klein.
6     Barclays people -- there was a conference room
7     that was set up called the Barclays Room, and
8     Mr. Klein was shuttling back and forth into that
9     room, and in that room was Archie Cox, who I
10    think probably made the decision.
11    Q.   Did you personally have any
12    discussions with anyone at Barclays about
13    Lehman's margin?
14        MR. BOISE: Objection.
15    Q.   And when I say "margin," I mean margin
16    that Lehman maintained either at the OCC, the
17    Options Clearing Corporation, or at any other
18    derivatives exchange?
19    A.   I did not.
20    Q.   As a 30(b)(6) witness, are you aware
21    of any discussions that Weil had with anyone at
22    Barclays concerning LBI margin?
23    A.   I haven't been able to find anybody
24    that did have that discussion.
25    Q.   Sir, you mentioned, I believe, you

Page 97

H. MILLER

1
2     made some references to DTC or DTCC?
3     A.   Yes.
4     Q.   The Depository Trust Corporation or
5     Clearing Corporation. Are you aware, sir,
6     whether anyone from DTC or DTCC was physically
7     present in your offices at any time over the
8     weekend of the closing?
9     A.   Yes.
10    Q.   And who was present?
11    A.   An attorney from Proskauer. What's
12    his name? Sheldon -- I forget his last name,
13    and I think there were some actual employees of
14    DTCC.
15    Q.   And do you know at what times they
16    were present?
17    A.   Well, there were so many people here
18    it was hard to tell who was with whom. But I
19    saw Sheldon periodically during the weekend,
20    particularly on Sunday and into Monday morning.
21    Q.   Did there come a time, sir, when you
22    became aware that there was a separate letter
23    agreement between Barclays, the Lehman trustee,
24    and DTC?
25        MR. BOISE: Objection.

Page 98

1           H. MILLER
2     A.   Very much like the, if you want to
3   call them negotiations, discussions between JPM,
4   JPMorgan, and Barclays, there were discussions
5   going on with representatives of DTCC. There
6   were representatives of the LBI trustee here for
7   a good portion of the weekend also.
8     Q.   Did you participate in the
9   negotiations of the DTCC letter?
10    A.   No.
11         MR. BOISE:  By "you," do you mean him
12   personally or Weil Gotshal?
13    Q.   You personally.
14    A.   No.
15    Q.   Are you aware of whether anyone from
16   Weil Gotshal personally participated in any of
17   the negotiations from the DTCC letter?
18    A.   Not to any great extent.
19    Q.   Did you see the DTCC letter anytime
20   prior to the closing?
21    A.   It was -- I don't recall seeing a
22   document. It was sort of described --
23   periodically there were sort of -- everybody,
24   everybody got together in one room and there was
25   sort of an overall report on what was happening,

Page 99

1           H. MILLER
2   but I don't recall ever seeing a document.
3     Q.   When you say "an overall report," what
4   do you recall of the overall report that you
5   obtained?
6     A.   A status report. Are we making
7   progress? Are we going to be able to close?
8     Q.   And did you ultimately understand that
9   progress was being made?
10    A.   The reports were progress was being
11   made. As I said before, the big hurdle was JPM
12   and Barclays, and when that was resolved, things
13   started really moving towards a closing.
14    Q.   And beyond understanding the progress
15   ultimately -- at different times was or was not
16   made, and ultimately was made, did you have any
17   further or deeper or other participation in any
18   of the negotiations with the DTCC letter?
19         MR. BOISE:  Objection.
20    A.   No.
21    Q.   And the same, I assume, is your answer
22   with respect to as a Weil 30(b)(6) witness?
23    A.   Correct.
24         MR. MAGUIRE:  Thank you, sir. I have
25   no further questions.

Page 100

1           H. MILLER
2   EXAMINATION BY
3   MR. TECCE:
4     Q.   Good afternoon, Mr. Miller.
5     A.   Good afternoon.
6     Q.   My name is James Tecce. I'm an
7   attorney at Quinn Emanuel. We are special
8   counsel to the Creditors Committee. I'll be
9   very brief, sir. I just have a few questions
10   for you.
11         The closing of the sale transaction
12   took place over the weekend of September 20 to
13   21; is that correct?
14    A.   Saturday, Sunday and Monday morning,
15   yes.
16    Q.   And the closing took place at Weil
17   Gotshal; is that correct?
18    A.   That is correct.
19    Q.   Okay. And was the closing a single
20   meeting or was it a series of meetings that were
21   taking place simultaneously?
22    A.   A series of meetings. This entire
23   floor was consumed with meetings.
24    Q.   And do you have an understanding, sir,
25   as to whether or not Creditors Committee

Page 101

1           H. MILLER
2   representatives were allowed to participate in
3   all the meetings that were taking place in
4   connection with the closing?
5     A.   To the best of my knowledge, they were
6   allowed to participate in every meeting.
7     Q.   Do you know whether there were any
8   meetings that they were not allowed to
9   participate?
10    A.   I'm not aware of any meetings -- oh,
11   yeah. They probably weren't allowed into the
12   Barclays Room.
13    Q.   The -- early in the morning of Sunday,
14   September 21, I believe you mentioned that you
15   were present when the Creditors Committee
16   representatives left; is that correct?
17    A.   That was the morning -- Monday
18   morning, not Sunday morning.
19    Q.   Monday morning, I'm sorry.
20         And I believe that you said that one
21   of them said to you, "If it's okay with you,
22   it's okay with us"; is that correct?
23    A.   Yes.
24    Q.   And who was it that said that to you?
25    A.   I believe it was Sol Burian, and it

Page 102

H. MILLER

1  H. MILLER
2  was later affirmed by Luc Despins.
3      Q.   And what did Mr. Despins say to you?
4      A.   "If you guys are satisfied with it,
5  we're satisfied."
6          MR. TECCE: Okay. I have no further
7  questions. Thank you.
8          MR. BOISE: I have a few questions,
9  but maybe it would be useful just to take a
10  quick break, like about ten minutes. I
11  think my questions will be no longer than
12  ten minutes.
13         THE VIDEOGRAPHER: The time is now
14  12:41 P.M. We are now off the record.
15         (Recess.)
16         THE VIDEOGRAPHER: The time is now
17  12:53 P.M. We are now back on the record.
18  FURTHER EXAMINATION BY
19  MR. BOISE:
20      Q.   Mr. Miller, let me ask you to look at
21  Exhibit 20, 21 and 517, which were the exhibits
22  that counsel used with you in their
23  cross-examination.
24      A.   Just give me one minute.
25      20, 21?

Page 103

1  H. MILLER
2      Q.   20, 21 and 517. 517 is the
3  Transaction Summary.
4      A.   Okay.
5      Q.   Is there anything in Exhibits 20, 21
6  or 517 that is inconsistent with your
7  understanding at the time that you made the
8  representations that you did to the Court and
9  the motion that you made to the Court on
10  September 19?
11      A.   No.
12         MR. GAFFEY: Objection to the form.
13         MR. TECCE: Join in the objection.
14         MR. MAGUIRE: Objection to form.
15      Q.   Let me direct your attention to
16  Exhibit 444.
17      A.   Yes.
18      Q.   Which is a declaration of Ms. Shari
19  Leventhal, and in particular, let me direct your
20  attention to paragraph 12.
21      A.   Yes.
22      Q.   Where it says that, "In connection
23  with the repo agreement, LBI was to provide
24  Barclays with approximately 49.7 billion in
25  securities in return for the $45 billion in cash

Page 104

1  H. MILLER
2  funded by Barclays. This ratio was consistent
3  with the ratio of cash to securities used in the
4  New York Fed's Repurchase Agreement with LBI on
5  the night of September 17." Do you see that?
6      A.   I do.
7      Q.   And was that consistent with your
8  understanding on September 19, 2008?
9      A.   It is.
10      Q.   Let me ask you next to look at Exhibit
11  460A.
12      A.   460A. Yes.
13      Q.   And this document in the middle of the
14  first page indicates it was first sent to an
15  Arthur Bruhmuller and that Mr. Bruhmuller then
16  forwarded it on to a number of people. Do you
17  see that?
18      A.   Yes, I do.
19      Q.   Can you identify for the record who
20  Mr. Bruhmuller was?
21      A.   Only from the e-mail, that he is with
22  Lazard. Mr. Flores is with Lehman, and -- I
23  don't know how to pronounce his name --
24  Descoteaux was with Lazard.
25      Q.   And Lazard was the advisors to the

Page 105

1  H. MILLER
2  Creditors Committee; is that correct?
3      A.   No, Lazard was the advisor to Lehman.
4      Q.   Lazard was the advisor to Lehman.
5          And if you look at the bottom of the
6  first page, the e-mail that is then forwarded on
7  to everybody, it's from Gerald -- Gerard Reilly,
8  do you see that?
9      A.   Yes, I do.
10      Q.   And he says, "The first question is
11  very difficult. My understanding of the deal is
12  that they will purchase our assets that remain
13  in LBI on the closing date which will not be the
14  same as the assets on the 12th. That purchase
15  will be at a fixed discount on the assets that
16  remain to reflect the bulk size of the
17  purchase." Do you see that?
18      A.   I do.
19      Q.   Let me ask you to look next at Exhibit
20  507.
21          (Exhibit 507, an e-mail from Marie
22  Stewart to Emma Bailey dated September 24,
23  2008, marked for identification, as of this
24  date.)
25      A.   Yes.

Page 106

H. MILLER

1
2     Q.   And in particular, the first
3     substantive paragraph of this e-mail, which is
4     from Marie Stewart, and she says, "I spoke to
5     David Murgio of Weil re the Barclays Repurchase
6     Agreement and got his view on how it works
7     (which is we sold assets and repo is terminated
8     and there are no settle-up payments to be
9     made)." Do you see that?
10    A.   I do.
11    Q.   And is that consistent with your
12    understanding of how the transaction would work
13    as of September 19, 2008?
14    A.   Well, the e-mail is dated September
15    24, and this was after the closing, and as I
16    read it, Marie -- whoever was asking the
17    question was talking to David Murgio
18    post-closing, and I believe David was explaining
19    what happened, how it actually functioned.
20    Q.   And what I'm asking, I guess, is, I
21    understand this is a few days after the closing?
22    A.   Yeah.
23    Q.   But is what Mr. Murgio of Weil is
24    saying here, is that consistent with your
25    understanding of how it would work when you were

Page 107

H. MILLER

1
2     actually doing the transaction?
3     A.   Well, it developed over that weekend
4     as to how the repo was resolved, and as I
5     testified before, essentially, it was, in
6     effect, terminated.
7     Q.   And indeed, Ms. Fife had told the
8     Court on the 19th that there would be no true-up
9     or settlement payments, correct?
10    A.   Well, I don't know what Ms. Fife meant
11    by the word "true-up." There was never a
12    true-up in the context of a balance sheet
13    transaction. The true-up I think she was
14    referring to was there was some discussion as to
15    certain securities, if they appreciated in
16    value, there was going to be some sort of a
17    sharing arrangement.
18    Q.   And that's what was eliminated?
19    A.   Yeah.
20    Q.   So, in terms of the assets that were
21    acquired, there was never going to be a true-up?
22    A.   Never going to be a true-up.
23    Q.   Because it was not a balance sheet
24    transaction?
25    A.   Victor Lewkow, I think that was his

Page 108

H. MILLER

1
2     name, said absolutely not right from the
3     beginning. He's from Cleary Gottlieb, by the
4     way.
5     Q.   Let me show you Exhibit 509.
6         (Exhibit 509, an e-mail dated
7     September 18, 2008 at 23:02 from Martin
8     Kelly to Richard Krasnow, marked for
9     identification, as of this date.)
10    Q.   This is an e-mail dated September 18,
11    2008 from Martin Kelly to Richard Krasnow of
12    Weil?
13    A.   Yes.
14    Q.   And in your capacity as a 30(b)(6)
15    witness, did Weil Gotshal receive this on or
16    about September 18?
17    A.   Clearly this was in our files. It's
18    an e-mail from Martin Kelly to Richard Krasnow
19    at 11, 11:02 that Thursday, September 18. Mr.
20    Krasnow, who is a partner in the firm, was not
21    heavily involved in the transaction. This
22    document was in our files, but I'm not sure that
23    anybody beside Richard Krasnow saw it.
24    Q.   The -- if you look at the third page
25    of the exhibit under the heading "Liabilities."

Page 109

H. MILLER

1
2     A.   Third page, yes.
3     Q.   It says -- do you see the listing
4     about a third of the way down that says
5     "Payables"?
6     A.   Yes.
7     Q.   And under that it's "Compensation
8     Payables"?
9     A.   Right.
10    Q.   And it shows a number of 360 as of
11    August 31, '08 and 520 as of September 17, '08,
12    do you see that?
13    A.   I do see it.
14    Q.   And then it talks about transaction
15    adjustments of a thousand. And these numbers
16    are all in millions, correct?
17    A.   Right.
18    Q.   So when it talks about a thousand
19    there, that's actually a billion dollars; is
20    that correct?
21    A.   Uh-huh.
22    Q.   And then it shows the balance sheet
23    transferred at 1.52 billion, that is, the 520
24    million as of September 17 and the transaction
25    adjustment of a billion, correct?

28

Page 110

H. MILLER

1
2    A.    That's what the document reflects,
3    yes.
4    Q.    Let me ask you to look next at Exhibit
5    516.
6        (Exhibit 516, a document bearing Bates
7        Nos. MTHM0000139 through 147 with
8        attachment, marked for identification, as of
9        this date.)
10    A.    Yes.
11    Q.    And this is an e-mail from David
12    Murgio to Brian Kelly?
13    A.    Correct.
14    Q.    Dated September 21, 2008, correct?
15    A.    That's correct.
16    Q.    And you've already identified, I
17    think, David Murgio as being at Weil; is that
18    correct?
19    A.    That is correct.
20    Q.    And Brian Kelly was at Milbank; is
21    that correct?
22    A.    That's correct.
23    Q.    And Milbank was representing the
24    Creditors Committee; is that correct?
25    A.    He was the attorney.  And the other

Page 111

H. MILLER

1
2    party to the e-mail was Mike Fazio, who was at
3    Houlihan Lokey.
4    Q.    And if you look at the second page,
5    you see a smaller version of the chart that we
6    looked at earlier showing the market value --
7    A.    Yes.
8    Q.    -- of the repo collateral at $49.9
9    billion, correct?
10    A.    That seems to be identical to the
11    earlier exhibit that you showed me this morning.
12    Q.    Now, is there anything that I've shown
13    you in Exhibit 516, 509, 507 or 460A that is in
14    any way inconsistent with the understanding that
15    you had at the time that Weil Gotshal made the
16    motion to approve the sale on September 19,
17    2008?
18        MR. TECCE:  Objection to the form of
19        the question.
20        MR. GAFFEY:  Join the objection.
21    A.    And that's -- just could you repeat
22    the exhibit numbers, please?
23    Q.    Sure.  Exhibit 516, 507, 509 --
24        MR. POLKES:  Let's do this, I'm sorry,
25        one at a time here.

Page 112

H. MILLER

1
2    A.    507, okay.
3    Q.    509.
4    A.    Okay.
5    Q.    516.
6    A.    Okay.
7    Q.    And 460A.
8    A.    The only reservation I would have is
9    if we were apprized of a, quote, discount,
10    whatever that means, in 50 -- 460A, would have
11    brought that to the attention of the court.
12    Q.    And this is the bulk discount that
13    you're referring to?
14    A.    Yes.  I'm not sure what it means, but
15    if there was a discount, we would have to know
16    more about it.
17    Q.    Did you understand at the time that
18    there were discussions between Barclays and
19    Lazard that the marks on the securities that
20    were involved were uncertain and different
21    people had different views as to them?
22    A.    I wouldn't call that a discount.
23    Q.    If the Lehman marks were reduced
24    because Barclays thought either that they were
25    stale or that conditions had changed, would you

Page 113

H. MILLER

1
2    call that a discount?
3    A.    No.
4    Q.    If the Lehman marks were reduced
5    because Barclays prevailed in its view that the
6    number should be lower, would you consider that
7    a discount?
8        (Continued on the next page to include
9        the jurat.)

Page 114

```
 1              H. MILLER
 2    A.   No.
 3          MR. BOISE: I have no more questions.
 4          MR. GAFFEY: Nothing further.
 5          MR. MAGUIRE: Nothing further. Thank
 6    you.
 7          MR. TECCE: Nothing further. Thank
 8    you.
 9          THE WITNESS: Thank you all.
10          THE VIDEOGRAPHER: That concludes the
11    video record for today. The time is now
12    1:07 P.M. We are now off the record.
13              oOo
14
15
16
                 _____
17               HARVEY R. MILLER
18    Subscribed and sworn to
      before me this    day
19    of      2010.
20
      _____
21
22
23
24
25
```

Page 115

```
 1              H. MILLER
 2              CERTIFICATE
 3    STATE OF NEW YORK )
                        : ss
 4    COUNTY OF NEW YORK)
 5          I, Kathy S. Klepfer, a Registered
 6    Merit Reporter and Notary Public within and
 7    for the State of New York, do hereby
 8    certify:
 9          That HARVEY R. MILLER, the witness
10    whose deposition is herein before set forth,
11    was duly sworn by me and that such
12    deposition is a true record of the testimony
13    given by such witness.
14          I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage and that I am in no way
17    interested in the outcome of this matter.
18          I further certify that neither the
19    deponent nor a party requested a review of
20    the transcript pursuant to Federal Rule of
21    Civil Procedure 30(e) before the deposition
22    was completed.
23          In witness whereof, I have hereunto
24    set my hand this 7th day of January, 2010.
25          ---------------------------
```

Page 116

```
 1              H. MILLER
 2              INDEX
 3    WITNESS:        EXAMINATION BY      PAGE
 4    H. MILLER    Mr. Boies      5, 102
 5              Mr. Gaffey      71
 6              Mr. Maguire     90
 7              Mr. Tecce      100
 8    EXHIBITS:           PAGE
 9    Exhibit 505, a document bearing Bates Nos.   61
10    LAZ-C-00045462 through 463
11    Exhibit 506, a document bearing Bates Nos.   51
12    WGM-LEHMAN-E 0006125 through 127 with
13    attachment
14    Exhibit 507, an e-mail from Marie Stewart to  105
15    Emma Bailey dated September 24, 2008
16    Exhibit 508, a document bearing Bates Nos.   42
17    WGM-LEHMAN-E 00015980 through 82 with
18    attachment
19    Exhibit 509, an e-mail dated September 18,   108
20    2008 at 23:02 from Martin Kelly to Richard
21    Krasnow
22    Exhibit 510, a document bearing Bates Nos.   52
23    WGM-LEHMAN-E 00021381 and 21409
24    (Exhibit 511, marked but not used.)
25    (Exhibit 512, marked but not used.)
```

Page 117

```
 1              H. MILLER
 2              INDEX (Cont'd.)
 3    EXHIBITS:           PAGE
 4    Exhibit 513, an e-mail dated September 17,   67
 5    2008 at 13:08
 6    (Exhibit 514, marked but not used.)
 7    (Exhibit 515, marked but not used.)
 8    Exhibit 516, a document bearing Bates Nos.   110
 9    MTHM0000139 through 147 with attachment
10    Exhibit 517, a document entitled "Transaction  71
11    Summary"
12    Exhibit 518, a document bearing Bates Nos.   86
13    WGM-LEHMAN-E 00000355 through 403
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 118

```
 1              H. MILLER
 2   NAME OF CASE: In re: Lehman Brothers, Inc.
 3   DATE OF DEPOSITION: January 7, 2010
 4   NAME OF WITNESS: Harvey R. Miller
 5   Reason Codes:
 6        1. To clarify the record.
          2. To conform to the facts.
 7        3. To correct transcription errors.
 8   Page _____ Line _____ Reason _____
     From _____ to _____
 9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25
```

# BCI EXHIBIT

# 88

Page 1

1                    D. O'DONNELL

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                          Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                      Debtors.

10

    ----------------------x

11

12   VIDEOTAPED DEPOSITION OF DENNIS C. O'DONNELL

13            New York, New York

14            January 6, 2010

15

16

17

18

19

20   Reported by:

21   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

22   JOB NO. 26649

23

24

25

Page 2

1       D. O'DONNELL
2       January 6, 2010
3
4           Videotaped deposition of DENNIS C.
5       O'DONNELL, held at the law offices of Boies,
6       Schiller & Flexner, LLP, 575 Lexington
7       Avenue, New York, New York, before Kathy
8       S. Klepfer, a Registered Professional
9       Reporter, Registered Merit Reporter,
10      Certified Realtime Reporter, Certified
11      Livenote Reporter, and Notary Public of
12      the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 3

1           D. O'DONNELL
2
3               A P P E A R A N C E S :
4       JONES DAY, LLP
5       Attorneys for Lehman Brothers, Inc.
6           222 East 41st Street
7           New York, New York 10017
8       BY: WILLIAM J. HINE, ESQ.
9
10      BOIES, SCHILLER & FLEXNER, LLP
11      Attorneys for Barclays Capital
12          575 Lexington Avenue - 7th Floor
13          New York, New York 10022
14      BY: JACK G. STERN, ESQ.
15          JULIE NOCIOLO, Paralegal
16
17      QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
18      Attorneys for the Official Committee of
19      Unsecured Creditors
20          51 Madison Avenue
21          22nd Floor
22          New York, New York 10010
23      BY: JAMES C. TECCE, ESQ.
24
25

TSG Reporting - Worldwide    877-702-9580

Page 4

1           D. O'DONNELL
2       A P P E A R A N C E S : (Cont'd.)
3       HUGHES, HUBBARD & REED, LLP
4       Attorneys for the SIPA Trustee
5           One Battery Park Plaza
6           New York, New York 10004
7       BY: CARL W. MILLS, ESQ.
8
9       MILBANK TWEED HADLEY & McCLOY, LLP
10      Attorneys for Milbank Tweed Hadley & McCloy
11      and the Witness
12          1850 K Street, NW
13          Suite 1100
14          Washington, D.C. 20006
15      BY: DAVID S. COHEN, ESQ.
16          CONSTANCE BEVERLEY, ESQ.
17
18
19      Also Present:
20          STEVEN SANPIETRO, Legal Video Specialist
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 5

1           D. O'DONNELL
2           (Exhibit 498, Notice of Deposition
3       Pursuant to Rule 30(b)(6), marked for
4       identification, as of this date.)
5           THE VIDEOGRAPHER:  This is the start
6       of the tape labeled number 1 of the
7       videotaped deposition of 30(b)(6) witness
8       Dennis O'Donnell in the matter of In Re:
9       Lehman Brothers, Inc.
10          This deposition is being held at 575
11      Lexington Avenue, New York, New York, on
12      Wednesday, January the 6th, 2010, at
13      approximately 9:35 A.M.
14          My name is Steve Sanpietro from TSG
15      Reporting, Inc. I'm the legal video
16      specialist.  The court reporter today is
17      Kathy Klepfer, in association with TSG
18      Reporting.
19          Will counsel please introduce
20      yourselves for the record.
21          MR. STERN:  Sure.  Jack Stern from
22      Boies, Schiller & Flexner for Barclays
23      Capital.
24          MR. COHEN:  David Cohen with Milbank
25      Tweed Hadley & McCloy, here on behalf of

TSG Reporting - Worldwide    877-702-9580

Page 6

```
 1            D. O'DONNELL
 2  30(b)(6) subpoena recipient Milbank Tweed
 3  Hadley & McCloy and the witness, Dennis
 4  O'Donnell.
 5       MR. TECCE:  James Tecce of Quinn
 6  Emanuel on behalf of the Official Committee
 7  of Unsecured Creditors.
 8       MR. MILLS:  Carl Mills of Hughes,
 9  Hubbard & Reed on behalf of the trustee,
10  James W. Giddens.
11       MR. HINE:  William Hine of Jones Day
12  on behalf of Lehman Brothers Holdings, Inc.
13       MS. BEVERLY:  Constance Beverly from
14  Milbank Tweed Hadley & McCloy on behalf of
15  Milbank Tweed Hadley & McCloy.
16       MS. NOCIOLO:  Julie Niciolo from
17  Boies, Schiller & Flexner on behalf of
18  Barclays Capital.
19       THE VIDEOGRAPHER:  Will the court
20  reporter please swear in the witness.
21               * * *
22  DENNIS C. O'DONNELL, called as a
23    witness, having been duly sworn by a Notary
24    Public, was examined and testified as
25    follows:
     TSG Reporting - Worldwide   877-702-9580
```

Page 7

```
 1            D. O'DONNELL
 2  EXAMINATION BY
 3  MR. STERN:
 4     Q.   Good morning, Mr. O'Donnell.
 5     A.   Good morning.
 6     Q.   We've marked as our first exhibit the
 7  deposition notice for today.  We've marked it as
 8  Exhibit 498 and I have placed that in front of
 9  you.
10       I have also placed in front of you for
11  ease of reference a blank calendar for the month
12  of September 2008 because we're going to be
13  focusing largely on that period of time today.
14       Did you have an opportunity to review
15  the deposition notice that we've marked as
16  Exhibit 498 before today?
17     A.   I am reviewing it as we speak, and the
18  answer to your question is yes, I have reviewed
19  this deposition notice prior to today.
20     Q.   What did you do to prepare for today's
21  position to?
22     A.   That falls into a couple of
23  categories.  I have been involved in this matter
24  for some time and was involved with the prior
25  document subpoena so, in that context, did
     TSG Reporting - Worldwide   877-702-9580
```

Page 8

```
 1            D. O'DONNELL
 2  review documents that were ultimately produced
 3  prior to their production.
 4       Subsequent to receipt of the 30(b)(6)
 5  subpoena, I have reviewed additional documents,
 6  spoken with counsel, and spent time with counsel
 7  and others at Milbank reviewing the relevant
 8  facts.
 9     Q.   Did you have an opportunity to speak
10  with Mr. Despins?
11     A.   I have not.
12     Q.   Did you review any of Milbank's time
13  entries from the September 2008 time period?
14     A.   At what point in time does your
15  question --
16     Q.   In preparation for this deposition.
17     A.   Not in preparation for this
18  deposition, no.
19     Q.   As you know, the deposition notice
20  focuses largely on Milbank's knowledge and
21  understanding of the sale transaction and
22  elements of the sale transaction as of various
23  points in time, and I'd like to start today with
24  the point in time before the Sale Approval
25  Hearing on September 19, 2008.
     TSG Reporting - Worldwide   877-702-9580
```

Page 9

```
 1            D. O'DONNELL
 2       You recall attending the Sale Approval
 3  Hearing?
 4     A.   Yes, I attended the sale hearing.
 5     Q.   Who else from Milbank attended that
 6  hearing, if you recall?
 7     A.   A number of Milbank partners and
 8  associates, including Luc Despins, Dennis Dunn,
 9  Paul Aronzon, Crayton Bell, myself and Evan
10  Fleck.
11     Q.   I'd like to focus on the day of the
12  Approval Hearing, start in the morning, and ask
13  whether Milbank received any briefings
14  concerning the status of the sale transaction on
15  that day.
16     A.   Since the appointment of the
17  commitment -- retention of Milbank by the
18  Committee on Wednesday, the 17th, there were a
19  number of discussions between or among Milbank
20  and the Debtors' advisors.  Whether any took --
21  whether I can segregate the ones that took place
22  on the morning of the 19th I cannot tell you
23  definitively at this point.
24     Q.   Describe for me, if you would, the
25  briefings or conversations that Milbank had
     TSG Reporting - Worldwide   877-702-9580
```

Page 10

D. O'DONNELL

1  concerning the elements of the sale transaction
2  in the period from Milbank's retention through
3  to the beginning of the Sale Approval Hearing.
4      MR. COHEN: Does that relate to
5  briefings by the Debtors?
6      MR. STERN: It would include briefings
7  by the Debtors, that would be Lehman, Weil
8  and Lazard, or if there were any
9  conversations with Barclays or anybody
10  acting on behalf of Barclays.
11      MR. COHEN: But not internal
12  conferences.
13      THE WITNESS: Understood.
14      There were two significant briefings
15  that I recall. The first, there was a
16  meeting for all Creditors or all interested
17  parties at Lehman on the morning of the 18th
18  where attorneys from Weil and advisors to
19  the Debtors, including, I believe, people
20  from Lazard and A&M answered questions for
21  attorneys from Milbank and its -- and the
22  Committee's advisors, Houlihan and FTI, as
23  well as questions answered by a number of
24  other interested third parties. That was

TSG Reporting - Worldwide    877-702-9580

Page 11

D. O'DONNELL

1  the first such briefing.
2      After that meeting ended, there was a
3  meeting at which only Milbank, Houlihan and
4  FTI participated with, again, Weil, I
5  believe people from A&M, and Lazard.
6  Q.    Where did that second meeting take
7  place?
8  A.    At the offices of Weil Gotshal.
9  Q.    Where did the first meeting take
10  place?
11  A.    At the offices of Weil Gotshal.
12  Q.    Were those meetings both on September
13  18?
14  A.    Yes, they were.
15  Q.    Did Milbank receive any further
16  briefings or receive any further information
17  concerning the transaction before the sale
18  hearing began on the afternoon of September 19?
19  A.    To repeat my testimony from earlier,
20  from -- from the moment of our retention through
21  the hearing, there were ongoing discussions
22  between Milbank attorneys and attorneys at Weil
23  regarding elements of the transaction or ...
24  Q.    As of the start of the Sale Approval

TSG Reporting - Worldwide    877-702-9580

Page 12

D. O'DONNELL

1  Hearing, had Milbank been told that the
2  transaction had changed in any way from the
3  transaction that had originally been explained
4  to Milbank?
5  A.    The transaction from Milbank's
6  perspective was a moving target through that
7  period. There were changes that were publicly
8  disclosed and were also disclosed to Milbank
9  prior to the hearing, including those
10  memorialized in the First Amendment to the APA.
11  Q.    Before the hearing began, what did
12  Milbank understand or what had Milbank been told
13  concerning the Fed financing of Lehman Brothers,
14  Inc. and Barclays' replacement of that
15  financing?
16  A.    Events during this period, between
17  Wednesday and Friday, moved at a very rapid
18  pace. Disclosures regarding the changes were
19  made to Milbank and made to others, sometimes at
20  the same time, sometimes simultaneously.
21      Whether Milbank was told anything
22  specifically about that issue prior to the
23  hearing I cannot tell you.
24  Q.    You don't recall?

TSG Reporting - Worldwide    877-702-9580

Page 13

D. O'DONNELL

1  A.    I don't know whether -- is the
2  question whether Milbank alone was told
3  something or whether Milbank as part of a group
4  of Creditors asking questions was told
5  something?
6  Q.    The question really is whether Milbank
7  understood or knew a fact regardless of how it
8  was learned.
9  A.    And the fact that they learned is what
10  again?
11  Q.    Anything having to do with Barclays'
12  replacement of the Fed Repurchase Agreement with
13  LBI.
14  A.    As I sit here, I don't know whether we
15  learned about that prior to the hearing or
16  during the hearing or during the period leading
17  up to the hearing, bearing in mind that the
18  hearing was scheduled to start at 4 P.M. and did
19  not start until sometime later as events
20  continued to unfold and additional changes were
21  disclosed to Milbank and the Court.
22  Q.    By the end of the Sale Approval
23  Hearing, did Milbank have any understanding
24  concerning Barclays' replacement of the Fed

TSG Reporting - Worldwide    877-702-9580

Page 14

D. O'DONNELL

1  repo?
2  A. Milbank knew at that point what was
3  disclosed to the Court by Weil during the
4  hearing.
5  Q. Did Milbank have any additional
6  information beyond that?
7  A. Again, there were ongoing discussions
8  or efforts to have discussions between Milbank
9  and Weil. There were people in court that day.
10 There were people in the office that day seeking
11 to communicate with Weil regarding the status of
12 the transaction.
13 At what point in time we learned of
14 the role -- of the changes with respect to the
15 repo is not something I can pinpoint with
16 accuracy.
17 Q. Okay. At some point before the end of
18 the Sale Approval Hearing, did Milbank have an
19 understanding concerning the amount of the repo
20 loan that Barclays assumed?
21 A. Before the end of the hearing, we --
22 we understood what I believe it was Mr. Miller
23 or Ms. Fife told the Court about the amount of
24 that loan.
25

TSG Reporting - Worldwide    877-702-9580

Page 15

D. O'DONNELL

1  Q. Aside from what Mr. Miller and Ms.
2  Fife told the Court, did Milbank receive any
3  information in separate off-the-record
4  discussions?
5  A. To the best of my knowledge, no.
6  Q. By the end of the Sale Approval
7  Hearing, what understanding or knowledge did
8  Milbank have concerning the amount of securities
9  transferred to Barclays in connection with
10 replacing the Fed repo?
11 A. Again, I think our knowledge would
12 have been limited to what was represented on the
13 record at the hearing.
14 Q. Is it your testimony that Milbank was
15 not told anything about that other than what was
16 said on the record?
17 A. Yes.
18 Q. Now, during the course of the hearing,
19 do you recall that there was a recess?
20 A. I recall that there were a number of
21 recesses.
22 Q. Do you recall that there was a recess
23 towards the beginning of the hearing at which
24 lawyers from Weil explained changes in the
25

TSG Reporting - Worldwide    877-702-9580

Page 16

D. O'DONNELL

1  transaction?
2  A. Yes, I recall that recess.
3  Q. What occurred during that recess?
4  MR. COHEN: Objection. Vague.
5  Q. You can answer.
6  MR. TECCE: For the record, I just
7  wanted the record to be clear that we're
8  joining in Mr. Cohen's objections, and
9  without doing it every time that he does it,
10 to avoid clarity on the record.
11 MR. STERN: Sure.
12 Q. Let me rephrase the question. What
13 was Milbank told during that first recess?
14 MR. COHEN: Objection. Vague.
15 A. Milbank was told during that first
16 recess what everyone else was told during that
17 first recess. My recollection is that, again,
18 it was Ms. Fife or Mr. Miller summarized for the
19 parties-in-interest in the courtroom
20 developments, ongoing developments, in the
21 transaction, attempting to present a summary of
22 where the deal stood at that moment in time.
23 Q. Do you recall whether Ms. Fife made
24 the presentation or Mr. Miller made the
25

TSG Reporting - Worldwide    877-702-9580

Page 17

D. O'DONNELL

1  presentation?
2  A. To the best of my recollection, it was
3  Ms. Fife who made the presentation.
4  Q. During that recess period, did anybody
5  else address developments in the transaction?
6  A. It was, to the best of my
7  recollection, an interactive process. There
8  were -- I believe Lazard may also have been in
9  the courtroom. It may have been there
10 addressing issues. And there were others from
11 Weil on the corporate side who may have been
12 assisting Ms. Fife in making the presentation.
13 Q. In talking about developments in the
14 transaction, did anyone on behalf of Lehman
15 discuss Barclays' replacement of the Fed repo?
16 A. I do not remember that being the focal
17 point of any discussion during that recess.
18 Q. Is it possible that that issue was
19 discussed?
20 MR. COHEN: Objection. Calls for
21 speculation.
22 A. My recollection is that Mr. Miller had
23 told the Court, had represented to the Court,
24 and I'm not sure whether it was before or after
25

TSG Reporting - Worldwide    877-702-9580

Page 18

D. O'DONNELL

1  that recess, that Barclays was -- had taken out
2  the Fed or had replaced the Fed with respect to
3  that repo, but I don't recall whether there were
4  further statements made during that recess or
5  questions asked during that recess on that
6  point.
7      Q.  So you don't recall?
8      A.  I don't recall.
9      Q.  And do you recall whether Mr. Miller
10  or Ms. Fife or anybody from Lazard during that
11  recess discussed the amount of collateral or
12  securities Barclays was receiving in exchange
13  for taking out the Fed's financing?
14      A.  Again, in the context of that recess,
15  I don't remember that being a specific issue of
16  discussion or questioning.
17      Q.  It may have been, but you just don't
18  recall?
19      MR. COHEN: Objection. Calls for
20  speculation.
21      A.  I don't recall.
22      Q.  Do you recall whether during that
23  recess there was any discussion concerning
24  whether Barclays would receive as a part of the
25  TSG Reporting - Worldwide    877-702-9580

Page 19

D. O'DONNELL

1  transaction certain clearance box assets or
2  unencumbered assets?
3      A.  I also do not recall whether that
4  issue was discussed during the recess.
5      Q.  Do you recall during that recess any
6  person from Lehman referring to a category of
7  additional assets estimated by Lehman to be
8  worth $1.9 billion?
9      A.  Again, no recollection of that that
10  was discussed during that recess.
11      Q.  Is that a category of assets or was
12  the transfer of that category of assets
13  something Milbank knew going into the Approval
14  Hearing?
15      A.  It was an evolving process. The
16  Approval Hearing lasted eight hours. Whether --
17  I do not believe that Milbank knew about the
18  clearance box securities during the hearing.
19      Q.  When you say you don't believe, do you
20  have a firm recollection that Milbank was not
21  told about that category of assets, or is it
22  that you don't recall?
23      A.  I don't -- I believe that Milbank was
24  not told about that category of assets prior to
25  TSG Reporting - Worldwide    877-702-9580

Page 20

D. O'DONNELL

1  the hearing.
2      Q.  Okay. Did Milbank learn about that
3  category of assets during the hearing?
4      A.  They -- I -- they did not, to the best
5  of my knowledge, learn about that category of
6  assets during the hearing.
7      Q.  Did Milbank participate in any
8  discussions either before the hearing or during
9  the hearing concerning a category of assets
10  described as being worth $1.9 billion?
11      A.  To the best of my recollection, no.
12      Q.  Did anybody from Milbank take any
13  notes of any of the discussions on September 19
14  with Weil, Lazard or others concerning the
15  developments in the transaction?
16      A.  If any -- I did not, and I'm not aware
17  of anyone who did.
18      Q.  Did you participate in any discussions
19  with Weil concerning whether -- withdraw that.
20      When Milbank was at court on September
21  19 for the hearing, were there any discussions
22  or meetings that Milbank participated in in
23  which anyone complained to Weil or others about
24  developments in the transaction?
25  TSG Reporting - Worldwide    877-702-9580

Page 21

D. O'DONNELL

1      MR. COHEN: Is that anyone from
2  Milbank or anyone?
3      Q.  Anyone.
4      A.  The courtroom was full. There were
5  two overflow courtrooms. There were many
6  Creditors and parties in interest there with
7  views about the transaction and the current
8  state of the transaction. Milbank I'm certain
9  heard from some of those Creditors about their
10  views.
11      Q.  Do you recall anyone complaining about
12  a transfer of assets estimated to be worth 1.9
13  billion?
14      A.  No specific -- I have no specific
15  recollection of anyone making that specific a
16  complaint.
17      Q.  Is it possible that somebody made that
18  complaint?
19      MR. COHEN: Objection. Calls for
20  speculation.
21      Q.  And that you just don't recall?
22      MR. COHEN: Same objection.
23      A.  I have no specific recollection of
24  such complaint.
25  TSG Reporting - Worldwide    877-702-9580

Page 22

D. O'DONNELL

1
2    Q.   Do you recall that there -- do you
3    have a firm recollection that there were never
4    any such complaints?
5    A.   I don't have a firm recollection to
6    that effect either.
7    Q.   Okay.  So you don't have a firm
8    recollection one way or the other?
9    A.   Correct.
10    Q.   Okay.  What discussions, if any, did
11    Milbank participate in relating to developments
12    in the transaction -- withdrawn.
13        In the discussions leading up to and
14    at the sale hearing concerning developments in
15    the transaction, did Milbank learn anything
16    concerning the treatment of 15c3 assets or
17    regulatory capital in connection with the
18    transaction?
19    A.   To the best of my knowledge, no.
20    Q.   Do you recall whether there were any
21    discussions on that subject?
22    A.   I have no recollection or no knowledge
23    of any discussions on that topic prior to the
24    conclusion of the sale hearing.
25    Q.   When did Milbank first learn, to the

TSG Reporting - Worldwide    877-702-9580

Page 23

D. O'DONNELL

1
2    best of your recollection, that 15c3 assets or
3    regulatory capital were being considered as a
4    part of the transaction?
5    A.   To the best of my knowledge, over the
6    course of the weekend that followed the sale
7    hearing.
8    Q.   Do you have a firm recollection that
9    Milbank did not know that before the end of the
10    sale hearing?
11    A.   I have a firm recollection to that
12    effect, yes.
13    Q.   What is your best recollection
14    concerning when Milbank first learned the terms
15    of Barclays' replacement of the Fed financing?
16        MR. COHEN:  Objection.  Vague.
17    A.   I'm not certain that we -- that
18    Milbank ever learned definitively the terms of
19    that transaction.
20    Q.   At some point before the closing,
21    Milbank understood that Barclays had replaced
22    the Fed's financing, correct?
23    A.   Correct.
24    Q.   Okay.  And when did Milbank first
25    develop that understanding?

TSG Reporting - Worldwide    877-702-9580

Page 24

D. O'DONNELL

1
2    A.   Over the course of the weekend
3    following the closing.
4    Q.   Not before the end of the sale
5    hearing?
6    A.   Well, as I previously testified, I
7    believe Mr. Miller did tell the Court that in
8    fact Barclays had replaced the Fed financing, so
9    we knew that it had happened.
10        If the question is did we know the
11    terms of it, we began to understand the terms of
12    it over the course of the weekend, but I never
13    received answers to all of our questions about
14    those terms.
15    Q.   As of the Sale Approval Hearing, did
16    Milbank know that Barclays had announced
17    publicly that Barclays anticipated realizing a
18    gain on the acquisition of $2 billion after tax?
19    A.   Timeframe again?
20    Q.   As of the start of the sale hearing.
21    A.   As of the start of the sale hearing, I
22    do not believe that Milbank knew of that
23    announcement.
24    Q.   Milbank learned of that after the sale
25    hearing?

TSG Reporting - Worldwide    877-702-9580

Page 25

D. O'DONNELL

1
2    A.   I believe Milbank learned of that over
3    the course of the weekend.
4    Q.   Going into the sale hearing, did
5    Milbank know that certain bondholders believed
6    that Barclays would receive a windfall discount
7    on the transaction?
8    A.   As I previously testified, there were
9    many Creditors with many complaints about the
10    transaction.  As counsel to the Committee, we --
11    we heard from a number of those Creditors about
12    their complaints.
13    Q.   Did Milbank hear specifically from Dan
14    Golden about his analysis of the transaction and
15    the analysis of the transaction that Goldman
16    Sachs had done on his behalf?
17        MR. COHEN:  Objection.  Foundation.
18    A.   Milbank did receive from Mr. Golden an
19    e-mail forwarding an e-mail from someone at
20    Goldman Sachs raising issues of that
21    description.
22    Q.   And what do you recall those issues
23    were?
24    A.   I don't have a specific recollection
25    of the precise terms of the issues raised, but I

TSG Reporting - Worldwide    877-702-9580

Page 26

D. O'DONNELL

1  think they raised -- there were a number of
2  issues raised. They were issues relating to
3  precisely what Barclays was -- what assets
4  Barclays was buying and what it was giving up to
5  get them.
6     Q.  Do you recall that Mr. Golden and
7  Goldman Sachs had concluded that Barclays would
8  receive a windfall discount of billions of
9  dollars?
10        MR. COHEN: Objection. Foundation.
11    A.  I don't have a specific recollection
12 that that terminology specifically was used.
13    Q.  Did Milbank do anything to assess the
14 points that Mr. Golden was making?
15    A.  Throughout this period Milbank was
16 conducting diligence on an expedited timetable
17 seeking to understand the transaction. The
18 e-mail received from Mr. Golden was -- was part
19 of that, that overall mix. It was taken into
20 account and was part of the reason that we were
21 seeking fuller answers about the terms of the
22 transaction.
23    Q.  You referred to two meetings at Weil
24 on the 18th. Starting with the first meeting,

TSG Reporting - Worldwide    877-702-9580

Page 27

D. O'DONNELL

1  can you tell me in general what Milbank learned
2  at that meeting concerning the transaction?
3     A.  The first meeting was a, a meeting
4  generally open to all Creditors. Milbank did
5  not take the lead with respect to asking
6  questions or obtaining information at that
7  meeting. To the best of my recollection, there
8  was a -- there were a whole range of questions
9  asked about many aspects of the transaction.
10 Beyond that, I can't be more specific.
11    Q.  And then you referred to a second
12 meeting. What was discussed in that meeting?
13    A.  The second meeting, which took place
14 following the first meeting, was a -- was the
15 first sit-down meeting between the Debtors and
16 Milbank and the Committee's advisors, and it
17 covered a range of topics, including the
18 transaction. I can't, as I sit here, I can't
19 tell you specifically what issues were raised or
20 discussed that relate to the Barclays
21 transaction, but I'm -- I can't tell you with
22 any specificity what issues were discussed.
23    Q.  I take it that, before the Sale
24 Approval Hearing, Milbank had reviewed the

TSG Reporting - Worldwide    877-702-9580

Page 28

D. O'DONNELL

1  original Asset Purchase Agreement?
2     A.  It had.
3     Q.  And Milbank had reviewed the First
4  Amendment?
5     A.  It had.
6     Q.  In connection with the APA, did
7  Milbank have an understanding going into the
8  sale hearing concerning the total value of the
9  purchased assets to be transferred under the
10 original APA?
11    A.  Milbank itself did not have a specific
12 understanding or opinion with respect to the
13 value issues here. Houlihan Lokey was the
14 Committee's financial advisor and was charged
15 with understanding and evaluating the value
16 components of the transaction.
17    Q.  Do you know whether Houlihan ever
18 developed an understanding concerning the total
19 value of the purchased assets under the APA?
20        MR. COHEN: Objection. Vague.
21    A.  Houlihan focused on that issue and
22 asked questions about that issue prior to and
23 after the sale hearing.
24    Q.  Did Houlihan ever provide Milbank with

TSG Reporting - Worldwide    877-702-9580

Page 29

D. O'DONNELL

1  a figure representing the total value of all
2  purchased assets being transferred to Barclays
3  under the APA?
4        MR. TECCE: I'm going to object.
5        MR. COHEN: You can answer that yes or
6  no. That goes into privilege and work
7  product.
8     A.  Yes.
9     Q.  It's your testimony that Houlihan had
10 a calculation representing the total value of
11 all purchased assets in the aggregate; is that
12 your testimony?
13    A.  Let me clarify. All purchased assets,
14 including all components of the "purchased
15 asset" definition?
16    Q.  Yes.
17    A.  As I sit here I don't have a
18 recollection that Houlihan ever provided a total
19 number with respect to all purchased assets.
20    Q.  Did Milbank understand that the
21 consideration that Barclays would pay included
22 the assumption of certain liabilities?
23        MR. COHEN: Objection. Vague. Under
24 which document?

TSG Reporting - Worldwide    877-702-9580

Page 30

1           D. O'DONNELL
2    Q.   Under the APA.
3           MR. COHEN: The original?
4    A.   The original?
5    Q.   Yes.
6    A.   Under the terms of the original APA,
7    yes, we -- Milbank understood that part of the
8    consideration would be the assumption of certain
9    liabilities.
10   Q.   Okay.  And going into the sale
11   hearing, did Milbank have a calculation for the
12   total value of all assumed liabilities under the
13   APA?
14   A.   Going into the sale hearing, Milbank
15   did not have a calculation provided by Houlihan
16   of the total value of all assumed liabilities,
17   no.
18   Q.   Did it have a calculation of the total
19   value of all assumed liabilities from any
20   source?
21   A.   Going into the sale hearing, Milbank
22   had what the Debtors represented to the Court
23   was the total value of the assumed liabilities.
24   Q.   Is it your testimony that the Debtors
25   made a representation to the Court concerning
     TSG Reporting - Worldwide    877-702-9580

Page 31

1           D. O'DONNELL
2    the total value of all assumed liabilities under
3    the APA?
4           MR. COHEN: Objection.  Vague.
5           We're talking about September 19 and
6    the original APA?
7           MR. STERN: Yes.
8    A.   To the best of my recollection, the
9    Debtors made representations to the Court
10   regarding the cure and compensation components
11   of the assumed liabilities.
12   Q.   You understand that under the APA
13   there was a list of assumed liabilities,
14   correct?
15   A.   Correct.
16   Q.   You understand that under the APA
17   there were provisions relating to the assumption
18   of cure payments by Barclays?
19   A.   Correct.
20   Q.   And you understand that under the APA
21   there was a provision relating to compensation
22   payments by Barclays?
23   A.   Correct.
24   Q.   My question is whether at any time
25   Weil or Lehman made a representation to Milbank
     TSG Reporting - Worldwide    877-702-9580

Page 32

1           D. O'DONNELL
2    concerning the total value of all assumed
3    liabilities under the APA, including the list of
4    assumed liabilities listed in the APA and cure
5    and compensation?
6    A.   The timeframe is prior to the hearing?
7    Q.   Prior to the hearing.
8    A.   To the best of my knowledge, no.
9    Q.   So, going into the hearing, Milbank
10   did not have a total figure for all purchased
11   assets and it did not have a total figure for
12   the value of all assumed liabilities; is that
13   correct?
14   A.   Correct.
15   Q.   Did Milbank at any time prior to the
16   Sale Approval Hearing suggest to Weil Gotshal
17   that the purchase agreement should include
18   valuation conditions with respect to purchased
19   assets and assumed liabilities?
20           MR. COHEN: Objection.  Vague.
21   A.   To the best of my knowledge, Milbank
22   did not make any such suggestion prior to the
23   hearing.
24   Q.   Prior to the hearing did Milbank
25   lawyers ever suggest to Weil Gotshal that the
     TSG Reporting - Worldwide    877-702-9580

Page 33

1           D. O'DONNELL
2    purchase agreement should include
3    representations and warranties concerning the
4    total value of purchased assets and the total
5    value of assumed liabilities?
6           MR. COHEN: Objection.  Vague.
7    A.   In a limited context, in the timeframe
8    in the context of the access we had at the time,
9    no.
10   Q.   So, prior to the hearing, Milbank
11   never suggested to Weil that the purchase
12   agreement should include representations and
13   warranties concerning the total value of
14   purchased assets and the total value of assumed
15   liabilities; is that correct?
16   A.   That's correct.
17           MR. COHEN: Objection.  Vague.
18           By "purchase agreement," are you
19   talking about the APA?
20           MR. STERN: Yes.
21   Q.   Let me rephrase the question.  So,
22   prior to the hearing, Milbank never suggested to
23   Weil that the APA should include representations
24   and warranties concerning the total value of
25   purchased assets and the total value of assumed
     TSG Reporting - Worldwide    877-702-9580

Page 34

1          D. O'DONNELL
2   liabilities; is that correct?
3      A.   That is correct.
4      Q.   Did Milbank ever suggest to Weil
5   before the Sale Approval Hearing that the APA
6   should include true-up provisions with respect
7   to the value of purchased assets or assumed
8   liabilities?
9      A.   To the best of my knowledge, no.
10     Q.   Did Milbank understand that the
11  original APA included a purchase price
12  adjustment provision?
13     A.   Yes.
14     Q.   Did Milbank understand as of the sale
15  hearing that that provision had been deleted?
16     A.   No.
17         Strike that. I --
18     Q.   Let me rephrase the question.  Did
19  Milbank understand as of the Sale Approval
20  Hearing that that purchase price adjustment
21  provision -- withdrawn.
22         Did Milbank understand as of the Sale
23  Approval Hearing that the parties had agreed
24  that they would delete that purchase price
25  agreement -- purchase price adjustment provision
         TSG Reporting - Worldwide    877-702-9580

Page 35

1          D. O'DONNELL
2   from the Final Agreement?
3         MR. COHEN:  Objection.  Vague.
4      A.   Based on representations made during
5   the hearing, Milbank did understand that the
6   purchase price adjustment had been removed from
7   the deal, yes.
8      Q.   Did anyone from Houlihan at any time
9   ever communicate with Milbank -- withdrawn.
10         When Milbank learned that Barclays had
11  announced that it anticipated a $2 billion
12  after-tax gain on the transaction, what was
13  Milbank's reaction?
14         MR. COHEN:  I'm going to caution the
15  witness to not discuss either client
16  communications or internal communications.
17     A.   Over the course of the weekend,
18  Milbank did receive a copy of the announcement.
19  It reviewed it and ultimately forwarded it to
20  Houlihan to review as well.
21     Q.   Was that announcement by Barclays at
22  all inconsistent with Milbank's understanding of
23  the transaction?
24     A.   The announcement was made on September
25  17 and related to a version of the transaction
         TSG Reporting - Worldwide    877-702-9580

Page 36

1          D. O'DONNELL
2   that was not the version of the transaction
3   approved by the Court or under discussion over
4   the weekend, so we didn't -- Milbank did not
5   attempt to draw any comparisons between what was
6   discussed in that announcement and what was
7   approved by the Court or was under discussion
8   over the weekend.
9      Q.   Did Milbank believe that the earlier
10  transaction was irrelevant at the time of the
11  Court's approval?
12         MR. COHEN:  You can answer that yes or
13  no, but don't get into the thought process
14  or work product behind that.
15     A.   No.
16     Q.   Milbank understood that Barclays'
17  announcement related to the transaction as it
18  stood on September 17, correct?
19     A.   Based on the date on the announcement,
20  yes.
21     Q.   Okay. Did Milbank believe the
22  Barclays announcement remained relevant as of
23  the time of the sale hearing?
24     A.   Milbank --
25         MR. COHEN:  You can answer that yes or
         TSG Reporting - Worldwide    877-702-9580

Page 37

1          D. O'DONNELL
2   no.
3      Q.   Withdrawn. Did Milbank believe that
4   Barclays' September 17 announcement remained
5   relevant at any time prior to the closing?
6         MR. COHEN:  Yes or no.
7      A.   Yes.
8      Q.   So the Barclays announcement was
9   relevant?
10     A.   Prior to closing, yes.
11     Q.   Was that announcement of an
12  anticipated gain considered by Milbank to be at
13  all inconsistent with the terms of the
14  transaction as Milbank understood the
15  transaction prior to closing?
16         MR. COHEN:  You can answer that yes or
17  no.
18     A.   Can you repeat the question?
19     Q.   Sure. Was the announcement by
20  Barclays of an anticipated acquisition gain
21  inconsistent with Milbank's understanding of the
22  transaction?
23     A.   Yes.
24     Q.   What did Milbank do to address that
25  inconsistency?
         TSG Reporting - Worldwide    877-702-9580

Page 38

D. O'DONNELL

1
2     A.   It forwarded the announcement to
3  Houlihan, who was charged with evaluating the
4  value components of the transaction.
5     Q.   Did Milbank do anything other than
6  that?
7         MR. COHEN: You can answer yes or no.
8     A.   No.
9     Q.   As to Barclays' announcement of an
10 anticipated $2 billion after-tax acquisition
11 gain, did Milbank ever raise any concerns with
12 Weil or Lazard or anyone from Lehman about that
13 announcement?
14    A.   Timeframe, please?
15    Q.   At any time. At any time through
16 September 22.
17    A.   Through closing.
18        Over the course of the weekend, we
19 were seeking answers to many questions about the
20 transaction. I cannot tell you that -- that
21 that announcement was not brought to Weil's
22 attention.
23    Q.   Do you have a recollection of Milbank
24 discussing that announcement with Weil?
25    A.   I don't have a specific recollection

TSG Reporting - Worldwide    877-702-9580

Page 39

D. O'DONNELL

1
2  to that effect, no.
3     Q.   Did Milbank make -- withdrawn. Prior
4  to the closing, did Milbank have any
5  communications with anybody from Barclays or
6  representing Barclays?
7     A.   Yes.
8     Q.   Who?
9     A.   One communication of which I am aware
10 is one with Mark Shapiro of Barclays.
11    Q.   This is prior to closing. Mark
12 Shapiro was with Lehman.
13    A.   All right.
14    Q.   And my question goes to --
15    A.   Yeah, you're correct.
16    Q.   -- Barclays -- we'll come back to Mark
17 Shapiro, but my question goes to Barclays
18 executives or Barclays lawyers or financial
19 advisors.
20    A.   Over the course of the weekend,
21 representatives of Barclays were at Weil, and
22 Milbank did have some limited contact with
23 Barclays representatives during that period.
24    Q.   Did Milbank ever raise any concern
25 with the Barclays people concerning Barclays'

TSG Reporting - Worldwide    877-702-9580

Page 40

D. O'DONNELL

1
2  announcement of an anticipated $2 billion
3  after-tax acquisition gain?
4     A.   To the best of my knowledge, no.
5     Q.   Why not?
6     A.   As I've previously testified, we were
7  looking at many issues, had many unanswered
8  questions. That announcement was one element of
9  the facts of which we were aware of that weekend
10 that we had questions about, but we did not ask
11 Barclays about it.
12    Q.   Did Milbank not consider it
13 significant enough to raise with Barclays?
14        MR. COHEN: Objection. Vague.
15    A.   The, again, the announcement spoke of
16 a $2 billion gain of some sorts, but it was
17 couched in accounting jargon that we at Milbank
18 did not definitively have an understanding of.
19 We forwarded it to Houlihan to investigate
20 further and tell us what they thought the
21 announcement meant.
22    Q.   Did Milbank ever ask whether Barclays
23 still anticipated an acquisition gain on the
24 transaction in light of the further developments
25 in the transaction leading up to closing?

TSG Reporting - Worldwide    877-702-9580

Page 41

D. O'DONNELL

1
2         MR. COHEN: Did they ask Barclays that
3  question?
4         MR. STERN: Anyone.
5     A.   Timeframe again?
6     Q.   Anytime leading up to closing.
7     A.   And did we ask anyone?
8     Q.   Yes.
9     A.   I have no specific recollection that
10 we asked anyone that question.
11    Q.   Can you explain why Milbank would not
12 have asked that question?
13        MR. COHEN: Objection. I will
14 instruct the witness not to answer. That's
15 work product.
16    Q.   Now, you referred to a conversation
17 with Mark Shapiro. What do you remember about
18 that conversation?
19    A.   My recollection relates to an e-mail
20 from Mark Shapiro in which Mark Shapiro told
21 Milbank and Houlihan and FTI who at Lehman they
22 should speak to about various issues.
23    Q.   Do you recall approximately when that
24 e-mail was sent?
25    A.   I believe that e-mail was sent on the

TSG Reporting - Worldwide    877-702-9580

Page 42

D. O'DONNELL

1    18th of September.
2        Q.   After the sale hearing and before the
3    closing, what was Milbank's role in connection
4    with the transaction?
5            MR. COHEN: Objection. Vague.
6        A.   Milbank's role as counsel to the
7    Committee was to seek to undertake the diligence
8    with respect to the transaction that it had not
9    been able to undertake prior to the sale hearing
10   and desire to undertake, you know, complete
11   before closing.
12       Q.   Did Milbank understand that there was
13   a provision of the Sale Order concerning
14   Committee consent to possible changes in the
15   purchase agreement?
16           MR. COHEN: You can answer yes or no.
17       A.   Yes.
18       Q.   Is that a provision that Milbank
19   negotiated with Weil?
20           MR. COHEN: You can answer yes or no.
21       A.   Yes.
22       Q.   Tell me about Milbank's negotiations
23   with Weil concerning that provision of the Sale
24   Order.

TSG Reporting - Worldwide    877-702-9580

Page 43

D. O'DONNELL

1        A.   That provision of the Sale Order was
2    one of several that were -- was discussed during
3    the sale hearing and after the sale -- after the
4    Court had actually approved the hearing --
5    approved the sale and prior to entry of the
6    order. It was anticipated that changes might be
7    made, the Debtors had represented that to the
8    Court, and the Committee wanted to ensure that
9    it had the ability to consent to any such
10   changes.
11       Q.   Who from Milbank negotiated that
12   provision?
13       A.   There were a number of Milbank
14   partners in the courtroom that day and night. I
15   can't tell you as I sit here who took
16   responsibility for that specific provision, but
17   it was one of several Milbank partners.
18       Q.   Over the weekend leading to the
19   closing, did Milbank have any discussions with
20   Weil concerning whether the Committee's consent
21   would be required?
22       A.   Yes.
23       Q.   What were those discussions?
24       A.   The order stated that if there were

TSG Reporting - Worldwide    877-702-9580

Page 44

D. O'DONNELL

1    material modifications made to the transaction,
2    the -- both the consent of the Committee and
3    approval of the Court would be required. As we
4    evaluated the transaction over the weekend, the
5    issue of whether any of the proposed changes
6    were material was something that came up with
7    Weil.
8        Q.   And who discussed that?
9        A.   To the best of my recollection, these
10   discussions were between Luc Despins and Harvey
11   Miller.
12       Q.   And do you know what they discussed?
13       A.   I don't believe the discussions were
14   conclusive. It was -- the Committee was, as I
15   previously testified, conducting diligence over
16   the weekend, had questions that had not yet been
17   answered, and the issue was whether if these
18   questions could not be answered, whether any of
19   the open issues were material enough to require
20   Court approval.
21       Q.   Aside from the discussion between Mr.
22   Despins and Mr. Miller, were there any other
23   discussions between Milbank and Weil concerning
24   that issue?

TSG Reporting - Worldwide    877-702-9580

Page 45

D. O'DONNELL

1        A.   No.
2        Q.   And how did you learn what Mr. Despins
3    and Mr. Miller discussed?
4        A.   Through discussions with others at
5    Milbank.
6        Q.   Who?
7        A.   Crayton Bell.
8        Q.   Anybody else?
9        A.   No.
10       Q.   What did Mr. Bell tell you?
11       A.   Mr. Bell was present in the room when
12   these discussions took place.
13       Q.   And what did he tell you about the
14   discussions?
15       A.   That they were largely hypothetical;
16   that the question came up in the context of, if
17   these -- if the questions that remained
18   unanswered yielded certain types of answers,
19   would Court approval be required.
20       Q.   Did Mr. Bell tell you what Mr. Despins
21   said in that conversation?
22       A.   Not verbatim, no.
23       Q.   In general?
24       A.   I've already testified as to my

TSG Reporting - Worldwide    877-702-9580

Page 46

D. O'DONNELL

1  general understanding of what the discussion
2  entailed.
3      Q.  Did Mr. Despins or anybody from
4  Milbank ever tell Weil that Milbank believed
5  Committee consent would be required?
6      A.  If it was definitively established
7  that there were material changes to the
8  transaction, yes.
9      Q.  When did Milbank make that assertion
10 to Weil?
11     A.  I don't have a verbatim account of the
12 discussion, but the general thrust of the
13 discussion I just recounted covered that point
14 as well.
15     Q.  And any material changes would have to
16 be reflected in the final written agreement; is
17 that right?
18     A.  Correct.
19     Q.  Was Milbank ever provided the final
20 written agreements, the Final Purchase
21 Agreement?
22     MR. COHEN:  Objection.  Vague.
23     A.  Can you be more specific as to which
24 document you're talking about?
25

TSG Reporting - Worldwide    877-702-9580

Page 47

D. O'DONNELL

1      Q.  After the closing, did Milbank ever
2  receive the Final Purchase Agreement?
3      A.  The purchase agreement --
4      Q.  Let me define the Final Purchase
5  Agreement.
6      A.  It would be helpful, yes.
7      Q.  Because it's defined in the Sale Order
8  and then it was defined again when Milbank filed
9  these papers.
10         The final purchase --
11         MR. COHEN:  Which papers?
12         MR. STERN:  The Final Purchase
13     Agreement papers.
14         MR. COHEN:  When Milbank filed the
15     final --
16         MR. STERN:  Did I say Milbank?
17         MR. COHEN:  Yes.
18         MR. STERN:  I misspoke.  I meant Weil.
19     Q.  When Weil filed the final agreements,
20 the Final Purchase Agreement was defined as,
21 number one, the original APA; number two, the
22 First Amendment to the APA; and, number three,
23 the Clarifying Letter?
24     A.  Okay.
25

TSG Reporting - Worldwide    877-702-9580

Page 48

D. O'DONNELL

1      Q.  That's the Final Purchase Agreement.
2  So my question is, after the closing, did
3  Milbank receive a copy of the Final Purchase
4  Agreement?
5      A.  Yes.
6      Q.  Okay.  Based on the review of that
7  Final Purchase Agreement, did Milbank have any
8  discussions with Weil concerning whether
9  Committee consent would be required?
10         MR. COHEN:  Object to the form.
11     A.  Yes.
12     Q.  What were those discussions?
13     A.  Milbank had ongoing discussions with
14 Weil after the closing about questions it had
15 about the financial components of the
16 transaction.
17     Q.  Focusing on the Final Purchase
18 Agreement, including the final Clarification
19 Letter --
20         MR. COHEN:  And the schedules?
21     Q.  Focusing on the Final Purchase
22 Agreement, including the Clarification Letter,
23 the material that Milbank had as of September
24 22, did Milbank have discussions with Weil
25

TSG Reporting - Worldwide    877-702-9580

Page 49

D. O'DONNELL

1  concerning whether, based on the material that
2  Milbank had on September 22, there would be a
3  need for Committee consent?
4      A.  As of September 22, Milbank did not
5  have the schedules, so the substance of the
6  discussions at that point were regarding
7  Milbank's need to see the final schedules.
8      Q.  Putting aside the schedules, based on
9  the terms that were in the agreements that
10 Milbank had, did Milbank ever express to Weil on
11 September 22 that Committee consent was
12 necessary?
13     A.  No, we had no reason to because at
14 that point in time we didn't have the
15 information necessary to reach a conclusion as
16 to whether Committee consent would be required.
17     Q.  In other words, based on the face of
18 the Clarification Letter, Milbank did not
19 identify any material changes requiring
20 Committee consent?
21         MR. TECCE:  Objection to the form of
22     the question to the extent it calls for work
23     product or privileged information.
24     A.  Can you repeat the question?
25

TSG Reporting - Worldwide    877-702-9580

Page 50

1          D. O'DONNELL
2     Q.    When Milbank received the final
3    Clarification Letter, did Milbank conclude based
4    on the face of the Clarification Letter alone
5    that there were material changes requiring
6    Committee consent?
7          MR. COHEN: Objection.
8          MR. TECCE: Same objection.
9          MR. COHEN: Calls for privilege and
10   work product. Instruct the witness not to
11   answer.
12    Q.    After Milbank received the final
13   Clarification Letter, did Milbank communicate
14   with Weil that Committee consent would be
15   required based on the terms of the Final
16   Clarification Letter?
17    A.    No.
18          MR. COHEN: Objection. Vague.
19          Are you using Final Clarification
20   Letter and the September 22 documents that
21   were provided without the schedules
22   interchangeably?
23          The Clarification Letter has
24   schedules. The witness has testified that
25   on September 22, we didn't get schedules. I
TSG Reporting - Worldwide    877-702-9580

Page 51

1          D. O'DONNELL
2    have no idea what you mean by final
3    Clarification Letter.
4     Q.    On September 22, Milbank received the
5    text of the Clarification Letter, correct?
6     A.    Correct.
7     Q.    Based on the text of the Clarification
8    Letter, did Milbank ever tell Weil that there
9    were material changes requiring Committee
10   consent?
11    A.    No.
12    Q.    Over the weekend before the closing,
13   was Milbank provided information relating to
14   what would become Schedule A of the
15   Clarification Letter?
16    A.    Yes.
17    Q.    What information was Milbank given?
18    A.    Milbank was provided with drafts of
19   Schedule A.
20          MR. COHEN: Jack, is this a good time
21   for a break? I'm having a technical
22   difficulty here.
23          MR. STERN: Sure. Sure. Let's take a
24   break.
25          THE VIDEOGRAPHER: That is the end of
TSG Reporting - Worldwide    877-702-9580

Page 52

1          D. O'DONNELL
2    tape number 1. The time is 10:42 A.M.
3    We're now off the record.
4          (Recess.)
5          THE VIDEOGRAPHER: This is the start
6    of tape number 2. The time is now 10:55
7    A.M. We are now back on the record.
8    BY MR. STERN:
9     Q.    Mr. O'Donnell, I have placed in front
10   of you a thick document that we previously
11   marked as Exhibit 461B. I'll ask you to review
12   that and then, if you can, tell me what you
13   understand that to be.
14    A.    Based on my review of the document, it
15   appears to be the copy of Schedule A that was
16   provided to Milbank on September 21, 2008.
17    Q.    That's over the weekend before the
18   closing?
19    A.    Correct.
20    Q.    Were there other schedules made
21   available to Milbank and Houlihan over that
22   weekend?
23          MR. COHEN: Objection. Vague.
24    A.    Other copies of Schedule A?
25    Q.    Or any schedules of purchased assets.
TSG Reporting - Worldwide    877-702-9580

Page 53

1          D. O'DONNELL
2    A.    No.
3    Q.    461B -- your testimony is that 461B is
4    the only spreadsheet or schedule that was made
5    available to Milbank and Houlihan over the
6    weekend?
7    A.    Yes.
8    Q.    And when Milbank received this, did
9    Milbank have any questions concerning the
10   information here?
11          MR. COHEN: You can answer yes or no.
12    A.    Yes.
13    Q.    And what questions did Milbank have?
14          MR. COHEN: Objection. Calls for work
15   product. If you're asking for questions
16   that it had to people, not in a privileged
17   environment, like the Debtors or Barclays,
18   you can answer that, but internal
19   conversations or conversations with the
20   Committee's financial advisors I'll instruct
21   you not to answer.
22    Q.    What questions did Milbank have of
23   either Lehman or Barclays' representatives
24   concerning the information contained in Exhibit
25   461B?
TSG Reporting - Worldwide    877-702-9580

Page 54

D. O'DONNELL

1
2    A.    Milbank did not raise any questions
3    with any of the debtor representatives
4    concerning Exhibit 461B.
5    Q.    Is that because that was Houlihan's
6    responsibility?
7    A.    Correct.
8    Q.    Over the weekend before the closing,
9    did Milbank have an understanding concerning the
10   amount of financing that Barclays had assumed in
11   stepping into the Fed's shoes?
12   A.    As I previously testified, only to the
13   extent that that information was provided at the
14   hearing on the 19th.
15   Q.    Milbank had no further discussion
16   concerning that issue over the weekend?
17   A.    Correct.
18        MR. COHEN: Again, only to the extent
19   that it was with people outside of the
20   privilege.
21   A.    Over the course of the weekend,
22   Milbank seeking information about a variety
23   of topics and had directed Houlihan to do the
24   same. So questions were being raised about
25   issues that included the amount of the Barclays

TSG Reporting - Worldwide    877-702-9580

Page 55

D. O'DONNELL

1
2    repo.
3    Q.    Okay. What information did Milbank
4    receive from Lehman or Barclays' representatives
5    concerning the terms of the Barclays repo?
6    A.    Timeframe?
7    Q.    Over the weekend before the closing.
8    A.    At some point on Sunday, I believe,
9    late on Sunday, Milbank was provided with an
10   explanation, or proffered explanation, of the
11   relevant numbers.
12   Q.    Who provided that explanation?
13   A.    I believe it was provided by Michael
14   Klein.
15   Q.    And when Mr. Klein provided that
16   explanation, who else was present?
17   A.    Representatives of Houlihan and
18   Milbank.
19   Q.    Do you recall approximately what time
20   of day that took place?
21   A.    I believe it was very late in the
22   evening of Sunday, the 21st, and potentially
23   early in the morning of Monday, the 22nd.
24   Q.    And what did Milbank learn through
25   that explanation?

TSG Reporting - Worldwide    877-702-9580

Page 56

D. O'DONNELL

1
2    A.    That it had further questions to ask
3    and directed Houlihan to continue to investigate
4    the issues.
5    Q.    Did Milbank tell Mr. Klein that
6    Milbank had further questions?
7    A.    To the best of my recollection, the
8    conversation was one in which the
9    explanation was -- the explanation was proffered
10   and questions were asked until he left the room.
11   Q.    What questions were asked?
12   A.    Questions relating to the specific
13   numbers that were disclosed to Milbank and
14   Houlihan in this context.
15   Q.    What were those numbers?
16   A.    I don't have a specific recollection
17   of the numbers, and it was Houlihan that was
18   charged with evaluating and understanding those
19   numbers.
20   Q.    In that discussion with Mr. Klein, did
21   anyone other than Mr. Klein provide any
22   explanation?
23        MR. COHEN: Objection. Vague.
24   A.    Anyone?
25   Q.    For example, did Mr. Miller or anybody

TSG Reporting - Worldwide    877-702-9580

Page 57

D. O'DONNELL

1
2    from Weil or Lazard participate in providing an
3    explanation?
4    A.    To the best of my recollection, no.
5    Q.    Over that weekend between the end of
6    the Sale Approval Hearing and the closing, were
7    Milbank lawyers present at Weil Gotshal?
8    A.    Yes.
9    Q.    Which Milbank lawyers?
10   A.    Crayton Bell, Luc Despins, David
11   Eastlake.
12   Q.    Anybody else? Yourself?
13   A.    I was not present, no.
14   Q.    Were you present at any time over that
15   weekend?
16   A.    I was not, no.
17   Q.    What was — what was Mr. Bell's role
18   over that weekend?
19   A.    Mr. Bell is a corporate partner at
20   Milbank who was there with a hope of reviewing
21   the documents as they were revised.
22   Q.    And do you know whether he was
23   provided drafts of the documents?
24   A.    He spent a lot of time sitting and
25   waiting, but was ultimately provided with a

TSG Reporting - Worldwide    877-702-9580

Page 58

D. O'DONNELL

1    draft of the Clarification Letter, yes.
2
3        Q.    Do you know whether he was provided
4    more than one draft of the Clarification Letter?
5        A.    Timeframe?
6        Q.    Over the weekend between the Sale
7    Approval Hearing and the closing.
8        A.    He was provided with a draft of the
9    clarification sometime on the afternoon of
10   Saturday, the 20th, and may have seen other
11   drafts towards the end of the process on Sunday
12   night, Monday morning, but primarily he had
13   access to only the draft provided on Saturday.
14       Q.    You say he may have been provided
15   drafts on Sunday. Do you know whether he was?
16       A.    I don't know definitively that he was
17   provided with a draft subsequent to the one that
18   he saw on Saturday.
19       Q.    You don't know one way or the other?
20       A.    I don't know one way or the other.
21       Q.    Do you know whether over that weekend
22   on Saturday and Sunday certain drafts of the
23   agreements were distributed in hard copy at
24   Weil?
25       A.    There were many people meeting at Weil

TSG Reporting - Worldwide    877-702-9580

Page 59

D. O'DONNELL

1
2    over that weekend. It's possible that there
3    were hard copy drafts distributed to others.
4    The only draft that we received was the one
5    referenced on Saturday.
6        Q.    You don't know, however, whether Mr.
7    Bell received hard copy subsequent drafts?
8        A.    Correct.
9        Q.    So it's possible that Mr. Bell
10   received in hard copy subsequent interim drafts
11   of the Clarification Letter between Saturday and
12   the closing?
13       A.    It is --
14            MR. COHEN: Objection. Calls for
15   speculation.
16            You can answer.
17       A.    I don't have any specific knowledge
18   whether he did or not.
19       Q.    You can't exclude the possibility,
20   however, that Mr. Bell, while at Weil, while
21   physically present at Weil, received hard copy
22   interim drafts of the Clarification Letter,
23   correct?
24       A.    My general understanding of the course
25   of dealing that weekend was that Mr. Bell spent

TSG Reporting - Worldwide    877-702-9580

Page 60

D. O'DONNELL

1
2    a long time waiting and not receiving what he
3    needed to receive to do what he wanted to do
4    there.
5        Q.    I understand your testimony about
6    waiting, but my question is whether you know one
7    way or the other if Mr. Bell, while at Weil on
8    Sunday going into the closing, received in hard
9    copy subsequent drafts of the Clarification
10   Letter?
11            MR. COHEN: Objection. Asked and
12   answered.
13       Q.    Do you know that one way or the other?
14            MR. COHEN: Same objection.
15       A.    I have no specific knowledge of that.
16       Q.    So it's possible that he did?
17            MR. COHEN: Objection. Calls for
18   speculation.
19       Q.    Correct?
20            MR. COHEN: Asked and answered.
21       Q.    So it's possible that he did, correct?
22            MR. COHEN: Same objections.
23       A.    Yes.
24       Q.    Do you know how much time Mr. Bell
25   spent at Weil over that weekend leading to the

TSG Reporting - Worldwide    877-702-9580

Page 61

D. O'DONNELL

1
2    closing?
3        A.    He was there most of Saturday and most
4    of Sunday into Monday morning.
5        Q.    And the closing was Monday morning?
6        A.    Correct.
7        Q.    Do you know how much time Mr. Despins
8    spent at Weil over that weekend leading to the
9    closing?
10       A.    He was also there most of Saturday and
11   most of Sunday into Monday morning.
12       Q.    And Mr. Eastlake?
13       A.    He was there for a period of time on
14   Sunday afternoon into -- into Monday morning.
15       Q.    Did anybody from Milbank attend the
16   closing?
17       A.    No.
18       Q.    Why not?
19       A.    The closing was electronic. It took
20   place on the morning of the 22nd. There was no
21   need for us to be there.
22       Q.    Was Milbank invited to attend the
23   closing?
24       A.    Yes.
25       Q.    Do you know whether certain schedules

TSG Reporting - Worldwide    877-702-9580

Page 62

D. O'DONNELL

1  
2 or draft schedules were reviewed at the closing?
3    A.  No.
4    Q.  You don't know?
5    A.  Correct.
6    Q.  While Mr. Bell, Mr. Despins and Mr.
7 Eastlake were at Weil over the weekend before
8 the closing, what meetings did they participate
9 in, putting aside meetings with the Committee or
10 Houlihan?
11    A.  To reiterate my testimony, they spent
12 a lot of time waiting around, but I believe on
13 Saturday they participated in a meeting that
14 included a number of the key parties, including
15 Weil and representatives of Barclays, and
16 participated in a similar meeting late in the
17 day on Sunday.
18    Q.  Did they participate in any meetings
19 in which representatives of JPMorgan Chase were
20 present?
21    A.  I believe representatives of JPMorgan
22 Chase were present at at least one of those
23 meetings.
24    Q.  Did they participate in any meetings
25 at which representatives of the DTCC were

TSG Reporting - Worldwide    877-702-9580

Page 63

D. O'DONNELL

1  
2 present?
3    A.  I don't have specific recollection of
4 all of the parties in these meetings, but they
5 have been described as meetings including all
6 the key parties, so I'm assuming -- I won't
7 assume.  I don't know.
8    Q.  Describe for me, if you would, the
9 Saturday meeting.
10    A.  Our role was peripheral.  It occurred
11 I believe shortly after us being provided with
12 the draft of the Clarification Letter.  We had
13 many questions about the Clarification Letter
14 and were not in a position to participate
15 productively in the meeting.
16    Q.  Did the Milbank lawyers observe the
17 meeting?
18    A.  Yes.
19    Q.  Do you know how long it lasted?
20    A.  Not precisely, no.
21    Q.  Roughly?
22    A.  An hour or so.
23    Q.  And what were the topics discussed in
24 that Saturday meeting?
25    A.  The ongoing negotiations over the open

TSG Reporting - Worldwide    877-702-9580

Page 64

D. O'DONNELL

1  
2 issues relating to the transaction.
3    Q.  Do you know whether there were any
4 discussions in that meeting concerning the
5 treatment of the Barclays repo?
6    A.  To the extent that that is an issue
7 reflected in the Clarification Letter, yes.
8    Q.  Do you know whether there were any
9 discussions in that meeting concerning the
10 treatment of the clearance box assets?
11    A.  Same answer.
12    Q.  Do you know whether there were any
13 discussions in that meeting concerning the
14 treatment of the 15c3 assets?
15    A.  Same answer.
16    Q.  Do you know whether there were any
17 discussions in that meeting concerning the
18 treatment of exchange-traded derivatives?
19    A.  The same answer, with the
20 qualification that my level of familiarity with
21 the meeting is not a verbatim account, but my
22 general understanding is that it related to the
23 open issues, including the Clarification Letter.
24    Q.  Turning to the late Sunday meeting,
25 can you tell me what the topics of that meeting

TSG Reporting - Worldwide    877-702-9580

Page 65

D. O'DONNELL

1  
2 were?
3    A.  A continuation of the Saturday
4 meeting.
5    Q.  Do you know what, if any, discussions
6 took place at the late Sunday meeting concerning
7 the treatment of the Barclays repo?
8    A.  Not specifically, no.
9    Q.  Do you know whether there were any
10 discussions at the late Sunday meeting
11 concerning how LBI and JPMorgan would handle a
12 shortfall in delivery of securities under the
13 Barclays repo?
14    A.  Again, that was one of the issues
15 under discussion over the weekend.  Whether it
16 was specifically discussed in the Sunday or
17 Saturday meeting I cannot tell you.
18    Q.  It may have been, in other words?
19    A.  Your guess is --
20       MR. COHEN:  Objection.  Calls for
21 speculation.
22    Q.  Let me just -- is it your testimony
23 that that subject would have been discussed over
24 the weekend?
25    A.  It was -- it should have been

TSG Reporting - Worldwide    877-702-9580

Page 66

D. O'DONNELL

1    discussed over the weekend.
2        Q.    Do you know whether Milbank attended
3    any meetings either on Saturday or Sunday in
4    which that issue, namely, the delivery shortfall
5    under the Barclays repo, was discussed?
6        A.    Could you be more specific about the
7    issue you're alluding to?
8        Q.    Sure.  Was there any discussion over
9    the weekend -- withdrawn.  Did Milbank
10   participate in any discussion with Lehman
11   representatives or Barclays representatives or
12   JPMorgan representatives over that weekend
13   concerning a shortfall in delivery of securities
14   to Barclays under the Barclays repo estimated to
15   be worth roughly $7 billion?
16       A.    To the best of my recollection, the
17   only discussion I have knowledge of regarding
18   that subject was that with Mr. Klein, to which I
19   referred in my earlier testimony.
20       Q.    So in the discussion with Mr. Klein,
21   that issue of the $7 billion shortfall was
22   discussed?
23       A.    Yes.
24       Q.    And what was Milbank's understanding
25

TSG Reporting - Worldwide    877-702-9580

Page 67

D. O'DONNELL

1    concerning that shortfall?
2        MR. COHEN:  Based on -- is the
3    question limited to what did Mr. Klein tell
4    you?
5        Q.    Based on what you were told over that
6    weekend.
7        A.    Again, that was part of the
8    explanation of the numbers, as to which Houlihan
9    took the lead, and it was Houlihan -- Houlihan
10   would be the best party to address what the
11   explanation was and what we thought about it.
12       Q.    Looking at Exhibit 461, if you would,
13   the second page, you see in the upper left
14   corner there is a --
15       A.    Second page?
16       Q.    It should be the third page.
17       A.    Third page.
18       Q.    You see in the upper left-hand corner
19   there's a column labeled Collateral and a column
20   labeled Market Value?
21       MR. COHEN:  Is only the first page of
22   this exhibit Bates-numbered?
23       MR. STERN:  Correct, because the
24   remainder is a spreadsheet --
25

TSG Reporting - Worldwide    877-702-9580

Page 68

D. O'DONNELL

1        MR. COHEN:  Okay.
2        MR. STERN:  -- that was produced in
3    native format.
4        Q.    So let me come back to my question.
5    You see in the upper left-hand corner there's a
6    column labeled Collateral and a column labeled
7    Market Value?
8        A.    Correct.
9        Q.    And do you see there's a row just
10   before the Total row labeled TP Cash?
11       A.    I see the line to which you are
12   referring, yes.
13       Q.    Do you see there's a figure next to
14   that of $7 billion?
15       A.    I see the $7 billion number, yes.
16       Q.    Did Milbank have any understanding
17   concerning the relationship of that figure to
18   the delivery shortfall in the Barclays repo as
19   of the weekend?
20       MR. COHEN:  You can answer that yes or
21   no.
22       A.    No.
23       Q.    Do you know whether Houlihan did?
24       MR. COHEN:  You can answer that yes or
25

TSG Reporting - Worldwide    877-702-9580

Page 69

D. O'DONNELL

1    no.
2        A.    Yes.
3        Q.    Did Milbank -- did Houlihan have an
4    understanding of the relationship between that
5    figure and the shortfall in the delivery of
6    securities under the Barclays repo?
7        A.    It was an issue at which they were
8    looking.  Whether they had reached an
9    understanding at that point in time I cannot
10   tell you.
11       Q.    So you don't know?
12       A.    I don't know.
13       Q.    Did Milbank review these market value
14   figures when Milbank received this document?
15       A.    No.
16       Q.    Why not?
17       MR. TECCE:  Objection to the form of
18   the question.
19       MR. COHEN:  I'll also object to the
20   question.  It calls for work product, and
21   instruct the witness not to answer.
22       Q.    Going back to the late Sunday meeting
23   that you described, how late in the day was that
24   meeting?
25

TSG Reporting - Worldwide    877-702-9580

Page 70

D. O'DONNELL

1
2    A.   Are you referring to the meeting with
3    Mr. Klein?
4    Q.   No, I'm referring to the meeting with
5    a number of parties, including JPMorgan.
6    A.   I believe that meeting took place
7    shortly before the meeting with Mr. Klein.
8    Q.   So late in the evening or early
9    morning?
10    A.   Correct.
11    Q.   And do you know who attended that
12    meeting?
13    A.   Again, it's been described to me as a
14    meeting with all the key parties. I can't tell
15    you with specificity who was there.
16    Q.   And what discussion was there at that
17    meeting concerning the treatment of clearance
18    box assets?
19    A.   The meeting was a continuation of the
20    ongoing discussions, and based on my
21    understanding of what transpired there, that
22    issue may have been discussed, but I don't have
23    a specific recollection that it was.
24    Q.   Was the value of the clearance box
25    assets described to Milbank at any time over

TSG Reporting - Worldwide    877-702-9580

Page 71

D. O'DONNELL

1
2    that weekend?
3    A.   No.
4    Q.   Milbank was never given an estimate by
5    Lehman of the value of those assets?
6    A.   It was Houlihan who was asking those
7    questions, so if anyone received that
8    information, it was Houlihan.
9    Q.   And at the Sunday, this Sunday meeting
10    with all the key parties, was there any
11    discussion concerning the value of the
12    securities Barclays was receiving under the
13    Barclays Repurchase Agreement?
14    A.   I don't have any specific knowledge
15    that that issue was discussed specifically at
16    that meeting.
17    Q.   Was there any discussion concerning
18    how those securities would be treated under the
19    Clarification Letter?
20    MR. COHEN: Objection. Vague.
21    A.   No specific knowledge as to whether
22    that issue was discussed at that meeting.
23    Q.   Was there any discussion at that
24    meeting concerning the treatment of
25    exchange-traded derivatives?

TSG Reporting - Worldwide    877-702-9580

Page 72

D. O'DONNELL

1
2    A.   Same answer.
3    Q.   You don't know one way or the other?
4    A.   I have -- I don't have specific
5    knowledge that that issue was discussed at that
6    meeting.
7    Q.   It may have been, but you just don't
8    know, is that correct?
9    A.   Correct.
10    Q.   And was there any discussion at that
11    Sunday meeting concerning the treatment of the
12    15c3 assets?
13    A.   Same answer.
14    Q.   There may have been, but you don't
15    know?
16    A.   Correct.
17    Q.   When Mr. Bell reviewed whatever drafts
18    of the Clarification Letter he received, did he
19    ever communicate any comments to Lehman or
20    Barclays lawyers?
21    A.   He posed questions to Lehman and
22    Barclays lawyers.
23    Q.   Did he ever make any comments or
24    suggestions on the drafts?
25    A.   No.

TSG Reporting - Worldwide    877-702-9580

Page 73

D. O'DONNELL

1
2    Q.   What questions did he pose?
3    A.   A variety of questions about the
4    evolving draft.
5    Q.   Can you be more specific?
6    A.   Questions relating to the key issues
7    that had changed since the execution of the
8    original APA.
9    Q.   And what were those?
10    A.   The primary issue related to the
11    change, the changes in the definition of
12    "purchased assets."
13    Q.   Specifically, what were those changes
14    that he raised questions about?
15    A.   Without the document in front of me,
16    it's hard to be specific about precisely the
17    questions, what questions were asked.
18    Q.   Okay. Let's turn, then, to Exhibit
19    26. We can put 461 to the side, just to get it
20    out of your way.
21    MR. COHEN: Are we done with it?
22    MR. STERN: I think so.
23    Q.   Exhibit 26 is a document that was
24    marked in a previous deposition. It is a Notice
25    of Filing of Purchase Agreement, et cetera, and

TSG Reporting - Worldwide    877-702-9580

Page 74

D. O'DONNELL

1  it includes at Exhibit A, Asset Purchase
2  Agreement, dated September 16, 2008; Exhibit B,
3  First Amendment to the Asset Purchase Agreement
4  dated September 19, 2008; and Exhibit C,
5  Executed Clarification Letter Agreement, dated
6  September 20, 2008.
7      Let's turn to Exhibit C.
8      MR. COHEN: I think the record
9  misstated Exhibit A. It's dated September
10  16, 2008.
11      MR. STERN: I meant to say September
12  16.
13     Q.  Let's turn to Exhibit C. Do you
14  recognize this document?
15     A.  Yes.
16     Q.  Is this -- is this a document that
17  Milbank received on September 22, 2008?
18     A.  Yes.
19     Q.  When Milbank received this document,
20  did Milbank identify anything in the document
21  that was inconsistent with what the Court had
22  been told at the Approval Hearing on September
23  19 and did Milbank communicate that to Weil
24  Gotshal?

TSG Reporting - Worldwide    877-702-9580

Page 75

D. O'DONNELL

1      MR. COHEN: I would object to the
2  extent the question calls for anything other
3  than a communication to Weil Gotshal. And
4  it's compound.
5     Q.  Let me ask it this way, because you're
6  right, it is compound.
7      After Milbank received the
8  Clarification Letter on September 22, did
9  Milbank communicate to Weil Gotshal anything
10  that Milbank had identified as being
11  inconsistent with what the Court had been told
12  at the Sale Approval Hearing?
13     A.  No.
14     Q.  After Milbank received the
15  Clarification Letter on September 22, did
16  Milbank communicate to Weil that Milbank
17  believed that Committee consent would be
18  required?
19     A.  No.
20     Q.  Now, looking at the first page of the
21  Clarification Letter under the heading Purchased
22  Assets; Excluded Assets, I'm going to turn to
23  Section 1(a)(ii), and it reads: "with respect
24  to clauses (a), (d) and (e) of the definition of

TSG Reporting - Worldwide    877-702-9580

Page 76

D. O'DONNELL

1  'Purchased Assets' in the Original Agreement,
2  instead of the items referred to in such
3  clauses, (A) the securities owned by LBI and
4  transferred to Purchaser or its Affiliates under
5  the Barclays Repurchase Agreement (as defined
6  below) as specified on Schedule A previously
7  delivered by Seller and accepted by Purchaser;
8  (B) such securities and other assets held in
9  LBI's 'clearance boxes' as of the time of the
10  Closing, which at the close of business on
11  September 21, 2008 were as specified on Schedule
12  B previously delivered by Seller and accepted by
13  Purchaser (provided, however, that Purchaser in
14  its discretion may elect within 60 days after
15  the Closing to return any such securities to
16  LBI); provided, that no securities owned by LBHI
17  or any Subsidiary of LBHI (other than LBI and
18  other than as specified in the Agreement or
19  clause (iii) below) are Purchased Assets,"
20  capital P, capital A, "and (C) exchange-traded
21  derivatives (and any property that may be held
22  to secure obligations under such derivatives)
23  and collateralized short-term agreements."
24      With that section that I just read in

TSG Reporting - Worldwide    877-702-9580

Page 77

D. O'DONNELL

1  mind, can you tell me whether any of the issues
2  reflected here were discussed at the late Sunday
3  meeting among the key parties at Weil Gotshal?
4      MR. COHEN: Objection. Vague.
5     A.  No, I cannot tell you specifically
6  that this specific paragraph of the
7  Clarification Letter was discussed at that
8  meeting.
9     Q.  You don't know one way or the other?
10     A.  Correct.
11     Q.  Okay. It may have been, but you
12  simply don't know, correct?
13     A.  Correct.
14     Q.  The paragraph I read has three
15  subsections, A, B and C, describing different
16  categories of assets. With respect to the first
17  category, Category A, the securities transferred
18  under the Barclays repo, did Milbank have as of
19  September 22 an estimate of the value of those
20  securities?
21      MR. COHEN: You can answer that yes or
22  no.
23     A.  Yes.
24     Q.  And what was the -- what was that

TSG Reporting - Worldwide    877-702-9580

Page 78

D. O'DONNELL

1  estimate?
2  MR. COHEN: To the extent that that
3  estimate came from the Committee's financial
4  advisors, do not disclose that. If the
5  estimate came from the Debtors or Barclays
6  or some public source, you can disclose it.
7  A.  As of September 22, Milbank had the
8  draft Schedule A that had been provided over the
9  weekend, and Houlihan had been diligencing that
10  schedule but had not reached conclusions as to
11  the validity of the numbers in that schedule.
12  Q.  That's Schedule 461?
13  A.  Correct.
14  Q.  That's Exhibit 461B?
15  A.  Correct.
16  Q.  With respect to Category B, the
17  clearance box assets, did Milbank as of
18  September 22 have an estimate of the value of
19  those assets?
20  MR. COHEN: You can answer that yes or
21  no.
22  A.  Yes.
23  Q.  What was that estimate?
24  MR. COHEN: Same caveat. To the

TSG Reporting - Worldwide    877-702-9580

Page 79

D. O'DONNELL

1  extent it came from the Debtors, Barclays or
2  some non-privileged source, you can disclose
3  it. To the extent it came from Houlihan or
4  one of the Committee's financial advisors,
5  I'll instruct you not to answer.
6  A.  It was $1.9 billion.
7  Q.  And with respect to Category C,
8  exchange-traded derivatives and any property
9  that may be held to secure obligations under
10  such derivatives, as of September 22, did
11  Milbank have an estimate of the value of those
12  assets?
13  MR. COHEN: You can answer that yes or
14  no.
15  A.  Yes.
16  Q.  And what was that estimate?
17  MR. COHEN: To the extent that it came
18  from a privileged source, I'll instruct you
19  not to answer. If it came from a
20  non-privileged source, you can answer.
21  A.  I don't have a specific recollection
22  of what that number was.
23  Q.  Do you know whether either Barclays or
24  Lehman did provide an estimate concerning the

TSG Reporting - Worldwide    877-702-9580

Page 80

D. O'DONNELL

1  value of exchange-traded derivatives and any
2  property held to secure those derivatives as of
3  September 22?
4  A.  Yes, I believe they did.
5  Q.  Do you have any recollection of the
6  rough order of magnitude that you were given?
7  A.  I don't have a specific recollection
8  at this point.
9  Q.  Do you have a -- do you have a
10  recollection of whether it was in excess of $1
11  billion?
12  A.  My vague recollection is that it was
13  less than that.
14  Q.  Do you remember whether it was less
15  than a billion, or are you not sure?
16  A.  I'm not sure.
17  Q.  And do you know who gave you that
18  estimate? Withdrawn.
19  Do you know who gave Milbank that
20  estimate?
21  A.  Lehman.
22  Q.  Lehman. Do you know who from Lehman?
23  A.  No.
24  Q.  Do you know whether that estimate was

TSG Reporting - Worldwide    877-702-9580

Page 81

D. O'DONNELL

1  given to Barclays?
2  A.  I don't know.
3  Q.  Looking at page 4 under paragraph 8.
4  MR. COHEN: This is Tab C to Exhibit
5  26?
6  MR. STERN: Correct.
7  Q.  On page 4, paragraph 8 is labeled
8  Transfer of Customer Accounts. Do you see that?
9  A.  Yes, I do.
10  Q.  Okay. And I'll read it into the
11  record: "All customer accounts of LBI other
12  than customers who are affiliates of LBI shall
13  be transferred to purchaser. In connection
14  therewith, purchaser shall receive (1) for the
15  account of the customer any and all property of
16  any customer, including any held by or on behalf
17  of LBI, to secure the obligations of any
18  customer whose accounts are being transferred to
19  purchaser as part of the business and (2) to the
20  extent permitted by applicable law, and as soon
21  as practicable after the closing, $769 million
22  of securities as held by or on behalf of LBI on
23  the date hereof pursuant to Rule 15c3-3 of the
24  Securities Exchange Act of 1934, as amended, or

TSG Reporting - Worldwide    877-702-9580

21 (Pages 78 to 81)

Page 82

D. O'DONNELL

1
2  securities of substantially the same nature and
3  value. Liabilities arising under seller's
4  arrangements with DTC and its affiliated
5  clearing organizations shall be excluded
6  liabilities."
7      Now, with respect to the $769 million
8  figure in that paragraph, were there any
9  discussions concerning that amount —
10     MR. STERN: Let's go off the record
11 for a second.
12     (Discussion off the record.)
13     Q.   With respect to the $769 million
14 figure in that paragraph, were there any
15 discussions concerning that amount over the
16 weekend prior to the closing?
17     -  MR. COHEN: You can answer that yes or
18 no.
19     A.   Yes.
20     Q.   And what were those discussions?
21     MR. COHEN: You can answer that to the
22 extent that there were discussions with
23 people outside the privilege, meaning the
24 Committee, its professionals and advisors,
25 but to the extent that there were

TSG Reporting - Worldwide    877-702-9580

Page 83

D. O'DONNELL

1
2  discussions among that group, I'll instruct
3  you not to answer.
4      A.   Yes, there were discussions with the
5  Debtors concerning that issue over the weekend.
6      Q.   Okay. And what were those
7  discussions?
8      A.   To the best of my recollection, they
9  related to what portion of that $769 million
10 would go to Barclays and what portion would stay
11 with LBI.
12     Q.   Who participated in those discussions?
13     A.   I'm aware of discussions on that topic
14 between Luc Despins and Harvey Miller.
15     Q.   And in those discussions was there any
16 reference to the total amount of 15c3 assets
17 available for transfer?
18     A.   I don't have any specific recollection
19 as to that issue.
20     Q.   Do you know whether the amount of 15c3
21 assets believed at the time to be available for
22 transfer was greater than $769 million?
23     MR. COHEN: You can answer that yes or
24 no.
25     A.   I think I should qualify my last

TSG Reporting - Worldwide    877-702-9580

Page 84

D. O'DONNELL

1
2  answer and this answer by saying that I know the
3  issue of the amount of the 15c3 deposits and how
4  they would be divvied up was discussed. I'm not
5  sure of the precise numbers at issue. I don't
6  know whether the 769 is the total number or the
7  number that was allocated to Barclays.
8      Q.   Okay. But there were discussions
9  between Mr. Despins and Mr. Miller concerning
10 that issue?
11     A.   Correct.
12     Q.   And do you know what was discussed
13 in -- between Mr. Despins and Mr. Miller on that
14 subject?
15     A.   That it was an open issue, subject to
16 ongoing negotiation, and Mr. Despins asked Mr.
17 Miller for a report as to the outcome of those
18 negotiations.
19     Q.   Going back to page 2 at the top, we
20 referred to that Category C, exchange-traded
21 derivatives and any property that may be held to
22 secure obligations under such derivatives, is
23 it -- is it your recollection that, separate and
24 apart from the 15c3 assets, you had an
25 estimate -- Milbank received an estimate from

TSG Reporting - Worldwide    877-702-9580

Page 85

D. O'DONNELL

1
2  Lehman of the value of the exchange-traded
3  derivatives and any property that may be held to
4  secure those derivatives?
5      MR. COHEN: Objection. Vague.
6      A.   An estimate from whom?
7      Q.   From Lehman.
8      A.   I don't have a clear recollection one
9  way or the other. The numbers in this paragraph
10 overlap in my recollection, so I can't
11 definitively tell you that we did receive an
12 estimate as to Category C prior to the closing.
13     Q.   So the value of Category C may have
14 been, may have been uncertain as of that time?
15     A.   Much --
16     MR. COHEN: Objection. Calls for
17 speculation.
18     A.   Much was uncertain as of this time
19 from our perspective and from Houlihan's
20 perspective.
21     Q.   And do you know whether much was
22 uncertain from Barclays' perspective?
23     MR. COHEN: Objection. Calls for
24 speculation.
25     A.   I have no idea what was in Barclays'

TSG Reporting - Worldwide    877-702-9580

Page 86

D. O'DONNELL

1  mind.
2  Q.   Did Barclays ever express to you that
3  much was uncertain to Barclays?
4  A.   Our dealings with Barclays that
5  weekend were very limited, and in that context,
6  no.
7  Q.   So staying with this paragraph that
8  runs from page 1 to page 2, Category A, I
9  believe you told me that the estimate that you
10 had for that category is the amount reflected on
11 Exhibit 461B, correct?
12     MR. COHEN: Objection.
13 A.   Correct.
14     MR. COHEN: I think that misstates the
15 testimony.
16 Q.   Let me ask my question again.
17     With respect to Category A, am I
18 correct that you told me that the estimate that
19 Milbank had for that category is the amount
20 reflected on Exhibit 461B; is that correct?
21 A.   The estimate that Milbank had was that
22 provided in the draft of Schedule A circulated
23 on Sunday, the 21st.
24 Q.   And that's Exhibit 461B?

TSG Reporting - Worldwide   877-702-9580

Page 87

D. O'DONNELL

1  A.   That appears to be the case, yes.
2  Q.   And if you look at the third page of
3  Exhibit 461B, you see that lists a total figure
4  of $49.9 billion?
5  A.   Correct.
6  Q.   Okay. And for Category B, looking
7  back to the Clarification Letter on page 1,
8  Category B, I believe you indicated the estimate
9  that Milbank had as of the closing was 1.9
10 billion; is that correct?
11 A.   Correct.
12 Q.   And for Category C, exchange-traded
13 derivatives and any property held to secure
14 those derivatives, that amount was uncertain, to
15 the best of your recollection; is that correct?
16 A.   Correct.
17     MR. STERN: Let's take a short break.
18     THE VIDEOGRAPHER: The time is now
19 11:48 A.M. We're now off the record.
20     (Recess.)
21     THE VIDEOGRAPHER: The time is now
22 12:04 P.M. We are now back on the record.
23 BY MR. STERN:
24 Q.   Let's look back at Exhibit 26, Tab C,

TSG Reporting - Worldwide   877-702-9580

Page 88

D. O'DONNELL

1  page 5, please. Do you see on page 5 a
2  paragraph 13 labeled Barclays Repurchase
3  Agreement?
4  A.   Yes, I see that paragraph.
5  Q.   Going back to the meetings over the
6  weekend at Weil among the key parties, do you
7  know whether the subject matter of this
8  paragraph was discussed in those meetings that
9  Milbank attended?
10     MR. COHEN: The non-privileged
11 meetings?
12     MR. STERN: Yes.
13 A.   As previously testified, with respect
14 to other parts of this letter, no, I don't know,
15 whether this specific paragraph was discussed in
16 those meetings.
17 Q.   Do you have any reason to believe that
18 it was not discussed at those meetings?
19 A.   I have no reason to believe that it
20 was not discussed.
21     (Exhibit 499, a document bearing Bates
22 Nos. WGM-LEHMAN-E 00002746 through 2766,
23 marked for identification, as of this date.)
24 Q.   We've handed you a document that we've

TSG Reporting - Worldwide   877-702-9580

Page 89

D. O'DONNELL

1  marked as Exhibit 499, and I'll ask you to take
2  a look at it and identify it for us, if you
3  would.
4     (Document review.)?
5  A.   I've reviewed the document.
6  Q.   Can you tell us what it is?
7  A.   It appears to be an e-mail forwarding
8  to Crayton Bell a draft of the Clarification
9  Letter on 9/19/2008.
10 Q.   Let me mark another document as the
11 next exhibit, and I'll ask you to review that
12 and identify that for me as well.
13     (Exhibit 500, a document bearing
14 HLHZ0020162 through 182, marked for
15 identification, as of this date.)
16     MR. COHEN: Is this Exhibit 500?
17     MR. STERN: Yes.
18     MR. COHEN: I'll note for the record
19 Exhibit 500 appears to be three documents
20 clipped together.
21     MR. STERN: They should be stapled
22 together. It's all a part of one document.
23 We'll staple the exhibit.
24     (Document review.)

TSG Reporting - Worldwide   877-702-9580

Page 90

D. O'DONNELL

1     A.  I've reviewed the document.
2     Q.  What is it?
3     A.  It appears to be another draft of the
4 Clarification Letter forwarded to Crayton Bell
5 on Saturday afternoon, September 20.
6      (Exhibit 501, a document bearing Bates
7 Nos. WGM-LEHMAN-E 00013962 through 13982,
8 marked for identification, as of this date.)
9     Q.  We're marking another exhibit Exhibit
10 501, and I'll ask you the same question after
11 you have a chance to review it.
12      (Document review.)
13     A.  I've reviewed the document.
14     Q.  Do you know what it is?
15     A.  It appears to be an e-mail attaching
16 yet another draft of the Clarification Letter
17 forwarded by Bob Messineo to David Murgio on
18 Sunday -- on Sunday, September 21, at 12:39 P.M.
19     Q.  Okay. At the top, there's an
20 instruction from David Murgio to Ann Peterson at
21 Weil: "Please print and copy 15 of each of
22 these and hold by your desk. Thanks."
23      Do you know whether, while Mr. Bell
24 was at Weil on September 21, he received a copy
25    TSG Reporting - Worldwide   877-702-9580

Page 91

D. O'DONNELL

1 of the drafts that we marked as Exhibit 501?
2     A.  I do not know whether Mr. Bell
3 received a copy of this draft.
4     Q.  He may have, but you simply don't
5 know?
6     A.  Correct.
7     Q.  Okay.
8      (Exhibit 502, a document bearing Bates
9 Nos. WGM-LEHMAN-E 00013889 through 13899,
10 marked for identification, as of this date.)
11     Q.  We've marked another document as
12 Exhibit 502. I'll ask you to take a look at it
13 and then I'll ask you to identify it.
14      (Document review.)
15     A.  I've reviewed the document.
16     Q.  Can you identify it?
17     A.  It appears to be an e-mail from David
18 Leinwand at Cleary Gottlieb circulating another
19 draft of the Clarification Letter at 9:23 A.M.
20 on September 21.
21     Q.  And at the top, there's an instruction
22 again from David Murgio to Ann Peterson:
23 "Please print and staple ten of these."
24      Do you know whether, while Mr. Bell
25    TSG Reporting - Worldwide   877-702-9580

Page 92

D. O'DONNELL

1 was present at Weil on September 21, he received
2 a copy of this material that we've marked as
3 Exhibit 502?
4     A.  I do not know.
5     Q.  You don't know one way or the other?
6     A.  Correct.
7     Q.  So it's possible that he did, but you
8 don't know?
9     A.  Correct.
10      (Exhibit 503, a document bearing
11 Bates Nos. HLHZ0019919 through 19930, marked
12 for identification, as of this date.)
13     Q.  We've marked another document as
14 Exhibit 503, and I'll ask you to review this and
15 identify it for us.
16      (Document review.)
17     A.  I've reviewed the document.
18     Q.  And what is it?
19     A.  It appears to be an e-mail from David
20 Murgio attaching, I believe, though it's hard to
21 tell from the form of e-mail, the -- the -- a
22 copy of what purports to be the final version of
23 the Clarification Letter.
24     Q.  Before the closing on September 22,
25    TSG Reporting - Worldwide   877-702-9580

Page 93

D. O'DONNELL

1 did Mr. Bell or anybody from Milbank suggest to
2 Weil that the final agreements should include
3 valuation conditions for the purchased assets
4 and assumed liabilities?
5     A.  No.
6     Q.  Before the closing on September 2,
7 did -- I'm sorry, before the closing on
8 September 22, did Mr. Bell or anyone from
9 Milbank suggest to Weil that the final agreement
10 should include a cap on the value of purchased
11 assets?
12     A.  No.
13     Q.  Before the closing on September 22,
14 did Mr. Bell or anybody else from Milbank
15 suggest to Weil that the final agreement should
16 include a floor or limit or cap on the value of
17 assumed liabilities?
18     A.  No.
19     Q.  Before the closing on September 22,
20 did Mr. Bell or anybody else from Milbank
21 suggest to Weil that the final agreement -- the
22 final agreement should include representations
23 and warranties concerning the value of purchased
24 assets and the value of the consideration under
25    TSG Reporting - Worldwide   877-702-9580

Page 94

D. O'DONNELL

1
2  the final agreement?
3      A.  No.
4      Q.  And before the closing on September
5  22, did Mr. Bell or anybody else from Milbank
6  suggest to Weil that the final agreement should
7  include true-up provisions with respect to the
8  value of the purchased assets or the value of
9  the consideration under the final agreement?
10     A.  No.
11     Q.  Now, when Weil made a motion for
12  approval of the sale, did Milbank review the
13  Weil Gotshal motion?
14     A.  Can you be more specific about the
15  motion you're referring to?
16     Q.  I'll hand you what has previously been
17  marked as Exhibit 440. I've handed you what has
18  previously been marked as Exhibit 440, and this
19  is Debtors' Motion to (A) Schedule a Sale
20  Hearing; (B) Establish Sales Procedures; (C)
21  Approve a Breakup Fee; and (D) Approve the Sale
22  of the Purchased Assets and the Assumption and
23  Assignment of Contracts Relating to the
24  Purchased Assets. Do you see that?
25     A.  Yes, I do.

Page 95

D. O'DONNELL

1
2      Q.  Did Milbank review these papers at the
3  time they were served?
4      A.  Yes, it did.
5      Q.  What understanding did Milbank have at
6  the time concerning the extent of Barclays'
7  obligation under the original APA to make cure
8  payments?
9      MR. TECCE:  Objection.
10     MR. COHEN:  I object to the extent
11  that the question calls for legal advice,
12  privileged communications and attorney work
13  product, and instruct Mr. O'Donnell not to
14  answer with respect to those areas.
15     If you have an understanding from a
16  non-privileged source, you can speak to
17  that.
18     A.  Based on the representations made by
19  the Debtors at both the bidding procedures and
20  the Sale Hearing, we understood that the APA
21  required Barclays to make certain cure and
22  compensation payments.
23     Q.  Was it Milbank's understanding that
24  Barclays had the right, but not the obligation,
25  to take assignment of contracts and leases which

Page 96

D. O'DONNELL

1
2  are -- were designated for assumption and
3  assignment by the -- by Barclays?
4      MR. COHEN:  I'll instruct Mr.
5  O'Donnell to limit his answer to
6  non-privileged sources and not reveal
7  privileged communications or attorney work
8  product in his response.
9      A.  Based on representations at the
10  hearing on the 19th and the terms of the Sale
11  Order itself, yes, that was our understanding.
12     Q.  Did Milbank understand that there
13  would be certain filings made in connection with
14  cure amounts for what were labeled Closing Date
15  Contracts?
16     MR. COHEN:  Hold for a second.
17     Give the same limitation. Mr.
18  O'Donnell can reveal understandings that
19  Milbank may have received from
20  non-privileged sources, but internal
21  communications and attorney work product
22  should not be revealed in your answer.
23     A.  Yes, I believe that there was a
24  procedure originally prescribed in the motion
25  that was superseded by discussions amongst

Page 97

D. O'DONNELL

1
2  parties on the 19th as disclosed to the Court by
3  Mr. Miller or Ms. Fife.
4      Q.  Do you know whether — withdrawn. Did
5  Milbank review the filing that was made with
6  respect to closing date contracts when that
7  filing was made?
8      MR. COHEN:  You can answer that yes or
9  no.
10     A.  I need clarification as to what
11  specific filing you're referring to.
12     Q.  Do you know whether a filing was made
13  before the Sale Approval Hearing identifying
14  Closing Date Contracts that Barclays would
15  assume?
16     A.  Yes, I believe that there was one.
17     Q.  Did Milbank review that filing?
18     MR. COHEN:  You can answer that yes or
19  no.
20     A.  Yes.
21     Q.  Okay. Did that filing list cure
22  amounts for the Closing Date Contracts?
23     MR. COHEN:  Objection. The document
24  speaks for itself. If you have a
25  recollection as to what was in that

Page 98

1           D. O'DONNELL
2    document, you can answer yes or no.
3    A.    Yes, it did list cure amounts.
4    Q.    Did Milbank add up those amounts?
5           MR. COHEN: Instruct the witness not
6    to answer. It's attorney work product.
7    Q.    Was Milbank aware of the total amount
8    of those listed cure amounts?
9           MR. TECCE: Same objection. To the
10   extent that it comes from a non-privileged
11   source, you can answer.
12   A.    Based upon representations made at the
13   hearing by Mr. Miller, yes.
14   Q.    Do you recall the total amount of the
15   cure payments for the Closing Date Contracts
16   that were listed on the filing that was made
17   before the Sale Approval Hearing?
18          MR. COHEN: So the question is do you
19   remember the number in a publicly filed
20   motion?
21          MR. STERN: Yes.
22          MR. COHEN: Object to the form.
23   A.    I don't remember, one, whether there
24   was a total number listed; and, if there was, I
25   don't remember what it was.
     TSG Reporting - Worldwide    877-702-9580

Page 99

1           D. O'DONNELL
2    Q.    Assuming that there was no total
3    number listed, did Milbank do anything to add up
4    the amounts that were listed?
5           MR. COHEN: Instruct the witness not
6    to answer on the basis of work product.
7    Q.    Is that something Milbank could have
8    done at the time?
9           MR. COHEN: You can answer that yes or
10   no.
11   A.    Yes.
12   Q.    Did Milbank have an understanding
13   that, within 60 days of the closing, there would
14   be a further filing with respect to designated
15   contracts and proposed cure amounts for those
16   contracts?
17          MR. COHEN: I instruct the witness to
18   limit his response as to Milbank's
19   understanding to any understanding it
20   received from non-privileged sources.
21   A.    Yes.
22   Q.    And did Milbank review that filing
23   when it was made?
24          MR. COHEN: You can answer yes or no.
25   A.    Yes.
     TSG Reporting - Worldwide    877-702-9580

Page 100

1           D. O'DONNELL
2    Q.    And did Milbank total the cure amounts
3    that were listed in that filing?
4           MR. COHEN: I instruct the witness not
5    to answer on the basis of attorney work
6    product.
7    Q.    Is that something Milbank could have
8    done?
9           MR. COHEN: You can answer yes or no.
10   A.    Yes.
11   Q.    As of the Sale Hearing, did Milbank
12   understand that Barclays was assuming certain
13   obligations to pay certain employee benefits and
14   compensation?
15          MR. COHEN: Instruct the witness to
16   limit his response as to Milbank's
17   understanding to any understanding it
18   received from non-privileged sources.
19   A.    Yes.
20   Q.    Based on Milbank's review of the
21   original APA, did Milbank understand that the
22   amount of Barclays' compensation obligation
23   would depend on the number of transferred
24   employees taking employment with Barclays?
25          MR. COHEN: I instruct the witness not
     TSG Reporting - Worldwide    877-702-9580

Page 101

1           D. O'DONNELL
2    to answer on the basis of attorney work
3    product.
4    Q.    After the closing on September 22, was
5    Milbank aware of the deadline by which the
6    Committee would need to make any motion for
7    reconsideration of the Sale Order?
8           MR. COHEN: Objection. Calls for a
9    legal conclusion.
10   A.    Yes.
11   Q.    And what was that deadline?
12          MR. COHEN: Objection. Calls for a
13   legal conclusion.
14   A.    Pursuant to the rules, it would have
15   been ten days after entry of the order.
16   Q.    Was Milbank aware after the closing or
17   did Milbank monitor what the final deadline
18   would be for appealing the Sale Order?
19          MR. COHEN: Objection. I instruct the
20   witness not to answer on the basis of
21   attorney work product.
22   Q.    Was Milbank aware that a motion for
23   reconsideration of the Sale Order had been made?
24          MR. COHEN: You can answer yes or no.
25   A.    Yes.
     TSG Reporting - Worldwide    877-702-9580

Page 102

1          D. O'DONNELL
2      Q.   And was Milbank aware of how that
3  affected the time for which parties would have to
4  appeal the Sale Order?
5          MR. COHEN:  I instruct the witness not
6      to answer on the basis of attorney work
7      product.
8      Q.   Am I correct that the Committee did
9  not object to approval of the sale transaction
10  at the September 19 Sale Approval Hearing?
11          MR. COHEN:  You can answer yes or no.
12      A.   Yes.
13      Q.   What factors did the Committee
14  consider in deciding not to object?
15          MR. COHEN:  I instruct the witness not
16      to answer on the basis of attorney-client
17      privilege and attorney work product.
18      Q.   Am I correct that the Committee did
19  not make a motion for reconsideration of the
20  Sale Approval Order?
21          MR. COHEN:  You can answer yes or no.
22      A.   Yes.
23      Q.   What factors did the Committee take
24  into consideration in determining whether or not
25  to make such a motion?
        TSG Reporting - Worldwide    877-702-9580

Page 103

1          D. O'DONNELL
2          MR. COHEN:  I instruct the witness not
3      to answer on the basis of attorney-client
4      privilege and attorney work product.
5      Q.   Am I correct that the Committee did
6  not appeal the Sale Approval Order?
7          MR. COHEN:  You can answer yes or no.
8      A.   Yes.
9      Q.   What factors did the Committee take
10  into consideration in deciding not to appeal the
11  Sale Approval Order?
12          MR. COHEN:  I instruct the witness not
13      to answer on the basis of attorney-client
14      privilege and attorney work product.
15      (Discussion off the record.)
16          THE VIDEOGRAPHER:  That is the end of
17      tape number 2.  The time is 12:34 P.M.
18      We're now off the record.
19      (Luncheon recess.)
20
21
22
23
24
25
        TSG Reporting - Worldwide    877-702-9580

Page 104

1          D. O'DONNELL
2          AFTERNOON SESSION
3          THE VIDEOGRAPHER:  This is the start
4      of tape number 3.  The time is now 1:20 P.M.
5      We are now back on the record.
6  DENNIS C. O'DONNELL, resumed and
7      testified as follows:
8  EXAMINATION BY (Cont'd.)
9  BY MR. STERN:
10      Q.   I'd like to go back to September 22
11  after Milbank had received the Final Purchase
12  Agreement.
13          At that point did Milbank have any
14  certainty concerning the value of the purchased
15  assets in the Final Purchase Agreement?
16      A.   No.
17          MR. TECCE:  Objection to the form of
18      the question to the extent that it asks him
19      to reveal privileged information or work
20      product.
21      Q.   At that point, did Milbank have any
22  certainty concerning the value of the
23  consideration, including assumed liabilities, in
24  the Final Purchase Agreement?
25      A.   No.
        TSG Reporting - Worldwide    877-702-9580

Page 105

1          D. O'DONNELL
2      Q.   At that point did Milbank have any
3  certainty concerning whether the value of the
4  consideration, including purchased assets, was
5  perfectly balanced with or a wash with the value
6  of purchased assets?
7      A.   No.
8      Q.   Did Milbank believe at that point,
9  that is, September 22, after receiving the Final
10  Purchase Agreement, that there was a certain cap
11  on the value of the purchased assets in the
12  Final Purchase Agreement?
13          MR. COHEN:  Objection.  I instruct the
14      witness not to answer.  Calls for legal
15      advice and attorney work product.
16      Q.   Did Milbank believe upon receiving the
17  Final Purchase Agreement that there was a $47.4
18  billion cap on the value of purchased assets in
19  the Final Purchase Agreement?
20          MR. COHEN:  Instruct the witness not
21      to answer.  Calls for privileged
22      communications and attorney work product.
23      Q.   When Milbank received the Final
24  Purchase Agreement on September 22, did Milbank
25  have any concern that the agreement had not been
        TSG Reporting - Worldwide    877-702-9580

Page 106

D. O'DONNELL

1
2  authorized by the Court?
3      MR. COHEN: Instruct the witness not
4  answer. Calls for privileged communications
5  and attorney work product.
6      Q.    Did Milbank ever express to Weil after
7  receiving the Final Purchase Agreement on
8  September 22 a concern that the Final Purchase
9  Agreement had not been authorized by the Court?
10     A.    In what time period?
11     Q.    In the period September 22 through
12  September 30.
13     A.    No.
14     Q.    And on September 22 itself, upon
15  receiving the Final Purchase Agreement, Milbank
16  did not express any concern to Weil that the
17  Final Purchase Agreement had not been authorized
18  by the Court; is that right?
19     A.    Correct.
20     Q.    As of receiving the Final Purchase --
21  withdrawn. As of September 22, upon receiving
22  the Final Purchase Agreement, did Milbank ever
23  express any concern to Weil that the transaction
24  as reflected in the Final Purchase Agreement was
25  not a wash?

TSG Reporting - Worldwide    877-702-9580

Page 107

D. O'DONNELL

1
2      A.    Milbank repeated requests for access
3  to the final schedules to address that amongst
4  other issues.
5      Q.    The final schedules are those for
6  Schedule A and Schedule B?
7      A.    Correct.
8      Q.    Based on the estimated values that
9  Milbank had as of that time, as of September 22,
10  for Schedule A and Schedule B assets, based on
11  that information, did Milbank ever say to Weil
12  that Milbank was concerned that the transaction
13  was not a wash?
14     MR. COHEN: Objection. Vague as to
15  "estimated values."
16     A.    Houlihan continued to review the
17  schedules, had raised questions about the
18  schedules. We had passed on to Weil our
19  concerns and questions about the schedules.
20     Q.    Did anybody from Milbank ever say to
21  anybody at Weil on September 22 that Milbank was
22  concerned that the Final Purchase Agreement did
23  not reflect a balanced transaction or a wash?
24     MR. COHEN: Object to the form.
25     A.    Milbank had questions and raised those

TSG Reporting - Worldwide    877-702-9580

Page 108

D. O'DONNELL

1
2  questions with Weil.
3      Q.    Did anybody from Milbank ever say to
4  anybody at Weil on September 22 that Milbank was
5  concerned that the Final Purchase Agreement did
6  not reflect a balanced transaction or a wash?
7      MR. COHEN: Objection. Asked and
8  answered. Object to the form.
9      A.    As previously testified, Milbank had
10  concerns and was asking questions about, amongst
11  others, those issues.
12     Q.    Who expressed those concerns on behalf
13  of Milbank?
14     A.    Timeframe?
15     Q.    September 22.
16     A.    On September 22, Crayton Bell
17  specifically asked for the final schedules.
18     Q.    Aside from asking for the final
19  schedules, did Crayton Bell or anybody else from
20  Milbank express to Weil a concern that the Final
21  Purchase Agreement did not reflect a balanced
22  transaction or a wash?
23     A.    Are we talking about after the closing
24  or prior to the closing?
25     Q.    On September 22.

TSG Reporting - Worldwide    877-702-9580

Page 109

D. O'DONNELL

1
2      A.    The discussions with Weil on the
3  morning of the 22nd that arose out of the review
4  of the schedules may have alluded to that
5  concern.
6      Q.    Do you know whether they did?
7      A.    Not in the precise terms that you've
8  framed the question.
9      Q.    Did Milbank believe as of September 22
10  that the final transaction was supposed to be a
11  balanced transaction or a wash between purchased
12  assets and consideration?
13     MR. COHEN: You can answer that to the
14  extent you have a non-privileged source that
15  would reflect Milbank's belief or would have
16  informed Milbank's belief.
17     A.    Yes.
18     Q.    What steps did Milbank take before the
19  closing to assure that the Final Purchase
20  Agreement would actually reflect a balanced
21  transaction between purchased assets and
22  consideration?
23     MR. COHEN: Instruct the witness not
24  to answer on the basis of attorney-client
25  privilege and attorney work product.

TSG Reporting - Worldwide    877-702-9580

Page 110

D. O'DONNELL

1
2    Q.    What steps did Milbank take in
3    communicating with Weil Gotshal to assure that
4    the Final Purchase Agreement would actually
5    reflect a balanced transaction?
6        A.    As previously testified, Milbank, in
7    conjunction with Houlihan, requested information
8    relating to Schedule A.
9        Q.    Aside from requesting information, did
10    Milbank ever do anything to suggest that the
11    Final Purchase Agreement reflect a balanced
12    transaction?
13        MR. COHEN:  I'll instruct the witness
14    to limit his response to non-privileged
15    communications or actions.
16        A.    Milbank reported to Weil that Houlihan
17    could not get comfortable with the numbers as
18    reflected in the draft of the Schedule A that
19    they had reviewed.
20        Q.    What does that have to do with Milbank
21    suggesting changes to the Final Purchase
22    Agreement to assure that it would be a balanced
23    transaction?
24        MR. COHEN:  Object to the form.
25        A.    Can you repeat the question?

TSG Reporting - Worldwide    877-702-9580

Page 111

D. O'DONNELL

1
2    Q.    Did Milbank ever make any suggestions
3    to Weil concerning the need for representations
4    and warranties or valuation conditions for the
5    Final Purchase Agreement?
6        MR. COHEN:  Objection.  Asked and
7    answered.
8        A.    And the answer is no.
9        Q.    In the absence of those contractual
10    conditions, how could Milbank be assured that
11    the Final Purchase Agreement would provide for a
12    balanced transaction?
13        MR. COHEN:  Hold on for a second.
14        MR. TECCE:  I'm going to object to the
15    extent that his answer involves work product
16    or attorney-client communications.
17        MR. COHEN:  I'll join that objection
18    and add it calls for speculation.
19        A.    By recourse to Houlihan and the
20    evaluation of the numbers that Houlihan was
21    undertaking.
22        Q.    But I thought you told me those
23    figures were all uncertain at the time, isn't
24    that right?
25        A.    They were, yes.  Correct.

TSG Reporting - Worldwide    877-702-9580

Page 112

D. O'DONNELL

1
2    Q.    There was uncertainty concerning the
3    value of the purchased assets, correct?
4        A.    Correct.
5        Q.    There was uncertainty concerning the
6    value of the assumed liabilities, correct?
7        A.    Correct.
8        Q.    And Milbank had a transactional
9    lawyer, Crayton Bell, present at Weil before the
10    closing, correct?
11        A.    Correct.
12        Q.    And Mr. Bell was available to comment
13    on the Final Purchase Agreement, correct?
14        A.    Correct.
15        Q.    Mr. Bell knew that, in order to have a
16    balanced transaction, it is customary to provide
17    for representations and warranties and valuation
18    conditions, isn't that right?
19        MR. COHEN:  Objection.  Calls for
20    speculation.
21        A.    And I don't know what Mr. Bell knew in
22    that context.
23        Q.    He's a highly qualified transactional
24    lawyer, correct?
25        A.    He is, yes.

TSG Reporting - Worldwide    877-702-9580

Page 113

D. O'DONNELL

1
2    Q.    He's experienced, correct?
3        A.    Correct.
4        Q.    Do you know whether he's ever prepared
5    a purchase agreement providing for a balanced
6    transaction or a balance sheet transaction?
7        MR. TECCE:  Objection to the form of
8    the question.
9        A.    The answer is I don't know
10    specifically, but I assume that's the case, yes.
11        Q.    And do you know in those circumstances
12    whether Mr. Bell would know that representations
13    and warranties and valuation conditions were
14    essential in order to provide for a
15    contractually enforceable balanced transaction?
16        MR. COHEN:  Objection.  Calls for
17    legal conclusion and calls for speculation.
18        A.    And nothing about this transaction was
19    traditional or customary.  From the word go, it
20    was different.  So whatever his experience, you
21    know, his expectations or experiences were with
22    respect to other transactions would not
23    necessarily be applicable to this situation.
24        Q.    I see.  So it's your testimony that if
25    Mr. Bell knew from prior transactions that

TSG Reporting - Worldwide    877-702-9580

Page 114

D. O'DONNELL

1
2  representations and warranties and valuation
3  conditions were essential to create a balanced
4  transaction, he would not apply that experience
5  to this transaction?
6      MR. COHEN: Objection. Calls for a
7  hypothetical and speculation.
8  Q.  Is that your testimony?
9  A.  He might try.
10  Q.  Did he try?
11  A.  If given the opportunity, he might
12  have tried, yes.
13  Q.  Well, did he try?
14  A.  I don't know specifically whether he
15  raised those specific -- I think I've actually
16  already testified that he did not, he did not
17  make those suggestions.
18  Q.  And was the Committee concerned that
19  the transaction be a balanced transaction?
20      MR. TECCE: Objection to the form of
21  the question. I'll instruct the witness not
22  to answer on the grounds that it will
23  disclose attorney-client communications and
24  attorney work product.
25  Q.  Well, if the Committee genuinely

TSG Reporting - Worldwide    877-702-9580

Page 115

D. O'DONNELL

1
2  believed at the time that the transaction was to
3  be a balanced transaction, wouldn't Mr. Bell
4  have made those suggestions?
5      MR. COHEN: Objection. Calls for
6  speculation.
7  A.  If given the opportunity, he might
8  have.
9  Q.  When you say "given the opportunity,"
10  what do you mean?
11  A.  As previously testified, we, over the
12  course -- Milbank over the course of that
13  weekend spent a great deal of time waiting
14  around and seeking to participate in discussions
15  that were going on around us. We did not have
16  the opportunity to participate fully in the
17  negotiations that weekend.
18  Q.  Well, Mr. Bell did receive drafts of
19  the Clarification Letter, correct?
20  A.  We know that he received a draft on
21  Saturday afternoon, yes.
22  Q.  And he may have also received drafts
23  on Sunday?
24      MR. COHEN: Objection. Calls for
25  speculation.

TSG Reporting - Worldwide    877-702-9580

Page 116

D. O'DONNELL

1
2  Q.  Correct?
3  A.  It's possible that he received drafts
4  on Sunday afternoon, yes.
5  Q.  Didn't Mr. Bell have an opportunity to
6  make his suggestions directly to the Weil
7  lawyers?
8  A.  He engaged them in discussions, or
9  attempted to engage them in discussions, but
10  since we were not fully engaged in the
11  negotiation, it was difficult for us to comment
12  effectively on the document.
13  Q.  Was it essential to the Committee's
14  decision not to object to the transaction that
15  the transaction be a wash?
16      MR. COHEN: I instruct the witness not
17  to answer on the basis of attorney-client
18  privilege and attorney work product.
19  Q.  From September 22 through September
20  30, did anybody from Milbank ever discuss with
21  anybody from Weil whether it would be necessary
22  to return to Judge Peck to address any aspects
23  of the transaction?
24  A.  No.
25  Q.  Why not?

TSG Reporting - Worldwide    877-702-9580

Page 117

D. O'DONNELL

1
2      MR. COHEN: I instruct the witness not
3  to answer on the basis of attorney-client
4  privilege and attorney work product.
5  Q.  I'd like to turn back to Exhibit 26,
6  and I believe that you testified earlier that
7  much was uncertain concerning the value of
8  purchased assets; is that correct?
9  A.  Correct.
10  Q.  And to be more precise about that,
11  let's look at the APA, the original APA, under
12  Tab A, and specifically page 6. And on page 6
13  you see there's a definition of "purchased
14  assets"?
15  A.  I see that definition.
16  Q.  And it says, "'Purchased Assets' means
17  all of the assets of Seller and its Subsidiaries
18  used in connection with the Business (excluding
19  the Excluded Assets), including," and then it
20  lists Categories (a) through (s).  Do you see
21  that?
22  A.  Yes, I see that.
23  Q.  Did Milbank understand at the time
24  that the purchased assets could include assets
25  other than those specifically enumerated in

TSG Reporting - Worldwide    877-702-9580

Page 118

D. O'DONNELL

1  items (a) through (s)?
2      MR. COHEN: You can testify to the
3  extent that that understanding came from
4  non-privileged sources or means. To the
5  extent it comes from privileged sources or
6  analysis, I instruct you not to answer.
7  A.  Yes.
8      Q.  Let's go through these items (a)
9  through (s). Item (a), the retained cash, as of
10 the Sale Hearing, did Milbank have any
11 understanding as to what the amount of that
12 would be?
13     MR. COHEN: With respect to this line
14 of questioning, (a) through (s), I'll have a
15 standing instruction that you can testify as
16 to non-privileged sources of that
17 understanding, but privileged analysis or
18 sources I'll instruct you not to answer.
19     MR. STERN: Yeah, and the questions --
20     MR. COHEN: And that will apply
21 through (a) through (s).
22     Q.  Right, and the questions are intended
23 to ask about information derived from Lehman or
24 Barclays or from some other source other than a

TSG Reporting - Worldwide    877-702-9580

Page 119

D. O'DONNELL

1  privileged communication.
2      A.  Based on the terms of the document
3  itself, the answer is yes.
4      Q.  And what was that understanding?
5      A.  Retained cash is defined in the
6  document as an amount that is -- on page 2 of
7  the document, under Excluded Assets, to be all
8  cash, cash equivalents, bank deposits or similar
9  cash items of LBI and its subsidiaries other
10 than the $1.3 billion in cash, cash equivalents,
11 bank deposits.
12     Q.  So, as of the Sale Approval Hearing,
13 Milbank understood that the retained cash amount
14 was 1.3 billion?
15     A.  No, that's not my testimony.
16     Q.  Okay.  What is your testimony?
17     A.  It's all cash other than 1.3 billion.
18     Q.  I see.  And was this provision
19 ultimately removed in the Final Purchase
20 Agreement?
21     A.  Based on the terms of the
22 Clarification Letter, yes.
23     Q.  And that's something that Milbank
24 understood before the closing?

TSG Reporting - Worldwide    877-702-9580

Page 120

D. O'DONNELL

1      A.  Based on its review of the
2  Clarification Letter, yes.
3      Q.  Looking --
4      MR. COHEN:  Be careful in your
5  answers.  You should be revealing
6  non-privileged sources, not Milbank's
7  analysis of the documents and its work
8  product.
9      Q.  Okay.  Category (b), all deposits, et
10 cetera.  As of the closing, did Milbank have any
11 estimate of the value of this category of
12 purchased assets?
13     MR. COHEN:  You can testify to the
14 extent a non-privileged source provided
15 Milbank with an estimate.
16     A.  No.
17     Q.  So that was uncertain?
18     A.  Correct.
19     Q.  With respect to Category (c), the
20 transferred real property leases, did Milbank
21 receive from non-privileged sources an estimate
22 of the value of that category?
23     A.  No.
24     Q.  So that was uncertain as well?

TSG Reporting - Worldwide    877-702-9580

Page 121

D. O'DONNELL

1      A.  Correct.
2      Q.  Now, Category (d), was that ultimately
3  replaced in the Clarification Letter?
4      And we can look to the Clarification
5  Letter if you want, Tab (c), page 1.
6      MR. COHEN:  The documents are going to
7  speak for themselves.  The witness should
8  not be here interpreting the contracts on
9  the fly.
10     If you have an understanding from a
11 non-privileged source where a non-privileged
12 source told you that, you can repeat that
13 information.
14     The internal Milbank analysis I'll
15 instruct you not to answer, and you should
16 not be giving your own analysis here on the
17 record in real-time.
18     Q.  Let me see if I can simplify it.  Did,
19 upon receiving the Clarification Letter, Tab C,
20 did Milbank understand, based on Section
21 1(a)(ii) that clause (D) of the definition of
22 "purchased assets" was being replaced?
23     MR. COHEN:  Same instruction.
24     Do you understand the limitations?

TSG Reporting - Worldwide    877-702-9580

Page 122

D. O'DONNELL

2   A.  Other than as a result of privileged
3 communication or work product, no.
4   Q.  Okay. Let's turn to Category (e). As
5 of the Sale Hearing -- I'm sorry, let me turn
6 you back to Tab A, page 6. Tab A, page 6, item
7 (e), "50 percent of each position in the
8 residential real estate mortgage securities."
9 As of the Sale Approval Hearing, did Milbank
10 have an estimate of the value of that category
11 of purchased assets?
12   A.  Yes.
13   Q.  And what was that estimate?
14   A.  I believe it was $6 billion.
15   Q.  $6 billion in total or 50 --
16   A.  I believe it was $6 billion in total.
17   Q.  And so 50 percent would be 3 billion?
18   A.  Yes, based on representations made at
19 the hearing on the 19th.
20   Q.  Category (f), the furniture and
21 equipment, did Milbank have an estimated value
22 for that category?
23   A.  No.
24   Q.  (g), the purchased intellectual
25 property, did Milbank have an estimate of the

TSG Reporting - Worldwide    877-702-9580

Page 123

D. O'DONNELL

2 value of that category of purchased asset?
3   A.  No.
4   Q.  (h), the purchased contracts, did
5 Milbank have an estimate of the value of that
6 category of purchased asset?
7   A.  No.
8   Q.  Looking at item (q) on the next page,
9 all past and present goodwill and other
10 intangible assets, did Milbank have an estimate
11 of the value of that purchased asset?
12   A.  Yes.
13   Q.  And what was the estimate that Milbank
14 had of that?
15   A.  Based on representations made at the
16 hearing, Lehman was attributing a value of $250
17 million to the goodwill of LBI.
18   Q.  As to the intangible assets, did
19 Milbank ever receive an estimate of the value of
20 intangible assets?
21   A.  No.
22   Q.  So that was uncertain?
23   A.  Correct.
24   Q.  Let's turn to page 11 of the original
25 APA, and specifically on page 11, Section 2.3 on

TSG Reporting - Worldwide    877-702-9580

Page 124

D. O'DONNELL

2 assumption of liabilities, do you see that?
3   A.  Yes, I do.
4   Q.  It says, "On the terms and subject to
5 the conditions set forth in this Agreement, at
6 the Closing, Purchaser shall assume, effective
7 as of the closing, and shall timely perform and
8 discharge in accordance with their respective
9 terms, the following Liabilities of Seller and
10 its Subsidiaries (collectively, the 'Assumed
11 Liabilities')."
12     Looking at Category (a), "all
13 Liabilities of Seller incurred, after the
14 Closing, in connection with the Business," did
15 Milbank have an estimate of the amount of that
16 liability?
17   MR. COHEN: With respect to these
18 items, and if we go through all of the items
19 under 2.3, my instruction will be the same:
20 You can testify as to estimates
21 received from non-privileged sources, but
22 attorney work product or the Committee's
23 financial advisors, I will instruct you not
24 to answer as to their analysis and
25 information.

TSG Reporting - Worldwide    877-702-9580

Page 125

D. O'DONNELL

2   Q.  So as to category (a), did Lehman or
3 Barclays ever give you an estimate of that
4 category?
5   A.  No.
6   Q.  Okay. As to Category (b), "all
7 Liabilities of Seller under the Purchased
8 Contracts arising after...the date on which such
9 entity commenced a voluntary case or cases under
10 Chapter 11 or Chapter 7," did Lehman or Barclays
11 ever give you an estimate of the value of that
12 assumed liability?
13   A.  No.
14   Q.  Turning to item (d), "accounts payable
15 in the Ordinary Course of Business," et cetera,
16 did Lehman or Barclays ever give you an estimate
17 of the value of that assumed liability?
18   A.  No.
19   Q.  Okay. So that was uncertain?
20   A.  Correct.
21   Q.  Category (f), "all other Liabilities
22 to the extent related to the Business," et
23 cetera, did Lehman or Barclays ever give you an
24 estimate of that category of assumed liability?
25   A.  No.

TSG Reporting - Worldwide    877-702-9580

Page 126

D. O'DONNELL

1
2    Q.   To your knowledge, did Houlihan do any
3    work to estimate the value of the assumed
4    liabilities we just went over?
5    A.   You're referring to (a), (b) and (d)?
6    Q.   (a), (b) --
7    A.   (d).
8    Q.   -- (d), (f), (h).
9    MR. TECCE:  Caution the witness not to
10   reveal any attorney-client communications or
11   any attorney work product.
12   A.   No.
13   Q.   And going back to page 6, the
14   purchased assets, did Houlihan do any work, to
15   your knowledge, to estimate the value of the
16   purchased assets described in categories (b),
17   (c), (f), (g), (h) and (q)?
18   MR. TECCE:  Same instruction.
19   A.   Other than based on privileged
20   communications, I don't know.
21   Q.   Now, at some point after the closing,
22   am I right that Milbank did receive the final
23   versions of Schedule A and Schedule B?
24   A.   Yes, you're correct.
25   Q.   And did Milbank raise any concerns

TSG Reporting - Worldwide    877-702-9580

Page 127

D. O'DONNELL

1
2    about those schedules with Weil or with Barclays
3    representatives?
4    A.   Timeframe?
5    Q.   After the closing.
6    A.   Yes, Milbank did receive what
7    purported to be final versions of the schedules
8    on or about the 25th of September, forwarded
9    them to Barclays -- I mean to Houlihan, and
10   asked Houlihan to continue its diligence on
11   those documents, those schedules.
12   Q.   Do you know whether the Schedule A
13   that Milbank received on September 25 was
14   different from the spreadsheet that Milbank had
15   received over the weekend before the closing?
16   MR. COHEN:  Object to the form.
17   Q.   Or is that something that Houlihan
18   analyzed?
19   A.   That's something that Houlihan would
20   have analyzed.
21   Q.   Did Milbank ever express any concern
22   to Weil that the final schedules were different
23   from what had been described to Milbank over the
24   weekend before the closing?
25   MR. COHEN:  Objection.  Vague.

TSG Reporting - Worldwide    877-702-9580

Page 128

D. O'DONNELL

1
2    A.   Milbank did ultimately raise concerns
3    with Weil about the schedules and whether the
4    numbers accorded with their understanding of the
5    deal as presented over the weekend, yes.
6    Q.   Okay.  And what did Milbank say to
7    Weil in that regard?  What were the specific
8    concerns?
9    A.   Milbank ultimately conveyed to Weil
10   the concerns that had emerged from Houlihan's
11   analysis of the schedules.
12   Q.   And what were those concerns?
13   A.   That the numbers did not add up.
14   Q.   What numbers did not add up?
15   A.   That the amount of purchased assets
16   appeared to be larger than the amount
17   represented to the Committee and to the Court in
18   connection with approval of the transaction.
19   Q.   And did the schedules, the final
20   Schedules A and B, reflect values?
21   A.   Can you clarify your question?
22   Q.   Well, did the final Schedule A and the
23   final Schedule B contain -- reflect values for
24   the assets listed on those schedules?
25   A.   Can we refer to the -- strike that.

TSG Reporting - Worldwide    877-702-9580

Page 129

D. O'DONNELL

1
2    Q.   Do you know whether the final Schedule
3    A and final Schedule B had any type of value,
4    par value or otherwise?
5    A.   I believe it did have a par value
6    associated with each of the schedules.
7    Q.   Was Houlihan looking at the par value
8    when it raised its concern about the value of
9    the assets reflected on Schedules A and B?
10   MR. COHEN:  If you know.  It's beyond
11   the scope of the 30(b)(6).
12   MR. TECCE:  I'll also object to the
13   extent that it calls for work product.
14   A.   Houlihan had been directed to evaluate
15   the schedules, and Milbank was not apprized of
16   the specific methodology they were using to do
17   so.
18   Q.   Okay.  So when it comes to Houlihan's
19   analysis of the schedule, Milbank has no
20   non-privileged knowledge concerning that
21   analysis; is that right?
22   A.   That's correct.
23   Q.   I'll hand you what has previously been
24   marked as Exhibit 463B.  I'll ask you to take a
25   look at this, but my question will be whether

TSG Reporting - Worldwide    877-702-9580

Page 130

D. O'DONNELL

1
2  this is a document that Milbank ever received.
3      MR. COHEN: Is there a Bates-numbered
4  version of this document? What is the
5  source of it? It's not from your production.
6      MR. STERN: It's a -- it's a document
7  that was sent to certain Lehman people, so
8  it comes out of their e-mail, and it's also
9  a document we expect FTI to produce.
10      MR. COHEN: So does that mean it came
11  from the Lehman production?
12      MR. STERN: Off the record.
13      (Discussion off the record.)
14      MR. STERN: Let's go back on the
15  record.
16      MR. COHEN: Would you repeat your
17  question, please, or have the reporter read
18  it back?
19      MR. STERN: I don't think I've asked
20  it yet.
21      THE WITNESS: I'm still reviewing the
22  document.
23      Q.  After you review it, I just want to
24  ask you whether this is something Milbank ever
25  received.

TSG Reporting - Worldwide    877-702-9580

Page 131

D. O'DONNELL

1
2      MR. COHEN: I think that was the
3  question.
4      (Document review.)
5      A.  I have reviewed the document, and I
6  don't believe it is an e-mail that Milbank ever
7  received.
8      Q.  Do you know whether Milbank ever
9  received any part of this document?
10      A.  I believe that Milbank may have
11  received page 2 of the attachment.
12      Q.  The Footnote A?
13      A.  Correct.
14      Q.  Did Milbank have an understanding of
15  what that page represented?
16      MR. TECCE: Objection to the form of
17  the question.
18      Q.  Or would that have been Houlihan's
19  responsibility or FTI's responsibility?
20      A.  It would have been Houlihan or FTI's
21  responsibility.
22      Q.  At some point in October 2008, did
23  Milbank lawyers attend a presentation by Alvarez
24  & Marsal?
25      A.  You need to be more specific.

TSG Reporting - Worldwide    877-702-9580

Page 132

D. O'DONNELL

1
2      Q.  Let me give you a copy of a document
3  we've marked previously as Exhibit 464B. These
4  are pages from a presentation that Alvarez gave
5  to the Creditors Committee on October 8, 2008.
6      I'll ask you -- it includes a list of
7  subjects and then it includes certain pages from
8  the presentation, and after you review it, I
9  just want to ask if that is a presentation that
10  Milbank attended.
11      MR. COHEN: Is the exhibit the
12  truncated version of this document?
13      MR. STERN: Yes.
14      MR. COHEN: Do you have a copy of the
15  complete document if the witness needs to
16  see it?
17      MR. STERN: I don't know if we have
18  one in the room, but we can get one if you
19  want.
20      MR. COHEN: Let's see if he needs it.
21  This appears to be excerpts from a larger
22  presentation.
23      MR. STERN: Yes, it is.
24      (Document review.)
25      A.  Can you repeat the question?

TSG Reporting - Worldwide    877-702-9580

Page 133

D. O'DONNELL

1
2      Q.  The question is whether Milbank
3  lawyers attended the presentation by Alvarez &
4  Marsal on October 8?
5      A.  Yes.
6      Q.  And who from Milbank attended that?
7      A.  This was the first of a series of
8  monthly in-person meetings with Alvarez & Marsal
9  over the course of the case. It was likely a
10  long list of Milbank attorneys involved in
11  various aspects of the case. I assume Dennis
12  Dunn, Luc Despins, potentially Paul Aronzon were
13  there.
14      Q.  Let's look at the fourth page of the
15  exhibit. It has a heading at the top
16  Significant Transactions. Do you see that?
17      A.  Yes.
18      Q.  And then item A, it says, "Sale of
19  Lehman Brothers, Inc., broker-dealers to
20  Barclays (Fogarty)," do you see that?
21      A.  I do.
22      Q.  Did Milbank lawyers attend this part
23  of the presentation?
24      A.  To the best of my recollection,
25  Milbank attorneys were present throughout the

TSG Reporting - Worldwide    877-702-9580

Page 134

1         D. O'DONNELL
2   presentation.
3       Q.   Did you personally attend?
4       A.   I did, yes.
5       Q.   Do you have any recollection
6   personally of this part of the presentation?
7       A.   I don't have any personal recollection
8   of this part of the presentation being discussed
9   at any length.
10      Q.   Under "Assets Purchased" it lists
11  "43.1 billion repo assets - book value per
12  Lehman's stale marks; negotiated a $5 billion
13  reduction." Do you see that?
14      A.   I do.
15      Q.   At the time did Milbank have an
16  understanding or was there any discussion at
17  this presentation concerning the statement "book
18  value per Lehman's stale marks; negotiated a $5
19  billion reduction"?
20          MR. COHEN: Objection to the form.
21  Compound.
22          To the extent you're going to answer
23  the portion of the question that deals with
24  an understanding, then it needs to be coming
25  from a non-privileged source as opposed to

TSG Reporting - Worldwide    877-702-9580

Page 135

1         D. O'DONNELL
2   one of the Committee's financial advisors,
3   which may be the second part of the
4   question, which was, was there any
5   discussion at the presentation.
6          But again, I'll object to the form of
7   the question as vague.
8       Q.   So let me try to simplify it.
9          At this presentation did Alvarez
10  explain what was meant by the phrase "book value
11  per Lehman's stale marks"?
12      A.   Alvarez made a presentation. Various
13  members of the Alvarez team presented on various
14  topics. I don't have a specific recollection of
15  their presentation as to this topic, but
16  presumably they would have walked through this
17  slide, which probably would have been up on a
18  screen during the course of the presentation.
19      Q.   Do you have any recollection
20  concerning what Alvarez may have explained
21  concerning that phrase, "book value per Lehman's
22  stale marks"?
23      A.   No specific recollection, no.
24      Q.   Any general recollection?
25      A.   As I've previously testified, the

TSG Reporting - Worldwide    877-702-9580

Page 136

1         D. O'DONNELL
2   issue of the valuation of the assets and the
3   liabilities was an issue that we had questions
4   and concerns about. Houlihan was taking the
5   lead in that regard, and if anyone focused on
6   this issue during the meeting, it would have
7   been Houlihan.
8       Q.   Do you recall whether Houlihan did ask
9   questions concerning that phrase "book value per
10  Lehman's stale marks"?
11          MR. COHEN: At the meeting?
12      Q.   At the meeting.
13      A.   No recollection as to whether they
14  raised questions at the meeting.
15      Q.   Okay. Did anyone at the meeting raise
16  any questions concerning what was meant by the
17  phrase "negotiated a $5 billion reduction"?
18      A.   I have no recollection of that
19  specific phrase being discussed.
20      Q.   Do you have any recollection as to
21  whether that phrase caused any concern on the
22  part of Milbank or Houlihan?
23          MR. COHEN: Instruct the witness not
24  to answer on the basis of attorney work
25  product.

TSG Reporting - Worldwide    877-702-9580

Page 137

1         D. O'DONNELL
2       Q.   At the meeting with Alvarez, did
3   either Houlihan or Milbank express any concern
4   relating to that phrase "negotiated a $5 billion
5   reduction"?
6       A.   Express to whom?
7       Q.   To Alvarez.
8       A.   To my recollection, no.
9       Q.   Sitting here today do you know what
10  that phrase refers to?
11          MR. COHEN: Objection. Beyond the
12  scope of the 30(b)(6).
13      Q.   Go ahead.
14      A.   It's highly ambiguous from my
15  perspective sitting here today. It could mean
16  one of many things.
17      Q.   What are the things it could be?
18          MR. COHEN: Objection. Calls for
19  speculation.
20      A.   And I don't think it's my role here to
21  speculate.
22      Q.   Well, I'm asking you to.
23          MR. COHEN: You should not speculate.
24  If you know, you should answer. If you
25  don't know, you should answer you don't

TSG Reporting - Worldwide    877-702-9580

Page 138

D. O'DONNELL

1  know.
2  Q.   Sitting here today what, as you read
3  this phrase, "negotiated a $5 billion
4  reduction," what are your possible
5  interpretations of that phrase as you sit here
6  today?
7           MR. COHEN: Objection. Calls for
8  speculation. If you know what that means,
9  you can answer. If you don't know, answer
10  you don't know.
11  A.   This presentation was drafted by
12  Alvarez. I don't know what they meant by that
13  phrase.
14  Q.   Aside from this presentation by
15  Alvarez, have you heard that phrase before in
16  connection with the sale transaction?
17           MR. COHEN: Objection. Vague as to
18  time.
19  A.   What timeframe are you talking about?
20  Q.   At any time.
21           MR. COHEN: Objection. Overbroad.
22  A.   After Quinn assumed responsibility for
23  Barclays matters --
24           MR. TECCE: I would also like to

TSG Reporting - Worldwide    877-702-9580

Page 139

D. O'DONNELL

1  caution him not to reveal the content of any
2  attorney-client communications or other work
3  product.
4  A.   Based on my reading of the 60(B)
5  Motion after the fact, yes.
6  Q.   What is your understanding of the
7  meaning of this phrase "negotiated a $5 billion
8  reduction" based on reading the Rule 60(B)
9  Motion?
10           MR. COHEN: Objection. Vague.
11  A.   Based on my after-the-fact reading of
12  the 60(B) Motion, without any independent
13  knowledge of the full investigation conducted by
14  Quinn, one of the allegation in the 60(B) Motion
15  is that there was a secretly negotiated $5
16  billion reduction in the purchase price of the
17  assets.
18  Q.   At the time that this phrase was
19  presented by Alvarez in their October 8
20  presentation, do you recall anybody in
21  attendance expressing any concern or alarm based
22  on this phrase?
23           MR. COHEN: I'll caution the witness
24  to answer as to only non-privileged

TSG Reporting - Worldwide    877-702-9580

Page 140

D. O'DONNELL

1  expressions of concern or alarm. Privileged
2  communications and analysis are beyond the
3  scope of this deposition. I would instruct
4  you not to answer.
5  Q.   This is at the meeting with Alvarez.
6  A.   Based on other than privileged
7  communications, no.
8  Q.   After the presentation by Alvarez, did
9  Milbank or Houlihan, to your knowledge, have any
10  discussions with anybody acting on behalf of
11  either Lehman or Barclays concerning this
12  reference to negotiated a $5 billion reduction?
13  A.   Can you repeat the question?
14           (Record read.)
15  A.   I need the question repeated again.
16  I'm sorry.
17           (Record read.)
18  A.   As to Milbank, I don't have any
19  knowledge that this specific phrase from this
20  specific document was discussed with anyone at
21  Barclays -- at Lehman or Weil.
22  Q.   Okay. Putting aside this specific
23  phrase, and focusing on the general concept of a
24  negotiated $5 billion reduction, however you

TSG Reporting - Worldwide    877-702-9580

Page 141

D. O'DONNELL

1  want to phrase that, was there ever any
2  discussion between Milbank or Houlihan on the
3  one hand, to your knowledge, and representatives
4  of Lehman or Barclays on the other hand?
5  A.   As a general matter, the discussions
6  between Milbank and Weil regarding the schedules
7  related, generally speaking, to an approximate
8  $5 billion discrepancy, yes.
9  Q.   And how was that?
10           Withdrawn. Explain that to me.
11           MR. COHEN: Objection. Vague.
12  Q.   Explain to me how the discussions
13  concerning the schedules related to a $5 billion
14  discrepancy.
15  A.   Houlihan's analysis of the schedules
16  to date or up until the point -- during the time
17  when Milbank was still involved with the matter
18  suggested that there was a mismatch between
19  assets and liabilities of approximately $5
20  billion.
21  Q.   And when did those discussions between
22  Houlihan and Weil concerning that discrepancy or
23  mismatch begin?
24  A.   In mid October 2008.

TSG Reporting - Worldwide    877-702-9580

Page 142

D. O'DONNELL

2    Q.   And this reference in the Alvarez
3 presentation to negotiated $5 billion reduction,
4 is that the same concept for the same $5 billion
5 reduction referenced in the Committee's Rule 60
6 motion?
7      MR. COHEN: Objection. Beyond the
8 scope of the 30(b)(6) --
9    Q.   If you know.
10      MR. COHEN: -- notice.
11      The witness is not testifying on
12 behalf of the firm on this. The firm does
13 not represent the Committee in connection
14 with the 60(B) Motion.
15      MR. STERN: So are you instructing him
16 not to answer?
17      MR. COHEN: No, I'm telling you he's
18 not testifying on behalf of the firm. You
19 can answer the question, but it's of no
20 evidentiary value for purposes of your
21 subpoena.
22      MR. TECCE: Also, just with respect to
23 the form of the question, you're referring
24 to the presentation that was prepared by
25 A&M.

TSG Reporting - Worldwide    877-702-9580

Page 143

D. O'DONNELL

2    A.   As I previously testified, I have no
3 idea what A&M intended precisely by the phrase
4 in question, so I can't tell you whether it is
5 exactly the same issue that appeared later in
6 the 60(B) Motion.
7    Q.   It may be, but you don't know?
8    A.   No basis to determine.
9    Q.   One way or the other?
10    A.   Correct.
11      MR. STERN: Let's take a short break.
12      THE VIDEOGRAPHER: The time is now
13 2:17 P.M. We're now off the record.
14      (Recess.)
15      (Exhibit 504, a document bearing Bates
16 Nos. MTHM0012869 through 12871, marked for
17 identification, as of this date.)
18      THE VIDEOGRAPHER: This is the start
19 of tape number 4. The time is now 2:24 P.M.
20 We are now back on the record.
21 BY MR. STERN:
22    Q.   I've handed you a document that we've
23 marked as Exhibit 504, and I'd ask you to take a
24 look at it. It may make sense to read the
25 e-mail string from the back, and then I'll have

TSG Reporting - Worldwide    877-702-9580

Page 144

D. O'DONNELL

2 some questions.
3      I want to focus I think primarily on
4 the e-mail at the bottom of the first page, the
5 Luc Despins e-mail, 10/13, 3:47 P.M., but why
6 don't you read the whole thing.
7      (Document review.)
8    A.   I've reviewed the e-mail.
9    Q.   Okay. Let's focus on the Luc Despins
10 e-mail October 13, 2008, 3:47 P.M. on the first
11 page, and he writes to Ms. Fife, "Lori, this is
12 not in connection with sealing motion (although
13 I want to know more about the schedules before
14 that issue is up before the Court), but rather
15 our concern is with respect to the securities
16 which were transferred. Houlihan has reviewed
17 them and cannot even come close to the amount
18 which was announced in court (I think it was
19 $47.4 billion) and there is also a discrepancy
20 on the liability side (although it could be --
21 it could but much smaller than the issue on the
22 asset side). Houlihan's view would indicate
23 that the securities transferred could be worth
24 billions more than $47.4 billion. There may
25 very well be a logical explanation for all of

TSG Reporting - Worldwide    877-702-9580

Page 145

D. O'DONNELL

2 this, which is why the first meeting is just to
3 explore the issues."
4      Was there a meeting that followed up
5 from this e-mail?
6    A.   Yes.
7    Q.   And who attended that meeting?
8    A.   From Milbank, Matthew Barr and Evan
9 Fleck.
10    Q.   And who else?
11    A.   People from Houlihan, I believe Sol
12 Burian and/or Mike Fazio.
13    Q.   And who else attended?
14    A.   From Weil, Harvey Miller and Lori
15 Fife.
16    Q.   Who else attended the meeting, if
17 anybody?
18    A.   I think that's it.
19    Q.   And what was discussed at the meeting
20 concerning the schedules and the values in the
21 schedules?
22    A.   Mr. Despins' e-mail I think summarizes
23 the agenda for the meeting and that was the
24 substance of the discussion at the meeting.
25    Q.   Okay. And at the meeting did Houlihan

TSG Reporting - Worldwide    877-702-9580

Page 146

D. O'DONNELL

1
2  outline its analysis of the securities and why
3  it was concerned that the securities transferred
4  could be worth billions more than the $47.4
5  billion?
6      A.   I need to qualify my last answer to
7  suggest that I'm not sure if Houlihan was at the
8  initial meeting to which I am referring. It may
9  have been lawyers only.
10     Q.   Was there any discussion at that
11 meeting concerning the analysis that Houlihan
12 had done?
13     A.   The whole point of the meeting as
14 outlined in Mr. Despins' e-mail was to discuss
15 Houlihan's analysis, yes.
16     Q.   And what was said about Houlihan's
17 analysis?
18     A.   In substance, what is presented in the
19 e-mail; that there was a disconnect between the
20 numbers presented at the final hearing, the
21 hearing approving the sale, and the numbers
22 disclosed in the final schedules.
23     Q.   At the meeting did anybody explain the
24 basis of Houlihan's analysis and point out what
25 the disconnection was?

TSG Reporting - Worldwide    877-702-9580

Page 147

D. O'DONNELL

1
2      MR. COHEN: Objection. Vague as to
3  basis.
4      MR. STERN: I don't understand the
5  objection.
6      MR. COHEN: Do you mean what Houlihan
7  did, the work they did, the details of their
8  work?
9      MR. STERN: Yeah.
10     MR. COHEN: I don't understand what
11 "basis of analysis" is.
12     MR. STERN: That's a much better
13 question.
14     MR. COHEN: Try it. It's --
15     Q.   That's a much better question. I'll
16 adopt that question.
17     A.   Not in excruciating detail, but yes,
18 that Houlihan had evaluated the schedules and
19 could not reconcile the numbers to the numbers
20 they understood to be the numbers approved by
21 the Court.
22     Q.   And what was said about the work that
23 Houlihan did and the details of their work?
24     A.   Again, since I don't believe Houlihan
25 was in attendance, it was limited to a lawyer's

TSG Reporting - Worldwide    877-702-9580

Page 148

D. O'DONNELL

1
2  summary of their understanding of Houlihan's
3  findings to date.
4      Q.   Did Houlihan reflect those findings in
5  writing?
6      A.   Not for purposes of this meeting, no.
7      Q.   So nothing in writing was presented at
8  that meeting?
9      A.   Correct.
10     Q.   And what was the -- what was the work
11 that Houlihan had done that was discussed?
12     A.   They had reviewed the schedules, which
13 are hundreds of pages long, and had conducted
14 an, essentially, a evaluation analysis of the
15 schedules to determine what the real value of
16 the assets transferred was.
17     Q.   In doing that did they -- did Houlihan
18 reference certain pricing sources for the
19 assets?
20     MR. COHEN: I would instruct the
21 witness not to get into the details of what
22 Houlihan did. That's work product that has
23 not been shared.
24     Q.   Well, did anybody at this meeting
25 explain the work that Houlihan had done in terms

TSG Reporting - Worldwide    877-702-9580

Page 149

D. O'DONNELL

1
2  of pricing the assets?
3      A.   I don't believe so, and the meeting
4  was intended to, as indicated in Mr. Despins'
5  e-mail, to be an initial meeting to explore the
6  issues. It was not intended to be a full
7  working session. If that had been the case, it
8  would have involved financial advisors from both
9  sides.
10     Q.   Okay. Was there a subsequent -- was
11 there a follow-up meeting to this initial
12 meeting to address those issues?
13     A.   Not prior to Milbank's withdrawal from
14 involvement in these issues.
15     Q.   And when was that?
16     A.   That was in late November.
17     Q.   Late November Milbank withdrew?
18     A.   Milbank, over the course of a period
19 of time in October and November, gradually
20 transitioned responsibility for this matter to
21 Quinn.
22     Q.   And why was that?
23     A.   Out of an abundance of caution over
24 concerns that their initial questions and
25 concerns might ultimately yield a reason to

TSG Reporting - Worldwide    877-702-9580

Page 150

D. O'DONNELL

1  bring litigation with respect to the matter. No
2  decisions or conclusions had been reached in
3  that regard, but given Milbank's representation
4  of Barclays in other contexts, we deemed it
5  prudent to involve conflicts counsel as we
6  proceeded down this path.
7     Q.   Do you know whether there was -- does
8  Milbank know whether subsequent to this initial
9  meeting in October, whether there was a
10 subsequent meeting that Milbank did not attend
11 to address these issues?
12    A.   Once Milbank withdrew from
13 representation of the Committee with respect to
14 these issues, we did not participate in any
15 meetings, were not apprized of meetings, were
16 not -- were not in the loop on those
17 discussions. So the answer is no.
18    Q.   Before Milbank withdrew from handling
19 these issues, did Milbank have any other
20 communications with Lehman representatives
21 concerning these issues?
22    MR. COHEN: Objection. Vague.
23    Other than this one e-mail and this
24 meeting?

TSG Reporting - Worldwide    877-702-9580

Page 151

D. O'DONNELL

1     MR. STERN:  Correct.
2     A.   There was an ongoing course of
3  discussions. There were, I believe, follow-up
4  telephone calls and e-mails.
5     Q.   And at the October meeting that you
6  described, the meeting attended by Mr. Barr and
7  Mr. Fleck and Mr. Miller and Ms. Fife, what did
8  Mr. Miller and Ms. Fife say at that meeting?
9     A.   Point of clarification. The meeting
10 I'm -- I referred to did not take place in
11 October.
12    Q.   Ah. When did that take place?
13    A.   It took place on November 21, 2008.
14    Q.   When did Milbank withdraw?
15    A.   Quinn was fully in place as counsel on
16 this matter by the first week of December 2008.
17    Q.   Well, thanks for the clarification.
18    So Luc Despins, the meeting to follow
19 up on Luc Despins' October 13 e-mail, takes
20 place on November 21; is that right?
21    A.   Correct.
22    Q.   Okay. And your best recollection or
23 your best understanding is that it was attended
24 by Mr. Barr, Mr. Fleck, Mr. Miller and Ms. Fife?

TSG Reporting - Worldwide    877-702-9580

Page 152

D. O'DONNELL

1     A.   Correct.
2     Q.   And do you know if Houlihan was
3  present, or you just don't know?
4     A.   The best of my recollection is that
5  they were not.
6     Q.   Okay. Were there any discussions on
7  these issues between Milbank on the one hand and
8  Weil on the other hand at any time between Mr.
9  Despins' October 13 e-mail and that November 21
10 meeting?
11    MR. COHEN: Well, there's -- Exhibit
12 504 has an October 15 e-mail as well.
13    A.   Obviously, there was -- the e-mail in
14 question concerns a back and forth between
15 October 13 and October 15, but beyond that, yes,
16 there were additional discussions between
17 Milbank and Weil between October 15 and November
18 21.
19    Q.   And what were those discussions?
20    A.   The discussions took place between --
21 discussions took place between Mr. Barr and Ms.
22 Fife. There were e-mail exchanges and phone
23 calls.
24    Q.   And what did they discuss in their

TSG Reporting - Worldwide    877-702-9580

Page 153

D. O'DONNELL

1  e-mails and phone calls?
2     A.   Further elaboration on the issues that
3  had been raised by Mr. Despins and further
4  efforts to schedule the in-person meeting
5  suggested by Mr. Despins.
6     Q.   And in the further elaboration on the
7  issues that had been raised by Mr. Despins, what
8  did Mr. Barr tell Ms. Fife?
9     A.   Well, obviously based on Ms. Fife's
10 response on Exhibit 504, specifically, the
11 response on October 13, 2008 at 11:50 P.M., she
12 was not initially receptive to our concerns, and
13 what ensued was a process to convince Weil that
14 these concerns appear to have some basis and
15 that they needed to be investigated further.
16    Q.   And what did Mr. Barr say concerning
17 the basis for the concerns?
18    A.   In the course of telephone calls
19 and -- primarily telephone calls, reiteration of
20 the basic facts here.
21    Q.   Did he describe to Ms. Fife the
22 analysis that Houlihan had done?
23    A.   Again, lawyers don't necessarily do a
24 good job of summarizing what financial advisors

TSG Reporting - Worldwide    877-702-9580

Page 154

D. O'DONNELL

1  do to other lawyers. Houlihan had concerns, had
2  issues, and we communicated that fact to Weil.
3  Q.   Mr. Barr I assume had access to
4  whatever analysis Houlihan had done?
5  A.   That assumes that there was a written
6  work product. I don't know if there was.
7  Q.   And what was Ms. Fife's response in
8  these subsequent discussions?
9  A.   The initial character of her response
10  is disclosed in the e-mail to which I referred.
11  She did not think it was a productive use of the
12  Committee or the Debtors' time to investigate
13  these issues further.
14  Q.   Did, at the time in October, did
15  Milbank consider contacting Barclays' counsel
16  about these issues?
17  MR. COHEN: Objection. I'll instruct
18  the witness not to answer on the basis of
19  work product.
20  Q.   Well, at the time did Milbank do
21  anything to contact Barclays' counsel about
22  these issues?
23  A.   No.
24  Q.   At any point while Milbank was still
25  TSG Reporting - Worldwide   877-702-9580

Page 155

D. O'DONNELL

1  responsible for these matters, did anybody from
2  Milbank contact anybody acting on behalf of
3  Barclays to discuss these issues?
4  A.   Yes.
5  Q.   And when was that?
6  A.   I believe there were discussions
7  between Mr. Despins and Ms. Grandfield.
8  Q.   And when did those discussions take
9  place?
10  A.   Sometime in October.
11  Q.   And what was the substance of those
12  discussions?
13  A.   That we had concerns and unanswered
14  questions about the transaction.
15  Q.   And did Mr. Despins identify for Ms.
16  Grandfield what those concerns and unanswered
17  questions were?
18  A.   I don't know the level of detail
19  presented to Ms. Grandfield in these
20  discussions, no.
21  Q.   Did any of those concerns or
22  unanswered questions relate to a negotiated $5
23  billion reduction as referenced in the Alvarez
24  presentation?
25  TSG Reporting - Worldwide   877-702-9580

Page 156

D. O'DONNELL

1  MR. COHEN: Object to the form.
2  A.   As previously testified, the $5
3  billion number and the mismatch was the overall
4  theme of our concern, so it's likely that that
5  number came up in those conversations.
6  Q.   And that overall theme of your concern
7  is what was expressed by Mr. Barr to Ms. Fife in
8  his discussions with her and at the November 21,
9  2008, to the best of your knowledge?
10  A.   Yes, as I previously testified, that
11  is -- that is the central thesis of our concern
12  and would have been communicated in some
13  fashion.
14  Q.   Can you pinpoint for me in time when
15  the $5 billion mismatch, the overall theme of
16  your concerns, was identified by Houlihan or
17  Milbank?
18  MR. COHEN: Objection.
19  MR. TECCE: Object to the form of the
20  question and to the extent that it seeks
21  attorney-client communication or attorney
22  work product.
23  A.   Based on --
24  Q.   I'm just asking for a date.
25  TSG Reporting - Worldwide   877-702-9580

Page 157

D. O'DONNELL

1  A.   Again, based on other than privileged
2  communications, no, I cannot.
3  Q.   When is the first point in time that
4  Milbank or Houlihan communicated to Weil this
5  concern about a $5 billion mismatch?
6  MR. COHEN: Precisely $5 billion?
7  A.   On September 22 or at the end --
8  Sunday and Monday, the 21st and 22nd, and back
9  in that period, Houlihan communicated to Weil
10  that they could not get comfortable with the
11  numbers as presented in the draft schedule and
12  had, even at that stage, concerns about a
13  mismatch.
14  Q.   Okay. So this overall theme of the $5
15  billion mismatch was addressed between Milbank
16  and Houlihan on the one hand and Weil on the
17  other hand before the closing; is that correct?
18  MR. TECCE: Objection to the form of
19  the question.
20  A.   Whether it was $5 billion or another
21  number I cannot tell you. It was a mismatch.
22  It was in the billions. Approximately $5
23  billion is as close as I can get.
24  Q.   After the November 21 meeting between
25  TSG Reporting - Worldwide   877-702-9580

Page 158

D. O'DONNELL

1
2  Mr. Barr and Mr. Fleck and Ms. Fife and Mr.
3  Miller, did Milbank have any further involvement
4  in the discussion of these issues?
5      A.   During the period between November 21
6  and the first week of December, Milbank remained
7  involved and may have had further conversations
8  with Weil on these issues.
9      Q.   Do you recall what those conversations
10 were?
11     A.   I don't have any specific
12 recollections of conversations during that
13 period.
14     Q.   At any point did Milbank or Houlihan
15 provide anything in writing to Weil on these
16 issues?
17     A.   Other than Mr. Despins' e-mail of
18 October 13, I'm not aware of anything else in
19 writing.
20     Q.   Now, his e-mail of October 13 also
21 makes reference to a discrepancy on the
22 liability side.  What was that?
23     A.   That's the liability number disclosed
24 to the Court.
25          Strike that.  As I sit here, I

Page 159

D. O'DONNELL

1
2  can't -- I can't describe with any precision
3  what the liability issue was at that point in
4  time.
5      Q.   Okay.  And when he says "Houlihan's
6  review would indicate that the securities
7  transferred could be worth billions more than
8  47.4 billion," how many billions more than 47.4?
9      A.   And the question is?
10     Q.   Well, he -- Mr. Despins refers to
11 Houlihan's review and he says it "would indicate
12 that the securities transferred could be worth
13 billions more than the 47.4 billion," and my
14 question is did Houlihan or Milbank ever
15 communicate to Weil how many billions of dollars
16 more than the 47.4 billion?
17     A.   Well, that was the question.  I mean,
18 they -- they knew -- their review to date
19 suggested that there was a mismatch in the
20 billions, but they needed access to additional
21 information, which they needed to obtain through
22 the Debtors to refine that further.
23     Q.   And what was the additional
24 information that Houlihan needed from the
25 Debtors?

Page 160

D. O'DONNELL

1
2      A.   Again, that was information that
3  Houlihan needed.  I can't be very specific as to
4  what they needed to satisfy their own
5  methodologies, but I assume it relates to marks
6  that were available internally at Lehman.
7      Q.   Do you know if that information was
8  ever provided by Lehman to Houlihan?
9      A.   Can you repeat the question?
10     Q.   Do you know if that information was
11 ever provided by Lehman to Houlihan?
12     A.   There were discussions between
13 Houlihan and Lehman.
14          Strike that.  No, I don't.
15     Q.   The analysis that Mr. Despins refers
16 to, is that an analysis with respect to Schedule
17 A, only, or was it analysis with respect to both
18 Schedule A and Schedule B?
19     A.   I think the Committee had concerns
20 about both schedules, but I believe the
21 reference here is to Schedule A.
22     Q.   Was there ever any follow-up
23 discussion between Houlihan and Milbank on the
24 one hand and Weil or Lehman on the other hand
25 concerning Schedule B?

Page 161

D. O'DONNELL

1
2      A.   Not that I have specific knowledge of.
3      Q.   And am I correct that at no time
4  between the closing and the first week of
5  December, when Quinn Emanuel took over this
6  matter, did Milbank or Houlihan make an effort
7  to get pricing information from Barclays; is
8  that right?
9      A.   Not directly, in large part because at
10 that point in time the dynamic between Barclays
11 and the Debtors was not optimal.  There were
12 ongoing disputes about access to information
13 generally which the Debtors were embroiled in,
14 and part of the reasons for obtaining
15 information at this point was difficult was the
16 fact that Barclays had control over access to
17 most of the information we needed.
18     Q.   So you mentioned Mr. Despins'
19 conversation with Ms. Grandfield.  I believe
20 that was in October, am I right about that?
21     A.   Correct.
22     Q.   And did he ask Ms. Grandfield to
23 arrange for Barclays to provide certain
24 information?
25     A.   Not to my knowledge.

Page 162

1  D. O'DONNELL
2  Q. Did anybody from Milbank or Houlihan
3  or the Debtors in this period up to the first
4  week of December ask Barclays to provide
5  information on these issues?
6  A. Can you repeat the question?
7  (Record read.)
8  A. As to Milbank, no. As to Houlihan and
9  the Debtors, I cannot speak.
10  Q. You don't know?
11  A. I don't know.
12  Q. Did Milbank consider it important to
13  get this information from Barclays?
14  MR. COHEN: Objection. I'll instruct
15  the witness not to answer on the basis of
16  attorney-client privilege and work product.
17  Q. If Milbank had considered it important
18  to obtain this information at the time, that is,
19  before the first week of December 2008, what
20  options did Milbank have available to it in
21  order to obtain that information from Barclays?
22  MR. COHEN: Objection. This calls for
23  speculation, it's beyond the scope of the
24  30(b)(6) subpoena, and the witness is not
25  authorized to testify on behalf of the firm
TSG Reporting - Worldwide    877-702-9580

Page 163

1  D. O'DONNELL
2  as to the subject of that question.
3  Q. Well, you say that Milbank had
4  questions concerning the value of certain
5  purchased assets. I think that's clearly within
6  the scope of the subpoena.
7  Now, did Milbank ever send a letter to
8  anybody at Barclays or representing Barclays
9  requesting further information on that subject
10  before December 1 when Milbank withdrew?
11  A. No.
12  Q. Okay. And Milbank never sought the
13  Court's assistance in seeking that information,
14  am I right about that?
15  A. Correct.
16  Q. As of the time that Milbank withdrew
17  and Quinn Emanuel took over, was there a
18  timeline in place for obtaining this information
19  and resolving these questions?
20  MR. COHEN: Objection. I'll instruct
21  the witness not to answer. Calls for
22  privileged information and disclosure
23  protected by the Attorney Work Product
24  Doctrine.
25  Q. Did Milbank ever express to Weil --
TSG Reporting - Worldwide    877-702-9580

Page 164

1  D. O'DONNELL
2  did Houlihan or Milbank ever express to Weil a
3  desire to resolve these issues within a
4  specified period of time?
5  A. Yes.
6  Q. And what did -- what was expressed to
7  Weil?
8  A. As soon as possible.
9  Q. And what was the reaction?
10  A. It was an iterative process with Weil.
11  As previously -- as I previously testified, they
12  were not initially receptive obtaining their
13  cooperation and then obtaining what we needed
14  from them took time, took longer than we would
15  have wanted.
16  Q. You say it was an iterative process,
17  but did you have in mind some sense of time
18  pressure, some date by which you wanted to try
19  to have these issues resolved?
20  MR. COHEN: I'll instruct the witness
21  not to answer. It's legal advice, and attorney
22  privileged, and attorney work product.
23  Q. While it was an iterative --
24  withdrawn.
25  While it was an iterative process with
TSG Reporting - Worldwide    877-702-9580

Page 165

1  D. O'DONNELL
2  Weil, is it fair to say that, at least as early
3  as October 2008, Houlihan and/or Milbank had
4  brought to Weil's attention their concern about
5  this overall theme of a $5 billion mismatch?
6  A. Yes.
7  MR. STERN: I have no further
8  questions.
9  EXAMINATION BY
10  MR. COHEN:
11  Q. Mr. O'Donnell, I have just a couple of
12  questions.
13  After lunch, you fielded a number of
14  questions that went to the value of certain
15  items, including assets and liabilities in
16  connection with the sale to Barclays. Do you
17  recall those questions?
18  A. Yes.
19  Q. And you testified that the value of
20  certain assets and liabilities was uncertain.
21  Do you recall that testimony?
22  A. Yes.
23  Q. Would it be more accurate for you to
24  say that those values were uncertain to Milbank
25  and Houlihan?
TSG Reporting - Worldwide    877-702-9580

Page 166

```
 1           D. O'DONNELL
 2     A.   Yes.
 3     Q.   Did you mean to imply by your answers
 4  that the values of those assets and liabilities
 5  were uncertain to anyone other than Milbank
 6  and/or Houlihan?
 7     A.   No, I did not.
 8          MR. COHEN: I have no further
 9  questions.
10          MR. STERN: Okay. Thank you.
11          THE WITNESS: Thank you.
12          THE VIDEOGRAPHER: That concludes the
13  video record for today. The time is now
14  2:57 P.M. We are now off the record.
15             oOo
16
17
18
            _____
            DENNIS C. O'DONNELL
19
20  Subscribed and sworn to
    before me this     day
21  of       2010.
22
            _____
23
24
25
        TSG Reporting - Worldwide    877-702-9580
```

Page 167

```
 1           D. O'DONNELL
 2          CERTIFICATE
 3  STATE OF NEW YORK )
                      : ss
 4  COUNTY OF NEW YORK)
 5     I, Kathy S. Klepfer, a Registered
 6  Merit Reporter and Notary Public within and
 7  for the State of New York, do hereby
 8  certify:
 9     That DENNIS C. O'DONNELL, the witness
10  whose deposition is herein before set forth,
11  was duly sworn by me and that such
12  deposition is a true record of the testimony
13  given by such witness.
14     I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18     I further certify that neither the
19  deponent nor a party requested a review of
20  the transcript pursuant to Federal Rule of
21  Civil Procedure 30(e) before the deposition
22  was completed.
23     In witness whereof, I have hereunto
24  set my hand this 6th day of December, 2010.
            ------------------------------
25
        TSG Reporting - Worldwide    877-702-9580
```

Page 168

```
 1           D. O'DONNELL
 2          INDEX
 3  TESTIMONY OF D. O'DONNELL:          PAGE
 4  Examination by Mr. Stern ..................   7
 5  Examination by Mr. Cohen ..................  164
 6
 7  EXHIBITS:                          PAGE
 8  Exhibit 498, Notice of Deposition Pursuant    5
 9  to Rule 30(b)(6)
10  Exhibit 499, a document bearing Bates Nos.   88
11  WGM-LEHMAN-E 00002746 through 2766
12  Exhibit 500, a document bearing HLHZ0020162  89
13  through 182
14  Exhibit 501, a document bearing Bates Nos.   90
15  WGM-LEHMAN-E 00013962 through 13982
16  Exhibit 502, a document bearing Bates Nos.   91
17  WGM-LEHMAN-E 00013889 through 13899
18  Exhibit 503, a document bearing Bates Nos.   92
19  HLHZ0019919 through 19930
20  Exhibit 504, a document bearing Bates Nos.  143
21  MTHM0012869 through 12871
22
23
24
25
        TSG Reporting - Worldwide    877-702-9580
```

Page 169

```
 1              D. O'DONNELL
 2  NAME OF CASE: In re Lehman Brothers, Inc.
 3  DATE OF DEPOSITION: January 6, 2010
 4  NAME OF WITNESS: Dennis C. O'Donnell
 5  Reason Codes:
 6     1. To clarify the record.
        2. To conform to the facts.
 7     3. To correct transcription errors.
 8  Page _____ Line _____ Reason _____
 9  From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
    Page _____ Line _____ Reason _____
12  From _____ to _____
13  Page _____ Line _____ Reason _____
14  From _____ to _____
15  Page _____ Line _____ Reason _____
16  From _____ to _____
17  Page _____ Line _____ Reason _____
18  From _____ to _____
19  Page _____ Line _____ Reason _____
20  From _____ to _____
21  Page _____ Line _____ Reason _____
22  From _____ to _____
23  Page _____ Line _____ Reason _____
24  From _____ to _____
25
        TSG Reporting - Worldwide    877-702-9580
```

# BCI EXHIBIT

# 89

Page 1

1          HIGHLY CONFIDENTIAL - D. PETRIE

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                          Chapter 11

7     LEHMAN BROTHERS         Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                 Debtors.

10

      ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF DAVID PETRIE

14              New York, New York

15              August 26, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24293

## Page 2

1    HIGHLY CONFIDENTIAL - D. PETRIE
2    August 26, 2009
3         9:29 a.m.
4
5    HIGHLY CONFIDENTIAL deposition
6    of DAVID PETRIE, held at Jones Day
7    LLP, 222 East 41st Street, New York
8    New York, before Kathy S. Klepfer
9    a Registered Professional Reporter
10   Registered Merit Reporter, Certified
11   Realtime Reporter, Certified Livenote
12   Reporter, and Notary Public of the
13   State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide (877) 702-9580

## Page 3

1    HIGHLY CONFIDENTIAL - D. PETRIE
2
3         A P P E A R A N C E S :
4    JONES DAY, LLP
5    Attorneys for Lehman Brothers, Inc.
6       222 East 41st Street
7       New York, New York  10017-6702
8    BY: JAYANT W. TAMBE, ESQ.
9       TERRY McMAHON, ESQ.
10
11   BOIES, SCHILLER & FLEXNER, LLP
12   Attorneys for Barclays and the Witness
13       5301 Wisconsin Avenue, N.W.
14       Washington, D.C.  20015
15   BY: JONATHAN M. SHAW, ESQ.
16
17   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
18   Attorneys for the Creditors Committee
19       865 S. Figueroa Street, 10th Floor
20       Los Angeles, California  90017
21   BY: THOMAS O'BRIEN, ESQ. (By telephone)   .
22
23
24
25

TSG Reporting - Worldwide (877) 702-9580

## Page 4

1    HIGHLY CONFIDENTIAL - D. PETRIE
2    A P P E A R A N C E S : (Cont'd.)
3
4    JENNER & BLOCK, LLP
5    Attorneys for the Examiner
6       330 N. Wabash Avenue
7       Chicago, Illinois  60611-7603
8    BY: VINCENT LAZAR, ESQ.
9
10   HUGHES, HUBBARD & REED, LLP
11   Attorneys for the SIPA Trustee
12       1775 I Street, N.W.
13       Washington, D.C. 20006-2401
14   BY: JOHN F. WOOD, ESQ.
15
16
17   Also Present:
18       RAJESH ANKALKOTI, Alvarez & Marsal
19
20
21
22
23
24
25

TSG Reporting - Worldwide (877) 702-9580

## Page 5

1    HIGHLY CONFIDENTIAL - D. PETRIE
2    DAVID PETRIE, called as a
3       witness, having been duly sworn by a Notary
4       Public, was examined and testified as
5       follows:
6    EXAMINATION BY
7    MR. TAMBE:
8       Q.   Good morning, Mr. Petrie.  My name is
9    Jay Tambe.  I work with the law firm of Jones
10   Day.  We're special counsel to Lehman Brothers
11   Holdings, Inc.  With me is my colleague Terry
12   McMahon.
13          I'll let the other lawyers around the
14   table introduce themselves to you and then we'll
15   go through some preliminary matters.  Okay?
16          MR. WOOD: I'm John Wood from Hughes
17   Hubbard, and we represent the SIPA Trustee.
18          MR. ANKALKOTI: Rajesh Ankalkoti with
19   Alvarez & Marsal.
20          MR. LAZAR: Vince Lazar.  I'm
21   representing the Examiner.
22          MR. SHAW: And Jonathan Shaw with
23   Boies, Schiller & Flexner on behalf of
24   Barclays.
25          MR. TAMBE: And on the phone we have?

TSG Reporting - Worldwide (877) 702-9580

Page 6

HIGHLY CONFIDENTIAL - D. PETRIE

1
2       MR. O'BRIEN: On the phone is Tom
3   O'Brien from Quinn Emanuel representing the
4   Creditors Committee.
5   BY MR. TAMBE:
6       Q.   Mr. Petrie, have you ever given a
7   deposition before?
8       A.   No, I have not.
9       Q.   Okay.  Basic rules: I'm going to ask
10  you a series of questions about the
11  Lehman/Barclays transaction and what role, if
12  any, you may have played in that transaction.
13       If you have any trouble understanding
14  my question, let me know.  I'll rephrase it.
15  You have to give your answers vocally, no nods
16  of the head, et cetera.  She's writing down
17  everything you say, so yeses, nos. I'm happy to
18  clarify any question.
19       By whom are you currently employed?
20      A.   Barclays Capital.
21      Q.   And how long have you been with
22  BarCap?
23      A.   Been with Barclays Capital since
24  January 1998.
25      Q.   Before that by whom were you employed?

TSG Reporting - Worldwide (877) 702-9580

Page 7

HIGHLY CONFIDENTIAL - D. PETRIE

1
2       A.   I was employed by AIG Trading Group,
3   Fischer, Frances, Trees & Watts, and Progressive
4   Insurance Company.
5       Q.   At Barclays Capital, if you could just
6   describe, starting in '98 to the present,
7   broadly what your positions have been, what your
8   duties have been?
9       A.   Sure.  I began working at Barclays
10  Capital in a junior role in the repo desk.  That
11  role over several years grew into a repo trading
12  position as well as a risk management position
13  for the repo desk.
14       From the repo desk, as you said,
15  broadly, the end of 2005, 2006, I joined the
16  Barclays Bank, PLC Portfolio Group, and my
17  responsibilities were to run the dollar
18  portfolio; and in the beginning of 2008, I
19  returned to the repo desk to run the repo desk
20  for Barclays Capital in the U.S.
21      Q.   So, starting in January 2008, what was
22  your title or position at Barclays Capital?
23      A.   Specifically in January, I was still
24  working for the Barclays Bank portfolio.  I did
25  not take my responsibilities as the head of the

TSG Reporting - Worldwide (877) 702-9580

Page 8

HIGHLY CONFIDENTIAL - D. PETRIE

1
2   desk until roughly April.
3       Q.   And in April when you took your
4   responsibilities for the repo desk at Barclays
5   Capital, what was your position or title?
6       A.   My title was director.
7       Q.   And was that the title you held
8   throughout 2008?
9       A.   Yes.
10      Q.   Focusing on that position, starting in
11  April 2008 as a director --
12       And you were the head of the repo desk
13  for Barclays Capital in the U.S.; is that right?
14      A.   That's correct, for certain products.
15      Q.   Okay.
16      A.   Those products included Treasuries,
17  agencies, and mortgages.
18       MR. SHAW: Do you mind if I ask a
19  question to make the record clear?
20       MR. TAMBE: Sure.  Go ahead.
21       MR. SHAW: Are you currently the head
22  of the Barclays repo desk?
23       THE WITNESS: No, I am not.
24      Q.   What's your current position?
25      A.   I currently run the short-term

TSG Reporting - Worldwide (877) 702-9580

Page 9

HIGHLY CONFIDENTIAL - D. PETRIE

1
2   interest rate desk for Barclays Capital.
3       Q.   And how long have you had that
4   position?
5       A.   Since approximately October of last
6   year.
7       Q.   So it's fair to say shortly after the
8   Lehman/Barclays transaction you took on this new
9   position running the short-term interest rate
10  desk?
11      A.   Yes.
12      Q.   And maybe we can cut through some of
13  the questions.  Starting last October, October
14  2008, did you continue to have any involvement
15  in the Lehman/Barclays transaction, the
16  aftermath of that transaction?
17      A.   Yes.
18      Q.   If you could just briefly describe,
19  after October 2008 what has been the nature of
20  your involvement in the Lehman/Barclays
21  transaction?
22      A.   Assisting in the integration of the
23  two companies, specifically to the desk.
24      Q.   When you say "specifically to the
25  desk," what desk are you referring to in the

TSG Reporting - Worldwide (877) 702-9580

3

Page 10

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  post October 2008 time period?
3      A.  The repo desk.
4      Q.  And is that something that you're
5  still involved in in helping with the
6  integration of the two companies?
7      A.  No.
8      Q.  Was there a period of time when you
9  were involved in that and then that process
10 ceased when you were no longer involved in that
11 integration process?
12     A.  Yes.
13     Q.  Describe that time period for me.
14 From when to when?
15     A.  I would say by approximately
16 November/December that process ended.
17     Q.  Are you aware of a settlement
18 agreement that was entered into in or about
19 December 2008 concerning the Lehman/Barclays
20 transaction?
21     A.  What settlement agreement are you
22 speaking of?
23     Q.  Are you aware of any kind of
24 settlement agreement between Barclays, JPMorgan,
25 Lehman Brothers, Inc., the trustee for Lehman
TSG Reporting - Worldwide (877) 702-9580

Page 11

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  Brothers, Inc., in or about December 2008 having
3  to do with the transfer of collateral from
4  Lehman through JPMorgan to Barclays?
5      A.  As you describe it, no.
6      Q.  Okay.  We'll come back to that.  I'm
7  just trying to get a sense of where you fit into
8  the various pieces of the Lehman/Barclays
9  transaction as a whole.
10        So let's go back to the front end.  So
11 let's go back to April 2008.  You are on the
12 repo desk at Barclays Capital, correct?
13     A.  That is correct.
14     Q.  Just describe that desk for me in
15 terms of who you report to, who reports to you.
16 I'm just trying to get a sense of who the
17 individuals are who are involved with that desk.
18     A.  Sure.
19        MR. SHAW:  As of April 2008?
20     Q.  As of April 2008.
21     A.  I ran the U.S. dollar repo desk.  I
22 reported to Mark Dearlove, and --
23        Do you want me to go further as to who
24 Mark reported to?
25     Q.  Sure.
TSG Reporting - Worldwide (877) 702-9580

Page 12

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      A.  Mark Dearlove at the time reported to
3  Alastair Hodge, if I remember correctly.
4      Q.  And just in terms of titles or
5  positions, what was Mr. Dearlove's position?
6      A.  Managing director.
7      Q.  At Barclays Capital?
8      A.  Yes.
9      Q.  And he was based here in New York?
10     A.  No.
11     Q.  He was based overseas?
12     A.  Mark Dearlove was based in London.
13     Q.  How about Mr. Alastair Hodges, what
14 was his position or title?
15     A.  Alastair Hodge at the time was a
16 managing director in charge of Prime Services, I
17 believe.
18     Q.  And where was he based?
19     A.  London.
20     Q.  Other than being managing director,
21 did Mr. Dearlove and Mr. Hodge have any other
22 functionary titles, chief operating officer,
23 chief financial officer, things like that, those
24 types of titles?
25     A.  No.
TSG Reporting - Worldwide (877) 702-9580

Page 13

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      Q.  And was there any particular
3  department or group or unit that Mr. Dearlove
4  and Mr. Hodge were in?
5      A.  Prime Services.
6      Q.  And were you a member of that group as
7  well, the Prime Services Group?
8      A.  During that period, yes.
9      Q.  Yeah, I'm talking about the April 2008
10 period.  Is that still the case in September of
11 2008, that you're in the Prime Services Unit?
12     A.  Yes.
13     Q.  And are you still reporting in
14 September 2008 to Mr. Dearlove?
15     A.  Yes.
16     Q.  During this time period, April 2008
17 through September 2008, who is reporting to you?
18     A.  That would be my team at the time.
19        May I ask again for you to clarify,
20 clarify the dates again?
21     Q.  Yes.  This is April 2008 through
22 September 2008, so the months leading up to the
23 transaction.
24     A.  Multiple repo traders.
25     Q.  How many?
TSG Reporting - Worldwide (877) 702-9580

## Page 14

HIGHLY CONFIDENTIAL - D. PETRIE

1
2     A.   Approximately five.
3     Q.   And can you tell us their names?
4     A.   Bill Lent, Dan Saleeby, Ed Lane,
5  Dillon Minert, Tim Macauliff, James Petrie.
6     Q.   Related to you?
7     A.   Oscar Huettner.
8          No.
9     Q.   Oscar who?
10    A.   Huettner, H-U-E. William Martinez,
11 and Nate Hartley.
12    Q.   Now, Mr. Hartley is someone whose name
13 we've seen on a lot of e-mails. Could you
14 describe what his position was, again in this
15 time period, April through the transaction,
16 September 2008?
17    A.   Describe his job description?
18    Q.   His job description, what he did.
19    A.   Nate Hartley was a junior person,
20 individual on the desk who assisted in the
21 mortgage repo aspect of the repo desk.
22    Q.   The various people you identified,
23 were their job descriptions broken out by
24 product type or did they serve different
25 functions? Can you just give me a better sense

TSG Reporting - Worldwide (877) 702-9580

## Page 15

HIGHLY CONFIDENTIAL - D. PETRIE

1
2  of how this team was organized?
3     A.   Sure. Bill Lent, in charge or a
4  trader for Treasuries, specifically specials.
5     Q.   What do you mean by that?
6     A.   In repo, certain securities will trade
7  at a premium to what is called a general
8  collateral rate, and a repo desk has someone
9  that's a specialist trader to trade securities
10 that, in repo, that are at a premium.
11    Q.   So that's Mr. Lent. How about
12 Mr. Saleeby?
13    A.   Dan Saleeby was responsible for the
14 financing of agencies.
15    Q.   And when you say "agencies," you mean
16 Fannie Mae, Freddie Mac, things like that?
17    A.   The GSCs, that's correct.
18    Q.   Mr. Lane?
19    A.   Ed Lane's title is the overnight
20 trader. His job description or his
21 responsibilities were to broadly finance the
22 firm securities that didn't trade at a premium
23 to general collateral rates.
24    Q.   Dillon -- I didn't catch the last
25 name?

TSG Reporting - Worldwide (877) 702-9580

## Page 16

HIGHLY CONFIDENTIAL - D. PETRIE

1
2     A.   Minert, M-I-N-E-R-T. Dillon was a
3  trader -- well, was an assistant on the desk,
4  filled the role of reports, a very minor role on
5  the desk.
6     Q.   Macauliff?
7     A.   Tim Macauliff was a repo salesperson.
8     Q.   Any particular product or aspect of
9  the repo, or just general repos in general?
10    A.   His particular job responsibilities
11 was to raise money to finance the firm.
12    Q.   This is for Barclays Capital's own
13 financing needs?
14    A.   That is correct.
15    Q.   James Petrie?
16    A.   The same role.
17    Q.   Oscar Huettner?
18    A.   Oscar Huettner's responsibilities
19 included financing of mortgages, also balance
20 sheet management, and term funding.
21    Q.   You already told us about Mr. Hartley.
22 And there was one last person and my
23 handwriting is terrible, so Marshing or Marsh.
24 There was one last name. We can go back to the
25 list.

TSG Reporting - Worldwide (877) 702-9580

## Page 17

HIGHLY CONFIDENTIAL - D. PETRIE

1
2     A.   There is actually -- I remembered one
3  additional name.
4     Q.   Sure. We'll pick that up.
5          So, Mr. Hartley.
6     A.   Nate Hartley.
7     Q.   I'm sorry, Marshing? Marshing or
8  Marsh?
9          Martinez. Sorry, Martinez.
10    A.   William Martinez traded off the run
11 treasuries.
12    Q.   What do you mean by "off the run
13 treasuries"?
14    A.   Treasuries that are one or two removed
15 from original issuance.
16    Q.   And then there was one last person
17 that you just remembered?
18    A.   Yeah, John Garzan, G-A-R-Z-A-N.
19    Q.   What was his role?
20    A.   He was part of the grad program so he
21 was one or two years into the grad program.
22 It's a relatively junior role on the desk.
23    Q.   In this time period between April and
24 September of 2008, if you could describe
25 generally what was the role played by this desk

TSG Reporting - Worldwide (877) 702-9580

Page 18

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2    as part of Barclays Capital's business?  What
3    did this desk do?
4        A.    Between April and September?
5        Q.    Yes.
6        A.    The number one function of a repo desk
7    is to finance the firm's inventory.  Also, a
8    repo desk would engage in borrowing and lending
9    of securities with counterparties.
10       Q.    Anything else?
11       A.    Those are the main functions of a repo
12   desk.
13       Q.    And when you referred to engaging in
14   borrowing and lending of securities with
15   counterparties, is that also sometimes referred
16   to as the matched book?
17       A.    Yes.
18       Q.    What's your recollection of your
19   earliest involvement in what eventually became
20   the Lehman/Barclays transaction?
21       A.    My earliest involvement would have
22   been the Saturday, which I believe is September
23   12th, before the announcement of bankruptcy.
24       Q.    Okay.  That's Saturday, September 13.
25       A.    Okay, September 13.
TSG Reporting - Worldwide (877) 702-9580

Page 19

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2        Q.    And what is it that you remember about
3    your earliest involvement?
4        A.    My memory is I received a phone call
5    from my manager to please go into the office,
6    Barclays Capital, and once you get there, to
7    give him a call.
8        Q.    And who was your manager?
9        A.    As noted before, Mark Dearlove.
10       Q.    Let's take it chronologically from
11   that Saturday.  What I would like to do is spend
12   a little bit of time just placing you wherever
13   you were and whatever role you were playing in
14   the course of the next ten days or so, September
15   13 through the 22nd, 23rd of September.
16       So you get the call on the 13th.  You
17   go into the office.  Describe for me what you
18   were doing on the 13th.
19       A.    On the 13th?
20       Q.    In connection with the transaction.
21       A.    Yeah, on the 13th, I believe I arrived
22   at the office later in the afternoon and was
23   tasked with determining what value, if any,
24   there was to the Lehman Brothers repo desk.
25       Q.    Now, when you were called into the
TSG Reporting - Worldwide (877) 702-9580

Page 20

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2    office, are you told what this was about?
3        A.    No.  I was given a task and I did my
4    best to perform that task.
5        Q.    Let me ask it a different way.  You
6    were called into the office on a Saturday.  Are
7    you told this is about a possible transaction
8    with Lehman?
9        A.    I don't remember specifically being
10   told that this was a possible transaction with
11   Lehman.
12       Q.    You show up in the office on Saturday
13   and you were asked to determine if there is any
14   value in the Lehman Brothers repo desk, correct?
15       A.    Correct.
16       Q.    Did you ask why you were being asked
17   to do that?
18       A.    I don't remember.
19       Q.    Prior to Saturday, had you heard any
20   discussions in the office about Barclays
21   possibly buying Lehman?
22       A.    There was speculation across Wall
23   Street as to potential bidders for Lehman, so it
24   was reasonable for me to come to the conclusion
25   that perhaps that was what was going on in
TSG Reporting - Worldwide (877) 702-9580

Page 21

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2    regards to my task on that Saturday.
3        Q.    Did you ask anyone on Saturday what's
4    going on, why am I being asked to do this?
5        MR. SHAW:  Asked and answered.
6        Q.    He's going to object from time to
7    time.  I'm going to ask you to answer the
8    question.
9        A.    I do not remember asking anyone why I
10   was being asked to do this task.
11       Q.    All right.  You're asked to do the
12   task and you start doing it, correct?
13       A.    Yes.
14       Q.    Are you given some spreadsheets or
15   information about the repo desk at Lehman?
16       A.    Yes.
17       Q.    What are you given?
18       A.    I'm given matched book positions; a
19   broad overview of collateral that's held by
20   Lehman at the time.
21       Q.    Who gives you these documents or this
22   information?
23       A.    I don't recall exactly who gave me
24   those documents.
25       Q.    As you describe them, what I'm
TSG Reporting - Worldwide (877) 702-9580

Page 22

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  picturing is you got some spreadsheets or some
3  reports of some kind handed to you?
4      A.  Yes.
5      Q.  And in valuing those spreadsheets or
6  documents, were you working alone or were you
7  working with someone else?
8      A.  I had called in some team members, my
9  team members.
10     Q.  And who had you called in?
11     A.  I recall Bill Lent, Nate Hartley, and
12  perhaps Oscar Huettner.
13     Q.  And you and your team begin valuing
14  this portfolio on the Saturday, correct?
15     A.  That is correct.
16     Q.  Let's advance the story now.  I'll
17  come back to your valuing and how you went about
18  valuing the portfolio.  What else did you do on
19  Saturday?
20     A.  That was my sole task.
21     Q.  Did that task continue into Sunday?
22     A.  I'm not sure exactly what time that
23  task ended.
24     Q.  Do you recall it being running late
25  into the night?

TSG Reporting - Worldwide  (877) 702-9580

Page 23

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      A.  Yes.
3      Q.  What was the conclusion of that task?
4      A.  My conclusion of the task of valuing
5  Lehman's repo book was that it had zero value
6  and that it didn't present -- didn't present
7  value to the firm.
8      Q.  The documents or spreadsheets that you
9  had been provided, did those have valuations on
10  them?
11     A.  I don't recall.
12     Q.  Do you recall part of your exercise
13  that Saturday into late Saturday night
14  consisting of disagreeing with the values that
15  had been placed on the repo desk or the repo
16  assets with Lehman Brothers by others?
17     A.  Can you repeat the question?
18     (Record read.)
19     A.  Yes.
20     Q.  And what was the source of those other
21  values that you were disagreeing with?
22     A.  A repo desk can measure -- let's say a
23  typical repo desk can measure value for term
24  trades on what's called a net present value, and
25  the net present value that I determined from the

TSG Reporting - Worldwide  (877) 702-9580

Page 24

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  information I was provided with was
3  approximately zero and, to your question, there
4  was a suggestion that it was greater than zero.
5      Q.  And who was making the suggestion that
6  it was greater than zero?
7      A.  Representatives from Lehman Brothers.
8      Q.  And do you have a recollection of how
9  much greater than zero was being suggested as
10  the value for that desk?
11     A.  I believe they suggested it was
12  between 5 and 10 million dollars.
13     Q.  5 and 10 billion or million?
14     A.  Million.
15     Q.  Do you recall any of the
16  representatives of Lehman who were making the
17  suggestion?
18     A.  No.
19     Q.  Did you have conversations with people
20  from Lehman on that Saturday?
21     A.  Yes.
22     Q.  You were in a conference call with
23  some people?
24     A.  I was not on a conference call with
25  people.

TSG Reporting - Worldwide  (877) 702-9580

Page 25

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      Q.  These were face-to-face meetings with
3  Lehman people?
4      A.  They were phone calls.
5      Q.  Phone calls.  And do you remember any
6  of the people with whom you had those -- any of
7  the Lehman people with whom you had those phone
8  calls on that Saturday?
9      A.  Yes.
10     Q.  Who?
11     A.  Mike Webb, David Lohuis.  I believe
12  that's it.
13     Q.  Did you ever speak with Paolo Tonucci
14  that Saturday?
15     A.  Yes, I believe so.
16     Q.  Did you speak with Ian Lowitt that
17  Saturday?
18     A.  No.
19     Q.  You know who those two people are,
20  correct?
21     A.  Yes.
22     Q.  And you did deal with them at some
23  point in connection with the transaction,
24  correct?
25     A.  Yes.  Well, let's clarify.  Your

TSG Reporting - Worldwide  (877) 702-9580

Page 26

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  question may be a little bit better.
3      Q.   Okay.  Did you deal with Mr. Tonucci
4  in connection with the transaction?
5      A.   Which transaction?
6      Q.   The Lehman/Barclays transaction.
7      A.   The only reason why I'm discerning the
8  two is right now you're discussing me on
9  Saturday, so the answer would be no, I did not
10 discuss with Ian Lowitt that transaction or
11 exercise that I was currently involved in.
12     Q.   Is it fair to say that you discussed
13 that exercise you were involved in on Saturday,
14 the 13th, with Mr. Tonucci?
15     A.   Yes, I believe so.
16     Q.   Do you recall what you discussed with
17 Mr. Tonucci about that exercise?
18     A.   I recall in very broad sense as to
19 what the collateral mix looked like on Lehman
20 Brothers' balance sheet.
21     Q.   Was that a discussion about types of
22 collateral?
23     A.   When you say "discussion," what I
24 remember is perhaps simply, "Here's a breakdown
25 of our collateral mix," and that was the extent

TSG Reporting - Worldwide (877) 702-9580

Page 27

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  of our discussion.
3      Q.   All right.  Let's move forward on to
4  Sunday.  What was your involvement with any
5  aspect of any Lehman/Barclays transaction on
6  Sunday, the 14th?
7      A.   On Sunday, I was still crossing the
8  T's and dotting the I's, if you will, on the
9  previous day's exercise.
10     Q.   And did you prepare some kind of a
11 e-mail or a report on the conclusions you had
12 reached in your exercise?
13     A.   I believe I did.  That would be
14 reasonable.
15     Q.   Other than completing the exercise
16 that started on Saturday, were there any new
17 tasks related to the Lehman/Barclays transaction
18 that you engaged in on Sunday, the 14th?
19     A.   Any new tasks?  No.
20          (Exhibit 264 a document bearing Bates
21 Nos. BCI-EX-(S)-37165, marked for
22 identification, as of this date.)
23     Q.   Sir, I have placed before you a
24 one-page document marked Exhibit 264.  Take a
25 moment to look at it.  Let me know when you're

TSG Reporting - Worldwide (877) 702-9580

Page 28

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  done reviewing it.
3          (Document review.)
4      A.   Okay.
5      Q.   Do you recognize that as an e-mail
6  from Eric Bommensath to someone at Lehman?
7  You're copied on that e-mail, do you see it?
8      A.   I don't remember this e-mail.
9      Q.   No reason to believe you didn't
10 receive it, correct?
11     A.   All I can say is I don't remember the
12 e-mail.  I see that I'm CC'd on it, but I
13 received many e-mails that I was CC'd on.
14     Q.   Who is Eric Bommensath?
15     A.   Eric Bommensath is a managing director
16 at Barclays that's in charge of rates for
17 Barclays Capital North America.
18     Q.   Is he someone that you report to?
19     A.   No.
20     Q.   Just in terms of the seniority and
21 standing at Barclays Capital, where does he fit
22 in vis-a-vis Mr. Dearlove?
23     A.   Are you asking me how much senior is
24 Eric than Mark Dearlove?
25     Q.   If he is.

TSG Reporting - Worldwide (877) 702-9580

Page 29

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      A.   Eric Bommensath is senior to Mark
3  Dearlove, but in different reporting lines.
4      Q.   The reference in this e-mail to your
5  having spoken with David Lohuis and Mike Webb
6  from Lehman, do you see that?
7      A.   Yes, I can read the e-mail.
8      Q.   Do you have a recollection of having
9  spoken with Mr. Lohuis and Mike Webb from
10 Lehman?
11     A.   As I mentioned to you before, you
12 asked that question and those are the two people
13 I noted that I spoke with.
14     Q.   There's a reference in that same line
15 to, "They are worried to provide the file we
16 need."  Do you see that?
17     A.   I do see that.
18     Q.   Do you have any understanding what
19 that means?
20     A.   In the context of this e-mail, no, I
21 don't know.
22     Q.   And in terms of your recollection, do
23 you have any recollection that there were any
24 concerns or worries from Lehman about providing
25 the files that you need?

TSG Reporting - Worldwide (877) 702-9580

8

## Page 30

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      A.   No.
3           (Exhibit 265, a document bearing Bates
4      Nos. BCI-EX-(S)-37172 through 173, marked
5      for identification, as of this date.)
6      Q.   I have placed before you a two-page
7  document marked Exhibit 265. It's an e-mail
8  exchange. Take a moment to look at it. Let me
9  know when you're done looking at it.
10          (Document review.)
11     A.   I've finished reading it.
12     Q.   Starting from the first e-mail on the
13 first page, actually on the first page of
14 Exhibit 265, the very top of the page, there's
15 an e-mail from you to Mr. Bommensath. Do you
16 see that?
17     A.   I do see it.
18     Q.   Okay. And you state in that e-mail,
19 "I'm going to get everything I want it sounds
20 like." Do you see that?
21     A.   I can read it, yes.
22     Q.   And is it consistent with your
23 recollection that the information that you had
24 requested had been provided to you or was going
25 to be provided to you by Lehman?

TSG Reporting - Worldwide (877) 702-9580

## Page 31

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      A.   Yes.
3      Q.   And you state later on in your e-mail
4  you spoke to Paolo and indirectly Ian, do you
5  see that?
6      A.   Yes, I see it.
7      Q.   Do you have any understanding what you
8  meant by you had spoken indirectly with Ian?
9      A.   No.
10     Q.   The Saturday into Sunday, the 13th and
11 14th of September, did you have any
12 understanding of what the nature of the
13 contemplated transaction between Lehman and
14 Barclays was?
15     A.   No.
16     Q.   Did you have any understanding that a
17 transaction was not going to happen that
18 weekend?
19     A.   At what time?
20     Q.   At any point in Saturday/Sunday.
21     A.   Very late Sunday, it appeared to me
22 that there would not be a transaction.
23     Q.   And how did you get that
24 understanding?
25     A.   I believe I came to that conclusion

TSG Reporting - Worldwide (877) 702-9580

## Page 32

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  independently when I was told to go home.
3      Q.   Did you ask anyone about the status of
4  the transaction?
5      A.   I may have, but I don't remember who.
6  I certainly didn't get an answer.
7           (Exhibit 266, a document bearing Bates
8      Nos. BCI-EX-(S)-37192 through 194, marked
9      for identification, as of this date.)
10     Q.   Sir, I have placed before you a
11 three-page document marked Exhibit 266. The
12 last page is entirely blank. Take a moment to
13 look at that exhibit. Let me know when you're
14 done.
15          (Document review.)
16     A.   Okay.
17     Q.   Do you recognize this Exhibit 266 as
18 an e-mail that you sent to Mr. Dearlove and
19 others on or about Sunday, the 14th of
20 September, 2008?
21     A.   I don't remember this specific e-mail.
22     Q.   No reason to believe you didn't
23 prepare this e-mail, correct?
24     A.   That's correct.
25     Q.   We talked earlier about your having

TSG Reporting - Worldwide (877) 702-9580

## Page 33

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  summarized your conclusions in an e-mail or some
3  kind of report. Do you remember that
4  discussion?
5      A.   Yes.
6      Q.   Okay. Is this e-mail Exhibit 262 a
7  summary of your conclusions about the valuation
8  exercise that you did on Saturday and Sunday,
9  September 13th and 14th, 2008?
10     A.   My page here says 266.
11     Q.   Yes, Exhibit 266.
12          MR. SHAW:  You misspoke. You said
13     262.
14     Q.   Okay. 266.
15     A.   Yes.
16     Q.   The dollar values that appear in this
17 e-mail, are these the dollar values that you
18 ascribed to the relevant positions?
19     A.   Yes.
20     Q.   Turn to page 2 of this exhibit 266.
21 At the top of the page, there's a paragraph that
22 begins, "Their risking and NPV methodology is
23 sound and similar to what we do," do you see
24 that?
25     A.   I see it.

TSG Reporting - Worldwide (877) 702-9580

Page 34

```
 1         HIGHLY CONFIDENTIAL - D. PETRIE
 2      Q.   What did you mean by the phrase
 3   "risking and NPV methodology"?
 4      A.   "NPV" stands for net present value,
 5   and when a repo desk has engaged in term trades,
 6   there is an assigned rate to those term trades
 7   at the point of the initiation of said trade.
 8   As you move away from day one of that execution
 9   of the trade, prevailing rates will change over
10   time, and as they change, one calculates net
11   present value at those prevailing rates.
12      Q.   From your statement in this paragraph
13   that we were just reading, "Their risking and
14   NPV methodology is sound and similar to what we
15   do," were you indicating that you approved of
16   the way they risked -- they did their risking
17   and NPV methodology?
18         MR. SHAW:   Objection to form.  Vague
19   as to what you're -- the scope of his
20   approval of any methodology.
21      A.   Can you repeat the question?
22      Q.   Sure.
23         MR. TAMBE:   Can you read it back,
24   please?
25         (Record read.)
```
TSG Reporting - Worldwide (877) 702-9580

Page 35

```
 1         HIGHLY CONFIDENTIAL - D. PETRIE
 2      A.   No.
 3      Q.   What did you mean by your statement,
 4   then?
 5      A.   In general, repo desks should employ a
 6   way to risk their books.  It appeared over the
 7   very short amount of time that I've had the
 8   opportunity to look at their repo balances that
 9   they employed, at the very least, NPV
10   valuations.
11      Q.   And was the methodology used by Lehman
12   similar to the one used by Barclays?
13      A.   The way -- the very fact that they had
14   an NPV by nature of calculating an NPV would, by
15   nature, be similar to Barclays.
16      Q.   And what did you mean by your phrase
17   "the methodology is sound"?  What did you mean
18   by that?
19      A.   The math in calculating the net
20   present value of a term trade did not seem
21   flawed at the time I was looking at their books.
22      Q.   You say beyond that paragraph, "The
23   specials book is reflected at zero."  You see
24   that?
25      A.   I see it.
```
TSG Reporting - Worldwide (877) 702-9580

Page 36

```
 1         HIGHLY CONFIDENTIAL - D. PETRIE
 2      Q.   What did you mean by that?
 3      A.   They had wound down their specials
 4   book to have very little exposure.
 5      Q.   At the bottom of page 2 of Exhibit
 6   266, the paragraph with the word "Summary" above
 7   it, do you see that paragraph?
 8      A.   I see it.
 9      Q.   You have a sentence in the middle of
10   that paragraph that reads, "The repo desk's
11   methodology on trading and with whom appears
12   robust in its risk controls and management," do
13   you see that?
14      A.   Yes.
15      Q.   Okay.  And what did you mean by
16   "appears robust in its risk controls and
17   management"?
18      A.   It appeared to me during the short
19   period of me looking at those -- their books
20   that they understood the risks that they were
21   writing in repo.
22         (Exhibit 267, a document bearing Bates
23   Nos. BCI-EX-(S)-37195 through 197, marked
24   for identification, as of this date.)
25      Q.   Sir, I have placed before you a
```
TSG Reporting - Worldwide (877) 702-9580

Page 37

```
 1         HIGHLY CONFIDENTIAL - D. PETRIE
 2   three-page document marked Exhibit 267.  Take a
 3   moment to review this exhibit.  Let me know when
 4   you're done.
 5         (Document review.)
 6      A.   Okay.
 7      Q.   Do you recognize Exhibit 267 as a
 8   further piece of the analysis that was done by
 9   you and your team that weekend of September 13
10   and 14 of 2008?
11      A.   I don't remember this specific e-mail.
12      Q.   Having reviewed it now, do you
13   recognize it as part of that analysis?
14      A.   Yes.
15      Q.   This e-mail was prepared by
16   Mr. Hartley, correct?
17      A.   Yes.
18      Q.   Do you recall having a discussion with
19   Mr. Hartley about his conclusions and his
20   conclusions and his calculations in this e-mail?
21      A.   No.
22      Q.   One of the addressees on the e-mail is
23   Brian Rozen, R-O-Z-E-N.  Who is Mr. Rozen?
24      A.   Brian Rozen at the time was equal in
25   my, you could say in my title.  His
```
TSG Reporting - Worldwide (877) 702-9580

Page 38

HIGHLY CONFIDENTIAL - D. PETRIE
1
2   responsibilities were he was based in London and
3   was responsible for the financing of corporate
4   bond positions. His team was responsible for
5   the corporate bond positions.
6       Q.   On the weekend of the 13th and 14th,
7   were you engaged in an exercise to identify
8   assets that Barclays would not wish to purchase
9   from Lehman if there were -- if there was a
10  transaction?
11      A.   No.
12      Q.   At any time during that ten-day
13  period, starting on the 13th through the 23rd,
14  were you involved in such an exercise?
15      A.   No.
16      Q.   We'll come to an e-mail, an e-mail
17  which makes reference to a spreadsheet of
18  excluded assets. Does that have any meaning to
19  you?
20      A.   Yes.
21      Q.   Okay. What is your understanding of
22  the phrase "excluded assets" in this context?
23      A.   In the context of the timeframe, which
24  I believe you said from the 10th to the --
25      Q.   From the 13th to the 23rd.
TSG Reporting - Worldwide (877) 702-9580

Page 39

HIGHLY CONFIDENTIAL - D. PETRIE
1
2       A.   -- 13th to the 23rd, as we move into a
3   few days into that week, my sole responsibility
4   was to facilitate removing the Fed's funding of
5   Lehman Brothers and replace it with Barclays
6   funding Lehman Brothers. To accomplish that
7   would mean simply we would just take the assets
8   that the Fed was funding.
9       Q.   And the phrase "excluded assets," what
10  meaning does that phrase have in the context of
11  your answer?
12          MR. SHAW: Had you finished your
13  answer?
14      A.   No, I wasn't finished.
15      Q.   Go ahead and finish.
16      A.   To accomplish the task of only
17  receiving the collateral that the Fed had been
18  financing for Lehman being, by nature, include
19  assets that weren't being financed by the Fed,
20  which would be excluded assets.
21      Q.   You completely lost me with the last
22  part of your answer, so let me try again.
23          Later on in the week, you're involved
24  in the process of replacing the Fed financing
25  with the Barclays financing, is that fair to
TSG Reporting - Worldwide (877) 702-9580

Page 40

HIGHLY CONFIDENTIAL - D. PETRIE
1
2   say?
3       A.   Yes.
4       Q.   There are assets that are securing the
5   Fed financing, correct?
6       A.   Yes.
7       Q.   Are those same assets then used to
8   secure the Barclays financing?
9       A.   The intent was for Barclays to finance
10  the assets that the Fed had been financing on
11  Thursday of that week.
12      Q.   And in connection with Barclays
13  financing the assets that the Fed had been
14  financing, what role, if any, did excluded
15  assets play in that financing?
16      A.   Since Lehman Brothers was financing
17  assets outside of the Fed facility, and my only
18  purpose that week was to remove the Fed from
19  financing of the assets from that Thursday would
20  imply that there were -- not just imply, there
21  were other assets that would be excluded from
22  the Fed replacement trade, as I would call it.
23      Q.   So your understanding is the excluded
24  assets were those assets that in fact were not
25  securing the Fed financing?
TSG Reporting - Worldwide (877) 702-9580

Page 41

HIGHLY CONFIDENTIAL - D. PETRIE
1
2       A.   Yes.
3           (Exhibit 268, a document bearing Bates
4   Nos. BCI-EX-(S)-37199 through 200, marked
5   for identification, as of this date.)
6           (Discussion off the record.)
7           (Recess; Time Noted: 10:35 A.M.)
8           (Time Noted: 10:47 A.M.)
9   BY MR. TAMBE:
10      Q.   I think before we took the break, sir,
11  we placed in front of you a document Exhibit
12  268. Have you looked at that?
13      A.   No, I have not.
14      Q.   Why don't you take a look at that and
15  let me know when you're done.
16          (Document review.)
17      A.   Okay. I've read it.
18      Q.   On the first page of Exhibit 268,
19  that's an e-mail from Mr. Rozen to you
20  forwarding a set of e-mails. Do you see that?
21      A.   Yes.
22      Q.   And is it fair to say that this
23  collection of e-mails on pages 1 and 2 of
24  Exhibit 268 have to do with Barclays' existing
25  exposure to Lehman on the 14th, the Sunday, 14th
TSG Reporting - Worldwide (877) 702-9580

Page 42

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  of September, 2008?
3      A.   It appears to be.
4      Q.   This is not connected with any
5  contemplated larger transaction, that's just the
6  exposure that you had with -- to Lehman going
7  into that weekend, is that fair?
8      A.   Yes.
9      (Exhibit 269, a document bearing Bates
10  Nos. BCI-EX-(S)-37215 with attached chart,
11  marked for identification, as of this date.)
12      Q.   Sir, I've handed you a three-page
13  documents marked Exhibit 269. Take a moment to
14  look at it. Let me know when you're done.
15      (Document review.)
16      A.   Okay.
17      Q.   Do you recognize this three-page
18  document as an e-mail from Mr. Hartley to you
19  attaching an Excel spreadsheet?
20      A.   I recognize the document. I don't
21  recall Nate Hartley sending it to me, but I
22  recognize the document.
23      Q.   And if you could just briefly describe
24  the two-page spreadsheet that's attached to the
25  cover page. What is that document?

TSG Reporting - Worldwide (877) 702-9580

Page 43

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      A.   It appears to be a document that
3  Lehman would have produced to detail their --
4  their Holdings.
5      Q.   And I gather from your answer that you
6  can tell by looking at this document that this
7  is not a Barclays-prepared document, is that
8  fair?
9      A.   Yes, that's fair.
10      Q.   And your belief is it's a
11  Lehman-prepared document?
12      A.   Yes, it appears so.
13      Q.   Do you have any understanding about
14  the entries that appear in the second column
15  over? There's no heading, but there are a
16  series of percentages that appear there, do you
17  see that?
18      A.   I do see a column that's not head --
19  doesn't have a header.
20      Q.   And do you have an understanding as to
21  what those percentages mean?
22      A.   I do not have a clear understanding of
23  what those percentages mean.
24      Q.   Okay. In the context of this, of the
25  information that's contained on this

TSG Reporting - Worldwide (877) 702-9580

Page 44

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  spreadsheet, what's your best guess as to what
3  those percentages are?
4      MR. SHAW: Objection. Calls for
5  speculation.
6      MR. TAMBE: Sure does.
7      A.   I would speculate that these numbers
8  might represent haircuts.
9      Q.   If you look at the subject line of the
10  cover e-mail, the subject line states, "LIF
11  haircuts.xls," do you see that?
12      A.   I see it.
13      Q.   Was it your understanding that the
14  Lehman/Barclays transaction, at least the
15  weekend of September 13-14th, was being referred
16  to as the Long Island transaction?
17      MR. SHAW: Objection to form.
18      A.   Can you repeat the question?
19      (Record read.)
20      A.   No.
21      Q.   Let's go back to some of the exhibits
22  we were looking at before, some of the e-mails.
23      If you look at Exhibit 266, that's
24  your e-mail to Mr. Dearlove and others, do you
25  see that?

TSG Reporting - Worldwide (877) 702-9580

Page 45

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      A.   Yes.
3      Q.   Right? And your subject line, it's
4  "Initial Thoughts on Project long Island," do
5  you see that?
6      A.   Yes.
7      Q.   Does that refresh your recollection
8  that you referred to this Barclays transaction
9  that weekend as the Long Island project?
10      A.   I can see on that e-mail that I have
11  referred to initial thoughts on project Long
12  Island.
13      Q.   Okay. And this was a reference to the
14  Lehman/Barclays exercise that you were doing
15  that weekend, correct?
16      A.   I was involved, as we discussed, in a
17  project that weekend. I had heard other names
18  associated with that exercise.
19      Q.   Including Long Island?
20      A.   Yes.
21      Q.   And that was the Barclays name for
22  that transaction?
23      A.   I don't know.
24      (Exhibit 270, a document bearing Bates
25  Nos. BCI-EX-(S)-37217, with attached chart,

TSG Reporting - Worldwide (877) 702-9580

Page 46

1    HIGHLY CONFIDENTIAL - D. PETRIE
2   marked for identification, as of this date.)
3        Q.   Sir. I have placed before you a
4   three-page document marked Exhibit 270. Take a
5   look at it and let me know when you're done.
6        A.   May I ask, is this document different
7   than the previous document?
8        Q.   I think the attachment on both exhibit
9   269 and 270, at least to my eye, looks to be
10  similar, but you can confirm that for yourself.
11       Why don't we hold 270 aside. I just
12  want to make sure we've got the right attachment
13  to it, because these are native files that were
14  attached to that cover e-mail. So put 270
15  aside. We'll come back to it.
16       (Exhibit 271, a document bearing Bates
17  Nos. BCI-EX-(S)-37270, marked for
18  identification, as of this date.)
19       Q.   I have placed before you a one-page
20  document marked Exhibit 271. Take a moment to
21  review it and let me know when you're done.
22       (Document review.)
23       A.   I've read it.
24       Q.   And you recognize this as an e-mail
25  that you sent to your team and others at
TSG Reporting - Worldwide (877) 702-9580

Page 47

1    HIGHLY CONFIDENTIAL - D. PETRIE
2   Barclays, correct?
3        A.   I don't remember this e-mail in
4   particular.
5        Q.   Okay. No reason to believe you didn't
6   send this e-mail, right?
7        A.   Correct.
8        Q.   And just briefly, is it fair to say
9   that this e-mail is a set of instructions that
10  you gave your team on dealing with Lehman the
11  day of the Lehman bankruptcy filing?
12       A.   You've actually asked a two-part
13  question.
14       Q.   I have?
15       A.   Well, in my head you have.
16       So, first, I recognize this as a plan
17  of action for trading on Monday morning. No, I
18  don't believe it was at all related to me
19  thinking that there was going to be a pending
20  bankruptcy filing. It was me being cautious, as
21  I would be on any other volatile day, in regards
22  to how we would approach the market in trading.
23       Q.   Prior to September 15th, 2008, had
24  there been other days on which you had
25  instructed your team not to face Lehman?
TSG Reporting - Worldwide (877) 702-9580

Page 48

1    HIGHLY CONFIDENTIAL - D. PETRIE
2        A.   Yes, I believe so.
3        Q.   How many other days were there where
4   you had instructed your traders, your team not
5   to face Lehman?
6        A.   I don't know exactly.
7        Q.   Dozens of days?
8        A.   Perhaps.
9        Q.   In item number 7 of your e-mail you
10  state, "We need to monitor throughout the day
11  our settlements with Lehman and alert me to any
12  pending fails that may be related to Lehman."
13       What did you mean by that?
14       A.   Given the volatility in the
15  marketplace around the name Lehman, I was being
16  an encouraging prudence in regards to our
17  settlements with Lehman.
18       Q.   Is it fair to say that your
19  instruction in item number 1, "Do not face
20  Lehman," was an instruction not to put on new
21  trades with Lehman?
22       A.   Yes.
23       (Exhibit 272, a document bearing Bates
24  Nos. BCI-EX-115847 through 5876, marked for
25  identification, as of this date.)
TSG Reporting - Worldwide (877) 702-9580

Page 49

1    HIGHLY CONFIDENTIAL - D. PETRIE
2        Q.   Mr. Petrie, I have placed before you a
3   multi-page document marked Exhibit 272, and
4   before I ask you to sort of go through the
5   entire document, because it's a collection of
6   handwritten notes and other documents, I'm just
7   going to ask you some general questions about
8   different parts of this exhibit, okay?
9        A.   Would you like me to answer those
10  questions before reviewing the document?
11       Q.   Yes. And then as we get to different
12  stages, I'll let you review parts of the
13  document.
14       First of all, there's some handwriting
15  on the first several pages of this exhibit, do
16  you see that?
17       A.   Yes, there is.
18       Q.   Is that your handwriting?
19       A.   Without going through it in detail, it
20  appears mostly to be my handwriting.
21       Q.   And is it your understanding in the
22  last couple of days you produced for copying and
23  production a set of your handwritten notes
24  related to the Lehman/Barclays transaction?
25       A.   Yes.
TSG Reporting - Worldwide (877) 702-9580

Page 50

HIGHLY CONFIDENTIAL - D. PETRIE
1
2   Q.   Okay.  And it appears from these
3   photocopies that these are pages of a notebook
4   or a calendar, do you see that?  Do you see the
5   spiral binding down the side?
6   A.   Yes.
7   Q.   Do you in fact have a notebook that
8   has these notes in it?
9   A.   Yes.
10   Q.   Okay.  And was it your practice in or
11   about September 2008 to have daily notes of the
12   tasks that you were working on?
13   A.   Yes.
14   Q.   We're going to circle back to some of
15   the specific pages, but I want to turn your
16   attention in this exhibit all the way down to
17   page 115873.  And pages 873, 874 and 875 are
18   what appear to be a printout of a spreadsheet
19   with some handwritten notations on them.  Do you
20   see that?
21   A.   Yes.
22   Q.   And do you recognize that as your
23   handwriting that appears on those pages?
24   A.   In part.
25   MR. SHAW:  Just so we're clear, it
TSG Reporting - Worldwide (877) 702-9580

Page 51

HIGHLY CONFIDENTIAL - D. PETRIE
1
2   appears there's a duplicate page.  The
3   handwriting's different, but 873 and 874
4   appear to be the same page.
5   Q.   So we'll circle back and talk a little
6   bit more about that.  876, the very last page of
7   this exhibit, do you recognize that page?
8   A.   Yes.
9   Q.   Is that your handwriting?
10   A.   No.
11   Q.   What do you recognize that page as?
12   A.   I recognize this page as a relatively
13   broad attempt at a timeline.
14   Q.   And you said it was not your
15   handwriting, correct?
16   A.   That is correct.
17   Q.   Do you know whose handwriting it is?
18   A.   Yes.
19   Q.   Whose?
20   A.   Gerard LaRocca.
21   Q.   Do you know if this document, this
22   last page, page 876, was something that you
23   found in your files or your notes?
24   A.   Yes.
25   Q.   Okay.  Tell me about it.  How did
TSG Reporting - Worldwide (877) 702-9580

Page 52

HIGHLY CONFIDENTIAL - D. PETRIE
1
2   Mr. LaRocca's handwriting rough outline show up
3   in your notes?
4   A.   Gerard LaRocca and I at different
5   times throughout that week had spoken, and I
6   don't remember the exact timing of when this was
7   written.
8   Q.   And it's your understanding that this
9   page, page 876, the last page of this exhibit,
10   was a document prepared by Mr. LaRocca in or
11   about that week that we've been talking about,
12   the week of September 15th through 22nd of 2008?
13   A.   Yes.
14   Q.   If I just understand what's being
15   described here, there are basically two types of
16   financing being described here, correct?
17   MR. SHAW:  Objection.  Foundation.
18   A.   It appears, yes, to have two types of
19   financing being discussed.
20   Q.   And it describes day-by-day in
21   columns the status of each of those types of
22   financing, correct?
23   MR. SHAW:  Objection.  Foundation.
24   A.   I don't believe "status" is perhaps
25   the right word.
TSG Reporting - Worldwide (877) 702-9580

Page 53

HIGHLY CONFIDENTIAL - D. PETRIE
1
2   Q.   What's the word you'd use?
3   A.   Tuesday, we meet with the Fed and
4   we're asked -- Barclays is being asked to take
5   the Fed out of the Lehman financing.  It says a
6   "status" on the bottom, meaning where -- what
7   we're being requested to do by the Fed, being
8   told what to do by the Fed.
9   Wednesday, Barclays prepares to
10   execute on that request by the Fed.  Thursday,
11   we begin on that execution that was requested by
12   the Fed.
13   Q.   And there's dollar amounts associated
14   with the Thursday entries, do you see that?
15   A.   Yes, I see several dollar amounts.
16   Q.   And the items that you were describing
17   appear on the same line or row as the heading
18   "Fed Facility" in the left-hand side, do you see
19   that?
20   A.   Yes.
21   Q.   Above that there's another row, which
22   is titled "Barclays Tries to Assist LB by
23   Providing Liquidity Through Collateralized
24   Repo," do you see that?
25   A.   I see it.
TSG Reporting - Worldwide (877) 702-9580

14

Page 54

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    Q.   And then under Monday, Tuesday,
3    Wednesday and Thursday, there are numbers that
4    appear there, do you see that?
5    A.   Yes.
6    Q.   And do you understand that as being
7    the amount of the tri-party repo that Barclays
8    had on with Lehman during the first four days of
9    that week, the week of September 15th?
10   A.   You said four days.
11   Q.   Monday, Tuesday, Wednesday, Thursday.
12   A.   There's only three days noted here.
13   Q.   Okay. There's a Thursday there, is
14   there not?
15   A.   Okay, the number being zero.
16   Q.   Right.
17   A.   Yes, so four days.
18   Q.   So you have my question in mind?
19   A.   Can you repeat it?
20   Q.   Before we talk about the number of
21   days out of question.
22        (Record read.)
23   A.   These numbers seem to be accurate as
24   to the tri-party between Barclays and Lehman.
25   Q.   And if I understand the information

TSG Reporting - Worldwide (877) 702-9580

Page 55

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    contained in that row that we've been looking
3    at, that tri-party repo is reduced to zero by
4    Thursday, correct?
5    A.   This document says zero, that's
6    correct.
7    Q.   And that's your recollection of what
8    happened, right?
9    A.   Yes.
10   Q.   And on Thursday, it's also the day
11   that Barclays funds the replacement for the Fed
12   repo, correct?
13   A.   May I clarify --
14   Q.   Sure.
15   A.   -- your statement?
16        Thursday is the day that we were
17   executing at the behest of the Fed to remove
18   them from the funding of Lehman Brothers.
19   Q.   And you do so by funding a repo that
20   replaces the Fed repo, correct?
21   A.   That was the intention, correct.
22   Q.   On this last page of Exhibit 272, in
23   the "Fed Facility" row under "Thursday" there
24   are three items that appear, do you see that?
25   A.   Yes.

TSG Reporting - Worldwide (877) 702-9580

Page 56

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    Q.   The first item states, "Barclays wires
3    45 billion," correct?
4    A.   Yes.
5    Q.   That's the financing that Barclays
6    provided to Lehman on that Thursday, September
7    18th, correct?
8    A.   Yes.
9    Q.   Okay. The next item that appears
10   under the "Thursday" heading is, "Expected to
11   receive 49.6 in securities," do you see that?
12        MR. SHAW: Objection.
13   Mischaracterizes the document. It's
14   "expects," not "expected."
15   Q.   Okay. "Expects to receive 49.6 in
16   securities," do you see that?
17   A.   Yes.
18   Q.   And that's a reference to 49.6
19   billion, correct?
20   A.   Yes.
21   Q.   The next entry under the "Thursday"
22   column reads, "Actually receives 7B cash secured
23   in tri-party account at JPM. 43.3 in
24   securities," correct?
25        MR. SHAW: Is your question whether

TSG Reporting - Worldwide (877) 702-9580

Page 57

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    that's what appears on the sheet?
3        MR. TAMBE: Yes.
4        MR. SHAW: Or is that what happened?
5    Q.   Is that what appears on the sheet?
6    A.   Yes.
7    Q.   That's your understanding --
8    A.   That appears on the sheet. It states,
9    "7 billion cash secured in tri-party account at
10   JPM," and below that it says, "43.3 in
11   securities."
12   Q.   Okay. And the 43.3 is 43.3 billion,
13   correct?
14   A.   Billion.
15   Q.   Okay. And these are notes prepared by
16   Mr. LaRocca, correct?
17   A.   Yes.
18   Q.   All right. Let's go back to your --
19   the beginning of this exhibit, Exhibit 272.
20        Let me ask you, do you have the
21   original of this notebook here?
22        MR. SHAW: Here, no.
23        MR. TAMBE: We would like to take a
24   look at the original because of the
25   photocopy of handwritten notes, and I think

TSG Reporting - Worldwide (877) 702-9580

15

Page 58

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2    there's probably features on some of these
3    pages that we can't make out because of the
4    photocopying. So whenever you get a chance,
5    we would like to inspect the original.
6        MR. SHAW: We'll look into it. I
7    mean --
8        MR. TAMBE: Okay. It might make this
9    examination easier, so it's unfortunate that
10    we don't have the original here.
11        Q.    We've put together these pages in
12    Bates number order. Can you flip through these
13    pages and see, is this the order in which these
14    pages appear in your notebook.
15        (Document review.)
16        A.    It seems that they're in the order
17    they would be in my notebook. I would make a
18    couple clarifications.
19        Q.    Sure. Go ahead.
20        A.    Some of the dates on the pages are
21    incorrect. It seems that the dates are one day
22    ahead of perhaps what those dates were actually
23    when the notes were taken. That's human error,
24    had the wrong date. And it's possible, as I was
25    going through a volatile week, that I could be

TSG Reporting - Worldwide (877) 702-9580

Page 59

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2    jumping from pages forward or backward as I
3    would be making notes in a hurry. So they may
4    not necessarily be in perfect chronological
5    order.
6        Q.    Okay. If I understand your answer,
7    you seem to have confirmed that at least the
8    sequence in which these pages appear is the same
9    sequence in which they appear in your physical
10    notebook?
11        A.    They appear to be, yes.
12        Q.    Okay. But it may be that when you
13    were keeping those notes, you were jumping
14    around pages, given everything that was going on
15    that week?
16        A.    Correct.
17        Q.    Okay.
18        A.    And that the dates may be inconsistent
19    with the actual date on the top.
20        Q.    Okay. And your sense that the date
21    may be incorrect is based on the content of the
22    words versus the date that appears; is that
23    right?
24        A.    Yes.
25        Q.    And you generally remember -- okay.

TSG Reporting - Worldwide (877) 702-9580

Page 60

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2    Let's go through some of the these pages and we
3    can see if that's an issue that we need to drill
4    down on more.
5        Let's start with the first page.
6    What's your best understanding of the notations
7    that appear on that first page? What's being
8    described there?
9        A.    It appears to be me thinking out loud
10    about financing of positions.
11        Q.    There's no date, as far as I can tell,
12    that appears on that first page. Do you see
13    that?
14        A.    Yes.
15        Q.    The next page of the exhibit has a
16    date of 9/17/08 at the top. See that?
17        A.    Yes.
18        Q.    Does that at all help you in terms of
19    dating that first page, when it is that you were
20    making these notes?
21        A.    It doesn't.
22        Q.    You've got -- there's one date that
23    appears in a comment at the bottom of the page.
24    I'm going to need your help understanding. This
25    is on page 1 of the exhibit, the page that ends

TSG Reporting - Worldwide (877) 702-9580

Page 61

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2    in 847.
3        At the bottom of the page you've got a
4    "9/16." Do you see that?
5        A.    I see that.
6        Q.    If you can help us just understand
7    that comment that's appearing at the bottom
8    there. What is that comment? It's a
9    handwriting question.
10        A.    It appears to say, "10 and a half
11    billion versus equity, September 16."
12        Q.    And then below that?
13        A.    "Intraday cash needed to facilitate
14    settlements."
15        Q.    Does that help you date this page at
16    all?
17        A.    May I ask what day of the week
18    September 16th was?
19        Q.    It's a Tuesday, I believe. The 15th
20    was a Monday.
21        A.    Given that I made improper dates on
22    pages after these, I can't be certain if I meant
23    Monday or Tuesday.
24        Q.    At the top of this first page, there
25    appear to be items for treasuries, agencies and

TSG Reporting - Worldwide (877) 702-9580

Page 62

1        HIGHLY CONFIDENTIAL - D. PETRIE
2    mortgages, do you see that?
3        A.   Yes.
4        Q.   And the numbers that appear after each
5    of those, what are those numbers?
6        A.   Do you want me to give my best guess?
7        Q.   Your best guess, yes.
8        MR. SHAW: Objection. Calls for
9    speculation.
10       A.   Those numbers, 25 cents, 2.75 and
11   2.90, were probably reflective of current market
12   rates for repo transactions.
13       Q.   And are those references to haircuts
14   for those types of assets; is that what you're
15   referring to?
16       A.   No.
17       Q.   Okay. When you say they're current
18   market rates, how are those market rates being
19   expressed?
20       A.   A repo transaction has two parties,
21   normally, one party that's lending collateral
22   and another party that's lending cash. The
23   party lending cash will receive an interest rate
24   on that cash for the term of that loan. These
25   appear to be rates that would be attached to
TSG Reporting - Worldwide (877) 702-9580

Page 63

1        HIGHLY CONFIDENTIAL - D. PETRIE
2    those types of loans.
3        Q.   Further down on that first page 847,
4    there's a reference that appears to be the
5    number 100 followed by some words. You see
6    that?
7        A.   Yes.
8        Q.   Can you decipher that for me, please?
9        A.   "100 billion to Barclays" is what it
10   appears to be.
11       Q.   And do you have an understanding as to
12   what that entry means, "100 billion to
13   Barclays"?
14       A.   No.
15       Q.   At any time during that week, the week
16   of the 15th through the 22nd of September, did
17   you ever discuss with anyone the overall
18   economics of the transaction between Lehman and
19   Barclays?
20       A.   No.
21       MR. SHAW: Objection.
22       Q.   Do you know whether the transaction,
23   the acquisition of these assets by Barclays from
24   Lehman, resulted in a gain to Barclays?
25       A.   No.
TSG Reporting - Worldwide (877) 702-9580

Page 64

1        HIGHLY CONFIDENTIAL - D. PETRIE
2        Q.   Did anyone tell you about a discount
3    in the sale of assets from Lehman to Barclays?
4        A.   No.
5        Q.   Were you ever part of any
6    conversations or discussions about marking down
7    the Lehman assets that were being purchased by
8    Barclays?
9        A.   No.
10       Q.   Have you ever reviewed to this day the
11   Asset Purchase Agreement between Lehman and
12   Barclays?
13       A.   No.
14       Q.   Ever seen it?
15       A.   I've seen parts of it on the Internet.
16       Q.   When did you see parts of it on the
17   Internet?
18       A.   Approximately a month, couple months
19   ago maybe.
20       Q.   And for what purpose were you on the
21   Internet looking at parts of the APA?
22       A.   Curiosity.
23       Q.   Was it in connection with your
24   potential deposition in this case?
25       A.   No.
TSG Reporting - Worldwide (877) 702-9580

Page 65

1        HIGHLY CONFIDENTIAL - D. PETRIE
2        Q.   Other than looking at parts of the
3    APA -- let me withdraw that. What were you
4    curious about?
5        A.   I was curious about the enormity of
6    the times, so it wasn't just me looking at the
7    Lehman Brothers information. It would also be
8    looking at overall economically where we had
9    come from September 2000 -- September 2008 to
10   where we are now.
11       Q.   Were there other documents that you
12   were looking up on the Internet when you
13   happened across the APA?
14       A.   No.
15       Q.   Let me ask you the other way. Did you
16   go looking for the APA to see what the deal was?
17       A.   No.
18       Q.   And what is it that you remember about
19   the parts of the APA that you saw during your
20   Internet search?
21       A.   Simply that it was available on the
22   Internet.
23       Q.   Okay. Have you talked to anyone about
24   any of the terms of the APA?
25       A.   No.
TSG Reporting - Worldwide (877) 702-9580

Page 66

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    Q.   Are you aware of something called the
3    Clarification Letter?
4    A.   No.
5    Q.   Does that phrase have any meaning to
6    you?
7    A.   No.
8    Q.   Let's go back to this exhibit, Exhibit
9    272. The second page of the exhibit ends in
10   848. Do you see that?
11   A.   Yes.
12   Q.   If I'm reading this correctly, you
13   have a question that's sort of diagonally
14   written on this page, "When is Chapter 7
15   happening?" Is that what you have written
16   there?
17   A.   Yes.
18   Q.   And you had an understanding that the
19   Chapter 7 was the Chapter 7 filing by LBI, the
20   broker-dealer, correct?
21   A.   Can you ask the question again?
22   (Record read.)
23   A.   No.
24   Q.   Above that sentence we were just
25   discussing you have a star and then it reads,

TSG Reporting - Worldwide (877) 702-9580

Page 67

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    "We need to own assets." Did I read that
3    correctly?
4    A.   Yes.
5    Q.   And what was that a reference to?
6    A.   I don't remember.
7    Q.   Then you have two points at the middle
8    of the page numbered 1 and 2, do you see that?
9    A.   Yes.
10   Q.   Can you just help decipher those for
11   me?
12   A.   1 reads "Fed legal." 2, "Trading with
13   Lehman legal/PNL."
14   Q.   And what did you mean by those
15   entries?
16   A.   I don't remember.
17   Q.   Was it your concern during that week
18   that you felt like the Fed was pressuring
19   Barclays to provide financing to Lehman?
20   A.   No.
21   Q.   I believe earlier when you described
22   that week, you said you -- Barclays was told by
23   the Fed to provide replacement financing. Do
24   you remember saying that?
25   A.   Yes.

TSG Reporting - Worldwide (877) 702-9580

Page 68

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    Q.   What did you mean by that?
3    A.   The Fed asked/told -- the Fed
4    requested that Barclays replace them, being the
5    Fed, in the funding for the assets that the Fed
6    had been currently funding for Lehman as of
7    Thursday of that week.
8    Q.   Was it your sense that Barclays had
9    the option of saying no to the Fed?
10   MR. SHAW: Objection. Foundation.
11   A.   I don't know.
12   Q.   Was it your sense, based on what you
13   were doing at the company, that Barclays felt it
14   was under pressure to agree with the Fed's
15   request?
16   A.   I don't know.
17   Q.   Anyone ever say that to you?
18   A.   No.
19   Q.   Was your comment on page 2, Exhibit
20   272, did you have concerns about whether what
21   the Fed was doing was legal?
22   MR. SHAW: Objection. Asked and
23   answered.
24   A.   I never had that.
25   Q.   And your second point, "Trading with

TSG Reporting - Worldwide (877) 702-9580

Page 69

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    Lehman legal," were you concerned about the
3    legality of trading with Lehman?
4    MR. SHAW: Objection. Asked and
5    answered.
6    A.   What is your question?
7    Q.   That statement there, "Trading with
8    Lehman legal/PNL," did you have a concern when
9    you wrote that note about the legality of
10   trading with Lehman?
11   MR. SHAW: Objection. Asked and
12   answered.
13   A.   No.
14   Q.   What's the reference to PNL? What
15   does that mean?
16   A.   I don't know.
17   Q.   No idea what that means?
18   A.   No.
19   Q.   Does that abbreviation have any
20   meaning in your business?
21   A.   No.
22   Q.   I mean, P/L is profit/loss, correct?
23   A.   PNL is profit and loss.
24   Q.   PN. So these three letters, "PNL,"
25   ordinarily stand for profit and loss?

TSG Reporting - Worldwide (877) 702-9580

## Page 70

HIGHLY CONFIDENTIAL - D. PETRIE

1
2    A.    Yes.
3    Q.    The page numbered 850 at the bottom,
4    can you just read those notes to yourself. Let
5    me know when you're done.
6         (Document review.)
7    A.    Okay.
8    Q.    Just help me understand this. Do you
9    recognize this as a set of notes related to --
10   that were made on or about the same time?
11   A.    If you mean the same time as during
12   that week, the answer is yes.
13   Q.    No, and the items that appear on this
14   page, are these all thoughts related to one set
15   of events?
16   A.    I would say, looking at my
17   handwriting, until the last two points, it
18   appears to be one sitting, and to the bottom two
19   points, I appear to be -- have a little bit of
20   better handwriting, so maybe it's two separate
21   events. I'm not certain.
22   Q.    So just putting aside the bottom two
23   points, the rest of the text or the handwriting
24   that appears on this page, what is that, what
25   event or events is that handwriting capturing?

TSG Reporting - Worldwide (877) 702-9580

## Page 71

HIGHLY CONFIDENTIAL - D. PETRIE

1
2    A.    It appears to be capturing a broad
3    overview of the Fed -- of what the Fed had been
4    funding, touches on the type of collateral that
5    the Fed had been funding for Lehman Brothers,
6    and notes the -- at least two programs that the
7    Fed had been using to provide liquidity to
8    Lehman.
9         However, I should note that those two
10   acronyms, the TSLF and OMO, were not unique to
11   just Lehman, meaning those programs were used
12   street-wide. I'm sorry. Three, including the
13   PDCF.
14   Q.    There's a series of names that appear
15   at the top of the page. The first name I
16   recognize, at least the handwriting, is Scott
17   Leckner, do you see that?
18   A.    I do see that.
19   Q.    And who was Mr. Leckner?
20   A.    I don't know.
21   Q.    Do you recognize any of the other
22   names? I just can't read the handwriting.
23   A.    Below that appears to be John Feraca,
24   and then two below that, I see Paolo and then
25   Ian. And I don't recognize the other name.

TSG Reporting - Worldwide (877) 702-9580

## Page 72

HIGHLY CONFIDENTIAL - D. PETRIE

1
2    Q.    Is it your sense that this captures a
3    conference call, a discussion that you had with
4    these individuals?
5    A.    No.
6    Q.    Right in the middle of page you've got
7    a statement that reads, "Legal opinion on repo."
8    Do you see that?
9    A.    Yes.
10   Q.    Do you recall discussing with anyone
11   at Lehman obtaining a legal opinion on the repo?
12   A.    No.
13   Q.    Do you recall having a discussion with
14   anyone about the subject of obtaining a legal
15   opinion on the repo?
16   THE WITNESS: Does that infringe upon
17   my --
18   MR. SHAW: I will ask you not to
19   divulge the content of any discussions you
20   may have had with counsel for Barclays at
21   any point, but if you can answer the
22   question without divulging communications
23   you had with counsel for Barclays, go ahead.
24   THE WITNESS: Is that the content of
25   (inaudible) --

TSG Reporting - Worldwide (877) 702-9580

## Page 73

HIGHLY CONFIDENTIAL - D. PETRIE

1
2    MR. SHAW: Why don't we step outside
3    in the hall for a little bit.
4         (The witness and Mr. Shaw leave the
5    room to confer.)
6         (Time Noted: 11:45 A.M.)
7         (Time Noted: 11:48 A.M.)
8         (Record read.)
9    MR. SHAW: I will instruct you not to
10   reveal any communications you had with
11   Barclays, but if you had a discussion with
12   anyone other than counsel for Barclays about
13   that, you may answer.
14   A.    I did not have any discussions outside
15   of Barclays in regards to legal matters.
16   Q.    Any idea what you meant by this entry
17   on your diary, "Legal Opinion on Repo"?
18   A.    Making certain that I understood with
19   internal counsel --
20   MR. SHAW: We're not going to get into
21   your discussions with internal counsel.
22   MR. TAMBE: We're not talking about
23   internal discussions with counsel. He's
24   telling me what he was thinking.
25   Q.    What were you thinking?

TSG Reporting - Worldwide (877) 702-9580

Page 74

HIGHLY CONFIDENTIAL - D. PETRIE

1
2     A.   I don't know. "Legal Opinion on
3  repo." right, thinking out loud.
4     Q.   Right below the "Legal Opinion on
5  Repo" you have an entry that says, I believe,
6  "SIPIC waiver," do you see that? S-I-P-I-C
7  waiver, do you see that?
8     A.   Yes.
9     Q.   And there's a name next to that, Ray
10  Dorato?
11     A.   Yes.
12     Q.   At BONY, correct?
13     A.   The page says "BONY" after Ray Dorato.
14     Q.   Do you know Mr. Dorato as the general
15  counsel of BONY?
16     A.   I don't recognize the name.
17     Q.   It states, below "SIPIC waiver," "Is
18  Asset Purchase Agreement effective after
19  bankruptcy?" Do you see that? Or effect --
20          Did I read that correctly?
21     A.   You read it correctly.
22     Q.   What's that a reference to?
23     A.   I don't know.
24     Q.   Did you have a concern that there
25  would be a default on the repo if LBI went into

TSG Reporting - Worldwide (877) 702-9580

Page 75

HIGHLY CONFIDENTIAL - D. PETRIE

1
2  bankruptcy?
3     A.   In any repo transaction. whether it be
4  small or large, my job in running the repo desk
5  would be to continually be concerned about
6  events of default.
7     Q.   So your best guess is you in fact were
8  concerned about a potential default on the repo
9  that was being contemplated with Lehman,
10  correct?
11     A.   That is correct. However, I would
12  like for the record to show that I was concerned
13  about that for an event of default with any
14  transaction that we did, and in fact, during the
15  year 2008 and the end of 2007; there was
16  heightened concern across Wall Street in regards
17  to events of default. And repo desks across the
18  street were plagued with events of default that
19  did cause considerable losses across Wall
20  Street, and my job was -- part of my job was to
21  be wary of those events.
22     Q.   Had you experienced any defaults on
23  your repo desk?
24     A.   Yes, the Barclays repo desk
25  experienced defaults, most of them, if not all,

TSG Reporting - Worldwide (877) 702-9580

Page 76

HIGHLY CONFIDENTIAL - D. PETRIE

1
2  prior to me joining the desk, meaning me running
3  the desk in 2008.
4     Q.   I mean, if Barclays had lent money and
5  received collateral to secure that lending,
6  Barclays would be protected, right?
7     A.   The question you're asking is actually
8  the answer is no.  You do your best, one does
9  their best, in running a repo desk to protect
10  itself in the event of default of their
11  counterparties, and to the extent that there is
12  a default, lessons were learned quite quickly
13  that the depth of markets for certain types of
14  assets were quite shallow and oftentimes
15  resulted in losses.
16     Q.   And would you try and protect yourself
17  from a risk of default by asking for a greater
18  haircut on the collateral that was being
19  pledged?
20     A.   As Wall Street progressed through
21  2006, 2007, 2008, haircut issues were addressed
22  almost daily across all of Wall Street,
23  including Barclays.
24     Q.   And you increased the haircuts to try
25  and give yourself more protection, correct?

TSG Reporting - Worldwide (877) 702-9580

Page 77

HIGHLY CONFIDENTIAL - D. PETRIE

1
2     A.   Sometimes haircuts were increased.
3  Sometimes haircuts were decreased.
4     Q.   And if you had concerns about the
5  liquidity of a particular piece of collateral
6  that was being pledged to you, you would ask for
7  a greater haircut, correct?
8     A.   If a repo desk endeavors to borrow a
9  particular asset, it will make a determination
10  at the time of borrowing that asset as to what
11  is the correct haircut, period.
12     Q.   And just cutting to the chase on the
13  Fed repo that ultimately got replaced by the
14  Barclays financing, Barclays provided, what, $45
15  billion of financing to Lehman; is that right?
16     A.   In connection with the Barclays taking
17  the Fed out of the funding of Lehman, and at the
18  request of the Fed, we provided funding for $45
19  billion for the Fed collateral for Thursday.
20     Q.   And that Fed collateral had a value
21  greater than $45 billion, correct?
22     A.   Yes.
23     Q.   A value of approximately $50 billion,
24  correct?
25     A.   I would put it below that, but yes.

TSG Reporting - Worldwide (877) 702-9580

| Page 78 | Page 79 |
|---|---|
| HIGHLY CONFIDENTIAL - D. PETRIE<br>1<br>2    Q.    That was the haircut, correct?<br>3    A.    The haircut would reflect the<br>4  difference between the cash that's loaned and<br>5  the value of the collateral at the time of the<br>6  trade being executed.<br>7    Q.    And was it your understanding that if<br>8  there had been a default on the repo, that<br>9  Barclays would simply keep the collateral?<br>10    A.    In the event of a default, if an event<br>11  of default has occurred, it is normal practice<br>12  for the collateral that had been collateralizing<br>13  the loan to then revert to the lender of cash.<br>14    Q.    Just so I understand what you mean by<br>15  that, if Barclays is the lender and Barclays<br>16  has, say, 50 billion of collateral, and Lehman<br>17  defaults, Barclays gets to keep the collateral;<br>18  is that what you're saying?<br>19    A.    Yes.<br>20    Q.    Were you concerned at all that if<br>21  Lehman's default was the result of a bankruptcy,<br>22  Barclays may not be able to keep all of the<br>23  collateral?<br>24    A.    No.<br>25    Q.    Do you remember discussing that with<br>TSG Reporting - Worldwide (877) 702-9580 | HIGHLY CONFIDENTIAL - D. PETRIE<br>1<br>2  anyone during that week?<br>3    MR. SHAW:  Again, I'll --<br>4    Q.    Other than lawyers?<br>5    A.    No.<br>6    Q.    Next page, 851, towards the bottom<br>7  third of the page you have a line that begins<br>8  "excluded asset," do you see that?<br>9    A.    Yes.<br>10    Q.    And the calculation that appears<br>11  there, do you see that?<br>12    A.    Yes.<br>13    Q.    Can you, one, decipher that language<br>14  and, two, explain what you mean by that?<br>15    A.    May I take a moment to read the whole<br>16  page, please?<br>17    Q.    Sure.  Absolutely.  Let me know when<br>18  you're done.<br>19    A.    Okay.  Your question again, please?<br>20    (Record read.)<br>21    A.    Excluded asset says 71 billion; 10<br>22  something funded, meaning I can't read that,<br>23  that word; 61 billion balance, and I don't know<br>24  what that math is pertaining to.<br>25    Q.    Flip down a couple more pages to page<br>TSG Reporting - Worldwide (877) 702-9580 |

| Page 80 | Page 81 |
|---|---|
| HIGHLY CONFIDENTIAL - D. PETRIE<br>1<br>2  853.  There are details of notes on page 853,<br>3  854 over onto 855.  I'm not sure if they all go<br>4  together, but if you could look at those three<br>5  pages and just read those notes to yourself.<br>6  Let me know when you're done and I'll ask you<br>7  some questions.<br>8    (Document review.)<br>9    A.    I've looked them over.<br>10    Q.    One, do these three pages, should they<br>11  be read together as a set of notes about a<br>12  particular meeting or event?<br>13    A.    Yes.  The date's incorrect, it<br>14  appears.<br>15    Q.    And the date that appears on page 853<br>16  is 9/17/08, which was the Wednesday?<br>17    A.    Right.  This meeting occurred on<br>18  Tuesday.<br>19    Q.    And this meeting that you're referring<br>20  to is a meeting with the Fed; is that right?<br>21    A.    Yes.  It's physically at the Fed.<br>22    Q.    And you attended that meeting?<br>23    A.    Yes.<br>24    Q.    How long did the meeting last?<br>25    A.    Approximately two hours.<br>TSG Reporting - Worldwide (877) 702-9580 | HIGHLY CONFIDENTIAL - D. PETRIE<br>1<br>2    Q.    And just -- let's step away from the<br>3  notes for a second.  Just describe generally<br>4  what was discussed in the meeting.<br>5    A.    The Fed had asked Barclays to step<br>6  into the funding of Lehman and to take the Fed<br>7  out of the funding of Lehman.  That was the sole<br>8  purpose of the meeting.<br>9    Q.    And if I could just run down your<br>10  notes in terms of who attended that meeting.  I<br>11  think you have a list of names at the top of<br>12  page 853.  I can't read any of those names.<br>13    A.    Ian, Gerard, Elena.<br>14    Q.    Let me stop there for a second.  Ian<br>15  and Gerard, that would Ian Lowitt and Gerard<br>16  Reilly from Lehman?<br>17    A.    Gerard LaRocca.<br>18    Q.    Oh, Gerard LaRocca.  And Ian?<br>19    A.    Ian Lowitt.<br>20    Q.    Elena, who is Elena?<br>21    A.    Matrullo.<br>22    Q.    From?<br>23    A.    Our Credit Department.<br>24    Do you want me to continue?<br>25    Q.    Yes, please.<br>TSG Reporting - Worldwide (877) 702-9580 |

## Page 82

HIGHLY CONFIDENTIAL - D. PETRIE

1
2       A.    Ian, Alan, Art Citassamo.
3       Q.    Who are those three individuals?
4       A.    Ian Pryor, also from Credit; Alan
5   Kaplan from Barclays Legal; Art Citassamo, a
6   senior representative from Bank of New York.
7       Q.    And then the names that appear down
8   the -- I don't know, I'm not sure if they're
9   columns or descriptions. If you move over from
10  those names, there's another set of entries.
11  What are those?
12      A.    Lucinda.
13      Q.    Lucinda who?
14      A.    Brickler I believe is how you
15  pronounce her last name.
16      Q.    From Barclays?
17      A.    No, Lucinda -- these are now
18  individuals representatives attending the
19  meeting from the Fed.
20      So Lucinda. Next to her name is
21  "payments." Andrew, I can't decipher his last
22  name, but it says next to it "CCR."
23      Q.    And what does "CCR" stand for?
24      A.    I don't know.
25      Q.    Okay.

TSG Reporting - Worldwide (877) 702-9580

## Page 83

HIGHLY CONFIDENTIAL - D. PETRIE

1
2       A.    Then I read Donna from the Markets
3   Group. And it appears to be Jan Byce, as best I
4   can read my writing, and then Aaron Klein, but
5   next to both of their names I have counsel.
6       Rick -- I can't pronounce his last
7   name. I can't read his last name.
8       Q.    Okay.
9       A.    Next to his name I have "credit," and
10  then below that is the name Chris Burke, in
11  parentheses, "coming."
12      Q.    And who is Chris Burke?
13      A.    Chris Burke is a senior person that
14  works at the Fed.
15      Q.    You have a series of items below. If
16  you could just decipher those.
17      A.    Number 1, "Explain our undertaking of
18  Fed's" -- I can't read that next word -- "on
19  replacing LBI with BCI to assume 47 billion."
20      I'm sorry, I do know what that word
21  says.
22      Q.    Okay.
23      A.    Number 1, "Explain our undertaking of
24  Fed's focus on replacing LBI with BCI to assume
25  47 billion."

TSG Reporting - Worldwide (877) 702-9580

## Page 84

HIGHLY CONFIDENTIAL - D. PETRIE

1
2       Number 2, "Half collateral DTC
3   eligible/half Fed wire" -- I can't make out that
4   word.
5       Q.    Next item?
6       A.    Number 3, "Intention tomorrow to
7   reverse all collateral."
8       Q.    Let me just ask you about that entry
9   and your statement about the date when this
10  meeting took place. The meeting took place on
11  Tuesday. Was there an intention to reverse all
12  the collateral on the Wednesday?
13      A.    No.
14      Q.    The reversal of the collateral took
15  place on Thursday, right?
16      A.    That's correct.
17      Q.    Okay.
18      A.    Number 4, "Offering of day loan."
19  Number 5, "We take all collateral to PDCF."
20  Number 6, "Over two-week period put to street."
21      Q.    So those last two items, 5, "We take
22  all collateral to PDCF," what did you mean by
23  that?
24      A.    In the undertaking/at the behest of
25  the Fed, Barclays' funding Lehman Brothers for

TSG Reporting - Worldwide (877) 702-9580

## Page 85

HIGHLY CONFIDENTIAL - D. PETRIE

1
2   the collateral that the Fed was funding on
3   Thursday. Barclays received assurances from the
4   Fed that we would be able to take that
5   collateral and fund it through the PDCF, the
6   Primary Dealer Credit Facility, which is what
7   addresses point number 5.
8       Q.    And just to drill down that further,
9   whether or not that collateral otherwise
10  satisfied PDCF eligibility, Barclays was seeking
11  from the Fed an understanding that all of this
12  collateral would in fact be PDCF-eligible, is
13  that fair?
14      A.    Yes.
15      Q.    Okay. The next point?
16      A.    Number 6, "Over two-week period put to
17  street."
18      Q.    What do you mean by that?
19      A.    That Barclays, upon completion of what
20  I call the Fed trade, would make every effort to
21  self-finance the received collateral without the
22  assistance of the Fed facilities.
23      Q.    Just so I understand how 5 and 6 may
24  relate to each other, for a period of two weeks,
25  for up to a period of two weeks, you could use

TSG Reporting - Worldwide (877) 702-9580

Page 86

HIGHLY CONFIDENTIAL - D. PETRIE
1 the PDCF as a financing facility with this
2 collateral. After that two-week period, you
3 would start getting financing for that
4 collateral from the street or otherwise dispose
5 of that collateral, is that fair?
6    A.    No.
7    Q.    Okay.  How do 5 and 6 work together,
8 if at all?
9    A.    To be precise, on day one, upon
10 receiving the collateral, we had assurances from
11 the Fed that, should we need to fund the
12 collateral, we could do so through the PDCF, all
13 the while working towards self-financing.
14    Q.    What's the two-week period?  Is that a
15 limitation or a requirement that you become
16 self-financing with respect to that collateral
17 in two weeks?
18    A.    The discussion at the Fed was a
19 two-way discussion, and I felt comfortable that
20 I told the Fed that within a couple of weeks we
21 could finance this collateral.  It was not a
22 directive of the Fed.  It was my estimation that
23 I explained to the Fed.
24    Q.    Did Barclays in fact finance that

TSG Reporting - Worldwide (877) 702-9580

Page 87

HIGHLY CONFIDENTIAL - D. PETRIE
1 collateral to the street after the transaction,
2 so on and after the 22nd of September?
3    A.    Is your question the entire amount of
4 collateral or portions of the collateral?
5    Q.    Portions of it.
6    A.    On day one of receiving the
7 collateral, we started financing parts of that
8 collateral with the street.
9    Q.    Do you know of any efforts to sell the
10 collateral?
11    A.    No.
12    Q.    Do you know if there have been any
13 sales of the collateral?
14    A.    No.
15    Q.    If you look at the -- I'm sorry, let's
16 go on, items 7, 8 and 9 that appear on page 853.
17 So let's carry on.  If you could carry on
18 deciphering what your words are --
19    A.    Oh, just read it?
20    Q.    -- and then we can talk about what you
21 meant by some of these entries.
22    A.    Sure.  Number 7, "Discussing reserve
23 impact of" something -- I can't decipher the
24 word at this point -- "TSLF adding 20 billion

TSG Reporting - Worldwide (877) 702-9580

Page 88

HIGHLY CONFIDENTIAL - D. PETRIE
1 total."
2       Number 8, "Debit cap is 54 billion
3 according to Lucinda."  Below that in
4 parentheses, "13 billion," question mark,
5 question mark, "with Gerard."  9, "JPM"
6 something "pledge."
7    Q.    Okay.  If you can roll over to page
8 856, and looking at 856 and 857 together, if you
9 could first confirm for me whether those two
10 sets of notes all relate to the same event or
11 meeting?
12    A.    Yes, they appear to be.
13    Q.    And they reference a DTC meeting; is
14 that right?
15    A.    That's correct.
16    Q.    And when did the DTC meeting take
17 place?
18    A.    Upon leaving the Federal Reserve on
19 Tuesday evening, several of us walked directly
20 to the DTC to meet with them.
21    Q.    And what was the purpose of that
22 meeting?
23    A.    Given that the Fed had requested
24 Barclays to step into the funding of Lehman

TSG Reporting - Worldwide (877) 702-9580

Page 89

HIGHLY CONFIDENTIAL - D. PETRIE
1 Brothers, and it being a sizable trade, assets
2 move over or assets -- assets move over the DTC
3 wire.  So we were engaging DTC to let them know
4 what we were planning at the behest of the Fed
5 and to come up with a plan as to how to best
6 accomplish that.
7    Q.    How long did that meeting last?
8    A.    Approximately one hour.
9    Q.    And you identified on page 856 at the
10 top, you've got the I guess the two DTC people
11 you met with, Donald Donahue and Grace Montal?
12    A.    Isaac, I believe.
13    Q.    Isaac Montal.
14       Next section down, there appear to
15 be -- well, why don't you decipher what the next
16 three lines are.  It begins at "250MM" on the
17 left-hand side?
18    A.    Would you like me to read them to you?
19    Q.    If you could just first read them and
20 then tell me what you mean by those entries.
21    A.    It says, "250 million, 10,000
22 employees, licenses, 75 billion in assets.  1.
23 Corporate Headquarters; 2. Data centers and
24 more real estate.  60 billion in assets.  47

TSG Reporting - Worldwide (877) 702-9580

23

Page 90

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2    billion pledges to Fed."
3    Q.   And what is the import or meaning of
4    those items?
5    A.   When the meeting started, this would
6    appear to be a review given by one of the
7    Barclays representatives to DTC reflecting what
8    had already become released publicly.
9    Q.   So this is your understanding of --
10   these are your notes about a description about
11   the transaction that was given by Barclays to
12   DTC at that meeting?
13   A.   Well, it's a reflection of someone at
14   Barclays giving a description of, in broad
15   terms, of what was released I believe that same
16   morning publicly.
17   Q.   Released about what? About the
18   transaction, right?
19   A.   Well, what transaction? The
20   transaction --
21   Q.   The Lehman/Barclays transaction.
22        MR. SHAW:  You mean as of that time?
23        MR. TAMBE:  Yes, as of that time.
24   Q.   I'm sure they weren't trying to tell
25   the future on that day, so ...

TSG Reporting - Worldwide (877) 702-9580

Page 91

1    HIGHLY CONFIDENTIAL - D. PETRIE
2    A.   Yeah, this would be a, as I noted
3    before, a broad description as to what had been
4    released that same morning publicly by Barclays.
5    Q.   About the transaction? I mean,
6    released by Barclays about what? About the
7    transaction with Lehman, correct?
8    A.   About the broad transaction with
9    Lehman.
10   Q.   Okay. And the 60 billion in assets
11   and 47 pledged to Fed that appears on the
12   right-hand side, was it your understanding that
13   those were the liabilities that were being
14   assumed by Barclays?
15   A.   I don't know.
16   Q.   Because you've got two items for
17   assets. You've got 75 billion in assets and
18   you've got a writing that says 60 billion in
19   assets, do you see that?
20   A.   I see it.
21   Q.   Do you have any understanding as to
22   why you have those two different items for
23   assets?
24   A.   No.
25   Q.   On the next page, page 857, at the top

TSG Reporting - Worldwide (877) 702-9580

Page 92

1    HIGHLY CONFIDENTIAL - D. PETRIE
2    of the page, if you could just decipher what
3    those first two lines are that begin "JPM"?
4    A.   "JPM," dollar sign, "needs cash and
5    then release to LBI buckets."
6    Q.   And was that your understanding, that
7    JPM had to be paid to satisfy the Fed repo
8    before it would release the collateral to LBI?
9    A.   I would explain it in this way.
10   Q.   Okay.
11   A.   To complete the Fed trade where
12   Barclays would receive only the Fed collateral,
13   given that JPMorgan was the custodian for Lehman
14   Brothers, Barclays would send the cash first to
15   JPMorgan on behalf of Lehman and then JPMorgan
16   would receive the assets from the Federal
17   Reserve that would then come to Barclays, i.e.,
18   the Fed transaction.
19   Q.   Okay. Two lines below where you were
20   just reading, it says, "2 percent for 9/30," do
21   you see that?
22   A.   I see it.
23   Q.   What does that mean?
24   A.   It's discussing the terms as in rate
25   and termination date for the repo trade.

TSG Reporting - Worldwide (877) 702-9580

Page 93

1    HIGHLY CONFIDENTIAL - D. PETRIE
2    Q.   And the next line below that?
3    A.   The next line below that reads,
4    "Haircut charged will be implied."
5    Q.   What does that mean?
6    A.   Given that the Fed had extended
7    funding for Lehman assets, the Fed employed its
8    own haircut schedule for those assets. Given
9    that Barclays had been asked by the Fed and we
10   were undertaking taking the Fed out of their
11   lending of money to Lehman Brothers for those
12   specific assets, when we would receive those
13   assets versus the cash that we were lending to
14   Lehman, the collateral that we would receive,
15   which would be at this point identical to what
16   the Fed had been funding on that Thursday, the
17   haircuts would be implied because they had
18   already been applied to the Lehman loans.
19   Q.   Were there assets that the Fed was
20   funding against that Barclays did not want to
21   acquire?
22        MR. SHAW:  Objection. Foundation.
23   A.   No.
24   Q.   All right. Then you got four items at
25   the bottom of page -- the middle of page 857

TSG Reporting - Worldwide (877) 702-9580

24

Page 94

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2    numbered 1 through 4. Could you just describe
3    those for me and tell me what you were capturing
4    by those four points?
5    A.    Would you like me to just read them
6    first to you?
7    Q.    Sure, you can read them first.
8    A.    Number 1, "Lehman to 855. Program
9    tonight/test 8 A.M. No later."
10    Q.    What does that mean?
11    A.    855 is a, you could call it a
12    depository or an account, sorry, that was opened
13    up at JPMorgan for Barclays, meaning Barclays'
14    account number 855.
15    Q.    All right. Next item?
16    A.    Number 2, "Money goes whenever people
17    ready," meaning --
18    Q.    Okay, next item?
19    A.    3, "Goal 11 A.M. completion."
20    Q.    Next line?
21    A.    "47 billion versus 54 billion cap," in
22    parentheses, "Spike was 7 billion."
23    Q.    What does that mean?
24    A.    Every institution on Wall Street has a
25    cap, an intraday cap, as to how much they can be
TSG Reporting - Worldwide (877) 702-9580

Page 95

1    HIGHLY CONFIDENTIAL - D. PETRIE
2    exposed without being properly collateralized.
3    During the normal course of business,
4    an institution will be expecting collateral in
5    to satisfy the loans that it's made out. So
6    ones custodian has exposure during that period
7    of time in between receiving collateral and
8    sending out money, and the Fed had agreed to
9    increase that intraday cap to facilitate the
10    trade that they had asked us to do.
11    Q.    So the 47 billion was what?
12    A.    This line in my notes of "47
13    billion//54 billion cap" is referring to the cap
14    being raised so that we could complete the trade
15    with the Fed.
16    Q.    47 was what was Barclays' cap, is that
17    what you're saying?
18    A.    I don't know what the cap was at the
19    time when they raised it.
20    Q.    And was it your sense that it was
21    raised to 54 billion?
22    A.    Yes.
23    Q.    And the last item says --
24    A.    You should also --
25    Q.    Go ahead.
TSG Reporting - Worldwide (877) 702-9580

Page 96

1    HIGHLY CONFIDENTIAL - D. PETRIE
2    A.    -- clarify that, once again, as I just
3    stated, that there's a normal cap in place.
4    During a normal course of business, an
5    institution needs that cap to operate in the
6    most normal of conditions.
7    Q.    And what's the reference to the spike
8    in parentheses, "spike was 7 billion"?
9    A.    I take it as meaning the raise in the
10    cap that the Fed had agreed to.
11    Q.    Okay. All right, let's move to the
12    next set of notes, page 858.
13    MR. SHAW: Is this a good time to take
14    a lunch break?
15    MR. TAMBE: We can take a break now if
16    you want, that's fine. It's as good a time
17    as any.
18    (Luncheon recess; time noted: 12:33
19    P.M.)
20
21
22
23
24
25
TSG Reporting - Worldwide (877) 702-9580

Page 97

1    HIGHLY CONFIDENTIAL - D. PETRIE
2    AFTERNOON SESSION
3    (Time Noted: 1:12 P.M.)
4    DAVID PETRIE, resumed and
5    testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. TAMBE:
8    Q.    Mr. Petrie, if you have before you
9    Exhibit 272, these are the handwritten notes. I
10    just want to pick up where we left off, page
11    858.
12    Again, if you could just help describe
13    what you have down on 858.
14    A.    Sure. Let me just read through it
15    here.
16    (Document review.)
17    A.    This page -- well, do you want to go
18    line-by-line?
19    Q.    Why don't you just give me an overview
20    of what the page is.
21    A.    This page appears to be an attempt to
22    get an idea of what the different asset classes
23    are being held at Lehman.
24    Q.    And the valuations that appear on this
25    page against those asset classes, where would
TSG Reporting - Worldwide (877) 702-9580

Page 98

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    those valuations have come from?
3        A.    I don't know.
4        Q.    Were you using a custodian report as a
5    source of values for the Fed collateral?
6        A.    Were we using a custodian report?
7        Q.    Yeah.
8        A.    In regards to this page, like I said,
9    I don't know where I got these valuations from.
10       Q.    If you can move forward to page 861
11   and 8 -- 861 and 862. First question is whether
12   those two pages should be read together or are
13   those two separate events that have been
14   captured there?
15       A.    They appear to be separate.
16       Q.    Then let's just take page 861, and if
17   you can take a look at the entries you have on
18   861 and then briefly describe for me what's
19   being -- what you have written about there.
20       A.    Okay. I have, "Issue raised. DTC,
21   FINRA, Chase's attorneys, what happens with
22   transfer of accounts."
23       Q.    That's a reference to customer
24   accounts being transferred?
25       A.    I don't recall what specifically that
TSG Reporting - Worldwide (877) 702-9580

Page 99

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    issue, that entry is for here. I don't know.
3        Q.    Are you reading through the rest of
4    the document?
5        A.    Yeah, I'm reading through the rest of
6    it.
7            At the bottom of the page -- well, the
8    middle of the page appears to me to be a, where
9    we're talking about James Walker, Teri Scott, TJ
10   Gavenda, Matt Hughey, Scott Wadlow, I believe I
11   received a phone call from them wanting to get
12   insight into the Fed trade where they hadn't
13   been privy to what exactly was going on in
14   regards to the Fed trade previously.
15       Q.    And this would have been on the
16   Thursday, the 18th?
17       A.    I think -- was Thursday the 18th?
18       Q.    Thursday was the 18th.
19       A.    Okay. Yeah, that would make sense if
20   it was Thursday, the 18th.
21       Q.    And then at the bottom of the page you
22   have three numbered points?
23       A.    Yes.
24       Q.    If you could go into those, please.
25       A.    Number one, "Operation problem at DTC
TSG Reporting - Worldwide (877) 702-9580

Page 100

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    because of Lehman box being fixed," and then in
3    parentheses, "was delivering right back to
4    Chase."
5        Q.    And what does that mean?
6        A.    I believe what this references is
7    that, when Barclays initially transferred $5
8    billion for the Fed repo transaction the
9    Thursday morning, there were significant issues
10   in us, meaning Barclays getting collateral back
11   in return for that $5 billion, and point one is
12   an attempt by operations to explain why that
13   occurred, why it was such a slow process. And
14   the explanation in parentheses, "was delivering
15   right back to Chase," means that, to me, that
16   when the collateral was released by the Fed that
17   was meant to come to Barclays, went elsewhere.
18       Q.    The next point?
19       A.    Number 2, "Confusion around NewCo
20   concerns on" -- "on" something "to make the" --
21   "this account on the fly."
22       Q.    Based on --
23            Go ahead.
24       A.    They had denoted that, by Operations,
25   that given how quickly they were preparing an
TSG Reporting - Worldwide (877) 702-9580

Page 101

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    account on behalf of Barclays, that they may
3    have made an error on JPMorgan's side.
4        Q.    And then the next item, item number 3?
5        A.    Number 3, "JPMorgan not releasing
6    because margin on account," and beneath that I
7    have the name Heidi Miller.
8        Q.    And what's that a reference to?
9        A.    That is in reference to when the
10   collateral on Thursday was released by the Fed,
11   it was almost immediately recognized that other
12   deliveries were being made rather than the Fed
13   trade, meaning collateral coming to Barclays,
14   and presuming that other obligations were being
15   made rather than completing the Fed trade.
16       Q.    Just trying to understand what you're
17   saying here. Are you saying that after Barclays
18   wired the money, instead of getting the
19   collateral that was under the Fed trade, it
20   seemed to be getting collateral from -- that was
21   covering other obligations?
22       A.    Initially, we may have been getting
23   Fed collateral, but since that collateral was
24   not coming to Barclays swiftly, it was apparent
25   that collateral from the Fed trade was going
TSG Reporting - Worldwide (877) 702-9580

Page 102

HIGHLY CONFIDENTIAL - D. PETRIE

1    HIGHLY CONFIDENTIAL - D. PETRIE
2  elsewhere.
3    Q.   The collateral wasn't moving itself.
4  Someone was making the collateral move
5  elsewhere. Who was that?
6    A.   When it comes to operational issues
7  and how it got to where it was going, I don't
8  know.
9    Q.   But the collateral would have been
10  with the custodian, with Lehman's custodian,
11  right, JPM?
12    A.   When the Fed released the collateral,
13  it would have been released to JPM.
14    Q.   Right. Is it your understanding that
15  it was JPM that was directing it to the
16  incorrect place?
17    A.   I don't know.
18    Q.   Well, if it wasn't JPM, who else could
19  be moving the collateral?
20    A.   I think your conclusion that JPM was
21  obviously sending it somewhere other than
22  Barclays is correct. How that process occurs
23  I'm ignorant of.
24    Q.   And in your earlier answer were you
25  also suggesting that JPM was switching the

TSG Reporting - Worldwide (877) 702-9580

Page 103

1    HIGHLY CONFIDENTIAL - D. PETRIE
2  collateral so the collateral it was sending on
3  to Barclays may have been different from the
4  collateral that was being released by the Fed?
5    A.   It became very clear during the day
6  during Thursday that since collateral that had
7  been released to JPM had gone elsewhere, that to
8  collateralize the loan that we had extended to
9  Lehman to take the Fed out of the trade, that
10  collateral would have to come from elsewhere.
11    Q.   And these notes at the bottom of page
12  861, can you tell us when in the process, in the
13  mechanics of the repo, you made those notes?
14    A.   Not with certainty, no.
15    Q.   Putting the notes aside, what's your
16  general recollection of how events unfolded with
17  respect to the repo on the Thursday, the 18th?
18    A.   Arrived at the Lehman office early
19  morning on Thursday. There were several Lehman
20  representatives physically at the office. There
21  was multiple people that had dialed into that
22  office from both Barclays, JPMorgan and Lehman
23  operations.
24    We at some point in that morning,
25  early morning, had sent over $5 billion and

TSG Reporting - Worldwide (877) 702-9580

Page 104

1    HIGHLY CONFIDENTIAL - D. PETRIE
2  expected to receive collateral against that $5
3  billion. We did not receive collateral in a
4  timely fashion, and that's when it became quite
5  apparent that collateral had gone elsewhere.
6    And for the next several hours, we
7  waited, Barclays waited to determine how we
8  would proceed and also work towards getting a
9  resolution to collateralizing that first $5
10  billion loan. Subsequently, Barclays later on
11  that day sent an additional $40 billion in what
12  amounts to one lump sum, but in four different
13  wires, I believe it was four different wires,
14  and at that point, now $45 billion in total had
15  been sent and we were intent on completing the
16  Fed transaction.
17    Throughout the day, the collateral
18  coming to Barclays was quite slow and tedious.
19  As we reached critical times in the day that
20  have to do with when wires typically go down on
21  a trading day, Barclays and the Fed,
22  effectively, and DTC had extended the hours that
23  were permissible to trade for the street and
24  Operations area did their best to collateralize
25  that loan.

TSG Reporting - Worldwide (877) 702-9580

Page 105

1    HIGHLY CONFIDENTIAL - D. PETRIE
2    At the end of the day, we'll call the
3  end of the day when the wires were officially
4  shut, Barclays was not fully collateralized and
5  to the tune of approximately $7 billion. There
6  was some time in between the wires going down
7  and JPMorgan reengaging the group on the phone
8  call to agree to wire on Barclays behalf into
9  our account $7 billion cash to, in essence,
10  fully collateralize the $45 billion loan.
11    (Exhibit 273, a document bearing Bates
12  Nos. BCI-EX-(S)-37621, marked for
13  identification, as of this date.)
14    Q.   I've handed you a one-page document
15  marked Exhibit 273. Please take a look at that
16  document and let me know when you're done.
17    A.   Okay.
18    Q.   Do you recognize this as a
19  collection -- as a series of e-mails between
20  yourself and Mr. Dearlove and others?
21    A.   I don't remember specifically.
22    Q.   Do you recognize it as such having
23  read it here?
24    A.   I recognize that I wrote the e-mails.
25    Q.   You are just describing some of the

TSG Reporting - Worldwide (877) 702-9580

27

Page 106

```
1           HIGHLY CONFIDENTIAL - D. PETRIE
2    mechanics of the Barclays repo transaction that
3    was done on the 18th; is that right?
4        A.   Yes, some of the mechanics, that's
5    correct.
6        Q.   The first e-mail at the top of the
7    page is an e-mail from Mark Dearlove to you with
8    copies to others.  Do you see that?
9        A.   Yes.
10       Q.   Okay.  And in the body of the e-mail,
11   Mr. Dearlove states at the end, "Without this,
12   the Lehman transaction would have failed."  Do
13   you see that?
14       A.   Yes, I see it.
15       Q.   Did you understand what he was
16   referring to?
17       A.   I, no, I don't particularly.  I took
18   it as the repo transaction.
19       Q.   So you took that as a reference to the
20   repo transaction, not the overall asset purchase
21   transaction between Lehman and Barclays; is that
22   what you're saying?
23       A.   Yes, that's fair.
24       Q.   I'm handing you a document that was
25   previously marked as Exhibit 143B.  Take a
```
TSG Reporting - Worldwide (877) 702-9580

Page 107

```
1           HIGHLY CONFIDENTIAL - D. PETRIE
2    moment to look at the document.  There's a
3    spreadsheet attached to it.  Let me know when
4    you're done.  I'll ask you some questions.
5        (Document review.)
6        A.   Okay.  I've read through it.
7        Q.   This e-mail chain which begins at the
8    bottom of page 2 of this exhibit is from Stephen
9    King to you.  Do you see that?
10       A.   Yes, he I see it.
11       Q.   And attaches a file which is entitled
12   "Excluded Mortgage Assets, 9/17/2008.xls," do
13   you see that?
14       A.   Yes, I see it.
15       Q.   If you pull up to the front, that
16   e-mail gets forwarded on to various people, and
17   then if you get to the first -- the second
18   e-mail on the first page, it's from David Aronow
19   to Rick Policke and others, do you see that?
20       A.   Yes.
21       Q.   And there's a CC to someone at Bank of
22   New York Mellon, do you see that?
23       A.   Yes.
24       Q.   In the body of the e-mail it states,
25   "Attached to the Cusips associated with the book
```
TSG Reporting - Worldwide (877) 702-9580

Page 108

```
1           HIGHLY CONFIDENTIAL - D. PETRIE
2    that we were told on the call will be excluded
3    from the movements tomorrow.  These Cusips
4    should not be part of the pledge to BONY
5    according to our earlier conversation."  Do you
6    see that?
7        A.   I see that.
8        Q.   And this is an e-mail dated September
9    17, 2008, do you see that?
10       A.   I see that.
11       Q.   The movements tomorrow that were
12   referenced in that e-mail were the Fed repo
13   associated movements, correct?
14           MR. SHAW: Objection. Foundation.
15       A.   I wouldn't know.
16       Q.   You wouldn't know.  Were you aware of
17   any Cusips being excluded from the pledge to
18   Bank of New York under the Barclays repo
19   transaction?
20       A.   I was solely aware that we were to
21   take Fed collateral that was Lehman's collateral
22   that was being funded on Thursday, and by nature
23   of only wanting and being asked by the Fed to
24   take that collateral, by nature there would be
25   assets that we wouldn't be taking.
```
TSG Reporting - Worldwide (877) 702-9580

Page 109

```
1           HIGHLY CONFIDENTIAL - D. PETRIE
2        Q.   Were you aware of having identified to
3    Lehman what assets should be pledged to the Fed
4    so that those would then be the only assets that
5    would be pledged to you?
6        A.   No.
7        Q.   What was your understanding of the
8    file that you were receiving from Stephen King,
9    "Excluded Mortgage Assets," what was that a file
10   of?
11       A.   I don't know.
12       Q.   Well, you received that file from
13   Stephen King.  This is still on page 2 of this
14   exhibit.  You then forward that to Kevin Caffrey
15   at BONY Mellon, right?
16       A.   Yes.
17       Q.   Why are you forwarding that to Bank of
18   New York Mellon?
19       A.   It's a file that's been identified by
20   someone else of assets that aren't part of the
21   Fed repo is what I took it as.
22       Q.   Did you have any discussions with
23   Stephen King about the process by which these
24   assets were identified?
25       A.   No.
```
TSG Reporting - Worldwide (877) 702-9580

Page 110

```
1          HIGHLY CONFIDENTIAL - D. PETRIE
2     Q.  Do you have an understanding as to how
3   these excluded mortgage assets were identified?
4     A.  No.
5          (Exhibit 274, a document bearing Bates
6     Nos. BCI-EX-(S)-38010 through 38013, marked
7     for identification, as of this date.)
8     Q.  I've handed you a four-page document
9   marked Exhibit 274.  Please take a moment to go
10  through the document and I'll ask you about it,
11  starting with the last e-mail, which is on page
12  2 over to 3 over to 4.
13         (Document review.)
14    A.  I've read the last e-mail in the
15  string.
16    Q.  It's an e-mail from Teri Scott to
17  Jonathan Stone and several other people.  You're
18  CC'd on that e-mail, do you see that?
19    A.  Yes.
20    Q.  Do you recognize this as a summary of
21  the transactions that were done on the 18th of
22  September?
23    A.  I recognize it as Teri Scott's
24  summary, yes.
25    Q.  And you read his summary, correct, or
```
TSG Reporting - Worldwide (877) 702-9580

Page 111

```
1          HIGHLY CONFIDENTIAL - D. PETRIE
2   her summary?
3     A.  I've just now read it.
4     Q.  And is it consistent with your
5   recollection of those transactions?
6     A.  It is consistent with my recollection,
7   although parts of it I wasn't privy to previous
8   to receiving this e-mail.
9     Q.  What parts of it were you not privy to
10  prior to receiving this e-mail?
11    A.  On paragraph 1, in regards to the
12  tri-party and rehypothecation issues.
13    Q.  Anything else?
14    A.  In bold, the, "A list of Cusips to be
15  excluded has been provided to ensure collateral
16  we are not purchasing is excluded in this
17  matter" is something I'd be ignorant of.
18    Q.  And just so I understand your answer,
19  you were not aware until you saw this e-mail
20  that a list of Cusips to be excluded had been
21  provided to ensure the collateral that Barclays
22  was not purchasing was excluded from the
23  transfer, correct?
24    A.  Well, as noted before, we only wanted
25  to take the Fed collateral, and the way that the
```
TSG Reporting - Worldwide (877) 702-9580

Page 112

```
1          HIGHLY CONFIDENTIAL - D. PETRIE
2   writes this is worded a bit differently than my
3   understanding, but I can't speak for Teri Scott
4   and how -- what she meant by that statement.
5     Q.  Go to the next substantive e-mail in
6   this chain. It's the e-mail that begins at the
7   bottom of page 1 over to page 2 from John Haley
8   to Teri Scott and others.  Have you had a chance
9   to look at that e-mail?
10    A.  I'll read it right now.
11    Q.  Okay.
12         (Document review.)
13    A.  Okay.
14    Q.  You'll see in John Haley's e-mail, the
15  description that begins on page 1, carries over
16  on to page 2. Do you see that, the various
17  items that are listed there?
18    A.  Yes, I do.
19    Q.  Is it your understanding that,
20  following the repo on the 18th, on the morning
21  of the 19th, that was in fact the position of
22  the collateral and cash held by Barclays on the
23  Barclays repo?
24    A.  I can see that John Haley has produced
25  an e-mail to attempt to break down the types of
```
TSG Reporting - Worldwide (877) 702-9580

Page 113

```
1          HIGHLY CONFIDENTIAL - D. PETRIE
2   collateral that we received.
3     Q.  Is that consistent with your
4   recollection of what happened that evening into
5   the Friday?
6     A.  My recollection is in dollar terms.
7   We received 42.7-ish billion dollars worth of
8   collateral and got $7 billion in cash to
9   complete the Fed repo trade. This breakdown
10  from John Haley is something I wouldn't be able
11  to comment on. I don't know if it's correct or
12  not.
13    Q.  The very first e-mail at the top of
14  page 1, the short e-mail, I don't know if you've
15  read it. Have you?
16    A.  Not yet.
17    Q.  Just read it and let me know when
18  you're done.
19         (Document review.)
20    A.  I've read it.
21    Q.  That's another e-mail from Teri Scott,
22  do you see that?
23    A.  Yes.
24    Q.  In the middle of her e-mail, she
25  writes, "Ops. had to pull all the collateral
```
TSG Reporting - Worldwide (877) 702-9580

Page 114

1        HIGHLY CONFIDENTIAL - D. PETRIE
2    allocated to London, and we're therefore over
3    our unsecured limit by $1.9 billion." Do you
4    see that?
5        A.   I see that.
6        Q.   Do you have an understanding as to
7    what that means?
8        A.   No.
9        Q.   Do you have any understanding as to
10   what the phrase "collateral allocated to London"
11   means?
12       A.   No.
13       Q.   The next sentence reads, "Part of this
14   overage can also be attributed to EFG, as they
15   were unsecured by 1 billion." Do you see that?
16       A.   Yes.
17       Q.   What does EFG mean?
18       A.   Equity Finance Group.
19       Q.   And do you have an understanding as to
20   what this sentence means?
21       A.   Yes.   During the normal course of
22   business, there can be, especially during this
23   volatile time period in September, there can be
24   large valuations intraday in regards to the
25   value of collateral, and I take this sentence as
TSG Reporting - Worldwide (877) 702-9580

Page 115

1        HIGHLY CONFIDENTIAL - D. PETRIE
2    to meaning that, due to there being a valuation
3    change in collateral normally held by EFG, that
4    they needed additional billion-dollar loan from
5    PLC, which wouldn't be unusual.
6        Q.   When we were talking earlier about
7    John Haley's e-mail at the bottom of page 1 over
8    to page 2, you said that you thought about the
9    repo in some dollar terms, and you said $42
10   billion and change in collateral, do you
11   remember that?
12       A.   Yes.
13       Q.   Okay. That $42 billion in change in
14   collateral value, what is your --
15       A.   You said 42 billion change?
16       Q.   $42 billion and change. It's 42 point
17   something, right?
18       A.   Oh, okay.  Yes.
19       Q.   Where did that value come from, the
20   value that you have in your mind?
21       A.   The value of 42.7, approximately,
22   $42.7 billion would have come from, as assets
23   moved from JPMorgan to the Bank of New York
24   during the Fed trade, the valuations would come
25   from the Bank of New York.
TSG Reporting - Worldwide (877) 702-9580

Page 116

1        HIGHLY CONFIDENTIAL - D. PETRIE
2        Q.   So when you think of this $42.7
3    billion number, you're thinking of a Bank of New
4    York valuation number?
5        A.   Yes, and also thinking of it in terms
6    of, like I just mentioned, that there's a
7    volatile -- we were in volatile markets, so the
8    approximate value of 42.7 is a snapshot in time
9    that could go up or down, you know, minute by
10   minute as markets changed.
11       Q.   I assume when this repo was done on
12   the 18th, at some point on the 19th Barclays
13   received a report from BONY as to the value of
14   the collateral; is that correct?
15           MR. SHAW: Objection. Foundation.
16       A.   You're asking me, once again, am I
17   assuming that there was a report?
18       Q.   No, I'm asking you do you know whether
19   there was a report?
20       A.   There were attempts of reports to be
21   sent by Bank of New York to Barclays for
22   valuations of securities, but as mentioned,
23   those values would be during very volatile
24   markets and pricings could have been going up or
25   down during minutes and hours post-transaction.
TSG Reporting - Worldwide (877) 702-9580

Page 117

1        HIGHLY CONFIDENTIAL - D. PETRIE
2        Q.   I handed you a document that was
3    previously marked as Exhibit 157A, a two-page
4    document. Let me know when you're done
5    reviewing it.
6            (Document review.)
7        A.   I've read it.
8        Q.   You're not shown as a recipient or a
9    sender of any of these e-mails. I want to ask
10   you about the e-mail on the first page from
11   David Aronow to Paolo Tonucci, 19th of
12   September, 12:47. Do you see that?
13       A.   Yes, I see it.
14       Q.   David Aronow states in that e-mail,
15   "Barclays' Operations Team has recalculated the
16   value of the collateral that they received from
17   us last night and they are more than fully
18   collateralized, including the haircuts applied."
19           Do you see that?
20       A.   I read that.
21       Q.   Did you have any discussions with
22   David Aronow about recalculating the value of
23   the collateral Barclays received from BONY?
24       A.   No.
25       Q.   Had you expressed any views to David
TSG Reporting - Worldwide (877) 702-9580

---

Page 118

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  Aronow or to anyone else at Lehman about whether
3  you believed that Barclays was fully
4  collateralized as of Friday, the 19th of
5  September?
6      A.  No.
7      Q.  Was that your understanding, that you
8  were fully collateralized on the 19th of
9  September?
10      A.  I believed that we were, including the
11  $7 billion.
12      Q.  And did you have any discussions with
13  anyone at Lehman about standing down on the
14  transfer of any further movements of collateral
15  on that Friday, the 19th of September?
16      A.  I do not understand what he means by
17  "stand down."
18      Q.  Putting aside the collateral that
19  moved over on the 18th in connection with the
20  Barclays repo, were you aware of any movements
21  of collateral that were taking place on Friday,
22  the 19th?
23      A.  I was aware there were movements of
24  collateral, but for what purposes I'm not aware.
25      Q.  Did anyone say to you on the 19th of

TSG Reporting - Worldwide (877) 702-9580

---

Page 119

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  September or over the weekend of the 20th or
3  21st that, other than the Fed repo collateral,
4  other collateral had to be identified and moved
5  into Barclays by Lehman?
6      A.  No.
7      Q.  And did you ever have a view on the
8  19th and thereafter that the collateral that
9  Barclays received from the Fed repo was not the
10  collateral that Barclays intended to purchase
11  from Lehman?
12      MR. SHAW:  Objection.  Vague as to
13  time.
14      You say "intended to purchase from
15  Lehman."
16      A.  Can you repeat the question, please?
17      (Record read.)
18      A.  I wasn't part of that -- party to the
19  Asset Purchase Agreement.  I was only tasked
20  with one purpose, which was to receive the Fed
21  collateral to take the Fed out of the repo
22  trade, and it was clear that we did not receive
23  in its entirety the repo that had been at the
24  Fed from Lehman Brothers and given the
25  difficulties we have discussed already.  So it

TSG Reporting - Worldwide (877) 702-9580

---

Page 120

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  was clear to me that we had received collateral
3  to collateralize our loan that would have
4  included assets that were not part of the
5  original Fed trade on Thursday.
6      Q.  Are you aware of any effort to try and
7  transfer to Barclays that collateral which was
8  part of the Fed repo but which wasn't
9  transferred to Barclays?
10      A.  I know I went into the office on
11  Friday morning expecting to try to complete the
12  Fed repo transfer and that there was collateral
13  that had moved, but for what collateral was
14  satisfying, I don't know.
15      Q.  Let's go back to the notes, 272.  Page
16  862, which is the next page after the one we had
17  last discussed, if you could help us decipher
18  what the words that appear on that page.  If you
19  could just read them out and we can talk about
20  what you're writing about.
21      A.  It says, number 1, "PBN customer
22  finance."  Below that says, "Racers are RV with
23  LCPI," and the name James Walker on the same
24  line.  Below that says, "Trust structures.  LCPI
25  repo'd LBI.  LBI repo'd to street.  PDCF 20

TSG Reporting - Worldwide (877) 702-9580

---

Page 121

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  percent on racers.  Loans are still on LCPI.
3  Trust is funded by ABCP."  Then the name Martin
4  Kelly.
5      Q.  Okay.  So let's start unpackaging the
6  that.  The "PBN customer finance" that appears
7  in the first line, "PB" is prime brokerage or
8  prime brokering?
9      A.  That would seem reasonable.
10      Q.  Okay.  And racers, the reference to
11  racers, what are racers?
12      A.  I believe racers are a
13  securitized-type product that had been issued
14  off of another entity, not LBI, so Lehman
15  Brothers entity.
16      Q.  Is not the LCPI Lehman Commercial
17  Paper, Inc.?
18      A.  To be honest with you, LCPI, you've
19  just told me what it is.  I wouldn't have been
20  able to explain that to you.
21      Q.  Okay.  And so these are some kind of
22  structured security, and you say the "racers are
23  RV with LCPI."  What did you mean by that?
24      A.  Racers RV stands for reverse repo.
25      Q.  Okay.

TSG Reporting - Worldwide (877) 702-9580

Page 122

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    A.    So racers are reverse repo with LCPI,
3    and LCPI repo'd to LBI, and LBI would repo to
4    the street.
5    Q.    And is it fair to say that what those
6    notes indicate is the racers were used to secure
7    financing from the street, but indirectly
8    through LBI?
9    A.    LBI would raise cash to finance the
10   racers. You used the word "indirectly."
11   Q.    Yes.
12   A.    So I'm just clarifying. LBI repo'd to
13   the street.
14   Q.    Okay. And in turn, LCPI repo'd to
15   LBI, correct?
16   A.    According to what I was told, yes.
17   Q.    Do you recall whether racers were or
18   were not included in the assets that Barclays
19   purchased from Lehman?
20   A.    I am solely privy to the Fed repo
21   transaction. So, as far as the Fed repo
22   transaction occurring on Thursday, the racers
23   were not part of what the Fed was financing for
24   Lehman.
25   Q.    How do you know that?
TSG Reporting - Worldwide (877) 702-9580

Page 123

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    A.    I know that because they were part of
3    the other financing that Lehman Brothers had
4    received outside of the Fed funding.
5    Q.    So, on Wednesday, Lehman had Fed
6    financing and Lehman had a tri-party repo with
7    Barclays, correct?
8    A.    There was certainly Fed repo
9    financing. There had been during the week
10   financing by tri-party with Barclays, and any
11   other financing that Lehman Brothers had for its
12   assets I don't know.
13   Q.    But you seem to be fairly confident
14   that the racers were not part of the Fed
15   financing, correct?
16   A.    Yes.
17   Q.    And you assumed that the racers were
18   being financed elsewhere, correct?
19   A.    On Thursday, correct.
20   Q.    It says on your sheet, "PDCF, 20
21   percent on racers," do you see that?
22   A.    I see that.
23   Q.    PDCF is one of the Fed financing
24   facilities, correct?
25   A.    Yes.
TSG Reporting - Worldwide (877) 702-9580

Page 124

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    Q.    And the 20 percent is a reference to
3    haircut on racers, correct?
4    A.    I don't know.
5    Q.    Isn't that how you would typically
6    indicate the haircuts on securities?
7    A.    I don't know. The way it's written
8    here, if it was meant to reflect a haircut, I
9    normally would have written haircut.
10   Q.    Okay. Why then were you writing,
11   "PDCF, 20 percent on racers," any idea?
12   A.    No.
13   Q.    Do you know whether the racers were
14   financed by the -- under the tri-party financing
15   with Barclays?
16   A.    On that Thursday of the Fed, us taking
17   the Fed out of the repo trade, there's reason to
18   believe that they could have been part of that
19   funding.
20   Q.    Why do you say that there's reason to
21   believe they could have been part of that
22   funding?
23   A.    Well, they weren't part of the Fed
24   repo.
25   Q.    The next page over in your handwritten
TSG Reporting - Worldwide (877) 702-9580

Page 125

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    notes, Exhibit 272, the page that ends 863, do
3    you see that?
4    A.    Yes.
5    Q.    There's a calculation that appears at
6    the top of that page. Can you first read us
7    what that calculation is and, two, tell us what
8    it's a calculation of?
9    A.    "4.4 billion Chase. 2.4 Treasury.
10   1.1 IGP label. .7 government agency. .2 agency
11   MBS." Below that is "4.4 billion" underlined,
12   and top right is the word "gone" with an arrow
13   pointing towards "IGP label."
14   Q.    Okay. Any idea what that calculation
15   is all about?
16   A.    No.
17   Q.    All right. Next page, 864, has a date
18   of 9/18/08 on it. Do you see that at the top
19   left?
20   A.    Yes.
21   Q.    If you look at the entries on that
22   page, can you confirm whether that in fact is
23   the date of these entries?
24   A.    If 9/18 is that Thursday, then that
25   would seem to be correct given the minutes on
TSG Reporting - Worldwide (877) 702-9580

Page 126

HIGHLY CONFIDENTIAL - D. PETRIE

1    here.
2    Q.    There's a reference to Bob Diamond in
3    the second line, do you see that?
4        A.    Yes.
5        Q.    What's that in connection with, do you
6    know?
7        A.    Me thinking that, given the issues
8    that we had had throughout that Thursday, for
9    most of Thursday, and not receiving the proper
10   amount of collateral for the first amount of 5
11   billion that was sent, I was thinking out loud
12   on paper about what could be done or what
13   possibly could be done in regards to
14   facilitating a quicker movement of collateral.
15       Q.    And your thought was to have
16   Mr. Diamond get involved?
17       A.    It was a thought. He and I did not
18   speak.
19       Q.    You know he did get involved, right?
20       A.    I don't know that.
21       Q.    You know he put in a call to Jamie
22   Diamond to make the $7 billion get transferred?
23       A.    No, I don't know that.
24       Q.    Further down the line you have a line

TSG Reporting - Worldwide (877) 702-9580

Page 127

HIGHLY CONFIDENTIAL - D. PETRIE

1    item that says, "45 billion versus 49.6
2    billion," do you see that?
3        A.    Yes, I see it.
4        Q.    And that was a description of the cash
5    versus the collateral received, collateral plus
6    cash received?
7        A.    No, I don't think it is meaning that.
8        Q.    Okay. What do you think that means?
9        A.    Me reconfirming to myself what I hoped
10   to have happened that day.
11       Q.    Okay. Further down you have circled a
12   calculation which has three line items in it,
13   22.7, 5.023, and then a third line that I can't
14   read. Can you read that?
15       A.    It appears to read, and I haven't done
16   the math yet in my head to see if it adds up,
17   but it appears to read 4.8.
18       Q.    I don't think it's going to add up to
19   the number below that, though. Well, the 22.7
20   next to it states "Fed wire securities"; is that
21   right?
22       A.    Yes, that's right.
23       Q.    Those were the securities on the Fed
24   repo that were transferred via Fed wire,

TSG Reporting - Worldwide (877) 702-9580

Page 128

HIGHLY CONFIDENTIAL - D. PETRIE

1    correct?
2        A.    Your statement is saying that that is
3    what was transferred?
4        Q.    Okay.
5        A.    When I wrote this --
6        Q.    Uh-huh.
7        A.    -- it reflects perhaps an expectation
8    of what was to be transferred. I can't be
9    certain.
10       Q.    And can you tell by looking at the
11   numbers on this page or any of the entries when
12   you would have written these notes?
13       A.    I think reasonably we can assume that
14   these notes on the bottom half of page 864 were
15   written after Barclays had decided to send the
16   additional 40 billion in dollars.
17       Q.    Advance a couple of pages to page 866.
18   Let's go to the next page, 867. That
19   appears to have a date of 9/19 in the upper
20   right, but it's not clear to me. Can you tell?
21       A.    It appears 9/19.
22       Q.    If you can take a look at the entries
23   that you have on that page, and we can, once
24   you've read those, we can talk about them over.

TSG Reporting - Worldwide (877) 702-9580

Page 129

HIGHLY CONFIDENTIAL - D. PETRIE

1        (Document review.)
2        A.    Okay.
3        Q.    This handwriting is pretty difficult
4    for me to follow, so if you could help us go
5    down this page and tell us what you've got down.
6        A.    Okay. Top left, Rick. I can't read
7    the second name. Dan, John Sciola looks like,
8    JPMorgan, David Petrie, or David P., Barclays,
9    and Jai from Barclays, Dan Fleming.
10       Q.    And these are names of people who are
11   on the call? In a meeting? Either? Both?
12       A.    I believe this reflects Friday morning
13   as to who's at Lehman when we first get there,
14   which was approximately between 6 A.M. and maybe
15   7 A.M.
16       Q.    A few more names, you got a question
17   mark about whether Susan -- is that Susan
18   Cosgrove coming, is that what it says there?
19       A.    Yes.
20       Q.    Who's Susan Cosgrove?
21       A.    I forget.
22       Q.    You got four starred items below that.
23   If you could just read those, we can talk about
24   them.

TSG Reporting - Worldwide (877) 702-9580

Page 130

1          HIGHLY CONFIDENTIAL - D. PETRIE
2      A.  "David asked Rick to create file for
3  DTC download.  Fed and DTC box intended" I think
4  "in discussion."  I'm not sure of the word
5  "intended."
6      Q.  Okay.  Was it "Fed box initiated in
7  discussion"?  It's your handwriting.
8      A.  I'm sorry?
9      Q.  It's your handwriting, but could it be
10 "initiated in discussion"?
11     A.  Let me read it one more time, please.
12         (Document review.)
13     A.  Yeah, it could be "initiated in
14 discussion."
15     Q.  Or "included in discussion"?
16     A.  Yes.
17     Q.  Do you have a recollection of there
18 being a discussion about a DTC box on that day?
19     A.  I don't have a specific recollection
20 of a DTC box being discussed that day.
21     Q.  The next star?
22     A.  "Unencumbered collateral plus" -- I
23 can't be certain what the next word is -- "JPM
24 Chase" something "releases," arrow, meaning I
25 have an arrow pointing to "then release to
TSG Reporting - Worldwide (877) 702-9580

Page 131

1          HIGHLY CONFIDENTIAL - D. PETRIE
2  pledge to 855."
3      Q.  And 855 was the Barclays account at
4  JPM, correct?
5      A.  I believe so.
6      Q.  So --
7          MR. SHAW:  At JPM or BONY?
8          THE WITNESS:  I'm uncertain.
9      Q.  But the reference to 855 is to a
10 Barclays box either at BONY or at JPM?
11     A.  Yes.
12     Q.  The reference to unencumbered
13 collateral, do you see that?
14     A.  I see that.
15     Q.  That's not Fed repo collateral,
16 correct?
17     A.  Correct.
18     Q.  So this is a discussion now taking
19 place about other collateral other than the Fed
20 repo collateral?
21     A.  It's a discussion about collateral in
22 general, it seems.
23     Q.  Do you recall what that discussion
24 about collateral in general was about at this
25 meeting at Lehman on Friday?
TSG Reporting - Worldwide (877) 702-9580

Page 132

1          HIGHLY CONFIDENTIAL - D. PETRIE
2      A.  No.
3      Q.  Below that starred item there's
4  numbers that appear, 636, what looks like a 1,
5  074 box, do you see that?
6      A.  Yeah, I believe it says 636 and 074
7  box.
8      Q.  And do you recall there being a
9  discussion about two different DTC boxes that
10 day?
11     A.  No.
12     Q.  Okay.  The next starred item?
13     A.  "I described that we had a lot of
14 ambiguity around amount of any collateral.
15 Hence, tri-party loan was not discussed until
16 next morning."
17     Q.  And what does that mean?
18     A.  The Thursday of the Fed repo trade we
19 fully expected to receive only repo collateral
20 that Lehman had lent to the Fed on that
21 Thursday.  During that day, we came up short
22 collateral.  We, as in Lehman, was unable to
23 fully collateralize our loan, hence, the $7
24 billion that was credited to Barclays account.
25     The following day, Friday morning, I
TSG Reporting - Worldwide (877) 702-9580

Page 133

1          HIGHLY CONFIDENTIAL - D. PETRIE
2  was asked by Lehman about the tri-party trade
3  that had happened earlier in the week, and this
4  statement here explains what my answer was.  And
5  my answer to his question was we couldn't even
6  find collateral to fully collateralize our
7  original $45 billion loan.  Hence, there was no
8  reason for them to bring it up, which they
9  didn't, until that Friday.
10     I was perplexed as to why we couldn't
11 find collateral all day Thursday that should
12 have been part of the Fed repo transfer.
13     Q.  Okay.  Next bullet point?
14     A.  "Gerard said specifically not to take
15 more than 7 billion in pledges at 5:30 A.M. in
16 his office."
17     Q.  All right.  What does that mean?
18     A.  I take that as meaning that we had
19 received $7 billion in cash, and that if we were
20 able to fully collateralize that 7 billion, as
21 we had intended and as that the Fed requested us
22 to do that previous -- that previous night, that
23 we were to just satisfy the Fed's wishes in that
24 particular trade.
25         MR. TAMBE:  Let's take a short break.
TSG Reporting - Worldwide (877) 702-9580

Page 134

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      (Recess; Time Noted: 2:24 P.M.)
3      (Time Noted: 2:38 P.M.)
4  BY MR. TAMBE:
5      Q.   Going back to Exhibit 272, which are
6  handwritten notes, I think we're on page 868,
7  and if you could help us walk down this page and
8  understand what's on it.
9      A.   Okay. I'll just read through it
10  first, please.
11      Q.   Yes.
12      (Document review.)
13      A.   Okay. I'll attempt to read the names
14  at the top. It's labeled Friday, September
15  19th, '08. John Savoita. That is the best I
16  can get out of that name. Dan Fleming, perhaps.
17  I have him labeled here head of cash
18  management//Lehman. And Ed Purell, it looks
19  like.
20      And then the next line says -- it's
21  indistinguishable the first three words. Then,
22  "Heidi need Gerard." Below that I have Gerard's
23  what appears to be cell phone number. Then I
24  have, "Susan Cosgrove/DTC." David -- looks like
25  could be Aronow, John Feraca, David P., and Jai.
TSG Reporting - Worldwide (877) 702-9580

Page 135

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      Q.   And do you recall, was there a meeting
3  involving these people or a conference call
4  involving these people on Friday, the 19th?
5      A.   I don't recall if there was a
6  conference call.
7      Q.   Do you recall --
8      A.   I know that David Aronow, myself and
9  Jai were together the morning of Friday, the
10  19th.
11      Q.   In the middle of the page there's a
12  calculation that looks like it adds up to 5
13  billion, do you see that?
14      A.   I see it.
15      Q.   Could you just help us decipher that?
16      A.   As best I can read, it says "2.5
17  billion CNS," below that, "2.5 billion DTC,"
18  with those two adding up to 5 billion noted next
19  to it.
20      Q.   All the way to the left in that area,
21  it says, "Fed to deliver," is that it what it
22  says?
23      A.   Sorry, yes, "Fed to deliver."
24      Q.   Do you have an understanding of what
25  those notations mean?
TSG Reporting - Worldwide (877) 702-9580

Page 136

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      A.   No.
3      MR. SHAW: Can I ask a clarifying
4  question?
5      MR. TAMBE: Sure.
6      MR. SHAW: Is it "Fed to deliver" or
7  "fails to deliver"?
8      THE WITNESS: I stand corrected. To
9  be honest, I apologize, it's most definitely
10  "fails to deliver." I'm 100 percent sure it
11  says "fails to deliver."
12      Q.   How are you 100 percent sure that it's
13  "fails to deliver"?
14      A.   I can see my "A" and then an attempt
15  to dot the "I" afterwards.
16      Q.   Do you have a recollection of there
17  being $5 billion worth of fails to delivers?
18      A.   No.
19      Q.   There was some fails to delivers in
20  connection with this repo; is that correct?
21      A.   Yes.
22      Q.   And were steps taken to address those
23  fails to deliver?
24      A.   We should put into context better your
25  question. I'm sorry.
TSG Reporting - Worldwide (877) 702-9580

Page 137

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      Q.   Can you help me do that?
3      A.   Well, you're going to -- are you
4  asking about the failure of JPMorgan to
5  collateralize our 7 billion loan? That would be
6  my knowledge of fails to deliver.
7      Q.   Okay. Let me go back to the phrase
8  "fails to deliver" that appears on this page
9  next to this calculation of $5 billion. Do you
10  have any understanding of what that "fails to
11  deliver" is a reference to?
12      A.   No, I don't.
13      Q.   So when you said you were a hundred
14  percent certain it's "fails to deliver," you
15  were just saying you're a hundred percent
16  certain that's what your handwriting says?
17      A.   Yes.
18      Q.   And other than the JPMorgan failure to
19  deliver, are you aware of any other fails to
20  deliver in connection with the Barclays repo?
21      A.   No.
22      Q.   Next page, 869, looking at the top
23  half of this page, can you just read that to
24  yourself and then I'll ask you some questions
25  about it.
TSG Reporting - Worldwide (877) 702-9580

Page 138

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    (Document review.)
3    A.   Okay, I've read it.
4    Q.   Can you help us understand what you
5    have written down here?
6    A.   I have the name John Rodefeld with the
7    phone number 646-541-8046.
8    Q.   Who is John Rodefeld?
9    A.   The head of Operations at Barclays.
10    John Haley, who also works in
11   Operations at Barclays, and I have Ed Lane, who
12   worked for me.
13    Q.   The next set of text that appears
14   below there?
15    A.   "Friday morning, John Haley," I
16   believe it says "Cusips and quantify everything
17   from Lehman." The number 8500. "That is what
18   settled. More items later today. Guess a few
19   hundred. 1.040 billion mid value."
20    Q.   And do you know what that was a
21   reference to?
22    A.   Other than collateral coming into
23   Barclays, I wouldn't know what it's satisfying,
24   so no.
25    Q.   Turning to page 871, carries the date

TSG Reporting - Worldwide (877) 702-9580

Page 139

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    of 9/21/08, do you see that?
3    A.   Yes, I see it.
4    Q.   That's the Sunday? I believe it is
5    Sunday.
6    A.   Yeah, okay.
7    Q.   Do you recall being involved in
8    collateral movement or collateral
9    movement-related issues on that Sunday, the
10    21st?
11    A.   Just give me a moment, please, to read
12   through it.
13    Q.   Sure.
14    (Document review.)
15    A.   I vaguely remember a phone call that
16   day.
17    Q.   And your notes concern that call?
18    A.   Yes.
19    Q.   And can you help us decipher your
20   notes and tell us a little bit what that call
21   was about?
22    A.   It appears that DTC is trying to work
23   out some operational issues regarding transfer
24   of collateral, that would be the limit of my
25   knowledge, and giving some sort of timeframe as

TSG Reporting - Worldwide (877) 702-9580

Page 140

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    to how long that should take.
3    Q.   Are you aware of any understanding or
4    agreement that was reached with DTC either that
5    weekend or shortly thereafter?
6    A.   Only to the extent as to what is noted
7    here in my notes.
8    Q.   If you go further down in this exhibit
9    to page 873, 874 and 875, they appear to be
10   spreadsheets. Can you tell what those documents
11   are?
12    A.   The first two pages I believe are
13   identical. The document appears to be a list of
14   securities that were not part of the Fed repo
15   trade.
16    Q.   How do you know they were not part of
17   the Fed repo trade?
18    A.   I believe these securities represent
19   what was funded outside of the Fed repo trade
20   that occurred on Thursday, and this list was
21   provided to me I believe the Monday after the
22   transaction occurred.
23    Q.   How can you tell all that just by
24   looking at these sheets of paper? How do you
25   know all that?

TSG Reporting - Worldwide (877) 702-9580

Page 141

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    A.   On Monday morning, which would be the
3    22nd, I believe, is that correct?
4    Q.   Yes, 22nd.
5    A.   I was called in to an office around
6    3:30, between 3 and 3:30 in the morning to
7    discuss the $7 billion that JPMorgan had
8    originally given or pledged to Barclays in cash,
9    and there was an attempt to reach a settlement
10   of that $7 billion.
11    Part of that settlement JPMorgan had
12   attempted to include securities that were not
13   part of the Fed trade, and by nature of the
14   funding that we know that occurred that week,
15   there were assets that were being funded outside
16   of the Fed trade that included collateral that
17   would not be acceptable collateral to Barclays,
18   and one piece of that collateral is noted here
19   in this schedule that you have presented in
20   front of me.
21    Q.   And you're looking at page 874, the
22   item that reads "racer"; is that the one you're
23   referring to?
24    A.   Yes.
25    Q.   On the next page, 875, that's your

TSG Reporting - Worldwide (877) 702-9580

Page 142

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  handwriting on that page, right?
3      A.   The writing that says, "We need sent
4  to SK" is my handwriting.  Below that is not my
5  handwriting.
6      Q.   Okay.  And who's SK?
7      A.   Stephen King.
8      Q.   And the notation that appears below
9  that handwriting, "7.4 for 8.55," do you have
10  any understanding of what that means?
11      A.   No.
12      Q.   And any understanding whose
13  handwriting that is?
14      A.   No.
15      Q.   The table that appears on that page of
16  875 has a total sum of collateral value, at
17  least in the "Grand Total" column, of 15.8
18  billion.  Do you see that?
19      A.   Yes.
20      Q.   Do you have any understanding as to
21  what that number means?
22      A.   Collateral that was left funded by
23  other means outside of the Fed repo trade that
24  we had executed.  Barclays executed with Lehman
25  at the behest of Fed.

TSG Reporting - Worldwide (877) 702-9580

Page 143

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      Q.   On the Wednesday, the 17th, the amount
3  of the funding that was done through the
4  tri-party repo was about $15.8 billion, correct?
5      A.   Yes.
6      Q.   Is there any connection between that
7  15.8 and this 15.8 on this page, page 875,
8  Exhibit 272?
9      A.   I believe there could be a reasonable
10  connection.
11      Q.   What is that reasonable connection?
12      A.   If Lehman's only means of funding
13  itself was with the Fed and JPMorgan prior to
14  that week beginning, and there had been a
15  tri-party outside of the Fed trade that we were
16  stepping into, then this number could reflect
17  the number that was being funded outside of the
18  Federal Reserve funding.
19      Q.   Okay.  I've handed you, sir, a
20  two-page document previously marked Exhibit 133.
21  Take a look at it and let me know when you're
22  done.
23          (Document review.)
24      A.   Okay.
25      Q.   Turning to the second page of this

TSG Reporting - Worldwide (877) 702-9580

Page 144

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  Exhibit 133, there's a small spreadsheet that
3  appears there, do you see that?
4      A.   I see it.
5      Q.   Do you have an understanding as to
6  what information is contained on that
7  spreadsheet?
8      A.   I've never seen this spreadsheet.
9          (Exhibit 275, a document bearing Bates
10  Nos. BCI-EX-81015 through 81016, marked for
11  identification, as of this date.)
12      Q.   I handed you a two-page document
13  marked Exhibit 275.  Take a moment to look at
14  it.  Let me know when you're done.
15          (Document review.)
16      A.   I have looked over it.
17      Q.   Have you seen this e-mail before
18  today?
19      A.   No, I haven't.
20      Q.   You'll see this is an e-mail from
21  Jasen Yang to Archie Cox of Barclays, do you see
22  that?
23      A.   I do.
24      Q.   Who is Jasen Yang?
25      A.   Jasen Yang worked for Stephen King.

TSG Reporting - Worldwide (877) 702-9580

Page 145

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      Q.   And who is Archie Cox?
3      A.   Archie Cox is a chairman of North
4  America for Barclays.
5      Q.   And do you see this is a valuation of
6  collateral as provided for by BONY?
7      A.   I wouldn't be able to comment.  I
8  don't know.
9      Q.   Did you receive any valuations from
10  BONY on and after the 19th for the Fed repo
11  collateral?
12      A.   No.
13      Q.   We talked earlier about a 42.6 or 42.7
14  billion dollar number as a number you associated
15  with the value of the collateral transferred on
16  the night of the 18th, correct?
17      A.   Yes.
18      Q.   Okay.  Are you aware of a BONY
19  valuation of that collateral of about $45
20  billion?
21      A.   I'm aware that there were, like I said
22  earlier in my testimony, it was a highly
23  volatile market and that having a discrepancy in
24  valuations or movement, I should say, in
25  valuations was to be expected.

TSG Reporting - Worldwide (877) 702-9580

Page 146

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    Q.    Were you aware of a BONY valuation for
3    that collateral as of Thursday night, the values
4    as of Thursday night, of $45 billion?
5    A.    No.
6    Q.    Are you aware of any valuations by
7    BONY, any specific valuations by BONY for that
8    Fed repo collateral?
9    A.    Am I aware of any specific
10   valuations --
11   Q.    By BONY.
12   A.    -- by BONY?
13         BONY, as our custodian, is the one
14   that values the collateral.
15   Q.    Are you aware of any specific values
16   put by BONY on the Fed repo collateral that was
17   transferred over on the 18th?
18   A.    No.
19   Q.    Would that information not have
20   crossed your desk on the 19th, the 20th, the
21   21st?
22   A.    Your question said "specific
23   valuations." My desk, as mentioned in the very
24   beginning of the testimony, like any other repo
25   desk on Wall Street, is to finance the firm.

TSG Reporting - Worldwide (877) 702-9580

Page 147

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    So, as collateral enters Barclays, my group and
3    myself's number one job is to finance it.
4         So, to the extent that the value of
5    the collateral held by Barclays Capital went up,
6    I would then raise, or my group would raise,
7    cash to meet that obligation in financing it.
8    Q.    I've handed you a multi-page document
9    previously marked as Exhibit 83B. Take a moment
10   to look at the document and the spreadsheet
11   attached in the document. Let me know when
12   you're done.
13         (Document read.)
14   A.    I've read it.
15   Q.    Have you seen this document before
16   today?
17   A.    No.
18   Q.    Do you have any understanding of the
19   information that's contained in the spreadsheet
20   attached to this Exhibit 83B?
21   A.    Yes, I have some understanding.
22   Q.    What's your understanding of what that
23   spreadsheet is?
24   A.    Given that Barclays Capital had
25   received many different asset classes of

TSG Reporting - Worldwide (877) 702-9580

Page 148

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    securities from Lehman Brothers in taking the
3    Fed out of its trade, there was an attempt by
4    Stephen Sell to have those securities under the
5    watchful eye of the relevant trading desks to
6    manage the risk associated with those different
7    asset classes would be -- you asked my opinion.
8         I can't speak for Stephen Sell, but --
9    I haven't seen the document, but that's my
10   opinion.
11   Q.    Do you see the two bullet points on
12   the first page of the exhibit, Exhibit 83B, the
13   first bullet point reads, "We should book all
14   positions from the Lehman financing facility to
15   BCI (45 billion securities - see attached
16   file)."
17         Do you see that?
18         MR. SHAW: Objection.
19   Mischaracterizes the document.
20   Q.    Do you see that bullet point?
21         MR. SHAW: Objection.
22   Mischaracterizes the document.
23         MR. TAMBE: Whether he sees the
24   document?
25         MR. SHAW: The document you described

TSG Reporting - Worldwide (877) 702-9580

Page 149

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    does not exist because you left out a
3    critical piece of information.
4    Q.    The first bullet point on page 1 of
5    Exhibit 83B, do you see that first bullet point?
6    A.    I see the first bullet point.
7    Q.    This parentheses it "45 billion
8    securities - see attached file," do you see
9    that?
10        MR. SHAW: Objection.
11   Mischaracterizes the document.
12        MR. TAMBE: How does that
13   mischaracterize the document?
14        MR. SHAW: You have left out the
15   little mark that generally indicates --
16   well, I know what it generally indicates to
17   me and what I understand it is
18   approximately.
19   Q.    Okay. "Approximately $45 billion in
20   securities," do you see that?
21   A.    Yes, I see that --
22   Q.    The squiggly line?
23   A.    I would read it, "We should book all
24   positions from the Lehman financing facility to
25   BCI (approximately 45 billion securities - see

TSG Reporting - Worldwide (877) 702-9580

38

Page 150

```
 1         HIGHLY CONFIDENTIAL - D. PETRIE
 2   attached file)."
 3       Q.   That's the file we were talking about
 4   before, the spreadsheet that's attached to the
 5   cover sheet?
 6       A.   The file that you said -- yes, the
 7   spreadsheet that I haven't seen before until
 8   now, and if it adds up to 45, approximately 45
 9   billion, then, okay, then that's the file we
10   were talking about.
11       Q.   And the next bullet point states, "We
12   should book based on the price within the BONY
13   file, at least for Day 1." Do you see that?
14       A.   I see that statement.
15       Q.   And taking those two bullet points
16   together, do you understand that as Mr. Sell
17   saying that the BONY prices were used for
18   booking these trades into the Barclays system,
19   at least for Day 1?
20           MR. SHAW: Objection.
21       Mischaracterizes the document.
22       A.   I don't know what Stephen Sell was
23   trying -- what he was saying here.
24       Q.   What do you understand those two
25   bullet points to mean there?
```
TSG Reporting - Worldwide (877) 702-9580

Page 151

```
 1         HIGHLY CONFIDENTIAL - D. PETRIE
 2       A.   In Barclays' books and records, you
 3   have to characterize these assets being held in
 4   a price that is a starting price from whence you
 5   held them.
 6       Q.   Okay. And you understand this e-mail
 7   as saying that those prices should be the BONY
 8   prices, correct?
 9       A.   I can't speak for Stephen Sell.
10       Q.   That's what the e-mail said. Do you
11   read that? Do you understand the e-mail as
12   saying that?
13       A.   It appears that's what he's saying.
14       Q.   And do you know, based on how these
15   trades were booked to the Barclays system,
16   whether they in fact were booked to the BONY
17   prices on day one?
18       A.   I don't know.
19       Q.   Who would know that?
20       A.   I would suggest speaking to Stephen
21   Sell.
22       Q.   You said many, many times today that
23   there was a lot of volatility that week. If it
24   was up to you, what -- what day's prices should
25   have been used to book these assets when they
```
TSG Reporting - Worldwide (877) 702-9580

Page 152

```
 1         HIGHLY CONFIDENTIAL - D. PETRIE
 2   were booked in Barclays' books?
 3           MR. SHAW: Objection to form.
 4       A.   If it was up to me, at what prices
 5   should the assets that came over from the Fed
 6   repo trade been booked at; am I characterizing
 7   your question correctly?
 8       Q.   Not quite. What day's prices would
 9   you have used?
10           MR. SHAW: Objection to form.
11       Q.   Thursday's prices? Friday's prices?
12   Monday's price?
13           MR. SHAW: Objection to form.
14       A.   I'm not an accountant, so I wouldn't
15   know what day to use.
16       Q.   But you run the repo desk, right?
17       A.   Right, for financing --
18       Q.   You need to know what you have on your
19   assets so you know what you financed, right?
20   You need to have some sense of what prices
21   you're going to use?
22       A.   For financing the positions, it would
23   be current market value.
24       Q.   So you'd use the prices of the day you
25   got the assets into your books?
```
TSG Reporting - Worldwide (877) 702-9580

Page 153

```
 1         HIGHLY CONFIDENTIAL - D. PETRIE
 2           MR. SHAW: Objection to form.
 3       A.   Buying a security and financing a
 4   security, the price that you paid for the
 5   security versus where you finance that security
 6   can differ to the extent of market volatility.
 7       Q.   A lot of things can differ, okay? Do
 8   you have any procedures or rules that you follow
 9   when you get securities and you lend money? Are
10   you required to follow any particular pricing
11   convention or methodology?
12           MR. SHAW: Objection to form,
13       foundation, and vague as to who the "you" is
14       in that question.
15       Q.   You, Mr. Petrie. Is there a problem
16   with "you"? Is it unclear to you as to who the
17   "you" is in my question?
18       A.   I'm glad you clarified it, meaning my
19   attorney.
20           In running a repo desk, every day you
21   come into a new day where the market has moved
22   up or down, and you use, you can only use,
23   whatever market value of the securities that are
24   within Barclays Capital to raise cash.
25       Q.   And where Barclays is using a
```
TSG Reporting - Worldwide (877) 702-9580

Page 154

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  tri-party arrangement and there's a custodian
3  and the custodian has assigned prices to those
4  securities, are you required to use those
5  prices?
6        MR. SHAW: Objection to form.
7  Foundation.
8        A.   Bank of New York, being our custodian,
9  prices our securities, and when we lend those
10 securities, the value that we lend those
11 securities at is the money that we're able to
12 borrow to finance the firm.
13       Q.   And whose values do you use, Bank of
14 New York's values or your values?
15       A.   Bank of New York's.
16       Q.   Thank you. I have placed before you a
17 two-page document previously marked Exhibit
18 147A. Take a moment to review the document.
19 Let me know when you're done.
20       (Document review.)
21       A.   Okay. I've finished it.
22       Q.   Have you seen this document before
23 today?
24       A.   No.
25       Q.   There's a reference in the first

TSG Reporting - Worldwide (877) 702-9580

Page 155

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  e-mail at the top of page 1 to $1.9 billion of
3  additional collateral. Do you see that?
4        A.   Yes, I see it.
5        Q.   Do you recall having any discussions
6  with anyone on or after the 19th of September
7  about $1.9 billion of additional collateral?
8        A.   No.
9        Q.   I have handed you a document marked
10 144A. Take a moment to look at that document.
11 Let me know when you're done.
12       A.   I'm finished.
13       Q.   There's a forward of an e-mail on this
14 exhibit, and the e-mail is from Marty Malloy to
15 Gerard LaRocca and others. Do you see that?
16       A.   Yes.
17       Q.   Okay. Who's Marty Malloy?
18       A.   Marty Malloy is a managing director in
19 the Collateralized Finance Group.
20       Q.   And in terms of seniority, how does he
21 fit in with Mr. Dearlove and others we have
22 discussed?
23       A.   He's a senior member of the Barclays
24 team, so relatively on par.
25       Q.   There's a CC shown on his e-mail,

TSG Reporting - Worldwide (877) 702-9580

Page 156

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  Jacqui Stanley-Johns. Do you see that?
3        A.   I see that.
4        Q.   Is that a name you're familiar with?
5        A.   No.
6        Q.   And you see the subject line of this
7  e-mail, "Totals For the Fed Facility
8  Collateral," do you see that?
9        A.   I see that.
10       Q.   And are you familiar with this
11 calculation that appears below in his e-mail?
12       A.   No.
13       Q.   You haven't seen that before today?
14       A.   No, I have not.
15       MR. TAMBE: Let me take a short break.
16       (Recess; Time Noted: 3:22 P.M.)
17       (Time Noted: 3:31 P.M.)
18 BY MR. TAMBE:
19       Q.   Mr. Petrie, were you involved at all
20 in helping Barclays' auditors account for the
21 value of the securities that were purchased in
22 the Lehman/Barclays transaction?
23       A.   No.
24       Q.   I'm showing you what's previously been
25 marked as Exhibit 86B. Just take a look at it

TSG Reporting - Worldwide (877) 702-9580

Page 157

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  and tell me if you've ever seen that document
3  before.
4        (Document review.)
5        A.   No, I have not.
6        Q.   There's a column on page 1 of Exhibit
7  86B, column F, titled "PCG Liquidity Value." Do
8  you see that?
9        A.   Yes, I see it.
10       Q.   And do those words have any meaning to
11 you?
12       A.   Yes.
13       Q.   What is your understanding of what
14 those words mean?
15       A.   Product Control Group liquidity value.
16       Q.   And do you have an understanding as to
17 the calculations that are being done in that
18 column on page 1 of 86B?
19       A.   No, I do not.
20       Q.   I've handed you a one-page document
21 previously marked as 87B. Have you seen this
22 document before today?
23       A.   No.
24       Q.   There's a column F on this document
25 87B entitled "MV w Liquidity," do you see that?

TSG Reporting - Worldwide (877) 702-9580

Page 158

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    A.   I see that.
3    Q.   Do those words have any meaning to
4    you?
5    A.   No, not really.
6    Q.   I've handed you a document marked
7    Exhibit 88B. Take a moment to look through
8    those pages. Same question: Have you seen this
9    document before today?
10   A.   No, I have not.
11        MR. TAMBE: I have no further
12   questions. Thank you.
13   EXAMINATION BY
14   MR. WOOD:
15   Q.   Again, I'm John Wood from Hughes,
16   Hubbard & Reed and I represent the SIPA Trustee.
17        If you could take a moment to look
18   again at Exhibit 274, which you've previously
19   been shown, and that's the four-page e-mail and
20   I'm going to ask you again about the e-mail that
21   starts at the bottom of page 2 and goes on to
22   page 3 from Teri Scott on which you were CC'd.
23        And looking on the third page there,
24   you were asked previously about the language in
25   bold. It says, "The list of Cusips to be
TSG Reporting - Worldwide (877) 702-9580

Page 159

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    excluded has been provided to ensure collateral
3    we are not purchasing is excluded in this
4    transfer."
5        And I think you testified that you
6    would have worded it a bit differently. How
7    would you have worded it?
8    A.   The -- it would be a longer
9    explanation than just the bullet point.
10   Q.   Can you go ahead and give your best
11   explanation of it.
12   A.   Given that the Fed had requested us to
13   take the collateral that they were funding for
14   Lehman Brothers, Barclays' expectations were to
15   only receive that collateral that was being
16   funded on the Thursday of the repo transaction.
17   In preparation for that occurrence, recognizing
18   that there could be difficulties in getting that
19   collateral, or if there were difficulties in
20   getting that collateral, it was reasonable to
21   have securities that were not acceptable to
22   Barclays.
23   Q.   I'm sorry, can you explain that last
24   point? What do you mean "it was reasonable to
25   have securities that were not acceptable to
TSG Reporting - Worldwide (877) 702-9580

Page 160

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    Barclays"?
3    A.   Well, since we -- our intention and
4    what the Fed had wanted us to accomplish was to
5    simply replace them, the Fed, in funding Lehman
6    Brothers and accept only the securities that
7    they were funding, if there arose a problem
8    during that Thursday in getting only Fed
9    collateral, there would be collateral outside of
10   the Fed that we would be receiving, and as a
11   contingency to that, there would be naturally
12   collateral that would be acceptable and wouldn't
13   be acceptable if we weren't getting what we had
14   intended to receive from the Fed.
15   Q.   Did Barclays ask that any of the
16   collateral that was included in the Fed
17   transaction be excluded from the transaction
18   with Barclays?
19   A.   No.
20   Q.   That's all I have on that document.
21        (Exhibit 276, a document bearing
22   Bates Nos. BCI-EX-(S)-39186, marked for
23   identification, as of this date.)
24   Q.   Mr. Petrie, I am handing you what has
25   been marked as Exhibit 276. It's a one-page
TSG Reporting - Worldwide (877) 702-9580

Page 161

HIGHLY CONFIDENTIAL - D. PETRIE
1
2    e-mail from Harry Harrison to Gerard LaRocca,
3    and you and Ronti Pal are CC'd. Go ahead and
4    take a minute to look that over.
5        (Document review.)
6    A.   I've read it.
7    Q.   And the subject line is "DTCC," and
8    you see there the first sentence from
9    Mr. Harrison says, "Dave is helping Ronti work
10   through this."
11        Do you know what the "this" refers to?
12   A.   In the very general sense, yes.
13   Q.   And what did you understand that to
14   mean?
15   A.   This Sunday, the DTC had asked
16   representatives from Barclays to come to their
17   offices, representatives from different trading
18   areas to come to their offices, to discuss
19   various issues. I personally was on my way to
20   go down to those offices, but then was called
21   back and said it wasn't necessary.
22   Q.   So you did not go to the meeting?
23   A.   I was -- that's correct.
24   Q.   Do you know who did go to the meeting?
25   A.   I know that one representative from my
TSG Reporting - Worldwide (877) 702-9580

41

Page 162

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2    desk, Nate Hartley, was on his way to the
3    meeting. and when he got there, the meeting had
4    had concluded, in other words, whatever was
5    meant to happen or not to happen at that meeting
6    I don't know.
7        Q.    Do you know of anybody else from
8    Barclays who went to the meeting?
9        A.    No.
10       Q.    Do you know who from DTC was at the
11   meeting?
12       A.    No.
13       Q.    Do you know what other entities were
14   represented, if any?
15       A.    No, I don't.
16       Q.    Do you know what issues were discussed
17   at the meeting?
18       A.    No, I don't.
19       Q.    Do you know the purpose of the
20   meeting?
21       A.    No, I don't.
22       Q.    Since you were at least on your way to
23   the meeting, did anybody give you any idea going
24   into it of what the meeting was going to be
25   about?

TSG Reporting - Worldwide (877) 702-9580

Page 163

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2        A.    If memory serves correctly, I was told
3    go down to DTC meeting, you're needed, and I
4    said "okay" and was making my way to the
5    meeting, meaning packing up my briefcase at the
6    office, and then was told not to go to the
7    meeting. That's the extent of my knowledge of
8    the meeting.
9        Q.    Do you recall who originally asked you
10   to go to the meeting?
11       A.    I believe it was Harry Harrison.
12       Q.    And did Mr. Harrison tell you anything
13   about what the expected subject matter of the
14   meeting was?
15       A.    No.
16       Q.    If you look at the document at the
17   third paragraph, it says, "If the initial
18   reports are correct, they are showing 11 billion
19   in the box on Friday," and then it continues.
20            Do you know which box that refers to?
21       A.    I don't.
22       Q.    Then it continues, "8 billion of which
23   were treasuries, but confidence in that number
24   was low." Do you know why confidence in the
25   number was low?

TSG Reporting - Worldwide (877) 702-9580

Page 164

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2        A.    No, I don't.
3        Q.    If you look at the last paragraph, the
4    last sentence of the entire e-mail, it says,
5    "Lehman had actually managed to collapse the
6    majority of the rest of the matched book." What
7    did you understand that to mean?
8        A.    Leading up to the Lehman bankruptcy,
9    Lehman aggressively tried to pare down their
10   matched book.
11       Q.    Is that it?
12       A.    (Witness nods.)
13       Q.    Okay.
14           (Exhibit 277, a document bearing Bates
15   Nos. BCI-EX-(S)-39489, marked for
16   identification, as of this date.)
17       Q.    Mr. Petrie, I've handed you what has
18   been marked as Exhibit 277. It's a one-page
19   e-mail from Jasen Yang, who we have already
20   discussed, to you on Tuesday, September 23. Go
21   ahead and take a minute to look it over.
22           (Document review.)
23       A.    I've read it.
24       Q.    And the subject is "Box collateral"
25   and it's a very brief e-mail, so I'll just read

TSG Reporting - Worldwide (877) 702-9580

Page 165

HIGHLY CONFIDENTIAL - D. PETRIE
1    HIGHLY CONFIDENTIAL - D. PETRIE
2    it into the record:
3            "David, James Walker just mentioned
4    that something surprising might be going on with
5    the $1.9 billion of box collateral to Stephen
6    and I — anything we should know?"
7            Do you know what the something
8    surprising was?
9        A.    No.
10       Q.    Do you recall getting this e-mail?
11       A.    No.
12       Q.    Do you recall whether you responded to
13   this e-mail?
14       A.    No.
15       Q.    Do you recall ever discussing this
16   matter with Jasen Yang?
17       A.    No.
18       Q.    Do you recall anything else about what
19   the something surprising could be?
20       A.    No.
21           (Exhibit 278, a document bearing Bates
22   Nos. BCI-EX-(S)-40204 through 40206, marked
23   for identification, as of this date.)
24       Q.    I've just handed you what has been
25   marked as Exhibit 278. It's a three-page string

TSG Reporting - Worldwide (877) 702-9580

Page 166

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  of e-mails. Bates number at the bottom ends in
3  40204 through 40206. Take a moment to read that
4  over.
5      A.  Okay.
6         (Document review.)
7      A.  I've read it.
8      Q.  Look at the second page. There's an
9  e-mail from Robert Zekraus to you and several
10 other people on Thursday, September 25, and then
11 it looks like you respond to his e-mail.
12         In Mr. Zekraus's e-mail, he writes,
13 first paragraph -- well, actually I should say
14 the subject matter line is "Funding & Current
15 Liquidity Markets." First paragraph just says
16 he's available for a call. The second paragraph
17 says, "From the equity side we just received
18 notification that all of the LBI equity
19 collateral, approximately $8 billion, is finally
20 settled on to BCI's books."
21         What does that $8 billion refer to?
22     A.  I don't know.
23     Q.  If you look further down in that same
24 e-mail, after the list of five things, it says,
25 "Here are our projected funding numbers for

TSG Reporting - Worldwide (877) 702-9580

Page 167

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  tomorrow (note: This does not include the $8
3  billion in equity, equity-linked collateral from
4  above)," and then it lists several what appear
5  to be categories of assets that total 41.79
6  billion.
7         Do you know what the 41.79 billion
8  refers to?
9      A.  Only to the extent of what you've put
10 in front of me here.
11     Q.  And is that collateral that
12 transferred to BONY as part of the Repurchase
13 Agreement?
14     A.  I would take these numbers
15 holistically the funding numbers as what
16 Barclays needed to fund, including positions
17 that were held prior to the Lehman transaction
18 as well as post, would be my best answer to your
19 question.
20     Q.  Just so I understand, you're saying that
21 some of that $41.79 billion is unrelated to the
22 transaction between Lehman and Barclays?
23     A.  I can't speak for Robert Zekraus in
24 regards to this e-mail, but I believe that would
25 be a reasonable assumption given that he is

TSG Reporting - Worldwide (877) 702-9580

Page 168

HIGHLY CONFIDENTIAL - D. PETRIE
1
2  attempting to provide funding numbers for the
3  firm and he worked in the Equity Finance Group.
4  So it appears that he's giving a holistic view
5  of financing needs for the entire firm.
6      MR. WOOD:  I have no further
7  questions.
8      MR. LAZAR:  Nothing.
9      MR. SHAW:  Anything from Quinn
10 Emanuel?
11     MR. O'BRIEN:  No questions from me.
12     MR. TAMBE:  Thank you very much.
13     (Time noted: 3:55 P.M.)
14         oOo
15
16
17
18
       _____
       DAVID PETRIE
19
20  Subscribed and sworn to
    before me this   day
21  of      2009.
22
    _____
23
24
25

TSG Reporting - Worldwide (877) 702-9580

Page 169

HIGHLY CONFIDENTIAL - D. PETRIE
1
2      CERTIFICATE
3  STATE OF NEW YORK )
        : ss
4  COUNTY OF NEW YORK)
5      I, Kathy S. Klepfer, a Registered
6  Merit Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9      That DAVID PETRIE, the witness whose
10 deposition is herein before set forth, was
11 duly sworn by me and that such deposition is
12 a true record of the testimony given by such
13 witness.
14     I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18     I further certify that neither the
19 deponent nor a party requested a review of
20 the transcript pursuant to Federal Rule of
21 Civil Procedure 30(e) before the deposition
22 was completed.
23     In witness whereof, I have hereunto
24 set my hand this 26th day of August, 2009.
25 ----------------------------

TSG Reporting - Worldwide (877) 702-9580

Page 170

```
1            HIGHLY CONFIDENTIAL - D. PETRIE
2                      INDEX
3    TESTIMONY OF D. PETRIE:              PAGE
4    Examination by Mr. Tambe ...................   5
5    Examination by Mr. Wood  ...................  158
6
7    EXHIBITS:                    PAGE
8    Exhibit 264 a document bearing Bates Nos. .....   27
9    BCI-EX-(S)-37165
10   Exhibit 265, a document bearing Bates Nos. ..   30
11   BCI-EX-(S)-37172 through 173
12   Exhibit 266, a document bearing Bates Nos. ..   32
13    BCI-EX-(S)-37192 through 194
14   Exhibit 267, a document bearing Bates Nos. ..   36
15   BCI-EX-(S)-37195 through 197
16   Exhibit 268, a document bearing Bates Nos. ..   41
17   BCI-EX-(S)-37199 through 200             .
18   Exhibit 269, a document bearing Bates Nos. ..   42
19   BCI-EX-(S)-37215 with attached chart
20   Exhibit 270, a document bearing Bates Nos. ..   45
21   BCI-EX-(S)-37217, with attached chart
22   Exhibit 271, a document bearing Bates Nos. ..   46
23   BCI-EX-(S)-37270
24   Exhibit 272, a document bearing Bates Nos. ..   48
25   BCI-EX-115847 through 5876
```
TSG Reporting - Worldwide (877) 702-9580

Page 171

```
1            HIGHLY CONFIDENTIAL - D. PETRIE
2                      INDEX
3    EXHIBITS:                       PAGE
4    Exhibit 273, a document bearing Bates Nos. ..  105
5    BCI-EX-(S)-37621
6    Exhibit 274, a document bearing Bates Nos. ..  110
7    BCI-EX-(S)-38010 through 38013
8    Exhibit 275, a document bearing Bates Nos. ..  144
9    BCI-EX-81015 through 81016
10   Exhibit 276, a document bearing Bates Nos. ..  160
11   BCI-EX-(S)-39186
12   Exhibit 277, a document bearing Bates Nos. ..  164
13   BCI-EX-(S)-39489
14   Exhibit 278, a document bearing Bates Nos. ..  165
15   BCI-EX-(S)-40204 through 40206
16
17
18
19
20
21
22
23
24
25
```
TSG Reporting - Worldwide (877) 702-9580

Page 172

```
1        HIGHLY CONFIDENTIAL - D. PETRIE
2    NAME OF CASE: In re Lehman Brothers
3    DATE OF DEPOSITION: August 26, 2009
4    NAME OF WITNESS: David Petrie
5    Reason Codes:
6       1. To clarify the record.
        2. To conform to the facts.
7       3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25        _____
              DAVID PETRIE
```
TSG Reporting - Worldwide (877) 702-9580

# BCI EXHIBIT

# 90

Page 1

1                    N. PURCELL

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4      ----------------------x

5      In Re:

6                              Chapter 11

7      LEHMAN BROTHERS           Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al.,    (Jointly Administered)

9                       Debtors.

10     ----------------------x

11

12

13

14       VIDEOTAPED DEPOSITION OF NOEL PURCELL

15                  New York, New York

16                  January 13, 2010

17

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 27089

Page 2

1              N. PURCELL
2           January 13, 2010
3
4         VIDEOTAPED deposition of NOEL
5    PURCELL, taken pursuant to Rule 30(b)(6),
6    held at the law offices of Boies,
7    Schiller & Flexner, LLP, 575 Lexington
8    Avenue, New York, New York, before Kathy
9    S. Klepfer, a Registered Professional
10   Reporter, Registered Merit Reporter,
11   Certified Realtime Reporter, Certified
12   Livenote Reporter, and Notary Public of
13   the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              N. PURCELL
2         A P P E A R A N C E S:
3
4    JONES DAY, LLP
5    Attorneys for Lehman Brothers, Inc.
6        222 East 41st Street
7        New York, New York 10017-6702
8    BY: JENNIFER L. DEL MEDICO, ESQ.
9
10   BOIES, SCHILLER & FLEXNER, LLP
11   Attorneys for Barclays Capital
12       575 Lexington Avenue - 7th Floor
13       New York, New York 10022
14   BY: JACK G. STERN, ESQ.
15
16   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
17   Attorneys for the Creditors Committee
18       865 Figueroa Street, 10th Floor
19       Los Angeles, California 90017
20   BY: ERICA P. TAGGART, ESQ.
21       TYLER WHITMER, ESQ.
22       - and -
23       51 Madison Avenue, 22nd Floor
24       New York, New York 10010
25   BY: JAMES C. TECCE, ESQ.

Page 4

1              N. PURCELL
2
3         A P P E A R A N C E S: (Cont'd.)
4
5    HUGHES, HUBBARD & REED, LLP
6    Attorneys for the SIPA Trustee
7        One Battery Park Plaza
8        New York, New York 10004-1482
9    BY: CARL W. MILLS, ESQ.
10
11   STROOCK & STROOCK & LAVAN, LLP
12   Attorneys for the Witness and
13   Mizuho Corporate Bank, Ltd.
14       180 Maiden Lane
15       New York, New York 10038-4982
16   BY: CLAUDE G. SZYFER, ESQ.
17
18
19   Also Present:
20       STEVEN SANPIETRO, Legal Video Specialist
21       LISA J. HAYES, Mizuho Corporate Bank, Ltd.
22
23
24
25

Page 5

1              N. PURCELL
2         THE VIDEOGRAPHER:  This is the start
3    of the tape labeled number 1 of the
4    videotaped deposition of 30(b)(6) witness
5    Noel Purcell, in the matter of In Re:
6    Lehman Brothers Holdings, Inc.
7         This deposition is being held at 575
8    Lexington Avenue, New York, New York, on
9    Wednesday, January the 13th, 2010 at
10   approximately 9:32 A.M.
11        Counselors' appearances have been
12   noted for the record.  Will the court
13   reporter please swear in the witness.
14                * * *
15   NOEL PURCELL, called as a
16       witness, having been duly sworn by a Notary
17       Public, was examined and testified as
18       follows:
19   EXAMINATION BY
20   MR. STERN:
21   Q.   Good morning, Mr. Purcell.
22   A.   Good morning.
23   Q.   You understand that you're here today
24   as a representative of the Creditors Committee?
25   A.   I do.

2  (Pages 2 to 5)

Page 6

1          N. PURCELL
2      Q.   And do you understand that the topics
3    that we plan to cover relate to the sale
4    transaction involving Lehman and Barclays --
5      A.   I do.
6      Q.   -- from September 2008?
7      A.   Yes.
8      Q.   And you understand that the topics
9    relate to the Committee's understanding and
10   evaluation of that transaction?
11     A.   I do.
12     Q.   When was the Committee first formed,
13   to the best of your recollection?
14     A.   "When formed," you mean?
15     Q.   When did the Committee first start to
16   conduct business?
17     A.   The Committee was formed on September
18   17, 2008, with our first meeting that morning to
19   begin to select the professionals.
20     Q.   I placed in front of you a blank
21   calendar for the month of September 2008 because
22   we'll be focusing largely on that time period.
23          Do you understand that on September
24   19, there was a hearing in the Bankruptcy Court
25   concerning approval of the sale transaction?

Page 7

1          N. PURCELL
2      A.   I do.
3      Q.   Can you tell me from the period when
4    the Committee was formed through the time of
5    that Approval Hearing what the Committee did in
6    order to understand and evaluate the sale
7    transaction?
8          MR. SZYFER:  Objection to form.
9      A.   On September 17, the Committee took
10   most of the day to put together a professional
11   team. So for most of that day and that evening
12   up until about 11:30 that night, there really
13   wasn't much discussion about the business
14   aspects of Lehman Brothers. It was more putting
15   together the administrative function of the
16   team.
17          Late that evening, there was a
18   discussion amongst the team, which included the
19   Milbank lawyers and the U.C.C. who were there at
20   the time, some of their representatives and the
21   U.C.C., including Stroock & Stroock & Lavan and
22   the attorneys for some of the other parties on
23   the U.C.C., about some of the urgent natures
24   within Lehman Brothers' estate.
25          That included a number of different

Page 8

1          N. PURCELL
2    aspects of the estate, funding issues, liquidity
3    issues, and that included things like sale of
4    certain assets, but we went into no detail that
5    evening. We didn't have much detail to discuss.
6          Over the next two days, there was
7    several calls back and forth, I don't believe we
8    got together directly, to discuss a whole host
9    of issues within the estate. One of those
10   issues was the Barclays transaction and what it
11   was that we knew about the Barclays transaction
12   at that point in time.
13     Q.   In this period from the 17th through
14   the 19th, did the Committee members themselves
15   have any direct contact with the parties to the
16   sale transaction?
17     A.   Can you define "parties"?
18     Q.   Yes. Lehman on the one hand and
19   Barclays on the other hand and their respective
20   lawyers and financial advisors. So that would
21   mean, basically, you know, Lehman executives,
22   Barclays executives, Weil Gotshal, Lazard.
23     A.   No.
24     Q.   And my --
25     A.   I'm sorry.

Page 9

1          N. PURCELL
2      Q.   I'm sorry. And my question goes to
3    whether the Committee members themselves had any
4    direct contact with those parties.
5      A.   No.
6      Q.   The Committee's contact with those
7    parties was through its professionals; is that
8    right?
9      A.   Yes, it was.
10     Q.   Would the same be true for the period
11   from the 19th through the closing of the sale
12   transaction on September 22?
13          MS. TAGGART: Object to form.
14          MR. SZYFER: And when you say "the
15   same," you're talking about the Committee's
16   contact was through its professionals with
17   those parties that you listed in the
18   question before?
19          MR. STERN: Sure. Yes.
20     Q.   Let me spell it out so that the record
21   is clear.
22          Did the Committee in the period from
23   the 19th through the closing of the sale
24   transaction on September 22 have any direct
25   contact with the parties to the sale

Page 10

N. PURCELL

2  transaction?
3     A.  No.
4     Q.  All the Committee's contacts were done
5  through its professionals?
6     A.  Yes.
7     Q.  And in the period from the 17th
8  through to the closing to the 22nd, when the
9  Committee sought to raise questions or express
10  its views concerning the transaction, am I
11  correct that that was also done through the
12  Committee's professionals?
13     A.  Yes.
14     Q.  In the period from the 17th through
15  the closing on the 22nd, was there any
16  information concerning the sale transaction that
17  the Committee got independent of what it learned
18  from its professionals?
19        MS. TAGGART:  Object to form.
20     Q.  To the best of your recollection.
21     A.  No.
22     Q.  So, in the period from the 17th
23  through the 22nd, to the best of your
24  recollection, the Committee did not receive
25  information concerning the sale transaction

Page 11

N. PURCELL

2  independent of what it learned from its
3  professionals; is that correct?
4        MS. TAGGART:  Object to form.
5     A.  Yes.
6     Q.  Now, after the closing -- now, after
7  the closing on September 22, 2008, and going
8  into the end of September and the month of
9  October, did the Committee have any direct
10  contact with Alvarez & Marsal concerning the
11  transaction?
12     A.  Yes.
13     Q.  And what was that contact?
14     A.  In early October, if I remember
15  correctly, there was a meeting of the Unsecured
16  Creditors Committee together with various
17  representatives of the estate, Alvarez & Marsal,
18  Brian Marsal and some of his team to discuss all
19  the urgent factors that were going on in the
20  estate and what they knew at that time.
21     Q.  Do you recall who attended that
22  presentation from the Creditors Committee?
23        MR. SZYFER:  Object to the form.
24     A.  I believe all of the standing
25  Unsecured Creditor Committee members were there.

Page 12

N. PURCELL

2  I think that's it.  Yeah.
3     Q.  Do you recall who else was at that
4  presentation outside of Creditors Committee
5  members?
6        And I'm just asking for your best
7  recollection.  I realize it as was a long time
8  ago.
9     A.  Sure.  I think various counsel
10  representing members of the U.C.C. directly.
11  For my benefit, Mark Speiser from Stroock &
12  Stroock & Lavan was there.  I believe Michael
13  Hawkins from Covington & Burling was there
14  representing Julie Becker.  I believe, and I
15  can't remember who specifically from Houlihan,
16  but I believe Houlihan & Lokey representatives
17  were there.  FTI representatives were there,
18  together with Milbank counsel.
19     Q.  Do you recall whether anybody from
20  Weil Gotshal attended that presentation?
21     A.  I don't recall.
22     Q.  One way or the other?
23     A.  One way or the other.
24     Q.  Do you recall whether anybody from
25  Lazard attended that presentation?

Page 13

N. PURCELL

2     A.  I don't recall one way or the other.
3     Q.  Other than the Alvarez presentation in
4  early October, in this period after the closing
5  on September 22 through the end of October 2008,
6  to the best of your recollection, did the
7  Committee members have any direct contact with
8  any of the parties to the transaction or their
9  professionals?
10     A.  By "direct," can you define "direct"
11  for me?
12     Q.  By "direct," I mean a situation like
13  the Alvarez presentation, where the Committee
14  was speaking directly or was hearing directly
15  from Alvarez as opposed to communicating through
16  its counsel or financial professionals.  Does
17  that help?
18     A.  Yes.
19     Q.  Okay.
20     A.  No, I do not believe so.
21     Q.  So, other than the Alvarez
22  presentation in early October, in this period
23  from September 22 through the end of October
24  2008, to the best of your recollection, the
25  Committee did not have direct contact with the

4  (Pages 10 to 13)

Page 14

```
1              N. PURCELL
2    parties to the transaction or their
3    representatives; is that your best recollection?
4    A.  Yes.
5         MR. SZYFER: Just to be clear, Mr.
6    Stern, are you counting Alvarez & Marsal as
7    a representative of one of the parties since
8    Alvarez & Marsal is, in a sense, working for
9    Lehman?
10        MR. STERN: Yes.
11        MR. SZYFER: Okay. I just want to
12   make sure that you understand that
13   clarification.
14   A.  Can you restate the question with that
15   clarification, please?
16   Q.  Sure. So, other than the Alvarez
17   presentation in early October, in this period
18   from September 22, 2008, through the end of
19   October 2008, to the best of your recollection,
20   is it correct that the Committee did not have
21   direct communications with the parties to the
22   transaction or their representatives?
23   A.  Yes.
24        (Exhibit 519B, a document bearing
25   Bates Nos. CMTE0007889 through 8244, marked
```

Page 15

```
1              N. PURCELL
2    for identification, as of this date.)
3         (Discussion off the record.)
4         THE VIDEOGRAPHER: The time is now
5    9:49 A.M. We are now back on the record.
6    BY MR. STERN:
7    Q.  Mr. Purcell, looking at Exhibit 519B,
8    if you could review this document which was
9    produced to us by the Committee and tell me if
10   you understand what it is or if you recall what
11   it is.
12   A.  Looks to be a series of e-mails
13   between members of the Committee and Committee
14   counsel, regarding exactly what I don't know --
15   portions of it are redacted -- referencing
16   certain calls, including the Neuberger Committee
17   call at 9:30 on 10/16.
18   Q.  And after the series of e-mails, there
19   is a page that in the upper left says DTC074.
20   Do you see that?
21   A.  I do.
22   Q.  Do you know what this page is?
23   A.  I do not.
24        MR. STERN: Let me mark this as the
25   next exhibit.
```

Page 16

```
1              N. PURCELL
2         (Exhibit 520B, a document bearing
3    Bates Nos. CMTE0001047 through 1049, marked
4    for identification, as of this date.)
5    Q.  I'll ask you to please read through
6    that and then I'll have some questions for you
7    about it.
8         (Document review.)
9    A.  Okay, Mr. Stern.
10   Q.  Have you ever seen Exhibit 520B before
11   today?
12   A.  No, I have not.
13   Q.  Did you review it in preparing for
14   today's deposition?
15   A.  No, I did not.
16   Q.  Before I get to the specifics of 520B,
17   let me ask you a general question. In the
18   period from September 17 through the closing of
19   the sale transaction on September 22, what
20   factors did the Committee consider in evaluating
21   whether to object to the sale transaction?
22        MR. SZYFER: Object to the form.
23        MS. TAGGART: I'm going to object to
24   the form and I'm also going to instruct not
25   to answer on privilege on that basis, on
```

Page 17

```
1              N. PURCELL
2    work product and attorney-client.
3    Q.  Turning to Exhibit 520B, if you look
4    on the page that bears the Bates number ending
5    1048 in the bottom half of that page, there's an
6    e-mail from -- and I'm not sure I'm going to
7    pronounce this correctly -- Nitin Bajpai. Do
8    you see that?
9    A.  I do. I don't know how to pronounce
10   his name either.
11   Q.  Do you know who that is, Bajpai?
12   A.  I do not.
13   Q.  Was Shinsei International at any point
14   a member of the Creditors Committee?
15   A.  I don't know Shinsei's -- the exact
16   entity that Shinsei represented within its
17   organization of the Committee. I don't know the
18   exact term. I do not believe Shinsei
19   International is that entity.
20   Q.  Was there any Shinsei entity -- and
21   that's S-H-I-N-S-E-I -- was there any Shinsei
22   entity that at any time was a member of the
23   Creditors Committee?
24   A.  Yes.
25   Q.  Did Shinsei at some point cease to
```

5 (Pages 14 to 17)

Page 18

```
 1              N. PURCELL
 2   become a member of the Creditors Committee?
 3        MR. SZYFER: And are you now -- are
 4   you referring to the Shinsei entity that Mr.
 5   Purcell has mentioned or are you just
 6   discussing Shinsei International or any
 7   generic Shinsei entity?
 8        Q.  Well, what is the Shinsei entity, to
 9   the best of your knowledge, that is a member of
10   the Creditors Committee?
11        A.  I only know it as Shinsei.
12        Q.  Okay. Did Shinsei ever cease to
13   become a member of the Creditors Committee?
14        A.  Yes.
15        Q.  And when did that happen?
16        A.  I believe Shinsei resigned from the
17   Committee in early December 2009.
18        Q.  Shinsei was a member of the Creditors
19   Committee in September 2008, correct?
20        A.  Yes.
21        MS. TAGGART: Object to form.
22        Q.  Do you know who Nitin Bajpai is?
23        A.  I do not.
24        Q.  Do you know who Sally Rocker is?
25        A.  I do not.
```

Page 19

```
 1              N. PURCELL
 2        Q.  Who -- do you know who Ed Gilbert is?
 3        A.  Yes, I do.
 4        Q.  And who is he?
 5        A.  Mr. Gilbert was the representative for
 6   Shinsei who interacted with the U.C.C.
 7        Q.  Turning to the page that ends with the
 8   Bates number 1048, and the e-mail that's
 9   reflected here is being sent Saturday, September
10   20, 2008, 12:32 A.M. It states in the second
11   paragraph towards the middle, "The current
12   stance of the U.C.C. is not to object, as there
13   does not appear to be a viable option, and the
14   judge seems determined to move the process along
15   and to approve the sale, even while he
16   acknowledges that there is insufficient
17   information, but cites the necessity to preserve
18   financial stability as an overriding concern."
19        Do you see that?
20        A.  I do.
21        Q.  To your knowledge, at any time between
22   September 17 and the closing on September 22 did
23   the Committee take into consideration in
24   evaluating the sale transaction whether there
25   was a viable option?
```

Page 20

```
 1              N. PURCELL
 2        MR. SZYFER: Objection to the form.
 3        A.  The Committee looked at the entire
 4   transaction and the lack of data supporting all
 5   facts of the transaction as a problem. Options
 6   and who else might be a possible buyer was also
 7   a concern, as all other assets -- all other
 8   aspects of this transaction were.
 9        Q.  In considering the lack of data
10   supporting all facts of the transaction to be a
11   problem, did the Committee consider whether it
12   should object on that basis?
13        MS. TAGGART: Object on form,
14   privilege, and I'm going to instruct not to
15   answer on attorney-client and work product
16   privileges.
17        Q.  Did the Committee ever object to the
18   sale transaction based on what you referred to
19   as the lack of data?
20        A.  Object? Can you define "object"?
21        Q.  Did the Committee ever tell Judge Peck
22   that it objected to the transaction because of
23   the lack of data?
24        MS. TAGGART: Object to form.
25        A.  And when you mean "Committee," you
```

Page 21

```
 1              N. PURCELL
 2   mean the direct Committee members or you mean
 3   the Committee advisors?
 4        Q.  The Committee in whatever way it
 5   communicated with the Court.
 6        A.  I believe the Committee indicated to
 7   Judge Peck on a number of occasions that we were
 8   troubled with the fact that we didn't have all
 9   the details of the transaction. If you consider
10   that an objection from your defined term, then
11   we objected.
12        Q.  Did the Committee, to your knowledge,
13   ever object to the sale transaction before Judge
14   Peck?
15        MS. TAGGART: Object to form.
16        A.  Again, the "Committee" meaning its
17   advisors or the Committee?
18        Q.  The Committee appeared before Judge
19   Peck through its counsel, correct?
20        A.  Yes.
21        Q.  Okay. To your knowledge, did the
22   Committee's counsel ever indicate to the Court
23   that the Committee objected to the sale
24   transaction?
25        A.  I do not believe the Committee
```

6 (Pages 18 to 21)

Page 22

1          N. PURCELL
2    formally objected to the transaction. The
3    Committee certainly expressed its concerns about
4    the details of the transaction and the lack
5    thereof.
6        Q.   But the Committee did not object; is
7    that right?
8            MS. TAGGART: Objection. Asked and
9        answered.
10       A.   Formally, no.
11       Q.   And in light of the concerns that you
12   just described, why did the Committee not
13   object?
14           MS. TAGGART: Objection --
15           MR. SZYFER: Objection.
16           MS. TAGGART: -- to form and to
17       privilege, and I'm going to instruct not to
18       answer on attorney-client and work product
19       privileges.
20       Q.   In deciding not to object, despite the
21   Committee's concerns about lack of information,
22   did the Committee take into consideration the
23   lack of a viable option?
24           MS. TAGGART: Same objections and same
25       instructions. So I'm instructing not to

Page 23

1          N. PURCELL
2        answer on privileges.
3        Q.   In deciding not to object, despite the
4    Committee's concerns about lack of information,
5    did the Committee take into consideration any
6    concerns about preserving financial stability?
7            MS. TAGGART: Same objections and same
8        instruction.
9        Q.   Before the transaction closed on
10   September 22, did the Committee ever consider
11   taking any action to block the closing?
12           MS. TAGGART: I'm going to — same
13       objections and instruction. So I'm going to
14       instruct you not to answer on privileges.
15       Q.   In deciding not to object to the
16   transaction, did the Committee ever take into
17   consideration the effect on the
18   debtor-in-possession financing for Lehman if the
19   transaction did not go through?
20           MS. TAGGART: Same objections and
21       instruction.
22       Q.   In deciding not to object to the sale
23   transaction, did the Committee ever take into
24   consideration the views of various government
25   agencies?

Page 24

1          N. PURCELL
2            MS. TAGGART: I'm going to object and
3        instruct on that basis. If you want to ask
4        questions about what input they had about
5        various government agencies, there may be
6        information we would allow.
7        Q.   What did the Committee know about the
8    views of various government agencies concerning
9    the sale transaction?
10           MS. TAGGART: And let me explain our
11       position on this. We are willing to have
12       him testify about the Committee's
13       understanding on this issue, but not the
14       communications to the extent it came from
15       counsel, but I would ask an agreement that
16       that not be a waiver to any privilege to the
17       extent that that issue was discussed among
18       counsel.
19           So if I can have that agreement, then
20       he can answer that question.
21           MR. STERN: I'm not going to engage in
22       this kind of a negotiation on the record.
23       I'm just going to ask my questions and you
24       can either instruct him not to answer,
25       object, or let him answer.

Page 25

1          N. PURCELL
2        Q.   What did the Committee know about the
3    views of various government agencies concerning
4    the sale transaction?
5            MS. TAGGART: Okay. Then I'm going to
6        object and give this instruction, which is,
7        in light of the fact that counsel for
8        Barclays will not agree to say that it's not
9        a waiver, and I understand that some of the
10       information came to you through counsel, why
11       don't you only say if you received any
12       information that was not from your
13       professionals and not from counsel that was
14       about the issue of the views of various
15       government agencies concerning the sale
16       transaction.
17           So if you received information about
18       the views of various government agencies
19       concerning the sale transaction from someone
20       other than your professionals and your
21       counsel, you should answer.
22       A.   We did not receive any information
23   about various government agencies and their
24   views on this transaction from counsel or from
25   any other -- any other position.

7  (Pages 22 to 25)

Page 26

N. PURCELL

1    N. PURCELL
2    Q.    Did the Committee have a view as to
3    whether the Court would approve the transaction
4    even if the Committee did object?
5        MS. TAGGART: And I'm going to object
6    and instruct not to answer unless there has
7    been some view that was given from the
8    Committee to someone directly to someone in
9    the public, such as the Court or someone
10   outside of counsel and the professionals.
11       But if it was just an internal
12   Committee view that was not expressed on
13   that issue to someone outside of the counsel
14   and the professionals, then I instruct you
15   not to answer the question.
16   A.    Could you repeat the question, please?
17   Q.    Did the Committee have a view as to
18   whether the Court would approve the transaction
19   even if the Committee did object?
20   A.    No.
21   Q.    The front page of Exhibit 520B, the
22   bottom half, there's an e-mail dated Saturday,
23   September 20, and it says 1:25. In the first
24   paragraph, last sentence, it states, "Even if
25   the U.C.C. had objected, all indications were

Page 27

1    N. PURCELL
2    that the judge would have ruled against it and
3    executed the transaction."
4        Do you recall that view being
5    expressed within the Committee?
6        MS. TAGGART: I'm going to object and
7    instruct not to answer on work product and
8    attorney-client privilege.
9    Q.    The next line states, "Whether there
10   is a chance to challenge this transaction
11   further or overturn it is something we can
12   discuss with the U.C.C. counsel tomorrow. I
13   would be doubtful that we could." Do you see
14   that?
15   A.    I do.
16   Q.    Okay. Do you recall whether the
17   Committee considered whether to challenge the
18   transaction or seek to overturn it at any point
19   before the closing on September 22?
20       MS. TAGGART: I'm going to object and
21   instruct not to answer on attorney-client
22   and work product privileges.
23   Q.    Did the Committee at any time before
24   the closing on September 22 have any
25   understanding concerning what the consequences

Page 28

1    N. PURCELL
2    would be for the DIP financing of Lehman if the
3    sale transaction was not completed?
4        MS. TAGGART: I'm going to object and
5    instruct not to answer on attorney-client
6    and work product privileges.
7    Q.    Did the Committee, in deciding whether
8    to object to the transaction, take into
9    consideration the consequences for the DIP
10   financing?
11       MS. TAGGART: Same objection and
12   instruction.
13   Q.    In the period before the closing of
14   the transaction, was the Committee aware of any
15   facts that the Committee viewed as reasons not
16   to object to the transaction?
17       MS. TAGGART: I'm going to object and
18   instruct not to answer on privilege.
19       Can we take a break?
20       MR. STERN: Just before we do, just
21   before we do, I just want to clarify.
22   You're going to instruct the witness not to
23   answer questions concerning the Committee's
24   knowledge of certain facts; is that right?
25       MS. TAGGART: I'm going to instruct

Page 29

1    N. PURCELL
2    not to answer about the considerations and
3    decisions that were made. That's based on
4    work product and attorney-client privilege.
5    It's my understanding as a factual matter
6    that those decisions were made as part of in
7    discussions with counsel and its
8    professionals and was -- and was work
9    product and, thus, attorney-client.
10       As far as the facts that were learned,
11   he can testify to any facts that were
12   communicated to directly to the Committee
13   through any public source. As you know,
14   most of the facts came through counsel.
15       We are willing to let him testify
16   about the understanding that came from all
17   sources but so long as there is not an
18   argument that waives privilege because,
19   as you understand, most of the basis for
20   that was communications that came from
21   counsel.
22       MR. STERN: So if I ask about facts
23   that the Committee learned through counsel,
24   and if I agree that by asking those
25   questions there's no waiver, you will allow

8 (Pages 26 to 29)

Page 30

N. PURCELL

1   N. PURCELL
2   him not answer -- you will allow him to
3   answer?
4       MS. TAGGART: Yes. And to be clear,
5   if you say what was the Committee's
6   understanding at certain times and on
7   certain issues, he can testify about the
8   Committee's understanding that came from all
9   sources so long as you don't -- agree that
10  that's not a waiver as to the
11  communications, yes, we would allow those
12  questions.
13      MR. STERN: I'll agree on that limited
14  basis and then ask my questions.
15      Do you need to take a break?
16      MS. TAGGART: Yeah.
17      MR. STERN: Okay.
18      MS. TAGGART: Thank you.
19      THE VIDEOGRAPHER: The time is now
20  10:20 A.M. We are now off the record.
21      (Recess.)
22      THE VIDEOGRAPHER: The time is now
23  10:26 A.M. We are now back on the record.
24  BY MR. STERN:
25  Q.   Picking up from the last colloquy and

Page 31

1   N. PURCELL
2   going back to Exhibit 520B, at the top of the
3   first page of 520B, the first e-mail, which
4   appears to be sent Saturday, September 20, 6:03
5   A.M., says that if the sale was not approved,
6   the DIP would have been due, and if someone
7   hadn't provided a new DIP, the entire stake of
8   the Asset Management Unit could have been
9   foreclosed on. Then it goes on and says "no
10  other DIP lender was forthcoming."
11      What facts was the Committee aware of
12  before closing of the sale transaction
13  concerning what would happen to the DIP
14  financing if the sale transaction was not
15  completed?
16      MS. TAGGART: I'm going to object and
17  instruct not to answer. I understand, given
18  our previous discussion, I should probably
19  explain.
20      He can describe his understanding of
21  the sales transaction regarding facts. Your
22  question I think is going to what might
23  happen in the future, which is analysis, not
24  just facts, such as what is the DIP
25  financing right now. So I am still

Page 32

1   N. PURCELL
2   instructing not to answer on attorney-client
3   and work product to that question.
4   Q.   What facts did the Committee know
5   about the DIP financing before the sale
6   transaction closed?
7       MS. TAGGART: Object to form. I will
8   allow you to answer. Please don't disclose
9   any communications that happened with
10  counsel, but you can testify to any facts,
11  if any, that the Committee had on that
12  question, which is about DIP financing
13  before the sale transaction closed.
14  A.   I don't believe the Committee had any
15  official understanding of the DIP facility
16  transaction.
17  Q.   Did the Committee have any
18  understanding of the facts concerning the
19  positions of various government agencies with
20  respect to the sale transaction?
21      MS. TAGGART: Object to form, but you
22  can answer, to the extent you understand it,
23  with that same instruction: Don't reveal
24  communications with counsel.
25  A.   I don't believe the Committee had any

Page 33

1   N. PURCELL
2   official facts regarding the government
3   agencies' position.
4   Q.   Did the Committee have any
5   understanding of the facts concerning whether
6   any bidder other than Barclays had submitted a
7   bid?
8       MS. TAGGART: You can answer.
9   A.   I don't believe the Committee had any
10  official knowledge of any other bidders, either
11  positively or negatively.
12  Q.   Did the Committee have any knowledge
13  of facts concerning whether the Court was
14  determined to move the process along and approve
15  the sale?
16      MS. TAGGART: Objection. And I'm
17  going to instruct not to answer on
18  privilege. I don't think that that's a
19  fact; that's more asking for analysis.
20  Q.   Well, you saw in Exhibit 520B that
21  Shinsei made reference to that, correct?
22      MS. TAGGART: Object to form.
23  A.   I see that someone from Shinsei
24  indicated that, yes.
25  Q.   Okay. And did you see that Shinsei

9 (Pages 30 to 33)

Page 34

N. PURCELL
1
2  noted that the Court was concerned with the
3  necessity to preserve financial stability as an
4  overriding concern?
5        MS. TAGGART: Object to form.
6     A.  Can you point me, counsel, in the
7  e-mail to where it says that?
8     Q.  Sure. Do you see at the bottom of the
9  second page of Exhibit 520B that Shinsei states
10 as follows: "The current stance of the U.C.C.
11 is not to object, as there does not appear to be
12 a viable option, and the judge seems determined
13 to move the process along and to approve the
14 sale, even while he acknowledges that there is
15 insufficient information, but cites the
16 necessity to preserve financial stability as an
17 overriding concern"?
18       MS. TAGGART: Is the question --
19       MR. SZYFER: Objection.
20       MS. TAGGART: -- just does he see it?
21       MR. SZYFER: Objection to the form.
22    Q.  Do you see that statement by Shinsei?
23    A.  I do see that statement from Nitin
24 Bajpai of Shinsei, yes, Shinsei International.
25    Q.  Do you recall any discussions within

Page 35

N. PURCELL
1
2  the Committee, not involving counsel, concerning
3  those points?
4        MR. SZYFER: Which points?
5        MR. STERN: The points we just read
6     from this e-mail.
7        MS. TAGGART: Okay. So you can answer
8     so long -- was there a discussion with the
9     Committee that didn't involve any counsel on
10    that subject, and for now just answer yes or
11    no to that.
12       MR. SZYFER: And are you just
13    referring to the sentence you just read or
14    other questions that you have asked
15    regarding this e-mail, Mr. Stern?
16       MR. STERN: I think it's clear.
17       MS. TAGGART: Then object to form.
18       MR. SZYFER: Yeah, I don't think it
19    is. Object to form.
20    A.  No.
21    Q.  To the best of your knowledge, at any
22 point before the closing did the Committee
23 consider that it should not object to the sale
24 because, as the Shinsei e-mail states, there
25 does not appear to be a viable option and the

Page 36

N. PURCELL
1
2  judge seems determined to move the process along
3  and to approve the sale, even while he
4  acknowledges that there is insufficient
5  information, but cites the necessity to preserve
6  financial stability as an overriding concern?
7        MS. TAGGART: Object to form and
8     instruct not to answer on attorney-client
9     and work product privileges.
10    Q.  At any point before the closing, did
11 the Committee consider that it should not object
12 to the sale because, as the Shinsei e-mail
13 states, no other bidder submitted a bid, and
14 even if the U.C.C. had objected, all indications
15 were that the judge would have ruled against it
16 and executed the transaction?
17       MS. TAGGART: Object to form and
18    instruct not to answer on privilege. And
19    really I think this is a standing objection
20    about why the Committee made the decision
21    that it did. That position, that legal
22    position, is now on the record both to the
23    Court and in our motions.
24       What was the considerations behind
25    that is privileged, and I do think it's a

Page 37

N. PURCELL
1
2  waste of the time to keep asking that same
3  question.
4     Q.  At any point before the closing, did
5  the Committee consider that it should not object
6  to the sale because, as the Shinsei e-mail
7  states, if the sale was not approved, the DIP
8  would have been due, and if someone hadn't
9  provided a new DIP, the entire stake of the
10 Asset Management Unit could have been
11 foreclosed?
12       MS. TAGGART: Same objection. Same
13    instruction.
14       (Exhibit 521B, a document bearing
15    Bates Nos. CMTE0000577 through 580, marked
16    for identification, as of this date.)
17    Q.  Before we turn to 521B, and I'll give
18 you a chance to review it, let me ask this: In
19 deciding whether to object to the sale
20 transaction, did the Creditors Committee take
21 into consideration any information or any
22 factors that the Committee obtained through any
23 source other than its counsel and its financial
24 advisors?
25       MS. TAGGART: I'm going to object as

10 (Pages 34 to 37)

Page 38

```
 1           N. PURCELL
 2     worded considering the preface about what
 3     went into the determination to object to the
 4     sale.
 5         If you, Mr. Stern, would like to ask
 6     whether the Creditors Committee had
 7     information from any source other than its
 8     counsel or its financial advisors, I would
 9     allow that question.
10         MR. STERN: Ms. Taggart, I think you
11     know that the rules do not allow this type
12     of speaking objection. If you have an
13     objection to the form, please state it, but
14     these kinds of speaking objections are
15     really inappropriate.
16         Can you repeat the question?
17         (Record read.)
18         MS. TAGGART: I'm going to object to
19     form and instruct not to answer as worded
20     for the reasons I stated before.
21     Q.  In deciding whether to object to the
22     sale transaction, did the Creditors Committee
23     have information from any source other than its
24     counsel or its financial advisors?
25         MS. TAGGART: I have to give the same
```

Page 39

```
 1           N. PURCELL
 2     instruction and objection, but it's really
 3     to the preface. I do think that there's
 4     information that you could get if you
 5     dropped that preface. That's obviously up
 6     to you. To that question I'm instructing
 7     not to answer.
 8     Q.  In relation to the sale transaction,
 9     did the Committee have information from any
10     source other than its counsel or its financial
11     advisors?
12         MS. TAGGART: I'm going to object to
13     form for vagueness, but you can answer that.
14     A.  Can you repeat the question, please?
15     Q.  In relation to the sale transaction,
16     did the Committee have information from any
17     source other than its counsel or its financial
18     advisors?
19     A.  No.
20     Q.  Why don't you take a moment to read
21     what we have marked as Exhibit 521B.
22         (Document review.)
23     A.  I've read it, Mr. Stern.
24     Q.  Can you identify this document for us?
25     A.  Yes, I can.
```

Page 40

```
 1           N. PURCELL
 2     Q.  What is it?
 3     A.  It's an e-mail I sent to Committee
 4     members on Friday, September 26, 2008, at 10:42
 5     A.M.
 6     Q.  Aside from your own counsel at
 7     Stroock, did you copy any other counsel?
 8     A.  I don't believe I did.
 9     Q.  And what was the purpose of this
10     communication?
11     A.  To express to the Committee members
12     directly my personal frustration with the lack
13     of information that the Committee had in making
14     decisions within the estate.
15     Q.  Okay. You write that, "During the
16     past week, Lehman and its related entities,
17     together with their advisors, have engaged in a
18     fire sale disposition of several assets,
19     representing billions of dollars of value to the
20     Creditors of the Debtor entity. We were told by
21     all parties involved that the sale of the
22     following entities had to be consummated
23     immediately or risk losing some or all of the
24     value of the assets for the Creditors."
25         And do you see that you list various
```

Page 41

```
 1           N. PURCELL
 2     entities below that, including the
 3     broker-dealer?
 4     A.  I do.
 5     Q.  And when you refer to the
 6     broker-dealer, are you referring to the sales
 7     transaction involving Barclays that the Court
 8     approved?
 9     A.  I am.
10     Q.  And what, to the best of your
11     recollection, were you told as to why the sale
12     of the broker-dealer had to be consummated
13     immediately or risk losing some or all of the
14     value of that asset?
15         MS. TAGGART: I'm going to object and
16     give the following instruction: Please do
17     not reveal anything that you were told by
18     your financial advisors or your counsel. If
19     you were told or passed on information about
20     what was told through parties such as Lehman
21     or Barclays or other public sources, you can
22     reveal that.
23     A.  There were no other sources of
24     information I had other than our advisors on
25     those issues.
```

11 (Pages 38 to 41)

Page 42

N. PURCELL

1      N. PURCELL
2      Q.   And what did your advisors tell you
3    concerning whether the sale of the broker-dealer
4    had to be consummated immediately or risk losing
5    some or all of the value of that asset?
6          MS. TAGGART: Objection. I'm going to
7    instruct not to answer on privilege.
8      Q.   Further down in the e-mail, you write,
9    "During the very hurried meetings we had in
10   person and via conference call late last week
11   regarding the Lehman broker-dealer, we were
12   given a variety of reasons by our own
13   professionals as to why our strategy should be
14   to essentially abstain from any vote either way
15   on the sale to Barclays." Do you see that?
16     A.   I do.
17     Q.   What reasons are you referring to?
18         MS. TAGGART: I'm going to instruct
19   not to answer on privilege.
20     Q.   You then write, "One of the major
21   reasons, among many, was simply a lack of
22   clarity on a number of salient points in the
23   sale agreement. Our position was understood and
24   agreed to by all members of the Committee, and a
25   unanimous vote was provided in favor of that

Page 43

N. PURCELL

1      N. PURCELL
2    strategy for that asset."
3          Do you see that?
4      A.   I do.
5      Q.   You refer to the major reasons, among
6    many. What were those various reasons?
7          MS. TAGGART: I'm going to object and
8    instruct not to answer on attorney-client
9    and work product privileges.
10     Q.   Did the Committee consider what you
11   refer to as a lack of clarity to be a reason to
12   refrain from objecting or a reason to object?
13         MS. TAGGART: I'm going to object and
14   instruct not to answer on privilege as
15   described before.
16     Q.   Before the Lehman bankruptcy case,
17   what experience did you have in connection with
18   other bankruptcy matters?
19         MS. TAGGART: You mean him personally,
20   Mr. Purcell?
21         MR. STERN: Yes. Yes.
22     A.   I have managed the debt assets for
23   three separate institutions in a number of
24   bankruptcies over a 20-year career.
25     Q.   And over that 20-year career, was it

Page 44

N. PURCELL

1      N. PURCELL
2    your experience, your own experience, that lack
3    of information would generally be a reason for a
4    party to object to a transaction rather than to
5    refrain from objecting?
6          MR. SZYFER: Object to the form.
7          And Mr. Purcell, to the extent that
8    answering that question would require you to
9    disclose any attorney-client communications
10   from any of those previous Chapter 11
11   bankruptcy experiences, I would instruct you
12   not to answer.
13     A.   Based upon that instruction, I have no
14   comment on that.
15     Q.   Well, as you looked at the
16   Barclays/Lehman transaction, did you consider
17   lack of information to be a reason not to object
18   or a reason to object?
19         MS. TAGGART: I'm going to object and
20   instruct not to answer on privilege.
21     Q.   I'm just asking for your own
22   perspective.
23         MS. TAGGART: If you have some
24   independent perspective that was not
25   informed by counsel, such as if you formed

Page 45

N. PURCELL

1      N. PURCELL
2    it before speaking to counsel, you can do
3    that. If your considerations on this issue
4    is all made in your deliberations with the
5    Committee and counsel, I would instruct you
6    not to answer.
7      A.   Based upon that instruction, I have no
8    opinion on that.
9      Q.   Well, aside from lack of information
10   or, to use your words, lack of clarity, were
11   there other facts or factors that the Committee
12   considered in its unanimous vote to essentially
13   abstain on the sale to Barclays?
14         MS. TAGGART: Objection and instruct
15   not to answer on privilege.
16     Q.   Aside from lack of information or lack
17   of clarity, did the Committee know of any other
18   facts or factors that had any bearing on its
19   unanimous vote to essentially abstain on the
20   sale to Barclays?
21         MS. TAGGART: Same objection and
22   instruction.
23     Q.   Turning to the second page of Exhibit
24   521B, it states, "while I fully respect the
25   nature of the melting ice cube scenarios that

12 (Pages 42 to 45)

Page 46

```
 1            N. PURCELL
 2  continue to be put in front of us."
 3          When you refer in that clause to
 4  "melting ice cube scenarios," what are you
 5  referring to?
 6     A.   I'm referring to the asset disposition
 7  within the estate.
 8     Q.   And what was the melting ice cube
 9  scenario?
10       MS. TAGGART:  I'm going to object and
11     instruct not to answer unless there is
12     something other than your correspondence
13     with counsel that gave you further detail
14     about what that melting ice cube scenario
15     was.
16     A.   Based upon that instruction, I have no
17  answer.
18       MR. STERN:  This is the next exhibit.
19       MS. TAGGART:  We just have a small
20     clarification for the record.
21       THE WITNESS:  One clarification.  I
22     believe earlier, Mr. Stem, you asked me
23     were there any other attorneys who were CC'd
24     on this e-mail, and my apologies, but Martin
25     Feinberg, who is at BCC here, is an in-house
```

Page 47

```
 1            N. PURCELL
 2  counsel from Mizuho Corporate Bank.
 3     Q.   Which is your company?
 4     A.   Yes, it is.
 5       (Exhibit 522B, a document bearing
 6     Bates Nos. CMTE0000571 through 574, marked
 7     for identification, as of this date.)
 8     Q.   Before we turn to 522B, were there any
 9  facts that the Committee was aware of that the
10  Committee considered to be reasons not to object
11  to the sale transaction?
12       MS. TAGGART:  Objection and instruct
13     not to answer.
14     Q.   All right.  Let's look at 522B, and
15  I'll ask you to look at this and then identify
16  it for us, please.
17       (Document review.)
18     A.   After reviewing it, the document, this
19  is an e-mail string between myself and David Yu
20  from Metropolitan Life and David and it appears
21  to be Committee members as well as Committee
22  advisors.
23     Q.   And you sent him an e-mail September
24  22 it looks like 2:19 A.M. AST, and you write,
25  "Hi, David.  Prior to tomorrow's call, you and I
```

Page 48

```
 1            N. PURCELL
 2  should have a quick call.  We are thinking alike
 3  on the issues and want to hear your thoughts on
 4  some items.  Would you be available to talk
 5  later in the A.M.?"
 6          When you wrote "we are thinking alike
 7  on the issues," what issues were you referring
 8  to?
 9     A.   I don't remember.
10     Q.   Did you ever have a follow-up call
11  with Mr. Yu?
12     A.   I don't remember.
13     Q.   I'm going to give you a document that
14  has previously been marked as Exhibit 476B.  To
15  start, I would just like you to -- it's a
16  lengthy document, so to start, I would like you
17  to glance at it and tell me if you recall seeing
18  this before and if you can tell me what it is,
19  and then I may point you to some specific
20  sections in the attachment.
21       (Document review.)
22     A.   Okay, Mr. Stern, what's your question?
23     Q.   Do you know what this is?
24     A.   Appears to be an e-mail from Ed
25  Gilbert at Shinsei Bank to various members of
```

Page 49

```
 1            N. PURCELL
 2  the Unsecured Committee and advisors, and it
 3  says here in the subject, "Transcript of
 4  Barclays/Lehman Agreement Announcement, 17
 5  September '08."
 6     Q.   And you see there's a transcript of a
 7  September 17 call attached?
 8     A.   By "call," you mean a question and
 9  answer session?  I believe so.
10     Q.   Yes.  In assessing the sale
11  transaction, what role did the information
12  reflected in this document play?
13       MS. TAGGART:  Objection and
14     instruction not to answer.
15     Q.   Did the Committee review the
16  information in this document before the sale
17  transaction closed?
18       MS. TAGGART:  You mean every member?
19       I object to form, but you can answer.
20     A.   I see that Ed Gilbert sent it to the
21  members of the Committee.  I can't say if each
22  Committee member reviewed it.
23     Q.   Okay.  Did you review it?
24     A.   At that time?
25     Q.   Yes.
```

13 (Pages 46 to 49)

Page 50

N. PURCELL

1    N. PURCELL
2    A.    I don't recall reviewing this, no.
3    Q.    I'm not going to take you through
4    every aspect of the attachment, but I do want to
5    ask you some specific questions relating to some
6    of the information on the second page of the
7    transcript, which is the Bates number ending
8    9128.
9        Do you see that page?
10   A.    I do.
11   Q.    Look at the third paragraph. I'll
12   just read it. It states, and this is Mr. Varley
13   speaking: "The acquisition of the core of old
14   Lehman's based around the U.S. broker-dealer
15   operations, we have acquired the associated
16   infrastructure. We will be taking on about
17   10,000 employees. We are acquiring trading
18   assets with a current statemented value of $72
19   billion in trading liabilities with the current
20   estimated value of $68 billion, for a cash
21   consideration of $250 million."
22       Do you see that?
23   A.    Yes, I do.
24   Q.    Do you know whether the Committee
25   considered the $72 billion figure and the $68

Page 51

N. PURCELL

1    N. PURCELL
2    billion figure to be relevant to the final
3    transaction that was closed on September 22?
4        MS. TAGGART: Object to form. I would
5    instruct -- instruct not to answer on
6    privilege as currently worded.
7    Q.    Did the Committee know, as of the
8    closing of the sale transaction, whether the
9    final transaction involved the acquisition of
10   trading assets with a current estimated value of
11   $72 billion?
12       MS. TAGGART: You can answer.
13       MR. SZYFER: Object to the form.
14   A.    The Committee understood, or believed
15   we understood, certain aspects of the
16   transaction. Whether it was $72 billion or not
17   at that point I don't recall.
18   Q.    So you don't recall one way or the
19   other?
20   A.    I don't recall whether $72 billion was
21   the number used at that time. The numbers have
22   moved substantially throughout the case.
23   Q.    What do you recall about how the
24   numbers moved substantially?
25       MS. TAGGART: Objection and a limited

Page 52

N. PURCELL

1    N. PURCELL
2    instruction on privilege. You can explain
3    your answer, just don't reveal any
4    communications. But if you want to explain
5    the facts known over time, to the extent you
6    understand the question, you should answer.
7    A.    What numbers are you speaking of?
8    Q.    Well, did you have an understanding
9    that, with respect to the trading assets that
10   Barclays would acquire, the numbers had moved
11   substantially from September 17 through the time
12   of closing on September 22?
13       MS. TAGGART: Object to form.
14   A.    I believe -- and let me ask, when you
15   say "you," you mean the Committee, correct?
16   Q.    You and the Committee.
17   A.    I believe the Committee understood
18   that there was questions regarding the asset
19   value, the liability value, what was made up of
20   those various positions, and that the numbers
21   were being quoted differently at different times
22   leading up to the closing of the sale.
23   Q.    Did the Committee understand that,
24   between September 17 and September 22, there had
25   been changes in the trading assets that Lehman

Page 53

N. PURCELL

1    N. PURCELL
2    had available to transfer to Barclays?
3        MS. TAGGART: Object to form.
4    A.    Can you repeat the question?
5        (Record read.)
6    A.    I would say the Committee understood
7    aspects of the sale were moving. Whether we
8    understood at the time details specifically as
9    to the trading assets or any other aspect of the
10   transaction, I would say no, we didn't.
11   Q.    And despite that lack of
12   understanding, the Committee decided to abstain
13   or not object to the sale transaction; is that
14   correct?
15       MS. TAGGART: Object to form and
16   instruct not to answer on privilege.
17   Q.    Did the Committee understand that the
18   figures that Lehman had presented earlier in the
19   week concerning trading assets available to
20   transfer to Barclays had changed by the time of
21   the Approval Hearing?
22       MS. TAGGART: Object to form, but you
23   can answer.
24   A.    The Committee did not understand the
25   value of those assets, who determined the

14  (Pages 50 to 53)

Page 54

N. PURCELL

1    N. PURCELL
2    number, as you quoted, of those assets, and why,
3    if in fact they did change, they did change.
4        Q.    Did the Committee understand that
5    Lehman had indicated that the value of the
6    trading assets available to transfer to Barclays
7    had changed in the period from September 16 to
8    the time of the Approval Hearing on September
9    19?
10        MS. TAGGART:  Object to form.
11        A.    I do not recall at the time who was
12    quoted as using the value of those assets.
13        Q.    So you don't recall one way or the
14    other whether, as of the Approval Hearing, the
15    Committee understood that Lehman had indicated
16    the value of the trading assets available to
17    transfer to Barclays had changed?
18        MS. TAGGART:  Object to form.
19        Q.    Is that your testimony?
20        A.    I don't recall whether the Committee
21    understood it was Lehman quoting values for the
22    assets or what was available for trading at that
23    time.
24        Q.    Do you recall whether the Committee
25    understood that, between September 16 and

Page 55

N. PURCELL

1    N. PURCELL
2    September 19, there was a change in the value of
3    trading assets available to transfer to
4    Barclays?
5        MS. TAGGART:  Object to form.
6        A.    The Committee wasn't formed on the
7    16th, so it couldn't have been for the 16th. If
8    you mean between the 17th, when we were formed,
9    and the 19th, during that period of time, again,
10    the facts available to the Committee were
11    minimal on the transaction. So I don't know if
12    the Committee understood at that point
13    specifically who was making the statement that
14    these assets were available for transfer,
15    whether it be Lehman or someone else.
16        Q.    Staying with the same page of this
17    Exhibit 476B, below the paragraph we just read,
18    skipping the next paragraph, it states, "We also
19    mentioned in our announcement," do you see that?
20        A.    Yes, I do.
21        Q.    "We also mentioned in our announcement
22    today that certain of our shareholders have
23    expressed support for the transaction and an
24    interest in increasing their shareholdings in
25    Barclays. In fact, the transaction is capital

Page 56

N. PURCELL

1    N. PURCELL
2    ratio accretive without additional equity
3    issuance. And the source of that accretion is
4    the negative goodwill from the transaction,
5    which amounts to about $2 billion -- 2 billion
6    U.S. dollars post tax." Do you see that?
7        A.    I do.
8        Q.    Before the Committee decided to
9    abstain or not object to the sale transaction,
10    was the Committee aware of this announcement by
11    Barclays?
12        A.    I see that Ed Gilbert sent this
13    announcement by e-mail to the Committee members.
14    I'm not sure if any Committee member read this
15    prior to it, so therefore, I'm not sure whether
16    we were aware of this announcement prior to the
17    sale closing.
18        Q.    Did any Committee member express any
19    concern about the fact that Barclays had
20    announced that it anticipated to realize a $2
21    billion after-tax acquisition gain?
22        MS. TAGGART:  I'm going to object and
23    instruct you should only answer if there was
24    some communication that was outside of
25    counsel and the Committee deliberations it

Page 57

N. PURCELL

1    N. PURCELL
2    had with counsel and its professionals. But
3    if there was some outside communication on
4    that topic, you should testify about it.
5        A.    Based upon that instruction, I do not
6    believe there was any outside discussion outside
7    of counsel on this issue.
8        THE VIDEOGRAPHER:  The time is now
9    11:10 A.M.  We are now off the record.
10        (Recess.)
11        THE VIDEOGRAPHER:  This is the start
12    of tape number 2.  The time is now 11:22
13    A.M.  We are now back on the record.
14    BY MR. STERN:
15        Q.    Let me show you a document we
16    previously marked as Exhibit 478B.
17        A.    Mr. Stern, are we done with 476B?
18        Q.    For the time being.
19        A.    Okay.
20        MR. SZYFER:  Do you have any
21    additional copies, Mr. Stern?
22        MR. STERN:  I'm sorry?
23        (Document handed to Mr. Szyfer.)
24        MR. SZYFER:  Great.  Thanks.
25        Q.    Okay.  If you would look at Exhibit

15 (Pages 54 to 57)

Page 58

1          N. PURCELL
2    478B, Mr. Purcell, and tell me if you've ever
3    seen this before?
4      A.    Yes, I have.
5      Q.    And do you see at the top there's an
6    e-mail exchange between Gilbert and Becker, and
7    Gilbert writes, "Julie, you are welcome.
8    Interesting to understand what a bargain
9    Barclays thinks it has." Do you see that?
10     A.    I do see that, yes.
11     Q.    Do you recall any discussion within
12   the Committee concerning what a bargain Barclays
13 - thought it had?
14        MS. TAGGART: I'm going to object and
15     instruct not to answer for any discussions
16     that happened when the Committee was with
17     counsel present. If the Committee had any
18     discussions on that topic without any
19     counsel present, you can answer.
20     A.    I don't recall having any discussions
21   on this topic outside of counsel.
22     Q.    Do you recall whether the Committee
23   was aware of the fact that Barclays had
24 - announced it anticipated realizing a gain on the
25   acquisition?

Page 59

1          N. PURCELL
2        MS. TAGGART: Object to form. You can
3     testify whether you heard a fact, if you
4     call it a fact, Barclays had announced it
5     anticipated realizing a gain on the
6     acquisition.
7        Object to form.
8 ·      MR. STERN: Can you repeat the
9     question?
10       (Record read.)
11     A.    I don't remember if the official
12   Committee was aware that Barclays had announced
13   that, as discussed previously, that Gilbert had
14   sent an e-mail to the Committee indicating their
15   announcement on the 17th, but I'm not aware who
16   read that or when it was read, if it was read at
17   all.
18     Q.    Let me show you what we've marked
19   previously as Exhibit 477B. I'll ask you to
20   look at that and tell me if you've ever seen it
21   before.
22     A.    I don't believe I've ever seen this
23   before.
24     Q.    The subject line reads "Barclays
25   investor call transcript from Wednesday where

Page 60

1          N. PURCELL
2    they described how great the Lehman buy
3    is/negative 2 billion goodwill after tax."
4        Do you see that?
5      A.    I do.
6      Q.    And do you recognize that as the same
7    information reflected in the transcript that we
8    reviewed earlier?
9        MS. TAGGART: Object to form.
10     Foundation.
11     A.    When you say "recognize," what do you
12   mean?
13     Q.    Do you have any understanding as to
14   whether this is referring to the same
15   information that was reflected in the transcript
16   that we reviewed earlier?
17     A.    Since I've never seen this before and
18   never discussed it with Mr. Gilbert that I'm
19   aware of, I don't -- I can't say whether this
20   relates to that or whether it relates to some
21   other information that Mr. Gilbert might have
22   had at that time.
23     Q.    And in Mr. Gilbert's e-mail message to
24   Jacob, he says, "We will make sure this
25   information is considered in the Lehman

Page 61

1          N. PURCELL
2    proceeding." Do you see that?
3      A.    I do see what he said, yes.
4      Q.    Was there any discussion among
5    Committee members concerning whether the
6    information the Committee had concerning
7    Barclays' anticipated gain should be considered
8    in the Lehman proceeding?
9        MS. TAGGART: Objection to form and
10     privilege. I instruct you not reveal any
11     answer that would include discussions with
12     the Committee and its counsel. If you have
13     some discussion of the Committee members
14     outside of counsel, you can answer.
15     A.    I don't remember having a conversation
16   outside Committee counsel about this issue.
17       MR. STERN: Let's mark this as the
18     next exhibit.
19       (Exhibit 523B, a document bearing
20     Bates Nos. CMTE0005337 through 5339, marked
21     for identification, as of this date.)
22     A.    Thank you.
23     Q.    I've placed in front of you a document
24   that we've marked as Exhibit 523B. I would like
25   you to look at it and identify it, if you would, ·

16  (Pages 58 to 61)

Page 62

N. PURCELL

1       N. PURCELL
2   please.
3       (Document review.)
4       A.   I have looked at it. I can't identify
5   it.
6       Q.   Okay. You can -- you've never seen it
7   before?
8       A.   I saw this in preparation for this
9   meeting today, but I can't identify it.
10      Q.   Okay. So, aside from your preparation
11  for the deposition, you had not seen this
12  document before today?
13      A.   I don't recall seeing this at any time
14  prior to the preparation.
15      Q.   Okay. Do you know when this document
16  was provided to the Committee?
17      A.   I don't know that it was provided to
18  the Committee; and, if it was, I don't recall
19  when it was provided.
20      Q.   Do you know whether any information
21  concerning this document was communicated to the
22  Committee?
23      MS. TAGGART: That's just a yes or a
24  no answer. You can answer yes or no to that
25  question.

Page 63

N. PURCELL

1       N. PURCELL
2       A.   No.
3       Q.   Do you know whether any information
4   reflected in this document was discussed with
5   the Committee?
6       MS. TAGGART: Object to form.
7       You can answer yes or no to that.
8       A.   Can you give me the question again,
9   please?
10      (Record read.)
11      A.   No, I don't know.
12      Q.   Let me show you a document that we
13  have previously marked as Exhibit 463B.
14      A.   Thank you.
15      Q.   And my question about this is going to
16  be whether you -- whether this document was ever
17  given to the Committee. So why don't you take a
18  moment to review it, and that will be my
19  question.
20      (Document review.)
21      A.   Mr. Stern, would you like me to read
22  the entire document or would you just --
23      Q.   If you could look at it and tell me if
24  you've ever seen it before, that will be
25  helpful. If you've ever seen it before other

Page 64

N. PURCELL

1       N. PURCELL
2   than in preparing for this deposition.
3       A.   I do not recall seeing this prior to
4   preparing for the deposition.
5       Q.   Okay. I just want to turn to the
6   third page of the exhibit, and you see in the
7   upper left --
8       A.   Mr. Stern, I'm sorry, you're referring
9   to the Asset and Liability page that's marked
10  number 1?
11      Q.   Yes. Yes. Exactly. Exactly.
12      And I just want to ask, there's a line
13  under the left column Assets, there's a line
14  that says Repo Assets and there's a line that
15  says Negotiated Mark Haircut. Do you see that?
16      A.   I do.
17      Q.   Do you recall this information? Well,
18  withdrawn.
19      Did the Committee at some point in
20  October receive information concerning a
21  negotiated mark haircut of $5 billion?
22      MS. TAGGART: Object to form.
23      You can answer yes or no to the extent
24  you understand.
25      A.   Are you referring to this document

Page 65

N. PURCELL

1       N. PURCELL
2   here or in any document or in any form of
3   information?
4       Q.   In any way did -- did the Committee in
5   October of 2008 receive any information from a
6   source other than counsel concerning a
7   negotiated mark haircut of $5 billion?
8       MS. TAGGART: Object to form.
9       Q.   Or a $5 billion reduction from book
10  value in connection with the sale transaction?
11      MS. TAGGART: Object to -- object to
12      form, and I would instruct not to answer not
13      only to your communications with counsel but
14      with your professionals.
15      MR. STERN: Well, I think --
16      Q.   Let me rephrase the question. Aside
17  from counsel or the Committee's financial
18  advisors, did the Committee, in September or
19  October of 2008, receive any information
20  concerning a negotiated mark haircut or a
21  reduction from book value of $5 billion?
22      MS. TAGGART: Object to form.
23      A.   Specifically during the period of
24  September 2008 and October of 2008, I can't
25  remember if we were told by any source other

17 (Pages 62 to 65)

Page 66

N. PURCELL

1    N. PURCELL
2    than counsel or anyone else about a $5 billion
3    mark.
4        Q.    Turning back to the exhibit and the
5    line that reads "negotiated mark haircut" and
6    has a figure 5.0 next to that, do you see that?
7        A.    I do.
8        Q.    As you sit here today, do you have any
9    understanding concerning what that refers to?
10       A.    No.
11       Q.    Let me show you a document that we've
12   previously marked as Exhibit 464B.  This is an
13   excerpt of a larger presentation, but I'm only
14   going to focus on parts of the overall
15   presentation.
16            If you would just look at this and
17   tell me if you recall seeing any part of this
18   and what it relates to.
19            (Document review.)
20       A.    I do recall seeing this.
21       Q.    And what is it?
22       A.    It appears to be a report from Alvarez
23   & Marsal to the Unsecured Creditors Committee
24   regarding various aspects of the estate as of
25   October 8, 2008.

Page 67

N. PURCELL

1    N. PURCELL
2        Q.    Okay.  And if you would turn to the
3    third page of the exhibit.
4        A.    Yes.
5        Q.    At the top it says "Significant
6    Transactions," and then it says: "A. Sale of
7    Lehman Brothers, Inc./Broker Dealer to Barclays
8    (Fogarty)."  Do you know who Fogarty is?
9        A.    Mr. Fogarty works for Alvarez &
10   Marsal.
11       Q.    And aside from this presentation, did
12   you ever have any communications with Mr.
13   Fogarty?
14            MS. TAGGART:  You can answer that yes
15   or no.
16       A.    No.
17       Q.    Below that heading, there are bullet
18   points and there's an arrow that says Assets
19   Purchased.  It reads, "43.1 billion repo assets,
20   and then it states the following: "Book value
21   per Lehman stale marks; negotiated a $5 billion
22   reduction."
23            When this refers to "book value per
24   Lehman stale marks" and "negotiated a $5 billion
25   reduction," what do you understand this to be

Page 68

N. PURCELL

1    N. PURCELL
2    referring to?
3            MS. TAGGART:  Object to form.
4    Foundation.
5        A.    I'm not sure what this refers to.
6        Q.    And at the time that you attended the
7    presentation, do you recall any discussion
8    concerning these points?
9        A.    The points specifically about the $5
10   billion reduction?
11       Q.    Yes.
12       A.    I don't recall specific discussions on
13   that point.
14       Q.    Do you recall any general discussions
15   on that point at this presentation?
16       A.    No.
17       Q.    And you don't know what that refers
18   to?
19       A.    I do not.
20       Q.    Do you recall whether any member of
21   the Committee at that presentation raised any
22   concerns relating to that statement, "negotiated
23   a $5 billion reduction"?
24            MR. SZYFER:  Object to the form.
25       A.    We referred to at that meeting on

Page 69

N. PURCELL

1    N. PURCELL
2    October 8?
3        Q.    Yes.
4        A.    I don't recall.
5        Q.    Do you recall whether after that
6    meeting any member of the Committee raised any
7    concerns about a negotiated $5 billion
8    reduction?
9            MS. TAGGART:  I'm going to object and
10   instruct not to answer on privilege.
11           (Exhibit 524B, a document bearing
12   Bates No. CMTE0007889 through 7891, 8241
13   through 8247, and 7892 through 7894, marked
14   for identification, as of this date.)
15       A.    Mr. Stern, you don't have an October
16   2008 calendar for my review?
17       Q.    Sorry.
18       A.    Okay.  Had to ask.
19       Q.    If you would look at this Exhibit 524B
20   and tell me if you know what it is.
21           (Document review.)
22       A.    Can you repeat the question, sir?
23       Q.    Yes.  Do you know what this document
24   is?
25       A.    When you say "document," you mean

18  (Pages 66 to 69)

Page 70

```
1            N. PURCELL
2  everything within the staple? There's a series
3  of documents here.
4      Q.  Yes.  Yes.
5      A.   It appears to be an e-mail string for
6  various references and various issues together
7  with what appears to be a filing in the Lehman
8  case and other attachments.
9      Q.  Okay.  Turning to the other
10 attachments, I want to focus on two pages, and
11 I'll refer to the Bates numbers at the bottom.
12 The first would be the Bates number that ends
13 8245.  That has a series of figures on it with a
14 column A and a column B.  Do you see that?
15     A.   I do.
16     Q.  Do you know what those figures
17 represent?
18     A.   I do not.
19     Q.  Turning ahead, if you could flip three
20 pages ahead -- actually, four pages, to the
21 Bates number 7893, there's a box with columns
22 labeled G and H.  Do you see that?
23     A.   I do.
24     Q.  Do you know what those figures
25 represent?
```

Page 71

```
1            N. PURCELL
2      A.   No.
3      MR. SZYFER:  For the record, Mr.
4  Stern, just looking at Exhibit 524B, the
5  Bates numbers aren't sequential.  It starts
6  off 7889, 7890 and then goes to 91, and then
7  it goes to 8241 through to 47 and then back
8  to 7892.  Is this how this was produced, or
9  did you guys put this together?
10     MR. STERN:  No, my understanding is
11 that this is the way it came to us, but I
12 can't absolutely represent this.  I think
13 there are some materials within this
14 document as it was produced to us that were
15 omitted because of their length, but my
16 understanding is that we got things in this,
17 in this way.
18     Q.  From the time that the Committee was
19 formed on September 17 through the closing of
20 the sale transaction on September 22, from time
21 to time did the Committee receive written
22 reports concerning information relating to the
23 sale transaction?
24     MS. TAGGART:  You can answer yes or
25 no.
```

Page 72

```
1            N. PURCELL
2      A.   Can you define "written reports,"
3  please?
4      Q.  Well, did the Committee ever receive
5  e-mails or memos from its counsel or from its
6  financial advisors providing information, facts
7  concerning the sale transaction?
8      A.   Yes, I believe they provided
9  information.
10     Q.  And do you recall the nature of the
11 facts that they reported to the Committee?
12     MS. TAGGART:  I'm going to object and
13 instruct not to answer as currently worded.
14 Again, if you want to just discuss what
15 facts or understanding he and the Committee
16 knew at a specific period of time without
17 reference to where it came from, we're
18 willing to allow those questions as
19 previously described.
20     Q.  Well, from September 17 through the
21 closing of the sale transaction, what were the
22 facts that the Committee had concerning the
23 assets that would be transferred to Barclays as
24 a part of the sale?
25     MS. TAGGART:  Object to form, but you
```

Page 73

```
1            N. PURCELL
2  can answer.  Please don't describe the
3  communications, but you can describe the
4  facts as addressed in that question.
5      A.   I don't recall the specific facts.
6      Q.  Between September 17th and the closing
7  of the sale transaction on September 22, what
8  facts did the Committee have concerning the
9  liabilities that Barclays would assume as part
10 of the transaction?
11     A.   I don't recall the specific
12 liabilities.
13     Q.  Before the sale transaction closed on
14 September 22, what facts did the Committee have
15 concerning Barclays' replacement of the Fed's
16 financing of LBI?
17     MS. TAGGART:  Object to form.
18     A.   When you -- when you say "facts," what
19 do you mean?
20     Q.  What information did the Committee
21 have concerning Barclays' replacement of the Fed
22 repo as of --
23     MS. TAGGART:  Object to form.
24     Q.  -- as of the sale closing?
25     A.   It was our understanding that as part
```

19 (Pages 70 to 73)

Page 74

N. PURCELL

2 of the transaction Barclays would step into the
3 Fed's funding role.
4    Q.    And did the Committee understand that,
5 in general, in such repos the value of the
6 securities transferred would generally exceed
7 the value of the cash provided for those
8 securities?
9        MS. TAGGART: Object to form.
10    A.    I don't believe I remember exactly
11 whether the Committee understood that point.
12    Q.    What facts did the Committee have
13 before the closing of the sale transaction
14 concerning the market value of the securities
15 transferred to Barclays in connection with that
16 repo replacement?
17        MS. TAGGART: Object to form.
18    A.    Again, I don't remember the specific
19 facts.
20    Q.    Do you remember generally the facts?
21    A.    Can you repeat your question?
22    Q.    What facts did the Committee have
23 before the closing concerning the market value
24 of the securities transferred to Barclays under
25 the repo?

Page 75

N. PURCELL

2    A.    What general facts?
3    Q.    Yes.
4    A.    I believe the Committee understood
5 that the transaction itself included the sale of
6 some real estate, some securities, the transfer
7 of certain individuals in return for
8 liabilities. What those liabilities were I
9 can't recall.
10    Q.    Did the Committee, as of the closing,
11 have any certainty concerning the value of the
12 assets Barclays was acquiring?
13    A.    No.
14    Q.    As of the closing, did the Committee
15 have any certainty concerning the value of the
16 consideration, including assumed liabilities,
17 that Barclays was providing?
18        (Continued on the next page to include
19    the jurat.)
20
21
22
23
24
25

Page 76

N. PURCELL

2        MS. TAGGART: Object to form.
3    A.    No.
4        MR. STERN: I have no further
5 questions.
6        MS. TAGGART: I have no questions.
7 Okay.
8        MR. STERN: Off the record.
9        THE VIDEOGRAPHER: That concludes the
10 video record for today. The time is 11:51 A.M.
11
12        oOo
13
14
15
16
17
18
19    _____
        NOEL PURCELL
20
21 Subscribed and sworn to
   before me this    day
22 of    2010.
23
   _____
24
25

Page 77

N. PURCELL
2        CERTIFICATE
3 STATE OF NEW YORK )
        : ss
4 COUNTY OF NEW YORK)
5        I, Kathy S. Klepfer, a Registered
6 Merit Reporter and Notary Public within and
7 for the State of New York, do hereby
8 certify:
9        That NOEL PURCELL, the witness whose
10 deposition is herein before set forth, was
11 duly sworn by me and that such deposition is
12 a true record of the testimony given by such
13 witness.
14        I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18        I further certify that neither the
19 deponent nor a party requested a review of
20 the transcript pursuant to Federal Rule of
21 Civil Procedure 30(e) before the deposition
22 was completed.
23        In witness whereof, I have hereunto
24 set my hand this 13th day of January, 2010.
25        ------------------------------

20 (Pages 74 to 77)

Page 78

```
 1            N. PURCELL
 2            INDEX
 3   WITNESS:        EXAMINATION BY        PAGE
 4   N. PURCELL        Mr. Stern        5
 5
 6   EXHIBITS:                PAGE
 7   Exhibit 519B, a document bearing Bates Nos.    14
 8   CMTE0007889 through 8244
 9   Exhibit 520B, a document bearing Bates Nos.    16
10   CMTE0001047 through 1049
11   Exhibit 521B, a document bearing Bates Nos.    37
12   CMTE0000577 through 580
13   Exhibit 522B, a document bearing Bates Nos.    47
14   CMTE0000571 through 574
15   Exhibit 523B, a document bearing Bates Nos.    61
16   CMTE0005337 through 5339
17   Exhibit 524B, a document bearing Bates No.    69
18   CMTE0007889 through 7891, 8241 through 8247,
19   and 7892 through 7894
20
21
22
23
24
25
```

Page 79

```
 1            N. PURCELL
 2   NAME OF CASE:  In Re: Lehman Brothers Holdings, Inc.
 3   DATE OF DEPOSITION: January 13, 2010
 4   NAME OF WITNESS: Noel Purcell
 5   Reason Codes:
 6       1. To clarify the record.
         2. To conform to the facts.
         3. To correct transcription errors.
 7
 8   Page _____ Line _____ Reason _____
     From _____ to _____
 9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25
```

21 (Pages 78 to 79)

# BCI EXHIBIT

# 91

Page 1

1           HIGHLY CONFIDENTIAL – R. RICCI

2           UNITED STATES BANKRUPTCY COURT

3           SOUTHERN DISTRICT OF NEW YORK

4      ----------------------x

5      In Re:

6                          Chapter 11

7      LEHMAN BROTHERS        Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al.,     (Jointly Administered)

9

            Debtors.

10

       ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13          DEPOSITION OF RICH RICCI

14          New York, New York

15          September 8, 2009

16

17

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 24547

Page 2

1    HIGHLY CONFIDENTIAL - R. RICCI
2    September 8, 2009
3    9:56 a.m.
4
5    HIGHLY CONFIDENTIAL deposition
6    of RICH RICCI, held at Jones Day,
7    LLP, 222 East 41st Street, New York,
8    New York, before Kathy S. Klepfer,
9    a Registered Professional Reporter,
10   Registered Merit Reporter, Certified
11   Realtime Reporter, Certified Livenote
12   Reporter, and Notary Public of the
13   State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    HIGHLY CONFIDENTIAL - R. RICCI
2    A P P E A R A N C E S :
3    JONES DAY, LLP
4    Attorneys for Lehman Brothers, Inc.
5    222 East 41st Street
6    New York, New York 10017-6702
7    BY: DAVID L. CARDEN, ESQ.
8    JENNIFER DEL MEDICO, ESQ.
9    BART GREEN, ESQ.
10
11   BOIES, SCHILLER & FLEXNER, LLP
12   Attorneys for Barclays and the Witness
13   5301 Wisconsin Avenue, NW
14   washington, DC 20015
15   BY: HAMISH HUME, ESQ.
16   JONATHAN D. SCHILLER, ESQ.
17   LOUIS SMITH, ESQ.
18
19   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
20   Attorneys for the Creditors Committee
21   51 Madison Avenue
22   22nd Floor
23   New York, New York 10010
24   BY: ERIC M. KAY, ESQ.
25

Page 4

1    HIGHLY CONFIDENTIAL - R. RICCI
2    A P P E A R A N C E S : (Cont'd.)
3    JENNER & BLOCK, LLC
4    Attorneys for the Examiner
5    330 N. Wabash Avenue
6    Chicago, Illinois 60611-7603
7    BY: DAVID C. LAYDEN, ESQ.
8
9    HUGHES, HUBBARD & REED, LLP
10   Attorneys for the SIPA Trustee
11   One Battery Park Plaza
12   New York, New York 10004-1482
13   BY: WILLIAM R. MAGUIRE, ESQ.
14   KENNETH E. LEE, ESQ.
15   FARA TABATABAI, ESQ.
16
17
18
19   Also Present:
20   RAJESH ANKALKOTI, Alvarez & Marsal
21
22
23
24
25

Page 5

1    HIGHLY CONFIDENTIAL - R. RICCI
2    RICH RICCI, called as a
3    witness, having been duly sworn by a Notary
4    Public, was examined and testified as
5    follows:
6    EXAMINATION BY
7    MR. CARDEN:
8    Q.   Mr. Ricci, my name is David Carden.
9    I'm special counsel for the Lehman estate with
10   the firm of Jones Day.
11   I think for your benefit, although we
12   have all become old friends, we ought to run
13   around the table so you know who's here.
14   A.   Okay.
15   Q.   This is my colleague Jen Del Medico.
16   And we'll go from there.
17   MR. MAGUIRE: I'm Bill Maguire from
18   Hughes, Hubbard & Reid, counsel to the
19   Trustee of the Estate of Lehman Brothers,
20   Inc. and I'm here with my partner Ken Lee
21   and Fara Tabatabai.
22   MR. KAY: Eric Kay from Quinn,
23   Emanuel, Urquhart, Oliver & Hedges for the
24   Official Creditors Committee in the Lehman
25   Chapter 11 cases.

Page 6

HIGHLY CONFIDENTIAL - R. RICCI

1    HIGHLY CONFIDENTIAL - R. RICCI
2    MR. LAYDEN: David Layden from Jenner
3  & Block for the Examiner.
4    MR. ANKALKOTI: Rajesh Ankalkoti from
5  Alvarez & Marsal on behalf of the Lehman
6  estate.
7    MR. GREEN: Bart Green with Jones Day.
8    MR. SMITH: Louis Smith, Boies
9  Schiller & Flexner.
10    MR. SCHILLER: Jonathan Schiller and
11  Hamish Hume.
12  BY MR. CARDEN:
13    Q.   State your name for the record, sir.
14    A.   Yes, my name is Rich Ricci.
15    Q.   By whom are you employed, Mr. Ricci?
16    A.   Barclays Capital.
17    Q.   What's your current position?
18    A.   I'm the Chief Operating Officer of the
19  Investment Banking and Investment Management
20  Division.
21    Q.   Is that the only title you hold?
22    A.   Managing director.
23    Q.   Okay. How long have you had that
24  position?
25    A.   I've been in this position since

Page 7

HIGHLY CONFIDENTIAL - R. RICCI

1    HIGHLY CONFIDENTIAL - R. RICCI
2  January of 2005.
3    Q.   How long have you been employed by
4  Barclays?
5    A.   Since November of 1994, so 15 years.
6    Q.   Do you have any professional degrees,
7  sir?
8    A.   I have my undergraduate degree.
9    Q.   You're not an accountant?
10    A.   Not an accountant, no.
11    Q.   And your professional degree -- pardon
12  me, your college degree was in what?
13    A.   Finance.
14    Q.   From where?
15    A.   Creighton University.
16    Q.   And we're going to try to get right to
17  it and not waste anybody's time, so we're going
18  to focus our attention on the month of September
19  2008, about a year ago. And I brought a prop
20  with me, which everybody that's been in the
21  deposition with me knows I use with some, I
22  think, utility.
23    If anybody else needs a copy, let me
24  know, but that's the month of September 2008.
25    In the month of September 2008, your

Page 8

HIGHLY CONFIDENTIAL - R. RICCI

1    HIGHLY CONFIDENTIAL - R. RICCI
2  position at Barclays again was what?
3    A.   Chief operating officer of Investment
4  Banking and Investment Management.
5    Q.   And were you based in London?
6    A.   Yes.
7    Q.   Did there come a time in September
8  2008 in which you had any discussions with
9  anyone at Barclays about an acquisition
10  involving Lehman Brothers?
11    A.   Yes.
12    Q.   When was that? When was the first
13  such conversation, sir?
14    A.   In the month of September or prior to
15  the month of September?
16    Q.   Let's just go with the month of
17  September.
18    A.   To the best of my recollection,
19  probably sometime around the 3rd or the 4th.
20    Q.   And with whom did you have that
21  conversation?
22    A.   Bob Diamond.
23    Q.   Just the two of you in the
24  conversation?
25    A.   Would have been Bob Diamond. Probably

Page 9

HIGHLY CONFIDENTIAL - R. RICCI

1    HIGHLY CONFIDENTIAL - R. RICCI
2  would have spoken to, as I recall, John Varley.
3  Also may have spoken to Jerry del Missier.
4    Q.   And what was the general gist of that
5  conversation?
6    MR. HUME: Objection. Vague.
7    Q.   That's just what the word "gist"
8  means, Mr. Ricci. Go ahead.
9    A.   The general nature of the conversation
10  was it was a very, very uncertain time in the
11  markets. We had seen the collapse of Bear
12  Stearns. There were lots of rumors about other
13  Wall Street firms. We had seen UBS in some
14  serious trouble, and conversations began around
15  potentially would Lehman face maybe some of the
16  same fate as some of the other houses on the
17  streets and would we be in a position or
18  interested in potentially acquiring Lehman.
19    Q.   Now, was that conversation focused on
20  at least the possibility of acquiring all of
21  Lehman Brothers?
22    A.   At the time, yes.
23    Q.   Yes. And in fact, you did have a
24  series of conversations subsequent to that with
25  Lehman Brothers concerning an acquisition of the

Page 10

HIGHLY CONFIDENTIAL - R. RICCI

1
2  entire firm, did you not?
3    A.   That's correct.
4    Q.   And when did those conversations
5  start?
6    A.   Those conversations would have started
7  on Friday, the 12th of September.
8    Q.   And when did they end, if they did?
9    A.   On the acquisition of the whole of
10 Lehman Brothers?
11   Q.   Yes.
12   A.   Those conversations will have ended on
13 the -- sometime on the 14th of September.
14   Q.   Which was the Sunday, correct?
15   A.   That's correct. Thank you for the
16 prompt.
17   Q.   What was your role in connection with
18 those conversations or that possible transaction
19 with Lehman Brothers?
20   A.   My role at the time was as one of the
21 lead business heads in potentially determining
22 whether an acquisition made sense. I was also
23 teed up as the, I guess as the senior person to
24 lead discussions from our side.
25   Q.   And did you have a team of people who

Page 11

HIGHLY CONFIDENTIAL - R. RICCI

1
2  were involved in the discussions on behalf of
3  Barclays?
4    A.   We did.
5    Q.   Who were they?
6    A.   It would have been Bob Diamond, Jerry
7  del Missier. The team was built up over time.
8  So Mike Keegan, Stephen King, Michael Evans,
9  Archie Cox, Michael Klein, who we retained as an
10 advisor on the transaction. Certainly we had
11 conversations with our board and John Varley.
12 I'm sure there were others.
13   Q.   Did each of those individuals have a
14 particular area concerning the transaction for
15 which they were responsible, as well-defined as
16 that?
17   A.   People were placed within the team
18 kind of in their area of expertise, but as it
19 was in incredibly uncertain times, while we
20 attempted to make sure that we had the skills
21 matched up with the appropriate people on the
22 other side, I'm sure there was overlap by
23 someone who needed help from one area or
24 another.
25   Q.   Who amongst those individuals was

Page 12

HIGHLY CONFIDENTIAL - R. RICCI

1
2  responsible for actual valuing the Lehman
3  assets?
4    A.   I left someone off as well. Patrick
5  Clackson.
6        But Mike Keegan would have been
7  involved in those discussions. Stephen King
8  would have been involved in those discussions.
9  They would have spoken to other people on their
10 desks in looking to value those assets.
11   Q.   And what was Mr. Klein's
12 responsibility?
13   A.   Mr. Klein was an advisor to us and he
14 took the lead, given his background and
15 experience, on the larger framework of the
16 transaction.
17   Q.   Amplify that for me, if you would.
18 What do you mean by "larger framework in the
19 transaction?"
20   A.   So there's, you know, clearly a
21 framework of a deal. There's these people.
22 There's these assets. There's potentially these
23 buildings. This is how it might shape up. This
24 might be the structure that we want to use, and
25 then teams would fill out the more areas of

Page 13

HIGHLY CONFIDENTIAL - R. RICCI

1
2  expertise, to fill in the blanks in the bigger
3  framework.
4    Q.   Between Friday, the 12th, and Sunday,
5  the 14th, did Barclays have any conversation
6  internally concerning the acquisition of some
7  portion of Lehman Brothers as opposed to the
8  purchase of the entire firm?
9    A.   Not that I recall.
10   Q.   And we know at some juncture the
11 conversations related to the acquisition of all
12 of Lehman Brothers ended on Sunday. Can you
13 tell me why, sir?
14   A.   We had reached an agreement we felt
15 with Lehman Brothers that was always subject to
16 certain regulatory conditions. On Sunday, the
17 14th, there was a question as to the ability of
18 Lehman to open on Monday morning and that there
19 would be required for Lehman to open a guarantee
20 of all Lehman's liabilities.
21       Under UK listing rules, a guarantee of
22 that size cannot happen without shareholder
23 approval. We asked the UK listing authority to
24 waive that ruling. They did not. We then asked
25 the United States Government to provide that

4

Page 14

HIGHLY CONFIDENTIAL - R. RICCI

1      HIGHLY CONFIDENTIAL - R. RICCI
2  guarantee, and they said they could not do that.
3      Q.   What time was that on Sunday?
4      A.   As I recall, it was around midday.
5      Q.   At that time you were in New York,
6  were you not?
7      A.   Yes, sir.
8      Q.   And Mr. Diamond was in New York?
9      A.   Yes, sir.
10     Q.   And in fact, the entire team that I
11 think you described here, was there anyone who
12 was not in New York on that core Barclays team?
13     A.   John Varley was in the UK.
14     Q.   Mr. Clackson, was he here?
15     A.   I believe Mr. Clackson was here.
16     Q.   Did you spend any time in the offices
17 of Lehman Brothers on that weekend between the
18 12th and the 14th?
19     A.   I may have briefly.
20     Q.   Who was the person at Barclays, if
21 there was one, and if there was more than one,
22 please tell me that, who was responsible for
23 actually sitting down across the table from
24 somebody at Lehman Brothers, if this is the way
25 it happened, and having the discussion

Page 15

1      HIGHLY CONFIDENTIAL - R. RICCI
2  concerning the acquisition of the entire firm?
3      A.   There were several dialogues.
4      Q.   Okay.  Tell me what they were, if you
5  will.
6      A.   So Bob Diamond would have had a
7  conversation with Dick Fuld initially; I had a
8  brief conversation, series of conversations with
9  Mark Shafir; and Michael Klein and Archie Cox
10 would have a series of conversations with Mark
11 Shafir and others.
12     Q.   Okay.  Was Mr. McDade involved in
13 conversations with Barclays on that weekend
14 concerning the sale of the entire firm?
15     A.   Yes.
16     Q.   Did you have any conversations with
17 him?
18     A.   I can recall speaking to Bart that
19 weekend, but not really about the deal.
20     Q.   I just am trying to understand what
21 I'll call the rhythm of the conversations, who
22 was really sort of running the operation from
23 the Barclays side, and you started your
24 testimony by saying that you were heading up a
25 team?

Page 16

1      HIGHLY CONFIDENTIAL - R. RICCI
2      A.   Uh-huh.
3      Q.   Tell me what your role was as you saw
4  it in connection with coordinating all of the
5  team that Barclays had.  I'm talking now about
6  the weekend of the 12th through the 14th.
7      A.   Weekends of the 12th, right.
8          MR. HUME:  Objection.  Asked and
9  answered.
10     Q.   You can answer the question.
11     A.   Sorry, can you repeat the question?
12     Q.   During the weekend, from the 12th
13 through the 14th, when you testified that your
14 role was to oversee or coordinate the Barclays
15 team, exactly what did you mean and what did you
16 do?
17     A.   So I was the head of the Barclays
18 team.  Mark Shafir was put forward as the head
19 of the Lehman team.  My role was to ensure that
20 we then had the appropriate teams, whether it be
21 overall structure of the deal, asset valuations,
22 human resources people, buildings, facilities,
23 making sure that all those pieces were
24 coordinated and executed.
25     Q.   And were they all reporting up to you

Page 17

1      HIGHLY CONFIDENTIAL - R. RICCI
2  as you were doing the negotiation?
3      A.   Yes.
4      Q.   Were they providing written reports to
5  you?
6      A.   Not that I recall.
7      Q.   Okay.  Now, at some time on Sunday
8  after it was clear that the sale of the entire
9  firm was not going to happen, did there come a
10 time when Barclays entered into conversations
11 among itself as to whether it could acquire a
12 portion of Lehman Brothers?
13     A.   The afternoon of the 14th, the Sunday,
14 we were still trying to figure out a way that we
15 could buy all of Lehman.  There was no
16 conversation amongst -- that I can recall
17 amongst the Barclays team about acquiring a
18 piece of Lehman until Bart McDade spoke to Bob
19 late on Sunday night.
20     Q.   Bob Diamond?
21     A.   Bob Diamond, yes.
22     Q.   And did Mr. McDade, if you know, call
23 Mr. Diamond or did Mr. Diamond call Mr. McDade
24 about a possible acquisition by Barclays of a
25 portion of Lehman Brothers?

Page 18

HIGHLY CONFIDENTIAL - R. RICCI

1
2    A.    I believe Mr. McDade called Mr.
3    Diamond.
4    Q.    Were you present when he did so?
5    A.    No.
6    Q.    And that was sometime later in the
7    evening on Sunday?
8    A.    Yes.
9    Q.    Do you know approximately when?
10    A.    I want to say early Sunday evening, 7
11    or 8 o'clock, because we were both going to
12    Smith & Wollensky's for dinner and Bob had told
13    me he had gotten the call from Bart. Could have
14    been later than that, but it was Sunday evening.
15    Q.    Did you have dinner with Mr. McDade
16    that evening?
17    A.    No.
18    Q.    I'm sorry, I misspoke. I apologize.
19    Did you have dinner with Mr. Diamond
20    that evening?
21    A.    Mr. Diamond had dinner with his
22    family. I said hello to him and I had dinner at
23    the bar.
24    Q.    By yourself?
25    A.    It was dinner. I had -- I was with --

Page 19

HIGHLY CONFIDENTIAL - R. RICCI

1
2    Q.    Actually, I do that all the time. I
3    find it a very agreeable way to eat dinner.
4    But I'm interrupting. Was anyone --
5    did you have a companion for dinner that
6    evening?
7    A.    I think Jerry del Missier might have
8    been there.
9    Q.    When you were at Smith & Wollensky's,
10    Mr. Diamond told you he had received a phone
11    call from Mr. McDade about a possible
12    transaction concerning a portion of Lehman
13    Brothers?
14    A.    That's what I recall, yes.
15    Q.    Do you remember any detail about what
16    Mr. Diamond said to you about his conversation
17    with Mr. McDade other than that?
18    A.    It was very brief. Bob said that Bart
19    had called and were we interested in buying a
20    portion of Lehman out of bankruptcy and did I
21    know how that might work.
22    Q.    We were talking about the conversation
23    between Mr. McDade and Mr. Diamond, and you said
24    something about how that might work. You're
25    talking about how if you knew how it would work?

Page 20

HIGHLY CONFIDENTIAL - R. RICCI

1
2    A.    Correct. Mr. Diamond asked me if I
3    knew how that might work.
4    Q.    All right. Let's just make sure we're
5    clear on the two conversations because they got
6    conflated at that point. I was only asking
7    about the conversation such as it was related to
8    you between Mr. Diamond and Mr. McDade.
9    A.    Oh, okay. Sorry.
10    Q.    A purchase of some Lehman assets out
11    of bankruptcy. And it was a brief conversation?
12    A.    Correct.
13    Q.    And you don't recall anything else
14    about the detail of that conversation?
15    A.    No.
16    Q.    And then Mr. Diamond asked you, I take
17    it, at Smith & Wollensky's whether you knew how
18    that might work?
19    A.    Correct.
20    Q.    What did you say to him in response to
21    that question?
22    A.    I said I didn't. I wasn't sure how it
23    would work. I wasn't quite sure it was going to
24    happen the next day.
25    Q.    And was there any discussion between

Page 21

HIGHLY CONFIDENTIAL - R. RICCI

1
2    you and Mr. Diamond about the quantum of the
3    assets or the nature of the assets, anything at
4    all about what portion of Lehman Brothers was
5    being considered?
6    A.    I don't recall that he specifically
7    mentioned anything at that point.
8    Q.    All right. Did Mr. Diamond ask you if
9    you would assist in evaluating such a
10    transaction?
11    A.    Yes.
12    Q.    Did he do that at the restaurant that
13    evening?
14    A.    Yes.
15    Q.    Okay. And did he ask you to go back
16    to the Barclays offices or report to Lehman
17    Brothers or show up at Barclays the next day?
18    Did he give any instructions as to how he wanted
19    you to proceed?
20    A.    I believe we agreed to meet at the
21    office the next morning.
22    Q.    You didn't go back to the office that
23    night, I take it?
24    A.    Not right from there, no. I believe I
25    went home and went back early in the morning.

Page 22

HIGHLY CONFIDENTIAL - R. RICCI
1
2    Q.   Do you know if anybody at Barclays
3    worked on the transaction that Mr. McDade
4    suggested to Mr. Diamond at Barclays on the
5    evening of Sunday, September 14th?
6    A.   I don't recall.
7    Q.   At some point on Monday morning you
8    show up to work?
9    A.   Yes.
10    Q.   Remember what time that was?
11    A.   Early. Don't remember. Don't have a
12    recollection.
13    Q.   Did Mr. Diamond give you an assignment
14    with regard to evaluating the transaction that
15    had been suggested by Mr. McDade?
16    A.   Yes.
17    Q.   What was your assignment?
18    A.   My assignment was to see if we could,
19    you know, get our team back together and work
20    out a deal with the estate of the bankruptcy
21    court with creditors on getting a portion of
22    Lehman done.
23    Q.   And once again, were you heading up
24    the team?
25    A.   Yes.

Page 23

HIGHLY CONFIDENTIAL - R. RICCI
1
2    Q.   Was the team essentially the same team
3    that you had before when you were evaluating the
4    purchase of the entire firm?
5    A.   Yes.
6    Q.   Okay. Were there any additions or
7    subtractions of consequence? Strike the
8    "consequence."
9        Were there any additions or
10    subtractions?
11    A.   I'm sure we added more people
12    particularly on the accounting side and the
13    legal side.
14    Q.   Okay. How did you come to find out on
15    that Monday what the general nature of the
16    potential transaction was?
17    A.   I believe I had a conversation with
18    Bob Diamond that essentially told me it would be
19    for the Lehman Brothers U.S. businesses. That
20    was how I first heard about it.
21    Q.   When you say Bob, meaning Mr. Diamond?
22    A.   Correct.
23    Q.   Is there another Bob, by the way? I
24    won't keep interrupting you. If there's another
25    Bob, I'll keep interrupting you. If not, I'll

Page 24

HIGHLY CONFIDENTIAL - R. RICCI
1
2    let you go.
3    A.   If there's another Bob, I'll make sure
4    I make it clear.
5    Q.   If you mention Bob, you're talking
6    about Diamond?
7    A.   Correct.
8    Q.   Did Mr. Diamond talk to you about
9    whether there would be actual securities of any
10    kind acquired by Barclays in the possible
11    transaction, the proposed transaction?
12    A.   No.
13    Q.   What did you do next after Mr. Diamond
14    had that conversation with you?
15    A.   I believe I went to go see Michael
16    Klein to determine and seek his advice on how we
17    might move forward.
18    Q.   Was it just you and Mr. Klein in that
19    conversation?
20    A.   I believe that was the case.
21    Q.   What did Mr. Klein say to you and what
22    did you say to him?
23    A.   To the best of my recollection, I
24    believe we discussed that we needed to determine
25    what we wanted to purchase and we had a

Page 25

HIGHLY CONFIDENTIAL - R. RICCI
1
2    brief conversation around -- and that was in
3    terms of assets. We had a brief conversation
4    around people and making sure that we also
5    considered, you know, buildings, that type of
6    thing. Just a very broad conversation about
7    determining what we wanted to buy and how we
8    were going to protect the franchise.
9    Q.   When you say "protect the franchise,"
10    was it the intention of Barclays at that point
11    for the transaction to be capital-neutral?
12        MR. HUME: Objection. Vague.
13    Q.   You understand what I mean, don't you?
14    A.   No.
15    Q.   If you're going to be acquiring these
16    assets, there was going to be capital
17    requirement to run the firm, was there not?
18    Capital was going to be required to operate the
19    businesses that you were going to be acquiring
20    in the transaction?
21    A.   Potentially.
22    Q.   Yes. Was there any conversation about
23    the amount of capital that would be necessary in
24    this conversation with Mr. Klein?
25    A.   No. What we talked about were not

Page 26

1          HIGHLY CONFIDENTIAL - R. RICCI
2   buying a balance sheet, if that's where you're
3   headed, but really buying, you know, a series of
4   assets and assuming some liabilities and, you
5   know, starting on that premise.
6       Q.   Was there any conversation at that
7   time concerning whether or not Barclays was
8   prepared for the acquisition of the Lehman
9   assets to have an adverse impact on its capital?
10      A.   We were clear, given the uncertain
11  environment as an organization, that we did not
12  want to pursue a transaction that could have
13  negative impacts on our capital.
14      Q.   And with whom did you have that
15  conversation or series of conversations?
16      A.   I would have had that conversation
17  with John Varley, with Mr. Diamond, Patrick
18  Clackson, with Michael Klein.
19      Q.   Anyone else?
20      A.   Not that I can recall.
21      Q.   Would Mr. Keegan have known that it
22  was the intention of Barclays not to have an
23  adverse impact on its capital in the acquisition
24  of assets from Lehman Brothers?
25          MR. HUME: Objection. Lacks

Page 27

1          HIGHLY CONFIDENTIAL - R. RICCI
2   foundation.
3       A.   Mr. Keegan could possibly have been
4   aware.
5       Q.   What about Mr. King?
6          MR. HUME: Same objection.
7       A.   I don't know if Mr. King knew or not.
8       Q.   Now, after you had that conversation
9   with Mr. Klein and you talked in these general
10  subjects, assets, people and buildings, what did
11  you do concerning the Lehman transaction?
12      A.   I don't recall, actually.
13      Q.   Okay. Did you stay at the offices of
14  Barclays throughout the day?
15      A.   I went over to Lehman Brothers'
16  offices at some point in the day, yes.
17      Q.   Why did you go over to Lehman?
18      A.   We were negotiating with Lehman which
19  assets we may purchase and which liabilities we
20  may assume.
21      Q.   When you say "we"?
22      A.   Barclays Group.
23      Q.   Okay. Were you in those
24  conversations?
25      A.   I was in -- I was in conversations

Page 28

1          HIGHLY CONFIDENTIAL - R. RICCI
2   with the Barclays side. Not directly on the
3   Lehman's, with the Lehman people.
4       Q.   Okay. Am I correct that the people
5   with whom you would have had conversations as to
6   which assets Barclays was interested in
7   purchasing and at what prices would have been
8   Mr. King and Mr. Keegan?
9       A.   Mr. King, Mr. Keegan, Mr. Clackson.
10      Q.   All right. Did you give them any
11  instructions at that time as to what assets they
12  ought to be considering and at what prices they
13  should consider?
14      A.   At that time during the week, again,
15  we were very concerned with all the uncertainty
16  in the market and the potential risk we were
17  taking to ensure that we, whatever assets we did
18  take, were taken at the appropriate price. That
19  would have been my steer.
20      Q.   And by "appropriate price," you mean a
21  price at which their acquisition would not have
22  had an adverse impact upon the capital at
23  Barclays, correct?
24      A.   No.
25      Q.   What do you mean?

Page 29

1          HIGHLY CONFIDENTIAL - R. RICCI
2       A.   The appropriate price would have been
3   the best estimate of market value given all the
4   uncertainty in the market.
5       Q.   Did you give them that instruction on
6   Monday?
7       A.   I believe I did.
8       Q.   And did you give them any parameters
9   of any kind concerning how they should evaluate
10  what the appropriate price was?
11      A.   They know their desks and their books
12  better than I do. I didn't give them any
13  specific instructions on how to value the
14  assets.
15      Q.   Do you know if on Monday they were
16  looking at specific Lehman assets or only
17  classes of assets, or both?
18          MR. HUME: Objection. Vague.
19      A.   I don't recall if they were looking at
20  classes, you know, at general classes of assets
21  or they had gotten down to the detail that
22  quickly.
23      Q.   Did you advise them one way or the
24  other as to whether they should look at specific
25  assets as opposed to classes of assets on that

Page 30

HIGHLY CONFIDENTIAL - R. RICCI

1  Monday?
2      A.   I didn't advise them specifically, no.
3  Certainly understanding their books, they would
4  have wanted to look at some point at individual
5  assets.
6      Q.   There's a concept of Risk-weighted
7  assets, correct?  Does that mean anything to
8  you?
9      A.   Yes.
10     Q.   Okay.  Was there any instruction given
11 to them concerning the nature of the assets that
12 they should consider on a risk-weighted basis?
13     A.   I don't recall.  Not from me.
14     Q.   At any time during your discussions
15 with the Barclays team, was there any discussion
16 about the relative risk associated with specific
17 assets or with specific assets or classes of
18 assets?
19     A.   Risks associated with assets?
20     Q.   Uh-huh, on a risk-weighted basis.
21     A.   On a risk-weighted basis?
22     Q.   Yes.
23     A.   I don't recall specifics.
24     Q.   Okay.  At any point on that Monday did

Page 31

HIGHLY CONFIDENTIAL - R. RICCI

1  you have any conversations with anybody as to
2  how much additional capital Barclays would need
3  in order to acquire those portions of Lehman
4  that it was considering taking in?
5      A.   I recall sometime on the Monday I
6  think that there was a first estimate of an
7  estimate of a number of additional capital we
8  might need in the broker-dealer to support an
9  acquisition of assets.
10     Q.   Do you remember what that number was?
11     A.   No, I don't.
12     Q.   Do you remember who came up with it?
13 Let me strike that.
14         Do you remember who told you the
15 number?
16     A.   No, not precisely.
17     Q.   You didn't, in any event, I take it,
18 come up with that number?
19     A.   No.
20     Q.   Do you have any recollection of what
21 the number was?
22     A.   Not that I recall.
23     Q.   I think I'm right that during this
24 time period there was a four-hour difference

Page 32

HIGHLY CONFIDENTIAL - R. RICCI

1  between London and New York.  It's that period
2  of time in September when it's a four-hour as
3  opposed to five-hour difference, but you'll
4  correct me if I'm mistaken.  I'm only offering
5  that to you because some of the things we're
6  going to be looking at today have GMT time on
7  them.  So I want you to focus on that.  I'm not
8  trying to tell you what the time difference is,
9  but I believe it's that.
10     A.   I don't believe that's correct,
11 actually.
12     Q.   All right.
13     A.   British summertime I think ends in
14 October.
15     Q.   Let me show you what's previously been
16 marked as Exhibit 330.
17         MR. HUME:  You mean a four-hour
18 difference from GMT; is that what you mean?
19         MR. CARDEN:  From GMT to New York.
20 That's what I was told.
21         THE WITNESS:  From GMT?
22         MR. HUME:  London may not have been on
23 GMT.
24     A.   London would not have been GMT.  So

Page 33

HIGHLY CONFIDENTIAL - R. RICCI

1  it's a five-hour difference between London and
2  New York.
3      Q.   I'm sorry.  I understand.
4         (Discussion off the record.)
5      Q.   I'm only pointing it out that some of
6  these e-mails will have GMT on them and you can
7  do the calculation that you feel is appropriate.
8         Let me you show what has been marked
9  previously as Exhibit 330 and ask -- direct your
10 attention to the bottom of the page, the first
11 page, and ask if that refreshes your
12 recollection that an initial estimate of $5
13 billion was made for purposes of capitalizing
14 the Lehman entity?
15     A.   Okay.
16     Q.   Does it refresh your recollection?
17         MR. HUME:  He's asking if you
18 remember.  That's what "refreshes your
19 recollection" is.
20     A.   Do I remember this?  As I said, I
21 remember that -- someone mentioning it, but I
22 didn't have a recollection of the number, no.
23     Q.   Fine.  I'll ask you whether or not
24 this document refreshes your recollection that

Page 34

HIGHLY CONFIDENTIAL - R. RICCI
1
2  the number was $5 billion?
3      A.   Okay.  It was $5 billion, which was
4  the estimate at the time.
5      Q.   Yes.
6      A.   Okay.
7      Q.   Do you have an understanding of what
8  is meant when -- strike that.  At the top of the
9  page in that first section of e-mail, it says,
10  "Spoke with Sants and Gieve."
11          I don't know if I'm pronouncing those
12  correctly.  Who are those individuals?
13      A.   Hector Sants is the chief executive of
14  the Financial Services Authority and John Gieve
15  is the -- I believe John Gieve is the chief
16  civil service -- chief civil servant associated
17  with Treasury.
18      Q.   And in that same section of the
19  exhibit it makes a reference down a few more
20  lines saying, "We had to stick to our capital
21  plan."  You see that?
22      A.   Yes.
23      Q.   What was that capital plan at that
24  time, do you recall?
25      A.   I can't speak for what Mr. Varley was

Page 35

HIGHLY CONFIDENTIAL - R. RICCI
1
2  referring to, but if I was to -- my
3  understanding of that would have been we
4  obviously have a capital plan that we file with
5  the regulators.
6      Q.   We were talking about you having gone
7  over to Lehman Brothers on the Monday, and we
8  got into the conversation concerning the
9  instructions given as to the assets that
10  Barclays was going to be acquiring.
11          Did you have any conversations with
12  anyone at Lehman while you were over at the
13  Lehman offices that day?
14      A.   Regarding?
15      Q.   Anything.
16      A.   I recall I think speaking to some of
17  the human resource people on the Monday about
18  potential people issues.
19      Q.   What do you mean by "people issues"?
20      A.   It was, with all the uncertainty
21  around Lehman and in the market, it was --
22  Lehman people were being very, very heavily
23  recruited by other Wall Street firms, and I was
24  concerned that Lehman may lose a lot of its core
25  people.

Page 36

HIGHLY CONFIDENTIAL - R. RICCI
1
2      Q.   At some time on the Monday, was there
3  a conversation with anyone in which you were
4  involved -- let me rephrase that.  At any time
5  did you have a conversation on Monday, September
6  15, about the need to establish a bonus pool for
7  Lehman people to keep them from leaving the
8  employment of Lehman and then Barclays?
9      A.   I don't recall if that was
10  specifically on Monday, the 15th.
11      Q.   At some point did you have such a
12  conversation?
13      A.   Yes.
14      Q.   With whom did you have that
15  conversation or conversations?
16      A.   I had conversation with Skip McGee and
17  with human resource people.  I don't recall
18  their names.
19      Q.   Lehman human resource people?
20      A.   Lehman human resource people.
21      Q.   Did you have those conversations at
22  Lehman?
23      A.   Yes.
24      Q.   Did you ask them how much Lehman had
25  accrued for bonuses for its people that were

Page 37

HIGHLY CONFIDENTIAL - R. RICCI
1
2  among those that would be, if the transaction
3  went through, moving to Barclays?
4      A.   Lehman presented me and others with a
5  number of roughly $2 billion that they felt they
6  needed to compensate the Lehman staff.
7      Q.   Did you agree to that number?
8      A.   Not initially.  It was presented to
9  me.
10      Q.   Did there come a time when you did
11  agree to that number?
12      A.   Yes.
13      Q.   When was that?
14      A.   Sometime during that week.
15      Q.   Do you recall when?
16      A.   No.
17      Q.   When you say that you agreed to the
18  number, does that mean that Barclays committed
19  to pay the $2 billion in bonuses to the
20  individuals at Lehman who would be coming into
21  Barclays' employment?
22          MR. HUME:  Objection.
23  Mischaracterizes the testimony.
24      A.   What we had agreed was that we would
25  assume a liability related to compensation.

Page 38

HIGHLY CONFIDENTIAL - R. RICCI
1
2   "Compensation" was defined in my conversations
3   as bonuses or severance or other non- sort of
4   salary-related matters, that we would assume
5   that liability, that we didn't agree that we
6   would pay the whole thing out.
7       We recognized we might have to, but we
8   did not agree that we would absolutely pay the
9   whole thing out. In the end, we did, but at the
10  time, we didn't absolutely agree. We were
11  hoping we might not have to pay it all out, but
12  we assumed the liability and expected we may
13  have to pay it out.
14      Q.   Did Barclays ever establish a
15  potential bonus pool of $1.4 billion in
16  connection with the conversations you were
17  having with Lehman.
18      A.   I don't recall ever having a
19  conversation with Lehman about a pool of 1.4
20  billion.
21      Q.   Did you ever have a conversation
22  internally at Barclays about establishing a
23  bonus pool of 1.4?
24      A.   At the time, you know, things were
25  very uncertain. We were concerned about

Page 39

HIGHLY CONFIDENTIAL - R. RICCI
1
2   protecting Barclays against downside risk. We
3   had assumed a liability. We had hoped that we
4   might not have to pay it. We had some scenarios
5   where we may not have pay it we came up with,
6   but we expected that we may indeed have to pay
7   it. So, as part of those iterations, the number
8   1.4 may have come up. Others may have come up.
9       Q.   Do you recall?
10      A.   I recall 1.4 coming up, 1.35, I think,
11  actually, as a rough estimate at one point.
12      Q.   When do you recall that coming up?
13      A.   I don't recall the timing.
14      Q.   With whom did you have conversations,
15  if anyone, at Barclays concerning a potential
16  bonus pool of 1.35?
17      A.   Would have had conversations with
18  Michael Evans, with Patrick Clackson.
19      Q.   You say there was scenarios under
20  which you might not have to pay that amount.
21  What did you mean by that?
22      A.   It was a, you know, I didn't know -- a
23  scenario might have where, if we had kept fewer
24  people than we thought, there were also
25  scenarios we may have had to pay more if we

Page 40

HIGHLY CONFIDENTIAL - R. RICCI
1
2   ended up keeping more Lehman people than we
3   thought. So that's an example.
4       Q.   When did you have the conversations
5   with Mr. Evans and Mr. Clackson about the bonus
6   pool of 1.35 during the week of September 15?
7       MR. HUME: Objection. Asked and
8   answered.
9       Q.   I'm sorry?
10      A.   I don't recall.
11      Q.   Was it after the Asset Purchase
12  Agreement was signed on Tuesday, the 16th of
13  September?
14      MR. HUME: Objection. Asked and
15  answered.
16      A.   I don't recall.
17      Q.   I'm going to show you what has been
18  appropriately marked as Exhibit No. 1, Mr.
19  Ricci. Have you ever seen that document before?
20  I'll state for the record, it's the Asset
21  Purchase Agreement.
22      (Document review.)
23      A.   I recall seeing parts of it. Not
24  quite in this format.
25      Q.   Did you recall seeing parts of it

Page 41

HIGHLY CONFIDENTIAL - R. RICCI
1
2   after it had been executed or as it was being
3   developed?
4       A.   I would have seen parts of it probably
5   as it was being developed and after it was
6   executed.
7       Q.   Did you have any responsibility for
8   doing any of the editing of this document or
9   drafting of the document?
10      A.   No.
11      Q.   Do you recall which portions of the
12  document that you saw as it was being developed?
13      A.   I'll have to look at the document.
14      Q.   Go ahead.
15      (Document review.)
16      A.   I remember seeing the section on
17  Purchased Assets on page 6.
18      Q.   And again, that's as it was being
19  drafted, correct?
20      A.   Correct.
21      I recall seeing page 34, Article IX,
22  Employees and Employee Benefits.
23      Q.   Those two sections of the APA you saw
24  prior to their execution, correct?
25      A.   Correct.

Page 42

HIGHLY CONFIDENTIAL - R. RICCI
1
2    Q.   Article IX refers to a financial
3    schedule.  Do you see that reference?
4    A.   Page 34?
5    Q.   It's page 35, actually, I think, in
6    the fifth line.  Do you see the reference to a
7    financial schedule?
8    A.   Let me get there.
9    Yes.
10    Q.   Okay.  Do you recall having seen the
11    financial schedule referred to in Article IX of
12    the APA?
13    A.   I don't recall.
14    Q.   I show you what's previously been
15    marked as Exhibit 19, Mr. Ricci.  Have you ever
16    seen that schedule before?
17    A.   I don't recall seeing it.
18    Q.   Do I take it that you don't know one
19    way or the other whether this is the schedule
20    referred to in Article IX?
21    A.   That's correct.
22    Q.   Now, when you saw the draft of the APA
23    prior to its execution -- strike that.  When you
24    saw the definition of "purchased assets" in the
25    APA prior to its execution, did it reference

Page 43

HIGHLY CONFIDENTIAL - R. RICCI
1
2    that the assets that were being acquired
3    approximated $70 billion?
4    A.   What page is it on?
5    Q.   Page 6.
6    A.   Yes.
7    Q.   Okay.  Did that number ever change in
8    any of the drafts of the APA that you saw?
9    A.   I don't recall.
10    Q.   That $70 billion reflects a discount
11    off of the Lehman marks as of that time,
12    correct?
13    MR. HUME:  Objection.  Vague.
14    A.   I don't recall.
15    Q.   Do you recall that the assets that
16    Barclays agreed to purchase on Monday, the 15th,
17    or Tuesday, the 16th, were priced at a discount
18    off of Lehman's marks?
19    MR. HUME:  Objection.  Vague and
20    ambiguous.  Off of which marks?
21    MR. CARDEN:  Those would be Lehman's
22    marks.  That's what was in the question.
23    MR. HUME:  As of what time?  It's not
24    clear because it's not clear what time.
25    Marks as of when?

Page 44

HIGHLY CONFIDENTIAL - R. RICCI
1
2    BY MR. CARDEN:
3    Q.   With that assistance, Mr. Ricci, go
4    ahead and answer the question.
5    A.   We didn't purchase a balance sheet, so
6    we purchased a series of assets and assumed a
7    series of liabilities.  The purchase of the
8    assets, any marks on those assets would have
9    been reflective of what we believed the fair
10    price for those assets was.  I can't speak for
11    what was on Lehman's books.
12    Q.   I'm just asking what you know.  Do you
13    know whether or not the prices at which Barclays
14    agreed to purchase those assets reflected a
15    discount off of Lehman's marks for those assets?
16    A.   The timing of the question is
17    important because if we were working off of a
18    Lehman balance sheet of Friday night or Lehman
19    accounts of Friday night, if we were valuing
20    those on Monday, the world collapsed.  There
21    would have been, you know, significant
22    write-downs in any assets.
23    Q.   My question is a different one, Mr.
24    Ricci.  You either know it or you don't know it.
25    The question is do you know that the

Page 45

HIGHLY CONFIDENTIAL - R. RICCI
1
2    prices at which Barclays was agreeing to
3    purchase the assets reflected in the Asset
4    Purchase Agreement which are given at
5    approximately $70 billion reflect a discount off
6    of whatever Lehman marks existed as of that
7    time?
8    A.   As of what time, sir?
9    Q.   As of the time that this was executed,
10    sir.
11    MR. HUME:  Objection.  Lacks
12    foundation as to what that date is.
13    A.   I can't speak for every single asset,
14    but in order to try to answer your question, if
15    there -- given what I know about the timing of
16    when we first started looking at their assets
17    versus when this agreement was signed, I would
18    think there would have been a discount, yes, of
19    Lehman assets -- the Lehman marks on their
20    assets, yes.
21    Q.   I'm just talking about the marks.  I'm
22    not talking about what Barclays thinks they're
23    worth.  I'm only talking about whether it
24    reflected a discount off of Lehman marks.
25    MR. SCHILLER:  He can hear you.  Don't

Page 46

1    HIGHLY CONFIDENTIAL - R. RICCI
2    raise your voice.
3        MR. CARDEN: Just so the record is
4    clear, I didn't raise my voice. I don't
5    think anyone around the table will say so.
6    So whatever purpose you intended by that is
7    really irrelevant.
8        MR. SCHILLER: I was just reacting to
9    you.
10    Q.   Please continue. I speak softly, Mr.
11    Ricci, so if it comes up a notch, perhaps it may
12    seem loud.
13        Did you make any instructions to Mr.
14    Keegan or Mr. King about valuing the assets that
15    were being acquired by Barclays at a price so as
16    to, if you will, cover the liabilities being
17    assumed by Barclays?
18    A.   I don't understand the question.
19    Q.   Well, Barclays was assuming some
20    liabilities in this transaction, wasn't it, sir?
21    A.   Yes.
22    Q.   How much were those liabilities, do
23    you remember?
24    A.   At this point in the transaction, I
25    don't remember.

Page 47

1    HIGHLY CONFIDENTIAL - R. RICCI
2    Q.   The initial transaction on that Monday
3    would have had Barclays acquiring certain short
4    positions, wouldn't it?
5    A.   Yes.
6    Q.   Do you recall that those short
7    positions were estimated at approximately 69
8    billion?
9        MR. HUME: Objection. Asked and
10    answered.
11    A.   I don't recall what they were.
12    Q.   Look at page 12, sir.
13    A.   Of the APA?
14    Q.   Yes.
15    A.   Okay.
16    Q.   Do you recall that?
17    A.   No.
18    Q.   Okay. Do you recall at the time the
19    APA was executed how much the asset -- pardon
20    me -- how much the liabilities being assumed by
21    Barclays were?
22        MR. HUME: Objection. Asked and
23    answered.
24    A.   At the time that this APA was
25    executed?

Page 48

1    HIGHLY CONFIDENTIAL - R. RICCI
2    Q.   Yes.
3    A.   No.
4    Q.   Do you recall how much was being paid
5    by Barclays for the buildings?
6    A.   Yes.
7    Q.   How much?
8    A.   I believe it was 1.3 billion for the
9    building and the data centers.
10    Q.   And Barclays was paying something for
11    the goodwill, wasn't it?
12    A.   Not for goodwill.
13    Q.   Let me --
14    A.   We were paying -- I think we paid a
15    couple hundred million or 250 million for the
16    franchise, if you will.
17    Q.   Do you have any reason to doubt that
18    the APA's -- strike that.
19        1.3 for the building, 250,000 for --
20    to the estate, correct?
21    A.   Million.
22    Q.   Pardon me?
23    A.   250 million. You said thousand.
24    Q.   $1.55 billion, correct?
25    A.   Yes.

Page 49

1    HIGHLY CONFIDENTIAL - R. RICCI
2    Q.   Was Barclays paying anything else?
3    A.   Barclays was assuming some
4    liabilities.
5    Q.   Do you remember how much? Do you
6    remember how much they were?
7        MR. HUME: Objection. Asked and
8    answered.
9    A.   I don't recall.
10    Q.   Did you have any involvement in
11    negotiating those amounts?
12    A.   No, not directly.
13    Q.   Now, at the time that the APA was
14    executed, and it bears on its face the date of
15    September 16, you believed that the bonus pool
16    was 1.4, didn't you, sir?
17        MR. HUME: Objection. Asked and
18    answered. Mischaracterizes testimony.
19    A.   No, I didn't believe that.
20    Q.   As of this time, did you believe the
21    bonus pool to be some different number?
22    A.   I knew we had assumed a liability for
23    bonus pool of $2 billion. I was hoping that we
24    could not spend the whole thing, but was
25    expecting that we may have to. I didn't know

Page 50

HIGHLY CONFIDENTIAL - R. RICCI

1 anything.
2
3    Q.    As of the time that the APA was
4 executed, did you believe the bonus pool was $2
5 billion?
6         MR. HUME: Objection. Asked and
7    answered.
8    A.    I knew I had assumed a liability for
9 $2 billion and I could have to pay 2 billion,
10 yes.
11    Q.    I realize that. You told me that. I
12 was just trying to nail it down to a time, so I
13 don't think we established that before.
14        So my question is, at the time that
15 the APA was signed on Tuesday, the 16th of
16 September, did you believe that the bonus pool
17 that Barclays had undertaken to pay was $2
18 billion?
19    A.    I believe that's correct, yes.
20    Q.    And where did you get that
21 understanding, sir?
22    A.    I had agreed that number with human
23 resources and Skip McGee.
24    Q.    When did you do that?
25    A.    I don't recall.

Page 51

HIGHLY CONFIDENTIAL - R. RICCI

1
2    Q.    Monday, the 15th of September?
3    A.    I don't recall.
4    Q.    But you did it before the APA was
5 signed?
6         MR. HUME: Objection.
7    A.    I believe --
8         MR. HUME: Objection. Asked and
9    answered.
10    A.    I believe I was told before, yes.
11    Q.    And when you read the draft of the APA
12 prior to its being executed, was there anything
13 in Article IX that you thought was inaccurate
14 and did not reflect the agreement that you had
15 made with Mr. McGee?
16         MR. HUME: Objection to the extent it
17    calls for a legal conclusion.
18        (Document review.)
19    A.    Sorry, sir. I've read that. Can you
20 ask me the question again, please?
21    Q.    And when you read the draft of the APA
22 prior to its being executed, was there anything
23 in Article IX that you thought was inaccurate
24 and did not reflect the agreement that you had
25 made with Mr. McGee?

Page 52

HIGHLY CONFIDENTIAL - R. RICCI

1
2    A.    The -- I don't think it's inaccurate,
3 but it's somewhat confusing. I had spoken to
4 Mr. McGee about the $2 billion covering
5 severance as well as bonuses, et cetera.
6    Q.    At any time did you have any
7 conversations with anyone at Barclays concerning
8 how much was going to be paid out in connection
9 with the bonus pool established, whether it was
10 going to be more or less than $2 billion?
11    A.    At any point?
12    Q.    Yes.
13    A.    Well, certainly as we went through our
14 year-end bonus process, sure.
15    Q.    During the week of September 15th
16 after the Asset Purchase Agreement had been
17 signed -- let me restate that.
18        After the Asset Purchase Agreement had
19 been signed on the 16th, did you have any
20 conversations with anyone at Barclays concerning
21 their belief that Article IX did not reflect the
22 agreement that had been made concerning bonus
23 pool?
24    A.    I don't recall.
25    Q.    I'm going to show you what has been

Page 53

HIGHLY CONFIDENTIAL - R. RICCI

1 previously marked as Exhibit 285B.
2    A.    Thank you.
3    Q.    Which has two e-mails on it, the top
4 one from you to Mr. Clackson and the bottom from
5 Mr. Clackson to you and Mr. Evans. Take a
6 moment and review it.
7        (Document review.)
8    A.    Okay.
9    Q.    Okay. The first e-mail -- let's just
10 start with the bottom because it's an e-mail
11 chain. Mr. Clackson writes to you and Mr. Evans
12 on Wednesday, September 17th, at 7:07 P.M.
13 regarding a $650 million problem. Do you recall
14 having gotten this e-mail, sir?
15    A.    Yes.
16    Q.    Do you recall why Mr. Clackson thought
17 he had a $650 million problem?
18    A.    Again, I think you need to -- one
19 needs to look at these e-mails in the context of
20 the broader transaction.
21        So, as I stated previously, we had
22 assumed a liability of $2 billion around
23 compensation. We were hoping, in an uncertain
24 environment where we were trying to ensure that

Page 54

HIGHLY CONFIDENTIAL - R. RICCI

1  we had some protection against downward market
2  movements, we wouldn't have to pay all of it,
3  and had done some theoretical analysis around
4  could we not have to spend it all, and what this
5  is saying is that there's 1.35 billion in his
6  last estimate, which gave him $650 million of
7  certain protection, and what I interpreted this
8  as was, as I just previously stated, this was
9  saying that if we paid out compensation and
10 severance to the employees that were coming over
11 from Lehman, if there was anything left over, it
12 had to go to the Lehman employees, which I
13 didn't feel was right nor in the spirit of the
14 agreement which I had discussed with Skip.
15     So thank you for the prompting.
16 That's what that meant, and my note to Archie
17 was saying that this doesn't work.
18     Q.  When you pointed, that doesn't help
19 the court reporter.
20     A.  In my note to Mr. Cox where I said,
21 "Archie, this is a problem.  We can't have this
22 clause because of that reason."
23     Q.  I just want to make sure I'm clear
24 here.  Mr. Clackson is writing to you that the

Page 55

HIGHLY CONFIDENTIAL - R. RICCI

1  paragraph that is Article IX says that Barclays
2  has to pay $2 billion to -- in connection with
3  the bonus pools, correct?
4     A.  He's referring to that we have to pay
5  it.  I think specifically, my understanding was
6  specifically he's saying that if there was
7  anything left over, and again, we recognized we
8  may have to pay the 2 billion, but we're hoping
9  we didn't have to, then -- and in fact, we did
10 pay out the 2 billion -- that it would have to
11 go to remaining employees, any employees that
12 had transferred over that weren't severed, if
13 there was anything left over, had to go to
14 employees, which wasn't right.
15     Q.  Do you know what Mr. Clackson meant
16 when he said, "I needed 1.35 billion, which gave
17 me 650 million of goodwill"?
18     A.  What Mr. Clackson was referring to was
19 is that he needed -- he was trying to create a
20 buffer for protection against downside market
21 movements.  As I stated earlier, very important
22 to Barclays that they protect their capital, and
23 one of the ways we might -- thought we might
24 create that buffer, given the amount of risk we

Page 56

HIGHLY CONFIDENTIAL - R. RICCI

1  were taking on in assuming all these assets, was
2  is there a way we could underspend the
3  liabilities.
4     And we had looked at possible
5  solutions, but it was more of hope, and that's
6  what he's referring to.  He's saying now, gosh,
7  you know, that -- what he's telling me in this
8  note is that if we're going to pay out the whole
9  2 billion, I can't -- I need to find 650 million
10 somewhere else.
11     Q.  But you told me that in the purchase
12 of the assets by Barclays that they had paid a
13 price that reflected a discount off the Lehman
14 marks, correct?  So that was intended to --
15     MR. HUME:  Let him finish the
16 question.
17     Q.  -- which was intended to provide some
18 cushion for Barclays, correct?
19     A.  No, that's not what I said.  What I
20 said was was that I believe that it was a very
21 uncertain market and that Barclays had purchased
22 assets it would have believed to be reflective
23 of the market price at the time, but it was a
24 very, very uncertain market, with huge risk.

Page 57

HIGHLY CONFIDENTIAL - R. RICCI

1     Q.  Did you give any instructions to Mr.
2  King or Mr. Keegan that in pricing the assets
3  that were being purchased by Barclays that they
4  keep in mind the risks that were being assumed
5  by Barclays and that they should pay, you know,
6  a very low price for them?
7     A.  Never gave them that instruction.
8     Q.  Did you believe that the asset prices
9  which they assigned to the assets being
10 purchased by Barclays were fair market prices at
11 the time?
12     A.  I thought what we paid for the assets
13 was fair, but again, it was an uncertain
14 environment.
15     Q.  And again, in the Asset Purchase
16 Agreement, those assets were quantified at 70
17 billion, correct?
18     A.  Per the Asset Purchase Agreement,
19 correct.
20     Q.  And that was on Tuesday?
21     A.  Tuesday.
22     Q.  The 16th of September?
23     A.  Correct.
24     Q.  The same time that those assets were

Page 58

HIGHLY CONFIDENTIAL - R. RICCI

1
2 being valued at $70 billion in the Asset
3 Purchase Agreement, did Barclays make any
4 representations to anyone that the assets were
5 in fact worth 75 billion?
6    A.   Not that I recall.
7    Q.   Did you ever do so, sir?
8    A.   Not that I recall.
9    Q.   Going back to Exhibit 285B, you say in
10 your e-mail to Mr. Clackson that you never
11 agreed to it?
12    A.   Uh-huh.
13    Q.   Did you mean you never agreed to the
14 language in Article IX?
15    A.   In my --
16    Q.   Which is quoted at the bottom of the
17 page.
18    A.   I never agreed with Skip was that,
19 specifically, that if there were employees left
20 over, if there was any money left over, we would
21 pay it to employees. That's what I was
22 referring to.
23    Q.   When you say "if there was any money
24 left over," what do you mean?
25    A.   What I mean is after we had paid all

Page 59

HIGHLY CONFIDENTIAL - R. RICCI

1
2 bonuses and severance, if there was any money
3 left of that 2 billion, I didn't believe it
4 should go to Lehman employees who would already
5 will have been paid a bonus and a bonus based on
6 their performance just because there was money
7 left over.
8    Q.   I'm just trying to understand what you
9 mean by "money left over." If you have got a
10 pool of people and you've got a bonus pool to
11 apply to those people's severances and to their
12 bonuses, Article IX provides that $2 billion be
13 paid out to those people, correct?
14    A.   Which we did pay out, yes.
15    Q.   That's what the article says, correct?
16    A.   Correct.
17    Q.   So how would any money ever be left
18 over?
19    A.   Well, as he points out, if, you know,
20 people left voluntarily, they wouldn't be paid a
21 bonus, okay? And what they were proposing,
22 which is what I said I didn't agree to, was the
23 specifics that if a lot of people leave and
24 there's money left, it shouldn't go to employees
25 who stayed just because they stayed. They

Page 60

HIGHLY CONFIDENTIAL - R. RICCI

1
2 should be paid a fair and equitable bonus for
3 the year in which they were -- for their
4 performance.
5    Q.   At the time you agreed to a bonus pool
6 of $2 billion with Mr. McGee, did you have an
7 estimate as to how many people at Lehman
8 Brothers would stay versus would go?
9    A.   I had no clue.
10    Q.   Do you know now how many people agreed
11 and moved to Barclays, what percentage?
12    A.   I believe it turned out that over 90
13 percent came.
14    Q.   About 99 percent, do you recall that
15 number?
16    A.   I don't recall the number, but I knew
17 it was in the 90s.
18    Q.   Did you really think on Tuesday when
19 this article went into the APA that there was
20 going to be so many people who voluntarily were
21 going to leave the employment of Lehman Brothers
22 that you would be able to save $650 million?
23    A.   Never had that, that -- didn't think
24 that way, but clearly at the time there were
25 lots of very senior people who were very highly

Page 61

HIGHLY CONFIDENTIAL - R. RICCI

1
2 compensated who were being recruited by lots of
3 firms on Wall Street. As a matter of fact, Mark
4 Shafir, who was the lead negotiator for Lehman,
5 left that week to go to Citibank with the team,
6 and there were other groups of people who were
7 also being courted by the street.
8    Q.   Well, Barclays was managing that
9 problem in part by saying that it was not going
10 to do the transaction if some odd eight people
11 didn't sign on with Barclays, right?
12    A.   I don't recall if the transaction was
13 all predicated on eight people staying. I don't
14 recall that.
15    Q.   Were there some very small number of
16 people, to your knowledge, that had to sign on
17 or else there would be no deal, whether it was 8
18 or some other number?
19    A.   I recall on the original weekend that
20 we were presented with a group of eight people
21 that they wanted to make sure signed. I don't
22 recall that during the subsequent events.
23    Q.   Okay. Now, you say in your e-mail to
24 Mr. Clackson that you never agreed to it?
25    A.   Uh-huh.

Page 62

HIGHLY CONFIDENTIAL - R. RICCI

1
2    Q.    And you're not then saying you didn't
3    agree to the language in Article IX, correct?
4    A.    I'm agreeing -- what I'm saying to Mr.
5    Clackson is that my -- I had spoken to Mr. Cox
6    specifically about this language and told him
7    that I didn't want it in.
8    Q.    When did you do that?
9    A.    Some -- probably on the Monday, the
10   15th.
11   Q.    So let's go back to that for just a
12   moment.  On Monday, the 15th, Mr. McGee has told
13   you that there should be a bonus pool of $2
14   billion where Barclays has to pay out this
15   amount, correct?
16   A.    Correct.
17   Q.    And you had --
18   A.    He's told me there needs to be a bonus
19   pool of 2 billion.
20   Q.    And you saw the language in Article IX
21   at some point on Monday or early Tuesday, right?
22   A.    Didn't necessarily see all this
23   language at that time.
24   Q.    Okay.  You saw some language that
25   caused you to have a conversation with Mr. Cox

Page 63

HIGHLY CONFIDENTIAL - R. RICCI

1
2    saying you didn't want the language in the
3    agreement, correct?
4    A.    I responded to Mr. Cox when I saw this
5    draft.
6    Q.    This is written on Wednesday?
7    A.    Uh-huh.
8    Q.    I thought you told me that you spoke
9    to Mr. Cox about not wanting this language in
10   the agreement on the Monday?
11   A.    Sorry.  Sorry.  I beg your pardon.
12   Thank you.
13   Q.    Did I misunderstand you?
14   A.    No, I got confused.
15   Q.    Let's go back.
16   A.    So I had a conversation with Mr.
17   McGee.
18   Q.    On Monday?
19   A.    On Monday, that said 2 billion, cover
20   severance, bonuses, all sort of non-salaried
21   comp.  I had the conversation with Archie as
22   well.
23   Q.    Was that on Monday, the 15th, as well?
24   A.    I believe it was Monday, the 15th,
25   that that needed to be reflected in the

Page 64

HIGHLY CONFIDENTIAL - R. RICCI

1
2    agreement.
3    Q.    You told Mr. Cox that your agreement
4    with Mr. McGee needed to be reflected in the
5    Asset Purchase Agreement, correct?
6    A.    Correct.
7    Q.    And that the bonus pool should be $2
8    billion?
9    A.    Correct.
10   Q.    What did you mean when you said that
11   the language -- that you didn't want the
12   language in the agreement?
13   A.    The language I'm specifically speaking
14   to is the language that says, "Any amounts that
15   would have been allocated in respect of any
16   transferred employee who voluntarily terminates
17   employment before such award is made shall
18   instead be allocated among the remaining
19   transferred employees, who include for this
20   purpose those transferred employees who are
21   terminating, without cause, by purchase or its
22   affiliates prior to the time the awards are
23   made."
24   Q.    And you saw that language on Monday,
25   correct?

Page 65

HIGHLY CONFIDENTIAL - R. RICCI

1
2    A.    Yes.
3    Q.    All right.  And you told Mr. Cox you
4    didn't want that language?
5    A.    Well, when I spoke to Mr. Cox was that
6    that's not the spirit in which I agreed it, and
7    does this mean that if we don't end up paying 2
8    billion for some reason, that I'd have to give
9    it to the employees, and I think I spoke to
10   Jonathan Hughes and I think he --
11        MR. HUME:  Let me just caution the
12   witness --
13   Q.    Let's stay with Mr. Cox for a moment.
14        MR. HUME:  -- not to divulge any
15   communications with counsel.
16   Q.    Tell me what you said to Mr. Cox about
17   that language first.
18   A.    I want to know if I have flexibility
19   in that language so I wouldn't have to create
20   these excess payments to transferred employees.
21   Q.    What did Mr. Cox say to you?
22   A.    I believe he spoke to counsel.
23   Q.    Okay.  Did he tell you that in fact
24   you had that flexibility?
25        MR. HUME:  Objection.  To the extent

Page 66

HIGHLY CONFIDENTIAL - R. RICCI

1    it requires you to relate any advice from
2    counsel, whether direct or through Mr. Cox,
3    it's privileged. I instruct you not to
4    answer.
5        Q.    Let's just deal with the conversation
6    you had with Mr. Cox prior to him going away to
7    talk to someone where no counsel was present.
8    Did Mr. Cox give you his view as to the meaning
9    of that language --
10       A.    No.
11       Q.    -- in that conversation?
12       A.    No.
13       Q.    Okay.  And then Mr. Cox said he'd get
14   back to you?
15       A.    He went to go speak to counsel.
16       Q.    Okay.
17           MR. HUME:  David --
18           MR. CARDEN:  I'm not going to ask
19   about that.  I'm not going to ask about
20   that.
21           MR. HUME:  I think when you're done
22   with this line of questioning, we should
23   take a break.
24           MR. CARDEN:  That's fine.

Page 67

HIGHLY CONFIDENTIAL - R. RICCI

1        Q.    When you saw the e-mail from Mr.
2    Clackson to you and Mr. Evans, your response to
3    this language was that you had not agreed to it,
4    correct?
5        A.    Not agreed to the principle.
6        Q.    Not agreed to the principle.  And
7    you're copying Mr. Cox on your e-mail at the top
8    of the page?
9        A.    Correct.
10       Q.    And you're saying, "This is the
11   problem.  We can't have this clause, I don't
12   think."  See that language?
13       A.    Uh-huh.
14       Q.    Were you asking Mr. Cox whether this
15   language could be eliminated from the APA?
16       A.    No, not specifically.
17       Q.    What did you mean by, "We can't have
18   this clause, I don't think"?
19       A.    I was concerned that the -- that the
20   language in the -- around the payments to
21   transferred employees was difficult, and I
22   wanted to explore whether we had flexibility,
23   recognizing the agreement was signed.
24       Q.    You testified that you believe that

Page 68

HIGHLY CONFIDENTIAL - R. RICCI

1    Barclays might ultimately have to pay out the 2
2    billion?
3        A.    Uh-huh.
4        Q.    But it's also the case, is it not,
5    that Barclays didn't intend to at the time that
6    it entered into the Asset Purchase Agreement?
7            MR. HUME:  Objection.  Vague and
8        ambiguous.
9        A.    No, I think that we had hoped that we
10   might not have to, but recognized that we may
11   have to, as I've stated previously.
12       Q.    And the estimate of $650 million that
13   you might not have to pay out, do you know where
14   that came from?
15       A.    I don't recall.
16       Q.    Do you recall where the $1.35 billion
17   number came from?  If Mr. McGee had given you 2
18   billion, where did the 1.35 come from?
19       A.    The 1.35 came from human resources
20   from some theoretical scenarios.
21       Q.    Who's human resources?
22       A.    Michael Evans.
23           MR. HUME:  David, I think this is a
24   good time to take a short break.

Page 69

HIGHLY CONFIDENTIAL - R. RICCI

1            MR. CARDEN:  Okay.  Sure.
2            (Recess; Time Noted:  11:19 A.M.)
3            (Time Noted:  11:31 A.M.)
4    BY MR. CARDEN:
5        Q.    Mr. Ricci, I'm going to show you what
6    has been marked as Exhibit 286B, some of which
7    will be familiar to you.  The only difference in
8    this is that this is Mr. Evans' response to the
9    Clackson e-mail to you.
10           You gave a response to Mr. Clackson,
11   which we have just gone through as Exhibit 285B,
12   and this is Mr. Evans' response.  Just take a
13   moment and read his e-mail, if you would.
14       A.    Okay.
15       Q.    Did you ever have any conversations
16   with Mr. Evans about the $650 million problem
17   that Mr. Clackson identified on Wednesday,
18   September 17th?
19       A.    I believe I did talk to him.
20       Q.    Do you recall what you said to him and
21   what he said to you?
22       A.    I recall we had a conversation around
23   the -- back to the point on the excess payment
24   that would be available to employees and also,

Page 70

1        HIGHLY CONFIDENTIAL - R. RICCI
2    you know, about his estimate of what the bonus
3    pool spend might be under certain uncertain
4    scenarios.
5        Q.    Do you recall what he said to you?
6        A.    No.
7        Q.    Did he reiterate that he thought the
8    estimate of 1.35 was accurate?
9        A.    I don't recall.
10       Q.    After this $650 million problem that
11   Mr. Clackson identifies on Wednesday came up,
12   did Barclays continue to try to avoid paying the
13   entire $2 billion that is called for by the
14   Asset Purchase Agreement?
15       MR. HUME:  Objection.
16   Mischaracterizes testimony and lacks
17   foundation.
18       A.    As I said before, we assumed a
19   liability of $2 billion.  We recognized that I
20   expected we may have to pay it.  We were hopeful
21   that we might find a way not to.
22       Q.    But you really would not have assumed
23   a liability of $2 billion had you found a way
24   not to pay it, would you?
25       A.    We assumed a liability of $2 billion.

Page 71

1        HIGHLY CONFIDENTIAL - R. RICCI
2    We expected we may have to pay it, yes.
3        Q.    I'm sorry, that's not responsive.  I
4    understand you didn't -- you hoped to find some
5    way not to pay it.  I understand that.
6        A.    Uh-huh.
7        Q.    And we'll come back to that for a
8    moment.  I'm asking a quite straightforward
9    question.  You would not -- Barclays would not
10   have assumed a $2 billion liability if they
11   ended up paying 1.35, would it?
12       A.    At the time Barclays would not have
13   assumed a $2 billion liability if it didn't
14   expect that it may have to pay it, correct.
15       Q.    And Barclays continued to evaluate
16   whether it could avoid paying the entire $2
17   billion even after the closing of the
18   transaction on Monday, the 22nd, didn't it?
19       MR. HUME:  Objection.  Lacks
20   foundation.
21       A.    It was uncertain what we were going to
22   have to pay.  We had a long bonus process
23   through the rest of the year we had to figure
24   out.
25       Q.    And in connection with those

Page 72

1        HIGHLY CONFIDENTIAL - R. RICCI
2    discussions, the estimate of the bonus pool that
3    was the original estimate of 1.35 or 1.4 was
4    what Barclays was trying to stay to, wasn't it?
5        A.    Barclays -- I wouldn't say Barclays
6    was trying to stay to it.  Barclays was trying
7    to make -- you know, again, it was a very
8    uncertain environment.  It was a time where, you
9    know, certainly there was market -- this --
10   what's the right word? -- dislocation, and that
11   was not only around asset values and around
12   certainty of the future, it was also around
13   compensation, who knew it was going to happen.
14       And again, Barclays fully understood
15   and assumed a liability of $2 billion, which it
16   ultimately paid, expecting it may have to, but,
17   you know, hopefully finding ways that it didn't
18   have to.
19       Q.    Did you keep track of the payments
20   that were made pursuant to Article IX of the
21   APA, that is, did you personally pay attention
22   to how much was being paid out pursuant to that
23   paragraph?
24       A.    I personally didn't keep those books,
25   no.

Page 73

1        HIGHLY CONFIDENTIAL - R. RICCI
2        Q.    Do you know by when those payments had
3    to be made out -- made, rather?
4        A.    I don't recall precisely by what date
5    they had to be paid out.
6        Q.    Would you take a look at Article IX.
7        A.    Okay.
8        Q.    About the eighth line or so it says,
9    "Such '08 annual bonuses shall be awarded on or
10   before March 15, 2009."
11       A.    Sorry, counsel, what page are you on?
12       Q.    I apologize.  Article IX, page 35.
13       You see the sentence --
14       A.    Yes.
15       Q.    Article IX provides for the bonuses to
16   be paid out on or before March 15, 2009,
17   correct?
18       A.    Correct.
19       Q.    Is it your testimony, sir, that $2
20   billion was paid out to the former employees of
21   Lehman Brothers on or before March 15, 2009?
22       A.    I don't know.
23       Q.    Let me show you what has been
24   previously marked as Exhibit 284B, which is an
25   e-mail with an attachment from Mr. Evans to Mr.

Page 74

1          HIGHLY CONFIDENTIAL - R. RICCI
2    Diamond, Mr. del Missier, Mr. Jenkins and to
3    yourself, subject: Summary of current spend.
4    And it's dated Tuesday, September 23, the day
5    after the close. Do you see that?
6        A.    Yes.
7        Q.    Okay. Direct your attention to page 2
8    of the document, sir. At the bottom of the page
9    there's a paragraph that talks about current
10   funding pressures. Do you see that?
11       A.    Bottom of page 2?
12       Q.    Bottom of page 2 of the exhibit.
13       A.    What you are referring to, sir?
14       Q.    I'm sorry, the paragraph, "Current
15   Funding Pressures," do you see that paragraph at
16   the bottom of page 2 of the exhibit?
17           You were on page 3.
18       A.    I beg your pardon. Sorry, I was
19   looking at the page 1 of 7.
20       Q.    That's not a problem. We'll get there
21   together.
22           You see the paragraph at the bottom of
23   page 2 that is entitled "Current Funding
24   Pressures"?
25       A.    Uh-huh.

Page 75

1          HIGHLY CONFIDENTIAL - R. RICCI
2        Q.    And the first line of which says that
3    "three funding pressures currently exist that
4    are putting pressure on the original bonus pool
5    estimate of 1.4 billion."
6        A.    Yes, I see that.
7        Q.    Did you have a series of conversations
8    with people at Barclays through the fall of 2008
9    in which there was discussion concerning
10   pressures being put on Barclays with regard to
11   the bonus pools that had been established by
12   Article IX?
13       A.    Can I read the document so I
14   understand the context in which this is being
15   laid out? Thank you.
16           (Document review.)
17       Q.    You're welcome to look at as much of
18   it as you wish. If you're going to get into the
19   schedules, I would ask you to tell me, because I
20   don't think my question has anything to do with
21   that.
22       A.    Okay.
23           (Document review continues.)
24       A.    Okay.
25       Q.    And the question is, to read again:

Page 76

1          HIGHLY CONFIDENTIAL - R. RICCI
2    Did you have a series of conversations with
3    people at Barclays through the fall of 2008 in
4    which there was discussion concerning pressures
5    being put on Barclays with regard to the bonus
6    pool that had been established by Article IX?
7        A.    Again, as I've stated previously, we
8    had assumed the liability of 2 billion dollars,
9    expected we may have to pay it. We hoped we
10   might not have to, and yes, there was
11   discussions around scenarios where we might not
12   have to.
13       Q.    And the reference in this document to
14   which I directed your attention at the bottom of
15   page 2 of the original bonus pool estimate of
16   1.4, that's Barclays' estimate of what it would
17   have to pay out?
18       A.    That was one of scenarios that said
19   maybe we can pay out 1.4.
20       Q.    I'd like to go back to Monday, the
21   15th, and the early morning of Tuesday.
22       A.    Uh-huh.
23       Q.    I'm going to show you what has been
24   marked previously as Exhibit 20. I will tell
25   you, Mr. Ricci, you're not on this.

Page 77

1          HIGHLY CONFIDENTIAL - R. RICCI
2        A.    Okay.
3        Q.    You'll look in vein for your name.
4           I would like you to take a look at the
5    bottom e-mail, which is from Martin Kelly to Ian
6    Lowitt, dated September 16 at 5:10 A.M., which
7    reads, "Well, it took all night and lots of back
8    and forth, but the deal is done and ready for
9    the board. Final price did not change
10   meaningfully. Approximately a 5 billion all in
11   economic loss versus our marks."
12           I just want to direct your attention
13   to that language. Does this refresh your
14   recollection that in fact the price that
15   Barclays agreed to pay for the assets that it
16   agreed to purchase on Monday evening and Tuesday
17   morning reflected a $5 billion discount off of
18   Lehman's marks for those assets, 5 billion?
19       A.    I can't tell you anything about
20   Lehman's books. We didn't buy a balance sheet
21   or work with Lehman on a balance sheet. What we
22   did was we bought a series of assets at prices
23   that we thought were fair.
24       Q.    Did anybody tell you on Monday evening
25   or Tuesday morning that the price that Barclays

Page 78

HIGHLY CONFIDENTIAL - R. RICCI

1     HIGHLY CONFIDENTIAL - R. RICCI
2    agreed to pay for those assets did reflect a $5
3    billion discount from Lehman's marks for those
4    assets?
5        A.    I don't recall.
6        Q.    Did anybody tell you that the $70
7    billion in purchased assets referenced on page 6
8    of the APA to which we have drawn your attention
9    previously was in fact a number which reflected
10    a discount off of Lehman's marks?
11        A.    I don't recall.
12        Q.    Did you have any responsibilities
13    during the week of September 15 for
14    communicating with the board of Barclays
15    concerning the transaction?
16        A.    I was in attendance at the board
17    meetings.
18        Q.    Was there a Barclays board meeting the
19    week of the 15th?
20        A.    I believe there was, yes.
21        Q.    Where was that meeting?
22        A.    I believe that meeting was in London.
23        Q.    Did you participate by telephone?
24        A.    I participated by telephone.
25        Q.    And did you participate by telephone

Page 79

HIGHLY CONFIDENTIAL - R. RICCI

1     HIGHLY CONFIDENTIAL - R. RICCI
2    on Wednesday, the 17th?
3        A.    I don't recall.
4        Q.    Did you receive any board materials
5    prior to participating in that board meeting?
6        A.    I don't recall. Possible. I don't
7    recall.
8        Q.    Did you have any responsibility for
9    preparing any board materials for that meeting?
10        A.    I don't believe I was responsible for
11    preparing the materials. I think I was on the
12    board call to answer questions.
13        Q.    Did you participate for the entire
14    meeting?
15        A.    I fell asleep during the meeting.
16        Q.    To the extent that counts as
17    participation, you were present in body for the
18    entire meeting, I take it?
19        A.    Correct.
20        Q.    You didn't walk out at any point?
21        A.    No. I did fall asleep during the
22    meeting.
23        Q.    Do you recall for how long you fell
24    asleep?
25        A.    It was a while. I was pretty tired.

Page 80

HIGHLY CONFIDENTIAL - R. RICCI

1     HIGHLY CONFIDENTIAL - R. RICCI
2        Q.    I appreciate that.
3              Now, when you participated in the
4    meeting by telephone, were you in a room with
5    other people from Barclays?
6        A.    I believe Mr. LaRocca was in the room
7    with me.
8        Q.    No one else, as far as you recall?
9        A.    As far as I recall.
10        Q.    Was anyone who had been negotiating
11    the transaction with Lehman Brothers on Monday
12    and Tuesday present in the board meeting that
13    occurred on Wednesday, the 17th?
14        A.    I don't recall.
15        Q.    Is it your general practice to
16    participate in board meetings for Barclays?
17        A.    As required, I participate.
18        Q.    Is that more often than not that you
19    do participate in board meetings?
20        A.    Depends on the topic and the year.
21        Q.    Do you recall anything that was said
22    during that board meeting?
23        A.    I don't recall.
24        Q.    I take it that the transaction that
25    had been negotiated on Monday night and

Page 81

HIGHLY CONFIDENTIAL - R. RICCI

1     HIGHLY CONFIDENTIAL - R. RICCI
2    Tuesday -- strike that. I take it that the
3    transaction that had been negotiated that
4    resulted in the APA was presented to the board
5    at that time, wasn't it?
6        A.    I believe that's correct, yes.
7        Q.    And that was at least one of the
8    purposes for the board meeting, wasn't it?
9        A.    Correct.
10        Q.    Do you have any recollection of having
11    provided any information concerning the terms of
12    that transaction to anyone for purposes of
13    presenting it to the board?
14        A.    I don't recall providing or putting
15    together the deck at all.
16        Q.    Did you ever see the deck? By that I
17    take it you mean -- what do you mean by the
18    deck?
19        A.    The board materials.
20        Q.    The PowerPoint that would have been
21    presented or --
22        A.    The presentations that normally go to
23    the board are in PowerPoint format.
24        Q.    So do you recall having seen the deck
25    that was presented?

Page 82

HIGHLY CONFIDENTIAL - R. RICCI

1
2    A.   I don't recall having seen it, but I'm
3    sure I was copied on an e-mail.
4    Q.   Okay.  Were you asked any questions
5    during the board meeting?
6    A.   I fell asleep.
7    Q.   But that's not quite responsive.
8    A.   Sorry.
9    Q.   Realize you might have been asked some
10   during the time you were asleep.
11   A.   I don't recall being asked any
12   questions, no.
13   Q.   All right.  How long did it last?
14   A.   I don't recall.
15   Q.   Do you recall in that board meeting
16   that in fact the board of Barclays was told that
17   the assets that had been acquired by Barclays
18   pursuant to the APA were worth $75 billion?
19   A.   I don't recall that.
20   Q.   Would that surprise you?
21   A.   In terms of, you know, the amount of
22   uncertainty that there was in the market at the
23   time, valuations were difficult to assess.  I
24   don't recall.  Would it surprise me or not, I
25   don't know.

Page 83

HIGHLY CONFIDENTIAL - R. RICCI

1
2    Q.   The APA talks about $70 billion in
3    assets.  We have seen that.  That's page 6,
4    correct?
5         MR. HUME:  Objection.
6    Mischaracterizes the document.
7         MR. CARDEN:  Well, I'd be really
8    stunned, Hamish, of how that
9    mischaracterizes the document.
10        MR. HUME:  You left out the word
11   "approximately."
12   Q.   Do you remember page 6 of the APA, the
13   definition of "purchased assets"?
14   A.   I've got the section, sir.
15   Q.   Okay.  And it refers to the
16   transaction involving approximately $70 billion
17   in assets, correct?
18   A.   I can see that, yes.  Approximately,
19   yes.
20   Q.   Now, it's not your testimony, is it,
21   that between Tuesday, the 16th, and the board
22   meeting of Barclays on the 17th those assets
23   increased in value based on the market, is it?
24   A.   I -- I don't know.
25   Q.   We'll, you've talked about the

Page 84

HIGHLY CONFIDENTIAL - R. RICCI

1
2    uncertainty in the market.  Was the market
3    bouncing up during the week, Mr. Ricci?
4    A.   The market was all over the place.
5    Depends on your assets.
6    Q.   Do you know whether or not those
7    assets increased in value to $75 billion by
8    Wednesday?
9    A.   I don't recall.
10   Q.   Do you remember what time of day the
11   Barclays board meeting was?
12   A.   I believe it was early in the morning,
13   U.S. time.
14   Q.   Can you give me any better estimate
15   than that?
16   A.   I don't recall.  Sorry.
17   Q.   Where were you sitting when you
18   participated in that board meeting?
19   A.   I was on the 32nd floor of Lehman
20   Brothers.
21   Q.   I'm going to show you -- we've got to
22   mark this one.
23        (Exhibit 378, a document bearing Bates
24   Nos. BCI-EX-(S)-00023787 through 788 with
25   attachment, marked for identification, as of

Page 85

HIGHLY CONFIDENTIAL - R. RICCI

1
2    this date.)
3    Q.   Mr. Ricci, I've shown you what has
4    been marked Exhibit 378, which has a cover
5    e-mail and then what appears to be a, or is
6    referenced as being the board deck.  I don't
7    want to characterize it.  It is what it is.
8         Have you seen any of these documents
9    before today, sir?
10   A.   Not that I recall.
11   Q.   Take a look at the board deck.  You
12   haven't turned to it yet.  I just want to make
13   certain that it doesn't refresh your
14   recollection that you actually did see it.
15   A.   I may have.
16   Q.   It would have been available to you in
17   any event, wouldn't it, sir?
18   A.   Yes, sir.
19   Q.   Now, the cover e-mail from Mr.
20   Clackson to Mr. Walker -- I'm sorry, strike
21   that.  Apologize.
22        The cover e-mail has two e-mails on
23   it, do you see that?
24   A.   Yes, sir.
25   Q.   And the first one at the bottom there,

Page 86

HIGHLY CONFIDENTIAL - R. RICCI

1 the first in time, is from Mr. Clackson to Mr.
2 Haworth and you're CC'd, and does this refresh
3 your memory that on Tuesday, September 16th,
4 seems like somewhat later in the evening, you
5 received this e-mail?
6
7        Right now it's just a question of
8 whether it refreshes your recollection, sir.
9    A.   Doesn't refresh my recollection.
10    Q.   Okay.  Now, September 16 was the day
11 the Asset Purchase Agreement was signed,
12 correct?
13    A.   I believe it was signed then.
14 Obviously not executed until later in the week
15 or the following Monday, but yes.
16    Q.   And this e-mail was sent to you that
17 same evening that it was signed, wasn't it?
18    A.   Yes.
19    Q.   And the Asset Purchase Agreement says
20 that Barclays is purchasing 70, approximately
21 $70 billion of assets on page 6, doesn't it?
22    A.   That's correct.
23    Q.   And this e-mail says, and I will tell
24 you it's also in the board materials, that
25 Barclays is purchasing $75 billion of assets.

Page 87

HIGHLY CONFIDENTIAL - R. RICCI

1 Do you see that?
2    A.   That's what it says here, yes.
3    Q.   Do you have an explanation for me,
4 sir, as to why the board of Barclays is being
5 told something different than is in the APA as
6 to the value of the assets being acquired by
7 Barclays?
8    A.   I don't.  I can only tell you that it
9 was very uncertain valuations and they were all
10 approximate.  Very uncertain environment.  Lots
11 of risk.
12    Q.   Isn't it the case that the $70 billion
13 referenced in the APA reflects a discount of $5
14 billion off of the Lehman marks as of that time?
15    A.   I can't speak to the Lehman balance
16 sheet.
17    Q.   And you have no recollection of the
18 price being paid by Barclays as reflecting a $5
19 billion discount off of Lehman's marks?
20    A.   I don't recall that specifically.
21    Q.   Do you recall it generally?
22    A.   Sorry, I don't recall it.
23    Q.   Do you recall it --
24        If you turn to I think it's page 3 --

Page 88

HIGHLY CONFIDENTIAL - R. RICCI

1 4, actually.  It's the first substantive page of
2 the deck.  Starts Executive Summary at the top.
3 See that?
4    A.   Yes.
5    Q.   In kind of the third of the way -- not
6 a third of the way down, the third bullet point,
7 the second arrow that says, "We would acquire
8 $75 billion of assets and liabilities," you see
9 that?
10    A.   Yes.
11    Q.   "The business would include RWA of
12 13.5 billion," do you see that?
13    A.   Yes.
14    Q.   What does that mean?  I know what RWA
15 is, but what does it mean in this context?
16    A.   What does what mean, sir?
17    Q.   An RWA at 13.5 million?
18    A.   That there are risk-weighted assets
19 associated with the assets that are being
20 acquired of 13.5 billion.
21    Q.   And does that affect the equity ratios
22 that are required for purposes of capital?
23    A.   It can.
24    Q.   Okay.  Now, the executive summary

Page 89

HIGHLY CONFIDENTIAL - R. RICCI

1 doesn't reflect that Barclays is assuming any
2 liabilities.  Do you have an explanation for why
3 that's done?
4    A.   It says we would acquire 75 billion of
5 assets and liabilities.
6    Q.   Fair enough.  It doesn't say anything
7 about the compensation and the cure assumption
8 of liabilities, does it, sir?
9    A.   No.
10    Q.   Do you have an explanation of why
11 that's the case?
12    A.   No, sir.
13    Q.   Do you know if that's because the
14 discount that had been paid by Barclays really
15 was sufficient so as to cover the liabilities
16 being assumed by Barclays?
17    A.   I don't know, sir.
18    Q.   Was it your goal as the chief
19 negotiator of Barclays to make certain that the
20 discount that was being paid -- or, pardon me,
21 discount that was embedded in the price paid by
22 Barclays was sufficient to cover the liabilities
23 being assumed by Barclays?
24        MR. HUME:  Objection.  Lacks

23

Page 90

1     HIGHLY CONFIDENTIAL - R. RICCI
2  foundation. You have asked now dozens of
3  questions about this discount. The witness
4  has testified --
5        MR. CARDEN: Just let him answer --
6        MR. HUME: -- he doesn't recall it.
7        MR. CARDEN: -- Hamish.
8     A.  I don't recall it.
9     Q.  What is negative goodwill?
10    A.  I'm not an accountant, but it is -- I
11 couldn't give you the technical definition.
12    Q.  You could tell me it's profit,
13 couldn't you?
14    A.  It's not necessarily profit. It's an
15 accounting -- it's a technical accounting term
16 which I'm not familiar with the definition of.
17 I wouldn't equate it with profit.
18    Q.  Let me leave this for just a moment
19 and ask you a question about the assumption by
20 Barclays of certain contracts that had been
21 entered into by Lehman Brothers for purposes of
22 running its businesses.
23        Did you have any conversations with
24 anybody on Monday or Tuesday about those
25 contracts?

Page 91

1     HIGHLY CONFIDENTIAL - R. RICCI
2     A.  Yes.
3     Q.  With whom did you have conversations
4  on that subject?
5     A.  Patrick Clackson.
6     Q.  Do you recall when?
7     A.  I don't recall when.
8     Q.  Do you recall why?
9     A.  Clearly one of the important things in
10 taking on an organization as big as Lehman is
11 being able to operate the company, and so we
12 needed to have a conversation about, okay, if
13 this deal goes through, how do we open for
14 business.
15    Q.  Do you recall how much in contracts
16 Barclays might have been assuming in connection
17 with the transaction?
18    A.  Lehman Brothers had given -- had
19 provided an estimate to us of roughly $2
20 billion.
21    Q.  Do you recall when they did that?
22    A.  I don't recall when they did that.
23    Q.  Did you have any conversations with
24 anyone at Lehman about that number?
25    A.  No.

Page 92

1     HIGHLY CONFIDENTIAL - R. RICCI
2     Q.  You spoke only to Mr. Clackson about
3  the number?
4     A.  As far as I can recall.
5     Q.  Did you ask Mr. Clackson about
6  concerning his views as to the accuracy of that
7  number?
8     A.  I would have asked Mr. Clackson on
9  what was the number based.
10    Q.  Did you accept the Lehman number of $2
11 billion at face value or did you try to do some
12 due diligence on the number, that is, Barclays,
13 not you personally?
14    A.  We accepted the number because Lehman
15 provided it. We -- I believe Patrick told me we
16 tried to get some basis for what the number was.
17 It was so uncertain. The -- it was difficult at
18 that time to get accurate information from
19 Lehman on just about anything as, you know, the
20 bankruptcy and the seizing of assets and all
21 sorts of things were coming to the fore. There
22 was tremendous uncertainty and difficult to get
23 information from Lehman.
24    Q.  Did Lehman state that that $2 billion
25 number was a worst case basis?

Page 93

1     HIGHLY CONFIDENTIAL - R. RICCI
2     A.  I didn't have a conversation with
3  anyone from Lehman.
4     Q.  Were you personally concerned that the
5  number could be larger than $2 billion?
6     A.  I had no idea what the number could
7  have been.
8     Q.  Did you take any steps to find out --
9  pardon me. Did you take any steps to satisfy
10 yourself that the $2 billion number provided by
11 Lehman was a worst case number?
12    A.  What I wanted to -- what I did do was
13 I spoke to Patrick and told Patrick that it was
14 important that, again, given all the uncertainty
15 we had, that he could satisfy himself as best he
16 could that we had enough money in the Lehman
17 estimate for contracts.
18    Q.  Do you recall the number as of the
19 time that the APA was entered into as being $2
20 billion?
21    A.  It was roughly $2 billion.
22    Q.  Do you recall at any time during the
23 week of September 15th that that number was
24 smaller than that, was reduced?
25    A.  In what context was it reduced?

Page 94

HIGHLY CONFIDENTIAL - R. RICCI
1
2    Q.    In any context. Do you recall -- let
3    me ask the question differently, all right?
4    Forget the idea of reduction. I apologize.
5         At any time during the week of
6    September 15th, was a lower number mentioned to
7    you as being the extent of the contracts that
8    might be assumed by Barclays pursuant to the
9    APA?
10    A.    There were various estimates around
11    numbers. Again, lots of uncertainty, though
12    there may have been several numbers mentioned.
13    I don't recall.
14    Q.    Do you recall, did you go to the court
15    hearing on Wednesday, September 17th?
16    A.    No, sir.
17    Q.    Did you go to the court hearing on
18    Friday, September 19?
19    A.    No, sir.
20    Q.    I take it you didn't go to the court
21    hearing on Tuesday, the 16th of September, did
22    you?
23    A.    No, sir.
24    Q.    Following the closing of the
25    transaction on the Monday, the 22nd, did you

Page 95

HIGHLY CONFIDENTIAL - R. RICCI
1
2    have any conversations with anybody about the
3    amount or the quantum of contracts that Barclays
4    would be assuming?
5    A.    I would have had conversations with
6    Patrick to --
7    Q.    That's Mr. Clackson?
8    A.    Mr. Clackson. I beg your pardon.
9         -- that now that we had, you know,
10    completed the acquisition, we needed to get our
11    arms around those contracts.
12    Q.    Let's go back to the exhibit that's in
13    front of you here, 378.
14    A.    Which one, sir?
15    Q.    378. And we were on the Executive
16    Summary page. The third arrow point underneath
17    the third bullet point says that Barclays would
18    be offering 250 million to acquire the business
19    and buying 1.5 billion worth of company-related
20    property. That's the headquarter and the data
21    centers. You see that, right?
22    A.    Uh-huh.
23    Q.    While I recognize you're not an
24    accountant, the purchase of the buildings would
25    have been, from an accounting standpoint, a wash

Page 96

HIGHLY CONFIDENTIAL - R. RICCI
1
2    transaction, right? They would have purchased
3    it at market value, correct?
4    A.    Correct.
5    Q.    Okay. And so in addition to the $250
6    million being paid by Barclays pursuant to the
7    Asset Purchase Agreement, which is in the
8    Executive Summary here, it's your testimony that
9    Barclays would have been assuming possible
10    contracts worth 2 billion, correct?
11    A.    That's correct.
12    Q.    And may have had to pay as much as 2
13    billion in compensation, correct?
14    A.    That's correct.
15    Q.    That's a total of $4 billion, right?
16    A.    That's correct.
17    Q.    Plus the 250 is 4.25?
18    A.    That's correct.
19    Q.    Correct?
20         That's the, we'll call it for purposes
21    of this moment, the acquisition cost, right?
22    Potential acquisition cost?
23    A.    No, because there was also a purchase
24    of assets.
25    Q.    Well, I'm getting to that.

Page 97

HIGHLY CONFIDENTIAL - R. RICCI
1
2    A.    Okay.
3    Q.    The line, the recognition of negative
4    goodwill, now, while you're not an accountant,
5    neither is the board, right?
6    A.    Uh-huh. Well, there's some
7    accountants on the board.
8    Q.    Did you hear any explanation or can
9    you give me an explanation of what was meant in
10    connection with this executive summary as to
11    what it meant that there would be negative
12    goodwill in the transaction?
13    A.    I didn't write the deck.
14    Q.    Can you give me any explanation of
15    what that phrase means, sir?
16    A.    Negative goodwill, as I understand it,
17    again, not an accountant, would have been that
18    the assets would have exceeded the liabilities
19    we assumed. Those assets could be intangible
20    assets. They could be straight assets. They
21    could be securities. It could be cash. It
22    could be anything.
23    Q.    Okay. All right. So let's just work
24    with a net negative goodwill of $3 billion.
25    That would have meant that the assets being

Page 98

HIGHLY CONFIDENTIAL - R. RICCI
1
2   acquired by Barclays as of the time this
3   executive summary is presented to the board on
4   Wednesday, the 17th, would have exceeded the
5   liabilities being assumed by $3 billion,
6   correct?
7       A.   That would have been all assets
8   including intangible assets. Again, not an
9   accountant, but I would say that's right.
10      Q.   And am I correct, then, that if
11  Barclays is assuming -- strike that. The
12  building would have been a wash, we've already
13  said that, right?
14      A.   Yes.
15      Q.   That means that the comp, the cure and
16  the 250 million spent, 4.25, right?
17      A.   Yes.
18      Q.   There would have been over and
19  above -- there would have been, when you netted
20  out the transaction, Barclays is making $3
21  billion on the transaction, taking those into
22  account, correct?
23          MR. HUME: Objection. Vague and
24  ambiguous.
25      A.   As I said previously, there was a lot

Page 99

HIGHLY CONFIDENTIAL - R. RICCI
1
2   of uncertainty. So the idea was, in a very
3   uncertain market with the huge amount of risk we
4   were taking on through the acquisition of
5   Lehman, was to create some downside protection.
6       Also recognizing that a lot of the
7   assets that we were buying were very difficult
8   to value, that there wouldn't be a final true-up
9   of the balance sheet until all the assets had
10  been delivered, accounted for, et cetera, and
11  that that was why we were looking to create some
12  protection for Barclays. And the negative
13  goodwill, in essence, it equals that protection.
14      Q.   I understand. I meant to ask a
15  different question. If I didn't, I'll try it
16  again.
17      If Barclays is assuming liabilities as
18  much as 4.25, and it's got negative goodwill of
19  $3 billion, isn't it a fact, sir, that the
20  assets acquired by Lehman Brothers pursuant to
21  Barclays' calculations are worth $7 billion more
22  than they paid for it?
23      A.   I don't know. I'd have to do the
24  math, look at the statistics.
25      Q.   Please do the math for me.

Page 100

HIGHLY CONFIDENTIAL - R. RICCI
1
2       A.   Well, I can't do the math just based
3   on what you said. I would want to understand
4   the schedules, and so I'm happy to look at the
5   schedules and see if I can do that, but ...
6       Q.   Okay.
7       A.   From the schedules, I can't calculate
8   the negative goodwill.
9       Q.   Well, the summary says it's $3
10  billion. I was actually asking a different
11  question. I'll try again.
12      A.   Okay.
13      Q.   I apologize if I wasn't clear.
14      In order for Barclays to be realizing
15  a $3 billion negative goodwill -- strike that.
16  Let me rephrase it. In order for Barclays to be
17  accomplishing a 75 -- a $3 billion negative
18  goodwill number in this transaction, isn't it a
19  fact that the assets -- I'm talking about the
20  securities being acquired by Barclays -- would
21  have had to have been greater -- would have to
22  have been $7.25 billion greater than they paid?
23      A.   I'm not an accountant and I didn't
24  write the deck. I'm sorry.
25      Q.   Would you agree with me, Mr. Ricci,

Page 101

HIGHLY CONFIDENTIAL - R. RICCI
1
2   that for Barclays to recognize $3 billion in
3   negative goodwill on the Lehman transaction,
4   that it would have to have valued the assets
5   that it -- securities, now -- that it acquired
6   from Lehman at more than $3 billion beyond what
7   it paid?
8       A.   I'm not an accountant, sir.
9       Q.   Well, it's assuming $4.25 billion in
10  liabilities. We've already gotten to that,
11  correct?
12          MR. HUME: Objection.
13      Q.   You with me there?
14          MR. HUME: Objection.
15  Mischaracterizes the testimony and lacks
16  foundation.
17      Q.   You agree with me on that, don't you?
18      A.   I agree that there was $2 billion of a
19  comp accrual, roughly $2 billion of a contracts
20  accrual we assumed, and $250 million that would
21  pay for the business.
22      Q.   And you agree with me, would you not,
23  that if securities being acquired by Barclays in
24  the Lehman transaction were worth or valued by
25  Barclays at $4.25 billion more than it paid,

Page 102

HIGHLY CONFIDENTIAL - R. RICCI
1    than Barclays would have a zero, a negative --
2    pardon me, a flat negative goodwill. It had no
3    negative goodwill, correct?
4        A.    I'm not an accountant, so I don't want
5    to get too technical, but there's lots of other
6    assets. Could have been securities. Could have
7    been intangible. Goodwill. I don't recognize
8    your math. I'm not an accountant.
9        Q.    Well, are there any intangibles that
10    you can tell me about as you sit here today that
11    were involved in this transaction? You referred
12    to those a few times.
13        A.    I believe there were some intangibles
14    related to the list of clients and contacts that
15    were assumed by Barclays. There may have been
16    some software. I'm sure there were other things
17    in that broad category.
18        Q.    Do you know if they have been factored
19    into the $3 billion negative goodwill number in
20    this document?
21        A.    I can't attest to this document in the
22    sense that I didn't write it.
23        Q.    It's not your testimony, is it, Mr.
24    Ricci, that Barclays could have recognized $3

Page 103

HIGHLY CONFIDENTIAL - R. RICCI
1    billion in negative goodwill and paid market
2    value for the Lehman assets?
3        MR. HUME: Objection. Vague and
4    ambiguous.
5        Q.    Because it assumed $4.25 billion in
6    liabilities?
7        MR. HUME: Objection to the form of
8    the question.
9        A.    Can you repeat the question? I didn't
10    understand it. It was a double negative.
11        Q.    It's not your testimony, is it, Mr.
12    Ricci, that Barclays could have recognized
13    negative goodwill on the Lehman transaction if
14    it purchased the securities for market value?
15        MR. HUME: Same objection.
16        A.    I still don't understand your
17    question. It's not my testimony? Could you do
18    it, please, without a double negative?
19        Q.    Okay. No, I can't do it without a
20    double negative. That's what the English
21    language provides for me in this context.
22        A.    I don't understand your question, sir.
23        Q.    Okay. That's fine. I'll ask the
24    question and try it again.

Page 104

HIGHLY CONFIDENTIAL - R. RICCI
1        Understanding as -- taking the
2    definition of "negative goodwill" that you have
3    given me, that assets are greater than
4    liabilities, and assuming that Barclays was to
5    pay out all of the $4.25 billion that you have
6    identified as being potential liabilities, is
7    there any way that Barclays could have
8    accomplished or recognized negative goodwill of
9    $3 billion if it had paid market value for the
10    Lehman securities?
11        MR. HUME: Objection. Lacks
12    foundation.
13        A.    Certainly. Negative goodwill can come
14    from other sources and it could have come from
15    the write-up of intangible assets, and I
16    actually believe in the accounts that we
17    published at the end of the year a large portion
18    of the final gain on Lehman was related to those
19    intangible assets.
20        Q.    Did you have anything to do, sir, with
21    calculating any of the numbers in the Executive
22    Summary on the board deck?
23        A.    I don't believe I did.
24        Q.    If you would turn to page 5 of the

Page 105

HIGHLY CONFIDENTIAL - R. RICCI
1    deck, which I think is just a few more pages on,
2    do you understand the total assets -- strike
3    that.
4        Page 5 relates only to securities
5    positions, correct? It doesn't refer to the
6    building or the data center?
7        A.    I don't know what's in the other
8    category.
9        Q.    Do you recognize in the other category
10    it looks like it's 19.9 billion, you see that?
11        A.    Yes, sir.
12        Q.    That's surely not the building, is it?
13        A.    You said building or other assets, so
14    I don't know what's in the other category, sir.
15        Q.    Does the number of $75.3 billion on
16    this page reflecting the total assets in the
17    Lehman transaction refresh your memory that
18    that's how Barclays valued the positions that it
19    purchased on Tuesday, September 16?
20        MR. HUME: Objection. Asked and
21    answered.
22        A.    I don't recall, sir.
23        Q.    Do you remember having had a
24    conversation with anyone at Barclays concerning

Page 106

HIGHLY CONFIDENTIAL - R. RICCI

1  HIGHLY CONFIDENTIAL - R. RICCI
2  how to characterize the transaction -- strike
3  that.
4         While we're waiting for the document,
5  let me just ask you a question: Did you ever
6  have a conversation with Mr. McDade about
7  whether he would come over to Barclays after the
8  closing?
9     A.   Yes.
10    Q.   Tell me about that conversation.
11    A.   Bart had made it very clear to Mr.
12  Diamond and I from the beginning that he was not
13  looking to come to Barclays for any long-term
14  employment. He would do anything, you know, he
15  could possibly do to help with the transaction
16  in terms of being helpful, being available,
17  helping with the people, but he really had no
18  long-term interest in coming to Barclays.
19        Over time, I got to know Mr. McDade,
20  had another conversation with him post the
21  closing about whether he might want to change
22  his mind and come back after a period of time,
23  and he again said no, he had had enough of Wall
24  Street.
25        (Exhibit 379, a document bearing Bates

Page 107

HIGHLY CONFIDENTIAL - R. RICCI

1  HIGHLY CONFIDENTIAL - R. RICCI
2  Nos. BCI-EX-(S)-00053514 through 53515,
3  marked for identification, as of this date.)
4     Q.   Mr. Ricci, I've shown you what has
5  been marked Exhibit 379 and at the bottom of the
6  page reflects an e-mail from Mr. Diamond to a
7  collection of people, including yourself. Do
8  you see that?
9     A.   Yes.
10    Q.   And Mr. Diamond is writing, "Just
11  heard" -- by the way, this is dated the 17th of
12  September, which is Wednesday.
13        Do you recall getting that e-mail?
14    A.   Yes.
15    Q.   Do you recall whether this was in
16  connection with how the transaction should be
17  characterized to the court on Wednesday,
18  September 17th?
19    A.   I -- no, as I recall, it was around
20  the press release and what our public
21  positioning on the actual purchase price was
22  going to be.
23    Q.   Okay. You see at the bottom of the
24  page Mr. Diamond says, "Just heard we are
25  planning the small number for price." Do you

Page 108

HIGHLY CONFIDENTIAL - R. RICCI

1  HIGHLY CONFIDENTIAL - R. RICCI
2  know what number he was referring to?
3     A.   I believe I recall that he was talking
4  about the characterization of the $250 million
5  that we purchased the franchise for.
6     Q.   And then he says, "Please do not" --
7  "Please do not." I take it there's probably
8  supposed to be a period here. "The (circa) $2
9  billion number is out."
10        Do you have an understanding what that
11  means?
12        MR. HUME: Objection. Lacks
13  foundation. Calls for speculation.
14    A.   I believe he was referring to the fact
15  that we should include the price we paid for the
16  buildings as well as the franchise in our press
17  release.
18    Q.   Did you have a conversation with Mr.
19  Diamond about why the larger -- we'll call it
20  the larger number should be utilized instead of
21  the small number?
22    A.   I don't recall.
23    Q.   Did you weigh in on this conversation
24  as to which number ought to be utilized in the
25  press release?

Page 109

HIGHLY CONFIDENTIAL - R. RICCI

1  HIGHLY CONFIDENTIAL - R. RICCI
2     A.   I don't recall.
3     Q.   Now, the building transaction was, as
4  we've testified, as you've testified previously,
5  a wash? You purchased it at market value,
6  correct?
7     A.   Correct.
8     Q.   Do you know if the larger number which
9  included the price paid for the building was
10  utilized in the press release?
11    A.   I don't recall, actually.
12    Q.   Do you recall having had a
13  conversation with anybody at Barclays as to why
14  it would be harmful to characterize the
15  transaction as having been for the smaller
16  number?
17    A.   No. The only conversation I do
18  remember was the fact that the $2 billion number
19  was becoming public, was out on the wire and in
20  the public domain.
21    Q.   In the top line it says -- it refers
22  to RED, all caps. Is that Bob Diamond?
23    A.   Yes, Robert E. Diamond.
24    Q.   There's an e-mail in the middle of the
25  page from Chris Lucas to Mr. Diamond and you're

Page 110

1      HIGHLY CONFIDENTIAL - R. RICCI
2  copied on it where Mr. Lucas says, "Take your
3  point - got the total consideration in as well
4  in the detailed paragraph - a bit of a
5  compromise, but better than not having it at
6  all."
7      Do you have an understanding of what
8  that means?
9      MR. HUME: Objection. Lacks
10  foundation.
11      A.  I don't.
12      Q.  Did you follow up, to your knowledge,
13  with any of the people that wrote to you on this
14  subject concerning it?
15      A.  Not to my knowledge.
16      (Exhibit 380, a document bearing Bates
17  Nos. BCI-EX-00081880 through 81884, marked
18  for identification, as of this date.)
19      Q.  Take a look at the -- I'm sorry, go
20  ahead. I'm trying to find my copy of this right
21  now. I gave Hamish mine.
22      MR. HUME:  Was this produced without
23  an e-mail?
24      MS. DEL MEDICO:  I believe so.
25      MR. HUME:  Someone's hard copy

Page 111

1      HIGHLY CONFIDENTIAL - R. RICCI
2  document? I think we produced hard copy
3  documents and e-mails.
4      MR. CARDEN: I think there is. I
5  think there might be an e-mail here. I have
6  an e-mail attached to it, but I don't think
7  it has anything to do with it.
8      MR. SCHILLER: Can we see that?
9      MR. CARDEN: Yes, I don't think it --
10      MR. HUME:  You are deducing that this
11  is accidentally just the next Bates number,
12  so to speak?
13      MS. DEL MEDICO:  It's not even the
14  next Bates number. Some of the documents
15  when we submitted them to the vendor printed
16  out with Bates numbers not sequential. So
17  it doesn't look like it's attached at all.
18      Q.  Anyway, let's soldier on here, Mr.
19  Ricci.
20      MR. SCHILLER: Let me ask you this, do
21  you want the witness to -- I apologize for
22  talking on the record. This is off the
23  record.
24      (Discussion off the record.)
25      Q.  Mr. Ricci, I show you what has been

Page 112

1      HIGHLY CONFIDENTIAL - R. RICCI
2  marked as Exhibit 380. Have you ever seen this
3  document before?
4      A.  Not that I recall.
5      Q.  Do you know who I might talk to at
6  Barclays who could help me identify it, who
7  created this?
8      A.  May I have a second to read it?
9      Q.  Sure.
10      (Document review.)
11      Q.  Can you tell me anything about it at
12  all?
13      A.  I can't. The only thing I can tell
14  you is that it looks like it could have been
15  produced by the Group Planning Department.
16      Q.  Who's the head of that department?
17      A.  Mr. Lucas.
18      Q.  And I'm sorry if you said this. I
19  apologize. I don't mean to be asking you again.
20  Have you seen this before?
21      A.  I don't recall seeing it.
22      Q.  If you look at page 2, would you
23  review that? You see it makes reference to the
24  cost of the project -- strike that. Project
25  Long Island was a transaction involving the

Page 113

1      HIGHLY CONFIDENTIAL - R. RICCI
2  purchase of Lehman assets, wasn't it?
3      A.  Project Long Island originally was,
4  you know, the evaluation of Lehman Brothers
5  started way back in July. We just kept the name
6  through all the variations.
7      Q.  Better said than I said it. So a
8  reference to Project Long Island means a
9  transaction at the time being contemplated with
10  Lehman Brothers. Whether it was for the entire
11  firm or some portion of the firm, it's the same
12  nomenclature given to it by Barclays, correct?
13      A.  That's correct.
14      Q.  So this document is dated on its face
15  September 15th, Transaction Overview, it
16  references, and that's the Monday, right?
17      A.  Yes.
18      Q.  Okay. On page 2 of the document, you
19  see in the middle of the page where it says that
20  the cost of that transaction being contemplated
21  on September 15th was for a price of zero
22  consideration?
23      A.  I see that, yes.
24      Q.  Do you agree that the transaction
25  being contemplated for the purchase of Lehman

Page 114

1    HIGHLY CONFIDENTIAL - R. RICCI
2  assets on Monday, September 15, was for zero
3  consideration paid by Barclays?
4    A.    I don't recognize the document, but I
5  also would say that zero consideration was not
6  right.
7    Q.    In which respect would it be wrong,
8  sir?
9    A.    We had purchased assets.  We had
10  assumed risk.  We had bought buildings.  You
11  know, certainly there was -- I don't know what
12  he means by "zero consideration," but certainly
13  there were elements of the transaction that we
14  had purchased.
15    Q.    Well, if -- I realize you don't know
16  what he means by this, but if he meant by this
17  net zero consideration, would you agree with it?
18    MR. HUME:  Objection.  Vague and
19    ambiguous.
20    A.    I don't understand what "net zero
21  consideration" means either.
22    Q.    I take it you have no -- well, strike
23  that.  Based on your time at Barclays, do you
24  have any understanding of why a document such as
25  Exhibit 380 would have been produced?

Page 115

1    HIGHLY CONFIDENTIAL - R. RICCI
2    MR. HUME:  Objection.  Calls for
3    speculation.
4    A.    From time to time, the group central
5  planning function produces independent analysis
6  of all types of things, oftentimes without any
7  input from the business.
8    Q.    Do you know to what purpose Exhibit
9  380 would in the ordinary course of business
10  have been put?
11    A.    No.
12    Q.    Let's go back to Monday, the 15th, and
13  when we last left you there you were having a
14  conversation with Mr. McGee concerning comp, and
15  you talked about that, and you've had some
16  conversations concerning the contracts.
17    Do you recall what else you did that
18  day, what other aspects of the transaction you
19  were involved in that day?
20    A.    To the best of my recollection, on the
21  Monday, I would have been ensuring that we had
22  the appropriate resources dedicated to each
23  team.  I would have probably been getting
24  updates from various Barclays Capital members
25  through the day.

Page 116

1    HIGHLY CONFIDENTIAL - R. RICCI
2    I would have started to turn my
3  attention to, if we were going to be successful
4  in closing out the transaction, what did I need
5  to think about to get Lehman Brothers/the new
6  Barclays Capital operationally ready for the
7  following week.
8    Q.    Did you have any conversations with
9  Mr. Varley on that Monday?
10    A.    I don't recall.
11    Q.    Is it fair to say you did speak to him
12  during the week of the 15th?
13    A.    Yes, sir.
14    Q.    Did you give him sort of updates on
15  the transaction as it was unfolding?
16    A.    Yes.
17    Q.    Did you get any instructions from Mr.
18  Varley as to what he believed you should be
19  trying to accomplish in the negotiation of the
20  transaction?
21    A.    Mr. Varley was clear that, given the
22  uncertain markets, given the bankruptcy of
23  Lehman, the rumored problems with AIG, the
24  rumored transaction of B of A and Merrill Lynch,
25  to make sure that we were protecting the capital

Page 117

1    HIGHLY CONFIDENTIAL - R. RICCI
2  of Barclays.
3    Q.    And did you ask him what he meant by
4  that?  When you say he was clear, did he say
5  those words to you?
6    A.    I don't recall if he said those
7  specific words, but that was -- my understanding
8  was clear.
9    Q.    That was your understanding of what he
10  was saying to you?
11    A.    Yes, sir.
12    Q.    And did you also have an understanding
13  of what he meant by that in connection with the
14  actual negotiations or the transaction?
15    A.    I believe my understanding was that he
16  wanted to ensure that whatever the final
17  transaction looked like, we weren't harming the
18  capital position of Barclays.
19    Q.    And by harming the capital position of
20  Barclays, what did you understand to be -- that
21  he meant or that you understood him to mean?
22    A.    That the -- to ensure that the large
23  risk we were assuming had enough protection in
24  whatever the final deal looked like to ensure
25  that Barclays' capital positions were no worse

Page 118

HIGHLY CONFIDENTIAL - R. RICCI
1
2  off than it was before we started the
3  transaction.
4      Q.   And did at any time he quantify how
5  much protection that should be?
6      A.   Not that I recall.
7      Q.   Did anyone during the week of
8  September 15th quantify how much protection
9  Barclays should build into any Lehman
10 transaction to protect its capital?
11     A.   Not that I recall.
12     Q.   Did you personally have a view as to
13 how much protection should be built into any
14 Lehman transaction so as to protect the capital
15 of Barclays?
16     A.   My personal view was that, given the
17 uncertainty that was there, the risk that we
18 were taking, that I should try to get, you know,
19 as much protection as I could in the context of
20 a transaction.
21     Q.   I appreciate that. I'm just
22 wondering, did you ever quantify that?
23     A.   I didn't have a set number in my mind,
24 no, sir.
25     Q.   I'm just trying to understand how the

Page 119

HIGHLY CONFIDENTIAL - R. RICCI
1
2  protection that Barclays accomplished in the
3  transaction was derived. If Mr. Varley didn't
4  give you the number, you didn't come up with a
5  specific number, you didn't have a conversation
6  with anybody as to what the number was, how did
7  whatever protection Barclays was building into
8  the transaction come to pass?
9      A.   Well, negative goodwill is an output,
10 as far as I'm concerned. It's not an input. I
11 wanted to make sure that we were valuing the
12 assets at appropriate prices; that any
13 liabilities we were assuming, while we may have
14 to pay them, were there ways that we -- and
15 expected we may have to pay them, were there any
16 ways we could hope not to pay them and still
17 get, you know, the franchise that we wanted.
18          But it was a very, very uncertain time
19 with lots and lots of risk and the negative
20 goodwill became an output, not an input.
21     Q.   But at the very least you wanted to
22 make certain that the value of the assets that
23 were acquired more than compensated the
24 liabilities assumed?
25     A.   I wanted to make sure our assets

Page 120

HIGHLY CONFIDENTIAL - R. RICCI
1
2  covered our liabilities at a minimum, yes.
3      Q.   Was there any overage over and above
4  the assets covering the liabilities that you
5  thought Barclays needed to accomplish in the
6  transaction?
7          MR. HUME: Objection. Asked and
8      answered.
9      Q.   Actually, let me rephrase the
10 question. It was poorly stated.
11         You testified that you wanted to make
12 certain that the assets covered the liabilities,
13 correct?
14     A.   Yes.
15     Q.   Did at any time during the week of the
16 15th of September, did you have in your mind
17 just how much more the assets being acquired
18 should be valued so as to protect Barclays over
19 and above the liabilities being assumed?
20         MR. HUME: Objection. Asked and
21     answered.
22     A.   No, because the environment was such
23 that there were new asset valuations every day
24 and it was very difficult to say I'm comfortable
25 at this level, I'm not comfortable at that

Page 121

HIGHLY CONFIDENTIAL - R. RICCI
1
2  level, but let's make sure that we are, given
3  the information we have, valuing the assets at,
4  you know, the appropriate price.
5          MR. SCHILLER: Is there a time when
6      you traditionally break for lunch?
7          (Discussion off the record.)
8      Q.   We're going to come to this in the
9  afternoon after you've been fed, but at towards
10 the end of the week there was an effort to
11 identify additional Lehman assets for purposes
12 of the transaction, correct?
13     A.   That is correct, to replace assets
14 that weren't delivered earlier in the week and
15 agreed to earlier in the week.
16     Q.   Right. Were you involved in
17 evaluating -- strike that. Were you involved in
18 that process at any level?
19     A.   I was involved in -- at a high level
20 in terms of the potential assets.
21     Q.   Did you give anyone working for you
22 or, for that matter, anybody at Lehman Brothers
23 a number which they should try to identify --
24 strike that -- a number of assets, a valuation
25 of assets that they should identify for purposes

Page 122

1    HIGHLY CONFIDENTIAL - R. RICCI
2    of adding in the transaction?
3        A.    I don't recall being given the
4    specific number.
5        Q.    The confusion can simply be mine, but
6    at some point you stopped look for assets,
7    right?
8        A.    Yes.
9        Q.    Okay.    Why did you stop when you
10    stopped?
11        A.    We had -- it is quite confusing, so I
12    certainly understand your question.
13        You know, we had an agreement earlier
14    in the week.    It was tumultuous during that
15    whole week about trying to find assets that were
16    in the purchase agreement that said were ours,
17    that we had agreed to, they had been seized by
18    the parties, Lehman couldn't find them, and we
19    were trying to replace those with assets of
20    similar value as best we could.
21        Q.    I was simply just trying to identify
22    whether there was a number in terms of the
23    valuation of those additional assets that you
24    were trying to identify.
25        A.    No, I don't think we had a specific

Page 123

1    HIGHLY CONFIDENTIAL - R. RICCI
2    number other than trying to replace replacement
3    value what we couldn't get our hands on.    I
4    don't recall what that number was off the top of
5    my head.
6        Q.    You testified you didn't remember how
7    big the discount was off of Lehman's marks, that
8    you didn't value the assets in that way, right?
9        A.    That's correct.
10        Q.    Was whatever price Barclays paid on
11    Monday for the Lehman assets meant to build
12    in -- strike that.    The valuation of the assets
13    that Barclays purchased on Monday was set by
14    Barclays so as to achieve the cushion you have
15    described, correct?
16        MR. HUME:    Objection.
17    Mischaracterizes the evidence and lacks
18    foundation.
19        A.    When I -- my instructions to Mr.
20    Keegan and Mr. King were to make sure that
21    whatever assets they wanted to purchase --
22    again, they know their desk and their
23    appetite -- were brought in and bought at the
24    appropriate price.
25        Q.    And that appropriate price from

Page 124

1    HIGHLY CONFIDENTIAL - R. RICCI
2    Barclays' standpoint was at a price to give
3    Barclays a cushion, wasn't it?
4        MR. HUME:    Objection.    Vague and
5    ambiguous.
6        Q.    In terms of market movements?
7        A.    That depends on the asset.
8        Q.    Was it --
9        A.    Depends if they were illiquid assets
10    or there were market prices.    We were trying to
11    do our best to determine what the right and
12    appropriate price was.
13        Q.    Let's just take the liquid assets for
14    a moment.    Was it the case that the prices that
15    Barclays was prepared to pay for the Lehman
16    assets on Monday set by Barclays so as to
17    achieve a cushion against market risk during
18    that time period?
19        MR. HUME:    Objection.    It lacks
20    foundation and you have asked this question
21    already.
22        A.    Again, the instructions were to buy
23    the assets at an appropriate price.    The
24    appropriate price would reflect either, you
25    know, market price or the illiquidity premium,

Page 125

1    HIGHLY CONFIDENTIAL - R. RICCI
2    if they weren't liquid assets, and that was the
3    instruction that was given.
4        Q.    How did you intend for Barclays to
5    have the cushion you described it needed to be
6    accomplished in the purchase of those assets?
7        A.    There were several ways to achieve it,
8    we had hoped.    One was to ensure that in any
9    price we were paying for assets, particularly
10    illiquid prices, illiquid assets, of which there
11    were a lot, that we had an appropriate liquidity
12    premium in our price.
13        Secondly, as I've already testified,
14    on the comp and the cure payments, we had hoped
15    that we could pay less than what we had assumed
16    but recognize that we might have to assume
17    those.    And also, we had intangible assets, that
18    is, you know, accounting function that might
19    help create some cushion.    Those were the big
20    components.
21        Q.    Did you provide a percentage for the
22    liquidity risk that you described?
23        A.    No.
24        Q.    Did you ask Mr. Keegan or Mr. King
25    what such -- what an appropriate liquidity

32

Page 126

1    HIGHLY CONFIDENTIAL - R. RICCI
2  percentage would be?
3    A.   No.
4    Q.   Which assets in particular are you
5  referring to as having been illiquid in
6  connection with the initial Lehman transaction
7  on Monday and Tuesday?
8    A.   As I recall, there was -- there was
9  some mortgages which were certainly illiquid. I
10 don't remember what type of real estate may have
11 been on there. I don't recall any specifics
12 beyond that.
13   Q.   I'm going to --
14   A.   But they were very illiquid markets at
15 the time.
16   Q.   I'm sorry.
17   A.   That's okay.
18   Q.   I'm show you what's been marked
19 Exhibit 19. I realize you haven't seen that
20 before, but there has been testimony that's the
21 schedule that's referred to in Article IX of the
22 APA. There is a list of assets on the left-hand
23 column. You see that? Starts with "government"
24 and has 40 billion there?
25   A.   Uh-huh.

Page 127

1    HIGHLY CONFIDENTIAL - R. RICCI
2    Q.   Which of those assets would you
3  consider to have been illiquid assets at the
4  time?
5        MR. HUME: Objection. Lacks
6  foundation.
7    A.   I can't speculate. I don't know what
8  the -- what was contained in each of these
9  categories.
10       MR. CARDEN: All right. Let's have
11 lunch.
12       (Luncheon Recess; Time Noted: 12:45
13 P.M.)

Page 128

1    HIGHLY CONFIDENTIAL - R. RICCI
2        AFTERNOON SESSION
3        (Time Noted: 1:26 P.M.)
4  RICH RICCI, resumed and
5        testified further as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. CARDEN:
8    Q.   Let's just go back to Exhibit 378 for
9  just a moment, which is in front of you. And
10 you were on the board call. Do you have any
11 recollection while being on the call of anyone
12 saying that Barclays was acquiring $75 billion
13 worth of assets?
14   A.   I don't recall.
15   Q.   And I take it it follows, then, that
16 you don't recall whether or not you corrected
17 them that the Asset Purchase Agreement provided
18 for an acquisition of $70 billion, correct?
19   A.   I don't recall.
20   Q.   Who would have prepared, if you know,
21 the deck itself?
22   A.   The deck most likely would have been
23 prepared by Group Planning.
24   Q.   And you told me before who was head of
25 Group Planning, but I can't recall the name

Page 129

1    HIGHLY CONFIDENTIAL - R. RICCI
2  right now.
3    A.   Reports to Mr. Lucas.
4    Q.   Was Mr. Lucas with you in New York
5  during the negotiations?
6    A.   No.
7    Q.   Did you communicate to Mr. Lucas
8  during the week of September 15th concerning
9  the transaction, apart from what might be an
10 e-mail?
11   A.   I can't recall, but I must have.
12   Q.   Can you tell me who in your view would
13 have been the one who would have calculated the
14 negative goodwill number of 3 billion that is in
15 Exhibit 378?
16       MR. HUME: Objection. Lacks
17 foundation.
18   A.   Would have been Patrick Clackson or
19 someone on his team.
20   Q.   Was Mr. Clackson in New York during
21 the week of September 15?
22   A.   I believe he was there for part of the
23 week.
24   Q.   Do you recall whether he was there on
25 Monday, Tuesday and Wednesday? Do you have any

Page 130

```
1        HIGHLY CONFIDENTIAL - R. RICCI
2    recollection of when he was there?
3        A.   I believe he was there Monday.  I
4    can't recall when he went back.
5        Q.   Okay.  When did you return to London?
6        A.   I can't recall specifically, but I
7    think it might have been sometime during the
8    week of the 22nd.
9        Q.   Can you do any better than that for
10   me, or is that --
11       A.   Well, I really don't recall, but I
12   would have either gone back late Friday night
13   and come back Sunday night or I would have gone
14   back probably sometime Thursday or Friday, the
15   25th or 26th.
16       Q.   Now, sometime during the week of
17   September 15, there was a question that arose
18   concerning Lehman's ability to deliver the
19   assets that had been purchased by Barclays on --
20   pursuant to the Asset Purchase Agreement,
21   correct?
22       A.   That is correct.
23       Q.   Do you recall when that was?
24       A.   I don't recall specifically when that
25   first came up.
```

Page 131

```
1        HIGHLY CONFIDENTIAL - R. RICCI
2        Q.   How did you first learn of it?
3        A.   I don't recall specifically, but
4    certainly there was a tremendous amount of
5    confusion around the parallel transaction we
6    were trying to execute with the Fed and JPMorgan
7    to step in the Fed's shoes in terms of a repo
8    they had with Lehman.
9        Q.   With regard to the repo, when did you
10   first learn that the Fed wanted Barclays to step
11   into its shoes concerning the repo?
12       A.   I believe that was the Tuesday, 16th
13   of September.
14       Q.   Do you remember what time of day?
15       A.   I don't remember what time of day.
16       Q.   It was before, in any event, the board
17   meeting on Wednesday, the 18th, correct?  17th,
18   pardon me.
19       A.   That's correct.
20       Q.   After the Fed asked Barclays to step
21   into its shoes on the repo, were you provided,
22   that is, was Barclays provided a list of the
23   collateral supporting the repo?
24       A.   At some point, yes.
25       Q.   Do you remember when that was?
```

Page 132

```
1        HIGHLY CONFIDENTIAL - R. RICCI
2        A.   No.
3        Q.   Some of the collateral that was
4    supporting the Fed repo was among the collateral
5    that -- pardon me, among the positions that had
6    been purchased by Barclays, right?
7            MR. HUME:  Objection.  Lacks
8    foundation.
9        A.   I don't recall specifically.
10       Q.   Who --
11       A.   I would say there was certainly
12   confusion.
13       Q.   Do you remember how much the Fed had
14   loaned to Lehman pursuant to the repo?
15       A.   I believe it was $45 billion.
16       Q.   At any time did you learn the value of
17   the collateral supporting the repo, the Fed
18   repo?
19           MR. HUME:  Objection.  Vague and
20   ambiguous.
21       A.   Are you referring, sir, to the value
22   that the Fed had ascribed to the collateral?
23       Q.   Well, I was trying to leave the
24   question open because, as you've already
25   testified, values were changing.  So what I was
```

Page 133

```
1        HIGHLY CONFIDENTIAL - R. RICCI
2    asking, which is the reason why the question was
3    not objectionable, was whether or not at any
4    point you learned any valuations concerning the
5    collateral that had been supporting the Fed
6    repo.
7        A.   I did not get a complete answer until
8    months and months later because, first, we had
9    difficulty securing the assets; secondly, we had
10   difficulty getting the information; and, third,
11   these were incredibly difficult to price.
12       Q.   Maybe the best way to do this, Mr.
13   Ricci, is for you just to walk me through from
14   the time you learned about the Fed's desire for
15   Barclays to take over on the repo, you know,
16   through the remainder of the week concerning
17   what you did by way of trying to identify the
18   collateral, problems with it being delivered and
19   the like, and then we'll go from there.  I think
20   this calls for some sort of narrative discussion
21   by you.
22           MR. HUME:  Objection.
23       Q.   Tell me what you remember.
24           MR. HUME:  Object to the form.
25       A.   Okay.  So sometime on Tuesday we
```

34

Page 134

1    HIGHLY CONFIDENTIAL - R. RICCI
2    received, "we" being Barclays, received a call
3    from Tom Baxter at the Fed. I'm not sure who
4    the call went in to originally. Might have been
5    to counsel.
6         Gerard LaRocca then came to me and
7    said that the Fed would like us to step into
8    their shoes in this repo position. I asked him
9    how large. He said 45 billion. I said, wow,
10   that's -- that's a lot of money.
11        The Fed in various conversations had
12   made it clear they would look favorably upon us
13   doing this. I felt like we had to do it. So we
14   agreed that we would take them out of their
15   position.
16        Those conversations kind of went
17   through Tuesday, Wednesday, and then I believe
18   Thursday, the 18th of September, we began to
19   send out the cash and wait for the assets to
20   come in. Because of my concern, given the
21   uncertain environment of -- and us having to
22   send out $45 billion of cash for collateral that
23   I hadn't seen nor had we seen a great deal of in
24   Barclays, I wanted to do it in $5 billion
25   increments.

Page 135

1    HIGHLY CONFIDENTIAL - R. RICCI
2         So we sent $5 billion in cash, and it
3    took quite a long time for $5 billion of
4    securities to come in. Clearly, with the
5    bankruptcy, with the general environment, with
6    all the confusion around Lehman, it appeared
7    JPMorgan was having difficulty as the agent to
8    find the assets and deliver them.
9         A call sometime in the day from
10   JPMorgan --
11   Q.   This is Thursday now?
12   A.   This is Thursday, yes, sir, the 18th
13   of September. I believe it was from Steve Black
14   from JPMorgan, who is co-head of their
15   investment bank, came in to Bob Diamond -- I
16   believe it was Mr. Black, it could have been
17   someone else -- came in to Mr. Diamond and they
18   asked could we send the remaining $40 billion in
19   cash all at once in order to expedite this
20   process and they would work with us and they
21   would petition the Fed to keep the Fed window
22   open to try to accommodate any delays there
23   might be in getting us the securities.
24        I was not comfortable sending out the
25   40 billion. I expressed that to Mr. Diamond.

Page 136

1    HIGHLY CONFIDENTIAL - R. RICCI
2    Mr. Black or someone senior from JPMorgan gave
3    Mr. Diamond assurances that if we went first,
4    they would follow up promptly, and so we ended
5    up sending out the 40 billion.
6         Collateral then began coming in. Some
7    of it was on the Fed register of assets, some
8    was not. So I wasn't involved in the actual
9    process of reviewing that. The desk was as well
10   as Mr. LaRocca and the operations people.
11        Mr. LaRocca kept me informed through
12   the night.
13   Q.   This is Thursday now?
14   A.   This is Thursday night now into Friday
15   morning, the 19th of February. We were having a
16   hard time getting it -- JPMorgan was having a
17   hard time delivering collateral, it being the
18   collateral, on the Fed register.
19        At some point, it was late, I believe
20   it was around 1 in the morning, the Fed closed
21   their window, and JPMorgan, who had failed to
22   deliver at that point $7 billion still of
23   securities, put $7 billion of cash into
24   Barclays' capitals account at JPMorgan.
25   Q.   Are you finished?

Page 137

1    HIGHLY CONFIDENTIAL - R. RICCI
2    A.   Yes, with that --
3    Q.   With that segment?
4    A.   Yes.
5    Q.   Okay. Did you have a conversation
6    with anybody at JPMorgan about putting 7 billion
7    in cash into Barclays' box in lieu of the
8    securities?
9    A.   Mr. LaRocca had those conversations
10   and Mr. Rodefeld into their account.
11   Q.   Insofar as you were concerned, was the
12   provision of the cash better than getting
13   securities, worse than getting securities, or of
14   no consequence to Barclays?
15   A.   At the time, the cash was put into the
16   Barclays account as a temporary measure, and
17   again, Mr. Rodefeld was the point person on
18   this, awaiting the delivery of the securities.
19   Q.   Now, you made reference to the
20   securities on the Federal Register?
21   A.   Correct.
22   Q.   At some point prior to the end of this
23   process, Barclays did have a list of everything
24   that was backing up the Fed repo, correct?
25   A.   Someone in Barclays would have had

Page 138

1        HIGHLY CONFIDENTIAL - R. RICCI
2    that, yes.
3        Q.    And you were kept apprized as to the,
4    I'll call it the substitution by JPMorgan Chase
5    of collateral in lieu of collateral that was in
6    the register?
7        A.    I was kept apprized as to the status
8    of the delivery and was informed that JPMorgan
9    was struggling to deliver the collateral. I
10   wasn't kept apprized of any detail of what
11   assets may have been coming, what assets may
12   have been rejected, what assets may have been
13   accepted.
14       Q.    What was your understanding, if any,
15   as to why JPMorgan was having to struggle to
16   deliver the collateral?
17       A.    My understanding was that, in the
18   confusion of the Lehman bankruptcy, there were
19   lots and lots of claims made on lots of
20   different assets at JPMorgan and things may have
21   been moved from accounts, but they were
22   described to me as operational difficulties
23   based on confusion surrounding the bankruptcy.
24       Q.    Okay. Do you recall when you learned
25   that the 7 billion in cash was going to be

Page 139

1        HIGHLY CONFIDENTIAL - R. RICCI
2    deposited into Barclays' account as a
3    placeholder?
4        A.    That would have been sometime early in
5    the morning on the 19th of February.
6        Q.    And at that time did Barclays do a
7    calculation as to what it believed it had
8    received from JPMorgan Chase in return for the
9    $45 billion position that they had undertaken?
10       A.    I believe that for the $45 billion
11   outlay we had and would have kept a running
12   tally through the evening as to what collateral
13   was received to support the $45 billion outlay.
14       Q.    Okay. Do you recall what those
15   numbers were?
16       A.    No.
17       Q.    At the end of the day, as in right
18   now, do you know how much collateral was
19   received by Barclays in return for the $45
20   billion outlay?
21           Let me rephrase the question. I
22   apologize. It has a flaw in it. Let me just
23   state the question.
24           As of the close of the transaction on
25   Monday, September 22, did you have a view as to

Page 140

1        HIGHLY CONFIDENTIAL - R. RICCI
2    the value of the collateral that had been
3    provided to Barclays in return for its $45
4    billion outlay?
5        A.    Well, it took us months to value the
6    overall collateral and so we really didn't have
7    a final view I don't believe until February of
8    2009. Also, subsequent to that weekend --
9    pardon me, to that Monday, we found out that
10   JPMorgan had removed the $7 billion from our
11   account and we had received no additional
12   collateral. So it was very difficult to
13   identify what we had, what we didn't have.
14       Q.    We'll come back to all this. I just
15   wanted to try to put some brackets around the
16   conversation.
17           It's the early morning hours of
18   September 19th and JPMorgan has put in the $7
19   billion into your account as a placeholder, as
20   you have called it, correct?
21       A.    Yes.
22       Q.    At some point that morning, it was
23   your view that Barclays needed additional assets
24   in order to protect itself, correct?
25       A.    It had become clear to me through the

Page 141

1        HIGHLY CONFIDENTIAL - R. RICCI
2    week that we were having difficulty getting the
3    assets that we had agreed to as part of the APA
4    both through partly the inability of the Lehman
5    and their banks, JPMorgan, to deliver those
6    assets was confused by -- made more complicated
7    by the confusion around the repo and what assets
8    were where, and yes, I was worried that we
9    weren't getting enough assets for our
10   protection.
11       Q.    Someone prior to you has characterized
12   the various Lehman transactions as Lehman 1, 2
13   and 3, something you may or may not have heard
14   before. But for purposes of my questions here,
15   Lehman 1 was the potential purchase of the
16   entire firm, Lehman 2 was the transaction
17   described in the Asset Purchase Agreement, and
18   Lehman 3 was the transaction described to the
19   court on September 19. Okay?
20       A.    Okay.
21       Q.    At some point during the week, as a
22   consequence of the repo transaction, there was a
23   change from Lehman 2, which was the APA, to the
24   transaction described to the court on Friday,
25   correct?

Page 142

HIGHLY CONFIDENTIAL - R. RICCI
1
2  A.  It wasn't just as a result of the repo
3  transaction. There was difficulty of, as I
4  recall, of Lehman being able to provide the
5  assets and the appropriate information on the
6  assets that were laid out in agreement 2.
7  Q.  Okay. And when did that difficulty
8  manifest itself?
9  A.  I don't recall specifically, but
10  pretty much as we, you know, started on Tuesday
11  to try to find the assets, it became clear that
12  they were struggling with the information to
13  provide information.
14  Q.  It's fair to say, isn't it, that the
15  transaction that had been contemplated in the
16  Asset Purchase Agreement, which was called
17  Lehman 2, was not the transaction that was
18  described to the court on Friday, correct?
19  A.  Certainly there were changes in some
20  of the assets, correct.
21  Q.  And at some point, the repo was
22  essentially utilized, if you will, to get assets
23  into Barclays hands, correct?
24  MR. HUME:  Object to the form. Vague
25  and ambiguous.

Page 143

HIGHLY CONFIDENTIAL - R. RICCI
1
2  A.  We had agreed to step into the Fed's
3  shoes on the repo transaction and outlaid $45
4  billion in exchange for assets. There was
5  confusion around whether some of those assets
6  were, you know, part of the APA agreement,
7  whether they were pledged to other people, it
8  was -- whether they could even be delivered.
9  There was all sorts of confusion around that.
10  Q.  Let me ask it this way. I'm just
11  trying to make a distinction between Lehman 2
12  and Lehman 3.
13  Under Lehman 2, you were buying $70
14  billion worth of assets and then the Fed asked
15  you to step into their shoes which had various
16  assets backing up the repo, correct?
17  MR. HUME:  Objection to the form of
18  the question and the use of the phrase in
19  Lehman 2 and Lehman 3.
20  MR. CARDEN:  Talk to Mr. Varley.
21  Q.  Go ahead.
22  A.  In Lehman 2, we were buying some
23  categories of assets that in Lehman 3 either
24  changed or weren't available, yes.
25  Q.  Said another way, you weren't going to

Page 144

HIGHLY CONFIDENTIAL - R. RICCI
1
2  purchase the $70 billion of assets contemplated
3  in Lehman 2 and also take the assets that were
4  supporting the Fed repo, were you?
5  A.  Best I recall, the reason that we
6  weren't was really the failure to identify those
7  assets in what you refer to as transaction 2
8  rather than a conscious decision to say we're
9  going to do one versus the other.
10  Q.  Okay. Now, on the morning of the
11  19th, you testified that you were concerned as
12  to whether or not Barclays had sufficient assets
13  for its protection, right?
14  A.  Yes.
15  Q.  Did you talk to anybody about that
16  concern? Did you take any action?
17  A.  I would have spoken certainly to Mr.
18  LaRocca, I would have spoken to Mr. Clackson,
19  and I would have spoken to Mr. Klein as to my
20  concerns around securing, you know, assets
21  appropriate for our protection.
22  Q.  Did you talk to anybody at Lehman
23  about that, about your concern?
24  A.  I don't know if I talked particularly
25  about the concern. I certainly would have had

Page 145

HIGHLY CONFIDENTIAL - R. RICCI
1
2  conversations about other assets.
3  Q.  On Friday morning, Barclays had laid
4  out 45 billion, correct?
5  A.  Correct.
6  Q.  You were concerned about Barclays
7  being protected, which means you wanted a
8  certain quantum of assets in order for it to be
9  at least made whole, right?
10  A.  I wanted as much protection I could
11  get given the uncertainties in the market, yes.
12  Q.  Did you have in your own mind a target
13  for how much in assets you believed it was
14  necessary over and above the $45 billion that
15  you had outlaid for Barclays to be protected?
16  MR. HUME:  Objection. Asked and
17  answered before lunch several times.
18  A.  I didn't have a specific number in
19  mind.
20  Q.  Did you have a general number?
21  A.  I didn't have a general number in
22  mind. Again, my instructions have been
23  consistent to make sure that any assets we were
24  taking were at the appropriate values, and I was
25  also hopeful that the estimates that had been

Page 146

HIGHLY CONFIDENTIAL - R. RICCI
1
2 made for comp and cure payments through
3 leveraging, you know, Barclays' platforms, we
4 might be able to underspend to create some
5 cushion. But it was an environment where
6 valuations were very, very, very difficult and
7 uncertain, I think as evidenced by the fact that
8 we didn't determine the final valuation of these
9 transactions until February of '09.
10     Q.    But you weren't relying on Friday
11 morning about the possibility that Barclays
12 could underspend on the comp and the cure pieces
13 in order to develop the cushion that you wanted
14 Barclays to have, were you?
15     A.    We were looking at various scenarios
16 that might estimate what a possible cushion
17 might be. It clearly, in that environment, was
18 so uncertain that you couldn't bid on anything,
19 but we were running some scenarios that we
20 thought would give us enough comfort that we
21 could execute the transaction with some sense of
22 cushion.
23     Q.    Did the scenarios involve both an
24 element of how little you might be able to spend
25 on comp and cure plus what discounts you might

Page 147

1     HIGHLY CONFIDENTIAL - R. RICCI
2 be able to purchase certain assets at? What
3 were the components of the scenarios?
4     A.    We, by the Friday, the 19th, we had,
5 you know, again, we were hopeful that we could,
6 you know, leverage other Barclays' platforms or
7 find other ways to underspend.
8         We were also, you know, ensuring that
9 when we were pricing assets, for instance, on
10 the illiquid side, that we were factoring in an
11 appropriate liquidity premium that might give us
12 some protection if we couldn't move the assets.
13     Q.    Let me try again to ask what I meant
14 to ask a little while ago. On Friday morning,
15 it was not your view that Barclays' possible
16 ability to underspend on comp and cure was what
17 you were going to rely on for coming up with a
18 cushion to protect Barclays Capital by itself?
19         MR. HUME:  Object to the form of the
20 question.
21     A.    We were looking at it in pieces. So,
22 again, I didn't have a particular number in
23 mind. We needed to make sure that, in the very
24 uncertain environment, we would have purchased
25 assets recognizing that uncertain environment,

Page 148

1     HIGHLY CONFIDENTIAL - R. RICCI
2 whether it was through liquidity premium or
3 views on where our models were saying the market
4 was going, and we were hoping we would
5 underspend on the other side.
6     Q.    It was both pieces, correct?
7     A.    Sure.
8     Q.    Now, you said you ran various -- by
9 the way, us used a phrase that you might be able
10 to save money by leveraging Barclays' platform.
11 What did you mean by that?
12     A.    Well, on the contract side, I had no
13 idea what Lehman's obligations were, but there
14 may have been opportunities to use Barclays'
15 contractors for some of those services, maybe
16 able to get better pricing that Lehman might
17 have had. That's what I mean by "leveraging the
18 platform."
19     Q.    Do you have any recollection of how
20 much you thought you might be able to save on
21 comp and cure versus what kind of advantageous
22 pricing you might get on assets, what the ratio
23 was for purposes of developing the cushion that
24 Barclays needed to protect its capital?
25     A.    I don't recall the specifics on the

Page 149

1     HIGHLY CONFIDENTIAL - R. RICCI
2 comp and the cure, and we were ensuring that it
3 was an advantageous pricing. I want to make
4 sure that's not the use of the word I used.
5 That's your word. That we were factoring in the
6 appropriate pricing levels for assets. I'm not
7 sure what the split was.
8     Q.    I didn't mean to be provocative with
9 "advantageous pricing," but you told me you
10 wanted to get pricing for the illiquid assets
11 that gave you sufficient cushion to be able to
12 get out of the assets if you weren't able to
13 sell them right away, right? That's what I
14 meant by "advantageous."
15     A.    Sorry, I took the term "advantageous"
16 as a pejorative. Sorry if it wasn't intended.
17     Q.    Advantageous to Barclays?
18     A.    Well, what it was was a price that
19 reflected that liquidity premium discount. It's
20 a very common way that banks would price
21 illiquid instruments, reflecting market value.
22     Q.    Okay. So, going back to my question,
23 just to make certain you were clear on what I
24 was asking, as you were trying to evaluate what
25 you could possibly save by leveraging Barclays'

Page 150

HIGHLY CONFIDENTIAL - R. RICCI
1
2   platform on the contract side and what you might
3   be able to save on the compensation side, plus
4   what kind of pricing you could get on the assets
5   you were purchasing, was there any percentage
6   that those various components represented as you
7   tried to come up with a cushion that Barclays
8   needed to protect its capital?
9        MR. HUME: Objection. Asked and
10       answered.
11       A.  I don't recall any set percentage from
12   each that we were trying to ascribe to.
13       Q.  Okay.  Did you come up with a number
14   in terms of leveraging Barclays' platform on the
15   contract piece and how much you might be able to
16   save on the comp piece?  Did you come up with a
17   number for that component on Friday?
18       A.  I don't recall on Friday if we came up
19   with a specific number on the Friday.
20       Q.  Was anybody providing any information
21   or counsel to you as to what kind of savings
22   Barclays could accomplish on the contract piece
23   that day, on Friday?
24       A.  On the estimates that we had assumed
25   as part of the transaction, Patrick Clackson had

Page 151

HIGHLY CONFIDENTIAL - R. RICCI
1
2   created several scenarios as to what numbers
3   might be.
4        Q.  Do you remember what they were, just a
5   range?
6        A.  I don't recall.
7        Q.  Were they written down?
8        A.  I don't recall that either.
9        Q.  It was an important aspect of your
10   considerations on Friday morning, wasn't it, how
11   much might be saved on the contract piece?
12       A.  Amongst others.
13       Q.  Correct.
14       A.  I mean, the issue that we were, again,
15   as an output, kind of using that negative
16   goodwill as a proxy for cushion and protection,
17   you know, it was an output, so there were
18   several inputs, of which I'm sure that was one.
19       Q.  Do you know how Mr. Clackson was going
20   about trying to determine what the savings on
21   the contract piece might have been by being able
22   to leverage Barclays' platform?
23       MR. HUME: Objection. Lacks
24       foundation.
25       A.  I don't know what process Mr. Clackson

Page 152

HIGHLY CONFIDENTIAL - R. RICCI
1
2   followed, but I do know that it was very, very
3   difficult to get information out of Lehman on
4   lots of fronts, including how they supported
5   some of their numbers.
6        Q.  Do you know if during the week of
7   September 15th the estimate for the contracts
8   being potentially being assumed by Barclays had
9   been going down?
10       A.  There were a wide series of
11   theoretical estimates across what could or could
12   not be possible.  I do recall numbers being
13   thrown about.  I don't remember specifics.
14       Q.  You testified this morning that you
15   recalled a number around $2 billion as being the
16   number for the contracts.  Do you remember that?
17       A.  What we assumed.
18       Q.  Of what you --
19       A.  As the estimated liability.  That is
20   correct.
21       Q.  Let me restate.  I want to make
22   certain I'm being clear with you.
23       You testified previously that you
24   thought that the estimate of contracts that
25   Barclays might have to assume to do its business

Page 153

HIGHLY CONFIDENTIAL - R. RICCI
1
2   could be as much as $2 billion, right?
3        A.  We assumed that estimate provided by
4   Lehman Brothers of what their contracts might be
5   of $2 billion, yes.
6        Q.  And do you know that on Wednesday the
7   number was down to 1.5?
8        A.  I don't recall that.
9        Q.  Do you remember it ever going down to
10   1.5?
11       A.  I don't recall that.
12       Sorry, can I ask a clarification
13   question?
14       Q.  Sure.
15       A.  The 1.5 being the estimate that we
16   were to assume?
17       Q.  Correct.
18       A.  I stand by my statement.  I don't
19   recall that.
20       Q.  Other than the $2 billion that you
21   testified about this morning as being the
22   estimate, do you have any recollection of any
23   different number for the amount or the quantum
24   of the contracts that Barclays would be
25   assuming, the estimate that it would be assuming

HIGHLY CONFIDENTIAL - R. RICCI

1  in the transaction?
2      A.  I don't recall a number estimate of
3  what we would be assuming other than the 2
4  billion.
5      Q.  Do you recall that on Friday morning,
6  though, Mr. Clackson told you that he thought
7  there could be savings accomplished as a
8  consequence of being able to leverage Barclays'
9  platform concerning those contracts?
10     A.  I don't recall specifically, but that
11  would be consistent with, you know, the idea of
12  trying to come up with a plausible scenario that
13  might create some cushion.
14     Q.  Okay.  And one other component of the
15  scenario on Friday morning now was also whether
16  or not Barclays could pay less than the $2
17  billion in bonus payments that are specified in
18  Article IX, correct?
19     A.  Seeing if we could underspend the
20  estimate on the comp would also have been part
21  of that theoretical analysis.
22     Q.  And the third piece would have been
23  what I characterize as advantageous pricing,
24  which you called simply called pricing of the

HIGHLY CONFIDENTIAL - R. RICCI

1  assets themselves in some way so as to
2  accomplish an additional cushion for Barclays?
3      A.  Appropriate pricing.
4          MR. HUME:  Object to the form.
5      Q.  So the third component would be to
6  accomplish appropriate pricing, in your view,
7  that would give Barclays cushion to protect its
8  capital, right?
9          MR. HUME:  Object to the form.
10     A.  Yes.
11     Q.  Now, on Friday morning as you tried to
12  position Barclays so as to protect its capital,
13  tell me what you did.
14     A.  As I recall, having struggled to get
15  assets per transaction 2, struggling with the
16  repo from JPMorgan or from the Fed, pardon me,
17  that JPMorgan was acting as agent for, yes, I
18  was uncomfortable that we had enough cushion
19  given the uncertainties in the market.  So I
20  believe I recall I instructed Mr. Klein and I
21  had a conversation with Mr. Clackson that we
22  needed more assets.
23     Q.  And you've told me that you did not
24  have a specific number of additional assets that

HIGHLY CONFIDENTIAL - R. RICCI

1  you thought were necessary to provide Barclays
2  the cushion to protect its capital at that time,
3  correct?
4      A.  Not that I recall.
5      Q.  Maybe it's me not understanding it,
6  but I'm trying to -- let me ask it this way.
7  Strike that.
8          On Friday morning, you took a view
9  that you didn't have sufficient cushion,
10  correct?
11     A.  Uh-huh.  Yes.
12     Q.  And I think it follows that you
13  necessarily had to take a view as to how much
14  cushion would have been sufficient, am I
15  correct?
16     A.  Is that a question?
17     Q.  Yes.  Am I correct?
18     A.  Again, there was incredible
19  uncertainty.  I was now looking at a transaction
20  which had been signed on Tuesday, which didn't
21  look like a lot of those assets were going to
22  arrive.  We had problems getting collateral for
23  the $45 billion we had outlaid to the Fed.
24  Markets were getting worse.  I felt I needed as

HIGHLY CONFIDENTIAL - R. RICCI

1  much as I could get to protect the firm.
2      Q.  Okay.
3      A.  And I wasn't sure what Lehman had
4  left.
5      Q.  Okay.
6      A.  Didn't know there was anything left.
7      Q.  All right.  What did you do to try to
8  determine how much Lehman left that could be
9  transferred to Barclays?
10     A.  I believe I instructed Mr. Klein to
11  see if Lehman had any other assets.
12     Q.  Did you tell anybody on Friday morning
13  that if Barclays were unable to come up with
14  additional assets, that it would not go through
15  with the transaction?
16     A.  I don't -- I recall certainly having
17  those thoughts.  I can't recall if I said that
18  to anyone specifically.
19     Q.  And by "additional assets," I meant
20  additional Lehman assets, you understood?
21     A.  Additional Lehman assets, yes.
22     Q.  Did anybody at Lehman's object to
23  Barclays trying to identify additional assets
24  that could be transferred to it in connection

Page 158

HIGHLY CONFIDENTIAL - R. RICCI

1      HIGHLY CONFIDENTIAL - R. RICCI
2   with the transaction?
3      A.   Not that I recall.
4      Q.   At any point did anybody at Lehman
5   suggest that Barclays was being piggish?
6      A.   I remember having a conversation with
7   Alex Kirk after we had tried to seek more
8   assets, and I expressed some discomfort to Alex
9   that I still didn't think we had enough assets,
10  and he said there's nothing left.  And I said
11  something like to him, well, fine, we're not
12  going to be -- we're not going to be pigs and go
13  after every last nickel.  We'll try to get
14  comfortable with what you have given us, and if
15  that's the case, we're done.
16     Q.   So is it fair to say that Barclays
17  stopped looking for additional Lehman assets
18  when Mr. Kirk said there was nothing else left
19  to transfer to Barclays?
20     A.   I recall saying to Alex that -- he was
21  very worried that we were going to walk because
22  we had asked for more assets, they had given us
23  what we could, he was worried we were going to
24  walk, and I said, okay, if this is it, if this
25  is all we can find before we go to court, you

Page 159

1      HIGHLY CONFIDENTIAL - R. RICCI
2   know, we'll take it, we'll take the chance, but
3   we won't kill the deal over looking for more
4   assets.
5      Q.   So, based on that conversation with
6   Mr. Kirk, Barclays stopped looking for
7   additional Lehman assets, correct?
8      A.   I believe that's correct.
9      Q.   Do you remember when on Friday that
10  was?  That would be Friday, the 19th of
11  September?
12     A.   I don't recall.  It was certainly -- I
13  think it was Friday afternoon, but I couldn't be
14  specific.
15     Q.   Was the search for additional Lehman
16  assets going on during the same time that the
17  court hearing was taking place on Friday
18  afternoon and into the evening?
19     A.   Not that I recall.  I recall that we
20  had -- we had searched for the assets before the
21  court hearing and that that was the end of it.
22     Q.   Again, you didn't go to court that
23  day?
24     A.   Did not go to court.
25     Q.   Who did go to court for Barclays,

Page 160

1      HIGHLY CONFIDENTIAL - R. RICCI
2   apart from its counsel?
3      A.   Michael Klein.  Jonathan Hughes.  I'm
4   not sure who else.
5      Q.   Now, do you recall what additional
6   assets were identified by Lehman on that Friday,
7   the 19th of September, which were transferred to
8   Barclays?
9      A.   The final deal included the repo
10  assets, they included the buildings, they
11  included the exchange-traded derivatives and the
12  associated collateral, they included the
13  unencumbered assets that were sitting in the
14  boxes at the very -- at the clearing agencies,
15  and they included the 15c3 moneys or equivalent
16  securities to 15c3 moneys.
17     Q.   When you talked about the collateral
18  supporting the exchanged-traded derivatives, was
19  that collateral in the transaction as of Friday
20  the 19th, in your view?
21     A.   That -- the exchanged-traded
22  derivatives were in the transaction at the
23  beginning, and as far as I was concerned, yes,
24  they were in the transaction on the Friday
25  night, yes.

Page 161

1      HIGHLY CONFIDENTIAL - R. RICCI
2      Q.   I'm not talking about the
3   exchange-traded derivatives themselves.
4      A.   The collateral, yes.
5      Q.   I'm talking about the margin.
6      A.   Yes.  Yes.
7      Q.   It's your view that the margin for
8   those positions was in the deal from the
9   beginning?
10     A.   Yes.  Absolutely.  You wouldn't take
11  the positions and not take the collateral
12  because you yourself have a collateral call the
13  first day.
14     Q.   Do you recall there having been an
15  amendment to the language of the agreement over
16  the weekend to make certain or to include the
17  collateral supporting those positions?
18     A.   No.  As I recall, the language
19  associated with the --
20          Are you referring to the clarification
21  letter?
22     Q.   Yes.
23     A.   The original -- the clause that was in
24  the original APA that contained the derivatives
25  and the associated collateral, that clause had

Page 162

HIGHLY CONFIDENTIAL - R. RICCI

1    changed, but not that element, and so we just
2    restated that element in the clarification
3    letter. There were other elements of that
4    clause that changed, not that clause.
5    Q.    What I'm trying to get at, maybe I'm
6    doing it awkward, but I'll try again. Was the
7    inclusion of that collateral in the transaction
8    pursuant to the clarification letter that was
9    executed, did that add, in your view, assets
10   into the transaction that were not present in
11   the APA?
12   A.    No. In my mind, the exchange-traded
13   derivatives and the associated collateral was
14   always in the transaction. And again, you
15   wouldn't take the positions without the
16   collateral.
17          (Exhibit 381, a document bearing Bates
18          Nos. BCI-EX-00078268 through 78270, marked
19          for identification, as of this date.)
20   Q.    Mr. Ricci, I show you what has been
21   marked Exhibit 381. Just take a moment and
22   review it. It's three or four different
23   e-mails.
24          (Document review.)

Page 163

HIGHLY CONFIDENTIAL - R. RICCI

1    Q.    Have you had a chance to take a look?
2    A.    I have.
3    Q.    Okay. Let's start at the bottom, it's
4    a logical place to start, where Mr. Klein writes
5    to you and -- actually, I take it back. Let's
6    turn the page. It's on the other side where you
7    write to Mr. Klein, "Alex" -- I take it that's
8    Mr. Kirk?
9    A.    That's correct.
10   Q.    "tells you that they're killing you
11   on the 1.9 bucket and not paying anything for
12   it. What gives?" What does that mean?
13   A.    As I recall, Mr. Kirk told me that we
14   were getting -- that the creditors were saying
15   we were getting $1.9 billion of value on the --
16   I believe this was the unencumbered assets and
17   not paying anything for it, and I'm asking Mr.
18   Klein how can that be and what's going on, and
19   that's what that means.
20   Q.    And he writes you back that he doesn't
21   follow, "We are being given 1.9 billion of
22   faith," right?
23   A.    Uh-huh.
24   Q.    Your response to him, "He," I guess

Page 164

HIGHLY CONFIDENTIAL - R. RICCI

1    meaning Alex again, "told me creditor were
2    squawking. Let's get it then." What does that
3    mean, "let's get it then"?
4    A.    I don't recall.
5    Q.    Is that a reference to Barclays
6    getting the 1.9 as additional cushion?
7    A.    Well, that was already the agreement.
8    So I think I was saying that if Mr. Klein didn't
9    follow or didn't know what Alex was talking
10   about, then let's just carry on with it.
11   Q.    You say it was already in the
12   agreement. It wasn't in the APA, obviously?
13   A.    No. Sorry. I agreed with Mr. McDade.
14   It would be part of the transaction.
15   Q.    Okay. Some point on Friday you had a
16   conversation with Mr. McDade in which it was
17   agreed that the $1.9 billion would be additional
18   assets provided to Barclays to provide as a
19   cushion, correct?
20   A.    That we would take $1.9 billion in
21   additional assets.
22   Q.    When was that conversation?
23   A.    I believe that was Friday afternoon
24   prior to the hearing.

Page 165

HIGHLY CONFIDENTIAL - R. RICCI

1    Q.    In addition to that 1.9, do you recall
2    the amount of any additional assets that were
3    transferred to Barclays that day apart from the
4    repo?
5          MR. HUME: Objection. Vague and
6    ambiguous.
7    A.    That were transferred to Barclays that
8    day?
9    Q.    On Friday morning early throughout the
10   day, Barclays was looking for additional assets,
11   correct?
12   A.    Correct.
13   Q.    And 1.9 was transferred to Barclays,
14   correct?
15   A.    Wasn't transferred. It was agreed
16   that we would take it. Still waiting for it.
17   Q.    All right. Okay. Was there any
18   additional assets that day other than the 1.9 --
19   A.    Yes.
20   Q.    -- that was agreed would be
21   transferred to Lehman -- to Barclays?
22   A.    The 15c3 deposit money.
23   Q.    And how much was that?
24   A.    Roughly $750 million.

42

Page 166

HIGHLY CONFIDENTIAL - R. RICCI

1    HIGHLY CONFIDENTIAL - R. RICCI
2    Q.  Now, at the time that you had your
3  conversation with Mr. Kirk in which he said that
4  Lehman had nothing left to transfer to Barclays,
5  did you have an understanding of the value of
6  the collateral that had supported the Fed repo
7  that had been transferred, already been
8  transferred to Barclays?
9    MR. HUME: Objection. Asked and
10    answered.
11    A.  As I stated earlier, a tremendous
12  amount of uncertainty, wasn't sure what
13  collateral we had, wasn't sure what the value
14  was, didn't have reliable numbers.
15    Q.  So do I understand it that on Friday
16  when you spoke to Mr. Kirk you just didn't know
17  the value of the collateral that you had gotten
18  in connection with the Fed repo?
19    A.  I don't recall having a specific
20  number.
21    Q.  Do you recall there having been a
22  different valuation for what collateral was
23  transferred provided by BONY as opposed to what
24  had been provided by Lehman?
25    A.  I do recall that they were different,

Page 167

1    HIGHLY CONFIDENTIAL - R. RICCI
2  yes.
3    Q.  Do you recall how much they were
4  different?
5    A.  No.
6    Q.  Do you recall with whom you spoke
7  about that difference, if anyone?
8    A.  No. I do remember having a
9  conversation about BONY's numbers -- BONY didn't
10  deal with a lot of the assets that we were
11  taking, so -- it didn't trade them, so there
12  was, as happens sometimes with custodian banks,
13  there was questions over the potential accuracy
14  of BONY's marks, but I do remember they were
15  different.
16    Q.  Do you know if anyone at Barclays
17  spoke to BONY about the valuations that BONY had
18  provided on the Friday, September 19?
19    A.  I don't know.
20    Q.  You did not, I take it?
21    A.  I did not, sir.
22    Q.  At the time, do you know if you were
23  provided valuations provided by BONY and the
24  valuations provided by Lehman?
25    A.  I don't recall.

Page 168

1    HIGHLY CONFIDENTIAL - R. RICCI
2    Q.  As of your conversations with Mr. Kirk
3  on Friday, I am correct, am I not, that the $7
4  billion had already been transferred from
5  JPMorgan into Barclays' account?
6    A.  We believed at the time on the Friday
7  morning that there was $7 billion in our account
8  pending the completion of the transaction.
9    Q.  Okay. So, as of the time you spoke to
10  Mr. Kirk on Friday, did you have a number in
11  your mind as to the valuations that -- of the
12  assets that Barclays had received in exchange
13  for the $45 billion that it had outlaid?
14    MR. HUME: Objection. Asked and
15    answered numerous times.
16    A.  I don't recall.
17    Q.  Did there come a time on the weekend
18  of September 20th and 21st that you took a view
19  as to the valuation of the assets obtained by
20  Barclays in exchange for the $45 billion that it
21  had paid out on the Fed repo?
22    A.  I can confirm I definitely didn't go
23  home the 20th and 21st, as I previously said,
24  because now I'm remembering the weekend before
25  the opening.

Page 169

1    HIGHLY CONFIDENTIAL - R. RICCI
2    I don't recall, I don't recall coming
3  to a view.
4    Q.  Did Barclays, to your knowledge, come
5  to a view as to the value of those positions?
6  Let's take Saturday as the beginning. Let me
7  restate the question.
8    On Saturday, September 20th, did
9  Barclays have a view as to the value of the
10  assets that it had received in exchange for the
11  $45 billion it had paid out of the Fed repo?
12    MR. HUME: Objection. Vague and
13    ambiguous.
14    A.  I don't recall.
15    Q.  You don't recall whether they had one
16  or you don't recall the number?
17    A.  I don't recall whether they had one.
18  That weekend events started turning towards what
19  do we need to do to open for business on Monday.
20    Q.  Do you know whether an opening balance
21  sheet was provided by anyone in connection with
22  the transaction?
23    A.  I don't recall.
24    (Exhibit 382, a document bearing Bates
25  Nos. BCI-X-00080984 through 80985, marked

Page 170

1    HIGHLY CONFIDENTIAL - R. RICCI
2    for identification, as of this date.)
3        Q.    Mr. Ricci, I've shown you what has
4    been marked as Exhibit 382. Just take moment
5    and satisfy yourself. Just take a look.
6        (Document review.)
7        Q.    You ready?
8        A.    No.
9        MR. HUME: Before you ask any
10    questions on this, this was an exchange of
11    e-mails amongst Barclays principals and
12    their legal counsel and I'd like a moment to
13    look at it and see if it's privileged.
14        MR. CARDEN: Well, to satisfy your
15    concern, Hamish, I mean, it was produced,
16    I've been using it, I've been focusing on
17    the top e-mail, not the bottom one, and the
18    top e-mail does not have any conceivable
19    disability because it's an e-mail from Mr.
20    Ricci to Mr. Klein, neither of whom are
21    lawyers.
22        So let's just confine our questions
23    for the moment to that. We may have to
24    substitute the document if that's the
25    appropriate thing to do.

Page 171

1    HIGHLY CONFIDENTIAL - R. RICCI
2        Q.    So let's ignore the bottom of this,
3    Mr. Ricci, and I'd like to direct your attention
4    to the top e-mail, which is from you to Mr.
5    Klein on Sunday, September 21st, at around 2:38
6    in the afternoon. Do you see that?
7        A.    2:38 in the morning, I think.
8        Q.    You're probably right. Yeah, sorry.
9        Just take a look at that blank piece.
10    Do you see that?
11        A.    Yes.
12        Q.    Okay. In the first line you say,
13    "Pretty convinced resis not in 52 after talking
14    to a few people." Do you know what that line
15    means?
16        A.    So I must be saying that something to
17    do with residential mortgages were not in 52
18    something. I was talking to a few people.
19        Q.    Does that refresh your recollection
20    that Barclays had valued the assets that it
21    received in exchange for the $45 billion at 52
22    billion?
23        A.    Possibly could have. I don't recall
24    the specific number, but I don't remember a
25    specific 52.

Page 172

1    HIGHLY CONFIDENTIAL - R. RICCI
2        Q.    You would have had any valuation that
3    Barclays made of the assets that it had obtained
4    in exchange for the repo payment on that
5    weekend, wouldn't you?
6        A.    Well, what I'm assuming the 52
7    meaning, quite simply, is just simply an
8    assumption that it was $45 billion in collateral
9    that may or may not have been valued yet plus $7
10    billion in cash.
11        MR. CARDEN: Off the record.
12        (Discussion off the record.)
13        (Exhibit 383, a document bearing Bates
14    Nos. BCI-EX-00080668, marked for
15    identification, as of this date.)
16        Q.    Mr. Ricci, I show you what has been
17    marked as Exhibit 383, which is an e-mail from
18    Mr. King to you. Just take a moment to read
19    this one.
20        Finished?
21        A.    Uh-huh.
22        Q.    Mr. King has said the best estimate --
23    "current best estimate is the portfolio inc," I
24    suppose that means includes, but "7 billion cash
25    is 48.5 to 49 billion." Do you remember getting

Page 173

1    HIGHLY CONFIDENTIAL - R. RICCI
2    this e-mail?
3        A.    Yes.
4        Q.    Okay. Had you asked Mr. King to value
5    the assets that had been transferred to Barclays
6    in exchange for the $45 billion that it had laid
7    out on the repo?
8        A.    He would have been on the team, yes.
9        Q.    And this number of 48.5 and 49 billion
10    doesn't include the 1.9 of the 15c3 or the
11    $750,000 -- I'm sorry, the 1.9 or the $750,000
12    from the 15c3, does it?
13        MR. HUME: Objection. Lacks
14    foundation.
15        A.    No, it wouldn't.
16        Q.    Okay.
17        A.    If I recall correctly, the $49 billion
18    was roughly I believe what the Fed had pledged
19    as collateral against the 45 billion. So --
20        Q.    Okay. I stated this awkwardly, but I
21    just want to be clear. The moneys transferred
22    pursuant to the 15c3 accounts of 750 and the 1.9
23    is not included in these numbers in Exhibit 383,
24    is it?
25        A.    To the best of my knowledge.

| Page 174 |
|---|
| HIGHLY CONFIDENTIAL - R. RICCI |
| 1 |
| 2 Q. Who is Gerard? |
| 3 A. Gerard LaRocca. |
| 4 Q. That's what I thought. |
| 5 (Exhibit 384, a document bearing Bates |
| 6 Nos. BCI-EX-00079340 through 79342, marked |
| 7 for identification, as of this date.) |
| 8 Q. Mr. Ricci, I have put before you |
| 9 Exhibit 384, and I would like to direct your |
| 10 attention to the e-mail at the bottom, which is |
| 11 from Gary Romain to you, Mr. Clackson and Mr. |
| 12 Walker. The subject is "Long Island - draft |
| 13 balance sheet/goodwill" and then something. |
| 14 Do you recall having gotten this |
| 15 e-mail, sir? |
| 16 A. Yes. |
| 17 Q. You see it refers to "appropriate cure |
| 18 payment accrual requires further attention"? |
| 19 A. Yes. |
| 20 Q. Do you recall what that meant at the |
| 21 time? |
| 22 A. I don't know what Mr. Romain was |
| 23 referring to. |
| 24 Q. Did you have a conversation with him |
| 25 about the cure payment accrual about that time? |

| Page 175 |
|---|
| HIGHLY CONFIDENTIAL - R. RICCI |
| 1 |
| 2 A. I don't recall having a conversation |
| 3 with Mr. Romain. |
| 4 Q. This is Monday, September 22nd. It's |
| 5 fair to say, isn't it, that at that time you |
| 6 were still looking to determine what the size of |
| 7 Barclays' cushion was, correct? |
| 8 A. We certainly would have been needed to |
| 9 make an announcement to the market, to our board |
| 10 around what the best estimate was of what our |
| 11 position was. |
| 12 Q. And in connection with that, knowing |
| 13 what the actual or the best estimate of current |
| 14 contracts would have been a piece of that, |
| 15 right? |
| 16 A. Certainly. |
| 17 Q. Do you know what is meant by the "2.83 |
| 18 billion valuation adjustment is S. King's first |
| 19 cut only"? |
| 20 A. I don't, I don't, but -- I don't know |
| 21 what that specifically is referring to, no. |
| 22 Q. Okay. Do you recall having gotten the |
| 23 chart that's the second and third page of this |
| 24 exhibit? |
| 25 MR. HUME: What's the exhibit number |

| Page 176 |
|---|
| HIGHLY CONFIDENTIAL - R. RICCI |
| 1 |
| 2 of this exhibit? |
| 3 MR. CARDEN: 383. 384, sorry. |
| 4 A. I don't recall looking at it, but |
| 5 clearly I was copied on the e-mail. |
| 6 Q. Do you know what it is? |
| 7 A. It looks like an accounting |
| 8 reconciliation. |
| 9 Q. Related to the acquisition of the |
| 10 Lehman assets? |
| 11 A. The negative goodwill. |
| 12 Q. I'm sorry, was that a yes or -- |
| 13 A. Yes. |
| 14 Q. Now, I don't have any titles on the |
| 15 heads of these columns. I don't know what they |
| 16 mean, but I see next to line 14 "Inventory - |
| 17 Thursday Close." In the D column, 45.16 or 18, |
| 18 do you see that? |
| 19 A. Yes. |
| 20 Q. Do you know to what that refers? |
| 21 MR. HUME: Objection. Lacks |
| 22 foundation. |
| 23 MR. CARDEN: Not if he tells me what |
| 24 it means. |
| 25 A. Seems to be a summary of things in |

| Page 177 |
|---|
| HIGHLY CONFIDENTIAL - R. RICCI |
| 1 |
| 2 column C. |
| 3 Q. And do you know what column C is? |
| 4 A. No. |
| 5 Q. Were those the assets that were |
| 6 acquired by Barclays? |
| 7 A. I can't -- I don't know what the |
| 8 underlying assets are. |
| 9 Q. Could they be anything else, in your |
| 10 view? |
| 11 A. I don't know. I'm not trying to be |
| 12 difficult, I just don't -- there's no labels on |
| 13 the categories. |
| 14 Q. Nor did I think you were being |
| 15 difficult. I don't have the -- I don't have |
| 16 anything more than you have in front of you. |
| 17 A. Yeah. |
| 18 Q. Or else I would showing it to you. |
| 19 I'm going to be asking for it in a moment, but I |
| 20 don't have it for the time being. |
| 21 If you look down on line 28, it shows |
| 22 total assets of 52.02, do you see that? |
| 23 A. Yes. |
| 24 Q. Does that refresh your recollection in |
| 25 any respect as to where you got the 52 that you |

45

Page 178

1    HIGHLY CONFIDENTIAL - R. RICCI
2    used on the day before in the e-mail that you
3    sent?
4    A.    No.  As I said, I think it would
5    reinforce the fact it was simply $45 billion of,
6    you know, approximate collateral that we would
7    have received on the Friday, the $45 billion
8    received on the Friday with no, you know,
9    without final valuations and estimate
10   approximation of what the value of the
11   collateral we would have received from JPMorgan
12   plus the $7 billion in cash.
13   Q.    I won't torture you over this since
14   you haven't seen it or don't know what these
15   columns are either, but I will ask you one last
16   question, not that my questioning I trust has
17   been a torture, but at the bottom of the page it
18   does show on line 46 the negative goodwill of
19   what looks like 2.98, do you see that?
20   A.    Yes.
21   Q.    And this relates to the acquisition of
22   Lehman assets, right?
23   A.    Well, it looks like that that was as
24   of the Friday, but there's no calculation as to
25   what it was with the revalued assets in the

Page 179

1    HIGHLY CONFIDENTIAL - R. RICCI
2    other two columns, which is difficult to make
3    any connection.
4    Q.    Well, let me ask you what you mean by
5    that.  You say the 2.98 relates to a valuation
6    on Friday.  What are you basing that testimony
7    upon?
8    A.    I'm just assuming that the Friday P&L
9    or the Friday inventory, I'm just assuming it's
10   based on an approximation of the $45 billion in
11   collateral plus the $7 billion in cash.
12   I don't know what columns H and I are,
13   but clearly they have been revised.
14   Q.    I'm not asking to ask you to guess
15   about this, but I will ask you one last
16   question.  Am I correct that the negative
17   goodwill referenced in this document, to the
18   extent it relates to the Lehman transaction in
19   any of its forms, reflects assets over
20   liabilities of $2.98 billion?
21   MR. HUME:  Object to the form.
22   A.    I'm not an accountant.  It's difficult
23   for me to make sense of what all these columns
24   are.
25   Q.    Look at line 55, which carries onto

Page 180

1    HIGHLY CONFIDENTIAL - R. RICCI
2    the next page?
3    A.    Yes.
4    Q.    It says, "Trades are initially booked
5    at BONY prices - 2.83 billion is the initial
6    estimate of the adjustment Barclays marks."
7    Does that refresh your recollection as
8    to the valuation adjustment referenced on the
9    first page of the exhibit as having been a
10   change in the BONY marks to represent -- to
11   reflect Barclays' prices?
12   A.    It would have supported my
13   recollection of the conversations that BONY
14   weren't experts in a lot of the products that
15   and that -- and assets that we took and that we
16   were, you know, marking them from the initial
17   transfer price from BONY to reflect what would
18   be the appropriate price for our books.
19   Q.    And you were marking them down, at
20   least according to this document, $2.83 billion,
21   correct?
22   A.    Yes.
23   MR. CARDEN:  Let's take a break.
24   (Recess; Time Noted.  2:36 P.M.)
25   (Time Noted:  2:52 P.M.)

Page 181

1    HIGHLY CONFIDENTIAL - R. RICCI
2    BY MR. CARDEN:
3    Q.    Mr. Ricci, I show you what's been
4    marked previously as Exhibit 133, which on the
5    face of it is an e-mail from Mr. Clackson to you
6    on Friday, September 19th, in the morning.  It
7    encloses an e-mail from Mr. Yang to Mr. Clackson
8    and references a haircut summary.
9    Do you remember getting this?
10   A.    No.
11   Q.    Do you have any understanding based on
12   the events of that morning as to what this
13   document represents, and by that I mean the
14   second page?
15   A.    No.
16   Q.    Thank you.
17   (Exhibit 385, a document bearing Bates
18   Nos. BCI-EX-00079472 through 79473, marked
19   for identification, as of this date.)
20   Q.    I show you what's been marked Exhibit
21   385.  Take a moment and review it.  A number of
22   e-mails here from you.
23   A.    Okay.
24   Q.    I'd like to start with actually the
25   second page, you may not have turned it over

Page 182

HIGHLY CONFIDENTIAL - R. RICCI
1  yet, and there's an e-mail from Mr. Clackson to
2  you on Tuesday, September 23rd, very early in
3  the morning. Do you see that?
4      A.  I do.
5      Q.  Okay. And he, that being Mr.
6  Clackson, says, "So some things we have to keep
7  working on to squeeze out what we can, but looks
8  more like 3 to 3.5 rather than 4 plus. Basic
9  issue is outside repo not enough assets." Do
10  you know what he meant by that?
11      MR. HUME: Objection. Lacks
12  foundation and calls for speculation.
13      A.  I'm not quite sure what he was
14  referring to.
15      Q.  Well, you respond to him by saying,
16  "What have we told the group?" So at the time
17  you must have had some kind of understanding
18  about what he meant, right?
19      A.  I'm not sure if he was talking about,
20  you know, this was an estimate of negative
21  goodwill or this was an estimate of haircut
22  cushion, I don't know, but I would have wanted
23  him to know what he would have said to the
24  group.
25

Page 183

HIGHLY CONFIDENTIAL - R. RICCI
1      Q.  Either way?
2      A.  Either way.
3      Q.  And then there's an e-mail on the
4  first page that's from you to Mr. Clackson,
5  "Derivs are 800. Do we think 2.0?"
6      Do you know what that means?
7      A.  In the context of this set of e-mails,
8  clearly we were -- again, there was a lot of
9  uncertainty about the valuation. In our last
10  discussion we talked about Stephen King. Now,
11  looking at marks more appropriate, $2.83 billion
12  lower, I'm still at this stage worried about
13  cushion. I'm probably pushing Mr. Clackson to
14  see if there's any room anywhere else, we're
15  sure we have everything valued appropriately.
16  Mr. Clackson to responds to me that he's only
17  got 800. I'm telling him I'm worried about
18  cushion and I say I'm worried.
19      Q.  What does it mean in the e-mail, the
20  second one from you to Mr. Clackson on Tuesday
21  at 1:13 in the morning, "Need to get to 4 or no
22  writedown capacity," what does that mean?
23      A.  I'm worried that the asset valuations,
24  which I mentioned took us months and months to
25

Page 184

HIGHLY CONFIDENTIAL - R. RICCI
1  finally figure out, were going to be a problem
2  and wanted to make sure we had some cushion.
3      Q.  What did you mean when you said that
4  Barclays needed to get to 4 or there was no
5  writedown capacity?
6      MR. HUME: Objection. Asked and
7  answered.
8      MR. CARDEN: It was asked.
9      Q.  Go ahead.
10      A.  I said we needed to get more money
11  because I was worried about the valuation of the
12  assets.
13      Q.  But what was the capacity to write
14  down? Why was that an issue at that point?
15      A.  It was capacity. I was just worried,
16  again, as I stated previously, I needed to
17  protect Barclays' capital position. Markets
18  looked to be going one way. I was just worried
19  that we would, you know, not have enough
20  protection.
21      Q.  Did you mean by that reference that if
22  you didn't get to a $4 billion negative goodwill
23  number, that there wouldn't be sufficient
24  capacity for Barclays to write down the assets

Page 185

HIGHLY CONFIDENTIAL - R. RICCI
1  and still be capital-neutral?
2      A.  I don't recall.
3      Q.  Does the e-mail that you sent to Mr.
4  Clackson on Tuesday at 1:13 in the morning
5  refresh your recollection that Mr. Clackson in
6  his e-mail to you earlier that morning was
7  referring to negative goodwill when he
8  referenced 3 -- 3 to 3.5 rather than 4 plus?
9      A.  I'm not sure if that was reference to
10  negative goodwill or not, but clearly I had a
11  view on the markets that they were going to
12  continue to go down.
13      Q.  And your e-mail of Tuesday morning at
14  1:13 wherein you say -- use the number 4, do you
15  know what that 4 refers to?
16      A.  I don't recall.
17      (Exhibit 386, a document bearing Bates
18  Nos. BCI-EX-(S)-00024686 through 24687,
19  marked for identification, as of this date.)
20      Q.  I show you what has been marked 386,
21  Mr. Ricci. I just want to direct your attention
22  to the e-mail that is the second one which is
23  from Mr. Clackson to you on Wednesday, September
24  24, at 4:24 regarding the Lehman assets purchase

Page 186

1    HIGHLY CONFIDENTIAL - R. RICCI
2  wherein Mr. Clackson says, "See below 7 billion
3  of our cash is locked up by JPM, your name seems
4  to be against this...looks like a big problem."
5       What do he mean, if you know, about
6  your name being against that?
7    A.   Can I read the e-mails, please?
8    Q.   Of course you can.
9       (Document review.)
10   A.   I believe what he's saying is my name
11  is against it is it's -- because it references
12  the $7 billion cash balance held in our account
13  at JPM we've been unable to access has been
14  raised to Bob Diamond and it's my job to try to
15  get the $7 billion from JPMorgan.
16   Q.   Did you have a conversation with Mr.
17  Diamond about you undertaking that
18  responsibility?
19   A.   We had several conversations about
20  that, yes.
21   Q.   Thought you might have.
22      Did you receive any special bonus or
23  compensation for your role in concluding the
24  Lehman transaction, Mr. Ricci?
25   A.   I received a zero bonus in 2009 --

Page 187

1    HIGHLY CONFIDENTIAL - R. RICCI
2  2008.
3    Q.   I'm not sure that's fully responsive.
4  It might be.
5    A.   No. Zero.
6    MR. CARDEN:  Mr. Ricci's come to us
7  today for two reasons:  One because we
8  noticed his deposition to discuss the
9  transaction, and also as a 30(b)(6)
10  representative.
11      I think what we'll do here is carry on
12  around the table and conclude the first
13  piece of this, which is the non-30(b)(6)
14  piece.  We'll see how far we get.  I'm told
15  by Mr. Hamish just moment ago --
16   MR. HUME:  Mr. Hume.
17   MR. CARDEN:  I'm sorry, I apologize.
18      Told by Mr. Hume that -- well, Mr.
19  Hamish works as well -- that someone else
20  has been designated for at least a piece of
21  the 30(b)(6) subjects that we thought or
22  were helpful that you would be able to help
23  us on today, which I don't know what the
24  division is, we'll explore that later on,
25  and we haven't had a chance to really assess

Page 188

1    HIGHLY CONFIDENTIAL - R. RICCI
2  that yet.  I guess you're trying to bring
3  that person to us on Thursday, correct?
4    MR. HUME:  He's already noticed
5  independently as a 30(b)(6) representative
6  on other topics.
7    MR. CARDEN:  You're just going to add
8  the subjects to his --
9    MR. HUME:  I think as necessary.
10      Look, we're doing our best to respond
11  to a lot of information requests in a short
12  amount of time and to prepare people who are
13  being deposed anyway to answer those.  So I
14  think Mr. Ricci can answer some of those
15  questions.  To the extent you want detailed
16  financial information, Mr. Romain is going
17  to be in a better position to do that.
18   MR. CARDEN:  Okay.  All right.  My
19  colleague reminds me that we do hope for
20  @Exhibit 384 with column headings, if it
21  exists.
22   MR. HUME:  Okay.  I mean, I'll look.
23      You think it exists?
24   MR. CARDEN:  Well, because somebody
25  ought to know what the letters mean.  There

Page 189

1    HIGHLY CONFIDENTIAL - R. RICCI
2  ought to be a legend or there ought to be
3  headings.  I'm not saying somebody took the
4  headings off the top of it, but there ought
5  to be a legend that tells us what columns A,
6  B, C, D, what they all mean.  There's got to
7  be a reference someplace.
8       Thank you very much, Mr. Ricci.
9    THE WITNESS:  Thank you, counsel.
10  EXAMINATION BY
11  MR. MAGUIRE:
12   Q.   Mr. Ricci, as you know, my name is
13  Bill Maguire from Hughes, Hubbard & Reed
14  representing the Estate of Lehman.
15      Let me ask you first about the cushion
16  that you describe.  We saw some documents
17  describing at one stage a report to the Barclays
18  board of a $3 billion cushion, do you recall
19  that?
20   A.   I recall there was a document that
21  said there was $3 billion of negative goodwill.
22   Q.   And you understood that to be in
23  excess of assets over liabilities?
24   A.   I'm not an accountant, but that's
25  correct.

Page 190

HIGHLY CONFIDENTIAL - R. RICCI

1    Q.    And you wanted Barclays to have a
2  cushion, a protection in this transaction?
3    A.    Yes.
4    Q.    Was the $3 billion, was that in your
5  mind a minimum cushion? In other words, were
6  you prepared to do this transaction with
7  anything less than a minimum of $3 billion
8  excess of assets over liabilities?
9    A.    As I explained earlier, I didn't have
10  a specific target number in mind. There was a
11  tremendous amount of uncertainty in the market
12  and a lot of downward movement in the market. I
13  wanted to ensure that we had appropriate
14  protections to protect Barclays' capital
15  position and didn't have a specific number that
16  had to be in place or wouldn't do a deal.
17    Q.    So you don't recall at any stage
18  formulating in your own mind a minimum cushion
19  below which you simply would not do the deal?
20    A.    I don't recall ever coming up with a
21  minimum, but there, you know, as I stated
22  earlier, there may have been a time when, you
23  know, if I wasn't satisfied that I thought we
24  had enough, I would walk away. But I didn't

Page 191

HIGHLY CONFIDENTIAL - R. RICCI

1    have a number in mind. It was just a very
2  dynamic market and things were moving one day to
3  the next, hour to hour.
4    Q.    But it was important to you to make
5  sure that there was a cushion, as big a cushion
6  as possible for Barclays in undertaking this
7  transaction?
8    A.    Yes.
9    Q.    Ultimately, as the transaction
10  progressed through closing, how big was the
11  cushion that you ultimately obtained for
12  Barclays?
13      MR. HUME: Objection. Vague and
14  ambiguous.
15    A.    I don't recall what the final accounts
16  that we published in February were, but it's a
17  matter of public record. I don't remember off
18  the top of my head.
19    Q.    I'm asking you now for your
20  recollection at the time of the closing. As of
21  that time, did you have in your own mind an
22  understanding as to what the cushion was that
23  you had negotiated and obtained for Barclays?
24      MR. HUME: Objection. Asked and

Page 192

HIGHLY CONFIDENTIAL - R. RICCI

1    answered.
2    A.    At the time, there was tremendous
3  amount of uncertainty. I didn't get my assets
4  from JPMorgan. I still haven't gotten all my
5  assets from the estate. It was very difficult
6  to, until this is all settled and done, to
7  determine what the final valuation was.
8      So, you know, the accounting teams
9  come up with a valuation of all sorts of things,
10  and again, it's in our accounts, but I don't
11  recall a specific number at the end of the day.
12    Q.    Did you have in mind any cushion that
13  you believed Barclays was entitled to under the
14  deal as of the date of the closing?
15    A.    I don't recall.
16    Q.    Was there any occasion when, in your
17  understanding, Barclays was going to have a
18  smaller cushion than the $3 billion number
19  that's being used here?
20    A.    I suppose there were times I was
21  worried that we weren't going to have any
22  cushion.
23    Q.    The numbers could always work out
24  higher or lower. I'm really asking you, did you

Page 193

HIGHLY CONFIDENTIAL - R. RICCI

1    at any stage formulate a thought in your mind
2  that the cushion that Barclays was going to have
3  come the end of this deal was going to be
4  different -- let me strike that -- was going to
5  be less than a $3 billion cushion?
6    A.    I don't recall ever having a thought
7  that it could be, you know, it had to be a
8  minimum of $3 billion cushion.
9    Q.    You don't recall any discussions with
10  anyone about the cushion that Barclays had being
11  less than $3 billion at any time prior to the
12  closing of the transaction?
13    A.    I don't recall.
14    Q.    You mentioned that Mr. Klein was at
15  the bankruptcy hearing on Friday, the 19th, the
16  sale hearing?
17    A.    That's correct.
18    Q.    Did you have any discussions with Mr.
19  Klein about that hearing?
20    A.    Yes.
21    Q.    What was that discussion?
22    A.    Using the term "discussion" broadly,
23  but an e-mail exchange about a couple of
24  specific issues. I remember him describing it

Page 194

HIGHLY CONFIDENTIAL - R. RICCI
1
2  as, you know, a pretty intense, crazy scene
3  that, you know, we had made our piece, it was a
4  long hearing.
5      Q.   Let me ask you to leave aside the
6  e-mail correspondence and just ask you if there
7  was a verbal discussion.
8      A.   Sorry. I didn't separate out. There
9  was a verbal conversation around the atmosphere,
10  lots of cameras, lots of people there, you know,
11  large numbers of people. There was, you know,
12  there was a long hearing, the -- you know, that
13  was kind of the tenor and flavor of what the
14  hearing was about.
15     Q.   Did Mr. Klein tell you how the
16  transaction had been presented to the judge?
17     A.   Not that I recall.
18     Q.   Did he tell you that the transaction
19  had been presented to the judge?
20     A.   I don't recall.
21     Q.   Did you have an understanding that the
22  purpose of the sale hearing was to explain to
23  the judge what the transaction was and to obtain
24  the approval of the judge for the transaction?
25     A.   Yes, there was to be a presentation by

Page 195

HIGHLY CONFIDENTIAL - R. RICCI
1
2  Lehman and, yes, that there would be a
3  presentation to the judge, yes.
4      Q.   And did you understand that that
5  involved describing to the judge what the assets
6  were that were in the sale and what was being
7  paid for those assets?
8      A.   I wasn't at the hearing, but I would
9  have assumed that the description of the
10  transaction would have been made by the relevant
11  parties.
12     Q.   Did you ever inform yourself as to
13  what was -- how the transaction was described to
14  the court at that hearing?
15     A.   No, not that I can recall.
16     Q.   If Mr. Ricci was at the hearing and
17  you weren't, how did --
18         MR. HUME: This is Mr. Ricci.
19     Q.   I'm sorry, Mr. Ricci.
20         If Mr. Klein was at the hearing and
21  you weren't, how did Barclays coordinate its
22  different teams between the Barclays
23  representatives who were in court and the
24  decision-makers and negotiators who were not
25  present in court?

Page 196

HIGHLY CONFIDENTIAL - R. RICCI
1
2         MR. HUME: Objection. Vague and
3  ambiguous.
4      A.   By the time the hearing was occurring,
5  you know, we had agreed the terms of the deal,
6  and Mr. Klein would have told me if the terms of
7  the deal in which we had reached agreement with
8  Lehman that was presented by Lehman at the
9  hearing or whoever the appropriate parties were
10  at the hearing, if it was different, he would
11  have told me.
12     Q.   Did Mr. Klein ever tell you that there
13  was anything that was presented at the hearing
14  that was in any way inconsistent with Barclays'
15  understanding of the transaction?
16     A.   Not that I can recall.
17     Q.   Did Mr. Klein tell you that the court
18  had been advised that cash was excluded from the
19  sale?
20     A.   Not that I recall.
21     Q.   Was it your understanding that cash
22  was excluded from the sale?
23     A.   Define "cash." I'm not sure what you
24  mean by "cash." All cash?
25     Q.   Dictionary definition of "cash."

Page 197

HIGHLY CONFIDENTIAL - R. RICCI
1
2      A.   Well, no, it was never described to me
3  that cash had been excluded from the deal. If
4  there had been cash as part of collateral that
5  we were taking, I would have assumed the cash
6  would have come over.
7         So the vague notion that, you know,
8  cash was excluded from the deal, I don't -- my
9  understanding of the deal was not that, you
10  know, that if, for instance, there was cash in
11  margin accounts, the cash would come.
12     Q.   Has anyone ever told you that cash was
13  excluded from the deal?
14         MR. HUME: Objection. To the extent
15  that calls for you to reveal any
16  conversation you had at the time or since
17  with any legal counsel, instruct you not to
18  answer to preserve the privilege.
19     Q.   I'm going to ask you to exclude from
20  your answers any communications that you had
21  with your counsel to get any kind of legal
22  advice. So you can exclude that.
23         But has anyone, with that exclusion,
24  has anyone other than your lawyers ever told you
25  that cash was excluded from the deal?

50

Page 198

HIGHLY CONFIDENTIAL - R. RICCI

1    A.    Not that I recall.
2    Q.    Did Barclays in fact obtain cash in
3    the sale?
4        MR. HUME: Objection. Vague and
5    ambiguous.
6    A.    Well, we would have received some cash
7    from JPMorgan. I'm not sure what other cash we
8    may have received, if any.
9    Q.    It's your understanding that Barclays
10   did receive cash in the deal; is that correct?
11       MR. HUME: Objection. Asked and
12   answered.
13   Q.    Is that your understanding, sir?
14   A.    As I said previously, we received some
15   cash from JPMorgan.
16   Q.    We've seen a number of exhibits that
17   refer to $7 billion in cash that Barclays
18   obtained in the transaction. Is that your
19   understanding, sir, that Barclays obtained $7
20   billion of cash in the transaction?
21   A.    We didn't receive $7 billion of cash
22   in the transaction.
23   Q.    Can you tell me how much cash Barclays
24   did obtain in the transaction?

Page 199

HIGHLY CONFIDENTIAL - R. RICCI

1    A.    It was less than $7 billion.
2    Q.    Did you ever have an expectation of
3    obtaining $7 billion of cash in the transaction?
4    A.    We expected to receive cash or
5    collateral or a combination of the two that
6    would have -- at one point we had the
7    expectation it would have equaled $7 billion,
8    yes.
9    Q.    Do you know how much cash Barclays did
10   obtain in the transaction?
11       MR. HUME: Objection. Vague and
12   ambiguous.
13   A.    I don't know how much total cash
14   Barclays obtained in the transaction.
15   Q.    Can you give me any estimate?
16       MR. HUME: Objection. Calls for
17   speculation. Lacks foundation.
18   A.    I don't know the total amount of cash
19   that Barclays received in the transaction.
20   Q.    Is there any ballpark you can give me,
21   your best understanding?
22   A.    I believe we received about a billion
23   dollars in cash from JPMorgan, and I don't know
24   any other cash we received.

Page 200

HIGHLY CONFIDENTIAL - R. RICCI

1    Q.    You testified earlier, sir, that the
2    obtaining or seeking additional assets from
3    Lehman stopped when people went down to the
4    bankruptcy court hearing on Friday, the 19th, do
5    you recall that?
6    A.    I believe what I said was is that, by
7    the time the hearing had started, we had stopped
8    seeking more assets from Lehman.
9    Q.    At any time following that, did
10   Barclays seek to obtain any additional assets
11   from Lehman?
12   A.    Not that I can recall.
13   Q.    Are you aware of whether the economics
14   of the transaction to Barclays changed over the
15   weekend following the bankruptcy court hearing?
16       MR. HUME: Objection. Vague and
17   ambiguous.
18   A.    Over the weekend?
19   Q.    Yes.
20   A.    Not that I can recall.
21   Q.    Are you aware of whether there was any
22   change in the assets that were included in the
23   sale that occurred over the weekend following
24   the bankruptcy court approval?

Page 201

HIGHLY CONFIDENTIAL - R. RICCI

1    A.    Not that I recall.
2    Q.    Are you aware of any assets that were
3    added to the deal following the bankruptcy court
4    hearing?
5    A.    Not that I recall.
6    Q.    Are you aware of any assets that were
7    subtracted from the deal following that hearing?
8    A.    On that weekend?
9    Q.    Yes.
10   A.    Not that I recall.
11   Q.    And the markets were closed over that
12   weekend, right?
13   A.    Yes.
14   Q.    So there was no market -- change in
15   the market values over that weekend?
16   A.    Markets were open in other parts of
17   the world, so potentially there might have been
18   valuations to those assets.
19   Q.    Let me leave aside any change in
20   valuations from market reasons over the weekend.
21   Are you aware of any additional value that
22   Barclays tried to get over the weekend or did
23   get over the weekend from Lehman?
24       MR. HUME: Objection. Asked and

Page 202

HIGHLY CONFIDENTIAL - R. RICCI

1  answered.
2      A.   Not that I recall.
3      Q.   Did anyone tell you that the court had
4  been advised that Barclays was obtaining $47.4
5  billion in assets as a result of this
6  transaction?
7      A.   Not that I recall.
8      Q.   Does the number $47.4 billion, is that
9  consistent with your understanding of the
10 transaction?
11     A.   Not that I recall.
12     Q.   What was your --
13     A.   Again, lots of uncertainty around true
14 valuations.  We were missing $7 billion in
15 JPMorgan moneys.  We didn't get a real
16 understanding of the total valuations of the
17 assets until February.
18     Q.   Did you ever ask anyone what had been
19 represented to the court in terms of the value
20 of the assets that Barclays was getting in the
21 transaction?
22         MR. HUME:  Objection.  Asked and
23 answered.
24     A.   Not that I recall.

Page 203

HIGHLY CONFIDENTIAL - R. RICCI

1      Q.   You mentioned some 15c3 assets that
2  were discussed between you and Mr. McDade on
3  Friday?
4      A.   That's correct.
5      Q.   Did you understand that initially
6  there was a hope or expectation that that amount
7  might be in excess of $1 billion?
8      A.   As I recall -- sorry, I do recall that
9  there was at one point talk about it being $1.7
10 billion.
11     Q.   Did you understand there was some
12 difficulty in calculating that to determine what
13 exactly the excess was?
14     A.   I recall that we settled on a number
15 of $765 million or -- of 15c3 funds or other
16 securities to that amount.
17     Q.   How did you come to the -- was it 765
18 or 769?
19     A.   Roughly 750 million.  About 765 sticks
20 in my mind.
21     Q.   How did you come to that specific
22 number?
23     A.   I believe Patrick Clackson told me
24 that number.

Page 204

HIGHLY CONFIDENTIAL - R. RICCI

1      Q.   And do you know how that number was
2  derived?
3      A.   No.
4      Q.   Did anyone explain now 15c3 assets had
5  ended up in 750 million instead of the larger
6  number that you had originally been working
7  with?
8      A.   At the time, as I previously stated,
9  there was a lot of uncertainty around Lehman and
10 the quality of information coming from Lehman
11 numbers.  So I don't recall being told anything
12 other than the number was wrong.
13     Q.   Did you understand what a 15c3 account
14 was?
15     A.   Not in detail, no.
16     Q.   Did anyone explain to you that it was
17 a lockup or customer reserve account?
18     A.   Not that I recall.
19     Q.   Did anyone tell you that regulatory
20 approval was required in order to transfer funds
21 out of the 15c3 account?
22     A.   Not that I recall.
23     Q.   Did you ever have an understanding as
24 to whether Barclays would be entitled to any of

Page 205

HIGHLY CONFIDENTIAL - R. RICCI

1  that money if the regulators didn't give an
2  approval for any of those funds to move from the
3  15c3 accounts?
4      A.   As I stated, I recall that it was $750
5  million of 15c3 funds or other securities.  I
6  don't recall any conversations to that effect.
7      Q.   Do you recall any conversations with
8  anyone concerning whether the ability of Lehman
9  to move those funds to Barclays might be limited
10 by regulators?
11     A.   Only to counsel.
12     Q.   And when you say "only to counsel,"
13 are you talking about a discussion that you had
14 over the weekend, before the closing, or
15 subsequently?
16     A.   Subsequently.
17     Q.   So, as of the weekend following the
18 bankruptcy hearing, is it fair to say you had no
19 discussions with anyone as to what limitations
20 there were on Lehman's ability to pay the 15c3
21 account?
22     A.   Not that I recall.
23     Q.   Did you have any discussions with
24 anyone at Lehman other than Mr. McDade

Page 206

HIGHLY CONFIDENTIAL - R. RICCI

1 concerning the 15c3?
2    A.   Not that I recall.
3    Q.   In your discussion with Mr. McDade,
4 did you have a number at that stage as to what
5 might be in the 15c3?
6    A.   I recall at that stage it was around
7 750 million.
8    Q.   And did you understand that only the
9 excess from the account could qualify for
10 transfer?
11    A.   I only had the 750 million. That's
12 the only thing I recall.
13    Q.   Did you understand whether that was
14 the total in the account or the excess in the
15 account?
16    A.   My understanding was that was what
17 Barclays was getting in the transaction.
18    Q.   You had no further detailed
19 understanding as to exactly what was in Lehman's
20 15c3 account?
21    A.   Not that I can recall.
22    Q.   We'll mark as Exhibit 387.
23       (Exhibit 387, Debtors' Third Rule
24    30(b)(6) Deposition Notice to Barclays on

Page 207

HIGHLY CONFIDENTIAL - R. RICCI

1 Issues Pertaining to Exchange-Traded
2    Derivatives and Exchange Deposits, marked
3    for identification, as of this date.)
4    Q.   Sir, this is a 30(b)(6) deposition
5 notice in this matter dated August 12, 2009.
6       Have you ever seen this document
7 before?
8    A.   In my prep session for this, yes.
9    Q.   So you have an understanding that
10 Barclays has designated you as its 30(b)(6)
11 witness with respect to the topics that are
12 identified on Schedule A?
13    A.   Yes.
14       MR. HUME: As I said earlier, Mr.
15    Ricci is a 30(b)(6) representative in
16    response to this notice. To the extent
17    another witness is needed, we'll provide
18    him.
19    Q.   And sir, you have knowledge with
20 respect to each of the three topics that are
21 identified in Schedule A; is that correct?
22    A.   Yes.
23    Q.   The first paragraph refers to the
24 Options Clearing Corporation, or OCC. Do you

Page 208

HIGHLY CONFIDENTIAL - R. RICCI

1 see that?
2    A.   Yes.
3    Q.   And it talks about the, (ii), the
4 existence, extent and constituent component
5 parts of any property, you see that?
6    A.   Yes.
7    Q.   It's a long sentence, but it goes on
8 to talk about whether "as margin, guarantee,
9 clearing fund deposit, or any other form with
10 the OCC or any other foreign or domestic
11 exchange," do you see that?
12    A.   Yes.
13    Q.   And it specifically refers "to which
14 Barclays claims entitlement under the
15 clarification letter or the Transfer and
16 Assumption Agreement."
17    A.   Yes.
18    Q.   Did you follow all that?
19    A.   Yes.
20    Q.   Are you aware that Barclays claims
21 entitlement to certain margin and guarantee or
22 clearing fund deposit?
23    A.   Yes.
24    Q.   If I refer to margin and clearing fund

Page 209

HIGHLY CONFIDENTIAL - R. RICCI

1 deposit as margin, will we understand each
2 other?
3    A.   Yes.
4    Q.   Did you have an understanding at the
5 time of the sale hearing, Friday, the 19th, as
6 to what the value of the excess margin was that
7 Lehman had at the OCC?
8    A.   It might be helpful if I told you who
9 I've spoken to to be able to speak on behalf of
10 Barclays Group.
11    Q.   Sure.
12    A.   So I've spoken to Liz James.
13    Q.   Who?
14    A.   Liz James, who's the product head of
15 Futures; I've spoken to Shawn Teague, who works
16 in the Independent Valuations Group in Barclays
17 Capital; I've spoken to Jerry Shi, who was an
18 ex-Lehman valuation, independent valuations
19 person who's come over with them; and I spoke to
20 the last person is -- oh, and Mark Washtell, who
21 is in the Independent Evaluations Group as well.
22       Can you ask your question again,
23 please?
24    Q.   And this question is really directed

Page 210

HIGHLY CONFIDENTIAL - R. RICCI

1  to your understanding at the time of the sale
2  hearing on September 19.
3      A.   Me personally or me as the 30(b)(6)
4  representative for the group?
5      Q.   You personally.
6      A.   Okay.
7      Q.   As of that date, what was your
8  understanding as to whether, if there was value,
9  how much the excess margin was at the OCC and
10  other foreign exchanges?
11      A.   We weren't sure. I wasn't sure.
12      Q.   Did you have any understanding?
13      A.   Of the excess margin?
14      Q.   Yes.
15      A.   I don't recall.
16      Q.   When you say you don't know, you're
17  saying as of September 19, you did not know?
18      A.   Correct.
19      Q.   Do you understand today that Barclays
20  has claimed, has demanded from the estate the
21  value of the excess margin at the OCC?
22      A.   Yes.
23      Q.   Do you understand that Barclays claims
24  both cash and securities?

Page 211

HIGHLY CONFIDENTIAL - R. RICCI

1      A.   Yes.
2      Q.   Do you understand that Barclays has
3  already obtained the cash from JPMorgan?
4      A.   That's not my understanding.
5      Q.   Is it your understanding that Barclays
6  has obtained any cash margin that LBI had at
7  OCC?
8      A.   I don't know.
9      Q.   Do you know what the amount of cash
10  margin was that Barclays had at OCC?
11      A.   I don't know.
12      Q.   Do you know whether Barclays --
13          MR. HUME:  On these numerical
14      questions for the specific number, it's
15      unclear whether you're asking him as
16      30(b)(6) or not. I think the answer is the
17      same either way, but the company knows the
18      numbers; this witness doesn't know the
19      numbers.
20      Q.   If I don't ask you otherwise, I'm
21  assuming that you'll tell me what you know
22  individually and, if not, what you know by way
23  of being informed as a 30(b)(6) witness. Is
24  that fair?

Page 212

HIGHLY CONFIDENTIAL - R. RICCI

1      A.   Okay. I apologize. I thought you
2  were asking me as an individual, continuing down
3  that path.
4      Q.   So if we broaden it so my questions
5  are, in the first place, to your personal
6  knowledge, if you have it, and then if you
7  don't, you can default to what you've been told,
8  you can tell me what it is you've been told.
9          So, with that change, do you have an
10  understanding as to how much Lehman had in
11  excess margin at the OCC?
12      A.   I personally don't know and I don't --
13  I don't have that information on behalf of
14  Barclays Group. Barclays Group does know and
15  someone will be able to provide that
16  information.
17      Q.   If you look at the second paragraph on
18  Schedule A, sir, it speaks to the negotiation
19  and drafting first of all of the clarification
20  letter. Can you tell me, what is your knowledge
21  of the negotiation and drafting of the
22  clarification letter?
23          MR. HUME:  The topic is broader. It's
24      more specific than that.

Page 213

HIGHLY CONFIDENTIAL - R. RICCI

1      Q.   We can start generally what's your
2  knowledge of the -- how involved were you in the
3  drafting of the clarification letter?
4      A.   I personally would not have been
5  involved in the drafting of the clarification
6  letter.
7      Q.   Did you see any drafts of the
8  clarification letter?
9      A.   I would have, yes.
10      Q.   Were all drafts run by you?
11      A.   Not all drafts.
12      Q.   What were your instructions to your
13  people as to what you wanted to see and didn't
14  want to see?
15      A.   I didn't give them instructions per se
16  as to what I wanted to see and what I didn't
17  want to see. If there was something that was
18  important or that was of a nature that someone
19  needed my view on, lawyers represented it to me.
20      Q.   So you were the decision-maker and
21  people brought things to you if they felt they
22  needed your input on a specific point?
23      A.   If they needed specific input. I'm
24  not a lawyer.

Page 214

HIGHLY CONFIDENTIAL - R. RICCI
1  HIGHLY CONFIDENTIAL - R. RICCI
2  Q.   Specifically, this speaks to (i)
3  exchange-traded derivatives.  You see that, sir?
4  A.   Yes.
5  Q.   Do you have any personal knowledge
6  with respect to the negotiation, the drafting of
7  the clarification letter with respect to
8  exchange-traded derivatives?
9  A.   My personal knowledge is that
10  exchange-traded derivatives and associated
11  collateral had been in the original APA.  The
12  clause in which it was contained in in the
13  original APA was changed in the clarification
14  letter because other elements not related to the
15  exchange-traded derivatives and the associated
16  collateral were changed.
17  So to be -- make sure there was
18  clarity around it, the explicit language
19  repeating what was in the original APA was added
20  to the clarification letter around
21  exchange-traded derivatives.
22  Q.   When you say the explicit language,
23  you're saying the explicit language from the APA
24  was then carried over into the clarification
25  letter?

Page 215

1  HIGHLY CONFIDENTIAL - R. RICCI
2  A.   There wasn't explicit language.  It
3  might not have included every "the," "and" and
4  letter, but the language related to
5  exchange-traded derivatives and the intent
6  around exchange-traded derivatives was
7  transferred to the clarification letter, yes.
8  Q.   If you can take a look, sir, at
9  Exhibit 1.  If you turn, sir, to page 6.
10  A.   Yes.
11  Q.   And look at little subdivision D.
12  A.   Yes.
13  Q.   You see a reference there to
14  exchanged-traded derivatives?
15  A.   Yes.
16  Q.   Is this paragraph D the language that
17  you were referring to?
18  A.   It was the, not necessarily specific
19  language, but exchange-traded derivatives and,
20  of course, associated collateral, because you
21  wouldn't assume exchange-traded derivatives
22  without the collateral was the intent of the APA
23  around exchange-traded derivatives.
24  Q.   What do you understand collateralized
25  short-term agreements to be?

Page 216

1  HIGHLY CONFIDENTIAL - R. RICCI
2  A.   Short positions.  I'm not sure what
3  they relate to.
4  Q.   Do you have any understanding of what
5  was meant in the APA or what the term
6  "collateralized short-term agreements" mean?
7  MR. HUME: Objection.  Asked and
8  answered.  Calls for speculation.
9  A.   I'm not sure what you're specifically
10  referring to.
11  Q.   When you say you're not specifically
12  sure, can you tell me generally what you
13  understand "collateralized short-term
14  agreements" to mean?
15  A.   Not in this context.
16  Q.   Do you have an understanding in any
17  context what is a collateralized short-term
18  agreement?
19  MR. HUME: Objection.  Asked and
20  answered.  Calls for speculation.
21  A.   No.
22  Q.   Sir, is it your understanding that
23  this paragraph D includes not only
24  exchange-traded derivatives, but also associated
25  collateral that has been posted in connection

Page 217

1  HIGHLY CONFIDENTIAL - R. RICCI
2  with those derivatives?
3  A.   Yes.
4  Q.   And what is the basis for that
5  understanding?
6  A.   Because I don't think a company would
7  assume a position without assuming the
8  collateral, because if it just assumed the
9  position, the exchange would want the company
10  assuming the position to post the collateral.
11  So why would you take one without taking the
12  collateral?
13  Q.   Do you have any other basis for your
14  understanding other than what you have just
15  said?
16  A.   No.
17  Q.   Did you discuss your understanding
18  that exchange-traded derivatives included the
19  associated margin with anyone other than
20  counsel?
21  A.   I personally didn't.  I'm not sure if
22  anyone at the firm did.
23  Q.   Did you or, to your knowledge, anyone
24  at Barclays have any discussions with anyone at
25  Lehman as to whether margin was included in the

55

Page 218

1    HIGHLY CONFIDENTIAL - R. RICCI
2  sale?
3    A.  I didn't have that. I didn't have
4  personally those conversations.
5    Q.  Are you aware, sir, whether anyone at
6  Barclays had any discussions with anyone at
7  Lehman as to whether excess margin at OCC or any
8  other exchange was included in the sale to
9  Barclays?
10    A.  I don't recall. Someone from Barclays
11  may be able to answer that question.
12    Q.  As a representative of Barclays, do
13  you have knowledge or can you tell us whether
14  Barclays has knowledge of any such discussions?
15    A.  I can't recall, but someone else from
16  Barclays may be able to attest to that.
17    Q.  And if we wanted to know what Barclays
18  thought the value of Lehman's excess margin at
19  the OCC or any other exchange was at any point
20  in time, we would look to Mr. Romain for that?
21    A.  I think Mr. Romain or Mr. King. Mr.
22  Romain. Mr. Romain.
23    Q.  When you mentioned that the language
24  had been taken from the APA and put in the
25  clarification letter, were you referring to this

Page 219

1    HIGHLY CONFIDENTIAL - R. RICCI
2  paragraph D that we've been looking at?
3    A.  I was referring to the -- I may
4  have -- as I believe I said, it wasn't
5  necessarily the exact language, but there had
6  been changes to that clause, and the
7  clarification letter was, again, explicitly
8  making the point around exchange-traded
9  derivatives being included so as to not confuse
10  other elements of that clause were taken out and
11  being replaced. Those were being changed and
12  the exchanged-traded derivative language was
13  being inserted in the clarification letter.
14    Q.  So that everyone was clear what
15  Barclays was obtaining, the term
16  "exchange-traded derivatives" was put into the
17  clarification letter?
18    A.  There was other terms as well, I
19  believe, but the language was to be explicit so
20  everyone knew what Barclays was getting,
21  correct.
22    Q.  Did you understand by using the term
23  "exchange-traded derivatives," by that term
24  alone, it was clear to everyone that Barclays
25  was getting not only the exchange-traded

Page 220

1    HIGHLY CONFIDENTIAL - R. RICCI
2  derivatives, but also any excess margin at any
3  exchange?
4    A.  Are you talking about what's in the
5  clarification letter?
6    Q.  No, I'm asking about your
7  understanding. Was it your understanding that
8  by using that term "exchange-traded derivatives"
9  it was clear to everyone that Barclays was
10  getting not only the derivatives, but all excess
11  margin at any exchanges?
12    A.  Yes.
13    Q.  Sir, (ii) on our Schedule A speaks to
14  the exchange deposit which Barclays claims
15  entitlement under the clarification letter, TAA
16  or otherwise. And the TAA I believe is the
17  Transfer and Assumption Agreement?
18    A.  That's correct.
19    Q.  Are you familiar with that document?
20    A.  Yes.
21    Q.  What was your role with respect to the
22  negotiation and drafting of the Transfer and
23  Assumption Agreement?
24    A.  Personally, none.
25    Q.  Who negotiated and drafted the

Page 221

1    HIGHLY CONFIDENTIAL - R. RICCI
2  Transfer and Assumption Agreement?
3    A.  I believe counsel would have drafted
4  it.
5    Q.  Who negotiated the Transfer and
6  Assumption Agreement?
7    A.  I believe it was Michael Klein.
8    Q.  Did you have any discussions with
9  Michael Klein concerning the Transfer and
10  Assumption Agreement?
11    A.  Not that I recall.
12    Q.  What discussions did Barclays have
13  with anyone, any of the other parties,
14  concerning the Transfer and Assumption
15  Agreement?
16    A.  I don't know what conversations
17  Barclays may have had.
18    Q.  Do you have any knowledge, either
19  personally or as designated 30(b)(6)
20  representative of Barclays, of what discussions
21  Barclays had with any other party to the
22  Transfer and Assumption Agreement?
23    A.  I'm sure Barclays did have some
24  conversations, but I don't know what they are.
25    Q.  And you'll see the last line of this

## Page 222

HIGHLY CONFIDENTIAL - R. RICCI

item 2 speaks to the documents and analysis
referred to in paragraph 2(c)(i) of the Transfer
and Assumption Agreement. See that, sir?

A.    I do.

Q.    Can you tell me what are the documents
and analysis that are referred to in that part
of the agreement?

A.    Do we have the TAA somewhere?

Q.    I'll show you, sir, a document that's
been marked as Exhibit 51.

A.    I'll have to defer that specific
question to my colleague, Mr. Romain.

Q.    Do you have any knowledge, sir, of the
credit analysis that Barclays did prior to
entering into the Transfer and Assumption
Agreement?

A.    I personally don't. I'm sure Barclays
does. Mr. Romain would be able to answer that.

Q.    And as a 30(b)(6) witness, you have
no -- you have not informed yourself or obtained
any additional information from anyone else on
that subject prior to coming here?

A.    No, as I said, Mr. Romain will deal
with that.

## Page 223

HIGHLY CONFIDENTIAL - R. RICCI

Q.    We have exhausted everything that you
can give us on that subject?

MR. HUME:    Which subject?

Q.    On the subject of --

A.    2(c)(i).

Q.    -- on the analysis that Barclays
performed?

A.    Yes.

Q.    You can put the exhibit aside for the
moment, sir.

You had told us a little bit earlier
about the requirement for a shareholder vote in
certain circumstances in order for Barclays to
enter into a certain kind of transaction.

Can you tell me, what was it that
triggered the requirement for a shareholder vote
on the part of Barclays?

A.    What I spoke to earlier was the
guarantee that was required to be provided for all
of Lehman's liabilities for the entire Barclays
enterprise to open for business on the 15th of
September, and as I understand it, the amount of
that guarantee exceeded the threshold as a
percentage of the market cap of Barclays Capital

## Page 224

HIGHLY CONFIDENTIAL - R. RICCI

that has allowed for the company to make an
independent decision to approve that without
going to the shareholders for further approval.

Q.    So the trigger was a percentage of
market cap?

A.    Yes, the guarantee as percentage of
market cap, I believe.

Q.    Do you have an approximate sense as to
what that translates to in dollar or even
sterling terms?

A.    I don't remember the numbers.

Q.    Who requested the waiver? And that's
the waiver of the shareholder vote.

A.    I believe John Varley, representing
the board, asked for the waiver.

Q.    And from whom did Mr. Varley make that
request?

A.    I believe it was of the UK listing
authority and the FSA.

Q.    And that waiver was not granted?

A.    That's correct.

Q.    Had the waiver been granted, then
Barclays would have been able to proceed and do
the transaction without a shareholder vote?

## Page 225

HIGHLY CONFIDENTIAL - R. RICCI

A.    We would have been able to provide
that guarantee without a shareholder vote. I
can't speak if there had been other things that
may have gotten in the way of the transaction.

Q.    Let me ask you now, with respect to
the week that ended with Friday, the 19th, and
the sale hearing before the bankruptcy court, in
the course of that week, did you understand that
a number of exchanges wanted Barclays to assume,
to step into the shoes of Lehman and give them
an unlimited guarantee of Lehman's obligations?

A.    Yes.

Q.    Did you understand, for example, that
the Depository Trust Corporation wanted such a
guarantee?

A.    Yes.

Q.    And did you understand that they had a
number of concerns that they might be exposed to
losses on the Lehman trades?

A.    Yes.

Q.    The Depository Trust Corporation is
sometimes referred to as the DTC?

A.    DTCC.

Q.    DTCC?

Page 226

HIGHLY CONFIDENTIAL - R. RICCI
1
2    A.   Yes.
3    Q.   Did you understand that there were
4    many billions of unsettled Lehman trades that
5    all had to be cleared through the system?
6    A.   Yes.
7    Q.   And they were concerned about their
8    exposure in clearing those trades?
9    A.   Yes.
10   Q.   They were afraid that their exposure
11   could extend to many billions of dollars?
12   A.   I don't recall what the numbers were,
13   but they were concerned, yes.
14   Q.   The exchanges are protected by a
15   clearing fund that each member keeps with the
16   exchange; is that correct?
17   A.   That's my understanding, yes.
18   Q.   And they also have protection of being
19   able to look to the assets that the member has
20   with the exchange; is that your understanding?
21   A.   I don't know.
22   Q.   Did you hear that certain of the
23   exchanges -- let me focus on DTC. Did you hear
24   that DTC was concerned about Barclays obtaining
25   assets from Lehman which were at DTCC and to

Page 227

HIGHLY CONFIDENTIAL - R. RICCI
1
2    which DTC looked to as a potential source of
3    collateral to protect itself against losses in
4    clearing Lehman trades?
5    A.   I don't recall.
6    Q.   Did you understand that DTCC wanted an
7    unlimited guarantee from Barclays?
8    A.   I do recall that, yes.
9    Q.   Did Barclays give DTCC an unlimited
10   guarantee?
11   A.   No, it did not.
12   Q.   Why not?
13   A.   I don't recall why we didn't.
14   Q.   Who made the decision that Barclays
15   would not give DTCC an unlimited guarantee?
16   A.   I don't recall.
17   Q.   Do you recall having discussions about
18   giving DTCC an unlimited guarantee?
19   A.   I do.
20   Q.   And what do you recall of those
21   discussions?
22   A.   I recall the uncertainty of the time,
23   and I don't think they fully understood what
24   their exposures were. We certainly didn't. The
25   transaction at that point was not to -- for the

Page 228

HIGHLY CONFIDENTIAL - R. RICCI
1
2    whole organization of Lehman. We didn't have
3    any responsibility for kind of historic Lehman
4    deals, and I don't think given the circumstances
5    and the markets as they were, there was any
6    appetite to provide an unlimited guarantee.
7    Q.   You understood that, without an
8    unlimited guarantee, DTCC was exposed?
9    MR. HUME: Objection. Calls for
10   speculation.
11   A.   I don't recall what the -- I know they
12   were concerned.
13   Q.   Did you understand that DTCC was
14   looking for an unlimited guarantee from Barclays
15   so that DTCC itself would not be exposed to
16   loss?
17   MR. HUME: Objection. Asked and
18   answered.
19   A.   I believe I do recall, yeah, they did,
20   but I wasn't sure that -- I mean, there
21   certainly was a conversation about it, yes.
22   Q.   Did you understand that by not giving
23   that guarantee, an unlimited guarantee to DTCC,
24   that left DTC with exposure?
25   MR. HUME: Objection. Calls for

Page 229

HIGHLY CONFIDENTIAL - R. RICCI
1
2    speculation.
3    A.   I don't know. I know it wasn't in the
4    interest of Barclays to provide that guarantee.
5    Q.   Did you have any discussions with
6    anyone about the impact on Lehman as a going
7    concern if DTCC refused to clear trades?
8    A.   Not that I recall.
9    Q.   Did you ever have an understanding
10   that the transaction could be affected if DTCC
11   refused to clear unsettled trades?
12   A.   I do remember conversations around the
13   mechanics, and I believe that we agreed to pay
14   $250 million to DTCC as kind of a backstop
15   against losses.
16   Q.   Do you have any knowledge of the
17   negotiations or discussions with DTCC?
18   A.   Yes, they were part of a broad set of
19   conversations on that weekend of the 20th and
20   21st of September.
21   Q.   What was your role in the discussions
22   with DTCC?
23   A.   Oh, boy. I was on several calls with
24   them, with regulators, with JPMorgan. I don't
25   think I was on every call with the specific

Page 230

HIGHLY CONFIDENTIAL - R. RICCI

1    negotiations with the DTCC. I think that might
2    have been Gerard LaRocca, but I do agree -- I do
3    remember agreeing to support the $250 million
4    backstop with the DTCC.
5        Q.  Did you understand that that was
6    embodied in a written agreement, a letter
7    agreement with DTCC?
8        A.  I believe that's correct.
9        Q.  Did you ever see that letter
10   agreement?
11       A.  I don't recall.
12       Q.  Did you ever agree that the Lehman
13   accounts at DTCC would be excluded from the sale
14   to Barclays?
15       A.  I don't recall.
16       Q.  Did anyone ever tell you that the
17   accounts, the Lehman accounts at DTCC were being
18   excluded from the sale?
19       A.  I don't recall.
20       Q.  Did you have any discussions with
21   anyone at DTCC about excluding any accounts or
22   assets at DTCC from the sale?
23       A.  I don't recall.
24       Q.  Who was the main person dealing with

Page 231

HIGHLY CONFIDENTIAL - R. RICCI

1    DTCC?
2        A.  I think it was Gerard LaRocca.
3        Q.  Did you have any discussions with Mr.
4    LaRocca about what needed to be done to get
5    DTCC's cooperation or support for the
6    transaction?
7        A.  The only thing I recall was the $250
8    million backstop.
9        Q.  Do you recall anything else?
10       A.  No.
11       Q.  You had had a discussion with Mr.
12   McDade on the Friday concerning certain assets
13   at DTCC; is that correct?
14           MR. HUME:  Objection.  Vague and
15   ambiguous.
16       A.  I don't recall specifically talking
17   about DTCC with Mr. McDade.
18       Q.  You had some discussions with him
19   about looking for additional assets, and one of
20   those was the 15c3?
21       A.  Sorry.  Yes.
22       Q.  And then there was something else?
23   Was that the -- in addition to the 750 million
24   or so that you thought was in the 15c3, was

Page 232

HIGHLY CONFIDENTIAL - R. RICCI

1    there also some additional assets?
2        A.  There was unencumbered assets at
3    various -- in various boxes.
4        Q.  And did you understand those boxes
5    were at DTCC?
6        A.  I believe one of them mentioned was at
7    DTCC. I believe there were others as well.
8        Q.  Do you recall ever agreeing that any
9    of those boxes could be excluded from the sale?
10       A.  No.
11       Q.  Did Mr. LaRocca ever tell you that any
12   of those boxes were excluded assets under the
13   sale?
14       A.  Not that I recall.
15       Q.  Sir, a little bit ago you mentioned
16   that you had spoken to four people. The first
17   one was Liz James?
18       A.  Yes.
19       Q.  Can you tell me what was the nature of
20   your conversation with Liz James?
21       A.  We were talking about the information
22   and the valuation of the Lehman positions at the
23   OCC on the time of the transaction.
24       Q.  And what did she tell you about that?

Page 233

HIGHLY CONFIDENTIAL - R. RICCI

1        A.  She told me that it was incredibly
2    difficult to get information, any information,
3    from Lehman, and it took a matter of several
4    weeks before they actually got information. The
5    information they received was incomplete, took
6    them even longer for them to put a value and
7    really understand the composition of the
8    positions.
9        Q.  When you referred to positions, are
10   you referring now to Lehman positions at OCC?
11       A.  Lehman positions as well as customer
12   positions.
13       Q.  At OCC?
14       A.  Yes.
15       Q.  Did Ms. James tell you any numbers or
16   any valuations that Barclays had obtained at any
17   time?
18       A.  No.
19       Q.  Did she tell you anything about
20   positions at any foreign exchanges?
21       A.  She mentioned that -- it might have
22   been her, it might have been others on the call
23   that mentioned information on, you know, Lehman
24   North America positions. There were other

Page 234

HIGHLY CONFIDENTIAL - R. RICCI

1 exchanges it was also difficult to get
2 information for, same issues.
3     Q.    And what about foreign exchanges?
4     A.    Yes, that were on foreign exchanges,
5 yes.
6     Q.    And again, no valuations?
7     A.    No.
8     Q.    Anything else that Ms. James told you?
9     A.    Not that I can recall.
10     Q.    What was the nature of your discussion
11 with Shawn Teague?
12     A.    Similarly, around information
13 gathering, the difficulties in getting
14 information. A lot of the positions that came
15 over Barclays didn't have, you know, in its own
16 systems, static data or market data to be able
17 to immediately understand the positions. It was
18 a big manual effort to try to understand what
19 the -- what the positions that were coming over
20 were let alone value.
21     Q.    Any valuations?
22     A.    No.
23     Q.    Again, this is all with respect to
24 positions at OCC and at foreign exchanges?

Page 235

HIGHLY CONFIDENTIAL - R. RICCI

1     A.    Correct.
2     Q.    Anything other than that that Mr.
3 Teague told you?
4     A.    Not that I can recall.
5     Q.    You spoke with Mr. Shi?
6     A.    Yes.
7     Q.    What did Mr. Shi tell you?
8     A.    Actually, everyone was on the same
9 call. It was very much similar to my
10 description of my previous conversations.
11     Q.    Was there anything beyond what you've
12 told us so far in connection with Mr. Teague or
13 Ms. James that you learned from Mr. Shi?
14     A.    Not that I can recall, no.
15     Q.    And how about Mark Washtell, was he on
16 the same call?
17     A.    Yes. Similar theme.
18     Q.    Anything that you learned additional
19 that you can tell us beyond what you've told us?
20     A.    No.
21     Q.    Anyone else you spoke to in connection
22 with your preparation today other than the four
23 people that you mentioned and your counsel?
24     A.    No.

Page 236

HIGHLY CONFIDENTIAL - R. RICCI

1     Q.    Sir, I'll show you a document that's
2 been previously marked as Exhibit 52. Have you
3 ever seen this document before, sir?
4     A.    Not that I recall.
5     Q.    If you turn to the second page of
6 the -- actually, let me first ask you to turn to
7 the last page. Is that Mr. LaRocca's signature?
8     A.    Looks like it, yes.
9     Q.    You're familiar with his signature?
10     A.    Vaguely.
11     Q.    And to the extent of your familiarity,
12 you recognize that?
13     A.    Yes.
14     Q.    Would you turn, sir, to the second
15 page of the agreement. You see in paragraph 1
16 there's a section called "Winding Down of
17 Accounts." You see that?
18     A.    Yes.
19     Q.    Do you have an understanding what
20 winding down of accounts is?
21     A.    No.
22     Q.    And I'm not speaking specifically to
23 this agreement. Just as a general matter, do
24 you have an understanding of winding down

Page 237

HIGHLY CONFIDENTIAL - R. RICCI

1 accounts?
2     A.    No.
3     Q.    You'll see the first sentence here
4 says, "Barclays has indicated, and hereby
5 agrees, that all of the accounts of LBI
6 maintained at the Clearing Agencies Subsidiaries
7 (the accounts) constitute 'Excluded Assets'
8 within the meaning of the APA." See that, sir?
9     A.    I do.
10     Q.    Do you have an understanding that the
11 term "excluded assets" meant assets that were
12 outside the sale to Barclays?
13         MR. HUME: Objection to the extent it
14     calls for a legal conclusion.
15     A.    I don't know.
16     Q.    Did you have an understanding from
17 your work on the APA that there were purchased
18 assets and excluded assets, do you recall that?
19     A.    I don't recall.
20     Q.    Did you have an understanding
21 generally, leave aside the magic term "excluded
22 assets," you understood that Barclays was
23 acquiring certain assets and leaving others?
24     A.    As I stated earlier, the part of the

Page 238

HIGHLY CONFIDENTIAL - R. RICCI

1   HIGHLY CONFIDENTIAL - R. RICCI
2   APA I was familiar with was the purchased assets
3   as well as some of the stuff around the employee
4   benefits.
5       Q.   Did you have an understanding on
6   September 22, 2008 that the accounts of Lehman
7   at DTCC were going to be excluded from the sale
8   to Barclays?
9       A.   Not that I recall.
10      Q.   Mr. LaRocca never told you that?
11      A.   Not that I recall.
12      Q.   Do you believe that's something that
13  Mr. LaRocca should have brought to your
14  attention that was a matter of sufficient
15  importance that you should have been advised of
16  that?
17      A.   I don't know. I don't know.
18      Q.   Did you have any understanding as of
19  September 22, 2008, as to what items Mr. LaRocca
20  would bring to your attention and what items he
21  would deal with on his own authority?
22      A.   No, there was no specific guidance.
23      Q.   Did Mr. LaRocca have authority to say
24  that substantial assets, or any assets for that
25  matter, could be excluded from the sale?

Page 239

HIGHLY CONFIDENTIAL - R. RICCI

1   HIGHLY CONFIDENTIAL - R. RICCI
2       A.   Mr. LaRocca would have been working
3   with our counsel and our deal team on the
4   specific nature of those trades and what might
5   be included or excluded.
6       Q.   And to the extent that he was working
7   with counsel in good faith and doing his best to
8   get the best job for Barclays, he had the
9   authority to enter into whatever agreements that
10  he had to enter into; is that correct?
11      A.   Yes, broadly.
12      Q.   Did you ever tell him that if there
13  was any agreement he entered into that was more
14  than $2 billion or $3 billion or some other
15  number, he had to come back and get your
16  specific approval?
17      A.   I never had that conversation, but --
18  I never had that conversation with him, no.
19      Q.   Did you ever have an understanding as
20  to the amount of the accounts, the value of the
21  total assets that were in the DTCC box, the
22  Lehman box at DTCC?
23      A.   I don't recall.
24      Q.   Did Mr. McDade ever indicate to you
25  what the approximate value of the boxed assets

Page 240

HIGHLY CONFIDENTIAL - R. RICCI

1   HIGHLY CONFIDENTIAL - R. RICCI
2   were?
3       A.   I remember we had a conversation. And
4   again, I'm not sure if it's DTC-specific, but we
5   had a conversation it was about $1.9 billion of
6   value in unencumbered assets.
7       Q.   Did Mr. LaRocca have --
8       A.   On the 15c3 account we had a
9   conversation it was 765, 750 million, roughly.
10      Q.   I was going to ask about the box
11  assets. Did Mr. LaRocca have authority to enter
12  into an agreement with DTCC that excluded assets
13  of as much as $1.9 billion --
14      A.   I don't recall.
15      Q.   -- on the sale to Barclays?
16      A.   I don't recall.
17      Q.   When you say you don't recall, I'm
18  asking you from your understanding and the way
19  that you were working with Mr. LaRocca at the
20  time, did he have that authority or not?
21      A.   I don't recall. I don't believe Mr.
22  LaRocca would have done that without speaking to
23  somebody on the deal team or somebody senior in
24  Barclays.
25      Q.   Do you know whether Mr. LaRocca spoke

Page 241

HIGHLY CONFIDENTIAL - R. RICCI

1   HIGHLY CONFIDENTIAL - R. RICCI
2   to anyone on the deal team or anyone at Barclays
3   about that?
4       A.   I don't know.
5       Q.   This refers to the accounts at DTCC,
6   and you mentioned there were a number of other
7   exchanges as well?
8       A.   My understanding was that there were.
9       Q.   Do you know which exchanges they were?
10      A.   I don't.
11      Q.   Have you heard of Euroclear or
12  Euronext, was that one of --
13      A.   I don't know if they were there or
14  not.
15      Q.   Did you have any understanding as to
16  the respective value of the DTCC accounts as
17  opposed to any other clearing account?
18      A.   No. As I previously stated, I just
19  knew the $1.9 billion number.
20      Q.   When you say the $1.9 billion number,
21  that's what Mr. McDade had explained to you was
22  the value of the Lehman unencumbered accounts;
23  is that correct?
24      A.   That's correct.
25      Q.   When he told you that, that was in

Page 242

HIGHLY CONFIDENTIAL - R. RICCI
1
2  your conversation on Friday prior to the
3  bankruptcy sale hearing?
4      A.   That's correct.
5      Q.   Did you ever get any further
6  clarification on the value of the Lehman
7  accounts in any of the clearing exchanges?
8      A.   Not that I recall.
9      Q.   The only number that you remember is
10 that 1.9 billion?
11     A.   That's correct.
12     Q.   Did there come a time when anyone
13 expressed to you that the absence of support
14 from DTCC could be fatal to the deal?
15     A.   I don't recall anyone saying it could
16 be fatal to the deal. I do recall, and again,
17 it was -- you know, now we've been up for 49 or
18 50 hours -- big conversations around the table
19 with the Fed, DTC, JPMorgan, the OCC might have
20 been there, talking through potential
21 operational issues in getting open on Monday
22 morning.
23     Q.   What do you recall of the problems,
24 the operational issues in opening Monday morning
25 if in the event the DTCC refused to clear Lehman

Page 243

HIGHLY CONFIDENTIAL - R. RICCI
1
2  trades?
3      A.   I don't recall what the specific --
4  the specific nature of what would happen if DTC
5  didn't clear.
6      Q.   Did you at any time have an
7  understanding as whether it would have been
8  possible for Barclays to proceed with the sale
9  without DTCC's agreement to continue to clear
10 Lehman trades?
11     A.   I don't think we had ever had a
12 conversation that said it would be fatal if they
13 didn't, not that I can recall.
14     Q.   We've been discussing for some time
15 the concerns that DTCC had about its exposure to
16 Lehman. I would now like to switch topics and
17 ask you about the concerns of OCC, the Options
18 Clearing Corporation.
19         (Discussion off the record.)
20         (Recess; Time Noted: 4:11 P.M.)
21         (Time Noted: 4:20 P.M.)
22 BY MR. MAGUIRE:
23     Q.   Sir, what was your involvement in
24 Barclays' discussions with the OCC?
25     A.   Again, to the extent that they were at

Page 244

HIGHLY CONFIDENTIAL - R. RICCI
1
2  the big table of people there on the Sunday
3  night, Sunday, the 21st of October (sic), I
4  can't remember specifics about the OCC other
5  than they might have been at the table.
6      Q.   And when you say Sunday, you're
7  referring to, if you look at the calendar,
8  that's the 21st?
9      A.   The 21st of September, yes.
10     Q.   So they might have been at the table,
11 but you don't recall any interchange between
12 Barclays and the OCC?
13     A.   I don't recall.
14     Q.   What about prior to that Sunday, had
15 you been involved in any discussions between
16 Barclays and the OCC?
17     A.   I don't recall.
18     Q.   Did you understand that the OCC was
19 concerned about its exposure to Lehman?
20     A.   I don't recall.
21     Q.   Did you ever have an understanding
22 that the OCC wanted Barclays to step into the
23 shoes of Lehman?
24     A.   Everyone wanted -- everybody wanted
25 Barclays to step into the shoes of Lehman at the

Page 245

HIGHLY CONFIDENTIAL - R. RICCI
1
2  time, and that certainly isn't what we had
3  bought or contracted to, but I don't remember
4  specifically the OCC.
5      Q.   Do you recall any discussions about
6  giving OCC an unlimited guarantee or assuming
7  all of Lehman's liabilities to the OCC?
8      A.   I don't remember that conversation.
9      Q.   Did Mr. LaRocca have authority to
10 enter into an agreement whereby Barclays would
11 assume all of Lehman's obligations to the OCC?
12     A.   I don't believe Mr. LaRocca would have
13 had that authority, no.
14     Q.   And why do you say that?
15     A.   Because it sounds, without knowing the
16 specifics of what type of dollar commitment
17 there may have been, it sounds like a sizable
18 transaction that he would need approval to enter
19 into.
20     Q.   Did you ever authorize Mr. LaRocca to
21 enter into any agreement whereby Barclays
22 assumed all of Lehman's obligations to the OCC?
23     A.   Not that I recall.
24     Q.   Are you aware whether anyone at
25 Barclays authorized Mr. LaRocca to enter into

62

Page 246

HIGHLY CONFIDENTIAL - R. RICCI

1   HIGHLY CONFIDENTIAL - R. RICCI
2   such an agreement?
3       A.   Not that I recall.
4       Q.   Who would know besides Mr. LaRocca
5   whether such an authority had been granted?
6       A.   Well, Mr. LaRocca obviously would
7   know. I don't know.
8       Q.   Put it a little differently, could
9   that have happened, could Mr. LaRocca have been
10  given authority to -- for Barclays to assume all
11  the liabilities of Lehman to the OCC without
12  your knowing about it?
13      A.   It would seem unlikely.
14      Q.   You would certainly expect that Mr.
15  LaRocca would have brought very specifically to
16  your attention any proposed agreement whereby
17  Barclays would assume all of Lehman's
18  obligations to OCC?
19      A.   Yes, with the exception that I don't
20  remember what conversations may have occurred
21  with the OCC around that large table on the
22  Sunday evening. Whether that topic came up
23  there I don't remember.
24      Q.   You looked briefly at Exhibit 51
25  before, so it's probably in front of you. It's

Page 247

1   HIGHLY CONFIDENTIAL - R. RICCI
2   the Transfer and Assumption Agreement.
3       A.   Yes, sir.
4       Q.   When was the first time that you saw
5   that agreement?
6       A.   I don't recall.
7       Q.   Let me put it, do you recall seeing
8   that document anytime in September of 2008?
9       A.   I don't recall.
10      Q.   Do you recall any discussions with
11  anyone in September 2008 concerning the Transfer
12  and Assumption Agreement?
13      A.   Not that I recall, no.
14      Q.   And I assume you would give the same
15  answer if I asked you about drafts of the
16  agreement?
17      A.   Yes.
18      Q.   Do you recall any discussions about
19  the Transfer and Assumption Agreement?
20      A.   No.
21      Q.   From your discussion with Mr. Klein
22  concerning what had happened to the bankruptcy
23  hearing, you understood the court had approved
24  the sale to Barclays?
25      A.   Yes.

Page 248

1   HIGHLY CONFIDENTIAL - R. RICCI
2       Q.   Did you have an understanding that the
3   court had been told about the different changes
4   to the deal that had happened during the week
5   leading up to that court hearing?
6       A.   My understanding from Mr. Klein was
7   that the court had approved the deal, as I
8   understood it.
9       Q.   And did you understand that there
10  needed to be some documentation of the changes
11  that had happened in the period leading up to
12  the sale hearing?
13      A.   I didn't know. You know, at that
14  stage, I knew that the original agreement we had
15  struck, we didn't get the assets. We had a new
16  agreement, certainly there would have been
17  changes to it, and my understanding was that the
18  deal as I understood it and that Lehman had
19  understood it and that Lehman had presumably
20  explained to the court was approved.
21      Q.   And did you understand that there
22  needed to be further documentation by way of the
23  clarification letter?
24      A.   I don't recall.
25      Q.   Did you have an understanding as to

Page 249

1   HIGHLY CONFIDENTIAL - R. RICCI
2   what the purpose of the clarification letter
3   was?
4           MR. HUME: Objection. Asked and
5   answered.
6       A.   I don't recall.
7       Q.   Sir, we were looking at a while ago
8   that Schedule A to the notice?
9       A.   Yes.
10      Q.   You'll see there's, in the third item,
11  there's the "timing and extent of disclosures to
12  the Bankruptcy Court, the SIPA Trustee, LBHI and
13  all other parties-in-interest," do you see that,
14  sir?
15      A.   Yes, sir.
16      Q.   And that's regarding the actual or
17  proposed transfer to Barclays of any
18  exchange-traded derivatives and any exchange
19  deposit. Do you see that, sir?
20      A.   Yes, sir.
21      Q.   What is your knowledge about those
22  disclosures?
23      A.   The disclosures were in the original
24  APA, they were in the clarification letter, and
25  they were also published in Barclays' accounts.

Page 250

1      HIGHLY CONFIDENTIAL - R. RICCI
2      Q.   Do you have any other knowledge, sir,
3   about any other disclosures?
4      A.   Not that I'm aware of, no.
5      Q.   When you refer to Barclays' accounts,
6   can you tell me what you're referring to?
7      A.   Barclays' annual report.
8      Q.   And that's Barclays' annual report for
9   2008?
10     A.   Correct.
11     Q.   And that was published in sometime in
12  early 2009; is that correct?
13     A.   April, I believe.
14     Q.   April. Now, when you referred to the
15  original APA, is that to the document we have
16  marked as Exhibit 1?
17     A.   Yes.
18     Q.   And specifically, was that the
19  reference to exchange-traded derivatives in that
20  on page 6, that little subsection D which you
21  spoke about earlier?
22     A.   Yes.
23     Q.   Were you referring to anything else
24  when you referred in your answer to the
25  original -- disclosure in the original APA?

Page 251

1      HIGHLY CONFIDENTIAL - R. RICCI
2      (Document review.)
3      A.   It would be the primary reference and
4   anything associated referencing that paragraph
5   in the agreement.
6      Q.   When you say "the primary reference
7   and anything associated," you mean --
8      A.   If there's other references to that
9   clause within the agreement.
10     Q.   Other references to that clause D in
11  the agreement; is that correct?
12     A.   Yes.
13     Q.   Are you personally aware of any other
14  disclosures that Barclays made concerning the
15  transfer of exchange-traded derivatives or any
16  margin in the original APA other than that one
17  clause, Section 1 -- Section 1.1 and then little
18  D on page 6, which refers to exchange-traded
19  derivatives, other than that one clause and any
20  references to that one clause that may appear
21  elsewhere in the agreement?
22     A.   I'm personally not aware, no.
23     Q.   How about as Barclays 30(b)(6)
24  designee, are you aware of any other disclosures
25  in the APA to that transfer other than that one

Page 252

1      HIGHLY CONFIDENTIAL - R. RICCI
2   clause D?
3      A.   I'm not aware.
4      Q.   And are you personally are, as
5   Barclays 30(b)(6) designee, aware of any
6   disclosures other than the three that I
7   mentioned, the original APA, the clarification
8   letter, and the disclosure in Barclays accounts?
9      MR. HUME:  Disclosures to whom?
10  Object to the --
11     MR. MAGUIRE:  The disclosure that the
12  witness has testified about, which is item 3
13  of his deposition notice.
14     MR. HUME:  I object that it's compound
15  and vague because it's not clear disclosures
16  to whom. There are several people listed.
17     Q.   Let me break it up for you, sir. You
18  understand my questions are all directed to item
19  3 on Schedule A, to those disclosures?
20     A.   Correct.
21     Q.   Now my question is, are you aware,
22  either personally or as Barclays 30(b)(6)
23  designee, of any such disclosures to anyone
24  other than the three that you've testified to?
25     MR. HUME:  Objection. Compound.

Page 253

1      HIGHLY CONFIDENTIAL - R. RICCI
2      A.   I'm not, but my colleague, who will be
3   as the other witness in this regard, may have
4   knowledge of other of Barclays' disclosures, be
5   they to accountants or other parties involved.
6      Q.   I believe we've exhausted all of your
7   knowledge both personally and as Barclays
8   30(b)(6) designee of all disclosures to the
9   Bankruptcy Court, the SIPA Trustee, the Lehman
10  Brothers Holdings, Inc., and all other
11  parties-in-interest?
12     A.   That is correct.
13     Q.   Are you aware, sir, do you have any
14  knowledge whether Barclays made any disclosure
15  to the court that the sale to Barclays included
16  a cushion to protect Barclays?
17     MR. HUME:  Whether Barclays made any
18  disclosures?
19     MR. MAGUIRE:  Yes.
20     A.   I'm not aware.
21     Q.   Are you aware whether there was any
22  disclosure to the court of any cushion to
23  protect Barclays?
24     A.   I don't know.
25     Q.   Are you aware, sir, whether there was

Page 254

```
1          HIGHLY CONFIDENTIAL - R. RICCI
2    any disclosure by Barclays or anyone else to the
3    SIPA Trustee of a cushion to protect Barclays?
4        A.   I don't know.
5        Q.   Are you aware whether there was any
6    disclosure to the Creditors Committee of any
7    cushion to protect Barclays?
8        A.   I don't know.
9        Q.   Are you aware, sir, of any disclosure
10   by Barclays or anyone else to the SIPA Trustee
11   of the value of the assets that Lehman had, the
12   margin assets at OCC?
13       A.   I don't know.
14       Q.   Are you aware of any disclosure by
15   Barclays or anyone else to the SIPA Trustee of
16   the value of Lehman assets at foreign clearing
17   exchanges?
18       A.   I don't know.
19       Q.   Are you aware of any such disclosures
20   by Barclays or anyone else to anyone on the
21   Creditors Committee?
22       A.   I don't know.
23       Q.   I'll show you a document that's been
24   marked -- it's the clarification letter. It's
25   been marked as Exhibit 25.
```

Page 255

```
1          HIGHLY CONFIDENTIAL - R. RICCI
2        Do you recognize the document, sir?
3        A.   Yes.
4        Q.   If you turn to the first page, Section
5    I(a)(ii), see there's a reference to Schedule B,
6    do you see that, sir?
7        A.   Under Section B?
8        Q.   Yes, it's about two lines up from the
9    bottom. The second line up from the bottom.
10       A.   Okay.
11       Q.   Do you have an understanding what
12   Schedule B was?
13       A.   Not that I recall.
14       Q.   If you turn to the next page, sir,
15   under the top of the page, the clause capital C,
16   you see a reference to "exchange-traded
17   derivatives and any property that may be held to
18   secure obligations under such derivatives and
19   collateralized short-term agreements," do you
20   see that?
21       A.   Yes.
22       Q.   Do you have an understanding in this
23   context what the term "collateralized short-term
24   agreement" means?
25       A.   No.
```

Page 256

```
1          HIGHLY CONFIDENTIAL - R. RICCI
2        MR. HUME: Objection. Asked and
3    answered.
4        Q.   You'll see there's a parenthetical
5    after "exchange-traded derivatives," "and any
6    property that may be held to secure obligations
7    under such derivatives." Do you see that?
8        A.   Yes.
9        Q.   Do you have an understanding what that
10   means?
11       A.   That is meant to be collateral.
12       Q.   When you say "collateral," does that
13   mean margin?
14       A.   Yes.
15       Q.   And what about clearing fund deposit,
16   you include that also in margin?
17       A.   Yes.
18       Q.   Did you have any discussions with
19   anyone about including that clause, the clause
20   in the parenthetical?
21       A.   No.
22       Q.   Did you understand the difference
23   between exchange-traded derivatives and property
24   that may be held to secure obligations under
25   those derivatives?
```

Page 257

```
1          HIGHLY CONFIDENTIAL - R. RICCI
2        A.   I believe so, yes.
3        Q.   And what's the difference?
4        A.   Derivatives is position and the
5    property that may be held to secure obligations
6    is margin.
7        Q.   Did you have an understanding over the
8    weekend prior to the closing as to the value of
9    the positions, the exchange-traded derivatives
10   positions that Lehman had?
11       MR. HUME: Objection. Asked and
12   answered.
13       A.   Not that I recall. As I testified
14   earlier, there was a lot of confusion and a lot
15   of lack of information.
16       Q.   Did you have an understanding as to
17   the value of the property that may be held to
18   secure obligations under Lehman's derivatives?
19       A.   Not that I recall, sir.
20       Q.   Show you a document previously marked
21   as Exhibit 49. I'm not going to ask you about
22   the cover e-mail, sir. I'm only going to ask
23   you about the attached draft of the
24   clarification letter.
25       Can you tell me whether you've seen
```

Page 258

HIGHLY CONFIDENTIAL - R. RICCI

1
2  that draft before?
3      A.   Not that I recall.
4      Q.   Sir, if you turn to page 2 of the
5  draft, you'll see a section D there concerning
6  excluded assets, do you see that?
7      A.   Yes, sir.
8      Q.   Did you have an understanding what was
9  broadly meant by "excluded assets" under the
10  APA?
11      A.   Not that I recall.
12      Q.   Did you have a general understanding
13  that excluded assets were assets that were not
14  going to Barclays?
15      A.   Yes.
16      Q.   If you follow down that clause D,
17  you'll see there's a "provided that" about four
18  or five lines down, do you see that?  It says,
19  "Provided that" --
20      A.   Yes.
21      Q.   -- "excluded assets shall not
22  include," and then there's a (i) and then
23  there's a (ii), are you with me?
24      A.   Yes.
25      Q.   (ii) is cash, cash equivalents, bank

Page 259

HIGHLY CONFIDENTIAL - R. RICCI

1
2  deposits or similar cash items maintained (A),"
3  and then there's a reference to 15c3-3, do you
4  see that?
5      A.   Yes.
6      Q.   Did you understand that the 15c3
7  account involved -- the transfer of funds from
8  that account to Barclays would involve a
9  transfer of cash?
10      A.   Not that I recall.
11      Q.   If you follow the next line, it goes
12  on to say "or by or on behalf of any clearing
13  agency or clearing organization to
14  collateralize, guarantee, secure (whether as
15  margin, guaranty fund deposit or in any other
16  form."  You see that, sir?
17      A.   I do, sir.
18      Q.   Did you understand that this language
19  at any time was included in any draft of the
20  clarification letter?
21          MR. HUME:  Objection.  Asked and
22      answered.
23      A.   As I stated already, I've never seen
24  this draft and I don't recall that being in any
25  clarification letter.

Page 260

HIGHLY CONFIDENTIAL - R. RICCI

1
2      Q.   Did you understand that the
3  clarification letter entitled Barclays to any
4  cash that was held by or on behalf of any
5  clearing organization to collateralize,
6  guarantee, secure either as margin or fund
7  deposit the obligations of LBI?
8      A.   Not that I recall.
9      Q.   You don't recall understanding that
10  any such asset was included in the sale?
11          MR. HUME:  Objection.
12      A.   Sorry.  Maybe you can repeat the
13  question.
14      Q.   Did you understand that, as part of
15  the sale to Barclays, Barclays was acquiring
16  cash that was held at any clearing agency or
17  organization to guarantee or secure the
18  obligations of LBI?
19          MR. HUME:  Objection.  Vague and
20      ambiguous.
21      A.   Again, I think I testified earlier I'm
22  not sure I understand the question.
23      Q.   Let me try to break it down for you.
24          Did you understand that the OCC was a
25  clearing organization?

Page 261

HIGHLY CONFIDENTIAL - R. RICCI

1
2      A.   Yes.
3      Q.   And did you understand that Lehman had
4  deposited margin at the OCC?
5      A.   Yes.
6      Q.   And did you understand that Barclays
7  was acquiring not only the positions that Lehman
8  had at OCC, but also the margin?
9      A.   My understanding was the margin was
10  coming with the positions, yes.
11      Q.   Did you understand that that margin
12  included cash?
13      A.   Potentially could have included cash.
14      Q.   Did you understand that all that was
15  coming to Barclays?
16      A.   My understanding was it was all coming
17  to Barclays, yes.
18      Q.   So if I ask you to look at the
19  language we've been discussing, if we look to a
20  clearing organization, you understand that OCC
21  was a clearing organization?
22      A.   Yes.
23      Q.   And you understood that Lehman had
24  deposited margin at the OCC?
25      A.   Yes.

Page 262

HIGHLY CONFIDENTIAL - R. RICCI
1
2    Q.    And that margin was to secure the
3    obligations of Lehman?
4    A.    Yes.
5    Q.    And you understood that potentially
6    that margin could include cash?
7    A.    Yes.
8    Q.    And you understood that all that was
9    coming?
10    A.    My understanding was all the margin
11    was coming, yes.
12    Q.    Did anyone tell you that this language
13    in this provision, clause D, had been removed
14    from the clarification letter prior to its being
15    executed?
16    A.    Not that I recall.
17    Q.    Did anyone advise you that language in
18    the clarification letter entitling Barclays to
19    OCC margin had been removed from the
20    clarification letter?
21    A.    Not that I recall.
22    Q.    Would you have expected the removal of
23    language entitling Barclays to OCC margin to
24    have been brought to your attention?
25    MR. HUME: Objection. Calls for

Page 263

HIGHLY CONFIDENTIAL - R. RICCI
1
2    speculation.
3    A.    I'm not a lawyer. I'm not -- I wasn't
4    involved in the drafting of these documents. So
5    depending if it was a business issue or a legal
6    issue would have depended whether it was brought
7    to my attention or not.
8    Q.    I'm certainly not going to ask you any
9    legal issues, you're off the hook on that one,
10    but as a business issue, was it your expectation
11    that if anyone was going to agree that the OCC
12    margin, cash, was out of the deal, that that
13    would have been brought to your attention?
14    A.    If someone was going to agree that the
15    OCC piece was going to be left out of the deal,
16    so all the margin wasn't coming, is that another
17    way to ask your question?
18    Q.    Right.
19    A.    And my understanding was it was all
20    coming. I would have expected someone to have
21    told me it wasn't coming.
22    Q.    Did Mr. LaRocca have authority to
23    enter -- to agree that margin wouldn't come to
24    Barclays without your prior approval?
25    A.    Would have been highly unlikely.

Page 264

HIGHLY CONFIDENTIAL - R. RICCI
1
2    Q.    Could that have happened without your
3    knowing about it?
4    A.    I don't know.
5    Q.    Did you have in your mind a value
6    attributable to the OCC margin?
7    MR. HUME: Objection. Asked and
8    answered.
9    Q.    At the time that the clarification
10    letter was being drafted?
11    MR. HUME: Objection. Asked and
12    answered.
13    A.    Not that I recall.
14    Q.    The reason I ask is, would your answer
15    with respect to Mr. LaRocca's authority, could
16    that change depending on whether there was a lot
17    of value at the OCC or maybe not so much value
18    at the OCC?
19    A.    I think, given the expectation that I
20    had, I'm not sure value would have come into it
21    in that circumstance. I can't tell. It's
22    speculative.
23    Q.    What I'm trying to understand is, your
24    reporting relationship with Mr. LaRocca, was he
25    required to bring small-dollar issues to your

Page 265

HIGHLY CONFIDENTIAL - R. RICCI
1
2    attention as well as big-dollar issues?
3    A.    It would depend on the issue.
4    Sometimes small-dollar issues have big
5    ramifications.
6    Q.    With respect to OCC margin, was there
7    any special ramification to that other than
8    simply the value of the assets?
9    A.    Not that I recall. I don't -- I can't
10    recall a conversation engaging Mr. LaRocca on
11    it.
12    Q.    Do you recall thinking of the OCC
13    margin during that weekend as a big-dollar
14    issue?
15    MR. HUME: Objection. Asked and
16    answered.
17    A.    I don't recall a number in my mind of
18    what it was. I do recall that margin was coming
19    with exchange-traded derivatives positions.
20    Q.    If we leave aside any special reasons
21    for a small-dollar issue to have significance
22    and we talk about issues that have significance
23    only in terms of value to Barclays, did you have
24    in your mind over that weekend, prior to the
25    signing of the clarification letter, any

## Page 266

HIGHLY CONFIDENTIAL - R. RICCI

1    monetary limit to Mr. LaRocca's authority to
2    what he could agree to without coming to you?
3        A.    Not that I recall.
4        Q.    Sir, I show you a document marked
5    364A.  Do you recognize this e-mail string?
6        (Document review.)
7        A.    Yes.
8        Q.    If we start at the top, can you tell
9    us what you meant when you e-mailed Mr. Diamond?
10        A.    There was a process that was running
11    in the market there that certain exchanges were
12    liquidating Lehman portfolios and auctioning
13    them off, and we had been in our commodities
14    business had been bidding, as in other parts of
15    our business, for some of these portfolios, and
16    the results of this e-mail traffic was that we
17    had obviously won an auction of some of these
18    exchange-traded derivatives and that we were
19    going to, you know, make some money from it,
20    $350 million.  And I said that to Mr. Diamond
21    and said, you know, that's great, we just need
22    to make sure it's real, reconcile it, and make
23    sure it's right.
24        Q.    So that the $350 million that's -- the

## Page 267

HIGHLY CONFIDENTIAL - R. RICCI

1    P&L, that means profit; is that right?
2        A.    Revenue.
3        Q.    Revenue.  So that's not a transfer of
4    assets, that's assets that have been sold and
5    the income or the gain on the sale is 350
6    million?
7        A.    These were assets that we had bid for
8    in open market, unrelated to the Lehman
9    acquisition, that we had bid for and had won in
10    a resulting P&L revenue increase of 350 million.
11        Q.    And when did that transaction occur?
12        A.    Oh, I don't know specifically.
13        Q.    Do you know whether the transaction
14    was before or after the sale to Barclays?
15        A.    I don't know.  We had been bidding in
16    other books as well.  You know, I think we made
17    some bids on some of the equity exchange-traded
18    derivatives which we didn't win.  We may have
19    done some -- I don't think fixed income bid at
20    all.  We were in the market, as were others.
21        MR. MAGUIRE:  This would be a good
22    time for a break.  I think I can take a few
23    minutes and see if I can cut things short.
24        (Recess; Time Noted: 4:59 P.M.)

## Page 268

HIGHLY CONFIDENTIAL - R. RICCI

1        (Time Noted:  5:07 P.M.)
2    BY MR. MAGUIRE:
3        Q.    Sir, if you could turn to Exhibit 25,
4    it's the clarification letter you were looking
5    at earlier.
6        A.    Yes, sir.
7        Q.    On page 2, you had talked about a
8    parenthetical with the expression "and any
9    property that may be held to secure obligations
10    under such derivatives."
11        A.    I'm sorry, Mr. Maguire.
12        Q.    It's the clarification letter, so it's
13    Exhibit 25.
14        A.    Yes.
15        Q.    It's on the second page.
16        A.    Second page, yes.
17        Q.    And about five lines down from the
18    top.
19        A.    What clause?
20        Q.    That little parenthetical, "and any
21    property that may be held to secure obligations
22    under such derivatives"?
23        A.    I'm sorry, Mr. Maguire, what clause?
24        Q.    It's clause -- you're with me on page

## Page 269

HIGHLY CONFIDENTIAL - R. RICCI

1    2, right?
2        A.    I'm on page 2, yes.
3        Q.    The clause at the very top?
4        A.    Yes, continuation from I(ii), right.
5        Q.    Exactly, and it's the second line.
6        A.    Sorry.  I'm with you now.  Yes, sir.
7        Q.    So we're both on the -- at the same
8    parenthetical, which reads, "and any property
9    that may be held to secure obligations under
10    such derivatives."
11        A.    Yes, sir.
12        Q.    Do you personally or, as Barclays
13    designee, know how that clause came to be
14    inserted into the clarification letter?
15        A.    I don't know how it was inserted in
16    the clarification letter either as myself or
17    speaking as the designee.
18        MR. HUME:  We will seek to see if we
19    can get a designee to answer that question.
20        Q.    And in the same capacities, are you
21    aware of any discussions between Barclays and
22    Lehman concerning the insertion of that clause?
23        A.    No, in a personal capacity.  I'm not
24    aware of any as the Barclays designee, but we

---

Page 270

1        HIGHLY CONFIDENTIAL - R. RICCI
2    may find someone who can answer that question.
3        Q.    Sir, if you can turn to page 4 of the
4    letter?
5        A.    Yes, sir.
6        Q.    In the middle of the page, just below
7    the middle of the page, there's a section H
8    called "Transfer of Customer Accounts"?
9        A.    Yes, sir.
10       Q.    You see that has a number of
11   subclauses and the second subclause is (ii)?
12       A.    Yes.
13       Q.    It reads, "To the extent permitted by
14   applicable law, and as soon as practicable after
15   the closing, $769 million of securities as held
16   by or on behalf of LBI, as of the date hereof,
17   pursuant to Rule 15c3-3 of the Securities
18   Exchange Act of 1934, as amended, or securities
19   substantially of the same nature and value," you
20   see that little clause two I?
21       A.    Yes, sir.
22       Q.    Did you understand that the obligation
23   of Lehman to pay money from the 15c3-3 account
24   was subject and to the extent that such a
25   transfer was permitted by applicable law?

---

Page 271

1        HIGHLY CONFIDENTIAL - R. RICCI
2        MR. HUME:  Objection.  Asked and
3    answered.
4        A.    My understanding was that the 769
5    million or securities to that effect were coming
6    to Barclays.
7        Q.    And did you understand that that
8    obligation was subject to whether there was in
9    fact an excess in the 15c3 account and that the
10   transfer was therefore permitted by law?
11       A.    As I believe I said earlier, I don't
12   recall that.  I thought that the $769 million or
13   securities to that amount were coming to
14   Barclays.
15       Q.    Did you read the final clarification
16   letter?
17       A.    No.
18       Q.    Have you ever read that little clause
19   (ii) before?
20       A.    Not that I recall.
21       Q.    Prior to reading that clause today,
22   were you aware that there was this limitation
23   "to the extent permitted by applicable law"?
24       A.    Not that I recall.
25       Q.    Did anyone ever tell you that

---

Page 272

1        HIGHLY CONFIDENTIAL - R. RICCI
2    Barclays' entitlement to 15c3 assets was subject
3    to a condition?
4        MR. HUME:  Can you please make that
5        excluding any conversations with counsel?
6        MR. MAGUIRE:  Certainly.
7        Q.    Anyone excluding counsel --
8        MR. HUME:  Counsel at the time or
9        since.
10       Q.    -- ever tell you that Barclays'
11   entitlement to 15c3 assets was subject to a
12   condition?
13       A.    Not that I recall.
14       Q.    Did Mr. LaRocca have authority to make
15   the transfer of any assets to Barclays subject
16   to any conditions that he had not gotten your
17   approval on?
18       A.    Can you repeat the question, the first
19   part?
20       Q.    Yes.  Did Mr. LaRocca have
21   authority --              .
22       A.    Sorry not that, but I mean the second
23   part.  Sorry.
24       Q.    Did Mr. LaRocca have authority to make
25   any transfer to Barclays conditional without

---

Page 273

1        HIGHLY CONFIDENTIAL - R. RICCI
2    running that condition by you?
3        MR. HUME:  Object to the extent it
4        calls for a legal conclusion.
5        A.    Not that I recall.  Again, it may have
6    come down to size or, you know, overall
7    importance to the transaction.  If it was a
8    significant contingency, he would have spoken to
9    me or someone on the deal team, I would have
10   thought.
11       Q.    $769 million seems like a lot of
12   money?
13       A.    It is a lot of money.
14       Q.    Did he have authority to make an asset
15   that large, to make its transfer conditional
16   without vetting it with you first?
17       A.    I would not have thought so.
18       Q.    Did he ever represent to you that this
19   transfer of $769 million was unconditional?
20       A.    Mr. LaRocca?  I don't recall having a
21   conversation with him about it.
22       Q.    Did anyone ever represent to you that,
23   other than counsel, did anyone ever represent to
24   you that this $769 million transfer was
25   conditional?

---

Page 274

HIGHLY CONFIDENTIAL - R. RICCI
1
2    A.    Was conditional?
3    Q.    Yes.
4    A.    As I said, not that I recall.
5    Q.    Did you ever understand from anyone
6    that there was any regulatory approval required
7    for in order for Barclays to obtain any part of
8    the 15c3 assets?
9    A.    Not that I recall. My conversation
10   with Mr. McDade was that we were going to get
11   the 769 million or equivalent securities.
12   Q.    And when you say "equivalent
13   securities," what do you mean?
14   A.    Or securities equal to that amount.
15   They were going to pay us $769 million.
16   Q.    What's the difference between
17   15c3-type securities and equivalent securities,
18   in your understanding?
19   A.    My understanding was they would find
20   the money somewhere else.
21   Q.    And where else did you think they were
22   going to find the money?
23        MR. HUME: Objection. Calls for
24   speculation.
25   A.    I don't recall. It was Friday

Page 275

HIGHLY CONFIDENTIAL - R. RICCI
1
2    afternoon.
3    Q.    Did you have an understanding that
4    there was an additional $769 million lying
5    around at Lehman?
6    A.    Sorry, can you repeat the question?
7    Q.    Did you have an understanding --
8    A.    Sorry, I don't understand the
9    question.
10   Q.    Did you have an understanding that
11   there were assets in the amount of over $700
12   million at Lehman that were not already being
13   transferred to Barclays?
14        MR. HUME: Objection. Lacks
15   foundation. Calls for speculation.
16   A.    As I said earlier in my testimony, it
17   was very confusing at Lehman. It was very
18   difficult for Lehman to say what they had and
19   didn't have. Information was very confused. So
20   I wanted to make sure that if there was other
21   assets, and for some reason the 769 couldn't be
22   delivered, that we have some recourse to find
23   them.
24   Q.    Did anyone tell you that there were
25   other assets at Lehman in the amount of as much

Page 276

HIGHLY CONFIDENTIAL - R. RICCI
1
2    as $769 million that were available?
3    A.    Not that I recall.
4    Q.    If you had been aware of additional
5    property at Lehman, you would have wanted to
6    have that in order to increase Barclays' cushion
7    or protection, isn't that right?
8        MR. HUME: Objection. Calls for
9    speculation.
10   A.    I was trying to, at that time, make
11   sure Barclays was protected. I would have, you
12   know, if there were other assets that were
13   specifically identified, we would have certainly
14   considered asking for them.
15   Q.    Did you understand that a 15c3 account
16   was for the protection of customers?
17        MR. HUME: Objection. Asked and
18   answered.
19   A.    As I said, I wasn't aware of 15c3.
20   Q.    Did Mr. LaRocca ever give you to
21   understand that if Lehman was unable to give
22   you -- to transfer to Barclays moneys out of its
23   15c3 account, it would go and get that money,
24   that 769 million, from customer property?
25   A.    Not that I recall.

Page 277

HIGHLY CONFIDENTIAL - R. RICCI
1
2    Q.    Would you have accepted a transfer
3    from Lehman that came at the expense of customer
4    property?
5    A.    If the money wasn't -- let's see. I
6    suppose depending on what it was. It's hard for
7    me to answer the question without specifics.
8    Q.    Did you have any discussions about
9    obtaining property from Lehman that was customer
10   property?
11   A.    Not that I recall.
12   Q.    Did you ever understand that any of
13   the consideration that was being paid to
14   Barclays as part of the sale was coming out of
15   customer property?
16   A.    Not that I recall.
17        MR. MAGUIRE:  Sir, that's all the
18   questions I have for you at this time.
19   Thank you.
20        THE WITNESS: Thank you, Mr. Maguire.
21        MR. CARDEN:  Eric? .
22        MR. KAY:  I have no questions.
23        MR. CARDEN:  David?
24        MR. LAYDEN:  No.
25   EXAMINATION BY

Page 278

HIGHLY CONFIDENTIAL - R. RICCI

MR. CARDEN:

Q. I have just a few questions. I believe you testified, Mr. Ricci, that Barclays wouldn't have taken the exchange-traded derivatives positions without taking the margin, correct?

A. Yes.

Q. Why would that be the case?

A. Because if you didn't take the margin, the exchange would have asked Barclays to post the margin themselves.

Q. I take it that your answer is that if you were going to assume the positions, you thought Barclays should be entitled to the margin securing those positions?

A. Correct.

Q. If the exchange-traded derivatives that Barclays was acquiring in connection with this transaction were liquidated on Friday, would the rationale for keeping the margin go away?

MR. HUME: Objection. Calls for speculation.

A. It would have depended what the

Page 279

HIGHLY CONFIDENTIAL - R. RICCI

liquidation value was.

Q. Let's assume that the positions had been liquidated and that there was still excess margin in those positions. Is there any reason in the world why Barclays should be entitled to margin when the positions no longer existed and there was no need for it to secure them?

A. I don't know the answer to that question.

Q. Can you think of any rationale as you see it for Barclays keeping the margin if the positions had been liquidated?

A. Not specifically off the top of my head.

Q. I would like to go back to Monday when you were in your negotiations with Lehman Brothers concerning the purchase of certain Lehman assets.

A. Which Monday, sir?

Q. I'm sorry. I apologize. Let me restate. On Monday, September 15th, conversations were being had between Barclays and Lehman Brothers concerning the purchase of some collection of Lehman assets, correct?

Page 280

HIGHLY CONFIDENTIAL - R. RICCI

A. That's correct.

Q. And some of those assets were securities positions, correct?

A. Correct.

Q. Why did Barclays want to buy securities positions from Lehman at all? Why did they care about buying those positions?

MR. HUME: I object. To the extent the answer would require divulging attorney-client privilege, instruct the witness not to answer.

Q. Go ahead, Mr. Ricci.

A. Can you repeat the question, please, sir?

Q. Why did Barclays want to buy Lehman assets -- strike that. Why did Barclays want to buy securities positions from Lehman on Monday, September 15?

A. My understanding was that there was a view expressed that just taking the people and the buildings wouldn't be a situation that would be looked upon favorably by the bankruptcy court.

Q. Who expressed that view to you?

Page 281

HIGHLY CONFIDENTIAL - R. RICCI

MR. HUME: Objection. To the extent it calls for attorney-client privilege information, I instruct the witness not to answer.

A. Counsel.

Q. Okay. Was there any discussion about the amount of securities positions, quantum of those positions that should be purchased by Barclays to satisfy the bankruptcy court?

MR. HUME: Same objection.

Q. Just a yes or no answer.

A. Not that I recall.

Q. Do you know how Barclays settled upon the $70 billion in securities positions that is referenced in the APA as being the amount of securities which it was prepared to purchase?

A. I don't recall.

MR. CARDEN: That's all I have.

THE WITNESS: Thank you.

MR. CARDEN: Thank you, sir.

MR. HUME: I have a few very brief questions for the witness.

EXAMINATION BY

MR. HUME:

Page 282

1    HIGHLY CONFIDENTIAL - R. RICCI
2    Q.    Mr. Ricci, earlier in the deposition I
3    think you referenced the fact that Barclays
4    assumed liabilities for compensation and cure,
5    do you recall that?
6    A.    Yes.
7    Q.    I think you referenced -- I think you
8    may have said we assumed $2 billion liability
9    for comp, we assumed liability for cure 2 or 2
10    and a quarter billion, do you recall that?
11        MR. CARDEN: Objection to form.
12    A.    I do, yes.
13    Q.    Was it your understanding at the
14    beginning of that week, September 15th, that --
15    strike that. Did the numbers 2 or 2 and a
16    quarter billion for comp and cure come from
17    Lehman?
18    A.    Yes, they did.
19    Q.    Did you understand both of those
20    numbers at the beginning of that week, September
21    15, when you got them to be estimates?
22    A.    Yes.
23    Q.    You understood the 2 billion for cure
24    to be an estimate when you first got it on
25    September 15th or 16th?

Page 283

1    HIGHLY CONFIDENTIAL - R. RICCI
2    A.    Yes.
3    Q.    And did you understand the estimate to
4    be a number for both bonus and severance
5    payments?
6    A.    Yes. As I think I said earlier,
7    the -- whether someone was staying or someone
8    was going, bonus or severance, it was sort of
9    all that extraordinary compensation.
10    Q.    I think there was reference in your
11    earlier testimony to a bonus pool. Do you
12    remember that expression, "bonus pool"?
13    A.    Yes.
14    Q.    In your mind was the bonus pool to
15    cover both bonus and severance?
16    A.    Yes, the bonus pool is referring to
17    the 2 million -- 2 billion that was to cover
18    both bonus and severance, yes.
19    Q.    And did you and your colleagues think
20    for a while that you may be able to cover
21    obligations necessary to keep the Lehman people
22    you wanted for potentially less than that 2
23    billion?
24    A.    At some points, yes.
25    Q.    And later in the week, was there a

Page 284

1    HIGHLY CONFIDENTIAL - R. RICCI
2    concern that the agreement may not allow you
3    that flexibility?
4    A.    Yes.
5    Q.    I think counsel for LBHI asked if you
6    agreed to the $2 billion number at the execution
7    of the agreement. Do you recall that?
8    A.    Yes.
9        MR. CARDEN: Objection to form.
10    Q.    What did you understand by his
11    question, "the execution of the agreement" to
12    be?
13    A.    At the closing.
14    Q.    The closing on Monday, the 22nd?
15    A.    Correct.
16    Q.    Not on September 16th?
17    A.    Correct.
18    Q.    The cure estimate of 2 or 2 and a
19    quarter billion, did you understand that to be
20    an estimated amount?
21    A.    Yes.
22    Q.    Did you know the details of where the
23    number came from?
24    A.    No.
25    Q.    Did you ever learn the details of

Page 285

1    HIGHLY CONFIDENTIAL - R. RICCI
2    where the number came from?
3    A.    No.
4    Q.    Did you ever know one way or the other
5    how accurate the estimate was?
6    A.    No.
7    Q.    Mr. Ricci, did you ever discuss with
8    Bart McDade the idea that the purchase
9    agreement -- strike that. Did you ever discuss
10    with Bart McDade the idea that the Barclays
11    acquisition should be a wash in which assets and
12    liabilities would equal one another?
13        MR. CARDEN: Objection to form.
14    A.    I never had that conversation with Mr.
15    McDade.
16    Q.    Do you ever recall discussing that
17    with anyone at Lehman?
18        MR. CARDEN: Same objection.
19    Q.    You may answer.
20    A.    No, never had that conversation.
21    Q.    Do you ever recall agreeing to the
22    concept that the Barclays acquisition would be
23    a -- would have assets equal to liabilities and
24    be a wash?
25    A.    No.

Page 286

HIGHLY CONFIDENTIAL - R. RICCI

1
2  Q.  Do you believe, given the uncertain
3  asset values that were being acquired, that it
4  would have even been possible to do a deal that
5  would have been a mathematical wash with the
6  assets equal to liabilities?
7      MR. CARDEN:  Objection to form.
8  A.  No, we were buying a collection of
9  assets and assuming certain liabilities.  We
10 weren't buying a balance sheet, per se.
11 Q.  Could you look for Exhibit 51 in your
12 pile, please.
13 A.  Yes.
14 Q.  Exhibit 1 is called a Transfer and
15 Assumption Agreement.  Do you see that?
16 A.  Yes.
17 Q.  If you look at paragraph 1 of Exhibit
18 1, it says, "For good and valuable
19 consideration, the receipt and sufficiency of
20 which are hereby acknowledged," do you see that?
21 A.  Yes.
22 Q.  It then says, "Lehman hereby sells,
23 assigns, transfers and sets over to Barclays,
24 without recourse, without representation or
25 warranty, other than as expressly provided

Page 287

HIGHLY CONFIDENTIAL - R. RICCI

1
2  herein, all of Lehman's rights, title, interest,
3  powers, privileges, remedies, obligations and
4  duties into, under, and in respect of the
5  account as of the effective date, including with
6  respect to," and it says "clearing fund deposit,
7  all margin deposits held by OCC," and then "all
8  settlement obligations with regard to
9  transactions in cleared accounts," and then
10 finally, "all rights and obligations in respect
11 of exercises of option contracts and
12 assignments."  Do you see all that?
13 A.  Yes, I do.
14 Q.  And you testified earlier that it was
15 your understanding that Barclays was acquiring
16 the exchange-traded derivatives from Lehman,
17 correct?
18 A.  That is correct.
19 Q.  And you understood that Barclays was
20 acquiring the collateral associated with those
21 derivatives?
22 A.  That's correct.
23 Q.  And did you understand that Barclays
24 was taking over the settlement obligations of
25 Lehman with respect to the Options Clearing

Page 288

HIGHLY CONFIDENTIAL - R. RICCI

1
2  Corporation as part of that general acquisition?
3  A.  In looking at the document, yes.
4  Q.  Can you look at the third page of this
5  document?
6  A.  Yes.
7  Q.  You see it's signed by Gerard LaRocca?
8  A.  Yes.
9  Q.  Do you have any reason to believe that
10 he did not have authority to sign this document?
11 A.  No.
12 Q.  Do you believe he did have authority
13 to sign this document?
14 A.  Yes.
15 Q.  Mr. Maguire asked you some questions
16 about concern of the DTCC over their exposure to
17 settlement obligations, do you recall that?
18 A.  Yes.
19 Q.  And you testified that you recall
20 Barclays depositing $250 million as a limited
21 recourse guarantee of those obligations, do you
22 recall that?
23 A.  Yes.
24 Q.  Do you recall that Barclays did not
25 take over any -- assume any further guarantee

Page 289

HIGHLY CONFIDENTIAL - R. RICCI

1
2  beyond that 250 million?
3  A.  Yes.
4  Q.  Did you ever at any time form the
5  impression or the understanding that because
6  Barclays was not taking over the settlement
7  obligations of the DTC account, it was not
8  receiving the clearance box assets represented
9  to you as being roughly worth 1.9 billion?
10 A.  No.
11 Q.  That was never your understanding?
12 A.  Never my understanding.
13 Q.  Did you think those clearance box
14 assets remained in the deal through to the
15 closing?
16 A.  Yes.
17     MR. HUME:  No further questions.
18     MR. CARDEN:  Thank you, sir.
19 EXAMINATION BY
20 MR. MAGUIRE:
21 Q.  You were just asked about the DTC and
22 about the Transfer and Assumption Agreement
23 which relates to the OCC?
24 A.  Yes.
25 Q.  And you understand we have a situation

73

Page 290

HIGHLY CONFIDENTIAL - R. RICCI

1  here where Barclays did not assume Lehman's
2  obligations to the DTCC?
3     A.   Yes.
4     Q.   Barclays did assume all of Lehman's
5  obligations to the OCC?
6     A.   Yes.
7     Q.   Can you explain why Barclays did those
8  two different things, treated the OCC
9  differently from the DTCC?
10    A.   I don't recall.
11    Q.   Your counsel asked you about Mr.
12  LaRocca's -- you believe Mr. LaRocca had
13  authority to enter into the Transfer and
14  Assumption Agreement, and you previously
15  testified about a problem -- maybe that's the
16  wrong word, but an issue where, at a certain
17  percentage of market cap, the company would need
18  shareholder approval in order to issue a
19  guarantee or assume a liability.  Do you recall
20  that testimony?
21    A.   Yes.
22    Q.   Did you know on the weekend before the
23  closing whether assuming the liabilities of
24  Lehman at the OCC triggered that shareholder

Page 291

HIGHLY CONFIDENTIAL - R. RICCI

1  vote requirement?
2     A.   I don't recall that was a factor.
3     Q.   Did you know during the weekend before
4  the closing whether assuming all of the
5  obligations of Lehman to the OCC would involve
6  Barclays losing money?
7     A.   I don't recall.
8     Q.   Did you have an understanding before
9  the closing that the assets at the OCC were so
10  great that assuming all of Lehman's liabilities
11  would involve no risk to Barclays because there
12  was excess margin at the OCC?
13    A.   As I said, I don't recall the reason
14  why we treated them differently.
15    Q.   And you have no information by way of
16  your preparation as a designee for this
17  deposition that would help us explain why
18  Barclays did that?
19    A.   No, but one of my colleagues may.
20    Q.   When you refer to your colleague,
21  you're referring to Mr. Romain?
22    A.   Mr. Romain.
23         MR. HUME:  We'll determine who the
24  appropriate colleague is.

Page 292

HIGHLY CONFIDENTIAL - R. RICCI

1     A.   Or the appropriate person.
2          MR. MAGUIRE:  Very good, sir.  Thank
3  you.
4          (Time Noted: 5:34 P.M.)
5                    oOo
6
7
8
9
10
11
12
13
14
15
16
17
18
                    _____
                    RICH RICCI
19
20  Subscribed and sworn to
    before me this    day
21  of       2009.
22
    _____
23
24
25

Page 293

HIGHLY CONFIDENTIAL - R. RICCI
CERTIFICATE

1  STATE OF NEW YORK )
2                    : ss
3  COUNTY OF NEW YORK)
4       I, Kathy S. Klepfer, a Registered
5  Merit Reporter and Notary Public within and
6  for the State of New York, do hereby
7  certify:
8       That RICH RICCI, the witness whose
9  deposition is herein before set forth, was
10  duly sworn by me and that such deposition is
11  a true record of the testimony given by such
12  witness.
13       I further certify that I am not
14  related to any of the parties to this action
15  by blood or marriage and that I am in no way
16  interested in the outcome of this matter.
17       I further certify that neither the
18  deponent nor a party requested a review of
19  the transcript pursuant to Federal Rule of
20  Civil Procedure 30(e) before the deposition
21  was completed.
22       In witness whereof, I have hereunto
23  set my hand this 8th day of September, 2009.
24
25       ----------------------------

Page 294

```
1        HIGHLY CONFIDENTIAL - R. RICCI
2                    INDEX
3    WITNESS:        EXAMINATION BY        PAGE
4    R. RICCI        Mr. Carden        5, 278
5                    Mr. Maguire      189, 289
6                    Mr. Hume            282
7
8    EXHIBITS:                          PAGE
9    Exhibit 378, a document bearing Bates      84
10   Nos. BCI-EX-(S)-00023787 through 788 with
11   attachment
12   Exhibit 379, a document bearing Bates     106
13   Nos. BCI-EX-(S)-00053514 through 53515
14   Exhibit 380, a document bearing Bates     110
15   Nos. BCI-EX-00081880 through 81884
16   Exhibit 381, a document bearing Bates     162
17   Nos. BCI-EX-00078268 through 78270
18   Exhibit 382, a document bearing Bates     169
19   Nos. BCI-X-00080984 through 80985
20   Exhibit 383, a document bearing Bates     172
21   Nos. BCI-EX-00080668
22   Exhibit 384, a document bearing Bates     174
23   Nos. BCI-EX-00079340 through 79342
24   Exhibit 385, a document bearing Bates     181
25   Nos. BCI-EX-00079472 through 79473
```

Page 295

```
1        HIGHLY CONFIDENTIAL - R. RICCI
2                INDEX (Cont'd.)
3    EXHIBITS:                          PAGE
4    Exhibit 386, a document bearing Bates      185
5    Nos. BCI-EX-(S)-00024686 through 24687
6    Exhibit 387, Debtors' Third Rule 30(b)(6)  207
7    Deposition Notice to Barclays on Issues
8    Pertaining to Exchange-Traded Derivatives
9    and Exchange Deposits
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 296

```
1        HIGHLY CONFIDENTIAL - R. RICCI
2    NAME OF CASE:  In re Lehman Brothers
3    DATE OF DEPOSITION: September 8, 2009
4    NAME OF WITNESS: Rich Ricci
5    Reason Codes:
6        1. To clarify the record.
         2. To conform to the facts.
7        3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
     From _____ to _____
9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
     From _____ to _____
21
     Page _____ Line _____ Reason _____
22   From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25
```

75