# BCI EXHIBIT

# 92

Page 1

1

2                          BANKRUPTCY COURT

3                  SOUTHERN DISTRICT OF NEW YORK

4

    ------------------------X

5

    In Re:

6                                    Chapter 11

7    LEHMAN BROTHERS          Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,      (Jointly Administered)

9

10                  Debtors.

    ------------------------X

11

12

13                    RULE 30(b)(6)

14              VIDEOTAPED DEPOSITION

15                         OF

16                BARRY W. RIDINGS

17               New York, New York

18            Friday, January 15, 2010

19

20

21

22

23

    Reported by:

24   ANNETTE ARLEQUIN, CCR, RPR

    JOB NO. 27090

25

Page 2

```
 1
 2
 3
 4
 5                    January 15, 2010
 6                    9:12 a.m.
 7
 8        RULE 30(b)(6) videotaped deposition
 9     of BARRY W. RIDINGS, held at the law
10     offices of Boies, Schiller & Flexner, LLP,
11     575 Lexington Avenue, 7th Floor, New York,
12     New York, before Annette Arlequin, a
13     Certified Court Reporter, a Registered
14     Professional Reporter and Notary Public of
15     the State of New York.
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
 1
 2   APPEARANCES:
 3
 4      JONES DAY, LLP
 5      Attorneys for Lehman Brothers, Inc.
 6         222 East 41st Street
 7         New York, New York 10017-6702
 8      BY: DAVID L. CARDEN, ESQ.
 9         BART GREEN, ESQ.
10
11      BOIES, SCHILLER & FLEXNER, LLP
12      Attorneys for Barclays Capital
13         575 Lexington Avenue - 7th Floor
14         New York, New York 10022
15      BY: JONATHAN D. SCHILLER, ESQ.
16         HAMISH HUME, ESQ.
17         JONATHAN KRISBERGH, ESQ.
18         NICHOLAS KEMP, ESQ.
19
20      QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
21      Attorneys for the Creditors Committee
22         51 Madison Ave - 22nd Floor
23         New York, New York 10010
24      BY: ROBERT D. DAKIS, ESQ.
25
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
 1
 2   APPEARANCES: (Cont'd.)
 3
 4      HUGHES, HUBBARD & REED, LLP
 5      Attorneys for the SIPA Trustee
 6         One Battery Park Plaza
 7         New York, New York 10004-1482
 8      BY: SETH D. ROTHMAN, ESQ.
 9
10      CRAVATH, SWAINE & MOORE, LLP
11      Attorneys for the Witness
12         Worldwide Plaza
13         825 Eighth Avenue
14         New York, New York 10019-7475
15      BY: HECTOR J. VALDEZ, ESQ
16         THOMAS G. RAFFERTY, ESQ
17
18
19
20
21
22   ALSO PRESENT:
23      CARLOS LOPEZ, Legal Video Specialist
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED by
 3   and between the attorneys for the
 4   respective parties herein, that filing and
 5   sealing be and the same are hereby waived.
 6          IT IS FURTHER STIPULATED AND AGREED
 7   that all objections, except as to the form
 8   of the question, shall be reserved to the
 9   time of the trial.
10          IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized to
13   administer an oath, with the same force and
14   effect as if signed and sworn to before the
15   Court.
16
17             - o0o -
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 6

1          Ridings
2          (Deposition Exhibit 561A, Document
3  Bates stamped LAZ-A-00004543 through 4549,
4  marked for identification, as of this
5  date.)
6          (Deposition Exhibit 562A, Email dated
7  9/18/08 from Creswell to Distribution at
8  Lazard NYC, Bates stamped LAZ-C-00049033 to
9  49041, marked for identification, as of
10 this date.)
11         (Deposition Exhibit 563A, Email dated
12 9/18/08 from Descoteaux to Ridings, Bates
13 stamped LAZ-C-00049400 through 49405,
14 marked for identification, as of this
15 date.)
16         (Deposition Exhibit 564A, Email dated
17 10/8/08 from Descoteaux to Ridings and
18 Whiting with attachment, Bates stamped
19 LAZ-C-00063724 through 63817, marked for
20 identification, as of this date.)
21         *    *    *
22         THE VIDEOGRAPHER:  This is the start
23 of tape labeled No. 1 of the videotaped
24 deposition of Barry W. Ridings in the
25 matter In Re: Lehman Brothers Holdings
         TSG Reporting - Worldwide    877-702-9580

Page 7

1          Ridings
2  Inc.
3          This deposition is being held at 575
4  Lexington Avenue, New York, New York on
5  January 15th, 2010 at approximately 9:12
6  a.m.
7          My name is Carlos Lopez from TSG
8  Reporting, Inc. and I am the legal video
9  specialist.
10         The court reporter is Annette
11 Arlequin in association with TSG Reporting.
12 Will the court reporter please swear
13 in the witness.
14         *    *    *
15 B A R R Y   W.   R I D I N G S, called as a
16     witness, having been duly sworn by a
17     Notary Public, was examined and testified
18     as follows:
19 EXAMINATION BY
20 MR. SCHILLER:
21    Q.    Good morning, Mr. Ridings.
22    A.    Good morning.
23    Q.    My name is Jonathan Schiller and I
24 represent Barclays in this matter.
25         Would you please state for the record
         TSG Reporting - Worldwide    877-702-9580

Page 8

1          Ridings
2  your name and your position at Lazard?
3     A.    Barry Ridings, R-i-d-i-n-g-s.
4          I'm vice chairman of investment
5  banking at Lazard.
6          I'm a managing director of the firm
7  and I co-head our global restructuring group.
8          I'm also chairman of Lazard Capital
9  Markets, which is our securities business and I
10 am also chairman of Lazard Middle Markets, which
11 is our middle market M&A practice.
12    Q.    Let's begin with the week
13 September 15th through September 19th, 2008 if
14 we can.
15         And do you recall appearing in court
16 before Judge Peck with Harvey Miller and
17 Mr. McDade on the 19th at the sale approval
18 hearing?
19    A.    Yes.
20    Q.    Can you describe the engagement of
21 Lazard in the week preceding that hearing?
22    A.    Yes. On that Monday we got a phone
23 call from, I think it was Weil, Gotshal, asking
24 if we could come over for an hour or two, and I
25 arrived at Lehman's building kind of
         TSG Reporting - Worldwide    877-702-9580

Page 9

1          Ridings
2  mid-afternoon and I don't think I left Lehman's
3  building for about 48 hours. It turned out to
4  be longer than an hour or two.
5          And what we were asked to do is to
6  get re-engaged by Lehman, now in bankruptcy, to
7  act as their financial advisor. That's a broad
8  description of our assignment.
9     Q.    Thank you.
10         During the course of that period
11 September 15th through September 19th, did you
12 reach a view whether there was a realistic
13 opportunity to sell the Lehman North American
14 business to any entity like than the Barclays?
15         MR. DAKIS:  Objection to form.
16         MR. CARDEN:  Objection.
17    A.    Again, to put things in context, that
18 was, and again, I've been doing this for
19 35 years, we were in unprecedented times and the
20 fact that an entity like Lehman Brothers could
21 actually file bankruptcy was unbelievable.
22         At the same point you had Bear
23 Steams having just melted and been sold to
24 JPMorgan.
25         You had the problems at AIG and you
         TSG Reporting - Worldwide    877-702-9580

Page 10

Ridings

1 Ridings
2 also had problems at Merrill Lynch, Morgan
3 Stanley, Goldman Sachs, and the securities
4 markets were probably in the worst condition
5 ever that one could imagine.
6         And so there had been efforts made
7 before the bankruptcy to do a transaction with a
8 number of parties. None of those came to
9 fruition. Lehman files bankruptcy. They're
10 reapproached by Barclays to do a transaction.
11        In my mind I don't think there was an
12 alternative transaction available that could
13 have been done on any timely basis and the
14 passage of time was so critical given the
15 pressures on the market that this was not a
16 situation where you could take months or even
17 weeks to do a transaction.
18     Q.   Let me just try to understand the
19 last part of what you said.
20        By September 19th, 2008, had you
21 concluded that there was no alternative
22 transaction to the proposed sale to Barclays?
23        MR. CARDEN: Objection to form.
24        MR. DAKIS: Same objection.
25     A.   That's correct.
TSG Reporting - Worldwide    877-702-9580

Page 11

Ridings

1 Ridings
2     Q.   By September 19th, 2008, did you have
3 a view if the sale were not approved by Judge
4 Peck pursuant to Weil, Gotshal's motion that the
5 liquidation of the Lehman North American
6 business would pose enormous risks?
7        MR. CARDEN: To whom?
8        Objection.
9        MR. DAKIS: Same objection.
10        MR. SCHILLER: Let me rephrase that.
11 BY MR. SCHILLER:
12     Q.   If there were no sale approved to
13 Barclays on September 9th, did you have a view
14 whether there would be the risk of enormous loss
15 to Lehman?
16     A.   That is my view, and more so if this
17 transaction didn't happen, I think the
18 repercussions in the financial market would have
19 been catastrophic to a number of other financial
20 institutions.
21        So the reverberation of a Lehman
22 liquidation would have had a major negative
23 impact on the U.S. capital markets.
24     Q.   You had past experience with Drexel
25 Burnham and the failure of that investment bank;
TSG Reporting - Worldwide    877-702-9580

Page 12

Ridings

1 Ridings
2 is that correct?
3     A.   Unfortunately, yes, I was a managing
4 director at Drexel when it also went bankrupt.
5     Q.   And did your experience there help
6 inform the views that you held on September 19th
7 as you've just described?
8     A.   Yes.
9     Q.   Was it possible to calculate the
10 potential losses to Lehman of a liquidation as
11 of September 19th with any certainty?
12     A.   I don't think you could have done it
13 with certainty because you would have been
14 making assumptions.
15        But in a financial meltdown of this
16 magnitude, the prices of securities would have
17 dropped by enormous amounts.
18     Q.   And it was your view on September 9th
19 that a sale to Barclays was superior to any
20 liquidation by Lehman?
21        MR. DAKIS: Object to the form.
22     A.   Yes.
23     Q.   Since September 19th, have you
24 learned anything that would cause you to change
25 that conclusion?
TSG Reporting - Worldwide    877-702-9580

Page 13

Ridings

1 Ridings
2     A.   No. I believe today that there was
3 no other alternative; that that was the best
4 alternative at the time.
5     Q.   Let me ask you to look at the Asset
6 Purchase Agreement, which is Exhibit 1 in this
7 proceeding, and I'm not going to ask you to
8 review it, I just want you to have it in mind.
9        You've seen the APA before, have you
10 not?
11     A.   Yes.
12     Q.   Did the APA provide for the purchase
13 of a business and its employees?
14        MR. CARDEN: Objection.
15        MR. DAKIS: Same objection.
16        MR. ROTHMAN: Same objection.
17     A.   In -- the Asset Purchase Agreement
18 provides whatever it says it provides for. In
19 my mind, Barclays did buy a business and it was
20 described in the Asset Purchase Agreement.
21     Q.   Was the sale to Barclays a precise
22 exchange of equal values of assets and
23 liabilities?
24        MR. DAKIS: Objection to form.
25     A.   It was not a precise exchange.
TSG Reporting - Worldwide    877-702-9580

Page 14

Ridings

2 Again, Barclays, in my mind, bought a business
3 and they paid certain cash, they assumed certain
4 liabilities and that's the value that they paid
5 the estate, and for that they got certain assets
6 and they got certain fixed assets and intangible
7 assets and people.
8    Q.   Let me ask you to look at the second
9 exhibit that I've placed in front of you,
10 Exhibit 25 in this proceeding, which is a
11 clarification letter between Lehman and
12 Barclays.
13    _ Do you see that?
14    A.   Yes.
15    Q.   When you were in court on
16 September 19th, at the time of your proffer to
17 Judge Peck, did you understand that the sale
18 documentation that Judge Peck was being asked to
19 approve included a Clarification Agreement that
20 was to be completed between the parties?
21    A.   I believe that's correct.
22    Q.   Let me ask you to look at the first
23 page of the Clarification Agreement, Exhibit 25,
24 and direct your attention to paragraph 1 (ii)
25 under "Purchased Assets."

Page 15

Ridings

2    Do you see that?
3    A.   Yes.
4    Q.   And in that paragraph which addresses
5 the definition of purchased assets, the parties
6 identify assets that are going to be transferred
7 to Barclays, including, as you see under letter
8 A, the securities that are subject to the
9 Barclays Repurchase Agreement.
10    Do you see that?
11    A.   Yes.
12    Q.   And under paragraph B, Barclays is to
13 receive such securities and other assets held in
14 LBI's clearance boxes at the time of the
15 closing.
16    Do you see that?
17    A.   Yes.
18    Q.   And if I may ask you just to turn the
19 page and to note paragraph C which provides a
20 transfer to Barclays of exchange-traded
21 derivatives and any property that may be held to
22 secure obligations under such derivatives and
23 collateralized short-term agreements.
24    Do you see that?
25    A.   Yes.

Page 16

Ridings

2    Q.   Do you also see that there are no
3 values given for these purchased assets in the
4 Clarification Agreement?
5    A.   That's correct.
6    Q.   The sale to Barclays was the purchase
7 of a business and the assets that went with the
8 business to the extent they were not excluded,
9 irrespective of what their value was, correct?
10    MR. DAKIS: Objection to form.
11    MR. CARDEN: Objection to form.
12    MR. ROTHMAN: Objection.
13    A.   Again, my understanding is that
14 Barclays bought a business and in buying that
15 business they paid a certain amount of cash and
16 assumed certain liabilities, and for that they
17 got the assets in that business.
18    So I'm not sure if I answered your
19 question, but that is my understanding of the
20 transaction.
21    Q.   And values, specific values
22 associated with those assets, whether estimated
23 or otherwise, were not provided for in the APA
24 or the clarification letter, correct?
25    MR. CARDEN: Objection to form.

Page 17

Ridings

2    MR. DAKIS: Same objection.
3    MR. ROTHMAN: Same objection.
4    A.   That's correct.
5    Q.   Was this deal structured to be a
6 precise wash, Mr. Ridings?
7    MR. CARDEN: Objection to form.
8    MR. DAKIS: Objection.
9    A.   I do not think it was structured that
10 way.
11    Q.   Do you know whether there was
12 disagreement between Barclays and Lehman over
13 the actual values of assets or liabilities
14 involved in the transaction?
15    MR. CARDEN: Objection to form.
16    MR. DAKIS: Same objection.
17    MR. ROTHMAN: Join in the objection.
18    A.   Yes.
19    Q.   What was your understanding generally
20 of such disagreement?
21    A.   My understanding is that, to put it
22 in context, we had a tumultuous week where the
23 market was extremely volatile and generally on a
24 down trend, and that throughout that week
25 Barclays had made the point that Lehman's marks

Page 18

Ridings

1  were not market or stale and that there was a
2  disagreement as to what the market value of
3  those securities actually were.
4     Q.   To your knowledge, was there
5  uncertainty that week over the values of the
6  assets or liabilities that were involved in the
7  transaction?
8        MR. CARDEN: Objection to form.
9        MR. DAKIS: Same objection.
10    A.   Absolutely.
11    Q.   Do you recall that the agreement
12 between the parties provided for no
13 representations or warranties concerning the
14 values of the assets and the liabilities in the
15 transaction?
16    A.   I think that's generally correct.
17    Q.   Was it also your understanding that
18 the purchase agreement, Exhibit 1 before you,
19 contained, as of September 19th, contained no
20 true-up or profit sharing mechanism?
21    A.   In this document, in the APA that was
22 signed, that's correct.
23    Q.   And as a result of that, is it fair
24 to say that the parties provided no contractual
25

TSG Reporting - Worldwide    877-702-9580

Page 19

Ridings

1  mechanism to make sure that the assets and the
2  liabilities involved in the transaction
3  ultimately matched?
4        MR. CARDEN: Objection to form.
5        MR. DAKIS: Objection to form.
6        MR. ROTHMAN: Same objection.
7     A.   I don't think it was part of the
8  transaction that there was to be a match.
9     Q.   Thank you.
10       Let me ask you to turn to the next
11 exhibit that we placed before you, 561A.
12    A.   Yes.
13    Q.   561A are six pages of documents,
14 various schedules and time lines produced from
15 Lazard's records, Mr. Ridings, and let me ask
16 you to look first at the first page of the
17 exhibit, page 4543.
18       Do you see the part of this schedule
19 referred to as "Assets"?
20    A.   Yes.
21    Q.   And do you see the date on the top
22 right corner of 9/18/08?
23    A.   Yes.
24    Q.   Do you know who wrote that date there

TSG Reporting - Worldwide    877-702-9580

Page 20

Ridings

1  by any chance?
2     A.   Yes.
3     Q.   Who did?
4     A.   I did.
5     Q.   All right. Does this reflect that
6  you received this schedule on 9/18?
7     A.   Yes.
8     Q.   If you look at the assets listed
9  there on the left side of the schedule, it
10 provides for none of the intangible assets
11 associated with the business sold to Barclays,
12 does it?
13    A.   No.
14    Q.   If you compare the totals for those
15 assets on page 4543 to the next page, 4544,
16 which is dated 9/16/08 at the top on the right
17 side.
18       Do you see that?
19    A.   Yes.
20    Q.   You see there is a change in the
21 estimate of the assets from $62.7 billion on the
22 9/18 balance sheet to $57.9 billion on the
23 September 18th draft balance sheet, correct?
24       MR. CARDEN: Objection to form.
25

TSG Reporting - Worldwide    877-702-9580

Page 21

Ridings

1        MR. DAKIS: Same objection.
2     A.   Yes.
3     Q.   Does this change reflect the downward
4  values that you were referring to earlier in
5  your testimony?
6        MR. CARDEN: Objection to form.
7        MR. DAKIS: Join in the objection.
8     A.   Just to be clear, the second page,
9  544, again, there's a date on the upper right
10 corner, but it appears to be set up roughly
11 similar to the first page that had my notes on
12 it.
13       There's one or two very slight
14 variations and obviously there are no headers
15 and it has a different date on it, and I believe
16 that SB is Steve Berkenfield's initials.
17    Q.   Right.
18    A.   But again, you can get the same point
19 that you're making on the first page, that in
20 those couple of days there was dramatic
21 decreases in the price of securities.
22    Q.   Turning again to what is not on page
23 4543 under "Assets," I asked you whether there
24 were intangible assets associated with the

TSG Reporting - Worldwide    877-702-9580

Page 22

Ridings

1
2  business that was being sold to Barclays that
3  are not reflected there and I believe you said
4  that is correct.
5      A.   Yes.
6      Q.   And to explore that briefly, there's
7  no reflection of purchased fixtures, fittings or
8  software listed among the assets there, correct?
9      A.   That's correct.
10     Q.   There are no transferred properties
11 leases listed there; isn't that right?
12     A.   Correct. There are no fixed assets
13 either.
14     Q.   There are no fixed assets either.
15         A bit later on I'm going to take you
16 to a larger balance sheet and return to this
17 subject.
18         On the question of a wash, which I
19 mentioned a few minutes ago, did Lazard proffer
20 to the court at any time that this transaction
21 was to be a wash?
22     A.   No.
23     Q.   Did you in fact believe on
24 September 19th that this transaction was going
25 to be a wash?

TSG Reporting - Worldwide    877-702-9580

Page 23

Ridings

1
2      A.   Again, just to be clear what you mean
3  by wash, because that's not a term I've been
4  using, but that everything sold equals
5  everything purchased.
6      Q.   That's right.
7      A.   No.
8      Q.   Let me ask you to turn to the next
9  exhibit, I'm going to hold this one off because
10 we're going to return to this, which is 562A, a
11 six-page set of news articles distributed in
12 Lazard on September 18, 2008.
13         Do you see that?
14     A.   Yes.
15     Q.   And I'm just going to ask you about
16 the last page.
17     A.   The very last page?
18     Q.   The very last page of that exhibit,
19 which is part of a Reuters report.
20         You will see that by turning the page
21 before just to understand the context of what
22 I'm going to ask you to look at.
23         And this is a report on the impending
24 sale. The second full paragraph on the last
25 page of 5628 says, "The deal would also lift

TSG Reporting - Worldwide    877-702-9580

Page 24

Ridings

1
2  Barclays' capital ratio even before the bank
3  completes a planned capital injection alongside
4  the deal because of a negative goodwill
5  adjustment from the deal amounting to about
6  $2 billion after tax."
7          Do you see that?
8      A.   Yes.
9      Q.   Does Barclays' statement on
10 September 17th as reported here by Reuters that
11 it expected to record a multibillion dollar
12 acquisition gain on the transaction, is that
13 statement inconsistent in any way with your
14 proffer in testimony to the court on
15 September 19th?
16         MR. CARDEN: Objection to form.
17         MR. DAKIS: Same objection.
18         MR. ROTHMAN: Join in the objection.
19     A.   Again, my proffer didn't speak to how
20 Barclays is going to account for a transaction
21 and I don't know how Barclays accounted for the
22 transaction.
23         But my proffer was that this was the
24 highest and best alternative that we had. In
25 fact the only alternative that we had.

TSG Reporting - Worldwide    877-702-9580

Page 25

Ridings

1
2      Q.   As the Reuters article reports,
3  Barclays made an announcement of this gain,
4  anticipated gain, two days before the hearing.
5          Is that a surprise to you that
6  Barclays anticipated a gain on this acquisition?
7          MR. DAKIS: Objection to the form.
8  BY MR. SCHILLER:
9      Q.   As of September 19th.
10         MR. CARDEN: Objection to form.
11         MR. DAKIS: Objection.
12         MR. ROTHMAN: Objection.
13     A.   It's not a surprise to me, but it's
14 Barclays' accounting, so again, I'm not going to
15 put a lot of relevance on the U.K. accounting
16 for this.
17     Q.   To your knowledge, there was no
18 limitation on whether Barclays could profit from
19 this trade, correct?
20         MR. CARDEN: Objection to form.
21         MR. DAKIS: Same objection.
22         MR. ROTHMAN: Join in the objection.
23     A.   That's correct.
24         Just to be clear, if Barclays lost
25 money on this transaction, it would have been

TSG Reporting - Worldwide    877-702-9580

Page 26

Ridings

1  the end of the U.S. capital markets.
2
3      Q.   Let me ask you to turn to the next
4  exhibit, 377A, which is Barclays' disclosed
5  acquisition gain on this transaction. The
6  document was generated in February of 2009.
7      If you look at page 5844, you see the
8  valuation by Barclays of the financial assets
9  that it had purchased on September 22nd
10 amounting to $50 billion?
11     A.   Yes.
12     Q.   .160?
13     And it goes on below that to list
14 some of the other assets, some of which we
15 discussed earlier; intangibles, real estate,
16 fixtures, fittings and software.
17     Do you see that?
18     A.   Yes.
19     Q.   And that leaves a total of
20 $53,540,000,000 of assets acquired in the
21 transaction, correct?
22     A.   Yes.
23     Q.   And then if you return to the first
24 page of Exhibit 377A and you address line 39,
25 the gain on acquisition, you see that Barclays

TSG Reporting - Worldwide    877-702-9580

Page 27

Ridings

1
2  recognized a gain of approximately $4.2 billion
3  on the acquisition, correct?
4      A.   Yes.
5      Q.   And is the gain that was recognized
6  as reported here inconsistent in any way with
7  your understanding of the sale on which you
8  proffered testimony on September 19, 2008?
9      MR. CARDEN: Objection.
10     MR. DAKIS: Objection.
11     MR. ROTHMAN: Objection to the form.
12     A.   I don't think it's inconsistent.
13 It's just something different, the way Barclays
14 accounts for this.
15     Q.   Are you generally familiar with the
16 Rule 60 motion that was filed by Lehman in this
17 proceeding?
18     A.   In a very high-level fashion, yes.
19     Q.   And in terms of your high-level
20 review of the motion, you understand that it was
21 not filed by Weil, Gotshal, correct?
22     A.   That's right.
23     Q.   Based on everything that you know as
24 of today, do you believe your proffer in
25 testimony to the court on September 19th was

TSG Reporting - Worldwide    877-702-9580

Page 28

Ridings

1
2  accurate and fair and appropriate?
3      A.   I do.
4      Q.   During the week of September 19,
5  2008, did you have an understanding whether
6  Barclays and Lehman were engaged in discussions
7  concerning Lehman's marks?
8      A.   They were.
9      Q.   And did Lehman exercise diligence
10 regarding that process?
11     MR. CARDEN: Objection to form.
12     MR. DAKIS: Same objection.
13     A.   Can you clarify the question, please?
14     Q.   You were familiar with discussions
15 between Barclays and Lehman concerning Lehman's
16 marks.
17     A.   Yes.
18     Q.   And did your diligence address those
19 discussions in any way?
20     MR. CARDEN: His diligence?
21     MR. SCHILLER: Lazard's diligence.
22     MR. CARDEN: Objection to form.
23     MR. DAKIS: Same objection.
24 BY MR. SCHILLER:
25     Q.   Did Lazard exercise a level of

TSG Reporting - Worldwide    877-702-9580

Page 29

Ridings

1
2  diligence in reaching its opinions as to why
3  this transaction should be approved by the
4  court?
5      MR. CARDEN: Objection to form.
6      MR. DAKIS: Same objection.
7      A.   We did due diligence during the week
8  and that supported our conclusions at court.
9      Q.   And in the course of doing that
10 diligence, did you become aware of the process
11 in which Barclays and Lehman were engaged
12 concerning Lehman's marks?
13     MR. CARDEN: Objection to form.
14     MR. DAKIS: Same objection.
15     A.   Again, it was my understanding that
16 throughout the week Barclays had said that the
17 marks were not appropriate; that they were too
18 high because they were no longer market or
19 stale.
20     I nor anyone on my team were in any
21 meetings where people were talking about
22 specific securities and what the marks should
23 be.
24     Q.   In the proffer of your testimony on
25 September 19th, Mr. Miller said that you would

TSG Reporting - Worldwide    877-702-9580

Page 30

Ridings

1
2  testify that the parties exchanged numerous bids
3  and asks and turn countless drafts.
4       Do you recall that?
5       A.  Yes.
6       Q.  In terms of exchanging numerous bids
7  and asks, does that include this process of
8  discussing Lehman's marks?
9       MR. CARDEN: Objection to form.
10      A.  It included everything that was being
11  discussed.
12      Q.  And including the exchange between
13  the parties concerning Lehman's marks.
14      A.  My understanding is that there was
15  significant discussions on what the appropriate
16  marks for various securities were.
17      Q.  Let me ask you to look at the next
18  exhibit I've put before you, 563A, which is an
19  email from Mr. Descoteaux to you on
20  September 18, 2008 transmitting prior email,
21  including an email from Gerard Reilly dated
22  September 17, 2008 regarding diligence items.
23      Do you see that?
24      A.  Yes.
25      Q.  Would you identify Mr. Descoteaux,

TSG Reporting - Worldwide    877-702-9580

Page 31

Ridings

1
2  please?
3       A.  David is a managing director in the
4  restructuring group at Lazard and worked with me
5  and for me on this transaction.
6       Q.  And would you identify Mr. Bruhmuller
7  as well.
8       A.  Arthur is -- I believe Arthur is
9  either a VP or director at Lazard.
10      Q.  Mr. Miller advised Judge Peck that
11  you, sir, were intimately involved in the
12  negotiations between Barclays and Lehman that
13  week of September 15th, correct?
14      A.  Yes, although I was not in every
15  single meeting because there literally were
16  multiple meetings going on at the same time.
17      Q.  Who was negotiating with Barclays on
18  behalf of Lehman, to your knowledge, during that
19  period?
20      MR. ROTHMAN: Objection to form.
21      MR. DAKIS: Same objection.
22      A.  My recollection is that Mark
23  Schaeffer, Bart McDade, and that's my direct
24  knowledge. I'm sure there were other people
25  that were involved.

TSG Reporting - Worldwide    877-702-9580

Page 32

Ridings

1
2       Q.  Did you learn that week who Gerard
3  Reilly was by any chance?
4       A.  No, I do not know who he is.
5       Q.  As far as you know, did you
6  participate in any meetings with Gerard Reilly?
7       A.  I don't think so.
8       Q.  Mr. Reilly writes to Mr. Kelly on
9  September 17th, page 49402 of Exhibit 563A,
10  Mr. Ridings.
11      A.  I'm not sure I know who Martin Kelly
12  is either.
13      I do know Dan Flores.
14      Q.  Can you identify Mr. Flores for the
15  record, please?
16      A.  I don't know his exact title, but he
17  worked at Lehman Brothers.
18      Q.  All right. Reilly's email to these
19  gentlemen says, "The first question is very
20  difficult. My understanding of the deal is that
21  they will purchase our assets that remain in LBI
22  on the closing date, which will not be the same
23  as the assets on the 12th. That purchase will
24  be at a fixed discount on the assets that remain
25  to reflect the bulk side of the purchase. We

TSG Reporting - Worldwide    877-702-9580

Page 33

Ridings

1
2  can track our PL by assets category which gives
3  some indication of how much we have moved the
4  marks. We can also provide assets as of the
5  16th with marks so they can get some
6  prospective. Let me know what we need."
7       Do you see that?
8       A.  Yes.
9       Q.  That then is sent to Mr. Flores, as
10  we've noted, and he sends it on to your
11  colleague, Mr. Bruhmuller, who is asked, "What
12  are your thoughts on this?"
13      Do you see that?
14      A.  Yes.
15      Q.  And then Mr. Bruhmuller writes, "We
16  are trying to get a sense for how marks have
17  evolved since Friday. I think the first
18  priority would be to see the inventory of what's
19  being sold, how the marks have evolved and info
20  on the buyer discount."
21      Would a discount as set forth in this
22  exhibit change in any way your support for this
23  transaction on September 19th?
24      MR. CARDEN: Objection to form.
25      MR. DAKIS: Same objection.

TSG Reporting - Worldwide    877-702-9580

Page 34

1          Ridings
2        A.   My understanding was that there was
3   not a built-in discount, but given the fact that
4   we did not have a viable alternative, this --
5   the rationale he sets is a reasonable rationale;
6   that one would get a discount for a bulk
7   purchase, but that was not my understanding of
8   what the deal was.
9        Q.   If there had been a bulk purchase as
10  you understand that expression, would that have
11  concerned you in any way as of September 19th,
12  2008?
13           MR. CARDEN: Objection.
14           MR. ROTHMAN: Objection to form.
15           MR. DAKIS: Same objection.
16       A.   Could you just clarify what you mean
17  by "concern"?
18       Q.   Would it have changed in any way your
19  proffer to the court on September 19th?
20           MR. ROTHMAN: Same objection.
21           MR. DAKIS: Same objection.
22           MR. DAKIS: Same objection.
23       A.   I don't think so. If you're telling
24  me someone wants a 90 percent discount, yes,
25  that doesn't make a lot of sense to me.
    TSG Reporting - Worldwide    877-702-9580

Page 35

1          Ridings
2        If you're telling me someone wants a
3   five or ten percent discount, that's not going
4   to change my proffer to the court in terms of we
5   still have the highest and best alternative and
6   it's better than liquidation.
7        Q.   So if Lazard provided Barclays with a
8   five percent or a ten percent discount in the
9   transaction before the court on September 19th,
10  that would not have changed your proffer to the
11  court in favor of the sale.
12           MR. DAKIS: Objection to form.
13           MR. RAFFERTY: Jonathan, you mean if
14  Lehman had provided? You said if
15  Barclays --
16           MR. SCHILLER: Let me rephrase the
17  question.
18  BY MR. SCHILLER:
19       Q.   If Barclays received a five or
20  ten percent discount off of Lehman's marks at
21  the time, that would not have changed your
22  recommendation to the court to approve the sale,
23  correct?
24           MR. CARDEN: Objection.
25           MR. ROTHMAN: Objection.
    TSG Reporting - Worldwide    877-702-9580

Page 36

1          Ridings
2           MR. DAKIS: Join.
3        A.   Just a couple of comments. To answer
4   your question, you need to put it in context of
5   the week that we're in, the markets are
6   extraordinarily volatile, things are changing
7   literally by the minute and generally things
8   were trending down, not up.
9        There was continued disagreement
10  between Barclays and Lehman as to what the
11  appropriate marks were and if you're saying a
12  five or ten percent discount off of the Lehman
13  marks, which is what Barclays had always said,
14  they didn't use percentages but they said your
15  marks are stale and they're not reflective of
16  what's happening in the market, the order of
17  magnitude that you've just discussed with me,
18  that would not change my opinion that this was
19  better than liquidation and it's the highest and
20  best and only alternative we had.
21       Q.   What order of magnitude would have
22  affected you?
23           MR. CARDEN: Objection to form.
24           MR. DAKIS: Same objection.
25           MR. ROTHMAN: Join in the objection.
    TSG Reporting - Worldwide    877-702-9580

Page 37

1          Ridings
2        A.   Let me try and describe it this way:
3   What these securities were, some of them, were
4   very illiquid securities, so if we go to some
5   financial literature, for example, like Shannon
6   Pratt, who's a well-known author who writes
7   about valuing securities and illiquidity
8   discounts, what he writes is that illiquidity
9   discounts on securities, and that means
10  securities that cannot readily be sold, averages
11  35 to 40 percent.
12       Now again, everything is fact
13  specific but what you and I just discussed isn't
14  close to -- I don't think it's close to 35 or
15  40 percent, sort of illiquidity discount.
16       Q.   Did you have any understanding during
17  this period September 15th to September 19th
18  that any discount as discussed in the Reilly
19  email was a secret that Lehman was to not share
20  with anybody?
21           MR. CARDEN: Objection to form.
22           MR. ROTHMAN: Same objection.
23           MR. DAKIS: Join in the objection.
24       A.   I'm sorry. Can you rephrase that?
25       Q.   Sure.
    TSG Reporting - Worldwide    877-702-9580

Page 38

Ridings

1
2      A.   The objections... I lost track.
3      Q.   The Reilly email which goes to Arthur
4  and then to Descoteaux refers to a discount of
5  some sort, does it not?
6      A.   I think it says a bulk market
7  discount.
8      Q.   Did Lazard have any understanding
9  that such a discount was a secret not to be
10 shared outside of Lazard?
11         MR. CARDEN:  Objection to form.
12         MR. DAKIS:  Same objection.
13     A.   I have no knowledge of that.
14     Q.   At any point that week in the
15 negotiations between Barclays and Lehman in
16 which you participated, were there closed or
17 secret discussions of any kind as far as you
18 could tell?
19         MR. CARDEN:  Objection to form.
20         MR. DAKIS:  Same objection.
21     A.   There were no secret discussions.  By
22 closed, the door was closed.  I'm not sure what
23 you mean by closed.
24     Q.   Well, I think you've answered my
25 question.

TSG Reporting - Worldwide    877-702-9580

Page 39

Ridings

1
2      A.   I mean things that were discussed in
3  the meetings, I reported back to the parties at
4  Lehman and if appropriate, counsel.
5          And generally I'm trying to think of
6  a meeting that I was at where there was not a
7  Lehman person with me and none -- the week kind
8  of runs together, but I actually can't think of
9  any meetings that I was in a room with Barclays
10 without a Lehman person with me.
11     Q.   So as far as you recall, there was
12 nothing secret about Barclays' assertion that
13 the Lehman marks were stale and too high.
14         MR. DAKIS:  Objection to form.
15 Mischaracterizes his testimony.
16     A.   They said that all the time.  There's
17 nothing secret about that.
18     Q.   Let me ask you to look at the next
19 exhibit, Exhibit 20, which is a Lehman email
20 dated September 16th from Mr. Tonucci to
21 Mr. Lowitt.
22          Do you see that?
23     A.   Yes.
24     Q.   And in this email chain below is an
25 email from Mr. Kelly to Lowitt early in the

TSG Reporting - Worldwide    877-702-9580

Page 40

Ridings

1
2  morning of September 16th --
3      A.   Yes.
4      Q.   -- saying, "Well, it took all night
5  and lots of back and forth, but the deal was
6  done and ready for the board.  Final price did
7  not change meaningfully.  Approximately a
8  $5 billion all-in economic loss versus our marks
9  and $3.6 billion of residential assets left
10 behind."
11          Do you see that?
12     A.   Yes.
13     Q.   Do you have an understanding whether
14 the "$5 billion all-in economic loss versus our
15 marks" refers to the difference between what
16 Barclays thought the assets were worth versus
17 the Lehman marks?
18         MR. CARDEN:  Objection to form.
19         MR. DAKIS:  Objection to form.
20         MR. ROTHMAN:  Objection to form.
21     A.   I believe that's true, but again, I
22 didn't write this and I'm not familiar with it.
23     Q.   Is this document and what it purports
24 consistent with your understandings of the
25 discussions between the parties that week?

TSG Reporting - Worldwide    877-702-9580

Page 41

Ridings

1
2          MR. CARDEN:  Objection to form.
3          MR. DAKIS:  Objection to form.
4          MR. ROTHMAN:  Objection to form.
5      A.   It's not inconsistent.  The
6  discussion that week are the market was falling
7  rapidly and the marks were not current and they
8  were stale.
9          But again, my understanding of the
10 transaction is they were buying a business and
11 in buying a business, they got assets and
12 liabilities.
13     Q.   Is there anything inconsistent in
14 this exhibit and your proffer in testimony
15 before the court on September 19th in support of
16 the sale?
17         MR. ROTHMAN:  Objection to the form.
18         MR. CARDEN:  Objection to the form.
19         MR. DAKIS:  Objection to the form.
20     A.   I don't think so.
21     Q.   Let me ask you to look at the next
22 exhibit, Exhibit 21, sir, which is another
23 internal email, this one dated September 18,
24 2008 from Mr. Kirk to Mr. Reilly in response to
25 a previous email from Reilly that is also set

TSG Reporting - Worldwide    877-702-9580

Page 42

1      **Ridings**
2  forth on page 9627.
3          Do you see that?
4      A.   Yes.
5      Q.   And in Mr. Reilly's email that begins
6  this particular chain on this page, there is a
7  reference to "open issues on the deal" and he
8  writes, "I need some help resolving these
9  issues."
10         And then at paragraph 3 Mr. Reilly
11 wrote, "Not clear on the amount of block
12 discount or how we make it happen. Defaulting
13 on repo could be the best as discount could be
14 taken from haircut. If not, then we need to
15 give business an allocation of block discount so
16 they can mark down the books tonight. Does that
17 create a problem as it could tip the broker
18 early? Would we rather have that be in the sale
19 price tomorrow?"
20         Do you see that?
21     A.   Yes.
22     Q.   Is there anything in Exhibit 21 that
23 is inconsistent with your support for the sale
24 on September 19, 2008?
25         MR. CARDEN: Objection to the form.
       TSG Reporting - Worldwide    877-702-9580

Page 43

1      **Ridings**
2          MR. DAKIS: Objection to the form.
3          MR. ROTHMAN: Objection to the form.
4      A.   There are things in here I actually
5  don't understand. This is not a document I'm
6  familiar with, but I don't understand what he
7  says could create a problem as it could tip the
8  broker early. I just don't know what that
9  means.
10         And again, my understanding is that
11 this is essentially what we talked about. I
12 don't recall negotiations where people said I
13 want a block bulk sale discount.
14         But there's nothing here with those
15 provisos that would cause my testimony to the
16 court to be different. This was the only
17 alternative we had. It is better than
18 liquidation.
19     Q.   By September 19, 2008, did you
20 determine that the transaction which had first
21 taken form on September 16th and 17 had been
22 completely restructured?
23     A.   Yes.
24     Q.   Can you describe that restructuring
25 generally?
       TSG Reporting - Worldwide    877-702-9580

Page 44

1      **Ridings**
2      A.   My understanding is that, and again,
3  this is top level, that Lehman had gone to the
4  Fed and pled certain securities and the Fed had
5  lent Lehman money, and the Fed said, for
6  whatever reasons, they said, This is not going
7  to work for us, Barclays. We essentially need
8  you to step into our shoes." So Barclays
9  stepped into the shoes of the Fed.
10         And so the securities that were
11 originally going to go to Barclays and the
12 original deal Lehman didn't have anymore, so
13 Barclays stepped into the shoes of the Fed and
14 the transaction was restructured around that.
15     Q.   You mentioned securities that Lehman
16 did not have anymore.
17         Could you describe what you meant by
18 that?
19     A.   Again, my general understanding, that
20 again, Lehman had to fund its business every
21 day. If it didn't have funding, it would have
22 to liquidate. And in order to get funding, they
23 would pledge securities with the Fed and they
24 would get overnight loans against that. And
25 without the liquidity, they couldn't open for
       TSG Reporting - Worldwide    877-702-9580

Page 45

1      **Ridings**
2  business and we would have been in liquidation.
3          For whatever reason the Fed at some
4  point said, "This doesn't work for me where I'm
5  your bank, Barclays. If you're going to buy
6  this company, you're going to buy me out of my
7  position right now."
8          Again, this is generalization. I'm
9  sure there's a lot of legal specifics that I'm
10 glossing over.
11     Q.   At that time of the discussions
12 concerning the Fed repo, do you know whether
13 counterparties had been seizing Lehman
14 securities that week?
15     A.   My understanding is they had been.
16 The one that comes to mind is the commodity
17 exchange, but that's all I recall actually.
18     Q.   So were there Lehman securities that
19 had been available to Barclays on September 16th
20 or 17th that were no longer available to Lehman
21 by the 18th and the 19th?
22     A.   I think that's correct.
23     Q.   Let me ask you to go back to
24 Exhibit 561A, which is a series of schedules and
25 balance sheets that I went over with you
       TSG Reporting - Worldwide    877-702-9580

Page 46

Ridings

1    earlier, and ask that you turn to the second to
2    the last page, 4548, which has the word
3    "Timeline" at the top.
4        Do you see that?
5    A.   Yes.
6    Q.   Do you know who prepared this
7    document?
8    A.   I don't know who prepared it.
9        I do know that it's not a Lazard
10   template so we did not prepare it.
11   Q.   Did you understand that there was a
12   Fed -- that there was a haircut in the Fed repo
13   of approximately $4.7 billion?
14   A.   I wouldn't characterize it that way.
15       I would characterize it that when
16   people go to the Fed to borrower money, the Fed
17   does not lend you dollar for dollar. They're
18   going to lend you less than the collateral that
19   you give them.
20   Q.   And did you understand that the
21   difference between what the Fed was loaning and
22   the collateral it was pledged was approximately
23   $4.7 billion?
24   A.   I don't know the specifics, but I

TSG Reporting - Worldwide    877-702-9580

Page 47

Ridings

1    that's order of magnitude correct.
2    Q.   And did you also understand that when
3    Barclays stood in the shoes of Fed with respect
4    to the repo, the ratio of the loan to the
5    pledged collateral was consistent with that Fed
6    ratio?
7        MR. CARDEN: Objection to form.
8        MR. DAKIS: Same objection.
9    A.   I'm not sure I know the answer to
10   that question.
11   Q.   If you look at the exhibit I've
12   placed in front of you where it provides under
13   "Thursday," a reference to the "the Fed
14   facility" and it's written, "Barclays wires $45
15   billion in cash to JPMorgan, expects to receive
16   $49.6 billion in securities," do you understand
17   that to be a reference to the Fed repo we've
18   been discussing in which Barclays stood in the
19   Fed's shoes?
20   A.   I think that's correct.
21   Q.   I've seen an email in which you
22   mentioned that during the day on Thursday you
23   were talking to creditors, you were in a meeting
24   with creditors.

TSG Reporting - Worldwide    877-702-9580

Page 48

Ridings

1        Do you recall meeting with creditors
2    on Thursday?
3        MR. CARDEN: Objection to form.
4        MR. DAKIS: Same objection.
5    A.   My recollection is that we had a
6    meeting at Weil, Gotshal on Thursday with some
7    of the creditors.
8    Q.   Was there a discussion of this
9    substantial change in the transaction in terms
10   of the role of the Fed repo?
11   A.   I actually don't recall specifically.
12   I would have thought it would have been
13   discussed, but I don't recall.
14   Q.   Before Judge Peck, Harvey Miller
15   proffered your testimony and when he did, he
16   offered to the court your testimony that the
17   negotiations between Lehman and Barclays that
18   week were, quote, arm's length, difficult and
19   aggressively negotiated by the parties.
20       Was that accurate?
21   A.   Yes.
22   Q.   Mr. Miller also proffered as your
23   testimony that the sales agreement between
24   Lehman and Barclays that was before the court

TSG Reporting - Worldwide    877-702-9580

Page 49

Ridings

1    was, quote, the result of good faith
2    negotiations.
3        Did you believe that at the time?
4    A.   Yes.
5    Q.   Based on everything that you know
6    today, was this proffer of your testimony to the
7    court on September 19th fair and accurate?
8    A.   I'm struggling with fair.
9        It certainly was accurate and I
10   attempted to be accurate, and I believe today I
11   was accurate.
12   Q.   Have you become aware of anything
13   since that hearing that has led you to believe
14   that the information you received from Lehman
15   was inaccurate in any way?
16   A.   I do not believe that Lehman gave me
17   inaccurate information. They -- in an
18   unbelievable stressful period, they gave us
19   whatever information they had. Remember, things
20   were changing by the second.
21   Q.   Do you have any reason to believe
22   that those at Lehman who were dealing with
23   Barclays that week were not acting in good
24   faith?

TSG Reporting - Worldwide    877-702-9580

Page 50

Ridings

1
2    A.   I have no reason to believe that to
3    be the case.
4    Q.   Let me include in that question
5    Mr. McDade, Mr. Tonucci, Mr. Kirk and
6    Mr. Lowitt.
7         Do you have any reason to believe any
8    of them did not act in good faith in their
9    dealings with Barclays leading up to
10   September 19th?
11   A.   I think they all acted in good faith.
12        I feel very comfortable in making
13   that statement with respect to Bart, since I got
14   to know him so well.
15        And I would say for Ian, he's an
16   officer of a company.  He had fiduciary duties
17   that he has.
18        I believe it to be the case for the
19   other two, although I had only met them one or
20   two times.
21   Q.   Do you recall whether the contractual
22   documentation between the parties required as a
23   closing condition that a number of officers of
24   Lehman go to Barclays?
25   A.   Yes.
     TSG Reporting - Worldwide    877-702-9580

Page 51

Ridings

1
2    Q.   The individuals I've just named,
3    McDade, Tonucci, Kirk, Lowitt, were they
4    included in that condition?
5         MR. CARDEN: Objection to form.
6         MR. DAKIS: Objection to form.
7    A.   I'm not sure about Kirk.
8         Certainly the other three.
9    Q.   You may have answered this already
10   but I want to be clear.
11        Did you have an understanding from
12   your interactions with these gentlemen that they
13   knew they had a fiduciary duty to Lehman that
14   week?
15   A.   I had no discussion on that point
16   with Kirk or Tonucci, or Lowitt for that case,
17   but Lowitt is an officer.  I mean he has a
18   fiduciary duty.
19        With respect to Bart, I think it was
20   clear that Bart knew he had to be the honest
21   broker.
22   Q.   As a general matter, was it your
23   understanding that week that Lehman's financial
24   inventory was uncertain and changing constantly?
25        MR. CARDEN: Objection to form.
     TSG Reporting - Worldwide    877-702-9580

Page 52

Ridings

1
2    A.   I'm going to ask you to clarify
3    "uncertain."
4    Q.   Let me ask only about the value of
5    the Lehman inventory.  You've talked previously
6    about the downward pressures, the tumultuous
7    market moving.
8         Let me ask you whether you understood
9    that the value of Lazard's financial inventory
10   was uncertain.
11   A.   Of Lehman.
12   Q.   Lehman's financial inventory.
13   A.   We have no financial inventory.
14   Q.   Let me start again.
15        During that week of September 15th
16   through September 19th, was it your view that
17   the value of Lehman's financial inventory was
18   uncertain and changing constantly?
19        MR. CARDEN: Objection to form.
20        MR. DAKIS: Objection.
21        MR. ROTHMAN: Objection to form.
22   A.   It was certainly changing constantly,
23   you know, by the hour and the markets were under
24   incredible stress and the general trend of that
25   during the week was downward.
     TSG Reporting - Worldwide    877-702-9580

Page 53

Ridings

1
2    Q.   In your proffer to Judge Peck, you
3    are quoted as stating, "The sale of LBI must be
4    immediately consummated or there will be little
5    or nothing left to sell."
6         Is that accurate?
7    A.   I think that's what he said, yes.  I
8    think he said about what I would say, yes.
9    Q.   And you agree with that proffer.
10   A.   Yes.
11   Q.   Let me ask you a couple more
12   questions about Exhibit 561A, which I have --
13   which you have before you.
14        I'm going to ask you to turn to page
15   4545, which is another balance sheet.
16        When you were in court with
17   Mr. Miller on September 19th, do you recall his
18   statement to Judge Peck that there would be
19   "$2 billion of exposure to transfer employees"
20   for Barclays?
21   A.   I think that's generally correct.
22   Q.   And as regards cure payments, do you
23   recall that Mr. Miller said to the court that
24   there was $1.2 billion potential exposure to
25   Barclays for contracts and leases that Barclays
     TSG Reporting - Worldwide    877-702-9580

Page 54

Ridings

1
2    may assume?
3        MR. CARDEN: Objection to the form.
4        MR. DAKIS: Objection to the form.
5        MR. ROTHMAN: Objection to the form.
6    A.   I think that's what he said, yes.
7    Q.   Did you have an understanding that
8    these were rough Lehman estimates that
9    Mr. Miller was describing?
10       MR. CARDEN: Objection to form.
11       MR. DAKIS: Same objection.
12       MR. ROTHMAN: Objection.
13   A.   Yes. I don't think there was any
14   specific number for all the employees. The year
15   hadn't been finished yet, so that was an
16   estimate of what -- it was an upward estimate.
17   If they were going to keep the employees, they
18   were going to have to pay them to keep them.
19       The other one, my understanding is it
20   was an estimate and actually the number had
21   started out higher and had come down. It was an
22   estimate.
23   Q.   And in terms of a compensation, would
24   those payments be contingent upon how many
25   people actually transferred to Barclays?

TSG Reporting - Worldwide   877-702-9580

Page 55

Ridings

1
2        MR. CARDEN: Objection to form.
3        MR. ROTHMAN: Same objection.
4        MR. DAKIS: Same objection.
5    A.   That's certainly one of the factors,
6    yes, and you can't force people to work for
7    Barclays.
8    Q.   So at the page I mentioned earlier,
9    4545 of 561A, on the left side of the balance
10   sheet there are accrued amounts for payables,
11   including compensation and trade liabilities.
12       Do you see that?
13   A.   Yes.
14   Q.   And those accruals there as adjusted
15   are less than the numbers that Mr. Miller gave
16   the court Friday night, correct?
17       MR. CARDEN: Objection to form.
18   A.   Correct.
19   Q.   Is there any information on page 4545
20   that is inconsistent with your proffer in
21   testimony in support of the sale on
22   September 19th?
23       MR. CARDEN: The whole page?
24       Objection to form.
25       MR. DAKIS: Same objection.

TSG Reporting - Worldwide   877-702-9580

Page 56

Ridings

1
2    A.   Well, with respect to those two line
3    items we've been talking about, it does not
4    change my proffer.
5        We'd have to talk about the other
6    line items otherwise.
7        MR. SCHILLER: Okay. Why don't we
8    take a short break and I'll just have a
9    little bit more.
10       THE VIDEOGRAPHER: The time is 10:16
11   a.m. We're going off the record.
12       (Recess is taken.)
13       THE VIDEOGRAPHER: The time is 10:39
14   a.m. We're back on the record, video
15   No. 2.
16   BY MR. SCHILLER:
17   Q.   Mr. Ridings, let me ask you to look
18   at the last exhibit that I've put in your pile,
19   564A.
20   A.   Yes.
21   Q.   And this is a Lazard -- an Alvarez &
22   Marsal presentation to the Creditors Committee
23   that was sent to David Descoteaux and copy to
24   you on October 8, 2008, correct?
25   A.   Yes.

TSG Reporting - Worldwide   877-702-9580

Page 57

Ridings

1
2        MR. CARDEN: Objection to the form.
3        MR. DAKIS: Same objection.
4    BY MR. SCHILLER:
5    Q.   And may I ask you to turn to the next
6    to last page, 63753, please, where Alvarez &
7    Marsal make reference to the, quote, sale of
8    Lehman Brothers to Barclays.
9        Do you see that?
10   A.   Let me make sure we're on the same
11   page. That was kind of the middle of my deck,
12   so it's page 28 on the bottom left?
13   Q.   Yes, sir.
14   A.   Okay. Thank you.
15   Q.   You made mention earlier in your
16   testimony to Lehman stale marks.
17       Do you recall that?
18   A.   Yes.
19   Q.   Let me point you to the first bullet
20   under "Assets Purchased," which reads,
21   "43.1 billion Repo Assets. Book value per
22   Lehman stale marks; negotiated a $5. billion
23   reduction."
24       Do you see that?
25   A.   Yes.

TSG Reporting - Worldwide   877-702-9580

Page 58

Ridings

1   Q.   If this $5 billion reduction is what
2   Mr. Reilly meant in his email that we've looked
3   at concerning bulk discount or block discount,
4   then this was information known to Lazard,
5   correct?
6        MR. CARDEN: Objection.
7        MR. DAKIS: Objection to form.
8        MR. ROTHMAN: Objection.
9   A.   Can you restate that, please.
10  Q.   Sure.
11       We looked at Mr. Reilly's email that
12  Mr. Descoteaux and Arthur received.
13  A.   Yes.
14  Q.   And he made reference to a bulk
15  discount there.
16       Do you recall that?
17  A.   He had a reference to, yes.
18  Q.   And you've also testified to Lazard's
19  knowledge of the negotiation between Barclays
20  and Lehman over Lehman's stale marks, correct?
21  A.   Yes.
22  Q.   And if the reference by Reilly to a
23  discount was a reference to a negotiated
24  $5 billion reduction as written by Alvarez &

TSG Reporting - Worldwide    877-702-9580

Page 59

Ridings

1   Marsal here, then that was something that Lazard
2   had knowledge of, correct?
3        MR. DAKIS: Objection to the form.
4        MR. ROTHMAN: Objection to the form.
5   A.   Again, my knowledge is I don't recall
6   any discussions where people talked about bulk
7   discounts in the negotiation.
8        I do recall that Barclays
9   consistently said the marks are not current.
10       What this says, I don't know if it's
11  related to what Reilly said at all, but Barclays
12  clearly thought the assets they were getting
13  were not worth what Lehman had them on their
14  books for.
15       And again, remember, they bought a
16  business and the business was conveyed by some
17  assets. This page clearly doesn't list all the
18  things, the gives and takes of the business.
19  This only has a couple of them.
20  Q.   I direct your attention back to
21  Exhibit 561A for a moment, and on the second
22  page, 4544, on the balance sheet, there is a
23  spread between the estimated long positions of
24  $72,650,000,000 and the short positions of

TSG Reporting - Worldwide    877-702-9580

Page 60

Ridings

1   $68.400 million, correct?
2        MR. CARDEN: Objection to form.
3        MR. DAKIS: Same objection.
4   A.   There is a difference, yes.
5   Q.   And if that is what Reilly meant when
6   he referenced discount, this was also a
7   difference known to Lazard as of September 16th,
8   correct?
9        MR. CARDEN: Objection to form.
10       MR. DAKIS: Objection to the form.
11       MR. ROTHMAN: Objection to the form.
12  A.   Again, I don't know what Reilly
13  meant. I had seen this schedule, it came out of
14  our files and I obviously know what the schedule
15  says, and there is a difference between total
16  adjusted assets and total liabilities.
17  Q.   And what is that difference, roughly?
18  A.   It's about $4 billion.
19  Q.   Let me ask you to look at the first
20  exhibit again, the APA, and return again to page
21  6, the definition of "Purchased Assets,"
22  Mr. Ridings, please.
23  A.   Yes.
24  Q.   And you see at subparagraph D there

TSG Reporting - Worldwide    877-702-9580

Page 61

Ridings

1   is a reference to government securities,
2   commercial paper, corporate debt, corporate
3   equity exchange, traded derivatives and
4   collateralized short-term agreements with a book
5   value as of the date here of approximately $70
6   billion long positions?
7   A.   Yes.
8   Q.   Do you recall when you were in court
9   on September 19th that one of Weil, Gotshal's
10  partners, Lori Fife, explained to the court that
11  Lehman was originally selling long positions of
12  approximately $70 billion, but today,
13  September 19th, was selling assets with a value
14  of $47.4 billion.
15       Do you remember that?
16  A.   I think that's what she said, yes.
17  Q.   Do you know how that $47.4 billion
18  number was derived?
19  A.   I'm not sure how it was derived.
20  Q.   And if you look at the purchased
21  assets as defined here, there were a number of
22  assets purchased by Barclays in addition to the
23  long positions, correct?
24       MR. CARDEN: Objection to form.

TSG Reporting - Worldwide    877-702-9580

Page 62

Ridings

2 MR. DAKIS: Same objection.
3 A. If you're asking did they buy more
4 than what is in paragraph D, the answer is yes.
5 There are lots of letters here, co-signs for
6 3 pages, what they bought.
7 Q. And did those other categories that
8 you're looking at there, including the
9 intangibles, furniture and equipment, the
10 residential real estate, mortgages, provide
11 potentially substantial but unquantified values
12 to Barclays?
13 MR. ROTHMAN: Objection to form.
14 MR. DAKIS: Same objection.
15 A. I'm not sure I understand the
16 question.
17 Q. In addition to the $70 billion long,
18 these other assets listed there are not
19 quantified, but they provide substantial but
20 unquantified value in the sale, don't they?
21 MR. DAKIS: Objection to form.
22 MR. ROTHMAN: Same objection.
23 A. Let me see if I can understand.
24 Again, I think Barclays bought a
25 business and the form of the transaction is
TSG Reporting - Worldwide    877-702-9580

Page 63

Ridings

2 identified in assets and there's a laundry list
3 of running up to letter S of the various things
4 they bought. And again, some of these include
5 goodwill and software and things of that like,
6 and then you also have people. I mean that's
7 not -- you can't convey people but that's
8 something else that Barclays got.
9 So I think that's the answer. I mean
10 the only number here I think is the approximate
11 number of $70 billion for subsection D.
12 Q. When you appeared before the court on
13 September 19th, did you have any certainty as to
14 the value of all purchased assets that were to
15 be conveyed to Barclays?
16 MR. CARDEN: Objection to form.
17 MR. ROTHMAN: Objection to form.
18 A. By "certainty" you mean did I know
19 exactly what they were worth that day.
20 Q. Let me ask it again.
21 Did you have any understanding when
22 you testified before the court on September
23 19th, what the value that day was of the assets,
24 all the purchased assets that were to be
25 conveyed to Barclays?
TSG Reporting - Worldwide    877-702-9580

Page 64

Ridings

2 A. If you recall, the hearing went till
3 sometime Saturday morning. No one in the
4 courtroom had closing marks for Friday during
5 the hearing, so I think the answer is I didn't
6 know with certainty what the dollar number was
7 of the assets conveyed.
8 Q. And is it also your testimony that in
9 your view no one could have known?
10 MR. ROTHMAN: Objection to form.
11 MR. DAKIS: Same objection.
12 A. Again, we were selling a business.
13 They were buying a business and they agreed to
14 assume certain liabilities and they paid a
15 certain amount of cash. They were taking --
16 they were getting these assets.
17 Once they owned it, it was their
18 risk. When the markets opened Monday, the
19 markets could have gone up or down and that was
20 their risk. I guess it's really Tuesday.
21 Whenever the deal closed.
22 But at 1:00 a.m. Saturday morning, I
23 don't think any of us had a piece of paper that
24 said the closing marks on these securities are
25 X. And even if there were, those were the
TSG Reporting - Worldwide    877-702-9580

Page 65

Ridings

2 Lehman numbers. Those may or may not be what
3 Barclays thought they were worth.
4 Q. So you didn't rely on any precise
5 valuation of assets and liabilities when you
6 recommended approval of the sale to the court on
7 September 19th.
8 MR. CARDEN: Objection to form.
9 MR. DAKIS: Same objection.
10 A. Again, my testimony was that it was
11 the highest and best alternative that we had,
12 and the alternative was liquidation. I was
13 confident and remain confident that this
14 transaction was better than a liquidation would
15 have been.
16 Q. Earlier in your testimony you made
17 reference to consequences of any loss on the
18 part of Barclays as a result of its purchase of
19 this business.
20 Can you describe for me what you
21 meant in your response earlier?
22 A. Sure.
23 That didn't go into the consideration
24 of whether I thought this was a good or bad
25 deal. Barclays was taking a risk.
TSG Reporting - Worldwide    877-702-9580

Page 66

1          Ridings
2          I was making a comment kind of as a
3    U.S. citizen. If Barclays had expended this
4    money and the capital markets continued to fall,
5    there was a chance Barclays would then
6    subsequently fail, which would have meant that
7    Goldman, Morgan Stanley, the list goes on and on
8    of firms that may fail. It -- literally we were
9    talking about the end of the capital markets as
10   we knew them that week. It was that bad.
11         A year-and-a-half later you may say
12   uh, you're overreacting, but I've done this for
13   35 years. I can't stress to you the
14   unbelievable nature of that week.
15         So Barclays took a huge risk and if
16   this transaction failed for Barclays, it was a
17   bet the ranch transaction for Barclays.
18         But that had nothing to do with my
19   opinion as to whether this was the best price
20   and deal for Lehman.
21   Q.   And it was your opinion that it was,
22   correct?
23   A.   What I said in my proffer and on the
24   stand, this was the highest and best that we had
25   and it was clearly better than liquidation.

TSG Reporting - Worldwide    877-702-9580

Page 67

1          Ridings
2          MR. SCHILLER: Thank you,
3    Mr. Ridings.
4          MR. CARDEN: Take a break? Take a
5    short break.
6          MR. SCHILLER: Sure.
7          THE VIDEOGRAPHER: The time is 10:55
8    a.m. We're going off the record.
9          (Recess is taken.)
10         MR. CARDEN: We don't have any
11   questions.
12         (Time noted: 10:57 a.m.)



15

16   _____
    BARRY W. RIDINGS

18

19   Subscribed and sworn to before me
20   this   day of       2010.

21

22

23

TSG Reporting - Worldwide    877-702-9580

Page 68

1

2          C E R T I F I C A T E

3

4    STATE OF NEW YORK  )

5                       ) ss.:

6    COUNTY OF QUEENS   )

7

8          I, ANNETTE ARLEQUIN, a Notary Public
9    within and for the State of New York, do
10   hereby certify:
11         That BARRY W. RIDINGS, the witness
12   whose deposition is hereinbefore set forth,
13   was duly sworn by me and that such
14   deposition is a true record of the
15   testimony given by such witness.
16         I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that I am
19   in no way interested in the outcome of this
20   matter.
21         IN WITNESS WHEREOF, I have hereunto
22   set my hand this 15th day of January, 2010.

23

24   --------------------------------

25        ANNETTE ARLEQUIN, CCR, RPR

TSG Reporting - Worldwide    877-702-9580

Page 69

1

2          I N D E X

3

4    Witness                    Page
5    BARRY W. RIDINGS
6    MR. SCHILLER               7
7

8          INDEX OF EXHIBITS
9    Description                Page
10

    Deposition Exhibit 561A, Document Bates    6
11   stamped LAZ-A-00004543 through 4549
12

    Deposition Exhibit 562A, Email dated    6
13   9/18/08 from Creswell to Distribution
    at Lazard NYC, Bates stamped
14   LAZ-C-00049033 to 49041,
15

    Deposition Exhibit 563A, Email dated    6
16   9/18/08 from Descoteaux to Ridings,
    Bates stamped LAZ-C-00049400 through
17   49405
18

    Deposition Exhibit 564A, Email dated    6
19   10/8/08 from Descoteaux to Ridings and
    Whiting with attachment, Bates stamped
20   LAZ-C-00063724 through 63817
21

22

23

24

25

TSG Reporting - Worldwide    877-702-9580

Page 70

```
 1
 2        ERRATA SHEET FOR THE TRANSCRIPT OF:
 3     CASE NAME: LEHMAN BROTHERS HOLDINGS, INC.
 4     DATE:     JANUARY 15, 2010
 5     DEPONENT: BARRY W. RIDINGS
 6     Pg. Ln.  Now Reads   Should Read  Reason
 7     __ __ _____   _____  _____
 8     __ __ _____   _____  _____
 9     __ __ _____   _____  _____
10     __ __ _____   _____  _____
11     __ __ _____   _____  _____
12     __ __ _____   _____  _____
13     __ __ _____   _____  _____
14     __ __ _____   _____  _____
15     __ __ _____   _____  _____
16     __ __ _____   _____  _____
17
18          _____
19          BARRY W. RIDINGS
20     SUBSCRIBED AND SWORN BEFORE ME
21     THIS____DAY OF_____ 2010.
22
23     _____
24     (Notary Public)
25     MY COMMISSION EXPIRES:_____
```

TSG Reporting - Worldwide    877-702-9580

# BCI EXHIBIT

# 93

1          HIGHLY CONFIDENTIAL - J. RODEFELD

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                          Chapter 11

7     LEHMAN BROTHERS        Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

              Debtors.

10

      ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF JOHN RODEFELD

14          New York, New York

15          August 27, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24294

Page 2

```
1        HIGHLY CONFIDENTIAL - J. RODEFELD
2              August 27, 2009
3                  9:33 a.m.
4
5          HIGHLY CONFIDENTIAL deposition
6       of JOHN RODEFELD, held at Jones Day
7       LLP, 222 East 41st Street, New
8       York, New York, before Kathy S.
9       Klepfer, a Registered Professional
10      Reporter, Registered Merit Reporter,
11      Certified Realtime Reporter, Certified
12      Livenote Reporter, and Notary Public
13      of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1       HIGHLY CONFIDENTIAL - J. RODEFELD
2
3           A P P E A R A N C E S :
4       JONES DAY, LLP
5       Attorneys for Lehman Brothers, Inc.
6          222 East 41st Street
7          New York, New York  10017-6702
8       BY: JAYANT W. TAMBE, ESQ.
9          BRIDGET CRAWFORD, ESQ.
10
11      BOIES, SCHILLER & FLEXNER, LLP
12      Attorneys for Barclays and the Witness
13         5301 Wisconsin Avenue, N.w.
14         washington, D.C.  20015
15      BY: JONATHAN M. SHAw, ESQ.
16
17      QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
18      Attorneys for the Creditors Committee
19         865 South Figueroa Street, 10th Floor
20         Los Angeles, California  90017
21      BY: THOMAS O'BRIEN, ESQ. (By telephone)
22
23
24
25
```

Page 4

```
1        HIGHLY CONFIDENTIAL - J. RODEFELD
2        A P P E A R A N C E S :  (Cont'd.)
3
4       JENNER & BLOCK, LLP
5       Attorneys for the Examiner
6          330 N. Wabash Avenue
7          Chicago, Illinois  60611-7603
8       BY:  DAVID C. LAYDEN, ESQ.
9
10      HUGHES, HUBBARD & REED, LLP
11      Attorneys for the SIPA Trustee
12         One Battery Park Plaza
13         New York, New York  10004-1482
14      BY: SETH D. ROTHMAN, ESQ.
15         FARA TABATABAI, ESQ.
16
17
18      Also Present:
19         RAJESH ANKALKOTI, Alvarez & Marsal
20
21
22
23
24
25
```

Page 5

```
1        HIGHLY CONFIDENTIAL - J. RODEFELD
2       JOHN RODEFELD, called as a
3          witness, having been duly sworn by a Notary
4          Public, was examined and testified as
5          follows:
6       EXAMINATION BY
7       MR. TAMBE:
8          Q.  Good morning, Mr. Rodefeld.  My name
9       is Jay Tambe.  I'm with the law firm of Jones
10      Day.  We're special counsel to the estate of
11      Lehman Brothers Holdings, Inc.  With me is
12      Bridget Crawford.
13          I'm going to have the other counsel
14      around the table introduce themselves to you and
15      then we'll get started.
16          MS. TABATABAI: I'm Fara Tabatabai
17      with Hughes Hubbard.  We represent the SIPA
18      Trustee.
19          MR. ROTHMAN: Seth Rothman from Hughes
20      Hubbard, also for SIPA Trustee.
21          MR. LAYDEN:  David Layden from Jenner
22      & Block on behalf the Examiner.
23          MR. ANKALKOTI:  Rajesh Ankalkoti from
24      Alvarez & Marsal on behalf of the estate.
25          MR. SHAW: Jonathan Shaw of Boies,
```

Page 6

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    Schiller & Flexner on behalf of Barclays.
3        MR. TAMBE:  And we have counsel on the
4    phone as well?
5        MR. O'BRIEN:  This is Tom O'Brien at
6    Quinn Emanuel in Los Angeles on behalf of
7    the Creditors Committee.
8    BY MR. TAMBE:
9        Q.   Mr. Rodefeld, I'm going to ask you
10   some questions about the Lehman/Barclays
11   transaction and what role, if any, you may have
12   played in connection with that transaction.  And
13   the time period I'm going to be focused on is
14   really sort of September 2008, and to the extent
15   you had an involvement after September 2008,
16   we'll ask you some questions about that.  Okay?
17       A.   Fine.
18       Q.   You're employed by Barclays Capital
19   now?
20       A.   That's correct.
21       Q.   How long have you been at Barclays
22   Capital?
23       A.   Since January 1999.  Ten and a half
24   years.
25       Q.   And prior to Barclays Capital, by whom

Page 7

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    were you employed?
3        A.   Salomon Brothers, Inc.
4        Q.   And how long had you been at Salomon?
5        A.   16-plus years.
6        Q.   Starting in January '99 to the
7    present, if you could just give us a brief
8    overview of your career at Barclays Capital,
9    what departments, positions, et cetera.
10       A.   Okay.  I was hired out of the UK.  I
11   was an expat at Salomon Brothers.  Came over
12   back to the U.S. as a senior operations manager,
13   various line management responsibilities over a
14   number of different functional areas, through
15   the years taking on more responsibilities.
16       I believe it was in early, mid 2007
17   when I took over all of U.S. operations, which I
18   managed until the Lehman integration, at which
19   point I was -- I took on more global
20   responsibilities and various line management
21   responsibilities in the U.S.
22       Q.   And what's your current title and
23   position at Barclays?
24       A.   I'm a managing director in charge of
25   various operations, global and regional.

Page 8

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2        Q.   Within sort of the various divisions
3    or working groups at Barclays Capital, is there
4    a particular group that you head up?
5        A.   There's a number of groups I head up.
6        Q.   If you could describe those?
7        A.   On a global basis, I'm responsible for
8    all the global reference data, which is all the
9    accounts and the instrument.
10       Q.   Okay.
11       A.   Globally, I'm also responsible for the
12   collateral -- within those groups, there's a
13   couple hundred, 300 people or so -- mostly
14   responsible globally for the Collateral
15   Management Unit.  Regionally, I'm responsible or
16   mostly responsible for the Mexico and the Brazil
17   offices of operations, and then locally here in
18   the U.S. I'm responsible for all the OTC
19   derivative operations, emerging market
20   operations, commodities, securitized products,
21   and some other various aspects.
22       Q.   Is it fair to say that throughout your
23   tenure at Barclays Capital you have been
24   involved in managing operations?  The scope of
25   the operations you manage may have changed, but

Page 9

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    you effectively have been managing operations in
3    one form or the other?
4        A.   That's correct.  That's for my whole
5    career.
6        Q.   And if you could give us a description
7    of what it means to manage operations, what's
8    included in that?
9        A.   Making sure that all the aspects of
10   confirmations, settlements, reconciliations,
11   balancing, general ledger reconciliation and so
12   forth, anything post-trade.
13       Q.   And does your job encompass making
14   sure there are systems in place to make sure
15   those things happen, but are you also checking
16   the actual results of those operations?
17       Do you understand the question?
18       A.   I think so.
19       Q.   Okay.
20       A.   My job is to manage people that manage
21   most of the line functions.  I do look at some
22   of the MIS that's produced out of those
23   functional areas to make sure that, you know,
24   anything that looks out of place, I might review
25   it and discuss it with them.  But by and large,

Page 10

HIGHLY CONFIDENTIAL - J. RODEFELD

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    I have a number of senior managers that run the
3    day-to-day operations, whether it's the
4    technology or the processing.
5        Q.    Okay. I'm going to ask my question in
6    a slightly different way. Let's just take an
7    example of a particular commodity trade. A
8    trade is placed on some exchange. Operations
9    would include making sure you have the right
10   procedures in place to make that trade, book
11   that trade, record that trade in the systems of
12   Barclays?
13       A.    Well, we don't make the trade.
14       Q.    So the traders will make the trade?
15       A.    Traders make the trade. Sellers sell
16   the trade. We process the trade.
17       Q.    Once the trade is processed and the
18   operations folks who work for you and report to
19   you make sure it gets reported and recorded in
20   the right place, is that part of what they would
21   do?
22       A.    Yes, and reconcile.
23       Q.    Would they also be asked to look at
24   the valuation of that trade, or does the price
25   sort of just move with the transaction, you

Page 11

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    record the transaction and the price that's
3    reported by the trader?
4        A.    The price is established by the
5    trader. We don't get involved in the valuations
6    or the, you know, whether the price is traded
7    correctly or incorrectly.
8        Q.    Okay. All right. In describing your
9    tenure at Barclays, you said you headed up all
10   of U.S. operations at Barclays Capital until the
11   Lehman integration?
12       A.    Right.
13       Q.    What point in time more specifically
14   would you say the Lehman integration occurred?
15       A.    Well, it started pretty much
16   immediately.
17       Q.    Okay.
18       A.    So there was probably a period from
19   September through November/December when we
20   formally came out with a new org. structure, you
21   know, to the new, keeping the global head and
22   then redefining the regional responsibilities
23   here in the U.S.
24       Q.    And so was it then in November or
25   December that you took on your more expanded and

Page 12

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    different role?
3        A.    Yes, but I had the collateral
4    management responsibilities globally prior to
5    that. So, as part of my global -- the U.S.
6    operations head, plus the Global Collateral
7    Management Team was prior to the Lehman
8    integration.
9        Q.    There's a particular week in September
10   I'm going to ask you to sort of focus on, and
11   maybe it's ten days, starting roughly the
12   12th -- the 13th of September, which is a
13   Saturday, through the 22nd of September, which
14   is the following Monday.
15       A.    Uh-huh.
16       Q.    That's the week in which a lot of
17   things happened concerning the Lehman/Barclays
18   transaction.
19            What were you doing during that week,
20   just broadly, and then we'll narrow down into
21   specific things?
22       A.    From that Saturday on, at that point,
23   the Friday there was -- Friday evening, we were
24   made aware that there was a potential to look at
25   Lehman, some type of acquisition. So it

Page 13

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    actually starts on Friday, Friday evening at
3    probably around 6 o'clock in the evening. And
4    the reason I say that is only because that leads
5    us into the Saturday.
6            So Friday we actually had to do -- we
7    went over to Simpson Thacher, did some
8    high-level introductions with the Lehman folks,
9    understood their organization in terms of
10   management structure, people, locations, things
11   of that nature, just to get our arms around
12   potentially what we would have to deal with
13   going forward.
14           So the Saturday and Sunday was just
15   reviewing, looking at the organization, and
16   opening up that dialogue.
17       Q.    On the --
18       A.    And starting to think about planning
19   on that Saturday and Sunday what we would have
20   to do if we in fact would go through with this.
21       Q.    The Friday meeting at Simpson Thacher,
22   who went over from Barclays to that meeting?
23       A.    It was myself -- I was instructed to
24   bring a couple of senior managers over. I don't
25   remember all. I do remember it being a

Page 14

1  HIGHLY CONFIDENTIAL - J. RODEFELD
2  gentleman named John Clifford, Kim Wolfe, Lucy
3  Dorr, and there may have been one or two more
4  people. I just don't recall the names. I just
5  don't recall. I'm sure it's available.
6      Q.  And this meeting that you are
7  describing at Simpson, was this a meeting
8  focused on operational issues?
9      A.  Yes. Yes.
10     Q.  And was it your understanding that
11 there were other meetings taking place between
12 Barclays and Lehman folks on business and other
13 terms?
14     A.  They may have. I wasn't privy to
15 those. I just went into the Simpson offices and
16 was directed to an office where we did a
17 conference call with the Lehman senior
18 management on the ops. side.
19     Q.  And then the folks from Lehman that
20 you were speaking with, those were generally
21 your counterparts at Lehman?
22     A.  That's correct.
23     Q.  Saturday and Sunday, if you could just
24 describe with some more detail the kinds of
25 things you were doing on Saturday and Sunday.

Page 15

1  HIGHLY CONFIDENTIAL - J. RODEFELD
2      A.  Nothing specific other than starting
3  to think about the, you know, if in fact we
4  started to integrate, you know, understanding
5  their products versus our product mix and, you
6  know, thinking about the systems, thinking about
7  if we had to hit the ground running quickly,
8  what we would do. It was more informal
9  discussions about it rather than putting a
10 project plan together.
11     Because things weren't -- we weren't
12 on solid ground at that point. What we were
13 doing, I think we were just spending time having
14 discussions about aspects of what we would do,
15 just colleagues in operations. It was more, I
16 think it was more informal.
17     Q.  You described some of the folks that
18 had gone over with you to Simpson. If you could
19 just help me understand a little bit better
20 about your immediate sort of reporting lines.
21 Who do you report to? Who reports to you,
22 direct reports to you?
23     MR. SHAW:  You mean today or back then
24 in September?
25     Q.  Back then in September of 2008. Good

Page 16

1  HIGHLY CONFIDENTIAL - J. RODEFELD
2  point.
3      A.  Back in September, everybody in the
4  U.S. reported to me.
5      I'm sorry, what was the rest of the
6  question?
7      Q.  And who did you report to?
8      A.  I reported to, on a global basis, a
9  woman named Carole Machell, who is the global
10 head of operations.
11     Q.  And when you said everyone in the U.S.
12 reported to you, again, you're talking about the
13 operations people in the U.S., correct?
14     A.  That's correct.
15     Q.  And how many people was that back in
16 September of 2008?
17     A.  400 maybe.
18     Q.  How many of them were direct reports
19 to you?
20     A.  There is direct and indirect. There
21 is direct a number -- indirect only because we
22 have a matrix management. We have global
23 management and we have local management based on
24 a product or functional area. So locally
25 everybody reported to me on a dotted line or a

Page 17

1  HIGHLY CONFIDENTIAL - J. RODEFELD
2  hard line, depending, and some people had hard
3  lines into the UK operations management.
4      So locally they would report to me.
5  Globally, they might report to somebody else,
6  but dotted line in to me. So, theoretically, at
7  some point everybody comes in to me, either a
8  dotted or a hard line.
9      Q.  I imagine on a daily basis you don't
10 have 400 people constantly in contact with you.
11 There's probably a handful of people that you're
12 dealing with on a day-to-day basis more so than
13 others, is that fair?
14     A.  Correct.
15     Q.  Who are the main people you were
16 dealing with on a day-to-day basis?
17     A.  On a day-to-day basis, it would be a
18 woman named Kim Wolfe, Lucy Dorr, John Clifford,
19 a gentleman named Jason Pietruski. I believe
20 those would be probably the four people on a
21 senior level on a regular basis. I could be
22 leaving somebody out, but those are the ones I
23 can think about from that period.
24     Q.  Okay. And are there different areas
25 of particular areas of responsibility for these

Page 18

1    **HIGHLY CONFIDENTIAL - J. RODEFELD**
2    four individuals?
3        A.   Yes.
4        Q.   Can you just tell us, going through
5    each one, just generally what part of operations
6    they focus on, like Kim Wolfe, starting with
7    Kim?
8        A.   Well, Kim Wolfe focused on reference
9    data.
10       Q.   And what do you mean by "reference
11   data"?
12       A.   All the instruments, all the account
13   clients, making sure those databases were, you
14   know, running.
15       Q.   When you referred to accounts clients,
16   I'm just trying to get a better sense of --
17       A.   Customer accounts. So if we trade
18   with a new customer, we have to set up that
19   account, and if we trade a new instrument, we
20   have to set up that instrument in our databases.
21       Q.   How about Larry Dorr?
22       A.   Lucy Dorr.
23       Q.   I'm sorry, Lucy Dorr. That's my own
24   handwriting.
25       A.   Also, there's another one. Larry

Page 19

1    **HIGHLY CONFIDENTIAL - J. RODEFELD**
2    Sola, too, just as I'm thinking about it.
3        Q.   So Lucy Dorr?
4        A.   Lucy Dorr was responsible for all the
5    middle office functions, sitting on the trading
6    floor, middle office being after the trade's
7    booked, making sure that the trade is processed
8    downstream into the various systems.
9        Q.   John Clifford?
10       A.   John Clifford was responsible for
11   settlements.
12           And I need to add another name: John
13   Haley. That should be it now.
14       Q.   Is it Jordan? No. Clifford, is it
15   Clifford?
16       A.   That's John Clifford, which is
17   settlements. That's the one we just said.
18       Q.   Pietruski?
19       A.   Jason Pietruski runs the Collateral
20   Management Group.
21       Q.   What does that job entail?
22       A.   It's the -- most of the job is related
23   to the OTC derivatives, the mark to markets for
24   collateral calls on swaps and options.
25       Q.   Larry Sola?

Page 20

1    **HIGHLY CONFIDENTIAL - J. RODEFELD**
2        A.   Larry runs the Loans Team, primary and
3    agency.
4        Q.   And John Haley?
5        A.   John Haley also runs settlements.
6    John Haley ran some of the products. John
7    Clifford ran some of the other products.
8        Q.   All right. Were any of these folks
9    with you working over that weekend,
10   Saturday/Sunday?
11       A.   They may have been. I don't remember,
12   but they could have been.
13       Q.   Going into that week, the week of
14   September 15th, 2008, again give us just a brief
15   overview of what you were doing that week in
16   connection with the Lehman/Barclays transaction.
17       A.   Okay. Well, the weekend, again,
18   nothing had been formalized, so it was informal
19   discussions about what we might do and various
20   discussions with colleagues. I may have been in
21   the office, I may not have, I don't remember.
22           And part of the reason for that is I
23   have -- I had two homes at that point. We had
24   an office in Whippany, New Jersey, where I had a
25   corporate apartment, and I have a home on Long

Page 21

1    **HIGHLY CONFIDENTIAL - J. RODEFELD**
2    Island, so I don't know where I was, to be
3    honest with you, during that period of time. I
4    could have been in either place or in either
5    office.
6           Monday I came in, normal day, and
7    related to the Lehman, I believe that's the day
8    that we settled a tri-party with Lehman. And I
9    believe that was the only thing that I can
10   remember specifically that was happening on the
11   Monday.
12       Q.   And then did you have a role to play
13   in settling that tri-party with Lehman on
14   Monday?
15       A.   Yes. I instructed the payment to be
16   made.
17       Q.   And that was a preexisting tri-party
18   agreement from the prior week?
19       A.   I don't recall when the tri-party
20   agreement we had with Chase and Lehman, if it
21   was in a preexisting or if it was a -- one
22   drafted up that day or whatever. I just don't
23   recall what it was.
24       Q.   And if there had been any kind of
25   amendment made to that tri-party agreement, is

Page 22

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  that something you would have been involved in?
3    A.  Probably not. As long as I knew we
4  had an agreement in place, I was going -- I
5  would settle it.
6    Q.  So that's the Monday. Let's go down
7  the week. What's your recollection of what your
8  involvement was with the Lehman/Barclays
9  transaction the next day?
10    A.  I believe on Tuesday we increased the
11  tri-party, and I forget if it went from 2 to 5
12  or 2 to 10, I just don't remember that, and it
13  was at that point, I believe it was on Tuesday
14  afternoon that we found out that we might have
15  to take over the funding for the discount window
16  for taking the Lehman and Chase out and putting
17  Barclays and BONY in place.
18    Q.  And you'd be taking over the discount
19  window from the Fed financing that was being
20  provided?
21    A.  Correct. So that was the first, I
22  believe it was on Tuesday that that was raised
23  as that had to happen by Thursday.
24    Q.  And there was a much larger repo
25  financing transaction done by Barclays on

Page 23

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  Thursday, correct?
3    A.  That's correct.
4    Q.  Is that the $45 billion?
5    A.  Correct.
6    Q.  Between the Tuesday and the Thursday,
7  what role, if any, did you play in anticipation
8  of that $45 billion funding?
9    A.  In terms of the role that I played, it
10  was more of coordination, working with the likes
11  of the settlements folks, both at Lehman and at
12  Barclays, to rationalize how we were going to
13  unwind one, take it to the other, and get it all
14  done in the same day. So it was more of
15  operational aspects of how to get it done based
16  on a defined population.
17    Q.  We've heard about a couple of
18  meetings. One meeting at the Fed, one meeting
19  at the DTCC.
20    Do you recall being at any such
21  meeting in connection with that?
22    A.  I wasn't -- no, I didn't attend any of
23  those meetings.
24    Q.  And again, your focus in discussing
25  all of this was from the operations side to make

Page 24

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  sure it ran smoothly; is that correct?
3    A.  That's correct.
4    Q.  Okay. It's my understanding that the
5  collateral that had been pledged to the Fed was
6  going to be transferred either via Fed wire or
7  DTC; is that correct?
8    A.  Yes.
9    Q.  Were there also any physical
10  securities that would need to be transferred?
11    A.  We weren't sure at the time. We just
12  didn't have the full population at the time.
13    Q.  Going into Thursday, did you play any
14  role in drawing up lists or reviewing lists of
15  collateral that would be transferred or moved?
16    A.  On the -- we had gotten a list I
17  believe it was either Tuesday or Wednesday of
18  the population that would be coming to us.
19    Q.  And this is a list you got from
20  Lehman?
21    A.  I think it came from Lehman. I'm -- I
22  just don't recall, but I'm assuming it either
23  came from Lehman or in-house. Somebody gave it
24  to us.
25    Q.  Did the list that you received on this

Page 25

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  Tuesday or Wednesday timeframe have any
3  valuation for the collateral?
4    A.  I don't recall. I don't know. I
5  really did not focus on the list per se other
6  than the fact that it was a list out there.
7    Q.  And again, in this time period,
8  Monday, Tuesday, Wednesday of that week of the
9  15th, had anyone described to you generally what
10  the overall Lehman/Barclays transaction was
11  about?
12    A.  I don't believe so. I believe at the
13  time I was just told that we were doing a large
14  financing trade because that there was some type
15  of an acquisition was going to take place.
16    Having been involved in a due
17  diligence the prior weekend, I knew that we were
18  looking at Lehman, various aspects, you know, so
19  I knew that that was out there, but didn't know
20  what we were looking to buy, what we were
21  looking to sell, other than the fact I knew I
22  had to process whatever came down.
23    Q.  In connection with the Lehman/Barclays
24  transaction, there's a contract called the Asset
25  Purchase Agreement. Is that a contract that

Page 26

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  you've ever seen?
3      A.   Yes.
4      Q.   Okay.
5      A.   Yeah, I believe I saw that in December
6  when we were looking at the Chase settlement. I
7  think that might be the first time I saw that.
8      Q.   There's another document that's
9  referred to as a clarification letter. Are you
10  familiar with that phrase?
11      A.   I'm familiar with the phrase. I don't
12  believe I saw a clarification letter.
13      Q.   Do you have any understanding of a
14  clarification letter and what role, if any, it
15  may have played in the Lehman/Barclays
16  transaction?
17      A.   No.
18      Q.   And just filling in some blanks in my
19  mind from your answer about the Asset Purchase
20  Agreement, is it fair to say that you had no
21  role in the negotiation of the Asset Purchase
22  Agreement in any way?
23      A.   That's correct, I had no role at all
24  in that.
25      Q.   You were just shown the agreement for

Page 27

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  the first time sometime in December?
3      A.   Yes.
4      Q.   In September, in the week of September
5  15th, did anyone describe to you orally,
6  broadly, the economics of the deal?
7      A.   I'm sorry, when was this?
8      Q.   The week of September 15th.
9      A.   No.
10      Q.   Thereafter, after the week of
11  September 15, has anyone ever described to you
12  broadly the economics of the deal?
13      A.   No.
14      Q.   Do you have any understanding one way
15  or the other whether Barclays recognized a gain
16  on the acquisition of the Lehman assets that it
17  purchased?
18      A.   No.
19      Q.   Going into Thursday of that week, it's
20  the 18th, describe for me generally what you
21  were doing on the 18th? That's the day of the
22  big repo.
23      A.   Okay. Starting on Wednesday, we had a
24  plan put in place between the two organizations
25  on how we were going to process the work on

Page 28

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  Thursday. So we have to start there.
3      So we came in with a plan on Thursday
4  to process the reverse repo, and the kick-off
5  was to send them funds, piece of the funds, and
6  then taking collateral back, and then we would
7  repeat that exercise until we got up to the 45
8  billion that was necessary to complete the
9  transaction. So I was sitting at 200 Park
10  Avenue. Most of the action would have been done
11  in our Whippany office because that's where our
12  processing hub was.
13      So, on the phone with the folks in
14  Whippany, sent over the first 5 billion sometime
15  in the morning, and it was taking quite a long
16  time to get the collateral back to settle the
17  first tranche. Recognizing that we had a long
18  way to go, recognizing that the market
19  facilities have closing times, the Fed, DTC, and
20  not getting enough of the answers, I took a cab
21  over to the Lehman offices at 745 Seventh
22  Avenue.
23      It was there I met with David Aronow
24  and some other folks, possibly Alastair,
25  possibly others, I just don't remember who was

Page 29

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  there on that morning, and we discussed why it
3  was taking so long to get the rest of the
4  collateral on the first lot of 5 billion.
5      From that point on, there were lots of
6  discussions, and at some point in the early
7  afternoon, we were told to send the bulk of the
8  money over, that there was commitment to send
9  collateral to us, okay? So I instructed our
10  payments group to make the rest of the 40
11  billion.
12      We took in the rest of the collateral.
13  We worked to take in the rest of the collateral.
14  The market facilities, the Fed wire and DTC,
15  extended their closing time late into the
16  evening, and we worked to get the collateral in
17  the door to satisfy the reverse repo.
18      Q.   And when all the action stopped, the
19  transfers stopped Thursday night, what was the
20  status of the collateral movement? How much had
21  moved over?
22      A.   On the securities or the cash?
23      Q.   On the securities.
24      A.   On the securities, what Bank of New
25  York had told us at the point in time from their

## Page 30

HIGHLY CONFIDENTIAL - J. RODEFELD

1  records that they had felt that there was I
2  believe 42-point-something billion of market
3  value that had come in.
4      Q.   And how about on the cash side?
5      A.   On the cash side, we had taken in a
6  piece of -- well, 300 million, originally, which
7  was part of DTC because one of the securities
8  had matured, so they paid us the cash rather
9  than the securities as the collateral.  And then
10 we then went into, we were short collateral, and
11 we did a tri-party for the difference of the 7
12 billion.
13     Q.   So there was a 7 billion cash
14 component and a 42-and-change billion dollar
15 securities component?
16     A.   Based on BONY's marks, yes.  We had no
17 line of sight to those marks.
18     Q.   What do you mean by that?
19     A.   I didn't see them personally.
20     Q.   Later on, in subsequent days, Friday,
21 Saturday of that week, the 19th, the 20th, did
22 anyone express to you any concerns about the
23 BONY marks?
24     A.   I'm sorry, what dates?

## Page 31

HIGHLY CONFIDENTIAL - J. RODEFELD

1      Q.   The Friday, Saturday, the subsequent
2  days.
3      A.   Not -- no, I don't believe -- no, I
4  don't recall the discussions on anybody raising
5  issues to me on the marks themselves.
6      Q.   Were there any issues raised on the
7  Friday, Saturday, Sunday, so again the days
8  after this collateral movement took place, about
9  the Cusips that had been transferred over?
10     A.   The -- well, by and large, we didn't
11 have many of the Cusips in our systems because
12 we didn't trade the products.  So a large
13 percentage of the assets that we took in we had
14 not in our systems to begin with.  So the
15 question -- we didn't have questions because we
16 didn't even have the trades.  The securities, we
17 didn't trade some of the securities, so it
18 wouldn't -- there was no questions, it was just
19 that we took them and we put them into Bank of
20 New York as a lockup place.
21     Q.   Were you involved in any discussions
22 or any activities on the Friday, Saturday,
23 Sunday after there was collateral movement to
24 try and reconcile pieces of collateral, to

## Page 32

HIGHLY CONFIDENTIAL - J. RODEFELD

1  reconcile values, anything of that nature?
2      A.   No.
3      Q.   Were you aware of other people doing
4  that at Barclays?
5      A.   Not directly aware.  I assumed other
6  people were looking at it, but I don't know
7  specifically, you know, that anybody on an
8  individual basis was looking at them.
9      Q.   Putting aside the collateral that
10 moved on Thursday, the 18th, were you involved
11 in any collateral movements that were initiated
12 on Friday, the 19th?
13     A.   I'm sorry, say that again.
14     Q.   Were you involved in any collateral
15 movements from Lehman to Barclays that were
16 initiated on Friday, the 19th?
17     A.   Yes.
18     Q.   Okay.  Describe those, please.
19     A.   On Friday morning, Lehman delivered us
20 a population of securities, I believe it was a
21 billion and change, to our Bank of New York
22 account and I took those securities in.
23     Q.   When you say "a billion and change,"
24 does 1.9 sound about right?

## Page 33

HIGHLY CONFIDENTIAL - J. RODEFELD

1      A.   It could have been.  I just -- I know
2  it was over a billion.
3      Q.   And do you know why Lehman was
4  delivering these securities on Friday?
5      A.   Not particularly.
6      Q.   Have you heard anything about it?
7      A.   I knew it was coming, but I wasn't
8  aware if it was collateral or anything else.
9  They just came, so I took them in.
10     Q.   Were there any transfers of cash from
11 Lehman to Barclays that you were aware of on
12 Friday?
13     A.   No.
14     Q.   After that weekend of the 20th/21st of
15 September -- actually, withdraw that.  At any
16 time in connection with the Lehman/Barclays
17 transaction were you involved in any discussions
18 concerning OCC margin?
19     MR. SHAW:  And let me just caution you
20 not to discuss -- not to disclose any
21 discussions you had with counsel for
22 Barclays about that issue.
23     THE WITNESS:  Okay.
24 There were discussions with counsel on

Page 34

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2   that subject subsequent, not on those days.
3   Q.   So but in those days, so around
4 September 18th, 19th, a few days after that,
5 were you involved in any discussions about OCC
6 margin?
7   A.   I had discussions with counsel.
8   Q.   In that time period?
9   A.   I had discussions with counsel I don't
10 believe during that timeframe, but I had
11 discussions. I don't recall the days I had
12 discussions with counsel.
13   Q.   Other than counsel, did you discuss it
14 with anyone else?
15   A.   With counsel always on-site.
16   Q.   Here's my question: Are you asking
17 questions or providing information to counsel,
18 or are you having discussions about OCC margin
19 with other operations people and counsel happens
20 to be present?
21   A.   Counsel drove them.
22   Q.   Counsel drove them, okay. And could
23 you identify who the counsel were?
24     MR. SHAW: You can give the names.
25   A.   Alan Kaplan.

Page 35

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2   Q.   In-house lawyer at Barclays?
3   A.   Associate general counsel.
4   Q.   And again, without going into the
5 substance of the discussions, was that topic of
6 OCC margin the subject of discussion that you
7 had after that point in time, so October,
8 November, December to the present?
9   A.   It was not in -- I don't even believe
10 it was in September. I don't recall the dates,
11 but I don't believe it was in September.
12   Q.   Okay. Then maybe I'm unclear on when
13 you had the discussion on this topic with
14 Mr. Kaplan. Was it in September 2008?
15   A.   I don't believe so.
16   Q.   Is it your general recollection that
17 it was long after the closing of the
18 Lehman/Barclays transaction?
19     MR. SHAW: You can give the time
20 period.
21   A.   Yes, it was long after, I believe.
22   Q.   After the December settlement?
23   A.   I don't recall. It could have been
24 before the December settlement. It could have
25 been right at that time. It could have been

Page 36

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2 after. I'm not sure of the dates.
3   Q.   And other than yourself and
4 Mr. Kaplan, who else was present at that
5 discussion?
6     MR. SHAW: You can answer that.
7   A.   At different times, Jonathan Hughes,
8 might have been James Walker, may have been
9 Alastair Blackwell. Those are the names that
10 come to mind.
11   Q.   And just so I know who these
12 individuals are, Mr. Hughes?
13   A.   He's global head of counsel.
14     MR. SHAW: Global general counsel for
15 Barclays.
16   Q.   Walker?
17   A.   He was the CFO.
18   Q.   And Blackwell?
19   A.   At the time, he was -- well,
20 subsequent to the acquisition, he became head of
21 U.S. Ops. for Barclays.
22   Q.   And sounds like from your prior answer
23 that there were a series of discussions; is that
24 right?
25   A.   Yeah, there were more than one.

Page 37

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2   Q.   And different people from this group
3 were involved in different discussions; is that
4 correct?
5   A.   Say that again.
6   Q.   All of the same group of people
7 weren't in every discussion, Kaplan, Hughes,
8 Walker, Blackwell and you, it wasn't this group
9 of five meeting every single time; is that
10 right?
11   A.   No, it wasn't. It was different
12 times, different people. Those are the names
13 that I recollect.
14   Q.   Putting aside these discussions, just
15 generally in terms of what you do day-to-day,
16 what you did day to day in operations, what was
17 your involvement with OCC margin?
18   A.   Zero, probably, other than the fact
19 that we had a team that might have managed a
20 small amount of activity, and if anything ever
21 surfaced as a problem, but I don't recall ever a
22 major problem in OCC that I had to get involved
23 in. It's a very, very, pre-acquisition, it was a
24 very small part of our business as Barclays.
25 There was nothing on my radar.

Page 38

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2        Q.    And OCC is the Options Clearing Corp.,
3    correct?
4        A.    Yes.
5        Q.    And the exchange-traded options,
6    certain exchange-traded options are traded
7    through the OCC, correct?
8        A.    I assume so, yeah.
9        Q.    If I understand your prior answer,
10   Barclays, pre-Lehman acquisition, didn't do a
11   significant amount of business on the OCC,
12   correct?
13       A.    I think that's a fact, yes.  I don't
14   know for certain what we were doing pre-Lehman
15   at this time.  I just don't remember.
16       Q.    And it's your understanding that among
17   the assets acquired in the transaction was more
18   OCC business than you had done before, is that
19   fair?
20       A.    I would -- I don't know the answer to
21   that.  I don't know what we were doing in terms
22   of volume before or after.
23       Q.    Okay.  But there were OCC issues that
24   you were dealing with post-acquisition?
25       A.    There may have been.  I don't remember

Page 39

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    specifically.  There may not have been, to be
3    honest with you.
4        Q.    And again, putting aside the
5    discussions with counsel, did you have any
6    discussions with anyone else about OCC
7    operations post acquisition?
8        A.    No.
9        Q.    In any of these discussions you had
10   with counsel, do you recall providing a witness
11   statement?
12           MR. SHAW:  We're not going to get into
13   substantive discussions with counsel.
14           MR. TAMBE:  If he wrote a prior
15   witness statement we're allowed to ask it.
16           MR. SHAW:  We're not going to get into
17   discussions with his involvement with
18   counsel.
19       Q.    So we have our record clear, sir, in
20   any of your discussions with counsel, did you
21   provide a witness statement, yes or no?
22           MR. SHAW:  Let me take a break and
23   discuss this with him out in the hall.
24           (The witness and Mr. Shaw leave the
25   room to confer.)

Page 40

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2        (Record read.)
3           MR. SHAW:  And I'm going to instruct
4    you not to answer the question and asserting
5    privilege.
6           MR. TAMBE:  And is it attorney-client
7    privilege?  Work product?  Both?
8           MR. SHAW:  Both.
9    BY MR. TAMBE:
10       Q.    Do you have an understanding one way
11   or the other whether assets that were
12   transferred from Lehman to Barclays included OCC
13   positions and the associated margin with those
14   positions?
15           MR. SHAW:  And I will caution you not
16   to reveal any information you learned in the
17   course of discussions with counsel, but if
18   you have an answer outside of that context,
19   you can answer it.
20       A.    Outside of that context, I knew there
21   was OCC business.
22       Q.    From an operations side, did you have
23   to make any special arrangements to be able to
24   conduct that business at Barclays?
25       A.    We would have had to process transfer

Page 41

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    positions or whatever the process would have
3    normally been to move positions.
4        Q.    Okay.  And who amongst your sort of
5    lead deputies would have been responsible for
6    that?
7        A.    I don't recall, but it -- I don't
8    recall specifically, but -- I know the team that
9    runs that team, but I don't know who would have
10   done the processing.
11       Q.    And who runs that team?
12       A.    Matthew, I don't know -- I can't
13   remember his last name off the top of my head.
14   It's just Matt something.  I can get it, I just
15   don't have it.
16       Q.    Do you recall being involved in any
17   discussions or activities concerning 15c3-3
18   amounts?
19       A.    I had heard there were several
20   discussions on it, yes, I had heard that.
21       Q.    And what had you heard about those
22   amounts?
23       A.    That -- specifically, I didn't know
24   what the issues were other than the fact that it
25   was being handled by a different team of people

Page 42

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    than me.
3         (Exhibit 279A, a document bearing
4    Bates Nos. BCI-EX-(S)-47450 through 47452,
5    marked for identification, as of this date.)
6    Q.  Sir, I've handed you a three-page
7    document marked Exhibit 279A. It's an e-mail
8    exchange. If you could take a look at it, let
9    me know when you're done reviewing it, and I'll
10   ask you some questions.
11        (Document review.)
12   A.  Uh-huh.
13   Q.  Done?
14   A.  Yes.
15   Q.  Who's Labib Mahfouz?
16   A.  He was a colleague of mine at Barclays
17   who had left the organization sometime before
18   that.
19   Q.  Did he work in operations at Barclays?
20   A.  No.
21   Q.  What was his role at Barclays?
22   A.  He was a business manager for credit
23   derivative businesses, I believe.
24   Q.  In the middle of page 1 of Exhibit
25   279A, there's an e-mail from Mr. Mahfouz to you,

Page 43

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    and he says, "The Lehman deal is great.
3    Basically bought a broker-dealer for $250
4    million. Nice building." Do you see that?
5    A.  Yeah.
6    Q.  Was that your understanding of the
7    transaction being --
8    A.  I have no idea what he was talking
9    about there.
10   Q.  Had you had any discussions with
11   Mr. Mahfouz about the transaction?
12   A.  No.
13   Q.  I'm going to ask you some questions
14   about the mechanics of the repo that we
15   discussed before, but just to close out one
16   area, after the transaction occurred, so getting
17   into late September or October and later, can
18   you just describe what your involvement was, if
19   any, with the Lehman integration?
20   A.  On a management side, structuring the
21   groups to get integration between the support
22   organizations, logistics and so forth. So there
23   was the business side, and then on the other
24   side was making sure all the clean-up work was
25   done in terms of any cash breaks, settlement

Page 44

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    breaks, making sure all the trades were
3    accounted for, anything to do with the normal
4    course of balancing our depots to our books and
5    records.
6    Q.  You described before the December
7    settlement. What role, if any, did you play in
8    connection with the December settlement?
9    A.  Sometime in mid December, I believe, I
10   was told that we were going to have a settlement
11   of some sort, and at that point somebody, a
12   managing director from Chase's operations group
13   reached out to me through e-mail and introduced
14   herself and said, we're going to have a
15   settlement, we believe there's a settlement
16   going to be occurring in the near future, wanted
17   to put names into the frame of who was going to
18   be involved, and we -- and said that -- we
19   started initial dialogue about the settlement of
20   the portfolio that was coming over and how
21   operationally we were going to handle the cash
22   aspects of all the corporate actions that would
23   have been engaged because of the fact that the
24   transaction is going to be dated as of
25   September.

Page 45

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    So any corporate actions between
3    September and December would have had cash
4    flows, possibly, and we talked about the
5    mechanics and who would have to be engaged in
6    both organizations to make sure that we could
7    tie out to the number prior to the settlement to
8    make it as painless as possible for both
9    organizations.
10   Q.  And the corporate actions you're
11   talking about are things like payment of
12   interest or dividends or even maturity of
13   securities?
14   A.  Correct. Would probably not have been
15   maturities. More likely would have been
16   dividends, straight dividends and interest, and
17   talked about where the depots where we would
18   receive collateral and so forth.
19   Q.  And again, your job was to speak
20   with -- or, your involvement was to speak with
21   this person from JPM and make sure that that
22   process moved smoothly?
23   A.  Yes.
24   Q.  Did you have any involvement in
25   identifying collateral to be moved or valuing

Page 46

1  HIGHLY CONFIDENTIAL - J. RODEFELD
2  collateral to be moved?
3      A.   No, I was given a list.
4      Q.   Who gave you a list?
5      A.   I don't recall if it was Chase or if
6  somebody internally had sent it to me, but I did
7  get the list.
8      Q.   And how long was your involvement?
9  How many days were you involved in this December
10 exercise?
11     A.   Right through the settlement, and any
12 reconciliations that would have taken place
13 after the movement of the securities and the
14 cash, there were -- there was a protracted
15 reconciliation going on on the physical
16 securities that we received that took probably
17 the better part of a month to reregister them
18 out of the name of the previous holders into
19 Barclays' name. So, from a mechanics point of
20 view, I was involved in that probably into
21 January.
22     MR. TAMBE: Let's just take a short
23     break. We'll get some exhibits together and
24     carry on.
25     (Recess; Time Noted: 10:26 A.M.)

Page 47

1  HIGHLY CONFIDENTIAL - J. RODEFELD
2      (Time Noted: 10:33 A.M.)
3      (Exhibit 280A, a document bearing
4  Bates Nos. BCI-EX-(S)-47647 through 47648,
5  marked for identification, as of this date.)
6  BY MR. TAMBE:
7      Q.   Sir, I have placed before you a
8  two-page document marked 280A. Take a moment to
9  look at it. I'll ask you a couple of questions.
10     (Document review.)
11     A.   Okay.
12     Q.   Focusing on the e-mail at the top of
13 page 1 from John Haley to you and others, do you
14 see that?
15     A.   Yes.
16     Q.   Mr. Haley makes a comment in his
17 e-mail, second sentence, "There is some Fed
18 collateral that is not eligible for GCF
19 transaction." Do you understand what he meant
20 by that?
21     A.   No.
22     Q.   What is a GCF transaction?
23     A.   I don't know. I'm not a -- it's -- I
24 assume it's some type of cash management
25 tri-party something, but I just don't -- I'm not

Page 48

1  HIGHLY CONFIDENTIAL - J. RODEFELD
2  a guru on the GCF stuff.
3      Q.   On the second page, there's one
4  particular bullet point I want to ask you about.
5  There's a bullet point where John Haley writes,
6  "Lehman pledges to BONY Account 855."
7      Do you see that?
8      A.   Yes.
9      Q.   Do you have any understanding about
10 that account, the 855 account at BONY?
11     A.   Limited. I know it's an account that
12 Barclays has that we take in collateral to.
13     Q.   Was that account specifically set up
14 for purposes of this transaction?
15     A.   I don't recall. I don't believe so.
16 It may have been open prior to that, but I don't
17 know that for certain.
18     Q.   I have placed before you a document
19 previously marked Exhibit 124. If you take a
20 moment to look at it, let me know when you're
21 done and I'll ask you a few questions.
22     A.   Okay.
23     (Document review.)
24     A.   Okay.
25     Q.   Just drawing your attention to the

Page 49

1  HIGHLY CONFIDENTIAL - J. RODEFELD
2  e-mail that starts on page 1 over onto page 2,
3  which is an overview of the mechanics of the
4  trade that was done on Thursday, did you play
5  any role in developing those mechanics?
6      A.   I'm sure I participated in some of
7  those conversations that I was part in most of
8  those discussions on Tuesday and Wednesday as we
9  prepped for it. Much of the discussion I
10 believe was John Haley discussing it, the actual
11 aspects of the deliveries and the receipts as a
12 settlement protocol with his colleagues at
13 Lehman.
14     Q.   Was it your understanding that all of
15 the collateral pledged by Lehman to the Fed was
16 going to be transferred to Barclays?
17     A.   I was aware that we were -- we had a
18 list that was going to be transferred to us.
19 Whether that list had all Fed stuff in it or
20 other stuff I wasn't privy to. So whatever was
21 on the list is what I knew we were taking. That
22 may or may not have been discount window.
23 Assumption probably was a good piece of it was,
24 but if it was in total, I didn't have access to
25 that information.

Page 50

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2    Q.    Did you have any understanding that
3    there were assets pledged to the Fed that
4    Barclays had specifically said would be excluded
5    from the transfer?
6    A.    No.
7    Q.    Are you aware generally of any list of
8    excluded assets that was transmitted by Barclays
9    to Lehman in connection with this transaction?
10    A.    There was a list, and I don't know if
11    it was transmitted to them or if we had a list,
12    that there was concern that we did not want any
13    substitutions from the list. So we were given a
14    list, and I don't remember if I saw the list or
15    if it went to the Whippany office or whatever,
16    but I recognized that there was a list of assets
17    that we weren't going to take in case there had
18    to be substitutions for whatever reason.
19    Q.    And just so we understand, generally
20    why would there be reasons for substitution in
21    the context of a repo?
22    A.    Well, typically there wouldn't be,
23    right? But typically you repo one for one, one
24    trade, one repo, not one trade, multiple
25    securities.

Page 51

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2    Q.    Was this trade any different where
3    there was a concern that there might be
4    substitutions?
5    A.    No, we were working off of the
6    assumption that we were going to get what was on
7    the list.
8    (Exhibit 281A, a document bearing
9    Bates Nos. BCI-EX-(S)-47924 through 47926,
10    marked for identification, as of this date.)
11    Q.    Sir, I have placed a three-page
12    document before you marked Exhibit 281A. Take a
13    moment to look at that and I'll ask you some
14    questions.
15    A.    Okay.
16    (Document review.)
17    A.    Okay.
18    Q.    I'll focus on the first e-mail on page
19    1, over onto page 2. It's from John Haley to
20    several people, including you. Do you see that?
21    A.    Yes.
22    Q.    Judging from the time and date stamp,
23    this is appears to be late Thursday night in --
24    A.    Yeah.
25    Q.    -- New York, right?

Page 52

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2    A.    Early Friday morning, actually.
3    Q.    Early Friday morning.
4    A.    It's actually late, yeah, it's GMT
5    time. So it's probably 12 o'clock. I don't
6    know what time it is.
7    MR. SHAW: It's daylight savings, so
8    probably about 1 in the morning.
9    THE WITNESS: Okay.
10    Q.    So we have in the e-mail from
11    Mr. Haley to you and others sort of a reap of
12    the transaction, correct?
13    A.    Yes.
14    Q.    The values that appear in his e-mail,
15    do you know where those values come from?
16    A.    Bank of New York.
17    Q.    Just generally from the operations
18    perspective, if you have collateral that's
19    coming to you from a custodian for a tri-party
20    arrangement, do the values ascribed by the
21    tri-party custodian travel with that collateral?
22    That wasn't a good question.
23    From an operations perspective, if you
24    have collateral going back and forth in a
25    tri-party repo arrangement?

Page 53

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2    A.    Right.
3    Q.    Is it your understanding that the
4    custodian for that tri-party repo agreement
5    assigns values for that collateral?
6    A.    Typically, they will assign values
7    because they are the ones that are going to
8    allocate it into the third party to secure the
9    overnight loan, but we have our own systems that
10    also value that collateral. So we'll
11    sanity-check what the third party tri-party
12    agent puts on to make sure we're getting
13    efficient use of our collateral versus the cash
14    we're borrowing.
15    So, in essence, they put the values
16    on, which is the rules of the road, but we can
17    challenge it, and we do if we don't think that
18    they're putting accurate values on that what our
19    systems are telling us.
20    Q.    And in connection with the
21    Lehman/Barclays repo, are you aware of any
22    challenges made by Barclays to the BONY
23    evaluations?
24    A.    No, to the extent that we didn't
25    have -- typically, we would own the securities,

Page 54

HIGHLY CONFIDENTIAL - J. RODEFELD

1    so we would know what the values are from our
2    own systems. This was an unusual circumstance.
3    We didn't have the trades in our system, so we
4    didn't have the ability to challenge from a
5    systems perspective.
6        (Exhibit 282A, a document bearing
7        Bates Nos. BCI-EX-(S)-47942 through 47944,
8        marked for identification, as of this date.)
9    Q.    Sir, I have placed before you a
10   document marked Exhibit 282A. Take a moment to
11   look at that document and let me know when
12   you're done. I'll ask you a couple questions.
13   A.    Okay.
14   Q.    This e-mail chain in Exhibit 282A on
15   the first page has an e-mail from you to Teri
16   Scott and several other people at Barclays, do
17   you see that?
18   A.    Yes.
19   Q.    And just looking at the names and the
20   e-mail addresses, looks like a lot of these
21   folks are in the Finance Department at Barclays,
22   is that fair?
23   A.    Yeah, ops. and finance, yes.
24   Q.    And you were providing a report in

Page 55

HIGHLY CONFIDENTIAL - J. RODEFELD

1    this e-mail describing the close-out of the
2    tri-party for 15.8 billion, correct?
3    A.    Yes.
4    Q.    And you're describing broadly the
5    Barclays/Lehman repo which took out the Fed,
6    correct?
7    A.    Correct.
8    Q.    I want to understand for what purpose
9    are you providing the summary to the finance
10   people?
11   A.    Just as a form of completeness, I
12   think. There was probably no motivation other
13   than just keeping everybody in the loop of where
14   we were.
15   Q.    And further up in that e-mail chain,
16   there's a response to your e-mail from someone
17   in the Treasury Department, Mr. Garcha, do you
18   see that?
19   A.    Yes.
20   Q.    And he says, "Scott Wadlow has some
21   questions for you," see that?
22   A.    Yes.
23   Q.    Who is Scott Wadlow?
24   A.    I don't know. I assume it was

Page 56

HIGHLY CONFIDENTIAL - J. RODEFELD

1    somebody in Treasury or somebody. I don't know
2    the -- the name vaguely looks familiar, but I
3    don't know who he is.
4    Q.    Let me go way out on a limb here. Do
5    you remember speaking with Mr. Wadlow?
6    A.    No.
7    Q.    Do you remember speaking with anyone
8    from Treasury on or about February -- sorry, on
9    or about Friday, the 19th of September, about
10   this transaction?
11   A.    I very well could have. I don't
12   recall specific conversations. I worked right
13   through the night through till the next day, so
14   there would, you know, there could have been
15   conversations and I'm just not remembering them,
16   nothing in particular.
17   Q.    Were you involved at all in working
18   with Barclays' auditors to prepare the account
19   statements for Barclays concerning this
20   acquisition?
21   A.    Peripherally, yes. They had asked me
22   some questions and sat down with me, but I don't
23   remember specific working with them on it at
24   all.

Page 57

HIGHLY CONFIDENTIAL - J. RODEFELD

1    Q.    Do you remember any of the topics on
2    which they asked you questions?
3    A.    Sure. They asked about the
4    transaction itself and just general what would
5    happen over those two days and how we accounted
6    for the securities and how we booked and
7    rebooked the trades and what was the
8    reconciliation process and so forth and so
9    forth, more mechanical in nature, making sure
10   all the trades got into the system, did we
11   reconcile to the depots and so forth and so
12   forth. So I'm sure there were conversations of
13   that nature regarding the transaction.
14   Q.    Do you recall having any discussions
15   with anyone about where, what legal entity the
16   trades would be booked in for tax purposes?
17   A.    Related to the September --
18   Q.    Related to the Lehman/Barclays
19   transaction either in September or any transfers
20   that were made in December.
21   A.    In December there were discussions
22   about legal entities related to the Chase
23   settlement.
24   Q.    Okay. And with whom did you have

Page 58

1    **HIGHLY CONFIDENTIAL - J. RODEFELD**
2    those discussions?
3        A.    I assume it was -- I don't remember
4    specific people, but I assume it was the
5    business folks on the desk and people in finance
6    or product control, finance.
7        Q.    And if you could describe for us what
8    those discussions were.  What did you talk
9    about?
10        A.    Just more of a, again, more of a
11    mechanical nature, is how would we reflect them
12    on our books given the fact that they were on a
13    different Barclay entity, how would we make sure
14    we would keep control of the securities and so
15    forth.
16        Q.    Were you involved in any discussions,
17    either in September or on December, about
18    booking the transferred securities into
19    particular Barclays entities so as to minimize
20    U.S. tax impact?
21        A.    No, I was not involved in any of those
22    discussions.  I was told which entity to book
23    them to.  That was it.
24        (Exhibit 283A, a document bearing
25    Bates Nos. BCI-EX-(S)-47719 through 47724,

Page 59

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    marked for identification, as of this date.)
3        Q.    Sir, I have placed before you a
4    document marked Exhibit 283A.  Take a moment to
5    review that e-mail chain and let me know when
6    you're done.
7        (Document review.)
8        A.    Okay.
9        Q.    I'm just going to start with the back
10    of this e-mail chain 283A and ask you first
11    about some questions about some names.
12        Working from the back, the first
13    e-mail in this chain is an e-mail that begins on
14    page 7722, if you look at the bottom last four
15    digits at the bottom, from Beatrice Montaudy,
16    M-O-N-T-A-U-D-Y.  And who is that?
17        A.    She works as an analyst in the Tax
18    Department of Barclays Capital.
19        Q.    And she's got a series of questions in
20    her e-mail.  That e-mail eventually ends up
21    getting forwarded to you, if you'll look on page
22    7720.  I think it's Mark Rudduck, R-U-D-D-U-C-K,
23    who forwards that e-mail to you that's in
24    question.  See that?
25        A.    Yes.

Page 60

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2        Q.    And who is Mark Rudduck?
3        A.    Mark Rudduck I believe is the business
4    manager for the equity business out of our
5    London office on the business side.
6        Q.    Having reviewed this document, do you
7    have a recollection of this discussion taking
8    place about where the equities would be booked?
9        A.    No, not particularly to this
10    discussion, but I just remember that there was
11    lots of discussions about how to book it from an
12    operations perspective.
13        Q.    On page 21, 7721?
14        A.    Uh-huh.
15        Q.    There's an e-mail at the middle of
16    that page from Beatrice Montaudy to Mark Rudduck
17    and others.  You're not shown as a copy on that
18    e-mail, but it's an e-mail that gets forward to
19    you, do you see it?
20        A.    Yes.
21        Q.    In the first full paragraph of that
22    e-mail, there's a question about the valuation
23    calculation that the "discount" between the
24    value of the assets acquired and the purchase
25    price not be subject to 46 percent marginal U.S.

Page 61

1    **HIGHLY CONFIDENTIAL - J. RODEFELD**
2    tax rate, do you see that?
3        A.    Yes.
4        Q.    Did you have any discussions with
5    anyone at any time in connection with the
6    Lehman/Barclays transaction about a discount?
7        A.    No.  I don't have a clue what that
8    even means.
9        Q.    A couple paragraphs down, there's a
10    paragraph in that same e-mail, there's a
11    paragraph that begins "U.S. tax," do you see
12    that?
13        A.    Yes.
14        Q.    The last sentence of that paragraph
15    states, "The gain on the equities is, Day 1, 2.5
16    billion U.S. dollars," do you see that?
17        A.    Yes.
18        Q.    Did you have any discussions with
19    anyone about there being a $2.5 billion gain on
20    the equities positions on day one?
21        A.    No.
22        Q.    And do you recall there being any
23    discussions on the 18th/19th that you were part
24    of where particular collateral or assets that
25    were coming in from the Fed were being allocated

Page 62

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    to particular operating entities?
3        A.   No.  On day one in September?
4        Q.   Yes.
5        A.   No.
6        Q.   After day one was there some effort to
7    reallocate the collateral that had been
8    transferred over?
9        A.   No.  December when we did the Chase
10   settlement, that was the first time I was under
11   the understanding that there was other entities
12   potentially going to be involved.
13       Q.   And in December what entities do you
14   recall being involved in the transfer?
15       A.   The Long Island entity here.
16       Q.   Okay.
17       A.   And there was another entity as well.
18       Q.   And is there a particular Barclays
19   entity name that you associate with the Long
20   Island entity?  Is it Barclays Capital?  Some
21   LLC?
22       A.   I just called it Long Island entity.
23   We called it LIL, Long Island.
24       Q.   Okay.  In the settlement in December,
25   you said there was a list of collateral that you

Page 63

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    were discussing; is that right?
3        A.   In December?
4        Q.   Yes, in December.
5        A.   That's correct.
6        Q.   Okay.  After the settlement agreement
7    was done in December, did you review the
8    collateral that was actually transferred over
9    against that list that you had been working
10   with?
11       A.   Personally, no.
12       Q.   Do you know if that was done?
13       A.   We booked trades to take in that
14   collateral, so we would have reconciled what
15   came in versus what we have in our systems.  To
16   the extent that there were differences, we would
17   have reconciled them and so forth, but the job,
18   my job was to make sure that we got in all the
19   securities that were on the list that we had
20   been agreed upon to make sure they settled in
21   the right depots.
22       Q.   Did all of those securities that were
23   on the list make it over?
24       A.   Yes.  Yeah.
25       Q.   And you also got transferred to you

Page 64

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    securities that were not on that list, correct?
3        A.   Not in December, no.
4        Q.   When?
5        A.   Which one?  What are we --
6        Q.   After December?  There was a transfer
7    of securities in September.  Put that aside.
8        A.   Okay.
9        Q.   We move to December.  In December
10   there's a list of securities that's the subject
11   of the settlement agreement.
12       A.   Correct.
13       Q.   Those are going to be transferred
14   over.  Those do get transferred over, correct?
15       A.   Correct.
16       Q.   In and after December, are there
17   additional securities that get transferred over?
18       A.   Not that I'm aware of.
19       MR. TAMBE:  I don't have any further
20   questions.  Thank you.
21       MR. ROTHMAN:  I'll ask a few.  Take a
22   five-minute break.
23       (Recess; Time Noted:  11:04 A.M.)
24       (Time Noted:  11:21 A.M.)
25   EXAMINATION BY

Page 65

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    BY MR. ROTHMAN:
3        Q.   Good morning, Mr. Rodefeld.  My name
4    is Seth Rothman.  I'm from Hughes, Hubbard &
5    Reed.  We represent the SIPA Trustee.
6        A.   Okay.
7        Q.   I'd like to start by marking as an
8    exhibit an e-mail string with the Bates No.
9    00048037.  That will be number 284A.
10       (Exhibit 284A, a document bearing
11       Bates Nos. BCI-EX-(S)-48037 through 48038,
12       marked for identification, as of this date.)
13       (Document review.)
14       A.   Okay.
15       Q.   Your copy of the document is actually
16   double-sided.
17       A.   Yes, I saw the back.
18       Q.   Okay.  Good.
19       A.   Thank you.
20       Q.   I just wanted to make that clear.
21       This is an e-mail from -- the top
22   e-mail is from Michelle Turner to you on Friday,
23   September 19; is that correct?
24       A.   Yes.
25       Q.   Who is Michelle Turner?

Page 66

**HIGHLY CONFIDENTIAL - J. RODEFELD**

1     A.   She is an operations manager that ran
2   the Cash Management Team at Barclays Capital.
3     Q.   Do you recall receiving this e-mail
4   from Ms. Turner?
5     A.   Not particularly, no.
6     Q.   At the bottom of the string, she
7   forwards an announcement from Citibank, CLS
8   Services, do you see that?
9     A.   Yes.
10     Q.   What are the CLS Services?
11     A.   That is the FX netting that gets done
12   by a facility called CLS, which is continuous
13   link settlement, where it's a market facility
14   that takes the -- all the FX trades with the
15   dealers and nets them down and all the
16   participants within it and creates a net amount
17   per currency that each dealer has to settle upon
18   as opposed to moving hundreds and thousands of
19   payments individually.
20     Q.   And "FX" refers to foreign exchange?
21     A.   That's correct.
22     Q.   Did Barclays have a foreign exchange
23   business?
24     A.   Yes, it did.

Page 67

HIGHLY CONFIDENTIAL - J. RODEFELD

1     Q.   And were you involved --
2     A.   Not Barclays Capital, no. Barclays,
3   PLC.
4     Q.   Were you involved in that business at
5   all? This is now prior to the sale transaction
6   with Lehman.
7     A.   Very, very limited. Most of the
8   processing and the operations for all our FX
9   business was in London and Singapore. So only
10   to the extent there might be some support people
11   on the desk that would come in to me.
12     Q.   Okay. You write back to Ms. Turner,
13   "We are not taking the FX business from Lehman."
14     A.   Correct.
15     Q.   How did you know that?
16     A.   I don't recall, other than the fact
17   that I must have asked somewhere along the line
18   to say, you know, are we taking any position in
19   the FX, long and -- that's what I'm surmising
20   from this. I don't remember, you know, why I
21   asked. I'm sure I asked it about all the
22   product asset classes that would have been out
23   there on the Lehman entities.
24     Q.   And you think that because it relates

Page 68

**HIGHLY CONFIDENTIAL - J. RODEFELD**

1   to the job you were doing in operations?
2     A.   Oh, I'm sure it would have been
3   related to do we need to worry about any
4   processing of the FX support.
5     Q.   Did anybody at Barclays give you a
6   rundown or a summary of which businesses you
7   were taking from Lehman and which you were not?
8     A.   Nothing on a -- I have not received
9   anything formally from anybody.
10     Q.   You didn't read anything?
11     A.   I don't recall like a list that says
12   we're taking this, not taking this, nothing like
13   that.
14     Q.   So you don't really know --
15     A.   I don't know what context I was
16   sending this other than the fact that, you know,
17   she was passing on information related to CLS,
18   and because we weren't taking the FX business, I
19   was communicating to her that it shouldn't be an
20   issue, that they're not -- that CLS is shutting
21   down on the Lehman side because we weren't doing
22   their FX business.
23     Q.   But you don't recall how it is you
24   learned that Barclays was not taking the FX

Page 69

**HIGHLY CONFIDENTIAL - J. RODEFELD**

1   business from Lehman?
2     A.   No, I don't recall that.
3     Q.   The second sentence of your e-mail,
4   you say, you write, "Suspect we will cherrypick
5   the better sales and traders." Are you
6   referring there to the FX business?
7     A.   I'm sure I must have been, just
8   thinking along those -- just from reading it at
9   face value, that's what I would have probably
10   just surmised. No fact or based on fact, just
11   chatter.
12     Q.   Put that exhibit aside. Let's go back
13   to a new topic now -- actually, an old topic,
14   the repo transaction that you testified about
15   this morning that took place on Thursday where
16   Barclays replaced the Fed.
17     A.   Right.
18     Q.   And I think by Friday you said that
19   you had received certain collateral had come in
20   to the Bank of New York; is that right?
21     A.   On Friday, you're saying, or Thursday?
22     Q.   That Thursday night into Friday
23   morning, but by Friday morning you had received
24   certain collateral?

Page 70

HIGHLY CONFIDENTIAL - J. RODEFELD

2  A.  Correct.
3  Q.  So you had approximately $42 billion
4  in securities?
5  A.  Based on Bank of New York's marks.
6  Q.  Right.  And you had 7 billion in cash?
7  A.  Correct.
8  Q.  And then there was another 1.1 billion
9  you said that came in on Friday, but you weren't
10  sure if that related to the repo or not, is that
11  fair?
12  A.  That's accurate.
13  Q.  Okay.  How are you mechanically
14  getting this information?  Is there a system
15  that you look at?  Do you get a report from the
16  Bank of New York?
17  A.  I don't get a report.  There may be a
18  report that's driven.  I don't know enough about
19  the mechanics of the 855 account at DTC whether
20  they produce something.  Typically, I wouldn't
21  care because I would have my own books and
22  records to rely on.
23  So what happens at the 855 reporting
24  through Bank of New York, I don't know what they
25  do, if they -- how they handle that account.  I

Page 71

HIGHLY CONFIDENTIAL - J. RODEFELD

2  just don't know enough about that account.
3  Q.  How do you learn that there's $42
4  billion in securities that have made their way
5  to the Bank of New York account?
6  A.  It was all verbal over the box coming
7  from Bank of New York as assets were coming into
8  the account.
9  Q.  Okay.  And is your group then
10  responsible for determining where those assets
11  go next?
12  A.  Yes.  Yeah.
13  Q.  Okay.  And do you know what happened
14  to that 42 billion in securities?
15  A.  Yes.
16  Q.  What happened to it?
17  A.  We executed trades against them,
18  actual outright trades, and then we moved them
19  out of that location into our proprietary
20  accounts since we purchased them outright.  So
21  they would go into our normal DTC or Fed BAU
22  accounts.
23  Q.  When you say you purchased them
24  outright, what are you referring to?
25  A.  We purchased those assets, a series of

Page 72

HIGHLY CONFIDENTIAL - J. RODEFELD

2  assets.  The location of those assets were
3  sitting at -- in my 855 account, which was a
4  location just to put those securities.  We then
5  took them out of the 855 DTC account at Bank of
6  New York to our proprietary Barclays accounts at
7  DTC.
8  Q.  Okay.
9  A.  Because they become -- once we
10  purchase them outright, they became part of our
11  normal box positions.
12  Q.  When you say you purchased them
13  outright, are you referring to the sale
14  transaction with Lehman?
15  A.  The -- I don't know the terminology
16  you're using.  What I do know is we booked
17  transactions to buy those securities from
18  Lehman.  Those trades that were booked in our
19  systems had securities that were in the 855
20  account.
21  Mechanically, I have a trade in my
22  system saying you have purchased securities from
23  Lehman.  You have a location at 855.  From a
24  mechanical point of view, I just move the
25  securities from the 855 account into my

Page 73

HIGHLY CONFIDENTIAL - J. RODEFELD

2  propriety account to settle that transaction
3  since we have purchased them outright from
4  Lehman.
5  Q.  What's the basis of your understanding
6  that you have purchased them outright from
7  Lehman?  Did somebody tell you?  Did you read it
8  somewhere?
9  A.  No, transactions are booked in our
10  trade capture systems by traders.
11  Q.  So you can tell from the system?
12  A.  The front office system feeds our
13  settlement system, which says, okay, we've done
14  a purchase of securities and we knew that the
15  securities that we were purchasing from Lehman,
16  we knew where the location was because the day
17  before they were all put into that account, or
18  two days before, whatever the date they actually
19  came in.
20  Q.  Okay.  Now, are you also tracking the
21  $7 billion in cash collateral?
22  A.  Yes.
23  Q.  And what happens to that $7 billion in
24  cash?
25  A.  First, we requested that 7 billion on

Page 74

HIGHLY CONFIDENTIAL - J. RODEFELD

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    Friday through our normal course of business.
3    We asked Chase to put it into our -- I believe
4    into our DDA account at Chase. That didn't
5    happen. We got a statement that day showing
6    that we had the tri-party outstanding, so we
7    were comfortable.
8        Monday we got another statement from
9    Chase saying the 7 billion is still in the
10   tri-party account. We were comfortable. We
11   asked them again to move it out to Barclays'
12   account, and then sometime after that it became
13   evident that Chase wasn't releasing that 7
14   billion back to us immediately, and that's when
15   we escalated it up the ranks to the management
16   line.
17       Q.  Is Barclays purchasing the 7 billion
18   in cash the same way it's purchasing the 42
19   billion in securities?
20       MR. SHAW: Objection to form.
21       You can answer.
22       Q.  You can answer, if you understand.
23       A.  I don't know what the assets they were
24   purchasing.
25       Q.  Okay. But with respect to the cash,

Page 75

HIGHLY CONFIDENTIAL - J. RODEFELD

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    do you also see in your system whether it's been
3    purchased or not?
4        A.  No. It sits out there as a tri-party
5    trade. So it's a financing trade, but for
6    technical purposes, that's the only way it goes
7    into the system as tri-party.
8        Q.  How about the $1.1 billion in
9    securities that you told us was transferred on
10   Friday?
11       A.  Right.
12       Q.  Did you know what happened to those
13   securities?
14       A.  They got -- they were commingled with
15   all the other securities into the 855 account
16   and they just sat there and became part of that
17   portfolio that we took in from Thursday and
18   Friday.
19       Q.  And did your system show that Barclays
20   had purchased those securities?
21       A.  At some point later on, yes, when they
22   booked the trades into the system showing that
23   they bought them outright.
24       Q.  When did that occur?
25       A.  That occurred over a, probably a

Page 76

HIGHLY CONFIDENTIAL - J. RODEFELD

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    three- or four-week period from September 22nd,
3    I believe, through the three or four weeks.
4        The reason it took so long to book all
5    those trades, normally you would do that pretty
6    quickly, but we didn't have a lot of those
7    instruments set up in our databases since we
8    weren't trading them. So the back-end process
9    of getting the instruments set up in the system,
10   making sure you can process trades for them,
11   making sure you have all the information you
12   need to set up the instrument, probably 70
13   percent of those instruments were easily set up
14   in our security database. Then there were other
15   instruments that just took longer.
16       So, until you get that instrument,
17   that's the starting point. It has to be in our
18   instrument database so you can book a trade
19   against it. So there was a lag time between the
20   9/22 until we finally finished booking all the
21   trades.
22       Q.  When you say "all the trades," you're
23   including both the securities that made up the
24   42 billion in securities that transferred on
25   Thursday and also the 1.1 billion that

Page 77

HIGHLY CONFIDENTIAL - J. RODEFELD

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    transferred on Friday, is that fair?
3        A.  It was the full population that was in
4    the 855 account, correct.
5        Q.  And is it fair that -- just so I
6    understand what you're telling me, you see in
7    your system that it's been purchased and that's
8    the basis for why you say Barclays bought these
9    outright, but you don't have any independent
10   understanding based on any of the deal documents
11   or --
12       A.  I wasn't part of any -- the
13   negotiations or any part of the deal at all
14   other than the settlement aspects.
15       Q.  I'm going to mark as 285, Exhibit
16   285A, an e-mail from you to Gerard LaRocca.
17   It's Bates-stamped 49066.
18       (Exhibit 285A, a document bearing
19   Bates Nos. BCI-EX-(S)-49066, marked for
20   identification, as of this date.)
21       (Document review.)
22       A.  Okay.
23       Q.  This e-mail is an e-mail that you send
24   to Mr. LaRocca on Wednesday, September 24,
25   correct?

Page 78

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  A.  Uh-huh.
3  Q.  You need to answer out loud.
4  A.  Oh, sorry.  Yes.
5  Q.  So this is now in the middle of the
6  next week after --
7  A.  Correct.
8  Q.  -- the repo transaction?
9     MR. SHAW:  Actually, I would point out
10  that this appears to be sent Tuesday night.
11  We've got that GMT problem.
12     MR. ROTHMAN:  Fair enough.
13  Q.  Do you recall sending this e-mail to
14  Mr. LaRocca?
15  A.  Not particularly.
16  Q.  You write, "Rich was looking for the
17  market value and confirmation of the securities
18  we received on Friday from Lehman as part of the
19  1.9 billion they were going to post."
20     Who is Rich?
21  A.  I don't know, but it could be Rich
22  Ricci or it could be another Rich.  I just don't
23  remember.
24  Q.  And you write, "On Friday we received
25  collateral worth 1.077 million."

Page 79

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  A.  Correct.
3  Q.  Is that the 1.1 million we've been
4  talking about?
5  A.  That was received on the Friday.
6  Q.  Correct.
7  A.  Correct.
8  Q.  That's the same --
9  A.  I -- yes, if it's on Friday we
10  received the collateral worth, that would be the
11  same collateral.  That was the only collateral
12  we received on that Friday.
13  Q.  Okay.  And then you refer to a
14  schedule with a list of another 990 unique
15  issues?
16  A.  Uh-huh.
17  Q.  What does that mean, "unique issues"?
18  A.  Individual issues.  We had a schedule
19  that Lehman had sent us saying they were going
20  to deliver us these securities, but we didn't
21  get them all.  So this is -- I'm just
22  referencing the fact that we didn't get
23  everything that was on the schedule.
24  Q.  So you were supposed to get another
25  990 individual securities with a market value of

Page 80

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  862 million?
3  A.  That's what I would recollect based on
4  this e-mail, yes.
5  Q.  Okay.  And then you say that the
6  reason is because DTC put the block on the
7  account?
8  A.  Correct.
9  Q.  What happened with respect to that?
10  A.  Friday morning, the market opens up.
11  DTC has accounts that are open at -- Lehman has
12  accounts that have opened at DTC at that point
13  in time, so they started delivering me assets.
14  I took those assets, and then a point in time
15  came where DTC stopped allowing Lehman to use
16  that account so they put a block on it, whatever
17  terminology.  I don't know if that's the formal
18  terminology, but they basically were not
19  allowing Lehman to move any more collateral out
20  of that account.
21  Q.  Did you know why DTC was doing that?
22  A.  I had no idea at that point what was
23  causing that.
24  Q.  Did you find out later?
25  A.  Later I found out that they declared

Page 81

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  bankruptcy, I think it was on that Friday, but
3  I'm not a hundred percent sure.  But that's
4  probably what I recollected happened at the
5  time, but I'm not a hundred percent certain.
6  But I would assume that would have been the
7  reason why the DTC stopped them.
8  Q.  Did you hear from anybody that that
9  was the reason?
10  A.  I don't remember.
11  Q.  Did you read any --
12  A.  I don't know the reason other than the
13  fact that I remember that there was a bankruptcy
14  that day, and it would have seemed logical sense
15  that DTC would have put a stop on it until they
16  could figure out where they were at.  That would
17  have been my best guess of what I...
18  Q.  Okay.  So, as of that Friday, Barclays
19  has collateral now of 49, approximately $49
20  billion, consisting of the 42 billion in
21  securities and the 7 billion in cash; is that
22  right.
23  A.  Based on Bank of New York's
24  valuations.
25  Q.  Right.

Page 82

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2    A.   Yes.
3    Q.   Why is Lehman posting an additional
4    1.9 billion on Friday or intending to post an
5    additional 1.9 billion on Friday?  Do you know?
6        MR. SHAW: Objection. Foundation.
7    A.   I don't know why they posted it at
8    that point in time on Friday morning. I just
9    took the collateral.
10   Q.   Okay. But your understanding was that
11   Barclays was supposed to have approximately $49
12   billion in collateral, correct?
13   A.   Barclays was supposed to have
14   approximately 49-point-something billion dollars
15   worth of collateral. We had no way to validate
16   what the real valuation was of that collateral
17   other than what Bank of New York was telling us.
18   Q.   Do you know whether the 1.9 billion
19   was intended to replace some of the cash?
20   A.   At that point in time, I had no idea
21   what it was going to replace, the cash or what
22   the -- I was just told take it in.
23   Q.   Did at some later point in time you
24   gain an understanding as to what that 1.9
25   billion was supposed to do?

Page 83

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2    A.   Much later on. Not up until during
3    the period that we were purchasing the assets.
4    Somewhere subsequent to that, I was never really
5    sure whether it was related to the collateral on
6    the repo or the purchase of the unencumbered
7    assets. Because to me it was a block of assets.
8    I didn't distinguish between the repo versus the
9    unencumbered assets for my purposes because it
10   didn't matter to me.
11   Q.   You said much later in time. Are you
12   thinking about a particular conversation that
13   you had with someone?
14   A.   No, I just know that somewhere down
15   months later when we just, you know, probably
16   had general conversations on it, that's when it
17   probably came out. I can't say on a particular
18   time or date or anything like that. I just know
19   later on, you know, there was discussions about
20   it.
21   Q.   Do you recall who you had those
22   discussions with?
23   A.   No, just general conversations with
24   somebody. I just don't know. I just know
25   that -- I recollect that there were

Page 84

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2    conversations on it.
3    Q.   Conversations with people at Barclays?
4    A.   Could have been Barclays or Lehman. I
5    don't remember, to be honest. It could have
6    been just rehashing it with Lehman people for --
7    I just don't remember. I just know that
8    somewhere I had a conversation on it.
9    Q.   When you say "Lehman people," are you
10   talking about --
11   A.   Ex-Lehman legacy people from the -- it
12   could have easily been any one of them. I just
13   don't recall.
14   Q.   Can you recall about when you had
15   these discussions?
16   A.   I just know it was probably much later
17   on, you know, only to the fact that I really
18   wasn't focused on the population as much in
19   terms of, you know, the reasons as to making
20   accounting for it, making sure the trades were
21   booked, the trades were settled, securities were
22   moved. That was my focus.
23   Q.   When you say "much later on," do you
24   think this was a couple of weeks later or a
25   couple of months later?

Page 85

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2    A.   It was probably more months later.
3    Q.   The e-mail, just to clarify one thing
4    in the e-mail, you write that, "On Friday, we
5    received collateral worth 1.0077 million." Did
6    you mean billion when you wrote that?
7    A.   Yeah. I was getting a little punchy,
8    I guess. Yeah, it was clearly a billion.
9    Q.   And why are you passing this
10   information along to Mr. LaRocca? Do you
11   recall?
12   A.   Not particularly, no.
13   Q.   I'm going to mark 286A, another
14   e-mail. This one is double-sided,
15   Bates-numbered 49165 to 49166.
16       (Exhibit 286A, a document bearing
17       Bates Nos. 49165 through 49166, marked for
18       identification, as of this date.)
19       (Document review.)
20   A.   Okay.
21   Q.   The top e-mail is from you to a
22   Stephen Sell?
23   A.   Right.
24   Q.   Who is Mr. Sell?
25   A.   Stephen is a business manager for the

Page 86

1     HIGHLY CONFIDENTIAL - J. RODEFELD
2   trading floor.
3     Q.   And if you go down to the bottom of
4   the first page, he notes to you and a number of
5   other people, "It appears we have received some
6   additional assets yesterday from LEH," which is
7   Lehman, correct?
8     A.   Right.
9     Q.   "PMTG would like to book these into a
10  PMTG book as soon as possible."
11        What is PMTG?
12    A.   It's the Private Mortgage Trading
13  Group. It's a trading desk on the floor of our,
14  what was then 200 Park Avenue.
15    Q.   And then you write back to Jasen Yang.
16  Who is Jasen Yang?
17    A.   Jasen's a trader on the PMTG desk.
18    Q.   And you say that you're aware of the
19  schedule attached and that you were told that
20  the 862 million plus the 301 million assets did
21  not come in on Friday and failed when the DTC
22  shut down the Lehman pipes.
23        Does the 862 million refer to the 990
24  unique issues that we were just talking about?
25    A.   I don't know that to be certain, but

Page 87

1     HIGHLY CONFIDENTIAL - J. RODEFELD
2   it's possible. It's more than likely, given
3   it's in this context, but I just don't have
4   specific recollection. But it, you know, that
5   would be, you know, the logical place you would
6   think it is.
7     Q.   And do you recall what the 301 million
8   assets refers to?
9     A.   No. What they could have been is I
10  think they were coming from two different DTC
11  accounts, I believe, and one might have been 862
12  in one account and 301 may have been in another
13  account. I don't recollect, but that would
14  probably be the reason why I split it out into
15  the two.
16    Q.   Okay. And --
17    A.   Or because of the location of the
18  securities rather than anything else.
19    Q.   And those two pools of assets are
20  separate from the 1.1 billion that you did get
21  that Friday?
22        MR. SHAW: Objection to form.
23    A.   I'm not sure I understand the
24  question.
25    Q.   The 301 million isn't part of the 1.1

Page 88

1     HIGHLY CONFIDENTIAL - J. RODEFELD
2   billion that was transferred, this is a
3   different --
4     A.   I don't know that to be the fact, but
5   based on the writing of this, it's saying it
6   didn't come in on Friday. So I would -- without
7   factually knowing for certain, I can make, you
8   know, some logical assumptions, but I don't know
9   that to be the fact.
10    Q.   Okay. And in the e-mail above that,
11  Mr. Yang says, writes to you, "Actually, I
12  suppose nobody's told me that, except that there
13  seems to be a widely held assumption that they
14  were delivered. Did any assets make it in
15  except the financing?"
16        Do you know what he meant by that?
17        MR. SHAW: Objection. Foundation.
18    A.   No, I'm not sure what he was
19  talking -- you know, my only, the reason my
20  response to that, "that is why I'm concerned,"
21  is just that what information is passing around,
22  is everybody working off of the same
23  information. That's the only thing I can
24  rationalize, just to say let's all make sure we
25  all have the same information.

Page 89

1   HIGHLY CONFIDENTIAL - J. RODEFELD
2        When he makes reference he didn't
3   know, you know, that's just what I thought or
4   something like that. That's why I said we need
5   to -- we can't just throw around numbers.
6   That's all.
7     Q.   Okay. Did there come a time over the
8   weekend of September 20th and 21st where people
9   from Barclays went to the DTCC's offices?
10        MR. SHAW: Objection. Foundation.
11    A.   I don't know for certain. I just
12  wasn't privy to that, and I know it wasn't me,
13  so if -- there might have been people that have
14  gone there that I'm unaware of, but I didn't go
15  to the DTC offices.
16    Q.   Did you hear anything about Barclays
17  going to inspect the positions in Lehman's DTC
18  accounts?
19    A.   I don't recall. It could have been.
20  I just don't recall during that period of time.
21  I don't know what -- I don't know what would
22  have been the benefit enough to say why, you
23  know, it would have been a critical business
24  need or not. It just doesn't -- I just don't
25  recall.

Page 90

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2    Q.   Were you talking to John Haley over
3    that weekend?
4    A.   I'm certain I was. John and I spent a
5    lot of time back and forth together.
6    Q.   Do you know if he had gone to the
7    DTCC?
8    A.   I don't know that to be fact. He
9    could have, but I just don't know that. You
10   know, he might have. I just can't recall that,
11   to be honest.
12   Q.   Did you hear anything over that
13   weekend about whether Barclays was going to be
14   purchasing unencumbered securities in the Lehman
15   DTC accounts?
16   A.   Not over that weekend, no.
17   Q.   Did you hear that at a later point in
18   time?
19   A.   Months later. This goes back to that
20   earlier discussion we had where, you know, when
21   they asked about the securities that came in on
22   the 19th as unencumbered securities, somewhere
23   along those lines months later, that's where I
24   became aware that we were buying those actual
25   securities.

Page 91

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2    Q.   You told me before that the DTCC put a
3    hold on the trading from the Lehman box that
4    Friday?
5    A.   Yeah. Not trading from it, movements
6    from it.
7    Q.   Thank you.
8         Was that hold ever lifted, do you
9    know?
10        MR. SHAW: Objection. Foundation.
11   A.   I don't know to be certain, no, I
12   don't know.
13   Q.   Do you know if Barclays had to take
14   any actions to get that hold lifted?
15   A.   No, I don't know. There must have
16   been. Well, let me qualify -- just restate that
17   again. We received assets on the 29th and the
18   30th. They may have come through that account,
19   so they may have been under the control of
20   either SIPC or DTC or some other body to release
21   those securities to us.
22        So I do know that at some point they
23   may not have taken the block off, but they
24   allowed securities to move through there because
25   I do believe on the 29th and 30th they came to

Page 92

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2    those accounts. So there must have been either
3    an unblocking or some mechanism that allowed us
4    to get those securities through there.
5    Q.   Do you know why Barclays was receiving
6    securities from there on the 29th and the 30th?
7    A.   No, I don't.
8    Q.   Do you know whether those securities
9    were part of the repo collateral?
10   A.   I don't know that. I didn't think
11   about it in those terms.
12   Q.   Does your systems show -- would your
13   systems show whether that was the case or not?
14   A.   No. Well, the only thing our systems
15   will show is that we purchased securities. We
16   didn't book any trades as financing trades on an
17   individual basis. So we wouldn't reflect that.
18   All you'd reflect is in the depot that you
19   received collateral from Lehman.
20        Once the trades were booked as
21   outright trades, that's when we knew that,
22   formal books and records, that we had trades and
23   that we were looking for that collateral as
24   proprietary positions now since we bought them
25   outright.

Page 93

HIGHLY CONFIDENTIAL - J. RODEFELD

1
2    Q.   Okay. Let's go back to the weekend of
3    September 20th and 21st. Did you hear anything
4    about an agreement over that weekend involving
5    Barclays, LBI and the DTCC?
6    A.   I don't understand the question.
7    Q.   Do you know if there was an agreement
8    reached over that weekend between Barclays,
9    Lehman Brothers and the DTCC?
10   A.   I don't know if there was agreements
11   reached. There was dialogue about the clearing
12   of the outstanding trades. I remember those --
13   that dialogue, but I don't know if that was --
14   there was -- I wasn't party to any agreement
15   that was taking place at DTC or anything of that
16   nature.
17   Q.   Were you involved in those dialogues?
18   A.   Yeah.
19   Q.   Where did they take place?
20   A.   They would have taken place at 745
21   Seventh Avenue.
22   Q.   And who participated in these
23   dialogues with you?
24   A.   I don't remember, but I -- I just
25   don't remember. I would assume people in legal

Page 94

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    or somebody of that nature.
3        Q.    There was people there from --
4        A.    Barclays. Barclays Capital.
5        Q.    Is this just legal people at Barclays?
6        A.    Barclays Capital. At this point, it
7    was Barclays legal people.
8        Q.    Were there people from LBI or from the
9    Trustee?
10        A.    There were LBI people on the floor.
11    Whether they were in those conversations, I
12    don't believe so.
13        Q.    Are there people in those
14    conversations from the DTCC?
15        A.    There were DTC folks on the calls,
16    right? And so there were discussions about, you
17    know, were we going to clear the trades on
18    behalf of LBI, the outstanding trades that
19    hadn't settled yet at the depositories. So
20    there were discussions, you know, and we were
21    saying we're not settling those trades, they're
22    not our trades.
23        That's the extent of what I remember
24    about that. I don't think there was any formal
25    agreements, though, other than the fact that we

Page 95

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    stated a position.
3        Q.    What is it, when you say you weren't
4    going to settle the trades, what do you mean by
5    that?
6        A.    So if Lehman sold securities to a
7    client and needed to make a delivery, we were
8    telling DTC we're not taking ownership of that
9    settlement process, that's Lehman's process. We
10    didn't -- we hadn't bought LBI at that point.
11    So, for our purposes, it's that why would we
12    take ownership of the settlement when we hadn't
13    taken ownership of those -- of the entity.
14        Q.    Did DTCC express any concerns about
15    those settlements?
16        A.    I don't know if they expressed
17    concern. They were looking for facts, right,
18    what we were doing.
19        Q.    What happens if the settlement fails?
20        A.    The trade doesn't just settle in the
21    system. The cash doesn't go one way. The
22    securities don't go another way.
23        Q.    Does the DTCC guarantee the settlement
24    of those trades?
25        A.    I don't know. I don't know enough

Page 96

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    about DTCC bylaws when there's a default of any
3    sort.
4        Q.    Is the DTC exposed, mechanically
5    exposed if a trade doesn't settle?
6        A.    DTC is participant-owned. So DTC just
7    represents all the other participants. So, in
8    theory, if there's a loss at DTC, that is shared
9    amongst all the participants of DTC.
10        So, you know, if there is going to be
11    a, like in any kind of a corporate action where
12    DTC is involved in it, if there's a loss, it's
13    distributed out to all its members.
14        Q.    Okay. So --
15        A.    I'm not an expert on DTC bylaws, on
16    closeouts or bankruptcy or anything else like
17    that. I'm not an expert at all.
18        Q.    So over the weekend of the 20th and
19    the 21st, you are, at least for some of the
20    time, up at the Lehman headquarters at 745
21    Seventh Avenue?
22        A.    Correct.
23        Q.    Why are you up there?
24        A.    On the weekend of the 21st -- well, we
25    should start when I started going to the Lehman

Page 97

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    offices, right? And I started taking up camp
3    there because I went up there on that Thursday
4    when there was started to be a lot of confusion
5    in the morning, late morning hours about that
6    first lot that we were sending over in cash and
7    the collateral, so I decided to go to the Lehman
8    offices to make sure I was closer to talking to
9    the folks that I needed to get a hold of rather
10    than by phone.
11        And so at that point there, once I had
12    taken an office on the 31st floor, it was just a
13    matter of convenience a lot of times just going
14    back and forth between the Seventh Avenue office
15    and the 200 Park Avenue office of mine, so I
16    just needed a place to have a PC and work from
17    both place, no more, no less.
18        Q.    So at some point over the weekend
19    these discussions involving the DTCC people
20    begin. How do you get brought into those
21    discussions?
22        A.    I don't remember how I was brought
23    into the discussions, but I just know that I was
24    part of the discussions when there was queries
25    about the outstanding trades that Lehman had

Page 98

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    against the rest of the industry.
3        Q.    Can you recall if somebody in
4    particular at Barclays asked you to join those
5    discussions?
6        A.    No, I -- logistically, I was on the
7    31st floor, so there was a lot of activity on
8    the 31st floor. So they saw a senior ops.
9    person, they probably said, John, come in, sit
10   here and, you know, be part of those
11   discussions.
12       So I don't know how I ended up dragged
13   into them, but I know that, you know, as a
14   senior ops. manager representing Barclays, I got
15   engaged in those conversations.
16       Q.    So when you had these conversations,
17   are you in somebody's office or are you in a
18   conference room? Where are you exactly?
19       A.    It was multiple offices, depending on
20   when the call came in and, you know, so forth on
21   the 31st floor. There were no assigned offices
22   on 31, so people would just jump in an office
23   and say I'm taking ownership today and work from
24   there. And then so it could have been I walked,
25   drifted into the office, somebody might have

Page 99

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    been on the phone and said, John, can you
3    understand what this guy's talking about or
4    something like that.
5        Q.    Are these Barclays people that are
6    using these offices or --
7        A.    They were Barclays people, but there
8    were some Lehman folks around. I just don't
9    know, you know, who was in what offices. But,
10   yeah.
11       Q.    And the people calling you into the
12   office to join the call, are those Barclays
13   people that are doing that or is it Lehman
14   people, or both?
15       A.    I don't remember, but more than likely
16   they were Barclays people.
17       Q.    And you don't recall who it was from
18   Barclays that was on these calls with you?
19       A.    No, and I don't even -- you know, you
20   know, I just don't recall. I mean, there could
21   have been Lehman operations people there as
22   well. Alastair Blackwell could have been there,
23   he might not have been there. The dates and the
24   times and the meetings almost become a blur.
25       So I don't remember specific calls. I

Page 100

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    just know that I was on calls with DTC related
3    to the settlement, the settlements that -- the
4    trades that hadn't settled at DTC related to the
5    Lehman accounts and who was going to take
6    ownership of those settlements.
7        Q.    Did you ever go down to the offices at
8    Weil Gotshal and attend any meetings or
9    discussions there?
10       A.    Yes.
11       Q.    When did you do that?
12       A.    When it was, I believe, and I don't
13   have my dates right, but when we went to the
14   close the first time with Chase on the 7
15   billion, I was asked to participate in that
16   meeting at the General Motors Building when we
17   went to that first closing about the settlement
18   of the 7 billion and how that was going to get
19   distributed.
20       Q.    When did that occur?
21       A.    By Monday morning, 6, 7 o'clock in the
22   morning.
23       Q.    What Monday, the 22nd?
24       A.    No, it would have been the following
25   week, I believe.

Page 101

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2        Q.    Okay.
3        A.    Because we were still at the point on
4    the 22nd of thinking we had a tri-party for 7
5    billion with JPMorgan Chase, so the meeting at
6    Weil was the how do we settle the 7 billion the
7    first time prior to the next settlement that
8    took place in December.
9        Q.    So the first time would have been at
10   the end of September?
11       A.    Would have a date, right, that date,
12   whatever date. And it could have been first
13   part of October, I just lose track. Whatever
14   date that we decided to have that large meeting
15   with JPMorgan and several other interested
16   parties at that meeting.
17       Q.    Let's go back to the weekend of the
18   20th and the 21st. Did you go to the GM
19   Building to Weil's offices over that weekend?
20       A.    No.
21       Q.    Let me show you a copy of a letter
22   agreement that we previously marked as Exhibit
23   52. It's already been blessed.
24           (Document review.)
25       A.    Okay.

Page 102

HIGHLY CONFIDENTIAL - J. RODEFELD

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    Q.   Have you ever seen Exhibit 52 before?
3    A.   Yes.
4    Q.   When did you see it?
5    A.   I'm sure I saw it at the period of
6    time in September or October -- September, I
7    guess, only because it's to my attention, and I,
8    you know, vaguely remember something about this,
9    but nothing in particular.  It just looks
10   familiar, to be honest with you.  I don't know
11   why, it just looks familiar.
12   Q.   What, if anything, do you remember
13   about it?
14   A.   Nothing.  Absolutely zero.
15   Q.   Were you involved in negotiating this
16   letter agreement?
17   A.   No.  I don't even understand enough
18   about it, to be honest, what it even means.
19   Q.   Did you attend any meetings where this
20   letter agreement was discussed?
21   A.   Unless this was part of the meetings
22   that we had over that weekend where there were
23   discussions about, you know, the clearing of the
24   securities, I may have participated in those
25   meetings, and if that translated into this

Page 103

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    document, you know, then -- then I was party to
3    some of those meetings, yes.
4    The fact that they put it to my
5    attention, you know, because I was part of those
6    meetings or because I was the head of ops., I
7    don't recall, but it could have been one of
8    those two reasons.
9    Q.   You don't know why it's to your
10   attention?
11   A.   No, other than the fact that, as the
12   head of ops., and as being party to those
13   discussions with a number of these people at
14   DTCC on that weekend, that's the only thing I
15   can think of is why they put it to my attention.
16   Q.   Who at the DTCC did you talk to?
17   A.   Specifically, I didn't talk to
18   anybody, you know, that I can recollect, but I
19   know on the call was Larry Thompson, and I
20   believe Don Donahue was probably on those calls
21   as well.  And there might have been other people
22   in the room from DTCC.  Those are the two names,
23   you know, that I remember.
24   Q.   When you were on those calls, was
25   there any consensus reached or resolution

Page 104

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    reached as to how the trades were going to be
3    cleared?
4    A.   Not on the calls that I participated
5    in, there was no agreements.  There were
6    discussions about the MBSCC, how we -- the
7    governments and so forth, but there was no
8    resolution, I don't believe, that I was on that
9    says, okay, we're going to go in this direction
10   and that's the formal agreement or anything like
11   that.  I don't recall that.
12   Q.   Is it fair to say that the only thing
13   you do recall is what you told me before, is
14   that Barclays was not going to be responsible
15   for settling those trades?
16   A.   Right, that was the only thing that I
17   remember that sticks out in my mind from those
18   conversations.  Because it was such a prominent
19   point to DTCC and there was more than one
20   conversation on that subject, so that's why I
21   remember.
22   I don't know if there were other
23   reasons why we were on the call that might have
24   been minor issues.  There could have been.  I
25   just don't recollect.  That was the only major

Page 105

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    issue I remember, being who's going to own the
3    future settlements of the outstanding trades.
4    Q.   Do you recall any discussions about
5    whether Barclays would purchase any of the
6    assets that were --
7    A.   No, nothing along those lines.
8    Q.   Did you hear any discussion about --
9    A.   It was more -- it was all operational
10   in nature.  Settlement purposes, not execution
11   purposes.
12   Q.   Did you have an understanding that
13   there were other discussions or meetings with
14   the DTCC going on that you were not involved in?
15   A.   There may have been, yeah.  I would
16   assume that there were other discussions going
17   on that I wasn't party to.  I just don't know
18   specifically what they were or anything.
19   Q.   If you take a look at the paragraph of
20   the letter that's numbered number 1 that's in
21   bold, "Winding Down of Accounts"?
22   A.   Yes.
23   Q.   The letter reads, "Barclays has
24   indicated, and hereby agrees, that all of the
25   accounts of LBI maintained at the clearing

Page 106

1  HIGHLY CONFIDENTIAL - J. RODEFELD
2  agency's subsidiaries," and then in parentheses
3  it defines the accounts, "constitute 'excluded
4  assets' within the meaning of the APA."
5      A.  Uh-huh.
6      Q.  Did you hear any discussions about
7  whether the accounts of LBI maintained at the
8  clearing agency's subsidiaries would constitute
9  excluded assets within the meaning of the APA?
10     A.  No, and in fact, I didn't even know
11 what "APA" even meant.  I wasn't party to any of
12 the APA discussions, so -- and there was no
13 discussions in anything that I was aware of
14 about excluded assets.
15     Q.  Did you hear anything about the court
16 hearing that took place on Friday evening?
17     A.  Yeah.
18     Q.  What did you hear?
19     A.  Again, if this is the one where they
20 said that we could purchase Lehman, is that the
21 one -- I don't know.  There was a court hearing,
22 I know, that was I guess when we were going to
23 make the payment for the assets, the building
24 and some of the other things.
25          So I believe there was a court hearing

Page 107

1  HIGHLY CONFIDENTIAL - J. RODEFELD
2  to saying it had to be approved before we could
3  actually settle the -- and the only reason that
4  I would have been party to that is if I had to
5  make the money payment to settle the cash that
6  would have to go out the door to settle that.
7          So I was probably told that this is
8  waiting on a court settlement, so be available
9  if we need to wire cash out to satisfy the
10 purchase.
11     Q.  Okay.  I take it you didn't attend the
12 court hearing that took place?
13     A.  No.
14     Q.  And nobody gave you a summary of --
15     A.  Nothing.
16     Q.  -- or description of what happened
17 that the hearing?
18     A.  My only interest in the court hearing
19 was to be on notice that I might have to wire a
20 large sum of cash out and that I had to
21 coordinate that since I had -- I was the senior
22 person that controlled the wires.
23     Q.  Do you see in paragraph 2 of Exhibit
24 52 it says "guaranteed" in bold?
25     A.  I'm sorry, where is that?

Page 108

1       HIGHLY CONFIDENTIAL - J. RODEFELD
2      Q.  About midway down the page.
3      A.  Oh.  Oh.  Yes, okay.
4      Q.  The letter reads, "In order to induce
5  DTCC to take the foregoing actions, Barclays
6  hereby agrees to guarantee, indemnify and hold
7  harmless DTCC and each of the clearing agency's
8  subsidiary and each of its, or their, officers,
9  directors, employees, owners, agents and
10 representatives against any and all losses,
11 claims, damages, expenses or liabilities that
12 any of them may incur as a result of winding
13 down and closing out the accounts, which
14 guarantee is limited to the cash deposit
15 described below."
16          And then if you look at the paragraph
17 just underneath, it defines the cash deposit as
18 $250 million, do you see that?
19     A.  Uh-huh.
20     Q.  Do you recall any discussions
21 concerning a guarantee of $250 million?
22     A.  Seeing this now, I remember something
23 about $250 million, but I don't put into context
24 why I remember it.  It just looks familiar and
25 may have been a guarantee, and I just haven't

Page 109

1       HIGHLY CONFIDENTIAL - J. RODEFELD
2  recollect any reason why I know that.  Just
3  numbers look familiar and guarantees and 250.
4  That's the reason, yeah, I'm sure there was --
5  it looks familiar, but I don't know why it looks
6  familiar.
7      Q.  Would your group have been the group
8  that did the wire transfer that's mentioned
9  there?
10     A.  At the end of the day, if there was
11 money going out the door, that size of money, I
12 would have been aware of it, and you know, the
13 reason somebody would have said, "John, make a
14 payment of $250 million" and I would have
15 executed it.  So, you know, there --
16     Q.  Do you recall doing that?
17     A.  No.  There was a lot of big payments
18 going out at any given the time, and one versus
19 another doesn't ...
20     Q.  Okay.  You can put that agreement
21 aside.  Let me show you what has been marked at
22 a prior deposition as Exhibit 83B.  This is, for
23 the record, this is an e-mail from Stephen Sell
24 to a number of people, including you, and it's
25 got a Bates stamp of 6647.  There's also an

Page 110

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    attachment to the e-mail.
3        A.    Okay.
4        Q.    Do you recall receiving this e-mail
5    from Mr. Sell?
6        A.    Not specifically, but my name is on it
7    so I assume I received it.
8        Q.    Under the "redacted" stamp your name
9    is listed in three of the bullet points.  Can
10   you -- these are open issues questions.  Can you
11   walk me through those three bullet points and
12   tell me what it is that you were doing?
13       A.    Sure.  The first one is a question
14   asking the positions that were done by Lehman
15   against the street, you know, were what I'm
16   assuming is forward positions, meaning they have
17   sold forward, that were executed by Lehman the
18   previous week prior to when they were still
19   operating as a functioning entity, asking
20   whether we were going to settle those trades.
21   We were taking on the forward positions, meaning
22   were we going to settle those trades.  That's
23   the way I would read it.
24       Q.    Did you get an answer to that?
25       A.    I don't remember specifically other

Page 111

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    than the fact that we didn't take ownership of
3    them, so I don't remember about that particular
4    time if I got an answer on it or not.
5    Subsequent to that we knew we didn't settle any
6    forward trades, so that's what I recollect about
7    that.  At the period of time, I don't remember.
8        The second one is what was the
9    contractual settlement date we were going to put
10   on those trades since we were buying them
11   outright, and we were looking for a date so if
12   we were going to book the trades into our trade
13   capture systems, what would be trade date, what
14   would be settlement date.  So, obviously, the
15   settlement date being important for accrued
16   interest purposes and lots of other things, so
17   that there was a question there.
18       Subsequent to that, I believe we ended
19   up locking down that we were going to use 9/22
20   as the settlement date, formal contractual
21   settlement date, in our trade capture system.
22   So that would have been the second question.
23       And then the third one was more
24   mechanical:  Can you provide an asset control
25   point person for setting up the securities?

Page 112

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2    What that means is, many of these instruments we
3    didn't have in our settlement systems or our
4    front-end systems and that reference data needed
5    to be set up on them, and they were looking for
6    one particular person to drive the whole process
7    given the extent of the new issues we had to put
8    into our system to do it on a coordinated
9    fashion.  And my assumption is I would have
10   found a senior dedicated person that would have
11   just monitored that piece of it so that it would
12   be fluid in terms of setting up those instrument
13   so we could book the trades.
14       Q.    You can put that exhibit aside.
15       Let me just follow up briefly on
16   Exhibit 52, which was the DTCC letter.  Do you
17   recall how you received that, whether it was by
18   e-mail or by hand or some way?
19       A.    No, I don't.
20       Q.    Do you recall forwarding it on to
21   anybody else?
22       A.    I'm sure I would have given it to
23   Gerard LaRocca, asking him what should we do
24   with this.
25       Q.    And why Mr. LaRocca?

Page 113

1    HIGHLY CONFIDENTIAL - J. RODEFELD
2        A.    Gerard was serving as the point person
3    on a lot of discussion.  So, for my purposes,
4    any escalation in the U.S. that I felt that
5    needed to go -- and Carole was in the UK, as my
6    global head, but on a regional basis, I was
7    facing off to Gerard for any escalation issues,
8    and then Gerard would take it to where he needed
9    to take it to in the organization.
10       Q.    Okay.
11       A.    That was just a chain of command for
12   me.
13       Q.    Just so I understand your answer,
14   you're assuming you would have given it to
15   Gerard.  You don't have any independent
16   recollection of actually doing that?
17       A.    He would have been the only person I
18   would have given a document of that type to.
19   There's nobody else -- below me, I wouldn't have
20   given it to me below me, and I was head of U.S.
21   Ops., and the person right above me was Gerard.
22   So, from a logical perspective, he would be the
23   person I would give it to, if anybody, if I got
24   it.  And there would have been nobody else that
25   I would have given it to.

Page 114

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2    Q.   And you don't recall any discussions
3  with him regarding the --
4    A.   Not specifically on it. The document
5  looks familiar. Why, I don't know. I think it
6  was because they put director of operations
7  rather than my title. I think maybe that
8  annoyed me a little. It's probably more
9  political than practical.
10   Q.   You mentioned earlier this morning
11 that there was a list of the collateral that you
12 were receiving for the repo, you recall that?
13   A.   I'm sorry, what specific -- what
14 population are we talking about?
15   Q.   If we go back to the repo on Thursday
16 where Barclays took out the Fed.
17   A.   Barclays received collateral on
18 Thursday, correct.
19   Q.   You said at some point Barclays got a
20 list, and I think you said you really -- you
21 knew there was a list, but you didn't really
22 have much to --
23   A.   On Tuesday.
24   Q.   -- do with it.
25        Was that on Tuesday?

Page 115

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2    A.   Which list? Just clarify for me which
3  list we're talking about. There were a number
4  of different lists.
5    Q.   Did you ever get a list of the $42
6  billion in securities -- strike that. Did you
7  ever get a list of the collateral that was
8  supposed to move to Barclays to secure the $45
9  million repo loan?
10   A.   There was a couple of things. I got a
11 list of what we received from Bank of New York
12 recently relating to some subpoenas, I believe,
13 or some requests for data. So I did get a list
14 then.
15        Back in September, did I get a list?
16 Personally, I probably did not get a list.
17 There wouldn't have been a need to give me a
18 list. I wouldn't have known what to do with it
19 if they had given me a list. It probably would
20 have been an extensive list. So could someone
21 have sent me a list, hard copy or e-mail?
22 Possibly. I just don't recall.
23   Q.   Okay. I'm going to mark as the next
24 exhibit an e-mail string, again double-sided.
25 Bates number on the first page is 49591 and it's

Page 116

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  from Carole Machell to you.
3        (Exhibit 297A, a document bearing
4        Bates Nos. BCI-EX-(S)-49591 through 49592,
5        marked for identification, as of this date.)
6        (Document review.)
7    A.   Okay.
8    Q.   Does this e-mail refer to the
9  transfers that we've discussed on September 29
10 and 30?
11   A.   They look to be, yeah.
12   Q.   Okay. If you take a look at the
13 earliest e-mail in the string, it's from Neal
14 Ullman?
15   A.   Uh-huh.
16   Q.   Do you know who Neal Ullman is?
17   A.   Yes.
18   Q.   Who is he?
19   A.   Neal Ullman is a managing director
20 previously at Lehman who was responsible for
21 most of the security settlements at Lehman
22 Brothers.
23   Q.   And at the time of this e-mail on
24 September 29, 2008, is he working for Barclays?
25   A.   I don't know. Legally, I just don't

Page 117

HIGHLY CONFIDENTIAL - J. RODEFELD
1
2  know when he became a Barclays Capital employee,
3  so I don't know that to be fact.
4    Q.   Okay. Well, he says -- the first
5  e-mail on the string is sent to you, among other
6  people, correct?
7    A.   Uh-huh.
8    Q.   He says, "We have completed the
9  deliveries of the 636 collateral to Barclays
10 Capital. We have delivered a total of 255.6
11 million in collateral." Correct?
12   A.   Yes.
13   Q.   And does "636" refer to a particular
14 account at the DTC?
15   A.   That's a Lehman Brothers account at
16 DTC.
17   Q.   Okay. But that's what you understand
18 the "636" to refer to?
19   A.   I'm sure that's what I would have
20 referred it to, yes.
21   Q.   And then it says, "There are three
22 Cusips that are chilled at DTC and which we were
23 not able to deliver at this time totaling 14.3
24 million." Do you recall what that issue was?
25   A.   Not particularly. I mean, you know,

Page 118

1      HIGHLY CONFIDENTIAL - J. RODEFELD
2    based on this e-mail, I assume there was some
3    reason they couldn't move the three securities,
4    they were in a corporate action or some reason.
5         "Chilled" is a term that's used for
6    some reason that they can't move securities to
7    somebody for some particular reason. So I
8    assume that he's just highlighting the fact that
9    these were supposed to come to us as well, but
10   they couldn't deliver them at that particular
11   time because they were -- something was
12   happening on a corporate action related to them.
13   That would be my guess anyway.
14        Q.   Okay. And so you write back, "Thanks
15   for the note. Do we have an approximate amount
16   market value that we may be receiving from the
17   O74 box."
18        A.   Which is the second DTC box.
19        Q.   A second account?
20        A.   At DTC that belonged to Lehman
21   Brothers, Inc.
22        Q.   And then he tells you back, "I
23   understand that in total we need to deliver 950
24   million, so we need about 695 million to find in
25   the O74 box."

Page 119

1      HIGHLY CONFIDENTIAL - J. RODEFELD
2        A.   Uh-huh.
3        Q.   Do you understand why they need to
4    deliver 950 million?
5         MR. SHAW:  Objection. Foundation.
6        A.   I have no idea. I don't know what
7    context -- I don't know where the 950 million
8    came from and why that number becomes special.
9    You know, it just doesn't -- it could be -- I
10   don't know. Maybe it's related to the September
11   19th positions. I don't know in what frame he's
12   referencing this to.
13        Q.   Okay. The next e-mail up you write to
14   Carole Machell, "Once we get the 695 million, I
15   believe that will be it."
16        A.   Yeah. I probably meant to say that's
17   all that's coming.
18        Q.   Based on what?
19        A.   Based on what Neal's telling me, that
20   they're going to send me 695 and then I would be
21   done.
22        Q.   Okay. But then she asks you to, when
23   you have ten minutes, can you take her through
24   this.
25        A.   Yes.

Page 120

1      HIGHLY CONFIDENTIAL - J. RODEFELD
2        Q.   Any recollection of speaking to her
3    about it?
4        A.   No. Probably took more than ten
5    minutes, though. That's the only thing I can
6    probably recollect.
7         No, I have no idea, other than the
8    fact that, you know, just communicating
9    information back to her where we were at any
10   particular time. But my believing it ...
11        (Continued on the next page to include
12   the jurat.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 121

1      HIGHLY CONFIDENTIAL - J. RODEFELD
2         MR. ROTHMAN:  Well, I thank you for
3    your time. That's all I have.
4         THE WITNESS:  Great.
5         MR. SHAW:  Anything from our friends
6    on the phone?
7         MR. O'BRIEN:  No questions.
8         MR. TAMBE:  No further questions.
9    Thank you.
10        (Time Noted: 12:32 P.M.)
11            oOo
12
13
14
15
                 _____
                 JOHN RODEFELD
16
17   Subscribed and sworn to
     before me this    day
18   of      2009.
19
20           _____
21
22
23
24
25

Page 122

HIGHLY CONFIDENTIAL - J. RODEFELD

1 CERTIFICATE
2 STATE OF NEW YORK )
3 : ss
4 COUNTY OF NEW YORK)
5      I, Kathy S. Klepfer, a Registered
6 Merit Reporter and Notary Public within and
7 for the State of New York, do hereby
8 certify:
9      That JOHN RODEFELD, the witness whose
10 deposition is herein before set forth, was
11 duly sworn by me and that such deposition is
12 a true record of the testimony given by such
13 witness.
14      I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage and that I am in no way
17 interested in the outcome of this matter.
18      I further certify that neither the
19 deponent nor a party requested a review of
20 the transcript pursuant to Federal Rule of
21 Civil Procedure 30(e) before the deposition
22 was completed.
23      In witness whereof, I have hereunto
24 set my hand this 27th day of August, 2009.
25

------------------------------------

KATHY S. KLEPFER, RPR, RMR, CRR, CLR

Page 123

HIGHLY CONFIDENTIAL - J. RODEFELD

1 INDEX
2 WITNESS:        EXAMINATION BY        PAGE
3 J. RODEFELD     Mr. Tambe           5
4                 Mr. Rothman        65
5
6
7 EXHIBITS:                         PAGE
8 Exhibit 279A, a document bearing Bates    42
9 Nos. BCI-EX-(S)-47450 through 47452
10 Exhibit 280A, a document bearing Bates    47
11 Nos. BCI-EX-(S)-47647 through 47648
12 Exhibit 281A, a document bearing Bates    51
13 Nos. BCI-EX-(S)-47924 through 47926
14 Exhibit 282A, a document bearing Bates    54
15 Nos. BCI-EX-(S)-47942 through 47944
16 Exhibit 283A, a document bearing Bates    58
17 Nos. BCI-EX-(S)-47719 through 47724
18 Exhibit 284A, a document bearing Bates    65
19 Nos. BCI-EX-(S)-48037 through 48038
20 Exhibit 285A, a document bearing Bates    77
21 Nos. BCI-EX-(S)-49066
22 Exhibit 286A, a document bearing Bates    85
23 Nos. 49165 through 49166
24 Exhibit 297A, a document bearing Bates    116
25 Nos. BCI-EX-(S)-49591 through 49592

Page 124

HIGHLY CONFIDENTIAL - J. RODEFELD

1 NAME OF CASE: In re Lehman Brothers Holding, Inc.
2 DATE OF DEPOSITION: August 27, 2009
3 NAME OF WITNESS: John Rodefeld
4 Reason Codes:
5    1. To clarify the record.
6    2. To conform to the facts.
7    3. To correct transcription errors.
8 Page _____ Line _____ Reason _____
   From _____ to _____
9
10 Page _____ Line _____ Reason _____
   From _____ to _____
11 Page _____ Line _____ Reason _____
   From _____ to _____
12
13 Page _____ Line _____ Reason _____
   From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
   Page _____ Line _____ Reason _____
18 From _____ to _____
19 Page _____ Line _____ Reason _____
   From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 Page _____ Line _____ Reason _____
   From _____ to _____
24
25      JOHN RODEFELD _____

# BCI EXHIBIT

# 94

1

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4     ------------------------------x

      In Re:                    Chapter 11

5     LEHMAN BROTHERS            Case No. 08-13555 (JMP)

      HOLDINGS, INC., et al.,     (Jointly Administered)

6     ----------------------------)

7

8        * * * HIGHLY CONFIDENTIAL * * *

9         DEPOSITION OF GARY ROMAIN

10          New York, New York

11       Thursday, September 10, 2009

12

13

14

15

16

17

18

19

20    Reported by:

      FRANCIS X. FREDERICK, CSR, RPR, RMR

21    JOB NO. 24298

22

23

24

25

## Page 2

```
1
2
3
4              September 10, 2009
5              9:42 a.m.
6
7
8
9        HIGHLY CONFIDENTIAL deposition of
10   GARY ROMAIN, held at the offices of
11   Jones Day, 222 East 41st Street, New
12   York, New York, pursuant to Notice,
13   before Francis X. Frederick, a Certified
14   Shorthand Reporter, Registered Merit
15   Reporter, and Notary Public of the
16   States of New York and New Jersey.
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1
2    A P P E A R A N C E S:
3
4    JONES DAY, LLP
5    Attorneys for Lehman Brothers, Inc.
6        222 East 41st Street
7        New York, New York 10017-6702
8    BY: JAYANT W. TAMBE, ESQ.
9        TERRY McMAHON, ESQ.
10
11
12   BOIES, SCHILLER & FLEXNER, LLP
13   Attorneys for Barclays Capital
14   and the Witness
15       5301 Wisconsin Avenue N. W.
16       Washington D.C. 20015
17   BY: JONATHAN M. SHAW, ESQ.
18       LOUIS SMITH, ESQ.
19
20   QUINN, EMANUEL, URQUHART, OLIVER &
21   HEDGES, LLP
22   Attorneys for the Creditors Committee
23       865 S. Figueroa Street, 10th Floor
24       Los Angeles, California 90017
25   BY: SOYUN ROE, ESQ. (via telephone)
```

## Page 4

```
1
2
3    A P P E A R A N C E S: (Cont'd.)
4    JENNER & BLOCK, LLC
5    Attorneys for the Examiner
6        330 N. Wabash Avenue
7        Chicago, Illinois 60611-7603
8    BY: JACOB P. ZIPFEL, ESQ.
9
10   HUGHES, HUBBARD & REED, LLP
11   Attorneys for the SIPA Trustee
12       1775 I Street, N.W.
13       Washington D.C. 20006-2401
14   BY: JOHN F. WOOD, ESQ.
15       SAMUEL C. McCOUBREY, ESQ.
16
17
18
19
20
21
22
23
24   ALSO PRESENT:
25   RAJESH ANKALKOTI, Alvarez & Marsal
```

## Page 5

```
1        PROCEEDINGS - HIGHLY CONFIDENTIAL
2    G A R Y   R O M A I N, called as a witness,
3        having been duly sworn by a Notary
4        Public, was examined and testified as
5        follows:
6    EXAMINATION BY
7    MR. TAMBE:
8        Q.   Good morning, Mr. Romain. My name
9    is Jay Tambe. I'm with the law firm of Jones
10   Day. We're special counsel to Lehman Brothers
11   Holdings, Inc. We're here to ask you some
12   questions about the Lehman/Barclays
13   transaction from September of last year. With
14   me is my colleague, Terry McMahon. I'm going
15   to let the other lawyers down the table
16   introduce themselves and then we'll get
17   started.
18       THE WITNESS: Okay.
19       MR. WOOD: John Wood from Hughes
20   Hubbard & Reed on behalf of the SIPA
21   trustee.
22       MR. McCOUBREY: Sam McCoubrey also
23   from Hughes Hubbard & Reed on behalf of
24   the SIPA trustee.
25       MR. ZIPFEL: Jacob Zipfel from
```

Page 6

G. ROMAIN - HIGHLY CONFIDENTIAL

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    Jenner & Block representing the
3    examiner.
4         MR. SHAW: Jonathan Shaw and Louis
5    Smith, Boies, Schiller & Flexner, on
6    behalf of Barclays and the witness.
7         MR. TAMBE: Just before we get
8    started a couple of preliminary matters.
9    Mr. Shaw, as I understand it, this
10   witness has been identified as a
11   30(b)(6) witness for certain topics on
12   certain 30(b)(6) notices, correct?
13        MR. SHAW: Correct.
14        MR. TAMBE: And there are three
15   30(b)(6) notices. He's been identified
16   as a witness with knowledge on the third
17   notice, the OCC notice; is that correct?
18        MR. SHAW: Yes. And certain
19   aspects of the second notice as well.
20        MR. TAMBE: So on the third notice
21   I believe yesterday was the first that
22   we heard that he might be an additional
23   deponent on that. And in addition this
24   morning before we got started with the
25   deposition you have handed me several

Page 7

G. ROMAIN - HIGHLY CONFIDENTIAL

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    manila folders of documents. If you
3    could just tell me generically, what is
4    this collection of documents?
5         MR. SHAW: In preparing himself to
6    testify on these topics under the
7    30(b)(6) notice Mr. Romain has made some
8    notes and compiled a few materials that
9    will help him to testify accurately.
10        MR. TAMBE: Okay.
11        MS. ROE: Excuse me. I just
12   wanted to note my appearance. Soyun Roe
13   Quinn Emmanuel, Los Angeles, on behalf
14   of Creditors Commitment.
15        MR. TAMBE: Okay. Got it.
16        MR. WOOD: Can I just ask a
17   question on that. When you were saying
18   that the witness made some notes and
19   compiled a few documents to testify, so
20   are these all documents that were
21   created in the process of preparing the
22   30(b)(6) witness or were some of them
23   pre-existing documents?
24        MR. SHAW: With the exception of
25   his notes and some annotations on some

Page 8

G. ROMAIN - HIGHLY CONFIDENTIAL

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    pre-existing documents, they were all in
3    existence before this.
4         MR. TAMBE: And just for the
5    record, there are nine manila folders
6    and I believe each folder has multiple
7    copies of relevant documents, correct?
8         MR. SHAW: That was the intent.
9         MR. TAMBE: Okay. Thanks.
10        Now, in addition to testifying as
11   the 30(b)(6) witness, the witness is
12   also here to provide testimony as a
13   notice witness, correct?
14        MR. SHAW: Correct.
15   BY MR. TAMBE:
16        Q.   All right. So, Mr. Romain, as we
17   proceed through the day today we're going to
18   ask you questions of your own personal
19   knowledge and ask you about certain documents
20   that have been gathered through the discovery
21   process. When we get to a topic concerning a
22   30(b)(6) issue, we will -- I will identify
23   that I'm asking you a series of questions in
24   your capacity as a 30(b)(6) witness.
25        Let me step back and ask you

Page 9

G. ROMAIN - HIGHLY CONFIDENTIAL

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    generally, what, if anything, have you done to
3    prepare yourself to testify as the 30(b)(6)
4    witness?
5         A.   In order to prepare myself I
6    revisited the work that I did on the
7    acquisition and subsequently to refresh my
8    memory. And I put together the notes which
9    have just been provided to you to further
10   ensure that I'll be giving accurate testimony
11   on certain aspects. And that was about
12   basically it.
13        Q.   And when you said you revisited
14   the work that you'd done, did you do that
15   yourself or with others?
16        A.   I did that myself. Where there
17   were items where I wanted to refresh my memory
18   I spoke with other people.
19        Q.   Okay. Could you identify the
20   people you spoke with?
21        A.   They're numerous. It depends on
22   which particular item you're talking about.
23   But I wouldn't be able to put together a
24   complete list off the top of my head.
25        Q.   Okay. At least in my mind there

Page 10

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  are broadly three areas in which you are the
3  30(b)(6) witness. One is to do with the OCC
4  margin and values. The other has to do with
5  what we refer to as Schedule A and Schedule B
6  on the Asset Purchase Agreement, correct?
7    A.  Yeah.
8    Q.  And a third category were certain
9  documents or spreadsheets that were prepared
10 for Barclays auditors, right?
11   A.  Sure.
12   Q.  On the Schedule A, Schedule B
13 issues who did you speak with to get ready for
14 your 30(b)(6) deposition?
15   A.  The most significant conversations
16 I had in preparation were with -- let me go
17 through it -- with Sean Teague. With Stephen
18 Callick. With Jerry Shi. With Lee Bowell.
19 With Ian Cooper.
20   MR. SHAW:  Let me just ask to
21    clarify the question. Mr. Tambe's
22    question involves specifically the
23    subject of the Schedule A and Schedule
24    B. Were your conversations you
25    described on that subject or on other

Page 11

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  subjects?
3    THE WITNESS:  In terms of just the
4    Schedule A and Schedule B that would be
5    the -- discussion I've had on Schedule A
6    and Schedule B. I have to give this
7    some thought.
8    (Pause on the record.)
9    A.  Actually, those five. Schedule A
10 and Schedule B would be just Sean Teague. The
11 other four would relate to the third item, the
12 OCC.
13   Q.  And on the auditor spreadsheets
14 who did you speak to if anyone to get ready to
15 testify on those topics?
16   A.  The auditor spreadsheets I didn't
17 speak to anybody in particular because the --
18 the two documents -- the two main documents,
19 one of which was put together by myself so
20 very little refreshing of memory was required.
21   The other one I worked with
22 consistently over the period. So, again, very
23 little refreshing of my memory was required.
24   Q.  Did you read any deposition
25 testimony that's been given in this matter to

Page 12

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  get ready for your deposition?
3    A.  I read the deposition testimony of
4  Patrick Clackson.
5    Q.  And did you speak with Mr.
6  Clackson about his deposition testimony?
7    A.  No.
8    Q.  Did you speak with anyone else
9  about Mr. Clackson's deposition testimony
10 other than counsel?
11   A.  No.
12   Q.  You're currently employed by
13 Barclays, correct?
14   A.  That's correct.
15   Q.  And in what position?
16   A.  I'm head of technical accounting
17 and private equity finance for Barclays
18 Capital.
19   Q.  And how long have you been at
20 Barclays?
21   A.  Just over five years.
22   Q.  And before that where were you?
23   A.  I was at Deloitte for nine years
24 prior to that.
25   Q.  And do you hold any professional

Page 13

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  certifications from any accounting bodies
3  anywhere in the world?
4    A.  I'm an ICA so the English and
5  Welsh Institutional Chartered Accountant.
6    Q.  Last September 2008, did you have
7  the same position that you have now?
8    A.  I did, yes.
9    Q.  Describe generally for me in the
10 time period of, say, August, through December
11 of 2008, broadly, what role you played in
12 connection with the Lehman acquisition.
13   A.  Sure.
14   Q.  So starting in August.
15   A.  Yeah. In August I was involved in
16 an exercise placed on the published financial
17 information for Lehman to try to come up with
18 a picture of what the accounts of combined
19 Barclays and Lehman might look like. Barclays
20 and Lehman use different sets of accounting
21 rules so the primary purpose of my involvement
22 was to try to eliminate those differences. I
23 was then involved -- well, let's give a time
24 line. So Friday the 13th of September --
25   Q.  It's the 12th of September.

Page 14

G. ROMAIN - HIGHLY CONFIDENTIAL

1    A.    Friday, the 12th of September. I
2  became aware that some people were heading
3  over to New York in relation to a potential
4  deal with Lehman. I was called onto a
5  conference call in the early hours of Saturday
6  the 13th of September with Marie Stewart who
7  was my equivalent at Lehman, Lehman Brothers.
8  So the head of their technical accounting
9  department. Really to try to augment my
10  understanding. Because obviously during
11  August we only had access to published
12  financial information. So to augment my
13  understanding by talking to somebody who had a
14  greater understanding of their accounting
15  policies and how they feed into their
16  financial statements.
17        I then flew to New York on the
18  afternoon of Saturday, the 13th. When I
19  arrived it would have been early evening and I
20  was advised that the deal which was being
21  considered was no longer proceeding. A few
22  hours later I was called into the office by
23  Patrick Clackson. He had a few questions in
24  relation to a deal which may be resurrected at

Page 15

G. ROMAIN - HIGHLY CONFIDENTIAL

1    that time. I didn't have any details of the
2  transaction that we were looking at but he had
3  a couple of accounting questions which I
4  answered for him.
5        The next time that I had
6  involvement was -- it would have been
7  mid-morning on Monday, the 15th, when I and a
8  number of others headed across to the Lehman
9  headquarters at -- on Seventh Avenue with the
10  understanding that there was a deal which was
11  now being pursued. And I spent the next 24 to
12  30 hours I guess over there. I can't remember
13  exactly when I left but it would have been
14  probably early afternoon Tuesday. During that
15  period I was providing support to -- well, to
16  Patrick Clackson and through him to a number
17  of individuals were involved in the
18  negotiations at that time. That assistance
19  was -- some of it was administrative, just
20  pulling together documents, copying them, and
21  providing them to them. Other was liaising
22  with a number of Lehman staff to try to get a
23  number of information that they were asking --
24  Barclays executives were asking for.

Page 16

G. ROMAIN - HIGHLY CONFIDENTIAL

1    Q.    Let me stop you there.
2    A.    Sure.
3    Q.    So you're on the Monday/Tuesday of
4  the week of the bankruptcy.
5    A.    That's right.
6    Q.    You've described some of the
7  support you were providing Mr. Clackson and
8  others those two days.
9        Is it fair that on that
10  Monday/Tuesday you were not involved in
11  negotiating any aspect of the transaction?
12    A.    That's correct. I wasn't involved
13  in any of the negotiations.
14    Q.    Were you doing any valuation
15  exercises of Lehman's assets on the
16  Monday/Tuesday?
17    A.    No, I was not.
18    Q.    Were you aware that there were
19  valuation discussions taking place between
20  Barclays and Lehman on that Monday/Tuesday?
21    A.    I was aware that valuation was an
22  element of the conversations which were going
23  on. But I wasn't involved in discussions
24  themselves.

Page 17

G. ROMAIN - HIGHLY CONFIDENTIAL

1    Q.    What if anything do you recall
2  about the nature of the valuation discussions
3  that you understood were taking place?
4    A.    I don't really have any
5  understanding of the nature.
6    Q.    All right. So let's carry on back
7  with the time line. You were talking about
8  Monday/Tuesday. Carry on.
9    A.    Sure. So from that period onwards
10  the main task which was given to me was to
11  look towards our accounting treatment and
12  eventual disclosure of the transaction. So
13  over the next period of -- well, from then
14  right through till shortly before our
15  financial statements were published in
16  February I had and maintained the acquisition
17  balance sheets which was -- until just before
18  it was published was in the form of an Excel
19  spreadsheet which was summarizing the balance
20  sheet which needs to be disclosed in our
21  financial statements in the 6-K. That was a
22  working document through that period of the
23  time line.
24    Q.    Okay. On that Monday/Tuesday of

Page 18

G. ROMAIN - HIGHLY CONFIDENTIAL
1   that week, the week of the 15th, were you
2   involved in reviewing or preparing any
3   materials for the board of directors of
4   Barclays?
5       A.  I was not involved in reviewing or
6   preparing any.
7       Q.  Okay.  Did you -- okay.
8           We're just going to pull an
9   exhibit and I'll discuss that with you.
10      A.  Sure.
11          (Pause on the record.)
12      Q.  Sir, I've placed before you a
13  document that's previously marked as
14  Exhibit 377A.
15      A.  Um-hum.
16      Q.  It has the Bates numbers
17  BCI-EX-115843 through -846.
18      A.  Um-hum.
19      Q.  Is that the final Excel version of
20  the acquisition balance sheet, sir?
21      A.  Yes.  That's correct.  It's --
22  sheets 844 and 845 are the final Excel --
23  well, 845, 845 and 846 are the final Excel
24  versions of the acquisition balance sheet.

Page 19

G. ROMAIN - HIGHLY CONFIDENTIAL
1   843 was and is the same information which is
2   put into a form appropriate for disclosure
3   because Barclays' balance sheet have a
4   prescribed format and the items in the
5   acquisition balance sheet needed to be
6   appropriately allocated amongst those balance
7   sheet categories for disclosure.
8       Q.  And so the acquisition balance
9   sheet, the Excel version, the -44, -45 and
10  -46, that's the document you were describing
11  before which was an evolving document which
12  finally rolled up to the disclosure document
13  which is the first page of the exhibit; is
14  that fair?
15      A.  It's fair.  To expand, when you
16  say final, it was final in that it was the
17  version which was disclosed in our 2008
18  financial statements.  Under the regulatory
19  accounting standards you have until twelve
20  months after the acquisition to finalize your
21  initial accounting for an acquisition.  That
22  anniversary hasn't quite passed yet and,
23  therefore, this is not final until we declare
24  our accounting disclosed.

Page 20

G. ROMAIN - HIGHLY CONFIDENTIAL
1   Q.  And as you sit here, are you aware
2   of any adjustments or changes you expect to
3   make on the one-year anniversary?
4       A.  We don't expect to make any
5   changes.
6       Q.  And we'll come back to 377A later
7   in the examination.
8       A.  Sure.
9           (Deposition Exhibit 388A, document
10          bearing production number
11          BCI-EX-(S)-000520127 with attachment,
12          marked for identification as of this
13          date.)
14  BY MR. TAMBE:
15      Q.  Sir, I've placed before you a
16  document marked as 388A.  It's a cover e-mail
17  and what looks like a Powerpoint document
18  attached to it.  Please take a moment to
19  review it and let me know when you're done and
20  I'll ask you some questions.
21          (Document review.)
22      Q.  Sir, have you had a chance to
23  review it, sir?
24      A.  I have, yes.

Page 21

G. ROMAIN - HIGHLY CONFIDENTIAL
1   Q.  Okay.  And you'll see the cover
2   e-mail is an e-mail from Marie Stewart and you
3   referred to her earlier, correct?
4       A.  That's right.
5       Q.  She was your counterpart at
6   Lehman.
7       A.  That's correct.
8       Q.  And this is a cover e-mail
9   addressed to you and looks like others at
10  Barclays; is that correct?
11      A.  Yes.  That's correct.
12      Q.  Who's Chris Weidler and Charles
13  Utley?
14      A.  Chris Weidler, he works in finance
15  based in London.  His title is head of
16  financial reporting.  European head of
17  financial reporting.  Charles Utley is the US
18  regional head of technical accounting based in
19  New York.
20      Q.  And the document that's attached
21  to this e-mail from Marie Stewart to you, was
22  that a document you had requested that she
23  provide you?
24      A.  I don't recall receiving this

Page 22

G. ROMAIN - HIGHLY CONFIDENTIAL
1 document. I do recall Marie Stewart sending a
2 number of documents to me during the process
3 from Saturday on for the next couple weeks. I
4 don't recall requesting or subsequently using
5 this document.
6    Q.    And having skimmed through the
7 document, do you have an understanding of what
8 the document is?
9    A.    I have an understanding that it
10 is -- it is the sum -- it's the summary of
11 some exercise to fair value elements of the
12 Lehman Brothers business. That's what it
13 seems to be.
14    Q.    The e-mail from Marie Stewart is
15 dated the 13th of September. The Saturday,
16 correct?
17    A.    Yeah.
18    Q.    And that's the day you flew over
19 from London to New York to join your
20 colleagues here.
21    A.    Yeah.
22    Q.    The transaction that was being
23 contemplated over that weekend, was that an
24 acquisition of the entirety of Lehman's

Page 23

G. ROMAIN - HIGHLY CONFIDENTIAL
1 business?
2    A.    The transaction that -- my
3 understanding of the transaction which I was
4 informed had not been proceeded with when I
5 left on Saturday was an acquisition of the
6 Lehman business. That was my understanding.
7 But I wasn't involved in those discussions so
8 it's only an understanding.
9    Q.    And was it your understanding --
10 do you have an understanding what this e-mail
11 from Marie Stewart to you was in connection
12 with that contemplated transaction?
13    A.    No, I don't.
14    Q.    Do you recall using the attachment
15 to that e-mail for any purpose?
16    A.    No.
17       (Deposition Exhibit 389A, document
18       bearing production number
19       BCI-EX-(S)-00052084, marked for
20       identification as of this date.)
21 BY MR. TAMBE:
22    Q.    Sir, I've placed before you a
23 one-page document marked Exhibit 389A. Take a
24 moment to review it and let me know when

Page 24

G. ROMAIN - HIGHLY CONFIDENTIAL
1 you're done.
2    A.    Sure. Yeah.
3    Q.    You'll recognize this as an e-mail
4 from Mr. Clackson to you and many other folks
5 at Barclays.
6       Do you see that?
7    A.    Yeah.
8    Q.    Is Mr. Clackson someone you report
9 to directly?
10    A.    No, I report -- well, are you
11 asking now or at that time?
12    Q.    Let's ask back then.
13    A.    Back then I was reporting to Hugh
14 Shields who reported to Patrick Clackson.
15    Q.    And now?
16    A.    And now I report to Mark Merson
17 who reports to Patrick Clackson.
18    Q.    You'll see in Mr. Clackson's
19 e-mail, the second paragraph states, "We
20 nearly got there and the value created by the
21 deal would have been an incredible
22 $25 billion."
23       Do you see that?
24    A.    I do, yeah.

Page 25

G. ROMAIN - HIGHLY CONFIDENTIAL
1    Q.    Did you have any discussions with
2 anyone over that weekend about the value of
3 Lehman transaction, the deal that was being
4 contemplated?
5    A.    No, I didn't.
6    Q.    And just in orders of magnitude
7 the value of $25 billion, do you have any idea
8 how that compares to the value of the Lehman
9 operations that were contemplated being
10 acquired that weekend?
11    A.    No, I don't know.
12    Q.    You told us that on Monday, the
13 15th, you learned that a potential transaction
14 with Lehman possibly was back in
15 consideration, correct?
16    A.    That's correct.
17    Q.    And who did you hear that from?
18    A.    I heard that from James Walker who
19 was the CFO of the Americas at the time.
20    Q.    At Barclays.
21    A.    At Barclays Capital.
22    Q.    And what were you told about the
23 nature of the contemplated transaction on
24 Monday, the 15th?

Page 26

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        A.   At that time very little. I was
3    essentially providing support to a group of
4    people that were negotiating to make a deal.
5    But I wasn't involved in the negotiation of
6    the deal directly. So my involvement was much
7    more limited to the information I was
8    providing at that time.
9        Q.   Was it your understanding either
10   on Monday or in the subsequent days that the
11   transaction that was being contemplated was a
12   purchase of select assets from Lehman
13   Brothers?
14       A.   Yes.
15       Q.   Did you have an understanding as
16   to whether Barclays was negotiating the value
17   at which it would be purchasing those assets
18   from Lehman Brothers?
19       A.   I didn't have an understanding of
20   the negotiations as involves those terms, no.
21       Q.   At any time, has it been your
22   understanding that Barclays purchased assets
23   from Lehman at a value other than the book
24   value at which those assets were being carried
25   by Lehman?

Page 27

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        A.   Sorry. I'm not sure I understand
3    the question.
4        Q.   Lehman had a series of assets that
5    it carried at some value on its books,
6    correct?
7        A.   Yeah.
8        Q.   Is it your understanding -- has it
9    ever been your understanding, that Barclays
10   purchased some selection of those assets at
11   values other than the book values at which
12   Lehman carried those assets?
13       A.   I didn't have an understanding of
14   a transaction whereby we were purchasing
15   certain assets at a particular value. I had
16   an understanding of the assets that were being
17   purchased which grew over time and I have an
18   understanding of the amount of consideration
19   which was being paid as being elements of the
20   deal. But in terms of the relationship
21   between the two, I wasn't involved in the
22   discussions as to how those terms were arrived
23   at.
24       Q.   In connection with the Lehman
25   transaction, did anyone ever use the phrase

Page 28

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    "block discount"?
3        A.   I don't recall anybody using the
4    phrase.
5        (Deposition Exhibit 390A, document
6        bearing production numbers
7        BCI-EX-(S)-00023761 through
8        BCI-EX-(S)-00023762 with attachment,
9        marked for identification as of this
10       date.)
11   BY MR. TAMBE:
12       Q.   Sir, I've placed before you a
13   multi-page document marked Exhibit 390A. Take
14   a moment to review the document. It's a cover
15   e-mail, a placeholder sheet, and then a small
16   spreadsheet. Let me know when you're done.
17       (Document review.)
18       A.   Okay, yeah.
19       Q.   All right. The cover e-mail, at
20   least the e-mail address block states it's
21   from Tom McCosker to several people at
22   Barclays but you recognize this as an e-mail
23   that you sent, correct?
24       A.   That's right.
25       Q.   You were sending it from Tom's

Page 29

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    e-mail box.
3        A.   Absolutely.
4        Q.   The spreadsheet that's attached to
5    the cover e-mail, could you tell us what that
6    is?
7        A.   Well, that is -- that was a very
8    preliminary summary of assets and liabilities
9    which was put together into a balance sheet
10   format and I was asked to send to the people
11   in the "to" box there.
12       At the time I sent the e-mail I
13   was at the -- I was on the 31st floor of 745
14   providing support to Patrick and the
15   negotiators. I was provided with these
16   numbers as being numbers to put into that
17   format and sent.
18       Q.   In your cover e-mail you'll see a
19   reference to the PC used was installed with an
20   updated version of Excel.
21       Do you see that?
22       A.   Yeah.
23       Q.   Was that a Lehman PC that you were
24   using to create this?
25       A.   No. It was a Barclays laptop that

Page 30

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    we'd taken across.
3        Q.   On your acquisition summary, the
4    third page of the exhibit, the calculation
5    there begins with the line item that states
6    Inventory Carrying Amount.
7        Do you see that? 64 billion?
8        A.   I do, yes.
9        Q.   Where did that number and the
10   other numbers on the sheet come from?
11       A.   I don't recall who provided them
12   to me. At that stage I wouldn't have been
13   involved in any of the underlying work so I
14   was provided with those numbers to send and at
15   that time, the 16th of September, would have
16   obviously been very preliminary numbers.
17       Q.   And the next line item on that
18   page, the third page of 390A, is Inventory
19   Valuation Adjustment.
20       Do you see that?
21       And that's a negative $3.5 billion
22   number.
23       A.   Yeah.
24       Q.   Right. Do you know what that's a
25   reference to?

Page 31

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        A.   I don't, no.
3        Q.   If you look on your cover e-mail
4    that you sent you refer to that $3.5 billion
5    adjustment as a writedown.
6        Do you see that?
7        A.   I do, yeah.
8        Q.   Was it your understanding that the
9    carrying value of these assets was being
10   written down by Barclays in calculating this
11   acquisition summary?
12       A.   At that time I didn't have enough
13   information to have a real sense.
14       Q.   You had on the liability section a
15   bonus accrual item of 1.3 billion.
16       Do you see that?
17       A.   Yeah.
18       Q.   And, again, do you know the source
19   of that number?
20       A.   I don't, no.
21       Q.   I'm sorry if I've already asked
22   you this. Who was providing you with these
23   numbers?
24       A.   I don't recall who provided me
25   with those numbers precisely. It would have

Page 32

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    been somebody that was involved in the process
3    but I couldn't pinpoint to it an individual.
4        Q.   And, again, I'm just trying to
5    understand the exercise that was going on when
6    this sheet was prepared.
7        A.   Sure.
8        Q.   You had an Excel spreadsheet
9    opened and someone was giving you assets and
10   liabilities to put into a balance sheet, a
11   rudimentary balance sheet; is that right?
12       A.   That's correct.
13       Q.   Sir, I've handed you a document
14   that was previously marked as Exhibit 378.
15   It's a covering e-mail, a placeholder sheet,
16   and then a Powerpoint presentation. Take a
17   moment to review the document and please let
18   me know when you're done.
19       (Document review.)
20       A.   Okay.
21       Q.   The attachment to the cover
22   e-mail, the Powerpoint document, have you seen
23   that document before today, sir?
24       A.   I've seen it in preparation for
25   the deposition. If it's -- or if not this

Page 33

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    one, something which looks very similar to it.
3        Q.   Just keep that document in front
4    of you. I'm marking another exhibit.
5        A.   Um-hum.
6        (Deposition Exhibit 391A, document
7    bearing production numbers
8    BCI-EX-001766522 through
9    BCI-EX-001766536, marked for
10   identification as of this date.)
11   BY MR. TAMBE:
12       Q.   Sir, I've had placed before you a
13   document marked 391A. Please take a look at
14   it. It's also a Powerpoint presentation with
15   a similar title to Exhibit 378.
16       Is that the document you reviewed
17   in preparation for the deposition?
18       MR. SHAW: I note that there
19   appear to be multiple documents here.
20       A.   Are these identical?
21       Oh, no. This one has some
22   scribbles on it.
23       They look very, very similar so
24   I'm not sure.
25       Q.   And just as a housekeeping matter,

Page 34

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    the last three pages of the exhibit, I think
3    we can just extract. It's a different form of
4    document. It look like a memo.
5    A. Oh, okay.
6    Q. You can just pull those right off.
7    A. Sure.
8    Q. So the exhibit will just be the
9    Powerpoint presentation.
10    A. Okay.
11    Q. So looking at the Powerpoint
12    presentation it appears to be on a quick
13    summary similar to the document that's
14    attached to Exhibit 378 except for some
15    handwritten scribbles; is that right?
16    A. It appears to be, yes.
17    Q. Are those your handwritten
18    scribbles there?
19    A. No. That's not my handwriting.
20    MR. TAMBE: I could ask counsel.
21    We received this collection of documents
22    I believe yesterday. Is that right,
23    Terry?
24    MR. McMAHON: Right.
25    MR. TAMBE: Whose files did these

Page 35

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    documents come from?
3    MR. SHAW: If it's what I think it
4    is, then this was from a collection of
5    hard copy documents that Mr. Romain had.
6    MR. TAMBE: Okay.
7    BY MR. TAMBE:
8    Q. Is that fair, Mr. Romain? Was
9    that a collection of hard copy documents that
10    you turned over to your counsel?
11    A. Yes, that's true.
12    Q. And it's possible that in that
13    collection of hard copy documents were
14    documents with other people's handwriting on
15    them?
16    A. Yes.
17    Q. And you wouldn't know whose
18    handwriting this is on Exhibit 391A; is that
19    fair?
20    A. No, no.
21    Q. Do you understand the nature of
22    the handwriting? I believe you're looking at
23    page 5 of the Powerpoint.
24    A. I'm looking at page 5. No, I'm
25    not aware of what the amendments were there

Page 36

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    for.
3    Q. If you look at that column that
4    states New Transaction Included Gross, do you
5    see that column?
6    A. I do, yes.
7    Q. That column totaled up to
8    75.3 billion?
9    Do you see that?
10    A. I do, yeah.
11    Q. And the heading on this Powerpoint
12    page states total assets and new transaction
13    are 75 billion.
14    Do you see that?
15    A. I do.
16    Q. Any understanding as to where that
17    number comes from, the $75 billion number?
18    A. No, I don't. There were multiple
19    spreadsheets circulating around that time as
20    the nature of the deal and information changed
21    around that time and subsequently. So I
22    wouldn't know -- I wouldn't know what set of
23    numbers these were drawn from. But given the
24    date they would certainly have been very
25    preliminary numbers.

Page 37

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    Q. And looking at this exhibit,
3    Exhibit 391A, if you turn to the second page
4    of the exhibit -- yeah, that's the one.
5    It states Project Long Island
6    Board Discussion Materials.
7    Do you see that?
8    A. I do.
9    Q. And do you understand these were
10    materials prepared for discussion at a board
11    of directors meeting at Barclays?
12    A. I don't know that.
13    Q. Well, if you turn to the next
14    page, page 2 of the presentation, the very
15    last point on that page states, "We are
16    seeking board approval for the transaction and
17    to issue 612 million Barclay shares."
18    Do you see that?
19    A. I do.
20    Q. Does that help your understanding
21    that this was prepared for the board of
22    directors meeting for Barclays?
23    A. I don't know that.
24    Q. Did the $75 billion number we were
25    talking about a few minutes ago, are you aware

Page 38

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    of any other description of the assets to be
3    purchased being provided to the board of
4    directors on or around the 16th of September?
5         A.   I wasn't involved in the provision
6    of materials to the board.
7              (Deposition Exhibit 392A, document
8         bearing production numbers
9         BCI-EX-(S)-00023813 through
10        BCI-EX-(S)-0023814, marked for
11        identification as of this date.)
12   BY MR. TAMBE:
13        Q.   Sir, I've handed you a two-page
14   document marked 392A. It's an e-mail chain.
15   Take a moment to review it and let me know
16   when you're done.
17             (Document review.)
18        A.   Okay.
19        Q.   You'll see the cover e-mail, the
20   first e-mail at the top of the page, the first
21   page of Exhibit 392A, is someone from called
22   Vivek Syal?
23        A.   Um-hum.
24        Q.   To you and then c.c.'d to others.
25        Do you see that?

Page 39

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2         A.   Yes.
3         Q.   Who is Vivek Syal?
4         A.   He works for Barclays Capital but
5    are you asking for what role he would have
6    been performing at that time?
7         Q.   If you know, yeah.
8         A.   I can't recall the exact title.
9    He was -- he was a member -- a function which
10   I would describe as similar to investor
11   relations, but Barclays Capital rather than
12   Barclays Group.
13        Q.   And you'll see that Vivek is
14   forwarding you an e-mail which has a
15   calculation in it.
16        Do you see that?
17        A.   Yes.
18        Q.   And the e-mail that's being
19   forwarded to you, and you were a c.c. on that
20   original e-mail as well, begins with the
21   following phrase: "Following the numerous
22   e-mails on people trying to reconcile the
23   75.3 billion pound in the board dec and in
24   particular wanting to understand the
25   19.9 billion in the board dec..." and then it

Page 40

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    goes on.
3              Do you recall on or about the 16th
4    being involved in any discussions about
5    reconciling numbers in the board dec?
6         A.   I recall this e-mail, certainly.
7         Q.   Okay. So what do you recall about
8    this e-mail?
9         A.   I recall that Bill was trying to
10   reconcile a set of numbers he had and we had a
11   conversation. I don't recall the entire
12   content of that conversation. But essentially
13   during that period the numbers -- people's
14   understanding of the numbers on the 16th and
15   subsequent to that, was changing over time.
16   And I was trying to help Bill to track down
17   where the number that he was referring to may
18   have come from.
19             In terms of the source of the
20   information which is included here, I don't
21   know where -- I don't know where those numbers
22   would have come from.
23        Q.   And what you're referring to are
24   the numbers in Bill Castell's e-mail, the
25   asset and liability numbers, the other

Page 41

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    calculations, correct?
3         A.   Precisely.
4         Q.   Were you ever able to answer his
5    question as to reconciling the 75.3 billion
6    number?
7         A.   I don't recall.
8         Q.   Did you ever conclude that that
9    was an incorrect number?
10        A.   The numbers which were circulated
11   for a variety of purposes between a number of
12   people during that period were based on
13   preliminary estimates and people's best
14   understanding of numbers. So I wouldn't use
15   the word incorrect. I would say that the
16   numbers -- the appropriate numbers for the
17   deal changed over time for a variety of
18   reasons until we ended up with the numbers
19   that were disclosed in our annual report.
20        Q.   Were you involved at all in
21   calculating any of the numbers that were
22   disclosed to the Street in the analyst call
23   that was held on the 17th of September?
24        A.   I don't recall any direct
25   involvement. I may have answered questions

11

Page 42

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  from people who were involved in that. But it
3  would be difficult to say more than that.
4      Q.   And certainly when Barclays was
5  speaking to the Street on the 17th, Barclays
6  would have made an effort to be accurate in
7  its description of the transaction, correct?
8      A.   Because I wasn't involved in the
9  conversation, I think I probably -- I don't
10  have a great understanding of what the form
11  and requirements are for those type of
12  announcements. So I wouldn't want to comment
13  inaccurately.
14      Q.   Okay. Well, I would expect
15  accuracy to be one of the requirements,
16  correct?
17      A.   I would expect that -- I would
18  expect faithful representation. Accuracy is a
19  term which is difficult to find when -- based
20  on provisional information.
21      Q.   Do you have any understanding of
22  the headings Gross and Net as they're used in
23  that calculation that's provided by Mr.
24  Castell to you and others?
25      A.   No. I -- no, I don't know what

Page 43

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  those columns specifically represented, no.
3      Q.   But if you just follow the math,
4  it appears that on a line-by-line basis there
5  is a gross number, there's a parenthetical
6  which appears to be a deduction, and then a
7  net number.
8          Do you see that?
9      A.   I do.
10      Q.   Okay. And this is all in the
11  section titled FV Inventory.
12      A.   Yes.
13      Q.   And you recognize that as fair
14  value inventory?
15      A.   Yes.
16      Q.   Do you have any understanding as
17  to why, on or about the 16th of September,
18  these adjustments were being made to the gross
19  valuation numbers?
20      A.   No, because I don't have a sense
21  of what the gross column represents. I don't
22  have a sense of what might be deducted or why.
23      Q.   If you flip over to the next page,
24  at the top of the page there's two lines. One
25  line simply means minus and there's a negative

Page 44

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  1.5 number.
3          Do you see that?
4      A.   I do.
5      Q.   And then there's a little asterisk
6  that states Unallocated Deduction. Not
7  assigned to a specific asset class.
8          Do you see that?
9      A.   Yeah.
10      Q.   And, again, were you aware on or
11  around the 16th of a roving unallocated
12  deduction to fair value?
13      A.   No.
14      Q.   This calculation rolls up to a
15  negative goodwill number of 3 -- I presume
16  billion -- pretax.
17          Do you see that?
18      A.   Yeah.
19      Q.   What is negative goodwill?
20      A.   Goodwill, positive or negative, is
21  an accounting concept which is calculated as
22  the difference between net assets acquired and
23  consideration paid in an acquisition.
24      Q.   So if you were going to calculate
25  a gain on acquisition you would need to

Page 45

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  calculate the negative goodwill; is that
3  correct?
4      A.   If you were to put together the
5  accounting for an acquisition you would
6  calculate -- you would calculate goodwill, and
7  depending on whether the goodwill is positive
8  or negative, the treatment would differ. If
9  goodwill is negative it would be included in
10  the income statements as a profit.
11          (Deposition Exhibit 393A, document
12      bearing production numbers
13      BCI-EX-(S)-00052197 through
14      BCI-EX-(S)-00052198, marked for
15      identification as of this date.)
16  BY MR. TAMBE:
17      Q.   Sir, just before we go on to the
18  exhibit that's been placed before you I just
19  want to make sure I understood your last
20  answer.
21      A.   Sure.
22      Q.   I believe you said if goodwill is
23  negative it would be included in the income
24  statement as a profit; is that right?
25      A.   For accounting purposes; that is

Page 46

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2  correct, yes.
3      Q.   All right.
4      Sir, I've placed before you a
5  two-page document marked 393A.  It's a cover
6  e-mail and a spreadsheet.  Have you had a
7  chance to review the document?
8      A.   I have, yes.
9      Q.   The attachment, do you have an
10 understanding of what that attachment is?
11     A.   It's a schedule which I did see at
12 the time which was produced by Lehman, I
13 believe.  Yeah.
14     Q.   If you'd have Exhibit 392A in
15 front of you.  If you turn to page 2 of
16 Exhibit 392A, that's the calculation from Bill
17 Castell that we were looking at a few minutes
18 ago.  That has a total asset number of 72.05.
19     Do you see that?
20     A.   Yeah.
21     Q.   And the spreadsheet in
22 Exhibit 393A has an Adj. total assets of
23 72.65.
24     Do you see that?
25     A.   I do.

Page 47

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2      Q.   Do you have any understanding in
3  Exhibit 393A what the nature of the adjustment
4  is that's referred to in Adj. total assets?
5      A.   No, I don't.
6      Q.   And in Exhibit 393A which is the
7  Lehman-prepared document you testified about,
8  the Pure Payment and Comp Payment under
9  Liabilities, did you have an understanding on
10 the 16th what the source of those numbers was?
11     A.   No, I didn't.
12     Q.   As you sit here, do you know where
13 those numbers came from on the 16th?
14     A.   No, I don't.
15     Q.   Was it your understanding that
16 those numbers were inserted there to balance
17 out this balance sheet?
18     A.   No.  I don't have any
19 understanding of the source of any of the
20 numbers on the spreadsheet.
21     (Deposition Exhibit 394A, document
22     bearing production numbers
23     BCI-EX-(S)-00052200 through
24     BCI-EX-(S)-00052201, marked for
25     identification as of this date.)

Page 48

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2  BY MR. TAMBE:
3      Q.   Sir, I've placed before you a
4  two-page document marked Exhibit 394A.  Take a
5  moment to review it and let me know when
6  you're done.
7      (Document review.)
8      A.   Okay.
9      Q.   And you'll recognize at the top of
10 this exhibit, there's an e-mail exchange at
11 the top, the first page, and the top e-mail is
12 from James Walker to you and others.
13     Do you see that?
14     A.   Yes.
15     Q.   And the attachment is a marked-up
16 portion of what appears to be a balance sheet.
17     Do you see that?
18     A.   Yes.
19     Q.   Do you have an understanding as to
20 what this document is and what the handwritten
21 notations are?
22     A.   My understanding is that this was
23 another version of a representation of assets
24 and liabilities based on information at the
25 time.  It's clear that we were trying to tie

Page 49

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2  this out to some other document.  During that
3  week there were many exercises of this nature
4  as understanding of the transaction and its
5  component parts changed.
6      So that was part of that ongoing
7  process.
8      Q.   Any idea as to what you're trying
9  to tie this spreadsheet out to?
10     A.   No.
11     Q.   And is this your handwriting on
12 the second page of the exhibit?
13     A.   No.
14     Q.   394A?
15     A.   No.
16     Q.   Do you know whose handwriting it
17 is?
18     A.   I don't know.
19     (Deposition Exhibit 395A, document
20     bearing production numbers
21     BCI-EX-(S)-00052268 through
22     BCI-EX-(S)-00052270, marked for
23     identification as of this date.)
24 BY MR. TAMBE:
25     Q.   Sir, I've placed before you a

Page 50

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    three-page document marked Exhibit 395A. Take
3    a moment to review it and let me know when
4    you're done.
5        (Document review.)
6        A.   Okay.
7        Q.   Now, this is an e-mail you'll see
8    from Bill Castell to several folks at Barclays
9    and other places.
10        Do you know what the purpose of
11    that this e-mail was? I see addresses here
12    for db.com. I assume that's deutschebank.com?
13        A.   I don't know the people but db.com
14    is the standard e-mail ending for Deutsche
15    Bank, yes.
16        I don't have an understanding as
17    to the purpose for this.
18        Q.   Okay.
19        A.   It implies that there was a call
20    so...
21        Q.   And there's a reference to an 0745
22    DD call. Does that have any meaning to you?
23        A.   No. DD could mean a number of
24    things. I'm not sure.
25        Q.   Okay. And this e-mail from Bill

Page 51

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    Castell has another calculation of total
3    assets, total liabilities.
4        A.   Um-hum.
5        Q.   Do you know where these numbers
6    come from?
7        A.   No. No, I don't know where he got
8    them from.
9        Q.   Were you ever a participant in
10    discussions with analysts about this
11    transaction? External analysts about the
12    Lehman Barclays transaction?
13        A.   No.
14        Q.   In the week of the 15th, do you
15    recall discussions about how and where the
16    assets that were being acquired were going to
17    be booked? And by where I mean what entity.
18    What legal entity.
19        A.   During that week I don't recall
20    any discussions along those lines, no.
21        Q.   Okay. Subsequent to that week, do
22    you recall any discussions about how and where
23    the assets were going to be booked?
24        A.   Yes. Yes, there were numerous
25    discussions around entity allocations within

Page 52

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    Barclays group, over the next period of time.
3    I'm not sure exactly how long.
4        Q.   And what you refer to as entity
5    allocations, what drove the decision as to
6    what entity was selected for allocating
7    particular assets?
8        A.   I don't think there was a single
9    determining factor. As with any decision of
10    that nature you'd be considering a number of
11    things like infrastructure that was present in
12    the various entities. Capital. The normal
13    activities of the entities. These are issues
14    of a type which I would expect to feed into
15    it. But at a time which I recall being raised
16    at one time or another.
17        Q.   How about tax considerations?
18        A.   Tax considerations as well, yes.
19        Q.   So that would be a fourth. It
20    wasn't included in one of the three you
21    mentioned.
22        A.   They were examples.
23        Q.   So let's make sure we covered all
24    the possible reasons why you might choose to
25    allocate in one entity versus another. You

Page 53

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    mentioned infrastructure. You mentioned
3    capital, by which I assume you mean regulatory
4    capital requirements?
5        A.   Primarily. Yeah, it would seem to
6    be encapsuled in regulatory capital.
7        Q.   Then you talked about normal
8    activities. So I guess you were allocating
9    the assets to entities that's consistent with
10    their normal activities. Is that what you
11    mean?
12        A.   Yes.
13        Q.   And then another consideration
14    would be tax.
15        A.   Yes.
16        Q.   You want to minimize the tax
17    burden on the enterprise as a whole; is that
18    right?
19        A.   Well, I don't work in the tax
20    department so I wouldn't be able to say the
21    tax minimization is always the primary reason.
22    But tax considerations I would expect to be
23    considered -- I wouldn't be able to represent
24    that list of four generic categories as an
25    exhaustive list clearly.

Page 54

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2      Q.   In connection with the
3    Lehman/Barclays transaction and the
4    allocations of assets to particular Barclays
5    entities, can you identify any other reason
6    for the allocation other than these four that
7    we've discussed?
8      A.   Not off the top of my head, no.
9           MR. TAMBE: Let's just take a
10     short break and we'll continue.
11          THE WITNESS: Sure.
12          (Recess taken.)
13   BY MR. TAMBE:
14     Q.   Sir, I've placed before you a
15   document that was previously marked as
16   Exhibit 283A. It's a somewhat long e-mail
17   chain. So if you want to start from the back
18   and read your way up to the front, let me know
19   when you're done and I'll ask you some
20   questions.
21          (Document review.)
22     A.   Okay.
23     Q.   This e-mail chain, Exhibit 283A,
24   starts off with an e-mail from you at the top
25   to Caroline Owen and others.

Page 55

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2      Q.   Do you see that?
3      A.   Yeah.
4      Q.   And you're asking for a
5    coordinated approach on how assets are brought
6    onto the Barclays balance sheet, correct?
7      A.   Yeah.
8      Q.   In your second paragraph of your
9    e-mail you state, the second sentence, "I've
10   heard nothing about an SPV plan and generation
11   of gain in PLC..."
12          And then the sentence goes on.
13     A.   Yeah.
14     Q.   One, what did you mean by SPV
15   plan?
16     A.   There's a reference in Mark
17   Rudduck's e-mail two down about potential sale
18   to an SPV which is responding to a reference
19   in Beatrice Montaudy's preceding e-mail of a
20   plan to acquire assets through an SPV of
21   Barclays.
22     Q.   Do you recall --
23     A.   At all times -- what I was saying
24   there was that I hadn't heard about it and
25   that if there were discussions on it that the

Page 56

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2    broader finance needs to be involved.
3      Q.   Do you recall having had
4    discussions with any of these people who are
5    on this e-mail chain about an SPV plan?
6      A.   No, I'm not sure what plan
7    Beatrice would have been talking about at that
8    time.
9      Q.   And the other phrase you use in
10   your e-mail was generation of gain in PLC.
11          Do you see that? It's in your
12   e-mail, the first e-mail.
13     A.   Yeah.
14     Q.   And when you refer to PLC you're
15   talking about Barclays Bank PLC, correct?
16     A.   Yeah. I'm referring back to
17   Beatrice's e-mail where she identifies the
18   plan as being to acquire through SPV of BBPLC
19   and sell to BCSI to recognize a gain in BBPLC.
20   So I was -- I was saying I didn't know
21   anything about such a plan.
22     Q.   Just so I get through the
23   abbreviations, BBPLC is just Barclays Bank
24   PLC, right?
25     A.   That's correct.

Page 57

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2      Q.   And BCSL is?
3      A.   It's Barclays Capital Securities,
4    Ltd. I'm 99 percent sure that's the name of
5    it.
6      Q.   Okay. And both the PLC and the
7    limited company are non-US companies, correct?
8      A.   They are both UK companies.
9      Q.   Okay. And your reference or the
10   reference to recognition of gain --
11     A.   They're both UK companies. That's
12   not to say that US operations and assets are
13   not owned by those. So, for example, BBPLC
14   does have a New York branch.
15     Q.   And apart from those two entities,
16   you also have a US broker/dealer entity,
17   correct?
18     A.   That's correct.
19     Q.   And what's the name of that
20   entity?
21     A.   Barclays Capital, Inc. I think
22   is -- BCI is its normal reference.
23     Q.   And if you go to the third page of
24   Exhibit 283A, that's an e-mail from Beatrice
25   Montaudy, Mark Rudduck, and Jasen Yang.

Page 58

G. ROMAIN - HIGHLY CONFIDENTIAL

Do you see that?

A.   Yes.

Q.   And she makes a reference in there to the 46 percent marginal tax rate applicable to BCI.

Do you see that?

A.   Yes.

Q.   And so that's the US tax rate applicable to the US broker/dealer, correct?

A.   That's how I'd read the sentence. I don't have a particular detailed knowledge of the tax regimen.

Q.   In that same sentence, earlier in that sentence she makes a reference to the following: "It was essential to the valuation calculation that the 'discount' between the value of the assets acquired and the purchase price not be subject to the 46 percent marginal US tax rate applicable to BCI."

Do you see that?

A.   I do.

Q.   Do you have any understanding as to what she meant by that?

A.   No, I don't know.

Page 59

G. ROMAIN - HIGHLY CONFIDENTIAL

Q.   And the use of the word "discount" in her sentence, was it your understanding that the differential in the value of the assets acquired versus the purchase price paid was a discount?

MR. SHAW: Objection to form.

A.   I don't recall reading the e-mail chain down that far.  My response as I read and recollect it was a response to the e-mail from Caroline suggesting that I get involved. So this is certainly the first time I recall seeing the sentence and I don't have any sense as to what Beatrice meant by it.

Q.   And other than this e-mail chain, did you hear anyone else at Barclays refer to that differential to mean the value of the assets acquired and the purchase price as a discount?

A.   No.

Q.   What is Beatrice Montaudy's position?

A.   She works in the tax department in New York.

Q.   And what's her position within the

Page 60

G. ROMAIN - HIGHLY CONFIDENTIAL

tax department?

A.   I'm not sure.  At the time she reported to Susan Grbic.  She was the US head of tax.

Q.   And do you know what her position is now, Beatrice Montaudy's, if she's still with the bank?

A.   She's still in the US tax department, yes.

Q.   And her position?

A.   I don't know.

Q.   As the week goes on, Tuesday, Wednesday, Thursday, that week of the 15th of September, was it your understanding that the nature of the transaction was changing?

A.   I don't recall precisely what day I became aware of that but certainly by the Monday when a deal had been executed I was aware that the form of the deal was different than that envisaged previously.

Q.   So you're comparing Monday, the 15th, to the weekend?

A.   Yes.

Q.   Now moving further in the week,

Page 61

G. ROMAIN - HIGHLY CONFIDENTIAL

was it your understanding that the deal that was discussed and the deal that was the subject of the acquisition sheets we were looking at before, the Monday/Tuesday transaction, did that change during the course of the week?

A.   So from when to when?

Q.   So starting Monday, the 15th, the day that Lehman declares bankruptcy, you go back, you reengage in discussions with Lehman on the 15th.

A.   Yeah.

Q.   That deal that evolves from those discussions, does that change during the course of the week as far as you know?

A.   Sorry.  That was the question I was responding to previously.  I must have misunderstood the question.

Yes.  It was -- so over the week from the 15th to Monday, the 22nd when the deal was executed, I understood that the form of the deal changed.

Q.   As you sit her, what's your understanding of the how the form of the deal

Page 62

1           G. ROMAIN - HIGHLY CONFIDENTIAL
2     changed from the 15th to the 22nd?
3           So not what you knew at the time
4     but what you know now with the benefit of
5     everything that's happened.
6           A.    The main thing I know is that the
7     deal that was executed finally there may have
8     been changes in the form which I was not
9     specifically aware of. The change in the form
10    I was aware of was that we were entering into
11    a repo type transaction involving the Fed but
12    that was the principal difference that I was
13    aware of.
14          Q.    Now, going back to the week of the
15    15th, did you become aware of this change to a
16    repo type transaction during that week?
17          A.    I can't recall precisely when I
18    became aware of that because I know I was
19    definitely aware of it by the 22nd. It's
20    possible I was aware of that sometime before
21    then, but I can't recall accurately whether
22    that was the case or not.
23          Q.    Do you recall what role you played
24    on Thursday, the 18th, Friday the 19th, over
25    the weekend, onto the 22nd?  What were you

Page 63

1           G. ROMAIN - HIGHLY CONFIDENTIAL
2     doing during that time frame?
3           A.    I don't accurately recall. I was
4     involved in discussions around the balance
5     sheet I was maintaining so including lofty
6     placeholder numbers at that stage obviously
7     and speaking to people to try to improve
8     those. But beyond that general level I don't
9     recall specific involvements during those
10    days.
11          Q.    Do you have any understanding of
12    any efforts made by Lehman and Barclays to
13    identify additional assets to be delivered by
14    Lehman to Barclays on Friday, the 19th, and
15    then the weekend that followed?
16          A.    No.
17          Q.    Was it your -- is it your
18    understanding that all of the assets acquired
19    by Barclays from Lehman, the deal that was
20    finally executed, are also assets that came
21    over as a result of the repo?
22          A.    My understanding was that the repo
23    transaction was involved but to my
24    understanding the assets that were acquired or
25    the liabilities that were incurred were

Page 64

1           G. ROMAIN - HIGHLY CONFIDENTIAL
2     from -- I was less involved and interested in
3     how things developed during the week because I
4     wasn't particularly involved in that.
5           What I was interested in was the
6     deal which ended up getting done. So it was
7     based on the deal documents and conversations
8     with those who understood elements of any one
9     asset class. Rather than -- rather than any
10    sort of development or other sets of
11    discussions.
12          Q.    In terms of working with the
13    balance sheet which was a document that you
14    said was an iterative document that you were
15    working with, how did you obtain information
16    that you put into your work-in-progress
17    balance sheet?
18          A.    It was principally a process of
19    liaison and discussion across finance and with
20    others. So I was speaking with many people
21    over the course of months to at first get an
22    understanding of the nature of the transaction
23    and the assets and liabilities that had been
24    acquired. And then later at a more granular
25    level to get an accurate representation for

Page 65

1           G. ROMAIN - HIGHLY CONFIDENTIAL
2     our books and records and annual report.
3           So it was a project size involving
4     a huge number of people in the back.
5           Q.    And did you actually sit down with
6     the Asset Purchase Agreement and use that as a
7     guide to helping you create the balance sheet?
8           A.    The Asset Purchase Agreement was
9     one of the documents which I looked at, yes.
10          Q.    And did you actually annotate the
11    Asset Purchase Agreement against the changes
12    that were made in the clarification letter?
13          A.    I made no annotations that I can
14    recall, no.
15          Q.    Okay.
16          A.    I -- no.
17          Q.    Were you aware of changes to the
18    Asset Purchase Agreement that were made via
19    the clarification letter?
20          A.    I wasn't aware of changes. I
21    was -- the best way of putting it would be
22    that I looked at the Asset Purchase Agreement,
23    the amendment to the Asset Purchase Agreement,
24    and the clarification letter as a
25    representation of the transaction. I wasn't

Page 66

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    differentiating between the two. I had to
3    look at all of them to get a sense of the
4    transaction that was done.
5    Q.   When's the first time you recall
6    seeing the Asset Purchase Agreement?
7    A.   I definitely saw -- I'd definitely
8    seen it by the 18th. It's possible I may have
9    seen a draft a day or two before that. I say
10   a draft. A version or a copy. I definitely
11   have an e-mail which indicates that I had it
12   on the 18th because I looked for that in
13   preparing for this deposition.
14   Q.   Do you recall what the event or
15   circumstance was that makes you so sure that
16   you had it by the 18th? You saw an e-mail?
17   A.   I saw an e-mail.
18   Q.   Sorry. Do you know why you were
19   provided with a copy on the 18th?
20   A.   Because I was responsible for
21   putting together the acquisition balance
22   sheets and it was important I had a sense of
23   the transaction so I was seeking to get copies
24   of relevant deal documentation.
25   Q.   When's the first that you saw the

Page 67

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    clarification letter?
3    A.   Again, in preparing for the
4    deposition I had looked at my e-mails and I
5    definitely have an e-mail on the 22nd which
6    had the clarification letter attached to it.
7    Q.   Did you find any indication in
8    preparing for your deposition that you
9    received a copy of the clarification letter
10   prior to the 22nd?
11   A.   No.
12   Q.   And in terms of the process you
13   followed in putting together the balance sheet
14   you actually sat down with the operative legal
15   documents to help you prepare the balance
16   sheet?
17   A.   I referred to them, yes. Yes.
18        (Deposition Exhibit 396A,
19   three-page document bearing production
20   numbers 464242, marked for
21   identification as of this date.)
22   BY MR. TAMBE:
23   Q.   Sir, I've placed before you a
24   three-page document marked Exhibit 396A. Take
25   a moment to review it and tell me when you're

Page 68

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    done.
3        MR. SHAW: I'll note that there
4    appears to be an erroneous or additional
5    unknown date on this at the very top.
6    I'm not sure if it's just an artifact of
7    the document production.
8        MR. TAMBE: Yeah. The first two
9    lines on page 1 are an artifact of the
10   document production. As is the date
11   that appears in the bottom left-hand
12   corner.
13       (Document review.)
14   A.   Okay.
15   Q.   And you'll see your cover e-mail
16   is an e-mail from you to Martin Kelly at
17   Lehman.
18       Do you see that?
19   A.   Yes.
20   Q.   And others.
21   A.   Yes.
22   Q.   And who is Martin Kelly?
23   A.   At that time?
24   Q.   Yeah, at that time.
25   A.   Martin was -- I'm not sure

Page 69

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    precisely what his position was but he was a
3    senior member of finance for Lehman.
4    Q.   Okay. And what role does he have
5    now?
6    A.   He's now the CFO of the Americas
7    for Barclays Capital.
8    Q.   And if you follow this e-mail
9    chain it starts with a request from Patrick
10   Clackson to James Walker trying to acquire --
11   trying to obtain a balance sheet.
12       Do you see that?
13   A.   Yeah.
14   Q.   And then James sends that request
15   on to Martin Kelly.
16       Do you see that?
17   A.   Yeah.
18   Q.   And there's an e-mail then from
19   Martin to James Walker and to you with some of
20   the numbers on the balance sheet.
21       Do you see that?
22   A.   I see the e-mail, yes.
23   Q.   Just in terms of process, let me
24   ask you why was Barclays reaching out to
25   Lehman for an opening balance sheet?

Page 70

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2      MR. SHAW: Objection, foundation.
3      Q.   If you know.
4      A.   I don't know why James
5  specifically sent it to Martin.  During the
6  period we were speaking with Lehman employees
7  who had familiarity with some of the acquired
8  assets for some information.  But I
9  wouldn't -- I wouldn't know precisely why
10  James at that time thought that Martin was the
11  best source of information for the numbers at
12  that stage.
13      Q.   And as you developed your balance
14  sheet, the one that you worked on --
15      A.   Yeah.
16      Q.   -- did you work off of the Lehman
17  prepared balance sheet or did you create a new
18  balance sheet from scratch?
19      A.   I created a new balance sheet from
20  scratch.
21      Q.   Did you compare your balance sheet
22  to the Lehman balance sheet?
23      A.   There wasn't any Lehman balance
24  sheet as such that I was aware of.
25      Q.   And what I mean by the Lehman

Page 71

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2  balance sheet, the Lehman-prepared balance
3  sheet.
4      A.   Apart from this list here I'm not
5  aware of a parallel Lehman balance sheet
6  existing.
7      (Deposition Exhibit 397A, document
8      bearing production numbers
9      BCI-EX-(S)-00013605 through
10      BCI-EX-(S)-00013606 with attachment,
11      marked for identification as of this
12      date.)
13  BY MR. TAMBE:
14      Q.   Sir, I've handed you a document
15  marked Exhibit 397A.  It's a cover e-mail, a
16  placeholder sheet, and a spreadsheet.  Take a
17  moment to review it and let me know when
18  you're done.
19      (Document review.)
20      A.   Sure.
21      Q.   Have you had a chance to review
22  it?
23      A.   Yeah.
24      Q.   If you look at the cover e-mail,
25  the second e-mail on the first page is an

Page 72

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2  e-mail from Robert Azerad to you, James
3  Walker, and others.
4      Do you see that?
5      A.   Yeah.
6      Q.   And it attaches a document that's
7  titled Copy of Opening Balance Sheet.  There's
8  some more notations after that.
9      A.   Sure.
10      Q.   And the attachment appears to be a
11  spreadsheet.
12      Do you see that?
13      A.   Yeah.
14      Q.   And you'll see that several of the
15  items on that spreadsheet tie into the numbers
16  on the other exhibit we were looking at,
17  Exhibit 396A.
18      Do you see that?
19      A.   Yes.
20      Q.   Does this refresh your
21  recollection at all that you received a
22  spreadsheet from Lehman setting out the
23  opening balance sheet?
24      A.   Well, I clearly received this
25  spreadsheet, yes.

Page 73

G. ROMAIN - HIGHLY CONFIDENTIAL
1
2      Q.   Did you have any discussions with
3  Lehman about the valuation of the total assets
4  that's reflected on Exhibit 397A?
5      A.   No.  No.
6      Q.   And did you have an understanding
7  as to the source of that information?
8      A.   No, I don't have any understanding
9  as to the source.
10      (Deposition Exhibit 398A, two-page
11      document bearing production number
12      44230, marked for identification as of
13      this date.)
14  BY MR. TAMBE:
15      Q.   Sir, I've handed you a two-page
16  document marked Exhibit 397A.  Take a moment
17  to review that and let me know when you're
18  done.
19      (Document review.)
20      Q.   Oh, I'm sorry.  398A.
21      A.   Okay.
22      Q.   And in Exhibit 398A in the
23  middle -- towards the bottom of the first page
24  there's an e-mail from you to Martin Kelly.
25      Do you see that?

Page 74

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2      A.   Yes.
3      Q.   And you're in particular asking
4  him about his $44.88 billion number.
5           Do you see that?
6      A.   Yes.
7      Q.   And you ask him whether the
8  additional 1.9 billion of assets separate to
9  the 15(c)(3) is part of that 44.88 number.
10          Do you see that?
11     A.   I see that, yeah.
12     Q.   What's your understanding of what
13 the 1.9 billion of additional assets is a
14 reference to?
15     A.   The 1.9 is a reference there to
16 securities which were due to Barclays clearing
17 process. And the purpose of my mail was
18 essentially to ensure that we weren't double
19 counting when trying to identify the assets
20 that needed to be valued.
21     Q.   And you see the response from
22 Martin Kelly to you where he says, "Includes
23 the 1.9B."
24          Do you see that?
25     A.   Yes.

Page 75

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2      Q.   Do you recall further discussions
3  on this topic as to whether the 44.88 included
4  the 1.9?
5      A.   Yes.
6      Q.   And do you recall that ultimately
7  you resolved the 1.9 was not included as part
8  of the 44.88?
9      A.   Well, if we're using shorthand for
10 the 1.9 and the 44.88 to refer to assets from
11 the clearance box and assets which came across
12 the repo, then the conclusion of those
13 discussions was that not all of the assets
14 from the clearance boxes had come across. And
15 there was some which were still to be
16 received. The 1.9, 2.9, and 44.88 were not --
17 did not end up being represented as Barclays'
18 view of the fair value of the assets which is
19 the numbers that are represented in that
20 financial statement.
21          I'm not sure what the source of ·
22 those two numbers themselves and the values
23 was.
24     Q.   And it's your understanding that
25 the assets in the clearance boxes is what

Page 76

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  ultimately became Schedule B; is that right?
3      A.   I don't have enough of an
4  understanding about the precise composition of
5  Schedule B as it relates to understanding
6  there. My understanding was that Barclays was
7  o due to receive the assets from the clearing
8  box and we received some but not others at
9  that time.
10     Q.   Putting on your 30(b)(6) hat now
11 for a moment.
12     A.   Yeah.
13     Q.   What is your understanding of
14 Schedule A to the Asset Purchase Agreement?
15     A.   My understanding of Schedule A was
16 that it was the representation of the assets
17 which were coming across to Barclays against
18 the reverse repo.
19     Q.   So your understanding is that all
20 of the assets that are listed on Schedule A
21 were assets that had been pledged to the Fed
22 and were transferred to Barclays.
23          MR. SHAW: Objection.
24          Mischaracterizes the prior testimony.
25          Foundation.

Page 77

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2      Q.   You can answer if you understand
3  the question.
4      A.   I was aware that there was a
5  reconciliation process which was required of
6  Schedule A at the detailed CUSIP level but
7  it's my understanding that was what Schedule A
8  was intended to represent, yes.
9      Q.   Just so we're clear, every CUSIP
10 that appears on Schedule A it is your
11 understanding as the 30(b)(6) witness for
12 Barclays that every one of those CUSIPs was a
13 CUSIP that had been pledged to the Fed?
14     A.   No. That's not my understanding.
15          MR. SHAW: And I'm going to object
16 this witness has been offered only with
17 respect to the Schedule A and Schedule B
18 issues to talk about the Barclays effort
19 to value the securities that appear on
20 Schedule A and Schedule B.
21          MR. TAMBE: Okay. So let's just
22 mark the 30(b)(6) and maybe it's already
23 been marked. Has it already been
24 marked?
25          MR. McMAHON: This one I think has

Page 78

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    not been.
3        MR. TAMBE: Okay. So then let's
4    mark it. We'll just mark the 30(b)(6)
5    notice so we have some precision as to
6    what he's being offered for and what
7    he's not being offered for.
8        MR. SHAW: Okay.
9        (Pause on the record.)
10   BY MR. TAMBE:
11       Q.  Sir, I've placed before you a
12   document that's been marked 81B.
13       MR. TAMBE: My first question is
14   really a point of clarification for your
15   counsel. On items 1 and 2 of Schedule A
16   of this 30(b)(6) notice for what -- for
17   what subjects or topics is Mr. Romain
18   the 30(b)(6) witness for Barclays?
19       MR. SHAW: Mr. Romain is a
20   30(b)(6) witness on the issue of
21   Barclays' efforts to value the
22   securities that were on Schedule A and
23   Schedule B.
24   BY MR. TAMBE:
25       Q.  Taking off your 30(b)(6) hat, do

Page 79

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    you have any understanding as to how the
3    assets that came to be listed on Schedule A
4    and Schedule B were selected?
5        A.  No, I don't. No.
6        Q.  And taking off your 30(b)(6) hat,
7    do you have any understanding as to how the
8    assets on Schedule A and Schedule B were
9    transferred to Barclays?
10       A.  No, I don't. No.
11       Q.  Do you have an understanding as to
12   whether the assets on Schedule A and Schedule
13   B have, in fact, been transferred to Barclays?
14       A.  In terms of -- at the CUSIP level
15   I was aware there was a reconciliation process
16   so my understanding is that is not a -- that's
17   not a perfectly accurate statement was my
18   understanding. My involvement with the
19   Schedule A and Schedule B assets was in
20   relation to ensuring that the assets that were
21   received by Barclays were the properly
22   recorded value. The process by which they
23   came to be transferred to Barclays is an area
24   which I don't have particular insight into.
25       (Pause on the record.)

Page 80

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.  Sir, I've placed before you a
3    document marked previously as Exhibit 86B.
4    Would you take a moment to look at this
5    spreadsheet and let me know when you're done.
6        (Document review.)
7        A.  Okay.
8        Q.  When you talked about the
9    valuation of the Schedule A and Schedule B
10   assets, does this document, Exhibit B, relate
11   to that process in any way?
12       A.  It does, yes.
13       Q.  Is 86B the summary level valuation
14   of the Schedule A assets?
15       A.  Yeah. It's the summary level
16   valuation for -- yeah, for those assets.
17       Q.  So now with your 30(b)(6) hat
18   firmly on I'm going to ask you to explain to
19   me at the summary level from Exhibit 86B what
20   is the information that's in 86B. And you can
21   start with the spreadsheet and go by rows or
22   columns. Describe this collection of
23   information.
24       MR. SHAW: Before we do, can we
25   just confirm that the witness believes

Page 81

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    this was the final version of that?
3        MR. TAMBE: Sure.
4        Q.  Is it the final version?
5        A.  It looks like the final version.
6    To be definitive I would need to compare -- to
7    be definitive sitting here right now I would
8    need to compare the numbers with those on the
9    acquisition balance sheet.
10       Q.  And we had earlier this morning
11   looked at what you believed to be the final
12   version of the acquisition balance sheet.
13       A.  Yeah.
14       Q.  Let me see if I can locate that.
15   Which is Exhibit 377A.
16       A.  Yeah.
17       Q.  Are you doing that comparison now,
18   sir?
19       A.  I am, yes.
20       Yes. This is the final version.
21   There were some immaterial off-line
22   adjustments made just to tidy up right before
23   the financial statements were published but
24   the differences were very minor.
25       Q.  So keep before you the final

Page 82

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2   acquisition balance sheet which is 377. Also
3   keep in front of you 86B. I'm going to add
4   one more document to your pile for now and
5   that's a document previously marked as
6   Exhibit 87B and if you could confirm that that
7   is the valuation of the Schedule B assets.
8      A.   Sorry. I think there's been --
9   there's confusion there.
10      Q.   Okay.
11      A.   Exhibit 86B is the valuation of
12   the assets which were received by Barclays,
13   whether Schedule A or Schedule B.
14      Q.   All right.
15      A.   The Exhibit 87B is the valuation
16   of the -- of securities which were received on
17   or around the 22nd of September from JPMorgan
18   Chase.
19      Q.   Okay. No, you're absolutely
20   right. Okay. So going back to 86B, 86B
21   includes both Schedule A and Schedule B.
22      A.   Yeah. It includes all of the
23   Schedule A and Schedule B assets that were
24   received around -- well, around the time of
25   the deal. So yes.

Page 83

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2      Q.   All right. So looking at -- and
3   87B, is that a final schedule as well, if you
4   can confirm that?
5      A.   It is, yes.
6      Q.   Let's start with 87B which is the
7   JPM -- it has the title JPM assets.
8      Do you see that?
9      A.   Yes.
10      Q.   And putting on your 30(b)(6) hat
11   which should remain firmly on this whole
12   series of questions.
13      A.   Sure.
14      Q.   Describe for me what this
15   spreadsheet is.
16      A.   This spreadsheet is a summary of a
17   valuation of those assets designed for
18   inclusion in our books and records and in our
19   financial statement disclosures.
20      Q.   And going across the columns,
21   column A of this spreadsheet lists -- these
22   are the top third asset categories.
23      Do you see that?
24      A.   Yes.
25      Q.   There's a phrase there, Portfolio

Page 84

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2   3. Does that have any meeting to you, sir?
3      A.   Portfolio 3 was the term used to
4   refer to the JPMorgan assets.
5      Q.   And then you have several asset
6   categories. Lines 13 and 14 have the initials
7   PMTG and PMTG unknown.
8      Do you see that?
9      A.   Yes.
10      Q.   What is PMTG?
11      A.   PMTG is a group within the firm.
12   It's a business line. It relates -- let me
13   get this correct. Principal mortgage trading
14   group I think is the full name.
15      Q.   There's a separate line item, line
16   6, which states Agency Mortgage.
17      A.   Yeah.
18      Q.   Okay. Do you know if any agency
19   mortgages are included within PMTG?
20      A.   Well, the line for PMTG is not
21   supposed to indicate that these were all
22   assets of a PMTG type. That group wouldn't
23   typically trade in some of these items. The
24   significance here is that PMTG were the group
25   that were taking responsibility for

Page 85

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2   coordinating the valuation of the acquired
3   assets from a business perspective.
4      So what happened was that
5   initially assets were taken into a central
6   pot, if you like, such that they could be
7   considered, you know, as part of the
8   acquisition.
9      Subsequent to that assets were
10   transferred to the appropriate group that
11   would trade in those asset classes as a data
12   matter also in the Street or whatever decision
13   was made with those assets subsequent to
14   acquisition. But PMTG were responsible until
15   that happened from a business perspective.
16      Q.   So assets that would have come
17   over from JPMorgan obviously would not have
18   had a PMTG tag on them. They would have been
19   agency mortgages, corporates, munies, et
20   cetera, right?
21      A.   All asset classes.
22      Q.   If you look behind the line 13
23   PMTG does it break out into separate asset
24   classes?
25      A.   The breakout of the asset classes

Page 86

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    is rows 6 to 10.
3          Oh, in terms of the PMTG item.
4     Q.   Yes.
5     A.   Right. I may have misunderstood
6    the question then.
7          The PMTG -- the non-PMTG items are
8    principally the ones in 6 to 10. The items in
9    row 13 would have been the ones which, by
10   nature, were more relevant to PMTG as a group.
11   But PMTG were responsible for all of them
12   until they were transferred out of this sort
13   in effect pool which the assets were initially
14   transferred into. As a matter of practice
15   they were our single point liaison for the
16   Lehman acquisition.
17    Q.   All right. Column B is titled
18   Notional. And what's your understanding of
19   what that means?
20    A.   The contractual notional of the
21   underlying assets.
22    Q.   Column C is -- well, before we go
23   to C, when you say contractual notional that
24   is the principal amount owing on those
25   securities?

Page 87

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     A.   Yes. The principal value, yes.
3     Q.   Column C is FO value. Does that
4    mean front office value?
5     A.   It does, yes.
6     Q.   And whose front office?
7     A.   Our front office.
8     Q.   What --
9     A.   Barclays, sorry.
10    Q.   What is the significance of a
11   front office value?
12         MR. SHAW: Objection.
13    Q.   What does it mean?
14    A.   The process by which assets are
15   valued within Barclays is that first off the
16   front office would value. The second line of
17   consideration is that price testing will occur
18   within the product control group within
19   finance. So the initial marking of any book
20   including this book would be done by the front
21   office.
22    Q.   And does the front office include
23   the traders who trade these products?
24    A.   Yes. The front office would be
25   the traders.

Page 88

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     Q.   Column D is JP value.
3     A.   Yes.
4     Q.   And that's the value -- well, what
5    is that?
6     A.   That's the value that JPMorgan
7    were contributing to the securities on the
8    30th of September.
9     Q.   So both column C and column D are
10   30th of September values.
11    A.   That's correct.
12    Q.   Do you know when this particular
13   sheet, 87B, was prepared?
14    A.   There were -- again, there were
15   multiple versions of this as our understanding
16   of the assets developed. The -- until a final
17   version was produced which was shortly before
18   the annual report was produced.
19    Q.   When was the earliest version of
20   this document prepared, 87B?
21    A.   The earliest version in that form
22   would have been shortly after the 22nd of
23   December. Because we weren't able to -- the
24   appropriate value for us to include in our
25   books and records was the value of the

Page 89

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    inventory on the day we received the items,
3    being the 22nd of December.
4          Prior to that there were -- there
5    were understandings of what assets we were
6    expecting to receive and therefore preliminary
7    versions. But nothing which had data which
8    was struck to a date which would have been
9    appropriate for inclusion could have existed
10   before the 22nd of December.
11    Q.   The column C and column D are
12   values as of the 30th of September, right?
13    A.   Yeah.
14    Q.   Why was that date picked?
15    A.   It was picked largely for
16   practical reasons. It was a month-end. It
17   didn't have any significance for books and
18   records. Which was the primary purpose of
19   this spreadsheet.
20    Q.   Was there any discussion within
21   Barclays at valuing both doing a front office
22   value and a JP value of these JPM assets as of
23   the 22nd of September 2008?
24    A.   Sorry. I don't understand the --
25    Q.   Was there any discussion of doing

Page 90

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    the valuation as of the 22nd of September as
3    opposed to the 30th of September?
4        A.    There was discussion with auditors
5    as to what the appropriate date to include in
6    our books and records was for these. The two
7    dates -- the two relevant dates were the 22nd
8    of December and the 22nd of September.
9    Because you've got the transaction date and
10   you've got the date you receive the assets and
11   there's two different ways of viewing the
12   transaction from an accounting perspective
13   purely the decision which was reached was to
14   use the 22nd of December.
15       Q.    How did Barclays calculate its
16   front office values as of the 30th of
17   September for these assets which it did not
18   receive until the 22nd of December?
19       A.    I can talk to the general process
20   of valuation as at the date. In terms of how
21   the front office went about its -- how it went
22   about it in a historical sense, the processes
23   would have been the same and were the same.
24   But struck at a different date. We had the
25   items -- we had the identity of the items. So

Page 91

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    it's a case of valuing as at based off market
3    data which is relevant as of that date. So
4    I'm not sure if I'm understanding the
5    question.
6        Q.    I think towards the end of your
7    answer you answered it. So let me see if I
8    understand it.
9        A.    Yeah.
10       Q.    For the items that you received
11   from JPMorgan Chase on December 22nd, on or
12   about December 22nd, your traders went back to
13   market data to try to value those assets as of
14   the 30th of September; is that right?
15       A.    There had been previously drafts
16   of expected values which predated the 22nd of
17   December. And the 30th of September was a
18   date which was looked at on a consistent basis
19   as the understanding as to the identity of the
20   assets that we would receive changed. And
21   then when we reached the 22nd of December, the
22   22nd of -- the valuation as of the date the
23   items were received were updated and were
24   focused upon. There was not a great deal of
25   focus on the 30th of September values at that

Page 92

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    time because their significance at that time
3    was marginal.
4        Q.    Again, just so I understand what
5    you're telling me, are you saying that you
6    knew as early as the 30th of September the
7    list of assets that you eventually received on
8    December 22nd?
9        A.    No.
10       Q.    No. When did you first know what
11   specific assets you would be receiving from
12   JPMorgan Chase?
13       A.    I'm not sure what date that that
14   was absolutely finalized.
15       Q.    So, again, I'm going back to this
16   process that was followed in coming up the
17   with the column C values which is the front
18   office values. Was it a process where your
19   traders in December, sometime in December got
20   a list of the JPMorgan Chase assets by CUSIP
21   number and went back to historical pricing
22   data to try and price those as of the 30th of
23   September?
24       A.    That's correct.
25       Q.    Okay. And just focusing on that

Page 93

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    exercise, why didn't they price them as of the
3    22nd of September? For that column, column C.
4        A.    That exercise wasn't done for the
5    first time until the 22nd of December. The
6    understanding as to the items would have
7    changed as understanding as to what items
8    would be received changed in the days and
9    weeks preceding the 22nd of December. So it
10   wasn't a new process, let's value them on the
11   30th of September, on the 22nd of December.
12   That wasn't the first time where people were
13   looking at that. Over the period -- over the
14   period from the acquisition date up until the
15   22nd of December there was an ongoing process
16   to try and get a handle on what value - what
17   assets and what value of assets we would end
18   up receiving. And that was again an iterative
19   process. This just represents a part of that
20   being two month-end values and the actual
21   value that we received.
22       Q.    Let me try it another way.
23             Was September 30th the month end
24   picked because there was better or more
25   complete pricing data available as of the 30th

Page 94

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2 of September as opposed to the 22nd of
3 September?
4     A.  I'm not sure.
5     Q.  And do you have any sense
6 generally whether this collection of assets
7 you received from JPMorgan Chase increased in
8 value or decreased in value from the 22nd of
9 September to the 30th of September?
10     A.  I don't have a great sense of the
11 sense which is created by the summary.  The
12 values for the 30th of September were not
13 items that I particularly focused on because
14 from the point of the view of the process of
15 valuing being -- the point of view of valuing
16 the portfolio, the important number was the
17 most up to date number.
18     If you're looking at previous
19 month ends, say the 31st of October or the
20 30th of November, as time was progressing,
21 then at that time it was -- the interesting
22 thing would be based on our assessment of what
23 assets we expect to receive, what they'd be
24 worth at that time, at the point in time we're
25 setting because we didn't know when we

Page 95

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2 received them so the 22nd of December wasn't a
3 date which had any significance for us earlier
4 than that.  So we were constantly updating our
5 best estimate of the value we expected to
6 receive.
7     So there were values done of this
8 portfolio or our best estimate of this
9 portfolio on a number of dates preceding that
10 as time progressed.  And this was the last one
11 because this was the one that corresponded
12 with the date that we received them.
13     Q.  Just help me trace your -- trace
14 the connection between 87B and 377A.  You
15 could use line items or page numbers.
16     A.  Sure.
17     Q.  I just want to see where the
18 numbers, if they do, from 87B track onto the
19 spreadsheet that's 377A.
20     A.  The tracking is the cell E-18 from
21 37B.
22     Q.  So that's 3.9 billion and change.
23     A.  Yeah.
24     Q.  All right.
25     A.  That feeds through to -- the

Page 96

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2 easiest one to look at is actually the one
3 which is numbered 844.  That feeds through to
4 cell C-8.  And then cell G-18 is a component
5 of cell C-12.
6     MR. SHAW:  Just so we're clear,
7     when you said G-18 you were talking
8     about on 87B and when you were talking
9     about C-12 you were talking on the
10     second page of 377A?
11     THE WITNESS:  That's correct.
12     Q.  Okay.  So the -- looking at 87B,
13 the cell you pointed me to was E-18.
14     A.  Yes.
15     Q.  That's the column dated 22
16 December 2008 BCG value, correct?
17     A.  Yes.
18     Q.  And the total number is 3.916
19 billion and change, right?
20     A.  (Witness nods.)
21     Q.  And when you go over to the
22 acquisition balance sheet which is
23 Exhibit 377A on the second page in column --
24 in cell C-8, the number of 3.92 is just a
25 rounded up 3.916, correct?

Page 97

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2     A.  That is correct.
3     Q.  There is in the acquisition
4 balance sheet a line item for valuation
5 adjustment which is a negative $2.09 billion
6 number, correct?
7     A.  Yes.
8     Q.  And what you have also told me is
9 for the JPMorgan Chase assets there is an item
10 number which is G-18 which is $176 million.
11     A.  Yeah.
12     Q.  That is also part of the 2.09
13 valuation adjustment.
14     A.  That's correct.
15     Q.  All right.  Okay.  So on your
16 acquisition balance sheet, the JPM inventory
17 which is line 8, that is being valued as of
18 December 12th, 2008, correct?
19     A.  December 22nd.
20     Q.  Sorry.  December 22nd, 2008.
21     A.  That's correct.
22     Q.  You're right, yeah.
23     The line item which is 7 on your
24 acquisition balance sheet which states Initial
25 Inventory, that is being valued as of the 22nd

Page 98

G. ROMAIN - HIGHLY CONFIDENTIAL

1    of September, 2008, correct?
2    A.    Yes.
3    Q.    And those valuations and the other
4    items on your acquisition balance sheet roll
5    up to the negative goodwill item of
6    4.7 billion, correct?
7    A.    Those items are part of the net
8    assets which contribute towards the negative
9    goodwill calculation, yes.
10    Q.    And if I go to the first page of
11    Exhibit 337A, which is a form of the
12    acquisition balance sheet, that was used for
13    disclosure purposes, correct?
14    A.    Yeah.
15    Q.    On that first page of
16    Exhibit 377A, the values for the assets are as
17    of those different dates that we've talked
18    about. Some of those assets are valued as of
19    the 22nd of December and some of them are
20    being valued as of the 22nd of September.
21    A.    That's correct.
22    Q.    All right. Other than those two
23    dates, are there any other dates as of which
24    assets were valued for purposes of your

Page 99

G. ROMAIN - HIGHLY CONFIDENTIAL

1    acquisition balance sheet?
2    A.    No.
3    Q.    Let's take a look at 86B which --
4    I'm sorry. Let's stay with 87B for a minute.
5    A few other items here.
6    Column E on 87B which is BCG
7    value, what's that? The product control
8    group?
9    A.    Yes. That's correct.
10    Q.    And what is that? An internal
11    independent price valuation group of some
12    type?
13    A.    Yes. That's the mid price value
14    that resulted from the process of product
15    control price testing front office values. So
16    that was the end agreed Barclays value. The
17    mid price.
18    Q.    And just to be clear, what that
19    process was, the obtaining of the BCG value,
20    could you describe how just mechanically the
21    process that's followed within Barclays to
22    come up with those BCG values. Go from the FO
23    values, the front office values, to the BCG
24    values.

Page 100

G. ROMAIN - HIGHLY CONFIDENTIAL

1    A.    Yeah. So the front office will
2    mark their assets -- the traders who trade the
3    assets and are closest to it for that purpose,
4    that's the same process that we followed on a
5    business as usual basis for all assets, all
6    trading assets which are held by Barclays
7    Capital.
8    Those valuations would then be
9    considered by price testing group which
10    resides within product control. They would
11    test those prices by reference to observe for
12    market data and indices and close proxies and
13    broker quotes and other sources of independent
14    information which will differ according to
15    asset class and security type.
16    The difference between those two
17    values would be assessed and discussed and a
18    consensus value will be included on the
19    balance sheet.
20    Q.    The next column over, F, is MV
21    with liquidity which is market value with
22    liquidity; is that right?
23    A.    Yes. That's the market value
24    stated at bid price. So under accounting

Page 101

G. ROMAIN - HIGHLY CONFIDENTIAL

1    standards we're required to measure assets at
2    bid so our best estimate of exit price. And
3    that's what column F is. And that's the net
4    number which feeds into the acquisition
5    balance sheet and therefore the negative
6    goodwill calculation and financial statement
7    disclosures.
8    Q.    At the bottom section of this
9    spreadsheet, 87B, is titled Entity Level
10    Breakdown.
11    Do you see that?
12    A.    Yeah.
13    Q.    Could you describe briefly what
14    information is being shown in that section of
15    the spreadsheet.
16    A.    Yeah. That's the allocation of
17    the items between two legal entities.
18    Q.    Okay. What are those two legal
19    entities?
20    A.    LMBR is BBPLC is part of a branch
21    of that. And LIICT is a separate entity whose
22    full name -- I can't recall its full name off
23    the top of my head. It was another
24    wholly-owned subsidiary of the Barclays group.

Page 102

```
1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    I can't recall the full name.
3         Q.   Okay.  If you look at 337A which
4    is the acquisition balance sheet --
5         A.   Yeah.
6         Q.   -- and if you look at the second
7    page, line 8 which is the JPM inventory, we
8    earlier looked at cell C-8 which is the BCG
9    value number, the 3.92, correct?
10        A.   Yes.
11        Q.   And if you read across that line,
12   that 3.92 number is allocated between BCI,
13   right?  .69 is allocated to BCI?
14        A.   I have misspoke.  The LMBR relates
15   to BCI not to BBPLC.
16        Q.   All right.  And the remainder,
17   3.23 billion, is allocated to column N as in
18   Nancy, 3.23.
19             Do you see that?
20        A.   Yes.
21        Q.   And that's a Cayman -- that's
22   Cayco is what it's called?
23        A.   Yeah.  That was a shorthand.  That
24   wasn't its full name.  That's the main reason
25   why I can't recall the full name of it because
```

Page 103

```
1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    I was used to referring to it in shorthand as
3    Cayco.
4         Q.   What can you tell us about what
5    Cayco is?
6         A.   It's a subsidiary of Barclays
7    Group.
8         Q.   Is it a Cayman Islands company?
9         A.   It was certainly going to be set
10   up in the Caymans which is why it was referred
11   to as Cayco.  My recollection is that's --
12   yeah, my recollection is that is what happened
13   here.
14        Q.   And just to be clear, the BCI
15   where .69 of the 3.9 billion is allocated,
16   that's the US broker/dealer, correct?
17        A.   That's correct, yes.
18        Q.   Let's turn to 86B.
19             86B is Schedule A and Schedule B,
20   correct?
21        A.   86B is -- yeah, it's the inventory
22   which was received -- it's the inventory which
23   was received the weekend of the 21st and the
24   days preceding that.
25        Q.   Does 86B include any inventory
```

Page 104

```
1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    that you expected to receive but have yet not
3    received?
4         A.   No.  This spreadsheet is the
5    valuation of the inventory we did receive.
6         Q.   And I apologize if I've asked you
7    this before.  Other than 86B and 87B, are you
8    aware of any other inventory that you're
9    expecting to receive that you haven't yet
10   received?
11        A.   In addition to 86B and 87B?
12        Q.   Yes.
13        A.   Yes, I am.
14        Q.   Okay.  And what is that other
15   inventory?
16        A.   Items from the LBI clearance boxes
17   which has not yet been transferred to
18   Barclays.
19        Q.   And so those items have not been
20   included in your calculations in 86B and 87B;
21   is that correct?
22        A.   That's correct.
23        Q.   And, therefore, they haven't --
24   well, maybe not therefore.  And they have not
25   been included in your acquisition balance
```

Page 105

```
1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    sheet, Exhibit 377A?
3         A.   That's not correct.
4         Q.   Okay.  So where on 87 -- on 377A
5    have you provided for items that you expect to
6    receive but, in fact, have not yet received?
7         A.   To the extent that they have been
8    recognized they are included in cell C-11.
9         Q.   And that's an item of about 700
10   million, correct?
11        A.   Yes.
12        Q.   And it's titled Additional
13   Unencumbered Assets?
14        A.   Yes.
15        Q.   And now setting those aside, what
16   else is there in terms of collateral that you
17   expect to receive, have not yet received, and
18   haven't accounted for in your acquisition
19   balance sheet?
20        A.   And haven't accounted for.
21        Q.   Have not accounted for.
22        A.   There are further unencumbered
23   assets which we commonly refer to as list B-2
24   and C which were not included in cell C-11 of
25   the second page of 377A in terms of other
```

Page 106

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    assets that have not been recognized.
3        There is also collateral raised
4    futures positions held in Lehman affiliates
5    which has not been recognized. There is --
6    actually, would it be possible to refer to
7    those notes? I'm sure there are two smaller
8    items -- there are four items which I -- I'm
9    aware there are four items. That's two of
10   them. There are two other items which I can't
11   immediately recall.
12       Q.   And the notes that you're
13   referring to are the notes that were handed
14   over to us this morning.
15       A.   Yes.
16       Q.   Is it your handwritten notes?
17       A.   Yes.
18       (Deposition Exhibit 399A,
19   handwritten notes, marked for
20   identification as of this date.)
21       A.   Oh, yes. So the principal and
22   interest on --
23       Q.   Hold on one second. Let's just
24   get --
25       A.   Sure.

Page 107

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.   I've handed you an exhibit which
3    has been marked as 399A. Are those the notes
4    that you were referring to?
5        A.   They are.
6        Q.   Okay. And if you could state for
7    the record what the other items are. The
8    other two items are.
9        A.   The other two items are principal
10   and interest on the unencumbered assets which
11   are summarized in cell C-11 of Exhibit 377A.
12   And also -- and also collateral against
13   customer positions which held in the form of
14   letters of credit were not recognized for
15   accounting purposes.
16       Q.   Just on your notes, where in your
17   notes are you? This is page 1 of your notes,
18   right?
19       A.   Yes. It's the second -- it's the
20   second bullet. So I've just been through the
21   four subbullets of the second bullet.
22       Q.   And the second bullet just to be
23   clear is titled Assets Not Received Not on
24   Balance Sheet, Not on BS.
25       A.   Yes.

Page 108

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.   That's it.
3        A.   Yes.
4        Q.   And your estimate of the value of
5    those four items is 765 million and then you
6    have a provision, correct?
7        A.   The provision is against those
8    items. They're two separate items.
9        Q.   Okay. So the valuation then -- or
10   your estimate of the valuation of those four
11   items is 765 million?
12       A.   Yes.
13       Q.   And, again, just to be clear,
14   those do not appear -- that item, 765 million,
15   is not included on your acquisition balance
16   sheet, Exhibit 377A, correct?
17       A.   Correct.
18       Q.   And it's not part of 86B and 87B.
19       A.   That's correct.
20       Q.   Okay.
21       All right. 86B. There are two
22   parts of the first page of Exhibit 86B that I
23   want to draw your attention to. There appears
24   to be a valuation and calculation as of the
25   22nd of September which goes from line 1

Page 109

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    through line 30; is that right?
3        (Document review.)
4        A.   Yes.
5        Q.   And then starting on line 32 down
6    to line 45, if I'm reading this correctly,
7    this appears to be a valuation or a
8    calculation as of 9 January, '09; is that
9    correct?
10       A.   No. It's a valuation as at 22nd
11   of September but they're two slightly
12   differing versions. One is between rows 3 and
13   14 and the other is between 32 and 44. There
14   were a couple of individual adjustments which
15   needed to be made which are summarized in
16   those 27 to 30.
17       But the valuations are -- for
18   financial reporting purposes that net
19   difference which is 57 million from cell E-30
20   is not particularly material.
21       Q.   And in connecting 86B and 377A,
22   which cells on 86B roll up into the second
23   page of 377A?
24       A.   So the ones in row 14.
25       Q.   And so those would be D-14 and

28

Page 110

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    F-14?
3          A.   That's correct.  As I said, there
4    were some immaterial adjustments but if you
5    were to -- there were some immaterial
6    adjustments which were made at the last minute
7    but at a material level the cells D-14 and
8    F-14 are the ones which roll up into the
9    acquisition accounting in our financial
10   statements.
11         Q.   The differential between the
12   values in the -- in column D, BCG value, and
13   the column E, Market Value 9/22, that's again
14   pricing at the bid.  Is that the reason for
15   the differential?
16         A.   Yes.  It's the bid/offer
17   differential, yes.
18         Q.   The differential between column C
19   and column D, do you know why there's a
20   differential there?
21         A.   The column C values don't feed
22   into our financial reporting.  They were
23   values which were ascribed to the securities
24   by the custodian whereas we are required to
25   value them by asset class according to

Page 111

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    relevant accounting standards and in line with
3    valuation methodology used for other similar
4    assets already owned by the bank.  So the
5    important numbers from our financial reporting
6    perspective are those between D and F rather
7    than what the custodian may have attributed to
8    them.
9          Q.   You told us earlier that this
10   document, 86B, you confirmed that this was the
11   final version that rolled up into your
12   disclosure document, correct?
13         A.   Yes.
14         Q.   When was the first version of 86B
15   created?
16         A.   The form of it changed and evolved
17   over time.  So this is the final
18   representation of valuation process which was
19   ongoing from the time of the acquisition.  The
20   spreadsheet in which that process was embodied
21   may have been simpler or different at various
22   stages through that time.  But it was an
23   evolution.
24         Q.   And if I understand the way this
25   spreadsheet works, 86B, there is in fact CUSIP

Page 112

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    level valuation data that rolls up into each
3    of these categories, line 3, line 4, line 5,
4    et cetera; is that correct?
5          A.   That's correct.
6          Q.   Now, some of the collateral that
7    was transferred over to Barclays on the 18th,
8    19th and that time period of September 2008,
9    some of that's been sold, correct, by
10   Barclays?
11         A.   Some of it, yes.
12         Q.   Okay.  How, if at all, has the
13   value at which assets were sold been reflected
14   in this spreadsheet?
15         Let me just rephrase that.
16         Is the price obtained by Barclays
17   on the sale of assets that were acquired from
18   Lehman, is that reflected on this spreadsheet?
19         A.   Not directly.  What I would say is
20   that there are various levels of liquidity
21   embodied in the various underlying assets.  So
22   you've got very liquid and frequently traded
23   positions whereby they could be valued in a
24   straightforward manner by reference to
25   observed market data for the 22nd of

Page 113

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    September.
3          And then there are less liquid
4    assets which trade very infrequently and for
5    which is there not much market data for those
6    assets.
7          In order to arrive at a 22nd of
8    September valuation you'll be looking at a
9    number of things, transactions in similar
10   assets, recent transactions in assets, et
11   cetera.  And for those -- assets of those
12   types, the price at which assets were sold
13   shortly after may be a factor which would be
14   taken into account because it may be
15   additional evidence as to what the appropriate
16   mark was for the 22nd of September.
17         But if those prices are used, then
18   they are used only as evidence to try to
19   improve the estimate of value on the 22nd of
20   September.  And, therefore, would be adjusted
21   for any changes in circumstances or market
22   conditions between the 22nd of September and
23   the dates of sale.
24         So the simplest answer is, no,
25   they're not reflected at all directly.  But

Page 114

1     G. ROMAIN - HIGHLY CONFIDENTIAL
2  the more -- the more accurate answer is that
3  for illiquid assets sales may factor into the
4  valuations as one part of the consideration of
5  the right price.
6     Q.  Okay.  They may factor in and, in
7  fact, were factored in for certain CUSIPs.
8     A.  I don't have a sense of to what
9  extent those sales did feed in because that's
10 getting down to a more CUSIP-by-CUSIP
11 level consideration.
12       In terms of the general process,
13 for the more liquid securities to the extent
14 they were sold, yes, they would have been
15 taken into account.  But to get an accurate
16 sense of whether that occurred in any material
17 sense it would be necessary to talk to the
18 relevant asset class experts.
19    Q.  The liquidity value column, column
20 F, BCG Liquidity Value, in effect the numbers
21 that appear there are basically column D minus
22 column E, correct?
23    A.  Yes.  That's the bid/offer
24 adjustment.
25    Q.  But if I understand your last --

Page 115

1     G. ROMAIN - HIGHLY CONFIDENTIAL
2  your prior answers, that's not just the
3  bid/offer adjustment, correct?
4     A.  No.  That is just the bid/offer
5  adjustment.
6     Q.  Okay.  So any adjustments that are
7  made on account of sales and price discovery
8  through sales of assets, are they not
9  reflected in column F?
10    A.  They would be reflected.  Any
11 adjustments to mid price that are required to
12 get to bid are included in that column for
13 whatever reason based on whatever evidence.
14    Q.  So you would reflect the bid/offer
15 adjustment where you didn't transact but where
16 you had a bid and offer you would price it at
17 the bid, correct?
18    A.  All of the securities included
19 there are priced at the bid.
20    Q.  And in those instances where you
21 actually had a transaction in the weeks
22 subsequent to acquiring the assets, and you
23 sold the asset, you actually executed as a
24 particular price, you would use that as the
25 price or at least that would factor into your

Page 116

1     G. ROMAIN - HIGHLY CONFIDENTIAL
2  analysis of the appropriate price?
3     A.  It may do.  Depending on other
4  evidence which is available in order to get to
5  the right bid price.
6     Q.  Do you have any understanding as
7  to why the PCG values in column D were
8  different from the BoNY values in column C?
9     A.  No.
10       MR. TAMBE:  We could break for
11 lunch.
12       MR. SHAW:  Forty-five minutes?
13       MR. TAMBE:  Forty-five minutes.
14       (Luncheon recess taken at 12:28
15 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 117

1     G. ROMAIN - HIGHLY CONFIDENTIAL
2        A F T E R N O O N   S E S S I O N
3        (Time noted:     1:22 p.m.)
4  G A R Y   R O M A I N,   resumed and
5     testified as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. TAMBE:
8     Q.  I understand, Mr. Romain, you
9  wanted to clarify or add to one of your
10 answers before the lunch break?
11    A.  Oh, yes.  That's correct.  When we
12 were talking about the securities which come
13 across, I was asked about whether any which
14 have not been received by Barclays were
15 included on the acquisition balance sheet and
16 I directed you towards the additional
17 unencumbered assets on to which is cell C-11
18 in the second page of Exhibit 377A.
19       I want to clarify, that is not the
20 only asset on the acquisition balance sheet
21 which had not been received by Barclays.
22 There's four types of which that is one.  But
23 the four -- they're actually -- they're
24 summarized in the four bullets on the top of
25 the first page of Exhibit 399A.  So there's

Page 118

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  futures collateral held from brokers. There's
3  the OCC collateral largely in the form of
4  government securities. There's the
5  unencumbered assets item. And there's also
6  the amount of $769 million receivable from
7  15(c)(3) or equivalent tax. So to be
8  complete, that's the sum of the assets
9  included on the acquisition balance sheet
10 which are not in physical possession of
11 Barclays.
12     Q.  Okay. And other than C-11, where
13 else would you find on this acquisition
14 balance sheet, which is the second page of
15 377A, those items?
16     A.  So the first item, the futures
17 collateral is included in item C-17.
18     Q.  Futures customer balances.
19     A.  That's right.
20         The second item, OCC collateral,
21 is included in item C-18. The unencumbered
22 assets we talked about as being item C-11.
23 And the 15(c)(3) or equivalent is item C-15.
24     Q.  In your handwritten notes,
25 Exhibit 399A, you have a bracket and the words

Page 119

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  app 3 billion.
3         Do you see that?
4     A.  Yes.
5     Q.  So approximately $3 billion of
6  asset value on the acquisition balance sheet
7  is attributable to these four categories of
8  assets not received.
9     A.  That's correct.
10    Q.  All right. And if you look at the
11 line items on 377A, C-11 is -- is the entirety
12 of that cell comprised of assets not yet
13 received?
14    A.  Yes.
15    Q.  How about the 15(c)(3) assets?
16    A.  Yes.
17    Q.  So none of that has been received
18 by Barclays as yet.
19    A.  That's correct.
20    Q.  The futures customer balances?
21    A.  That's a mixture. Some of that
22 has been received and some of that has not.
23    Q.  Okay. And then the OCC customers
24 on clearing margin?
25    A.  That item's actually easier to see

Page 120

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  on the following page where it's shown gross
3  because that item is the net of the collateral
4  balances and the fair value of the derivative
5  positions.
6         The collateral balance is item
7  F-16 and item F-26. There's no distinction
8  between those two lines items other than
9  historically I had one number and then I added
10 another number until I realized quite shortly
11 into the process that I was actually looking
12 at a single number.
13         So the total of 2.29 is partly
14 received and partly not received.
15    Q.  Okay. Just so I follow through
16 then on that, on the acquisition balance sheet
17 on page 2 of Exhibit 377 for OCC customer and
18 clearing margin you have an amount of .98.
19    A.  Yes. .98 directly feeds through
20 from cell F-26.
21    Q.  On the next page.
22    A.  Yes.
23    Q.  Page 845?
24    A.  Whereas the item, 0.21 is the net
25 of item F-16 and item F -- E-42. Sorry.

Page 121

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2     Q.  And where does that show up on the
3  acquisition balance sheet? Is that C-14?
4     A.  The net of F-16 and E-42 on the
5  third page shows up in item C-14.
6     Q.  Exchange traded options.
7     A.  Yes.
8     Q.  And C-14, that's an amount
9  actually received by Barclays.
10    A.  The -- C-14 is the net of two
11 items from the point of view of the gross
12 balance sheet. It's split up principally into
13 a valuation because qualitatively it's a
14 different process to value the open exchange
15 derivative positions as opposed to valuing the
16 cash and securities which represent the margin
17 against those positions.
18         So the item really to look at --
19 or the items to look at are F-16 and F-26.
20 The total of that is the total of the customer
21 margin against OCC positions and some of that
22 total, 2.29, has been received and some has
23 not.
24    Q.  And how much has not been
25 received?

Page 122

G. ROMAIN - HIGHLY CONFIDENTIAL

A.    It's approximately a billion
dollars.

        (Deposition Exhibit 400A, document
        bearing production numbers
        BCI-EX-(S)-00024451 through
        BCI-EX-(S)-00024455, marked for
        identification as of this date.)
BY MR. TAMBE:

Q.    Mr. Romain, we're back to a
non-30(b)(6) topic. I've placed before you
Exhibit 400A. Take a moment to review and it
let me know when you're done.

        (Document review.)

A.    Okay.

Q.    And you'll see there's a cover
e-mail from Patrick Clackson to you.

A.    Um-hum.

Q.    Which is forwarding the attachment
to this document, Exhibit 400A.

        Do you see that?

A.    Yes.

Q.    And is the attachment a document
you're familiar with?

A.    It's a document I remember seeing,

Page 123

G. ROMAIN - HIGHLY CONFIDENTIAL

yes.

Q.    And the last page of this exhibit
which is titled Appendix B, Preliminary
Balance Sheet, is that a document that you
prepared?

A.    I can't tell if there's been any
amendment to it but it is essentially a
document I prepared, yes.

Q.    And this is an e-mail dated
September 22nd, 2008. Both the e-mails on the
first page are as of that date.

        Do you see that?

A.    Yes.

Q.    The 22nd was the Monday following
the Lehman bankruptcy filing. On that day
what was your source of information for the
items that appear on this last page of
Exhibit 400A?

A.    I don't recall the source at that
time. This was another version of the
iterative balance sheet that was developing
over the period. The iteration at any given
date was based on the best information I had
available at the time.

Page 124

G. ROMAIN - HIGHLY CONFIDENTIAL

Q.    Does the valuation adjustment line
if you see up in the asset allocation -- do
you see it?

A.    Yes.

Q.    That's a negative $2.83 billion
number?

A.    Yes.

Q.    On the 22nd of September your BCG
group had not gone through and done any kind
of valuation adjustment, correct?

A.    I can't recall if it's accurate to
say they had done nothing. It's fair to say
that the detailed valuation work that was
required to get to the end valuations had not
yet occurred.

Q.    Do you have any understanding as
to how that adjustment number of 2.83 billion
was arrived at on Monday the 22nd of
September?

A.    No.

Q.    I understand from other e-mails
that Stephen King may have been the source of
that number. Is that your understanding?

A.    I don't recall if that number was

Page 125

G. ROMAIN - HIGHLY CONFIDENTIAL

sourced from Stephen or otherwise.

Q.    You know Stephen, correct?

A.    I do, yes.

Q.    And what role did he play at
Barclays at this point in September of '08?

A.    So he was a senior trader within
the PMCG group and was one of the people in
the front office that was most involved with
the -- with the acquisition from a business
perspective and he was one of my main contacts
from a business perspective during the entire
process.

Q.    And did you have any discussions
with Stephen as early as the 22nd about
valuation adjustments to the inventory that
had come over?

A.    I don't recall precise dates of
conversations I had with him. I was certainly
having conversations with him throughout the
process to work on ensuring that the
acquisition balance sheet I would be treating
it at any time was as accurate as I could make
it.

Q.    We could probably move to the side

Page 126

```
1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   for now 87B, your handwritten notes, and the
3   other stuff.  But keep 400A, the document we
4   were just looking at handy.  And especially
5   the last page of 400A.
6            (Pause on the record.)
7            (Deposition Exhibit 401A, document
8        bearing production numbers
9        BCI-EX-(S)-00052667 through
10       BCI-EX-(S)-00052668 with attachment,
11       marked for identification as of this
12       date.)
13  BY MR. TAMBE:
14       Q.   I've handed you a three-page
15  document marked Exhibit 401A.  Take a moment
16  to look at it and let me know when you are
17  done.
18           (Document review.)
19       A.   Okay.
20       Q.   And this is an e-mail from you to
21  Rich Ricci and others.  Do you see that?
22       A.   Yes.
23       Q.   And you're attaching another
24  iteration of the acquisition balance sheet,
25  correct?
```

Page 127

```
1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        A.   Yes.
3        Q.   And you state in your e-mail "The
4   $2.83 valuation adjustment is S. King's first
5   cut only."
6            Do you see that?
7        A.   Yes.
8        Q.   If you could turn to the balance
9   sheet which is the last page of Exhibit 401A.
10       A.   (Witness complies.)
11       Q.   And if we compare it to the
12  balance sheet we were looking at which is
13  400A, both of these are -- the cover e-mails
14  are 22nd September 2008.  It looks like
15  Exhibit 401 is a little bit later in the day
16  than Exhibit 400.  You could confirm that for
17  yourself.
18       A.   Yeah.  They're both on the same
19  date and, yes, they're the e-mails from
20  slightly different times during the day, yes.
21       Q.   Right.  And 401 is after 400,
22  correct?
23       A.   Yes.
24       Q.   There's a couple of changes that I
25  want to bring to your attention.  One is on
```

Page 128

```
1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   Exhibit 401A, you have a line item now for
3   Friday P&L approximately.
4            Do you see that?
5        A.   Yes.
6        Q.   And so that's reflecting a Friday
7   profit and loss number?
8        A.   That's what Friday P&L stands for,
9   yes.
10       Q.   And that's a number of about
11  $200 million.
12       A.   Yes.
13       Q.   What is your understanding of what
14  that entry referred to?
15       A.   I don't recall putting together
16  this precise version.  The item is included as
17  part of the calculation of fair value based on
18  best information at the time.  But in terms of
19  how precisely it fit into that calculation I
20  don't have a clear recollection.
21       Q.   The valuation adjustment number
22  is the same as before, the 2.83 billion
23  negative.
24            Do you see that?
25       A.   Yes.
```

Page 129

```
1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.   And there's a note associated with
3   that adjustment, note 5.
4        A.   Yes.
5        Q.   And in Exhibit 401A note 5 states
6   Trades are initially booked at BoNY prices.
7   2.83 billion is initial estimate of the
8   adjustment Barclays' marks.
9            Do you see that?
10       A.   Yes.
11       Q.   And, again, do you know what
12  process was followed in coming up with this
13  $2.83 billion number on the 22nd?
14       A.   That would have been -- or was an
15  early estimate of the adjustment that would be
16  required to get the inventory to the 42.55
17  number which would have been the best
18  estimates of the prior bid price at that time.
19  As talked about, these numbers were moving
20  frequently during this period as additional
21  information was acquired.
22            But that's what the 2.83 -- that's
23  the purpose of the 2.83 was fulfilling in that
24  calculation there at that time.
25       Q.   Okay.  And I could see
```

Page 130

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     mathematically how the 2.83 sort of gets
3     subtracted from the 45.18 but what's the
4     process that yields the 2.83? Is it CUSIP by
5     CUSIP? Is it by asset category? Is it an
6     estimate of the entire portfolio? How is that
7     done? Back at that point in time.
8         A.   Back at that point in time I don't
9     have clear understanding of the process that
10    Stephen went through to get that initial cut.
11    It was understood at that time that we were
12    working on provisional numbers and a
13    provisional understanding of the assets. And
14    that a great deal of work involving Stephen
15    King and front office but also finance price
16    testing and discussion with PwC, our auditors,
17    would be required before we got to a number
18    which was sufficiently verified to be included
19    in our financial statements.
20        Q.   I understand, Mr. Romain, that you
21    probably went through a lot of additional
22    steps before you put anything in your reported
23    financial statement. I really am focusing on
24    that date, the 22nd of September, the
25    transaction has closed that morning. I just

Page 131

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     want to know if you know what process was
3     followed in arriving at that estimate that
4     morning.
5         A.   I don't know, no.
6         Q.   If you'd look down in
7     Exhibit 4012A, below the net asset calculation
8     there are line items -- I'm sorry -- below the
9     total asset calculation, there are line items
10    for repo liability, cure, retention, bonus.
11        Do you see that?
12        A.   Yes.
13        Q.   And if you compare the entries for
14    cure and bonus accrual on Exhibit 401A to
15    those same items on 400A you'll see different
16    entries, right?
17        A.   Yes, yes.
18        Q.   So the cure payment which was
19    reflected at 2.25 in Exhibit 400A in
20    Exhibit 401A is .8 billion.
21        Do you see that?
22        A.   Yes.
23        Q.   And do you know a reason for why
24    that number changed on the 22nd of September?
25        A.   Well, at that time when I was

Page 132

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     putting together the acquisition balance
3     sheets, I didn't have an understanding as to
4     what cure payment was or what the nature of
5     our obligation was. So there were initial
6     placeholder numbers included for that as well
7     as a number of other items. The source of
8     those numbers I don't recall precisely now but
9     I do recall that they were moving quickly as I
10    had discussions with people who had an
11    understanding of the terms of the
12    acquisition -- the terms of the acquisition in
13    that regard and better understood the
14    appropriate item -- the appropriate quantum to
15    be included.
16        The cure in particular had two
17    sources of uncertainty which persisted for
18    some time. The first was uncertainty as to
19    amount which was an exercise by which we
20    needed to identify which contracts we'd be
21    accepting and therefore which cure payments
22    would be paid.
23        And the second was a question of
24    accounting treatment under appropriate
25    accounting standards because in acquisition

Page 133

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2     accounting you're required to include only
3     obligations that you take on. And there is a
4     way of viewing the cure payments which
5     would -- and which would imply that we should
6     not recognize any cure payments as an accrual
7     in the acquisition balance sheet because we
8     had no obligation to accept any contracts.
9         That was an issue which was
10    discussed for some time with PwC. That
11    discussion was running parallel with the
12    separate consideration of how much cure we
13    thought we'd end up paying. The end
14    resolution of that was that we felt that the
15    appropriate interpretation of accounting
16    standards would require us to include our best
17    estimate for cure payments in the acquisition
18    balance sheet and that's what we ended up
19    doing.
20        Q.   And by the time you end up
21    disclosing your financial statements for the
22    acquisition, did you ultimately use the
23    financial number that was actually paid out by
24    Barclays for cure?
25        A.   By the time we -- by the time we

Page 134

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  published our financial statements the process
3  was not quite complete but very substantially
4  complete. So the amount we included as an
5  accrual was $224 million. My recollection is
6  that by the time we reached financial
7  statements we paid very close to that amount
8  and there was a small amount which we were
9  intending still to pay. And when I revisited
10  it in the middle of this year the difference
11  between what we paid and what we recognized in
12  our financial statements was very small. A
13  quantum of less than a million dollars as I
14  recall.
15      Q.   Okay. And as you compared 400A
16  and 401A, the net asset number in 401A is
17  $4.52 billion, correct?
18      A.   Yes.
19      Q.   And that's up from 3.67 billion in
20  Exhibit 400A.
21      A.   Yes.
22      Q.   I've handed you, sir, a document
23  previously marked as Exhibit 361A. Take a
24  moment to review it and let me know when
25  you're done.

Page 135

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2      (Document review.)
3      MR. WOOD:  Can I just note on the
4  record that I think this same document
5  has also been marked as Exhibit 384 in
6  another deposition.
7      (Document review continuing.)
8      A.   Okay.
9      Q.   And sir, do you recognize this as
10  a forward of your e-mail that we were just
11  looking at, Exhibit 401A, by Mr. Clackson to
12  Rich Ricci and so on?
13      Do you see that?
14      A.   Yes.
15      Q.   And you can confirm this for me
16  but it appears to me that the attachment to
17  Exhibit 361A, the acquisition summary,
18  although the printout is a little different I
19  believe it's the same spreadsheet as 401A but
20  correct me if I'm wrong.
21      A.   Yes. Yes, it is.
22      Q.   Now, if you focus on Mr.
23  Clackson's e-mail to Rich Ricci forwarding
24  this draft balance sheet, he states, "So some
25  things we have to keep working on to squeeze

Page 136

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  out what we can, but looks more like 3 to 3.5
3  rather than 4 plus."
4      Do you see that?
5      A.   Yes.
6      Q.   What's he referring to with the 3
7  to 3.5 rather than the 4 plus?
8      MR. SHAW:  Objection, foundation.
9      A.   I don't know.
10      Q.   Was it your understanding that
11  there was a target negative goodwill number
12  that you were looking to achieve?
13      A.   No.
14      Q.   That wasn't your understanding.
15      A.   No, that wasn't my understanding.
16      Q.   Did you have an understanding as
17  to any target goodwill number?
18      A.   No.
19      Q.   Rich Ricci responds to Patrick
20  Clackson by saying, "What have we told Group?"
21      Do you see that?
22      A.   Yes.
23      Q.   Do you understand what the
24  reference to "group" there is?
25      A.   I don't -- I don't know what he

Page 137

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  means. Typically when we refer to group we
3  mean Barclays Group.
4      Q.   Putting this exhibit aside, at
5  this time period, early the week of the 22nd,
6  were you party to any discussions about trying
7  to achieve a negative goodwill number that
8  coincided with the negative goodwill number
9  that had been set out in the Barclays board
10  presentations the prior week?
11      A.   No.
12      Q.   Was there any concern about not
13  achieving the negative goodwill number that
14  had been disclosed to the board?
15      MR. SHAW:  Objection, foundation.
16      A.   Not that I was aware of.
17      Q.   Sir, I've handed you what's been
18  previously marked as Exhibit 385. If you
19  could take a moment to review that e-mail
20  chain and let me know when you're done.
21      (Document review.)
22      A.   Okay.
23      Q.   You'll see this e-mail chain
24  begins again on page 2 with the cover e-mail
25  to Exhibit 401A which is your e-mail to the

Page 138

G. ROMAIN - HIGHLY CONFIDENTIAL

1    group.
2        Do you see that?
3    A.   Yes.
4    Q.   And I want to draw your attention
5    to the first page of Exhibit 385 which is the
6    third e-mail down which is from Rich Ricci to
7    Patrick Clackson.
8        Do you see that?
9    A.   Yes.
10   Q.   It says, "Need to get to 4 or no
11   write-down capacity."
12       Write-down is misspelled but it
13   says write-down capacity.
14       Do you see that?
15   A.   Yes.
16   Q.   Do you know what that was a
17   reference to?
18   A.   No, I don't.
19       (Deposition Exhibit 402A, document
20       bearing production number
21       BCI-EX-(S)-00052678, marked for
22       identification as of this date.)
23   BY MR. TAMBE:
24   Q.   Sir, I've handed you a one-page

Page 139

G. ROMAIN - HIGHLY CONFIDENTIAL

1    document marked Exhibit 402A. Take a moment
2    to review it and let me know when you're done.
3        (Document review.)
4    A.   Okay.
5    Q.   And you'll see the bottom e-mail
6    on this page, Exhibit 402A, is an e-mail from
7    you to Jasen Yang copied to others.
8        Do you see that?
9    A.   Yes.
10   Q.   Okay. Who is Jasen?
11   A.   Jasen is another trader in the
12   PMGT group. I believe he reports to Stephen
13   King.
14   Q.   You state in your second
15   paragraph, "What we're ultimately trying to
16   get to is a valuation for the total portfolio
17   (including the 1.9 billion from the box) for
18   inclusion in the acquisition balance sheet -
19   Friday close so not including any
20   Monday/Tuesday gain/losses which should remain
21   in trading P&L."
22       Do you see that?
23   A.   Yeah.
24   Q.   Were you stating in that sentence

Page 140

G. ROMAIN - HIGHLY CONFIDENTIAL

1    that you were trying to value the total
2    portfolio as of Friday close of business
3    prices?
4    A.   Yeah. That point in time --
5    that's the direction I'm giving to Jasen at
6    that point in time, yes.
7    Q.   I understand from your testimony
8    this morning that for the collateral that was
9    transferred over, the Thursday, Friday, the
10   weekend, the valuation date that was picked
11   was September 22nd, the Monday, right?
12   A.   That's true.
13   Q.   Why the change? Why was that the
14   ultimate decision?
15   A.   At that point in time the deal had
16   only just been done and my understanding of
17   what happened when and other terms and what
18   had been received when was incomplete and
19   evolving. And over time discussions of
20   various aspects occurred and one of which was
21   the appropriate valuation date and the
22   appropriate valuation date was determined to
23   be the 22nd of September.
24   Q.   In Exhibit 401A you have a line

Page 141

G. ROMAIN - HIGHLY CONFIDENTIAL

1    item there for Friday P&L.
2        Do you see that?
3    A.   Yes.
4    Q.   Can you tell from that version of
5    the acquisition summary balance sheet as of
6    what date you were valuing the inventory?
7    A.   I can't, no. And to be clear I
8    wasn't valuing the inventory.
9    Q.   Or Barclays was valuing the
10   inventory.
11   A.   Yeah.
12   Q.   Because the line right above the
13   Friday P&L line in Exhibit 401A reads
14   Inventory Thursday Close.
15       Do you see that?
16   A.   Yes.
17   Q.   And Thursday is when the Fed repo
18   assets were transferred over to Barclays,
19   correct?
20   A.   I don't have full information of
21   exactly what was transferred precisely when.
22   Q.   Do you know who would have
23   provided you with the Friday P&L number that
24   appears in Exhibit 401A?

| | |
|---|---|
| Page 142 | Page 143 |

**Page 142**

G. ROMAIN - HIGHLY CONFIDENTIAL

1   G. ROMAIN - HIGHLY CONFIDENTIAL
2   A.   No.
3   Q.   When the valuation was done as of
4   Monday the 22nd of September were the prices
5   used close of business prices on Monday the
6   22nd?
7   A.   I'm not sure. I'm not the
8   valuation expert. I'm not sure what the
9   CUSIP-by-CUSIP approach that was taken was.
10  And, you know, what market convention is for
11  valuing the various security types which were
12  involved.
13  Q.   Okay. Who would know the answer
14  to that?
15  A.   It would the price testing group
16  within product control.
17  Q.   And just so I understand, just
18  using 401A as the example, if the decision was
19  made -- and the decision was made -- to price
20  the inventory as of Monday, September 22nd,
21  having done that, would you take into account
22  in valuing the assets any P&L on Friday?
23  A.   I'm not sure I quite understand
24  the question. Sorry. Take into account in
25  what way?

**Page 143**

1   G. ROMAIN - HIGHLY CONFIDENTIAL
2   Q.   As you do in Exhibit 401A.
3       In Exhibit 401A, if I understand
4   what's going on there, there's a valuation --
5   at least it appears to be, inventory Thursday
6   close. And then the gain that is earned by
7   Barclays during the day on Friday is reflected
8   as additive to the asset value.
9       Do you see that?
10  A.   Yes.
11  Q.   If the decision was made that you
12  weren't going to value the inventory as of
13  Thursday, you were going to value the
14  inventory as of Monday, would that eliminate
15  the need to record a P&L gain for Friday?
16  A.   You'd be valuing it by reference
17  to the Monday price. So that would be the sum
18  of what you'd need to do.
19  Q.   But this P&L gain that's reflected
20  on Exhibit 401A, that would be categorized as
21  the trading P&L, correct?
22  A.   I don't know what that item
23  particularly was.
24      (Deposition Exhibit 403A, document
25  bearing production numbers

| | |
|---|---|
| Page 144 | Page 145 |

**Page 144**

1   G. ROMAIN - HIGHLY CONFIDENTIAL
2   BCI-EX-(S)-00024689 through
3   BCI-EX-(S)-00024690 with attachment,
4   marked for identification as of this
5   date.)
6   BY MR. TAMBE:
7   Q.   Sir, I've handed you a three-page
8   document marked Exhibit 403A. A cover e-mail,
9   a placeholder page, and then a spreadsheet.
10  Let me know when you're done reviewing it.
11      (Document review.)
12  A.   Okay.
13  Q.   And the last page of Exhibit 403A,
14  if you can confirm that that's another version
15  of the acquisition balance sheet, correct?
16  A.   It is, yes.
17  Q.   And it's a cover e-mail from you
18  to Patrick Clackson and that's dated September
19  24th, correct?
20  A.   Yes.
21  Q.   Now, if you compare Exhibit 403A,
22  the acquisition balance sheet in Exhibit 403A,
23  with Exhibit 401A, you'll see that the net
24  asset number has $6.01 billion.
25      Do you see that?

**Page 145**

1   G. ROMAIN - HIGHLY CONFIDENTIAL
2   A.   Yes.
3   Q.   And at least one of the drivers of
4   that change is the valuation adjustment
5   number. And you'll see it's down from 2.83 to
6   1.38.
7   A.   Sorry. You changed my reference
8   to which version?
9   Q.   Sure. The two documents you
10  should be looking at are Exhibit 401A and
11  403A.
12  A.   Yes. One of the differences is
13  that.
14  Q.   Okay. Now, that's roughly a
15  $1.5 billion difference, correct? In the
16  valuation adjustment.
17  A.   Well, it's -- in terms of the
18  adjustment that's made to the 45.18 to get to
19  a net number the difference is slightly less.
20  Q.   Right.
21  A.   Because there's no 0.2.
22  Q.   The P&L, the Friday P&L number is
23  no longer --
24  A.   Yes.
25  Q.   But looking at just the valuation

Page 146

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    adjustment line you've gone from a 2.83
3    negative to a 1.38 negative adjustment,
4    correct?
5        A.    My concern there is whether we're
6    comparing like with like. I don't know enough
7    about the 0.2 to know whether that was rolled
8    into the 1.38 or not.
9        Q.    And do you have any understanding
10    as to the reason for the change from 2.83 to
11    the 1.38 putting aside the 0.2?
12        A.    No.
13        Q.    Both in 401A and 403A on -- for
14    the inventory pricing there's a note that
15    reads, "Trades are initially booked at BoNY
16    prices."
17        Do you see that?
18        A.    Yes.
19        Q.    Do you know what the convention is
20    in pricing securities that are used for repo
21    trading?
22        A.    I don't know.
23        Q.    And do you know whether the Bank
24    of New York was Barclays' agent for that repo
25    transaction?

Page 147

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        A.    I'm not sure of the precise
3    relationships in that regard, no.
4        MR. TAMBE:  Let's take a short
5    break.
6        (Recess taken.)
7    BY MR. TAMBE:
8        Q.    Mr. Romain, we talked this morning
9    about some of the assets acquired by Barclays
10    having been sold.
11        Do you remember that?
12        A.    Once the assets were acquired a
13    number of things happened to them. Some would
14    have been sold relatively shortly. Some were
15    transferred into ongoing trading books to be
16    managed by the relevant traders. Once that
17    happens they're commingled with assets which
18    were acquired in other ways so there would
19    have been some which had been elected and
20    there would have been some which were held for
21    a long period.
22        Q.    We had a brief discussion about
23    whether prices at which the assets were sold
24    factored into the valuation analysis in some
25    way.

Page 148

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        Do you recall that discussion?
3        A.    Yeah.
4        Q.    Okay. Would transfers of assets
5    within the Barclays Group be treated as sales
6    and factored into that calculation?
7        A.    In terms of the measurement
8    objective being an external fair value, those
9    prices would not factor -- those prices in and
10    of themselves would not factor into the
11    valuations.
12        However, the price at which
13    something is transferred into may well be a
14    representation of what our best estimate of
15    the market price is at that time in which case
16    they may well be the same number.
17        But in terms of the considerations
18    which feed into the price that assets were
19    transferred internally within Barclays I don't
20    have a great deal of insight into how that
21    works in practice.
22        Q.    And just so I understand your
23    answer, at least for some of the assets
24    acquired from Lehman there were transfers of
25    those assets within Barclays, correct?

Page 149

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        A.    Yes.
3        Q.    And there were values ascribed to
4    those assets when those assets were
5    transferred internally, correct?
6        A.    Yes.
7        Q.    And on some occasions you have
8    taken into account the values at which those
9    internal transfers were done for purposes of
10    valuing those assets for the acquisition
11    balance sheet; is that correct?
12        A.    No.
13        Q.    Okay. Is it the case that
14    internal transfers and internal transfer
15    values were disregarded in doing your
16    acquisition balance sheet valuation?
17        A.    I was not directly involved in the
18    valuation. I did not factor into the
19    acquisition balance sheet transfers. What I
20    factored into the acquisition balance sheets
21    was Barclays' best estimate of the bid price
22    for those securities which was determined in
23    accordance with Barclays' ongoing valuation
24    policies and applicable accounting standards.
25        Q.    Okay. And when you took into

Page 150

G. ROMAIN - HIGHLY CONFIDENTIAL
1  account Barclays' best estimate would
2  Barclays' best estimate include bids provided
3  by Barclays' own internal traders?
4      A.   The process for valuation is
5  dependent on the asset type.  And for less
6  liquid assets it's more judgmental than it is
7  for more liquid assets.  However, the maximum
8  possible use is always made of external data.
9  So the views of traders as to the appropriate
10 valuation of an asset being their best
11 estimate of an external bid price for that
12 asset is a part of the valuation process which
13 is supplemented by external market data and
14 price testing -- and price testing procedures.
15 The precise balance between those depends on
16 the asset but external market data to the
17 extent it is available is typically the best
18 evidence of the appropriate fair value.  So
19 that's the concept.  When you get down to
20 individual security level, that's where my
21 sort of level of knowledge ends.
22     Q.   The spreadsheets that roll up into
23 the summary sheets -- we looked at 87B and 86B
24 which were the summary level sheets that then

Page 151

G. ROMAIN - HIGHLY CONFIDENTIAL
1  rolled up into the acquisition balance sheet.
2  Do you remember that?
3      A.   Yes.
4      Q.   Okay.  The CUSIP level
5  spreadsheets, do those indicate what
6  particular methodology or process was used on
7  a CUSIP-by-CUSIP basis for determining the
8  value?
9      A.   Not to my recollection.  That's
10 the result of the process.  But for the less
11 liquid and more complex instruments, the
12 methodology is not something which were
13 typically captured in the Excel spreadsheets.
14 There are extensive valuation procedures and
15 policies within the bank which are used as a
16 reference point for how to value these assets.
17 And the approach, the value of these assets
18 was in mind in those policies both internally
19 and in the opinion of the our outside
20 auditors.
21     Q.   In terms of orders of magnitude
22 can you ascribe any percentage to the
23 percentage of this portfolio, the percentage
24 of the inventory that you believe is the fault

Page 152

G. ROMAIN - HIGHLY CONFIDENTIAL
1  of this less liquid more complex difficult to
2  value type of security.
3      A.   There's no dividing line really.
4  It's a spectrum.
5      Q.   I just want to make sure I have
6  one point covered.  It's my understanding that
7  at least some of the assets acquired from
8  Lehman were subject to internal sales within
9  Barclays from one desk to another desk.  Is
10 that your understanding as well?
11     A.   Yes.
12     Q.   Okay.  Were the prices at which
13 those assets sold within Barclays ever counted
14 by you as a sale price that was used in the
15 valuation?
16     A.   No.  I was -- I had no awareness
17 of the price at which securities were sold.
18 What I asked for and received was the fair
19 values of the assets.
20     Q.   So a trader reporting a fair value
21 of an asset to you may have factored in an
22 internal sale price but you wouldn't know
23 that.
24     A.   The trader wasn't reporting

Page 153

G. ROMAIN - HIGHLY CONFIDENTIAL
1  valuations to me.
2      Q.   Who was?
3      A.   The numbers that fed into those
4  were the numbers which had been through the
5  process which we discussed earlier which
6  involved input from traders, price testing
7  within finance, and auditor review.
8          So those are the numbers which I
9  took, the numbers which had passed through
10 those processes and were then viewed as the
11 agreed appropriate fair value for the
12 instruments.
13     Q.   Okay.  And so the processes that
14 yield the numbers that you then used, those
15 processes could have included prices at which
16 assets sold within Barclays; is that correct?
17         MR. SHAW: Objection.  That calls
18 for spec --
19     A.   I wouldn't want to speculate on
20 that.  All I can say which is not a response
21 to your question, but it's pertinent to it, is
22 that the values which came out of that process
23 were Barclays' view of the appropriate fair
24 value for those instruments, irrespective of

Page 154

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    whether transfers had occurred in those
3    instruments or not subsequent to the
4    transaction date. That was the measurement
5    objective and that's what -- and that is the
6    basis on which those numbers were considered.
7        Q.   I'm not quarrelling with you, sir,
8    as to whether Barclays Capital believed those
9    to be the fair values. All I'm trying to
10   understand is the mechanical point which is --
11   and maybe you don't know the answer to this.
12           In arriving at Barclays' best
13   estimate of the fair values of those assets
14   did the processes which you referred to take
15   into account the prices at which assets were
16   transferred within Barclays?
17       A.   They took into account the
18   traders' view of the value of the securities
19   based on their experience and available market
20   data.
21       Q.   And do you know whether the
22   traders' views about valuation included prices
23   at which securities were transferred within
24   Barclays?
25       A.   No, I don't know that.

Page 155

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    Q.   Okay. Thank you.
3        MR. TAMBE: I pass the witness.
4           * * *
5    EXAMINATION BY
6    MR. WOOD:
7    Q.   Good afternoon, Mr. Romain.
8    Again, I'm John Wood. I'm from Hughes,
9    Hubbard & Reed. I represent the SIPA trustee.
10          And just to start off I'm going to
11   ask you some questions in your capacity as a
12   30(b)(6) witness regarding margin held secure
13   exchange rate derivatives and just to speed
14   things along why don't you go ahead and take a
15   look at your handwritten notes, Exhibit 399A.
16       A.   (Witness complies.)
17       Q.   On the second page, sort of the
18   middle of the page there, you've got an entry
19   that's margin posted by LBI at OCC (23/9).
20          Do you see that?
21       A.   Yes.
22       Q.   Is that margin posted by LBI at
23   the OCC on September 23rd?
24       A.   It's from the 23rd of September
25   statement. My understanding is that there's a

Page 156

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    day lag in the statement. So it's intended to
3    represent the 22nd of September.
4        Q.   And it looks like you have three
5    entries there, cash, governments, and LOC; is
6    that correct?
7        A.   Yes.
8        Q.   And LOC is letters of credit?
9        A.   That's correct.
10       Q.   What are letters of credit?
11       A.   Well, they're essentially
12   facilities which are drawn down, the account
13   party being third-party banks but they take
14   various forms.
15       Q.   So in writing this are you
16   counting that as an asset?
17       A.   We have not included that in our
18   acquisition balance sheets at the current
19   time. But we're not distinguishing between
20   those three items in terms of the nature of
21   our claim and entitlement. These are viewed
22   as -- all the three are viewed as margin which
23   is related to the positions that were taken
24   on. But it's margin which is held in one of
25   three forms.

Page 157

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    Q.   Now, when you say your claim and
3    entitlement, does that mean a claim and
4    entitlement from the estate?
5        A.   I'm not sure in terms of the -- in
6    what way we make a claim at all or against
7    who. It's my understanding that these items
8    we are entitled to receive under the service
9    of the acquisition.
10       Q.   And so why were they not included
11   in the acquisition balance sheet?
12       A.   The letters of credit?
13       Q.   Yes.
14       A.   I'm not directly involved in the
15   proceedings but I understand there are
16   discussions with the counterparties to those
17   letters of credit which we don't believe has a
18   bearing on our entitlement from a legal
19   perspective. But when preparing financial
20   statements we tend to be conservative and
21   prudent in the way we do so. So if there are
22   ongoing conversations or just more potentially
23   disputes we would bear that in mind whether or
24   not to include them in that balance sheet.
25       Q.   Are the disputes you're referring

Page 158

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2    to there with counterparties?
3        A.    I don't have a great deal of
4    detail around the nature of the disputes.
5        Q.    And just so I understand, could
6    you take a look at Exhibit 377A which you
7    previously went through with Mr. Tambe.
8        A.    Yes.
9        Q.    And so that's page 3, Bates
10   numbers ending in 845.
11       A.    Yeah.
12       Q.    And I believe with Mr. Tambe you
13   added up lines 16 and 26.
14       A.    Yes.
15       Q.    To get to about 2.29 billion of
16   collateral.
17       A.    That's right, yes.
18       Q.    And so your numbers there, are
19   those intended to roughly correspond to the
20   cash -- actually, no.  Let me rephrase that.
21          Are those supposed to correspond
22   to the liens that we're looking at on
23   Exhibit 399A?
24          MR. SHAW:  Could you clarify when
25   you say your numbers there, what you're

Page 159

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2    referring to?
3        Q.    Sure.  The lines 16 and 26 on
4    Exhibit 377A, page 3, are those corresponding
5    to any numbers in your handwritten notes which
6    are Exhibit 399A?
7        A.    Yes.  The total of the cash and
8    governments number in -- on page 399A
9    corresponds to the total of sales F-16 and
10   F-26 on page 3 of 377A.
11       Q.    So the numbers we were talking
12   about on 377A, page 3, are the same which
13   you've got here on your handwritten notes
14   except that 377A does not include the letters
15   of credit?
16       A.    That's correct.  There's small
17   rounding differences but it's essentially the
18   same number.
19       Q.    And have the letters of credit
20   been delivered?
21       A.    No.
22       Q.    So when you were testifying
23   earlier that about a billion dollars from the
24   2.29 had not been received -- and to be clear
25   the 2.29 is referring to page 3 of

Page 160

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2    Exhibit 377A -- that number would go up if you
3    added the letters of credit?
4        A.    It would do, yes.  I was referring
5    principally to the government securities.  If
6    you would include that then the number would
7    be higher but that's not recognized in the
8    balance sheet which is why I excluded it in
9    that response.
10       Q.    When you say you're referring to
11   government securities -- so the government
12   securities have not been delivered?
13       A.    That's correct.
14       Q.    But the cash has?
15       A.    The cash has -- I think as of the
16   year end there may have been a small amount
17   which hadn't been delivered.  But my
18   understanding is it has now been substantially
19   delivered.
20       Q.    So just so I understand, by and
21   large, of the three things listed here, the
22   cash has been delivered, the government
23   securities have not, and the letters of credit
24   have not.
25       A.    Yes.  That's my understanding.

Page 161

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.    So you come to a total of $2.554
3    billion approximately.
4        A.    Yes.
5        Q.    For those three categories,
6    correct?
7        A.    That's right.
8        Q.    Do you know what the total would
9    be for margin held at other exchanges?
10       A.    The margin held at other exchanges
11   is included in the --
12       Q.    Just to be clear you're referring
13   to 337A?
14       A.    Yes.  Page 3 of 377A the amount
15   which is included in the acquisition balance
16   sheets there is -- actually, it's aggregated.
17   It is an element of cell F-20.
18       Q.    And that's future assets?
19       A.    Yes.
20          MR. SHAW:  Futures assets.
21          MR. WOOD:  I'm sorry.  Thank you.
22   Futures assets.
23       A.    Yes.
24       Q.    And is it your understanding that
25   that cell 20-F number includes the derivatives

Page 162

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  securities themselves and margin?
3        Just to be clear, I was asking
4  about the margin, collateral, et cetera.
5    A.  The total or net futures balance
6  sheet including derivative positions and
7  margin is the net of cell F-20 and cell E-44.
8    Q.  So those two combined; is that
9  correct?
10    A.  So E-44 is a liability.  So the
11  net is 1.18.
12    Q.  Got it.
13    A.  Feeds through to the summary
14  balance sheet which is on page 2 of 377A which
15  is cell G-17.  The only difference between
16  those two pages is that on page 2 certain
17  items are shown net for convenience.  Futures
18  being one of them.
19    Q.  And so margin deposits and
20  collateral would be included within the 1.18
21  number?
22    A.  Yes.
23    Q.  Do you know how much of that 1.18
24  number?
25    A.  I don't have a breakdown at hand,

Page 163

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  no.
3    Q.  What else does that 1.18 number
4  include?  Besides margin and collateral?
5    A.  I'm talking about the main items
6  on page 2 of 399A.  And the last bullet item.
7    Q.  I'm sorry.  You're on 399A?
8    A.  Yes.  This was just to jog my
9  memory as to the main things which are
10  included in that number.
11    Q.  Sure.
12    A.  So it's margin, both held by --
13  which is held by either LBI or brokers and
14  exchanges.  And then there's net debit or
15  credits with domestic and foreign brokers.  So
16  those items are net margin and position
17  numbers which we've never really looked at --
18  well, I've never included gross on the
19  acquisition balance sheet because for
20  accounting purposes we show them net.  Because
21  of the way those exchanges operate.  And so
22  it's essentially -- it's the net of margin and
23  customer accounts.  That's what the 1.18 is.
24    Q.  But you don't know how to break
25  out the -- I'm sorry.  Let me rephrase that.

Page 164

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        You don't know what the number for
3  margin would be in isolation?
4    A.  Sitting here now, no.
5    Q.  Any of these documents we've been
6  through so far in the deposition, to your
7  knowledge, do any of those documents show the
8  number for margin held at exchanges other than
9  the OCC?
10    A.  No.  In the documents which we
11  included today, did that include futures?  It
12  did.
13        MR. SHAW:  I think it did.  You
14      may have a document in that pile we
15      showed you.
16    A.  There is a document in the pile
17  which shows some items.
18        MR. SHAW:  If you want to hand
19      help me the pile he could probably pull
20      it out for you.
21    A.  It's not the complete
22  reconciliation but it probably includes most
23  of them.
24    Q.  A couple of these I made some
25  handwritten notes.

Page 165

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    A.  There's two spreadsheets.
3    Q.  These first two are all you need?
4  Are you asking only for the first two?
5    A.  There's two spreadsheets.  This
6  one (indicating).  Here.  So this one and this
7  one (indicating).  That shows which -- that
8  shows --
9    Q.  We're going to want to mark that
10  but before I do that could you tell me which
11  one here you wanted to do first?
12    A.  I don't mind.
13    Q.  So which one of these two were you
14  going to point me to?
15    A.  Both of them.
16    Q.  Okay.
17        MR. WOOD:  Mark both of these
18      documents.
19        (Deposition Exhibit 404A, balance
20      sheet, marked for identification as of
21      this date.)
22        (Deposition Exhibit 405A, balance
23      sheet, marked for identification as of
24      this date.)
25

Page 166

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   BY MR. WOOD:
3       Q.   Okay.  Mr. Romain, I'm handing you
4   two one-page documents, 404A and 405A.  Each
5   is a one-page spreadsheet which your counsel
6   produced at the beginning of this deposition
7   today.  Do either or both of those --
8       MR. SHAW:  Sorry.  Did I get 405A?
9       MR. WOOD:  We could pause.  I'm
10   sure we have another one somewhere.
11
12   BY MR. WOOD:
13       Q.   Mr. Romain, would either
14   Exhibit 404A or 405A or both aid you in
15   answering my question about the total amount
16   of margin held on behalf of LBI at exchanges
17   other than the OCC?
18       A.   It's helpful in that it shows the
19   breakdown of large constituent items.  To give
20   a single number I would need a reconciliation
21   between these and the acquisition balance
22   sheet which I don't have to hand but it is
23   assistance in showing some of the items.
24       Q.   Should we start with 404A?
25       A.   Sure.

Page 167

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2       Q.   Could you explain what this
3   document is?
4       A.   Yes.  So this breaks down some
5   items of margin, contractual -- in reaction to
6   exchange rate future contracts at various
7   exchanges.  The top two items -- well, the top
8   item -- there's a list of items under money
9   market funds which comes down to 1,063 and
10   cash 871.  They -- those numbers are based on
11   the 6th of October actually when -- my
12   understanding is that these items were
13   physically transferred across right on the
14   acquisition date.  So you'll see my note on
15   the left-hand side which actually indicates
16   that the total of these items included in the
17   acquisition balance sheet is 2.79 million
18   rather than 1.934 perhaps because we needed to
19   quantify a value as at the 22nd of September
20   rather than the 2nd of October.  But it still
21   shows the nature of the items included.
22       It then shows --
23       Q.   Before you move on can I just ask
24   you about that?  Are these margin deposits?
25       A.   These -- this is -- the cash and

Page 168

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   mutual funds were margin posted by customers
3   that was not totally -- it was held by LBI.
4   It wasn't posted with any exchange.
5       Q.   And where if anywhere does that
6   fit into your notes, your handwritten notes,
7   which are Exhibit 399A?
8       A.   That is -- under Items it is the
9   first subbullet where it says Cash mutual
10   funds, margin held by IBI, not at exchange.
11       Q.   And these have already been
12   received?  By Barclays, correct?
13       A.   These have -- yes, they have
14   already been received.
15       Q.   And pursuant to what part of the
16   agreements between the parties as part of the
17   sale transaction were these $2.197 billion in
18   assets transferred?
19       A.   That was -- they form part of the
20   collateral bridge by customers against
21   customer accounts which were taken off as part
22   of the transaction.  So we took on the account
23   and the related collateral which had been
24   posted.
25       Q.   And just so I understand so these

Page 169

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2   are all related to customer accounts, not
3   proprietary accounts?
4       A.   Were these all -- my understanding
5   is these were all customers.
6       Q.   Okay.  I know I interrupted you so
7   was there anything else you wanted to cover
8   under that heading money market funds before
9   we turn to foreign brokers?
10       A.   No.
11       Q.   Okay.  So could you explain to me
12   what the entries are under foreign brokers?
13       A.   They were amounts of collateral
14   which had been placed with brokers overseas
15   which again related to customer accounts which
16   had been taken on but were being held.  Being
17   held overseas.
18       Q.   And so the total that's been
19   received as of the creation of this document
20   was 265 million, closer to 266 million; is
21   that correct?
22       A.   Yes.
23       Q.   And then there's another 99
24   million that had not been received.
25       A.   Yes.

Page 170

G. ROMAIN - HIGHLY CONFIDENTIAL

1    Q.   Do you know when this document had
2    been created?
3    A.   Not precisely but it was recent.
4    In the last few days.
5    Q.   So to your knowledge are those
6    numbers still accurate?
7    A.   I'm not aware of any changes to
8    those numbers.
9    Q.   And what's this entry Lehman
10    entities?
11    A.   This represents collateral which
12    was placed -- this relates to collateral which
13    was placed with exchanges whereby the Lehman
14    entity that had the exchange membership was
15    not LBI so was placed by an affiliate entity.
16    Q.   And then just to be clear, the
17    headings money market funds and the two
18    headings for foreign brokers, those all are
19    LBI?
20    A.   Yes.
21    Q.   So now looking at this page what
22    is the total amount of margin that was held by
23    LBI at foreign exchanges?
24    A.   Foreign exchanges. LBI.

Page 171

G. ROMAIN - HIGHLY CONFIDENTIAL

1    Q.   Is that the approximately 365
2    million?
3    A.   Yes.
4    Q.   Are you aware of any other margin
5    or collateral held at foreign exchanges?
6    A.   Well, I believe that -- I believe
7    that some of the items included under Lehman
8    entities would have been held by foreign
9    exchanges but not LBI. I'm not sure exactly
10    what the amount would be.
11    Q.   So to get the total margin held by
12    LBI, and by that I mean margin and collateral,
13    would that be the approximately 365 million at
14    foreign exchanges, the 2.554 billion
15    approximately that we talked about earlier at
16    the OCC, which is on page 3 of your
17    handwritten notes, Exhibit 399A, plus this
18    2.197 billion under the heading money market
19    funds at the top of 404A?
20    A.   I'm sorry, yes. That isn't quite
21    the total. This is -- this is --
22    Q.   And I'm speaking of LBI here.
23    A.   Yes. Yes. This doesn't
24    include -- to the best of my recollection now,

Page 172

G. ROMAIN - HIGHLY CONFIDENTIAL

1    the items which are not -- which are not
2    included here but do feed into the total asset
3    number which is included in cell F-20 at page
4    3 of 377A is firstly the -- oh, no, we're not
5    talking about OCC, are we? Okay.
6    Q.   Well, no, I was actually. What I
7    was trying to do here is to total up at least
8    three things; one was the margin and
9    collateral held at foreign exchanges reflected
10    in the middle of 404A, the OCC margin
11    reflected on page 2 of your handwritten notes.
12    A.   Right.
13    Q.   And then we had this money market
14    funds.
15    Is there anything else that you
16    would add in to get the total margin held to
17    secure exchange rate derivatives?
18    A.   Yeah. You'd add in the second
19    bullet under items which is --
20    Q.   On what document?
21    A.   Which is in document 399A on the
22    second page which is margin which is held at
23    broker exchanges by LBI for Treasury bills
24    which is not included in this summary. It's

Page 173

G. ROMAIN - HIGHLY CONFIDENTIAL

1    not included in 404A.
2    Q.   So margin held that's not at
3    exchanges, is that something that Barclays is
4    expecting to receive?
5    A.   The stuff which is not held at
6    exchanges is the money markets and cash
7    amounts from 404A which has been received.
8    Q.   I'm sorry. So everything under
9    this heading money market funds, those are not
10    at exchanges.
11    A.   Yeah. They were not at exchanges,
12    that's right. There was additional margin
13    which was held by LBI at exchanges largely in
14    the form of Treasury bills which again had
15    been received.
16    Q.   And is that reflected anywhere on
17    404A?
18    A.   It's not, no. 404A was intended
19    to be a complete listing. It was a breakdown
20    of certain items which had a breakdown to show
21    their constituent parts. If you total these
22    up it does not equal the 3.78 total number
23    that we talked about in 377A. There is a
24    breakdown behind that which totals up to that

Page 174

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  number which includes everything on 404A but
3  also includes the Treasury bill item that I
4  mentioned there.
5    Q.    And where's that breakdown?
6    A.    The Treasury bill item is not --
7  the only mention of it is in the documents
8  we're looking at is in my handwritten notes
9  when I was prompting myself as to what the
10  component parts of the total futures number
11  was.
12    Q.    And so the T-bills are included in
13  the 3.78?
14    A.    They are, yes.
15    Q.    Is there anything else that went
16  into the 3.78?
17    A.    Is there anything else that went
18  into the 3.78.
19    I couldn't say with absolutely
20  certainly there weren't other similar items
21  but those were the substantial items.
22    Q.    In that case do you know what the
23  number is for the T-bills?
24    A.    Off the top of my head, I don't
25  know.

Page 175

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    Q.    Since there's other items we can't
3  figure it out just by adding up the numbers we
4  have and figuring out what the delta is,
5  right?
6    A.    I feel slightly sorry saying that
7  was definitely what you could do because I may
8  have forgot some smaller items. The 3.78 is
9  the total -- well, the 3.78 less the item of
10  2.6 in cell E-44 is the net of the total
11  margin and customer positions which were taken
12  on. It has a number of components some of
13  which are broken down here but that's what the
14  net of those two numbers represent.
15    Well, to be absolutely complete
16  that's what it represents in terms of the
17  items which were included in the acquisition
18  balance sheet. As touched on earlier in
19  testimony, the futures collateral which is
20  held at affiliates is not included in the
21  acquisition balance sheet. We haven't
22  recognized as an asset as yet.
23    Q.    I think I asked you this before
24  and got your answer but I just want to make
25  sure just in case I missed this.

Page 176

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    A.    Sure.
3    Q.    The total value of the margin and
4  collateral held at foreign exchanges is the
5  365 million on 404A?
6    A.    By LBI, yes.
7    Q.    By LBI, right.
8    So looking at page 2 of
9  Exhibit 399A we just talked a moment ago about
10  the T-bills. The next line looks like there's
11  something written there in a circle. What is
12  that?
13    A.    That was a note to myself
14  yesterday as OS meaning outstanding. I wanted
15  to understand what exchanges were primarily
16  included in that number.
17    Q.    Sorry. In which number?
18    A.    Within the domestic exchanges item
19  in the acquisition balance sheet. Which is
20  not included in the -- it's not included in
21  the schedule 404A but it is one of the
22  constituent parts of the net futures number in
23  the acquisition balance sheet.
24    Q.    You said you wanted to find out
25  what exchanges were included in that?

Page 177

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    A.    Yeah.
3    Q.    And did you find that out?
4    A.    I did, yeah. It was a number of
5  different exchanges. The most significant
6  balance was CME.
7    Q.    And do you know the total number
8  for those domestic exchanges?
9    A.    Without the breakdown in front of
10  me I wouldn't want to guess.
11    Q.    Do you remember a ball park?
12    A.    My recollection is the ball park,
13  it's a net asset of approximately
14  $500 million.
15    Q.    And is that margin?
16    A.    That's the net of margin and
17  customer positions in those exchanges. Those
18  are exchanges where we face the exchange. So
19  from our position -- from our point of view we
20  have a net position with the exchange.
21    Q.    And the next line is foreign
22  brokers. You also have that listed as
23  outstanding?
24    A.    No, no.
25    Q.    Oh, the OS does not refer to that?

Page 178

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2      A.    No.
3      Q.    Okay.  What does that line mean
4  then?
5      A.    So that's the amount of 365 we
6  were just talking about.
7      Q.    Okay.  And the next line on your
8  handwritten notes is affiliates; is that
9  correct?
10      A.    Yes.
11      Q.    What does that say in the
12  parenthetical?
13      A.    With exchange membership.  So
14  that's the items at the bottom of 404A where
15  it talks about that it was LBI that had the
16  exchange membership so the position was -- it
17  was between another Lehman entity.
18      Q.    Now we'll turn your attention to
19  Exhibit 405A.
20      A.    Yes.
21      Q.    What is this document?
22      A.    405A is collateral for proprietary
23  rather than customer positions.
24      Q.    And where is this held?
25      A.    That's -- the customer ID is on

Page 179

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2  the left.  In terms of when -- which exchanges
3  I'm not sure.
4      Q.    Does it include OCC?
5      A.    This item doesn't include OCC.
6  The OC -- OCC accounts, the -- in the
7  acquisition balance sheet, the 074 accounts
8  are ones which are included in the OCC items.
9  So the -- so on page 3 of 377A it's item F-16
10  and F-26 and the 084 accounts are included
11  within the futures item.  So the 3.78 in row
12  20 and the 2.6 in row 44.
13          So all of the OCC positions are
14  included.  They're included into separate --
15  two separate items.
16      Q.    I just want to make sure I
17  understood your last answer.  So when you said
18  all the OCC positions are included you meant
19  included in 377A?
20      A.    Exactly.
21      Q.    But they're not included in
22  Exhibit 405A?
23      A.    That's correct.  They are
24  different items, yes.
25      Q.    And for Exhibit 405A, are these

Page 180

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2  all held at exchanges?
3      A.    Are they all held at exchanges.
4          I'm not certain that it's all held
5  at exchanges.  It's certainly my understanding
6  that the majority is but I didn't get into
7  that level of granularity for the purposes of
8  this schedule.
9      Q.    And are these all foreign?  And by
10  that, just to be clear I mean non-United
11  States?
12          MR. SHAW:  Objection to form.
13      Q.    Let me rephrase that.
14          To the extent they're held at
15  exchanges are they all non-US exchanges?
16      A.    I'm not aware of any US exchanges
17  included here.  I couldn't say with absolute
18  certainty but I'm not aware of any held with
19  US exchanges.
20      Q.    Now, can you explain your note at
21  the bottom of 405A which appears to be some
22  sort of a total?
23      A.    Yeah.  The total is essentially
24  the total of the items which have got a yes --
25  a Y rather than an N in the last column.

Page 181

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2      Q.    And what does a Y mean?
3      A.    A Y means there were live trades
4  in that account on 22nd of September and,
5  therefore, we were taking on the positions and
6  the collateral.  The ones with the N we've not
7  claimed the collateral on those accounts
8  because there were no live trades on the 22nd
9  of September.  I would say the total there --
10  I do recall I didn't have a calculator at the
11  time so it was done mentally so hopefully it's
12  accurate.
13      Q.    The 482 million approximately is
14  your rough total of all the ones that have a Y
15  by them?
16      A.    That's right.
17      Q.    And the ones that are N, those
18  just stayed?
19      A.    They hadn't been claimed, yes.
20      Q.    Have not been claimed by Barclays.
21      A.    That's correct.
22      Q.    And you have the 482 million
23  broken out into two categories.  Could you
24  explain those?
25      A.    Yes, sir.  The 210 ones held by

Page 182

G. ROMAIN - HIGHLY CONFIDENTIAL

1    LBI with foreign exchanges, they have been
2    recognized on the balance sheet and are,
3    therefore, included in the numbers in
4    Exhibit 377A.
5        The 272 is the total of the ones
6    which are held by Lehman affiliates which we
7    have not recognized the assets for financial
8    reporting purposes. They are -- that's part
9    of the items which -- those two items are
10   talked about on the front page of 399A. They
11   form part of the subbullet of the first bullet
12   and being an asset which has not been received
13   but is recognized on balance sheet. Futures
14   collateral at foreign brokers.
15       Q.   The 210 million?
16       A.   It includes the 210 million. I
17   think that's the total amount, yes.
18       Well, actually, let me be accurate
19   about that. The 210 is included in that item
20   but I haven't quantified the items so I
21   couldn't say that that's -- that is everything
22   not received. I'm not aware of anything else
23   which is included there.
24       The 272 feeds into the first

Page 183

G. ROMAIN - HIGHLY CONFIDENTIAL

1    subbullets of assets not received but not on
2    the balance sheet which is futures collateral
3    at affiliates. These two items -- yes,
4    actually, sorry. That was why I was
5    hesitating. I knew that I was missing
6    something. 405A is only the propositions. So
7    the items referred to on the front page of
8    399A is customer and prop. So the 210 is
9    included within the first subbullet of the
10   first bullet. And the 272 is included in the
11   460 item. But both items also included
12   customer positions.
13       Q.   So focusing just on LBI, meaning
14   leaving aside the other affiliates, if I
15   wanted to know the total amount of margin held
16   at foreign exchanges on behalf of LBI, both
17   customer and proprietary, I would add up the
18   365 from 404A and the 210 from 405A?
19       A.   Yes.
20       Q.   And Barclays is either seeking or
21   has received both the 365 million and the 210
22   million?
23       A.   That's correct.
24       Q.   And 404A gives me the breakout of

Page 184

G. ROMAIN - HIGHLY CONFIDENTIAL

1    what's been received and not received of the
2    365 customer.
3        A.   Yes.
4        Q.   Do you have something similar for
5    the proprietary ones on -- that are described
6    in 405A?
7        A.   I'm not aware that we've received
8    any of that.
9        Q.   Okay. That was going to be my
10   question.
11       A.   Yeah.
12       Q.   Mr. Romain, I'm handing you what's
13   previously been marked in another deposition
14   as Exhibit 95B.
15       MR. SHAW: Are we finished with
16   any of the exhibits you've been going
17   through?
18       MR. WOOD: For now hopefully.
19       Q.   Actually, you might want to keep
20   them handy because I'm just going to ask
21   whether some of the numbers in here relate to
22   any of those. And this presumably was already
23   described when it was first introduced so I
24   won't describe it at any great length but it's

Page 185

G. ROMAIN - HIGHLY CONFIDENTIAL

1    an e-mail with a somewhat lengthy set of
2    Options Clearing Corporation account
3    summaries.
4        And you could take as much time as
5    you want obviously to look it over but I'll
6    tell you my first question is just going to
7    relate to the e-mail at the top of the first
8    page. So the latest e-mail chronologically
9    where if you -- on the top of the first page
10   it says "The first statement shows collateral
11   of 522 million" and I'm going to ask you about
12   that.
13       (Document review.)
14       A.   Okay.
15       Q.   So if you see the e-mail at the
16   top. So the latest one chronologically to Ian
17   Lowitt from Francis Pearn. It says, "Craig
18   Jones provided the OCC statements as of
19   September 22nd for the LBI 074 account. The
20   first statement shows collateral value of
21   $522 million (cash and government securities)
22   in LBI. The second file details approximately
23   2 billion of collateral (letters of credit,
24   cash and securities)."

Page 186

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2           And then it continues.
3           Let's start with the 522.
4       $522 million, do you know what that refers to?
5       A.   No.
6       Q.   Same question with the $2 billion
7   of collateral?
8       A.   No, no.
9       Q.   Can you -- I mean, you'll see if
10  you add those two together you'll get --
11  meaning the 522 million and the 2 billion, you
12  get something close to the total you have on
13  page 2 of Exhibit 399A.
14      A.   Yeah.
15      Q.   Which you had 2.554 billion.
16      A.   Yeah.
17      Q.   This gets you -- and the numbers
18  are obviously rounded off.  That gets you to
19  the 2.522 billion but they seem to break them
20  down totally differently.  You have no
21  understanding what the numbers are on
22  Exhibit 95B?
23      A.   No.
24      Q.   Mr. Romain, we're handing you
25  what's already been marked in a previous

Page 187

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2   deposition as Exhibit 228.  It's a one-page
3   e-mail followed by numerous pages, the top of
4   which says the Options Clearing Corporation.
5       A.   I'm the only one without it.
6       Q.   Oh, I'm sorry.  Here.  Take mine.
7           MR. SHAW:  An interesting way to
8       take a deposition.  I'd like to you
9       imagine I've handed you a document.
10          MR. WOOD:  Just shows the mastery
11      of the facts that I've come to expect
12      from this witness.
13      Q.   I'll ask you a similar question.
14  And obviously take as much time as you want to
15  look it over but my first question is going to
16  relate to the e-mail at the top from Gerard
17  Reilly to Chris O'Meara which says, "This has
18  been confirmed as a good balance.  We are
19  going to send to BarCap who is looking for our
20  positions and balances 507m," which I assume
21  refers to $507 million and this was on
22  September 21st.
23          Do you have any idea what that
24  number is?
25      A.   No.

Page 188

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2       Q.   The subject line is BIX, B-I-X,
3   statements.  What does that mean?
4           MR. SHAW:  Objection, foundation.
5       A.   I don't know.
6       Q.   Mr. Romain, could you take another
7   look at Exhibit 361A which you were handed
8   earlier in the deposition.
9           (Pause on the record.)
10      Q.   You have it in front of you?
11      A.   Yes.
12      Q.   And I'll just note again on the
13  record that I believe Exhibit 361A is
14  also designated as Exhibit 384.  And, again,
15  it's a one-page e-mail string.  Attached is
16  what your September 22nd e-mail referred to as
17  the latest acquisition balance sheet and
18  negative goodwill calculation.
19      A.   Yes.
20      Q.   And does this acquisition balance
21  sheet reflect Barclays' best understanding of
22  the components of the transaction as of 7:56
23  p.m. on September 22nd when you sent it?
24          MR. SHAW:  Objection.  Foundation.
25      A.   It represents my best

Page 189

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2   understanding at that time.
3       Q.   And did you create the document?
4   To be clear, by the document I mean the first
5   page of the attached -- well, the two-page
6   attachment.
7       A.   I did.
8       Q.   Now, on line 13 of the attachment
9   you have exchange traded options.  That does
10  not include margin or collateral, does it?
11      A.   At that time my understanding of
12  the component parts of the exchange traded
13  options item was based on very preliminary
14  information.  So I wouldn't be able to answer
15  reliably as to whether that was just a
16  placeholder number somebody had given me or a
17  net of two placeholder numbers somebody had
18  given me or something else.  But it was my
19  best estimate based on the information I'd
20  been provided as to the most appropriate
21  number that I could include at that time.
22      Q.   And that's for exchange traded
23  options themselves, correct?
24          MR. SHAW:  Asked and answered.
25      A.   I can't recall.

Page 190

G. ROMAIN - HIGHLY CONFIDENTIAL

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.    Do you see anywhere else in here
3    where margin or collateral held by LBI at OCC
4    would be included?
5        A.    Some of the numbers in here were
6    provided to me with at that time a relatively
7    low level of understanding as to what the
8    component parts are so I don't think I could
9    say definitively that the answer would be no.
10        Q.    If you'll look again at
11    Exhibit 377A, do you know the approximate date
12    when Exhibit 377A was created?
13        A.    This version would have been
14    created either right at the end of January or
15    at the beginning of February.
16        Q.    2009?
17             And on exhibit some 377A, line 18
18    you have OCC customer and clearing margin?
19        A.    Sorry.  Which page?  The second
20    one?
21        Q.    Second page.  Line 18.
22        A.    Yes.
23        Q.    Why do you add clearing margin?
24        A.    In terms of the name attributed to
25    that I can't recall.

Page 191

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.    Did anyone suggest to you that
3    margin should be included in the acquisition
4    balance sheet?
5             MR. SHAW: Objection to form.
6        A.    Yeah, I'm not sure what you mean
7    by suggested.  By that stage we had a final
8    balance sheet so understanding as to what
9    should be included was well formed.
10             So notwithstanding the name of the
11    item included in cell A-18, the understanding
12    was that the customer positions and associated
13    margin was included as an acquired asset and
14    should be included in the acquisition balance
15    sheet.
16        Q.    If you look still on Exhibit 377A
17    page 2, line 14, you'll see the entry for
18    exchange traded options.
19        A.    Yes.  Line 14 and line 18 should
20    be viewed together.  They're separate
21    primarily because of laziness on my part.
22    They're two items from very early on when I
23    had little understanding of the nature of OCC
24    as an exchange or the acquisition agreement.
25    That understanding grew over time and it

Page 192

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2    became clear that in fact I should be viewing
3    those items together.  But the spreadsheet was
4    already set up and I didn't take the trouble
5    to combine the lines.
6        Q.    Those lines being 14 and 18?
7        A.    Those lines being 14 and 18, yes.
8        Q.    But back in September on
9    Exhibit 361A you didn't have them combined
10    there, did you?
11        A.    This was a very, very early
12    version.
13        Q.    But the exchange traded options
14    listed on Exhibit 361A, line 13, is
15    $.30 billion, correct?
16        A.    Yes.
17        Q.    Now, that can't possibly include
18    the $.98 billion of OCC customer and clearing
19    margin that was later reflected on line 18 of
20    Exhibit 377A, can it?
21             MR. SHAW: Objection to form.
22        A.    I don't recall how that number was
23    put together or who provided it to me.
24    However, the answer to the question as to
25    whether it could is yes, it could.

Page 193

1        G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.    How?
3        A.    Because it could be a net of two
4    numbers which is the case for item C-14 which,
5    if you turn to --
6        Q.    C-14 on which document?
7        A.    On the second page of 377A.
8    That's a net number.  It's the net of two
9    items on the next page being line F-16 and
10    B-42.
11             So the second page there is a
12    summary.  For quite a few of these items there
13    are actually gross assets and liabilities
14    which underlie those and the item in C-14 is
15    one of those which is shown net on that
16    summary page.
17        Q.    And going back to line 18 again on
18    Exhibit 377A --
19             MR. SHAW: Page 2?
20             MR. WOOD: Page 2.
21        Q.    -- what could that possibly be
22    netted with to fit it within page 2 of
23    Exhibit 361A?
24             MR. SHAW: Objection to form.
25    Vague.  And maybe it will help you form

Page 194

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    another question if I give you a little
3    more information as to what I'm
4    objecting to.
5        MR. WOOD: Sure.
6        MR. SHAW: There is a category
7    that's being captured in there and
8    there's a number that's being captured
9    in there. And so it's not clear to me
10    whether you're asking whether the number
11    that's being captured a particular
12    category is -- can be captured inside
13    that bucket on the other sheet or
14    whether you're asking whether the
15    concept represented by the category can
16    be captured.
17        MR. WOOD: At this point I'm
18    asking about the number. I think I
19    already asked about the concept so --
20    A.    In terms of the number, the
21    number --
22    Q.    The .98 which is line 18 of page 2
23    of 377A.
24    A.    The number which is included in --
25    Q.    So if you look at 377A, line 18,

Page 196

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    did you have any estimate in mind of what the
3    margin at OCC could have been?
4    A.    I don't recall. I don't recall
5    where the number came from at that time.
6    Q.    Do you recall including anywhere
7    in the acquisition balance sheet attached to
8    Exhibit 361A, the OCC clearing margin?
9    A.    I don't recall having an
10    understanding of the components of the 300
11    million item which is included there. So I
12    can't speak knowledgeably as to what may or
13    may not have been included in the number on
14    that date.
15    Q.    On September 22nd, when you
16    created this acquisition balance sheet again
17    attached to Exhibit 361A, did you believe that
18    margin and collateral held at the OCC was part
19    of the purchase assets?
20        MR. SHAW: I'm sorry. Could you
21    read that one back, please.
22        (Record read.)
23        MR. SHAW: All right. You can
24    answer.
25    A.    I don't recall.

Page 195

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    it's OCC customer and clearing margin and
3    you've got $.98 billion.
4    A.    In order to understand what I mean
5    by that those numbers it's necessary to look
6    at the numbers on the next page. However,
7    that's not necessary to ask the question. To
8    ask the question the main thing to point out
9    is the difference in dates. 361A was put
10    together on the 22nd of September with a very
11    high level understanding of what this item was
12    and what an appropriate number might be. I
13    don't recall what information it was based on
14    or who it was provided to me by. But that,
15    along with most of the other numbers which are
16    included in 361A, was based on very early
17    understanding of the acquisition. So it's not
18    possible to compare the two numbers in such a
19    way and say is this number included within
20    that number because that number was a very
21    early estimate or part of a very early
22    estimate of the acquisition balance sheet
23    based on the information I had at that time.
24    Q.    When you created the acquisition
25    balance sheet that's attached in Exhibit 361A,

Page 197

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    Q.    Is there anyone else we can talk
3    to to find out whether or not margin and
4    collateral held at the OCC was included in
5    this September 22nd acquisition balance sheet?
6    A.    I'm not sure how to answer that.
7    Is there --
8    Q.    Is there anybody else at Barclays
9    who might be knowledgeable?
10    A.    The answer to that question may be
11    yes but I don't recall where that number came
12    from so I wouldn't know who to direct you
13    towards in terms of that particular number in
14    that particular document.
15    Q.    And when you say that number what
16    number are you referring to?
17    A.    The number in cell C-13 of page 2
18    of Exhibit 361A.
19    Q.    Is it correct that the acquisition
20    balance sheet went through several different
21    versions or drafts between the September 22nd
22    version we're looking at in Exhibit 361A and
23    the version I believe you said was probably
24    January or February of this year that's marked
25    as Exhibit 377A?

Page 198

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        MR. SHAW: Objection. Asked and
3    answered.
4        A.    Yes. It went through a large
5    number of iterations. It was a working
6    document.
7        Q.    Do you know if this line for OCC
8    customer and clearing margin was included in
9    any of the versions prior to 377A?
10        A.    I don't recall what the versions
11    prior to -- oh, 377A?
12        Q.    Yes.
13        A.    An item related to OCC accounts
14    was included in versions between those two
15    dates, yes.
16        Q.    Just to be clear, I'm referring to
17    OCC margin. If it helps you you can look at
18    again line 18 of page 2 of Exhibit 377A
19    entitled OCC Customer and Clearing Margin.
20        A.    Yeah.
21        Q.    Do you know if that line and that
22    title was included in -- or a title similar to
23    that was included in any versions prior to
24    377A?
25        MR. SHAW: Objection to form. You

Page 199

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    can answer.
3        A.    Lines with titles similar to that
4    were included in drafts between those two
5    dates, yes.
6        Q.    Do you know approximately when
7    they were included? First included I should
8    say.
9        A.    I don't remember exactly when, no.
10        Q.    Do you recall generally when?
11        A.    No. No. In terms of context, my
12    understanding of the appropriate amount to
13    include in that line item as it eventually was
14    represented developed over time. And
15    certainly from my perspective there was
16    significant conservancy around what the
17    acquisition documents meant initially because
18    I was not involved in the negotiations so I
19    had to read the documents and speak to people
20    who were involved in those negotiations, speak
21    to people who traded on those exchanges to get
22    that understanding, and also secure sufficient
23    resource to assist me in chasing down the
24    numbers which was a process which took a
25    significant amount of time. We obviously had

Page 200

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    the end point of our financial reporting in
3    January and February in mind and we were
4    always including -- I was always including my
5    best representation of the balance sheet and
6    all items through that period.
7        But necessarily that understanding
8    as it's represented there went through
9    significant change, not just that item but all
10    items, as the degree of information and the
11    amount of work increased over the period.
12        Q.    Did anyone point out to you that
13    OCC margin was missing from earlier iterations
14    of this?
15        A.    I don't recall what the component
16    parts of the number in 0.3 were or who
17    provided it to me so I couldn't answer
18    accurately as to whether that number was an
19    early representation of a net number of two
20    larger gross items or any other number of
21    possibilities as to what it represented
22    without a recollection of where it came from.
23        Certainly, over time the
24    appropriate interpretation of the acquisition
25    agreements and terms were something which I

Page 201

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    acquired and we then did work to quantify what
3    numbers should be included on that basis.
4        And that occurred during the weeks
5    after the acquisition date.
6        Q.    I think I was asking a slightly
7    different question which is did anybody ever
8    point out to you that he or she thought that
9    the acquisition balance sheet was missing OCC
10    margin?
11        A.    I think that was the question I
12    was trying to answer, though. I'm not sure
13    whether people would have had a good view that
14    something was missing because it's not clear
15    to me whether -- it's not clear to me and it
16    wouldn't have been clear to other people
17    without understanding of how the 0.3 was put
18    together as to what was included and what was
19    not included. So I don't recall it being
20    pointed out to me that there was anything
21    missing.
22        MR. SHAW: When we reach a
23    reasonable breaking point.
24        MR. WOOD: Sure. We can do it now
25    if you'd like.

Page 202

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2       (Recess taken.)
3   BY MR. WOOD:
4       Q.   Mr. Romain, when was margin held
5   to secure derivatives first included in the
6   deal between Lehman and Barclays?
7       A.   I'm not sure. I wasn't involved
8   in the negotiations so I couldn't answer the
9   question.
10      Q.   When did you first come to believe
11  that margin held to secure derivatives was
12  included in the deal?
13      A.   Could you clarify? Do you mean
14  when I first came aware or with the awareness
15  I have now when do I think it was first
16  included?
17      Q.   When did you first become aware?
18      A.   I don't recall.
19          MR. SHAW: Are we on -- this is a
20  30(b)(6) question?
21          MR. WOOD: Yes.
22          MR. SHAW: You may want to refer
23  to your notes.
24      Q.   Yes. Feel free to refer to your
25  notes.

Page 203

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2       A.   Sure.
3          (Document review.)
4       Q.   After looking at your notes did
5   you want to add anything to your answer?
6       A.   It depends which question you're
7   asking. If you're asking when did I become
8   aware myself, I don't recall when I became
9   aware. If you're asking when they became part
10  of the deal, I wasn't involved in the
11  negotiations myself but being aware that it
12  was going to be an item we were going to be
13  talking about today I had a number of
14  conversations with people who would assist me
15  in understanding a little more about the
16  negotiation of the transfer and assumption
17  agreement and they are summarized in the notes
18  on pages 3 and 4 of Exhibit 399A.
19      Q.   And who did you have those
20  conversations with?
21      A.   With Ed Rosen who is a lawyer at
22  Cleary Gottlieb and with Jonathan Hughes who
23  is Barclays' general counsel.
24      Q.   And did your conversations with
25  Mr. Rosen refresh your recollection on this

Page 204

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2   point?
3       A.   They didn't refresh my
4   recollection. I wasn't involved in the
5   negotiation. But they provided to me the
6   information that's summarized there as regards
7   his involvement in the negotiation of that
8   arrangement.
9       Q.   So as a 30(b)(6) witness can you
10  tell me when margin to secure derivatives was
11  added to the proposed deal between Lehman and
12  Barclays Capital?
13      A.   I can tell you that we were
14  continuing to look into specific conversations
15  and communications around the negotiation
16  process. But as a minimum they were -- the
17  terms of the transfer and assumption
18  agreements were part of discussions between
19  Barclays' trustee and the OCC prior to
20  agreeing to the transfer and assumption
21  agreements.
22      Q.   Prior to the signing of the TAA
23  was margin held to secure derivatives included
24  anywhere in the deal between Lehman and
25  Barclays?

Page 205

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2       A.   Prior to the signing of the
3   transfer and assumption agreement.
4       Q.   Correct.
5       A.   The inclusion of collateral in the
6   deal was most directly included and clarified
7   in the clarification letter.
8       Q.   And where --
9       A.   To the Asset Purchase Agreement.
10          Would it be possible to get the
11  rest of the e-mails which I'm referring to?
12          MR. WOOD: First of all, does
13  everybody have Exhibit 25? I've now
14  handed the witness what's previously
15  been marked as Exhibit 25. What we
16  refer to as the clarification letter.
17      A.   Yes.
18      Q.   And can you point me to the
19  relevant language in Exhibit 25 that according
20  to Barclays provides Barclays' the margin held
21  to secure derivatives?
22          MR. SHAW: Take your time. Look
23  through the document.
24      A.   In terms of the extent to which
25  it's included in this document it's within

Page 206

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  paragraph 8.
3      Q.   I'm sorry.  Paragraph what?
4      A.   Eight.
5      Q.   And could read me the language
6  you're referring to.
7      A.   Transfer of Customer Accounts.
8  All customer accounts of LBI (other than
9  customers who are affiliates of LBI) shall be
10 transferred to purchaser in connection
11 therewith --
12     Q.   If I can just interrupt, are you
13 planning to read the whole paragraph or was
14 there a particular passage in the paragraph?
15     A.   No, I was going to stop there.
16     Q.   Okay.  Continue.  Sorry.
17     A.   In connection therewith purchaser
18 shall receive, one, for the accounts of the
19 customer, any and all property of any customer
20 including any held by or behalf of LBI to
21 secure the obligations of any customers whose
22 accounts had been transferred to purchaser as
23 part of the business.
24     I'll stop there.
25     Q.   Are there any other provisions in

Page 207

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  the clarification letter that provide Barclays
3  the margin to secure derivatives?
4      MR. SHAW:  Objection to form.
5      A.   I'm not sure I can answer the
6  question just because it's -- my memory is
7  letting me down.  Is there anything else.  I'd
8  be happy to read the whole thing to make sure
9  that there's nothing else which -- that I was
10 referring to when reaching the understanding
11 in combination with discussions with other
12 parties.  But I would confirm that it's that
13 paragraph which was the primary one which I
14 was always referred to when asking that
15 question.
16     Q.   Now, this clarification letter,
17 Exhibit 25, is -- on page 1 says it's dated as
18 of September 20th but I can tell you we've
19 heard testimony to the effect that it was
20 signed on the 22nd.  Which is the same date
21 that the TAA was signed.
22     Prior to September 22nd, to your
23 knowledge, did any iterations of the deal
24 between Lehman and Barclays provide that
25 margin to secure derivatives was part of

Page 208

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  purchase assets?
3      A.   My understanding of the
4  acquisition of these positions is that they're
5  daily margined derivatives positions.  So it's
6  difficult to view the positions and margin as
7  separately.
8      In terms of whether there was
9  specific signed documentation which referred
10 directly to the collateral, I'm not sure
11 whether that is the case.  But my
12 understanding is that it was understood that
13 they are viewed together and that the
14 clarification letter was just that, a
15 clarification of the deal which it was
16 understood that we'd entered into.
17     Q.   As you may know there was an
18 original Asset Purchase Agreement which was
19 signed by the parties I believe on September
20 16th and so then the clarification letter and
21 the TAA as we refer to it came along later.
22     As part of the earlier deal as it
23 was on September 16th was margin held to
24 secure derivatives included in that deal?
25     MR. SHAW:  Objection.  Asked and

Page 209

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2  answered.  He just told you that it was
3  always the deal.
4      A.   Yeah.  I'm not sure I could answer
5  that any more clearly.
6      (Pause on the record.)
7      Q.   Mr. Romain, I'm handing you what's
8  been previously marked at another deposition
9  as Exhibit 49.  It's an e-mail from Dave
10 Leinwand to several individuals dated
11 Saturday, September 20th at 11:13 p.m.  The
12 subject is Revised clarification letter.  The
13 content of the e-mail just says "Attached is a
14 revised draft of the clarification letter.
15 The attached has not been reviewed by Barclays
16 and remains subject to comment."
17     And attached to it is what appears
18 to be two versions, two drafts of the
19 clarification letter.  One has red-line
20 markings, the other appears not to.  We'll
21 just start with the one that does not have a
22 red line so the first attachment there.
23     If you look on page 2 and just to
24 be clear this is Bates number at the become
25 ends in 24956.

Page 210

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        Are you with me? It should be the
3    second page.
4        A.   I don't have that page. It just
5    goes from page 1 to page 3.
6        MR. SHAW: Actually so does mine.
7        MR. McMAHON: We should have
8    another copy here.
9        MR. WOOD: Yeah. We should have a
10   good copy.
11       (Pause on the record.)
12       Q.   Now hopefully you have both the
13   odd and even numbered pages of the attachment.
14       A.   Yes.
15       Q.   Do you see the second page ending
16   in 24956 at the bottom?
17       A.   Yes.
18       Q.   If you look in the middle of the
19   page there's a paragraph D.
20       A.   Yeah.
21       Q.   And just to be clear, that's all
22   part of the definition of purchase assets;
23   excluded assets that begins on the prior page?
24       A.   Um-hum.
25       Q.   And then on paragraph D about the

Page 211

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    fifth line down do you see an underline
3    provided?
4        A.   Yes.
5        Q.   It says "Provided that 'excluded
6    assets' shall not include..." and then it has
7    a little Roman numeral i. Little Roman
8    numeral ii is Cash, cash equivalents, bank
9    deposits, or similar cash items maintained (a)
10   by or on behalf of LBI pursuant to Rule
11   15(c)(3)-3 of the Securities Exchange Act of
12   1934 or otherwise, or by or on behalf of any
13   clearing agency or clearing organization to
14   collateralize, guarantee, secure (whether as
15   margin, guarantee, fund deposit or in any
16   other form) the obligations of LBI or any
17   other person in an account maintained by or
18   behalf of LBI for which purchaser shall become
19   responsible as of the closing pursuant to the
20   requirement of any such clearing agency or
21   clearing organization."
22       Do you see that language?
23       A.   Yes.
24       Q.   Have you read that language
25   before?

Page 212

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        A.   Yes.
3        Q.   And so you -- I take it you've
4    seen this particular draft of the
5    clarification letter? As far as you can tell.
6        A.   Well, I should clarify. I've seen
7    the language which was included in the final
8    draft. I don't think I've ever seen this
9    draft.
10       Q.   Okay. This language that I read
11   was not included in the executed version of
12   the clarification letter, was it?
13       A.   Okay. Well, I've seen the
14   excluded assets definition so if that language
15   is not included in the final version I would
16   not have seen that language before.
17       Q.   Do you see in the language I read
18   the parenthetical that says whether it's
19   margin, guarantee, fund deposit or in any
20   other form?
21       A.   Yes.
22       Q.   That language did not make it into
23   the executed version of the clarification
24   letter, did it?
25       A.   I wouldn't be able to answer that

Page 213

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    without comparing it to the executed document.
3    I haven't memorized the executed document.
4        Q.   That's okay. So then I take it
5    you're not aware of at any point at which this
6    language was dropped?
7        A.   We're continuing to look into
8    matters in relation to the drafting --
9    successive drafting of the agreements. At
10   this point I'm not aware.
11       Q.   So I take it you wouldn't be aware
12   of why it was dropped.
13       A.   I wouldn't know.
14       Q.   Was the bankruptcy court that was
15   overseeing the LBHI and the LBI proceedings
16   ever informed that margin held to secure
17   derivatives was part of the purchase assets?
18       MR. WOOD: I'll just note on the
19   record that counsel pointed out --
20       MR. SHAW: Yeah. I'm indicating
21   his notes because it shows as a result
22   of his investigation.
23       MR. WOOD: So I'll just note on
24   the record that counsel is pointing the
25   witness to I believe his handwritten

Page 214

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2    notes.
3       MR. SHAW: Exhibit 399A.
4       A.   In terms of the disclosure of the
5    acquisition of the derivatives and associated
6    collateral it was disclosed to LBHI, the SIPA
7    trustee, creditors' committee, and other
8    interested parties in the APA, the sale order
9    and the clarification letter and in the TAA
10   and we're currently investigating other
11   disclosures.
12      Q.   Now, as I understand your answer
13   you mentioned LBHI, the SIPA trustee, the
14   creditors' committee.  You didn't mention the
15   bankruptcy court there, did you?
16      MR. SHAW: He mentioned other
17      interested parties.
18      Q.   Were you including the bankruptcy
19   court in the other interested parties?
20      A.   It was disclosed to parties, the
21   APA, the clarification letter, the TAA.  And
22   to answer more fully as to who was informed
23   when, on that particular point that's an area
24   which I continue to look into.
25      Q.   Do you know whether the bankruptcy

Page 215

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2    court was ever informed orally of the
3    inclusion of margin held to secure derivatives
4    in the deal?
5       MR. SHAW: Objection, foundation.
6       A.   I don't know but we are continuing
7    to look into and investigate other disclosures
8    of facts -- of that fact.
9       Q.   Mr. Romain, other than the Asset
10   Purchase Agreement, the clarification letter,
11   and the TAA, all of which I believe you
12   mentioned, are you aware of any other manner
13   in which the bankruptcy court was informed of
14   the inclusion of margin held to secure
15   derivatives in the deal?
16      MR. SHAW: Did you mean to leave
17      out the sale order which was in the list
18      that he read to you?
19      MR. WOOD: I'll add in the sale
20      order.  Thank you.
21      A.   At this time I'm not aware of any
22   other means by which the bankruptcy court was
23   made aware.  But as I'm saying we continue to
24   investigate any other disclosures that were
25   made.

Page 216

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2       Q.   Mr. Romain, I'm handing you what's
3    previously been marked as Exhibit 209.  Feel
4    free to take a moment to look that over.
5       (Document review.)
6       MR. WOOD: Okay.  I'll just note
7      for the record that I believe one of the
8      documents that was marked earlier in
9   .  this exhibit comes from a -- comes from
10     the same e-mail chain but that this one
11     I believe was not previously marked.  Or
12     used during this deposition.
13      Q.   So if you see on page 2 of this
14   document an e-mail that you wrote on September
15   21st to Martin Kelly c.c.'ing James Walker you
16   write, "Martin, a basic question but want to
17   make sure I'm understanding this summary.
18   Will the 44.880 correspond to what came across
19   against the repo - you mention and additional
20   $1.9 billion of assets (separate to the
21   15(c)(3)) which is included/excluded in this
22   number...?"
23      Do you see that?
24      A.   Yeah.
25      Q.   First of all, is correct that the

Page 217

1       G. ROMAIN - HIGHLY CONFIDENTIAL
2    $44,880,000 refers to 44.8 billion?
3       A.   Yes.
4       Q.   And then the response you got from
5    Martin Kelly says includes the 1.9 billion.
6       Do you see that?
7       A.   Yeah.
8       Q.   And then it says "Robert can
9    bridge it for you."
10      Is Robert Robert Azerad?
11      A.   Yes.
12      Q.   And do you know what he meant by
13   bridge it for you?
14      A.   What I was looking at here was
15   some early information as to what securities
16   were being -- was being included in best
17   estimate of the balance sheet on the 22nd of
18   September included an amount of $44.88 billion
19   and I was trying to understand what that
20   represented.  Specifically I was trying to
21   understand whether it represented only assets
22   which came across against the reverse repo or
23   whether it also included assets that we were
24   expecting to receive from LBI clearance boxes.
25      The response from -- the numbers

Page 218

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    as you say were provisional values based on
3    what information I can't recall, but using
4    them as shorthand for the two items, the
5    question is whether the 1.9 billion which was
6    the number which was being mentioned to
7    represent assets coming across from the
8    clearance boxes, whether that was included in
9    the 44.88.
10        Martin's response indicated that
11    it was and that Robert would be able to
12    reconcile for me either to split the 44.88
13    into what amount represented assets against
14    the repo and what amount represented assets
15    from the clearance box.
16        This issue continued to be
17    investigated over the coming days and weeks
18    and it was clear that the initial view
19    represented by Martin then was not entirely
20    accurate and that we had not received all
21    assets from the clearance boxes which is still
22    the case today.
23        Q.    To your knowledge, is any of the
24    $1.9 billion included in that 44.88?
25        A.    Yes.

Page 219

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.    How much?
3        A.    I don't know.
4        Q.    Is the portion that's already
5    been -- of the $1.9 billion that's already
6    been transferred to Barclays, was that
7    included?
8        A.    Sorry.
9        Q.    I should rephrase that.
10        When you're saying that some of
11    the $1.9 billion was included in the 44.88
12    billion are you referring to the clearance box
13    assets that had already been transferred to
14    Barclays?
15        A.    Yes.
16        Q.    Okay. So the 44.88 billion
17    represents assets that had been transferred at
18    that time as opposed to purchase assets
19    generally?
20        A.    I don't know what the 44.88
21    billion number itself represented. But the
22    purpose of my question was to try to ascertain
23    that.
24        Q.    So some of the $1.9 billion of
25    clearance box assets -- was some of that

Page 220

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    included in the repo transaction?
3        A.    I'm not specifically aware of how
4    these securities were transferred to Barclays.
5    Moving forward the important thing for me was
6    identifying what assets had been received by
7    Barclays. It was of far lesser importance
8    from my point of view in putting together the
9    acquisition balance sheet as to whether they'd
10    been transferred against the repo or against
11    the clearance boxes for that part of the
12    exercise.
13        The main thing I was trying to do
14    here was to ensure that I wasn't double
15    counting anything and conversely that I wasn't
16    missing anything and, therefore, that when we
17    moved forward to try to accurately value the
18    assets which had been received that we were
19    working on the correct population.
20        Q.    Okay. So some of the $1.9 billion
21    in clearance box assets were transferred
22    before this e-mail -- those were transferred
23    on Friday, September 19th; is that right?
24        A.    I'm not sure of the date.
25        Q.    Okay. Just so I understand, is it

Page 221

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    your testimony you don't know whether or not
3    any such transfers of clearance box assets
4    were also part of the repo transaction?
5        A.    I don't know. No, I don't have a
6    huge amount of detailed knowledge in terms of
7    the precise mechanics by which the assets were
8    transferred.
9        Q.    Do you know who might be able to
10    tell us that?
11        MR. SHAW: Any of the previous
12    witnesses who testified about it
13    including on the 30(b)(6) level.
14        MR. WOOD: I'm not sure that the
15    testimony is all consistent. So that's
16    why I'm looking for additional names.
17        Q.    But if you don't know any that's
18    fine.
19        A.    No. I don't know anybody in
20    particular.
21        (Deposition Exhibit 406A, document
22    bearing production numbers
23    BCI-EX-(S)-00052709 through
24    BCI-EX-(S)-00052710, marked for
25    identification as of this date.)

Page 222

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2   BY MR. WOOD:
3      Q.   Mr. Romain, I've handed you what's
4   been marked as Exhibit 406A. It's a
5   two-page -- or in the version you have
6   one-page double-sided -- e-mail chain. At the
7   top of the first page, the most recent e-mail
8   is from you to Stephen King c.c.'ing Jasen
9   Yang on Tuesday, September 23rd. The subject
10  line for all three of the e-mails is
11  Valuation/opening balance sheet.
12          Do you see that?
13     A.   Yes.
14     Q.   Looking at the bottom of page 1,
15  so the earliest e-mail chronologically -- do
16  you need a minute to look it over or are you
17  ready?
18     A.   I've just read it.
19     Q.   Okay. The earliest
20  chronologically of these e-mails where you
21  write, "On Tuesday September 23rd at 11:05
22  a.m. Jasen..." and in the first paragraph
23  there's a reference to the $44.8 billion and
24  so then the last line of that paragraph says,
25  "However, this valuation does not yet

Page 223

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2   attribute any value to the 1.9 billion that
3   came across from the Lehman box rather than as
4   repo collateral. Is that all correct?"
5      A.   Yeah.
6      Q.   What did you mean by that?
7      A.   Again, that was an early part of
8   the process by which I was trying to assess
9   what the appropriate -- what the appropriate
10  view of the value of the assets that had come
11  across at that time based on the information
12  at that time. I had two sources of
13  information, neither of which at that stage I
14  particularly understood fully and I was trying
15  to go between the two. So Patrick, which was
16  Patrick Clackson, had mentioned to me a
17  current view of the valuation of the Long
18  Island acquired assets from the front office
19  meaning Jasen and Stephen which was
20  42.9 billion plus 300 million which came
21  across as cash. And that this corresponded to
22  the same assets as the 44.8 billion number
23  that was referred to in our conversation
24  around my e-mail to Martin Kelly.
25          What I was trying to do here was

Page 224

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2   work out was I comparing like with like so was
3   this -- were both numbers either including or
4   excluding assets from the clearance box.
5          And -- yes, actually, that was the
6   main thing I was trying to ascertain from
7   Jasen.
8          And then I started moving on to
9   get a sense from them whether the 42.9 and 300
10  million were indeed their best estimates of
11  fair value of those assets on that date.
12     Q.   Mr. Romain, I'm handing you the
13  first several pages of what's been marked 85B.
14  I'd be happy to get the lengthier version
15  which has longer attachments if you'd like or
16  if we end up getting into that.
17          But if you could look first at
18  the -- there's an e-mail chain and then
19  attached to it there's a page where it says
20  page 1 at the bottom entitled Lehman
21  Brothers/Barclays Capital APA Lead Sheet. And
22  the actual exhibit in full has numerous pages
23  showing what went into that. But before we
24  get into that I just want to find out are you
25  familiar with this document at all?

Page 225

1      G. ROMAIN - HIGHLY CONFIDENTIAL
2      A.   No.
3      Q.   To your knowledge you've never
4   seen it before?
5      A.   To my knowledge I've never seen
6   it, no.
7      Q.   Okay. In that case I won't spend
8   any further time on it.
9          I'm handing you a one-page
10  document that's previously been marked as
11  Exhibit 374A. It's a very short e-mail from
12  Patrick Clackson to you on Tuesday, September
13  23rd. Subject BS. It says "Box securities
14  worth 1.5 and exchange traded zero and may be
15  some upside - may need a provision."
16          Do you see that?
17     A.   Yeah.
18     Q.   First of all, what do you
19  understand Mr. Clackson to mean by box
20  securities worth 1.5?
21     A.   Without a context sitting here
22  right now I don't recall.
23     Q.   Do you think that's a different
24  valuation of the 1.9 billion in securities we
25  were previously discussing?

Page 226

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2         MR. SHAW: Objection. Calls for
3    speculation.
4         A.   I don't know.
5         Q.   And then he wrote exchange traded
6    zero. What did you understand him to mean by
7    that?
8         A.   Again, without the context of
9    being there at the time and recalling the
10   conversation I was having with help me at that
11   time I don't know.
12        Q.   Do you recall what you understood
13   him to mean by may be some upside?
14        A.   No.
15        Q.   Do you recall what you understood
16   him to mean by may need a provision?
17        A.   No.
18        (Deposition Exhibit 401A, document
19        bearing production number
20        BCI-EX-(S)-0005241 9 with attachment,
21        marked for identification as of this
22        date.)
23   BY MR. WOOD:
24        Q.   Mr. Romain, I'm handing you what's
25   been marked as Exhibit 407A. As you see it's

Page 227

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    a one-page e-mail with a one-page attachment.
3         A.   Yeah.
4         Q.   The e-mail is -- it's Bates
5    numbers ending in 52419. I don't see any
6    Bates numbers on the attachment but it's our
7    understanding that these were produced
8    together.
9         Looking at it can you tell whether
10   or not that attachment was, in fact, the
11   attachment to the e-mail?
12        A.   I can't tell.
13        Q.   Okay. In your September 20th
14   e-mail to James Walker and several other
15   people you write, "James, Please find attached
16   a completion balance sheet based on the APA as
17   amended plus the clarification letter (and our
18   conversation with Patrick)."
19        Just looking at the attachment
20   does that appear to be a completion balance
21   sheet?
22        A.   Yes, yes. A completion balance
23   sheet being another term which has been used
24   for acquisition balance sheet.
25        Q.   If you look along the left about

Page 228

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    maybe a third of the way down the page, you'll
3    see Assets in Fed box (net of $.9 billion
4    writedown).
5         A.   Yeah.
6         Q.   What does the Fed box refer to?
7         A.   I don't recall.
8         Q.   Do you think that was the
9    clearance box at DTC?
10        A.   I don't know.
11        Q.   Okay. Do you know why there was a
12   $.9 billion writedown?
13        A.   No. I don't know.
14        Q.   Did you create this document?
15        A.   Yes.
16        Q.   Do you see margin held to secure
17   derivatives anywhere on this sheet?
18        A.   Those words don't appear, no.
19        Q.   That's all I have for that
20   document.
21        (Deposition Exhibit 408A, document
22        bearing production number
23        BCI-EX-(S)-00052859, marked for
24        identification as of this date.)
25

Page 229

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    BY MR. WOOD:
3         Q.   Mr. Romain, I'm handing you what's
4    been marked as Exhibit 408A. It's a one-page
5    e-mail chain -- actually, just a single e-mail
6    I should say. Bates Numbers ending in 52859.
7    It's an e-mail from you to Patrick Clackson
8    c.c.'ing several people on Thursday, September
9    25th. The subject is Acquisition balance
10   sheet - areas of uncertainty.
11        You write, "Patrick, As requested
12   remaining uncertainties on the acquisition
13   balance sheet." And then you have the heading
14   Operational. The second bullet there is
15   $1.9 billion assets from LBI box not yet
16   received.
17        Then you have a little asterisk at
18   the bottom. There's a note that says that
19   means As of this morning we need to catch up
20   with Marcus/Phil.
21        As of September 25th had any of
22   those $1.9 billion in assets from the box been
23   transferred to Barclays?
24        MR. SHAW: Asked and answered.
25        A.   I believe the answer was yes.

58

Page 230

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    Q.  Some had.
3    A.  I believe the answer was yes, yes.
4    Q.  But you don't recall how much; is
5    that correct?
6    A.  No, I don't recall how much, no.
7    Q.  The next line is 15(c)(3)
8    asset - asset to be finalized/received.
9        What needed to be finalized?
10   A.  I don't have an accurate
11   recollection as to what my level of knowledge
12   or understanding of that item was on the 25th
13   of September.
14   Q.  Do you recall whether finalized
15   referred to the need to make a final
16   calculation of any excess beyond the 15(c)(3)
17   lockup requirement?
18       MR. SHAW: Objection. Asked and
19   answered.
20   A.  No. I don't recall.
21   Q.  Do you recall whether finalized
22   referred to any need to get regulatory
23   approval from any government agencies?
24       MR. SHAW: Objection. Asked and
25   answered.

Page 231

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    A.  No, I don't recall.
3    Q.  The next line is exchange traded
4    options - uncertainty around this population
5    and its valuation.
6        Do you know what you meant by the
7    uncertainty?
8    A.  I don't know precisely what I
9    meant in terms of what the nature of my
10   uncertainty was at that point in time but I
11   would say that it was certainly in the context
12   of a significant degree of uncertainty on my
13   part as to that as well as many other items at
14   that stage. So it doesn't surprise me that I
15   was representing there as being uncertainty
16   from my perspective at that date.
17   Q.  Okay.
18       (Deposition Exhibit 409A, document
19   bearing production number
20   BCI-EX-(S)-00052876, marked for
21   identification as of this date.)
22   BY MR. WOOD:
23   Q.  I've handed you what's been marked
24   as Exhibit 409A. It's a single page of
25   e-mails containing three e-mails all dated

Page 232

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    Friday, September 26th. Bates number at the
3    bottom of the page ends in 52876. Subject is
4    1.9 free collateral. As you'll see there's --
5    the earliest chronologically is from Stephen
6    King to Patrick Clackson and James Walker.
7    Looks like Mr. Clackson then forwarded the
8    e-mail onto you without any comment later that
9    day and you forward it on to Philip Nash,
10   Marcus Morton, and Charles Utley also without
11   any comment.
12       Mr. King wrote in the earliest
13   e-mail "The file containing the extra 1.9
14   billion has not been delivered and can't be
15   right because it contains some bonds which are
16   already in the BarCap repo."
17       What did you understand him to
18   mean by contains some bonds which are in the
19   BarCap repo?
20   A.  I'm not sure.
21   Q.  He continued, "Therefore the 1.5
22   est as the value of the 1.9 cannot be relied
23   upon."
24       What did you understand him to
25   mean by that sentence?

Page 233

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    A.  I'm not sure exactly what he
3    meant, no. No, I'm not sure.
4        (Deposition Exhibit 410A, document
5    bearing production numbers
6    BCI-EX-(S)-00052909 through
7    BCI-EX-(S)-00052911, marked for
8    identification as of this date.)
9    BY MR. WOOD:
10   Q.  Mr. Romain, I've handed you what's
11   been marked as Exhibit 410A, a three-page
12   e-mail string. It appears that they are all
13   dated Friday, September 26th. Subject is
14   15(c)(3). Feel free to take a moment to look
15   that over.
16       (Document review.)
17   Q.  Okay. And the earliest of this
18   e-mail is from you to Marty Kelly, Friday,
19   September 26th. You wrote, "So was wondering
20   if the 15(c)(3) number/process had been
21   resolved...thanks, Gary."
22       What did you mean if the 15(c)(3)
23   number/process had been resolved?
24   A.  The 15(c)(3) was one of the items
25   on the Barclays balance sheet at that time and

Page 234

G. ROMAIN - HIGHLY CONFIDENTIAL
1  it was item which I had particularly little
2  knowledge or understanding about. So what I
3  was getting at with the question to Martin was
4  whether he could help me to understand what
5  the status of that number was and explain to
6  me in a little more detail what the item
7  represented which he then partially did.
8      Q.    So his answer that same day begins
9  with "Not resolved - it still appears that
10  there is plenty of cushion in the reserve but
11  I cannot estimate the timing of the release of
12  that cushion."
13      What was the significance of the
14  cushion in the reserve?
15      A.    I'm not sure. I don't have a
16  great understanding of the way that 15(c)(3)
17  rules work. So at that time it would have
18  been -- at that time the message I would have
19  gotten out of Martin's e-mail was principally
20  that there was more I needed to understand
21  before I had any certainty as to what that
22  item represented.
23      Q.    And then number 4 of that same
24  e-mail he writes -- it's on the next page.

Page 235

G. ROMAIN - HIGHLY CONFIDENTIAL
1  "For the SEC to allow us to release cash from
2  the reserve formula," it's misspelled there,
3  "we need to prepare a reserve requirement of
4  accounts staying at LBI versus going to BCI -
5  until our operations group catches up on
6  booking trades and clearing fails we cannot
7  prepare that schedule."
8      So based on his response to your
9  inquiry what action, if any, did you take
10  regarding the acquisition balance sheet you
11  were working on?
12      A.    I don't recall.
13      Q.    Then in your response back to him
14  starts off, "Martin, thanks. More moving
15  parts than I appreciated!"
16      Then you say later in that e-mail
17  "It would be good to walk through the current
18  situation on the phone if you have a minute."
19      Do you recall if you talked to him
20  on the phone?
21      A.    I don't recall, no.
22      Q.    And then you'll see up above he
23  writes, "Sure. I'll call you Monday. Hope
24  you get some time out."

Page 236

G. ROMAIN - HIGHLY CONFIDENTIAL
1      You still don't remember whether
2  you spoke to him?
3      A.    No.
4      (Deposition Exhibit 411A, document
5  bearing production numbers
6  BCI-EX-(S)-00052978 through
7  BCI-EX-(S)-00052981, marked for
8  identification as of this date.)
9  BY MR. WOOD:
10      Q.    Mr. Romain, I've handed you
11  Exhibit 411A, a four-page e-mail string.
12  Bates numbers ending in 52978 to 52981.
13      The dates on the various e-mails
14  appear to be Sunday, September 28th, and
15  Monday, September 2003. Subject is Current
16  position reconciliation. Go ahead and take a
17  moment to look that over.
18      (Document review.)
19      A.    Okay.
20      Q.    At the very bottom of the first
21  page you'll see there's a From: Marcus Morton
22  dated September 29th, 2008.
23      A.    Um-hum.
24      Q.    To you c.c.'ing Charles Utley.

Page 237

G. ROMAIN - HIGHLY CONFIDENTIAL
1  And it starts out, "Just a quick explain.
2  Apparently the 1.9 was partly delivered on
3  Thursday, part on Friday."
4      Now, this is dated September 29th
5  but do you know whether the Thursday and
6  Friday referred to there are September 18th
7  and 19th or September 25th and 26th?
8      A.    I don't know. My understanding is
9  it would be the 18th and 19th.
10      Q.    And what do you base that on?
11      A.    It's only speculation really. I
12  don't know.
13      Q.    Are you inferring that just from
14  the context of the e-mail or do you have a
15  recollection that there were transfers on the
16  18th and 19th but not on the 25th or 26th?
17      A.    I'm not sure whether there were
18  transfers on the 25th and 26th. I know there
19  were transfers of some assets on the 18th and
20  19th but I shouldn't say that there weren't on
21  the 25th and 26th. I'm not sure.
22      Q.    At the very end of that same
23  paragraph Mr. Morton writes, "An early
24  estimate is around 1 to $1.2 billion more than

Page 238

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    original balance but with some securities
3    still unpriced."
4        Do you know what he meant by that?
5    A.    I'm not sure what I was basing
6    that on, no.  This was the process whereby we
7    were trying to get the handle on what we'd
8    received, reconcile the balance, and then
9    enable us to start valuing.  And what I take
10   from that e-mail is as of that date, that
11   process was far from complete and there was
12   evidently a lack of certainty as to what we'd
13   received and what it was worth at that time.
14       Q.    And then you replied to him.  And
15   then he wrote back, this is on September 29th
16   at 16:28.  The second line of it is "Also we
17   just received a further $200 million in
18   collateral today!"
19       MR. SHAW:  Objection to form.  250
20   million.
21       MR. WOOD:  I'm sorry.  Did I say
22   something else?
23       MR. SHAW:  You said 200.
24       MR. WOOD:  Oh, thank you.
25       Q.    "It was 250 million in collateral

Page 239

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    today!"
3        Do you know what that 250 million
4    in collateral was?
5    A.    No.
6        Q.    The next paragraph says "Also
7    Rodefeld was saying that we received 300
8    million in cash as part of the collateral."
9        Do you know what that 300 million
10   in cash was?
11   A.    I'm aware that when we received
12   assets that one of the assets we received was
13   300 million in cash against the repo.
14       Q.    So the 300 million in cash was
15   part of the repo transaction?
16   A.    300 million was an asset that was
17   received by Barclays at around the time of the
18   repo in terms of the precise relationship of
19   the asset to the repo.  I'm no expert in that
20   but it was received and was one of the assets
21   which was included in the acquisition balance
22   sheet on that basis.
23       Q.    Do you know whether that was from
24   LBI's clearance boxes at DTC?
25   A.    I don't know, no.

Page 240

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2        Q.    You replied and then at the top of
3    this page Marcus Morton writes, "Apparently
4    the 250 is more collateral that has been freed
5    up at DTC which they had sent to us."
6        Do you know what that refers to?
7    A.    No.
8        Q.    Then he continues, "They're also
9    looking at their other account at DTC to see
10   if there is more.  Not quite sure how to
11   handle this and not on the list agreed with
12   LEH and the lawyers of what we should
13   receive."
14       Do you know whether that list
15   refers to Schedule B?
16   A.    No.  I'm not sure what he was
17   referring to.
18       Q.    Did you ask him what he was
19   referring to?
20   A.    I don't recall.
21       Q.    Do you know why Barclays was
22   getting assets that were not on the list
23   agreed with LEH and the lawyers?
24       MR. SHAW:  Objection to form.
25   Assumes facts not in evidence.

Page 241

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2    A.    I don't know whether that was the
3    case.  And I don't know -- I don't have a
4    great deal of knowledge about the precise
5    mechanics by which the assets were transferred
6    to Barclays.  I would say that this was more
7    ensuring that the assets that we received were
8    credited to the accounts.
9        Q.    Mr. Romain, I just want to take
10   you back to something we discussed earlier.
11   When I was asking about Exhibits 399A and 404A
12   which you're welcome to take a look at but you
13   may be able to answer without them, we
14   discussed several types of collateral that you
15   said were held for affiliates of LBI but not
16   for LBI itself.
17       Do you recall that?
18   A.    They were posted to exchanges in
19   which LBI affiliates had the exchange
20   membership.  That relates to LBI customers.
21       Q.    Okay.  So on, for example,
22   Exhibit 404A, at the bottom where we had the
23   Lehman entities, and those are non-LBI
24   affiliates, correct?
25   A.    Yeah, they are -- yeah, other

Page 242

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  Lehman entities, yes.
3     Q.    But this margin relates to
4  derivatives held by LBI customers?
5     A.    Yeah. It relates to -- it's
6  collateral that relates to customer accounts
7  that we took on but related to derivatives
8  which traded on exchanges which other Lehman
9  entities held the exchange membership for.
10     Q.    So at the bottom of 404A there's a
11  line that says Totals Not Received and it says
12  95 million. Is that correct?
13     A.    It says 95 in Treasury bills and
14  then there's 289 million which I believe is
15  held just in currency. I'm not sure for -- in
16  terms of the form that's held in but they are
17  both items of margin which are held in
18  exchanges related to those.
19     Q.    Does the "not received" refer to
20  both of those numbers, both the 289 million
21  and change and the 95 million?
22     A.    It's my understanding that it
23  does.
24     Q.    And what's your -- looks like a
25  handwritten note that says less 169 million.

Page 243

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  And it says something else after that. I
3  can't read that.
4     A.    Provision.
5     Q.    What does that mean?
6     A.    That means that we didn't
7  recognize the entire amount on the financial
8  reporting purposes because based on our level
9  of knowledge around the balance when we
10  published our financial statements we hadn't
11  done enough work to feel comfortable doing so.
12  But it has nothing to do with the status of
13  your claims to the assets.
14     Q.    And is Barclay claiming those
15  assets?
16     A.    Yes.
17     Q.    That's both the 289 million and
18  change and the 95 million?
19     A.    Yes. They're both included in the
20  amounts we're claiming.
21     Q.    And, to your knowledge, Barclays
22  has not received any of those?
23     A.    To my knowledge, we haven't
24  received any of them.
25     Q.    If you would look for a moment at

Page 244

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  Exhibit 399A.
3     A.    Sure.
4     Q.    Are those numbers that we were
5  just talking about, the 289 million plus and
6  the 95 million reflected in your handwritten
7  notes here?
8     A.    Yes. They're included in the 460.
9     Q.    What else is in the 460?
10     A.    The main item is prop collateral I
11  believe which is included in the other
12  schedule.
13     Q.    So it's Exhibit 405A.
14     A.    Yes.
15     Q.    And just to be clear, when you say
16  prop collateral you're referring to
17  proprietary collateral?
18     A.    Yes.
19     Q.    And so what from Exhibit 405A is
20  included to get you to the 460?
21     A.    I don't have a reconciliation in
22  front of me but if you give me a second I
23  should be able to check.
24          (Document review.)
25     Q.    Before you answer that can I just

Page 245

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  ask you another question and we can come back
3  to that?
4     A.    Sure.
5     Q.    At the top of 405A it says Lehman
6  Brothers Inc. Proprietary Futures.
7     A.    Yes.
8     Q.    So that's all LBI, correct?
9     A.    So I'm not sure I understand the
10  question.
11     Q.    So I guess I'm a little puzzled as
12  to why anything from 405A would go under
13  future collateral and affiliates.
14     A.    All of the top proprietary -- in a
15  sense it's a proprietary position of LBI. But
16  it's held -- it's a position for which the
17  exchange membership is held by another
18  affiliate. So the position was held by the
19  affiliate.
20     Q.    Okay. Got it.
21          Okay. So, sorry. Back to my
22  question if you still have it in mind.
23     A.    I think it's just the 272 and 169.
24  So I'm not entirely sure where the 95 in
25  Treasury bill feeds in to the list on the

Page 246

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  front of 399A.
3      Q.   So at the bottom of 405A where
4  you've got your handwritten notes and you've
5  got the 210, 4 unrecognized, and the 272
6  affiliates not recognized.
7      A.   Yeah.
8      Q.   Is it correct that Barclays is
9  seeking both the 210 and the 272?
10     A.   That's correct.
11     Q.   And I think you told me this
12 earlier so I apologize if I ask again, but it
13 is correct that the 210 has been transferred
14 to Barclays and the 272 has not?
15     A.   I don't think any of that's been
16 transferred to Barclays.
17     Q.   Oh, you don't think any of it has.
18     A.   No.
19     Q.   Okay.
20     A.   I'm not positive about that. But
21 I don't think it has.
22          Yeah, my only concern with that is
23 I'm aware that sometime during 2009 an amount
24 was received from Macquarie. So it may be
25 that an element of the Macquarie amount may

Page 247

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  have been received. But the thing I'm not
3  sure about is whether the amount received from
4  Macquarie is part of the amount on 405A or
5  whether it's part of the amount on 404A.
6      Q.   Meaning it could have been either
7  proprietary or on behalf of customers and you
8  don't recall?
9      A.   That's correct.
10     Q.   Okay.
11          MR. SHAW: Good time for a break?
12          MR. WOOD: Yes. I might be
13 finished so we could take a break.
14          (Recess taken.)
15          MR. WOOD: I have nothing further.
16          THE WITNESS: That was quick.
17          MR. SHAW: I have a couple quick
18 ones.
19          * * *
20 EXAMINATION BY
21 MR. SHAW:
22     Q.   First of all, you testified a
23 little bit earlier today about delivery of
24 certain cash from some accounts. And did you
25 wish to offer a clarification on your

Page 248

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  testimony on that issue?
3      A.   Yeah. Yeah. If I can find the
4  appropriate --
5      Q.   Which exhibit are you looking for?
6      A.   Sorry. Exhibit 399A. We were
7  talking about the list of the OCC collateral,
8  cash, governments, less some credits. And one
9  of the questions which came up was whether to
10 my knowledge the cash had been received and I
11 offered that I believe that substantially all
12 of it had been received and that answer is
13 accurate. Substantially all -- my
14 recollection is that substantially all of the
15 cash item on that page has been received.
16          However, to the extent that any of
17 the government securities may have matured
18 into cash or the extent to which any letters
19 of credit may have been drawn down and
20 represent cash I'm not aware of any cash which
21 may have resulted from those two items had
22 been received. So just to be -- just to make
23 sure I'm being completely clear.
24     Q.   Another issue that you discussed
25 earlier today was the question of when

Page 249

1    G. ROMAIN - HIGHLY CONFIDENTIAL
2  Barclays believes the -- strike that.
3          Another issue you discussed
4  earlier today was the issue of when the margin
5  collateral entered the deal. Do you want to
6  offer any clarification on your testimony on
7  that issue?
8      A.   Sure. To amplify the response
9  from earlier, the collateral entered the deal
10 in the APA. The clarification letter was
11 exactly that, a clarification. And that's
12 related to the reason I spoke about earlier
13 that in our view it's not -- it's not
14 meaningful to think about positions and
15 collateral separately due to their nature.
16 And for that reason our view is that the
17 collateral went to the deal in the APA.
18     Q.   And when you say it's not
19 meaningful to think about collateral
20 separately from the positions, what do you
21 mean by that?
22     A.   The positions are daily margins,
23 derivatives, and to have a full understanding
24 of the position you need to look at the
25 close-out value of the derivative as well as

63

Page 250

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    the cumulative initial and variation margin
3    which had been posted before that date. It's
4    only by being those two together that you get
5    a representation of the position. And that's
6    the underlying reasoning why. But to be clear
7    the collateral went into the deal into the
8    APA.
9        Q.    Just so that we're completely
10   clear on this, you do not have any personal
11   knowledge of the terms of the deal or the
12   issue of when Barclays acquired the right to
13   the collateral. That's simply the result of
14   the investigation you conducted which was set
15   forth in your handwritten notes, Exhibit 399A;
16   is that right?
17       A.    That's absolutely correct.
18           MR. SHAW: Okay. I have no
19       further questions.
20           MR. WOOD: I have just one.
21           * * *
22   EXAMINATION BY
23   MR. WOOD:
24       Q.    Just to make sure I understand you
25   correctly, when you say that the margin or

Page 251

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    collateral was included in the APA even before
3    the clarification letter, you're relying on
4    the inclusion of exchange traded derivatives
5    under the definition of purchase assets?
6        A.    I'm relying on my discussions with
7    officers of Barclays in relation to preparing
8    for this deposition and that's Barclays' view
9    that I came to as a result of those
10   conversations.
11       Q.    Do you know what provision of the
12   Asset Purchase Agreement that's based on?
13       A.    I wouldn't want to talk to the
14   term-by-term assessments at this time. But
15   I'll just repeat that it's the position and
16   understanding I came to from those
17   discussions.
18       Q.    So then leaving aside for right
19   now the term-by-term assessments as you
20   referred to it, more generally is it your view
21   that collateral and margin were included in
22   the APA because exchange traded derivatives
23   were included?
24       A.    It's my understanding that they
25   were included in the deal. Without wanting to

Page 252

1          G. ROMAIN - HIGHLY CONFIDENTIAL
2    to talk to the individual items of term and
3    logic which led to that conclusion, that is --
4    yeah, that's the understanding that I've come
5    to.
6        Q.    Are you aware of any other
7    provisions in the Asset Purchase Agreement
8    other than the inclusion of exchange traded
9    derivatives under the definition of purchase
10   assets that could possibly be interpreted to
11   convey the margin and collateral to Barclays?
12           MR. SHAW: Objection. Calls for a
13       legal conclusion. Foundation.
14       A.    I wouldn't want to speculate on
15   the sum total of the possible ways of
16   interpreting each sentence in the document
17   which I'd need to do to be able to accurately
18   state that there's no way of interpreting any
19   other clause in that manner.
20       Q.    But as you're sitting here today
21   are you aware of any other provisions?
22       A.    As I'm sitting here today, I am
23   not basing my assessment on a term-by-term
24   assessment of which terms within that document
25   lead to the conclusion. But based on

Page 253

1
2    conversations I've had as to Barclays' view of
3    the deal which resulted from the Asset
4    Purchase Agreement.
5           MR. WOOD: I have nothing further.
6           MR. SHAW: Okay. I don't have any
7       further questions.
8           MR. WOOD: Great, Mr. Romain.
9       Thank you very much for your time.
10          (Time Noted:    5:21 p.m.)
11
12
13
14
15
16
17
18
19   _____
20       GARY ROMAIN
21
22   Subscribed and sworn to before me
23   this ____ day of _____, 2009.
24
25

Page 254

```
1
2        C E R T I F I C A T E
3    STATE OF NEW YORK    )
4                        : ss.
5    COUNTY OF NEW YORK  )
6         I, FRANCIS X. FREDERICK, a Notary
7    Public within and for the State of New
8    York, do hereby certify:
9         That GARY ROMAIN, the witness
10   whose deposition is hereinbefore set
11   forth, was duly sworn by me and that
12   such deposition is a true record of the
13   testimony given by the witness.
14        I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage, and that I
17   am in no way interested in the outcome
18   of this matter.
19        IN WITNESS WHEREOF, I have
20   hereunto set my hand this 10th day of
21   September, 2009.
22
23   _____
24        FRANCIS X. FREDERICK
25
```

Page 255

```
1
2    ---------------- I N D E X ----------------
3    WITNESS        EXAMINATION BY   PAGE
4    GARY ROMAIN    MR. TAMBE        5
5                   MR. WOOD       154, 250
6                   MR. SHAW         247
7
8    ---------- INFORMATION REQUESTS ------------
9    DIRECTIONS: NONE
10   RULINGS: NONE
11   TO BE FURNISHED: NONE
12   REQUESTS: NONE
13   MOTIONS: NONE
```

Page 256

```
1
2    ----------------- EXHIBITS -----------------
3    EXHIBIT              FOR ID.
4    Exhibit 388A
5    Document bearing production
6    numbers BCI-EX-(S)-000520127
7    with attachment........................ 20
8    Exhibit 389A
9    document bearing production
10   number BCI-EX-(S)-00052084.............. 23
11   Exhibit 390A
12   document bearing production
13   numbers BCI-EX-(S)-00023761
14   through BCI-EX-(S)-00023762
15   with attachment........................ 28
16   Exhibit 391A
17   document bearing production
18   numbers BCI-EX-001766522
19   through BCI-EX-001766536................ 33
20   Exhibit 392A
21   document bearing production
22   numbers Exhibit 392A
23   document bearing production
24   numbers BCI-EX-(S)-00023813
25   through BCI-EX-(S)-00023814............. 38
```

Page 257

```
1
2    ----------------- EXHIBITS -----------------
3    EXHIBIT              FOR ID.
4    Exhibit 393A
5    document bearing production
6    numbers BCI-EX-(S)-00052197
7    through BCI-EX-(S)-00052198............. 45
8    Exhibit 394A
9    document bearing production
10   numbers BCI-EX-(S)-00052200
11   through BCI-EX-(S)-00052201............. 47
12   Exhibit 395A
13   document bearing production
14   numbers BCI-EX-(S)-00052268
15   through BCI-EX-(S)-00052270............. 49
16   Exhibit 396A
17   three-page document bearing
18   production numbers 464242............... 67
19   Exhibit 397A
20   document bearing production
21   numbers BCI-EX-(S)-00013605
22   through BCI-EX-(S)-00013606
23   with attachment........................ 71
24
25
```

Page 258

```
 1
 2     ----------------- EXHIBITS -----------------
 3     EXHIBIT                    FOR ID.
 4     Exhibit 398A
 5     two-page document bearing
 6     production number 44230................ 73
 7     Exhibit 399A
 8     handwritten notes...................... 106
 9     Exhibit 400A
10     document bearing production
11     numbers BCI-EX-(S)-00024451
12     through BCI-EX-(S)-00024455............ 122
13     Exhibit 401A
14     document bearing production
15     numbers BCI-EX-(S)-00052667
16     through BCI-EX-(S)-00052668
17     with attachment........................ 126
18     Exhibit 402A
19     document bearing production
20     number BCI-EX-(S)-00052678............. 138
21     Exhibit 403A
22     document bearing production
23     numbers BCI-EX-(S)-00024689
24     through BCI-EX-(S)-00024690
25     with attachment........................ 143
```

Page 259

```
 1
 2     ----------------- EXHIBITS -----------------
 3     EXHIBIT                    FOR ID.
 4     Exhibit 404A
 5     balance sheet.......................... 165
 6     Exhibit 405A
 7     balance sheet.......................... 165
 8     Exhibit 406A
 9     document bearing production
10     numbers BCI-EX-(S)-00052709
11     through BCI-EX-(S)-00052710........... 221
12     Exhibit 401A
13     document bearing production
14     number BCI-EX-(S)-00052419
15     with attachment....................... 226
16     Exhibit 408A
17     document bearing production
18     number BCI-EX-(S)-00052859............. 228
19     Exhibit 409A
20     document bearing production
21     number BCI-EX-(S)-00052876............. 231
22     Exhibit 410A
23     document bearing production
24     numbers BCI-EX-(S)-00052909
25     through BCI-EX-(S)-00052911............ 233
```

Page 260

```
 1
 2     ----------------- EXHIBITS -----------------
 3     EXHIBIT                    FOR ID.
 4     Exhibit 411A
 5     document bearing production
 6     numbers BCI-EX-(S)-00052978
 7     through BCI-EX-(S)-00052981............. 236
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 261

```
 1
 2     NAME OF CASE: LEHMAN BROTHERS
 3     DATE OF DEPOSITION: SEPTEMBER 10, 2009
 4     NAME OF WITNESS: GARY ROMAIN
 5     Reason codes:
          1. To clarify the record.
 6        2. To conform to the facts.
          3. To correct transcription errors.
 7     Page _____ Line _____ Reason _____
       From _____
 8
       Page _____ Line _____ Reason _____
 9     From _____ to _____
10     Page _____ Line _____ Reason _____
       From _____ to _____
11
       Page _____ Line _____ Reason _____
12     From _____ to _____
13     Page _____ Line _____ Reason _____
       From _____ to _____
14
       Page _____ Line _____ Reason _____
15     From _____ to _____
16     Page _____ Line _____ Reason _____
       From _____ to _____
17
       Page _____ Line _____ Reason _____
18     From _____ to _____
19     Page _____ Line _____ Reason _____
       From _____ to _____
20
       Page _____ Line _____ Reason _____
21     From _____ to _____
22     Page _____ Line _____ Reason _____
       From _____ to _____
23
       _____
24
       GARY ROMAIN
25
```

# BCI EXHIBIT

# 95

1

2                 UNITED STATES BANKRUPTCY COURT

3                 SOUTHERN DISTRICT OF NEW YORK

4       ------------------------x

5       In Re:

6                                 Chapter 11

7       LEHMAN BROTHERS          Case No. 08-13555(JMP)

8       HOLDINGS, INC., et al,    (Jointly Administered)

9                 Debtors.

10      ------------------------x

11

12                 DEPOSITION OF GARY ROMAIN

13                   New York, New York

14                   January 13, 2010

15

16      Reported by:

17      MARY F. BOWMAN, RPR, CRR

18      JOB NO. 27082

19

20

21

22

23

24

25

Page 2

```
 1
 2
 3
 4                    January 13, 2010
 5                    10:15 a.m.
 6
 7
 8         Deposition of GARY ROMAIN, held at the
 9    offices of Hughes, Hubbard & Reed, LLP, One
10    Battery Park Plaza, New York, New York, before
11    Mary F. Bowman, a Registered Professional
12    Reporter, Certified Realtime Reporter, and
13    Notary Public of the State of New York and New
14    Jersey.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2              APPEARANCES:
 3
 4    JONES DAY, LLP
 5    Attorneys for Lehman Brothers, Inc.
 6         222 East 41st Street
 7         New York, New York  10017-6702
 8    BY: JAYANT TAMBE, ESQ.
 9         KELLY CARRERO, ESQ.
10
11    BOIES, SCHILLER & FLEXNER, LLP
12    Attorneys for Barclays and The Witness
13         5301 Wisconsin Avenue, NW
14         Washington, DC  20015
15    BY: HAMISH HUME, ESQ.
16
17
18    QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
19    Attorneys for the Creditors Committee
20         51 Madison Avenue
21         New York, New York  10010
22    BY: ERIC KAY, ESQ.
23
24
25
```

Page 4

```
 1
 2              APPEARANCES:
 3
 4    HUGHES, HUBBARD & REED, LLP
 5    Attorneys for the SIPA Trustee
 6         One Battery Park Plaza
 7         New York, New York  10004-1482
 8    BY: WILLIAM R. MAGUIRE, ESQ.
 9         NEIL OXFORD, ESQ.
10         AMINA HASSAN, ESQ.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2
 3
 4
 5         IT IS HEREBY STIPULATED AND AGREED, by
 6    and between the attorneys for the respective
 7    parties herein, that filing and sealing be
 8    and the same are hereby waived.
 9         IT IS FURTHER STIPULATED AND AGREED
10    that all objections, except as to the form
11    of the question, shall be reserved to the
12    time of the trial.
13
14
15         IT IS FURTHER STIPULATED AND AGREED
16    that the within deposition may be sworn to
17    and signed before any officer authorized to
18    administer an oath, with the same force and
19    effect as if signed and sworn to before the
20    Court.
21
22
23
24
25
```

2 (Pages 2 to 5)

Page 6

```
 1              ROMAIN
 2       (Exhibit 533A, document Bates stamped
 3    BCI-EX-295932 through 33 marked for
 4    identification, as of this date.)
 5       (Exhibit 534A, notes entitled
 6    "Preparation Notes for January 13
 7    Deposition" marked for identification, as of
 8    this date.)
 9    GARY ROMAIN,
10       called as a witness by the parties,
11       having been duly sworn, testified as follows:
12    EXAMINATION BY
13    MR. MAGUIRE:
14    Q.   Good morning, Mr. Romain.
15    A.   Morning.
16    Q.   My name, as you know, is Bill Maguire.
17    I will be asking you some questions today. If
18    you need to take a break at any time, let me
19    know and we will find a convenient time to take
20    a break. Is that OK?
21    A.   That's fine.
22    Q.   I will try to make my questions clear.
23    I may not always succeed. If you are in any
24    doubt, let me know and I will try to clear up
25    the question.
```

Page 7

```
 1              ROMAIN
 2    A.   OK.
 3    Q.   If you answer the question, we can
 4    assume that you understand it; is that fair?
 5    A.   Yes.
 6    Q.   Sir, can you tell me briefly what you
 7    did to prepare for today's deposition?
 8    A.   I went back over a number of documents
 9    which related to the preparation of acquisition
10    balance sheets and other documents which I had
11    relating to other items which were mentioned in
12    the deposition notice.
13       I also talked to a number of
14    colleagues and I had discussions with counsel.
15    Q.   And when did you do all that?
16    A.   Over the last three, four weeks, I
17    guess.
18    Q.   And the documents that you mentioned,
19    did you collect those documents together?
20    A.   I had those stored electronically, so
21    I didn't move them. It was just a question of
22    refreshing my memory on some of them.
23    Q.   Did you compile any collections of
24    documents, any binders or even electronic
25    collections of documents?
```

Page 8

```
 1              ROMAIN
 2    A.   No.
 3    Q.   You mentioned that you spoke to some
 4    people. Can you tell us who the people that you
 5    spoke with were?
 6    A.   Yeah. I spoke with Eric Clark, Liz
 7    James, Sean Teague, Lily McInerny, Craig Jones,
 8    Dan Dziemian. Those are the main people.
 9    Q.   If during the course of the deposition
10    you remember anybody else, you can feel free to
11    tell us, OK?
12    A.   Will do.
13    Q.   When did you speak with Ms. James?
14    A.   I spoke with her a couple of times
15    briefly and had a long conversation with her
16    yesterday.
17    Q.   Can you tell us about the conversation
18    you had with her yesterday?
19    A.   Sure. It was largely to talk about
20    some of the futures-related balances, to confirm
21    my understanding and confirm that that
22    understanding was consistent with hers and her
23    information.
24    Q.   What was your understanding with
25    respect to the futures-related balances?
```

Page 9

```
 1              ROMAIN
 2    MR. HUME: Objection, vague.
 3    Q.   Well, I understand from your previous
 4    answer that you needed to confirm or you wanted
 5    to confirm your understanding by speaking with
 6    her?
 7    A.   Sure.
 8    Q.   Can you tell me specifically what it
 9    was that you wanted to confirm?
10    A.   I'm trying to think what particular
11    points I covered. The main point we covered was
12    what margin and customer balances were
13    recognized on the balance sheet and what we had
14    received and what we hadn't received.
15    Q.   Was this a phone call yesterday or was
16    it a meeting?
17    A.   It was a phone call.
18    Q.   Where was Ms. James, to the best of
19    your knowledge?
20    A.   I believe that she was in her normal
21    place of work in New York. But I didn't
22    actually ask her.
23    Q.   How long was the call with Ms. James?
24    A.   It was approximately 20 to 30 minutes.
25    Q.   And did anyone else participate
```

3 (Pages 6 to 9)

Page 10

ROMAIN

1
2 besides you and Ms. James?
3    A.  Yes.  Alan Kaplan participated and
4 Tricia Bloomer participated, and that was it.
5    Q.  And when you say participated, they
6 were present on the call?
7    A.  They were present on the call.
8    Q.  Did they say anything on the call?
9    MR. HUME:  Objection.  To the extent
10    you are going to probe conversations with
11    counsel, which may have been intermingled
12    with the gathering of facts for this
13    30(b)(6) witness to report to you, I'm
14    objecting, as that is probing into work
15    product privilege, and instructing the
16    witness not to answer.
17    If you want to ask about specific
18    facts that the witness gathered, you can do
19    so obviously, and he has notes to reflect
20    the facts he has gathered.
21    Q.  Let me break it down.  Did
22 Mr. Kaplan -- you can answer this yes or no.
23 Did Mr. Kaplan say anything on the call?
24    A.  Yes.
25    Q.  Did he say anything with respect to

Page 11

ROMAIN

1
2 futures?
3    MR. HUME:  Objection.  Vague, and
4    again, I think it is calling for the witness
5    to report upon work product privileged
6    conversations with counsel, and instructing
7    him not to answer.
8    Q.  Did Tricia Bloomer say anything on the
9 call?
10    MR. HUME:  Same objection, same
11    instruction.
12    Q.  Is Ms. Bloomer a lawyer?
13    MR. HUME:  Yes.
14    A.  Yes.
15    Q.  Did you -- when you spoke with
16 Ms. James, did you have any document in front of
17 you?
18    A.  Yes.
19    Q.  And what was that?
20    A.  I don't recall every document that I
21 had in front of me at the time.  But it
22 included, it included the acquisition balance
23 sheets, so that would be Exhibit 377-A.
24    It included listings of margin and
25 collateral, which are, I believe, part of

Page 12

ROMAIN

1
2 Ms. James' declaration.
3    I don't recall that -- I don't recall
4 any other documents.
5    Q.  Now, did you have her declaration in
6 front of you when you were on the call?
7    A.  I definitely had the exhibits which
8 were the listings.  I don't recall if I had any
9 preceding text.
10    Q.  Do you recall having any document with
11 you on the call other than Exhibit 377-A and the
12 exhibits to Ms. James' declaration?
13    MR. HUME:  Objection, asked and
14    answered.
15    A.  I don't.
16    Q.  I'll show you a copy of Ms. James'
17 declaration and ask you to confirm those are the
18 exhibits that you are referring to.
19    A.  OK.
20    Q.  We'll mark this as Exhibit 535-A.
21    (Exhibit 535A, declaration of
22    Elizabeth James marked for identification,
23    as of this date.)
24    Q.  Sir, you have Exhibit 535A.  Have you
25 seen that document before, the declaration of

Page 13

ROMAIN

1
2 Elizabeth James?
3    A.  I have, yes.
4    Q.  When did you see it before?
5    A.  I first saw it, I think on Monday.
6    Q.  What about the exhibits, Exhibit 1, 2
7 and 3 to the James declaration?  When did you
8 see those before?
9    A.  Yes, at the same time.
10    Q.  And you had each of those exhibits
11 before you when you were on the call with
12 Ms. James?
13    A.  Yes.
14    Q.  Now, do you know who set up the call?
15    A.  I don't actually, no.
16    Q.  Was there an agenda for the call?
17    A.  There was not a formal agenda.
18    Q.  And you have mentioned that you had
19 spoken to Ms. James briefly a couple of times
20 before the call.  Can you tell us what were the
21 nature of those communications?
22    A.  I don't recall.  They would have been
23 very brief conversations at some time in the
24 preceding weeks.  So I don't recall.
25    Q.  Do you recall generally why you had --

4 (Pages 10 to 13)

Page 14

ROMAIN

1 first of all, let me ask you, had you reached
2 out to Ms. James or had she called you?
3  A. I don't recall.
4  Q. Do you recall anything of the
5 conversations that you have had with Ms. James
6 prior to Monday?
7  A. No, only that they were brief. I
8 don't recall ever spending a great deal of time
9 speaking with Liz James before yesterday.
10  Q. When you had the call yesterday --
11   MR. HUME: Yesterday or Monday?
12  Q. I am sorry, Monday. Was it Monday or
13 yesterday?
14  A. The call was yesterday.
15  Q. Yesterday. I am sorry. I think you
16 may have mentioned Monday a couple of times?
17  A. I think you asked when I first saw the
18 declaration, and I mentioned Monday.
19  Q. Thank you for clearing the record.
20  So you first saw the declaration,
21 Exhibit 535A, on Monday, but the call with
22 Ms. James that you have been talking about
23 happened yesterday?
24  A. That's correct.

Page 15

ROMAIN

1  Q. Why don't you tell us, just lead us
2 through that call as best you recall it from the
3 very beginning through the end?
4   MR. HUME: Again, I wasn't on the
5  call. To the extent the call involved two
6  other lawyers, there may be work product
7  privileged communications with lawyers, so I
8  instruct the witness not to answer to the
9  extent it involves privileged communications
10  from the lawyers.
11   To the extent you are simply
12  confirming facts that are in your notes,
13  then I think the witness can answer.
14  A. I don't recall from beginning to end
15 the content of the conversation. I -- the --
16 the main content as regards facts was to go
17 through the schedules and insure that it was
18 consistent with my understanding of the
19 delivered and undelivered proprietary and
20 customer margin.
21  Q. When you say the schedules, you are
22 referring to Exhibit 1, 2 and 3 to the James
23 declaration?
24  A. That's right, yes.

Page 16

ROMAIN

1  Q. With respect to Exhibit 1, can you
2 tell us what was discussed concerning Exhibit 1?
3  A. It was to confirm -- it was to confirm
4 facts which I had already gathered around my
5 understanding of the proprietary futures margin
6 which had not yet been delivered and to confirm
7 that her information was consistent with mine,
8 which it was.
9  Q. And based on the facts that you had
10 gathered, what was your understanding of
11 Exhibit 1?
12  A. My understanding of Exhibit 1 was that
13 it contained a breakdown of undelivered margin
14 from proprietary futures accounts.
15  Q. This notes at the top of Exhibit 1,
16 "valued as of account closeout," what's your
17 understanding as to what that refers to?
18  A. I'm not entirely sure.
19  Q. Is the total here, 457 million and
20 change, is that included on the acquisition
21 balance sheet?
22  A. The -- some is and some isn't. The
23 amounts which were included were in relation to
24 Lehman Japan and Lehman Singapore.

Page 17

ROMAIN

1  The amounts which weren't included
2 form part of the -- there is an amount of 470
3 million dollars in undelivered margin
4 proprietary and customer which isn't included in
5 the acquisition balance sheets.
6  So some of that is included on
7 Exhibit 1, and some of it is included on
8 Exhibit 3.
9  Q. OK. And with respect to Exhibit 1,
10 you have identified Lehman Japan. That's
11 designated by the Lehman JP? Is that right?
12  A. Yes.
13  Q. And you mentioned Lehman Singapore. I
14 assume that's Lehman SGP?
15  A. Yes.
16  Q. What about Bank of Montreal and
17 Kenanga? Are they included?
18  A. Didn't go through line by line, but
19 certainly the amounts, the amounts for the other
20 brokers for Lehman Japan -- the brokers other
21 than Lehman Japan and Lehman Singapore across
22 Exhibit 1 and 3 were materially the same as the
23 amount included on the acquisition balance
24 sheet.

5 (Pages 14 to 17)

Page 18

ROMAIN

1
2      So I didn't do a position-by-position
3  reconciliation, but I just wanted to insure that
4  if I looked at the information that Liz James
5  was included -- was including in her
6  declaration, that -- at a high level -- well, at
7  a level of reasonable materiality, that it was
8  consistent with my understanding of what was and
9  wasn't included on the acquisition balance
10 sheet, and it was consistent.
11     Q.   For Exhibit 3 you are saying again
12 what is designated under Lehman Brothers Japan
13 is included on the acquisition balance sheet?
14     A.   That's correct.
15     Q.   And the same for -- I don't see Lehman
16 Brothers Singapore on Exhibit 3.
17     A.   Yeah. It's -- Lehman Brothers PTE I
18 believe is a Singapore entity. I think that's
19 the one.
20     Q.   Anything else that you are aware of
21 that's included here other than Lehman Brothers
22 Japan and Lehman Brothers PTE?
23     A.   In Exhibit 1?
24     Q.   In Exhibit 3, I am sorry.
25     A.   Oh, right. Exhibit 3, everything is

Page 19

ROMAIN

1
2  included other than amounts which are Lehman
3  affiliates with non-Japan and Singapore, so the
4  third-party foreign brokers, so the 99 million
5  dollars is included, and 5 million dollars,
6  although it is a small item, I believe is
7  included.
8      The amounts which are not included are
9  only the foreign Lehman affiliates other than
10 Singapore and Japan.
11     Q.   So that's Lehman Brothers SA and
12 Lehman Brothers International Europe?
13     A.   Yes. I'm not sure about Futures Asia,
14 as I didn't do a position-by-position
15 reconciliation, but that's -- that's the
16 approach that was taken to recognition. That's
17 the approach that was taken to recognition in
18 the acquisition balance sheet.
19     Properly customer cash from foreign
20 Lehman affiliates other than Singapore and Japan
21 were not included in the acquisition balance
22 sheet.
23     Q.   Did you discuss with Ms. James what
24 was meant by "valued as of account closeout" on
25 Exhibit 1?

Page 20

ROMAIN

1
2      A.   It was mentioned briefly. Liz would
3  be able to explain in greater detail exactly
4  what it meant.
5      My recollection was that the valuation
6  dates for these accounts are not the same. They
7  were valued based on statements on the date that
8  the relevant accounts were closed out. So --
9  and those dates were different between different
10 brokers and custodians.
11     In terms of any dealer detail than
12 that, I don't have it, because the numbers were
13 materially similar to the numbers I was
14 expecting to see, so I didn't investigate any
15 marginal valuation differences with Liz.
16     Q.   So it is your understanding that the
17 valuation of these were valued as -- based on
18 statements as of the closeout of the accounts;
19 is that right?
20     MR. HUME: Objection, asked and
21 answered.
22     A.   That's my recollection of the
23 conversation.
24     Q.   And with respect to Exhibit 2 and
25 Exhibit 3, it is your understanding that all

Page 21

ROMAIN

1
2  those valuations are based on statements as of
3  September 19, 2008?
4      A.   I'm not sure. It is only the title of
5  the spreadsheet would indicate that, but we
6  didn't go into the issue of valuation date for
7  these exhibits in any detail on the call, so.
8      Q.   Well, let me ask you, Exhibit 2, is
9  that -- are the amounts reflected on Exhibit 2
10 included on the acquisition balance sheet?
11     A.   Yes. All these items are included.
12 As I mentioned, we didn't reconcile the precise
13 valuations, but the totals were materially what
14 I was expecting to see, and the items all were
15 included.
16     So there may be some immaterial
17 differences in the precise number.
18     Q.   And if we wanted to check a specific
19 item here, we would go to what? To the
20 statement? The backup for this, in other words,
21 what's your understanding is the backup for the
22 individual numbers here?
23     A.   My understanding of the backup is that
24 it was statements, but to be definitive, you'd
25 be better to ask Liz.

6 (Pages 18 to 21)

Page 22

ROMAIN

2  Q.  Can you tell me where on the
3  acquisition balance sheet the amounts set forth
4  in the 2.2 billion dollars contained in
5  Exhibit 2 is reflected?
6      A.  Absolutely.  So in the acquisition
7  balance sheets, in terms of the balance sheet
8  which was actually used and referred to most
9  often, that would be the second page of
10 Exhibit 377A, and those items would be included
11 in cell C17.
12     In the grossed-out, grossed-up version
13 of Exhibit 377A, which is the third page, they
14 would be included in cell F20.
15     Q.  The first part of Exhibit 2 refers to
16 money market funds.  Can you tell me what is
17 listed underneath that, starting with BGI prime
18 MM?  What are these money market funds and what
19 do they represent?
20     MR. HUME:  Bill, can I just ask where
21 in the notice we are?  Because I want to
22 make sure it is one Mr. Romain is designated
23 for.  These questions may be more
24 appropriate for Liz James.
25     MR. MAGUIRE:  Yeah.  I believe there

Page 23

ROMAIN

2  is actually several topics, principally
3  377A, the acquisition balance sheet.  I
4  understand that all of this is on the
5  balance sheet.  I just want to have an
6  understanding of what the asset is that is
7  reflected on the balance sheet.
8      If the witness doesn't know, obviously
9  we will take it up with Ms. James.
10     A.  These, the money market funds were
11 part of the assets of the acquired customer
12 business.  They were essentially assets which
13 were held previously by LBI to secure
14 obligations of its customers, and there was
15 obviously an offsetting liability to return that
16 marginal collateral to those customers, which is
17 included in the relevant customer account.
18     That's the case for the money market
19 funds and also the cash items in Exhibit 2.
20     Q.  Where is the offsetting liability
21 reflected on the Exhibit 377A?
22     A.  In the summary version in the second
23 page of Exhibit 377A, it's included within cell C17.
24 And in the grossed-up version, the third page of
25 Exhibit 377A, it is included in cell E44.

Page 24

ROMAIN

2  Q.  You referred to, is that an E44?
3      A.  That's correct.
4      Q.  And that's an amount of 2.6 billion
5  dollars?
6      A.  Yes.  The obligation is part of the
7  customer accounts which is included in that
8  cell, but the cell includes other things.
9      Q.  Does that cell also include the -- any
10 other items reflected on Exhibit 2?
11     A.  No.
12     Q.  So that cell is 2.6 billion dollars,
13 and you're saying that the 2.6, 1 billion and 63
14 million represents these money market funds on
15 Exhibit 2?
16     A.  No, no.
17     Q.  No?
18     A.  The money market funds are assets
19 which are included in cell F20.  The point I was
20 making was more that customer accounts are also
21 recorded.  They are in 2.60.  And the customer
22 accounts include -- well, principally two things
23 for each customer, open positions and
24 collateral-related obligations.
25     And they are included in the 2.6 along

Page 25

ROMAIN

2  with -- the total customer liability within cell
3  E44 is, I believe, around -- actually I'll
4  check.  It is most of the 2.6, but I'll check in
5  my notes.
6      Yes.  So, out of the 2.6, 2.34 billion
7  dollars are customer accounts.  The remainder
8  are liabilities to exchanges and brokers.
9      Q.  So of the 2.6, it breaks down into
10 2.34 of customer liabilities and a remaining --
11 I am sorry, how much is the rest?
12     A.  260 million, I guess.  Approximately.
13     Q.  And that represents, 260 million
14 represents what?
15     A.  It's liabilities to various exchanges
16 and brokers.
17     Q.  And if you can explain for us the
18 accounting in terms of the 2.34.  That
19 represents money that is -- has been posted by
20 customers and a liability that the brokerage has
21 to those customers; is that correct?
22     MR. HUME:  Objection to the form of
23 the question.
24     Q.  Maybe you could just -- I understand
25 you said that the 2.34 represents a liability to

7  (Pages 22 to 25)

Page 26

ROMAIN

1 customers.
2     A.    It represents, it represents the
3 customer accounts which are in liability
4 positions. Customer accounts are
5 representations of the receivable or payable
6 between -- well, previously LBI and now Barclays
7 and the relevant customer, and entries into
8 those accounts will be made for a number of
9 reasons, but you're right, one of those reasons
10 is if they post collateral or margin to secure
11 their obligations, then the accounting would be
12 that we would record the collateral on balance
13 sheets as assets and also record a liability to
14 the customer.
15    Q.    And what other customer -- when you
16 said customer accounts and liability positions,
17 can you tell me how else a customer account is
18 in a liability position, other than by a
19 customer posting collateral?
20    A.    Nothing comes to mind. I'm not sure I
21 can be definitive that there is no other way.
22 I'm not an expert in the operation of futures
23 or -- well, in the futures and other exchange
24 traded accounts, but certainly the main way in

Page 27

ROMAIN

1 which it will end up in a liability position is
2 where they post collateral.
3    Q.    Have you investigated whether there is
4 any customer accounts and liability positions
5 other than by a customer posting collateral to
6 secure margin?
7    A.    I've not investigated on a
8 line-by-line basis, so I could not be definitive
9 that there is no customer accounts in a
10 liability position for any other reason. But
11 what I can say is that the large -- the very
12 large majority of customer accounts in that
13 population are in a liability position for that
14 reason.
15    Q.    And you're not aware of any exception?
16    A.    I'm not aware of any exception, but I
17 haven't looked for any exception.
18    Q.    Can you explain to me the accounting
19 when a customer posts margin to secure a
20 customer position?
21         MR. HUME: Objection, vague.
22    A.    Do you mean the double entry which is
23 recorded when --
24    Q.    Yeah.

Page 28

ROMAIN

1    A.    -- it is posted?
2         Yeah, there are two entries recorded.
3 One is a debit entry within assets for the
4 margin which has been received. The other is a
5 credit entry within liabilities within the --
6 representing the liability entry within the
7 relevant customer accounts.
8    Q.    Now, when the customer posts margin to
9 secure a particular position, the broker may
10 have to post margin at an exchange; is that your
11 understanding?
12    A.    The broker will -- in that situation,
13 there is also -- there will also be an
14 obligation on the broker to post margin in
15 relation to its trades with the exchange, and
16 some of its trades with the exchange represent
17 customer trades.
18    Q.    So we have a customer who requires a
19 particular position at an exchange. The broker
20 may ask the customer to post margin with the
21 broker, and then we have the double entry
22 booking that you described, the debit to assets
23 for the margin and a credit to liabilities?
24    A.    Yes.

Page 29

ROMAIN

1         MR. HUME: I will object to the form
2 of the question, and again --
3    Q.    And those two entries --
4         MR. HUME: My objection wasn't
5 finished.
6         You are asking this witness questions
7 about how the futures business works, which
8 is beyond the scope of his 30(b)(6).
9         MR. MAGUIRE: I'm just asking for the
10 debits and the credits. I'm just going to
11 keep it to the accounting for now.
12    Q.    My question then is, when the broker
13 then turns around and takes that position on the
14 exchange for its customer, it then has to post
15 margin or may have to post margin with the
16 exchange?
17    A.    It may or may not.
18    Q.    Where it does have to post margin, can
19 you tell me what the accounting is for that?
20    A.    So when one of our accounts has to
21 post margin, it will record two entries. One is
22 it removes the asset from its balance sheets,
23 and the second is it records a receivable from
24 the exchange.

8 (Pages 26 to 29)

Page 30

ROMAIN

2 Q. In the event that none of the margin
3 that is posted is used when the position is
4 closed out, how does the reversing of that
5 transaction work?
6 A. Sorry?
7 MR. HUME: Objection, vague, no
8 foundation, and beyond the scope of his
9 30(b)(6).
10 Q. You said the broker removes the assets
11 that's put, I guess, in the amount of the margin
12 that's being posted and records a receivable
13 from the exchange?
14 A. Yeah, if we are talking about cash
15 collateral. Yeah.
16 Q. And then if the margin ultimately is
17 returned to the broker, is that accounting
18 reversed?
19 MR. HUME: Objection, you are beyond
20 the scope of the 30(b)(6). Where are you in
21 the 30(b)(6)?
22 MR. MAGUIRE: Well, we are trying to
23 get the acquisition balance sheet. I
24 understand there's 2.6 billion dollars of
25 liabilities of which 2.34 represent customer

Page 31

ROMAIN

2 margins, so I want to understand how that
3 accounting rolls up to the balance sheet.
4 MR. HUME: Then ask him that. You are
5 asking him a hypothetical about how things
6 work.
7 MR. MAGUIRE: It is not a
8 hypothetical. This is all customer
9 liabilities. The witness testified that
10 2.34 represents customer accounts and
11 liability positions.
12 Q. I'm simply asking, where you have
13 margin that the exchange has posted because of
14 positions that its customer wants, and
15 ultimately those positions are closed out and
16 the margin is no longer needed by the exchange,
17 the margin is returned to the broker, the
18 broker then reverse the accounting that you
19 described and reverse the receivable?
20 MR. HUME: What does that have to do
21 with the 2.34? You are asking a
22 hypothetical, when this happens or that
23 happens.
24 MR. MAGUIRE: If you want to direct
25 the witness not to answer, do so and we will

Page 32

ROMAIN

2 move on. I'm not going to argue the
3 question with you.
4 A. To be clear, the amounts which were
5 included in the acquisition balance sheet were a
6 snapshot of the assets which were either held by
7 LBI as security for customer obligations with an
8 offsetting amount within customer accounts and
9 the assets which were held at various brokers
10 and exchanges on that date.
11 So the accounting within LBI
12 beforehand didn't feed into the acquisition
13 accounting. The acquisition accounting is a
14 snapshot for what the assets and liabilities
15 acquired were on that date.
16 Q. And the liabilities included the 2.34
17 for customer --
18 A. That's correct.
19 Q. -- accounts.
20 Can you tell me where that 2.34 is on
21 the first page of Exhibit 377A?
22 A. It is included within cell D20 or D --
23 C20 and D20.
24 Q. The -- any margin that Lehman had
25 posted with any exchange in respect of the

Page 33

ROMAIN

2 customer positions that had given rise to the
3 2.34 billion dollar of liability, where is that
4 margin?
5 A. I am sorry, could you repeat that
6 question.
7 Q. I understand that there is 2.6 billion
8 dollars that you have testified about, of which
9 2.34 represents customers and the other is
10 liability to exchanges and brokers.
11 A. Yup.
12 Q. Focusing now specifically on the
13 customers, and I understand that most, if not
14 all of that arose from where the customer had
15 posted collateral to secure margin. What I am
16 looking for is where Lehman posted margin --
17 A. Right.
18 Q. -- at the exchanges in respect of
19 those customer positions.
20 A. Yeah, that's a difficulty --
21 MR. HUME: Objection. Objection,
22 vague as to "in respect of."
23 A. Yeah. Because Lehman posts collateral
24 to exchanges in relation to the requirements of
25 those exchanges or brokers upon Lehman rather

9 (Pages 30 to 33)

Page 34

ROMAIN

1 than -- so there is not a direct correlation,
2 you will not be able to draw a direct
3 correlation between those two items.
4       You wouldn't be able to look at the
5 amounts posted by Lehman with brokers and
6 specifically say whether they are customer --
7 whether they came from a cash receipt from a
8 customer or they came from LBI's cash otherwise,
9 because cash is fungible.
10       But there are two separate items.
11 There are -- in terms of the assets which were
12 recorded on the acquisition date, there are two
13 separate items. There are items which were held
14 by LBI as security for customer obligations with
15 a liability on the customer accounts, and then
16 there is also assets which are held by brokers
17 as security for LBI's obligations to those
18 brokers. And those -- in terms of the
19 acquisition accounting, those two items are both
20 reflected.
21    Q.   Do the exchanges keep separate or did
22 Lehman maintain separate accounts at the
23 exchanges for its proprietary positions as
24 opposed to customer positions?

Page 35

ROMAIN

1       MR. HUME: Objection, lacks
2 foundation, and beyond the scope of the
3 30(b)(6).
4    A.   I'd be wary of getting into trying to
5 explain the nature of the accounts which Lehman
6 held or -- which Lehman had with brokers,
7 because my understanding is limited to what I
8 needed to understand to be able to prepare the
9 accounting. I'm not an expert on how that
10 works.
11    Q.   So you're not able to say how much of
12 the collateral that Lehman posted was posted in
13 respect of accounts where the positions were for
14 Lehman's customers as opposed to its proprietary
15 activities?
16    A.   I'm unable to -- I have -- actually,
17 give me a second, I'll be able to articulate
18 what I can talk to knowledgeably and what I
19 can't.
20       Yes. So based on discussion with Liz
21 and also listings which fed into my acquisition
22 accounting, I'm able to distinguish between
23 accounts which are designated as proprietary
24 accounts and accounts which are designated as

Page 36

ROMAIN

1 customer accounts. However, at a greater level
2 of detail in terms of exactly how that works
3 with the relationship between LBI and the
4 brokers, I'm probably not the best person to
5 talk to that.
6       That split is the one contained in
7 Exhibits 1, 2 and 3 of Liz James' testimony.
8    Q.   If I wanted to find out how much
9 margin LBI posted with respect to customer
10 positions, are you the best person to ask or
11 someone else?
12    A.   The best person to ask about that
13 would be Liz James.
14    Q.   And you're not able to tell me that
15 from either the acquisition balance sheet or any
16 of the pages that are part of Exhibit 377A?
17    A.   That's correct. It is -- all of the
18 assets which are held to secure customer
19 obligations or held with brokers to support
20 LBI's obligations, either in customer or
21 proprietary accounts, are included as assets,
22 but for accounting purposes, the distinction is
23 not of great significance.
24    Q.   Is there a distinction from an

Page 37

ROMAIN

1 accounting perspective between customer and
2 proprietary accounts in that with customer
3 accounts you have a liability to customers that
4 you don't have in the case of the broker
5 proprietary positions?
6    A.   For accounting purposes, assets and
7 liabilities are presented separately,
8 notwithstanding the fact that there are
9 obviously interrelationships between how the
10 amounts arise, and between the assets and
11 liabilities.
12       But purely for presentational purposes
13 in the annual report, they are shown separately.
14 So the links between the two would not be clear
15 from Barclays' external financial reporting.
16    Q.   Your involvement has only been with
17 respect to the financial reporting and the
18 accounting?
19    A.   That's correct.
20    Q.   You will see on Exhibit 377A, the
21 first page has an amount for cash, 1.55 billion
22 dollars.
23    A.   Yes.
24    Q.   Can you tell me where that cash is?

10 (Pages 34 to 37)

Page 38

ROMAIN

1
2     A.   The amount included within cash has
3   two elements. I'm just trying to make sure
4   that -- if you notice, the first page of Exhibit
5   377A was put together purely for external
6   reporting purposes. So the actual balance sheet
7   which was used and prepared and best understood
8   are the following pages.
9         So there are links between those
10  balance sheets and the front page. Those
11  categories, they are not meaningful in terms of
12  how the acquisition balance sheet was actually
13  put together.
14        My belief is that the 1.55 has two
15  elements, 1.25 received as part of settlement
16  with JP Morgan in December 2008, and 300 million
17  which was received as part of the Schedule A
18  settlement and for a matured security in
19  September of 2008.
20        I think that they are the two items
21  which make up that balance.
22    Q.   When you say Schedule A settlement,
23  what are you referring to?
24    A.   There was an ongoing discussion and
25  then dispute with JP Morgan as to the settlement

Page 39

ROMAIN

1
2   of part of the Schedule A delivery, which was
3   resolved in December, and resulted in the
4   receipt of certain securities and 1.25 billion
5   dollars in cash.
6     Q.   And the 300 million that you referred
7   to, what is that?
8     A.   So there was a delivery of assets in
9   September in relation again to Schedule A assets
10  which were all securities, with one exception,
11  which was that one of the securities matured
12  either on the day it was going to be delivered
13  or very shortly before, I believe.
14        But whatever, we ended up receiving
15  300 million in cash instead of the security
16  because it matured.
17    Q.   And it's your understanding that the
18  1.55 billion in cash does not include any margin
19  or clearing fund that Lehman maintained at any
20  exchange?
21    A.   That's correct. I believe that's
22  included in cash. And it is included in the
23  assets but not in that line item within assets.
24    Q.   I am showing you a document previously
25  marked as 407A. Where were you on the weekend

Page 40

ROMAIN

1
2   of Saturday, 20th September, 2008?
3     A.   I was in New York.
4     Q.   And you were working on the balance
5   sheet; is that right?
6     A.   Saturday, 20th, yeah. I had just
7   started trying to pull something together, yes.
8     Q.   And over time, you continued to keep
9   various iterations of the draft balance sheet?
10    A.   That's correct.
11    Q.   Until it was ultimately finalized in
12  Exhibit 377A?
13    A.   That's correct, yes.
14    Q.   Have there been any corrections or
15  additions to the balance sheet, Exhibit 377A?
16    A.   No, there have not. The permitted
17  period for corrections to acquisition accounting
18  expired a year after the acquisition, so 22nd of
19  September, 2009, and there have been no
20  amendments.
21    Q.   If you turn to the balance sheet
22  attached to this e-mail, I assume -- you have
23  got 0S for a number of entries. Does that mean
24  outstanding?
25    A.   It does, yes.

Page 41

ROMAIN

1
2     Q.   You were waiting on information; is
3   that correct?
4     A.   Yes.
5     Q.   And there is a reference a couple of
6   lines down to "valuation adjustment." Do you
7   see that?
8     A.   Yes.
9     Q.   What were you told about the need for
10  a valuation adjustment?
11    A.   Well, at that stage it was very early
12  in the process, so the information that I was
13  receiving was very draft and changing very
14  rapidly. In accounting terms, it is necessary
15  to include financial assets in acquisition
16  accounting at their fair value, and that should
17  be fair value determined according to business
18  as usual valuation policies and procedures for
19  the bank and relevant accounting standards.
20        So it was known that we would need to
21  assess the identity and appropriate valuation of
22  the assets, and that that would take some time.
23        In terms of what I was told about the
24  source of that 2.5 in particular, I have no
25  recollection. But certainly through the

11 (Pages 38 to 41)

Page 42

ROMAIN

1  periods, the understanding of the population,
2  the sources of the valuations in terms of the
3  original, sort of mid prices, and also any
4  adjustments required to get to an appropriate
5  bid level required by IFRS accounting standards
6  was something that was changed for some time.
7  Q.  A little further down you'll see cash,
8  1.3.  What was your understanding as to where
9  that cash was at the -- back when you were in
10  New York on September 20?
11  A.  I don't recall the source information
12  for this particular iteration of the balance
13  sheet.
14  Q.  If you could --
15  A.  No, I don't.  I don't recall that.
16  Q.  If you go two lines down, you will see
17  previously excluded, 50 percent MBS.  What did
18  that represent?
19  A.  I know what it referred to.  I don't
20  know what the number itself represented.  It
21  would certainly have been a very initial
22  estimate of the items to be included.  But I
23  recall that there was some suggestion that we
24  would take only 50 percent of mortgage-backed

Page 43

ROMAIN

1  securities, and that changed -- I don't recall
2  the precise order of what happened in relation
3  to that term or the source of that number.  But
4  the item would have related in some way to the
5  information I had been provided at that point in
6  time on that item.
7  Q.  This line item disappears from the
8  balance sheet that ultimately culminated -- the
9  spreadsheet that culminated in 377A.  Can you
10  explain why that happened?
11  A.  As we went forward, we got information
12  which improved over time on what assets we did
13  acquire and what assets we needed to value, and
14  they were grouped appropriately.  So all of the
15  Schedule A assets and Schedule B assets were
16  included in the inventory line, so there was no
17  breakout in the acquisition balance sheet
18  between asset classes, including
19  mortgage-backed.
20  Whether it was included or excluded
21  from discussions around -- in terms of the deal
22  at various times was not relevant going forward,
23  because we were accounting for the deal that
24  occurred.

Page 44

ROMAIN

1  Q.  Does Exhibit 377A include any
2  mortgage-backed securities?
3  MR. HUME:  Objection, lacks
4  foundation.
5  A.  It does.  I'm not -- I don't -- I
6  don't have at hand the breakdown.  I think you
7  would have it in other exhibits, underlying the
8  valuation where things are split by CUSIP and
9  also by type.
10  So the best source of information for
11  precisely the breakdown of that would be to
12  refer to those exhibits.
13  Q.  The underlying CUSIP detail --
14  A.  And the summaries thereof which fed
15  into the inventory lines in the acquisition
16  balance sheets.
17  Q.  Meaning the initial inventory and the
18  JPM inventory lines?
19  A.  Yes.
20  Q.  We will mark as Exhibit 536A.
21  (Exhibit 536A, document Bates stamped
22  BCI-EX-(S) 52476 through 78 with attachment
23  marked for identification, as of this date.)
24  Q.  Sir, this is an e-mail you sent on or

Page 45

ROMAIN

1  about the 22nd of September, 2008?
2  A.  Yeah.
3  Q.  If you'll turn to the attached balance
4  sheet, and can you tell me what the reference to
5  "new box" is there?
6  A.  That at the time that was reflective
7  of the information I had on a Schedule A versus
8  Schedule B split, although I wouldn't have
9  understood it in those terms at the time.  It
10  was very early, so there was very provisional
11  information around the inventory which had been
12  acquired, which at the time was giving the book
13  value of 44.88 and the adjusted value of 42.05.
14  That's just additional information
15  that somebody would have given me at the time
16  for an estimated split between Schedule A and
17  Schedule B assets.
18  Q.  And the reference to current book
19  value, whose book value is that?
20  MR. HUME:  Objection, vague.
21  A.  I don't know.  I don't know.
22  Q.  The repo, did you understand that to
23  constitute the inventory in Schedule A?
24  A.  At that time, I don't recall whether I

12  (Pages 42 to 45)

Page 46

ROMAIN

1  had a good understanding of what was meant by
2  Schedule A and Schedule B, but I would have
3  understood it as being the information I had at
4  the time around the assets received as part of
5  the repo transaction.
6      But as I say, I have to express that
7  that was -- that was based on information which
8  I had at that time which was -- certainly at
9  that time was changing very rapidly as I got
10  more and more accurate information.
11     Q.   And based not only on the information
12  you had then but also the information you have
13  now, your understanding of the assets under "new
14  box" is what, the assets in Schedule B?
15     A.   My understanding now is that was the
16  information that I had at the time for the split
17  between Schedule A and Schedule B, not that that
18  ended up being the actual split, because at that
19  time, it was based on very early provisional
20  information.
21     Q.   Is the -- are all of the assets on
22  Schedule A and Schedule B included on the
23  acquisition balance sheet, Exhibit 377A?
24     A.   Are all of the --

Page 47

ROMAIN

1      MR. HUME: I am going to object to the
2  vagueness of the question.
3      Q.   Well, let me try to break it out. The
4  assets that were on Schedule A, are they all
5  reflected on Exhibit 377A?
6      A.   I never reviewed Schedule A, but all
7  of the assets that were received in settlement
8  of -- either received in September or received in
9  settlement of Schedule A or received in December
10  in respect of the settlement of other aspects of
11  Schedule A from JP Morgan are included in the
12  acquisition balance sheets.
13     As regards Schedule B, there is an
14  amount which is included in the acquisition
15  balance sheet which represents securities which
16  were received in September from Schedule B and
17  other securities from Schedule B which by the
18  time we finalized our acquisition accounting --
19  well, by the time we finalized our 2008
20  financial statements, we were in a position to
21  include in the acquisition balance sheet. It
22  does not include some other assets from
23  Schedule B to which we also had title.
24     Q.   And can you explain the split between

Page 48

ROMAIN

1  the assets from Schedule B that Barclays
2  believes it is entitled to that -- what's the
3  distinction between Schedule B assets that are
4  reflected on Exhibit 377A and the ones that are
5  not?
6      A.   The distinction was based on which
7  assets on that schedule we had done sufficient
8  work around and had a sufficient understanding
9  of by -- I can't recall the exact date, but
10  February 2009, when we were finalizing our 2008
11  financial statements, to be comfortable to
12  include them within our acquisition accounting.
13     There are other assets on Schedule B
14  which we completed our consideration of our
15  entitlement after that date, and they are the
16  ones which are not included in the acquisition
17  balance sheet.
18     Q.   If you turn to Exhibit 399A. With
19  respect to the Schedule B assets that are not
20  reflected on the acquisition balance sheet, can
21  you tell me where they are?
22     A.   Yes. They are included in the item
23  unencumbered assets, brackets B2/C.
24     Q.   That's 162 million?

Page 49

ROMAIN

1      A.   Yes.
2      Q.   Where are those assets?
3      A.   I don't know precisely where they are.
4  I know they have not been delivered to Barclays,
5  but I'm not sure who is holding them.
6      Q.   What is the backup for this
7  162 million figure that you have here?
8      A.   There is a colleague who pulls
9  together a listing which we update monthly of
10  assets not received, and he does the work on
11  that. But it is basically information which is
12  received from some colleagues who work in
13  operations who did the work to work through
14  Schedule B, consider which were unencumbereds
15  and therefore available for delivery to
16  Barclays.
17     So we updated our understanding, but
18  it was based on that internal consideration. I
19  don't have underlying listings myself.
20     Q.   Who is the person who has the
21  underlying listings for this 162 million?
22     A.   The colleague that works with me on
23  this is Charles Utley, but he would be acquiring
24  them from others who actually had the listings.

13 (Pages 46 to 49)

Page 50

ROMAIN

1 don't know what their names are.

Q. But he acquires the actual listing itself or he just is told a number?

A. He works with the people who put together the number to update our understanding on a monthly basis. I'm not positive of the extent of his discussion with them, whether he just takes their listing or whether he is involved in additional discussion. I think it is closer to the former. 1 don't think he does too much other than just collate other people's work in that area.

Q. You haven't seen the listing, the backup for the 162 million?

A. I could not definitively say 1 have never seen a listing at any time, but to the best of my -- to the best of my knowledge, 1 don't have it.

Q. What about the backup for the next line, can you just explain what the next line is and then tell us where the backup is?

A. Yes. That's principal and interest on Schedule B assets which have not been received but are included on the balance sheets. So over

Page 51

ROMAIN

time, those assets accrue interest, and therefore, we are entitled to that as well.

So we include that in our listing of assets not received and not on balance sheets, because we haven't recognized it on the balance sheet yet.

Q. Where is the backup for that?

A. That would be the same response as for the previous item. My colleague worked with others within the bank to collate the information.

Q. And that's the same colleague, Mr. Utley, who collects that?

A. Yes.

Q. And how about the first line, futures collateral at affiliates, 460 million, what's the backup for that?

A. So that's the -- those are the items that we talked about earlier. So the amount within the exhibits to Liz James' testimony which are held with foreign affiliates other than Japan and Singapore, that's that item.

Q. So the backup for this item would be the various statements for those accounts?

Page 52

ROMAIN

A. That would be the primary source of -- that would be the primary source of backing.

Q. And is Mr. Utley the person who collects the information for that line as well as for the other lines here?

A. Yeah, he is -- he collates the information on these items on a monthly basis to update our understanding. He doesn't actually do the work, but he collates the information.

Q. And then the last line, you have provisions OCC, looks like JP and P&I?

A. Yes. That's two items, one of which is no longer applicable and one of which is. So there was a receivable -- there was a receivable which we were recognizing on the balance sheets which represented the recovery of the cost of closing out OCC affiliate positions and we had not recorded the full provision, but we now have.

So the relevant expense has gone through P&L in 2009. So that's the difference, the position when these notes were put together. Since then we have actually recorded that in P&L, so that would need to be taken off the

Page 53

ROMAIN

list.

There is still the other item which is the JP P&I. Basically what that is, is that in our valuation of the inventory received from JP Morgan in December 2008, we included in that valuation accrued principal and interest between September and December. We thought we would also be entitled to some value from JP Morgan to compensate just for the fact that we didn't get any assets for three months.

But the understanding is that the eventual agreement reached with JP Morgan was that we would not receive such an amount. The securities and cash we received was full satisfaction of their obligations. And therefore, we should have removed that from our books and taken an expense. We have not yet done so for accounting purposes.

Q. And can you explain why you have not yet done so?

A. The main reason is that we are looking -- the main reason is there are a number of assets which we have not recognized to which we are entitled, which are the ones which are

14  (Pages 50 to 53)

Page 54

1          ROMAIN
2    listed above, and we haven't recognized those as
3    income. So we are viewing all of those
4    unrecognized items together and taking a
5    materiality call on whether or not to make an
6    adjustment now or whether to wait until the
7    matter is finally settled.
8          The view we reached is it would be
9    inappropriate to take the expense for the JP
10   Morgan item when we believe there are other
11   assets which we are entitled to and have not yet
12   recognized. So for financial reporting
13   purposes, we haven't recognized any of those
14   items other than the OCC point, which was
15   recognized when the matter was settled.
16      Q.  So if you wanted to get the backup for
17   any of these items, the futures collateral,
18   unencumbered assets B2/C, the other remaining
19   two items, you would go to Mr. Utley who
20   collects this information, and he would be able
21   to get them through the operations people?
22          MR. HUME: Object to the use of the
23   word "backup." There is backup to these
24   already produced.
25      Q.  That's where you would get the

Page 55

1          ROMAIN
2    information, sir; is that right?
3      A.  If I was to -- if I needed the
4    information myself, I would ask Charles for it,
5    yes. Charles Utley.
6      Q.  We were looking at Exhibit 536A and
7    the reference to "new box." Did you understand
8    "new box" to refer to clearance boxes? Or do
9    you understand that now?
10     A.  I understand it now as being
11   information which was early information about --
12   early information which was attempting to get to
13   that split.
14     Q.  And do you understand that there are
15   assets that were at Lehman's clearance box at
16   DTC that are included in the acquisition balance
17   sheet, Exhibit 377A?
18     A.  Yes, there are amounts which are
19   included which relate to assets received on
20   19th, 29th and 30th of September from clearance
21   boxes, and also assets not yet received.
22     Q.  Do you understand that the balance
23   sheet also includes assets from any other
24   clearance boxes, other than DTC?
25          MR. HUME: Objection, lack of

Page 56

1          ROMAIN
2    foundation.
3      A.  I'm not, I'm not certain on that, on
4    that assets.
5      Q.  Do you know if there are any assets on
6    the balance sheet from Lehman's clearance box at
7    Euronext?
8      A.  I'm not 100 percent sure of what -- I
9    have a complete inventory of the clearance boxes
10   which were represented in Schedule B, and the
11   assets which were included were either delivered
12   or on Schedule B and to which we are entitled.
13   But I personally have never done an inventory of
14   the exact split of within which clearance boxes
15   those assets reside.
16          MR. HUME: Nor is it a 30(b)(6) topic,
17   I don't believe.
18     Q.  We will mark this as 537A.
19          (Exhibit 537A, document Bates stamped
20   BCI-EX-(S) 78976 with attachment marked for
21   identification, as of this date.)
22     Q.  It's an e-mail dated September 23,
23   2008, from Stephen King.
24          If you turn to the attachment, sir,
25   what I really want to ask you about is at the

Page 57

1          ROMAIN
2    bottom of the first page, you will see a
3    reference to DTC SPO deposit.
4      A.  Yeah.
5      Q.  Can you tell me what that is?
6      A.  I don't definitively know.
7          MR. HUME: This document was not
8    within your 30(b)(6) notice for this
9    witness. I know you want to ask about the
10   SPO deposit, which I think the witness has
11   already testified about, but this is not a
12   document in your notice.
13          MR. MAGUIRE: That's fine.
14     Q.  Can you tell me about the SPO deposit?
15     A.  Sure. Yes. That's the 300 million
16   dollar item which I mentioned earlier as being
17   one of the two items included in the cash line
18   in the front page of Exhibit 377A.
19          So that was received as part of the
20   assessment of Schedule A delivery in relation to
21   a security which we were informed had matured or
22   was maturing, so you received the 300 million in
23   the estate.
24          MR. HUME: I would be grateful for a
25   short break not too long from now.

15 (Pages 54 to 57)

Page 58

ROMAIN

1
2       MR. MAGUIRE: That's fine. Maybe we
3    will finish up one document and we will take
4    a break.
5       Q.   I will show you Exhibit 85-B. And it
6    is just with respect to the list of exhibits
7    here, the APA schedules.
8       A.   Yup.
9       Q.   Can you explain to me how they relate,
10   if they relate, to the letters and numbers that
11   you use on the first page of your handwritten
12   notes, Exhibit 399A.
13       And what I am interested in knowing is
14   whether the references that you have to A and B1
15   on the third line of your notes correlate in any
16   way with the Exhibit 85B.
17       A.   Sorry, can you just repeat that
18   last --
19       Q.   Let me try to break it down for you.
20       If you look at your handwritten notes,
21   if you look at the third line, you see
22   "unencumbered assets A/B1"?
23       A.   Yes.
24       Q.   Can you tell me whether A/B1 has
25   anything to do with the exhibits that are

Page 59

ROMAIN

1
2    identified on Exhibit 85-B?
3       A.   I don't know. I don't think I have
4    ever seen these before.
5       Q.   What were you referring to on the
6    third line of 399A when you have that A/B1?
7       A.   So they were, they were the -- that
8    was the value of the assets on Schedule B which
9    had not been delivered to Barclays but were
10   included in our acquisition accounting.
11       Q.   And what does the A mean after that?
12       A.   Well, Schedule B for these purposes
13   was split by operations, I believe. I'm not
14   sure if it was done externally, but certainly my
15   understanding, between lists A, B1, B2 and C,
16   which were qualitatively different and therefore
17   needed a different consideration as to our
18   entitlement to them.
19       Essentially A was assets which were
20   identified as being on Schedule B with no
21   customer claims or encumbrances, or most
22   obviously.
23       B1, B2 and C, I don't have the precise
24   sort of technical differentiation, but as we
25   went through those, items which were on lists B2

Page 60

ROMAIN

1
2    and C, it was more difficult to prove that
3    Barclays was entitled to those or -- I don't
4    know whether it was more difficult to prove.
5    Those we had not -- we had not done the work on
6    those by the time we finalized our acquisition
7    accounting, is what I can say.
8       Q.   And have you since done the work?
9       A.   I have not done the work personally,
10   but Barclays is in a position whereby we have
11   identified the value of the assets from lists A,
12   B1, B2 and C to which we are entitled, and they
13   are, they are on the balance sheet for A and B1,
14   and they are in the item unencumbered assets B2
15   and C. So lists B2 and C.
16       Q.   When did Barclays make the decision as
17   to whether to change its acquisition accounting
18   as reflected on Exhibit 377A?
19       MR. HUME: Objection, vague.
20       A.   We haven't changed it. Sorry? Can
21   you explain --
22       Q.   When was the decision made not to
23   change it?
24       A.   Not to change it?
25       Q.   Yeah.

Page 61

ROMAIN

1
2       A.   Well, it is an ongoing consideration.
3    So we met regularly through the course of 2008
4    and 2009 within finance to discuss our knowledge
5    of the accounting and whether there was anything
6    which suggested that a change should be made,
7    and that continued up until August -- up until
8    September 22nd, when we were required to make a
9    final decision.
10       Q.   And as of September 22nd, had anything
11   changed with respect to the unencumbered assets
12   B2 and C that you have here?
13       A.   These were prepared after that.
14       Q.   When were these prepared?
15       A.   I can't remember the exact date of my
16   deposition. Was it --
17       Q.   As of the date of your deposition, you
18   are saying?
19       A.   Yeah, yeah.
20       Q.   Have there been any changes since
21   then?
22       A.   No.
23       Q.   With respect to those assets, have
24   you -- has Barclays or you done any
25   consideration as to whether the acquisition

16 (Pages 58 to 61)

ROMAIN

accounting should be changed with respect to the unencumbered assets?

A. We are not permitted to change our acquisition accounting. If what is included on that balance sheet requires adjustment now, we would still adjust our financial statements, but it wouldn't feed into the acquisition accounting or negative goodwill calculation. It would just feed into post-acquisition P&L if we had to change anything now.

We do continue to consider that, and obviously these proceedings are ongoing. So we continue to consider that.

MR. MAGUIRE: OK. I assume these different listings, A, B1, B2, C, have been produced, but if you could just identify the Bates numbers for us, I'd appreciate that.

MR. HUME: I believe this all relates, on these lists of unencumbered assets, to what Jim Hraska has been designated, as the corporate representative, is in the best position to explain the analysis that underlies those lists, not this witness.

MR. MAGUIRE: This is a good time to



ROMAIN

take a break.

THE WITNESS: Sure.

(Recess)

(Exhibit 538A, document Bates stamped BCI-EX-S109996 through 110002 marked for identification, as of this date.)

MR. HUME: This is a document we clawed back yesterday.

MS. HASSAN: We have the replaced version.

MR. HUME: OK.

BY MR. MAGUIRE:

Q. Sir, you will see under futures customer balances in this exhibit, you have a reference to Lee making progress?

A. Yes.

Q. Who is Lee?

A. Lee is Lee Bowell.

Q. What was Lee doing here?

A. Well, in relation to the futures-related items, up until about mid October, I hadn't really done much of them. I didn't know much about them or had talked to many of the people who were involved, and I



ROMAIN

didn't really have the capacity to do that myself.

So I asked Lee Bowell who worked for me over in London to fly across to look at that balance, to work with people who had a greater understanding of it, so we could properly account for it.

Q. What did Lee do going forward after you asked him to become involved?

A. He did exactly that. He flew across, I'm not sure of the exact date. It was mid October, so shortly before this. And worked with people like Liz James to get an understanding of the futures assets and liabilities that we needed to record in the acquisition balance sheet, because before then, I didn't personally have much information about those balances.

So there were -- well, for some time, there was nothing recorded when I had no information. Then there were very early placeholder amounts, placed off some verbal communications or indications, but there was -- you will see more information and more breakout



ROMAIN

being included from the time that Lee flew across and started working on the area.

Q. If you turn to the balance sheet, you will see there is a number of notes. With respect to note 9, does that apply to the 15c3 asset?

A. Yes.

Q. And you will see it says, "Timing of receipt is uncertain and subject to SEC approval."

What was the basis, what was the source of your information for that?

MR. HUME: Obviously to the extent the question requires you to reveal anything from attorneys, you are instructed not to answer. But otherwise, you may answer.

A. I had a limited understanding of the 15c3 item, but was aware that there was a receivable which was referred to in the contractual documents in an amount of 769 million dollars that was included, and I knew people were working on it in terms of its status in terms of recoverability.

But it was included in -- it was

Page 66

ROMAIN

1  included, that amount, based on the information
2  I had on that date.
3      Q.   What discussions did you have as to
4  whether the SEC would approve the transfer of
5  this asset?
6          MR. HUME: Other than discussions with
7      counsel, if you had any.
8      A.   I don't recall. I don't recall any.
9      Q.   Are you aware of anything that
10  Barclays has done to assess the likelihood of
11  SEC approval?
12     A.   Not specifically with SEC, no. I'm
13  aware that Barclays' position as regards the
14  claim and recoverability of the asset is as
15  reflected in Exhibit 377A. Yeah.
16     Q.   Can you tell me, other than including
17  it in 377A, can you tell me anything that
18  Barclays has done to assess the likelihood that
19  it will recover these 15c3 assets in the amount
20  of .77 billion dollars?
21         MR. HUME: That question is outside
22     the scope of the 30(b)(6). I don't think
23     the witness can answer it.
24     Q.   To the extent of your awareness.

Page 67

ROMAIN

1      A.   I don't have any personal awareness.
2      Q.   Note 12 refers to margin. Do you see
3  that, sir?
4      A.   You referred to -- note 12. It refers
5  to the OCC options. The labels given to these
6  line items were based on a partial understanding
7  as to what they were. But this was, you know,
8  this was reflecting knowledge that I knew that
9  there was OCC-related assets and liabilities
10  which needed to be included.
11     Q.   And who was doing the investigation
12  that you referred to in note 12?
13     A.   21st October, in terms of the
14  investigation, in terms of what should be
15  included in the acquisition balance sheet, there
16  wasn't really much. There was a similar
17  position to futures, that I had done very little
18  work. I had a couple of conversations, so I
19  knew that there was something which needed to be
20  accounted for. I knew that it included margin
21  and it included positions, but I didn't have a
22  great deal of information other than that.
23         The things that we did to expedite
24  that was similar to futures, that I asked a

Page 68

ROMAIN

1  colleague from London to fly across who had
2  capacity to work on it. He didn't fly across
3  until around about 10th November, I think.
4          So before then, any numbers in
5  relation to exchange traded options or related
6  margin would just have been numbers based on,
7  you know, early verbal indications from people
8  within the business. And at that time, it looks
9  like the item included is 570 million dollars.
10     Q.   Who is the person who -- you referred
11  to somebody flying across. Would you just give
12  me the names of the people who handled the
13  investigation that you refer to in note 12
14  concerning OCC margin?
15     A.   Well, at that time, it was under
16  investigation by people within the business and
17  I was just a recipient of information, the main
18  information being that the investigation was
19  ongoing.
20         I was aware of -- I was aware of some
21  issue in some areas of the margin which were
22  being held, custodian being JP Morgan, and we
23  were having other problems with them, so I knew
24  that was one of the things which was being

Page 69

ROMAIN

1  thought about, but I didn't have any detailed
2  information, other than that.
3      Q.   Who was the person within the
4  business --
5      A.   My contact was Sean McKenna.
6      Q.   Sean McKenna? Where is Sean McKenna?
7      A.   Now?
8      Q.   Yeah.
9      A.   He works for a company called C12,
10  same company that Stephen King works for.
11     Q.   At the time he worked for Barclays?
12     A.   Yes.
13     Q.   And who else was involved in the
14  investigation that you referred to here?
15     A.   I'm not sure. At that time, at that
16  time, I didn't really have the capacity to do
17  much more than there was, and I spent most of my
18  time on items where I had information I was
19  working through. So the inventory, fixed
20  assets, other things of that nature.
21         The OCC-related options had very
22  little finance attention from me, finance
23  department at Barclays, very little attention
24  from me on that, until Iain Cooper flew across

18 (Pages 66 to 69)

Page 70

ROMAIN

1 in early November.
2     So my main source of information was
3 Sean McKenna. I'm not sure who else on the
4 business side was working on it with him.
5     Q.    If you turn to the last page. You see
6 there is a reference to uncertainties around
7 acquired balance sheet, around the middle of the
8 page?
9     A.    Yes.
10     MR. HUME: I don't. Where is it?
11     MR. MAGUIRE: It's just --
12     THE WITNESS: It is on the next page.
13     MR. MAGUIRE: Yes, last page, middle
14 of the page.
15     MR. HUME: I see.
16     Q.    Can you explain what's meant by the
17 first sentence there?
18     MR. HUME: I'm not sure that's within
19 the 30(b)(6) either.
20     A.    My understanding of what it means is
21 that at that time, there was a great deal of
22 uncertainty around various aspects of the
23 balance sheet. In terms of intercompany
24 receivables and payables, LBI had countless

Page 71

ROMAIN

1 balances with other Lehman entities for
2 countless purposes, and many of those remained
3 with the LBI company, bankruptcy estate.
4     However, at that point in time, Lee
5 was clearly trying to consider the extent to
6 which receivables and payables from Lehman
7 affiliates in relation to the futures, futures
8 business, so where Lehman affiliates were
9 acting, where Lehman affiliates had the exchange
10 membership, and therefore, LBI traded with those
11 affiliates who then traded with brokers on their
12 behalf, the extent to which those balances
13 should be accounted for.
14     And what he's stating there was that
15 at that time, based on the information he had,
16 there was an uncertainty for him. It doesn't
17 mean for Barclays. He had flown out, so he had
18 started to work on it. So that's what the
19 statement means.
20     Q.    Does the acquisition balance sheet
21 include intercompany receivables and payables
22 related to clients' positions at Lehman
23 affiliates acting as brokers?
24     MR. HUME: Objection to the form of

Page 72

ROMAIN

1 the question as vague.
2     A.    What it includes is -- it includes
3 affiliate balances as regards -- as summarized
4 in the exhibits to Liz James' -- Liz James'
5 declaration. It includes balances with Lehman
6 affiliates to the extent indicated by Liz James'
7 declaration and our conversation earlier on
8 that, in that some affiliate balances are not
9 included on the balance sheets, and some
10 affiliate balances, mainly Singapore and Japan,
11 were included on the balance sheets.
12     Q.    And can you explain to us why some
13 were included and some were not included?
14     A.    It was a question of when we got to
15 finalizing our 2008 financial reporting, the
16 information that we had on that at that time,
17 based on the situation with many of those
18 affiliates, the distressed nature of the
19 segregation of the relevant assets.
20     So it was recoverability issues.
21 There is no distinction in terms of -- there is
22 no distinction being drawn in terms of
23 entitlement. But we had to take a view on our
24 knowledge around collectability.

Page 73

ROMAIN

1     Q.    So all receivables and payables
2 related to clients' positions at any Lehman
3 affiliates that had acted as brokers should be
4 on the balance sheet unless there is some
5 recoverability issue?
6     MR. HUME: Objection, mischaracterizes
7 testimony. Ambiguous question.
8     A.    They will be on the balance sheet
9 unless they are included in the approximately
10 460 million, 470 million dollar item that we
11 talked about earlier that wasn't included on the
12 balance sheet.
13     Q.    We will mark as Exhibit 539A an e-mail
14 from Gary Romain to Michael Guamuccio -- did I
15 pronounce that right?
16     A.    I believe so, yes.
17     Q.    And others, dated Friday, 24 October,
18 2008.
19     (Exhibit 539A, document Bates stamped
20 BCI-EX110050 marked for identification, as
21 of this date.)
22     Q.    Sir, you sent this e-mail to
23 Mr. Guamuccio and others?
24     A.    That's correct.

19 (Pages 70 to 73)

Page 74

ROMAIN

1
2    Q.   Did you have a discussion with him
3    about the subject?
4    A.   Yes.
5    Q.   What was the upshot of that?
6    A.   That we found the securities on the
7    date they were delivered.
8    Q.   And what was -- what did
9    Mr. Guarnuccio say to you in respect of that?
10    A.   There was a discussion around it,
11    because most of the assets on the acquisition
12    balance sheet were valued as of the close date,
13    and there are often matters of judgment and
14    interpretation in terms of accounting which need
15    discussion internally and with auditors, and
16    this is one of them.
17    We needed to explain the view as to
18    why the most appropriate valuation for
19    acquisition accounting for the securities
20    received, securities and cash received from
21    JP Morgan would be to value them based on the
22    value that was eventually delivered to us,
23    rather than a hypothetical value that those same
24    securities might have had on the 22nd of
25    September.

Page 75

ROMAIN

1
2    And we discussed it back and forth for
3    a while, and we were all in agreement that that
4    was the right thing to do.
5    Q.   The choice was between the acquisition
6    date and the date of delivery?
7    A.   I can't think of -- I can't think of
8    any other date being suggested. I don't have
9    100 percent recall of the entire discussion, but
10    those are the two principal dates which come to
11    mind.
12    Q.   Did you assess the financial statement
13    impact of choosing one date over the other?
14    A.   No.
15    Q.   Did you have any understanding what
16    the impact would be on the financial statements?
17    A.   No, no.
18    Q.   Do you know whether the market had as
19    a general matter gone up or gone down since the
20    acquisition date?
21    MR. HUME: Objection, vague and
22    ambiguous. What market?
23    A.   I don't -- I didn't look in great
24    detail into the components or the individual
25    securities that were eventually delivered in

Page 76

ROMAIN

1
2    December. So as to whether or not their value
3    would have been greater or lesser on that date
4    as compared to September, I don't know.
5    Q.   We will mark as Exhibit 540A an e-mail
6    from Mr. Romain to Stephen King dated
7    27 October, 2008.
8    (Exhibit 540A, document Bates stamped
9    BCI-EX-(S)110053 with attachment marked for
10    identification, as of this date.)
11    Q.   Did you send this e-mail, sir?
12    A.   Yes.
13    Q.   The last item you see is the 15c3
14    asset?
15    A.   Yes.
16    Q.   Can you explain from an accounting
17    standpoint why you needed to be comfortable that
18    the capped 769 million entitlement was not under
19    any material threat?
20    A.   It was to insure there was no double
21    counting in our balance sheet. I don't
22    personally have a great deal of understanding of
23    the 15c3 accounts and how it operates. I just
24    wanted to make sure that none of the, none of
25    the value which was included in other items

Page 77

ROMAIN

1
2    would represent a double count with that
3    769 million dollars. That is me personally
4    based on a lack of a great deal of knowledge
5    about those items, rather than anything else,
6    and that was discussed, and the results of that
7    discussion were as represented on Exhibit 377A.
8    Q.   When you say double counting, the
9    concern you had was that the 769 million here
10    might be in more than one place on your
11    acquisition balance sheet?
12    A.   I needed to make sure that wasn't the
13    case, yes.
14    Q.   Did you have any separate concern as
15    to the recoverability of the 15C3 asset?
16    A.   I had -- I -- I had a wish to make
17    sure that the assets and number I was including
18    was the right one and a recoverable amount.
19    Yeah.
20    Q.   What did you do to make sure that was
21    the case?
22    MR. HUME: To the extent that
23    answering that question requires divulging
24    communications with lawyers, I instruct the
25    witness not to answer.

20 (Pages 74 to 77)

Page 78

ROMAIN

1
2    A.   On that basis, there is nothing that I
3    can think of to add to the response.
4    Q.   Did you make at one point a provision
5    with respect to the -- to this asset, 15C3
6    asset?
7    A.   Yes, I do recall it being shown lower
8    amounts for a period before Barclays reached its
9    final view on the appropriate carrying amount.
10   Q.   And what was the basis for that?
11   MR. HUME: Basis for?
12   Q.   Making that provision?
13   A.   That was essentially that I as an
14   accountant would -- heard that there were --
15   there were discussions around the 15c3 assets in
16   terms of it having not been delivered.
17   Typically when you've got a security -- I'm
18   sorry, not a security, where you have got a
19   receivable which has not been delivered, and I
20   personally didn't have a great sense of finality
21   or great understanding of the discussions which
22   were ongoing, and on a periodic basis I wrote
23   those down with the knowledge I needed to
24   finalize the view before we finalized the
25   balance sheets.

Page 79

ROMAIN

1
2    So it was written down on that basis
3    for a period of time until the final view was
4    reached, and then it was stated at the
5    appropriate amount.
6    Q.   What is the threshold in terms of
7    likelihood of recovery for recognition as
8    opposed to nonrecognition on the financial
9    statements?
10   A.   For acquisition accounting, it is fair
11   value. So it's -- there is not a probable or
12   not probable explicitly included in the
13   accounting standards. It is more you recognize
14   a fair value which will take into account
15   uncertainties after. However, where you have
16   got single large items, then whether you
17   attribute a fair value to an item or not will
18   often involve discussion around probability of
19   receipt.
20   But there is no hard and fast rule.
21   It is a matter of judgment. But the underlying
22   principle is fair value.
23   Q.   What was the threshold that Barclays
24   applied in recognizing assets on the acquisition
25   balance sheet in terms of probability of

Page 80

ROMAIN

1
2    recovery? How much certainty did you decide you
3    would require in order to recognize an asset on
4    that balance sheet?
5    A.   As I said, you recognize assets at
6    fair value when you are satisfied that they
7    exist. So for assets where we had done
8    sufficient work to understand those assets, and
9    their value, we included them. Where we didn't,
10   we did not.
11   So that there is no -- there is no
12   sort of probability number which was involved in
13   that.
14   Q.   So in recognizing the assets on the
15   balance sheet, you did not undertake an analysis
16   to determine whether the recoverability of each
17   asset was more probable than not?
18   MR. HUME: Objection, mischaracterizes
19   the testimony.
20   A.   Yes, that's not quite the case, and
21   the recoverability of an asset will be one of
22   the facts which is taken into account in
23   determining its fair value.
24   Q.   Did you do a probability assessment
25   with respect to the 15c3 asset?

Page 81

ROMAIN

1
2    MR. HUME: Objection. To the extent
3    it calls for divulgence of privileged legal
4    advice, I instruct the witness not to
5    answer.
6    A.   On that basis, as I previously
7    indicated, the recognition of that asset would
8    reflect Barclays' view as to the appropriate
9    fair value of that asset for inclusion in
10   acquisition accounting.
11   Q.   And the question simply is, did you do
12   an analysis as to whether Barclays -- it was
13   probable that Barclays would obtain that asset?
14   MR. HUME: You are asking this witness
15   whether he did an analysis of whether we are
16   going to win our legal dispute that we have
17   with you?
18   MR. MAGUIRE: The question is, did he
19   do that or not? Did he do a probability
20   analysis?
21   MR. HUME: Separate from the lawyers.
22   MR. MAGUIRE: Just asking if he did a
23   probability analysis.
24   MR. HUME: You are instructed not to
25   answer to the extent the lawyers did an

21 (Pages 78 to 81)

Page 82

ROMAIN

1    ROMAIN
2    analysis of their entitlement.
3         Beyond that, I think he already has
4    answered.
5    Q.   Sir, anything you need to say?
6    A.   I don't have anything I can add to
7    that.
8    Q.   I notice that on the -- your draft
9    acquisition balance sheet, at some stage, you
10   refer to an OCC clearance box. I think that
11   ultimately becomes OCC customer and clearing
12   margin.
13   A.   Yes. The labels which are included
14   alongside either option futures or OCC items in
15   early versions would typically reflect at that
16   stage the fact that very little work had been
17   done on those from the finance perspective and
18   from my perspective. So they may well be less
19   than absolutely accurate characterizations of
20   the nature of everything which is included in
21   there. But that's because they are based on the
22   level of information and understanding I had at
23   any given date. Which is the case for all the
24   iterations of the balance sheet.
25   Q.   We will mark as Exhibit 541A an e-mail

Page 83

1    ROMAIN
2    from Robert Konowalchuk to Mr. Romain dated 25
3    November, 2008.
4         (Exhibit 541A, document Bates stamped
5    BCI-EX-(S)110070 through 74 marked for
6    identification, as of this date.)
7    Q.   Sir, if you turn to the second-to-last
8    page, there is a draft acquisition balance sheet
9    there.
10   A.   Yup.
11   Q.   I guess the last page with any text on
12   it. And you will see the page before that has a
13   similar acquisition balance sheet with some
14   notes.
15   A.   This is -- the two schedules are the
16   same acquisition balance sheet. It is the net
17   and gross presentation.
18   Q.   Right.
19        If you look at note 5, you see it
20   says, "SEC agreement is required before amounts
21   can be released"?
22   A.   Yes.
23   Q.   Did you have any discussions with any
24   of your auditors concerning that requirement?
25   A.   I don't think any auditors talked to

Page 84

1    ROMAIN
2    me about the PIM balance sheet. No, I don't
3    recall that I had any discussions with them
4    around that.
5    Q.   What about with respect to the 15c3
6    assets? Did you have any discussions with the
7    auditors about that?
8         MR. HUME: Just for the record, that's
9    not what note 5 refers to.
10        MR. MAGUIRE: Understood.
11   A.   I am sorry, can you repeat the
12   question.
13   Q.   Yeah. The 15C3 asset has a note 2
14   beside it. Do you see that?
15   A.   Yes.
16   Q.   It says, "Timing of receipt is
17   uncertain and subject to SEC approval." Do you
18   see that?
19   A.   Yes.
20   Q.   Did you have any discussions with any
21   of the auditors concerning that SEC approval
22   requirement?
23   A.   No. I didn't have any discussions
24   with them about that. But they may have asked
25   me about the balance sheets, and they may have

Page 85

1    ROMAIN
2    asked me about that number, but I wouldn't have
3    been the right person to talk to them about SEC
4    discussions. So no, I didn't.
5    Q.   We will mark as Exhibit 542A an e-mail
6    from Mr. Romain to Mr. Clackson and others dated
7    10 December, 2008.
8         (Exhibit 542A, document Bates stamped
9    BCI-EX-(S)110092 with attachment marked for
10   identification, as of this date.)
11        MR. HUME: I would like to make a
12   statement for the record, if I could. The
13   previous exhibit, and I think the one
14   before, have this phrase about, "Timing of
15   receipt is uncertain and subject to SEC
16   approval."
17        I need to reserve our right to
18   determine whether or not that is potentially
19   subject to a claw back, if it in any way
20   relates to the -- relates to any legal
21   advice at the time. And I will try to do
22   that as promptly as possible.
23   Q.   So you sent Exhibit 542A?
24   A.   Yes.
25   Q.   And what were you referring to here?

22 (Pages 82 to 85)

Page 86

ROMAIN

1       ROMAIN
2       A.   So I was referring to the underlying
3    schedule which shows two balance sheets. One is
4    the balance sheet based on the best information
5    I had at November month end, and the second was
6    a sort of working balance sheet for, you know,
7    what updates would need to be made to that
8    version for eventual December month-end
9    financial accounting.
10      So making adjustments for additional
11   information and potential adjustments which I
12   had become aware of or worked on further between
13   November month end and the 10th of December.
14      Q.   We will mark as Exhibit 543A an e-mail
15   from Mr. Romain to Mr. Holloway dated 14
16   December, 2008.
17      (Exhibit 543A, document Bates stamped
18   BCI-EX-(S)218500 through 501 with attachment
19   marked for identification, as of this date.)
20      Q.   I am going to ask you about the
21   attachment, which is a December 12 e-mail I
22   believe you were copied on. Specifically on the
23   second page of that, there is a section called
24   "Bid Offer Spread."
25      A.   OK.

Page 87

ROMAIN

1       ROMAIN
2       Q.   The first sentence says that "the
3    values that we received for equity prices are
4    based on the last traded," and goes on to talk
5    about an assumption that these are mids. What
6    do you understand mids to be?
7       A.   This is part of the technical process
8    under which our specialists determine the
9    appropriate bid price, which is the price we are
10   required to mark assets at. So I do not
11   understand everything which is in Marcus'
12   e-mail, but references to mids would mean mid
13   price.
14      Q.   And you see that there is an
15   assumption here that these are mids?
16      A.   Yes.
17      Q.   Do you know whether anything was done
18   to check whether that was an appropriate
19   assumption?
20      A.   I don't know what checks were made.
21   However, as Marcus goes on to clarify, we are
22   required to mark the assets at bid price in any
23   case. So whether the prices were mid or offer,
24   as he suggested a possible alternative, we would
25   still need to make an appropriate adjustment to

Page 88

ROMAIN

1       ROMAIN
2    get them to our best estimate of bid, which is
3    neither mid nor offer.
4       Q.   Is there a written protocol that
5    describes the process that your technical people
6    went through here in performing their
7    valuations?
8       A.   There are valuation policies which are
9    applied within the bank and which are applied in
10   this process also.
11      Q.   Were there any exceptions to the
12   company's valuation policies that were applied
13   here?
14      A.   We valued, we valued the securities in
15   line with those policies. I have not audited
16   the work that was performed, but that was the
17   objective and those were the policies that we
18   apply for these valuations, as well as all
19   others which were reflected in our year-end
20   accounting.
21      Q.   That work was subject to audits by the
22   external auditors; is that right?
23      A.   Yes.
24      Q.   Do you know what the external auditors
25   did with respect to that process and the work

Page 89

ROMAIN

1       ROMAIN
2    that had been done?
3       A.   No.
4       Q.   Do you know whether that work was also
5    subject to any review by internal audit?
6       A.   I don't know.
7       Q.   And you see the first component that
8    Mr. Morton spoke to, as to "time before Barclays
9    perfected ownership of the assets and was able
10   to trade"?
11      A.   Yes.
12      Q.   Do you know whether there was any
13   adjustment made to the fair value of the assets
14   based on this timing issue?
15      A.   No, there was not.
16      Q.   So he mentioned a number that's a
17   little north of 500 million dollars. There was
18   no adjustment made with respect to timing.
19      A.   The issue was being discussed with the
20   auditors as regards the appropriate valuation
21   date, and the position which was agreed on that
22   was that they should be valued at bid price as
23   at the closing date.
24      So at this point, so December 12 and
25   also December 14, we were engaged in a

23  (Pages 86 to 89)

Page 90

ROMAIN

1
2   discussion with their auditors as to the
3   appropriate valuation date. And that's the
4   context for Marcus' e-mail, but the conclusion
5   was they were valued without adjusting for any
6   period after the close date that it took us to
7   perfect our control or management of the assets.
8       Q.   We'll mark 544A as a document Bates
9   stamped BCI-EX-(S)00110108 through 112.
10          (Exhibit 544A, document Bates stamped
11      BCI-EX-(S)00110108 through 112 marked for
12      identification, as of this date.)
13      Q.   Sir, can you tell me, do you recognize
14  Exhibit 544A?
15      A.   Yes, I do.
16      Q.   What is it?
17      A.   This was a document which PWC put
18  together as part of our discussion with them as
19  to the appropriate valuation date. To aid those
20  discussions, they put together a summary of
21  their understanding of what happened when.
22  And -- yeah, so that's what that document is.
23      Q.   Under Thursday, September 18, there is
24  a reference to securities received as
25  collateral. The first two bullets refer to

Page 91

ROMAIN

1
2   28 billion of wirable securities and then 14 to
3   15 billion that was moved from being pledged to
4   DTC. Do you see that?
5       A.   I do.
6       Q.   Whose valuations were used there?
7       A.   I don't know.
8       Q.   If you turn to the second-to-last page
9   just above Thursday, September 25.
10      A.   Yup.
11      Q.   It starts on the previous page. It
12  deals with the honest broker program.
13      A.   OK, yeah.
14      Q.   Did this honest broker program
15  transaction with DTC have any impact on the
16  balance sheet --
17      A.   No.
18      Q.   -- Exhibit 377A?
19          Can you explain why?
20      A.   We -- in terms of for accounting
21  purposes, this was raised to me sometime after
22  it occurred and -- as well as this memo here,
23  and determined that the most appropriate
24  representation was that this was a
25  post-acquisition sale of securities from

Page 92

ROMAIN

1
2   Barclays to DTC.
3       Q.   So that means that it wouldn't affect
4   the opening balance sheet?
5       A.   That's correct.
6       Q.   And that the result of this
7   transaction would be reflected as a post balance
8   sheet trade?
9       A.   That's correct.
10      Q.   Was there a loss or a profit
11  recognized on this transaction?
12      A.   The sale price was very similar to the
13  price -- to the fair value for acquisition
14  accounting, and, yes, so the fair value for the
15  securities included in Exhibit 377A was
16  1732 million. And they were sold under the
17  honest broker program for 1715 million. So that
18  is a loss of 17 million, which I guess is about
19  1 percent.
20      Q.   And you're reading from --
21      A.   I'm reading from my notes, which is--
22      Q.   Exhibit 534A?
23      A.   Yes. 534A.
24      Q.   And can you tell me where on your
25  notes is the topic you are reading from?

Page 93

ROMAIN

1
2       A.   Yes. It is 34B and 34C at the top of
3   the fifth page.
4       Q.   We don't need to mark this. I am
5   going to show you just one page I want you to
6   look at in Barclays' annual report, 2008 annual
7   report, page 235.
8       A.   OK.
9       Q.   You will see, sir, at the bottom of
10  the table, there is a section that begins, "The
11  acquired assets and liabilities summarized in
12  the table above." Do you see that?
13      A.   Yes.
14      Q.   And the second sentence says, "For
15  this reason, it is not practical to reliably
16  determine the carrying amount of the assets and
17  liabilities in the pre-acquisition books and
18  records of Lehman Brothers."
19          Do you see that?
20      A.   Yes.
21      Q.   By carrying amount, do you understand
22  that to be the book value?
23          MR. HUME: Objection, vague and
24  ambiguous.
25      A.   Carrying amount would mean the amounts

24 (Pages 90 to 93)

Page 94

ROMAIN

1  ROMAIN
2  at which those items were stated in the books
3  and records of Lehman prior to acquisition.
4      Q.   Prior to September 22?
5      A.   Yes.
6      Q.   And do you know whether Barclays, in
7  fact, had access to the books and records of
8  Lehman?
9          MR. HUME:  Had at what time?
10     Q.   Following the September 22
11  acquisition?
12     A.   I don't know.
13     Q.   Do you know whether it was in fact
14  practical to determine the book value of the
15  assets and liabilities in Lehman's books?
16         MR. HUME:  Objection, vague as to what
17  time.
18     A.   It's important to distinguish between
19  practical and possible. There is very little
20  which is impossible, but the disclosure
21  requirement that's there to satisfy is in
22  accounting standards, which basically says that
23  you should include that information unless it is
24  not practical to do so.
25         And practical is typically -- for

Page 95

1  ROMAIN
2  reporting purposes is typically viewed as
3  including cost-benefits. So if it was -- if it
4  were to take a lot of effort disproportionate to
5  benefits of including the disclosure for
6  financial reporting purposes, even though
7  neither of those concepts can be quantitatively
8  measured, then you don't include it, and it is
9  typical for acquisitions of this nature that you
10  would not include that.
11     Q.   And do you in fact know whether it was
12  practical to get the carrying value or book
13  value of the assets from Lehman's records?
14     A.   In the context I've just described in
15  terms of including cost-benefit, it was not
16  practical.
17     Q.   How do you know that?
18     A.   Because I was involved in the
19  discussions around that.
20     Q.   And can you tell me what you know of
21  those discussions?
22     A.   One of those discussions is that to --
23  that setting aside questions of access to books
24  and records, which we really didn't get into,
25  even if we had perfect access, it would have

Page 96

1  ROMAIN
2  taken a lot of time to extract the carry amounts
3  of all of the acquired assets and liabilities
4  from the assets and liabilities which were not
5  subject to the acquisition.
6         And the amount of time that it would
7  have taken was viewed as, by far excessive to
8  what we would ever consider taking to fulfill
9  that disclosure requirement.
10         MR. HUME:  Is there a reason you don't
11  want to make that an exhibit, Bill?
12         MR. MAGUIRE:  What?
13         MR. HUME:  The one you just showed
14  him.
15         MR. MAGUIRE:  It is a public record.
16  It is also very thick. But I don't think
17  there is any dispute as to what the 2008
18  report was. It's a matter of judicial
19  notice.
20         MR. HUME:  I think it is just good
21  order to keep a copy of it. I'm not making
22  an issue of it.
23         MR. MAGUIRE:  I don't see any reason
24  to. If you want to, I'm happy to, but we
25  have already got a pretty big record.

Page 97

1  ROMAIN
2         MR. HUME:  Do you have a copy for me?
3         MS. HASSAN:  Yes.
4      Q.   We will mark as Exhibit 545A an e-mail
5  from Mr. Romain to Mr. Morton and others dated
6  10 January, 2009.
7         (Exhibit 545A, document Bates stamped
8  BCI-EX-(S)110133 through 34 marked for
9  identification, as of this date.)
10     Q.   You sent this e-mail, sir?
11     A.   Yes.
12     Q.   You note that, just before the end,
13  you note that there are other potential assets
14  which do not have sufficient certainty of
15  recoverability. Do you see that?
16     A.   Yup.
17     Q.   What was the level of certainty that
18  you felt was necessary for recognition?
19     A.   I guess I need to just go back to the
20  previous answer. There is no fixed level of
21  certainty for acquisition accounting. The
22  concept is fair value. And in determining fair
23  value or whether to attribute to fair value, one
24  of the things we would consider is our knowledge
25  around the recoverability of assets, which was

25 (Pages 94 to 97)

Page 98

ROMAIN

1  one of the things which would have fed into
2  that.
4  Q.  If you turn to the acquisition balance
5  sheet, you will see under the C3 asset it has
6  0.19. Is that 190 million dollars?
7  A.  Yeah.
8  Q.  And then how is that amount arrived
9  at?
10  A.  At that time, that was 25 percent of
11  the total amount, being the percentage that we
12  were carrying some of our sort of general
13  non-acquisition related Lehman claims at. As
14  mentioned earlier, that was shown at that level
15  for a time, I'm not sure how long, when from an
16  accounting point of view, I and others didn't
17  think we knew enough about the item to reach a
18  final determination on the appropriate carry
19  amount.
20  We shortly thereafter reached a view
21  as a bank as to the appropriate carry amount,
22  and that's what guided the final acquisition
23  accounting.
24  Q.  So mathematically, the .19 here is
25  25 percent of the .77?

Page 99

ROMAIN

2  A.  Mathematically, that's what that
3  number is.
4  Q.  And when you refer to general
5  non-acquisition related Lehman claims, what were
6  you referring to?
7  A.  Where Barclays traded with Lehman and
8  ended up with a claim against the bankruptcy
9  estate, because it was owed cash at the time
10  that the organization went into bankruptcy. And
11  as discussed, that was not viewed as the
12  appropriate measurement basis in our final
13  acquisition accounting.
14  Q.  So your final acquisition accounting,
15  you changed that from 25 percent to 100 percent?
16  A.  The final acquisition accounting
17  included 100 percent of the 769 million, yes.
18  Q.  We will mark as Exhibit 546A an e-mail
19  from Lee Bowell to Gary Romain and Iain Cooper.
20  (Exhibit 546A, document Bates stamped
21  BCI-EX-(S)110162 through 63 with attachment
22  marked for identification, as of this date.)
23  Q.  Sir, Lee Bowell refers to — he tells
24  you about the conversation he needs to have with
25  PricewaterhouseCoopers concerning the split

Page 100

ROMAIN

2  between acquisition and post acquisition. What
3  did you understand that to refer to?
4  A.  Yeah, I understood that to refer to
5  the cost of closing out LBF positions which were
6  held in the OCC 084 accounts and whether we
7  should view that as a cost of the acquisition or
8  post-acquisition costs.
9  Q.  What was the financial statement
10  impact of that question?
11  A.  If it was a cost of acquisition, it
12  would be included in P&L as a reduction in the
13  negative goodwill amount. If it wasn't, it
14  would be included at the same amount also in
15  P&L, but would be included in -- probably in a
16  trading profit line instead.
17  So it is about which line item in the
18  P&L that cost appears in.
19  Q.  And then you asked for update of
20  balance sheet breakdowns after adjustments had
21  been made, right?
22  A.  Yeah.
23  Q.  If we look at the attachment.
24  A.  Yeah.
25  Q.  Do I understand that the first column

Page 101

ROMAIN

2  represents the 19th of September on a net basis,
3  and that the net is of the gross amount of
4  assets represented by the second column and the
5  gross amount of liabilities, which is the third
6  column?
7  A.  The -- yeah, the first column is
8  the -- is the overall futures balance sheet,
9  which was reflected in Exhibit 377A. And then
10  there is a gross up, which is required for
11  accounting purposes to show assets and
12  liabilities separately. They are the two
13  numbers which you will see in the gross tab in
14  Exhibit 377A.
15  Q.  And the gross amount of the assets,
16  3.783 billion, that appears on Exhibit 377A?
17  A.  In the third tab of 377A, the 3.783
18  number appears in cell F20, and the 2.605
19  appears in cell E44.
20  Q.  And that corresponds with the gross
21  amount of the liabilities on the overall futures
22  balance sheet?
23  A.  That's the financial statement
24  presentation, yeah, so the gross, the gross
25  after the futures balance sheet.

26 (Pages 98 to 101)

Page 102

ROMAIN

1
2     Q.   Does the net number on the overall
3  futures balance sheet for the 19th of September,
4  that 1.178 billion dollar number, does that
5  appear anywhere in Exhibit 377A?
6     A.   So on the second page of 377A, which
7  is the summary acquisition balance sheet, that
8  figure is included in cell C17.
9     Q.   Now, if we look at the overall futures
10  balance sheet, the cash amount there, can you
11  tell me where that cash is?
12        MR. HUME:  This is on Exhibit 546A?
13        MR. MAGUIRE:  Yes.
14     A.   It is, yeah.  I just want to check so
15  I can be definitive.
16     Q.   Sure.
17        MR. HUME:  I am going to object to the
18     question, as I think the question is unclear
19     and ambiguous.
20     A.   I don't know where it is, no, cash
21  being fungible, but it has substantially been
22  delivered to Barclays.  I think there may be a
23  small amount which was not delivered to -- but
24  if so, that would be in the range of 10 to 15
25  million dollars, but substantially all of the

Page 103

ROMAIN

1
2  cash balance was delivered.
3     Q.   If you look at your notes,
4  Exhibit 399A, there is the handwritten notes.
5     A.   Yes.
6     Q.   If you look at the second page, around
7  the middle of the page, this is just above
8  futures, and you have a reference to cash there,
9  1.375 billion in cash?
10     A.   Yes.
11     Q.   Would you tell me whether that is
12  different from any of the 811 million dollars of
13  cash that's on the overall futures balance
14  sheet.
15     A.   Yes, it is different.
16     Q.   And can you explain how.
17     A.   That's the amount which relates to
18  options, not futures.
19     Q.   So the cash that relates to options at
20  the OCC is 1.375 billion dollars?
21     A.   That was -- I mean I don't have the
22  number on hand, but it certainly is in that
23  area, and based on also the notes there, which I
24  was short at the time, yes, it's that or a
25  number very close to it.

Page 104

ROMAIN

1
2     Q.   And the 811 million dollars that's
3  reflected on the overall futures balance sheet
4  is cash that's separate from that that relates
5  to the futures business?
6     A.   That's correct.
7     Q.   The next item on the overall futures
8  balance sheet are mutual funds?
9     A.   Yes.
10     Q.   Can you tell me whether they are
11  reflected on any of the exhibits to the James
12  declaration that you reviewed with us earlier?
13     A.   Yes.  They're not -- I'm not sure --
14  they are.  But the thing I'm not sure of right
15  now is the reconciliation between the item in
16  Exhibit 2, which is 1 billion dollars, and the
17  amount in the acquisition balance sheet of
18  1.385 billion dollars.
19        As I sit here right now, there is a
20  reason for the difference between the two, but I
21  don't recollect it.
22     Q.   With the exception of that difference,
23  those two numbers correspond to the same
24  categories of assets?
25     A.   That's correct.

Page 105

ROMAIN

1
2     Q.   And what about with respect to at
3  T bills?  Is that reflected on any of the
4  exhibits of Ms. James' declaration?
5     A.   Yes, they are.  They are included
6  within other items.  As you see from the futures
7  breakdown there, that is marginal cash which is
8  held with various exchanges and brokers.  The
9  exhibits to Liz James' includes those items in
10  the relevant broker or, you know, whether it is
11  foreign customer or prop, proprietary.
12        Liz James' exhibits do not split the
13  form in which that collateral was held to show
14  what was held in T bills or in any other form.
15  But they are included within Liz's items.
16     Q.   What about domestic exchanges?
17     A.   Collateral held at domestic exchanges
18  is not included in the exhibits to Liz James'
19  testimony, the collateral.  So that net
20  404 million dollars is collateral which is --
21  which at the time of acquisition was placed with
22  domestic exchanges and is not included in the
23  exhibits, and I fed that back and Liz will deal
24  with that in her deposition.
25     Q.   Now, when you say 404, you are

27 (Pages 102 to 105)

Page 106

ROMAIN

1  referring to the $403,733,010?
2  A.   That's correct.
3  Q.   What about foreign brokers?
4  A.   Yes. Again, that's included in the
5  relevant foreign brokers numbers.
6  Q.   In her exhibits?
7  A.   In her exhibits.
8  Q.   What's meant by house positions?
9  A.   Proprietary positions.
10  Q.   And then Lehman affiliates?
11  A.   That's the same. That's also
12  included.
13  Q.   That's included in the --
14  A.   In the Liz James exhibits.
15  Q.   In the Liz James exhibits.
16  And the receivable under Lehman
17  affiliates, what does that represent?
18  A.   That represents margin which was held
19  with Lehman affiliates. So placed by LBI with
20  Lehman affiliates who had exchange memberships
21  in those jurisdictions.
22  And that's also included in the
23  exhibits to Liz James' declaration.
24  Q.   What's the payable?

Page 107

ROMAIN

1  A.   There was also payable to certain
2  affiliates. I'm not sure -- I'm not sure what
3  that represented.
4  There is backing which is -- it is
5  not -- it would not be included because it
6  wasn't a receivable. All of Liz James' are
7  basically collateral which was due to be
8  delivered to Barclays.
9  There were also some payables to
10  various exchanges where LBI's account with them
11  was in a payable situation. In terms of the
12  trades which led to that position
13  pre-acquisition, I don't know what they are.
14  Q.   So if you wanted to find out what that
15  payable represents, how would you -- what would
16  you do?
17  A.   I'd go back to either backing -- I'd
18  go back to the underlying work that was done to
19  put together the futures balance sheets. Each
20  of these assets and liability items, as you
21  would expect, has components.
22  Q.   Sure. And who has that? Who did the
23  work of putting this together?
24  A.   Lee Bowell.

Page 108

ROMAIN

1  Q.   Now, finally there is a provision, do
2  you see that, for 168.8 million?
3  A.   Yeah.
4  Q.   What's that?
5  A.   That is a part of the 470 million
6  dollars that I mentioned earlier for Lehman
7  affiliates other than Japan and Singapore. So
8  288 million includes some items which we didn't
9  include on the acquisition balance sheet. So
10  that provision was to deduct closed items, so
11  they didn't -- they didn't appear on the
12  acquisition balance sheet.
13  Q.   Is that provision reflected anywhere
14  on your handwritten notes?
15  A.   It is part of the 460 million items,
16  assets not received and not on balance sheet.
17  Q.   When you say part of, is the 460 a net
18  of this provision or --
19  A.   No. The 169 is part of the 460. So
20  there were -- in the way that this is presented,
21  some of the items were not recognized, just
22  weren't included on here in the first place.
23  Some of them were included in the 288 and
24  therefore need to be deducted.

Page 109

ROMAIN

1  So the 168 is a subset of 460. The
2  rest of it doesn't appear at all.
3  Q.   OK. So the 460 represents futures
4  collateral at affiliates that is not recorded on
5  the acquisition balance sheet?
6  A.   Exactly.
7  Q.   And with respect to that, there is --
8  I suppose that breaks up into all kinds of
9  different affiliates?
10  A.   Yup.
11  Q.   And you're saying that one component
12  of that 460 is this provision for about 169
13  million dollars?
14  A.   Yes.
15  Q.   OK. And I assume Lee Bowell will be
16  the person who will have the individual
17  components of the breakdown of that?
18  MR. HUME: Objection, vague.
19  A.   The breakdown of the components is --
20  of the 470 are included in Liz James'
21  deposition. The breakdown of -- essentially
22  there is two ways of not including something in
23  the balance sheet. You either don't put it into
24  this summary at all, or you put it in, in the

28 (Pages 106 to 109)

Page 110

ROMAIN

288 million, and then deduct it.

So mechanically which of the items were excluded in either of those two ways is really just arithmetic. We could have put all of it in there and then deducted the whole 470 or put none of it in there and you would end up with the same number, so it is just arithmetic really. The breakdown of the total 470 not included is in Liz James' deposition.

MR. HUME: Declaration.

A. Declaration, sorry.

Q. You have completely lost me, I'm afraid. It is not your fault. It is late in the morning.

You referred to 470, and I see a 460 in front of me on your handwritten notes.

A. 470 is I think that -- the amount, the amount as at the end of this year. I think there might have been some accrued interest, so it might be a couple million higher, so to the nearest ten million, I was rounding up to 470 in my mind.

Q. That's my first question: We are talking about the same thing?

Page 111

ROMAIN

A. We're talking about the same item. So if we talk about 460, to avoid confusion, we didn't want to recognize it on the balance sheet, based on the position we were in, in February, 2009. So what we had to insure is that none of that 460 appeared in the 3,783,128.

So to insure that, there are two ways of insuring that that 460 is not included there. One is if we just don't include it at all. And some of the items just weren't included in this breakdown in the first place. However, some of them were included in the 288 million receivable, and therefore, they needed to be deducted.

Q. And the assets that were included in the overall futures balance sheet amounted to 168.8 million? No? OK.

A. No. The 168.8 were assets which we did not wish to include in the acquisition balance sheet. So I need to deduct.

Q. I understand that. But I thought this 168 was part of the 460.

A. It is, yes.

Q. And the rest of the 460 wasn't

Page 112

ROMAIN

anywhere on the overall futures balance sheet?

A. It wasn't in this breakdown of it. That's right. Yeah.

Q. So the reason for this provision of 168.8 is that that corresponds to the amount of futures collateral at affiliates that had been included on the overall futures balance sheet?

A. That's right.

Q. Which you did not want to recognize?

A. That's right.

Q. And the details of that breakout Lee Bowell would have?

MR. HUME: Objection, vague.

A. In terms of the split between what wasn't included in this particular summary and what was included and then deducted, yeah, Lee would have that.

Q. The next item is customer balances.

A. Yeah.

Q. And what do they represent, these debits and credits?

A. They represent the payables and receivables to customers.

Q. And can you tell me which is which?

Page 113

ROMAIN

A. So customer accounts which were in a receivable position are the 315 million, and customer accounts which were in a payable position is the 2.335.

Q. And this is from the perspective of Barclays?

A. Yes.

Q. So the customer receivable, this means that customers owe Barclays 315 million dollars?

A. Yes.

Q. And Barclays owed customers 2.335 billion dollars.

A. Yes.

Q. For what did Barclays owe customers 2.33 billion dollars?

A. In order to be able to quantify that, you would have to go through each customer account and look at activity, because any customer account, it is a running total of items, of payables and receivables.

So the largest two items which you would expect to see in a customer account will be payables in relation to collateral they placed with the broker to secure their

29 (Pages 110 to 113)

Page 114

ROMAIN

1    ROMAIN
2    obligations, and the other main item you would
3    expect to see in customer accounts is the fair
4    value of their open futures positions with the
5    broker.
6         There would be other smaller items
7    like accrued fees, and I'm sure there are other
8    smaller items which would also factor into their
9    accounts balance.
10        Q.   And you show the accrued fees
11   separately here?
12        A.   It is on a different line here, but
13   yes, so you could combine those two if you
14   wished. But they are both, they are both --
15   actually I'm not sure what -- I shouldn't
16   misspeak. I'm not entirely sure what that
17   7 million item is, because it is too small for
18   me to have spent much attention on.
19        Q.   You are referring to the accrued fees?
20        A.   The accrued fees, yeah.
21        Q.   And then after that -- so what is net
22   assets then?
23        A.   Net assets? That's the net of the
24   assets and liabilities in the futures balance
25   sheet before the deduction of a couple of other

Page 115

1    ROMAIN
2    items, the largest of which is the one mentioned
3    a little while ago, which was the cost of -- no,
4    no -- yeah, that's right. It was the cost of
5    closing out the affiliate positions in the 084
6    account, which at that time was -- in the end
7    ended up being, I think, 36 million, but it was
8    something around there. So we also viewed that
9    as being a cost of acquisition and deducted
10   that. So that's the OCC loss just below net
11   assets.
12        Q.   I'm sorry, what was the OCC loss? How
13   did that come about?
14        A.   That came about because in the -- I
15   think it was initially in the 084 -- prior to
16   the acquisition, in the 084F account at the OCC,
17   there were -- that account didn't have any LBI
18   proprietary positions. It only included LBI
19   affiliate positions, which upon acquisition were
20   transferred into customer accounts, and then
21   closed out at a cost of approximately 40 million
22   dollars.
23        Q.   Does Barclays have any payable or
24   receivable associated with that loss?
25        A.   No. Not -- we haven't got anything

Page 116

1    ROMAIN
2    recognized. We recognize that as a loss in P&L.
3         Q.   If you could look at the cash amount
4    that's at the top, 811 million dollars. Does
5    that have any relationship to the cash that's
6    shown on Exhibit 2 of Ms. James' declaration?
7         A.   Yes.
8         Q.   How does that correspond?
9         A.   It is the same item. As I say, the --
10   there is an explanation for the differences
11   between the cash and mutual and money market
12   fund items, but they are the same item. I don't
13   recall, I don't recall the precise differences
14   at this time.
15        Q.   So you can't explain the precise
16   reconciliation between the 871 million on
17   Exhibit 2 of her declaration and 811 million on
18   Exhibit 546A, but you're comfortable that those
19   numbers can be reconciled?
20        A.   That's correct.
21        MR. HUME:  It is 1:30. Can we take a
22   break for lunch?
23        MS. HASSAN:  It is set up.
24        MR. MAGUIRE:  OK, if you want to take
25   a break now, that's fine.

Page 117

1    ROMAIN
2    MR. HUME:  OK.
3    (Luncheon recess taken at 1:27 p.m.)
4    (Continued on next page)

30   (Pages 114 to 117)

Page 118

```
1                ROMAIN
2       Q.   Sir, we have been going through
3    Exhibit 546A. The overall futures acquisition,
4    futures balance sheet. Is there a similar
5    balance sheet showing the overall options
6    position?
7       A.   There are underlying calculations
8    that -- it is not in the same format. In terms
9    of the backing for the underlying numbers for
10   the margin. It is -- the OCC statement for the
11   relevant date is the backing and the numbers
12   come straight from that. And for the
13   derivative, they required valuation much in the
14   same way as the schedule A assets require
15   valuation.
16           So the backing for that is a large
17   spreadsheet which is a CUSIP-by-CUSIP listing of
18   the option positions which totals to the option
19   valuation.
20      Q.   Have you seen that spreadsheet?
21      A.   Yes.
22      Q.   What is the total result of the
23   derivatives, the options derivatives position?
24      A.   The options are a liability of 1.03
25   billion. It is a little bit of rounding, but
```

Page 119

```
1                ROMAIN
2    yeah.
3       Q.   And where is that 1.03 on the
4    acquisition balance sheet?
5       A.   Oh. Yes, so on the second page of
6    Exhibit 377A, it is included within -- it is
7    included within cell C14, and in the third page
8    of gross version is included in the cell E42.
9       Q.   And E42 says exchange-traded options
10   derivative MTM. Is that mark to market?
11      A.   Mark to market, yes.
12      Q.   That is an amount of 1.1 billion?
13      A.   Yes. That item also includes the cost
14   of closing out affiliate positions, affiliate
15   OCC positions which -- well, the total cost was
16   104 million dollars. In our acquisition
17   accounting, we had written the receivable from
18   LBI down to 25 percent which was a 77 million
19   expense. We actually have now written it off
20   completely. So we recorded the additional 28
21   million I think in 2009 P&L.
22      Q.   So this reflects 75 percent of that
23   104 million?
24      A.   Yes.
25      Q.   Plus the 1.03 billion?
```

Page 120

```
1                ROMAIN
2       A.   Yes.
3       Q.   For the actual positions?
4       A.   Yes.
5       Q.   And those positions, what exchanges,
6    what options exchanges were they at? That
7    covers -- let me strike that.
8            That covers all the Lehman's options
9    business at the OCC and any other exchange, is
10   that right?
11      A.   That includes the positions in the
12   073 -- 074 and 277 accounts, the OCC. I'm not
13   aware of any other positions that were included
14   in the acquisition balance sheet or in the
15   acquisition, but that is -- in terms of -- in
16   terms of options.
17           But certainly that is what that item
18   represents. It is OCC, OCC options.
19      Q.   If you turn to your notes, your
20   typewritten notes for today's deposition, topic
21   43. If you go to 43G.
22      A.   Yeah.
23      Q.   If we look for the derivatives
24   positions themselves as opposed to the margin or
25   the collateral, where do we find them on the
```

Page 121

```
1                ROMAIN
2    acquisition balance sheet?
3       A.   Excuse me, sorry.
4       Q.   Do you see the topic G talks to margin
5    collateral and derivatives positions at foreign
6    exchanges?
7       A.   Yes.
8       Q.   With respect to -- with respect not to
9    the margin or collateral, but the positions
10   themselves, where do we find them on the
11   acquisition balance sheet?
12      A.   The -- well, the -- are we talking
13   about the options or the futures now?
14      Q.   You may have to break it out for us,
15   but what I want ultimately is the total for
16   options and futures for derivatives and then the
17   two components.
18           WITNESS' ATTORNEY: G is the foreign
19      exchanges?
20      A.   Yeah, that's right. So in terms of
21   just foreign exchanges, the open trade value, it
22   was something which was difficult to pull
23   together and had some estimation in the process,
24   but we did an exercise to get our best number.
25   Because the thing with the open trades is that
```

31 (Pages 118 to 121)

Page 122

ROMAIN

1
2  they are included within the overall balance
3  with customers and with exchanges.
4      So for the OCC options, that was
5  obviously with the OCC, so not foreign. For the
6  futures, what was the net? That was
7  approximately 154 million dollars. Negative
8  which is as included in the notes under G.
9      Q.   And you are referring to a sentence
10  that says, "The open trade value of the customer
11  positions traded on foreign exchanges on certain
12  non-OCC cleared domestic exchanges as of the
13  closing was approximately a negative 154
14  million" --
15      A.   The overall value is zero, obviously,
16  because it was customer business. So there is
17  154 million with customers and then we have
18  offsetting trades with the exchanges which we
19  deposited 154 million dollars.
20      Q.   Can you do that more slowly or explain
21  that to me.
22      A.   For customer positions, to look at the
23  overall value of the positions, you have got the
24  value of the trade between -- well,
25  preacquisition between LBI and the customer

Page 123

ROMAIN

1
2  which will be a certain amount and the overall
3  amount was negative 154 million dollars and you
4  will have the offsetting trade with the exchange
5  which will be equal and opposite to that.
6      Q.   So in terms of taking the two equal
7  and offsetting trades -- maybe trade isn't the
8  right word --
9      A.   Open derivative positions.
10      Q.   OK. If we take first the position
11  between the customer and Lehman as between the
12  customers and Lehman, you're saying that the
13  result, the overall open trade value was a
14  negative 154 million?
15      A.   That's correct.
16      Q.   Then if we look at the offsetting
17  position between Lehman and the exchange, that
18  was, again, a negative equal and opposite, an
19  offsetting 154 million?
20      A.   Yeah. As I say, we had to do -- we
21  looked into this because it was one of the
22  things which was asked about and it is not
23  something to just -- that can easily be picked
24  up because the -- to do it 100 percent
25  accurately would require us to go through each

Page 124

ROMAIN

1
2  customer account and break it up between margin
3  open derivative positions and other. So there
4  was some estimation and assumptions involved in
5  the process. So it wouldn't -- I wouldn't be
6  saying that that number is absolutely accurate.
7      Q.   That's the best estimate?
8      A.   That's our best estimate.
9      Q.   It refers to not only foreign
10  exchanges, but certain non-OCC cleared domestic
11  exchanges. Can you tell me what that referred
12  to, non-OCC cleared domestic exchanges?
13      A.   The main one was the CME.
14      Q.   Do you know whether this margin at the
15  CME, that's included on the acquisition balance
16  sheet?
17      A.   There is margin. Yes. Yes. There
18  was -- I don't have the exact figure, but the
19  total amount of the margin receivable -- the
20  margin that had been pledged at domestic
21  exchanges to secure LBI's obligations was 400
22  million dollars. It may have been sort of 404,
23  I think. The majority of that was CME. I don't
24  recall the exact number.
25      Q.   Do you know -- I assume all of that is

Page 125

ROMAIN

1
2  on the acquisition balance sheet?
3      A.   That's correct.
4      Q.   Do you know what clearing fund was on
5  the -- was at CME, Chicago Mercantile Exchange?
6      A.   No, I don't know.
7      Q.   If we broaden it to all the domestic
8  exchanges, do you know, taking them as whole,
9  what the total clearing fund was?
10      A.   No. For accounting purposes, this --
11  that distinction didn't feed in.
12      Q.   Now, what about at the OCC? Do you
13  know what the clearing fund was at the OCC?
14      A.   No, no. It is not something which I
15  have a great deal of knowledge about.
16      Q.   Do you know whether the total clearing
17  fund at all of the foreign and domestic
18  exchanges is reflected on the acquisition
19  balance sheet?
20      A.   I'm -- I don't know. I mean, I guess
21  I'm not -- I'm not too cognizant of how -- you
22  know, how the clearing funds fit into the
23  picture to be honest. I'm aware of the amount
24  of collateral which was pledged with exchanges
25  and therefore needs to be recognized as a

32  (Pages 122 to 125)

Page 126

ROMAIN

1  receivable. But in terms of the mechanics and
2  how that fits in, I don't know.
3  Q.   If you needed to find out what the
4  total amount of a clearing fund was across all
5  the domestic and foreign exchanges that has been
6  recognized on the balance sheet, on the
7  acquisition balance sheet, how would you
8  determine that?
9  A.   I'm not sure.
10 Q.   Do you know who would know that?
11 A.   Sitting here now, no, I don't. No.
12      WITNESS' ATTORNEY: Did you use the
13 term "clearing fund" in your 30(b)(6)?
14      MR. OXFORD: I think it is part of the
15 definition of margin.
16      WITNESS' ATTORNEY: Then that should
17 be made clear in the question because I
18 don't think the question could be answered.
19 If it is included in the definition of
20 margin, the witness can answer the question
21 and I think that the predicate for that
22 question wasn't made clear to the witness.
23 Clear funds included in margin, then this
24 witness has the numbers.

Page 127

ROMAIN

1
2  Q.   Do you understand -- let me --
3       WITNESS' ATTORNEY: It is not a
4  question of what he understands clearing
5  fund to be. That wasn't a 30(b)(6) topic.
6       MR. MAGUIRE: I am not asking for a
7  definition of clearing funds. I simply want
8  to know where the clearing fund is.
9       WITNESS' ATTORNEY: The 30(b)(6)
10 didn't ask anyone to break out clearing fund
11 from other margin. It just included it
12 within the definition of margin.
13      MR. MAGUIRE: I understand that's your
14 position.
15      WITNESS' ATTORNEY: It is not my
16 position, it is what the 30(b)(6) says.
17 It's what your partner just said it says.
18      MR. MAGUIRE: You don't need to recite
19 what the document says. Let me strike that.
20 Let's focus on this.
21 Q.   With respect to the -- what do you
22 mean in your notes by the "open trade value"?
23 A.   So the mark to market of unsettled
24 derivatives as of the acquisition date.
25 Q.   And the open trade value with respect

Page 128

ROMAIN

1
2  to options, that's the 1.1 billion number that
3  you have told us about?
4  A.   1.03. Yeah.
5  Q.   1.03, I am sorry.
6       Do you know how much of that is at the
7  OCC versus foreign exchanges?
8  A.   That's all at the OCC.
9  Q.   All at the OCC. So there is no --
10 nothing reflected on the acquisition balance
11 sheet in respect of any open trade value at any
12 foreign options exchanges that you are aware of?
13 A.   I'm not aware of anything.
14 Q.   A little further up at the beginning
15 of your notes on G, you say, "The margin and
16 collateral held at foreign exchanges, brokers
17 and clearing houses, excluding collateral held
18 at domestic exchanges, brokers, clearing houses,
19 was valued as of the closing at approximately
20 1.2 billion dollars."
21 A.   Yeah.
22 Q.   And can you tell me that 1.2 billion
23 dollars, where any of that is reflected on the
24 overall futures balance sheet, 546A?
25 A.   So it is included in a number of

Page 129

ROMAIN

1
2  places. So within 154 in T Bills, within the
3  foreign brokers number, a bit further down 261,
4  Lehman affiliates receivables. That's the main
5  place. Where else -- and then there is also an
6  element of that wasn't recognized on the balance
7  sheet as we talked before. So the 470 doesn't
8  feed into the overall asset number.
9  Q.   And that's the 470 million dollar
10 number that you spoke about and which is was 460
11 million in your handwritten notes?
12 A.   That's correct.
13 Q.   Is there a breakdown schedule that you
14 have seen that shows that 1.2 billion dollars
15 broken out by exchange?
16 A.   Yes. It is included in the exhibits
17 to Liz James' declaration. It is -- those are
18 the individual items. To get to 1.2, you have
19 to add up a few of them. But however that's --
20 that's the source of that is an item-by-item
21 representation of the various exchanges
22 involved.
23 Q.   You mentioned with respect to the
24 overall options acquisition, there was an, in
25 addition to the margin, a valuation of the

33 (Pages 126 to 129)

Page 130

ROMAIN

1  derivative positions and there was a large
2  spreadsheet that went CUSIP by CUSIP?
3  A. Yes.
4  Q. Who was involved in that process of
5  going through that CUSIP by CUSIP?
6  A. That was part of the overall valuation
7  exercise which was occurring through the
8  periods, through the period from sort of
9  acquisition through -- or shortly after
10 acquisition date through to finalizing the
11 acquisition accounting in January, February from
12 a finance perspective. The main person that was
13 involved in that was Jerry Shi, S-H-I, and also
14 a number of people in the business would have
15 been -- who were looking after those option
16 positions were involved.
17 Q. Was Ms. James involved in that
18 process?
19 A. Liz James works in the futures area,
20 whereas the spreadsheet we are talking about was
21 the one which underlies the 1.03 which is
22 options. So she wouldn't have been involved in
23 that.
24 Q. She is not involved. OK, who on the

Page 131

ROMAIN

1  business side was involved?
2  A. My main contact was Sean McKenna. I'm
3  not sure who else was involved in it.
4  Q. If you have 546A in front of you,
5  there are a couple of items at the end. One is
6  WAMCO. Can you tell me what that relates to?
7  A. I don't know. It is a small amount,
8  wasn't an amount which I focused on myself.
9  Q. Sure. If you turn to your typewritten
10 notes, Exhibit 534A, at the bottom of the first
11 page you have a section on OCC options?
12 WITNESS' ATTORNEY: Which page?
13 MR. MAGUIRE: The first page?
14 A. Yes.
15 Q. And your first sentence concerns this
16 number, 1.027 billion. Is that the 1.03 billion
17 we have been discussing?
18 A. It is, yes.
19 Q. And you say of this, 800 million
20 represented the loss as of acquisition on the
21 LBSF options?
22 A. Yeah.
23 Q. So all of that was recognized as a
24 liability on the balance sheet?

Page 132

ROMAIN

1  A. That's correct.
2  Q. You say this represented the loss as
3  of acquisition. Do you know whether that was as
4  of the acquisition date, September 22, or a
5  later date?
6  A. It was -- it was the 22nd, yes.
7  Q. And these are LBSF options? That's a
8  Lehman affiliate?
9  A. That's correct, yeah.
10 Q. Do you know whether that Lehman
11 affiliate had posted any margin in respect of
12 those positions?
13 WITNESS' ATTORNEY: Objection, lacks
14 foundation. He is not a 30(b)(6) witness on
15 that question.
16 Q. Do you know, sir?
17 A. The margin that was posted in those
18 accounts covered by the LBI and LBS positions.
19 Q. My question is whether LBSF itself
20 posted --
21 A. I don't know. I don't know whether it
22 would have. I'm not sure of all that.
23 Q. Who would know that?
24 A. I'm not sure.

Page 133

ROMAIN

1  Q. If you turn to the top of the next
2  page; first full paragraph describes a loss of
3  730 million that was experienced in late
4  September and early October. Do you see that?
5  A. Yeah.
6  Q. How was that 730 million dollar also
7  accounted for?
8  A. That's post-acquisition P&L.
9  Q. So that loss did not affect the
10 opening balance sheet?
11 A. That's correct.
12 Q. Do you know whether Barclays engaged
13 in any hedging transactions with respect to any
14 of the positions that generated this loss?
15 A. On where there were some hedging
16 transactions, I don't -- I don't have detail,
17 you know, detailed knowledge of precisely what
18 they were, but there were some hedging
19 transactions.
20 Q. Do you know whether the accounting
21 that's reflected here, 730 -- that 730 million
22 dollar loss, do you know whether that's net of
23 the results of any hedging transactions?
24 WITNESS' ATTORNEY: Objection, lacks

34  (Pages 130 to 133)

Page 134

ROMAIN

1
2  foundation. Again, beyond the 30(b)(6). I
3  am letting it go because we are trying to be
4  open and cooperative, but you have not
5  established that he knows any details about
6  when the hedging was, nor is it a 30(b)(6)
7  topic.
8       MR. MAGUIRE: This witness is here in
9  his individual capacity and I very much do
10 not want to bring him back either in his
11 individual capacity nor as --
12      WITNESS' ATTORNEY: He is not --
13      MR. MAGUIRE: I am trying to give you
14 an assurance I'm not bringing him back in
15 his individual capacity or as a 30(b)(6).
16      WITNESS' ATTORNEY: You did not notice
17 his deposition in an individual capacity.
18      MR. MAGUIRE: That's right, but you
19 have asked for an assurance. So I can't
20 give you that assurance if you are telling
21 me I can't ask any questions about his
22 knowledge.
23      WITNESS' ATTORNEY: You can ask if you
24 lay a foundation for them, or else I will
25 object. It is not clear when the hedging

Page 135

ROMAIN

1
2  was that you are asking him about.
3       Q.  Sir, do you know whether the 730
4  million dollar loss that's expressed here takes
5  into account any offsetting hedging
6  transactions?
7       A.  In terms of context, I don't know too
8  much about the hedging transactions. I do know
9  that number is gross. It doesn't include the
10 impact of hedges.
11      Q.  When Barclays experiences a loss on --
12 in the course of trading and the loss is
13 incurred in connection with trading that was the
14 subject of a hedge, can you tell me how that is
15 generally accounted for, whether the loss is
16 recorded in a gross basis or whether the loss is
17 recorded net of any offsetting or hedging
18 activity?
19      WITNESS' ATTORNEY: Objection, vague
20 and ambiguous.
21      A.  It is somewhat of a moot point for
22 financial reporting purposes because the results
23 of both the transactions and hedges are included
24 within trading profit and loss in the P&L as it
25 is presented. They will be recorded gross.

Page 136

ROMAIN

1
2  Absolutely. So, yes, they are recognized gross.
3  They will both be presented within the overall
4  trading results of Barclays, but they are
5  recorded gross.
6       Q.  If we wanted to find out about any
7  hedging transactions that Barclays entered into
8  with respect to any positions that Lehman had,
9  who would be able to tell us that if you know?
10      A.  I'm not sure.
11      Q.  The next section -- I'm sorry just
12 before the end of that section, you talk about
13 certain interviews with Clark, Briana and
14 McInerny. Tell me what interviews you are
15 referring to there.
16      A.  I had a conversation with those three
17 individuals yesterday, and I had had a
18 conversation with just Eric a few days before.
19      Q.  And I am sorry, Eric is --
20      A.  Clark, sorry.
21      Q.  Tell us first about your conversation
22 a few days ago with Eric?
23      A.  I'm trying to think. It was very
24 brief. The only substantial point I can recall
25 is he mentions the 730 million dollar number and

Page 137

ROMAIN

1
2  its basis and I asked him a couple of questions
3  to make sure I understood what it was and that's
4  it really.
5       Q.  With respect to the conversation that
6  you had with these people yesterday, can you
7  tell us what happened there?
8       A.  It covered the same thing. I am
9  thinking I just went through really the time
10 line of sort of what happened between the
11 acquisition date and December and October. So I
12 was just understanding the significance of the
13 dates and reaffirming the meaning of the 730
14 million dollar amount.
15      Q.  And then it is your understanding that
16 from the 7th of October, the assets, the
17 proprietary options positions basically being
18 mixed in with the legacy, I'll call them,
19 positions in Barclays' inventory?
20      A.  Yeah, they were transferred into
21 existing trading books, yes.
22      Q.  When they were transferred over, they
23 were transferred over based on the valuations
24 that people had -- that your pricing people had
25 put on those proprietary options positions, is

35 (Pages 134 to 137)

Page 138

ROMAIN

2 that correct?
3    A.  I don't know.  Because none of that
4 would have any consequence for external
5 accounting.  I didn't look into at what price,
6 you know, two areas of Barclays might have
7 transferred the positions.
8    Q.   The proprietary options positions, as
9 of the closing date are reflected on the balance
10 sheet, right?
11    A.  Yup.
12    Q.   Do you know whether the transfer of
13 those positions to -- at Barclays systems was
14 done at the same price that was used for those
15 positions on the acquisition balance sheet or a
16 different price?
17       WITNESS' ATTORNEY:  Objection, vague.
18    A.  I don't know.
19    Q.   The next section talks about
20 nonaffiliate customer options and you note in
21 the second paragraph that Barclays did not book
22 any gains or losses on nonaffiliate customer
23 options.  Do you see that, sir?
24    A.  Um-hm.
25    Q.   Why is that?

Page 139

ROMAIN

2    A.  They were customer -- they were
3 customer options and for the options, Barclays
4 didn't take on the OCC customers as customers
5 and did not close out the positions as we did
6 with affiliate balances.  So the customer
7 positions remained -- remained customer
8 positions.  So they continued to experience
9 gains and losses on those positions as they
10 would have been doing.
11    Q.   The next section is 074C, affiliate
12 options.
13    A.  Yeah.
14    Q.   In the second paragraph, you talk
15 about the close-out of these options.  All these
16 options were closed out?
17    A.  Yeah.
18    Q.   And you note a net receivable from LBI
19 based on the LBI Europe options?
20    A.  Yes.
21    Q.   Why is that a receivable from LBI?
22    A.  In terms of the -- in terms of the
23 legal basis, I'm not sure.  In terms of the
24 accounting treatment, we do not show any
25 receivable.  We have written off 75 percent of

Page 140

ROMAIN

2 it as a cost in the acquisition balance sheet
3 and we wrote off the remaining 25 percent in
4 2009 P&L.  So there is no receivable showing.
5    Q.   Is the same true for the next item
6 based on the LBF options?
7    A.  That is for the -- that comment is
8 really for the net receivable of the -- of those
9 four items plus the one in the -- so paragraph
10 24, million items.  So if you look at the
11 payments made to close out positions and for
12 some OCC-related costs, the total payment made
13 by Barclays was 104 million dollars and the
14 receivable, which might otherwise have been
15 recognized, has been written off.
16
17    Q.   Next page, you have a section on OCC
18 futures and you discuss that in terms of both
19 LBI affiliates and the nonaffiliated customers,
20 right?
21    A.  Yes.
22    Q.   And with the affiliates, there was a
23 36 million dollar loss in closing everything
24 out?
25    A.  That's correct, yes.

Page 141

ROMAIN

2    Q.   Was that accounted for -- how was that
3 accounted for?
4    A.  It was accounted for in the same way.
5 The timing was slightly different in that we had
6 written off 100 percent of it and in the
7 acquisition accounting, but it's been recorded
8 as an expense, an expense being a deduction from
9 the negative good will on the acquisition.
10    Q.   You say Barclays did not book any
11 gains or losses upon close-out of any
12 nonaffiliated customer options, and again, why
13 is that?
14    A.  Again, for the same reason, the
15 positions were positions of customers, so they
16 would experience gains and losses on their open
17 positions as -- that's what I expect.
18    Q.   Were the customers' positions closed
19 out?  Are --
20    A.  By close out --
21    Q.   By close-out, do you mean liquidation
22 or transfer of the account from Lehman to
23 Barclays?
24    A.  It is upon transfer and any close outs
25 which may have occurred around the time.  I'm

36 (Pages 138 to 141)

Page 142

ROMAIN

1  not sure of the extent to which there were --
2  I'm not sure of the extent to which positions
3  were closed out for nonaffiliates, for
4  nonaffiliate customers because it didn't feed
5  into the accounting, the acquisition in any
6  case, so it wasn't directly pertinent to that
7  accounting.
8      Q.  The next section is drawing on margin.
9  When closing out positions at the OCC, do you
10  see that?
11     A.  Yeah.
12     Q.  And I gather from what follows, that
13  that's done through Barclays' DTC accounts?
14     A.  That's correct. That's the way that
15  exchange processes those cash movements.
16     Q.  Was there any drawing on any Barclays
17  DTC accounts?
18     A.  Was there any drawing on -- well,
19  there were -- in terms of the close-out of
20  affiliates, in terms of the close-out of
21  affiliate balances, I'm not 100 percent sure
22  that it was effected via the OTC account. I
23  would assume it was because that is the
24  settlement mechanism for close-out payments for

Page 143

ROMAIN

1  that exchange. I can't be 100 percent
2  definitive.
3      And there would have been drawings on
4  OTC accounts for any normal sort of close-outs
5  of positions that might have been directed by
6  customers who wished to close out their
7  positions. I'm not sure of the extent to which
8  that has occurred and if so, when, again. That
9  was more a mechanic for cash movements rather
10  than anything that would feed into the
11  accounting.
12     Q.  So do you know one way or the other
13  whether the OCC drew on any margin in closing
14  out any positions that it --
15     A.  On margin?
16     Q.  Yeah.
17     WITNESS' ATTORNEY: Objection, asked
18  and answered.
19     A.  That exchange does not -- that's not
20  the way they process those cash payments. They
21  will draw on DTC account, on DTC settlement
22  accounts, and then the margin requirements will
23  probably change by an amount. So instead of
24  taking cash from one pot, they take it from

Page 144

ROMAIN

1  another pot, but it is -- that's just cash
2  plumbing, how cash moves.
3      Q.  I wasn't really asking about the
4  plumbing, that's fine. Do you know whether the
5  OCC drew on assets in the DTC account with
6  respect to --
7      A.  I am sorry, previously you talked
8  about margin. So it is a question around
9  whether a cash movements on the -- in the DTC
10  settlement accounts or against margin.
11     Q.  Well, let me ask you either. Is there
12  any drawing by the OCC either on margin or DTC
13  accounts?
14     A.  Any cash movements for close-outs of
15  positions would have occurred through the DTC
16  settlement accounts. I'm not sure the extent to
17  which they happened and if so when. There would
18  not have been any drawings to the best of my
19  knowledge or Barclays' knowledge on margin
20  accounts because that's not how that exchange
21  works.
22     (Exhibit 547A, letter dated
23  January 12, 2010 from Christopher M. Green
24  with attachment marked for identification,

Page 145

ROMAIN

1  as of this date.)
2      Q.  We have marked as Exhibit 547A a
3  letter dated January 12, 2010 to Robert G.
4  Gaffey from Christopher M. Green with at least a
5  summary page of attachment and maybe summary
6  pages from each of the attachments. By no means
7  the entire spreadsheets.
8      I just want you to have that there for
9  reference, sir, in case it is of assistance as
10  we deal with the next topic on your notes which
11  is topic 27, DTCC clearance box assets?
12     A.  OK.
13     Q.  With respect to A, you refer to a
14  table.
15     A.  Yes.
16     Q.  I guess table discusses -- do you want
17  to maybe explain the table for us?
18     A.  Sure. So each row is an item in the
19  acquisition balance sheet. So in Exhibit
20  377A -- and I'm splitting those items between
21  four columns and the four columns -- well, the
22  first column represents schedule A assets which
23  were delivered in September. The second column
24  represents assets which were delivered as part

37 (Pages 142 to 145)

Page 146

ROMAIN

1  of the JPM settlement as regards schedule A
2  assets. The third column represents the
3  schedule B assets which were received in late
4  September and the fourth column represents
5  schedule B assets that are not received and that
6  were included in the acquisition balance sheet.
7      Q.  And if we take the first -- the bottom
8  of the left-hand side, you have a valuation
9  adjustment at the bottom that totals 2.087
10  and that's -- ties to the 2.09 number in the
11  acquisition balance sheet?
12      A.  That's correct.
13      Q.  Now, what do you understand that
14  valuation adjustment to represent?
15      A.  That's the bid/offer adjustment which
16  is required to appropriately state assets at
17  their bid prices as required by accounting
18  standards.
19      Q.  Does Barclays maintain all of the
20  securities that it carries at fair value
21  according to that same principle?
22      A.  Yes, they are all shown at bid prices
23  except where there are some -- except where
24  there are a specific guidance to do otherwise

*(lines renumbered)*

Page 147

ROMAIN

1
2  which are very limited circumstances. So --
3  well, the main one is if you have got offsetting
4  risk positions, so you have got long and short
5  positions, then you will typically show both the
6  long and short positions at their mid prices
7  because the bid offer adjustments would offset
8  anyway and you will only apply a bid over
9  reserve to the net long position.
10      Obviously, here, these are just long
11  positions, these are just assets, so we would
12  show them at bid prices because that's what's
13  required.
14      Q.  Then you have 784 million dollar
15  schedule B amount which is split up by the
16  different days in which the assets were
17  received?
18      A.  Uh-huh, yup.
19      Q.  19th of September, that's a reference
20  to the 074 box at DTC, is that right?
21      A.  Yeah.
22      Q.  And 29th of September, that's a
23  reference to 636, that's the account, is that
24  correct?
25      A.  Yes, 636 box, yeah.

Page 148

ROMAIN

1
2      Q.  And 30th of September, you have
3  parenthetical 7256. What does that represent?
4      A.  I'm not familiar -- it is a small
5  number. I'm not familiar with that account, but
6  it is -- it's a delivery from another box. I
7  have not personally looked into precisely what
8  box that is.
9      Q.  Do you know whether that box was at
10  the Depository Trust Corporation?
11      A.  I don't know where it was.
12      Q.  Now, if we look at the January 12
13  letter and its attachments.
14      A.  Yup.
15      Q.  This relates to a number of
16  spreadsheets. Are you familiar with any of
17  these spreadsheets?
18      A.  I am.
19      Q.  With all of them?
20      A.  The first one I'm familiar with in
21  that it was via the workings behind -- let me
22  just check. I just need to check something.
23      So this was a calculation of the total
24  fair value of assets recognized on the
25  acquisition balance sheet which relate to

Page 149

ROMAIN

1
2  schedule A deliveries, both September and
3  December. So it is the total fair value of both
4  of those.
5      Q.  The first page has repo collateral
6  valuation summary, do you see that?
7      A.  Yes, that's the page I was talking
8  about. That's the calculation to give us the
9  total fair value what we received on the
10  schedule A deliveries.
11      Q.  If we look at the top 45.788. If I
12  remember value of financial inventory received
13  and that's what is reflected on the acquisition
14  balance sheet.
15      A.  Yup.
16      Q.  And then I guess in this box, there is
17  two nonrepo items that are taken out?
18      A.  That's correct, yes.
19      Q.  And then cash is added in?
20      A.  Yes.
21      Q.  And that gives a total of 45.55
22  billion?
23      A.  That's correct.
24      Q.  If we turn to the next spreadsheet,
25  it's called schedule B, is that right, 22

38  (Pages 146 to 149)

Page 150

ROMAIN

September?

A. Yeah.

Q. The first column is notional. What is -- I shouldn't say first column. I guess first column after the description of the securities is notional. What do you mean by notional?

A. That's the par value or face value of the securities.

Q. And then BoNY value is a value attributed to those securities by BoNY, is that correct?

A. Yes, that's my understanding, yeah.

Q. And PCG value is Barclays desk's?

A. That's the mid price value that was included in our acquisition accounting.

Q. That's the Product Control Group, is that right?

A. It's determined by -- under Barclays' price testing and valuation policies which require final verification by the Product Control Group.

Q. And then what's the -- what's the next column, MV 922 with bid/offer?

Page 151

ROMAIN

A. That is the bid/offer adjustment against those mid values that is required to adjust them to bid prices.

Q. And the amount of that adjustment is under -- the amount of that adjustment is 19 million, point 6?

A. That's right, yeah.

Q. And that -- that adjustment is called a -- is that -- I guess after that adjustment has been made, there is a value called PCG liquidity value? --

A. Yeah, that's the bid price.

Q. So all of the securities that are the subject of this spreadsheet are carried on Barclays' books at the PCG liquidity value.

A. Plus accrued interest which is the final column.

Q. Right. And the liquidity value you understand to be the bid price?

A. Yes, that's right.

Q. And all securities that Barclays buys -- except for the very limited exceptions, are carried on Barclays' books at the bid price?

A. That's correct. Well, all assets

Page 152

ROMAIN

which are fair-valued not accrual-accounted loans.

Q. The next spreadsheet, can you tell me what this is?

A. Right here, of course, yeah. This is the split of that item between the different deliveries. So this is the work-in which gives us the 19th, 29th and 30th items that are included in my printed notes.

Q. Can you show us at the left-hand side the 9/30, September 30 and 9/19, September 19 and so on?

A. Can you repeat that question, sorry.

Q. You are saying this gives us the breakout, I am trying to see where it says --

A. Sorry. So, each row is a different delivery. The columns are the same, the same columns as on the preceding sheet. So it is breaking out the BoNY price, the Barclays mid price, the bid/offer and then the bid price. And then also the -- and then the principal and interest which gives us the 26, the 589 and the 174, which are the numbers that you see in the fourth column of numbers when you add to the

Page 153

ROMAIN

final column, the 7.

Q. And then the next spreadsheet, is that just the underlying detail for this?

A. It is certainly a part of that. I can't quite work out from the way it's printed, but it's part of the underlying detail, yes. That's the same for the rest. That's the same for the rest of these spreadsheets. They feed up into those top summary sheets.

Q. Now, by the way, how is interest computed where we see --

A. It was a -- it was a rough calculation because it's, you know, it is an adjustment you need to make to fair value. If a security is halfway between two coupon payment dates, then its fair value will be different than if it is the day before a coupon payment date. It is the accrual of interest over time.

So there was a calculation made to estimate the appropriate adjustments to make sure that we were showing the appropriate bid price which reflected accrued interest.

Q. If we take topic 39 on your typewritten notes.

39 (Pages 150 to 153)

Page 154

ROMAIN

1
2    A.    Yeah.
3    Q.    You refer to your attached memo?
4    A.    Yeah.
5    Q.    Is that -- or your produced memo,
6    that's Exhibit 533A.
7    A.    That's correct.
8    Q.    You go on then on the next page under
9    topic 40, you talk about Exhibit 86B, and you
10   say these are clean prices. Can you tell me
11   what you mean by that?
12   A.    That's -- when you value a security at
13   a clean price means when you don't include
14   accrued interest. Or actually to get the credit
15   fair value, you need to include accrued
16   interest.
17   Q.    And you say there is an additional 345
18   million included in the acquisition balance
19   sheet in respect of the accrued interest?
20   A.    Yes.
21   Q.    How is that computed?
22   A.    That's the calculation I was just
23   talking about. You try to assess -- it would be
24   based on the frequency of coupon payment dates
25   for the securities which were acquired, the rate

Page 155

ROMAIN

1
2    of interest accruing through that period, to
3    make an appropriate fair value adjustment. I
4    didn't do the calculation myself, but it was
5    performed by finance and verified, included as
6    the addition.
7    Q.    Is the accrued interest based on the
8    actual coupon rate of each individual security?
9    A.    I'm not sure whether it was done at a
10   CUSIP-by-CUSIP level. I'm not sure if there was
11   some approximation, but certainly any level of
12   approximation that was included, it would have
13   been appropriate within materiality bounds.
14   MR. MAGUIRE: This is probably a
15   pretty good time for a break. Thank you.
16   (Recess)
17   MR. MAGUIRE: We will mark as Exhibit
18   548A an e-mail from Robert MacGoey to Mark
19   Morton dated February 1, 2005.
20   (Exhibit 548A, document Bates stamped
21   BCI-EX-(S) 00110233 through 236 marked for
22   identification, as of this date.)
23   Q.    Before we turn too this exhibit, sir,
24   we had discussed a little earlier Barclays'
25   policy for recording the fair value of

Page 156

ROMAIN

1
2    securities. Do you understand that to be a
3    written policy that's available for the product
4    control group and other professionals at
5    Barclays in market securities?
6    A.    There are -- yeah, there are written
7    valuation policies. I don't use them day-to-day
8    because I'm not in that department, but there
9    are written valuation guidelines.
10   Q.    You have access to them, just don't
11   use them on an daily basis?
12   A.    I would have to ask somebody for them.
13   I don't have them in my office or anything, but
14   I could get them if I wanted to.
15   MR. MAGUIRE: Hamish, I believe we
16   have outstanding a request for those
17   policies.
18   WITNESS' ATTORNEY: I think we are
19   producing them, but is the request -- we can
20   discuss it off line.
21   Q.    This e-mail I have handed you, I would
22   like you to look at the beginning of the string.
23   It is on the second page of the exhibit.
24   A.    OK.
25   Q.    The first item that's raised here is

Page 157

ROMAIN

1
2    the bid/offer issue, the desk marks the bid. Do
3    you see that?
4    A.    Yeah.
5    Q.    And the valuation adjustment is taken
6    on the desk price; therefore, this appears to be
7    double-counting. How is this issue resolved?
8    A.    The items which were included in the
9    acquisition balance sheets were definitely bid
10   prices with no double counting. So it would
11   have been resolved in one of two ways. Either
12   Rob MacGoey was mistaken or there was an
13   amendment made. I don't know which of the two,
14   but I do know the outputs. The resolution was
15   that the items which were included in 3778 were
16   appropriately marked at bid prices as at right
17   date.
18   Q.    And you will see that he makes a
19   reference here to various dates, December 31,
20   December 22 and notes of prices changed
21   significantly in many cases from the 22nd to the
22   31st. Can you tell me what was the date that
23   Barclays used to value the JP Morgan settlement
24   securities?
25   A.    I don't understand the point that Rob

Page 158

ROMAIN

1    MacGoey is making here. My understanding is
2    they are marked as of the date they are
3    received. So I think that was 22nd, 23rd of
4    December. So I don't understand that point.
5    I'm not sure what he is -- what he is
6    suggesting.
7        Q.    He also has a reference here to,
8    "Consistent with the Lehman portfolio approach."
9    And do you understand that the -- leaving aside
10   the JP Morgan portfolio and focusing on the
11   securities that were, I think, earlier
12   identified as repo securities, do you understand
13   that that portfolio had been valued based on
14   September 22 values or did you understand that
15   some other date was used?
16       A.    They were valued based on the 22nd.
17       Q.    22nd of September, 2008?
18       A.    That's correct.
19       Q.    Did you participate in any discussions
20   with Barclays' auditors concerning any of these
21   points?
22       A.    I did participate in discussions as to
23   the appropriate valuation date. As I said some
24   hours earlier, there was some discussion around

Page 159

ROMAIN

1    whether or not we should use a later date
2    because it took us some time to take control of
3    the assets and reconcile them, et cetera. It is
4    possible that there are some crossed wires here
5    or it's possible that -- it is possible at this
6    time that discussion had not completed because
7    Rob is suggesting here that there is a -- still
8    an argument which is out there to mark at 30th
9    of September, but that's not what happened.
10       MR. MAGUIRE: We will mark as Exhibit
11   549 a document, an e-mail from Mr. Romain to
12   Michael Guarnuccio dated July 23, 2009.
13       (Exhibit 549A, document Bates stamped
14   BCI-EX-(S) 218489 through with attachment
15   marked for identification, as of this date.)
16       Q.    This e-mail attaches a memo that you
17   prepared?
18       A.    That's correct, yeah.
19       Q.    And what was the purpose of this memo?
20       A.    This was both for Barclays' purposes
21   and to provide places for discussion with PWC
22   when considering the acquisition accounting as
23   it was going to be reflected in the interim
24   financial statements as at 30th of June, 2009.

Page 160

ROMAIN

1
2        MR. MAGUIRE: We will mark as Exhibit
3    550A a document Bates stamped BCI-EX-(S)
4    00218460.
5        (Exhibit 550A, document Bates stamped
6    BCI-EX-(S) 218460 marked for identification,
7    as of this date.)
8        Q.    Do you recognize this document?
9        A.    Yeah.
10       Q.    You will see there is a reference to
11   PWC spreadsheet. Do you know if these different
12   references here are to a single spreadsheet or
13   multiple spreadsheets?
14       A.    That was a single spreadsheet which
15   was probably all the evidence that was provided
16   to PWC when they were looking at the 2008
17   financial statements.
18       So this memo was to reconcile
19   between the underlying sort of CUSIP-by-CUSIP
20   valuation summaries and what was included in the
21   acquisition balance sheet and the square
22   brackets rule. So just to check that that was
23   also consistent with the spreadsheet that PWC
24   had had.
25       Q.    Who prepared the PWC spreadsheet?

Page 161

ROMAIN

1
2        A.    It was put together by Sean Teague.
3        MR. MAGUIRE: Hamish, we would request
4    that document, please.
5        WITNESS' ATTORNEY: Sorry, you are
6    asking --
7        MR. MAGUIRE: The PWC spreadsheet.
8        WITNESS' ATTORNEY: That relates to
9    this Exhibit 550A.
10       MR. MAGUIRE: That the witness just
11   referred to reflected on this document.
12       WITNESS' ATTORNEY: We will take it
13   under advisement. We can discuss it off the
14   record.
15       Q.    Sir, I am going to show you a document
16   you have seen before, Exhibit 404A, and the
17   reason I am showing it is if you can help me
18   just explain where that fits in with the
19   exhibits to Ms. James' declaration.
20       WITNESS' ATTORNEY: This document
21   doesn't have a Bates number. Does anyone
22   understand why?
23       MR. MAGUIRE: 404A?
24       WITNESS' ATTORNEY: Was it produced by
25   us?

41 (Pages 158 to 161)

Page 162

ROMAIN

1  MR. MAGUIRE: I assume yeah.
2  Q.  It has your handwriting on it, sir,
3  right?
4  A.  Yeah, it is my handwriting.
5  WITNESS' ATTORNEY: Is there a
6  question?
7  MR. MAGUIRE: Yeah, the question is
8  how 404A relates to the exhibits to
9  Ms. James' declaration.
10  A.  So the money markets and the cash
11  elements are the same as Exhibit -- as the first
12  items in Exhibit 2. And also, actually, the
13  notes on this -- well, Liz James is going to
14  talk to you in more detail in her deposition,
15  but the notes I've made on this have refreshed
16  my memory as to the difference between these
17  items and the ones we talked about on the
18  futures balance sheet and it was that they were
19  a different date.
20  As you can see from the handwriting,
21  that Liz James' spreadsheets were based on 6 of
22  October and the trustee physically transfers
23  cash over to us rather than the acquisition
24  date. So as I said, Liz will talk to that

Page 163

ROMAIN

1  tomorrow. But as I explained, there was a
2  reason for the difference.
3  The 26 -- yeah, so -- then you have a
4  foreign brokers 265986 which again is the other
5  number on Exhibit 2. And then --
6  Q.  Hold on one second so I can catch up
7  to you.
8  A.  This spreadsheet is Exhibit 2 and
9  Exhibit 3.
10  Q.  I see, OK.
11  And you were saying that the
12  difference, the reconciliation, you believe for
13  the difference between the futures acquisition
14  balance sheet number and the number here is
15  simply one of timing?
16  A.  I recall having a conversation with
17  Liz when I was preparing for the first
18  deposition and it was on those lines, but only
19  that that is -- only that that is a contributing
20  factor and we will be able to talk to it more
21  accurately once we have looked into it.
22  Q.  This is another spreadsheet, 405A,
23  which I believe you have also seen before and we
24  have -- and it also contains your handwriting,

Page 164

ROMAIN

1  sir. Can you tell me where this fits into
2  Ms. James' exhibits?
3  A.  It is the same items which were
4  included in Exhibit 1. There is a 25 million
5  difference in the total which I believe is
6  because the Exhibit 405A is as at the 19th of
7  September, whereas Exhibit 1 was based on
8  statements on the date of account close-out,
9  which is a later date. It is the same items,
10  the undelivered proprietary collateral and
11  margin.
12  Q.  So 405A, I am sorry, is the one as of
13  September --
14  A.  September 19th.
15  Q.  September 19. Sir, I will show you a
16  copy of an expert report of Professor Paul
17  Pfleiderer.
18  MR. MAGUIRE: Hamish, if you have a
19  preference, we will mark it; otherwise, I
20  don't think we need to mark it.
21  WITNESS' ATTORNEY: No, that's fine.
22  I like marking it because it says with the
23  official transcript.
24  MR. MAGUIRE: That's fine. Done.

Page 165

ROMAIN

1  Exhibit 551.
2  (Exhibit 551A, Expert Report of
3  Professor Paul Pfleiderer marked for
4  identification, as of this date.)
5  Q.  Sir, have you seen this exhibit
6  before?
7  A.  Yes, I have.
8  Q.  And when did you see it?
9  A.  I saw it on Sunday. I saw it on
10  Sunday.
11  Q.  When did you first meet
12  Mr. Pfleiderer?
13  WITNESS' ATTORNEY: Objection, lacks
14  foundation.
15  Q.  Professor Pfleiderer?
16  A.  I don't know actually. I, I was on a
17  call with a number of people which I think
18  included Paul Pfleiderer, but I'm not 100
19  percent certain. I think he was on the call.
20  Q.  Who all was on the call as best you
21  can --
22  A.  Sorry?
23  Q.  Who do you remember being on that
24  call?

42  (Pages 162 to 165)

Page 166

ROMAIN

1      ROMAIN
2      A.    I remember there being expert
3    witnesses on the call, but I do not recall a
4    name. I didn't note it down at the time, the
5    names. But I knew that the expert witnesses in
6    the case were on the call.
7      Q.    When was the call?
8      A.    I can't remember. It was a -- I think
9    it was just before Christmas, not just after.
10   Yeah.
11     Q.    Where were you at the time?
12     A.    I was in London.
13     Q.    How did the call get set up?
14     A.    Mechanically, I'm not sure who set it
15   up. It is placed with counsel.
16     Q.    Did you understand the purpose of the
17   call was to enable experts to interview you to
18   get a better understanding of the accounting for
19   the acquisition?
20     A.    Yeah, that's right.
21     Q.    Were there any documents that were
22   referred to in the course of the call?
23     A.    There were a number of documents which
24   would -- I wouldn't be able to pick out any
25   particular -- the sort of documents which have

Page 167

ROMAIN

1      ROMAIN
2    been produced here. In terms of was there any
3    specific document that I can recall right now
4    that was talked about, I can't.
5      Q.    Was there a list of documents that was
6    the subject of the call?
7      A.    No, there was no specified list.
8      Q.    Did you have anything in front of you
9    during the call?
10     A.    I was sitting at my terminal. So
11   I'm -- I may have referred to things as I was
12   talking, but I can't recall.
13     Q.    Sir, if you turn to page 63 of the
14   report, you will see a section that begins
15   Barclays' accounting gain on the acquisition.
16   Are you with me?
17     A.    Yeah, yeah.
18     Q.    Have you read -- that goes by the
19   way -- that starts at paragraph 109 and taking
20   that section all the way through to page 71,
21   paragraph 121, have you read that section of
22   this report?
23     A.    I read the report. I didn't study it
24   at great length, but I read it through.
25     Q.    And did you pay particular attention

Page 168

ROMAIN

1      ROMAIN
2    to the accounting part of the report?
3      A.    I remember reading this. I didn't --
4    of the subjects which would be more relevant to
5    me personally, that would be one because it
6    was -- it is a part that I knew more about.
7      Q.    Now, was there anything in the
8    accounting section of the report that you
9    disagreed with?
10     A.    I guess once -- in order to be
11   definitive about is there anything in this
12   report I disagree with, I would want to read it
13   more carefully. I don't recall anything from
14   the quick read which stood out. But I don't
15   think I could be any more definitive than that.
16     Q.    There was nothing that you took
17   exception to as you did your quick reading?
18     A.    Not to my recollection.
19     Q.    You don't remember reading anything
20   and saying that doesn't sound right or that's
21   not right?
22         WITNESS' ATTORNEY: Objection, asked
23     and answered.
24     A.    As I said, based on a -- based on a
25   quick read, there was nothing of that nature

Page 169

ROMAIN

1      ROMAIN
2    that I recall, and to be more definitive about
3    it, I would want to read it more carefully.
4      Q.    You will see in paragraph 110, the
5    professor notes in the second sentence that, "I
6    and staff working at my direction also have
7    interviewed Gary Romain, head of technical
8    accounting at Barclays Capital, to get a better
9    understanding of the methods, procedures, and
10   processes by which Barclays developed its
11   accounting summary of the acquisition."
12         Do you see that?
13     A.    Yeah.
14     Q.    Do you understand that to be a
15   reference to the phone call you have had with
16   various people whose names you are not able to
17   give me?
18     A.    There was -- so I had a call and I
19   also met with, again, some expert witnesses
20   whose names I don't recall. I'm sure I could --
21   I obviously could find them out, which was a
22   couple months earlier when I was in New York. I
23   think that was the first -- I think that was the
24   first weekend in November, 2009.
25     Q.    How long did that meeting last?

43 (Pages 166 to 169)

Page 170

ROMAIN

1
2     A.   It was a couple of hours. I'm not
3   sure exactly.
4     Q.   And were there any documents that were
5   used at that meeting?
6     A.   Yeah, again, there were lots. And all
7   the sort of documents which we are talking about
8   now. I don't have -- I don't have a full
9   listing of every document that we were looking
10  at.
11    Q.   Have you turned to page 65 of the
12  report. At the bottom of the page, last
13  sentence, the page reads, "Taken together, the
14  repo collateral, the clearance box assets and
15  15c3 asset add up to a total of approximately
16  47.8 billion dollars."
17        Do you see that, sir?
18    A.   I do, yes.
19    Q.   Then it goes on to add in the
20  exchange-traded derivatives and associated
21  collateral and that brings the total to 50.2
22  billion dollars. Do you see that?
23    A.   I do see that, yes.
24    Q.   Is that consistent with your
25  understanding?

Page 171

ROMAIN

1
2     A.   I haven't checked the arithmetic. It
3   would be relatively easy to do. The 47.8 is
4   correct. Yeah, both numbers are correct.
5     Q.   If you turn, sir, to page 68. You
6   will see the first full sentence -- I'm sorry,
7   second full sentence on the page notes that as
8   it turned out, the exchange-traded derivatives
9   accounts had a net day one value to Barclays of
10  approximately 2.4 billion dollars and it
11  continues. Do you see that sentence?
12    A.   I do, yeah.
13    Q.   Do you know what is the source for
14  that 2.4 billion dollar number?
15    A.   So that's -- that is the total of the
16  net -- that's the total of the -- that's the
17  total of the futures and options assets and
18  liabilities included on the acquisition balance
19  sheet.
20    Q.   And the underlying source for that
21  then with respect to the futures are the
22  documents supporting the overall futures balance
23  sheet?
24    A.   Yeah.
25    Q.   And with respect to options, are the

Page 172

ROMAIN

1
2   pricing data that was, that you have testified
3   about, plus the statements showing the margin?
4     A.   That's correct.
5     Q.   Now, the pricing information that
6   people performed in terms of the deriving those
7   numbers, were they subject to the same fair
8   value policies that you have referred to
9   earlier?
10    A.   Yes.
11    Q.   And in terms of -- do you know whether
12  those positions also were supported by account
13  statements at the OCC? In other words, did --
14  are there account statements from the OCC which
15  identify those positions and their value?
16        WITNESS' ATTORNEY: Objection, lacks
17  foundation.
18    A.   I don't know what the source for the
19  position-by-position listing was.
20    Q.   If you turn to your typewritten notes,
21  Exhibit 534A.
22    A.   Yup.
23    Q.   For topic 43, I believe it is, 43,
24  43G -- I am sorry, 43H.
25    A.   Yup.

Page 173

ROMAIN

1
2     Q.   Maybe you could just explain this for
3   me.
4     A.   Sure. So in terms of margin
5   collateral derivatives at the OCC, so you have
6   got the options, 074 -- it is also 274, but that
7   was a very small number. So 074 accounts, there
8   was margin placed with the OCC of 2.295 million,
9   included in the balance sheets, which was 1.328
10  million cash, 966 million Treasuries. There was
11  also an amount of 40 million which was in the
12  form of proceeds of letters of credit which is
13  not recognized in the balance sheet.
14        And then futures, so the 084 accounts,
15  there was margin of 87 million dollars which
16  was -- 47 million was recognized on the balance
17  sheet, 40 million was, again, letter of credit,
18  not recognized on the balance sheet, and there
19  were no -- there was no formal market maker
20  positions that Barclays took on. That account
21  only included affiliate positions which Barclays
22  closed out at a cost of 36 million dollars which
23  was included as an expense in the negative good
24  will calculation.
25    Q.   In terms of providing an audit trail

44  (Pages 170 to 173)

Page 174

ROMAIN

1  ROMAIN
2  to PricewaterhouseCoopers for the assets in the
3  options -- the options balance sheet or
4  basically the OCC assets, what was the
5  information besides the spreadsheet that was
6  provided to PricewaterhouseCoopers?
7      A.  I'm not sure. I don't have a complete
8  inventory of what they asked for and received on
9  that.
10     Q.  If you go to the next item clearance
11 box or encumbered assets, (i)?
12     A.  Yup.
13     Q.  Top of the next page, the second
14 sentence refers to 250, is that million?
15     A.  Yes.
16     Q.  And what does that refer to?
17     A.  250 million represents two amounts.
18 One amount the list B2 and C securities from
19 schedule B that we hadn't recognized on the
20 balance sheets because we hadn't done sufficient
21 work to identify the relevant securities when we
22 were finalizing our 2008 financial statements.
23        That's -- what's the amount. I think
24 it is around about -- here it is. So 160
25 million dollars approximately and then also

Page 175

1  ROMAIN
2  includes principal and interest which would have
3  been accruing on the 707 million list A and B1
4  assets which we have not yet received and that
5  is -- well, in previous deposition, it was an
6  amount of 63 million dollars approximately.
7  Time has elapsed since then, so I believe it is
8  around 90 million dollars, giving the total of
9  250.
10     Q.  If you look at topic 47, reference to
11 the less liquid assets.
12     A.  Yeah.
13     Q.  Is it true to say that all of the
14 assets that Barclays has acquired are now being
15 valued on the -- everything that's on the
16 acquisition balance sheet has been subjected to
17 a fair value?
18     A.  Yes.
19     Q.  And with respect to the remaining
20 assets that you described that have not been
21 recorded on the balance sheet, but which
22 Barclays maintains it is entitled to a value as
23 being attributed to those as well?
24     A.  Well, no --
25        WITNESS' ATTORNEY: Objection, vague

Page 176

1  ROMAIN
2  and ambiguous.
3      A.  Attributed in what way? It is not
4  recognized on the balance sheets anywhere.
5      Q.  I'm not asking --
6      A.  But we are monitoring, we are
7  monitoring the value. I guess what I want to
8  say is if it came to the time that we were to
9  recognize those assets, then an amount of due
10 diligence and application of policy and all
11 that, et cetera, which has not happened would
12 need to happen.
13     Q.  And with respect to your handwritten
14 notes, Exhibit 399A, the assets not received not
15 on the balance sheet, those four items represent
16 everything that you are aware of?
17     A.  The items are -- yeah, they are the
18 items I am aware of, that's right.
19     Q.  And those amounts there subject to, I
20 guess, the 63 and the inflection of time, you
21 say that's now closer to 90, but the numbers
22 there represent Barclays' best estimate of their
23 values?
24     A.  The numbers, the numbers now are
25 similar, but as you say, so the principal and

Page 177

1  ROMAIN
2  interest would have increased. The unencumbered
3  assets would have a different value because they
4  are securities whose market value changes over
5  time. But the amount is not materially
6  different.
7        MR. MAGUIRE: OK. Why don't we take a
8  break and see if we can wrap this up.
9        THE WITNESS: Sure.
10       (Recess)
11     Q.  Sir, you referred in your notes that
12 you prepared for this deposition, see produced
13 memo, and that's I believe Exhibit 533A.
14     A.  That's correct.
15     Q.  This has the post-acquisition gains
16 and losses for Lehman inventory?
17     A.  It is the results of an exercise which
18 we performed. To be clear, to try and do this
19 is not easy and it does reflect quite a number
20 of assumptions because all of this inventory was
21 commingled in trading books. So it is -- it was
22 a fair amount of work, but it's after that
23 amount of work, it was best estimates we could
24 come up with.
25     Q.  And when you say the assumptions, what

45  (Pages 174 to 177)

Page 178

1              ROMAIN
2    kinds of assumptions did you need to make?
3        A.   I didn't do the detailed work, but
4    there was some assumptions around the, you know,
5    the allocation of hedges, the allocation of
6    total P&L in a book between Lehman acquired and
7    legacy where there are, you know, very similar
8    assets which are in the same book.
9            Then you may have to do some pro rata
10   or arithmetic to come up with a reasonable
11   estimate which would be the case for hedges as
12   well where the hedges are put on as a hedge of
13   the overall book and some of that book was
14   acquired in the lame acquisition and some of it
15   was not. So it is those sort of estimates.
16       Q.   Where you had the same CUSIP in
17   Barclays' inventory securities with the same
18   CUSIP that were both legacy Barclays inventory
19   and acquired inventory from Lehman, I take it
20   that on any given day, the same pricing would
21   apply to all of those securities with that same
22   CUSIP?
23       A.   If you have got something with the
24   same CUSIP which is sitting in a trading book,
25   then the relevant trader and product control

Page 179

1              ROMAIN
2    contact would be valuing it as a single amount.
3    They would have no idea.
4            Obviously, there are some estimates
5    and judgments involved in valuing, so if you had
6    a -- you know, in a -- in theory, if you had
7    similar structured products in completely
8    different books, then would two traders and two
9    product controllers end up with a slightly
10   different number in a range, possibly. But
11   that -- it is quite a far-fetched situation
12   because it is unlikely you would have two
13   structured products which are that similar.
14           So there is some judgment involved,
15   but certainly where you have got the same CUSIP
16   in the same book, then it is valued in the same
17   way.
18       Q.   In terms of the -- in the course of
19   this memo here, there is a lot of references to
20   hedging. How did Barclays allocate for the
21   purposes of this memo hedging results to
22   specific types of securities and trading
23   results?
24       A.   There were assumptions made, but I
25   wouldn't be in a position to sort of

Page 180

1              ROMAIN
2    characterize the assumptions. I didn't do the
3    detailed work. I asked for the analysis to be
4    performed and was clear about what we were
5    trying to achieve. But didn't do the detailed
6    calculation and interrogation.
7        Q.   So if we look, for example, at agency
8    mortgages which were 13 billion, there is 291
9    million dollar total gain on assets and that's
10   where the, those mortgages were sold,
11   transferred, then realizing a gain of 291
12   million, is that correct?
13       A.   That's, that's the best estimate of
14   the P&L on the assets and related hedges. I
15   would expect that some of those assets would
16   have been sold and some of them would not have
17   been sold. So if they are mark to market books,
18   so you recognize gains and losses irrespective
19   of whether they are sold.
20       Q.   And you understand there is an offset
21   here of 151 million losses on hedges and you're
22   saying some judgment has been applied in terms
23   of allocating a hedge or some amount of a hedge
24   to these specific positions?
25       A.   That's correct. In all of these

Page 181

1              ROMAIN
2    items, there was some -- there was some judgment
3    applied in reaching a best estimate.
4        Q.   And you're not privy to the specifics
5    of what the hedges were or how specifically they
6    were allocated to one group of securities as
7    opposed to another?
8            WITNESS' ATTORNEY: Object to the
9    form.
10       A.   That's correct.
11       Q.   Where did you get -- let me ask you
12   first of all, did you prepare this memo?
13       A.   No.
14       Q.   Who did?
15       A.   So this memo is a summary of work
16   which was performed by different product control
17   areas for the different books in terms of
18   pulling it together in and summarizing in a
19   memo. The author was Charles Utley. He did not
20   do -- he didn't do much of the work -- much, if
21   any, of the work. It was more a, my memory is
22   fading me. He pulled other people's work into a
23   single summary memo.
24       Q.   So he would have dealt with the people
25   at the product control areas and risk management

46 (Pages 178 to 181)

Page 182

ROMAIN

1    ROMAIN
2    and whoever else and brought in -- and pulled
3    that information together and then he
4    specifically wrote the memo?
5        A.    That's correct.
6        Q.    With respect to the JPM inventory,
7    this is the inventory that Barclays obtained in
8    December, is that right?
9        A.    Yes.
10        Q.    Do you know whether there was any
11    hedging on any of that inventory any time prior
12    to its receipt?
13        A.    I -- no, I don't know.
14        Q.    Who would know that? Do you know?
15        A.    If there was any hedging, I guess
16    the -- whoever put on the hedges, because it
17    didn't feed in any way into Barclays'
18    acquisition accounting. It is not something
19    which I would have any knowledge of.
20        Q.    And similarly, you don't have any
21    knowledge whether there was any hedging that was
22    done with respect to any of the initial
23    inventory prior to acquisition?
24        A.    That's correct, yeah, I don't know.
25        Q.    There is a reference here to losses on

Page 183

1    ROMAIN
2    auction. Can you tell me what auction means?
3        A.    That's -- so basically, when the
4    inventory was first acquired, it was acquired
5    into a central book if you like and subsequent
6    to that, it was either transferred to trading
7    desks or it was sold externally and the 160
8    million is the net P&L which was recognized in
9    that central book during the period up until
10    those sales and transfers occurred.
11        Q.    So all of the inventory goes into, you
12    call it a central book?
13        A.    Yeah, so the initial accounting, it
14    was -- a large portfolio of assets was received
15    in largely in one -- in a small number of
16    deliveries over a very short period of time
17    which is unusual and, therefore, it was
18    initially maintained in a central book.
19        But during the period in which it was
20    reconciled, booked, decisions were made in terms
21    of who the appropriate desk was to manage those
22    positions going forward. And once that process
23    was complete, the positions were transferred to
24    the appropriate trading desks that would then
25    manage it as part of their overall existing

Page 184

1    ROMAIN
2    positions or sold in the market.
3        Q.    So the date of September 22, I guess,
4    for the initial inventory and December 22 for
5    the JPM inventory, those are the dates when the
6    acquired inventory goes into the central book?
7        A.    I'm not sure how it works with the
8    December 22 inventory. But certainly for the
9    September 22, yeah, that was the date when --
10    that was the valuation date that was used for
11    initially recording the inventory.
12        In terms of the actual bookings, there
13    is clearly a fact -- those 22nd of September
14    values and the appropriate bid/offer were not
15    finally determined for some time afterwards. So
16    in terms of how that was managed internally
17    between central book and the trading desks,
18    because that has no impact on Barclays'
19    accounting or internal reporting, it is not
20    something I'm aware of.
21        Q.    So all this shows is that a fair value
22    was put on the inventory as of the appropriate
23    valuation date, the acquisition date?
24        A.    Yes.
25        Q.    And then some time after that, that

Page 185

1    ROMAIN
2    inventory was either sold externally or moved to
3    specific trading desks?
4        A.    Yes.
5        Q.    And there was a change in value
6    between the initial acquisition accounting and
7    the valuation as of the date of that either
8    external sale or internal transfer?
9        A.    That's correct.
10        Q.    And the difference in value is 160
11    million dollars?
12        A.    Yes.
13        WITNESS' ATTORNEY:    Negative.
14        Q.    Negative. And that is on not only the
15    external sales, but also on the internal
16    transfers, is that right?
17        A.    That's right, yes.
18        Q.    Total amount of internal transfers is
19    that 37.2 billion?
20        A.    Yeah. Yeah, that's right.
21        Q.    So there is only about 7 billion
22    dollars that was sold externally, is that right?
23        A.    That was the main difference between
24    37.2 and 44.3. I'm not aware of any other items
25    in that difference, but I guess -- I'm not aware

47  (Pages 182 to 185)

Page 186

ROMAIN

1 
2  of any other difference.
3      Q.   Do you have a breakdown of what the
4  gain or loss was on the 7 billion dollars that
5  was sold externally?
6      A.   I don't. I don't have a split of the
7  160 million between external sales and internal
8  transfers.
9      Q.   When you have an internal transfer, do
10 you record that as a profit or loss?
11     A.   That was no impact on Barclays'
12 external reporting and -- no.
13     Q.   So the 160 million here that would
14 have the part of that, that was realized on
15 selling 7 billion dollars externally, 7 billion
16 dollars worth of securities externally?
17     A.   No, no. Changes in value during the
18 period will impact on our -- what's the best way
19 of putting it?
20         So the securities would have changed
21 in value during the period between initial
22 acquisition and then either sale or transfer and
23 that's the 160 million. So the sale, the
24 transfer itself doesn't trigger any -- doesn't
25 trigger any gain or loss, but the positions may

Page 187

ROMAIN

1 
2  have changed in value during the period.
3      Q.   Who were the main people at
4  PricewaterhouseCoopers with whom you dealt with
5  in connection with the accounting, Barclays'
6  accounting for the sale, for the acquisition?
7      A.   The main two people I dealt with were
8  Mike Guamuccio, who is the partner in charge of
9  the U.S. audit, and Rob MacGoey who is a, I
10 think is a senior manager. He could be a
11 director, but works for Mike on the U.S. audit.
12     Q.   Who on the Barclays' side was the main
13 contact for the partner and the manager?
14     A.   They would have had -- they would have
15 had many contacts. If they wanted to understand
16 the overall acquisition accounting or any
17 accounting policy or technical accounting, some
18 overriding issues, then I would have been the
19 main contact. If they were auditing any of the
20 individual line items in the balance sheets
21 which would have been most of their time, then
22 they would have spoken to different people
23 depending on which item.
24     Q.   With respect to futures, who would
25 have been the contact person?

Page 188

ROMAIN

1 
2      A.   For futures, their main first -- their
3  main point of contact within finance -- they
4  would have talked to -- they would have talked
5  to Lee Bowell on the balance sheet and they
6  would have talked to various people on the
7  product control and valuation. To be honest,
8  most of their attention on it would have been on
9  the valuation, I would guess. So I'm not sure,
10 I'm not sure who that would have been.
11     Q.   With respect to options, who was the
12 principal contact?
13     A.   Again, for options, if they were
14 talking about the link with the acquisition
15 balance sheets, so the sort of summary sheets,
16 it would have been Iain Cooper. But most of the
17 time would have been on the valuation, I would
18 expect most of their time to have been on the
19 valuation, in which case their main contact
20 would on valuation would have been Jerry Shi.
21     Q.   Who is Jerry Shi?
22     A.   At the time, Jerry Shi worked in the
23 product control valuations group covering
24 equities.
25     Q.   And now?

Page 189

ROMAIN

1 
2      A.   He has left the firm, so I'm not sure
3  who he works for.
4          MR. MAGUIRE: Sir, thank you. I have
5  no further questions.
6          WITNESS' ATTORNEY: Do the lawyers
7  representing the debtor or committee have
8  any questions?
9          MR. TAMBE: We have no questions.
10         MR. KAY: No questions.
11         MR. TAMBE: Thank you.
12         (Time Noted: 5:00 p.m.)
13 
14 
15         _____
15         GARY ROMAIN
16 
17 Subscribed and sworn to
18 before me this      day
19 of January, 2010.
20 
21         _____
22 
23 
24 
25

Page 190

```
 1              ROMAIN
 2           INDEX:
 3   WITNESS      EXAM BY:        PAGE:
 4   G. Romain    Mr. Maguire       5
 5
 6           EXHIBITS
 7   Exhibit No.           Marked
 8   Exhibit 533A Document Bates stamped      9
 9       BCI-EX-295932 through 33
10   Exhibit 534A Notes entitled "Preparation  9
11       Notes for January 13
12       Deposition"
13   Exhibit 535A Declaration of Elizabeth    15
14       James
15   Exhibit 536A Document Bates stamped      47
16       BCI-EX-(S) 52476 through 78
17       with attachment
18   Exhibit 537A Document Bates stamped      59
19       BCI-EX-(S) 78976 with
20       attachment
21   Exhibit 538A Document Bates stamped      66
22       BCI-EX-S109996 through 110002
23   Exhibit 539A Document Bates stamped      76
24       BCI-EX110050
25
```

Page 191

```
 1              ROMAIN
 2           EXHIBITS
 3   Exhibit No.           Marked
 4   Exhibit 540A Document Bates stamped      79
 5       BCI-EX-(S)110053 with
 6       attachment
 7   Exhibit 541A Document Bates stamped      86
 8       BCI-EX110070 through 74
 9   Exhibit 542A Document Bates stamped      88
10       BCI-EX-(S)110092 with
11       attachment
12   Exhibit 543A Document Bates stamped      89
13       BCI-EX-(S)218500 through 501
14       with attachment
15   Exhibit 544A Document Bates stamped      93
16       BCI-EX-(S)00110108 through 112
17   Exhibit 545A Document Bates stamped     100
18       BCI-EX-(S)110133 through 34
19   Exhibit 546A Document Bates stamped     102
20       BCI-EX-(S)110162 through 63
21       with attachment
22   Exhibit 547A Letter dated  January 12,  147
23       2010 from Christopher M. Green
24       with attachment
25
```

Page 192

```
 1              ROMAIN
 2           EXHIBITS
 3   Exhibit No.           Marked
 4   Exhibit 548A Document Bates stamped     158
 5       BCI-EX-(S) 00110233 through
 6       236
 7   Exhibit 549A Document Bates stamped     162
 8       BCI-EX-(S) 218489 through with
 9       attachment
10   Exhibit 550A Document Bates stamped     163
11       BCI-EX-(S) 218460
12   Exhibit 551A Expert Report of Professor 168
13       Paul Pfleiderer
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 193

```
 1              ROMAIN
 2
 3           CERTIFICATE
 4   STATE OF NEW YORK )
 5              )ss:
 6   COUNTY OF NEW YORK)
 7       I, MARY F. BOWMAN, a Registered
 8   Professional Reporter, Certified Realtime
 9   Reporter, and Notary Public within and for
10   the State of New York, do hereby certify:
11       That GARY ROMAIN, the witness whose
12   deposition is hereinbefore set forth, was
13   duly sworn by me and that such deposition is
14   a true record of the testimony given by such
15   witness.
16       I further certify that I am not
17   related to any of the parties to this action
18   by blood or marriage and that I am in no way
19   interested in the outcome of this matter.
20       In witness whereof, I have hereunto
21   set my hand this 13th day of January, 2010.
22
23
          _____
          MARY F. BOWMAN, RPR, CRR
24
25
```

49 (Pages 190 to 193)

Page 194

```
1              ROMAIN
2          * * *ERRATA SHEET* * *
3   NAME OF CASE:  In Re: Lehman Brothers
4   DATE OF DEPOSITION: 1/13/10
5   NAME OF WITNESS:  GARY ROMAIN
6   Reason codes:
7       1. To clarify the record.
        2. To conform to the facts.
8       3. To correct transcription errors.
9   Page ____ Line ____ Reason____
    From _____ to_____
10
11  Page ____ Line ____ Reason____
    From _____ to_____
12
13  Page ____ Line ____ Reason____
    From _____ to_____
14
15  Page ____ Line ____ Reason____
    From _____ to_____
16
17  Page ____ Line ____ Reason____
    From _____ to_____
18
19  Page ____ Line ____ Reason____
    From _____ to_____
20
21  Page ____ Line ____ Reason____
    From _____ to_____
22
23
24          _____
            GARY ROMAIN
25
```

50 (Page 194)

# BCI EXHIBIT

# 96

Page 1

1

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4      -------------------------------x

       In Re:                    Chapter 11

5      LEHMAN BROTHERS            Case No. 08-13555 (JMP)

       HOLDINGS, INC., et al.,    (Jointly Administered)

6      ---------------------------)

7

8          * * * HIGHLY CONFIDENTIAL * * *

9          DEPOSITION OF JAMES SEERY

10           New York, New York

11        Thursday, September 3, 2009

12

13

14

15

16

17

18

19

20     Reported by:

       FRANCIS X. FREDERICK, CSR, RPR, RMR

21     JOB NO. 24296

22

23

24

25

**Page 2**

```
1
2
3
4            September 3, 2009
5            8:40 a.m.
6
7
8            HIGHLY CONFIDENTIAL deposition of
9     JAMES P. SEERY, JR., held at the offices
10    of Jones Day, 222 East 41st Street, New
11    York, New York, pursuant to Notice,
12    before Francis X. Frederick, a Certified
13    Shorthand Reporter, Registered Merit
14    Reporter and Notary Public of the States
15    of New York and New Jersey.
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1
2     APPEARANCES:
3
4     JONES DAY, LLP
5     Attorneys for Lehman Brothers, Inc.
6         222 East 41st Street
7         New York, New York 10017-6702
8     BY:  DAVID L. CARDEN, ESQ.
9          BART GREEN, ESQ.
10
11    BOIES SCHILLER & FLEXNER, LLP
12    Attorneys for Barclays Capital
13        575 Lexington Avenue - 7th Floor
14        New York, New York 10022
15    BY:  JACK G. STERN, ESQ.
16
17    QUINN, EMANUEL, URQUHART, OLIVER &
18    HEDGES, LLP
19    Attorneys for the Creditors Committee
20        865 S. Figueroa Street, 10th Floor
21        Los Angeles, California 90017
22    BY:  ERICA P. TAGGART, ESQ.
23
24
25
```

**Page 4**

```
1
2     APPEARANCES: (Cont'd.)
3
4     HUGHES, HUBBARD & REED, LLP
5     Attorneys for the SIPA Trustee
6         One Battery Park Plaza
7         New York, New York 10004-1482
8     BY:  WILLIAM MAGUIRE, ESQ.
9          FARA TABATABAI, ESQ.
10
11    ALSO PRESENT:
12        RAJESH ANKALKOTI, Alvarez & Marsal
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1          J. SEERY - HIGHLY CONFIDENTIAL
2     JAMES  SEERY,  called as a witness,
3          having been duly sworn by a Notary
4          Public, was examined and testified as
5          follows:
6     EXAMINATION BY
7     MS. TAGGART:
8          Q.  Good morning, Mr. Seery.
9          A.  Good morning.
10         Q.  As I just said, my name is Erica
11    Taggart and I represent the Creditors
12    Committee. Are you employed right now?
13         A.  I am.
14         Q.  By whom?
15         A.  Sidley & Austin.
16         Q.  And what do you do there?
17         A.  I'm a partner.
18         Q.  Do you have a specialty?
19         A.  They tell me I'm a bankruptcy
20    lawyer.
21         Q.  How long have you been practicing
22    as a lawyer?
23         A.  Twenty-some -- you know, around 20
24    years.
25         Q.  When did you graduate from law
```

Page 6

1    **J. SEERY - HIGHLY CONFIDENTIAL**
2    school?
3    A.    '90.
4    Q.    Is your license to practice still
5    active?
6    A.    I hope so.
7    Q.    And where are you licensed to
8    practice?
9    A.    New York State.
10    Q.    How long have you been working for
11    Sidley & Austin?
12    A.    Since May 4th.
13    Q.    What did you do before May 4th?
14    A.    I was at Barclays.
15    Q.    What was your title at Barclays?
16    A.    Managing director.
17    Q.    What did you do as managing
18    director?
19    A.    I was in the -- I guess
20    technically in the loan group.
21    Q.    What do you mean by technically?
22    A.    The transition of my business -- I
23    had completed the transition to my business.
24    My role was somewhat undefined so I was
25    helping various businesses at Barclays with

Page 7

1    J. SEERY - HIGHLY CONFIDENTIAL
2    customer relationships, with deals, with
3    restructuring.  A number of different
4    functions.
5    Q.    Whom did you report to when you
6    were managing director at Barclays?
7    A.    I don't know.
8    Q.    Did anyone report to you?
9    A.    No.
10    Q.    How long did you work as managing
11    director at Barclays?
12    A.    From the close of the transaction
13    to I think May 4th or May 3rd.
14    Q.    And you're talking about the
15    transaction between Barclays and Lehman?
16    A.    Yes.
17    Q.    What were your hours,
18    approximately, at Barclays when you were
19    working there?
20    A.    I worked for 20 years.  I don't
21    have hours.  Twenty-something years.  I work
22    all the time.
23    Q.    Were you busy there?
24    A.    At Barclays?
25    Q.    Yes.

Page 8

1    **J. SEERY - HIGHLY CONFIDENTIAL**
2    A.    No.
3    Q.    What kind of hours did you keep --
4    did you stay at the office for set hours?
5    A.    Not for set hours.  I showed up
6    before 7 every day and didn't leave before 5
7    or 6 every day.
8    Q.    Were there times that you didn't
9    have work to do when you were at Barclays?
10    A.    I could always find something to
11    do.
12    Q.    Were there times that you weren't
13    working while you were there?
14    A.    No.
15    Q.    Where did you work before you
16    worked at Barclays?
17    A.    Lehman Brothers.
18    Q.    Do you know what part of Lehman
19    Brothers was employing you?
20    A.    Yes.
21    Q.    What was it?
22    A.    Fixed income.
23    Q.    What was your title when you were
24    working at Lehman Brothers?  Let's start with
25    the title right before the transaction.

Page 9

1    **J. SEERY - HIGHLY CONFIDENTIAL**
2    A.    Global head of fixed income,
3    loans.
4    Q.    What are fixed income loans?
5    A.    Fixed income is a division.  Loans
6    was the product.
7    Q.    How long did you have that role as
8    global head of fixed income, loans?
9    A.    About four years.  Four-plus
10    years.
11    Q.    What did you do as global head of
12    fixed income, loans?
13    A.    I was responsible for all of
14    Lehman's loans, high-grade, high-yield.  The
15    fixed income commitment with respect to those
16    loans which is underwriting.  Trading.  Sales.
17    Hedging.  Portfolio management.  Distressed
18    finance.  I had a significant role in running
19    high yield and distressed as well.
20    Q.    Whom did you report to?
21    A.    Alex Kirk.
22    Q.    Do you know what his position was?
23    A.    At the end he was the head of
24    fixed income.
25    Q.    Whom -- who were your direct

Page 10

1    J. SEERY - HIGHLY CONFIDENTIAL
2  reports?
3    A.  I had a lot.
4    Q.  Approximately how many?
5    A.  Probably had at least -- at least
6  seven directs. Maybe more.
7    Q.  Who are the --
8    A.  Approximately 40 all-in.
9    Q.  Who are the direct reports that
10  you can recall now?
11    A.  Well, there was a sales team. And
12  while they sometimes filtered through a senior
13  sales, head of sales, I had technically direct
14  report to them. There was the traders of
15  loans. There was the portfolio management
16  team. And there was the distressed financing
17  and restructuring team which had a split
18  report.
19    Q.  Who was the -- was there a direct
20  report associated with the sales team that
21  reported to you?
22    A.  John Kitei.
23    Q.  What about in the traders of
24  loans? Was there a director report to you?
25    A.  There was -- there was a couple

Page 11

1    J. SEERY - HIGHLY CONFIDENTIAL
2  but the chief one would be Alex Stromberg.
3    Q.  What about in portfolio
4  management?
5    A.  Greg Smith.
6    Q.  Did you say distressed assets was
7  the last?
8    A.  Distressed finance and
9  restructuring. Mark Shapiro.
10    Q.  When you were global head of fixed
11  income, loans, were you acting at all in a
12  legal capacity?
13    A.  No.
14    Q.  At any time when you were working
15  at Lehman Brothers did you work in a legal
16  capacity?
17    A.  No.
18    Q.  How long were you working with
19  Lehman Brothers?
20    A.  Ten years.
21    Q.  Can you --
22    A.  I'm sorry. Not quite ten years.
23  A little short of ten years.
24    Q.  What was your position before you
25  were global head of fixed income, loans?

Page 12

1    J. SEERY - HIGHLY CONFIDENTIAL
2    A.  I ran the restructuring and
3  portfolio workout businesses.
4    Q.  About approximately when were you
5  dealing with restructuring and portfolio
6  workout businesses?
7    A.  I had restructuring portfolio
8  management for workout -- portfolio management
9  for just the regular business of our loans
10  and distressed positions from '99 when I got
11  there till 2005.
12    Q.  Was there a time when you became
13  involved in negotiations relating to any type
14  of transaction between Barclays and Lehman?
15    A.  Yes.
16    Q.  When was the first time you had
17  any involvement in such negotiations?
18    A.  One of the first days that
19  Barclays got involved.
20    Q.  Do you know about when that was?
21    A.  September last year.
22    Q.  I'm going to give you just a
23  calendar from that year, from September 2008.
24  That might help in identifying dates.
25    Looking at this calendar do you

Page 13

1    J. SEERY - HIGHLY CONFIDENTIAL
2  know the date that was the first time that you
3  became involved in any negotiations between
4  Lehman and Barclays?
5    A.  It was either around the -- I
6  think the first day they got involved was the
7  10th or the 11th of September of 2008.
8    Q.  And in what way did you become
9  involved?
10    A.  I was involved in the team to look
11  to try to sell Lehman Brothers.
12    Q.  How did you get involved? Did
13  somebody ask you?
14    A.  Alex Kirk asked me to do it.
15    Q.  And what in particular did he say
16  was the direction for what you would be doing?
17    A.  Come help us sell Lehman Brothers.
18    Q.  And what did you do once you got
19  that direction?
20    A.  I went and helped sell Lehman
21  Brothers.
22    Q.  How did you do that?
23    A.  Described our businesses. Worked
24  on providing data to potential purchasers.
25  Walking them through the operation of the

Page 14

1    J. SEERY - HIGHLY CONFIDENTIAL
2    business as well as the positions that we
3    held.
4    Q.   During this part -- so before LBHI
5    declares bankruptcy, who did you speak to with
6    Barclays in relation to negotiations?
7    A.   There was a team that they had on
8    diligence. Mostly reporting to Rick Van Zijl.
9    Q.   And what type of data were you
10   providing?
11   A.   Positions, marks, personnel,
12   structure, commitments.
13   Q.   What do you mean by providing
14   positions?
15   A.   We provided the potential
16   purchasers with a list of the assets that
17   Lehman Brothers held as well as the
18   liabilities related to those assets.
19   Q.   Were you providing data on all of
20   the assets and liabilities or some subset?
21   A.   Generally the loan positions.
22   Q.   Did you provide --
23   A.   And some of the high-yield
24   positions.
25   Q.   Did you provide documents related

Page 15

1    J. SEERY - HIGHLY CONFIDENTIAL
2    to these?
3    A.   Yes.
4    Q.   And did the documents list
5    specific assets or categories of assets?
6    A.   Specific and categories.
7    Q.   And did they also include the --
8    was a value attributed to those assets?
9    A.   Yes. They had marks.
10   Q.   What are marks?
11   A.   Mark is the position value that we
12   ascribe to a particular position each day
13   based upon either the current market or a
14   reasonable good faith estimate of where the
15   asset would trade in a reasonable period of
16   time.
17   Q.   How often was Lehman marking its
18   books?
19   A.   Daily.
20   Q.   Did it do that for all of its
21   assets?
22   A.   All of the assets I was
23   responsible for. I don't know -- I don't know
24   what other people did with their marks on a
25   daily basis.

Page 16

1    J. SEERY - HIGHLY CONFIDENTIAL
2    Q.   Did Lehman mark its -- all the
3    loan positions on a daily basis?
4    A.   Yes.
5    Q.   Who did that?
6    A.   Various people reporting to me.
7    Or through others to me.
8    Q.   Did they put that information in a
9    computerized system?
10   A.   Yes.
11   Q.   Did the computerized system have a
12   name?
13   A.   There were many systems in loans.
14   Q.   So people put in marks to various
15   systems in loans?
16   A.   Yes.
17   Q.   How would you find out what the --
18   well, how did you find out what the marks were
19   for the assets that you were providing
20   information to Barclays for?
21   A.   Can you restate the question?
22   Q.   Yeah. Well, how did you get the
23   information to find out the positions and the
24   marks for the assets that you were providing
25   information about when you were in

Page 17

1    J. SEERY - HIGHLY CONFIDENTIAL
2    negotiations with Barclays?
3    A.   We printed out ledgers.
4    Q.   Where did you get them?
5    A.   From a computer.
6    Q.   And what about information about
7    liabilities; where was that kept?
8    A.   Same place.
9    Q.   How did you decide which positions
10   were going to be valued based on the current
11   market versus a good faith estimate about
12   where the asset would trade in a reasonable
13   period of time?
14   A.   I don't quite understand your
15   question.
16   Q.   You mentioned that there were two
17   ways that Lehman might value assets. I think
18   based on the current market or a good faith
19   estimate where the asset would trade at a
20   reasonable period of time. Which assets were
21   valued one way versus another?
22   A.   Those that had a current market
23   were marked to the market. Those that did not
24   were marked to a model.
25   Q.   And when you say an estimate about

Page 18

J. SEERY - HIGHLY CONFIDENTIAL

1    where the asset would trade in a reasonable
2    period of time, could you tell me the
3    reasonable period of time that you would
4    have --
5        A.    It would depend on the asset and
6    the size of the position.
7        Q.    What was the range?
8        A.    Of what?
9        Q.    Of the amount of time that you
10   would consider reasonable.
11       A.    Zero to 30 days. It could go
12   long. It can't be shorter than zero but it
13   could go a little longer depending on the
14   asset.
15       Q.    Why did Lehman mark its books
16   every day?
17       A.    We were required to mark our books
18   every day according to GAAP.
19       Q.    Now, although you had the
20   information about loan positions, during these
21   negotiations before the bankruptcy, did you
22   also have -- did you ever see information that
23   valued all of the assets that Lehman held at
24   that time?
25

Page 19

J. SEERY - HIGHLY CONFIDENTIAL

1        A.    Did I ever see information that
2    valued all of the assets that Lehman held at
3    the time. No.
4        Q.    Do you have an approximate amount
5    of what the total value of the assets that you
6    were looking at and conveying to Barclays was?
7        A.    I don't recall.
8        Q.    Do you have a sense of the range?
9    Was it more than $50 billion?
10       A.    It was in that neighborhood.
11            Strike that for a second.
12            You asked me if -- that we were
13   conveying to Barclays. That's not what I was
14   talking about. I was talking about the value
15   of our positions. Whether they were conveyed
16   or not is a whole separate issue.
17       Q.    Okay. So do you have a sense of
18   what the value of the assets that Lehman held
19   were prior to the bankruptcy?
20       A.    No.
21       Q.    What was the 50 billion - very
22   estimate range - what were you trying to
23   describe there?
24       A.    The loan book.
25

Page 20

J. SEERY - HIGHLY CONFIDENTIAL

1        Q.    Okay.
2        A.    That's just the neighborhood. I
3    don't think it was quite that high.
4        Q.    And what was the approximate
5    amount of liabilities prior to the bankruptcy
6    that was associated with that loan book?
7        A.    The net -- the net numbers are
8    what I am giving to you. So it was somewhere
9    between 20 and 50 billion was the total. I
10   don't recall. It was a net number. The
11   liabilities would net off the total.
12       Q.    Meaning that it's the assets and
13   then you subtracted the liabilities.
14       A.    To reach that number, yes.
15       Q.    And who did you give this
16   information to at Barclays?
17       A.    Rick Van Zijl and his team.
18       Q.    Did you discuss the information
19   with them?
20       A.    Yes.
21       Q.    What type of questions were they
22   asking about it?
23       A.    Line-by-line review of the loan
24   book.
25

Page 21

J. SEERY - HIGHLY CONFIDENTIAL

1        Q.    Did you have any discussion about
2    the method that Lehman was using to value the
3    loan book with Barclays?
4        A.    They knew it was mark to market.
5    And that was our discussion.
6        Q.    Did Barclays ever discuss
7    valuing -- whether there was an accurate
8    valuation of the loan book at the time?
9        A.    That was the nature of our
10   discussions.
11       Q.    And what in particular did anybody
12   at Barclays say about what the appropriate
13   value of the assets that you were discussing
14   should be?
15       A.    Repeat that.
16       Q.    Yeah. What was Barclays saying on
17   the topic of how these assets should be
18   valued?
19       A.    They're asking how we came up with
20   whatever values we had and reviewing the value
21   of each line item that was material.
22       Q.    Did they agree with the valuation?
23       A.    Sometimes.
24       Q.    Were there times that they
25

Page 22

J. SEERY - HIGHLY CONFIDENTIAL

1     disagreed with the valuation?
2     A.   I'm sure there were.
3     Q.   Did they ever convey a
4     disagreement about the valuation?
5     A.   Yes.
6     Q.   And what did they say?
7     A.   We disagree with this mark.
8     Q.   Who in particular said anything
9     that disagreed with the mark?
10     A.   Jason Moynihan who was their
11     trader.
12     Q.   Anyone else?
13     A.   Not that I recall.
14     Q.   And what did Jason Moynihan say on
15     the topic of a disagreement about the
16     valuation of a mark of the assets you were
17     discussing?
18     A.   If he disagreed with the mark, he
19     would say I think this mark is either too high
20     or too low.
21     Q.   Did he give a basis why he thought
22     that they were too high or to low?
23     A.   He would have a different view of
24     the market.

Page 23

J. SEERY - HIGHLY CONFIDENTIAL

1     Q.   Did he say anything about what his
2     view of the market was?
3     A.   The ones that he thought were too
4     high he said he thought the market was lower.
5     The ones that he thought were too low he said
6     he thought the market was higher.
7     Q.   Did he provide any further basis
8     for that?
9     A.   No.
10     Q.   And how did you respond?
11     A.   Depends on which line item. Some
12     we said you're wrong and here's the most
13     recent trade. Others we would have said fair
14     point, maybe we should move that down a
15     little. Others we said we didn't -- if they
16     were marked to model we told him why, because
17     there wasn't a current market, here's how the
18     value compared to others. It was an
19     interactive discussion.
20     Q.   How confident were you in Lehman's
21     processes of marking the loan book in
22     determining a value that was appropriate for
23     those assets?
24     MR. STERN: Objection to the form.

Page 24

J. SEERY - HIGHLY CONFIDENTIAL

1     You can answer.
2     A.   I was very confident in the way we
3     marked our loan book.
4     Q.   Were you part of the modeling
5     process for those that did not have a current
6     market position?
7     A.   Yes.
8     Q.   And can you generally describe
9     what was the model that Lehman was using for
10     valuing assets that didn't have a current
11     market price?
12     A.   There were various ways to mark
13     positions to model. So there's not one simple
14     way to do that.
15     Q.   Approximately how many ways?
16     A.   Each one -- each loan could be
17     different. There could be many different
18     types of ways.
19     Q.   What were some of the inputs that
20     you would look to in trying to determine the
21     appropriate value of an asset if there wasn't
22     a current market for it?
23     A.   Value of related assets. Value of
24     comparable assets. Direction of the market.

Page 25

J. SEERY - HIGHLY CONFIDENTIAL

1     Value of collateral. Interest rates. Changes
2     in spread and ratings. M&A activity.
3     There's many, many other factors
4     you consider.
5     Q.   Did you have any further
6     conversations about position with anyone at
7     Barclays leading -- in the negotiations before
8     the bankruptcy?
9     MR. STERN: About positions?
10     MS. TAGGART: Yes.
11     MR. STERN: You mean assets as
12     opposed to --
13     MS. TAGGART: Yes. Positions of
14     assets.
15     A.   I don't quite understand the
16     question.
17     I'll speak loudly.
18     Q.   Okay.
19     A.   You can go.
20     Q.   Was there any further conversation
21     about any valuation of any of the assets that
22     you were discussing with Barclays?
23     A.   You said before the bankruptcy on
24     your last question. Do you want me to limit

Page 26

1    J. SEERY - HIGHLY CONFIDENTIAL
2  it to before or after?
3    Q.   I do.  Before.
4    A.   There were numerous discussions
5  along the lines that I previously described.
6    Q.   So you had further discussions
7  about the appropriate value of the assets?
8    A.   Correct.
9    Q.   Any other topics?
10    A.   Before the bankruptcy.  Yes.
11    Q.   What other topics?
12    A.   Private equity.
13    Q.   Anything else?
14    A.   Contracts.
15    Q.   Anything else?
16    A.   DIP financing.  Building.  Data
17  centers.  Numerous other issues.
18    Q.   And what was generally the topics
19  that you discussed surrounding private equity?
20    A.   The nature of the positions.  The
21  value of the positions.  And how we came to
22  those values.
23    Q.   Was there a time that you were
24  justifying Lehman's value of the positions in
25  the private equity?

Page 27

1    J. SEERY - HIGHLY CONFIDENTIAL
2    A.   I was explaining Lehman's
3  positions.  I didn't think I needed to justify
4  them.
5    Q.   Why didn't you think that you
6  needed to justify them?
7    A.   It's not what I was asked to do.
8    Q.   Were you reporting the results of
9  these discussions to anyone at Lehman?
10    A.   Yes.
11    Q.   Who?
12    A.   Alex Kirk.
13    Q.   Anyone else?
14    A.   The entire team working on the
15  transaction.
16    Q.   How did your discussions with
17  Barclays before the bankruptcy come to an end?
18    A.   We had a transaction to buy the
19  entire company, save for the real estate, the
20  private equity, and the mortgages.  And that
21  transaction was approved by Barclays.  And
22  then we were told that the FSA required
23  shareholder vote per Barclay's charter unless
24  the US government was willing to stand behind
25  some portion of the losses.  And the treasury

Page 28

1    J. SEERY - HIGHLY CONFIDENTIAL
2  and Fed didn't think that was a good idea.
3    Q.   Was there a price associated with
4  that transaction that was agreed to?
5    A.   It was a -- I don't recall the
6  exact price.  It's well known.  It's not a big
7  secret.
8    Q.   Were you involved in discussions
9  regarding a possible transaction with Barclays
10  after the bankruptcy of LBHI?
11    A.   Yes.
12    Q.   And I believe that bankruptcy is
13  on the morning of September 15th.  That's the
14  Monday.  Is that consistent with your memory?
15    A.   Correct.
16    Q.   What was the first thing that you
17  did after the bankruptcy related at all to a
18  potential transaction with Barclays?
19    A.   It's a broad question.  Do you
20  want to narrow it or would you like me to give
21  you a broad answer?
22    Q.   I'd like to know the first thing
23  that you did and I'm willing to take that full
24  answer of the first thing.
25    A.   The first thing I did was take a

Page 29

1    J. SEERY - HIGHLY CONFIDENTIAL
2  deep breath and think about how we had to hold
3  an organization together in order to have any
4  transaction.
5    Q.   How did you first learn that there
6  were still negotiations happening with
7  Barclays even after the bankruptcy?
8    A.   I was involved in the discussions
9  and decisions to try to go back to them after
10  the SEC and the Fed told us to file.
11    Q.   Who else was involved in those
12  discussions?
13    A.   Alex Kirk, Bart McDade.  Mark
14  Shafir.  Mark Shapiro.  Steve Berkenfeld.  To
15  some degree, Dick Fuld.  Probably about it in
16  those direct discussions.
17    Q.   When was the first discussion that
18  you had on this topic?
19    A.   Sometime on the morning -- I
20  believe sometime on the morning or early day
21  of the 15th.
22    Q.   And what do you remember being
23  said during -- tell me your memory of that
24  meeting.
25    A.   I don't recall a specific meeting.

Page 30

1      J. SEERY - HIGHLY CONFIDENTIAL
2    I said that's when I had first discussion
3    about it.
4       Q.   Tell me what you recall about the
5    first discussion about it.
6       A.   We generally talked about trying
7    to find an alternate transaction and possible
8    ways to do that as the firm was getting shut
9    down by its clearing bank and being shut off
10   by its customers.
11      Q.   And was there any discussion in
12   your first discussions on the morning of the
13   15th about what the transaction might look
14   like with Barclays?
15      A.   Yes.
16      Q.   And what was described as possible
17   transactions with Barclays and how that might
18   look?
19      A.   The transaction of the assets of
20   the broker -- sale of the assets of the
21   broker/dealer.
22      Q.   Who do you mean by the
23   broker/dealer?
24      A.   Lehman Brothers, Inc.
25      Q.   And was there a discussion at that

Page 31

1      J. SEERY - HIGHLY CONFIDENTIAL
2    time about which assets might be conveyed in
3    that sort of transaction?
4       A.   Generally the business and the
5    assets related to operating the business.
6       Q.   So after your initial discussion
7    about the possibility of this type of
8    transaction what did you do next? And this is
9    again on Monday, September 15th.
10      A.   Again, incredibly broad question.
11      Q.   Well, I'll take what you did next.
12      A.   I'm quite sure I might have eaten
13   something.
14      Q.   Okay. When was the next time that
15   you participated in any way in activities that
16   would lead to a transaction with Barclays?
17      A.   It was constant.
18      Q.   Okay. Well, what are some of the
19   activities that you did then?
20      A.   Again, worked on keeping the firm
21   together. By that I mean make sure the lights
22   stay on, security stays in place. The
23   building continues to operate. Employees show
24   up to work. Contact customers.
25      Q.   What was another task that you did

Page 32

1      J. SEERY - HIGHLY CONFIDENTIAL
2    related to the negotiations with Barclays on
3    the 15th besides keeping the firm together?
4       A.   Consider how to finance the firm.
5       Q.   How do you mean that?
6       A.   To obtain money to operate the
7    firm on a day-to-day basis as well as to
8    finance the positions that the firm held.
9       Q.   What's financing positions?
10      A.   Obtaining capital to support the
11   value of the positions that you hold.
12      Q.   And on the 15th what did you do
13   related to considering how to finance the
14   firm?
15      A.   We worked on a DIP financing. And
16   I worked constantly with treasury regarding
17   issues that arose with respect to repo
18   financing as well as clearing bank issues.
19      Q.   What's DIP financing?
20      A.   Debtor-in-possession.
21      Q.   And what did you do relating to
22   working on DIP financing?
23      A.   In sum, we obtained a DIP from
24   Barclays.
25      Q.   Is a DIP like a loan from Barclays

Page 33

1      J. SEERY - HIGHLY CONFIDENTIAL
2    but it happens at a time that it's -- the
3    company is in bankruptcy?
4       A.   Yes.
5       Q.   Why did you choose Barclays as the
6    funder for that?
7       A.   They were the logical choice.
8       Q.   Was it related to the potential
9    transaction with them?
10      A.   Yes.
11      Q.   And do you know the amount of DIP
12   financing that you got from Barclays?
13      A.   I don't recall.
14         MS. TAGGART: Would you mark this
15   as the next exhibit. I think it's 337B.
16         (Deposition Exhibit 337B, Pledge
17   Agreement dated as of September 7, 2008
18   among Lehman Brothers Holdings, Inc., as
19   Grantor and Barclays Bank PLC, as
20   Collateral Agent, marked for
21   identification as of this date.)
22   BY MS. TAGGART:
23      Q.   Do you recognize this document?
24      A.   No.
25      Q.   If you turn to the third-to-last

Page 34

1    J. SEERY - HIGHLY CONFIDENTIAL
2    page so it has on the bottom 943 -- actually,
3    for the record, let me identify Exhibit 337B
4    is a document that goes from Bates
5    BCI-CG-00058925 through -945. And it's
6    entitled Pledge Agreement dated of September
7    17th, 2008 among Lehman Brothers Holding, Inc.
8    and Barclays Bank PLC.
9        And if you look --
10        MR. STERN: Why don't you first
11    take a chance -- take a moment to review
12    the document as a whole and then turn to
13    the page that is the third-to-last page
14    in the exhibit.
15    A.    To make it really easy first or
16    faster, that's my signature. This is a pledge
17    agreement.
18    Q.    Is this document related to DIP
19    financing with Barclays?
20    A.    It is.
21    Q.    Can you describe generally what
22    is -- this document is?
23    A.    It's a security arrangement.
24    Q.    Was there collateral that was
25    pledged as part of this?

Page 35

1    J. SEERY - HIGHLY CONFIDENTIAL
2    A.    Yes.
3    Q.    Do you know the amount of the
4    collateral?
5    A.    Do you mean the dollar value or
6    the face amount or how many different things
7    were included?
8    Q.    I mean the value of the
9    collateral, what Lehman believed the value of
10    the collateral was that was security for this
11    loan.
12        MR. STERN: Objection to the form.
13    A.    No.
14    Q.    Do you know how much cash was --
15    was there cash conveyed as part of this doc --
16    contract?
17        MR. STERN: Objection to the form.
18    A.    I don't recall.
19    Q.    You can put that aside.
20        Then what did you do with the
21    treasury related to repo financing?
22    A.    I didn't do anything with the
23    treasury related to repo financing.
24    Q.    Did you have discussions at all
25    about -- with the treasury about repo

Page 36

1    J. SEERY - HIGHLY CONFIDENTIAL
2    financing?
3    A.    I did not have any discussions
4    with the treasury regarding repo financing.
5    Q.    I'm sorry. Maybe I'm misreading
6    my notes but what were you describing was your
7    activity on the 15th that related to treasury
8    and repo financing?
9    A.    On the 14th I had discussions with
10    the Fed and the SEC regarding Lehman having to
11    file. From the 14th on, there were
12    intermittent discussions, sometimes including
13    me, via phone regarding Lehman's repo and the
14    Fed's involvement in Lehman's repo.
15        If I said the treasury was
16    involved in that I believe that's a
17    misstatement. The treasury was involved in
18    the decision, as I understand it, not to
19    provide support for the original transaction.
20    Q.    Was there a time that the Fed and
21    Lehman entered into a repo transaction?
22    A.    Yes.
23    Q.    And what is a repo transaction?
24    A.    It's a repurchase agreement.
25    Q.    During your time at Lehman

Page 37

1    J. SEERY - HIGHLY CONFIDENTIAL
2    Brothers did you work on repo agreements?
3    A.    Yes.
4    Q.    Approximately what number of repo
5    agreements have you worked on when you worked
6    at Lehman?
7    A.    I don't know.
8    Q.    Is it over ten?
9    A.    It's probably in the ten to 20
10    range.
11    Q.    And in a repurchase agreement,
12    what's the general structure that makes it a
13    repurchase agreement?
14    A.    The general structure is that the
15    first party sells assets to the second party
16    with an agreement and obligation of the first
17    party to buy them back in an agreement -- in
18    an obligation of the second party to sell them
19    back.
20    Q.    As part -- just generally in repo
21    transactions is the party that receives money,
22    do they pledge collateral as security for that
23    money?
24    A.    Can you say that again?
25        MS. TAGGART: Can you read it

Page 38

1       J. SEERY - HIGHLY CONFIDENTIAL
2    again.
3           THE COURT REPORTER: Sure.
4           (Record read.)
5       A.   No.
6       Q.   In the -- do they give anything as
7    security for the money that they receive?
8       A.   That's not the structure of a
9    repo.
10      Q.   Is collateral involved at all in
11   the structures of repos?
12      A.   No.
13      Q.   What about the repo that was with
14   the Fed, was collateral pledged as security?
15      A.   No.
16      Q.   Was collateral given to the Fed?
17      A.   That's not the structure of a repo
18   transaction.
19      Q.   What is the structure of a repo
20   transaction?
21      A.   As I described previously.
22      Q.   Could you say it again, then?
23           THE WITNESS: Can you read it
24   back.
25           MR. STERN: Francis, it's about 30

Page 39

1       J. SEERY - HIGHLY CONFIDENTIAL
2    lines ahead.
3           MS. TAGGART: Ah, I see. You
4    don't need to.
5       Q.   What did you mean by the first
6    party selling assets to the second? How does
7    that happen?
8       A.   The first party grants to the
9    second party the right to purchase certain
10   assets. The second party executes that right
11   and takes ownership of those assets.
12      Q.   Have you heard the term "haircut"?
13      A.   Yes.
14      Q.   And what does the term haircut
15   mean in the context of repo transactions?
16      A.   The haircut is the difference
17   between the value of the assets conveyed and
18   the price paid for those assets.
19      Q.   And generally in repo transactions
20   is the -- are assets given that are at a
21   higher value than the price that is paid?
22           MR. STERN: Objection to the form.
23   You can answer.
24      A.   Yes.
25      Q.   How's the amount of the haircut

Page 40

1       J. SEERY - HIGHLY CONFIDENTIAL
2    generally determined in repo transactions?
3       A.   There is no general way to
4    determine the haircut in a repo transaction.
5       Q.   Why is that?
6       A.   Because it depends on the assets.
7    Depends on the market. Depends on the
8    participants.
9           Now, when you talk about repo
10   transactions just so we're clear -- and what
11   you asked me about is you asked me about repo
12   transactions generally. There are thousands
13   of different kinds of repo transactions.
14      Q.   Okay. Well, let's --
15      A.   They could be range -- a pawn
16   arrangement could be described as a repo
17   transaction if you wanted to show the document
18   in such a way.
19      Q.   Okay.
20      A.   And then other ways to finance the
21   firm's positions.
22      Q.   What about in repo transactions
23   with the Fed? Is there a general procedure
24   for determining the amount of the haircut?
25      A.   I don't know that repo

Page 41

1       J. SEERY - HIGHLY CONFIDENTIAL
2    transactions with the Fed are generally done.
3       Q.   Okay. Well, let's focus on the
4    repo transaction that was done with the Fed.
5           First of all, what was your
6    involvement in -- let's start with setting up
7    the repo transaction that Lehman did with the
8    Fed.
9       A.   I had none.
10      Q.   Do you know when it was set up?
11      A.   No.
12      Q.   When was the first time that you
13   became aware of it?
14      A.   The week of the 15th.
15      Q.   And how did you become aware of
16   it?
17      A.   The prior week when we were down
18   at the Fed the Fed was very concerned with the
19   repo market for financing securities firms and
20   banks. Subsequent to Lehman's filing some of
21   their fears were confirmed and the repo market
22   began to fall apart. My understanding is that
23   the Fed stepped in and became a repurchase
24   agreement participant in order to fund Lehman
25   Brothers' position and maybe the positions of

Page 42

```
1          J. SEERY - HIGHLY CONFIDENTIAL
2    other firms. I don't know.
3        Q.  Do you know the price that was
4    paid in the repo transaction?
5        A.  No.
6        Q.  Do you -- were you at all
7    involved -- or do you know what collateral was
8    sold to the Fed as part of the repo
9    transaction?
10        A.  No.
11        Q.  What was your involvement after
12    learning of the transaction generally
13    regarding this repo transaction with the Fed?
14            MR. STERN: Objection to the form.
15        A.  I don't understand your question.
16        Q.  After you learned -- were you at
17    all involved in anything related to the Fed
18    repo transaction?
19        A.  No.
20        Q.  Did you have any discussions with
21    anyone at Lehman related to the Fed repo
22    transaction?
23        A.  I believe I did.
24        Q.  Whom did you have discussions
25    with?
```

Page 43

```
1          J. SEERY - HIGHLY CONFIDENTIAL
2        A.  I believe I discussed it with Alex
3    Kirk, Paolo Tonucci. And there may be others.
4        Q.  And what topics were you
5    discussing with them?
6        A.  Generally how to take the Fed out
7    of its repo position.
8        Q.  And what was said on that topic?
9        A.  The Fed made clear before the
10    filing, and I understand subsequent to the
11    filing, that it did not intend to finance
12    Lehman Brothers.
13            Before the filing they made very
14    clear that they wanted us to file and they
15    wanted out of their funding of any Lehman
16    positions.
17            And during that week my
18    understanding, although I did not have the
19    conversations directly, is they reiterated the
20    positions that they took on Sunday the 14th
21    and demanded to be taken out of their repo.
22        Q.  I'll probably turn back to this
23    Fed repo transaction but let's just stay with
24    the 15th.
25            Did you do anything else —
```

Page 44

```
1          J. SEERY - HIGHLY CONFIDENTIAL
2    discuss the Fed repo transaction at all on the
3    15th?
4        A.  I don't recall.
5        Q.  What did you do relating to
6    valuing the capital when you were considering
7    how to finance the firm on September 15th?
8        A.  I don't understand the question.
9        Q.  I think when you were describing
10    your activities on the 15th under the topic of
11    I considered how to finance the firm, one
12    issue related to financing positions was to
13    obtain capital support and the value of the
14    capital.
15            Do you know when you meant related
16    to your activity related to the value of the
17    capital?
18        A.  If I said something about the
19    value of capital, I misspoke. I don't believe
20    I said that.
21        Q.  What were the clearing bank issues
22    that you were dealing with on the 15th?
23        A.  We had significant concern that
24    JPMorgan, and to a lesser degree Citibank,
25    perhaps State Street, would not act as our
```

Page 45

```
1          J. SEERY - HIGHLY CONFIDENTIAL
2    clearing bank and clear trades.
3        Q.  What did you do related to that?
4        A.  Considered ways to expedite a
5    transaction so that the firm wouldn't fall
6    apart.
7        Q.  And you mean expedite a
8    transaction such as a transaction with
9    Barclays?
10        A.  That would have been one way, yes.
11        Q.  What are the other ways that you
12    were considering dealing with this issue
13    relating to the clearing bank?
14        A.  Maybe we could find another
15    clearing bank.
16        Q.  Did you think that you were able
17    to find another clearing bank?
18        A.  No. You can't find another
19    clearing bank.
20        Q.  Why not?
21        A.  It's far too complicated a
22    relationship to put together in a day or two.
23    There aren't many clearing banks. And while
24    they act as financial intermediaries to make
25    the entire system -- financial system work,
```

Page 46

1        J. SEERY - HIGHLY CONFIDENTIAL
2    they're not regulated as such so they're
3    allowed to do whatever they want subject to
4    their contracts.
5        Q.   And why did you think that
6    JPMorgan was going to stop clearing trades?
7        A.   I was told that they were failing
8    to clear trades.
9        Q.   What impact would it have on
10   Lehman Brothers' business if its clearing bank
11   failed to clear trades?
12       A.   There wouldn't be a business.
13       Q.   Why not?
14       A.   Because counterparties count on
15   being able to trade with you, count on the
16   sanctity of that trade, when they say it's
17   done that it is in fact done, and take other
18   financial actions related to the trade that
19   they engaged in. So if the trade is not
20   cleared that implicates all of their other
21   positions and their other actions.
22       Q.   Let's go back to the 15th. You
23   were describing your activities and they were
24   general categories of you were doing
25   activities related to keeping the firm

Page 47

1        J. SEERY - HIGHLY CONFIDENTIAL
2    together and considering how to finance the
3    firm.
4        Were there other activities that
5    you were involved with on the 15th?
6        A.   I think that general description
7    is sufficient.
8        Q.   Were you at all involved in
9    negotiations with Barclays related to a
10   potential transaction? Still staying on the
11   15th.
12       A.   Yes.
13       Q.   In what way were you involved?
14       A.   I believe on that date -- and my
15   dates might be slightly off -- on that date we
16   were discussing the structure of a
17   transaction, how you could accomplish a
18   transaction swiftly before the firm collapsed,
19   and how to finance the transaction between
20   agreement and closing.
21       Q.   Tell me everybody at Lehman that
22   you had discussions with on the 15th that
23   related in any way to negotiations with
24   Barclays.
25       A.   Around approximately that date --

Page 48

1        J. SEERY - HIGHLY CONFIDENTIAL
2    and, again, the days all ran together as they
3    were basically 24-hour days -- the names that
4    I previously gave you which were Kirk, McDade,
5    Berkenfeld, Shafir, Shapiro, were the key
6    senior people. Tonucci. Lowitt. Those were
7    the key senior people and obviously -- or
8    maybe not so obviously, I had numerous and
9    constant discussions with the people who
10   worked with or for me in various parts of the
11   firm.
12       Q.   Did you speak directly with anyone
13   at Barclays related to negotiations?
14       A.   When?
15       Q.   Let's stay on the 15th.
16       A.   Again, in the first part of that
17   week, without being firm that it's the 15th, I
18   certainly had negotiations with Van Zijl.
19   Discussions with LaRocco. Some discussions
20   with Keegan. And their various team members.
21       Q.   What were the topics that you
22   discussed with Van Zijl?
23       A.   How Van Zijl was limited to the
24   DIP.
25       Q.   What about with LaRocco?

Page 49

1        J. SEERY - HIGHLY CONFIDENTIAL
2        A.   The DIP and general transaction
3    structure.
4        Q.   What in particular was discussed
5    related to transaction structure between you
6    and LaRocco?
7        A.   The DIP timing. Structure of an
8    asset sale. How a 363 sale of assets would
9    work in the bankruptcy court. How we would
10   continue to stay in business to make sure
11   there was a business that we could deliver at
12   closing.
13       Q.   Did you have any discussions with
14   Mr. LaRocco regarding the value of assets that
15   Lehman had or would convey?
16       A.   Not in that first part of the week
17   that I recall, no.
18       Q.   What were the topics that you
19   discussed with Mr. Keegan?
20       A.   In the early part of the week very
21   limited. I don't -- actually don't remember.
22   I'm not sure that Mike was there in that first
23   two days.
24       Q.   In those first two days, any other
25   discussions with anyone at Barclays?

Page 50

1    J. SEERY - HIGHLY CONFIDENTIAL
2    A.   No.
3    Q.   Now, in these first two days --
4    and maybe it's easier if we have a time period
5    that it -- you know, was there a time that
6    there became a written agreement between
7    Barclays and Lehman?
8    A.   Yes, there was a time there became
9    a written agreement.
10    Q.   Let's mark -- actually, this is
11    already a marked exhibit so I'll...
12         I've put before you a document
13    that's been marked Exhibit 1 previously and is
14    called an Execution Copy of Asset Purchase
15    Agreement among Lehman Brothers Holdings,
16    Inc., others, and Barclays Capital dated
17    September 16th, 2008.
18         Do you recognize this document?
19    A.   I do.
20    Q.   And what is it generally?
21    A.   It is an Asset Purchase Agreement
22    among Lehman Brothers Holdings, Inc., Lehman
23    Brothers, Inc., LB745, LLC and Barclays
24    Capital, Inc.
25    Q.   Okay. For now let's just use this

Page 51

1    J. SEERY - HIGHLY CONFIDENTIAL
2    as the time frame and I want to talk -- when I
3    now ask questions about your activities it's
4    leading up until this Asset Purchase Agreement
5    is first executed.
6         Were you involved in providing
7    information to the negotiations team that led
8    up to this asset purchase agreement?
9    A.   Was I in -- I'm trying to
10    understand the question. Was I involved in
11    providing information to the --
12    Q.   To the Lehman negotiation team
13    related to this transaction.
14    A.   I certainly discussed aspects of
15    the business with the team members and those
16    discussions related to this agreement.
17    Q.   What were the topics that you were
18    discussing with team members related to the
19    transaction?
20    A.   Generally how to deliver the
21    franchise or business to the buyer.
22    Q.   What did you say on that topic?
23    A.   That we needed the get it done
24    very, very quickly. That we needed to remain
25    in business pending the closing. That we had

Page 52

1    J. SEERY - HIGHLY CONFIDENTIAL
2    to have sufficient financing both with respect
3    to positions and day-to-day operations to keep
4    the business going.
5    Q.   Anything else?
6    A.   I don't recall.
7    Q.   Did you discuss what assets were
8    available to be part of a transaction?
9    A.   Just generally the assets required
10    to operate the business.
11    Q.   And what were the categories of
12    assets that you were discussing that you
13    believed were required to operate the
14    business?
15    A.   Generally the physical, tangible
16    assets that you need to operate the business.
17    Some of the intangible assets, as well as the
18    positions that you needed.
19    Q.   Give me an example of an
20    intangible asset that you would be discussing.
21    A.   Trademark.
22    Q.   What did you discuss related to
23    the positions in regard to assets that would
24    be part of a potential transaction?
25    A.   Generally that you needed to have

Page 53

1    J. SEERY - HIGHLY CONFIDENTIAL
2    positions to be open for business and continue
3    to trade with the customers that you put those
4    positions on with.
5    Q.   Whom did you discuss this topic
6    with, being the positions that might be needed
7    to be part of a transaction?
8    A.   Generally with Berkenfeld,
9    Shapiro, Shafir.
10    Q.   Did you provide any infor -- did
11    you gather any data during this time leading
12    up to the asset purchase agreement?
13    A.   I think I generally described
14    previously gathering a myriad of data for
15    various purposes. So the answer to that
16    question would be yes.
17    Q.   Well, from the time of the
18    bankruptcy until the asset purchase agreement
19    what data did you provide to anybody at either
20    Lehman's or Barclays related to a potential
21    transaction?
22    A.   General discussions regarding the
23    market, treatment of our business in the
24    market, employee issues, customer issues.
25    That's about it.

Page 54

1      J. SEERY - HIGHLY CONFIDENTIAL
2      Q.   Did you provide any information
3   related to the marks for any of the positions
4   that Lehman had?
5      A.   We continued to mark our book on a
6   daily basis.
7      Q.   And what do you mean by you
8   continued to mark the book on a daily basis?
9      A.   We stayed abreast of the market
10  and if there were changes in the market we
11  changed the marks of our positions.
12     Q.   And was there ever a time that
13  Lehman Brothers stopped marking its books
14  until the transaction with Barclays?
15     A.   I don't know.
16     Q.   How do you know that Lehman
17  continued to mark the books on a daily basis?
18     A.   The marks that I was responsible
19  for continued to be updated.  I really can't
20  speak to anybody else's marks.
21     Q.   Which marks were you responsible
22  for?
23     A.   I previously described the loan
24  book and those positions.
25     Q.   And did you continue to believe

Page 55

1      J. SEERY - HIGHLY CONFIDENTIAL
2   that the marks that Lehman had on the book for
3   the marks that you were responsible at least
4   were accurate?
5      A.   Yes.
6      Q.   And did you continue to mark the
7   positions for the ones that you were
8   responsible for related to loan positions by
9   either the current market price or the good
10  faith estimate of where the asset would trade
11  under a reasonable period of time?
12     A.   Yes.
13     Q.   Did you continue to use the same
14  method that was used before LBHI declared
15  bankruptcy?
16     A.   Yes.
17        MS. TAGGART:  Why don't we just
18     take a short break.
19        MR. STERN:  Fine.
20        MS. TAGGART:  Five or ten.
21        (Recess taken.)
22  BY MS. TAGGART:
23     Q.   What time of day did Lehman mark
24  its books?
25     A.   There wasn't a specific time.

Page 56

1      J. SEERY - HIGHLY CONFIDENTIAL
2   They were marked throughout the day and
3   checked at the end of the day.
4      Q.   What about on Monday, the 15th?
5   Was that also true that they were marked
6   throughout the day and then checked at the end
7   of the day?
8      A.   I don't know.  It was a hectic
9   day.
10     Q.   Were you involved at all in
11  providing information about the current marks
12  to the negotiation team for any of the assets?
13     A.   Not that I recollect.
14     Q.   Have you ever heard the term book
15  value?
16     A.   Yes.
17     Q.   What does that mean?
18     A.   It's the amount -- the value of an
19  asset on someone's books.
20     Q.   What's the relationship between
21  the marks that Lehman was making on this daily
22  basis and the book value of an asset?
23     A.   I'm not an accountant but they
24  should have been really the same.  The book
25  value would be the value -- normally the book

Page 57

1      J. SEERY - HIGHLY CONFIDENTIAL
2   value is determined as the amount you pay for
3   an asset less any impairment charges you've
4   taken against it or increased by any gains
5   with respect to the value of that asset.
6   Usually the impairments and the gains would be
7   put in a different section of the asset or
8   liability side of the balance sheet.
9      Q.   Now, you said that you knew that
10  Lehman was marking the books for ones that you
11  were in charge of.  Was that in the fixed
12  income loan area?
13     A.   Yes.
14     Q.   And you'd mentioned earlier a
15  number of products that were under the fixed
16  income loan area.  Do you know if Barclays
17  ended up purchasing any of those assets that
18  were under your purview of the fixed income
19  loan area?
20     A.   Yeah.  It's just called the loan
21  area.  It would be easier.  Fixed income was
22  again the division I worked in.
23        The question, did they purchase
24  assets related to the loan business?
25     Q.   Did they purchase any of the

15  (Pages 54 to 57)

Page 58

1      J. SEERY - HIGHLY CONFIDENTIAL
2   products that were under the loan area?
3      A.   They purchased the business. I
4   think you're getting at did they purchase
5   positions.
6      Q.   Okay. Did they purchase any of
7   the positions that fell under the loan area?
8      A.   I don't believe they purchased any
9   of the positions in the loan business.
10      Q.   Do you know why not?
11      A.   Do I know why not. No, I don't
12   know why not.
13      Q.   Were you involved in any of the
14   private equity positions on the 15th and 16th?
15      A.   No.
16      Q.   What other activities were you
17   involved in related to the Barclays
18   negotiation before the signing of the APA?
19      A.   I think I've generally described
20   all of them.
21      (Pause on the record.)
22      Q.   So I've put before you a document
23   that previously has been marked as Exhibit 19
24   and it's dated 9/16/2008. Have you ever seen
25   this document before?

Page 59

1      J. SEERY - HIGHLY CONFIDENTIAL
2      A.   I believe I have.
3      Q.   Do you know -- what is it?
4      A.   It is a one-page simple,
5   high-level asset and liability statement.
6      Q.   What was the first time you saw
7   it?
8      A.   During the week of September 15th.
9      Q.   Who gave it to you?
10      A.   I don't recall.
11      Q.   Did you see early iterations of
12   this?
13      A.   I don't know if they were earlier
14   or later. I've seen multiple iterations of
15   this document.
16      Q.   Did you contribute to making this
17   document or documents like it?
18      A.   I'm not quite sure how to answer
19   your question. If you are asking did I
20   anything to do with providing information that
21   may have been used in this document, I think I
22   did. I can't say whether I actually had an
23   impact on any particular number on this
24   document. I did not type this document up or
25   give any of these numbers directly.

Page 60

1      J. SEERY - HIGHLY CONFIDENTIAL
2      Q.   What information did you provide
3   that may have been used in making the document
4   in Exhibit 19?
5      MR. STERN: Objection to the form.
6      A.   I generally provided information
7   regarding the structure of the transaction,
8   how to -- you know, why you had to have
9   liabilities offsetting positions, the
10   volatility of the market which was extreme.
11   And I may have had a discussion about one or
12   two items. I can't recall.
13      Q.   What information did you provide
14   regarding the structure of the transaction?
15      A.   I think I previously said that
16   regarding the structure you needed to transfer
17   assets that would enable to business to run.
18   That would also encompass liabilities.
19      Q.   Why is it your understanding that as
20   part of the transaction it was intended that
21   Barclays would continue to run the business
22   after the transaction?
23      A.   Yes.
24      Q.   And that as -- in that transaction
25   then Barclays needed whatever assets it needed

Page 61

1      J. SEERY - HIGHLY CONFIDENTIAL
2   to continue to run the business after it
3   purchased these parts of Lehman.
4      A.   Yes.
5      Q.   And then what did you mean by you
6   provided information about what liability has
7   to offset positions?
8      A.   The assets that are transferred
9   are not of static value. That's particularly
10   true -- so as I described how my positions
11   were marked on a daily basis, every asset on
12   this sheet and every liability on this sheet
13   changes every day and virtually every hour of
14   every trading day. So this is not -- this is
15   a snapshot of a fluid book of business.
16      Q.   So what did you mean by
17   liabilities have to offset positions?
18      MR. STERN: Objection to the form.
19      A.   Asset values change up or down.
20   Liabilities related to those assets change up
21   or down.
22      Q.   What generally are the types of
23   liabilities that were associated with assets
24   that would be reflected on Exhibit 19?
25      A.   They're listed here as -- I

Page 62

1　　　　J. SEERY - HIGHLY CONFIDENTIAL
2 believe these are set forth as short positions
3 for these collateralized short-term funding as
4 well as derivatives, equities, governments.
5　　　Q.　What are short positions?
6　　　A.　A short is a position where you
7 sell an asset without actually owning it. And
8 you borrow the asset in order to complete your
9 short trade but you owe that asset in the
10 future.
11　　　Q.　Any further information that you
12 provided related to liabilities offsetting
13 positions?
14　　　A.　I certainly discussed some of the
15 positions regarding the liabilities. I don't
16 know if I directly contributed to the number
17 that's on the sheet.
18　　　Q.　What did you discuss related to
19 positions related to liabilities?
20　　　A.　I was involved in some discussions
21 regarding the cure payment which is listed at
22 the bottom of the liabilities.
23　　　Q.　Whom did you discuss cure payment
24 with?
25　　　A.　I don't recall directly.

Page 63

1　　　　J. SEERY - HIGHLY CONFIDENTIAL
2　　　Q.　What did you discuss related to
3 cure payment?
4　　　A.　What the cure payment is and what
5 the types of contracts that might have to be
6 cured and how we would come up with an
7 estimate of what that amount could be.
8　　　Q.　And what is a cure payment?
9　　　A.　In connection with the assignment
10 assumption of contracts under the bankruptcy
11 code the debtor is required to cure all
12 defaults under the contract before it can be
13 assigned.
14　　　Q.　And what did you discuss or
15 provide information relating to how to come up
16 with an estimate of what the cure payment
17 would be?
18　　　A.　We had looked at payables with
19 regard to the DIP to come up with an estimate
20 of the amount of money we would need for a DIP
21 financing. And we generally discussed what
22 portion of those might be attributable to
23 executory contracts that were necessary to run
24 the business. And how -- and how those --
25 that amount would be part of the transaction

Page 64

1　　　　J. SEERY - HIGHLY CONFIDENTIAL
2 to cure any shortfalls in order to assign
3 those contracts to the buyer.
4　　　Q.　Did you provide information that
5 went into the actual number here? Meaning
6 there's a line here --
7　　　A.　Did I show specific numbers, I
8 don't recall. I don't think so. I wasn't the
9 controller or treasurer.
10　　　Q.　Do you know one way or another
11 whether the number that's reflected on
12 Exhibit 19 of 225 under Cure Payment is
13 consistent with the cure payment calculations
14 that Lehman came up with as part of the
15 process that you described?
16　　　A.　I believe that that is in the
17 neighborhood of the numbers that we came up
18 with.
19　　　Q.　And who was involved in coming up
20 with the numbers?
21　　　A.　Various people in the treasury and
22 accounting groups at Lehman.
23　　　Q.　And who was this information
24 reported to that was part of -- any part of
25 the negotiation team or somebody putting

Page 65

1　　　　J. SEERY - HIGHLY CONFIDENTIAL
2 together this number?
3　　　A.　Generally -- and I don't have the
4 specific recollection of an actual
5 conversation -- but generally to Berkenfeld,
6 Shafir and Shapiro, who were handling the
7 assembly of the information for the asset
8 purchase agreement.
9　　　Q.　Did you see documents that were
10 the results of this process?
11　　　A.　Of which process?
12　　　Q.　Of trying to estimate the cure
13 payment.
14　　　A.　I don't recall if it was in
15 connection with the cure payment or the DIP
16 but I certainly saw documents that shows
17 Lehman's payables.
18　　　Q.　Did you see the documents that
19 went into the estimate that eventually I
20 suppose arrived at the 225 cure payment's that
21 here?
22　　　A.　I don't recall specifically the
23 documents that would have come up with that
24 number but, as I said, between the DIP and
25 this document I certainly considered and saw

Page 66

1          J. SEERY - HIGHLY CONFIDENTIAL
2    documents that related to Lehman's payables.
3        Q.    Was that -- the process that you
4    described about a possible way of estimating
5    what the cure payments would be, did Lehman
6    actually go through that process?
7        A.    I believe we did, yes.
8        Q.    And did anybody report the results
9    of the process to you in particular?
10       A.    No.
11       Q.    Who did they report the results of
12   that process to?
13       A.    I don't know specifically.
14       Q.    When you said that it's in the
15   neighborhood of numbers that you were aware
16   of, what was your knowledge based on of what
17   that number was?
18       A.    The payables that I'd previously
19   seen and an estimate of the portion of those
20   payables that related to outstanding executory
21   contracts.
22       Q.    Did you provide any other
23   information or data that went into any
24   specific numbers that are listed on
25   Exhibit 19?

Page 67

1          J. SEERY - HIGHLY CONFIDENTIAL
2        A.    No.
3        Q.    What is your understanding of what
4    numbers are reflected here on -- as the
5    numbers next to assets on this column?
6        A.    The snapshot mark value of those
7    assets and the snapshot mark liability of the
8    value of the liabilities.
9        Q.    Did you ever discuss with anyone
10   what those numbers referred to?
11            MR. STERN:  Objection to the form.
12       A.    I don't really understand the
13   question.  If you're asking me do I have an
14   idea what those numbers refer to, the answer
15   is yes.
16       Q.    Let's start with did you discuss
17   with anyone what the numbers refer to.  First
18   did you have an understanding perhaps --
19       A.    I wouldn't need to discuss it so I
20   don't recall discussing -- when someone puts
21   government and agency 40 billion next to it
22   someone doesn't have to tell me that the 40
23   billion relates to government and agency
24   because I can read it.
25       Q.    And so what is your understanding

Page 68

1          J. SEERY - HIGHLY CONFIDENTIAL
2    of what the numbers refer to?
3        A.    I think I gave that already.
4        Q.    And that's the snapshot of the
5    mark value of those assets?
6        A.    Yes.
7        Q.    Is it your -- was it your
8    understanding at the time that the numbers
9    listed on Exhibit 19 related to the mark value
10   of the assets that Lehman was making for those
11   assets?
12       A.    Can you say that again?
13       Q.    Sure.  Maybe you could describe
14   what you mean by mark value of those assets.
15       A.    I previously described how the
16   loan book was marked.  I'm now shown a sheet
17   that shows assets and liabilities with a value
18   next to them.  I believe all of Lehman's books
19   were marked in a similar fashion.  And those
20   value would reflect -- those values that are
21   listed on this sheet would reflect the marks
22   related to those assets and liabilities as
23   kept on Lehman's balance sheet at the time
24   this snapshot was taken.
25       Q.    And do you know one way or another

Page 69

1          J. SEERY - HIGHLY CONFIDENTIAL
2    whether the number that's the total under
3    assets is accurate as far as a snapshot of the
4    mark value of those assets at the time?
5            MR. STERN:  Objection to the form.
6        A.    I don't know -- I don't know if it
7    is or not.
8        Q.    Are any of the positions that you
9    dealt with in the loan group, any of those
10   values reflected on this document?
11       A.    No.
12       Q.    Do you know how any of the
13   particular numbers were arrived at on the
14   asset valuation for any of these particular
15   categories?
16       A.    No.
17       Q.    Do you know the process that was
18   being used to gather information about the
19   value of these positions that are reflected on
20   Exhibit 19?
21       A.    No.
22       Q.    And did you discuss with anybody
23   the accuracy of any of the values that are
24   reported here under assets, liabilities,
25   putting aside cure which we've already

Page 70

J. SEERY - HIGHLY CONFIDENTIAL

1    discussed.
2    A. Generally, yes.
3    Q. What did you discuss? Or let's
4    start with who did you discuss that question
5    with?
6    A. Berkenfeld, Shafir, Shapiro. At a
7    subsequent time, Kirk.
8    Q. Okay. And what did you discuss
9    with Berkenfeld, Shafir, and Shapiro regarding
10    the values that were attributed on Exhibit 19?
11    A. That this was a high-level
12    snapshot; that the values were constantly
13    moving; that the market was incredibly
14    volatile and that these snapshots might not be
15    the same if taken at a later time.
16    Q. Who said those things?
17    A. I certainly did.
18    Q. Was there anything else further
19    that Mr. Berkenfeld, Shafir, or Shapiro said
20    on those topics?
21    A. Not that I recall.
22    Q. Anything else that was discussed
23    about the values that are on Exhibit 19?
24    A. Not that I recall.

Page 71

J. SEERY - HIGHLY CONFIDENTIAL

1    Q. Going back to Exhibit 1 which was
2    the asset purchase agreement, could you turn
3    to page 6.
4    A. (Witness complies.)
5    Q. And you'll see there's a
6    definition of purchased assets.
7    A. Um-hum.
8    Q. And let's start with subsection
9    (d) which is government securities, commercial
10    paper, corporate debt, corporate equity,
11    exchange traded derivatives and collateralized
12    short-term agreements with a book value as of
13    the date hereof of approximately $70 billion
14    collectively long positions.
15    First of all, were you involved at
16    all in coming up with the number 70 billion
17    that's listed here?
18    MR. STERN: Objection to the form.
19    A. No.
20    Q. Do you know what it reflects?
21    MR. STERN: Objection to the form.
22    A. I know what it says. I don't know
23    what it reflects.
24    Q. Do you know if it's related at all

Page 72

J. SEERY - HIGHLY CONFIDENTIAL

1    to the numbers that are related on Exhibit 19?
2    MR. STERN: Objection to the form.
3    A. I don't know.
4    Q. Do you know one way or the other
5    whether the $70 billion number here is
6    accurate regarding the book value of the
7    assets being described here?
8    A. I don't know.
9    Q. Then you see under (e), 50 percent
10    of each position in the residential real
11    estate mortgage securities. Were you involved
12    at all in any discussions coming up to the APA
13    regarding residential real estate mortgage
14    securities?
15    A. No.
16    Q. Were you involved in any
17    negotiations that led to that subsection of
18    this document?
19    A. You mean (e) in the hole?
20    Q. (e), the residential real estate
21    mortgage securities.
22    A. No.
23    Q. Okay. Then why don't you turn to
24    page 12 and it's the continuation of the

Page 73

J. SEERY - HIGHLY CONFIDENTIAL

1    section regarding assumption of liabilities.
2    And in particular subsection (i) that's on 12
3    regarding all short positions and repos
4    relating to any securities or interests of the
5    types included in the definition of long
6    positions with a book value as of the date
7    hereof of approximately $69 billion...and it
8    goes on.
9    Did you contribute at all to let's
10    start with the drafting of this?
11    A. No.
12    Q. Did you contribute to the
13    calculation that came up with the $69 billion?
14    A. No.
15    Q. Do you know one way or the other
16    whether that's accurate as describing the book
17    value of the positions described here?
18    A. I don't know.
19    Q. Were you involved in drafting any
20    part of the asset purchase agreement?
21    A. No.
22    Let me just clarify on that last
23    question. I don't recall. I don't think so.
24    I don't recall.

Page 74

J. SEERY - HIGHLY CONFIDENTIAL

1    J. SEERY - HIGHLY CONFIDENTIAL
2        Q.   Do you know if you read it before
3    it was executed?
4        A.   I'm quite sure I read parts of it.
5    I don't recall which parts.  I certainly was
6    around when it was getting negotiated but I
7    did not sit at the table and wordsmith this
8    document.
9        Q.   Were you involved in any
10   negotiations over the price that Barclays was
11   paying that was reflected in the asset
12   purchase agreement?
13       A.   No.
14       Q.   Did you have any discussions with
15   anyone about that, the price that Barclays
16   should pay?
17       A.   The price that Barclays should
18   pay.
19            Not that I recall.
20       Q.   Okay.  After the asset purchase
21   agreement was signed tell me about the next
22   activities that you were engaged in related in
23   any way to the transaction with Barclays?
24       A.   Similar to the previous
25   discussion.  That is keeping the business

Page 75

1    J. SEERY - HIGHLY CONFIDENTIAL
2    together.  Try to deliver that business in
3    accordance with the provisions of the asset
4    purchase agreement and assuring that we could
5    bring the transaction to court and obtain
6    approval to consummate the transaction.
7        Q.   As part of keeping the business
8    together to deliver that business did Lehman
9    continue to comply with its regulatory
10   requirements of marking its books?
11       A.   I don't know.
12       Q.   What about for the loan book that
13   you were dealing with; did Lehman continue to
14   mark its books?
15       A.   I believe we did.  Understanding
16   that it was incredibly volatile and the market
17   was incredibly illiquid and these products --
18   the loan products in particular -- are
19   illiquid.
20       Q.   What do you mean by illiquid?
21       A.   Meaning that there is not ready
22   liquidity to transact at any size at any time.
23       Q.   What did you do relating to
24   assuring that you could bring the transaction
25   to court and get approval?

Page 76

1        J. SEERY - HIGHLY CONFIDENTIAL
2        A.   I did a variety of different
3    things, including trying to make sure that we
4    stayed open for business, that employees
5    didn't leave, that transactions were --
6    outstanding transactions were closed, that we
7    had funding to continue to operate, that we
8    continued to fund our positions.  Those types
9    of activities.
10       Q.   Leaving off -- now let's talk
11   between the signing of the APA and the court
12   hearing.  Were you involved --
13       A.   Which court hearing?
14       Q.   Let's do the court hearing on
15   Friday, September 19th.
16       A.   Okay.  I believe there were court
17   hearings during the week.
18       Q.   Okay.  Were you involved -- did
19   you attend the court hearing that was on the
20   17th?  So that's the Wednesday.
21       A.   Yes.
22       Q.   And what was your role at the
23   court hearing?
24       A.   I believe at the court hearing at
25   the 17th I was one of just a couple of

Page 77

1        J. SEERY - HIGHLY CONFIDENTIAL
2    business people from Lehman there to assure
3    that I could answer any questions regarding
4    the business for our attorneys at Weil and to
5    assure that we properly presented the
6    transaction to the court.
7        Q.   Why did you think it was important
8    to properly present the transaction to the
9    court?
10       A.   Because that's how you get a
11   transaction -- 363 transaction approved,
12   particularly one that required significant
13   speed to get it done.
14       Q.   Who else was providing information
15   to Weil or anyone who was presenting
16   information to the court about the business
17   transaction that you know of?
18       A.   In the court that day or
19   generally?
20       Q.   Generally.  But let's start with
21   providing information that would go to the
22   court for the September 17th hearing.
23       A.   All of the folks that were
24   previously mentioned with the possible
25   exception of Kirk who wasn't really around the

Page 78

1       J. SEERY - HIGHLY CONFIDENTIAL
2   execution of the deal at that point.
3       But certainly everybody else that
4   I mentioned.
5       Q.   Who else attended from Lehman the
6   court hearing on September 17th?
7       A.   I don't recall. I don't believe
8   there were many senior people there. I don't
9   remember if Bart was there -- Bart McDade was
10  there or not.
11      Q.   So now going towards -- from the
12  signing of the APA through the hearing on
13  September 19th, were you involved in any
14  negotiations with Barclays?
15      A.   Yes.
16      Q.   What were the negotiations that
17  you were involved in?
18      A.   There was significant -- or a
19  myriad of negotiations regarding the transfer
20  of the business, how it would be consummated,
21  what the assets were, the financing of
22  Lehman's positions, the types of assets that
23  had to be financed that would be transitioned
24  over as part of the business.
25      Q.   Who at Barclays did you speak to

Page 79

1       J. SEERY - HIGHLY CONFIDENTIAL
2   on those topics?
3       A.   Between, you know, the 17th and
4   the 19th I spoke to -- that I can recall, I
5   spoke to Keegan, LaRocco, Ricci and Mahon.
6       Q.   Could you spell that last one?
7       A.   M-A-H-O-N.
8       Q.   What did you speak with Keegan
9   about?
10      A.   The structure of the transaction.
11  The assets. His concerns regarding the value
12  of those assets.
13      Q.   Anything else?
14      A.   The business. The risk in the
15  business. The volatility of the markets.
16      Q.   What in particular did you say
17  related to assets and concerns regarding the
18  value of assets when you spoke with Mr.
19  Keegan?
20      A.   At various times Mr. Keegan was
21  concerned that the assets may not have been
22  marked appropriately based on the significant
23  volatility in the market at that time. In
24  particular the long assets were subject to
25  significant downward pressure subsequent to

Page 80

1       J. SEERY - HIGHLY CONFIDENTIAL
2   Lehman's filing which caused a general and
3   greatly discussed upheaval in the credit
4   marks.
5       Q.   What did you say on the topic?
6       A.   Generally that we were trying to
7   mark the assets -- I'm sure that the various
8   businesses at Lehman were trying to mark the
9   assets constantly that they were -- the values
10  were moving significantly, that there were
11  transactions -- some transactions still
12  getting done. That the pricing of the assets
13  were subject to, you know, minute-by-minute
14  fluctuation, and that we were trying to
15  deliver all the assets that would be required
16  to get the deal done.
17      Q.   Did you tell him that you thought
18  that the marks, considering the circumstances,
19  were as accurate as they could be with those
20  circumstances?
21      MR. STERN:  Objection to the form.
22      A.   No. I don't recall.
23      Q.   Did you make any changes to the
24  books after talking to Mr. Keegan about his
25  concerns?

Page 81

1       J. SEERY - HIGHLY CONFIDENTIAL
2       MR. STERN:  Objection to the form.
3       A.   I didn't have any authority to
4   make changes to the books.
5       Q.   Do you know if anyone at Lehman
6   made any changes to the books in response to
7   any concern from Barclays about the value that
8   was on those books?
9       A.   Not that I know.
10      Q.   What efforts were you aware of at
11  Lehman in trying to mark assets given these
12  circumstances?
13      A.   Only as I previously described.
14      Q.   Can you restate those? Now I want
15  to know the efforts that Lehman --
16      A.   My business continued to try to
17  mark assets to market on a daily basis. I
18  believe that all of the other businesses tried
19  to do the same but I don't know that they
20  actually did it.
21      Q.   Did you discuss with anyone at
22  Barclays including Mr. Keegan about what type
23  of assets could be conveyed to Barclays in the
24  transaction?
25      MR. STERN:  Objection to the form.

Page 82

1       J. SEERY - HIGHLY CONFIDENTIAL
2       A.   I'm sorry.
3       Q.   Yeah.  Was any of the topics --
4       A.   Just with Barclays?  Barclays
5   people?
6       Q.   Yeah.  Let's start with Barclays
7   people.
8       A.   Okay.  Barclays and Barclays
9   Peabody.  I did discuss it with Keegan.
10      Q.   Okay.  And what did you discuss
11  with Keegan regarding what assets could be
12  conveyed as part of a transaction?
13      A.   That we would continue to try
14  to -- between the 17th and the 19th
15  discussions were to try to put together a
16  relatively matched book of assets, meaning
17  longs and shorts.  And we continued to try to
18  do that.
19      Q.   What's a matched book of assets?
20           MR. STERN:  Objection to the form.
21      A.   Actually withdraw matched book
22  because it wasn't really matched.  A matched
23  book would be longs and shorts related to the
24  same positions.  This wasn't a matched book.
25  This with a balanced book, if you will, for

Page 83

1       J. SEERY - HIGHLY CONFIDENTIAL
2   lack of a letter term meaning you had
3   offsetting short positions designed to offset
4   the long positions that you had.
5       Q.   Did you discuss with anyone at
6   Barclays or Lehman about whether this
7   transaction, that there was a goal of having a
8   balanced book?
9           MR. STERN:  Objection to the form.
10      A.   Not that -- no.  We were trying to
11  deliver the assets to run the business.  There
12  wasn't a requirement that it be balanced
13  necessarily.
14      Q.   So why were you talking about
15  having a balanced book?
16      A.   Because of the volatility in the
17  market that the snapshot that you would take
18  would leave you exposed if you just bought
19  long assets.
20      Q.   Who expressed that opinion?
21      A.   I did.
22      Q.   Anyone else?
23      A.   Not that I recall.
24      Q.   And who did you tell that opinion
25  to?

Page 84

1       J. SEERY - HIGHLY CONFIDENTIAL
2       A.   Certainly I had those discussions
3   with Keegan, Kirk, Creditors Committee.  Weil.
4   Others internal at Lehman.
5       Q.   When did you have discussions with
6   the Creditors Committee on the topic of a
7   balanced book?
8           MR. STERN:  Objection to the form.
9       A.   It wasn't on a balanced book.  It
10  was discussions about the risk of the assets
11  and those discussions went from the 19th --
12  for sure on the 19th, some on the 20th, and
13  significant discussions on the 21st.
14      Q.   We'll return to that in a bit.
15      A.   Actually, pretty significant on
16  the 19th, too, now that I recall.  Before the
17  hearing.
18      Q.   Did anybody from -- that you ever
19  spoke to at Barclays express an opinion
20  whether as part of the transaction there was a
21  goal or intention to have a balanced book?
22      A.   No.
23      Q.   Okay.  Did you have any
24  discussions with anyone at Lehman -- and this
25  is now between the APA and the hearing on the

Page 85

1       J. SEERY - HIGHLY CONFIDENTIAL
2   19th -- about any topic related to the
3   valuation of positions or assets that Lehman
4   was conveying in the transaction?
5       A.   Generally, we discussed the
6   volatility in the market and the impact that
7   volatility would have on the positions that we
8   held that were being funded at first by the
9   Fed and then by Barclays and that were going
10  to be part of the transaction with Barclays.
11      Q.   First, tell me what you mean by
12  there were positions that were held by the Fed
13  that were going to be part of the transaction
14  with Barclays.
15      A.   We previously discussed and you
16  had asked me about repo transactions and the
17  Fed being involved in a repo transaction with
18  Lehman Brothers.
19      Q.   And what's your understanding of
20  what happened with the assets that were
21  pledged to the Fed?  What happened with those?
22      A.   Again, you have to understand that
23  the book is a very fluid book.  It's not a
24  fixed set of assets.  So what's repoed on
25  Monday might not be the same assets and

Page 86

J. SEERY - HIGHLY CONFIDENTIAL

1  unlikely to be the same assets that are repoed
2  on Tuesday.
3        The Fed carried that repo from
4  sometime prior -- from the prior week in
5  through the beginning of the week, and as I
6  previously testified had made very clear to us
7  that it wanted out of its financing position.
8  And the risk of a party that wants out is if
9  you can't take them out they can foreclose you
10 out.
11       Barclays agreed to step into the
12 funding of the positions that otherwise would
13 have gone to the Fed. The positions, as I
14 said, though, were very fluid.
15    Q.    Okay. So what happened to the
16 positions that were part of the Fed
17 transaction once Barclays stepped into the
18 shoes of the Fed?
19    MR. STERN: Objection to the form.
20    A.    Again, it's categories of
21 positions. It's not the actual positions.
22 Some may be the same. Some may not. And I
23 think I just said that Barclays agreed to step
24 up and fund what otherwise would have been

Page 87

J. SEERY - HIGHLY CONFIDENTIAL

1  funded by the Fed.
2     Q.    What was your role in that
3  transition from the -- of Barclays stepping
4  into the shoes of the Fed?
5     A.    I didn't really have one. That
6  was done by treasury. Meaning Lehman's
7  treasury.
8     Q.    Were you involved at all in
9  valuing any of the assets that were -- let's
10 start with the assets that were a part of the
11 Fed transaction.
12    A.    No.
13    Q.    Were you involved in ever valuing
14 any of the assets that went over to Barclays
15 as part of Barclays stepping into the shoes of
16 the Fed?
17    A.    I was involved in certain of the
18 assets that Barclays was considering funding
19 in relation to the repo transaction. I didn't
20 provide valuations but I gave general view of
21 some of the assets.
22    Q.    Okay. What assets were those?
23    A.    Specifically there was a Racers --
24 what we called the Racers trust which was an

Page 88

J. SEERY - HIGHLY CONFIDENTIAL

1  asset that I believe was not in the Fed repo
2  but was in the clearing box that JPMorgan
3  sought to put to Barclays as part of a repo
4  transaction, not necessarily the Fed repo
5  transaction. And I was asked about those
6  assets.
7     Q.    Who asked you?
8     A.    John Mahon.
9     Q.    Is that the one I had you spell
10 before?
11    A.    Yes. I think we normally say
12 Mahon or Mahon. But he likes Mahon.
13    Q.    And when did you speak with Mr.
14 Mahon on that topic of the Racers?
15    A.    I don't recall if it was Wednesday
16 night or Thursday night.
17    Q.    And what did you say on the topic
18 of the Racers?
19    A.    That I didn't believe that was an
20 appropriate security that would have been put
21 into the Fed and I didn't believe that it
22 actually had been. But I didn't really know.
23    Q.    And why did you think that it
24 wasn't an appropriate security?

Page 89

J. SEERY - HIGHLY CONFIDENTIAL

1     A.    It initially had been rated a lot
2  higher. But a lot of the assets that were in
3  that trust had degraded over time.
4     Q.    How did you know that?
5     A.    I recognized the assets.
6     Q.    What kind of assets were they?
7     A.    They were various type of loan or
8  bond type assets.
9     Q.    What did Mr. Mahon say on the
10 topic?
11    A.    I don't recall.
12    Q.    How did you learn that JPMC was
13 seeking to put them into some sort of repo
14 transaction with Barclays?
15    A.    JPMorgan?
16    Q.    Yes.
17    A.    Okay. And repeat the question
18 again.
19    Q.    Yeah. How did you learn that
20 JPMorgan was seeking to put Racers Trust as
21 part of a repo transaction with Barclays?
22    A.    Mahon called me and asked -- and I
23 believe he was in London. And asked me about
24 various assets, most of which were either --

Page 90

1   J. SEERY - HIGHLY CONFIDENTIAL
2   that were not easily identifiable to see
3   whether I knew what they were and whether they
4   were regular, if you will, repo tran --
5   assets.
6       Q.   What happened with the Racers?
7       A.   I believe it stayed in the
8   JPMorgan clearing box where it started.
9       Q.   What's a clearing box?
10      A.   There's a complicated arrangement
11  that governs how securities firms often
12  finance themselves and clear trades.  That is
13  a -- relates to a clearing bank that acts on
14  behalf of the firm to settle trades and then
15  finance the positions on a nightly basis with
16  the Street.  The clearing box is a term used
17  to describe the place where your assets are
18  held either when they're not in repo
19  overnight, or if they're not -- that's fine.
20  Where they're not subject to a repo.
21      Q.   Did you discuss any other
22  categories of assets with Mr. Mahon?
23      A.   I don't recall.
24      Q.   Did you ever discuss residential
25  mortgage-backed securities with anybody

Page 91

1   J. SEERY - HIGHLY CONFIDENTIAL
2   related --
3       A.   Not that I recall.
4       Q.   Or RESIs?
5       A.   I know what residential
6   mortgage-backed securities are but I don't
7   recall having that discussion.
8       Q.   Okay.  Anything else -- or
9   conversations that you had with anybody
10  regarding the assets that were ultimately
11  transferred to Barclays when Barclays took
12  over for the Fed?
13      MR. STERN:  Can I hear the
14  question back, Francis.
15      (Record read.)
16      MR. STERN:  Objection to the form.
17      A.   When?
18      Q.   Let's go from the signing of the
19  APA until the court hearing.
20      A.   I had various discussions
21  regarding the assets that were funded by
22  Barclays with numerous people including the
23  Barclays folks which would be Keegan and
24  LaRocco.  Some other discussions with Mahon.
25  Numerous discussions with Lehman personnel

Page 92

1   J. SEERY - HIGHLY CONFIDENTIAL
2   which would include all the previously
3   mentioned, and by this time for certain Kirk.
4   Numerous discussions with Weil Gotshal.
5   Numerous discussions with Creditor Committee
6   representatives including representatives from
7   Houlihan Lokey and Milbank Tweed.
8       Q.   What were the topics that you
9   discussed with those people regarding the
10  assets that were funded by Barclays?
11      A.   That assets -- generally that
12  assets were in -- being funded in a repo
13  format.  That those assets were part of the
14  business.  That the values were volatile.  The
15  market was volatile and the values were
16  shifting.  That the repo would be used as part
17  of the transaction to close the trade with
18  Barclays.
19      Q.   When did you learn that the repo
20  was going to be used as part of the
21  transaction to close the trade with Barclays?
22      A.   I don't recall specifically.
23      Q.   Do you know who told you or how
24  you learned?
25      A.   I don't recall.

Page 93

1   J. SEERY - HIGHLY CONFIDENTIAL
2       Q.   And what do you mean that the repo
3   was going to be used as part of the
4   transaction to close the trade?
5       MR. STERN:  Objection to the form.
6       A.   The repo -- the assets that were
7   going to be transferred with the business,
8   meaning the positions that were going to be
9   transferred with the business, were financed
10  through a repo structure.  And that in order
11  to transfer those assets to Barclays as part
12  of the business, one had to either refinance
13  the repo with another party or get Barclays to
14  finance the repo.  Barclays financed the repo
15  that week.
16      Q.   Did you have any discussions on
17  which assets in particular could be
18  transferred from what was part of the Fed
19  transaction to the Barclays transaction?
20      A.   Other than the previously
21  described Racers I don't recall specific
22  transact -- discussions.
23      Q.   Okay.  And as part of these
24  discussions with these folks, did you also
25  have discussions about what was the

Page 94

1    J. SEERY - HIGHLY CONFIDENTIAL
2    appropriate way to value the assets that were
3    going to be transferred to Barclays?
4        A.    Other than the market marked
5    values and the discussion regarding Racers,
6    not that I recall.
7        Q.    And what did you have a discussion
8    about the market marked values?
9        A.    That the asset values were fluid
10   and they would have to be continually marked.
11       Q.    Were you part of the process at
12   all in continuing to mark the values of those
13   assets?
14       A.    No.
15       Q.    Do you know if those asset values
16   were continuing to be marked?
17       A.    I don't know.
18       Q.    Did you have any discussions with
19   JPMorgan about any issues related to the repo
20   transaction?
21       A.    I was involved in two sets of
22   discussions with JPMorgan. One was a
23   conversation over the phone in Paolo Tonucci's
24   office with Pauly, Steve Berkenfeld, me, and
25   there were probably ten other people in the

Page 95

1    J. SEERY - HIGHLY CONFIDENTIAL
2    office where the representative from JPMorgan
3    along with some senior folks from JPMorgan
4    were demanding more collateral. And I don't
5    recall if this was -- when this was that week.
6    And we told them they had plenty of collateral
7    and they had to clear our trades. They didn't
8    have the ability to shut us down.
9        Q.    Why did they say they were
10   demanding more collateral?
11       A.    They felt uncomfortable.
12       Q.    And what was Lehman's response to
13   that?
14       A.    You have plenty of collateral.
15   You're well over-collateralized.
16       Q.    And what did JPMorgan do?
17       A.    I think they agreed to disagree
18   and told us they felt bad.
19       Q.    Now, how was that related, if at
20   all, with the repo transactions with Barclays?
21           MR. STERN:  Objection to the form.
22       A.    I don't recall that it was. And
23   then the second set of discussions where I
24   didn't really say much if anything, I don't
25   think I said anything, was at Weil Gotshal on

Page 96

1    J. SEERY - HIGHLY CONFIDENTIAL
2    Sunday, the 21st, which related to separate
3    repo issues and Barclays -- and JP clearing
4    trades as that week started and we were trying
5    to close the transaction.
6        Q.    Did there ever -- I'll come back
7    to Sunday 21st transaction that talked about
8    with JPMC. But before I get there were you
9    involved at all in a process to try to find
10   unencumbered assets or additional collateral
11   to give to Barclays?
12       A.    I was aware of it. I wasn't
13   running around looking for assets.
14       Q.    What was your knowledge about that
15   process?
16       A.    As the -- as we were coming
17   towards the hearing on the 19th, the market
18   volatility was creating significant concern on
19   Barclays' part that the marks might not be
20   accurate because of that volatility and
21   downward pressure on prices; that the size of
22   the transaction had to be considered with
23   respect to the value being ascribed to those
24   assets; and that without sufficient protection
25   in the liabilities as well as -- from the

Page 97

1    J. SEERY - HIGHLY CONFIDENTIAL
2    liabilities, as well as the movement in the
3    value that Barclays would be at significant
4    risk of loss with respect to those positions.
5        So they were demanding that more
6    collateral be posted to give them more
7    protection from market fluctuations.
8        Q.    Whom did you discuss that topic
9    with?
10       A.    Kirk, Lowitt, Tonucci, Keegan.
11       Q.    When did you --
12       A.    Ricci. Those are the general
13   people around the discussions.
14           MR. STERN:  Excuse me.  I don't...
15       Q.    Was this in one meeting or a
16   series of discussions?
17       A.    Series of discussions.
18       Q.    Who at Barclays did you in
19   particular talk to on the topic of their
20   desire for additional assets?
21       A.    Keegan. The others I left off
22   were -- I had a lengthy discussion with the
23   Committee about this action. When I say the
24   Committee the people at the committee that I
25   spoke to were the Houlihan representatives as

Page 98

J. SEERY - HIGHLY CONFIDENTIAL

1    well as the Milbank Tweed representatives.
2         Q.   Okay.  Let's start with your
3    discussions with Keegan.  What specifically
4    did Keegan say on the subject of additional
5    assets that might be needed to be included as
6    part of the transaction?
7         A.   I don't recall specifically.  Mike
8    just generally expressed significant concern
9    regarding the value of the assets and the risk
10   of holding those assets in the size that they
11   were in in a very volatile market.
12        Q.   Was this a discussion just between
13   you and Mr. Keegan or other people as well?
14        A.   There were numerous people
15   involved.  I don't recall the specific meeting
16   or discussion.
17        Q.   Did you in particular say
18   something to Mr. Keegan on that topic?
19        A.   I don't recall.
20        Q.   Okay.  Do you remember anyone from
21   Lehman responding to Mr. Keegan's concern
22   about the value of the asset and the risk
23   holding those assets and the size?
24        A.   Generally, I and others objected

Page 99

J. SEERY - HIGHLY CONFIDENTIAL

1    to his concern and tried to assuage that
2    concern and tell him what's $45 billion among
3    friends.  There's really not -- he shouldn't
4    be that concerned and these were valuable
5    assets that were appropriately marked.  So we
6    negotiated with him.
7         Q.   Do you remember anything a
8    specific person at Lehman said on that topic?
9         A.   No.  Not the specific statements.
10        Q.   Do you remember any more about in
11   what way Lehman objected to that concern?
12        A.   There were significant discussions
13   about Barclays' concern and that we didn't
14   like the fact that they were raising it.  We
15   didn't have other encumbered assets.  Other
16   unencumbered assets.  That we thought that the
17   values were fine and that they were protected
18   by the quality of the assets, the value that
19   they put up against them as well as the short
20   positions.
21        Q.   What do you mean by the quality of
22   the assets?
23        A.   That these were not -- these were
24   assets that could be identified and priced.

Page 100

J. SEERY - HIGHLY CONFIDENTIAL

1         Q.   What do you mean by the -- they
2    were protected by -- I think you said the
3    quality of the assets and the value.  What did
4    you mean by that?
5         A.   The quality -- what did I say
6    exactly?
7              MR. STERN:  The quality of the
8         assets, the value that they put up
9         against them as well, as the short
10        position.
11        Q.   Ah.  What did you mean by the
12   value they put up against them?
13        A.   The amount of money that they had
14   put against the assets.
15        Q.   Amount who had put up?
16        A.   Barclays.
17        Q.   How -- I'm sorry.  But how does
18   that -- how does the amount of money that
19   Barclay put up address their concern about the
20   value of the assets?
21        A.   How would -- they had --
22             MR. STERN:  Objection to the form.
23        A.   You previously asked me about a
24   haircut so they got that.

Page 101

J. SEERY - HIGHLY CONFIDENTIAL

1         Q.   Describe to me what you mean by
2    they were protected because of a haircut that
3    they had previously put up and that they got.
4         A.   Same description I gave you before
5    of a haircut.  They put up less than the
6    marked value of the assets.
7         Q.   So you're referring to earlier
8    when we were discussing a haircut there was an
9    amount of collateral that the value of which
10   is supposed to be higher than the price given
11   in some sort of financing, right?
12        A.   That's correct.
13        Q.   And in what way was there a
14   haircut that was related to the transaction
15   with Barclays?
16        A.   In what way was there -- there was
17   a haircut on the repo.
18        Q.   Meaning that the repo transaction
19   that Barclays was stepping into the shoes of
20   had a haircut where there was -- the value of
21   the collateral that was part of the repo
22   transaction was more than the money that was
23   given?
24        A.   Yes.

Page 102

1    J. SEERY - HIGHLY CONFIDENTIAL
2    Q.  Do you know how much more?
3    A.  No, I don't recall.
4    Q.  And did Barclays end up keeping
5    that haircut?
6        MR. STERN:  Objection to the form.
7    A.  I don't understand the question.
8    Q.  Okay.  Maybe I don't understand
9    what you said.  I think that when you said one
10   of the reasons -- one of the responses to
11   the -- to the concern about the value of the
12   assets was that the value that had been put up
13   against the amount which included the haircut,
14   and I think you said which Barclays got, what
15   did you mean by that?
16   A.  I don't think I said that Barclays
17   got.  I think I said Mike expressed concern
18   about the value of the assets they were
19   holding an ability to close the transaction
20   the way it was currently structured with the
21   volatility in the market.  One of the factors
22   that would mitigate his concern would be the
23   haircut.
24       So between the amount they put up
25   versus the assets, what we described as the

Page 103

1    J. SEERY - HIGHLY CONFIDENTIAL
2    quality of the assets, the other value in the
3    transaction we argued that they were
4    sufficiently protected.  They wouldn't suffer
5    significant risk and loss.
6    Q.  Now, in a normal repo transaction
7    does the person who's doing the financing
8    usually keep the haircut -- keep the excess
9    collateral once the money has been repaid?
10   A.  The -- I think you're jumping
11   ahead too many steps.
12   Q.  Okay.
13   A.  So in a repo transaction I
14   described how the first party sells to the
15   second party and the second party agrees to
16   sell it back.  And that there's a difference
17   between the amount -- the value of the assets
18   that are sold versus the amount -- the
19   purchase price.  And then when they sell it
20   back they repay the amount.
21       But it's a higher amount.  Which
22   includes an embedded charge.
23   Q.  So you refer to the embedded
24   charge as a margin?
25   A.  That would be their margin.

Page 104

1    J. SEERY - HIGHLY CONFIDENTIAL
2    Q.  And the amount -- how does the
3    margin compare to the haircut?
4    A.  There can be, you know, enumerable
5    ways to compare the margin to the haircut.
6    Q.  Is it often that the haircut is in
7    the excess collateral that is given as part of
8    the repo is even more than the margin that
9    will be -- covers even more than the margin
10   amount?
11   A.  The party entering into the repo,
12   the buyer of the assets, should structure the
13   repo so that it has more collateral or more
14   assets than the amount that it pays over plus
15   the margin.
16   Q.  And after the party who took the
17   money and sold the assets pays back the money
18   plus a margin, do they usually get back the
19   excess amount of collateral and assets?
20   A.  They buy all the assets back.
21   Q.  In this transaction which Barclays
22   took over, did Barclays keep all of the
23   collateral that was pledged --
24   A.  The repo transaction is different
25   than how the trans -- the APA closed.

Page 105

1    J. SEERY - HIGHLY CONFIDENTIAL
2    Q.  How is it different?
3    A.  One's a financing transaction.
4    The other is a sale.
5        MR. STERN:  Erica, are you asking
6    Mr. Seery what happens in a default?
7    What happens to the excess collateral in
8    a default scenario?
9        MS. TAGGART:  Well, perhaps my
10   questions aren't clear.
11   Q.  Well, I guess I can ask that.  So
12   what happens in a default scenario?  So when a
13   person -- the party who takes the money can't
14   pay back the money to buy back the assets.
15   A.  Because it's structured as a
16   repo -- and again I'm not a repo expert and,
17   as I said earlier, there are enumerable
18   different kinds of repos -- but the general
19   structure is that if the party that sold the
20   assets is unable to buy the assets back, that
21   the first party keeps the assets.
22   Q.  Have you seen that happen before?
23   A.  Have I seen repurchase agreements
24   get closed out.  Yes.
25   Q.  Have you ever seen a time when

| Page 106 | Page 107 |
|---|---|

**Page 106**

1  **J. SEERY - HIGHLY CONFIDENTIAL**
2  there was a default and the party that
3  purchased the assets kept all the assets?
4  A. I don't recall. I believe so,
5  yes.
6  Q. Can you name any situations now
7  that happened like that?
8  A. There's numerous bankruptcy cases
9  that involve repos and financial institutions
10 starting from Bevel Bressler on. So that I've
11 seen -- I haven't been involved in one but
12 I've seen numerous cases.
13        Usually there is a shortfall which
14 is why there's a case. And that is because
15 the assets turn out not to be sufficient
16 because of the volatility or because of the
17 price of the assets or some other reason.
18 Q. Have you ever seen an example
19 where the assets more than covered the price
20 plus the margin but the party that gave the
21 money to buy the assets kept all the assets?
22        MR. STERN: Objection to the form.
23 A. That's the structure of the trade.
24 I don't know if I've seen it.
25        MS. TAGGART: Let's take a break.

**Page 107**

1  J. SEERY - HIGHLY CONFIDENTIAL
2        MR. STERN: Okay.
3        (Recess taken.)
4  BY MS. TAGGART:
5  Q. I wanted to return to a comment
6  that I think you made when we were talking
7  about Exhibit 19 and that was the schedule of
8  assets and liabilities that were related to
9  the initial asset purchase agreement. And I
10 think that you had said that some of the
11 information that you provided was how you have
12 to have offsetting liabilities and assets.
13        Do you remember what information
14 you provided on that topic?
15 A. I think I said general discussion
16 around that being the structure. You don't
17 have to have anything.
18 Q. And what was your understanding of
19 the structure regarding the offsetting
20 liability and assets?
21 A. That there was both longs and
22 shorts in this book.
23 Q. And was it your understanding
24 that -- well, first of all, you noticed that
25 on the actual schedule the assets matched the

| Page 108 | Page 109 |
|---|---|

**Page 108**

1  **J. SEERY - HIGHLY CONFIDENTIAL**
2  liabilities.
3        MR. STERN: Objection to the form.
4  A. The assets matched the liabilities
5  in this schedule, correct.
6  Q. And was it your understanding that
7  the deal that you agreed to in the asset
8  purchase agreement had the structure where you
9  would have offsetting liabilities and assets?
10        MR. STERN: Objection to the form.
11 A. The -- I think on this -- on the
12 16th this structure was the structure that
13 we're trying to get to, yes.
14 Q. And --
15 A. But, again, this is a snapshot.
16 So these assets and liabilities set forth on
17 this sheet diverge or can diverge.
18 Q. Was your understanding of the deal
19 as of the 16th that -- did you have an
20 understanding whether Barclays was supposed to
21 make a profit out of the deal?
22        MR. STERN: Objection to the form.
23 A. Did I understand that Barc --
24 Barclays was clearly supposed to make a profit
25 out of the deal or they wouldn't do it.

**Page 109**

1  J. SEERY - HIGHLY CONFIDENTIAL
2  Q. What do you mean by that?
3  A. People don't do deals that are not
4  profitable.
5  Q. And in what way did you believe
6  that Barclays was making a profit?
7        MR. STERN: Objection to the form.
8  A. I believe they were buying one of
9  the best fixed income franchises on Wall
10 Street for a very good price.
11 Q. What do you mean by very good
12 price?
13        MR. STERN: Objection to the form.
14 A. I mean that the franchise was
15 worth a lot of money and they were not going
16 to have to pay what it was fully worth because
17 there was no funding to keep the franchise
18 going.
19 Q. What was your understanding of the
20 price that Barclays was agreeing to pay?
21 A. They were going to pay -- buy
22 assets, have liabilities, take the risk on
23 those assets and liabilities, and pay a
24 billion dollars for the building. Pay another
25 couple hundred million for the data centers.

Page 110

1       J. SEERY - HIGHLY CONFIDENTIAL
2   And pay a couple -- 250 for the franchise.
3       Q.   Was it your understanding that
4   Barclays would have gain on acquisition of --
5   where its assets and value that it received
6   was more than the liabilities and value that
7   it gave?
8           MR. STERN: Objection to the form.
9       A.   I don't understand your question.
10      Q.   Was it your understanding that
11  Barclays -- there was an intention that
12  Barclays would have a gain upon acquisition at
13  the end of this transaction?
14          MR. STERN: Objection to the form.
15      A.   It was my understanding that
16  Barclays was hoping if they could hold the
17  franchise together, keep the employees and the
18  customer relationships, to have a significant
19  gain and that with respect to the assets,
20  meaning the positions that were going to be in
21  that book long and short, they owned the risk.
22  So there could be a gain or there could be a
23  loss.
24          MR. CARDEN: It's not responsive.
25  Move to strike.

Page 111

1       J. SEERY - HIGHLY CONFIDENTIAL
2       THE WITNESS: It's a deposition.
3           MS. TAGGART: Could you read back
4   my question.
5           (Record read.)
6   BY MS. TAGGART:
7       Q.   So focusing on the moment that the
8   transaction closes, was it your understanding
9   that at that moment it was the intention that
10  Barclays would have a gain?
11          MR. STERN: Objection. Asked and
12  answered.
13      A.   I didn't have an understanding as
14  to whether they would have a gain or a loss on
15  the moment the transaction closed.
16      Q.   And did you have -- just looking
17  at Exhibit 19, that schedule, does it reflect
18  any gain to Barclays?
19          MR. STERN: Objection to the form.
20      A.   It does not reflect any gain or
21  loss to anybody.
22      Q.   It reflects that the assets
23  matched the value of the liabilities that were
24  going to be taken on by Barclays, right?
25          MR. STERN: Objection to the form.

Page 112

1       J. SEERY - HIGHLY CONFIDENTIAL
2       A.   I'd love to help you but I got to
3   tell you what it says. It shows a list of
4   assets and a list of liabilities and a set of
5   numbers next to each. And it shows that they
6   balance at the bottom.
7           It doesn't purport to do anything
8   else. I doesn't purport to talk about gains,
9   loses, risks, benefits. That's all it does.
10          So whatever -- I don't even know
11  what you're trying to get to but that's not
12  what this piece of paper says.
13      Q.   Well, let's look at the
14  liabilities part of Exhibit 19.
15      A.   Um-hum.
16      Q.   Did -- and let's set aside for a
17  moment cure and comp. Did Barclays actually
18  take on any of these liabilities in the
19  tran -- in what actually closed?
20      A.   And my recollection is no. And
21  the reason for that is that we couldn't
22  deliver them.
23      Q.   So the transaction that ultimately
24  closed, did Barclays take on any liabilities
25  related to the assets that it purchased?

Page 113

1       J. SEERY - HIGHLY CONFIDENTIAL
2           MR. STERN: Objection to the form.
3       A.   It took on a tremendous amount of
4   risk and liability. I don't think you
5   understand what liabilities are.
6       Q.   Okay. Why don't you describe to
7   me --
8       A.   I already did.
9       Q.   Let's start with what liabilities
10  meant in the context of Exhibit 19 that are
11  being described here.
12      A.   My understanding is these are
13  short positions.
14      Q.   And in the transaction that
15  ultimately closed did Barclays take on any
16  short positions?
17      A.   No. We were unable to deliver
18  those positions to them.
19      Q.   Let's talk about what you did now
20  on Friday, the 19th.
21          When did you get to work on
22  Friday, the 19th?
23      A.   I don't know. I don't remember if
24  I went home. I'm sure I didn't actually.
25      Q.   What did you do prior to the court

Page 114

1       **J. SEERY - HIGHLY CONFIDENTIAL**
2    hearing?
3       A.    The morning was spent trying to
4    work with Barclays as you previously asked
5    with respect to additional assets to try to
6    deal with their concern regarding the
7    positions that they were going to get and the
8    volatility in the market.
9       I then discussed with the
10   Creditors Committee at length the structure of
11   the transaction before the court hearing and
12   how it had evolved first with respect to some
13   additional assets that Barclays was looking
14   for and then with respect to how we were
15   unable to deliver any of the short positions.
16      **Q.    What did you do regarding finding**
17   **additional assets to address the concern**
18   **regarding positions on that Friday?**
19      A.    I didn't do anything.
20      **Q.    Okay. Let's talk about -- I'm**
21   **going to do every meeting that you had with**
22   **anyone with the Creditors Committee up until**
23   **the sale hearing. And then we'll talk about**
24   **the time after that.**
25      **What was the first meeting you had**

Page 115

1       **J. SEERY - HIGHLY CONFIDENTIAL**
2    with anyone related to the Creditors
3    Committee?
4       A.    In court on the 17th. I'm sorry,
5    the -- yeah, the 17th.
6       **Q.    Whom did you speak with?**
7       A.    Dennis Dunne. Luc Despins. And I
8    don't recall if Houlihan was there yet.
9       **Q.    Was it in the actual courthouse?**
10      A.    Um-hum.
11      **Q.    In the same room that the hearing**
12   **was taking place?**
13      A.    Yeah. I believe that they were in
14   by then.
15      **Q.    And what did you say?**
16      A.    I talked about the structure of
17   the transaction. What we were trying to
18   accomplish. And what their concerns were.
19      **Q.    What exactly, or to the best of**
20   **your recollection, did you say regarding the**
21   **structure of the transaction?**
22      A.    That we were trying to sell the
23   business to Barclays. That there were no
24   other buyers. That we would shortly be out of
25   business. That we were having trouble funding

Page 116

1       J. SEERY - HIGHLY CONFIDENTIAL
2    our positions, holding customers in, and
3    holding employees in.
4       **Q.    Anything else that you said**
5    **regarding the structure of the transaction?**
6       A.    Not that I recollect.
7       **Q.    Did you say that there was going**
8    **to be a sale of assets?**
9       A.    Not that I recollect.
10      **Q.    Did you discuss anything about the**
11   **repo transaction?**
12      A.    Not that I recollect.
13      **Q.    Did you discuss at all what value**
14   **was being conveyed in assets or liabilities?**
15      A.    Just in respect of the business in
16   general.
17      **Q.    And what did you say on that?**
18      A.    That they were buying the US
19   franchise and the positions that would help
20   run the US franchise.
21      **Q.    And what did you say regarding**
22   **what you wanted to accomplish?**
23      MR. STERN: Objection to the form.
24      A.    Yes. I said I wanted to close a
25   transaction.

Page 117

1       J. SEERY - HIGHLY CONFIDENTIAL
2       **Q.    Anything else that you remember**
3    **saying to the Creditors Committee on the 17th?**
4       A.    Not that I recollect.
5       **Q.    And what did the Creditors**
6    **Committee say to you?**
7       A.    They understood that the business
8    was very fragile. They understood that there
9    weren't other buyers, that employees had
10   previously tried to leave. They were getting
11   their arms around the transaction.
12      **Q.    Who in particular said any comment**
13   **relating to an understanding that there**
14   **weren't other buyers?**
15      A.    I don't recall specifically.
16      **Q.    And do you remember what**
17   **specifically was said?**
18      A.    No.
19      **Q.    You mentioned earlier that you**
20   **heard Creditors Committee's concerns. What**
21   **did anyone from the Creditors Committee say on**
22   **the topic of their concerns about the**
23   **transaction?**
24      A.    They wanted to understand it.
25   Knew it had to move fast. Knew that there was

Page 118

```
 1          J. SEERY - HIGHLY CONFIDENTIAL
 2  significant risk that the whole business would
 3  fall apart. But they still wanted to spend
 4  time trying to understand the transaction.
 5      Q.   And did they describe the process
 6  that they would go through to try to
 7  understand the transaction?
 8      A.   No.
 9      Q.   Did you provide any information --
10  any documents to the Creditors Committee?
11      A.   In court at that particular
12  meeting?
13      Q.   Yes.
14      A.   Not that I recollect other than
15  the asset purchase agreement.
16      Q.   Had you given anything before that
17  time to the Creditors Committee?
18      A.   Yeah. I don't know that I gave it
19  to them because it was filed in court and they
20  had it. No.
21      Q.   Anything else that you remember
22  discussing what either side said in this
23  meeting in the 17th with the Creditors
24  Committee?
25      A.   No.
```

Page 119

```
 1          J. SEERY - HIGHLY CONFIDENTIAL
 2      Q.   What was the next time that you
 3  had any meeting with the Creditors Committee?
 4      A.   I spent time, and I don't exactly
 5  know when it was, with Saul Burian, Brad Geer,
 6  and -- I forget her name. A woman from
 7  Houlihan. I just -- I know her -- I can't
 8  remember her name -- in the Lehman boardroom
 9  discussing the structure of the transaction,
10  the business, the risk of the business.
11  Generally the volatility of the markets and
12  the assets.
13      Q.   Was this before the 19th sale
14  transaction? Sale hearing?
15      A.   Yes. I'm pretty sure, yes.
16      Q.   Do you know if it was the same
17  day?
18      A.   It was at night so it probably was
19  either the night of the 17th or the night of
20  the 18th.
21      Q.   And are those people you just
22  described all with Houlihan?
23      A.   Yes.
24      Q.   And what's your understanding of
25  Houlihan's role?
```

Page 120

```
 1          J. SEERY - HIGHLY CONFIDENTIAL
 2      A.   They're the advisor to the
 3  Creditors Committee.
 4      Q.   What in particular on this meeting
 5  did you say regarding the structure of the
 6  transaction?
 7      A.   I don't recall the specifics. I
 8  just recall the meeting of where it was and
 9  how late it was.
10      Q.   Do you understand -- do you
11  remember what you described generally about
12  the structure of the transaction at that time?
13      A.   We talked about the deal. The
14  risk in the market. The transfer of assets.
15  The positions. The issues with respect to
16  closing customer trades during the pendency of
17  the transaction. How we would get it closed.
18  The timing. The assets. I don't recall the
19  actual specifics. But it was a diligence
20  meeting on their part where they asked a lot
21  of questions.
22      Q.   How did you discuss the deal to
23  the Creditors Committee prior to the 19th
24  court hearing?
25      A.   Generally that we were selling the
```

Page 121

```
 1          J. SEERY - HIGHLY CONFIDENTIAL
 2  business to Barclays. That Barclays would get
 3  the positions that were necessary to run the
 4  business. And generally what they would pay.
 5  And whether there would be significant
 6  drawings on the DIP which we didn't think so.
 7      Q.   What was said regarding what they
 8  would pay?
 9      A.   The value of -- I think we were
10  just talking about the building, the data
11  centers, 250. I don't recall specific
12  discussions around the assets.
13      Q.   Do you remember if there was any
14  discussion about the value of assets that were
15  being conveyed to Barclays?
16      A.   There was definitely discussion of
17  the assets. I don't recall the specifics.
18      Q.   Including the value of the assets?
19      A.   Yeah. That it was a big book and
20  a significant amount of securities positions
21  that had to be financed and transferred.
22      Q.   Did you describe -- do you think
23  that you did describe what you believed the
24  value of the assets were that were being
25  transferred?
```

A. I don't recall talking about the specific numbers of the values because it was a diligence on their part. They were asking questions.

**Q. Did you give any documents that would go to the value of the assets that were being transferred?**

A. I don't recall.

**Q. Did you describe --**

A. It wasn't just the assets being transferred. It was the assets that were being retained as well.

**Q. Okay. Do you remember what was described about the positions?**

A. No.

**Q. Did you describe the repo transaction?**

A. I don't recall.

**Q. Did you describe how Barclays was stepping into the shoes of the repo transaction?**

A. I don't recall.

**Q. Did you describe that there had been any changes from the transaction as**





**described the previous time before the 17th?**

A. I don't recall that I had that discussion. Nor do I recall whether there had been changes by that point.

**Q. Do you remember anything that anyone from the Creditors Committee commented on the information that you gave?**

A. No. Only that the general comments regarding the understanding about the -- keeping the business together, trying to get the transaction done quickly. The risk in the deal. And personal issues regarding the transaction.

**Q. What do you mean by personal issues regarding --**

A. Just, you know, they are nice folk and understood that it was not an easy process.

**Q. In either of your meetings before the sale hearing on the 19th, did you ever say to anyone at the Creditors Committee in substance that Barclays would be making a profit out of this deal?**

A. I'm quite certain that I said this





is a great deal for Barclays.

**Q. When you say you're quite certain, do you remember saying those words?**

A. Yes.

**Q. And how did you describe how it was a great deal for Barclays?**

A. Because this is a -- I think I said before, it's a great franchise that had significant value and significant income-generating capability and there were -- it was going to be either completely lost or they would purchase it.

**Q. Did you describe in any substance whether Barclays was going to realize a gain upon acquisition as a result of this transaction?**

MR. STERN: Objection to the form.

A. I don't quite understand the question so the Committee specifically said at one meeting we know this is a great deal. We understand that. We just want to know how great a deal it is.

**Q. And how great a deal did you describe?**





A. It's a great deal.

**Q. Did you give any more specifics than that?**

A. No. We gave a lot of specifics going through line by line on Sunday what was being transferred and how -- how it was being transferred.

**Q. Staying, though, with the -- before the weekend, so this 17th and then the 19th meeting, did you convey at all that -- first of all, did you provide any specifics for how this was a great deal for Barclays?**

A. Not that I recollect.

**Q. And when I say the substance of gain upon acquisition, did you convey in any way that at the end of this deal the money and assets that Barclays was taking was greater than the liabilities and money that Barclays was giving?**

MR. STERN: Objection to the form.

A. Not that I recollect.

**Q. And do you know one way or another whether you disclosed to the Creditors Committee anything related to the repo**

Page 126

1    J. SEERY - HIGHLY CONFIDENTIAL
2  transaction prior to the sale hearing?
3    A.    Prior to the sale hearing on the
4  19th, yes.
5    Q.    Okay.  What did you disclose to
6  the Creditors Committee regarding a repo
7  transaction?
8    A.    Specifically on the 19th l had a
9  lengthy call with Burien, Geer -- l don't
10  recall if it was Dunne or Despins or both --
11  and a guy whose name l forget who used to be
12  at Deutsche Bank who's a Committee advisor,
13  about the structure of the repo, the transfer
14  of the assets, and the mechanism doing it
15  through the repo, the changes that were
16  occurring before the hearing, the fact that we
17  no longer could deliver the short positions,
18  and the concern that Barclays had about the
19  value of the assets.
20    Q.    When was this?
21    A.    Before the hearing on the 19th.
22  Late morning -- early afternoon, late morning.
23    Q.    And what specifically did you say
24  regarding the structure of the repo?
25    A.    My recollection is that we talked

Page 127

1    J. SEERY - HIGHLY CONFIDENTIAL
2  about the fact that we could not deliver
3  shorts; that the longs were going to be
4  settled through a settlement of the repo; that
5  Barclays would own the risk of those
6  positions.
7        And basically that's it.  The
8  mechanics of how that would happen.  lt was a
9  very fluid discussion.
10    Q.    Did you say -- did you describe
11  how Barclays bad stepped into the shoes of the
12  Fed regarding the repo transaction?
13    A.    They already knew that.
14    Q.    How did tbey know?
15    A.    l don't know how they knew.  They
16  knew.  We discussed it.  lt was part of the --
17  it wasn't a secret.
18    Q.    And did you describe at all the
19  collateral and tbe specific assets that were
20  being transferred to Barclays as part of the
21  repo?
22    A.    Did l describe at all the
23  collateral and the specific assets that were
24  being transferred.
25        They had already assumed that

Page 128

1    J. SEERY - HIGHLY CONFIDENTIAL
2  funding liability.
3    Q.    Well, did you describe to the
4  Creditors Committee on this call on the 19th
5  what assets were being given to Barclays --
6    A.    Categories of assets, yes.
7    Q.    Okay.  Did you describe value of
8  the assets that were being given to Barclays?
9    A.    Generally l believe l worked off
10  of this sheet or some derivative of this
11  sheet.
12    Q.    Was it your understanding --
13        MR. CARDEN:  Pointing to
14  Exhibit 19?
15        THE WITNESS:  Yes, sorry.
16    Q.    And was it your understanding as
17  of the 19th that the assets that were being
18  delivered to Barclays as part of that repo
19  transaction were the same as the assets that
20  were described on Exhibit 19?
21    A.    They definitely were not the same.
22    Q.    Why were you referring to that
23  sheet, Exhibit 19?
24    A.    l said this sheet or a derivative
25  of this sheet.  So these are categories of

Page 129

1    J. SEERY - HIGHLY CONFIDENTIAL
2  assets.  The specific assets would most
3  certainly not be the same.  And the actual
4  amounts would change by market value or
5  trading of those assets that occurred during
6  the week.
7    Q.    So you described categories.  Did
8  you describe at all the value of the assets
9  that were being transferred as part of the
10  repo transaction?
11    A.    Yes, yeah.
12    Q.    What exactly did you describe?
13    A.    l don't recall what the numbers
14  were but they were on the sheet.
15    Q.    Was there a sheet of paper that
16  you gave to the Creditors Committee?
17    A.    No.  lt was a phone call.
18    Q.    Okay.  Then were on what sheet?
19    A.    Either 19 or a derivative of 19.
20  l don't know.
21    Q.    Do you remember if the number --
22  do you remember at all what the range of the
23  number was on the sheet that you were --
24    A.    l don't recall.
25    Q.    Hold on.

Page 130

J. SEERY - HIGHLY CONFIDENTIAL

1
2    -- the sheet that you were
3    referring to when you were described the
4    transaction to the Creditors Committee?
5        A.   I don't recall.
6        Q.   Do you know if there's any sheet
7    that looks something like this (indicating)
8    that relates to the repo transaction?
9        A.   Is there a sheet that -- my
10   recollection is that these assets, many of
11   these assets, if not all, were involved, many
12   of them were involved in the repo transaction.
13       Q.   Did you describe to the Creditors
14   Committee anything related to the haircut that
15   was associated with the repo?
16       A.   Not that I recollect.
17       Q.   Did you describe whether Barclays
18   was going to keep all of that collateral as a
19   result of the transaction?
20       A.   I believe we discussed the
21   mechanic of how it would close.
22       Q.   And what did you describe on that
23   topic?
24       A.   How the repo would be settled.
25   There wouldn't be a purchase back.  Barclays

Page 131

J. SEERY - HIGHLY CONFIDENTIAL

1
2    would own the assets.  And Lehman would not
3    have an obligation to buy them back or make
4    them whole if there was any shortfall.
5        Q.   And you made that description on a
6    call on the 19th prior to the sale hearing?
7        A.   Yes.
8        Q.   And did you -- was there any
9    discussion about whether the assets that you
10   were saying Barclays would get to keep, how
11   that value related to the amount of money that
12   Barclays had paid as part of the repo
13   transaction?
14       A.   I'm pretty sure we did that on the
15   19th.  We certainly -- I'm pretty sure, yes.
16       Q.   And what do you think you said on
17   that topic?
18       A.   We talked about how much was
19   advanced versus the amount of the market value
20   of that collateral at the time it was
21   purchased.
22       Q.   And what did you say?
23       A.   I don't recall the specifics but
24   that there was clearly a haircut and
25   discussion about that.

Page 132

J. SEERY - HIGHLY CONFIDENTIAL

1
2        Q.   How did you know the market value
3    of the collateral?
4        A.   Other than from receiving a sheet
5    that had numbers on it, I did not know it.  I
6    don't trade those products and check those
7    marks.
8        Q.   Who gave you a sheet that had
9    numbers that reflected the value of the
10   collateral?
11       A.   I don't recall where I got the
12   sheet from.
13       Q.   And how did you describe the
14   changes that happened with the transaction
15   before the hearing?
16       A.   Very much as I previously
17   described to you that we discussed how
18   Barclays was concerned about the values in the
19   volatile market; that they were seeking
20   additional assets; that we were trying to find
21   different assets that may or may not have
22   value or be pledgeable; that we had some
23   assets that were not typical repo assets that
24   we might be able to transfer them to give some
25   more support to the transaction; that we had

Page 133

J. SEERY - HIGHLY CONFIDENTIAL

1
2    expected to be able to transfer the
3    liabilities, meaning the short positions but
4    that we got closed out on those and were
5    unable to do so and that Barclays would be
6    able to take the longs naked meaning without
7    any kind of offset.
8        Q.   I want to get an understanding of
9    your knowledge of the value of the collateral
10   prior to the sale hearing.
11       A.   Um-hum.
12       Q.   First of all, were you involved in
13   any discussions with the Fed about the value
14   of the collateral that would he pledged?
15       A.   No.
16       Q.   Were you involved in any
17   discussions with Barclays prior to the sale
18   hearing about the value of the collateral that
19   they would take when they took over the repo?
20       A.   No.
21       Q.   Did you discuss with anyone --
22       A.   Other than my previously described
23   description of my conversations with John
24   Mahon.
25       Q.   Okay.

Page 134

J. SEERY - HIGHLY CONFIDENTIAL

1    J. SEERY - HIGHLY CONFIDENTIAL
2    And in that did you come to an
3    agreement or discuss actual number of the
4    total value of the collateral that would go
5    over to Barclays?
6    MR. STERN: Objection to the form.
7    A.    Just repeat that, please.
8    Q.    Yeah. In your conversations with
9    John Mahon did --
10    A.    I didn't give him the
11    pronunciation. He can pronounce his name
12    however he likes.
13    Q.    Did he or you actually give a
14    number that was the value of the assets that
15    would go over to Barclays?
16    A.    No.
17    Q.    Did you know the number -- the
18    value of the assets that would go to Barclays
19    as part of the collateral when they took over
20    the repo?
21    A.    I believe I did at the time, yes.
22    Q.    And how did you know it?
23    A.    I don't recall who told me.
24    Q.    And what was it?
25    A.    I don't recollect the exact

Page 135

1    J. SEERY - HIGHLY CONFIDENTIAL
2    number. It was north of $40 billion.
3    Q.    So you think you spoke to somebody
4    about it? Did you see also --
5    A.    It was part of numerous
6    discussions with a variety of people. It
7    wasn't my responsibility so I didn't dwell on
8    the actual amount that they were getting. Or
9    paying.
10    Q.    Okay. When you talked to the
11    Creditors Committee what did you say about
12    what is the number of the value of the assets
13    that Barclays was getting when they took over
14    the repo?
15    MR. STERN: Objection to the form.
16    A.    When I talked to the Creditors
17    Committee did I have a number?
18    Q.    Yes.
19    A.    Yes.
20    Q.    What was the number?
21    A.    I don't recollect.
22    Q.    And do you know where you got the
23    number from?
24    A.    Off the sheet of paper.
25    Q.    Do you know what the sheet of

Page 136

1    J. SEERY - HIGHLY CONFIDENTIAL
2    paper looked like?
3    A.    It liked like Exhibit 19.
4    Q.    And did you say -- that number
5    that you were given, what was that? Was that
6    the value that Lehman had put on the value of
7    the collateral?
8    A.    That's correct.
9    Q.    Who derived that number?
10    A.    I don't know.
11    Q.    Do you know if Barclays
12    contributed to that number that you had?
13    A.    They would not have -- my
14    understanding is that they would not have.
15    That would have been Lehman's number.
16    Q.    Was -- did you know if there was a
17    number that came from the Fed?
18    A.    No. I don't. Meaning that the
19    Fed valued it?
20    Q.    Yeah.
21    A.    No. The Fed didn't mark the
22    collateral.
23    Q.    All right. What did anyone from
24    the Committee say -- what did anyone from the
25    Committee say on this telephone conference on

Page 137

1    J. SEERY - HIGHLY CONFIDENTIAL
2    the 19th that was prior to the court hearing?
3    A.    I don't recall specifically.
4    There was significant interchange about the
5    various categories. The value, the
6    volatility, why we lost the liabilities or the
7    shorts. The mechanics. Changes to the deal.
8    I don't recall the specific things that were
9    said. It was really explaining the deal and
10    then answering a lot of questions from Saul
11    and from the other gentleman who formerly had
12    been at Deutsche Bank.
13    Q.    When you described this look for
14    seeking additional assets, did you describe --
15    put any numbers or value on the amounts of
16    assets that were being collected?
17    A.    Not that I recollect.
18    Q.    Or the number of assets that were
19    being demanded?
20    A.    Not that I recollect.
21    Q.    Did the Committee make any
22    response to that part that at this time Lehman
23    was still looking for additional assets to
24    convey to Barclays?
25    A.    I don't recollect the specifics of

Page 138

1    J. SEERY - HIGHLY CONFIDENTIAL
2  their response. The general response would
3  have been -- I don't recollect the specifics.
4    Q.  Okay. Anything else that you did
5  before you attend the sale hearing on Friday,
6  the 19th?
7    A.  I think I spent some time on the
8  phone with Weil, Lori Fife and Harvey Miller.
9  I think Lori was prepping Bart McDade for the
10 hearing. I don't recall what else. There was
11 lots of prep for the hearing.
12   Q.  And I don't want to go into
13 specifics of your communication but what were
14 generally the topics that you were
15 communicating with Weil prior to the hearing?
16   A.  The structure of the deal. The
17 issue with respect to the assets. The
18 mechanics. The change. You know, how we
19 would deal with JPMorgan issues through the
20 weekend. How we would try to get the
21 transaction closed. Bart's testimony.
22 Changes to the documents. Whatever else they
23 needed any further explanations.
24   Q.  How did you get to the court
25 hearing?

Page 139

1    J. SEERY - HIGHLY CONFIDENTIAL
2    A.  Usually I take the subway.
3    Q.  Okay. Now, at the court hearing
4  who did you speak to at the court hearing
5  besides pleasantries where you actually had
6  substantive conversations with?
7    A.  Certainly substantive
8  conversations with the Weil team. Bart
9  McDade. I don't recall if I had any other
10 substantive conversations with anyone -- any
11 other constituents at that hearing. And then
12 I had with me two people from Lehman.
13   Q.  Who did you in particular speak to
14 on the Weil team?
15   A.  Lori Fife. Harvey Miller. Shai
16 Waisman. I don't remember if Roberts was
17 there or not. I don't recall.
18   Q.  During the sale hearing did you
19 speak with anyone back at Lehman who wasn't at
20 the sale hearing?
21   A.  I spoke to -- I said there were
22 two Lehman people with me at the hearing. And
23 I don't recall if I had any conversations,
24 phone conversations, with anyone back at
25 Lehman from the hearing.

Page 140

1    J. SEERY - HIGHLY CONFIDENTIAL
2    Q.  Okay. Are you aware of any
3  disclosure to the court during that hearing of
4  the structure of the transaction being that
5  Barclays was going to take over the shoes of
6  the Fed related to the repo transaction?
7    A.  I believe that that was the
8  substance of the conversation with respect to
9  part of the change -- you know, the mechanics
10 to how we'd get it done. I don't recall the
11 specifics but it was pretty clear -- my
12 recollection is it was pretty clear that we
13 talked about the changes to the agreement, the
14 issues with respect to the shorts, the overall
15 deal structure, and how we hoped to get it
16 closed. And the size obviously.
17   Q.  And I know you probably don't
18 remember the numbers but was the number that
19 was described about the value of the
20 collateral that would be part of what Barclays
21 took when they overtook the repo transaction
22 consistent with your understanding of what
23 that value was?
24   MR. STERN: Objection to the form.
25   A.  I'm not sure I understand your

Page 141

1    J. SEERY - HIGHLY CONFIDENTIAL
2  question. Did I -- if your question is did
3  numbers that were spoken about in court
4  generally correspond with my understanding of
5  the transaction the answer is yes.
6    Q.  And do you remember any disclosure
7  made to anyone at the court regarding the
8  search and giving of additional assets to --
9    A.  My recollection is yes. I think
10 it was.
11   Q.  And that was disclosed to the --
12 your memory is that it was disclosed to the
13 judge in open court?
14   A.  I thought that's -- I think that's
15 the case, yes.
16   Q.  Okay.
17      So showing you an exhibit
18 previously marked as Exhibit 319 and the top
19 of the chain is from Alex Kirk to James Seery
20 with the subject, "What's going on?"
21      Do you recognize this document?
22   A.  I know what it is. I don't know
23 that I've seen this before.
24   Q.  Does it look like e-mail
25 correspondence between yourself and Mr. Kirk

Page 142

1    J. SEERY - HIGHLY CONFIDENTIAL
2  on the 19th?
3    A.  Yes.
4      MR. STERN:  Why don't you take a
5  moment to read through the e-mails.
6      (Document review.)
7    Q.  So my question is going to be
8  first why were you asking Mr. Kirk the second
9  to the top, "What is the value of the
10 collateral that Barclays posted to the DTC
11 today?"
12   A.  I don't recall specifically.
13   Q.  Do you know if somebody requested
14 that you do it?
15   A.  I don't recall if someone
16 requested it or not.
17   Q.  And what do you mean by the
18 collateral that Barclays posted to the DTC
19 today?
20   A.  I think what I -- I think that's a
21 misstatement.  What I'm asking is what's the
22 value of the repos on that day.
23   Q.  And why were you asking somebody
24 else?
25   A.  I didn't have the number at my

Page 143

1    J. SEERY - HIGHLY CONFIDENTIAL
2  fingertips.
3    Q.  And so Mr. Kirk writes, "I believe
4  the value is 45.5.  I don't know the marked
5  value."
6      Did you convey that information to
7  anybody?
8    A.  I don't recall.
9    Q.  And did you ever find out what the
10 marked value was?
11   A.  I don't recall.
12   Q.  Do you know whether it's accurate
13 that the value of that collateral is 45.5?
14   A.  I don't know.  My assumption is
15 that the original posting amount was 45.5 but
16 there was, as I said, a lot of market
17 volatility so there could have been a change
18 in the value which is --
19   Q.  Do you know one way or the other
20 whether that's an accurate value for the
21 amounts of collateral that was -- that was
22 part of that repo transaction?
23   A.  I don't know.
24      MR. STERN:  Is -- oh, this is
25 previously marked.

Page 144

1    J. SEERY - HIGHLY CONFIDENTIAL
2    Q.  And now I'm showing you a document
3  previously marked as Exhibit 320 that goes
4  from Bates numbers 10293820, also through -820
5  although it is a second page.  And on top it's
6  from Jean-Francois Astier to Alex Kirk.
7      Do you recognize this document?
8    A.  I don't think I've ever seen this.
9    Q.  And I'll note for the record that
10 you don't appear to be copied on these.
11     But I want you to look -- if you
12 look at the bottom of the first page you see
13 there's an e-mail from Erika Weinberg to Rod
14 Miller.  Do you know who Erika Weinberg is?
15   A.  No.
16   Q.  Do you know who Rod Miller is?
17   A.  Yes.
18   Q.  Who's Rod Miller?
19   A.  He's a partner at Weil.
20   Q.  And it says, "Did you know that
21 Barclays closed out their repo with Lehman and
22 took all of the assets as collateral?  Beth
23 was concerned.  This happened right before
24 close of market."
25     And you'll see a little bit higher

Page 145

1    J. SEERY - HIGHLY CONFIDENTIAL
2  it asks, "Is this part of a plan?"
3      And way at the top it says, "I
4  don't understand it either.  Seery says it is
5  okay.  He's walking out to call you."
6      Do you remember any conversations
7  with any of the folks on this chain,
8  Jean-Francois Astier, Rod Miller, or Erika
9  Weinberg, on the subject of Barclays closing
10 out the repo and taking all the assets as
11 collateral?
12   A.  Jean-Francois was at the hearing.
13 I don't recall the specifics of the
14 conversation and I don't think that Barclays
15 closed out the repo.  And if they closed out
16 a repo they wouldn't hold assets as collateral
17 so it doesn't really make sense.
18   Q.  Explain what you mean by that.
19   A.  When you close out a repo you own
20 the assets in the repo structure as we
21 discussed earlier so when you close out the
22 repo it means that the counterparty has failed
23 to buy them back.  You already own them.  You
24 just close it out.
25   Q.  And what was your understanding --

Page 146

1    **J. SEERY - HIGHLY CONFIDENTIAL**
2    **if this is inaccurate, in what way is it**
3    **inaccurate in relation to what happened?**
4         MR. STERN: Objection to the form.
5    A.    I thought they carried, meaning
6    Barclays, the repo over the weekend. I don't
7    recollect that this is what happened.
8    **Q.   Okay.  Do you remember having a**
9    **conversation -- of coming out of the**
10   **courthouse to discuss this issue?**
11   A.    I don't -- I don't remember if I
12   was actually able to get out and talk to Alex.
13   I don't recollect having been able to do that.
14   **Q.   Okay.  Let's -- what did you do**
15   **related to this transaction or negotiations**
16   **following the sale hearing?**
17   A.    Following -- give me a two-minute
18   break?
19   **Q.   Okay.**
20        (Recess taken.)
21   BY MS. TAGGART:
22   **Q.   What were your activities related**
23   **to negotiations with the transaction following**
24   **the sale hearing on the 19th?**
25   A.    Let me just try to set it up

Page 147

1    J. SEERY - HIGHLY CONFIDENTIAL
2    because I'm not sure exactly.  The 19th -- the
3    hearing on the 19th went very late into the
4    night.  And there were a number of discussions
5    at the hearing.  Objections.  Passion pleas
6    from Danny Golden and the like.  And we broke
7    with some open items with the court approving
8    the transaction my recollection is subject to
9    the Committee sign-off on the final deal
10   terms.  For some reason I don't have a lot of
11   recollection of Saturday.  I just don't
12   remember what the heck we did.  I don't think
13   I went home.
14        And on the 21st there were just --
15   there were a number of things to clean up to
16   try to get to the transaction.  I don't
17   remember if I was in contact with the
18   Committee or not.
19        On the 21st I got called to Weil
20   by Alex because there was concern that
21   JPMorgan was causing significant problems and
22   might not clear trades that would probably put
23   Barclays in a position where they didn't want
24   to close the deal and take the risk of the
25   assets on or buy the other parts of the

Page 148

1    J. SEERY - HIGHLY CONFIDENTIAL
2    business.
3         So we went over there and my
4    responsibility when I got there was to help
5    work with the Committee through the
6    transactions.  I mentioned earlier I sat in on
7    the discussion, argument, negotiation, with
8    JPMorgan as did the Committee.  And then spent
9    a lot of time with Weil and with the Committee
10   and that was again Saul, Brad, the guy from --
11   the former Deutsche Bank guy as well as --
12   **Q.   Mike Fazio?**
13   A.    Yeah.  Yeah.  Thank you.
14        As well as I believe it was Luc
15   that was there, not Dennis.  But I don't
16   have -- it was one or the other.
17   **Q.   Okay.**
18   A.    And that went all night until we
19   reached agreement, the Committee signed off,
20   and we closed.
21   **Q.   What topics were discussed with**
22   **the Committee on the 21st?**
23   A.    Specifically the assets that were
24   being transferred to -- the positions that
25   were being transferred to Barclays.  And the

Page 149

1    J. SEERY - HIGHLY CONFIDENTIAL
2    mark value of those positions versus the
3    amount that Barclays had put up against them.
4    And the mechanics of how that would happen
5    that the repo would be closed out, that Lehman
6    would give up -- would be relieved of its
7    obligation to buy them back and Barclays would
8    own the positions at a risk.
9    **Q.   What did you say about the marked**
10   **value versus the amount put up against them?**
11   A.    There were numerous discussions
12   regarding those values, the different kinds of
13   positions on the sheet, the issues with
14   respect to JPMorgan and the transfer of
15   certain of the assets and the reduction in the
16   size of the positions versus the cash that
17   Barclays put up.  Very detailed discussions
18   that the risk or the benefit was going to be
19   Barclays' with respect to those positions and
20   the amount they put up.
21   **Q.   What did you say was the marked**
22   **value of the positions that Barclays was**
23   **taking over?**
24   A.    I don't recall the numbers.
25   **Q.   Did you recall whether it was more**

Page 150

1        J. SEERY - HIGHLY CONFIDENTIAL
2    or less than the cash that had been put up?
3        A.    It was more.
4        Q.    Do you know about how much more?
5        A.    I don't recall the number.  It was
6    not an insignificant amount of money.  Meaning
7    it was a significant amount of money.
8        Q.    Do you know if it was more or less
9    than $5 billion?
10        A.    I don't remember if it was more or
11    less than 5.
12        Q.    Do you know if it was more or less
13    than the amount that had been told the court
14    on the hearing on Friday?
15        A.    I don't recall the amount -- the
16    specific amounts from the court hearing versus
17    the amounts on Sunday.
18        Q.    But do you just remember the
19    relative amount -- do you remember that the
20    marked value of the collateral that was being
21    given to Barclays, that amount being higher
22    than what had been described to the court on
23    Friday?
24        MR. STERN:  Objection to the form.
25        A.    I don't recall that the amount was

Page 151

1        J. SEERY - HIGHLY CONFIDENTIAL
2    higher.  What I recall is that it was higher
3    than the amount of cash that was put up in
4    both instances.
5        Q.    Do you know if -- what about
6    comparing kind of the delta between the
7    collateral amount and the cash described to
8    the court and the delta between the
9    transaction as you were describing?  Do you
10    know if that delta had increased?
11        A.    Do you mean had the haircut
12    increased?  I don't recall.  The delta would
13    be the change between the two numbers.  Not
14    between two sets of numbers.
15        Q.    Okay.
16        A.    But I don't recall whether it had
17    gone up or down.  I don't know.
18        Q.    Okay.  And do you remember in any
19    way conveying that the value that Barclays was
20    receiving of collateral versus the cash that
21    it gave up had increased from the way that it
22    was described on the 19th?
23        MR. STERN:  Objection to the form.
24        A.    I don't recall if it was a
25    different amount.  It was -- the marked value

Page 152

1        J. SEERY - HIGHLY CONFIDENTIAL
2    of the assets was higher than the amount of
3    cash put up.  And we had numerous discussions
4    regarding that.
5        Q.    Okay.  What did you discuss
6    regarding that?
7        A.    That it was higher.  Why.  Where
8    was the risk.  What were the types assets.
9    What was the potential benefit to Barclays.
10    What was Barclays' potential risk.
11        Q.    And what did you describe was the
12    potential benefit to Barclays?
13        A.    We went through line by line.
14    Barclays' potential benefit was that they
15    could manage this very large book of assets
16    and gain a profit from those positions.
17        Barclays' risk was that in this
18    market at the time they would be unable to do
19    that well and they could have a significant
20    loss.
21        Q.    Did you discuss at all the topic
22    of whether the marked value of that assets was
23    the appropriate way to value the assets?
24        A.    Whether the marked value was the
25    appropriate way.  We talked about -- I don't

Page 153

1        J. SEERY - HIGHLY CONFIDENTIAL
2    recall -- we certainly talked about the marks
3    and whether the marks were subject to change
4    and the risk inherent in those types of
5    assets.  I don't recall if we talked about
6    whether there was a different way to value an
7    asset, a position.  I'm pretty sure we didn't
8    because that's the generally accepted way to
9    value those assets.
10        Q.    Did you believe on the 9 -- on
11    Friday, the 21st, that those marks were
12    accurate?
13        A.    Sunday the 21st?
14        Q.    Sorry.  Sunday the 21st.
15        A.    My belief is that they were
16    accurate.  I didn't know.  And I did know that
17    the assets were subject to a volatile market
18    again.  So there were -- there were repo-able
19    assets but the assets would change hour by
20    hour.
21        Q.    Did you have any discussions about
22    the additional assets that were being
23    transferred separate from the assets
24    transferred as part of the repo?
25        A.    I don't recollect those

Page 154

1        J. SEERY - HIGHLY CONFIDENTIAL
2    discussions. We discussed in detail each of
3    the provisions of the contract.
4        Q.    And what documents did you provide
5    to the committee?
6        A.    There certainly was a large
7    position sheet that I recollect which was a
8    ledger with all of the positions in it. I
9    don't recall specifically giving that to them
10   but I know they had it.
11       Q.    Who was giving you information
12   about the positions at that time?
13       A.    I don't recollect who had --
14   whether that had come from Paolo Tonucci or
15   someone else in Ian Lowitt's group but it was
16   someone at Lehman. And then the folks from
17   Barclays had all of the positions that they
18   had taken in with the Lehman marks on them.
19       Q.    And what was the Committee's
20   reaction to this information?
21       A.    Questions. Analysis. Discussion.
22       Q.    Were there any concerns about the
23   value of the assets that were being conveyed
24   to Barclays?
25       A.    There was certainly discussion

Page 155

1        J. SEERY - HIGHLY CONFIDENTIAL
2    about it. I'm not sure what you mean by
3    concern.
4        Q.    Did the Committee voice any
5    concerns that the amount of assets or value
6    being conveyed to Barclays was too high?
7        A.    They thought it was a great deal
8    and wanted to know if there was a better deal
9    that we could get. We believed that there was
10   not; that that was the transaction that we'd
11   shown to the court, that was the transaction
12   that we were charged with closing, and it was
13   up to them to say whether we were going to get
14   it done or not.
15       Q.    What did they say on that it was a
16   great deal?
17       A.    They were hoping to get more
18   dollars from Barclays.
19       Q.    You mean the Committee was
20   expressing that they felt Barclays was making
21   a great deal because Barclays was getting a
22   lot of value.
23       A.    Yes.
24       Q.    And what did you say on saying
25   that this was the same transaction that had

Page 156

1        J. SEERY - HIGHLY CONFIDENTIAL
2    been presented to the court?
3        A.    That this is the deal. Right?
4    That it may be a great deal for Barclays, it
5    may not be. The value of a treasury or agency
6    on day one could be considerably higher or
7    lower the next day. That hedging a book of
8    40-plus billion dollars was incredibly tough
9    and incredibly risky in a very difficult,
10   illiquid market and that this is the deal that
11   we could do and they could either say yes or
12   no.
13       MR. STERN: They being?
14       THE WITNESS: The Committee.
15       Q.    Okay. And what did the Committee
16   ultimately say on their ultimate opinion about
17   the transaction?
18       A.    That they wished we could get a
19   better deal but that was the only deal and
20   they approved the deal.
21       Q.    Who in particular said that?
22       A.    The group -- I don't remember if
23   it was in unison shouted but they all
24   acknowledged agreement to the deal. So Mike,
25   Saul, Luc, and Brad.

Page 157

1        J. SEERY - HIGHLY CONFIDENTIAL
2        MS. TAGGART: We need to mark this
3    one.
4        (Deposition Exhibit 338B,
5        photocopy of handwritten document,
6        marked for identification as of this
7        date.)
8    BY MS. TAGGART:
9        Q.    I've put before you a document
10   we're marking 338B which has a lot of
11   handwritten notations.
12            Have you seen this document
13   before?
14       A.    No.
15       Q.    Is any of this your handwriting?
16       A.    I don't think so.
17       Q.    Do you know if this document was
18   given to the Committee?
19       A.    I have no idea. I've never seen
20   it before.
21       Q.    Do you know what any of these
22   markings mean?
23       A.    I don't know what this is.
24       Q.    Okay.
25       MR. STERN: Can I ask what the

Page 158

1      J. SEERY - HIGHLY CONFIDENTIAL
2    source of this document is?
3        MS. TAGGART: I believe that it is
4    from the Committee. Something given to
5    them.
6        MR. STERN: I see. Because it's
7    not Bates stamped. In other words, it
8    hasn't been produced in connection with
9    this discovery.
10       MS. TAGGART: Right.
11       MR. STERN: Okay.
12   BY MS. TAGGART:
13       Q. Tell me about your conversation
14   regarding JPMorgan.
15       A. The Committee was in the room
16   during those negotiations. It was a rather
17   large room at Weil. And it really centered
18   around some additional cash that Barclays was
19   going to put up. An extra approximately
20   $7 billion. And they were willing to put it
21   up for what they viewed as repo-able
22   securities. And the discussions and argument
23   and negotiations were around -- a lot around
24   Racers and a lot of collateral debt Barclays
25   did not want to take from JPMorgan and that

Page 159

1      J. SEERY - HIGHLY CONFIDENTIAL
2    JPMorgan was trying to push onto Barclay.
3        Q. And was there a resolution that
4    was reached before closing the transaction?
5        A. Yes. JPMorgan agreed that they
6    would -- that it wasn't Barclays
7    responsibility -- my recollection is that it
8    wasn't Barclays responsibility to take this
9    other collateral out of the box from JP and
10   that JP would not stand in the way of closing
11   the trade, the sale to Barclays, and would
12   continue to facilitate the closing of trades
13   that Barclays would make as the owner of the
14   new business. And I don't know if they agreed
15   any further to keep them as the clearing bank
16   or not. I just don't know.
17       Q. In your discussion at all with the
18   Committee now prior to the transaction closing
19   did you convey the substance that Barclays at
20   the end of this would be making a profit or
21   otherwise gain at the closing?
22       MR. STERN: Objection to the form.
23       A. Well, the Committee said, Look,
24   they're getting -- they're going to close out
25   these assets and they're going to own these

Page 160

1      J. SEERY - HIGHLY CONFIDENTIAL
2    assets that are worth more than the amount
3    that they put up.
4        Q. Did you agree with that?
5        A. It's just math. Yeah. Of course.
6        Q. And I think we've asked before but
7    do you remember at all the extent of that gain
8    that was being discussed on that Sunday?
9        MR. STERN: Objection to the form.
10       A. Well, the question -- it's not
11   necessarily a gain or a loss because they
12   don't book and take gains or losses by the
13   minute so it would really depend on where they
14   came out at the end of the transaction.
15       Q. But --
16       A. I don't even know that -- I don't
17   know how Barclays accounts for those types of
18   transactions, whether they mark to market
19   daily, whether they have a book and hold. I
20   don't know how they would account for it at
21   the end.
22       But the question -- if your
23   question is did the Committee know that the
24   amount of cash advanced was less than the
25   amount of the assets, the answer is yes. Did

Page 161

1      J. SEERY - HIGHLY CONFIDENTIAL
2    we discuss it, the answer is yes. Did they
3    say is that too much, the answer is yes. Did
4    we go through a view as to whether there was
5    some other transaction we could do, the answer
6    is yes. Did they accept that what was what
7    Barclays would get, the answer is yes.
8        Q. And do you remember any further
9    discussion about the difference between the
10   cash and the amount of assets?
11       A. That's a lot of discussion.
12       Q. Okay.
13       A. I don't recall anything else.
14       Q. Any numbers?
15       A. I just don't recall the numbers.
16   This was two weeks -- a week and a half.
17       Q. There were some numbers discussed
18   but you don't remember offhand today.
19       A. We had cheats in front of us,
20   yeah. We were talking real numbers. It
21   wasn't theoretical.
22       Q. And what did you say about your
23   view whether there were other transactions
24   possible?
25       A. That there weren't. Because we

Page 162

1    J. SEERY - HIGHLY CONFIDENTIAL
2    had been in court. Lehman had tried to shop
3    prior to the bankruptcy itself. That the
4    credit crisis that was going on in mid to
5    late -- mid '08 through the summer and then
6    post Lehman's filing, no one was showing up to
7    finance these positions or to buy Lehman
8    Brothers.
9        And there were a number of, you
10   know, potential parties that could have if
11   they thought it was such a great and riskless
12   deal. For example, JPMorgan could have easily
13   afforded and taken down the whole thing. But
14   they didn't think it was so special.
15       The Committee members, Danny
16   Golden talked about possibly putting together
17   at court a bunch of guys to come in and do
18   this trade. They never did. So there wasn't
19   another deal.
20   Q.    Were there any changes made to the
21   transaction on Sunday, the 21st?
22       MR. STERN: Objection to the form.
23   A.    Not that I recall. This was
24   the -- no. I don't think so.
25   Q.    Okay.

Page 163

1    J. SEERY - HIGHLY CONFIDENTIAL
2        MS. TAGGART: Let's take a break.
3    We need to talk about kind of dividing
4    up the remaining time.
5        MR. STERN: Okay. Fair enough.
6        (Recess taken.)
7    BY MS. TAGGART:
8    Q.    We talked about -- turning again
9    to Sunday the 21st, and the meeting with the
10   Creditors Committee, who else from Lehman was
11   having discussions with the Creditors
12   Committee?
13   A.    Really nobody. The only other
14   person -- persons who were involved were Weil.
15   And that was Harvey, Lori, Roberts and Michael
16   Klein. He was in and out quickly.
17   Q.    And did Harvey, Lori, and Roberts
18   also have discussions with the Creditors
19   Committee?
20   A.    They were in the room when I was
21   having these discussions. And then I -- there
22   was someone else with me and I just can't
23   remember.
24   Q.    Was Kirk there?
25   A.    Kirk was there but he wasn't

Page 164

1    J. SEERY - HIGHLY CONFIDENTIAL
2    involved in those discussions.
3    Q.    And was there more than one
4    meeting with the Creditors Committee?
5    A.    It would be as if we were having
6    this discussion here today. Discussion,
7    leave, back. It's really one meeting with
8    breaks.
9    Q.    Who was the one who described the
10   deal to the Creditors Committee? Was that
11   you?
12   A.    That was me.
13   Q.    And what specifically were the
14   documents that you gave?
15   A.    I don't recall. They had the
16   asset purchase agreement for sure and then we
17   both had a ledger and the way it transpired
18   was Saul and I believe Luc, but I don't
19   recollect Luc specifically, coming up and
20   asking with Mike -- Mike was there for sure.
21   They said here's the description that they
22   understood the transaction. I believe that
23   the way that Saul said it was here's what I
24   understand, what am I missing.
25   Q.    They had a document that described

Page 165

1    J. SEERY - HIGHLY CONFIDENTIAL
2    the transaction?
3    A.    They had the asset purchase
4    agreement. They had their notes of the
5    transaction. And they had a ledger with the
6    positions on it.
7    Q.    Okay. And what did you say they
8    were missing?
9    A.    They weren't missing anything.
10   Q.    They thought that accurately --
11   A.    They were pretty accurate about
12   what the deal was and what the positions were
13   and what the numbers were. And we walked
14   through categories of assets.
15   Q.    Were they in a different -- were
16   they in a different room from -- well, how
17   many rooms were there that there were
18   discussions going on on the 21st?
19   A.    There were at least three, maybe
20   four rooms. There was the big giant room
21   where we started our first discussion. Then
22   there was a separate room that I had which is,
23   you know, a decent sized conference room. I
24   don't remember if they had their own
25   conference room. They must have. And then

Page 166

1      J. SEERY - HIGHLY CONFIDENTIAL
2    there was a room Barclays had. So there was a
3    Lehman room, a committee room, a big party
4    room, a Barclays room. And I don't recall if
5    there were others.
6       Q.   Okay.
7       A.   JP must have had their own room,
8    too.
9       Q.   Did you ever come to an
10   understanding of the value of the assets on
11   the 22nd as of the -- the value of the assets
12   that were conveyed to Barclays?
13      MR. STERN: Objection to the form.
14      Q.   Total value and total assets.
15      A.   I don't quite understand what
16   you're asking me.
17      Q.   Do you know sitting here today
18   what is the value of all of the assets that
19   were conveyed to Barclays as part of the
20   transaction with Lehman?
21      A.   The value would change, you know,
22   moment by moment. But I don't know what that
23   number was at the time of close.
24      Q.   And do you have an understanding
25   sitting here today of -- on the day of close

Page 167

1      J. SEERY - HIGHLY CONFIDENTIAL
2    on the 22nd whether Barclays realized a gain
3    and that the value that it received was more
4    than the value that it gave -- valued on the
5    22nd?
6       MR. STERN: Objection to the form.
7       A.   Again, whether it's a gain or a
8    loss depends on how you account for it and
9    when you account for it. The simple math is
10   that the marked value of the assets that they
11   closed out was larger than the amount of cash
12   that they had previously put up.
13      Q.   Do you know that difference?
14      A.   I do not know the difference.
15      Q.   Okay. What compensation did you
16   receive from Barclays when you worked there?
17      A.   From Barclays?
18      Q.   Yes.
19      A.   I had a regular pay. I don't
20   remember what my salary is. █████████
21   Something like that. █████████
22   And then I had a bonus in the form of deferred
23   comp and I don't remember the exact number.
24      Q.   Do you know the approximate range?
25      A.   A █████████

Page 168

1      J. SEERY - HIGHLY CONFIDENTIAL
2       Q.   When did you first have any
3    discussion about potential employment with
4    Barclays?
5       A.   After the close. I assumed that
6    they'd want to keep me. And I actually
7    assumed that they wanted me to run their loan
8    business. But their structure was very
9    different from the way Lehman ran its
10   businesses. So I never really worried about
11   or discussed with them exactly what my role
12   would be. And started talking to them after
13   the close as they transitioned the business.
14      Q.   Who was the first person at
15   Barclays that you spoke to on that topic?
16      A.   I don't remember if it was Keegan
17   or if it was a guy named -- not Rich Ricci.
18   There was another Ricci spelled differently
19   who is the head of the loan business out of
20   London. His first name escapes me. Or if it
21   was Bomensath. It might have been Bomensath.
22   I don't recollect exactly. But we were --
23   once closed it was trying to keep as much of
24   the team together and transition the business
25   to Barclays as quickly as possible.

Page 169

1      J. SEERY - HIGHLY CONFIDENTIAL
2       MS. TAGGART: Let's mark this as
3    the next one.
4       (Deposition Exhibit 339B, document
5    bearing production numbers
6    BCI-EX-(S)-00000648 through
7    BCI-EX-(S)-00000650, marked for
8    identification as of this date.)
9    BY MS. TAGGART:
10      Q.   We're marking as Exhibit 339B a
11   document that goes from BCI-EX-(S)-000648
12   through -650 and at top is an e-mail from
13   Lindsay Martin on November 23rd.
14      Though you're welcome to read it
15   all I don't think that you are on this chain
16   and I in particular want to draw your
17   attention to the second down from Eric Felder
18   to Lindsay Martin that starts --
19      MR. STERN: Well, take your time.
20   Take your time to read it.
21      MS. TAGGART: All right. Let me
22   finish where he should be directed.
23      Q.   -- that starts "Seery was part of
24   the top 50."
25      So read that part and then

Page 170

1    J. SEERY - HIGHLY CONFIDENTIAL
2    anything else you want to familiarize
3    yourself.
4        A.   Okay.
5            (Document review.)
6        A.   Okay.
7        Q.   Okay. So you see in the e-mail
8    from Eric Felder it says "Seery was part of
9    the top 50 in FID so he had the conversation
10    on Friday."
11            And I also read in if you -- one
12    e-mail further down it says, "Found him,
13    thanks. Have you spoken to Hammack and Seery
14    yet?"
15            Did you speak to anyone -- Lindsay
16    Martin or anyone else from Barclays on --
17    before this time on September 23rd about your
18    employment?
19        A.   No.
20        Q.   Do you know what they're referring
21    to about the top 50 in FID?
22        A.   Part of the transaction was
23    that -- and this I found out pretty late into
24    it, they wanted to make -- Barclays wanted to
25    make sure that they retained key personnel

Page 171

1    J. SEERY - HIGHLY CONFIDENTIAL
2    that helped drive the business. And so they
3    had a guaranteed bonus as a percentage of the
4    prior year's comp for certain individuals.
5        Q.   And did you understand that you
6    were one of those individuals?
7        A.   At some point I understood I was
8    one of those individuals and I believe it was
9    post close.
10        Q.   Okay.
11            MS. TAGGART:   That's all my
12    questions for now. If there's remaining
13    time I might have some more but I want
14    to give my colleagues a chance, too.
15            THE WITNESS:   Sure.
16                * * *
17    EXAMINATION BY
18    MR. CARDEN:
19        Q.   Mr. Seery, I'm David Carden,
20    special counsel for the estate.
21            When you spoke about having seen
22    some executory contracts I think early in the
23    week of the 15th which reflected as you recall
24    somewhere in the neighborhood of $2.25 billion
25    of Lehman contracts, was that in connection

Page 172

1    J. SEERY - HIGHLY CONFIDENTIAL
2    with DIP financing that you were looking into
3    or that resulted in the creation of
4    Exhibit 337B?
5        A.   Yeah. I don't know if I actually
6    saw the contracts. I know others were
7    assembling them. In connection with the DIP I
8    did not look at any executory contracts. I
9    looked at payables.
10        Q.   Okay. Well, I just want to be
11    clear that when you said there was something
12    in the neighborhood of 2.25 billion then you
13    were saying you saw some sort of document that
14    had payables on it.
15        A.   Yes.
16        Q.   All right. And were those
17    payables for the entire firm?
18        A.   I don't recollect if it was the
19    entire firm. I would think we who would have
20    broken it out certainly just to the US
21    business. But I don't recollect.
22        Q.   Well, if you look at Exhibit 337B
23    which I think is the DIP financing --
24            MR. STERN:   Let's get that out.
25        Q.   It's a pledge agreement.

Page 173

1    J. SEERY - HIGHLY CONFIDENTIAL
2            Does that pledge agreement relate
3    to a financing of the entire firm, that is the
4    entire Lehman Brothers Holdings, Inc.?
5        A.   It relates to a financing of
6    Lehman Brothers Holdings, Inc. When you say
7    the entire firm, Europe was already gone.
8    Asia was gone. A number of other businesses
9    were beginning to be shut down. So it was to
10    Holdings but it didn't relate to what I would
11    describe as the entire company.
12        Q.   Okay. Fair enough. It was an
13    agreement, though, to finance what was left of
14    Lehman Brothers as of the date it was
15    executed.
16        A.   Correct.
17        Q.   That also included LBI, didn't it?
18        A.   Yes.
19        Q.   And the list of payables that you
20    saw, do you know as you sit here today whether
21    that was a subpart of LBHI, that is only
22    related to the US business, or do you know if
23    it related to the entire firm?
24        A.   I don't recollect. My -- I don't
25    recollect.

Page 174

1    J. SEERY - HIGHLY CONFIDENTIAL
2    Q.    Okay.  You do understand -- well,
3    strike that.
4          You did understand, however, that
5    at the time that this DIP financing document
6    was created in the week of September 15th and
7    signed by you, that Barclays was not
8    interested in purchasing anything beyond
9    assets that were in North America, correct?
10    A.    They were not going to.  They were
11    very interested and wished they could have
12    done it.
13    Q.    Fair enough.  I should have —
14    A.    And, in fact, committed to it.
15    Q.    Yeah.  Let me restate the question
16    because I understand your point.
17          At the time that the DIP financing
18    was entered into, Exhibit 337B, and you saw
19    payables in connection with that, Barclays was
20    not going to acquire anything other than the
21    North American assets.
22    A.    That's correct.
23    Q.    So some of the contracts that --
24    strike that.
25          Some of the payables that you saw

Page 175

1    J. SEERY - HIGHLY CONFIDENTIAL
2    in connection with the DIP financing that's
3    337B related to non-US assets, didn't they?
4          MR. STERN:  Objection to the form.
5    A.    I don't know that.
6    Q.    You don't know that one way or the
7    other?
8    A.    I don't think -- I don't know one
9    way or the other.  I don't believe that I
10    would have included, for example, Asian
11    payables in what my requirements were for the
12    amount to be paid in the US.
13    Q.    When you say you wouldn't have
14    required it, did you ask someone to get the
15    list of payables?
16    A.    Yeah.
17    Q.    Okay.  Who did you ask?
18    A.    I believe Beth Rudofker.
19    Q.    And did anyone help Beth, to your
20    knowledge?
21    A.    I don't think she got it herself
22    so there were lots of people working on all of
23    these matters and this was, you know, in the
24    middle of the night.  We're talking about
25    around the DIP right now.

Page 176

1    J. SEERY - HIGHLY CONFIDENTIAL
2    Q.    And you did ask her to do that in
3    connection with DIP financing that's been
4    marked as 337B, right?
5    A.    Yes.
6    Q.    And the contracts that would have
7    been required for Lehman Brothers to operate
8    the -- what business was left would have
9    included foreign assets, wouldn't they?
10    A.    Yes.
11    Q.    Foreign subsidiaries, foreign
12    operations.
13    A.    Not necessarily, no.
14    Q.    Well, maybe I'm just unclear,
15    then.  The DIP agreement that is marked as
16    337B would have provided the funding for
17    operating all that was left of Lehman Brothers
18    Holdings, Inc. as of that date, correct?
19    A.    Correct.
20    Q.    And as of that time there were
21    foreign operations for Lehman Brothers
22    Holdings, Inc. and subsidiaries, were there
23    not?
24    A.    There were some foreign special
25    purpose entities that I don't believe required

Page 177

1    J. SEERY - HIGHLY CONFIDENTIAL
2    any funding, but the foreign businesses I
3    believe were basically gone by then.  I don't
4    think we had funding obligations to Asia or to
5    Europe at that point.
6    Q.    Do you know?
7    A.    I'm pretty sure we didn't.
8    Q.    Okay.
9    A.    Europe had already filed.  And I'm
10    pretty sure that Asia did.  I don't recollect
11    exactly.
12    Q.    Do you remember whether you asked
13    Beth only to provide you with executory
14    contracts for North America?  Or for the
15    United States, rather?
16    A.    I don't remember the exact
17    discussion.
18    Q.    Now, at the time -- strike that.
19          When did you first see Exhibit 19
20    which is the balance sheet?
21    A.    I don't remember.
22    Q.    Do you remember how you came to
23    see it?
24    A.    No.
25    Q.    Do you remember who gave it to

Page 178

1    J. SEERY - HIGHLY CONFIDENTIAL
2    you?
3       A.   Not specifically, no.
4       Q.   Do you have any idea why they gave
5    it to you?
6       A.   No.
7       Q.   Do you know if you saw it in or
8    about the date that it was -- that it bears in
9    the upper right-hand corner which is 9/16
10   which is a Tuesday?
11      A.   I don't recollect exactly when I
12   got it. I certainly got the asset purchase
13   agreement and I believe it was an exhibit to
14   it but I don't recall exactly.
15      Q.   Yeah. I'll -- I think your
16   counsel will permit me to -- will indulge me
17   to say it's not an exhibit but it is referred
18   to in the asset purchase agreement.
19      A.   Okay.
20      Q.   Do you know if you got this asset
21   purchase agreement and this Exhibit 19 on or
22   about the same time?
23      A.   I would think so, yes. I don't
24   know for sure.
25      Q.   Do you know who gave you the asset

Page 179

1    J. SEERY - HIGHLY CONFIDENTIAL
2    purchase agreement?
3       A.   I don't recollect.
4       Q.   Did you read it closely when you
5    got it?
6       A.   Not real close because it wasn't
7    what I had to deal with.
8       Q.   That's really kind of where I'm
9    going. You really didn't have any
10   responsibilities with regard to the asset
11   purchase agreement at that time, did you?
12      A.   Not drafting it or putting pieces
13   into it, no.
14      Q.   Or even implementing the
15   transaction that is described in it.
16      A.   Some of the implementation as I
17   described this morning I was heavily involved
18   in, yes.
19      Q.   You became involved in certain
20   aspects after the asset purchase agreement was
21   entered into. But do you know if the asset
22   purchase agreement was given to you in order
23   to enable you to perform those tasks?
24      A.   I don't recall specifically.
25      Q.   Did you ever talk to Steve

Page 180

1    J. SEERY - HIGHLY CONFIDENTIAL
2    Berkenfeld about the asset purchase agreement?
3       A.   Steve was on the floor negotiating
4    it and we definitely talked.
5       Q.   Do you remember having spoken to
6    him about the APA?
7       A.   Not specifically but we certainly
8    talked about the transaction.
9       Q.   Did you talk to anyone, to your
10   recollection, about Exhibit 19?
11      A.   I don't know if it was that
12   exhibit. We discussed either that document or
13   something derivative of it which I talked
14   about with numerous people.
15      Q.   Do you know -- strike that.
16           At some point you said that you
17   were responsible for -- and I don't want to --
18   I'm just paraphrasing for purposes of the
19   question, I don't want to put words in your
20   mouth -- the structure of the deal. You had
21   discussions concerning the structure of the
22   transaction.
23           Do you recall that testimony?
24      A.   Right. The mechanics and how the
25   structure would work and how we would get it

Page 181

1    J. SEERY - HIGHLY CONFIDENTIAL
2    done, yes.
3       Q.   All right. Did you mean by that
4    that -- the relationship of assets to
5    liabilities in any respect?
6       A.   No.
7       Q.   And did anybody ever describe this
8    transaction to you as a wash transaction?
9       A.   No.
10      Q.   Do you know if this transaction
11   was described to the board as a wash
12   transaction?
13      A.   No, I have no idea.
14      Q.   Okay. As you look at Exhibit 19 I
15   think you testified that the assets and
16   liabilities add up, correct? They match.
17      A.   The numbers are the same.
18      Q.   The numbers are the same.
19           And you would agree with me, would
20   you not, that Exhibit 19 does not reflect any
21   kind of profit to Barclays on its face?
22           MR. STERN: Objection to the form.
23   Asked and answered.
24      A.   Exhibit 19 doesn't reflect
25   Barclays at all.

Page 182

1    J. SEERY - HIGHLY CONFIDENTIAL
2        Q.    And for that -- well, you would
3    agree with me, would you not, that -- well,
4    let me back up a second.
5        Do you know whether Exhibit 19
6    with regard to the assets that are valued on
7    its face reflect a discount off what were then
8    the Lehman marks?
9        A.    I do not know.
10        Q.    Have you ever heard in connection
11    with the Lehman/Barclays transaction something
12    referred to as a clarification letter?
13        A.    I don't think so.
14        Q.    I'm going to show you what's been
15    previously marked as Exhibit 25. Have you
16    ever seen it before?
17        MR. STERN: Take your time.
18        (Document review.)
19        A.    I don't recollect if I've seen
20    this document before.
21        Q.    Okay. In any event, you had no
22    role or responsibility for preparing any
23    aspect of that document, did you?
24        A.    No.
25        Q.    Did you ever have any

Page 183

1    J. SEERY - HIGHLY CONFIDENTIAL
2    conversations with anyone at any time about
3    there being a need from Barclays' standpoint
4    to terminate the repo transaction?
5        A.    Yes.
6        Q.    With whom did you have those
7    conversations?
8        A.    The Committee. LaRocco. I'm
9    trying to think who else. My counsel. You
10    know, Weil.
11        Q.    Was that on Sunday?
12        A.    Yes.
13        Q.    Tell me what you remember having
14    been said about Barclays' need to terminate
15    the repo transaction.
16        A.    The transaction would be
17    terminated and that would be -- and Lehman
18    would be relieved of its obligation to buy
19    back and that would be how we would close.
20    That would be the mechanic.
21        Q.    Did you tell them why -- strike
22    that.
23        Do you know why Barclays wanted to
24    terminate the repo transaction?
25        A.    Did I know -- I believe I knew,

Page 184

1    J. SEERY - HIGHLY CONFIDENTIAL
2    yes.
3        Q.    Okay. What -- did anyone at
4    Barclays -- well, strike that. Look at
5    paragraph 13 of the clarification letter.
6        A.    (Witness complies.)
7        MR. STERN: Take your time to read
8    it.
9        THE WITNESS: Um-hum.
10        (Document review.)
11        A.    Okay.
12        Q.    Did you ever have any conversation
13    with anybody about this paragraph?
14        A.    No.
15        Q.    Did you ever have a conversation
16    with anyone concerning the facts reflected in
17    the last sentence of the paragraph that the
18    notice of termination relating to the Barclays
19    repurchase agreement dated September 19th,
20    2008 would be rescinded?
21        A.    No. As I testified earlier, I
22    didn't think that it even -- that there was
23    any such notice or that it had been done. It
24    doesn't make sense that it was done.
25        Q.    When you say that it doesn't make

Page 185

1    J. SEERY - HIGHLY CONFIDENTIAL
2    sense that it was done, it doesn't make sense
3    that the termination notice was rescinded?
4        A.    No, that it was actually -- that
5    there was a termination notice or that there
6    had been any kind of termination prior to the
7    closing.
8        Q.    Did there come a time when you had
9    learned that there had been a termination
10    prior to closing?
11        A.    Not before the testimony today.
12        Q.    All right. So the first you knew
13    that in fact that the termination notice that
14    was dated September 19th was rescinded is in
15    speaking with me now.
16        A.    Actually, a little bit -- well,
17    the rescinded, yes. The purported termination
18    was a little bit earlier today.
19        Q.    All right. And I take it then
20    that you had no conversation with anybody
21    about Barclays about their desire to actually
22    rescind the prior termination notice.
23        A.    No.
24        Q.    Do you have any explanation for me
25    at all as to why they would need to rescind

---

Page 186

J. SEERY - HIGHLY CONFIDENTIAL

1  the prior termination notice?
2  
3     MR. STERN: Objection to the form.
4     A.   I have -- I didn't know that there
5  was one. As I said, it didn't make sense for
6  the way we were working all the way through.
7  I don't know why it was given on the 19th.
8  And it wouldn't have made sense if they were
9  going to carry it through the weekend which I
10 thought was the understanding.
11    Q.   Okay. I take it you didn't have
12 any conversation with anybody on the Creditors
13 Committee about the rescinding of the prior
14 notice of termination.
15    A.   No. And, in fact, the underlying
16 predicates of our conversation were that if
17 there would be a termination it would only be
18 at closing. Not that it had been previously
19 terminated.
20    Q.   Now, on Thursday -- I think it was
21 Thursday, you testified that there was --
22 maybe the Friday -- there was a desire to find
23 some additional collateral to transfer
24 Barclays.
25    A.   The days do run together but I

---

Page 187

J. SEERY - HIGHLY CONFIDENTIAL

1  believe that was Friday morning.
2  
3     Q.   Okay. And I think you said that
4  you weren't aware of any specific amount of
5  collateral that was being sought.
6     A.   No. It was generated as I
7  testified out of Barclays' nervousness
8  regarding the values in the transaction and in
9  the repo and their desire to have more assets
10 in that transaction.
11    Q.   Do you know who at Lehman Brotbers
12 was involved in trying to find additional
13 unencumbered assets to transfer to Barclays?
14    A.   I believe I testified that it was
15 Lowitt and his team who would have included
16 Tonucci and others.
17    Q.   And did you have any
18 responsibility whatsoever once you -- or
19 during the Friday to assist in any way
20 identifying any unencumbered collateral?
21    A.   Certainly analyzing what we were
22 talking about in terms of potentially
23 providing additional collateral, whether it
24 could be provided, whether it was subject to
25 other liens, some of those kinds of concerns I

---

Page 188

J. SEERY - HIGHLY CONFIDENTIAL

1  was involved in that, yes.
2     Q.   Were tbere conversations you had
3  with people at Lehman Brothers concerning
4  whether the collateral that was being
5  identified could be transferred?
6     A.   Yes.
7     Q.   With whom were you speaking?
8     A.   Lowitt, Kirk, Tonucci, McDade.
9     Q.   At any point in time did anybody
10 say to you at Lehman Brothers bow much
11 additional collateral was being sougbt?
12    A.   We certainly talked about the
13 amounts they sought. I don't remember the
14 amounts.
15    Q.   Did they tell you how the amounts
16 were derived?
17    A.   No.
18    Q.   In other words, did tbey say to
19 you at any point that Barclays was looking for
20 an additional 1 billion, 2 billion, 3,
21 billion, 4 billion, $5 billion?
22    A.   I don't recollect the ask. There
23 definitely was an ask.
24    Q.   There clearly was an ask, right?

---

Page 189

J. SEERY - HIGHLY CONFIDENTIAL

1     A.   Yes.
2     Q.   You just don't remember what it
3  was.
4     A.   I just don't remember the number.
5  I think Alex got that information. I don't
6  remember the --
7     Q.   Alex Klein.
8     A.   Kirk.
9     Q.   Alex Kirk. That's what I mean.
10       Did you ever see any calculation,
11 ledger of any kind, on Friday as additional
12 unencumbered collateral was being sought that
13 reflected from Lehman's standpoint how much
14 value or what the value was of what Barclays
15 had already received?
16    A.   You mean the value of the assets
17 subject to the repo?
18    Q.   Yes.
19    A.   We had our marks. And I think we
20 were living by our marks.
21    Q.   And do you recall what your marks
22 were?
23    A.   The amount?
24    Q.   On tbe collateral actually already

---

Page 190

J. SEERY - HIGHLY CONFIDENTIAL

1    transferred to Barclays.
2        A.   No. I don't recall the numbers.
3        Q.   Is it fair to say that after --
4    well, strike that.
5            Is it fair to say that from Monday
6    morning, September 15th on, that you were not
7    involved in the valuation of any of the
8    collateral that went to Barclays in connection
9    with the asset purchase agreement, proposed to
10   go there, or which ultimately was transferred?
11       MR. STERN: Objection to the form.
12       Q.   Let me restate it because it's
13   compound. Let me say it this way.
14           After Monday, September 15th, you
15   had no involvement whatsoever in the valuation
16   of any assets that Barclays received in the
17   Lehman/Barclays transaction.
18       MR. STERN: Objection to the form.
19       A.   All right. If the question -- I
20   think you're asking me did I put forth or was
21   I involved in the values that were derived for
22   marking those positions. The answer is no.
23   But I did testify about my involvement with
24   discussions regarding those values.

Page 191

J. SEERY - HIGHLY CONFIDENTIAL

1        Q.   I understand. I'm just talking
2    about whether you were involved in deriving --
3        A.   No.
4        Q.   Okay.
5        A.   Those were not positions that I
6    marked.
7        Q.   Yeah. Because I believe what you
8    said was that the positions that you were
9    responsible for marking, that is the loan
10   portfolio, was not part of the transaction.
11       A.   That's right.
12       Q.   That's true for the private equity
13   positions as well, correct?
14       A.   That's correct.
15       Q.   And you did have some involvement
16   in connection with the marking of private
17   equity positions as well?
18       A.   Discussions around the value down
19   at the Fed as well as checked on some of the
20   positions. I did not have responsibility to
21   mark those positions.
22       Q.   Okay. Now, did Eric Felder have
23   any responsibilities for the valuation of any
24   of the assets that were transferred to

Page 192

J. SEERY - HIGHLY CONFIDENTIAL

1    Barclays?
2        A.   I don't -- did Eric Felder have --
3    I'm sorry. Can you say that again?
4        Q.   Let me just restate it.
5            To your knowledge, did Eric Felder
6    have any responsibility for marking the
7    positions -- marking the assets that went to
8    Barclays in the Barclays/Lehman transaction?
9        A.   I believe that those -- at least
10   some of those positions would have rolled up
11   to Felder at that time. So he would have had
12   ultimate responsibility for those marks.
13       Q.   Did you have any conversations
14   with Felder during the week of September 15th?
15       A.   I didn't talk to him at all.
16       Q.   Pardon? You didn't talk to him?
17       A.   I didn't talk to him at all that I
18   recollect.
19       Q.   Did you talk to -- I think you did
20   say you talked to Mark Shafir, correct?
21       A.   Yes.
22       Q.   Just generally speaking, what were
23   you speaking to Shafir about?
24       A.   Generally the deal overall.

Page 193

J. SEERY - HIGHLY CONFIDENTIAL

1    Getting it done. Completing -- Mark was down
2    at the Fed and was negotiating the deal
3    through I think Wednesday. I forget when he
4    left. And so he was around. And questions
5    about how to get it done and whether we'd be
6    able to hold the firm together pending the
7    closing. What we were doing in that regard,
8    et cetera.
9        Q.   You're aware that he did leave the
10   employment of Lehman Brothers that week,
11   right?
12       A.   Yes.
13       Q.   Do you know why?
14       A.   No.
15       Q.   Was there ever any talk about why
16   he left in the middle of the transaction?
17       A.   I assume he got a deal he liked.
18       Q.   But was there any discussion as to
19   why he couldn't wait to Monday?
20       A.   No. And it was a little bit
21   disconcerting.
22       Q.   It was disconcerting for him to
23   leave in the middle of the transaction?
24       A.   Just not a good way to go out.

Page 194

1    J. SEERY - HIGHLY CONFIDENTIAL
2        Q.    And have you ever had any
3    conversations with anybody about why he did
4    leave in the middle of the transaction?
5        A.    No.
6        Q.    I take it then you have no opinion
7    on why he did.
8        A.    No.
9        Q.    Now, you testified when you were
10   in the conversations with the Committee on the
11   Sunday, the 21st, that someone had a ledger of
12   some kind.
13       A.    Yeah.  We had ledgers which showed
14   all the positions.
15       Q.    Okay.  Were those ledgers that
16   showed the positions of what was actually
17   supporting what had been the Fed repo?
18       A.    They were -- I believe they were
19   the close of Friday's positions that went to
20   Barclays.
21       Q.    All right.  So it was some part of
22   what had been in the Fed repo?
23            MR. STERN:  Objection to the form.
24       A.    It may have -- I don't know.  It
25   may have or may not have.  It was Friday's

Page 195

1    J. SEERY - HIGHLY CONFIDENTIAL
2    close to Barclays.
3        Q.    Do you know whether or not all of
4    the assets that had been supporting the Fed
5    repo, in fact, were ultimately transferred to
6    Barclays?
7        A.    I don't know.  I would think not.
8        Q.    But in any event the ledgers that
9    you had on Sunday showed the actual positions
10   that had been transferred.
11       A.    Yes.
12       Q.    Right.  Who prepared those, do you
13   know?
14       A.    They would have been prepared out
15   of Lehman treasury.
16       Q.    And they had Lehman marks, right?
17       A.    Yes.
18       Q.    Did you give copies of those to
19   the Committee?
20       A.    I don't recall if I gave them.
21   They had them.
22       Q.    Were they allowed to keep them?
23       A.    I'm sure they were.  We didn't
24   take any docs back.
25       Q.    All right.  I'm sorry if I missed

Page 196

1    J. SEERY - HIGHLY CONFIDENTIAL
2    this but were there any other documents apart
3    from the ledger that you just described that
4    were shared with the Committee?
5        A.    Other than the asset purchase
6    agreement and ancillary documents related to
7    that, no.  Not that I recollect.
8        Q.    Now, I'm not by any means meaning
9    to diminish your role in any of this.  It was
10   obviously substantial.  But I'm wondering why
11   it was that you were the one selected to
12   actually speak to the Committee on Sunday
13   about the deal.  Do you have any explanation
14   for that?
15       A.    I think because Alex got called
16   into the deal and worked for Alex for ten
17   years and done a lot of deals.
18       Q.    All right.  And -- but Alex was
19   not in the meeting with you, right?
20       A.    He was in some of the meetings,
21   yeah.
22       Q.    I'm talking about the meeting with
23   the Committee now.
24       A.    Yeah.  Because we started in the
25   big room after the JPMorgan.  He was there at

Page 197

1    J. SEERY - HIGHLY CONFIDENTIAL
2    that time.  He stepped out and moved to
3    another room.  I don't know if he came back in
4    or out of that meeting.  But he there for a
5    lot of the time.
6        Q.    All right.  And you testified to
7    this and I'm sorry because I didn't gather it
8    all in, but other than Alex was anyone else
9    from Lehman Brothers in the meeting with the
10   Committee at which the deal was described?
11       A.    Yeah.  The answer is yes, there
12   was.  And I just don't recall -- and I can't
13   tell you why I just don't recall -- who else
14   was sitting with me.
15       Q.    I want you to look for a moment at
16   Exhibit 338B which is that handwritten
17   document which you said you'd never seen
18   before.
19            Before we get it to, let me just
20   ask you.  I think you said in connection with
21   the meeting with the Committee that you
22   described the transaction as the one that had
23   been shared with the court on Friday.
24            MR. STERN:  Objection to the form.
25       A.    Yes.  Yeah, this was the

Page 198

1    J. SEERY - HIGHLY CONFIDENTIAL
2  transaction that we were discussing, yes.
3      Q.   Right. On Sunday you were
4  describing that same transaction.
5      A.   Yes.
6      Q.   Had there been any changes, to
7  your knowledge, in the transaction from the
8  description of the transaction on Friday to
9  the court, between that time and the time that
10  you were meeting with the Committee on Sunday?
11      MR. STERN: Objection to the form.
12      A.   I think I testified that there
13  weren't material transaction changes to the
14  structure. There would have been changes to
15  the positions and the amounts.
16      Q.   Meaning valuations.
17      A.   Correct.
18      Q.   But you don't recall the quantum
19  of those changes?
20      A.   No.
21      Q.   Do you remember which direction
22  they went? In other words, were the asset
23  values higher than what was being transferred
24  or were they lower?
25      A.   I don't recollect. I mean, there

Page 199

1    J. SEERY - HIGHLY CONFIDENTIAL
2  wasn't a lot going higher in those days.
3      Q.   Did you know at the time that you
4  met with the Committee on Sunday that some
5  cash had been transferred to Barclays?
6      MR. STERN: Objection to the form.
7      Q.   Let me restate that question.
8      Did you know at the time you spoke
9  to the Committee that Lehman Brothers had
10  attempted to transfer cash to Barclays?
11      A.   I don't recollect that right now.
12      Q.   Okay. Is there anything on
13  Exhibit 338B that you can recognize as
14  relating to the information -- I mean, I'm
15  talking about the numbers now, okay? -- that
16  you shared with the Committee on Sunday. I
17  know it's not your document. I'm not trying
18  to say that it is.
19      But is there anything on here that
20  you recognize that you would say, Yeah, well,
21  that's basically what we communicated or no,
22  it's very different than what we communicated?
23      MR. STERN: Objection to form.
24      A.   I'm not exactly sure what -- how
25  this document is set up, why it's got these

Page 200

1    J. SEERY - HIGHLY CONFIDENTIAL
2  four quadrants and what all -- what they're
3  trying to lay out here. But these are in the
4  neighborhood of the numbers that we talked
5  about.
6      Q.   Okay. That's what I'm getting at.
7  I mean, if you look back at Exhibit 19, you
8  know, you'll see $72 billion of assets,
9  roughly and $68 billion of liability. And you
10  see the 72 and the 68 at the top here. And
11  I'm not trying to put words in your mouth.
12  I'm just trying to understand what -- since we
13  don't have the ledger in front of us whether
14  this bears any relationship at all to the
15  information that was shared by you to the
16  Committee on Sunday.
17      MR. STERN: Objection to the form.
18      A.   Yeah, I don't know the exact -- I
19  don't recall the exact numbers but these are,
20  you know, in ranges that the numbers we were
21  talking about.
22      Q.   Okay. So let's just go through
23  them so we're clear on what that means. We
24  see the 72 and the 68. Leaving those aside
25  for just a moment, you weren't talking, were

Page 201

1    J. SEERY - HIGHLY CONFIDENTIAL
2  you -- well, let me ask you. In the meeting
3  with the Committee on Sunday were you speaking
4  at all about what was on the balance sheet
5  marked Exhibit 19?
6      A.   We hadn't spoken about 72 and
7  68 -- I never spoke about 72 and 68. Not
8  Friday, not Sunday.
9      Q.   Yeah, that wasn't the deal
10  anymore, correct?
11      A.   It wasn't the deal on Friday. It
12  wasn't the deal on Sunday.
13      Q.   Right. So going to the 49.9 I
14  think that language next to it says premark.
15  First off, do you have any understanding what
16  that would mean, premark?
17      MR. STERN: Objection to the form.
18      A.   I don't know who wrote this. I
19  could tell you what I would mean.
20      Q.   What would you mean?
21      A.   That would be the amount before it
22  was marked for losses for that day. Or gains
23  for that day.
24      Q.   Just by way of example without
25  reference to this document, do I understand

Page 202

J. SEERY - HIGHLY CONFIDENTIAL

1  you to mean that sometime during the day if
2  there were an asset say on Friday, the 19th,
3  that had not been -- no final marks had been
4  given to that position, that would be a
5  premark type valuation?
6      A.  No.  I think what you refer to is
7  you start the day at some asset's worth 90 and
8  at the end of the day it's either worth 91 or
9  it's worth 89.  So premark would be 90.
10     Q.  Ninety, okay.
11         Postmark, 44 to 45.
12     A.  Yeah.  It says 45 -- 44 plus 45.
13 I don't know why that's there.
14     Q.  Yeah, I guess that's right.  It
15 does say that.
16         Add box, 1.9.  Does that mean
17 anything to you?
18     MR. STERN:  Objection to the form.
19     A.  Again, I'm not sure what they're
20 referring to.  But there were assets in the
21 box so there were additional assets that we
22 were trying to get into the trade.
23     Q.  Do you know whether those
24 additional assets that were in the box had

Page 203

J. SEERY - HIGHLY CONFIDENTIAL

1  actually been put into the trade?
2      A.  I don't know.
3      Q.  Were you aware on Friday as
4  additional assets were being sought that they
5  were being sought -- 15(c)(3) assets were
6  being sought?
7      A.  Yes.
8      Q.  What are 15(c)(3) assets, do you
9  know?
10     A.  I don't recollect the specifics.
11 But they related to -- I believe they related
12 to mortgage assets.  And there was a real
13 question whether they could actually be
14 pledged, transferred, repoed or not.
15     Q.  But they're not in-the-box assets,
16 though, are they?
17     A.  No, I don't believe so.
18     Q.  And there's no reference on this
19 document to 15(c)(3) assets, is there?
20     A.  No, there's not.  Not that I see.
21     Q.  Let's just go over to the right
22 side while we're here.  It says federal
23 liability is 45.5.  Does that mean anything to
24 you?

Page 204

J. SEERY - HIGHLY CONFIDENTIAL

1      MR. STERN:  Objection to the form.
2      Q.  Again, in connection with the
3  general conversation you had with the
4  Committee on Sunday.
5      A.  I don't know what -- you know,
6  again, the numbers -- I don't know what this
7  document purports to be or who drafted this.
8  That would be a lot more helpful if we're
9  going to discuss it to know whose it was.
10 It's not mine.  It looks to me like that's the
11 liability side of their little mini balance
12 sheet here to say we got 47 and against it
13 we've got 45.
14     Q.  45.5.
15     A.  Correct.
16     Q.  The extra liabilities of 4.25 you
17 recognize those as having been the comp and
18 cure numbers -- the total, anyway, on the
19 Exhibit 19?
20     MR. STERN:  Objection to the form.
21     A.  Until you said that I didn't
22 recognize that as anything.
23     Q.  Okay.  Did you speak to the
24 Committee on Sunday about the undertaking by

Page 205

J. SEERY - HIGHLY CONFIDENTIAL

1  Barclays to pay comp and cure numbers?
2      A.  Never came up.  Not to my
3  recollection.
4      Q.  Okay.
5      A.  In the context of the trade it
6  was -- although those are large numbers, they
7  were small in the context of the trade.
8      Q.  And I take it when you were
9  talking previously -- when Ms. Taggart was
10 questioning you about the assets being
11 transferred to Barclays being less than the
12 liabilities they were assuming, that did not
13 take into account the comp and cure numbers
14 that are in Exhibit 19, did it?
15     A.  That did not -- again, to the
16 extent that those are -- I was not referring
17 to comp and cure at all.
18     Q.  You were just talking about the
19 value of the assets themselves.
20     A.  Yes.
21     Q.  Without any --
22     A.  Securities.
23     Q.  -- extra liabilities being assumed
24 by Barclays, correct?

Page 206

1     J. SEERY - HIGHLY CONFIDENTIAL
2        A.   Correct.
3        Q.   And you also were not talking
4     about the buildings and the data centers?
5        A.   No. 1 was not.
6        Q.   Okay. Now, at the bottom it
7     refers to 8.55 and that looks to me like it
8     says held up. Does that jog your memory?
9     Does that mean anything to you?
10       A.   1 don't recall the exact numbers
11    but there was a portion of the repo that 1
12    mentioned related to 7 billion approximately
13    in cash that JP -- that Barclays was prepared
14    to buy additional repo assets and JP wanted to
15    put to Barclays assets that Barclays didn't
16    want and didn't believe was appropriately part
17    of the repo.
18       Q.   It says Monday a.m. reverse trade.
19    Do you see that at the bottom?
20       A.   Yep.
21       Q.   You didn't talk to the Committee
22    about reversing the trade on Monday, did you?
23       A.   No. Terminating the trade.
24       Q.   Terminating the trade.
25       A.   We talked about terminating the

Page 207

1        J. SEERY - HIGHLY CONFIDENTIAL
2     trade. Not reversing the trade.
3        Q.   Not rescinding the prior
4     termination.
5        A.   No. This doesn't say that either.
6     This talks about -- 1 don't know what a re --
7     1 know what a reverse repo is but 1 don't know
8     what a reverse trade is.
9        Q.   Okay. You said previously that
10    Lehman had tried to shop itself. What was
11    being shopped prior to the week of September
12    15th was the sale of the entire firm, correct?
13       A.   Or an investment, yes.
14       Q.   Meaning a third-party equity stake
15    in the firm.
16       A.   1 was specifically involved with
17    direction -- discussions with Korea
18    Development Bank as well as with Bank of
19    America. 1 don't know about other specific
20    efforts.
21       Q.   But at no time was there a Lehman
22    transaction prior to September 15th where
23    Lehman was going to sell its broker/dealer
24    operation, correct? As a stand-alone
25    operation.

Page 208

1        J. SEERY - HIGHLY CONFIDENTIAL
2           MR. STERN: Objection to the form.
3        A.   Not that 1 know of.
4        Q.   Right. And, indeed, there was no
5     conversation that Lehman had with any
6     prospective purchasers concerning the sale of
7     a business entity if Barclays purchased prior
8     to September 19th, right?
9           MR. STERN: Objection to the form.
10       Q.   Of which you're aware.
11       A.   Well, no. We specifically had
12    discussions with BofA regarding what. It was
13    to buy the entire. But it certainly would
14    have included those business entities.
15       Q.   Let me restate the question.
16       A.   And KDB as well.
17       Q.   There was no conversation prior to
18    September 15th, 2008 wherein Lehman considered
19    the sale of only the business entities that
20    Barclays purchased, correct?
21       A.   No. We didn't actually plan on
22    dismantling the company.
23       Q.   Yeah. Was there only one meeting
24    that you had on Sunday, the 21st of September,
25    where you described the transaction to the

Page 209

1        J. SEERY - HIGHLY CONFIDENTIAL
2     Committee?
3        A.   There was one long meeting with
4     breaks. So we actually moved from -- 1
5     specifically recollect having this discussion
6     in at least two separate rooms a couple
7     different times and also in the waiting area
8     outside one of the rooms with the Committee
9     folks.
10          And 1 don't recall if we did it by
11    phone as well because they left. And 1 stayed
12    there all night. And 1 know we talked to them
13    and 1 believe they caucused with their
14    Committee and that's when they came back and
15    said we approve it.
16       Q.   Are you aware, Mr. Seery, at any
17    time whether or not Lehman valued any of the
18    assets that Barclays was considering
19    purchasing on a fire sale basis in case the
20    transaction did not go through?
21       A.   Did we do a fire sale valuation.
22          1 don't recollect specifically. 1
23    know we talked about what you might get for
24    assets if we can close the transaction. But 1
25    don't know that we did a fire sale valuation.

Page 210

J. SEERY - HIGHLY CONFIDENTIAL

1    I don't recollect it.
2       Q.   Okay. You weren't involved in
3    such a valuation.
4       A.   I don't remember. I could have
5    been but I just don't remember it.
6       Q.   Well, did you have any involvement
7    in preparing Mr. McDade for his testimony on
8    Friday, the 19th?
9       A.   Yeah, a little bit.
10      Q.   What did you do?
11      A.   I was by phone. He was over at
12   Weil with Lori Fife and I called in a couple
13   of times, gave him some additional
14   information, and I talked to Bart before he
15   went on the stand in the courtroom.
16      Q.   What kind of information were you
17   providing to him on that day in preparing for
18   his testimony?
19      A.   I don't recall specifically. It
20   related to the transaction, the changes from
21   that morning. He was around some of those.
22   All of them, frankly. To some degree or
23   another. And the structure of the deal. And
24   how it was going to get closed over the

Page 211

J. SEERY - HIGHLY CONFIDENTIAL

1    weekend.
2       Q.   When you say the way the
3    transaction had changed that morning there had
4    been some, what changes do you recall having
5    occurred?
6       A.   The ones that we talked about
7    earlier with respect to the additional efforts
8    to try to find additional collateral, the
9    concerns Barclays had, the fact that the short
10   or right side of the balance sheet had gone.
11   Those changes.
12      Q.   Meaning the shorts.
13      A.   Yeah.
14      Q.   By the time you spoke to Mr.
15   McDade when he was over at Weil Gotshal, had
16   unencumbered assets been located and a
17   decision been made to transfer them to
18   Barclays?
19      A.   I don't recollect if they actually
20   got any additional assets. I know they asked
21   for them. And I thought we identified the
22   15(c)(3)s as well as some other stuff. And if
23   you showed me a document that says, you know,
24   additional from the box or something. I don't

Page 212

J. SEERY - HIGHLY CONFIDENTIAL

1    recollect that they actually went to Barclays.
2       Q.   Okay. Do you have a recollection
3    of whether or not you had a conversation with Mr.
4    McDade on Friday, the 19th, as to whether
5    those additional assets had been identified
6    and transferred?
7       A.   I don't specifically remember what
8    I told Mr. McDade.
9       Q.   Okay. And you said you had a
10   phone conversation with him. And you had
11   another conversation. Was that a personal
12   conversation?
13      A.   I was in the courtroom with him.
14      Q.   And did you speak to him in the
15   courtroom in any way that was -- to prepare
16   him for his testimony?
17      A.   It wasn't a specific prep but we
18   certainly talked about what his testimony was
19   going to be or how he was going to be
20   proffered.
21      Q.   I take it you didn't have any
22   involvement in providing to Mr. McDade any
23   fire sale prices that Lehman would have
24   received should the transaction not go

Page 213

J. SEERY - HIGHLY CONFIDENTIAL

1    through.
2       A.   Not that I recollect.
3       Q.   You know Mr. Gelband?
4       A.   Yes.
5       Q.   Did you have any conversations
6    with him during the week of September 15th
7    concerning the Barclays transaction?
8       A.   Not significant.
9       Q.   Okay. You didn't work with him in
10   connection with any of the things you were
11   doing.
12      A.   No.
13      Q.   And I take it you don't have an
14   understanding of exactly what he was doing
15   that week.
16      A.   He wasn't around the stuff I was
17   doing.
18      Q.   All right.
19         MR. CARDEN:  That's all I have.
20   Thank you, sir.
21         THE WITNESS:  Thank you.
22         MR. MAGUIRE:  Sir, Bill Maguire,
23   from Hughes Hubbard representing the
24   trustee of Lehman Brothers. I'll try to

Page 214

1    J. SEERY - HIGHLY CONFIDENTIAL
2    be fairly brief.
3        * * *
4    EXAMINATION BY
5    MR. MAGUIRE:
6        Q.    You pointed out that there was a
7    reference on this exhibit, I believe it's 338,
8    to add box. Do you have an understanding what
9    the word "box" means in that context?
10        MR. STERN: Objection to the form.
11        A.    Yeah, my understanding of the word
12    box would be, you know, the Lehman customer
13    box at JPMorgan.
14        Q.    Do you have any information beyond
15    that as to what the box means in terms of the
16    sale here to -- by Lehman to Barclays?
17        MR. STERN: Objection to the form.
18    Are you asking in relation to this
19    document?
20        Q.    In the relation to the sale. Did
21    you have an understanding of the use of the
22    term box in connection with that sale?
23        MR. STERN: Objection to the form.
24        A.    Yeah. I know how the box works
25    and how it works in a repo transaction. I

Page 215

1    J. SEERY - HIGHLY CONFIDENTIAL
2    don't have an understanding of what your
3    question is.
4        Q.    You don't recall any discussions
5    with anyone about transferring the box to
6    Barclays in relation to the sale?
7        A.    No. The one nine -- I have a
8    vague recollection the one nine was additional
9    assets and it says here that they were from
10    the box which would make sense. I just don't
11    know what exactly they were or whether they
12    actually went over.
13        Q.    And you don't recall any
14    discussions along those lines.
15        MR. STERN: Objection to the form.
16        A.    Not specifically at this time.
17        Q.    Let me ask you about the hearing
18    on Friday the 19th that you attended.
19        A.    Yes.
20        Q.    That was a very long hearing,
21    obviously.
22        A.    Yes.
23        Q.    Did there come a time when there
24    was a recess where the judge left the
25    courtroom and there was a discussion and then

Page 216

1    J. SEERY - HIGHLY CONFIDENTIAL
2    the judge came back and court continued?
3        A.    I believe there were a few
4    recesses.
5        Q.    Do you recall during one of those
6    recesses there was a description about the
7    transaction?
8        A.    During the various recesses there
9    were numerous conversations and descriptions.
10    I believe in one of them it was a pretty
11    formal description to folks in the courtroom
12    about what the changes were.
13        Q.    Do you recall any Barclays lawyer
14    participating in any of those recess
15    discussions?
16        A.    Barclays' lawyers were certainly
17    there. And certainly listening. They -- the
18    description of the changes was I believe all
19    Weil Gotshal, Lehman's lawyers.
20        Q.    Do you recall anything that any
21    Barclays' lawyers said?
22        A.    Not of substance. Or
23    significance.
24        Q.    In any event, the judge returned
25    to the courtroom and the transaction was

Page 217

1    J. SEERY - HIGHLY CONFIDENTIAL
2    presented to the judge.
3        A.    Yes. That's my recollection.
4        Q.    And the transaction that was
5    presented to the judge is consistent with what
6    your understanding was of the transaction.
7        A.    That's my recollection, yes.
8        Q.    And that was consistent with what
9    you understood from the discussions that you'd
10    heard during the recess.
11        A.    Yes.
12        MR. MAGUIRE: Nothing further.
13    (Continued on next page to include
14    jurat.)

Page 218

```
1        J. SEERY - HIGHLY CONFIDENTIAL
2            MR. STERN:  Anything else?
3            MS. TAGGART:  Nope.
4            MR. STERN:  Okay.
5            THE WITNESS:  Thanks very much.  I
6    appreciate the effort getting it done
7    quickly.  Thanks.
8            (Time Noted:      1:01 p.m.)
9
10
11
12
13
14
15
16
17
18
19        _____
20        JAMES SEERY
21
22   Subscribed and sworn to before me
23   this ___ day of _____, 2009.
24
25
```

Page 219

```
1
2        C E R T I F I C A T E
3    STATE OF NEW YORK   )
4                       : ss.
5    COUNTY OF NEW YORK  )
6        I, FRANCIS X. FREDERICK, a Notary
7    Public within and for the State of New
8    York, do hereby certify:
9        That JAMES SEERY, the witness
10   whose deposition is hereinbefore set
11   forth, was duly sworn by me and that
12   such deposition is a true record of the
13   testimony given by the witness.
14       I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage, and that I
17   am in no way interested in the outcome
18   of this matter.
19       IN WITNESS WHEREOF, I have
20   hereunto set my hand this 3rd day of
21   September, 2009.
22
23
24       _____
25       FRANCIS X. FREDERICK
```

Page 220

```
1
2    ---------------- I N D E X ----------------
3    WITNESS          EXAMINATION BY      PAGE
4    JAMES SEERY      MS. TAGGART         5
5            MR. CARDEN     171
6            MR. MAGUIRE    214
7
8
9
10
11   ---------- INFORMATION REQUESTS ------------
12   DIRECTIONS:  NONE
13   RULINGS:  NONE
14   TO BE FURNISHED:  NONE
15   REQUESTS:  NONE
16   MOTIONS:  NONE
17
18   ---------------- EXHIBITS ----------------
19   EXHIBITS                FOR ID.
20   Exhibit 337B
21   Pledge Agreement dated as of
22   September 7, 2008 among Lehman
23   Brothers Holdings, Inc., as
24   Grantor and Barclays Bank PLC,
25   as Collateral Agent.................. 33
```

Page 221

```
1
2    ----------------- EXHIBITS -----------------
3    EXHIBITS                    FOR ID.
4    Exhibit 338B
5    photocopy of handwritten document...... 157
6    Exhibit 339B
7    document bearing production
8    numbers BCI-EX-(S)-00000648
9    through BCI-EX-(S)-00000650............ 169
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```