# BCI EXHIBIT

# 97

Highly Confidential

Page 1

1              M. Shapiro

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4  ----------------------x

5  In Re:

6                        Chapter 11

7  LEHMAN BROTHERS      Case No. 08-13555(JMP)

8  HOLDINGS, INC., et al.,   (Jointly Administered)

9

                Debtors.

10

   ----------------------x

11

12        * * *HIGHLY CONFIDENTIAL* * *

13        DEPOSITION OF MARK J. SHAPIRO

14            New York, New York

15            August 7, 2009

16

17

18

19

20

21

22

23  Reported by:

24  KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25  JOB NO. 24036

Highly Confidential

Page 2

```
1              M. Shapiro
2           August 7, 2009
3             9:30 a.m.
4
5        HIGHLY CONFIDENTIAL deposition
6   of MARK J. SHAPIRO, held at Jones
7   Day, LLP, 222 East 41st Street, LLP,
8   New York, New York, before Kathy S.
9   Klepfer, a Registered Professional
10  Reporter, Registered Merit Reporter,
11  Certified Realtime Reporter, Certified
12  Livenote Reporter, and Notary Public
13  of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25
```
TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 3

```
1              M. Shapiro
2
3        A P P E A R A N C E S:
4
5   JONES DAY, LLP
6   Attorneys for Lehman Brothers, Inc.
7       222 East 41st Street
8       New York, New York  10017-6702
9   BY:  DAVID L. CARDEN, ESQ.
10       KELLY A. CARRERO, ESQ.
11       JENNIFER DEL MEDICO, ESQ.
12
13  BOIES, SCHILLER & FLEXNER, LLP
14  Attorneys for Barclays and the Witness
15      575 Lexington Avenue - 7th Floor
16      New York, New York  10022
17  BY:  JACK G. STERN, ESQ.
18
19
20
21
22
23
24
25
```
TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 4

```
1              M. Shapiro
2   A P P E A R A N C E S: (Cont'd.)
3
4   QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
5   Attorneys for the Creditors Committee
6       865 Figueroa Street, 10th Floor
7       Los Angeles, California 90017
8   BY: ERICA P. TAGGART, ESQ.
9
10  JENNER & BLOCK, LLC
11  Attorneys for the Examiner
12      330 N. Wabash Avenue
13      Chicago, Illinois 60611-7603
14  BY: DAVID C. LAYDEN, ESQ.
15
16  HUGHES, HUBBARD & REED, LLP
17  Attorneys for the SIPA Trustee
18      1775 I Street, N.W.
19      Washington, DC 20006-2401
20  BY: JOHN F. WOOD, ESQ.
21      SAMUEL C. McCOUBREY, ESQ.
22
23  Also Present:
24      THOMAS E. HOMMEL, Lehman Brothers
25      PHILIP E. KRUSE, Alvarez & Marsal
```
TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 5

```
1              M. Shapiro
2   MARK J. SHAPIRO, called as a
3      witness, having been duly sworn by a Notary
4      Public, was examined and testified as
5      follows:
6   EXAMINATION BY
7   MR. CARDEN:
8      Q.   Good morning, Mr. Shapiro.
9      A.   Good morning.
10     Q.   My name is David Carden.  I represent
11  the Lehman estate as their special counsel and
12  my colleagues with me here are Jen Del Medico
13  and Kelly Carrero.  And I think we'll go around
14  the table and identify ourselves for your
15  benefit, although I think you'll probably know
16  several of these people.
17       MR. WOOD:  I'm John Wood from Hughes,
18  Hubbard & Reed, and we represent the Trustee
19  under the Security Investors Protection Act.
20       MR. McCOUBREY:  I'm Sam McCoubrey,
21  also from Hughes, Hubbard & Reed, and we
22  represent the Trustee.
23       MS. TAGGART:  Erica Taggart with Quinn
24  Emanuel for the Committee.
25       MR. HOMMEL:  Tom Hommel with Lehman
```
TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 6

1        M. Shapiro
2  Brothers.
3        MR. KRUSE: Philip Kruse with Alvarez
4  & Marsal.
5        MR. LAYDEN: David Layden, Jennifer &
6  Block, on behalf of the Examiner.
7        MR. STERN: Jack Stern, Boies,
8  Schiller & Flexner, for Barclays Capital and
9  the witness.
10       MR. CARDEN: I hate housekeeping
11 matters since I don't typically do well with
12 them, but last time you and I spoke, Jack,
13 we decided that we would do exhibits in
14 chunks like this and I'm told this is not
15 the way we decided to go, in our -- my
16 absence, anyway.
17       So what I want to do today is try to
18 use the exhibits that have previously been
19 marked, to the extent possible, obviously,
20 and if not, I'm going to put an A on the end
21 of any exhibits that I use so that we know
22 that the deposition that is occurring right
23 here is different than the one that is
24 occurring next door of one of your
25 colleagues.
   TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 7

1        M. Shapiro
2        So, is that fair enough?
3        MR. STERN: Yes. And I also think we
4  had a general agreement with Mr. Gaffey
5  yesterday concerning our treatment of
6  confidentiality designations and that that
7  would be done as it was done for Mr.
8  Felder's deposition.
9        MR. CARDEN: Okay.
10 BY MR. CARDEN:
11    Q.  Would you please state your name, Mr.
12 Shapiro?
13    A.  Mark J. Shapiro.
14    Q.  By whom are you presently employed?
15    A.  Barclays Capital.
16    Q.  And what's your position there?
17    A.  I am the head of Restructuring and
18 Finance within the Investment Banking Division.
19    Q.  Okay. And just generally what does
20 that entail?
21    A.  It entails running a group of 16
22 bankers that are dedicated to working on matters
23 that involve stress and distressed companies,
24 either working for companies, working for
25 creditors, and sometimes financing companies
   TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 8

1        M. Shapiro
2  that are either in or out of bankruptcy.
3    Q.  Stating the obvious, you're a lawyer,
4  are you not?
5    A.  I was a lawyer.
6    Q.  Well, once a lawyer, always lawyer,
7  don't you think?
8    A.  I don't think I have to comment on
9  that.
10   Q.  What you're saying is you're not
11 practicing law now?
12   A.  I'm not practicing and I don't have a
13 license to practice.
14   Q.  But you do have a law degree, correct?
15   A.  I graduated from law school, yes.
16   Q.  And in the past you were a practicing
17 lawyer, were you not?
18   A.  Correct. I was a partner at Shearman
19 & Sterling.
20   Q.  At some point you were employed by
21 Lehman Brothers, correct?
22   A.  Starting in September of 2002.
23   Q.  What was your position when you first
24 joined Lehman Brothers?
25   A.  Co-head of Restructuring within
   TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 9

1        M. Shapiro
2  Investment Banking in Lehman Brothers.
3    Q.  And what generally were your
4  responsibilities in that position? Are they the
5  same as they presently are with Barclays?
6    A.  Essentially the same. We were more, a
7  little bit more focused on the advisory practice
8  and less focused on financing, now we're a
9  little more balanced, as we went through Lehman,
10 if you're talking about 2002 versus later, I
11 think that was your question --
12   Q.  Yes.
13   A.  -- as of the date we started.
14   Q.  Okay. And did your position remain
15 the same throughout your entire tenure at Lehman
16 Brothers?
17   A.  It changed in I guess it was spring or
18 summer -- spring of 2008, something like that.
19 I can't remember exactly when. It was decided
20 within the firm that it made sense to spend more
21 time on financing than we had before, and in
22 order to effectuate that, we basically created a
23 joint venture between Investment Banking and
24 Fixed Income where my group was basically a
25 joint venture and to do both. And as a result
   TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 10

1          M. Shapiro
2   of that, I was asked to head the whole thing and
3   so my position went from co-head to head of the
4   group.
5      Q.   When did that happen?
6      A.   I can't remember exactly. I think it
7   was the spring of -- spring of '08, but I don't
8   remember exactly.
9      Q.   And to whom did you report in that
10  position?
11     A.   So I reported to two different people
12  within the firm, Mark Shafir, who was the head
13  of M&A from the banking side and Paul Parker,
14  who was his co-head. I mean, if you're talking
15  about at the end versus along the way --
16     Q.   Yes.
17     A.   Because obviously things changed.
18     Q.   As fascinating as that would be for
19  both of us to go through, my focus is really
20  going to be obviously at the end.
21     A.   And then on the fixed income side, it
22  was -- it was Jim Seery, who ran loan sales and
23  trading for fixed income.
24     Q.   I'm sorry, I just missed the import of
25  that. Did you report to him on that side or --

Highly Confidential

Page 11

1          M. Shapiro
2      A.   Yeah, well, when we say report, this
3   was a new thing, so it was a joint venture
4   between the two divisions. I was running the
5   joint venture. Jim was on the fixed income
6   side, so he was responsible from fixed income
7   for that and, effectively, you know, I wouldn't
8   say I was reporting to him in the sense of, you
9   know, he never obviously gave me reviews or
10  comp, because what happened was that that all
11  really came to fruition, as I said,
12  spring/summer.
13          Obviously it was a tough general
14  summer overall. There wasn't a lot of
15  financings going on in, you know, within Lehman
16  in terms of the distressed area that I was in
17  until call it towards the end of the summer when
18  we worked on Tronox. So it was all kind of
19  information.
20          So when you say reporting, there
21  wasn't a whole lot to report to.
22     Q.   Now, in your position as head of
23  Restructuring at Lehman, did you become
24  acquainted with how the business sides really
25  function, by that I mean how they ran a matched

Highly Confidential

Page 12

1          M. Shapiro
2   book, how they did their business?
3      A.   No, I would say that, you know, on the
4   investment -- you know, the firm is set up
5   within three divisions: Investment Banking,
6   Fixed Income and Equities. So if you're on the
7   banking side, you really are not part --
8   participating in any way on the trading side
9   where they're dealing with things around how
10  they -- how they buy, sell or finance assets.
11  So not really.
12     Q.   And you did not become acquainted even
13  in the most general sense as to how they did
14  their business as a consequence of the position
15  you had at Lehman?
16          MR. STERN: Objection to the form.
17     A.   Yeah, I'm not sure I understand your
18  question.
19     Q.   Do you understand what a matched book
20  is?
21     A.   If you're talking about where a party
22  purchases an asset and then finances that asset
23  with liability that they, you know, borrowed
24  money, if that's what you would call a matched
25  book, or a series of those assets together being

Highly Confidential

Page 13

1          M. Shapiro
2   a matched book, I guess that would maybe
3   constitute a matched book, but it's not a term I
4   use frequently.
5      Q.   Okay. But in using that term in the
6   way you defined it, you are generally acquainted
7   with how a matched book works, correct?
8      A.   Just to the extent I just described
9   it.
10     Q.   Okay. All right. And as a
11  consequence of your position at Lehman, did you
12  become acquainted with the fact that, on the
13  trading side, Lehman ran a matched book?
14     A.   Not really.
15     Q.   Not news to you today, though, right?
16     A.   Today I wouldn't say it's news to me,
17  but I would say during my, you know, seven years
18  at Lehman, I really didn't give thought to how
19  Lehman financed itself.
20     Q.   Okay. Now I brought a prop today,
21  which is a calendar from September of 2008,
22  which I brought to the last deposition and I was
23  responsible for. This is something to which you
24  can refer if you wish. I don't think we're
25  going to mark it. Time is what it is and

Highly Confidential

Page 14

1           M. Shapiro
2    everybody knows exactly what days of the week
3    we're going to be referring to.
4           But what I would like to do is direct
5    your attention to the week of September 8 last
6    fall.
7       A.   Uh-huh.
8       Q.   And at some point during that week
9    Lehman Brothers entered into negotiations with B
10   of A with regard to the sale of the firm,
11   correct?
12      A.   I don't know.
13      Q.   Okay.  Were you involved with any
14   negotiations concerning a sale of all or part of
15   the firm during the week of September 8?
16      A.   No.
17      Q.   Were you involved with negotiations
18   concerning a sale of all or part of the firm on
19   the weekend of -- well, I don't know what you
20   call a weekend, but September 13 and 14?
21      A.   No.
22      Q.   Did there --
23      A.   Other than, other than by the -- other
24   than by the end of Sunday night when I made a
25   suggestion on something, but not -- I was not

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 15

1           M. Shapiro
2    personally involved in any of the discussions,
3    negotiations, or anything else relating to a
4    sale.
5       Q.   Where were you the weekend of
6    September 13?
7       A.   I was in the offices principally at
8    Lehman Brothers.
9       Q.   Okay.  What were you doing in the
10   offices that weekend?
11      A.   Preparing for a bankruptcy.
12      Q.   And were you working with outside
13   lawyers with regard to the possible filing?
14      A.   Yes.  The firm had hired -- I believe
15   it was Steven Berkenfeld that hired Weil
16   Gotshal.
17      Q.   All right.  Were you at any point in
18   time, from during the week of September 8 and
19   the weekend of September 13, in conversations
20   with anyone at Lehman Brothers concerning the
21   terms of any deal that might be done with Bank
22   of America?
23      A.   Not the terms, no.  I was aware
24   starting on the Thursday the 11th that
25   discussions were going on between -- and I think

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 16

1           M. Shapiro
2    this is probably reported in the press maybe at
3    the same time even, but I was aware that there
4    were discussions going on between Bank of
5    America and Lehman Brothers and I think Barclays
6    and Lehman Brothers that most of it was
7    happening in and around the Fed, the Fed had a
8    big involvement in it, and that's pretty much
9    what I knew as of the, you know, 11th, 12th.
10          And then there was obviously a lot of
11   discussion within Lehman Brothers as to what was
12   going on down at the Fed that I heard, you know,
13   heard snippets of.  But I was not personally
14   directly in discussions with anybody about it.
15      Q.   And were you in discussions with
16   anyone at Barclays during the week of September
17   8th or the weekend of September 13th concerning
18   a possible transaction with Lehman Brothers?
19      A.   No, the only -- the only discussion
20   that I was even a part of was the night of
21   Sunday the 7th -- night of Sunday the 14th when
22   I went into Bart McDade's office about 6 o'clock
23   that evening and told him that we could sell
24   ourselves to Barclays in bankruptcy and I wanted
25   to make sure he understood that, and then he

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 17

1           M. Shapiro
2    called Bob Diamond on the phone, who was I
3    believe having dinner, as has been reported, but
4    I only heard Bart's side of the conversation.
5       Q.   Uh-huh.
6       A.   And he told Bob Diamond that I was in
7    the room with him, that I -- I told Bart that
8    the firm could sell itself to Barclays if
9    Barclays was interested in purchasing Lehman in
10   a Chapter 11 asset sale and was Barclays
11   interested in doing that.
12          And that was probably about a
13   five-minute conversation, to which I only heard
14   Bart's side of the conversation, and he got off
15   the phone and he said he's going to call us
16   back.  He said he needs to call somebody and
17   he's going to call us back in a few minutes.
18      Q.   Let's just go a little slower through
19   this conversation so I understand what it was
20   you were proposing to Mr. McDade --
21      A.   Sure.
22      Q.   -- that was in any respect different
23   than what had been transpiring over the weekend
24   when the transaction with Barclays had not
25   consummated, correct?

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 18

1         M. Shapiro
2    A.   Correct.
3    Q.   So I'm not a bankruptcy lawyer, so
4  you'll have to sort of tutor me just a little
5  bit, but exactly what you were you recommending
6  to Mr. McDade was possible after the
7  conversations with Barclays had failed on the
8  weekend?
9    A.   I recommended to him that we see
10  whether Barclays would be willing to purchase
11  Lehman Brothers, in whole or in part, through
12  what's known as a Section 363 sale, which would
13  have involved, you know, a sale of all or any
14  part of the assets and assumption of liabilities
15  of Lehman Brothers in order to effectuate a
16  going concern sale.
17    Q.   And when you say at Lehman Brothers,
18  you mean Lehman Brothers, Inc., or do you mean
19  Lehman Brothers Holding?
20    A.   I think at that point we were just
21  talking about a generic Lehman Brothers.  The
22  specificity of which assets was yet to be
23  determined.
24    Q.   I take it that your suggestion to Mr.
25  McDade was that Barclays could purchase all or

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 19

1         M. Shapiro
2  some of the assets of whatever of the Lehman
3  Brothers entities we're referring to, correct?
4    A.   I wasn't that specific with Bart.  I
5  basically said we can sell the firm -- we can
6  sell ourselves, I think was maybe my words, the
7  firm to Barclays in a 363, you know.  You know,
8  I didn't know if Bart understood what that was
9  because he wasn't a bankruptcy expert,
10  obviously.
11         He did understand what I was talking
12  about.  I gave him the 30-second snippet, if you
13  want to call it that, of pretty much what I just
14  told you.
15    Q.   I was going to ask you if I could have
16  the same 30 seconds, but if I've had it, fine.
17    A.   Then he immediately call Bob Diamond
18  to share that with him.
19    Q.   Was anybody else in the room when you
20  had your conversation with Bart?
21    A.   Somebody else was in the room, yes,
22  but I just don't remember who it was.
23    Q.   Was it Mr. Shafir?
24    A.   It might have been Mr. Shafir.  I just
25  can't remember.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 20

1         M. Shapiro
2    Q.   Was this idea Mr. Shafir's idea or
3  your idea?
4    A.   It was my idea.
5    Q.   And Mr. McDade reported to you that
6  Mr. Diamond was going to have to get back to
7  you?
8    A.   He didn't report to me.  He was on the
9  phone.
10    Q.   I see.
11    A.   He said -- dropped the phone.  He said
12  he needs to call somebody.  He's going to call
13  us back in a few minutes.
14    Q.   Did he call back?
15    A.   Yes.
16    Q.   What happened in that conversation?
17    A.   Bart spoke to him very briefly.
18    Q.   Was it personally or was it on a
19  speakerphone?
20    A.   No, it was personally.  So I didn't
21  hear the other side of the conversation, and
22  when Bart got off, which was a very short
23  conversation, he said he wants to -- he wants to
24  move forward and he wants to have his team meet
25  our team 7 A.M. tomorrow morning.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 21

1         M. Shapiro
2    Q.   Now --
3    A.   Here in our office.
4    Q.   Now, who was Lehman's team at that
5  point?
6    A.   Well, when were you talking about?
7    Q.   When Mr. McDade got off the phone and
8  said he wants to meet our team at 7 A.M., who
9  was on that team?
10    A.   Well, it was whoever Bart was going to
11  have in that meeting.
12    Q.   Were you on that team?
13    A.   Yes.
14    Q.   Who else was on it?
15    A.   Well, when you say "who else was on
16  the team," I don't think that's the right
17  question.  I think --
18    Q.   All right.
19    A.   Are you asking me the question who was
20  in the first meeting?
21    Q.   I was going to ask you that question,
22  but I didn't know whether Mr. McDade had gotten
23  off the phone and said I want you to assemble a
24  team.  Let's back up a little bit.
25    A.   No, he did not.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 22

M. Shapiro
1
2    Q.   All right. After your conversation
3    with Mr. McDade when he had just spoken to Mr.
4    Diamond the second time, what did you do? Did
5    you stay at the firm or did you go home?
6    A.   I stayed at the firm.
7    Q.   What did you do at that point?
8    A.   I started thinking about and mapping
9    out what -- how we might be able to sell the
10   assets, you know, the assets of the firm in a
11   way that would be able to effectuate a
12   transaction.
13   Q.   How did you do that?
14   A.   Well, I had been, starting on --
15   starting on Thursday night when I first was
16   asked to be involved in thinking about a
17   possible bankruptcy filing, I had pulled
18   together for myself, since I wasn't allowed to
19   have anybody working for me, so it was pretty
20   much a one-man operation from Thursday --
21   Thursday, Friday for me in terms of thinking
22   about this, a corporate chart, tried to figure
23   out where the assets and liabilities were, tried
24   to understand where the real estate was housed
25   since nobody wanted to seem to touch the real
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 23

1    M. Shapiro
2    estate, that was the kind of, you know, the set
3    of assets that people did not want to seem to
4    want to acquire, generally, and tried to think
5    about how a deal could be structured that would
6    allow for a sale of the entire firm, let's call
7    it, without a sale of the real estate. I would
8    say that was my principal focus on thinking
9    about how a sale might occur.
10   Q.   You're talking about back on the prior
11   Thursday?
12   A.   Back on Thursday.
13   Q.   How did you know on Thursday that the
14   acquirers were not interested in acquiring the
15   real estate? Somebody told you that?
16   A.   When I learned about what was
17   happening generally on Thursday afternoon, you
18   know, I had been told by one of the M&A guys
19   that the firm had set up something that they
20   called Spinco; that the assets they were in the
21   process of trying to keep, move the, house the
22   commercial real estate assets in Spinco; that
23   generally speaking, you know, the buyers were
24   not interested in the real estate, that they
25   were worried about it, given everything that was
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 24

1    M. Shapiro
2    going on in the real estate world; and that the
3    idea in any kind of sale, whoever it was to, was
4    to effectively sell the Lehman Brothers as a
5    going concern firm to somebody.
6       This is outside of bankruptcy now
7    we're talking about.
8    Q.   Yes.
9    A.   And to spin off those assets to the
10   shareholders as a real estate going concern, you
11   know, proposition that would, you know, at some
12   point presumably be worth something, maybe more
13   than it was perceived to be worth at the time of
14   the spinoff.
15   Q.   Now, what was Project Green? Is that
16   a name you know?
17   A.   No.
18   Q.   After you spoke to Mr. McDade that
19   evening around 6 o'clock on Sunday and you
20   stayed at the firm, did you have any part in
21   preparing a balance sheet for Lehman Brothers?
22   A.   No.
23   Q.   Did you do anything to prepare for the
24   meeting at 7 A.M. the next morning?
25   A.   Yes.
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 25

1    M. Shapiro
2    Q.   What did you do?
3    A.   At first I called in people on my team
4    to come in and help me. Realizing that whatever
5    we were potentially going to be undertaking was
6    going to be very challenging, I needed more
7    people who could help deal with different issues
8    that were clearly going to need to be addressed.
9    Q.   Let's stop there. Tell me who was on
10   your team that evening.
11   A.   Well, people were coming in, I'd say,
12   over the course of the evening. So Dan Flores
13   came in first. He was a vice president and one
14   of my most trusted associates, associates in the
15   general sense.
16   Q.   I understand.
17   A.   And then others came in over the
18   course of the evening, including Gil Sanbom,
19   who is a managing director and was formally
20   co-head with me, and he's the chairman of
21   Advisory Restructuring. George Mack, who was a
22   senior vice president and someone who, again,
23   very senior, you know, a lot of bankruptcy
24   experience.
25       And they, in turn, called in some
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 26

1          M. Shapiro
2  other people, so that there were a few analysts
3  and I can't remember all the people, but there
4  were, you know, of the -- of the 12 or 13 people
5  in the group, probably eight or nine of them
6  were called in to come in and help.
7      Q.  Okay.  And did you have a task, if you
8  will, something you were trying to prepare as a
9  group for purposes of the 7 A.M. meeting the
10 next morning?
11     A.  Not as a group. I thought it made
12 sense to figure out, you know, could we come up
13 with a reasonably straightforward deal
14 structure, and so we did put together a
15 PowerPoint presentation that we utilized during
16 the meeting at 7 A.M. the next day.
17     Q.  All right.  You stayed there all
18 night?
19     A.  No. We -- I think I left -- we worked
20 from, you know, that point through probably
21 until about 1 or 2. Then I went home and then I
22 came in very early. Obviously I was there by 7
23 A.M. the next morning. So I went home, got a
24 couple hours of sleep, and then came back.
25     Q.  Who prepared the PowerPoint
   TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 27

1          M. Shapiro
2  presentation?
3      A.  Well, Dan Flores did a draft of it for
4  me and then I reviewed it and made changes to
5  it.
6      Q.  You took it home with you to do the --
7  did you do the edits before you left?
8      A.  I think I did the edits before I left.
9      Q.  And --
10     A.  I think. I, truthfully, I don't
11 remember exactly.
12     Q.  What you --
13     A.  It was very high level. It wasn't
14 granular because we didn't have any granular
15 facts, so it was just here's a basic framework
16 for how to think about this based on what we
17 understood from the M&A team Barclays had been
18 talking about generally.
19     Q.  Did it include financial information
20 for the Lehman Brothers entities you were
21 talking about?
22     A.  No, not that I recall.
23     Q.  Tell me what it looked like so I can
24 try to locate it.
25     A.  I haven't seen it since then, so I --
   TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 28

1          M. Shapiro
2  what I remember is it was one or two pages, it
3  was very short, and it had a series of different
4  categories of like I think different things that
5  could be sold, but that was, you know, and
6  which -- maybe which company housed it, with a
7  general description of how a 363 might work,
8  something like that.
9          I, honestly, I'd have to look at it
10 again. I haven't looked at it so I don't
11 remember exactly. But it was intended in my
12 mind to at least lay out a basic framework for
13 how this kind of a transaction gets done. Not
14 dissimilar in any way to any other 363 sale that
15 I had worked on before.
16     Q.  Did it identify the various divisions
17 of Lehman Brothers and what assets it's had?
18     A.  I don't remember.
19     Q.  Was it presented at 7 o'clock the next
20 morning to --
21     A.  Not 7 o'clock, no.
22     Q.  When was it presented?
23     A.  It was presented towards the end of
24 that meeting.
25     Q.  Let's talk about the meeting at 7 A.M.
   TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 29

1          M. Shapiro
2      First off, when you came in to Lehman
3  Brothers on -- that would be then Monday
4  morning, the 8th, correct?
5      A.  Correct.
6      Q.  Pardon me. I misspoke.
7      A.  No, Monday morning, the 15th.
8      Q.  The 15th. What time did you get in
9  the office?
10     A.  Right before the meeting.
11     Q.  Did you have any meetings with anyone
12 at Lehman Brothers prior to going into the
13 meeting?
14     A.  Not that I recall.
15     Q.  Who was in the meeting at 7 o'clock?
16     A.  To the best of my recollection, from
17 the Lehman side it was Mark Shafir, myself, Skip
18 McGee, Bart McDade. There were I believe a
19 number of Weil Gotshal attorneys there. Harvey
20 Miller, Lori Fife, I think Tom Roberts. I can't
21 remember who else. Maybe others, I just don't
22 remember. But it wasn't a huge meeting. It was
23 a reasonably small meeting.
24         And then from Barclays it was Archie
25 Cox, Michael Klein, who was their advisor,
   TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 30

M. Shapiro
1   Cleary, a number of Cleary Gottlieb lawyers,
2   which included Victor Lewkow. I don't remember
3   who else from Cleary. There might have been
4   others. I don't have a complete recollection,
5   but that's most of the people, probably.
6   **Q.   Okay.  Bob Diamond wasn't there?**
7   A.   No.
8   **Q.   Was Steve Berkenfeld there?**
9   A.   I don't remember.
10  **Q.   How long did the meeting last?**
11  A.   I would guess it lasted about two
12  hours, maybe something like that, in that
13  neighborhood.
14  **Q.   Would you tell me what you recall**
15  **about what was said in the meeting and, as best**
16  **you can at this point, by whom?**
17  A.   It was a long time ago so it's hard to
18  remember specifics, truthfully.
19      I remember Barclays saying that they
20  were, you know, they were interested in
21  purchasing the U.S. assets of Lehman, the U.S.
22  business of Lehman. They were not interested in
23  buying the commercial real estate, let's call it
24  the Spinco assets. That was not something that
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 31

M. Shapiro
1   they wanted.
2       They said, I think, that they didn't
3   think that they were going to be interested in
4   businesses outside the United States, but they
5   hadn't finalized that yet, but that was kind of
6   their starting -- kind of starting point, let's
7   call it. They would still consider that, but
8   they hadn't made a final decision on it, but
9   that's where they were heading, was just to
10  obtain -- just to purchase the U.S. businesses.
11      There was some discussion about
12  timing. They asked Harvey Miller, you know, how
13  long would this take, how would he see it going.
14  His response was, you know, that we would have
15  to do it quickly, obviously. He thought that,
16  you know, if we could move very quickly, it
17  could get done, you know, reasonably fast. I
18  think he estimated that it would probably be, in
19  his estimation, about 15 days, and to which I --
20  to which I responded saying, I don't think the
21  firm will be able to survive that long and that
22  I thought we needed to do it more rapidly and
23  that I thought we needed to try to accomplish a
24  sale, you know, within a shorter timeframe than
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 32

M. Shapiro
1   that.
2   **Q.   Why was the firm under that kind of**
3   **pressure?  Why couldn't it survive 15 days?**
4   A.   Based on my personal observations,
5   people were packing up and leaving. The e-mails
6   were flying around saying goodbye. The general
7   mood was one of people believing that Lehman
8   Brothers was going to be liquidated and that
9   everybody was moving on to wherever they could
10  try to move on to and that there wasn't going to
11  be a going concern left because you wouldn't
12  have all the people around to actually function
13  in their positions.
14  **Q.   Was a timeframe set at that meeting**
15  **for purposes of getting a transaction done?**
16  A.   No.
17  **Q.   Was there any discussion about any**
18  **specific assets of Lehman, apart from the**
19  **commercial real estate that you described, that**
20  **of the U.S. assets that Barclays was interested**
21  **in purchasing?**
22  A.   You know, unfortunately, I don't have
23  a great recollection of exactly the specifics in
24  that meeting. I think -- I think there was
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 33

M. Shapiro
1   probably some discussion about the real estate,
2   you know, the building. I just don't remember
3   exactly.
4   **Q.   Did the people from Barclays bring**
5   **anything to the meeting, any documents?**
6   A.   Not that I remember.
7   **Q.   They had done a due diligence of**
8   **Lehman assets at some point in time for the**
9   **transaction that was being negotiated over the**
10  **weekend, right?**
11      MR. STERN: Objection to the form.
12  A.   Can you clarify the question or read
13  back the question?
14  **Q.   You were aware, were you not, that**
15  **Barclays was not starting from ground zero when**
16  **it was meeting with you?  They had already done**
17  **an analysis or review of certainly the assets --**
18  **I thought you told me a little while ago that**
19  **you were aware that there was some kind of**
20  **negotiation between Lehman Brothers and Barclays**
21  **at the end of the prior week and over the**
22  **weekend, right?**
23      MR. STERN: Objection to the form.
24      You can answer.
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 34

```
1              M. Shapiro
2      A.  I was aware starting on, as I said,
3  Thursday afternoon that there were discussions
4  going on generally between Lehman Brothers, the
5  Fed, and a number of institutions which were
6  rumored to be Barclays and B of A.  I have no
7  idea what Barclays' level of diligence was other
8  than what I heard afterwards, which was that
9  they hadn't started doing due diligence until
10 Wednesday of this week, meaning Wednesday the
11 10th.
12     Q.  Okay.
13     A.   So that's what I heard after the fact.
14 I have no personal knowledge of when they
15 actually started or what they actually did.
16     Q.  Okay.  When you were in the meeting
17 with the Barclays people and the Lehman people
18 on the morning of the 15th, is it your
19 recollection there was no discussion of any
20 specific Lehman assets that were -- that
21 Barclays was interested in purchasing?
22     A.  I don't remember.
23     Q.  And was this PowerPoint presented in
24 the meeting?
25     A.  Yeah, later during the meeting,
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 35

```
1              M. Shapiro
2  because Lori Fife took the lead in describing
3  let's call it generically what a transaction
4  could look like structurally, and then this --
5  this document was kind of similar to what Lori
6  then had outlined, and I think we provided it to
7  everybody towards the end of the meeting.  We
8  didn't actually then go through that document.
9      Q.  As best you recall, is it the only
10 document that was discussed or shared in the
11 meeting?
12     A.  I don't remember.
13     Q.  What happened immediately after the
14 meeting so far as you were concerned?
15     A.  I'm trying to remember immediately
16 after the meeting.  I think we -- I think what
17 was agreed was that there was -- people were
18 going to split up into different functions to
19 start to work through to how to get to a
20 transaction, which is I'd say, you know, a
21 normal -- a normal thing you do is figure out,
22 okay, who's going to be doing what part of the
23 deal, who's going to be focused on which
24 particular elements of the deal.
25          And I think there was agreement that,
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 36

```
1              M. Shapiro
2  you know, amongst different people that there
3  would be different people -- different people
4  would be gathered to start working towards
5  different pieces of the deal.
6      Q.  Okay.  Again, I've already confessed
7  I'm not a bankruptcy lawyer, so perhaps you can
8  tell me what those various divisions of labor
9  were.
10     A.   Well, there was clearly, you know,
11 there was clearly going to be, if you look at
12 what -- what was Barclays going to buy, we
13 weren't really exactly sure what they were going
14 to buy.  So we start with let's call it the
15 bigger pieces, which was starting with the real
16 estate.
17          All right, so we had a building in New
18 York that we all worked in, 745 Seventh Avenue.
19 I learned during the course of I guess the
20 weekend maybe that there were two buildings, two
21 or three buildings -- I believe two buildings in
22 New Jersey that were operation centers that
23 would also be necessary as part of the, you
24 know, back office, computer functions, all of
25 those things that support a financial firm that
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 37

```
1              M. Shapiro
2  would need to be sold in order to sell the
3  business as a going concern.  So those buildings
4  would be sold.
5          Then there was the question of, well,
6  what assets, i.e., what are the assets of
7  Lehman.  The assets of Lehman obviously included
8  a range of things ranging from securities that
9  they owned to private equity positions to real
10 estate positions to, you know, other -- other
11 kinds of financial assets.  The question was
12 what would Barclays buy.  That was obviously was
13 going to be them telling us what they were
14 interested in buying.
15          There were obviously the contracts in
16 terms of the operations of the firm in a
17 bankruptcy in order to transfer contracts.  You
18 need to in 363 sale have them assumed and
19 assigned, so we needed to figure out a way that
20 they could understand in some way what those
21 contracts might be.
22          Obviously there was the liabilities
23 side of the firm, which is what assets -- what
24 liabilities would they assume as part of the
25 transaction, ranging from ordinary-course
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 38

1　　　　　　　M. Shapiro
2　payables to accrued compensation to other
3　elements that obviously --
4　　　　　Again, these were not specifically
5　discussed that I recall in this meeting. I'm
6　just giving you a general view from my
7　perspective of how I was thinking about the
8　different elements involved. Obviously there
9　was also the question of the non-U.S. parts of
10　the firm and what they were going to do around
11　those.
12　　　　　We obviously had operations, large
13　operations in Europe and a large operation in
14　Asia, not quite as large, but still meaningful,
15　and how they were going to deal with that. So
16　the question was really what was it that they
17　were going to buy and how, once they decided
18　what they were going to be willing to buy, how
19　were we going to structure that.
20　Q.　Let's step out of the time sequence
21　for a moment and then let me ask you this
22　question: Did there come a time when you
23　finally learned exactly what it was that
24　Barclays was intending to buy?
25　A.　I would say, generally, in terms of
　　　　TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 39

1　　　　　　　M. Shapiro
2　categories, yes, but over the course of a, you
3　know, let's call it 24-hour period, so it was,
4　you know, it wasn't -- it wasn't a -- it wasn't
5　like they had a list and said here's exactly
6　what we're buying, here are the exact assets.
7　　　　　We knew at some point that they wanted
8　to own the building, 745 Seventh Avenue; that
9　they wanted the data centers; that they were
10　looking at the book of securities, they were
11　diligencing that kind of in a real-time basis.
12　　　　　They had two, at least two senior
13　executives that I recall that were not in the
14　original meeting that I recall at least. Maybe
15　one of them might have been Rich Ricci. I can't
16　remember if he was in that first 7 A.M. meeting,
17　but Rich Ricci and Mike Keegan, who I met, were
18　both senior executives or are currently senior
19　executives of Barclays, but senior executives
20　who were diligencing a lot of the securities
21　that were under consideration by them for
22　purchase.
23　　　　　I'd have to go back through the -- you
24　know, ultimately I think they concluded that
25　they did not want Europe, they did not want
　　　　TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 40

1　　　　　　　M. Shapiro
2　Asia, and obviously that actually made -- made
3　life from a deal perspective a little simpler
4　because those two entities that -- general
5　entities, meaning Lehman Brothers International
6　in London and whatever the name of the Asian
7　entity was, were at that point both either in
8　insolvency proceedings or on the verge of
9　insolvency proceedings which were completely
10　outside the Chapter 11.
11　　　　　And since a court in the bankruptcy
12　court in the U.S. only has jurisdiction to deal
13　with assets under its jurisdiction in the United
14　States, it would have been very difficult to put
15　together a multifaceted deal that was across
16　borders in the time that we all believed we had
17　to accomplish a transaction.
18　　　　　So I would say their desires matched
19　up well in my mind at the time with what was
20　achievable.
21　Q.　Going back to the meeting in the
22　morning, did it start at 7 o'clock?
23　A.　Yes.
24　Q.　And end at about 9, you said?
25　A.　I don't remember exactly. It was a
　　　　TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 41

1　　　　　　　M. Shapiro
2　few hours. It was a few hours of meetings.
3　Q.　I would like to talk a little bit
4　about the landscape of that day, meaning how
5　people actually divided up and where they were
6　and what rooms they were in and where you were
7　and the like.
8　　　　　Now, we can do this, you know, one
9　step at a time, but maybe you should give me an
10　overview, if you can, so we can begin to talk
11　about this with more specificity.
12　　　　　So after the meeting breaks up, do
13　people essentially get assignments to deal with
14　the various aspects of a possible transaction
15　and occupy certain rooms? Tell me what it is
16　that happened.
17　A.　Again, it's hard to remember exactly
18　what happened minute or minute or hour by hour.
19　Q.　That's why I asked the question the
20　question the way I did. I appreciate that that
21　might be difficult. I'm just right now trying
22　to get an understanding of what -- I'm calling
23　it the landscape of the day.
24　A.　Sure.
25　Q.　How work got done that day.
　　　　TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 42

1              M. Shapiro
2    A.   Right.
3    Q.   **If you could give me some background.**
4    A.   I would say people were generally, you
5    know, people who were working on the deal, which
6    there were many, were gathered -- I would say
7    the leaders were gathered from time to time on
8    the 31st floor. Different conference rooms were
9    allocated to different people or different
10   teams.
11        So Barclays had a room. I don't know,
12   you know, I'm not sure who was in their room,
13   but they had a room or two. Cleary had a room
14   or two. We had a couple of rooms, meaning
15   Lehman had a few rooms. There was a room where
16   the DIP -- room or rooms that the DIP
17   negotiations were going on, which was a
18   separate, separate set of discussions,
19   obviously, separate but related.
20        One of the problems we had
21   logistically was that, you know, 31 is set up as
22   a dining room and not as a conference center
23   with laptops and computers and printers, and we
24   started the deal there, ended the deal there.
25        It was probably, you know, it was not

Highly Confidential

Page 43

1              M. Shapiro
2    the easiest place to get a deal done.
3    Ultimately, we had to bring in printers and
4    computers. And I think during the course of the
5    evening through the night someone at Cleary
6    suggested we move to Cleary, which I said, no,
7    we're not moving 100 people to Cleary in the
8    middle of the night. That didn't seem like a
9    good idea to me.
10        MR. STERN: Minor thing: Is it 31 or
11   32?
12        THE WITNESS: Sorry. 32.
13   Q.   **We were going to get to that, but**
14   **thank you.**
15   A.   32. 32nd floor.
16        So I don't know if that answers your
17   question about kind of logistically where people
18   were, but there were -- obviously every room was
19   being taken up by somebody who was a participant
20   in the discussions dealing with some function in
21   the discussion.
22   Q.   **Now --**
23   A.   And it was actually very, given the
24   time we had, it was very well organized. We had
25   labels on each door. Everybody knew whose room

Highly Confidential

Page 44

1              M. Shapiro
2    was -- which room was which so people were not
3    interrupting people if they wanted privacy.
4        And we -- the lawyers started working
5    immediately on a general contract that was, I
6    don't know who -- I think -- I don't remember
7    who did the drafting, I think it might have been
8    Weil Gotshal, a guy named Mike -- I forget his
9    last name. Mike, I forget his last name, but
10   was a partner, M&A partner, working for Tom
11   Roberts or working with Tom Roberts. He was one
12   of the principal drafts people of the contract.
13   Q.   **Of the Asset Purchase Agreement?**
14   A.   Of the Asset Purchase Agreement,
15   correct.
16        MR. STERN: Lubowitz.
17        THE WITNESS: That's it. Lubowitz,
18   that's correct. Mike Lubowitz.
19   Q.   **Let's talk about the rooms for just a**
20   **moment so I'm clear what the breakup is. I**
21   **understand there were several Lehman rooms, but**
22   **were the rooms broken down for people who were**
23   **dealing with issues related to contracts the**
24   **firm had, compensation, you know, securities**
25   **positions, and was it that broken down?**

Highly Confidential

Page 45

1              M. Shapiro
2    A.   No, it was not. It was broken down by
3    let's call it who was doing what work. So you
4    had a room probably about the size of this room
5    where lawyers were gathered around the table
6    similar to this who were starting to think about
7    a contract, right?
8        And they were -- obviously everybody
9    was waiting because there was no contract,
10   right? It had to be drafted. It had to be, you
11   know -- and then not only did it have to be
12   drafted, but you had to start putting the meat
13   on the bones, which is what is it that Barclays
14   was interested in buying and what would that all
15   look like.
16        So there was a room that was
17   effectively filled with lawyers that I would
18   come in and out of around later in the day and
19   the evening around kind of what was going on.
20   Because obviously we were negotiating and
21   drafting, you know, real-time. So we were going
22   through page by page and going through
23   provisions and negotiating specifics around each
24   provision. And it obviously took more than one
25   round to do that.

Highly Confidential

Page 46

M. Shapiro
1
2    Q.    Where was the actual negotiation of
3    the transaction taking place?
4    A.    On the 32nd floor.
5    Q.    And was it taking place in any one
6    place?
7    A.    On that -- let me say it was taking
8    place on the 32nd floor on the night of -- on
9    the day and the night of the 15th and 16th.
10   After that, obviously there were other
11   negotiations that took place which were not
12   necessarily in those rooms.
13   Q.    Okay.  Who was negotiating the
14   transaction, as opposed now to getting backup
15   for the negotiators, if you take my point?
16   A.    I would say our lead negotiator, the
17   lead overall negotiator was Bart McDade, who was
18   the president of the firm.  I would say he was,
19   you know, he was informed on every key
20   provision.  He obviously was not, you know,
21   privy to every legal negotiation, but, you know,
22   you wouldn't expect him to be because that's not
23   the role of a CEO.  That's what we had lawyers
24   and other people for.  But in terms of any key
25   provisions, he was always consulted and his

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 47

M. Shapiro
1
2    input was obtained.
3    Q.    Anyone else for Lehman who was a
4    principal negotiator?
5    A.    Then in terms of let's call it -- but
6    I'm differentiating -- I'm differentiating
7    different levels of negotiation, which always
8    occur in every transaction.  So you have let's
9    call it the in-the-trench negotiators who are
10   negotiating most of the individual provisions
11   and then you have the leaders of each side who,
12   when things are not agreed to or when there's a
13   dispute, people go back to them and try to see
14   whether or not.  So I would --
15   Q.    And that was Mr. McDade?
16   A.    That was Mr. McDade, yes.
17   Q.    And who on the Barclays side was his
18   counterpart?
19   A.    It appeared to me to be Archie Cox,
20   but I'm not privy to all the discussions that
21   happened at Barclays.  But Archie was, of
22   anybody at Barclays, he was the face of Barclays
23   that we saw the most of.  He appeared to be the
24   person who was, at least on its face, making the
25   decisions.  He might have been consulting with

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 48

M. Shapiro
1
2    others, including Bob Diamond, for all I know,
3    or Rich Ricci or other people.
4    But to us, when Michael Klein would --
5    Michael Klein was their investment banker, so he
6    was also, let's call it -- now I'll get to the
7    second part of your question, which was who was
8    in the trenches dealing with some specific
9    issues as we negotiated this deal through --
10   Q.    Right.
11   A.    -- as you always have, and that team
12   was really a combination of Mark Shafir, who was
13   the head of M&A, myself, Skip McGee from time to
14   time, depending on what provisions we were
15   dealing with, he was around and we would consult
16   with him, and then the lawyers from Weil
17   Gotshal, which included Lori Fife, who's a
18   bankruptcy lawyer, Tom Roberts, Mike Lub --
19   What's his name?
20   MR. STERN:  Lubowitz.
21   A.    -- mike Lubowitz, and then on the
22   other side it was really Archie Cox, this guy
23   Michael Klein, and then the Cleary lawyers led
24   by really Victor Lewkow.
25   And then there were many other people

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 49

M. Shapiro
1
2    who were involved in ascertaining what the
3    assets were that were being -- that were
4    proposing to be purchased and proposing to be
5    sold, and there were many people who were trying
6    just to obtain sufficient information that would
7    form the basis for a contract that could
8    ultimately be presented to the court because
9    obviously we needed to make sure that we
10   understood what we had the right to sell to
11   Barclays.
12   Given the fact that we were talking
13   about a very large firm of, you know, with a lot
14   of securities and there was a lot of stuff going
15   on, meaning people were taking legal action
16   against Lehman all over the world, we had to be
17   sure ultimately that whatever we were telling
18   them we were selling to them we actually had the
19   legal right to sell to them.
20   Q.    Was Steve Berkenfeld involved in the
21   negotiations on that Monday and Tuesday?
22   A.    Yes.
23   Q.    Would he have been one of the people
24   negotiating what you call in the trenches?
25   A.    He was more involved in some of the

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 50

1      M. Shapiro
2  legal negotiations. He was definitely at the
3  table from time to time with the lawyers. He
4  was not, to the best of my recollection, in the
5  meetings that took place between myself, Mark
6  Shafir, Archie and Michael Klein.
7      Q.  I want to get the names of the people
8  that you recall who were dealing with specific
9  issues before we come back to how the actual
10 negotiations took place.
11     You said that there were people
12 looking at securities, people dealing with the
13 real estate and the like. Can you give me any
14 names of people who were dealing with those
15 component parts of a possible transaction?
16     A.  Sure. Okay. So let's start with the
17 real estate.
18     Q.  Okay.
19     A.  So they said to us that they would buy
20 the buildings for appraised value. I believe
21 that was Archie who told us that. And so that
22 seemed like a pretty reasonable way to approach
23 it given the fact that, you know, no one wanted
24 to just pick a number.
25     So we said we would go off and get an

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 51

1      M. Shapiro
2  appraisal, they would go off and get an
3  appraisal, and hopefully they would match or
4  come close to matching. So I called the head of
5  Investment Banking, Real Estate, Steve Hash, and
6  told him that I needed him to hire a firm to
7  provide us with desktop appraisals for 745
8  Seventh Avenue and the two data centers.
9      He asked me a few questions like
10 should they assume that the building was going
11 to be occupied as a going concern or was it
12 going to be an empty, you know, an appraisal
13 based on an empty building. I said, no, we
14 should assume that it's a full working building,
15 that it would be effectively, you know, I don't
16 know what you want to call it, but leased up as
17 if, you know, a valuation based on a fully
18 occupied 745 and a fully occupied set of data
19 centers.
20     And he said he would go off and hire
21 one of the major appraisal firms. I don't
22 recall whether it was Cushman or -- it was one
23 of the traditional firms that you would go to to
24 get a real estate appraisal of major commercial
25 real estate. And I told him that we had very

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 52

1      M. Shapiro
2  little time to get it done, that we needed it
3  within a day or two, and he said he would go
4  work on that.
5      Q.  Okay.
6      A.  So I would say that was -- and then
7  he, I believe he in turn assigned people within
8  his group to help him facilitate that. And I
9  don't know what Barclays did, but I believe that
10 they -- they had their own appraisal, I believe.
11 So that was the real estate.
12     On the securities side, I would say I
13 was not privy to some of, a good chunk of what
14 was happening other than the fact that there
15 were a number of people who I think Bart tasked
16 to make sure, you know, we were figuring out
17 what is it that we had and how, you know, and
18 give appropriate information to Barclays in
19 terms of those securities. And I know that
20 there were a lot of different people who were
21 being asked to pull all this information
22 together.
23     So, for example, Alex Kirk, who ran
24 High Yield was involved in that. Jim Seery, who
25 ran Loan Sales and Trading was involved in that.

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 53

1      M. Shapiro
2  Martin Kelly, who I don't know his function, but
3  I know he was involved in helping find some of
4  that information.
5      Q.  Ian Lowitt?
6      A.  Probably Ian Lowitt, yeah, but
7  probably more -- he was probably dealing more
8  with Bart and, you know, than -- I mean, I dealt
9  with Ian from time to time, but not a lot.
10     Q.  What about Mark Gelband?
11     A.  Mark Gelband? You mean Mike Gelband?
12     Q.  Mike Gelband.
13     A.  Mike was I think the head of Fixed
14 Income at the time or a senior guy in Fixed
15 Income. I forget his title at that point
16 because he had come and left and come back. He
17 was definitely involved in it at some point.
18     Q.  And when we say "it," talking about
19 the securities?
20     A.  Securities, yeah.
21     And don't forget these are all people
22 who were in the Fixed Income Division, you know,
23 senior leaders of the Fixed Income Division who
24 had obviously the most access to what fixed
25 income securities we had.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 54

1         M. Shapiro
2    Q.   Okay.
3    A.   I don't know -- I don't know on the
4    equity side who was involved. I suspect Jerry
5    Donini, who ran the Equities Division, had some
6    role, but I don't know for sure.
7    Q.   Before we leave fixed income, was Eric
8    Felder involved?
9    A.   Eric Felder was involved at some
10   level, but my impression was that he was not
11   around a good chunk of the weekend. From what I
12   was hearing, he was out, you know, shopping
13   himself.
14   Q.   You say not involved in the weekend?
15   We're on Monday and Tuesday now. I just want to
16   be clear on what time period we're talking.
17   A.   Okay. Sorry. I was thinking the
18   weekend.
19   Q.   You're talking about the weekend
20   previous or the weekend --
21   A.   Well, what I was -- when I was
22   talking, I'm meaning like starting on Sunday
23   night, Monday. Probably by Monday during the
24   day, Felder was around, yeah, and I don't know
25   exactly what his role was.
       TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 55

1         M. Shapiro
2    Q.   But the word was he was shopping
3    himself and he wasn't around?
4    A.   At the time the word was, you know, he
5    wasn't completely around.
6    Q.   But do you know whether or not he had
7    any involvement?
8    A.   I don't personally know. I think he
9    had some involvement, but I don't know what the
10   level of involvement was, how detailed, what he
11   exactly did. I know that we were trying to
12   get -- we were trying to get him to look at
13   something that involved some fixed income piece,
14   but I just don't remember what it was.
15   Q.   Were there people involved in pulling
16   together compensation information for Barclays?
17   A.   I don't personally know. I don't
18   know.
19   Q.   And you referred previously to this
20   collection of contracts that Barclays might be
21   assuming. Was there someone looking at that
22   universe?
23   A.   Yeah.
24   Q.   Who was that?
25   A.   I wouldn't say there was someone. I
       TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 56

1         M. Shapiro
2    don't know who it was, but I can tell you how we
3    started to think about it.
4    So, obviously, given my background,
5    you know, and knowing how these deals get done,
6    you quickly say, okay, what's someone who's on
7    the buy side going to want, right? They're
8    going to clearly need some of these contracts
9    that are running this firm.
10   Now, Lehman is a gigantic firm. I had
11   no idea how many contracts we would ultimately
12   have to assume, have assumed and assigned to
13   them. So when we sat down, and clearly we
14   started talking about, you know, what were the
15   material contracts, there wasn't anybody who
16   really -- who had ever been tasked with the
17   notion of like what Lehman -- you know, a firm
18   as big as a place like Lehman, there isn't a
19   single person who is expecting to have to answer
20   the question of what are all the contracts of
21   Lehman Brothers, right? And so there wasn't a
22   push the button, here's all the contracts.
23   So we asked -- I tasked one of the
24   people who worked for me, George Mack, and said
25   we need to start to get someone who can pull
       TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 57

1         M. Shapiro
2    together either a list or, you know, something
3    that ultimately Barclays could start to look at
4    to understand what these contracts might be, and
5    as we started talking about it with Archie
6    Cox -- I believe it was Archie -- and Michael
7    Klein, one of them asked something like, you
8    know, well -- I said you understand that the
9    way -- and they didn't really have much of an
10   appreciation for bankruptcy, truthfully.
11   Michael Klein, while he had been an investment
12   banker, he had, as far as I was concerned, zero
13   knowledge of bankruptcy and so I was explaining
14   to him how you effectuate a sale that involves
15   an assumption of contracts by a debtor.
16   So what I explained to him was that
17   you need to -- they would have the right to pick
18   which contracts they ultimately wanted. We
19   would give them some reasonable timeframe to do
20   this, which, you know, I proposed 60 days. I
21   thought that would be sufficient time for them
22   to figure it out since we didn't know exactly
23   what we were talking about.
24   And that's a pretty -- I would call
25   that a pretty common, maybe even a short,
       TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 58

1          M. Shapiro
2    relatively speaking, period of time to do that
3    in, and told them that they would have to pay
4    the cure costs for any contracts that they would
5    want to have assumed and assigned to them as
6    part of this deal, that that was something that
7    we wanted them to take on, that that was not
8    something that the estate was prepared to do.
9    And I explained to them that, in my experience,
10   that's the normal way that these deals get done.
11       Q.   And your concern at that point as a
12   bankruptcy person was that those claims would
13   be -- pardon me, those contracts could end up
14   being claims against the estate, so you wanted
15   them taken on by Barclays?
16       A.   Yeah, we wanted -- I would say there
17   were two issues.  One was we wanted to design a
18   contract that made sense in the context of what
19   we were doing, and so this was a very standard
20   provision for when you're selling a company is
21   the buyer having the right to purchase contracts
22   that they ultimately choose to purchase.
23       And I would say it's always
24   negotiated, actually, whether the buyer or the
25   seller will end up paying the cure costs of the

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 59

1          M. Shapiro
2    assumed contracts.  That's usually a very
3    heavily negotiated item in the context of a 363
4    sale.  My going-in negotiating position was,
5    Barclays, you need to take them all, you need to
6    pick up all the cure costs.
7        Q.   Now --
8        A.   And then the question came back to me,
9    well, what are we talking about?  How much are
10   we talking about?
11       Q.   And you had said previously that there
12   had been, when you sat down to look at this,
13   there was -- you used that phrase "when you sat
14   down."  I take it there was some gathering of
15   people, yourself, maybe Mr. Mack?
16       A.   Actually, it was a big room and it was
17   basically Archie and Michael Klein and Mark
18   Shafir and myself.
19       Q.   All right.  And you met
20   specifically -- at least part of the meeting was
21   for purposes of trying to identify or understand
22   what the contracts that would have to be assumed
23   by Barclays?
24       A.   Well, we were talking about a bunch of
25   different issues and this was one of them, and

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 60

1          M. Shapiro
2    this took a while to explain, obviously, because
3    it has a level of complexity to it that they
4    were not really aware of.
5        Q.   At the time you're sitting down at
6    this meeting, had you already asked Mr. Mack to
7    try to identify the universe of contracts that
8    Lehman had?
9        A.   No, I think as a result of this
10   meeting I then called him and said I need you to
11   figure out and start finding out like where are
12   the contracts, who are they with, can we get a
13   list of them.  You know, I was expecting to see,
14   you know, a computer stack of just like a
15   printout or something this high (indicating),
16   whatever we could get.
17       Q.   "This high" meaning two feet or so?
18       A.   Yeah, two feet, sorry, that could
19   allow Barclays to diligence and to start to
20   understand what this might be, recognizing that
21   we were going to give them 60 days so they
22   didn't need to know everything before we closed.
23   But the question that came back to us was, which
24   was a fair question, was, okay, well, how much
25   do you think this would -- if we assumed, you

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 61

1          M. Shapiro
2    know, a lot of these contracts, what do you
3    think it's going to cost us to do this?
4        Q.   Was the question if we assumed a lot
5    of them or the question whether we assumed all
6    of them?  I mean, what was the actual question
7    itself?
8        A.   I think it was a more general
9    question, which was, when we said, you know,
10   here -- there's a lot of contracts, I can't tell
11   you what they are, they could be in the
12   thousands, I really can't be sure, but we will
13   try to get that information obviously in the
14   course of the day.  Because this was probably, I
15   don't know, early afternoon or something like
16   that on that -- on the 15th.
17       The question came back, I believe from
18   Archie, you know, well, what would the cure
19   costs be?  I think he was just trying to get a
20   sense of what we were talking about, you know,
21   on the assumption that many of the contracts
22   could be contracts he would need to assume in
23   order to continue to operate the business,
24   right?  He really didn't have -- none of us
25   really knew exactly what they would have to

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 62

1          M. Shapiro
2    assume. We assumed that a good chunk of them
3    would have to be assumed in order to continue to
4    run the firm.
5        Q.   It's fairly, fairly stated, isn't it,
6    that you knew some of them would have to be
7    assumed and you knew some of them would not have
8    to be assumed, correct?
9        A.   We didn't know some of them wouldn't
10   have to be assumed. We assumed that many of
11   them would have to be assumed. We didn't know
12   what wouldn't have to be assumed because we had
13   no idea what Barclays wouldn't need, nor did we
14   actually know what all of the contracts were.
15   We just knew that there were likely to be a lot
16   of them.
17       Q.   And so you tasked Mr. Mack after this
18   meeting to get the collection of contracts?
19       A.   Start a process to get somebody in the
20   firm or some group of people in the firm to pull
21   together the contracts. That was kind of task
22   one. And then to the cure point, let's call it,
23   to the question of, well, what is it that --
24   what would be the magnitude of what we might
25   have to pay, we didn't know, and so we started

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 63

1          M. Shapiro
2    thinking about, well, how -- how could we figure
3    that out in the timeframe that we had,
4    recognizing that we all believed that we had,
5    you know, a short time, a couple of days, two
6    days, three days, at best, to pull this
7    information together in some satisfactory way to
8    Barclays.
9        Q.   And how did you go about trying to
10   identify what I'll call the quantum? How big is
11   this number?
12       A.   So I think I first asked George Mack,
13   again, as part of this, to figure out like what
14   were the outstandings that were unpaid under
15   these contracts. And I think he went to
16   somebody and the answer came back we can't
17   possibly figure that out in this time
18   specifically to each contract. It was just, you
19   know, there was no ability, functionally, to do
20   that in the time we had. That's just not -- I
21   was not humanly possible.
22       So but Barclays obviously wanted that
23   information from us, so we started thinking
24   about, well, how could we approximate that
25   amount. And so a group of us, we were talking

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 64

1          M. Shapiro
2    about it on the Lehman side, and we said, well,
3    one way that we could estimate this was by
4    having somebody look at the payables run, the
5    normal payables run in the ordinary course,
6    exclude comp, right, whatever is normally paid
7    for compensation on a weekly or monthly basis,
8    take a snapshot of a normal payable cycle, all
9    right, so at any given time you have a certainly
10   amount of payables outstanding, not knowing when
11   under every contract a payment was going to be
12   made, and not knowing they were all current,
13   necessarily, but we assumed that a lot of them
14   would be paid normally, you know, on a monthly
15   cycle, and provide us with an overall number
16   that would be a proxy for what the payments
17   under, you know, if you were assuming many of
18   those contracts, what those payments estimated
19   could be.
20       So that this was an intent. And we
21   told Barclays we couldn't provide them with the
22   specifics that they were looking for, but we
23   would try to get them an estimate of, for them
24   and ourselves, obviously, an estimate of what we
25   thought the amount would be that could be paid

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 65

1          M. Shapiro
2    if they were going to have to assume all of
3    these contracts.
4        Q.   Who did that work?
5        A.   I don't know. George -- George went
6    off and started talking to people in the finance
7    area. And there were many people that were
8    working around, obviously around the clock on
9    these things trying to pull this information
10   together for us. I don't know who actually did
11   the work.
12       Q.   Is George the person that you tasked
13   to get the number?
14       A.   George is the person who I tasked to,
15   you know, to get people to provide us with those
16   numbers.
17       Q.   Right. That's what I meant. Is it
18   George that reported back to you as to what the
19   proxy for the --
20       A.   I don't remember --
21       Q.   Let me just finish.
22       George reported back to you in terms
23   of what he thought the proxy for the cure number
24   was?
25       A.   I don't remember.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 66

1          M. Shapiro
2      Q.   Was your approach in generating what
3  the cure number could be to make certain that
4  you came up with a, you know, a large enough
5  number to cover any and all contingencies, in
6  other words, you shot high?
7      A.   No, we were just trying to come up
8  with an estimate. I mean, we knew that we were
9  working with imperfect information. We knew
10 Barclays wanted at least an estimate of -- and
11 everyone understood, I would say, through that
12 day and evening that it was an estimate and that
13 the reality was that they, you know, it could
14 have been low, it could have been high, we
15 didn't exactly know. We were trying to give
16 them a fair estimate, to the best of our
17 abilities over the course of that 48-hour
18 period, as to what we thought they would
19 potentially have to pay, and recognizing that it
20 was possible that that could be high, it was
21 possible that that could be low.
22     Q.   I understand on Monday and Tuesday as
23 you were trying to come up with this estimate
24 you did it in this way you have described, but
25 did work continue on identification of contracts

Highly Confidential

Page 67

1          M. Shapiro
2  and what the actual obligation of Lehman was
3  throughout the week of September 15th?
4      A.   I don't remember.
5      Q.   Were you involved in any way with what
6  I'll call an effort to actually identify what
7  the cure number was as opposed to using a proxy?
8      A.   I don't remember.
9      Q.   Do you have any recollection as to
10 whether anyone continued that effort?
11     A.   I don't remember.
12     Q.   If anyone continued the effort, would
13 it have been Mr. Mack?
14     A.   No. Mr. Mack had the fortuity, maybe,
15 of getting married that weekend and so he had to
16 leave on the 17th to start his plans for his
17 wedding preparations on Saturday or Sunday. So
18 he left on Wednesday, and that was the end of
19 his involvement until he came back from his
20 honeymoon.
21     Q.   When Mr. Mack left, did you give the
22 responsibility for what we've been calling the
23 cure number to someone else?
24     A.   I don't remember. I don't think so.
25 I think he -- he had done what we had done.

Highly Confidential

Page 68

1          M. Shapiro
2  What we had done I don't think -- I think -- I
3  don't think he thought that there was anything
4  else that he was being asked to do when he left.
5  If he did, he obviously handed it off to whoever
6  was working with him.
7      Q.   To the best of your recollection, was
8  any work done to identify the actual obligations
9  of Lehman for the contracts that it had after
10 the Monday and Tuesday --
11     A.   I don't know.
12     Q.   -- the 15th and 16th of September?
13     A.   I don't know.
14     Q.   And do you know anyone who would know
15 the answer to that question?
16     A.   Only those who were potentially doing
17 the work.
18     Q.   Did you ever see a stack of, you
19 know -- you put your hands two feet apart. Did
20 you ever see the run of contracts Lehman had?
21     A.   I recall that there were some Excel
22 spreadsheets or someone had put together
23 something along the way, I'm not sure where it
24 was, like when it was during the course of that
25 week, whether it was before we signed the

Highly Confidential

Page 69

1          M. Shapiro
2  contract, after we signed the original contract,
3  but there was definitely stuff, when I say
4  "stuff," I mean papers prepared that had some
5  specifics around contracts. I don't remember
6  reading them in detail.
7      Q.   Do you know whether the information on
8  those sheets was sufficient to derive what the
9  actual obligations of Lehman Brothers were on
10 those contracts?
11     A.   Since I don't remember what they said,
12 I don't know the answer to your question.
13     Q.   I had asked you a little while ago
14 about whether someone was dealing with the
15 compensation questions. I think you said you
16 didn't have any recollections of that?
17     A.   No. No. No. I said I didn't, at the
18 point we started this, it wasn't clear to me
19 who -- ultimately, Bart obviously was going to
20 be dealing with the compensation issue. I would
21 say of the -- along the way the people who
22 ultimately dealt with the compensation issue was
23 Bart and Skip McGee and Mark Shafir.
24          And I had a little bit of input into
25 the drafting of the provision because I was

Highly Confidential

Page 70

```
1           M. Shapiro
2   sitting with the lawyers for Weil and Cleary as
3   they were drafting that provision, making sure
4   that it reflected what I was told that the
5   business deal was, but I would say, to the best
6   of my recollection, it was Bart, Skip and Mark
7   Shafir who were on the Lehman side dealing with
8   this.
9           MR. STERN: I don't want to interrupt
10  your flow, but if there's a convenient
11  point --
12          MR. CARDEN: Let's finish the comp
13  piece.
14          MR. STERN: In the next ten minutes or
15  so.
16      Q.  Do you know who was dealing with it on
17  the Barclays side?
18      A.  Again, as I said earlier, the
19  principal face that we were dealing with in
20  terms of seeing was Archie Cox and Michael
21  Klein. I don't know who was actually dealing
22  with that or who they were talking to or -- so I
23  don't know the answer.
24      Q.  And you say that you were involved in
25  the actual drafting of the provision concerning
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 71

```
1           M. Shapiro
2   compensation?
3       A.  I didn't personally draft it. I was
4   sitting there, we were in a hallway, actually,
5   and I believe it was -- it was there were two
6   lawyers, one -- two employment compensation
7   lawyers, I would call them, one from Weil
8   Gotshal and one from Cleary Gottlieb sitting
9   next to each other. They were drafting, having
10  things typed, and then reviewing them basically
11  side-by-side together, and I at one point sat
12  down next to them and started reading the
13  provisions with them to make sure that I
14  understood it, that I could report back to make
15  sure that it was accurately reflecting what I
16  was being told the basic business deal was.
17      Q.  Was it your responsibility to
18  communicate to those lawyers what should be in
19  the compensation provision in the APA?
20      A.  I wouldn't say it was my
21  responsibility. I would just say that nobody
22  said to me your responsibility is to make sure
23  that the compensation provision is -- I just
24  took it upon myself to make sure, because I
25  obviously have legal training and I can read
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 72

```
1           M. Shapiro
2   contracts and make sure that I think they are
3   clear, that I read it and communicated to the
4   lawyers my input based on what I was being told
5   by Bart, Skip and Mark.
6       Q.  Okay. Just so I'm clear, I don't want
7   to get hung up on the word "responsibility"
8   here. At some point you were told by Bart, Skip
9   and Mark what the agreement was concerning
10  compensation, and you communicated that to the
11  lawyers at Cleary and Weil that did the
12  drafting?
13      A.  Yeah, I'm not -- I don't know -- I
14  don't think I necessarily communicated. I
15  wasn't the intermediary, if you want to call it
16  that.
17      Q.  Uh-huh.
18      A.  So I wouldn't say I was the
19  intermediary that was communicating the message
20  back to the lawyers. I would say that one of
21  the principals clearly discussed with Weil
22  Gotshal, maybe Tom Roberts. I don't know the
23  answer to your question who at Weil. I believe
24  that someone on the Weil side was told by a
25  senior master at Barclays what the deal was, I
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 73

```
1           M. Shapiro
2   think I was also told what the deal was, and
3   then the lawyers were off drafting and then I
4   was basically there to read it from my
5   perspective and make sure that I was comfortable
6   that the deal as explained to me was being
7   properly reflected. Since neither Bart nor Mark
8   and -- well, Skip I think went to law school and
9   practiced, but he doesn't function as a lawyer,
10  I'm probably a closer functionary in that
11  respect than they were.
12      Q.  What was your recollection of what the
13  deal was on compensation?
14      A.  My recollection was that, you know,
15  the all-in compensation pool that Barclays was
16  willing to agree to which would, you know, pick
17  up all moneys for 2008 that would be paid to
18  people that were moving over to Barclays, they
19  were --
20          Let me back up. My understanding of
21  the deal was that they were going to make offers
22  of employment to everybody in the U.S. business,
23  number one; that they were going to give people
24  at least 90 days and pay severance to the extent
25  that they didn't keep people around for whatever
```

TSG Reporting - Worldwide    877-702-9580

Page 74

```
1              M. Shapiro
2   reason; that they were going to pay bonuses, you
3   know, they were going to have a bonus pool of
4   some amount of money that was going to, as part
5   of this, the overall -- as part of the overall
6   compensation, there was a bonus pool; that they
7   were going to be paying out of bonus pool an
8   amount that was -- that had some relationship to
9   what Barclays had accrued -- not Barclays,
10  sorry, that Lehman had accrued for 2008,
11  excluding what had been paid out under salary to
12  date to that point in time, right?
13          Because as you know, in investment
14  banks, the salary portion is, from a -- for most
15  of the people who are senior executives and
16  investment bankers, the bonus portion is the
17  most significant portion of compensation. The
18  salary is just a very small portion of what
19  people have typically earned.
20          And so Barclays was agreeable to, you
21  know, subject to whatever total number that was
22  going to be, to paying some of that.
23     Q.  By when did they have to pay that?
24     A.  By March 15th of 2009, which was I
25  guess the date that they would typically pay
```

Page 75

```
1              M. Shapiro
2   bonuses.  Because at Lehman we typically
3   received our bonuses in January or February.
4      Q.  Anything else that you recall about
5   the deal on compensation?
6      A.  Well, the number ultimately was an
7   all-in $2 billion number, which was supposed to
8   pick up kind of everything I just described to
9   you.  There was also an adjustment mechanism
10  which said something like if 10 percent of the
11  people didn't come to Barclays, and there was
12  different people, like there was a -- there were
13  sort of let's call it the more important people
14  from their perception, there was a few hundred
15  people that they truly cared about who really
16  drove the businesses.  If 10 percent, I believe,
17  of those people didn't come and those people's
18  comp for 2008 represented in excess of 10
19  percent, I think they had the right to take that
20  out of the pool.  So I think there was some
21  adjustment mechanism built into it.
22     Q.  Just so I'm clear, then, so the bonus
23  pool that was going to be created was going to
24  be paid out by March 15, '09, correct?
25     A.  Yes.
```

Page 76

```
1              M. Shapiro
2      Q.  Was it all cash?
3      A.  You know, that was never clear to me
4   and it was a concern to me, actually, that I
5   don't think, you know, was expressed
6   specifically in the contract.
7      Q.  Did you have an understanding of
8   whether it was supposed to be all cash?
9      A.  I didn't have an understanding, no.
10     Q.  When you talked to Bart or Mark or
11  Skip about it, did they speak to you about
12  whether or not it was going to be a cash bonus?
13     A.  No.
14     Q.  You ultimately were paid a part --
15  paid a bonus under that provision, were you not?
16     A.  I was paid a bonus under a contract
17  that they offered me, yeah, which obviously that
18  money was sourced from ultimately the pool of
19  capital that was created from that provision.
20     Q.  Do you recall -- and we can get your
21  contract out later --
22     A.  Sure.
23     Q.  -- do you recall sitting here now how
24  much you were paid pursuant to the comp
25  provision you just described?
```

Page 77

```
1              M. Shapiro
2      A.  It was a combination of I think around
3   a          bonus in cash and -- it was about
4   25 percent of the total bonus in Barclays'
5   restricted stock, whatever they call it.  They
6   have a different name for it, but at Lehman we
7   had something called restricted stock units, or
8   RSUs.  Barclays has whatever their name for a
9   similar kind of security is that they have in
10  some sort of a trust that -- and we were told
11  when we -- when ultimately -- when ultimately
12  were offered specific letters, at least when I
13  was offered a specific letter, and I was told
14  that everybody was basically more or less being
15  treated similarly from this standpoint,
16  generally at my level, that about 25 percent of
17  the bonus compensation was in stock.
18     Q.  You were also --
19     A.  Which I was pleasantly surprised at.
20          MR. CARDEN:  Let's just mark this and
21  then we'll take a break after we just have a
22  few questions concerning it.  I don't
23  believe this has been marked so this is the
24  next exhibit, which is 55A.
25          (Exhibit 55A, a document bearing Bates
```

Highly Confidential

Page 78

M. Shapiro

1    M. Shapiro
2    Nos. BCI-EX-00077347 through 77349, marked
3    for identification, as of this date.)
4    Q.   Mr. Shapiro, I show you what he wants
5    been marked as Exhibit 55A, and this is the
6    contract to which you were just referring,
7    correct?
8    A.   That's correct.
9    Q.   And I note here that, consistent with
10   your testimony, you were paid a 2008 guaranteed
11   cash bonus of ▮▮▮▮▮ correct?
12   A.   That's correct.
13   Q.   And you were paid that before March
14   15th of 2009, were you not?
15   A.   I was paid that right around that
16   time. I don't remember exactly, but in that
17   neighborhood.
18   Q.   Okay. And the 2008 EPP recommendation
19   about which you just spoke in the amount of
20   ▮▮▮▮▮ you were also paid that no later or
21   around March 15, 2009, right?
22   A.   Well, when you say "paid that," these
23   are --
24   Q.   I'm sorry. Fair enough.
25   A.   Granted them.
     TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 79

M. Shapiro

1    M. Shapiro
2    Q.   Let me restate that, okay? I'm sorry.
3    Consistent with your testimony just a
4    moment ago, you were granted the shares pursuant
5    to the 2008 EPP recommendation here on or around
6    March 15 of 2009, correct?
7    A.   I was provided pursuant to this
8    provision that states 2008 EPP recommendation.
9    Q.   Yes.
10   A.   That they would request that these
11   shares, you know, of the Barclays Employees
12   Benefit Trust be granted, having an aggregate
13   market value of, you know, ▮▮▮▮▮ which I
14   presume were awarded to me -- I believe they
15   were awarded to me sometime around March 15.
16   Q.   Now, there's a special cash award as
17   well, correct?
18   A.   That's correct.
19   Q.   And that was not to be paid before
20   March 15 of 2009, was it?
21   A.   No, those were offered as part of, I
22   guess at the time, an inducement to keep people
23   like myself there. I was told that there would
24   be a -- they would be paid in two parts. First
25   part would be I think -- does it say on the
     TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 80

M. Shapiro

1    M. Shapiro
2    first anniversary of the starting date at
3    Barclays? And then the second 250 would be paid
4    on the second anniversary of the starting date
5    at Barclays.
6    Q.   I take it you have not been paid any
7    part of that special cash award as of this date?
8    A.   No, I have not.
9    Q.   I understand based on your prior
10   testimony, then, that this special cash award
11   was not part of the bonus pool that was
12   negotiated between Barclays and Lehman, correct?
13   A.   I don't know that. I don't know how
14   ultimately this money was -- relates to the $2
15   billion that was agreed to under the contract.
16   So I don't know the answer to your question.
17   Q.   I thought you told me that the bonus
18   pool had to be paid out by March 15 of 2009?
19   A.   I did say that, yes.
20   Q.   And this has not been paid out, has
21   it?
22   A.   This has not been paid out.
23   Q.   As a consequence, is it your
24   understanding this was not part of the bonus
25   pool that was negotiated between Barclays and
     TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 81

M. Shapiro

1    M. Shapiro
2    Lehman?
3    A.   I hadn't really thought about it.
4        MR. STERN: Objection to the form.
5    A.   I hadn't really thought about it
6    before you just asked your question. I can
7    only -- I can only base it on what you just
8    said, which was that the contract provides
9    that -- the contract, as I recall it, and maybe
10   I should look at it, but my recollection was
11   that the contract provided -- the contract, when
12   I say "the contract," I mean the Asset Purchase
13   Agreement -- provided that the bonuses I think
14   we were going to be paid by March 15th of 2009.
15       Your inference is that, since this
16   amount of money is not being paid by March 15 of
17   2009, it's not part of the bonus pool. I would
18   agree with that inference I think based on the
19   fact that that's what the contract said, but I
20   would think I would want to look at the contract
21   one more time before I confirm my answer.
22   Q.   I'm going to do that right now and
23   then we can take a break. Let me show you what
24   has been previously marked as Exhibit 1, which
25   is the Asset Purchase Agreement.
     TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 82

1              M. Shapiro
2         If I can direct your attention to page
3    35, which has the compensation clause about
4    which you have given prior testimony.
5    A.   Okay.
6    Q.   If you see paragraph 9(c), the top of
7    page 35, it does make reference to the annual
8    bonuses being awarded on or before March 15,
9    2009, consistent with your recollection, do you
10   see that?
11   A.   Yes, I do.
12   Q.   So, repeating my question now that
13   you've had an opportunity to look at the APA,
14   the special cash award was not part of the bonus
15   pool, was it, sir?
16   A.   Let me answer in the following way:
17   There was no discussion specifically that I'm
18   aware of around this special cash award at the
19   time of this contract. This was obviously
20   something that was provided to me and presumably
21   to others at Lehman who were willing to sign a
22   contract.
23        It would, based on my reading of this
24   contract, it would appear that this money did
25   not come from that pool of capital that was
     TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 83

1              M. Shapiro
2    allocated since it did say that that pool would
3    have to be paid by March 15.
4    Q.   When you say "this money," you mean
5    the special cash award?
6    A.   The special cash award, correct.
7         MR. CARDEN:  Let's take a break.
8         (Recess; Time Noted:  10:50 A.M.)
9         (Time Noted:  11:04 A.M.)
10   BY MR. CARDEN:
11   Q.   I'd like to understand a little better
12   than I presently do just how you were, I'm going
13   to call it -- say functioning on Monday
14   afternoon and Tuesday and describe some of the
15   things you were doing, you know, but tell me, if
16   you will, you know, how were you actually
17   functioning in this negotiation process, you
18   personally?
19   A.   So I would say that my function was to
20   work with -- initially, my function was to work
21   with Mark Shafir, Bart on helping to construct a
22   transaction -- since I was the firm's
23   restructuring expert, obviously that expertise
24   was required -- to provide input into how to do
25   so, you know, effectively; to help Mark
     TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 84

1              M. Shapiro
2    negotiate points, particularly points that
3    involved anything around bankruptcy matters that
4    were obviously let's call them technical in
5    nature, not something that he had any real depth
6    key expertise around; and to I would say help
7    kind of quarterback the entire effort over the
8    course of the days.
9         Again, I wouldn't say that anyone said
10   to me, you know, Mark, please do the following.
11   It was just kind of an expectation that that was
12   my role given the function that I had and given
13   the team that had been put together by Bart.
14   Q.   You've described how you met with the
15   Weil and Cleary people in that hallway and
16   reviewed the compensation provision of the
17   contract?
18   A.   That was just one piece of a much
19   bigger puzzle, obviously.
20   Q.   Were there other pieces of that
21   puzzle, other aspects of the APA that you
22   reviewed to see if they were consistent with
23   what you were told was the business deal that
24   had been reached?
25   A.   Well, I would say over the course of
     TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 85

1              M. Shapiro
2    the drafting of the document, you know, I didn't
3    leave the firm, so I stayed through the night.
4    I was -- I read every draft of the contract that
5    came out.  I provided my comments on the
6    drafting.  I sat with both sides.
7         There was a lot of what I call, you
8    know, typical lawyering that was going on,
9    pretty heated discussions, negotiations on both
10   sides around lots of different points, and I was
11   trying to find a way to get to commercial
12   resolution on them so that we could, you know,
13   make sure that we were progressing the deal as
14   best we could without getting stuck on what can
15   sometimes be very parochial points.
16        You know, a compensation lawyer might
17   have a particular technical thing that he
18   required, and I tried to make sure that we were
19   sort of seeing the forest from the trees, making
20   sure that we weren't getting stuck on what I
21   would call very, very minute points relative to
22   the size of the transaction we were dealing
23   with.
24        I wouldn't say I was involved in every
25   single discussion by any means, and I -- and I
     TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 86

1        M. Shapiro
2   was involved in direct discussions with Mark, as
3   I described earlier, with Archie and with
4   Michael Klein during the course of the night,
5   you know, middle of the night let's call it of
6   whether you want to call the night of the 15th
7   or the morning of the 16th, on some discrete
8   issues.
9      Q.   Come back to those in a moment.  I
10  just want to understand one aspect about how you
11  were functioning.
12       Did you take it upon yourself in the
13  reading of the various drafts to ensure that
14  what you understood to be the business
15  agreements that had been reached were being
16  memorialized in the document?
17     A.   To the best of my ability.  I mean,
18  you know, obviously there were a number of us
19  reading the contract, myself, Steve Berkenfeld,
20  Mark Shafir, although I think Mark probably read
21  it less so than me or than Steve.
22       The lawyers -- obviously, there was a
23  lot of responsibility placed on Weil.  So you
24  had, as I said, Mike -- what's his name?
25       MR. STERN:  Lubowitz.
     TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 87

1        M. Shapiro
2     A.   -- Mike Lubowitz, Lori Fife, Shai
3   Waisman so, you know, some of them were
4   obviously reading the contract carefully.  Tom
5   Roberts.
6        So there was a group of people who
7   were all reading the contract to try to make
8   sure that it reflected the business deal or, to
9   the extent that there was a dispute in any way,
10  we were bringing it to the right people to see
11  if it could either get resolved or modified or
12  not.
13     Q.   Of that group of people you just
14  described, yourself, Steve Berkenfeld, Lori
15  Fife, I think you said Tom Roberts, were all of
16  you kept apprized of the business terms and the
17  negotiations that were being conducted by Bart
18  and Archie Cox?
19     A.   Well, I would say I don't know how to
20  answer that question exactly when you say the
21  "business negotiations."  I'm not -- I don't
22  know exactly what Bart and Archie were
23  negotiating, so I'm not sure --
24     Q.   Let me ask it a different way.  It's
25  an awkward question.  I'm just trying to
     TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 88

1        M. Shapiro
2   understand what you just said.
3        When you were reading the contract,
4   you weren't reading it just to see if it
5   legally, you know, conformed with some idea of
6   what the agreement ought to be.  You were
7   reading it to see if it conformed with what you
8   understood to be the terms of the business deal,
9   correct?
10     A.   No, I was reading it.  I was reading
11  every word of that contract.  Truthfully, I
12  viewed this as a pretty, you know, significant
13  responsibility that I had to, you know, to the
14  Lehman estate and to the deal to make sure that
15  it was being done correctly.
16       Obviously, you know, I had a lot of
17  deal experience, I had drafted those kinds of
18  contracts, I have negotiated those contracts,
19  and so I was probably one of the few people
20  around that had the ability to make sure that
21  not only was the business deal being reflected,
22  but also that I felt comfortable with the legal
23  terms that were in it.
24       Again, I wasn't playing lawyer there,
25  we had Weil Gotshal to do that, and we had --
     TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 89

1        M. Shapiro
2   and we had, you know, Steve Berkenfeld to do
3   some of that, but I was reading it sort of
4   comprehensively.
5      Q.   I'm just trying to understand how you
6   came to know the business terms to make certain
7   that the APA was consistent with what deal had
8   been reached?
9      A.   Sure.  So I think what I did was, as I
10  went through the contract, I obviously, you
11  know, looked at it, and on the key -- on the key
12  provisions, I went back to people during the
13  night and made sure that what was in the
14  contract was what had been agreed to.
15     Q.   And was Steve Berkenfeld doing the
16  same thing?
17     A.   Not really from what I remember.  I
18  don't have a perfect recollection of what Steve
19  was doing.  Steve was -- Steve was kind of
20  hanging around.  He actually went home during
21  the night and got some sleep, so I stayed
22  through the night.  He left and then he came
23  back.  And I said, I'm glad you're back because
24  it's good to have a fresh set of eyes looking at
25  this stuff again, and maybe he came back at 6 or
     TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 90

1        M. Shapiro
2    7 in the morning.
3        So I would say that he -- he didn't
4    play -- he wasn't in the negotiations with
5    Shafir and I, with Michael Klein and
6    Archie, so I can't tell you exactly what Steve
7    did except that I know that he was reading the
8    contract, he was -- he was around the table from
9    time to time with the lawyers, and then he
10   ultimately -- you know, again, he was one of the
11   more senior people at Lehman Brothers involved
12   in the deal over that course of those days and
13   he ultimately signed the contract.
14   Q.   Did you have conversations with him
15   concerning deal terms in the contract that you
16   recall?
17   A.   I probably did. I just -- I don't
18   have any specific like exactly what we were
19   talking about. I think, you know, we definitely
20   of course chatted through the day and night.
21   Q.   When you said that you were glad to
22   have another or a new set of eyes or fresh set
23   of eyes, did you mean to make certain that the
24   contract was consistent with the business terms
25   that had been agreed upon?
         TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 91

1        M. Shapiro
2    A.   No, I just meant generally speaking,
3    he's a lawyer, I wanted to be sure that we
4    weren't missing anything, you know, and that,
5    you know, when you're reading a contract at 5 in
6    the morning, 6 in the morning, if you've been up
7    all night, you start to get a little tired.
8        So I just wanted to be sure that there
9    were other people besides -- obviously Weil
10   Gotshal, we were trusting them a lot, but from a
11   business perspective, we needed to be sure that
12   whatever we were entering into properly
13   reflected the general deal and didn't put Lehman
14   in a legal position that it had -- wouldn't
15   create any problems for it.
16   Q.   Just so I'm clear, was anyone other
17   than yourself that you know about reading the
18   contracts and their drafts for purposes of
19   determining whether or not it accurately
20   reflected the business deal that had been
21   reached?
22   A.   Well, Bart. People were bringing the
23   contract to Bart. I don't know what exactly he
24   read, but I know that people went over all of
25   the key terms with Bart. So clearly Bart was in
         TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 92

1        M. Shapiro
2    the loop and it's possible that others were.
3        I just, you know, again, there were --
4    as drafts would come out, they would have a
5    stack of them and they were being handed out to
6    people, and so I don't -- I'm not privy to all
7    the people who read the contract. I do know
8    that Bart was, you know, provided, you know,
9    with a contract and somebody went through that
10   with him.
11   Q.   When you had a question as to whether
12   or not the contract comported with what the
13   business agreement had been, did you go back
14   only to Bart? Did you go back to other people?
15   A.   I didn't really have that many
16   conversion, truthfully. It wasn't like I had a
17   thousand questions. It's actually a reasonably
18   straightforward contract and so it was really
19   around sort of, you know, some of the key issues
20   that we had to go through the contract for me to
21   tell you as we thought about these key issues
22   what they were.
23       But there were only I would call it a
24   handful of key issues that were in the contract
25   that were contractual issues as opposed to -- as
         TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 93

1        M. Shapiro
2    opposed to diligence and other things that were
3    still going on during that timeframe.
4    Q.   We'll take a moment and just pass
5    through it here and see if we can identify some
6    of those, but do you recall any of the key
7    issues before we start that process?
8    A.   I think it'll be easier if we just
9    flip through the contract.
10   Q.   Okay. Why don't you go through and
11   maybe give me a summary at the beginning of what
12   you consider to be the key issues about which
13   you had some questions.
14   A.   Okay.
15   Q.   And then we'll go through them.
16   A.   Well, are we talking about key issues
17   that I had questions about or just key issues
18   that had to be focused?
19   Q.   I'm sorry, I thought you said there
20   were only a handful of things that you had to go
21   back and ask about those key issues, so I was
22   trying to pick up on what you said.
23   A.   Okay.
24   Q.   You tell me.
25   A.   I guess -- is there --
         TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 94

1       M. Shapiro
2       Q.   What I don't need you to do is tell me
3   what the key aspects of the agreement are.
4       A.   I guess what I'll -- what I really
5   meant is I will focus on what I thought were the
6   key issues that I needed to make sure I was
7   focused on.
8       Q.   Fine.
9       A.   And if I have a recollection that I
10  had a question about it, I will share that with
11  you as we go through this.
12      Q.   Excellent.
13      A.   I don't have anything at this minute
14  until I look at it and see exactly what we're
15  talking about.
16      Q.   And you're looking at Exhibit 1.
17      A.   Correct.
18          So we're talking about Article II has
19  the -- really is where it starts after the
20  definitions. Purchase of -- shall purchase, it
21  says in 2.1, on the terms and subject to the
22  conditions, purchaser shall purchase, acquire
23  from the seller and 745.
24          There was some discussion early on
25  about which entity, legal entity held 745

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 95

1       M. Shapiro
2   Seventh Avenue, was there a mortgage right on
3   it, was there not a mortgage on it. There had
4   been some structured -- it had been structured
5   when it had been put into whatever it had been
6   put into about maybe a splitting of the building
7   and the ground lease. I can't recall exactly.
8       Q.   Okay.
9       A.   But I know that there were some things
10  around it, and I did focus on that and told the
11  real estate person to let's make sure we get
12  this right, let's make sure that we understand
13  exactly what we have to convey and that we get
14  this whole provision right, that we know who the
15  right seller is.
16          I believe, to the best of my
17  recollection, that 745 was an entity that held
18  some portion of the building in some way, some
19  rights that related to the building.
20      Q.   Now, only because you passed by it,
21  I'm going to draw you back to page 6.
22      A.   Okay.
23      Q.   I'm assuming that, since you passed by
24  it, you didn't --
25      A.   Well, I didn't look through the

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 96

1       M. Shapiro
2   definitions. I figured it's easier to look at
3   the definitions in the context of a provision.
4       Q.   Let me just draw your attention,
5   before we pass beyond the definitions, to the
6   definition of "purchased assets." Did you focus
7   on that?
8       A.   . Yes, it definitely was a provision
9   that I spent time making sure that I tried to
10  understand it at the time, yes.
11      Q.   And were you trying to determine what
12  exactly Barclays was buying and what was being
13  left behind?
14      A.   Most importantly, I wanted to be sure,
15  (A) what was it that we were conveying to them.
16  Is it clearly delineated, right? We always want
17  to be sure that you know in a contract,
18  particularly when things are moving quickly,
19  that you're getting it right. And so I just
20  wanted to be sure that whatever we were putting
21  in the contract we, you know, we all understood
22  what it was.
23      Q.   Okay. I draw your attention to
24  subparagraph (d) underneath "Purchased Assets"
25  on page 6. Do you see the reference to

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 97

1       M. Shapiro
2   approximately $70 billion in securities?
3       A.   Yes.
4       Q.   Did you focus on what those securities
5   were when you read this contract?
6       A.   Did I focus on what those securities
7   were?
8       Q.   Let me rephrase that question. I
9   phrased that poorly.
10          When you read the contract, were you
11  aware of what positions in government
12  securities, commercial paper, corporate debt,
13  corporate equity, Exchange-traded derivatives
14  and collateralized short-term agreements were as
15  referenced in subparagraph (d) under "purchased
16  assets"?
17      A.   Okay. So let me try to -- let me try
18  to answer that in the context of the way things
19  were happening over the course of those days.
20          So obviously, as I explained earlier,
21  people were trying to understand what was the
22  book of securities that we actually had title to
23  that we could sell to Barclays. In particular,
24  I was pointing out to people that we needed to
25  make sure that we were getting -- people around

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 98

1         M. Shapiro
2  the firm in the securities area were pulling
3  together information, batches of information
4  about each of the different pools of securities
5  that the firm owned.
6         As you can imagine, given the fluidity
7  of the situation, people were blowing Lehman out
8  of positions. So it was a very fluid situation
9  in terms of like knowing on a, you know, you
10 could do a photo, you know, photo check on time
11 1, but by time 3, meaning an hour later, it
12 could have been a different situation.
13        So what I was telling everybody was
14 let's get as much real-time information as we
15 can around these securities, but everyone was
16 pointing out that it was changing rapidly and
17 the balance sheet was actually shrinking rapidly
18 as things were being taken from Lehman, in other
19 words, the repo positions they had, they were
20 being blown out of securities.
21        If you recall, the only company that
22 we actually put into bankruptcy was the holding
23 company and most of the securities were held at
24 the broker-dealer, and so that was not still
25 under the bankruptcy yet until maybe Wednesday,

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 99

1         M. Shapiro
2  I can't remember when they actually filed it,
3  but it wasn't filed immediately.
4         And so there were still things
5  happening at the broker-dealer that led to those
6  securities in the different pools potentially
7  changing, through no fault of Lehman, just
8  because the market was -- things were happening
9  in the market on the other side of the other
10 side of Lehman Brothers.
11        So people were -- I would say this was
12 where you asked me earlier, you know, who was
13 doing a lot of the securities analysis. You
14 know, this is where Bart and Alex and -- Alex
15 Kirk, Jim Seery, Martin Kelly, probably Ian
16 Lowitt, people were very focused on let's figure
17 out what do we have.
18        You know, Bart was clearly trying to
19 get as much information real-time as he could
20 get so that we could try to understand what did
21 we have the right to convey to Barclays. The
22 last thing that I wanted to see was us telling
23 Barclays we can convey this security to you,
24 finding out we didn't ultimately have it, and
25 having a breach of contract which could let them

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 100

1         M. Shapiro
2  walk away from the deal.
3         So I wanted to be sure that if we --
4  that we could identify, to the best of our
5  abilities under the circumstances, what is it
6  that we thought we could convey to them legal
7  title to. So, in that effort, in that effort,
8  and I guess George Mack was a little bit I think
9  around that effort at some point, one of my
10 analysts, John Grenier was brought in with a
11 laptop who was told, let's start to kind of put
12 together a sheet that might reflect what
13 securities were being told by other people in
14 the firm we owned that we think we can convey,
15 and then what's the funding against those
16 securities that Barclays would have to assume as
17 part of this.
18 Q.   Because that was the offset for the --
19 Barclays was going to take the position, but it
20 also had to take the financing of those
21 positions?
22 A.   I wouldn't say they had to. I would
23 say the discussion was we have securities, and
24 we have financing for those securities, and that's
25 the -- that was, in a sense, the basis for the

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 101

1         M. Shapiro
2  discussion. That was obviously a negotiation
3  that took place really I believe between Bart
4  and people at Barclays, ultimately.
5  Q.   The discussion as to what assets would
6  be taken and what financings --
7  A.   What liabilities would be assumed in
8  connection with those securities, correct.
9  Q.   When did this Grenier -- I'm sorry, I
10 forgot his first name.
11 A.   John.
12 Q.   When did John --
13 A.   He was only at the firm for three
14 weeks at that point, so he was thrust into an
15 interesting position.
16 Q.   When do you recall him coming into the
17 process to try to assemble this list of
18 positions?
19 A.   Probably Sunday night, I mean like
20 Sunday night late, and then probably starting
21 very, very early in the morning on Monday
22 morning.
23 Q.   Okay. So obviously developing this
24 list of security --
25 A.   It wasn't a list like a long list.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 102

```
 1          M. Shapiro
 2   This was categories of different things that
 3   were being identified by other people to him.
 4   He was basically a scribe with a computer,
 5   right? And basically was asked, okay, put this
 6   on a piece of paper, show up with a laptop, get
 7   up to Bart's office, and let's start to make
 8   sure we understand what securities might be able
 9   to be conveyed.
10          And it turned out to be clearly a
11   moving process, because as the two days went on,
12   you know, the information that we started with,
13   which was that we believed that Lehman had a
14   hundred billion dollars, roughly, of securities
15   that could be conveyed to Barclays ultimately
16   translated down to I believe in the low $70
17   million range by 24 to 48 hours later, and then
18   even less as we get further into the week.
19      Q.   At the time that you reviewed the
20   drafts of the APA, did the number 70 billion
21   change in the draft?
22      A.   I don't remember. I suspect it did,
23   but I don't remember.
24      Q.   And at the time -- obviously this is
25   the signed version, Exhibit 1, do you see that?
```

Highly Confidential

Page 103

```
 1          M. Shapiro
 2      A.   Yes.
 3      Q.   At that time was there any schedule of
 4   any kind backing up the $70 billion number?
 5      A.   I wouldn't say it was backing it up.
 6   I would say in connection with this there was
 7   this piece of paper that we were just kind of
 8   using as a way to, for all of our purposes, make
 9   sure that we knew kind of what we were talking
10   about in terms of people figuring out, okay,
11   what is it that we were buying and they are
12   assuming.
13          So this piece of paper was created
14   that ultimately got initialed by Berkenfeld, I
15   know, I remember seeing it, that had a list of
16   different securities on the asset side,
17   different securities on the liability side.
18   That did change. You know, over the course of
19   those two days, there was probably, I don't
20   know, there could have been as many as ten or
21   more iterations of that particular piece of
22   paper, and I was not -- I was not in the middle
23   of drafting that piece of paper, so I can't
24   speak to how it got changed or why it got
25   changed other than the fact that, as the
```

Highly Confidential

Page 104

```
 1          M. Shapiro
 2   information came in through the securities
 3   people, those numbers got changed.
 4      Q.   Who was drafting that document?
 5      A.   Well, as I said, John Grenier was the
 6   scribe. "Scribe" meaning he was --
 7      Q.   I was talking about the document that
 8   Steve Berkenfeld initialed.
 9      A.   That's what I'm talking about. That
10   document turned into the document Steve
11   initialed.
12      Q.   I didn't understand that. So Steve --
13   pardon me. John was working on this document
14   that ultimately became --
15      A.   Yeah.
16      Q.   -- the balance sheet that was
17   initialed by Steve?
18      A.   Correct.
19      Q.   Okay. Let's go back to the 70 billion
20   for just a moment. Were the value of those
21   securities based on Lehman's marks?
22      A.   Well, this says it has a book value.
23   So I believe it was based on Lehman's -- as
24   Lehman had marked them as of the time that this
25   contract got signed, which meant -- the contract
```

Highly Confidential

Page 105

```
 1          M. Shapiro
 2   got signed at 10:30 P.M. around on Tuesday -- on
 3   the night of the 16th, so I'm presuming that on
 4   or about the close of business on the 16th there
 5   was a view, and it does say approximately 70
 6   billion, so presumably there was a list that was
 7   taken that they had obviously different pools of
 8   securities in, they had the marks that Lehman
 9   had on those securities as of that date,
10   approximately, and that's presumably where this
11   $70 billion came from.
12      Q.   Do you know if Barclays was given a
13   discount in the purchase of those assets?
14      A.   I don't know what you mean by a
15   "discount."
16      Q.   Well, the $70 billion is based, as you
17   said, on Lehman's marks. Do you know whether or
18   not, in selling the securities to Barclays,
19   whether different marks were used?
20      A.   No, these -- again, as I recall, this
21   70 billion was a rough approximation of the
22   aggregate book value, you know, based on
23   Lehman's marks, of the asset side of the deal,
24   right? And so I would say, no, there was no
25   discount because obviously it was a book value.
```

Highly Confidential

Page 106

1           M. Shapiro
2       Then you had the other side of the
3    deal, as you mentioned before, which was the
4    liabilities side. My recollection was that the
5    liabilities side was lower, that the funding of
6    these securities, which actually is not a
7    surprise because people take haircuts, right?
8    People don't lend you necessarily a hundred
9    cents on the dollar against an asset.
10      So there was a lower amount of a
11   liability that was assumed opposite these 70. I
12   do remember, again, that changed along the way,
13   right, in the terms of like -- but it was
14   always, it was always, to the best of my
15   recollection, somewhere between one and a half
16   and two billion dollars of differential between
17   the amount of liabilities that were being
18   assumed in connection with these securities by
19   Barclays versus the amount of assets that were
20   book-valued by Lehman Brothers under the
21   schedule, which kind of made sense to me because
22   if they were, you know, if they were taking a
23   matched book (A) you're going to always have
24   small -- some amount of haircut, right, against
25   what people were willing to lend you against
        TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 107

1           M. Shapiro
2    those securities; and, two, I assume that, this
3    is just my personal assumption, that, you know,
4    given the volatility of the time we were in
5    where the stock market had just absolutely, you
6    know, so volatile over that course of those
7    couple of days, and I can't remember exactly
8    what happened in those two days, but it was, you
9    know, the Friday before I think was bad and a
10   couple of days around it was bad, and I'm
11   obviously -- the world was in crisis. No one,
12   no one knew where the next day's marks might
13   have to be given the fact that people were
14   genuinely worried that if Lehman toppled over
15   completely and all these securities might be put
16   into the marketplace, what those marks might be.
17      So I just had a presumption that a
18   negotiation was taking place, you know, really
19   between Bart and the people on the securities
20   side and Barclays over what they're prepared to
21   assume, assuming that there was -- that they
22   were, on their side, building some cushion in
23   for volatility that they could, you know, by the
24   Monday morning they wake up and all of a sudden
25   they find these securities are worth 20 percent
        TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 108

1           M. Shapiro
2    less. So that was just my presumption. I don't
3    know if that's actually what happened.
4    **Q.   Are the financing to which you are**
5    **referring that were being assumed by Barclays**
6    **referenced on page 12 in paragraph 2.3I?**
7       MR. STERN: Objection to the form.
8    Can I just -- can you read the question
9    again?
10      (Record read.)
11      MR. STERN: You can answer.
12   A.   Yeah, that's my general understanding,
13   is that this "I" provision was the offset to the
14   provision that we just went through, and so you
15   had 70, approximately 70 in that provision,
16   approximately 69 in this provision. That
17   reflects what I just told you before.
18   **Q.   All right, now I interrupted you. You**
19   **were just starting through the provisions of the**
20   **APA that you had focused on.**
21   A.   Yeah.
22   **Q.   And I drew you back to the definition**
23   **of "purchased assets," so I'm going to turn you**
24   **loose again.**
25   A.   This could take a while, if I'm going
        TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 109

1           M. Shapiro
2    to read through this.
3    **Q.   I'm here all day.**
4       MR. STERN: Take your time.
5       MR. CARDEN: Jack is looking quite
6    relaxed and comfy over there.
7       MR. STERN: Take your time.
8    A.   I am taking my time. I'm just telling
9    you I have to read this contract.
10      So, as we go through 2.3, I'll just
11   tell you what I spent some time I remember on.
12   **Q.   Okay.**
13   A.   To the best of my recollection.
14      So 2.3(b) has liabilities of Seller
15   under the purchased contracts arising after the
16   date of such entity. So that was obviously a
17   provision that was attached to the provision
18   dealing with what contracts we might assume and
19   assign, and they were agreeing that they would
20   pick up any liabilities from and after the date
21   of this contract under those purchased
22   contracts.
23      There was some discussion, because we
24   were giving them 60 days to decide whether or
25   not they would take any of these contracts,
        TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 110

1          M. Shapiro
2  right, there was some discussion about whether
3  kind of who would be responsible during this
4  60-day period for the contracts because you were
5  going to clearly accrue administrative expenses
6  during the case if you hadn't yet made a
7  decision.
8          So just, you know, let's take a simple
9  example of a, you know, a computer contract,
10 computer -- if they had decided that they didn't
11 need the computers that were there and they
12 terminated whatever lease or whatever else there
13 was around those computers, during the 60 days
14 that we were giving them to make a decision to
15 assume or assign, the counterparty to that
16 contract -- and there was thousands of these
17 things -- had a right to administrate a priority
18 claim under the bankruptcy code, right?
19         I wanted to be sure that they were
20 picking up those liabilities so that, even if
21 they decided not to take the contract, they were
22 still responsible for whatever arose after the
23 contract so that the estate wouldn't be
24 responsible for that.  There was some discussion
25 about that, and after, you know, to-ing and

Highly Confidential

Page 111

1          M. Shapiro
2  fro-ing with them, they ultimately agreed to do
3  that.  I do remember that one.
4          Maybe we can -- the next provision
5  that I'm looking at is 2.3(c), which is "all
6  Liabilities assumed under Article IX," Roman IX,
7  and maybe we should skip that until we get to
8  that because that obviously has some of the
9  compensation provisions that we need to talk
10 about.
11     Q.   Okay.
12     A.   I definitely was, as I mentioned
13 earlier, involved in trying to make sure that
14 that properly reflected the deal.
15         On 2.3(f), the provision that says,
16 "All other Liabilities to the extent related to
17 the Business, the Purchased Assets or the
18 Transferred Employees," there was some general
19 discussion I remember certainly the lawyers of
20 trying to iron out this.  And frankly, you have
21 to -- I think you have to look at this provision
22 and read this with the Excluded Liabilities
23 provision, because while this says certain
24 things and the Excluded Liabilities provision
25 says notwithstanding what's said here, certain

Highly Confidential

Page 112

1          M. Shapiro
2  things are excluded.  So they have to kind of be
3  read hand-in-hand, so I do remember talking
4  about like what were the things related to the
5  business that would or wouldn't be included.
6          Obviously you have the provision you
7  pointed out before, (i).  There was a lot of
8  discussion about how to properly reflect that.
9  Specifically, Mike Lubowitz wanted to be sure
10 that he accurately reflected what this meant as
11 people thought at the time.  I would say that it
12 was intended to mean the liabilities associated
13 with the assets from a funding standpoint.
14     Q.   The assets that were being acquired?
15     A.   The assets that were being acquired,
16 correct.
17         And there were shorts positions.  One
18 of the things this says is includes short
19 positions.  You could, in theory, have had a
20 short position that was unrelated to the asset
21 side, right?
22     Q.   Right.
23     A.   So I don't know the specifics of that.
24         2.4(c) makes it clear that the
25 purchaser was required to pay the cure amounts

Highly Confidential

Page 113

1          M. Shapiro
2  that were required under 2.5.  I remember trying
3  to make sure that we had that right.
4          There was some discussion under 2.4(d)
5  about, you know, how would medical claims work,
6  people who were coming across from Lehman to
7  Barclays, you know, what, you know -- and I
8  think they basically took the position like they
9  are not assuming anything at all, whatsoever, as
10 it related to Lehman employees kind of personal,
11 medical, anything that arose pre-petition, that
12 they -- it would start fresh when you moved over
13 to Barclays.
14     Q.   Okay.
15     A.   I was just trying to, you know,
16 understand it really so that I could explain to
17 people kind of what was happening when this deal
18 closed from a personal standpoint in terms of
19 what people would have rights to and not have
20 rights to.
21     Q.   Okay.
22     A.   That would be 2.3.  2.5, you know, I
23 probably, you know, oversaw this provision, if
24 you want to call it that, right, in terms of
25 how, you know -- I negotiated the 60 days,

Highly Confidential

Page 114

M. Shapiro

1    M. Shapiro
2    worked with the lawyers to make sure we had this
3    right. I think it's pretty -- actually, I think
4    it's very straightforward.
5        They had the right to, you know,
6    designate contracts, and if they designated the
7    contracts, we had the obligation to have it
8    assumed and assigned to them and they had the
9    obligation to pay the cure costs.
10    Q.  Okay. Now that you're on page 1, I'm
11    going to just interrupt your review and ask you
12    a general question so I can budget our time for
13    the rest of our day.
14    A.  Okay.
15    Q.  I realize that you were involved quite
16    closely with the APA. Were you also involved
17    with any documentation of the transaction as it
18    changed through the week, the clarification
19    letters, for example?
20    A.  I was definitely not involved with the
21    clarification letter from a documentation
22    standpoint. As I recall, on that Friday, there
23    was still, you know, a lot of -- there was still
24    a lot of concern as to whether Barclays was
25    going to actually finish the deal, actually
TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 115

1    M. Shapiro
2    close the deal, you know, and I remember there
3    was a lot of discussions happening in Bart's
4    office about what securities they would actually
5    buy, what could we convey to them, you know, in
6    terms of what did we know that we had the right
7    to convey to them. The size of the balance
8    sheet had been shrinking during the course of
9    the week given the volatility of the market and
10    people blowing Lehman out of positions and
11    valuations coming down.
12        There was this confluence of all
13    different things happening that were changing
14    the nature of the securities that was described
15    in that 70/69 million dollars set of provisions,
16    and so I would say I was in Bart's office during
17    the morning of Friday going through the contract
18    with him and with the lawyers, Tom Roberts, and
19    like walking him through all the provisions and
20    probably --
21    Q.  The provisions in the clarification
22    letter or the APA?
23    A.  No, the provisions in the APA.
24    Q.  Okay.
25    A.  I don't know when the clarification
TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 116

1    M. Shapiro
2    letter actually started to be drafted, but at
3    some point on Friday during the day, you know, I
4    don't know if it was maybe sometime in the
5    morning, I think it was determined that Barclays
6    was not going to take -- or, that the securities
7    that were described previously in this APA were
8    not necessarily the same securities that could
9    be conveyed to Barclays given the change in
10    everything that had happened between the time
11    that this contract had been presented to the
12    court and Friday when we were actually showing
13    up in court.
14        So it needed to reflect the actual
15    deal, and as I understood it, there were
16    discussions between Bart and Barclays and other
17    people who worked with Bart -- I was not privy
18    to those discussions directly -- that Barclays
19    would end up taking the repo book that Barclays
20    had been told by the Fed to take over on
21    Wednesday during, you know, during the time
22    right before the Asset Purchase Agreement
23    stalking horse hearing.
24        Barclays again had, to the best of my
25    knowledge, had been told by the Federal Reserve
TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 117

1    M. Shapiro
2    Bank and the treasury that they had to take over
3    that repo book which the government had taken
4    over Sunday night.
5    Q.  Sunday night, the 14th?
6    A.  Sunday night, the 14th.
7        So, again, I don't know exactly what
8    transpired that led to that decision ultimately,
9    except surmising that things had changed a lot
10    factually in terms of what securities Lehman
11    Brothers had the right to deliver.
12        And so there was definitely a business
13    understanding, as I understood it when I left
14    the firm to go to the hearing, which was
15    probably -- I probably left around between 3 and
16    4 o'clock to take the subway downtown.
17    Q.  On Friday?
18    A.  On Friday to the hearing.
19        Bart was still -- Bart was -- Bart
20    had -- Bart left about the same time and was
21    heading to Weil Gotshal to be prepped for the
22    hearing, and there was an agreement, as I
23    understood it, that they were going to take the
24    assets and liabilities that really were relating
25    to the repo book which had the same, you know,
TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 118

M. Shapiro
1  M. Shapiro
2  proportionality to it.
3  **Q.  Same proportion as what?**
4  A.  You had the 70 and the 69, and I think
5  I remember hearing it was something like, you
6  know, 45 and -- 45 in liabilities and maybe 47
7  in assets, something like that. So when I say
8  proportionality, I meant there was a difference
9  between the liability side and the asset side by
10  between one and two billion dollars.
11  And so I don't remember, until the
12  hearing, I don't remember hearing about the
13  clarification letter. Like I didn't see it. I
14  didn't hear about it. Obviously it was being
15  drafted by the lawyers. And then Lori Fife in
16  the hearing got up -- I think it was Lori, it
17  was maybe Harvey and Lori, but I think Lori did
18  the specifics of going through what the
19  clarification letter was going to say, what the
20  deal was, as revised, so that everybody
21  understood, could understand, you know, that
22  there had been some changes in the deal and the
23  deal terms from the APA that had been presented
24  as the stalking horse APA, which is not uncommon
25  in these kinds of deals and certainly not

Highly Confidential

Page 119

M. Shapiro
1  M. Shapiro
2  uncommon in a deal that had this level of
3  complexity in terms of the -- the securities
4  that were being sold.
5  Does that answer your question?
6  **Q.  Yes, it does, and we were just getting**
7  **to paragraph 3.3. I wanted to focus your**
8  **attention on it, which is an adjustment to the**
9  **cash amount, a kind of true-up, if you will. Do**
10  **you recall focusing on this provision?**
11  A.  Yes, I do.
12  **Q.  Tell me what you remember about that.**
13  A.  I remember that there was some
14  discussion, there was some discussion -- I was
15  involved in some part of this discussion, I just
16  can't remember exactly when or exactly who it
17  was with, but I do remember having some
18  discussion where we talked about the fact that
19  one way to deal with the fact that this $70
20  million was still approximate and people were
21  trying to get their hands on everything was to
22  create a provision that would say, basically,
23  you know, that there would be some sort of a
24  true-up down the road.
25  And when I say true-up, I mean there

Highly Confidential

Page 120

M. Shapiro
1  M. Shapiro
2  would be a purchase price adjustment as really
3  outlined here. And again, I didn't negotiate
4  the terms of this in terms of dollars or how
5  much or exactly how it worked, but I do remember
6  being part of a discussion where we talked about
7  that Lehman Brothers would have the benefit of
8  this provision which would give Lehman Brothers
9  the right up to $750 million in the event that
10  the value of the securities increased before
11  Barclays were to have sold them.
12  Let me refresh my recollection of
13  exactly what this says now.
14  (Document review.)
15  A.  So the concept -- there was really two
16  concepts in this provision. One was that
17  Barclays would have the sole right to just
18  decide when they wanted to sell any of these
19  securities that they were buying. So we didn't
20  really control that. So, unlike a provision
21  where they had to hold it to a point in time,
22  this wasn't that. They could have turned around
23  and sold this the next day or up to the 12th
24  month anniversary, right? Or they could have
25  held it.

Highly Confidential

Page 121

M. Shapiro
1  M. Shapiro
2  And the concept was whenever they --
3  whenever they did so, they would take, you know,
4  a recognized profit or loss, as determined by
5  the LBI mark as of the date of this contract,
6  and then, in the event that the profits exceeded
7  the losses, the aggregate profits exceeded the
8  losses, then up to the first $500 million, the
9  purchaser had to pay the seller the net amount,
10  and if it was more than the $500 (sic) there
11  was a 50 percent concept with a total cap of
12  750.
13  **Q.  Were you aware that this provision was**
14  **eliminated in the clarification agreement to**
15  **which you were just referring?**
16  A.  Yes, I was told that as part of the
17  revised deal that Barclays -- there was
18  obviously, in that last call at the last part of
19  the deal, the last negotiation that Bart had
20  with them, I was told that as part of the give
21  and take of the negotiation, they were taking
22  certain things on that they didn't expect to
23  take on and that they wanted this provision
24  removed, and so I recall it was removed.
25  **Q.  Do you recall what they were taking on**

Highly Confidential

Page 122

1         M. Shapiro
2   that they hadn't previously agreed to take on?
3       A.   I don't specifically remember.  I
4   would have to -- I would have to go back and
5   obviously look at other things, but I don't,
6   sitting here right now, I don't remember
7   exactly.
8       Q.   Do you know the categories of things
9   they were taking on?  Were they securities
10  positions?
11      A.   Well, I remember that they were
12  supposed to get some cash originally in the
13  deal, and I think we dropped the notion that we
14  would be transferring the cash to them.  But I
15  don't remember the specifics.  I would have to
16  spend more time.
17      Q.   What would you look at to determine
18  what they were taking on that was additional?
19      A.   Well, you would have to go back to --
20  you would have to look at all along the way the
21  negotiations.  This was -- and again, you
22  wouldn't find this all in writing because this
23  was a negotiation going on amongst business
24  people.
25      Q.   Let me just jump ahead, if you will,
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 123

1         M. Shapiro
2   in the interest of time and there's a lot of
3   things in here, and I know that you focused on
4   many of them, but maybe we ought to just go
5   ahead to Article IX to which you referred a few
6   times in your answers concerning this agreement
7   and focus on subparagraph (c), which is on page
8   35.  And after you tell me what you recall about
9   that, in addition to everything you have already
10  told me, we'll move on.
11      A.   Okay.  So what I remember is that this
12  provision was being drafted, as I said earlier,
13  by, you know, a Cleary employee benefits lawyer
14  and a Weil employee benefits lawyer, neither of
15  whom I knew before that day.  And I remember --
16      MR. STERN:  I'll just note that the
17  witness is referring to page 34.
18      THE WITNESS:  Yes, page 34 --
19      MR. CARDEN:  Did I misspeak?
20      MR. STERN:  No, you didn't misspeak,
21  but I think you were directing him to page
22  35.
23      A.   Article IX, Section 9.1, and we were
24  talking now about sometime probably during the
25  afternoon late -- maybe early late morning,
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 124

1         M. Shapiro
2   early afternoon of the 16th of September.
3       Q.   Okay.
4       A.   These lawyers were drafting this and I
5   remember looking at it.  I remember I was
6   standing with -- I was standing with Paul
7   Parker, who was co-head of M&A, who happened to
8   be in the hallway at that point in time.  These
9   lawyers were sitting kind of in an alcove of the
10  hallway on chairs, and so there were people kind
11  of that were milling about who were not directly
12  reading this or negotiating it, and I remember
13  saying to him, "Let's make sure we get this
14  right.  Can you get Skip?"  Because I want to
15  make sure that we have this right because Skip's
16  one of people who was in that negotiation, to
17  the best of my knowledge.
18      And so Skip came over and I just said,
19  "I want to make sure we get this right.  This is
20  a pretty important provision for everybody.
21  Let's make sure that we have it clear."
22      Q.   Okay.
23      A.   And I remember reading it.  I remember
24  going through particularly paragraph --
25  paragraph (c) with the lawyers, especially this
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 125

1         M. Shapiro
2   whole reduction provision that dealt with the 10
3   percent.  I think -- I think Barclays' initial
4   position was basically reduce this total comp by
5   anybody who's not staying or who's not offered a
6   contract, or I can't remember exactly, but
7   basically their point was they wanted a
8   reduction.
9       We pushed back and said no reduction.
10  This ultimately came to some kind of a, as you
11  can see here, some kind of a compromise, if you
12  want to call it that, which required both 10
13  percent voluntarily terminated.  And no one
14  knew, obviously, how many people were actually
15  going to go over to Barclays.  It was such an
16  uncertain time, and they didn't certainly make
17  any -- give anybody, other than I think the top
18  eight executives, any assurances of anything
19  through that period.
20      And so we wanted to be sure that we
21  had a provision that, you know, seemed fair.  So
22  that's how this got drafted.
23      Q.   Do you remember there having been a
24  specific number that represented the bonus
25  accrual for LBI at this time?
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 126

1           M. Shapiro
2     A.   No.  The only number I recall was
3  there was a 2 billion total comp number that had
4  been both referred to and that also is
5  referenced, somewhere in here referenced, in I
6  think it's Schedule -- here it is -- reflected
7  on the financial schedule delivered.
8          So there was a 2 billion total comp
9  number which included, as I said, to the best of
10  my recollection, the bonus pool and the
11  severance obligations that they were taking on
12  as part of this, and that number was on that --
13  if you recall the schedule I mentioned that John
14  Grenier was working on -- that number was in
15  that schedule.
16     Q.   And the schedule that John Grenier was
17  working on perhaps starting as early as Sunday
18  night, but sometime in that Sunday night, Monday
19  morning time period, you said that schedule
20  changed over time, correct?
21     A.   It definitely changed.
22     Q.   Did the comp number change on that
23  schedule?
24     A.   I don't think the comp number changed
25  much.  I think there was an approximate number

Highly Confidential

Page 127

1           M. Shapiro
2  of 2 billion, from what I remember, about that,
3  and I don't think it changed.  But again, I
4  can't be sure, because I didn't, as I mentioned
5  earlier, I was not privy to that schedule being
6  changed.  I was not sitting around with people
7  as they made changes to that, so I might have
8  seen it like at -- I probably did see it at a
9  point, and I might have seen it at another
10  point, and I probably saw it at the end.
11  What -- the sausage-making, what actually
12  happened, I doubt I saw everything.
13     Q.   I'm going to show you what has been
14  marked as Exhibit 19.  That's the schedule to
15  which you are referring, is it not?
16     A.   Yes.
17     Q.   Okay.  And this is the schedule that's
18  referred to in subparagraph 9(c) of Article IX,
19  right?
20     A.   It looks like it to me.  It has
21  Berkenfeld's initials on it and I do remember
22  that he initialed the final one.
23     Q.   Were you there when he initialed it?
24     A.   I believe I was, yeah.
25     Q.   Where did that happen?

Highly Confidential

Page 128

1           M. Shapiro
2     A.   On the 32nd floor.
3     Q.   Did it happen in a conference room
4  with -- tell me where it happened on the 32nd
5  floor.
6     A.   I think it happened in the conference
7  room, but I'm not positive.  I mean, I -- we
8  were all -- it was late.  It was probably around
9  between 10 and 10:30 at night, and I just
10  remember thinking to myself -- on the, sorry, on
11  the night of the 16th, you know, somewhere
12  between 8:30 and 10:30 at night, and I just
13  remember thinking to myself, I hope they don't
14  ask me to sign this thing because, you know, you
15  know, and Steve obviously was an authorized
16  signatory and he was the one who was asked to
17  sign it.
18     Q.   Do you know why it was him as opposed
19  to someone else?
20     A.   I do not know.
21     Q.   Was there any discussion about this
22  document when it was initialed by Steve?
23     A.   Not that I'm aware of.  Not that I
24  recall.
25     Q.   Were there Barclays people in the

Highly Confidential

Page 129

1           M. Shapiro
2  room?
3     A.   When he signed it?
4     Q.   Yes.
5     A.   There were lawyers, I believe, but I
6  don't know for sure who was there.
7     Q.   To what use was this document to be
8  put, if any, in addition to being referenced in
9  paragraph 9(c)?
10     A.   Right, well, as I said earlier, I
11  think this piece of paper ultimately was being
12  used through the course of the discussions
13  between Sunday night, really Monday morning,
14  let's call it, and Tuesday night, as trying to
15  capture what assets and liabilities were being
16  conveyed, right?
17          And so I think that you would, if you
18  had all the different versions of this, you
19  would find that probably all these numbers were
20  changing.  As they were giving -- as they were
21  giving people new information, both sides of
22  this was changing in terms of the, let's call it
23  the upper part of this, the securities that are
24  described and the liabilities that are described
25  outside of the cure payment and the comp

Highly Confidential

Page 130

1         M. Shapiro
2  numbers.
3         I don't think that those changed, to
4  the best of my recollection, from maybe the
5  first one I saw to this one, but certainly these
6  numbers changed, and I think -- I think we
7  started with higher numbers in terms of
8  aggregate numbers that were just bigger. And
9  then as the course of the week, those two days
10  went on, it got a bit smaller. That's the best
11  I remember.
12    Q.   You testified previously about the
13  definition of "purchased assets" and, in
14  particular, the 70, approximately $70 billion in
15  assets being purchased by Barclays, correct?
16    A.   Yes.
17    Q.   That $70 billion number does not
18  appear to be on Exhibit 19, do you agree with
19  that?
20    A.   No, I would say that that was
21  intended -- again, I wasn't the draftsperson of
22  the contract, so I can't speak to it, but I
23  think because they used the word
24  "approximately" -- you have to remember that you
25  had lawyers working on the document, right?
TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 131

1         M. Shapiro
2  Reasonably quickly, and lots of them.
3         But, you know, you had Mike, who was
4  the principal draftsperson, with a few other
5  people, you had someone on the Cleary side and
6  maybe some other lawyers involved, and then you
7  had people who were working on this, which was
8  separated from the lawyers.
9    Q.   "This" meaning Exhibit 19?
10    A.   Yeah. And when I say "this," I don't
11  really mean so much the exhibit itself as I mean
12  the information that was going into this
13  exhibit.
14         So what I would say is that the
15  approximately $70 billion number was intended to
16  reflect the fact that ultimately people were
17  talking about, at the time of Tuesday, again
18  this all changed later, that there was this
19  amount of assets that we believed we could
20  convey to them.
21    Q.   Which is 72.?
22    A.   65.
23    Q.   65?
24    A.   And that there was this amount of
25  liabilities that they were prepared to assume as
TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 132

1         M. Shapiro
2  of this date.
3    Q.   Which is 68.4?
4    A.   Which is 68.4 in financing obligations
5  that they were taking on associated with those
6  securities up to -- under this schedule it says
7  2.25 cure payments and up to $2 billion of comp.
8    Q.   Do you have any explanation for me as
9  to why this schedule, which is referred to in
10  the APA in paragraph 9(c), has different numbers
11  than the quantum of purchased assets and assumed
12  liabilities in the same document?
13    A.   Well, I would say it's not very
14  different if you look at, you know,
15  approximately 70 billion versus 72.65 billion
16  and approximately -- and 68.4 billion versus
17  approximately 69 billion, in my mind, in the
18  context of this transaction are not materially
19  didn't.
20    Q.   Okay. You don't recall any discussion
21  about that differential at all?
22    A.   Do not recall any discussion at all.
23    Q.   Did you have any conversation with
24  anyone about the, you know, the residential
25  mortgage assets as being included or not
TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 133

1         M. Shapiro
2  included in the deal?
3    A.   There was discussion -- yeah, there
4  was definitely like sometimes there was -- at
5  one point they were in. At one point they were
6  not in. At one point it was 50 percent in. I
7  really -- that really was not something that I
8  was involved in.
9         I was aware of it as it was happening,
10  but I didn't participate in it. I would say
11  that Shafir and Bart were probably two of the
12  people closest to that, this discussion.
13    Q.   Did you ever have a conversation with
14  anyone as to whether or not Exhibit 19 should be
15  attached to the APA when it was presented?
16    A.   No, no discussion about whether it
17  should be attached, no.
18    Q.   Is it your view that paragraph 9(c) in
19  referring to the schedule -- strike that. Do
20  you have any explanation for why it wasn't
21  attached to the APA?
22    A.   I think it wasn't intended to actually
23  be part of the contract. I think if you have a
24  contract that's going to be -- to have a
25  schedule that says, like this schedule, make
TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 134

M. Shapiro

1 this part of the contract, right, I think that
2 because of the -- because of the timing of
3 everything and the information flow and how this
4 was all coming together, the people who were
5 putting this together, as I said before, were,
6 you know, were not sitting in the drafting room
7 while the lawyers were drafting.
8 So the lawyers took, you know, what I
9 would say is a reasonable approach, which was to
10 say approximately 70, and this schedule, which
11 was the -- which was the business people's
12 attempt to reflect what they were trying to
13 agree, to reflects 72.56 and 68.5, which in my
14 mind at the time certainly reflected the
15 approximate numbers that were in the contract.
16 Q. Do you know whether or not the reason
17 there is any differential at all has anything to
18 do with the residential mortgage positions?
19 A. I don't know.
20 Q. Let's go back and pick something up
21 about which you have testified previously.
22 MR. CARDEN: Let's mark this as
23 Exhibit 56A.
24 (Exhibit 56A, Agreement, marked for

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 135

M. Shapiro

1 identification, as of this date.)
2 Q. I want to point out that your name is
3 not on this document, so if you're looking in
4 vein for it, you won't --
5 A. I was looking for it.
6 Q. It's not here, at least not that I've
7 seen.
8 A. I don't even think I was --
9 Q. My question simply is, have you seen
10 any portion of this document? Including the top
11 page, but my focus really is on the following
12 pages.
13 A. The answer is no, I have not ever seen
14 this document.
15 Q. And this is not the PowerPoint to
16 which you were referring that was used in the
17 meeting on Monday morning?
18 A. Let me just look at it.
19 (Document review.)
20 A. No, this is not the document, nor have
21 I ever seen this document.
22 Q. Okay. Did you have anything at all to
23 do with the Repurchase Agreement that first the
24 Fed had had -- start with that.

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 136

M. Shapiro

1 Did you have anything to the Fed repo
2 agreement?
3 A. What do you mean by "anything to do
4 with"?
5 Q. Did you have any discussions with
6 anybody concerning -- strike that. Did you have
7 any discussions with anybody about the
8 assumption of the Fed repo agreement by
9 Barclays?
10 A. Yes.
11 Q. With whom?
12 A. Well, it really starts with the
13 assumption of the JPMorgan repo agreement by the
14 Fed. So, as I understand it, I was told -- I
15 was told on Sunday afternoon when it became
16 clear in the late afternoon that Lehman was
17 going to have to file for Chapter 11, once
18 the -- once the government determined that it
19 wasn't going to intercede in any way, that as
20 part of an attempt to insulate the markets from
21 further dislocation beyond what they thought
22 might happen, that the Fed was going to take
23 over the JPMorgan repo book as of Sunday night,
24 and I was told that by I think Tom Russo.

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 137

M. Shapiro

1 Then I learned from Jim Seery, I think
2 it was on Wednesday, maybe right before the
3 hearing, actually, right before the bankruptcy
4 court hearing that was the stalking horse
5 hearing, I remember him telling me that the Fed
6 had basically told Barclays that if it wanted
7 support for the transaction from the U.S.
8 government, it would have to take over the repo
9 book from the government itself.
10 And so I was not directly involved in
11 anything, I'm just telling you what I remember
12 hearing, so it could be untrue. But assuming
13 that it's true, that Barclays was told or asked
14 to take over the book from the government and
15 that it did so either late Wednesday night or
16 early Thursday morning from the government.
17 Q. Were you ever told by anyone that
18 Barclays had canceled the repo agreement with
19 Lehman?
20 A. At what point in time?
21 Q. At any point in time.
22 A. Not that I remember, no.
23 Q. Do you recall having had any
24 conversations with Martin Kelly in connection

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 138

M. Shapiro

1
2    with your -- I'm going to call it, you know,
3    quarterbacking role?
4        A.    Yeah, I definitely dealt with him. I
5    don't think I had ever met Martin before this
6    weekend. I hadn't met a lot of these people
7    before this weekend. I definitely had some -- I
8    definitely sat down with him once, I think, and
9    went through -- one of the things we were trying
10    to do was to, when Barry Ridings and Lazard was
11    hired on Sunday night, one of the functions that
12    they undertook was to try to understand what
13    securities were being sold and try to understand
14    the value of those securities and also try to
15    understand what those securities might be valued
16    at -- and this was obviously going to be
17    speculative -- if Lehman was not purchased and
18    these securities were going to have to be
19    liquidated in any way.
20        And so one of the things that I think
21    we talked to Martin about was organizing that
22    effort, finding who were the right people and
23    all, that these were obviously different pockets
24    of kinds of securities. I didn't know most of
25    the people in Fixed Income. He was around some

Highly Confidential

Page 139

M. Shapiro

1
2    of this stuff, so I remember he was helping
3    organize some of that. He was clearly someone
4    who was around some of these discussions on the
5    securities.
6        I wouldn't say I had extensive, like,
7    you know, like extensive discussions with him
8    around this stuff, so I do remember coming into
9    contact with him, you know, regularly over the
10    course of a 24-hour period, let's say, but he
11    was really spending a lot of time, as I could
12    see it, at least, with where Bart was asking him
13    to get certain information for Bart, maybe Ian
14    as well, and so he was around the financial side
15    of these securities in terms of information
16    flow.
17        Q.    Could you tell what the difference in
18    role, if any, was between Ian and Martin in
19    connection with that effort?
20        A.    I couldn't tell you, no.
21        Q.    Were you ever present when Martin was
22    speaking to Bart about the securities that were
23    being considered for sale?
24        A.    I probably was, but I don't really
25    have any specific recollection of exactly what

Highly Confidential

Page 140

M. Shapiro

1
2    he would have said.
3        Q.    And do you remember any conversations
4    with Martin concerning how those securities were
5    being valued?
6        A.    No. Not specifically, no.
7        Q.    Are you aware --
8        A.    No, I don't remember specifically that
9    I had such conversations.
10        Q.    Did you ever have any conversations
11    with Martin about valuing those securities on
12    any basis other than Lehman's marks?
13        A.    No. No.
14        Q.    Did you ever have any conversations
15    with anyone concerning whether or not the value
16    of those securities had been discounted off of
17    Lehman's marks in the sale to Barclays?
18        A.    No, no discussion that I ever heard
19    about a discount.
20        Q.    Are you, as you sit here today, are
21    you aware of whether a discount was given to
22    Barclays in the sale of those securities?
23        A.    I'm not aware that there was a
24    discount. The only, again, the only awareness
25    of the difference between the marks that were on

Highly Confidential

Page 141

M. Shapiro

1
2    the securities that were (A) first described in
3    the contract and then ultimately were in the
4    repo book, which was reflected in the -- I think
5    the testimony that Bart gave at the hearing as
6    well as Lori Fife's description to the court,
7    was that there was a differential between the
8    marked value of the securities that were to be
9    transferred and the liabilities associated with
10    those securities that were assumed by Barclays,
11    where there was let's call it somewhere between
12    a one and a half and two billion dollar
13    differential which everybody was aware of.
14        How that was ultimately determined
15    might have been, you know, that was obviously
16    something that was -- was not something that I
17    was privy to.
18        Q.    Was your understanding that was the
19    term of the -- the deal terms of the
20    transaction?
21        A.    Yeah, as described both in the court
22    and in the contract, correct.
23        MR. CARDEN:    Let's go off the record
24    for a second.
25        (Recess; Time Noted: 12:08 P.M.)

Highly Confidential

Page 142

1        M. Shapiro
2        (Time Noted: 12:22 P.M.)
3   BY MR. CARDEN:
4        Q.   You testified previously that on,
5   maybe it was Thursday evening or at some point
6   later in the week, that you thought that there
7   was some concern about Barclays going through
8   with the deal, okay? I don't know what language
9   you used. Tell me what the -- was there
10  anything that Barclays said to anyone at Lehman
11  that caused that concern, or was it just a
12  general anxiety about wanting to get something
13  done?
14       A.   No, it was really a comment that was
15  made to me by Jim Seery, who said something like
16  there's a big, I think his words were "shit
17  show" going on between JPMorgan and Barclays
18  around the repo and that, you know, JPMorgan was
19  screwing around doing something that Jim
20  characterized, as I said, as something that was
21  not positive, and that, you know, that was
22  putting the deal potentially at risk. That was,
23  I would say, the nature of what concerned me.
24  So that was it.
25       Q.   I take it that that was related in

Highly Confidential

Page 143

1        M. Shapiro
2   some way to what assets were going to be
3   available to sell to Barclays?
4        A.   No.
5        MR. STERN: Objection to the form.
6        A.   No, as I understand it, at the time it
7   was really related to this repo that had been
8   taken over and that, you know, not digressing
9   too much, JPMorgan, you know, in my mind, was a
10  bad actor in the entire situation. And so
11  ranging from the fact that they pulled a lot of
12  liquidity out of the firm before we filed to
13  entering into an agreement to be able to set
14  things off shortly before the filing took place
15  to then, you know, as Jim explained it to me at
16  the time, kind of changing the mix of what was
17  in the repo that Barclays was basically being
18  asked to take over by the Fed.
19       So, as far as I knew at that point in
20  time, in the week, you know, as of Tuesday when
21  we signed the contract and once we went to
22  court, the contract says what it says in terms
23  of the mix of securities and the repo
24  securities, if you want to call them those, had
25  not been -- that was not dealt with until

Highly Confidential

Page 144

1        M. Shapiro
2   Friday, as I understood it.
3        So this was happening really more like
4   Wednesday-ish when this whole repo thing came
5   up, and my understanding was that that could
6   put, you know, a chink in the deal because
7   Barclays was concerned about what was going on.
8   That's -- and that was the nature of the concern
9   that I had, just that particular issue.
10       Q.   Did Jim Seery have something to do
11  with the repo? Was it part of his
12  responsibility?
13       A.   He knew about stuff. I don't know
14  what he actually had to do with it. He was in
15  the loop on certain things, but I don't know
16  what he actually had to do with it.
17       Q.   Did you ever have any conversations
18  with anyone at Lehman as to what collateral was
19  in the repo?
20       A.   In the JPMorgan repo?
21       Q.   No, I'm sorry, in the repo taken over
22  by Barclays?
23       A.   No. Not specifically, no.
24       Q.   Generally?
25       A.   When I say "specifically," I mean, I

Highly Confidential

Page 145

1        M. Shapiro
2   knew there was a repo. I didn't know what
3   securities were in it. So if that's the nature
4   of your question, the answer is no.
5        Q.   Did you ever develop an understanding
6   as to how Barclays taking over the repo changed
7   in any way the terms of the transaction
8   memorialized in the APA?
9        A.   Well, I would say my understanding
10  was, at the time, that we had this description
11  in the APA of this call it 70 billion and 69
12  billion of assets/liabilities which related to
13  some pool of securities that were categorized in
14  that schedule that we went through before,
15  Schedule -- that was referenced in --
16       Q.   Exhibit 19 --
17       A.   Exhibit 19.
18       Q.   -- the balance sheet?
19       A.   Exactly.
20       Q.   Initialed by Steve?
21       A.   Right, initialed by Steve.
22       And then, over the course of the week
23  it became more difficult for everybody both on
24  the Lehman side and on the Barclays side to
25  ensure that those securities were actually

Highly Confidential

Page 146

M. Shapiro

1       M. Shapiro
2   saleable because of the amount of securities
3   that had been blown out, had been sold, had been
4   bought, the change in the values. Everything
5   was happening, you know, in a way that did not
6   lend itself to a very clear understanding,
7   probably on both sides at that point as to
8   exactly what was going to be conveyed.
9       So I think there was some comfort
10  taken that there was a known amount of
11  securities and loan as a result of the repo,
12  right? So you had a repo, you had a defined
13  group of securities that existed in the repo
14  that was, up until JPMorgan maybe played around
15  with it, I don't know exactly what happened, by
16  Friday presumably -- and again, I was not privy
17  to this so I'm just surmising based on my
18  recollection -- that the principle was that this
19  was a group of securities, the universe of which
20  was identifiable, the liabilities associated
21  with them obviously was identifiable because
22  that was the repo loan, and therefore, you could
23  do a deal on that basis where there was clarity
24  around exactly what was being taken over.
25      That was my understanding of why the

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 147

1       M. Shapiro
2   deal ultimately got modified on Friday, and then
3   that was obviously explained in court and
4   evidenced by, ultimately, that clarification
5   letter that got entered into.
6       Q.   Did you ever speak to Bart McDade
7   about that change?
8       A.   I don't remember.
9       Q.   Going back just a moment to the
10  hearing on Wednesday, were you in court that
11  day?
12      A.   Yes, I was sitting in the audience.
13      Q.   Did you help prepare Bart for that
14  hearing?
15      A.   I did -- I wouldn't call it I helped
16  prepare him. He actually was with the Weil
17  folks who actually prepared him. I think I said
18  I think I was in his office a couple of hours
19  before we went down. I said, "You ever been in
20  bankruptcy court before?" And he said no, and I
21  said, "Well, let me just give you -- I'll just
22  tell you kind of what it's like."
23      I gave him a few minutes of advice
24  just generally about like what it is and then,
25  you know, how his testimony was probably going

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 148

1       M. Shapiro
2   to get proffered, but he still could end up
3   getting called as a witness, and he -- I don't
4   think he was particularly looking forward to it,
5   but he, you know, he was going to do it.
6       Q.   Okay. And did you help prepare him on
7   Friday before the hearing on Friday?
8       A.   Not really. I was in his office
9   before we all went down, a couple of hours
10  before we went down, but really the Weil
11  folks were going to prepare him.
12      Q.   Let me show you again what has been
13  marked as Exhibit 19 and draw your attention to
14  the cure amount about which you testified
15  previously --
16      A.   Yes.
17      Q.   -- reflected on this schedule as
18  being, as I read it, 2.25 billion. Do you see
19  that?
20      A.   Yeah, I do see that.
21      Q.   Do you recall that number ever
22  changing in the course of the week?
23      A.   I don't remember -- I don't really
24  remember how that 2.25 got in there. I
25  personally have a better recollection of a $1.5

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 149

1       M. Shapiro
2   billion number that we were using for -- and
3   obviously it was an estimate, right?
4       So these were all, at the end of the
5   day, as I explained to you earlier, we were
6   trying to do our best at the time to provide
7   Barclays, principally, with a perspective on
8   what it might cost them to take over all of the
9   contracts that could be subject to the
10  assumption of the assignment. And so, as I said
11  earlier, we were trying to come up with an
12  estimate of what that number was.
13      My recollection was we -- I used, in
14  my own head, a billion-five, and the reason I
15  remember that is that when we were negotiating
16  the breakup fee, we were -- I was thinking
17  about -- and I had negotiated the breakup fee in
18  the transaction relating to the stalking horse
19  bid -- I remember thinking, okay, we can do 3,
20  typically 3 percent of the deal. Barclays asked
21  for a lot more going in. They asked -- I think
22  Victor Lewkow told me something like $250
23  million or something like that. It was big
24  number. And I told him we weren't going to do
25  that, that in my mind that, you know, there

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 150

1       M. Shapiro
2   was -- that that could be perceived as, you
3   know, chilling the bidding. I didn't want any
4   perception of anybody feeling that they couldn't
5   make a bid.
6       Obviously, you know, I said that 3
7   percent was a normal -- he was not a bankruptcy
8   lawyer, by the way. So I was -- I wouldn't say
9   I was educating him because he obviously was a
10  smart guy, but I was explaining to him in my
11  experience what an acceptable number would be
12  from the court's perspective, and at the time my
13  recollection is we were looking at $250 million
14  for goodwill, it was around a million to a
15  million-450 for the buildings, which ultimately,
16  you know, that was our estimate, we didn't have
17  our desktop appraisals yet --
18      MR. STERN: Billion.
19  A.  Billion, yeah, sorry.
20      1.45 billion. That was a
21  billion-seven. We added this estimate for cure
22  costs of a billion and a half, that got us to
23  3.2 billion, and we told them that the $100
24  million breakup fee would be approximately 3
25  percent and that's what we would be willing to
        TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 151

1       M. Shapiro
2   do, plus some expense reimbursement, I think
3   maybe 25 million.
4       Q.   And that's in your negotiation with
5   Barclays?
6       A.   That's in my negotiation Cleary on
7   behalf of Barclays, correct.
8       Q.   Right?
9       A.   And so in using the number -- I
10  remember that the billion-five was a number we
11  used from a cure standpoint, and that was how we
12  got as part of the arrival of what, you know,
13  what a $100 million number would be, you know,
14  viewed as. And so at the time that seemed, you
15  know, as a fair number given the kind of
16  transaction we were with entering into and not,
17  not unusual in size in a large transaction.
18      You know, I worked on the Time Warner
19  transaction. We advised Time Warner around
20  Adelphia and we had something like 2 percent of
21  an 18 to 20 billion dollar transaction. So this
22  was not nearly as large on the scale of things.
23      So $100 million felt like we could
24  pass muster with the court, with the committee,
25  felt like a fair number, and I remember
        TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 152

1       M. Shapiro
2   negotiating that very -- in a very difficult
3   conversation with Victor where he was, you know,
4   telling me it couldn't be that low and had to be
5   higher, and I basically told him we weren't
6   going to do that.
7       Q.   When was this conversation?
8       A.   In the middle of the night on the
9   15th/16th.
10      Q.   Did he explain why he thought it was
11  important for that number to be so much higher?
12      A.   Yeah. Buyers always want higher
13  numbers because it keeps -- it gives them a
14  natural advantage over any other bidder, of
15  course.
16      Q.   Was there anyone else they thought
17  might come in and bid?
18      A.   I don't know what was in their minds,
19  but --
20      Q.   What was in your mind? Did you think
21  someone else could come in?
22      A.   I didn't think that was likely. I
23  thought that, you know, and I think this is part
24  of my discussion with him, I said that, you
25  know, that the firm had been shopped all summer
        TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 153

1       M. Shapiro
2   and we didn't have a buyer. Obviously, Bank of
3   America, who was the other bidder, had just
4   announced their deal with Merrill Lynch so they
5   were out of the picture.
6       The world felt like it was in a state
7   of virtual collapse. AIG was going down at the
8   same time as we were, or potentially going down,
9   I should say, since they got rescued, but we
10  didn't. And I told him that I didn't, you know,
11  as far as I was concerned, I didn't see, you
12  know, I said, kind of look around you. Do you
13  see any other people doing a deal with someone
14  else? I mean, you're here, we're here. I think
15  that we need to, most importantly, put, you
16  know, a number on the table for the court that's
17  a fair number that would still provide you
18  compensation if you did get topped, but not some
19  number that would not be acceptable to people.
20      Q.   Now, in that conversation on late
21  Monday night or early Tuesday morning, you say
22  you used a number for cure of 1.5?
23      A.   Yes. My recollection for the purposes
24  of calculating this $100 million.
25      Q.   I understand. Do you have any
        TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 154

1      **M. Shapiro**
2      **recollection where you got that number and why**
3      **it's different than number that's in Exhibit 19?**
4          A.   The only recollection I have is that,
5      as I said, I had asked people to go back and get
6      me a proxy for what that month, you know, call
7      it snapshot of a monthly payables number would
8      be off of let's call them trade payables, which
9      would really cover contracts that you're paying
10     under, excluding employee liabilities and things
11     like that.
12         Somebody probably in my team who was
13     tasked with that -- it could have been George
14     Mack, it could have been somebody else, Dan
15     Flores -- I'm sure came back to me and said, I'm
16     being told that rough cut around a billion-five,
17     but it was a true estimate, we never told
18     Barclays it was anything other than an estimate,
19     and we told them it could be higher, it could be
20     lower. And it was, at the end of the day, it
21     was always going to be based on what contracts
22     they ultimately assumed. So, you know, which we
23     didn't have any clear view on other than the
24     fact that we thought they were going to need a
25     good chunk of the contracts to operate the firm.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 155

1          M. Shapiro
2          Q.   Just so I'm clear, I understand what
3      **the number was and where you got it and the**
4      **like, but do you have any explanation for why**
5      **it's different -- the 1.5 you used is different**
6      **than the 2.25 in Exhibit 19?**
7          A.   No, I don't know why they're
8      different, no.
9          Q.   Now, when you did your -- when you had
10     **your conversation with the Cleary gentleman, Mr.**
11     **Lewkow, did you include in the calculation --**
12     strike that.
13         **When you had your conversation with**
14     **Victor Lewkow about the breakup fee, you did not**
15     **include the comp number for purposes of**
16     **calculating the breakup fee, did you?**
17         A.   No, I didn't.
18         Q.   And why is that?
19         A.   I guess it was a judgment call on my
20     part, but an argument certainly could have been
21     made, if I had included it as part of it, that
22     those were funds that were going solely to
23     employees as opposed to, when you think of a
24     cure payment, that's clearly going -- that's,
25     you know, there's a clear benefit to the estate

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 156

1          M. Shapiro
2      of picking up cure payments for two reasons:
3      One is that sometimes the estate can be asked to
4      pick them up as part of the assumption
5      assignment, which I didn't want to have happen,
6      and two is that, to the extent that they were --
7      Barclays was going to take contracts, that was
8      eliminating claims from the estate which
9      otherwise would have arisen under those
10     contracts being rejected.
11         So there's a good reason why. And
12     certainly I remember Mr. Despains, Luc Despains,
13     at the hearing argued about whether or not that
14     was appropriate to include as part of the, let's
15     call it -- but it's not uncommon, and I think
16     people in the profession would agree that it's
17     not uncommon for designated assumed liabilities
18     to be included as part of the purchase price.
19         It was my judgment that the comp pool,
20     because it was solely for employees, because an
21     argument certainly would have been made probably
22     that, you know, employees -- that Lehman's
23     obligation to pay employees, you know, was that
24     a legal obligation that, you know, a lot of it
25     was bonus or severance that who knows whether it

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 157

1          M. Shapiro
2      ultimately would have been permitted to be paid
3      if it had actually been argued.
4          So rather than getting into that
5      argument, I'm a reasonably practical person, in
6      my judgment and experience of 20 years of doing
7      this, it was less complicated to leave it out.
8      And all it would have done was add to the
9      number, which I wasn't trying to do.  I was
10     trying to keep it to a number that I felt was a
11     reasonable number that people could find
12     acceptable.
13         Q.   And I take it Mr. Lewkow didn't add it
14     **in to get to a bigger number either?  He didn't**
15     **try to add it in?**
16         A.   No. No.  He just wanted a bigger
17     number per se, truthfully.  He didn't really
18     care how I was calculating it.  He just wanted a
19     bigger number.
20         And we had a pretty vociferous
21     argument in the middle of the night, and I just
22     remember pushing back very hard on him and
23     basically telling him that he should be focused
24     on getting the deal done as opposed to worrying
25     about a topping bid.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 158

1          M. Shapiro
2          (Exhibit 57A, a document bearing Bates
3     Nos. 10296233 through 10299664, marked for
4     identification, as of this date.)
5     Q.    Show you what has been marked as
6     Exhibit 57A, Mr. Shapiro. I will tell you that
7     the top e-mail sliver doesn't have your name,
8     but if you look right below, there's one below
9     it that does.
10    A.    Okay.
11    Q.    And it's my earnest and heartfelt
12    belief that the document that is page 2 is what
13    was attached to this e-mail.
14    A.    Okay.
15    Q.    But I could be wrong.
16    A.    Okay.
17    Q.    So let me ask you this way:  Have you
18    ever seen Exhibit 57A before?
19          MR. STERN: I'll just note that the
20    Bates numbers are not sequential. I'll just
21    note that for the record.
22    Q.    Have you ever seen page 2 of Exhibit
23    57A?
24    A.    Only in preparation for this
25    deposition.
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 159

1          M. Shapiro
2     Q.    You have no recollection of having
3     seen it before?
4     A.    None.
5     Q.    Do you know for a fact that you
6     didn't?
7     A.    I don't know for a fact that I didn't,
8     but I don't have any recollection of it, and I
9     don't know who Julie Barboza is.
10    Q.    Okay.
11    A.    I suspect, just, you know, by way of
12    background, that I was copied on a lot of things
13    I think during those two days because people
14    thought I was one of the key people around it,
15    and I was not able to read my e-mails, as you
16    can imagine, every minute of the day going
17    through a 48-hour negotiation.
18          So is it possible that I saw it?  It's
19    possible. I don't remember it and I don't know
20    who she is.
21    Q.    Okay.  I take it, since you don't
22    recall having seen it, that you can't explain
23    the way this document's set up in terms of its
24    numbers.  It goes from 1, 4, 7 and 5?
25    A.    No idea.
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 160

1          M. Shapiro
2     Q.    There's nothing in your experience
3     that helps illuminate why that would be the
4     case?
5     A.    I have no idea, no. Nothing in my
6     experience, other than that she doesn't know how
7     to number.
8     Q.    Well, if you haven't seen this, no
9     sense pushing it around. Okay. Thank you for
10    that.
11          I show you what has been marked
12    Exhibit 22, Mr. Shapiro. Have you ever seen
13    this document before?
14    A.    No.
15    Q.    I draw your attention to page 95 under
16    the --
17    A.    I just want to see what this document
18    actually is.
19    Q.    Take your time.
20    A.    I presume that this is the annual
21    report as published by Barclays.
22    Q.    I have no more information than you do
23    in looking at the document --
24    A.    Okay.
25    Q.    -- on its face.
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 161

1          M. Shapiro
2     A.    Okay. I have never read it. I
3     presume Results Announcement is their equivalent
4     of an annual report.
5     Q.    I can only offering you the following
6     modest benefit. I didn't write it and so it is
7     what it -- it is what it is based on the review
8     of the document.
9     A.    Okay.
10    Q.    But right now I'm only directing your
11    attention to page 95 of Exhibit 22?
12    A.    Okay.
13    Q.    You've already told me you have not it
14    before, right?
15    A.    No, I have not seen this.
16    Q.    I want to draw your attention to the
17    penultimate paragraph on that page, which is a
18    one-line paragraph.  "The excess of the fair
19    value of net assets acquired over consideration
20    paid resulted in 2,262,000 of gains on
21    acquisition."  See that?
22    A.    I do see the sentence, correct.
23          MR. STERN: I think you should read
24    the whole section.
25          MR. CARDEN: I apologize. Actually, I
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 162

1      M. Shapiro
2    think Jack is absolutely correct about that.
3      Q.   Why don't you just take a moment and
4    read this section under "Acquisitions."
5      A.   Okay.
6      Q.   Okay.  I may have misspoken before,
7    but let me just rephrase the question.
8          Directing your attention to the
9    penultimate paragraph that says, "The excess of
10   the fair value of net assets acquired over
11   consideration paid resulted in a 2,262 million
12   pound -- million pounds of gains on
13   acquisition."  Do you see that?
14     A.   Yes, I do see that.
15     Q.   Okay.  Let's say it simpler because
16   it's better to say billion.  It's easier to say
17   billion.
18     A.   I understand what you're saying.
19     Q.   It's 2,262 million of pounds, which is
20   awkward.  So you see the paragraph that states
21   that Barclays realized a gain on the
22   Lehman/Barclays transaction of $1.262 billion,
23   do you see that, sir?
24     A.   I do see that, yes.
25     Q.   Pounds.  My mistake.  I'm sorry.

Highly Confidential

Page 163

1      M. Shapiro
2      Do you see the paragraph that states
3    that Barclays realized a 2.262 billion pound
4    gain on the Lehman/Barclays transaction?
5      A.   I do see the sentence that says that.
6      Q.   Based upon your involvement in the
7    negotiation between Lehman Brothers and
8    Barclays, is that consistent with what you
9    understand to be the transaction?
10     A.   I have no idea how this relates to the
11   transaction.
12         MR. CARDEN:  Okay.  I'm going to
13   take -- I'm going to stand down to my
14   colleagues now.
15         (Discussion off the record.)
16         (Luncheon recess; Time Noted:  12:48
17   P.M.)

Highly Confidential

Page 164

1      M. Shapiro
2      AFTERNOON SESSION
3      (Time Noted:  1:27 P.M.)
4    MARK J. SHAPIRO, resumed and
5      testified further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. CARDEN:
8      Q.   I just have what I think will be a
9    short series of questions, and then I'm going to
10   pass you off to some of my friends down here at
11   the end of the table.
12         You went to the hearing on Friday?
13     A.   Correct.
14     Q.   Which lasted late into the evening?
15     A.   Until about 1 A.M.
16     Q.   You stayed the entire time?
17     A.   Correct.
18     Q.   Did you report to Lehman on Saturday?
19     A.   No, I did not.
20     Q.   Sunday?
21     A.   When you say "report"?
22     Q.   Well, did you go to the building on
23   Saturday?
24     A.   No, I went to California, actually.
25     Q.   Okay.  Did you go on business?

Highly Confidential

Page 165

1      M. Shapiro
2      A.   No, I was -- my first cousin's
3    daughter was getting bat mitzvahed in San
4    Francisco and so I -- had he promised her I would be
5    there and so I -- the hearing ended at 1 A.M.  I
6    got home in to Connecticut about 2:30, showered,
7    shaved, took about a 15-minute nap, and then got
8    in my car and drove to JFK and got on the 6 A.M.
9    flight to San Francisco.
10     Q.   Somebody should have put you in a car
11   instead of having you drive your own.
12         When did you come back from
13   California?
14     A.   I wasn't sure who I was employed by at
15   that point.
16     Q.   When did come back from California?
17     A.   Late Sunday night.
18     Q.   Arriving Monday morning, or
19   arriving --
20     A.   No, we arrived I believe on Sunday
21   night.
22     Q.   Did you go into the office on Sunday?
23     A.   Yes.
24     Q.   Did you have any responsibilities of
25   any kind related to what I'll call closing the

Highly Confidential

Page 166

1           M. Shapiro
2   transaction that day?
3       A.   No.
4       Q.   What did you do that day at work?
5       A.   I spoke to Jim Seery a little bit
6   about, you know -- the transaction had been
7   announced as closed I think at opening of the
8   morning. There were a lot of people
9   congratulating me, truthfully, about getting it
10  done and wanting to hear what happened. And so
11  there was a fair amount of like relief,
12  generally relief, I guess, and we had a whole --
13  I mean, one of the things that, in the meantime,
14  I have a business to run and so we had a lot of
15  clients who we were trying to make sure we
16  preserved the relationship with as we brought
17  them from Lehman to Barclays. And as you
18  probably know, part of the deal was that
19  engagements would be transferred over.
20          And that was a process. You had to
21  get the client's approval, et cetera. So we
22  were in -- I was getting my team to focus on
23  let's make sure that we bring everybody along.
24  We actually kept every single mandate we had at
25  Lehman over to Barclays, with the exception of
            TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 167

1           M. Shapiro
2   one that we had basically had to give up during
3   the weekend, but other than that -- during the
4   weekend when they needed to have somebody around
5   it.
6           But so I'd say I spent that better
7   part of that day and obviously just dealing with
8   the aftermath, but not in terms of like the
9   documentation or the deal.
10      Q.   Did you have any responsibilities
11  concerning the collateral, the valuation of the
12  collateral, the transfer of the collateral,
13  anything at all concerning that I'll call the,
14  you know, finalizing the transaction?
15      A.   No.
16      Q.   So your labors were done as of Friday?
17      A.   Yeah. My view was, as of Monday, I
18  was figuring out -- my wife had complained to me
19  all week that I was the only person at Lehman
20  Brothers not looking for a new job, and so
21  since -- I told her I had a responsibility to,
22  if we could get this deal done with somebody, to
23  help complete it. I felt I had done that and I
24  was at that point going to figure out what I was
25  going to do next. So I would say I was spending
            TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 168

1           M. Shapiro
2   some of my time talking to -- talking to people,
3   including an offer made from your own firm.
4       Q.   All right. And you signed -- I'm
5   sorry, when did you receive the offer letter
6   that's been marked as 55A? It's dated September
7   25, 2008.
8       A.   I think around that date. That's my
9   recollection. I had been -- you know, as soon
10  as we came over, of course, everybody was saying
11  like what's happening. And I have, you know, I
12  had 12, 13 people working for me. I felt
13  responsibility for them, you know, in terms of
14  what was going to happen next. So I was trying
15  to figure out what to do.
16          I had gotten a lot of, while the week
17  was going on, e-mails and voice mails from
18  people offering me or saying, you know, when
19  this all finishes up, let's talk, you know, what
20  are you going to do next. Corinne Ball, as I
21  indicated, your partner left me a long message
22  saying you won't have to skip a day, you could
23  be a partner here tomorrow, just call me back,
24  please. And there were other people like that
25  who had very kind messages.
            TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 169

1           M. Shapiro
2           And so I basically was trying to
3   figure out what to do. I didn't really know
4   anything about Barclays at all. Literally, I
5   didn't know a single person at Barclays, had
6   never dealt with Barclays, didn't really know
7   what this would mean for me in terms of, you
8   know, my area that, you know, that I do business
9   in and whether in fact it would be an effective
10  platform to do business in it.
11          And so it was a combination of me
12  figuring out is it a place that I wanted to go
13  to, how were they going to fairly compensate me,
14  would I be able to have my group, my title, what
15  was the -- what was the deal going to be in
16  terms of advisory and financing, would we have
17  access to balance sheet. I mean, all of those
18  questions in my mind, and then weighing that
19  against other opportunities that people were
20  coming in to me with.
21      Q.   During this time period, the September
22  2008, did you have a personal e-mail address?
23      A.   I have an AOL account, yes.
24      Q.   Is there any reason to believe that
25  anything related to this transaction, any
            TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 170

M. Shapiro

1       M. Shapiro
2    communications of any kind, resulted in
3    communications in your AOL account?
4       A.   I don't think so, no. I would be
5    really surprised if I -- I was at the firm
6    pretty much the whole time, and if I wasn't at
7    the firm, I was in bed sleeping for two or three
8    hours a night. So I would say highly unlikely.
9       Q.   Okay. Did you carry a BlackBerry
10   during those --
11      A.   Yes.
12      Q.   -- weeks?
13      A.   Yes.
14      Q.   And is your BlackBerry set up so as to
15   receive AOL and the Lehman e-mail?
16      A.   No, it couldn't. You can only,
17   because of the firewalls up at investment banks,
18   you can only access -- you can't even access
19   Yahoo or AOL or anything through your BlackBerry
20   or your computer. You just can't do it.
21      Q.   Well, we may come to this, but we'll
22   want you to take a look at your AOL account and
23   see what you've got, but we'll pass that right
24   now and I'll deal with your counsel on that.
25           You are, by the way, represented by

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 171

M. Shapiro

1       M. Shapiro
2    Mr. Stern, correct?
3       MR. STERN: Yes.
4       A.   Barclays has employed Mr. Stern as
5    counsel, and he's defending my deposition,
6    correct.
7       Q.   All right. That's usually the first
8    question somebody asks, but sometimes we like to
9    turn things around.
10          MR. CARDEN: I'm finished for now. As
11      the world works, I'll probably come up with
12      some more questions by the time it comes
13      back around to me.
14          THE WITNESS: Okay.
15   EXAMINATION BY
16   MR. WOOD:
17      Q.   I'll probably be fairly brief. Again,
18   I'm John Wood from Hughes, Hubbard & Reed. We
19   represent the SIPA Trustee.
20          You said earlier that you had a
21   conversation in Bart McDade's office on
22   September 19; is that correct?
23      A.   Yes.
24      Q.   This is a Friday?
25      A.   Correct. Yes.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 172

M. Shapiro

1       M. Shapiro
2       Q.   Was anybody else there?
3       A.   Yeah, there were numerous people
4    there.
5       Q.   Were they all from Lehman?
6       A.   And Weil Gotshal.
7       Q.   Was anybody from Barclays there?
8       A.   Not that I recall.
9       Q.   Or representatives from Barclays?
10   Might have been people from Cleary.
11      A.   No, because these were -- I wasn't
12   there all day, obviously. I was there for a
13   given time, maybe it was an hour, something like
14   that, and these were discussions around -- these
15   were Lehman-only, Lehman and counsel discussions
16   about different aspects of the deal that we were
17   chatting about. So, no, it wasn't in
18   negotiation with Barclays.
19      Q.   Did you have any conversations with
20   Barclays or their representatives that day?
21      A.   That day? I just don't remember.
22      Q.   Going --
23      A.   I mean, it's possible I did because, I
24   mean, people were all talking about lots of
25   different things, you know, throughout so you

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 173

M. Shapiro

1       M. Shapiro
2    might run into someone who --
3       Q.   I'm not talking about in the hallway
4    or passing conversations at the bankruptcy
5    court.
6       A.   I don't remember having any direct
7    discussion on a specific topic as I sit here
8    today with anyone at Barclays on Friday.
9       Q.   So nothing that you would consider
10   negotiations with Barclays?
11      A.   No, the -- from my vantage point in my
12   role of the negotiations, all of the
13   negotiations took place over that night and day,
14   you know, day, night, day.
15      Q.   Which night?
16      A.   Day of the 15th, night of the 15th,
17   day of the 16th into the evening on the 16th.
18   After that, then the next day we really did a
19   Creditor Committee presentation and I lead that
20   presentation of what the deal would look like
21   and we gave information to the Creditors
22   Committee and their counsel.
23      Q.   Which day was that?
24      A.   17th before the stalking horse
25   hearing. So the committee was appointed that

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 174

1      M. Shapiro
2 morning.
3      I think it was either late morning or
4 early afternoon, I just don't remember the time,
5 we met with Houlihan, Milbank, some committee
6 members who were there. It was a huge -- big
7 rooms. I was basically tasked with explaining
8 the deal to them, walking them through it,
9 bringing in people who could help explain any
10 specifics that they had questions about as a
11 follow-up matter. So we did that for a couple
12 of hours.
13      Then we left and they were left
14 obviously to think about everything and do some
15 diligence and then we all ended up in court by 5
16 o'clock.
17      Q.   The deal changed substantially on or
18 around September 19, didn't it?
19      A.   I won't characterize it, but I would
20 say the deal -- the securities that were being
21 conveyed in the deal changed I believe on that
22 date.
23      Q.   And you've already talked about that
24 so I'm going to ask you a different question.
25      Were you involved in any conversations

TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 175

1      M. Shapiro
2 on the 19th involving the possibility of adding
3 additional assets to the definition of
4 "purchased assets"?
5      A.   Adding additional assets? Meaning
6 conveying more assets to Barclays?
7      Q.   Conveying more assets from Lehman to
8 Barclays?
9      A.   Not that I recall, no.
10      Q.   Do you recall any conversations about
11 the possibility of including Lehman's margin
12 account at the OCC?
13      A.   No.
14      Q.   Any conversations about including
15 funds from Lehman's margin accounts at any other
16 exchanges?
17      A.   I don't remember having any
18 conversations or even hearing of conversations
19 about margin accounts and exchanges.
20      Q.   Do you remember any conversations
21 about so-called clearance box assets at DTC?
22      A.   No. The only thing that I heard, and
23 I don't know if this was clearance box at DTC,
24 was, you know, was really relating to the
25 JPMorgan repo. I don't know if that has a

TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 176

1      M. Shapiro
2 relationship to DTC or not, but not, you know,
3 it wasn't -- the term "clearance box" wasn't the
4 term that was used. It was really a box and but
5 it was around the JPMorgan repo and -- nothing
6 to do with DTC that I heard about.
7      Q.   I want to show you what's already been
8 marked as Exhibit 25, and this is the signed
9 version of what we referred to as the
10 clarification letter.
11      A.   Okay.
12      Q.   I'm going to show it to you just so
13 you know what I'm talking about here in terms of
14 the term "clearance box assets."
15      A.   Okay.
16      Q.   The term "clearance boxes" is just
17 there in quotation marks at the bottom of page
18 1, about three lines up.
19      A.   Okay. I see what you're talking
20 about.
21      Q.   Do you have any recollection of any
22 conversations about those assets?
23      A.   Not specifically, no. Only as it
24 might relate to something that I heard about
25 JPMorgan doing something and leaving behind in a

TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 177

1      M. Shapiro
2 box -- and I didn't really understand it when
3 someone mentioned it to me because I wasn't sure
4 how this all worked -- but leaving behind I
5 think they called them hammers or nails and
6 hammers or something like that. I think they
7 were implying derogatorily about the kinds of
8 securities that JPMorgan was leaving behind and
9 had -- and something about JPMorgan had like
10 left behind for Barclays some crappy securities,
11 essentially.
12      Q.   Do you remember who said that?
13      A.   Jim Seery.
14      Q.   Did he use the term "cats and dogs"?
15      A.   No, he didn't use "cats and dogs." He
16 used more like --
17      Q.   Hammers and nails, you think?
18      A.   It was some term that had metal
19 involved. It was hammers or it was something.
20 A term I had never actually heard before, but
21 obviously a term that may be used in the trade
22 of people who deal in securities.
23      Q.   Do you recall any conversations about
24 whether or not to include these so-called
25 clearance box assets in the deal?

TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 178

M. Shapiro

2    A.   No idea.
3    Q.   Were you involved in any conversations
4  regarding the inclusion of assets from Lehman's
5  15c3-3 account in the deal?
6    A.   I don't know what a 15c3-3 account is
7  and I don't believe I had anything to do with
8  any conversations around whatever that account
9  is.
10   Q.   If you'll take a look at that same
11  exhibit number 25 on page 4, paragraph 8. And
12  this is just to see whether this refreshes your
13  recollection at all.
14        Paragraph 8, little Roman ii, "To the
15  extent permitted by applicable law, and as soon
16  as practicable, after closing, $769 million of
17  securities is held by or on behalf of LBI on the
18  date hereof pursuant to Rule 15c3-3 of the
19  Securities and Exchange Act" -- I'm sorry, "the
20  Securities Exchange Act of 1934." The sentence
21  continues, but that's just to see if that
22  refreshes your recollection at all.
23   A.   Not at all, no. The only thing I knew
24  about custody under this paragraph of transfer
25  of customer accounts was, as explained to the

TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 179

1        M. Shapiro
2  court, which was that the customer accounts were
3  all being transferred because of the SIPA -- by
4  the SIPAC -- by SIPA to Barclays out of the
5  estate.
6        And in fact, I do have one
7  recollection in connection with transferred
8  accounts where the government had told us not to
9  file a bankruptcy for LBI until they felt that
10  all the accounts had actually been successfully
11  moved out of LBI, or whatever the -- whatever
12  entity it was, I think it was LBI -- into
13  Barclays because they didn't want the bankruptcy
14  to interfere with the transfer of those
15  accounts. The only thing I recall about that
16  was that specific fact. It just stuck in my
17  mind at the time.
18   Q.   And when you say "explained to the
19  court," who did that explanation?
20   A.   During -- I think it was either Harvey
21  or -- Harvey Miller or Lori Fife who explained
22  that the accounts were, you know, consistent
23  with the desires of the SIPA Trustee and the
24  S.E.C., being transferred from out of the
25  broker-dealer to let's call it a safe haven. I

TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 180

1        M. Shapiro
2  think it was Barclays.
3    Q.   Was that explanation --
4    A.   And I actually had a personal interest
5  in it because I had an account at Lehman which
6  had a lot of securities and other things in it,
7  and I wanted -- I obviously wanted to know like
8  where was my -- where are all these securities.
9  I had probably a million dollars in securities
10  held at Lehman and I didn't know where they
11  were. Obviously had some concern about what
12  would happen, and so I was personally interested
13  in like where were these happening.
14        And then very shortly after the deal
15  closed, I remember getting something that said,
16  you know, Barclays, you know, I get a notice in
17  the mail or something and something -- an e-mail
18  or something saying that Barclays now had taken
19  over the account and I should contact so and so.
20  And my broker at Lehman in the interim between
21  the filing and the deal closing had left and
22  gone to UBS, so I didn't even have anyone to
23  call to know what happened.
24   Q.   That explanation in court by Harvey
25  Miller or Lori Fife, do you recall, was that in

TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 181

1        M. Shapiro
2  front of Judge Peck while he was --
3    A.   I think everything was in front of
4  Judge Peck.
5    Q.   While he was in the courtroom?
6    A.   Yes. Presumably, yes.
7    Q.   The reason I'm asking about that, do
8  you recall a recess during which attorneys stood
9  up and explained the substance of the deal to
10  the attendees outside the presence of the judge?
11   A.   This is on Friday?
12   Q.   Yes, Friday the 19th.
13   A.   I remember Lori -- I remember Harvey
14  and, you know, the judge saying something like,
15  you know, I've been told by the attorneys that
16  some changes have been made. Either Mr. Miller
17  is going to explain them or volunteer one of his
18  partners to explain it. I believe Lori Fife got
19  up and then explained the deal.
20        I seem to recall that there might have
21  been a recess at some point after that, I just
22  don't have a specific recollection, and I was
23  not party to it. I was there just sitting in
24  like on the window ledge next to the -- next to
25  where people were -- the witnesses were lined

TSG Reporting - Worldwide   877-702-9580

## Highly Confidential

Page 182

```
1             M. Shapiro
2    up, just observing, basically.
3       Q.   As far as you can recall, though, you
4    stayed during any such recess?
5       A.   I stayed. I didn't leave. Well,
6    actually I did leave the court at one point.
7    I'm trying to remember if this was Friday. No,
8    this was probably on -- I'm trying to remember.
9          At one point someone asked for the
10   real estate appraisals, and I knew who had them,
11   and I can't remember if this was on Wednesday or
12   Friday. So I did leave the court. The only
13   time I left the court was to go find the person
14   who had the real estate appraisals, and I can't
15   remember if that was on that Wednesday or that
16   Friday. But that was the only time I left the
17   court.
18      Q.   I would like to show you what's
19   already been marked as Exhibit 11. And it
20   doesn't appear that you're on this e-mail.
21      A.   Okay.
22      Q.   This is a string of looks like three
23   e-mails. If you look at the one in the middle,
24   the last paragraph there that begins "Weil
25   lawyers"?
```

TSG Reporting - Worldwide   877-702-9580

## Highly Confidential

Page 183

```
1             M. Shapiro
2       A.   I'm sorry, where are you looking?
3          MR. STERN: Why don't you read the
4    whole thing just from top to bottom.
5          (Document review.)
6       A.   Okay. I know most of the people who
7    are named in this e-mail, but I've never seen
8    this e-mail before.
9       Q.   I understand that. The paragraph
10   there that says, "Weil lawyers a bit out of
11   whack, but granted timing here not unexpected.
12   They didn't explain the balance sheet changes
13   well, but then a Barclays lawyer came in and
14   gave a much better explanation"?
15      A.   I have no --
16      Q.   Do you recall --
17      A.   I have no idea. First of all, this is
18   a person who had nothing to do with the deal,
19   for absolute sure. I can tell you that. Dan
20   Kamensky was a lawyer who worked for the
21   distressed traders on the fixed income side.
22      Q.   Do you know whether he was in court,
23   though?
24      A.   No idea. He might have been in court
25   because -- he might have been in court only
```

TSG Reporting - Worldwide   877-702-9580

## Highly Confidential

Page 184

```
1             M. Shapiro
2    because he's a lawyer who's a former bankruptcy
3    type who was interested and who worked for the,
4    effectively, the trading guys and the sales guys
5    on the distressed side. So I don't know what
6    kind of information he was trying to ultimately
7    glean from a business perspective, but --
8       Q.   But --
9       A.   So I -- but I don't know what he was
10   trying to get at here, nor he have an official
11   role in anything.
12      Q.   All I'm really interested in is
13   whether you know what this presentation was by a
14   Barclays lawyer.
15      A.   I do not know.
16      Q.   Doesn't sound familiar at all?
17      A.   Well, I believe when they say
18   "Barclays lawyers," the only lawyers who
19   spoke for Barclays, as far as I recall, were
20   Cleary lawyers. I believe Lindsee Grandfield --
21   I think that's her name -- the bankruptcy
22   lawyer, she definitely at one point got up and
23   spoke or presented something.
24      Q.   And again --
25      A.   Look, there's a transcript for the
```

TSG Reporting - Worldwide   877-702-9580

## Highly Confidential

Page 185

```
1             M. Shapiro
2    hearing, obviously, so I don't -- I don't
3    remember everything that happened. If you
4    showed me the transcript and I read it, I might
5    have a better recollection.
6       Q.   Actually, what I'm really interested
7    in is if there's anything that's not reflected
8    on the transcript. That's why I was asking
9    about that recess.
10         Do you recall whether during any
11   recess a lawyer representing Barclays got up and
12   explained the deal?
13      A.   I do not know.
14      Q.   Did you take any notes during the
15   hearing?
16      A.   I think I did take some notes, yes.
17      Q.   Did you keep those notes?
18      A.   I don't know. I'm not a very
19   organized person, so I would have to -- it's
20   possible they're in some pile. I mean,
21   basically I moved -- I had an office. It's been
22   moved like three times. I didn't really keep --
23   because I actually sit on a desk as opposed to
24   like in an office. So I keep some stuff in the
25   office. It could be still there. It could be
```

TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 186

```
 1            M. Shapiro
 2   gone. I would have to spend a lot of time
 3   looking.
 4          It was, at best, it was a notepad, on
 5   a notepad like this, and I think the only notes
 6   I took were kind of -- I remember thinking this
 7   is a pretty interesting historical moment. This
 8   is in the courtroom, by the way, the only notes
 9   I took were in the courtroom. And I think I
10   wrote down a few things that Judge Peck said
11   because I just thought that they were going to
12   be quotes that were going to be out there at
13   some point.
14          MR. STERN: We'll see if we can find
15   that.
16     Q.   Did you have your BlackBerry with you
17   in the courtroom?
18     A.   Yes.
19     Q.   Did you send --
20     A.   You couldn't -- I don't -- I can't
21   remember if we could use it or not. Yeah, I
22   think we could use the BlackBerry.
23     Q.   Mr. Berkenfeld told us that
24   technically you were supposed to check it, but a
25   lot of people brought them in.
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 187

```
 1            M. Shapiro
 2     A.   I think I did use it on occasion,
 3   yeah.
 4     Q.   Do you recall sending e-mails?
 5     A.   Yeah, I think I sent a few e-mails.
 6   People were e-mailing me saying like, how's it
 7   going? What's going on? You know, when are you
 8   out of there? And I was kind of just giving
 9   people a very short like, yes, you know, it's
10   going to be a few more hours.
11          Everybody obviously who was interested
12   in like has the deal been approved. I would say
13   that was the predominant question I was getting
14   from a few people. I was getting inundated by a
15   couple of people like has the deal been approved
16   yet, and I said, no, we're still here.
17   Obviously the hearing went on from 6 till like I
18   in the morning and ultimately got approved,
19   so -- but, yeah, I definitely responded on
20   occasion in very short thrift to people who
21   e-mailed me.
22     Q.   Under the deal as it was described at
23   the court on September 19, was Lehman supposed
24   to give Barclays any cash?
25     A.   Under the original agreement, as I
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 188

```
 1            M. Shapiro
 2   recall, there was a cash transfer. Under the
 3   revised agreement, I don't believe -- again, I'd
 4   have to review the agreement again in more
 5   detail, but my recollection, my best
 6   recollection is that that was changed and there
 7   was no cash passing hands from Lehman to
 8   Barclays.
 9     Q.   And do you recall how you learned
10   about that change?
11     A.   I think I heard about that change -- I
12   heard about that change during the day on
13   Friday.
14     Q.   Before court?
15     A.   Yeah, here -- I think it was in the
16   afternoon I heard about it, and then it was
17   actually the whole deal -- I didn't really have
18   full understanding of the deal because I wasn't,
19   you know, in Bart's office when they were
20   finishing it, as I explained earlier. So I
21   heard what everybody else heard at the time, but
22   I do have a recollection that the -- that there
23   was an elimination of the cash transfer.
24     Q.   And just to be clear, you think you
25   learned about that at that meeting in Bart
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 189

```
 1            M. Shapiro
 2   McDade's office on the 19th?
 3     A.   Again, I'm being a little bit careful
 4   because I don't have a precise recollection.
 5   I'm trying to give you the best --
 6     Q.   That's okay.
 7     A.   -- kind of sense that I remember. I
 8   don't -- if I learned about it, it would have
 9   most likely been in Bart's office at some point
10   during that day because that's most likely where
11   it would have come from, is someone -- either
12   Bart or someone working for Bart or Shafir, you
13   know, might have been Shafir. I can't tell you
14   because I don't have a specific recollection.
15   But it would have most likely have been, you
16   know, in one of the meetings that I attended in
17   Bart's office.
18     Q.   Do you recall who said it?
19     A.   No. I don't even remember it actually
20   being said. I just have a recollection that I
21   knew before the hearing that the cash piece had
22   been eliminated. I just don't remember where I
23   got it from.
24          MR. STERN: Is this a meeting at which
25   counsel was present?
```

TSG Reporting - Worldwide    877-702-9580

M. Shapiro

1
2    THE WITNESS: Weil Gotshal was pretty
3    much in Bart's office most of that afternoon
4    because Mike was doing the contract. And so
5    whatever changes were happening, he was
6    sitting there with his computer making
7    changes. Mike --
8        What's his name?
9        MR. STERN: Lubowitz.
10       THE WITNESS: Lubowitz.
11       So counsel would have probably been
12   around.
13       MR. WOOD: Just to make the record
14   clear, I'm not intending to ask about any
15   comments that the lawyers made there.
16       MR. STERN: I think you already asked
17   a question about discussions with counsel,
18   but go ahead.
19       MR. WOOD: By asking about the
20   conversation in Mr. McDade's office?
21       MR. STERN: You're asking about
22   conversations between the client and their
23   counsel. It's your choice as to whether you
24   want to do that.
25       MR. WOOD: Well, when I asked about

M. Shapiro

1
2    the meeting earlier, I don't recall the
3    witness -- when I asked about the meeting in
4    Mr. McDade's office, I don't recall the
5    witness saying originally that anyone from
6    Weil was there.
7        THE WITNESS: I think I had said
8    actually earlier in the testimony actually I
9    think I had said that.
10       MR. CARDEN: Anyway, he can't put in
11   anything from that meeting, so I think we
12   can move on.
13       MR. WOOD: He doesn't recall it so we
14   can move on.
15   Q.   Do you remember any presentation to
16   the court -- I'm sorry, do you recall any
17   representations to the court regarding whether
18   or not cash would be included in the deal?
19   A.   I don't remember. When you say
20   "representations to the court," you mean in the
21   form of an oral presentation by someone or what
22   do you mean?
23   Q.   At all.
24   A.   Well, the contract spoke for itself
25   and the motion describing the contract

M. Shapiro

1
2    presumably speaks for itself, so whatever they
3    will say was said and whatever was said in the
4    hearing on the record was said, I don't --
5    Q.   Do you recall anything being said --
6    A.   I don't personally.
7    Q.   -- orally?
8    A.   I don't remember anything.
9    Q.   Okay. The clarification letter you
10   have there, Exhibit 25, have you read that
11   before today?
12   A.   Yes, I read it in preparation for the
13   deposition.
14   Q.   Did you read it before then?
15   A.   It's possible that I read it when I
16   got back from California and I asked for a set
17   of documents. I may have -- I may have looked
18   at it, but I don't think I like read it, read it
19   because the deal had been done and I wasn't part
20   of that negotiation and it said clarification
21   letter and I wasn't that interested in it.
22   Q.   Do you recall whether you read it at
23   all over the weekend while you were in
24   California?
25   A.   No, I definitely did not. I had

M. Shapiro

1
2    virtually no communication -- I mean, maybe I
3    had minor, but I had almost no communication
4    with anybody from Lehman Brothers over the
5    weekend.
6        MR. WOOD: Okay. I don't have
7    anything else, thanks.
8    EXAMINATION BY
9    MS. TAGGART:
10   Q.   Do you know where Michael Klein is
11   now?
12   A.   Only -- well, the answer is no.
13   Q.   What's the last that you heard where
14   Michael Klein was or might be?
15   A.   I read an article in the paper, when
16   was it, I don't know when it was, months ago
17   that he and Sandy Weil might have been forming
18   some sort of a venture to buy distressed assets
19   or invest in distressed banks or something like
20   that.
21   Q.   Also you talked at the very beginning
22   that when you were setting out to kind of make
23   the deal and put it in some sort of contract
24   form, you had a big -- a structural idea of what
25   that would be.

Highly Confidential

Page 194

1           M. Shapiro
2       **What was your first concept**
3    **structurally about what assets were going to be**
4    **transferred? Not, obviously, not at a specific**
5    **level but kind of when you're first putting**
6    **together the deal, what was the criterion you**
7    **were looking in what assets might be there?**
8        A.    At the end of the day, it was really
9    what the purchaser was willing to buy as opposed
10   to what I was willing to sell because we didn't
11   have a lot of choices, obviously. So the
12   structure of the deal had to be tailored to what
13   our buyer or buyers, depending on what we had in
14   hand, and when we started thinking about it, I
15   didn't know it was going to be Barclays. When I
16   started working on it, I thought it could either
17   be B of A or Barclays, had actually written a
18   short memo to -- an e-mail to Mark Shafir and
19   Tom Russo and Brad Whitman, who's on the M&A
20   team, which was a paragraph or two basically
21   saying that if we couldn't get a deal done with
22   somebody out of court that maybe we could
23   actually effectuate a 363 sale in court with a
24   buyer, either Barclays or BarCap, and I thought
25   we could actually get something done reasonably

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 195

1           M. Shapiro
2    quickly if we had the support of the regulators.
3        And so I would say that sort of
4    general construct was, okay, it's going to be an
5    asset deal of some kind. Then obviously we need
6    to figure out what assets is your buyer going to
7    buy. In my simple world, it was buy the
8    buildings, New York, New Jersey, buy whatever
9    securities you're prepared to buy, right? And
10   that was obviously a decision that Barclays had
11   to make as to what it wanted to buy and Lehman
12   had to make as to what it wanted to sell, which
13   wasn't, obviously, within my pursue; deal with
14   whatever liabilities could be assumed, you know,
15   in terms of the firm's ongoing businesses and
16   how we could create -- get Barclays to pick up
17   the maximum amount of liabilities, because
18   obviously that would limit what the estate was
19   responsible for; deal with the contracts, as we
20   discussed earlier, in terms of assuming the
21   assigned contracts; deal with the -- deal with
22   the employees and how they were going to be
23   treated, because at the end of the day, you
24   know, I don't think Barclays believed that it
25   was buying an empty building. I think they

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 196

1           M. Shapiro
2    believed they were buying a going concern with
3    people who could function to create a going
4    concern. This is a business where your human
5    capital walks in and out the door every day, and
6    that's the most important capital you have, is
7    the people. So we had to figure out how to
8    ensure that we were able to convince people to
9    stick around and not leave while we were getting
10   this done.
11       Those are probably the general
12   categories when I started thinking about this.
13   There were a lot of other assets that Lehman
14   owned, private equity assets, commercial real
15   estate, obviously you had the Europe, you had
16   Asia, and, you know, my view was that, you know,
17   to actually get a transaction accomplished
18   within a reasonable period of time, we needed to
19   keep it as simple as we could because obviously
20   the simpler it's kept the more easily people can
21   understand it.
22       Q.    **Was there a time that you got an**
23   **indication of what Barclays was interested in**
24   **buying as far as the assets?**
25       A.    Yeah, I think, as I indicated earlier,

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 197

1           M. Shapiro
2    at some point Archie Cox and their team said,
3    you know, we want to buy the building, obviously
4    we need the buildings in New Jersey, we're
5    evaluating the securities. Obviously so they
6    were not committing to what they would or
7    wouldn't buy. They were doing diligence on
8    that. There was a whole team of people from
9    Barclays that were on -- I think they were on
10   the 31st floor, from what I remember seeing
11   them, in some offices doing diligence around
12   different securities, but I really wasn't party
13   to that.
14       There was the discussion I mentioned
15   earlier which was more of a generic discussion
16   about having the right to purchase contracts
17   that they could assume and assign, but there was
18   no specificity as to, well, I want this specific
19   contract, I want that specific contract.
20       At some point during the week they
21   clearly had a team of people that were starting
22   to go through that, but that had been an ongoing
23   effort from them since they had 60 days to
24   figure it out.
25       Q.    **How best --**

TSG Reporting - Worldwide    877-702-9580

1        M. Shapiro
2        I'm sorry.
3        A.    I'm just thinking. As you're asking,
4    I'm just thinking about your question.
5        In terms of assets --
6        Q.    Let's talk about the securities in
7    particular.
8        A.    Sure.
9        Q.    When did that evaluation of securities
10    end so that Barclays had made a decision about
11    what securities it wanted to buy?
12        A.    Well, I would say it was -- it seemed
13    to me that it was an ongoing process that really
14    took place throughout the week because it was
15    not just what Barclays could buy, but what
16    Lehman could convey, right?
17        As I indicated earlier, I was
18    personally very focused on making sure that
19    everyone understood. You know, there weren't
20    very many people who had ever worked on a
21    bankruptcy deal, and I just wanted people to
22    understand that we could only convey what we had
23    right, title and interest to convey,
24    notwithstanding bankruptcy.
25        And so it was very important that

1        M. Shapiro
2    everyone make sure that they try to get the
3    facts as right as they could under the
4    circumstances and be able to convey, you know,
5    what we had right, title and interest in, not
6    subject to a lien, et cetera.
7        So, in light of the size of the Lehman
8    Brothers balance sheet, it was taking time to
9    evaluate that from both side's perspective, time
10    in terms of understanding what they were, time
11    in terms of presumably understanding what each
12    side believed the marks to be, et cetera.
13        So that was an ongoing process that
14    did not end when we left court on Wednesday
15    where they were named the stalking horse and
16    they clearly, if we had tried to convey to them
17    securities that we didn't have title to, for
18    example, they could have said, no, we don't have
19    to close.
20        So I believe, you know, the changes
21    that were ultimately made to the contract
22    reflect the fact that the facts had continued to
23    change from Monday to Friday based on what we
24    believed to be a snapshot on call it the middle
25    of the night on Monday. The contract was

1        M. Shapiro
2    drafted, as I said, on Tuesday, and then as
3    Wednesday when we were in court, and then over
4    the -- but facts had continued to change,
5    obviously, facts were continuing to change post
6    the hearing, and therefore people ultimately got
7    to a different set of securities that ultimately
8    were conveyed by Friday.
9        Q.    What, if anything, was decided about
10    what securities would be conveyed as of the
11    signing of the APA?
12        A.    I'm not sure I understand your
13    question.
14        MR. STERN: Objection as to form.
15        Q.    Well, let's look at it.
16        A.    Okay.
17        Q.    It's Exhibit 1, and you can go to page
18    6.
19        A.    I'm sorry, I'm looking at this
20    exhibit. Is this what you're talking about?
21        MR. STERN: Let me get Exhibit 1.
22        Q.    So if you turn to page 6, in
23    particular on Purchased Assets, and let's start
24    on section D, which starts with government
25    securities, commercial paper, corporate debt.

1        M. Shapiro
2        A.    Yeah. Okay. I'm looking at that
3    section.
4        Q.    Sure. Go ahead. Sorry.
5        What was your understanding of what
6    was being agreed to with Section D?
7        A.    What it says: That the purchased
8    assets included government securities,
9    commercial paper, corporate debt, corporate
10    equity, exchange-traded derivatives, short-term
11    agreements that had a book value of
12    approximately 70 billion, and that that group
13    obviously was I'll call it generically described
14    in this provision, let's call it the backing of
15    that, the information from which that was
16    derived obviously was for people who were in the
17    securities area and who at the time were using
18    that sheet that we talked about earlier, that --
19    I forget what the exhibit is.
20        Q.    19.
21        A.    Exhibit 91, we were using that as a
22    shorthand way to categorize and put down on a
23    piece of paper what both sides believed were
24    going to be transferred that were, you know,
25    theoretically, at that point in time, owned by

Highly Confidential

Page 202

1           M. Shapiro
2    Lehman Brothers.
3       Q.   Was it your understanding that there
4    was some sort of bucket of assets that there was
5    an agreement as of the time of the signing of
6    the APA would be transferred?
7          MR. STERN: Objection.
8       Q.   That is being described in subsection
9    D?
10         MR. STERN: Objection to the form.
11      A.   I'm not sure I understand your
12   question.
13      Q.   Is subsection D meant to describe an
14   actual set of securities that is in any way had
15   already been determined as of the signing of the
16   APA?
17      A.   I'm still not -- subsection D
18   describes what both sides believed to be the
19   types, kind and magnitude of the securities
20   that Barclays, as the buyer, Lehman, as the
21   seller, believed could be conveyed to Barclays
22   under this contract as of -- as of the time we
23   signed it, which was, you know, as I said, about
24   10:30 on that Tuesday night, the 16th.
25      Q.   I guess what I'm trying to get at, I

TSG Reporting - Worldwide   877-702-9580

---

Highly Confidential

Page 203

1           M. Shapiro
2    understand that things were pretty fluid, and
3    when you were talking about contracts, there's a
4    whole process that's in this contract where
5    you're going to review contracts and evaluate
6    and choose.
7       A.   Right.
8       Q.   But when it comes to the securities,
9    first of all, you're not describing a process of
10   choosing securities in a contract, right?
11      A.   That's correct.
12         MR. STERN: Wait. Wait. Wait. I
13   just want a standing objection to the form.
14      Q.   And was it your understanding there
15   was an agreement that there would be conveyed
16   some bucket of assets that had a value at that
17   date of $70 billion?
18         MR. STERN: Objection to the form.
19   Can you read the question?
20         (Record read.)
21      A.   I can't speak to an agreement as to
22   value. I can only say that I believed the
23   parties intended by this provision D that
24   this -- these categories of securities, meaning
25   government securities, commercial paper, et

TSG Reporting - Worldwide   877-702-9580

---

Highly Confidential

Page 204

1           M. Shapiro
2    cetera, as described in Exhibit D, which I
3    believe Lehman had a book value with respect to
4    such securities of $70 billion as of that night,
5    that that's what the parties agreed were the --
6    were the securities to be transferred on the
7    asset side.
8       Q.   Well, were there actually securities
9    that had been agreed as of the signing of the
10   APA to be transferred?
11         MR. STERN: Objection to the form.
12      A.   When you say "were there securities,"
13   I'm not sure what you mean by that.
14      Q.   I'm trying to find out what's -- I
15   think you mentioned, I was trying to check my
16   notes, that when you were drafting, you were
17   trying to make sure that it really delineated
18   what was agreed to?
19      A.   Yes.
20         MR. STERN: That's the question?
21      A.   Your question was were we trying to
22   accurately reflect what was agreed?
23      Q.   Yes. Sure.
24      A.   I would hope we were trying, yeah.
25      Q.   So I understand that this describes

TSG Reporting - Worldwide   877-702-9580

---

Highly Confidential

Page 205

1           M. Shapiro
2    some things, and I want to find out in what way
3    you think you're describing. First of all, were
4    there at the time of the signing of the APA
5    actual securities, a bucket of securities that
6    are being described by subsection D?
7          MR. STERN: Objection to the form, but
8    you can answer.
9       A.   I can only state what I know as a
10   matter of fact personally, which was that it was
11   represented by people who were going through the
12   reames of data that provided the description of
13   securities and however they were categorizing it
14   that the information we were given was that
15   these securities as described in this form were
16   available to be conveyed as of that time by
17   Lehman to Barclays.
18         As I think I indicated in earlier
19   testimony, the facts on the ground changed
20   significantly because not only were some of the
21   securities that Lehman -- that people at Lehman
22   may have believed were owned by Lehman as of
23   that moment in time, they learned later during
24   the week that maybe they weren't necessarily
25   owned, they might have been sold, trades were

TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 206

1          M. Shapiro
2   closing, people were getting blown out.
3          So, you know, this is a trading
4   business, right? I think if you stepped into
5   any trading business, you would learn very
6   quickly that it's very hard to absolutely know
7   with absolute certainty as of a given minute
8   exactly what you have and that's why I think
9   this says "approximately 70 billion." It gives
10  categories of securities.
11         In the 24 hours we had, I think this
12  was the best we could do as a description within
13  a contract. That didn't mean that people
14  didn't, from a business perspective, have the
15  backup for what they believed to be able to be
16  conveyed as of that date. They did, but then,
17  as I indicated, as they learned more about what
18  was happening to Lehman over the course of the
19  next few days, those changed.
20  **Q.   Is it your understanding that what's**
21  **being described here is an intent to convey any**
22  **of these categories, government securities,**
23  **commercial paper, et cetera, that can be**
24  **conveyed?**
25         MR. STERN: Objection to the form.

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 207

1          M. Shapiro
2   A.   If we couldn't convey them, we
3   couldn't make the representations that we make
4   in the contract so we wouldn't have been able to
5   actually close the deal. So obviously you
6   can't -- often you enter into a contract where,
7   on the day you enter into the contract, you say
8   something, but then you have to bring the rep
9   down at closing.
10         And this is not a rep that could have
11  been brought down at closing in terms of being
12  able to convey to them right, title and interest
13  to these specific securities as they had
14  identified them as of that date because there
15  were things that changed about those securities.
16  **Q.   I understand you think whether it's**
17  **implicit or just known in the industry that you**
18  **cannot convey ones that you don't have title to,**
19  **that's going to be a limitation --**
20         MR. STERN: Wait. I'm waiting to hear
21     the question.
22  - **Q.   That would be a limitation that you**
23  **think is built into this deal, right?**
24         MR. STERN: Objection to the form.
25         Can I hear the question?

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 208

1          M. Shapiro
2   (Record read.)
3          MR. STERN: That's the question.
4   **Q.   Maybe I can put it another way.**
5   A.   Okay.
6   **Q.   In what way, as a contractual matter,**
7   **would Lehman breach this provision?**
8   A.   Okay. So if you were to look at
9   Section 5.4 of the contract, it says "Title to
10  Purchased Assets," and it says, "Other than the
11  real property...intellectual property...Seller
12  owns each of the purchased assets, the Seller --
13  and Purchaser will be vested with good and
14  exclusive titles to such Purchased Assets, free
15  and clear of all Liens, other than Permitted
16  Exceptions, to the fullest extent permitted
17  under Section 363."
18         So I would call that a reasonably
19  standard provision in a sale contract, and
20  basically it means that you have to convey good
21  title to your buyer or your buyer either doesn't
22  have to close or can sue you for breach of
23  contract if you close and deliver him an asset
24  that you didn't have the right to convey.
25  **Q.   How would Lehman breach this provision**

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 209

1          **M. Shapiro**
2   **of the contract?**
3          MR. STERN: Objection to the form.
4          You can try to answer.
5   A.   Well, my fear was they could have
6   breached it, or possibly could have breached it
7   if they agreed to let's call it a set of
8   securities that existed in their books and
9   records as reflected by traders and other people
10  who were in control of those records as of the
11  date that we signed this that in fact things
12  were happening that were well beyond the
13  knowledge of those of the lawyers drafting this
14  contract in the context of the trading business,
15  which actually did occur, and therefore, we were
16  making -- then if you can't know that an asset
17  that you are trying to convey you actually have
18  title to because either (A) you already sold it
19  to somebody else or (B) someone took it from you
20  because you had repoed it and you didn't -- and
21  the repo was taken, you know, the repo was
22  terminated and the security was taken and,
23  therefore, while on your books and records you
24  might have shown that as an asset you owned
25  subject to the repo, by the time Friday came

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 210

1          M. Shapiro
2   along, you no longer owned it because the repo
3   had been blown out.
4          So things like that concerned me about
5   making sure that we were able to make the rep at
6   closing.
7      Q.   On the page 6, though, the description
8   of purchased assets, I think that you have
9   mentioned that there's no schedule attached of
10  the assets that are going to be conveyed, right?
11     A.   Yeah, the only schedule that was in
12  any way referenced that had let's say a
13  relationship to this was the schedule we
14  previously talked about.
15     Q.   And that even wasn't attached --
16     A.   That was not a party to the contract.
17  That was just a referred to schedule.
18     Q.   And I believe this -- you said this
19  value of approximately 70 billion, did you
20  believe there was actually an agreement that
21  securities valued at 70 billion would be
22  conveyed?  Is that the way you read this?
23     A.   What it says is what I believe was
24  agreed to.
25     Q.   So Lehman is agreeing to give assets
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 211

1          M. Shapiro
2   that have this description, government
3   securities, commercial paper, that are valued as
4   of -- at approximately $70 billion as of the
5   signing of the APA?
6          MR. STERN: Objection to the form.
7      A.   Lehman agreed to sell to Barclays the
8   securities that were described in Section D in
9   accordance with the terms of this agreement as
10  part of this agreement.
11     Q.   Do you see there's not much
12  description about what those assets are, right?
13         MR. STERN: Objection to the form.
14     A.   If you're asking could there -- could
15  there have been more detail behind each of these
16  if this deal was done in the course of a let's
17  say a month and you had lots of time, I guess
18  probably the answer would be yes, but since this
19  deal was done in a week, and because you were
20  dealing with a moving -- a moving target in the
21  sense as I described earlier, some of the
22  securities that were trying to be conveyed were
23  being changed on the ground, this was the best
24  that the lawyers could do to reflect the
25  business agreement, which I believe it does
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 212

1          M. Shapiro
2   accurately reflect as of that Tuesday night what
3   people had agreed to, that obviously that was
4   required to be changed because of the fact both
5   sides recognized that this description no longer
6   accurately reflected what could be conveyed as
7   of Friday.
8      Q.   We also talked or you spoke earlier
9   about how the liabilities were at 69 billion,
10  approximately, and the conveyed assets was 70
11  billion, right?
12     A.   Yeah, those two -- there was obviously
13  a linkage because the liabilities were, you
14  know, were financings of these securities, for
15  the most part, as I understood it.
16     Q.   Was it your understanding that, in
17  making this deal, that there were going to be
18  some parity between the assets and the
19  liabilities?
20         MR. STERN: Objection to the form.
21     A.   I don't really know what you mean by
22  "parity." I think as I described it earlier,
23  just in terms of the facts as I knew them, there
24  was a number which was approximately 70 billion
25  in this contract which was reflecting that
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 213

1          M. Shapiro
2   schedule that said around 72 billion. There
3   was -- on the asset side. On the liability
4   side, this says I think approximately 69
5   million. The schedule reflected around 68.4,
6   69.4. I don't remember what it said, again,
7   approximately.
8          The difference between the two would
9   generally reflect I think the fact that you've
10  never financed 100 percent of the positions that
11  you were buying, right? Everything was
12  haircutted a bit.
13         So I -- you're asking me the question,
14  was there a different between the asset side and
15  the liability side, yeah, but I would have
16  expected that.
17     Q.   Let's look at Exhibit 19. Do you
18  still have that in front of you?
19         MR. STERN: No, but we'll get it out.
20     Q.   I'm also going to show you what's
21  previously been marked as Exhibit 18.
22         First, for the record, do you
23  recognize Exhibit 18?
24     A.   They look very similar to me, so when
25  you say do I recognize it, I don't have a
          TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 214

1           M. Shapiro
2    specific recollection of it, other than
3    generally I am familiar with this schedule as it
4    kind of looks like the last schedule I looked
5    at.
6        Q.    You see they look similar.  They have
7    columns.  There's assets --
8        A.    Yeah.
9        Q.    -- and liabilities?
10       A.    Yeah.
11       Q.    And similar categories, right?
12       A.    Yes.
13       Q.    And some changes in the numbers?
14       A.    Yeah, one looks like it was done at
15    11:18, one looks like it was done 10:09.
16       Q.    And I believe you said there was a
17    number of iterations of this type of
18    spreadsheet, right?
19       A.    I believe there were multiple
20    iterations of it.
21       Q.    You notice that on both Exhibit 18 and
22    Exhibit 19 the assets and liabilities are the
23    same, right?
24       A.    Let's see.  No, they're not the same.
25    Well, when you say they're the same, meaning the
                TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 215

1           M. Shapiro
2    same categories?  What do you mean by "the
3    same"?
4        Q.    In both Exhibit 18 and Exhibit 19, the
5    totals of the assets match the totals of the
6    liabilities in that exhibit?
7        A.    No, I don't agree with what you just
8    said, unless I don't understand what you just
9    said, which is probably --
10       Q.    Well, let's look at Exhibit 18.
11       A.    Let's just take the first column of
12    assets.  So I see government and AG, agencies,
13    40 billion.  Commercial paper, 1.1.  That's the
14    same.  Mortgages, 2.9 versus 2.7.
15       Q.    I just mean the totals.  So let me try
16    to ask that again.  Let's just start with
17    Exhibit --
18       A.    Total dollars?  What are we talking
19    about when you say "total"?  Can you be more
20    precise?
21       Q.    Let's start with Exhibit 18.  On the
22    bottom, the number for adjusted total assets is
23    73.15, which I believe is billions of dollars,
24    right?
25       A.    Yes.
                TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 216

1           M. Shapiro
2        Q.    And that's also the total that's
3    listed under liabilities, 73.15?
4        A.    Those two numbers match, correct.
5        Q.    And in Exhibit 19 the totals also
6    match, where the total assets is 72.65 and then
7    the total liabilities is 72.65 also, right?
8        A.    Those numbers are the same, I agree.
9        Q.    Do you remember in previous iterations
10    of this document whether the assets and
11    liabilities also matched each other?
12       A.    I think, again, as I said, there were
13    multiple of these documents.  I think that there
14    were times when they didn't match, but I can't
15    be absolutely sure of that, but I think that
16    there were.
17       Q.    And do you know if going into signing
18    the APA the understanding was, although these
19    numbers might change, there would be a matching
20    between the assets that were conveyed and the
21    liabilities that were assumed?
22           MR. STERN:  Objection to the form.
23           Let me hear the question again.
24           (Record read.)
25       A.    I don't know the answer to your
                TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 217

1           M. Shapiro
2    question.
3        Q.    You also mentioned, I think you said
4    that you would expect the liabilities to be a
5    little bit less than the assets for what you
6    described as a haircut; is that right?
7           MR. STERN:  Objection to the form.
8        A.    What I described is that when people
9    typically finance an asset, when financial
10    institutions finances an asset, it doesn't
11    usually lend 100 cents on the dollar because if
12    the asset value goes down, then they're
13    out-of-pocket.  So usually they have some
14    cushion for what's known as a haircut so that
15    before they lend, they only lend a portion
16    of the asset value.  So it didn't surprise me
17    that we had that differential since we were
18    talking about a book.
19       Q.    And do you mean that on a
20    particular -- each individual security?
21       A.    Sure.
22       Q.    So a security would have an asset but
23    the liability of it would be a little bit less
24    for each individual security?
25       A.    Depending --
                TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 218

1          M. Shapiro
2      MR. STERN: Objection to the form.
3      Can I hear the question again?
4      (Record read.)
5      MR. STERN: Objection to the form.
6      Are you talking about generally speaking?
7      Are you talking about specifically to this
8      set of assets?
9      Q.   I'm first trying to find out about
10     your general understanding that you think
11     usually in some transaction that the assets will
12     be a little bit more than the liability to
13     reflect a risk or financing?
14         MR. STERN: Objection to the form.
15     Look, I've been very patient, but I think
16     these questions are very misleading. I
17     don't even where you get the "little bit
18     less" from.
19     A.   Can I hear the question again? I'm
20     not sure what the question is.
21     (Record read.)
22     A.   I think you should restate your
23     question because I don't really understand it.
24     Q.   I'm just trying to first understand
25     your understanding about the way that assets and
         TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 219

1          M. Shapiro
2      liabilities interact.
3      A.   Okay.
4      Q.   So maybe you could state it again.
5          For this transaction for the APA, what
6      was your understanding of what you expected the
7      relationship between assets and liabilities
8      would be?
9      A.   Okay. I had no -- I had no
10     understanding specifically to these assets of
11     what they should be, which is really what you're
12     getting at. I think what I was explaining to
13     you is that, generally speaking, in the
14     commercial financing area, you find that
15     institutions are not willing to lend necessarily
16     the full market value, 100 cents on the dollar,
17     against the security that they are financing
18     because they are worried, potentially, that they
19     would have to take a haircut, take a hit if the
20     value of that security goes down.
21         So people typically lend at some
22     margin, some margin less than, generally
23     speaking, and I'm not referring to this specific
24     transaction and the securities involved here, so
25     then my second statement, which was it didn't
         TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 220

1          M. Shapiro
2      surprise me that there was a difference between
3      the stated marked value of the assets in the APA
4      and the stated liabilities being assumed
5      associated with them and that there was a
6      difference between the two, that didn't surprise
7      me for the reason I just stated.
8      Q.   But you don't --
9      A.   I have no personal knowledge as to
10     what amount of financing was specifically
11     associated with each security that fell within
12     the baskets of each of these categories that
13     were to be conveyed. Hopefully that answers
14     your question.
15     Q.   You don't know one way or another
16     whether that general commercial practice
17     explains the difference between the liabilities
18     and the assets in this case?
19     A.   I do not, no.
20     Q.   Also, if you look at the definition --
21     Let's go back to 6 of "Purchased
22     Assets."
23         MR. STERN: We're on Exhibit 1?
24     Q.   Exhibit I, page 6, subsection D under
25     "Purchased Assets." You'll see -- well, that 70
         TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 221

1          M. Shapiro
2      billion, that approximate, do you know if that
3      includes what's listed on Exhibit 19 as
4      mortgages?
5      A.   Can I see Exhibit 19?
6          MR. STERN: We're on page 6 at what
7          point? What's the question? Do you mind
8          telling me what you're focusing on?
9          MS. TAGGART: It's the same provision
10         that I've been talking about.
11         MR. STERN: Can you just tell me what
12         it is as a courtesy? I'm looking at the
13         page. I was getting an exhibit so now I'm
14         looking at the page. Can you tell me what I
15         should be looking at?
16         MS. TAGGART: It's page 6, the
17         definition of "Purchased Assets," subsection
18         D.
19         MR. STERN: Thank you.
20     A.   Could you repeat the question?
21     (Record read.)
22         MR. STERN: Objection to the form.
23     A.   As I testified earlier today, the
24     approximately $70 billion that's referenced in
25     section D on page 6 relates to the 72.65 number
         TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 222

1          M. Shapiro
2 that's under the "adjusted total assets" line
3 since -- since the 72.65 is the total of the
4 62.7 and the 10, which obviously doesn't exactly
5 add up, which is approximately 72.65. The
6 bottom -- the first column totals 62.7. The
7 second column shows 10. If you add those two
8 up, you get to 72.7. This says 72.65. My only
9 point is that the mortgages -- you were
10 referring to mortgages of 2.7 in that line.
11 It's subsumed within the 72.65.
12     Q.   Well, in subsection E of page 6, which
13 is "Purchased Assets," it talks about 50 percent
14 of each position in the residential real estate
15 mortgage securities. Do you see that?
16     A.   Yes.
17     Q.   Do you know if there's any
18 relationship between that and what's described
19 in Exhibit 19 as mortgages under "Assets"?
20     A.   My recollection is that the resis,
21 what was called the resis, were being treated
22 separately. And "resis" I think is shorthand
23 when people are talking about them for the
24 residential real estate mortgages, that those
25 were not being treated as part of this asset
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 223

1          M. Shapiro
2 group; they were being dealt with separately.
3     Q.   So your understanding is that the
4 mortgages described on Exhibit 19 are different
5 than the mortgages that are described on page 6,
6 the definition of "purchased assets," subsection
7 E?
8     A.   To the best of my recollection, I
9 don't think that the resis were necessarily
10 included in the assets that are described here,
11 but the only thing I would say is that I was not
12 the person who was in any way putting the
13 information together around what securities
14 actually went into each of these buckets, so I
15 can't be sure. But that's what I -- that's the
16 best recollection I have.
17     Q.   Were you involved at all in the
18 discussions or negotiations about what resis
19 were going to be conveyed?
20     A.   No, there was some discussions about
21 would Barclays take resis, would Barclays not
22 take resis. I have a recollection of the
23 discussion. I don't remember -- I was not
24 personally involved in those discussions, no.
25        I believe Bart, Mark Shafir, maybe
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 224

1          M. Shapiro
2 others, but it wasn't me.
3     Q.   You described earlier that you thought
4 that JPMC was I think you used the term "a bad
5 actor"?
6     A.   From my perspective.
7     Q.   Can you describe why you used that
8 term?
9     A.   Well, I thought that they -- they,
10 before the bankruptcy, they were the ones who
11 took the liquidity out of Lehman Brothers by
12 virtue of the demand that they made on Lehman
13 Brothers in the week that led up to the
14 bankruptcy.
15        So Lehman Brothers started the week
16 with $40 billion of liquid capital in the bank
17 accounts, and by the end of the week, we had
18 virtually none of it and, you know, to the point
19 where we had to send them a nasty letter on -- I
20 think it was on Friday or Saturday asking them
21 to allow us to wire $20 million to Weil Gotshal
22 for retainer.
23        And one of the things that I learned
24 in the course of getting involved that Thursday
25 when I sat down with a number of the lawyers who
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 225

1          M. Shapiro
2 had worked for Treasury and I was trying to
3 understand, you know, what kind of cash we had,
4 is I learned that they had required the firm to
5 enter into a letter agreement that required --
6 allowed them to set off any cash that they were
7 holding against any exposures that they had
8 across any agreement that they had with Lehman
9 Brothers, which they didn't have the right to
10 before that agreement was entered into, they
11 only had it as it related to their clearing
12 obligations.
13        I believe that they used their
14 monopoly position as a clearing bank to extract
15 that agreement from Lehman Brothers, and that
16 allowed them to basically take the position that
17 any assets that Lehman had at JPMorgan and the
18 cash that was being held by JPMorgan anywhere
19 could be set off against any obligation that
20 Lehman Brothers had to JPMorgan anywhere, and
21 that that was the, in my view, the final blow to
22 Lehman Brothers.
23        So I'm not saying that they
24 necessarily did anything wrong legally. I'm
25 just saying that I believe that they were a key
TSG Reporting - Worldwide   877-702-9580

Highly Confidential

Page 226

1         M. Shapiro
2    reason why Lehman's liquidity ran dry.
3         Q.   What's that based on? What's your
4    understanding based on the facts that you've
5    got?
6         A.   What I just described. What I was
7    told by other people in the firm and the
8    agreement that I actually saw.
9         Q.   Who did you talk to about it?
10        A.   I talked to -- there were, on the
11   agreement itself, I talked to a number of
12   lawyers who were lawyers for the Treasury Group
13   who, when I was basically doing some of my own
14   due diligence to figure out what were we dealing
15   with here on Friday, they told me about --
16        Q.   Let's not talk about what you talked
17   with lawyers for now.
18        MR. STERN:  No, wait. I think he is
19   entitled -- you asked a question. He's
20   entitled to give an answer. There was no
21   instruction from either of Lehman's
22   counsel --
23        MR. CARDEN:  We just got to the
24   lawyers.
25        MS. TAGGART:  I just asked who he

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 227

1         M. Shapiro
2    spoke with. If you want to -- I just don't
3    want to hear later that you -- right now I
4    am not asking for what he spoke with any
5    lawyers about. If you want him to go ahead
6    and answer, that's fine, but I want it to be
7    clear --
8         MR. STERN:  No, it's not my choice.
9    I'm not asking the questions.
10        MS. TAGGART:  My question was not what
11   was said. My question was who did you speak
12   with.
13        MR. STERN:  I'm going to wait for the
14   next question.
15        MS. TAGGART:  Well, that's fine.
16        Q.   Is there anyone else that you spoke
17   with on this topic about the JPMC issue?
18        A.   Outside of lawyers?
19        Q.   Outside of lawyers.
20        A.   I believe I told a few other people
21   about it and how I was absolutely shocked that
22   we would let that happen, and that I think I --
23   I think I characterized it as sort of
24   ridiculously stupid on our part.
25        Q.   Just to make the record clear, did you

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 228

1         M. Shapiro
2    make -- were you involved in any changes to the
3    contract with Barclays after the court hearing
4    on September 19?
5         A.   No, I was not.
6         Q.   Also earlier today you spoke about
7    the -- how there was originally a provision that
8    was, I believe, provision 3.3, the adjustment to
9    the cash amount, and it was your understanding
10   it was eventually eliminated in the revised
11   deal?
12        A.   That's my recollection.
13        Q.   Do you know when there was the
14   decision to revise that part?
15        A.   Well, I don't know -- I don't know
16   when this is meant to actually revise just that
17   specific part. As I indicated, I think that
18   there was an overall agreement on making changes
19   to this that happened on that either Thursday or
20   that more likely to be actually -- was actually
21   agreed to on that Friday.
22        Q.   You also mentioned earlier today that
23   you had spoken with Mark Kelly and --
24        A.   Martin Kelly.
25        Q.   Martin Kelly, excuse me.

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 229

1         M. Shapiro
2         -- to try to get an understanding of,
3    if the securities were sold, if it was possible
4    to value them based on if Lehman was not
5    purchased and was liquidated?
6         A.   I don't believe --
7         MR. STERN:  Objection to the form.
8    Can I hear that question again?
9         (Record read.)
10        A.   I'll --
11        MR. STERN:  Is there a question?
12   Wait. I'm not quite sure.
13        Q.   Was that your testimony earlier today?
14        A.   I'm not sure what the question is that
15   you asked me. I think I know what it is and I
16   would restate the question if you would like me
17   to.
18        Q.   No, I -- we can -- why don't you
19   say --
20        A.   I don't understand your question.
21        MR. STERN:  Let her ask questions and
22   you give answers.
23        THE WITNESS:  Fine.
24        Q.   Can you describe what the conversation
25   was that you had with Martin Kelly on the

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 230

1           **M. Shapiro**
2   subject of valuation if Lehman was not
3   purchased?
4       A.   Yeah, I don't think it was necessarily
5   just Martin Kelly. I just can't remember. I
6   think he was involved in those discussions.
7           What we were trying to do was find the
8   right people at Lehman Brothers who could -- and
9   it wasn't one person, it was groups of people --
10  who were responsible for trading and, you know,
11  and managing the portfolios of these different
12  categories of securities so that Barry Ridings
13  could meet with these people and get their
14  perspective on how they believed those
15  securities -- what those securities might end up
16  being worth if Lehman was forced to sell those
17  securities in the near term.
18          And so Martin was one of I think a
19  number of people that helped us organize
20  different people in the firm to meet with Barry
21  Ridings on I believe Thursday and Friday to --
22  so he could evaluate what would happen if this
23  transaction did not complete and what the
24  potential loss in value to the estate might be
25  if a forced sale of these securities were to

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 231

1           M. Shapiro
2   take place.
3       Q.   Who is Barry Ridings?
4       A.   Barry Ridings. He's the senior
5   partner and investment banker at Lazard.
6       Q.   I'm laughing. It's a West Coast
7   thing. I can't say the difference between Barry
8   and berry.
9           And the Thursday and Friday, is that
10  the 18th and 19th?
11      A.   I believe -- it would have been -- it
12  would have been the 18th or the 19th, I believe,
13  yes. It could have been earlier, too. I just
14  don't have a specific recollection, but I think
15  it was during those, you know, during the course
16  of this week. I don't remember exactly what
17  days he actually did that. He would have a
18  better recollection of what days he did it, but
19  it was during the course of that week.
20      Q.   Do you know any other people who were
21  involved in that evaluation?
22      A.   I believe I spoke to -- I believe on
23  some of this he spoke to Felder, probably
24  Gelband, Alex Kirk, you know, different people
25  who, within the Fixed Income, mostly Fixed

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 232

1           M. Shapiro
2   Income, not always, and I think there was some
3   derivatives people. I don't remember all the
4   people, no. These are not people that for the
5   most part I knew. I knew a few of them.
6       Q.   Did you ever communicate about the
7   results of that evaluation with Mr. Ridings or
8   anyone else?
9       A.   Not specifically, other than listening
10  to his testimony in court where I think he
11  testified as to his view of what they might --
12  what might happen if the transaction didn't
13  close and Lehman was liquidated and those
14  securities were liquidated. I think he
15  testified on that.
16          (Continued on the next page to include
17      the jurat.)
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

---

Highly Confidential

Page 233

1           M. Shapiro
2       Q.   Did you see any documents associated
3   with that evaluation?
4       A.   No.
5           MS. TAGGART: That's all my questions.
6   Thank you.
7           MR. STERN: Anybody else?
8           MR. CARDEN: You're a free man.
9           MR. STERN: I think were done.
10          THE WITNESS: Okay, thanks.
11          (Time Noted: 2:42 P.M.)
12              oOo
13
14
15
16
17
                    _____
                    MARK J. SHAPIRO
18
19      Subscribed and sworn to
        before me this    day
20      of      2009.
21
        _____
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 234

```
 1              M. Shapiro
 2            CERTIFICATE
 3    STATE OF NEW YORK )
                       : ss
 4    COUNTY OF NEW YORK)
 5          I, Kathy S. Klepfer, a Registered
 6    Merit Reporter and Notary Public within and
 7    for the State of New York, do hereby
 8    certify:
 9          That MARK J. SHAPIRO, the witness
10    whose deposition is herein before set forth,
11    was duly sworn by me and that such
12    deposition is a true record of the testimony
13    given by such witness.
14          I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage and that I am in no way
17    interested in the outcome of this matter.
18          I further certify that neither the
19    deponent nor a party requested a review of
20    the transcript pursuant to Federal Rule of
21    Civil Procedure 30(e) before the deposition
22    was completed.
23          In witness whereof, I have hereunto
24    set my hand this 7th day of August, 2009.
25          ------------------------------
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 235

```
 1              M. Shapiro
 2              INDEX
 3    WITNESS:        EXAMINATION BY      PAGE
 4    M. SHAPIRO       Mr. Carden         5
 5                     Mr. Wood          171
 6                     Ms. Taggart       193
 7
 8    EXHIBITS:                 PAGE
 9    Exhibit 55A, a document bearing Bates    78
10    Nos. BCI-EX-00077347 through 77349
11    Exhibit 56A, Agreement           135
12    Exhibit 57A, a document bearing Bates    158
13    Nos. 10296233 through 10299664
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Highly Confidential

Page 236

```
 1           M. Shapiro
 2    NAME OF CASE:  In re Lehman Brothers Holding
 3    DATE OF DEPOSITION:  August 7, 2009
 4    NAME OF WITNESS:  Mark J. Shapiro
 5    Reason Codes:
 6       1. To clarify the record.
         2. To conform to the facts.
 7       3. To correct transcription errors.
 8    Page _____ Line _____ Reason _____
      From _____ to _____
 9
      Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
      From _____ to _____
12
      Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
      From _____ to _____
15
      Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
      From _____ to _____
18
      Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
      From _____ to _____
21
      Page _____ Line _____ Reason _____
22    From _____ to _____
23    Page _____ Line _____ Reason _____
      From _____ to _____
24
25    _____
```

TSG Reporting - Worldwide    877-702-9580

# BCI EXHIBIT

# 98

Page 1

1          HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    1

2                UNITED STATES BANKRUPTCY COURT

3                SOUTHERN DISTRICT OF NEW YORK

4     - - - - - - - - - - - - - - - - - - - - - -

5     In Re:

                        Chapter 11

6

7     LEHMAN BROTHERS    Case No. 08-13555(JMP)

      HOLDINGS, INC. et al., (Jointly Administered)

8

9                        Debtors.

10    - - - - - - - - - - - - - - - - - - - - - - -

11                  HIGHLY CONFIDENTIAL

12          DEPOSITION OF PAOLO TONUCCI

13                Friday 14 August 2009

14                    At:  7:00 am

15                    Taken at:

16                    Jones Day

                   21 Tudor Street

17                      London

                   United Kingdom

18

19    Reported by: AILSA WILLIAMS

      Certified LiveNote Reporter

20

21

22

23

24

25

## Page 2

```
 1         HIGHLY CONFIDENTIAL - PAOLO TONUCCI        2
 2                   A P P E A R A N C E S
 3     JONES DAY, LLP
           Attorneys for Lehman Brothers, Inc.
 4         222 East 41st Street
           New York, NY 10017-6702
 5         BY: JAYANT W. TAMBE, ESQ
               BRIDGET CRAWFORD, ESQ
 6
       BOIES, SCHILLER & FLEXNER, LLP
 7         Attorneys for Barclays Capital and the
           Witness
 8         5301 Wisconsin Avenue, NW
           Washington, DC 20015
 9         BY: HAMISH HUME, ESQ.
10     QUINN, EMANUEL, URQUHART, OLIVER & HEDGES,
           LLP
11         Attorneys for the Creditors Committee
           865 S. Figueroa Street, 10th Floor
12         Los Angeles, California 90017
           BY: MATTHEW BUNTING, ESQ.
13             ERICA TAGGART, ESQ. (By Phone)
14     SIMPSON THACHER & BARTLETT LLP
           Attorneys for the Witness
15         425 Lexington Avenue
           New York, NY 10017-3954
16         BY: CHRISTOPHER J. LUCHT
17
18     HUGHES, HUBBARD & REED, LLP
           Attorneys for the SIPA Trustee
19         One Battery Park Plaza
           New York, NY 10004-1482
20         BY: WILLIAM R. MAGUIRE, ESQ.
21     Also Present:
22         PHILIP E. KRUSE, Alvarez & Marsal
23
24
25
```

## Page 3

```
 1         HIGHLY CONFIDENTIAL - PAOLO TONUCCI        3
 2
 3                     I N D E X
 4     PAOLO TONUCCI ... ... ... ... ... ... ...5
 5     DIRECT EXAMINATION BY MR. TAMBE: ... ... ... ... ...5
 6     CROSS-EXAMINATION BY MR. MAGUIRE: ... ... ... ... 177
 7                 INDEX OF EXHIBITS
 8     Exhibit 136A E-mail, Lowitt to Kelly ... ... ... ... ...28
 9     Exhibit 137A E-mail, Tonucci to "Accept ... ... ... ... ...64
           Barclays Offer"
10
11     Exhibit 138A BCI-EX-00077360-62 ... ... ... ... ...68
12     Exhibit 139A E-mail, Hraska to various ... ... ... ...72
13     Exhibit 140A E-mail, Azerad to various ... ... ... ...86
14     Exhibit 141A Bates 10331632-10320368 ... ... ... ... ...93
15     Exhibit 142A BCI-EX-00055047-59912 ... ... ... ... ... 101
16     Exhibit 143A E-mail, Tonucci to various ... ... ... ... 110
17     Exhibit 144A BCI 000580 ... ... ... ... ... ... ... 119
18     Exhibit 145A E-mail. Tonucci to various ... ... ... ... 123
19     Exhibit 146A E-mail, Azerad to various ... ... ... ... 128
20     Exhibit 147A E-mail, Azerad to various ... ... ... ... 130
21     Exhibit 148A E-mail, Reilly to various ... ... ... ... 137
22     Exhibit 149A BCI-EX-00077823-24 ... ... ... ... ... 143
23     Exhibit 150A E-mail. Tonucci to various ... ... ... ... 150
24     Exhibit 151A E-mail, Azerad to various ... ... ... ... 151
25     Exhibit 152A E-mail, Beldner to Kelly ... ... ... ... 154
       Exhibit 153A E-mail, Kelly to Beldner ... ... ... ... 155
```

## Page 4

```
 1         HIGHLY CONFIDENTIAL - PAOLO TONUCCI        4
 2
 3     Exhibit 154A E-mail. Beldner to Kelly ... ... ... ... 158
 4     Exhibit 155A E-mail. Veksler to various ... ... ... ... 159
 5     Exhibit 156A BCI-CG00055192-55669 ... ... ... ... ... 165
 6     Exhibit 157A E-mail. Tonucci to Aronow ... ... ... ... 169
 7     Exhibit 158A E-mail. Berland to various ... ... ... ... 171
 8     Exhibit 159A E-mail. Yu to various ... ... ... ... ... 173
 9     Exhibit 160A E-mail. Tonucci to O'Meara ... ... ... ... 175
10     Exhibit 161A E-mail. Fleming to Tonucci ... ... ... ... 177
11     Exhibit 162A E-mail. Tonucci to Lyons ... ... ... ... 179
12     Exhibit 163A E-mail. Tonucci to Fleming ... ... ... ... 182
13     Exhibit 164A E-mail. Tonucci to Azerad ... ... ... ... 192
14     Exhibit 165A E-mail. Hraska to Tonucci ... ... ... ... 194
15     Exhibit 166A E-mail. Tonucci to Blackwell ... ... ... ... 194
16     Exhibit 167A E-mail. Azerad to Tonucci ... ... ... ... 199
17     Exhibit 168A E-mail. Forrest to various ... ... ... ... 201
18     Exhibit 169A E-mail. Azerad to Tonucci ... ... ... ... 205
19     Exhibit 170A E-mail. Blackwell to various ... ... ... ... 207
20     Exhibit 171A E-mail. Tonucci to Murgio ... ... ... ... 208
21     Exhibit 172A E-mail. Tonucci to Lowitt ... ... ... ... 214
22     Exhibit 173A E-mail. Kelly to various ... ... ... ... 216
23
24
25
```

## Page 5

```
 1         HIGHLY CONFIDENTIAL - PAOLO TONUCCI        5
 2                   PAOLO TONUCCI
 3                 Having been sworn,
 4                 Testified as follows
 5         DIRECT EXAMINATION BY MR. TAMBE:
 6         MR. TAMBE : Morning, Mr. Tonucci. We
 7     met this morning. My name is Jay Tambe with Jones
 8     Day, representing the Lehman Brothers Holdings
 9     Estate. I will have counsel introduce themselves
10     to you and then we will get started.
11         MS CRAWFORD: Bridget Crawford from
12     Jones Day.
13         MR. MAGUIRE: Bill Maguire, Hughes,
14     Hubbard & Reed for the Trustee.
15         MR. BUNTING: Matthew Bunting, Quinn,
16     Emanuel, Urquhart, Oliver & Hedges for the
17     Creditors Committee and on the phone Erica
18     Taggart, also Quinn, Emanuel, Urquhart, Oliver &
19     Hedges.
20         MR. KRUSE: Phil Kruse with Alvarez &
21     Marsal on behalf of the LBHI Estate.
22         MR. LUCHT: Christopher Lucht, Simpson
23     Thacher & Bartlett, on behalf of the witness in
24     his individual capacity.
25         MR. HUME: Hamish Hume from Boies,
```

Page 6

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    6
2    Schiller & Flexner representing Barclays.
3        MR. TAMBE: Erica, can you hear us?
4        MS TAGGART: Yes, thank you.
5        MR. TAMBE: Morning, Mr. Tonucci. By
6    whom are you currently employed?
7        A.  Barclays.
8        Q.  In what capacity?
9        A.  I work in the treasury area.
10       Q.  What is your position?
11       A.  Head of group balance sheet.
12       Q.  And is that head of group balance sheet
13   for global operations?
14       A.  That is right, for global operations.
15       Q.  How long have you held that position?
16       A.  Since February of this year.
17       Q.  How long have you been employed by
18   Barclays?
19       A.  Since September, 26 September 2008.
20       Q.  What was your position at Barclays when
21   you first joined Barclays in September 2008?
22       A.  US treasurer for Barclays Capital.
23       Q.  If you could describe for us briefly
24   what your duties have been since you joined
25   Barclays, both as US treasurer and now as global

Page 7

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    7
2    treasurer?
3        A.  I am not the global treasurer.
4        Q.  Okay.
5        A.  Head of global balance sheet.  The US
6    treasurer role was focused on liquidity and
7    capital managemen for the US Barclays Capital
8    operations and the role with group treasury, the
9    global balance sheet role is responsible for
10   funding and hedging for the group's balance sheet
11   globally.
12       Q.  Before joining Barclays
13   in September 2008 you were employed by Lehman
14   Brothers, correct?
15       A.  That is correct.
16       Q.  And what Lehman Brothers entities were
17   you employed by?
18       A.  LBHI and LBI.
19       Q.  Collectively for the Lehman entities
20   when did you first begin working for the Lehman
21   entities?
22       A.  December 1996.
23       Q.  If you can give us a brief overview of
24   your career at Lehman, the positions you held, the
25   time periods that you held them for?

Page 8

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    8
2        A.  Yes.  I joined Lehman as head of or
3    manager for the fixed income derivatives product
4    control team from 96 to 98.
5        From 98 to 2000 I was manager of fixed income
6    liquid markets product control.
7        From 2000 to 2002 I was head of asset and
8    liability management for Europe within the treasury area.
9        From 2002 until 2005 I was head of assets and
10   liability management for the group globally in New York.
11   From 2005, or in 2005 I was international treasurer and then
12   also through 2005 to 2000 onwards I was global treasurer.
13       Q.  And in your capacity as global treasurer
14   for the Lehman entities, could you briefly
15   describe what your duties were?
16       A.  Responsible for funding liquidity and
17   capital management for the group.
18       Q.  And to whom did you directly report in
19   that capacity?
20       A.  To the CFO.
21       Q.  In the time period, say, in 2008, who
22   were your direct reports at Lehman?
23       A.  Most recenly in 2008, Robert Azerad,
24   Dan Fleming, Janet Birney.
25       Q.  The last name?

Page 9

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    9
2        A.  B-I-R-N-E-Y.  Julie Boyle, B-O-Y-L-E.
3    Jackie F-R-O-M-M-E-R and Kevin Thatcher.
4        Q.  Mr. Azerad, what was his position and
5    role at Lehman?
6        A.  He was responsible for liquidity
7    management.
8        Q.  And Mr. Fleming?
9        A.  For cash management.
10       Q.  And when you use the phrase "liquidity
11   management", what do you mean by that?
12       A.  I mean for the tracking, reporting, and
13   execution of liquidity oversight.
14       Q.  Does liquidity management include
15   arranging for repurchase agreements and other
16   forms of financing for the Lehman entities?
17       A.  Generally not.
18       Q.  Who within Lehman would have been
19   responsible for repurchase agreements and
20   liquidity, financing of that nature?
21       A.  Secured financing was managed within the
22   prime brokerage team and overseen by John Coghlan.
23       Q.  And John was not one of your direct
24   reports, is that correct?
25       A.  He was not, no.

## Page 10

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    10

2  Q. Was he in the line of reporting in your
3  department?
4  A. No, he was not, he was within the prime
5  brokerage business.
6  Q. I guess I am trying to understand this
7  better. Repurchase agreements and financing
8  secured by repurchase agreements is part of
9  liquidity of the firm, correct?
10  A. It is.
11  Q. And your responsibility included
12  liquidity management, correct?
13  A. It did.
14  Q. Could you describe for me how your role
15  and Mr. Coghlan's role were related to each other?
16  A. Certainly. Any activity that was
17  performed by the secured funding team would affect
18  our liquidity and would be a component of the
19  resulting liquidity. We would therefore work
20  closely with that team to understand their
21  activities but, you know, to collectively I guess
22  ensure that we were executing the right series of
23  transactions, but the actual activity was executed
24  entirely by John's team, and there was no
25  reporting line from John to me.

## Page 11

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    11

2  Q. As overseeing liquidity management at
3  Lehman, you were responsible for figuring out how
4  much cash Lehman needed on a daily basis just to
5  run operations, correct?
6  A. How much cash we needed, how much cash
7  we had.
8  Q. Once you figured out how much cash you
9  needed, how much cash you had, you would have to
10  tell the secured funding team how much cash they
11  needed to raise overnight, correct?
12  A. The execution of transactions was within
13  that team. We would within Dan Fleming's area
14  advise them of the broad requirements, because we
15  were tracking the cash in the cash accounts, and
16  had the most accurate within the group forecasts
17  of what the cash position was, so there was that
18  interaction.
19  Q. If I am —
20  A. But to be clear we were not directing
21  them to execute explicit transactions. We were
22  advising them of what the overall cash position
23  was and what we saw as the collateral position.
24  Q. So you told them what the needs were,
25  they figured out how to get the cash, right?

## Page 12

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    12

2  A. Yes.
3  Q. Was that the case during the week
4  of September 15 as well. Were those the roles
5  played by yourself and Mr. Coghlan during the week
6  of September 15, 2008?
7  A. In the week leading up to?
8  Q. No, the week of September 15, starting
9  Monday 15 September?
10  A. The position was quite different at that
11  point. We were certainly trying to -- we were
12  certainly trying to execute the same function,
13  meaning that we were trying to calculate and
14  advise what the cash position was and what the
15  financing requirements were. However, the access
16  to information and our ability to predict the
17  position was impaired by both difficulties with
18  the change in the group that had happened, because
19  obviously all of the intercompanies, the
20  intercompany activity was severely impaired or
21  completely ceased, and the difficulties with
22  getting information from clearers and from the
23  exchanges, but we were trying to perform that same
24  function of forecasting and advising what the cash
25  position was and the collateral position.

## Page 13

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    13

2  Q. And you, Mr. Tonucci, you were much more
3  hands-on involved in the mechanics of repurchase
4  agreements that week, correct?
5  A. I would not say so, actually. I don't
6  recall -- I don't recall anything other than
7  really the oversight of the sort of final
8  positions, the final trades that were booked. So
9  I wouldn't say that there was a -- I wouldn't say
10  that there was a significant change in my level of
11  involvement.
12  Q. We have a window into sort of your
13  involvement that week through e-mails and
14  testimony from other people. Would you say your
15  involvement with repos that week was similar to
16  your investment with repos in prior weeks and
17  months?
18  A. I would say probably a little bit more.
19  If you look at the volume of repos that week and
20  the volume of repo counterparties, there were very
21  few. There were repos with the Fed and with
22  Barclays and probably a couple of other
23  counterparties. So there were very few repos
24  being executed. So consequently I think, you
25  know, the level of oversight of those particular

Page 14

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          14

1  repos was greater than would typically have been
2  the case for a much larger set of repos.
3      Q.  And your personal involvement in those
4  particular repos was much greater than your
5  involvement had been on prior repos.  Is that
6  correct?
7      MR. HUME:  Object to the form of the
8  question and to the lack of foundation.  I think
9  if you have e-mails you should show him to
10  characterize what you are asking.
11     MR. TAMBE:  Do you have my question in
12  mind?
13     A.  I am not sure, this point about much
14  more involved, it is difficult for me to respond
15  to.  I would say that there was slightly more
16  involvement than there would have been in a normal
17  day's repo activity but I would not say that I was
18  much more involved, no.
19     Q.  Let's see what you were involved in
20  during that week broadly.  I am going to start in
21  this period beginning September 12, Friday
22  through September 22, the Monday.  Start at the
23  beginning, September 12, and just generally tell
24  me what your involvement was in the events of that

Page 15

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          15

1  weekend, in terms of possibly doing transactions
2  with buyers, the filing of the bankruptcy, your
3  role in the sale of assets to Barclays and finally
4  the closing of the transaction on September 22,
5  and we will take it in pieces but I want to get an
6  overview of your recollection of your involvement
7  during that ten day period.  Okay?
8      A.  Okay.
9      Q.  Let's start with the weekend before the
10  filing of the bankruptcy.  What were you involved
11  in starting on Friday, September 12?
12     A.  Friday was a trading day and so the
13  range of activity included overseeing our
14  financing position that day and our financing --
15  our liquidity forecasting, which I would
16  characterize as regular daily activity, regular
17  daily oversight.
18     There was due diligence, specifically
19  with Bank of America for much of that day, and
20  there was towards the end of the day discussion
21  with Barclays directly and with the due diligence
22  teams at one other potential buyer.
23     Q.  What other potential buyer?
24     A.  Nomura, but I didn't speak to them

Page 16

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          16

1  directly.
2      Q.  And I gather from your answer then you
3  were speaking directly with the due diligence
4  teams from Bank of America?
5      A.  Yes.
6      Q.  And you had direct discussions with
7  Barclays towards the end of the day on the 12th?
8      A.  Yes, in the capacity of due diligence,
9  not negotiations.
10     Q.  And when you mean in capacity of due
11  diligence you were providing information?
12     A.  That is right.
13     Q.  In terms of liquidity management on the
14  12th, were there any particular constraints on
15  Lehman or challenges for Lehman in terms of
16  managing its liquidity for operations on the 12th?
17     A.  Yes.
18     Q.  Can you describe what those constraints
19  were?
20     A.  There was a large cash request from
21  JP Morgan, which was for $5 billion in cash, and
22  that was a significant challenge.  There were
23  changes being made to secured funding haircuts and
24  collateral agreements and there were margin

Page 17

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          17

1  requests from a variety of clients.  So overall
2  I would characterize it as extremely busy and
3  complicated.
4      Q.  You used a phrase, "There were changes
5  in secured funding haircuts", is that right?  I
6  want to understand what you mean by "haircuts"?
7      A.  The difference between the market value
8  and the cash received is known as the haircut in
9  a secured funding arrangement, the market value of
10  the securities I should say.
11     Q.  So is it fair to say that the haircut
12  allows you to determine how much cash you can
13  borrow against a given market value of securities?
14     A.  That is correct.
15     Q.  And what were the changes in haircuts on
16  the 12th, generally?
17     A.  Generally, they were that the haircuts
18  were widening, but I don't have any specifics.  I
19  don't recall any specifics.
20     Q.  We go into the weekend of 13 and 14
21  September.  Describe for me what your duties were
22  that weekend?
23     describe for me what your duties were that weekend
24  and what you were doing that weekend?
25     A.  Due diligence continued.  Discussion

Page 18

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI    18
2 with the internal team on potential outcomes and
3 the management of potential purchases. Some
4 discussion with external lawyers acting for the
5 Board in terms of fairness opinions.
6      Q. Generally, when you are talking about
7 interactions you had with external counsel for
8 Lehman Brothers during that time period, you can
9 identify that you had those contacts but I would
10 urge you not to disclose the substance of your
11 conversations with external counsel for Lehman.
12 Understood?
13      A. Yes.
14      Q. I mean when my question is requesting an
15 answer of that type, just alert me if you think
16 you are going to have to tell me about
17 conversations with external counsel. Fair?
18      A. Yes.
19      Q. In terms of who the potential purchasers
20 being discussed were over the weekend
21 of September 13 and 14, you had BFA, correct?
22      A. Correct.
23      Q. Barclays was still a potential
24 purchaser?
25      A. Barclays was the most likely purchaser.

Page 19

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI    19
2      Q. Nomura, was that still a potential
3 purchaser?
4      A. Not that I was aware of.
5      Q. Other than those three were any other
6 potential purchasers discussed that weekend?
7      A. Not that I am aware of.
8      Q. When you say you had discussions with
9 the internal team, who was the internal team that
10 you were having discussions with?
11      A. Largely with Ian Lowitt but with other
12 members of Lehman's senior management.
13      Q. Do you recall any of the other members
14 of senior management that you had discussions with
15 that weekend?
16      A. Bart McDade, Tom Russo, Stephen
17 Berkenfeld, Alex Kirk.
18      Q. Any others?
19      A. I can't recall.
20      Q. When did you first learn that Lehman
21 Brothers Holdings Inc was contemplating
22 a bankruptcy filing?
23      A. I believe first contemplated on
24 Saturday.
25      Q. Were you asked to perform any tasks

Page 20

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI    20
2 specifically in connection with contemplated
3 filing of the bankruptcy?
4      A. Only one comes to mind, which was to
5 make a payment to Weil Gotshal.
6      Q. We go ahead with the bankruptcy filing
7 on September 15. Describe for me the kinds of
8 things you were doing on September 15. What was
9 your day like?
10      A. So the filing happened in the early
11 hours of the morning and there was great confusion
12 about the consequences of that, so much of the day
13 was spent fielding telephone calls from various
14 parts of the organization within Lehman, some from
15 external counterparties seeking clarification as
16 to the position, which entities may have filed and
17 the position of the remaining entities, and trying
18 to oversee the position and funding for LBI, the
19 US broker dealer.
20      Q. Describe for me what actions you took
21 and conversations you had in connection with the
22 funding for LBI, the US broker dealer on the 15th?
23      A. We had been instructed that the Fed
24 would be providing secured financing and that
25 other secured financing arrangements would be

Page 21

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI    21
2 maturing, so the discussion to the extent that
3 there was any was really just about executing that
4 transaction.
5      Q. When you say "that transaction", the Fed
6 transaction?
7      A. With the Fed, yes.
8      Q. Were you involved in executing the
9 transaction with the Fed?
10      A. Not executing it, no.
11      Q. Were you involved with negotiating the
12 transaction with the Fed?
13      A. No.
14      Q. What was your involvement with the Fed
15 transaction?
16      A. Only overseeing the collateral, the
17 collateral allocation and the cash received
18 afterwards.
19      Q. When you say "overseeing collateral
20 allocation", what was your role in overseeing?
21 What specifically did you do to oversee collateral
22 allocation on the Fed repo?
23      A. I reviewed the collateral that had been
24 allocated and the cash that had been received
25 against that collateral. My role was largely

Page 22

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    22
2    analytical and much of the liquidity oversight is
3    an analytical function. It is explaining the
4    changes in the liquidity position and explaining
5    the financing arrangements in the context of the
6    overall financial picture and balance sheet of the
7    entity. So I don't know -- my group did not book
8    the transactions or the allocations, but clearly
9    it was important to understand the substance of
10   the transaction and detail of the transaction that
11   was executed to get a clear picture of the
12   financial position of the entity.
13       Q.  Who booked the transaction?
14       A.  The secured funding area.
15       Q.  Mr. Coghlan's group?
16       A.  Yes.
17       Q.  Did you have conversations with
18   Mr. Coghlan about the Fed funding on the 15th?
19       A.  I don't recall.
20       Q.  You said you reviewed the collateral.
21   What were you reviewing the collateral allocated
22   for. Let me restate that. You stated earlier you
23   reviewed the collateral allocated. For what
24   purpose were you reviewing the collateral
25   allocated?

Page 23

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    23
2        A.  I have already explained that, to
3    understand the financial position of the entity.
4    It is obviously pertinent to the financial
5    position of the entity to understand the
6    collateral that has been transferred and the value
7    received for that.
8        Q.  So your review includes what specific
9    pieces of collateral that have been allocated, is
10   that right?
11       A.  That is right.
12       Q.  And you also did a review of what values
13   had been ascribed to that collateral?
14       A.  That is right.
15       Q.  Let's talk about the values ascribed to
16   the collateral allocated. Who determines the
17   values of the collateral, the market value of the
18   collateral that is being allocated for financing?
19       A.  The tri-party provider in the case of
20   a tri-party repo transaction.
21       Q.  And was the Fed funding a tri-party
22   funding?
23       A.  It was.
24       Q.  Who was the third party?
25       A.  JP Morgan and Chase.

Page 24

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    24
2        Q.  So would it be correct to say that
3    JP Morgan and Chase would determine the values for
4    the collateral allocated by Lehman for the Fed
5    funding on September 15, is that correct?
6        A.  Yes.
7        Q.  And the applicable haircuts would then
8    be applied to the JP Morgan valuation, is that
9    correct?
10       A.  That is correct.
11       Q.  Now, Lehman would have its own values
12   for the collateral that was allocated to this
13   funding, correct?
14       A.  That is correct.
15       Q.  Was part of your review to see how the
16   JP Morgan values differed from the Lehman values
17   for the same collateral?
18       A.  It was.
19       Q.  Do you recall generally if the JP Morgan
20   values were higher, lower or the same?
21       A.  I don't recall.
22       Q.  Do you recall there being any
23   significant discrepancy at any time with the
24   JP Morgan prices for the collateral during that
25   week, September 15?

Page 25

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    25
2        MR. HUME: Object to the form of the
3    question. Any time during the week?
4        MR. TAMBE: Yes.
5        A.  I don't recall.
6        Q.  Generally, as a matter of mechanics,
7    when the tri-party provider had done a valuation
8    of collateral and that valuation was significantly
9    lower than the Lehman valuation, that would affect
10   how much money you could borrow, correct?
11       A.  That is correct.
12       Q.  So you would probably disagree with the
13   valuation done by the third tri-party provider,
14   correct?
15       MR. HUME: Object to the form of the
16   question.
17       A.  No.
18       Q.  You had no ability to disagree?
19       A.  We had no ability to disagree, nor do we
20   have an ability to negotiate the haircuts provided
21   by the Fed or by other lenders.
22       Q.  I am not talking about the haircut, I am
23   talking about the market value of the collateral
24   before you apply the haircuts?
25       A.  We had no ability to object.

## Page 26

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          26

1
2  I certainly did not.
3      Q.  Do you recall what the term was of the
4  Fed funding that was put in place on 15 September?
5      A.  I believe it was overnight.
6      Q.  Moving to the 16th, was that facility
7  rolled over on the 16th?
8      A.  The majority of the facility was rolled
9  over.  Barclays provided some financing as well as
10  the amount of the facility with the Fed reduced.
11      Q.  Before we get to the 16th, on the 15th,
12  other than dealing with the Fed funding, were you
13  also involved in any discussions about a possible
14  acquisition of the North American assets by
15  Barclays?
16      A.  I was not, no.
17      Q.  Were you aware that Barclays had
18  returned to Lehman to engage Lehman in discussions
19  about that?
20      A.  I was aware, yes.
21      Q.  How did you become aware of that?
22      A.  I can't remember who advised me but
23  someone, one of the senior members of the firm had
24  advised me that that was the case.
25      Q.  On the 15th through the morning of the

## Page 27

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          27

1
2  16th were you involved in any negotiations with
3  Barclays about the purchase by Barclays of
4  Lehman's North American assets?
5      A.  I was not.
6      Q.  But you were aware those negotiations
7  were taking place, correct?
8      A.  I was.
9      Q.  Did you provide any due diligence
10  information in that time period?
11      A.  I don't believe so.
12      Q.  What was your understanding of what
13  transaction was being contemplated on the 15th
14  over into the 16th between Lehman and Barclays?
15      A.  I understood that it was the purchase of
16  the business and assets, some selection of assets
17  of the North American Lehman Brothers business.
18      Q.  And either on the 15th or 16th did you
19  have any understanding of what the economics of
20  that deal were?
21          MR. HUME:  Objection, lacks foundation.
22      A.  Not really.  I mean, I was aware of the
23  balance sheet that was being agreed at a very
24  summary level and, as I am sure you know, Martin
25  Kelly sent me a note advising me of some of the

## Page 28

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          28

1
2  details, so I had a very general sense of the
3  substance of the transaction, but to say that
4  I understood the economics would be, you know,
5  would not be accurate.
6      Q.  The Martin Kelly e-mail that you are
7  referring to, is that the one that talks about the
8  5 billion-dollar loss?
9      A.  That is right.
10      Q.  Let's take a look at that e-mail.  It is
11  136A.
12          (Exhibit 136A marked for identification)
13          MR. HUME:  Is that a new number?
14          MR. TAMBE:  Yes.
15          MR. HUME:  Has this document not been
16  made an exhibit yet?
17          MR. TAMBE:  I just do not know if it has
18  been.  Wherever possible we are trying to avoid
19  re-marking exhibits.  My guess is this one has
20  been.  We could not figure out what the number
21  was.
22          Mr. Tonucci, I have placed before you
23  a document marked Exhibit 136A.  Is that the
24  e-mail that you were referring to?
25      A.  That is correct.

## Page 29

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          29

1
2      Q.  That is an e-mail from Martin Kelly, you
3  are cc'd on that e-mail at the bottom.  Do you see
4  that?
5      A.  Yes.
6      Q.  There is a reference in there to a
7  "$5 billion all in economic loss versus our
8  marks".  Do you see that?
9      A.  I do.
10      Q.  What was your understanding of that
11  phrase?  What did that mean?
12      A.  I read that to mean that there would be
13  a discount to the marks at that time on the
14  assets.
15      Q.  And this notion of a discount on the
16  marks on the assets, was that a feature of the
17  transaction that ultimately persisted with the
18  transaction as it unfolded?
19          MR. HUME:  Objection, calls for
20  speculation and lacks foundation.
21      A.  Can you repeat?
22      Q.  Let me rephrase.  You understood the
23  5 billion dollars all in economic loss versus our
24  marks to be a reference to a discount off the
25  marks, correct?

Page 30

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    30

1
2  A. Yes.
3  Q. The deal that was ultimately done and
4  closed on September 22, that too included
5  a discount off of Lehman's marks, correct?
6  A. That is correct.
7  Q. Okay, and the amount of that discount
8  off of Lehman's marks was about $5 billion, is
9  that right?
10  MR. HUME: Objection, lacks foundation.
11  A. It is uncertain, because obviously there
12  were a lot of valuation movements and so
13  I couldn't say with certainty, but certainly what
14  I can say is versus the valuations that I recall
15  seeing from our analysis it was about that number.
16  Q. About $5 billion?
17  A. About $5 billion.
18  Q. Was it your understanding that about
19  a $5 billion discount was a negotiated amount of
20  discount?
21  MR. HUME: Objection, lacks foundation.
22  A. Only insofar as what I can read in this
23  e-mail.
24  Q. Here is what I am getting at. This
25  e-mail, 136A, is sent to you on

Page 31

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    31

1
2  early September 16, correct? The deal that is
3  contemplated on the 16th changes in many ways by
4  the 22nd, correct?
5  A. Yes.
6  Q. The amount of the discount in this
7  e-mail, the $5 billion you are telling me was
8  about the discount when all was said and done at
9  the end of the day, is that correct?
10  A. That is correct.
11  Q. Is it your understanding that the
12  $5 billion amount was the agreed upon discount for
13  the transaction?
14  MR. HUME: Objection, the witness has
15  said he did not participate in the negotiations
16  and so the question lacks foundation.
17  A. Only as I said from what I read here. I
18  didn't have any further discussions about the
19  discount that I can recall.
20  Q. Do you have an understanding of how the
21  discount was effected, how was the discount made
22  available to Barclays?
23  MR. HUME: Objection, vague and
24  ambiguous.
25  A. Do you want to reword that?

Page 32

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    32

1
2  Q. Do you have trouble with the question?
3  A. Not sure why you mean.
4  Q. How did Barclays get the
5  5 billion-dollar discount?
6  A. Right. I think what was contemplated in
7  the negotiation, and what was executed in terms of
8  the settlement probably differed slightly, you
9  know, and involved over the week the settlement of
10  the transaction, meaning the actual transfer of
11  securities and cash was through the repo
12  agreements, and essentially the termination of
13  those repo agreements.
14  Q. Was the discount given to Barclays by
15  defaulting on the repo?
16  MR. HUME: Objection. You are asking
17  the witness very general questions about
18  a complicated transaction without walking him
19  through any of the details of that transaction. I
20  think the line of questioning lacks foundation.
21  MR. TAMBE: You have an objection to
22  form, right, Hamish? So noted. Answer the
23  question, please.
24  MR. HUME: I think the line of
25  questioning is calling for speculation and lacks

Page 33

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    33

1
2  foundation.
3  MR. TAMBE: Do you remember my question?
4  Probably not. Do you want it read back?
5  A. Yes, please.
6  (Read back)
7  A. Yes, I would say that was the way in
8  which the transaction was settled, so that is
9  fair.
10  Q. Would it also be fair to say, therefore,
11  that the discount was embedded in the haircut on
12  the repo transaction?
13  MR. HUME: Objection, what discount?
14  MR. TAMBE: The 5 billion-dollar
15  discount.
16  MR. HUME: What 5 billion-dollar
17  discount? You have not established or laid any
18  record of foundation.
19  MR. TAMBE: Hamish, make objection to
20  form, move on. Don't make speaking objections.
21  MR. HUME: The objection is this is
22  a deliberately ambiguous and misleading line of
23  questioning.
24  MR. TAMBE: Do you have my question in
25  mind?

Page 34

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    34

1
2    A.  Could you repeat it please or read it
3    back.
4            (Read back)
5    A.  In a repo transaction there is haircut,
6    a difference between the market value and the cash
7    value received.  You could view that as
8    a discount.  I think in this case it is fair to
9    say that that was the settlement mechanics and
10   therefore the way that the difference between
11   market value and cash paid was accomplished.
12   There was in that sense a discount.
13   Q.  So I understand your last answer, there
14   was a 5 billion-dollar differential, roughly,
15   between the cash paid by Barclays and the market
16   value of the collateral they received, correct?
17   A.  That was when I looked at our analysis,
18   that was about the size of the number.
19   Q.  Let's go back to the week of the 16th.
20   You get the e-mail from Martin Kelly telling you
21   about at least an agreement in principle, correct?
22   A.  That is correct.
23   Q.  Let's move forward from there.  You have
24   got on the 16th a Fed funding facility in place,
25   correct.  Right?

Page 35

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    35

1
2    A.  That is correct.
3    Q.  And you have got a repo from Barclays as
4    well, correct?
5    A.  Yes.
6    Q.  And there was a pre-existing master
7    repurchase agreement with Barclays, correct?
8    A.  I believe so.
9    Q.  That was amended on Monday September 15?
10   A.  I believe so.
11   Q.  Were you involved in the amendment to
12   that?
13   A.  I was not.
14   Q.  Who was?
15   A.  I don't know.
16   Q.  Do you have an under standing of what
17   the terms were of the Barclays -- the amended
18   Barclays repurchase agreement?
19   A.  I don't really recall, no.
20   Q.  Am I right to believe that there are
21   haircut schedules associated with repo agreements?
22   A.  Correct.
23   Q.  There was such a haircut schedule in
24   connection with the Fed repo, correct?
25   A.  There was.

Page 36

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    36

1
2    Q.  And there was a haircut schedule on the
3    Barclays repo, correct?
4    A.  I believe so, yes.
5    Q.  Do you recall there being any
6    significant difference between the haircuts on the
7    Fed repo and the haircuts on the Barclays repo?
8        MR. HUME:  Objection.
9    A.  There were certainly differences, I
10   can't recall how significant.
11   Q.  Do you remember if there were particular
12   asset classes in which there were differences?
13   A.  I don't, no.
14   Q.  The Fed repo was an overnight repo,
15   right?
16   A.  Correct.
17   Q.  So it rolled over from the 15th to the
18   16th?
19   A.  Correct.
20   Q.  And rolled over again from the 16th to
21   the 17th?
22   A.  Not the same size, no.
23   Q.  Tell me briefly what the changes were,
24   if any, in the size of the Fed repo from Monday to
25   Tuesday to later in the week?

Page 37

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    37

1
2    A.  I can't recall the exact details.  I
3    recall that the Barclays repo on the -- again, I
4    am not certain about this but the Barclays repo on
5    the 16th, I believe, was for $5 billion.  On the
6    17th I believe it was for $8 billion and then on
7    the Thursday there was obviously a much bigger
8    transaction and so that changed the Fed repo,
9    which became zero.
10   Q.  Let's talk about that bigger transaction
11   on Thursday, okay.  Describe for me how the Fed
12   repo went to zero and what happened with the
13   Barclays repo on Thursday?
14   A.  It is difficult for me to talk about the
15   mechanics because I am not that close to the
16   operational mechanics of the repo being unwound,
17   but my understanding was that the repo unwound on
18   the Thursday morning, which would be typical in
19   a tri-party repo, that an overnight repo would
20   unwind, you would return the collateral and the
21   cash and the transactions would then settle with
22   that collateral that was released, and at the end
23   of the day a new financing transaction would be
24   settled.
25       In this instance there was complexity because

Page 38

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                38

1
2  JP Morgan was the tri-party agent for Lehman and had been
3  the tri-party agent in the transaction with the Fed. BONY
4  was the tri-party agent for Barclays and so there was a need
5  to transfer collateral from JP Morgan to Bank of New York
6  tri-party system, and I am not sure about the mechanics
7  involved in that transfer but it was clearly a more
8  complicated transaction than if the financing had just been
9  through the JP Morgan tri-party system.
10     Q. Is it your understanding that on
11  Thursday, in this bigger transaction on Thursday,
12  Barclays effectively replaced the Fed and the Fed
13  funding transaction?
14     A. I was not involved in the discussions
15  with Barclays or with the Fed on the removal or
16  replacement of the Fed in that transaction, so I
17  can't really talk to the specifics, but my
18  understanding was that the Fed transaction was
19  going to mature on the Thursday and they were not
20  really providing any financing subsequently.
21     Q. Wednesday night into Thursday, do you
22  recall the size of the Fed funding being
23  approximately $45 billion?
24     A. Yes, that sounds about right.
25     Q. And the Fed was holding approximately

Page 39

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                39

1
2  $50 billion in collateral against that financing?
3     A. That sounds right.
4     Q. And the big transaction that you
5  described on Thursday effectively had Barclays
6  coming in and putting in $45 billion to pay off
7  the Fed repo, correct?
8     A. I understood that they were going to be
9  putting in 45, that it was going to be
10  a 45 billion-dollar transaction, yes.
11     Q. And all the collateral that was being
12  held by the Fed was then going to be transferred
13  to Barclays, correct?
14        MR. HUME: Objection, asked and
15  answered. He has already explained.
16     A. To be honest, I was not close enough to
17  the actual transaction that was being booked to
18  know exactly where all the collateral was going to
19  end up, nor was I close enough to any agreements
20  with Barclays or with the Fed as to where all of
21  the collateral was going to end up.
22     Q. So effectively on Thursday the Fed
23  funding goes down to zero, correct?
24     A. That is correct.
25     Q. And they exit the financing picture at

Page 40

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                40

1
2  that point?
3     A. That is correct.
4     Q. And what you have left is the Barclays
5  repo, correct?
6     A. That is correct.
7     Q. Describe for me what happens with the
8  Barclays repo over the next few business dates?
9  We are now into Thursday on to Friday the 19th.
10        MR. HUME: Again, objection to the form
11  of the question and the lack of foundation.
12     A. That transaction happened on Thursday.
13  That was essentially the last of that transaction
14  in the way that I think about it. It was executed
15  on Thursday night and settled Thursday night into
16  Friday morning and that was the end of that
17  transaction. After that it was just a matter of
18  that transaction terminating and the collateral
19  being rebooked as a purchase by Barclays and as
20  a sale by Lehman.
21     Q. Do you recall if the Barclays repo was
22  terminated on Friday?
23     A. I don't.
24     Q. The legal documentation for the
25  Lehman/Barclays transaction, are you generally

Page 41

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                41

1
2  familiar with that documentation?
3     A. With parts of it.
4     Q. What do you understand the operative
5  legal documentation to be for that transaction?
6        MR. HUME: I am going to object again.
7  You are asking -- he said he is not a negotiator.
8  You have shown him their documents and you keep
9  asking him to speculate about the entire
10  transaction. I will counsel the witness not to
11  speculate.
12     A. I am not a lawyer but I believe that the
13  asset purchase agreement is the document that you
14  are referring to.
15     Q. Is that a document that you -- when is
16  the first time you saw the asset purchase
17  agreement?
18     A. Not until a long time after the
19  transaction closed.
20     Q. Is it fair to say during the week of the
21  15th to the 22nd you did not see the asset
22  purchase agreement?
23     A. I didn't, no.
24     Q. Did you see something called
25  a clarification letter?

Page 42

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          42

1    A. Not until long after the close.
2    Q. You know what I mean by "clarification
3    letter"?
4    A. I know what you mean when you say the
5    clarification letter in relation to this
6    transaction, yes.
7    Q. I am sorry, I cut you off. What is your
8    understanding of the clarification letter?
9        MR. HUME: Objection. Same objection.
10   You are asking someone who was not a negotiator,
11   who is not a lawyer to speculate as to the meaning
12   of these documents that you are not even showing
13   him.
14   A. Only that it was a clarification to the
15   purchase agreement.
16   Q. Do you know when it was negotiated?
17   A. I believe on the -- prior to closing on
18   the -- I don't remember. Actually, I don't know
19   when it was negotiated.
20   Q. Did anyone ever tell you why
21   a clarification letter was needed?
22   A. No.
23   Q. Did you review any drafts of
24   a clarification letter?
25

Page 43

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          43

1        MR. HUME: Objection, asked and
2    answered.
3    A. No.
4    Q. During the week of September 15, so from
5    the 15th through the 19th, were you aware of any
6    mark downs on the Lehman assets on Lehman's own
7    books?
8        MR. HUME: Objection, vague and
9    ambiguous.
10   A. There was a great deal of volatility in
11   prices over that week so I can't really sort of
12   answer whether there were any specific mark downs.
13   I was not part of the process of re-marking those
14   books or re-marking the assets, but there was
15   a great deal of price volatility and so I would
16   certainly expect that there would be asset price
17   movements and I would expect most of them to be
18   down.
19   Q. Were you aware of a general mark down
20   process in connection with Lehman's assets during
21   that week?
22   A. No.
23   Q. Going back to Thursday and the closing
24   out of the Fed facility, and then the Barclays
25

Page 44

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          44

1    repo, you said the Bank of New York was
2    a tri-party provider for the Barclays repo, is
3    that right?
4    A. That is right.
5    Q. So they would have played a similar role
6    to the role played by JP Morgan on the Fed
7    facility, correct?
8    A. That is correct.
9    Q. And therefore Bank of New York would
10   have had prepared valuations of the collateral
11   that was being posted on the Barclays repo,
12   correct?
13   A. Correct.
14   Q. And they did that, correct?
15   A. I believe so, yes.
16   Q. Are you familiar generally with the Bank
17   of New York valuations of the collateral posted by
18   Lehman?
19   A. Generally, yes.
20   Q. Are you aware of any discrepancies
21   between the Bank of New York valuations for the
22   collateral and Lehman valuations of that same
23   collateral?
24        MR. HUME: Objection to form, what
25

Page 45

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          45

1    collateral?
2    Q. The Barclays collateral.
3    A. There was certainly a very comprehensive
4    reconciliation required because of the number of
5    securities that were moving, and some of those
6    securities were quite complicated in terms of not
7    just the valuation but the actual amounts. These
8    are mortgage securities, mortgage pass throughs,
9    so there was a very big reconciliation required
10   and there were differences identified in the
11   details of the securities. There were differences
12   in the valuations and for certain there were
13   differences in the valuations.
14   Q. And this reconciliation process that you
15   just described, when did that take place?
16   A. I think the reconciliation that I
17   remember sort of in detail was after the closing.
18   I think we tried to do a reconciliation on the
19   Friday. When I say "we", it was within the
20   operations team, and certainly after the 22nd or
21   on the 22nd, and after there were more detailed
22   reconciliations produced.
23   Q. When you got to Barclays were you
24   involved in dealing with Barclays' accountants in
25

12  (Pages 42 to 45)

Page 46

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    46
2    accounting for the economics of the acquisition of
3    Lehman by Barclays?
4        A.  We were asked to contribute to the
5    initial balance sheet, the preparation of an
6    initial balance sheet, but I would say that my
7    involvement with the accountants was as an
8    information provider and was sporadic.  I was not
9    involved in -- after the initial balance sheet,
10   components of the initial balance sheet were
11   provided, our balance sheet commitment, I don't
12   think I did very much in terms of the accounting
13   for the transaction.
14       Q.  In addition to helping with the
15   preparation of the initial balance sheet, did you
16   play any role in reviewing the valuation of the
17   acquisition in connection with the year-end
18   results for Barclays?
19       A.  I saw the balance sheet, the acquisition
20   balance sheet a number of times, and as I say I
21   was peripherally involved.  The accounting for
22   this was quite complicated because of the
23   different entities that were involved, and so yes
24   I saw some details but the overall economics
25   I would say was not really clear to me.  I was not

Page 47

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    47
2    sort of involved at that level.
3        Q.  You are generally aware that Barclays
4    has reported a gain on the acquisition, correct?
5        A.  Yes.  I mean, I am aware of what was
6    publicly disclosed.  I have not seen the details
7    of the calculation of that.
8        Q.  What is your general understanding of
9    the magnitude of the gain reported by Barclays for
10   the year-end 2008 from the Lehman acquisition?
11       A.  That a gain on acquisition was reported
12   of over 2 billion pounds.
13       Q.  Over 2 billion pounds?
14       A.  Yes.
15       Q.  Is it your understanding that there may
16   well be additional gains from the acquisition that
17   have not yet been reported by Barclays?
18       MR. HUME:  Objection.
19       A.  I am not aware of that.
20       Q.  You don't know one way or the other?
21       A.  I don't.
22       Q.  Did you ever talk to anyone as to why
23   Barclays was getting a 5 billion-dollar discount
24   on this transaction?
25       A.  I don't think I did, no.

Page 48

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    48
2        Q.  You told us that you reviewed the asset
3    purchase agreement and the clarification letter at
4    some time after the closing of the transaction?
5        A.  No, I didn't say I reviewed them.
6    I said I was shown parts of the asset purchase
7    agreement and the clarification letter.
8        Q.  Even better.  Do you recall whether the
9    asset purchase agreement or the clarification
10   letter reflect a 5 billion-dollar discount?
11       MR. HUME:  Objection to the form of the
12   question.  What do you mean "reflect"?
13       Q.  Do you have my question in mind?
14       A.  Could you repeat it, please?
15       (Read back)
16       MR. HUME:  Again I am going to object to
17   the question since you have not shown him the
18   agreements, he is not a lawyer and he was not
19   a negotiator.
20       Q.  You were shown parts of the agreements,
21   right, that is what you said?
22       A.  I just don't know.
23       Q.  Let me ask you the question.  You were
24   shown parts of these agreements, the asset
25   purchase agreement and the clarification letter,

Page 49

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    49
2    right?
3        A.  Yes.
4        Q.  The parts that you were shown, did they
5    show a 5 billion-dollar discount?
6        MR. HUME:  Do you recall is the
7    question.
8        A.  I don't recall, no.
9        Q.  What parts of the agreement do you
10   recall being shown?
11       A.  I don't know.  I don't know.  I didn't
12   see the whole agreement so -- I don't think I saw
13   the whole agreement.  I saw components of it
14   related to the various schedules of assets that
15   were being transferred and to some of the other
16   assets that were included in the agreement.
17       Q.  Was there a particular task or event in
18   connection with which you were shown these pieces
19   or parts of the transaction documents?
20       A.  Yes, in the preparation I would say of
21   revisions to Schedule B to the agreement and in
22   the analysis of the 15c3 receivables.
23       Q.  And what role did you play in connection
24   with the revisions to Schedule B?
25       A.  Providing some analytical support to the

Page 50

1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        50
2    determination of available collateral.
3        Q.   Does that mean you determined what
4    collateral was available to be included in
5    Schedule B?
6        A.   No.
7        Q.   What do you mean by "analytical
8    support"?
9        A.   It means that I helped coordinate the
10   process of reviewing collateral that may be
11   available that was being extracted from various
12   systems that you would typically use, whether it
13   was the operations systems or some of the
14   databases which aggregate that information and
15   provide a different cut of analysis. So my work,
16   my involvement, was in reviewing that to ensure
17   that it was being appropriately queried and
18   analyzed and understood, validated.
19       Q.   Who else was involved in this process?
20       A.   The operations team were really the
21   experts in the operating systems and therefore in
22   understanding the availability of collateral.
23       Q.   Who was the operations team?
24       A.   Alastair --
25       Q.   Who was the operations team doing this?

Page 51

1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        51
2        A.   Alastair Blackwell manages that team.
3    I would say that Jim Hraska was the person most
4    involved.
5        Q.   And this event that you are describe,
6    the revisions to Schedule B, this is post-closing,
7    correct?
8        A.   That is correct.
9        Q.   And in the weeks immediately after the
10   closing of the transaction?
11       A.   Pre-closing there was an analysis
12   performed to determine the unencumbered
13   collateral, as I am sure you are aware, which was
14   the basis for the original Schedule B.  The
15   subsequent analysis I would say was to correct for
16   errors that may have been made in the initial
17   aggregation of information in the initial
18   analysis, and to reflect some of the breaks in the
19   different systems that were used, stock record
20   breaks for example.  That exercise continued
21   sporadically through the remaining three months of
22   2008.
23       Q.   Again, just talking about the revisions
24   to Schedule B, I want to talk about the
25   post-closing revisions to Schedule B.  The errors

Page 52

1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        52
2    you are talking about, is it errors about
3    identifying particular pieces of collateral? Is
4    that the nature?
5        A.   That is correct.
6        Q.   When you said "stock record breaks",
7    what do you mean by "stock record breaks"?
8        A.   These are breaks between the internal
9    accounting records and the external depository
10   statements.
11       Q.   In terms of ownership of particular
12   securities, is that what you mean?
13       A.   In terms of possession.
14       Q.   Did these revisions to Schedule B that
15   took place post-close affect the value of the
16   collateral that was listed on Schedule B, the
17   total value?
18       MR. HUME:  Objection. The revisions to
19   Schedule B are being referred to -- I believe the
20   record is unclear whether you mean revisions to
21   the schedule filed a week after the closing or any
22   subsequent work after that.  For the line of
23   questioning to be clear that needs to be made
24   clear in the questions.
25       MR. TAMBE:  I am talking about the

Page 53

1        HIGHLY CONFIDENTIAL - PAOLO TONUCCI        53
2    revisions to Schedule B that you talked about,
3    Mr. Tonucci.
4        MR. HUME:  There have been a number of
5    answers that he has provided so I still think the
6    question is unclear.
7        MR. TAMBE:  So the revisions to Schedule
8    B that you were talking about, did those revisions
9    affect the total value of the Schedule B?
10       A.   I am referring to the revisions that
11   happened in the period after the initial filing of
12   Schedule B and I am not sure when and if the --
13   you know, when and if revisions were actually
14   lodged with the court.  I am not a lawyer and I am
15   not sure what the legal process was but certainly
16   the internal calculations of unencumbered
17   collateral is what I am referring to as the
18   revisions to Schedule B that happened essentially
19   after the initial filing of Schedule B in
20   late September, and those revisions changed the
21   collateral detail significantly.  So the values
22   clearly changed along with the composition of the
23   assets.
24       Q.   Did they change up, increasing value, or
25   did they change down?

Page 54

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI        54
2        A.  I believe they changed in both
3    directions.
4        Q.  As an aggregate?
5        A.  I don't know.
6        Q.  Do you have an understanding as to the
7    origination of Schedule B?
8        A.  I do.
9        Q.  What is your understanding about the
10   origination of Schedule B?
11       A.  The origination of Schedule B was to
12   list the unencumbered collateral that was to be
13   included within the sale and purchase agreement.
14       Q.  So this was unencumbered collateral
15   other than the collateral that had already been
16   posted to Barclays under the Barclays repo,
17   correct?
18       A.  That is correct.
19       Q.  And is it your recollection that the
20   origination of Schedule B goes back to Friday,
21   19 September?
22           MR. HUME:  Objection, lacks foundation.
23       A.  That is correct.
24       Q.  And do you recall there being an effort
25   on September 19 to find additional collateral for

Page 55

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI        55
2    Barclays?
3        A.  I do.
4        Q.  What can you tell us about the efforts
5    to find additional collateral for Barclays?
6        A.  That we were asked on the morning of the
7    19th to find if there was additional collateral to
8    include in the transaction.
9        Q.  Asked by whom?
10       A.  I believe I was asked by Ian Lowitt.
11       Q.  Did Ian Lowitt tell you why he was
12   asking you to find additional collateral?
13       A.  He said that it was necessary for the
14   transaction to close and he reiterated that
15   through the day.
16       Q.  In addition to Schedule B, were there
17   other collections of assets that were put together
18   to provide additional collateral to Barclays?
19       A.  There were receivables in the form of
20   the 15c3 reserve, which were reviewed, and through
21   the course of the Friday there were other
22   receivables that were also reviewed to determine
23   if they could be included as assets or collateral
24   in the sales agreement.
25       Q.  What other receivables?

Page 56

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI        56
2        A.  We reviewed derivative receivables and
3    margin balances, FX receivables, that is foreign
4    exchange.  I should add actually we also reviewed
5    some bank receivables, because there had been cash
6    posted with some of the clearing banks, so that
7    was also reviewed.
8        Q.  Safe to say you looked in every corner
9    for assets and receivables that you could deliver
10   to Barclays?
11           MR. HUME:  Objection, vague and
12   ambiguous.
13       A.  We reviewed the balance sheet to see
14   where there might be additional assets.
15       Q.  You looked everywhere, right?
16       A.  We looked across the whole balance
17   sheet.
18       Q.  And this was a directive from Mr. Lowitt
19   to find these assets, correct?
20       A.  That is correct.
21       Q.  And you found a bunch of unencumbered
22   assets and put them in Schedule B?
23       A.  That is correct.
24       Q.  And then you found these 15c3
25   receivables, is that right?

Page 57

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI        57
2        A.  I would say we identified the 15c3
3    receivables as an asset that could be transferred.
4        Q.  Who is the "we" who identified those
5    receivables?
6        A.  It was again overseen by Ian but it was
7    myself, Martin Kelly, Robert Azerad.
8        Q.  What was approximately the value of the
9    15c3 receivables that you identified?
10       A.  There was uncertainty, a great deal of
11   uncertainty about the excess, but there was
12   certainty about the actual deposits that had been
13   made for 15c3, which included a cash deposit with
14   Wells Fargo for a billion dollars and securities
15   which in the calculation had been valued at, I
16   believe, $769 million.
17       Q.  And so that is about what, $1.7 billion
18   total?
19       A.  That is correct.  There may have been
20   other balances.  I think that there were other
21   securities balances also that were on deposit but
22   I recall specifically those two.
23       Q.  On the Friday the 19th, is it your
24   recollection that the 15c3 receivables were
25   identified as assets or receivables that in fact

Page 58

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    58

1
2  could be transferred to Barclays?
3      MR. HUME: Objection to the lack of
4  foundation.
5      A. That is correct, that is my
6  understanding.
7      Q. From your earlier answer it seems that
8  there were receivables that you identified that
9  maybe you concluded could not be transferred to
10  Barclays, is that fair?
11      A. That is correct.
12      Q. The 15c3's could be transferred to
13  Barclays, right?
14      MR. HUME: Objection to the vagueness of
15  the question. What do you mean by "could"?
16      A. I mean, I would try and clarify this --
17      Q. Sure.
18      A. The thinking was that there was
19  a surplus, that calculation that although it
20  was uncertain as to both the amount of the surplus
21  and the requirement, these represented assets
22  which were transferable and, you know,
23  identifiable and transferable. I would say that
24  the distinction with some of the other receivables
25  was that it was much more difficult, given our

Page 59

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    59

1
2  information, our sort of accounting position at
3  that time, our transactional detail at that time,
4  it was much more difficult to identify specific
5  receivables that could have been transferred. So
6  it was more a matter of that these were much more
7  easily identifiable, but yes, we did believe that
8  they were transferable, or would become
9  transferable. It was always understood that there
10  was a regulatory approval that would be required
11  but that they would become transferable.
12      Q. Did you have any discussions with
13  Mr. Lowitt as to whether transferring those
14  receivables was part of the deal with Barclays?
15      MR. HUME: Objection, what receivables?
16      Q. The 15c3 receivables?
17      A. I do recall talking to him about that,
18  yes.
19      Q. What did he tell you?
20      A. We were looking for potential other
21  assets and so we were going to include this in the
22  agreement.
23      Q. Do you know one way or the other whether
24  the 15c3 receivables were part of the asset
25  purchase agreement?

Page 60

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    60

1
2      A. I can't recall if they were part of the
3  asset purchase agreement or some clarification
4  letter.
5      Q. The parts of the asset purchase
6  agreement or the clarification letter that were
7  shown to you, do you recall whether they had any
8  reference to the 15c3 assets?
9      A. I don't recall. I don't recall which.
10  I do recall that there was in one or other of
11  those documents a reference to that, to those
12  assets.
13      Q. The other receivables you mentioned, the
14  derivatives receivables, could you describe what
15  you mean by derivative receivables?
16      A. Yes. Particularly for LBI there were
17  substantial margins posted at the exchanges, which
18  were accounted for, essentially accounted for as
19  receivables, and those are what I refer to as
20  derivative receivables.
21      Q. Would an example of derivative
22  receivables be these types of receivables that
23  were posted with the OCC?
24      MR. HUME: Objection to the form of the
25  question. These type? Which type of receivables?

Page 61

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    61

1
2      Q. Derivative receivables?
3      A. I would say that would be consistent
4  with my understanding.
5      Q. And the OCC is the Options Clearing
6  Corp?
7      A. That is correct.
8      Q. Do you recall in the bits and pieces of
9  the asset purchase agreement, the APA and the
10  clarification letter that was shown to you whether
11  those documents provided for derivatives
12  receivables to be transferred to Barclays?
13      MR. HUME: Objection. You are asking
14  this witness to give an opinion on a legal
15  document that you have not shown him. He is not
16  a lawyer and he said he was not a negotiator of
17  the deal.
18      MR. TAMBE: You have an objection to
19  foundation and form.
20      MR. HUME: I am not just objecting to
21  foundation. It is an inappropriate, misleading
22  question.
23      MR. TAMBE: Don't make speaking
24  objections. Object to form, move on, we will get
25  through this faster.

Page 62

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          62

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI          62
2        MR. HUME: It is not just an objection
3  to form.
4        MR. TAMBE: Are you instructing him not
5  to answer?
6        MR. HUME: I am objecting to
7  a misleading line of questioning.
8        MR. TAMBE: Thank you.
9        Mr. Tonucci, do you have my question in
10 mind?
11       (Read back)
12    A. I don't recall.
13    Q. Another type of receivable you described
14 before were FX receivables?
15    A. Um huh.
16    Q. Did you identify any foreign exchange
17 receivables that could be transferred to Barclays?
18    A. There was a receivable balance for
19 forward settling foreign exchange on the LBI
20 balance sheet.
21    Q. And the determination was that those
22 receivables could be transferred to Barclays, is
23 that right?
24       MR. HUME: Objection to the form,
25 objection to the vagueness of the word --

Page 63

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          63

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI          63
2     A. There was insufficient detail to be able
3  to confirm that, that that still existed at that
4  point in time.
5     Q. At some subsequent point in time was
6  a determination made as to those FX receivables?
7     A. I don't know.
8     Q. Another category of receivables you
9  identified were bank receivables?
10    A. Yes.
11    Q. Again, the same series of questions on
12 the bank receivables; was a determination made on
13 the 19th that those were transferable to Barclays?
14    A. On the 19th there was a determination
15 made that it was too complicated and too uncertain
16 to be able to say whether those were transferable.
17    Q. And on some subsequent date after the
18 19th was a determination made as to whether those
19 could be transferred?
20    A. I don't know.
21    Q. You were in New York during this week,
22 correct?
23    A. That is correct.
24    Q. Do you recall accepting your offer of
25 employment at Barclays?

Page 64

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          64

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI          64
2     A. I do.
3     Q. When did you do that?
4     A. I believe it was 26 September.
5     Q. You sent an e-mail on the morning of the
6  22nd accepting your offer, right?
7        MR. HUME: Objection, lacks foundation.
8     A. I can't remember.
9     Q. Do you recall about an hour after the
10 ink dried on the clarification letter you sent an
11 e-mail?
12       MR. HUME: Objection to form.
13    A. I don't remember.
14    Q. Let me show it to you.
15       (Exhibit 137A marked for identification)
16       I have handed you a one page document
17 marked Exhibit 137A. Do you have that before you?
18    A. I do.
19    Q. Do you recognize this as an e-mail that
20 you sent to an e-mail box called "Accept Barclays
21 offer at Lehman.com"?
22    A. Yes.
23    Q. And the subject simply says: "I accept".
24 Correct?
25    A. Yes.

Page 65

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          65

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI          65
2     Q. You were accepting an offer of
3  employment for Barclays, right?
4     A. Yes.
5     Q. What offer were you accepting on
6  Monday September 22 at 1:04 pm GMT?
7     A. I can't recall the details at that point
8  but I believe that the offers went out over the
9  weekend, but I don't recall the exact details of
10 it at that point. I recall the hard copy in more
11 detail. I am not too sure when that was sent out.
12    Q. If I understand your answer, at some
13 point over the weekend of the 20th/21st you
14 received a soft copy of the offer?
15    A. Yes.
16    Q. And at some point during the week of the
17 22nd you actually signed a hard copy?
18    A. That is correct.
19    Q. But you knew before the 20th that you
20 would be offered employment by Barclays, correct?
21       MR. HUME: Objection.
22    A. I knew on the evening of the 19th that
23 I would receive an offer from Barclays.
24    Q. Had you had any discussions with anyone
25 prior to September 19 about receiving an offer

## Page 66

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    66

1
2    from Barclays?
3        A.  No.
4        Q.  What was the communication you received
5    on the evening of September 19 about an offer from
6    Barclays?
7        A.  After the Lehman and the Barclays and
8    the other teams had gone to the bankruptcy court,
9    after the day's work had been completed and I was
10    going to head home, and I had been up all night so
11    I was exhausted, and so I am not too sure, I am
12    not too sure of the exact time, before departing
13    for the day Ian Lowitt advised me that I would
14    receive an offer, and he gave me the general terms
15    that I would likely be offered.
16        Q.  When you say "the general terms", the
17    general economic terms of the offer?
18        A.  The general economic terms, but I was
19    not sure of the position at that point.
20        Q.  Prior to that September 19, had you had
21    discussions with Ian about what your future held
22    for you?
23        A.  No.
24        Q.  No discussions?
25        A.  No.

## Page 67

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    67

1
2        Q.  Did you try to get any assurance from
3    him or anyone else about whether there was a place
4    for you at Barclays?
5        A.  No.
6        Q.  You knew he would be heading to
7    Barclays, right?
8        A.  I didn't, no.
9        Q.  Did you know whether any of the folks
10    that you were working with at Lehman that week
11    were going to be headed to Barclays?
12        A.  I expected that there would be some that
13    were heading to Barclays but I was not sure of
14    exactly whom.
15        Q.  Barclays was buying the North American
16    operations, correct?
17        A.  Correct.
18        Q.  And they needed people to run those
19    operations?
20        A.  Correct.
21        Q.  So your expectation was that some
22    significant number of Lehman folks would in fact
23    get offers from Barclays?
24        A.  That is correct.
25        Q.  And you certainly hoped to be included

## Page 68

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    68

1
2    in that group?
3        A.  Yes, I think it is fair to say I hoped
4    to be included.
5        Q.  Your compensation at Lehman for the
6    calendar year 2007, the full calendar year, could
7    you briefly describe what your total Lehman
8    compensation was?
9        A.  I was on an ex-pat arrangement, so I
10    will leave that aside.  The basic components of
11    compensation, total compensation of $2 million.
12        Q.  And was that broken out into cash and
13    non-cash?
14        A.  Yes.  Salary was around -- I think it
15    was $250,000.  The cash was around, I would say
16    around a million dollars total cash, cash bonus
17    and then stock was the remainder.
18        Q.  And the stock component that you
19    received, your 2007 compensation, that was
20    immediately vested stock?
21        A.  No, that vested in the regular schedule,
22    which is 5 years for Lehman.
23        (Exhibit 138A marked for identification)
24        Q.  Sir, I have placed before you a 3-page
25    document marked exhibit 138A.  Is that a copy of

## Page 69

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    69

1
2    the offer of employment you received from Barclays
3    Capital over the weekend of September 20/21?
4        A.  Yes.
5        Q.  It carries a date of September 22 on the
6    first page, right?
7        A.  Correct.
8        Q.  And that is your signature on the last
9    page?
10        A.  That is correct.
11        Q.  Looking at the first page of
12    Exhibit 138A, the economic terms of your
13    employment are as set forth up there, correct?
14        A.  That is correct.
15        Q.  You have a compensation of 268,336 per
16    annum?
17        A.  That is right.
18        Q.  There is a guaranteed cash bonus for
19    2008, do you see that?
20        A.  I do.
21        Q.  That is in the amount of 1.185 million?
22        A.  Correct.
23        MR. HUME:  Sorry, I am unsure.  We are
24    going to designate obviously any portion of the
25    transcript that relates to compensation highly

Page 70

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    70

1  confidential. Is it understood we can do that
2  after the deposition?
3      MR. TAMBE: Yes, and I think the
4  agreement that was reached at the Felder
5  deposition we assume carries for all depositions.
6      MR. HUME: For all designations we can
7  do it later rather than during.
8      MR. TAMBE: You can do it later. Let's
9  just follow the Felder rule. I think it was that
10  we were going to treat the entire transcript as
11  highly confidential.
12      MR. MAGUIRE: Treating the entire
13  transcript as highly confidential for a week and
14  make the designations within the week.
15      MR. TAMBE: Going back to the
16  guaranteed cash bonus of 1.185 million, did you
17  receive that in February 2009?
18      A. I am not sure if it was February
19  or March but it was received in 2009.
20      Q. And was that the amount of the cash
21  bonus you received in February or March 2009?
22      A. That is correct.
23      Q. Did you also receive the next item, the
24  2008 EPP recommendation. Do you see that?

Page 71

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    71

1      A. I do.
2      Q. And did you?
3      A. I did.
4      Q. Was it roughly that amount?
5      A. Yes.
6      Q. The next category, "special cash award",
7  do you see that?
8      A. Yes.
9      Q. That is a special cash award of 700,000,
10  do you see that?
11      A. That is right, yes.
12      Q. Do you have an understanding as to why
13  you were receiving a special cash award?
14      A. I assumed that it was -- I assumed that
15  it was being awarded to a group of senior
16  employees that Barclays felt were going to be of
17  future value to the organization.
18      Q. Have you received any portion of the
19  special cash award as of today?
20      A. No.
21      Q. You had a change in position you said
22  early on in February or March 09?
23      A. That is right.
24      Q. Has your compensation increased as

Page 72

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    72

1  a result of that change in position?
2      A. My basic salary I would say is
3  consistent and I am not sure of my bonus.
4      Q. Do you have any guaranteed cash bonus
5  component in your new position?
6      A. No.
7      Q. Do you have any guaranteed EPP?
8      A. No.
9      Q. Any special cash awards?
10      A. No.
11      (Exhibit 139A marked for identification).
12      Q. I have placed before you a 2-page
13  document marked Exhibit 139A. Let me know when
14  you have had a chance to review it.
15      A. I have reviewed it, yes.
16      Q. A couple of questions about some of the
17  names that appear on this e-mail chain. Some you
18  have mentioned this morning but a couple of others
19  I want to ask you about. David Aronow, what
20  position did Mr. Aronow have?
21      A. He is within the operations team.
22      Q. At Lehman.
23      A. At Lehman.
24      Q. And he made the move to Barclays as

Page 73

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    73

1  well?
2      A. Yes.
3      Q. John Palchynsky, what position did he
4  have at Lehman?
5      A. He was in the operations team.
6      Q. Did he make the move to Barclays?
7      A. Yes.
8      Q. John Feraca. Was he in the operations
9  team at Lehman as well?
10      A. He was in the prime services team.
11      Q. Did he make the move to Barclays?
12      A. Yes.
13      Q. Monty Forrest, what was his position at
14  Lehman?
15      A. He was in the prime services team.
16      Q. Did he make the move to Barclays?
17      A. He did.
18      Q. Neil Ullman, what was his position at
19  Lehman?
20      A. He was in the operations team.
21      Q. Did he make the move to Barclays?
22      A. He did.
23      Q. Dan Fleming, you have mentioned before.
24  Did he make the move to Barclays?

Page 74

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    74

2  A. He did.
3  Q. Just a question about the e-mail address
4  for Mr. Fleming. It has in parentheses "TSY"
5  after it. Do you see that?
6  A. Yes.
7  Q. Any understanding what that means?
8  A. Treasury.
9  Q. And that was a designation used within
10 Lehman?
11  A. I don't know. I think that the TSY
12 designation is used where there may be more than
13 one person, just to identify which one it is.
14  Q. Craig Jones, what was his position
15 within Lehman?
16  A. He was in treasury.
17  Q. Did he make it over to Barclays?
18  A. He did.
19  Q. Look at the top half of Exhibit 139A.
20 There is a message there from Mr. Palchynsky to
21 several people, including you. Do you see that?
22  A. I do.
23  Q. He says in there: "Anyway, see you all
24 at BarCap". Do you see that?
25  A. I do.

Page 75

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    75

2  Q. There is an e-mail dated September 19,
3  2008. Do you see that?
4  A. I do.
5  Q. Around 6:28 pm, right?
6  A. Yes.
7  Q. So was this the first that you had heard
8  about your employment at Barclays?
9  A. I believe that I had heard perhaps an
10 hour before that.
11  Q. Was this the first that you had heard
12 that all these other people were also going to be
13 going to Barclays?
14  A. This is a relatively junior person in an
15 operations area, who could have been speculating.
16 It was not clear to me that all of these people
17 were going to be moving over.
18  Q. This chain of e-mails has a subject line
19 that says: "Urgent, tri unwind". Do you see that?
20  A. I do.
21  Q. And what was the "Urgent tri unwind"
22 about, if you recall?
23  A. It was to do with the cash balance that
24 was placed with JP Morgan on the night by Barclays
25 on the night of the 18th, and was part of the

Page 76

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    76

2  tri-party arrangement, and it was being unwound.
3  Q. And the collection of people on these
4  e-mails were involved in assisting with that
5  unwind?
6  A. They were involved in the repo
7  operations.
8  Q. So they would have dealt with that
9  unwind and other aspects of the repo?
10  A. Yes.
11  MR. TAMBE: Thank you. We will take
12 a short break now.
13  (Break from 8:55 to 9:14 am.).
14  Q. I am showing you a document previously
15 marked as Exhibit 19. Have you seen this document
16 before today, sir?
17  A. I have.
18  Q. What do you understand it to be?
19  MR. HUME: Objection to the form.
20  A. It was the balance sheet that was I
21 believe, you know, part of the negotiation for the
22 sale to Barclays, so the estimated balance sheet.
23  Q. And the estimated balance sheet for what
24 entity?
25  A. For the part of LBI that was being sold.

Page 77

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    77

2  Q. Do you recall if this is a document that
3  you saw during that week, the week
4  of September 15, 2008?
5  A. Yes, I believe I saw it on the 16th.
6  Q. Do you know in connection with what
7  event or action did you see this document?
8  A. In relation to the Barclays contemplated
9  purchase.
10  Q. Who showed it to you?
11  A. I think it was Ian Lowitt.
12  Q. Did you play any role in the preparation
13 of this document, Exhibit 19?
14  A. I did not.
15  Q. We had earlier talked about the
16 $5 billion discount. Do you know if the
17 $5 billion discount was reflected in this
18 document, Exhibit 19?
19  MR. HUME: Objection, lacks foundation.
20  A. I do not know.
21  Q. If you look under the "liabilities"
22 column, last two entries above the total are
23 titled "Cure PMT" and "Comp". Do you see that?
24  A. I do.
25  Q. And there is a total of about four and

Page 78

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                78

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI      78
2    a quarter billion dollars, do you see that?
3        A.  I do.
4        Q.  Did you have any understanding during
5    the week of the 15th as to what those items were?
6        A.  No, not really.
7        Q.  Do you have any understanding today
8    about what those items were?
9        A.  I can read that the compensation number
10    is compensation and I am not sure about the cure
11    payment.
12        Q.  At any time from September 15th to the
13    present have you had discussions with anyone,
14    other than counsel, about the cure payment and
15    comp liabilities assumed by Barclays?
16        A.  No, I have not.
17        Q.  Going up to the assets side of this
18    balance sheet, there is a sub-total of
19    $62.7 billion for assets.  Do you see that?
20        A.  I do.
21        Q.  Was that your understanding of the
22    assets available to LBI on or about September 15
23    or September 16 of 2008?
24        MR. HUME:  Objection, lacks foundation.
25    Are you asking his understanding at that time or

Page 79

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                79

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI      79
2    the assets at that time?
3        Q.  His understanding of assets at that
4    time?
5        A.  I would have expected the assets to be
6    of that order.
7        Q.  And that is something you would have
8    tracked in connection with your liquidity
9    management function, correct?
10        A.  Not in this form.  This is sort of an
11    accounting representation, and so it was not so
12    relevant to funding, which is slightly different,
13    a different way of viewing the balance sheet.
14        Q.  But you would want to know what the
15    aggregate amount of Government and agency paper
16    that Lehman had?
17        A.  Yes.
18        Q.  Because that is what you would be
19    pledging as collateral against —
20        A.  That is right.
21        Q.  You would care about what commercial
22    paper you had?
23        A.  That is right.
24        Q.  For the same reasons?
25        A.  That is right.

Page 80

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                80

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI      80
2        Q.  The derivatives item on this Exhibit 19,
3    do you have an understanding as to what that was
4    comprised of?
5        A.  I mean, the derivative balance is on
6    both sides, the assets and the liabilities, and I
7    am not sure exactly what went into either of
8    those.
9        Q.  You had talked earlier about being
10    involved in preparing an opening balance sheet for
11    Barclays.  Do you recall that?
12        A.  I do.
13        Q.  Did you use Exhibit 19 or a document
14    like Exhibit 19 as a starting point for that work
15    that you did?
16        MR. HUME:  Objection to the form.
17        A.  No, I did not.
18        Q.  What process did you follow in preparing
19    the opening balance sheet?
20        A.  In reconstructing the balance sheet we
21    used the transactions which we understood to have
22    settled in the process of settling.
23        Q.  And by "the transactions" you mean the
24    transactions pursuant to the asset purchase
25    agreement, the clarification letter?

Page 81

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                81

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI      81
2        A.  That is right.
3        Q.  I have had placed before you a document
4    or I have placed before you a document marked
5    Exhibit 60B.  Take a moment to look at those
6    2 pages, let me know when you are done.
7        A.  Yes.
8        Q.  Are you familiar with that document?
9        A.  No.  It is the first time I have seen
10    it.
11        Q.  Take a moment to read the cover e-mail
12    and the spreadsheet that is attached and I am
13    going to ask you a couple of questions about the
14    information that is contained in that document,
15    and let me know when you are done.
16        A.  Okay.
17        Q.  Turning to the attachment to the cover
18    e-mail, do you have a general understanding of the
19    nature of the information that is contained on
20    that spreadsheet that is the second page of
21    Exhibit 60B?
22        A.  Yes, a general understanding.
23        MR. HUME:  May I just ask, the e-mail
24    says it is September 18, 2008.  The attachment is
25    dated March 27, 2009.

## Page 82

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    82 |
| 2 | MR. TAMBE: I think the attachment is |
| 3 | a native format document so when you print it out |
| 4 | it prints out the date on which it was printed |
| 5 | out. That is just my guess. |
| 6 | MR. HUME: This is not Bates numbered. |
| 7 | MR. TAMBE: No, it is not. |
| 8 | MR. HUME: So I am objecting to the form |
| 9 | of the exhibit. |
| 10 | MR. TAMBE: Okay. |
| 11 | MR. HUME: And I am reserving all rights |
| 12 | to object to the authenticity of the exhibit. |
| 13 | MR. TAMBE: Do you have my question in |
| 14 | mind? Probably not. |
| 15 | A. I don't. |
| 16 | Q. We will have it read back. |
| 17 | (Previous Question and Answer Read back) |
| 18 | Looking down this attachment to Exhibit 60B and |
| 19 | the left-hand side under the heading "Program", there is |
| 20 | a series of entries with the title "TSLF". Do you see that? |
| 21 | A. I do. |
| 22 | Q. Do you recognize that as a Fed funding |
| 23 | program? |
| 24 | A. I do. |
| 25 | Q. And that the term security is lending |

## Page 83

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    83 |
| 2 | facility? |
| 3 | A. That is correct. |
| 4 | Q. There is a total associated with that, |
| 5 | do you see that? |
| 6 | A. I do. |
| 7 | Q. The next item is "PDCF", and that is the |
| 8 | prime dealer credit facility, is that right? |
| 9 | A. Primary dealers credit facility. |
| 10 | Q. Primary dealers, and the next item is |
| 11 | OMO, and that is open market operations? |
| 12 | A. That is correct. |
| 13 | Q. And all three of these items, TSLF, PDCF |
| 14 | and OMO are Fed funding facilities that were |
| 15 | available back in September 2008? |
| 16 | A. That is correct. |
| 17 | Q. Looking at the amounts, the grand total |
| 18 | amounts at the bottom, is it your recollection |
| 19 | that that was roughly the amount of the Fed |
| 20 | facility borrowing as of September 18, 2008? |
| 21 | MR. HUME: Objection to the form. |
| 22 | A. Yes, that sounds about right. |
| 23 | Q. I would like your understanding of the |
| 24 | different values that appear in the grand total |
| 25 | line or row. |

## Page 84

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    84 |
| 2 | MR. HUME: What grand total line, which |
| 3 | line? |
| 4 | MR. TAMBE: There is only one grand |
| 5 | total line. |
| 6 | MR. HUME: At the bottom? |
| 7 | Q. Yes. Par amount, $43 billion and |
| 8 | change. Do you see that? |
| 9 | A. Yes. |
| 10 | Q. Do you have an understanding as to what |
| 11 | that is a reference to? |
| 12 | A. I do. |
| 13 | Q. Okay, what? |
| 14 | A. Par amount of the securities. |
| 15 | Q. So that would be the par amount of |
| 16 | securities pledged? |
| 17 | A. That is correct. |
| 18 | Q. The next column over is titled "Current |
| 19 | market". Do you see that? |
| 20 | A. I do. |
| 21 | Q. And that carries a value at the bottom, |
| 22 | the grand total row of $49.7 billion. Do you see |
| 23 | that? |
| 24 | A. I do. |
| 25 | Q. What is your understanding of what that |

## Page 85

| | |
|---|---|
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    85 |
| 2 | column and that grand total represents? |
| 3 | MR. HUME: Objection, lacks foundation. |
| 4 | A. I could read what it says, which is |
| 5 | "current market", and I would assume that is the |
| 6 | current market valuation as attributed by whoever |
| 7 | is preparing this document. |
| 8 | Q. And then the next two columns are |
| 9 | "Paydown amount" and "Anticipated prefunding |
| 10 | dollar amount". Do you have an understanding of |
| 11 | what these terms means? |
| 12 | MR. HUME: Objection. I believe you are |
| 13 | asking the witness to speculate about a document |
| 14 | he has not seen before. |
| 15 | Q. Managing liquid, you know what paydown |
| 16 | amounts are? |
| 17 | A. It is actually not a term that I would |
| 18 | typically use. |
| 19 | Q. Any understanding what that term means? |
| 20 | A. I assume that that is the cash component |
| 21 | of the transaction. |
| 22 | Q. And the anticipated prefunding dollar |
| 23 | amount, is that a term you are familiar with? |
| 24 | A. No. |
| 25 | Q. Not a term you use? |

Page 86

| | |
|---|---|
| | Page 86 |
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    86 |
| 2 | A. No. |
| 3 | Q. Any idea what that means? |
| 4 | MR. HUME: Objection, calls for |
| 5 | speculation. |
| 6 | A. No, not really. |
| 7 | MR. HUME: He is asking you to |
| 8 | speculate. |
| 9 | Q. Just in broad dollar terms, was it your |
| 10 | understanding that the amount of the Fed facility |
| 11 | on or about September 18, 2008, was a funding of |
| 12 | about $44 billion or $45 billion against a market |
| 13 | value of collateral of about $50 billion? |
| 14 | A. Yes, that sounds right. |
| 15 | (Exhibit 140A marked for identification.) |
| 16 | Q. I have had placed before you a document |
| 17 | marked Exhibit 140A, a 3-page document. Take |
| 18 | a moment to look at it, let me know when you are |
| 19 | done. You done? |
| 20 | A. I have read through it. |
| 21 | Q. Do you recognize that document? |
| 22 | A. Actually, I can't recall going through |
| 23 | this, no. |
| 24 | Q. Do you see the cover e-mail is an e-mail |
| 25 | from Mr. Robert Azerad? |

Page 87

| | |
|---|---|
| | Page 87 |
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    87 |
| 2 | A. Yes. |
| 3 | Q. Martin Kelly? |
| 4 | A. Yes. |
| 5 | Q. You are shown as a cc on that? |
| 6 | A. Yes. |
| 7 | Q. Do you understand the information that |
| 8 | is contained on page 2 of Exhibit 140A? |
| 9 | A. Not entirely sure I do. |
| 10 | Q. Do you recall there being a discussion |
| 11 | or an analysis during that week of September 15 |
| 12 | about assets available to be transferred by LBI to |
| 13 | Barclays? |
| 14 | A. I do, yes. |
| 15 | Q. What do you recall about that analysis |
| 16 | or discussion? |
| 17 | A. That obviously we were trying to be as |
| 18 | specific as possible about not just the assets |
| 19 | that were on the balance sheet but actually what |
| 20 | was going to be available for transfer. The |
| 21 | difference between the balance sheet from a sort |
| 22 | of accounting or GAPP perspective from a funding |
| 23 | perspective, was really one of granularity, in |
| 24 | terms of what has settled and exactly where the |
| 25 | securities are that are in the repo agreements or |

Page 88

| | |
|---|---|
| | Page 88 |
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    88 |
| 2 | reverse repo agreements. So the effort was to try |
| 3 | and establish what was exactly available for |
| 4 | transfer. |
| 5 | Q. Is it your understanding that the assets |
| 6 | that were listed on the LBI balance sheet, not all |
| 7 | of those ultimately were transferable to Barclays? |
| 8 | A. Yes. |
| 9 | Q. We had seen earlier in Exhibit 19, which |
| 10 | I think is still before you, if you can just turn |
| 11 | to that -- |
| 12 | A. Yes. |
| 13 | Q. This is a balance sheet I think you told |
| 14 | us of LBI as of September 16, 2008, correct? |
| 15 | A. Yes 15th, I think, I assume. |
| 16 | Q. And that has a total adjusted assets or |
| 17 | adjusted total assets of 72.6 billion. Do you see |
| 18 | that? |
| 19 | MR. HUME: Objection. Did you ask |
| 20 | whether this Exhibit 19 was a balance sheet for |
| 21 | LBI. |
| 22 | MR. TAMBE: Yes? |
| 23 | MR. HUME: Was that the question? |
| 24 | MR. TAMBE: That was not the question, |
| 25 | no. The question was whether it as had a total |

Page 89

| | |
|---|---|
| | Page 89 |
| 1 | HIGHLY CONFIDENTIAL - PAOLO TONUCCI    89 |
| 2 | adjusted assets of 72.6 billion. |
| 3 | MR. HUME: Before you asked if it was |
| 4 | a balance sheet of LBI. |
| 5 | MR. TAMBE: The record is what it is. |
| 6 | You have an objection to make, make it, let's move |
| 7 | on. |
| 8 | MR. HUME: I think the record is |
| 9 | misleading now. You asked a question that the |
| 10 | witness did not understand. |
| 11 | MR. TAMBE: Unless you are challenging |
| 12 | the witness I am not sure what that objection is |
| 13 | all about. |
| 14 | Let's go back to the Exhibit 19, LBI |
| 15 | balance sheet adjusted total assets 72.65 billion. |
| 16 | Correct. |
| 17 | A. I can see that, yes. |
| 18 | Q. And is it your recollection that over |
| 19 | some -- over the course of that week, the week |
| 20 | of September 15, the assets of LBI available for |
| 21 | transfer were less than 72.65 billion? |
| 22 | A. Yes. |
| 23 | Q. It went down to a number of about |
| 24 | 50 billion, correct? |
| 25 | A. I am not sure it ever went as low as |

## Page 90

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    90

that, but anyway it certainly went down.

Q. How low did it go in your recollection?

A. Somewhere between 50 and 60 billion.

Q. And part of the reason for that change from 72 to the 50 to 60 billion range is assets that could not be transferred to Barclays, correct?

MR. HUME: Objection, lacks foundation.

A. Yes, that is right. I mean, insofar as they were transactions that were being settled elsewhere, and so the securities would not be available for transfer to Barclays.

Q. Going back to Exhibit 140A, the 3-pager, on the third page of that exhibit, there is an analysis set forth. Do you see that?

A. I do.

Q. Do you have an understanding of what that analysis is?

A. General, yes.

Q. Generally, could you tell us what that analysis is?

A. It is a summarization of the inventory which has been reversed in from other entities or repo'd out. The LBI proprietary matched book is

## Page 91

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    91

a representation of the inventory which is both reversed in and repo'd out.

Q. If you can just explain what a matched book is? It is a phrase I have seen in some of the e-malls. I want to get a better understanding of what that is.

A. The matched book is a financing business where securities are financed on behalf of customers and the matching that is on the other side, they are financed to the street or with other customers, so it is an activity where the financing should be matched.

Q. And presumably Lehman are in some spread in the course of this matched activity?

A. It should, yes.

Q. During the course of this week of September 15 was the matched book reduced down effectively to zero?

A. As close as possible to zero.

Q. Were you involved during this time period, September 18, September 19, in identifying or helping to identify those assets of LBI that would be available for transfer to Barclays?

A. Yes, particularly in the sort of

## Page 92

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    92

18th/19th period.

Q. And Mr. Azerad was involved in that process as well?

A. Yes.

Q. Was Mr. Martin Kelly involved in that as well?

A. Yes.

Q. What was Mr. Kelly's position?

A. Martin was the financial controller so he was the accounting -- he was essentially the accountant for the group, chief accountant for the group.

Q. Your co-equal or your subordinate?

A. We were both direct reports to the CFO.

Q. Gerry Reilly, Gerard Reilly, what was his position?

A. He was the product controller, the head of products control, which is really the business CFO, business units' CFO.

Q. Which business units?

A. He actually oversaw all of the business units.

Q. Give me a description of what you would consider a business unit?

## Page 93

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    93

A. Just any of the fixed income for example, any of the trading businesses.

Q. So fixed income was a business unit that he would oversee?

A. Right. I would think of Gerry as being the management accountant and Martin being the entity accountant, if that makes any sense.

Q. Not entirely, but that is fine. We will move on. Francis Pearn, P-E-A-R-N?

A. Yes.

Q. Who was Francis?

A. He worked for Gerry.

Q. Were Gerry and Francis involved in this process we talked about, identifying the assets of LBI that were in fact transferable to Barclays?

A. They were, yes.

(Exhibit 141A marked for identification)

Q. I have handed you an exhibit marked Exhibit 141A, which is a cover e-mail with a spreadsheet attached to it. If you could generally look at the cover e-mail and the spreadsheet attached, I will ask you some general questions and then maybe some specific ones about the spreadsheet. Just let me know when you are

Page 94

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          94

1
2   done.
3       A.  Okay.
4       Q.  Starting with the cover e-mail, reading
5   the chain from the bottom up, do you recognize
6   that as an e-mail sent to you from Mr. Hraska?
7       A.  I do.
8       Q.  Just some terminology I want to get your
9   understanding on. Mr. Hraska asks you, says:
10          "We do not have MV of DTC yet but are working
11  on it".
12          Is that a reference to market value of
13  DTC?
14      A.  Correct.
15      Q.  And DTC is?
16      A.  DTC is the Depository Clearing
17  Corporation.
18      Q.  The next line, there is a reference to
19  "GFS". What is that a reference to?
20      A.  It is a system that was used to collate
21  assets and financing information called the Global
22  Financing System.
23      Q.  That is a system at Lehman?
24      A.  That is correct.
25      Q.  And market value data about securities

Page 95

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          95

1
2   is entered into that system?
3       A.  No.
4       Q.  Okay. Describe it?
5       A.  Market data is received from other
6   systems. GFS is just an aggregation tool, so
7   would source data from settlement systems or from
8   other pricing sources and apply that to the
9   inventory positions or collateral positions.
10      Q.  So if Lehman has a collection of
11  mortgage backed securities, those are valued by
12  the traders at Lehman on some regular basis, is
13  that right?
14      A.  That is correct.
15      Q.  And those values get pulled into GFS
16  automatically, is that correct?
17      A.  That is correct.
18      Q.  So the Lehman traders would go in and
19  ascribe values to those securities, right?
20      A.  That is correct.
21      Q.  And GFS, do you have to run a GFS
22  program or does GFS automatically update itself
23  when new values are entered for particular
24  collateral?
25      A.  It runs on an overnight basis so it

Page 96

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          96

1
2   should pick up all of the most current
3   information.
4       Q.  So if you wanted to track the value
5   ascribed by Lehman to a particular CUSIP over the
6   course of that week, September 15 through 22nd, if
7   I queried the GFS system, it could give me a daily
8   valuation of that CUSIP?
9       A.  I have no idea.
10      Q.  Who would know the answer to that?
11      A.  That is a technological question on data
12  storage and retrieval, so I would speak to someone
13  in the technology department.
14      Q.  In terms of figuring out how much money
15  Lehman could borrow on any day, would you query
16  the GFS system for values?
17      A.  Yes.
18      Q.  Who would do that on your behalf? Would
19  you do that yourself?
20      A.  No.
21      Q.  Who would do that?
22      A.  Someone within my team, someone junior
23  to Robert generally.
24      Q.  I just want to understand a little about
25  this spreadsheet that is attached to this cover

Page 97

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          97

1
2   e-mail, Exhibit 141A. Are you generally familiar
3   with the format of this spreadsheet?
4           MR. HUME: Object to the form.
5       A.  Generally.
6       Q.  It is a kind of spreadsheet that was
7   prepared at Lehman from time to time, is that
8   right?
9       A.  That is correct.
10      Q.  I want to get an understanding of some
11  of the column headings, what your understanding is
12  of what they mean. Let's use the column title, so
13  column A, on the first page of the spreadsheet has
14  a code "PR underscore space ID". Do you see that?
15      A.  Yes.
16      Q.  What is your understanding of what that
17  means?
18      A.  It is an identifier.
19      Q.  A Lehman identifier?
20      A.  I believe so.
21      Q.  The next column is "CUSIP", and that is
22  the security identifier, is that right?
23      A.  That is correct.
24      Q.  The next, column C, is "LB underscore
25  space rating". Do you see that?

Page 98

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          98

1
2    A.  I do.
3    Q.  And what is that a reference to?
4    A.  I think that is an amalgam rating,
5    default rating from -- for I guess a Lehman
6    assigned default rating.
7    Q.  Columns D, E and F are external rating
8    agency ratings, is that right?
9    A.  That is correct.
10   Q.  And the next column, G, is titled "Long
11   underscore space description".  Do you see that?
12   A.  I do.
13   Q.  And that is just a description of the
14   security?
15   A.  Correct.
16   Q.  Turn over to the next page, 10320368,
17   column H, that is just a quantity, "QTY"?
18   A.  Correct.
19   Q.  And quantity in this setting means what?
20   A.  It means -- I am not sure if they are
21   equity securities but for fixed income securities
22   it means the notional or principal amounts and
23   for -- and the principal, notional or nominal are
24   all somewhat interchangeable terms for fixed
25   income securities, and for equity securities it is

Page 99

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          99

1
2    generally the number of shares.
3    Q.  Okay, and for fixed income securities
4    the quantity column would be the principal then
5    outstanding?
6    A.  Yes.
7    Q.  The next column?
8        MR. HUME:  Did you finish your answer?
9    A.  I was going to say it is not necessarily
10   the principal outstanding on the security.  It is
11   the principal balance held by or owned by the
12   entity.
13   Q.  Understood, thank you.  Column I?
14   A.  Yes.
15   Q.  "Price".  Do you have an as to what that
16   column is?
17   A.  That is the price attributed to the
18   security.
19   Q.  If you look down that column, on this
20   particular page 10320368, you will see a lot of
21   entries that are less than one, so it is
22   zero-point something.  What is the pricing
23   convention that you think is being used here?
24       MR. HUME:  Objection, lacks foundation.
25   A.  I don't know.

Page 100

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          100

1
2    Q.  Generally what pricing convention would
3    you use in pricing securities in the Lehman
4    system?
5        MR. HUME:  Objection, the witness has
6    not testified that he prices any securities.
7    A.  I don't know what the pricing convention
8    is.
9    Q.  Next column J: "Price underscore space
10   source".
11   A.  Yes.
12   Q.  And there is a series of abbreviations
13   below in that column.  The first one says "TMS"?
14   A.  Yes.
15   Q.  Do you have an understanding of what TMS
16   is?
17   A.  It is a settlement system.
18   Q.  There is a series of entries titled
19   "MTS", what is that?
20   A.  It is a settlement system.
21   Q.  These are both Lehman settlement
22   systems?
23   A.  I don't know if they are Lehman
24   proprietary systems or whether they are street
25   wide settlement systems but they are settlement

Page 101

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          101

1
2    systems used at Lehman.
3    Q.  And then column K is titled "MV", and
4    that is market value, correct?
5    A.  That is correct.
6    Q.  The e-mail on page 1 of Exhibit 141A,
7    these are all e-mails dated September 19, 2008.
8    Do you see that?
9    A.  I do.
10   Q.  Do you recall preparing a spreadsheet
11   with market valuations for Barclays on the morning
12   of September 19, 2008?
13       MR. HUME:  Objection to form.
14   A.  I don't remember preparing that for
15   Barclays, no.
16   Q.  Do you remember preparing that period on
17   the morning of —
18   A.  I do remember preparing a summary of the
19   repo transaction and the values that we saw.
20       (Exhibit 142A marked for identification.)
21   Q.  Sir, I have placed before you a document
22   marked Exhibit 142A.  It has two initial pages
23   which are e-mails and then a spreadsheet attached
24   to it.  Take a moment to look at the document and
25   let me know when you are done, and I will have

Page 102

1　　HIGHLY CONFIDENTIAL - PAOLO TONUCCI　102
2　questions for you similar to the questions I asked
3　you about 141A.
4　　　　MR. HUME: I am just going to register
5　an objection on the record to the extent that the
6　first e-mail in the chain may be privileged and we
7　reserve our rights to claw back anything that is
8　privileged.
9　　　Q. Are you done?
10　　A. Yes.
11　　Q. You will see this e-mail chain starts on
12　the second page of Exhibit 142A with an e-mail
13　from you to Gerry Reilly.
14　　A. Yes.
15　　Q. And the file you are sending him with
16　the e-mail is titled "Inventory Adjustments.xls"
17　do you see that?
18　　A. Yes.
19　　Q. This is a series of e-mails on pages one
20　and two, again dated Friday September 19, 2008.
21　Do you see that?
22　　A. Yes.
23　　Q. Do you recall preparing an inventory
24　adjustment file on September 19?
25　　A. Yes.

Page 103

1　　HIGHLY CONFIDENTIAL - PAOLO TONUCCI　103
2　　Q. What is your recollection about that
3　process of preparing this inventory adjustment?
4　　A. We were trying to identify the
5　securities in the repo transaction.
6　　Q. The repo that had occurred on the night
7　of the 18th, correct?
8　　A. That is correct.
9　　Q. And the file that you were forwarding,
10　"inventory adjustments.xls", would you have
11　prepared that file?
12　　A. I think that Robert Azerad prepared it
13　but I cannot be sure.
14　　Q. You were involved in the preparation of
15　the file?
16　　A. Yes, in the reviewing.
17　　Q. For what purpose were you reviewing the
18　inventory adjustment file?
19　　A. I was reviewing it to make sure that it
20　made sense and looked accurate.
21　　Q. Just going through the column headings
22　so I understand what these column headings are,
23　starting with the third page of the exhibit, last
24　four digits 5049 on the Bates number, do you see
25　that?

Page 104

1　　HIGHLY CONFIDENTIAL - PAOLO TONUCCI　104
2　　A. Yes.
3　　Q. So starting with column A, "Account",
4　and there is a series of codes that appear in that
5　column. What is your understanding of what
6　information is contained in that column?
7　　A. I think they are trading accounts.
8　　Q. These are trading accounts at Lehman?
9　　A. Yes.
10　　Q. Next column B, "Account name", the name
11　of the trading account, I take it?
12　　A. Yes.
13　　Q. The next column is "Adjusted flag". Do
14　you see that?
15　　A. I do.
16　　Q. What is that a reference to?
17　　A. I don't know.
18　　Q. Next column over, "Adjustment, [ADJ]
19　comment." Do you see that?
20　　A. Yes.
21　　Q. Do you have an understanding what that
22　means?
23　　A. No.
24　　Q. Next column over, E, "Cost centre", do
25　you have any understanding what that means?

Page 105

1　　HIGHLY CONFIDENTIAL - PAOLO TONUCCI　105
2　　A. Yes, it is the cost centre attached to
3　the trading book.
4　　Q. The next column over, F, is "Lead
5　account"?
6　　A. Yes.
7　　Q. What is that a reference to?
8　　A. I think that is just where there is
9　trading book roll-ups, so it means that you have
10　different layers of trading accounts and then they
11　can aggregate into a larger more aggregated
12　account.
13　　Q. Next column over, G, is "Trader name".
14　then you go over to "DBS entity", column H. What
15　is that?
16　　A. DBS was the general ledger system, so
17　the entity was the annotation for or should have
18　been the annotation for the DBS entity.
19　　Q. What does DBS stand for?
20　　A. I don't know.
21　　Q. All right. The next page, page 5050
22　last digits, there is a series of columns for
23　division, region and then it says "BPM level zero,
24　one and two". Do you see those columns?
25　　A. Yes.

## Page 106

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                106

1
2   Q.   What does BPM stand for?
3   A.   Business performance measurement.
4   Q.   Next column, "Real world Cusip".  That
5   is the security identifier?
6   A.   Correct.
7   Q.   Turn to page 5051.  First column is
8   "ISIN", again an identifier for the security,
9   correct?
10   A.   Correct.
11   Q.   "Q" is "Product".  There is a series of
12   codes that appear there.  Do you have an
13   understanding of what that column is?
14   A.   No.
15   Q.   Then you have columns for product name,
16   coupon, maturity date, coupon rate, source system.
17   Let's go over to page 52.
18   A.   Yes.
19   Q.   There is a column entitled "W", "Trade
20   date position".  What is your understanding of
21   what information is contained in that column?
22   A.   The trade date position is a position
23   for accounting purposes, which should represent
24   what your ownership interest is.  It may not
25   correspond to the actual settled position but, for

## Page 107

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                107

1
2   example, if you buy some shares, if you were to
3   buy some shares today then you would record the
4   fact that you have an economic interest, an
5   economic exposure in those shares, but you may not
6   pay for them or settle those for a few days, but
7   your economic interest and exposure is the trade
8   date position.
9   Q.   Then you have columns X and Y for clean
10   market price and dirty market price.  Do you see
11   that?
12   A.   I do.
13   Q.   Could you briefly describe what clean
14   market price and dirty market price is?
15   A.   Clean market price is the trader price
16   exclusive of the accrued coupon.  The dirty market
17   price is the traded price inclusive of the accrued
18   coupon.
19   Q.   Column Z is "Gross long inventory TD at
20   MV"?
21   A.   Yes.
22   Q.   What is TD at MV?
23   A.   Trade date at market value.
24   Q.   And that calculation is done using clean
25   market price, the dirty market price or neither?

## Page 108

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                108

1
2   A.   I am not sure.
3   Q.   The next column over, "Long Intraco
4   Netdown TD at MV".  Do you have an understanding
5   as to that column, column Z?
6   A.   Column Z is the gross long inventory TD
7   at MV.
8   Q.   I am sorry, column AA, sorry:  "Long
9   Intraco Netdown TD at MV."
10   A.   I actually think that should say --
11   Q.   "Intraco"?
12   A.   "Intraco Netdown", which means that
13   there may be trading books that are both long and
14   short, and this is the first of the netdowns to
15   reflect offsetting positions.
16   Q.   Then you have a net long column, AB, and
17   that is just a net long position, is that right?
18   A.   That is right.
19   Q.   And then you have a series of columns,
20   AC, AD.  Over on to the next page, 5053.
21   A.   Yes.
22   Q.   AE, which deals with short positions,
23   correct?
24   A.   That is right.
25   Q.   Then you have a column AF, "B/S summary

## Page 109

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                109

1
2   total"?
3   A.   Yes.
4   Q.   What is that?  Is that the buy/sell?
5   A.   No, balance sheet summary.
6   Q.   And then AG is balance sheet usage?
7   A.   Yes.
8   Q.   The prices that appear in X and Y, the
9   clean market price and the dirty market price,
10   with respect to fixed income securities, would
11   those be observed trading prices or would those
12   also include indicative or pricing assumptions by
13   traders at Lehman?
14   MR. HUME:  Objection, lacks foundation.
15   Witness has testified he was not involved in
16   pricing.
17   A.   They may be observable.  They would
18   probably be a combination of exchange traded,
19   which are observable on assets at closing prices
20   and trader determined prices and trader input
21   prices.
22   Q.   Were you aware of any process
23   on September 19, 2008, where traders at Lehman
24   were marking down positions on that date?
25   A.   I was not, no.

Page 110

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    110
2    (Exhibit 143A marked for identification)
3    Q.  I have placed before you a one paged
4    document marked Exhibit 143A.
5    A.  Yes.
6    Q.  Do you see that is an e-mail sent by you
7    to various people at Barclays?
8    A.  I do.
9    Q.  Sent on Friday, September 19, on or
10    about -- looks like noon Eastern time?
11    A.  Yes.
12    Q.  And you are sending over a file
13    captioned "BarCap collateral.xls".  Do you see
14    that?
15    A.  Yes.
16    Q.  And you state in the body of your e-mail
17    that "This is using our prices".  Do you see that?
18    A.  Yes, I do.
19    Q.  That means using the Lehman prices,
20    right?
21    A.  That is right.
22    Q.  And you state that: "It shows less than
23    BONY file so we may be being conservative." Do you
24    see that?
25    A.  I do.

Page 111

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    111
2    Q.  And your reference to BONY file is
3    a reference to the BONY prices, correct?
4    A.  Right.
5    Q.  The Bank of New York prices, correct?
6    A.  Yes.
7    Q.  And Bank of New York was the tri-party
8    provider on the BarCap tri-party agreement,
9    correct?
10    A.  Yes.
11    Q.  Do you recall Barclays requesting you to
12    provide the Lehman marks as separate from the BONY
13    prices?
14    A.  I don't, no.
15    Q.  Do you recall any discussions on
16    Friday September 19 about the BONY prices versus
17    the Lehman prices, a discussion with Barclays?
18    A.  No, not with Barclays.  I do recall --
19    there was obviously a tremendous amount of
20    complexity in this transaction and the repo
21    transaction in particular was very complicated,
22    and all that we were trying to do was to establish
23    the accuracy of the positions that have
24    transferred over and some reference in terms of
25    valuations.  We had asked for details from

Page 112

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    112
2    Barclays from their BONY file because they would
3    have received an electronic version of the
4    tri-party reporting from their tri-party provider,
5    so we were just going through the process of
6    trying to identify any discrepancies or problems;
7    discrepancies in the quantity, problems in terms
8    of differences in the assets or in valuations.
9         I would say that this was relatively -- this was
10    a relatively early cut.  As I recall, we only received the
11    file shortly before this, you know, that morning, and so it
12    was certainly not a complete and finalized piece of work.  I
13    don't recall anyone from Barclays requesting that we provide
14    Lehman values or JP Morgan values.  This was just to give
15    them some reference to help everyone understand the
16    transaction.
17    Q.  We earlier talked about the effort on
18    Friday September 19 to identify additional assets
19    and receivables.  Do you recall that?
20    A.  I do.
21    Q.  Do you recall that effort being the
22    result of concerns about the valuation of the repo
23    collateral?
24    A.  I don't recall it being explicitly that,
25    although I do -- when I spoke about it with Ian it

Page 113

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    113
2    was clear that one of the considerations was the
3    valuations, was going to be the valuations, and
4    the mix of collateral, and it was not clear to
5    them and to some of the senior managers exactly
6    what collateral had been transferred over because,
7    as I say, it was a very complicated process, and
8    so to have their trading teams review and revalue
9    all of that was clearly a necessary part of it.
10    Q.  And then do you recall the effort being
11    the result of concerns about preserving the
12    economic value of the transaction for Barclays?
13    A.  Yes, I mean, it was all linked together.
14    It is perhaps worth saying, and you can see here
15    that there are thousands and thousands of
16    securities and they are complicated securities.
17    Some of these are not liquid, insofar as there are
18    observable market prices, and the complexity with
19    reviewing this is tremendous, particularly with
20    mortgage securities and structured securities.  I
21    can certainly think of at least one large position
22    that was transferred over, for which there would
23    be a tremendous range of valuation, you know,
24    potentially ascribed, and I am sure that that
25    could be applied to many securities.

Page 114

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    114

1
2    So given that the -- you have to understand that
3    this is a transaction where the actual assets being
4    transferred over is really only being finalized on that
5    morning, and is still being reviewed, and so we were trying
6    to provide support and assistance insofar as, you know,
7    determining the securities and a potential value for those.
8    But this is not something which had already been reviewed
9    and values confirmed by Barclays, and the BONY system could
10   also have had problems with valuing some of these
11   securities.
12       Q. The one large position you were talking
13   about, that is Pine?
14       A. Yes.
15       Q. What was Pine?
16       A. Pine was a CLO, which is
17   a collateralized loan obligation.
18       Q. I have handed you a document that was
19   previously marked as Exhibit 47. It is about
20   3 pages of cover e-mails, 4 pages of cover
21   e-mails, and a large spreadsheet. If you can
22   review the e-mails and take a look at the
23   spreadsheet, let me know when you are done, and I
24   will ask you some questions about them.
25       MR. HUME: The binding of this exhibit

Page 115

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    115

1    was obviously done for ease of presentation,
2    right? It was not presented like this originally.
3       A. Yes.
4       Q. Reviewing this chain of e-mails,
5    starting with the earliest e-mail, which is an
6    e-mail from you to various people, the subject
7    line is: "Delivering other assets to Barclays".
8    Do you see that?
9       A. Yes.
10      Q. And is that a reference to this process
11   we talked about, the assets over and above the
12   repo assets?
13      A. That is correct.
14      Q. Take a look at the first page of this
15   exhibit, the e-mail, page 1, Exhibit 47. At the
16   top of the page there is an e-mail from David
17   Murgio at Weil to two additional people, V Lewkow
18   and R Davis. Do you see that?
19      A. I do.
20      Q. Was it your understanding that
21   spreadsheet information about the collateral was
22   provided by lawyers for the estate to the lawyers
23   for Barclays?
24      A. Yes.

Page 116

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    116

1
2       Q. There is a reference to BarCap
3    collateral.xls. Do you see that file?
4       A. I do.
5       Q. That was the same file that you had sent
6    over earlier, right, Exhibit 143A?
7       A. Yes.
8       Q. If you turn to the fifth page, Bates
9    number 5138 are the last four digits, do you see
10   that calculation up there?
11      A. I do, yes.
12      Q. And it is a total of 49.9 billion. Do
13   you see that?
14      A. I do.
15      Q. And that is in the market value column?
16      A. I see that.
17      Q. And there is four components to that
18   total. Do you see that?
19      A. I do.
20      Q. The first is Fed collateral?
21      A. Yes.
22      Q. Do you have an understanding of what
23   that item is?
24      A. Yes.
25      Q. What is it?

Page 117

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    117

1
2       A. It is Fed wirable collateral that was
3    transferred over, Fed being the market
4    settlement system for this type of collateral.
5       Q. The next line item is DTC074. Do you
6    see that?
7       A. I do.
8       Q. Is that an account or a box at DTC?
9       A. That is I think an account at DTC.
10      Q. A Lehman account?
11      A. Yes.
12      Q. The next item is DTC636. Do you see
13   that?
14      A. I do.
15      Q. What is your understanding of what that
16   is?
17      A. That is a different type of DTC account.
18      Q. And in the last line item is "TP
19   cashed". What does that stand for?
20      A. That is the tri-party cash.
21      Q. Was it your understanding on
22   Friday September 19 that there was 7 billion
23   dollars in cash to be delivered to Barclays?
24      A. I understood that $7 billion of cash had
25   been given by -- had been deposited by Barclays

Page 118

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          118

1    with JP Morgan and that it was being held by
2    JP Morgan.
3        Q.  Was it your understanding of -- I guess
4    these e-mails are all dated September 20, so was
5    it your understanding on September 20, 2008, that
6    the total value of the collateral on the cash in
7    the transaction was 49.9 billion?
8        MR. HUME:  Objection, vague and
9    ambiguous as to the value.
10       A.  This was my view of the repo transaction
11   on the Thursday night, and it was limited to that,
12   just to the repo transaction.
13       Q.  So the 15c3 cash, for example, would be
14   in addition to this?
15       A.  That is correct, yes, as well as the
16   other unencumbered collateral, as well as other
17   components to the agreement.
18       Q.  The other unencumbered collateral, that
19   would be the Schedule B collateral?
20       A.  That is what became Schedule B
21   collateral, that is right.
22       Q.  So that would be added to these items
23   here?
24       A.  That is right.

Page 119

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          119

1        Q.  If you go down to page 5139, do you see
2    that?
3        A.  I do.
4        Q.  There is a column titled "Market value"?
5        A.  Yes.
6        Q.  Do you know what the source of that
7    market value information was in this spreadsheet?
8        A.  I believe that this was the Lehman price
9    market value.
10       (Exhibit 144A marked for identification)
11       Q.  I have handed you a one page document
12   entitled Exhibit 144A.  Take a moment to look at
13   that and let me know when you are done.
14       A.  Yes.
15       Q.  Have you seen this document before
16   today?
17       A.  I have not, no.
18       Q.  Do you remember the information that is
19   contained in this document?
20       A.  I do.
21       Q.  If you can just go through the
22   components, the components I want to talk to you
23   about are the component that add up to the total
24   securities cash received item.  Do you see that?

Page 120

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          120

1        A.  Okay, yes.
2        Q.  If you start with the Fed wire
3    securities, that is similar to the Fed collateral
4    entry we were discussing earlier, correct?
5        A.  Correct.
6        Q.  And the next item is "DTC cash".  Do you
7    see that?
8        A.  I do.
9        Q.  Do you have an understanding as to what
10   that is?
11       A.  DTC securities.
12       Q.  The next item down "DTC cash .3".
13   I assume these are billions?
14       A.  Yes.
15       Q.  Do you have an understanding of what
16   that line item is?
17       A.  I assume it is more DTC securities.
18       Q.  The reference to "Repo cash, 7 billion".
19   Do you see that?
20       A.  Yes.
21       Q.  We have discussed that before?
22       A.  That is correct.
23       Q.  And then it says "Today DTC collateral".
24   Do you see that?

Page 121

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          121

1        A.  I do.
2        Q.  And that is 390 million.  This is an
3    e-mail dated as of September 19, 2008.  Do you
4    have an understanding as to what that means?
5        A.  I don't know the specifics.
6        Q.  And that rolled up into 52.19 billion
7    total.  Do you see that?
8        A.  Yes.
9        Q.  Again, this does not include, as far as
10   you know, the 15c3 cash, correct?
11       A.  That is correct.
12       Q.  Do you know whether this includes
13   Schedule B?
14       A.  I would presume that the "Today DTC
15   collateral" includes some of what became the
16   Schedule B collateral.
17       Q.  When you look below the total securities
18   cash received there is a repo cash amount.  Do you
19   see that?
20       A.  Yes.
21       Q.  And that is 45 billion?
22       A.  Yes.
23       Q.  So the differential between the value of
24   the securities and cash received and the repo cash

Page 122

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    122

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    122
2    amount is listed as excess collateral there,
3    right?
4    A.   That is right.
5    Q.   That is $7 billion?
6    A.   Yes.
7    Q.   So that is the excess of market value
8    over cash paid for the repo?
9    A.   That is, you know, what it looks like.
10    Q.   And this, as far as you can tell, the
11    folks who have sent this e-mail around are all
12    Barclays folks, right?
13    A.   Yes.
14    Q.   Not former Lehman people, is that right?
15    A.   No.
16    Q.   And are they also still at Barclays?
17    A.   I have no idea.
18    Q.   Do you know any of these names, Gerry
19    LaRocca?
20    A.   I do.
21    Q.   Does Gerry work with you?
22    A.   No.
23    Q.   Not in your department or group?
24    A.   No.
25    Q.   Stephen King?

Page 123

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    123

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    123
2    A.   I know Stephen, yes.
3    Q.   Is he in your group?
4    A.   No.
5    Q.   Back in the last quarter of 2008, did
6    you work with Gerry or Stephen?
7    A.   Yes, intermittently.  I mean we were not
8    in the same group but we worked together on a few
9    things, you know.
10    (Exhibit 145A marked for identification)
11    Q.   I have had placed before you a 3-page
12    document marked Exhibit 145A.
13    A.   Yes.
14    Q.   If you take a moment to look at that
15    e-mail chain and let me know when you are done.
16    A.   Yes.
17    Q.   You will see the subject line of the
18    series of e-mails is "Opening balance sheet".  Do
19    you see that?
20    A.   I do.
21    Q.   This is part of the effort that you had
22    testified about before, which was preparing the
23    initial opening balance sheet?
24    A.   That is correct.
25    Q.   It starts off with an e-mail from Martin

Page 124

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    124

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    124
2    Kelly to Robert Azerad, Blackwell and Beldner,
3    right.  Who was Brett Beldner?
4    A.   He is an accountant who worked for
5    Martin Kelly.
6    Q.   He was at Lehman, right?
7    A.   He was.
8    Q.   Is he now at Barclays?
9    A.   I don't know.
10    Q.   You are copied on that e-mail at the
11    bottom of page 2, right?
12    A.   Yes.
13    Q.   If you go over to page 1 of this
14    Exhibit 145A, it is the e-mail at the bottom of
15    the page which is an e-mail from you to a group of
16    people.  Do you see that?
17    A.   Yes.
18    Q.   And you have got sort of two items in
19    your e-mail, correct?
20    MR. HUME:  Which e-mail?
21    Q.   The bottom of page 1.  Are you with me,
22    Mr. Tonucci?
23    A.   What are the two items?
24    Q.   The first item is "I think they have
25    ..." and you correct yourself, "42.9 billion of

Page 125

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    125

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    125
2    assets and paid net 38 billion of cash."  Do you
3    see that?
4    A.   Yes.
5    Q.   That is one item in your e-mail,
6    correct?
7    A.   Correct.
8    Q.   And that is your recap of the repo
9    situation?
10    A.   That is correct.
11    Q.   You have a second item: "Their opening
12    balance sheet should also include 1.9 billion of
13    box assets".  Correct?
14    A.   Correct.
15    Q.   What is that a reference to?
16    A.   The unencumbered collateral.
17    Q.   Schedule B?
18    A.   Which became Schedule B.
19    Q.   I guess there is a third item then, "and
20    one billion of cash receivable from the release of
21    lock ups."  Correct?
22    A.   That is correct.
23    Q.   And that is the 15c3?
24    A.   That is correct.
25    Q.   And at least on the morning

Page 126

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          126

1  of September 20 those were the sort of three
2  components you were thinking of as comprising the
3  balance sheet. Correct?
4      MR. HUME: Objection, lacks foundation.
5      A. Those were the components that I was
6  aware of, so I was not the accountant and I was
7  not on the negotiation team and I was not aware of
8  any other entries that may be being made for
9  example on the liability side or for other assets
10 over and above these.
11     Q. Just on a net basis, the three
12 components that you identified at the bottom of
13 page 1, there is a net of 4 billion on the repo
14 piece, correct?
15     A. If you are calculating the 42.9 minus
16 the 38.
17     Q. Yes.
18     A. That is the calculation you are doing?
19     Q. That is the calculation. It is actually
20 4.9.
21     A. That is correct.
22     Q. You add to that the 1.9 of boxed assets?
23     A. Yes.
24     Q. With no offsetting liability against

Page 127

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          127

1  that 1.9?
2      MR. HUME: Objection, lacks foundation.
3      A. That is not clear to me. I can only
4  tell you the asset side that I was aware of.
5      Q. So the asset side you have net assets on
6  the repo of 4.9, 1.9 on the box assets and then
7  a billion on the cash receivable?
8      MR. HUME: Objection, vagueness, vague
9  and ambiguous.
10     MR. TAMBE: Right?
11     A. You can read it.
12     Q. And that is a total of what, about
13 7.9 billion?
14     MR. HUME: Objection, lacks foundation.
15 You are just asking him to do the maths?
16     A. You are just asking me to add up?
17     Q. 7.8 billion --
18     A. Yes.
19     Q. Were you aware of any liabilities that
20 offset that 7.8 billion dollars of net assets
21 delivered to Barclays?
22     A. I knew there were some liabilities.
23     Q. What magnitude?
24     A. I was not sure but I knew that there

Page 128

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          128

1  were liabilities for compensation and for other
2  payments, services and so on that, you know, were
3  not part of the numbers that I was putting
4  together.
5      (Exhibit 146A marked for identification)
6      Q. I have handed you a 3-page document
7  marked Exhibit 146A, an e-mail chain. Let me know
8  when you are done reviewing it.
9      A. Yes.
10     Q. Do you recognize this as a series of
11 e-mails between folks at Lehman about a transfer
12 of collateral to BarCap?
13     A. Yes.
14     Q. And this is a series of e-mails
15 dated September 22, 2008. Correct?
16     A. Yes.
17     Q. And it is early in the morning, right,
18 6:00 or 7:00 am?
19     A. Yes.
20     Q. And is that before the clarification
21 letter is signed?
22     MR. HUME: Objection, lacks foundation.
23 The witness has testified he didn't review it that
24 week.

Page 129

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          129

1      A. I can't say.
2      Q. Do you recall there being some urgency
3  on the morning of September 22 to getting answers
4  to this question, "queuing up delivery to BarCap"?
5      MR. HUME: Objection, vague.
6      A. I don't really know but, you know,
7  I would say that everyone was focused on doing
8  their job.
9      Q. And what was your job that morning?
10     A. Well, we were trying to close the
11 transaction in an orderly way.
12     Q. There is an e-mail at the bottom of page
13 1 over to page 2 from Monty Forrest to you and
14 Robert Azerad. Do you see that e-mail?
15     A. Yes.
16     Q. And his first numbered point, which is
17 at the bottom of page 1 over on to page 2 states:
18     "What was the final agreed upon list (our
19 version or the version after Robert took out and
20 re-marked Lehman paper.)"
21     Do you see that?
22     A. Yes.
23     Q. Do you understand the reference to
24 re-marked Lehman paper?

Page 130

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          130

1
2    A.   Well, just I think it is more relevant
3    that he just removed the Lehman paper. There was
4    some -- in the original unenumbered list there
5    was some securities which were Lehman issued.
6        Q.   It is not your understanding that there
7    was a mark down of Lehman paper by Robert in that
8    list?
9        A.   That is not what it refers to.
10        (Exhibit 147A marked for identification)
11        Q.   I have handed you a 2-page document
12    marked Exhibit 147A, an e-mail chain.  Please
13    review it and let me know when you are done.
14        A.   Yes.
15        Q.   And you recognize this as a series of
16    e-mails, again dated September 22, 2008?
17        A.   Yes.
18        Q.   And these are additional e-mails about
19    the financing facility?
20        A.   Additional e-mails about the securities
21    that were transferred over and confirmation of
22    those securities.
23        Q.   On page 2 of this exhibit, the body of
24    the e-mail from Jasen Yang to Robert Azerad and
25    James Hraska.  Do you see that?

Page 131

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          131

1
2    A.   Yes.
3        Q.   And you are seen as a copy on that
4    e-mail?
5        A.   Yes.
6        Q.   It appears from that e-mail that he is
7    sending over to you the BONY valuation of the
8    collateral, is that right?
9        A.   Sending over the BONY file, which
10    includes the valuation, but it obviously also
11    includes the details around nominal and
12    securities.
13        Q.   There is a reference to BONY market
14    value of approximately 45MM. Do you see that?
15        A.   Yes.
16        Q.   He was referring to a 45 billion-dollar
17    value, correct?
18        A.   I assume so.
19        Q.   You will see on page 1 of the e-mail
20    a reference to "fast reconciliation". Do you see
21    that?
22        A.   I do.
23        Q.   Was that sort of the beginning of the
24    reconciliation process you talked about before?
25        A.   We had tried to do an initial

Page 132

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          132

1
2    reconciliation on the Friday. This was
3    a subsequent reconciliation and at a more detailed
4    level. Jasen had identified what he saw as some
5    discrepancies, and we were trying to resolve
6    whether those discrepancies existed, principally
7    in the securities that were transferred over and
8    the nominal value of those securities.
9        (Break from 10:37 to 10:55 am.)
10        MR. TAMBE:  Mr. Tonucci, I have placed
11    before you a document marked Exhibit 126. Can you
12    take a moment to look at the e-mail chain and let
13    me know when you are done.
14        A.   Yes.
15        Q.   Starting with the e-mail at the bottom
16    of the page, it is from Gerry Reilly to Ian Lowitt
17    and Michael Gelband.  You are copied on it.  Do
18    you see that?
19        A.   I do.
20        Q.   There are three numbered items in that
21    e-mail.  Do you see that?
22        A.   Yes.
23        Q.   The third item reads: "Not clear on the
24    amount of blocked discount or how we make it
25    happen." Do you see that?

Page 133

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          133

1
2    A.   Yes.
3        Q.   And you understand that to be
4    a reference to the 5 billion-dollar discount that
5    we talked about earlier?
6        MR. HUME:  Objection, lacks foundation.
7        A.   I understand it to be a reference to the
8    discount on purchase, so I would have linked it to
9    that $5 billion.
10        Q.   Then the next sentence reads:
11        "Defaulting on repo could be the best as
12    discounts could be taken from the haircut."
13        Do you see that?
14        A.   Yes.
15        Q.   Do you remember discussing with anyone
16    at Lehman defaulting on the repo as a way of
17    providing the discount to Barclays?
18        A.   Yes.
19        Q.   With whom did you discuss that?
20        A.   I think it was with Ian and with Gerry,
21    perhaps Martin Kelly as well.
22        Q.   And then in Gerry's e-mail at the bottom
23    of this e-mail chain on exhibit 126 he says:
24        "If not that then we need to give business an
25    allocation of block discount so they can mark down the

Page 134

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    134
2    hooks tonight."
3        Do you see that?
4    A.  Yes.
5        Q.  Do you recall if that ever happened,
6    whether there was an allocation of a block
7    discount?
8    A.  I don't know.
9        Q.  Does the phrase "block discount" have
10   any meaning to you?
11   A.  Not really.
12       Q.  Other than what we have talked about
13   here?
14   A.  Other than in this context.
15       Q.  The next e-mail up, from Ian Lowitt to
16   Gerry Reilly and Michael Gelband talks about
17   "shrinking down matched hook". Do you see that?
18   A.  I do.
19       Q.  Do you understand that to he a reference
20   to what we talked about before, about the matched
21   hook being shrunk down to zero?
22   A.  Yes.
23       Q.  The first bullet point in Gerry Reilly's
24   e-mail at the bottom of the page talks about the
25   option rate hook. Do you see that?

Page 135

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    135
2    A.  Yes.
3        Q.  Was it your understanding during this
4    week of 15 September that there were assets that
5    Barclays was picking and choosing as to which
6    assets it was prepared to purchase?
7    A.  That is right.
8        MR. HUME:  Objection.
9    A.  That was my understanding.
10       Q.  And from whom did you get that
11   understanding?
12   A.  I can't recall but I understood that
13   they were not going to he buying all the assets.
14       Q.  Was it your understanding that there was
15   a change or an evolution in the transaction where
16   it went from being all assets to only some assets?
17   A.  No, I understood that it was never all
18   assets.
19       Q.  Did you have an understanding as to who
20   was making the decisions as to which assets it
21   would he?
22   A.  It was -- I think it was the negotiation
23   team, Barclays and Lehman negotiation team.
24       Q.  Was it your understanding that it was
25   Barclays making the decisions?

Page 136

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    136
2    A.  Well, they were the huyers so they would
3    hy extension have the final decision on what
4    assets are bought.
5        Q.  I have placed before you a document
6    marked Exhibit 127. It is another branch in the
7    e-mail chain that we were looking at before in
8    126. Let me know when you are done with the
9    document.
10   A.  Yes.
11       Q.  So it starts with the same Gerry Reilly
12   e-mail at the bottom hut there is a different
13   e-mail at the top. At the top of the document
14   there is an e-mail from Eric Felder to various
15   e-mail at Lehman. Do you see that?
16   A.  Yes.
17       Q.  And Eric says:
18       "The Barclays guys chose the assets. We did not
19   have anything to do with it."
20       Do you see that?
21   A.  Yes.
22       Q.  And that was consistent with your
23   understanding of how the assets were picked --
24       MR. HUME:  Objection to the lack of
25   foundation. Mr. Tonucci is not on that e-mail.

Page 137

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    137
2    A.  I mean, I have only seen this e-mail in
3    the deposition process and have not spoken to
4    Eric and I was not part of the negotiation team.
5    I am not sure what Eric was seeing. Eric was also
6    not -- you know, he was running the credit book so
7    I don't know if he would have seen all parts of
8    this process.
9        Q.  Basically, one way or the other, you
10   don't know whether what Eric says here is right?
11   A.  That is right.
12       (Exhibit 148A marked for identification)
13       Q.  I have handed you a 2-page document
14   marked Exhibit 148A. Let me know when you are
15   done with it.
16   A.  Okay.
17       Q.  In the top e-mail on this chain of
18   e-mails from Gerry Reilly to Martin Kelly and
19   Daniel Flores, I want you to focus on that e-mail.
20   Do you have it there?
21   A.  I do.
22       Q.  You are not shown as a copy on any of
23   these e-mails. Can I ask you about a phrase that
24   is used in this e-mail. The third sentence of
25   that e-mail, Gerry Reilly's e-mail states that:

Page 138

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    138

1  "Purchase will be at a fixed discount on the
2  assets that remain to reflect the bulk size of the
3  purchase".
4      Do you see that?
5  A.  I do.
6  Q.  Did anyone ever describe for you the
7  reason for the discount being the bulk size of the
8  purchase?
9  A.  I don't recall that, no.
10  Q.  Does that phrase have any meaning to
11  you?
12  A.  I have not seen it before.
13  Q.  Then the next sentence in Gerry Reilly's
14  e-mail starts off by saying: "We can track our
15  PL..." Is that profit and loss?
16  A.  Yes.
17  Q.  "... by assets category, which gives
18  some indication of how much we have moved the
19  marks". Do you see that?
20  A.  Yes.
21  Q.  Do you understand the reference to
22  "moving the marks"?
23  A.  Yes. Can I give you just a bit of
24  context, because I think that you are sort of

Page 139

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    139

1  misunderstanding some of this. Post Lehman, even
2  pre the Lehman filing on the weekend of
3  12/13/14th, there was a tremendous amount of price
4  volatility and tremendous amount of uncertainty in
5  sort of the traded price of a lot of securities,
6  even those which were exchange traded, and
7  therefore there was more visibility on -- we were
8  experiencing a huge amount of volatility. The
9  process of re-marking, that was something that
10  would typically be conducted on a daily basis and
11  was conducted by thousands of traders, so it was
12  not as though there was one person with a giant
13  brain sat at the centre of this re-marking process
14  who had understanding and ability to re-mark all
15  of these assets. It really was a very distributed
16  process which involved many, many people, because
17  they were responsible for their trading books and
18  for the risks on those trading books, and had the
19  best understanding of the securities.
20     So on any given day there was going to
21  be a lot of price volatility and the movement in
22  the marks was often just a function of market
23  price volatility. It may also be a function of
24  actual trading activity, but I would say that in

Page 140

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    140

1  this week the amount of trading activity for these
2  particular securities and for these traders was
3  limited, so really it is a matter of sort of
4  interpretation of where the market is.
5     You have to add to that the fact that
6  the holding company had filed and so the coverage
7  of the desks was also impaired. I don't think
8  that there would be every trader turning up and
9  re-marking his book. So there was great
10  difficulty in just creating the P&L and in being
11  able to track the movements. So that sort of
12  added to the complexity here.
13     So my interpretation here is that the
14  amount that we have moved the marks is really just
15  a reference to the traders re-marking their books
16  because of this, because of what is being observed
17  in the market, and it probably was the most
18  volatile week in the market in the last nearly
19  100 years. So very, very difficult, very
20  difficult process, and we were not getting good
21  P&L's on a daily basis as a result. It was much
22  more complicated than was typically the case, and
23  on a typical day the process was complicated, so
24  this was really extraordinarily difficult to

Page 141

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    141

1  track, to track assets, the asset position and to
2  track valuations.
3  Q.  In the week of September 15 you did not
4  do any of the marking of the prices, right?
5  A.  Absolutely not.
6  Q.  That is not something you do?
7  A.  No.
8  Q.  You don't know specifically what traders
9  marked down what prices for what reason, correct?
10  A.  No.
11  Q.  You don't know if the marking down was
12  pursuant to price movements in the market or
13  because they were allocated a block discount?
14  A.  I don't know with certainty, but you did
15  ask me for my interpretation of this and my
16  interpretation is that it is going to be
17  predominantly because of the volatility in
18  valuations in the market.
19  Q.  Okay, and you don't know whether that is
20  because they were allocated a block discount to
21  mark down their books?
22  A.  I am saying that it is not because of
23  the allocation of a block discount. My
24  interpretation of this is that it was because of

## Page 142

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    142

1  the market price movements.

2    Q.  I have handed you a document marked as

3  Exhibit 71B. It is an e-mail exchange between

4  yourself and Alastair Blackwell. Do you see that?

5    A.  Yes.

6    Q.  It is on Friday, September 19, 2008. Do

7  you see that?

8    A.  Yes.

9    Q.  At the top of the e-mail Alastair asks

10  you: "Putting the repo into default is my

11  conversion?" Do you see that?

12    A.  Um hum.

13    Q.  Do you have a recollection of having

14  a discussion with Alastair about putting the repo

15  into default on Friday, September 19?

16    A.  I don't, no.

17    Q.  Any understanding of the phrase "my

18  conversion", what he meant by that?

19    A.  My interpretation would be that his area

20  would have to rebook the repo, convert the repo

21  into a sale transaction.

22    Q.  And your understanding was that

23  a default on the repo really converted what was a

24  two-leg transaction; the repurchase leg would go

## Page 143

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    143

1  away and there would effectively be a sale of the

2  asset?

3    MR. HUME:  Objection.

4    A.  That is correct. It would become

5  a sale.

6    (Exhibit 149A marked for identification)

7    Q.  I have handed you a 2-page document

8  marked Exhibit 149A. Let me know when you are

9  done reviewing that document.

10    A.  Yes.

11    Q.  Have you ever seen this document before

12  today?

13    A.  No.

14    Q.  You know who Bob Diamond is, right?

15    A.  Yes.

16    Q.  Who is he?

17    A.  He is the President of Barclays.

18    Q.  Do you know who Michael Klein is?

19    A.  Yes.

20    Q.  Who is Michael Klein?

21    A.  He is someone who was involved in the

22  transaction.

23    Q.  Is he someone that you dealt with during

24  that week of September 15?

## Page 144

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    144

1    A.  Yes, I spoke to him. I dealt with him

2  you know, just through that week. I don't think I

3  have seen him since then.

4    Q.  Describe your interactions with

5  Mr. Klein during that week. What were you

6  speaking with him about?

7    A.  Predominantly it was clarification of

8  the assets, so Michael was asking for various

9  points, just details of the sort of asset

10  schedules and some of the other transfers. That

11  is all I can really recall.

12    Q.  Was he part of the conversations on

13  Friday, September 19, about locating additional

14  assets and value for Barclays?

15    A.  I didn't speak to him on that, sorry, I

16  don't know.

17    Q.  In his e-mail to Bob Diamond on

18  Saturday, September 20, 2008, Mike says: "Great

19  day. We clawed back 3 billion more of value of

20  the transaction". Do you see that?

21    A.  I do see that.

22    Q.  Any understanding as to what he is

23  referring to in the 3 billion more of value?

24    MR. HUME:  Objection, calls for

## Page 145

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    145

1  speculation.

2    A.  I don't know what would go into that

3  specifically.

4    Q.  Was it your understanding on Friday or

5  Saturday of that week that Lehman had provided an

6  additional $3 billion of value to Barclays?

7    MR. HUME:  Objection, lacks foundation.

8  Witness has testified he was not negotiating the

9  economics of the deal.

10    A.  I can't really answer that, I don't

11  know.

12    Q.  But we have talked about a couple of

13  items of additional value on Friday, September 19,

14  right?

15    A.  We have, but we have also talked about

16  the price volatility and the lack of certainty

17  around the actual assets that were being

18  transferred, and just the difficulty in

19  establishing values. So I mean I wouldn't sort

20  of, you know, I wouldn't sort of describe this as

21  just additive to the original transaction. It was

22  clearly changing.

23    Q.  And among the items that were added was

24  1.9 billion in Schedule B, is that right?

Page 146

1     **HIGHLY CONFIDENTIAL - PAOLO TONUCCI**    146
2        MR. HUME: Objection, mischaracterizes
3     his testimony.
4        Q.  Right?
5        MR. HUME: Objection.
6        A.  Can I clarify your question, please?
7        Q.  You can answer my question.
8        A.  I am asking you what are you referring
9     to when you are saying "in addition there was". I
10    am not sure what you mean. In addition to what?
11       Q.  I have talked about the components at
12    least that you have in your e-mail, where you
13    recap the opening balance sheet, right, you have
14    the repo component and then you have 1.9 billion
15    for what we have talked about, became Schedule B,
16    and then you had another billion dollars of the
17    15c3 receivables?
18       A.  That is correct.
19       Q.  And the 1.9 and the 1 is about
20    $2.9 billion, right?
21       A.  That is correct.
22       Q.  And that was additional value over and
23    above the repo, correct?
24       MR. HUME: Objection.
25       A.  Additional assets over and above the

Page 147

1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI    147
2     repo assets that were transferred on the Thursday
3     night.
4        Q.  We have touched on this briefly, about
5     the $7 billion in cash that had been transferred
6     from Barclays to JP Morgan, is that right?
7        A.  That is correct.
8        Q.  On Friday, the 19th?
9        A.  That was transferred on the Thursday,
10    the 18th.
11       Q.  On Thursday the 18th, just using that as
12    a springboard, can you describe for me generally
13    the interactions between Lehman and JP Morgan
14    during that week, so that week of the 15th on
15    through the 22nd?
16       A.  Yes. JP Morgan was continuing to
17    provide clearance for LBI, and so there were
18    discussions through the week about that activity
19    related to that clearance activity. You know,
20    I spoke to them a number of times about all
21    related to clearance activity, tri-party and
22    securities clearance.
23       Q.  I think you described that one of the
24    liquidity issues that arose on the 12th, the
25    Friday the 12th, was a demand for additional

Page 148

1     **HIGHLY CONFIDENTIAL - PAOLO TONUCCI**    148
2     collateral by JP Morgan?
3        A.  That is correct.
4        Q.  And that presented Lehman with some
5     difficulties?
6        A.  It was a very large cash request, so an
7     unusual size and difficult, a difficult request to
8     fulfill, particularly in the way that they -- the
9     timing that they wanted it.
10       Q.  In terms of dealing with JP Morgan
11    during the week of the 15th through the 22nd, did
12    you experience any other difficulties or
13    impediments in dealing with them?
14       A.  They were certainly not being very
15    cooperative.
16       Q.  Can you describe to me what you mean by
17    that?
18       A.  Really they were just not being very
19    cooperative.
20       Q.  Anything specific you recall?
21       A.  No, general. I don't think there is
22    anything specific that I would point to, just
23    generally not very cooperative, not providing
24    a lot of information, you know, not on a timely
25    basis, not releasing transactions on a timely

Page 149

1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI    149
2     basis, you know, those types of things.
3        Q.  Do you recall any difficulty in dealing
4     with JP Morgan over the $7 billion in cash either
5     on 19 September or thereafter?
6        A.  I absolutely never spoke to them about
7     that.
8        Q.  Did other people describe to you their
9     interactions with JP Morgan about that item?
10       A.  Not really.
11       Q.  Are you aware of any settlement
12    agreement between JP Morgan and Barclays over the
13    subject matter of this proceeding?
14       A.  I am. It was a matter of I think court
15    record and it was publicly disclosed. I am not
16    aware of any details over and above those that
17    were publicly disclosed.
18       Q.  What are you aware about — scratch
19    that. What is your knowledge about the settlement
20    between JP Morgan and Barclays?
21       A.  That there was a component of cash and
22    there were a selection of securities that were
23    transferred. I have not seen the securities that
24    were transferred over but I was aware that that
25    was the sort of composition, and I think

| Page 150 | Page 151 |
|---|---|

**Page 150**

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                150

1
2  subsequently I may have seen some asset level cut
3  of that, because of the entities in which it was
4  going to get booked in in Barclays, but it is very
5  sort of general information.
6      Q.  In the time period after you joined
7  Barclays, were you involved at all in doing any
8  analytics or assisting with that settlement?
9      A.  No.
10     Q.  Were you asked to do any valuations of
11 what had been transferred to Barclays in
12 connection with that settlement?
13     A.  No.
14     Q.  Have you seen any documentation about
15 the settlement?
16     A.  No.
17     Q.  Do you know who would have done the
18 analytics in connection with that settlement?
19     A.  I would imagine that it would have been
20 the accounting team, the finance team, so it could
21 be Martin Kelly, someone in Martin Kelly's team.
22     MR. HUME:  Don't speculate.
23     A.  But I don't know.  I mean that is
24 speculative.
25     (Exhibit 150A marked for identification)

**Page 151**

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                151

1
2      Q.  I have handed you a document marked
3  Exhibit 150A.  Take a moment to read that and let
4  me know when you are done.
5      A.  I have read it.
6      Q.  I think the bottom e-mail is one we have
7  seen on another exhibit.  It is the e-mail from
8  Martin Kelly to certain people?
9      A.  Yes.
10     Q.  Requesting the opening balance sheet.
11 Your response in the fourth paragraph, an e-mail
12 which begins: "I think the reversions within the
13 asset transferred."  Do you see that?
14     A.  Yes.
15     Q.  Further down in that paragraph you refer
16 to treating something as a "broken repo".  What
17 did you mean by a "broken repo"?
18     A.  A defaulted repo.
19     Q.  And there is a reference to cleaning up
20 with the clients at the other side, and that is
21 what, reconciling — what did you mean by that?
22     A.  Clean up with a broken repo or defaulted
23 repo is the rebooking of that transaction as
24 a purchase or as a sale.
25     (Exhibit 151A marked for identification)

| Page 152 | Page 153 |
|---|---|

**Page 152**

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                152

1
2      Q.  I have handed you a 3-page document
3  marked Exhibit 151A.  Let me know when you are
4  done reading it.
5      A.  Yes.
6      Q.  Once again this is an e-mail chain that
7  begins with the request for the opening balance
8  sheet at the bottom of page 1 over to page 2.  Do
9  you see that?
10     A.  I do.
11     Q.  At the top of page 1 is an e-mail from
12 Robert Azerad to you and others.  Do you see that?
13     A.  I do.
14     Q.  And it refers to the details of the
15 15e3, both customer and PAIB.  Do you see that?
16     A.  I do see that, yes.
17     Q.  What is your understanding of what PAIB
18 stands for?
19     A.  I thought it was to do with other
20 brokers.
21     MR. HUME:  Again, don't speculate if you
22 are not sure.
23     A.  It is not really my area of knowledge.
24     Q.  Would that be Mr. Azerad's area of
25 knowledge?

**Page 153**

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                153

1
2      A.  Not really.  It would be more people,
3  someone from the regulatory accounting or
4  compliance group.
5      Q.  Do you have an understanding of the
6  spreadsheet that is attached as page 3 of this
7  exhibit?
8      A.  I do.
9      Q.  What is your understanding of what that
10 spreadsheet is —
11     A.  It is a calculation of the 15e3 and the
12 requirement on different days.
13     Q.  And was this spreadsheet or this
14 analysis prepared to identify the cash that was
15 available to be transferred?
16     A.  Yes, that is right, it was part of that
17 work.
18     Q.  The next e-mail down from — the second
19 e-mail down from the top of the page is an e-mail
20 from you to Robert Azerad and others, identifying
21 the 15e3 cash as a component to be added to the
22 balance sheet.  Right?
23     MR. HUME:  Objection to the phrase
24 "added to the balance sheet."
25     A.  The mail was to include within the

Page 154

```
             HIGHLY CONFIDENTIAL - PAOLO TONUCCI        154
 1
 2   opening balance sheet the receivable related to
 3   15e3.
 4       Q.  In that same e-mail you have questions
 5   for Dan.  I assume that is Dan Fleming?
 6       A.  Correct.
 7       Q.  And you have questions about the
 8   transferring over of collateral that was locked up
 9   for 15e3 needs.  Do you see that?
10       A.  Yes, I do.
11       Q.  Do you know if that collateral was
12   transferred over to Barclays?
13       A.  I don't believe it was.
14       Q.  Do you know what happened to that
15   collateral?
16       A.  I don't.
17       (Exhibit 152A marked for identification)
18       Q.  I have handed you a 3-page document
19   marked 152A.  It is another e-mail chain.  Would
20   you take a look at it, let me know when you are
21   done.
22       A.  Yes, it is the same chain that we saw
23   earlier.
24       Q.  But a different branch of that chain?
25       A.  It has a couple of extra points at the
```

Page 155

```
             HIGHLY CONFIDENTIAL - PAOLO TONUCCI        155
 1
 2   top, which I was not included on.
 3       (Exhibit 153A marked for identification)
 4       Q.  I have handed you a 2-page document
 5   marked Exhibit 153A.  Let me know when you are
 6   done looking at it.
 7       A.  Yes.
 8       Q.  The first page is two e-mails, one from
 9   Robert Azerad to you and others.  Do you see that?
10       A.  I do.
11       Q.  Attaching an opening balance sheet?
12       A.  I do.
13       Q.  And the top e-mail, I guess, is that
14   document being forwarded to Brett Beldner?
15       A.  Yes.
16       Q.  And the document attached is the asset
17   side of the balance sheet, correct?
18       A.  Correct.
19       Q.  And you were involved in preparing this,
20   right?
21           MR. HUME:  Objection, lacks foundation.
22       A.  Robert prepared it.  I reviewed it, so
23   that is the level of involvement.
24       Q.  I guess in some of the earlier e-mails
25   you had some comments about things to be included
```

Page 156

```
             HIGHLY CONFIDENTIAL - PAOLO TONUCCI        156
 1
 2   as receivables, et cetera?
 3       A.  Correct.
 4       Q.  On this exhibit, Exhibit 153A, were any
 5   derivatives included as part of the total assets?
 6           MR. HUME:  Objection, lacks foundation.
 7       A.  This includes the assets that I was
 8   aware of and was limited to the assets that
 9   I would have some visibility around, and as you
10   can see it does not include anything on the
11   liability side and it does not have anything on
12   derivatives.  I didn't have visibility on either
13   of those.
14       Q.  Is it your understanding at some point
15   the assets side picked up a derivatives component
16   as well?
17       A.  Yes, that is my understanding.
18       Q.  If you didn't have visibility on that,
19   where would that have come from?  Who would have
20   provided that information for the balance sheet?
21       A.  I think the product control team or
22   other parts of the finance team.  It is perhaps
23   worth just saying, there were some other
24   components to the transaction which were not
25   related just to these series of repos and these
```

Page 157

```
             HIGHLY CONFIDENTIAL - PAOLO TONUCCI        157
 1
 2   assets being transferred.  For example, there was
 3   a whole slew of activity around what moved into
 4   Barclays wealth, so the non-institutional
 5   business.
 6       Q.  The PIN business?
 7       A.  The PIN business, yes, which again I
 8   didn't have any visibility really into.  So I am
 9   not sure about the sort of accounting there.  On
10   the derivatives side it was again -- it was not
11   something that I really had any visibility around.
12       Q.  Do you know the economics of the PIN
13   component of the transaction?
14       A.  I don't, no.
15       Q.  Have you seen any analysis or valuations
16   of that?
17       A.  I have not, no.  My involvement in that
18   has been limited to -- it has been really very
19   limited.  I am aware of some of the issues with
20   transferring assets over and I was involved in
21   some of the reconciliations around positions that
22   were expected to be transferred over in the
23   various conversions but did not get transferred,
24   but I have not seen any economics or anything over
25   and above that.
```

## Page 158

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          158

2  Q.  Do you recall there being a customer

3  cash component with the PIN transfer?

4  A.  I don't, no.

5  (Exhibit 154A marked for identification)

6  Q.  Have you had a chance to review 154A?

7  A.  Not yet.  Right.

8  Q.  Have you seen Exhibit 154A before today?

9  A.  No.

10  Q.  Would you turn to the second page of the

11  exhibit.  You will see it is the calculations we

12  saw before, only now there has been a section

13  added for liabilities.  Do you see that?

14  A.  Yes.

15  Q.  And this spreadsheet as well does not

16  have an asset entry for derivatives, right?

17  A.  I cannot see one.

18  Q.  There is a line item under "liabilities"

19  for equity, do you see that?

20  A.  I do.

21  Q.  What is your understanding, if any, of

22  what that line item is?

23  A.  It is the balancing item.

24  Q.  That is just to balance out the assets

25  and liabilities?

## Page 159

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          159

1  A.  That is correct.

3  (Exhibit 155A marked for identification)

4  Q.  I have handed you a 2-page document

5  marked Exhibit 155A, a cover e-mail and

6  a spreadsheet.  Let me know when you are done

7  reviewing it.

8  A.  Yes.

9  Q.  This cover e-mail is from Irina Veksler.

10  Do you see that?

11  A.  Yes.

12  Q.  Do you know who Irina Veksler is?

13  A.  Yes, she works for Robert.

14  Q.  If you look at the spreadsheet, similar

15  to the one we saw before, maybe just a few changes

16  in the numbers.  Do you see that?

17  A.  I do.

18  Q.  This is on Sunday, September 21, 2008,

19  if you look at the cover e-mail.  What is your

20  general recollection of changes to the asset

21  valuation that weekend?  What were the reasons or

22  some of the reasons for changes in the asset

23  valuation that weekend?

24  MR. HUME:  Objection to the form and the

25  vagueness of the phrase "asset valuation".

## Page 160

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          160

2  A.  I don't know if there were any asset

3  valuation changes, and I certainly was not

4  involved in any asset valuation changes.  This

5  exercise, and my recollection of Irina's version

6  of this was purely to clean up the asset

7  classifications.

8  Q.  Do you have 153A before you?

9  A.  Yes.

10  Q.  It is this document.

11  A.  Yes.

12  Q.  If you turn to the calculation that is

13  attached to that exhibit, you will see there is

14  some changes in classification but there is also

15  a change in the bottom line number.  Do you see

16  that?

17  A.  Yes.

18  Q.  Do you have any understanding as to why

19  the bottom line number had changed?  I think both

20  of these e-mails are over that same weekend.

21  A.  It is a trivial amount.  It is

22  34 million, it is rounding.  I don't know what

23  Irina did.  It could have been changing the

24  decimal points or something.

25  Q.  The one other change that I see in the

## Page 161

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          161

2  two spreadsheets, on Exhibit 155A there is now

3  a line item for derivatives and other contracts.

4  Do you see that?

5  A.  I do.

6  Q.  Do you recall any discussion or

7  understanding as to where that line item or why

8  that line item was added?

9  A.  No.  I think that Irina was going

10  through the GFS classifications, the asset

11  classifications to just clean up the

12  representation of those balances.  These are the

13  balances that we were aware of, so those within

14  the repo contracts and the other assets schedule,

15  which was what became Schedule B, and I don't

16  think it was anything more than that.  So this is

17  just trying to clean up classification of those

18  assets.  She would not have been aware of anything

19  over and above that.

20  Q.  I have handed you what has been

21  previously marked as Exhibit 86B, a collection of

22  documents.  Let me know when you have had a chance

23  to review them.  It is 3 pages.

24  A.  Yes.

25  Q.  Have you seen this document before

Page 162

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                162

1    today?
2        A.  No.
3        Q.  Are you familiar with this document?
4        A.  No.
5        Q.  I will ask you a couple of notations and
6    see if they have any meaning to you.  There is
7    a column, column D, which is titled "PCG value".
8    Do you see that?
9        A.  I do.
10       Q.  Do you understand what that means?
11       A.  Product control group value.
12       Q.  There is a column F titled "PCG
13   liquidity value".  Do you see that?
14       A.  I do.
15       Q.  Do you have any understanding as to what
16   that means?
17       MR. HUME:  Don't speculate.
18       A.  I don't want to speculate.
19       Q.  Sir, I am handing you a document that
20   was previously marked as Exhibit 87B.  Are you
21   familiar with that document?
22       A.  No.
23       Q.  I am handing you a document marked
24   Exhibit 88B.  That is a multipage document.  If

Page 163

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                163

1    you can take a look at that and let me know if you
2    are familiar with any of that document.
3        A.  I have not seen this before.
4        Q.  If you turn to page 3 of this document,
5    Exhibit 88B, there is a spreadsheet with the title
6    "Long Island Acquisition Balance Sheet Draft".  Do
7    you see that?
8        A.  I do.
9        Q.  Do you have an understanding as to what
10   the Long Island acquisition was?
11       A.  Yes.
12       Q.  It is the Lehman/Barclays transaction?
13       A.  Yes.
14       Q.  Is this spreadsheet one that you are
15   familiar with?
16       A.  I don't believe I have seen this.
17       Q.  The documents that were marked as
18   Exhibits 86B, 87B and 88B have been described to
19   us as spreadsheets containing information provided
20   to Barclays' auditors in connection with the
21   acquisition.  Were you involved in providing any
22   information to Barclays' auditors in connection
23   with the acquisition?
24       A.  I was not, no.

Page 164

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                164

1        Q.  Did Barclays' auditors ever have
2    conversations with you about what they were doing
3    to account for the acquisition?
4        A.  They didn't speak to me, no.
5        Q.  Or anyone in your group that you are
6    aware of?
7        A.  I believe that they spoke to one or two
8    of the more junior people in the group about the
9    components in Schedule B, what you would know as
10   Schedule B, but I think that that was it.
11       Q.  Do you have any understanding as to the
12   questions that they had about Schedule B?
13       A.  I think mainly it was around the way
14   that it was constructed and balances confirmed,
15   certainly not to do with valuation.
16       Q.  Of the assets that were transferred from
17   Lehman to Barclays, the various pieces of
18   collateral, do you have any understanding as to
19   whether any of that collateral has been sold by
20   Barclays?
21       MR. HUME:  Objection, lacks foundation.
22       A.  Again, I would be speculating but --
23       MR. HUME:  Don't speculate.
24       A.  So I should not.

Page 165

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                165

1        Q.  Who would know about sales of
2    collateral, what is sold by Lehman to Barclays and
3    that may have been onsold now by Barclays?
4        A.  I don't know who the best person would
5    be.  I would assume that someone in Patrick
6    Claxton's team would be able to.
7        Q.  Claxton's team?
8        A.  Patrick Claxton's team.
9        Q.  What is his position, Claxton?
10       A.  He is BarCap CFO.
11       MR. TAMBE:  Okay.  Let's take a break
12   and then pick up again.
13       (Break for Lunch from 11:53 to 12:33.)
14       (Exhibit 156A marked for identification)
15       MR. HUME:  Before we get started, in
16   terms of timing and what we discussed,
17   unfortunately the goal was to finish so he could
18   preserve his Friday afternoon for work.  He has
19   things to do, which is why we started at 7:00.  He
20   is I think realistically to take until 2:00 pm.
21       MR. BUNTING:  2:00 or 3:00?
22       MR. HUME:  2:00.  That was I think the
23   time he had in his 7-hour cut-off.  Obviously we
24   are not saying you are only entitled to that, and

Page 166

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    166

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI          166
2    based on what you said before the break it is not
3    clear that an hour and a half will be -- it sounds
4    like an hour and a half will not be enough. We
5    will see. If it is not enough we can arrange to
6    keep it open perhaps. He is here when you are
7    coming back for Claxton on September 4. We can do
8    it the day before or something.
9         MR. TAMBE: Okay, let's get as much
10   progress as we can.
11        I have placed before you a document
12   marked Exhibit 156A. It is a cover e-mail and
13   then what appears to be a set of spreadsheets
14   attached to it. Are you familiar with those
15   documents?
16        A. I am.
17        Q. The cover e-mail, at the top of the
18   e-mail it is from you to Duane McLaughlin and
19   others. Do you see that?
20        A. I do.
21        Q. And what you are doing is providing the
22   latest iterations of Schedule A and Schedule B
23   part one, as of September 26, 2008. Correct?
24        A. That is correct.
25        Q. And this is following a reconciliation

Page 167

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    167

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI          167
2    process that had commenced as early
3    as September 19 and continued post-closing?
4        A. That is correct.
5        Q. Just a question about the market values
6    that are used in these attachments.
7        A. Yes.
8        Q. Generally, what is the source of the
9    market value information in this document?
10       A. I believe that that was the --
11       MR. HUME: I am sorry, I need to
12   register an objection. This e-mail looks
13   privileged.
14       MR. TAMBE: How could it be privileged?
15       MR. HUME: It is from September 26 after
16   the transaction and it is between Barclays.
17       MR. TAMBE: And Weil.
18       MR. HUME: Where is Weil?
19       MR. TAMBE: David Murgio, Weil cc'd,
20   look at the bottom e-mail.
21       MR. HUME: Okay. In both e-mails, okay,
22   all right, sorry about that.
23       A. I believe that the valuations were the
24   Lehman source valuations.
25       Q. As of what date?

Page 168

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    168

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI          168
2        A. Probably as of the 18th. I am not sure
3    that they were updated subsequently, close of the
4    18th.
5        Q. Just as a matter of convention, that was
6    picked as the valuation date to be used for these
7    schedules, was that a conscious decision?
8        A. No, I mean for convenience, because, you
9    know, systems were not being updated afterwards or
10   we were not getting full feeds from all of the
11   external providers, and it was almost by necessity
12   the reference date that we were using and the
13   reference data, but it was not a conscious
14   decision that it should be as of that date.
15       Q. Are you aware of a valuation done of
16   these securities that are in the spreadsheet
17   attached to Exhibit 156A, a valuation that was
18   done as of 19 September?
19       A. I am actually not aware of any explicit
20   valuation done. There have been many I think
21   valuations as of the closing date for recording
22   the transaction, you know, the value of the
23   transaction, so I am not sure which you are
24   referring to. I have not really been part of
25   those.

Page 169

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                    169

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI          169
2        Q. Who has at Barclays?
3        A. That would be part of the finance
4    function.
5        Q. Claxton's group?
6        A. Claxton.
7        Q. Claxton's group, right.
8        (Exhibit 157A marked for identification)
9        I have placed before you a 2-page document marked
10   Exhibit 157A. Take a moment to look at it, let me know when
11   you are done.
12       A. Yes.
13       Q. There is a chain of e-mails between
14   David Aronow and yourself?
15       A. Yes.
16       Q. The e-mail in the middle of page 1 is
17   from David Aronow to you with a CC to Ian Lowitt.
18   There is a reference there to the Barclays repo.
19   Do you see that?
20       A. I do.
21       Q. Towards the middle of that first big
22   paragraph in that e-mail it states that:
23       "They are not interested in moving forward with
24   any more collateral movements from us to them today through
25   the process we built and applied yesterday."

Page 170

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    170
2        Do you see that?
3    A. I do.
4    Q. Do you have an understanding as to what
5    that is a reference to?
6    A. Yes, I think that that is the specific
7    process where collateral was moving from JP Morgan
8    to BONY and had been applied the previous day, so
9    I think that there was an unusual process of
10   pre-agreeing collateral and cash movements and
11   there was not going to be any more of that.
12       Q. And this was not a limitation on
13   movements of other collateral outside of the repo
14   process?
15   A. That was not my interpretation that
16   there was not going to be that -- excuse me, I did
17   not interpret this as meaning that there were not
18   going to be any other movements outside of the
19   repo process.
20       Q. In terms of the repo process, you
21   understood this as an indication from Barclays
22   that they considered themselves to be fully
23   collateralized applying the haircuts to the repo
24   piece?
25       MR. HUME: Objection, lacks foundation.

Page 171

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    171
2    As of what time?
3        MR. TAMBE: As of the date of this
4    e-mail.
5    A. That was what David was saying. I
6    didn't really have an insight into what Barclays
7    were thinking the situation was and I am not too
8    sure that David really knew. I think he may be
9    speculating.
10       Q. What was David's role?
11   A. He worked in the operations area.
12       Q. And he would have been communicating
13   with Barclays about the repo mechanics?
14   A. Around the repo mechanics, yes.
15       (Exhibit 158A marked for identification)
16       Q. I have handed you a 3-page-exhibit
17   marked Exhibit 158A. Just let me know when you
18   have had a chance to review it.
19   A. Yes.
20       Q. We talked this morning about some
21   efforts to identify FX receivables that might be
22   transferred to Barclays. Does this e-mail relate
23   to that effort?
24   A. It relates to that and to the more
25   general possibility of Barclays assuming the

Page 172

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    172
2    settlement counterparty role around FX
3    transactions.
4        Q. And if they were to do that, drawing
5    your attention to the bottom of page 1, was the
6    understanding that they would stand to get the
7    $1.3 billion of excess cash in the account?
8    A. The $1.3 billion of excess cash in the
9    account is I believe the balance with Citibank,
10   and that was a possibility that Citibank would
11   then release that, because they really had been
12   very explicit with the fact that they were holding
13   it against FX activity.
14       Q. Just to be clear, if Barclays were able
15   to step into those transactions they would get the
16   benefit of that cash?
17       MR. HUME: Objection, calls for
18   speculation.
19   A. I think potentially.
20       Q. These e-mails are dated 18 and
21   19 September. Do you know if in fact as the
22   transaction unfolded whether Barclays did in fact
23   step into this position?
24   A. I believe they did not step into that
25   position.

Page 173

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    173
2        Q. Who within Barclays would know whether
3    in fact they stepped into that position? You said
4    you believe they did not so I want to know if
5    there is someone who has better information.
6    A. I am pretty certain that they didn't
7    step into these transactions.
8        Q. Is there a reason why they didn't step
9    into these transactions?
10       MR. HUME: Objection, calls for
11   speculation, lacks foundation.
12   A. There were a tremendous volume of
13   transactions, and the analysis required to
14   understand that and the exposures was too great to
15   accomplish in the limited time.
16       Q. And so what happened with these
17   transactions then?
18   A. They remained with Lehman as the
19   counterparty.
20       (Exhibit 159A marked for identification)
21       Q. I have placed before you a document
22   marked Exhibit 159A, a one page e-mail chain.
23   Have you reviewed it?
24   A. Yes.
25       Q. At the top of the page there is an

Page 174

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    174

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    174
2    e-mail from Anna Yu at Lehman to several people,
3    including you. Do you see that?
4    A. Yes.
5    Q. There are two items in her e-mail. One
6    is concerning the 15c3-1 segregated cash. Do you
7    see that?
8    A. I do.
9    Q. And we have talked about that before.
10    The second item relates to "Futures seg cash and
11    margin receivables breakout."
12    A. Yes.
13    Q. What is that a reference to?
14    MR. HUME: Objection, lacks foundation.
15    A. I don't know the details. I can only
16    read that it was related to future seg cash and
17    margin receivables.
18    Q. Do you understand that as related to the
19    OCC transactions?
20    MR. HUME: Objection, calls for
21    speculation.
22    A. The risk system recorded futures,
23    exchange traded options and FX transactions, and
24    so I would expect that the OCC transactions would
25    be recorded on that system and would be a part of

Page 175

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    175

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    175
2    these balances.
3    (Exhibit 160A marked for identification)
4    Q. I have handed you a one page document
5    marked Exhibit 160A. Let me know when you have
6    had a chance to review it.
7    A. I can see this.
8    Q. There is an exchange of e-mails between
9    yourself and Chris O'Meara at Lehman?
10    A. Yes.
11    Q. The second e-mail from the top is an
12    e-mail from Chris O'Meara to you. There is
13    a discussion about the 15c3-3 lock up. Towards
14    the end of his e-mail he asks: "Is DTCC issue
15    fatal?" Do you see that?
16    A. I do.
17    Q. What was the DTCC issue that he was
18    referring to, do you know?
19    A. I believe this was just DTC supporting
20    the settlements post-close.
21    Q. And was there a concern that they would
22    not be supporting the settlements post-close?
23    A. There was certainly not any clarity on
24    how this was going to work.
25    Q. You respond to Chris O'Meara's e-mail

Page 176

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    176

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    176
2    with the line at the top that says "Possibly
3    fatal", and then you say: "Can you call me re
4    15c3". Do you see that?
5    A. Um hum.
6    Q. Your reference to "possibly fatal", is
7    that a reference to the DTCC issue or to the 15c3
8    issue?
9    A. DTCC issue.
10    Q. Is there a connection between the DTCC
11    issue and the 15c3 issue?
12    A. No.
13    Q. Two separate issues?
14    A. Yes.
15    MR. TAMBE: I think in the interests of
16    time I am going to pass the questioning to other
17    counsel. I think I am largely done. If we do
18    have any clean-up questions we would like to take
19    you up on your offer to finish examining
20    Mr. Tonucci when we return for the Claxton
21    deposition. I assume that offer still stands.
22    MR. HUME: If necessary and reasonable
23    within the time limit, yes.
24    MR. TAMBE: Thank you, Mr. Tonucci.
25    A. Thank you.

Page 177

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    177

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    177
2    CROSS-EXAMINATION BY MR. MAGUIRE:
3    (Exhibit 161A marked for identification)
4    MR. MAGUIRE: Mr. Tonucci, I have handed
5    you a document we have marked as Exhibit 161A, an
6    e-mail exchange between you and Mr. Fleming. You
7    will see that Mr. Fleming advised you on Sunday,
8    September 21, about the statement from the OCC.
9    What was that a reference to?
10    A. It is just a margin statement received
11    from the OCC.
12    Q. And reflects a large excess position
13    in-house and customer?
14    A. Yes.
15    Q. What does that mean?
16    A. That we had excess margin deposited with
17    the exchange.
18    Q. He goes on to say: "I do not know how
19    accessible this is." What did you understand that
20    to mean?
21    A. At that time it was not clear what the
22    clearing banks that serviced our cash payment
23    requirements were going to support, so it was not
24    clear whether JP Morgan Chase, for example, would
25    actually execute a payment or release a payment.

Page 178

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          178

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI          178
2  So the mechanisms for accessing cash and
3  transferring cash were at that point unclear.
4      Q.  Was there clarity as to the actual state
5  of the margin at OCC?  In other words, was that in
6  real time?  Did you know exactly what the excess
7  was?
8      A.  I didn't.
9      MR. HUME:  Objection, lacks foundation.
10     A.  I don't know.
11     Q.  How did you come to be involved in this
12 e-mail exchange?
13     A.  Dan worked for me managing the cash
14 management area and I think he was just trying to
15 keep me up-to-date on anything that he thought
16 would be relevant or of interest.
17     Q.  Had you asked him specifically for any
18 OCC excess?
19     A.  I don't believe I had.
20     Q.  Was this part of the effort to find
21 collateral to move to Barclays?
22     A.  No, it was not.
23     Q.  You respond to him, you say: "But that
24 may include the value of LCs drawn."  What does
25 that mean?

Page 179

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI          179
2      A.  It was typically the case that there
3  would be some LCs also deposited with the
4  exchanges. LCs are letters of credit provided by
5  third party banks, and I was not sure if that
6  excess amount reflected the OCC drawing down on
7  some of those LCs.
8      Q.  What is the significance of that if
9  there has been a drawdown in LCs?
10     MR. HUME:  Objection, calls for
11 speculation.
12     A.  It was certainly not my area of
13 expertise but, you know, I think a question to ask
14 was whether they calculated the excess inclusive
15 of any cash that they may have received from third
16 party banks.
17     Q.  Did you find out about that?
18     A.  I don't recall.
19     Q.  What is the difference between the house
20 and the customer excess?
21     A.  I am not sure.
22     (Exhibit 162A marked for identification)
23     Q.  I will show you a document we will mark
24 as Exhibit 162A.  You will see this is an exchange
25 that starts September 22, with a question about

Page 180

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI          180
2  the final list of purchased assets.
3      A.  Yes.
4      Q.  What did you understand is meant by the
5  final list of purchased assets?
6      A.  The assets which were transferred under
7  the repo agreement and the other collateral -- I
8  can't recall the details of this schedule -- the
9  other collateral, including the unencumbered
10 assets. I am not sure about the sort of precision
11 composition of this list, and there is not a lot
12 of color given in the initial e-mail, so I don't
13 know if I responded with what was included on
14 Schedule B.
15     Q.  You referred to 15c3 lock up of cash of
16 769 million. Do you see that?
17     A.  Yes.
18     Q.  And you had told us previously I believe
19 that there was about a billion dollar of cash at
20 Wells Fargo?
21     A.  Yes.
22     Q.  The 769, was that cash or securities?
23     A.  Securities.
24     Q.  What kind of securities were they?
25     A.  I believe that they were treasuries.

Page 181

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI          181
2      Q.  Are you familiar with the term "cash
3  equivalent"?
4      A.  I am.
5      Q.  What does that mean to you?
6      MR. HUME:  Objection, calls for
7  speculation.
8      A.  Equivalent to cash.
9      Q.  And the treasuries that were the subject
10 of this lock up, were they equivalent to cash?
11     A.  I don't think so.
12     Q.  Why not?
13     A.  Because I think what goes into cash and
14 cash equivalent is really overnight money market
15 investments, and I don't believe these treasuries
16 were overnight treasuries.
17     Q.  You use the term "cash" here, cash of
18 769 million. Can you tell us why you used that
19 term, as opposed to securities?
20     A.  Because it was late and I was exhausted
21 and so, you know, it is clearly wrong, because I
22 was absolutely certain that they were securities.
23     Q.  You use the term "lock up". What does
24 that refer to?
25     A.  I use the term "15c3 lock up". It is

Page 182

1
2    the entirety of that is important. It is the
3    amount of cash and securities that was segregated
4    against the 15c3 reserve requirement.
5        Q. I will show you a document we will mark
6    as Exhibit 163A.
7        (Exhibit 163A marked for identification)
8        This is an e-mail string. You are welcome to look
9    at as much of it as you want. I am just going to ask you
10   about the top of the page, where Mr. Fleming asks you: "Are
11   these the OCC positions that would have been terminated and
12   have generated the cash?" Do you see that?
13       A. Is that not from me to him.
14       Q. I am sorry, you are correct, it is from
15   you to Mr. Fleming.
16       A. Yes.
17       Q. Can you explain to us what you were
18   referring to there?
19       A. I was looking for clarification on what
20   this statement was and what exactly these
21   positions related to and how they affected the
22   cash position or the margin position. So up to
23   this point I had never seen this report before or
24   this type of report so I was just looking for
25   clarification as to how to interpret it.

Page 183

1
2        Q. And you understood the report contained
3    positions at OCC?
4        A. That is correct.
5        Q. What did you mean when you asked the
6    question whether these are the positions that
7    would have been terminated?
8        A. I was not sure whether all of the OCC
9    positions had been terminated or whether some
10   positions had remained open, so there was at that
11   time a lack of certainty about which positions had
12   been closed out by the exchanges, and I was not
13   sure if that was applicable to OCC as well. I was
14   aware that the CBOT had closed out some positions.
15   I was just asking the question whether that was
16   the case here.
17       Q. Did you have any information about any
18   close out of positions at OCC?
19       A. I did not, no.
20       Q. Did you get any information as a result
21   of this question?
22       A. I don't believe I saw anything more, no.
23       Q. I will show you a document that has
24   previously been marked as Exhibit 53. Have you
25   seen this e-mail before, sir?

Page 184

1
2        A. No.
3        Q. Can you tell me who Mr. Willoughby is?
4        A. He was a lawyer at Lehman Brothers.
5        Q. Was he working in connection with the
6    transfer of OCC positions?
7        A. I don't know.
8        Q. Did you speak with him on or
9    about September 30, 2008, concerning the transfer
10   of OCC positions to Barclays?
11       A. Yes, briefly.
12       MR. HUME: Can I state for the record,
13   I thought we had made a request to claw this
14   e-mail back. It is privileged. Are you aware of
15   that?
16       MR. MAGUIRE: I am not aware, but
17   I mean if you can reserve your rights that is
18   fine, but I still intend to ask the witness about
19   his conversation with Mr. Willoughby.
20       MR. HUME: We reserve the right to -- I
21   believe we have clawed it back as privileged and
22   if we haven't I don't think it is appropriate asking
23   questions about it.
24       MR. MAGUIRE: You can state, you can
25   reserve your rights on that but I believe there

Page 185

1
2    was testimony at I think Mr. Berkenfeld's
3    deposition that Mr. Willoughby was acting in
4    a business capacity in connection with this. That
5    is my understanding. Now, I am free to be
6    corrected but I don't think this is the time or
7    place to do that.
8        MR. HUME: It is the time and the place
9    if we have clawed the e-mail back. Do you take
10   the position even if we have clawed it back
11   that --
12       MR. MAGUIRE: I believe you are
13   entitled to reserve your rights as to the e-mail.
14   I am not aware that you have clawed it back.
15       MR. HUME: We can determine that in one
16   minute off the record and I would like to do that,
17   because if we have clawed it back I don't think
18   you are allowed to ask questions about it, unless
19   and until you have successfully challenged the
20   privilege asserted.
21       MR. MAGUIRE: Okay. If you are taking
22   the position that you want to direct the witness
23   not to answer the questions, that is fine, but I
24   don't think the questions I am asking would be
25   objectionable whether or not there was any claw

Page 186

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI    186
2  back.
3      MR. HUME:  Let's put the document aside
4  and just ask the questions.
5      MR. MAGUIRE :  Let me ask you directly
6  then.
7      MR. HUME:  Put the document aside,
8  ignore the document and answer the questions.
9      MR. MAGUIRE :  In September 2008 you had
10  some discussions with people at Barclays
11  concerning some open issues under the transfers of
12  assets from Lehman to Barclays.  Isn't that
13  correct?
14      A.  There were a variety of conversations,
15  yes.
16      Q.  And in connection with OCC positions you
17  identified two, what you described as the main
18  open issues concerning the transfer.  Isn't that
19  correct?
20      A.  I can't really recall the specifics.
21      Q.  Do you recall that one specific that you
22  identified as an open issue was in connection with
23  the transfer of OCC positions, the extent to
24  whether that was only with the amount, the minimum
25  amount necessary to support the collateral and

Page 187

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI    187
2  exchange the OCC.  Do you recall that, sir?
3      A.  I recall asking the question.  I should
4  clarify that I had not seen the APA and so I would
5  not really have an understanding of what had been
6  agreed.  I was just asking the question.
7      Q.  And you were asking the question whether
8  Barclays was entitled to anything from the
9  Lehman's position at OCC beyond the collateral
10  that was necessary to support specific positions?
11      MR. HUME:  To the extent you were asking
12  that question of a lawyer, it is privileged.  You
13  should not reveal either the question asked or the
14  answer given.
15      A.  I honestly do not recall the specifics
16  of that conversation.  My reason for interest
17  would have been to help direct the group that
18  worked for me in cash management to provide the
19  relevant analytical support or information.  I
20  don't really have a view on what the entitlement
21  was or an understanding, and I am not a lawyer.
22      Q.  I am not asking you for a legal view,
23  sir.  Can you explain to us the difference between
24  the amount necessary to support a position at OCC
25  and an amount that is not limited by that?  Can

Page 188

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI    188
2  you just explain that distinction for us?
3      MR. HUME:  Objection.  He testified he
4  is not expert in the OCC issues.
5      A.  I was asking very open questions because
6  I don't really know the specific mechanics around
7  this, so this was just a better understanding so
8  that I could then help my team provide the sort of
9  necessary supporting information.  So I am asking
10  these questions in a general way.
11      Q.  And you don't have an understanding as
12  to whether Barclays was entitled to anything in
13  terms of OCC margin beyond what was necessary to
14  support specific positions?
15      MR. HUME:  Objection to the form of the
16  question.
17      A.  I don't have a view or an understanding
18  of what the entitlement was, full stop.  I had not
19  seen the APA.  I don't have -- I am not a lawyer
20  and I have not reviewed it in relation to this, in
21  relation to these series of positions.
22      Q.  Did you ever discuss this question with
23  Ian Lowitt?
24      A.  I don't believe so.
25      Q.  Did you ever discuss this with any other

Page 189

1  HIGHLY CONFIDENTIAL - PAOLO TONUCCI    189
2  business person?
3      A.  I can't recall having done so.
4      Q.  Did you discuss this with anyone else,
5  whether a lawyer or not, who was acting in
6  a business capacity?
7      MR. HUME:  If it was a lawyer, you
8  should not answer.
9      A.  I don't recall.
10      Q.  When you talked to Mr. Willoughby, was
11  he practising as a lawyer?  Was he a lawyer, in
12  other words, who actually was providing legal
13  advice?
14      A.  Yes.
15      Q.  Or was he somebody who had a business
16  function at Barclays?
17      A.  I thought of him as a lawyer.
18      Q.  Did you obtain any legal advice from
19  Mr. Willoughby?
20      MR. HUME:  Objection.  You are not
21  entitled to get that information.
22      Q.  Only "yes" or "no".
23      MR. HUME:  I am instructing the witness
24  not to answer that.
25      A.  I am not going to answer.

Page 190

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    190

1
2    MR. HUME: He is not qualified to
3    articulate what is legal advice and it is
4    privileged.
5    Q.  Fine.  Let me ask you, did you obtain
6    any advice from Mr. Willoughby?
7    MR. HUME: Objection. Don't answer.
8    Q.  I am not asking for the substance of any
9    advice I just want to know did Mr. Willoughby
10    respond and provide you with any advice following
11    that discussion that you had?
12    MR. HUME: Object to the
13    characterization of whether there was
14    a communication.  You can ask whether there was
15    a communication from Mr. Willoughby.
16    A.  I don't recall.
17    Q.  You don't recall receiving any
18    communication from Mr. Willoughby in response to
19    the discussion that you had in late September?
20    A.  That is right.
21    Q.  And you don't recall following up with
22    Mr. Willoughby concerning that communication?
23    A.  That is right.
24    Q.  So as far as you recall, you have never
25    touched this subject since that one discussion you

Page 191

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    191

1
2    had with Mr. Willoughby in late September, 2008?
3    A.  Certainly not that -- I don't recall
4    speaking to Scott Willoughby and I would say that
5    my involvement in this transaction subsequent to
6    that was minimal.
7    Q.  And you don't recall discussing this,
8    this I mean in the OCC positions and Barclays'
9    entitlement since September 2008 with anyone?
10    A.  No, I don't believe I have discussed
11    with anyone.
12    Q.  You testified earlier about unencumbered
13    assets, and specifically I want to ask you about
14    Schedule B that you mentioned.  Where were the
15    assets that are listed on Schedule B physically
16    located?
17    A.  There were very many versions of
18    Schedule B so you are going to have to be more
19    specific.
20    Q.  I am just now looking only for your
21    understanding as to where they were physically
22    custodied.  If it is more than one place or
23    changed over time, let me know?
24    A.  That is what I am saying, it was more
25    than one place and it changed over time.

Page 192

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    192

1
2    Q.  What were the different places where
3    those assets were --
4    A.  DTCC, JP Morgan, Euroclear.  I can't
5    remember the name of the Canadian depository, so
6    those are the ones that I remember.
7    Q.  At any time was Schedule B limited to
8    the unencumbered assets at DTC?
9    A.  Not that I am aware of.
10    Q.  I will show you a document we will mark
11    as 164A.
12    (Exhibit 164A marked for identification).
13    If we start at the bottom, you will see there is
14    an e-mail that then gets sent to you on 18 September, and
15    then you forward to Mr. Azerad.  Do you see that?
16    A.  I do.
17    Q.  And the chain starts with what is called
18    a box summary.  Can you tell me what the box
19    summary is?
20    A.  Yes, it is the securities in possession,
21    in the clearance box.
22    Q.  When you say "clearance box", is that
23    the clearance box at DTC?
24    A.  No, it could mean any number of
25    custodial or depository arrangements.

Page 193

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    193

1
2    Q.  Then you will see Mr. Azerad's e-mail
3    says: "FYI, 3.2 billion at risk."  Can you explain
4    what "3.2 billion at risk" means?
5    A.  I don't think I can.
6    Q.  Did you have an understanding at the
7    time that you received this e-mail?
8    A.  I am assuming the 3.2 billion is the
9    "stays at LBI" position.  I am not too sure what
10    the "at risk" means.
11    MR. HUME: Don't speculate.
12    Q.  In your e-mail you say: "That seems very
13    high.  What are the assets they need to sell?"
14    Does that help you to understand what you were
15    hearing here and what you were following up with?
16    A.  Not really.  I mean, there was a lot
17    going on, and I am sure you have seen that there
18    were a lot of e-mails that I was getting, so
19    responses like that could be quite open, just
20    because I don't really know what was going on and
21    I was trying to get information from others.
22    Q.  What was the Sparrow report?
23    A.  Charlie Sparrow was the mortgage trader,
24    he was the head of the mortgage desk, so I think
25    it was his report of positions.

49 (Pages 190 to 193)

Page 194

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    194
2        Q. I will show you a document we will mark
3    as Exhibit 165A.
4        (Exhibit 165A marked for identification).
5        I would like to start with Mr. Blackwell's e-mail
6    to you, sir, in which he says:
7        "We need to fund DTC 1.2 billion to allow
8    settlement."
9        A. Which one are you looking at?
10       Q. Did I give you the wrong document? No,
11   sorry, I gave you the wrong document. Let's mark
12   this as Exhibit 166A.
13       (Exhibit 166A marked for identification)
14       Q. Mr. Blackwell asks: "We need to fund DTC
15   1.2 billion to allow settlement and we need to
16   call with Chase." Can you tell me, what was your
17   understanding as to why there is a need to fund
18   1.2 billion to DTC?
19       A. To facilitate the DTC settlement
20   process, there was often a prefunding requirement.
21   You would get the cash back at the end of the day
22   but intra day they would require funding in order
23   to essentially grease the wheels and initiate the
24   settlement chain.
25       Q. This is to clear trades?

Page 195

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    195
2        A. That is right, to clear trades.
3        Q. You responded: "Don't know how we can do
4    this". Do you know how this ultimately was
5    resolved?
6        A. I don't.
7        Q. If you turn back to the previous
8    document I gave you, Exhibit 165A, here Mr. Azerad
9    notes that: "We managed to pledge over about
10   800 million in MV." Do you understand that to be
11   market value?
12       MR. HUME: Excuse me, you say Mr. Azerad
13   notes?
14       A. It is Jim Hraska.
15       MR. MAGUIRE : Quite right, strike that.
16       MR. HUME: Is there a reason it begins
17   with a ee at the top?
18       MR. MAGUIRE : I am not aware of any.
19       MR. HUME: Object to the form of the
20   document but go ahead. We have never seen it
21   before.
22       MR. MAGUIRE : You did receive this, did
23   you not, sir, this e-mail?
24       A. I guess so.
25       MR. HUME: Don't guess. Do you remember

Page 196

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    196
2    receiving it is the question.
3        A. I don't remember receiving it.
4        Q. My only question is this is a reference
5    here to a pledge of 800 million to Barclays?
6        A. Um hum.
7        Q. Can you tell me what was Lehman doing on
8    Friday, September 19, pledging 800 million to
9    Barclays?
10       MR. HUME: Objection, calls for
11   speculation and lacks foundation. Don't
12   speculate. Only speak to what you know.
13       A. I don't know.
14       Q. Do you have any knowledge of any
15   collateral being pledged to Barclays
16   on September 19?
17       A. I do have knowledge of that.
18       Q. What knowledge do you have?
19       A. The details of some securities that were
20   pledged I think became Schedule B1, and I am not
21   sure when I sort of became really conscious of
22   these. I don't remember seeing this mail.
23   Certainly at that point I had not seen any
24   details, so it was after that.
25       Q. So you had knowledge that some

Page 197

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    197
2    collateral was being pledged to Barclays?
3        A. I have knowledge that some collateral
4    was pledged to Barclays. I am not aware of having
5    knowledge at the time it was being pledged.
6        Q. When did you learn that it had been
7    pledged to Barclays?
8        MR. HUME: Object to the vagueness of
9    the word "pledged" in this line of questioning.
10       A. I think late on the 19th, perhaps on the
11   20th.
12       Q. Did you understand -- I will use the
13   word "transfer" maybe. Did you understand the
14   business reason why this collateral had been
15   transferred to Barclays?
16       A. Not specifically, but I would assume as
17   part of the sales agreement.
18       Q. And when did the transfer physically
19   occur?
20       MR. HUME: Objection, calls for
21   speculation.
22       A. I think I can only say that the
23   transfers that happened that Jim is referring to
24   appear to have happened on the 19th. I am aware
25   that there were actually subsequent transfers.

Page 198

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    198
2        Q.  In the following week?
3        A.  Yes, in the following week.
4        Q.  How did you come to learn about these
5    transfers?
6        A.  I believe that Jim Hraska made me aware
7    of them.
8        Q.  What did he tell you about them?
9        A.  This is the transfers on the 19th I am
10    referring to.  I don't remember getting any
11    specifics from him.
12        Q.  How did you come to learn that they were
13    part of the sale agreement?
14        A.  I didn't come to learn of that.  I was
15    saying that that was my assumption, that would be
16    my assumption.
17        Q.  Did you ever get any information from
18    anyone as to whether or not they were part of the
19    safe agreement?
20        MR. HUME:  Objection to form.
21        A.  I don't think so.  I don't know.  What
22    do you have in mind?
23        Q.  I am just trying to understand.  I am
24    trying to learn what you know about those
25    transfers, whether you learned about it on the

Page 199

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    199
2    19th or whether you learned about it the following
3    week or even subsequently to that?
4        MR. HUME:  Objection, asked and
5    answered.
6        A.  My recollection was that I learned that
7    either late on the 19th or the 20th, but when you
8    ask about the sales agreement I am not sure what
9    you have in mind.
10        Q.  I don't have anything in mind.  I am
11    just trying to understand what was the business
12    reason for the transfer to Barclays.  If your
13    understanding is that it was part of the sale
14    agreement, I just want to confirm that.
15        A.  That is my understanding.
16        Q.  Do you have any different understanding?
17        A.  I don't have any different
18    understanding.
19        Q.  I will show you a document we will mark
20    as Exhibit 167A.
21        (Exhibit 167A marked for identification)
22        If we start at the beginning of the string, the
23    second page, sir, chronologically the beginning, Mr. Azerad
24    is informing you that he found 700 million in the DTC box,
25    and at the end of his e-mail the key question is whether

Page 200

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    200
2    they can count the 800 million delivered to Barclays on
3    Friday.  Do you see that, sir?
4        A.  I do.
5        Q.  Can you tell us what the issue was that
6    Mr. Azerad and you were communicating about here?
7        A.  It is just a representation of the
8    unencumbered collateral that was being included as
9    transferable.
10        Q.  When you say "the representation", what
11    do you mean?
12        A.  In order to represent it accurately in
13    the opening balance sheet or in the various
14    agreements, we just wanted to be clear on how this
15    was going to be -- how this should be recorded.
16    So I think Roben is asking the question: are we
17    treating the 800 million they got transferred on
18    the Friday as part of the unencumbered collateral
19    schedule?
20        Q.  And what was the answer to that
21    question?
22        A.  I don't see an answer to that.  I think
23    we are asking -- Ian was asking that we get
24    a legal confirmation, and I don't recall seeing
25    one.

Page 201

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    201
2        Q.  Where did the 800 million collateral
3    come from?
4        A.  I think it was from the DTC, one of the
5    DTC accounts.
6        Q.  I will show you a document we will mark
7    as Exhibit 168A.
8        (Exhibit 168A marked for identification)
9        If we start at the first e-mail you received,
10    Saturday, September 20 e-mail, on the second page, you were
11    copied on that e-mail from Mr. Forrest, right?
12        A.  Yes.
13        Q.  You see the subject is "Re:
14    1.9 billion."
15        A.  Yes.
16        Q.  What is the significance of the 1.9?
17        A.  The 1.9 billion was the initial estimate
18    of the unencumbered collateral.
19        Q.  And at the time of that, of that initial
20    estimate, do you remember where that collateral
21    was custodied or whether it was in more than one
22    place?
23        A.  It was in a number of places.
24        Q.  The first item here is 800 million at
25    BONY.  Do you know whether that is reference to

## Page 202

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    202

1    the 800 million that had been transferred on the
2    Friday?
3        A. I don't. I would assume so.
4        MR. HUME: Don't assume. Don't
5    speculate.
6        Q. The next is: "We have 746 million in
7    074." Do you recognize that as a DTC box?
8        A. I do.
9        Q. You will see number 4 says: "We have
10    identified another 300 million of mortgages in
11    636." Do you know what 636 is a reference to?
12        A. Another DTC box or account.
13        Q. And Mr. Forrest says: "That is a total
14    of 2.181 billion." Do you see that, sir?
15        A. Yes.
16        Q. Was there a specific target that people
17    were shooting for, a specific total people were
18    trying to get to?
19        A. Not really.
20        Q. So people were kind of keeping score of
21    what they found but there was not any number that
22    you had in mind as a target that you needed to get
23    to?
24        MR. HUME: Objection to the form.

## Page 203

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    203

1        A. Not really. I mean I think, as Ian
2    says, it is more important just to be accurate.
3        Q. You had mentioned that you had heard I
4    believe on the Friday that there was a need for
5    additional collateral in order for the transaction
6    to close; that was something that Mr. Lowitt told
7    you?
8        A. Um hum.
9        Q. And he reiterated that a number of times
10    during the day?
11        A. Yes.
12        Q. Did he tell you how much additional
13    collateral would be needed to make the transaction
14    close?
15        A. I thought — no, I don't remember the
16    total. It was more than 2 billion.
17        Q. Was there a number that he gave you and
18    you don't remember what that is now?
19        A. I don't remember what it was. I don't
20    remember if he gave me a number and I don't
21    remember what it was.
22        Q. Over the course of the next couple of
23    days, the Saturday and the Sunday, did you hear of
24    a target, a number that was needed in order to

## Page 204

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    204

1    close the transaction?
2        A. I think we had gone to the bankruptcy
3    court on Friday with the unencumbered collateral
4    at 1.9 billion, so that was our initial estimate,
5    and then a further billion or so in the 15c3
6    reserve account, so that would give nearly
7    $3 billion. I think that that is what everyone
8    was expecting the value of the unencumbered
9    collateral plus the 15c3 to be.
10        Q. When you say "we went to the bankruptcy
11    court", you are describing what everybody's
12    expectation was at the time everybody went down to
13    the bankruptcy court hearing?
14        MR. HUME: Objection to the form,
15    calling for speculation about what other people's
16    expectations were.
17        Q. That certainly was your understanding?
18        A. It was my understanding.
19        Q. Did you attend the hearing before the
20    bankruptcy court?
21        A. I did not.
22        Q. Did you hear from anybody who did
23    attend?
24        A. Yes.

## Page 205

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    205

1        Q. Who did you hear from?
2        A. From Chris O'Meara.
3        Q. Who was Chris O'Meara?
4        A. He was at Lehman Brothers. He had been
5    head of risk.
6        Q. What did Chris O'Meara tell you about
7    the hearing?
8        A. That it was long and seemed to have gone
9    well, and that the court had approved the sale.
10        Q. Did he tell you anything else?
11        A. No.
12        Q. Did he tell you anything about any
13    proceedings that had happened in the course of the
14    hearing?
15        A. No, he kept it to a minimum.
16        Q. Did you hear from anyone else other than
17    Chris O'Meara about the hearing?
18        A. I did not.
19        Q. I will show you a document we will mark
20    as Exhibit 169A.
21        (Exhibit 169A marked for identification.)
22        The subject of these e-mails is "PL on 9/18". Do
23    you have an understanding what "PL" refers to?
24        A. I am not sure here. I am not

## Page 206

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                206

1
2  understanding these mails.
3     Q.  Do you have any understanding just as to
4  what the letters capital P and capital L stand
5  for?
6        MR. HUME:  Objection, calls for
7  speculation.  He has already testified he does not
8  know.
9     A.  I don't know.
10    Q.  You will see that there is a reference
11  here to your expecting 3.1 billion, and that is
12  contrasted with finding only 1.9 billion.  Can you
13  explain to us what your expectation was?
14        MR. HUME:  Objection, lacks foundation.
15    A.  I don't know.  I don't know where that
16  number has come from.  I don't have a recollection
17  of expecting that or communicating that to Irina.
18    Q.  Your e-mail says:  "My previous answer
19  was as of Friday night".
20    A.  It is not my e-mail.
21    Q.  You are right, it is Mr. Azerad's e-mail
22  to you, and his previous answer was as of Friday
23  night and Irina's answer is as of Thursday night.
24  Does that assist you in any way?
25    A.  No.

## Page 207

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                207

1
2     Q.  I will show you a document we will mark
3  as Exhibit 170A.
4        (Exhibit 170A marked for identification)
5        First, sir, can you tell me what prompted you to
6  send the first e-mail here, just before 4:00 am on
7  Monday, September 22?
8     A.  I can't remember.
9     Q.  You say:
10       "You should plan on moving all the unencumbered
11  collateral in the DTC box first thing".
12        Did you have an understanding then as to what the
13  value of the unencumbered collateral in the DTC box was?
14    A.  Only the estimates.
15    Q.  And what was the estimate you had at
16  this time?
17    A.  I don't remember.
18    Q.  Did you follow up on this instruction?
19    A.  I don't remember.  This is 4:00 in the
20  morning as the transaction was being sort of
21  finalized, and I had been up all night, in front
22  of the Creditors Committee for much of it, so you
23  know it may well be that -- I mean there are going
24  to be things that I just don't remember about.  I
25  was quite tired.

## Page 208

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                208

1
2     Q.  I am sure you were.  My only question is
3  whether there was something specifically that made
4  you at 4 o'clock in the morning send this
5  particular e-mail?
6     A.  I don't recall it.
7     Q.  I will show you a document we will mark
8  as Exhibit 171A.
9        (Exhibit 171A marked for identification)
10    Q.  The transfers to the BONY records, this
11  refers to the assets transferred on Friday?
12    A.  Yes.
13    Q.  Is it your understanding that was the
14  800 million that was transferred on Friday that
15  was the subject of some of the earlier e-mails
16  that we looked at?
17    A.  I believe so.
18    Q.  You had referred to I think Schedule B1
19  or .1 I think in your earlier testimony.  Is that
20  what is referred to here as the first part of the
21  Schedule B?
22    A.  Yes.
23    Q.  Did I understand you earlier to say that
24  another group was responsible ultimately for
25  determining the exact assets that should be in

## Page 209

HIGHLY CONFIDENTIAL - PAOLO TONUCCI                209

1  Schedule B and should not be in Schedule B?
2
3     A.  Yes.
4     Q.  Was that Mr. Claxton's group?
5     A.  No, Mr. Claxton is at BarCap.  It was
6  Mr. Blackwell, who is the head of the operations
7  area and was therefore in the best place to
8  determine what assets were held.
9     Q.  I will show you a document previously
10  marked as Exhibit 85B.  With respect to the list
11  of exhibits that are attached here, 1 to 8, were
12  you involved, sir, in the preparation of any of
13  those?
14    A.  I don't think directly but some of this
15  may have come from my team.
16    Q.  Did you attend the APA scheduled meeting
17  on September 30?
18    A.  I don't recall.
19    Q.  Were there any APA scheduled meetings
20  that you remember attending?
21    A.  I remember attending one meeting on
22  this.  It may well have been this one.
23    Q.  What happened at that meeting?
24    A.  It was I think, as I recall, almost
25  entirely dedicated to trying to explain the

## Page 210

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          210

1
2  sequence of transactions.
3      Q.  Which transactions?
4      A.  The various repo transactions and
5  collateral transfers.
6      Q.  Who was at that meeting?
7      A.  I don't recall.
8      Q.  Do you recall anyone who was present at
9  the meeting?
10     A.  Not by name.
11     Q.  If you turn to the first exhibit, the
12  APA lead sheet.
13     A.  Yes.
14     Q.  Can you tell us what the elements of the
15  top part, which describe the securities
16  transferred under Barclays repo agreement, the
17  total transferred under the repo agreement, what
18  does that refer to?
19     A.  The assets transferred on the Thursday
20  night repo.
21     Q.  And the reference to "Fed settled" and
22  "DTC settled", what does that mean?
23     A.  I think we have covered this but it is
24  Fed wirable securities and DTC settled securities.
25     Q.  And then the next is the unencumbered

## Page 211

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          211

1
2  box as of Sunday 9/21/08, APA clearance boxes, APA
3  Schedule B?
4      A.  Yes.
5      Q.  Underneath that it has "Positions not
6  with no memo seg, positions with memo seg", and
7  a sub-total of those positions?
8      A.  Yes.
9      Q.  What was your understanding as to what
10  they referred to?
11     A.  They refer to securities identified at
12  the DTC, within the DTC box.
13     Q.  And underneath that is 636, that is
14  another DTC box?
15     A.  That is a different DTC box.
16     Q.  And that gives a total for the positions
17  as of Sunday, September 21; is that correct?
18     A.  That is correct.
19     Q.  And then the next section is the Friday
20  9/26 transfers.  What does that refer to?
21     A.  The Friday -- I think that is wrong
22  actually.  I am not sure.
23     Q.  When you say you think it is wrong, why
24  do you say that?
25     A.  I don't think there was -- I don't know

## Page 212

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          212

1
2  why it says 9/26.  Maybe it means Friday 19th.
3      Q.  So there were certainly transfers on
4  a Friday and it was either the 19th or the 26th or
5  maybe both, you don't know?
6      A.  Yes.  I don't think there were any
7  transferred on the 26th though.
8      Q.  What about the Monday transfers?  What
9  does that refer to?
10     A.  There were some further transfers on I
11  believe -- I think it was on the Monday.
12     Q.  Saying Monday, are we now talking about
13  the 22nd?
14     A.  Yes, I think so.
15     Q.  Then there is another line for "Monday
16  transfers par amount".  What does that mean.
17     A.  I don't know.
18     Q.  Then for the total unencumbered box it
19  is about 2.6 billion.  Do you see that?
20     A.  Yes, I see that.
21     Q.  Is that a reference to the clearance box
22  at DTC?
23         MR. HUME:  Objection, lacks foundation.
24     A.  No, I don't think so.
25     Q.  What do you understand the unencumbered

## Page 213

HIGHLY CONFIDENTIAL - PAOLO TONUCCI          213

1
2  box to refer to?
3      A.  It could be the unencumbered, you know,
4  it is just a sub-total, not even one that looks as
5  though it was right to me.  It looks to me as
6  though there has been double counting in this.
7  You can see this yourself but the 269 appears
8  twice and shows up in the sub-total or in the
9  total.  That cannot be right.
10     Q.  Do you know whether this was corrected?
11     A.  I don't know.  I didn't prepare it.  I
12  don't recall seeing a revised version.
13     Q.  What do you understand the total
14  unencumbered box to refer to?
15     A.  It was an estimate of the unencumbered
16  collateral but I am not sure if it was specific to
17  just DTC.
18     Q.  Who would be the person who would know
19  best what specifically was at DTC and what
20  transfers were made from the DTC box at any
21  particular date?
22     A.  Jim Hraska.
23     Q.  I will show you a document previously
24  marked as Exhibit 48.  If we start with the first
25  e-mail chronologically, you are copied on an

Page 214

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    214

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    214
2    e-mail from Mr. Lowitt to Mr. McDade and
3    Mr. Berkenfeld. Do you see the question there:
4    "Did the court accept the 15c3 lock up and
5    unencumbered box make it through to BarCap." Do
6    you see that question?
7        A. I see that, yes.
8        Q. Did you hear any response or understand
9    what the answer to that question was?
10       A. I didn't receive a response.
11       Q. Did you discuss that issue with anybody?
12       A. This is not to be facetious but this is
13   what we have been talking about so I think I have
14   discussed it with lots of people over the past
15   year.
16       Q. I am not talking now generally about the
17   15c3 lock up or the unencumbered box. I am asking
18   specifically about whether the court accepted —
19       A. I didn't speak to anyone about that.
20       Q. We will mark this as Exhibit 172A.
21       (Exhibit 172A marked for identification)
22       The first e-mail is a Saturday e-mail from
23   Mr. Lowitt to you.
24       A. Yes.
25       Q. He says:

Page 215

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    215

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    215
2        "We need to launch an effort as soon as possible
3    to ensure we get the 15c3 lock up money and also secure the
4    unencumbered box".
5        He asks you to coordinate with Berkenfeld on that.
6    What did you do?
7        A. I spoke to Robert Azerad about it. I
8    don't recall speaking to — when I spoke to
9    Stephen but I am sure I did. He is a lawyer so
10   I presume I am not allowed to discuss what
11   I talked to him about.
12       MR. HUME: You are if he want you to.
13       A. Is that right?
14       MR. HUME: Yes.
15       A. I am sure I talked to him about what he
16   could help with so for me this was sort of largely
17   a legal question.
18       Q. You respond: "Agreed. Will use Robert
19   for this". Then someone comes back to you and
20   says:
21       "You need to be close to it. If we don't succeed
22   you and I are toast, despite all our heroics."
23       Did you discuss this e-mail with Mr. Lowitt?
24       A. I didn't.
25       Q. Did you have an understanding what he

Page 216

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    216

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    216
2    meant?
3        A. I did.
4        Q. What did he mean?
5        A. He meant that in spite of all the work
6    that we had put in this was important to closing
7    the transaction.
8        Q. Did you have any further follow-up with
9    Mr. Lowitt concerning the 15c3 or the unencumbered
10   box?
11       A. I am sure I did.
12       Q. Do you recall any?
13       A. I don't recall specifics, no.
14       Q. We will mark this as Exhibit 173A.
15       (Exhibit 173A marked for identification)
16       You testified earlier, sir, that you
17   understood that any transfer would be subject, and
18   this is specifically with respect to 15c3, that
19   any transfer would require regulatory approval?
20       A. Yes.
21       MR. HUME: Objection, mischaracterizes
22   the testimony. He cannot testify as to what was
23   required.
24       Q. What was your understanding as to what
25   kind of regulatory approval was required?

Page 217

HIGHLY CONFIDENTIAL - PAOLO TONUCCI    217

1    HIGHLY CONFIDENTIAL - PAOLO TONUCCI    217
2        MR. HUME: Same objection.
3        A. It is consistent really with what Martin
4    is saying here. Martin would be more of the
5    expert on this than I would, and I would defer to
6    him in terms of what was required.
7        Q. The 15c3, you have explained how there
8    was a billion in cash, there was also 769 in
9    securities, and ultimately the agreement was to
10   transfer only the 769 in securities. Is that your
11   understanding?
12       A. That is my understanding.
13       Q. Do you have any — did you hear how that
14   final agreement came about?
15       MR. HUME: Objection, lacks foundation
16   and calls for speculation. The witness has said
17   he was not a negotiator of the terms of the deal.
18       A. No, I mean I was not really privy to the
19   final decision.
20       Q. Did anyone ever tell you how that final
21   decision came about?
22       MR. HUME: Same objection. If the
23   someone was a lawyer then make sure that they are
24   waiving the privilege.
25       A. I think if anything it would have been

Page 218

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI       218
2    one of the Weil lawyers that would have told me.
3        Q.  Did you have any discussions with
4    Mr. Lowitt about how the final decision was made?
5        A.  I don't recall, no.
6        MR. HUME:  Are you intending to finish
7    today?  You only have three minutes until
8    2 o'clock.
9        MR. MAGUIRE:  I am not going to finish
10   in three minutes.  I think we are going to go
11   a bit beyond that.  It might actually be feasible
12   but definitely not within the next three minutes
13   or probably the next 30 minutes.
14       MR. HUME:  Do the Creditors Committee
15   still expect to have questions?
16       MR. BUNTING:  45 minutes estimate.  I
17   think realistically, if you need to go today,
18   rather than try and compress into the time you
19   don't have an hour and a quarter, on the basis of
20   the commitment that you have made that you be
21   available at a time approximate to the Claxton
22   deposition in London.
23       MR. HUME:  That would seem to be
24   a convenient time for those of us coming over from
25   the US.

Page 219

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI       219
2        MR. BUNTING:  As long as we don't get
3    into an argument about getting time then that is
4    fine by us.
5        THE WITNESS:  My only concern is that we
6    don't have another very extended, unnecessarily
7    extended session, but I am happy to within reason
8    of course.
9        MR. HUME:  With the understanding that
10   it will not be a full day, it will be something to
11   accommodate the time, roughly half an hour,
12   roughly 45 minutes, maybe a little bit more time
13   but not a full day, a couple of hours, I think we
14   can make the commitment, and I believe the witness
15   will be around in London that week, perhaps on the
16   3rd.
17       THE WITNESS:  Yes.
18       MR. HUME:  You can check your calendar
19   to confirm 100 percent.  We can tentatively plan
20   for perhaps the afternoon or the morning of the
21   3rd.
22       MR. BUNTING:  That is good for us.
23       MR. MAGUIRE:  We may have to make
24   arrangements, not sure I can make it back,
25   arrangements either by phone or somebody

Page 220

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI       220
2    substituting, but we will work that out.
3        MR. BUNTING:  We will probably have the
4    same arrangement as today with Erica on the phone
5    and myself in person.
6        MR. HUME:  So we will agree to leave the
7    deposition open on that basis.
8        MR. MAGUIRE:  That is fine.
9        MR. TAMBE:  Thank you.
10       (Deposition concluded for the day at 2:00 pm.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 221

1      HIGHLY CONFIDENTIAL - PAOLO TONUCCI       221
2
3
4        CERTIFICATE OF DEPONENT
5
6    I, Paolo Tonucci, hereby certify that I have read
     the foregoing pages, numbered 1 through 223, of my
7    deposition of testimony taken in these proceedings
     on Friday, 14 August 2009, and, with the exception
8    of the changes listed on the next page and/or
     corrections, if any, find them to be a true and
9    accurate transcription thereof.
10
11
12
13
14   Signed:  ........................
15   Name:   Paolo Tonucci
16   Date:  ........................
17
18
19
20
21
22
23
24
25

Page 222

```
1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI      222
2           CERTIFICATE OF COURT REPORTER
3
4     I, AILSA WILLIAMS, an Accredited LiveNote Reporter
      for TSG Reporting, hereby certify that the
5     testimony of the witness Paolo Tonucci in the
      foregoing transcript, numbered pages 1 through
6     223, taken on Friday, 14 August 2009 was recorded
      by me in machine shorthand and was thereafter
7     transcribed by me; and that the foregoing
      transcript is a true and accurate verbatim record
8     of the said testimony.
9
10    I further certify that I am not a relative,
      employee, counsel or financially involved with any
11    of the parties to the within cause, nor am I an
      employee or relative of any counsel for the
12    parties, nor am I in any way interested in the
      outcome of the within cause.
13
14
15
16
17    Signed: ......................
18    AILSA WILLIAMS
19    Dated: August 14, 2009
20
21
22
23
24
25
```

Page 223

```
1     HIGHLY CONFIDENTIAL - PAOLO TONUCCI      223
2
3                    E R R A T A
4            Deposition of Paolo Tonucci
5     Page/Line No.      Description      Reason for
6     change
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23    Signed: ...................
24    Name:  Paolo Tonucci
25    Date:  ...................
```

# BCI EXHIBIT

# 99

1           HIGHLY CONFIDENTIAL – JOHN VARLEY                 1

2                 UNITED STATES BANKRUPTCY COURT

3                 SOUTHERN DISTRICT OF NEW YORK

4      - - - - - - - - - - - - - - - - - - - -

5      In Re:

                          Chapter 11

6

7      LEHMAN BROTHERS    Case No. 08-13555(JMP)

       HOLDINGS, INC. et al., (Jointly Administered)

8

9                         Debtors.

10     - - - - - - - - - - - - - - - - - - - -

11                   HIGHLY CONFIDENTIAL

12               DEPOSITION OF JOHN VARLEY

13               Thursday, September 3, 2009

14                   At:  12:00 pm

15                     Taken at:

16                      Barclays

                   1 Churchill Place

17                       London

                   United Kingdom

18

19     Reported by: AILSA WILLIAMS

       Certified LiveNote Reporter

20

21

22

23

24

25

Page 2

1  HIGHLY CONFIDENTIAL - JOHN VARLEY          2
2          A P P E A R A N C E S
3  JONES DAY, LLP
   Attorneys for Lehman Brothers, Inc.
4  222 East 41st Street
   New York, NY 10017-6702
5  BY: JAYANT W. TAMBE, ESQ
   BRIDGET CRAWFORD, ESQ
6
   BOIES, SCHILLER & FLEXNER, LLP
7  Attorneys for Barclays Capital and the
   Witness
8  5301 Wisconsin Avenue N.W
   Washington D.C 20015
9  BY: JONATHAN M. SHAW
10 QUINN, EMANUEL, URQUHART, OLIVER & HEDGES,
   LLP
11 Attorneys for the Creditors Committee
   16 Old Bailey
12 London, United Kingdom, EC4M 7EG
   BY: MATTHEW BUNTING, ESQ.
13
   HUGHES, HUBBARD & REED, LLP
14 Attorneys for the SIPA Trustee
   1775 I Street, N.W
15 Washington D.C. 20006-2401
   BY: JOHN F. WOOD
16 Also Present:
17 PHILIP E. KRUSE: Alvarez & Marsal
18 GREG BARDEN: Jones Day
19 DEBORAH COOPER: Barclays
20
21
22
23
24
25

Page 3

1  HIGHLY CONFIDENTIAL - JOHN VARLEY          3
2
3          I N D E X
4  JOHN VARLEY ... ... ... ... ... ...4
5  DIRECT EXAMINATION BY MR. TAMBE: .. ... ... ... ...4
6  CROSS-EXAMINATION BY MR. WOOD:  ... ... ... ... .90
7  CROSS-EXAMINATION BY MR. BUNTING:  ... ... ... .92
8  REDIRECT EXAMINATION BY MR. ... ... ... ... ... 112
   TAMBE:
9
   FURTHER CROSS-EXAMINATION BY MR. ... ... ... ... 114
10 WOOD:
11 FURTHER CROSS-EXAMINATION BY MR. ... ... ... ... 117
   BUNTING:
12
13     INDEX OF EXHIBITS
14 Exhibit 337A Powerpoint Presentation ... ... ... ... 19
15 Exhibit 338A E-mail, Rosen to Varley ... ... ... ... 37
16 Exhibit 339A Message from J. Varley ... ... ... ... 39
17 Exhibit 340A E-mail, Merson to Varley ... ... ... ... 40
18 Exhibit 342A E-mail, Clackson to Walker ... ... ... 48
19 Exhibit 343A Barclays Announcement ... ... ... ... 60
20 Exhibit 344A E-mail, HR to Varley ... ... ... ... 71
21 Exhibit 341A E-mail, from Lucas to Varley ... ... ... 73
22 Exhibit 345A E-mail, Chase to Barclays  ... ... ... 78
23 Exhibit 346A E-mail, Varley to Diamond  ... ... ... 95
24 Exhibit 347A E-mail, Le Blanc to Varley ... ... ... 96
25 Exhibit 348A E-mail, M. Smith to various ... ... ... 97

Page 4

1  HIGHLY CONFIDENTIAL - JOHN VARLEY          4
2          JOHN VARLEY
3      Having been duly sworn,
4      Testified as follows:
5  DIRECT EXAMINATION BY MR. TAMBE:
6      MR. TAMBE:  Good afternoon, Mr. Varley.
7  My name is Jay Tambe with the law firm of Jones
8  Day, special counsel to Lehman Brothers Holdings
9  Inc. With me is my colleague, Bridget Crawford.
10     I will let the other attorneys and folks
11 down the table introduce themselves to you on the
12 record and then we will get started.
13     MR. WOOD:  John Wood, from the law firm
14 Hughes, Hubbard & Reed, and we represent the
15 SIPA Trustee.
16     MR. BUNTING:  Matthew Bunting from
17 Quinn, Emanuel, Urquhart, Oliver & Hedges
18 representing Creditors Committee.
19     MR. KRUSE:  Phil Kruse with Alvarez &
20 Marsal on behalf of the LBHI estate.
21     MR. SHAW:  Jonathan Shaw, Boies,
22 Schiller & Flexner, on behalf of Barclays and
23 Mr. Varley.
24     MS COOPER:  Deborah Cooper, Head of
25 Group Litigation, Barclays.

Page 5

1  HIGHLY CONFIDENTIAL - JOHN VARLEY          5
2      MR. TAMBE:  We understand we have some
3  time constraints here. I think we have a total of
4  3 hours of your time and while reserving all of
5  our rights we want to make the best use of that
6  time.
7      What I would like to pose to you this
8  afternoon are a series of questions about the
9  Barclays/Lehman transaction and get your best
10 recollection and show you some documents and
11 discuss some documents with you. Is that fair?
12     A.  It is.
13     Q.  What is your current position, sir?
14     A.  I am the Group Chief Executive of
15 Barclays.
16     Q.  And within the structure at Barclays
17 where does that place you in the hierarchy?
18     A.  It is really as the name says, I am the
19 Chief Executive Officer.  We have a board, of
20 which I am a member.  There is a Chairman of the
21 board who is not an executive officer.  The board
22 has responsibility for strategy.  The board is
23 answerable to shareholders and I have
24 responsibility for implementing strategy.
25     Q.  As between you and Mr. Diamond, could

Page 6

HIGHLY CONFIDENTIAL - JOHN VARLEY                6

1
2  you describe the nature of that relationship and
3  hierarchy as between you and Mr. Diamond?
4      A.  Could you repeat the first part of your
5  question, which I didn't hear.
6      Q.  As between you and Mr. Diamond could you
7  describe the nature of that relationship in the
8  hierarchy between you and Mr. Diamond?
9      A.  I have a number of direct reports.  Bob
10  Diamond is one of those direct reports.  The way
11  that I run Barclays is that we have two principal
12  business divisions; one is called investment
13  banking and investment management and the other is
14  called global retail and commercial banking.
15  Mr. Diamond has responsibility for the businesses
16  within investment banking and investment
17  management.  He is also President of the group.
18      Q.  Going back to last year and the
19  Lehman/Barclays transaction, in broad strokes if
20  you can describe for me what was the role that you
21  played, what was your individual involvement in
22  considering that deal, negotiating that deal,
23  taking that deal through the board, whatever other
24  steps you may have taken?
25      A.  Perhaps it would help if I answer the

Page 7

HIGHLY CONFIDENTIAL - JOHN VARLEY                7

1
2  question within the context of the operating
3  protocols here.  I said to you a moment ago that
4  as Chief Executive Officer I am answerable to the
5  board for the implementation of strategy.  We
6  employ 140-odd thousand people in Barclays.  We do
7  business in 50 countries or so, and the breadth of
8  that business requires delegation of operational
9  activity.
10      So Bob Diamond, as head of the
11  investment banking and investment management
12  business, has operational responsibility for the
13  running of those businesses within a strategic
14  framework that I impose on that business and the
15  other businesses.  That operating protocol would
16  apply to this particular transaction.
17      So that I had responsibility for taking
18  the strategy of the acquisition of the Lehman
19  North American businesses to the board, discussing
20  that with the board, receiving their authority to
21  implement, and I then delegated, subject to the
22  strategic framework that we had set for the
23  transaction, I then delegated responsibility for
24  the negotiation and the execution of the
25  transaction to Bob Diamond.

Page 8

HIGHLY CONFIDENTIAL - JOHN VARLEY                8

1
2      Q.  Is it fair for me to say, based on that
3  answer, that you were not involved directly in
4  negotiating any aspect —
5      A.  I am sorry, you did ask me that question
6  and I didn't answer it.  You are right, I was not
7  involved at all in the negotiations.
8      Q.  So you delegated that to Mr. Diamond,
9  and I assume Mr. Diamond had other people doing
10  various tasks that fall within the negotiating and
11  execution of that strategy?
12      A.  That is a fair assumption.
13      Q.  Okay.  In terms of the overall strategic
14  view of this transaction, my understanding from
15  seeing the documents and listening to some
16  witnesses is the strategy evolved as the financial
17  crisis unfolded.  It seems to me that Barclays had
18  one view of the kind of transaction it wanted to
19  do at Lehman prior to Lehman filing for
20  bankruptcy, it then reached a set of terms with
21  Lehman soon after Lehman Brothers filed for
22  bankruptcy, and maybe that deal evolved again.
23      In very broad terms, if you could set out for me
24  how your strategy and view of the transaction evolved.  It
25  may all have been in a very compressed period of time but my

Page 9

HIGHLY CONFIDENTIAL - JOHN VARLEY                9

1
2  sense was there was an evolution there.
3      A.  Actually there was no evolution of the
4  strategy.  I mean the way that I think of strategy
5  is that strategy should be at its best enduring.
6  The context for the implementation of strategy may
7  change with the environment but the strategy that
8  caused us, that brought us to the Lehman
9  transaction, to answer as you require me to at the
10  general level, the strategy that brought us to the
11  Lehman transaction is a strategy that had at its
12  heart the pursuit of higher growth in Barclays
13  over time by business line and geographical
14  diversification.
15      If I can illustrate that point, if I take you back
16  to the beginning of this decade, Barclays was a business
17  that was substantially based in the UK, with the
18  overwhelming majority of its earnings coming from retail and
19  commercial banking here in the UK.
20      What I have been doing, as Chief Executive, is to
21  diversify Barclays' earning base, partly by growing non-UK
22  retail and commercial banking businesses, partly by growing
23  non-retail and commercial banking businesses, and a lot of
24  that growth has also been outside the United States.
25      We have felt for some time that our exposure to

Page 10

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    10
2    the United States is smaller than it should be, and you will
3    know, as I do, that if you choose to compete in the United
4    States you need to choose your ground carefully. Many
5    foreign companies have tried and failed in your country. We
6    have chosen a limited set of competitive fields in the
7    United States, of which investment banking is one.
8        So there were two things that we were seeking to
9    do through the Lehman transaction. One was to increase
10   significantly the size of the investment banking business in
11   the biggest capital market in the world, and second to
12   increase our exposure to the United States, because the
13   United States is the biggest generator of economic profit in
14   the financial services industry today.
15       Those two broad strategic thrusts caused us to
16   identify this as an opportunity of strategic advancement.
17       I would say that you could apply -- to
18   your sort of ancillary point, I would say that you
19   could apply that thinking to each of the
20   iterations of the Lehman's transaction that we
21   examined. You know, that is the way that I would
22   look at it, and I think that is the way the board
23   would look at it here.
24       Q.  In terms of obtaining authority from the
25   board to pursue the strategic or pursue the

Page 11

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    11
2    strategy with respect to Lehman, again describe
3    for me broadly, and we will get into more specific
4    board materials, on how many occasions did you
5    have to go back to the board with different
6    aspects of the Lehman deal? Was there an initial
7    authority granted by the board that then changed
8    over time? If you can just describe that process
9    for me.
10       A.  Let me try. Again, I would start with
11   the strategic framework, which is a board that has
12   accepted the proposition that we should seek to
13   grow our exposure in the United States and that we
14   should seek to globalize our investment banking
15   business. That is a strategic anchor point that
16   has existed in Barclays for some years.
17       In working our way through the credit
18   crunch we had had from time to time discussions
19   with the board in which we said that the crisis
20   might create opportunities that would not exist
21   outside the crisis, and we had had a general
22   discussion with the board here in June of last
23   year in which we examined, at the strategic level
24   only, and discussed the opportunity to advance the
25   strategy that I have described to you down two

Page 12

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    12
2    potential avenues, of which Lehman was one.
3        This was, as I say, a high level
4    strategic review, where the premise was: If it
5    should become possible to do a transaction with
6    Lehmans, do you, the board feel, as I the Chief
7    Executive feel, that this would be a good way of
8    implementing the strategy?
9        Q.  And at that June 2008 discussion were
10   any materials submitted to the board analyzing
11   Lehman's business and the nature of that
12   opportunity?
13       A.  You may well need to refresh my memory
14   on that point. I presume that there were some
15   board materials tabled at that time but I don't
16   have a clear recollection of what they were, but
17   as an example we might have tabled for the board:
18   This is what the Lehman's business looks like.
19   Here is public disclosure relating to Lehman's.
20   This is where its people are. This is where its
21   earnings are derived from, and so on.
22       Q.  I can't refresh your recollection on
23   that. I don't think we have any materials from
24   that time period. The reason I ask the question
25   is that type of discussion with the board, where

Page 13

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    13
2    it got to that level of specifics, Lehman was
3    discussed, that would have been done with the
4    benefit of at least some written materials?
5        A.  I should not indulge in idle speculation
6    and I have a fallible memory.
7        Q.  You have been well trained for the
8    deposition. Go ahead.
9        A.  So, if I then go in a sense the more
10   proximate to the transaction part of your
11   question --
12       Q.  So we left June behind?
13       A.  We left June behind, and I do not recall
14   precisely whether between June and the middle
15   of September there was any -- there was certainly
16   no lengthy discussion of the Lehman opportunity at
17   the one board meeting that took place between June
18   and mid-September, but certainly it is possible I
19   think that we may have said that the Lehman
20   situation appeared to be deteriorating. Then, and
21   again I don't have precise recall, there were
22   various board discussions in the run up to
23   a telephone meeting of the board that we had on
24   the Sunday.
25       Q.  The Sunday before the bankruptcy filing?

Page 14

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    14
2    A.  Yes, so I think I am talking about
3  Sunday 14 September. I believe, and I think there
4  may also have been a further telephone meeting of
5  the board on the Tuesday or the Wednesday,
6  probably the Tuesday, given that we made, as you
7  know, an announcement on the Wednesday.
8    Q.  Let's take those two events in turn.
9  The Sunday board meeting, by Sunday 14 September
10  you already had a due diligence team that was
11  doing a fairly deep dive into Lehman's books.
12  Correct?
13    A.  We did.
14    Q.  And you had made some initial I guess
15  conclusions about assets that you found attractive
16  and assets that you did not want to purchase at
17  all. Is that fair?
18    A.  Well, we had concluded some initial due
19  diligence and had a point of view.  If I can just
20  back up for one moment, it will be a convenience,
21  if you are prepared to allow it, for me to refer
22  to the transaction that we were looking at on the
23  Saturday and the Sunday as Lehman one.
24    Q.  That would be helpful.
25    A.  The transaction that we announced on

Page 15

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    15
2  Wednesday as Lehman two and the transaction that
3  we implemented as Lehman three.
4    Q.  That is very helpful.
5    A.  If that helps.
6    Q.  No, that is very helpful.
7    A.  The due diligence that we were doing at
8  the back end of those weeks before the bankruptcy
9  filing, that due diligence was aimed at Lehman
10  one.  We had identified a number of areas where we
11  felt that the valuations applied by Lehmans to
12  their balance sheet were optimistic.  Now, you
13  will conclude whether that coincides with your
14  description, but that would be my description.
15    Q.  Let's drill down a little bit more,
16  because my understanding is not only you had
17  identified these assets where you found Lehman's
18  valuations to be optimistic, maybe overly so, but
19  you had then taken the next step of listing them
20  as excluded assets in any contemplated
21  transaction?
22    A.  Um hum.
23    Q.  Is that fair?
24    A.  What we did, and here I am recalling
25  a set of conversations that we had with the US

Page 16

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    16
2  administrations in its various guises, we
3  indicated that we would not be able to, we would
4  not be prepared to proceed with Lehman one if
5  certain assets came with the Lehman one
6  transaction.
7    Q.  Just to be clear on the record, you are
8  talking about discussions you had with the US
9  Government, about the role the US Government might
10  play, if any, in the Lehman one transaction?
11    A.  Yes.
12    Q.  And you were discussing a backstop or
13  some kind of a Government facility that would in
14  effect cover the risk of loss on those assets that
15  you would exclude from your transaction?
16    A.  As I recall it, we were looking at two
17  particular areas. One was a set of assets that we
18  didn't want to acquire, and two was the
19  guaranteeing for the period between announcement
20  and closing, which could have been a period of
21  several months, the guaranteeing of the trading
22  liabilities of Lehman's through that period.
23    In a sense we were indifferent to how those
24  particular steps were procured, whether by the US Government
25  as principal or whether by the US Government as agent with

Page 17

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    17
2  other principals, but we were clear going into the Lehman
3  one transaction that the Lehman one transaction, if it would
4  be executed by Barclays, would have to have those features.
5    Q.  And the period of time that you
6  described between signing up the agreement and the
7  closing of the transaction, was that a function of
8  the approvals that you needed to obtain from your
9  shareholders?
10    A.  Partly, but partly regulatory approvals
11  and partly the sheer complexity of a transaction
12  of that size. I mean, my recollection is that the
13  Lehman's balance sheet was, you know, two-thirds
14  of a trillion dollars.  There was a lot of
15  complexity in it. Any transaction involving such
16  an acquisition takes time to close, as you know.
17    Q.  I just want to drill down this
18  two-thirds of a trillion dollars number, just
19  because there is a lot of zeros that end up flying
20  around here. That is what, $600 billion?
21    A.  My recollection is that the Lehman
22  balance sheet on the Friday night before Lehman
23  went into administration, the gross balance sheet
24  was about $670 billion.
25    Q.  And the Lehman one transaction that you

Page 18

1    **HIGHLY CONFIDENTIAL - JOHN YARLEY**    18
2    described, what did you contemplate acquiring off
3    of that balance sheet of $670 billion?
4        A.  I do not recall the precise number.  It
5    would have been the majority of the balance sheet
6    but it would not have been all of the balance
7    sheet.  You will recall that I said in answer to
8    your earlier question that we had formed a point
9    of view about various assets that we were not
10   prepared to acquire and that were we not able to
11   ring fence and exclude those then we were not
12   prepared to proceed.
13       Q.  I am just confused because we may have
14   an extra zero here.  I thought the assets that you
15   were thinking of acquiring in Lehman one were
16   somewhere south of 100 billion dollars, somewhere
17   in the range of 70 or $75 billion?
18       A.  That was Lehman two.
19       Q.  That was Lehman two, so Lehman one was
20   in fact as large as you have indicated?
21       A.  I think it is a matter of public record
22   that what we were looking at was the acquisition
23   of Lehmans, full stop.
24       Q.  Why did Lehman one not go through?
25       A.  Well, I mentioned to you a moment ago,

Page 19

1    HIGHLY CONFIDENTIAL - JOHN YARLEY    19
2    in response to an earlier question, that we had
3    formed a judgment around the board table that
4    there were some conditions precedent that we would
5    apply to a Lehman's one transaction, if we were to
6    execute it, and the conditions precedent were
7    broadly twofold.  One was the ring fencing and
8    excising from the transaction of assets that we
9    were not prepared to take, and second was the
10   issuance of a US Government guarantee on the
11   trading liabilities of Lehmans for the period
12   between announcement and closing.  It was clear to
13   us that we were not going to be able to satisfy
14   both those conditions precedent.
15       (Exhibit 337A marked for identification)
16       MR. SHAW:  Take a few minutes.
17       MR. TAMBE:  I have had placed before you
18   a document marked Exhibit 337A.  It is a cover
19   e-mail and what appears to be a Powerpoint
20   presentation behind it.  Take a moment to look at
21   it, let me know when you are done, and I will ask
22   you some questions about it.
23       A.  Thank you.
24       Q.  The attachment to Exhibit 337A is
25   a transaction that has been discussed there, two

Page 20

1    **HIGHLY CONFIDENTIAL - JOHN YARLEY**    20
2    versions of the Lehman one transaction.  Is that
3    right?
4        A.  Yes, I believe so.
5        Q.  Can you tell from looking at the
6    document or the cover e-mail whether this was
7    a document that was submitted to the board for the
8    board's consideration for the Sunday meeting?
9        A.  I can't tell from this.  The sender is
10   somebody who assists Bob Diamond and the
11   recipients are either members of the Group
12   Executive Committee or some members of the Group
13   Executive Committee, which I chair, and Rich
14   Ricci, whose identity you will be familiar with.
15       Q.  In the attachment there is a reference
16   to a Long Island transaction, and you refer to the
17   Lehman transaction broadly as the Long Island
18   transaction, correct?
19       A.  Yes.
20       Q.  And Baltimore was a reference to
21   Barclays, correct?
22       A.  Correct, yes.
23       Q.  There are two scenarios laid out,
24   starting on page 3, and referenced throughout this
25   presentation.  If you could briefly describe for

Page 21

1    HIGHLY CONFIDENTIAL - JOHN YARLEY    21
2    me what was the difference in approach between
3    these two scenarios?
4        A.  Well, I would suggest to you that it is
5    as they are labeled.
6        Q.  Was there one that was preferred over
7    the other?
8        A.  I don't recall.
9        Q.  Were you pursuing both at the same time?
10       A.  I think what we were being presented
11   with here was a way of looking at the potential
12   economic outturns of a transaction.  In other
13   words, I think it would be unrealistic to say:
14   "Well, we want the no synergies no write down
15   route or the synergies plus write down route."
16   That is not the way that transactions get
17   executed, as you know.
18       What we are looking at here is hypothetical perms,
19   trying to establish a range of strategic and financial
20   outturn.
21       Q.  There is a reference on page 3 under the
22   scenario two column, the third bullet makes
23   a reference to "Write downs include additional
24   impairment of Long Island assets of 7.5 billion"
25   and in parentheses "in addition to those included

Page 22

1          HIGHLY CONFIDENTIAL - JOHN VARLEY          22
2    in scenario one, total 10.8 billion pretax". Do
3    you see that?
4         A.   I do see that.
5         Q.   The write down of $7.5 billion in Long
6    Island assets, was that a target or was that the
7    result of your analysis that there in fact would
8    be a write down of that amount?
9         A.   I talked earlier about the fallibility
10   of my memory. I have no recollection of which of
11   those two it was.
12        Q.   Who would know the answer to that?
13        A.   Just repeat your question, could you?
14        Q.   Could you repeat it?
15             (Read back)
16        A.   It is possible that Bob Diamond would
17   have a recollection of that. It is possible that
18   Rich Ricci would have a recollection of that.
19        Q.   At least from your understanding of the
20   transaction, is it possible that there was
21   a target that you were shooting for, a write down
22   target of 7.5 billion?
23        A.   No, I think that is unlikely. If you
24   ask me to -- if we just step back for a moment,
25   this document is dated Friday 12th. It felt as

Page 23

1          HIGHLY CONFIDENTIAL - JOHN VARLEY          23
2    though the world was coming to an end on Friday
3    the 12th. Actually it felt closer to the end of
4    the world on the following Monday and Tuesday. We
5    had to take a conservative approach to valuations
6    because valuations were more volatile over that
7    period than in any period that I can remember in
8    my 25 years in banking.
9             We were not, as I would assume, reading
10   this -- my recollection is imperfect as I say --
11   but my assumption is that we were not targeting,
12   we were simply reflecting a conservative
13   assessment of what was happening to the valuation
14   of the assets. You just have to look at Stock
15   Market volatility over that period to understand
16   how dangerous it was to make inadequately
17   conservative judgments about the possible downside
18   in a balance sheet of this size.
19        Q.   Why did you do the deal then, if things
20   were so perilous?
21        A.   We took a risk judgment. We took a risk
22   judgment, and the deal we did was not this deal,
23   as you know. Remember that this is Lehmans one.
24   You will see in here, maybe you saw it -- I was
25   wrong as to 670, it was 600. 7 and a half billion

Page 24

1          HIGHLY CONFIDENTIAL - JOHN VARLEY          24
2    dollars on $600 billion is roughly a percent.
3    Stock markets were moving by 15 per cent in a
4    48-hour period at that time. That is what I mean
5    by volatility.
6         Q.   I guess that is where I am not following
7    you then. If things were so volatile, why were
8    you running a scenario, scenario two, which had
9    the write down, had a one percent write down?
10             MR. SHAW: Objection, foundation.
11        Q.   Was that being adequately conservative
12   in your write downs?
13        A.   Well, I think the question that I would
14   ask myself is did we proceed with this
15   transaction? You know the answer to that
16   question.
17        Q.   The concerns about volatility and risk
18   persisted in your consideration of Lehman two and
19   in your execeution of Lehman three, correct?
20        A.   Yes.
21        Q.   Would you turn to page 15. You will see
22   here there seems to be a breakdown of a 7.4 or
23   $7.5 billion number. Do you see that?
24        A.   I do.
25        Q.   There is a column labeled "valuation

Page 25

1          HIGHLY CONFIDENTIAL - JOHN VARLEY          25
2    uncertainty", and there is a series of rows with
3    different asset classes. Do you see that?
4         A.   I do.
5         Q.   If I am reading that correctly, I see
6    that analysis as suggesting a valuation
7    uncertainty of 7.4 billion versus $65 billion of
8    the enumerated assets on page 15, and no
9    evaluation uncertainty as to the other assets of
10   534 billion. Am I reading that correctly?
11        A.   You may or may not be. It is not clear
12   to me from looking at this. Nor is my
13   recollection clear as to whether we had a view
14   about valuation uncertainty in relation to the
15   534.9 or whether we didn't. All this tells you is
16   that we did have a view about valuation
17   uncertainty relating to the 65.1.
18        Q.   Looking at the headings for the itemized
19   assets, so starting with commercial mortgages down
20   to SIVs and SIYs lite, as the deal progressed from
21   Lehman one to Lehman two and then to Lehman three,
22   would you agree with me that those are the types
23   of assets you sought to exclude from the
24   transaction?
25             MR. SHAW: Objection, compound.

## Page 26

HIGHLY CONFIDENTIAL - JOHN VARLEY                26

1
2      A. Say again?
3          MR. SHAW: I said it is a compound
4   question but you can answer it if you can.
5      A. My recollection is that within the
6   balance sheet that we acquired in Lehman three
7   there was some but not much exposure to the asset
8   classes referred to here.
9      Q. And in Lehman two you had sought to
10  exclude these asset classes entirely?
11     A. The answer I have just given you in
12  relation to Lehman three I think would also be
13  relevant to your Lehman two question, in other
14  words that there would be I believe some small
15  components of these asset classes within the
16  Lehman two balance sheet that we were
17  contemplating.
18     Q. It seems to me from the answers you have
19  been giving that clearly you saw a big change from
20  Lehman one to Lehman two in terms of type of deal
21  contemplated by Lehman one to the type of deal
22  contemplated by Lehman two, correct?
23     A. Yes.
24     Q. Did the deal change significantly in
25  your view between Lehman two and Lehman three?

## Page 27

HIGHLY CONFIDENTIAL - JOHN VARLEY                27

1
2      A. The principal difference between Lehman
3   one -- I will come to Lehman two and Lehman three
4   in a minute, but the principal difference between
5   Lehman one and Lehman two was that with Lehman one
6   we were acquiring the entire enterprise and with
7   Lehman two we were acquiring Lehmans North
8   American broker dealer business, so they were very
9   different propositions, in a sense illustrated by
10  the balance sheet size point, which is that the
11  total balance sheet of Lehmans pre the weekend in
12  question was $600 billion and what was
13  contemplated in Lehman two, as I recall, was
14  a balance sheet of about $70 billion. So there
15  was a significant difference between those two.
16          The difference between Lehman three and Lehman two
17  was really the size of the balance sheet. The business that
18  we were acquiring was Lehman Brothers North America
19  business, the number of people that we were contemplating
20  hiring was I think unchanged or substantially unchanged as
21  between Lehman two and Lehman three. The difference lay in
22  the size of the balance sheet acquired. From a strategic
23  point of view, there was no difference at all between Lehman
24  two and Lehman three. From a strategic point of view there
25  was a very significant difference between Lehman one and

## Page 28

HIGHLY CONFIDENTIAL - JOHN VARLEY                28

1
2   Lehman two.
3      Q. You estimated the size of Lehman two at
4   about $70 billion. What is your recollection of
5   the size of Lehman three?
6      A. About $50 billion, somewhere between 40
7   and $50 billion.
8      Q. In your recollection, what accounted for
9   the difference between 70 billion, roughly
10  70 billion for Lehman two and roughly 50 billion
11  for Lehman three?
12     A. Two things principally. The first would
13  be that as a result of the -- if I back up, you
14  may recall that the Fed required that it was taken
15  out of the equation, and we had a view in Lehman
16  two about the assets that would be populating the
17  Lehman two balance sheet. As a result of the
18  taking out of the Fed, through a repo trade which
19  took place on as I recall the Thursday, the assets
20  that were available, quotes "were available"
21  through Lehman two were not the assets that we had
22  expected to acquire in Lehman two. They were
23  different.
24     Q. Fewer assets?
25     A. Point number 1 --

## Page 29

HIGHLY CONFIDENTIAL - JOHN VARLEY                29

1
2      Q. Just so I understand it, there were
3   fewer assets available?
4      A. Different assets.
5      Q. Different assets?
6      A. Point number two, the markets were very
7   volatile. Valuations were falling and therefore
8   the trend of the size of the balance sheet, just
9   as a result of the marking to market that was
10  occurring day by day was down. Those would be the
11  two principal things that drive the difference
12  between Lehman two and Lehman three.
13     Q. In terms of the consideration that
14  Barclays was going to pay, did that change between
15  Lehman two and Lehman three?
16     A. My recollection is that we had an
17  estimate of the cost of the Lehman two
18  transaction, and the principal area of softness in
19  that estimate was the valuation attributable to
20  the buildings that we would acquire. The building
21  valuation, as I recall, of the marking to market
22  the end of the week in question. So it may be
23  that we had estimated, and I believe I recall that
24  we had estimated a somewhat higher building
25  valuation number, and my recollection also is that

Page 30

HIGHLY CONFIDENTIAL - JOHN VARLEY                    30

1    we sought a third party valuation, and that third
2    party valuation came in somewhat lower than had
3    been discussed as between Lehman management and
4    Barclays management. I think that that would be
5    the principal difference.
6         The one other thing that I would say is that the
7    fixed point as we went into Lehman one and as we started to
8    discuss Lehman two was the mark-to-market of the balance
9    sheet on Friday 12 September, but that mark-to-market became
10   immediately irrelevant as the markets opened on Monday,
11   because the markets were collapsing on Monday, and that of
12   course was influencing our approach to valuation.
13        Q. You talked about the value of the
14   buildings. That was one component of the
15   consideration that Barclays paid. What else did
16   Barclays pay in the form of consideration?
17        A. We paid $250 million.
18        Q. Anything else?
19        A. Well, you might cavil at the definition
20   of "payment" but we took responsibility for 10,000
21   people and the ongoing liabilities of a very big
22   business. Whether you regard that as payment or
23   not, you will be the judge of that, but I regard
24   it as a big element of financial risk that we took
25

Page 31

HIGHLY CONFIDENTIAL - JOHN VARLEY                    31

1    on, in addition to the payment that we made, to
2    say nothing of, and believe me it was very much in
3    my mind, to say nothing of the volatility in the
4    balance sheet.
5         Q. On the responsibility for the people,
6    are you referring to the comp and the cure
7    assumptions of liability, the compensation
8    liabilities and the liabilities to cure defaults
9    in contracts?
10        A. I don't know that I am familiar
11   precisely with the second point. The first point,
12   I mean we hired 10,000 people. It costs quite
13   a lot of money to run 10,000 investment bankers.
14        Q. Did you assume any historical Lehman
15   liabilities with respect to those 10,000 people or
16   any of them?
17        A. There was an obligation created by the
18   pre-existing Lehman management in relation to the
19   2008 compensation prospects of the Lehman team,
20   and we assumed that obligation.
21        Q. Do you know roughly what the amount of
22   that obligation was?
23        A. I do. Roughly the amount of the
24   obligation was $2 billion, distinguished as I
25

Page 32

HIGHLY CONFIDENTIAL - JOHN VARLEY                    32

1    recall it as to about 50 per cent in cash and
2    about 50 per cent in equity.
3         Q. Do you know if Barclays has fulfilled
4    that obligation?
5         A. I do know that we have fulfilled that
6    obligation.
7         Q. How do you know that?
8         A. $2 billion is quite a large obligation.
9         Q. That is real money.
10        A. It is real money, and we always
11   understood going into this transaction that there
12   was an expectation that we had to honor, so in the
13   usual way, as we do these things at the year-end,
14   I am talking now about Barclays on its own,
15   ex-Lehman, we would review what we think is
16   appropriate and make discretionary awards or bonus
17   payments.
18        In the case of the Lehmans staff there was no
19   discretion, the obligation pre-existed, and it is an
20   obligation as I say that we felt duty bound to honor.
21        Q. Have you spoken to someone other than
22   your counsel recently about whether in fact you
23   have paid out $2 billion off this historic Lehman
24   obligation that you took on?
25

Page 33

HIGHLY CONFIDENTIAL - JOHN VARLEY                    33

1         A. I have not spoken to anybody about it
2    recently, no.
3         Q. But you know that it has in fact been
4    satisfied?
5         A. Well, I mean I didn't pass the ledger
6    entries myself. I would regard that as fitting
7    within the delegation of operational authority
8    that I referred to earlier. Barclays Capital,
9    enlarged as it is by the entry of a large number
10   of Lehman staff, has responsibility for paying its
11   staff. Barclays Capital will have presided over
12   the payments of those obligations.
13        Q. Other than these staff or compensation
14   related obligations were there any other
15   obligations that Barclays assumed in connection
16   with this transaction?
17        A. If I give you an example of the sort of
18   thing that I would expect, I am sure that there
19   were extensive data provision contracts by I am
20   guessing Bloomberg, by Reuters. Those were
21   contracts which would have been important for the
22   ongoing business of Lehmans that we had acquired.
23   We would have assumed such obligations.
24        Q. You have mentioned the increasing

HIGHLY CONFIDENTIAL - JOHN VARLEY                    34

2  volatility and risk from Friday the 12th over the
3  weekend into Monday and Tuesday, and you were
4  taking the risk, right?
5      A.  When you say we were taking a risk --
6      Q.  You were taking a risk in going through
7  with this transaction in such perilous markets?
8      A.  I think the business of banking is risk
9  taking.
10     Q.  And this was one of the bigger risks you
11  were taking?
12     A.  We took a big risk.
13     Q.  How did you try to protect yourself from
14  the risk of the volatility of prices?
15     A.  You will recall that in the announcement
16  we made — beg your pardon, you may or may not
17  recall, but in the announcement we made on the
18  Wednesday after Friday the 12th --
19     Q.  So the conference call with the analyst?
20     A.  Yes, which was the announcement of
21  Lehmans two, we made the point very clearly, both
22  in the announcement and in the conversation that
23  we had with the market, that there was
24  a difference between the quantum of assets and
25  quantum of liabilities in the balance sheet, and

HIGHLY CONFIDENTIAL - JOHN VARLEY                    35

2  that was because there had been a significant
3  shift in valuations and because markets were
4  volatile, and therefore it was appropriate for us
5  and would be actually in any transaction of this
6  size; let alone a transaction of this size in
7  those markets, it would be appropriate for us to
8  seek a discount and indeed obtain a discount to
9  the asset valuation, were we to proceed with the
10  transaction, and that differential was about
11  $4 billion.
12     Q.  And the discount that you are referring
13  to was between the 72 and the 68 that was
14  discussed on Wednesday, the 17th, in your analyst
15  call and press releases, right?
16     A.  That is the discount that I am referring
17  to, and I think it is important to stress, though,
18  that what we were looking at was the moving
19  realtime balance sheet of Lehmans two, as compared
20  with the balance sheet position on the Friday
21  night, and what I would say is that because of the
22  unprecedented volatility of markets that week our
23  conservatism, in other words the importance of the
24  preservation of that delta between asset valuation
25  and liability valuation, became the more important

HIGHLY CONFIDENTIAL - JOHN VARLEY                    36

2  with the passing of each day.
3      Q.  And as the deal changed from Lehman two
4  to Lehman three, you preserved that delta?
5      A.  It was, as I saw it, an essential
6  ingredient of my willingness to proceed with the
7  transaction, because of the incipient uncertainty.
8      Q.  Once you are into Lehman two and you
9  have announced to the world that the outlines of
10  Lehman two, you have now got a number, you have
11  got this 4 billion-dollar delta, is that
12  4 billion-dollar delta then the target as the deal
13  changes from Lehman two to Lehman three? I would
14  expect it to be --
15     A.  I am just thinking carefully about how
16  I thought about it at the time.  How I thought
17  about it at the time was that we had to protect
18  a margin to ensure that as the valuations in the
19  balance sheet were realized, and you should know
20  that they have not yet fully been realized, in
21  other words our expectation was that the risk
22  period would be very protracted, we needed to
23  ensure that we had an appropriate margin. I don't
24  know whether "target" is quite the right way of
25  describing it, but I was certainly very fixated on

HIGHLY CONFIDENTIAL - JOHN VARLEY                    37

2  the need to have a substantial discount.
3      Q.  Do you recall a discussion on Friday,
4  the 19th, where some of the folks that report to
5  you reported to you that maybe there was not
6  enough cushion or delta because of the assets that
7  in fact had been transferred over, and therefore
8  there was a need to obtain additional assets? Do
9  you recall any discussion like that?
10     A.  I don't, no.
11     Q.  Do you know whether Barclays acquired
12  any assets other than the assets that were
13  transferred from the Fed repo to Barclays?
14     A.  I don't know whether we did or whether
15  we didn't.  I would be surprised if we did.
16     (Exhibit 338A marked for identification)
17     Q.  This is number 338A. I have placed
18  before you a document marked 338A. It is a real
19  short e-mail. If you can just let me know when
20  you are done reviewing it, we can talk about it
21  briefly.
22     A.  Thank you, yes.
23     Q.  This is an e-mail to you from Jeff Rosen
24  at Lazard. Do you see that?
25     A.  Yes.

Page 38

HIGHLY CONFIDENTIAL - JOHN VARLEY          38

1
2    Q.  Is Jeff Rosen someone you had been
3    communicating with over the weekend in connection
4    with the Lehman one transaction?
5    A.  My recollection is imperfect.  We have
6    a number of advisers.  Lazards, of whom Jeffrey is
7    a senior director, often advised us on
8    transactions.  Actually, my recollection is that
9    we did not engage them or seek their advice on
10   this transaction, but as you will know that
11   doesn't always prevent investment bankers trying
12   to advise you on a transaction.
13   Q.  So there is no mystery, Lazards was an
14   adviser to Lehman in the transaction.
15   A.  Um hum.
16   Q.  Does that help your recollection?
17   A.  It would certainly confirm that we
18   didn't retain them ourselves.
19   Q.  That is why I am just trying to figure
20   out why Mr. Rosen is contacting you and
21   Mr. Diamond directly on the morning that Lehman
22   filed for bankruptcy.
23   A.  Because he is the relationship lead
24   under Bruce Wasserstein at Lazard, and in the
25   ordinary course of any three-month period he would

Page 39

HIGHLY CONFIDENTIAL - JOHN VARLEY          39

1
2    quite often ring me to talk about what is going on
3    in the market, and this was such a call.
4    Q.  Okay.  Do you recall having a discussion
5    with Mr. Rosen following this e-mail?
6    A.  Do you know, I don't think I did have
7    a conversation with him actually.
8    Q.  Do you remember having a conversation
9    with anyone else from Lazards in connection with
10   the Lehman transaction?
11   A.  I don't.
12   (Exhibit 339A marked for identification)
13   Q.  Sir, I have placed before you a one page
14   document marked Exhibit 339A.  Take a moment to
15   look at it, let me know when you are done.
16   A.  Thank you.
17   Q.  Do you recognize this as an e-mail that
18   you sent to I guess the senior leaders at the bank
19   announcing the Lehman two transaction?
20   A.  I recognize it as a communication that
21   I sent to the senior leaders of the group.  It was
22   not announcing a Lehmans two transaction.  It was
23   indicating the possibility of a Lehmans two
24   transaction.
25   Q.  In the second paragraph of your

Page 40

HIGHLY CONFIDENTIAL - JOHN VARLEY          40

1
2    announcement you make a reference to the
3    "opportunity to purchase what we regard as the
4    good parts of the investment bank (including
5    people, infrastructure and licenses) without
6    having to take on any exposure to the bad parts".
7    Do you see that?
8    A.  I do see that, yes.
9    Q.  Was that basically the formula you
10   followed in coming up with the Lehman two
11   transaction?
12   A.  Although I didn't do it explicitly
13   there, what I was seeking to do, remember that
14   they had been hearing in the media about the
15   Lehman one transaction, was to juxtapose Lehman
16   one and Lehman two, in other words this was
17   a transaction which was smaller, where we could be
18   more selective.  That was the point that I was
19   seeking to make by that remark.
20   MR. SHAW:  Is this a logical time for
21   five minutes?
22   MR. TAMBE:  Yes, we can break now.
23   (A short break).
24   (Exhibit 340A marked for identification).
25   Q.  I have handed you a 2-page document

Page 41

HIGHLY CONFIDENTIAL - JOHN VARLEY          41

1
2    marked Exhibit 340A.  Take a moment to review it,
3    let me know when you are done.
4    A.  Thank you.
5    Q.  This is an e-mail to you from Mark
6    Merson.  Do you see that?
7    A.  Yes, it is, yes.
8    Q.  This was in preparation for the call
9    that you had with analysts on 17 September,
10   correct?
11   A.  Correct.
12   Q.  This collection of bullet points, are
13   these issues that you had discussed with
14   Mr. Merson to develop this list of talking points?
15   A.  No, I had not.
16   Q.  So this is something that he would have
17   prepared for your review?
18   A.  Yes.
19   Q.  He says in the introduction to his
20   e-mail: "John, as we agreed..."
21   A.  Um hum.
22   Q.  Had you had a discussion with Mr. Merson
23   about the points he was going to address in this
24   draft?
25   MR. SHAW:  Asked and answered.

Page 42

1      HIGHLY CONFIDENTIAL - JOHN VARLEY        42
2      A. Say again?
3          MR. SHAW: Go ahead, you can answer.
4      A. No, I had not. He rang me, as I recall,
5   to ask whether it would be helpful if he prepared
6   an outline, and that is what this is.
7      Q. On the second page of the exhibit, about
8   halfway down the bullet points, there is a bullet
9   point that begins:
10      "Together with negative goodwill from
11   transaction of approximately ($2 billion post tax)".
12      Do you see that?
13      A. I do, yes.
14      Q. Do you have an understanding as to what
15   that is a reference to, "negative goodwill"?
16      A. Yes, it is a technical term which is
17   applied within the international financial
18   reporting standards by which our accounting is
19   governed. Let me try to explain it. If you
20   acquire for a purchase consideration of 10 assets
21   or a business that has a net asset value of five,
22   then you would create goodwill of five, and
23   goodwill is subject to an impairment test, it is
24   carried in the balance sheet and subject to an
25   impairment test.

Page 43

1      HIGHLY CONFIDENTIAL - JOHN VARLEY        43
2      If on the other hand you acquire assets
3   of 10 for a valuation of five, then there would be
4   negative goodwill of five because of the discount
5   at which you are buying the assets. So negative
6   goodwill is a term of science describing in
7   a scientific way what most people would refer to
8   as a discount.
9      Q. Just using that example, if you look
10   a little further up in these bullet points there
11   is a bullet point that says:
12      "Assets of 75 billion together with associated
13   liabilities of 71 billion."
14      That is a 4 billion-dollar delta there. Do you
15   see that?
16      A. I do.
17      Q. That is your first example, that is
18   goodwill acquiring assets of 75 billion against
19   associated liabilities of 71 billion, that is not
20   negative goodwill, that is just regular goodwill?
21      A. Yes.
22      Q. Okay. So this negative goodwill is
23   a reference to some other aspect of the
24   transaction; that is not a reference to the
25   $4 billion?

Page 44

1      HIGHLV CONFIDENTIAL - JOHN VARLEV        44
2      A. May I go back to my earlier answer. I
3   think I have misunderstood your question. What I
4   believe we are seeking to say in this, in the line
5   that you have just referred to, is the acquisition
6   of assets at a discount, which would be consistent
7   with the 2 billion post tax referred to lower down
8   the page. You will note that all of these and
9   I note that all of these are in square brackets,
10   indicating the somewhat fluid nature of the
11   balance sheet at the time.
12      Q. And then further down in the bullet
13   points, going below the negative goodwill bullet
14   point, there is a bullet points that reads:
15      "Appropriate risk management for Barclays
16   shareholders: transaction excludes Lehman risk assets."
17      Do you see that?
18      A. Yes.
19      Q. Going back to our discussion about ways
20   in which you tried to manage the risk you were
21   taking on, that was in fact one of the ways you
22   were trying to manage the risk is by excluding
23   certain assets or asset classes from the
24   transaction. Correct?
25      A. If you acquire a balance sheet of

Page 45

1      HIGHLY CONFIDENTIAL - JOHN VARLEY        45
2   $70 billion you cannot possibly exclude risk.
3      Q. What did you mean by this bullet point
4   then?
5      A. I didn't. Remember that this was
6   a document that was prepared for me and it was
7   written by Mark Merson. There is no such thing as
8   exclusion of risk from Lehman one or Lehman two or
9   Lehman three.
10      Q. Okay. The phrase he uses, "Transaction
11   excludes Lehman risk assets", do you think that
12   was an accurate description of an aspect of the
13   Lehman two transaction?
14      A. I suspect what he was referring to there
15   was, again it is a juxtaposition with Lehman one.
16   There had been quite a lot of media coverage and
17   coverage in the market of the extent of toxic
18   assets in the Lehman balance sheet. The point
19   that we would certainly have wanted to get across
20   and sought to get across to the market was that
21   those elements of that balance sheet were not
22   being conveyed in the transaction that we were
23   contemplating.
24      Q. And it was important for you that the
25   market understand that Barclays was not taking on

Page 46

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    46
2    those, for want of a better phrase "toxic assets",
3    correct?
4        A.  Well, it was important to me that the
5    market understood what we were taking on.  They
6    could then extrapolate from that what we were not
7    taking on.  The simple way of looking at that is
8    the size of the balance sheet being acquired
9    relative to the size of the pre-administration
10   balance sheet.  The one was about 12 percent of
11   the other.
12       Q.  Sorry I keep jumping up and down these
13   bullet points.
14       A.  That is all right.
15       Q.  There is one about a third of the way
16   down that says:
17       "Also acquiring at fair value the business, head
18   office and data centers at fair value."
19       Do you see that?
20       A.  I do see that, yes.
21       Q.  Is that a reference to the point you
22   made earlier about the appraisal of certain assets
23   that were being acquired, and you were basically
24   paying the appraised value for those assets?
25       A.  That line is a reference to the fact

Page 47

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    47
2    that we wanted to acquire buildings, that we would
3    pay for buildings, but we would pay for buildings
4    at the current market valuation.  That is what the
5    words "at fair value" are designed to convey.
6        Q.  Was there any discussion of having
7    a third party valuation done of the trading
8    assets, the securities that Barclays was
9    acquiring?
10       MR. SHAW:  Objection, foundation.
11       A.  Not to my recollection.  It would be
12   very unusual, I would say unprecedented, in such
13   circumstances, for such a valuation to be applied.
14       Q.  Because clearly you had a difference of
15   opinion with the Lehman valuations that existed on
16   12 September, correct?
17       A.  We did.
18       Q.  Is it fair to say that when you agreed
19   upon Lehman two, that you were able to reach
20   agreement with Lehman as to what values to ascribe
21   the assets that would be included in Lehman two?
22       A.  We formed a view about what we thought
23   was a realistic valuation, and we sought thereby
24   to ensure that we would be generating negative
25   goodwill on the transaction.  As to detail beyond

Page 48

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    48
2    that, that was detail that I delegated to the deal
3    team.
4        (Exhibit 342A marked for identification)
5        Q.  Sir, I have placed before you a document
6    marked Exhibit 342A.  It is a cover e-mail with
7    a Powerpoint attachment.  If you could take
8    a moment to review that, let me know when you are
9    done, and I will ask you some questions.
10       A.  Thank you.
11       Q.  Although you are not shown as
12   a recipient of the cover e-mail, do you recognize
13   the attachment as materials used at the board
14   meeting on 16 September?
15       MR. SHAW:  Is there any indication this
16   is the final version?
17       MR. TAMBE:  No, this is all we got from
18   you.
19       A.  I don't recollect.
20       MR. TAMBE:  If there is a final
21   version, if you could produce it, that would be
22   great.
23       MR. SHAW:  I don't know that it is not.
24       MR. TAMBE:  But there was
25   a presentation made to the board?

Page 49

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    49
2        A.  As I recall, there was a presentation
3    made to the -- I think we had a telephone meeting
4    with the board on the Tuesday.
5        Q.  Would you have participated in that by
6    phone or were there some people who gathered in
7    person?
8        A.  I expect I would have participated
9    physically, in this room.
10       Q.  Do you recall going through a slide deck
11   in the course of that presentation?
12       A.  I don't recall it I am afraid.
13       Q.  If you look at page 2 of the slide deck
14   itself.
15       A.  Yes.
16       Q.  At the time you made your presentation
17   to the board, did you have a signed asset purchase
18   agreement with the sellers?
19       A.  I don't recall.
20       Q.  Had you seen a copy of the asset
21   purchase agreement at the time you made the
22   presentation?
23       A.  I beg your pardon, could you repeat?
24       Q.  Had you seen a draft or a version of the
25   asset purchase agreement at the time you made your

Page 50

HIGHLY CONFIDENTIAL - JOHN VARLEY          50

1
2  presentation to the Barclays board?
3      A.  I had not, no.  That was the
4  responsibility of the deal execution team.
5      Q.  Would someone on the deal exececution
6  team have reviewed this presentation or the final
7  version, if this is not the final version of
8  a board presentation, to ensure that in fact it
9  reflected the agreement that had been struck
10  between Barclays and Lehman?
11      A.  This was a very fluid situation.  The
12  time of the circulation of this draft was Tuesday,
13  the 16th at 10:50.  I do not know where we were in
14  the negotiations at that time.
15      Q.  On page 2 of the attachment there is
16  a summary, an executive summary of the
17  transaction.  If you look at the first set of
18  arrows, the first one begins: "We intended to seek
19  permission ..." I want to focus on those four
20  arrows there.  The second arrow refers to an
21  acquisition of 75 billion of assets and
22  liabilities.  Do you see that?
23      A.  I do.
24      Q.  This arrow does not separate out the
25  $75 billion of assets versus the $71 billion of

Page 51

HIGHLY CONFIDENTIAL - JOHN VARLEY          51

1
2  liabilities.  Is there any reason why not?
3      MR. SHAW:  Objection, foundation.
4      A.  I don't know.
5      Q.  Because your understanding was you were
6  not acquiring 75 billion of assets and
7  liabilities, correct?
8      A.  I draw your attention to the third
9  arrow, where there is a statement: "The
10  recognition of negative goodwill amounts to
11  $3 billion pretax".
12      Q.  That would be my next question.  The
13  numbers we had looked at on the earlier Exhibit,
14  75 billion versus 71 billion, my question is where
15  does that 3 billion-dollar negative goodwill
16  amount come from?
17      A.  You are assuming a level of precision in
18  a market that is moving with volatility that is
19  unprecedented by anything that has been seen in
20  the last hundred years, and I wish it were
21  possible to be absolutely precise in answering
22  questions of that sort.  Even at the time, even
23  with the benefit of contemporary recall I would
24  not have been able to answer such a question.
25      Q.  Did the board impose any restrictions on

Page 52

HIGHLY CONFIDENTIAL - JOHN VARLEY          52

1
2  their grant of authority or did they give the
3  execution team carte blanche to do this
4  transaction, even if in this extremely volatile
5  period the metrics changed completely?
6      A.  The way that we organize such matters,
7  because as your question assumes you cannot have
8  the board making realtime decisions about
9  a transaction of this complexity, is that
10  authority would be delegated to the Executive
11  Committee to execute a transaction that is broadly
12  consistent with what has been approved by the
13  board.
14      Q.  So, for example, if you had said to the
15  board you expected $3 billion of pretax
16  goodwill —
17      MR. SHAW:  Negative goodwill you mean?
18      A.  Yes.
19      Q.  That is something you would strive to
20  achieve even if the particular specifics of the
21  deal were changing and evolving because of market
22  conditions?
23      A.  It is, but I would form and the
24  Executive Committee would form a judgment about
25  whether there was a change in the deal parameters

Page 53

HIGHLY CONFIDENTIAL - JOHN VARLEY          53

1
2  that caused us to go back to the board.
3      Q.  And as the deal evolved from Lehman two
4  to Lehman three, you did not go back to the board
5  for any additional authority, is that correct?
6      A.  That is my recollection, that we did
7  not.
8      Q.  In the executive summary I don't see
9  a reference, and feel free to look through the
10  rest of the document, to the 2 billion-dollar item
11  we were discussing before, which was the
12  obligation that Barclays was assuming for the
13  employees of Lehman?
14      A.  If you want me to look for it in the
15  document I am very happy to.
16      Q.  I don't believe it is in this document.
17  I stand to be corrected but it is not in the
18  executive summary for sure.
19      A.  I don't know whether it is or whether it
20  is not.  As I said to you, I am very happy to
21  search the document for it to see whether I agree
22  with you.  You should tell me what you want me to
23  do.
24      Q.  Look at the executive summary and tell
25  me whether you see it there.

Page 54

1       HIGHLY CONFIDENTIAL - JOHN VARLEY        54
2       A.  I shall.  May I remind myself what you
3   are wanting me to find a reference to.
4       Q.  The 2 billion-dollar obligation that we
5   discussed earlier.
6       A.  The compensation obligation.
7       Q.  The compensation obligation, yes.
8       A.  Thank you.  I will look.  I see no
9   reference to it on page 2.
10      Q.  Do you recall at the meeting on the
11  16th, the board meeting on the 16th, having had
12  any discussions with the board about that
13  obligation that Barclays was assuming?
14      A.  I don't.
15      Q.  Do you recall any discussion with the
16  board about any other obligations that Barclays
17  was assuming as part of the Lehman two
18  transaction?
19      A.  I don't, no.
20      Q.  Do you recall any discussion with any
21  board members after the September 16 meeting about
22  that 2 billion-dollar obligation?
23      A.  I don't.
24      Q.  No board member has come up to you and
25  said: "John, why didn't you tell us about the

Page 55

1       HIGHLY CONFIDENTIAL - JOHN VARLEY        55
2   2 billion-dollar obligation when you presented
3   this deal to the board?"
4       A.  If I describe to you the financial
5   parameters of the transaction, we had presented to
6   the board the acquisition of the Lehman two
7   balance sheet, the acquisition of an ongoing
8   business, the acquisition through hiring of many
9   thousands of people.  The board would understand
10  that there were ongoing profit and loss account
11  obligations, liabilities generated by the hiring
12  of 10,000 people.
13      Indeed, I noticed as I went through this document
14  a reference to the monthly run rate cost.  That was
15  a business expense, and it was a business expense that we
16  took seriously because we had no certainty as to the
17  reconstitution of the earnings power of Lehmans, given what
18  had happened to Lehmans.
19      Q.  Go ahead.
20      A.  I mentioned to you in answer to an
21  earlier question that at the end of the year we
22  make judgments about variable compensation or
23  bonuses.  At the remuneration committee meetings
24  that occurred at the end of last year, board
25  members, because the remuneration committee is

Page 56

1       HIGHLY CONFIDENTIAL - JOHN VARLEY        56
2   chaired by a non-executive director, the Deputy
3   Chairman of Barclays, reference was made at that
4   time to our honoring the obligation that we
5   discussed in our earlier question.
6       Q.  Okay.  Just to be clear, the
7   2 billion-dollar obligation that we have been
8   talking about, that is a historic obligation.
9   That was Lehmans' obligation that was taken over
10  by Barclays.  It is not for ongoing service.  It
11  is for 2008 service, correct?
12      A.  Yes.
13      Q.  Pre-Barclays service?
14      A.  Not pre-Barclays service, because
15  remember that there was a quarter of the year when
16  it was Barclays service.
17      Q.  For three quarters Lehman, one quarter
18  Barclays, correct, and the amount of that
19  obligation is almost exactly the same as the
20  2 billion-dollar post tax negative goodwill that
21  you report to the board, correct?
22      A.  It happens to be, but the way that
23  accounting operates is if there is an accrual, as
24  there was an accrual, then that is already
25  contained within the profit and loss accounts that

Page 57

1       HIGHLY CONFIDENTIAL - JOHN VARLEY        57
2   we are absorbing, and represents a liability which
3   is funded.  The $2 billion has nothing at all to
4   do with the $2 billion post tax.  The $2 billion
5   post tax is generated by the negative goodwill
6   feature that we have discussed earlier.
7       Q.  I guess the only question I was raising
8   is if the 2 billion-dollar compensation liability
9   had not been accounted for in this executive
10  summary, if that was an obligation that was not
11  reflected in these numbers, it would effectively
12  wipe out that negative goodwill number.
13      A.  Yes, but you see, if there were
14  a 2 billion-dollar liability which was not
15  accrued, then that would represent an unfunded
16  liability, which we would certainly have made
17  reference to in any discussion with the board.  We
18  are assuming an unfunded liability of $2 billion,
19  a pretty big deal.  If you are assuming a funded
20  liability then there is no P&L consequences at
21  all.  The P&L reference here is not to the meeting
22  through a funded liability of that liability at
23  year-end, it is referring to the mismatch between
24  the value of assets and the value of liabilities
25  post tax.

Page 58

1      HIGHLY CONFIDENTIAL - JOHN VARLEY        58
2        Q.  You may have lost me there.  I will ask
3    you one follow-up question on this.  Was the
4    2 billion-dollar compensation liability in your
5    view a funded liability or an unfunded liability?
6        A.  It was a funded liability, in other
7    words it was accrued.
8        Q.  And did Barclays receive some value in
9    order to be able to pay out that compensation?
10       A.  No, it was just part of the P&L account
11   that we assumed.  We got no value from it at all.
12       Q.  When you say the P&L account, are you
13   talking about the difference between the value of
14   the assets and what you paid for the assets?
15       A.  No, I am referring to the ongoing income
16   cost and impairment consequences of assuming
17   Lehmans North America business.  Perhaps I can
18   describe it in this way.  I don't know whether you
19   find this helpful but you should think of the
20   compensation as entirely P&L neutral to
21   Barclays.  There was an obligation, it was a
22   funded obligation through an accrual in the profit
23   and loss account.  It was entirely neutral as to
24   the P&L or capital consequences to Barclays.
25       Q.  I guess where I am losing you is on the

Page 59

1      HIGHLY CONFIDENTIAL - JOHN VARLEY        59
2    profit and loss account.  I have looked at the
3    list of assets you purchased.  You purchased
4    assets, correct?
5        A.  Yes, that is the balance sheet.  That is
6    not the profit and loss account.
7        Q.  Where is the profit and loss account
8    that you purchased?  Where did you get this funded
9    obligation from?
10       A.  It comes in through the balance sheet.
11   What I am saying is the way an accrual -- let me
12   try to explain.  We make payments of our variable
13   compensation at the end of the year, but in
14   anticipation of making an obligation to make
15   payments, this is just in the ordinary course of
16   business, in anticipation of that we will make an
17   accrual each month, which is recognized in our
18   profit and loss account, and that accrual, that
19   cash if you like will sit on the balance sheet as
20   a reserve which can be drawn down without impact
21   to the profit and loss account.  That is the
22   situation that obtained within the Lehman
23   businesses that we acquired.
24       So if you ask me was the accrual represented as
25   a component of the balance sheet, yes, it was, but the way

Page 60

1      HIGHLY CONFIDENTIAL - JOHN VARLEY        60
2    in which it had been built up was through a draw on the
3    profit and loss account of Lehmans pre-administration.
4        (Exhibit 343A marked for identification)
5        Q.  Sir, I have handed you a document marked
6    Exhibit 343A, a multipage document.  Take a moment
7    to flip through it just to familarise yourself
8    with it and then I will ask you some questions.
9        A.  Thank you.
10       Q.  We had discussed earlier today
11   a conference call that you did with the analysts,
12   correct?
13       A.  We did, yes.
14       Q.  And I will tell you this is a printout
15   from the Barclays website of the transcript of the
16   Wednesday 17 September 2008 conference call.
17       A.  Thank you.
18       Q.  And Barclays does put on its website
19   from time to time transcripts of its calls with
20   analysts, correct?
21       A.  Actually, I didn't know that we did.
22       Q.  It is rather helpful that you do.  Well,
23   you do and here it is.  Did you have a script or
24   any kind of a Powerpoint presentation in front of
25   you when you were doing this analysts call?

Page 61

1      HIGHLY CONFIDENTIAL - JOHN VARLEY        61
2        A.  My recollection is that I had a script
3    and my recollection is that this is the script.
4        Q.  I mean, generally is it your practice in
5    these analysts calls to follow the script as
6    closely as you can?
7        A.  Yes.
8        Q.  For regulatory and legal compliance
9    reasons I take it?
10       A.  Among other things, yes.
11       Q.  For what other reasons?
12       A.  It is important that I as a regular
13   presenter to the market and those who present
14   alongside me are clear in advance and consistent
15   in what we are saying, so it is our practice to
16   operate off scripts.
17       Q.  And you told us earlier that it was
18   important to you to at least relate to the market
19   what assets you were purchasing as part of the
20   Lehman two transaction, correct?
21       A.  Well, my answer to that would be that it
22   was important for the market to understand the
23   nature of the transaction that we were
24   contemplating.
25       Q.  And it was important from your

Page 62

1    HIGHLY CONFIDENTIAL - JOHN YARLEY    62
2    perspective that the market understand that you
3    were not purchasing the toxic assets, correct?
4        A.  Well, it was important that the market
5    understand that this was Lehman two, not Lehman
6    one.
7        Q.  And that would mean you were not
8    purchasing any toxic assets?
9        A.  It would mean that the size of the
10   balance sheet that we were acquiring was very
11   different.  It would also mean that we had been
12   able to be relatively selective in the business
13   that we were acquiring.
14       Q.  And the selections you were doing, you
15   were not selecting toxic assets for inclusion, you
16   were deselecting such assets?
17       A.  I think that would be a reasonable way
18   of describing it.
19       Q.  The first few pages are a presentation
20   by you outlining the transaction.  I want to draw
21   your attention to one particular paragraph on
22   page 2 of this exhibit, that is the paragraph that
23   begins: "The acquisition of the core of old
24   Lehmans business".  Do you see that?
25       A.  I do, thank you.

Page 63

1    HIGHLY CONFIDENTIAL - JOHN YARLEY    63
2        Q.  In that paragraph you make a reference
3    to acquiring trading assets with a current
4    estimated value of $72 billion and trading
5    liabilities with a current estimated value of
6    $68 billion for a cash consideration of
7    $250 million.  Do you see that?
8        A.  I do, yes.
9        Q.  The numbers that appear there, the
10   $72 billion and the $68 billion, those are numbers
11   that reflect Barclays' view of what the
12   appropriate values were for those assets?
13       A.  Yes.
14       Q.  So these are not the Lehman values that
15   you are talking about, these are the Barclays
16   values?
17       A.  I mentioned earlier that we were seeking
18   to ensure that we were appropriately contemporary
19   in our valuations and that we had created an
20   appropriate delta between asset and liability
21   values, and what you have put to me would be
22   consistent with that.
23       Q.  Turn to page 6 of the presentation, or
24   the transcript.  There is a question at the
25   bottom.  If you can read the question to yourself

Page 64

1    HIGHLY CONFIDENTIAL - JOHN YARLEY    64
2    and then we will talk about your answer, which
3    appears on page 7.
4        A.  Can I ask which question you are
5    referring me to?
6        Q.  Question number four at the bottom of
7    the page.
8        A.  Thank you.  Thank you, yes.
9        Q.  You have read both the question and your
10   answer?
11       A.  I have read the first answer.  Is that
12   what you are referring me to?
13       Q.  Yes, your answer.
14       A.  There is a further question and an
15   answer.  Are you asking me to comment on the first
16   answer?
17       Q.  Let's do the first answer.  So the first
18   question, which is question number four at the
19   bottom of page 6 of Exhibit 343A, and the answer
20   that appears at the top of page 7.
21       A.  Thank you, yes.
22       Q.  You state that: "The transaction is
23   structured as we want it to be".  Do you see that?
24       A.  Yes, I do.
25       Q.  And that was a true statement when you

Page 65

1    HIGHLY CONFIDENTIAL - JOHN YARLEY    65
2    made it, correct?
3        A.  I believe it to have been.
4        Q.  And you said further on in that
5    sentence: "But we have been very deliberate in our
6    choices here", and that was a true statement when
7    you made it.  Correct?
8        A.  I believe it to have been.
9        Q.  You state between those two sentences:
10       "It is of course subject to Court approval
11   and we are respectful of the court".
12       Do you see that?
13       A.  I do.
14       Q.  What obligation, if any, do you think
15   Barclays had to advise the court of the economics
16   of this transaction?
17           MR. SHAW:  Objection, calls for a legal
18   conclusion.
19       A.  I have no ability to answer that
20   question.
21       Q.  Other than anything your lawyers may
22   have told you, do you have any reason to believe
23   that the transaction that was actually executed,
24   Lehman three, whether that had been adequately
25   described to the court?

Page 66

HIGHLY CONFIDENTIAL - JOHN VARLEY                66

1    MR. SHAW: Objection, foundation.
2    A.   I have no knowledge of the precise
3    description given to the court. Of course, the
4    whole world knew that Lehmans was for sale, or
5    bits of Lehmans was for sale. As I understand it,
6    we were the only buyer.
7    Q.   How do you know you were the only buyer?
8    A.   Anybody else who wanted to bid,
9    I presume, could have sought to put their own
10   proposal in front of the court, but as I recall it
11   nobody else did.
12   Q.   Turning back to page 3 of Exhibit 343A,
13   and there is a question and answer here. It is
14   the question that appears towards the middle of
15   the page, further question: "Mike". Do you see
16   that?
17   A.   I do.
18   Q.   If you could read that question and then
19   read the answer from Chris Lucas, I believe.
20   A.   Yes.
21   Q.   Let me know when you are done.
22   A.   Thank you, yes.
23   Q.   Just drawing your attention to Chris
24   Lucas' answer, the first sentence of his answer,

Page 67

HIGHLY CONFIDENTIAL - JOHN VARLEY                67

1    second clause states:
2    "The vast majority of those assets are quoted
3    equity Government and agency paper, CP market
4    instruments and derivatives and are relatively sizable
5    cash and matched book."
6    Do you see that?
7    A.   I do.
8    Q.   And do you agree with that description
9    of the vast majority of the assets that were being
10   acquired in Lehman two?
11   MR. SHAW: Objection, foundation.
12   A.   The balance sheet that we were acquiring
13   was the balance sheet that supported the broker
14   dealer business of Lehmans North America.
15   I mentioned in answer to an earlier question that
16   you directed to me that there was as I recall it
17   a small percentage of assets that I think are
18   referred to in this answer by Chris Lucas.
19   Q.   I think you may have lost me there. You
20   are saying that the assets that are listed in
21   Chris Lucas' answer were in your view a small
22   percentage of the assets acquired?
23   A.   No, I am not saying that.
24   Q.   Are you agreeing with Chris Lucas that

Page 68

HIGHLY CONFIDENTIAL - JOHN VARLEY                68

1    the vast majority of the assets that were acquired
2    in Lehman two were as described by Mr. Lucas?
3    A.   Well, I would certainly say that the
4    majority were. I said in my previous answer that
5    the balance sheet that we acquired was the balance
6    sheet supporting the broker dealer business of
7    Lehmans North America, and that would mostly
8    comprise the sorts of assets referred to by Chris
9    Lucas here.
10   Q.   Further down in Mr. Lucas' answer, he
11   refers to a process and he says:
12   "A process where we took the original marks,
13   reviewed them and then took some further write downs,
14   but that is against a very small portion, less than
15   five percent of that book".
16   Do you see that?
17   A.   I do see that, yes.
18   Q.   Do you generally agree with Mr. Lucas'
19   description of the mark down process that Barclays
20   engaged in?
21   MR. SHAW: Objection, foundation.
22   A.   I think you need to ask the people who
23   had operational responsibility for the
24   transaction, that question.

Page 69

HIGHLY CONFIDENTIAL - JOHN VARLEY                69

1    Q.   On to page 5 of this Exhibit 343A.
2    A.   Thank you.
3    Q.   The question and answer I want to draw
4    your attention to and have you read to yourself is
5    question number three at the top of the page and
6    your answer right below that. Let me know when
7    you have done.
8    A.   Yes, thank you.
9    Q.   Towards the end of his question
10   Mr. Rayner asks you:
11   "Or is that very much, this is mark-to-market as
12   of last night, all the toxic stuff is outside of this
13   portfolio. We are expecting if anything maybe to run
14   profits from these positions".
15   Focusing on that aspect of his question, you
16   respond:
17   "The 'or is it' piece of your analysis, Tom, is
18   the right way of looking at it."
19   Do you see that?
20   A.   I do see that, yes.
21   Q.   Was it your expectation to run profits
22   from the positions that were being acquired in
23   Lehman two?
24   A.   No, my remark there was directed at this

Page 70

HIGHLY CONFIDENTIAL - JOHN VARLEY          70

1  is mark-to-market as of last night. I had no
2  means of knowing whether we would make profits or
3  not. The direction of the markets was pretty
4  clear at that time. It was down.
5      Q.  Could you please explain to me then the
6  next sentence in your answer, where you say:
7          "So we absolutely expect to preserve that buffer
8  and in the way that Chris has described we have marked, and
9  the capital derived from the negative goodwill that
10  arises..." et cetera.
11     A.  Yes, the buffer point, my reference to
12  the buffer there is the delta between the asset
13  valuation and the liability valuation.
14     Q.  Given everything that was going on in
15  the market and volatility in the market, why did
16  you absolutely expect to preserve that buffer?
17  How could you?
18     A.  The expectation is to preserve it in the
19  transaction.
20     Q.  What do you mean by that?
21     A.  What I mean is that at the execution of
22  the transaction there is that delta. Once the
23  transaction has been closed then the delta may
24  expand or it may contract. It is there to protect

Page 71

HIGHLY CONFIDENTIAL - JOHN VARLEY          71

1  against downside risk in volatile markets.
2      (Exhibit 344A marked for identification)
3      Q.  I have handed you a multipage document
4  marked Exhibit 344A. If you can take a moment to
5  review that and let me know when you are done.
6      A.  I will, thank you very much. Thank you.
7      Q.  Sir, do you recognize the attachment to
8  that e-mail, Exhibit 344A, as the press release
9  issued by Barclays announcing the Lehman two
10  transaction?
11     A.  I do, yes.
12     Q.  The cover e-mail makes a reference to
13  the 72 billion and $68 billion. Do you see that?
14     A.  I do.
15     Q.  It goes on to state: "and including
16  a sentence, well down the text, for the total
17  consideration of USD 1.75 billion."
18     A.  Um hum.
19     Q.  Was there any significance to the phrase
20  "well down the text"?
21     A.  I don't recall.
22         MR. SHAW:  Objection, foundation.
23     A.  But it is on page 3 of the text, as
24  I observed it.

Page 72

HIGHLY CONFIDENTIAL - JOHN VARLEY          72

1      Q.  On page 3 of the text there is
2  a sentence, second paragraph, that reads:
3          "The combined consideration totals some one
4  billion pounds."
5      A.  Yes.
6      Q.  "(US$1.7 billion)".
7      A.  Yes.
8      Q.  However, on page 1 of the release the
9  cash consideration is identified as 0.14 billion
10  pounds or 250 million US?
11     A.  Could you point me to that? I can't see
12  it.
13     Q.  Second full paragraph.
14     A.  I see it now, yes.
15     Q.  That is a reference to --
16     A.  Well, you will see that what we state
17  there is first of all what are we paying for the
18  business, answer $250 million or $.25 billion. We
19  go on to say we will also acquire the New York
20  headquarters, et cetera, so we were describing
21  both components of the consideration there.
22     Q.  And the 1.75 is simply the 250 million
23  plus the value of the real estate and the data
24  centers?

Page 73

HIGHLY CONFIDENTIAL - JOHN VARLEY          73

1      A.  You will see, yes, estimated at
2  $1.5 billion, you are right.
3      Q.  Again, I have not seen in this press
4  release any reference to the 2 billion-dollar
5  obligation that Barclays was assuming.
6      A.  You would not.
7      Q.  For the reasons you have stated before?
8      A.  For the reasons that I stated before,
9  which is that this was a P&L neutral item and
10  therefore was of no interest to the market.
11     (Exhibit 341A marked for identification)
12     Q.  I have handed you a one page double
13  sided exhibit.
14     A.  Yes.
15     Q.  This is marked Exhibit 341A.
16     A.  Yes.
17     Q.  Let me know when you are done reviewing
18  it.
19     A.  Yes, thank you.
20     Q.  You will see this is an e-mail exchange
21  which starts at the bottom of the page with an
22  e-mail from Bob Diamond to Chris Lucas. You are
23  copied on it. Do you see that?
24     A.  I do, yes.

Page 74

HIGHLY CONFIDENTIAL - JOHN VARLEY                    74

1     HIGHLY CONFIDENTIAL - JOHN VARLEY          74
2     Q.  And there is some responses to that
3     e-mail?
4     A.  Yes.
5     Q.  Mr. Diamond says in his e-mail:
6     "Just heard we are planning the small number for
7     price. Please do not."
8     Do you see that?
9     A.  I do, yes.
10    Q.  Do you understand that as a reference to
11    the 250 million-dollar number?
12    A.  I don't know actually.
13    Q.  Having reviewed this e-mail and the
14    context of what was going on on the 17th, any idea
15    what Mr. Diamond was talking about here?
16    A.  My recollection is that we wanted to
17    make sure that the market understood that if we
18    were buying an asset at net asset value, the
19    buildings, then that is P&L neutral. What we
20    wanted the market to focus on was what is the
21    purchase consideration for Lehman Brothers North
22    America, because actually that was the question
23    that we anticipated getting: "What are you paying
24    for the business? We are not interested in the
25    buildings. Buying those at net asset value, fine,

Page 75

HIGHLY CONFIDENTIAL - JOHN VARLEY                    75

1     HIGHLY CONFIDENTIAL - JOHN VARLEY          75
2     that is your business." They are not interested
3     in that. Our anticipated line of questioning was:
4     "What are you buying the business for?" And
5     I recollect that there was a dialogue around that
6     that we felt we needed in the press announcement
7     to identify the components of the 1.75, and you
8     will see in fact in the press announcement that we
9     did release that, we did identify the components
10    of the 1.75.
11    Q.  And when Bob Diamond refers to the circa
12    2 billion number, do you see that as a reference
13    to the 1.75?
14    A.  I am speculating but my answer to that
15    is speculatively yes, I think that is what he is
16    referring to. That would seem to follow from the
17    rest of the e-mail.
18    Q.  You respond further up in this e-mail
19    chain: "Actually, I like the smaller price." Do
20    you see that?
21    A.  Yes.
22    Q.  In light of your earlier answer in terms
23    of wanting the market to understand the components
24    of the 1.75, what is it that you liked about the
25    smaller price?

Page 76

HIGHLY CONFIDENTIAL - JOHN VARLEY                    76

1     HIGHLY CONFIDENTIAL - JOHN VARLEY          76
2     A.  May I refer you back to document 344A.
3     What I wanted to do was to ensure that the market
4     understood what price we were placing on the
5     business. It was quite possible, given these
6     numbers, for the market to be distracted by
7     a 1.75 billion number when in fact the price for
8     the business was a 250 million-dollar business.
9     Hence the prominence given to 250 million in the
10    second paragraph of the announcement. That is the
11    smaller number that I was referring to.
12    Q.  Mr. Diamond says:
13    "It is very important to the bankruptcy court
14    to see the larger number. It is not credible and very
15    harmful I think to be seen trying to show lower."
16    Do you see that? I assume you just have
17    a difference of opinion with Mr. Diamond on that point.
18    A.  No. I mean I think that the way I was
19    looking at it was the constituency that we were
20    preparing this document for, and by "this
21    document" I mean the announcement that is attached
22    to Exhibit 344A, the constituency that we were
23    preparing that document for was our owners, and
24    the analysts who analyse the value of Barclays
25    stock. There were other constituencies of course.

Page 77

HIGHLY CONFIDENTIAL - JOHN VARLEY                    77

1     HIGHLY CONFIDENTIAL - JOHN VARLEY          77
2     What price did we contemplate at this time paying
3     for what we were acquiring, not $250 million but
4     $1.75 billion. I think that is the point that is
5     being referred to here.
6     Q.  And the other constituency that it might
7     have been advantageous for Barclays, it may have
8     been advantageous for Barclays for the bankruptcy
9     court to see the larger number, that is what
10    Mr. Diamond is saying. Correct?
11    MR. SHAW: Objection, foundation.
12    A.  You must ask him.
13    Q.  We will ask him, but what was your view
14    in terms of the disclosures that were being made
15    to the bankruptcy court? What numbers do you
16    think were being disclosed to the bankruptcy
17    court?
18    A.  I refer you to Exhibit 341A, and I quote
19    myself: "Actually, I like the smaller price but we
20    were right to include reference to 1.75 billion."
21    Q.  Do you know one way or the other whether
22    the bankruptcy court was advised of other
23    consideration that Barclays was providing in this
24    transaction beyond the 1.75?
25    A.  I don't know.

Page 78

```
 1        HIGHLY CONFIDENTIAL - JOHN VARLEY        78
 2       Q.  We have had several discussions about
 3    the 2 billion-dollar compensation obligation.
 4       A.  We have.
 5       Q.  Is that something that Barclays should
 6    have advised the bankruptcy court of as
 7    a consideration that was being paid by Barclays?
 8          MR. SHAW:  Objection, calls for a legal
 9    conclusion, foundation.
10       A.  We assumed an obligation and we honored
11    the obligation.  In a sense that is all I can say
12    and have to say about that particular issue.
13       Q.  You don't know one way or the other
14    whether that was --
15       A.  I have no idea what the court thought or
16    indeed what was said to the court on the subject.
17          MR. TAMBE :  Let's just take a short
18    break.
19       A.  Very good.
20          (A short break).
21          (Exhibit 345A marked for identification)
22       Q.  I have handed you a multipage document
23    marked Exhibit 345A, a cover e-mail and then
24    a letter to you from Mr. Dimon, JPM Chase.  Take
25    a moment to review it, let me know when you have
```

Page 79

```
 1        HIGHLY CONFIDENTIAL - JOHN VARLEY        79
 2    done.
 3       A.  Thank you.
 4       Q.  Do you recall receiving this letter from
 5    Mr. Dimon?
 6       A.  I do.
 7       Q.  Did you have a discussion with Mr. Dimon
 8    after you received this letter about this letter?
 9       A.  I had one conversation with him.  I
10    don't recall whether it was before receiving this
11    letter or after receiving this letter.
12       Q.  And the matters that are discussed in
13    this letter eventually were resolved, at least as
14    between JPM and Barclays.  Is that correct?
15       A.  They were.
16       Q.  And that was pursuant to a settlement
17    agreement, correct?
18       A.  As to the precise mechanism of
19    settlement, I am not aware of that, but the matter
20    was settled.
21       Q.  Turning your attention to page 5 of
22    Mr. Dimon letter, and if you can just read to
23    yourself the first full paragraph at the top of
24    page 5.
25       A.  "On Friday night"?
```

Page 80

```
 1        HIGHLY CONFIDENTIAL - JOHN VARLEY        80
 2       Q.  "On Friday night", that is the
 3    paragraph.
 4       A.  Thank you.
 5       Q.  Do you recognize the first sentence of
 6    Mr. Dimon paragraph on page 5 of his letter as
 7    a reference to Lehman two versus Lehman three?
 8       A.  Yes.
 9       Q.  The next sentence of that first full
10    paragraph, he states:
11          "The court was not apprised of the purchase
12    that Barclays Capital now says it agreed to make."
13          Do you agree or disagree with Mr. Dimon's
14    characterization there?
15          MR. SHAW:  Objection to form.
16       A.  I don't know the answer to that
17    question.
18       Q.  The next sentence he states:
19          "Instead of the court being told that Barclays
20    Capital was purchasing approximately 49.7 billion in
21    securities for 45 billion in cash, the court was told that
22    Barclays Capital was purchasing 47.4 billion in securities
23    for 45.5 billion in cash."
24          Do you see that?
25       A.  I do see it, yes.
```

Page 81

```
 1        HIGHLY CONFIDENTIAL - JOHN VARLEY        81
 2       Q.  I assume you have no view as to what the
 3    court was told about the transaction on Friday, is
 4    that correct?
 5       A.  I have no knowledge of what the court
 6    was told.
 7       Q.  Given your understanding of Lehman
 8    three, what would you expect the court to have
 9    been told on Friday about the Lehman three
10    transaction?
11       A.  I don't think I can speculate as to what
12    I would or would not have expected the court to be
13    told.
14       Q.  Fine.  In your mind the Lehman three
15    transaction, was that roughly a transaction where
16    Barclays Capital was purchasing 49.7 billion in
17    securities for 45 billion in cash?
18       A.  I don't know, as I have said to you
19    a moment ago, what was conveyed particularly to
20    the court.  Remember that -- two things I would
21    say to you.  One is that within a strategic
22    framework that I had agreed the authority, the
23    authority to execute a transaction broadly
24    consistent with that delegation had been delegated
25    to Bob Diamond and his team.  The second thing to
```

Page 82

HIGHLY CONFIDENTIAL - JOHN VARLEY                82

1  point out is that the timing of the arrival of
2  this letter, so that you should be aware, was the
3  timing was the weekend in which the Financial
4  Services Authority changed all the rules relating
5  to the capitalization of British banks. It would
6  be a simple illustration of how both immediately
7  after the Lehman transaction and in the weeks that
8  followed it my preoccupation was on the issues
9  that were extant in London at that time relating
10 to capitalization. Hence the substantial
11 delegation that I gave to Bob Diamond to conclude
12 the transaction.
13     Q.  Fair enough. My question was a little
14 different, because I accept that you don't know
15 what representations were made or should have been
16 made to the bankruptcy court, so let's take that
17 as a given, and let's just go to what your
18 understanding was in your position at Barclays of
19 the economics of the Lehman three transaction.
20 Was it roughly the purchase of $49.7 billion in
21 securities against a payment of $45 billion in
22 cash?
23     MR. SHAW: Objection, foundation.
24     A.  There is a transaction which morphed
25

Page 83

HIGHLY CONFIDENTIAL - JOHN VARLEY                83

1  from Lehman two to Lehman three, in which I wanted
2  to ensure that there was an appropriate delta
3  between the assets and the price that we were
4  paying for the assets. The precise numbers,
5  whether it was for example 46.9 or 47.2, I don't
6  have a recollection of.
7     Q.  If you look at the numbers 49 and 45,
8  that is roughly a 4 billion-dollar delta, right?
9     A.  Um hum.
10    Q.  The other pair of numbers that Mr. Dimon
11 puts in his letter is 47.4 versus 45.5, which is
12 roughly a 2 billion-dollar delta. Was it your
13 understanding of the Lehman three transaction that
14 the deal had morphed to a point where the delta
15 was now only 2 billion?
16    A.  These are Mr. Dimon's assertion, they
17 are not mine. This is his language, not mine.
18    Q.  What I am trying to get at, in your
19 recollection, was it ever your view that the
20 Lehman three transaction was a transaction in
21 which there was a 2 billion-dollar delta?
22    A.  You will recall that what we had said to
23 the market two days earlier was that we expected
24 there to be something like a 3 billion-dollar
25

Page 84

HIGHLY CONFIDENTIAL - JOHN VARLEY                84

1  delta between the two, and in some of the
2  documentation that we have been reviewing that
3  number has been sort of variously three to four.
4  My expectation was as I delegated the authority to
5  Bob Diamond and team that a number at or about
6  3 billion pretax, which would morph into 2 billion
7  post tax would be the number.
8     Q.  Looking again in round numbers at the
9  value of the assets that in fact were acquired
10 under Lehman three, the final iteration of the
11 discussions, what is your best sense of the value
12 of those assets?
13    MR. SHAW: Objection, foundation.
14    Q.  At the time they were acquired?
15    MR. SHAW: Objection, foundation.
16    A.  I do not know. That is precisely an
17 operational detail that was delegated to the
18 subject area expert, Mr. Diamond.
19    Q.  Was it in excess of $50 billion?
20    A.  Was what --
21    MR. SHAW: Objection, foundation.
22    Q.  The value of assets acquired in Lehman
23 three in excess of $50 billion?
24    A.  I believe it was less than $50 billion.
25

Page 85

HIGHLY CONFIDENTIAL - JOHN VARLEY                85

1  I said in answer to an earlier question that the
2  numbers were between 40 and 50 billion.
3     Q.  The next page of Mr. Dimon's letter, his
4  paragraph number three, in the middle of that
5  paragraph he writes:
6        "We are both duty-bound to ensure that LBI
7  receive the value it was supposed to receive in
8  exchange for your $45 billion."
9        Do you see that?
10    A.  I am trying to find it.
11    Q.  It is in point number three.
12    A.  Yes, I have point number three. I am
13 just trying to find --
14    Q.  About seven sentences down.
15    A.  Thank you, I have got it, yes.
16    Q.  So you see that sentence.
17    A.  Yes.
18    Q.  Do you share Mr. Dimon's view that
19 Barclays is duty-bound to ensure that LBI receive
20 the value they were supposed to receive in
21 exchange for your $45 billion?
22    MR. SHAW: Objection, calls for a legal
23 conclusion, foundation.
24    A.  I don't have an opinion about that.
25

Page 86

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    86
2    These are assertions by Mr. Dimon. You should
3    speak to him about the assertions that he has
4    made. As to the execution detail, the execution
5    detail had been delegated by me to Mr. Diamond.
6    Q.  Do you have any reason to believe, sir,
7    that LBI did not receive the value it was entitled
8    to receive?
9    A.  I have no knowledge.
10    Q.  You have no knowledge one way or the
11    other?
12    A.  I have no knowledge.
13    Q.  Sir, I have handed you a document that
14    was previously marked as Exhibit 88B. If you
15    would take a moment to review the document, let me
16    know when you have done that.
17    A.  Thank you, yes.
18    Q.  Let me ask you first, have you seen this
19    document before today?
20    A.  Not that I recall, no.
21    Q.  Turning your attention to the third page
22    of this exhibit --
23    A.  Yes.
24    Q.  -- you will see it is a spreadsheet
25    titled: "Long Island Acquisition Balance Sheet

Page 87

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    87
2    Draft." Do you see that?
3    A.  Yes.
4    Q.  If you look down the listing of column
5    C, the numbers in column C.
6    A.  Column C, yes.
7    Q.  You will see an item entry there for
8    financial assets.
9    A.  Yes.
10    Q.  And you will see an entry there for
11    total assets.
12    A.  Total assets, I do see that, thank you,
13    yes.
14    Q.  Then you see an item entry for total
15    liabilities.
16    A.  Yes.
17    Q.  For a net asset number of 5.63 billion.
18    Do you see that?
19    A.  I do.
20    Q.  Is it your understanding, sir, that the
21    delta on the acquisition of assets versus
22    consideration paid in the Lehman transaction was
23    as much as 5.63 billion?
24    MR. SHAW: Objection. This is a draft.
25    Foundation.

Page 88

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    88
2    A.  I have not seen this document, to my
3    recollection, so I am not able to express a point
4    of view about the mathematics in it.
5    Q.  I am handing you what has previously
6    been marked as Exhibit 22. Do you recognize this
7    Exhibit 22 as the results announcement for 2008
8    for Barclays?
9    A.  I do.
10    Q.  The equivalent of an annual report?
11    A.  No.
12    Q.  What is it?
13    A.  It is a results announcement.
14    Q.  What results are you announcing?
15    A.  We are announcing our full year results,
16    2008. The way that operates, to explain the
17    difference between it and the report and accounts,
18    is the reports and accounts is a much fuller
19    document, giving much more extensive disclosure,
20    covering not just the prior year but the year
21    before that, with substantial areas of the report
22    and accounts being audited. This is what we refer
23    to as our preliminary announcement. We make this
24    release in typically mid-February. The report and
25    accounts goes out at the end of March.

Page 89

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    89
2    Q.  Who prepares this document?
3    A.  It is prepared by Barclays. To be
4    particular, it is prepared by a combination of the
5    finance team in Barclays and the investor
6    relations team in Barclays.
7    Q.  I want to draw your attention to page 95
8    of this report.
9    A.  Thanks, I will just go there. Yes.
10    Q.  There is a section on that page numbered
11    11, "Acquisitions". Do you see that?
12    A.  Yes.
13    Q.  And item A is Lehman Brothers North
14    American business?
15    A.  Yes.
16    Q.  The fifth paragraph under the A is
17    a single sentence which reads:
18    "The excess of the fair value of net assets
19    acquired over consideration paid resulted in 2.2 billion
20    pounds of gains on acquisition."
21    Do you see that?
22    A.  Yes.
23    Q.  Do you believe that to be an accurate
24    statement when made by Barclays in this report?
25    A.  I do, yes.

Page 90

1         HIGHLY CONFIDENTIAL - JOHN VARLEY          90
2      Q.  Do you understand that to be an accurate
3   description of the source of the gains on
4   acquisition?
5      A.  Yes, I do.
6         MR. TAMBE :  In the interests of time I
7   am going to pass the witness to co-counsel.  We
8   reserve all of our rights.  Thank you very much,
9   Mr. Varley.
10         CROSS-EXAMINATION BY MR. WOOD:
11      MR. WOOD:  I am John Wood from Hughes,
12   Hubbard & Reed representing the SIPA Trustee.
13      You were saying earlier that some of the
14   valuations Lehman gave to some of the assets on
15   their balance sheet were optimistic.  Do you
16   recall that?
17      A.  Yes.
18      Q.  Would you include in that the
19   residential mortgage securities?
20         MR. SHAW:  Objection, foundation.  Go
21   ahead.
22      A.  I was not responsible personally for
23   reviewing the valuations, so I am not familiar
24   with the detail of the valuations but I do recall
25   there being conversations from Bob Diamond to me

Page 91

1         HIGHLY CONFIDENTIAL - JOHN VARLEY          91
2   in which he indicated that we were uncomfortable
3   through our due diligence at some of the marks.
4      Q.  Why were the residential mortgage
5   securities being considered as part of the deal?
6         MR. SHAW:  Objection, vague.  Which deal
7   are you talking about, Lehman one, Lehman two,
8   Lehman three?
9         MR. WOOD:  Right now, let's talk about
10   Lehman two.
11      A.  My recollection I think, illustrated by
12   some of the documents that we reviewed in the
13   previous section of this meeting, is that the
14   residential mortgage assets included within the
15   balance sheet acquired were quite small.
16      Q.  If you look again at Exhibit 343A.
17      A.  You will just have to bear with me while
18   I find that.  I have a big pile here.  343A.  I
19   will be with you as quickly as I can.  I have it,
20   yes.
21      Q.  That is the transcript of
22   Wednesday September 17 call.
23      A.  Yes.
24      Q.  If you go again to the bottom of page 3,
25   again there is an answer from Chris, who we

Page 92

1         HIGHLY CONFIDENTIAL - JOHN VARLEY          92
2   established earlier is Chris Lucas.  In the middle
3   of that paragraph he says:
4      "There is a small amount of mortgage paper which
5   has been heavily written down and included in those
6   numbers".
7      A.  Yes.
8      Q.  Did Lehman Brothers want Barclays to
9   take the residential mortgage securities?
10         MR. SHAW:  Objection, foundation.
11      A.  I don't know.
12      MR. WOOD:  That is all I have.
13         CROSS-EXAMINATION BY MR. BUNTING:
14      MR. BUNTING:  I am Matthew Bunting, here
15   for the Creditors Committee.
16      A.  Thank you.
17      Q.  Right at the beginning today you
18   mentioned that there were two options on the table
19   in June 08 for developing Barclays.
20      A.  Yes, I did.
21      Q.  One of which was Lehman.
22      A.  Yes.
23      Q.  What was the other one?
24      A.  May I consult my counsel?
25      MR. BUNTING:  Absolutely.

Page 93

1         HIGHLY CONFIDENTIAL - JOHN VARLEY          93
2      A.  Maybe we can do it outside.
3         (A short break.)
4      A.  Thank you very much for giving me the
5   time.  May I ask you to repeat the question?
6      Q.  The question was you had two options
7   that you were examining in June 08.  One was
8   Lehman, what was the other one?
9      A.  The other potential opportunity,
10   background here to remind you being that we
11   thought that the credit crunch might create
12   opportunity for transformational transactions, the
13   other opportunity was the possibility of a merger
14   with a major competitor.
15      Q.  Okay.  When you came to do Lehman one,
16   Lehman two, Lehman three, is it fair to say that
17   one of the major factors influencing what you did
18   was the attitude of the regulatory authorities
19   here in the UK and in the US?
20      A.  Could you just repeat the first part of
21   your question which I didn't hear very clearly.
22      Q.  In Barclays, making decisions about
23   Lehman one, two and three, was the attitude of the
24   regulatory authorities a major influence in that?
25      A.  The situation was, as I described in the

Page 94

HIGHLY CONFIDENTIAL - JOHN VARLEY                94

1    earlier part of our conversation this afternoon,
2    that we had predetermined around the board table
3    two principal conditions precedent to our being
4    prepared to go ahead, and because those conditions
5    precedent were never achievable in the outturn we
6    never formally -- I never formally sought the
7    consent of the FSA to Lehmans one.
8         Of course, as we are required to do, we were in
9    dialogue with the FSA about what we were looking at, but
10   what would typically happen in such circumstances is that we
11   would inform the FSA of something that we had in mind and
12   were looking seriously at. Then, if we achieved
13   a transaction, the structural aspects of which were
14   satisfactory to the board, we would then seek formal
15   consent. We never got that far.
16        Q. You mentioned a dialogue. Who from
17   Barclays was responsible for that dialogue?
18        A. Principally me.
19        Q. And others in addition to you?
20        A. I don't recall. Of course I do recall
21   my own dialogue with the FSA but I don't recall
22   who else from our team here was talking to them.
23        Q. If I can just show you an e-mail, and
24   I apologize to those from North America for the

Page 95

HIGHLY CONFIDENTIAL - JOHN VARLEY                95

1    size of the paper.
2         (Exhibit 346A marked for identification)
3         Q. This is an e-mail from you to Bob
4    Diamond on Saturday 13, reporting on a call with
5    Hector Sants?
6         A. Yes. May I just read it. Thank you.
7         Q. You see in the third line there, Hector
8    has said they are going to impose the requirement
9    for shareholder consent. Could you explain what
10   you meant when you reported that or how you
11   understood that?
12        A. Yes. The reference to the UKLA is a UK
13   listing authority which reports into the FSA,
14   although it is a separately constituted entity.
15   On the Saturday night, as I recall it, so the
16   night of 13 September, we had dialogue with the UK
17   listing authority to understand whether any of the
18   steps that we were contemplating in relation to
19   Lehman one would require shareholder consent, and
20   the view that the UK listing authority came up was
21   that we would require shareholder consent. There
22   were specifics in the conversation that I don't
23   recall but that is what I was referring to there.
24        MR. SHAW: Before you go on, this

Page 96

HIGHLY CONFIDENTIAL - JOHN VARLEY                96

1    document should have been designated "highly
2    confidential", so I am designating it highly
3    confidential. We will I suppose provide
4    a replacement, find some way to restamp it.
5         Q. Were there any discussions with the UKLA
6    or the FSA about a waiver of the requirement for
7    shareholder consent in relation to Lehman one?
8         A. There might well have been but I don't
9    recall it. I mean, what would typically happen in
10   such circumstances is there would be a dialogue to
11   establish whether as a matter of predisposition
12   there would be a requirement for consent, but the
13   UKLA has quite significant and wide discretions,
14   so there may have been, but it was not
15   a conversation conducted by myself.
16        (Exhibit 347A marked for identification)
17        Q. I will show you another e-mail, which
18   will be marked 347A. Just take a moment to read
19   that.
20        A. Thank you.
21        Q. So this e-mail or the first e-mail in
22   the chain is from you to Robert Le Blanc, sent on
23   the evening of Sunday September 14, so after the
24   e-mail we just looked at, which is marked 346A.

Page 97

HIGHLY CONFIDENTIAL - JOHN VARLEY                97

1         A. This is the second e-mail in the chain,
2    isn't it, my e-mail?
3         Q. Absolutely, your e-mail to Robert.
4         A. Yes.
5         Q. What is Robert's role in the bank?
6         A. He is the Group Risk Director.
7         Q. Does this e-mail follow a conversation
8    that you had with Hector Sants?
9         A. My recollection is that as we thought
10   that the Lehman situation was reaching
11   a denouement, and as I sent Bob Diamond to New
12   York to conduct the due diligence, I told Hector
13   of those things. So there was a pattern of
14   dialogue between myself and Hector Sants over the
15   days in question, again as you would expect, he is
16   the Chief Executive of our regulator.
17        Q. Did the FSA's position, whether
18   expressed by Hector Sants or by someone else, to
19   Lehman one change during that dialogue?
20        MR. SHAW: Objection, foundation.
21        A. I don't know.
22        (Exhibit 348A marked for identification)
23        Q. I have an e-mail attachment we will mark
24   348A, this being an e-mail sent on

## Page 98

HIGHLY CONFIDENTIAL - JOHN VARLEY 98

1 Monday September 15 by Marie Smith to a number of
2 recipients, who appear to constitute the Barclays
3 board at the time. Is that a fair description?
4 A. I am sorry, I didn't hear the middle of
5 what you said.
6 Q. I am looking at the "To" line of this
7 e-mail, and this appears to be sent to the board.
8 A. Yes.
9 Q. It attaches a note from you and a note
10 from Investor Relations. I am less interested in
11 the Investor Relations note. I am more interested
12 in the note from you, which is the third page of
13 that document.
14 A. I see that, dated 15 September.
15 Q. The part I am interested in is the
16 second part, following "I can anticipate your
17 question about the likely attitude of the UK
18 authorities."
19 A. May I read it.
20 Q. Absolutely, yes.
21 MR. SHAW: While he is reading, I am
22 going to note this one also should have been
23 designated highly confidential, so I am
24 redesignating this.

## Page 99

HIGHLY CONFIDENTIAL - JOHN VARLEY 99

1 A. Thank you, yes.
2 Q. Now, this note is sent at a time after
3 Lehman one had become Lehman two. Is that
4 correct?
5 A. Lehman one had collapsed, yes.
6 Q. Lehman one had gone off the table?
7 A. Yes.
8 Q. And you were discussing Lehman two?
9 A. Exactly, because this is Tuesday 15th I
10 think, isn't it?
11 MR. SHAW: Monday.
12 A. Monday 15th, I beg your pardon, in
13 anticipation of the board meeting on the Tuesday,
14 yes.
15 Q. And in relation to the FSA there you say
16 that you have been in touch with the FSA and the
17 Bank of England. Then, looking at the fourth
18 line:
19 "The FSA's reaction to Long Island two or Lehman
20 two is to say they have defined the capital corridor down
21 which they expect us to walk."
22 A. Yes.
23 Q. What did you understand by "the capital
24 corridor"?

## Page 100

HIGHLY CONFIDENTIAL - JOHN VARLEY 100

1 A. What I was referring to there was that
2 at any given time the Financial Services
3 Authority, as our supervisor, has expectations as
4 to capital ratios that it expects us to bear, and
5 one of their interests in Lehman one, two and
6 three was how our capital ratios would look post
7 acquisition. That is what I was referring to. We
8 have a predetermined by them minimum capital ratio
9 to which we must operate at or above at all times.
10 Q. How did you describe Lehman two to
11 Hector Sants?
12 A. My recollection is that I told him that
13 we had not been able to get the transaction we
14 wanted on Lehman one, and I would then have taken
15 him through the outline of Lehman two, which we
16 have looked at in various documents that describe
17 it.
18 Q. Did you have a further discussion about
19 Lehman three with the FSA?
20 A. I don't recall.
21 Q. You focused on the discussions you had
22 with the FSA. Did you have discussions at this
23 time with the other tripartite authorities?
24 A. I make reference in this note to John

## Page 101

HIGHLY CONFIDENTIAL - JOHN VARLEY 101

1 Gieve. That is Sir John Gieve, then Deputy
2 Governor of the Bank of England. It was his part
3 of the Bank of England that was engaged in this
4 transaction and with as I recall it somewhat less
5 frequency than my dialogue with Hector I was
6 ringing John Gieve in the lead up to the weekend
7 and over the weekend to make sure that the Bank of
8 England, who were in dialogue with the Fed, knew
9 what was happening as we saw it.
10 Q. Did you have discussions with the
11 treasury?
12 MR. SHAW: About the Lehman --
13 Q. About Lehman two or Lehman three or
14 indeed Lehman one?
15 A. I don't remember having them, no.
16 Q. Would others at the bank potentially
17 have had those discussions or would they have been
18 reserved to you if they had occurred?
19 A. It is possible -- I am talking outside
20 this particular occasion -- it is possible there
21 would be on any given situation or transaction
22 dialogue between members of the team here and the
23 treasury. My working assumption, given that the
24 tripartite authorities have come to work more and

Page 102

HIGHLY CONFIDENTIAL - JOHN VARLEY        102

1  more closely over the period of the credit crunch,
2  is that any dialogue, and I should say that there
3  is sort of corroboration outside the context of
4  this at this point, that any dialogue I have with
5  member number one is pretty quickly transmitted to
6  members two and three. So I recall having on
7  a mental checklist, had we proceeded with Lehman
8  one, that I would need to call either Lord Mynors,
9  who is Minister for the City within the treasury
10 or the Chancellor of the Exchequer, Alastair
11 Darling, but Lehman one did not proceed, therefore
12 I didn't make the call.
13    Q. Do you recall any part of what I call
14 central Government, the treasury or cabinet,
15 expressing a view to Barclays about whether this
16 transaction should occur?
17    A. No.
18    Q. Could we go back to the document marked
19 345A, which is the letter from Jamie Dimon. We
20 have obviously covered this letter in some detail
21 so I will try not to tread over old ground, but
22 could you just explain to me your understanding at
23 the time of what JP Morgan's role in the
24 transaction acquisition of Lehmans, what

Page 103

HIGHLY CONFIDENTIAL - JOHN VARLEY        103

1  JP Morgan's role was?
2    MR. SHAW: If you have an understanding
3  of that.
4    A. I do not understand. I can answer what
5  was JP Morgan Casano's role for Barclays, they are
6  our corporate broker, therefore they for example
7  transact business between Barclays and the UK
8  listing authority, and the corporate broker in the
9  UK is required to be party to transactions that
10 are announced to the Stock Exchange.
11    Q. I was wanting to focus on JP Morgan
12 Chase in New York, who were party to a repo
13 transaction. Were you aware of that?
14    A. Yes.
15    Q. What did you understand their role to be
16 in relation to the repo transaction?
17    A. They were the conduit through which
18 monies that would pass as a result of the repo
19 transaction with the Fed did pass.
20    Q. So what did you need from JP Morgan in
21 order for Lehman three to close?
22    MR. SHAW: Objection, foundation.
23    Q. You can answer.
24    A. What would we need?

Page 104

HIGHLY CONFIDENTIAL - JOHN VARLEY        104

1    Q. What role did JP Morgan have in the
2  closing of Lehman three?
3    MR. SHAW: Objection, foundation.
4    A. We were expecting the release of a large
5  amount of cash held to our order by JP Morgan and,
6  as you see from the Dimon letter, there was
7  a dispute as to what should be released and when.
8    Q. How would you in a nutshell describe
9  that dispute?
10   A. It is interesting to me that Jamie Dimon
11 can only write about it in an 8-page letter.
12   Q. That is why I used the word "nutshell".
13   A. It is not susceptible to nutshell
14 analysis. I wish it were.
15   Q. You mentioned earlier that you had
16 a discussion with Jamie Dimon, and you cannot
17 recall whether it was before or after receiving
18 this letter.
19   A. Um hum.
20   Q. Was that the totality of your
21 discussions about this non-nutshell dispute with
22 Jamie Dimon?
23   A. I can't recall whether I had one
24 conversation with him or two. I certainly had

Page 105

HIGHLY CONFIDENTIAL - JOHN VARLEY        105

1  one. It possible that I had a second. But the
2  dialogue between Barclays and JP Morgan Chase was
3  conducted by Bob Diamond and Rich Ricci.
4    Q. The discussion you did have with Jamie
5  Dimon, the discussion or discussions, what was the
6  content of those discussions?
7    A. We had a strong point of view that money
8  held to our order by JP Morgan Chase should have
9  been delivered, and it had not been. I made that
10 point and I made the point also that the
11 relationship between JP Morgan as an organization
12 and Barclays is a long-standing one, and I drew to
13 his attention the irony of our advisor from the
14 point of view of UK corporate brokerage being
15 guess who, JP Morgan.
16   Q. When you received this letter, do you
17 recall if you had any discussions within Barclays
18 about the letter? I am not asking you about any
19 discussions that you had with your legal team.
20   A. My recollection is that I circulated it
21 to those who I would typically circulate such
22 a letter to, our general counsel, to Bob Diamond
23 and to Rich Ricci.
24   Q. What was your sense of that group,

Page 106

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    106
2    leaving aside the general counsel, their attitude
3    to what was said by Jamie Dimon?
4        A.   We disagreed with a lot of what he was
5    saying.
6        Q.   What did you do to — how did you
7    personally move to resolve the dispute?
8        A.   I didn't move personally to resolve it.
9    I said to Bob Diamond that one of the things that
10   we needed to do was to resolve this, that it
11   seemed to both him and me that proceeding by
12   litigation would be best avoided, and I asked him
13   to work with his team to resolve it with the Dimon
14   team.
15       Q.   Did you have any further involvement in
16   the dispute after that?
17       A.   I had no further involvement in the
18   dispute. From time to time Bob told me how
19   matters were progressing.
20       Q.   And how were matters progressing?
21           MR. SHAW:  And here to the extent that
22   his reports relayed the advice of counsel or
23   counsel's assessment of the situation please
24   don't --
25       A.   Understood. "Glacially" would be my

Page 107

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    107
2    nutshell answer.
3        Q.   And was a resolution finally achieved?
4        A.   Yes.
5        Q.   What is your understanding of the terms
6    of that resolution, at a commercial level, not
7    asking you to repeat the terms of the settlement
8    agreement?
9        A.   Most but not all of the assets to which
10   we thought we were entitled were released to us,
11   and we agreed to drop litigation that we had
12   initiated against Bear Stearns, which has
13   subsequently been acquired by JP Morgan.
14       Q.   Aside from the dropping of the Bear
15   Stearns litigation, are you aware of other
16   concessions made by Barclays to achieve
17   a resolution?
18       A.   I am not, no.
19       Q.   The letter raises a number of fairly
20   detailed factual points, and based on what you
21   have said today I suspect your answer may be that
22   you are not familiar with the content of many of
23   those points, but I wanted to touch on some of
24   them, just to check whether these were points that
25   you were aware of. If you start on the first page

Page 108

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    108
2    of the letter itself, the final paragraph, where
3    it says:
4            "JP Morgan continued to act as the clearing bank
5    for LBI", and then the next sentence: "We did so at the
6    request of the Fed and Barclays Capital itself."
7            Would that request have been a request that you
8    were involved in making?
9        A.   No.
10       Q.   Going to the second page, there is
11   a table there setting out a number of figures.
12   Did you examine those figures when you received
13   the letter?
14       A.   I didn't, no.
15       Q.   You did not?
16       A.   No, I did not. I read the letter but
17   your word "examine" suggest that I sort of
18   forensically studied them, and I did not.
19       Q.   Do you have a view as to whether those
20   figures are accurate?
21       A.   I have no view at all as to whether
22   those figures are accurate.
23       Q.   If you go on to immediately after the
24   table, and looking at the words in parentheses
25   here, the final sentence:

Page 109

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    109
2        "For a very significant amount of that
3    collateral, the movement of which between the Fed
4    collateral pool and the Barclays Capital collateral
5    pool was undoubtedly deliberate, Barclays Capital
6    assigned a loan value greater than the amount that had
7    been assigned by the Fed".
8            Did you have any knowledge prior to this
9    letter of the process of assigning loan values?
10       A.   No, I did not.
11       Q.   Does it surprise you that Barclays
12   Capital had assigned loan values higher than those
13   assigned by the Fed?
14           MR. SHAW:  Objection, assumes a fact not
15   in evidence. Foundation.
16       Q.   Sorry, your answer?
17       A.   I have no answer.
18       Q.   Okay. Would you go to the fourth page.
19       A.   Yes.
20       Q.   Page 4 of 7, and looking at the final
21   paragraph of that page, Mr. Dimon says, about
22   halfway through the paragraph:
23           "On Friday your personnel told ours that they had
24   'forgotten' about the tri-party and were 'confused'".
25           Does that accord with your understanding

Page 110

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    110
2    of the statements made by your personnel?
3        MR. SHAW: Objection, foundation.
4        A. I had had no such statements by our
5    personnel as to those facts.
6        Q. Do you believe that your personnel had
7    forgotten about the tri-party?
8        A. I have no knowledge.
9        Q. Do you know if they were confused?
10        A. I have no knowledge of that either.
11        Q. If you go to page 6.
12        A. Yes.
13        Q. Numbered paragraph 3. Looking towards
14    the end of that paragraph, where there is
15    discussion about an accounting. This follows on
16    from the question you were asked earlier about
17    whether you were duty-bound to ensure the values
18    received, and there is a suggest by Mr. Dimon that
19    an accounting be undertaken but it says:
20        "Your personnel have declined, citing the amount
21    of time and effort it would take. We should do that
22    accounting and should do it now".
23        A. I see that.
24        Q. Are you aware whether an accounting
25    occurred?

Page 111

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    111
2        A. I am not, no.
3        Q. Then, moving to the final page, page 7,
4    I suspect that you may have answered this question
5    already, but to confirm, Mr. Dimon says:
6        "We are prepared to sit down and discuss these
7    issues this weekend".
8        Did you personally sit down that weekend for
9    a discussion?
10        A. No. I spent the weekend with the
11    British Government. That was the weekend of the
12    change of the regulatory capital rules, so I did
13    not sit down with Mr. Dimon over the weekend, no.
14        Q. What were you discussing with the
15    Government? Was it Lehman specific or —
16        A. No. Remember, this is the weekend of
17    11 October. On the weekend of 11/12 October, two
18    banks here were effectively nationalized. The
19    forced merger of HBOS and Lloyd's took place, and
20    every other bank had its capital ratio increased.
21    It was a busy weekend.
22        Q. Are you aware if any other members of
23    your team sat down with the JP Morgan team?
24        A. I am not aware.
25        Q. Do you know what has been done to value

Page 112

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    112
2    the collateral which Barclays has ultimately
3    received?
4        A. No, I don't.
5        Q. Are you aware of any further disclosures
6    being made to the court since the deal closed
7    about the value received?
8        A. I am not, no.
9        MR. BUNTING: I have nothing further,
10    thank you.
11        REDIRECT EXAMINATION BY MR. TAMBE:
12        MR. TAMBE: Just one follow on question.
13    As we talked about Lehman one, two and three, we
14    talked about a shrinking or changing basket of
15    assets that Barclays was contemplating purchasing.
16    Did you ever seriously consider doing
17    a transaction where you did not purchase any
18    assets, where you simply offered employment to the
19    now laid off or soon to be laid off employees from
20    Lehman, buy a building and that is it?
21        MR. SHAW: When you say "you" you mean
22    him personally or Barclays?
23        MR. TAMBE: Barclays.
24        MR. SHAW: Foundation.
25        A. We were assuming a lot of operational

Page 113

1    HIGHLY CONFIDENTIAL - JOHN VARLEY    113
2    and cost liabilities in Lehman two and Lehman
3    three. We had great uncertainty as to the
4    reconstitutability of the Lehman's North America
5    broker dealer franchise. Remember, its clients
6    had been through an executrating experience in the
7    bankruptcy, and many of those clients would have
8    regarded their relationship with Lehmans as at an
9    end.
10        What we wanted to do was to try to give ourselves
11    the best chance, through structuring the transaction, of
12    creating an immediately ongoing business opportunity, and
13    the acquisition of the balance sheet was a fundamental
14    component of creating that opportunity. For all the
15    attendant uncertain — and I say it was very uncertain,
16    we didn't know whether we would be able to resurrect
17    relationships that had been so badly hurt as a result of the
18    bankruptcy. But it seemed to us that we needed to do was to
19    create that opportunity, and the acquisition of the balance
20    sheet enabled us to create that opportunity faster I think
21    than it would have otherwise been generated.
22        Q. And the acquisition of the balance sheet
23    also gave you an opportunity to get that delta
24    that would help offset some of the liabilities you
25    were taking on?

## Page 114

HIGHLY CONFIDENTIAL - JOHN VARLEY    114

1    A.  Well, I don't see it in quite that way.
2    What I would say is that given that we wanted to
3    acquire the balance sheet, we then wanted to
4    ensure that there was an appropriate discount.  So
5    I would not accept the way you have described it.
6    I think about it and thought about it at the time
7    the way I have just described it to you.
8        MR. TAMBE:  Thank you.
9        MR. SHAW:  You have one question?
10        FURTHER CROSS-EXAMINATION BY MR. WOOD:
11        MR. WOOD:  Just a couple of quick ones.
12    Going back to your comparison earlier between the
13    risk of Lehman one and Lehman two, I believe you
14    said that Lehman two involved significantly less
15    risk than Lehman one.  Is that correct?
16    A.  Yes.
17    Q.  Would it be fair to say that Lehman
18    three also involved significantly less risk than
19    Lehman one?
20    A.  Less if one calibrates that simply
21    through the barometer of balance sheet size, but I
22    think I said earlier -- but let me say this, in
23    case I didn't, that the risk of Lehman two was
24    significantly less than the risk of Lehman one.

## Page 115

HIGHLY CONFIDENTIAL - JOHN VARLEY    115

1    The delta of risk between three and two was a much
2    narrower delta than the delta of risk between two
3    and one, and that is because two and three were
4    substantially, not wholly, but substantially
5    similar transactions.  We were acquiring the
6    Lehman North American broker dealer business and
7    we were hiring a large, you know, several thousand
8    people.  We were not acquiring the whole Lehmans
9    global enterprise, which is what we had
10    contemplated in Lehmans one.
11    Q.  If you can take another look at
12    Exhibit 343A, again that is the transcript of
13    the September 17 conference call.
14    A.  Yes, I will just see if I can find it.
15    Got it, thank you.
16    Q.  If you look at page 2, midway down that
17    page, the paragraph that begins: "The acquisition
18    of these businesses and assets ..."
19    A.  Yes.
20    Q.  We see you refer there to a transaction
21    that is "derisked," and you are referring to
22    Lehman two there.  Correct?
23    A.  Yes.  I think what I was trying to
24    convey there was that relative to -- it is

## Page 116

HIGHLY CONFIDENTIAL - JOHN VARLEY    116

1    a relative statement, not an absolute statement
2    I guess is what I am saying.  In other words, that
3    the risk of Lehman one would have been
4    considerably greater than the risk of Lehman two,
5    and remember that the backdrop to this call with
6    analysts was a very large amount of media and
7    market coverage of Lehman one.  We needed to get
8    people to focus on the fact that this was
9    a different transaction, the risk dynamics were
10    different.  But I make the comment "relative"
11    versus "absolute" advisedly, because no
12    transaction in which you assume assets of tens of
13    billions of dollars is risk free.  It is not
14    literally derisked, could not possibly be.  The
15    markets were moving.
16    Q.  But to the extent that Lehman two was
17    derisked, would it be fairer to say that Lehman
18    three was similarly derisked?
19    A.  Not similar.  That was the point I was
20    making a moment ago, that the delta of lower risk
21    as between three and two was a lot smaller than
22    the delta of lower risk between two and one.  Two
23    and one were radically different transactions.
24    Two and three were not radically differ

## Page 117

HIGHLY CONFIDENTIAL - JOHN VARLEY    117

1    transactions; the difference was in the size of
2    the balance sheet that we acquired in three.
3    Q.  And so do the risks go down from two to
4    three?
5    A.  Yes.
6        MR. WOOD:  I have nothing further.
7        FURTHER CROSS-EXAMINATION BY MR. BUNTING:
8        MR. BUNTING:  I have one question.  Can
9    you pinpoint when Lehman two became Lehman three?
10    A.  I can't pinpoint it.  It was some time
11    between lunchtime Wednesday and lunchtime Friday.
12    Q.  And why did it become Lehman three?
13    A.  I sought to give an answer to that in an
14    earlier answer, but let me repeat what I said.
15    The drivers of that change were first of all the
16    different set of assets that we acquired or that
17    we were able to acquire post the repo that we have
18    been talking about earlier, and second, the market
19    dynamics, which were atrocious that week.
20    Q.  Was the move from two to three an
21    evolution or a revolution?
22        MR. SHAW:  Objection.
23    A.  I don't know what your definition of
24    those words is.

Page 118

```
1        HIGHLY CONFIDENTIAL - JOHN VARLEY        118
2      Q.  Was is it a progressive change or did
3    someone say: "Right, we are doing a different
4    deal"?
5        MR. SHAW:  Objection, foundation.
6      A.  The strategy of the deal was
7    substantially consistent.  The differential was in
8    the size of the balance sheet, and I have
9    explained why the size of the balance sheet
10   reduced in three versus two.
11     Q.  But there was not a "eureka" moment
12   where two became three?
13     A.  The differential, the big differential
14   occurred between one and two.
15     Q.  But then two became three, rather than
16   someone within Barclays identifying a need to
17   shift?
18     A.  No.  I will simply repeat what I have
19   said before, and I don't know whether that is
20   helpful or not, but I will repeat it in case it
21   is.  There were two drivers of the change from two
22   to three.  One was the ongoing and as it appeared
23   at the time semi-catastrophic deterioration in
24   market sentiment and in market substance.  Second
25   was the impact on the assets to be acquired of the
```

Page 119

```
1        HIGHLY CONFIDENTIAL - JOHN VARLEY        119
2    Fed repo transaction.
3        MR. WOOD:  Thank you.
4        MR. SHAW:  One quick question I need to
5    ask you.  When you talked about the difference in
6    risk between Lehman two and Lehman three, were you
7    referring simply to the reduction in the size of
8    the balance sheet.
9      A.  Yes.  If I had not made that clear, let
10   me make it clear now.  The substance of the
11   transaction two and three was the acquisition of
12   Lehman Brothers North America broker dealer
13   business, no change as between the two.  The only
14   change between the two and the lesser risk that I
15   was referring to was because in Lehman one the
16   size of the balance sheet was larger -- I beg your
17   pardon -- in Lehman two the size of the balance
18   sheet was larger than in Lehman three.
19       MR. SHAW:  I have no further questions.
20       MR. TAMBE:  Thank you, Mr. Varley.
21     A.  Thank you very much.
22
23
24
25
```

Page 120

```
1        HIGHLY CONFIDENTIAL - JOHN VARLEY        120
2
3             CERTIFICATE OF DEPONENT
4
5    I, John Varley, hereby certify that I have read
6    the foregoing pages, numbered 1 through 122, of my
     deposition of testimony taken in these proceedings
     on 3 September, 2009, and, with the exception of
7    the changes listed on the next page and/or
     corrections, if any, find them to be a true and
8    accurate transcription thereof.
9
10
11
12
13   Signed:  ........................
14   Name:   John Varley
15   Date:  ........................
16
17
18
19
20
21
22
23
24
25
```

Page 121

```
1        HIGHLY CONFIDENTIAL - JOHN VARLEY        121
2        CERTIFICATE OF COURT REPORTER
3
4    I, AILSA WILLIAMS, an Accredited LiveNote Reporter
     with European Deposition Services, London,
5    England, hereby certify that the testimony of the
     witness John Varley in the foregoing transcript,
6    numbered pages 1 through 122, taken on 3
     September, 2009 was recorded by me in machine
7    shorthand and was thereafter transcribed by me;
     and that the foregoing transcript is a true and
8    accurate verbatim record of the said testimony.
9
10   I further certify that I am not a relative,
     employee, counsel or financially involved with any
11   of the parties to the within cause, nor am I an
     employee or relative of any counsel for the
12   parties, nor am I in any way interested in the
     outcome of the within cause.
13
14
15
16
17   Signed:  ........................
18   AILSA WILLIAMS
19   Dated: 9/3/2009
20
21
22
23
24
25
```

Page 122

1       HIGHLY CONFIDENTIAL - JOHN VARLEY        122
2
3              E R R A T A
4           Deposition of John Varley
5    Page/Line No.    Description    Reason for
6    change
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23    Signed:    ...................
24    Name:    John Varley
25    Date:    ..................

# BCI EXHIBIT

# 100

Page 123

1          HIGHLY CONFIDENTIAL – J. VARLEY

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ----------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS          Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                    Debtors.

10

      ----------------------x

11

12          * * *HIGHLY CONFIDENTIAL* * *

13    CONTINUED DEPOSITION OF JOHN VARLEY (TELEPHONIC)

14               New York, New York

15               September 11, 2009

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 24300

Page 124

HIGHLY CONFIDENTIAL - J. VARLEY
September 11, 2009
9:05 a.m.

CONTINUED HIGHLY CONFIDENTIAL
deposition of JOHN VARLEY, held at
Jones Day, LLP, 222 East 41st Street,
New York, New York. before Kathy S.
Klepfer, a Registered Professional
Reporter, Registered Merit Reporter,
Certified Realtime Reporter, Certified
Livenote Reporter, and Notary Public
of the State of New York.

TSG Reporting - Worldwide  (877) 702-9580

Page 125

HIGHLY CONFIDENTIAL - J. VARLEY

A P P E A R A N C E S :
JONES DAY, LLP
Attorneys for Lehman Brothers, Inc.
    222 East 41st Street
    New York, New York  10017-6702
BY: JAYANT W. TAMBE, ESQ.
    BART GREEN, ESQ.

BOIES, SCHILLER & FLEXNER, LLP
Attorneys for Barclays and the Witness
    575 Lexington Avenue - 7th Floor
    New York, New York  10022
BY: JACK G. STERN, ESQ.

QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
Attorneys for the Creditors Committee
    16 Old Bailey
    London, United Kingdom  EC4M 7EG
BY: MATTHEW BUNTING, ESQ. (Via telephone)

TSG Reporting - Worldwide  (877) 702-9580

Page 126

HIGHLY CONFIDENTIAL - J. VARLEY
A P P E A R A N C E S : (Cont'd.)
HUGHES, HUBBARD & REED, LLP
Attorneys for the SIPA Trustee
    1775 I Street, N.W.
    Washington, D.C.  20006-2401
BY: JOHN WOOD, ESQ.

Also Present:
    PHILIP E. KRUSE, Alvarez & Marsal
    DEBORAH COOPER, Barclays (Via Telephone)
    PAUL LOFTUS, Barclays (Via telephone)

TSG Reporting - Worldwide  (877) 702-9580

Page 127

HIGHLY CONFIDENTIAL - J. VARLEY
JOHN VARLEY, called as a
witness, having been duly sworn by a Notary
Public, was examined and testified as
follows:
EXAMINATION BY
BY MR. TAMBE:
    Q.   Mr. Varley, this is Jay Tambe from
Jones Day, special counsel to the Lehman
Brothers Holdings, Inc. Estate. We're
continuing the deposition that we commenced last
week in London, and we understand you will be
available for one hour this afternoon; is that
correct?
    A.   That is correct, yes.  Thank you.
    Q.   If you could tell me, Mr. Varley, is
anyone else present in the room with you where
you are taking this call from?
    A.   Yes.  I have a colleague of Deborah
Cooper, whom you met last week; Mr. Paul Loftus,
who is internal counsel in the Barclays legal
team.
    Q.   And anyone else?
    A.   No.  If there was anybody else, I
would have mentioned them.

TSG Reporting - Worldwide  (877) 702-9580

2

Page 128

HIGHLY CONFIDENTIAL - J. VARLEY
1
2    MR. TAMBE: All right. Just so we
3    have the record clear, that is a
4    continuation of the deposition that we're
5    doing via telephone. Mr. Varley has
6    identified the people who are in the room
7    with him.
8        By agreement of counsel, a court
9    reporter who is located here in New York has
10   just administered the oath to Mr. Varley,
11   and this examination will focus on one
12   exhibit which we have previously provided to
13   Barclays, and that exhibit has been marked
14   here today as Exhibit 412B.
15       (Exhibit 412B, a cover letter from
16   Boies Schiller with attached document
17   bearing Bates Nos. BCI-EX-166277 through
18   166348, marked for identification, as of
19   this date.)
20   Q.   And Mr. Varley, do you have a copy of
21   that document before you?
22   A.   No, I don't.
23       MR. STERN: Paul, this is the large
24   package of documents with the cover letter
25   that Jonathan Shaw forwarded to you.

TSG Reporting - Worldwide (877) 702-9580

Page 129

HIGHLY CONFIDENTIAL - J. VARLEY
1
2        MR. FORTUS: Okay, fine.
3    A.   In which case I think in answer to
4    your earlier question, we do have it, yes.
5    Q.   And if you could confirm for me. sir.
6    that the documents you are looking at has a
7    cover letter dated September 2, 2009, from Boies
8    Schiller to my colleague, Robert W. Gaffey?
9    A.   Yes.
10   Q.   And the documents attached to that
11   cover letter commence with a Bates number, which
12   is in the lower right-hand corner,
13   BCI-EX-00166277, all the way --
14   A.   Yes, I have that. Thank you.
15   Q.   And the last page in the package is
16   00166348.
17   A.   Yes. Thanks.
18   Q.   Drawing your attention just to the
19   cover page, the letter from your lawyers at
20   Boies Schiller, in the first paragraph that
21   letter states, "The disc contains non-privileged
22   responsive paper documents from the files of
23   John Varley." Do you see that?
24   A.   I do.
25   Q.   And is it your understanding, sir.

TSG Reporting - Worldwide (877) 702-9580

Page 130

HIGHLY CONFIDENTIAL - J. VARLEY
1
2    that these documents are in fact documents from
3    your files?
4    A.   It is my understanding, yes.
5    Q.   Just so I have a sense of where these
6    documents were located, do you have a file or
7    set of files relating to the Lehman/Barclays
8    transaction?
9    A.   No. These documents -- if I can just
10   describe my working practice. I will assemble
11   from time to time relating to transactions of
12   which we're involved or announcements that we're
13   making or results that we are reporting, I will
14   typically have what I think of as a hand file
15   where into a folder I will put documents that I
16   think are going to be useful to me in particular
17   as I have conversations with shareholders or the
18   media, and the file from which these documents
19   are extracted, and I can say that these are all
20   the documents from that file, serve just that
21   purpose.
22       I recall putting it together at the
23   time of the Lehman transaction so that when we
24   made our various statements to the market, for
25   example, on the Wednesday after the Lehman's

TSG Reporting - Worldwide (877) 702-9580

Page 131

HIGHLY CONFIDENTIAL - J. VARLEY
1
2    weekend, if I can describe it that way, I had
3    available to me notes that I might find helpful.
4    So, as an example, I think in here you will see
5    the announcement that we made at the time, the
6    text of a briefing that I did to the wire houses
7    and market and so on.
8    Q.   The file that you just described, you
9    said these are all of the files that were in
10   that folder. Were there documents in that
11   folder that were privileged documents that your
12   counsel has withheld from production on claims
13   of privilege?
14   A.   Let me make two comments. I'm not
15   qualified to answer as to the designation of
16   these documents as non-privileged, but no doubt
17   my counsel, if he has something to say about
18   that, will say something about it.
19       In answer to your question, and
20   consistent with what I said a moment ago, all
21   the documents that were in that file were passed
22   to my counsel, and I believe that all of those
23   documents have been transmitted to you. But my
24   counsel will confirm otherwise.
25       MR. STERN: That's correct. And Jay,

TSG Reporting - Worldwide (877) 702-9580

3

Page 132

HIGHLY CONFIDENTIAL - J. VARLEY

1        HIGHLY CONFIDENTIAL - J. VARLEY
2  I simply, I don't know whether any documents
3  were actually withheld as privileged. I can
4  certainly check on that.
5     MR. TAMBE: And we would ask you to do
6  that.
7     MR. STERN: Okay.
8    Q.  Mr. Varley, from your earlier answer I
9  gather that this collection of documents is a
10  file that you began to assemble back when the --
11  back when Barclays and Lehman were contemplating
12  and going through the transaction last year; is
13  that correct?
14    A.  Well, contemplating -- the only reason
15  why I'm pausing is that your word
16  "contemplating" introduces a different temporal
17  standard. By that I mean that this file was
18  assembled by me in preparation for the
19  communication work that we were doing in the
20  knowledge that there was a transaction to be
21  communicated to the market.
22     I don't know whether -- I hope I have
23  made myself clear. So I can't remember, I'm
24  afraid. You may have looked at, I'm afraid I
25  have not looked at, which of these documents are

TSG Reporting - Worldwide (877) 702-9580

Page 133

HIGHLY CONFIDENTIAL - J. VARLEY

1        HIGHLY CONFIDENTIAL - J. VARLEY
2  dated and what the first dated document is. But
3  I say again that the hand file was constructed
4  by me in anticipation of a communication
5  obligation to the market and to the media.
6    Q.  And my question was inartfully
7  phrased. I just wanted to confirm that this was
8  a collection that was prepared
9  contemporaneously, at the time you were making
10  those communications to the market?
11    A.  Yes. Yes. That's very clear, and my
12  answer I hope is also clear.
13    Q.  It is. Thank you. So let's turn to
14  these documents. The second page of the
15  exhibit, the last three digits on the page are
16  277?
17    A.  Yes.
18    Q.  And it appears to be a spreadsheet of
19  some kind with handwritten notations. Do you
20  see that?
21    A.  I do. Thank you.
22    Q.  Is that your handwriting that appears
23  on that page?
24    A.  Yes.
25    Q.  This particular spreadsheet as far as

TSG Reporting - Worldwide (877) 702-9580

Page 134

HIGHLY CONFIDENTIAL - J. VARLEY

1        HIGHLY CONFIDENTIAL - J. VARLEY
2  I can tell does not have a date on it. Do you
3  know when this -- when the underlying document,
4  the electronic document, was prepared, the
5  spreadsheets?
6    A.  I don't, no. I don't know.
7    Q.  I just want to understand some of the
8  handwritten notations that you have made on this
9  document. Do you recall the circumstances under
10  which you made those notations?
11    A.  My recollection is that this was a
12  sheet that was given to me by one of the team
13  working on the Lehman's transaction and that, as
14  they described the sheet to me, I jotted down
15  the handwritten notes that you see on the face
16  of the page.
17    Q.  Do you have any recollection as to who
18  on the team you would have been speaking with as
19  you were jotting this down?
20    A.  Well, I'm afraid my recollection is
21  imperfect. I think it might have been Chris
22  Lucas, but I am not sure that it was Chris
23  Lucas. And the one other thing that I would say
24  is that you remember that last week we agreed
25  the convention, the nomenclative convention of

TSG Reporting - Worldwide (877) 702-9580

Page 135

HIGHLY CONFIDENTIAL - J. VARLEY

1        HIGHLY CONFIDENTIAL - J. VARLEY
2  Lehman 1, Lehman 2, Lehman 3?
3    Q.  I do remember that. That was very
4  helpful. Thank you.
5    A.  I observe that this relates to Lehman
6  3.
7    Q.  And just to be clear, that's the deal
8  as actually done?
9    A.  Yes.
10    Q.  I'm going to ask you some comments
11  about some of the handwritten notations. At the
12  top, towards the top of the page, against the
13  minus 2.83 number?
14    A.  Yes.
15    Q.  You have written "haircut," do you see
16  that?
17    A.  I do.
18    Q.  Do you have any understanding as to
19  why you had identified the 2.83 as a haircut?
20    A.  Well, you'll see that there are --
21  there are two "haircut" words there, and one has
22  a question mark against it, and if I can just
23  take you through what I think lay behind the
24  logic of those two handwritten notes and the
25  question mark.

TSG Reporting - Worldwide (877) 702-9580

## Page 136

HIGHLY CONFIDENTIAL - J. VARLEY

1  HIGHLY CONFIDENTIAL - J. VARLEY
2      You'll remember last week when we were
3  discussing risk in the context of Lehman 2 and
4  Lehman 3, that I think it is possible to -- I
5  thought it then and said to you at the time --
6  possible to think by reference to sheer
7  quantification and balance sheet size of Lehman
8  3 by that standard being less risky than Lehman
9  2 because the size of the balance sheet of
10 Lehman 3 was quite significantly lower than the
11 size of the balance sheet of Lehman 2.
12     But I also, I think, mentioned last
13 week, and I say it again today, that in these
14 markets any transaction of whatever size was
15 going to be a risky proposition. And here we
16 are talking about, under Lehman's 3, a
17 transaction, an acquisition of a balance sheet
18 of many tens of billions of dollars, and I was
19 preoccupied in ensuring, given the extraordinary
20 volatility that we were seeing in the market
21 that week, I was preoccupied in ensuring that in
22 any acquisition of a balance sheet by Barclays,
23 the delta between, that is, the differential
24 between the asset valuation and a liability
25 valuation was protected to ensure that there was

TSG Reporting - Worldwide (877) 702-9580

## Page 137

1  HIGHLY CONFIDENTIAL - J. VARLEY
2  an appropriate margin for error in a risky
3  transaction that we were contemplating.
4      And in Lehman 2 there had been such a
5  delta, and I wanted to be sure, as I was being
6  talked through Lehman 3 on this sheet of paper,
7  and I believe I was, I wanted to be sure that
8  that delta still existed because, although the
9  size of the balance sheet was somewhat smaller,
10 Lehman 2 you'll recall being approximately $70
11 billion and Lehman 3 being approximately $45
12 billion, although the size was smaller, the
13 assets contained within the balance sheet were
14 quite different, and therefore, the assets that
15 came in through the Fed repo transaction were
16 not the assets that had been contemplated in
17 Lehman 2. And that was why I wanted to be
18 certain that the delta or the haircut was in
19 place.
20     Q.   And can you tell from looking at this
21 document or from your recollection that in fact
22 you were satisfied that the delta had been
23 preserved to your satisfaction?
24     A.   Well, I can see myself questioning
25 whether the delta of 3 to 4 billion dollars,

TSG Reporting - Worldwide (877) 702-9580

## Page 138

1  HIGHLY CONFIDENTIAL - J. VARLEY
2  which is the delta that we had discussed in our
3  conversation last week, was still available.
4  And I draw your attention a little bit below
5  those "haircuts" words to the right. You'll see
6  there is a phrase -- you may be able to read
7  it -- "query buffer of 3 - 4 billion."
8      So I think my answer to your question
9  is it wasn't clear to me whether that buffer,
10 that haircut, that delta had been protected and
11 I was wanting to test that point.
12     Q.   All right. So the reference you just
13 made is to the right-hand side, a little bit
14 further down the page, there's a question mark
15 and then it reads, "Buffer of 3 - 4 billion"?
16     A.   Yes.
17     Q.   Right above --
18     A.   That's what --
19     Q.   Go ahead.
20     A.   That's what it reads, yes.
21     Q.   Right above that notation there's some
22 other handwriting which I cannot decipher. If
23 you could help me with that, please.
24     A.   Yes. I think what it says, I'm
25 ashamed to say that I have some difficulty in

TSG Reporting - Worldwide (877) 702-9580

## Page 139

1  HIGHLY CONFIDENTIAL - J. VARLEY
2  deciphering it as well, but I believe it says,
3  "Secs," S-E-C-S, "collateral of repo funding
4  from Fed," I think is what it says.
5      MR. STERN:  "Secs" being shorthand for
6  "securities"?
7      THE WITNESS:  "Secs" is my shorthand
8  for "securities."
9      Q.   Further down the page, so below the
10 printed text, there are handwritten notations,
11 and if we can start from the left-hand side,
12 there's almost a calculation, it appears, laid
13 out there. If I could just help us understand
14 what you have written there.
15     A.   Yes, I can't read and I can't recall
16 what I was saying. You see there's a word that
17 begins with a "P"?
18     Q.   Yes.
19     A.   And I think it might say "plus," but
20 I'm not sure, and it's got two lines underneath
21 it and it then says in brackets "JPMC."
22     The next word down is "borrow" 7.4,
23 and the next word down is "collat," my shorthand
24 for "collateral," 8.5, and then we have "gain
25 liability for failed trades 1.0."

TSG Reporting - Worldwide (877) 702-9580

Page 140

```
1          HIGHLY CONFIDENTIAL - J. VARLEY
2      Q.   Okay. And then over on the right-hand
3   side there's a phrase that begins "DTCC," I
4   believe?
5      A.   Yes. 2, what that says is -- it does
6   say "DTCC." Then dollar sign, "250 million
7   first loss, no more."
8      Q.   If you could just give us some context
9   for those two sets of comments, starting with
10  the left-hand side, the "plus JPMC" notations,
11  what is that a reference to?
12     A.   Well, can I just qualify what I say,
13  as I did various times last week, by saying to
14  you that this is a year ago, these were jottings
15  that I made at the time, and therefore, my
16  recollection is of course imperfect.
17          I think what I was referring to there,
18  what I was getting at there was, was there
19  over-collateralization of borrowing, and there
20  is an approximate difference of $1 billion
21  between 7.4 and 8.5 of collateral.
22          The "liabilities for failed trades,"
23  I'm not sure what I was referring to, and the
24  "DTCC 250 million first loss, no more," I'm not
25  sure what I was referring to.
```
TSG Reporting - Worldwide (877) 702-9580

Page 141

```
1          HIGHLY CONFIDENTIAL - J. VARLEY
2      Q.   All right. Further up on the same
3   page in the section right above "Total
4   Liabilities" there's some handwriting that
5   points out the 2.25 number and the 2.0 number
6   and then there's some words written to the right
7   of that and I can't decipher those.
8          What have you written there?
9      A.   That says "A/Cs payable," as in
10  accounts payable, and it then goes on to say
11  question mark, "Inc.," dollar sign, "1 billion
12  buffer."
13     Q.   What did you mean by that?
14     A.   I think I should qualify my answer as
15  I qualified my answer a moment ago, which is
16  that my recollection is imperfect, but the only
17  number in that section that I think would have
18  been familiar to me at the time was a bonus
19  accrual of $2 billion, and I remember that the 2
20  billion was split into two equal parts: A cash
21  obligation of a billion and a shares obligation
22  of a billion.
23          What we're looking at here, as you
24  understand, is a statement of cash, and I think
25  it possible, subject to the qualification that I
```
TSG Reporting - Worldwide (877) 702-9580

Page 142

```
1          HIGHLY CONFIDENTIAL - J. VARLEY
2   gave you a moment ago, that the "1 billion
3   buffer" refers to the difference between the $2
4   billion accrual relating to compensation that we
5   took over in exchange for the obligation to
6   satisfy that payment, the difference between the
7   2 billion and the 1 billion in cash that would
8   have to be paid out to meet the cash obligation
9   component of that.
10     Q.   If you could move down in this exhibit
11  to the page that ends in the numbers 294.
12     A.   Right. Hang on. Just bear with me
13  while I find it.
14          Yes.
15     Q.   And if you look at 294, 295 and 296,
16  they appear to be similar but not identical
17  handwritten pages?
18     A.   Well, if that's what you tell me, of
19  course I accept it. I can see a lot of
20  similarity. I can see one point of difference,
21  which is a telephone number on 94. There isn't
22  on 95 and there isn't on 96. Other than that,
23  they look to me to be broadly identical.
24     Q.   Go ahead.
25     A.   Go ahead.
```
TSG Reporting - Worldwide (877) 702-9580

Page 143

```
1          HIGHLY CONFIDENTIAL - J. VARLEY
2      Q.   No, I suspect the telephone number is
3   written on some kind of a Post-It note which
4   appears on 94 and was removed for purposes of
5   95?
6      A.   Yeah, could be. I don't know.
7      Q.   I'm not particularly interested in the
8   telephone number, so looking at either, you
9   know, as we go through this, you can look at 94,
10  95 or 96, wherever you find the handwriting
11  easiest or the copying easiest to follow, I just
12  want to get a sense of the information that
13  appears on this page.
14          Let's start with the box on the upper
15  right-hand corner. Can you decipher that for
16  us, please?
17     A.   Say that again.
18     Q.   Could you decipher for us the box that
19  appears on the upper right-hand corner. There's
20  a boxed-off area with what looks like a
21  calculation and then circled numbers 1, 2 and 3.
22     A.   Yes.
23     Q.   And if you could decipher that for us,
24  please?
25     A.   5.95 current RAF, brackets 30,
```
TSG Reporting - Worldwide (877) 702-9580

6

**Page 144**

HIGHLY CONFIDENTIAL - J. VARLEY

1     HIGHLY CONFIDENTIAL - J. VARLEY
2  brackets tier one deduction, brackets 50,
3  brackets valuation volatility equals pound sign
4  3.1 billion, line, 5.15, .12, something .5
5  billion stress, 10 percent times 2, 5 percent
6  times 3 equals 65 billion.
7        I, question mark, dollar sign 5.35
8  billion; 2, RAF, brackets 15 basis points, close
9  brackets; 3, and then underneath the 3, SMBC
10 equals ten basis points.
11     Q.   And what does all of that mean, sir?
12     A.   Well, I believe this has nothing at
13 all to do with the Lehman's transaction.  I
14 believe it is a sheet that is in the file from
15 another file, and that running total that you
16 see there is my calculation of our core tier 1
17 ratio at the end of 2008 made before the end of
18 2008, I believe.
19     Q.   And what does "RAF" stand for?
20     A.   Running annual forecast.  It is a
21 phrase that we use regularly in Barclays and it
22 describes our year-end forecast at any given
23 time.
24     Q.   All right.  So now let's go to the
25 left of that box, and you have numbered 1, 2, 3,

TSG Reporting - Worldwide (877) 702-9580

**Page 145**

1     HIGHLY CONFIDENTIAL - J. VARLEY
2  4.  Could you decipher that for us, please?
3     A.   Yes.  1 says DD update.  2 says
4  regulatory conv, that is, C-O-N-V, my shorthand
5  for "conversation," update.  3 is structure and
6  4 is next.
7     Q.   Could you tell from looking at this
8  note when in the process you would have made
9  these notations?  And again, putting aside that
10 box that appears in the upper right-hand corner
11 that we discussed, the rest of these notes, when
12 in the process do you think you made these
13 notations?
14     A.   It's not clear to me that they have
15 anything to do with the Lehman's transaction at
16 all, so I have no idea when I made these notes.
17 If I assumed, and it is an assumption, that I
18 was -- that all of the handwriting on the left
19 and the bottom of the page was put on the page
20 broadly at the same time as the section that we
21 have analyzed on the top right-hand side, I
22 could imagine that I was writing this in
23 September or October of last year because that
24 was the time when we were, for reasons that you
25 may be familiar with, but if you're not, and you

TSG Reporting - Worldwide (877) 702-9580

**Page 146**

1     HIGHLY CONFIDENTIAL - J. VARLEY
2  will allow me to explain them, I will of course
3  explain them, we were spending a lot of time
4  looking at our capital ratios in anticipation of
5  changes to the regulatory capital requirements
6  imposed on us by our regulator here in the
7  United Kingdom.
8     Q.   The only reference to Lehman I see on
9  this page is towards the bottom right-hand
10 corner, and I think you have an A and a B there
11 circled, and I can -- I think I can decipher the
12 word "Lehman," but maybe I'm not reading that
13 correctly.
14        What does that phrase that begins with
15 the circled A read?
16     A.   Yes, I think what it reads there is
17 "making it happen with Lehman's board."
18     Q.   All right.  That comment would suggest
19 to me that that notation was made when there
20 still was a Lehman's board, so sometime prior
21 to --
22     A.   Yes, you might be right.  I don't
23 know.  You might be right.
24     Q.   Does that help you at all in placing
25 the context of these notations?

TSG Reporting - Worldwide (877) 702-9580

**Page 147**

1     HIGHLY CONFIDENTIAL - J. VARLEY
2     A.   Well, I think that I made the caveat I
3  have about the top right-hand section, which I
4  don't think has anything to do with the Lehman's
5  transaction.  If I then look at the right-hand
6  section which starts OOO12 and then it says "you
7  asked four things," and then I have 1, 2, 3, 4
8  and then A and then B, if I look at those, I
9  think it possible that those notes were made in
10 anticipation of a dialogue with a board meeting
11 about Lehman 1.
12        And the reason I say that is that the
13 last note on the page, B, says, "Board go, no go
14 Sunday A.M.," and had we been proceeding with
15 Lehman 1, the timetable would have required a
16 board meeting on the Sunday morning, and indeed,
17 I recall that we did have a telephone board
18 meeting on the Sunday morning.
19     Q.   All right.  Thank you.  Moving forward
20 to page 297, the last three digits are 297.
21     A.   Thank you.  Yes, I have it in front of
22 me.
23     Q.   And that e-mail discusses a telephone
24 conference call with the New York Fed and with
25 Secretary Paulson, do you see that?

TSG Reporting - Worldwide (877) 702-9580

7

Page 148

HIGHLY CONFIDENTIAL - J. VARLEY

1
2    A.    I -- I'm just -- do you mind pausing
3    while I look at it?
4    Q.    No. Absolutely. Look at it. Let me
5    know when you're done.
6        (Document review.)
7    A.    Yes. Thank you. It does.
8    Q.    And there's a reference in the subject
9    line to a call on Saturday, September 13, at
10    8 A.M., do you see that? It's in the subject
11    line.
12    A.    I don't see a reference to Saturday,
13    actually, but I -- oh, I beg your pardon. Yes,
14    I've got it. Yes. Thank you. Yeah.
15    Q.    And did you in fact participate in a
16    conference call with the New York Fed and with
17    Secretary Paulson and others that morning,
18    September 13?
19    A.    I have to say that I was involved in I
20    think three conversations on the Friday and the
21    Saturday with Secretary Paulson. I don't recall
22    when nor do I recall -- nor do I recall which of
23    those also was with Mr. Geithner, but I recall
24    Mr. Geithner was in on more than one of them.
25    Q.    And we discussed last week that, at

TSG Reporting - Worldwide (877) 702-9580

Page 149

HIGHLY CONFIDENTIAL - J. VARLEY

1
2    least in contemplation of Lehman 1, Barclays had
3    spoken with the Fed and with U.S. authorities in
4    general about getting some kind of support for
5    moving forward with the Lehman 1-type
6    transaction; is that right?
7    A.    That is right, yes.
8    Q.    Did you have any calls with Secretary
9    Paulson or with the New York Fed on and after
10    the 15th of September in connection with the
11    Lehman transaction?
12    A.    Can you remind me, the 15th is --
13    Q.    It's the Monday.
14    A.    Which day of the week --
15    Q.    It's the Monday, sir.
16    A.    Say again?
17    Q.    Sorry.
18    A.    Monday.
19        I don't believe that I had any
20    conversation with the Secretary of State after
21    the weekend. So my answer, from recollection,
22    is that I did not have any conversation with him
23    or Mr. Geithner about a Lehman transaction
24    during the period after the weekend was
25    finished.

TSG Reporting - Worldwide (877) 702-9580

Page 150

HIGHLY CONFIDENTIAL - J. VARLEY

1
2    Q.    And you just made a reference to
3    Secretary of State. You mean the Secretary of
4    the Treasury, Mr. Paulson?
5    A.    I beg your pardon. I don't mean
6    Secretary of State. I mean Hank Paulson.
7    That's the less formal.
8    Q.    All right. Let's move on in the
9    exhibit to page 315.
10    A.    Yeah, I'm just turning there.
11        Thank you. Yes, I've got it.
12    Q.    I would like you to review, if you
13    would, pages 315 and 316 let me know when
14    you're done.
15    A.    Thank you. Yes, I have quickly
16    reviewed the contents of those two pages.
17    Q.    And looking at the content of those
18    two pages, can you identify for us what event or
19    circumstance those two pages were prepared for?
20    They appear to be talking points, sir.
21    A.    Yes, you may remember that when we
22    talked last week I made reference to the fact
23    that my head of investor relations here, Mark
24    Merson, had prepared some bullet points for me
25    in anticipation of a communication to the

TSG Reporting - Worldwide (877) 702-9580

Page 151

HIGHLY CONFIDENTIAL - J. VARLEY

1
2    market.
3        I have not checked whether this text
4    coincides with or indeed is the draft
5    presentation that Mark Merson referred to, but
6    you recall that we discussed last week an e-mail
7    sent by him to me which had some such language
8    on it, and this is either that or a derivative
9    of that, I would speculate.
10    Q.    We can move forward to page 319,
11    please.
12    A.    Say again.
13    Q.    319.
14    A.    Thank you very much. Yes.
15    Q.    What appears at 319 through 332
16    appears to be a board presentation deck that we
17    discussed last week. If you could confirm that
18    for me, please?
19    A.    Yes. Yes. I think it's the same. I
20    don't know whether it's the same draft, but it's
21    the same base document, yeah.
22    Q.    And you have some handwritten
23    notations that appear on page 319, do you see
24    those?
25    A.    Yes, I do.

TSG Reporting - Worldwide (877) 702-9580

Page 152

HIGHLY CONFIDENTIAL - J. VARLEY
1
2    Q.    And if you could just decipher those
3    for us, please?
4    A.    Yes.  In the block, in the rectangle,
5    that says "Tuesday board," and there are two
6    dash points to the right.  The upper one says
7    "check technology" and the lower one says "10
8    day point."
9    Q.    And what did those two comments mean?
10   A.    I don't recall, but I think it -- and
11   I fear I have no recollection and I can't even
12   speculate what I meant by "10 day point."
13         The "check technology" I suspect
14   refers to the fact that I would have asked one
15   of those participating from the deal team at the
16   Tuesday board meeting to give a comment about
17   the ability of Barclays Capital technology to
18   take on the Lehman business that we were
19   contemplating acquiring.
20   Q.    If we get past the PowerPoint
21   presentation to page 333, if you could turn
22   there.
23   A.    Yes.
24   Q.    If you could turn there and take a
25   look at pages 333 through 339 and let me know --

TSG Reporting - Worldwide  (877) 702-9580

Page 153

HIGHLY CONFIDENTIAL - J. VARLEY
1
2    A.    Uh-huh.
3    Q.    And please let me know when you're
4    done.
5    A.    Yes.  Thank you very much.  Let me
6    just have a look at them.
7         (Document review.)
8    A.    Thank you.  Yes, I've reviewed those
9    pages quickly.
10   Q.    And can you tell us what those pages
11   are?
12   A.    Yes.  I believe that they are the
13   speaking notes that I prepared ahead of the
14   briefing of the market that we undertook on the
15   Wednesday of the week after -- of the week
16   following the Lehman weekend.
17   Q.    And you used the phrase "I prepared."
18   What role did you play in the preparation of
19   these notes?
20   A.    You'll remember that we made some
21   reference a moment ago and last week to bullet
22   point notes prepared for me by our head of
23   Investor Relations, Mark Merson, and this looks
24   to me, this document, as though what I have done
25   is I have formatted for myself, typically by

TSG Reporting - Worldwide  (877) 702-9580

Page 154

HIGHLY CONFIDENTIAL - J. VARLEY
1
2    dictation into a dictating machine, then typed
3    out by my secretary, formatted for myself the
4    text that I wanted to use at the presentation to
5    the market.
6    Q.    Thank you.  If we could turn to page
7    340, which comes right after the speaking notes.
8    A.    Thank you very much.  Yes, I've got
9    that.
10   Q.    What is that document?
11   A.    Well, I think it's a document that is
12   as it says.  It's an estimate of funding.
13   Q.    It has a date in the upper right 16
14   September, do you see that?
15   A.    Yes, I do.
16   Q.    And if you'll look at that date and
17   you look at the value of the long assets --
18         MR. TAMBE:  Who just joined?  Hello?
19         (No response.)
20         MR. STERN:  I think somebody fell off.
21         (Discussion off the record.)
22         MR. TAMBE:  I think counsel from Quinn
23   Emanuel may have just dropped off, but they
24   will probably dial right back in.
25   Q.    Looking at this page, page 340, it has

TSG Reporting - Worldwide  (877) 702-9580

Page 155

HIGHLY CONFIDENTIAL - J. VARLEY
1
2    the date of 16th of September.  The value of the
3    long assets is, if you see the first straight
4    line, 72.4, do you see that?
5    A.    I do.
6    Q.    Is it your understanding that this is
7    a document that relates to the Lehman 2
8    transaction?
9    A.    I would speculate that it does because
10   it's got the broadly 70-billion type number in
11   the middle of the range, the 70-billion type
12   number that was true of Lehman 2, yes.
13   Q.    Right below the 72.4 number, there's a
14   notation that reads, "Less:  Negotiated
15   discount, minus 5."  Do you see that?
16   A.    I do.
17   Q.    What is that?
18   A.    I don't know the precise answer to
19   that question, but if I go back to my earlier
20   answer in relation, actually, to Lehman's 3, but
21   relevant to Lehman's 2, I was preoccupied -- we
22   were as a team preoccupied to ensure that we
23   accommodated the unprecedented volatility in the
24   market at that time by ensuring that there was a
25   discount, which I referred to earlier as either

TSG Reporting - Worldwide  (877) 702-9580

9

Page 156

1        HIGHLY CONFIDENTIAL - J. VARLEY
2   haircut or buffer or delta, a discount to the
3   asset price paid by us for the Lehman's
4   transaction, and that number in other documents
5   that we have looked at together during these
6   depositions has looked at -- it's sometimes been
7   3, it's sometimes been 4.
8        Here I speculate it's 5, but I think
9   that's what it is that we're referring to. And
10  I surmise that, but I would say that the reason
11  why it's there is because the balance sheet that
12  we were looking at was a balance sheet that had
13  been valued on Friday before the Lehman weekend,
14  and by the time that the markets opened on
15  Monday in the United States, the markets in the
16  rest of the world to the east of the United
17  States were falling, and it was for that reason
18  that we had sought to ensure that there was that
19  delta that I referred to. And I think that's
20  probably what the "negotiated discount 5" refers
21  to.
22       Q.   And the reference negotiated is a
23  reference to negotiated between Lehman and
24  Barclays; is that right?
25       A.   Well, I have to say I don't know, but

TSG Reporting - Worldwide (877) 702-9580

Page 157

1        HIGHLY CONFIDENTIAL - J. VARLEY
2   if you ask me to guess, I would guess the answer
3   to that is yes.
4        Q.   And do you know from whom you would
5   have obtained this document. page 340?
6        A.   I don't, I'm afraid. no.  I don't
7   recognize the typeface and I don't know its
8   origin.
9        Q.   If you could turn to page 345, please?
10       A.   Yeah.  Just one post-it, if I may, on
11  340, which is that I repeat this related to
12  Lehman 2. Lehman 2 was not a transaction that
13  got executed.
14       Sorry.  You were referring me to?
15       Q.   Page 345.
16       A.   345.  I'm just turning to that now.
17       Yes.  Thank you.
18       Q.   Again, there appears to be some kind
19  of a calculation set forth on page 345, and if
20  you could just help us understand that
21  calculation, please?
22       A.   Well, this is another reference I
23  think to our core tier 1 ratio, and so the
24  numbers I think are fairly clear.  5.36 and
25  deduct 50, 4.86, add 18, 504, add 21, 525, add

TSG Reporting - Worldwide (877) 702-9580

Page 158

1        HIGHLY CONFIDENTIAL - J. VARLEY
2   14, totals to 530.  The language on the
3   right-hand side is "neg. goodwill," meaning
4   negative goodwill.  The next is, brackets, 815
5   billion of WRA, brackets.  Next is SMBC at 1.5
6   and next is U/W dollars 1 billion.
7        And then at the bottom of the page in
8   handwriting A, projected year-end -- projected
9   YEB/sheet.  That means projected year-end
10  balance sheet in my shorthand.  And B says I
11  think net funding equals dollar sign 6 billion,
12  dash, dollar sign 8 billion.
13       So if you ask me to interpret, I think
14  maybe that was included in your question --
15       Q.   Yes, sir.
16       A.   -- negative goodwill would be what
17  arises in capital as computed by regulatory
18  supervisors around the world, in any event, in
19  the United Kingdom, what arises in capital if
20  there was an acquisition where there was a
21  discount to the net asset value.
22       And "WRA" is weighted risk assets,
23  which represent the denominator in the
24  regulatory capital calculation where capital is
25  the numerator.  15 billion was our assessment of

TSG Reporting - Worldwide (877) 702-9580

Page 159

1        HIGHLY CONFIDENTIAL - J. VARLEY
2   the weighted risk assets attributable to the
3   assets that we would acquire in Lehman's 2.
4        SMBC is Sumitomo Mitsubishi Banking
5   Corporation, from whom we were anticipating an
6   equity injection, and I think that the 1.5
7   billion I'm referring to there is an assessment
8   that we made at the time that their appetite
9   might be for $1.5 billion.
10       And the U/W 1 billion is underwriting
11  of a billion, and I think what that was
12  referring to was our estimate that we would be
13  able to issue shares to a value of about a
14  billion dollars associated with the transaction.
15       And I should say, in case it isn't
16  clear, that, for example, against the 21 SMBC
17  and the 14 underwriting a billion dollars,
18  there's a 21 and the 14 there.  Those are basis
19  point contributions to our core tier 1 capital
20  ratio.
21       Q.   All right.  If you could turn to the
22  next page, 346.
23       A.   Yes.  Thank you.  I have it.
24       Q.   Which appears to be, again, seems like
25  another tier 1 calculation ratio or capital

TSG Reporting - Worldwide (877) 702-9580

| Page 160 |
| --- |

HIGHLY CONFIDENTIAL - J. VARLEY

1 calculation ratio.
2    A.    Yes, I think it is.
3    Q.    The numbers are clear, but the
4 handwriting is not. If you could just run down
5 and help us understand that.
6    A.    The numbers are clear, you said? So
7 you want help on the handwriting?
8    Q.    Yes, please.
9    A.    Right. Starting from the top,
10 brackets, Inc. BarCap WRA 5 billion below RAF,
11 close brackets.
12        Can I just run through it and then try
13 and interpret for you?
14    Q.    That would be great.
15    A.    So that's the first line. Second line
16 says tier 1 deductibles and Reg. deductible
17 equals 2 billion. Next line after the equals
18 sign says, FSA valuation volatility adjustment,
19 and then next line says, tax affected. And then
20 out on the right-hand side there are two dash
21 points. One says currency gain and the other
22 says BarCap WRAs.
23        Then in the rectangular box to the
24 right it says, I think, funding liquidity,

TSG Reporting - Worldwide  (877) 702-9580

| Page 161 |
| --- |

HIGHLY CONFIDENTIAL - J. VARLEY

1 Congressional approval. Then, page 6, plus
2 Crane. Then, at year end or before, brackets,
3 month end, close brackets. Then CUM, which is
4 my shorthand for "cumulative," 53 billion WRA
5 reduction. Then, ignores A equity iss.. that's
6 issuance, brackets, other, close brackets.
7        Then, sales plus 25, and then -- I beg
8 your pardon, before the "ignores," it says (A)
9 equity issuance and sales, and then it was (B)
10 guarantee hit 20 basis points.
11        So, if I try to -- there are some
12 things here that I recognize and some things
13 that frankly I don't. The "Inc. BarCap WRA 5
14 billion below RAF," I think he's telling me that
15 our projected balance sheet for Barclays Capital
16 at the end of the year, which is relevant
17 because the balance sheet is translated into
18 WR -- it's weighted risk assets, and the
19 weighted risk assets are a component. By that I
20 mean the denominator of the regulatory capital
21 calculation.
22        This is suggesting to me that on the
23 latest RAF, that's the rolling annual forecast,
24 BarCap was telling me that its balance sheet was

TSG Reporting - Worldwide  (877) 702-9580

| Page 162 |
| --- |

HIGHLY CONFIDENTIAL - J. VARLEY

1 going to be 5 billion pounds lower at the end of
2 the year than in its most recent RAF.
3        The 30 tier 1 deductibles and
4 regulatory deduction, there are deductibles
5 applied by the Financial Services Authority here
6 to the capital that is derived from applying a
7 gross capital numerator to a weighted risk asset
8 denominator, and that's what I'm referring to
9 there, I believe.
10        The "FSA val. vol. adjustment" is a
11 Prudential adjustment that from time to time we
12 make to our capital ratio to take account of
13 volatility and valuation. I don't know, I'm
14 afraid, what I'm referring to other than
15 literally in currency gain and BarCap WRAs out
16 to the right.
17        The "tax affected" would be a net of
18 tax calculation that we would apply after a
19 gross of tax calculation to a valuation
20 volatility adjustment. So 12 is a netting of a
21 reduction in the capital ratio for tax, implying
22 the difference between 50 and 12 being a 38 net
23 reduction, which explains the difference between
24 the 5.38 and 5.

TSG Reporting - Worldwide  (877) 702-9580

| Page 163 |
| --- |

HIGHLY CONFIDENTIAL - J. VARLEY

1        "Page 6 and Crane" I'm afraid I don't
2 know what that's referring to. Crane is a
3 project. I know what it is, I remember what it
4 is. Crane was the project name we gave to the
5 equity subscription by Sumitomo Mitsubishi
6 Banking Corporation, which I referred to a
7 moment ago.
8        So I'm assuming there I think that we
9 would get 14 basis points of improvement to our
10 capital ratio as a result of the subscription by
11 Sumitomo Mitsubishi through project Crane for
12 new equity.
13        "At year-end or before," brackets,
14 "month end," close brackets, I just take
15 literally. "Cumulative 53 billion of WRA
16 adjustment," I'm afraid I don't know what that
17 is referring to.
18        "Ignores equity issuance," that would
19 be, I think, the equity issuance that we had in
20 mind for the market as opposed to the equity
21 issuance to Sumitomo Mitsubishi Banking
22 Corporation. "Sales plus 25," I assume that is
23 referring to the possibility of sales of
24 business that we were contemplating at that

TSG Reporting - Worldwide  (877) 702-9580

## Page 164

1      HIGHLY CONFIDENTIAL - J. VARLEY
2  time. And "guarantee hit at 20 basis points,"
3  I'm not sure what that is.
4      The one thing that I have not sought
5  to interpret, and I have difficulty
6  interpreting, it is the funding liquidity
7  Congressional approval. What I would speculate
8  that that's referring to is that, as I mentioned
9  to you before, in relation to Lehman 1, we were
10  not prepared to proceed unless we got some
11  funding guarantees put in place by the U.S.
12  authorities. And I might have been referring in
13  my, brackets, "Congressional approval," close
14  brackets, to the fact that any such funding
15  support would have been subject to broader
16  approval.
17    Q.  Thank you. If you could turn to the
18  last page of the exhibit, page 348.
19    A.  348, yes.
20    Q.  And just help us understand what you
21  have written there.
22    A.  Well, I'll try. Can I just remind
23  myself of what's on this page so I can try to
24  give you some context?
25    Q.  Sure.
TSG Reporting - Worldwide (877) 702-9580

## Page 165

1      HIGHLY CONFIDENTIAL - J. VARLEY
2    A.  Yeah, I think what this is is a set of
3  notes prepared by me in anticipation either of
4  updating our board or just possibly updating our
5  chairman in relation to Lehman 1, and so let me
6  tell you what it is and why that's why I think
7  it's probably a Lehman 1 document.
8      "RED update our meeting with lawyers."
9  "RED" stands for Bob Diamond. The next line
10  says guarantee -- "GTEE." That's guarantee.
11  Then the sort of half sign heading off to the
12  right, "Problem, we need help in working
13  through. Need to work with you, put a team on
14  it."
15      The oval or the line ringed with an
16  oval says, "Not done on DD. Stuff uncovering,"
17  I think is what that says, and then, "No move on
18  4 asks," and then Private equity: Willingness
19  to improve situation," and then it says 50
20  percent. And then under 1, 2 and 3 below, 1
21  says, "Rutherage/Geithner calls;" 2 says,
22  "Difficult to be met." No flex in their
23  framework," brackets, "FSA," close brackets.
24  "They will have to give. Spell out long-term
25  liquidity issue guarantee. Manage the
TSG Reporting - Worldwide (877) 702-9580

## Page 166

1      HIGHLY CONFIDENTIAL - J. VARLEY
2  wind-down."
3      And then there's some quotation marks
4  out on the right, "Can't be sure what's in the
5  535." And then lastly, I think it says,
6  "Reminded of statutory response by Treasury."
7      So it's very clear to me as I look at
8  that that this is all relating to Lehman 1. The
9  Rutherage and Geithner calls were features of
10  Lehman 1. The private equity component that we
11  discovered in the Lehman balance sheet through
12  the due diligence was only a feature of Lehman
13  1. The spell out the long-term liquidity issue
14  was a condition we were imposing on Lehman 1, as
15  you'll recall from our conversation last week.
16    MR. TAMBE: Thank you, Mr. Varley. I
17  have no further questions.
18    MR. STERN: Thank you very much, Mr.
19  Varley.
20    (Continued on the next page to include
21  the jurat.)
22
23
24
25
TSG Reporting - Worldwide (877) 702-9580

## Page 167

1      HIGHLY CONFIDENTIAL - J. VARLEY
2    THE WITNESS: Thank you very much.
3  Should I assume that the deposition is
4  therefore over?
5    MR. TAMBE: The deposition is now
6  over. We reserve whatever rights we have
7  with respect to privileged documents and the
8  rest, but thank you for making yourself
9  available again.
10    THE WITNESS: Understood. Thank you
11  very much.
12    (Time Noted: 10:01 A.M.)
13
14
15
16
17
18        _____
           JOHN VARLEY
19
20  Subscribed and sworn to
  before me this  day
21  of    2009.
22
23  _____
24
25
TSG Reporting - Worldwide (877) 702-9580

Page 168

```
1         HIGHLY CONFIDENTIAL - J. VARLEY
2                    CERTIFICATE
3     STATE OF NEW YORK )
                        : ss
4     COUNTY OF NEW YORK)
5          I, Kathy S. Klepfer, a Registered
6     Merit Reporter and Notary Public within and
7     for the State of New York, do hereby
8     certify:
9          That JOHN VARLEY, the witness whose
10    deposition is herein before set forth, was
11    duly sworn by me and that such deposition is
12    a true record of the testimony given by such
13    witness.
14         I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage and that I am in no way
17    interested in the outcome of this matter.
18         I further certify that neither the
19    deponent nor a party requested a review of
20    the transcript pursuant to Federal Rule of
21    Civil Procedure 30(e) before the deposition
22    was completed.
23         In witness whereof, I have hereunto
      set my hand this 11th day of September,
24    2009.
25         --------------------------
```

TSG Reporting - Worldwide (877) 702-9580

Page 169

```
1          HIGHLY CONFIDENTIAL - J. VARLEY
2                       INDEX
3     TESTIMONY OF J. VARLEY:             PAGE
4     Examination by Mr. Tambe .............. 127
5
6     EXHIBITS:                  PAGE
7     Exhibit 412B, a cover letter from Boies    128
8     Schiller with attached document bearing
9     Bates Nos. BCI-EX-166277 through 166348
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide (877) 702-9580

Page 170

```
1          HIGHLY CONFIDENTIAL - J. VARLEY
2     NAME OF CASE:  In re Lehman Brothers Holdings., Inc.
3     DATE OF DEPOSITION:  September 11, 2009
4     NAME OF WITNESS:  John Varley
5     Reason Codes:
6          1. To clarify the record.
           2. To conform to the facts.
           3. To correct transcription errors.
7     Page _____ Line _____ Reason _____
8     From _____ to _____
9
      Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
      From _____ to _____
12
      Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
      From _____ to _____
15
      Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
      From _____ to _____
18
      Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
      From _____ to _____
21
      Page _____ Line _____ Reason _____
22    From _____ to _____
23    Page _____ Line _____ Reason _____
      From _____ to _____
24
25         _____
```

TSG Reporting - Worldwide (877) 702-9580

13

# BCI EXHIBIT

# 101

Confidential

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------x

     In Re:                    Chapter 11

5    LEHMAN BROTHERS            Case No. 08-13555 (JMP)

     HOLDINGS, INC., et al.,    (Jointly Administered)

6    ------------------------------)

7

8        * * * HIGHLY CONFIDENTIAL * * *

9           DEPOSITION OF JASEN YANG

10             New York, New York

11          Friday, September 4, 2009

12

13

14

15

16

17

18

19

20    Reported by:

      FRANCIS X. FREDERICK, CSR, RPR, RMR

21    JOB NO. 24621

22

23

24

25

Confidential

|  | Page 2 |  | Page 3 |
|---|---|---|---|

**Page 2**

1
2
3
4        September 4, 2009
5        9:36 a.m.
6
7
8
9        HIGHLY CONFIDENTIAL deposition of
10   JASEN YANG, held at the offices of Jones
11   Day, 222 East 41st Street, New York, New
12   York, pursuant to Notice, before Francis
13   X. Frederick, a Certified Shorthand
14   Reporter, Registered Merit Reporter and
15   Notary Public of the States of New York
16   and New Jersey.
17
18
19
20
21
22
23
24
25

**Page 3**

1
2    A P P E A R A N C E S:
3
4      JONES DAY, LLP
5      Attorneys for Lehman Brothers, Inc.
6        222 East 41st Street
7        New York, New York 10017-6702
8      BY: WILLIAM J. HINE, ESQ.
9        GEORGE E. SPENCER, ESQ.
10
11     BOIES SCHILLER & FLEXNER, LLP
12     Attorneys for Barclays Capital
13        575 Lexington Avenue - 7th Floor
14        New York, New York 10022
15     BY: JACK G. STERN, ESQ.
16
17     HUGHES, HUBBARD & REED, LLP
18     Attorneys for the SIPA Trustee
19        One Battery Park Plaza
20        New York, New York 10004-1482
21     BY: SAMUEL C. McCOUBREY, ESQ.
22
23   ALSO PRESENT:
24     INGRID M. CHRISTIAN, Alvarez & Marsal
25

**Page 4**

1        J. YANG - HIGHLY CONFIDENTIAL
2    J A S E N   Y A N G,  called as a witness,
3        having been duly sworn by a Notary
4        Public, was examined and testified as
5        follows:
6    EXAMINATION BY
7    MR. HINE:
8      Q.   Good morning, Mr. Yang.
9      A.   Good morning.
10     Q.   My name is -- we met off the
11   record but my name is Bill Hine and I'm with
12   the firm of Jones Day and we are special
13   counsel to the Creditors Committee -- I'm
14   sorry, to the estate of Lehman Brothers
15   Holdings, Inc. in connection with this
16   bankruptcy proceeding so we're taking some
17   discovery with respect to that. And this
18   deposition here is what's called a 30(b)(6)
19   deposition and you've been designated by
20   Barclays as a deponent for a couple select
21   topics which we'll go over in a little bit.
22     A.   Um-hum.
23     Q.   Have you ever been deposed before?
24     A.   No, I have not.
25     Q.   Okay. So I'm sure your counsel

**Page 5**

1        J. YANG - HIGHLY CONFIDENTIAL
2    has advised you of the ground rules but
3    basically I'm going to ask you some questions.
4    You're going to give me some answers to the
5    best you can. My one request is that sometime
6    during the deposition I will undoubtedly ask a
7    misleading question or use a word improperly
8    or one of your technical terms that you folks
9    use. Please correct me, ask me to clarify it.
10   I want to ask you clear questions so you can
11   give me clear answers. So if we can agree on
12   that we can probably get started.
13          MR. STERN: Yes. I'll just note
14       for the record that the two topics are
15       first topic 4 which is a person with
16       knowledge of the calculations shown on
17       the e-mail of BCI 000580; and topic 5,
18       the marking process to take place the
19       afternoon of Friday, September 19th,
20       2008, referenced in BCI 000878 and
21       BCI-EX-00012161.
22   BY MR. HINE:
23     Q.   And I will be asking you questions
24   about those topics but also some general
25   questions around those topics.

Confidential

Page 6

J. YANG - HIGHLY CONFIDENTIAL
1
2    MR. HINE: So we do reserve our
3    rights to conduct the deposition of Mr.
4    Yang in his personal capacity if the
5    need ever arises.
6         But in that vein why don't we
7    enter as the first exhibit the
8    deposition notice.
9         MR. SPENCER: Previously marked.
10   BY MR. HINE:
11        Q.   Okay.  Mr. Yang, I'm handing you a
12   copy of a document previously marked as
13   Exhibit 81B from which your counsel was
14   reading, I believe.  I just wanted to point
15   out to you topics 4 and 5 on page 3.
16        A.   Um-hum.
17        Q.   Do you see them?
18        A.   Yes, I do.
19        Q.   You understand that you've been
20   designated by Barclays as the witness to speak
21   on those topics?
22        A.   Yes.
23        Q.   Okay.  Did you prepare for your
24   deposition at all today?
25        A.   Maybe.

Page 7

1         J. YANG - HIGHLY CONFIDENTIAL
2         Q.   What does that mean?
3              MR. STERN: Yes.  He met --
4         A.   Yes.  The short answer is yes.  I
5    didn't know if the question was today or...
6         Q.   Okay.  Fair enough.
7              Did you conduct any investigations
8    or factual reviews in preparation for your
9    deposition on those two topics?
10        A.   Yeah.  I took a look at some of
11   the e-mails that came across my desk around
12   that time.
13        Q.   Okay.  Anything else?
14        A.   No.  Just review of personal -- of
15   my e-mails.
16        Q.   Okay.  Did you meet with counsel
17   in preparation for today's deposition?
18        A.   Yes, I did.
19        Q.   Okay.  Did you review any
20   documents with counsel?
21        A.   Yes, I did.
22        Q.   Did any of those documents refresh
23   your recollection about either of these two
24   topics?
25        A.   Yes.

Page 8

1         J. YANG - HIGHLY CONFIDENTIAL
2         Q.   What documents are they?
3         A.   In particular, I think two e-mails
4    that were related to topic 4.  I believe topic
5    4 is an e-mail with a series of numbers that I
6    did to get some schedules sort of backing up a
7    couple of those numbers.
8         Q.   Okay.  And those e-mails were with
9    who?
10        A.   I received them, you know, that
11   morning.  Their times are clear in my head.
12   At 1:01 a.m. and 9:45 a.m. on the 19th.
13        Q.   Okay.
14        A.   But...
15        Q.   And do you recall who the e-mails
16   were with?
17        A.   I don't remember exactly.  I think
18   someone in operations.
19        Q.   Okay.  And do you know what the
20   topics of the e-mails were?
21        A.   Yeah.  The two numbers that I'm
22   referencing are just Fed Wire -- sort of a
23   block of Fed Wire settled securities
24   referenced in topic 4 and a block of DTC
25   settled securities in topic 4.  And they were

Page 9

1         J. YANG - HIGHLY CONFIDENTIAL
2    just lists of the securities that were
3    purportedly sort of making up those
4    populations of securities.
5         Q.   Okay.  Anything else on those
6    e-mails that you recall?
7         A.   Well, it was a list of the
8    securities and just sort of miscellaneous
9    information about them.
10        Q.   Okay.
11        A.   Including sort of, you know,
12   amounts and coupons and I think BoNY's marks
13   on them.
14        Q.   And when you say BoNY you're
15   referring to Bank of New York, correct?
16        A.   Yes.
17        Q.   All right.  So if we during this
18   deposition we use the phrase BoNY we'll both
19   understand it to mean Bank of New York; is
20   that right?
21        A.   Yes.
22        Q.   All right.  Before I get to the
23   documents in question, could you just give me
24   a brief description of your job at Barclays.
25        A.   Yes.  I was a member of a group

Confidential

Page 10

1          J. YANG - HIGHLY CONFIDENTIAL
2    called the Principal Mortgage Trading Group
3    where I -- sort of a proprietary trading and
4    portfolio management function using the bank's
5    capital.
6         Q.   And when you say "was," are you
7    talking about the period of time --
8         A.   I'm talking about the period of
9    time. I guess I still am.
10        Q.   Okay. Let's just be specific
11   here.
12        A.   Yes.
13        Q.   On the week of September 15th,
14   2008, this was your job?
15        A.   Yes. That was my job.
16        Q.   And what was your job title?
17        A.   Director.
18        Q.   Okay. And is that still your job?
19        A.   Yes.
20        Q.   Okay. So since then -- from
21   September 2008 until today you've held that
22   same job?
23        A.   Yes.
24        Q.   Okay. And when I see on the
25   e-mails after people's names, the designation

Page 11

1          J. YANG - HIGHLY CONFIDENTIAL
2    markets --
3         A.   Um-hum.
4         Q.   -- is that the Principal Mortgage
5    Trading Group you're talking about?
6         A.   We are a subset I think of that
7    designation. I don't think that actually is a
8    very precise designation but it's just
9    attached to our e-mail system.
10        Q.   Okay. In your position and in the
11   position you held in September of 2008 who did
12   you report to?
13        A.   Stephen King.
14        Q.   Okay. And what's his title?
15        A.   He was a managing director in the
16   Principal Mortgage Trading Group.
17        Q.   Did you report to anyone else?
18        A.   No.
19        Q.   And who reported to you?
20        A.   Let's see. At the time Daniel
21   Long did. I think he may have been my only
22   direct report at the time.
23        Q.   Okay. And could you just describe
24   for me your duties in that capacity? And,
25   again, I'm talking about the week of September

Page 12

1          J. YANG - HIGHLY CONFIDENTIAL
2    15th, 2008 up to the present.
3         A.   You know, my job encompasses a
4    variety of roles.
5         Q.   Sure.
6         A.   Including trading of certain types
7    of securities including CDOs and other --
8    primarily fixed income securities. As well
9    as, you know, I perform sort of a structuring
10   function inside the group. So -- which really
11   means either analyzing or executing sort of
12   more complicated structured transactions.
13        Q.   Okay.
14        A.   You know, rather than simple
15   buying and selling.
16        Q.   Okay. And are you involved with
17   pricing within that group?
18        A.   Yes. For certain securities.
19   Certain securities held by the PMTG group I'm
20   involved in pricing securities, yes.
21        Q.   Okay. And, again, before we get
22   into these documents, did you have any role in
23   the negotiations between Barclays and Lehman
24   during the week of September 15th in
25   connection with the sale transaction?

Page 13

1          J. YANG - HIGHLY CONFIDENTIAL
2         A.   No. All my interactions were
3    purely internal.
4         Q.   Okay. And, again, I just want to
5    get a general scope of your involvement --
6         A.   To be clear, there was no
7    negotiations. Occasionally there were
8    e-mails, you know, requesting information from
9    people at Lehman.
10        Q.   Okay. And information relating to
11   what?
12        A.   Let's see. Either populations of
13   securities that I was sort of assigned to be
14   analyze.
15        Q.   Okay.
16        A.   Or -- well, I guess, generally
17   about populations of securities I was assigned
18   to analyze.
19        Q.   Okay. We've had many depositions
20   before so I just want to see if I can get you
21   into different areas that we've all talked
22   about at many depositions.
23             Are you familiar with what we've
24   been calling the September 18th repurchase
25   transaction?

4

Confidential

Page 14

1           J. YANG - HIGHLY CONFIDENTIAL
2       A.   Yes.
3       Q.   Okay.  And if I use that term
4   you'll know what that means?
5       A.   When you say that you're referring
6   to the transaction that Barclays entered into
7   on September 18th.
8       Q.   Correct.
9       A.   Yes.
10      Q.   Do you have any understanding what
11  that transaction involved?
12      A.   I think fundamentally I do.  You
13  know, it's what I call sort of Barclays'
14  assumed repo where fundamentally obviously
15  they took possession of, you know, a large
16  portfolio of securities and provided funding
17  in exchange.
18      Q.   Okay.  And when you say took, took
19  from Lehman Brothers?
20      A.   Yes.
21      Q.   Okay.  And I believe that's the
22  transaction that we're going to get to when we
23  get to the documents that you've been
24  designated.
25          Were you involved in any other

Page 15

1           J. YANG - HIGHLY CONFIDENTIAL
2   pools of securities that came to Barclays as a
3   result of the Lehman Brothers transaction?
4       A.   Yes.  You know, I've reviewed I
5   suppose any number of portfolios of
6   securities, some of which I think -- not of
7   all of which were -- I suppose ended up being
8   transferred as portfolios themselves.  But I
9   did review additional securities that were
10  delivered to Barclays subsequent to this
11  transaction as well as, you know, any number
12  of other portfolios.
13      Q.   Okay.  Have you heard the term
14  unencumbered assets that were transferred to
15  Barclays as a result of the Lehman
16  transaction?
17      A.   Yes.
18      Q.   And so were you involved -- and,
19  again, tell me if I'm wrong -- correct me if
20  I'm wrong, but I would consider that separate
21  and distinct from the pool of securities that
22  came over to Barclays as a result of the
23  September 18th repo, correct?
24      A.   Yeah.  They could be separated.
25      Q.   Okay.  And could you describe for

Page 16

1           J. YANG - HIGHLY CONFIDENTIAL
2   me your role in connection with those
3   unencumbered assets.
4       A.   In general, just to review the
5   portfolio.  Understand what it encompassed.
6   Think about how Barclays might value it.
7       Q.   Okay.  And were you involved in
8   booking these various pools of securities into
9   Barclays' system?
10      A.   Yes.  I was involved in
11  coordinating that process.
12      Q.   Okay.  Anyone else involved in
13  that process?
14      A.   Frankly, a very long number of
15  people were because the securities were booked
16  by -- you know, there were many different
17  types of securities that had to be booked into
18  many different kind of systems, many different
19  trading assistants and traders.
20      Q.   Is it fair to say the booking of
21  these securities into Barclays' system was
22  principally done within Mr. King's department?
23      A.   I believe PMTG played a central
24  role in coordinating them but it was actually
25  booked by -- PMTG had access to certain types

Page 17

1           J. YANG - HIGHLY CONFIDENTIAL
2   of systems and to the extent other groups had
3   to be involved they were.
4       Q.   Okay.  Was PMTG the principal
5   entity within Barclays Capital that was
6   involved in valuing or pricing these
7   securities?
8       A.   I would say it was -- PMTG played
9   a coordinating role.  And by that I mean -- I
10  think we took the first cut at the portfolios
11  and then requested additional -- the
12  assistance of additional expertise inside the
13  firm as we needed it.
14      Q.   Okay.  And from what departments
15  would that expertise come?
16      A.   It might have come from either,
17  say, the credit trading desk, the emerging
18  markets desk, the equities division, the rates
19  desk.  By rates I mean the desk that trades
20  treasury and agency securities.
21      Q.   So am I correct to say it would
22  come from different departments depending upon
23  the nature of the securities involved?
24      A.   Right.
25      Q.   Okay.

Confidential

Page 18

1       J. YANG - HIGHLY CONFIDENTIAL
2       Mr. Yang, I'm going to hand you a
3    copy of what's previously marked as
4    Exhibit 144 which is one of the documents
5    referenced in the notice -- 30(b)(6) notice.
6       A.    Um-hum.
7       Q.    If you would mind taking a minute
8    and let me know when you've had a chance to
9    look at the document.
10      A.    Yeah. I'm ready.
11      Q.    You're ready? Okay.
12            Have you ever seen this document
13   before?
14      A.    Yes, I have.
15      Q.    What is it?
16      A.    Well, it's an e-mail from Marty
17   Malloy who was sort of the senior member in
18   the repo group at Barclays to Gerard and
19   Stephen. And it is I suppose -- keeping in
20   mind that Marty is not a trader of securities
21   and that's not what's done inside the repo
22   area or operations area, obviously, I think
23   this is his interpretation of the state of
24   that I guess what we're calling the September
25   18th repo transaction.

Page 19

1       J. YANG - HIGHLY CONFIDENTIAL
2       Q.    Before you continue, let me just
3    ask a couple questions. Who is Marty Malloy?
4       A.    He was a senior member of the repo
5    business at Barclays.
6       Q.    That's separate and distinct from
7    PMTG?
8       A.    Yes.
9       Q.    Okay. And his duties generally
10   involve repo transactions.
11      A.    Right. Right.
12      Q.    Okay. And then when you said
13   Gerry you're talking about Gerard LaRocco?
14      A.    Right.
15      Q.    And his role at Barclays is what?
16      A.    I believe he was and is the chief
17   administrative officer of the Americas.
18      Q.    Okay. And do you know why he
19   would be interested in this type of analysis?
20      A.    I believe -- I believe that
21   operations has some reporting role into him
22   and this data would have come from the
23   operations side of things.
24      Q.    Okay.
25      A.    But I'm not fully familiar with

Page 20

1       J. YANG - HIGHLY CONFIDENTIAL
2    his role in the transaction.
3       Q.    And operations is also separate
4    and distinct from PMTG?
5       A.    Yes, it is.
6       Q.    And you said Stephen, you meant
7    Mr. King?
8       A.    Yes.
9       Q.    Who is Jacqui Stanley-Johns who is
10   a c.c. on this e-mail?
11      A.    I actually do not know.
12      Q.    Okay. You never heard of her
13   before?
14      A.    I don't know who he or she is.
15      Q.    Okay. You'll see above that
16   e-mail heading is another e-mail. I guess
17   that means that this was forwarded to someone
18   else?
19      A.    Oh, yes.
20      Q.    Am I correct to say that Mr.
21   LaRocco forwarded it to Mr. Keegan?
22      A.    That's what it looks like, yes.
23      Q.    And who is Mike Keegan?
24      A.    Mike Keegan ran a number of
25   principal investing businesses at Barclays.

Page 21

1       J. YANG - HIGHLY CONFIDENTIAL
2    Although, not including PMTG.
3       Q.    So he's a trader?
4       A.    Yeah. Yeah. Or rather I think
5    he's a -- supervised traders.
6       Q.    Okay. And he supervises traders
7    in an area of the business separate from PMTG?
8       A.    Yes.
9       Q.    Okay. And his area is what?
10      A.    I believe they're a number of
11   principal investing businesses. What I mean
12   is our businesses that deploy the bank's
13   capital to make investments. I don't know all
14   of them. But I know...
15      Q.    I don't see your name on this
16   e-mail. How is it that you're familiar with
17   this e-mail?
18      A.    I believe this was subsequently
19   forwarded to me. I can't remember by who.
20   Since I know, you know, obviously a number of
21   these folks.
22      Q.    Okay. Do you recall when it was
23   forwarded to you?
24      A.    Not precisely. I would expect
25   sometime not long after this.

Confidential

Page 22

1      J. YANG - HIGHLY CONFIDENTIAL
2      Q.   Okay.  Do you know why it was
3   forwarded to you?
4      A.   Because I was tasked, you know, as
5   one of the actual front office personnel which
6   is to say traders who would start actually
7   looking at these securities and trying to
8   understand what the portfolio was.  And then,
9   you know, as a result attempt to value it from
10  Barclays' perspective as well risk manage it.
11     Q.   Okay.  So just to understand what
12  I think you said, they're forwarding --
13  someone forwarded this to tell you the pools
14  of securities that were going to be coming
15  into Barclays' system from the Lehman
16  transaction; is that right?
17     A.   I suppose it would have happened
18  already at this point.  But, yeah.  I think to
19  at least apprise me of what other
20  representations were being made about this
21  portfolio.
22     Q.   Okay.
23     A.   For this transaction inside the
24  firm.
25     Q.   Okay.  So you were not involved in

Page 23

1      J. YANG - HIGHLY CONFIDENTIAL
2   preparing this list or analysis?
3      A.   No, I was not.
4      Q.   Okay.  Do you know who was?
5      A.   I don't.  I can only assume Marty
6   was.
7      Q.   Okay.  And you're just assuming
8   that based on --
9      A.   I'm assuming that because he sent
10  the e-mail and I don't see any other forwards.
11     Q.   Do you know why he prepared this
12  type of analysis?
13     A.   Not precisely.  I assume
14  because -- I suppose because this is the way
15  he was thinking about the transaction.
16     Q.   Okay.  Other than that, do you
17  have any understanding of why he prepared this
18  analysis?
19     A.   It's a very general question.  I
20  mean, I could -- he was involved -- because he
21  was in the repo -- on the repo side I think
22  the actual execution of the transaction would
23  have -- you know, the legal form of this
24  transaction was something that he routinely
25  did.  So I think he was probably looked to as

Page 24

1      J. YANG - HIGHLY CONFIDENTIAL
2   sort of, you know, one of the bank's resources
3   and in sort of evaluating the actual execution
4   of the transaction.
5      Q.   Okay.  You're surmising this based
6   on his position in this e-mail; is that right?
7      A.   Right.  Right.
8      Q.   You don't have any specific
9   knowledge about why he might have been
10  preparing this analysis?
11     A.   I don't know who asked him for
12  this or what question this is in response to,
13  no.
14     Q.   Okay.  Do you recall any
15  discussions within Barclays about this
16  analysis presented on this e-mail?
17     A.   Certainly -- certainly we did
18  discuss it.  You know, I mean --
19     Q.   Who did you discuss it with?
20     A.   Probably primarily Stephen King.
21     Q.   Okay.  I assume you discussed it
22  after you received a copy of it.
23     A.   Right.
24     Q.   And so are we talking about the
25  weekend of the 20th and 21st?

Page 25

1      J. YANG - HIGHLY CONFIDENTIAL
2      A.   Probably the same day.
3      Q.   Okay.  And do you recall your
4   discussions with Mr. King about this e-mail?
5      MR. STERN:  Excuse me.  The same
6   day being the 19th of September?
7      A.   The same day being the 19th.
8      I don't recall specifically what
9   we would have -- to what end we were
10  discussing it.
11     Q.   Do you recall generally?
12     A.   I would imagine that we were
13  looking at the numbers and, you know, our -- I
14  guess we were looking at the numbers.  We
15  would probably have been trying to evaluate
16  sort of critically which of these numbers were
17  reliable and whether or not, you know, the
18  transaction looked like matched what we
19  expected it to be.
20     Q.   And what did you conclude based on
21  that?
22     A.   I don't know that we ever came up
23  with a specific conclusion.  Besides that
24  we -- obviously to validate any of this we
25  need to see, you know, what the assets

Confidential

| Page 26 |
|---|

```
1         J. YANG - HIGHLY CONFIDENTIAL
2    actually were and perform a valuation
3    ourselves.
4       Q.   Okay.  Any other recollection
5    about your discussions with Mr. King about
6    this e-mail other than what you just told me?
7       A.   Not specifically.
8       Q.   Okay.  Did you have any
9    discussions about this with anyone else?
10      A.   I don't think I would have
11   particularly.
12      Q.   You don't recall?
13      A.   I don't recall though.
14      Q.   Okay.  Do you have an
15   understanding -- was any action taken within
16   Barclays as a result of this e-mail being
17   sent?
18      A.   Not to my knowledge.
19      Q.   Okay.  Just so I break that down a
20   little bit, you don't know whether Mr. LaRocco
21   or Mr. Keegan did anything as a result of this
22   e-mail exchange?
23      A.   Yeah, I don't know if they did
24   anything.  They might have.  They might not
25   have.
```

| Page 27 |
|---|

```
1         J. YANG - HIGHLY CONFIDENTIAL
2       Q.   Okay.  And you don't know whether
3    Mr. Malloy, Mr. LaRocco, did anything as a
4    result of this e-mail exchange?
5       A.   I wouldn't have knowledge of that.
6       Q.   Okay.  Would you know whether Mr.
7    King took any action or had the PMTG group
8    take any action as a result of this e-mail?
9       A.   I wouldn't necessarily know but
10   not to my knowledge.
11      Q.   Okay.  Could we just take a minute
12   and look at some of these numbers.
13      A.   Um-hum.
14      Q.   So what is your understanding of
15   what these numbers represent just as a group?
16      MR. STERN:  You want to take them
17   as a group or line by line?
18      Q.   Whatever is easiest for you.
19      A.   I would say the first five lines
20   from Fed Wire Securities down through Today
21   DTC Collateral reflects a number of, you know,
22   general groupings of assets that Barclays
23   either would have had custody of or would have
24   expected to receive custody of.  And the
25   numbers would reflect some measure of the size
```

| Page 28 |
|---|

```
1         J. YANG - HIGHLY CONFIDENTIAL
2    of those populations of assets.
3       Q.   Size meaning the value of those
4    assets?
5       MR. STERN:  Objection to the form.
6       Q.   Well, let me be clear.  I mean,
7    it's not the number of CUSIPS or the number of
8    securities, right?
9       A.   No, I don't think so.  It would
10   be -- it would be some representation of
11   somebody's marks but certainly not Barclays'
12   because we had just received -- we were in the
13   process of figuring out what these actual
14   portfolios were.
15      Q.   So you understand these to be
16   dollar figures in billions of dollars, right?
17      A.   Yes.  Dollars in billions.
18      Q.   And do you know whose -- well,
19   before we get to that do you see where it
20   says, "Collateral received from Lehman on Fed
21   facility"?
22      A.   Um-hum.
23      Q.   What did you understand that to
24   mean?
25      A.   Well, I suppose -- and I have to
```

| Page 29 |
|---|

```
1         J. YANG - HIGHLY CONFIDENTIAL
2    say I don't agree necessarily with what Marty
3    wrote there.
4       Q.   Sure.
5       A.   I think he intended it to mean
6    that these are assets that would then secure
7    the 45 billion of lending that Barclays was
8    doing.  But I don't agree with him necessarily
9    because some of these items I'm not sure were
10   actually part of the repo transaction.
11      Q.   Well, let me just --
12      A.   But I don't necessarily have...
13      Q.   When you talked about the 45
14   billion in lending you were talking about the
15   September 18th repo transaction?
16      A.   Yes.  That's what I think the line
17   that says repo cash amount represents.
18      Q.   Okay.  That's --
19      A.   Towards the bottom.
20      Q.   So that's $45 billion, right?
21      A.   Yes.
22      Q.   And that's the amount that
23   Barclays effectively paid Lehman through the
24   September 18th repo transaction, right?
25      A.   Right.
```

Confidential

Page 30

J. YANG - HIGHLY CONFIDENTIAL
1
2    Q.    And the Total Securities/Cash
3 Received, do you see that line, which is 52.19
4 billion?
5    A.    Um-hum.
6    Q.    What does that represent?
7    A.    That's the sum of the numbers
8 attributed to the five -- the five blocks of
9 assets that Barclays received or expected to
10 receive.
11    Q.    Okay. So that's the value of the
12 collateral that was posted in support of
13 Barclays paying $45 billion, right?
14        MR. STERN: Objection to the form.
15    Could you repeat the question, Francis?
16        (Record read.)
17        MR. STERN: You can answer.
18    A.    I wouldn't say that. We, at that
19 point, hadn't had a chance to look at the
20 securities; so therefore had -- you know,
21 couldn't really put a value on it, per se.
22        So these numbers -- I think that
23 number is a proxy but subject to -- a proxy
24 for value, but subject to quite a bit of
25 needed due diligence.

Page 31

J. YANG - HIGHLY CONFIDENTIAL
1
2    Q.    Well, who put this value on it,
3 the 52.19?
4    A.    I don't -- for -- I think the
5 first two line items were tied -- those
6 numbers tied to schedules that I referred to
7 earlier. The e-mails -- the two e-mails that
8 I received at 1:01 a.m. and 9:45 a.m.
9    Q.    Just so we have a clean record
10 you're referring to the Fed Wire securities
11 valued at 28.6 billion and DTC cash at
12 15.9 billion?
13    A.    Those are the two lines I'm
14 referring to.
15    Q.    Okay.
16    A.    And in those schedules were marks
17 that I understood to be from the custodian
18 function at Barclays -- not at Barclays -- at
19 BoNY, that totaled to those numbers.
20    Q.    All right. So those -- the 28.6
21 and the 15.9 are valuations placed on these
22 securities by BoNY?
23        MR. STERN: Objection to the form.
24    You can answer.
25    Q.    That means you can -- you can

Page 32

J. YANG - HIGHLY CONFIDENTIAL
1
2 still answer.
3    A.    Oh. As I just said, I don't want
4 to use the word value because, you know,
5 BoNY's function in this thing, they're a
6 custodian. They're not in the business of
7 trading securities. They're not even really
8 in the business of valuing securities. They
9 just hold assets. And they have
10 infrastructure that attempts to estimate, if
11 you will, you know, the value of securities.
12        But I think it's considered --
13 especially in a market like this, it's
14 considered -- it would be hard to -- there was
15 certainly no assumption at Barclays that
16 BoNY's marks were anywhere close to the
17 realizable value of securities, necessarily.
18    Q.    Okay. Well, BoNY's the custodian
19 for the September 18th repo transaction,
20 right?
21    A.    Right.
22        MR. STERN: Objection to the form
23    Q.    And is it normal course that the
24 custodian in a repo places a value on the
25 securities?

Page 33

J. YANG - HIGHLY CONFIDENTIAL
1
2        MR. STERN: Objection to the form.
3    You can answer if you know.
4    A.    I don't necessarily know what's
5 customary in repo.
6    Q.    Okay. Have you ever been involved
7 in any other repo transactions before?
8    A.    Yes.
9    Q.    And did the custodians place a
10 value on it?
11        MR. STERN: Objection to the form.
12    A.    The repos I would have been
13 involved in were probably -- were for liquid
14 securities. So we would never have looked to
15 a custodian for values.
16    Q.    Okay. The reason I'm asking is
17 I've been told that it's normal course for a
18 custodian to place a value on the securities
19 that are the subject of a repurchase
20 transaction.
21    A.    Um-hum.
22 DI Q.    Do you have any reason to suspect
23 that that's not the normal course of business?
24        MR. STERN: Hold on. Hold on. I
25    think this really does go beyond the

Confidential

Page 34

1    J. YANG - HIGHLY CONFIDENTIAL
2    scope of this deposition. You've had
3    other witnesses with expertise in
4    repurchase transactions. You've had Mr.
5    LaRocco. And I really do think this
6    goes beyond the scope.
7        MR. HINE: Well, your objection is
8    noted but I'm still going to ask the
9    question because I don't think it does.
10        MR. STERN: I'm going to instruct
11    you not to answer. Stick with the
12    deposition topics, please.
13        MR. HINE: The deposition topic is
14    a little more broad than the math in
15    this document, Jack.
16        MR. STERN: The deposition topic
17    is black and white.
18        MR. HINE: It's how do you
19    calculate --
20        MR. STERN: So please stick with
21    the figures on this sheet.
22        MR. HINE: I know what the topic
23    is, Jack, and it's not relaying to me X
24    plus Y plus Z equals a number. It's the
25    general calculation that has to do with

Page 35

1    J. YANG - HIGHLY CONFIDENTIAL
2    this document.
3        MR. STERN: Ask another question,
4    Bill, and we'll deal with it question by
5    question.
6        MR. HINE: Okay. So you're
7    instructing him not to answer that
8    question?
9        MR. STERN: Yes.
10    BY MR. HINE:
11    Q.    All right. So Mr. Yang, so I
12    understood you to say I believe that the
13    numbers 28.6 billion and 15.9 billion comes
14    from e-mails that you received that you
15    believe reflect values or some kind of
16    ascribed value that BoNY put on these pools of
17    securities, correct?
18        MR. STERN: Objection to the form.
19    A.    I already said that I don't want
20    to use the word values for them. But as a
21    proxy let's call it BoNY marks.
22    Q.    Fine. All right. I was looking
23    for another word because I understood your
24    statements before.
25    A.    Yeah.

Page 36

1    J. YANG - HIGHLY CONFIDENTIAL
2    Q.    The 28.6 and the 15.9 are BoNY
3    marks, correct?
4    A.    Yes.
5    Q.    When I look further down I see DTC
6    cash is .3 billion, correct?
7    A.    Yes.
8    Q.    Is that a BoNY mark?
9    A.    I don't believe so. Clearly the
10    e-mail is not very clear. But my
11    understanding is -- because it's got the same
12    heading as the one right above it.
13    Q.    Right.
14    A.    But my understanding is that was
15    meant to represent funds deposited, I don't
16    know in what form or exactly where, by Lehman
17    to support -- to support clearing operations
18    through the DTC.
19    Q.    Okay.
20    A.    So it would have been sort of --
21    Q.    And those funds were supposed to
22    have been coming to Barclays Capital as a
23    result of this transaction?
24    A.    That was my understanding. I
25    don't have direct knowledge of whether they

Page 37

1    J. YANG - HIGHLY CONFIDENTIAL
2    did or didn't.
3    Q.    Okay. So the value of that asset
4    is simply -- is not in dispute, right? It's
5    cash?
6        MR. STERN: Objection to the form.
7    A.    I don't know.
8    Q.    Okay. You don't know. Okay.
9    Well, it says cash. Do you know
10    if, in fact, it was cash?
11    A.    I don't know. Many times cash
12    doesn't necessarily mean cash, per se. It
13    might mean cash securities. That's how the
14    line above it is clearly using it.
15    Q.    Oh, okay. That's what I was going
16    to ask you. In both of these contexts it says
17    cash and, again, this is -- I'm not trying to
18    mischaracterize other people's testimony. I
19    understood it was securities held at DTC.
20    And you -- so did you understand
21    the entries of DTC cash to possibly mean cash
22    securities?
23    A.    Well, when we say cash --
24        MR. STERN: I'm a little bit
25    confused. There are two lines that says

Confidential

## Page 38

1    J. YANG - HIGHLY CONFIDENTIAL
2    DTC cash. Which one are you asking
3    about?
4         MR. HINE: Both of them.
5    A.    Okay. I think they mean different
6    things.
7    Q.    Okay.
8    A.    When I use the term cash
9    securities what I mean are securities as
10   opposed to derivatives. So it just means
11   securities.
12   Q.    Oh, okay.
13   A.    Whereas, you know, some of the
14   other usages on this page might actually refer
15   to cash. I don't know.
16   Q.    All right. So then I see repo
17   cash. Do you see that? $7 billion?
18   A.    Yeah.
19   Q.    Is that in fact cash?
20   A.    My understanding is that it was
21   intended to be cash.
22   Q.    And what happened?
23   A.    I'm not familiar with the
24   specifics of what happened but I do know that
25   we eventually did not receive that in cash

## Page 39

1    J. YANG - HIGHLY CONFIDENTIAL
2    form.
3    Q.    Okay. So did -- other than that 7
4    billion did Barclays receive the rest of these
5    four entries in this spreadsheet?
6         MR. STERN: Objection to the form.
7    Q.    Let me be specific. Did Barclays,
8    in fact, receive the Fed Wire securities, the
9    DTC cash -- the two entries for DTC cash, and
10   the today DTC collateral entries?
11   A.    The reason it's hard to answer
12   that is because -- well, actually, let me just
13   go through them line by line.
14   Q.    Sure.
15   A.    The Fed Wire securities, that
16   represents the population of securities that
17   settled over the Fed Wire. In terms of the
18   schedule of securities that I think
19   corresponds to that 28.6 number I believe
20   Barclays did receive those securities.
21   Q.    Okay.
22   A.    The value of those securities of
23   course is an entirely separate question.
24   Q.    Right.
25   A.    The 15. -- the next line, DTC

## Page 40

1    J. YANG - HIGHLY CONFIDENTIAL
2    15.9, that population of securities Barclays
3    received a large portion of that, but I think
4    over the course of that weekend we realized
5    that that population wasn't exactly correct
6    because I had a spreadsheet -- you know, a
7    series of spreadsheets that added up to 15.9
8    but we did not receive all of those securities
9    ever.
10   Q.    How much did you receive?
11   A.    I don't know because at some point
12   we identified, you know, a handful of
13   securities that we didn't receive and just
14   started working with a different population
15   of -- the population that we did receive.
16        MR. STERN: And the 15.9 was BoNY
17   marks?
18        THE WITNESS: Yes. It would have
19   been -- it would have been the sum of
20   BoNY marks on that population of
21   securities.
22   Q.    Okay. And continue your story
23   with the DTC cash that's BoNY mark -- or
24   that's marked as .3 billion.
25   A.    So my understanding -- so I don't

## Page 41

1    J. YANG - HIGHLY CONFIDENTIAL
2    know if we received that.
3    Q.    Okay. And how about what's marked
4    as Today DTC Collateral with a mark of .39?
5         Do you see that?
6    A.    Yeah.
7    Q.    Did you receive that?
8    A.    The trouble with that is I don't
9    know -- I don't have a list of securities that
10   I personally saw that ever had any numbers
11   that added up to .39. So I don't know if we
12   received those.
13   Q.    Um-hum.
14   A.    The ones that Marty is referring
15   to here or other ones, although I do know we
16   did receive something.
17   Q.    Okay. Then let's just continue
18   with this chart. Where it says -- do you see
19   the entry DTC cash with a mark of 15.9?
20        Do you see that?
21   A.    Yes.
22   Q.    To the right of that it says
23   Equity/Corp. ETC. What does that mean?
24   A.    It's referring to what types of
25   securities those were. They were comprised of

Confidential

---

Page 42

1    J. YANG - HIGHLY CONFIDENTIAL
2  equity securities.  Corporate refers to
3  corporate debt.
4    Q.  Okay.
5    A.  And, in fact, it was comprised of
6  quite a number of other types of securities as
7  well.
8    Q.  Now, is the composition of that
9  15.9 entry different than the composition of
10 the .3 entry for DTC cash?
11   A.  Those populations were made up
12 of -- the compositions were different.
13   Q.  In what way?
14   A.  But they were --
15   Q.  In what way?
16   A.  Just in -- you know, I don't think
17 there was any effort made to preserve, you
18 know, exact consistent percentages of equities
19 versus corporate debt versus mortgages versus
20 other types -- asset classes represented.
21   Q.  Well, I guess my question is do
22 you know why there's two separate entries for
23 DTC cash, one with -- why didn't they just
24 combine them into one entry?
25   A.  Well, I would assume that it's

---

Page 43

1    J. YANG - HIGHLY CONFIDENTIAL
2  because the last one is today.  So -- it's
3  marked today.  So presumably it represented
4  securities -- I am assuming that it
5  represented securities that were received on
6  that Friday.
7    MR. STERN:  I think he's asking
8  why there are two lines for DTC cash,
9  one 15.9 and one .3.
10   Q.  It was a bad question.  Let me
11 just restate the question.
12   You'll see one with a 15.9 mark
13 and one with a .3 mark, right?
14   A.  Yes.  Yes.
15   Q.  Why are there two separate entries
16 fore DTC cash?
17   A.  Right.  The 15.9 is made up of
18 securities.  The .3 I never saw a security
19 list for.  So it may have been cash cash.
20   Q.  Okay.  You don't know.
21   A.  I don't know.
22   Q.  Okay.
23   Now, when you look down at the
24 bottom -- oh, okay.  Let's go to the right
25 again.  You'll see an entry -- I assume it's

---

Page 44

1    J. YANG - HIGHLY CONFIDENTIAL
2  to the right of the repo cash --
3    A.  Um-hum.
4    Q.  -- column.
5    It says 1.7 of this was posted to
6  BoNY?
7    Do you see that?
8    A.  Yep, I see that.
9    Q.  What does that mean?
10   A.  I have no idea what that refers
11 to.
12   Q.  Okay.  Now, further down I think
13 it's on the line that's entitled Today DTC
14 Collateral, it also says Equity/Corp.
15   Do you see that?
16   A.  Yep.
17   Q.  So that's just describing the
18 composition of that pool of collateral?
19   A.  Right.  The fact that those were
20 made up securities.
21   Q.  Okay.  Now, at the bottom it says
22 Total securities/cash received, 52.19 billion.
23   Do you see that?
24   A.  Um-hum, yep.
25   Q.  So am I understanding you correct

---

Page 45

1    J. YANG - HIGHLY CONFIDENTIAL
2  to say that you don't know if that was, in
3  fact, received even though this entry says
4  received?
5    A.  Well, in fact, I know that some of
6  it wasn't because that 7 billion repo cash
7  wasn't in the long -- you know, eventually.  I
8  don't know what people knew at the time.
9    Q.  Okay.  But over that weekend or on
10 Friday the 19th, the 7 billion had not been
11 received?
12   MR. STERN:  Objection to the form.
13   A.  I don't know.
14   Q.  Don't know?  Okay.
15   And do you have any understanding
16 of whether the rest of it was received?
17   MR. STERN:  Objection to the form.
18   A.  Yeah.  I think we already
19 discussed why it's hard for me to say if I
20 agree or not because --
21   Q.  So you don't know.
22   A.  I don't know.
23   Q.  Okay.  When -- you see the line
24 Excess Collateral, 7.9?
25   A.  Yes.

Confidential

| Page 46 | Page 47 |
|---|---|

**Page 46**

J. YANG - HIGHLY CONFIDENTIAL

1  
2  Q.  And I assume that's the difference
3  between 52.19 and 45 billion, correct?
4  A.  Yep.
5  Q.  Is that what you under -- do you
6  understand under -- is that what you
7  understood to be the haircut associated with
8  the September 18th repo?
9  MR. STERN:  Objection to the form.
10  A.  I don't think haircut is a very
11  precise term.
12  Q.  Okay.
13  A.  But -- I don't think it's a very
14  precise term. But I do agree that it's sort
15  of the excess of this sort of number, 52.19,
16  which is a proxy for some measure of what was
17  received over the loan amount.
18  Q.  I appreciate haircut's kind of a
19  colloquial term. We've heard it in all these
20  depositions. So is it fair to say -- and I am
21  trying to take into account your statements
22  previously about valuation, that the 7.19 is
23  the excess of the total securities in cash
24  received as collateral -- I'm sorry. Let me
25  rephrase it.

**Page 47**

J. YANG - HIGHLY CONFIDENTIAL

1  Is the 7.19 the excess of the
2  collateral that was posted in support of the
3  September 18th transaction over and above the
4  amount that Barclays paid? Taking into
5  account that those numbers are BoNY values,
6  not necessarily Barclays' values?
7  MR. STERN:  Objection to the form.
8  Let me hear the question again.
9  You're just totally ignoring his
10  responses and using your terminology
11  despite his testimony.
12  MR. HINE:  No, I'm not, Jack.
13  MR. STERN:  Yes, you are.
14  MR. HINE:  No, I'm not.
15  MR. STERN:  It's very misleading
16  and the record will reflect that --
17  MR. HINE:  And you can stop
18  coaching the witness.
19  MR. STERN:  I'm not coaching the
20  witness.
21  MR. HINE:  If you have an
22  objection to form, put it on the record.
23  MR. STERN:  I am not coaching the
24  witness. I've been silent throughout

| Page 48 | Page 49 |
|---|---|

**Page 48**

J. YANG - HIGHLY CONFIDENTIAL

1  
2  this. But, you know, it just goes too
3  far.
4  MR. HINE:  Let's read the
5  question.
6  MR. STERN:  It just goes too far.
7  MR. HINE:  Read the question.
8  MR. STERN:  You know what you're
9  doing. You know very well what you're
10  doing and it's highly misleading.
11  MR. HINE:  And you're coaching the
12  witness, Jack, so put an objection to
13  form on the record and that's it.
14  MR. STERN:  This witness does not
15  need to be coached, okay?
16  MR. HINE:  I'm not trying to
17  mislead him. I'm trying to ask a
18  question. So you stated your objection.
19  Fine. Let's move on.
20  MR. STERN:  You really should
21  relax. You really should relax. I want
22  the question reread. And you really
23  should stop asking misleading questions.
24  MR. HINE:  Please read the
25  question back.

**Page 49**

J. YANG - HIGHLY CONFIDENTIAL

1  (Record read.)
2  
3  A.  I wouldn't characterize them as
4  excess. The reason is because I've already
5  stated my -- the fact that I don't think 52.19
6  is a value and obviously we've also discussed
7  the fact that the 7 billion repo cash wasn't
8  eventually received.
9  So then the problem is the 45 of
10  course is just a dollar number. It's an
11  amount of cash that Barclays provided whereas
12  52.9 isn't an equivalent. It's a proxy.
13  So I don't think colloquially --
14  you know, it says excess collateral here. But
15  it's not really excess in the sense that you
16  have more. It's just the mathematical
17  difference obviously. And that's meant to --
18  you know, that's meant to do all kinds of
19  things including adjust for uncertainty about
20  what the actual value of the securities is.
21  Q.  So you take issue with Mr.
22  Malloy's use of excess collateral in this
23  document; is that right?
24  MR. STERN:  Objection to the form.
25  Take issue. You can answer.

Confidential

Page 50

J. YANG - HIGHLY CONFIDENTIAL

1      J. YANG - HIGHLY CONFIDENTIAL
2      A.    I think if -- everyone knows what
3   he means but I think it's not very precise
4   terminology, no.
5      Q.    Okay.  And what do you understand
6   the Margin Percentage entry to entail?
7      A.    I guess he's just expressing as a
8   percentage that 7.19 number of -- I can't
9   tell -- one of the other -- one of the two
10   numbers above it.  Probably the 7.19 divided
11   by 52.19.
12      Q.    Okay.  So that's how it's
13   calculated but what it does mean?
14      A.    He's just expressing as a
15   percentage the same concept he's expressing
16   with the 7.19.
17      Q.    Do you have an understanding of
18   what the term "margin" means in connection
19   with a repo transaction?
20      A.    Margin is a very commonly used --
21   margin has a lot of different meanings,
22   actually, in finance.  So I don't know why he
23   chose that in particular.  Very often when I
24   hear margin I actually think of an interest
25   rate but that's obviously not how it's being

Page 51

J. YANG - HIGHLY CONFIDENTIAL

1      J. YANG - HIGHLY CONFIDENTIAL
2   used.
3      Q.    Well, but how do you think it's
4   being used in this document?
5      A.    I think I would just refer to, you
6   know, the conversation we had about the 7.19
7   number.  I don't think it's in -- it's not in
8   excess in the sense again, you know, more than
9   the 4.45.  But it's just a measure of -- it's
10   just -- it's just a measure of to what extent
11   the proxy for the asset side of the balance
12   sheet exceeds the 45 million.
13      Q.    You don't really know what Mr.
14   Malloy meant by the use of the term margin; is
15   that what you're saying?
16      MR. STERN:  Objection to the form.
17      A.    I guess I know what I just said.
18   Why he chose margin instead of just
19   percentage, I don't know.
20      Q.    Well, is it also possible that he
21   was referring to amount of return Barclays was
22   going to get on its investment of $45 billion?
23      MR. STERN:  Objection to the form.
24      A.    I don't think so.
25      Q.    Why not?

Page 52

J. YANG - HIGHLY CONFIDENTIAL

1      J. YANG - HIGHLY CONFIDENTIAL
2      A.    It would just not have occurred to
3   me to read it that way.
4      Q.    Okay.  Do you know what Mr. Malloy
5   meant when he wrote it?
6      A.    I think what he meant was that
7   is -- that is -- I guess I don't.
8      Q.    Okay.
9      (Deposition Exhibit 349B, document
10   bearing production numbers
11   BCI-EX-00070958 through BCI-EX-00070961,
12   marked for identification as of this
13   date.)
14   BY MR. HINE:
15      Q.    Mr. Yang, I'm handing you a copy
16   of a document marked Exhibit 349B which is
17   admittedly a cut-off version of a spreadsheet
18   because I didn't want to enter a huge number
19   but my questions are really going to be
20   about --
21      MR. STERN:  Is this part of the
22   30(b)(6)?  I don't think this is listed
23   in the 30(b)(6).
24      MR. HINE:  The questions will
25   relate to the 30(b)(6) topic, Jack.

Page 53

J. YANG - HIGHLY CONFIDENTIAL

1      J. YANG - HIGHLY CONFIDENTIAL
2      MR. STERN:  No, no, no.  We're
3   going to limit this deposition,
4   particularly given the misleading nature
5   of the questions, to the documents that
6   are listed in topics 4 and 5.
7      MR. HINE:  Okay.  I'm going to ask
8   him about --
9      MR. STERN:  And I'm going to
10   instruct the witness not to answer any
11   other questions.
12      MR. HINE:  All right.  So you're
13   not going to -- you're going to instruct
14   the witness to answer no questions about
15   any other document --
16      MR. STERN:  I am limiting --
17      MR. HINE:  Just let me get it on
18   the record, Jack.  All right?
19      MR. STERN:  I'll tell you what I'm
20   doing.  I'm limiting this deposition to
21   the topics that are noticed as topics 4
22   and 5, period.
23      MR. HINE:  My question is I have
24   documents to ask him about that relate
25   to those topics.  Are you going to

Confidential

### Page 54

1      J. YANG - HIGHLY CONFIDENTIAL
2  instruct the witness not to answer
3  questions about any document other than
4  the three mentioned on the notice?
5      MR. STERN: Yes.
6      MR. HINE: Okay.
7      MR. STERN: And I dispute your
8  characterization of other documents. I
9  have no idea whether what you intend to
10  do here is directly related.
11      MR. HINE: We'll never know
12  because you're not going to permit him
13  to answer, right?
14      MR. STERN: We're going to limit
15  it to the documents in the notice.
16      MR. HINE: I'm going to ask a
17  question and you can instruct him not to
18  answer.
19      MR. STERN: That is ridiculous.
20  That's a waste of time. And we're going
21  to leave here unless you focus on the
22  topics --
23      MR. HINE: Jack, I'm just going to
24  make a record.
25      MR. STERN: Listen, we're going to

### Page 55

1      J. YANG - HIGHLY CONFIDENTIAL
2  leave this deposition -- I'm putting you
3  on notice. We're going to leave this
4  deposition if you don't proceed to ask
5  about the topics 4 and 5.
6      MR. HINE: I'm going to ask a
7  question. It is about topics 4 and 5.
8      MR. STERN: It is not --
9      MR. HINE: Just let me finish,
10  will you? I let you finish.
11      MR. STERN: No. If you have the
12  documents that are listed in topic 5,
13  ask about those documents. Otherwise we
14  are leaving this deposition, sir.
15      MR. HINE: I am going to do that.
16  But I just want to make a clear record
17  that you're instructing him not to
18  answer about any other topics; is that
19  right?
20      MR. STERN: If you don't move on
21  to topic 5 we are leaving now. It's
22  your choice. It is your choice. Mark
23  the documents listed in 5 or we leave
24  this deposition now.
25      MR. HINE: Just answer my

### Page 56

1      J. YANG - HIGHLY CONFIDENTIAL
2  question.
3      MR. STERN: It is your choice,
4  Bill.
5      MR. HINE: I just want to make --
6  Jack, I just want to make clear record.
7  I understand your objection.
8      MR. STERN: I am making a clear
9  record. And I am telling you if you do
10  not mark and move on to topic 5 we are
11  leaving. We're not going to put up with
12  this nonsense.
13      MR. HINE: All right. So you're
14  going to leave if I mark any exhibit
15  other than the ones listed in topic 5?
16      MR. STERN: Correct. Move on to
17  topic 5.
18  BY MR. HINE:
19      Q.  I'm still on the first exhibit,
20  topic 4, Mr. Yang.
21      A.  Um-hum.
22      MR. STERN: Bill, I think this
23  deposition is over.
24      MR. HINE: Jack, I'm not finished
25  with topic 4.

### Page 57

1      J. YANG - HIGHLY CONFIDENTIAL
2      MR. STERN: Okay. You're on which
3  exhibit?
4      MR. HINE: I'm still on the
5  exhibit we were talking about.
6      MR. STERN: Which is -- you had
7  marked an exhibit --
8      MR. HINE: Which is Exhibit 144A.
9      MR. STERN: Okay. So let's put
10  aside 349B.
11      MR. HINE: I am back on
12  Exhibit 144A which is the exhibit listed
13  in topic 4 of the notice.
14      MR. STERN: I thought you had
15  finished that.
16      MR. HINE: I'm not.
17      MR. STERN: Go ahead.
18      MR. HINE: The document I was
19  attempting to introduce relates to.
20  BY MR. HINE:
21      Q.  My question for you, Mr. Yang, is
22  have you had any discussions with -- well, let
23  me take a step back and just ask a general
24  question.
25      We talked about the $52.19 billion

Confidential

Page 58

1    J. YANG - HIGHLY CONFIDENTIAL
2  number on this chart, right?
3       A.   Um-hum.
4       Q.   And if you take away the 7 billion
5  in cash you're left with about $45 billion,
6  correct?
7       A.   Um-hum.
8       MR. STERN:  Objection to the form.
9       Q.   52 minus 7 is 45; is that right,
10 Mr. Yang?
11      A.   Yes.
12      Q.   Was there ever any discussions at
13 Barclays about whether, in fact, the assets
14 delivered to Barclays as part of the September
15 18th repo were properly valued by BoNY at
16 about $45 million? And, again, I'm talking
17 about the securities, not the cash component.
18      A.   Um-hum.  I actually think that the
19 broad assumption is -- maybe I'll take a step
20 back.
21      The securities reflected here that
22 comprise this portfolio, you know, obviously
23 September was a time when, you know, markets
24 were generally illiquid.  And many of these
25 securities were securities that even in normal

Page 59

1    J. YANG - HIGHLY CONFIDENTIAL
2  times would be considered illiquid securities.
3       So our presumption was that BoNY's
4  marks would not have been accurate.
5       Q.   When you say illiquid you mean
6  what?
7       A.   First of all, that pricing
8  information isn't easily available.  In many
9  cases these were securities that would not
10 transact in the market -- well, first of all,
11 would be bilateral transactions and -- with no
12 pricing posted to a general market, sort of
13 group exchange or listing.  And so unless you
14 were one of the two parties to the transaction
15 you wouldn't know where it traded.  And,
16 moreover, some of these securities traded very
17 infrequently.
18      Q.   Okay.  And so because they're
19 illiquid in that sense it was tough to put a
20 price on them?  Is that what you're saying?
21      A.   Exactly.  And because BoNY wasn't
22 in that business we assumed they would just
23 have the wrong prices.
24      Q.   Okay.  So did you ever hear people
25 from Lehman saying that they valued that pool

Page 60

1    J. YANG - HIGHLY CONFIDENTIAL
2  of securities at about 42.9 billion?
3       A.   I generally didn't have
4  conversations with Lehman people.
5       Q.   Okay.  Did you ever hear any
6  mention of the notion that that pool of
7  securities -- and, again, I'm putting aside
8  the cash just so we're clear.
9       A.   Um-hum.  We're talking about the
10 first two.
11      Q.   I'm putting aside the 7 billion in
12 cash.
13      A.   Right.
14      Q.   Okay.  Did you ever hear any
15 discussion during the week of September 15th
16 or even thereafter that Lehman placed a value
17 on that pool of securities at 42.9 or
18 thereabouts?
19      A.   I can't really recall.
20      Q.   Okay.  Do you recall any
21 discussions or meetings between Barclays folks
22 and Lehman folks about how to value that pool
23 of securities?
24      A.   Not as a whole or in general.  I
25 do know that there were occasional exchanges

Page 61

1    J. YANG - HIGHLY CONFIDENTIAL
2  at different points in time about, you know,
3  at least getting Lehman's impression of
4  certain positions.
5       Q.   Okay.  And was it your impression
6  that Lehman's valuation of these securities
7  was less than the BoNY values?
8       A.   It is my impression that it was
9  less than the BoNY values.
10      Q.   Do you know why?
11      A.   Our general assumption was -- when
12 I say BoNY's prices were wrong, they were
13 probably wrong in the sense that they were out
14 of date especially for illiquid securities.
15 In a falling market that means you end up with
16 an overestimate of marks.
17      Q.   So your impression or working
18 assumption during that week was that BoNY's
19 marks were overvalued?
20      A.   Right.
21      Q.   And how about Lehman's marks; do
22 you have any impression about whether their
23 marks were accurate?
24      A.   This is by know means
25 representative of the entire portfolio but on

Confidential

Page 62

J. YANG - HIGHLY CONFIDENTIAL
1
2    some of the most illiquid positions in the
3    discussions we had with them, you know, and
4    this is not in general, these are specific
5    incidents -- you know, specific securities, so
6    it may not mean anything, but I do know I
7    found that their prices were higher than I
8    would have assigned to them.
9        Q.    So in the end did Barclays assign
10   a value to this pool of securities that's
11   represented by the BoNY mark of 45 billion?
12       A.    Well, as I said, that 15.9
13   population ended up not being exactly accurate
14   because I said some securities did disappear.
15   Or, you know, we just eventually didn't
16   receive.
17       But eventually all of the
18   securities that we did receive, we did value
19   at because -- but I don't know what that
20   number would have come out to.
21       Q.    You don't know the value that
22   Barclays placed on that pool of securities?
23       A.    Right. Because of the process.
24   What we did is we booked everything in and
25   then, you know, obviously different desks had

Page 63

J. YANG - HIGHLY CONFIDENTIAL
1
2    responsibility for different types of assets.
3    And then everyone marks it in their systems
4    and that flows upstream.
5        Q.    So when you first booked them in
6    did you book them in at the BoNY marks?
7        A.    I don't recall what price we used
8    for booking. It wouldn't have been ours
9    because we didn't have them yet.
10       Q.    Ours meaning Barclays?
11       A.    Barclays. Because we hadn't
12   calculated them yet.
13       Q.    I think I understood you what just
14   said but let me see if I --
15       MR. STERN: I think this is now
16   going beyond the scope of this
17   deposition. I think Barclays' booking
18   and marking of the security positions
19   that it received in this transaction is
20   beyond the scope of this deposition.
21       MR. HINE: So are you instructing
22   him not to answer?
23       MR. STERN: Yes.
24       MR. HINE: All right.
25       (Pause on the record.)

Page 64

J. YANG - HIGHLY CONFIDENTIAL
1
2        MR. HINE: I'm going to get to the
3    two documents listed in deposition
4    notice item number 5 but I want to state
5    on the record our objection to the
6    restricting of the scope of this
7    deposition unduly and we are reserving
8    our rights to recall Mr. Yang either as
9    a 30(b)(6) or somebody else as a
10   30(b)(6) and to recall Mr. Yang in his
11   personal capacity. I just want to put
12   it on the record so I will follow your
13   objection and I'm going to stick to the
14   three documents that are in that notice.
15       MR. STERN: Fine. You've never
16   noticed Mr. Yang's deposition
17   personally. He's a 30(b)(6) witness.
18   There are many, many, many documents
19   relating to categories of securities and
20   you could go on for days and days. But
21   this is a limited 30(b)(6) deposition.
22   You will have other witnesses as you
23   know currently on the schedule who will
24   be able to address many of the questions
25   you have sought to ask here.

Page 65

J. YANG - HIGHLY CONFIDENTIAL
1
2        MR. HINE: Okay.
3        MR. STERN: Okay.
4        MR. HINE: You done?
5        MR. STERN: Yes.
6        MR. HINE: Okay. I'm just noting
7    our objection to your undue restriction
8    to the scope of this deposition and we
9    reserve our rights. So with that said
10   let me introduce the next exhibit.
11   Would you mark that.
12       (Deposition Exhibit 350B, document
13   bearing production numbers
14   BCI-EX-00012161 through BCI-EX-00012162,
15   marked for identification as of this
16   date.)
17   BY MR. HINE:
18       Q.    Mr. Yang, I'm handing you a copy
19   of a document marked as Exhibit 350B.
20       A.    Um-hum.
21       Q.    When you've had a moment to look
22   at it please let me know.
23       (Document review.)
24       A.    Okay. I'm ready.
25       Q.    You've had a chance to look at it?

Confidential

| Page 66 |
| --- |

J. YANG - HIGHLY CONFIDENTIAL
1
2    A.   Yeah.
3    Q.   Okay.  Have you ever seen this
4  document before?
5    A.   Yes.
6    Q.   Could you tell me what it is?
7    A.   It's an e-mail from Dan Long, who
8  is someone who worked for me, to Marty Malloy,
9  Kevin Walker, and myself.  I believe Kevin
10  Walker worked with Marty on sort of the repo
11  business.
12    Q.   Okay.  And what's the purpose of
13  this e-mail?
14    A.   So this is early Friday afternoon.
15  As I previously referenced, we had received --
16  I had received those two e-mails listing --
17  listing the securities that corresponded to
18  the 28.6 and the 15.9 that we just discussed.
19  What I had asked Dan to do -- at this point we
20  understood our objective to start the process
21  of actually trying to ascribe value to this
22  very large portfolio.
23          What I'd asked Dan to do was to
24  compile those securities simply by CUSIP and
25  quantity, whether that be notional amount or

| Page 67 |
| --- |

J. YANG - HIGHLY CONFIDENTIAL
1
2  number of shares, into sort of a master list
3  that we could work off of.
4    Q.   Okay.  So the two previous e-mails
5  you referenced, did they include lists?
6    A.   Yes.
7    Q.   So is it correct to say that he
8  took those two lists and compiled them into
9  one?  Is that what's going on here?
10    A.   That's exactly right.
11    Q.   And is that one entitled Master --
12  do you see this icon on the upper left-hand
13  corner?
14    A.   Yes.
15    Q.   Is that the compilation that
16  you're talking about?
17    A.   That was what Dan produced.  There
18  were some issues with that file.  It's purely
19  technical ones.  But the goal was to be a list
20  of CUSIPS and the quantities.
21    Q.   And I forget the times you
22  mentioned but you mentioned two e-mails
23  previously.
24    A.   Right.
25    Q.   Are they the e-mails lower down on

| Page 68 |
| --- |

J. YANG - HIGHLY CONFIDENTIAL
1
2  this page?
3    A.   No, no.  They were other e-mails.
4    Q.   Okay.  So this is -- if you turn
5  to the second page of this document --
6    A.   Um-hum.
7    Q.   -- it says -- it's an e-mail from
8  Dan Long.
9    A.   Um-hum.
10    Q.   It says, "Please find attached the
11  compiled master list of the DTC and Fed Wire
12  from Lehman on 9/18."
13          Do you see that?
14    A.   Um-hum.
15    Q.   Now, that, to your understanding,
16  corresponds to the entries on the Exhibit 144A
17  for Fed Wire securities and DTC cash marked at
18  15.9 billion?
19          MR. STERN:  Could I hear that
20  again.
21          (Record read.)
22          MR. STERN:  Objection to the form.
23  You can answer.
24    A.   The file was intended to
25  correspond to those.

| Page 69 |
| --- |

J. YANG - HIGHLY CONFIDENTIAL
1
2    Q.   I guess -- let me ask a clarifying
3  question.
4    A.   Yeah.
5    Q.   You see on Exhibit 144A, the
6  previous exhibit we talked about, there's
7  three different entries that say DTC, right?
8    A.   Right.
9    Q.   Two for cash and one says Today
10  DTC Collateral.
11          Do you see that?
12    A.   Um-hum.
13    Q.   So when Mr. Long on the second
14  exhibit, 350B, is referring to DTC, do you
15  understand him to be including all three of
16  those pools of securities?
17    A.   No.  The intent would have been to
18  just capture the -- well, the Fed Wire
19  securities and then the first -- the DTC line
20  item.
21    Q.   The one marked as 15.9?
22    A.   Right.
23    Q.   Okay.  Now, before we get to the
24  attachment at the top he writes, "Thanks,
25  Jasen, for your blessing on this master list."

18

Confidential

---

Page 70

1    J. YANG - HIGHLY CONFIDENTIAL
2        So does that mean you reviewed it?
3        A.    I did review it.  It was a very
4    large list.  So it wasn't a question of line
5    by line.  But you'll see that this e-mail --
6    you know, this is the third e-mail from Dan
7    and each time he had actually attached a file
8    where I found a problem.  Just a technical
9    issue with the compilation.  And I asked him
10   to revise it.  And so at this point, you know,
11   I knew the file still had issues but it was
12   usable.
13       Q.    Usable.  What do you mean by that?
14       A.    Well, simply that the technical
15   issues that I identified previously, he had
16   resolved.
17       Q.    The technical issues have to do
18   with just the listing of individual securities
19   or --
20       A.    Yeah, yeah.  The first technical
21   issue was simply that a certain security might
22   show up multiple times in the list.
23       Q.    Okay.
24       A.    I asked him to add those up.  And
25   then one other issue he had was just that some

---

Page 71

1    J. YANG - HIGHLY CONFIDENTIAL
2    of the CUSIPS in the process of being moved
3    around got corrupted.
4        Q.    Okay.  I've been told in some
5    other depositions that there was a
6    reconciliation process that went on between
7    Lehman and Barclays as to the list of CUSIPS
8    that came over in connection with the
9    September 18th transaction.
10       Are you referring to that process
11   in your last answer?
12       A.    No, no.
13       Q.    Okay.  So this is --
14       A.    Purely just copying CUSIPS and
15   amounts out of one -- you know, a number of
16   files all into one big file.
17       Q.    Okay.  So the correction of the
18   technical issues that you mentioned did not
19   involve meetings with Lehman and reconciling
20   lists of securities; is that right?
21       A.    No, no.
22       Q.    No, they did not?
23       A.    No, they did not.
24       Q.    Okay.
25       MR. HINE:  Let's mark this.

---

Page 72

1    J. YANG - HIGHLY CONFIDENTIAL
2        (Deposition Exhibit 351B, document
3        bearing production numbers BCI 000878
4        through BCI 000879 with attachment,
5        marked for identification as of this
6        date.)
7    BY MR. HINE:
8        Q.    Mr. Yang, I'm handing you a copy
9    of exhibit marked as Exhibit 351B.
10       A.    Um-hum.
11       Q.    Which is the same e-mail only it
12   contains an attachment as you'll see.
13       A.    Right.  Yes, I see that.
14       Q.    And then I don't expect you to go
15   line by line through this thing but is that
16   your understanding of what was the master list
17   assembled by Mr. Long?
18       A.    Yes.
19       Q.    Okay.  Now, at this point in time
20   there are no -- well, maybe let me ask another
21   question.
22       You'll see on that list there's
23   two columns.
24       A.    Um-hum.
25       Q.    One is CUSIP, correct?

---

Page 73

1    J. YANG - HIGHLY CONFIDENTIAL
2        A.    Um-hum.
3        Q.    And the other says Par Notionals.
4        Do you see that?
5        A.    Yes.
6        Q.    What does that mean?
7        A.    He's using shorthand -- a large
8    number of different types of securities
9    represented on this list including, you know,
10   shares of stock, as well as bonds, and
11   preferred stock and things like that.  So
12   he's -- by par/notionals he's using shorthand
13   for whatever the appropriate convention is for
14   the number -- for a quantity for that CUSIP
15   type.
16       So by -- for example, for common
17   stock he was -- used number of shares even
18   though his heading doesn't reflect that.  And
19   for bonds he generally used notional amounts.
20   I suppose those are the two large categories.
21       Q.    So just referring back to the
22   opening e-mail where you say summing -- or
23   he -- sorry.  Mr. Long says, "Summing to 88
24   some-odd billion."
25       Do you see that?

---

Confidential

## Page 74

J. YANG - HIGHLY CONFIDENTIAL
1
2      A.    Yes.
3      Q.    Notional?
4      A.    Yeah.
5      Q.    So he's referring to the sum of
6  this column on the spreadsheet?
7      A.    Right.  Yes.  He's referring to
8  the sum.
9      Q.    And did I understand you correctly
10 that some of the entries are in dollars and
11 some are in shares?
12     A.    Right.  So as a result the sum
13 itself is a meaningless number.  It's simply a
14 checksum.  So that, you know, if we had
15 another list we could -- and it added up to
16 the exact same number, it would be an
17 incredible coincidence if they weren't the
18 same list.
19     Q.    Okay.  So you're not using it for
20 any purpose other than to verify that you have
21 all the entries on this.
22     A.    Yeah.
23     Q.    Okay.  So it's -- all right.  I
24 think you answered my question.  It's a
25 meaningless sum in the sense that it's not

## Page 75

J. YANG - HIGHLY CONFIDENTIAL
1
2  dollars and cents or it's not shares.  It's
3  just your method of tracking whether he has
4  all the entries correct?
5      A.    Yes.
6      Q.    And did he end up having all the
7  entries correct?
8      A.    Well, this was Friday afternoon.
9  And the short answer is that he -- we got a
10 revised list on Saturday, and as I sort of
11 previously referenced, some of the things --
12 the securities in this list didn't show up in
13 sort of the revised list that we got from
14 operations.  There was never an explanation
15 for that.
16     Q.    Was that the result of a
17 reconciliation between Lehman and Barclays at
18 all?
19     A.    I don't know.  I don't know how --
20 what caused operations to refresh.
21     Q.    I guess I misunderstood you.  Mr.
22 Long works for you, correct?
23     A.    Yes.
24     Q.    He's not in operations, is he?
25     A.    No.  But -- I should clarify.  The

## Page 76

J. YANG - HIGHLY CONFIDENTIAL
1
2  two e-mails that we were compiling this list
3  from, I don't know if we sent them to me but I
4  could see -- but my understanding was they
5  were produced by our operations department.
6      Q.    Oh, okay.
7            Is it fair to say that if there
8  was some kind of reconciliation going on
9  between Barclays and Lehman that the
10 operations department probably would have done
11 that?
12     A.    It seems quite likely.
13     Q.    Okay.
14     A.    I don't know.  I wouldn't have
15 direct knowledge of that.
16     Q.    Okay.  You yourself or your
17 department -- let me just ask it differently.
18     A.    Yeah.
19     Q.    Do you know whether your
20 department participated in any kind of
21 reconciliation of CUSIP lists between Lehman
22 and Barclays?
23     A.    We didn't do that.
24     Q.    Okay.  So am I correct in
25 understanding that you were sent two e-mails

## Page 77

J. YANG - HIGHLY CONFIDENTIAL
1
2  with lists of securities as you previously
3  described --
4      A.    Um-hum.
5      Q.    -- and that all Mr. Long did was
6  put them in a single file?
7      A.    Right.
8      Q.    Okay.  And for what purpose?
9      A.    The idea was to -- well, let's
10 see.  The idea was to put them all in one
11 place.  And then sort them into different
12 types of securities so that we could figure
13 out who we should go to to analyze value and
14 risk manage those securities.
15           That was the premise.
16           The other thing that we intended
17 to do with that was compare it to the list of
18 securities that we sort of expected to
19 receive.
20     Q.    And did you do that?
21     A.    We did over the course of the
22 afternoon.  And found that it wasn't what at
23 least Dan and I were expecting.
24     Q.    In what way?
25     A.    Just that it was a different large

Confidential

---

Page 78

1        J. YANG - HIGHLY CONFIDENTIAL
2  portfolio of securities. We had been told to
3  expect another list.
4        Q.   What were you told to expect?
5        A.   We had been given another file
6  that we understood to represent the securities
7  that were held -- that were financed in
8  another facility the day before not provided
9  by Barclays. Provided by the Fed. And we
10 were told to expect that we would have -- get
11 substantially the same collateral. As it
12 turned out we didn't.
13       Q.   I think I understand that. Are
14 you referring to a Fed facility where the Fed
15 provided funding to Lehman over the course of
16 the week of the 15th?
17       A.   Right.
18       Q.   So you were given a list by who?
19       A.   I actually -- I was given the
20 list -- I mean, Stephen King forwarded it to
21 me but I don't remember where it came from.
22       Q.   Okay. And that list was the
23 securities that you understood to be in
24 support of the Fed financing from earlier that
25 week?

---

Page 79

1        J. YANG - HIGHLY CONFIDENTIAL
2        A.   Right.
3        Q.   And so that list ended up being --
4  again, I'm just trying to understand your
5  testimony. When you compared that list to
6  this list prepared by Mr. Long they were
7  different lists of securities?
8        A.   Yes. They were different lists.
9        Q.   Radically different or just a
10 couple?
11       A.   Very substantial --
12            MR. STERN: Objection to the form.
13       A.   Okay.
14       Q.   You can answer.
15       A.   Substantially different.
16       Q.   Okay. And so what did you do to
17 try to figure out what happened?
18       A.   In a certain sense that wasn't
19 part of my task.
20       Q.   Okay.
21       A.   You know, the task was to -- after
22 that was noted, our task was to value the
23 securities that we did have and risk manage
24 them.
25       Q.   Okay. And did you eventually

---

Page 80

1        J. YANG - HIGHLY CONFIDENTIAL
2  value the securities that are on this list?
3        A.   There was what I would think of as
4  an updated version of this that was provided
5  to us over the weekend which, you know, as I
6  say, was eventually booked into all of the
7  Barclays -- various Barclays systems and
8  valued by the appropriate trading desk.
9        Q.   And that was provided by the ops
10 people at Barclays?
11       A.   Yes.
12       Q.   So your department didn't create
13 that second list?
14       A.   No, we didn't create that second
15 list.
16       Q.   Okay. Can you read on the
17 covering e-mail it says -- again, this is from
18 Mr. Long. He says, "If you guys are
19 comfortable with this list then let's send to
20 Lehman for marks."
21       A.   Um-hum.
22       Q.   What was he referring to there?
23       A.   Well, as I said, at this point our
24 task was to start assigning a value to this.
25 And since we understood that the securities

---

Page 81

1        J. YANG - HIGHLY CONFIDENTIAL
2  came from Lehman, we thought it would be -- it
3  wouldn't hurt to ask them for their valuations
4  on these assets.
5        Q.   And did they send them to you?
6        A.   They -- I think I -- I don't -- I
7  think the short answer is no. I received a
8  number of files from them that had their marks
9  on certain securities. But -- and there was
10 some overlap with this but it wasn't in the
11 sense that they gave us their values on the
12 securities.
13       Q.   So what did they give you?
14       A.   Just files that contained their
15 valuations for certain securities but not --
16 but it wasn't necessarily, you know -- they
17 weren't necessarily the securities on this, in
18 this file, nor were they necessarily all of
19 the securities that we were interested in.
20       Q.   So it was an incomplete list as
21 compared to your list?
22       A.   Incomplete and sort of -- it was
23 just a different -- different set of
24 securities that they had marks for.
25       Q.   So was there a marking process

Confidential

Page 82

J. YANG - HIGHLY CONFIDENTIAL

1 that took place on -- at or about this time to
2 reconcile your list with the Lehman marks?
3     A.   No.  Because what I'm trying to
4 say is that I don't think that I ever got
5 Lehman's marks on this population of
6 securities.  I got their marks on another
7 population of securities which had some
8 overlap with this.
9     Q.   And did you make any use of those
10 marks?
11    A.   No.
12    Q.   Because it was not -- because it
13 was hard to reconcile the two lists?
14    A.   I think we ended up being -- this
15 afternoon we were most concerned with just
16 reconciling the lists.
17        MR. STERN:  This afternoon is what
18 date?
19        THE WITNESS:  The afternoon of
20 Friday, September 19th.
21    A.   So there wasn't actually a
22 valuation process that occurred that Friday.
23 At least by myself.
24    Q.   Okay.  Could you describe for me

Page 83

J. YANG - HIGHLY CONFIDENTIAL

1 what you mean by reconciling in that sense?
2     A.   Well, it was that comparison with
3 the Fed facility list.  You know, just the
4 simple task of telling whether or not this
5 list was -- how similar or different this list
6 was from the Fed facility list.  Just that
7 simple task was what we focused on that
8 afternoon.
9     Q.   And were you able to reconcile
10 those two lists?
11    A.   Well, I think we just concluded
12 that they were very different lists.
13    Q.   And when you say reconcile, are
14 you talking about reconciling within Barclays
15 or are you reconciling with Lehman?
16    A.   No.  Purely within Barclays.
17    Q.   So you just -- when you say
18 reconciling in that sense are you just saying
19 you're comparing the two lists?
20    A.   Yes.
21    Q.   Okay.  And was any action taken as
22 a result of the fact that the lists were
23 different?
24    A.   I don't know.

Page 84

J. YANG - HIGHLY CONFIDENTIAL

1     Q.   Is it fair to say that if there
2 was, it was someone else doing it?
3     A.   Right.
4     Q.   Okay.  And is that a function that
5 was probably undertaken by the ops people?
6     A.   Well, in terms of -- the
7 comparison we were making was between what we
8 were expecting to receive and what was
9 provided to us.  So that actually would have
10 been more of a commercial point that I assume
11 would have been handled by, you know, the team
12 negotiating the transaction.
13    Q.   So you didn't -- you
14 weren't involved in that?
15    A.   No.
16    Q.   Okay.  You mentioned that later on
17 sometime during that weekend there was an
18 updated version of this document produced,
19 correct?  Again, I'm referring to the master
20 file.
21    A.   The master.  Yes.  There was
22 another file that served as the master file.
23    Q.   And it was still titled Master
24 File?

Page 85

J. YANG - HIGHLY CONFIDENTIAL

1     A.   I don't recall what it was titled.
2 I think it would -- it probably -- it
3 wasn't -- it didn't have the same name because
4 it was produced --
5     Q.   Well, can I show you a document to
6 see if it is, in fact, the list you're talking
7 about?
8     A.   Sure.
9     Q.   Let me just mark it first.
10        (Deposition Exhibit 352B, document
11 bearing production numbers
12 BCI-EX-00013019 through BCI-EX-00013186,
13 marked for identification as of this
14 date.)
15 BY MR. HINE:
16    Q.   Mr. Yang, I'm handing you a copy
17 of a document marked as Exhibit 352B.
18    A.   Um-hum.
19    Q.   Which is Bates stamped
20 BCI-EX-00013019 through -13020.
21        And my first -- again, I'm not
22 going to ask you detailed questions about the
23 whole thing.  I just want to see if you
24 recognize this document.

Confidential

## Page 86

1　　　J. YANG - HIGHLY CONFIDENTIAL
2　　A.　This -- I do. This isn't the
3　revised master list that I was referring to
4　that superseded the one we were just about.
5　　Q.　Okay.
6　　A.　It's basically the same list. But
7　this actually has the comparison that I was
8　just referring to what we were told to expect.
9　　Q.　Oh, so this is not the revised
10　list that you said you received from ops later
11　on that weekend?
12　　A.　No. This is basically the same
13　list.
14　　Q.　Okay. But this is the -- this is
15　a document reflecting the reconciliation that
16　you just testified about?
17　　A.　Yes.
18　　Q.　And could you just explain to me
19　how it's doing that?
20　　A.　So the columns A and B are the
21　same as the other file.
22　　Q.　Okay. The other file meaning
23　Exhibit 351B?
24　　A.　Yes.
25　　Q.　Okay.

## Page 87

1　　　J. YANG - HIGHLY CONFIDENTIAL
2　　A.　Or ought to be.
3　　　And then columns E and F show the
4　quantities of that security that we were told
5　to expect.
6　　Q.　Told to -- meaning the Fed --
7　　A.　The Fed.
8　　Q.　-- program?
9　　A.　Yes.
10　　Q.　Okay. What's the difference
11　between column E and column F?
12　　A.　Simply whether that particular
13　security was settled via the DTC or was
14　settled via Fed Wire.
15　　Q.　Oh, so E is DTC and F is Fed Wire.
16　　A.　Right.
17　　Q.　Could you explain to me column D
18　where it looks like yes and no or Y and N?
19　　A.　Right. It's titled Changed Item.
20　But I don't -- I don't know what -- I don't
21　know actually what it's doing.
22　　Q.　Okay. And I interrupted you. So
23　how about G and H?
24　　A.　G is then the sum of E and F. So
25　G is the column that should be comparable to

## Page 88

1　　　J. YANG - HIGHLY CONFIDENTIAL
2　column B. And then H is just the difference
3　between the two.
4　　Q.　All right. So just so I
5　understand, in the line numbered 8136, the
6　entry in column H, 129 some odd thousand is
7　the difference between B and G?
8　　A.　Yes.
9　　Q.　So column H is telling you what?
10　　A.　The quantity of the difference
11　between what we've actually received of the
12　security and what we were expecting.
13　　Q.　Okay. And when you say quantity,
14　are we talking share numbers or price?
15　　A.　It would be either share numbers
16　for equities or notional amounts for bonds.
17　　Q.　And there's no way to tell that
18　from this chart, right?
19　　A.　No.
20　　Q.　Unless you had the CUSIP number
21　you would look up the type of security?
22　　A.　That's right.
23　　Q.　Okay. And so what did this
24　analysis tell you?
25　　A.　We can see that column H is -- if

## Page 89

1　　　J. YANG - HIGHLY CONFIDENTIAL
2　column H were all zeroes then we would
3　conclude we had the same portfolio. You'll
4　see that in many cases it's zero which means
5　that we got the same amount of that security
6　but in many, many cases it's also not zero.
7　　Q.　Okay. And the entries in column H
8　reflect where there's a difference between the
9　Fed program securities and the securities that
10　you guys received on Friday, the 19th.
11　　A.　Yes.
12　　Q.　All right. And what did you do
13　with this analysis in the end?
14　　A.　I think I conveyed to Stephen King
15　and Marty Malloy that the populations were
16　very different. I don't know what they did
17　with that information. And then, you know,
18　eventually we focused on valuing and risk
19　managing the portfolio. The corrected
20　portfolio that we received.
21　　Q.　Okay.
22　　　MR. HINE:　And am I correct, Jack,
23　that you're not going to let him testify
24　about how he priced the portfolio?
25　　　MR. STERN:　Well, that's not a

Confidential

| Page 90 | Page 91 |
|---|---|

### Page 90

1    J. YANG - HIGHLY CONFIDENTIAL
2  subject of this deposition. I believe
3  you have other witnesses on the calendar
4  who can discuss that.
5      MR. HINE: I understand. But for
6  this purpose, for this forum --
7      MR. STERN: But otherwise your
8  presumption is correct.
9      MR. HINE: Okay. Could we just
10  take a little break and let me see if I
11  have anything else?
12      MR. STERN: Sure.
13      (Recess taken.)
14  BY MR. HINE:
15      Q.    Back on the record.
16      Mr. Yang, I had a couple follow-up
17  questions about some issues we talked about
18  earlier.
19      A.    Um-hum.
20      Q.    If you refer back to Exhibit 144A.
21      A.    Yes.
22      Q.    I think you mentioned in the
23  course of your testimony you talked about
24  illiquid securities.
25      Do you recall?

### Page 91

1    J. YANG - HIGHLY CONFIDENTIAL
2      A.    Yes.
3      Q.    And the difficulty associated with
4  putting a price on them.
5      Do you recall that?
6      A.    Yes.
7      Q.    When you look at this entry on
8  Exhibit 144A for Fed Wire Securities, are
9  they -- is it fair to say that those are
10  typically liquid securities?
11      A.    More so, yes.
12      Q.    Okay. What types of securities
13  are embodied in what you folks call Fed Wire
14  securities?
15      A.    Fed Wire securities are
16  essentially treasury securities. So bonds,
17  bills, notes.
18      Q.    Okay.
19      A.    And agency, which by that I mean
20  Fannie Mae and Freddie Mac securities. Now,
21  those are -- you know -- in the grand scheme
22  of things those are more liquid. Illiquid
23  Fanny and Freddy securities do exist because
24  they can include CMOs.
25      Q.    Okay. I understand.

| Page 92 | Page 93 |
|---|---|

### Page 92

1    J. YANG - HIGHLY CONFIDENTIAL
2      A.    But they're generally more liquid,
3  yeah.
4      Q.    Is it fair to say as a general
5  rule that Barclays would have little dispute
6  with the BoNY values ascribed to those type of
7  Fed securities?
8      MR. STERN: Objection to the form.
9      Q.    Let me rephrase it. You
10  previously said you had -- I think you said
11  you had -- the presumption that there would be
12  some problems with the BoNY values listed on
13  this document, right?
14      MR. STERN: Objection to the form.
15      Q.    I'm just -- I'm not trying to
16  restate what you said. I'm just trying to
17  bring you back to your testimony.
18      MR. STERN: Except he used the
19  term "marks" so...
20      MR. HINE: Okay. Fair enough.
21      Q.    Do you recall saying something
22  about the fact that you -- Barclays had some
23  kind of presumption or assumption that the
24  BoNY marks might not be accurate in this
25  context, correct?

### Page 93

1    J. YANG - HIGHLY CONFIDENTIAL
2      A.    Right.
3      Q.    Does that assumption apply equally
4  to the marks for Fed Wire securities, do you
5  think?
6      A.    It's reasonable to say that we
7  would expect the differences to be bigger for
8  some of the DTC type securities than Fed Wire.
9  But I wouldn't say that -- I wouldn't say that
10  we would expect no disagreement on Fed Wire
11  securities.
12      Q.    Fair enough. When you say bigger,
13  you mean -- do I understand you correctly to
14  be saying that the DTC securities would be
15  more illiquid than the Fed Wire securities?
16      A.    To be very -- to be precise, the
17  most illiquid securities are all DTC settled.
18  Of course, there are also some liquid
19  securities that are settled via DTC.
20      Q.    Okay. But looking at it as a pool
21  there's probably more illiquid securities in
22  the DTC entries here than in the Fed Wire
23  entry?
24      A.    Yes.
25      Q.    Okay. So, to your recollection,

Confidential

Page 94

1        J. YANG - HIGHLY CONFIDENTIAL
2    did Barclays end up having the most concerns,
3    if you will, about the pricing -- or about the
4    marks BoNY had placed on the DTC securities?
5        A.   Yes.
6        Q.   Could I refer you back to
7    Exhibit 351B. And I just wanted to ask you a
8    question about -- well, let me just ask a
9    lead-up question.
10       Have you ever heard the term
11   Schedule A used in connection with the
12   Barclays/Lehman transaction?
13       A.   Yes.
14       Q.   And what did you understand
15   Schedule A to be?
16       A.   Schedule A was meant to be the
17   securities that were acquired on -- that were
18   received on September 18th as part of this
19   assumed repo transaction.
20       Q.   Okay. And who prepared Schedule
21   A?
22       A.   Like all things, it was a
23   collaborative process. But I was involved in
24   preparing part of it. But, in fact, the
25   primary data source was Lehman. I believe we

Page 95

1        J. YANG - HIGHLY CONFIDENTIAL
2    reviewed what they gave us and reformatted it.
3    But the data basically came from Lehman.
4        Q.   Okay. I guess my question is this
5    master list that we talked about,
6    Exhibit 351B, is that in any way an early
7    version of Schedule A or a precursor to
8    Schedule A?
9        A.   Conceptually this master list
10   should have been similar. You know, it
11   conceptually should have been Schedule A
12   except we know that there are some issues with
13   this list.
14       Q.   So did you -- when you eventually
15   did receive Schedule A or a version of
16   Schedule A, did you try to reconcile it
17   against this master list?
18       A.   Well, this was -- master list was
19   superseded by, you know, another list, another
20   similar list. We did do a comparison. We did
21   do a comparison but didn't have time to check
22   it line by line.
23       Q.   You did a comparison between what
24   and what?
25       A.   Between what Lehman provided as

Page 96

1        J. YANG - HIGHLY CONFIDENTIAL
2    the draft Schedule A and what -- and successor
3    to this master list that we had.
4        Q.   And by the successor you're
5    talking about the one that the ops people
6    provided you?
7        A.   Right. What I should clarify is
8    when I -- the successor list is the list we
9    actually worked off of. The terms of
10   assign -- booking trades and assigning them to
11   different desks for valuations or valuing it
12   ourselves.
13       That list did not distinguish
14   between securities received on Thursday as
15   part of the repo and securities received
16   subsequently. So including on Friday, the
17   19th.
18       So when we did the comparison
19   between what Lehman provided us as the draft
20   Schedule A, that list, of course they were
21   different because they were meant to be
22   different but we did do a comparison to see
23   that -- you know, it seemed approximately
24   correct.
25       Q.   Okay. Just so I understand what

Page 97

1        J. YANG - HIGHLY CONFIDENTIAL
2    you're talking about, the successor list that
3    you've been referring to that was prepared by
4    the ops folks included more than just the
5    securities that were transferred from the
6    September 18th repo; is that right?
7        A.   Right.
8        Q.   Okay. And then so did it
9    include -- I believe we've previously
10   discussed unencumbered assets that were
11   transferred to Barclays. Was that included on
12   that successor list, do you know?
13       A.   Yes. Yes.
14       Q.   And does the number 1.9 billion in
15   securities ring a bell with you in that
16   regard?
17       A.   Yes. It does. But unfortunately
18   it's not -- I believe -- what it means to me
19   is the number that was suggested for the
20   eventual total amount of unencumbered
21   securities that Barclays might receive.
22       Q.   Oh, okay.
23       And Barclays didn't receive it?
24       A.   Not to my knowledge.
25       Q.   Are you saying they received some

Confidential

Page 98

J. YANG - HIGHLY CONFIDENTIAL

1 but not all?
2     A.    Yes.
3     Q.    Okay.  And -- but that suggested
4 number, is that the difference -- is the
5 inclusion of that pool of securities the
6 difference between Master List, Exhibit 351B,
7 and the successor list you've been talking
8 about?
9     A.    No.  The successor list I don't
10 think included all of the 1.9 billion.  It
11 was -- you know, if I received the successor
12 list on Saturday it only included anything
13 that we would have received that Friday.
14     Q.    Okay.  So it was a report in time
15 as to what Barclays had actually received by
16 that Saturday.
17     A.    Exactly.
18     Q.    Okay.  And were there subsequent
19 versions of that list developed later in the
20 week or later in the month?
21     A.    We kept adding securities to that
22 list as we received them.
23     Q.    Okay.  So that list was meant to
24 embody the securities that actually made it to

Page 99

J. YANG - HIGHLY CONFIDENTIAL

1 Barclays.  Not necessarily what might have
2 encompassed a 1.9 list of unencumbered assets?
3     A.    No.  Yeah, that's exactly right.
4     Q.    Okay.  Okay.
5         All right.  So we were talking
6 about Schedule A, am I correct to say that
7 this list, 351B, became superseded and no
8 longer useful in the analysis leading to the
9 development of Schedule A?
10     A.    Yes.
11     Q.    But that successor list you're
12 talking about might have been involved in that
13 analysis?
14     A.    It was.
15     Q.    Okay.
16     A.    It was simply the thing against
17 which the Lehman Schedule A list was compared.
18     Q.    Okay.  And were you involved in
19 that comparison?
20     A.    Yes.
21     Q.    And I previously had asked you
22 about a reconciliation process between
23 Barclays and Lehman Brothers.
24     A.    Um-hum.

Page 100

J. YANG - HIGHLY CONFIDENTIAL

1     Q.    Is that -- is your effort involved
2 in that process, do you know?
3     A.    I didn't think of it that way.  I
4 had a very short time frame to compare what
5 Lehman had drafted as the Schedule A to the
6 securities that we had received.  And my main
7 goal was to -- pretty much all I could do was
8 determine that they superficially looked
9 similar.
10     Q.    And you were doing that at whose
11 request?
12     A.    Stephen -- Stephen King and
13 probably Barclays' legal department.
14     Q.    Okay.  Fair enough.  Thank you.
15         I want to direct your attention
16 back on Exhibit 351B.
17     A.    Um-hum.
18     Q.    To the last sentence of the e-mail
19 which we talked about earlier about, "Let's
20 send to Lehman for marks."
21         Do you recall that?
22     A.    Yes.
23         (Deposition Exhibit 353B, document
24 bearing production numbers

Page 101

J. YANG - HIGHLY CONFIDENTIAL

1 BCI-EX-(S)-00055573 through
2 BCI-EX-(S)-00055574, marked for
3 identification as of this date.)
4 BY MR. HINE:
5     Q.    I'm handing you a copy of a
6 document marked as Exhibit 353B which is a
7 document Bates stamped BCI-EX-(S)-00055573
8 through -74.
9     A.    Um-hum.
10     Q.    It's an e-mail on which you are a
11 c.c.  And I want to direct your attention to
12 the subject line of the e-mail which says,
13 "Barclays' teams are on the way over to meet
14 with us on our positions and marks.  Obviously
15 critical."
16         Do you see that?
17     A.    Um-hum.
18     Q.    And this is --
19         MR. STERN:  Take your time to read
20 the whole document.
21     Q.    Sure.
22     A.    I see that.
23         (Document review.)
24     A.    Okay.

Confidential

| Page 102 | Page 103 |
|---|---|

**Page 102**

J. YANG - HIGHLY CONFIDENTIAL
1
2    Q.    Do you recall this e-mail?
3    A.    Not in great detail, but, yes.
4    Q.    Well, my question is do you recall
5    any meetings on that Friday between the
6    Barclays team -- or I guess the Barclays team
7    was on their way over to the Lehman facility.
8          Do you recall that at all on that
9    Friday?
10    A.    Well, I wasn't involved in any of
11    those meetings. I was just privy to e-mails
12    like this that suggested those were happening.
13    Q.    Okay. Do you have any
14    understanding what took place at those
15    meetings?
16          MR. STERN: I guess -- I don't
17    mind you asking if this process
18    reflected in 353B relates to the process
19    referenced in 351B.
20          MR. HINE: Well, the notice
21    says --
22          MR. STERN: Well, the notice
23    refers to the process referenced in
24    those documents.
25          MR. HINE: The marking process

**Page 103**

J. YANG - HIGHLY CONFIDENTIAL
1
2    that took place on Friday.
3          MR. STERN: So what I'm -- and as
4    referenced in those documents. So what
5    I'm saying is I don't have a problem if
6    you ask him what -- whether the 353B
7    relates to the process referenced in
8    351B.
9          MR. HINE: Okay. Well, that's
10    what I'm trying to do.
11          MR. STERN: Well, I don't know
12    that that's your question.
13          MR. HINE: Let me rephrase the
14    question, Mr. Yang.
15    BY MR. HINE:
16    Q.    Do you have any understanding of a
17    marking process that took place on Friday, the
18    19th?
19    A.    I should -- I think the thing to
20    focus on is the time line. At 1:14 we were
21    just struggling to compile the securities that
22    we had received in. I knew that during the
23    day Friday traders at Barclays were talking to
24    traders at Lehman. The problem is nobody else
25    had this list of securities. So I should --

| Page 104 | Page 105 |
|---|---|

**Page 104**

J. YANG - HIGHLY CONFIDENTIAL
1
2    so the short -- so really I think this is a
3    huge generalization but in general the
4    conversations that were happening with
5    Barclays' traders getting Lehman's traders'
6    impressions on positions -- on positions that
7    had no particular relationship to the list of
8    securities that we actually got.
9    Q.    Were you involved in those
10    conversations?
11    A.    No. I just knew that they were
12    happening.
13    Q.    And what did you understand was
14    taking place in that regard?
15    A.    I don't recall exactly what
16    positions they were talking about. I was
17    focused on the positions we actually received.
18    Q.    Okay. Let me just -- I just want
19    to try to distinguish between these two
20    documents. I think when you mentioned
21    1:14 p.m. you were referring to the time for
22    the Exhibit 341B e-mail?
23    A.    Right. And we were still trying
24    to get our hands around what positions we had
25    received.

**Page 105**

J. YANG - HIGHLY CONFIDENTIAL
1
2    Q.    Okay. And in that e-mail it says,
3    "Let's send to Lehman for marks," right?
4    A.    Um-hum.
5    Q.    What did you understand that to
6    involve?
7    A.    The idea was that we -- so we did
8    know that there were ongoing conversations
9    between Barclays and Lehman traders about
10    marks on positions in general.
11          So one idea that we had was it
12    would not hurt to ask -- to send this to
13    people at Lehman and have them try to mark
14    this list of positions as well.
15    Q.    All right. So you were going to
16    send this list to Lehman in the hopes that it
17    somehow would assist or get involved in that
18    ongoing discussion between the traders that
19    you talked about?
20    A.    Rather the opposite. Hoping that
21    the Lehman traders would be able to assist us
22    or at least, you know, give us one more
23    reference point on this list of securities.
24    Q.    And when you say "this list"
25    you're talking about 351B.

Confidential

Page 106

1      J. YANG - HIGHLY CONFIDENTIAL
2      A.   Right. And -- or conceptually,
3  rather, the securities that we had received on
4  Thursday, September 18th.
5      Q.   All right. So now is that effort,
6  the sending it over to Lehman to get their
7  assistance as you just described, is that
8  different from a marking process that was
9  taking place on the Friday between Lehman and
10 Barclays?
11     A.   I think so. I don't know what
12 marking process means, per se.
13     Q.   Okay.
14     A.   In a certain sense I don't know
15 what positions these traders were talking
16 about.
17     Q.   Okay.
18     A.   So we were the only people who
19 knew -- we were the only traders at Barclays
20 who had possession of a list of the positions
21 we actually got.
22     Q.   Well, okay. I think I understand.
23 When you talked about these traders I believe
24 you pointed to Exhibit --
25     A.   353B.

Page 107

1      J. YANG - HIGHLY CONFIDENTIAL
2      Q.   -- 353B.
3           Is Mr. Martin a trader?
4      A.   Yes, he is.
5      Q.   Okay. And so Mr. Martin is
6  sending you the e-mail -- or copying you the
7  e-mail in 353B why?
8      A.   To let me know who on the Barclays
9  side was -- which traders were talking to each
10 other.
11     Q.   Okay. So you were involved in
12 that process?
13     A.   It was helpful for me to know
14 since I was the sort of -- I was tasked with
15 coordinating the process of eventually getting
16 marks on -- or eventually evaluating and
17 processing the securities that we were
18 actually receiving.
19     Q.   Okay. So in connection with
20 the -- and I want to talk about the e-mail on
21 353B where it says --
22          MR. STERN: Well, I guess --
23          MR. HINE: Let me just ask my
24 question, Jack.
25          MR. STERN: No, no, no. Because I

Page 108

1      J. YANG - HIGHLY CONFIDENTIAL
2  think this goes to the scope of the
3  deposition. Again, I don't know that
4  you've asked with respect to 351B if the
5  list was sent to Lehman for marks and if
6  Lehman provided those marks. I mean, it
7  seems to me that is within the scope of
8  the deposition.
9          MR. HINE: I did ask that and he
10 answered that earlier.
11         MR. STERN: Oh. So if you've
12 asked that and it's been answered then I
13 don't know --
14         MR. HINE: That process is
15 definitely related to the marking
16 process that's going on between the
17 traders.
18         MR. STERN: And you've established
19 that?
20         MR. HINE: Yes. He just testified
21 about that.
22         MR. STERN: I don't know about
23 that.
24         MR. HINE: Well, then, you can
25 review the transcript but I'm going to

Page 109

1      J. YANG - HIGHLY CONFIDENTIAL
2  ask him about this e-mail which is
3  marked as 353B.
4          MR. STERN: So let me hear your
5  question.
6          MR. HINE: All right.
7  BY MR. HINE:
8      Q.   Do you see the e-mail where Mr.
9  Martin copies you on February 19th?
10     A.   Um-hum.
11     Q.   Do you see that e-mail, Mr. Yang?
12     A.   Yeah.
13     Q.   Well, first of all, half way down
14 the e-mail it refers to someone named -- I
15 believe it's someone named Kashik.
16          Do you see that?
17     A.   I do.
18     Q.   Do you know who that is?
19     A.   The name's familiar but I don't
20 recall what role he had.
21     Q.   Do you know if he's a Barclays
22 employee or a Lehman employee?
23     A.   He was a Lehman employee. I
24 believe he's one of the addressees in the
25 e-mail from Ian Lowitt.

28

Confidential

Page 110

J. YANG - HIGHLY CONFIDENTIAL
1   J. YANG - HIGHLY CONFIDENTIAL
2   Q.   I see.  Oh, you're right.  Okay.
3        So just to lead up to the
4   question, Mr. King asks, "I assume you're
5   talking to Kashik."
6        Do you see that?
7   A.   Um-hum.
8   Q.   And then Mr. Martin's e-mail is a
9   response to that and he talks about some
10  conversations he had with the derivative and
11  CMO guys.
12       Do you know who that is?
13  A.   I don't exactly.  He would have
14  been referring in general to certain groups of
15  Lehman traders.
16  Q.   Okay.  So those are Lehman guys.
17  A.   Yes.
18  Q.   Okay.  And then he continues, "The
19  derivative guy said a lot of positions did
20  indeed look like repo ones in the file I
21  sent."
22       Do you see that?
23  A.   I do see that.
24  Q.   Do you know what that's referring
25  to?

Page 111

1   J. YANG - HIGHLY CONFIDENTIAL
2   A.   I don't know what file David would
3   have been referring to.  Although I can say
4   that it would not have been an extract from my
5   master list.
6   Q.   Okay.  Fair enough.
7        MR. STERN:  That is 351B.
8        THE WITNESS:  351B.
9   Q.   All right.  Then it continues,
10  "Told them to mark them consistent with his
11  inventory.  Appeared he got the message from
12  above to remark positions."
13       Do you see that?
14  A.   Um-hum, yeah.
15  Q.   Do you know what that's referring
16  to?
17  A.   No.  The first -- well, let me be
18  specific.  The first clause I would take to
19  read that David's asking for his impressions
20  on certain positions.  He's asking him to mark
21  them as he would his own inventory.
22       The second part I don't understand
23  what's being said.
24  Q.   Okay.  So I'm just trying to
25  understand what you said.  The first clause

Page 112

1   J. YANG - HIGHLY CONFIDENTIAL
2   where he talks about mark them consistent with
3   his inventory --
4   A.   Um-hum.
5   Q.   -- "his" meaning the trader at
6   Lehman?
7   A.   I think so.
8   Q.   So you understand this to be Mr.
9   Martin saying that he told the derivative guy
10  at Lehman, whoever that is, to mark his
11  position consistent with how they mark their
12  own inventory?
13       MR. STERN:  Objection to the form.
14  Don't speculate.
15  A.   I don't -- I don't know.
16  Q.   Okay.  Do you have any
17  understanding of what he was discussing with
18  this guy?
19       MR. STERN:  Objection to the form.
20  A.   No, I don't.
21  Q.   Do you have any understanding of
22  what -- you talked earlier about a process
23  between the traders going on at -- between
24  Lehman and Barclays on this Friday.
25       Do you have an understanding of

Page 113

1   J. YANG - HIGHLY CONFIDENTIAL
2   what actually -- what they were discussing?
3   A.   No.  It's not clear to me.
4   Q.   Do you have any general
5   understanding of what they were discussing?
6        MR. STERN:  Objection to the form.
7   Don't speculate.
8   A.   Yeah.  The general question.
9   Like, I mean -- if by general understanding
10  you mean they were talking about positions, I
11  assume so.  But I keep saying I don't know
12  what positions they were talking about because
13  I was the only one who had a list of
14  positions.
15  Q.   Okay.  They were talking about how
16  to price different positions?
17       MR. STERN:  Objection.
18  A.   Possibly.  I don't know.
19  Q.   Or -- okay.
20       Here's my -- the basis for my
21  question, Mr. Yang.  You've been designated as
22  a 30(b)(6) witness about a process -- a
23  marking process taking place on that Friday.
24       MR. STERN:  No, no, no.
25       MR. HINE:  Just let me ask the

29

Confidential

## Page 114

1      J. YANG - HIGHLY CONFIDENTIAL
2 question, Jack.
3      MR. STERN: No, you're misquoting
4 the notice. It says the marking process
5 to take place the afternoon of Friday,
6 September 19th, 2008, referenced in BCI
7 0087 and BCI-EX-0012161. 12161 you've
8 marked. You've marked 0087 as 351B.
9 And 351B says, "If you guys are
10 comfortable with this list then let's
11 send to Lehman for marks."
12      That is the scope of this
13 deposition. You've already asked about
14 that and you've gotten answers so I
15 don't know what your speech is about.
16      MR. HINE: That process is related
17 to the discussions between the traders
18 and I just want to ask a question to --
19      MR. STERN: No, no, no, no. I
20 don't think that that's established.
21      MR. HINE: Jack, fine. You have
22 your objection. Here's my question.
23      MR. STERN: I not only have my
24 objection but I'm going to instruct him
25 not to answer to the extent it goes

## Page 115

1 beyond the scope.
2      MR. HINE: You haven't even heard
3 my question.
4      MR. STERN: I'm just telling you.
5      MR. HINE: Can you just hear my
6 question before you instruct him not to
7 answer?
8      MR. STERN: I'm waiting. I'm
9 waiting. Go ahead. Ask your question.
10 BY MR. HINE:
11      Q. You've talked about some
12 discussions between the traders going on that
13 Friday between Lehman and Barclays folks,
14 correct?
15      MR. STERN: Objection. Objection.
16      MR. HINE: I'm just trying to --
17      MR. STERN: Look, he told you he
18 didn't -- you have the transcript saying
19 he didn't know --
20      MR. HINE: Jack, can I ask the
21 question before you coach him anymore.
22      MR. STERN: So I don't know why
23 you're trying to get the witness to
24 speculate.

## Page 116

1      J. YANG - HIGHLY CONFIDENTIAL
2      MR. HINE: I want him to say
3 whether he has any understanding --
4      MR. STERN: You want him to say
5 what you want him to say but he's told
6 you he doesn't know. He doesn't know.
7      MR. HINE: Let me ask the
8 question, I'll get him to say that, and
9 we'll move on.
10 BY MR. HINE:
11      Q. Do you know what was being
12 discussed between the Barclays and Lehman
13 traders on Friday that afternoon of the 19th?
14      MR. STERN: Objection. Asked and
15 answered.
16      A. No.
17      Q. No.
18      A. No.
19      MR. STERN: Are we done?
20      Q. Do you know anything further than
21 what you've just told me about a marking
22 process that took place on Friday, September
23 19th?
24      MR. STERN: Objection. You can
25 answer if you know anything further

## Page 117

1      J. YANG - HIGHLY CONFIDENTIAL
2 about the process referenced in 351B.
3      THE WITNESS: Um-hum.
4      Q. Now that your counsel has coached
5 you do you have an answer?
6      MR. STERN: You can answer that
7 question. You can answer the question
8 if you know anything further about the
9 process that's referenced in 351B.
10      A. Nothing that we haven't discussed
11 already.
12      Q. Do you have any knowledge of any
13 marking process on the afternoon of Friday,
14 the 19th, beyond what was referenced in 351B?
15      A. No.
16      MR. HINE: Fair enough. I'm done
17 because basically -- and I want to state
18 again I think you've unduly restricted
19 the scope of this deposition but given
20 those restrictions you've placed I'm
21 done. But I think Hughes Hubbard might
22 have a question or too.
23      MR. STERN: Okay. Well, we can
24 agree to disagree.
25      MR. HINE: Fine.

Confidential

Page 118

1        J. YANG - HIGHLY CONFIDENTIAL
2            MR. STERN: Do you have questions?
3            MR. McCOUBREY: I have a couple of
4        questions.
5    EXAMINATION BY
6    MR. McCOUBREY:
7        Q.   Mr. Yang, you testified a little
8    bit about a successor list to 351B, correct?
9        A.   Yes.
10       Q.   And that successor list reflected
11   securities that Barclays received on Friday,
12   right?
13       A.   I understand it to include those.
14       Q.   Okay. It included those?
15           And among those were included
16   some, if not all, of the 1.9 billion of
17   unencumbered assets that were conceptualized,
18   right?
19           MR. STERN: Objection to the form.
20       I don't understand that.
21       A.   The problem is 1.9 is a number.
22   It was never completely clear to me how that
23   was going to be transferred to Barclays in
24   terms of which exact population of securities.
25   So I don't --

Page 119

1        J. YANG - HIGHLY CONFIDENTIAL
2        Q.   Did you understand that that
3    included unencumbered assets?
4        A.   Well, I understood that included
5    assets that weren't transferred on Thursday,
6    as part of the repo transaction.
7        Q.   Did you understand whether any
8    assets that were not part of the repo
9    transaction were transferred on Friday?
10           MR. STERN: One second. One
11       second. One second. What topic does
12       this relate to?
13           MR. McCOUBREY: This relates to
14       topic 4, the marking process and
15       specifically the successor list to 351B.
16       I'm trying to find out exactly what was
17       on that successor list.
18           MR. STERN: Well, I don't think
19       that's what you've asked.
20           Let me hear the question again.
21           MR. McCOUBREY: Actually, I'll
22       rephrase the question.
23   BY MR. McCOUBREY:
24       Q.   Did that successor list include
25   securities that had been transferred to

Page 120

1        J. YANG - HIGHLY CONFIDENTIAL
2    Barclays beyond those that were transferred
3    with respect to the repo transaction?
4        A.   I think a complete answer to
5    that -- a precise answer to that is beyond the
6    scope of my knowledge.
7        Q.   You don't know?
8        A.   I just -- I knew the assets that I
9    was getting. But I don't know -- I don't know
10   the details of the repo transaction.
11       Q.   Okay.
12       A.   So I guess that's why I can't
13   answer that.
14           MR. McCOUBREY: And beyond that
15       I'd just like to confirm that your
16       counsel is going to limit the scope of
17       the deposition with respect to any
18       questions that I have similarly to how
19       he did with respect to Mr. Hine's
20       questions.
21           MR. STERN: Yes, I can confirm
22       that.
23           MR. McCOUBREY: Okay. We also
24       object to that and we'll reserve our
25       rights in that regard.

Page 121

1        J. YANG - HIGHLY CONFIDENTIAL
2            MR. STERN: Okay. We're done.
3            MR. HINE: Thank you, Mr. Yang.
4            (Time Noted:   11:39 a.m.).
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19   _____
20        JASEN YANG
21
22   Subscribed and sworn to before me
23   this ____ day of _____, 2009.
24
25

Confidential

| Page 122 | Page 123 |
|---|---|

Page 122

1
2          C E R T I F I C A T E
3   STATE OF NEW YORK   )
4             : ss.
5   COUNTY OF NEW YORK   )
6          I, FRANCIS X. FREDERICK, a Notary
7   Public within and for the State of New
8   York, do hereby certify:
9          That JASEN YANG, the witness whose
10  deposition is hereinbefore set forth,
11  was duly sworn by me and that such
12  deposition is a true record of the
13  testimony given by the witness.
14          I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage, and that I
17  am in no way interested in the outcome
18  of this matter.
19          IN WITNESS WHEREOF, I have
20  hereunto set my hand this 4th day of
21  September, 2009.
22
23          _____
24          FRANCIS X. FREDERICK
25

Page 123

1
2   ----------------- I N D E X -----------------
3   WITNESS        EXAMINATION BY    PAGE
4   JASEN YANG       MR. HINE        4
5                    MR. McCOUBREY   118
6
7   ---------- INFORMATION REQUESTS ------------
8   DIRECTIONS: 33
9   RULINGS: NONE
10  TO BE FURNISHED: NONE
11  REQUESTS: NONE
12  MOTIONS: NONE
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 124

1
2   ----------------- EXHIBITS -----------------
3   EXHIBIT               FOR ID.
4   Exhibit 349B
5   document bearing production
6   numbers BCI-EX-00070958
7   through BCI-EX-00070961................ 52
8   Exhibit 350B
9   document bearing production
10  numbers BCI-EX-00012161
11  through BCI-EX-00012162................ 65
12  Exhibit 351B
13  document bearing production
14  numbers BCI 000878 through
15  BCI 000879 with attachment.............. 72
16  Exhibit 352B
17  document bearing production
18  numbers BCI-EX-00013019
19  through BCI-EX-00013186................ 85
20  Exhibit 353B
21  document bearing production
22  numbers BCI-EX-(S)-00055573
23  through BCI-EX-(S)-00055574............. 101
24
25

Page 125

1
2   NAME OF CASE: LEHMAN BROTHERS
3   DATE OF DEPOSITION: SEPTEMBER 4, 2009
4   NAME OF WITNESS: LEHMAN BROTHERS
5   Reason codes:
      1. To clarify the record.
6     2. To conform to the facts.
      3. To correct transcription errors.
7   Page _____ Line _____ Reason _____
    From _____ to _____
8
    Page _____ Line _____ Reason _____
9   From _____ to _____
10  Page _____ Line _____ Reason _____
    From _____ to _____
11
    Page _____ Line _____ Reason _____
12  From _____ to _____
13  Page _____ Line _____ Reason _____
    From _____ to _____
14
    Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
    From _____ to _____
17
    Page _____ Line _____ Reason _____
18  From _____ to _____
19  Page _____ Line _____ Reason _____
    From _____ to _____
20
    Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
    From _____ to _____
23
24          _____
            JASEN YANG
25

32