# BCI EXHIBIT

# 141

# Exhibit Omitted

# BCI EXHIBIT

# 142

## Acquisition Balance sheet summary

| | Cash $'m | Equity $'m | Total $'m | Source |
|---|---|---|---|---|
| OBS Compensation accrual | 1,700 | 300 | 2,000 | APA |
| **Payments** | | | | |
| Pre 22/9 payroll items | (12) | - | (12) | Payroll records |
| Replacement RSUs | (11) | - | (11) | New RSUs granted as replacements for Ex-Lehman employees granted to them in 2008 prior to the acquisition - Barcap value 50% of Lehman face value representing a 50:50 split to the employee of write off and replacement |
| Bonus including social tax | (1,271) | (258) | (1,529) | TCR 23 Feb 2009 |
| IBD Grad programmes | (11) | - | (11) | Off cycle IBD grad programme payments paid in June 2009 |
| Severance | (238) | - | (238) | RIF & VIG list from HR |
| | (1,543) | (258) | (1,801) | |
| **Payable in future** | | | | |
| Severance | (27) | - | (27) | RIF and VIG list from HR and includes 25% for benefits for RIF |
| Payroll tax on Equity compensation | (9) | - | (9) | 1.79% of Equity compensation |
| Acquisition Buyout vesting over 2 years | (53) | - | (53) | Bonus relating to performance for 1 Jan to 22 Sept 08 but with future time serve criteria and with a portion linked to future production with 2 payments of $20m in equal tranches Feb 10 and Feb 11. |
| Payroll taxes on Acq buyout | (3) | - | (3) | and $13m to be delivered effectively in Feb 10 |
| | (92) | - | (92) | |
| **Other Items** | | | | |
| ISP awards | - | (55) | (55) | Additional shares awarded @ 25p share to compensate for loss in value of 2008 EPP awarded |
| Payroll taxes on ISP awards | (2) | - | (2) | |
| | (2) | (55) | (58) | |
| **Total spend** | (1,638) | (313) | (1,951) | |
| **Balance left- Cash basis** | 62 | (13) | 49 | |

Highly Confidential

EXHIBIT
PENGAD 800-631-6989
2 8/6
5/27/64

BCI-EX-00115843

# BCI EXHIBIT

# 143

10,000 employees ·· 4,000 ·· 900,000

Barclays will pay severance

Paying up Comp accrual.

Pension + 401k   } staying behind.
   ↳ Fully Funded

Executive & Select Employee Plan  ——
                                        slow - This    14B

_IMD Disc_

End of July started calling majority stake ·· 55%
        16 - 17 players
        15 NDAs
        11  1st Round: Bids from 10 ; Selected 5
        5-6 starting ; 3 NDAs — 1 round robot
        Changed to 50/50 split ·· the final on Round 6 Issues.
        Last Round ·· Bids From 4 (only calls For 3)
            Bain, HOF, Silverlake, CVC

2800 AUM
        High Net Worth bases    —→ huge attaches   PIM      | IB
        Liquidity business    ·· probably shut down.          | Capital Contracts
        ~~Silverlake~~
        Neuberger Berman   ·· equities
        ~~LBATs~~ LBAIM  —  ~~held~~ Lehman Bros Cals & consulting
            FCG
        LBAM ·· Fixed assets

_Not included:_
        Fixed product sales & trading  ⇒ Going to Barclays
  * Already invested in Lehman Cals ·· 1 Reshma, Spencer



1.5 b $\frac{7}{6}$ engaged Lehm contracts

NAV --
    LP - 2.3 B invtd s, Lehm (embedded Value 2+ ?)
      24 b $\frac{7}{6}$ assts und mgt.
    Crossroads - Ful $\frac{7}{6}$ fds in PE
      400 professionals - silo di: sur( fud.

Nen initiatives - Europe, Asia, Corp.

PIM
    Asset mgt - susyd relentivs,
    PE

Rest esizing litigns
Comnt prucu
Timle chts

Comml Re
Pincpl Trntnts
Frepn Subs
Banks
Law Suits     - Koreans (Sank cap:)
          - Dutch distrt
          - JP Morgan (ish g crass collctd)

Unwind of retained Lodc - derivatves

Eagle Enrgy     / Loan bok
Imperil Sugar

Confidential

HLHZ0038188

**Confidential**

**HLHZ0038189**

45.5 Long
All shorts closed out (duplicate)
Lean is @ 45.5
RE --- losing 100mm
Comp & Screen
Losing the upside in the portfolio
No Cash
350 PIM Broken
        Paid  220    300
        Crunch  110   150
              ─────   ─────
               330    450

20-30b closed out.
dops -                    Broken arrangement
Amer - 1 to 2%
Paribas   3 - 5%
Corp.   5 - 10%           47.5
Illiquid                 45.5

                         2 Cut
DTC -- Trade closings now   2 Employer
FX z currency

⚹ 250mm -- BD
⚹ Lehm None
⚹ Contracts

No Residential Mortgages
50,000

Confidential                                    HLHZ0038190

72 % A
68 % L
2.25 K
~
250
950 - 1 %
450
Yes
No

Core
Early Comp Serv
Grad--- II
745 7th Ave
NJ Data
Profit Sharing
DTC Settlements

47.4 B A
45.5 6 L
2.25
~
250
950 - 18
No
Yes

Purchased Assets
      LB Canada Inc.
      LB Start Forms  } PIM Business
      LB Urging
2 year license for Lehman
IMD proprietary license
No sharing of Residential Mortg.
No purchase of Eagle Energy

Over the Counter derivatives are not being taken

**Confidential**                    **HLHZ0038191**

# BCI EXHIBIT

# 144

Exhibit
563 B
KK 1-15-10

9/29 Mtg  Alix, Ron Miller, Paulo

Barclay's Got.

Barclay's Agreement — Clarification Agreement addendum to APA

Barclay Financing Collateral — $44 Billion

Fed settled  $28.7  + DTC  $15.4  (2 files)

Reps → sell to you securities / agree to buyback
        Sent $2.9 4 8Billion
    (H) ←————— (B)

DTC 074        $900 + $300 = $1.2 Billion

Friday  Hangles SONY  Records agred
Monday  [ File hogs ]                    F/N

I   Leadsheet Barclay Collateral   44 < 28.6 / 15.4

    Unconcular          1.3
                        1.0
                        ——

II  Sort subtotals   Miami
                     CS.

III  Exhibits
     Detailed File.

