# BCI EXHIBIT

# 155

THE OPTIONS CLEARING CORPORATION

ONE N. WACKER DRIVE, SUITE 500, CHICAGO, ILLINOIS 60606

WILLIAM H. NAVIN

EXECUTIVE VICE PRESIDENT, GENERAL COUNSEL, AND SECRETARY

TEL 312.322.1817    FAX 312.322.1836

WNAVIN@THEOCC.COM

October 14, 2008

**VIA FEDERAL EXPRESS**

James W. Giddens                                   Joseph Lodato
SIPA Trustee, Lehman Brothers Inc.                 SVP, Legal and Compliance
c/o Hughes Hubbard & Reed LLP                      Barclays Capital Inc.
One Battery Park Plaza                             70 Hudson Street
New York, New York  10004                          Jersey City, New Jersey  07302

Australia and New Zealand Banking Group            Bayerische Hypo-und
  Limited, New York Branch                           Vereinsbanks AG
1177 Avenue of the Americas                        150 East 42nd Street
New York, New York  10036                          New York, New York  10017

Bank of Tokyo-Mitsubishi UFJ,                      Lloyds TSB Bank plc
  Ltd., New York Branch                            1251 Avenue of the Americas
1251 Avenue of the Americas                        New York, New York  10020
New York, New York  10020

Ladies and Gentlemen:

    We wish to bring your attention to certain funds representing the proceeds of five letters of credit deposited as margin with The Options Clearing Corporation ("OCC") by Lehman Brothers Inc. ("LBI"), which is the subject of a pending liquidation pursuant to the Securities Investor Protection Act of 1970 ("SIPA").  The addressees of this letter include the SIPA trustee for the estate of LBI (the "Trustee"), Barclays Capital Inc. ("Barclays"), which  purchased LBI's options and futures accounts at OCC,  and the issuers of the referenced letters of credit (the "LC Issuers").  The letters of credit in question are as follows:

- No. S04743/8200 issued by Australia & New Zealand Banking Group Ltd NY Branch in the amount of $15,598,500.00
- No. S04744/8200 issued by Australia & New Zealand Banking Group Ltd NY Branch in the amount of $5,098,500.00

Page 2
October 14, 2008

- No. S015193 issued by Bank of Tokyo-Mitsubishi UFJ, Ltd NY Branch in the amount of $35,100,000.00
- No. NYSB2008730 issued Lloyds TSB Bank plc in the amount of $25,500,000.00
- No. SB237405 issued by Bayerische Hypo-unde Vereinsbank AG in the amount of $1.00

The letters of credit were issued in the standard form promulgated by the Unified Clearing Group. Under OCC's Rule 604(c), OCC has the right to draw upon a letter of credit deposited as margin "if the Corporation determines that such draw is advisable to protect the Corporation, other Clearing Members or the general public. If such draw is made without suspending the Clearing Member, funds received pursuant to the draw will be subject to the By-Laws and Rules applicable to deposits of cash margin." Each of these letters of credit was drawn down in full by OCC on September 19, 2008, without suspending LBI and prior to commencement of the SIPA proceeding, and the total proceeds thereof in the amount of $80,797,001.00 (the "LC Proceeds") are being held by OCC in a suspense account.

Under the terms of the Transfer and Assumption Agreement dated as of September 20, 2008, executed among OCC, the Trustee on behalf of LBI, and Barclays (see enclosed copy), LBI "sells, assigns, transfers, and sets over to Barclays . . . all of [LBI's] rights, title and interests, powers, privileges, remedies, obligations, and duties in, to, under, and in respect of" LBI's options and futures accounts at OCC (collectively, the "Account") "including with respect to: (i) the Clearing Fund deposit; (ii) all margin deposits held by OCC with respect to the Account; (iii) all settlement obligations with regard to transactions in cleared contracts; and (iv) all rights and obligations in respect of exercises of option contracts and assignments of such exercises." Barclays in turn "assumes and agrees to perform each obligation arising out of or to be performed with respect to the activity in the Account."

Because of the commencement of the proceeding under SIPA relating to LBI, the transfer of the Account to Barclays, the voluntary withdrawal of LBI from membership in OCC, and any potential ambiguity that any of these circumstances might create with respect to the ownership of the LC Proceeds, OCC has not given margin credit to Barclays for the LC Proceeds, nor has OCC released the LC Proceeds to Barclays. Based upon the documents cited above, it would appear that Barclays may be entitled to the LC Proceeds along with other margin assets in the Account that have been transferred to Barclays.

Notwithstanding the foregoing, it also seems that Barclays may have assumed LBI's reimbursement obligations to the LC Issuers with respect to amounts drawn under the letters of credit. Such a reimbursement obligation might be deemed to arise, for example, under the terms of the Transfer and Assumption Agreement in which Barclays assumed all obligations of LBI with respect to the Account (the letter of credit having been issued as margin for the Account). If that is the case, then Barclay's interest in the LC Proceeds would be offset by its reimbursement obligations to the LC Issuers. But if Barclays has assumed the reimbursement

Page 3
October 14, 2008

obligation, Barclays may also have succeeded to the benefit of any collateral held by the LC Issuers to secure the reimbursement obligation of LBI as if such collateral had been directly deposited with OCC as margin.

The Trustee also has an interest in the resolution of this matter. Even if the LC Proceeds were transferred to Barclays under the Transfer and Assumption Agreement, the reimbursement obligation to the LC Issuers would likely be an obligation of the estate of LBI if the obligation was not assumed by Barclays, in which case any collateral securing the obligation would likely also remain an asset of the estate.

We must also bring to your attention the fact that OCC has received a letter (copy enclosed) from Lovells, as counsel to Lloyds TSB Bank plc ("Lloyds"), stating that Lloyds believes that the proceeds from the Lloyds letter of credit should be returned to Lloyds on the grounds stated in the letter. Among other things, the Lovells letter states that "Lloyds is subrogated to the rights of LBI for the return of any unused Standby L/C Proceeds." An inquiry has also been received from Bank of Tokyo-Mitsubishi with respect to the disposition of the proceeds of their letters of credit. OCC is not aware of any legal obligation of OCC to return the LC Proceeds to the LC Issuers. Nevertheless, and for the reasons stated above, it may be that the most efficient resolution of the present situation is for all parties to agree that such proceeds be returned, that any collateral held by the LC Issuers, or the benefit thereof, be transferred to Barclays, and that the estate of LBI be relieved of any reimbursement obligation under the letters of credit.

OCC seeks to convene a meeting (in person or by conference call) of all interested parties with the hope of reaching a mutually agreed upon resolution of this matter. We are asking each of the addressees of this letter to identify a spokesperson with authority to address the issues on its behalf and to provide contact information to our outside counsel, Jim McDaniel of Sidley Austin LLP. Mr. McDaniel's e-mail address is jmcdaniel@sidley.com, and his telephone number is 312-853-2665. OCC would like to resolve this matter expeditiously and with the minimum cost to all parties.

Very truly yours,

The Options Clearing Corporation

By: _William H. Navin_
William H. Navin
Executive Vice President and General Counsel

Page 4
October 14, 2008


cc:      Carolyn B. Levine
         Hughes Hubbard & Reed LLP

         Christopher K. Kiplok
         Hughes Hubbard & Reed LLP

         Robin E. Keller
         Lovells
         590 Madison Avenue
         New York, New York 10022

         James R. McDaniel
         Sidley Austin LLP

         Jean Cawley
         OCC

### TRANSFER AND ASSUMPTION AGREEMENT

Agreement (the "Agreement") executed on September 20, 2008 with effect from and as of the close of business on Friday, September 19, 2008 among Lehman Brothers Inc. ("Lehman"), The Options Clearing Corporation, ("OCC", and Barclays Capital Inc. ("Barclays"). All defined terms (the first instance of which is indicated by underlining) not defined herein shall have the meaning assigned to such terms in OCC's By-Laws or Rules (collectively, the "Rules").

### WITNESSETH:

WHEREAS, Lehman is a clearing member of OCC and carries one or more accounts (nos. 74, 84 and 273 (collectively the "Account")) that contain certain positions in cleared contracts into which Lehman has entered;

WHEREAS, Lehman maintains Clearing Fund and margin deposits with OCC;

WHEREAS, Lehman desires to terminate its OCC membership and transfer its rights, obligations and liabilities under in and in respect of the Account pursuant to OCC's membership agreements and the Rules to Barclays, and Barclays desires to accept the transfer of all of Lehman's rights, obligations and liabilities under and in respect of the Account, including with respect to the Clearing Fund deposit and all margin deposits held by OCC with respect to the Account as of the effective date (the "Effective Date") of the consummation of the acquisition and assumption of certain assets and liabilities of Lehman by Barclays;

WHEREAS, OCC agrees to permit the transfer contemplated in the previous whereas clause;

NOW, THEREFORE, it is hereby agreed as follows:

1.    Transfer.

(a)    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lehman hereby sells, assigns, transfers, and sets over to Barclays, without recourse or without representation or warranty (other than as expressly provided herein), all of Lehman's rights, title, interests, powers, privileges, remedies, obligations, and duties in, to, under, and in respect of the Account, as of the Effective Date including with respect to: (i) the Clearing Fund deposit; (ii) all margin deposits held by OCC with respect to the Account; (iii) all settlement obligations with regard to transactions in cleared contracts; and (iv) all rights and obligations in respect of exercises of option contracts and assignments of such exercises.

(b)    As of the Effective Date, Barclays hereby accepts such sale, assignment, and transfer of the Account, agrees to be bound by and receive the benefits of maintaining such Account, and assumes and agrees to perform each obligation arising out of or to be performed with respect to the activity in the Account.

1

2.     Representations and Warranties.

(a)     Lehman and Barclays each hereby represents and warrants to the other and to OCC as follows:

(i)     it is duly organized and validly existing and has the power and legal right to execute and deliver this Agreement and to transfer or assume the rights and obligations being transferred hereunder, as the case may be;

(ii)     the execution, delivery and performance of this Agreement have been duly authorized by all necessary action; and

(iii)     this Agreement is legal, valid and binding agreement, enforceable against it in accordance with its terms.

(b)     Lehman hereby represents and warrants that it is the legal and beneficial owner of the interest being transferred by it hereunder and that such interest is free and clear of any adverse claim (except for such claims or interests of OCC).

(c)     Barclays hereby: (i) represents and warrants that it has received such documents and other information as it has deemed appropriate to make its own credit analysis and decision to enter into this Agreement; (ii) agrees that it will, independently and without reliance upon Lehman or OCC and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions with respect to the Account; and (iii) agrees that it will perform in accordance with their terms all of the obligations that by the terms of the Rules and any related agreements entered into between it and OCC, are required to be performed by it.

3.     Effective Date. This Agreement is being entered into on September 20, 2008, following the order of the United States Bankruptcy Court for the Southern District of New York (Manhattan) (Case No. 08-13555) approving execution of the Asset Purchase Agreement dated as of September 16, 2008, as amended on or before September 20, 2008, by Lehman and Barclays and the other parties thereto (the "Asset Purchase Agreement"); but this Agreement shall be effective as of close of business on the Effective Date.

4.     Rights. As of the Effective Date, all rights, obligations and liabilities of Barclays pursuant to OCC's membership agreements and the Rules shall apply to the Account.

5.     OCC Consent. OCC hereby consents to the transfer, assignment, assumption and release effected pursuant to this Agreement.

6.     Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to the conflict of law principles thereof.

2

[Washington DC #397038 v3]

7.    <u>Amendments and Waivers</u>.  This Agreement may be amended or any of its provisions waived only by a written instrument executed and delivered by each of the parties hereto.

8.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement by their duly authorized officers as of the date set forth above.

*James W. Giddens as SIPA Trustee for*
~~LEHMAN BROTHERS, INC.~~ *Lehman Brothers, Inc.*

By: _____

Print Name: *James B. Kobak, Jr.*

Title: *Attorney for Trustee*

**BARCLAYS CAPITAL INC.**

By: _____

Print Name: *Gerard S. La Rocca*

Title: _____

**THE OPTIONS CLEARING CORPORATION**

By: _____

Print Name: *WILLIAM H. NAVIN*

Title: *Executive VP*

CHI 4434679v.2

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT


**Lovells**

October 6, 2008                                            <u>**Via Email & Overnight Delivery**</u>

The Options Clearing Corporation
1 North Wacker Drive
Suite 500
Chicago, IL 60606

Attention:  Ms. Jean Cawley
            General Counsel

RE:    LLOYDS STANDBY LETTER OF CREDIT ON BEHALF OF THE OPTIONS CLEARING CORPORATION

Dear Ms. Cawley:

We have spoken on a couple of occasions over the last two weeks regarding this matter, and I am writing at Lloyds' request to ask for OCC's assistance in resolving the following issue:

On September 1, 2008, Lloyds TSB Bank plc ("**Lloyds**") issued Irrevocable Standby Letter No. NYSB2008730 (the "**Standby L/C**") in the amount of $60 million on behalf of Lehman Brothers Inc. ("**LBI**") for the benefit of The Options Clearing Corporation ("**OCC**").  A copy of the Standby L/C is attached hereto as <u>Annex A</u>.  As of September 18, 2008, the outstanding amount of the Standby L/C was $25 million.

On September 19, 2008, the Securities Investor Protection Corporation initiated a SIPA proceeding against LBI in the District Court for the Southern District of New York.  That same day, (i) OCC drew down the full amount of the Standby L/C (the "**Standby L/C Proceeds**"); (ii) Lloyds forwarded to LBI a reimbursement claim for the Standby L/C Proceeds (a copy of which is attached hereto as <u>Annex B</u>); and (iii) in connection with the sale of certain of LBI's assets to Barclays Capital, Inc. ("**Barclays**"), the Bankruptcy Court for the Southern District of New York entered an order approving and authorizing the assignment to Barclays of certain OCC clearing accounts which were formerly accounts of LBI (a copy of the court order is attached hereto as <u>Annex C</u>).  Subsequently, on September 22, 2008, OCC issued its Contract Adjustment Memorandum #24874, publicly confirming that the LBI accounts were indeed transferred to and assumed by Barclays.  A copy of the OCC memo is attached hereto as <u>Annex D</u>.  Upon information and belief, OCC continues to hold the Standby L/C Proceeds.

Lloyds believes that the Standby L/C Proceeds held by OCC should be returned to Lloyds on the ground that OCC no longer has any exposure to LBI since LBI's accounts and the obligations relating thereto have been assumed by Barclays.  Further, Lloyds is subrogated to the rights of LBI for the return of any unused Standby L/C Proceeds.

In our first conversation you advised us that OCC has identified the Standby L/C Proceeds and is holding them on account while it looks into this matter.  Lloyds asks that OCC hold the Standby L/C Proceeds in trust for the benefit of Lloyds, and advise us what if any further information you require in order to return the proceeds to Lloyds.  We believe that the return of the Standby L/C Proceeds would be without prejudice to OCC, Barclays or LBI.  We have advised Barclays through their

Ms. Jean Cawley                              - 2 -                          October 6, 2008

counsel of our position with respect to the Standby L/C Proceeds, and have asked them to confirm that they have no interest in the Standby L/C Proceeds. Barclays' counsel says they are still reviewing the questions but have not indicated any particular objection. Perhaps you have raised this with them also and if you are aware of their position, please let us know. We ask that OCC commence the process of return of the proceeds to Lloyds. If there are any facts relating to this situation which affect our conclusion, please let us know.

We look forward to speaking with you further.

Sincerely yours,

Robin E. Keller, Esq.

# BCI EXHIBIT

# 156



**Hughes Hubbard & Reed LLP**
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

James B. Kobak Jr
Direct Dial: 212-837-6757
kobak@hugheshubbard.com

November 14, 2008

<u>ELECTRONIC AND REGULAR MAIL</u>

James R. McDaniel, Esq.
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603

Dear Jim:

I write in response to your November 9, 2008 letter to the Trustee.

The Trustee is aware of the Transfer and Assumption Agreement, dated September 19, 2008, which of course I executed on his behalf, and the Trustee fully intends to comply with its terms. However, there remain between Barclays Capital Inc. and the Lehman Brothers, Inc. estate certain open issues and concerns surrounding the correlation between the deposited securities and the transfer of the options and futures positions they are intended to secure.

Our position is that this collateral can be transferred to Barclays (and the Trustee will gladly consent) if Barclays will live up to its bargain and assume the obligations involved for all customers, not just those in the so-called PIM accounts. We believe that this reflects both the letter and the intent of the Transfer and Assumption Agreement and certainly the Trustee's understanding when I signed that Agreement. However, this does not appear to be Barclays' understanding.

As we understand Barclays' position, it wishes to have all of the collateral transferred but to assume obligations only towards those customers whose accounts have been transferred to Barclays, and not those whose account have been transferred elsewhere or remain with LBI. This disposition does not, in our view, accord with the Transfer and Assumption Agreement and seriously impedes the Trustee's administration of the estate and ability to satisfy claims.

Δ π EXHIBIT 455
Deponent: Kobak
Date 2/7/0 Rptr: RK
WWW.DEPOBOOK.COM

60444585_4.DOC
New York    ■    Washington, D.C.    ■    Los Angeles    ■    Miami    ■    Jersey City    ■    Paris    ■    Tokyo

Confidential

HHR_00014574

Once the Trustee and his professionals, including Deloitte & Touche LLP, are provided with clear evidence and an undertaking by Barclays that the Deposited Securities are in fact collateral for transferred accounts as to which Barclays assumes all related obligations, we will promptly instruct J.P. Morgan Chase & Co. to transfer the deposited securities to Barclays in accordance with the OCC's instructions.  Otherwise the collateral should be divided in proportion to each entity's responsibilities and obligations toward the customers involved.

Sincerely yours,

James B. Kobak, Jr.

cc:    Kenneth Raisler, Esq.
        Counsel to Barclays Capital Inc.

       Harold S. Novikoff, Esq.
        Counsel to JPMorgan Chase & Co.

60444585_4.DOC

Confidential

HHR_00014575

# BCI EXHIBIT

# 157

CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS
LONDON · MOSCOW · FRANKFURT · COLOGNE
ROME · MILAN · HONG KONG · BEIJING

Writer's Direct Dial: (212) 225-2738
E-Mail: lgranfield@cgsh.com

MARK A. WALKER
LESLIE B. SAMUELS
ALLAN G. SPERLING
MAX GITTER
EVAN A. DAVIS
LAURENT ALPERT
VICTOR I. LEWKOW
LESLIE N. SILVERMAN
ROBERT L. TORTORIELLO
A. RICHARD SUSKO
LEE C. BUCHHEIT
JAMES M. PEASLEE
ALAN L. BELLER
THOMAS J. MOLONEY
JONATHAN I. BLACKMAN
WILLIAM F. GORIN
MICHAEL L. RYAN
ROBERT P. DAVIS
YARON Z. REICH
RICHARD S. LINCER
JAIME A. EL KOURY
STEVEN G. HOROWITZ
ANDREA G. PODOLSKY
JAMES A. DUNCAN
STEVEN M. LOEB
DANIEL S. STERNBERG
DONALD A. STERN
CRAIG B. BROD
WANDA J. OLSON
MITCHELL A. LOWENTHAL
DEBORAH M. BUELL
EDWARD J. ROSEN
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER
WILLIAM A. GROLL
JANET L. FISHER
DAVID L. SUGERMAN
HOWARD S. ZELBO
DAVID E. BRODSKY
ARTHUR H. KOHN
ANA DEMEL
RAYMOND B. CHECK
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
YVETTE P. TEOFAN
STEVEN L. WILNER
ERIKA W. NIJENHUIS
LINDSEE P. GRANFIELD
DAVID C. LOPEZ
CARMEN A. CORRALES
JAMES L. BROMLEY
PAUL E. GLOTZER
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
DAVID I. GOTTLIEB
LEONARD C. JACOBY
SANDRA L. FLOW
DANA G. FLEISCHMAN
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
MARGARET S. PEPONIS
LISA M. SCHWEITZER
KRISTOFER W. HESS
JUAN G. GIRÁLDEZ
DUANE McLAUGHLIN
BREON S. PEACE
CHANTAL E. KORDULA
BENET J. O'REILLY
RESIDENT PARTNERS

SANDRA M. ROCKS
ELLEN M. CREEDE
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
GABRIEL J. MESA
DAVID H. HERRINGTON
HEIDE H. ILGENFRITZ
KATHLEEN N. EMBERGER
NANCY I. RUSKIN
WALLACE L. LARSON, JR.
JAMES D. SMALL
AVRAM E. LUFT
RESIDENT COUNSEL

December 29, 2008

<u>By Email</u>

James Kobak, Jr. Esq.
Hughes, Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004

Dear Jim,

    We refer to the Asset Purchase Agreement dated September 16, 2008 (as amended, supplemented, modified or clarified) among Lehman Brothers Holdings Inc. ("<u>LBHI</u>"), Lehman Brothers Inc. ("<u>LBI</u>"), LB 745 LLC ("<u>745</u>"), and Barclays Capital Inc. ("<u>Barclays</u>") (the "<u>Purchase Agreement</u>"), as well as that certain Clarification Letter among LBHI, LBI, 745 and Barclays dated as of September 20, 2008 (the "<u>Clarification Letter</u>"). Capitalized terms used in this letter without definition shall have the meanings ascribed to them in the Purchase Agreement.