Richard   | Total # & #of Employees | → S IPA Trustee  Get approval to make pmts
          LBI exhibits  Trustee's lawyer.
          └→ agreed

AM 004887

Bodmiller

Alex Kirk -

Wed night Fed lent $45 Billion thru Chase, tri party repo
     ↳ couldn't finance position

Thurs told Barclays we want you to take + us out of lending facility

$62-65 Billion Bls

Barclays gave to JPM $45 Billion cash ← 7 Billion cash
got all collateral at Fed                38 Billion fund on repo
                    consideration
$45 Billion purchase by Barclays on Thurs morning thru JPM
     on repo contract on all assets funded by Fed.

$76.1          $38 Bil to purchase assets
JPM said a repo or other $8
Barclays pays $45 gets what in collateral

6 20100048

Lori, Rfe

Deliver to Bank of NY

who is supposed
to stat in



AM 004889

1st Repo w/ Feb Monday, 9/15        $48-49

Liab ] →lfd
$45B  Assumed Extinguished Liab
$1.78
$250 mn @ DTC
└ guar to LB I

$1.79  1.54 Included  1.29
250 mn

Took hit for .76
$3.1  One period — $1.5  over curve period
one period  $1.6

pd $38

Pd $38 cash  to buy  $88 B  assets  $429 Lehman Value Differentiation
                              $5.1
$38  Valued assets

1.9 Unencumbered securities
769 securities from back up

AM 004890

4734    (PR)    (IMD)

Assets

| | | Liab | | |
|---|---|---|---|---|
| Repo | $38 | Extinguish | $38 | -Bi- lateral |
| | 5 | | | |
| | 43/8 | | 0.0 | |
| Unencumbered | 1.9 | Bldg | 1.79 incl (250) | |
| Securities | 0.8 | Cure | 1.6 | |
| Bldgs incl Data Center | 1.54 | Compensation | 1.5 | |
| Total assets | $47.34 | Real Estate | 3.45 | |
| | | | $47.34 | |

8      <10>
8 <7.6>

$23B - JPM funded.

**Pre-Clearing Collateral**
9/17
Wed    $15.8 provided facility Barclays Barclays funding of collateral
Thurs    people at Barclays assumed JPM will fund again but Barclays
said no we will not fund again.

JPM $15.8 exposure
Will get much less
SIPC Trustee has to cooperate to liquidate free assets.
15: +7= 23 @ Holdings 150 or so Billion
No connection

Took week before closing; Barclays
Have → JPM Collateral

                    JPM
Bi- lateral Return or Tri-Party (3 parties    Borrower
                                              Lender
                                              Agent)

AM 004891

Paula Treasury Sub.
Barclays  Chase  BoNY
JPM lehman clears JPM

LBI & LBIE

Rollforward b/s.  dB am

$48 \rightarrow 45 \rightarrow$ #3,1 $\rightarrow 38B$
          $8,6$     $<1.5>$
          $<7.0>$

AM 004892

# BCI EXHIBIT

# 145

**DEPOSITION EXHIBIT**
562-0
1/15/10

**Jim Hraska 30(b)(6) Deposition Notes**

<u>TOPIC 32:</u>  **Schedule B to the Clarification Letter including:**

*a) the origin of Schedule B, including who compiled it;*

Schedule B was referenced in the Clarification Letter and represented the parties' best effort, based on the information available at the time, to list the "clearance box" securities that Barclays was entitled to receive. Because there was imperfect information, when Schedule B was filed with the Court, the parties agreed that Barclays retained its right to amend or supplement that list.

Schedule B was compiled by many people, including Anthony Crispino, William Parrinello, James Hraska, Nancy Denig, Paolo Tonucci, Robert Azerad, and various individuals at the Weil Gotshal firm, including David Murgio.

*b) the methodology for compiling it;*

Before the Closing, Lehman operations and finance personnel had attempted to create a list of assets in Lehman's clearance boxes that excluded all customer or affiliate assets that were fully paid for. A portion of the assets on that list were assets in LBI's DTC clearance box that had been pledged to BoNY for the benefit of Barclays on September 19, 2008. The remainder of the list was compiled by identifying positions that were designated as LBI firm inventory and LBI stock borrow.

After the Closing, those same individuals and others attempted to verify that the assets on that list either had been transferred (on the 19th, the 29th, or the 30th) or showed on Lehman's stock record as available to be transferred. There was also an attempt to identify any additional assets in Lehman's clearance boxes that were not customer or affiliate assets that had been fully paid for. Schedule B was the result of those processes.

*c) how Barclays has analyzed Schedule B, including how any analyses were performed by Barclays, how Barclays concluded that the securities listed on Schedule B were in LBI's clearance box, and any other results of any analyses;*

Barclays is not aware of any non-privileged analyses of Schedule B.

Barclays' conclusion that the securities listed on Schedule B were in LBI's clearance boxes was based on the selection criteria described above which were known to the former Lehman personnel who had devised and applied them.

*d) how the quantity shown on Schedule B was determined if multiple accounts showed ownership; and*

1

The quantity was netted by CUSIP because Lehman operations and finance personnel were confident that the selection criteria for the assets on the list excluded any customer or affiliate assets that were fully paid for.

*e) the review referred to at page 3 of the Granfield Letter that was used to determine that the assets referred to as "Undelivered Clearance Box Assets" belong to LBI, as opposed to LBHI or any other subsidiary, at the time of closing.*

To the extent that that statement in the Granfield Letter applies to assets listed on Schedule B, Barclays confirmed that the assets belonged to LBI, as opposed to LBHI or any other subsidiary, by confirming with the personnel who had participated in compiling schedule B that the selection criteria excluded all customer or affiliate assets that were fully paid for. To the extent that that statement referred to Exhibits A & B, the methodology employed in creating those Exhibits excluded all customer or affiliate assets that were fully paid for.

**TOPIC 33:** **Exhibits A & B to the Granfield Letter, including:**

*a) who prepared each exhibit and the methodology used to prepare each exhibit;*

The individuals primarily involved in the creation of Lists A, B1, B2 and C were:

| | |
|---|---|
| James Hraska | Mid Office Operations |
| Anthony Crispino | Settlement Operations |
| John Vergel de Dios | Treasury |
| Colin Telmer | Treasury |
| Josie Ocreto | Technology |
| Robert Azerad | Treasury |

Exhibit A reports the results of List A. Exhibit B reports the results of List B1. Exhibit C reports the results of a subset of Lists B2/C (sometimes referred to as Lists B2 and C).