    Pursuant to Section 1(a)(ii)(B) of the Clarification Letter, Purchased Assets, includes among other things, "such securities and other assets held in LBI's 'clearance boxes' as of the time of Closing....". As discussed with Deloitte and Touche by various Barclays representatives and as mentioned to you by Jonathan Hughes a couple of weeks ago, Barclays has identified certain assets that were in LBI's "clearance boxes" as of the Closing and are still in LBI's clearance boxes that should have been delivered to Barclays, but Barclays has not received ("<u>Undelivered Clearance Box Assets</u>"). The attached spread sheet lists Undelivered Clearance Box Assets having CUSIP numbers in which no LBI customers had long positions on September 22, 2008. Barclays has also identified other Undelivered Clearance Box Assets having CUSIP numbers in which LBI customers may have had long positions, but where the quantities of such securities held in the clearance boxes exceed the quantity of customer long positions. Barclays

James Kobak, Jr. Esq., p. 2

is still in the process of compiling information on this latter category of Undelivered Clearance
Box Assets, but expects to be in a position to provide you with detailed information in early
January.

   The Undelivered Clearance Box Assets are wholly separate from the securities
covered by the impending settlement between the Trustee, DTCC and Barclays (the
"Settlement"). The securities implicated by the Settlement relate to an ACATS reversal and are
listed on the various Exhibits to the DTCC Settlement Agreement.

   Pursuant to the Purchase Agreement, the Undelivered Clearance Box Assets
should have been delivered to Barclays, but delivery is now overdue. Barclays requests that the
Trustee deliver the Undelivered Clearance Box Assets or approve delivery of the Undelivered
Clearance Box Assets by the appropriate party. Should you have any questions regarding
delivery of these assets, you may contact me at (212) 225 2738.

   Sincerely,

   *Lindsee P. Granfield* (A.K.B.)

   Lindsee P. Granfield

cc: Jonathan Hughes

Attachment Omitted

# BCI EXHIBIT

# 158



**Hughes**
**Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone 212-837-6000
Fax 212-422-4726
hugheshubbard.com

James B. Kobak Jr
Direct Dial 212-837-6757
kobak@hugheshubbard.com

January 20. 2009

Lindsee P. Granfield
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York. NY 10006-1470

Dear Lindsee:

    We have reviewed your letter of December 29, 2008 regarding certain parts of the clarification letter dated as of September 20. 2008 which you contend entitle Barclays Capital, Inc. ("Barclays") to delivery of certain assets in clearance boxes at DTCC and its subsidiaries.

    Insofar as DTCC and its subsidiaries are concerned, your letter ignores what we believe to be the most relevant document, the letter dated September 22, 2008 between the Trustee. Barclays and Depository Trust Corporation (The "DTCC Letter.") The DTCC Letter, which controls the relationship among the parties with respect to what you refer to as LBI proprietary assets at DTCC, makes clear that the assets which you identify remain the property of the LBI estate and the Trustee.

    Apart from DTCC and the DTCC Letter. your request is at best premature. Many of the assets you identify may b property of. or subject to claims by. LBHI or its subsidiaries and therefore could not be. and are not, items to be transferred to Barclays under the Clarification Letter itself makes clear.

    Finally. your implication that the assets could be claimed by Barclays because they do not apparently represent customer long positions and therefore are not customer assets misses the mark. "Customer property" as defined by SIPA can and commonly does include what might otherwise be considered proprietary securities necessary to satisfy customers' net equty claims An allocation between "customer property" and general estate assets has not yet been made and will not be determined until later in the SIPA proceeding, when there is more complete knowledge as to the magnitude of customer claims and the extent and nature of all assets available to the estate. Barclay's request for release of all these assets almost certainly would encompass customer property in whole or in part and is therefore premature and overbroad even apart from the DTCC Letter.

2

If you and Barclay's believe that Barclays has and wishes to preserve a claim under the contract despite our conclusion. Barclays is free to file a claim in our proceeding.

Very truly yours,

James B. Kobak. Jr.

cc:    Jonathan Hughes
       Kenneth Caputo
       James Giddens

60821390 1 DOC

# BCI EXHIBIT

# 159


**BARCLAYS CAPITAL**

200 Park Avenue
New York NY 10166
USA

Tel +1 (212) 412 4000

January 27, 2009

James W. Giddens, Esq.
Trustee in the SIPA Liquidation of Lehman Brothers Inc.
c/o Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004

Dear Mr. Giddens:

On September 19, 2008 Lehman Brothers Inc. ("LBI") was placed into a liquidation proceeding (the "LBI Proceeding") pursuant to the Securities Investor Protection Act ("SIPA"). You were thereafter appointed to serve as the SIPA Trustee by order of the United States District Court of the Southern District of New York. The case was removed to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which on September 20, 2008 entered an order (the "Sale Order") approving the sale of certain of LBI's assets to Barclays Capital Inc. ("Barclays") under the Asset Purchase Agreement dated as of September 16, 2008 (as amended and clarified from time to time, the "Purchase Agreement"). The transaction contemplated by the Purchase Agreement and approved by the Sale Order closed on September 22, 2008.

Pursuant to the Purchase Agreement, certain LBI customer accounts were transferred to Barclays. Attached hereto as Exhibit A is a list of customer accounts transferred to Barclays that are subject to this letter agreement, identified by account name and number (each hereinafter referred to as a "Customer Account," and each owner or holder of such Customer Account, a "Customer").

On November 7, 2008, the Bankruptcy Court entered the Order Approving Form and Manner of Publication and Mailing of Notice of Commencement; Specifying Procedures and Forms for Filing, Determination, and Adjudication of Claims; Fixing a Meeting of Customers and Creditors; and Fixing Interim Reporting Pursuant to SIPA (the "Bar Date Order"). The Bar Date Order set January 30, 2009 as the bar date for receiving the maximum possible protection for customer claims under SIPA, and June 1, 2009 as the bar date for all claims.

Despite the Parties' good faith, ongoing efforts to reconcile and deliver to Barclays all Customer Accounts and related property, Barclays has not received to date certain securities, cash balances and other assets or amounts (and proceeds of the foregoing) that were credited to or due to Customer Accounts ("Undelivered Customer Property"). An aggregate schedule of Undelivered Customer Property, as estimated by Barclays in good faith as of January 15, 2009 (or other date as expressly noted), is detailed in Exhibit B hereto.

Barclays hereby asserts (both for itself and (solely to the extent stated herein) for the benefit of the Customers) a claim in the LBI Proceeding for any and all Undelivered Customer Property pursuant to 15 U.S.C. § 78fff-2(a)(2) and any other applicable law. Barclays understands that you as Trustee in the interest of protecting customers and facilitating the orderly transfer of customer accounts in keeping with the APA and applicable law, agree to accept this

Barclays Capital Inc.

Confidential

letter and its exhibits as a timely filed claim as contemplated by 15 U.S.C. §78fff-2(a)(2) and the Bar Date Order, the requirements of which (to the extent applicable) the Trustee hereby deems satisfied through execution and submission of this letter so as to be received by the Trustee on or before January 30, 2009. Nothing herein shall prejudice any right Barclays may have on its own behalf or on behalf of a customer or which a customer may have to file other or additional claims or to amend or withdraw any claim or claims, nor shall anything herein affect the ability or right of the Trustee to deny or object to any claim or claims on any ground other than lack of compliance with the Bar Date and whether this letter satisfies the form of claim requirements under the Bar Date Order.

In the event a Customer claim is not satisfied in connection with this claim (whether due to insufficient assets or other disputes regarding such claim), the relevant Customer(s) retain any right such Customer may now possess to prosecute such claim subject to each such Customer's providing evidence of its right to assert the claim in a form and manner reasonably acceptable to the Trustee and subject to all rights, defenses, and objections of the Trustee other than an objection to the claims based on a failure to meet the bar date.

Barclays agrees to (a) provide reasonable assistance and cooperation in the Trustee's reconciliation of this claim, including without limitation reconciling it with any potentially duplicative claims filed by or on behalf of individual Customers and (b) provide reasonable access to those relevant systems, data bases, screens, documents, and information to the extent necessary to, and solely for the purpose of, reconciliation of this claim and determination of Barclays' and customers' claims in respect of the Undelivered Customer Property, provided that Barclays' obligations described in this paragraph shall be subject to the terms of any Transition Services Agreement and/or Data Access Agreement that may be in effect between the Parties now or in the future (excluding the cost provisions of any such Transition Services Agreement and/or Data Services Agreement).

The Trustee agrees that he (and his employees, attorneys, and advisors) will not file the Exhibits attached hereto with the Bankruptcy Court without providing notice to Barclays so that Barclays may seek a protective order.

2.

Confidential                                                                                      HHR_00019810

Nothing herein shall be deemed an admission or allowance of any claim as to validity, type, or amount, with respect to which both the Trustee and Barclays reserve all of their respective rights.

Sincerely,

BARCLAYS CAPITAL INC.

By: _Gerard S. LaRocca_
Gerard S. LaRocca
Title: Chief Administrative Officer

ACKNOWLEDGED AND ACCEPTED FOR THE TRUSTEE:

By: _____
James B. Kobak, Jr.
Christopher K. Kiplok
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6000

His counsel

3

Confidential

# BCI EXHIBIT

# 160

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

WRITER'S INTERNET ADDRESS
jamestecce@quinnemanuel.com

February 10, 2009

**VIA ELECTRONIC AND U.S. MAIL**

Lindsee P. Granfield, Esq.
Cleary, Gottlieb, Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

Jonathan D. Schiller, Esq.
Boies, Schiller & Flexner LLP
5301 Wisconsin Ave. NW
Washington, DC 20015

Re:    ***In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555 (JMP)***

Dear Ms. Granfield and Mr. Schiller:

       We write as a follow-up to our February 3, 2009 meeting and appreciate the spirit of cooperation with which you made representatives of Barclays Capital Inc. ("Barclays") available to answer our questions.  As you know, the Creditors' Committee has been working to obtain clarity and an understanding of the final reconciliations of the sale transaction among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI") and LB 745 LLC (collectively with LBHI and LBI, the "Lehman Sellers"), on the one hand, and Barclays, on the other hand (the "Sale Transaction").  While the meeting greatly assisted our efforts, there are certain documents that we request Barclays provide (in addition to those set forth in our December 26, 2008 letter).  Specifically:

       (1)       With respect to the securities (the "Pledged Securities") that initially were pledged to The Federal Reserve Bank and then to Barclays pursuant to a repurchase agreement among the parties and the Bank of New York ("BNY"), as collateral agent (the "Repurchase Agreement"):  (a) the schedule(s) of Pledged Securities as of Thursday, September 18, 2008, delivered in connection with the Repurchase Agreement (the "September 18 Schedule"), (b) the schedule(s) of Pledged Securities as of Friday, September 19, 2008 (with documents concerning modifications to the September 18 Schedule, including changes in the value of the Pledged

**quinn emanuel urquhart oliver & hedges, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

Lindsee P. Granfield, Esq.
Jonathan D. Schiller, Esq.
February 10, 2009
Page 2 of 2

Securities (the "September 19 Schedule")), and (c) the schedule(s) of Pledged Securities as of Monday, September 22, 2008, immediately prior to closing (with documents concerning modifications to the September 19 Schedule, including changes in the value of the Pledged Securities);

(2)     Documents indicating the receipt by BNY, on behalf of Barclays, of the Pledged Securities from LBI and/or JPMorgan Chase Bank, N.A. during the period of September 18, 2008 through and including September 21, 2008, including the value ascribed to the Pledged Securities during such period, which demonstrates the approximate $7 billion shortfall in Pledged Securities that were to be delivered to Barclays under the Repurchase Agreement;

(3)     Documents, including schedules, reflecting Assumed Liabilities (as defined in the Asset Purchased Agreement among the Lehman Sellers and Barclays, dated as of September 16, 2008 (the "Original APA")), under the Original APA and documents concerning the values attributed to such Assumed Liabilities as of the date of the Original APA;

(4)     Documents, including schedules, of any **additional** Assumed Liabilities that Barclays assumed under or in connection with the clarification letter between the Lehman Sellers and Barclays, dated as of September 20, 2008 (the "Clarification Letter"), and the values attributed to such Assumed Liabilities as of the date of the Clarification Letter or thereafter; and

(5)     Documents concerning negotiations regarding the disposition of residential mortgage securities in connection with the Sale Transaction, specifically their transition from originally falling within the definition of "Purchased Assets" (i.e., 50% of each) under the Original APA, to the changes to the transaction brought about by sections 2 and 3 of the First Amendment to the APA, dated as of September 19, 2008, to the closing (where the agreement set forth in the First Amendment with respect to the residential mortgage securities was deleted and given no effect ab initio pursuant to section 1(d) of the Clarification Letter). This request includes documents concerning whether such residential mortgage securities were (a) included as part of Schedule A to the Clarification Letter, (b) included as part of Schedule B to the Clarification Letter, (c) otherwise transferred to Barclays under the Sale Transaction or (d) were retained by the Lehman Sellers.

We request the production of such information and documents set forth herein and in our prior letter on or prior to March 2, 2009. The requests in this letter are without waiver of any and all of the Committee's rights, which are reserved expressly. We appreciate your consideration of this matter.

Sincerely,

James Tecce

cc:     Susheel Kirpalani, Esq.
        Eric Kay, Esq.

# BCI EXHIBIT

# 161

# LEHMAN BROTHERS HOLDINGS INC.

BRYAN MARSAL
CHIEF EXECUTIVE OFFICER

February 19, 2009

Rich Ricci
Jonathan Hughes
Barclays Capital Inc.
200 Park Avenue
New York, NY 10166

Dear Rich and Jonathan:

   I am writing with respect two matters relating to the sale of Lehman Brothers's U.S. and Canadian investment banking and capital markets business to Barclays Capital as to which we need additional information as soon as possible. I'll outline them briefly below.

## I. Bonus Accrual

   The contract provides, in essence, that Barclays Capital would be responsible for the payment of the accrued bonus amount as of August 31, 2008 for the U.S./Canadian investment banking/capital markets business, and the agreement referenced a balance sheet provided to Barclays Capital indicating that this amount was $2.0 billion. We have now had a chance to conduct a preliminary review of the accrual for bonuses as of August 31, 2008, and it appears that the consolidated global accrual on the books of LBHI as of that date was only $1.3 billion. Although we are continuing our review, it appears that only approximately 55% of the global accrual relates to employees transferred to Barclays Capital. Accordingly, it appears that the liability assumed by Barclays Capital may be closer to $0.7 billion than the $2.0 billion provided for in the transaction.

   Given the scale of the discrepancy between what was referenced in the agreement and the actual accrual on the consolidated books of Holdings for the personnel assumed, reconciliation of this discrepancy is critical prior to the payment by Barclays Capital of any bonuses in excess of $0.7 billion. While Barclays Capital should be essentially indifferent from a financial point of view as to whether it pays this amount as bonus or a reduction in the purchase price for the business, this discrepancy is significant for the LBHI estate.

## II. Cure Amounts

   The September 16th balance sheet initialed by the parties indicated that $2.25 billion was accrued for potential cure costs in relation to contracts to be assumed and assigned post closing. While uncertainties about this number plainly existed prior to closing, to date we understand that approximately only $0.2 billion has been spent on such cures and that the latest estimate of the amount to be ultimately paid is dramatically less than was expected.

Again, given the size of the discrepancy between the September 16th number and the actual projected cure liability, it's important to us that we reconcile and understand the differential.

The above two items are clearly material to the debtor estates and we welcome your assistance in ensuring that our understanding of the books and records of the various referenced estates, and of the sales contract, is correct. You may also have supporting documentation or analyses that explain these discrepancies. If that is not possible, however, we reserve our rights to seek judicial relief based on the material differences between the projected and actual liabilities for these categories of expenses.

We are available to meet at your earliest convenience and would hope that you are available to discuss both of these issues within the next several days.

Best regards,

Bryan Marsal

cc:     Viktor I. Lewkow (Cleary Gottlieb Steen & Hamilton LLP)
        David Leinwand (Cleary Gottlieb Steen & Hamilton LLP)
        Duane McLaughlin (Cleary Gottlieb Steen & Hamilton LLP)
        Mitchell S. Eitel (Sullivan & Cromwell LLP)
        Jay Clayton (Sullivan & Cromwell LLP)

# BCI EXHIBIT

# 162



# BARCLAYS CAPITAL

200 Park Avenue
New York, NY 10166
USA

Tel    +1 (212) 412 4000

February 23, 2009

**VIA FACSIMILE**
Bryan Marsal
Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, NY  10020
Fax: (212) 526-2230

Dear Bryan:

I write in response to your February 19, 2009 letter addressed to Rich Ricci and me.

As we have been throughout the course of the transaction, we remain willing to discuss factual issues that may be helpful to you in administering the estate.  We note, however, that a number of other parties, including the examiner and the Creditor's Committee, are also undertaking a review of the sale transaction, and we would therefore want our discussions with you to include the topic of how Barclays can avoid addressing queries relating to the APA and the sale on a piecemeal basis.

While we look forward to discussing these factual issues with you, we reject any suggestion that there is a basis for any adjustment to the APA, or additional payments from Barclays to Seller, or that Barclays' interests should otherwise be adversely affected in any way by any supposed "discrepancy" relating to the September 16 schedule. We view your reservation of a supposed right to seek judicial relief as reflecting a serious misunderstanding of the facts and the APA.

Finally, as a housekeeping matter, we note that your letter was directed to the Barclays notice parties set forth in Section 13.7 of the APA.  Accordingly, in this response, we have copied the Seller notice parties, with the exception of Steven Berkenfeld, who is now employed by Barclays.  We assume it is your intention that you will replace Mr. Berkenfeld as the Seller notice party, but would ask that Seller consider giving Barclays a formal notice so specifying.

Very truly yours,

Jonathan Hughes

cc (via fax):    Rich Ricci, Barclays Capital
        Thomas Roberts, Michael Lubowitz and Harvey Miller,
            Weil Gotshal & Manges LLP (Fax: 212-310-8007)
        John Finley and Andrew Keller,
            Simpson Thatcher & Bartlett LLP (Fax: 212-455-2502)

Barclays Capital Inc.

# BCI EXHIBIT

# 163

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000
FACSIMILE (212) 225-3999
WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS
LONDON · MOSCOW · FRANKFURT · COLOGNE
ROME · MILAN · HONG KONG · BEIJING

Writer's Direct Dial (212) 225-2738
E-Mail lgranfield@cgsh.com

MARK A. WALKER
LESLIE B. SAMUELS
EDWARD P. GREENE
ALAN L. BELLER
MAX GITTER
EVAN A. DAVIS
LAURENT ALPERT
VICTOR I. LEWKOW
LESLIE N. SILVERMAN
ROBERT L. TORTORIELLO
A. RICHARD SUSKO
LEE C. BUCHHEIT
JAMES M. PEASLEE
ALAN L. BELLER
THOMAS J. MOLONEY
JONATHAN I. BLACKMAN
WILLIAM F. GORIN
MICHAEL L. RYAN
ROBERT P. DAVIS
YARON Z. REICH
RICHARD S. LINCER
JAIME A. EL KOURY
STEVEN G. HOROWITZ
ANDREA G. PODOLSKY
STEVEN M. LOEB
DANIEL S. STERNBERG
DONALD A. STERN
CRAIG B. BROD
WANDA J. OLSON
MITCHELL A. LOWENTHAL
DEBORAH M. BUELL
EDWARD J. ROSEN
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER

WILLIAM A. GROLL
JANET L. FISHER
DAVID L. SUGERMAN
HOWARD S. ZELBO
DAVID E. BRODSKY
ARTHUR H. KOHN
RAYMOND B. CHECK
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
YVETTE P. TEOFAN
STEVEN L. WILNER
ERIKA W. NIJENHUIS
LINDSEE P. GRANFIELD
ANDRES DE LA CRUZ
DAVID C. LOPEZ
CARMEN A. CORRALES
JAMES L. BROMLEY
PAUL E. GLOTZER
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI JR
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
DAVID I. GOTTLIEB
LEONARD C. JACOBY
SANDRA L. FLOW
DANA G. FLEISCHMAN
FRANCESCA L. ODELL

WILLIAM L. MCRAE
JASON FACTOR
MARGARET E. PEPONIS
LISA M. SCHWEITZER
KRISTOFER W. HESS
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
CHANTAL E. KORDULA
BENET J. O'REILLY
DAVID AMAN
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
CHRISTOPHER P. MOORE
JOON H. KIM
RESIDENT PARTNERS

SANDRA M. ROCKS
ELLEN M. CREEDE
E. DOUGLAS SCRIBBY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
GABRIEL J. MESA
DAVID H. HERRINGTON
HEIDE H. ILGENFRITZ
KATHLEEN M. EMBERGER
NANCY I. RUSKIN
WALLACE L. LARSON JR
JAMES D. SMALL
AVRAM E. LUFT
ELIZABETH LENAS
RESIDENT COUNSEL

March 6, 2009

VIA EMAIL
James Kobak, Jr., Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004

Re: *Securities Investor Protection Corporation v. Lehman Brothers Inc.*, No. 08-1420 (JMP)
SIPA (Bankr. SDNY) (the "SIPA Proceeding")

Dear Jim:

        We write in further response to your letter, dated January 20, 2009 ("your January 20th Letter"), concerning the Undelivered Clearance Box Assets.[1]

        We believe that the DTCC Letter you refer to in your January 20 Letter is fully consistent with the fact that the Undelivered Clearance Box Assets have been sold to Barclays. It would misconstrue the DTCC Letter to interpret it as somehow conveying back to the Trustee assets that were identified as sold to Barclays under the Asset Purchase Agreement (as clarified by the Clarification Letter). The DTCC Letter is captioned a "Winding Down of Accounts and Guaranty." As that caption suggests, the purpose of the letter was to address DTCC's exposures in relation to unsettled positions of LBI in its accounts maintained at DTCC. At the time of the closing of the Asset Purchase Agreement (as clarified by the Clarification Letter), if LBI through its DTCC accounts had sold a particular security, but the accounts did not contain or become credited with such security to cover its delivery obligation, or if LBI purchased a security for which it did not have the necessary funds, then in closing out the accounts LBI would have

---

[1]       Capitalized terms not otherwise defined herein have the meanings set forth in our December 29, 2008 correspondence, or your January 20th Letter, as applicable.