*b) any differences between each exhibit and Schedule B, including the reasons for such differences, and any changes that occurred between the creation or preparation of Schedule B and the exhibits;*

As described below, Exhibits A, B, and C were prepared using a different methodology to obtain a more direct access to the LBI stock record. Differences between the exhibits and Schedule B may be due to the different methodology employed, transactions occurring after the creation of Schedule B, or data issues.

Inventory Only    ( List A)

Source
Used stock record from TMS as the master source

2

Selection Criteria

1. LBI Entity (Company 12)
2. All Inventory Account Ranges (930 / 931 )
3. All Firm Depot Ranges (000 / 090 / 097 )
4. The only position on the stock record were cusips in depot and inventory ranges.

Report Rules:
1. If the summary of the firm depot balances and the summary of the Inventory range
were equal, then show the inventory as available.

Definition of Criteria / Rules
1. Performed by Mid Office / Treasury

Definition of Ranges
1. Performed by Clearance

Download of Data
1. Performed by Technology

Application of Rules
1. Performed by Technology

Creation of Report
1. Performed by Technology / Treasury


Inventory comingled with customer      (B1, B2)

Selection Criteria

1. LBI Entity (Company 12)
2. All Inventory Account Ranges (930 / 931 )
3. All Firm Depot Ranges (000 / 090 / 097 )
4. All Other Ranges (Customer)
5. Remove positions that fall into Inventory Only Criteria (List A)

Report Rules:  (To Separate out Firm vs. Customer positions)

B1
1. Summarize the Customer positions (all customers)
2. Subtract Step 1 results from Depo Position (to reserve positions for all customers)
3. From the Remaining Depot Balances take the lesser of the Summary of the Inventory
Positions (931 Range) or Remaining depot balance.

B2

3

1. Identify Prime Broker Customer subset from Step 1 above. (732 Range)

Definition of Criteria
1. Performed by Mid Office / Treasury

Definition of Ranges
1. Performed by Clearance

Download of Data
1. Performed by Technology

Application of Rules
1. Performed by Treasury via Excel Utilities

Creation of Report
1. Performed by Treasury

Customer Only    ( List C)

Source
Used stock record from TMS as the master source

Selection Criteria

1. LBI Entity (Company 12)
2. All Firm Depot Ranges (000 / 090 / 097 )
3. All Other Ranges (Customer)
4. The only positions on the stock record were cusips in depot and customer ranges


Report Rules:
1. Show securities where the summary of the firm depot balances and the summary of the
Customer range were equal.
2. Select only PB range (732)

Definition of Criteria / Rules
1. Performed by Mid Office / Treasury

Definition of Ranges
1. Performed by Clearance

Download of Data
1. Performed by Technology

Application of Rules

4

1. Performed by Treasury via Excel Utilities

Creation of Report
1. Performed by Treasury

Customer Based Firm Entitlements     ( List B2/C)

Source
Used stock record from TMS as the master source / Excel results above

Selection Criteria

1. Result set of B2 and C from above
2. 732 Account Cash Balances (Dr and Cr) from TMS

Report Rules:  (allowed rehypothecation up to 100% of Dr balance)

1. Eliminate all accounts with Credit Balances
2. Select all securities in accounts where the Marked Value of the securities was less
than the Debit balance
3. Select a prorata portion of all securities equally weighted, where the Marked Value of
the securities was greater than the Debit balance up to the value of the Dr balance.


*c) the listing of short positions in Exhibit A without offsetting long positions;*

Clerical error.

*d) how the amounts requested were determined in Exhibit B, including (i) the inclusion
of, in some instances, more than 20 accounts for an individual security; and (ii)
whether the amounts included in Exhibit B are net of customer long positions or
represent the gross amount of securities without deduction for customer long positions;*

The amounts requested in Exhibit B were determined using the methodology outlined
above for List B1.

The inclusion of multiple accounts for an individual security reflects the fact that multiple
trading accounts held that individual security.

Exhibit B does not include any customer positions.

*e) any documentation supporting the calculation for the securities in Exhibit B; and*

Exhibit B is the printed output of a spreadsheet.

5

*f) who determined whether the securities on Schedule B, Exhibit A and Exhibit B are unencumbered, how that determination was made, and any documentary support obtained or prepared in the process of making that determination.*

Those determinations were made as described above. Schedules B and Exhibits A, B, and C are the printed output of spreadsheets.

# BCI EXHIBIT

# 146

# Deposition notes – general

- Assets not received on B/S – futures collateral @ foreign brokers)
    - OCC collateral
    - Unencumbered assets (A/B1)    app $3b
    - 15c3 or equivalent

- Assets not received ("not on B/S") – futures collateral @ affiliates  460
    - Unencumbered assets (B2/C)    162
    - P + I on A/B1    63
    - OCC LoC collateral    80
                                    $765m
        less: provisions (OCC), ½ P+I    ($126m)
                                    $639m

- APA approx 18/9
- Clar^n letter 22/9 from R Smith
- TAA with OCC

- 13/14 Sep – deal off, on, off

- 15/16 Sep – 745 deal support

EXHIBIT
399 A
9/10/09 TT
PENGAD 800-631-6989

# Deposition notes - OCC options

- 80/90 k positions
- Not booked until 7 Oct (legacy Lehman systems turned back on)
- Valuation team received unreconciled population 2 Oct.
- Issues of principle discussed through Nov/Dec
- FV ↓ approx $700m by 7/10
- Most pricing eventually from exchanges
- Iain Cooper in US to assist from late Oct
- ↑ attention ⇒ resolution/agreement
- (+) Margin posted by LBI @ OCC (23/9)
  - Cash $1,375,442,113.24
  - Govts $ 926,286,116.90    } Σ = $2,554m
  - LoC $ 252,200,000.00

## Futures

- Includes domestic and foreign exchanges (ind OCC 084)
- Valued by reference to exchange statements

- Items - £/mutual funds - margin held by LBI not @ exchange
  - T. Bills - margin @ brokers/exchanges (prop + cust)
- (5) → - Domestic exchanges - net debit/credit
  - Foreign brokers -        "
  - Affiliates (with each membership) ———— " —— (not recog^d)

Deposition notes — negotiation of clarification
letter + TAA

① Continuing to look into specific conversations/comm⁼s
re TAA. There were, as a minimum, communications between
reps of Barclays, SIPC Trustee + OCC who all agreed
to the TAA
[See emails from Ed Rosen, Cleary + spoke
with Ed]

② Ed received email from OCC (21/9) regarding
expected collections at the OCC on 22/9 — May
be information relevant to 2(c)(i) of TAA.
Continuing to look for any other info/analysis.
[from Ed Rosen]

③ We agreed to assume the settlement obligations for LBI
a/c's @ OCC + to acquire all assets + pos⁼s in
the a/c's including all margin deposit.
[from J. Hughes confirmation]

④ The fact that Barclays was acquiring LBI's exchange-
traded derivatives and associated collateral was
disclosed to LBHI, SIPC trustee, the Creditors' Committee,
and other interested parties in the APA, the Sale
Order, the Clarification Letter and in the TAA
(which was signed by the SIPC Trustee's lawyer).
In addition, Barclays believes that the information
was also discussed with the Creditors' Committee
and other interested parties on Friday September
19 and at other times before the closing of the
transaction. Barclays is continuing to investigate
any other disclosures.