James Kobak, Jr., Esq., p. 2

liabilities to DTCC. It was of evident concern to DTCC that because certain identified assets
were to be conveyed to Barclays from LBI's accounts, and because Barclays was not going to
assume responsibility for the accounts, DTCC could have exposures to LBI for defined Losses
"as a result of winding down and closing out the Accounts." Therefore, the DTCC Letter
provides for a $250 million deposit as a limited recourse guarantee to protect DTCC against such
Losses. If that sum were insufficient, the DTCC Letter provides that DTCC and its affiliates
may have further recourse to the Accounts "in accordance with the rules and procedures of the
applicable Clearing Agency Subsidiary." It is for this reason that the Accounts are identified in
the DTCC Letter as being "Excluded Assets."

It should be quite clear in context, however, that while the DTCC Letter provides
that certain *accounts* maintained at DTCC and its affiliates were Excluded Assets, it does not
identify the securities *contained in those accounts* as Excluded Assets, or otherwise evidence any
intent to change the terms of sale as between the Seller and Barclays. Section 1(a)(ii)(B) of the
Clarification Letter provides that the "securities and other assets in LBI's 'clearance boxes' as of
the time of the Closing . . ." are included in the definition of the assets sold to Barclays. The
DTCC Letter does not purport to amend or even mention the Clarification Letter, nor does it
refer to all or any particular securities in the DTCC accounts. That omission would be
inexplicable if the DTCC Letter were actually intended by Barclays and LBI (through the
Trustee) to modify the terms of the Clarification Letter regarding "clearance box securities."

Since the DTCC Letter and the Clarification Letter were executed essentially
simultaneously, the correct way to read them together is that Barclays purchased the relevant
LBI assets, including "securities and other assets in LBI's 'clearance boxes' as of the time of the
Closing," but recognized DTCC's authority to wind down those accounts by closing out pending
transactions and, in that connection, provided a limited recourse guarantee over the LBI accounts
at DTCC. Further, the suggestion that the Undelivered Clearance Box Assets are "Excluded
Assets" is clearly inconsistent with the fact that in the days following the closing of the Asset
Purchase Agreement (as clarified by the Clarification Letter) the Trustee delivered to Barclays a
large portion of the "securities ... in LBI's 'clearance boxes' as of the time of Closing," thereby
confirming the above plain-reading of the Clarification Letter. Again, as between LBI and
Barclays, the Undelivered Clearance Box Securities were sold under the Clarification Letter and
nothing in the DTCC Letter questions that. The DTCC Letter plainly does not make the
Undelivered Clearance Box Securities property of the LBI estate.

We note that since the time of our December 29, 2008 letter, Barclays has
updated the spreadsheet of Undelivered Clearance Box Assets in which no LBI customers had
long positions on September 22, 2008. The revised spread sheet attached hereto as Exhibit A
lists Undelivered Clearance Box Assets having CUSIP numbers in which no LBI customers had
long positions on September 22, 2008 and supersedes the spreadsheet attached to our December
29, 2008 letter. In addition, we referred in the December 29, 2008 letter to Barclays having
identified other Undelivered Clearance Box Assets with CUSIP numbers in which LBI
customers may have had long positions, but where the quantities of such securities held in the
clearance boxes exceed the quantity of customer long positions, and indicated that Barclays

James Kobak, Jr., Esq., p. 3

would provide detailed information regarding those securities at a later date. The spreadsheet attached hereto as Exhibit B lists those other Undelivered Clearance Box Assets having CUSIP numbers in which LBI customers may have had long positions, but where the quantities of such securities held in the clearance boxes exceed the quantity of customer long positions. Nothing in this letter or in Exhibit B should be construed to suggest that a portion of the securities in the LBI clearance boxes at the time of closing equal to the quantity of long customer positions in such securities were not sold to Barclays pursuant to the Asset Purchase Agreement (as clarified by the Clarification Letter). Barclays is continuing to review information regarding customer long positions and securities in the clearance boxes at the time of closing and will revert to you in due course with information regarding additional clearance box securities sold to Barclays.

As to the suggestion in your January 20th Letter that the Trustee is unable to return the Undelivered Clearance Box Assets because they "may b [sic] property of, or subject to claims by, LBHI or its subsidiaries," Barclays has performed a careful review of the Undelivered Clearance Box Assets and has determined that such assets were owned by LBI, as opposed to LBHI or its subsidiaries, at the time of the closing of the Asset Purchase Agreement (as clarified by the Clarification Letter).

While your January 20th Letter ultimately suggests that Barclays simply file a claim for the Undelivered Clearance Box Assets in the SIPA Proceeding, the goal of our correspondence was to continue our ongoing cooperative efforts to reconcile assets deliverable under the Asset Purchase Agreement (as clarified by the Clarification Letter). While Barclays has in fact filed a protective claim in the SIPA Proceeding, we believe it is in the interests of both of our clients to seek to work together to resolve this issue rapidly and consensually.

Sincerely,

Lindsee R. Granfield

Enclosures

# Attachment Omitted

# BCI EXHIBIT

# 164



**BARCLAYS**
**CAPITAL**

200 Park Avenue
New York NY 10166
USA

Tel +1 (212) 412 4000

March 25, 2009

James W. Giddens, Esq.
Trustee for the SIPA Liquidation of Lehman Brothers Inc.
c/o Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004

Dear Mr. Giddens:

We refer to the Asset Purchase Agreement dated September 16, 2008 among Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI"), LB 745 LLC ("745"), and Barclays Capital Inc. ("Barclays"), as amended and clarified by that certain Clarification Letter dated as of September 20, 2008 (the "Clarification Letter") among LBHI, LBI, 745 and Barclays (the Asset Purchase Agreement as amended and clarified by the Clarification Letter being referred to herein as the "Purchase Agreement"). Capitalized terms used in this letter without definition shall have the meanings ascribed to them in the Purchase Agreement.

Barclays and the Trustee have worked cooperatively to resolve certain issues relating to the sale of assets from LBI to Barclays in the period since the Closing Date. Nevertheless, although it has been six months since the Closing Date, there remain significant amounts of assets in the four categories specified below that were purchased by Barclays under the Purchase Agreement, but have still not been delivered to Barclays:[1]

1.  <u>Undelivered Clearance Box Assets</u>:  Pursuant to Section 1(a)(ii)(B) of the Clarification Letter, Purchased Assets include among other things, "such securities and other assets held in LBI's 'clearance boxes' as of the time of Closing, which at the close of business on September 21, 2008 were as specified on Schedule B [to the Clarification Letter]." As previously detailed in Lindsee Granfield's letters to James Kobak, dated December 29, 2008 and March 6, 2009, Barclays has yet to receive all of the assets that were in LBI's "clearance boxes" as of the Closing, even though such assets plainly constitute Purchased Assets under the terms of the Purchase Agreement.

2.  <u>$769 Million of Securities</u>:  Pursuant to Section 8 of the Clarification Letter, "... Purchaser shall receive . . . (ii) to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as

---

[1] In addition to the categories of undelivered assets referenced in this letter, there are also significant amounts of customer assets not yet delivered to Barclays, which the Trustee is obligated under the Purchase Agreement to transfer to Barclays (although the parties are working through those separately). Further, there may be other Purchased Assets not mentioned in this letter that have yet to be delivered by the Trustee to Barclays. The Trustee is of course obligated under the Purchase Agreement to deliver all such assets to Barclays.

amended, or securities of substantially the same nature and value." (emphasis added). Barclays has yet to receive either $769 million of securities held by or on behalf of LBI pursuant to Rule 15c3-3 or securities of substantially the same nature and value, even though the Purchase Agreement clearly obligates the Trustee to deliver those assets to Barclays "as soon as practicable after the Closing". While Barclays has been patient in giving the Trustee time to analyze LBI's Rule 15c3-3 reserves, given that it has been six months since the Closing Date, the Trustee should deliver the above-referenced assets immediately.

3.  Margin of $900 million with Options Clearing Corporation: Barclays has yet to receive approximately $900 million in margin that is currently held with the Options Clearing Corporation (the "OCC Margin"). Pursuant to Section 1(a)(ii)(C) of the Clarification Letter, Purchased Assets include "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)." (emphasis added). In addition, Section 1(a) of the Transfer and Assumption Agreement executed on September 20, 2008 among LBI, the Options Clearing Corporation and Barclays expressly provides that Barclays acquired all of LBI's rights, title, interests, privileges and obligations in, to and in respect of the accounts carried by LBI with the Options Clearing Corporation, including with respect to "all margin deposits held by OCC with respect to" such accounts. As such, the OCC Margin plainly constitutes a Purchased Asset to be delivered to Barclays.

For well over four months, Barclays has been trying to obtain the Trustee's consent to the transfer of the OCC Margin as required by JPMorgan Chase Bank, N.A., which is currently holding the OCC Margin as agent on behalf of the Options Clearing Corporation. In a telephone conversation last Friday evening, Carolyn Levine stated that the Trustee's lawyers needed additional time to review Barclays' entitlement to the OCC Margin. Barclays is not aware of any issues as to Barclays' entitlement to the OCC Margin or that should in any way delay the Trustee's consent to transfer the OCC Margin to Barclays.

4.  Exchange-Traded Derivative Balances: Barclays has yet to receive certain cash balances and securities held to secure obligations of LBI and/or its customers in respect of exchange-traded derivatives and/or represent proceeds of such exchange-traded derivatives (the "Exchange Traded Derivative Security"). As noted above, Purchased Assets include "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)." (emphasis added). As such, the Exchange-Traded Derivative Balances plainly constitute Purchased Assets to be delivered to Barclays.

In late December, Barclays provided the Trustee's lawyers with a list of certain Exchange-Traded Derivative Balances not yet transferred to Barclays in an effort to obtain the assistance of the Trustee's lawyers to secure the transfer of such Balances from various foreign locations. We are concerned, particularly in the case of Exchange-Traded Derivative Balances in foreign locations, that losses may result if we do not have the Trustee's assistance in pursuing the expeditious transfer of such Balances to Barclays (including through communications with relevant custodians and regulators, providing them with necessary instructions and, where the custodian is a Lehman affiliate subject to

2

administration, insolvency or a similar proceeding, filing claims on a timely basis).  Last Friday evening, we learned from Carolyn Levine that the Trustee's lawyers have been in contact with some of the custodians and have filed claims relating to some Exchange-Traded Derivative Balances.  We were pleased to hear this and have requested information on the claims filed and actions taken to date by the Trustee's lawyers to ensure that our efforts are coordinated and that all appropriate actions are being taken to facilitate the transfer of Exchange-Traded Derivative Balances to Barclays.

It is essential that each of these matters be dealt with without further delay. We are available at any time to discuss the issues raised above.

Sincerely,

PP  Jonathan Hughes

Cc:    Lindsee P. Granfield
       Alan B. Kaplan
       James B. Kobak, Jr.
       Carolyn Levine
       Kenneth M. Raisler

3

# BCI EXHIBIT

# 165


# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

James B. Kobak Jr
Direct Dial: 212-837-6757
kobak@hugheshubbard.com

March 27, 2009

**BY HAND AND E-MAIL**
Lindsee P. Granfield, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York. NY 10006-1470

Dear Lindsee:

      We have reviewed your letter of March 6, 2009 regarding certain parts of the clarification letter dated as of September 20, 2008 that you contend entitle Barclays Capital Inc. ("Barclays") to delivery of certain assets in LBI's "clearance boxes" at The Depository Trust & Clearing Corporation and its Clearing Agency Subsidiaries (collectively, "DTCC"). As it appears that each side has now fully set forth its position, I will respond only briefly but also address some factual assertions that cause us considerable surprise and concern.

      First, our substantive position is unchanged from that set forth in my previous letter to you dated January 20, 2009. We believe that the more specific, tri-party letter of September 22, 2008 among the Trustee, Barclays and DTCC (the "DTCC Letter") is clear and unambiguous and is the controlling document. When the DTCC Letter specified that "all of the accounts of LBI maintained at the Clearing Agency Subsidiaries ... constitute 'Excluded Assets' within the meaning of the APA," it clearly included, in the vernacular of your letter, "the securities contained in those accounts"; any attempt to parse this simple and clear statement in the DTCC Letter by positing some kind of distinction between LBI's DTCC "accounts," on the one hand, and the "securities in those accounts," on the other hand, defies both common usage and common sense. Further, the DTCC Letter, as it pertains specifically to LBI's accounts at DTCC and involved the rights of entities (i.e., DTCC) that were not even parties to the APA clarification letter, overrides any asserted conflicting language (including the more general references to "clearance boxes") set forth in the APA clarification letter executed two days before.

      Second, I reiterate the points that I made in my previous letter to you regarding the probability that the securities held at DTCC that Barclays seeks constitute in whole or in substantial part either assets held for LBHI, LBIE or other entities or "customer property" within the meaning of SIPA. You claim without supporting documentation of any kind to have determined that rights of other Lehman entities or others cannot be

New York ▪ Washington, D.C. ▪ Los Angeles ▪ Miami ▪ Jersey City ▪ Paris ▪ Tokyo

60600885_2.DOC
New York ▪ Washington, D.C. ▪ Los Angeles ▪ Miami ▪ Jersey City ▪ Paris ▪ Tokyo

implicated with respect to any securities you claim; as noted below, we have substantial questions as to how any such determination could have been reached. You do not respond at all to the several sentences in my letter explaining the likelihood that property claimed will be allocated as "customer property" under SIPA.

In addition to these substantive points, some of the property listed in your schedules would not appear to be recoverable by Barclays even under its own interpretation of documents and events. While we have not fully reviewed the details behind the Exhibits to your letter, we note that they include on their face various categories of securities that would not be viewed as constituting securities held in an LBI "clearance box," such as, for example, physical securities. Indeed, many of the securities included in your lists, while owned by LBI as of September 21, 2008, do not appear in Schedule B to the clarification letter, which purported to set forth all of the securities and other assets held in LBI's "clearance boxes" as of that date. Aside from our differences of interpretation, we categorically reject any attempted expansion of the scope of the "clearance box" language in the APA clarification letter.

One point in your letter particularly troubles me and the Trustee. This is your reference (at page 2) to the supposed "fact that in the days following the closing of the Asset Purchase Agreement (as clarified by the Clarification Letter) the Trustee delivered to Barclays a large portion of the 'securities ... in LBI's clearance boxes' as of time of Closing'". As far as we are aware and aside from the possible occasional, subsequently rectified mistake (and certainly as far as was intended), the only securities that were moved by the Trustee to Barclays from the DTCC accounts in the days following the Closing would have been customer securities, in fulfillment of the purpose of this proceeding to transfer PIM customer accounts to Barclays. Such movements of customer securities are irrelevant to the treatment of what you contend are LBI's proprietary securities at DTCC. If Barclays is aware of any other movement of non-PIM securities at DTCC by employees of LBI or others to Barclays after the filing date, we need to investigate them immediately, using the Trustee's full investigative powers. Please provide forthwith any information or documentation that Barclays believes supports the fact of securities movements to which you refer.

Along the same lines, your letter indicates (at page 3) that Barclays has made a "careful review" and determination that none of the items it claims in its schedules could be considered the property of or subject to claims by customers or other Lehman entities including LBIE. Frankly, we are surprised that such a conclusion could be reached based on available records, the custodial arrangements in place at the filing date, and the extent of customer claims. Therefore we again request that you provide us forthwith with the documentation that supports these representations. We also would like to understand by what authority Barclays personnel took it upon themselves to access LBI information not pertaining in any way to PIM customers.

Very truly yours,

James B. Kobak, Jr.

# BCI EXHIBIT

# 166

# BOIES, SCHILLER & FLEXNER LLP

575 LEXINGTON AVENUE • 7TH FLOOR • NEW YORK, NY 10022 • PH. 212.446.2300 • FAX 212.446.2350

April 20, 2009

<u>BY HAND</u>

Robert W. Gaffey
Jones Day
222 East 41st Street
New York, NY 10017-6702

<u>*In re Lehman Brothers Holding Inc., et al.,* Case No. 08-13555 (JMP)</u>

Dear Mr. Gaffey:

I am writing in response to your April 13, 2009 letter.

Schedule 2 to the Declaration of Simon Powell submitted in support of the Debtors' application to retain Jones Day as Special Counsel, at page 8, represents that Barclays Capital Inc. ("Barclays") and certain of its affiliates are current clients of Jones Day. Your firm thus acknowledged that it has a conflict in being adverse to Barclays. *See* New York Rules of Professional Conduct (effective April 1, 2009) Rules 1.7 – 1.10. While disclosing that conflict, the retention application never suggested that Jones Day would become adverse to Barclays. The Order approving the retention of Jones Day as Special Counsel to the Estate never authorized Jones Day to undertake a representation adverse to Barclays. In fact, the Order contemplates that Jones Day would represent the Estate only in certain foreign proceedings and in unrelated litigation in California, not an investigation of the type your letter outlines. The investigation you propose to undertake is therefore barred by the conflict your firm disclosed and is outside the scope of the retention that the Court approved. In light of these circumstances, please advise us promptly as to how your firm intends to proceed.

In addition to disregarding the disqualification of your firm, your letter ignores a number of significant factors bearing on the Debtors' proposed investigation.

First, while your letter references a February 19, 2009 letter from Mr. Marsal to Mr. Hughes, it disregards the response that Mr. Hughes sent on February 23, 2009. In that response, Mr. Hughes stressed Barclays' view that the Debtors should coordinate their inquiries with the Examiner's investigation, as the Bankruptcy Court has directed, and not duplicate the Examiner's work. He offered to discuss with Mr. Marsal how

BOIES, SCHILLER & FLEXNER LLP

Robert W. Gaffey
April 20, 2009
Page 2

Barclays could avoid addressing inquiries concerning the court-approved sale on a
piecemeal basis.  Mr. Hughes also offered to discuss with Mr. Marsal factual matters
relevant to administration of the Estate or other issues of concern to Mr. Marsal.  Mr.
Marsal never responded to that offer.  Accordingly, this current demand for extensive
discovery is an unnecessarily burdensome and confrontational approach in these
circumstances.

    Second, the Debtors' document demands address topics that the Examiner is
already investigating and, we expect, will continue to investigate.  We question whether,
before sending these demands, the Debtors made any effort to coordinate with the
Examiner on these issues.  A simultaneous and duplicative investigation by the Debtors
will interfere with our ability to respond to the Examiner in a timely and complete
manner.

    Please inform the Debtors that Barclays remains willing to discuss these matters
at a mutually convenient time.

                                        Very truly yours,

                                        Jonathan D. Schiller

# BCI EXHIBIT

# 167



**Hughes
Hubbard**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

James B. Kobak Jr
Direct Dial: 212-837-6757
kobak@hugheshubbard.com

April 22, 2009

**BY MAIL AND EMAIL**
Jonathan Hughes, Esq.
Global General Counsel
Barclays Capital
200 Park Avenue, 27th floor
New York, NY 10166

Dear Jonathan :

I write in response to your letter of March 25 to the Trustee and with reference to some of the prior correspondence and discussions between counsel. For convenience, I will use the same defined terms that you use in your letter.

As you know from prior correspondence and communications, we have previously expressed our disagreement with the conclusions in your letter. We continue to disagree. I also take this opportunity to describe more fully and accurately than I believe your letter does some background facts and circumstances.

I will first address your four specific claims:

1.    Clearing Box Assets. You refer to Ms. Granfield's letters to me in late December and March but ignore the fact that I replied to Ms. Granfield's December letter on January 20, 2009, rejecting Ms. Granfield's interpretation and raising additional issues. Ms. Granfield did not reply to this letter until almost seven weeks later, on March 6, and, as I believe you are aware, I responded to this letter on March 27, 2009. We continue to reject the conclusion that Barclays has any claim to the assets in the DTCC clearing boxes, under the DTCC letter or otherwise. As our most recent letter notes, we also have serious questions about some of the factual assumptions referred to in your counsel's letter. We are still awaiting a response to those questions.

2.    $769 Million of Securities in 15c3-3 account. You mentioned this claim in a conversation you had with me, Mr. Kaplan and Mr. Caputo of SIPC at Barclay's offices this winter following a meeting to address our right to access to LBI books, records and information maintained at Barclays. I stated then that no claim to the securities could be considered until and unless it was clear that these customer-segregated assets would not be necessary to satisfy customer claims and avoid any shortfall of customer property – the clear meaning and intent of the phrase "to the extent permitted

by law" in the language of the Clarification Letter. It would make no sense to interpret the language about substituting property to mean that property, if any, from other sources could be taken to satisfy Barclays if the result would continue to be a shortage in customer property.

I stated then that the basis of any Barclays' claim should be formally asserted in a letter. Yet not until almost the end of March did we receive any such letter, with the claim set forth only in a conclusory manner. There is nothing in your letter that causes the Trustee to change his position or that could affect his fiduciary duties to preserve assets for use in satisfying customer claims. The Trustee would have no authority to permit, nor Barclays to receive, transfers of customer property needed to satisfy deficits in customer property.