5) We believe that outside counsel, Ed Rosen and Mike Mazzudin, reporting to Jonathan Hughes, represented Barclays in the negotiation and finalisation of the TAA. [Confirmed w/ J. Hughes + E. Rosen]

6) Barclays in continuing to look into any information regarding the early drafts of the clarification letter and the reasons for any changes made in each of those drafts.
[confirmed w/ J. Hughes]

# BCI EXHIBIT

# 147

### Preparation notes for January 13 deposition

*Margin*

*24. The acquisition balance sheets Barclays prepared that did not include OCC Margin.*

What was included on the acquisition balance sheet (and when) was a function of what information I personally had at any given time. Early on in my work, I had seen the relevant clause in the APA, so was aware there would likely be items related to exchange traded derivatives. However, I did not have information on what those items might be and whether they were significant amounts.

*25. The acquisition balance sheets Barclays prepared that included the OCC Margin, including the timing of and reason for such inclusion.*

I subsequently became aware, on a rolling basis, of estimates concerning exchange-traded options and associated margin that had been acquired and needed to be reflected. Still later, I became aware, again on a rolling basis, of estimates concerning the assets and liabilities associated with the futures business that had been acquired.

*(↳ margin?)*

The initial placeholder estimates were received verbally from Sean McKenna (options) and Tim Stack (futures), but it was known throughout this process that these were not the final amounts.

Even the very first (and roughest) estimates of net value I received on each of these categories were positive, and so must have included margin, although I did not have sufficient information to split out underlying components until later. The main factor which enabled more accurate estimates to be included in the acquisition balance sheet was securing additional resource to look into the items (two colleagues flew over from London to do so in mid October and mid November respectively).

The $80m 'derivatives' item included in the first 21 September balance sheet and some subsequent iterations did not relate to the exchange-traded derivatives component of the transaction that I reference above. Rather, this item was part of an initial list of inventory received from Robert Azerad (in his list, it was referred to as 'derivatives and other contracts').

*26. Any gain or loss booked by Barclays as a result of closing out LBI positions at the OCC, the cost of closing out those positions, and any Margin used in closing out those positions.*

### OCC OPTIONS

#### 074M and 074F Options

The total loss across both categories of options positions as of the time of acquisition, based on Barclays' price testing team's valuation work, was $1.027m billion. (Of this, $801.4 million represented the loss as of acquisition on the LBSF options. (Clark Decl. ¶ 5.).)  The total $1.1bn included in the acquisition balance sheet also

EXHIBIT
534-A
1|13|10  wb
PENGAD 800-631-6989

included a $77m provision against affiliate receivables arising on the close-out of affiliate OCC positions (see below).

Between 9/19 and 10/7 for LBI options and between 9/25 and 10/7 for LBSF options, these options and any related securities lost approximately $730 million in value. (Clark Decl. ¶ 8.)

Barclays has not tracked the Proprietary options positions separately from the other positions in its equity books since 10/7. Thus, there is no meaningful gain or loss information we can provide in relation to those options between 10/7 and whatever time those individual positions may have been closed out. (Clark, Bajana, and McInerny interviews.)

Non-affiliate Customer Options

Non-affiliate customer options were commingled with affiliate customer options in the 074C account and were also held in the 273C account.

Barclays did not book any gains or losses on non-affiliate customer options. Gains and losses were borne by the relevant customers.

*affiliate*

074C Affiliate Options

LBIE, LOTC, LBF, and LBSF options were commingled with customer options in the 074C customer account. (*Id.*)

Affiliate options in 074C continued to be processed on LBI's processing system and were closed out soon after the acquisition. (Dziemian Decl. ¶ 12) The close-out of these options resulted in gains and losses to Barclays that were recorded as follows (Dziemian Decl. ¶ 14):

Net receivable from LBI based on LBIE options: $112.8 million.

Net receivable from LBI based on LBF options: $53.4 million.

Net payable to LBI based on LOTC options: $63.8 million.

Net payable to LBI based on LBSF options: $22.1 million.

This totals an aggregate net receivable from LBI across all 074C affiliate options: $80.3 million.

Including an additional net receivable from LBI in respect of OCC related costs up to 31 December 2008 ($24 million), this gives an aggregate net receivable from LBI including all of the above of $104.3 million.

Amount of loss recorded on acquisition balance sheet: approximately $77 million (a 75% provision against the $104m receivable).

Amount of loss recorded in late 2009 based on further write-off in connection with the above: approximately $28 million (remaining 25% of $104m receivable was written off).

## OCC FUTURES

LBI had no proprietary or market making futures positions that settled through the OCC. All futures positions that settled through the OCC were held on behalf of either LBI affiliates (in 084F) or non-affiliate customers (in 084C). (James and Dziemian Declarations)

Barclays recorded a $36 million loss in connection with the close-out of the 084F affiliate futures. (James Declaration)

Barclays did not book any gains or losses upon close-out of any non-affiliate customer options. Gains and losses were borne by the relevant customers.

## DRAWING ON MARGIN WHEN CLOSING OUT POSITIONS AT THE OCC

As a mechanical matter, OCC settlements are typically effected by drawing directly on assets contained in Barclays' DTC accounts.

The issue of whether the OCC drew on margin in closing out positions would not affect Barclays' accounting for gains and losses, since regardless of whether the OCC drew on margin or drew directly on assets contained in Barclays' DTC accounts, the effect would be the same for accounting purposes.