3.    <u>Margin of $900 million with Options Clearing Corporation</u>. As you know, representatives of Barclays and the Trustee have worked for several months as a first priority to ensure that customers' positions were in fact being treated appropriately by Barclays, a matter that was not clear and in fact not the case for some customers. This process has now been largely completed, and we have turned to an evaluation of Barclays' claim.

As an initial matter, we do not believe that the language in the Clarification Letter concerning "property that may be held to secure obligations" can reasonably be read, or was intended, to include margin deposits (or membership deposits which Barclays has also claimed) posted by LBI. As for the Transfer and Assumption Agreement, its purpose was solely to assure the OCC that there would be assets available for satisfaction of liabilities from LBI's outstanding short derivatives positions. This was necessary because Barclays was unwilling to assume liabilities related to the tens of thousand of valuable accounts it obtained essentially for nothing under the APA and Clarification Letter. It was not the purpose of the Clarification Letter or the Transfer and Assumption Agreement to transfer (as between the Trustee and Barclays) OCC margin or clearing deposits in excess of the amount necessary to satisfy liabilities associated with LBI's derivatives trades (after taking into account recourse to customers and customer collateral). Any broader interpretation would lead to absurd results, would risk violation of Rule 15c3-3 and would mean that deposits that may have to be allocated in whole or in part to customer property and used to satisfy customer claims would not be available, leading to customer shortfalls. By the same token, it appears to us that BCI may already have laid claim to substantial cash deposits from OCC that it will have to return to the Trustee.

4.    <u>Exchange – Traded Deposits</u>. Again, we do not believe that these miscellaneous deposits and membership balances were intended to be transferred by the language to which you refer. To a large extent the Trustee's accountants believe that these foreign depositories may have been applied by the exchanges or Barclays itself to close out trades and satisfy customer obligations. Thus, I understand that in many cases apparent amounts on the books and records may not even exist because of closeouts. In any event, I understand, as you note in your letter, that efforts are now being made to contact the exchanges, reconcile the records, and preserve whatever rights and assets may

exist, and this is a necessary first step. We do not, however, believe that Barclays is entitled to whatever residuum of property or cash may exist.

More generally, I want to clarify that we have responded promptly but responsibly to Barclays' claims whenever they have been asserted. Even more important, there is no reason that Barclays' remaining claims should receive priority over the claims of customers and others which the Trustee and his representatives have been working diligently to satisfy through a substantial claims–processing operation. These efforts have only been hampered by the lack of access we have had until recently to LBI information maintained by Barclays.

Among other things, you ignore the fact that the Trustee's staff has worked tirelessly, literally around the clock, to accomplish many things, including:

- Implementing a bulk transfer of over $85 billion to Barclays--by far the largest such transfer in history;

- crafting an innovative letter agreement and procedure with Barclays that has allowed Barclays to protect itself by filing omnibus claims for protection under SIPA despite lack of full supporting detail and customer authorization;

- at the request of Barclays and the Federal Reserve Bank of New York, obtaining court approval for transfer of many billions of dollars worth of assets to Barclays despite questions by LBHI, the creditors' committee and others;

- cooperating with Barclays and obtaining court approval for the transfer of another several hundred million more dollars of property seized by DTCC;

- satisfying Barclay's requests to authorize tender offer participations, transfer principal and interest payments, execute intellectual property assignments, and assign hundreds of contracts to Barclays.

- The Trustee's staff has also devoted considerable time to answering questions from non-transferred customers to whom Barclays mistakenly mailed account statements after the filing date and to inquires from customers who have been given misinformation by Barclays representatives.

On the other hand, we find that reciprocal cooperation by Barclays or its own compliance with the terms of the Clarification Letter is often not forthcoming.

I do not mean to suggest that there has never been cooperation by some Barclays' employees or representatives or that we should not continue to seek to resolve issues in good faith despite our differences. We do, however, have serious differences about the

interpretation and implementation of the Clarification Letter with respect to each of the four claims addressed in your letter.

We do not believe that Barclays' positions on these and other matters concerning the meaning of the agreements were shared with or explained to the other parties to the agreements, the regulatory authorities, or the Court at the time of their negotiation, execution and approval. If the interpretations you express were to be accepted, they would have serious and potentially disastrous consequences for fulfillment of customer claims and ultimately for investor confidence in Barclays, the markets, and the entire system of broker regulation and customer protection. Indeed, it might then be the case that the PIM transfers already made to Barclays have resulted in an over-delivery of property to Barclays and its customers that would have to be returned to the Trustee, to say nothing of the effect the asserted claims may have on pending property transfers.

Very truly yours,

cc:    James W. Giddens, Esq.
       Kenneth J. Caputo, Esq.
       Lindsee Granfield, Esq.

60616820 1 DOC                              4

# BCI EXHIBIT

# 168

# BARCLAYS CAPITAL

200 Park Avenue
New York, NY 10166
USA

Tel    +1 (212) 412 4000

May 13, 2009

James W. Giddens, Esq.
Trustee for the SIPA Liquidation of Lehman Brothers Inc.
c/o Hughes, Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004

Re: Undelivered Purchased Assets

Dear Jim:

I write further to my letter to you of March 25, 2009 and Jim Kobak's response of April 22, 2009 with respect to the substantial quantity of undelivered assets that were acquired by Barclays Capital Inc. ("Barclays") under the Purchase Agreement as defined in my letter of March 25.[1] I am also writing to address the questions raised in Mr. Kobak's letter of March 27 and to correct what appear to be fundamental misunderstandings of this transaction and the Trustee's obligations under the Purchase Agreement, as reflected in Mr. Kobak's letters of January 20, March 27, and April 22, 2009.[2] I am also providing a response to the information request set forth in Mr. Kobak's letter of March 27, reiterated in his letter of April 27.

Since the Closing, we have been working diligently and patiently to receive the assets due to Barclays (putting aside for the moment the hundreds of millions of dollars of customer property that also remains undelivered), but Barclays' patience is not unlimited. You appear to have adopted positions that ignore and indeed contradict both the plain text of the agreements and what in fact occurred during the negotiations of the transaction, as well as the undertakings made by the Lehman side to induce Barclays to close this transaction. I am therefore compelled to correct the most egregious of the misstatements made in your correspondence as to the terms of the business deal, and to amplify our positions with respect to the assets that the Trustee, in disregard of pertinent contractual obligations, has failed to deliver.

Following your review of this letter, I request, at a mutually convenient time on the earliest practicable date, a high-level meeting to discuss our positions and determine whether an amicable resolution to these issues is possible.

I address each of the four categories of undelivered assets in turn below.

1. Clearance Box Assets

Based upon Mr. Kobak's letters of January 20 and March 27, it is apparently your position that the September 22, 2008 letter agreement by and among Barclays, the Trustee, and

---

[1] Capitalized terms not otherwise defined herein have the meanings set forth in my March 25 letter.

[2] Mr. Kobak's January 20 and March 27 letters were in response to the letters of Cleary Gottlieb Steen & Hamilton LLP dated December 29, 2008 and March 6, 2009, respectively.

the Depository Trust & Clearing Corporation ("DTCC") somehow amended the Clarification Letter executed by Barclays, LBHI, LB 745 LLC, and the Trustee. Mr. Kobak relies upon the statement in the DTCC Letter providing that the LBI accounts at the DTCC Clearing Agency Subsidiaries are "'Excluded Assets' within the meaning of the APA." Mr. Kobak argues that this statement "overrides any asserted conflicting language (including the more general references to "clearance boxes") set forth in the APA clarification letter executed two days before." March 27 Letter at 1.

Your position simply does not comport with either the plain text of the agreements or the negotiation that produced those agreements.

First, there is no conflict between the plain text of the Clarification Letter and that of the DTCC Letter. The Clarification Letter provides, in relevant part, that:

> Purchased Assets shall include … such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser (provided, however, that Purchaser in its discretion may elect within 60 days after the Closing to return any such securities to LBI); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below) are Purchased Assets.

Clarification Letter, at §1(a)(ii)(B).

The language from the DTCC Letter relied upon by Mr. Kobak provides as follows: "Barclays has indicated, and hereby agrees, that all of the accounts of LBI maintained at the Clearing Agencies Subsidiaries (the 'Accounts') constitute 'Excluded Assets' within the meaning of the APA." DTCC Letter, at ¶ 1. This language does not in any way contradict or modify the language quoted above, from Section 1(a)(ii)(B) of the Clarification Letter, which provides that certain categories of securities and other assets found within LBI's "clearance boxes" at the time of Closing were to be transferred to Barclays. By contrast, the DTCC letter simply confirms that the *accounts themselves* were not "Purchased Assets" and hence were not to be transferred to Barclays. There is no contradiction in language that provides both (1) Barclays was not acquiring the entirety of the various accounts (which would have presumptively included 100% of all assets and liabilities associated with those accounts), and (2) Barclays was instead acquiring only those securities and assets held in LBI's "clearances boxes" located within those various accounts (less certain securities owned by LBHI or one of its non-LBI subsidiaries). In short, the agreements provide that Barclays acquired securities within the accounts, rather than the accounts themselves.

Mr. Kobak's March 27 Letter contends that the distinction between the DTCC accounts themselves and the assets within those accounts "defies both common usage and common sense". That position could not be more wrong. There is nothing at all uncommon or nonsensical about an account owner agreeing to transfer securities from its account to another person, without agreeing to transfer the entire account. As explained above, that is precisely what was agreed to here. Moreover, "ownership" of a clearing account has no bearing whatsoever on the rights and obligations of the clearing member account holder vis-à-vis third

parties. Ownership of a clearing account governs only the rights and obligations of the account owner and the clearinghouse to each other. Put differently, ownership of a clearing account establishes only record ownership at the clearinghouse level and has no bearing on other agreements which establish beneficial ownership to assets in the account. Indeed, clearing accounts are structured specifically to immunize the clearinghouse from exposure to third party claims and legal relationships associated with activity in a clearing account. DTCC is in no way unique in this regard.

Second, the DTCC Letter cannot reasonably be read to be modifying the "clearance box" provision in the Clarification Letter. The DTCC Letter does not even mention the words "clearance boxes" or otherwise refer to Section 1(a)(ii)(B) of the Clarification Letter. Indeed, it does not reference the Clarification Letter anywhere, in any respect.

Mr. Kobak's letter of March 27 asserts that the Clarification Letter was "executed two days before" the DTCC Letter. That is not correct. As you well know, both the DTCC Letter and Clarification Letter were negotiated contemporaneously over the weekend of September 20-21, and were in fact executed simultaneously as part of the Closing on the morning of September 22, 2008. Indeed, your own time records submitted to the Bankruptcy Court for its approval make it clear that the Clarification Letter was not finalized on September 20, 2008, as you (like the rest of us) were reviewing drafts of the Clarification Letter on September 21 and into the early morning hours of September 22. All the Closing documents, which include the Clarification Letter, the DTCC Letter and numerous others, were reviewed and signed on your behalf at the Closing by AB Frelinghuysen. They were then delivered and exchanged in the early morning of September 22 at the Weil offices where Barclays and LBHI personnel and counsel also were present.

Under New York law, the actual time of execution, rather than the date listed on any agreement, determines whether agreements were contemporaneously executed. It is also well-established that contemporaneously executed agreements are to be read together. Thus, because the DTCC Letter and Clarification Letter were in fact executed contemporaneously and must be read together, there is no basis for the Trustee's position that the DTCC Letter somehow "overrides" the Trustee's obligations to Barclays under Section 1(a)(ii)(B) of the Clarification Letter.

Third, while it should not be necessary to go beyond the plain text of the agreements showing the Trustee's position to be without merit, the extrinsic evidence regarding the purpose of the DTCC Letter provides additional and overwhelming support for Barclays' position. As you know, the purpose of the DTCC Letter was solely to satisfy DTCC's concern regarding LBI's ability to honor its liabilities to DTCC (and its affiliates) arising from the winding down and closing of the LBI accounts. The DTCC Letter was not intended to affect, and does not in any way affect, LBI's liability to Barclays to deliver the Purchased Assets, including, without limitation, the "clearance box" securities under the Clarification Letter. To address DTCC's concerns that Lehman would not be able to fulfill its obligations to it, DTCC initially sought to have Barclays assume the LBI accounts at DTCC, thereby having Barclays "assume the liabilities associated with the accounts maintained by LBI at the DTCC and its subsidiaries . . . in their entirety and irrespective of whether assets or liabilities in a particular account were the

3

subject of the Purchase Agreement or were owned by LBI or an affiliate of LBI." Sale Order ¶
E.[3]

By Sunday night, September 21, it became apparent that DTCC's exposure to LBI from
processing the remaining transactions was substantially less than it had originally feared.
Accordingly, DTCC agreed in the DTCC Letter signed early the next morning that Barclays
would not assume the LBI accounts and liabilities to DTCC so long as Barclays agreed to deposit
$250 million of the purchase price with DTCC to serve as a limited recourse guarantee of LBI's
obligations to DTCC. As a result, at the same time that the DTCC Letter was being finalized, the
draft Clarification Letter was revised to provide that "LBI hereby instructs Purchaser to pay at
the Closing $250 million of the Cash Amount to Depository Trust Clearance Corporation . . . for
deposit as collateral against LBI's obligations to DTC (including its affiliated clearing
organizations). Such collateral account shall be maintained in accordance with the agreement
[i.e, the DTCC Letter] among LBI, Purchaser and DTC entered into in connection with the
Closing." Clarification Letter § 1(d).[4] Further, the Clarification Letter confirms that "Liabilities
arising under Seller's arrangements with DTC and its affiliated clearing organizations shall be
Excluded Liabilities." Clarification Letter § 8.

Thus, the purpose for the provision in the DTCC Letter stating that LBI's "accounts" at
DTCC are "Excluded Assets" was to confirm that, contrary to DTCC's original request, Barclays
was not going to be required to assume the accounts together with all liabilities in those
accounts. Instead, Barclays was obligated only to deposit the $250 million. The provision in no
way changed the agreement between the Trustee and Barclays to transfer the "clearance box"
securities to Barclays, just because some or all of those securities may have been located within
the DTCC system.

Fourth, on a number of occasions since the date of the Closing, the Trustee has
acknowledged (or at least failed to object to) the existence of an LBI obligation to transfer the
"clearance box" securities. In particular, the Trustee never communicated its view that the
DTCC Letter somehow rescinded its obligation to transfer the clearance box securities, despite
the following acknowledgements of Barclays' right to delivery of those securities:

- On September 30, 2008, LBHI filed with the Bankruptcy Court Schedule A and
Schedule B to the Clarification Letter bearing the legend: "Schedule B lists
securities believed to be held in LBI's "clearance boxes" as of the time of the
Closing (as defined in the Clarifying Letter) and is without prejudice to the right
of Barclays to receive other securities held in such clearance boxes but not listed
on Schedule B or to return securities, in each case pursuant to the terms of the
Clarifying Letter." The Trustee never questioned why Schedule B was being filed
or being characterized as not necessarily complete if Barclays had supposedly

---

[3] This statement in the Sale Order reflects the original understanding that Barclays would assume the DTCC
accounts "in their entirety," but would not necessarily acquire 100% of the assets *within* those accounts, thereby
further undermining your position that there is no such distinction.

[4] The Clarification Letter also superseded Amendment No. 1 to the Asset Purchase Agreement, which had provided
an earlier method for addressing DTCC's concerns about the satisfaction of LBI's liabilities to it.

4

disclaimed receipt of these securities by entering into the DTCC Letter on
September 22.

- The Services and Settlement Agreement dated as of September 22, 2008 among
  JPMorgan Chase Bank N.A., Barclays, the Trustee and LBHI, which was
  executed simultaneously with the Clarification Letter and the DTCC Letter, but
  has since been superseded by the JPM Settlement Agreement described below,
  expressly reserved Barclays' "interest in the cash, securities or other property . . .
  on the date hereof, . . . [in] any accounts maintained for LBI's customers or any
  lien-free accounts at Depository Trust Company." Services and Settlement
  Agreement § 2.

- Moreover, the December 5, 2008 Settlement Agreement among JPMorgan Chase
  Bank, N.A., Barclays, and the Trustee (the "JPM Settlement Agreement), which
  was negotiated after the simultaneous execution of the Closing documents,
  reserves Barclays' rights with respect to "securities or other assets held in any
  lien-free account at DTC . . ." JPM Settlement Agreement ¶ 3(b)(iii). This
  statement shows that as of December 5, 2008, Barclays and the Trustee
  recognized Barclays' unwavering view that it was entitled to "lien-free" securities
  at DTC. It also recognizes the distinction between the LBI *account* at DTCC and
  the "securities or other assets held" *within* such account.[5]

    Fifth, while you have taken the position since January 20, 2009 that you are not obligated
to transfer any clearance box securities, in the weeks following the Closing you in fact did
transfer such securities. In Mr. Kobak's letters of March 27 and April 27, he claims to be
unaware of the Trustee making any transfers of clearance box securities, and asks for
information regarding which transfers Barclays believes have occurred. In response to that
request, Barclays identifies the following transfers of clearance box securities:

    (i)      $1.035 billion from DTCC on September 19;

    (ii)     $270 million from DTCC on September 29;

    (iii)   $146 million from DTCC on September 30; and

    (iv)   $15 million from DTCC on September 30.[6]

    These transfers represent a significant portion of the securities listed on Schedule B,
which was filed with the Court on September 30, 2008 in order to identify the "securities

---

[5] The JPM Settlement Agreement also put the Trustee on notice of other assets to which Barclays asserted its rights,
including, without limitation, "securities or balances held in any reserve or segregated account maintained at any
time by or on behalf of LBI in accordance with Rule 15c3-3 under the Securities Exchange Act of 1934" as well as
"securities or other assets posted or held in respect of listed or exchange-traded contracts, including margin or
collateral held by or for the benefit of any exchange, depository, clearing firm, clearing organization or other
facility." JPM Settlement Agreement ¶ 3(b)(ii), (iv). We address these other undelivered assets below.

[6] The values listed in (i) through (iv) above are LBI market values, not Barclays' values.

believed to be held in LBI's 'clearance boxes' as of the time of the Closing." You therefore have no basis for refusing to complete the transfer of the remaining securities listed on Schedule B and other unencumbered securities that were in various "clearance boxes" as of the time of Closing.[7]

## 2. $769 Million of Securities

Section 8 of the Clarification Letter provides that in connection with the transfer of all LBI customer accounts to Barclays, "Purchaser shall receive ... (ii) to the extent permitted by applicable law, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value." Prior to the execution of the Clarification Letter, Lehman had indicated to Barclays that the SEC staff had informally signed off on this provision.

You have now taken the position that the introductory language, "to the extent permitted by applicable law," goes beyond what the SEC will permit with respect to the actual 15c3-3 securities, and somehow incorporates the limitation that no *substitute* property may be transferred to the extent there would remain an aggregate shortage of customer property. April 22 Letter at 1–2. That is an unjustifiable reading of this provision of the Clarification Letter. Securities valued at $769 million were part of the consideration to be delivered to Barclays. It was clearly represented and explained by Lehman to Barclays prior to execution of the Clarification Letter that the 15c3-3 reserve account held securities and cash of LBI substantially in excess of the Rule 15c3-3 reserve requirements. It was agreed that $769 million of securities in the reserve account could be delivered to Barclays as part of the sale, but, it was also agreed that if for any reason the Rule 15c3-3 reserve requirements did not permit the transfer of the securities in that reserve account, then LBI would instead transfer "securities of substantially the same nature and value." In other words, the language "to the extent permitted by applicable law" was included to condition the transfer of the assets from the actual Rule 15c3-3 account on compliance with applicable regulatory requirements. If applicable law would not permit such transfer, then LBI nonetheless remained obligated to find and transfer to Barclays alternative assets to substitute for the $769 million of Rule 15c3-3 securities.

Repeatedly, you have taken the position that the transfer of any further non-customer assets purchased by Barclays is "premature" as long as "an allocation between 'customer property' and general estate assets has not yet been made." January 20 Letter at 1. According to you, because "'customer property' as defined by SIPA can and commonly does include what might otherwise be considered proprietary securities necessary to satisfy customers' net equity claims," you refuse even to consider transferring any further assets until "there is more complete knowledge as to the magnitude of customer claims and the extent and nature of all assets available to the estate." January 20 Letter at 1.

The Trustee's obligations to LBI customers do not grant you license to breach the obligations undertaken by LBI in the Purchase Agreement. Consistent with the Trustee's

---

[7] In his March 27 letter, Mr. Kobak also asked "by what authority Barclays personnel took it upon themselves to access LBI information not pertaining in any way to PIM customers." The answer is simple: the definition of Purchased Assets in the APA includes LBI's "books and records" related to Purchased Assets. In carefully reviewing information concerning the undelivered "clearance box" securities and other Purchased Assets, Barclays accessed information needed to identify and locate Purchased Assets.

obligations to customers under SIPA, LBI contracted to deliver proprietary securities and other
LBI property to Barclays. The Trustee was authorized to transact in LBI's proprietary property
and committed to delivering that property to Barclays at the Closing or "as soon as practicable
after the Closing." The passage of time does not convert the Purchased Assets into "customer
property" by the expediency of their having not yet been delivered to Barclays.

### 3. OCC Margin Account

The express language of the Clarification Letter and the Transfer and Assumption
Agreement ("TAA") entitles Barclays to receive "all margin deposits held by OCC with respect
to the Account." Thus, Barclays is entitled to receive all amounts held as margin for LBI with
respect to its account at the Options Clearing Corporation ("OCC"), including the amounts held
with JPMorgan Chase Bank, N.A. subject to an OCC lien ("OCC Margin"). The language of the
Clarification Letter and the TAA is broad and unequivocal. The Trustee's reasons for refusing to
consent to the transfer of the OCC Margin disregard this fact.