### DTCC/Clearance Box Assets

*27. The securities or other assets transferred or pledged (in each case, of record or beneficially), or planned or requested to be transferred or pledged, to Barclays or The Bank of New York Mellon, by LBI, at any time on September 18 or 19, 2008, including:*

*a) the value of such securities or other assets, including Barclays' valuation of any such securities or other assets;*

The table below summarises the information required for 27(a) and 28(b), by splitting the OBS inventory balance of $45.79bn:

| | September Schedule A $m | December settlement $m | Schedule B received $m | Schedule B not rec'd $m | Total $m |
|---|---|---|---|---|---|
| Initial Inventory: | | | | | |
| PCG mid | 41,807 | - | 798 | - | 42,605 |
| JPM Inventory: | | | | | |
| PCG mid | - | 3,918 | - | - | 3,918 |
| Accrued interest | 338 | - | 7 | - | 345 |
| Cash collateral received | 300 | - | - | - | 300 |
| Additional unencumbered assets | - | - | - | 707 | 707 |
| Valuation adjustment | (1,891) | (177) | (19) | - | (2,087) |
| | | | | | |
| Total | 40,554 | 3,741 | 786 | 707 | 45,788 |

[NB: the above breakdown does not include $1.25bn cash received as part of the December repo settlement with JPM]

The $786m Schedule B amount may be split as follows:

19th Sep (074) - $589m ✓ ——▷ *so gives 9/19 marked down big time*
29th Sep (636) - $174m ✓
30th Sep (7256) - $26m ✓

[Total $789m, so immaterial $3m difference]

*28. The transfer of securities from LBI's DTCC accounts 0074 and 0636 on or around September 26 to 30, 2008, including:*

... ... ...

*b) the value of any such transferred securities.*

See table above.

*30. The negotiation and drafting of the Clarification Letter, and of the DTCC Letter, regarding LBI's accounts, and the securities contained therein, at DTCC, including:*

...

*g) what cash and securities Barclays has received to date pursuant to the provision of the Clarification Letter that states that purchased assets shall include "such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser" ...*

$786m in securities.

*34. The securities transferred to Barclays pursuant to the Sale Transaction that were purchased by DTCC under DTCC's "honest broker" program, including:*

*a) the face value of the securities purchased by DTCC under the "honest broker" program;*

$49m (these are equity securities, so initial face/par typically has very little relationship to fair value).

*b) the price paid by DTCC for the securities purchased by DTCC under the "honest broker" program; and*

$1,715m.

*c) whether the securities purchased by DTCC under the "honest broker" program were the subject of a valuation discount or any other discount in Barclays' acquisition balance sheets, including Exhibit 377A.*

No discount – acquisition balance sheet value $1,732m.

*35. Any DTCC Security payment Order, SPO deposit, or DTCC Margin transferred from LBI to Barclays, including the date, reason and amounts of such transfers, and the disclosure of the transfers to the Court, the Trustee, and all other parties in interest.*

$300m was transferred on 18th September and represented the proceeds of repo collateral that had matured. John Rodefeld was verbally advised that this was to occur by a Lehman employee and we do not have information on the identity of the relevant security.

### Sale Transaction Accounting

*38. The person in charge of accounting for the Sale Transaction at Barclays, the persons who directly report to that person, and the persons to whom that person directly reports.*

Persons reporting directly to me – David Bell, Nicholas Stewart, Lee Bowell and Chris Coulbeck. Of these, only Lee Bowell had any involvement in the Lehman acquisition accounting.

At the time, reported to Hugh Shields (Head of SCM Finance), now report to Mark Merson (Financial Controller, IBIM and CFO, UK/EMEA).

*39. The sale or transfer of any Purchased Assets by Barclays, whether to other Barclays PLC entities or to non-Barclays entities, including when any such sale or transfer occurred, the valuation of any assets sold or transferred, and any profit or loss booked for such sale or transfer.*

Please see produced memo.

*40. The following exhibits, including how the exhibit was prepared, who prepared it, the source of the information contained in it, the method of calculation used to prepare it, why it was prepared, how it was used, what it reflects, and whether it reflects accurately what it purports to reflect:*

*a) Exhibit 86B (marked during the August 7, 2009 Rule 2004 deposition of Alastair Blackwell), including whether it accurately reflects the final summary valuation of "all of the Schedule A and Schedule B assets that were received around ... the time of the deal":*

Yes it is an accurate reflection in all material respects (86B includes a total of $40,690m, whilst the acquisition balance sheet includes $40,695m as summarized in 27(a) above). These are clean prices though – an additional $345m is included in the acquisition balance sheet in respect of accrued interest.

*b) Exhibit 87B (marked during the August 7, 2009 Rule 2004 deposition of Alastair Blackwell), including whether it reflects accurately the summary valuation of assets received by Barclays from JPMorgan Chase on December 22, 2008: and*

Yes it is an accurate reflection in all material respects (87B includes a total of $3,740m, whilst the acquisition balance sheet includes $3,741m as reflected in 27(a) above). The schedule includes only securities, i.e. not the two relevant cash amounts (the $300m amount covered in 35 above and the $1.25bn received as part of the December JPM settlement).

*c) Exhibit 88B (marked during the August 7, 2009 Rule 2004 deposition of Alastair Blackwell).*

This is the final acquisition balance sheet, with one clerical Excel error corrected in Exhibit 377A.

*41. Acquisition balance sheets created prior to Exhibit 377A (marked during the September 4, 2009 Rule 2004 deposition of Patrick Clackson), including how the balance sheet was prepared, who prepared it, the source of the information contained in it, the method of calculation used to prepare it, why it was prepared, how it was used, and whether the balance sheet accurately reflects what it purports to reflect. This topic includes the following balance sheets:*

*a) the spreadsheet beginning with bates stamp BCI-EX-(S)-00052479:*

An early version based on very early information I had at that date.

*b) Exhibit 361A (marked during the September 4, 2009 Rule 2004 deposition of Patrick Clackson);*

An early version based on very early information I had at that date.

*c) Exhibit 403A (marked during the September 10, 2009 Rule 2004 deposition of Gary Romain):*

An early version based on very early information I had at that date.

*d) the spreadsheet beginning with bates stamp BCI-EX-(S)-00052845; and*

An early version based on very early information I had at that date.

*e) the spreadsheet beginning with bates stamp BCI-EX-(S)-00052798.*

An early version based on very early information I had at that date.

*42. Exhibit 377A, including how the spreadsheet was prepared, who prepared it, the source of the information contained in it, the method of calculation used to prepare it, why it was prepared, how it was used, and whether the spreadsheet accurately reflects: "[T]he final version of the acquisition balance sheet ... which was disclosed in [Barclays'] 2008 financial statements."*

Yes, this is the final version.

*43. Exhibit 377A, including:*

*a) whether the "initial inventory - PCG mid" includes any securities transferred or pledged by LBI to Barclays on September 19, 2008;*

This balance includes all securities received around that time – see 27(a) above.