The Clarification Letter provides that Barclays is to receive "any property that may be
held to secure obligations under [exchange-traded] derivatives." Clarification Letter § 1(a)(ii)(C)
(emphasis added). Section 1(a) of the TAA, which the Trustee signed on behalf of LBI, states:

> For good and valuable consideration, the receipt and sufficiency of which are
> hereby acknowledged, *Lehman hereby sells*, assigns, transfers, and sets over *to
> Barclays*, without recourse or without representation or warranty (other than as
> expressly provided herein), *all of Lehman's rights, title, interests, powers,
> privileges, remedies, obligations, and duties in, to, under, and in respect of the
> Account*, as of the Effective Date *including* with respect to the Account: (i) the
> Clearing Fund deposit; (ii) *all margin deposits held by OCC with respect to the
> Account*; (iii) all settlement obligations with regard to transactions in cleared
> contracts; and (iv) all rights and obligations in respect of exercise of option
> contracts and assignments of such exercises.

(Emphasis added).

In light of this clear language, the Trustee has no basis for refusing to agree to the transfer
of the remaining margin deposits. You assert that the TAA was *intended* "solely to assure the
OCC that there would be assets available for satisfaction of liabilities from LBI's outstanding
short derivatives positions." However, the plain text of the TAA also confirms the plain
meaning of the APA: Barclays acquired "all margin deposits." Therefore, as the language is
unambiguous, there is no need to go to intent. Moreover, no matter what the Trustee now
suggests was the "intent", the phrase "all margin deposits" cannot reasonably be read to mean, as
you assert, only the margin deposit that is not "in excess of the amount necessary to satisfy
liabilities associated with LBI's derivative trades." April 22 Letter at 3.

There is nothing in the TAA or elsewhere that could support such a radical rewriting of
the TAA provision quoted above. The express language of the TAA does not place any
limitation on Barclays' right to receive "all margin deposits held by OCC." The Trustee must

7

abide by the terms of the agreements he negotiated and signed and cannot now apply a different interpretation or purported intention to the Clarification Letter or the TAA.[8]

Accordingly, the Trustee should consent to the transfer of the OCC Margin as required by JPMorgan Chase Bank, N.A., which is currently holding the OCC Margin as agent on behalf of OCC.

### 4. Security for Exchange-Traded Derivatives

As explained above, Section 1(a)(ii)(C) of the Clarification Letter provides that "Purchased Assets" includes "any property that may be held to secure obligations under [exchange-traded] derivatives." Barclays has yet to receive certain cash balances and securities held to secure obligations of LBI and/or its customers in respect of such exchange-trade derivatives.

Barclays recognizes that the first step in resolving its claim to balances in the futures margin accounts in foreign locations involves identification of the accounts and ensuring that there are open positions in these accounts. As early as December 23, 2008, Barclays provided the Trustee with a list of various futures margin accounts, indicating whether there were open positions in the accounts at the time of the LBI transfer to Barclays and requesting the Trustee's assistance in recovering balances of accounts with open positions from various foreign locations. Since that time, Barclays has had continuing discussions with the Trustee regarding the recovery of these accounts and understands that the Trustee has itself identified a list of accounts in foreign locations and is working to secure their return. Barclays would appreciate receiving that list (to reconcile with its records) along with any information regarding the claims filed (or caused to be filed) and actions taken by the Trustee with respect to the accounts identified by Barclays and the accounts identified by the Trustee.

As to whether Barclays is entitled to any "residuum of property or cash" in the accounts after trades have been closed out or customer obligations have been satisfied, Barclays sees no basis for a position other than that summarized above regarding the OCC Margin.

\* \* \*

In light of the foregoing, we believe it would be productive to conduct a high-level meeting that would include you, Jim Kobak, representatives of SIPC, anyone from Deloitte you wish to include, and others that might assist in an effort to determine if resolution of these issues is possible. For this meeting to have any benefit, both Barclays and Hughes Hubbard must be prepared to address the questions that have been raised. We would propose that this meeting be conducted under the auspices of Rule 408 of the Federal Rules of Evidence as a "settlement discussion." We are available to meet the week of May 18, 2009 at a time and place that is

---

[8] Mr. Kobak's April 22 letter asserts that Barclays' interpretation of the TAA "would risk violation of Rule 15c3-3 and would mean that deposits that may have to be allocated in whole or in part to customer property and used to satisfy customer claims would not be available, leading to customer shortfalls." We reject the vague assertion that Rule 15c3-3 prevents compliance with the plain terms of the TAA.

8

mutually convenient.  Please advise as to whether you and your representatives are willing and prepared to participate in such a meeting.

Sincerely,

Jonathan Hughes

cc: Jim Kobak, Esq.
    Ken Caputo, Esq.
    Lindsee Granfield, Esq.
    Jonathan Schiller, Esq.
    Ken Raisler, Esq.

9

# BCI EXHIBIT

# 169

# BOIES, SCHILLER & FLEXNER LLP

575 LEXINGTON AVENUE • 7TH FLOOR • NEW YORK, NY 10022 • PH. 212.446.2300 • FAX 212.446.2350

June 8, 2009

<u>BY HAND</u>

James Kobak, Jr. Esq.
Hughes, Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004

<u>*In re Lehman Brothers Holdings Inc., et al.*,</u> Case No. 08-13555 (JMP)

Dear Jim:

Please find enclosed a disc containing information gathered in response to your mail of May 28. The disc contains Schedules A and B to the Clarification Letter as filed with the Court on September 30, 2008, and four spreadsheets showing the specific securities transferred to Barclays in the four transfers referenced in the Jonathan Hughes May 13, 2009 letter to Jim Giddens. A comparison of these spreadsheets to the two schedules shows that the securities in the four transfers are found on Schedule B.

In addition, the disc contains a copy of an LBI internal email that was provided to Barclays during the acquisition negotiations. This email shows that LBI's 15c3-3 reserve account contained $1 billion of cash and $769 million in securities, and indicates that the SEC had approved transferring up to $1 billion from this "lock up" amount.

We are continuing to review your requests in an effort to determine what other information might be useful for the June 12 meeting. Please let us know if you have been able to gather any of the information requested by Jonathan Hughes in his June 1 email to you.

Sincerely,

Hamish Hume

Enclosure

# BCI EXHIBIT

# 170

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

June 11, 2009

**BY MAIL AND EMAIL**

Hamish Hume, Esq.
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York NY 10022

> Re:    *In re Lehman Brothers Inc., et al*, Case No. 08-01420
> (JMP) SIPA

Dear Mr. Hume:

Thank you for your June 8 letter and enclosures, which provided only partial and minimal information in response to the requests that we have been making for many months.

With respect to the four spreadsheets you provided, our analysis shows that the CUSIPs listed in those files reflect a delivery of securities for the repo transaction with Barclays. I have previously asked Jonathan to confirm if Barclays has a different position but have received no response to that request.

You provided an internal Lehman email from the morning of September 19 that you say indicates the SEC's approval of the transfer of up to $1 billion from the 15c3-3 reserve fund. The record is clear that the SEC would not even consider authorizing an actual transfer unless there was in fact an excess in the 15c3-3 reserve account and customers would be fully protected. The Trustee's investigation to date reveals that those conditions have never existed and do not exist to date. At a minimum, certain balances should have been accounted for in the 15c3-3 calculation but were not. Even preliminary calculations indicate a serious a shortfall, not an excess, in the 15c3-3 account as of September 19. In addition, as you well know, it is unclear at this time whether there are sufficient other assets for customers to be fully protected without resorting to the assets Barclays claims in the 15c3-3 account.

We are continuing to work on the other requests made in Jonathan Hughes' June 1 email. Meantime, I enclose a copy of a September 19 15c3-3 reserve account calculation, and an October 22, 2008 email reflecting 15c3-3 cash and collateral held at Chase and Wells Fargo, both provided to the Trustee's office by Barclays.

In connection with Barclays' claim for the clearance box assets, the Trustee's office has been examining Schedule B to the Clarification Letter and Exhibits A and B to Lindsee Granfield's March 6 letter. These efforts would be greatly assisted by a response to the requests in my March 27 letter and May 28 email to Jonathan Hughes that Barclays provide documentation to support the position that none of the items that Barclays claims in its schedules

could be considered the property of or subject to claims by customers or other Lehman entities including LBIE. It would also be enormously helpful if Barclays provided an explanation of the methodology by which these lists were compiled.

I look forward also to Barclays' response to the other requests in my May 28 email, specifically for an understanding of the chronology of what Barclays believes occurred during the negotiations and the specific undertakings Barclays believes were made to induce Barclays to close this transaction, as well as the drafts of the clarifying and DTCC letters and the correspondence between Barclays and DTCC regarding its exposure.

In order for a meeting to be productive, I believe that this information, much of which I have been requesting for some months, should have been provided in sufficient time for it to be reviewed in advance. It appears now that this will not be the case. That said, if Barclays prefers to proceed with the meeting this Friday, the Trustee is prepared to go forward as an accommodation to Jonathan. We do expect that those in attendance for Barclays will be in a position to provide, at last, the information that we have been requesting.

Very truly yours,

James B. Kobak

JBK

Enclosure

60689185 1.DOC

# SIPC Trustee Requests

**Request Dated: 10/07/08**

**Lehman Request: # 14(n)**

**"Confidential Treatment Requested"**

## LEHMAN BROTHERS

1/1

**LEHMAN BROTHERS INC.**
**CONSOLIDATED 15c3-3 RESERVE FORMULA**
**AS OF SEPTEMBER 19, 2008**
*(in 000's)*

| | BD UNIT | GOVT UNIT | TOTAL |
|---|---|---|---|
| **CREDITS:** | | | |
| CUSTOMER CREDITS | 7,413,270 | 11,513,850 | 18,927,120 |
| CUSTOMER BANK LOAN | 866,229 | - | 866,229 |
| CUSTOMER STOCK LOAN | 2,030,953 | 88,169 | 2,119,122 |
| CUSTOMER FAIL TO RECEIVE | 4,123,101 | 946,595 | 5,069,696 |
| FIRM SHORT VS CUSTOMER LONG | 5,561,060 | 959,293 | 6,520,353 |
| CUSTOMER DIVIDENDS AND INTEREST | 5,322 | - | 5,322 |
| SECURITY COUNT DIFFERENCE | - | - | - |
| SUSPENSE ACCOUNT CREDITS AND SMV | 132,162 | 83,201 | 215,363 |
| AGED TRANSFER AND REORGANIZATION | - | - | - |
| OTHER | - | - | - |
| **TOTAL CREDITS** | 20,132,097 | 13,591,108 | 33,723,205 |
| **DEBITS:** | | | |
| CUSTOMER DEBITS | 12,909,569 | 2,784,116 | 15,693,685 |
| CUSTOMER STOCK BORROW | 4,380,656 | 456,993 | 4,837,649 |
| CUSTOMER FAIL TO DELIVER | 3,217,880 | 9,923,087 | 13,140,967 |
| CUSTOMER MARGIN WITH OCC | 507,418 | - | 507,418 |
| OTHER | - | - | - |
| AGGREGATE DEBITS | 21,015,523 | 13,164,196 | 34,179,719 |
| LESS 3% OF AGGREGATE DEBIT ITEMS | (630,466) | (394,926) | (1,025,392) |
| **TOTAL DEBITS** | 20,385,057 | 12,769,270 | 33,154,327 |
| EXCESS OF CREDITS OVER DEBITS | - | 821,838 | 821,838 |
| EXCESS OF DEBITS OVER CREDITS | 252,960 | - | (252,960) |
| CUSHION | | | |
| **PRELIMINARY AMOUNT SEGREGATED** | | | 568,878 |
| RR/SEC. BORROWED - 2% DEDUCTION | | | |
| **ADJUSTED REGULATORY LOCK-UP** | | | 569,000 |

## Montalbano, Loretta

| | |
|---|---|
| **From:** | william.burke@barclayscapital.com |
| **Sent:** | Wednesday, October 22, 2008 12:08 PM |
| **To:** | Karp, Marlo (US - Parsippany); anthony.stucchio@barclayscapital.com |
| **Subject:** | RE: 15c3 account at Chase |
| **Attachments:** | Document.pdf |

Marlo,
The customer Reserve collateral is held in a LW7 and PAIB is held in the LWA accounts at Chase. See the attached files
that reflect collateral held at Chase. Also included is a statement reflecting the cash on deposit with Wells Fargo.
Regards, Bill

---

**From:** Karp, Marlo (US - Parsippany) [mailto:mkarp@deloitte.com]
**Sent:** Wednesday, October 22, 2008 11:49 AM
**To:** Stucchio, Anthony; Burke, William T
**Subject:** RE: 15c3 account at Chase

Thanks!


**Marlo Karp**
Partner
Regulatory & Capital Markets Consulting
Deloitte & Touche LLP

Tel: (or Direct:) +1 973 602 6394
Main: +1 973 602 6000
Fax: +1 973 451 5159
Mobile: + 1 973 715 3625
mkarp@deloitte.com
www.deloitte.com

100 Kimball Drive
Parsippany, NJ 07054
USA

🖶 Please consider the environment before printing this message

**From:** anthony.stucchio@barclayscapital.com [mailto:anthony.stucchio@barclayscapital.com]
**Sent:** Wednesday, October 22, 2008 11:44 AM
**To:** Karp, Marlo (US - Parsippany); william.burke@barclayscapital.com
**Subject:** RE: 15c3 account at Chase

Bill will get if for you.

---

**From:** Karp, Marlo (US - Parsippany) [mailto:mkarp@deloitte.com]
**Sent:** Wednesday, October 22, 2008 10:47 AM
**To:** Stucchio, Anthony; Burke, William T
**Subject:** 15c3 account at Chase

HI Guys

Did you have a chance to look up the account number for the 15c3 account at Chase that holds the GNMA securities? We are trying to get confirmation that the GNMA securities are in place. If you have separate confirmation of that, please let me know. This is urgent in resolving multiple issues with Chase.

Thank you
Marlo

**Marlo Karp**
Partner
Regulatory & Capital Markets Consulting
Deloitte & Touche LLP

Tel: (or Direct:) +1 973 602 6394
Main: +1 973 602 6000
Fax: +1 973 451 5159
Mobile: + 1 973 715 3625
mkarp@deloitte.com
www.deloitte.com

100 Kimball Drive
Parsippany, NJ 07054
USA

 Please consider the environment before printing this message

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message.

Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited. [v.E.1]

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unless specifically indicated, this e-mail is not\an offer to buy or sell or a solicitation to buy or sell any securities, investment products or other financial product or service, an official confirmation of any transaction, or an official statement of Barclays. Any views or opinions presented are solely those of the author and do not necessarily represent those of Barclays. This e-mail is subject to terms available at the following link: www.barcap.com/emaildisclaimer. By messaging with Barclays you consent to the foregoing. Barclays Capital is the investment banking division of Barclays Bank PLC, a company registered in England (number 1026167) with its registered office at 1 Churchill Place, London, E14 5HP. This email may relate to or be sent from other members of the Barclays Group.

This e-mail may contain information that is confidential, privileged or otherwise protected from disclosure. If you are not an intended recipient of this e-mail, do not duplicate or redistribute it by any means. Please delete it and any attachments and notify the sender that you have received it in error. Unless specifically indicated, this e-mail is not an offer to buy or sell or a solicitation to buy or sell any securities, investment products or other financial product or service, an official confirmation of any transaction, or an official statement of Barclays. Any views or opinions presented are solely those of the author and do not necessarily represent those of Barclays. This e-mail is subject to terms available at the following link: www.barcap.com/emaildisclaimer. By messaging with Barclays you consent to the foregoing. Barclays Capital is the investment banking division of Barclays Bank PLC, a company registered in England (number 1026167) with its

registered office at 1 Churchill Place, London, E14 5HP.  This email may relate to or be sent from other members of the Barclays Group.



JPMORGAN CHASE BANK RDNS RB3/SYSTEM
Position Report

| SECURITY ISSUE | CUSIP | TOTAL POS | BOOK POS | DESK POS | EXCHANGE | MARKET VALUE | COUPON VALUE | COLLATERAL |
|---|---|---|---|---|---|---|---|---|

JPMORGAN CHASE BANK NFA SYSTEM
Position Report

BUSINESS DATE:   8-OCT-2008

CUSTOMER I.D.: D47 / LEHMAN BROTHERS INC ISOC

PAGE
8-OCT-2008 20:34:24.5

| | TOTAL POSITION | BOOK POSITION | BASK POSITION | EXCHANGE | MARKET VALUE | COUPON VALUE | CONTINGENT |
|---|---|---|---|---|---|---|---|
| TOTALS | 0 | 0 | 0 | 0 | 0.00 | 0.00 | 0 |
| STATUS | $35,435,000 | $35,435,000 | | 0 | 735,313,585.34 | 8,211,329.00 | 0 |
| TOTALS | $35,435,000 | $35,435,000 | | | | | |

MARKET PLUS COUPON VALUE   746,524,714.34

TOTAL NUMBER OF POSITIONS   0

(KR) POSITIONS
FROM: SUMMARY

PAGE
TO: END OF SUMMARY

8-OCT-2008 20:34:24.45



BUSINESS DATE: 8-OCT-2008

CUSTOMER: ... / LEHMAN BROS/...

PROGRAM CALSE BANK EDGE ED3 SYSTEM
POSITION REPORT

PAGE   12
8-OCT-2008 20:34:29.45

| | TOTAL POSITION | BOOK POSITION | DESK POSITION | EXCHANGE | MARKET VALUE | COUPON VALUE | COLLATERAL |
|---|---|---|---|---|---|---|---|
| CARES | | 0 | 0 | 0 | 0.00 | 0.00 | 0 |
| BONDS | 0 | 0 | 0 | 0 | 0.00 | 0.00 | 0 |
| TOTAL | $71,278.17 | $77,248.8674 | | 0 | $99,651,534.00 | $16,708.68 | 0 |

TOTAL NUMBER OF POSITIONS

$99,128,242.67

PAGE   12
8-OCT-2008 20:34:29.45

Page: 1 Document Name: untitled

DDE1 & IDS  ACCOUNT BALANCE HISTORY    08/10/17 15.26.44
                                WS      PRESS ENTER TO CONTINUE
                                        ACCT COND
                                        SHORT NAME  LEHMAN BROTHERS 1503-3

| XENT ACTION PROD CODE | CO CODE IDA | 3 OB CO ID ACCT | LEDGER | ACCOUNT BALANCE (COLLECTED/OPEN LONG COLLECTED) |
|---|---|---|---|---|
| DATE | CO | DDA | ACCT | | |
| 108/10/16 | | 114 | 670103429 | 907,555,503.79 | 907,555,503.79 |
| 108/10/15 | | | | 907,555,503.28 | 907,555,503.28 |
| 108/10/14 | | | | 907,555,503.79 | 907,555,503.79 |
| 108/10/13 | | | | 1,000,000,000.00 | 1,000,000,000.00 |
| 108/10/12 | | | | 1,000,000,000.00 | 1,000,000,000.00 |
| 108/10/11 | | | | 1,000,000,000.00 | 1,000,000,000.00 |
| 108/10/10 | | | | 1,000,000,000.00 | 1,000,000,000.00 |
| 108/10/09 | | | | 1,000,000,000.00 | 1,000,000,000.00 |
| 108/10/08 | | | | 1,000,000,000.00 | 1,000,000,000.00 |
| 108/10/07 | | | | 1,000,000,000.00 | 1,000,000,000.00 |
| 108/10/06 | | | | 1,000,000,000.00 | 1,000,000,000.00 |
| 108/10/05 | | | | 1,000,000,000.00 | 1,000,000,000.00 |
| 108/10/04 | | | | 1,000,000,000.00 | 1,000,000,000.00 |
| 108/10/03 | | | | 1,000,000,000.00 | 1,000,000,000.00 |
| 108/10/02 | | | | 1,000,000,000.00 | 1,000,000,000.00 |

PF: 10 -PREV 11 -NEXT

Page: 1 Document Name: untitled

XENT  6 IDS  DDA/SAV INQUIRY                        08/10/17 15:26:52
ACTION ITEM                        ACTION SUCCESSFUL

SHORT-NAME LEHMAN BROTHERS 1263-1
NSF/OD. TODAY N

AVAILABLE BALANCE INFO
907,555,503.79

907,555,503.79

# WELLS
# FARGO
Facsimile Cover Sheet    FAX: 612-667-7251

## 90 South 7th Street, Minneapolis, Minnesota    55429

To: Martin Flaherty
Company: Lehman Brothers
Phone:
Fax: 646-834-4373

From: Mike Skok
Company: Wells Fargo
Phone: 612-316-4622
Fax: 612-667-7251

Date: 10/17/2008
Pages including
this cover page: 3

Comments:

15c3-3 balances

Thank you

# BCI EXHIBIT

# 171

# B O I E S ,    S C H I L L E R    &    F L E X N E R    L L P

575 LEXINGTON AVENUE • 7TH FLOOR • NEW YORK, NY 10022 • PH. 212.446.2300 • FAX 212.446.2350

July 16, 2009

<u>BY EMAIL</u>

Robert W. Gaffey
Jones Day
222 East 41st Street
New York, NY 10017-6702

<u>*In re Lehman Brothers Holding Inc., et al.,* Case No. 08-13555 (JMP)</u>

Dear Bob:

        As part of Barclays' ongoing production of documents, enclosed are the documents we discussed concerning information showing aggregate bonus and severance compensation amounts for Transferred Employees and aggregate cure payments.  Please note that the cure payment information is current as of July 14, 2009, and that a number of cure cost objections remain outstanding.  These documents, Bates numbered BCI-EX-00077272 through BCI-EX-00077286 and BCI-EX-00077287, are designated as Highly Confidential under the July 14, 2009 Confidentiality Stipulation and Protective Order.