*b) the value of any securities transferred or pledged by LBI to Barclays on September 19, 2008 that are included in "initial inventory – PCG mid";*

$589m

*c) whether the "initial inventory - PCG mid" includes any securities transferred or pledged by LBI to Barclays between September 26 and 30, 2008;*

Yes

*d) the value of any securities transferred or pledged by LBI to Barclays between September 26 and 30, 2008 that are included in "initial inventory - PCG mid";*

$200m

*e) the difference between the face value of the "initial inventory – PCG mid" securities valued at $42.61 billion and the PCG valuation of those securities, including the reason for any such difference in value and the reason why such a difference is not reflected in Exhibit 377A;*

The difference is $45.5bn, due to the fact that the fair value of many assets was substantially different to face/par amounts. For example, illiquid assets, structured assets, distressed assets and equities. Face values were not included in 377A since they have no significance for acquisition accounting purposes.

*f) whether the £2.262 billion gain on the LBI acquisition includes the Margin to which Barclays claims entitlement, whether at the OCC or any other exchange;*

Yes, the £2.262bn gain reflects the Margin to which Barclays is entitled other than:

- Approx $470m of prop and customer related futures margin held at Lehman affiliates; and

-Approx $80m in OCC margin (LOC proceeds).

The exclusion of these items was reflective of our view on segregation and collectability at the time the 2008 results were being finalized, due primarily to the distressed financial status of certain LBI affiliate brokers that held portions of the futures-related collateral.

*g) Margin, collateral and derivatives positions at foreign exchanges, including:*

*1) their valuation;*

*2) what portion of the positions Barclays has received to date;*

*3) what portion of the positions Barclays believes it remains entitled to receive;*

The margin and collateral held at foreign exchanges, brokers, and clearing houses (i.e., excluding collateral held at domestic exchange, brokers, clearing houses) was valued as of the closing at approximately $1.2bn. We recognised all but $470m of that amount on the acquisition balance sheet (see (f) above).

To date, Barclays has received approximately $260m of the margin and collateral held at foreign exchanges, brokers, and clearing houses. (See Exhibit 2 to L. James Decl.) Barclays is entitled to the remaining approx $940m. (See Exhibits 1 and 3 to L. James Decl.) Liz James can speak in more detail concerning the received and outstanding collateral balances during her deposition on Thursday.

In addition, approximately $400m in margin and collateral was held at domestic exchanges, brokers and clearing houses.

Approximately $2bn of margin and collateral was held by LBI in the form of mutual funds and cash as security against customer obligations. The related customer accounts reflected offsetting liabilities to customers.

The open trade value of the proprietary positions traded on foreign exchanges (and certain non-OCC-cleared domestic exchanges) as of the closing was approximately negative $13 million. The open trade value of the customer positions traded on foreign exchanges (and certain non-OCC-cleared domestic exchanges) as of the closing was approximately negative $154 million.

*4) the basis of Barclays' claim to the positions;*

The governing contractual documents.

*5) whether Exhibit 377A includes all the positions and, if not, the nature and value of the positions that it does not include;*

Exhibit 377A includes all positions in proprietary and market maker accounts. It also includes all positions related to customers that became customers of Barclays (i.e. PIM and futures customers).

*6) the breakdown of such positions as between Margin, collateral and derivatives; and*

See 3 above.

*7) the bases for the "Futures customer payables" liability reflected at $2.60 billion in Exhibit 377A;*

A more appropriate title would have been "Futures related payables", since the amount (reflected in customer, exchange, and broker statements), represents amounts owing to customers, exchanges, and brokers in relation to positions and associated collateral. However, the large majority ($2.34bn) related to customer accounts.

*h) Margin, collateral and derivatives at the OCC, including their form and value, what Barclays has received to date, what Barclays believes it remains entitled to receive, whether any portion is not reflected in Exhibit 377A, any cost Barclays has incurred in liquidating or closing LBI's derivatives positions or accounts at the OCC, and the bases for the $1.10 billion liability in connection with "Exchange traded options - derivative MM" reflected in Exhibit 377A;*

Options (074 accounts):

Margin of $2,295m included in the acquisition balance sheet, margin of $40m excluded (letters of credit). The $2,295m was $1,328m cash and $966m treasuries. Barclays has not yet received $807m treasuries (30 Sep 2009 fair value) and $153m cash (mostly reflecting matured treasuries). The acquisition date fair value of the options positions held in LBI's firm and market-maker accounts at the OCC was ($1,027m).

Futures (084 accounts):

Margin $87m ($47m recognised in the balance sheet, $40m relates to LoC's not recognised). Cost of closing out affiliate positions $36m.

*i) clearance box or "unencumbered assets," including the value of the assets, what Barclays has received to date, what Barclays believes it remains entitled to receive, and whether any portion is not reflected in Exhibit 377A; and*

$786m received and included in the acquisition balance sheet, $707m included in the acquisition balance sheet but not received. $250m of securities and principal & interest not included in the balance sheet.

*j) assets Barclays claims it is entitled to receive, has not yet received, and did not include in Exhibit 377A, including those assets reflected on Exhibit 399A (marked during the September 10, 2009 Rule 2004 deposition of Gary Romain). "Assets not received (not on B/S)", "futures collateral and foreign brokers", "futures collateral @ affiliates", "Additional unencumbered collateral", "Unencumbered assets (B2:C)", "P+I on A:B1", and "OCC LoC collateral", including the value of such assets, the basis of Barclays' claim, and the reasons Barclays did not include the assets on its acquisition balance sheet.*

Nothing to add to earlier deposition notes (Exhibit 399A).

*44. Differences between and among the acquisition balance sheets referenced in topic 41 and Exhibit 377A, including the valuation of assets referenced therein.*

Information was gathered over time. The information available – especially during the first month or so was limited and changing.

*45. Any acquisition balance sheets created subsequent to the creation of Exhibit 377A.*

None.

*46. Differences between and among acquisition balance sheets referenced in topic 45 and Exhibit 377A, including the valuation of assets therein.*

Nothing further to add.

*47. The "[l]ess liquid" assets referenced on Barclays' acquisition balance sheets, including the valuation thereof, whether such assets are included in Barclays' reported gain on acquisition and, if so, what contribution such assets make to the reported gain on acquisition.*

I don't understand the question.