                Very truly yours,

                Jack G. Stern

JGS:ck

cc:    James Tecce, Quinn Emanuel
       Counsel to the Creditors' Committee (By Email, with Enclosure)

       James B. Kobak, Jr., Hughes Hubbard & Reed
       Counsel to the LBI Trustee (By Email, with Enclosure)

       Robert L. Byman, Jenner & Block
       Counsel to the Examiner (By Email, with Enclosure)

| | A<br>Date Submitted for<br>Payment | B<br>Vendor Name | C<br>Actual Amount of<br>Payment |
|---|---|---|---|
| 1 | | | |
| 2 | 22-Sep | Rolfe & Nolan | $524,009.73 |
| 3 | 22-Sep | PatSystems | $145,130.50 |
| 4 | 23-Sep | Con Edison | $329,005.71 |
| 5 | 23-Sep | HESS Corporation | $671,897.03 |
| 6 | 23-Sep | Environmental Contracting Corp. | $393,000.00 |
| 7 | 23-Sep | Rockefeller Center Mgmt | $390,377.08 |
| 8 | 23-Sep | Tishman Speyer Development, LLC | $3,458,645.00 |
| 9 | 23-Sep | Tishman Speyer Development, LLC | $567,816.63 |
| 10 | 25-Sep | NYSE ARCA LLC | $3,845,213.91 |
| 11 | 25-Sep | BATS Trading | $6,698,055.32 |
| 12 | 25-Sep | Trading Screen | $531,940.00 |
| 13 | 27-Sep | Ridge Technologies Inc. | $19,837.00 |
| 14 | 27-Sep | Beeline.com Inc | $6,235,918.75 |
| 15 | 30-Sep | Rockefeller Center Mgmt | $95,583.90 |
| 16 | 30-Sep | Fox River Execution Technology LLC | $306,711.72 |
| 17 | 30-Sep | Direct edge | $994,235.74 |
| 18 | 30-Sep | Investment Technology Group Inc* | $1,139,838.15 |
| 19 | 2-Oct | Tzero Processing services | $122,620.90 |
| 20 | 3-Oct | Vigliant LLC | $40,000.00 |
| 21 | 3-Oct | Tibco Software Inc | $1,637,797.28 |
| 22 | 3-Oct | Swaps Monitor | $64,992.09 |
| 23 | 3-Oct | Nansco Inc | $70,000.00 |
| 24 | 3-Oct | M&M technologies Corp | $707,590.00 |
| 25 | 3-Oct | Key Systems | $240,300.00 |
| 26 | 3-Oct | eClerx services limited | $561,340.33 |
| 27 | 3-Oct | Dell Marketing LP | $173,925.56 |
| 28 | 3-Oct | cortese consulting | $126,000.00 |
| 29 | 3-Oct | Advanced Innovative Marketing LLC | $38,772.88 |
| 30 | 3-Oct | Cushman & Wakefield | $2,081,170.92 |
| 31 | 4-Oct | Alternative Business Accomodations, Inc | $1,196,378.30 |
| 32 | 4-Oct | Altova | $111,142.50 |
| 33 | 4-Oct | Decision Design Corp | $17,875.00 |
| 34 | 4-Oct | Exegy Inc | $214,143.82 |
| 35 | 4-Oct | Headstrong Services, LLC | $645,900.00 |

BCI-EX-00077272

Highly Confidential

BCI-EX-00077273

Highly Confidential

| | A | B | C |
|---|---|---|---|
| 36 | 4-Oct | Joint Technology Development Corp. | $1,362,391.43 |
| 37 | 4-Oct | Market Research.com Profound | $287,326.55 |
| 38 | 4-Oct | Ramsey Quantitative Systems inc | $14,220.00 |
| 39 | 4-Oct | Sipera Systems Inc. | $221,877.80 |
| 40 | 4-Oct | TNT Expense Management LLC | $739,118.77 |
| 41 | 4-Oct | Trade Data** | $118,429.52 |
| 42 | 4-Oct | Tishman Speyer Development, LLC | $351,236.24 |
| 43 | 7-Oct | Tradebot Systems inc. | $51,339.87 |
| 44 | 9-Oct | Chancellor Dougall | $20,016.78 |
| 45 | 9-Oct | Daktronics | $149,557.50 |
| 46 | 9-Oct | Restaurant Associates | $293,118.00 |
| 47 | 9-Oct | Mirror Image Internet Inc. | $4,000.00 |
| 48 | 9-Oct | Michael Andrews Audio Visual Services Inc | $304,810.12 |
| 49 | 9-Oct | Murex North America | $130,487.96 |
| 50 | 9-Oct | PTS Consulting | $184,632.61 |
| 51 | 9-Oct | Jed Consulting | $60,000.00 |
| 52 | 9-Oct | Xpheria Llc | $302,500.00 |
| 53 | 9-Oct | Rational Enterprises LLC /Rational Consulting | $59,000.00 |
| 54 | 9-Oct | UST Global Inc | $365,698.43 |
| 55 | 9-Oct | Eurest | $91,115.61 |
| 56 | 9-Oct | Bloom Securities LLC | $1,464.00 |
| 57 | 9-Oct | Thomas Weisel Partners LLC | $134,130.30 |
| 58 | 9-Oct | Order Execution Services LLC | $125,648.17 |
| 59 | 9-Oct | Independent Brokers LLC | $118,279.50 |
| 60 | 9-Oct | NY Giants | $360,000.00 |
| 61 | 10-Oct | VVA LLC | $18,466.95 |
| 62 | 14-Oct | Thru Point Inc. | $77,350.00 |
| 63 | 14-Oct | Plus One Holdings, Inc. | $104,749.14 |
| 64 | 14-Oct | CMS Logistics, LLC | $30,880.00 |
| 65 | 14-Oct | Executive Transportation Group | $763,961.00 |
| 66 | 14-Oct | UTC Associates | $109,650.00 |
| 67 | 15-Oct | Video Corporation of America | $294,232.50 |
| 68 | 15-Oct | Corporate Transporation Group Ltd (CTG) | $207,345.00 |
| 69 | 15-Oct | Fairmont Hotel San Francisco | $10,000.00 |
| 70 | 15-Oct | Loews Miami Beach Hotel | $189,621.91 |
| 71 | 15-Oct | Decision Economics Inc. | $23,077.00 |

BCI-EX-00077274

| | A | B | C |
|---|---|---|---|
| 72 | 15-Oct | Flyte Time Worldwide | $11,451.05 |
| 73 | 15-Oct | Larsen & Toubro Infotech Limited | $1,483,030.60 |
| 74 | 15-Oct | Actuate Corp. | $468,000.00 |
| 75 | 15-Oct | Enterprise Engineering Inc. | $42,000.00 |
| 76 | 15-Oct | Align Communications | $793,330.00 |
| 77 | 15-Oct | Infinite Computer Solutions Inc. | $74,958.00 |
| 78 | 15-Oct | TelecommunicationsSystems Inc. | $111,003.75 |
| 79 | 15-Oct | Forest Electric | $79,575.92 |
| 80 | 15-Oct | Essential Trading Systems Corporation | $78,452.18 |
| 81 | 15-Oct | UMT Consulting Group LLC | $129,800.00 |
| 82 | 15-Oct | Iris Software, Inc | $418,787.75 |
| 83 | 15-Oct | Broadridge Securities Processing Solutions | $5,820,609.87 |
| 84 | 15-Oct | CLS Bank International | $344,998.57 |
| 85 | 15-Oct | eBX LLC / Alternative Trading Systems | $377,405.90 |
| 86 | 15-Oct | Access Data Corp. | $153,850.00 |
| 87 | 15-Oct | Polaris Software Lab | $1,032,591.00 |
| 88 | 15-Oct | Real Soft, inc. | $30,960.00 |
| 89 | 15-Oct | SecureWorks, inc. (a.k.a LURHQ) | $24,242.32 |
| 90 | 15-Oct | Trading Technologies International, Inc. | $56,355.00 |
| 91 | 15-Oct | Triple Point Technology, Inc. | $555,581.47 |
| 92 | 15-Oct | Westwater Corp. | $85,167.00 |
| 93 | 15-Oct | Verrazano Consulting Solutions LLC | $111,650.00 |
| 94 | 20-Oct | Hilton New York | $237,019.53 |
| 95 | 20-Oct | Restaurant Associates, one financial center, Boston | $4,631.09 |
| 96 | 20-Oct | Aleph | $11,114.00 |
| 97 | 20-Oct | Cognizant Technology Solutions US Corporations | $241,292.00 |
| 98 | 20-Oct | World Careers Network | $123,540.00 |
| 99 | 20-Oct | Zedak Corp. | $98,000.00 |
| 100 | 20-Oct | Infusion Dev Corporation | $288,500.00 |
| 101 | 20-Oct | FM Brokerage LLC | $69,524.80 |
| 102 | 20-Oct | Jeffeies Execution Services LLC | $212.00 |
| 103 | 20-Oct | MEB Options Inc | $338,803.92 |
| 104 | 20-Oct | Lakeshore Securities, LP | $106,332.65 |
| 105 | 20-Oct | Liquid Point LLC | $726,540.77 |
| 106 | 20-Oct | International Securities Exchange | $1,816,207.49 |
| 107 | 20-Oct | Keane Inc | $127,830.00 |

Highly Confidential

BCI-EX-00077275

| | A | B | C |
|---|---|---|---|
| 108 | 20-Oct | iTech US Inc | $11,900.00 |
| 109 | 20-Oct | Select Minds Inc | $68,250.00 |
| 110 | 20-Oct | New Media Technologies, Inc | $48,720.00 |
| 111 | 20-Oct | Gotham Technology Group | $526,511.08 |
| 112 | 20-Oct | Agilsys NJ, Inc | $625,695.36 |
| 113 | 20-Oct | ICAS corp | $453,838.34 |
| 114 | 20-Oct | Greyware Automation Products | $20,460.00 |
| 115 | 20-Oct | Enterprise Solutions providers | $144,000.00 |
| 116 | 20-Oct | Maslow Media Group | $4,009.75 |
| 117 | 20-Oct | Pebble Beach company | $5,000.00 |
| 118 | 20-Oct | T&M Protection Resources | $1,228,969.13 |
| 119 | 20-Oct | Structure Tone | $1,630,088.50 |
| 120 | 21-Oct | Gensler Architecture, Design & Planning, P.C. / Gensler & Associates/ M. Arthur Gensler Jr. & Associates, Inc. | $222,534.40 |
| 121 | 21-Oct | Secure Access Digital Systems | $14,601.64 |
| 122 | 21-Oct | Fidelity Capital Markets Services | $70,750.53 |
| 123 | 21-Oct | Markit Partners/ LOANX | $7,500.00 |
| 124 | 21-Oct | Boston Options Exchange Group, LLC | $118,584.45 |
| 125 | 21-Oct | BIDS Trading L.P. | $57,848.20 |
| 126 | 21-Oct | Pipeline Trading | $12,595.85 |
| 127 | 21-Oct | Wizcom Corporation | $190,750.00 |
| 128 | 21-Oct | US Information Systems Inc. | $369,242.62 |
| 129 | 21-Oct | SGP International | $127,440.00 |
| 130 | 21-Oct | Global Research Distribution | $558,216.69 |
| 131 | 21-Oct | Charge & Ride | $41,233.26 |
| 132 | 21-Oct | Payreel | $122,305.86 |
| 133 | 21-Oct | Crown Plaza | $88,956.75 |
| 134 | 21-Oct | New Meadowlands Stadium Company | $401,500.00 |
| 135 | 22-Oct | AV Services | $328,665.08 |
| 136 | 22-Oct | AngelPoints, Inc. | $45,547.00 |
| 137 | 22-Oct | Wipro Limited/ Wipro Inc. | $2,352,906.10 |
| 138 | 22-Oct | SOS Security incorporated | $436,295.39 |
| 139 | 22-Oct | Collins Building Services | $1,239,145.15 |
| 140 | 22-Oct | Clune Construction Company | $247,784.00 |
| 141 | 22-Oct | Hanover Moving & Storage | $429,373.37 |
| 142 | 22-Oct | Restaurant Associates | $5,766.02 |

Highly Confidential

BCI-EX-00077276

| | A | B | C |
|---|---|---|---|
| 143 | 22-Oct | Alpha Office Products/Staples | $753,573.67 |
| 144 | 22-Oct | DiscoverReady | $2,199,638.38 |
| 145 | 22-Oct | Advanced Technologies Support Group Inc. | $3,000.00 |
| 146 | 22-Oct | MBG Expense Management LLC | $29,420.00 |
| 147 | 22-Oct | IM2 Consulting | $165,000.00 |
| 148 | 23-Oct | Xcaper Industries LLC | $49,946.38 |
| 149 | 23-Oct | Maze Computer Communications | $19,037.50 |
| 150 | 23-Oct | Trade Settlement Inc. | $76,404.37 |
| 151 | 23-Oct | Northrup Grumman Information Technology, Inc. | $115,796.71 |
| 152 | 23-Oct | HCL Americas, Inc and HCL Technologies, Ltd. | $741,740.00 |
| 153 | 23-Oct | Gartner Inc and Computer Financial Consultants, Inc. | $956,070.00 |
| 154 | 23-Oct | Misys IQ LLC | $401,377.62 |
| 155 | 24-Oct | AFD Contract Furniture Inc. | $240,427.27 |
| 156 | 28-Oct | Aditi Technologies Private Ltd. | $67,500.00 |
| 157 | 28-Oct | Assentis Technologies, Inc. | $93,336.33 |
| 158 | 28-Oct | Bearing Point, Inc. | $232,080.00 |
| 159 | 28-Oct | CRD Capital | $86,500.00 |
| 160 | 28-Oct | Financial Software Systems | $31,500.00 |
| 161 | 28-Oct | Informa Investment Solutions | $341,750.00 |
| 162 | 28-Oct | Q2 Strategies | $60,000.00 |
| 163 | 28-Oct | Ritz Carlton - Central Park South | $7,145.65 |
| 164 | 28-Oct | Standard Register | $1,070,637.05 |
| 165 | 28-Oct | Strategic Systems Solutions | $65,022.00 |
| 166 | 28-Oct | Summit Systems, Inc. | $596,712.50 |
| 167 | 28-Oct | The Structure Consulting Group | $194,947.40 |
| 168 | 28-Oct | Williams Lea | $1,083,576.36 |
| 169 | 28-Oct | D&D Securities | $132,424.85 |
| 170 | 28-Oct | Tullet Liberty Securities Total Now Collins Stewart | $115,809.50 |
| 171 | 28-Oct | Charles River Brokerage | $104,222.73 |
| 172 | 28-Oct | Casey Securities | $353,468.40 |
| 173 | 28-Oct | LinkBrokers Derivatives Corp. | $400,521.00 |
| 174 | 28-Oct | SunGard Securities Finance LLC | $1,518,819.63 |
| 175 | 28-Oct | Equinox | $354,653.00 |
| 176 | 29-Oct | Associated Options, Inc. | $212,290.20 |
| 177 | 29-Oct | Eze Castle Transaction Services | $317,447.78 |
| 178 | 29-Oct | Whitaker Securities | $8,557.25 |

Highly Confidential

| | A | B | C |
|---|---|---|---|
| 179 | 29-Oct | NEOVEST | $13,701.54 |
| 180 | 29-Oct | Wolverine Execution Services, LLC | $20,071.80 |
| 181 | 30-Oct | Mark D. Fitchel | $120,750.00 |
| 182 | 30-Oct | PFPC Trust Co | $38,702.56 |
| 183 | 30-Oct | Jaros Baum & Bolles (JBB) | $134,320.30 |
| 184 | 30-Oct | Cliqbook | $64,565.87 |
| 185 | 31-Oct | AVI / SPL | $54,520.27 |
| 186 | 31-Oct | Sheraton New York Hotel & Towers | $637,905.27 |
| 187 | 31-Oct | Intercontinental Boston | $133,704.24 |
| 188 | 31-Oct | Integron | $632,576.00 |
| 189 | 31-Oct | Donald B. Blaikie & Co.** | $1,140.00 |
| 190 | 31-Oct | Donald B. Blaikie & Co. | $234.00 |
| 191 | 3-Nov | Reliance Globalcom Services, Inc. (YIPES) | $193,269.71 |
| 192 | 3-Nov | M&M Sentinel Glow Inc. | $45,000.00 |
| 193 | 3-Nov | Satyam Computer Services Ltd. | $389,823.00 |
| 194 | 3-Nov | Transaction Network Services, Inc. | $438,946.15 |
| 195 | 3-Nov | SAS Institute, Inc. | $327,712.86 |
| 196 | 3-Nov | Success Factors | $240,208.27 |
| 197 | 3-Nov | EMC Corporation/Business Edge Solutions | $1,053,047.77 |
| 198 | 3-Nov | Sun Microsystems | $40,735.94 |
| 199 | 3-Nov | CDW Direct LLC | $3,539,968.18 |
| 200 | 3-Nov | Carey International | $86,669.00 |
| 201 | 3-Nov | UTOG 2-Way Radio Inc | $64,665.84 |
| 202 | 3-Nov | Restaurant Associate, Chicago | $12,051.28 |
| 203 | 3-Nov | Robert Derector Associates (RDA) | $313,976.19 |
| 204 | 4-Nov | The Markets.Com | $147,612.17 |
| 205 | 4-Nov | Capital Moving & Storage | $36,144.59 |
| 206 | 4-Nov | Rockefeller Center Mgmt Corp | $719,560.18 |
| 207 | 4-Nov | Rockefeller Center Mgmt Corp | $2,420,220.34 |
| 208 | 4-Nov | Capgemini Financial Services USA, Inc. | $1,347,938.00 |
| 209 | 5-Nov | Greenwich Associates | $795,040.00 |
| 210 | 5-Nov | Atlas Van Lines/Nelson westerberg | $227,992.02 |
| 211 | 5-Nov | Henegan Construction co., Inc | $3,281,172.49 |
| 212 | 10-Nov | TRX Data Services | $26,799.00 |
| 213 | 10-Nov | Savvis Communications | $364,363.73 |
| 214 | 10-Nov | Spiral Binding Company, Inc. | $396,286.41 |

Highly Confidential

BCI-EX-00077277

BCI-EX-00077278

| | A | B | C |
|---|---|---|---|
| 215 | 10-Nov | Clayton Fixed Income Services, Inc. | $478,901.79 |
| 216 | 10-Nov | BGC Financial | $5,074,213.08 |
| 217 | 10-Nov | Cushman & Wakefield of CA | $24,976.51 |
| 218 | 12-Nov | Lason | $24,481.69 |
| 219 | 12-Nov | Factset Research Systems | $1,131,827.97 |
| 220 | 12-Nov | Iron Mountain Incorporated | $1,308,416.68 |
| 221 | 12-Nov | Intralinks Inc. | $770,400.00 |
| 222 | 12-Nov | International Data Corp | $531,455.82 |
| 223 | 12-Nov | Corporate Transporation Group | $19,843.79 |
| 224 | 12-Nov | CMS Innovative Consultants | $178,700.66 |
| 225 | 12-Nov | Creative Technology | $4,101.95 |
| 226 | 14-Nov | Intercall | $123,199.12 |
| 227 | 14-Nov | Smartsource/ Rent a PC | $24,070.09 |
| 228 | 14-Nov | Kenneth Heinze | $48,000.00 |
| 229 | 14-Nov | Charles B. Strauss | $50,532.46 |
| 230 | 14-Nov | IBM | $9,037,072.59 |
| 231 | 14-Nov | Intechra LLC | $34,846.13 |
| 232 | 14-Nov | Informatica Corporation | $161,840.00 |
| 233 | 14-Nov | Essential Trading Systems Corporation | $3,034.57 |
| 234 | 14-Nov | Quench of New Jersey | $5,274.02 |
| 235 | 14-Nov | Federal Express | $74,223.56 |
| 236 | 17-Nov | Deutsche Bank Securities Inc. | $804,268.05 |
| 237 | 17-Nov | Huron Consulting Group | $54,009.95 |
| 238 | 17-Nov | Horan Investment Corp.zip | $8,773.40 |
| 239 | 17-Nov | The Lindsey Group | $250,000.00 |
| 240 | 17-Nov | Pitney Bowes | $359,526.08 |
| 241 | 18-Nov | Institutional Investor | $117,776.25 |
| 242 | 18-Nov | Phoenix Partners | $402,027.50 |
| 243 | 19-Nov | NPD Intelect Inc. | $134,387.72 |
| 244 | 19-Nov | NetApp, Inc. | $300,377.64 |
| 245 | 19-Nov | Bright Horizons Children's Centers LLC | $98,620.60 |
| 246 | 20-Nov | Joseph McMurray/ Reynolds channel corp | $15,418.00 |
| 247 | 20-Nov | Michael Stapleton Associates | $133,599.80 |
| 248 | 20-Nov | PEI Systems, Inc. | $706,104.88 |
| 249 | 20-Nov | StreetAccount | $54,588.00 |
| 250 | 21-Nov | Tradeweb (Thomson Financal) | $840,673.85 |