# BCI EXHIBIT

# 148

# DOCUMENT INFO

Name:       Exall info sent 1 5 10 v7.xls

Location:   W:\Projects\BSF\BSF AM1001 XXX\SOURCE\

Size:       17KB (16,384 bytes)

Modified:   Friday, January 15, 2010 3:54 PM

Comments:   UNSUPPORTED OR EXCLUDED FILE TYPE

# DOCUMENT INFO

Highly Confidential                                                    BCI-EX-00297181

| Last | First | Lehman Title | 2007 Salary | Currency | Cash Bonus | Stock Bonus | Currency | Lehman Title | LB entity (e.o. LBHI,LBI) | 2008 Barclays Title |
|---|---|---|---|---|---|---|---|---|---|---|
| Azrad | Robert | Head of Corporate Advisory | 200,000 | USD | 2,080,000 | 3,720,000 | USD | Director | LBI | Director, Strategy & Planning |
| Berkenfeld | Steven | | | | | | | Head of Corporate Advisory | LBI | Mng Director, IBD - Commitments & Credit |
| Blackwell | Alastair | Senior Manager, Operations | 135,000 | GBP | 1,190,288 | 1,400,000 | USD | Global Head, Operations | LBI | Mng Director, Operations Management |
| Dorrin | Gerard | | | | | | | Division Head | LBI | Mng Director, Global Head - Equities |
| Felder | Eric | | | | | | | Division Head | LBI | Mng Director, Head of Global Credit Trading |
| Gelband | Michael | | | | | | | Head of Capital Markets | LBI | Did Not Join |
| Hraska | James | | | | | | | Group Manager | LBI | Director, Global Financing Mid Office |
| Humphrey | Thomas | | 200,000 | USD | 560,000 | 240,000 | USD | Senior Manager | LBI | Mng Director, Head of US FICC Sales |
| Kelly | Martin | | 225,000 | USD | 6,235,000 | 10,540,000 | USD | Global Financial Controller | LBI | Mng Director, Chief Financial Officer Americas |
| Kirk | Alex | | | | | | | Head of Principal Investing | LBI | Did not join |
| Lee | Hyung | | | | | | | Division Head | LGS | Did not join |
| Lovitt | Ian | Co-CAO | 200,000 | USD | 2,650,000 | 4,650,000 | USD | CFO/cooCAO | LBI | Mng Director, Infrastructure Management |
| McDade | Bart | Global Head, Equities | 450,000 | USD | 9,550,000 | 18,000,000 | USD | President/COO | LBI | Did not join |
| McGee | Hugh/Skip | Global Head, IBD | 450,000 | USD | 8,550,000 | 14,000,000 | USD | Global Head, IBD | LBI | Mng Director, Head of IBD |
| Nagpal | Ajay | | | | | | | Senior Manager | LBI | ? Did not join ? |
| Shafir | Mark | | | | | | | Managing Director | LBI | Mng Director, Global Head of Prime Services |
| Shapiro | Mark | | | | | | | Managing Director | LBI | Managing Director - Head of Restructuring & Finance Group |
| Tonucci | Paolo | | 135,000 | GBP | 891,664 | 840,000 | USD | Treasurer | GBL | No Corp Title, Head of Group Balance Sheet |

# BCI EXHIBIT

# 149



## Executive Committee Biographies

**Patrick Clackson**
*Managing Director, Chief Financial Officer Corporate and Investment Banking and Wealth Management*



Patrick Clackson is a Managing Director and Chief Financial Officer of Corporate and Investment Banking and Wealth Management, comprising Barclays Capital, Barclays Corporate and Barclays Wealth, based in London. He also has responsibility for the Corporate and Investment Banking and Wealth Management Strategic Planning team. Mr. Clackson is a member of the Executive Committee of Barclays Capital.

He joined Barclays Capital in December 1996, became CFO in 2003 and CFO of Barclays Wealth in 2005.

Mr. Clackson was formerly CFO at Sumitomo International plc. Prior to that, he was with Coopers & Lybrand where he qualified as a Chartered Accountant and focused on financial markets consultancy work (clients included Salomon Brothers and Goldman Sachs).

© Barclays Bank PLC 2010

# BCI EXHIBIT

# 150


**BARCLAYS**
CAPITAL

Home > About Barclays Capital > Our Firm > Executive Committee Biographies > Robert E. Diamond Jr

# Robert E. Diamond Jr

**Robert E. Diamond Jr.**
**President of Barclays PLC and CEO of Corporate and Investment Banking, and Wealth Management**



Robert E. Diamond, Jr. is President of Barclays PLC and Chief Executive of Corporate and Investment Banking, and Wealth Management, comprising Barclays Capital, Barclays Corporate and Barclays Wealth. He is an Executive Director of the Boards of Barclays PLC and Barclays Bank PLC and has been a member of the Barclays Group Executive Committee since September 1997. He joined the firm in summer 1996.

Mr. Diamond is also a Board Member of BlackRock following the integration of Barclays Global Investors.

Mr. Diamond was formerly Vice Chairman and Head of Global Fixed Income and Foreign Exchange at CS First Boston. Based in New York, he was a member of the Executive Board and Operating Committee of CS First Boston.

Mr. Diamond joined CS First Boston in 1992. Based in Tokyo, he was Chairman, President and Chief Executive Officer of CS First Boston Pacific, responsible for Investment Banking, Equity, Fixed Income and Foreign Exchange for the Pacific region.

Previously, Mr. Diamond was Managing Director and Head of Fixed Income Trading for Morgan Stanley International, spending 13 years with the firm.

Mr. Diamond began his career as a lecturer at the School of Business, University of Connecticut from 1976-1977.

A native of Concord, Massachusetts, USA, Mr. Diamond received a Bachelor of Arts degree in Economics from Colby College in Maine (1974) and an MBA from the University of Connecticut, where he ranked first in his class (1977). He was awarded Doctor of Humane Letters from the University of Connecticut in 2006 and Doctor of Laws from Colby College in 2008.

His external affiliations include:

- Chairman, Board of Trustees of Colby College, Waterville, Maine
- Chairman, Old Vic Productions, Plc
- Trustee, The Mayor's Fund for London
- Member of the Advisory Board, Judge Business School at Cambridge University
- Board Member, The Diamond Family Foundation
- Member of International Advisory Board, British-American Business Council
- Life Member of The Council on Foreign Relations
- Member, The Atlantic Council
- Trustee, The American School in London

He is married with three children.

© Barclays Bank PLC 2010

# ❋ BARCLAYS

# Robert E Diamond Jr

President of Barclays PLC and CEO of Corporate and Investment Banking, and Wealth Management



**Position:** President of Barclays PLC and CEO of Corporate and Investment Banking, and Wealth Management

Robert E. Diamond, Jr. is President of Barclays PLC and Chief Executive of Corporate and Investment Banking, and Wealth Management, comprising Barclays Capital, Barclays Corporate and Barclays Wealth. He is an Executive Director of the Boards of Barclays PLC and Barclays Bank PLC and has been a member of the Barclays Group Executive Committee since September 1997. He joined the firm in summer 1996.