Highly Confidential

BCI-EX-00077279

| | A | B | C |
|---|---|---|---|
| 251 | 21-Nov | CMA Quotevision | $143,684.69 |
| 252 | 21-Nov | Ted Moudis Associates | $185,533.27 |
| 253 | 23-Oct | Swiss Post | $155,976.25 |
| 254 | 23-Oct | Seamless/Web | $252,263.97 |
| 255 | 24-Nov | SumTotal Systems Inc. | $351,563.46 |
| 256 | 24-Nov | Tata Americas International Corporation | $1,820,259.86 |
| 257 | 24-Nov | Cushman & Wakefield | $266,856.09 |
| 258 | 24-Nov | Tishman Speyer | $1,328.57 |
| 259 | 24-Nov | FIX FLYER | $3,700.00 |
| 260 | 24-Nov | CBOE | $470,375.56 |
| 261 | 24-Nov | TJM | $30,315.75 |
| 262 | 24-Nov | Compliance Data Center | $73,936.15 |
| 263 | 26-Nov | A.C. Nielsen | $162,881.78 |
| 264 | 26-Nov | Dun & Bradstreet | $171,556.95 |
| 265 | 26-Nov | CHEEVERS & CO INC | $40,300.56 |
| 266 | 26-Nov | ABS BROKERAGE SERVICES, LLC | $122,240.62 |
| 267 | 26-Nov | MCNAMARA TRADING COMPANY | $46,651.91 |
| 268 | 26-Nov | DROWST TRADING, LLC | $578,824.37 |
| 269 | 1-Dec | Man Securities Now MF GLOBAL SECURITIES, INC. | $41,947.30 |
| 270 | 1-Dec | American Stock Exchange - Standard Billing | $544,916.06 |
| 271 | 1-Dec | CB Richard Ellis | $33,549.00 |
| 272 | 1-Dec | Dow Jones & Company, Inc. | $110,500.00 |
| 273 | 1-Dec | Hamilton | $45,091.90 |
| 274 | 1-Dec | ICE | $240,920.00 |
| 275 | 1-Dec | MarketAxess | $654,171.60 |
| 276 | 2-Dec | Credit Tex | $1,449,692.00 |
| 277 | 2-Dec | Highline Data | $35,000.00 |
| 278 | 2-Dec | NYFIX, Inc | $449,442.97 |
| 279 | 2-Dec | NYFIX Millennium | $62,184.40 |
| 280 | 4-Dec | Options Price Reporting Authority | $107,345.88 |
| 281 | 4-Dec | Gerson Lehman Group Inc. | $255,000.00 |
| 282 | 4-Dec | James Mintz Group | $4,335.00 |
| 283 | 4-Dec | Abovenet Communicaitons Inc | $59,920.00 |
| 284 | 4-Dec | Chicago Mercantile Exchange | $237,064.98 |
| 285 | 4-Dec | ACL Services Ltd. | $18,493.11 |
| 286 | 4-Dec | Relational Security Corporation | $27,440.00 |

Highly Confidential

BCI-EX-00077280

| | A | B | C |
|---|---|---|---|
| 287 | 4-Dec | GL Trade, Inc. | $281,859.35 |
| 288 | 5-Dec | Eastrich No. 167 Corporation | $2,445.29 |
| 289 | 8-Dec | Pyxis Solutions LLC | $49,054.31 |
| 290 | 8-Dec | Tangoe Inc. | $97,500.00 |
| 291 | 8-Dec | IVG Energy Ltd | $65,143.00 |
| 292 | 8-Dec | NYSE Transaction Inc. | $84,509.89 |
| 293 | 8-Dec | ICAP | $6,648,402.50 |
| 294 | 8-Dec | Charles River Development | $76,034.84 |
| 295 | 8-Dec | Choice Natural Gas | $53,089.76 |
| 296 | 8-Dec | FX Alliance LLC | $318,216.30 |
| 297 | 8-Dec | Remate Electronico, s.a. de c.v | $3,074.94 |
| 298 | 8-Dec | Empire Office | $91,397.19 |
| 299 | 8-Dec | Milrose consultants | $66,170.00 |
| 300 | 8-Dec | DPR Construction | $27,486.00 |
| 301 | 11-Dec | Aragon Construction | $80,193.50 |
| 302 | 11-Dec | ENLACE INT S.A. DE C.V. | $180,011.13 |
| 303 | 11-Dec | Instinet | $135,764.67 |
| 304 | 11-Dec | Susquehanna | $1,800,418.26 |
| 305 | 11-Dec | VYAPAR CAPITAL MARKET PARTNERS | $75,300.38 |
| 306 | 11-Dec | Sterling Commerce Inc. | $10,027.23 |
| 307 | 11-Dec | AECSoft USA, Inc. | $39,000.00 |
| 308 | 10-Dec | Intuit | $30,000.00 |
| 309 | 12-Dec | NYSE Market Inc | $2,339,116.15 |
| 310 | 12-Dec | Toronto Stock Exchange | $297,355.67 |
| 311 | 12-Dec | PTR Inc. Total | $35,303.00 |
| 312 | 15-Dec | United Parcel Service | $99,294.73 |
| 313 | 15-Dec | ADP, Inc | $7,001.82 |
| 314 | 15-Dec | 1301 Properties Owner LP | $1,006,986.07 |
| 315 | 15-Dec | Business Integration Group | $59,464.70 |
| 316 | 16-Dec | AVM/II | $15,625.00 |
| 317 | 16-Dec | BAXTER FX | $104,935.40 |
| 318 | 16-Dec | CARL KLIEM | $5,591.83 |
| 319 | 16-Dec | Chapdelaine | $17,566.00 |
| 320 | 16-Dec | Evolution | $13,169.57 |
| 321 | 16-Dec | FLEXTRADE | $211,260.06 |
| 322 | 16-Dec | G.A. Davies & Co. #1 & #2 | $7,920.76 |

Highly Confidential

BCI-EX-00077281

| | A | B | C |
|---|---|---|---|
| 323 | 16-Dec | GA Options/ GA Global Markets | $24,515.00 |
| 324 | 16-Dec | ILS BROKERS LTD. | $48,816.00 |
| 325 | 16-Dec | Landmark | $15,198.50 |
| 326 | 16-Dec | LCMC | $35,670.00 |
| 327 | 16-Dec | Libucki | $10,418.13 |
| 328 | 16-Dec | Liquidity Partners | $2,100.00 |
| 329 | 16-Dec | MBS Energy | $28,227.50 |
| 330 | 16-Dec | Murphy & Durieu | $74,141.25 |
| 331 | 16-Dec | Nova Commodities | $5,600.00 |
| 332 | 16-Dec | NYMEX (All COMEX & NYMEX Activity) | $1,527,695.48 |
| 333 | 16-Dec | Powernext Spot Fees | $28,244.60 |
| 334 | 16-Dec | Rafferty | $70,987.38 |
| 335 | 16-Dec | Sunrise | $263,436.00 |
| 336 | 16-Dec | Syntex | $3,875.00 |
| 337 | 16-Dec | Bourse de Montreal | $19,739.31 |
| 338 | 22-Dec | Tradition | $5,560,368.98 |
| 339 | 22-Dec | TriOptima - Credits | $372,865.00 |
| 340 | 22-Dec | CME | $156,994.28 |
| 341 | 22-Dec | Washington Speakers Bureau | $55,000.00 |
| 342 | 22-Dec | FTSE | $70,800.00 |
| 343 | 22-Dec | Global Coal | $14,100.00 |
| 344 | 22-Dec | Oceanus | $9,055.02 |
| 345 | 22-Dec | Parity Energy | $700.00 |
| 346 | 22-Dec | PMG/ Power Merchant Group | $14,875.00 |
| 347 | 22-Dec | PORTWARE LLC | $54,000.00 |
| 348 | 22-Dec | Tokyo FOREX & UEDA Harlow Ltd. | $311,080.60 |
| 349 | 22-Dec | Frictionless Commerce | $48,768.75 |
| 350 | 22-Dec | Internap Network Service Corp | $171,775.77 |
| 351 | 22-Dec | Fortify Software Inc. | $202,932.08 |
| 352 | 22-Dec | IPC Information Systems | $3,221,477.60 |
| 353 | 22-Dec | DataCert, Inc. | $33,025.00 |
| 354 | 22-Dec | Global Insight | $54,762.31 |
| 355 | 22-Dec | Energy Intelligence group | $4,246.08 |
| 356 | 22-Dec | Ciena Communications | $436,703.40 |
| 357 | 22-Dec | First Derivatives PLC | $137,000.00 |
| 358 | 22-Dec | AT&T | $1,660,628.71 |

Highly Confidential

BCI-EX-00077282

| | A | B | C |
|---|---|---|---|
| 359 | 22-Dec | 4Connections/ Optimum Light Path | $46,010.00 |
| 360 | 22-Dec | CURRENEX | $257,513.00 |
| 361 | 22-Dec | EXANE SA | $175,183.00 |
| 362 | 22-Dec | FX Connect | $97,927.00 |
| 363 | 22-Dec | I-Deal LLC | $398,545.26 |
| 364 | 22-Dec | LEK SECURITIES CORP | $20,434.40 |
| 365 | 22-Dec | VSNL (TATA Communications)/ Fraser stryker law firm | $326,026.23 |
| 366 | 22-Dec | MicroDesign Services/ SS&C Technologies NJ | $23,582.80 |
| 367 | 22-Dec | Cingular Wireless | $1,139,464.95 |
| 368 | 22-Dec | TalkPoint Holdings | $70,225.00 |
| 369 | 22-Dec | Responsive Data Solutions | $52,431.80 |
| 370 | 22-Dec | FAX EXPRESS | $1,022.53 |
| 371 | 22-Dec | TIME WARNER | $7,131.89 |
| 372 | 22-Dec | JABBER INC. | $33,719.57 |
| 373 | 22-Dec | ANIXTER INC. | $6,572.87 |
| 374 | 22-Dec | MERERER NICOLAS | $10,400.00 |
| 375 | 22-Dec | NASTEL TECHNOLOGIES INC. | $52,428.14 |
| 376 | 22-Dec | NETSCOUT SYSTEMS INC | $23,419.82 |
| 377 | 22-Dec | BTIG | $124,884.00 |
| 378 | 22-Dec | GFI | $3,509,688.41 |
| 379 | 22-Dec | Hill Farber | $366,017.51 |
| 380 | 22-Dec | OceanConnect Broker | $5,050.00 |
| 381 | 22-Dec | SSY | $20,104.71 |
| 382 | 22-Dec | WEST POINT DERIVATIVES LTD | $84,951.00 |
| 383 | 22-Dec | Clune Construction Company | $152,276.00 |
| 384 | 22-Dec | Prenax, Inc. | $222,556.39 |
| 385 | 22-Dec | Ginga Sing Petroleum | $2,000.00 |
| 386 | 22-Dec | Link Crude | $5,010.00 |
| 387 | 22-Dec | NASDAQ STOCK MARKET | $1,080,698.62 |
| 388 | 22-Dec | PHOENIX Partners London | $14,810.65 |
| 389 | 22-Dec | PVM Oil | $2,120.00 |
| 390 | 22-Dec | Spectron | $177,018.00 |
| 391 | 22-Dec | Information Builders Inc | $270,036.41 |
| 392 | 22-Dec | ACRONIS, INC | $125,357.00 |
| 393 | 22-Dec | STARCITE INC | $90,000.00 |
| 394 | 22-Dec | GREENLINE FINANCIAL TECHNOLOGIES INC | $65,000.00 |

Highly Confidential

BCI-EX-00077283

| | A | B | C |
|---|---|---|---|
| 395 | 22-Dec | United States Golf Association | $57,500.00 |
| 396 | 22-Dec | POWERLYTIX, LLC | $20,000.00 |
| 397 | 22-Dec | LANCOPE INC | $6,091.53 |
| 398 | 22-Dec | SCHOLES ELECTRIC & COMMUNICATION | $1,200.00 |
| 399 | 22-Dec | EXCEL MEDIA SYSTEM INC | $515.00 |
| 400 | 22-Dec | CITY NETWORKS INC | $242.68 |
| 401 | 22-Dec | Edgar | $6,000.00 |
| 402 | 23-Dec | William O'Neill | $30,176.00 |
| 403 | 23-Dec | Hewlett Packard | $1,234,148.68 |
| 404 | 23-Dec | Bell South | $18,349.13 |
| 405 | 23-Dec | AKF Engineers | $63,733.67 |
| 406 | 23-Dec | (SunGard) Wall Street Concepts LLC | $16,716.53 |
| 407 | 23-Dec | SunGard Reference Data Solutions, Inc. | $68,684.47 |
| 408 | 23-Dec | (SunGard) Automated Securities Clearance LLC (Protegent) | $28,743.75 |
| | | (SunGard) Automated Securities Clearance LLC | $418,359.20 |
| 409 | 23-Dec | (Brass) | $35,908.63 |
| 410 | 23-Dec | (SunGard) MicroHedge LLC | |
| 411 | 23-Dec | Sungard Investment Systems LLC | $17,466.89 |
| 412 | 23-Dec | SunGard Institutional Brokerage, Inc | $147,081.63 |
| 413 | 23-Dec | SunGard Availability Services LP | $112,695.00 |
| 414 | 23-Dec | SP 190 South LaSalle, L.P. | $60,072.44 |
| 415 | 23-Dec | Advantage Human Resourcing | $377,418.42 |
| 416 | 30-Dec | Advantage Data | $47,143.13 |
| 417 | 30-Dec | McLarty Associates  (AKA  Kissinger McLarty Associates) | $45,652.17 |
| 418 | 30-Dec | Strategic Insight | $70,443.75 |
| 419 | 30-Dec | Mainstar Software | $21,000.00 |
| 420 | 30-Dec | ILOG | $42,729.02 |
| 421 | 30-Dec | Avaya Inc. | $759,781.65 |
| 422 | 30-Dec | Rockefeller Center Mgmt Corp | $463,908.90 |
| 423 | 30-Dec | Rockefeller Center Mgmt Corp | $1,048,166.62 |

Highly Confidential

BCI-EX-00077284

| | A | B | C |
|---|---|---|---|
| 424 | 30-Dec | Cushman $ Wakefield | $285,712.60 |
| 425 | 30-Dec | Merrill Communications | $74,992.24 |
| 426 | 31-Dec | Thomson Reuters | $8,048,005.21 |
| 427 | 31-Dec | MCAFEE Inc | $48,000.00 |
| 428 | 31-Dec | Admit One | $15,620.00 |
| 429 | 31-Dec | Aperture Technologies | $66,243.70 |
| 430 | 31-Dec | Intex Solutions | $147,496.00 |
| 431 | 31-Dec | Premiere Global Service | $1,665.26 |
| 432 | 31-Dec | Total Fire Protection | $2,745.80 |
| 433 | 2-Jan | NYSE - Wombat | $154,900.00 |
| 434 | 2-Jan | Precision Engraving Company | $50,028.62 |
| 435 | 5-Jan | Moody's | $2,550,000.00 |
| 436 | 5-Jan | Fimat now Newedge | $2,889,435.44 |
| 437 | 6-Jan | Eurest/ Compass Group | $19,578.56 |
| 438 | 7-Jan | CGI North America | $266,558.80 |
| 439 | 8-Jan | CENTER FOR RESEARCH IN SECURITY PRICES | $2,500.00 |
| 440 | 9-Jan | Dresdner Kleinwort Services LLC (WPGH) | $35,821.24 |
| 441 | 9-Jan | IBM Corporation | $116,069.84 |
| 442 | 9-Jan | Quality Technology Services | $19,505.80 |
| 443 | 12-Jan | Lexis Nexis | $273,446.74 |
| 444 | 12-Jan | Canacord Adams | $25,000.00 |
| 445 | 13-Jan | Big Fix | $286,875.00 |
| 446 | 13-Jan | Mergermarket | $13,275.94 |
| 447 | 13-Jan | JEFFERIES & COMPANY, INC. | $61,609.00 |
| 448 | 13-Jan | Chicago Stock Exchange (Midwest Transaction Fees) | $90,687.92 |
| 449 | 13-Jan | Reuters (Brokerage) | $435,351.46 |
| 450 | 13-Jan | SCS Energy | $34,214.50 |
| 451 | 14-Jan | IMS Health | $22,250.00 |
| 452 | 14-Jan | Jasna Polana | $2,599.60 |
| 453 | 14-Jan | Riviera Country Club | $10,090.38 |
| 454 | 14-Jan | Frank Russell Company | $246,635.00 |
| 455 | 15-Jan | Factiva | $211,076.00 |
| 456 | 15-Jan | Private Raise/ Dealflow Media Inc. | $20,000.00 |
| 457 | 15-Jan | RCN New York Communications LLC | $150,626.41 |
| 458 | 15-Jan | RR Donnelley | $150,000.00 |
| 459 | 15-Jan | Arcot Systems | $118,000.00 |

Highly Confidential

BCI-EX-00077285

| | A | B | C |
|---|---|---|---|
| 460 | 16-Jan | Duetche Boarse | $188,829.19 |
| 461 | 16-Jan | FINRA - ACT | $819,198.95 |
| 462 | 27-Jan | Man Capital | $132,002.38 |
| 463 | 27-Jan | Scotts Flowers | $10,579.11 |
| 464 | 27-Jan | Price Waterhouse Coopers | $75,000.00 |
| 465 | 27-Jan | Bloomberg | $704,770.52 |
| 466 | 27-Jan | Cyveillance | $95,000.00 |
| 467 | 27-Jan | Ramsey Quantitative Systems, Inc. | $85,292.50 |
| 468 | 27-Jan | Lewtan | $57,709.69 |
| 469 | 27-Jan | Clearcorp | $10,113.00 |
| 470 | 27-Jan | Bloomberg | $10,907,678.47 |
| 471 | 30-Jan | Translux | $3,398.79 |
| 472 | 30-Jan | Interactive Data Corp | $599,700.15 |
| 473 | 3-Feb | Dimension Data | $139,762.50 |
| 474 | 5-Feb | WebEx | $78,575.00 |
| 475 | 5-Feb | Wall Street on Demand | $130,000.00 |
| 476 | 9-Feb | Investor Tools Inc. | $10,156.00 |
| 477 | 17-Feb | OC Tanner | $118,196.65 |
| 478 | 18-Feb | Mark Monitor | $37,742.50 |
| 479 | 19-Feb | MSCI Barra | $267,537.64 |
| 480 | 20-Feb | Align Communications | $30,800.00 |
| 481 | 19-Feb | MCI | $1,524,811.70 |
| 482 | 19-Feb | Verizon - Sonet | $316,264.25 |
| 483 | 3-Mar | Dealogic | $274,733.84 |
| 484 | 3-Mar | Wall Street Source | $9,591.04 |
| 485 | 3-Mar | Hotspot | $87,753.17 |
| 486 | 3-Mar | Bank of America Securities | $3,500.00 |
| 487 | 3-Mar | Totan Capital | $350,078.81 |
| 488 | 3-Mar | Whittaker & Garnier, Inc. d/b/a Pertrac Financial Solutions | $39,467.00 |
| 489 | 3-Mar | IKON Financial Services | $246,918.52 |
| 490 | 3-Mar | M&M Technologies | $33,750.00 |
| 491 | 3-Mar | M&M Sentinel Glow | $11,000.00 |
| 492 | 3-Mar | QTS | $21,924.60 |
| 493 | 4-Mar | verizon-wireless/ Cellco Partnership | $475,314.95 |
| 494 | 25-Mar | Sprint | $655,329.95 |
| 495 | 25-Mar | Tullett Preborn | $4,013,074.03 |

Highly Confidential

| | A | B | C |
|---|---|---|---|
| 496 | 30-Mar | Standard & Poor's | $1,691,018.34 |
| 497 | 6-Apr | HWA 555 Owners, LLC/ Lehman Brother Inc. | $1,200,000.00 |
| 498 | 10-Apr | Level3 -ICG | $10,798.34 |
| 499 | 13-Apr | Interactive Data Corp | $21,467.30 |
| 500 | 23-Apr | NYSE | $478,499.83 |
| 501 | 29-Apr | Bloomberg Finance LP | $16,835.97 |
| 502 | 11-May | LAVA | $296,431.00 |
| 503 | 12-May | IBM Corporation | $124,568.23 |
| 504 | 20-May | Constellation Place, LLC | $49,206.61 |
| 505 | 29-May | BT Americas | $1,020,131.78 |
| 506 | 29-May | Radianz | $404,656.00 |
| 507 | 30-May | Credit Suisse | $7,045.44 |
| 508 | 1-Jun | Factiva | $33,867.18 |
| 509 | 10-Jun | Cisco | $14,855,575.00 |
| 510 | Total | | $238,200,978.91 |

Highly Confidential

BCI-EX-00077286

# BCI EXHIBIT

# 172


**BARCLAYS
CAPITAL**

200 Park Avenue
New York, NY 10166
USA

Tel    +1 (212) 412 4000

July 27, 2009

Mr. James B. Kobak
Hughes Hubbard & Reed
One Battery Park Plaza
New York, New York 1004-1482

Dear Jim,

I write in response to your letter of July 9, 2009, and to the attachment which seeks a
wide variety of information from Barclays.