Mr Diamond is also a Board Member of BlackRock following the integration of Barclays Global Investors.

Mr Diamond was formerly Vice Chairman and Head of Global Fixed Income and Foreign Exchange at CS First Boston. Based in New York, he was a member of the Executive Board and Operating Committee of CS First Boston.

Mr Diamond joined CS First Boston in 1992. Based in Tokyo, he was Chairman, President and Chief Executive Officer of CS First Boston Pacific, responsible for Investment Banking, Equity, Fixed Income and Foreign Exchange for the Pacific region.

Previously, Mr Diamond was Managing Director and Head of Fixed Income Trading for Morgan Stanley International, spending 13 years with the firm.

Mr Diamond began his career as a lecturer at the School of Business, University of Connecticut from 1976-1977.

A native of Concord, Massachusetts, USA, Mr Diamond received a Bachelor of Arts degree in Economics from Colby College in Maine (1974) and an MBA from the University of Connecticut, where he ranked first in his class (1977). He was awarded Doctor of Humane Letters from the University of Connecticut in 2006 and Doctor of Laws from Colby College in 2008.

His external affiliations include:

- Chairman, Board of Trustees of Colby College, Waterville, Maine
- Chairman, Old Vic Productions, Plc
- Trustee, The Mayor's Fund for London
- Member of the Advisory Board, Judge Business School at Cambridge University
- Board Member, The Diamond Family Foundation
- Member of International Advisory Board, British-American Business Council
- Life Member of The Council on Foreign Relations
- Member, The Atlantic Council
- Trustee, The American School in London.

He is married with three children.

**You are here:  Home**

Barclays Bank PLC. Registered in England. Registered No: 1026167. Registered Office: 1 Churchill Place, London, E14 5HP. Barclays Bank PLC is authorised and regulated by the Financial Services Authority.

# BCI EXHIBIT

# 151

 **DTCC.**

**The Depository Trust &
Clearing Corporation**

About DTCC
# Board Bios

## Gerard LaRocca

### Managing Director, Chief Administrative Officer, Americas
### Barclays Capital

 GERARD LaROCCA is a Managing
Director and Chief Administrative
Officer, Americas, at Barclays
Capital. He is also the Chief
Executive of Barclays Capital US
Broker Dealer; Barclays Capital Inc
and the New York Branch Manager for Barclays Bank PLC.

Related Information

    DTCC's Board of Directors

    Download Hi-Res Photo

Based in New York, LaRocca joined Barclays Capital in 1998 as a Managing Director. From
November 1998 through June 2006 he managed Global Operations. From February 2000 through
December 2001, LaRocca served as Chief Financial Officer.

LaRocca has over 20 years of experience working in the financial services industry. He was
previously a Managing Director at Salomon Brothers.

In July 2003, he was appointed to the INROADS New York City Board of Directors. LaRocca has
been a Representative of the Financial Services Roundtable and a member on the Roundtable's BITS
Advisory Council since 2004.

In April 2006, he was appointed to DTCC's Board of Directors.

LaRocca received a BSc from Wagner College and an MBA from Pace University.

© 2010 The Depository Trust & Clearing Corporation

# BCI EXHIBIT

# 152



# Chris Lucas

Chris joined the Board on 1 April 2007. Chris came from professional services company PricewaterhouseCoopers LLP, where he was UK Head of Financial Services and Global Head of Banking and Capital Markets.



**Position:** Group Finance Director

Chris joined the Board on 1 April 2007. Chris came from professional services company PricewaterhouseCoopers LLP, where he was UK Head of Financial Services and Global Head of Banking and Capital Markets.

He was Global Relationship Partner for Barclays for the 1999–2004 financial years and subsequently held similar roles for other global financial services organisations.

Chris has worked across financial services for most of his career, including three years in New York as Head of the US Banking Audit Practice of PricewaterhouseCoopers LLP.

**You are here:   Home**

Barclays Bank PLC. Registered in England. Registered No: 1026167. Registered Office: 1 Churchill Place, London, E14 5HP. Barclays Bank PLC is authorised and regulated by the Financial Services Authority.

# BCI EXHIBIT

# 153



Home > About Barclays Capital > Our Firm > Executive Committee Biographies > Rich Ricci

# Rich Ricci

**Rich Ricci**
**Co-Chief Executive of Corporate and Investment Banking**

Rich Ricci is Co-Chief Executive of Corporate and Investment Banking. In November 2009, he became a member of the Barclays Group Executive Committee. He is also a member of the individual Executive Committees of Barclays Capital and Barclays Wealth.



Rich Ricci joined Barclays Capital in 1994 and assumed responsibility for several of its support areas. He became COO of Barclays Global Investors (BGI) and a member of the BGI Executive Committee in December 2002. In January 2005, Mr. Ricci was appointed COO of Barclays Investment Banking and Investment Management businesses comprising Barclays Capital, Barclays Wealth and BGI.

Prior to joining Barclays Capital, Mr. Ricci held senior front-office, finance and technology positions at the Bank of Boston and the Bank of New England.

Mr. Ricci holds a bachelor's degree in Finance from Creighton University.

© Barclays Bank PLC 2010

# BCI EXHIBIT

# 154

 **BARCLAYS**

# John Varley

John was appointed as Group Chief Executive on 1 September 2004, prior to which he had been Group Deputy Chief Executive from 1 January 2004.



**Position:** Group Chief Executive

John was appointed as Group Chief Executive on 1 September 2004, prior to which he had been Group Deputy Chief Executive from 1 January 2004.

He held the position of Group Finance Director from 2000 until the end of 2003. John joined the Executive Committee in September 1996 and was appointed to the Board in June 1998.

He was Chief Executive of Retail Financial Services from 1998 to 2000 and Chairman of the Asset Management Division from 1995 to 1998.

John is a non-executive director of pharmaceuticals company AstraZeneca PLC. He is also Chairman of Business Action on Homelessness, President of the Employers' Forum on Disability, President of the UK Drug Policy Commission and a member of the International Advisory Panel of the Monetary Authority of Singapore.

John is married and a father to two children.

**You are here:  Home**

Barclays Bank PLC. Registered in England. Registered No: 1026167. Registered Office: 1 Churchill Place, London, E14 5HP. Barclays Bank PLC is authorised and regulated by the Financial Services Authority.