You state in your letter that at our meeting on June 12, 2009, you explained that Barclays
should "provide to the Trustee the information necessary to determine the merits of
Barclays' claims." What your letter omits, however, is that at the same June 12 meeting,
we expressed our ongoing consternation that the Trustee believes it needs any additional
information to determine the merits of Barclays' contractual claims, given the
unequivocal, plain meaning of the contractual language that entitles Barclays to the assets
it seeks. As we have stated in detailed letters to you dating back to December of last
year, there is no plausible basis for the Trustee's ongoing refusal to acknowledge
Barclays' entitlement to receive (1) the clearance box securities promised to Barclays in §
1(a)(ii)(B) of the Clarification Letter, (2) the $769 million in securities promised to
Barclays in § 8(ii) of the Clarification Letter, (3) the OCC margin deposits described in §
1(a)(ii) of the Transfer and Assumption Agreement (and § 1(a)(ii)(C) of the Clarification
Letter), and (4) the balances for all exchange-traded derivative positions held in foreign
accounts in accordance with § 1(a)(ii)(C) of the Clarification Letter. During the June 12
meeting, you did not explain how the information you seek could change the plain
meaning of the foregoing contractual language. In addition, of course, Barclays
continues to seek over $1.3 billion belonging to the PIM customers who were transferred
to Barclays, which the Trustee agrees is owed but has nonetheless failed to transfer.

You also suggest in your letter that many of the information requests you attached to your
letter were requested at the June 12 meeting, or were previously requested. That is not
correct. Most of the information requests attached to your letter were not mentioned at
the June 12 meeting, and have not been previously requested. As you recall, we left the
June 12 meeting in order to consider whether to provide the information requested

1

relating to the clearance box securities, notwithstanding your statement during the meeting that the Trustee refused to acknowledge Barclays' entitlement to any of the undelivered assets referenced above – in contravention of the plain language of the purchase contract.

In any event, while we strongly disagree that the Trustee needs additional information to determine the merits of Barclays' claims, Barclays is already in the process of gathering much of the information you request for production in response to the document requests attached to LBHI's 2004 motion. As you know, that production will also be produced to you (and to the Creditors' Committee and the Examiner). In addition, Barclays will work with you to provide additional information in a reasonable and appropriate manner, subject to our ongoing objection that the requested production is overly broad and unduly burdensome, and is not necessary to determine Barclays' claims. We attach our specific responses to what we propose to provide on each of your various requests, which we look forward to discussing with you after you have reviewed it.

As stated above, we do not believe the information requested is necessary to determine that the plain text of the relevant contractual provisions entitles Barclays to the receipt of assets that have not been transferred. While your July 9 letter states that the Trustee has offered to provide a "formal determination of Barclays' claims" within 45 days of his receipt of the requested information, there is no basis for requiring that amount of time to acknowledge the plain text of the purchase contract. We also remind you that during our June 12 meeting, you agreed that the Trustee's 45 day offer was not a request that Barclays refrain from seeking judicial relief during that or any other time frame, and therefore reserve our rights to do so at any time.

We look forward to discussing this with you further, and to working toward a final, favorable, and prompt resolution of Barclays' claims under the acquisition agreements.


Yours sincerely,


Jonathan Hughes
Global General Counsel


Enclosure


2

# BCI EXHIBIT

# 173



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

James B. Kobak Jr
Direct Dial: 212-837-6757
kobak@hugheshubbard.com

July 30, 2009

Jonathan Hughes, Esq.
Barclays Capital
200 Park Avenue
New York, NY 10016

Re:    LBI: The Barclays Acquisition

Dear Jonathan:

This is in response to your letter dated July 27, 2009.

We continue to work towards transferring to Barclays the $1.3 billion that you seek for the PIM customers who were transferred to Barclays. As you know, we recently transferred over $200 million that had been held up at Chase and are pursuing other funds located at Chase or other depositories.

We, too, would like to resolve issues concerning the Barclays acquisition in order to add clarity with respect to the ability to satisfy customer and other claims and believe it is in everybody's interest for Barclays to provide us with the information we request as soon as possible. We welcome your offer of a meeting or meetings with the appropriate former employees involved in the preparation of Schedule B and with the people knowledgeable about Exhibits A and B, and ask that you please provide availability as soon as possible.

We also welcome your offer to schedule an interview with the relevant executives who have monitored the foreign accounts that are the basis for Barclays' claim that LBI owes Barclays $1 billion in security for foreign exchange traded derivatives. Please advise us of availability as soon as possible.

We would have preferred direct and immediate responses to the information we requested, instead of your referring us to Barclays' production in response to LBHI's 2004 motion. Nevertheless, we will work with the information provided in whatever form and at whatever pace you choose to provide it.

I must note that we need some of the information we have requested because we strongly disagree that the "unequivocal, plain meaning of the contractual language" supports Barclays' claims. Rather, we think that the language, both on its face and in the context in which

Jonathan Hughes

it was drafted and explained to the Court and regulators, as well as ourselves, plainly supports the Trustee's position and it behooves Barclays to show us this is not so. By way of example, Barclay's right to the securities in the 15c3-3 exists only to "the extent permitted by applicable law" and clearly was not intended to permit a transfer that would violate SEC and SIPA customer protection requirements -- as we know it would, at least at this point. The clearance boxes were expressly made "Excluded Assets" by the controlling agreement between all three parties with an interest in the matter. There is no warrant whatever, in the language of the clarification letter or the circumstances, for claiming a right to cash held at any exchanges.

These are just examples. There are other arguments, textual and otherwise, relevant to your interpretation of the clarification letter and the extent to which they can be given effect. I do not mean to rehearse them all here. Suffice it to say that the information we seek is necessary for a thorough evaluation of the competing interpretations, let alone to justify any possible resolution from the point of view of other interested parties.

I must also note, along the same lines, that Barclays should not limit its production in response to the LBHI 2004 discovery requests. The Court ordered Barclays to respond to those requests. Barclays is responsible for complying fully with that Order and we do not accept that Barclays may object to such compliance. We do not need to retread the ground covered by Hamish Hume and Robert Gaffey in their email exchanges dated July 16 and 17 (copy attached). Suffice it to say that the Trustee does not and will not agree to any non-compliance by Barclays with the Court's Order. Moreover, a failure by Barclays to comply with that Order will be of particular concern to us if it involves any documents about the Barclays acquisition or the subject of our dispute.

Your specific responses raise certain additional specific concerns as follows:

1.     Barclays states that it is producing emails for certain key negotiators. LBHI's 2004 requests are not limited to emails, nor are they limited to the persons Barclays has identified as its key negotiators. For example, we want to see the package that Barclays provided to its Board members in seeking their approval of the acquisition, and following the closing of the acquisition, and the economic "scorecard" or deal points that any Barclays personnel used to track the economics of the acquisition. These and other responsive documents should be produced whether or not they are included in the emails that you are proposing to produce.

2.     We asked that you provide us with any evidence of what the parties intended in the event that the excess in the 15c3-3 account was less than $769 million. Barclays points to the text of the Clarification letter to support its position that it is entitled to $769 million without regard to whether there is any excess in the account or its amount. As you know, we read the Clarification letter differently. That is why we asked you to substantiate your claim that the parties' bargained that Barclays would receive $769 million regardless of whether it was legally permissible to withdraw such amounts from the 15c3-3 reserve account. If you have any such evidence, we ask that you provide it. Otherwise, we will infer that Barclays has no such evidence.

Jonathan Hughes                                                                                              3

     3.    We similarly asked for any evidence to support Barclays' position that the parties intended it to receive --

        a.    $900 million in OCC margin deposit in excess of what was required to close out open positions (request 4b); and

        b.    $1 billion of cash for foreign exchange traded derivatives (request 5b).

     Again, we understand, but do not share, your view of the effect of the contractual text, and ask that you provide any evidence of the parties' intent other than the disputed agreements. Again, if you provide no evidence to support your position, we shall infer that Barclays has none.

     4.    Our reference to "other accounts" in Request 3d is simply to any other proprietary LBI account or source of funds. If Barclays learned that LBI had excess cash or assets in any such account, please respond to 3d.

                    Very truly yours,

                    James B. Kobak, Jr.

**Cave, Sarah L.**

| | |
|---|---|
| **From:** | Hamish Hume [hhume@BSFLLP.com] |
| **Sent:** | Friday, July 17, 2009 7:30 PM |
| **To:** | Robert W Gaffey |
| **Cc:** | Cave, Sarah L.; Christopher Green; Eric Kay; James Tecce; Jack G. Stern; Kobak, James B.; lbarefoot@cgsh.com; lgranfield@cgsh.com; Byman, Robert L; William J Hine |
| **Subject:** | RE: Barclays written responses to LBHI document requests |

Bob -

As discussed in our call earlier today regarding your e mail below, I think we have answers to the points you raise below which hopefully diminish any concern you may have. I will try to summarize those answers here as we discussed, but as we proceed we can of course at any time address these in more detail.

1. Our responses are intended to ensure that we have preserved our objections, because many of your responses are very broad. I believe that a production which satisfies your needs will be possible without your having to insist upon a response to the full breadth and scope of your requests, but I do believe we should preserve your objections in case, down the road, we reach a disagreement on appropriate scope. From our prior discussions and our discussion again today, I do not believe we have reached any such disagreement. Also, the reason we served our response on July 15 was because the Court's Order of June 25 provided that we should respond to your document requests 20 days from the date of that Order (i.e., July 15).

2. I understand you believe we have no right to object. We disagree. Hopefully, that disagreement will be academic as we work together to make a production that we believe is appropriate in light of the Court's Order, and that you believe is at least sufficient for your purposes.

3. The cut-off dates in our response were not intended to suggest that you have agreed to any cut-offs or waived any rights in that regard.

4. As discussed, the September 15 cut offs in our first three responses were not intended to suggest that we were not producing e mails from those custodians through September 30, but were based upon the mistaken reading of your requests as themselves having a cut off of September 15. Please read the references to September 15 in those responses as revised to state September 30.

5. Regarding the September 30 cut off, as we discussed, this is simply an attempt to make an initial production of the e mails most relevant to the transaction and the negotiations as promptly as possible. We believe the vast majority of what you are looking for is likely found in the September 15 - 22 time frame, and are trying to ensure that we produce for September first, given the time pressure we are under in producing documents to you in time for the depositions you have noticed. We are gathering e mails for the same custodians for after September 30, and will try to formulate search terms that may allow for a more efficient gathering of potentially relevant e mails from after September 30.

6. We will be producing written employment agreements for the listed former Lehman executives, and will be looking for the additional ones we outlined in response to request 8. In terms of negotiation e mails, we will search through September 30, and discuss additional searches with you.

7. We will await your comments and any questions on the aggregate compensation data that has been provided, and did not mean to suggest any fixed agreement had been reached on your necessarily being limited solely to that data.

8. As discussed, we will look into what may be possible to produce in response to Request 12, including the possibility of producing some form of high level back-up information to the February 2009 accounting gain that was reported.

9. Our response was not suggesting any fixed agreement of yours on the custodians we are searching. We believe the Barclays custodians we are searching are the employees who were most directly involved in negotiating and evaluating the transaction.

10. We discussed our response to Request 19 earlier today as we have previously. I am continuing to work on locating the correct data. I should be able to provide you an update next week.

11. As discussed, we will be looking for responsive non e mail documents as well e mail documents.

12. As discussed, we have confirmed deposition dates of July 31 for Eric Felder, August 6 for Steve Berkenfeld, August 7 for Alastair Blackwell, August 10 for Skip McGhee, and August 14 for Paulo Tonucci (in London). We also discussed other potential dates with you, including trying to schedule Ian Lowitt and Martin Kelly for the week of August 17. We hope to have more dates next week, as well as confirmation from you whether the foregoing can be confirmed.

Thank you,

Hamish

-----Original Message-----
From: Robert W Gaffey [mailto:rwgaffey@JonesDay.com]
Sent: Thursday, July 16, 2009 5:45 PM
To: Hamish Hume
Cc: cave@hugheshubbard.com; Christopher Green; Eric Kay; James Tecce; Jack G. Stern; kobak@hugheshubbard.com; lbarefoot@cgsh.com; lgranfield@cgsh.com; Byman, Robert L; William J Hine
Subject: Re: Barclays written responses to LBHI document requests

Dear Hamish

I have reviewed Barclays response to LBHI's document requests and have a few comments. This is not meant to be exhaustive.

1. As a general matter, I note the statements in your email that "these responses are not intended to be absolute or to convey anything different from what has been discussed in our teleconferences" and you "intend to continue to work with [us] to ensure that a proper production is made." Given those statements, I am not entirely sure what your purpose is in serving these belated "objections" because they are not consistent with

2

those statements in your cover e mail. If Barclays production is being
guided by the objections you have sent, its production will neither be
consistent with "what has been discussed" in our conferences nor a "proper
production." If Barclays production is not being guided by the parameters
set out in your Response, and they are merely for record making purposes,
please confirm that is the case. In this regard, we note that you waited
until after the July 15 omnibus hearing to serve your objections, when we
otherwise would have reported to the Court about issues we were not able to
resolve. If we cannot resolve these issues now, it is our intention to ask
the Court to see us its early convenience, not to wait for the next omnibus
hearing.

2. Even if your Response has been sent for record making purposes, we
believe it is ineffective. Barclays has no right at this point to
"preserve objections." Barclays had ample opportunity to outline its
objections and, indeed, did so when it opposed LBHI's Rule 2004 motion.
Rejecting those objections, the Court ordered Barclays to comply with our
document requests. Judge Peck's order is unambiguous. While we have
endeavored to address burden and similar practical issues with you in a
cooperative manner since the order was entered, and will continue to do so,
we do not accept that Barclays can now object again, after the Court has
rejected Barclays' objections and ordered compliance.

3. Peppered throughout your document is the suggestion that we have
agreed to cut off Barclays obligation to search for documents after
certain dates. We have not made that agreement. We have agreed that some
date cut offs were OK for production in the first instance, but understood
when you repeatedly have spoken about a rolling production that Barclays
would follow up beyond those initial dates.

4. In some cases you have inserted cut off dates to which we did not, and
would not, agree even for a first stage production. We never agreed to a
September 15 cut off date for Requests 1, 2 or 3. We have not discussed
such a cut off date. You have not previously proposed such a cut off date.
Quite obviously, we would never have agreed to such a cut off date
concerning negotiations which we all know continued after September 15.
Barclays unilateral choice of this cut off date (especially when Requests 1
and 2 already have a September 30 cut off date by their terms) leads us to
have some degree of scepticism about its real reason for inserting such a
date in its "objections" now. Clearly, requests such as numbers 1 and 2,
which call for documents about the negotiations of the deal at issue, which
closed September 22 and required adjustment activities after that date,
cannot be cut off for any good reason at September 15. As for Request
number 3, which calls for due diligence documents, there is no need for a
date cut off. One would suspect that most responsive documents pre-date
the deal, so if there are some that post date it, they will not appreciably
add to your search burden. Certainly, cutting off due diligence issues at
September 15 has no rational basis.

5. Similarly, we did not agree to a final and systemic cut off date of
September 30 for Request Nos. 5, 6, 10, 11, 16, or 17. As to some, but not
all, of them we said we would accept an approach in which your first round

3

searches might be limited to that period in order to get production going, and subject to further discussion after we saw Barclays initial production. For example, a September 30 cut off might ultimately make sense with regard to Request number 5, which addresses the financial schedule dated September 16, 2008. But it is not likely to make sense with regard to requests such as number 6, which addresses, among other things, the values Barclays assigned to the Assumed Liabilities on or after the date the transaction closed. And it certainly could not apply to requests such as number 16, which concerns values Barclays attributed to the Purchased Assets after the transaction closed. For example, this request would include documents regarding the earnings statement Barclays released in early 2009, which announced a $4.2 million gain on the acquisition of the Lehman assets resulting from "the excess of the fair value of net assets acquired over [the] consideration paid." We would harbor grave doubts if Barclays were to contend there are no responsive documents about that point which post date September 30.

6.  We did not agree to a September 21 cut off for Request numbers 8 and 9, which call for information about compensation offers to and agreements with former Lehman employees. Again, we would understand if most documents fall within the time period you identify, given the nature of the request, and we will take a look at those documents in the first instance, but we did not agree to this date cut off.

7.  To the extent your response to Request number 8 is meant to suggest that we agreed to accept only aggregate data of Barclays choosing, it is not accurate. We agreed to look at aggregate data in the first instance and determine if we need more detail than you provide. We did agree that we do not need production of every single written employment agreement, because you told us this could cover several lower tiers of employees and might involved thousands of agreements, but we did need to see the employment agreements of the persons you listed, and persons who were similarly situated to, and received similar agreements as those listed in your response (a fact that, at this point, only Barclays could know).

8. Barclays apparent refusal to produce anything in response to Request number 12 is a violation of Judge Peck's order. We will require compliance or we will seek appropriate relief.

9. I believe you also have overstated our agreement regarding the custodians whose files Barclays must search. We have not agreed that the people listed in your response to Request Number 1 are all whose must be searched. These are the people whose files you told us Barclays would be searching in the first instance. Again we agreed that this was acceptable for the first stage of a rolling production. And given your incorporation of that list in your objection to Request Nos. 2, 3, 4, 5, 6, 9, 16, the problem with that limitation runs across the board. In addition, given the way you have phrased this limitation, we have reason for concern. For example, in your objection to Request number 4, you have agreed to search the e mails of Cleary Gottlieb and Sullivan & Cromwell personnel who were "involved in the negotiation, drafting, execution and implementation of the Lehman-Barclays Transaction documents" but, with regard to the actual

4

Barclays personnel whose files you will search, you refer only to the names listed in response number 1, with no description. Is that a complete list of all Barclays personnel "involved in the negotiation, drafting, execution and implementation of the Lehman-Barclays Transaction documents"? If it is not, why would the search be limited to those custodians? We have been willing, as you know, to talk about a mechanism to reduce the number of custodians you have to search. But we would not agree to an arbitrary list which may omit important potential witnesses.

10. You response to Request number 19 is, to say the least, a bit vague. Are you producing the valuation documents it requests?

11. Each one of your responses speaks only in terms of searching "email." We have not agreed to such a limitation. If there are responsive hard copy documents (or documents in electronic form that were not in "email") they must be produced. By way of example only, if there were board packages prepared about the transaction distributed in paper form, they should be produced. Similarly, and also by way of example only, if employment offers or draft employment agreements were (as we have reason to believe some of them were) delivered by hand rather than via email, they would need to be produced, too.

12. Finally, as I said in the voice mail I left for you earlier, I had in my calendar that we were going to talk today so you could suggest alternative deposition dates for the witnesses listed in our notice. So all involved can coordinate their calendars, we need to agree on alternative dates very soon, or to go ahead on the noticed schedule.

Regards,

Bob

Robert W. Gaffey
JONES DAY
222 East 41st Street
New York, New York 10017
(212) 326-7838 (direct)
(914) 391-5927 (cell)
(212) 755-7306 (fax)
rwgaffey@jonesday.com


Hamish Hume
<hhume@BSFLLP.com
>                           To
        "rwgaffey@jonesday.com"
        <rwgaffey@jonesday.com>, William J
07/15/2009 06:42      Hine <wjhine@JonesDay.com>
PM                           cc
        "cave@hugheshubbard.com"
        <cave@hugheshubbard.com>,

5

Christopher Green
<Cgreen@BSFLLP.com>, James Tecce
<jamestecce@quinnemanuel.com>,
"Jack G. Stern"
<jstern@bsfllp.com>,
"kobak@hugheshubbard.com"
<kobak@hugheshubbard.com>,
"lbarefoot@cgsh.com"
<lbarefoot@cgsh.com>,
"lgranfield@cgsh.com"
<lgranfield@cgsh.com>, "Byman,
Robert L" <RByman@jenner.com>, Eric
Kay <erickay@quinnemanuel.com>
                    Subject
Barclays written responses to LBHI
document requests

Bob and Bill -

Attached please find written responses from Barclays to the LBHI document
requests. In addition to preserving certain objections as to scope, this
should also serve to provide everyone with the list of custodians whose e
mails we are currently gathering and reviewing for production in response
to various requests, which was requested during our last meet and confer
teleconference. I should also state that these responses are not intended
to be absolute or to convey anything different from what has been discussed
in our teleconferences, and that we intend to continue to work with you to
ensure that a proper production is made.

We expect to be producing additional information later this week and next.

Thank you,

Hamish

Hamish PM Hume
Boies, Schiller & Flexner
5301 Wisconsin Avenue, NW
Washington DC 20015
(202) 274 1149 (w)

6

(703) 328 9651 (cell)
hhume@bsfllp.com

IRS Circular 230 disclosure:
To ensure compliance with requirements imposed by the IRS, unless we
expressly state otherwise, we inform you that any U.S. federal tax advice
contained in this communication (including any attachments) is not intended
or written to be used, and cannot be used, for the purpose of (i) avoiding
penalties under the Internal Revenue Code or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.

The information contained in this electronic message is confidential
information intended only for the use of the named recipient(s) and may
contain information that, among other protections, is the subject of
attorney-client privilege, attorney work product or exempt from disclosure
under applicable law. If the reader of this electronic message is not the
named recipient, or the employee or agent responsible to deliver it to the
named recipient, you are hereby notified that any dissemination,
distribution, copying or other use of this communication is strictly
prohibited and no privilege is waived. If you have received this
communication in error, please immediately notify the sender by replying to
this electronic message and then deleting this electronic message from your
computer. [v.1](See attached file: DOC071509.pdf)

==========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other privilege.
If you received this e-mail in error, please delete it from your system
without copying it and notify sender by reply e-mail, so that our records
can be corrected.
==========

The information contained in this electronic message is confidential information intended only for the
use of the named recipient(s) and may contain information that, among other protections, is the
subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable
law. If the reader of this electronic message is not the named recipient, or the employee or agent
responsible to deliver it to the named recipient, you are hereby notified that any dissemination,
distribution, copying or other use of this communication is strictly prohibited and no privilege is
waived. If you have received this communication in error, please immediately notify the sender by
replying to this electronic message and then deleting this electronic message from your computer.
[v.1]